```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                        SOUTHERN DIVISION
 2
   ------------------------x
 3 UNITED STATES OF AMERICA  :
             Plaintiff       :
 4                           :
                             :
 5 vs                        :Criminal Action:    RWT-04-0235
                             :
 6                           :
   PAULETTE MARTIN, et al    :
 7          Defendants.      :
   ------------------------x
 8

 9                          Tuesday, June  13, 2006
                            Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11 Proceeding before the HONORABLE ROGER W. TITUS, United
   States District Judge, in courtroom 4C, commencing at
12 10:08 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS THE TESTIMONY AND PROCEEDINGS
15      OF THE CASE AS RECORDED   AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR              (301) 344-3912
25 Official Court Reporter
```

1                          I N D E X

2
                                  DIRECT      CROSS    REDIRECT   RECROSS
3  Christopher   Sakala   98

4  Juan  Encarnacion      128         121       207        210

5  Doug Malarkey          211

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                                   Page

23  Reporter's Certificate                           223

24  Concordance                                      224

25

1        THE COURT:  Mr. Sussman I understand your client

2 is in traffic.

3        MR. SUSSMAN:  That's correct.  She left a

4 message -- she called and I spoke to her.  She

5 apparently is on 495.

6        THE COURT:  I just arrived here myself.  I just

7 saw my orthopedic surgeon and, yes, the beltway is a

8 little messed up.

9        You're waiving her presence?

10       MR. SUSSMAN:  Yes.

11       THE COURT:  We will confirm that with her when

12 she gets her.

13       MS. GREENBERG:  One brief thing.  I know the

14 court is waiting on our jury instructions.  I spoke

15 with Mr. Montemarano -- he has the proxy of all

16 counsel, and I did speak with Mr. Mitchell who was at

17 our office briefly there about ten jury instructions.

18 Mr. Montemarano is going to revisit it with defense

19 counsel.  He's going to let me know Friday, and I

20 should have something to your chambers late Monday or

21 early Tuesday what is agreed upon and what is disagreed

22 upon.

23       MR. MONTEMARANO:  The disagreements are not

24 going to change.  So, if you want us to get that list

25 to you earlier --

1          THE COURT:   The sooner the better so I can
2  start working on it.

3          Counsel, some preliminary matters.  Last week we
4  started a little late because Mr. Montemarano  forgot
5  his coat, and I wanted to advise you that I too had an
6  experience like that in this courthouse.  Some of you
7  may know that Judge Day and I meet in the marshals'
8  exercise room every day at about 7:00; and one time
9  about ten months ago or a year ago, I came here having
10 brought my beautiful, blue pinstriped suit with me and
11 hung it in the bathroom while I exercised and reached
12 for it and discovered, much to my chagrin, that the
13 pants were not with it.  That having happened, I
14 concluded that this would never happen again.  So, I
15 have in my chambers a complete change of clothing.  I
16 mean, I have a jacket, pants, shirt, underwear, socks,
17 shoes and so forth.  So, the clothing excuse will no
18 longer work for the male attorneys in this case, unless
19 you're bigger than me, and Mr. Ward may be in that
20 category --

21         MR. WARD:   Thank you, Your Honor.  I appreciate
22 that.

23         THE COURT:  --  I will loan you my -- any part --
24 any article of clothing you need to be able to function
25 in your role as attorneys.  I'm sorry I cannot do the

1 same for the government , but I'm partial to the male

2 attorney s on that one . So if you are miss ing anything

3 -- I've even suppli ed one of the marshal s with a belt

4 because they know I have everything . So if you forget

5 something , don't turn around . Just come here . You may

6 be a little bit baggy in it , but that excuse is gone .

7        I have before me a lotion motion in limine by

8 Paulette Martin . I have review ed that and considered

9 it , and I have just sign ed off on my edit s to an

10 opinion and order which I will be filing within an hour

11 that denies it . So you can proceed on the basis that

12 it's been deni ed .

13        We will conclude today at 4:30 p.m. because I

14 have a meeting of our district court 's local rule s and

15 form s committee . Tomorrow we will start at 9:30 . I

16 will start at 10:00 on Thursday and Friday because of

17 proceed ings that I have at 9:00 . I intend to adjourn

18 each day at 4:30 .

19        Last ly , I arrive d here after see ing my

20 orthopedic surgeon , who want s to slice me up on Friday ,

21 July 21 . So , we will probably -- unless something

22 miraculous happen s like a cure , we won't sit on Friday ,

23 July 21 .

24        Now , I have been advise d by Ms. Merez that Juror

25 8 , who was in the select ion process Juror 75 has a

1 daughter in the military in Iraq who has had a very

2 serious problem and has been brought home to a hospital

3 -- a military hospital in, I believe, Missouri, and she

4 is distraught and wants to be with her daughter. I'm

5 reluctant to let any of our jurors go, but I don't know

6 if I've got much of an alternative. You're going to

7 have a very distracted and not very attentive juror if

8 you have her worrying about her daughter having a major

9 medical problem in Iraq.

10       Is there any objection to releasing Juror 8?

11       MR. MONTEMARANO: None from the defense, Your

12 Honor.

13       THE COURT: Are all the defendants here now?

14       MR. SUSSMAN: I'm sorry, Judge. Ms. Harden is

15 here. We apologize.

16       THE COURT: Well, if -- I've just been advised

17 by Ms. Merez that one juror has a doctor's appointment

18 at 8:30 tomorrow, and she says we should start tomorrow

19 at 10:00. So, we will start tomorrow at 10:00. So we

20 will be operating on a 10:00 to 4:30 schedule the rest

21 of the week.

22       I believe that's all the preliminary matters

23 that I wanted to bring to your attention.

24       MR. MCKNETT: Your Honor, if I may, while we

25 have a second. I understand the government is prepared

1 to use a chart in their opening statement . I would

2 like to make a formal objection to a portion of the

3 chart for the record . I realize it's argument , but

4 there is a section of the chart which affect s my client

5 and several other s.

6          In the lower right-hand corner there is a

7 caption "distributor s/facilitator s." I believe that's

8 inappropriate , because it confuse s two different role s.

9 I think it more appropriately should say "facilitator s

10 or distributor s." On that basis I will make an

11 objection for the record .

12          THE COURT:  All right . Mr. Montemarano , do you

13 join in that ?

14          MR. MONTEMARANO :  I would join in it . I would

15 further note that if the government at any point

16 intends to introduce that into evidence , I would be

17 object ing now with regard to the use of that language

18 on the chart at any time if they want to bring it into

19 evidence at any point down the road .

20          THE COURT:  Let me hear what Ms. Johnston has to

21 say .

22          MS. JOHNSTON:  Your Honor , first of all , I

23 belie ve the "/" would indicate that these people in

24 this box are either facilitator s and /or distributor s,

25 and that 's why the "/" is there . That 's going to be

1  our presentation .  The chart may be used with different
2  witness es to identify people who are not present  in the
3  courtroom .  If that 's the case and it does get admitted
4  into evidence , then we of course will remove that
5  description  from the chart .  The chart does not in and
6  of itself  indicate  anyone  in particular  is associate d
7  with a particular  role .

8         Those people in that box -- the government 's
9  theory is , and the government  will argue to the jury ,
10 that of those people  in that box , the ones on trial are
11 either distributor s and/or facilitator s of the drug
12 conspiracy .  That 's why the "/" is there , because of in
13 my experience  the "/" would mean that they are one
14 thing or the other .  At this point we're in opening
15 statement .  I don't think  there 's anything
16 objectionable  about that "/"instead of writing  "and/or"
17 on the chart .

18         THE COURT:  All right .  Mr. McKnett .
19         MR. MCKNETT :  Your Honor , I think Ms. Johnston
20 has made my argument .  She intends the "/" to mean
21 "and/or."  It would be very simple to take a piece of
22 white paper and put on there "facilitator s and/or
23 distribut or s."  I know what she intends the "/" to
24 mean .

25         THE COURT:  Can you put a "+" by the "/?"

1          MS. JOHNSTON:   A "+?"

2          THE COURT:   You know, meaning "and/or."

3          MS. JOHNSTON:   If the court would like a "+" on

4 the chart by the "/" I will be glad to do that.

5          THE COURT:   I mean, if that resolves it.

6          First of all, this is not an exhibit yet.  This

7 is going to be the basis for your presentation of the

8 evidence you intend to introduce, and it may never get

9 introduced.  If you simply put "and/or" on there, you

10 know, then I think --

11         MS. JOHNSTON:   A plus sign?

12         THE COURT:   A "+" next to the "/" and explain it

13 when you present opening statement that you're saying

14 it's either "and/or."

15         MS. JOHNSTON:   I intended to present my argument

16 that way as I explained to Mr. McKnett.  But if the

17 court would like a "+" on there, I will put a "+" next

18 to that.

19         THE COURT:   A plus would be fine.

20         MR. MCKNETT:   And an "and/or."

21         THE COURT:   Just make certain that you use the

22 words "and/or" when you point to it.  I've committed

23 her to saying "and/or" when I know she gets to it.

24         MR. MCKNETT:   Thank you.

25         THE COURT:   We will put a "+" on it.  So, it's

1  "+/."

2          MR. SUSSMAN:  Sir, I'm not as concerned about

3  the backslash as I am preliminary instruction s, if you

4  would.  I don't know what you give, but in informing

5  the jury that that's demonstrative and the government

6  theory is not evidence of any --

7          THE COURT:  Well, let me tell you what I intend

8  to do.  I intend to give the pretty generic

9  instruction s that all my colleague s give at the

10  beginning of a criminal case.  I do intend because of

11  the nature of this case and the fact that they're going

12  to be asked to make determination s with respect to a

13  number of crime s and drug quantiti es, to give them some

14  very preliminary instruction s on the law as to what the

15  crime s are and what the element s of the crime s are so

16  that they can pay attention during the testimony as to

17  whether these element s are present or not.

18          MS. JOHNSTON:  Your Honor, will we have an

19  opportunity to review instruction s to determine whether

20  or not we have any objection to the element s of the

21  offense s as the court's describe d them?

22          THE COURT:  I have put together preliminary

23  instruction s that are literal ly right out of Sand &

24  Siffert with regard to the conspiracy charge I have.

25  Because this is a charge under the drug conspiracy

1 statute, I have not put in the "overt acts"

2 requirement.

3          MS. JOHNSTON:   Your Honor, my concern is with

4 some of the substantive offenses. If the court is

5 using the substantive offense instructions as the court

6 used in the first trial in November, then I don't think

7 we have any problem.

8          THE COURT:   I essentially intend to do that. I

9 took out the paragraph that talks about why congress

10 decided to go after conspiracy, because that will be in

11 the final instructions but not here.

12         MS. JOHNSTON:   My concern is with the

13 substantive offenses. If the court is taking them

14 directly out of Sand, there may be some issues because

15 there are some incorrect statements.

16         THE COURT:   They're directly out of Sand &

17 Siffert. The only modification Sand & Siffert has the

18 overt act requirement which is not charged in this

19 case.

20         MS. JOHNSTON:   Is the court describing the other

21 on the offenses as well?

22         THE COURT:   Yes.

23         MS. JOHNSTON:   Then we have an objection to the

24 court reading the Sand & Siffert on the use of

25 telephone in furtherance of drug conspiracy offense,

1  because  in  Sand  they  make  it  a  requirement   that  the

2  person  actual ly  have  committed   the  under lying  offense ,

3  which  is  not  in  the  statute .   The  statute  says  either

4  you've  used  it  in  furtherance   of  the  commission   of  that

5  offense , or  you  used  it  to  facilitate .   So  by  making  it

6  a  requirement   that  one  actual ly  commit s  the  under lying

7  offense , Sand  has  done  away  with  the  statutory  element

8  of  facilitation   of  the  under lying  offense .

9          The  court  gave  an  instruction   in  the  first  trial

10  as  to  the  telephone   count  which  we  have  available   for

11  the  court , and  we  would  ask  the  court  to  give  the

12  instruction   the  court  gave  in  the  very  first  trial

13  because , as  I've  said , the  way  Sand  write s  it , they

14  make  commission   of  the  under lying  offense  a

15  requirement  , there by  striking  any  meaning  to  the

16  statutory  language   that  says  either  the  commission   of

17  or  facilitation   of  the  under lying  offense .   If  they

18  require  a  commission   of  the  under lying  offense  by  the

19  defendant , certain ly  then  there  would  be  no  way  you

20  would  facilitate   it  without  committing   it.

21          THE  COURT:   The  way  I  have  it  now  -- and  you

22  tell  me  what  you  believe  is  not  correct  -- the  element s

23  I've  enumerate d  are , first , that  the  defendant  used

24  the  telephone   for  or  communication   facility .

25          You  don't  want  that  in .   That 's  not  what's  used

1  in this case.

2        MS. JOHNSTON:   No.

3        THE COURT:   The telephone, as charged.

4        MS. JOHNSTON:   That's fine.

5        THE COURT:   Second, that the defendant used the

6  telephone in the process of committing or to facilitate

7  the commission of the conspiracy offense with which the

8  defendant is charged.  Is that all right?

9        MS. JOHNSTON:   That's fine, Your Honor.

10        THE COURT:   Third, that the defendant did so

11  knowingly and intentionally.

12        Those are the three elements.

13        MS. JOHNSTON:   That's fine.  That's the way the

14  court instructed it initially.

15        THE COURT:   Well, I'll tell you all each what

16  the elements are that I'm going to enumerate.

17        MS. JOHNSTON:   I don't have any problem with any

18  of the other instructions.   Your Honor, that would be

19  the only one that gave the government concern.  I do

20  have one -- when the court finishes that, I do have a

21  motion to make in terms of the defendants' opening

22  statement.

23        THE COURT:   Let me finish telling you what I'm

24  going to do.  I'm going to give the generic

25  instructions; I'm going to give the preliminary

1  instruction s on the law; I'm also going to tell them

2  general ly, because I've seen the verdict form and

3  they're going to be asked a lot of question s about

4  quantiti es, so I intend to provide -- state this to

5  them: I want to inform you as to some of the count s.

6  If you find the defendant guilty of that particular

7  count, you must also determine the type and quantity of

8  drug s that were involve d in that count. I will

9  instruct you further at the end of the case as to the

10  circumstance s in which drug s should be attributed to a

11  particular defendant if the government prove s those

12  circumstance s beyond a reasonable doubt . For now,

13  however , I just ask you to please pay attention to any

14  reference to the specific type and quantiti es of drug s

15  that are mention ed.

16      That's just maki ng them highlight it, because I

17  would hate to see them, after seven or eight week s,

18  say, you know , I forget all those quantiti es and, you

19  know , we're between a rock and a hard place . I don't

20  want to have that happen .

21      In addition to giving the general instruction s

22  and the specific ones on the law, I intend to remind

23  them to take the escalator ; remind them again of what

24  the hour s are that we are general ly going to follow .

25  I'm going to advise them that I have ordered the

1  attorney s to joint ly agree upon who should be the lead

2  question er for each witness and that any additional

3  question ing is preclude d if it's redundant,  and they

4  should understand that an objection by one is an

5  objection by all so they do not need to ass ume that if

6  somebody is silent on an objection that they don't

7  care , or they don't join in that objection they are

8  deem ed to have join ed in that objection , and they are

9  deem ed also to have join ed in the examination of any

10  witness .

11        I'm going to also tell them , because I just in a

12  recent case had this,  if they're hungry and want to eat

13  lunch that one of the place s they can go purchase food

14  is our wonderful commissary on the first floor , but I

15  would en courage them not to eat their food there .  They

16  can either come back to the jury room for this

17  courtroom or they can go to the jury lounge , but don't

18  eat be there because that 's a place that may also be

19  frequent ed by people who may be participati ng in the

20  case .

21        Yes, sir .

22        MR. SUSSMAN :  With regard to the housekeeping

23  issue about objection for one is an objection for all .

24  I think it would be fair for the court make it clear

25  that that 's just an efficiency thing and has nothing to

1 do with us being joined in any fashion, either

2 factually or --

3        THE COURT:   I will tell them it is my desire to

4 have them out of here before Christmas and I have made

5 such a directive.

6        All right.  Is there -- now, you say you had a

7 motion?

8        MS. JOHNSTON:   Your Honor, in light of the

9 court's ruling that is denying the defendant Martin's

10 request to introduce the plea agreements and

11 non-testifying codefendants, we would move in limine to

12 preclude any defense counsel from mentioning the fact

13 that other defendants have pled guilty or what the

14 circumstances were of those guilty pleas.

15        THE COURT:   Okay.  Mr. Montemarano, unless you

16 know some other reason other than that advanced in

17 your motion, I'm inclined grant the government's

18 motion.  I don't see any reason for any defense

19 attorney to making reference to any plea agreements in

20 opening statements.  Any disagreement?

21        MR. MONTEMARANO:   Court's indulgence, please.

22        I don't believe there's any other basis that I

23 have at this time.  I will note for the record that we

24 had requested to be heard on that motion and a motion

25 which was only occasioned by the very late guilty pleas

1  of George  Lindsey  Harris  and --

2          THE  COURT:    No.   I have  read  very  carefully  your

3  motion , the  opposition   filed  by the  government , and

4  we've  studied  it.   We've  read  the  cases.   For  reasons

5  that you will  get  in an  opinion  that  he will  have  to

6  you probably  within  the  hour , you  will  see  that  we

7  don't  agree .  So, I will   grant   the  government 's motion .

8  Defense  counsel  should  not  refer  to plea  agreements

9  during  their  opening  statements.

10          Counsel , with  regard  to Juror  8, who  was  Juror

11  75 during  the  selection  process .  I will  have  her

12  replaced  by the  thirteenth  juror , or  the  first

13  alternate , which  is J uror  140 .  Unless  there 's some

14  reason  you want  me to  bring  her  in  here  and  tell  her

15  she 's excused , I will  tell  Ms. Merez  she  is  excused  and

16  she  does  not  need  to come  in the  courtroom .

17          Any  objection  to that ?

18          MS.  JOHNSTON:    No  objection .

19          MR.  MONTEMARANO :   No  objection .

20          THE  COURT:    Ms. Merez , you  may  excuse  Juror  8,

21  who  is Juror  175  and  have  her  replaced  with  Juror  13,

22  who  is also  Juror  140 .

23          Counsel , any  other  reason  we should  not  begin

24  with  preliminary   instructions?

25          All  right , bring  them  in .

1                  (Jury returns at 10:28 a.m.)

2          THE COURT:   Good morning, ladies and gentlemen.

3  First, I wanted to advise you of a couple of traditions

4  in the court system.  One is that people stand up when

5  the judge walks in, and that's out of respect of the

6  judge's role of being the finder and arbiter of the

7  law.  It's not any respect for me.  It's for the

8  institution.  By the same token, the parties stand up

9  when you come in the courtroom, and that's because of

10  their respect for your role as the fact finders in this

11  case.  When you come in, you can plunk yourself right

12  now just like I do.  So, you don't need to wait until I

13  tell you to sit down.  Just make yourself comfortable

14  when you come in, and when you are all seated they will

15  then sit down.  So, relax with that.

16          I have already made a decision to excuse one of

17  our alternates.  I want to encourage the rest of you to

18  stay healthy, because if we lose the first alternate on

19  the first day of trial, that is not a good trend, and

20  our ability to insure we get this case to a conclusion

21  will be compromised.  So I urge you to stay healthy and

22  be able to survive this process.

23          I was a couple of minutes late today because I

24  had to go see my doctor, who wants to slice up my left

25  rotator cuff on July 21.  So, you can probably count on

1  July 21 we won't be sitting.

2      I wanted to give you some preliminary

3  instructions now that you have been sworn to act as the

4  jurors in this case.  It is going to be your duty to

5  find from the evidence what the facts are.  You and you

6  alone are the judges of the facts.  You will then have

7  to apply to those facts and the law as I will give it

8  to you, and you're required to follow that law whether

9  you agree with it or not.

10      Nothing that I may say or do during the course

11  of this trial is intended to indicate or should be

12  taken by you as indicating what your verdict should be.

13  The evidence from which you will find the facts will

14  consist of the testimony of the witnesses, documents,

15  and other things received into the record as exhibits,

16  and any facts the parties agree or stipulate to or that

17  I may instruct you to find.

18      Certain things are not evidence and must not be

19  considered by you as evidence.  Let me list them for

20  you now.  First, statements, arguments and questions by

21  lawyers are not evidence.  Indeed, you're about to hear

22  opening statements.  Opening statements are not

23  evidence, and what you see and hear out of the mouth of

24  the lawyers is simply their view as to what they

25  believe the evidence will show or fail to show in this

1  case , but it is not evidence .

2         Second , objections  to question s are not

3  evidence . Lawyer s have an obligation  to their client s

4  to make an objection when they believe  evidence  being

5  offered  is improper under the rule s of evidence .  You

6  should  not be influenced  by the objection  or by my

7  ruling  on it .  If the objection  is sustained , ignore

8  the question .  If it is over ruled , treat  the answer

9  like any other .  If you are instruct ed that some  item

10  of evidence  is received  for a limited  purpose  only , you

11  must  follow  that instruction .

12         Third .  Testimony  that I exclude  or tell  you to

13  dis regard  is not evidence  and must not be considered .

14         Four th.   Anything  you may have seen  or heard

15  outside  the courtroom  is not evidence  and must be

16  dis regard ed.  You are to decide  the case sole ly on the

17  evidence  present ed here in this courtroom .  There  are

18  two kinds of evidence :  direct  and circumstantial .

19  Direct  evidence  is direct  proof  of a fact such  as

20  testimony  of an eyewitness .  Circumstantial  evidence  is

21  proof  of fact s from which you may infer  or conclude

22  that other  fact s exist .  You may consider  both kinds of

23  evidence .  It will be up to you to decide  which

24  witness es to believe , which  witness es not to believe ,

25  and how much  of any witness ' testimony  to accept  or

1  reject .

2       I will give you some guideline s for determini ng

3  the credibility of witness es as well as complete

4  instruction s on the law at the end of the case , but I

5  would like to give you a brief summary at this time of

6  some of the element s of the offense s that the

7  government has charge d in this case .

8       In this case the defendant s are charge d with

9  five different crime s.  First , conspiracy to distribute

10 and possess with intent to distribute controlled

11 substance s; second , possession with intent to

12 distribute controlled substance s; three , use of a

13 communication s device to facilitate narcotic s

14 trafficking ; four , possession of a firearm in

15 furtherance of a drug trafficking crime ; and , five ,

16 possession of a firearm by a convict ed felon .

17      The indict ment contain s a total of 62 count s.

18 Each count charge s a defendant with a different crime .

19 Every defendant is charge d with every crime .  There are

20 seven defendant s on trial before you .  You must , as a

21 matter of law , consider each count of the indict ment

22 and each defendant 's involve ment in that count

23 separate ly, and at the conclusion of the trial you will

24 be asked to return a separate verdict on each defendant

25 for each count in which he or she is charge d.

1       In reaching your verdict, bear in mind that

2 guilt is personal and individual. Your verdict of

3 "guilty" or "not guilty" must be based solely upon the

4 evidence about each defendant. The case against each

5 defendant on each count stands or falls upon the proof

6 or lack of proof against that defendant alone. Your

7 verdict as to any defendant on any count should not

8 control your decision as to any other defendant or any

9 other count. No other considerations are proper.

10       The 62 counts of the indictment charge five

11 different crimes as follows: First, each of the seven

12 defendants is charged with one count of conspiracy to

13 distribute and possess with intent to distribute

14 controlled substances in violation of Title 21, Section

15 846 of the United States Code. A conspiracy is a kind

16 of criminal partnership, a combination or agreement of

17 two or more persons to join together to accomplish some

18 unlawful purpose. The crime of conspiracy to violate a

19 federal law is an independent offense. It is separate

20 and distinct from the actual violation of any specific

21 federal laws which the law refers to as "substantive

22 crimes." You may find a defendant guilty of the crime

23 of conspiracy to commit an offense against the United

24 States even though the substantive crime which was the

25 object of the conspiracy was not actually committed.

1          In order  to satisfy  its burden  of proof , the

2 government  must  establish  each of the  follow ing  two

3 essential  element s beyond a reasonable doubt  .  First ,

4 that  two or more person s entered  the un lawful  agreement

5 charge d in  the  indict ment ; and  second , that  the

6 defendant  know ingly and will fully  became  a member  of

7 the  conspiracy .

8          Five  of the  defendant s are  charge d with  the

9 substantive  crime  of distribution  and possession  with

10 intent  to distribute  controlled  substance s in violation

11 of Title  21, Section  841 of the  United  States  Code ,

12 otherwise  known  as the  Drug  Abuse  and Prevention  and

13 Control  Act .   That  law make s it a crime  for any  person

14 know ingly  or intentionally  to manufacture , distribute

15 or dispense  or possess  with  intent  to manufacture ,

16 distribute  or dispense  a controlled  substance .

17          Defendant  Paulette  Martin  is charged  with  17

18 count s of violating  this statute ; Learley  Goodwin  with

19 two count s; LaNora  Ali with  two  count s; Derrick  Bynum

20 with  one  count , and Ruby  Harden  with  one  count .   In

21 order  to prove  these  charge s against  a defendant,  the

22 government  must  establish  as to each  count  the

23 follow ing  three  element s of the  crime :   First , that  the

24 defendant  possess ed narcotic  drug s; second , that  the

25 defendant  knew  that  he or she  possess ed narcotic  drug s;

1  and  third ,  that  the  defendant   possess ed  the  narcotic

2  drug s  with  the  intent  to  distribute   them .

3          Each  of  the  defendant s  is  charge d  with  use  of  a

4  communication s  device  to  facilitate   narcotic s

5  trafficking   in  violation  of  Title  21 ,  Section  843 (b)  of

6  the  United  States  Code  which  provides ,  "It  shall  be

7  unlawful  for  any  person  know ingly  or  intentionally   to

8  use  any  communication   facility   in  committing   or  causi ng

9  or  facilitati ng  the  commission   of  any  act  or  act s

10  constituting   a  felony  under   the  narcotic s  law s."

11          Under   this  statute ,  defendant   Paulette  Martin  is

12  charge d  with  37  count s;  Learley  Goodwin  with  five

13  count s;  Reece  W hiti ng  with  seven  count s;  Derrick  Bynum

14  with  three  count s;  Ruby  Harden  with  two  count s;  Lavon

15  Dobie  with  five  count s,  and  LaNora  Ali  with  two  count s.

16          In  order  to  prove  these  charge s  against  the

17  defendant ,  the  government   must  establish   beyond  a

18  reasonable  doubt   as  to  each  count  the  follow ing  three

19  element s  of  the  crime .  First ,  that  the  defendant  use d

20  the  telephone   as  charge d  in  the  indict ment ;  second ,

21  that  the  defendant  use d  the  telephone   in  the  process  of

22  committing   or  to  facilitate   the  commission  of  the

23  conspiracy  of  the  offense  with  which  the  defendant  has

24  been  charge d;  third ,  that  the  defendant   did  so

25  know ingly  and  intentionally .

1          Two of the defendant s, Derrick  Bynum  and Lavon

2  Dobie , are  charge d with  possession  of  a firearm  in

3  furtherance  of  a drug  trafficking  crime  in violation  of

4  Title 18 , Section  924(c) of  the United  States  Code

5  which  provides , "Any  person  who , during  and  in relation

6  to any  kind  of  violence  or drug  trafficking  crime  for

7  which  the  person  may  be  prosecuted  in  a court  of  the

8  United  States  uses  or carries a  firearm  or who  in

9  furtherance  of  any  such  crime  possess es  a firearm  shall

10  be  guilty  of  a crime ."

11          In order  to prove  these  charge s against  the

12  defendant , the  government  must  establish  beyond  a

13  reasonable doubt   as  to each  count  the  follow ing three

14  element s of  the  crime .  First , that  the  defendant

15  committed  a drug  trafficking  crime  for  which  he  might

16  be  prosecuted  in  a court  of  the  United  States ; second ,

17  that  the  defendant  know ingly  use d or  carri ed a  firearm

18  during  and  in relation  to the  commission  of  or

19  know ingly  possess ed a firearm  in furtherance  of  the

20  conspiracy  offense  with  which  the  defendant  has  been

21  charge d.  In order  to find  a defendant  guilty  of  this

22  crime , you must  also  find  the  defendant  guilty  of  a

23  drug  trafficking  crime , and  I will  instruct  you further

24  about  this  at  the  end  of  the  case .

25          Finally , one  defendant , Derrick  Bynum , is

1  charged with possession of a firearm by a convicted

2  felon in violation of Title 18, Section 922(g)(1) of

3  the United States Code which provides, "It shall be

4  unlawful for any American who has been convicted in any

5  court of a crime punishable by imprisonment for a term

6  exceeding one year to ship or transport in interstate

7  or foreign commerce or possess in or affecting commerce

8  any firearm or ammunition, or to receive any firearm or

9  ammunition which has been shipped or transported in

10 interstate or foreign commerce."

11        The government must prove each of the following

12 elements beyond a reasonable doubt  in order to sustain

13 its burden of proving the defendant guilty.  First,

14 that the defendant was convicted in any court of a

15 crime punishable by imprisonment for a term exceeding

16 one year as charged and that the state has not restored

17 the defendant's civil rights following that conviction;

18 second, that the defendant knowingly possessed the

19 firearm as charged; and third, that the possession

20 charge was in or affecting interstate commerce.

21        Finally, with regard to the law, I want to

22 inform you that as to some of the counts, if you find

23 the defendant guilty of that particular count, you are

24 going to also be required to determine the type and

25 quantity of drugs that were involved in that count.  I

1  will  instruct  you  further  at  the  end  of  the  case  as  to

2  the  circumstance s  in  which  drug s  should  be  attributed

3  to  a  particular  defendant  if  the  government  prove s

4  those  circumstance s  beyond  a  reasonable  doubt  .  For

5  now , however , I  ask  you  to  please  pay  attention  to  any

6  reference s  to  the  specific  type  and  quantity  of  drug s

7  that  are  mention ed  during  this  trial .

8          Now  I  would  like  to  add  a  few  more  comment s

9  concern ing  your  conduct  as  juror s  in  this  case .  First ,

10  I  instruct  you  that  during  this  trial  you  are  not  to

11  discuss  the  case  with  anyone  or  permit  anyone  to

12  discuss  it  with  you.  Until  you  retire  to  the  jury  room

13  at  the  end  of  the  case  to  deliberate  on  your  verdict ,

14  you  are  simply  not  to  talk  about  the  case .

15          Second , do  not  read  or  listen  to  anything

16  touch ing  on  this  case  in  any  way .  If  anyone  should  try

17  to  talk  to  you  about  it , bring  it  to  my  attention

18  prompt ly .  To  date  I  have  not  been  aware  of  any

19  newspaper  attention  given  to  this  case .  If  I  become

20  aware  of  it , I  will  let  you  know , but  you  should  be

21  care ful  and  cautious  when  reading  news  repor ts .  If  you

22  see  anything  that  seem s  to  touch  or  reflect  on  this

23  case , turn  your  eye s  away  and  move  on  to  other

24  subject s .  As  I  said , it's  going  to  be  your  duty  to

25  decide  this  case  based  sole ly  on  the  evidence  present ed

1  here in court and not something you might read in the

2  newspaper or hear walking down the street.

3       Third, do not try to do any research or make any

4  investigation about the case on your own. I know this

5  is the era of the Internet and people can't resist

6  sometimes going home and turning on their computer and

7  sniffing around to try to do some independent

8  investigation. That would violate your oath as jurors

9  and you are not to do that. If you have any curiosity

10  about the case and you want to wander around the

11  computer looking at it, do it when this case is over,

12  but do not anything now.

13       Finally, do not form any opinion until all the

14  evidence is in. Keep an open mind until you start your

15  deliberations at the end of the case. You may take

16  notes if you want. Pads and pencils will be on the

17  table in the jury room.

18       If you take notes, please use care, and remember

19  that note taking can interfere with your ability to

20  watch the witnesses and to hear everything the

21  witnesses say. Notes must be left on your chairs in

22  the courtroom at the end of the day and on breaks. If

23  some people have taken notes, their notes will not

24  control when the jury is deliberating. It is each

25  juror's individual recollection that is to be

1  considered  when  you  deliberate  at  the  conclusion  of  the

2  case .

3         The  trial  will  begin  shortly .  First , the

4  attorneys  will  make  opening  statements .  An  opening

5  statement , as  I  mentioned  before , is  neither  evidence

6  nor  argument .  It  is  an  outline  of  what  that  party

7  expects  the  evidence  to  prove , and  it's  offered  to  help

8  you  follow  the  evidence .

9         Next , the  evidence  will  be  presented .  After

10  that, I will give   you  instructions  on  the  law , and  the

11  attorneys  will  make  their  closing  arguments  to

12  summarize  and  interpret  the  evidence  for  you .  You  will

13  then  retire  to  deliberate  on  your  verdict .

14         Please  remember  where  you  are  sitting , and  after

15  each  break  come  back  to  the  same  seat .  After  breaks

16  and  in  the  morning , you  should  come  back  to  the  jury

17  room  next  to  the  courtroom , not  to  the  jury  lounge  on

18  the  first  floor .

19         A  couple  of  additional  reminders, some  of  which

20  I  think  I've  given  you  previously  .  In  order  to  not

21  have  you  inadvertently  stumble  into  contact  with

22  someone  who  is  a  party  or  a  witness  in  this  case , I  ask

23  that  you  pretend  you're  in  a  department  store  and  take

24  the  escalator  to  the  fourth  floor  and  not  take  the

25  elevators .

1          I intend to operate this week every day from

2 10:00 to 4:30.  That may change, depending on

3 circumstances.  I understand someone had a doctor's

4 appointment so we couldn't start early tomorrow, so we

5 will be doing 10:00 to 4:30.

6          Let me also explain that this government

7 building has, like most government buildings, a place

8 on the first floor where you can purchase food.  I

9 don't vouch for the food.  I will tell you though that

10 while you may buy your food there, I request that you

11 not eat it there, because that is a place where people

12 gather together who may be involved in this case and

13 they might be talking about it and you might overhear

14 something you shouldn't hear.  If you purchase your

15 food there, please bring it back to the jury room or go

16 to the jury lounge with it, but don't eat your lunch

17 there.

18          I also want to explain to you that in order to

19 not have this case last until Christmas, I have made

20 some directives to the attorneys in this case to make

21 it a bit more efficient in use of your time.  I want

22 you to know that I have, by order, provided that an

23 objection by one attorney is deemed to have been joined

24 in by all attorneys on the defense side.  So if you

25 hear one objection by one attorney, you should just

1  pretend you heard six more attorney s object .  So, it's

2  not that somebody doesn't care .  I have direct ed them

3  to join in a single process of having a principal

4  object or as to whom all parti es will be deem ed to have

5  join ed, unless they ask to be exclude d from that

6  objection .

7        By the same token, I have made that same

8  direct ive as to the examination of witness es.  When a

9  government witness is call ed, the defense will agree

10  upon themselves who will be the principal question er of

11  that witness .  There may be additional question s by

12  other people but , once again , I have request ed that

13  they designate an attorney to do the lead question ing ,

14  and I have precluded any additional question ing by

15  other lawyer s that would be redundant .  That doesn't

16  mean there may not be additional question s and there

17  may be very proper question s, but in order to not have

18  repetitious question ing , I've made that direct ive and

19  you should consider nothing adverse to any defendant in

20  this case because his or her lawyer didn't object or

21  ask any question s of a witness because of the

22  directive s that I've given .  So, do not hold that

23  against them .  Blame me for that .

24        Counsel , unless there 's anything further , I'm

25  ready to proceed with opening statement s.

1          MR.  MARTIN:   Your  Honor ,  if  we  may  approach .

2          THE  COURT:   You  may .

3                    (At  the  bar  of  the  Court.)

4          MR.  MARTIN:   Mr.  Sussman  had  asked  that  you  make

5 it  clear  to  the  jurors  that  while  you  may  refer  to  us

6 collective ly,  that  individual ly  each  person  stands

7 alone  and  we  are  not  part  of  a  team .

8          THE  COURT:   I've  made  that  plain  in  my

9 instruction s  that  they  will  make  individual

10 assessment s.

11         MR.  MARTIN:   Okay .  I  drift  in  and  out ,  Your

12 Honor .  I  want ed  to  make  sure  it's  covered .

13         THE  COURT:   I  think  I've  made  that  plain .  This

14 is  not  group  justice .  It's  individual  justice .  I

15 think  I  made  that  plain  on  the  instruction s.

16         MR.  SUSSMAN :  Judge ,  while  we're  up  here .  I'm

17 going  to  reserve .  So ,  the  court  might  mention  --

18         THE  COURT:   All  right .

19         MR.  SUSSMAN :  --  that 's  one  of  the

20 possibiliti es.

21         MR.  WARD:   Your  Honor ,  I  didn't  want  to  make  a

22 fuss  earlier .

23         THE  COURT:   Because  I  said  you  were  bigger  than

24 me ?

25         MR.  WARD:   I  take  exception  to  the  court 's

1  remark s about  my  weight .

2        THE  COURT:   You  come  down  to  my  chamber s  and  see

3  if  you  can  fit  in  my  clothe s.

4        MR.  WARD:   Judge ,  I'm  sure  I  can  fit  your

5  clothe s.   I  hear  it  from  my  wife  all  the  time .

6        MS.  JOHNSTON:   Your  Honor ,  I  would  prefer  that

7  we  not  take  a  break  in  between  the  government 's  opening

8  statement  and  at  least  one  defense  opening  statement .

9        THE  COURT:   We 're  going  to  go  straight  through .

10       MR.  MONTEMARANO :   There  will  not  be  a  break

11  after  Ms.  Johnston 's  opening ?

12       THE  COURT:   We're  going  to  go  right  into  your

13  opening .

14       MR.  MONTEMARANO :   That 's  fine .

15                    (Back  in  open  court .)

16       THE  COURT:   Ladies  and  gentlemen ,  whenever  we  do

17  that ,  pre tend  you're  at  Ocean  City  or  some  pleasant

18  beech .   That 's  intend ed  to  make  sure  that  you  don't

19  hear  thing s  that  would  be  inappropriate  for  you  to

20  hear .

21       I  also  want  to  point  out  to  you  that  there  is  no

22  requirement  that  a  person  make  an  opening  statement  at

23  this  time ,  and  in  some  case s  parti es  may  de sire  to

24  reserve  their  opening  statement  to  give  it  at  the

25  beginning  of  the  defense  case .   So,  you're  going  to

1 hear some but perhaps not all of the defendant s give

2 opening statement s.

3        With that , Ms. Johnston, you may proceed .

4        MS. JOHNSTON:   Thank you , Your Honor .  May it

5 please the court.  Mr. Foreman and ladies and gentlemen

6 of the jury --

7        COURT REPORTER:  You need a mike.  You need a

8 mike .

9        MS. JOHNSTON:   I'm sure you all will notice

10 that especially late r in the day my voice will be

11 soft er.  If you have difficulty hear ing me but , more

12 important ly, if you have trouble hearing the witness ,

13 please start waivi ng your hands and get the court 's

14 attention so that that witness can repeat their answer s

15 to the question s, because you won't have an opportunity

16 to have transcript s in the jury roo m.  It is very

17 important that you hear all of the testimony , but

18 perhaps not so important that you hear the attorney s

19 talk .  At the same time , it is help ful if you hear the

20 question before you hear the answer .

21        As I said , my name is Deborah Johnston .  I'm an

22 Assistant United States attorney who works in this

23 court house for the Department of Justice .  I am join ed

24 by my co-counsel , Bonnie Greenberg .  Ms. Greenberg and

25 I share responsibility for present ing this case to you.

1  You will also see some other individuals assisting us

2  with this matter, and as you go through it and see the

3  volumes of documents and exhibits that are going to be

4  presented to you over the next, hopefully, only eight

5  weeks or so, you will understand why we've needed

6  assistance.

7          Sitting with us at counsel table is Ms.

8  Genevieve Holmes.  She's a paralegal in our office.

9  She may come in and out, depending what kind of

10  assistance we need at a particular time.

11          Also present in the courtroom are two of the

12  case agents.  Seated right at counsel table is Thomas

13  Eveler, who's the task force officer with the

14  department -- used to the be Bureau of Customs

15  Enforcement, but now it's Customs and Immigration

16  Enforcement, and Special Agent Steven Snyder, who is

17  likewise with Customs.  Again, they're here to make

18  sure that we present things to you in an efficient

19  manner and get our exhibits out and orderly in our

20  presentation to you.  If you see them come or go, it's

21  only because they have to take care of a matter to

22  expedite the trial.

23          With that said.  When we talk about an opening

24  statement, generally I like to think of it as nothing

25  more than a preview.  We all go to the movies or to the

1 theater or to a ball game from time to time , and when
2 we go , we generally know the movie 's a drama , it's a
3 comedy , this is the general plot of the movie , these
4 are the main characters in the movie , and that 's what
5 my opening statement is.  The opening statement is not
6 intended to review with you every witness that 's going
7 to testify or what those witnesses are going to say
8 but , rather , to give you like a road map to help you
9 listen to the testimony and follow along with the
10 witnesses as they are presented.

11      In this case , given the length of the trial and
12 the nature of the evidence , there may be some witnesses
13 who are called out of turn ; some witnesses will be
14 called and then recalled depending on what aspect of
15 the investigation  they're talking about , and I
16 apologize to you in advance for any disorientation .
17 We have witnesses coming from various places throughout
18 the country to testify , so we have to coordinate their
19 travel as well .

20      In terms of presenting you with a preview , I
21 want to focus in on drug conspiracy .  When you hear the
22 term "conspiracy " in a criminal case , one thinks of
23 this plot to, you know , commit a crime .  What a
24 conspiracy is in reality is nothing than a business .
25 It is an agreement between two or more people to engage

1   in activity to reach a common objective . In this

2   instance it's to commit a crime . The particular crime

3   in this case is the distribution and possession with

4   intent to distribute heroin , cocaine and cocaine base ,

5   which is also commonly known as "crack." Those are the

6   drugs involved in this business . It is really nothing

7   more than a business . I like to think of it as

8   something -- like in this instance , we all have

9   perhaps , growing up, knew of people who worked as Avon

10  ladies who sold cosmetics and perfumes, or there was a

11  vitamin company who had local distributors that didn't

12  operate necessarily out of stores -- I think it was

13  called Shakley [ph.]. In those cases, people came

14  together fulfilling different roles.

15        Avon has a president and executive offices and

16  corporate headquarters and people who manage the

17  overall business, and then they have local

18  distributors, regional managers who manage particular

19  regions and who obtain the products, store those

20  products and then dispense them out to their local

21  individuals who are distributing them .

22        When you get down to that local level , some of

23  those distributors will be -- make a living doing it.

24  This will be their whole employment . They thrive on

25  meeting people and developing customers and business

1 and so they sell a lot of those cosmetic s because

2 that 's their main source of income . Then you will have

3 other distributor s in that organization who got

4 involve d because they want ed -- they like d the product ,

5 so they want ed to get their product s at a dis count and

6 so they sign ed up as a representative of Avon and

7 they 'd get the product s, then they 'd sell maybe some ,

8 distribute some to their relative s or their friends or

9 their coworkers , but they weren't really interest ed in

10 maki ng it their source of income . That is really what

11 a drug conspiracy is. It is a drug business . It is

12 individuals involve d at all levels of a business

13 engage d in the business of distributing drug s. Their

14 purpose and their common goal is to distribute drug s,

15 not to necessarily make a million dollar s and not

16 necessarily to make no mone y but to -- they come

17 together with an agreement to distribute drug s.

18        In this case the organization work s very much

19 like a regional distribution center for product s such

20 as the Avon lady or the natural food vitamin people who

21 sell , without having their regional or having store s to

22 sell to local people or having a specific retail

23 outlet , and what I'd like to do is go over with you the

24 nature of this particular business and this particular

25 drug conspiracy .

1          This drug conspiracy involves a long period of

2  time.  The time charged in the indictment is from 1997

3  to June 1st of 2004.  That's roughly seven years and

4  change -- seven and a half years.  As with any

5  business, there are people who joined into this drug

6  business and left the drug business.  Some came in near

7  the end of it and some were involved throughout, and

8  every individual in this conspiracy had a different

9  role.  You're going to hear about their roles

10 throughout this trial.

11         If I could, using this chart, go over with you

12 some of the people you're going to hear about.  Because

13 while we have seven defendants in this case, this drug

14 business involves many other people, some of whom are

15 on this chart.  Hopefully, the ones we're going to

16 mention are on the chart, although there are probably a

17 couple who didn't make it to the picture board.

18         What this chart is going to help us understand

19 throughout this trial is that what we have here are the

20 regional distributors in the center box:  Mr. Goodwin

21 and Paulette Martin.  They are the regional

22 distributors.  They are the partners who ran this

23 business in Maryland and the Washington, D. C. area.

24 Mr. Goodwin and Ms. Martin, the evidence will show,

25 pooled their money to obtain drugs, reached out to find

1  source s independent  of  each  other , share d  their  drug s
2  with  each  other , and  then  use d other  individuals , sold
3  their  drug s, provided  their  drug s to people  who  then
4  distributed  the  drug s.

5        Mr.  Goodwin  and  Ms.  Martin  are  the  parti es.
6  They  are  the  center  of  this  business  as  it  operate d  in
7  this  area  from  1997  until  June  1st  of  19- -- June  1st
8  of  2004 , which  is  when  search  warrant s  and  arrest
9  warrant s were  executed  and  this  organization 's business
10 was  shut  down .

11       You  will  hear  that  indeed , in order  for  that
12 business  to work  here  in Maryland , they  had  to get  the
13 drug s from  somewhere , the  heroin , cocaine  and  cocaine
14 base .  You  will  hear  that  cocaine  base -- " crack " -- is
15 made  from  cocaine .  What  they  do  is  they  take  the
16 cocaine  and  take  out  the  hydrochloride  that 's  in it  and
17 make  it  a more  potent  form  of  cocaine  known  as  cocaine
18 base .  You  will  hear  it  referred  to  as  "crack ."  They
19 don't  grow  it  here , so  they  had  to  develop  their
20 source s to  get  it  from  other  place s.

21       Ms.  Martin  developed  a  source  for  her  heroin .
22 Her  source  for  heroin  was  Ms.  Levi  and  Mr.  Turn er .  Ms.
23 Levi  and  Mr.  Turn er  obtain ed  heroin , at  least  during
24 part  of  the  conspiracy , from  an  individual  name d Moises
25 Uriarte .  They  were  get ting  cocaine  -- heroin , rather .

1  They got the heroin and they brought it back to

2  Maryland . Ms. Levi and Mr. Turner had a residence up

3  in Columbia , Maryland where they process ed heroin .

4  They took kilo quantity -- kilogram quantiti es of

5  heroin , 1,000 grams , 2.2 pounds of heroin . They took

6  that heroin , process ed it -- it was relative ly pure

7  heroin -- and then they need ed somebody to market it

8  for them and sell it for them in this area.

9       Paulette Martin obtain ed the heroin from them

10 and she, in turn , sold it to individuals , distributed

11 it to individuals including her main customer -- the

12 main person would be Larry Nunn , who is not on trial

13 here , but you will hear about Mr. Nunn .

14      That is the aspect of the heroin that came into

15 this business . It came from these three individuals to

16 Ms. Martin , who then further distributed it to

17 individuals including Mr. Nunn . Again , they're not a

18 one product business . They're in the business of

19 sell ing drug s. Their primary drug in this

20 organization , in addition to many, many kilos of

21 heroin , was cocaine and cocaine base . Well , you don't

22 usually buy cocaine base from out of state . You

23 manufacture it yourself here , which is what Mr. Goodwin

24 and Ms. Martin did .

25      You will hear reference s during the trial that

1 they themselves made to having cooked it up, how the

2 "orange muffins" weren't very good -- there were other

3 phrases they used to refer to the processing of

4 cocaine, but they both had sources for that cocaine,

5 and those sources are listed across the top and you

6 will hear about them.

7       There was a source of cocaine in California.

8 Mr. Steve Brim used his son at one point as a courier

9 to bring the cocaine to these individuals, Ms. Martin

10 and Mr. Goodwin. Mr. Brim passed away in November of

11 2003. Mr. King, his son, was a truck driver. Mr.

12 King, as a truck driver, and his father before his

13 death, both delivered multiple kilograms of cocaine to

14 Ms. Martin. In single shipments those were made.

15 There would be ten kilos at a time and 15 kilos at a

16 time. In fact, you will hear that Mr. King was stopped

17 in Indiana, and roughly 18 kilos of cocaine were taken

18 off of his truck, and that cocaine was intended to be

19 delivered to Ms. Martin for further distribution

20 through the individuals listed below.

21       Well, with particularly any illegal product, as

22 opposed to a legal product, you have difficulty getting

23 that product, so you always want to have multiple

24 sources. Other sources that both Ms. Martin and Mr.

25 Goodwin used were Luis Mangual, Juan Encarnacion, and

1  an individual named Cuba LNU, "Last Name Unknown."  You

2  will see that throughout -- you will hear that term

3  used throughout, and that's because agents have not

4  been able to fully identify Mr. Cuba.

5       All three of these individuals going back to the

6  late nineties -- Mr. Encarnacion in the late nineties

7  provided multiple kilos of cocaine, either to Mr.

8  Goodwin or to Ms. Martin.  Mr. Cuba LNU, you will hear,

9  was someone who also provided cocaine to the both of

10 them.  Luis Mangual, particularly in 2003-2004,

11 provided multiple kilos of cocaine to them.

12      Finally, you will also hear about a group of

13 couriers.  These individuals in this box over here:

14 Michael Thurman, Tiffany Vessels, Ultra McKenzie, John

15 Irby and Xavier Moore worked for Mr. Goodwin.  Mr.

16 Goodwin used these -- utilized these individuals, some

17 of whom are drug users and some of whom sold drugs as

18 well, because remember when you're involved in the

19 business you sometimes play multiple roles.  They used

20 those couriers to obtain cocaine from two individuals

21 in Texas, primarily an individual named Steve Campbell,

22 and another identified only as Kelly LNU.  It is

23 through those individuals that Mr. Goodwin received

24 multiple kilos of cocaine, as well as Ms. Martin.  They

25 pooled their money together.

1           You will hear that at least one of these
2   courier s went and pick ed up money from both of them and
3   took the money and went down to Mr. Campbell , brought
4   back multiple kilogram s of cocaine to Mr. Goodwin and
5   Ms. Martin , and then they sold it as powder some of it ,
6   and the rest of it they cook ed and convert ed it to
7   crack cocaine at various facilities -- different
8   residence s -- and then provided it to the individuals
9   in the bottom box who serve d as distributor s for this
10  organization .

11          Given their role in this conspiracy , by in
12  large , most of the testimony you hear throughout these
13  next week s are going to be focused on them because they
14  are the principal s in this business .   They are the main
15  individuals .   They are the individuals who profit ed
16  most from this business and who controlled the
17  business .   If you take them out of the picture , what
18  happen s is you can't get this cocaine , this heroin down
19  to the distributor s and facilitator s.

20          In the bottom box here you have a number of
21  individuals .   Those individuals Mr. Arnold , Mr. Bird ,
22  Mr. Harris , Mr. Lane , Mr. Martin , Mr. Nunn and Mr.
23  Walk er , who are not on trial here .   However , in this
24  box you have Ms. Ali .   LaNora Ali, you will hear ,
25  teach es public school in the District of Columbia .

1  LaNora Ali assisted Ms. Martin in the cocaine business.
2  She assisted Ms. Martin in several ways.  She obtained
3  cocaine from Ms. Martin, she'd go into Ms. Martin's
4  house and Ms. Martin kept a log, and she'd write in it
5  what cocaine she was taking.  She was trusted by Ms.
6  Martin.  She was able to go in and obtain cocaine on
7  her own.

8          She also assisted Ms. Martin, you will hear, in
9  May of 2004, as Martin lived over in Takoma Park --
10 Hayward Drive is an address you will hear about.  It
11 will stick in your mind probably forever.  She was
12 doing a lot of her drug business out of her house, and
13 you will see surveillance tapes where people would
14 call on the phone and they would go over to the house;
15 they'd come right out and they'd come back a few days
16 later, all a practice of picking up drugs from Ms.
17 Martin.  Ms. Ali participated in that contact.  She
18 received drugs and she distributed drugs, some of which
19 she may have kept for her own use, in addition to
20 distributing it to people she knew.  She was also a
21 facilitator.

22         In May, the people in the neighborhood are
23 suspicious of all this activity in the house.  Ms.
24 Martin gets concerned, so she says she's got to move
25 her business down to her school, which is in the

1  District of  Columbia .  It's called Paula 's School  of

2  Perform ing Arts.  There wasn't any dance class es going

3  on; there was n't any music class es going on there .  A

4  search warrant was executed on that school on June 1st

5  of 2004 , and what they recovered from that school was

6  book safe s contain ing money ; they recovered  cocaine ,

7  crack , and heroin as well , all package d for

8  distribution .

9       When she get s this call -- is concerned  about

10 the citizen s meet ing who does she call ?  She call s Ms.

11 Ali and she says , Ms. Ali , come over and help us.  I

12 need your help , and don't tell your husband what you're

13 doing.  You will see the very bag s that were seize d on

14 June 1st that contain the drug s being taken out of

15 Hayward.  You will see the video of them get ting into

16 the car and then driv ing -- the video get s them in the

17 car , and then surveillance  has them at the school  later

18 that evening .

19       In addition  to that , she was so trusted  that Ms.

20 Ali kept in her house a suitcase  of Ms. Martin 's that

21 contain ed rough ly $100,000 in cash .  That was recovered

22 during  the execution  of the search warrant on June 1st .

23       Mr. Bynum is a drug distributor .  Mr. Bynum is

24 involve d in the distribution  of drug s.  You will hear

25 back in 1999 he was found  in possession  of drug s during

1    the time of this conspiracy .  You will also hear him

2    order drugs -- talk to Paulette on the phone order

3    "ticket s."  The agent will also tell you that "62" is a

4    common quantity of crack cocaine , that it break s down

5    somehow to start with 1,000 grams .  It gets down to 62,

6    and then 31 .  62 is a common quantity of drugs that are

7    sold for distribution .  Mr. Bynum got a lot-- many ,

8    many deliveri es of crack cocaine from Ms. Martin .

9          In addition , you will hear that when his

10   residence was search ed, they recovered a scale as well

11   as a firearm .  The court will instruct you that

12   firearm s -- he is charge d with possession  of the

13   firearm because he was a convict ed felon and cannot ,

14   under the law , possess a firearm but also because he

15   possess ed the gun in furtherance  of a drug conspiracy .

16   Unfortunate ly, sell ing drugs isn't a legal business , so

17   you need a gun to protect yourself  -- to protect your

18   product , because not only are you concerned about the

19   police .  Most drug deal ers would n't use their gun

20   against the  police , but they're concerned about being

21   robbed by other people involve d in the drug business

22   and by people just involve d in the crime s, because they

23   know drug deal ers aren't going to report the crime to

24   the police .  So, you need a gun to protect you in that

25   way .

1          Then you also have on trial here, Ms. Lavon

2   Dobie.  Ms. Dobie is also an individual who is very

3   close to Ms. Martin.  She obtained drugs from Ms.

4   Martin for distribution; she's involved with cocaine --

5   crack cocaine.  You will hear her ask for it as

6   something from the "Hard Rock Cafe," or who wants to go

7   to the "Hard Rock Cafe."  You will understand by the

8   end of this trial what terms are commonly used by

9   people engaged in drug trafficking.

10         The agents in this case have, between them, over

11  50 years of law enforcement  investigative experience in

12  narcotics cases.  When you talk about going to the

13  "Hard Rock Cafe," "rock" is a common term used for

14  crack cocaine, because it's hard.  Powder -- regular

15  cocaine is usually in a powder form.  She would not

16  only get the drugs for distribution from Ms. Martin,

17  but also when Ms. Martin and Mr. Goodwin ran into

18  problems because of Nathan King getting arrested or

19  they've got some bad cocaine from Texas, Ms. Dobie

20  looks for and tries to set up some other sources of

21  supply for this business.

22         Ruby Harden.  Ms. Harden, like Ms. Ali, works.

23  She's a truck driver.  She's in and out of this area.

24  She's not in this area every day.  She lives in the

25  Baltimore area.  Ms. Harden, likewise, obtained drugs

1 from Ms. Martin, drugs for herself and for distribution

2 to other people. Very much, perhaps, like that Avon

3 lady I mentioned to you who becomes part of this,

4 because they want the product for their own use and

5 also for their friends or relatives but not in it to

6 make money off of it. That would be the role of Ms.

7 Harden.

8        Then we have Mr. Reece Whiting, who is sitting

9 over at counsel table. Mr. Whiting, likewise, is an

10 older gentleman, as are many of these defendants. Mr.

11 Whiting, again, was a drug customer of Ms. Martin. He

12 called her asking for drugs but also was an advisor to

13 her. When any number of their associates got arrested,

14 such as Nathan King, such as Pernell Philpot, Ms.

15 Martin would consult with Mr. Whiting. Even when Mr.

16 Goodwin got arrested in November of 2003 with crack

17 cocaine, she would consult Mr. Whiting in terms of how

18 their cases should be handled. So, he was an advisor

19 as well to the business, providing advice and also

20 trying to make sure that any of the people who were

21 arrested were not in cooperating with the government.

22 So, that was his role as well as being an individual

23 who obtained drugs from Ms. Martin.

24        As you can see, these individuals that are on

25 trial here all have particular roles in this

1   conspiracy .   Some  are  larger  role s,  such  as  Ms.  Goodwin

2   and  Mr.  Martin  and  other s,  are  much  small er  or  limited

3   role s.   The  same  thing  with  the  time  period  in  term s  of

4   their  involve ment  in  this  case .   Some  throughout  the

5   whole  time ,  such  as  Ms.  Goodwin  and  Ms.  Martin ,  indeed

6   her  relationship  with  Ms.  Ali  and  Mr.  Bynum  goes  way

7   back  to  the  late  nineties ,  and  other s  with  more  limited

8   relationship s  with  Ms.  Mart in.

9        How  do  we  prove  --  what  is  the  evidence  that 's

10  going  to  be  brought  before  you ?  Where  is  it  going  to

11  come  from  to  prove  what  I've  just  laid  out  from  you ?

12  It's  going  to  come  from  any  number  of  different

13  source s.   As  with  any  other  business ,  the  best  source

14  for  how  a  particular  business  operate s  is  unfortunate ly

15  some  of  the  people  who  participate d  in  that  business .

16  In  this  case  you're  going  to  hear  from  some  of  the

17  courier s.   You're  going  to  hear  from  some  of  the

18  suppliers ,  because  they  know  the  business .   They  have

19  personal  deal ings  with  Ms.  Goodwin  and  Ms.  Martin .   In

20  hear ing  from  them  --  some  of  them ,  indeed ,  are

21  cooperating  witness es  who  are  testify ing  in  hope s  of

22  get ting  a  less er  sentence .   Other s  have  got  no

23  agreement  at  all .   While  you  will  be  instruct ed  that

24  the  testimony  of  o ne  of  them  alone  would  be  sufficient

25  if  you  believe d  it  to  convict  or  find  someone  guilty

1  beyond a reasonable doubt  , we don't rely on just their

2  testimony but, rather, you will see that there are

3  document s and there are surveillance s to corroborate

4  the testimony of those witness es.

5        In addition to that, you will have a snap shot of

6  this organization that come s to you as a result of a

7  court-ordered wiretap. It's something you don't get

8  every day. You have to go through a lot of hoop s to

9  get it. It's not like we hear on the news about NSA

10 wiretap ping everyone. There are court requirement s

11 before you can get a wiretap, and rough ly from March 7

12 of 2004 until June 1st of 2004, the telephone s of

13 Paulette Martin, Luis Mangual, and a Gwen Levi, during

14 different portion s of that time, were being

15 intercept ed. So, you will hear -- you will hear Ms.

16 Martin and Mr. Goodwin and Ms. Ali and Derrick Bynum

17 and Lavon Dobie and Ruby Harden and Reece Whiting all

18 on the wire tap engage d in drug conversation s.  That's

19 where the telephone count s come from. It give s you a

20 snapshot view of how this business operate d.

21        In closi ng, what I ask you to do at this time

22 is, as I said initial ly, when I -- you could n't hear

23 me, or at least Tracy could n't hear me, our court

24 reporter, is to make sure that you hear all of the

25 testimony. That is absolute ly imperative, because you

1  don't get a transcript , and in our judicial system you

2  are going to determine  the guilt of these defendant s or

3  their not being  guilty , and you must do so based  upon

4  all of the evidence .   If you hear all of this evidence ,

5  then you will be able to consider  it all , and when you

6  return a verdict  it will be a just and appropriate

7  verdict .

8          In the end , in our closin g argument , Ms.

9  Greenberg  and myself will ask you to do one thing , and

10 that is to hold each one of these  individuals

11 accountable  for their individual  role s in this

12 conspiracy .   We will ask you to do that based  upon all

13 of the evidence  that you hear throughout  the next few

14 week s.   Thank you .

15         THE COURT:    Mr. Montemarano , you may proceed .

16         MR. MONTEMARANO :  I've been do ing this for about

17 20 year s now , and I think I still need note s.   Part of

18 the reason  for that is it always  leave s me a little

19 breath less when I stand before  a jury and address  them

20 and have someone 's future  in my hands .   So I will tell

21 you , it's my honor  and my privilege  to represent

22 Paulette  Martin .   My name is Michael  Montemarano , and I

23 will be de fend ing her for the next two month s.   We're

24 going  to get to know each other  pretty  well .

25         I would  like to tell you there  are other

1 attorney s represent ing other people here , so what I
2 have to tell you this morn ing by in large refer s only
3 to my client .   They'll have a chance to speak to you
4 later this morn ing .   Some of them may choose not to
5 speak you until the defense put s on its case sometime
6 toward the end of July .

7      What I would like you to do is think care fully
8 about what I'm going to tell you .   Listen care fully to
9 what I'm going to tell you .   We're providi ng you with a
10 little insight , perhaps a prism which to view the
11 government 's case .   As we all know , there are four
12 branch es of government .   Here in this courtroom we have
13 the judicial branch .   You're in a court of law and
14 Judge Titus will be presiding.     We also have  a
15 legislative branch .   You 've heard Judge Titus refer to
16 repeat edly to law s that are going to be the subject of
17 this prosecution , law s enact ed by congress .   We have
18 the exec ut ive branch which is charge d with enforcing
19 the law s and exercisi ng its discretion , representative s
20 here from the office s of the U. S. Attorney and law
21 enforcement .

22      There 's a fourth branch :   You.   What's it in the
23 constitution ?   What's it say in the Declaration of
24 Independence ?   "We the people ."   You here today , and
25 for the next two month s, are here to judge the fact s

1  and to determine what is true and what is not. What I

2  have to tell you is my view of the case. What Ms.

3  Johnston has told you is the government 's view of the

4  evidence. Ultimate ly, it is your view of the case that

5  matter s. They're asking you to judge Paulette Martin,

6  and I'm going to ask you to do the very same thing.

7  You have to ask yourselves, who is Paul ette Martin?

8  I'm going to read you a bit of prose by a famous

9  American author. It's from an American classic --

10 make s a good movie to, too. I think it will give you a

11 way of understanding this prosecution.

12          "Then toss ing both arm s with measure less

13 imprecations, he shout ed out, 'I, I, I'll chase him

14 round Good Hope, round the Horn, round the Norway

15 Maelstrom and round Perdition 's flame s before I give

16 him up, and this is what we have ship ped for, men to

17 chase that white whale on both sides of the land all

18 over the sides of the earth until he spout s black blood

19 and rolls fin up." *Moby Dick*. I think that give s you

20 a way of understand ing this prosecution, ladies and

21 gentlemen, a way of understand ing the single -mind ed

22 pursuit of an object.

23          Who 's Paulette Martin? She 's a businesswoman.

24 She 's an entrepreneur. She 's a concert promoter.

25 She 's a cook. She 's a friend. She 's an aunt. She 's a

1  god-daughter .   She's known  and  honored  and  respect ed in

2  Washington 's African-American   community .   A drug

3  deal er?   Well , I'm here  to tell  you the  truth .   Yes ,

4  Paulette  Martin  dealt  drug s on occasion   -- small

5  amount s to friends , because  she had a serious  abidi ng

6  addiction  to cocaine  and had had one for  many , many

7  year s.   It is nothing  like  the government  has portray ed

8  to you , and I suggest  the evidence  will  show  that .

9         Look .   Congress  create s the law s.   The U. S.

10  attorney  enforce s them .   Well , let's talk  about  law s.

11  There 's a law against  gambling ; right ?   So who here has

12  never  thrown  a buck  in a pool  on the Super  Bowl ?   The

13  World  Series ?   Or everybody 's favorite , the NCAA

14  basketball  tournament ?   It's against  the law , ladies

15  and gentlemen .   It's gambling .   But there  are crime s,

16  and there  are "crime s."   If you put that money  in ,

17  you're  breaking  the law .   But are you a criminal ?   And

18  let 's not even  get talk ing about  state  lotteri es,

19  please .

20         You see , Paulette  Martin  has a problem  when the

21  government  come s call ing in June  of 2004 .   She has well

22  over  a half  a million  dollar s in liquid  assets  -- cash

23  in various  bank  account s.   Apparent ly, if you're  a

24  success ful businesswoman , entrepreneur , concert

25  promoter , friend , aunt , cook , and god-daughter , known

1   and respect ed in the African-American   community   in

2   Washington , D. C., you can't have that kind of money .

3   Maybe  you  need  to  run  Enron  or  something , I don't know ,

4   but  you  sure  can't  if  you're  Paulette   Martin .

5            The  government 's going  to provide  you an

6   explanation  for  where  that  money  came  from , and they're

7   going  to say  it's drug  money .   That 's one  way of

8   look ing  at  it , I  guess , except  the  problem  is the way

9   they're  going  to  try  to  prove  it  to  you .   They'r e going

10  to  bring  in cooperat ors, people  who have  been  convict ed

11  of  crime s  and  cut  deal s with  the  government   --

12  song birds .   Captive s.   People  who understand  that for

13  their  supper , they  certain ly must  sing , and  sing they

14  will .   They're  obligate d to  show  you  that  these  people

15  have  been  paid  by  the  government   in  the  best  coin

16  possible :   Time .   Because  the  only  way  you  get  time  off

17  your  sentence  is  if  the  government  make s a motion  to

18  the  court  for  your  cooperation .

19           You're  going  to  hear  the  word  and  let ter

20  together  repeat edly :   5(k) .   It 's part  of  the  federal

21  sentenci ng  guideline s that  let s the  government   move for

22  a reduction  of  the  sentence  of a defendant  based  upon

23  that  person 's cooperation .   The  government   can  make  the

24  motion .   No  defense  attorney  can .   Only  the  government

25  can .

1          I'm going to talk to you about one of those

2  people you're going to hear about a lot.  Here is a way

3  of welcoming all of these cooperators.  A gentleman is

4  going to be brought in by the name of Juan Encarnacion.

5  He's a drug dealer from the Dominican Republic.  He

6  pleads guilty solely to his cocaine dealing.  He does

7  both, but he only pleads guilty for one.  He gets a

8  break in his sentence for his cooperation years back --

9  nine years -- and he's going to come before you

10  anticipating a further break because of a motion

11  they're bringing.

12          Ms. Johnston talked about witnesses coming in

13  from out of order.  We will be moving witnesses in

14  from out of the country.  Sure, Mr. Encarnacion is a

15  guest of the federal government.  He's in a federal

16  institution in Arkansas the last time I looked.

17          Ms. Johnston said, perhaps you don't want to

18  listen to the lawyers.  No, I suggest you do want to

19  listen to the lawyers.  Not that what we say is

20  evidence; it gives you a way of looking at the

21  government's case.  So when we probe the honesty, the

22  veracity, and the recollection of the government's

23  witnesses, especially these paid witnesses, I suggest

24  to you our questions will be important to you, because

25  they're questions you're probably going to want to ask

1 yourselves . The government  is putting on these people

2 in light of  Paulette  Martin 's name  in spite  of  the fact

3 they know  about the  source s of  the funds  which  they

4 seize d in June  of  2004 . They know , I am sure -- ladies

5 and gentlemen , we're  going  to bring  in evidence  about

6 the Mary  Payne  T rust . Mary  Payne ?  My client 's

7 godmother . We're  going  to bring  in the attorney  who is

8 the trustee  of the Mary  Payne  T rust , who  is the

9 signatory  on the  four  check s amount ing  to almost

10 $100,000  in cash  written  to Paulette  Martin .  It's  not

11 drug money .  No one  has  ever  suggest ed Mary  Payne  is a

12 drug deal er .  Because  of her  love  for  Paulette  Martin ,

13 she is virtually  the  sole  beneficiary  of the  trust .

14 There  is $100,000  in cash .

15        The furs and the  clothi ng .  Mary  Payne  had a

16 mass ive  collection , and it  all went  to Paulette  Martin .

17 She then  sold  or gave  it away .  She  doesn't  get  money

18 for  furs  and does n't  get  money  for  jewelry .  There 's

19 the concert  promoter  who -- I believe , the gentleman  is

20 from North  Carolina .  His  name  is William son .  In May

21 of 2004 he is paid  $130,000  to promote  on behalf  of

22 Paulette  Martin  a tour  by a band  -- I believe  the name

23 is Levert  -- the brother s Levert .  I'm  no music  expert .

24 I'm  sorry .  Entrepreneur ?  Okay .  Or the  sale  of

25 Paulette  Martin 's home  in Prince  George's  County  and

1 the amount of money she netted out of that.  I think

2 you get the idea.

3          Look at her.  She's 59 years old.  A drug

4 dealer?  Dealing in kilogram quantities of cocaine?

5 Dealing in massive amounts of heroin?

6          You heard Ms. Johnston.  People carry guns.

7 Where are the guns?  Not in her possession.  She has

8 all the stuff in her possession and doesn't find it

9 necessary to have a firearm.  Their own theory doesn't

10 make sense.  I suggest that's not the only thing that

11 you will see in the government's case that doesn't make

12 sense.

13          Look at the rest of the codefendants, ladies and

14 gentlemen.  Look at their ages.  The popular idea --

15 television and movies -- is drug dealing is a young

16 man's game, a violent person's game.  Where are the

17 young, violent people here?  Ask yourself whether or

18 not maybe a woman who is drug-addicted might sale

19 cocaine to her friends in small amounts, in grams and

20 eighths of ounces -- tiny amounts -- to help her

21 friends.

22          If you listen carefully to the evidence and

23 scrutinize the evidence by the government, ladies and

24 gentlemen, you will find out you have some problems

25 with these bought and paid for cooperators or the

1 people they don't bring in. One name -- one person who
2 was on Ms. Johnston 's large chart is John Martin ,
3 Paulette Martin 's boyfriend . You will hear witness es
4 describe John as her husband . John Martin lived in her
5 home . You will hear evidence that John Martin had
6 large amount s of drug packaging taken from his vehicle
7 year s ago . Where 's John Martin ?

8         If you look , you listen and you think , Paulette
9 Martin will be just fine . Ask yourself , where these
10 people , the LNUs , "last names unknown ," are? They've
11 been investigati ng this for year s and they haven't
12 found these people yet? Their cooperat ors are
13 perfect ly happy to come in and dump on people in the
14 government 's custody . They provide independent
15 information . I don't think so , ladies and gentlemen .
16 Ask yourselves , because I won't always be able to.

17         What question s need to be answered for you to be
18 able to establish whether or not the government 's
19 prove d its case beyond a reasonable doubt ? If you
20 look , if you listen and if you think , you will see
21 Paulette Martin is nothing like what they say . Thank
22 you very much .

23         THE COURT: All right . Ladies and gentlemen ,
24 we're going to take a recess before we hear additional
25 opening statement s. We'll recess until quarter of 12.

1                    (Jury excused at 11:27 a.m.)

2                    (Off the record at 11:27 a.m.)

3                    (On the record  at 11:47 a.m.)

4        THE  COURT:   Counsel , what is the order we're

5 going in?

6        MR.  HALL:   I think that is what we intend ed,

7 Your Honor , was just to go in order .

8        THE  COURT:  All right .  Mr. Martin , you will be

9 the first .

10        Bring  them  in.

11                    (Jury  returns  at 11:49 a.m.)

12        THE  COURT:   Ladies and gentlemen  , we will

13 continue  with opening  statement s.  Now we will hear

14 from Mr. Martin .

15        MR.  MARTIN:   Thank you , Your  Honor .

16        May it please  the court .  Counsel .  Members of

17 the jury,  my name  is Anthony Martin .  I represent  Mr.

18 Learley  Reed Goodwin .

19        Mr. Goodwin , would  you please  stand  up, sir?

20            (Defendant  Goodwin  indicating .)

21        MR. MARTIN:   Mr. Goodwin  is 63 year s old  now,

22 ladies and gentlemen  , and I need to let you know from

23 the outset  that the defense  does not deny  that Learley

24 Reed Goodwin  know s Paulette  Martin .  I think the

25 evidence  is going  to show  that .  The evidence  is going

1  to show a lot of things, but it's not going to show

2  everything that the government tells you.  For that

3  reason we would ask you to keep an open mind.

4          First and foremost, you have to remember that

5  Mr. Goodwin was presumed innocent the day the police

6  came and arrested him; he was presumed innocent when he

7  walked into this courtroom; and he is presumed innocent

8  when you start your deliberations.  He cannot be found

9  to be anything else unless and until the government

10  proves beyond a reasonable doubt   that he is guilty of

11  any wrongdoing.

12          What is it that the government says that Mr.

13  Goodwin has done?  They tell you between 1997 and 2004

14  he conspired with some other people to distribute

15  controlled, dangerous substances.  We submit that the

16  evidence is not going to show that.  The government

17  tells you also that in Count Two, on November 25, 2003

18  or thereabouts, that Mr. Goodwin was found and arrested

19  while trying to distribute crack cocaine.  What the

20  government has not told you, and what the evidence will

21  show, is that the car Mr. Goodwin was arrested in was

22  not his car.  The car Mr. Goodwin was arrested in

23  belonged to a cooperating witness.  The car Mr. Goodwin

24  was arrested in, and the drugs that were found in the

25  car, did not belong to Mr. Goodwin; he did not

1  acknowledge  that  those  were  his  and,  in  fact,  during

2  his  arrest  the  evidence  will  show  a  telephone  call  was

3  received  by  the  police,  and  it  was  after  that  telephone

4  call  that  they  were  able  to  find  the  drugs  that

5  supposedly  belonged  to  Learley  Reed  Goodwin.   That  is

6  Count  Two.

7          There  are  other  counts  related  to  Mr.  Goodwin.

8  Count  18,  which  occurred  on  March  17,  2004,  where  the

9  government  alleges  that  Learley  Reed  Goodwin  made  the

10  first  of  five  telephone  communications  to  facilitate

11  the  use  and  distribution  of  drugs.   What  the  government

12  has  not  told  you  is  that's  not  his  phone  number,  and

13  the  government  is  not  telling  you  who  initiated  the

14  calls.

15          The  same  is  true  with  respect  to  the  phone  call

16  made  on  March  24,  2004,  in  Count  26.   That  is  not  his

17  phone  number,  and  they're  not  telling  you  who  initiated

18  the  call.

19          April  24,  2004,  which  is  Count  48.   Again,  what

20  the  government  is  not  telling  you  is  that  that's  not

21  Learley  Reed  Goodwin's  phone  number,  and  they're  not

22  telling  you  who  initiated  the  call.

23          May  5th  2004  the  government  says  that  he  used  a

24  telephone  to  facilitate  and  help  distribute  drugs.

25  That's  at  Count  51.   Again,  they're  not  telling  you

1  that he did not initiate the call and whose phone

2  number that is.

3         May 15, 2004, the last of the use of telephone

4  communications, which is Count 54. Again, that's not

5  his telephone number, and they're not telling you who

6  initiated the phone call.

7         We've got 62 counts here. Of those 62 counts,

8  five -- five are telephone communications. You've got

9  the conspiracy count, which is an umbrella count;

10 you've got Count Two, which I've already told you what

11 the evidence will show, and then you've got these five

12 communications.

13        The last count is one that Mr. Goodwin also

14 denies, and that is on May 15, 2004, possession with

15 intent to distribute a controlled, dangerous substance.

16 He denies each and every one of these counts, and we

17 believe that the government will not be able to show,

18 just because they allege that he's involved in some

19 illegal activity or agreement, that it is so.

20        Somebody pointed out to me just a few minutes

21 ago that the government trial counsel had mentioned

22 that they were giving you a preview of "coming

23 attractions." Ladies and gentlemen, as you all know,

24 usually what happens in a preview of "coming

25 attractions," you see the best scenes. We would submit

1  that you have seen the best, and from here it's not

2  going to get any better.

3          The presentation  of the evidence.  The

4  government  is going to get to go first, and that's how

5  it should be because they have the burden of proof.

6  The defense  -- when I say "the defense," I'm speaking

7  of Learley Reed Goodwin and Learley Reed Goodwin alone,

8  because that's who I represent.

9          The defense has absolutely nothing to prove.

10  While we may put on evidence, the judge has already

11  told you we don't have to do that, because if we don't

12  feel that they've submitted enough evidence, we may

13  very well decide that it's not necessary for us,

14  because your common sense will guide you and dictate

15  you. Ladies and gentlemen , when you came through that

16  door, although you've been instruct ed, nobody told you

17  you had to leave your common sense outside.  In fact,

18  we're count ing on the fact that you will use your

19  collect ive judgment and common sense during this entire

20  process, and particular ly during the deliberation

21  process, to do what's right.

22          After the government  present s its evidence, then

23  the defense goes, and then the government get s another

24  opportunity  to present evidence again if they so

25  choose.  Again, that's as it should be, because they

1  have a very, very high burden to meet. The types of

2  evidence you're likely to see and hear in this case

3  government trial counsel has already pointed out some

4  of that to you. She mentioned some of the things

5  you're likely to see and hear. You're likely to see

6  and hear audio tapes, transcripts, and you will hear

7  something about surveillance, GPS and those sorts of

8  things. The evidence will not show that there was any

9  GPS tracking on Mr. Goodwin. The evidence is not going

10 to show any surveillance on Mr. Goodwin. The evidence

11 is not going to show that there was a wiretap order on

12 Mr. Goodwin's phone. You're going to hear that with

13 respect to other defendants and other people who may

14 not be in this courtroom, but you're not going to hear

15 that regarding Learley Reed Goodwin.

16        With respect to the government's witnesses.

17 Watch what happens. What you're going to see is that

18 first the government is going to put a law enforcement

19 officer on the stand over there, and then in between

20 that they'll put in their cooperators, and then in the

21 end they're going to put on other law enforcement

22 personnel, and they're going to do that in an effort to

23 put their weakest in the middle, the ones that you're

24 not likely to believe, because they know that common

25 sense dictates that when somebody has something to gain

1   by lying that their testimony is not to be given the

2   weight that the government would like you to give it.

3   So, they're going to put on law enforcement officers

4   who have what many people believe to be an unbiased

5   and objective view of what the evidence shows.

6   They're not unbiased and objective. They sit here with

7   the government. They invested time in this case. They

8   have invested their reputation. They've put their

9   knowledge and experience to bat as to what the evidence

10  they think shows, and they've sold that package to the

11  government, and now the government has brought it into

12  court. Keep that in mind when the officers testify,

13  and particularly keep that in mind when you're

14  deliberating. Yes, the officers do have a vested

15  interest in the outcome of this case.

16        With respect to the people who are sandwiched in

17  between those law enforcement officials, what the

18  evidence is going to show is that each and every one of

19  those people has something to gain from their

20  testimony. You've already heard the term 5(k). You

21  might also hear something about a Rule 35, because at

22  least one witness is in jail now who was arrested back

23  in Indianapolis, and you will hear more about that

24  later on.

25        Witness testimony for the defense. I've already

1 mention ed to you that we don't have to present any

2 evidence .  But if we do , there will be a substantial

3 variance  between  what  the  government  want s you to

4 believe  and what  we believe  your  common  sense  lead s you

5 to believe .  The  evidence  you won't  see  and hear  is Mr.

6 Goodwin  carry ing  money  for  any  of  the  codefendant s , Mr.

7 Goodwin  being  arrested  with  any  of  the  codefendant s ,

8 Mr.  Goodwin 's fingerprint s on any of  the  weapon s that

9 may be referred  to in this  case , Mr.  Goodwin 's

10 fingerprint s on any of the baggi es that may be referred

11 to in this case , picture s of Mr. Goodwin  in any of the

12 coconspirator 's house s with , perhaps , the  exception  of

13 Paulette  Martin .  We've look ed at a lot  of  evidence .

14 The  government  may have  evidence  in that regard , but I

15 haven't  seen  it.  It does n't mean it does n't exist , but

16 we haven't  seen  it at this  time .

17        What  I'm asking  you to do , ladies and gentlemen  ,

18 is to keep an open mind and just don't buy into the

19 government 's theory because they wear the title "the

20 government ."  Your  task  at the end of the case s in

21 chief  for both  the  defense  and the government  is to

22 deliberate , and that mean s everyone  gets to speak .

23 Everyone  should  get to speak  at least  once -- at least

24 once  and give  consideration  to what  everybody  says .

25 Not everyone  is as articulate  as some  of the other s ,

1  but it doesn't mean that the same weight shouldn't be

2  given to everybody's notes in the deliberative   process.

3  I want you to compartmentalize the evidence.  There's

4  seven people sitting over here.  There's seven people

5  here.  Please look at the evidence only as it relates

6  to Learley Reed Goodwin.  Of the 62 counts, eight

7  counts reference him.  Five of those eight talk about

8  telephone use.  Remember, he has nothing to prove.

9       I've already told you, and the judge has told

10 you, he is presumed innocent.  Don't abandon your

11 collective common sense.  Don't be bullied into

12 accepting someone else's reasoning.  And please -- I've

13 told you this before -- don't allow for a spillover

14 effect.

15      It's going to be a long case, and I really

16 appreciate you taking the time to sit and listen to

17 this case.  On behalf of Mr. Goodwin, I want to thank

18 you for the attention that you've paid thus far, and I

19 particularly want to thank you for considering  not only

20 what we may argue but what each and every juror has to

21 say when you finally go into closed session.  Thank

22 you.

23      MR. HALL:  May it please the court.  Counsel.

24 Ladies and gentlemen of the jury  , my name is Marc Hall,

25 and I have the privilege  of representing Reece Whiting.

1  I'm going to ask Mr. Whiting if he will stand for a

2  moment so you can see him. I realize with the podium

3  here, it's --

4              (Defendant Whiting indicating.)

5         MR. HALL:   You can sit down, Mr. Whiting.

6         I realize with the podium here sometimes it's

7  difficult to see some of the participant s over there.

8  I wanted to make sure you had an opportunity to meet my

9  client. During this trial, the government is going to

10 prove to you that my client, Reece Whiting, is not

11 guilty of this charge. The government is going to

12 bring in their evidence and present it to you, and what

13 you are going to see is very simply that their evidence

14 is great ly want ing as relate s to Mr. Whiti ng. You will

15 reach the inescapable conclusion at the end of it that

16 Mr. Whiti ng is not guilty. I only represent Mr.

17 Whiti ng, and I think other counsel have made mention of

18 the fact that each of us only represent s our individual

19 client. So the remark s I'm going to make here this

20 afternoon -- I think it's just a minute past 12 --

21 relate only to Mr. Whiti ng.

22         The government has outline d their case to you.

23 Let me take that outline and outline what I expect you

24 are going to see during the course of this case from my

25 point of view and sort of give you a prism or heads up

1  as to where this case is going to go.  Now, the

2  government has told you that during the course of this

3  trial you are going to hear evidence that comes from

4  what are referred to as wiretap or Title 3

5  conversations.

6         First of all, it will become very apparent to

7  you during the course of this trial that my client, Mr.

8  Whiting, has known Paulette Martin for a very long

9  time.  As such, there is nothing suspicious or illegal

10 about the fact that he calls her.  He doesn't call her

11 with any tremendous frequency, but he does call her

12 because he knows her.

13        You are going to hear, during the course of this

14 case, through the government's evidence, that there are

15 approximately, give or take, a few -- about 12 phone

16 calls involving my client having a conversation with

17 Ms. Martin.  I suggest to you that the most important

18 thing you can do from the defense point of view is to

19 listen very closely to those phone calls, because when

20 you listen to them you're going to see that those phone

21 calls are not about drug transactions.

22        You're also going to learn during the course of

23 this case -- I think Ms. Johnston alluded to it in a

24 way, but I'll make it a little more direct.  You are

25 going to learn during the course of this case that my

1  client, Mr. Whiting, has a law degree.  He is not and

2  never has been licensed to practice law, but he does

3  have a law degree.

4          You will see that there are a number of

5  occasions in which he and Ms. Martin have conversations

6  that concern people that she knows that have been

7  arrested, and I suggest to you that you're going to see

8  that it's quite normal and in no way nefarious the fact

9  that as he does have some familiarity with the law, she

10 asks him questions that are appropriate to ask someone

11 who knows that.  He's not practicing law without a

12 license or anything of that nature, but these are not

13 unusual questions to ask somebody who knows something

14 about what they're talking about.  So you have those

15 conversations between Ms. Martin and Mr. Whiting.

16         Then another set of conversations, still within

17 the limited number that I told you, but you will also

18 have conversations in which they talk about "tickets."

19 Now, that is something that I believe you heard in the

20 government's opening; you heard it in another counsel's

21 opening; and you're going to hear it throughout this

22 trial.  But what I'm going to ask you to do -- when you

23 listen to those conversations about tickets, I want you

24 to pay very close attention to what is actually being

25 said, because whether or not "tickets" is a code word

1  is something , I guess , you're going to determine at
2  some point at the end of the case . I suggest to you
3  that what you should make note of is , at least with
4  reference to the conversation s that Mr. Whiting has
5  with Ms. Martin , you're never going to hear the word
6  "ticket " attach ed to a number . That 's going to be very
7  important , because it is difficult to imagine that
8  somebody could actual ly be ordering drug s from Ms.
9  Martin without being able to attach a number to it so
10  that she would know what he was talk ing about . So I'm
11  going to ask you to pay attention to that during the
12  course of those telephone conversation s.
13       Also , you're going to hear during the course of
14  this case from individuals that are referred to from
15  time to time as cooperating witness es , or you 've heard
16  mention from some of my brother counsel about
17  individuals who may have pled guilty in reference to
18  what 's call ed a 5(k) letter or have made some sort of
19  an agreement with the government in which they are
20  testify ing in exchange for some type of relief from
21  their sent ence . To that extent -- and the court is
22  going to certain ly instruct you as to this -- you have
23  to look at their testimony in light of what it is
24  they're get ting out of whatever deal they made .
25       I also want you to pay very close attention to

1   what you hear from any cooperating witness in regard to

2   Mr. Whiting.  Remember, Mr. Whiting stands alone just

3   as all of these defendants stand alone, and you have to

4   judge his guilt not collectively with everybody else,

5   but you have to judge his guilt just based upon what

6   you hear from cooperating witnesses regarding any

7   alleged purchases that he may or may not have made.

8   What I suggest to you that you are going to hear is

9   that to the extent that Mr. Whiting ever purchased

10  anything that we are talking about amounts so

11  incredibly small that they could not possibly be for

12  the purpose of redistributing drugs to anyone else.

13          You are also going to hear, during the course of

14  this case, that my client, Mr. Whiting, is 64 years

15  old.  In fact, I jokingly said to one of my fellow

16  counsel that the collective age of the defense

17  attorneys in this case is probably less than the

18  collective age of these defendants.  You are also going

19  to hear that Mr. Whiting -- the government spoke to you

20  about this -- that the purpose of dealing drugs is

21  obviously to make money, but you're going to hear that

22  Mr. Whiting is poor.  He is so poor in fact that you're

23  going to hear that he had to live with his and rent a

24  room from his ex-wife in order to put a roof over his

25  head.  Hardly the lifestyle of the drug dealer that the

1  government  wishes  to  make  Mr.  Whiting  out  to  be.   You

2  will  also  hear  that  he  had  to  work  several  jobs  even  to

3  make  ends  meet  in  that  limited  fashion  that  he  had.

4       What  you  won't  hear  in  this  case,  however,  is

5  you  will  not  see  any  drugs  brought  into  this  courtroom

6  that  have  Mr.  Whiting's  name  attached  to  them  from  a

7  transaction.   You  will  not  hear  of  surveillance  that

8  shows  Mr.  Whiting  making  a  drug  deal  with  anybody.   You

9  are  not  going  to  hear  about  his  car  being  followed  or  a

10 GPS  device  being  attached  to  it.

11      I  suggest  to  you  that  as  the  trial  progresses

12 you  will  see  that  there  is  very  little  to  be  presented

13 in  this  case  involving  my  client,  Mr.  Whiting.   As

14 such,  you  can  expect  that  when  witness  after  witness

15 takes  the  stand  and  testifies  concerning  possibly  other

16 individuals  that  I'm  not  going  to  cross  witnesses  that

17 do  not  involve  my  client,  Mr.  Whiting,  because,  as  I

18 said  to  you,  I  only  represent  Mr.  Whiting,  and  I  am

19 sure  that  Judge  Titus  would  be  very  happy  that  I  do  not

20 spend  time  crossing  people  that  do  not  affect  my

21 client.   Remember,  ladies  and  gentlemen,  this  is  the

22 government's  case  to  prove.   As  you  have  been  told,  Mr.

23 Whiting,  as  all  criminal  defendants,  is  presumed

24 innocent,  and  he's  innocent  until  such  time  as  you,  the

25 jury,  finds  that  there  is  sufficient  evidence  beyond  a

1  reasonable doubt   to convict  him of anything .

2         Now , I grew up in what's commonly referred  to  as

3  southern  Maryland , in a little  town called  Chesapeake

4  Beach.   As such , I went fishing a lot when  I was a kid ,

5  and you quickly learn when you fish that sometimes  you

6  catch  large fish and sometimes  you get small  fish , and

7  sometimes  when you go fishing you pull  up  an eel , or

8  you find that your hook got attached to a rubber  tire .

9  But  when you first feel that tug on your fishing line ,

10 you don't know what you have there , and I suggest  to

11 you that that 's what the position  of the government 's

12 case is.   They thought  there was something  more to Mr.

13 Whiting and Mr. Whiting's involvement than it really

14 is.

15         I suggest  to you , ladies and gentlemen  , that

16 when you have heard all of the evidence  in this case

17 and you've had an opportunity  to reveal  it and you've

18 heard the judge 's instruction s to you and you've gone

19 back in the jury room and you've discussed it, you will

20 see that Mr. Whiting just should  not have been there

21 and should  not have been here in this case and in this

22 courtroom , and I expect that you will return  a verdict

23 of not guilty .   Thank you .

24        THE COURT:   Thank  you .

25        MR. MITCHELL:   May it please  the court .

1  Counsel .   Good  morn ing  ladies  and  gentlemen  of  the

2  jury .   My  name  is  Timothy  Mitchell ,  and  I  also  have  the

3  privilege  to  represent  Derrick  Bynum .

4          Can  you  please  stand  up?

5              (Defendant  Bynum  indicating.)

6          MR. MITCHELL:    This  is  Derrick  Bynum ,  for  those

7  of  you  who  can't  see  over  the  podium .

8          I  think  you  will  be  happy  to  hear  I'm  going  to

9  be  brief .   You've  heard  a  lot  already ,  and  I  don't  want

10 to  repeat  a  lot  of  what  has  been  said .   I  do  have

11 thing s  that  I  would  like  to  add  beyond  what  counsel

12 have  said ,  but  I  think  in  my  opinion  you  really  want  to

13 hear  the  evidence  and  you  want  to  hear  the  witness es

14 and  you  don't  want  to  hear  the  lawyer s  talk  about  what

15 they  think  is  or  is  not  going  to  happen .

16         I  certain ly  don't  have  a  crystal  ball .   I  don't

17 suppose  that  the  government  has  a  crystal  ball .   You're

18 going  to  hear  evidence .   The  evidence  is  going  to  come

19 from  the  witness es  and  the  document s  that  are  present ed

20 to  you .   As  other  counsel  has  told  you ,  what's

21 extreme ly  important  here  is  that  my  client ,  Mr. Bynum .

22 I  represent  only  Mr. Bynum ,  and  he  has  plead ed  "not

23 guilty ."   He  is  given  the  right  of  the  presumption  of

24 innocence .   The  burden  is  on  the  government  then  to

25 prove  that  they  have  evidence  which  you  must  find

1 prove s their case beyond a reasonable doubt   .

2           Now , there is a lot that 's been said by the

3 government  about  all  the relationship s between  all

4 these people and that 's how it make s up big business ,

5 and they've referred to this case as a business

6 venture . Well , one of the thing s they didn't tell you

7 about my client that I think is very important  and I

8 would ask you to consider  as you're listening  to all

9 the thing s that are said about my client is my client

10 has a special relationship  with Paulette Martin . He is

11 the father of her grandchild . Naturally , there is

12 going to be a connection between the two. There is

13 going to be communication  between the two. It 's not

14 going to be unnatural or strange  that they have some

15 connection  or communication , far from a business

16 relationship  that the government  is suggest ing to you.

17           The government  also mention ed that Mr. Bynum has

18 a prior conviction , and that is in fact what the

19 government  intends to introduce  to you . Again , prior

20 convictions  don't mean that they're in fact guilty of

21 something  else later on . So, I ask you , when you do

22 consider  that and get that evidence , to look at that

23 from the standpoint  of that is his past , and look at

24 the evidence for the future today what you hear as to

25 whatever  conduct  he 's involve d in .

1          What the government is going to base a
2    tremendous amount on for Mr. Bynum is all the
3    communication that he had with Paulette Martin. Again,
4    as I mentioned to you, he is the father of her
5    grandchild -- her granddaughter. They are intending to
6    interpret those phone calls and try to convince you
7    that the words used in these phone calls mean that
8    they're naturally or certainly talking about drugs and
9    nothing else. What I ask you to do is what other
10   attorneys have asked you to do: Keep an open mind.
11   Think. Is it really that clear? Is it really that
12   certain? What words are used, meaning between the --
13   what words are used that naturally mean "drugs?"
14          As I said, I am going to be brief. I don't want
15   to repeat a lot of the things that have been said by
16   counsel because, again, I think you understand our
17   clients all have the presumption of innocence, and
18   it's your burden to collectively decide if the evidence
19   meets the standard of "beyond a reasonable doubt." I'm
20   not limiting my conversations with you because I have
21   little to say, because there will be a lot to be said
22   throughout this trial. We'll be here for a while and
23   we'll have an opportunity at the end of the case to
24   come back and discuss whether the government has
25   actually come through with their promises to you of

1  what they think is going to happen.  At that point

2  we'll have much more to say about what the evidence is

3  or is not and how it relate s to the verdict .

4       Again , thank you very much , ladies and

5  gentlemen , for being here.  I know it's a sacrifice .  I

6  know that you're all thrill ed to be on this jury .  But

7  as you all have been here , you all understand it's a

8  tremendous duty that you have , and we appreciate you

9  being here .  Thank you very much .

10      THE COURT:  Mr. Ward .

11      MR. WARD:  Thank you , Your Honor .  If the court

12  please .

13      THE COURT:  You may proceed .

14      MR. WARD:  Counsel .  Ladies and gentlemen of the

15  jury , good afternoon .  My name is Peter Ward , and I am

16  a lawyer in private practice in Towson , Maryland , just

17  above -- north of Baltimore City , and I've been

18  appoint ed to represent Lavon Dobie in this case .  I

19  want Lavon Dobie to stand so that you can see who she

20  is.

21           (Defendant Dobie indicating.)

22      MR. WARD:  That 's Ms. Dobie , my client .  Ms.

23  Dobie has pled "not guilty " to these charge s.  She has

24  demand ed her right to have a trial before a jury .  I'm

25  sure if she want ed to make a deal , there are plenty of

1 deals being offered by the government , but she chose

2 not to because she wants her case to be judged by you ,

3 and she's confident that you will find the government 's

4 case lacking .

5       I'm afraid I don't have any assistants to

6 introduce . I don't have a co-counsel . It's just me .

7 I don't have a couple of agents sitting with me at the

8 trial table to help me and run and get things for me

9 when I need them . I don't have a paralegal working for

10 me . It's just me . And I certainly don't have two

11 great big carts , as you can see over here , full of

12 whatever they're full of to present to you .

13       Now , there was a comment -- I think it was Marc

14 Hall about fishing . Of course , the problem with coming

15 last , or at least towards the end , is much of what you

16 are going to say has already been said . I was going to

17 use that analogy , because I think it's a very apt

18 analogy as far as this case is concerned and

19 particularly as far as my client is concerned . I speak

20 only for my client , Lavon Dobie .

21       The government in this case cast a very , very

22 wide net . When you go fishing and you catch a -- you

23 cast a wide net , you're going to catch an awful lot of

24 fish . As my brother counsel Mr. Hall said , there are

25 big fish that you're going to catch , and you're going

1  to hear an awful lot of those big fish testifying  for

2  the government .

3        As the judge said to you in his comment s

4  earlier , you must look upon the testimony of

5  cooperator s -- these big fish -- with considerable

6  scrutiny , and he will give you instruction s on the law

7  that appli es at the end of the proceed ings before you

8  deliberate .  Why do you look upon that kind of

9  testimony with such scrutiny ?  Because of two thing s.

10  1. Because there are people who have something  to sell .

11  What do they have to sell ?  They have to sell to the

12  government  whatever stori es they can concoct that they

13  believe the government  is interest ed in buy ing and ,

14  second, b ecause the government  has bought them .  I

15  don't mean the government  paid cash for them , but they

16  gave them something  -- are going to give them something

17  far more valuable than money : plea deal s.  Whether  it

18  be less time in jail or whether  it be no time in jail

19  at all , whatever  the consideration , the government  has

20  paid it to them , and therefore  you have to look at that

21  testimony askance , ladies and gentlemen  , and consider

22  what's flow ing back and forth .

23        Ms. Johnston  talk ed about business , and a

24  conspiracy  is just a business .  Well , there 's business

25  going on between the government  and these cooperator s

1  -- these big fish -- and that's why you have to look at

2  their testimony very, very carefully. When you're

3  looking in the net beyond the big fish, you get down to

4  the little fish. That, ladies and gentlemen, I suggest

5  to you -- and I suggest to you this is what the

6  evidence will show is that my client, Lavon Dobie, is a

7  little fish. She is a woman who just about all of her

8  adult life has suffered from the curse of drug

9  addiction. Since she was arrested back in June of '04,

10  she has taken measures to try to beat that addiction

11  and has not been using drugs.

12          In any event, she was an addict, and there is no

13  question and we make no bones about the fact that she

14  purchased drugs for her own personal use. Does that

15  make her a drug trafficker? I suggest, ladies and

16  gentlemen, that when you listen to the facts and you

17  listen to the law, you will find that though she may

18  have been a drug addict, and though she may have bought

19  for her personal use, that does not make her a drug

20  trafficker. To use the analogy that Ms. Johnston used

21  of the Avon lady: My client was not a regional

22  distributor for Avon. She was not even a local

23  distributor for Avon. She was the one that showed up

24  at the Avon party and bought some lipstick or some

25  powder or some perfume because she liked it. She was

1  not part the Avon business .

2       Judge Titus, in the process of selecting this

3  jury , talked to you about bedrock principle s, and you

4  all swore on your oath s that with regard to those

5  principle s that you could follow the instruction s given

6  you on the presumption of innocence . That is, that my

7  client and indeed as with all client s are presumed to

8  be innocent when they come into the courtroom .

9       Another bedrock principle that the judge talked

10 about was the burden of proof . That is the burden of

11 proof being on the government to prove their case

12 beyond a reasonable doubt   and burden of proof remaining

13 on the government throughout this trial .

14       Another , as the judge called, it "bedrock

15 principle " is the principle that there is no burden on

16 my client , as indeed there is no burden on any

17 defendant to prove herself or himself innocent . The

18 burden is always -- and it's a heavy burden . The

19 burden is always with the government . It's a heavy

20 burden because the government seeks to deprive

21 defendant s -- and certainly in this case my defendant

22 -- of her liberty . When the might and power of the

23 government come s down on an individual as it has done

24 in this case with my client , my client has the right

25 not only to expect but demand that they prove her

1  guilty  beyond a reasonable doubt    .

2         One of  the  other  bedrock  principle s  that  I'm  not

3  sure  was  mention ed  in  opening  but  it  certain ly  is  a

4  bedrock  principle  of  our  system  of  criminal  justice  is

5  the  right  to  trial  before  a  jury .  A  jury , ladies  and

6  gentlemen , as  you  will  hear  I'm  sure  again  in  this

7  case , you  as  a  jury  stand  between  the  might  and power

8  of  the  United  States  government , the  two  lawyer s

9  sitting  at  trial  table , the  paralegal , the  two  agent s,

10  the  mighty  stack  of  evidence  on  those  two  cart s  over

11  there  --  you  stand  between  all  of  that  and  my  client .

12         These  right s  the  judge  talk ed  about  were

13  original ly  enshrine d  in  a  document  that  was  known  as

14  the  Magna  Carta , or  The  Great  Charter .  That  document

15  is  the  --  not  one  of  the , but  the  bedrock  document s  on

16  which  our  whole  Anglo- American  system  of  justice  is

17  based .  The  Magna  Carta  came  about  in  1215  when  the

18  barons  of  England  confront ed  the  tyrannical  monarch ,

19  King  John  and  demand ed  that  they  as  citizen s  be  given

20  certain  right s.  They  didn't  want  John  being  the  law  in

21  and  of  himself .  They  didn't  want  to  live  subject  to

22  the  whim  and  capias  of  King  John .  They  want ed  law s  set

23  down  --  principle s  of  justice  set  down .  Hence , the

24  Magna  Carta .  So  you , as  juror s, ladies  and  gentlemen  ,

25  have  a  long  and  honorable  history  going  back  to  1215 .

1   As I said, you are like the barons who stood up to King
2   John.  You are sworn on your oath to stand up to the
3   government and demand that the government do its job.
4           I think it's been said by other counsel -- I
5   don't want to prolong my comments, but I think it bears
6   repeating -- that you as jurors are the supreme judges
7   of the facts.  Judge Titus is the judge of the law.  He
8   will tell you what the law is, and he will tell you how
9   you must apply it.  But when it comes to the facts,
10  you, ladies and gentlemen, overrule everybody because
11  it's your assessment of the facts that governs in this
12  case.  You're going to have to go back in that jury
13  room at the end of this trial and sift through a whole
14  mountain of evidence and testimony, and I certainly
15  don't envy you that job.  You will have to separate the
16  wheat from the chap, so to speak, and when you have
17  done your job as you were sworn to do, we -- that is my
18  client and I -- feel confident that you will find as to
19  her that the government has failed in its attempt to
20  prove her guilty beyond a reasonable doubt.
21          I thank you for your attention to my remarks,
22  ladies and gentlemen.  I wish I could say I was the
23  last to speak to you, but I think there are a couple
24  more, or at least one.  Thank you again.
25          THE COURT:  Thank you.

1          MR. SUSSMAN:  My name is Ed Sussman.  I

2  represent Ruby Harden.  With the court's permission, I

3  will reserve my opening.

4          THE COURT:  He will reserve his opening until

5  the beginning of the defense case.

6          THE COURT:  Mr. McKnett, do you wish to proceed?

7          MR. MCKNETT:  Yes, Your Honor.

8          Good morning.  My name is Harry McKnett.  I

9  represent LaNora Ali.

10         Ms. Ali, would you stand please?

11              (Defendant Ali indicating.)

12         MR. MCKNETT:  Ms. Ali is a married woman.  Her

13 husband is here today.  She is a daughter.  Her mother

14 is here, too.  She is a friend.  Her friends have been

15 here -- are here today and have been here previously

16 and will continue to be here during the course of this

17 trial.  Ms. Ali has lived and worked in the

18 Maryland-Washington, D.C. area for 35 years.  She is a

19 schoolteacher -- elementary school.  She is 52 years

20 old.  She has never before been accused of a crime.

21         I am the last lawyer to speak today, and I

22 suspect you're tired of hearing lawyers talk.  I

23 suspect you're anxious to get this trial started, so

24 I'll be brief.  I want you to remember five points.

25 First, it is the law that associating with someone who

1 is a criminal does not by itself make you a criminal .

2         Second , it is the law that merely being present

3 when a crime take s place does not by itself make you a

4 criminal either .  In both instance s more than that is

5 required .  It is the burden on the government to prove

6 all the element s of a crime before you can find anyone

7 guilty of anything .

8         Third , it is the law that a fact that a person

9 does something that may further the purpose s or the

10 objectives of a conspiracy does not make that person a

11 member of the conspiracy unless that person act s with

12 knowledge of the conspiracy and with the intention to

13 further the purpose s or objectives of the conspiracy .

14         Fourth , it is the law that it is not enough

15 that a person may act negligent ly , care lessly ,

16 mistaken ly , not of igno rance , by mistake , or fool ishly .

17 Before you can find a person guilty , you must find

18 beyond a reasonable doubt   that he or she act ed

19 know ingly , intentionally , voluntarily to further the

20 purpose s of the conspiracy .

21         Fifth , it is the law that simply buy ing drug s

22 does not by itself make the buyer a conspirator .  A

23 mere buyer of drug s for personal use is not a member of

24 a conspiracy to distribute drug s, because such a buyer

25 has agreed only to buy drug s and not to distribute them

1 further .   That is an essential  element  of a conspiracy

2 charge .  If you keep these five point s -- these five

3 simple  point s in mind  and  apply  them to the evidence  in

4 this  case , at  the  end  of this  trial  you will  return  a

5 just  verdict  with  regard  to Ms.  LaNora  Ali , and  that

6 verdict  will  be "not  guilty ."   Thank  you .

7         THE  COURT:   All right .   Counsel , I suggest  that

8 this  is an opportune  time  to take  a lunch  break , and  we

9 can  begin  testimony  immediate ly follow ing  lunch .  The

10 clock  says 12:35.   Let's resume  at 1:40, all right ?

11         Thank  you very  much , ladies  and gentlemen  .

12                    (Jury excused  at 12:  35 p.m. )

13                    (Off  the record  at 12:35 p.m. )

14                    (On the record  at 1:53 p.m. )

15         MR.  MONTEMARANO :   Your  Honor , very  brief ly.

16 Thank  you for permitting  me a bit of additional  time

17 before  you came  out .   On behalf  of myself , I'm stand ing

18 in for my office .   Something  came  up in the U. S.

19 Attorney 's office  in Baltimore  that I had  to sort  out

20 for my partner .

21         THE  COURT:   Mr. Sussman .

22         MR.  SUSSMAN :   Two  preliminary  matter s, Your

23 Honor .   My first  request  is a request  for severance  and

24 mis trial  based  on that .   In term s of the opening

25 statement s.   What  we've  heard  here  is a fair ly

1 consistent  pattern  of  Ms.  Martin  sells  small  amounts  of

2 drugs  and  three  of  the  defendants  have  already  opened

3 as  buyers  of  small  amounts  of  drugs.   That  kind  of

4 leaves  me  in  a  very  difficult  place  because  the

5 evidence,  from  my  understanding,  will  be  very  similar

6 in  terms  of  conversation  in  terms  of  the  wiretap  to

7 three  defendants  who  have  already  admitted  as  of  their

8 defense  that  they're  engaged  in  some  sort  of  drug

9 dealing  or  drug  buying,  I  should  say,  albeit  not

10 perhaps  that  charged  in  the  indictment.   From  a  factual

11 standpoint  it  puts  me  in  a  situation  where  I'm  facing

12 an  irreconcilable  defense.   Not  only  that  --  that's

13 only  one  prong  of  the  request.

14        The  second  prong  is  that  I  believe  that  the

15 severance  of  my  client  would  be  in  the  interest  of

16 judicial  efficiency.   Probably  my  client  by  herself

17 would  be  a  two-day  trial.   With  everyone  else  it's

18 projected  to  be  ten  weeks.   So,  I  don't  see  that  the

19 judicial  efficiency  favors  my  client,  nor  is  the  cost

20 of  the  proceeding  in  that  fashion  particularly

21 appealing.   For  that  reason,  I  would  ask  that  the  court

22 grant  the  severance  that  we've  previously  requested.

23        THE  COURT:   All  right.   Ms.  Johnston  or  Ms.

24 Greenberg.

25        MS.  JOHNSTON:   Your  Honor,  as  in  any  conspiracy,

1  different  individuals  have  different  role s.  Counsel  is

2  incorrect .  If  we  were  to  try  his  client  separate ly,  it

3  would  still  be  a  significant  length  of  trial  because  we

4  would  have  to  prove  the  over all  conspiracy  and  the

5  defendant 's  participation  in  it .  The  mere  fact  that

6  some  defendant s,  through  counsel  and  opening

7  statement s,  are  not  evidence ,  but  because  they  in

8  opening  statement  have  admitted  that  their  client s  may

9  have  use d  drug s  or  Ms.  Martin  may  have  sold  small

10  quantit ies  while  she  was  using  drug s  does  not  in  any

11  way  infer  guilt  on  the  part  of  Ms.  Harden .  So,  we

12  would  suggest  that  there  is  no  basis  for  a  severance  at

13  this  time .

14       THE  COURT:   I  have  previous ly,  at  the  outset  of

15  this  case ,  over  the  government 's  case  --  I  don't  want

16  to  say  opposition ,  but  lack  of  enthusiasm ,  directed

17  that  this  case  be  broken  up  because  it  was  way  too  big

18  to  be  tri ed  in  one  case ,  and  that 's  why  we  have  the

19  group ings  that  we  have  now .  I've  thought  long  and

20  care fully  about  that .  I  think  the  group ings  are

21  appropriate .

22       I  have  previous ly  address ed  the  question  of  a

23  severance .  I  don't  see  anything  new  that  would  cause

24  me  to  change  my  mind ,  and  we  simply  --  I  don't  see  any

25  prejudice  --  obvious ly  nobody 's  enthused  about  being

1  involved in a long trial, but by the same token, there

2  is simply not the resources to grant 31 separate trials

3  in this case, and the groupings that I have directed

4  the government to propose have been accepted by the

5  court and I believe they're appropriate, and therefore

6  I deny your motion for severance.

7        MR. SUSSMAN:   As things develop I will renew it

8  if appropriate, Your Honor.

9        THE COURT:   That's your job.  Go right ahead.

10 That's fine.

11       MR. SUSSMAN:   The second issue is fairly much

12 simpler from my perspective.  I think the government

13 indicated its first witness was going to be Officer

14 Sakala and this from, my perspective, sets a tone.  I

15 note in his Jenks material he introduced himself to the

16 grand jury as he's currently assigned to major narcotic

17 defender conspiracy unit of the Special Investigation

18 Division.  I think that kind of self-vouching creates a

19 parameter of the people I'm investigating and

20 testifying about are particularly dangerous people.  I

21 think it's enough to say, I'm a narcotics cop for

22 Montgomery County or whoever it is.  He can describe

23 his background, but that kind of self-vouching with

24 your title is, I think, inappropriate and prejudicial,

25 and I would ask that all the agents who testify not --

1 it's kind of like talking about the congressional Medal

2 of Honor I won when you introduced me to the jury. It

3 has nothing to do with the proceedings.

4          THE COURT: Ms. Johnston.

5          MS. JOHNSTON: Your Honor, these people are

6 witnesses who are going to describe their background.

7 When we talk about witnesses, the government is going

8 to intend to proceed -- as we did in the first trial,

9 we're going to call Agent Sakala basically to lay a

10 foundation for the use of some of the wiretap calls

11 with other witnesses, and we will later recall him when

12 we play the three volumes of calls that the court has

13 in front of it. Also, we have some other witnesses

14 whom we will call periodically -- surveillance agents,

15 some detectives such as Randy Kuscan, who is going to

16 testify today of a limited nature concerning the July

17 2nd 2002 seizure --

18          THE COURT: I don't want to cut you short, but

19 I'm going to cut you short.

20          I'm going to deny the motion. What the

21 gentleman's job title is what it is. I don't know how

22 you intend to introduce him, but if the title is not

23 his real title then I'll obviously consider the

24 question.

25          Let me caution counsel. I've taken 16 -- 15

1 people  and  taken  them  away  from  their  summer , and  I

2 don't  want  to  have  jurors  sitting  back  there  waiting

3 while  we  come  up  with  unscheduled  motions  not

4 previously  filed  in  accordance  with  the  orders  of  this

5 court .  I  recognize  that  some  matters  come  up  that  just

6 come  up , and  I'm  not  going  to  stop  that  from  happening ,

7 but  please  understand  they've  been  out  there  waiting

8 since  20  of  two  to  have  us  have  them  back  in  the

9 courtroom .

10       I'm  going  to  deny  that  motion .

11       I'm  ready  to  proceed .  Call  your  first  witness .

12       MS. JOHNSTON:   Your  Honor , we  would  ask  the

13 court  to  impose  a  rule  on  witnesses  in  this  matter  with

14 the  exception  of  the  government 's  case  agents .

15       THE COURT:   For  the  persons  in  the  courtroom  now

16 -- and  I  need  to  have  help  from  all  the  officers  of  the

17 court  here  to  keep  this  in  force  -- any  person  who  is

18 present  in  the  courtroom  who  expects  to  testify  as  a

19 witness  in  this  case  should  be  excused  at  this  time .

20 In  addition , any  person  who  does  testify  is  precluded

21 from  discussing  his  or  her  testimony  with  any  other

22 witnesses  who  are  not  yet  in  the  courtroom .

23       MR. MONTEMARANO :   On  behalf  of  the  defense , we

24 would  like  to  know  exactly  who  the  case  agent  is  or

25 isn't .  Will  it  be  these  two  gentlemen ?  Because

1 Special Agent/Detective Sakala sat through jury

2 selection, for example.

3          MS. JOHNSTON:  It will be these two agents who

4 are our case agents.  Detective Sakala will be

5 testifying as an expert witness, as was previously

6 disclosed, but he will not be present in the courtroom

7 during the other testimony, although as an expert

8 witness I imagine he could be in the courtroom but he

9 will testify as an expert witness.

10         THE COURT:  Call your first witness.

11         Ms. Merez, bring the jury in.

12         MS. JOHNSTON:  Your Honor, our first witness

13 we're going to be using the monitor for.  Coming in

14 here there's usually a big monitor there for the people

15 in the back row.

16         THE COURT:  Wait.  I'm getting a signal.

17         Ms. Johnston, I'm informed that the setup we

18 have in the courtroom right now is the setup that

19 traditionally is used in this courtroom, and in order

20 to bring this large screen thing, there's connectors we

21 don't have.  They would have to remove a row, and it's

22 not feasible -- they do have monitors in front of each

23 and every one of them.

24         MS. JOHNSTON:  They don't have monitors in front

25 of each and every one of them.  Your Honor, there are

1  three small monitors in the front row; there eight

2  jurors who are sitting in the back row who have no

3  monitor.  If the court would like, I can put the first

4  exhibit up on the screen and it will be very difficult

5  for the people in the back row to read what's on the

6  monitor.

7      THE COURT:  I'm as far away as the people in the

8  back row are from it and I can see it beautifully.

9      MS. JOHNSTON:  I have tried cases in this

10  courtroom before, and every time I've tried a case

11  there has been a big monitor for the jurors in the back

12  row.  I don't know whether it's usually here or I've

13  just been fortunate to have it in this courtroom.  I

14  thought it was in the courtroom when I was in here last

15  week, but that could be an oversight on my part, but

16  there is usually a big monitor in there when I've tried

17  a case in here.

18      THE COURT:  Hold on just one second.  Ms.

19  Johnston, it is simply not going to be possible to get

20  this done in a few minutes.  It is not normal to have

21  those monitors in this courtroom.  It is possible those

22  monitors belong to Courtroom 2A where I have a special

23  fondness for them.  If we can get them up here, it's

24  going to be a long time.

25      MS. JOHNSTON:  Your Honor, I'm not asking that

1 the court delay starting now.

2        THE COURT:   I'm not going to delay starting now.

3 If we can get it done -- I suspect it's not going to be

4 able to get done until tomorrow.  That's best I can do.

5        MS. JOHNSTON:   We appreciate that very much.

6 It's been my experience, and I may have been fortunate

7 to have been in here --

8        THE COURT:   You've been very fortunate, and

9 we'll try to keep you being fortunate, but we're not

10 going to have it today.  I will ask Chimes, which is

11 going to have to do some brain surgery to one of those

12 rows, as well as the IT people, to do what they can to

13 set you up with one large monitor, and that's all we

14 can do, but it can't be done today.  So, call witnesses

15 as to which that will not be critical and can proceed.

16        Bring the jury in.

17        Counsel, I'm going to remind you, you are my

18 policeman for identifying who are the witnesses.  If

19 you see anybody who is a witness that doesn't belong

20 here, let me know.

21        MS. GREENBERG:   Your Honor, I just informed Mr.

22 Ward that somebody who is on his witness list is in the

23 courtroom.

24        THE COURT:   Mr. Ward, did you hear that?

25        MR. WARD:   I'm sorry?

1          THE  COURT:   There's someone  on  your  witness  list

2  in  the  courtroom .  Are  you  going  to  not  call  that

3  person , or  do  you  want  to  excuse   them ?

4          MR. WARD:   No , Your  Honor .   There 's more  than

5  one  Goldie  Dobie .   There 's  a  Goldie  Dobie , III .   We're

6  not  talk ing  about  the   client 's  husband .

7          THE  COURT:   All right .

8          MS. JOHNSTON:   Your  Honor , Ms. Glad ys  Segal  is

9  in  the  courtroom .  She  is  going  to  serve  as  an

10  interpreter   for  our  next  witness .   I  don't  see  that

11  that 's  a  problem .

12          THE  COURT:   Interpreter ?   That 's no  problem .

13              (Jur y  return s  at  2:06  p.m. )

14          MS. JOHNSTON:   Your  Honor, the  government  would

15  call  Sergeant   Chris  Sakala.

16  Thereupon,

17                   **CHRISTOPHER   SAKALA** ,

18  having  been  called  as  a  witness  on  behalf  of  the

19  Plaintiff,  and  having  been  first  duly  sworn  by  the

20  Courtroom  Deputy,  was  examined  and  testified  as

21  follows:

22          THE  CLERK:   I  need  you  to  state  your  name  for

23  the  record.

24          THE  WITNESS:   Christopher   Sakala.   S A K A L A.

25                   **DIRECT   EXAMINATION**

1        **BY MS. JOHNSTON:**

2  Q.      Sergeant  Sakala , where are you employed  ?

3  A.      Montgomery  County  Police  Department.

4  Q.      How long have you been employed there?

5  A.      Since 1981.

6  Q.      And in what capacity?

7  A.      From 1981 to 1987  , I was assigned to the   Patrol

8  Division  of the  Silver  Spring  District.  From 1987 to

9  2005 , I was assigned to the   Special  Investigations

10  Division,  Narcotics  Section ; and from 2005 to the

11  present , I'm assigned to the   Fourth  District  Patrol.

12  Q.      How many years did you spend  investigating

13  narcotics cases?

14  A.      Going on 18 years.

15  Q.      You indicated that you're   no longer in

16  narcotics?

17  A.      That's correct.

18  Q.      Why is it that you left the   Narcotics  Section?

19  A.      I was promoted in earl  y 2005 and transferred to

20  Patrol  Division.

21  Q.      Thank you. Are you currently a sergeant    , then ,

22  with the police department?

23  A.      That's correct.

24  Q.      Was that transfer part of your being promoted?

25  A.      Yes.

1  Q.      During your 18 years in narcotics   , could you

2  describe for us the kinds of case   s that  you've

3  investigated?

4  A.      The first couple of years  , 1987 or late '80s  , I

5  investigated --  I was assign ed to the regular   Narcotics

6  Section in dealing   with, I guess , mid-level  violator s,

7  using things such as direct buys, hand   -to-hand buys,

8  buys  with informants   to do investigations.

9         In 1989 , I was transferred to our   Major  Narcotic

10 Offenders  Section , which works with federal task forces

11 and federal agencies to target higher level

12 organizations focusing on going after an entire

13 organization as opposed to an individual.

14 Q.      Have you been federally deputized during your

15 time in law enforcement?

16 A.      With several different agencies   ; FBI,  IRS,  DEA

17 and U. S. Customs  Service which is now   Immigration and

18 Customs  Enforcement.

19 Q.      What is the difference between acting just as

20 Montgomery  County police officer and being federally

21 deputized?

22 A.      It gives you police powers or the same law

23 enforcement authority as a federal agent.  Your title

24 is a task force officer but it    gives  you the same legal

25 authority to make arrests as a federal officers.

1 Q.      How many years have you worked as a federal task

2 force officer?

3 A.      Probably my first year was probably the late

4 '80s or '90s, and in this current one   -- for this

5 current case from  , I believe , 1995 to the present.

6 Q.      Could you describe for us some of the

7 investigative tools that    are used during the course of

8 a narcotics investigation?

9 A.      There's a whole myriad of thing   s that we use.

10 Everything from cooperating informants.  We use what

11 are called pin registers.  We use search warrants, we

12 use records, financial records, subpoenaing of records,

13 we use telephone records.  We use pole cams,      cameras

14 that do surveillance  .  More recently  in the last  --

15 probably last four years   , we use thing s that are known

16 as GPS tracking devices.  Pretty much anything at your

17 disposal , and then ultimately we use sometimes what's

18 called a Title 3  or electronic surveillance.

19 Q.      You use d a couple of term  s that if we could

20 begin with pin register   , if you could redescribe for

21 the ladies and gentlemen of the jury what a pin

22 register is and what kind of information you get from

23 it?

24 A.      Pin register is a device also known as a dial

25 number recorder that is placed on a telephone.   It

1  records the telephone numbers that    a target telephone

2  is in contact with.  In other words, what numbers are

3  dialed from  that phone  and what  numbers are call ed to

4  that phone.  It does not record the conversation    , but

5  what it does is it establishes calling patterns for

6  your target that your phone is in contact with phones

7  A, B and C.  By using that device  , you can establish

8  relationships between your target and other

9  individuals.

10 Q.      And you referenced cooperating individuals.

11 What do you mean by   a cooperating individual?

12 A.      That can fall into a whole host of categories    ,

13 everything from a paid informant to a defendant who's

14 cooperating as part of a plea agreement    , a disgruntled

15 husband , a wife, ex -girlfriend usually are very good

16 informants, neighbors, concerned citizens, almost any

17 of the individuals will fall into that category and

18 probably used all of them at one point in time.

19 Q.      Now, in regard to those individuals that we

20 typically think of   as informants,   people who are

21 receiving some benefit from the government    , do you

22 treat  those individuals differently than getting a call

23 from a regular law-abiding citizen?

24 A.      Yes.

25 Q.      How is that?

1  A.      You know , obviously the person has a bias of

2  some type and you're certainly more cautious when

3  dealing with that individual and take step    s to make

4  sure that what that person is telling you is correct or

5  true , and the way we do that is we try to get

6  independent corroboration of what that person is

7  telling us so we don't take it on face value     .  We then

8  go back and  try to  get records , other witness es to

9  corroborate what this person or that person has told us

10 as being true.

11 Q.      You also mentioned a    Title 3,  or wiretap

12 interception.  Are you able to use those in every case?

13 A.      No.  Very rarely.

14 Q.      Could you explain some of the limitations that

15 are placed upon law enforcement in using a      Title 3

16 intercept.

17 A.      In both federal and state law, the requirement

18 -- the main requirement for a   n electronic  surveillance

19 is the investigation -- investigative technique of last

20 resort .  You must exhaust every other option or show

21 that other options are not viable to succeed      in

22 investigating  the case. So it's the   last thing you do.

23      Once you decide that's the path you're going to

24 go, there's a whole series of steps you need to take in

25 order to get approval to even apply for the authority

1  to use electronic surveillance.

2  Q.      And then using a n electronic surveillance, is a

3  court order required?

4  A.      Yes, it  is.

5  Q.      Could you describe for the ladies and gentlemen

6  of the jury some of the limitations imposed upon law

7  enforcement officers in us  ing a Title 3  interception in

8  a case such as drug conspiracy?

9  A.      Yeah.  When you make your application, you apply

10 to listen to specific targets   , named targets for

11 specific conversations.  In other words    , you can't

12 listen to every conversation that you intercept.  The

13 conversations are broken down into what we call

14 pertinent conversations  , that being conversations which

15 are usually of a criminal nature and     nonpertinent

16 conversations.

17         The law permits  you to  listen to conversations

18 that are pertinent, conversations that     -- it does not

19 permit you to listen to   nonpertinent  conversations.  So

20 as you're listening when a    nonpertinent   conversation

21 comes up or a conversation turns into a     nonpertinent

22 nature, the monitoring equipment is turned off and you

23 quit listening.

24         It's called minimization  , and once the -- if the

25 pattern -- if the conversation turns back to a

1  pertinent call , then the equipment is then turned back

2  on and you're listening again  .  So throughout the

3  entire process you're deciding and making

4  determination s of what  is a pertinent and what is a

5  nonpertinent  conversation to decide what you're going

6  to listen to.

7  Q.     Just so we're clear.  You said that if the

8  conversation is  nonpertinent , you have to shut it off

9  and stop listen ing --

10 A.     That's correct.

11 Q.      -- but t hen you could listen again if it became

12 pertinent .  How do you know if it becomes pertinent if

13 you shut it off because it's    nonpertinent ?

14 A.     There's a process which is called spot

15 monitoring , and the judge will set down guidelines on

16 the exact specifics of how spot monitoring is

17 accomplished .  But normally , the equipment is turned

18 off for a period of time, then the equipment after that

19 period of time is turned back on   , the monitor will

20 listen to determine if the conversation has turned back

21 to being pertinent.

22       If it is , the monitor will continue recording

23 and monitoring .  If it is still  nonpertinent , the

24 equipment will again be turned back off for a period of

25 time , and that will continue during the entire length

1  of the conversation.

2  Q.      And there are -- are there any time con     straints

3  imposed in terms of how long you can operate a       Title 3

4  interception of someone's telephone calls?

5  A.      Yes.  There's several requirements.  The initial

6  order is good for 30 days.  However, in that 30 days       ,

7  you must make reports back to the judge showing the

8  progress  that you've made  , and the judge will make a

9  determination whether to continue authorizing the

10  interception for the wire.  So, essentially you're

11  getting -- keeping the judge up   -to-date  every ten days ,

12  and at the end of the 30 days    , the order will expire.

13  Q.      Can those orders be renewed?

14  A.      They can be if there's cause to -- cause and

15  reasons to renew them.  It's not an automatic renewal       .

16  You need to do another complete affidavit establishing

17  probable cause to continue interception.

18  Q.      Again , is that something that's authorized by

19  the court?

20  A.      That is correct  .  You actually make the

21  application,   the judge reviews it, and then we issue

22  order s.

23  Q.      In regards to this case that's being heard

24  before this jury, what was your role in this

25  investigation?

1 A.      I was one  of the three case agents.

2 Q.      The other two case agents being    Task Force

3 Officer  Eveler  and  Special  Agent  Snyder here present in

4 the courtroom ?

5 A.      That's correct.

6 Q.      You indicated that you had been involved     since

7 1995.

8         Had you started your investigation of these

9 particular defendant  s in 1995?

10 A.      No.

11 Q.      Was there another investigation ongoing back in

12 1995?

13 A.      Yeah , that's when  I joined the -- this

14 particular task force.  This case didn't start until

15 later.

16 Q.      Calling your attention to this case    , was court

17 authorization received to engage in     Title 3

18 interceptions or wiretaps?

19 A.      Yes.

20 Q.      Can you tell us how many telephone lines?

21 A.      Five telephone lines over a period of about

22 three month s.

23 Q.      I want to show you what's been marked as     CH-9 .

24 Are you familiar with this chart?

25 A.      Yes.

1   Q.      Does it accurately reflect the telephone line      s

2   that were intercepted    on their periods of interception?

3   A.      Yes.

4   Q.      If I could put it up on the screen and have you

5   walk us through it, please.

6           Starting with the top telephone number     , if you

7   could tell us what the number was and there's an

8   asterisk and explain that, whose      telephone  it was and

9   what the different categories are on the chart      .

10  A.      The first telephone -- target telephone was

11  (202) 277-8177.  That was a cellular telephone that was

12  utilized primarily by   Paulette  Martin , and the  asterisk

13  refer s -- if you look at the bottom   , during the

14  interception , the telephone number actually changed to

15  (202) 271-0991 on   March 26, 2004.

16  Q.      The second column?

17  A.      The second phone number.  It was (301) 270     -9007 ,

18  and that referred to the home residence or home

19  telephone of  Ms. Paulette   Martin, the hard line.

20  Q.      And where  was that phone located?

21  A.      Hayward  Avenue , Takoma  Park , Maryland .

22  Q.      When you say  "hard line ," what do you mean by

23  that ?

24  A.      The actual  telephone  at the residence.

25  Q.      In terms  of the  first telephone number   , there's

1 a second column that's called line designation    .  Can
2 you tell us what that refers to?
3 A.      What we did is on any multiple line wiretap     , you
4 will designate  A, B, C just to identify   the lines , and
5 then from that point on   , your conversations or
6 transcript or call  s will have that first letter
7 designator .
8        So call  B471, for example , would identify it as
9 the 47 1st call that was intercepted on    line B as
10 oppose d to C471.  So it's just an identifier for the
11 five lines  A, B, C, D and  E.
12 Q.      Can you tell whether call one was on the first
13 line or the fifth line; is that right?
14 A.      That's correct.  That's all is.
15 Q.      Then we have you   indicated, the   telephone
16 utilized  by, that was  Paulette  Martin on the first two
17 phones?
18 A.      Primarily,  yes.
19 Q.      What do  you mean by  "primarily? "
20 A.      Obviously , there were times when other people
21 would use the phone at the residence and her cell
22 phone, so she was the main person intercepted on the
23 line but there were other people.
24 Q.      Then the last column says   , dates of
25 interception .  Could you explain those numbers?

1 A.      Yeah.  We began intercepting on March 8, 2004

2 and ended interception on June 2, 2004.

3 Q.      Will you go down to the third number and     if you

4 could  explain the third and    the fourth  numbers

5 together .

6 A.      (202) 489- 1884 was the  C line, and  that was a

7 cellular telephone primarily used by    Luis  Mangual , Jr.,

8 and that was intercepted from April 7, 2004 to May 13,

9 2004 ; and the  D line was (202) 223-7729   , that was a

10 second cellular telephone used by    Luis  Mangual , Jr.,

11 and that was intercepted from April 7, 2004 to June 2,

12 2004.

13 Q.      Can you  tell  us why  the  start and stop dates on

14 those phone s are  different from the start and stop

15 dates on the   Martin phones?

16 A.      The application and authorization for the     Martin

17 phone was obtained before the authorization to

18 intercept the   Mangual phone.  We actually used

19 telephone conversations that we intercepted on the     A

20 and B line to obtain authorization to intercept the     C

21 and D line .  So, that's why you had the different start

22 dates.

23 Q.      Then finally the last number?

24 A.      The (202) 487 -1373 was a cellular telephone

25 primarily used by   Gwen dolyn Levi , and that was

1  intercepted from April 7, 2004 to April 25, 2004.

2  Q.      Why did the interception over that telephone

3  line end on April 25 of 2004 and not June      2 like three

4  of the other lines?

5  A.      Ms. Levi was arrested prior to the other

6  individuals , so that the  early  end date was a result of

7  her arrest.

8  Q.      Again on  line C also there's a different date of

9  May 13 of 2004.  Why is that date different?

10  A.      On or about that date or shortly before that

11  date , I believe  Mr. Mangual  ceased -- quit using that

12  phone, so there was nothing to intercept on it.

13  Q.      Even though you still had time on your order to

14  intercept those calls  ?

15  A.      That's correct.

16  Q.      During the course of a wiretap, could you

17  describe for the ladies and gentlemen of the jury how

18  you identified the speakers who are participating in

19  the conversations , and is there a -- describe how you

20  later identified them once the investigation was

21  terminated .

22  A.      Yeah.  There's no one hard and fast     method.

23  Obviously  when  you first get up on a wiretap    , you have

24  a lot of unknown males or unknown females because you

25  don't know the voices.  The first -- the easiest step      ,

1 obvious ly, to find out who the subscriber is of the

2 telephone .  And if you 're really lucky , you will get

3 the person who's using the phone is the actual

4 subscriber on the telephone.

5        A lot of times that's not the case   , you have to

6 use other methods.  One of the primary methods that we

7 use in this case and almost every case is

8 self-identifiers in the conversation.  Someone will

9 call, you know, person   B and say hey, this is   Chris.

10 Give me a call back  , and then somebody else will call

11 back and say hey, is   Chris there?  So you will get

12 self-identifie rs.

13        You will also get things like after they hang

14 up , someone will say   I just talked to   Joe Blow , so you

15 know the person in the previous conversation is       Joe

16 Blow.  Once you identify the voices as you     go through,

17 it becomes much easier to recognize the voice      s.

18        There are other ways we use it.  If we have a

19 cellular telephone a  nd we don't know specifically who

20 is using it , we will try to obtain   a picture  of the

21 person and compare that picture to surveillance

22 photographs .  We will go so far as   to call  the

23 telephone , while a person is   on surveillance  and watch

24 them answer the phone to    identify who is using it.

25 There is no one   method we use .  We just use a myriad of

1 technique s to try to  identify  who is using the

2 telephone.

3 Q.      That would be during the course of the wiretap

4 while you're  actually  intercepting  the  call ; is  that

5 correct?

6 A.      That's correct .

7 Q.      Now, i s there other information or methods     that

8 you use  once you have arrested individuals and shut

9 down the investigation  ?

10 A.      Sure .  When we talk to the people  , we will

11 listen to their voices and see if this is the same

12 person we've  been  listen ing to for the  last three

13 months , whether  we hear them in court proceedings    ,

14 we'll actually play conversations for cooperating

15 defendants , cooperating witnesses who will confirm what

16 we believe is who the speakers are.  It gets a little

17 bit easier at that point.

18 Q.      Now, in regards to this case, have you had

19 occasion to prepare a selection of telephone

20 conversations to be used in this trial?

21 A.      Yes.

22 Q.      Can you give us a ballpark estimate of how many

23 interceptions occurred during the course of the wiretap

24 over these five lines?

25 A.      There were probably   -- I would say probably well

1  over 10 ,000 interceptions.  Not all of the

2  interceptions contain conversation.  How many of the

3  calls interceptions contain conversations    , I couldn't

4  tell you exactly , but there were certainly in the

5  thousands of telephone calls.

6  Q.     Again , what is the difference between an

7  interception and a  n actual recorded conversation?

8  A.     When you're using the -- in the digital age    , a

9  lot of the interceptions that occur over the equipment

10 will contain just streams of data    , and they will

11 register as a call number on the equipment.  There      wa s

12 actually no call made.  You know   , for example , on a

13 cellular telephone , if everybody looks at their

14 cellular telephone , you will see that your cellular

15 telephone has a date and time on it     .

16      That is maintained   to a data  stream that's sent

17 by the cellular telephone, and that will come across

18 the equipment even though an actual call isn't made.

19 Those -- that is counted as a call number as an

20 interception , but is not a conversation so that     would

21 be the difference.

22 Q.    Now, in preparing conversations to be introduced

23 in this trial , have you included all of the actual

24 conversations that were intercepted    ?

25 A.     No.

1  Q.      Have you indeed included all of those that you

2  categorized as pertinent?

3  A.      No.

4  Q.      How did you determine the calls to be used here?

5  A.      Primarily the defendants that are on trial    , we

6  determined the  calls that are used  , and then even with

7  the defendants on trial not all the calls are used just

8  because they're not germane to the government's case.

9  Q.      Did you take into consideration the time that

10 would go into playing all the calls?

11 A.      It would take a long time to play all the calls    ,

12 yes.

13 Q.      Let me show you  a couple o f exhibits and ask you

14 to identify them.  Beginning with    CD-1, can you tell me

15 what  CD-1 is?

16 A.      This is a  CD containing the excerpted calls to

17 be used in this case.

18 Q.      Does this  CD contain true and accurate copies of

19 the calls  or portions of calls as they were recorded at

20 the time of the original intercepts back in 2004?

21 A.      Yes, calls and portions of calls.

22 Q.      Now, you indicated that some of those are merely

23 portions of the calls.  Have the entire calls been

24 available for defense counsel's --

25         MR. MARTIN:   Your Honor , I'm going to object to

1  the leading nature of these questions   .

2          THE COURT:  On this matter -- overruled.

3          MS. JOHNSTON:

4  Q.      Are the calls in their entirety    involved

5  available to all the parties in this case    ?

6  A.      All the calls are available if anybody want    s to

7  listen to them.

8  Q.      Why are some of the calls just portions of the

9  calls?

10  A.      Just for saving the   Court's time.  Some of the

11  calls can be rather lengthy  , and if you're only

12  interested in 30 seconds or a minute    , to play the other

13  23 minutes of the call would be very time consuming.

14  Q.      I want to show you three volumes that have been

15  marked on the outside cover as    Government's  Exhibit

16  CD-1A, CD-1B and CD-1C.

17          Do you rec ognize  those three transcript books?

18  A.      Yes.

19  Q.      Did you review and ass  ist and finally review

20  those transcripts to make sure they were accurate

21  versions of the portions of the calls that are

22  contained on   CD-1?

23  A.      Yes.

24  Q.      If  I could , I'm just going to take    CD-1A  and put

25  it up on the screen.

1          In reference to  CD-1A,  inside the front cover

2 there is something called an Index of Calls.  Do you

3 see that on the screen?

4 A.       Yes, I do.

5 Q.       Could you tell us what that is?

6 A.       It's a listing of all the calls that are

7 contained on  the CD and the transcript book.  If you

8 start on the very far left  , where it  says "exhibit,"

9 that's the actual call number  .  In other words , B14

10 would have been intercepted on the      B line and the

11 fourteenth call intercepted  .  The page, obviously, is

12 just a page reference for the transcript book      , and  the

13 description describes who the parties to the call are

14 and the date and time of interception.

15 Q.       Okay.  When we say the  B line -- again , that

16 would be the line at the residence of      Ms. Martin?

17 A.       That is correct.

18 Q.       Now, if we turn just to one of the calls and you

19 can ex plain the way the call is set up.  Turn     ing your

20 attention to  Page 2 of the actual transcript  , if you

21 can tell where you say that information come      s from  that

22 begin s at the  very top of the header  .

23 A.       The header begin s with  Encore , which was just

24 the designation for the investigation.  The case number

25 underneath , that long  BA number , is the  Customs

1   Enforcement case number.  Then you start with the call

2   number as  B28 .  Over to the right , you will see B 2,

3   which is the line that was intercepted on     , and you have

4   the date and time interception, the time is give     n in

5   military time , and this call  is at 17 :53.  It began and

6   ended at 17 :53, which is 5:53  p.m. to 5 :53 p.m .

7            And then you will have an incoming from or an

8   outgoing to , which tell s the  telephone number that was

9   in contact with the target telephone    .  And this one  --

10  in this particular case  , it was an incoming call from

11  (202) 498-1051 , and it would have been an incoming call

12  to the  B line , which was  Paulette  Martin's home

13  residence .  So this was an incoming call to her

14  residence , and then the intercepted parties are listed

15  followed by a demarcation to the transcript     , which is

16  listed below.

17  Q.     And i n this instance , the part ies are  listed as

18  Paulette  Martin and  Derrek  Bynum; is that correct  ?

19  A.     That's correct.

20  Q.     Without going through each of the  individual

21  call numbers, have you reviewed all three volumes?

22  A.     Yes.

23  Q.     Do each one of those accurately reflect the date

24  and time and telephone number involved in     each  one of

25  those calls?

1  A.      Yes.

2  Q.      In addition to that  , have you reviewed all those

3  calls,  and are each of the parties intercepted

4  accurately identified throughout the three volumes?

5  A.      Yes.

6  Q.      Now,  in regards to this   investigation,   as a case

7  agent , can you tell us when your investigation

8  generally commenced with reference to     Ms. Martin  and

9  the other defendants?

10 A.      It began in the end -- near t   he end of 2002

11 preliminarily but really didn't pick up more steam

12 until 2003 -- mid to late 2003.

13 Q.      Had you been involved in another investigation

14 prior to the end of 2002?

15 A.      Yes.

16 Q.      Was that investigation -- when did that

17 investigation end?

18 A.      The arrests were made in    November of 2001  , and

19 it continued on until beginning of 2003 when we were

20 getting ready for trial in that case.

21 Q.      As a result of that investigation, did that

22 cause you to investigate    Ms. Mart in?

23 A.      Yes.

24 Q.      Was she the focus of your investigation

25 initially ?

1  A.        Initially, yes.

2  Q.        During that first investigation that ended with        ,

3  I guess preparing for trial in 2003 but with arrests

4  the end of 2001, was anyone arrested who was -- who you

5  later determined was associated with     Ms. Martin?

6  A.        Yes.

7  Q.        Who would that have been?

8  A.        Juan  Encarnacion.

9  Q.        Was it subsequent to his arrest that you

10 received information relating to     Ms. Martin from   Mr.

11 Encarnacion ?

12 A.        Yes, after his arrest.

13 Q.        And did you act on that information immediately

14 at that time?

15 A.        If we did , it was of no great -- no --    I think

16 we might have put a pin register on her phone or

17 started very preliminary  , but nothing -- nothing

18 immediate.

19 Q.        Why was that?

20 A.        Because we were still busy with the case     that  he

21 was involved with and preparing for trial in that case.

22 Q.        Were there multiple defendants in that case?

23 A.        Yes, there were quite a few.

24         MS. JOHNSTON:   Court's indulgence.

25         Your  Honor , that's all the questions we have at

1 this time .  We will be recalling   Agent  Sakala  at a

2 later time .

3          THE  COURT:   Cross-examination?

4          MR.  MONTEMARANO :  Court's indulgence, please.

5          No questions from  the defense at this time  , Your

6 Honor.  We reserve the right to cross on this and the

7 rest of  Sergeant  Sakala's  --

8          THE  COURT:   Mr.  Sussman .

9          MR.  SUSSMAN :  I jus t have the a few brief

10 matters.   I wasn't part of the --

11          MR.  MONTEMARANO :  I'm sorry.

12          MR.  SUSSMAN :  If  I might .

13          THE  COURT:   You may .

14                    **CROSS-EXAMINATION**

15          **BY MR.  SUSSMAN :**

16 Q.     Good afternoon,   Sergeant.

17 A.     Good afternoon.

18 Q.     You mentioned initially that the gene   sis of this

19 investigation was in 1995; is that right?

20 A.     No.   I first joined the   Task Force in 1995.

21 Q.     Okay.  And  I belie ve you mentioned that

22 Ms. Martin became known to you sometime in 2001 or

23 2002?

24 A.     2002 we received information about her.

25 Q.     Okay.  And it's fair to say that from your

1  investigation that   Ms. Harden didn't become any subject

2  of this investigation   until March of 2004?  Would that

3  be accurate?

4  A.      That's probably accurate, yes.

5  Q.      Let me just go back to one of the things you

6  talked  about, the  transcripts.  You said you picked out

7  the transcripts to be used in this case; is that

8  correct?

9  A.      Well,  I didn't, but the government did, yes.

10  Q.      Well, you picked them out with the cooperation

11  of the prosecutor ; is that right?

12  A.      That's accurate , yes.

13  Q.      The other matter that you mentioned was      you

14  talked  about a pin register; is that     right?

15  A.      Yes.

16  Q.      As an investigative tool  , it's a useful tool  .

17  Would that be fair to say?

18  A.      Yes.

19  Q.      And particularly useful in connection with

20  conspiracies ?

21  A.      Yes, it is.

22  Q.      Just to dumb it down  , if you can, it's kind of a

23  caller  ID system ; isn't that right?

24  A.      Yeah.  It's a -- if you want to put it that way     ,

25  you can retrieve all the numbers being called to and

1  from , so it's a caller    ID.   I guess that works both

2  ways.

3  Q.      Right.  S o it can be used to , for example , to

4  monitor all the call  s that go out of my office, for

5  example ?

6  A.      It could be used to monitor the numbers of the

7  calls dialed , not the calls themselves  .

8  Q.      Right.  Y ou don't know who's making the call or

9  what they're saying?

10  A.      Correct.   You just know   what numbers  are being

11  dialed.

12  Q.      Right.   And c onversely , or the other  way around ,

13  you know all  the numbers  that are  coming into my office

14  as well?

15  A.      That's correct.  Usually.  There    are exception s,

16  but usually, yes.

17  Q.      There may be some blocked numbers?

18  A.      That's correct.

19  Q.      But o ne of the other things you can do and which

20  -- in terms of the technology   , you can see all of these

21  numbers and how they speak to each other as well    ; isn't

22  that right?

23  A.      If you have enough pin registers up, yeah, ther    e

24  are programs where you can establish not      only that the

25  target s is talk ing to A and B, but maybe  A and B are

1  talking to each other  .  So it is possible to develop

2  relationships that way, yes.

3          MR. SUSSMAN:   Thank you very much.

4          THE COURT:  Any redirect ?

5          MS. JOHNSTON:  No redirect  , Your Honor.

6          THE COURT:  All right .  You may step down.

7  Thank you very much.

8          THE WITNESS:  Thank you  , Your Honor .

9          (Witness excused at 2  :37 p.m. )

10         MS. JOHNSTON:   Your Honor , our next witness

11  would be  Juan Encarnacion.

12         THE COURT:   All right.

13         MS. JOHNSTON:  W e will have to have him brought

14  in.

15         THE COURT:  Is he available right now   ?

16         MS. JOHNSTON:  He should be available  , but I'll

17  have to call .  I think he needs an elevator ride    up to

18  the courtroom .

19         THE COURT:  Okay.   Good.

20         MS. JOHNSTON:  A nd Ms. Segal is here  -- a court

21  certified  Spanish interpret er is present.

22         THE COURT:  Why don't we take a 15   -minute recess

23  to get him in place and get the interpreter ready     .  By

24  that clock , it's 25 of.  We will be back at ten minutes

25  of 3:00 .

1                    (Jury excused at 2:38 p.m.)

2                    (Off the record  at 2:38 p.m. )

3                    (On the record  at 2:51 p.m. )

4          THE  COURT:   Ms. Johnston , do you intend to use

5   the monitor for this witness  ?

6          MS. JOHNSTON:  Just for a photograph and a

7   couple -- three photographs --

8          THE  COURT:  What  I'd like  to do , since that

9   monitor is strategically placed to block the view of

10  some of the defense   attorneys,  except when you're do  ing

11  that, could you put it down?     I think it can be put

12  down .

13         MS. JOHNSTON:   I don't want to break it  .

14         UNIDENTIFIED  MALE:  Would you like one of us to

15  do it, and then we can be blamed for breaking it?

16         MS. JOHNSTON:   I don't think it goes further

17  than that.

18         THE  COURT:  Well , can it be moved a little bit

19  or?

20         THE  CLERK:  Can it just be moved over on the

21  side?

22         THE  COURT:  Yeah .  We've put it on the floor

23  before once.

24         Ms. Johnston , do your  nonmonitor  questions now

25  and we'll get the monitor fixed.

1          MS.  JOHNSTON:  Is it lit up  , the monitor over

2 there?

3          THE  COURT:  It just came unplugged.

4          MS.  JOHNSTON:  It looks like it's lit up now.

5 Yes, it's working now.

6          THE  COURT:  Well, at the appropriate time    , bring

7 it back up.

8          MS.  JOHNSTON:  Will do.

9          THE  COURT:  All right.  Bring the jury in.

10          In the meantime  , defense counsel  , just do what

11 I'm doing and sit up tall.

12          MS.  JOHNSTON:   Your  Honor , we have to  swear the

13 interpreter.

14          THE  COURT:  Yes.

15          MS.  JOHNSTON:  Thank you.

16          THE  COURT:  Why don't you wait until the jury

17 come s in so they know what   we're  doing.

18          The language is  Spanish,  I assume ?

19          MS.  SEGAL:  Good afternoon , Your  Honor.  Yes,

20 federally certified   Spanish interpreter.

21          THE  COURT:  I'm going to explain to the jury

22 what we're doing.

23          MS.  JOHNSTON:   I expect  Mr. Encarnacion will be

24 able to answer some question   s in English , but she's

25 there to assist if he has any difficulties.

1                          (Jury returns at 2 :54 p.m. )

2              THE COURT:  Ladies and gentlemen, the next

3  witness is going to be testifying with the assistance

4  of an interpreter, so the first thing we     have to do is

5  to swear the interpreter to give an accurate

6  translation , then we swear the witness.  Meanwhile    , we

7  have one technology issue to address that's being taken

8  care of.

9              THE CLERK:  If the interpreter will raise her

10 right hand.

11                         (Interpreter sworn at 2 :55 p.m. )

12             THE CLERK:  Please state your name for the

13 record.

14             THE INTERPRETER:  Gladys   Segal , federally

15 certified court interpreter.

16             THE CLERK:  Thank you.

17             If the witness would please stand.

18 Thereupon,

19                    **RICARDO  JUAN  ENCARNACION** ,

20 having been called as a witness on behalf of the

21 Plaintiff, and having been first duly sworn by the

22 Courtroom Deputy, was examined and testified as

23 follows:

24             THE CLERK:   I need you to state your name for

25 the record.

1        MR.  ENCARNACION :  Juan  Encarnacion .

2        MS.  JOHNSTON:  So the record is clear   , we've

3  asked for a court certified    interpret er to  be

4  available.   Mr. Encarnacion understands some    English

5  but may have difficulty with some of the questions, so

6  I don't think we need the    interpreter to   translate word

7  by word but  Mr. Encarnacion  --

8        THE  COURT:   If he's able to answer in    English,

9  fine .  But to make certain that he understand   s the

10  questions, they should be translated for him.   Thank

11  you.

12              **DIRECT  EXAMINATION**

13        **BY MS. JOHNSTON:**

14 Q.    Mr. Encarnacion , would you state your name full

15 name for the record?

16 A.     Ricardo  Juan  Encarnacion.

17 Q.     How old are you , Mr. Encarnacion?

18 A.     Thirty-eight .

19 Q.     How far did you go in school?

20 A.     Eleven .

21 Q.     If you could lean forward and speak into the

22 microphone so that we can hear you.  Again    , feel free

23 to respond in   English .  If you have any difficulty

24 understanding the question or need assistance of the

25 interpreter , she's there to assist    you .

1  A.       All right.

2  Q.       Where were you born?

3  A.       Dominican  Republic.

4        MS.  JOHNSTON:    Your  Honor , may we approach the

5  bench very briefly?

6        THE  COURT:  You may.  At the bar of the    court.

7             (At the bar of the Court.)

8        MS.  JOHNSTON:  This witness testified in a     --

9        THE  COURT:  Wait until we get the horde up here.

10  We've  got a large group to get up here.

11        MS.  JOHNSTON:  This witness testified in the

12  last trial, and h  e used an interpreter periodically

13  during his testimony.    I have prepared him  , and for the

14  most part , communicated with him without an

15  interpreter .  So I would ask that we be allowed to

16  proceed without having question by question translation

17  done so that he just uses it -- it     will  go much more

18  quickly.

19        THE  COURT:  Okay.

20        MR.  WARD:  Again , he's very quiet.  Can we

21  please ask him to speak up   ?

22        THE  COURT:   I will  do both things.

23        MS.  JOHNSTON:   Instruct the interpreter that she

24  doesn't have to   --

25        THE  COURT:   All right.  Thank you  .

1                    (Back  in open court.  )

2            THE  COURT:   Mr. Encarnacion, two things  .  I want

3  you to be certain that you speak directly into that

4  microphone , very close to it ; and secondly , for the

5  interpreter, he does understand some     English so that

6  you don't need to translate every single question for

7  him.

8            If you need assistance with a question and you

9  don't understand the question, ask the interpreter to

10  assist you with a question.  But if you're able to

11  understand the question in    English , you may proceed to

12  answer it  in English.

13            THE  WITNESS:  All right.

14            THE  COURT:  Please do speak directly into the

15  micro phone  so everybody can hear you.

16            BY MS.  JOHNSTON:

17  Q.      Where did you grow up?

18  A.       In Dominican  Republic.

19  Q.      Is that where you're a    citizen?

20  A.      From  Dominican  Republic, yeah.

21  Q.      When did you first come to the     United  States?

22  A.       '88.

23  Q.      Did you leave this country after you were here

24  in 1988?

25  A.      Come in  '88, and back and forth  , and  I stay here

1 in, like, '91.

2 Q.      After you came here in the 1990s, did you remain

3 in -- were you in the   Maryland area?

4 A.      Yeah.

5 Q.      Calling your attention to the mid   -1990s to the

6 late 1990s, did you have occasion to meet anyone who is

7 present here in the courtroom?

8 A.      No.

9 Q.      Did you ever meet anyone who's here present here

10 in the courtroom?

11                    (Question interpreted.   )

12           THE WITNESS:  Yes.

13           BY MS.  JOHNSTON:

14 Q.      Who was it that you met?

15 A.      Paulette  Martin.

16 Q.      Excuse me?

17 A.      Paula  Martin .

18 Q.      Could you identify   Ms. Martin by something she's

19 wearing?

20 A.      Yeah , she wear a beige   shirt and glasses.

21 Q.      And where is she seated?

22 A.      It was on the right side    -- on the left side of

23 you.

24 Q.      The left side of mine?

25 A.      Yes.

1 Q.       Next to the gentleman that's to my immediate

2 left?

3 A.       Yeah.

4        MS. JOHNSTON:   Could we ask the record to

5 reflect that the witness has identified    Paulette

6 Martin?

7        THE COURT:  The record will so indicate.

8        BY MS. JOHNSTON:

9 Q.       Now, do you know approximately when it was that

10 you met Ms. Martin?

11 A.       It's, like, '98 or late  '97, something like

12 that.   I think it's  '98.

13 Q.       Where did you meet    Ms. Martin?

14 A.       I meet her in the house of one of her friend.

15 Q.       What were you do ing at Beverly's house ?

16 A.       I went there to try to talk to    Beverly about

17 some business that we had to set up    , and she got her

18 name , and I told her me et her there.

19 Q.       Could you repeat that answer for me?      I didn't

20 -- I didn't understand   part of it.

21 A.       I'm going to  Beverly house and to set up some

22 business with her , and then she get there  , and I meet

23 Ms. Paula over there in    Beverly house.

24 Q.       So you were at   Beverly's house doing some

25 business ?

1 A.       Yeah.

2 Q.       What kind of business were you doing with

3 Beverly?

4 A.       Drug business.

5 Q.       Excuse me?

6 A.       Drug business.

7 Q.       What kind of drugs were you discussing with     Ms.

8 -- with  Beverly?

9 A.       At that time , the heroin.

10 Q.       How much  heroin were you dealing with her?

11 A.       With , like , 78 to 90 grams  , something like that.

12 Q.       What were the circumstances that caused     you to

13 be dealing heroin with    Beverly?

14 A.       Here now?

15 Q.       No.  Why were you meeting with    Beverly to

16 discuss selling her 70 to 90 grams of heroin?

17 A.       Because she -- her husband got a deal with my

18 cousin , and he get in trouble  , and then  I trying to

19 get , the one he let  , and when  I came there to try to

20 deal with  --

21 Q.       I didn't understand the last portion of your

22 answer.  Could you please repeat it very slowly and

23 clearly?

24 A.       So they say why  I am there.

25 Q.       Yes .

1  A.      I am there because   I try  to go  set up some

2  business with heroin and trying to get about 70, 80,      90

3  grams they got in heroin.

4  Q.      How is it that you had the 70 to     90 grams of

5  heroin that you were try  ing to get rid of with   Beverly ?

6  A.      Because she's the one that    I know that my nephew

7  living there to  -- so she can get rid of it there

8  because her husband not there anymore    .  He was on  -- in

9  jail some time for some problem he got before.

10  Q.      You mentioned your nephew and her husband.

11          What was the relationship between your nephew

12  and her husband?

13  A.      My nephew was in jail at this time.

14  Q.      Your --

15  A.      So he in jail because   I don't want to mess with

16  that, so he  get --  it is drug s in there.  And   I know

17  Beverly,  and then  I trying to get and talk to her to

18  get rid of it because   I don't know anybody to -- who

19  buy that  .  But I know for her husband, because her

20  husband was not in the house anymore because he was in

21  jail because he got some car accident    , something like

22  that.

23  Q.      So your nephew was in jail?

24  A.      Yeah.  And  Beverly husband , too.

25  Q.      He was in jail, and the heroin that you had that

1  you were trying to   --

2  A.      That belong to my nephew.  Belong    ed to my nephew

3  at that time.

4  Q.      Did you actually sell that to    Beverly?

5  A.      Gave it to her, yeah.

6  Q.      When you went to   Beverly's to make those

7  arrangements how -- who    introduced you to   Ms.  Martin ?

8  A.      Huh ?

9  Q.      How were you introduce   d to Ms. Martin?

10  A.      So she get there , and I think she know exactly

11  what  I'm being there for.

12         MR.  MONTEMARANO : Objection , Your  Honor.

13         THE  WITNESS:  A nd she's giv ing it  all like  --

14         MS.  JOHNSTON:   Mr.  Encarnacion , please stop.

15         THE  COURT: Excuse me.    I didn't hear you  , Mr.

16  Montemarano .

17         MR.  MONTEMARANO :  The gentleman's answer began,

18  "I think."   I object.  No basis for knowledge.

19         THE  COURT:  All right.  Make sure you ask him to

20  tell you what he knows, okay   ?

21         BY MS.  JOHNSTON:

22  Q.      Would you tell us what was said between you and

23  Beverly and  Paula when you were introduced to     Paula?

24  A.      She gives me, like, a business card with her

25  phone number.  And then after that I call her like a

1  day or day before -- like two day or day before     , and we

2  meet some place, and then we said we talk about what

3  we're gonna do.

4  Q.      Now, when you say, "she gave me a business card

5  with her number on it  ," who is the  "she?"

6  A.      "She" is  Ms. Martin.

7  Q.      The woman you've identified here in court?

8  A.      She's on left side beside the gentleman there.

9  Q.      Once  Ms. Martin gave you the card, what did you

10 do with the card with her number on it?

11 A.      I put it in  my wallet; I call her , like , day

12 before.

13 Q.      The day before she gave you the card or the day

14 after?

15 A.      No.  The day after she gave me the card,     I call

16 her.  Sorry.

17 Q.      When you called her a day or so after she gave

18 you the card, what did you discuss with her on the

19 phone?

20 A.      I don't discuss that on the phone   .  I just  go

21 and talk to her by person, and we     -- because  I go to

22 what going to b  e the price or what we're going    to get

23 into her.

24 Q.      When you called her on the phone   , what did you

25 say on the phone?

1  A.      I really don't remember exactly what    I say on

2  the phone, but   I know it was something like that     I want

3  to see her or   I want to talk to her or something like

4  that, so ...

5  Q.      Did you arrange a meeting with her?

6  A.      Yeah.

7  Q.      Where did you meet with her?

8  **A.**      The first time that I meet her    , I saw her in

9  Beverly house , like in  a Safeway.  They got on the

10 beltway  or 49 5 in  Hyattsville  over  there.

11 Q.      Wait.  So you met her at a    Safeway or  a Giant?

12 A.      Yeah.  They got a   Safeway.   I don't remember

13 exactly if it's   Giant  or  Safeway they got over around

14 there.

15 Q.      Where is that   Safeway or  Giant  located?

16 A.      It's in  Hyattsville  and 495 .

17 Q.      New Hampshire  Avenue --

18 A.      Yes.

19 Q.      -- and  Route 49 5?

20 A.      Yeah.

21 Q.      What is that also known as?

22 A.      It was near  New Hampshire  Avenue , not

23 Hyattsville .

24 Q.      That road 49 5.  Is that the beltway?

25 A.      Yes, beltway.

1  Q.      How far is that from where    Beverly's house was?

2  A.      It's , like , a mile or , like , a half a mile.

3  Q.      When you met with   Ms. Martin at the shop -- at

4  the Safeway or  Giant , what discussion did you have with

5  her?

6  A.      I talk to her , she asked me about what we gonna

7  do or not  about the  price.

8  Q.      The price of what?

9  A.      Cocaine.   The price of  kilo cocaine,  and then

10 we're going to bring to her thing like that.

11 Q.      When you say the  price of a key, what -- a key?

12 A.      A kilo .

13 Q.      Kilogram?

14 A.      Kilogram .

15 Q.      Why were you discussing cocaine with    Ms. Mart in

16 if you had  delivered  heroin to  Beverly?

17 A.      Because that's not what   I do.   I don't know

18 about her.   I know about   -- that's not the thing that    I

19 do, so that's why  she don't ask me   about that .

20 Q.      What 's the  other thing that you do?

21 A.      Cocaine.

22 Q.      What was the price that you    gave to Ms. Martin

23 for a kilogram of cocaine?

24 A.      You know there's -- just sometimes is the price

25 between 20, 23  , something like that.

1  Q.      Twenty and 23?

2  A.      Yeah.

3  Q.      Is that $20?

4  A.      Twenty and 23 ,000.

5  Q.      Thousand?

6  A.      A kilogram, yeah.

7  Q.      What , if anything , was the agreement you reached

8  with Ms. Martin during that conversation?

9  A.      So we get agreement that   I get it in front and

10 then when she done finish with selling that    , I go and

11 get the money to her to her house.

12 Q.      I didn't understand.    I apologize,  Mr.

13 Encarnacion , anything that you just said.

14        What was the agreement that you made with     Ms.

15 Martin at -- outside the    Safeway or  Giant ?

16 A.      Oh.  The sale, when   I meet her there, how are we

17 going to do the business and about the price and things

18 like that.

19 Q.      Okay .  So you discussed how you were going to do

20 the business?

21 A.      Yeah.

22 Q.      What did you agree upon in    terms  of how you were

23 going to do the business  ?

24 A.      So we can settle and we both said what we gonna

25 do.  And then when   I get ready , so I call her and then

1  we trying to do some work.

2  Q.      Okay.  When you say when you're ready you will

3  call her and you will try to do some work   , what do you

4  mean by  "when  I'm ready? "

5  A.      When I get what  she need.

6  Q.      When you say, "When   I get what she need  ," what

7  are you referring to?

8  A.      When I get a key  -- the kilogram  I going to  sell

9  to her.

10  Q.      And how were you to contact her to let her know

11  that you got the kilogram of cocaine?

12  A.      So most of the time   I call , but I don't  even

13  talk thro ugh the phone .  I most of the time going to

14  her house to talk to her.

15  Q.      What do you say on the phone when you call her?

16  A.      I really don't remember  , but I don't  talk  about

17  drugs  on the  phone.

18  Q.      So you didn't talk about drugs on the phone    .

19  What would you say to her?

20  A.      Me and you have some deal to fix    , or maybe when

21  I call you, you know maybe about what     I'm trying to

22  tell you.

23  Q.      So what kinds of things would you say to      Ms.

24  Martin on the phone when you were ready?

25  A.      Like  I went to see her when    I talk to you,

1  something like that.

2  Q.      Why wouldn't you say on the phone,     I have a  kilo

3  of cocaine for you?

4  A.      No , I never talk about   kilo on the phone.

5  Q.      You would let her know that you wanted to meet

6  with her.

7  A.      Yeah.

8  Q.      Where were you getting your cocaine back in the

9  1998  timeframe?

10  A.      I getting it from guy in    New York.

11  Q.      What -- did you -- after you had that meeting

12  with  Ms.  Martin , did you actually get some cocaine from

13  the guy in  New York?

14  A.      Yeah.

15  Q.      What did you do once you got the cocaine from

16  the guy in  New York?

17  A.      What did  I do?

18  Q.      What did you do   -- once you got the cocaine from

19  the man in  New York, what did you do with it?

20  A.      I call  her and I let her know that   I'm ready  --

21  she ready to see me or thing like that.

22  Q.      How did you find out whether    or not  Ms. Martin

23  was ready to see you?

24  A.      I go to her house.    I talk to her in person all

25  the time.

1 Q.      Okay.  When you say you need   ed to find out if

2 she was ready to see you, what do     you mean, "ready to

3 see you ?"

4 A.      If she really need it or not.

5 Q.      Whether she really needed what or not?

6 A.      Whether she need a kilogram or not.

7 Q.      What would she tell you?

8 A.      Huh?

9 Q.      What did she tell you when you went to her house

10 to find out if she need   ed a kilogram?  W  hat did she

11 tell you?

12 A.      Bring it to her house; she going to take it.

13 Q.      Excuse me ?

14 A.      She going to take it.

15 Q.      She's going t o take it?

16 A.      Yeah.

17 Q.      Did she pay you for the kilogram of cocaine when

18 you brought it to her?

19 A.      No.  I gave her up  front.  And  when she done , I

20 get the money back.

21 Q.      You said you gave it to her up front    ?

22 A.      Yeah.

23 Q.      When she was done , you 'd get your money back.

24 What do  you mean by giving it to her up front?

25 A.      So that  I don't get the money until she going to

1  sell it to somebody else to get my money.

2  Q.     You trusted  Ms. Martin with the kilo of cocaine?

3  A.     Yeah.  So that's why  I give it to her up front  ,

4  and if  -- you got to take a  chance in this business.

5  Q.     You got to take a chance?

6  A.     Yes.

7  Q.     Why do you  have to take  a chance  in this

8  business?

9  A.     Because that's the way the people work in there.

10  Q.     How many -- do you know approximately how many

11  times back in   '98-99 you delivered cocaine that you

12  were getting from the people in    New York to  Ms. Martin .

13  A.      This, like, two time, three  , and then  I go back

14  to Dominican  Republic , stay there for  year s and year s

15  and years.   And when  I come back , the people that  I got

16  in New York disappear , and  I come back to here  , like ,

17  four months, six month  s, and then  I meet a guy and

18  named  Mangual  from Mexico, and then  I trying to supply

19  her back again.

20  Q.     Well , let's talk about before you went back to

21  the Dominican  for a year.

22  A.     Uh-huh.

23  Q.     How many time s did  you get drug s from  the people

24  in New York that you gave to   Ms. Martin?

25  A.     Like, two, three  time.

```
 1  Q.      Excuse me ?

 2  A.      Like, two, three time.

 3  Q.      What quantity did you   give her on each time?

 4  A.      From one to two.

 5  Q.      "One to two" meaning   one to two --

 6  A.      Two , sometimes one.

 7  Q.      Kilograms?

 8  A.      Yeah.

 9  Q.      Was it always  fronted to her?

10  A.      Yeah.

11  Q.      Did she always pay you for them?

12  A.      Huh ?

13  Q.      Did she pay you for them?

14  A.      Yeah.

15  Q.      Where did you deliver those kilograms to her

16  before you went back to the    Dominican ?

17  A.      When I deliver it?

18  Q.      Where?  Where?

19  A.      Where  I deliver it?

20  Q.      Yes.

21  A.      I deliver it to her house.

22  Q.      Okay.  Can you describe her house for us?

23  A.      Sure.

24  Q.      Describe it.  What did it look like?

25  A.      A brick house with  , like , a tree on the end of
```

1  the tree there.  So   I can't explain , but  if I see it  I

2  can explain to you.

3  Q.      Where was her house in relation to     Beverly's

4  house?

5  A.      It's like --  it's in the same -- the same area

6  they live.  It's , like , two or three block from    Beverly

7  house that she live.

8  Q.      Let me show you two pictures and ask you if you

9  recognize these two pictures.

10  A.      Yeah , this one is   Paula house.  That   , too.

11  Q.      Let me put them up on the screen.

12  A.      Yeah.

13  Q.      First with  P-2 .

14        MR. WARD: Excuse me  , counsel .  Could you  give

15  us the  exhibit n umbers , please?

16        MS. JOHNSTON:   P-2 .

17        MR. WARD: Well, speak up.

18        MS. JOHNSTON: Yes , Mr. Ward, I'm trying .  If

19  you can't hear , let me know and   I'll try to speak a

20  little louder.

21        BY MS. JOHNSTON:

22  Q.      Which of the two houses that we see in this

23  picture is  Ms. Martin's house?

24  A.      Yes.

25  Q.      Which one?

1  A.      The one with the brick    -- red brick.

2  Q.      Okay.  Would that be this one here on the left

3  looking down at the picture?

4  A.      Yes.

5  Q.      Showing you  P-3.

6          Is that the house where you were delivering the

7  cocaine to  Ms. Martin?

8  A.      Yes.

9  Q.      And this kilogram of cocaine  , were  you paid for

10 it as you dropped it off to her on these two or three

11 occasions?

12 A.      I can't understand that.

13 Q.      Did she  give you the money when you dropped it

14 off?

15 A.      No.  I give it to  her up  front and she pay me

16 when she done.

17 Q.      How much did she pay you for each kilogram for

18 cocaine?

19 A.      That depends.  Sometimes it's buy it from 20 to

20 23, 22; sometimes 24.  It depends.  It's not the same

21 price all the time.

22 Q.      So somewhere between 20 and $24,000?

23 A.      Yes.

24 Q.      Did you make some money on that when you sold it

25 to  Ms. Martin ?

1  A.        Yeah , we got to make something   .

2  Q.        How much money about did you make when you were

3  selling it to  Ms. Martin ?

4  A.         Just depend.  Sometimes you make   , like , $1,200,

5  sometimes you can make $1,500   , sometimes you can make

6  $1,000.   It just depends how you can get this   .

7  Q.        Now you indicated you left this country an    d went

8  back to the  Dominican ?

9  A.        Yes.

10  Q.        In 1999 or thereabouts?

11  A.        Yes.

12  Q.        Did you return back to this country?

13  A.        Yes.

14  Q.        Did you have any difficulty getting back into

15  this country?

16  A.        I fly one time , and then send me back from    New

17  York and trying to --   I'm trying to come back again   ,

18  and they send me back  , and I get a visa  for Mexico,  and

19  I come from  Mexico  border.

20  Q.        The first time you tried through     New York , they

21  didn't allow you in the country    ?

22  A.        No.

23  Q.        Calling your attention to late 2000.  Did you

24  come back into the country at that time?

25  A.        Yes.

1  Q.       How did you get back into the country in late

2  2000?

3  A.       I go to  Mexico  and  I  cross  the  border  to   Arizona

4  and come here with some other guy papers from        Puerto

5  Rico  that  I get birth certificate, and     I apply for

6  Mexican border.

7  Q.       The documents that you used to come in through

8  from  Mexico  through  Arizona , were those in your own

9  name?

10  A.       The name  I can't remember.  That's not my name      ,

11  it's another guy name.

12  Q.       So you used a false name when you came in?

13  A.       Yeah.

14  Q.       Do you recall what that name     was?

15  A.       If  I see, yeah.   If I see the name , I can.

16  Sometimes  I can  remember.  It's been long time.  If      I

17  see it , I could.

18  Q.       Did anyone come with you when you came back

19  in --

20  A.       Yeah.

21  Q.       -- through  Mexico  into  Arizona?

22  A.       Yes.

23  Q.       Who traveled with you at th   at time?

24  A.       My wife.

25  Q.       What is your wife's name?

1   A.        Alecia  Sanchez.

2   Q.        I want show you what's been marked as      Hayward 34

3   and ask you   if that refreshes your recollection

4   concerning the name you used when you came across the

5   border in  late 2000.

6   A.        Yes, that's the name.

7   Q.        What was the name you used   ?

8   A.        "Nicholas  Diaz ."

9   Q.        That was not your name legally    ?

10  A.        No.

11  Q.        You used that name because you couldn't get in

12  under your own name  ?

13  A.         Yeah.   I trying to get in and that's the way

14  that  I came.

15  Q.        Once you came across the border in late 2000, in

16  Arizona, did you return to the     Maryland area?

17  A.        Yes.

18  Q.        Where were you living here in     Maryland?

19  A.        I don't remember exactly the number of the

20  house , but it's in  Riverdale , big complex , but  I don't

21  remember exactly the house number    , but it's in

22  Riverdale , Maryland.

23  Q.        What street was it on?

24  A.        Bea con.  Bea con  Place.

25  Q.        In Riverdale , Maryland?

1  A.      Yeah.

2  Q.      After you got here, were you able to get back in

3  touch with your   New York --

4  A.       No.   I lose the contact with the people because

5  the people get in trouble   , too , and then   I can't get

6  drug from them.

7  Q.      Did there come a time in 2001 when you met

8  someone else   --

9  A.      Yes.

10  Q.      -- who was able to supply you with drugs?

11  A.      Yes.

12  Q.      Who was that?

13  A.      Mangual .

14  Q.      Was he from the   Dominican ?

15  A.      No.   He's from   Mexico .

16  Q.      Was he from   New York?

17  A.      No, he's from   Mexico .

18  Q.      Where was he living?

19  A.      He live around here   , too , around   Riverdale , I

20  think.

21  Q.      What were you getting from    Mangual ?

22  A.      I'm getting cocaine.

23  Q.      What quantities were you getting from      Mangual ?

24  A.      It depends.   Sometimes two, t   hree,  something

25  like that.

1  Q.      When you say two, three -- two to three ounces?

2  A.      No.  Kilogram.

3  Q.      What were you doing  with the two to three

4  kilograms you were getting from     Mangual ?

5  A.      I was giving to   Paula.

6  Q.      How did you get back in touch with     Paula when

7  you came back in 2001  ?

8  A.      I know where she live.

9  Q.      Was that the same house that you    've seen the

10  photographs of here  .

11  A.      Yes.

12  Q.      What was your discussion with her when you     got

13  back in 2001?

14  A.      I not remember , but maybe we're   talking  about

15  the same thing that we do before   , and we  don't have  the

16  same people supplying me all the time   , and maybe to her

17  that I find someone that's going   to get me something , I

18  have to wait for because sometimes when you find some

19  people , it's not like a different thing they have drugs

20  every day , so you got the wait some time together a    nd

21  back and  forth.  So maybe  I talk to her that   I have to

22  wait , like , week or two to get something to supply her.

23  Q.      What did  Ms. Martin  say when you  told her you

24  were going to wait a week or two to get some drug     s to

25  supply her?

1  A.      Like , let me know  when  you ready or when you

2  ready , bring that to me and   I get it.

3  Q.      Again , when you use the   phrase,  let me know when

4  you're ready , what does  "ready " mean?

5  A.      When you gather what you need.  When     I get what

6  you need.

7  Q.      What was it  that  you were referring to when you

8  get what  she need s?

9  A.      When  I get the drug  s.

10  Q.      The drugs you dealt with with    Ms. Mart in and

11  with  Mangual,  what drugs  was  that?

12  A.      Cocaine.

13  Q.      Was it anything else other than cocaine?

14  A.      No.

15  Q.      Were you able  to get drugs from   Mangual ?

16  A.      Yes .

17  Q.      Approximately how many times did you get drugs

18  from  Mangual ?

19  A.      Like, four or five times  , something like that  .

20  I get like two and three.  From seven to nine kilo

21  altogether.

22  Q.      What did you do with those seven to nine kilo     s

23  that you got from   Mr. Mangual ?

24  A.      I gave it to Paula.

25  Q.      Over what time period did   you get those seven to

1  nine kilos?

2  A.     I can't say exact time  , but you know , if you got

3  to sometime wait like a month or 15 days and, you know,

4  sometimes two months  , people don't get that  , like I say

5  before , every day.  Sometimes you got to wait like they

6  come or things like that   .

7  Q.     Did you get a diary of the dates when you

8  received the  drugs  and the dates when you delivered

9  them to  Ms. Martin?

10  A.     Like what do you mean diary  ?

11  Q.     Did you keep a calendar?

12  A.     No.

13  Q.     Did you write down the dates --

14  A.     No.  If  I keep that , maybe  I can say , okay , I

15  give it every 15 days or something like that   , but  I

16  don't do that.

17  Q.     Now, did you -- your dealing with    Mr.

18  Mangual  --

19  A.     Yes.

20  Q.     -- s tarted after you   returned  to this country in

21  late 2000?

22  A.     Mm-hmm.

23  Q.     Is that yes?

24  A.     Yes.

25  Q.     And when did it end?

1  A.       So when  I get locked out in 2001.

2  Q.       When did you get locked up in 2001?

3  A.       September 17.

4  Q.       What date was it?

5  A.       September 17.   I know  September -- no,  November

6  17 or 16, something like that.     I don't know exactly    --

7  I don't remember   -- exactly remember the date  , but I

8  know it was in   November.

9  Q.       November?

10  A.       Yeah.

11  Q.       Of 2001?

12  A.       Yes.

13  Q.       So these three or four transactions that

14  involved seven or nine kilograms of cocaine took place

15  between when you returned in    December of 2000 and when

16  you were arrested in   November of 2001?

17  A.       Yeah.

18  Q.       Now other than giving the cocaine to    Ms. Martin ,

19  did you give any of it to anyone else?

20  A.     I got another guy that   I give like a half, but    I

21  don't know where he getting it.  He disappear.      I don't

22  know about him no more.

23  Q.       When did you -- when say had another guy you

24  gave a half to   --

25  A.       Half a key.

1  Q.      Half kilogram?

2  A.      Mm-hmm .

3  Q.      Excuse  me?

4  A.      Half a kilogram.

5  Q.      Now, during the time that you were dealing with

6  Ms. Martin in 2001, where did you deliver the drugs?

7  A.      Repeat again.

8  Q.      During the time that you were getting the drug      s

9  from  Mangual , the seven to nine kilograms that you

10 delivered to  Ms. Martin, where did you deliver them?

11 A.      To her house.

12 Q.      The same house that you've identified for us

13 here before?

14 A.      Yes.

15 Q.      Now did you ever see her at any other places?

16 A.      The places that  I say in the beginning  , the

17 Safeway , and her house , and Beverly house .  That's it .

18 And she got --  I go one day and her school  , she got a

19 school in  Washington,  D. C.  I meet her one day there  ,

20 try and go in there and talk to her    , but we don't do

21 nothing there .  We have to go in there to the business

22 and see and talk to her.

23 Q.      You went to  meet with her at a business in

24 D. C.?

25 A.      Mm-hmm.

1  Q.      Whose business was it?

2  A.      This is , like , a school, a school, a school   ,

3  something like that.

4  Q.      Whose school was it?

5  A.      That's  Paula's school.

6  Q.      And did you deliver any drugs to her at the

7  school?

8  A.      No.

9  Q.      Pick up any money there?

10 A.      No.

11 Q.      You went there for what reason?

12 A.      Seems like  I call her or she call me   , and I was

13 around there , and she give me the address where she

14 live , where she are , and I go around there.

15 Q.      I didn't understand that.

16 A.      So maybe  I call her or she call me   , and we

17 trying to talk to maybe about something    , and she tell

18 me the address where she was   , and then  I go cross over

19 around there because   I know that area where   I speak

20 with her.

21 Q.      So you went there to speak with her    ?

22 A.      Yeah.

23 Q.      When you were there, were there any dance

24 students there?

25 A.      No.

1 Q.      Any students  at all?

2 A.      No.

3 Q.      Let me show you  Government's  Exhibit  P-184.

4         Do you recognize that photograph?

5 A.      Yeah, that's her school right there.

6 Q.      You don't  know the person in front of it  , do

7 you?

8 A.      Yes, that's her, too.    That looks like   Paula .

9 That look like her.    I'm not sure.  It look like her.

10 Q.     We'll put it up on the screen so everyone can

11 see it.   P-184, and i s that the school where you went

12 to meet with her?

13 A.     Huh?

14 Q.     Is that the school where you went to meet with

15 her?

16 A.     Yes.

17 Q.     That would have been back in 2001?

18 A.     I'm not sure.   I not remember exactly   if it was

19 in 2001 or before   I leave I meet her in there  .  I'm not

20 sure the day that   I go into that place.

21 Q.     So it could have been before you went back to

22 Dominican  for the year or after  ?

23 A.     That's wha t I'm saying .  I'm not really sure  ,

24 but I know  I go in there one time  , but I'm not exactly

25 sure what 's the date that   I go there before or after    I

1  leave.

2  Q.      Your purpose in going there was to discus    s your

3  business with her?

4  A.      Yeah.

5  Q.      Did you ever have any other business with      Ms.

6  Martin?

7  A.      No.

8  Q.      Now did you ever see any people when you went to

9  her house?

10  A.      Some people were going there   , but they friend --

11  her friend.

12  Q.      Do you remember any of her friends that you saw

13  at the house?

14  A.      No.

15  Q.      Did you ever deliver the kilos in front of

16  people?

17  A.      No.

18  Q.      Why not?

19  A.      Because when you do that, you don't want nobody

20  know if you -- what you doing   , what you not doing.  For

21  her care , for my care , too , so she don't want me --

22  nobody see what she do.

23  Q.      What about when you went to pick up the money?

24  A.      I didn't see anybody there   .

25  Q.      Excuse me?

1  A.       I didn't see anybody there.

2  Q.       And why wouldn't you want to see anybody else

3  when you were meeting her to pick up the money?

4  A.       It's like  I explain before.  Nobody wants to

5  you.

6  Q.       Nobody wants you --

7  A.       Nobody want nobody knows what you do with

8  somebody else , so it's a secret business.

9  Q.       Did you see any of her family members at th    e

10  house on occasion?

11  A.       Not many times.  Sometimes it go like her

12  daughter , she live in another apartment   , but she not

13  there with her .  So sometime , she get there , but she

14  don't know  I do business or not with her.  That's the

15  routine.   I don't know if she know or not   , but she

16  don't let me know that she really know about what we do

17  or not.

18  Q.       So you didn't  do the business in front of her

19  daughter.

20  A.       No.

21  Q.       What about any boyfriends or husbands of     Mrs.

22  Martin ?

23  A.       No.  I saw him going there sometime   , but I don't

24  do business  with him and he don't know about either.

25  Q.       Who was her husband or boyfriend that you saw

1  there?   Do you remember his name?

2  A.       John.

3  Q.       Why would n't you do the business in front of

4  John?

5  A.       I never do no business in front of    John.

6  Q.       Why not?   Same reason you told us before?

7  A.       Same reason.

8  Q.       Now you indicated that you were arrested in

9  November of 2001?

10 A.       Huh?

11 Q.       You told us you were arrested in    November of

12 2001.  Is that correct?

13 A.       Yeah.

14 Q.       Again , was that part of your dealings with    Mr.

15 Mangual ?

16 A.       Yes.

17 Q.       And as a result of your being arrested    , what

18 happened to your charges?

19 A.       So what it mean?

20          (The question was interpreted.)

21 A.       What is it that you mean?     I don't quite

22 understand.

23          BY MS. JOHNSTON:

24 Q.       You were arrested  , you were charged with drug

25 offenses; is that right?

1  A.      Yeah.

2  Q.      Okay.  What happened to your drug charges?

3  A.      I plead guilty.

4  Q.      Do you recall what you pled guilty to?

5  A.      I plead guilty with confession.

6  Q.      Again , did you plead guilty pur   suant to  a plea

7  agreement?

8  A.      Yeah.

9  Q.      Let me show you what's been marked as A     -1.

10         Do you recognize this document?

11 A.      That's sign right there.

12 Q.      Is that the plea agreement that you signed?

13 A.      Yeah.

14 Q.      As part of that plea agreement   , did you agree to

15 cooperate with the government?

16 A.      Yeah.

17 Q.      What did you do as part of your agreement?

18 A.      I got to say the truth, after that    , the judge is

19 going decide if  I get a point off or not   , and then it's

20 not sure that  I can get that or not so.

21 Q.      After you -- did you plead guilty back in

22 2002-2003?

23 A.      2003 , something like that   , I get my sentence.

24 Q.      And you were sentenced back then?

25 A.      Yeah.

1  Q.      And at that time  , what sentence did you receive?

2  A.      108 month.

3  Q.      Excuse me?

4  A.      108 month.

5  Q.      Was that the first time you have been convicted

6  of an offense in this country?

7  A.      Yes.

8  Q.      108 months of incarceration?

9  A.      Yes .

10 Q.      Have you been serving your sentence since then?

11 A.      Since then.

12 Q.      Do you have any expectation of getting your

13 sentence reduced further?

14 A.      I don't know , it's up to the judge.    I don't

15 know if  you going to give me some reduction   .  That's

16 between the judge and the prosecutor to do that or not.

17 I can ask them for it.

18 Q.      Okay.   Mr. Encarnacion, what do you hope is

19 going to happen to your sentence in this case?

20 A.      I hope they give me my two point off.

21 Q.      Okay.  You want two points off?

22 A.      Yeah.

23 Q.      Will you still be incarcerated?

24 A.      Yeah.

25 Q.      Will you still have years to serve on your

1  sentence?

2  A.      I'm going to still do some time   , even if I got

3  those point off or not.  Just not sure that     I can --

4  they going to give me that point or not    , so ...

5  Q.      Who make s the  decision about whether you will

6  get any further reduction in your sentence?

7  A.      The  judge .

8  Q.      Do you have any ex  pectation  you're going to get

9  probation ?

10  A.      No, I don't.

11  Q.      You expect to still serve a number of years in

12  prison; is that correct?

13  A.      Yeah.

14  Q.      When you're finished serving your sentence    , what

15  happens to you?

16  A.      They're going to send me back to my country.

17  Q.      I want  to go back to  Government's  Exhibit

18  Hayward 34 .  D o you recognize the alias that you used

19  on that document  .

20  A.      Yes.

21  Q.      What was the alias?

22  A.      That's a  Puerto  Rican  birth certificate.

23  Q.      What was the name on the birth certificate that

24  you used ?

25  A.      Nicholas  Diaz .

1 Q.      Is that the name you used to get into the

2 country?

3 A.      Yes.

4 Q.      Further down on that document   , there's also an

5 address .  Could you read the address to us    ?

6 A.       Yes.  Nicholas  Diaz,  7012  Beacon  Place,  that's

7 Riverdale,  Maryland.

8 Q.      Do you recognize that address   ?

9 A.      Yes.

10 Q.      Whose address that is?

11 A.      I living there with my wife.  That's my address       .

12 Q.      You live there had with whom?

13 A.      Alyssa  Sanchez.

14 Q.      Was t hat after you came back   to the country

15 using the name  Nicholas  Diaz ?

16 A.      Yes.

17 Q.      I'm going put this document    up on the screen.

18 This appear s to be a payroll slip.  Were you -- it

19 appears to have been completed by    PTK Associates , Inc .

20 Were you ever  employed by  PTK Associates , Inc .?

21 A.      No.

22 Q.      Did you ever receive any check    --

23 A.      No.

24 Q.      -- a s is indicated on here?

25 A.      No.

1  Q.      Did you ever work for   PTK Associates  --

2  A.      No.

3  Q.      -- and earn wages as are reflected on this pay

4  slip?

5  A.      No.

6  Q.      Did you have any drug --   I'd like you to look

7  around the courtroom on my left side.  Do you recognize

8  any of the other individuals seated here at      the counsel

9  --

10        MR.  MARTIN:  Objection , asked and answered.

11        THE  COURT:  Overruled.

12        BY MS.  JOHNSTON:

13  Q.      Do you recognize any of the other individuals     ,

14  other than  Ms. Martin , sitting at this table or at the

15  first table here in the audience?

16  A.      Yeah,  I know her.  The lady there with the beige

17  jacket is her friend.

18  Q.      And who is she?

19  A.      Sometime  I saw her going there  , but  I don't know

20  if she knows about my business with her.      I never do

21  business in front of the lady with her.

22  Q.      Do you know that lady's name?

23  A.      I don't remember because    I saw her like two,

24  three time , and  I not remember exactly her name.

25  Q.      Where did you see her?

1  A.      In Paula house.

2  Q.      The house that you've identified for us?

3  A.      Yeah.

4  Q.      Did you have any drug dealings with her?

5  A.      No.

6  Q.      Do you have any idea what her relationship was

7  with Ms. Martin?

8  A.      No.

9  Q.      So that the record is clear, could you describe

10 that person you're identifying by what she's wearing

11 and wears her hair?

12 A.      She has short hair and a beige jacket on.

13         MS. JOHNSTON:   We would ask the record to

14 reflect the witness has identified   Lanora Ali.

15         THE COURT:  The record will so indicate.

16         BY MS. JOHNSTON:

17 Q.      Did you have any drug dealings with any of these

18 people in the courtroom   --

19 A.      No.

20 Q.      -- other than  Ms. Martin?

21 A.      No.

22         MR. MARTIN:  Objection.

23         THE COURT:  What's the basis?

24         MR. MARTIN:  Same thing , asked and answered.

25         THE COURT:  Overruled.

1          BY MS. JOHNSTON:

2  Q.      Court's indulgence.

3          Mr. Encarnacion , just to clarify the record  ,

4  have you ever been convicted of any other crimes in any

5  other country ?

6  A.      No.

7  Q.      So this is your only conviction?

8  A.      Yeah.

9  Q.      You testified about getting points off.  Could

10 you explain to the ladies and gentlemen of the jury

11 what that means to you?

12 A.      That means the truth.  If    I not telling the

13 truth , the judge not going decide if     I can get the two

14 point off or not.  So, that's not sure, like     I said

15 before , but they going to decide if     I allow ed to get

16 the two point off  .  If I don't tell the truth  , I going

17 to be maybe punished for not telling the right thing.

18 Q.      Now, when you say , "two points off ," does that

19 -- what effect does that have on how long your sentence

20 is?

21 A.      I d on't  understand that  .

22 Q.      Let me repeat it.  You said that it's up to the

23 judge  if you can get two points off of your sentence.

24 A.      Huh-uh.

25 Q.      What  -- does that result in reducing your

1  sentence , making your sentence shorter   .

2  A.      Yeah.

3  Q.      Does it eliminate your sentence?

4  A.      Not completely.   I still got  to do some time .

5  If I can get the two point off  , I can get less time.

6  Q.      Has anyone told you how much    less time you're

7  going to get?

8  A.       No.  I don't know.  Years  , I'm not sure  I going

9  to get those two point.

10 Q.      You indicated  you have  to tell the truth?

11 A.      Yeah.

12 Q.      Is that part of your plea agreement   ?

13 A.      That's part of it.

14 Q.      Does that apply to questions asked by the

15 defense attorneys or by the judge?

16 A.      It's by the judge.

17 Q.      And what about the questions defense attorneys

18 ask you? Must you with   you be truthful in response    --

19 A.      Truth.

20 Q.      -- to their questions?

21 A.      Yeah.

22 Q.      What happens if you were to lie in response to

23 any questions?

24 A.      So I don't get  punished,  I going to get

25 punished , and then don't take my two point off.

1  Q.      You don't get two points off  .  What else could

2  happen to you?

3  A.      They going  to punish me and give me more time

4  for perjury.

5  Q.      Does it matter whose questions you answer

6  falsely ?

7          MR. MONTEMARANO :  Objection , asked and answered.

8          THE  COURT:  Overruled.

9          BY MS. JOHNSTON:

10 Q.      Does it matter if you lie in response to the

11 government's question   or you lie in response to   the

12 defense questions?

13 A.      You got to tell the   truth for  both sides.

14 Q.      Now, --

15         MS.  JOHNSTON:  C ourt's indulgence.   I have

16 nothing further.

17         THE  COURT:  All right.  Cross-examination.

18         MR.  MONTEMARANO :   Thank you,  Your  Honor.

19                  **CROSS-EXAMINATION**

20         **BY MR.  MONTEMARANO :**

21 Q.      Good afternoon , Mr. Encarnacion .  How are you?

22 A.      Fine .  How are you , sir.

23 Q.      We've never met before   , have we , sir?

24 A.      Huh ?

25 Q.      You and  I have never met before  , have we?

1  A.       No.  No.   I don't know you , sir.

2  Q.       I'd like to ask you a few questions following

3  along  Ms. Johnston's questions.

4  A.       Yeah.

5  Q.       You were talking about getting two points off.

6  A.       Yes.

7  Q.       Is your lawyer,  Mr. Davis ?

8  A.       Yes, sir.

9  Q.       Did he tell you what a decrease of two points

10 under the sentencing guidelines would mean?

11 A.       Not remember that he tell me something about

12 that because  I not sure that  I going to get two point

13 off.  Like  I explain before , it's on them.

14 Q.       You don't know what's going to be    --

15 A.       No.

16 Q.       But it's going to be a shorter sentence   ;

17 correct , sir?

18 A.       It's short time , but it not right if they give

19 me those  two point off or not .

20 Q.       That's only if you tell the truth   ; right?

21 A.       Yeah.

22 Q.       Now, your name  is not Nicholas  Diaz, is it?

23 A.       No.

24 Q.       But that's the name you used when you enter    ed

25 this country ; correct?

1  A.      Yes, sir.

2  Q.      You entered this country as an illegal alien;

3  correct, sir?

4  A.      Yeah.

5  Q.      So you weren't telling the truth to the --     at

6  the border , were you?

7  A.      Huh?

8  Q.      You weren't telling the truth   at the border ,

9  were you?

10  A.      They don't ask me anything.

11  Q.      They asked you for identification   ; didn't they ,

12  sir?

13  A.      Yeah.

14  Q.      May this  be marked as  Defense  Exhibit 1 for

15  identification, please?  Nogales    --

16  A.      Nicholas , yes.

17  Q.      No.  When you cross ed the border , was that

18  Nogales; correct?

19  A.      What's that mean  , "Nogales? "

20  Q.      Nogales , Texas.  The town.

21  A.      No, I didn't know that.  That was    --

22  Q.      Is that your driver's license   , sir?

23  **A.**      I don't know it was at Nogales   , the city around

24  there or not --  the first time  I cross around there.

25  Q.      You don't remember  ?

1          MS.  JOHNSTON:    Your  Honor , may we have the

2 document marked as an exhibit for purposes of the

3 record ?

4          MR.  MONTEMARANO:  It has been marked as

5 Defense 1.

6          MS.  JOHNSTON:  For identification only   ?

7          MR.  MONTEMARANO:  Y es.

8          BY MR.  MONTEMARANO:

9 Q.     This is a  Virginia driver's license that you

10 carried  with  you;  correct , sir?

11 A.     Yes.

12 Q.     We don't have a very clean copy here.

13          Nicholas  Diaz,  Drainsville R oad  in  Herndon ;

14 correct, sir?

15 A.     Mm-hmm.

16 Q.     Were you living on   Drainsville  Road ?

17 A.     Where?

18 Q.     Were you living?

19 A.     At that  time?

20 Q.     Yes.

21 A.     On Beacon  Place.   Beacon  Place on  Riverdale

22 Road.   Beacon  Place on  Riverdale  Road.

23 Q.     So you were not living on    Drainsville  Road ?

24 A.     No.

25 Q.     So that's not true either   ; right , sir?

1  A.      No, that's not my address.

2  Q.      That's not your address ?

3  A.      No.

4  Q.      Okay.  As a part of your plea agreement    , the

5  government dismissed other charges against you?

6  A.      When you say the other charges?

7  Q.      Were there other  charges that  they did not bring

8  against you or that they dropped?

9  A.       I don't have charge  .  I got a charge and then

10  that's what  I confessed for.

11  Q.      Let's talk about your arrest   .  You were arrested

12  on November 16 of 2001; correct, sir?

13  A.      Yeah, yeah .

14  Q.      The circumstances of you  r arrest revolved around

15  your  attempt  to  export an automobile?

16  A.      Yeah.

17  Q.      A Nissan  Maxima ?

18  A.      Yeah .

19  Q.      To the  Dominican  Republic?

20  A.      Yeah.

21  Q.      When you  attempted to  export this  automobile,

22  they found a secret compartment in the automobile?

23  A.      Yes, sir.

24  Q.      And in the secret compartment w   as a firearm ;

25  correct, sir?

1  A.      Yes, sir.

2  Q.      You weren't charge d with  that firearm , were you?

3  A.      Yes, sir.

4  Q.      And in that compartment was heroin; correct    ,

5  sir?

6  A.      They don't charge me for that   .  I got my lawyer

7  and they never -- they never got that.

8  Q.      We'll get there.

9  A.      Okay.

10 Q.      Mr. Davis i s a fine lawyer.

11 A.      Yeah.

12 Q.      I've known him for many years   .  I'm sure he did

13 a great job for you  .  Let's talk about what happened   .

14 A.      Okay.

15         MS. JOHNSTON:  Object ion to counsel's comments  ,

16 Your Honor.

17         THE COURT:   Mr. Montemarano , keep it to

18 questions, okay  ?

19         BY MR. MONTEMARANO:

20 Q.      You were arrested; correct, sir?

21 A.      Yes, sir.

22 Q.      A lawyer  was  appointed to a represent you   ?

23 A.      Yes, sir.

24         MS. JOHNSTON:   Your Honor , objection .

25         What time frame is he talk  ing about?

1          THE COURT:  Can you clarify what time you're

2 talking about ?

3          BY MR. MONTEMARANO :

4 Q.      You were arrested in 2001   ; correct , sir?

5 A.      Yes.

6 Q.      A lawyer was appoint  ed to represent you  ;

7 correct, sir?

8 A.      Yes.

9 Q.      Ultimately , as a part of your lawyer's

10 representation of you, a plea agreement was agreed upon

11 between you and him and the government; correct, sir?

12 A.      Yes.

13 Q.       In fact , Ms. Johnston was the prosecutor in that

14 case; was she not?

15 A.      Mm-hmm .

16 Q.      Okay.  The Customs searched that car before it

17 was exported from the country  ; correct , sir?

18 A.      Yeah.

19          MS. JOHNSTON:  Objection  .  Can we have a time

20 frame in terms of what car he's talking about?

21          THE COURT:  Yeah , please just clarify your

22 question , if you would.

23          BY MR. MONTEMARANO :

24 Q.      The car was seized by Customs and searched;

25 correct , sir?

1 A.      Yeah.  That's not here that for --    I'm not here

2 for that case.  They don't do anything back then.       I

3 get my lawyer and they never do anything    , so that mean

4 they dismiss the case  , so that case never been spent    .

5 I can go in there and do some different mood to try to

6 get rid of it because they going to do something to me,

7 so that case going to be over because they never do

8 anything.

9        I get no lawyer now  .  Mr. Davis , back then  I get

10 some lawyer , and he do the move and they never call me

11 to do anything against me   , so that case dismiss   , so we

12 no have to talk   about that   case anymore.

13 Q.      So your plea agreement with    Mr. Davis didn't

14 involve the car  ?

15 A.      Correct.

16      MS. JOHNSTON:  Objection  , Your Honor .  Counsel

17 is confusing two incidents as one    .  That happened back

18 in the early   '90s.  T hat didn't have any criminal

19 charges , and then   the November of 2001 incident.  We

20 ask that he --

21      THE COURT:  T ry it to make it clear from your

22 question what you're talking about    , Mr. Montemarano.

23      BY MR. MONTEMARANO:

24 Q.      Thank you.

25      Let's talk about 2001.    Mr. Davis was

1  representing you.  You were just charged with cocaine;

2  correct, sir?

3  A.      Yeah.

4  Q.      And you entered this plea agreement with the

5  government; correct, sir?

6  A.      Yeah.

7  Q.      And as result , you pled guilty with a conspiracy

8  with certain other people; correct, sir?

9  A.      Yeah.

10 Q.      And as a result , you also agreed to cooperate

11 with the government;   correct , sir?

12 A.      Yeah.

13 Q.      You agreed to tell them the truth; correct?

14 A.      Yeah.

15 Q.      And as a result of that  , you received benefit  s

16 from the  government ; correct, sir?

17 A.      I don't know yet.  It's not sure.

18 Q.      Well , there was a motion made at your original

19 sentencing that reduced your sentence.

20 A.      Yeah , but that's not  -- like I explain before  ,

21 that's nothing that can be for sure  .  They going to see

22 if they can allow that or not.

23 Q.      Back then , when you were senten  ced by Judge

24 Messitte  in this court , your sentence was   reduced;  is

25 that correct , sir?

1  A.      Mm-hmm.

2  Q.      Your attorney explain  ed to you , without the

3  government's cooperation   , you would not receive a

4  reduced sentence  ; correct , sir?

5  A.      Mm-hmm.

6  Q.      Without the  government 's cooperation , your

7  sentence wouldn't be reduced below the mandatory

8  min imum; correct , sir?

9  A.      Mm-hmm.

10  Q.      Otherwise , you would have gotten at least ten

11  years; correct?

12  A.      Mm-hmm.

13  Q.      As a result of that  , you enter ed this plea;

14  correct?

15  A.      Yes.

16  Q.      Now y ou're back here again seeking to get

17  another reduction; is that correct    ?

18  A.      Yeah.

19  Q.      When you talked to the government after your

20  arrest in 2001, did you tell them about your nephew?

21  A.      They know everything.    I told the truth then.

22  Q.      Did you tell them about   your nephew?

23  A.      Yeah.

24  Q.      That's  Junior?

25  A.      Torres.    Torres .

1 Q.      Junior Torres?

2 A.      Yes.

3 Q.      He's also known as   Junior Ivan Torres;  is that

4 correct , sir?

5 A.      Yes .

6 Q.      He was at that time incarcerated or not yet

7 incarcerated?

8 A.      I not remember if he was incarcerated or he was

9 back to my country  .   He get deport ed.

10 Q.      He got deported?

11 A.      Yeah.

12 Q.      Do you know where   Junior Torres is now ?

13         MS. JOHNSTON: Objection  , relevance.

14         THE COURT: What 's the relevance?

15         MR. MONTEMARANO :  I'd proffer that  Mr. Torres --

16         MS. JOHNSTON:   Your Honor , if he's going to

17 proffer , we can take a proffer at the bench.

18         THE COURT: All right .   Come to the bench.

19                   (At the bar of the court  .)

20         MR. MONTEMARANO :  I respectfully proffer that

21 Mr. Torres cooperated to seek a five  -year -- receive d a

22 five -year sentence , was deported illegally  , reentered ,

23 and once again has entered a cooperation agreement with

24 the government , and he is currently in custody in   D. C.

25         MS. JOHNSTON: W hat happen ed with Mr. Torres,

1 whether he's cooperating with the government --

2          MR. MONTEMARANO:  State of mind.  Trying to play

3 the system .

4          MS. JOHNSTON:  E xcuse me , Mr. Montemarano .  That

5 has nothing to do with whether this witness has motive

6 or bias or anything whatsoever.  It has nothing to do

7 with this witness'  state of mind .  He's testified in

8 terms of his plea agreement.  The notion that now we're

9 going to get into every other person that     he may know

10 --

11          THE  COURT:  Sustained.

12          MR. MARTIN:   Your Honor , suppose he's try ing to

13 --

14          THE  COURT:   I can't hear you.

15          MR. MARTIN:  If  Mr. Montemarano is get  ting to

16 the point that he may be try  ing to  seek benefit for his

17 nephew as well  , I think that's something he should be

18 allowed  to explore.

19          MS. JOHNSTON:   Your Honor , that's something he

20 would have had to disclose as     Jenks and  Giglio

21 material.

22          THE  COURT:   I sustain ed the  objection .

23               (Back in open court.  )

24          BY MR.  MONTEMARANO:

25 Q.    Junior  Ivan  Torres  was deported ; correct ?

1 A.      Yeah.

2 Q.      Do you know if he reenter  ed the  country?

3 A.      I didn't know.    I'm in here , so I can't know

4 anything.    I don't  even know my name sometime.

5 Q.      Now , let me see if  I understand the

6 circumstances where you claim to have met     Ms. Martin .

7 This is  Ms. Martin sitting right here next to me.

8 A.      Yeah.

9 Q.      You were delivering heroin to a woman named

10 Beverly; correct?

11 A.      Mm-hmm.

12 Q.      It wasn't your heroin  , it was  Junior  Torres'

13 heroin?

14 A.      Mm-hmm.

15 Q.      As a good deed , you were just delivering heroin

16 for him; correct?

17 A.      This  I explained that before that when he get

18 like he leave a certain amount in there     , and I know

19 who's the people going to do that he went to     , and I not

20 real -- I already know about that before.

21 Q.      And delivering some heroin for him was     n't a big

22 deal because he's family  ; right?

23 A.      Yeah.

24 Q.      And after all, drug dealing is what you did

25 then ; right?

1  A.       Yeah.

2  Q.       So heroin, cocaine  , it's kind of all the same   ;

3  right?

4  A.       Sometime.

5  Q.       Sometimes.  And you met at    Beverly's this woman;

6  correct?

7  A.       Yeah.  I meet her in  Beverly house.

8  Q.       You'd never met her before   ?

9  A.       No.

10 Q.       And she immediately offered you a business card      ;

11 correct ?

12 A.       Yeah.

13 Q.       Asked  you to  provide her cocaine; correct?

14 A.       Mm-hmm.

15 Q.       And at that point  , you told her you were

16 delivering heroin to   Beverly; correct?

17 A.       At that point?   I don't tell  Paula that  I do

18 some business with --

19 Q.       You didn't tell her you were delivering to

20 Beverly ?

21 A.       No , I didn't tell nothing to her at that time.

22        MS. JOHNSTON:   Your Honor , if the witness could

23 be allow ed to finish the response before counsel --

24        THE COURT:  Mr. Montemarano,  the witness '

25 testimony is sometimes a little difficult to

1  understand .   It's especially difficult if you interrupt

2  him , so please be certain to let him answer completely.

3           MR. MONTEMARANO :  Thank you , Your Honor.

4           BY MR. MONTEMARANO :

5  Q.      Did Beverly tell  Paulette --  Paula that you were

6  delivering heroin to her?

7  A.      I don't know ; not in front of me.

8  Q.      Not in front of you  ?

9  A.      No.

10 Q.      The package you brought it in, it wasn't labeled

11 heroin , was it?

12 A.      The label of?

13 Q.      You're not  walking down the street carrying a

14 package  that says, this  is heroin , on the side ; is that

15 correct ?

16 A.      No.

17 Q.      And this was 70 or 80 or 90 grams    , give or take

18 a little?

19 A.      Yeah.

20 Q.      That's about three ounces of heroin   ; right , sir?

21 It's not a little package at all   ?

22 A.      I could hold that in my hand.

23 Q.      Sure.  And you come and you meet with    Beverly .

24 Did Beverly pay you?

25 A.      No, not at the same time.

1  Q.      So you walked in,  you delivered this unknown

2  package to  Beverly , and  Paulette  Martin offered you a

3  business card and said can you get me cocaine.  Is that

4  your testimony?

5  A.      Not in front of -- not in front of    Beverly .  We

6  just meet in different place and we     discuss  what we

7  going to do the night before.

8  Q.      When you came in  Beverly's home , what room were

9  you in?

10 A.     I don't know .  I'm in the kitchen  .  I don't go

11 into any  of the  rooms.

12 Q.      Paulette was in the kitchen?

13 A.      When  Paula get there , I was there already.

14 Q.      So  Paula came in and you were already there?

15 A.      I already there  .

16 Q.      Did you  discuss  your deal with   Beverly in front

17 of  Paulette ?

18 A.      Me and  Beverly already was talking.

19 Q.      You were already done?

20 A.      Yeah.

21 Q.      And then you left?

22 A.      After  awhile , yes.

23 Q.      After awhile , you left .  And you never discussed

24 your business dealings with    Beverly with  Paula there in

25 the kitchen that day; correct?

1  A.       No.   Just -- I just was talk ing with  Beverly

2  before and  Paula come in , so I don't know  Paula going

3  in, if she go and talk to   Beverly for some different

4  reason .   I didn't know about that.

5  Q.       That day , you didn't discuss in front of    Beverly

6  your business dealings   --

7  A.       No.

8  Q.       -- w ith her ?

9  A.       No.

10  Q.       You didn't discuss anything with    Paula ?

11  A.       No.

12  Q.       And  Paula offered you a business card?

13  A.       Yes.

14  Q.       And asked you to meet her at a later date and

15  time ?

16  A.       Yeah.  She told me to make her call and    I may

17  call her later.

18  Q.       As a result of that  , you then called her;

19  correct ?

20  A.       Yeah , I call her.

21  Q.       Before that day , you had  never met Paulette --

22  Paula ever before;   correct?

23  A.       I never meet  Paula in  Beverly house .  I did meet

24  --

25  Q.       Before that meeting in   Beverly's house , you had

1 never met  Paula ?

2 A.        Yeah I meet her , but  I never meet her before.

3 Q.        Right.

4 A.        That's the first time th  at I meet her.

5 Q.        And then you met at a near  by supermarket  --

6 A.        Mm-hmm.

7 Q.        -- a nd you agreed on a cocaine deal; correct?

8 A.        Yeah.

9 Q.        And you can't remember if it's one kilogram or

10 two; correct?

11 A.        Not sure if  I bring one or two.  It's back then   ,

12 so.

13 Q.        That's the difference between 20 and    $46,000 ;

14 correct , sir?

15 A.        It's different.

16 Q.        That's what the price was then; correct, sir?

17 A.        Yeah .

18 Q.        You made sure that she was certain that she

19 wanted cocaine from you  ; correct , sir?

20 A.        Mm-hmm.

21 Q.        As a result of this discussion   , you went and

22 obtained one or two kil  ograms of cocaine; correct  , sir?

23 A.        Mm-hmm.

24 Q.        And as a result of your obtaining this one or

25 two  kilogram s of cocaine , you then delivered it to her;

1  correct, sir?

2  A.      I delivered it to her house.

3  Q.      And you delivered it to her and handed it to her

4  and she left your meeting with this cocaine; correct      ,

5  sir?

6  A.      No.  When  I first meet her , I don't meet her to

7  just give her cocaine on the street   , so I meet her to ,

8  yes, talking about what we going to do or what we not

9  going to do.

10 Q.      But you ultimately , at some point , did give her

11 cocaine ?

12 A.      Yeah.  But  I never gave cocaine in different

13 place; I always go to her house.

14 Q.      You did this at her house   ?

15 A.      Yeah.

16 Q.      Was it in the kitchen there   , too?

17 A.      Yeah.

18 Q.      And you delivered her cocaine   , this person you

19 had only met twice before   ; correct , sir?

20 A.      Mm-hmm.

21 Q.      You met her at   Beverly's , you met her at   that

22 Safeway.   You handed her at least $20,000 of co    caine,

23 perhaps as much as $46,000 of cocaine    ; correct , sir?

24 A.      Mm-hmm.

25 Q.      And you left her home; correct   , sir?

1 A.      Mm-hmm.

2 Q.      Without a penny   --

3 A.      Yeah.

4 Q.      -- in your hand.

5 A.      Yes.

6 Q.      And you have told us that you were profiting

7 perhaps as little as $800 a kilo; correct?

8 A.      $800?

9 Q.      You said it was $800, $1,000   , maybe $1,500 a

10 kilo profit?

11 A.      Sometimes , yeah.

12 Q.      So would it be fair to say that you were going

13 to make maybe $1,600   , or maybe $3,000?

14 A.      Yeah .

15 Q.      Somewhere in there  , depending  if it was one

16 kilogram or two  , sir?

17 A.      Yes.

18 Q.      You do still don't remember if it was     one

19 kilogram or two  .  So you went out and you bought this

20 cocaine to sell it to    Paula; correct?

21 A.      No , I get it fronted -- somebody    fronted me ,

22 yeah.

23 Q.      Somebody who knew    you ?

24 A.      Yeah.

25 Q.      Okay.

1  A.      It not like too much.  That's the business.  If

2  you know somebody doing   business, you got to take a

3  chance to give it to them and front   , and that's how

4  that work.

5  Q.      If you weren't paid eventually   for the  cocaine

6  by Paula , you couldn't have paid your supplier   ;

7  correct?

8  A.      If I don't get paid from her  , I can't get paid

9  in the other .  I got to pay the people who fronted me.

10 Q.      You've got to pay the people who fronted you    ?

11 A.      Yeah.

12 Q.      You didn't have that money  ; correct , sir ?

13 A.      No, I didn't have that money.

14 Q.      So you were trusting this woman you've met now

15 twice , never met before other than those two times     ,

16 with 20 or $40,000 of merchandise     --

17 A.      Yeah.

18 Q.      -- o n a promise ; correct , sir ?

19 A.      Yeah .

20 Q.      The people who don't pay their drug debts    , in

21 your experience , what happens to them?

22         MS. JOHNSTON:  Objection.

23         THE  COURT:  Overruled.

24         THE  WITNESS:  What happen to what?

25         BY MR.  MONTEMARANO :

1  Q.      People who don't pay their drug debts.

2  A.      This depend how people you got in front because

3  if I give you something    --

4  Q.      Depends on  the people you're dealing with.

5  A.      If I give you some kilo and you don't pay me    , I

6  not going to do anything to you because     I know that's a

7  chance I going to take.  Somebody kill you, but     I not

8  that kind of person  , so we got a different person to --

9  Q.      If I understood you correctly, someone could

10 kill you?

11 A.      Somebody can kill   if you don't.

12 Q.      That's what  I thought.  Thank you.

13         Court's indulgence, please.

14         You left  the country; correct, sir?

15 A.      Mm-hmm .

16 Q.      You came back to the   country?

17 A.      Yes.

18 Q.      And while you could not reestablish contacts

19 with your drug source in the    New York; correct, sir ?

20 A.      Yeah.

21 Q.      You were able to find a new supplier; correct,

22 sir?

23 A.      Yeah.

24 Q.      If I understand correctly  , this is a new

25 supplier who fronted you cocaine; correct, sir?

1  A.      Yes, sir.

2  Q.      You didn't bring 20 or $40,000 back from the

3  Dominican?

4  A.      I never had that together.

5  Q.      You never had that together?

6  A.      No.

7  Q.      So if somebody is not fronting it  , you're not

8  being able to sell it  ?

9  A.      Yeah.

10  Q.      And you found this  new source shortly after you

11  returned to  Hyattsville ; correct, sir?

12  A.      Say again.

13  Q.      You found this new source for cocaine shortly

14  after you returned to   Hyattsville ; is that correct ?

15  A.       Yeah, like two months after    I come from

16  Dominican .

17  Q.      You returned t o Riverdale , I'm sorry.

18  A.      Yeah.

19  Q.      Okay .  And that source , was that  Mangual ?

20  A.      Mangual .

21  Q.      He's  from  Mexico ?

22  A.      Yeah.

23  Q.      And he fronted you co  caine,  and you then started

24  selling it again; correct, sir?

25  A.      Mm-hmm.

1  Q.      At that point , how long had it been since you

2  had done business with   Paula?

3  A.      How long?

4  Q.      Yeah.

5  A.      How long thing  I do business?

6  Q.      How long had it been since you last did a deal

7  with  Paula?

8  A.      When  I come from  Dominican ?

9  Q.      When you came from the   Dominican .

10 A.      Sometime , you come , got the right source  , like

11 you say to give you product  , you have to wait in time

12 to get your right people to --    I not remember exactly

13 how long  I took to get drug from   Mangual  to her , so...

14 Q.      You did  your first deal after returning from the

15 Dominican,  you testified , in December of 2000; does

16 that sound correct?

17 A.      I not remember if it was    December , but it happen

18 in 2000.

19 Q.      Right at the end of 2000  , near New Year's in end

20 of the year ?

21 A.      Mm-hmm.

22 Q.      About 11 months before you're finally arrested,

23 right?

24 A.      Mm-hmm.  Mm-hmm.

25 Q.      You left the country in    '99 at some point?

1  A.      Yes.

2  Q.      '98?

3  A.      I leave in  '99 and stay in my country  , like , a

4  year.

5  Q.      Year?  Few years?  During that time   , you weren't

6  in contact with   Paula; correct?

7  A.      I making her call from my country to say hi to

8  her and thing like that.

9  Q.      You called her?

10  A.     Yeah.

11  Q.     Oh.  Collect?

12  A.     What you mean "collect  ?"

13  Q.     Collect.  Reverse charges?

14  A.     No.  No,  I don't call collect.

15  Q.     So you come back and you immediately start

16  dealing drugs again; correct, sir?

17  A.     Not immediately , but soon  I get in contact with

18  the people who gave me supply  .  I not sure what much

19  were because back then and there   , you never got any

20  money the day you started to deal for someone.

21  Q.     Okay.  And  during 2001 , you dealt , you said ,

22  seven to nine kilos  , you don't remember how much?

23  A.     Mm-hmm.

24  Q.     You don't  remember  how much you dealt with

25  Paulette before; correct, sir   ?

1  A.       No.

2  Q.       Just no recollection at all?

3  A.       No.

4  Q.       And the day you were arrested was what day?

5  A.       November 17 , I think.   November 17, 2001.

6  Q.       You remember that  ?

7  A.       I not remember exactly the day  , but I know it's

8  in November.   I think 17, 16, something.

9  Q.       Court's indulgence, please.

10         You can't tell us the dates of any of these

11 sales to  Paulette  Martin; correct, sir?

12 A.       What did you say  ?

13 Q.       You cannot tell   us the  dates of any of these

14 sales to  Paulette  Martin?

15 A.       No , no.

16 Q.       It's like  Ms. Johnston said  , you didn't keep a

17 calendar?

18 A.       No , I did not keep a calendar.

19 Q.       Didn't keep a   ledger ; is that correct  , sir?

20 A.       No.

21 Q.       You kept it all up here?

22 A.       (Witness n odded.)

23 Q.       We can trust you for that   ; right , sir?

24 A.       You got to trust sometime  .  You forgot what you

25 really had to remember sometime.

1         MR.  MONTEMARANO :  No further questions,    Your
2  Honor.

3         THE  COURT:  Any additional cross   ?

4         MR.  MARTIN:   Mr. Goodwin has no questions for
5  this witness , your Honor.

6         MR.  HALL:  No questions  , Your  Honor.

7         MR.  MITCHELL:   I just have a few  , Your  Honor.

8         THE  COURT:  You may , Mr. Mitchell.

9                        **CROSS-EXAMINATION**

10       **BY MR. MITCHELL:**

11 Q.     Mr.  Encarnacion ?

12 A.     Yes, sir.

13 Q.     You mentioned in your direct testimony that you
14 had been to  Ms. Martin's house and seen some of her
15 family members; is that correct?

16 A.     Yeah.

17 Q.     How was it that you got a chance to see her
18 family members?

19 A.     Sometime  I get in there and they come from --
20 they home , and they come to visit their mom    to say hi ,
21 but that's all that   I meet them.

22 Q.     And you were asked by the government w    hether  or
23 not you recognized anyone else that was here in the
24 room , any family members or other people   .  And you only
25 recognized one other person.

1        Do you --  I know that this   monitor  is kind of in

2  your way .  I just wanted to make sure  , do you recognize

3  my client right here in the blue?  Have you ever seen

4  him before?  Right here.  Just this gentleman right

5  here.

6  A.     I not remember see  ing him before.

7  Q.     Okay.  And  I would assume that part of your plea

8  is not to testify against anyone else,      Mr. Bynum or

9  anyone else; is that part of your plea agreement not      to

10  have to testify against anyone else   ?

11  A.      So against the people that   I agree to do

12  business of.

13        MR.  MITCHELL:   All right .  No further questions.

14        MR.  WARD:   I have a couple of questions  , Your

15  Honor.

16        THE  COURT:  Mr. Ward.

17        MR.  WARD: Maybe  I better step up here so the

18  witness can see me.

19                     **CROSS-EXAMINATION**

20        **BY MR. WARD:**

21  Q.     Good afternoon, sir.

22  A.     Yes, sir.

23  Q.     Let me step over here so you can see me without

24  craning your neck.

25        You talked about  -- when you were questioned by

1  Ms. Johnston , you talked about dealing with a woman

2  named Beverly; is that correct, sir?

3  A.      Yes, sir.

4  Q.      When did you sell drugs to    Beverly

5  approximately?

6  A.      When or how much?

7  Q.      When ?

8  A.      Just like  '98, '97, something like that.    I not

9  sure when it was , like , from '97, '98.

10  Q.      You were introduced to    Beverly by your nephew;

11  is that right?

12  A.      No.   I know  Beverly because her husband.

13  Q.      You knew her through her husband?

14  A.      Her husband.  Her husband was a dealer who deal

15  with my nephew , and then he get in trouble and we get

16  to Beverly because he say to give that to her.

17  Q.      So as  I understand it , you were   intro duced to

18  Beverly's husband by your nephew; is that right?

19  A.      I'm introduce d?

20  Q.      Huh ?

21  A.      I introduce to my nephew to her?  What you     say?

22  Q.      Did your nephew introduce you to    Beverly's

23  husband?

24  A.      Yes.

25  Q.      What was his first name?  Do you recall?

1 A.     Beverly 's husband?

2 Q.     Yeah.

3 A.     Dobie.

4 Q.     Dobie ?

5 A.     Dobie.

6 Q.     That was his first name or his last name    ?

7 A.     I didn't know.  That's how    I know him.

8 Q.     Okay.   And Beverly is his wife  ?

9 A.     Yes.

10 Q.    So she was   Beverly  Dobie ?

11 A.    They live together.    I don't know if they marry

12 or not.

13 Q.    Hum?

14 A.    They live together back then   , but  I don't know

15 if they marry or not.    I don't know if that's husband.

16 Q.    You believed that she was    Beverly  Dobie?

17 A.    Huh ?

18 Q.    You believed she was   Beverly  Dobie, the wife?

19 A.    Yeah , because they live together.

20 Q.    Okay.  How many times did you -- first of all,

21 did you actually , yourself,  deal with  Mr. Dobie?

22 A.    No , because  Dobie was in jail and then she gave

23 the work that he did  , and then  I give it to her , so

24 that's why.  He wasn't there    at th at time.

25 Q.    So Mr. Dobie had gone to jail?

1  A.      Yeah.

2  Q.      And your nephew went to jail   ?

3  A.      Yeah.

4  Q.      So you picked up the family business and went to

5  deal with  Beverly?

6  A.      Yeah .  My nephew leave that to me to get rid of

7  the one he's keeping there because     I didn't know about

8  that kind of business because that's a different type

9  of drug that he selling  , so I didn't know about that

10 kind of drug.

11 Q.      So cocaine is different than heroin?

12 A.      Yes.

13 Q.      It's like selling   Cadillac  --

14 A.      Or Mercedes  Benz .

15 Q.      -- o r something else ; is that right?

16 A.      (Witness nods.)

17 Q.      You actually met this   Mr. Dobie , did you ?

18 A.      I know Dobie , but I don't know really what's the

19 guy do with him  , so that's my nephew doing deal with

20 Dobie.

21 Q.      Yeah.  But what   I'm trying to ask you, or what

22 I'm driving at is  , did you meet this fellow    Dobie that

23 your nephew had been supplying drugs to who later went

24 to jail?

25 A.      I know him.

1 Q.      You remember now what he looked like?

2 A.      If I saw him , I mean I'd remember.

3 Q.      If you saw him , you'd remember ; right?

4 A.      Yeah.

5 Q.      How about Beverly?  If you saw   Beverly -- first

6 of all , how many times did you ever deal with     Beverly?

7 A.      I don't go many time to    Beverly  house .   Like

8 once, two time.

9 Q.      Two times?

10 A.      I think once or two.    I don't go long time there

11 because  I did that to her because not too much drug      I

12 got to  give and  I don't keep going on that like that     .

13 She really need it , so...

14 Q.      Is it fair to say if you saw this     Beverly today ,

15 you would be able to recognize her?

16 A.      Maybe.

17 Q.      Maybe ?

18 A.      Yeah.

19 Q.      All right.  Well , let me ask you this  :  The

20 fellow you knew as   Dobie you said you think you    'd

21 recognize,  do you see him in the courtroom today?

22 A.      I don't think   I look to anybody.

23 Q.      Huh ?

24 A.      They told me to take a look if    I see somebody ,

25 but I don't --  I got that thing in front.     I don't see

1 somebody behind that or anything like that.

2 Q.     Let me ask somebody to stand up.  Sir   , can you

3 stand up, please?  Can you stand up?  And would you

4 identify yourself by name?

5 A.     Goldie Dobie.

6        MR. WARD:  Do you have any relationship    , sir, to

7 Lavon Dobie?

8        MR. DOBIE:  Yes, I do.

9        MS. JOHNSTON:   Your Honor, objection.

10       THE COURT:  Mr. Ward.

11       MR. WARD:  Yes, sir.

12       THE COURT:  Wait a minute.  He's not been sworn.

13       MR. WARD:  All right.

14       MS. JOHNSTON:   Your Honor, we will stipulate

15 that the " Dobie" he's talking about is not any

16 relationship of  Lavon Dobie or the  Dobie that's sitting

17 in the courtroom , her husband .

18       MR. WARD:  Well, that's very kind of the

19 government, because that's exactly what    I was driving

20 at.

21       THE COURT:  That's just been resolved by

22 stipulation.

23       BY MR. WARD:

24 Q.     This is not the man that you've met    known as  Mr.

25 Dobie?

1  A.       No.

2  Q.       The lady standing over there   --

3           MR. WARD:  Would you stand up, ma'am?

4               (Defendant Lavon Dobie stands.)

5           BY MR. WARD:

6  Q.       Is that the lady that you know as   Dobie's wife?

7  A.       No.

8           MR. WARD:   Okay.  All right , sir , I have  no

9  other questions.

10          THE COURT:  Anything further?

11          MR. McKNETT : Yes , Your Honor , if I may.

12                   **CROSS-EXAMINATION**

13          **BY MR. McKNETT :**

14 Q.       Good afternoon.

15 A.       Good afternoon.

16 Q.       Sir, is this the first time you've testified in

17 court?

18 A.       Yes.

19 Q.       Did you prepare for your testimony?

20 A.       I talked to Ms. Dobie -- or to Deborah  Johnston

21 about it.

22 Q.       Before you entered into your plea agreement    , you

23 talked to the government; correct?

24 A.       Yes.

25 Q.       You did what's cal  led a  proffer session;

1 correct?

2 A.      What do you mean   "proffer session "?

3 Q.      You sat down with the government and your lawyer

4 and basically explained what you could tell the

5 government about drug dealing; correct?

6 A.      Yeah.  Yeah.

7 Q.      And then based on that conversation    -- how long

8 did that take that proffer session?

9 A.      How long did it take to try know what    I had to

10 say?

11 Q.      Yes.

12 A.      I don't know.  Sometime maybe like hours or 30

13 minute.

14 Q.      How many time s did you meet with government

15 agents, prosecutors  , to prepare for your testimony

16 today?

17 A.      I think two time.

18 Q.      Two times ?

19 A.      Yeah.

20 Q.      How long did it take total?

21 A.      Like hour, 30 minute together.

22 Q.      Part of the process was government ag    ent s asked

23 you questions ; correct ?

24 A.      Yeah.

25 Q.      And you've heard some of those same questions

1 today; haven't you?

2 A.      Yes.

3 Q.      It was a rehears al; wasn't it?

4 A.      Huh?

5 Q.      It was a rehears al?

6 A.      I don't understand that.

7              (The question was interpreted.)

8              THE WITNESS:  Not really.  Not really that.

9 It's like to say what   I really know and   I really doing .

10             BY MR. McKNETT:

11 Q.      So you would know what to say today?

12 A.      Yeah.

13 Q.      The government would ask you questions?

14 A.      Yeah.

15 Q.      And then you would answer them?

16 A.      Yeah.

17 Q.      And sometimes you would discuss with the

18 government your answers; correct?

19 A.      Yeah, yeah.

20 Q.      And sometimes they would ask you the questions

21 again; correct?

22 A.      Yeah.

23 Q.      And you would answer them again; correct?

24 A.      Yeah.

25 Q.      And sometimes you would have to discuss your

1 answers further; correct?

2 A.      Yeah.

3 Q.      When you were  prepar ing for  your testimony

4 today, were you shown any photographs?

5 A.      Show any photograph to her or they show me     ?

6 Q.      Show you.

7 A.      No , I don't see photograph today.

8 Q.      Nobody showed you any photographs?

9 A.      No.

10 Q.      Sir, you identified this woman back here as

11 someone you've seen before; correct?

12 A.      Yes.

13 Q.      You said , I believe , that you saw her perhaps

14 two or three times; correct?

15 A.      Yeah, yeah.

16 Q.      And you saw her at  Ms. Martin's house you said;

17 correct?

18 A.      Yeah.

19 Q.      Did you know her name?

20 A.      I not remember her name because    I never talk to

21 her like friend  , but I know she is that her friend   , and

22 -- but I never seen that she go in there with any kind

23 of business with  Paula like drug business.     I don't

24 know if they do some or not   , so that's not my business.

25 Q.      She was just there because she was a friend of

1  Ms. Martin's ; correct?

2  A.      Yeah.

3  Q.      Did Ms. Martin introduce you?

4  A.      Huh?

5  Q.      Did Ms. Martin introduce you to her  ?

6  A.      Maybe sometime they say this is   Juan or this is

7  one of my friend or something like that   , but not that's

8  the guy  I do business with or thing  like that.

9  Q.      So you never did business in front of her    ; did

10 you?

11 A.      No.

12 Q.      And you never did business with her   ; did you?

13 A.      No.

14 Q.      You never saw  Ms. Martin or anyone else do

15 business with her ; right?

16 A.      No.

17 Q.      When I say "do business ," you know  what I mean ,

18 don't you?  Dealing  drugs?

19 A.       Yeah.

20 Q.      You never  saw that  woman in any situation that

21 involved drugs, did you?

22 A.      No, sir.

23 Q.      Thank you.

24         THE COURT:  Any further cross-examination,

25 counsel?  All right.  You may redirect.

1          MS.  JOHNSTON:  Just a couple of questions.

2                   **REDIRECT  EXAMINATION**

3       **BY MS. JOHNSTON:**

4  Q.     Mr. Encarnacion , when you were talking about

5  Beverly and her husband whom you knew as      Dobie --

6  A.     Yes.

7  Q.     -- d o you know what his correct name was    ?

8  A.     I know that his name    Dobie , but I don't know his

9  last name.   I don't know if  Dobie is his last name or

10 not.  I don't really know  .  I just know him by that

11 name.

12 Q.     That was the nickname or name you knew him by    ?

13 A.     I don't know because --   I know  Junior call him

14 Dobie and  I meet him and that  's the name  I call him , so

15 I don't know if that's the last name or not.

16 Q.     You don't know whether that's his legal name

17 either?

18 A.     No.

19 Q.     That's just how you knew him based upon what

20 your nephew told you  ?

21 A.     Yeah.

22 Q.     In terms of your plea agreement, did anyone tell

23 you exactly what you had to say when you testified?

24 A.     I don't have to say exactly --   I had to say it

25 is true.  That's all   I have to say.

1  Q.      In preparing with government -- being debriefed

2  by government  counsel  before  you en tered  your plea

3  agreement, did anyone tell you what to say other than

4  the truth?

5  A.      No.  The truth.

6  Q.      And is your cooperation or your chance to get a

7  lower sentence based upon whether people get found

8  guilty ?

9          MR.  McKNETT :  Objection.

10          THE  COURT:  Overruled.

11          BY MS.  JOHNSTON:

12  Q.      Does it matter to you if people are found

13  guilty?

14  A.      No.

15  Q.      What's -- what controls whether or not you have

16  a chance to get a lower sentence?

17  A.      That's how -- like  I said before , that's up to

18  judge  and the government.    I don't have no choice

19  there .  I not sure  I going to get a point off or not.

20  I not sure .  It's on the judge.

21  Q.      What do you have to do as part    of your

22  agreement ?

23          MR.  MARTIN:  Objection  , asked and answered

24  several times.

25          THE  COURT:  Overruled.

1          BY MS. JOHNSTON:

2 Q.      Mr. Montemarano  asked you -- this gentleman here

3 asked you some questions.  Were you ever charged with

4 any crimes in this country or the    Dominican  or any

5 foreign country before you were arrested on     November of

6 2001?

7 A.      No, because the one he trying to bring back from

8 1997 , back then , I get my lawyer and they never charge

9 me for that.

10 Q.      You were never   charged  for that?

11 A.      No.

12 Q.      That had to do with sending a car out of the

13 country ?

14 A.      Out of the country.

15 Q.      And a gun that you had purchased   ?

16 A.      I buy a legal gun , and I put it in there , and I

17 never see it nor   I got to go show   it to the  court or

18 thing like that , so that mean they declined that.

19 Q.      When you were meeting with the agents before you

20 entered your guilty plea, were you the one who told

21 them who you sold the drugs to  ?

22          MR. MONTEMARANO :  Objection , Your  Honor.

23          MS. JOHNSTON: Let me rephrase it   .

24          BY MS. JOHNSTON:

25 Q.      Did you tell them that   Paulette  Martin  was a

Page 209

1  customer of yours?

2  A.      Yeah.

3  Q.      That was information you provided to them; is

4  that correct?

5  A.      Yes.

6          MS. JOHNSTON:   I have nothing further.

7          MR. MONTEMARANO:  Just one question   , Your Honor.

8          THE COURT:  You may.

9                  **RECROSS EXAMINATION**

10         **BY MR. MONTEMARANO:**

11 Q.      So it's up to the judge and the government if

12 you get a lower sentence; correct?

13 A.      Yeah.

14         THE COURT:  Anything further?

15         MR. MARTIN:  No , Your Honor .

16         THE COURT:  You may step down.  Thank you.

17                      (witness e xcused at 4 :17 p.m. )

18         THE INTERPRETER:   May the interpreter be

19 excused , Your Honor ?

20         THE COURT:  Y ou may.  We don't  need the

21 interpreter anymore  , do we ?

22         MS. JOHNSTON:  No , we don't.  Not at this time,

23 Your Honor.

24         THE COURT:  All right.

25         MS. JOHNSTON:  Not today.

1          Your  Honor , our next witness would be     Officer

2 Malarkey.

3          THE  COURT:  All right.

4 Thereupon,

5                    **DOUG  MALARKEY** ,

6 having been called as a witness on behalf of the

7 Plaintiff , and having been first duly sworn by the

8 Courtroom Deputy, was examined and testified as

9 follows:

10         THE  CLERK:   I need  you to  state your name for

11 the record.

12         THE  WITNESS:  My name is    Corporal  Doug  Malarkey.

13 M A L A R K E Y.

14                    <u>**DIRECT  EXAMINATION**</u>

15     **BY MS.  JOHNSTON:**

16 Q.     Where are you employed  ?

17 A.     Employed as a K -9 corporal with the city of

18 Takoma  Park  Police  Department.

19 Q.     Calling your attention back to July    4 of 2002 ,

20 were you employed with the    Takoma  Park  Police

21 Department ?

22 A.     Yes, ma'am , I was.

23 Q.     Were you working in   uniform at   that time ?

24 A.     Yes, ma'am , I was working uniform patrol.

25 Q.     And on that date  , did you have occasion to have

1 any contact with an individual named     John Martin , Jr.?

2 A.      Yes, ma'am , I did.

3 Q.      Can you describe approximately what time and

4 what happened on July  4 of  2002?

5 A.      Yes, ma'am.   About 02 :30 in the morning  , I was

6 field training a new officer,    Officer  Eric  Mueller.   We

7 were in the area of   New Hampshire  Avenue and  University

8 Boulevard , at which time we observed a white 1996     Ford

9 Thunderbird traveling southbound on     New  Hampshire

10 Avenue.

11      As we bulled in to proceed southbound on     New

12 Hampshire  Avenue , behind it , the  erratic nature of the

13 way the vehicle was being     driven, it  drew our attention

14 to the vehicle .   The vehicle would straddle l   anes one

15 and two, l ane two and three  , back and forth straddling

16 lanes  for several seconds.

17      Based on my training, knowledge   , and experience

18 I believed the driver to be    under  the influence of some

19 sort of narcotic or alcohol  ; therefore , we conducted a

20 traffic stop on   the vehicle at  13th and  Erskin , I

21 believe it was.

22      At that time , we effected the stop  .   The driver

23 of the vehicle was stopped and approached the vehicle

24 to inquire about the nature of his driving.

25 Q.      What occurred once you approached the vehicle?

1  A.      Upon approach , I introduced myself to the

2  driver , who was subsequently identified as    John Martin ,

3  Jr.  He was the driver and sole occupant of the

4  vehicle.  When  I asked him for his driver's license and

5  registration , during that dialogue  , I detected a

6  moderate odor of alcohol coming from the vehicle.      I

7  believed it to be either beer or malt liquor.

8         I asked him to step from the vehicle.  Once     I

9  saw a  -- just to his right side  , if you will , like sort

10 of underneath the right arm area    , I saw a  st. Ives  beer

11 bottle or malt liquor bottle   .  He was stepped out of

12 the vehicle and was immediately passed back to      Officer

13 McLean , who had arrived as soon as    I conducted the

14 stop.

15        My intention on passing him back to     Officer

16 McLean was that Officer McLean had just come back from

17 a field sobriety school   , so I'm thinking what better

18 person to give him to than    Officer McLean .

19 I retrieve d the beer bottle and   I was in the process of

20 retrieving the beer bottle   , which  I observed to be

21 open , the seal  was broken,  three -quarters empty , and

22 was still cold.

23        At that point in time   , a scuffle broke out

24 towards the back of the vehicle.     I immediately

25 responded back to assist   , and as  I was doing so , I

1  could see it appeared as though     Mr. Martin was

2  struggling to get away from    Officer McLean and  I

3  assisted in subduing    Mr. Martin , and he was secured.

4          Once he was secured , I asked what had taken

5  place.  There was a substance detected on     Mr. Martin by

6  Officer  McLean,  and officer   McLean  advised me what he

7  had or what he believed he had.  Once     Mr. Martin was

8  secured , I went back to conducting my investigation at

9  the vehicle.

10          In addition to smelling alcohol,    I also detected

11 what , through my training  , I describe as a   masking

12 agent .  It's like a heavy fab  ric softener or a

13 detergent  used for, you know, cleaning your clothes;

14 oftentimes  used to conceal the K   -9s when trying to

15 detect narcotics  , but it was very, very strong coming

16 from the vehicle.

17          Approached the vehicle again   , and in the

18 backseat in plain view  , there's a large black trash

19 bag.  Inside that trash bag  , which was , if you will ,

20 just imagine sitting on the rear   , left seat , kind of

21 half open /half closed , inside were what   I determined at

22 that point to be about 30 to 33 freshly-emptied kilo

23 wrappers of cocaine.   Based on my training, knowledge

24 and experience , that's what   I believed them to be and

25 subsequently that's what they were determined to be.

1          We requested that drug recognition expert

2    through  Montgomery  County because he was driving the

3    vehicle and because we found narcotic    s in the vehicle  ,

4    we thought it might be possible he might b    e under the

5    influence of narcotics.  That was handled through

6    Officer  McLean  and the county officers that responded.

7          I also found a   empty,  four pound box of baking

8    soda , which is used in the drug trade to cut narcotics

9    to reduce the percentage of it.  And inside that box

10   also was two  Ziploc bagg ies, if you will , one with an

11   orange on it , one with an apple on it   , which  I know

12   based on my training, knowledge and experience to be

13   with  the somewhat smaller   Ziploc bagg ies, if you will ,

14   maybe you've seen them on    TV or you may have seen them

15   other places , small bags of crack cocaine    and/or heroin

16   are sold in these tiny, tiny sandwich bag    s, if you

17   will.  You know an eighth of an inch by an eighth of an

18   inch and they're sold in    bundles  of 250  to 500 in your

19   grocery store s in the  D. C. area .

20          In these other bag s with  the apples and   the

21   oranges  on them , and t hat's how they're differentiate   d

22   with an apple and an orange   .  I also found a small hand

23   scale in the front compartment of the vehicle     , and all

24   the evidence was impounded as well     as the vehicle and

25   Mr. Martin was transported back to the station      , as well

1 as all the evidence was transported back to the

2 station.

3        Once back at the station,   I attempted to

4 determine the total quantity of what was in the black

5 trash bag , so I utilized the picnic table that was

6 outside of the station  .  The sun was basically just

7 coming up at this point and    I attempted to lay them out

8 and identify exactly how many were there.  Again      , my

9 number I came up with was roughly like 30 or 33     , but

10 DEA subsequently , I believe , came up with a lower

11 number.

12        As I was going through them   , I periodically

13 field tested small portions of a white powder su       bstance

14 which I observed still in the brick form and torn up       in

15 packaging of what   I believed to be  , you know , kilo

16 wrappers.  All of the subsequent field tests that       I did

17 conduct did come back positive   , a color reaction for

18 cocaine.

19 Q.    Now , if I can just interrupt you for a second.

20 I'm going to show you this chart here that's marked

21 CH-1.

22        The John Martin , Jr. that you're referring to.

23 Is he depicted on this chart and appropriately

24 identified as "  John Martin?"

25        MR. WARD:   What is the  exhibit  number ?

1          MS.  JOHNSTON:    CH-1.

2          THE  WITNESS:  This   subject,  bottom  row , third

3 from the left , is the  subject  which  I came in contact

4 with that night th  at I know  as "John  Martin , Jr."

5          BY  MS.  JOHNSTON:

6 Q.      So he's accurately depicted on this chart     as the

7 John  Martin you had contact with    --

8 A.      Yes, ma'am.

9 Q.      -- o n July 4, 2002?

10 A.      Yes, ma'am .

11 Q.      If  I could show you the exhibits that you've

12 discussed here briefly with us and have you identify

13 them.

14         Let me begin , first,  with what's been marked as

15 Government's  Exhibit  JM-3, if you could  tell  us what

16 that is .

17 A.      Yes, ma'am .  This is the hand scale  , which  I

18 observed  in the passenger compartment of the vehicle

19 upon  the traffic stop.  It's    used  to measure small

20 quantities of narcotics  on the street.

21 Q.      And  JM-4, can you tell us what that is?

22 A.      Yes, ma'am .  This is the  Maryland motor vehicle

23 administration registration   , which Mr. Martin  Jr.

24 produced that evening   as requested  upon the traffic

25 stop .

1 Q.     JM-1?

2 A.     Yes, ma'am.  This is the four pound box of

3 baking soda , which  I describe d to the jury as often

4 used as cut and repackaging of cocaine     and heroin .

5 Q.     Let me show you what's been marked as

6 Government's  Exhibit  Drugs 39 , and if you can identify

7 that exhibit.

8 A.     Yes, ma'am.  As   I was describing, the packaging    ,

9 the apple s and the  oranges , the small  Ziplocs,  if you

10 will , these two  Ziploc  baggies here are the small

11 Ziploc s, like each one of these would contain between

12 250 and 500 of the smaller    Zips used to sell smaller

13 quantities of narcotics  ; and also , I believe , detected

14 a residual amount of white powdery substance.

15 Q.     There was another bag   attached to that.  T hat

16 was removed or part   of the  substance that was removed

17 by the chemist   as opposed to --

18 A.     Correct.

19 Q.     Other than that , are these apple and orange

20 bagg ies in the condition they were in when you

21 recovered them?

22 A.     Yes, ma'am.

23 Q.     Were all of these items sent to the laboratory    ?

24 A.     They were -- all the evidence was turned over to

25 Montgomery  County  Drug  Task  Force upon my  arrival  at

1  the station , so they were turned over to    DEA through

2  them , and I believe either   their lab or the   Montgomery

3  County lab is the one who did the analysis.

4  Q.     So they would have separate   d the drugs or any

5  other material in the bags   ?

6  A.     Yes, ma'am.

7  Q.     Likewise , let me show you what's been marked as

8  Government's   Exhibit 35.  These are going to be 35     A

9  through  D.

10       Can you tell us what we have in these bags?

11  A.     Yes, ma'am.  Th ese a re -- the large black trash

12  bag that  I described that was sitting on the rear seat

13  of the vehicle upon the stop   , these are the kilo

14  wrappers -- when I say "kilo wrappers ," I'm referring

15  to a 2 .2 pound brick of powder cocaine that's

16  compressed that's then wrapped in plastic     , in

17  cellophane.

18       These particular wrappers that    I discovered in

19  the black trash bag were double and triple wrapped     , if

20  you will.  Basically  , they are wrapped initially in a

21  black plastic and then the    masking  agent th at I

22  smelled , the laundry detergent  , was then -- there was a

23  liquid coating a  round  that, and then there  were

24  rewrapped  again with a softer cellophane or softer

25  plastic,  you know , wrapped again to try to mask the

1  odor of it , and these appear to be all of the kilo

2  wrappers that were in the black bag.

3  Q.     Now, there  are some that look like   Ziploc

4  baggies inside.  Were those    Ziploc  baggies in the

5  garbage  bag or were those something that perhaps the

6  chemist  did in separating out the bag wrappers?

7  A.     Those , I belie ve, is  something the chemist    would

8  have done  to separate the wrappers  , or DEA did , to

9  actively depict   how many there were  , because in the

10  black trash bags were the kilo wrappers     , which

11  literally  still  had the shape of the brick  , as if they

12  had jus t been cut , still wet , still strong odor  .  It

13  appeared the property had just been removed from them.

14  Q.     In add ition  to that , it looks like there's some

15  black powder on some of these exhibit    s.  Can you tell

16  us what that is?

17  A.     Yes, ma'am.  During courtroom procedures     , it's

18  always asked that they be fingerprinted    .  So what's

19  done at either the lab or at the station is they're

20  dusted for fingerprints  .  It appears  whoever dusted

21  these , either at  DEA or Montgomery  County  Crime  Lab,

22  utilized black fingerprint powder and that's    what it

23  appear s to be.

24  Q.     Other than the black powder on the    Ziploc  bags ,

25  they were separately pack   aged  and the kilo wrappers

1  that  you seized that day?

2  A.      Yes , ma'am.

3  Q.      Who did  you turn  those over to?

4  A.      To  Randy  Cussan  [ph.] of the  DEA Task  Force.

5  Q.      Is he part to have   DEA  Task  Force ?

6  A.      Yes, ma'am , he is.

7  Q.      And then finally, l et me show you   what's  been

8  marked as  Exhibit  Drugs  38 .  Do you recognize that

9  exhibit?

10  A.      Yes, ma'am.  This is  , as I was periodically

11  going through the kilo wrappers to -- because we had

12  such a  large  quantity and literally  , if you picture

13  like a black lawn bag  s you're loading with leaves   , I

14  mean , there was with all these wrappers coming out      ,

15  there was cocaine falling every   where.

16         What  I want ed to do was periodically take a

17  random s ampling  to make sure  it was  consistent .  So as

18  I was going through the bags and separating      them,  I was

19  taking small amount  s of the powder   that  I was finding

20  inside the kilo wrappers and    I was periodically field

21  testing them .  The remnant s that were left over after

22  that that were not left inside of the bags     , I basically

23  saved , and that's what   we're seeing here.

24  Q.      That was your scrap  ing from  the kilo wrappers?

25  A.       Yes, ma'am , as I was going through all 25 to 30,

1 33.

2          MS. JOHNSTON:   Your Honor, if we could publish

3 these item s to the jury, we would appreciate it  , and

4 then I think  I'm about done with my questions  .

5          THE COURT:   With no objection , you may.

6          MS. JOHNSTON:  For the record  , Your Honor, I

7 think I may have said  Government's  Exhibit.  These are

8 Government's  Exhibit marked as   Drugs 35 A through  D.

9          THE COURT:  All right.

10          MS. JOHNSTON:   I belie ve I have no further

11 questions of this witness.

12          THE COURT:  All right.  We will resume tomorrow

13 at ten o'clock with cross-examination of this witness.

14          Any o ther matters?  Otherwise,   I will adjourn.

15          Take a few minutes to let the jury look at the

16 published exhibits  , and then we will recess.

17          MS. JOHNSTON:   Your Honor , may the witness step

18 down, please ?

19          THE COURT:  Yes, you may step down.

20                (Witness excused at 4  :34 p.m. )

21          THE COURT:   All right.  Ladies and gentlemen  , we

22 will resume tomorrow at ten o'clock with

23 cross-examination of the last witness.  Thank you      .

24                (Jury excused at 4  :37 p .m.)

25                (Off the record at 4:37 p.m.)

1                          **CERTIFICATE**

2

3       I, Tracy Rae Dunlap,   RPR , CRR , an Official Court

4   Reporter for the United States District Court of

5   Maryland, do hereby certify that I reported, by machine

6   shorthand, in my official capacity, the proceedings had

7   and testimony adduced upon the Jury Trial Proceedings

8   in the case of UNITED STATES OF AMERICA versus PAULETTE

9   MARTIN, et al,   Criminal  Action Number   RWT-04-0235 on

10  June 16, 2006.

11

12      I further certify that the foregoing 222 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17      In witness whereof, I have hereto subscribed my

18  name, this 15th day of March 2008.

19

20                       _____
                         TRACY  RAE  DUNLAP ,  RPR ,  CRR
21                       OFFICIAL COURT REPORTER

22

23

24

25