```
 1           UNITED STATES DISTRICT COURT OF MARYLAND
                         SOUTHERN DIVISION
 2
   -----------------------x
 3 UNITED STATES OF AMERICA  :
            Plaintiff        :
 4                           :
                             :
 5 vs                        :Criminal Action:    RWT-04-0235
                             :
 6                           :
   PAULETTE MARTIN, et al    :
 7          Defendants.      :
   -----------------------x
 8

 9                        Wednesday , June 13, 2006
                          Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11 Proceeding before the HONORABLE ROGER W. TITUS, United
   States District Judge, in courtroom 4C, commencing at
12 10:03 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS TESTIMONY AND PROCEEDINGS     AS
15      RECORDED AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR            (301) 344-3912
25 Official Court Reporter
```

```
 1                    I N D E X

 2                DIRECT      CROSS    REDIRECT   RECROSS

 3  Doug Malarkey               9

 4  Stanley  McLean    12       19

 5  Donald  Rigby      21       39

 6  Michael Johnson    44       57        61

 7  Timothy Anderson   62       78

 8  Nathan King        80      169

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                        Page

24  Reporter's Certificate                222

25  Concordance                           223
```

1          THE COURT:   Before  I  entertain  any  preliminary
2  matters,  let  me  say  something  I  feel  very  strong
3  strongly  about.   When  I  have  a  jury  waiting,  I  don't
4  want  to have  them  delayed with  unnecessary  preliminary
5  matters.   If  you  have  a preliminary  matter  you  know
6  you're  going  to  need  to  raise,  let  me  know  that,
7  hopefully  the  evening  before,  so  we  can  start  early  and
8  we  not  have  the  jury  waiting.   I  don't  want  the  jury
9  waiting while  we  debate  fine  points  of  law.
10          We're  going  to  conclude  today  at  4:30.
11  Tomorrow,  I  have  a  guilty  plea  at  9  o'clock,  and  we
12  will  start  at  10:00.   If  there  are  any  preliminary
13  matters  for  tomorrow,  just  come  for  the  guilty  plea,
14  and  when  it's  over,  we  will  take  them  up  between  the
15  end  of  the  guilty  plea  and  the  beginning  of  the
16  proceedings  for  the  day,  and  we  also  start  at  10
17  o'clock  on  Friday.
18          As  of  right  now,  there  will  be  a  short  day  on
19  July  20  because  all  of  the  judges  of  this  court  are
20  venturing  forth  on  Capitol  Hill  to  meet  with  all  of  our
21  Congress  members,  and  so  we  will  be  leaving  here  -- I
22  think  we  will  be  able  to  have  some  session  that  day  but
23  not  a  whole  session.   And  as  of  right  now,  unless
24  something  changes,  such  as  like  I  got  to  get  it  done
25  earlier,  I'm  going  to  have  surgery  on  July  21,  so  we

1 will have a nice, three-day weekend for you for that
2 weekend.
3         MR. SUSSMAN:  The 20th is about a half a day,
4 would you estimate that?
5         THE COURT:  Yeah, I think -- if it's a luncheon,
6 I'll probably see if I can bargain with the jury to
7 start at 8:00 or 8:30 and go to 11:00 or 11:30 and send
8 them home, but I won't do that if that's going to
9 destroy the life of some juror.  With that said, Mr.
10 Martin, you have a preliminary matter?
11         MR. MARTIN:  Yes, Your Honor.
12         MR. MONTEMARANO:  Could I ask the Court to give
13 us an idea of when you will know about our being able
14 to reschedule July 21 to schedule other things on July
15 21?
16         THE COURT:  Best I can tell you is there's about
17 a 99 percent chance, unless my shoulder falls off
18 between now and then, that that's going to be off.  The
19 only thing that would happen is if suddenly I had to
20 have it done earlier, and we could put it back on, but
21 I think you can pretty much go to the bank we won't sit
22 on July 21.
23         MR. MONTEMARANO:  I was going to make travel
24 plans.
25         THE COURT:  I think that's fair to go.

1          MR. MONTEMARANO:   Thank you, Your Honor.

2          THE COURT:   Yes, sir.

3          MR. MARTIN:   Very quickly, Your Honor.

4  Yesterday, you threw cold water on one of my brother

5  defense counsel when he tried to preserve the record,

6  and I just wanted to state that the Fourth Circuit.

7          THE COURT:   Tell me what you're referring to

8  because I'm not sure I know what you mean.

9          MR. MARTIN:   Well, Mr. Sussman got up yesterday

10 and he wanted to make a point about renewing his Motion

11 for Severance and everyone thought -- I had a case last

12 year that I argued in March, and even though I had

13 moved for Judgment of Acquittal and raised a particular

14 issue and then moved again at the conclusion of my case

15 in chief, one of the panel members said to me, well,

16 Mr. Martin, you didn't object to the verdict sheet, and

17 Mr. Martin you didn't raise the issue during the

18 testimony of the witness in question.

19          The point I'm getting at is, Your Honor, I think

20 the Fourth Circuit requires us to make the record at

21 every opportunity, and I don't think Mr. Sussman's

22 wasting a lot of time yesterday, and I would like to

23 let the Court know that I intend to stand up and

24 preserve an issue.

25          THE COURT:   First of all, nobody should be

1 bashful in this courtroom with me. I expect you to be

2 zealous advocates. That's one of the first obligations

3 you-all have, and if there's somebody who thinks their

4 proffer was not adequately heard, I will be glad to

5 hear the proffer. I don't want to shut anybody off.

6           MR. MARTIN:  The second thing, Your Honor, is

7 before -- I couldn't raise it yesterday, you left the

8 bench so quickly, so I couldn't address it after the

9 jury had left.

10          THE COURT:  Okay.

11          MR. MARTIN:  The next thing is, at some point,

12 we have to address a 609 issue.  Ms. Greenberg and I

13 have agreed to cross swords on that, so -- before he

14 testifies.

15          MS. GREENBERG:  Your Honor, may I suggest we

16 come back ten minutes before the lunch break?  The

17 witness won't be on until this afternoon.

18          THE COURT:  I will try to make the lunch break a

19 little bit longer than normal, like an hour and ten

20 minutes, so that we can we take it up without

21 shortening their lunch, plus I have a judge's meeting

22 today, but I'll work out something on that with you.

23 Okay.  Anything else?

24          MR. MONTEMARANO:  With regard to preliminary

25 matters, Your Honor, requesting notice as much in

1  advance  as  possible ,  if  something  come s  up  in  the

2  evening ,  would  you  want  us  to  call  chambers?

3        THE  COURT:   Yeah ,  call  chamber s  and  let  us  know

4  you  have  a  preliminary  matter ,  but  what  I  want  to  make

5  sure  is  I  don't  want  to  have  this  jury  out  there

6  cool ing  their  heel s.   My  over riding  concern  is  to  have

7  a  fair  trial  for  both  sides ,  but  my  next  over riding

8  concern  is  I  don't  want  to  take ,  now  15  citizen s  away ,

9  from  their  livelihood  and  everything  else  and  then  have

10  them  sit  here .

11        So  I  want  to  make  sure  that  they  are  in  the

12  seat s  hear ing  testimony  as  I've  promise d  them .   I  don't

13  want  to  dis courage  anybody  from  maki ng  proffer s  or

14  maki ng  preliminary  matter s.   I  just  want  to  do  it  so

15  it's  courteous   to  the  jury ,  and  if  Mr.  Sussman  would

16  like  at  any  time  today  to  make  an  addition al  proffer  on

17  that  matter ,  I  will  be  glad  to  hear  him .

18        All  right .   Are  we  ready  for  the  jury ?   Bring

19  them  in .

20              (Witness  resume s  the  stand .)

21              (Jury  returns  at  10  :09  a.m.)

22        THE  COURT:   Good  morn ing ,  ladies  and  gentlemen  .

23  I  want  you  to  know  there 's  something  new  in  the

24  courtroom  today .   I  should  tell  you  a  story  about  that

25  big  screen  over  there .   That  is ,  at  least  I'm  being

1 facetious , stolen property .  It does not belong in this

2 courtroom , but because you're going to be see ing a lot

3 of evidence , we purloin ed that from courtroom 2A.

4          This build ing , like many other build ings , was

5 too small the day it opened .  You may have noticed when

6 you've come in that there 's a dumpster outside .  That

7 is attempt ing to alleviate one of the problem s.  I told

8 you there were four district judge s, and if you count

9 them , there are three district judge courtroom s, so

10 there 's a problem .  That 's being remedi ed by that

11 dumpster .

12          When this courthouse opened , it also did not

13 have enough magistrate judge courtroom s, so the newest

14 courtroom in this court house is Courtroom 2A, and since

15 it's the youngest courtroom , it got all the newest

16 technology , bell s and whistle s, of which that 's one.

17 This is not my courtroom either .  This is Judge

18 Messitte 's courtroom , and he and I are ironically high

19 school classmate s, so I'm using my classmate 's

20 courtroom for this trial because it's big enough to

21 handle this many people .

22          Courtroom 2A is the one I'm shari ng until my

23 courtroom is finish ed, but that 's the long , sad story

24 of we stole that from Courtroom 2A, so my colleague ,

25 Judge Day, has only got one of those thing s in his

1  courtroom  instead  of  the  usual  two.   With  that,  you

2  will  be  better  able  to  see  some  of  these  exhibits  that

3  you  might  not  be  able  to  see  on  those  monitors.

4         All right.   We're  ready  to  resume

5  cross-examination   of  the  witness.   You've  already  been

6  sworn.   You  may  proceed.

7                    **CROSS-EXAMINATION**

8         BY  MR.  MONTEMARANO :

9  Q.      Is  it  Officer  Malarkey ?

10  A.      Corporal  Malarkey.

11  Q.      Corporal ?

12  A.      Yes, sir.

13  Q.      Good  morning.   How  are  you,  sir?

14  A.      Fine,  sir.   How  are  you?

15  Q.      Fine.   I've  got  a  couple  of  questions  concerning

16  your  testimony  yesterday  concerning  the  vehicle  seizure

17  and  John  Martin.

18  A.      Yes,  sir.

19  Q.      Mr.  Malarkey,  do  you  have  your  notes  with  you

20  from  the  stop?

21  A.      No, sir,  I  don't  have   any  paperwork  with  me.

22  Q.      Do  you  recall  that  he  provided  you  a  license ?

23  A.      No,  I  don't  believe  he  provided  a  license,  just

24  registration.

25  Q.      What  was  the  address  on  the  registration,  if  you

1  recall ?

2  A.      I don't recall , sir.

3  Q.      Did he, at any time in his statement  to you , use

4  the word Paulette  or name Paula ?

5  A.      No, sir .

6          MR.  MONTEMARANO :   No further  question s.

7          MR.  MARTIN:   Mr.  Goodwin  has  no  question s  for

8  Officer  Malarkey .

9          MR.  HALL:   Your  Honor , very  brief ly  if  I  may.

10                      **CROSS-EXAMINATION**

11         BY MR.  HALL:

12 Q.      Corporal , do I understand  correct ly that  Mr.

13 Martin  was  the  only  person  in  the  vehicle ?

14 A.      Yes, sir . He was  the  driver  and  sole  occupant

15 of  the  vehicle .

16 Q.      You  indicated  yesterday  in reference  to several

17 exhibit s that  there  was  a black , powdery  substance ,

18 which  was  fingerprint  powder ; is  that  correct ?

19 A.      Reference  to the  kilo  that  we  describe d

20 yesterday ?  Yes, sir .

21 Q.      And  are  you  aware  whether  there  are  any  result s

22 from  that  fingerprint ing ?

23 A.      No, sir .  I was  not  advise d as  to  the  result s of

24 the  fingerprint ing  of  any  of  the  evidence .

25 Q.      You  have  no  reason  to believe  that  my  client ,

1  Reece  Whiting 's  fingerprint s  would  have  been  on  there ?

2  A.     I have  no  knowledge  of  your  client 's

3  fingerprint s.

4          MR. HALL:    Thank  you .

5          THE  COURT:   Any  additional   cross ?

6          Any  redirect ?

7          MR.  WARD:   No.   None  from  Ms.  Dobie .   No

8  question s, Your  Honor .

9          THE  COURT:    You  may  step  down , Officer .   I'm

10 sorry , you  do  have  redirect ?

11         MS.  JOHNSTON:   No , I  don't, Your  Honor .   We're

12 finish ed  with   this  witness .

13         THE  COURT:    You  may  step  down .

14                 (Witness  excused  at  10:13 a.m. )

15         MS.  JOHNSTON:    Our  next  officer   would  be  Officer

16 McLean .

17         THE  CLERK:

18 Thereupon,

19                    **STANLEY MCLEAN** ,

20 having  been  called  as  a  witness  on  behalf  of  the

21 Plaintiff , and  having  been  first  duly  sworn  by  the

22 Courtroom  Deputy, was  examined  and  testified  as

23 follows:

24         THE  CLERK:   State  your  full  name   for  the  record .

25         THE  WITNESS:   Officer  Stanley  McLean , Takoma

1 Park Police Department.

2          THE CLERK:   Spell your last name.

3          THE WITNESS:   M C L E A N.

4                    **DIRECT EXAMINATION**

5          BY MS. JOHNSTON:

6 Q.        How long have you been employed with the Takoma

7 Park Police Department?

8 A.        Five years at the time.

9 Q.        What was your assignment on or about July 4,

10 2002?

11 A.        Takoma Park police operations, patrol section.

12 Q.        Were you in a uniform?

13 A.        Uniformed, marked vehicle, yes, ma'am.

14 Q.        And on that day, did you have occasion to have

15 contact with a John Martin?

16 A.        Yes, I did.

17 Q.        Could you describe where and when you had that

18 contact?

19 A.        Officer Malarkey and myself conducted a traffic

20 stop at Tarskin and 13th Street in reference to a

21 possible DUI driver.

22 Q.        When you say "DUI," what do you mean?

23 A.        Driving under the influence. He was conducting

24 some erratic movements on the road. We suspected he

25 was under some sort of influence of toxins.

1  Q.      Were you and Officer Malarkey in separate cars?

2  A.      We were in separate vehicles   .

3  Q.      Was he the lead car?

4  A.      He was the lead car; I was right behind him.

5  Q.      Describe what happened right after the traffic

6  stop was initiate d.

7  A.      At the traffic stop, Officer Malarkey and his

8  partner , Officer Mueller , approach ed the vehicle .  At

9  that time , Officer Mueller  approached the passenger

10 side and  Officer Malarkey was on the driver 's side and

11 began inter viewing the driver .  He observe d an odor of

12 alcohol ic beverage emanating from the vehicle .  He

13 asked the driver to step out , asked him for his

14 license .  At th at time , he then brought him back to me

15 to conduct a field sobriety test , at which time I

16 start ed asking question s about his -- any type of

17 medication s -- h e's under the influence of any type of

18 doctor 's care .  He state d no.  I asked him if he was

19 drinking , he said I had a couple beer s earlier from in

20 the day .

21 Q.      What did you do at th at time ?

22 A.      At that time , I requested permission  to search

23 his person for weapon s and CDS.  At that time , I

24 recover ed from his right , front pant s pocket two

25 glass ine bag s with white powder , white rock sub stance ,

1 suspect ed cocaine .   The subject at that time start ed to

2 resist and attempt ed to flee .   I call ed for Officer

3 Malarkey and Mueller for assistance .   He was then

4 detain ed in handcuff s and place d under arrest at that

5 time .   Search incident to arrest at that time recovered

6 from his left , front pant s pocket a blue piece of paper

7 with an unknown type of pill s in it .   Suspect ed

8 medication of an unknown variety , I'm not sure .

9 Q.      You mention ed that you recover ed two baggi es

10 that contain ed what appear ed to you to be drug s?

11 A.      Yes, ma'am .   It had a combination of white rock

12 substance and white powder substance , suspect ed

13 cocaine .

14 Q.      What was the difference , based on your train ing

15 and experience , between the white powder substance and

16 the white rock ?

17 A.      The white rock substance is crack cocaine and

18 the powder is cocaine .

19 Q.      Let me show you what has been mark ed as

20 Government 's Exhibit Drug s 36 and Drug s 37.   And if you

21 can identify those two item s.

22 A.      Yes, ma'am .

23 Q.      What are they ?

24 A.      These are the clear plastic baggi es recovered

25 from his right , front pant s pocket .

1  Q.      There is a separate bag attached to them that

2  appears to have the drug substance in it.  Do you see

3  those?

4  A.      Yes, ma'am  I do.

5  Q.      Did you remove the substance from the little

6  baggies or was that done at the lab?

7  A.      That was done at the lab for field testing and

8  chemical testing.

9  Q.      Also, the baggies seem to have been split apart

10 and now are black.

11 A.      Yes, ma'am.  I believe they did that at the lab

12 for fingerprint analysis.

13 Q.      Other than those two changes, the substance

14 having been removed from the baggies and the baggies

15 having been split and blackened with finger powder, are

16 these the drugs that you seized?

17 A.      Yes, ma'am.

18 Q.      What did you do with these drugs after you

19 seized them and the little baggies from Mr. John

20 Martin?

21 A.      Well, they were submitted as evidence for

22 Officer Malarkey and the DEA's case.

23 Q.      Were they turned over, then, to the DEA?

24 A.      Yes.

25 Q.      I want to show you a couple of other exhibits

1 very quickly.   JM-2.

2 A.      yes, ma'am.

3 Q.      JM-5 and JM-6.   If you can tell us what those

4 three items are.

5 A.      Okay.   After I placed the subject in custody, at

6 this time I recovered from his right, front pants

7 pocket his wallet, a black tri-fold wallet and a MAMSI

8 identification card belonging to Mr. Martin.   This was

9 also, I believe, the white piece of paper on which the

10 pills were folded up in in his left pants pocket.

11 Q.      Did you recover all of those from Mr. Martin?

12 A.      Yes, ma'am, I did.

13 Q.      In regard to that white piece of paper -- I can

14 put it up on the screen so everyone can see it -- could

15 you read the name that's in the center of that and the

16 telephone number's associated with that name?

17 A.      Phone Number 301-422-9254, I believe it's

18 pronounced "Neece."

19 Q.      That's at the very top?

20 A.      Mm-hmm.

21 Q.      The second telephone number?

22 A.      301-422-6523.   I believe it's "Grudi" or "Gudi."

23 Q.      Finally, the MAMSI part so that everyone can see

24 it.

25 A.      The MAMSI's insurance card belonging to member

1 name  John  A.  Martin , Jr.

2 Q.      Let  me  do  something  so  it's  easier  to  see.

3 A.      Okay .  Member  name  Martin , last  name  comma  John

4 A. Jr, MAMSI 's  insurance  card , I  believe .

5 Q.      What  is  the  effective  date  of  that ?

6 A.      The  e ffect ive  date  is  7/1/96.

7 Q.      The  plan  is  in  the  name  of  what ?

8 A.      MAMSI .

9 Q.      The  plan  number ?  What's  the  name  of  the  --

10 A.      The  plan  number  is  Paula 's  School  of  Performing

11 Arts .

12 Q.      Do  you  know  where  Paula 's  School  of  Perform ing

13 Arts  is  locate d?

14 A.      No, ma'am .  I'm  not  familiar  with  that  at  this

15 time .

16 Q.      Did  you  do  any  further  investigation  in  this

17 case ?

18 A.      After  the  traffic  stop ?  No, ma'am .

19      MS.  JOHNSTON:   Your  Honor , I  have  no  further

20 question s  of  this  witness .

21      May  I  publish  the  exhibit s?

22      THE  COURT:   Yes, you  may .

23      Any  cross-examination  ?

24                     **CROSS-EXAMINATION**

25      BY  MR.  MONTEMARANO :

1  Q.      Good morning, Officer McLean.  How are you?

2  A.      Good morning, sir.

3  Q.      That card you were just looking at.

4  A.      The insurance card?  Yes, sir.

5         MS. JOHNSTON:   Excuse me, Your Honor, can I

6  interrupt?  I seem to have forgotten a question.

7         THE COURT:  All right.  That's fine.

8                 **FURTHER  DIRECT  EXAMINATION**

9         BY MS. JOHNSTON:

10 Q.      Are there, inside of the wallet, some other

11 documents?

12 A.      Yes, ma'am.  Another piece of paper, a phone

13 number, a personal identification  card, a medical

14 examiner's certificate, I believe, for driving the --

15 or I'm unfamiliar with it at this time -- some business

16 cards and a credit card.  Another piece of paper with a

17 phone number on it.  Pardon me one second.  Yes, ma'am.

18 I dropped a piece of paper.  Here you go.

19 Q.      And the identification  items were in the name of

20 Mr. Martin as well?

21 A.      That's correct.

22 Q.      Let me show you this one piece of paper, and if

23 you can just read the name and telephone number that's

24 on the piece of paper.

25 A.      At the top of the piece of paper is Lois or

1 Luis, phone number: 240-353-8438.

2 Q.      Thank you.

3        MS. JOHNSTON:   Now I'm done, Your Honor.   I

4 appreciate your indulgence.

5        THE COURT:   All right.   You may proceed, Mr.

6 Montemarano.

7              **FURTHER  CROSS-EXAMINATION**

8        BY MR. MONTEMARANO:

9 Q.      The identification materials that Ms. Johnston

10 just showed you after I stood up and sat back down,

11 they were from Mr. Martin's wallet; correct?

12 A.      That's correct, sir.

13 Q.      That's the wallet Ms. Johnston holds in her hand

14 as far as you can tell?

15 A.      Yes, sir.

16 Q.      That was taken from the right front pants

17 pocket?

18 A.      No.  The wallet was recovered from his right

19 rear pants pocket.

20 Q.      Right here?  The rear?

21 A.      Yes, sir.

22 Q.      Back here?

23 A.      Yes, sir.

24 Q.      It was certainly on his person?

25 A.      Yes, sir.

1  Q.      Also  in  that  wallet  was  the  MAMSI  card;  correct?

2  A.      Yes.

3  Q.      That  MAMSI  card  is  one  that  said  Paula's  School

4  of  Performing  Arts?

5  A.      I  believe  so.  The  A  was  messed  up,  so  Paula's

6  School  of  Performing  A-something,  yes.

7          MR.  MONTEMARANO:  A-something?  Thank  you.

8          THE  COURT:  Any  additional  cross-examination  ?

9          MR.  MARTIN:  None  from  Mr.  Goodwin,  Your  Honor.

10         THE  COURT:  All  right.

11         MR.  HALL:  No,  Your  Honor.

12         THE  COURT:  Any  redirect?

13         MR.  MITCHELL:  No.

14         MR.  WARD:  No,  thank  you,  your  Honor.

15         THE  COURT:  Silence  is  a  negative  unless  I  hear

16  you  stand  up  and  say  yes.  All  right.  Any  redirect?

17         MS.  JOHNSTON:  I  have  no  redirect,  Your  Honor.

18         THE  COURT:  Officer,  you  may  step  down.  Thank

19  you  very  much.

20             (Witness  excused  at  10:23  a.m.)

21         MS.  JOHNSTON:  Our  next  witness  would  be  Don

22  Rigby  from  Western  Union.  I've  advised  counsel  we're

23  calling  Mr.  Rigby  a  little  out  of  turn  because  of  his

24  travel  schedule.

25  Thereupon,

1                          **DONALD  RIGBY ,**

2 having been called as a witness on behalf of      the

3 Plaintiff , and having been first duly sworn by the

4 Courtroom Deputy, was examined and testified as

5 follows:

6          THE CLERK:    State your name   for  the  record .

7          THE WITNESS:   Donald  Rigby .

8          THE CLERK:   Sp ell  your  last  name .

9          THE WITNESS:   R-I-G-B-Y.

10                    **DIRECT   EXAMINATION**

11          BY MS.  JOHNSTON:

12 Q.      Where are  employed?

13 A.      By Western  Union in St. Charles, Missouri.

14 That's near St. Louis.

15 Q.      And in what position?

16 A.      Subpoena  compliance  officer .

17 Q.      How  long  have  you  been  employ ed by Western

18 Union ?

19 A.      Forty-five  year s.

20 Q.      Could  you  de scribe  for  us  what  your  duti es  are

21 as a subpoena  compliance  officer ?

22 A.      I review  the  subpoena s  that  come  in from

23 attorney s  and  law enforcement , design  the  search

24 process , supervise  the  search  process,  provide  the

25 records  and  testify  the  records .

1 Q.     The records that you're referring to, are those

2 records that are created and maintained by Western

3 Union in the ordinary course of their business?

4 A.     Yes, ma'am.

5 Q.     Are those records, are they paper records or

6 electronic records or both?

7 A.     We provide both the -- mostly what I testified

8 to are paper records.

9 Q.     Let me show you what -- have you pulled some

10 records at the request of law enforcement in this case?

11 A.     Yes, ma'am.

12 Q.     I'm going to show you two sets of records marked

13 as R-2 and R-3.  I would first ask you whether or not

14 you can identify R-2 as being records of Western Union.

15 A.     Yes, this is a money transfer record from

16 Western Union.

17 Q.     Are they paper records or electronic?

18 A.     This is paper.  It's -- they're maintained in

19 the computer, but we print a copy of these when they're

20 requested.

21 Q.     R-3, if you can tell us whether or not those are

22 records you provided and which are maintained by

23 Western Union?

24 A.     Yes, we did provide these records, and it is

25 another money transfer maintained by Western Union.

1  Q.       And both were maintained and created in the

2  ordinary course of business?

3  A.       That's correct.

4  Q.       I'm going to put that up on the screen.  If you

5  have trouble seeing them, please let me know and I will

6  bring them up closer to you.  Starting with R-2 and the

7  first page, can you tell us what we're looking at here

8  on the screen?

9  A.       This is a computer record of a Western Union

10 money transfer.

11 Q.       Starting at the very top line, if you could walk

12 us through what information is contained on this

13 report.  And beginning here with the very first line,

14 what is that information?

15 A.       That's a money transfer control number, ten

16 digits that's randomly assigned by the computer when

17 it's input to our system.

18 Q.       Is that a file number, so to speak, for this

19 particular transaction?

20 A.       That's right.  It's an ID number.  Right.

21 Q.       If we go across there, there's the reference to

22 an agent CCC, and then some sevens and a P.  What does

23 that refer to?

24 A.       Yeah.  That's -- that field is for the agent ID.

25 In this case, it's a credit card transaction, so they

1  plug in the CCC and populate it with numbers.

2  Q.      Then underneath that, we have a reflection of a

3  payee and the name Nathan King. Can you tell us what

4  that is?

5  A.      That's the receiver's name. That's the receiver

6  of the money.

7  Q.      Continuing with the next line, if you could tell

8  us what that is.

9  A.      That's the phone number that was recorded at the

10  time that it was called in.

11  Q.      So this was a call in?

12  A.      Yes, it was. Credit card transactions are

13  called in or turned in online. This particular

14  transaction was called in over the telephone.

15  Q.      Okay. From this telephone number?

16  A.      That's correct.

17  Q.      Is that information that the computer picks up

18  when the call's received, or is it information that the

19  sender gives you when they call up to make the

20  transfer?

21  A.      It's picked up by the computer and recorded like

22  a -- something similar to a caller ID.

23  Q.      If we go across that line further, there's some

24  more information. What is that information across the

25  line?

1 A.      Well , there 's a credit  card  indicator , there 's a

2 TDDA means telephone  direct  to  Dallas .   That's where

3 our  call  center  was  located in  this  transaction .

4 Indicates it  was  sent  from  Hyattsville , Maryland  on

5 June 30.   It doesn't  show  the  year  there , but  in  other

6 parts of  this  document , it  will  show  that  it's  June  30

7 of  '02.

8 Q.      Is  that  the  date  reflected at  the  top --

9 A.      Yes .

10 Q.      -- of  the  record ?   And  then  we  will  see  it  later

11 on?

12 A.      Right .

13 Q.      And  then  the  next  line , if  you  could  just  walk

14 us  through , what  does  that  refer  to?

15 A.      That 's  the  ten  digit  money  transfer   control

16 number  again .   And  amount  is  $200 , and  the  receiver 's

17 name  below  that  is  Nathan  King .   That  is  will-call ,

18 that 's  the  type  of  service  we  provide .   Nathan   King

19 will  call  at  a  Western  Union  office .   We  won't  be

20 notifying  him  that  it's  there  and  available   for  him .

21 He  just  has  to  know  that .   Up  above , there 's  a

22 reference  to  Tucson , Arizona .   What  does  that  refer  to?

23 A.      That 's  the  intended payout  location .

24 Q.      Then  under  will-call ?

25 A.      Under  will-call  is  the  sender's  name , Paulette

1 Martin .

2 Q.     The next line ? What does that tell us ?

3 A.     That 's an agent ID for the location that paid

4 out the transaction .  That is the amount of princip le

5 that was paid out .

6 Q.     How much was that ?

7 A.     $200 .

8 Q.     The next line is ANI phone .

9 A.     That 's the phone number that was record ed by our

10 system when it was call ed in .

11 Q.     And prefer red customer number , what is that ?

12 A.     That 's a prefer red customer number that 's

13 assigned to the send er .  It document s all of her

14 address and phone number information .

15 Q.     And then MOD, what does that stand for ?

16 A.     MOD mean s money order.

17 Q.     Is that the method of payment ?

18 A.     No .  We call them money transfer s today , but MOD

19 is an abbreviation for money order ,and we just

20 retain ed that separation of general information before

21 we go on to information that document s every time

22 someone look at the transaction or does anything with

23 the transaction .

24 Q.     So that the section that come s after that

25 reference s any -- reference s the transaction specific s,

1  as well as anyone who may have looked at the record?

2  A.      That's right.  It provides -- the next area will

3  provide operator number and terminal ID, date and time.

4  Q.      What's the REC?

5  A.      REC means record.  A better description would be

6  sent, that's date and time the money transfer was sent.

7  Q.      Okay.  What is the rest of the information on

8  that line?

9  A.      That's an operator number, terminal ID, date and

10  time.

11  Q.      That the money order was sent?

12  A.      That the --

13  Q.      The transfer was sent?

14  A.      That's the date and time that the money transfer

15  was actually entered into the system and released.

16  Q.      And then paid?  What does that tell us?

17  A.      That's the date and time that the money transfer

18  was paid out to the receiver.

19  Q.      Then the CCA line.  What does that refer to?

20  A.      That's an operator number and terminal ID.  You

21  notice it's the same as the record line, so it's a

22  simultaneous record of the person who actually is

23  handling the transactions.

24  Q.      And then the next line, WC?

25  A.      You notice that is the same operator number and

1  terminal ID as -- on the pay line, so that indicates

2  when that operator went in to look at that transaction ,

3  and then just minute s later, he paid it out.

4  Q.      So that that is when the person at the location

5  where the wire transfer was picked up first looked at

6  the information ?

7  A.      That's right.

8  Q.      And then paid it out?  The payout time is two

9  minute s or so later; is that right?

10  A.      Exactly.

11  Q.      Then if you could continue with the next line ,

12  what does that tell us?

13  A.      That entire line is operator number , terminal

14  ID, and number indicators are caller ID indicato rs on

15  that entire line.

16  Q.      That tells you what number had called in?

17  A.      That's correct.

18  Q.      Called in the order?

19  A.      That's correct.

20  Q.      The next two or three lines, can you tell us

21  what they reference , the lines that have ATC in them?

22  A.      That's a process they go through to verify

23  validity of the card , and match it up with the card

24  holder , the card holder 's address, the card home phone

25  listed and verification process that they go through to

1   make sure there are no red flags.

2   Q.      What do you mean by "red flags?"

3   A.      Like if the information we had available on

4   Paulette Martin differed than what she gave us, that

5   would indicate that maybe it's not the actual caller.

6   There's an area there where they check -- they verify

7   it with a company that does verification on cards.

8   They do it for us online and that's all checking out.

9   Q.      It's all checking out legitimately?

10  A.      It is.

11  Q.      In terms of who the sender was?

12  A.      That's right.

13  Q.      And then we go down further, there's a reference

14  to Wilcox or SANBTOY?

15  A.      Yes.

16  Q.      What does that refer to?

17  A.      Note again that that is the same operator number

18  terminal ID that paid it out, and that operator is

19  recording information in there provided to us by the

20  receiver.

21  Q.      What was the --

22  A.      The first one is a driver's license.

23  Q.      Is that what the one stands for?

24  A.      That's right.

25  Q.      And the next series of numbers is what?

1  A.       The driver's license number.

2  Q.       And then the date and time?

3  A.       That's the date and the time and you note that's

4  the same date and time that the transaction was paid

5  out.

6  Q.       And then underneath that, again, there's some

7  more information put in by that same operator.

8  A.       The same operator who put the address provided

9  to us by the receiver and a phone number.

10 Q.       The phone number?

11 A.       Right.

12 Q.       Where?

13 A.       The 662 appears to be a phone number provided by

14 the receiver.

15 Q.       And then underneath that,  there's some more

16 information.  Where did that information come from  ?

17 A.       That's some information provided to us by the

18 sender, the sender's name, address, 9002 Bexhill Court,

19 Hyattsville, Maryland, the receiver's name, the credit

20 card number we charge it to, the phone number provided

21 to us and recorded from the sender, operator number,

22 total amount charged, money order indicator and credit

23 card indicator and the phone number.

24 Q.       The phone number, again, after the sender?

25 A.       That's correct.

1  Q.       Supplied by the credit card number of the sender

2  as well; is that correct?

3  A.       That's correct.

4  Q.       That information -- is that information

5  information provided by the sender?

6  A.       Yes, it is.  It's recorded by our system and

7  also provided by the sender.

8  Q.       Okay.  And in your system, do you have a way to

9  verify that information?

10 A.       That's correct.

11 Q.       And could you explain that verification process?

12 A.       Well, in the preferred customer number, they

13 record information on the sender, so in this case, most

14 likely they had the information already, and when the

15 information was provided, everything seemed to match

16 up.

17 Q.       And you also mentioned you have another system

18 or a company that verifies information for you.

19 A.       There's a company that verifies credit cards to

20 make sure they're valid and they match up with

21 information provided.

22 Q.       Is that what's reflected in the line that

23 references address verification, response codes?

24 A.       That's right.

25 Q.       Now, let me show you Page 2 of that record.  Can

1 you tell us what we're looking at here?

2 A.     Yes.  This is the check that's printed to make

3 payment of the money transfer.  In the U.S. and

4 Canada, we always -- our agents always write checks.

5 It's automatically printed on their printer, and they

6 have them endorsed, and usually our agents cash them on

7 the spot.

8 Q.     On this occasion, where was this wire transfer

9 that was sent on June 30 picked up?

10 A.     It was picked up, you can see on the top of the

11 check, there's William's Travel Centers in Eloy,

12 Arizona made payment of this transaction.

13 Q.     And on what date was it picked up?

14 A.     It was picked up on June 30, 2002.

15 Q.     Indeed is that what's referenced in the computer

16 record as the date and time of when it was picked up?

17 A.     That's right.  It was paid out June 30, '02, at

18 6:30 p.m. eastern time.

19 Q.     And it was originally sent on that same date?

20 A.     Sent on the same date at 6:11 p.m. eastern time.

21 Q.     Who was it made payable to?

22 A.     Made payable to Nathan King.

23 Q.     Was the $200 actually paid to him?

24 A.     Yes.

25 Q.     If we could briefly look at the second exhibit,

1  R-3.  Again, the first page of R-3, is this the same

2  kind of computer record that was involved in R-2?

3  A.      Yes, it is.

4  Q.      Can you describe for us what the date of this

5  transaction and how it commenced, whether it was credit

6  card or an in-person sender?

7  A.      This transaction was sent on March 18 of '02 at

8  5:20 p.m. eastern time.

9  Q.      That was reflected here in the line that I'm

10 referencing?

11 A.      That's right.

12 Q.      Where was it sent from?

13 A.      It was sent from Washington, D.C.  It was sent

14 from a -- they walked in and presented cash to the

15 Western Union agent.

16 Q.      Do you know where the agent was actually

17 located?

18 A.      Yes, I looked that up.  I think it's Cash

19 Checks.  I left that in my briefcase.

20 Q.      All right.  Again, does it reflect who the

21 sender was?

22 A.      The sender was Tiffany Vessels.

23 Q.      Who was the payee?

24 A.      The payee was Steven Ross.

25 Q.      The telephone number that's referenced there?

1 A.      That is the telephone  number  provided  to us by
2 the sender.
3 Q.       And then there's this G I S W M O X.   What does
4 that stand for?
5 A.       That's internal routing.   It means general  input
6 system, will call money order transaction.
7 Q.       I'm going to give you your briefcase.
8 A.       Thank you.  I apologize for not having that with
9 me.  The AWA number you see on the bottom  line is --
10 that's an agent  ID that belongs to the agent  that sent
11 the transaction, and that belongs to Check Cash 1 at
12 3433 14th Street  Northwest  in Washington, D.C.
13 Q.       Is that the location  where  the sender  actually
14 had to physically  appear  to conduct  this transaction?
15 A.       That is correct.
16 Q.       If you could describe -- if we continue  down the
17 lines, what was the reference  here to Houston, Texas?
18 A.       Yes.  That is the money transfer  control number
19 again to Houston.   The Houston, Texas is the intended
20 payout  location.
21 Q.       And the $687.50?
22 A.       That is the amount  paid out to the receiver.
23 Q.       And the receiver  would be Mr. Ross?
24 A.       That's Steven Ross is the receiver, yes.
25 Q.       Then there's something  called pass code question

1  2493.   What does that refer to?

2  A.      That is called a test question.  The sender has

3  authorized us to pay it out to Steven Ross without ID

4  if he is able to answer that -- if he has that pass

5  code.

6  Q.      Okay.  Who assigns the pass code?

7  A.      The sender.  The sender, Tiffany Vessels, would

8  provide the password.

9  Q.      Can you tell us the -- if we go down to receive,

10  what date this order was placed and time and when it

11  was paid out?

12  A.      Yes.  It was sent March 18, 2002, at 5:20 p.m.,

13  paid out the following day at 10:50 a.m.

14  Q.      Again, the reference underneath that, is that

15  from the agent who is paying it out is opening up the

16  file to check the status?

17  A.      That's right.  He first went in and looked at it

18  and identified it at 10:48 and paid it out at 10:50.

19  Q.      Then at the bottom in the parentheses, what

20  information is that?

21  A.      That is the information provided to us by the

22  sender.  The sender's name, address, city, state, zip,

23  receiver's name, phone number, operator number, total

24  amount charged -- total amount collected, I'm sorry.

25  Q.      $744.50 was what was paid by the sender?

1  A.       That's correct.

2  Q.       What was received by Mr. Ross was $687.50?

3  A.       That's right.

4  Q.       The telephone number there, is that the sender's

5  telephone number or the receiver's?

6  A.       That's the sender's telephone number provided to

7  us by the sender.

8  Q.       Now, calling your attention to the second

9  document in this item.  Again, are we looking at a

10 similar check?

11 A.       Yes.  This is -- like I say, we print checks on

12 every money transfer paid out in the US and Canada

13 drawn on Western Union's bank, and usually they are

14 cashed by our agent at the same time.

15 Q.       Is this the check for the transaction that was

16 referenced on Page 1?

17 A.       That's right.

18 Q.       And was paid out to Mr. Ross?

19 A.       That's right.

20 Q.       Where was it paid out?

21 A.       It was paid out of a place called Fiesta Mart in

22 Houston, Texas.

23 Q.       One of your agents?

24 A.       That's right.

25 Q.       In addition to that transaction, was there

1 another transaction that occurred with the sender

2 sending from the same location as the one we've just

3 looked at?

4 A.     This was sending from a different location.

5 Q.     Did you know what location this one was sending?

6 A.     Yes. This one was sent from a place called

7 Checks Cashed at 2812B Alabama Avenue, Southeast, also

8 in Washington, D.C.

9 Q.     Who was the sender on this one?

10 A.    The sender was Richard Willis.

11 Q.    The payee on this one?

12 A.    The payee was Rodney Green.

13 Q.    Then we have a number underneath the name Rodney

14 Green. What does that number refer to?

15 A.    That's the phone number provided to us by

16 sender.

17 Q.    Again, where was it to be picked up?

18 A.    Intended payout location is Houston, Texas.

19 Q.    Was there identification or do we have that

20 similar password?

21 A.    We have a password again.

22 Q.    What was the number on the password?

23 A.    5782.

24 Q.    If we go down, when was it sent?

25 A.    That's the -- that's the date and time that the

1 money transfer was sent.

2 Q.      When was it picked up?

3 A.      Picked up the following day at 10:46 a.m.

4 Q.      What was the amount of the actual wire transfer?

5 A.      687.50.

6 Q.      What was the total cost?

7 A.      744.50. And again, the information is at the

8 bottom.

9 Q.      Is the information provided by the sender?

10 A.      That's right. That's all information by the

11 sender. The sender's name, the address, city, state,

12 zip, receiver, phone number, total amount collected,

13 agent ID

14 Q.      Similarly, do we have the actual check that was

15 used to pay out?

16 A.      Yes. This is the check that was negotiated in

17 payment of that money transfer.

18 Q.      Okay. And where was this money transfer paid

19 out?

20 A.      It was paid out at Fiesta Mart in Houston,

21 Texas.

22 Q.      The same as the preceding one?

23 A.      Yes, I believe it was.

24 Q.      Again, what was the time that the Rodney Green

25 wire transfer was paid out?

1 A.       Rodney Green was paid out March 19, '02, at

2 10:46 a.m.

3 Q.       What time was the Steven Ross paid out?

4 A.       Paid out on March 19, '02, at 10:50 a.m.

5 Q.       Both in the same amount?

6 A.       Same amount, yes.

7 Q.       And the same facility?

8 A.       And the same facility.

9 Q.       Court's indulgence.

10         If we could, in terms of your records here, in

11 reference to the one that was sent by Ms. Vessels and

12 the one sent by Mr. Willis, are the addresses used by

13 the two senders the same?

14 A.       Yes, they are.

15         MS. JOHNSTON:   I have nothing further.

16         THE COURT:   Any cross?

17         MR. MONTEMARANO:   Thank you, Your Honor.

18                  **CROSS-EXAMINATION**

19         BY MR. MONTEMARANO:

20 Q.       Good morning, Mr. Rigby.   How are you doing?

21 A.       Fine, thank you.

22 Q.       My name is Michael Montemarano.   I represent

23 Paulette Martin.   I've got a couple of questions.

24         You work for Western Union; right?

25 A.       That's right.

1  Q.      The Western Union.

2  A.      That's right.   Western Union Money Transfer.

3  Q.      Those are the folks we see TV ads for about how

4  easy it is to transfer money and all that?

5  A.      I've seen some of those, yes.

6  Q.      Same company?

7  A.      Same company.

8  Q.      You have, within the way you do business in

9  terms of the money transfer part of the business, you

10 have a way you can set up, for lack of better term, an

11 account with Western Union so as to facilitate and

12 quicken the process of transferring money; is that a

13 fair statement?

14 A.      They issue cards, what they call preferred

15 customer cards, that will record the information

16 quicker for -- that's for walk-in customers can use

17 that gold card and it makes it faster.

18 Q.      To get one of those gold cards, that preferred

19 customer card, you have to provide certain personal

20 information; correct?

21 A.      Right.

22 Q.      It's verified by Western Union; correct?

23 A.      As far as I know, yes.

24 Q.      Okay.  And then when the money is received by

25 the payee, the person who is the recipient of the

1 money, there are two different ways that person can

2 receive it. Either they can pony up their ID; correct?

3 A.      Right.

4 Q.      And in the first document you looked at,

5 transferred by Paulette Martin using the preferred

6 customer card, that's what was done, because -- is that

7 a fair statement? Exhibit R-2, I believe it was. Do

8 you have that in front of you?

9 A.      No, I don't.

10 Q.      I tell you what. I do.

11       This is the transfer using the preferred

12 customer number of a Paulette Martin; correct?

13 A.      Yes.

14 Q.      And payable to Nathan King; correct?

15 A.      That's right.

16 Q.      When Mr. King collects the money, he provides

17 personal information that's confirmed by Western Union;

18 correct?

19 A.      Yes.

20 Q.      Although you weren't there when the money was

21 paid, it would be reasonable to assume he ponied up a

22 driver's license?

23 A.      They recorded -- that's what the agent recorded

24 in there, yes.

25 Q.      So he did use his driver's license; correct?

1  A.      That's what the document  indicates, yes.

2  Q.      One of the reasons you guys like to use the

3  driver's license is because it's got a photograph  on

4  it, and you can look at the photograph  and look at the

5  person and say, hey, that's the same guy.

6  A.      We do always require photo ID.

7  Q.      So we know who this person is.  On the other two

8  transfers, they were a password  transfer?

9  A.      That's right.

10  Q.      So short of the recipient being male, the Steven

11  Ross  transfer, there would be nothing else that person

12  would need other than being male other than the

13  password; correct?

14  A.      That is correct.

15  Q.      So you walk in -- I walk in and I say I'm Steven

16  Ross, here's the password, give me the money and they

17  gave it; correct?

18  A.      There's a little more to it.  They have to fill

19  out a form and tell us how much they're expecting, who

20  they're expecting from, and where they're expecting it

21  from.  That gives the agent information  to identify the

22  transaction.  Then they ask them for the password.  If

23  everything  checks out, he's entitled to the funds.

24  Q.      There is nothing in that transaction  requiring

25  personal  information  about the recipient; is that a

1  fair statement?

2  A.      That's a fair statement.

3  Q.      All you have to be is male?

4  A.      That's right.

5  Q.      If the transfer's to Steven Ross and Ms.

6  Johnston shows up, she doesn't look like a Steven; does

7  she?

8  A.      No.

9  Q.      Your agent is probably going to look, say you

10 don't look like a "Steven."

11 A.      She'd say, something's funny.

12 Q.      Something's funny.  For instance, one of the two

13 gentlemen seated just past Ms. Johnston, they've got

14 the password number, they're walking out with $200 out

15 of Fiesta Mart; correct?

16 A.      If they answer all of the questions and the

17 password; that is correct.

18      MR. MONTEMARANO:  No further questions.

19      MR. MARTIN:  Mr. Goodwin has no questions of

20 this witness.

21      MR. HALL:  No questions, Your Honor.

22      MR. WARD:  No questions, Your Honor.

23      THE COURT:  All right.  If there is no further

24 questions, any redirect?

25      MS. JOHNSTON:  No redirect, Your Honor.

1          THE COURT:   You may step down.   Thank you very

2   much.

3          MS. JOHNSTON:   May this witness be excused?

4          THE COURT:   You may be excused.

5               (Witness excused at 10:51 a.m.)

6          MS. GREENBERG:   Your Honor, the government next

7   calls Mike Johnson.

8   Thereupon,

9                    **MICHAEL JOHNSON**,

10   having been called as a witness on behalf of the

11   Plaintiff, and having been first duly sworn by the

12   Courtroom Deputy, was examined and testified as

13   follows:

14          THE CLERK:   Speak loud and clearly into the

15   microphone, please.

16          THE WITNESS:   Yes, ma'am.

17          THE CLERK:   State your full name   for the record.

18          THE WITNESS:   Michael Johnson.

19          THE CLERK:   Spell your last name, please.

20          THE WITNESS:   J O H N S O N.

21          MS. GREENBERG:   Your Honor, court's indulgence

22   for a moment.

23                    **DIRECT EXAMINATION**

24          BY MS. GREENBERG:

25   Q.     Sir, could you tell the jury your current

1  occupation ?

2  A.      I am currently a special agent with US

3  Immigration and Customs Enforcement.

4  Q.      Where were you employed before that?

5  A.      I was a police officer with the city of

6  Indianapolis from February of 1995 until February of

7  this year.

8  Q.      Were you employed in that capacity on or about

9  October 27, 2003?

10 A.      I was, ma'am.

11 Q.      Could you tell the jury what your duties and

12 responsibilities were on or about that date?

13 A.      At that time, I was assigned to the Criminal

14 Interdiction Unit of the Indianapolis Police

15 Department.

16 Q.      And as such, what were you doing?

17 A.      The Criminal Interdiction Unit's focus at that

18 time was rather two-pronged. The Indianapolis Police

19 Department recognized that traffic safety was very

20 important to the motoring public and the citizens of

21 Indianapolis. They also recognized that criminals are

22 most vulnerable when they're mobile.

23         So in that two-pronged approach, the most

24 important goal of the Criminal Interdiction Unit was to

25 promote traffic safety and to create a safe environment

1 for the motoring public, and while doing that, and

2 while enforcing traffic laws, take advantage of the

3 opportunity to contact criminals while they're mobile,

4 detect them, interdict them.

5 Q.    Now, I'm going to put up on the screen, and let

6 me just zoom this out a little bit. That's P-122

7 marked for our purposes. I know it's -- let me take it

8 out of the plastic, see if that gives you a better

9 view.

10        MR. WARD:   What was the number, ma'am?

11        MS. GREENBERG:   P-122.

12        BY MS. GREENBERG:

13 Q.    Do you recognize the truck that's depicted in

14 that picture?

15 A.    I do, ma'am.

16 Q.    Could you tell the jury how you came to see that

17 truck on that day? It's a tractor-trailer; is that

18 correct?

19 A.    It is a tractor-trailer. On October 27 of '03,

20 at approximately 2:25 p.m., I was on Interstate 70 in

21 Indianapolis, Marion County, Indiana observing

22 eastbound traffic at about the 91 mile marker, which is

23 on the east side of Indianapolis, when my attention was

24 drawn to this tractor-trailer when it appeared to be

25 exceeding the posted 55 miles per hour speed limit.

1  Q.       Based on your observation s, what did you do?

2  A.       Based on my observation , I activate d my radar

3  speed detection  device and was able to verify the

4  vehicle 's speed at 61 miles per hour  in a 55 miles per

5  hour zone .

6  Q.       Did you end up stopping  the vehicle ?

7  A.       I did stop the vehicle at approximately  the 92

8  mile marker .

9  Q.       What did you do then ?

10  A.       After stopping  the vehicle , I made a right -side

11  approach  to the tractor-trailer  and came into contact

12  with the tractor-trailer 's driver , Nathan King , who had

13  already exited the vehicle and met me as I was maki ng

14  my right-hand side approach . I ad vis ed Mr. King of the

15  violation  that I had observe d and asked him to

16  accompany  me back to my patrol car so that I could run

17  his driver 's license  and registration , which he did do.

18  Q.       Did you end up giving him a ticket for speed ing?

19  A.       I did . After run ning his driver 's license , I

20  noticed  that he had a warrant  out of Georgia  for a

21  traffic  violation .  I advise d him of the warrant , told

22  him they would n't extradite  out of Indiana , but he

23  need ed to get that take n care of as soon as he could .

24          Mr. King , during this conversation , while I was

25  conduct ing the normal business  in my traffic  stop , told

1  me he had been arrested prior for a drug arrest.  I was

2  continuing to issue my warning ticket during that

3  conversation.  When I was finished, I handed him the

4  warning ticket and told him I was complete with the

5  traffic stop as far as the violation.

6  Q.     Is that at all unusual in your business with

7  truckers to find that they've had a ticket from another

8  state?

9  A.     Oh, no, ma'am.

10  Q.     And to give them a warning for the speeding

11  violation?

12  A.     No, ma'am.  The trucking industry is very highly

13  regulated, and they often have violations on their

14  record.

15  Q.     Could you tell us a little bit about this area

16  you were patrolling, how that fits into commerce in the

17  United States?

18  A.     Interstate 70 is one of the four major east-west

19  routes across the United States.  There's the I-10

20  corridor, the I-40 corridor, the I-70 corridor, and the

21  I-80 corridor.  So a very good chunk of the east-west

22  traffic in the United States, from the southwest to the

23  northeast comes across Interstate 70.

24  Q.     It keeps you busy.

25  A.     It keeps us very busy -- kept us very busy,

1 rather .

2 Q.      Showing you what's been marked as P-123.  Could

3 you identify who is depicted in that photograph ?

4 A.      Yes, ma'am .  That is the gentleman who was

5 driving the tractor-trailer  from the earlier photo ,

6 Nathan King .

7 Q.      Now, did you receive consent from Mr. King to

8 search the tractor-trailer ?

9 A.      I did, ma'am .

10 Q.      Did you go ahead and search it?

11 A.      I did .

12 Q.      Would you tell the jury what you observed

13 immediate ly upon your beginning to search?

14 A.      When I got inside the tractor-trailer , up in the

15 sleeper berth , I found a lone screwdriver just laying

16 up on one of the shelves in the sleeper berth , kind of

17 out of place .  There were not other tools lying around .

18 It was just laying there , so I began examining the

19 heads of the screwing throughout the inside of the

20 tractor .

21      When I lifted the mattress -- in a semi

22 tractor-trailer , there 's a sleeper berth on the back of

23 it , and there 's a bed that lies across the back where

24 the driver can sleep in his off-duty time .  I lifted up

25 the mattress that was in the back of the sleeper berth

1  area  there ,  and  I  noticed  several  screws  that  appeared

2  to  have  been  taken  off  several  times  and  had  several

3  screw  marks .   When  you  use  a  screw  a  lot ,  it  will  tend

4  to  chew  up --

5  Q.     Could  see  that  in  plain  view  with  your  eyes ?

6  A.     Yes ,  I  could ,  so  I  went  ahead  and  I  removed

7  those  screws  with  the  screwdriver  that  was  in  the

8  sleeper  berth  area  of  the  truck  and  pulled  back  some

9  sheet  metal .   And  I  found  beneath  that  sheet  metal ,  two

10  duffel  bags ,  brand  new  duffel  bags ,  they  still  had  the

11  tags  on  them ,  underneath  the  sheet  metal .   When  I

12  opened  them  up ,  I  saw  several ,  what  I  described  as

13  kilo -size  bricks ,  what  I  believe  through  my  training

14  and  experience  to  be  cocaine .

15  Q.     I'd  like  to  show  you --  did  you  take  a

16  photograph  of  what  was  in   that  duffel  bag  to  preserve

17  how  you  saw  it  at  the  scene ?

18  A.     Yes,  ma'am .

19  Q.     Showing  you  what's  marked  as  P-120 .   Can  you

20  tell  the  jury  what  is  depicted ?

21  A.     Yes,  ma'am .   That  is  a --

22  Q.     Is  that  your  hand ,  by  the  way ?

23  A.     Yes,  ma'am .   No,  ma'am ,  is  not  my  hand .   I  was

24  taking  the  photograph .

25  Q.     All  right .   When  you  took  this  photograph ,  what

1 are we looking at in this bag?

2 A.     What we're looking at there is if I would have

3 opened -- if you could imagine opening a gym bag or

4 duffel bag, and opening it up, that is a picture

5 looking straight down into the gym bag.  There was a

6 trash bag inside of the gym bag itself.  What the

7 officer there is holding up is one of the kilo-size

8 bricks of what I believe to be at the time cocaine.

9 Q.     Based on the camera angle, are you looking

10 straight down at the heat seal?

11 A.     Yes, ma'am.  You're looking straight down at the

12 packaging that was on the cocaine.  What it was, was

13 one of the freezer saver, the food saver type vacuum

14 seal, heat-sealed bags that was around the packaging,

15 so that's what we're looking at right there.  Off to --

16 when you look at the picture, off to the left side of

17 the hand there, you will see some white square also

18 inside the gym bag, along with the cocaine were dryer

19 sheets, fabric softener sheets, which --

20 Q.     What effect does that have with the cocaine?

21 A.     What I have seen, and my experience in the past,

22 is that dryer sheets will often be with amounts of

23 drugs in an attempt to disguise the odor of the drug.

24 Q.     The dryer sheets in this plastic -- black

25 plastic bag were inside the canvas bag the way they're

1  depicted in this photograph?

2  A.      Yes, ma'am.

3  Q.      Sort of layers among the kilos of cocaine?

4  A.      Yes, ma'am.

5  Q.      Were you able to keep that in the same condition

6  after you took the picture?  The way it's layered?

7  A.      No, ma'am, we weren't able to keep it in the

8  same condition.  After I discovered the cocaine, I

9  called for Special Agent Steele from the Drug

10 Enforcement Administration who took custody of it and

11 sent it to the lab.  So it was not kept inside the bags

12 or anything.

13 Q.      But the dryer sheets were kept, just not in the

14 same --

15 A.      Yes, ma'am they were kept, yes.

16 Q.      Why did you call the Drug Enforcement

17 Administration?

18 A.      Because of the amount of cocaine that was

19 involved in this, this was an investigation that if

20 there was any way to keep the investigation going

21 beyond the traffic stop, it's what I wanted to do.  It

22 was a much bigger case than with the resources I had as

23 a local police officer that I could deal with, without

24 the assistance of the DEA.

25 Q.      Showing you the last picture, P-121.  Could you

1 tell the jury what is depicted on here?

2 A.      Yes, ma'am.  That is a picture of all of the

3 packages of cocaine that we recovered from the semi, on

4 the step getting into the semi next to the truck.

5 Q.      Approximately how many bags -- kilo bags were

6 there -- kilogram bags were there?

7 A.      Eighteen.

8 Q.      Based on your training and experience, what did

9 you believe was contained in the kilogram bags?

10 A.      Cocaine.

11 Q.      Did you have an opportunity to look at the

12 exhibits that were brought here to court in connection

13 with this case?

14 A.      I did, ma'am.

15 Q.      If I could ask you to approach the jury.  Just

16 to be clear.  What you see up on that screen, P-122, is

17 that the tractor-trailer with the cocaine the jury is

18 about to see?

19 A.      Yes, ma'am.

20 Q.      Is that the cocaine that you seized as a result

21 of a traffic stop on or about -- on about October 27,

22 2003?

23 A.      Yes, ma'am, it is.

24 Q.      If you could, let's see if I can help you.  Can

25 you take out the duffle bag and show the jury what you

1  found  in  the  bed  of  the  truck  that  we're  talking  about

2  here?  And  you  can  use  that  cart  to  assist  you.

3  A.      Underneath  the  sleeper  berth  of  the  tractor  that

4  I  was  speaking  of,  when  I  pulled  back  the  sheet  metal,

5  there  were  two  of  these  bags  up  underneath  the  bunk,

6  still  had  the  tags  on  them.  In  fact,  this  is  the  bag.

7  When  I  opened  up  the  bag  --

8  Q.      Just  for  the  record,  in  that  bag  you  previously

9  put  in  this  morning,  it's  Drugs  40A  through  40L,  is

10  that's  the  40  series  that  was  in  one  box?

11  A.      Yes,  ma'am.

12  Q.      And  you  repackaged  that  as  close  as  you  could  to

13  what  you  saw  that  day?

14  A.      Yes,  ma'am.

15  Q.      And  just  also  to  be  clear,  there  is  an

16  additional  bag  that's  put  on  by  the  lab  so  it's  a

17  little  bulkier  --

18  A.      Yes,  ma'am.

19  Q.      -- than  when  you  recovered  it?

20  A.      Yes,  ma'am.

21  Q.      You  got  it  as  close  as  you  possibly  could?

22  A.      Yes,  ma'am.

23  Q.      For  the  court  reporter  's  purposes,  do  I  need  to

24  give  him  a  microphone  or  are  you  all  right?

25        COURT  REPORTER:   I'm  okay.

1          MS. GREENBERG:   Great.   Thank you.

2          BY MS. GREENBERG:

3  Q.      Go ahead.   Thank you.

4  A.      When we opened up the bag, I could see the trash

5  bag in the top just as we see today.   Pulled it on open

6  and began seeing the bricks of cocaine on the inside of

7  the bag.   This package here, and actually these two

8  packages are the extra packaging that she was speaking

9  o.f these are packages from the DEA where they did the

10 drug analysis.   However, the rest of the packages are

11 inside.

12 Q.      If you could please just stack them on there so

13 the jury can see.

14 A.      The rest of the packages on the inside here are

15 as they were inside the truck with the exception of the

16 outside covering on some of them from the DEA samples,

17 but these are the food saver things that we were able

18 to see in the pictures, and this is how they were

19 packaged inside the truck.   And also, these are the

20 dryer sheets that you could see in the picture.

21 Q.      So in the Government's Exhibit 40 are a number

22 of dryer sheets, perhaps more than a dozen, that were

23 layered within these kilos -- kilograms of cocaine?

24 A.      Yes, ma'am.

25 Q.      If you could put the dryer sheets back in the

1  plastic  canvas  bag  and  also  show  the  jury  the  tags  on

2  the  bag  which  you  earlier  noted  that  you  observed.

3  A.       (Witness  indicating.)

4  Q.       Moving  you  along  to  Drugs  41,  41A  and  41B,  41C

5  and  41D.  Could  you  tell  the  jury  what's  in  this  box?

6  Again,  you  reviewed  this  earlier  today?

7  A.       These  would  be  the  drugs  from  the  other  gym  bag

8  that  was  in  the  --  underneath  the  sleeper.

9        MR.  WARD:   I'm  sorry,  we  can't  hear,  or  at  least

10  I  can't  hear.

11        THE  COURT:   You  have  to  speak  up  or  speak  into

12  the  mike.

13        THE  WITNESS:   I'm  sorry.  These  are  the

14  kilograms  --  kilogram  packages  of  cocaine  that  were  in

15  the  other  gym  bag  underneath  the  berth  of  the  truck.

16        BY  MS.  GREENBERG:

17  Q.       And  42?  I'll  hold  it  if  you  want  to  go  to  the

18  microphone.

19  A.       These  are  the  continuation  of  the  remainder  of

20  the  packages  of  cocaine,  along  with  some  more  DEA

21  samples  of  the  cocaine.

22  Q.       Again,  not  to  waste  the  grand  jury  --  the  jury's

23  time,  but  you  reviewed  this  earlier  today?

24  A.       I  did,  ma'am.

25  Q.       In  fact,  this  very  morning?

1 A.      Yes, ma'am.

2 Q.      In that duffel bag, could you tell the jury

3 what's in there?

4 A.      Once again, a trash bag just as was in the other

5 duffel bag, as well as the tags on the bag.  They were

6 identical.

7 Q.      Are there any dryer sheets in that trash bag?

8 A.      Yes, ma'am, there are.  More dryer sheets inside

9 that bag as well.

10       MS. GREENBERG:   Your Honor, just to be clear,

11 these drug exhibits, we don't want to go over each one

12 individually, but just for the record, they're drugs

13 40, then 40A through 40L inclusive, Drugs 41 and Drugs

14 41A through D inclusive, then Drugs 42 and Drugs 42A

15 through F inclusive.  And Your Honor, there's a great

16 number of them there, but can I just publish a

17 representative --

18       THE COURT:   You may.

19       MS. GREENBERG:   -- bag to the jury?  Thank you.

20 Publishing 42C for the jury -- Your Honor, 41C to the

21 jury, and I have no other questions, Your Honor.

22       THE COURT:   Any cross-examination?

23       MR. MONTEMARANO:  Yes, Your Honor.

24                   **CROSS-EXAMINATION**

25       BY MR. MONTEMARANO:

1  Q.      Special  Detective  Johnson; sir?

2  A.      Special  Agent  in train ing , but  yes .

3  Q.      You  were  hire d  by  ICE,  Immigration s  and  Custom s

4  Enforcement , in  or  about  February  of  this  year ?

5  A.      Yes, sir .

6  Q.      Mind  if  I  ask  when  you  applied  for  that  job ?

7  Ballpark .  Six  month s  ago ?

8  A.      Around  --  no.  Around  '02  or  so.  They  were  on

9  about  a  three -year  hiri ng  freeze .

10  Q.      Okay .  But  you  applied ; correct , sir ?

11  A.      I  did  apply , yes, sir .

12  Q.      Part  of  the  application  process , you  provided  to

13  them  information  about  your  train ing  and  experience ;

14  correct , sir?

15  A.      Yes, sir .

16  Q.      And  to  be  candid , there 's  nothing  wrong  with

17  this .  Part  of  what  you  told  them  is  about  the  major

18  investigation s  and  arrest s  you  had  been  involve d  in .

19  Is  that  fair  statement , sir?

20  A.      Yes, sir .

21  Q.      Including  this  one ?

22  A.      I  don't  know  specifically  because  not  know ing

23  exact ly  when  I  applied,  I  don't  know  if  I  had  conduct ed

24  this  investigation  yet .

25  Q.      Did  you  ever  make  any  other  seizure s  of  this

1  size?

2  A.      Exactly this size?  No, sir.

3  Q.      About this size?

4  A.      Yes, sir.

5  Q.      Bigger?

6  A.      Not on a traffic stop, but yes, sir.

7  Q.      Maybe a little smaller on a traffic stop?

8  A.      Roughly the same size.  I guess it depends on

9  what you're talking about or relative.  Have I seized

10 exactly this amount of cocaine before?  No.

11 Q.      More than ten keys?

12 A.      Yes.

13 Q.      More than 15?

14 A.      No.

15 Q.      Important stuff, right?  Important seizure?

16 A.      I'm sorry, sir?

17 Q.      An important stop and an important seizure; fair

18 statement?

19 A.      All drug arrests are important, sir.

20         MR. MONTEMARANO:  No further questions, Your

21 Honor.

22         THE COURT:  Any additional cross?

23         MR. MARTIN:  Briefly, Your Honor.

24                     **CROSS-EXAMINATION**

25         BY MR. MARTIN:

1 Q.      Good morning, Officer -- Special Agent.   Anthony

2 Martin on behalf of Learley Goodwin.

3 A.      Good morning, sir.

4 Q.      Right after Mr. King was stopped --

5 A.      Yes, sir.

6 Q.      -- he gave you permission to search the trailer;

7 correct?

8 A.      After we conducted the business of my traffic

9 stop, yes, sir.

10 Q.      Right.  At some point, he made a statement to

11 the government.  Were you there when he made the

12 statement?

13 A.      After I found the cocaine, I advised him of his

14 rights, which he stated that he understood.  He told me

15 during our conversation, he identified the concealment.

16 He told me about the bags.  He told me that he put it

17 in there, and he told me that he had been paid $5,000

18 for the load, but I wasn't involved in anything else

19 beyond that.

20 Q.      At no time during your conversation with him did

21 you ever hear him mention the name Learley Goodwin; is

22 that correct?

23 A.      No, sir.

24       MR. MARTIN:   Nothing further, Your Honor.

25       MR. HALL:   No questions, Your Honor.

1          MR. WARD:   No question s, Judge.

2          THE COURT:   Any redirect ?

3          MS. GREENBERG:   Brief ly.

4                   **REDIRECT  EXAMINATION**

5          BY MS. GREENBERG:

6  Q.     Were you involve d in the additional

7  investigation  after Mr. King's arrest ?

8  A.     No, ma'am .

9  Q.     That would have been DEA?

10 A.     Yes, ma'am .

11         MS. GREENBERG :  No further question s.

12         THE COURT:   You may step down .   Thank you .

13         THE WITNESS:   Thank you , Judge .

14              (Witness excused at 11:13 a.m. )

15         MR. MARTIN:   Your Honor , may we have our

16 mid-morning  break ?

17         THE COURT:   Sure .   We will take a break and be

18 back at 11:30.

19                   (Jury excused at 11:13 a.m. )

20                   (Off the record  at 11:13 a.m. )

21                   (On the record  at 11:29 a.m. )

22         THE COURT:   Are you ready for the jury ?

23         MR. MARTIN:   We are .

24         THE COURT:   Okay .

25              (Jury return s at 11:30 a.m. )

1        MS. GREENBERG:   Special Agent Snyder, rather

2 than sit that in front of the jury, the witness is

3 going to need to see it.

4        MR. WARD:   I can't hear a thing that's been

5 said.

6        MS. GREENBERG:   I was asking the agent if he

7 could move this closer to the witness stand so he can

8 have access to the exhibits.

9 Thereupon,

10                    **TIMOTHY CARL ANDERSON,**

11 having been called as a witness on behalf of the

12 Plaintiff, and having been first duly sworn by the

13 Courtroom Deputy, was examined and testified as

14 follows:

15        THE CLERK:   State your full name  for the record.

16        THE WITNESS:   My name is Timothy Carl Anderson.

17 Last name, A N D E R S O N.

18                    **DIRECT EXAMINATION**

19        BY MS. GREENBERG:

20 Q.     Sir, where are you employed?

21 A.     I'm employed by the Drug Enforcement

22 Administration  North Central Laboratory  in Chicago,

23 Illinois.

24 Q.     What is your position there?

25 A.     I'm employed as a forensic  chemist.

1 Q.      What is your background and training for that

2 position?

3 A.      I received a bachelor of science degree in

4 chemistry from the University of Wisconsin at Madison.

5 Graduation, I was hired by the Drug Enforcement

6 Administration and took part in a six-month training

7 program at the lab, as well as several training schools

8 in Virginia.

9 Q.      Do you have continued training in your role as a

10 DEA chemist?

11 A.      Yes.  Yearly, I take part in training that keeps

12 me current and refreshes my knowledge on the scientific

13 methods and techniques that I use on a day-to-day

14 basis.

15 Q.      How long have you been employed as a DEA

16 chemist?

17 A.      I've been employed almost nine years.

18 Q.      Have you ever been called to testify as an

19 expert in forensic chemistry?

20 A.      Yes, I have.

21 Q.      Have you been qualified by the various courts in

22 which you've been called as an expert in forensic

23 chemistry?

24 A.      Yes, I have.

25 Q.      Approximately how many times?

1 A.       Thirty times.

2 Q.       Approximately how many of those times have been

3 in federal court?

4 A.       Twenty-seven times.

5        MS. GREENBERG:   Your Honor, at this time, I

6 request that Tim Anderson be allowed to testify as an

7 expert in the field of forensic chemistry.

8        THE COURT:   Does the defense wish to inquire?

9        MR. MONTEMARANO:   No, thank you, Your Honor.

10        MR. MARTIN:   No, Your Honor.

11        THE COURT:   He will be permitted to express

12 opinions in the field of forensic chemistry.

13        BY MS. GREENBERG:

14 Q.       This morning, sir, upon your arrival to the

15 office, did you review those exhibits in front of you

16 containing bags, containing a white powdery substance

17 marked as Government's Exhibits 40A through 40L, 41A

18 through 41D and 42A through 42F?

19 A.       Yes, I did.

20 Q.       Did you look specifically at each bag and each

21 exhibit number on there --

22 A.       Yeah.

23 Q.       -- to save the jury some time?

24 A.       Yes, I did.

25 Q.       Had you seen those items before that are sitting

1  in front of you?

2  A.      Yes, I had.

3  Q.      Could you tell the jury how you came into

4  contact with those drug exhibits that I just mentioned?

5  A.      Originally, I received them as evidence

6  technician in my laboratory.  The exhibit was assigned

7  to me by my supervisor, and I received the evidence

8  from the evidence technician.

9  Q.      Was it -- how was it packaged when you received

10  it?

11  A.      When I received it, it was in -- the exhibit was

12  in two cardboard boxes sealed by the submitting agent.

13  Q.      If I could just hold up for you these boxes

14  marked 1.01 and 1.02.  Is that the boxes you received

15  them in?

16  A.      Yes, DEA evidence cardboard boxes.

17  Q.      Is that the usual procedure in which you get

18  suspected drug evidence?

19  A.      Yes, it is.

20  Q.      How is it given to your lab?

21  A.      It's submitted by the agents either by mail or

22  that's brought by the agents.

23  Q.      Looking at your DEA-7 in this particular case,

24  was this item obtained by Officer Mike Johnson?

25  A.      May I refer to my notes, Your Honor?

1          THE COURT:   Yes, you may.

2          THE WITNESS:   According to DEA-7, it was

3 received by Special Agent Steele.

4          BY MS. GREENBERG:

5 Q.     Steele received it from who?

6 A.     From Officer Mike Johnson.

7 Q.     That's reflect on your DEA-7 with relation to

8 these exhibits?

9 A.     Yes, it is.

10 Q.     Kevin Steele is a DEA special agent?

11 A.     That's my understanding, yes.

12 Q.     Officer Mike Johnson was with the Indianapolis

13 Police Department?

14 A.     Yes.

15 Q.     Is that the typical -- usual procedure that's

16 used in connection with submitting drugs for analysis?

17 A.     Yes, it is.

18 Q.     What did you do upon receiving these -- this

19 submission?

20 A.     Upon checking out the two boxes of evidence,

21 brang it back to my work area and then obtained a gross

22 weight, which is the weight of everything that I

23 checked out.  In this case, two boxes and the gross

24 weight was 25.67 kilograms.

25 Q.     That's the total for both those cardboard boxes?

1 A.       Yes, and the contents within.

2 Q.       So that includes the baggies and the trash bag

3 and everything?

4 A.       That's correct.

5 Q.       And then what did you do?

6 A.       Then I looked on the DEA Form 7, compared the

7 weight I had with the weight that the agent said was

8 submitted to make sure that they match within a certain

9 percentage.

10 Q.       Just to be clear, could you tell the jury when

11 you got these bags, how did they look to you?  How are

12 they packaged?

13 A.       The boxes or the --

14 Q.       The bags within the boxes.

15 A.       Oh, the bags within the boxes?  There were --

16 there was a black duffel bag in each box, and within

17 each duffel bag there was a black garbage bag, some

18 dryer sheets, and nine rectangular brick-like packages

19 wrapped in clear tape and plastic wrap.

20 Q.       How -- what was the condition of them?  Were

21 they open or sealed?

22 A.       They were all sealed.

23 Q.       What did you do, then, after you got the gross

24 weight?

25 A.       I then opened the boxes, took pictures of the

1 content s, and  then  began  with  my  preliminary   screen ing
2 test s of  the  brick s.
3 Q.      Your  gross  weight  of  25.67  before  you  go  on  to
4 your  analysis , how  did  that  compare  with  what  the
5 agent s had  determine d at  the  scene  was  the  approximate
6 gross  weight ?
7 A.      It  was  similar .  It  was  within  our  guideline s.
8 Q.      What  was  the  first  test  that  you  did  on  this  --
9 on  these  two  exhibit s, these  two  box es, exhibit s -- as
10 you  mark ed  them , 101  and  102 ?
11 A.      The  first  thing  I did  was  I remove d  the  brick s.
12 There  were  18 of  them .  I then , according   to  our
13 statistical   sampling  plan  took  14 of  those  18 and  made
14 a small  incision   into  each  of  the  brick s and  remove d a
15 small  portion  from  each  of  the  14 and  place d  that  into
16 three  chemical  reagent s or  color  test s just  -- it's
17 just  liquid , and  what  I'm  look ing  for  is  a color  range
18 when  the  powder   is  add ed  to  those  liquids .
19 Q.      What  was  the  result  of  the  color  test ?
20 A.      Of  the  14, I determine d that  11 of  them  were
21 similar , and  then  the  other  three  screen ed  slight ly
22 different , so  at  that  point , then  I took  the  other  four
23 that  I hadn't  tested  previously   and  tested  those  as
24 well , and  then  it  was  determine d that  14 of  them  were
25 similar  and  the  other  four  were  separate  or

1 sub-exhibited.

2 Q.      What do you mean by "slightly different?"

3 A.      In one of the tests, which is called a Sanchez

4 Test, the four separates actually gave a red color,

5 whereas the previous 14 hadn't, and that's an

6 indication of a possible presence of a cut or an

7 adulterant.  Typically, it's procaine or benzocaine,

8 which is another local anesthetic similar to cocaine.

9 Q.      Well, taking us back to the color test.  What

10 happens when you take a white powder, use the color

11 test, what color is indicative of cocaine?

12 A.      For the cocaine test, that's called the cobalt

13 thiocyanate test, and it's a pink liquid.  When you add

14 a white powder that is suspected cocaine, it will turn

15 blue.  It will actually be a blue precipitator or,

16 like, blue flecks in the pink, and that indicates a

17 possible presence of cocaine.

18 Q.      Was it -- did all of their samples pass the

19 color test?  Did they all turn blue?

20 A.      In that test all 18 turned blue.

21 Q.      So it was the next test that you did that you

22 had some difference because of potential cut in the

23 product; is that correct?

24 A.      That is correct.

25 Q.      Now, to stay with the color test.  Your

1 testimony is that, based on the preliminary test, all

2 these were indicative of cocaine because the color

3 turned blue?

4 A.      That's correct.

5 Q.      How does the color test that you do in your

6 laboratory compare to what agents use in the field

7 called a field test -- field testing substances?

8 A.      The field test kits, or NIK tests, are the same

9 chemical.  It's the cobalt thiocyanate reagent or

10 chemical.  It's the exact same, it's just in a

11 different package.

12 Q.      Based on your nine years of experience, could

13 you tell the jury how frequent is it that you have a

14 false positive from the color test?

15 A.      It's very rare.

16 Q.      But being that you're in the lab, you do

17 additional confirmatory tests?

18 A.      That's correct.

19 Q.      Is your testimony that the exhibits that you

20 pulled, the sampling that you pulled based on the

21 statistical analysis that you do, all of these showed

22 cocaine from the color test?

23 A.      Yes.

24 Q.      Moving on to the Sanchez test that you just

25 briefly talked about, could you explain to the jury

1 again , once you determine this is cocaine , what does

2 the Sanchez test for ?

3 A.      The Sanchez test is for a specific group of

4 chemical s , a class of chemical s called amines , and the

5 drug s or suspect ed drug s that are part of this group

6 are the common adulterant s or common cut s that are seen

7 typically with cocaine exhibit s but also with heroin

8 and meth exhibit s , and we test for that to see if there

9 are difference s because with the presence of a cut ,

10 that could significant ly decrease the percent purity of

11 the actual sample .

12 Q.      So , the next step , the Sanchez Test , is a purity

13 test , not a test to determine if it is or is not

14 cocaine ?

15 A.      That 's correct .

16 Q.      What did you do after the Sanchez Test ?

17 A.      After I determine d that the four were different

18 than the other 14 , I sub - exited the exhibit . So

19 instead of Exhibit 1 , it was now 1.01 and 1.02 , 14 were

20 handle d separate ly from the four . I did the same

21 test s , I just treat ed them as separate exhibit s because

22 of the difference s in my preliminary screen ing .

23 Q.      What did you do next ?

24 A.      The next point that I perform ed was to determine

25 the net weight or the weight of just the powder without

1  any of the packaging.  So for each of the two

2  sub-exhibits, I removed two of the bricks/packages,

3  completely opened them, got the weight of the packaging

4  with the powder and then the weight of just the

5  packaging.  Subtract that out and you get the weight of

6  just the powder.  With those two bricks, then I get an

7  average weight of what an average -- what the average

8  brick weight would be and then extrapolate or calculate

9  the total net weight based on that average.

10  Q.     What did you determine?

11  A.     I determined that Exhibit 1.01 was 14.03

12  kilograms and that Exhibit 1.02 was 3390 grams, or

13  3.390 kilograms.

14  Q.     So the total of these submissions to you was

15  over 17 kilograms?

16  A.     That's correct.

17  Q.     What did you do next?

18  A.     The next step with each exhibit was to get a

19  representative sample for further confirmatory testing,

20  and what's done in the case of hard, compressed bricks

21  of powder like this -- like these exhibits is that they

22  actually take an electric drill and drill into these

23  bricks.  Most of the time, they're compressed so tight

24  that it's hard to dig into it with a spatula, so what I

25  do is I drill five holes into each of a certain number

1  of the bricks and take that loose powder and combine it

2  to make a representative sample. And from that point,

3  I take that representative sample and continue with my

4  tests.

5          MS. GREENBERG: Your Honor, if I may approach.

6          THE COURT: You may.

7          BY MS. GREENBERG:

8  Q.     Handing you, for example, what's marked 41B.

9          Could you explain to the jury what the outer bag

10 is and the inner bag? How you received it and what you

11 did to that particular exhibit?

12 A.     Okay. This exhibit right here, the outer

13 packaging is a food saver bag, or it's a vacuum-sealed

14 pouch typically used for preserving food. Within it is

15 this rectangular package brick that's wrapped with

16 plastic wrap and clear tape, as well as a waxy layer --

17 a waxy substance, and then within it would be the hard

18 compressed white powder. For this particular brick,

19 this one was just screened. It was never completely

20 opened.

21 Q.     But the outer bag is something that your agency

22 put on?

23 A.     This is -- the food saver roll came with the

24 exhibit.

25 Q.     Could you compare that just so the jury

1  understand s with , for example , 40L?

2  A.      40L is a DEA, heat -seal ed evidence  envelope .

3  This is something  that I have at the laboratory  that I

4  put anything  that I open up from its original

5  packaging , and seal it back after I'm done with the

6  analysis .  And then within  it is a large Ziploc -type

7  bag that has loose powder , powder that 's been ground up

8  or drill ed, and this is after or subsequent  to my

9  analysis  and the making of the composite  powder .

10 Q.      So in other words , the exhibit s that look like

11 41B are as they were original ly received  and the

12 exhibit s that are like 40L are one s that you had to

13 break up or use in order to do your testing ?

14 A.      That 's correct .

15       MS. GREENBERG:    Your Honor , may I publish  these

16 two exhibits  to the jury?

17       THE COURT:   Yes , you may .

18       BY MS. GREENBERG:

19 Q.      What did you do after you drill ed the hole s and

20 representative  samplings  of the kilogram  brick s of

21 cocaine ?

22 A.      Once I received  -- once I form ed the composite

23 or the representative  sample , then I went on to my

24 confirmatory  testing .  These are scientific  instruments

25 that will give a definite  identification  upon

1 comparison with a standard of what is in the sample.

2 And the tests that I used to determine the identity of

3 these two sub-exhibits were two terms; GCMS, which is

4 gas chromatography mass spectrometry and then infrared

5 spectroscopy, or IR.

6 Q.     What were the results of those confirmatory

7 tests?

8 A.     Both Exhibit 1.01 and 1.02 contained cocaine

9 hydrochloride, and Exhibit 1.02 also contained procaine

10 hydrochloride.

11 Q.     Is that at all unusual in your experience?

12 A.     No, not at all.

13 Q.     Could you tell the jury what procaine

14 hydrochloride is?

15 A.     Procaine hydrochloride is a cut, or an

16 adulterant, that's often added to cocaine to mimic the

17 effects of cocaine, but it's a much cheaper and it

18 bulks up the powder. Procaine is commonly known as its

19 trade name novocaine, which is used in dentistry.

20 Q.     Did you do a further analysis to determine the

21 purity of the substances submitted to you?

22 A.     Yes, I did.

23 Q.     Could you tell the jury what you did?

24 A.     Both exhibits were used in the technique of gas

25 chromatography, just GC, and it's compared with a known

1  standard , a standard that we have at the lab .  In our
2  lab , it's 99.6 percent pure , and a solution is made and
3  it's compared on the instrument  with this standard .
4  Exhibit 1 .01 was calculate d as a purity of 87 percent ;
5  and Exhibit 1 .02, a purity of 64 percent .
6  Q.     Did you do anything further with regard to these
7  exhibit s in connection with DEA standard procedure s?
8  A.     Because Exhibit 1 .01 was great er than ten
9  kilogram s, in that case , we send some small sample s to
10  our special  evidence  testing  and research  laboratory
11  for a special  program  called the cocaine  signature
12  program .  Three, one- gram sample s were removed from
13  1.01 and sent to this laboratory .
14  Q.     Was there any significance  of the purity level
15  based  on your analysis ?
16  A.     No .  They were common percentage  level s that we
17  see with cocaine  brick s.
18  Q.     In other words , larger  quantiti es of cocaine ?
19  A.     Right .  Bulk -- bulk amount  of cocaine , yes .
20  Q.     And based  on your current  position , do you see a
21  lot of the larger  inter state  shipment s?
22  A.     Yes , we do.
23  Q.     Would  it be typical  to see this level  of purity
24  in the street -level  cocaine ?
25  A.     It's possible , but general ly it's cut or it's a

1  much lower purity.

2  Q.     Now, the smaller box.  Was that the box that you

3  used to sub out the exhibit?

4  A.     The smaller box is actually for any exhibit over

5  ten kilograms.  Once we were done with our analysis, we

6  separate everything except ten kilograms and put it in

7  a separate box, which is called bulk, and that amount

8  is destroyed after a certain amount of time, if it's

9  not needed for court or for any other purposes, just

10  for safety for not having that amount of powder

11  constantly stored in our vault, and also for just

12  storage space and requirements.

13  Q.     Because you are testifying in court, it's still

14  available?

15  A.     Yes, that's correct.

16  Q.     That's why the Box 1.01 was divided into two

17  boxes?

18  A.     Yes.  1.01 being approximately 14 kilograms,

19  four of those kilograms or four bricks were separated

20  and held for destruction.

21  Q.     You reviewed all the exhibits in front of you

22  today, which I previously mentioned, and they all are

23  from your analysis that you did on this back in

24  November of 2003?

25  A.     Yes, they're all still present.

1  Q.      When you are analyzing these exhibits in the

2  heat-sealed package, does it have any particular smell?

3  A.      There is generally -- there are generally

4  smells, yes.

5  Q.      Does that smell dissipate over time?

6  A.      Yes.  Depending on how long, definitely.

7  Q.      Do the dryer sheets help at all in masking the

8  smell?

9  A.      Generally, you just smell both smells of the

10 drugs and of whatever else it's packaged with.

11 Q.      And just to be clear, all of these exhibits, you

12 determined that they all contain cocaine and certain of

13 the cocaine exhibits had a procaine cut?

14 A.      That's correct.

15         MS. GREENBERG:    Court's indulgence.

16         THE COURT:    Cross-examination?

17                **CROSS-EXAMINATION**

18         BY MR. MONTEMARANO:

19 Q.      So we're clear.  As part of your chemist for the

20 DEA, analysis of that seizure in front of you, which is

21 approximately 17, 18 kilograms of white powder

22 substance?

23 A.      That's correct.

24 Q.      Came to you from Special Agent Kevin Steele by

25 way of a traffic stop by Michael Johnson of the

1  Indianapolis  Police  Department ?

2  A.       That 's  correct .

3  Q.       And  it  turns  out  it 's  cocaine ?

4  A.       That 's  correct .

5       MR.  MONTEMARANO :  No  further  question s,  Your

6  Honor .

7       MR.  MARTIN:   Mr.  Goodwin  has  no  question s.

8       MR.  HALL:   No  question s,  Your  Honor .

9       MR.  WARD:   No  question s,  Your  Honor .

10      THE  COURT:   Any  redirect ?

11      MS.  GREENBERG :  No,  Your  Honor .   May  the  witness

12  be  excused ?

13      THE  COURT:   You  may  be  excused .   You  may  step

14  down

15           (Witness  excused  at  11:54  a.m. )

16      MS.  JOHNSTON:   Your  Honor ,  our  next  witness  is

17  Nathan  King .  We  may  need  five  minute s.   I  advise d  the

18  courtroom  deputy .

19       Your  Honor ,  if  we  could  maybe  take  two  minute s

20  while  we're  wait ing  for  him  to  clean  out  all  of  the

21  cocaine  that 's  here .

22      THE  COURT:   That 's  fine .

23      MS.  JOHNSTON:   With  the  Court 's  permission ,  we

24  will  be  put ting  those  exhibit s  in  a  storage  area

25  near by,  but  we  will  have  them  available  to  the  Court

1  immediately.

2        THE COURT:   That's fine.

3  Thereupon,

4                        **NATHAN KING** ,

5  having been called as a witness on behalf of the

6  Plaintiff , and having been first duly sworn by the

7  Courtroom Deputy, was examined and testified as

8  follows:

9        THE CLERK:   Speak loudly and clearly into the

10 microphone , please .  State your full name  for the

11 record .

12       THE WITNESS:   Nathan King .

13       THE CLERK:   Spell your last name , please .

14       THE WITNESS:   K I N G.

15       THE CLERK:   Thank you .

16                  **DIRECT EXAMINATION**

17       BY MS. JOHNSTON:

18 Q.    Good morning , Mr. King .

19 A.    Good morning .

20 Q.    How old are you?

21 A.    Forty-one .

22 Q.    Where did you go to school ?

23 A.    Coolidge High School .

24 Q.    Coolidge High School .  And where is that

25 located?

1  A.        Washington , D. C.

2  Q.        Did you grow up in the Washington , D. C. area ?

3  A.        Yes .

4  Q.        Are you currently  incarcerate d?

5  A.        Yes , I am.

6  Q.        Are you -- what are you incarcerate d for ?

7  A.        Drug charge .

8  Q.        Where did you get that drug charge ?

9  A.        Indianapolis , Indiana .

10 Q.        Do you recall the date of that drug arrest ?

11 A.        October -- I think it's the 27th.

12 Q.        Of what year ?

13 A.        '03 .

14 Q.        Have you been arrested and incarcerate d since

15 October 27 of 2003 ?

16 A.        Yes .

17 Q.        Before your arrest on October 27 of 2003 , where

18 were you living ?

19 A.        In Mississippi .

20 Q.        Were you employ ed?

21 A.        Yes .

22 Q.        What did you do for a living ?

23 A.        Truck ing company .

24 Q.        What do you mean by "truck ing company ?"

25 A.        I own ed my truck . I own ed my own truck .

1 Q.       Excuse me?

2 A.       I owned my own truck.

3 Q.       Is that a tractor-trailer truck?

4 A.       Yes.

5 Q.       You indicated you grew up in the Washington, D.

6 C. area.   Who were your parents?

7 A.       Estelle Brim and Steve Brim.

8 Q.       Was Mr. Brim your natural father or your

9 stepfather?

10 A.       Stepfather.

11 Q.       Do they both continue to live in Washington, D.

12 C.?

13 A.       My mom do; my stepfather lives in California.

14 Q.       When -- do you know about when he moved to

15 California?

16 A.       Back in '82.

17 Q.       Did your parents then divorce and your father

18 remarried?

19 A.       Yes.

20 Q.       Did you continue contact with your step -- a

21 relationship with your stepfather after he moved to

22 California when he remarried?

23 A.       Yes.

24 Q.       Now, did there come a time when -- strike that.

25          Do you know anyone that you see here in the

1 courtroom?

2 A.      Ms. Martin.

3 Q.      Would you describe her by what she's wearing and

4 where she is in relationship to me?

5 A.      Next to, I guess, the white guy right there with

6 the glasses on.

7 Q.      Who's got the glasses on?

8 A.      Ms. Martin.

9       MS. JOHNSTON:    Could we ask the record to

10 reflect the witness has identified the defendant,

11 Paulette Martin?

12       THE COURT:    The record will so indicate.

13       BY MS. JOHNSTON:

14 Q.      How did you know Ms. Martin?    Strike that.

15       When did you first meet Ms. Martin?

16 A.      Back in '95.

17 Q.      Where did you meet her?

18 A.      At my mom's store.

19 Q.      Where did your mother have a store?

20 A.      In Northeast.

21 Q.      Do you know whereabouts in Northeast?

22 A.      The Rigs area, Rigs Road area.

23 Q.      What kind of business did your mother have

24 there?

25 A.      She had a restaurant, carryout.

1  Q.      How did -- who introduced you to Ms. Martin?

2  A.      My mom.

3  Q.      Was Ms. Martin involved?  Did she have any

4  businesses in that area?

5  A.      Yeah.  Next door, she had a dance studio.

6  Q.      I'm going to show you what's been marked as

7  P-184.  Do you recognize that photograph?  That

8  building?

9  A.      Yes.

10  Q.      What building is that?

11  A.       Ms. Martin's business.

12  Q.      You met her at your -- where was your mother's

13  store in relationship to your mother's restaurant  in

14  relationship  to this picture?  To the left or the

15  right?

16  A.       To the left.

17  Q.      That would have been back in 1995 or

18  thereabouts?

19  A.      Yes.

20  Q.      At that point in time, did you meet any other --

21  strike that.

22          Did you have any other contact with any other

23  people that you grew up with back in 1995?  In addition

24  to meeting Ms. Martin, did you meet any other folks

25  that you knew from growing up?

1  A.      No.  I mean, people I knew from, you know, from

2  school lived around that way.

3  Q.      At that time, back in 1995, were you living in

4  this area or had you already moved to Mississippi?

5  A.      I was -- in 1995 I was living in California.

6  Q.      And you had come back here to visit?

7  A.      Yes.

8  Q.      Were you also involved in drugs back around that

9  time?

10  A.      Yes.

11  Q.      What kind of drugs were you involved in back in

12  1995?

13  A.      Cocaine.

14  Q.      Who were you delivering the cocaine to?

15  A.      Lionel.

16  Q.      Lionel who?

17  A.      Nunn.

18  Q.      And where was he located?

19  A.      D. C.

20  Q.      Is he one of the individuals you knew from

21  growing up in the area?

22  A.      Yes.

23  Q.      Did you know any of his relatives?

24  A.      I knew his brother.

25  Q.      What is his brother's name?

1  A.       Larry.

2  Q.       Also Nunn?

3  A.       Yes.

4  Q.       Do they have any relationship with your mother,

5  Ms. Brim?

6  A.       They come out of the store, you know.

7  Q.       Now, as a result of that involvement in drugs

8  back in 1995, were you actually arrested and served

9  time?

10  A.      Yes.

11  Q.      Approximately when were you arrested?

12  A.      In '96.

13  Q.      Where did that arrest take place?

14  A.      Mississippi.

15  Q.      What kind of drugs?

16  A.      Cocaine.

17  Q.      When were you released from prison?

18  A.      In 2000.

19  Q.      When you got released in 2000, where did you

20  live?

21  A.      Mississippi.

22  Q.      What did you do for employment when you were

23  released?

24  A.      Drove trucks.

25  Q.      Do you recall when you got your commercial

1 driver's license so that you were able to drive truck?

2 A.      I restated my license back in 2000, when I came

3 home.

4 Q.      Did you own a truck at that time?

5 A.      No, I was driving for my brother-in-law, then I

6 bought a truck.

7 Q.      Who was your brother-in-law that you were

8 driving for?

9 A.      Eric Wade.

10 Q.     Eric Wade?

11 A.     Yes.

12 Q.     You said then you bought a truck.

13 A.     Yes.

14 Q.     Did you receive any assistance in buying that

15 truck?

16 A.     Yes.

17 Q.     Who did you receive assistance from?

18 A.     From my father.

19 Q.     That would be your stepfather, Steve Brim?

20 A.     Yes.

21 Q.     Was he, in that time in 2000, living out in

22 California?

23 A.     Yes, he was.

24 Q.     What did you do with your truck once you got it

25 and you were out of prison in 2000?

1  A.      I was driving cross-country.

2  Q.      When you say cross-country, generally from what

3  area to what area?

4  A.      Yes, ma'am, California to New York.

5  Q.      What type of materials were you transporting?

6  A.      Produce.

7  Q.      Would you take anything back on your return

8  trips?

9  A.      Yes.

10  Q.      What would you take back?

11  A.      Freight.  Commercial freight.

12  Q.      Did there come a time in 2001-2002 when you

13  learned that your father -- strike that.

14          Do you know whether or not your father knew

15  Paulette Martin?

16  A.      Yes.

17  Q.      How did he know Ms. Martin?

18  A.      I guess he come around my mom.

19  Q.      Excuse me?

20  A.      From my mom.

21  Q.      Was your father, Mr. Brim, still coming to

22  Maryland after he moved to California?

23  A.      Yes.  He would come up here in his truck.

24  Q.      In his truck?

25  A.      Yes.

1 Q.      What kind of truck did he have?

2 A.      He had a tractor-trailer.

3 Q.      Did he also have a trucking business with

4 multiple trucks?

5 A.      Yes.

6 Q.      Now, did father ever discuss with you what

7 business he was involved in in addition to his

8 legitimate trucking?

9 A.      Yes, he did.

10 Q.      Do you know about when that was and what

11 conversation you had?

12 A.      About 2002-2003, around in that area.

13 Q.      The spring, summer -- in relation to the spring,

14 summer of 2002, did your father sustain any health

15 problems?

16 A.      He had a stroke at the end of the spring,

17 summer time.

18 Q.      Of 2002?

19 A.      I believe it was -- 2002?  2003.

20 Q.      Excuse me?

21 A.      I believe it's 2002 -- yeah, 2002, I believe it

22 was.

23 Q.      Had you had the discussion with him about his

24 business before he had the stroke?

25 A.      Yes.

1 Q.      What was the conversation  that you had with your

2 father about his business ?

3 A.      He asked me to do a favor for him and I did .

4 Q.      What favor did he ask you to do for him?

5 A.      He asked me to pick some money up from Ms.

6 Martin .

7 Q.      Did he tell you what the money was for ?

8 A.      At first he didn't .  He just asked me to pick it

9 up , and I picked it up and took it back to him.

10 Q.      What did he tell you when you took it back to

11 him ?

12 A.      He really didn't say anything , just okay , thank

13 you .

14 Q.      When did you find out what the money was for ?

15 A.      When he asked me -- him and his friend had

16 something  going , and he asked me to ride with the guy

17 but drive my truck for this guy to take a package up to

18 Ms. Martin .

19 Q.      What was in the package s he asked you to follow

20 the guy with to take to Ms. Martin ?

21 A.      Some drug s.

22 Q.      What kind of drug s?

23 A.      Cocaine .

24 Q.      Were you surprise d when your father asked you to

25 help with the cocaine ?

1          MR. MONTEMARANO :   Objection,  Your  Honor .

2  Leading .

3          BY MS. JOHNSTON:

4  Q.      What  was  your  reaction  when  your  father  asked

5  you to  assist  with  delivering  cocaine  to  Ms. Martin ?

6  A.      I  just  did  it .   I  mean , you  know , my  dad  helped

7  me  out , so  I  just  do , like , a  favor  for  him .

8  Q.      How  did  your  dad  help  you  out ?

9  A.      He  assisted  me  with  my  truck .

10  Q.      If  we  could  go  back  to  the  late  spring  or  early

11  summer , 2002 , when  he  had  had  the  stroke , and  what  did

12  he  say  to  you  in  terms  of  picking  up  money  from  Ms.

13  Martin ?

14  A.      Well , he  couldn't  go  get  it , so  he  asked  me  to

15  go  get  it.

16  Q.      How  much  money  was  it ?

17  A.      About  $20,000 , something  like  that .

18  Q.      Was  that  $20,000  in  cash ?

19  A.      I  believe  so .   It  was  in  a  bag .   She  just  gave

20  it  to  him -- gave  it  to  me , and  I  just  gave  it  to  my

21  dad .

22  Q.      She  didn't  give  you  a  check ?

23  A.      No .

24  Q.      She  didn't  give  you  a  money  order ?

25  A.      No .

1 Q.      It was a bag?

2 A.      Yes.

3 Q.      Filled with money?

4 A.      Yeah, a little bag.

5 Q.      Where did you pick up the bag from?

6 A.      From her house.

7 Q.      From whose house?

8 A.      Ms. Martin's house.

9 Q.      Where was her house located?

10 A.      It was Adelphi in Maryland.

11 Q.      Had you been to that house?  Strike that.

12         Have you been to that house on more than one

13 occasion?

14 A.      Yes.

15 Q.      I want to show you what's been marked as

16 Government's Exhibit P-2.

17         Do you recognize either of those houses?

18 A.      Yes, I do.

19 Q.      Which one do you recognize?

20 A.      Ms. Martin's house.

21 Q.      If you can point to it on the screen.

22 A.      With the truck in the driveway.

23 Q.      Let me show you P-3.

24         Is that a close-up of the same house?

25 A.      Yes, it is.

1  Q.      Is that the location  -- when you said you went

2  to her house , is that the house where you went to pick

3  up the rough ly $20,000 ?

4  A.      Yes .  She gave it to me .

5  Q.      How did you contact Ms. Martin to let her know

6  you were going to be there to pick up the money ?

7  A.      I called .

8  Q.      Do you recall your conversation  with her ?

9  A.      Not really , not offhand .

10 Q.      Were you paid anything  for picking up that money

11 for your dad ?

12 A.      No .

13 Q.      Now , after you picked up that money for your

14 dad , what conversation s did you have with him

15 concern ing going back to see Ms. Martin again ?

16 A.      He just asked me to ride with the guy , this guy

17 that my father 's friend , go , you know , to deliver stuff

18 to Ms. Martin .  So I was just -- I was , like , the

19 middle guy that rode with the guy , make sure he got up

20 there .

21 Q.      Now , you said you rode with the guy .  Did you

22 ride in a car with him ?

23 A.      No , I'm saying I drove my truck and he drove his

24 truck .  So I just -- he followed me .

25 Q.      Follow ed you where ?

1  A.        To Maryland .

2  Q.        Where  in  Maryland  would  you  stop ?

3  A.        Up  near  P.G.  County ,  Prince  George's  County .

4  Q.        Can  you  describe  where  you  would  --  strike  that .

5            Did  you  take  your  trucks  --  your  two  trucks  up

6  to  Ms.  Martin 's  house ?

7  A.        No, ma'am .

8  Q.        Where  would  you  park  the  trucks?

9  A.        Off  of  New  Hampshire  Avenue  in  the  mall .

10 Q.        Can  you  describe  the  area  off  of  New  Hampshire

11 Avenue  where  you  left  the  trucks?

12 A.        Safeway  and  used  to  be  a  Zaire 's .

13 Q.        What  is  Zaire 's?

14 A.        I  mean  the  department  store .

15 Q.        And  the  gentleman  who  had  the  --  who  you  were

16 following  or  leading  up  to  that  area ,  what  was  his

17 name ?

18 A.        Louis .

19 Q.        Can  you  describe  Louis  for  us ?

20 A.        Tall  and  skinny ,  Afro- American ,  about  54 .

21 Q.        Had  you  met  him  before ?

22 A.        Yes .

23 Q.        Where  had  you  seen  him  before ?

24 A.        At  my  dad's  trucking  company .

25 Q.        Was  your  dad  able  to  make  trips  during  this  time

1 period between late spring/summer, 2002, and your

2 arrest in October, 2003?

3 A.      No.

4 Q.      During your conversation s with your father,

5 what, if any, explanation was there given for why you

6 had to go in addition to just Louis taking the drug s?

7       MR. MONTEMARANO :   Objection.

8       THE COURT:   Over ruled.

9       BY MS. JOHNSTON:

10 Q.      What discussion did you have with your father?

11 A.      Louis didn't want to meet nobody, so since I

12 knew Ms. Martin, I would go up there.

13 Q.      Was your father going to pay you anything for

14 doing this?

15 A.      No.

16 Q.      Did you ask for payment?

17 A.      No.

18 Q.      Why not?

19 A.      My dad -- he was helping me out with my

20 truck ing.  He had bought me a trail er.

21 Q.      What was in Louis' tractor-trailer  when you made

22 these trip s to -- and stopped in Maryland  to go to Ms.

23 Martin's?

24       MR. MONTEMARANO :   Objection.

25       Basis for knowledge.

1          THE COURT:    Rephrase  the  question .

2          BY MS.  JOHNSTON:

3  Q.        You  would  lead  Mr.  Louis'  truck  to  Maryland ;  is

4  that  correct ?

5  A.        Yes, ma'am .

6  Q.        You  would  get  to  the  Safeway /Zaire 's  parking

7  lot ?

8  A.        Yes .

9  Q.        What  would  you  do  there ?

10  A.        Louis  give  me  the  package  and  I'd  deliver  it  to

11  Ms.  Martin .

12  Q.        When  you  say  "the  package ,"  what  was  it?

13  A.        Cocaine .

14  Q.        Can  you  describe  the  size  of  those  package s?

15  A.        It  was  in  a  duffel  bag .

16  Q.        A black  --  usually  a  black  --  what  color  was  the

17  duffel  bag ?

18  A.        Blue ,  black .

19  Q.        What  size  was  it?   If  you  could  show  us  how  big

20  the  duffel  bag  was .

21  A.        Something  like  this .   (Witness  indicati ng.)

22  About  this  size .

23  Q.        Measuring  3 feet ?   Two  feet ?

24  A.        Yeah ,  about  2 feet ,  3 feet .

25  Q.        How  heavy  was  it?

1  A.        It was kinda heavy.

2  Q.        Can you give us an idea of how much it weighed?

3  A.        About -- between 15 pounds, 20 pounds, something

4  like that.

5  Q.        Fifteen to 20 pounds?  And what would you do

6  with the bag?  What would you do after you got the bag

7  from Louis?

8  A.        I just take it and give it to Ms. Martin.

9  Q.        Was it one bag or two bags?

10  A.        One bag.

11  Q.        How many trips did you make with Louis during

12  this time period?

13  A.        About four times.

14  Q.        And on each of those four times, what did you

15  take from Louis and take to Ms. Martin?

16  A.        Bag -- the same bag.

17  Q.        Can you give us an approximate, based on your

18  lifting the bag, what was in it?  Can you give us an

19  idea of how many kilograms of cocaine you delivered to

20  Ms. Martin that was transported by Louis to Maryland?

21         MR. MONTEMARANO:  Objection, Your Honor.  He's

22  never stated he looked in the bag.

23         THE COURT:  Overruled.

24         BY MS. JOHNSTON:

25  Q.        Based upon the weight and your knowledge of what

1   was in the bag, do you have an idea of how many

2   kilograms you were delivering at a time to Ms. Martin?

3   A.      Nine or something like that.

4   Q.      Excuse me?

5   A.      Nine.  Nine or ten, something like that.

6   Q.      Now, when you dropped those kilograms off to Ms.

7   Martin, did she -- was anyone else present?

8   A.      No.

9   Q.      At what locations did you drop off the bags with

10  the kilos in it to Ms. Martin?

11  A.      Over in Northeast and Takoma Park.

12  Q.      In terms of the house that we just looked at

13  where you first picked up the money for your dad, P-3,

14  did you ever drop off any drugs at that house?

15  A.      No, ma'am.

16  Q.      The house in Northeast, do you know who lived

17  there?

18  A.      Excuse me?

19  Q.      Do you know who lived in the house in Northeast?

20  A.      Granny.

21  Q.      Who was Granny?

22  A.      I don't -- I don't know her.  It's Ms. Martin's

23  friend.  She called her Granny.

24  Q.      Who called her Granny?

25  A.      Ms. Martin.

1 Q.      About how old was the woman?

2 A.      An older lady.

3 Q.      Other than this -- do you know whether or not

4 Ms. Martin was living there at the time or just using

5 Granny's house?

6 A.      She was living there.

7 Q.      Anyone else living there at the time other than

8 Ms. Martin and this old woman called Granny?

9 A.      Just them two.

10 Q.     I want to show you a picture that's been marked

11 as Government's Exhibit P-215.

12         Do you recognize this photograph?

13 A.     Yes, ma'am.

14 Q.     What is that a photograph of?

15 A.     The house in Northeast.

16 Q.     What house in Northeast?

17 A.     Granny's house.

18 Q.     Is that the house where you delivered the

19 cocaine?

20 A.     Yes.

21 Q.     Do you recognize -- are you able to recognize

22 either of the people standing on the porch?

23 A.     It looks like Ms. Martin.  I don't know who else

24 that is.

25 Q.     Okay.  So the woman looks like Ms. Martin to

1  you?

2  A.      Yes.

3  Q.      When you dropped off the kilogram s to Ms.

4  Martin, were you paid by Ms. Martin?

5  A.      Yes. She had give me money to take back.

6  Q.      At the same time that you dropped them off?

7  A.      No. I dropped it off and come back, then I go

8  deliver my load and come back and get the money.

9  Q.      With Ms. Martin, when you arrived at the house

10 and dropped them off, was anyone else present?

11 A.      Maybe, like, early in the morning, so -- it

12 would be early in the morning, the older lady who lived

13 there.

14 Q.      Would Granny, the older lady you referred to,

15 would she be actually in the room when you made the

16 delivery to Ms. Martin?

17 A.      No, ma'am.

18 Q.      So other than Ms. Martin, was there anyone else

19 present when you delivered it to her?

20 A.      No, ma'am.

21 Q.      Did you have any conversation with her when you

22 dropped it off?

23 A.      I just gave it to her and how you do in, stuff

24 like that, and then I'd leave.

25 Q.      Where would you go when you would leave?

1  A.      I'd go back to my truck and deliver my load.

2  Q.      How would you get from -- if you left your truck

3  at the Safeway/Zaires shopping center, how would you

4  get from there to Ms. Martin's house?

5  A.      You just talking about the house in Northeast.

6  They had another -- it was another that I had to walk

7  down to.

8  Q.      Let's back up for a second.  The first time that

9  you went there to get the $20,000, where did you park

10  your truck?

11  A.      I parked at Zaire's in the parking lot.

12  Q.      Then the first trip that you made with Louis?

13  A.      Yes.

14  Q.      Where did you two park your trucks?

15  A.      Parked at Zaire's one time.

16  Q.      For one of the cocaine deliveries, you parked at

17  the Zaire's/Safeway shopping center?

18  A.      Yes, ma'am.

19  Q.      When you parked there, where did you deliver the

20  drugs on that trip?

21  A.      Northeast.

22  Q.      To the house that you just --

23  A.      Yes.

24  Q.      Now, on the later trips, where did you park your

25  truck before taking the drugs to Ms. Martin?

1  A.       At Riggs Plaza.

2  Q.       Excuse me?

3  A.       Riggs Plaza.

4  Q.       Where is that in relation to Granny's house?

5  A.       Two blocks.

6  Q.       On the first trip when you parked at Zaire's and

7  Safeway, how did you get from that shopping center to

8  Granny's house in Northeast to deliver the drugs?

9  A.       My friend, Marcus.

10  Q.       Who's your friend, Marcus?

11  A.       A guy I grew up with.

12  Q.       How did you get him to pick you up there?

13  A.       I just called him and asked him to come and get

14  me.

15  Q.       Now, after you would drop off the kilos, would

16  you go back to California?

17  A.       No.  I go to do my load.

18  Q.       Your load being whatever was in your trailer?

19  A.       Yeah.

20  Q.       After you delivered your load, did you return to

21  Maryland?

22  A.       Yes.

23  Q.       For what purpose did you come back to Maryland?

24  A.       To pick the money up from Ms. Martin.

25  Q.       How would you know to come back to get the

1 money?

2 A.      Because  my  dad  --  my  dad  was  telling  me  to  go

3 over  there  and  get  it.

4 Q.      Excuse  me?

5 A.      My  dad  would  tell  me  to  go  and  get  the  money.

6 Q.      He  would  call  you  on  the  phone?

7 A.      Yes.

8 Q.      What  would  he  say?

9 A.      He'd  just  say  go  by  Paula  house.

10 Q.      You  knew  what  you  were  going  by  Paula's  house

11 for?

12 A.      Yes.

13 Q.      Did  you  contact  Ms.  Martin  by  the  phone  to  let

14 her  know  you  were  coming?

15 A.      Yes,  I  did.

16 Q.      Do  you  recall  the  telephone  numbers  you  used  to

17 call  her?

18 A.      No,  I  don't.

19 Q.      Again,  when  you  were  coming  back  from  delivering

20 your  load,  where  would  you  park  your  truck?

21 A.      At  Riggs  Plaza.

22 Q.      Where  would  you  meet  Ms.  Martin?

23 A.      I'd  just  go  by  the  house.

24 Q.      What  would  you  pick  up  from  her?

25 A.      A  duffel  bag.

1  Q.      What was in the duffel bag?

2  A.      Money.

3  Q.      Have any idea of how much money was in the

4  duffel bag?

5  A.      About $200,000, something in that range.

6  Q.      Excuse me?

7  A.      About $200,000.

8  Q.      Did you actually count the money?

9  A.      No.  My dad, he would just say --

10         MR. MONTEMARANO:  Objection.  Move to strike.

11         MS. JOHNSTON:   What would your dad say?

12         MR. MARTIN:    Objection.

13         THE COURT:   To what?  What did the dad say?

14         MR. MARTIN:   As to what the dad said.

15         MR. MONTEMARANO:  As to the amount.  Object and

16  move to strike.

17         THE COURT:   What's your response?

18         MS. JOHNSTON:   Your Honor, it's co-conspirator's

19  statements made in addition to the co-conspiracy.

20         THE COURT:   Overruled.

21         BY MS. JOHNSTON:

22  Q.      What would your dad tell you?

23  A.      He would say go and get it, about $200,000 or

24  whatever.

25  Q.      In the several trips that you made, how much

1  money did your dad tell you to pick up from Ms. Martin?

2  A.      It was about the same amount.

3  Q.      Which was what?

4  A.      $200,000.

5  Q.      And how would the money be packaged when you'd

6  pick it up from Ms. Martin?

7  A.      Well, it would be in a duffel bag.  I don't even

8  -- I didn't even bother looking, cause I just get it,

9  put it in my truck, and take it to my dad.

10 Q.      Could you give us an idea of the weight of that

11 bag?

12 A.      You put it on your shoulder, it was kind of

13 heavy.

14 Q.      How heavy was it?

15 A.      It was kind of heavy.  About 15 pounds.

16 Q.      How full was it in terms of the bag?  You

17 demonstrated for us about the size of the  bag, two to

18 three feet.   How full was it?

19 A.      It was full.  You had to zip it up.

20 Q.      All right.  Then what did you do with that bag

21 of money?

22 A.      Take it to my dad.

23 Q.      When you got to your dad, what did you do with

24 it?

25 A.      I'd just give it to him.

1  Q.      Where is this out in California ?

2  A.      Yes .

3  Q.      After you gave the bag to your father , what did

4  your father say to you about what was in the bag ?

5  A.      I gave it to him and he put it in his little

6  office  and that was about it .  I mean , you know .

7  Q.      Your father ever complain to you that the money

8  wasn't in the bag ?

9          MR. MONTEMARANO :    Objection , Your Honor .

10  Leading .

11          THE COURT:    Sustained .

12          BY MS. JOHNSTON:

13  Q.      After you did the first trip where you delivered

14  the drugs and brought back the bag of money , did there

15  come a time when you made a second trip ?

16  A.      Yes .

17  Q.      And the second trip , was Louis involved in that

18  as well ?

19  A.      Yes .

20  Q.      Did you follow the same procedure you described

21  for us for the first trip with Louis ?

22  A.      Yes, ma'am .

23  Q.      What did you take from Mr. Louis ' truck and

24  deliver to Ms. Martin on the second trip ?

25  A.      Yes .   Drugs .

1  Q.      What kind of drugs?

2  A.      Cocaine.

3  Q.      Again, about how many kilos of cocaine did you

4  take?

5  A.      About the same as the first one.

6  Q.      How were they packaged?

7  A.      In a duffel bag.

8  Q.      Did you personally carry the duffel bag?

9  A.      Yes.

10  Q.      So you felt the weight of the duffel bag?

11  A.      Fifteen, 20 pounds.

12  Q.      And in that regard, where did you deliver the

13  second load that you took?

14  A.      The second load?  Granny's house.

15  Q.      Same house?

16  A.      Yes.

17  Q.      Anyone present other than Ms. Martin when you

18  delivered it to her?

19  A.      No, ma'am.

20  Q.      Did Ms. Martin say anything to you when you

21  delivered it?

22  A.      Just general conversation.

23  Q.      What kind of general conversation would you have

24  with Ms. Martin?

25  A.      How you doing?  You know, how you feel?

1  Q.      Did you know people in common, you and Ms.

2  Martin?

3  A.      Yes, we did.

4  Q.      And who were some of the people that you knew in

5  common?

6          MR. MARTIN:   Objection.

7          This question was asked early on.  Asked and

8  answered.

9          THE COURT:   Overruled.

10          BY MS. JOHNSTON:

11  Q.      Who were some of the people you knew in common?

12  A.      My mom, my dad, Harvey -- the guy she did

13  fashion shows with -- and my uncle.

14  Q.      So when you dropped off a duffel bag, your

15  conversation, was it generally about each other and

16  people you knew?

17  A.      Yes.  I mean, that's it.

18  Q.      Was there ever any questions from Ms. Martin

19  concerning what was in the bag?

20  A.      No.

21  Q.      After you delivered the second time -- strike

22  that.

23          When you delivered the second time, did Ms.

24  Martin give you money when -- at the time you delivered

25  the drugs?

1 A.       No, ma'am.  I got in my truck and just delivered

2 my load.  Every time I come back, I just get the bag

3 and same routine.

4 Q.       Same routine as the first time when you were

5 there with Louis?

6 A.       Yes, ma'am.

7 Q.       Louis never went -- did Louis ever go with you

8 to Ms. Martin's?

9 A.       No, because he didn't want nobody -- he didn't

10 want nobody knowing.

11 Q.       You followed the same pattern for the four trips

12 or so that you made with Louis; is that correct?

13 A.       Yes, ma'am.

14 Q.       Any irregularities about any of those trips?

15 A.       No, ma'am.

16 Q.       Now, during this same time period, summer of

17 2002 into 2003, did you ever have any problems with

18 your tractor-trailer?

19 A.       Yes.

20 Q.       Where you needed any money to get it fixed?

21 A.       Yes.

22 Q.       I want to show you what's been marked as

23 Government's Exhibit R-2.

24       Do you recognize the second page of that

25 document?

1  A.       Yes.  It's a money order.

2  Q.       Do you recognize the signature of the person who

3  cashed it?

4  A.       I do.

5  Q.       Do you know who sent you that $200?

6  A.       Ms. Martin.

7  Q.       What did you need the money for?

8  A.       For a tire.

9  Q.       Do you recall if that was on a trip when you

10  were on your way to the east coast or on your way back

11  to the west coast?

12  A.       Going to California.

13  Q.       Now, on each of those four trips when you

14  returned to California, what did you do with the bag of

15  money?

16  A.       Give it to my dad.  Same thing.

17  Q.       And the amount of money, based on your

18  conversations with your dad and the weight of the bag,

19  was approximately how much?

20  A.       About the same.

21  Q.       Did there come a time in 2003, shortly before

22  your arrest, when you had made a trip to deliver drugs

23  to Ms. Martin and pick up money?

24  A.       Yes.

25  Q.       Okay.  Was there any problems in that trip, the

1  trip before your arrest?

2  A.      The trip before I got arrested?

3  Q.      Yeah.  The trip before you got arrested, was

4  there any problems either in terms of the drugs or the

5  money?

6  A.      No, ma'am.

7  Q.      Did you follow the same process on that trip as

8  you did on the previous trips with Louis?

9  A.      Yes.

10  Q.      After you returned to California, did you learn

11  about whether -- about whether --

12          MR. MONTEMARANO:  Objection, Your Honor.

13  Leading.

14          THE COURT:  I haven't heard the rest of the

15  question yet.  Get the whole question out and see if

16  it's leading or not.

17          BY MS. JOHNSTON:

18  Q.      When you got back to California  -- talking about

19  the trip before your arrest -- did you have any

20  conversations with your father concerning the amount of

21  money you brought back?

22  A.      Yes.

23  Q.      What was that conversation?

24  A.      He said that Paula owed him some money.

25  Q.      How much money did your father say that Paula

1  owed him?

2  A.      $75,000 .

3  Q.      Had you taken that $75,000 out of the bag?

4  A.      No, ma'am .

5  Q.      What else -- did your father say anything else ,

6  other than that Paula , Ms. Martin , still owed him

7  $75,000 ?

8  A.      That was just it.  He asked me just to -- you

9  know , I go back up there and pick it back up -- pick

10  the money up.

11  Q.      Did you ever get back up there to pick the money

12  up, the $75,000 ?

13  A.      No .

14  Q.      Why not ?

15  A.      I got arrested in Indiana .

16  Q.      Now , when you got arrested in Indiana , was Louis

17  with you?

18  A.      No .

19  Q.      How is it that you were traveling without Louis

20  on October 27 of 2003 ?

21  A.      Something was wrong with Louis ' truck and it was

22  in the shop .

23  Q.      How do you know that ?

24  A.      Because my dad told me .

25  Q.      What was your conversation with your dad before

1  you left California on that last trip?

2  A.      He just asked me to take the stuff up that I got

3  busted with to Paula and pick up the money that she

4  owed him, and Louis -- I asked him, and he said Louis

5  ain't gonna make it because there was something wrong

6  with Louis' truck.  It was in the shop.

7  Q.      So where were the drugs stored to go on the last

8  trip?

9  A.      It was in my truck.

10  Q.      How was it packaged?

11  A.      The same thing.  In the duffel bag.

12  Q.      Where did you place it in your truck?

13  A.      Under my sleeper.

14  Q.      Under what?

15  A.      My sleeper in my cab.

16  Q.      What happened when you got to Indiana?

17  A.      I got pulled over and they checked the truck and

18  found the drugs.

19  Q.      That was roughly 18 kilograms of cocaine?

20  A.      Yes, it was 18 exactly.

21  Q.      Was that more than you had taken with Louis?

22  A.      Yes.

23  Q.      And did you have any conversation with your

24  father concerning why you were taking more than the

25  usual trip that you took with Louis?

1  A.      He just said -- he just asked me to give it to

2  Paula.

3  Q.      In terms of the trips that you made with Louis,

4  was it one duffel bag or two?

5  A.      It was one single bag.

6  Q.      Excuse me?

7  A.      One.

8  Q.      How did that duffel bag compare to the two

9  duffel bags you got stopped with in terms of its

10 appearance and its weight?

11 A.      It was twice the weight as the other bags.

12 Q.      Excuse me?

13 A.      It was twice the weight of the other bags.

14 Q.      Which bag was twice the weight of the other

15 bags?

16 A.      I'm saying the bags that I had when I got

17 busted, it was heavier than the other bags.

18 Q.      Okay.  In terms of the appearance of the duffel

19 bag, when Louis transported it, you said you

20 transported one duffel bag.

21 A.      Right.

22 Q.      That duffel, bag in terms of its outward

23 appearance, was it the same or different from the two

24 duffel bags that you got arrested with?

25 A.      About the same as one bag, yes.

1 Q.      And the weight of the bag, the single bags that

2 you would transport with Louis, how did that weight

3 compare to the two bags that you brought here -- tried

4 to bring here in October of 2003?

5 A.      There was maybe about -- about the same bags,

6 but it was broke down to two bags this time instead of

7 one bag and about the same -- about the same weight.

8 Q.      Same total weight?

9 A.      About the same total weight.

10 Q.      When Louis transported the bags, where would

11 they be stored?

12 A.      In the trailer.

13 Q.      Okay.  Where in the trailer?

14 A.      In his trailer.  In the trailer part.

15 Q.      In the trailer part?

16 A.      Yeah.

17 Q.      Why didn't you store them in the trailer part of

18 your truck?

19 A.      Because my stuff was full all the way to the

20 back door.

21 Q.      Because what?

22 A.      My produce was back to the back door.

23 Q.      You unscrewed the screws and put the duffel bags

24 in your sleeper compartment?

25 A.      Yes.

1 Q.      After you got arrested, were you -- did you

2 remain in jail?

3 A.      Yes, I did.

4 Q.      Do you recall where you were housed?

5 A.      Marion County facility.

6 Q.      Did you have any conversation with your father

7 after you were arrested?

8 A.      I just called and told him, you know, what

9 happened and that was about it.  I called him, like,

10 two or three times, see how he was doing.

11 Q.      While you were arrested, what happened to your

12 father?

13 A.      He got killed.

14 Q.      When was that?

15 A.      The day before Thanksgiving.

16 Q.      Would that have been around November 25 of 2003?

17 A.      Yes.

18 Q.      And where was he killed?

19 A.      In front of his driveway.

20 Q.      In California?

21 A.      California.

22 Q.      While you were incarcerated in Indiana, did you

23 have access to telephones?

24 A.      Yes, I did.

25 Q.      Was that unlimited access?

1  A.      Yes.

2  Q.      How did the phone system work there?

3  A.      Call collect.

4  Q.      And do you know whether or not those calls were

5  recorded?

6  A.      Yes.

7  Q.      How did you know that?

8  A.      It says on the telephone.

9  Q.      Excuse me?

10 A.      It said on the telephone.

11 Q.      When you talked to your father before he passed

12 away, was there any discussion about what had been

13 taken from you in Indiana?

14 A.      He know I got stopped, so I guess he knew what

15 happened.

16 Q.      Did you tell him that you were arrested with the

17 drugs?

18 A.      No.  I just told him I'm locked up.

19 Q.      These $75,000 that he was owed, were you ever

20 able to pick that up from Ms. Martin?

21 A.      I was locked up.

22 Q.      Now, while you were incarcerated after your

23 father died, did you have occasion to speak with Ms.

24 Martin on the telephone?

25 A.      Yes.

1 Q.     Do you have any idea of how many times you

2 called her?

3 A.     A couple of times I called her.

4 Q.     In anticipation of your testimony here today,

5 have you had occasion to listen to approximately  six

6 telephone calls?

7 A.     Yes.

8 Q.     Okay.  Did you recognize  the voices on those

9 calls?

10 A.     Yes.

11 Q.     Where were you when you participated in those

12 telephone conversations?

13 A.     Locked up.

14 Q.     In Indiana?

15 A.     Yes.

16 Q.     Were those conversations -- the recordings,

17 based on your review of them, accurately record your

18 conversations with different people?

19 A.     Yes, it was.

20 Q.     In those conversations, do you recognize the

21 other persons who are participating  in addition to

22 yourself?

23 A.     Yes.

24 Q.     Are those the calls that we played to you that

25 we marked as Government 's Exhibit CD-2?

1 A.      Yes.

2 Q.      Did you also have occasion to review written

3 transcript s that were prepared  of those call s?

4 A.      Yes.

5 Q.      And those transcript s, do they accurate ly

6 reflect  the speak ers and what the speak ers were say ing

7 to the best  you could  hear them on the record ings ?

8 A.      Yes , it was .

9       MS. JOHNSTON:   Your Honor , at this time , the

10 government  would like to play some of these call s.  We

11 would like to distribute  the transcript s to the jury .

12 Defense  counsel  and the Court  already  have copies  of

13 those .

14       THE COURT:   Ladies and gentlemen  , you're going

15 to be hear ing some record ings and the government  is

16 going  to give you transcript s.  I want you to

17 understand  that these transcript s are what the

18 government  think s those tape s say .  They're an aid to

19 help you listen  to the tape s, but it is what's on the

20 tape that count s.  So if at any respect  you find that

21 the transcript  is not accurate , it is your listen ing

22 that you should  rely upon .  But the transcript s may be

23 of some assistance  to you , but as I said , should  there

24 be any discrepancy  if that 's not what you thought  the

25 person  said , what you should  listen  to is what you hear

1  on the tape.

2         MS. JOHNSTON:    Your Honor, may I approach the

3  witness?

4         THE COURT:    Yes.

5         MS. JOHNSTON:    The Court should have a copy.

6         THE COURT:    Yeah.

7         MS. JOHNSTON:    It's CD-2A is the exhibit number,

8  and it's the call on Page 1 of the transcript book.

9         BY MS. JOHNSTON;

10 Q.     before we get into those calls, Mr. King, when

11 you were arrested, were you interviewed?

12 A.     Excuse me?

13 Q.     After you were arrested, were you interviewed by

14 police authorities?

15 A.     Yes.

16 Q.     Did you make statements to them?

17 A.     Yes, I did.

18 Q.     Were they truthful statements?

19 A.     No, it wasn't.

20 Q.     Okay.  Do you recall what you told them?

21 A.     Yeah.  I told them what happened about the

22 drugs, and I told them that I was delivering the drugs

23 for somebody, and they was following me.

24 Q.     Excuse me?

25 A.     I told a different story than what happened.

1  Q.      Why didn't you tell them a truthful story?

2  A.      I didn't want to involve my dad.

3  Q.      Did you mention Ms. Martin at all to them

4  either?

5  A.      No.

6  Q.      Now, if we could turn the transcripts -- do you

7  have the transcript book in front of you? If you could

8  open to Page 1. Can tell us who the speakers are in

9  the call we're about to listen to?

10  A.      Yes.

11  Q.      Who are the two speakers that are reflected on

12  the transcript?

13  A.      Myself and Ms. Martin.

14  Q.      If we could play CD-2.

15          (Audio recording begins playing at 12:41 p.m.)

16          (Audio recording stops playing at 12:42 p.m.)

17          BY MS. JOHNSTON:

18  Q.      You can stop there please. In that first part

19  of the conversation on Page 2, Ms. Martin indicates

20  somebody named Goody was going to drive her. Do you

21  know who she was referring to as Goody?

22  A.      Yes.

23  Q.      Who was that?

24  A.      Her brother.

25  Q.      Had you ever met him?

1  A.      Yes.

2  Q.      And then further down, she speaks about somebody

3  paid her a visit and they dropped some little pieces of

4  paper.  What did you understand her to be referring to?

5  Still on Page 2, Mr. King.

6  A.      I'm listening.

7  Q.      At the bottom of Page 2.

8  A.      Okay.

9  Q.      Who did you understand her to be referring to?

10 A.      She just says somebody dropped some paper.  I

11 don't know.

12 Q.      Further down, she says, and they didn't get no

13 -- buy no furs, you know, they didn't get no furs or

14 anything from me.  What did you understand her to be

15 telling you there?

16 A.      The money.

17 Q.      What money?

18 A.      $75,000.

19 Q.      And how did -- what in that statement referred

20 to $75,000?

21 A.      She said they didn't get no furs.

22 Q.      And why is it that you conclude that the furs

23 referred to the $75,000?

24 A.      Because she owed the money to my dad.

25 Q.      Did you have anything to do with any furs with

1 Ms. Martin?

2 A.      No.

3 Q.      Did your father have anything to do with furs

4 with Ms. Martin?

5 A.      Not to my belief.

6 Q.      Did you ever transport furs from California to

7 Maryland to Ms. Martin?

8 A.      No.

9 Q.      Ever transport furs from Ms. Martin out to your

10 father in California?

11 A.      No.

12 Q.      What were the only things that you transported

13 from your father to Ms. Martin?

14 A.      The drugs.

15 Q.      What was the only thing you transported back

16 from Ms. Martin to your father?

17 A.      Money.

18 Q.      Now, if we -- then at the top of the next page,

19 Page 3, you tell her, don't mess with those people

20 there, and then you say, I tell you what's happened.

21 I'll tell you what you should do.

22        What are you telling -- what are you referring

23 to in those statements?

24 A.      She says something about a picture. I was,

25 like, my mind was, like, what picture, you know? Of

1 who?  What people?

2 Q.     Why do you tell her not to mess with those

3 people?

4 A.     Because I didn't know  the people.

5 Q.     Now if we could turn to Page 4 and the call

6 continues.

7        MS. JOHNSTON:   Agent Eveler, could we start at

8 1:56 of the call?

9        (Audio recording begins playing at 12:45 p.m.)

10       (Audio recording stops playing at 12:47 p.m.)

11       BY MS. JOHNSTON:

12 Q.     Uncle Gene.  Who was does that refer to?

13 A.     That's my uncle.

14 Q.     Do you know his full name?

15 A.     Yes.  Gene Bird.

16 Q.     In that -- is that -- did you then continue in

17 the conversation  with Ms. Martin about discussing your

18 mother and other people that you knew?

19 A.     Yes.

20 Q.     Now, if we could go back to just the end of that

21 call on Page 11, and about the middle of the page if we

22 could pick up there.

23       (Audio recording begins playing at 12:48 p.m.)

24       (Audio recording stops playing at 12:48 p.m.)

25       BY MS. JOHNSTON:

1  Q.      In that portion of the call, you tell her to put
2  a stop on those folks, and that you will call her back
3  to tell her what you know, and then she says she's
4  afraid to go out.  What are the two of you talking
5  about there?  On Page 11.
6  A.      She says somebody is supposed to came and got
7  the money, and I didn't know nothing about it.  I was
8  just, like, you know, I don't know what the people she
9  was talking about.
10 Q.      What, if any, relation did that have with the
11 pieces of the picture that was cut in pieces?
12 A.      She says a picture that somebody come to visit
13 her.  I don't know.
14 Q.      That's what she said to you?
15 A.      Right.
16 Q.      How do you know that they came to get the money
17 and she didn't give it to them?
18 A.      I don't know this either.  That's why I asked.
19 I was asking.  When she asked me, she's telling me that
20 somebody came to see her.  I just wondered who come to
21 see her and about the money.  The only thing I think in
22 my mind was I knew my dad knew about the money.
23 Q.      If we could go to CD-2B, which is on Page 12.
24         (Audio recording begins playing at 12:50 p.m.)
25         (Audio recording stops playing at 12:52 p.m.)

1          BY MS. JOHNSTON:

2  Q.      Again, who is speaking in this conversation?

3  A.      Me and Ms. Martin.

4  Q.      It would have taken place at around the time

5  that's reflected on the top of the transcript on

6  December 21st at 1503 hours, which is 3 o'clock in the

7  afternoon.   Is that the telephone number you called,

8  301-270-9007?

9  A.      Yes, ma'am.

10 Q.      Again, in this call, what are you and Ms. Martin

11 talking about, at least this portion of the call?

12 A.      She's telling me about the picture again, about

13 the guy dropped some paper, a picture or something.

14 Q.      And then she says that she's trying to -- going

15 to come to see you.   Did she ever come to see you?

16 A.      No, ma'am.

17 Q.      Again, there was a question -- you asked her

18 about who, who and what they want.   Who are you asking

19 her about?

20 A.      Whoever this guy -- these people she talking

21 about.

22 Q.      What people?

23 A.      She said the picture that she -- somebody come

24 and visit her, some picture.   I was asking her what did

25 they want.

1  Q.       And then -- she says on Page 13, Mr. King, she

2  says, ain't that something?  And you said, I'm just

3  saying there's no way.  What are you telling her?

4  There's no way what?

5  A.      I was saying, from my understanding, it was just

6  -- I knew about the money and my dad knew about the

7  money.  I'm, like, the -- I don't think  my dad told

8  nobody else, from my understanding, and he's dead.  He

9  died in -- the day before Thanksgiving  and this is in

10 December.

11 Q.       Then at the -- again, at the bottom  of Page 13,

12 she tells you that she took John with her because I'm

13 not going nowhere by myself.  Took John with her to go

14 where?  What was your understanding?

15 A.       She just said she took John and go.  I don't

16 know, you know, what she was saying about  she took

17 John.

18 Q.       What did that have to do with the picture?

19 A.       I don't know.

20 Q.       What did you understand  her to be telling you

21 when she said she took John?

22       MR. MARTIN:  Objection.  These questions call

23 for speculation  and conjecture.

24       THE COURT:  All right.  Overruled.

25       BY MS. JOHNSTON:

1  Q.      What did you understand  her to be telling you

2  when she said she took John with her because  she wasn't

3  going  anywhere  by herself .   Took John with her where ?

4          MR. MONTEMARANO :   Objection , asked  and  answered .

5  This is twice .

6          THE  COURT:   Overruled .  Overruled .

7          MS. JOHNSTON:    You may  answer .

8          THE  WITNESS:   I guess  to meet .

9          MR. WARD:   Objection  to what  he guess es , Your

10  Honor .   It clearly is a guess  that's what  he said .

11         THE  COURT:   I don't  want  you to  speculate  or to

12  guess .   If you have  an understand ing what  the

13  conversation   meant , you may give  us  that  understand ing .

14  I don't  want  you to guess  or speculate .   Do you

15  understand   that ?

16         THE  WITNESS:   Yes .

17         BY MS.  JOHNSTON:

18  Q.      What did you understand  her to be tell ing you ?

19  A.      The picture  she's talk ing about , the person .

20  She's going  to meet  the person .

21  Q.      And when  you tell that  she -- to listen , they

22  could  go F themselves , who are you tell ing them  can go

23  F themselves ?

24  A.      The people  she's talk ing about .

25  Q.      The people  that  she told  you she met with ?

1  A.      Yes.

2  Q.      The same ones who dropped the picture?

3  A.      Yes.

4  Q.      Why are you telling her that they should just go

5  F themselves?

6  A.      Because I was feeling -- my feeling was, like I

7  said earlier, that the only thing I knew is that me and

8  my dad knew about the money, so where did this person

9  come from?

10 Q.      Then she's talking about somebody should keep

11 their mouth closed.  Who was that?

12 A.      She's talking about my mom.

13 Q.      And then if we turn to Page 15, and then the

14 conversation starts in about what had happened up in D.

15 C. related to the jail or something.  Do you see that

16 on the top of Page 15?

17 A.      Yes.

18 Q.      That have anything to do with her meeting with

19 these people?

20 A.      No, ma'am.

21 Q.      This is general conversation you had with her?

22 A.      Yes.

23 Q.      And do you continue there discussing your mother

24 and some lady named Cookie for a couple of pages?

25 A.      Yes.

1 Q.      If we could go to the bottom of Page 17.  Let's

2 go to Page 18 in the middle of the page.  After

3 discussing your mother and this woman, Ms. Cookie, do

4 you get back to your reason for wanting to talk to Ms.

5 Martin at the bottom of Page 18?

6 A.      Yes.

7 Q.      Did the conversation then return to the money

8 and your dealings with Ms. Martin?

9 A.      Yes.

10 Q.      Why didn't you just come out to her and say,

11 where's my money on the phone?

12 A.      I ain't gonna -- she knew what I was talking

13 about when I was asking about the money.

14      MR. MONTEMARANO:   Objection, Your Honor.

15      THE WITNESS:   I mean, I didn't want to come out

16 on the phone like that, just say --

17      BY MS. JOHNSTON:

18 Q.      Why wouldn't you just come out on a phone like

19 that and say where's the $75,000?

20 A.      Because the phone was tapped.

21 Q.      If we could pick up on Page 18.

22      (Audio recording begins playing at 12:58 p.m.)

23      (Audio recording stops playing at 1:00 p.m.)

24      BY MS. JOHNSTON:

25 Q.      What was that information you just gave to Ms.

1  Martin ?

2  A.      Where  I  was  locked  up  at  in  Indianapolis .

3  Q.      I  want  to  show  you  what's  been  marked  as  Hayward

4  No. 7 .   I'm  going  to  point  you  to  a  particular  page

5  there .   Do  you  recognize  your  name  and  the  address ?

6  A.      Yes .

7          MR.  WARD:   What  is  the  exhibit ?

8          MS.  JOHNSTON:    The  exhibit  is  Hayward  7 .   If  I

9  could  put  it  up  on  the  screen .

10         BY  MS.  JOHNSTON:

11 Q.      Is  that  the  information  that  you  provided  to  Ms.

12 Martin  during  this  telephone  call ?

13 A.      Yes .

14         MS.  JOHNSTON:   Your  Honor ,  I  don't  know  if  the

15 Court  wants  me  to  finish  this  call  --  it's  several  more

16 pages  --  or  if  the  Court  wants  to  recess .   I  know  the

17 Court  has  a  meeting .

18         THE  COURT:   Why  don't  we  take  a  recess  now  and

19 we  will  resume  --  I  believe  someone  indicated  we  had  a

20 matter  we  needed  to  discuss .

21         Ladies  and  gentlemen ,  I'm  going  to  give  you  a

22 little  bit  longer  than  normal  lunch  break  because  we

23 have  an  administrative  matter  to  address  with  the

24 attorneys .   Please  return  at  2:10  p.m.,  and  we  will

25 resume  with  this  testimony .

1                    (Jury excused at 1:01 p.m.)

2                    (Off the record at 1:01 p.m.)

3                    (On the record at 2:09 p.m.)

4          THE COURT:   Counsel, I want to remind you again,

5    I told the jury we would be resuming at 2:10.  That

6    clock is actually slow.  It's now 2:09, and when I said

7    I would take up preliminary matters, I went 2 o'clock

8    so we would have ten minutes to do it.

9          So when people aren't here, you're cutting off

10   your time for preliminary matters.  I try -- I

11   earnestly try to have this court run a little better on

12   time record than Amtrak, so I would ask your

13   cooperation in being at the appointed place and time

14   when we're ready to address things.

15         MR. WARD:   I thought you said be back at 2:10.

16   That's what I wrote down.

17         THE COURT:   For the jury.  No, what I said

18   before was I would add ten minutes to it so we could

19   have ten minutes for our preliminary matters.

20         MR. WARD:   If I misunderstood, I apologize.

21         THE COURT:   I have got a hint of what's afoot in

22   the issue that was alluded to.  I don't think this is

23   an issue for the witness on the stand; is that correct?

24         MS. GREENBERG:   Correct, Your Honor.

25         MR. MARTIN:   That's correct, Your Honor.

1         THE COURT:  If that's the case, then I suspect
2  that this witness is going to be on the stand for a
3  while.  Is this the next sequential witness?
4         MS. GREENBERG:  It could be, Your Honor,
5  depending what time we finish with this witness.
6         THE COURT:  Is there a witness you can take
7  before him?  What I was thinking of doing was dealing
8  with this on the break.
9         MS. GREENBERG:  Why don't we see where we are at
10  the break and whether he switch around witnesses.
11         THE COURT:  If you could switch around, that
12  would be good, unless it's going to really destroy your
13  sequence and timing and so forth, but I would prefer we
14  bring the jury in as scheduled at 2:10, continue with
15  this witness, conclude this witness, see what the time
16  is, and if we need to take one witness out of turn
17  then, whether we address this issue before this witness
18  takes the stand, any problem with that?
19         MS. GREENBERG:  No, Your Honor.
20         THE COURT:  Let's see if the jury is ready.  Did
21  I cut off your proffer?  Did you want to make a
22  proffer?
23         MR. MARTIN:  All I wanted to say, Your Honor,
24  you may very well want to address this motion before
25  the jury comes back in because there are motions with

1  regard  to  all  defense  counsel , and  I don't know   what

2  cross-examination   will  be  to  Nathan  King .

3        THE  COURT:   Unless  somebody  tells  me  they  want

4  to  do  the  same  thing  with  this  witness , then  I  would

5  defer  to  the  next  witness .

6        MR.  MONTEMARANO :   Then  I  think  since  I will  be

7  leading  on  Mr.  King , my  intention  was  to  question  him

8  about  his  prior  record  as  provided  to  us  last  week  by

9  the  government .   They  provided  rap  sheets  relating  to

10  his  priors.   It's  also  in  the  other  Jenks  material , and

11  I  was  intending  to  inquire  of  him  relative  to  that,

12  rather  standard  boring  operating  procedure .

13        MS.  JOHNSTON:   I don't know  what  in  particular

14  counsel  is  intending  to  cross-examine  Mr.  King  about ,

15  just  to  give  me  that  broad  thing .  Anything  he's  been

16  arrested  about , we  will  question  him  about .  We  gave

17  him  the  complete  criminal  history .  Just  so  we're

18  clear , that  was  available  to  them  a  week  prior  to  the

19  start  of  trial  June  6, not  last  week .

20        THE  COURT:  We  will  cross  that  bridge  when  we

21  get  to  the  question , all  right ?  And  Mr.  Sussman , did

22  you  have -- did  I  cut  you  off  on  a  proffer ?  If  you

23  want  to  make  a  proffer , make  a  proffer .

24        MR.  SUSSMAN :  No , this  is  something  designed  to

25  save  time  Your  Honor .  Two  things , Ms.  Johnston  and  I

1 have some professional disagreement s.  The first one
2 concern her respond ing with a legal argument  to an
3 objection  about  the co-conspirator 's hearsay  rule .  I
4 don't think  that 's a proper argument .  I'm sure the
5 Court know s the law and know s what counsel  is object ing
6 to and know s what her theory is, and  I don't think  it 's
7 appropriate .  I think if that need s to be said , it
8 should  be said at the bench .

9        MS. JOHNSTON:   I thought the Court was asking me
10 what my position was , so I gave it to him.

11        THE COURT:   I will ask that we do those thing s
12 at the bench .  I agree with you.

13        MR. SUSSMAN :  Second  thing .

14        THE COURT:   What I'm try ing to avoid , Mr.
15 Suss man , as you can obvious ly see , I'm try ing to
16 minimize  the number  of bench conference s with so many
17 lawyer s, but by no mean s do I wish to prejudice anybody
18 by having colloquies that shouldn't be heard by the
19 jury and  I will make certain we don't do that.

20        MR. SUSSMAN :  With respect  to the last witness .
21 Ms. Johnston approach ed him with what she call ed Harden
22 -- I'm sorry , Hayward-7 .  Now , Hayward-7 , she show ed
23 him one document .  Hayward-7 , in my calculation , is a
24 group of document s, perhaps  60 or 70 page s, I don't
25 know if my count is right .  I asked Ms. Johnston to

1 identify for us what exhibits she would be using with a

2 witness before taking the stand. She was unwilling to

3 do so.

4        I don't think it's appropriate for her to have

5 20 or 30 or 40 pages labeled Hayward-7, show the

6 witness one page, without showing it to us or putting

7 it on the screen, because I don't know what she's

8 showing the witness, and I think that's basic right.

9        THE COURT:   I have not required that either side

10 disclose what the exhibits are that they're going to

11 use with that witness. I do believe she indicated what

12 exhibit number it was, and that she was going to a

13 specific page. Apparently it's not paginated. If, in

14 the future, you are troubled by the fact that you don't

15 know which page it is and you want to turn to it, just

16 tell me that and I'll make sure she told you.

17        MS. JOHNSTON:   I believe I put it up on the

18 screen so everyone could see what I was referring to.

19        MR. SUSSMAN:   I missed it if it was on the

20 screen, and they're not paginated.

21        THE COURT:   Please don't hesitate to interject

22 that you would like to know where it is in the book so

23 you can take a look at your exhibits and see where it.

24 is. I don't have a problem with it. That's fine.

25        MR. SUSSMAN:   In terms of delaying the process,

1  if it does, it does.

2           THE COURT:   I want to remind you, again, if you

3  I cut you off on any proffer you want to make, make

4  sure you let me know.  We'll take it up as a

5  preliminary matter and take as long a proffer as you

6  want.  In the meantime, we have the jury.  Let's bring

7  the jury in.

8           MS. JOHNSTON:   Do we have our witness, Your

9  Honor?

10          THE COURT:   Oh, yes.

11          MR. MITCHELL:   One of the other issues is the

12  monitor.

13          THE COURT:   Oh, you can't see.  Mr. Mitchell,

14  how about if I just tell the witness to sit up so that

15  people can see him.

16                (Jury returns at 2:16 p.m.)

17          THE COURT:   We'll begin as soon as the witness

18  is brought in, so just one moment.

19                (Witness resumes the stand at 2:19 p.m.)

20          THE COURT:   You may proceed, Ms. Johnston.

21          MS. JOHNSTON:   Thank you, Your Honor.

22          BY MS. JOHNSTON:

23  Q.      Mr. King, when we left off, I had showed you

24  what was marked as government's -- a page of what was

25  marked as Government's Exhibit Hayward-7.

1            Did you recognize  that address  that was on  that

2 page?

3 A.      Yes.

4 Q.      What is that  in relation  to the call?  What is

5 that information?

6 A.      While I was  incarcerate d.  You talking about the

7 address  that you  just show ed me?

8 Q.      The one that  was on the  screen right  next to

9 you.  It should  be on the  screen.

10 A.      Incarcerate d in Indianapolis .

11 Q.      Is that the  information  you were giving  Ms.

12 Martin  during the  telephone  call?

13 A.      Yes.

14 Q.      If we could  continue  with the  call, please.

15          (Audio  record ing begin s play ing at 2:19 p.m.)

16          MS. JOHNSTON:    We're on Page 21.

17          (Audio  record ing stop s play ing at 2:23 p.m.)

18          BY MS.  JOHNSTON:

19 Q.      On Page 25, the  reference  that you will  write

20 her at the  address  that you  send me and then  you say

21 Granny's.

22          Is that the  same address  where you  dropped  off

23 the cocaine  and pick ed up the  money from  Ms. Martin?

24 A.      Yes, it is.

25 Q.      Do you recall  the name of that  street?

1 A.      I believe it's Nicholson  Street.

2 Q.      What part of Washington  was it?

3 A.      Northeast.

4 Q.      Your conversation  there about on the same Page

5 25 where you're offering to write her back and explain

6 to her and you're telling her that that's BS.  And what

7 are you referring to there on Page 25?

8 A.      I told her to write me back -- I told her write

9 me back and, you know, send me the picture, write me

10 and -- you know, send me the picture, I look at it,

11 I'll write her back.  And she was saying something else

12 about -- she was talking about something about somebody

13 said something and I was, like, that's bull shit.

14 Q.      Continue.

15 A.      I'm saying from my memory, that's what I recall

16 of -- she was talking about somebody -- somebody else.

17 Q.      But when you said to her, okay, do that, and

18 tell me what's going on, then you can tell this

19 shit head that you'll feel a little better than what you

20 know.  What are you telling her there?  What are you

21 telling her to send you or to do?

22 A.      I don't recall in my memory on that.

23 Q.      That's fine.  Now, at the bottom, was -- did the

24 transcript accurately reflect that you told Ms. Martin

25 you loved her?

1 A.      Yes, I did.  I told her that.

2 Q.      Now, if we could go to the next call, which is

3 CD-2C, transcript  on Page 27.

4         Did you review that transcript  and that call and

5 did you listen to the recording and compare it with the

6 transcript?

7 A.      Yes, I did.

8 Q.      Is the transcript  accurate  in terms of who the

9 speakers are?

10 A.      Yes, it is.

11 Q.      Again, was this call while you were in the jail

12 in Indiana?

13 A.      Yes, it is.

14 Q.      On or about  the time and date reflected?

15 A.      Yes.

16         MR. WARD:   Excuse me, what is the date?

17         MS. JOHNSTON:   The date is December  23 of '03.

18 It's Page 27 of the transcript  book.

19         MS. WARD:   Thank you.

20         MS. JOHNSTON:   If we could play that call,

21 please.

22         (Audio recording begins playing at 2:26 p.m.)

23         (Audio recording stops playing at 2   :29 p.m.)

24         BY MS. JOHNSTON:

25 Q.      The picture, is that the same as the picture in

1 the first call?

2 A.      Yes.

3 Q.      Who is Uncle Gene?

4 A.      That's my uncle.

5 Q.      You told her you tried to call Uncle Gene to

6 tell him to do something.  What was the something you

7 were going to ask Uncle Gene to do?

8 A.      To go talk to her about the money that -- the

9 $75,000.

10 Q.      To talk to whom about the $75,000?

11 A.      Paula.

12 Q.      Then further down, Ms. Martin says because he

13 doesn't know anything about anything.

14 A.      Right.

15 Q.      What did you understand her to be telling you?

16 A.      She's saying Uncle Gene don't know nothing about

17 the money.

18 Q.      The money being what money?

19 A.      The $75,000.

20 Q.      If we could go to the next call, CD-2D on Page

21 30.

22          Again, did you review the call and the

23 transcripts for this call?

24 A.      Yes, I did.

25 Q.      CD-2D.  Did this call happen on or about

1  Christmas  day  of  2003  while  you  were  still  in  Indiana ?

2  A.      Yes .

3  Q.      Does  it  correct ly  identify  parti es?

4  A.      Yes , it  does .

5  Q.      Who  are  the  part ies  to  this  call ?

6  A.      Me  and  Ms.  Martin .

7  Q.      If  we  could  play  it , please .

8        (Audio  record ing  begin s  play ing  at  2:30  p.m. )

9        (Audio  recording  st  ops  playing  at  2:31  p.m. )

10       BY  MS.  JOHNSTON:

11  Q.      Does  the  conversation  go  on  for  several  minutes

12  and  you  discuss  your  mother  and  other  people  that  you

13  and  Ms.  Martin  know ?

14  A.      Yes .

15  Q.      Calling  your  attention  to  the  portion  that  we

16  played ,  at  the  very  end  of  the  page ,  you  ask  how 's  Aday

17  doing , at  Page  30  at  the  bottom .   Who's  "Aday ?"

18  A.      That 's  Ms.  Martin 's  grand daughter .

19  Q.      Above  that , you  ask ed  how  is  D  do ing .   Who  is

20  the  "D"  you  were  referring  to , again  on  Page  30 , Mr.

21  King ?

22  A.      D?  I  don't  recall  who  D  is .  I  don't  know .

23  Q.      Above  that , after  you  wish  Ms.  Martin  a  Merry

24  Christmas , you  asked  her  how  you  do ing , and  Ms.  Martin

25  respond ed , oh  your  uncle  came  to  see  me , and  I -- I

1 gave him those papers.

2        What was your understanding of what Ms. Martin

3 was telling you?

4 A.      She gave Uncle Gene the money.

5 Q.      Did you have conversations then with Mr. --

6 Uncle Gene -- do you know Uncle Gene's full name?

7 A.      Yeah.  Eugene Bird.

8 Q.      Did you have conversations with Mr. Bird

9 concerning whether or not he received any money from

10 Ms. Martin?

11 A.      Yes, he did.

12 Q.      What was your conversation with Mr. Bird?

13 A.      He said that she had gave him some money, but it

14 wasn't the money that I was looking for.

15 Q.      Do you know how much money -- did Mr. Bird tell

16 you how much money she had given him?

17 A.      It was, like, $3,500 or something like that.

18 Q.      Now, if we could go to call CD-2E, which is on

19 Page 34.  Do you have that page in front of you Mr.

20 King?

21 A.      Yes, I do.

22 Q.      In terms of this call, it reflects that it was

23 the day after Christmas, again from the Marion County

24 Jail.  Now it's to a different number.

25        Do you recognize that telephone number at the

1  top?

2  A.      Yes.

3  Q.      Whose  telephone  number  is  that?

4  A.      My  fiancee  number.

5  Q.      Excuse  me?

6  A.      My  fiancee,  Elizabeth.

7  Q.      What's  her  name?

8  A.      Elizabeth  Evans.

9  Q.      Who  are  the  parties  to  this  conversation?

10  A.      Me  and  Elizabeth.

11  Q.      Excuse  me?

12  A.      Me  and  Elizabeth.

13  Q.      Does  a  third  person  get  on  the  phone  during  this

14  conversation?

15  A.      Yes,  he  does.

16  Q.      Who  is  that  third  person?

17  A.      Uncle  Gene.   Uncle  Gene.   Gene  Bird.

18  Q.      If  we  could  please  play  this  call,  CD-2E.

19          (Audio  recording  begins  playing  at  2:33  p.m.)

20          MS.  JOHNSTON:    If  we  could  play  just  the  first

21  couple  of  lines  to  get  him  to  recognize  the  voices.

22          (Audio  recording  stops  playing  at  2:34  p.m.)

23          BY  MS.  JOHNSTON:

24  Q.      Who  are  the  two  voices  in  the  beginning  part?

25  A.      Me  and  Elizabeth.

1  Q.      Do you have some conversation  with her at the

2  beginning  concern ing her and Christmas  at the beginning

3  of this conversation ?

4  A.      Yes .

5  Q.      If we could start at Page 35 about a third of

6  the way up from the bottom on Page 35 .

7          (Audio  record ing begin s play ing at 2:34 p.m. )

8          (Audio  record ing stop s play ing at 2:35 p.m. )

9          BY MS. JOHNSTON:

10 Q.      Who is she going to try to call for you at the

11 end of that call  on the bottom of Page 36?  Who do you

12 ask her to call ?

13 A.      Gene , my uncle .

14 Q.      How is that call going to be set up?

15 A.      Three -way .

16 Q.      Were there any problem s with maki ng a three -way

17 call with you being on the phone from the jail ?

18 A.      Yeah .  You got to blow into the phone .

19 Q.      Why do you have to blow in the phone ?

20 A.      Because  it's cut off , attempt ing to make a

21 three -way .

22 Q.      In this conversation , do you then try to make a

23 three -way call by blow ing in the phone ?  Eventually , on

24 Page 38, are you able to make connect  and have a

25 three -way conversation ?

1  A.      Yes.

2  Q.      Okay.  If we could start with --

3          (Audio recording begins playing at 2:36 p.m.)

4          (Audio recording stops playing at 2:38 p.m.)

5          BY MS. JOHNSTON:

6  Q.      Who are the three people in that portion of the

7  conversation?

8  A.      Myself, Elizabeth and Gene.

9  Q.      What were you discussing?

10  A.      Discussing the money.

11  Q.      Was there a problem with the money?

12  A.      Yes, there was.

13  Q.      What was the problem with the money?

14  A.      It wasn't money that was supposed to have been

15  the money, $75,000.

16  Q.      How do you know that?

17  A.      Because he said it was not.

18  Q.      Excuse me?

19  A.      Eugene said it was not, he didn't get the

20  $75,000.

21  Q.      Did you continue your conversation with Ms.

22  Evans after Mr. Bird hung up?

23  A.      Yes.

24  Q.      If we could continue with playing it.

25          (Audio recording begins playing at 2:39 p.m.)

1          (Audio recording stops playing at 2:39 p.m.)

2          BY MS. JOHNSTON:

3  Q.     Now, there, it's just you and    Elizabeth

4  speaking.   What are you telling her when you say I

5  don't know what kind of games they're playing, and she

6  says you're supposed to be calling her to get it

7  straight.  Who are you supposed to be calling?

8  A.     Ms. Martin.

9  Q.     What are you talking about when you say you

10  don't know what kind of games they're playing?  What

11  are you referring to?

12  A.     Games with the money.

13  Q.     If we could pick up again with the call on Page

14  45.

15          (Audio recording begins playing at 2:40 p.m.)

16          (Audio recording stops playing at 2:41 p.m.)

17          BY MS. JOHNSTON:

18  Q.     If you could, in that portion of the call, what

19  are you discussing when you -- when the reference is

20  made to 75?

21  A.     It was $75,000.

22  Q.     And then further down on the page, you reference

23  that she plays dumb.  She ain't dumb.  It's BS.  What

24  are you telling Elizabeth?

25  A.     I was telling her she'll -- you know, she owes

1  $75,000 , she knew what I was talking about it.

2  Q.     Who is the "she"?

3  A.     Ms. Martin .

4  Q.     And then Ms. Evans asks you what can she have to

5  put in the bank , and what do you tell her?

6  A.     I had to get the money first .

7  Q.     What money were you referring to?

8  A.     The $75,000 .

9  Q.     That call continue s, and during that call , do

10 you talk about your expense s and what's going on with

11 Ms. Evans back down where she live s?

12 A.     Yes .

13 Q.     If we could go to the last call , CD-2F on Page

14 56 .

15         Again , did that call occur while you were in the

16 same jail facility ?

17 A.     Yes .

18 Q.     And was it a call to the number that's listed

19 there , 301-270-9007 ?

20 A.     Yes .

21 Q.     And who are the parti es to the call ?

22 A.     Me and Ms. Martin .

23 Q.     Would that have occurred on or about December 27

24 at the time indicated on the call ?

25 A.     Yes .

1  Q.      If we could play it, please.

2          (Audio recording begins playing at 2:43 p.m.)

3          (Audio recording stops playing at 2:45 p.m.)

4          BY MS. JOHNSTON:

5  Q.      During that portion of the conversation that

6  begins on Page 56, on Page 56 when you say got a

7  letter, what came in the letter that you got from Ms.

8  Martin?

9  A.      A picture of the person she said came to see

10 her.

11 Q.      Was there an actual letter with it?

12 A.      A little note.

13 Q.      Did you recognize those people?

14 A.      No, I don't.

15 Q.      Had you ever seen those -- that person before?

16 A.      No, I did not.  No, I didn't.

17 Q.      And then on Page 57 where Ms. Martin references

18 that your father -- it says at the top, I told you your

19 father had called.

20         At the time of this conversation, was your

21 father still alive?

22 A.      My father's dead.

23 Q.      And had you had any conversations with your

24 father before he died about the $75,000 other than it

25 wasn't paid?

1 A.      No, I didn't.

2 Q.      Now, further down, there's some conversation

3 about Ms. Martin on Page 57, says she just has to come

4 and see you. Did she ever come to see you?

5 A.      No, ma'am.

6 Q.      Then you say, let me see.  How can I say it this

7 way.  What were you hesitating about?

8 A.      I don't recall what I was hesitating about.

9 Q.      There's some discussion about papers for your

10 brother to go to school.  Do you have a brother?

11 A.      Yes, I do.

12 Q.      What's his name?

13 A.      Billy Joe King.

14 Q.      Was he in any school that you know of?

15 A.      No.

16 Q.      Then we ended up where Ms. Martin says for your

17 brother, and you said don't mess with, and you were cut

18 off then.  Do you have an ongoing relationship with

19 your brother?

20 A.      No, I don't.

21 Q.      Were you telling her not to mess with him?

22 A.      Yes.

23 Q.      Then the conversation goes into another subject

24 talking about your mother's business and this lady

25 Cookie again.  Do you see that on Page 58?

1  A.       Yes.

2  Q.       At the bottom of -- why don't we just go ahead

3  and play that straight through, please.  Pick up right

4  where we left off on Page 58.

5          (Audio recording begins playing at 2:48 p.m.)

6          (Audio recording stops playing at 2:52 p.m.)

7          BY MS. JOHNSTON:

8  Q.       Now, Mr. King, at the bottom of Page 8 where Ms.

9  Martin talks about having a show with R. Kelly and

10 Alicia Keys and Nelly, based on your knowledge, do you

11 know whether or not she was involved with any of those

12 stars?

13 A.       No, I don't know.

14 Q.       Did she ever send you any fliers or anything to

15 say she was producing a show with them?

16 A.       No.

17 Q.       Now, when we get to Page 59, you start

18 stuttering a little bit and pausing and say -- ask a

19 about the paperwork for the house and stuff, and you

20 say you gave it to Uncle Gene, the paperwork for the

21 house for Uncle Gene.  What are you talking about when

22 you say the paperwork for the house?

23 A.       The money.  The $75,000.

24 Q.       And then you say -- you said you gave it to

25 Uncle Gene and Ms. Martin repeats your question; is

1 that correct? Did I give it to him?

2 A.      Yes.

3 Q.      And then you have a discussion about -- she says

4 what he told me to, and you say that he's senile. What

5 were senile.

6        What were you discussing with her there? Were

7 you saying that Mr. Bird is senile?

8 A.      I was saying that he wasn't understanding what I

9 was trying to tell him about the money what -- how

10 much money to get.

11 Q.      And then again at the bottom, you refer to the

12 paperwork with you. What did you mean by the paperwork

13 with Ms. Martin at the bottom of Page 59?

14 A.      The money.

15 Q.      And then at the top of Page 60, you indicate

16 that your dad never picked up the paperwork. Again,

17 paperwork refers to what?

18 A.      The $75,000, the money.

19 Q.      Why didn't you just say $75,000 on the phone?

20 A.      I don't know. I ain't -- I wasn't going to

21 discuss like that money on the phone like that.

22 Q.      Why?

23 A.      The phone was -- it says it's recording --

24 tapped.

25 Q.      Then Ms. Martin then says that's what the guy

1  said he was suppose d to get.   What  guy  did  you

2  understand  her  to be  referring  to?

3  A.      I don't know .  She said , I guess  the  guy  in  the

4  picture , the  picture  -- whoever  she's sending me the

5  picture  of.

6  Q.      You didn't  recognize  him?

7  A.      No , I don't know  the  guy .

8  Q.      Do  you  still  have  the  picture ?

9  A.      Yes .

10  Q.      You  saw  the  picture ?

11  A.      Yes .

12  Q.      Did  you  recognize  him?

13  A.      I  look ed at  it .  I didn't know  who  it  was .   I

14  threw  it in  the  trash  can .

15  Q.      Then  that  continue s, and  you  tell  her  further

16  down  on Page  60 that  you  had  to  straight en  out  that

17  contract , that  contract , that  paperwork  for  the  house .

18  What  are  you tell ing  Ms.  Martin ?

19  A.      Well , I feel  that  Ms.  Martin  is  play ing  game s

20  with  me  about  the  money , so  I  just  told  her , yeah , I

21  straight en  the  contract .   You  need  to  give  me  the

22  money , and  I don't know  who  the  guy  is  that  you're

23  referring  to suppose d to  get  the  money .  So  I  just  --

24  Q.      Told  her  you  had  taken  care  of --

25  A.      That 's what  I told  her , yes .

1  Q.      And why did you tell her that?

2  A.      Because I thought that she was BS-ing me about

3  the money.

4  Q.      Why did you think she was BS-ing you about the

5  money?

6  A.      Because it wasn't making no sense.  She said she

7  talked to my dad about the money and my dad was dead.

8  He's passed away.

9  Q.      And was that guy in the picture anyone you had

10 seen at your father's yard or with your father?

11 A.      I don't even know the guy.  Never seen him in my

12 life.

13 Q.      After that call, did you have more calls while

14 you were in jail with Ms. Evans and Mr. Bird and

15 perhaps even Ms. Martin?

16 A.      I believe so.

17 Q.      Did you ever receive the $75,000 from Ms.

18 Martin?

19 A.      No, I did not.

20 Q.      To your knowledge, is that money still owed to

21 your father or to you?

22 A.      Yes.

23 Q.      What -- that money was payment for what?

24 A.      It was the money I supposed to pick up when I

25 delivered the things -- the cocaine that she didn't

1  give all the money to my dad.

2  Q.      You use the word "things" and you've used the

3  word "business" and you've used the word "paperwork."

4  Why don't you just say "cocaine?"

5  A.      Cocaine.

6  Q.      Well, when you're on the telephone, why don't

7  you just say cocaine?

8          MR. MONTEMARANO:   Asked and answered, Your

9  Honor.

10         THE COURT:   Overruled.

11         THE WITNESS:   Because I was in there for

12  trafficking cocaine.  I didn't want to say that on the

13  telephone.

14         BY MS. JOHNSTON:

15  Q.      Now, if I could show you a page of Government's

16  Exhibit Hayward-28 and ask you to look at this page.

17  There is a reference to Nathan's address there.  Do you

18  recognize that address?

19  A.      Yes.

20  Q.      Okay.  And what address is that?  Whose address

21  is it?

22  A.      It's P.O. Box -- this is while I was locked up

23  in MDOC in Mississippi.

24  Q.      And then let me show you Hayward-26.  Do you

25  recognize that exhibit?

1  A.      Yes.

2  Q.      Whose information  is that?

3  A.      Elizabeth  Evans.

4  Q.      Now, Mr. King, you were writted -- you were

5  brought  in here to testify; is that correct?

6  A.      Yes.

7  Q.      Did you reach out to our office to provide this

8  information?

9          MR. MARTIN:   Objection , leading.

10         THE  COURT:   Sustained .

11         BY MS. JOHNSTON:

12  Q.     Mr. King , did you ever , on your own , attempt  to

13  contact  our office  to provide  information ?

14         MR. MONTEMARANO :  Objection .  Same  objection .

15         MR. WARD:   Same  question .

16         THE  COURT:   Overruled .

17         BY MS. JOHNSTON:

18  Q.      You may answer  the question .  Did you ever send

19  a letter to our  office ?

20  A.      No.

21  Q.      Call  our  office ?

22  A.      No.

23  Q.      Offer  in any  way that  you had  information  about

24  Ms. Martin  or other  people ?

25  A.      No.

1  Q.      What sentence are you serving now, Mr. King?

2  A.      Twenty years.

3  Q.      Do you have any expectation of getting any

4  reduced sentence as a result of your testimony here?

5  A.      No.

6  Q.      Just so the record is clear, you reference d some

7  people as Mr. Eugene Bird and some other folk s.  I want

8  you to look at CH-1 and tell me if you recognize any of

9  the people that appear on CH-1.

10          MR. MARTIN:  Again, Your Honor, objection.  This

11  is very similar to the initial question that was asked

12  about pan ning the courtroom and recognizi ng people.

13          THE COURT:  I could n't hear the last thing you

14  said.

15          MR. MARTIN:  I said, objection, Your Honor.

16  This is very similar to the first question that I had

17  object ed to.  I don't know if you want me to approach

18  as opposed to maki ng argument in front of the jury.

19          THE COURT:  Why don't you approach so I can hear

20  you better.

21              (At the bar of the Court.)

22          MR. MARTIN:  Your Honor, I think twice before,

23  the government trial counsel had asked a pass ing

24  question regard ing Mr. Learley Goodwin, and at least

25  once after that, she had asked the witness to look

1 around the courtroom, to pan the courtroom and see if

2 he recognized anyone else and he had answered no. I

3 think he answered no twice, and it seems to me that

4 this is a third attempt to ask the same question, this

5 time, though, by showing an exhibit, so I would object,

6 asked and answered.

7          MS. JOHNSTON:   I would tend to disagree with Mr.

8 Martin in terms of asking him about Mr. Goodwin.  He

9 identified Ms. Martin.

10          COURT REPORTER:  I don't know what the noise is

11 up here, but I cannot hear you.

12          MS. JOHNSTON:   I'm using the chart because this

13 witness, during his testimony, has identified any

14 number of people whose pictures appear on that board,

15 so I'd like him to identify them on the record.

16          THE COURT:  What you intend to ask him is not to

17 find Learley Goodwin on the chart, but to identify

18 people he's already identified by name, such as Eugene

19 Bird?

20          MS. JOHNSTON:   I want to ask him to identify

21 anyone on the chart whom he recognizes on the chart.

22          MR. MARTIN:   That's my objection.

23          MS. JOHNSTON:   Quite frankly, that would go to

24 cross-examination, to go to the strength if he does --

25 I don't know that he is going to identify with respect

1  to Mr. Goodwin .  I anticipate  he is going  to identify

2  Mr. Brim , his father ; Mr. Bird , his uncle ; probably Mr.

3  Nunn , whom he also knew from growing up in the

4  neighborhood .  I don't know  who else he may or may not

5  identify  on that  chart .  And I don't think  it's

6  appropriate  for me to lead him .

7        THE COURT:   I don't have  a perfect  memory .  I do

8  remember  you asking  him does he recognize  any people  in

9  the courtroom , and he identified Paulette  Martin .  I

10 heard that question  asked .  It may have been -- the

11 record  will be my guide on that .  I don't  see any

12 reason  why you can't  ask him to tell  you whether  he

13 recognize s any person s on the  chart .

14        MS. JOHNSTON:   That 's what I was going  to ask

15 him .

16        THE COURT:   If on cross-examination  you think

17 that he's somehow  being  inconsistent , you can pound him

18 on the fact  that  he didn't  identify  anybody  else when

19 he was asked  to .

20        MR. MARTIN:   Your Honor , there 's another  way for

21 her to do that .

22        THE COURT:   This chart  has far more than the

23 people  on trial  here .

24        MR. MARTIN:   That 's true .

25        THE COURT :  She want s to know  which  of these

1 people  on  this  chart  he  knows.

2          MR. MARTIN:   What she can do is she can make

3 reference  to his  testimony.   Now, you mentioned  Mr.

4 So-and-so, and you mentioned Mr. So-and-so.  Would  you

5 point  out  where  he  is?  Would  you  point  out  where  she

6 is?  You mentioned Ms. Paulette Martin.  Point  out

7 where  she  is.   You  know, he  said  he  doesn't  recognize

8 --

9          MS. JOHNSTON:   I don't think  there's anything

10 wrong  with  me  asking  the  question.   I don't  think   this

11 jury should  get  the  impression  that  I  have  told  him  who

12 to identify  on  the  chart, which  is  what  they  will  do --

13          THE  COURT:   Why don't you ask  it his  way and

14 then  if  there's  anybody  else  on  the  chart  you

15 recognize.

16          MS. JOHNSTON:   If that's  the  way  the  Court  would

17 like me to extend  the  questioning, I will  do  that.

18          MR. WARD:   Your Honor, before  we  leave  the

19 bench, I would  like  to  make  a  comment.

20          THE  COURT:   Wait  a minute.

21          MR. MONTEMARANO:   The reason  I object  to this

22 chart  at  this  point  is  there  are  names  on  the  pictures.

23          MS. JOHNSTON:   The names  have  been  covered  up.

24          MR. MONTEMARANO:   Are  they  all  covered  up?

25          MS. JOHNSTON:   We have  put  tape  on  it  that's

1  removable .

2      MR. WARD:  Your Honor , if I may .  This Court has
3  been consistent ly prodding us during the trial to move
4  it along , and I don't take issue with that .

5      THE COURT:  You used to do it yourself .

6      MR. WARD:  I used to do it myself , and I've
7  understood -- understand that , but I've lost count
8  during this last episode of direct examination how many
9  times the witness was asked , and what does the 75 refer
10  to?  Of course it refers to $75,000 , but he was asked
11  so many times , I lost count of it.  Same thing with
12  what was the $75,000 for?  Was it for cocaine ?  I lost
13  count of that , too.  Now, either counsel thinks that
14  this jury is a bunch of morons --

15      THE COURT:  I think the jury may be able to hear
16  you .

17      MR. WARD:  Either counsel thinks the jury is a
18  bunch of morons , or I've lost -- I just don't
19  understand what's going on here .  It seems to me if
20  we're wasting time , repetitive question s is wasting an
21  awful lot of time on counsel .

22      THE COURT:  I hear your concern .  I think that
23  she's entitle d to ask that question , because the
24  reference is made so many times in the document .  And
25  if she goes too far , I'll cut her off .  I recognize

1 what your concern is, but I do think that when a person

2 uses 75 over and over again in that document, it could

3 mean different things.

4        MS. JOHNSTON:   Your Honor, Mr. Ward can

5 certainly make his comments and his objections, but I

6 do take exception to his personal comments that the

7 government thinks the jury consists of nothing but --

8        THE COURT:   His objection.

9        MR. WARD:   But morons is the word I used.

10       THE COURT:   Wait, wait counsel.   Your objection

11 is too late.   I hear your concern, and if she goes too

12 far, object, and I'll stop it.   All right?

13       MR. WARD:   Thank you.   And I only drew that

14 conclusion because I could think of no other conclusion

15 that made sense.

16       THE COURT:   All right.   Thank you.

17              (Back in open court.)

18       BY MS. JOHNSTON:

19 Q.    Mr. King, I'm showing you this chart here and

20 asking you to -- excuse me.   Just a moment.

21       MS. JOHNSTON:   Your Honor, I'm going to need

22 about three minutes.

23       MR. WARD:   Excuse me, Counsel, would you keep

24 your voice up please?   Those us at the far end of the

25 courtroom can't hear anything.

1          MS. JOHNSTON:   Your Honor, I'm going to need

2    about three minutes because there's an issue with the

3    chart as it now exists before I show it to the witness.

4    I want to take care of a matter.

5          THE COURT:   All right.  Why don't you just take

6    care of it?  I don't want to recess and reconvene.

7    There's no such thing as a five-minute recess with this

8    battleship, so take care of your problem and we'll

9    wait.

10                    (Off the record at 3:05 p.m.)

11                    (On the record at 3:08 p.m.)

12          MS. JOHNSTON:   Your Honor, I apologize.  What I

13   thought was covered up was not completely covered up,

14   so I've asked the agent to cover it up so the names are

15   not disclosed to the witness.

16          THE COURT:   All right.

17                    (Off the record at 3:08 p.m.)

18                    (On the record at 3:10 p.m.)

19          BY MS. JOHNSTON:

20   Q.    Mr. King, I'm going to ask you to look at these

21   photographs and tell us if you recognize any of the

22   people whom you've mentioned here during your

23   testimony.

24   A.    Yes.

25   Q.    Okay.  If you could just point to who you

1  recognize.

2  A.       (Witness indicating.)

3  Q.       Who is that?

4  A.       That's Ms. Martin.

5  Q.       Okay.  Do you recognize anyone else?

6  A.       Eugene Bird.

7  Q.       Anyone else?

8  A.       (Witness indicating.)

9  Q.       Who is that?

10  A.       Goody.

11  Q.       Okay.  Anyone else?

12  A.       Larry.

13  Q.       Larry who?

14  A.       Nunn, right there.  And Larry.

15  Q.       Okay.  You've identified a few people.  I'm

16  going to ask you to take this pen and write the names

17  next to the people you've identified and then continue

18  looking.  I don't know if you were finished or not, but

19  starting with Paula, write how you know her, what her

20  name is, by what name you know her, and then I want you

21  to initial and date it.  Not on that tape.  Put it

22  right next to her picture over here.

23  A.       Okay.  (Witness indicating.)

24  Q.       Tell us what you've written.

25  A.       Paula Martin.

1  Q.      Okay.  You have to speak into the microphone.

2  A.      Paula Martin.

3  Q.      Put your initials and today's date --

4  A.      (Witness indicating.)

5  Q.      -- which is the 14th of June.

6          Who else have you recognized?

7  A.      Goody.  (Witness indicating.)

8  Q.      What did you write there?

9  A.      Goody.

10  Q.      And if you could, initial and date it.

11  A.      (Witness indicating.)

12  Q.      Anyone else you recognize on the picture -- on

13  the chart?

14  A.      Mr. Bird.

15  Q.      Mr. Bird?

16  A.      Eugene.

17  Q.      Anyone else on the picture you recognize?

18  A.      Yes.

19  Q.      Who do you recognize?

20  A.      Larry Nunn.

21  Q.      If you could write it not on the white tape, but

22  next to the picture and put your initials .

23  A.      (Witness indicating.)

24  Q.      If you need to look at the chart.  Who else do

25  you recognize?

1  A.       My dad.

2  Q.       If you could write your dad's name next to his

3  picture.

4  Q.       Maybe if I hold it for you, it will be easier to

5  do.

6  A.       (Witness indicating.)

7  Q.       And anyone else do you recognize?

8  A.       Yeah.

9  Q.       Who is that?

10  A.       Larry Lane.

11  Q.       How do you know Mr. Lane?

12  A.       We grew up as kids.

13  Q.       Okay.

14  A.       (Witness indicating.)

15  Q.       Is he related to anyone you've identified on the

16  chart?

17  A.       Yes.

18  Q.       Who is he related to?

19  A.       Goody.

20  Q.       What's the relationship between Larry Lane and

21  Goody?

22  A.       Stepfather.

23  Q.       Who's -- Mr. Goody --

24  A.       Yeah.

25  Q.       -- is the stepfather for Mr. Lane?

1  A.      Yes.

2  Q.      Anyone else you recognize on there?

3  A.      Yes.

4  Q.      Okay.  Who's that?

5  A.      (Witness indicating.)

6  Q.      All right.  Let me put it down again.  First of

7  all, turn towards the jury and tell them who you're

8  identifying.

9  A.      Philpot.

10 Q.      Say it --

11 A.      Philpot.

12 Q.      And point to which picture is Philpot.

13 A.      (Witness indicating.)

14 Q.      If you could please initial and write the name

15 you know him by and initial and date it.

16 A.      (Witness indicating.)

17 Q.      How do you know Mr. Philpot?

18 A.      He's like a Godbrother to me.

19 Q.      A what?

20 A.      Godbrother.

21 Q.      And in one of the calls that we played, there

22 was a reference to a Philpot.

23 A.      Right.

24 Q.      Is that the same Philpot you've identified?

25 A.      Yes.

1 Q.    Was that in your call with Ms. Martin that we

2 played earlier today?

3 A.    Yes.

4 Q.    Anybody else you recognize?  There are a lot of

5 pictures.

6 A.    Bridget.

7 Q.    Who?

8 A.    Bridget, my dad's -- my dad's wife.

9 Q.    Where is that?

10 A.    (Witness indicating.)

11 Q.    Okay.  If you would write her name in and

12 initial it and date it, please.

13 A.    (Witness indicating.)

14 Q.    Anyone else?

15 A.    Louie.

16 Q.    Who?

17 A.    Louie.

18 Q.    Okay.  Who's Louie?

19 A.    Friend.  Friend of the family.

20 Q.    I didn't hear you.  Please speak into the

21 microphone.

22 A.    Friend of the family.

23 Q.    Could you, again, write Louis or Louie next to

24 Louie and put your initials and the date?

25 A.    (Witness indicating.)

1   Q.      Is that it?

2   A.      That's all.

3           MS. JOHNSTON:   I have no further questions of

4   this witness.

5           MR. MARTIN:   Just for the record, I've been to

6   the Fourth Circuit.   I renew my earlier objection.

7           THE COURT:   Your objection is noted and

8   overruled.

9           Mr. Montemarano, you may proceed.

10          MR. MONTEMARANO:   Thank you.

11                    **CROSS-EXAMINATION**

12  Q.      Good afternoon, Mr. King.   How are you?

13  A.      All right.

14  Q.      We have never met before; have we?

15  A.      No.

16  Q.      My name is Michael Montemarano.   I represent

17  Paulette Martin.   That's her right here; right?

18  A.      Yes.

19  Q.      I'd like to ask you just a few questions, if I

20  could.   Let's start with your father's untimely

21  passing.   He died at Thanksgiving of 2003; is that

22  correct?

23  A.      The day before Thanksgiving.

24  Q.      The day before.   And if my math serves, that's

25  just about a month after you were arrested in

1 Indianapolis; is that correct, sir?

2 A.     Yes.

3 Q.     And you told -- in response to Ms. Johnston's

4 question, you said your father had been shot; is that

5 correct?

6 A.     Yes.

7 Q.     His shooting didn't have anything do with drugs

8 now; did it?

9 A.     I don't know.  I wasn't there.  I don't know.

10 Q.     You don't know?

11 A.     I don't.

12 Q.     You don't know.  Is that your answer, sir?

13 A.     Yes.

14 Q.     Okay.  Do you remember testifying on the 10th of

15 November, 2004, before a grand jury in this building?

16 A.     Yes.

17 Q.     Do you remember doing that?

18 A.     Excuse me?

19 Q.     Do you remember doing that, testifying before

20 the grand jury here in this courthouse back in 2004, in

21 November?

22 A.     Yes.

23 Q.     Remember being asked questions by Ms. Johnston?

24 A.     Yes.

25 Q.     Do you remember about halfway through your

1  testimony being asked the following question? Tell you

2  what, I'll put it up on the monitor so it will be

3  easier for you to follow along --

4        MS. JOHNSTON:   I'm going to object to it being

5  placed before the jury. He's questioning a witness.

6        THE COURT:   Sustained.

7        MR. MONTEMARANO:   Sure, Your Honor. I'll show

8  it to him then. Exhibit for Defense 2.

9        BY MR. MONTEMARANO:

10 Q.    This will comport be with your recollection;

11 would it not, sir? November 10, 2004?

12 A.    Yes.

13 Q.    Nathan king?

14 A.    Yes.

15 Q.    Okay. That's you; right?

16 A.    Yes.

17 Q.    Page 32 of your testimony. See where you're

18 asked this question? I'm going to read it to you.

19 Now, had you had any discussions with anyone concerning

20 what happened to your father? Remember that question?

21 A.    Yes.

22 Q.    Why don't you read your answer to the ladies and

23 gentlemen of the jury? Speak up, make sure they can

24 hear you.

25        MS. JOHNSTON:   Objection.

1            THE COURT:   Come to the bench.

2                 (At the bar of the court.)

3         MS. JOHNSTON:   I don't know for what purpose

4  this is being offered, but he asked him whether or not

5  he -- how his father had been killed and that it wasn't

6  over drugs, and he said no.  The answer here is not

7  inconsistent with the testimony he gave, so I don't

8  understand where we're going with this.

9         THE COURT:   Let me see what the answer is.

10        MS. JOHNSTON:   And I should advise counsel, if

11  counsel is going to open this door, then it will come

12  out that this witness knows that there was meetings

13  with Lionel Nunn, and that he believes Ms. Martin may

14  have information about his father's death, and that Ms.

15  Martin may have been involved in the whole incident

16  involving how Mr. Brim ended up shot.

17        The case is still open in Los Angeles County,

18  but there are connections -- alleged connections

19  between the second wife, Mr. and Mrs. Nunn, Ms. Brim,

20  his mother, and Ms. Martin.  So, there are connections

21  between all of them.  I don't know that this is where

22  anyone wants to go with this matter, and I just want

23  that clear to counsel.

24        THE COURT:   Mr. Montemarano, I will read, for

25  the record, what the response is that you're trying to

1   get him to read.  The question is now had you -- strike

2   that.

3           Now, had you had discussions with anyone

4   concerning what happened to your father?  The answer

5   you wanted him to read was, I called my grandmother and

6   my aunt and the family, and then they discussed about

7   him getting killed and stuff.  His wife and him was

8   getting a divorce and he -- he was going through that.

9   Now, how is that inconsistent with his testimony?

10          MR. MONTEMARANO:   It continues further where it

11  talks about him going to his stepmother 's home -- Mr.

12  Brim, that is, going to his wife's home, his new wife's

13  home and getting shot by her new boyfriend.

14          MS. JOHNSTON:   The Court can read it.

15          THE COURT:   I'll read it.  It goes on to say,

16  did your father ever tell you that he was concerned

17  about his wife threatening him or hiring anyone to kill

18  him?  Answer:  Well, they had an incident one day.  I

19  was not there.  It was something that he told me.  He

20  went to the house to go see my younger brother, and

21  there was a guy there, and him and Bridget, that was

22  his wife, they had a little heated argument or

23  something, and this guy -- Bridget gave the gun to this

24  guy to shoot my dad a gun.  My dad told me that's what

25  happened and after that the police came.  They told my

1 dad he'd have to leave.  My dad left.  He went back to

2 New York.

3         How is that inconsistent with what he said?

4 This is describing an earlier incident, not his murder.

5         MR. MONTEMARANO:  I'll leave it alone, Your

6 Honor.

7         THE COURT:  Well I'll sustain the objection.

8         MR. MONTEMARANO:  Fair enough.

9         THE COURT:  Wait a minute.  Mr. Montemarano,

10 come back.

11        MR. SUSSMAN:  The mikes are on.  Can we check

12 the microphones?

13        THE COURT:  You're asking the wrong person here.

14 I think the answer is probably yes.  It is probably

15 yes, but I would have to get the IT people up here to

16 answer that question.

17        MR. SUSSMAN:  That's the way --

18        THE COURT:  I profess my lack of confidence on

19 that issue.

20        MS. JOHNSTON:  I don't know if they could just

21 turn off -- if they just turn off the --

22        THE COURT:  In 2A, I know you can.

23        MS. JOHNSTON:  They can see our monitors on our

24 tables.  He was asking if something could be displayed

25 only to the witness and not to the jury, not

1  microphones.

2                    (Back in open court.)

3           THE COURT:   The objection was sustained.   You

4  may proceed.

5           MR. MONTEMARANO:   Thank you, Your Honor.

6           BY MR. MONTEMARANO:

7  Q.        Did you ever speak to your father about the

8  differences he was having with his prior wife?

9           MS. JOHNSTON:   Objection.

10          THE COURT:   Sustained.

11          MR. MONTEMARANO:   Court's indulgence, please.

12          BY MR. MONTEMARANO:

13 Q.        Now, when you were arrested in Indianapolis,

14 that wasn't your -- that's the time you're serving now,

15 right, from 2003; correct, sir?

16 A.        Yes.

17 Q.        That's a 20-year sentence?

18 A.        Yes, it is.

19 Q.        Federal time?

20 A.        Yes, it is.

21 Q.        Non-parole; correct, sir?

22 A.        Yes.

23 Q.        Did you go to trial?

24 A.        No.

25 Q.        Take a plea?

1  A.        Yes, I did.

2  Q.        Did you have a lawyer?

3  A.        I had an appointed lawyer.

4  Q.        Appointed one.  Are you not happy with your

5  appointed lawyer?

6  A.        Yes.  I mean --

7  Q.        You wanted to hire your own; didn't you?

8  A.        Excuse me?

9  Q.        You wanted to hire your own lawyer; did you not,

10 sir?

11 A.        No.  I got appointed one.

12 Q.        The arrest in Indianapolis was not your first

13 arrest; correct, sir?

14 A.        No, it wasn't.

15 Q.        Nor did it result in your first conviction;

16 correct, sir?

17 A.        Right.

18 Q.        Nor did it result in your first conviction for

19 narcotics trafficking; correct, sir?

20 A.        Right.

21 Q.        In fact, your first conviction was in 1985; was

22 it not.

23         MS. JOHNSTON:   Objection, may we approach the

24 bench?

25                   (At bar of the court.)

1        MS. JOHNSTON:   This is that issue that

2 apparently -- I would like a proffer in terms of --

3        MR. WARD:   Whoa, whoa, whoa.   We're not up here

4 yet.

5        THE COURT:   Wait until the whole crew gets in.

6        MS. JOHNSTON:   We should have had this proffer

7 outside of the presence of the jury.   I had asked

8 before what Mr. Montemarano intended to do in terms of

9 the witness' prior record.   We, as a courtesy, gave

10 them a total printout.   We didn't disclose -- he didn't

11 disclose to us, as is required by the rule, what prior

12 convictions he was going to rely on, and we are

13 entitled to advance notice.

14        I've had to object in front of the jury.   It

15 looks like the government is trying to hide something.

16 I don't know what he's going to ask him about, if it's

17 a littering conviction, a possession of marijuana

18 conviction, if it's a drug trafficking conviction, but

19 to do this in front of the jury without giving the

20 government prior notice is inappropriate.

21        THE COURT:   Where do you intend to go with this,

22 Mr. Montemarano?

23        MR. MONTEMARANO:   Excuse me?

24        THE COURT:   Where do you intend to go with this?

25        MR. MONTEMARANO:   I'm going to lay out to the

1   Court, that based upon the material provided by the

2   government, a criminal record printout as well as prior

3   questioning of Mr. King under oath, he has a 1985

4   possession of cocaine conviction in D.C.; he has a

5   1986 assault with a deadly weapon in D.C.; 1987, he

6   has a threatening in 1989, and he denies it, at least

7   on -- it's virtually identical to the Indianapolis --

8   virtually identical. Just change the location and it

9   sounds the same. About 15 kilograms of cocaine inside

10  the sleeper of his truck, et cetera. Stopped by the

11  local police on a traffic stop; search incident with

12  consent leads to the seizure and he gets six years in

13  Mississippi for that. He gets out in either 2000 or

14  2002.

15        I was going to inquire about that because the

16  material provided by the government suggests 2002.

17  However, he testified previously under oath, he gets in

18  and out 2000, and then the arrest at the end of 2003

19  for the identical crime as in Mississippi.

20        MS. JOHNSTON: Your Honor, perhaps it might be

21  appropriate to take the afternoon recess for the jury

22  so that they're not sitting here while we have this

23  discussion.

24        THE COURT: Why don't we do that and we can

25  continue this discussion? I will tell them to break

1 until about a quarter till.

2        MR. MARTIN:   Your Honor, my issue remains --

3        THE COURT:   I will tell them we will talk while

4 they're out and we will take a brief break.

5                    (Back in open court.)

6        THE COURT:   Ladies and gentlemen, I'm going to

7 let you recess until quarter of 4:00.

8                    (Jury excused at 3:30 p.m.)

9        MR. MCKNETT:   Your Honor, may Ms. Ali step out?

10        THE COURT:   Ms. Ali you have a right to be

11 present. If you want to step out while we have this

12 argument, you may do so. Let the record reflect she

13 waives her right to be present during this discussion

14 on the issue that's been raised.

15        All right. Counsel, settle down so we can

16 proceed on this. I have received but have not had a

17 chance to study the notice filed by counsel for Learley

18 Reed Goodwin with respect to all government witnesses,

19 that include but not limited to Horace Smith, who we

20 haven't reached yet, but I'm assuming that the issue

21 identified in this Notice of Intent and the

22 government's opposition to it is the same issue on this

23 witness; is that correct?

24        MS. GREENBERG:   Yes, Your Honor. Just for the

25 record, we got that, I think, around noon today.

1          THE  COURT:    This  notice?

2          MR.  MARTIN:    It  was  during  the  morning  break  at

3  11:30.

4          MS.  GREENBERG:    Okay.  11:30,  not  noon,  but  for

5  the  record,  that's  when  we  got  that.

6          THE  COURT:    I  have  a  case  that  may  be  germane  to

7  this,  United  States  versus  Vgeri,  V G E R I,  and  --

8          MR.  MONTEMARANO:    Is  there  a  cite,  Your  Honor?

9          THE  COURT:    I'm  getting  there.    51  F.3d,  876

10  from  the  9th  Circuit.    Tell  me,  Ms.  Johnston  or  Ms.

11  Greenberg,  what  your  position  is  on  this  issue?

12          MS.  JOHNSTON:    Your  Honor,  I  think  Ms.  Greenberg

13  can  address  it  in  terms  of  Mr.  Goodwin's  claim  in  terms

14  of  Horace  Smith  in  terms  of  Mr.  Montemarano's  attempt

15  with  Mr.  Nathan  king.

16          In  terms  of  the  question  asked  in  front  of  the

17  jury,  as  to  that  question,  the  government  will  withdraw

18  its  objection  because  the  question  has  already  been

19  before  the  jury  and  the  government  doesn't  want  the

20  jury  to  think  that  it  is  hiding  something  in  terms  of

21  Mr.  King's  criminal  history.

22          However,  the  government  objects  to  any  further

23  questioning  about  any  of  his  other  arrests  and

24  convictions  up  to  his  conviction  that  he  sustained  in

25  Mississippi  in  1995.    There  were  several  that  counsel

1  rattled off.  We have not received any notice as is
2  required under 609 for any convictions that are more
3  than ten years lapsed, and we're entitled to advance
4  written notice, and that's not been complied with.  So
5  that's the government 's position as it applies to Mr.
6  King.
7        Ms. Greenberg provided the Court and counsel
8  with a copy of that Ninth Circuit opinion, which also
9  quotes a Third Circuit opinion saying that not giving
10  advanced notice is certainly a basis to exclude the
11  testimony.  I didn't quickly jot down what Mr.
12  Montemarano said at the bench, but there are such
13  things as possession of marijuana and --
14        MR. MONTEMARANO:  Cocaine.
15        MS. JOHNSTON:   Excuse me?
16        MR. MONTEMARANO:  Cocaine.
17        MS. JOHNSTON:  Possession of cocaine.  I assume
18  he's saying there was a conviction, that there was also
19  a charge of a threat or an assault with a deadly weapon
20  that are all old convictions well outside that ten-year
21  limit time period.  We have not been given any notice
22  of his intent to use those convictions.
23  Counsel has known of those convictions since we
24  provided Jenks, which would have been available to him
25  a week prior to the start of the trial date, which was

1 June 6th, and we didn't get notice of that.  Had we

2 gotten notice of it, we would have asked the Court to

3 rule.

4        We could have brought it out in our direct

5 examination.  That's why the rule is there, but because

6 we were not given notice of his intent to do so, we did

7 not cover those issues in direct examination, and so

8 now to allow him to do it in cross-examination  in

9 violation of the notice requirement, we believe, is not

10 appropriate.

11        MS. GREENBERG:   Your Honor, may I add to that?

12 This came up with Mr. Martin's witness, and just to

13 complete everything on the government 's behalf before

14 he speaks.  Your Honor, the case was just pulled out

15 today because we, again, received the notice at 11:30,

16 the 9th Circuit case, and even the 9th Circuit said

17 that when somebody had one full business day to provide

18 the requisite notice, it was insufficient to have them

19 leave to cross-examine that person that day without

20 providing the notice.  In this case, we gave out Jenks

21 approximately  three weeks ago -- week before trial, so

22 it's about three weeks ago; is that correct Ms.

23 Johnston?

24        MR. MARTIN:   It was May 31.

25        MS. GREENBERG:   Two weeks, and it was during

1  this morning when Mr. Martin and I had a conversation

2  where he advised me that he was going to rely on 1991

3  convictions as to Mr. Smith.  They relate to burglary

4  and larceny-type offenses, not the type of offenses

5  that are on trial here.

6        Your Honor, the ten-year requirement is listed

7  specifically in 609(b) and it requires sufficient

8  advance written notice.  We had given written notice to

9  each of the defendants about the nature and substance

10  of their convictions.  So not only is the timing

11  incorrect in this case, but the substance of the notice

12  does not give the government notice about what

13  convictions are more than ten years old that the

14  defense wants to rely on, so just on both prongs, the

15  sufficiency of the notice and the timing in the notice

16  are inappropriate and unallowed for cross-examination

17  because they don't comply with the rule.

18        MR. MARTIN:  May I approach before responding,

19  Your Honor?

20        THE COURT:  Sure.

21        MR. MARTIN:  What government is referring to and

22  --

23        THE COURT:  Can I see the exhibit?

24        MR. MARTIN:  Yes.

25        On May 31, 2006, the defense received discovery

1 from the government , including the Jenks information
2 that was just referred to by Madam Trial Counsel . Your
3 Honor , what you have now in front of you is the Jenks
4 material , in no particular order , I might add , despite
5 what the government has represent ed earlier , and next
6 to that you see one , two, three, four,  five reams of
7 copy paper , each ream having , I guess, about 500
8 sheet s.
9        The point being , there were over 3,000 page s
10 that were submitted to the defense that we had to spend
11 time put ting in some kind of discern able order .  Now ,
12 the government has also mention ed that I'm reach ing
13 back to 1991 to talk about crime s of dis honesty , to go
14 to his credibility , his trust worthiness .   The fact of
15 the have mat ter is,  I'm reach ing back to crime s that
16 start in 1995, go through 1997, that isn't the real
17 issue .
18        The real issue is whether or not there is
19 surprise here and whether or not there is sufficient
20 notice .  The government certain ly can't claim that
21 they're surprise d I intend ed to use this information in
22 my cross-examination  because they provided it to us ,
23 but they didn't provide it to us in a way that was
24 going to leap off the page or leap from outside those
25 3,000 page s that they --

1         THE COURT:   You're basically saying that they
2 gave you hay stack.
3         MR. MARTIN:   They gave us a hay stack.  We found
4 a needle, and to my surprise, that is the first time in
5 years I've had a government counsel tell me I'm not
6 going to let you cross-examine him on that because you
7 didn't give me written notice.  I do admit I gave her
8 written notice this morning, but Your Honor, the whole
9 point behind 404(b) and 609(b) is to avoid surprise.
10 And the real question here is whether or not they have
11 gotten sufficient notice that the defense intends to
12 use.
13         THE COURT:   What is your --
14         MR. MARTIN:   Your Honor, please.
15         THE COURT:   Just one question is on my mind.
16 Let me hear what your answer is.  Their position is
17 that, among others, the purpose of this notice
18 requirement is to allow them to bring it out themselves
19 on direct examination, and when you don't give it to
20 them early enough, they -- you can't effectively do
21 that with the witness.  What is your response to that?
22         MR. MARTIN:   They can recall the witness.  He's
23 subject to withdrawal.  Presumably -- Mr. Smith hasn't
24 taken the stand yet.  Mr. Nathan King is still here,
25 but if Your Honor would let me continue with my

1  argument .

2          The  case  that  they  cite  out  in  the  9th  Circuit

3  was  one  where  the  witness  was  on  the  stand  very  similar

4  to  as  we  have  here  now , and  the  defense  counsel

5  attempt ed  to  cross -examine  that  witness  regard ing

6  earlier  mis conduct s  and  earlier  convictions , and  the

7  Court  said , no, we're  not  going  to  allow  you  leave  to

8  do  that  at  this  point  because  the  government  didn't

9  have  any  notice .

10          We  don't  know  if  the  defense  actual ly  got  this

11  information  or  if  they  got  the  information  from  the

12  government  as  is  the  case  here . They  had  it , they  gave

13  it  to  us . There  is  no  surprise . Your  Honor , you've

14  got  to  read  404(b)  and  609(b)  together , and  the  reason

15  you  have  to  do  that  is  because  the  two  essentially  have

16  the  same  purpose .

17          One , you  know , regards  to  the  accused , the  other

18  one  regards  witness es . You  will  notice  under  404(b),

19  there  is  no  written  requirement  that  burden  is  only

20  place d  upon  the  defense , otherwise  the  government  could

21  have  come  over  to  me  and  give n  me  oral  notice  a  few

22  days  before , and  I, as  a  courtesy , have  always  given

23  the  government  oral  notice , but  this  time  they're

24  say ing , no, we  want  it  in  writing , so  I  gave  it  to  them

25  in  writing .

1        She didn't say she was surprised.  She didn't
2 say that there's nothing that she can do to counter it.
3 She hasn't argued any prejudice whatsoever, and I
4 submit to you that I've complied with the rule.  The
5 rule doesn't state to give notice within a specific
6 period of time, otherwise I lose the right to do it.
7 It just says that it has to be in writing, and we've
8 done that.
9        I would ask the Court that because the
10 government has argued no prejudice here, and I've
11 complied with the rule, that Mr. Goodwin be allowed to
12 cross-examine Mr. Horace Smith with respect to his
13 prior acts of misconduct that go directly to his
14 credibility.
15        MR. MONTEMARANO:  Your Honor, if I may.
16        THE COURT:  You may.
17        MR. MONTEMARANO:  I'd like to supplement Mr.
18 Martin's comments with certain ones more relevant to my
19 position.
20        Initially, when the Jenks became an issue, I
21 brought it to the Court's attention and to Ms.
22 Johnston's attention, by letter to Ms. Johnston, which
23 I faxed to chambers.  When it was raised initially at
24 the beginning of the trial, Your Honor said you would
25 address it on a witness-by-witness basis.  The

1 government had its chance to demand notice at that

2 point.

3        We made clear we could not make sense of this

4 material interwoven together in a way that we were not

5 able to understand or ascertain.  I will tell the Court

6 as an officer of the court, I've got almost a third of

7 the Jenks that I haven't even managed to figure out

8 where it goes yet.  I've got Jenks that I have in files

9 with labels on them that have no relation to the stuff

10 the government claims is there because I don't

11 understand what it's about.

12        Now, that photograph was taken in my office by

13 me with my digital camera before I began with the Jenks

14 so I would have a record of what we received.  It was

15 not Bates-stamped.  This would easily be a solvable

16 problem if I could point the government to a particular

17 page, Page 2742.  We can't do that.

18        Your Honor has said we'll address it as each

19 witness comes up.  The government, being happy with

20 that, cannot now claim there is no prior notice.  We

21 brought it up and gave the government a chance to get

22 well out in front on this issue when it happened, and

23 indeed, the defense in this case, because of the

24 wonders of electronic mail, has been in constant

25 contact with --

1          THE  COURT:   Let me ask you this , Mr.

2  Montemarano :  I did make notes and couldn't keep track

3  of the specific things you wanted to talk about .

4          MR. MONTEMARANO :  Yes, sir .

5          THE  COURT:   I couldn't tell which of these were

6  more than ten and which ones were less than ten from

7  pure memory , but let me ask you this:   Assume  you

8  prevail on this argument .  We still get to the question

9  of whether a ten-year conviction  comes in or not under

10  the test of the probative  value outweighs the

11  prejudicial  effect .  What's your position on that ,

12  assuming you win on the argument  being made by the

13  government .

14          MR.  MONTEMARANO:   For starters, Ms. Johnston 's

15  suggestion  that 1996 is the limit is patently wrong .

16  The limit would be, by any sort of mathematic s, 1989 or

17  1990.  Mr. King has spent seven of the last ten years

18  under lock and key.  That tolls the ten-year -- he went

19  away in Mississippi  in '96, came out in 2000 or '02, at

20  least four to five years there , and has been locked up

21  for three years on the incident conviction,  which he's

22  current ly serving time .  So we're going back at least

23  to '90, and probably to '88.  Let's split the

24  difference  and say '89.

25          The only convictions  beyond that limit are one

1  in '85 for cocaine.  He has said to the grand jury, I

2  didn't get involved in cocaine until '88 or '89.  I

3  suggest that is specifically admissible to rebut his

4  claim under oath.  And in '86 it's clearly a crime of

5  moral turpitude, assault with a deadly weapon.  Now if

6  Ms. Johnston did not understand I was going to go into

7  this, I suggest that the claim is rather disingenuous.

8  The replication that this is being done by a

9  Mississippi prosecutor when Mr. King takes a stand in

10 the 1996 Mississippi case and a Motion to Suppress

11 where, under oath, Mr. King lies to a judge out there

12 is set out in the material they gave to us.

13         THE COURT:  Mr. Montemarano, let me cut you off.

14         MR. MARTIN:  Your Honor, would you like me to

15 tell you --

16         THE COURT:  Gentlemen, do not snatch defeat from

17 the jaws of victory.  Stop.  Stop right there.  All

18 right.  I have reviewed this.  There's a two-step

19 process I'm required to go through.

20         I certainly think that the probative value of

21 these convictions outweighs the prejudicial effect; and

22 secondly, under the circumstances of the notice in this

23 case, the notification came from the government.  And

24 while it might have been nice for them to bring this

25 out on direct, I don't agree that this is a matter that

1  would be governed by the case from the 9th Circuit

2  that's been brought to my attention.

3        In addition, the question there was whether it

4  was an abusive of discretion to deny cross-examination.

5  I view this as discretionary and I will permit the

6  cross-examination.  All right.  Now, we're going to

7  take a five-minute recess.

8        MR. MONTEMARANO:  Your Honor, while we're on

9  this subject, again, I don't want to snatch defeat.

10       THE COURT:  Don't snatch defeat.

11       MR. MONTEMARANO:  Yes, sir.  However can we be

12  clear how far back I'm going to be permitted to go, or

13  can we do that after the break?

14       MS. JOHNSTON:  Can we have some notice of what

15  he's going to go into, even though we haven't been

16  given the notice we're entitled to under the rule?

17  Whether we provided him the document or not, we don't

18  know what he's going to use.

19       THE COURT:  Mr. Montemarano, will you please

20  give her some notice of what you're going to do?

21       MR. MONTEMARANO:  I will.

22       THE COURT:  You had some notes there.

23       MR. MONTEMARANO:  Yes, sir.

24       THE COURT:  If you need to write them down and

25  give them to her, give them to her, and it would help

1 if you wrote it down and gave it to me, too, so I can

2 take a look at it.

3          MR. MONTEMARANO:   Absolutely, Your Honor.

4          THE COURT:   And if you want to have a copy made,

5 we'll make copies for you, but I need to see them.   And

6 what you should do is to make certain you go with the

7 younger than tens first.   And then I will take a look

8 in more detail.

9          MS. JOHNSTON:   Your Honor, can we have an Order

10 from the Court that we receive notice of what they

11 intend to use for all future witnesses at least a

12 business day prior to them calling those witnesses?

13          THE COURT:   Counsel, I want you to give Ms.

14 Johnston notice of what specific things you intend to

15 use at least a day before so we don't have this food

16 fight again.   All right?

17          MR. HALL:   Of course, Your Honor, we don't know

18 --

19          MR. WARD:   As soon as we get notice of what

20 witnesses are going to be, Your Honor.

21          MS. JOHNSTON:   Your Honor, they have been

22 getting notice of who the witnesses are going to be and

23 they have --

24          THE COURT:   If there's a problem, Mr. Ward, you

25 let me know.

1          MR. WARD:   If we get notice the next day, we

2   will give responsive notice, I mean when we know who

3   they're going to call.

4          THE COURT:   The faster they give you the notice,

5   the faster you can give notice back because I don't

6   want to have trial by ambush and surprise.   If I have

7   to stretch it out that they get two days' notice to

8   secure this problem, I'll do it.   I'm not prepared to

9   do that yet.   I'm asking you-all to behave yourselves.

10  Counsel, I'm going to take a precisely five-minute

11  recess.   I want to have this jury back in here at ten

12  minutes of.

13                  (Off the record at 3:46 p.m.)

14                  (On the record at 3:56 p.m.)

15         THE COURT:   Please be seated.   All right.   All

16  right.   Now, Mr. Montemarano, I have the list here of

17  three convictions that I assume are ones -- please be

18  seated -- that are ones that have a -- the completion

19  of confinement more than ten years ago?

20         MR. MONTEMARANO:   Correct

21         THE COURT:   Correct?   And the other ones are all

22  within the ten years; correct?

23         MR. MONTEMARANO:   Yes, sir.

24         THE COURT:   What are the specific facts and

25  circumstances that outweigh prejudicial effect on these

1 three ?

2       MR. MONTEMARANO :  Court's indulgence , just for a

3 second , because I want to make sure I'm giving the

4 correct reference to the Court .

5       1986 -- excuse me , 1985, he was arrested in

6 Washington for possession of -- depending on when you

7 ask him in 1996, my understanding is that he admits to

8 having been possession of cocaine .

9       THE COURT:  Let me ask you this :  You referred ,

10 I thought in your colloquy , to grand jury testimony .

11 You weren't referring to his direct testimony ; were

12 you ?

13       MR. MONTEMARANO :  This is -- so the Court is

14 clear , Mr. King testifies in 1996 on the 19th of

15 September .

16       THE COURT:  Excuse me , can you take the witness

17 back out for a few minutes ?  While we're taking him

18 out , I want to tell you that I'm pleased to advise you

19 that we now can switch off the monitors for the jury .

20 We now know how to do it.  So if we need to turn them

21 off , we'll turn them off when the appropriate time

22 comes.  All right .  I didn't think it was appropriate

23 to do it with him --

24       MR. MONTEMARANO :  You're right , Your Honor .  I

25 should have thought of that .

1             THE COURT:   Go ahead.

2             MR. MONTEMARANO:    This comes from

3  cross-examination.

4             THE COURT:   During what, the grand jury?

5             MR. MONTEMARANO:    In a Motion to Suppress in the

6  Mississippi arrest in 1996 where he is quizzed about

7  his prior record, and he admits to many an '85

8  conviction in D. C., and '86 conviction in D. C., and

9  an '87 PWID in Maryland.  The '86 was assault with a

10 deadly weapon; the 85 was possession, apparently it

11 says cocaine.  I cannot find the reference, and I did

12 not highlight my copy, but when he's asked in front of

13 our grand jury here, he admits to selling marijuana and

14 PCP at the time.  So he certainly admits to having done

15 it, but I believe --

16            THE COURT:   He hasn't testified to that on

17 direct today.

18            MR. MONTEMARANO:    No.

19            THE COURT:   So how is it impeachment of what he

20 said today?

21            MR. MONTEMARANO:    It's a question of his

22 character.  His prior narcotics distribution going back

23 ten years before the Mississippi arrest, which he's

24 freely admit today previously under oath, either in

25 front of the grand jury or in Mississippi.

1          THE  COURT:   Okay .  So that  is your  answer  with

2 respect  to all  three  of these  convictions ?

3          MR.  MONTEMARANO :  Yes , Your  Honor .

4          THE  COURT:  Ms.  Johnston .

5          MS.  JOHNSTON:   Your  Honor , my problem  is sort  of

6 two-fold .  One  is that  I don't know   if counsel  is going

7 to intend  to say  that  he lied between  -- before  the

8 grand  jury because  he said  one thing  in Mississippi  and

9 another  thing  in the grand  jury , which  we would  object

10 to because  that 's not  impeach ing  him concern ing  his

11 testimony  here  today .  That  would  be evidence  of

12 extraneous  matter s that  are not  before  this  jury .

13          So , if that 's what  counsel  is intend ing  to , then

14 I would  object  to that .  We still  object  to the use  of

15 these  convictions  because  of the issue  with  609 .  They

16 don't go to his  credibility  as a witness .  They go to

17 the fact  that  he is an admitted  drug  deal er , which  he

18 has admitted  in the past , and I told  the Court  I was

19 going  to withdraw  my objection  to the first  question

20 because  -- I will  do that  in front  of the jury because

21 if the Court  is going  to let  it in, I should  have  had

22 notice .  We would  have  brought  it out  in our  case , so I

23 don't -- I want  to limit  the prejudice  the government

24 is going  to incur with  the jury for having  not  bring ing

25 it out .

1        THE COURT:   I will permit you to withdraw it.

2        MS. JOHNSTON:   I think it's improper for counsel

3   to introduce evidence of specific prior incident s where

4   the defense counsel think s he can prove that a witness

5   has lied because I don't think that 's the proper manner

6   of impeach ing him.

7        THE COURT:   I think you can impeach him with

8   respect to matter s that he lied about today in his

9   direct testimony.  Now, it may very well be that you

10  impeach him with something he said in a transcript in a

11  Mississippi proceed ing, but I don't know why it would

12  be appropriate to go into his later grand jury

13  testimony and delve into inconsistenci es there.

14       I mean , you're using this examination for the

15  purpose of impeach ing him as a witness today based on

16  what he said today, and I don't think you should go

17  that far, Mr. Montemarano.  So if you would, you may,

18  as I've already indicated, use the young er convictions.

19  She's going to withdraw her objection in any event as

20  to the more than ten-year-old convictions.

21       You may use them in examination of this witness.

22  If he deny s them, you can use the transcript from

23  Mississippi you just mention ed.  I don't think we need

24  to go into that.  He said something late r in front of

25  the grand jury here that 's inconsistent with the

1 Mississippi .

2          MR. MONTEMARANO :  My proffer  of the Court  is  if

3 he told  the  grand  jury  he  got  involve d  in  cocaine   in

4 '88 or '89.

5          THE COURT:   And you know  it happened  earlier

6 than that ?

7          MR. MONTEMARANO :  He's already  admitted  it.   I

8 would intend  before  I get  to that  question  to inquire

9 about his '86 Mississippi  possession .

10          THE COURT:   If he says  something  inconsistent

11 that that would  go to, if  he says  something  on cross

12 that's inconsistent , you can pound  him in two on that.

13          MR. MONTEMARANO :   Thank you , Your  Honor .

14          THE COURT:   Until  he says  something  that's

15 inconsistent .   I mean , let's see  where  he goes  with it.

16          MR. MONTEMARANO :  I think  I understand .

17          THE COURT:   Look , we're  going  be argui ng until

18 4:30 , and then  we're  going  to send  the  jury  home .   I

19 don't want  to go too  long .

20          MS. JOHNSTON:    The problem  now  is counsel  is

21 asking him a question  about  another  act . He should  be

22 bound by his answer s because  it's not something  that

23 goes to his direct  examination . He is going  to ask him

24 about statement s that he may  have  made  in Mississippi

25 before  -- during  a motion s hear ing about  his  criminal

1 history .

2        THE  COURT:   He's not going to go there unless

3 the witness denys the conviction .

4        MS. JOHNSTON:   I just want to make sure that

5 that's --

6        MR. MONTEMARANO:   That's what I understood , Your

7 Honor .

8        THE  COURT:   My ruling , hoping that I'm right , is

9 that you may inquire as to these convictions , and I'm

10 going to give you latitude to do that , but I don't want

11 to have you wandering off into transcript s if you don't

12 need to.  If the witness says yes, sir , I was convict ed

13 of that and that's what it said in Mississippi , you

14 don't wander into that Mississippi  transcript .

15        MR. MONTEMARANO:   Of course not .

16        THE COURT:   All right .  Bring the jury in.

17        Let me remind you , Counsel , that the jury will

18 be here at 10:00 .  I'm going to ask that everybody be

19 here by quarter of 10:00, just in case pesky little

20 matter s arise that you would like to bring to my

21 attention , so I will be on the bench at 9:00 with a

22 guilty plea , so I should be finish ed up by quarter of

23 10:00 at the latest unless the defendant is late or

24 something .

25             (Witness resume s the stand .)

1                 (Jury returns at 4:04 p.m.)

2          THE COURT:  All right, you may proceed.

3          MR. MONTEMARANO:  Thank you, your Honor.

4          THE COURT:  Ms. Johnston?

5          MS. JOHNSTON:  Your Honor, based on the

6  additional information the government received, the

7  government will withdraw its objection.

8          THE COURT:  All right.  The objection is

9  withdrawn.  You may proceed, Mr. Montemarano.

10          MR. MONTEMARANO:  Thank you, Your Honor.

11          BY MR. MONTEMARANO:

12  Q.     Okay.  Let's re-establish where you are, Mr.

13  King.  You're right now doing 20-year, non-parole

14  federal sentence from your arrest and conviction in

15  Indianapolis; correct, sir?

16  A.     Yes.

17  Q.     That was for about 17 and half kilograms of

18  cocaine, give or take?

19  A.     Yes.

20  Q.     Under the sleeper of your cab; correct, sir?

21  A.     Yes.

22  Q.     It's fair to say that's not your first arrest

23  under those circumstances?

24  A.     No.

25  Q.     Not your first conviction under those

1 circumstance s; correct , sir?

2 A.      No.

3 Q.      1996, almost the same thing happened to you in

4 Pearl , Mississippi ; did it not , sir?

5 A.      Yes.

6 Q.      You received a six-year sentence from that?

7 A.      Yes, I did.

8 Q.      You got out about when, if you recall?   2000?

9 2002?

10 A.      Two -- about 2000, 2001?

11 Q.      2000 or 2001.  So it would be fair you hadn't

12 been on the street for more than maybe two years tops

13 when you were picked up in Indianapolis ?

14 A.      Yes.

15 Q.      Okay.  And your 1996 arrest in Mississippi , that

16 wasn't your first involvement in cocaine; was it, sir?

17 A.      Yes, it -- I had a PCP charge.   That was it.

18 Q.      When did you start dealing cocaine ?

19 A.      It was back in 1996.  I mean, between -- I got

20 caught -- I got busted in '96, arrested in '96.

21 Between '94 and '96.

22 Q.      You didn't start dealing cocaine in '88 or '89?

23 A.      No.

24 Q.      Out of abundance of caution , may we approach ,

25 Your Honor ?

1          THE  COURT:   You  may.

2                 (At the bar of the Court.)

3          MR.  MONTEMARANO :   My  copy  to --

4          THE  COURT:   Okay.

5          MR.  MONTEMARANO :   After  his  arrest , is  there  a

6  prior  arrest  in  D. C. ?  Did  there  come  a  time  when  you

7  got  involve d  in  cocaine ?  Yes, sir .  Approximately   when

8  was  that ?  Approximately  --  had  to  be  about  '89.  He

9  just  said  '96.

10         MS.  JOHNSTON:   I  think  it  goes  on  in  the  grand

11  jury  to  explain  he  was  the  middleman .

12         THE  COURT:   You  may  want  to  clear  that  up.

13         MR.  MONTEMARANO :   Fair  enough .

14         THE  COURT:   I  mean , it  sounds  to  me  like  he's

15  interpret ing  your  question  to  be  when  you're  deal ing,

16  and  he  may  think  that  there 's  much  more  a  quantity  he

17  was n't  deal ing .

18         MR.  MONTEMARANO :   That 's  fair .

19         THE  COURT:   And  it  goes  into  another  matter .

20         MR.  MONTEMARANO :   I  totally  agree  and  thought  I

21  would  approach .

22                 (Back  in  open  court .)

23         BY  MR.  MONTEMARANO :

24  Q.    Let  me  ask  the  question  a  little  different ly,

25  Mr.  King , because  I  don't  want  to  confuse  you .  Before

1   1996, the arrest in Mississippi, were you involved with

2   cocaine in any way?

3   A.      Basics.

4   Q.      Do you recall testifying in front of the grand

5   jury here in this courthouse?

6   A.      I don't recall.

7   Q.      Let's cut right to the chase.  Do you remember

8   Ms. Johnston asking you was there a time when you got

9   involved with cocaine, and you're telling her about

10  1989?  Does that refresh your recollection?  Does that

11  sound wrong?

12  A.      Yeah.  I got picked up -- I was charged, but I

13  never got charged on the charge.

14  Q.      Just asked you if you were involved.  Just

15  because you don't get caught doesn't mean you're not

16  involved; does it, sir?

17  A.      Listen, I was at a house.  I was on a block.

18  They sweeped the whole block and went to court of

19  what's his name.  I never got charged for that.  I was

20  on the block when they came and swept the whole

21  neighborhood.  They locked everybody up on the block.

22  Q.      So you weren't charged?

23  A.      No, I wasn't charged.

24  Q.      How about in 1987 in Maryland, were you charged

25  there?

1  A.      Yeah, what's his name charged, PCP --

2  Q.      Is that with intent?

3  A.      The PCP charge?

4  Q.      PCP, not cocaine.

5  A.      No.

6  Q.      And that '87 charge, you would have been, let me

7  see if my math serves, 22?

8  A.      I was about 21 years old when I got my charge.

9  Q.      You're 41 now?

10  A.      Right, yes.

11  Q.      It's fair to say you've been involved with

12  drugs, one way or another, for about 20 years?

13  A.      Yes, you could say that.

14  Q.      Now, it's your testimony that you're repeatedly

15  bringing drugs to Maryland on behalf of your father for

16  Ms. Martin; is that a correct statement?

17  A.      Yes.

18  Q.      Every time you bring the drugs, Ms. Martin pays

19  you; is that a correct statement?

20  A.      She paid when -- she pays when I'd come back.

21  Q.      But when she came and gave you something,

22  correct -- rather, when you came and gave her

23  something, she did not give you money in return at that

24  point; is that correct?

25  A.      No.

1  Q.      And you testified on direct that she couldn't
2  pay then; isn't that what you said?  Correct?

3  A.      Right.

4  Q.      But it's your testimony that she eventually paid
5  your father; correct?

6  A.      Yes.

7  Q.      In fact, she wasn't paying you; correct?  She
8  was paying your dad?

9  A.      Right.

10 Q.      That's Steve Brim.

11 A.      Yes.

12 Q.      In fact, it's your testimony that you would haul
13 the cocaine cross-country.  What is that, three- or
14 four-day trip?  Three-day trip?

15 A.      Four-day trip.

16 Q.      Four-day trip, and then you'd haul the money
17 back to LA, another four-day trip?

18 A.      Yes.

19 Q.      You never looked in those duffel bags full of
20 money; correct, sir?

21 A.      No.

22 Q.      You never knew what was inside; correct?

23 A.      I knew there was money in there.

24 Q.      You understood it was money, but you never
25 looked; correct?

1  A.      Right.

2  Q.      There came a time when you were hauling not just

3  $20,000, but $200,000 back across the country in the

4  sleeper cab of your truck; correct, sir?

5  A.      Yes.

6  Q.      You had a flat tire in Arizona, was it?

7  A.      Yes.

8  Q.      Where in Arizona was it exactly?

9  A.      Eloy.

10  Q.      Excuse me?

11  A.      Eloy.

12  Q.      Eloy, that's it.  My memory is fading, I'm

13  afraid, sir.  In Eloy, Arizona, you're stuck; correct,

14  sir?

15  A.      Right.

16  Q.      Arizona, that's right next door to California,

17  you're most of the way home?

18  A.      Yes.

19  Q.      You have to pick up the phone to call somebody

20  to give you some help with that flat tire; right?

21  A.      Yes.

22  Q.      Tires for a big old tractor-trailer like yours,

23  they're not cheap.  They cost a couple hundred dollars

24  or something?

25  A.      Yes, they do.

1 Q.      You picked up the phone and you called Paulette

2 Martin to get help with your flat tire; correct, sir?

3 A.      Yes.

4 Q.      This is while you're making this trip back to

5 California with $200,000 in cash sitting under your

6 hinny because you're, like, sitting -- no, that's the

7 sleeper that's back here, so it's, like, right behind

8 you; right?

9        Sir, you're driving along, there's $200,000 back

10 here; correct, sir?

11 A.      Yes.

12 Q.      So you went all the way to the phone, picked up

13 the phone and called Paulette Martin; right?  Right?

14 A.      Yeah.

15 Q.      And she went to Western Union and sent you $200;

16 is that right?

17 A.      Excuse me, can I have a minute?

18 Q.      Please.

19 A.      When you said that with the money that Ms.

20 Martin send me, I wasn't hauling no money back.  Not

21 every time I come up here, that doesn't mean I was

22 hauling drugs to her.

23 Q.      You testified on direct you were going back with

24 a cab full of money and got a flat tire, sir.

25        MS. JOHNSTON:   Objection.

1          THE WITNESS:   No, sir.

2          MS. JOHNSTON:   I'll withdraw it.

3          BY MR. MONTEMARANO:

4 Q.      Now you're telling us that trip wasn't with

5 money?

6 A.      No.

7 Q.      Court's indulgence.

8          Now, remember being asked some questions about

9 one of the calls, and Ms. Martin discussing Alicia Keys

10 and promoting concerts?  Do you remember that?

11 A.      Yes.

12 Q.      At the time you're talking to her, you're locked

13 up; is that a fair statement?

14 A.      Yes.

15 Q.      So you're saying you didn't know anything about

16 that; is that correct?  You didn't know anything about

17 her involvement with concerts; is that correct?

18 A.      No, I didn't.

19 Q.      In fact, when you're on the phone with her,

20 you're talking about things that are important to you;

21 correct, sir?

22 A.      Yes.

23 Q.      They're not giving you furloughs from the Marion

24 County jail to go concerts, now; are you?

25 A.      No.

1  Q.       In fact, that's not the only phone call you
2  talked to her about concerts, did you?
3  A.       I recall that was it.
4  Q.       You don't recall there being anywhere else in
5  any of the phone calls you talked to her about
6  concerts?
7  A.       No.
8  Q.       You don't recall?
9          MR. MONTEMARANO:    Your Honor, if could ask Task
10 Force Officer Eveler to cue up Phone Call No. 2 --
11 excuse me, Phone Call No. 1 at Page -- Court's
12 indulgence, please -- Page 6.  It's right about where
13 the government stopped playing that call.  Why don't we
14 go from there?  Can you do that, Task Force Officer
15 Eveler -- or Detective Eveler; is that more correct?
16         DETECTIVE EVELER:   Either one.
17         MR. MONTEMARANO:    This is on Page 6 of your
18 transcript, ladies and gentlemen of the jury   .   Towards
19 the bottom of the page.
20         DETECTIVE EVELER:   I said yes, but --
21         MR. MONTEMARANO:    Take your time.  Appreciate
22 your assistance.
23         MS. JOHNSTON:   Perhaps Counsel could move to
24 another area of cross-examination  and we can get the
25 computer booted up and turned on.  We didn't know it

1  was going to be needed.

2          THE COURT:  We'll have him holler when he's

3  ready.

4          MR. MONTEMARANO:  That's fine, Your Honor.

5  Thank you.

6          BY MR. MONTEMARANO:

7  Q.      You told us that your trips back here to deliver

8  cocaine to Paulette Martin were undertaken with this

9  gentleman by the name of Louis; correct?

10 A.      Yes.

11 Q.      And unless I'm very wrong, you told the

12 government and the grand jury what you knew about

13 Louis, right?

14 A.      Yes.

15 Q.      You told them he's African-American; correct?

16 A.      Yes, he is.

17 Q.      Age 54, give or take?

18 A.      Yes.

19 Q.      About 5'9", right?

20 A.      Yes.

21 Q.      About 200 pounds, 210, something like that?

22 A.      Yes.

23 Q.      You don't know his last name.

24 A.      No, I don't.

25 Q.      You don't know where he lives?

1  A.      No, I don't.

2  Q.      You don't know if he's married?

3  A.      No, I don't.

4  Q.      This is a guy you're driving cross-country with,

5  eight-day round trips how many different times?

6  A.      About four times.

7  Q.      About four times.  So four times eight, that's

8  32 -- you spent a month with this gentleman and you

9  don't know any more than his height and his weight and

10 his complexion?

11 A.      No, I don't.  I told her the weight and height

12 and the complexion.

13 Q.      This guy's been working with your dad, right?

14 A.      Yes.

15 Q.      It's your testimony when you would pick up the

16 money from Paul Martin's house, you would park a few

17 blocks away at a shopping center?

18 A.      Yes.

19 Q.      You would walk to her house; correct?

20 A.      Yes.

21 Q.      That's the house on Nicholson?

22 A.      Yes.

23 Q.      Northeast D.C.?

24 A.      Northeast.

25 Q.      You'd pick up, like, I guess, a duffel bag full

1  of money?

2  A.       Yes.

3  Q.       You'd go marching back to your truck, right?

4  A.       Yes.

5  Q.       And you did that with $20,000; right?

6  A.       Yes, I did.

7  Q.       And you did it with $200,000, and you're walking

8  down the streets of Washington, D.C.; is that a fair

9  statement?

10  A.       Yes, it is.

11          MR. MONTEMARANO:  Okay.  Are we close?

12          DETECTIVE EVELER:  Fairly.

13          BY MR. MONTEMARANO:

14  Q.       I'll go on.

15          During all those trips up and down the blocks,

16  nobody ever disturbed you or accosted you or anything

17  else; right?

18  A.       No.

19  Q.       You've spoken about a woman Paulette Martin

20  lived with, Granny.

21  A.       Yes.

22  Q.       Do you know Granny by any other name?

23  A.       Probably told me.  I forgot her name.  I know

24  Granny.

25  Q.       You forgot her name.  Eugene Bird, the gentleman

1  you mentioned, Gene Bird also.  That's your uncle;

2  right?

3  A.       Yeah.

4  Q.       Do you know Granny's his cousin?

5  A.       Yes.

6  Q.       It didn't occur to you to mention that?

7  A.       I don't know her name.

8  Q.       And you've testified earlier today that you're

9  not expecting any sort of benefit for your testimony

10 today; is that correct?

11 A.       Yes.

12 Q.       So you're not expecting the government to ask

13 the judge in Indiana to cut you some kind of break?

14 A.       No.

15 Q.       So, if they were to tell the judge you want a

16 shorter sentence, you'd tell them no; right?

17          MS. JOHNSTON:   Objection.

18          THE COURT:   Overruled.

19          BY MR. MONTEMARANO:

20 Q.       You don't want any kind of benefit for your

21 testimony here; is that right, sir?

22 A.       Yes.

23 Q.       You don't.  You're telling us here under oath,

24 God is your witness, when they offer you some kind of

25 break off that 20-year bit, you're going to say, nah,

1 that's okay?

2          MS. JOHNSTON:   Objection.

3          THE COURT:   Sustained.

4          BY MR. MONTEMARANO:

5 Q.     I asked you earlier about you wanting a private

6 lawyer and you said not really out in Indiana; correct?

7 Did you ever talk to Paulette at all about money for a

8 lawyer?

9 A.     I don't recall it.

10 Q.     You don't recall? You don't recall her

11 suggesting maybe she could send you about $1,000?

12 A.     I don't recall.

13 Q.     Maybe that 75 was $7,500 the lawyer was going to

14 charge you?

15 A.     I don't recall it.

16 Q.     You don't recall anything like that?

17 A.     No.

18 Q.     You weren't very happy with the job he did; were

19 you?

20 A.     Excuse me?

21 Q.     You weren't very happy with the job he did on

22 that case that got you 20 years; were you?

23 A.     I mean, from the statutes of the guidelines in

24 the book, that's what it was.

25 Q.     But you thought that search should have been

1  thrown  out;  didn't  you?

2  A.       Excuse  me?

3  Q.       You  thought  that  search  of  your  truck  should

4  have  been  thrown  out;  didn't  you?

5          MS.  JOHNSTON:    Objection  to  the  relevance.

6          THE  WITNESS:    No.

7          THE  COURT:    Wait  a  minute.

8          Sustained.    Disregard  the  answer.

9          MR.  MONTEMARANO:    Your  Honor,  at  this  time  I

10  need  to  go  on  to  the  transcript.    We're  seconds  away.

11          THE  COURT:    Are  we  seconds  away?

12          DETECTIVE  EVELER:    Yes.

13          THE  COURT:    All  right.

14          BY  MR.  MONTEMARANO:

15  Q.       Let's  go  back  to  your  dad's  cocaine  business  for

16  a  moment.    He's  sending  cocaine  here,  you're  taking

17  money  back.    You're  not  getting  paid  for  this;  right?

18  A.       No.

19  Q.       But  he  did  help  you  buy  your  truck;  right?

20  A.       Yes.

21  Q.       Your  business  --  you've  told  us  your  business

22  was  hauling  produce  west  and  commercial  freight  west;

23  is  that  a  fair  statement?

24  A.       Yes.

25  Q.       The  fact  is,  your  business  was  hauling  cocaine;

1  wasn't it?

2  A.      My business hauling cocaine?

3  Q.      Well, when you were asked by Ms. Johnston what

4  did you do, you said I transported produce and then I

5  returned with commercial freight.

6  A.      Yes.

7  Q.      The fact is, you're hauling cocaine.  That's

8  where you're making your money; right?

9  A.      No.

10  Q.      You didn't ever make money hauling cocaine?

11  A.      No.  I lived off my paychecks off my loads.

12  Q.      Lionel Nunn never paid you $5,000 a load to

13  bring cocaine?

14  A.      That was back in -- that was back in the 90s.

15  Q.      Back in the 90s?

16  A.      Yes.

17  Q.      So long before '96, you're hauling cocaine in

18  your truck; right?

19  A.      Yes.

20  Q.      Okay.  In fact, when you're arrested in 1996,

21  you talked to the police; correct?  You told them you

22  were taking that cocaine to New Jersey; didn't you?

23  A.      Yes.

24  Q.      You didn't say anything about Paulette Martin;

25  right?

1 A.      No.

2 Q.      Didn't say anything about Lionel Nunn?

3 A.      No.

4 Q.      Didn't say anything about anybody, but you lied

5 to them; didn't you?

6 A.      No, I did not.

7 Q.      You were taking that cocaine to New Jersey?

8 A.      Yes.

9 Q.      Why don't you go ahead and play it, Detective

10 Eveler, please?

11         MR. WARD:   What page is this?

12         MR. MONTEMARANO:   Page 6 of the transcript book.

13         (Audio recording begins playing at 4:24 p.m.)

14         (Audio recording stops playing at 4:25 p.m.)

15         BY MR. MONTEMARANO:

16 Q.      The call that Ms. Johnston asked you about back

17 on Page 58, sir, was a call on the date of -- bear with

18 me, please.   It's at 5:48 p.m. on the 26th of December,

19 the day after Christmas?

20 A.      Yes.

21 Q.      That's when you said, I remember us talking

22 about concerts then, but you didn't seem to remember

23 this call.   This call took place on the 14th, two weeks

24 before.   Fourteenth of December at 8:12 in the morning.

25 A.      Yes.

1  Q.      First thing in the morning, you don't remember
2  that call; correct, sir?
3  A.      Yes, I do now.
4  Q.      You do now?
5  A.      I mean, you asked me the question.  I thought
6  you was talking about Kansas City, not St. Louis and
7  Detroit.
8  Q.      Okay.  If I could turn your attention as well to
9  the second call in the book, the one on the 21st that
10 begins on Page 12.  Would you be surprised to learn
11 that four pages in on that one, you're talking about
12 another trip out of town?  I'm going to be on the road
13 a lot?
14         Do you remember Paulette saying that to you?
15 Does that refresh your recollection, sir?  Would you
16 like me to play the call in -- excuse me, would you
17 like Detective Eveler to play the call?
18 A.      You can play it.  You can play it.
19 Q.      Do you need to hear it or does that refresh your
20 recollection so that three of the six calls here, she's
21 telling you about being out of town promoting tours and
22 concerts; correct?  Is that a fair statement?
23 A.      Yes.
24 Q.      Okay.  Now, you had mentioned at one point you
25 met a gentleman by the name of Harvey.

1  A.      yes.

2  Q.      That would that be Harvey Washington?

3  A.      Yes.

4  Q.      Okay.  He's an African-American  gentlemen?

5  A.      Yes, he is.

6  Q.      Little heavy set?

7  A.      Yes.

8  Q.      About 40?  Kind of looks like Luther Vandross in

9  a younger day maybe?

10 A.      Yes.

11 Q.      That's a fair description of him?  And he

12 promoted fashion shows; did he not, sir?

13 A.      Yes, he did.

14 Q.      Ms. Martin helped him promote fashion shows;

15 correct, sir?

16 A.      Excuse me?

17 Q.      Ms. Martin helped him promote fashion shows; did

18 she not, sir?

19 A.      From my understanding, that's what she say.

20 Q.      That's your understanding; correct, sir?  Did

21 you ever go to any of those shows?

22 A.      No, I've never been to one of them.

23 Q.      You had no reason to think that wasn't

24 happening, now; did you?

25 A.      I don't know.  I know Harvey -- Harvey

1 Washington, he did shows.

2 Q.      So you certainly know about that; correct, sir?

3 A.      Yes.

4 Q.      Okay.  Court's indulgence.

5       MR. MONTEMARANO:  Will the Court be greatly

6 offended if I ask if we can break for the day?  I've

7 got more questions, but I want to make sure I'm not

8 repeating myself.  I'd like to organize my notes.

9       THE COURT:  Well, do you intend to repeat

10 yourself the next day?  You may want to go a little

11 further, and then you can finish and we'll switch to

12 other counsel tomorrow morning.

13       MR. MONTEMARANO:  Thank you, Your Honor.

14       BY MR. MONTEMARANO:

15 Q.      So all those phone calls that we listened to

16 when you were in the jail talking about paperwork was

17 really talking about the $75,000 you claim Paulette

18 Martin didn't pay; is that a correct statement, sir?

19 A.      Yes.

20 Q.      Every one of those calls about the papers, you

21 never used the word debt; correct?

22 A.      No.

23 Q.      Never talked about owing anything; correct?

24 A.      Right.

25 Q.      Never said anything about that was due my dad;

1  correct ?

2  A.     Yes.

3  Q.     Now you're telling me here today, three years

4  later, you're telling us that's what these calls mean;

5  right, sir?

6  A.     Yes.

7         MR. MONTEMARANO:   No further questions, Your

8  Honor.

9         THE COURT:   All right.   Perfect timing.   We're

10  doing better than Amtrak.

11        Ladies and gentlemen  , we will adjourn  for the

12  day.   Please be back, ready to go at 10 o'clock

13  tomorrow, and counsel and the parties should be here at

14  quarter of 10:00 so we can take up any preliminary

15  matters and have the jury in the box ready to go at 10

16  o'clock.   Thank you very much.

17              (Off the record at 4:30 p.m.)

18

19

20

21

22

23

24

25

1                        **<u>CERTIFICATE</u>**

2

3       I, Tracy Rae Dunlap,   RPR , CRR , an Official Court

4  Reporter for the United States District Court of

5  Maryland, do hereby certify that I reported, by machine

6  shorthand, in my official capacity, the proceedings had

7  and testimony adduced upon the Jury Trial Proceedings

8  in the case of UNITED STATES OF AMERICA versus PAULETTE

9  MARTIN, et al, Criminal Action Number    RWT-04-0235 on

10 June 14 , 2006.

11

12      I further certify that the foregoing 2    21 pages

13 constitute the official transcript of said proceedings,

14 as taken from my machine shorthand notes, of said

15 proceedings.

16

17      In witness whereof, I have hereto subscribed my

18 name, this 21st day of April 2008.

19

20

21                              _____

22                              TRACY RAE DUNLAP, RPR , CRR
                                OFFICIAL COURT REPORTER
23

24

25