```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                      SOUTHERN DIVISION
 2
   -----------------------x
 3 UNITED STATES OF AMERICA  :
            Plaintiff       :
 4                          :
                            :
 5 vs                       :Criminal Action:    RWT-04-0235
                            :
 6                          :
   PAULETTE MARTIN  , et al  :
 7          Defendants.      :
   -----------------------x
 8

 9                      Thursday, June 15, 2006
                        Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11 Proceeding before the HONORABLE ROGER W. TITUS, United
   States District Judge, in courtroom 4C, commencing at
12 9:57 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS THE TESTIMONY AND PROCEEDINGS
15      OF THE CASE AS RECORDED   AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR            (301) 344-3912
25 Official Court Reporter
```

1                         I N D E X

2
                         DIRECT      CROSS    REDIRECT   RECROSS
3  Nathan King                        17        33        42

4  Dave Martini          48          73       75,132     91,136

5  Horace  Smith         141         176      198

6  Kyle  Fulmer          206         219      228        236

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                              Page

24  Reporter's Certificate                      249

25  Concordance                                 250

1        THE   COURT:    I  understand   there 's  a  preliminary

2  matter ?

3        MS.  GREENBERG:    Your  Honor , just  relating  to  the

4  discussion  we  had  yesterday  as  to  cross-examination   of

5  witness es  under  Rule  609 .

6        As  to  Horace  Smith , the  court  ruled  that  the

7  notice  was  sufficient , given  the  nature  of  this  case .

8  Mr.  Martin  gave  me  a  list  of  the  follow ing  convictions

9  as  to  Mr.  Smith .  The  first , a  conviction  on  June  23 ,

10  1995 , larceny  by  check  in  Fairfax  county ; September  19 ,

11  1995 , forgery  of  check s  in  Arlington  C  ounty ; January

12  24 , 1997 , credit  card  fraud  in  Fairfax  County ; January

13  24 , 1997 , larceny , in  Alexandria ;  August  15 , 1997 ,

14  burglary  and  grand  larceny , Virginia .

15        I  appreciate  him  giving  me  the  additional

16  convictions  within  the  ten  year s, and  I  just  have  two

17  question s for  the  court .  1.  H as  the  court  already

18  made  the  determination  as  to  the  one s  outside  the  ten

19  year s  that  the  609 (b)  standard  is  met ?  In  other  words ,

20  that  these  would  substantially  --

21        THE  COURT:   No , I  have  not  made  that

22  determination .

23        MS.  GREENBERG:   Your  Honor , at  this  time  I  would

24  submit , then , that  for  a  larceny  and  forgery  of  check s,

25  which  is  basically , you  know , falsifying  check s  to  get

1 money, that are at this point 11 years old, that the

2 probative value is not the substantial -- the

3 prejudicial effect of these -- of introducing these

4 convictions is not substantially outweighed by the

5 probative value under 609(b). As the court knows,

6 that's a different standard than 609(a), which 609(a)

7 does not have the substantial language.

8         My second question is just to clarify -- again,

9 I appreciate Mr. Martin giving me this list, but there

10 is also a probation before judgment conviction as to --

11 if you want to call it a conviction -- as to Mr. Smith,

12 and I just don't want to be blind-sided that it's not

13 on the list but it is within ten years.  I would bring

14 up the probation judgment at the bench.  But since he

15 gave me an entire list of prior convictions that he

16 intends to use, I trust that the probation before

17 judgment is not going to become an issue.

18         THE COURT:  That should not become an issue

19 unless there's something Mr. Martin is going to tell me

20 that I'm wrong.

21         MR. MARTIN:  No.  Those were the convictions  I

22 intended to focus on, Your Honor.

23         In terms of addressing the 403 balancing

24 requirement, I would respond by saying, any witness who

25 takes the witness stand puts their credibility at

1  issue .   These  crime s  go  direct ly  to  trustworthiness  .

2          THE  COURT:   Tell  me  what  the  crime s  are  that  are

3  more  than  ten  year s  old .

4          MR.  MARTIN:   If  you  can  stand  by ,  sir .

5          THE  COURT:   I  wasn't  able  to  keep  up  with  Ms.

6  Greenberg 's  list .

7          MR.  MARTIN:   Actual ly ,  I  made  a  second  copy .   If

8  she  has  a  second  copy ,  I  can  just  hand  it  to  the  court .

9          THE  COURT:   Yeah ,  that  would  be  easier  if  you

10  could  just  hand  it  to  me .

11          MR.  MARTIN:   May  I  approach ?

12          THE  COURT:   Yes ,  you  may .   Just  hand  it  up  here .

13          That 's  fine .   Thank  you .

14          MR.  MARTIN:   I'll  read  them  into  the  record ,

15  Your  Honor .

16          THE  COURT:   Okay .

17          MR.  MARTIN:   The  first ,  as  the  court  can  see ,  is

18  the  23  June ,  19 95  larceny  conviction  in  Fairfax  County ;

19  the  second  is  the  19  September  '95  forgery  of  check s  in

20  Arlington  County ;  the  third  being  the  24  January  1997

21  credit  card  fraud  conviction  in  Fairfax  County ;  the

22  fourth  being  the  24  January  '97  larceny  in  Alexandria ;

23  and  the  last  being  the  15  August  '97  burglary  and  grand

24  larceny  conviction  in  Virginia .

25          THE  COURT:   What  is  the  status  --  are  these  the

1 state at the time of the conviction , or the dates that

2 the sentence was concluded ?

3         MR. MARTIN:    That's a good question , Your Honor .

4 I think those were the dates he was actually convicted,

5 but I can check very quickly if you'd like .

6         MR. WARD:    Your Honor , I think under 609(b), the

7 rule , it is from the witness ' conviction or release

8 from confinement, whichever is later .

9         THE COURT:    Do we know the release date on

10 these ?

11         MR. MARTIN:    Sorry , sir?

12         THE COURT:    Do we know the release date under

13 these ?

14         MR. MARTIN:    I don't .

15         THE COURT:    These may all be less than ten years

16 is why I'm asking .

17         MR. MARTIN:    If it's less than ten years, then

18 the rule , I don't think , even applies.

19         THE COURT:    I mean , the first two -- unless the

20 sentence was very light , it would appear to be -- might

21 be less than ten . I don't know .

22         MR. MARTIN:    The larceny by check that I

23 referred to -- let's see . Guilty June 23, 1995.

24         Did I list that , Your Honor ?

25         MS. GREENBERG:    Yes . It's your first one .

1          MR. MARTIN:  It simply says, "found guilty."
2  That's the day he was found guilty.  It doesn't say
3  whether or not that was the date he was actually
4  sentenced.  There was a false pretenses.  There was no
5  indictment on that, so I didn't list it.
6          There was a forgery of checks where he was found
7  guilty on 21 -- I'm sorry, on the 21st day of February
8  1997, and it simply says, "guilty."  It doesn't say
9  whether he was sentenced on that date.  So, I guess
10 what I did was I just went through the rap sheet, and
11 wherever I saw the date that a "guilty" verdict was
12 entered, those were the dates that I listed.
13         THE COURT:  So we don't know the release date?
14         MR. MARTIN:  No, sir.  I don't.
15         THE COURT:  All right.  Assuming that the first
16 two are ones outside the ten years, what is the
17 government's argument on them?
18         MS. GREENBERG:  Your Honor, not to take up the
19 court's time simply restating the rule -- and as we'll
20 certainly get to convictions like this in the defense
21 case, I wanted the court to know about the standard,
22 which is hard to meet but not impossible to meet.
23 Based on the offenses, it look looks like they're
24 standard passing bad checks by a different name.
25         THE COURT:  I think the probative value of these

1 convictions , in light of the fact that they deal with

2 dishonest behavior going to credibility , outweigh s the

3 prejudicial effect , and I will permit the

4 cross-examination .

5       MS. GREENBERG:   Your Honor , the second thing --

6 just as a housekeeping matter , and to move thing s

7 along .  If any defense counsel want s to use this

8 system , it does take some time to make sure that it's

9 working .  We try and come in early and do that in the

10 morning , but if they would like it with a particular

11 witness , a heads up to the case agent would be

12 appreciate d.

13       THE COURT:   Counsel , please do that so we don't

14 have mechanical delay s while we're doing it .

15       MR. MONTEMARANO :   For that , I apologize , Your

16 Honor .   I should have thought it through .

17       THE COURT:   That 's fine .

18       Two question s.   Is the jury here ?

19       THE CLERK:   We were missing two just a minute

20 ago .

21       THE COURT:   Okay .   Is the witness here ?   Because

22 there was an issue about that .

23       THE WITNESS:   He's back in the hold ing tank .

24       THE COURT:   Mr. Sussman .

25       MR. SUSSMAN :   Just a quick matter .   I told Ms.

1  Johnston, in looking at the Jenks, there's -- a guy's

2  going to testify, either today or tomorrow, Michael

3  Thurman.  In reading his testimony, he relates an

4  incident where a person named "Gerald Isles" (phonetic)

5  allegedly sold drugs to Ms. Martin.  I represent Gerald

6  Isles, and I represent him in a case that is going to

7  trial in September in front of Judge Lamberth in D. C.

8       It's not a problem with Ms. Martin.  The

9  incident doesn't concern anything that involves her.  I

10  haven't consulted with Mr. Isles about it.  I don't

11  think he would have a problem, either.  He has been

12  reputed to have sold drugs to many, many people.  I

13  wanted to put it on the record.  I don't think it's a

14  conflict or problem, but I thought we ought to air it

15  for the court.

16       THE COURT:  Anybody else want to raise an issue

17  about that?

18       All right, you've placed it on the record.

19       Mr. Martin, I was making certain I didn't cut

20  you off on a proffer.  Is there any additional proffer

21  you want to make?

22       MR. MARTIN:  Not at this time, sir.

23       THE COURT:  All right.  Everybody gets a chance

24  to proffer away.

25       MS. JOHNSTON:  Your Honor, just so the record is

1 clear .   Mr. Thurman does not know Mr. Sussman 's client

2 in this case , Ms. Hardin, to the government 's

3 knowledge .

4        THE COURT:   I didn't see any issue , but thank

5 you for bring ing it to the court 's attention .

6        All right .  We will see how we're doing with the

7 juror s.

8        MR. MONTEMARANO :   One other matter , brief ly.

9        THE COURT:   Yes, sir .

10        MR. MONTEMARANO :   I just spoke to Ms. Johnston

11 about trying to get some information to insure that

12 there would not be any impediment to the continuation

13 of the trial .   At this point , I believe that I will be

14 seek ing to recall Nathan King .   There is a mass ive

15 amount of information still in my office concern ing him

16 that I need to check through this weekend .   In,

17 particular four CDs of call s from Marion C ounty ,

18 Indiana , the jail where he was locate d.

19        THE COURT:   You mean to recall him for

20 additional  cross ?

21        MR. MONTEMARANO :   Or as a part of the defense

22 case .

23        THE COURT:   All right .

24        MR. MONTEMARANO :   I'm not sure how the court

25 would like to do that , since he is from out of state .

1   I understand  he's doing  time  out  of  state .

2          Would  the  court  permit  me  to  do  further  cross

3   examination  on  Tuesday?   Or  even  tomorrow , depend ing  on

4   when  I  get  the  materials  sort ed  out ?  I  will   probably

5   be  in  the  office  on  Sunday  going  through  it .  Or , in

6   the  alternative , should  I  have  a  writ  and  bring  him  in ?

7          MS.  JOHNSTON:   Your  Honor , I  would  object  to

8   counsel  do ing  cross  later .  He  has  had  CDs  of  jail

9   call s  for  many , many , many  month s .  He  had  those  in

10  discussion  that  would  not  --  he  did  not  receive  those

11  at  the  last  minute .  That  would  be  beyond  the

12  government 's  direct  examination .

13          If  there  are  other  call s  he  want s  to  question

14  about , there  would  be  question s  of  admissibility   about

15  those  call s  in  term s  of  the  hearsay  exception   because

16  they  would n't  necessarily  be  statement s  of  the  parti es

17  against  their  interest .  It  would n't  necessarily  be  in

18  furtherance  of  the  conspiracy , clear ly , if  the  defense

19  want s  to  introduce  them .  So , there  are  a  myriad  of

20  issue s  concern ing  that .

21          It  would  be  inappropriate  for  him  now  to  have

22  the  weekend  to  decide  whether  or  not  he  has  further

23  basis  to  cross -examine .  There  is  nothing   surprisi ng

24  about  what  Mr.  King  is  say ing .  We  went  so  far  as  to

25  give  him  copies  of  the  transcript  of  Mr.  King 's

1  testimony in his Mississippi state case back in '95 and

2  '96 of that suppression hearing because we happened to

3  have that.

4          In terms of those jail calls. They were

5  previously provided. So, if counsel thinks there's

6  some bases for him to call him as his witness, I don't

7  know -- the marshals have been wanting to send our

8  writted prisoners back as soon as we release them so

9  that -- because of housing problems here. If the court

10  wants to ask the marshals to hold him so that Mr.

11  Montemarano has time over the weekend to decide whether

12  or not he needs to call him as a defense witness, the

13  government has no objection to that. I'm sure that the

14  marshals would accommodate holding him for a few more

15  days. I don't think the marshals can send him back and

16  then Mr. Montemarano do a writ and necessarily get him

17  back.

18          THE COURT:  I don't want to have them make round

19  trips if they don't need to, but I can ask the marshals

20  to keep him here. We're not going to keep him here

21  forever.

22          MR. MONTEMARANO:  So Ms. Johnston is clear, we

23  have had these CDs for months. I'm speaking about

24  further cross. Calling him about defense witnesses

25  revolving around questions he answered yesterday

1 afternoon , following  the  break .

2        THE  COURT:   Look .   If  the  jury  is  ready , I want

3 to  bring  them , and I will  ask  the  marshals,  even  if  he

4 finishes  today , to  keep  him  here  until  next  week  and

5 we'll  finally  resolve  the  question  of  whether  he  gets

6 --

7        MR.  MONTEMARANO :   Thank  you , sir .

8        THE  COURT:   -- further  cross -examine d  or  held

9 here  for  a defense  witness .

10        MR.  MCKNETT :   May  I consult  with  the  government

11 while  the  jury  is  coming  in, just  for  ten  seconds ?

12        THE  COURT:   That 's  fine .

13        MS.  JOHNSTON:   One  other  matter .   I've  spoke n  to

14 defense  counsel , and  they  have  agreed  to  stipulate  that

15 the  call s  that  were  play ed -- the  jail  call s  that  were

16 play ed  were  actual  record ing  from  the  Marion  C  ounty

17 Jail  that  were  made  on  the  date  and  time  as  set  forth

18 in  the  transcript .

19        THE  COURT:   Why  don't  you  announce  that

20 stipulation  when  jury  come s  in?

21        MS.  JOHNSTON:   I will .

22        We  are  work ing  on  a drug  stipulation  to

23 eliminate  another  witness  later  this  morn ing  that  has

24 to  do  with  Mr.  Martin 's  client , and  I believe  they've

25 all  sign ed  that .   So , we  will  save  that  one .

1          THE COURT:  All right.

2          MR. MONTEMARANO: So it's clear, Your Honor.

3 Those are calls from the CDs that I would be seeking to

4 perhaps introduce other calls on from, so we're on the

5 same page.

6          THE COURT:  All right.

7          MR. WARD:  I asked for the large board with

8 pictures on it to be produced today, and I want to make

9 sure it's here.

10         THE COURT:  I think it's right there, isn't it?

11 Unless that's a different exhibit, that's right in

12 front of them.

13         MR. WARD:  Is that the same one?

14         THE COURT:  Yes.  It's right here.

15         MR. WARD:  Oh, good.  Thank you, Judge.

16         THE COURT:  Well, I see the back of it, but I

17 assume it's the same one.

18         One of the jurors is late because he was stuck

19 behind a presidential motorcade.  You can use that

20 excuse once during this trial.  The, "I forgot my coat"

21 routine -- yes, ma'am?

22         MS. JOHNSTON:  Your Honor, Mr. McKnett has asked

23 the government to stipulate to a change of one of the

24 transcripts.  The government doesn't recall what was

25 said on the tape, so I've suggested to him that he just

1 play that call , but I don't want , in his question , or

2 in front of the jury , any reference to the fact that he

3 asked the government to agree to this change and that

4 we didn't . So, we'll cue it up and play it for him.

5       THE COURT:   Let the jury decide what the correct

6 version is.  That's what I've told them when the case

7 began .

8       MR. MCKNETT :  Your Honor , I would not -- I would

9 simply not do that .  I would ask the gentleman to a --

10 for the record , I what I asked was , there's a word on

11 Page 25, Line 3 --

12       THE COURT:   Wait a minute . I've got to get --

13 which volume ?

14       MR. MCKNETT :  It's in Mr. King's transcript .

15       THE COURT:   Mr. King ?

16       MR. MCKNETT :  Page 25.

17       Your Honor , it's just a tense change from "send"

18 to "sent ."  That's all I was asking about . I was not

19 implying the government was not cooperating in any way.

20       THE COURT:   What page was it?

21       MR. MCKNETT :  Page 25, Your Honor .

22       THE COURT:   Page 25.

23       MR. MCKNETT :  It's the conversation on December

24 21 at 15:03 hours .

25       THE COURT:   Where is it on the page ?

1          MR. MCKNETT:  The third line down.

2          THE COURT:  Where it says, "You send me?"

3          MR. MCKNETT:  Where it says, "You send me."  I

4 heard it to say, "You sent me."

5          THE COURT:  Sent me?

6          MS. JOHNSTON:  Your Honor, it's in the middle of

7 a section that we played.

8          With the court's permission, can the agent cue

9 it up now while we're waiting for the jury?

10         THE COURT:  Yeah, cue it up.

11         MS. JOHNSTON:  You will hear it played.

12         THE COURT:  Ready for the jury?

13         Okay, bring them in.

14         Bring the witness in.

15                 (Witness resumes the stand at 10:15 a.m.)

16                 (Jury returns at 10:15 a.m.)

17         THE COURT:  Good morning, ladies and gentlemen.

18 We're ready to proceed with further cross-examination

19 of the witness.

20         MR. MARTIN:  With the court's permission.

21         THE COURT:  You may proceed.

22         MR. MARTIN:  Thank you, sir.

23                      **CROSS-EXAMINATION**

24         BY MR. MARTIN:

25 Q.    Good morning, Mr. King.  My name is Anthony

1 Martin, and I represent Mr. Goodwin.

2        Yesterday, Mr. King, you were shown a chart --

3 this chart here.  Do you remember that?

4 A.     Yes.

5 Q.     And at the time you were shown the chart, you

6 identified Mr. Goodwin as somebody you had known.

7        Do you remember that?

8 A.     Yes.

9 Q.     All the names were masked out, with the

10 exception of the names at the very top where it says,

11 "Goodwin-Martin Organization."

12        Do you see that?

13 A.     Yes.

14 Q.     And Mr. Goodwin's photo is right next to

15 Paulette Martin's; is that's correct?

16 A.     Yes, it is.

17 Q.     You've known Mr. Goodwin from many, many years

18 ago, isn't that true?

19 A.     Yes.

20 Q.     In fact, you knew Mr. Goodwin when you were a

21 child; right?

22 A.     Yes.

23 Q.     You know Larry Lane.

24 A.     Yes.

25 Q.     And Larry Lane is Mr. Goodwin's stepson; right?

1 A.       Yes.

2 Q.       You never had any dealings related to drugs with

3 Mr. Goodwin, did you?

4 A.       No, sir.

5          MR. MARTIN:   No further questions, Your Honor.

6          MR. HALL:   Your Honor, I have no questions of

7 this witness.

8          MR. MITCHELL:   Just a few, Your Honor.

9                        **CROSS-EXAMINATION**

10         BY MR. MITCHELL:

11 Q.      Mr. King, hi.  My name is Timothy Mitchell.  I

12 represent Mr. Bynum.

13         You had mentioned some of Paulette Martin's

14 friends and also family that you're familiar with;

15 correct?

16 A.      Yes.

17 Q.      Are you familiar with her daughter?

18 A.      Yes.

19 Q.      And her granddaughter?

20 A.      Yes.

21 Q.      Are you familiar with the father of her

22 granddaughter?

23 A.      I seen him one time.

24 Q.      You've seen him one time before?

25 A.      Yes.

1  Q.      Would you recognize him again if you saw him?

2  A.      Not -- not really.

3  Q.      Did you see him on any of the -- you were

4  previously shown this chart.  Did you recognize him

5  from this chart?

6  A.      No.

7  Q.      Do you want to take a closer look and make sure?

8  A.      No.

9  Q.      You're certain that you met him before?

10  A.      Yeah.  He came by her house one time when I came

11  by there.

12  Q.      You're certain about that?

13  A.      Yes.

14         MR. MITCHELL:   No further questions.

15         THE COURT:  Mr. Ward.

16         MR. WARD:  A couple, Your Honor.

17                   **CROSS-EXAMINATION**

18         BY MR. WARD:

19  Q.      Good morning, Mr. King.

20  A.      Good morning.

21  Q.      Referring to this chart, which is Exhibit CH-1.

22  Let me get over here so that you can see and the jury

23  may see.

24         May I stand here, Your Honor?

25         THE COURT:  Certainly, you may.

```
 1          BY MR. WARD:
 2 Q.      You identified Larry Lane; is that correct?
 3 A.      Yes, sir.
 4 Q.      That's what you wrote there, the name "Larry
 5 Lane."
 6 A.      Yes.
 7 Q.      And a "Mr. Nunn;" is that right?
 8 A.      Yes.
 9 Q.      And a "Bridget?"
10 A.      Yes.
11 Q.      Now, does that say "Bridget Brim?"
12 A.      Yes.
13 Q.      Now, that's your father's name; right?
14 A.      Yes.
15 Q.      Who is Bridget Brim in relation to your father?
16 A.      His wife.
17 Q.      Oh, his wife.
18 A.      Yes.
19 Q.      And Bridget Brim is someone that you know very
20 well; is that correct?  Or you knew very well.
21 A.      Yes.
22 Q.      Now, is this his first wife, your mother?  Or is
23 this the second wife?
24 A.      Second wife.
25 Q.      This is the woman he married when he went out to
```

1  California ; is that right ?

2  A.      Yes, sir .

3  Q.      Over how long a period of time did you know

4  Bridget B rim ?

5  A.      A couple year s.

6  Q.      A couple of year s?  Did you see her fairly

7  regular ly?

8  A.      Not really , because I didn't really go over my

9  dad's house because me and her didn't get along .

10  Q.      Once a month ?  Twice a month ?

11  A.      Probably twice a month .

12  Q.      Twice a month .  But you certain ly saw her enough

13  that when you saw this photograph today you recognized

14  it as being your stepmother .  Is that right , sir?

15  A.      Look s like it , yes .

16  Q.      Now , is your stepmother , Bridget B rim , in the

17  courtroom today ?

18          I want you -- if I may, Your Honor -- to stand

19  up and look around the courtroom and tell the ladies

20  and gentlemen of the jury   if Bridget B rim is in the

21  courtroom .

22  A.      No .

23          MR. WARDS:   Okay .  Thank you , so very much .

24          That 's all .

25                        **CROSS-EXAMINATION**

1          BY MR. SUSSMAN:

2  Q.      Good morning.  My name is Ed Sussman.  I

3  represent Ms. Harden over there, who you indicated

4  previously you don't know Ms. Harden.  Correct?

5  A.      Yes.

6  Q.      You grew up in the area of Riggs Road,

7  Northeast; is that right?

8  A.      No, sir.

9  Q.      What part of town did you grow up in?

10         What area?

11 A.      I grew up in northwest.

12 Q.      You went to Coolidge High School.  That's on the

13 other side of Blair Road; right?

14 A.      Yes.

15 Q.      Your mother operated a restaurant on Riggs Road;

16 is that right?

17 A.      Yes.

18 Q.      And that restaurant was located at the

19 intersection of Riggs and South Dakota Avenue.  Would

20 that be accurate?

21 A.      Yes, sir.

22 Q.      So it was just a couple of doors down from where

23 Ms. Martin's dance studio was; is that right?

24 A.      Yes.  Next door.

25 Q.      Okay.  Now, the restaurant.  Is that a soul food

1 place?

2 A.      Yes, it was.

3 Q.      It was kind of a neighborhood gathering place?

4        People would come through, hang out, talk, and

5 buy food?

6 A.      Yeah, buy food.

7 Q.      And was it fair to say that you didn't have a

8 lot of interest yourself in dancing lessons?  Is that

9 right?

10 A.      Yes.

11 Q.      But you saw kids going in and out of the dance

12 studio; isn't that right?

13 A.      No.

14 Q.      Didn't pay attention?

15 A.      I didn't pay attention.

16 Q.      But in the community, the common knowledge was

17 that Ms. Martin ran a dance studio.  Is that right?

18        MS. JOHNSTON:   Objection.

19        MR. SUSSMAN:  It's not for the truth.

20        THE COURT:   Sustained.

21        MR. SUSSMAN:  Can we approach?

22        THE COURT:   Yes.

23            (At the bar of the Court.)

24        MR. SUSSMAN:  I'm asking based on what his

25 understanding was, and people talked about it.  It's

1  not for the truth of the matter.  I'm not asking that

2  it be taken as the truth of the matter.  It's just the

3  general discussion in the community.

4       MS. JOHNSTON:  It's irrelevant.  If he is not

5  asking him for the truth of the matter asserted that

6  she ran the dancing school, then it's not relevant what

7  he thinks about what the understanding was in the

8  community.

9       THE COURT:  That's what he said.  He doesn't

10 know anything about it.

11      MR. SUSSMAN:  He said he didn't see, so I asked

12 him the next question about what was the general

13 discussion and his understanding was.

14      MS. JOHNSTON:  Are we talking about in the '80s?

15 In the early '90s?  The mid-'90s?

16      THE COURT:  He can ask him, did you discuss with

17 anyone else whether people dance there, and when did

18 you have those discussions.  I mean, I think you have

19 to lay a foundation to go into something like this.

20      MS. JOHNSTON:  My objection also is that it is

21 irrelevant.

22      What's the purpose of the question if it is not

23 to show that there were students at that dance school?

24 I don't know what the relevance is of what his

25 knowledge is with what the community thought.  It

1 certainly doesn't go to his cross-examination , and it

2 doesn't go to his credibility, if it's not being

3 offered for the truth that there -- that people in the

4 community believed she operated a dance studio.

5          THE COURT:  For what purpose are you offering

6 it?

7          MR. SUSSMAN:  There is a general importance to

8 help people's reputation .  If people hold themselves

9 out as dance studio operators or promoters, and they're

10 known that way, it's a reasonable -- it's reasonably

11 relevant for -- to elicit that information .  Other

12 people can rely on that -- how people --

13          THE COURT:  Unless you're going to proffer that

14 he's going to testify that he's talked to people and

15 he's seen people going in and out -- who have seen

16 people going in and out and getting dance lessons, I

17 think you are --

18          MR. SUSSMAN:  I can only ask the question .

19          THE COURT:  I sustain the objection .

20               (Back in open court .)

21          BY MR. SUSSMAN:

22 Q.    Mr. King, I think you also testified it was your

23 understanding that there were fashion shows ongoing

24 during that period of time; isn't that right?

25 A.    Yes .

1  Q.      There was some guy named Harvey who you talked

2  about in a phone call as having something to do with

3  those fashion shows; is that right?

4  A.      Yes.  Harvey would do the fashion shows.

5  Q.      Fair to say you didn't have much interest in the

6  fashion shows?

7  A.      No.

8  Q.      Okay.  Now, let me ask you -- you testified

9  about deliveries and pickups you made from Ms. Martin's

10 house; is that correct?

11 A.      Yes.

12 Q.      You indicated that there was a woman named

13 "Granny" who lived under Ms. Martin's roof; is that

14 right?

15 A.      Yes.

16 Q.      There was no indication to you that "Granny"

17 knew anything about what was going on; isn't that

18 right?

19 A.      No.

20 Q.      Okay.  Similarly, you indicated that on at least

21 one occasion you asked a friend of yours, Marcus, to

22 drive you over to the house; is that right?

23 A.      Yes, sir.

24 Q.      Was that instead of calling a cab, or hailing a

25 cab?

1 A.       Excuse me.

2 Q.       Was that instead of calling a taxi, or hailing a

3 taxi?  You asked a friend to do you a favor?

4 A.       Yes.

5 Q.       When he drove you over, did he just wait outside

6 while you went inside?

7 A.       Yes, he did.

8 Q.       Okay.  It's fair to say you didn't tell him

9 anything about your business; isn't that right?

10 A.       No, I did not.

11 Q.       So he was seated right next to whatever it was,

12 seven keys or ten keys of cocaine; is that right?

13 A.       Yes.

14 Q.       He didn't know what was in that car; is that

15 right?

16 A.       No, he did not.

17 Q.       Now, later on, you indicated that you had --

18 after you were locked up in Indiana, you had phone

19 calls and phone conversation with Ms. Martin; correct?

20 A.       Yes, sir.

21 Q.       It's fair to say that the basic reason you were

22 calling her is you were trying to get back that

23 $75,000; is that right?

24 A.       Yes.

25 Q.       You testified -- you indicated you knew the

1  phone was tapped; isn't that right?

2  A.      That's what it says.  It says, "Conversations

3  are being recorded."

4  Q.      There is a sign in front of the phone saying

5  your conversation will be recorded; right?

6  A.      Yes.

7  Q.      Nevertheless, you had to talk to her because

8  that was your only form of communication; is that

9  right?

10 A.      Yes.

11 Q.      You had to use a kind of vailed -- well, let me

12 change the word on it.

13         You had to use a kind of secret way of talking,

14 would that be fair?

15 A.      Yes.

16 Q.      Had you not been on a tapped phone, you could

17 have talked to her a lot differently; right?

18 A.      Probably the same -- probably use the same thing

19 to talk to her.

20 Q.      In this case you have no choice but to use that

21 phone; is that right?

22 A.      Yes.

23 Q.      During the course of that conversation, she

24 mentioned to you the names "Alisha Keyes" and another

25 performer; is that right?

1 A.      Yes.

2 Q.      Okay.  That had nothing to do with any drug code

3 or anything, did it?

4 A.      No.

5 Q.      It just was something she was telling you about,

6 a concert or music business; right?

7 A.      Yeah.  That's what she said.

8 Q.      You weren't particularly interested in that;

9 right?

10 A.      No, I wasn't.

11 Q.      In terms of -- you testified at the grand jury;

12 is that correct?

13 A.      Yes.

14 Q.      And before you go in a grand jury, you sit down

15 with the government and you generally talk about what

16 you know; is that right?

17 A.      Yes.

18 Q.      During the course of those discussions, were you

19 shown photographs -- a book of photographs?

20 A.      Yes.

21 Q.      Were you shown approximately 100 photographs?

22 A.      Yeah.  It was a lot of photographs.

23 Q.      Would 80 to 100 be a fair estimate?

24 A.      Somewhere in that area.

25          MR. SUSSMAN:  Thank you very much.

1        I have nothing more.

2        THE COURT:   Mr. McKnett.

3        MR. MCKNETT:   Thank you, Your Honor.

4                    **CROSS-EXAMINATION**

5        BY MR. MCKNETT:

6 Q.     Good morning, Mr. King.

7 A.     Good morning.

8 Q.     Mr. King, I just want to go back and ask you a

9 couple of questions about some of the conversations we

10 heard yesterday and some of the contents of them.

11       This gentleman named Harvey.   You've met him;

12 right?

13 A.     Yes.

14 Q.     He's a promoter; right?   He puts on shows?

15 A.     Yes.

16 Q.     Fashion shows?

17 A.     Fashion shows.

18 Q.     Entertainment?

19       Do you know if he does entertainment, as well?

20 Musical shows?

21 A.     I just know fashion shows.

22 Q.     You just know fashion shows?

23 A.     Yes.

24 Q.     You met him through Ms. Martin, didn't you?

25 A.     No, I did not.

1 Q.      How did you meet him?

2 A.      Harvey was -- we went to --

3 Q.      I'm sorry?

4 A.      We both in junior high school together.

5 Q.      You knew he was an associate of Ms. Martin;

6 correct?

7 A.      Yes.

8 Q.      Do you have your transcript book in front of

9 you?

10 A.     Yes, I do.

11 Q.     Could you turn to Page 29, please?

12 Q.     Do you have it there?

13 A.     Yes.

14 Q.     At the top, there's -- it starts with "P.M."

15 That's Paulette Martin; correct?

16 A.     Yes.

17 Q.     Five lines down -- four lines down, Ms. Martin

18 says to you -- you're in this conversation as well;

19 correct?

20 A.     Yes.

21 Q.     She says to you, "I got to run to Danker's for

22 two hours. I gotta go and pick up some accessories."

23         Do you see that?

24 A.     Yes.

25 Q.     Are you familiar with Danker's?

1   A.      It's a furniture store.

2   Q.      It's a furniture store; correct?

3   A.      Yes.

4   Q.      So, what Ms. Martin was saying is she was going

5   to a furniture store and pick up some household

6   accessories; correct?

7   A.      Yes.

8   Q.      Would you turn to Page 25, please?  And I want

9   to ask you a question.

10          I'm sorry, Your Honor.  I misplaced my Page 25

11  for a moment.

12          At the top of Page 25, the third line down, it's

13  "N.K.," which is you; correct?

14  A.      Yes.

15  Q.      And on the transcript it says, "And I'll write

16  the address that you send me."

17          Do you remember yesterday when that portion of

18  the conversation was played that it said, "And I'll

19  write the address that you sent me?"  It was past

20  tense.  Do you remember that?

21  A.      Yes.

22  Q.      Did you remember that?

23  A.      Yes.

24  Q.      So the word "send" should actually be "sent?"

25  A.      Okay.  Yes.

1  Q.      The address that Ms. Martin, right, "sent" you

2  was Granny's address.   Correct?

3  A.      Yes, it was.

4  Q.      Granny's is the address in northeast; correct?

5  A.      Yes.

6  Q.      You say that was on Nicholson?

7  A.      I believe Nicholson Street, yes.

8  Q.      Ms. Martin didn't live there, did she?

9  A.      As far as I know, she live here.

10 Q.      As far as you know, she lived there?

11 A.      Yeah.

12 Q.      That was the address that she would have you

13 meet her, according to your testimony; correct?

14 A.      Yes.

15 Q.      And that was the address that she wanted you to

16 send things to, or the letter in this case; correct?

17 A.      Yes.

18 Q.      And I think you said on -- and your testimony

19 was that the person Granny, to the best of your

20 knowledge, had no idea what was going on, correct,

21 between you and Ms. Martin?

22 A.      Yes.

23        MR. MCKNETT:   Thank you.

24        THE COURT:   Redirect.

25        MS. JOHNSTON:   Yes.   Thank you, Your Honor.

1                    REDIRECT EXAMINATION

2              BY MS. JOHNSTON:

3  Q.      Mr. King, just a few questions.

4              Yesterday, Mr. Montemarano, the gentleman seated

5  here to my left, had asked you about your father's

6  murder.

7              Do you recall those questions?

8  A.      Yes, ma'am.

9  Q.      To your knowledge, has your -- has anybody been

10  charged or arrested for your father's murder?

11  A.      No, ma'am.

12  Q.      So it still remains open?

13  A.      Yes, ma'am.

14  Q.      Counsel also asked you about your drug -- your

15  dealings with Lionel Nunn.

16              Do you recall those questions?

17  A.      Yes.

18  Q.      Do you recall testifying in the grand jury on

19  November 10 of 2004?

20  A.      Yes, ma'am.

21  Q.      I'm going to mark this as Miscellaneous 1 for

22  identification only.

23              Back in November 2004, when you were in front of

24  the grand jury -- I'm calling your attention to Page

25  1415. Just read over those -- Page 14. Take your time

1  to read that, and read the top of Page 15.

2  A.      Yes, I remember.

3  Q.      And look at the top of Page 15.

4          Back in November of 2004, did you describe your

5  drug dealings with Lionel Nunn to the grand jury?

6  A.      Yes, ma'am.

7  Q.      Also in front of the grand jury -- calling your

8  attention to Page 21, back in November of 2004 -- did

9  you also discuss with the grand jury --

10         MR. WARD:   Objection, Your Honor.

11         MS. JOHNSTON:   What, if any, discussion --

12         MR. WARD:   That's leading.

13         BY MS. JOHNSTON:

14 Q.      What, if any, discussion did you have with the

15 grand jury concerning the $20,000 that was owed to your

16 father, beginning on the bottom of Page 20?

17 A.      Yes, I see.

18 Q.      And the top with Page 21?

19 A.      Yes.

20 Q.      What information did you provide the grand jury

21 back in November 2004 concerning the $20,000?

22         What did you tell the grand jury?

23 A.      That my dad asked me to pick that up for him,

24 the $20,000.

25 Q.      What did you tell the grand jury in terms of who

1  you were supposed to pick it up from?

2  A.      Paulette Martin.

3  Q.      Before the grand jury -- back in November of

4  2004 -- what if any information did you give them

5  concerning the -- where you picked it up?

6  A.      I told them I picked it up at Adelphi, Maryland.

7  Q.      Similarly, back when you testified in front of

8  the grand jury in 2004, did you provide them any

9  information concerning the additional trips that you

10 made to Ms. Martin?

11         Calling your attention to Page 22.

12 A.      Yes.

13 Q.      And Page 23.

14 A.      Yes.

15 Q.      And Page 24.

16 A.      Yes, ma'am.

17 Q.      You provided -- would you describe for us what

18 you told -- generally what you told the grand jury back

19 in 2004?

20 A.      I told them that my dad asked me to deliver

21 stuff to Paula, make sure it got up there, and follow

22 Louis.

23 Q.      And calling your attention to Page 3 of the

24 grand jury.

25         Were you able to provide them with a description

1  of who Louis was?

2  A.      Yes, ma'am.

3  Q.      Similarly, did you -- when you were in front of

4  the grand jury -- calling your attention to Page 38 of

5  your grand jury testimony, at the bottom of Page 37.  I

6  believe it begins -- starts, really, at the top of Page

7  37.

8          MR. MONTEMARANO:  Your Honor, I'm going to

9  object at this time and request to be heard at the

10  bench.

11         THE COURT:  All right.

12              (At the bar of the Court.)

13         MR. MONTEMARANO:  When Ms. Johnston began using

14  Mr. King's grand jury testimony, as a matter of

15  courtesy I decided to give her a little bit of leeway.

16  I would, at this point, inject she is intending to go

17  all of the thing -- go through this transcript and say

18  he said all these things he said yesterday.  She never

19  asked him to read the predicate questions as to whether

20  he remembered what he said in front of the grand jury.

21         Secondly, using this, which is not cross-

22  examination, reaches proffer.  She can ask him what he

23  said; she can attempt to cross on his inability to

24  recollect.  But simply having him parrot what is in the

25  grand jury transcript, as he has been doing, is

1  entirely  inappropriate   of  the  grand  jury  testimony .

2          MS.  JOHNSTON:    First  of  all , counsel , Mr.

3  Montemarano  made  a  point  that  this  witness  didn't

4  mention  his  drug  dealing  with  Lionel  Nunn .  So,

5  initially , I  raised  that  question  because  indeed  he  had

6  provided  that  information  to  the  government  in  a  prior

7  statement .

8          Secondly , the  other  questions  I'm  asking  about

9  go  to  show  that  he's  given  a  prior  consistent   statement

10  with  his  testimony  here  in  court  in  rebuttal  to  Mr.

11  Montemarano 's  questioning  of  him , trying  to  show  that

12  his  statements  were  not  consistent   that  he  was  not

13  being  truthful  yesterday .

14          THE  COURT:    How  much  farther  do  you  intend  to

15  go?

16          MS.  JOHNSTON:    I  think  this  is  probably  close  to

17  the  end .

18          THE  COURT:    I  think  you're  about  close  to  the

19  end of  going  over  his  wire .  Two  more  questions .

20          MS.  JOHNSTON:    That's  all  I  intend  to  do.

21          MR.  MONTEMARANO :  Thank  you , Your  Honor .

22              (Back  in  open  court .)

23          BY  MS.  JOHNSTON:

24  Q.    Calling  your  attention  to  Page  30 -- beginning

25  on  Page  35  of  your  grand  jury  testimony , continuing

1  through page 38.

2          What information did you provide the grand jury

3  concerning the $75,000, back in November of 2004?

4  A.    It was the only Paula Martin owed $75,000 from

5  $150,000.

6  Q.    And calling your attention to Page 38.

7          What if any discussion did you have with the

8  grand jury concerning Mr. Byrd's role in trying to get

9  that $75,000 for you?

10          Beginning on Page 37, at the bottom, continuing

11  over on the top of 38.

12          What did you tell the grand jury in November of

13  2004 concerning $75,000 that was owed to Mr. Byrd?

14  A.    I asked Mr. Byrd to go ask Paula about the

15  money, and he came back with, he said, $3,500 that she

16  gave him.

17  Q.    Is that what you told the grand jury back in

18  2004?

19  A.    Yes.

20  Q.    You've never been given a copy of your grand

21  jury testimony to read, have you?

22  A.    No, I haven't.

23          MR. MONTEMARANO:  Objection, Your Honor.

24          THE COURT:  Go ahead.  Approach the bench.

25                 (At the bar of the Court.)

1          MR.  MONTEMARANO :   In  view  of  that ,  the  defense
2  -- that  is  a  back  door  way  -- That  is  entire ly
3  inappropriate  in  light  of  Your  Honor 's  ruling  that  she
4  go  a bit  further  with  regard  to  the  objection  that  I
5  raise d.

6          MS.  JOHNSTON:   I  think  I  asked  two  or  three
7  question s about  what  was  in  the  grand  jury  testimony .
8  We  didn't  have  any  discussion  up  here  tat  bench
9  concern ing  my  last  question ,  which  was  to  establish
10  before  this  jury  that  he  didn't  read  his  grand  jury  in
11  preparation  for  his  testimony  here  in  court  yesterday .

12          THE  COURT:   All  she 's  asking  him  is  to  review  --
13  did  you  review  your  grand  jury  testimony  before  you
14  testifi ed  today .

15          MR.  MONTEMARANO :   It  is  permitting  the
16  government  to  have  the  witness  vouch  for  the  grand  jury
17  testimony  which ,  I'm  submitting ,  was  use d
18  inappropriately  for  purpose s of  direct  examination  and
19  not  for  purpose s of  rehabilitation  when  he  establish ed
20  he  could  not  remember  thing s.

21          MS.  JOHNSTON:   I  don't  believe  he  said  he
22  could n't  remember  thing s Monday .

23          MR.  MONTEMARANO :   She  never  asked .   That 's  my
24  point .

25          MS.  JOHNSTON:   I  don't  think  I  had  to  ask

1  whether he remembered things or not.  I asked questions
2  about what he said before the grand jury to show his
3  statements were consistent.
4          THE COURT:  I think she's made proper use of the
5  grand jury testimony.  I didn't let her go any farther,
6  and I think she certainly can ask if he read it.
7          Overruled.
8          MR. MONTEMARANO:  Thank you, Your Honor.
9                  (Back in open court.)
10         MS. JOHNSTON:  Now, Mr. King --
11         THE COURT:  I don't think he answered.
12         Did he answer the question?
13         BY MS. JOHNSTON:
14 Q.     Mr. King, were you ever given a copy of your
15 grand jury testimony to read before you came into the
16 courtroom to testify?
17 A.     No, ma'am.
18 Q.     You mentioned Granny's house.
19        What street is that on?
20 A.     I believe it's Nicholson Street.
21 Q.     Whose house was that, granny's or Ms. Martin's?
22 A.     It was Granny's house by my -- you know, from my
23 understanding.
24 Q.     I think it was Mr. Sussman who asked you if
25 Granny was staying with Ms. Martin.

1  A.       Yes.  She was in -- it's her house, I believe.

2  Q.       It was whose house?

3  A.       Granny's house.

4  Q.       So it was Ms. Martin staying with Granny?

5  A.       Yes.

6  Q.       Mr. Montemarano asked you if you expected to get

7  anything in return for your testimony.

8  A.       No.

9  Q.       Did we have a discussion concerning your 20-year

10 sentence?

11 A.       Yes.  It's a 20-year sentence.

12 Q.       What were you told concerning whether or not

13 anything would be done to reduce your sentence?

14 A.       Nothing.

15 Q.       You fully understand that; is that correct?

16 A.       Yes.

17         MS. JOHNSTON:   I have nothing further.

18         THE COURT:   Any recross?

19         MR. MONTEMARANO:   Thank you, Your Honor.

20                    **RECROSS EXAMINATION**

21         BY MR. MONTEMARANO:

22 Q.       This is the same grand jury that Ms. Johnston

23 showed you.  Correct, sir?

24 A.       Yes, sir.

25 Q.       November 10, 2004.  Correct, sir?

1           Does that sound about right?

2 A.     Yes.

3 Q.     So here with the math -- I'm not real good with

4 numbers -- that's a year after you were arrested in

5 Indianapolis; right?

6           It's a year after your dad's killed; right?

7 A.     Yeah.

8 Q.     It's a year after you made a statement to the

9 Indiana State Police, or the Indianapolis police, the

10 officer who arrested you, the guy with the dark hair,

11 kind of heavyset, named Johnson.

12          Does that sound right?

13 A.     I believe so.

14 Q.     A year after you were interviewed by the DEA out

15 in Indiana; correct?

16 A.     Yes.

17 Q.     And at no time in that did you tell them about

18 Paulette Martin; right?

19 A.     No.

20 Q.     And at no time during that year did you tell

21 them about the $75,000; right?

22 A.     No.

23 Q.     That the $75,000 that we don't find in those

24 telephone conversations until you tell us about them

25 today; right?

1  A.      I mean, I was asking about my money.  I mean,

2  the money in the conversation.  Yes, it was.

3  Q.      It was your dad's money, wasn't it?

4  A.      Yes.

5  Q.      And you said your father's murder is still open;

6  correct?

7  A.      To my knowledge it is.

8  Q.      To your knowledge.

9          And were you asked questions about prior threats

10  to your father when you were in front of the grand

11  jury?

12  A.      Yes.

13  Q.      Wasn't there a time when Bridget, his new wife,

14  was stepping out on him with another man?  Correct?

15          MS. JOHNSTON:   Objection.

16          Relevance.

17          THE COURT:  Overruled.

18          MR. MONTEMARANO:   Thank you, Your Honor.

19          BY MR. MONTEMARANO:

20  Q.      Wasn't there a time when he was -- his new wife,

21  Bridget Brim, was stepping out on him and seeing

22  another man?  Correct?

23  A.      Not to my knowledge that she stepped out on him,

24  seeing another man.

25  Q.      She didn't have a new boyfriend?

1   A.        I don't know .

2   Q.        There wasn't a time when he went to the new

3   boyfriend in Bridget 's new place of abode , their new

4   residence , and Bridget gave a gun to the boyfriend and

5   pulled it on your dad?

6            MS. JOHNSTON:    Objection .

7            Relevance , and beyond the scope of redirect .

8            THE COURT:    Overruled .

9            THE WITNESS:    No.   My father went to his house

10  on Chester Street and there was a guy there , but I

11  don't know if the guy is Bridget 's boyfriend or who

12  the guy was .   I can't say that .   Bridget gave the guy a

13  gun .

14            BY MR. MONTEMARANO:

15  Q.        Bridget gave this guy a gun?

16  A.        Yes .

17  Q.        The guy pulled it on your dad?

18  A.        Yes , he did .

19  Q.        Was your dad shot at that time ?

20  A.        No .

21  Q.        But he was shot at another time ; right ?

22  A.        Yes .

23            MR. MONTEMARANO :   No further questions , Your

24  Honor .   Thank you .

25            THE COURT:    Any further recross ?

1          MR. MARTIN:   Nothing from Mr. Goodwin, sir.

2          MR. HALL:   No, Your Honor.

3          MR. MITCHELL:   No, Your Honor.

4     THE COURT:   Mr. Ward?

5          MR. WARD:   If I may, Your Honor.

6     THE COURT:   You may.

7                 **RECROSS EXAMINATION**

8     BY MR. WARD:

9  Q.     You were asked about what you told the grand

10 jury, Mr. King.  Tell these ladies and gentlemen   what

11 you told the grand jury about a woman named "Lavon

12 Dobie."

13 A.     Who?

14 Q.     Lavon Dobie.

15 A.     I don't know her.

16 Q.     You never heard the name before; right?

17 A.     Right.

18 Q.     You didn't mention "Lavon Dobie" to the grand

19 jury because you've never heard the name before; is

20 that right?

21 A.     Right.  I don't know her.

22 Q.     Do you see -- well, if you don't know "Lavon

23 Dobie," obviously you cannot identify her in court, but

24 let me ask the lady on the end.  Could you stand up,

25 please?

1          (Defendant Dobie stands.)

2          MS. JOHNSTON:   Objection.

3          BY MR. WARD:

4 Q.       Do you know that lady?

5 A.       No, I don't.

6          MR. WARD:   Thank you.

7          That's all, Your Honor.

8          MS. JOHNSTON:   Your Honor, just for the record

9 there, I was objecting to counsel asking his client to

10 say anything.

11          THE COURT:   She didn't say anything, so your

12 objection is sustained.

13          MS. JOHNSTON:   Thank you, Your Honor.

14          THE COURT:   But we know who stood up.

15          MR. WARD:   I never asked her to say anything,

16 Your Honor.   I just asked her to stand up.

17          THE COURT:   Any further recross?

18          Any further examination of this witness?

19          MS. JOHNSTON:   No, Your Honor.

20          THE COURT:   All right, you may step down.   Thank

21 you very much.

22                    (Witness excused at 10:52 a.m.)

23          MS. JOHNSTON:   Your Honor, before we call the

24 next witness, the parties -- the government and all

25 defendants, through their counsel, have agreed that the

1  Marion County Jail calls that were played yesterday and

2  have been identified as being contained on CD 2 and

3  that are associated with the transcript CD 2A through F

4  are actual, true recordings of the telephone calls from

5  the Marion County Jail in Indiana that occurred on the

6  dates and the times as reflected in the transcripts.

7          THE COURT:  All right.

8          Ladies and gentlemen, what she just read to you

9  was a stipulation, which means the parties have simply

10 agreed that those facts are true, and you need not have

11 independent testimony to that effect.  So, you may

12 accept you're those facts as true.

13         MR. MONTEMARANO:  Your Honor, before the next

14 witness takes the stand, can I have 30 seconds to speak

15 to the marshals?

16         THE COURT:  Yes.

17         MR. MONTEMARANO:  Thank you.

18         Thank you, Your Honor.

19         THE COURT:  All right.

20         MS. GREENBERG:  Your Honor, the government's

21 next witness is Sergeant Dave Martini.

22 Thereupon,

23                    **DAVID MARTINI**,

24 having been called as a witness on behalf of the

25 Plaintiff, and having been first duly sworn by the

1 Courtroom Deputy, was examined and testified as

2 follows:

3          THE CLERK:  If you would, state your name for

4 the record.

5          THE WITNESS:   I'm Sergeant David Martini:

6 M-A-R-T-I-N-I.

7                    **DIRECT EXAMINATION**

8          BY MS. GREENBERG:

9 Q.      Sir, could you tell the jury, please, your

10 background, training and experience?

11          Where are you currently employed?  Let's start

12 with that.

13 A.      I'm employed by the   Prince George's  County

14 Police Department.

15 Q.      As a sergeant; is that correct?

16 A.      Yes, ma'am.

17 Q.      Could you give them some idea of your

18 background, training and experience?

19 A.      I was originally --   I started off in law

20 enforcement as a member of the    United States Secret

21 Service Uniformed Division.  While    I was in their

22 police academy,   I received training in basic narcotic

23 investigation, identification, field testing, street

24 values.

25          Then  I got hired by the   Prince George's  County

1 Police department.  While   I went through their six-

2 month training academy, there   I also got training in

3 basic drug identification, field testing, street

4 values.

5        Since  I've been on the department,   I've been to

6 several different schools and conferences.  One

7 conference that   I've attended several times is

8 McGlothlin  Narcotics Investigation Sharing Conference.

9 That's a seminar where we go over different drug

10 trends, sales, distribution schemes and technologies

11 and investigative technologies.

12        I've also been to the Financial Investigators

13 School given by the   Maryland State Police.   I've been

14 through the basic narcotics investigator school given

15 by the Prince George's County Police Department; I've

16 been to conspiracy school given by the Maryland State

17 Police;  I've been to a concealed compartment seminar

18 given by the  New York Unified Intelligence Division.

19        I've been to managing confidential informants/

20 managing undercover investigation school    given by the

21 DEA, Drug Enforcement Administration.

22        I've been through drug interdiction school given

23 by the Maryland State Police.

24        I've been through the basic drug investigators

25 school given by the Drug Enforcement Administration.

1          I've been through the clandestine laboratory

2  investigation safety certification program given by the

3  Drug Enforcement Administration; also several

4  certification schools to follow up that.

5          I've been to a crack cocaine practical knowledge

6  training that was given by the    DEA and the   Prince

7  George's  County Police Department's drug lab.

8          I've been to interception secure communication

9  school, which is a wiretap school given by the

10  multi-jurisdictional counter-drug task force.

11          I've been through National Guard Counter-drug

12  technology seminar.

13          I've also been through jump chain with the

14  Prince George County Police.

15          Also, I have been an instructor at the       Prince

16  George's  County Police Academy for drugs.       I have been

17  instructor with several grand juries that have been

18  presented to the   Prince George's  County Police.

19          Also, in a lab setting, I've personally

20  converted powder cocaine to crack cocaine, cocaine base

21  and also in a lab setting    I've personally manufactured

22  or made methamphetamine.

23  Q.     Now, sir, is it fair to say with all that

24  training that you've spoken about in your current job

25  that your time in law enforcement has been involved in

1 the area of drug enforcement?

2 A.      Yes, ma'am.  My time on the police department --

3 I spent approximately 12 and a half years within the

4 narcotics enforcement division.

5 Q.      And you moved up the ranks to -- currently

6 you're a sergeant?

7 A.      Yes, ma'am.

8 Q.      Were you employed as a   Prince George's  County

9 law enforcement officer in    November of 2003?

10 A.      Yes, ma'am,  I was.

11 Q.      Specifically, on November 25, 2003 were you so

12 employed?

13 A.      Yes, ma'am.

14 Q.      Did you work with a confidential informant      on

15 that date?

16 A.      Yes, ma'am.

17 Q.      Since the date of that incident, has the name of

18 the informant been disclosed?

19       It it's no longer a secret confidential

20 informant; is that correct?

21 A.      To the best of my knowledge the name has been

22 disclosed in connection with this investigation.  Yes,

23 ma'am.

24 Q.      During normal circumstance there is times      when

25 you keep a confidential informant confidential, and

1   there's some times when you reach an agreement, either

2   with the prosecutor or with the informant that that

3   name gets disclosed?

4   A.      Yes, ma'am.

5   Q.      The person you were working with that day is

6   Raynard -- R-A-Y-N-A-R-D -- Dorsey -- D- O-R-S-E-Y?

7   A.      Yes, ma'am, that is the individual.

8   Q.      Known on the street as "Nard?"

9   A.      Yes, ma'am.

10  Q.      Now, without telling -- without stating what was

11  discussed between you and   Mr. Dorsey, did you work with

12  him to make a series of phone calls to a potential

13  target?

14          MR. MONTEMARANO:  Objection,   Your Honor.

15          Leading.

16          THE COURT:  Sustained.

17          MS. GREENBERG:   I'm trying to not get into the

18  conversations.

19          THE COURT:  Sustained.

20          Just ask it in a different way.

21          BY MS. GREENBERG:

22  Q.    I don't  want you to talk about what you and    Mr.

23  Dorsey discussed, but what did you and   Mr. Dorsey do on

24  November 25, 2004?

25  A.      He gave information to us pending a potential

1 investigation, and on that day we made several

2 attempted -- several pages and cell phone calls to the

3 target of the investigation.

4 Q.      Given the words that you just used,

5 "investigation" and "target" -- I don't want to be

6 pedantic, but what were you doing on that date?

7       What was it relating to?

8 A.      It was related to what   I always do: drug

9 investigations.

10 Q.      In your job, what were you using    Mr. Dorsey for?

11 A.      As I stated, he was working as a confidential

12 informant that was calling out or contacting a drug

13 supplier.

14 Q.      What was your goal that day as a law enforcement

15 officer?

16 A.      To have the informant contact the drug supplier,

17 bring a quantity of illegal drugs to the informant, at

18 which time we would stop the individual and make an

19 arrest.

20       MR. MONTEMARANO : Objection,  Your Honor.  Can we

21 be heard at the bench?

22            (At the bar of the Court.)

23       MR. MONTEMARANO :  Apparently, there is going to

24 be testimony following shortly behind this suggesting

25 that the drug supplier -- to use    Mr. Dorsey's term --

1  because that's where this language is coming from, not

2  from Detective Martini -- Sergeant Martini is that the

3  drug supplier will be one of the defendants here.      I

4  respectfully submit that all of this is hearsay.  They

5  can say that we had him call the subject of our

6  investigation, but saying he called a "drug supplier"

7  is a  conclusion, an allegation, or at very best a claim

8  not subject to cross-examination because     Mr. Dorsey is

9  not here.

10      If Mr. Dorsey thinks he's a drug supplier, good

11 for  Mr. Dorsey; they can put   Mr. Dorsey on the stand.

12 Unless they're going do that, they can't use anything

13 out of  Mr. Dorsey's mouth from this person, and the

14 mere suggestion of a drug supplier is -- it goes to the

15 very issue of why we're here,    Your  Honor.

16      MS.  GREENBERG:  Judge, it's not what the witness

17 said.  He's misinterpreting what the witness said.  He

18 said that was the goal of his investigation that day.

19      THE  COURT:  The intent is to always have the

20 informant make communication with drug suppliers, not

21 that  Mr. Dorsey told him anything.

22      MR.  MONTEMARANO:  How does he know --

23      THE  COURT:   I will sustain an objection to the

24 extent that the answer of this witness is dependent on

25 what  Mr. Dorsey told him, and   I'm sure  Ms. Greenberg

1  will ask further questions that can steer away from

2  anything that  Mr. Dorsey told him.  He will simply say

3  he instruct ed Mr.  Dorsey to make phone calls.

4           MS. GREENBERG:   Your Honor, that's what he

5  already said.  Without saying what Mr. Dorsey told you,

6  what were you trying to do that day?  That's all he

7  said.

8           THE  COURT:  That's proper.

9           MR. MARTIN:   Your Honor, if  I can be heard

10  briefly.   I understand the government is going to call

11  Mr. Dorsey, and this testimony is --

12           THE  COURT:  You said what?

13           MR. MARTIN:  That the government is going to

14  call  Raynard  Dorsey.

15           THE  COURT:   I don't know what they're going to

16  do.

17           MR. MARTIN:  If they're not going to call

18  Raynard  Dorsey,  I would object based on   Crawford versus

19  Washington.   I think we need an opportunity to

20  cross-examine  Mr. Dorsey on his basis -- the claim he's

21  making that somebody is a supplier.

22           MS. GREENBERG:   Your Honor, I specifically led

23  this witness to not get into any conversations with

24  Mr. Dorsey.  We are trying very hard to keep on the

25  court's schedule.   I want to wait and see how today

1  goes and may or may not call    Mr. Dorsey.  If counsel

2  wants to call  Mr. Dorsey if we don't -- we're just

3  trying to limit things where we can.

4         THE COURT:  Are you going to offer recordings

5  with this witness?

6         MS. GREENBERG:  No.

7         Your Honor, I can proffer what I'm going to do.

8  I'm going to -- he was present when these telephone

9  calls were made.  He's going to state the number that

10 he either directly dialed or    Mr. Dorsey dialed.he was

11 at the Prince George's County Plaza Center where    Mr.

12 Goodwin showed up, and conducted a search of the

13 vehicle and seized certain items.  He is not going to

14 get into any conversations.

15        MR. MONTEMARANO :  Where is the basis for

16 knowledge that the person he's on the phone with is a

17 drug supplier?  That's a claim from    Mr. Dorsey.  This

18 officer has not stated he has arrested this person or

19 seized drugs from this person.  This person could be

20 the Queen of the  May as far as Agent Martini --

21        THE COURT:  The questions so far have not asked

22 anything about what   Dorsey told him.

23        MR. MONTEMARANO :  I completely agree,  Your

24 Honor.  But when he says there is this person, a drug

25 supplier, there has to be a basis for knowledge.  There

1  has been no basis demonstrated.  If they can

2  demonstrate that knowledge out of Detective Martini's

3  mouth and his knowledge, he's a drug supplier.

4  Otherwise, he's just a suspect.

5       MS. GREENBERG:   Your Honor, I think my question

6  was -- it's very pedantic.  He's a drug investigator.

7  He is to work with the drug informant and get that

8  person to get some drugs.  He is not out there to catch

9  a murderer or to catch a fraud person.  He is to put

10 the whole thing in context.  He never said it's what

11 the person told him.  It's not a proffered issue.

12      THE COURT:   I don't think there is a proffered

13 issue, but it could be if you don't ask the right

14 questions.  So far   I think you've asked the correct

15 questions.

16      Do not steer this witness into what    Mr. Dorsey

17 told --

18      MS. GREENBERG:   I've been leading him so he may

19 not get into those conversations.

20      THE COURT:  Y ou may appropriately lead him.

21      MR. MONTEMARANO :  For scheduling purposes, we

22 would lodge a continuing objection.

23      THE COURT:  I will give you a continuing

24 objection.

25      MR. MONTEMARANO :  Thank you, sir.

1                    (Back in open court.)

2            BY MS. GREENBERG:

3  Q.      Now, to follow up with what happened next

4  Sergeant  Martini.  Without telling us what was

5  discussed, did you then work with    Mr. Dorsey to make a

6  series of phone calls?

7  A.      Yes, ma'am,  I did.

8  Q.      You were there when the numbers were dialed?

9  A.      Yes, ma'am.

10 Q.      And either you dialed them or you directed      Mr.

11 Dorsey to dial them?

12 A.      Yes, ma'am, that is correct.

13 Q.      Did you make a record of these telephone numbers

14 --

15 A.      Yes,  I did.

16 Q.      -- on your notes?

17 A.      Yes, ma'am.

18 Q.      Could you tell the jury what cell telephone

19 number you called?

20          If you need to look at your notes, please go

21 ahead.

22 A.      Thank you.

23          The cellular telephone number that    I provided  --

24          MR.  WARD:  I'm going to interpose another

25 objection,  Your Honor.  I hesitate to do it, and   I hate

1  to do it, but   I think there's an issue here.

2          THE COURT:  All right, approach the bench.

3                  (At the bar of the Court.)

4          MR. WARD:  Your Honor, unless these telephone

5  numbers originated with this witness and not with      Mr.

6  Dorsey, then   I think we have a -- they were okay if

7  they originated with   Mr. Dorsey and   Dorsey said, here's

8  a number we want to call, you know, whatever that

9  number is.   I think that that is hearsay.

10          THE COURT:  She hasn't asked the witness where

11  he got the number from.

12          MR. WARD:  Well --

13          THE COURT:  Unless and until -- if the answer to

14  the question is,   Mr. Dorsey gave it to me, then there

15  might be a problem, but she hasn't asked that question.

16          MR. WARD:  I think she has to ask it.  She can't

17  just ask  him what number did he dial.  We want to know

18  where it came from.

19          MS. GREENBERG:  You can ask him if you want.

20          MR. WARD:  No, no, no, no  , no.  Absolutely not.

21          THE COURT:  All she's asked this witness is,

22  what number did you call?

23          MR. WARD:  No, sir.  Because if the number came

24  from Dorsey, it's the same as having    Dorsey testify and

25  identify --

1          THE  COURT:   The question does not presuppose
2 anything  about where he got the number from.
3          MR.  WARD:    Your  Honor, it's very simple for her
4 to say, the number you dialed.  Where did it come from?
5          THE  COURT:    I can't tell the prosecutor what
6 questions to ask.    I don't think there's anything wrong
7 with the question.  She said, what number did you cause
8 the informant to dial?
9          I overrule your objection.
10                    (Back in open court.)
11          BY MS.  GREENBERG:
12 Q.      If we can continue with what you did that day,
13 Sergeant  Martini.  What numbers did you either directly
14 or tell the --  Mr. Dorsey to dial?
15          What were we, on cellular or pager?     I forget.
16 A.      The cellular telephone number.
17 Q.      If you can tell the jury the cellular telephone
18 you told him to dial.
19 A.      The number provided was (202) 832-0125.
20 Q.      Was there also a pager number that was called
21 during the course of the day?
22 A.      Yes, ma'am.
23 Q.      What was that pager number?
24 A.      It was pager number (202)837-9705.
25 Q.      These calls were made between what time and what

1 time?

2         Without getting into each individual call, if

3 you could give a span of time when the first pager or

4 cellular telephone call was sent by you and      Mr. Dorsey

5 and when the last call was made.

6 A.     It started at about 3  :50 p.m. in the afternoon,

7 and the last call was about 9:00 p.m. at night.

8 Q.     During that day on, and at those times, 3    :50 and

9 9:00 p.m. on November 25, 2003, did you receive a call

10 back from your calls to either the pager or the cell

11 phone number?

12 A.     Yes, ma'am.

13 Q.     Were you able to tell from the caller     ID what

14 number was calling you back?

15 A.     Yes, ma'am.

16 Q.     Would you give -- there was -- was there more

17 than one number?

18 A.     Yes, ma'am.

19 Q.     And could you give the jury the numbers which

20 you received calls back from in response to your calls

21 to the cellular telephone or to a page?

22 A.     The one cell phone -- the one telephone number

23 we received a telephone call or return call from was

24 (202) 388-9033.  We also received a return call from

25 (202) 832-0125.  We received another call from another

1  phone number which was (202) 247-5303.

2  Q.      The number (202) 247-5303.  Approximately what

3  time was that received?

4  A.      We received that call at approximately 9:51 p.m.

5  Q.      All right.  As a result of these -- let me just

6  ask you.  On the cellular telephone -- were you able to

7  record a message on the cellular telephone during your

8  work that day?

9  A.      No, ma'am, we didn't.

10 Q.      Why not?

11 A.      I know that we didn't have the proper ear piece

12 that you need to make a recorded telephone call.

13 Q.      Let me ask you a different way.

14         Were you able to leave -- was the person's cell

15 phone accepting your message that you were calling the

16 cellular telephone that you called?

17 A.      No.  Many times when the call was placed to the

18 target's cellular telephone, it rolled over to voice

19 mail, and the voice mail was full and wouldn't let our

20 C.I. leave a message.

21 Q.      What did you end up doing at approximately 9:00

22 o'clock that evening?

23 A.      We went to 3500 Eas  t West Highway,  Hyattsville ,

24 Prince George's  County,  Maryland, which is the Prince

25 George's Shopping Center.

1  Q.      Did you have assistance there at the time?

2  A.      Yes, I did.   I had several other members from

3  the police department that were assisting with the

4  investigation at that time.

5  Q.      You arrived there at approximately what time?

6          What time did you arrive there?

7  A.      At approximately 8:25 p.m.

8  Q.      Was anyone with you?

9  A.      Yes, ma'am, other officers.  We also had the

10 confidential informant,   Mr. Dorsey.

11         MS. GREENBERG:  Your   Honor, to prevent another

12 objection, may we approach --

13         THE  COURT:  You may.

14         MS.  GREENBERG:  -- and   I'll proffer something?

15         Thank you.

16              (At the bar of the Court.)

17         MS.  GREENBERG:   Your Honor, given the previous

18 objections as to   Mr. Dorsey's hearsay,   I wanted to let

19 the court know that one thing   I intend to elicit from

20 this witness is how did he know to stop the car that

21 drove in, and it's because   Mr. Dorsey pointed out the

22 car.  It's not to say that the person is a drug dealer;

23 it's to explain why the officer approached the car that

24 he did.

25         MR. MARTIN:   I don't have any objection to that.

1  It's my client, okay?    Learley  Goodwin is my client,

2  and this testimony,   I think, goes to   Learley  Goodwin.

3  With that,  I don't have an objection.

4        THE  COURT:  There's no objection.

5        Mr.  Montemarano  has one.

6        MR.  MONTEMARANO :  Not at all.

7        So the record is clear.  If the question had

8  been answered by the sergeant, as a person     Mr.  Dorsey

9  claimed was a drug dealer, the person we wanted to

10  investigate or something like that, but when he said no

11  more -- no predicatory language to it,     I'm going to

12  have to come out on my of my seat on Sergeant Martini

13  and every other witness who goes down that route.  Just

14  so it's clear.

15        MR.  MARTIN:  Just to make my position clear,     I

16  don't have any objection to    Mr.  Dorsey identifying

17  vehicle that  Mr.  Goodwin was driving.  If that's all

18  he's going to say -- he's going to say that's the

19  vehicle you're looking for, fine.     I don't have any

20  objection to that.

21        MR.  WARD:  Well,  I do because.  I guess    I'm

22  maintaining my hearsay objection, but --

23        MS.  GREENBERG:   Your Honor, it's a hearsay

24  exception just to explain why this officer did what he

25  did.

 1         MR.  MARTIN:  For that limited purpose, I have no
 2 objection.
 3         THE  COURT:  All right, thank you.
 4                 (Back in open court.)
 5         BY MS.  GREENBERG:
 6 Q.      Sergeant  Martini, did you see a vehicle come
 7 into the parking lot about 20 to 25 minutes after you
 8 received your last call from that particular cell
 9 phone?
10 A.      Yes, ma'am.  A white   Cadillac El Dorado arrived
11 on the parking lot.
12 Q.      What time was that?
13 A.      That was approximately 9   :25 p.m.
14 Q.      How did -- what did you do with the respect to
15 that white El Dorado   Cadillac?
16 A.      The  Cadillac pulled onto the parking lot and
17 parked in a parking spot in front of the Outback
18 steakhouse, at which time the informant indicated that
19 that was the target we were looking for, and a stop
20 team of officers approached the vehicle --
21         MR.  MARTIN:  Objection to what the confidential
22 witness identified as "the target."
23         THE  COURT:  Sustained.
24         Ask it a different way.
25         MS.  GREENBERG:   Your Honor, if  I may lead this

1 witness?

2          BY MS. GREENBERG:

3 Q.      Did you stop that vehicle, the white El Dorado

4 Cadillac?

5 A.      Yes, ma'am.

6 Q.      What caused you to stop the vehicle?  Did

7 anybody say anything to you?

8 A.      The informant told me that that was --

9          MR. WARD:  Objection.

10         BY MS. GREENBERG:

11 Q.      Did the informant tell you that was the vehicle

12 you should be looking for?

13 A.      Yes, ma'am.

14 Q.      And therefore you approached that vehicle?

15 A.      Yes, ma'am.

16 Q.      What did you do then?

17 A.      A group of officers stopped the occupants of the

18 vehicle, they were detained, and then we conducted a

19 search of the vehicle.

20 Q.      Did you identify occupants of the vehicle?

21 A.      Yes, ma'am.

22 Q.      Who were they?

23 A.      The driver of the vehicle was   Mr. Learley

24 Goodwin, his 17 year-old daughter and 14 year-old

25 grandson.

1  Q.      Was a search of the vehicle conducted?

2  A.      Yes, ma'am.

3  Q.      What was your role with respect to the search of

4  this vehicle?

5  A.      When any officers found anything that they felt

6  would be pertinent to the case, they would call for me

7  and I came over and  I recovered anything that was

8  evidence.

9  Q.      Is that sort of standard operating procedure for

10 searches?

11 A.      Yes, ma'am.

12 Q.      Could you explain to the jury how that works in

13 terms of how many officers were searching and how

14 physically did you become the recovering officer for

15 those items?

16 A.      Since  I was the lead investigator for the case,

17 I'm right there on the scene, and maybe there's a

18 couple of officers that are searching a vehicle while

19 somebody else is dealing with the occupants of the

20 vehicle.  Whenever anybody is searching and they come

21 across an item, they call me over.  At that time,      I

22 come over and  I'll take custody of whatever we believe

23 to be evidence.   I'll put it into an evidence bag and

24 take notes on where we found the item.

25 Q.      Did you cause pictures to be taken?

1  A.       Yes, ma'am.

2  Q.       First of all,  Your Honor, if  I may approach.

3           THE  COURT:  You may.

4  Q.       Showing you what's been marked as government's

5  Exhibit 28 and 28  A.

6           Could you tell the jury what these are?

7  A.       This is a  Motorola cellular telephone, and this

8  is also a  Motorola telephonic  paging device.  It's a

9  pager.

10  Q.      At the time of your stop in    November of 2003,

11  did you record the numbers off these two items, the

12  telephone number of the pager and -- the telephone

13  number associated with the pager and the telephone

14  number associated with the cellular telephone?

15  A.       No, ma'am,  I didn't.

16  Q.       Was it necessary to do in connection with this

17  trial?

18  A.       I didn't do that, ma'am.

19  Q.       Not possible as far as you know?

20  A.       No, ma'am.

21  Q.       Government's  Exhibit 29.

22           What is that?

23  A.       This is a wallet that had several documents in

24  it.

25  Q.       That was seized from where?

1 A.      It was from Mr . Goodwin's pants pocket.

2 Q.      Did you receive any money -- was any money

3 seized on that day?

4 A.      Yes, ma'am.

5 Q.      Showing you government's   Exhibit 30.

6        What is that?

7 A.      These are the property records that records the

8 amount of money that was seized during the

9 investigation on that day.

10 Q.      Could you tell the jury where the money was

11 seized from?

12 A.      From  Mr. Goodwin's person.  He had several

13 different bundles in three different pockets.

14 Q.      Do you have a recollection of where the money

15 was and in what amount?

16 A.      I believe that there was $7,000 in one inside

17 coat pocket, another $2,025 in another coat pocket, and

18 about $685 or $695 in a pants pocket.

19 Q.      And you recorded the quantity and type of bills

20 recovered from each place?

21 A.      Yes, ma'am.

22 Q.      That's on Government's   Exhibit 30?

23 A.      Yes, ma'am.

24 Q.      For example:  M-1.  Would that be one location,

25 and then it's all listed under there?

1   A.       Yes, ma'am.

2   Q.       For a total of $7,000?

3   A.       Yes, ma'am.

4            MS. JOHNSTON:    Your Honor, apparently there's a

5   problem with the monitors.

6            THE COURT:  Oh.

7            MS. JOHNSTON:  The large monitor is not working,

8   but the smaller ones are; is that correct?

9            THE COURT:  Okay.  It's on now.

10           MS. GREENBERG:    Ms. Johnston has the magic touch

11  with this machine.

12           BY MS. GREENBERG:

13  Q.       M-2 lists the bills that were recovered from the

14  second location on   Mr. Goody's person   for a total of

15  $2,025?

16  A.       Yes, ma'am.

17  Q.       And M-3 lists the quantity and type of bills

18  that were recovered in the third location on      Mr.

19  Goody's person for a total of 685 dollars; is that

20  correct?

21  A.       Yes, ma'am.

22  Q.       And in your work as a drug law enforcement

23  officer in the drug area, did you notice anything

24  typical about these types of bills?

25  A.       Aside from the fact it was a large quantity of

1  money, it was broken down into smaller bundles that

2  were wrapped in rubber bands.

3  Q.      What does that mean to you?

4  A.      Well, what it --

5          MR. MARTIN:  Objection.

6          THE WITNESS:  -- in legitimate businesses --

7          MR. MARTIN:  Objection.

8          THE COURT:  Wait a minute.  Wait a minute.

9  Don't keep answering once the objection is made.

10         Do you want to approach on it?

11              (At the bar of the Court.)

12         THE COURT:  All right, what is the basis for

13  your objection?

14         MR. MARTIN:  Did you proffer him as an expert?

15         MS. GREENBERG:  No.

16         MR. MARTIN:  He's talking generally about what

17  bundles of money means, and    I think that's

18  inappropriate for him to talk about generally what

19  happens in drug cases.    I think he has to talk

20  specifically about this case and whether he has any

21  base of knowledge for believing that that is drug money

22  or the  proceeds of drug sells.

23         THE COURT:  Ms. Greenberg?

24         MS. GREENBERG:   Your Honor, I can certainly

25  proffer him, in that case, as an expert.     I think his

1  recitation in all that he's done in his many years of

2  narcotics work.

3          THE COURT:  If you want him to be able to give

4  viewpoints like that,   I think you need to qualify him.

5  You may have already done that.

6          All right, thank you.

7          MS. GREENBERG:   Your Honor, I believe  Mr.

8  Martini's background as already given to the jury is

9  sufficient for him to be qualified as an expert in the

10 field of narcotics trafficking, and    I ask that he be so

11 allowed to be give his opinion as to the nature and

12 trends of drug trafficking.

13         THE COURT:  All right.  Any objection?  Anybody

14 wish to inquire?

15         MR. MONTEMARANO:   I do, Your Honor.

16         THE COURT:   You may.

17         MR. MONTEMARANO:  Thank you.    I only have two

18 questions.

19                    **CROSS-EXAMINATION**

20         BY MR. MONTEMARANO:

21 Q.     You've been in narcotics investigation and

22 enforcement for about 12 years, give or take, sergeant?

23 A.     Yes, sir.

24 Q.     That's all in  P. G.?

25 A.     Yes, sir.

1  Q.      It's during that time you attended that

2  exhaustive list of classes; correct, sir?

3  A.      Yes, sir.

4  Q.      Classes all taught by police officers; correct?

5  A.      Either law enforcement officers, retired

6  officers --

7  Q.      Prosecutors?

8          MS. GREENBERG:   Your Honor, please let the

9  witness finish.

10         THE COURT:  Yeah, let him finish.

11         THE WITNESS:  At times prosecutors and civilians

12 that are usually involved with law enforcement.

13         BY MR. MONTEMARANO :

14 Q.      You don't have a law degree; correct?

15 A.      No, sir, I don't.

16 Q.      No defense attorney has ever spoke there; right?

17 A.      I have had classes where defense attorneys have

18 spoke.

19 Q.      Oh, okay.  Good.

20         Thank you, Your Honor.

21                    **CROSS-EXAMINATION**

22         BY MR. MARTIN:

23 Q.      Good day, detective.

24 A.      Good afternoon.

25 Q.      Anthony Martin for Mr. Goodwin.

1          Are you published?

2  A.      No, sir.

3  Q.      Have you ever been subject to peer review to

4  determine how good you are in terms of any articles

5  that you may have written?

6  A.      We don't have a peer review system with the

7  Prince George's County Police Department.

8  Q.      Have you ever been qualified before as an

9  expert?

10 A.      Yes, sir.

11 Q.      Where?

12 A.      With the Circuit Court of   Prince George's

13 County, Maryland and District Court with    Prince

14 George's County, Maryland.

15 Q.      I have no further questions,   Your Honor.

16          THE COURT: All right,   I will accept him to give

17 expert opinions in the field that you've proffered.

18                    **REDIRECT EXAMINATION**

19          BY MS. GREENBERG:

20 Q.      Sergeant Martini, given that the court has

21 accept you as an expert, can you tell this jury how

22 you've seen this type of bundles of bills before you

23 recovered from  Mr. Goodwin?

24 A.      What it is, when people are involved in a

25 legitimate business they have cashiers and cash

1  registers, and they have computer systems that keep a

2  legitimate record of exactly the transactions that take

3  place and how they exchange money, but in an illegal

4  distribution scheme of drugs you don't have a checkout;

5  you don't have a cashier; you don't have a nice drawer

6  that has a place for $1s and $5s and $10s and $20s.

7           So, how does a drug person deal with their money

8  is they'll put it in bundles or piles of maybe $100,

9  fold it in half, put it in a rubber band, and that

10  small bundle represents $100.  Other times you will see

11  it in $1,000, in a thicker bundle, again folded     in half

12  with a rubber band.  You know, ten of these small

13  stacks equals $1,000, maybe.  Ten of these large stacks

14  equals $10,000.

15           With a drug transaction, it's very quick.

16  There's not a lot of time on these.  You don't want to

17  be caught by law enforcement.  So when you give

18  somebody -- let's say for instance -- a kilogram of

19  cocaine, and that person is going to exchange you

20  $30,000, you may get a paper bag with 30 of those

21  $1,000 bundles.  You count the bundles, you have 30,

22  you have  $30,000.

23           Again, they don't have a cash register.  How do

24  drug dealers keep track of their money?  By their

25  bundles.  Their casher register is their coat pockets,

1  their pants pockets, their glove box, maybe a duffel

2  bag in the car.

3  Q.      And based on what you've seen in terms of your

4  -- have you seen that in terms of your work, what

5  you've just described?

6  A.      Yes, ma'am.  Numerous times.

7  Q.      How does that relate to the seizure that we had

8  here from  Mr. Goodwin on November 25, 2003?

9  A.      This quantity of money -- a majority of the

10  money was broken down into what     I would consider a drug

11  fold, or bundles.  They were folded in half, wrapped in

12  rubber bands in increments of,     I believe, you know,

13  $100, a $1,000.

14  Q.      Is that -- that drug folder or drug bundle.  Is

15  that a term you're just using here, or is that common

16  terminology in the law enforcement and drug community

17  for what you saw here?

18  A.      It's called a "drug fold," a "doper fold," a

19  "bundle."

20  Q.      So the approximate $9,710 that you seized from

21  Mr. Goodwin on November 25, 2003 fit what you have seen

22  before?

23  A.      Yes, ma'am.

24  Q.      Could you explain -- on the jurors' screen

25  there's this notation to 303 quantity of $20 bills.

1          Does that comport with your view that these were

2 drug bundles or drug folds?

3 A.      Again, it's a larger quantity of money, and a

4 majority of the bills are larger quantities of bills, a

5 lot of $20s, some $50s, some $100s.

6 Q.      What is the significance of so many $20 bills?

7 A.      Like other commodities, drugs are sold in either

8 larger amounts or they cost more.

9          MR. MONTEMARANO : Objection,  Your Honor.

10          Calls for supposition about things.  This is a

11 bit far afield I submit,  Your Honor.

12          MS. GREENBERG:   Your Honor, it's his training

13 and experience.

14          THE COURT:  Ask it a different way so we don't

15 have this objection.

16          BY MS. GREENBERG:

17 Q.      Is there a significance to that large number of

18 $20 bills?

19 A.      A lot of times drugs are sold in increments of

20 $20, $100 -- there's not a lot of drugs that are sold

21 for $1.87.  There's not a lot of change involved.

22 Q.      Now,  I'd  like to show you some items that are

23 contained within   Goodwin 29.

24          The wallet.  That was recovered from where?

25 A.      From his --  I believe it was his right rear

1 pants pocket.

2 Q.     And were the numbers here recovered from the

3 wallet?  This piece of paper?

4 A.     Yes, ma'am.

5 Q.     And I won't have you read all these, but two

6 little yellow slips of paper with some numbers on it.

7        Was that recovered from the wallet?

8 A.     Yes, ma'am.

9 Q.     And a MAMSI card.

10       Can you see that on your screen?

11 A.     Yes, ma'am.

12 Q.     Can you read the member name?

13 A.     It is --

14 Q.     Would you like me to zoom in a little?

15 A.     Mr. Learley Goodwin.

16 Q.     How is that?

17 A.     The member name is  Mr. Learley Goodwin.

18 Q.     Effective date?

19 A.     Is July 1st 1996.

20 Q.     The expiration date?

21 A.     Is June 30, 2004.

22 Q.     Do you see -- underneath the plan number do you

23 see a Group Name?

24 A.     Yes, ma'am.

25 Q.     What is that?

1 A.      Paula's School of Performing -- and it looks

2 like an " A" for the last letter before it's cut off.

3 Q.      Also in the wallet was there a driver's license?

4 A.      Yes, ma'am.

5 Q.      And in whose name is that?

6 A.      That is  Mr. Learley  Reed  Goodwin.

7 Q.      Was that the same person that you arrested on

8 that date?

9 A.      Yes, ma'am.

10 Q.      Do you see this individual in the courtroom?

11 A.      Yes, ma'am.

12 Q.      Could you identify him by where he's sitting and

13 what he's wearing?

14 A.      He's going to be that gentleman sitting right

15 there with the brown shirt on.

16 Q.      Your  Honor, let the record reflect that the

17 witness has identified    Mr. Goodwin.

18          MR.  MARTIN:  No objection.

19          THE  COURT:  The record will so indicate.

20          BY MS.  GREENBERG:

21 Q.      What was  Mr. Goodwin doing in the car?  Was he a

22 passenger?  A driver?  Inside?  Outside?

23 A.      He was the driver of the vehicle.

24 Q.      Who was with him again?

25 A.      It was his 17 year-old daughter and 14 year-old

1  grandson.

2  Q.      Was this card also in the wallet that was marked

3  as Government's   Exhibit 29?

4  A.      Yes, ma'am.

5  Q.      Could you read, for the record, what's on this

6  card in terms of the name and the business?

7  A.      It's  Lobo's Discount Car Center, and the

8  person's name is   Mr. Good.

9  Q.      And Department of Consumer and Regulatory

10 Affairs business license.

11         In what business name is that?

12 A.      The business name is   Lobo's Discount Car Center.

13 Q.      And licensing name?

14 A.      Learley  Goodwin.

15 Q.      Were there a couple of cards relating to another

16 individual recovered from   Mr. Goodwin?

17 A.      Yes, ma'am.

18 Q.      Could you read what this -- the name and the

19 description on this card?

20 A.      The card is for   Paulette  Martin, and Designer

21 Clothing.

22 Q.      Could you read what the number was on this card?

23 A.      Telephone number (301) 439-3545.

24 Q.      Court's indulgence.

25         Did you take pictures of this particular

1 vehicle?

2 A.     I don't recall if we did take pictures of the

3 vehicle.

4 Q.     Let me show you   P-77 and ask if that image is

5 familiar to you.

6 A.     Oh, yes.

7        I mean, we took pictures of items and things we

8 recovered in the vehicle.     I don't recall pictures of

9 the vehicle.

10 Q.    That was a bad question.

11       Do you recognize what's depicted in P-77?

12 A.    Yes, ma'am,  I do.

13 Q.    What is that?

14 A.    That's a  Pepsi bottle -- actually, a fake

15 compartment that you can conceal items in.

16 Q.    What is reflected in P-78?

17 A.    That's that same  Pepsi bottle that's been taken

18 apart to demonstrate how it comes apart to conceal

19 items.

20 Q.    Where was this  Pepsi bottle that's reflected in

21 P-77 and P-78 when you recovered it?

22 A.    It was located on the front passenger seat of

23 the Cadillac El Dorado  Mr. Goodwin was driving and

24 parked in front of the Outback steakhouse.

25 Q.    Is this picture substantially how you saw that

1  Pepsi bottle in the car?

2  A.      Yes, ma'am.

3  Q.      When you opened up this bottle, as reflected in

4  P-78, did you find anything inside it?

5  A.      Yes, ma'am.

6  Q.      What did you find inside it?

7  A.      Approximately 30 to 32 grams of suspected

8  cocaine base or crack cocaine.

9  Q.      Is that what is depicted in P-79?

10  A.      Yes, ma'am.  That's an overall picture of all

11  the items that were found within the bottle and the

12  bottle beside it.

13  Q.      You have the -- you've seized the bottle, so you

14  have it to show the jury?

15  A.      Yes, ma'am.

16  Q.      Could you describe this picture of what is

17  depicted in the picture before you showed them the

18  bottle?

19  A.      The base of the bottle is sitting upright, the

20  top of the bottle is laying on its side, and then

21  within it are small plastic Ziploc baggies which

22  contain quantities of suspected cocaine base and also

23  another larger plastic bag that had some smaller Ziploc

24  baggies within it.

25  Q.      This item there.  Is that marking on the plastic

1 baggy?

2 A.      It looks like it's a little apple-type.

3 Q.      What is depicted in P-80?

4 A.      That's some of the currency that was seized.

5 Q.      And P-81?

6 A.      That's more of the currency that was seized in

7 its original bundle form.

8 Q.      And P-82?

9 A.      That's also another item of the money that was

10 seized.

11         Again, those are in the original bundle form.

12 Q.      Is it correct to say that before you made up

13 your list --

14         A JUROR:   Your Honor, we did not see --

15         MS. GREENBERG:   Your Honor, maybe  I could

16 publish the pictures to the jury.

17         A JUROR:  It's bleeding out.

18         THE COURT:  Yeah.  They couldn't see it.

19         MS. GREENBERG:   I will publish this to the jury.

20         THE COURT:  Circulate it to the jury.

21         BY MS. GREENBERG:

22 Q.      So the pictures the jury is looking at are

23 originally how you seized them from    Mr. Goodwin?

24 A.      Yes, ma'am.

25 Q.      Now, I showed you this particular card and     I

1  asked you to read   Mr. Good and the business, but     I
2  neglected to ask you, sir, to read the number -- the
3  telephone number on the top.
4         Could you read that for the jury?
5  A.      The telephone number is (202) 388-9033.
6  Q.      How does that number relate, if at all, to the
7  calls that you received during your work that day back
8  from the individuals that you and     Mr. Dorsey were
9  calling?
10 A.     Well, Mr. Dorsey was trying to make contact with
11 the target of our investigation, and he received a
12 telephone call back; the caller    ID showed that number
13 of (202) 388-9033.
14 Q.     Your Honor, with the court's permission     I think
15 that this exhibit would be better seen if the witness
16 approaches the jury.
17        THE COURT:  All right, you may.
18        BY MS. GREENBERG:
19 Q.     For the record,   I am handing you Government's
20 Exhibit  Goodwin 27 and Drugs 1.
21        Taking Government's   Exhibit 27.  Could you
22 explain to the jury where you found them?
23 A.     When we found it, it was just laying on the
24 passenger front seat of the vehicle which is flat on
25 the seat.  If you saw it in the picture, that's how we

1   discovered it, just laying there like that.

2   Q.      Did you end up discovering what's marked as

3   Drugs 1 in that bottle?

4   A.      Yes, ma'am.

5   Q.      That is depicted on the pictures that we showed

6   the jury a few minutes ago?

7   A.      Yes, ma'am.

8   Q.      Could you show them with that    Pepsi bottle how

9   that works and where Drugs 1 was?

10  A.      What it is is that in the lower portion of this

11  is a water substance that's been colored -- it might

12  even be real  Pepsi -- but you can see it.  It looks

13  like it's a full  Pepsi.  It has a weight of a    Pepsi

14  bottle so it's been half drank so you'd never know,      and

15  the items that are concealed would be behind the label.

16  So when you take this off, it comes off, and they're

17  hidden right inside there.

18  Q.      And Drugs 1.  Where did that come from?

19  A.      From right inside here.

20  Q.      Your Honor, may  I publish Drugs 1 and Goodwin 30

21  to the jury?

22          THE COURT:  You may.

23          BY MS.  GREENBERG:

24  Q.      Sir, while the jury is looking at Drugs 1, could

25  you approximate the street value of those drugs?

1 A.        Approximately $6,000.

2 Q.        Based on your experience, is that a quantity

3 consistent with possession or a quantity consistent

4 with distribution?

5 A.        With possession with intent to distribute.

6 Q.        Is it a quantity consistent with simple

7 possession?

8 A.        No, it wouldn't be.

9          What it is, it's approximately 30 grams.  An

10 individual serving of cocaine or crack cocaine is

11 usually a small rock.  It's     .1 gram -- a tenth of a

12 gram.  There's approximately 30 grams there, so that

13 would be approximately 300 servings contained within

14 that bag.  If each serving costs $20, that's

15 approximately $6,000 worth of cocaine.

16 Q.        Court's indulgence.

17          Your Honor, just to be clear,    Goodwin 27 is the

18 Pepsi bottle, for the record, that will be moved in as

19 an exhibit.

20          THE COURT:  All right.

21          MS. GREENBERG:  Just to be careful.

22          No further questions.

23          THE COURT:  All right.  This would be an

24 appropriate time for a break.  Let's recess until five

25 minutes of 12.

```
 1                    (Witness excused from the stand.)

 2                    (Jury excused at 11:36 a.m.)

 3                    (Off the record at 11  :36 a.m.)

 4                    (On the record at 11  :57 a.m.)

 5        THE  COURT:  Ready for the jury?

 6        MR.  MONTEMARANO :  Just a couple of preliminary

 7 matters.

 8        MS.  GREENBERG:  Does  Mr. Montemarano  need the

 9 witness to step out of the room?

10        MR.  MONTEMARANO :  I don't believe so.

11        Your  Honor, the defense would proffer that

12 Sergeant  Martini was not identified in advance as an

13 expert.  Unless the government can proffer to the

14 contrary, we don't recall it.     I don't think any of us

15 has the formal expert notification from the government,

16 number one, and there were rulings with regard to that.

17 We are entitled to make requests under Rule 16.       Your

18 Honor recalls ruling on several motions by defendants

19 concerning the materials upon which the expert would be

20 relying, A, as well as, B, the summary of their

21 qualifications.  That's number one.

22        Moving past that.   I will open the cross on

23 Sergeant  Martini but  I'm going to do a small and

24 limited section.   I'm just going to do it in advance of

25 Mr. Martin, who will be -- in essence is the primary
```

1 cross-examiner.

2        Is that acceptable to the court, or would the

3 court want  Mr. Martin to proceed?

4        THE COURT:  You have already had an opportunity

5 to cross-examine him on qualifications.

6        MR. MONTEMARANO:  This gentleman has just

7 finished.

8        MS. GREENBERG:  About his qualifications.

9        THE COURT:   I inquired as to whether anybody

10 wished to cross on qualifications, and nobody said

11 "yes."

12        MR. MARTIN:  This isn't about qualifications.

13        MR. MONTEMARANO:  We're talking about not the

14 question of qualifications but, rather, the question of

15 advanced notice, which we are entitled to, which we

16 demanded and which we raised issues regarding.

17        THE COURT:  You didn't raise any issue about it

18 when he was -- in fact, the defense asked that the

19 prosecution qualify him.  When the prosecution

20 qualified him, no objection was made to him being an

21 expert.

22        Isn't it a little late to be doing this?

23        MR. MONTEMARANO:   I'm sorry?

24        THE COURT:  I sn't it a little late to be making

25 this objection?

1        MR. MONTEMARANO :  When  the government offered

2 him as an expert witness, we did object.      I think that

3 is adequate to preserve the record, based upon what we

4 have been through up to this point relative to --

5        MS. GREENBERG:  Your Honor, may I just put on

6 the record, Rule 16, Expert Witness section, which is

7 under subsection (a)(1)(g) said, "any witness the

8 government intends to use as an expert."      I didn't

9 intend to use this witness as an expert.      I merely

10 responded to defense    counsel' s objection, and therefore

11 acceded to  their request that he be qualified as an

12 expert before he talk about the drug bundles.  It

13 wasn't somebody we called as an expert witness during

14 their testimony.  There was an objection and      I met that

15 objection, and  I did not foresee him testifying as an

16 expert.  Therefore,   I have not violated the rule.

17        THE COURT:  I'm going to overrule the objection.

18        You may inquire, if you wish, on

19 cross-examination.

20        MR. MONTEMARANO :  Thank you.

21        As to the cross-examination order, the court has

22 no problem with our suggestion that    I will precede  Mr.

23 Martin, but  I'm only to do a limited portion of his

24 testimony.

25        THE COURT:  You mean because you're not the lead

1 cross-examiner?

2          MR. MONTEMARANO:  Pretty much.

3          THE COURT:  All right,  I'll tolerate that.

4          Bring the jury in.

5                    (Witness resumes the stand.)

6                    (Jury returns at 12  :01 p.m.)

7          MS. GREENBERG:   Your Honor, the exhibits did not

8 make their way around the jury, so if we can continue

9 publishing the exhibits they had before the break.

10         THE COURT:  You may.

11         Mr. Montemarano, you may proceed.

12         MR. MONTEMARANO:  Thank you,   Your Honor.

13                    **RECROSS  EXAMINATION**

14         BY MR. MONTEMARANO:

15 Q.     Good morning,  Sergeant  Martini.  How are you?

16 A.     Good morning.  Fine.

17 Q.     I've got a couple of questions for you about the

18 testimony you gave based upon your expertise concerning

19 money.

20 A.     Yes, sir.

21 Q.     You're an expert, so you can qualify --

22 A.     All right.

23 Q.     Let's imagine you needed legal representation,

24 okay?

25 A.     I needed what?

1 Q.      Legal representation.   Needed to hire an

2 attorney.

3 A.      Okay.

4 Q.      Let's assume you call up that attorney, and

5 let's assume you call me.  You know my name.  It is

6 Italian like yours.  So you see my name in the phone

7 book and you call me up, okay?

8 A.      All right.

9 Q.      Let's assume we set up an appointment, and let's

10 assume you come to my office.  Okay?

11       Let's assume you told me that    I would -- that

12 you need me to start work immediately, okay?  Fair

13 enough?

14 A.      Yes, sir.

15 Q.      In your experience, you're aware that an

16 attorney wouldn't start work until he was paid; is that

17 a fair statement?

18       MS. GREENBERG:    Your Honor, I object.    I'm

19 willing to give this some leeway, but I don't at all

20 see how this is relevant to this witness's direct

21 testimony.

22       THE COURT:  Tie it together pretty soon.

23       MR. MONTEMARANO :  Absolutely,  Your Honor.

24       THE COURT:  Overruled.

25       BY MR. MONTEMARANO :

1  Q.      Let's assume you came to my office and you

2  brought cash to pay your legal fees.

3  A.      Okay.

4  Q.      Let's assume you sat down across the desk from

5  me and you handed me cash.  Would it be possible you

6  might have counted out that cash and separated it into

7  bundles to save the time for it to be counted?  Would

8  that be possible?

9  A.      That is possible.

10  Q.      It would be possible that as a lawyer    I might

11  not have a cash register in my office?

12  A.      That's possible.

13  Q.      So if  I sat and counted the money and separated

14  it into folds so that   I could take it to the bank and

15  save my teller some time, that wouldn't make me a drug

16  dealer would it?

17  A.      If you're telling me in that circumstance that a

18  legitimate client came to you and gave you legitimate

19  money and now you're taking that money to the bank, no,

20  I don't see how that would make you a drug dealer.

21  Q.      It wouldn't  make you a drug dealer that you came

22  into my office with the money already bundled in your

23  pocket, would it, sir?

24  A.      No, sir, it wouldn't.

25  Q.      And the part of   P.G. County where you made the

1  arrest, what is the racial composition of that neck of

2  the woods in  P. G., because  I'm from  P.G. so  I don't

3  know.

4  A.     I don't know the exact racial composition

5  myself.

6  Q.     Based on your training and your experience as a

7  P. G. County narc -- narcotics officer for 12 years,

8  give or take, would it be fair to say that a majority

9  of the people you investigate and/or arrest happen to

10  be African-American?

11       MS.  GREENBERG:  Objection.

12       THE  COURT:  What's the relevance of that?

13       MR.  MONTEMARANO :  Just asking.

14       THE  COURT:  Sustained.

15       BY  MR.  MONTEMARANO :

16  Q.     So you would agree that there are lots of

17  reasons that somebody might have money folded and

18  separated into bundles in discreet amounts?

19  A.     There are usually several explanations for

20  everything everybody does.

21  Q.     No further questions, sergeant.  Thank you for

22  your time.

23       THE  COURT:  All right.

24                 **CROSS-EXAMINATION**

25       BY MR.  MARTIN:

1  Q.      Good afternoon, Detective Martini.  My name is

2  Anthony  Martin and  I represent  Mr. Goodwin.

3          You testified about this stop at the     P. G.

4  shopping plaza, and your confidential witness was a     Mr.

5  Raynard  Dorsey; is that correct?

6  A.      Yes, sir.

7  Q.      You had investigated   Mr. Raynard  Dorsey prior to

8  this stop taking place; is that correct?

9  A.      That  I investigated  Mr. Dorsey?  No, sir.    I

10 never had an investigation against    Mr. Dorsey.

11 Q.      Mr. Dorsey was in custody at the time, wasn't

12 he?

13 A.      Yes, sir, he was.

14 Q.      And  Mr. Dorsey, as a result, was facing

15 potential charges at the time, was he not?

16 A.      Yes, sir.

17 Q.      Mr. Dorsey was not free to leave and go where he

18 wanted, was he?

19 A.      That is correct, sir.

20 Q.      So Mr. Dorsey makes these phone calls because

21 you tell him that you want to target suppliers of

22 drugs; is that your testimony?

23 A.      Yes, sir.

24 Q.      And you also tell him what quantities you're

25 interested in; isn't that correct?

1  A.      Yes, sir.

2  Q.      As a result of that,   Mr. Dorsey agrees to

3  cooperate with you; right?

4  A.      Yes, sir, that's correct.

5  Q.      So Mr. Dorsey makes some phone calls, and at

6  some point he tells you that a white    Cadillac is going

7  to come at a certain place at a certain time; correct,

8  sir?

9  A.      Yes, sir, along with some other information that

10 he provided.

11 Q.      Along with some other information.

12         And eventually you see the quite    Cadillac show

13 up, and  Mr. Dorsey says, that's the vehicle; correct?

14 A.      Yes, sir.

15 Q.      As you testified earlier that in the vehicle

16 were three people, including    Mr. Goodwin.

17 A.      Yes, sir.

18 Q.      Now you go and search this vehicle, but let me

19 ask you this.  Before doing so, did you check the

20 registration on that car?

21 A.      No, sir,  I didn't.

22 Q.      Did you know that the car was registered to

23 Doran  Dorsey?

24 A.      Not at the time of the incident, no, sir.

25 Q.      Did  Mr. Dorsey ever tell you that that was his

1  vehicle?

2  A.      Not until after -- no, he never told me it was

3  his vehicle; and   I didn't know about the registration

4  until after the event took place.

5  Q.      Did Mr. Dorsey also tell you that the contents

6  in the vehicle belonged to him?

7  A.      No, sir.

8  Q.      Now, there was a substantial amount of time that

9  passed before any drugs were actually found in that

10 car; isn't that true?

11 A.      Substantial.  Reasonable.    I didn't clock it

12 but, yes, it was a little bit of time until we

13 discovered it in the hidden bottle.

14 Q.      In fact, you were having trouble finding the

15 drugs, didn't you?

16 A.      That is true.

17 Q.      Did you  call Mr. Dorsey, or  Mr. Dorsey called

18 you and he told you where to look; isn't that correct?

19 A.      No, sir, he didn't.

20 Q.      And as a result of your search, you found these

21 drugs in a plastic container; correct?

22 A.      Well, while on the scene we received indication

23 why the -- where to look for the drugs.

24 Q.      Who gave you that information?

25 A.      It was his 17 year-old daughter that was in the

1 vehicle.  She said that's where her father kept it.

2 Q.      Did you at any time take that plastic bottle

3 and test it for fingerprints?

4 A.      I tested it for fingerprints myself, sir.

5 Q.      You didn't find  Mr. Goodwin's fingerprints on

6 there, did you?

7 A.      I didn't have any luck recovering any

8 fingerprints.

9 Q.      Did you check to see if  Mr. Dorsey's

10 fingerprints were on that bottle?

11 A.      When I dusted the bottle for latent

12 fingerprints,  I couldn't recover any.

13 Q.      You wrote a report regarding this stop, did you

14 not?

15 A.      Yes, sir.

16 Q.      And you put everything that was pertinent and

17 relevant -- everything that was important in that

18 report; right?

19 A.      I don't believe  I put --  I don't believe  I put

20 anything and everything.    I put enough to have the

21 person charged -- criminally charged.

22 Q.      You never mentioned in your report that his

23 daughter said there was drugs in the bottle, did you?

24 A.      I don't believe that I put that anywhere, sir.

25 Q.      No, you didn't.

1          What else did you find in that car, detective?
2    You said you found money from    Mr. Goodwin.  Did you
3    find money in any other place in the car?
4    A.      No, not that  I can recall.
5    Q.      You don't recall.
6          You also said that you noted certain telephone
7    numbers, and one of those telephone numbers was from
8    Lobo's discount; is that correct?
9    A.      Yes.  It was on that business card and it was on
10   the caller  ID from an earlier made phone call.
11   Q.      There was no surveillance of anyone at    Lobo's
12   Discount prior to the stop taking place at    P. G.
13   shopping plaza; isn't that correct?
14   A.      We didn't have any addresses prior to that stop
15   that we could set up on.  We didn't know where that
16   number came back to.
17   Q.      Mr. Dorsey told you that he knew this particular
18   supplier and he knew about his whereabouts; right?
19   A.      I don't know if you would say his "whereabouts,"
20   but he was familiar with the individual and knew of
21   some potential addresses where he could be.
22   Q.      So you could have set up a surveillance at
23   Lobo's Discount; correct?
24   A.      Prior to the stop we did not have the address or
25   the name of  Lobo's Discount.

1 Q.      You could have asked   Mr. Dorsey for that and

2 gotten it; right?

3 A.      To the best of my recollection we did talk to

4 him about him.   I don't know if he ever had a true,

5 good address where he knew exactly that he could give

6 us and we could go set up on it.

7 Q.      So your testimony is that   Mr. Dorsey did not

8 know where to find   Mr. Goodwin?  Is that your

9 testimony?

10 A.     I'm saying he didn't provide us with an exact

11 address for anywhere we could go and set surveillance

12 prior to this taking place.

13 Q.      He mentioned a   Tiffany Vessels to you, did he

14 not?

15 A.      Pardon me?

16 Q.      He mentioned   Tiffany Vessels to you, didn't he?

17 A.      I would have to maybe refer to my notes.

18 Q.      Would you like to refer to your notes?

19 A.      Yes, sir.

20       I don't have anything in my notes, or    I can't

21 recall anything that about a    Tiffany Vessels.

22 Q.      You don't recall her name at all?

23 A.      No, sir.

24 Q.      That's fair.

25       I'm going to give you your notes anyway.  You

1  may want to look them during the course of your

2  testimony, if the judge allows me to do that.

3        Did Raynard Dorsey tell you where he lived?

4  Where Raynard Dorsey lived?

5  A.    Did Raynard tell me where he lived himself.

6  Q.    Yeah.

7  A.    Mr. Dorsey?

8  Q.    Yeah.

9  A.    Again, if I can refer back to my notes.

10 Q.    If I may approach, Your Honor --

11        THE COURT:  You may.

12        BY MR. MARTIN:

13 Q.    -- just to give him his notes.

14        Just for the record, I'm handing the police

15 officer all of the discovery that    I got relating to

16 this particular incident -- this particular stop on

17 November 25, 2003.

18        So, your testimony is that despite all of your

19 experience investigating narcotics dealers and

20 suppliers and buyers, you never thought to ask      Mr.

21 Dorsey where he could find   Mr. Goodwin?

22 A.    Yes, sir, I did.  Definitely.

23 Q.    And he never mentioned to you that    Mr. Goodwin

24 lived with his aunt,  Tiffany Vessels?  That's your

25 testimony?

1  A.      No, sir, he didn't.

2  Q.      Did Mr. Dorsey ever tell you that   Mr. Goodwin

3  had paid to get him out of jail?

4  A.      I'm a little bit confused.

5  Q.      Did Mr. Dorsey tell you that   Mr. Goodwin paid to

6  get him out of jail?

7  A.      You mean on another occasion?

8  Q.      Yes.

9  A.      If he did, again,   I don't recall.

10 Q.      And did  Mr. Dorsey tell you that the    Cadillac

11 that  Mr. Goodwin was stopped in was collateral for

12 repayment?

13 A.      No, sir, he didn't.

14 Q.      With respect to   Lobo's Discount.

15         Do you know how many cars    Mr. Goodwin sold on

16 that particular day at   Lobo's Discount?

17 A.      No, sir, I don't.

18 Q.      But you did check out   Lobo's Discount afterward

19 and discover that it was a car dealership, did you not?

20 A.      No, sir, I didn't.

21 Q.      So you never checked to see whether or not there

22 was a legitimate source for the money that you found on

23 Learley  Goodwin?

24 A.      I didn't, but we have people within our unit

25 that do those things.

1 Q.      Did anybody within your unit check that out?

2 A.      I'm not sure.

3         After I seized the money, we have another

4 investigative unit that does the followup on any money

5 seizure.

6 Q.      You didn't follow up on that because at that

7 point, as far as you were concerned, you had your man;

8 right?

9 A.      It's not my duty to follow up on where money --

10 whether it's legitimate or not.  We have a financial

11 unit that follows up on whether it's legitimate funds

12 or not, but that's not my duty.

13 Q.      Are you finished testifying?

14 A.      Yes, sir.

15 Q.      You testified that based on your training and

16 experience, certain things that you see lead you to

17 believe that the money is illegitimate and that it's

18 tainted money; isn't that correct?  Isn't that what you

19 testified to earlier?

20 A.      There are certain pieces of the puzzle that

21 combine to lead you to certain decisions or certain --

22 Q.      Conclusions?

23 A.      There you go, conclusion.

24 Q.      Certain conclusions.  And that was your opinion;

25 right?

1  A.      Yes, sir.

2  Q.      You didn't look for anything that may have

3  contradicted that conclusion, did you?

4  A.      Like I said, I seized the money;   I seized drugs;

5  I made the arrest.  Then there's a followup unit that

6  looks into the money and whether it's legitimate.  They

7  do their thing as far as the financial aspect.

8  Q.      Sir, I'm going to ask you the question again.

9  It's a real easy question.

10         So there was nothing that you did that led you

11 to investigate whether or not there were other

12 explanations for your conclusion; is that correct?

13         It's either yes or no.

14 A.      I didn't do any followup either way to come to

15 the conclusion, or either to prove or disprove what      I

16 felt.

17 Q.      So the answer is no; correct?

18 A.      I didn't do any further investigation or look

19 into it further to prove or disprove what     I thought it

20 was.

21 Q.      If I might, just for a minute -- court's

22 indulgence.

23         How many people were involved in the search

24 there on November 25, 2003, if you recall?

25 A.      Approximately four or five investigators --

1 officers.

2 Q.      While they were doing that search, you also had

3 some people there with cameras; right?

4 A.      I mean, we had a camera on the scene, and we

5 were taking pictures of things as we found them.

6 Q.      Isn't it a fact that what really happened was

7 you placed the items in a position so that you could

8 get a clear picture of them?

9 A.      If we found an item of evidence, we tried to

10 take it in its original position where it was.  Some of

11 the photographs that the jury has seen where things are

12 laid out on the floor, now that's where we had it back

13 at our office.  Before we process it as evidence, we

14 like to take good pictures of it.

15 Q.      Right.  So when you testified earlier that you

16 found the  Pepsi bottle in the front of the car, that,

17 in fact, is not where it was found.

18 A.      Detective Grant discovered that    Pepsi bottle.

19 That's where it was found, laying on the passenger

20 front seat.

21 Q.      So you didn't find it, somebody else did.

22 A.      That's correct.

23 Q.      So you're just testifying as to what somebody

24 else found.

25 A.      Yes, sir.

1 Q.      And you had no reason to doubt him, because he's

2 a police officer; right?

3 A.      I have no clear cut reason to doubt him.

4 Q.      Mr. Dorsey, you said, was in custody.  Where was

5 he?

6 A.      He was right in close proximity standing by the

7 vehicle.

8 Q.      Did you monitor  Mr. Dorsey in the 24 hours prior

9 to this stop taking place?

10 A.      No, sir, I didn't.

11 Q.      Do you know whether  Mr. Dorsey made any phone

12 calls in the 24 hours prior to this stop at     P. G.

13 shopping plaza?

14 A.      No, sir, I don't have any first hand knowledge

15 of that.

16 Q.      Did Mr. Dorsey tell you that other people had

17 access to the white  Cadillac besides  Mr. Goodwin?

18 A.      No, sir.  That never came up.

19 Q.      Did you assume, based on your training and

20 experience, that because  Mr. Goodwin was driving that

21 car that he was the owner of the vehicle?

22 A.      I don't know if  I assumed at any point that he

23 owned the vehicle.   I know he utilized the vehicle from

24 what  I was told.

25 Q.      Did you assume that because    Mr. Goodwin was

1 driving at that time that he had exclusive use of the

2 vehicle?

3 A.      I don't know if he had --   I never thought that

4 maybe he had exclusive use, but he had the use of it at

5 the time when  I stopped him.

6 Q.      So you assumed at the time of the stop that any

7 contraband found in the vehicle belonged to him.

8 A.      He was the driver of the vehicle and in

9 possession, so, yes,   I did.

10 Q.      And you didn't actually find the drugs on his

11 person, did you?

12 A.      No, sir.

13 Q.      Okay.  Now,  I think if  I heard you correctly you

14 also said that there were no recordings of any of the

15 conversations between   Mr. Dorsey and  Mr. Goodwin prior

16 to the stop; is that correct?

17 A.      That is correct, sir.

18 Q.      Were you standing next to   Mr. Dorsey when he

19 made the phone calls to   Mr. Goodwin?

20 A.      Yes, sir.

21 Q.      And you had the ability or capacity to make

22 recordings if you wanted to, didn't you?

23 A.      That was in  November of 1993.

24 Q.      2003, sir.

25 A.      I'm sorry, 2003.

1          I don't think  I had the ear piece adapter to

2  make recorded phone calls on that day.  Cell phones

3  take a little bit of a different recording device.

4  Q.      So your testimony is that on 25 November 2003,

5  just a few days shy of 2004, you didn't have the

6  technology to record a telephone conversation in a

7  setup buy?

8  A.      In a what?

9  Q.      It's not a controlled by, it's set up.  A sting

10  operation.  That's your testimony?

11  A.      Oh, no, no, no, no.  The technology is there.      I

12  personally, and my partner on that day, did not have

13  the proper ear piece adapter to make the phone call or

14  record a phone call.

15  Q.      Based on your training, your experience and your

16  background, that would have been a good investigative

17  technique, wouldn't it?

18          You could have done that.

19  A.      Any piece of the pie you can present to the jury

20  is always a good thing.

21  Q.      Exactly.  And that would have been a powerful

22  piece of evidence to submit to the jurors -- to the

23  ladies and gentlemen of the jury to consider to

24  corroborate  Mr. Dorsey; correct?

25  A.      If at that time we were going to disclose who

1  the confidential informant at the time to the jury.  If

2  we weren't going to disclose him, we would be doing

3  that now.

4  Q.     You wouldn't have been worried about exposing

5  the identity of an informant at the time of trial,

6  would you?

7  A.     Sometimes there is like -- as it was stated

8  earlier, sometimes you do divulge informants and

9  sometimes you don't.

10 Q.     So we don't have any way of knowing exactly what

11 Mr. Dorsey said to  Mr. Goodwin other than your

12 recollection of something that occurred almost two and

13 half years ago; is that correct?

14 A.     Yes, sir.

15 Q.     You didn't tap the telephone line at     Lobo's

16 Discount, did you?

17 A.     No, sir.

18 Q.     So we don't have a recording from that end

19 either, do we?

20 A.     No, sir.

21 Q.     Did Mr. Dorsey tell you that   Mr. Goodwin owned

22 several apartments?

23 A.     I don't recall being told he owned several

24 apartments.   I knew he stayed at several different

25 locations, or   I was told.

1  Q.      This was near the end of the month, wasn't it?

2  A.      November 25.  Close to the end of the month,

3  yes, sir.

4  Q.      Close to the end of the month.

5          Court's indulgence; ladies and gentlemen,

6  please.

7          Your Honor, if  I may approach and take back the

8  items that  I gave to the witness earlier.

9          THE COURT:  You may.

10         BY MR. MARTIN:

11  Q.      There were a number of items that were taken

12  from the vehicle on that day.     I think that was your

13  testimony; is that correct, officer?

14  A.      There was -- well, there was only a few items:

15  Some documents, the drugs, the    Pepsi bottle.

16  Q.      And there was some paperwork, too?

17  A.      Yes, sir.

18  Q.      I think, if  I recall correctly, trial counsel

19  for the government had put up some documents for      you to

20  look at, phone numbers and things like that?

21  A.      Yes, sir.

22  Q.      There were small slips of paper?

23  A.      Those were taken from his wallet that was on his

24  person.

25  Q.      Do you recall whether or not    Mr. Goodwin had any

1 bank deposit slips on him at the time?

2 A.      No, I don't.

3 Q.      Just to make absolutely certain, your testimony

4 is that Mr. Goodwin's daughter told you her dad keeps

5 drugs in the bottle?  That's your testimony?

6 A.      I said that she related information to us that

7 that's where her dad kept it.  She spoke those words to

8 Detective Grant and Detective Grant spoke those words

9 to me.

10 Q.     I have no further questions of this witness,

11 Your Honor.

12         One last thing.  You said "Detective Grant;" is

13 that correct?

14 A.      Yes, sir.

15 Q.      I have nothing further.

16         MR. HALL:  Your Honor, if I may.

17         THE COURT:  You may.

18         MR. HALL:  Government counsel, could   I see

19 number 29?  If  I may approach the witness,   Your Honor.

20         THE COURT:  You may.

21                   **CROSS-EXAMINATION**

22         BY MR. HALL:

23 Q.      Sergeant, isn't it; correct?

24 A.      Yes, sir.

25 Q.      I'm showing you what has been introduced as

1  Government's Exhibit    Goodwin 29.

2          Is that an exhibit you were shown earlier this

3  morning?

4  A.      Yes, sir, it was.

5  Q.      Do you recall that?

6  A.      Yes, sir.

7  Q.      Okay.  Hold onto it just for a second, if you

8  will.

9          Sir, did you -- you went through everything that

10 was in that wallet; is that correct?  You looked at all

11 the items?

12 A.      At one time, yes,  I did.

13 Q.      Yes.  And you found -- if   I recall correctly,

14 you found a number of business cards?

15 A.      Yes, sir.  Some business cards, documents,

16 little slips of paper.

17 Q.      And a couple of small pieces of paper that would

18 fit in a wallet; correct?

19 A.      Yes, sir.

20 Q.      Okay.  And a number of those items had phone

21 numbers written on them; is that fair to say?

22 A.      Yes, sir.

23 Q.      Okay.  And some of those phone numbers have

24 individuals' names next to it; is that right?

25 A.      Yes, sir.

1 Q.      And would you -- did you look at all of them?

2 A.      At one time, yes,  I did.

3 Q.      Not this morning necessarily, but at some point

4 in your investigation or your handling of this case you

5 looked at all of those names and numbers; right?

6 A.      Yes, sir.

7 Q.      Would you agree with me that the name "   Reece

8 Whiting" is not on any of those pieces of paper?

9 A.      What name?

10 Q.      "Reece  Whiting."

11 A.      There's several different phone numbers, several

12 different  names, and  I haven't looked at this for a

13 while.   I don't recall whether it's there or not.

14 Q.      Go ahead and take a look.  Tell me if you see

15 the name " Reece  Whiting."

16 A.      Do you want me to break the seal on this?

17 Q.      Or I can show you -- go ahead and open it.

18 A.      The name " Reece  Whiting" is not on any of these

19 papers.   I didn't see it.

20 Q.      Okay.  All right.  Now, let me ask you this.      I

21 believe you indicated in your direct examination that

22 the phone calls that were made involving this       Mr.

23 Dorsey were made from -- were they made from a police

24 station?  Is that correct?

25 A.      Yes, sir.

1  Q.      Which station was it?

2  A.      It was the District 3 station located in Palmer

3  Park.

4  Q.      That's what's commonly referred to sometimes as

5  the Seat Pleasant Station, or officially known as

6  District 3; right?

7  A.      Yes, sir.

8  Q.      And there's a detective bureau there; is that

9  correct?

10  A.      Yes, sir.

11  Q.      As there are at each one of the primary      Prince

12  George's  County Police Department stations; right?

13  A.      Yes, sir.

14  Q.      And you indicated that neither you nor -- I

15  believe it was Officer Grant -- had an appropriate

16  listening device for cell phone; is that right?

17  A.      Yes, sir.

18  Q.      Did you attempt to see if you could locate one

19  in the District 3 station from any of your colleagues

20  in the detective bureau?

21  A.      No, sir, we didn't.

22  Q.      And the homicide bureau was also at that

23  location; right?

24  A.      That is correct.

25  Q.      You didn't try to go get one from them, either,

1 did you?

2 A.      No, sir.

3 Q.      That's all the questions    I have.

4                    **CROSS-EXAMINATION**

5         BY MR. MITCHELL:

6 Q.      Sergeant  Martini, just to expand a little bit on

7 what previous counsel just asked you.

8          In the process of speaking with    Mr. Dorsey,  I

9 would assume that you had numerous contacts with him

10 and discussed what he knew and didn't know about

11 various individuals that may have some relation to the

12 drug trade; correct?

13 A.      Yes, sir.

14 Q.      And the purpose of that was to expand your

15 investigation and find more people that might be

16 involved in this type of activity; correct?

17 A.      Yes, sir.

18 Q.      In the course of those discussions, did you ever

19 come across the name of "  Derrek  Bynum" or begin any

20 investigation of "  Derrek  Bynum" based on anything that

21 you learned from   Mr. Dorsey?

22 A.      No, sir,  I never did.

23 Q.      I assume that if you had, you would have put

24 that into some report or some document to memorialize

25 that information so you could further investigate;

1  correct?

2  A.      Yes, sir.

3  Q.      Thank you very much.  No further questions.

4          MR. WARD:  Just a couple of short questions,

5  Your Honor.

6                    **CROSS-EXAMINATION**

7          BY MR. WARD:

8  Q.      Good afternoon, detective.

9  A.      Good afternoon.

10 Q.      Detective, at the time you stopped this

11 gentleman and found the money on him and so forth, you

12 already testified you found a    Lobo's Discount Auto

13 Center card in his pocket -- in his wallet; is that

14 correct, sir?

15 A.      Yes, sir.

16 Q.      All right.  And in the same wallet you found a

17 D. C. business license in his name for    Lobo's Discount

18 Car Center; is that correct, sir?

19 A.      Yes, sir.

20 Q.      As far as you know, was that a legitimate

21 license?

22 A.      I couldn't answer yes or no to it.    I don't have

23 any experience with validating licenses.

24 Q.      You don't have any reason to believe it wasn't a

25 legitimate license; correct?

1 A.      That's correct.    I didn't have any reason not to

2 believe it.

3 Q.      I think you've already testified that you did

4 not go to the address of    Lobo's to check up and see if

5 in fact it was an ongoing and legitimate auto sales and

6 repair business; is that correct, sir?

7 A.      That is correct, sir.

8 Q.      I assume that means then that at the same time

9 you didn't find at that address a business going on

10 known as  B & B Auto; is that correct, sir?

11 A.      I never did any followup as far as the     Lobo's

12 car dealership.

13 Q.      All right, sir.  But you did look at the list of

14 telephone numbers that you found in his wallet with

15 names; is that correct, sir?

16 A.      Yes, sir.

17 Q.      And you just looked at them again now.

18 A.      Yes, sir.

19 Q.      Did you see the name "  Lavon  Dobie" on that list

20 at all?

21 A.      What's the name?

22 Q.      "Lavon  Dobie."   D-O-B-I-E.

23 A.      I'd have to look at them again.

24 Q.      Of course.   I understand.   I don't you expect

25 you to keep it all in your mind, but just take a look.

1 You might also look for the name " Becky" while you're

2 at it.   Lavon "Becky" Dobie.

3 A.     No, sir.   I didn't see either of those names.

4 Q.     It's fair to say that a number of the telephone

5 numbers listed on those papers you just looked at do

6 not have names listed next to them, is that correct?

7 A.     That is correct, sir.

8 Q.     And as  I understand it, you did not follow up

9 yourself on the phone numbers to see who they were

10 registered to.

11 A.     That is correct, sir.

12 Q.     You cannot say to this jury that any of those

13 telephone numbers on that list belong to or were

14 identified with  Lavon Dobie.

15 A.     No, sir.   I don't know who those numbers belong

16 to.

17 Q.     Okay.  Thank you, detective.

18      MR.  SUSSMAN :  Briefly.

19                **CROSS-EXAMINATION**

20      BY MR.  SUSSMAN :

21 Q.     Sergeant, you've qualified as an expert witness

22 on a number of occasions; is that correct?

23 A.     Yes.

24 Q.     How many times have you testified in court?

25      Ballpark.

1 A.      Dozens of times.    I don't have an exact number.

2 Q.      You've had many, many seminars and training; is

3 that correct ?

4 A.      Yes, sir.

5 Q.      As an experienced witness, you know you're only

6 supposed to testify to what you personally observed; is

7 that correct?

8         MS. GREENBERG:  Objection.

9         MR. SUSSMAN:    As a fact witness, you testify to

10 --

11        MS. GREENBERG:  To answer the question.  That's

12 not a fair question.  He's supposed to answer the

13 question.

14        THE COURT:  Overruled.

15        You answer the question.

16        THE WITNESS:  Could you repeat the question,

17 please.

18        BY MR. SUSSMAN:

19 Q.      As a witness, you testify to what you personally

20 observe; correct?

21        MS. GREENBERG:  Objection.

22        BY MR. SUSSMAN:

23 Q.      Let me ask it this way.

24        As a witness, you understand you're not supposed

25 to testify as to what other people tell you.

1          MS. GREENBERG: Objection.

2          THE COURT: Overruled.

3          THE WITNESS:   I understand, as a witness, that

4 if a question is posed to me,    I answer it to the best

5 of my ability.

6          BY MR. SUSSMAN :

7 Q.     During the course of your testimony, you

8 testified to things that you had no personal knowledge

9 of; is that correct?

10         MS. GREENBERG: Objection.

11         THE COURT:   Mr. Sussman , if an objection is not

12 made, the answer will be received, and many questions

13 have been asked of this witness that might be subject

14 to that.   I don't think you're proceeding with a fair

15 inquiry if you proceed that way.

16         BY MR. SUSSMAN :

17 Q.     In terms of your answers to   questions, did you

18 disclose if other officers had told you that before you

19 were specifically asked?

20         MS. GREENBERG: Objection.

21         THE COURT:  Have you got a specific question you

22 want to refer to?

23         BY MR. SUSSMAN :

24 Q.     There were questions concerning location of

25 items; is that correct?

1 A.      Yes, sir.

2 Q.      And you described where items were located,

3 isn't that correct, in your answer?

4 A.      Yes, sir.

5 Q.      In point of fact, later on you said that other

6 officers had told you about the locations; isn't that

7 right?

8 A.      Are you getting into specific -- where items of

9 evidence were located, or the fact of how the

10 information was related to us about the drugs being

11 within the  Pepsi bottle?

12 Q.      No.   I'm getting into the question you testified

13 that other officers had told you the location of items;

14 isn't that correct?

15      MS.  GREENBERG:   Your Honor, objection.

16 It mischaracterizes  his testimony.

17      THE COURT: Yeah.    I believe what the testimony

18 was was that the daughter told him where he kept drugs.

19      MR. SUSSMAN:  That's a particular location,     Your

20 Honor.

21      There's another question about location.

22      THE COURT:  Ask another question.

23      BY MR.  SUSSMAN:

24 Q.      I'll ask the same question, if    I might, about

25 the location.

1          Other than the location of drugs, you were asked

2   about other locations where items were photographed;

3   right?

4   A.     Yes.

5   Q.     Later on you testified that you didn't see --

6          MS. GREENBERG:  Objection.  Mischaracterized the

7   testimony by the question.  He's suggesting something

8   -- may we approach?

9          THE COURT:  All right.

10                      (At the bar of the Court.)

11         MS. GREENBERG:   Your Honor, maybe  Mr. Sussman

12  was -- maybe  I lulled him to sleep during my direct

13  testimony, but this witness was the seizing agent.  In

14  other words, during his drug testimony    I went through,

15  he said that when officers found things, he was the one

16  that seized them and that that is the nature of a

17  seizing agent.  He did not represent to anyone -- and

18  by Mr. Sussman  suggesting that he's misrepresenting his

19  testimony, it's incorrect.  That is typical in these

20  search warrants where officers would find things,

21  locate things, and then he would be the seizing agent.

22  He testified on direct as to that, an    d Mr. Sussman  is

23  trying to make it look like he hid the fact from the

24  jury that he didn't find --

25         MR. MARTIN:  On cross-examination -- if    I may be

1  heard, Your Honor.  On cross-examination he talked

2  about Detective Grant and what Detective Grant had told

3  him.  Detective grant.  He specifically mentioned, when

4  I asked him about where certain items were found in the

5  photographing of those items.  So now he's going to

6  Aiesha  Goodwin, but we're not neither talking about

7  Aiesha Goodwin.  Mr.  Sussman , I believe is talking

8  about the testimony --

9        MS. GREENBERG: He is the seizing agent.  Other

10 officers find things and he seizes them.  You will see

11 that a lot in this trial.

12       THE COURT:  I don't like the form of your

13 question as if he's making some admission to something.

14       MR. SUSSMAN :  That's exactly what I'm trying to

15 imply, because he's giving hearsay responses as well as

16 direct responses, and he's trying to -- until it's

17 unravelled, he --

18       THE COURT:  You can ask the witness, what did

19 you take as opposed to what somebody else took and have

20 him clarify that, but   I don't think this is some great

21 concession that he's making.  He's a seizing agent;

22 he's describing what were the items that were

23 recovered.  If you want to ask him, did you recover

24 that item or did somebody else recover that item, you

25 can do that.

1         MR. SUSSMAN :  I want to define my question.     I

2  want to ask him particular questions such as how often

3  does he testify as to what other people told him.  A

4  seizing agent   -- I've been through a lot of cases where

5  there's seizing agents, and what a seizing agent does

6  is he's a list maker.  Other agents come to him and

7  show him where a piece -- an item is and he writes it

8  down.

9         THE  COURT:  You may inquire into the

10  circumstances of this particular case, but     I don't

11  think that that's proper to ask a question that treats

12  it as if he's hiding something when he hasn't hidden

13  anything.

14         MS. GREENBERG:   Your Honor, for circumstances of

15  this case, we will bringing in just pretty much the

16  seizing agent because we have so many locations.  We're

17  not bringing in each individual person who made an

18  inventory.

19         MR. SUSSMAN :  That's not how it was portrayed.

20         MS. GREENBERG:  That's how I brought it out on

21  direct.

22         THE  COURT:  You can ask questions about specific

23  items that were taken and as to whether he was the one

24  that found it, whether he was the one who seized it.

25         MR. SUSSMAN :  I'm not trying to go through that.

1  I'm trying to establish the fact that his testimony is

2  a compendium of hearsay.

3         THE COURT:   I don't know what it is.  He may

4  very well have been the person that found one item,

5  somebody else found another one.  I don't know.

6         MS. GREENBERG:  Suggesting that this witness

7  misrepresented that to the jury, it's just patently not

8  true.

9         THE COURT:  It's not proper to represent --

10        MR. SUSSMAN:   I took that from his

11 cross-examination that that's what the witness

12 answered.

13        MR. MARTIN:  He told me that Detective Grant was

14 the one who found the bottle.

15        MS. GREENBERG:  Yes.  He finds it and then he

16 seizes it.

17        MR. MARTIN:  He also told me Detective Grant

18 told him.

19        THE COURT:  This can be clarified by specific

20 questions.   I don't think there's anything sinister

21 that he's reporting what items were seized is improper

22 when he wasn't the person who actually found it as

23 opposed to the one who seized it.

24        MR. SUSSMAN:  If the court's ruled, the court's

25 ruled.

1            THE COURT:   I've ruled, so go ahead and ask some

2  more questions.

3                       (Back in open court.)

4            BY MR. SUSSMAN :

5  Q.      Just to clarify this.

6            In terms of your investigation and search of the

7  vehicle, how many times in your testimony did you

8  testify to things that other officers told you?

9  A.      That other officers what, sir?

10 Q.      Told you.

11 A.      That other officers told me?

12 Q.      That's correct.

13           Without getting into the --

14 A.      There was one --

15 Q.      I'm just asking for a number, sir.

16           THE COURT:  Let him answer the question.

17           THE WITNESS:  There was one thing that an

18 officer told me that   I testified to, and when items of

19 evidence are located by officers, at that time they

20 notify the seizing officer or recovering officer which

21 is me.  So there would have been several times in this

22 investigation that an officer said, Dave,    I just found

23 some money here, and   I would respond to that location

24 and recover it.

25 Q.      Those items were left in the place where they

1 found them?

2 A.      Yes, sir.

3 Q.      Well, you testified some items were removed; is

4 that correct?

5 A.      Excuse me?

6 Q.      You testified some items were removed later on

7 during some point to be photographed.

8 A.      They were removed by me.

9 Q.      But in terms of the actual location, your

10 testimony dealt with the location of other items -- of

11 some of those items by other officers; isn't that

12 correct?

13 A.      Whenever an officer is searching and he finds an

14 item, he then notifies --

15 Q.      I'm asking a yes or no question.

16          MS. GREENBERG: Objection,   Your Honor.

17          THE COURT:  Sustained.

18          Let him answer the question.  You've got to let

19 him finish.

20          THE WITNESS:  When an officer is searching and

21 he finds an item he believes to be of value, he will

22 immediately call me over because    I'm the lead

23 investigator, or I will come there and determine

24 whether it's something    I believe to be evidence, and at

25 that time I will recover it and take it.

1          BY MR. SUSSMAN :

2 Q.       Was that the situation with Detective Grant?

3 A.       Yes, sir.

4 Q.       Thank you very much.

5          THE COURT:   Mr. McKnett ?

6          MR. MCKNETT :   Thank you,   Your Honor.

7                          **CROSS-EXAMINATION**

8          BY MR.  MCKNETT :

9 Q.       Good afternoon, detective.

10 A.      Good afternoon.

11 Q.      Detective,  I want to ask you a couple of

12 questions based on your experience -- your training and

13 your expertise as an expert.

14          I think you said that a personal use quantity of

15 crack cocaine would be about    .1 gram; is that correct?

16 A.      No.  I just said that's the approximate size of

17 an individual serving.  One small, commonly sold rock

18 of cocaine weighs   .1 gram, and it goes for about $20.

19 Q.      It goes for how much?

20 A.      $20.

21 Q.      I believe you described it as a "serving," and     I

22 used it as a "quantity," but if you want to use it as a

23 "serving," that's fine.

24          How long would that serving last the user?

25 A.      It would depend on the user's tolerance level,

1 how much they've used it in the past, how long -- that

2 would determine how high -- how long the high will

3 last.  Also, possibly, size and body weight will

4 determine a little bit of it, and also depending --

5 sometimes a user might take that small rock that they

6 buy for $20 and they don't have a lot of money, so they

7 might cut that in half and smoke half now and half in

8 an hour.  So, there's some different variances to it

9 but, I mean, that average rock gets smoked up fairly

10 quickly.

11 Q.     Quickly.

12 A.     Yes, sir.

13 Q.     If a person wanted to, he could use the entire

14 quantity in one sitting; right?  One usage?

15 A.     Yes, sir.

16        And then would be high for -- they'd be high for

17 a while.

18 Q.     Based on your training and experience, what

19 would be a personally used quantity of powder cocaine?

20 A.     I don't know if  I ever gave limitations as to

21 what a personal use could be or what a level of

22 distribution could be.   I was just saying what a

23 serving would be.  Like a serving of potatoes, a

24 serving of crack cocaine would be approximately    .1

25 gram.

1          A serving of what you would do for powder

2    cocaine?  Powder cocaine is sold a little differently.

3    It's sold in half gram increments and one gram

4    increments.  You might buy one gram of powder cocaine,

5    but you would snort or utilize several -- you would get

6    several lines from it that you would inhale.  It

7    wouldn't just be something that you inhale at once.

8    Powder cocaine isn't sold quite the same as crack

9    cocaine.

10   Q.     A typical quantity would be one gram?

11   A.     Well, about the lowest quantity you could buy on

12   the street for powder cocaine is a half gram.

13   Q.     And it's sold, as  I think you said --  I just

14   want to be clear.  You've said it's sold in half gram

15   increments?

16   A.     For powder cocaine.  That's usually about as

17   small as you can go for powder cocaine.

18   Q.     If you go up a little bit you get one gram,

19   maybe one and a half, and then maybe two grams?  It

20   depends  on how much money you have,    I assume.

21   A.     Yes, sir.

22   Q.     How much would a half a gram cost?

23          I'm talking in terms of 2004.

24   A.     Of powder cocaine?

25   Q.     Correct.

1          MS. GREENBERG:    Your Honor,  I think we're well

2 outside the scope of direct examination.

3          THE COURT:    I think we're getting close.

4          Get the cost and --

5          MR. MCKNETT:  Just about done,    Your Honor.

6          THE COURT:  Okay.

7          BY MR. MCKNETT:

8 Q.      In 2004 what would be the average price of, say,

9 a gram of powder cocaine?

10          MS. GREENBERG:    Your Honor, now we're a year

11 after.

12          MR. MCKNETT:  Excuse me?

13          THE COURT:  This is November 2003.  You want him

14 to --

15          BY MR. MCKNETT:

16 Q.      He was talking -- on November 25, 2003, what

17 would be, in your experience, the cost to a user of a

18 gram of powder cocaine?

19 A.      To buy a gram of powder cocaine would cost

20 between $80 and $100, depending on your personal

21 circumstances with the person you're buying from.

22 Q.      And in what geographic area are you referring to

23 when you establish that price?

24 A.      Geographic area?    I mean the Washington,  D. C.

25 metropolitan area.

1  Q.      Thank you.

2                  **REDIRECT EXAMINATION**

3        BY MS. GREENBERG:

4  Q.      Sergeant  Martini,  I just have a few quick

5  questions.  Just to clarify it, what was your role in

6  terms of seizing evidence on November 25, 2003?

7  A.      Since  I was the lead investigator in the case,

8  other officers were searching the vehicle and patting

9  down  Mr. Goodwin.  Whenever an officer finds an item

10 believed to be evidence, they immediately call me as

11 the lead i nvestigator.   I come over.   I then photograph

12 the item where it was located by the officer -- they're

13 called the locating officers and     I'm known as the

14 seizing and recovering officer.    I photograph it.    I

15 then take full custody of the item and     I bring it back

16 to our office and   I process it into evidence.

17 Q.      Is that standard operating procedure?

18 A.      Yes, ma'am, it is.

19 Q.      And showing you up on the screen what's been

20 marked as P-77.

21         During your initial search -- you and the other

22 officers' initial search of the car, did you have any

23 reason to look inside that     Pepsi bottle?

24 A.      During the initial search?

25 Q.      Yes.

1  A.       No, ma'am.

2  Q.       Did it look like an ordinary    Pepsi bottle?

3  A.       Yes, it did.

4  Q.       When  Mr.  Martin asked you questions, you

5  mentioned you received some information which caused

6  you to seize that    Pepsi bottle.

7  A.       Yes, ma'am.

8  Q.       What was that specific information?

9  A.       I said that we had received information on the

10  scene of the location of cocaine in the      Pepsi bottle,

11  and when  I said "we"  I meant law enforcement officers.

12  I never said  I personally received that information.

13  Q.       Did that cause you to take this picture and

14  seize that  Pepsi bottle?

15  A.       Detective Grant notified me that he had found

16  cocaine.   I immediately came over, and he said --

17           MR. MARTIN:  Objection.

18           THE  WITNESS:  -- this is where it was.

19           MR. MARTIN:  Continuing.

20           THE COURT:   Overruled.

21           BY MS. GREENBERG:

22  Q.       You seized that as the locating officer?

23  A.       Yes, ma'am.

24  Q.       Was that in the position that you see it there

25  when it was recovered from the vehicle?

1 A.      Yes, ma'am.

2 Q.      And the only reason it wasn't recovered earlier,

3 if I understand it right, is because it looked like a

4 Pepsi bottle?

5 A.      It looked and it felt like a    Pepsi bottle.

6 Q.      In response to  Mr. Martin's questions, what

7 information was it that caused you to look inside the

8 Pepsi bottle?

9        MR. MARTIN:  Objection.

10        THE COURT:  Hasn't he already answered this

11 question?

12        MR. MARTIN:   I know what the answer is going to

13 be, Your Honor.

14        THE COURT:  Well, approach the bench.

15                   (At the bar of the Court.)

16        THE COURT:  State   your objection.

17        MR. MARTIN:  The answer is -- the objection is

18 hearsay.  He's going to say that    Aiesha Goodwin said,

19 My dad keeps the drugs in the bottle.

20        MS. GREENBERG:  Yes,   Your Honor.  He opened the

21 door to that.

22        THE COURT:  Haven't we already had that answered

23 already?

24        MR. MARTIN:   Your Honor, I had no idea he was

25 going to answer in that way.

1          MS.  GREENBERG:  He opened the door,    Your  Honor.

2          THE  COURT:  If the door has been opened, it's

3 already been answered.    I'm going to overrule the

4 objection.

5                    (Back in open court.)

6          BY MS.  GREENBERG:

7 Q.      You may answer the question.

8          Do you want me to repeat it?

9 A.      Yes, ma'am.

10 Q.      What caused law enforcement to go over and look

11 inside that  Pepsi bottle?

12          I believe  Mr. Martin talked to you about that,

13 and I just want to put the two incidents together so

14 that the jury can understand.  If I understand your

15 testimony so far --

16          MR.  MONTEMARANO:  Objection,    Your  Honor.

17          MS.  GREENBERG:    I'm trying to lead the witness

18 back to the last question.

19          BY MS.  GREENBERG:

20 Q.      Detective Grant told you he found something in

21 the  Pepsi bottle and you went over and seized it.

22          What caused the re-look at that    Pepsi bottle as

23 you spoke to  Mr. Martin about on cross?

24 A.      Because we had received -- Detective Grant

25 received information that there was drugs inside of the

1 Pepsi bottle.

2 Q.     What was that specific information and who was

3 it from?

4        MR. MARTIN:  Objection.  Compound.

5        THE COURT:  Make it --

6        BY MS. GREENBERG:

7 Q.     Who provided that information?

8 A.     Detective Grant told me     I received the

9 information from his daughter.  She said, that's where

10 my dad keeps it.

11 Q.     Keeps what?

12 A.     The cocaine.

13 Q.     Then, if  I understand the sequence of events

14 right, who actually went inside that     Pepsi bottle?

15 A.     Detective Grant initially located.  It once he

16 saw it was cocaine, he immediately called me.

17 Q.     Is that standard operating procedure?

18 A.     Yes, ma'am.

19 Q.     Court's indulgence.

20        Nothing further,  Your Honor.

21        MR. MONTEMARANO :  Your Honor, court's indulgence

22 please.

23        THE COURT:  All right.

24                    **RECROSS EXAMINATION**

25        BY MR. MARTIN:

1  Q.      Just to make absolutely clear on this.      I think

2  I had asked you before -- and if    I didn't,  I'm asking

3  you now:  Aiesha Grant's alleged statement doesn't

4  appear anywhere in any of your reports, does it?

5  A.      No, sir.

6  Q.      And what's more, when Officer Grant -- when

7  Detective Grant calls you, he's not on site, is he?

8  A.      Yes, he is.

9  Q.      And he's off site with --

10         MS.  GREENBERG:  Objection.

11         BY MR.  MARTIN:

12 Q.      And he's with   Raynard  Dorsey at the time he

13 calls you; correct?

14 A.      I thought you just asked me the question that he

15 was on site.

16 Q.      There was an objection to that.      I withdraw that

17 question.   I'm asking you now whether or not Detective

18 Grant was with Raynard Dorsey at the time he called you

19 and told you to look in the Pepsi bottle.

20 A.      No, he wasn't.  He was at the vehicle with the

21 Pepsi bottle.

22 Q.      Nothing further.

23         THE  COURT:  All right.  Anything further of this

24 witness?

25         You may step down, detective.

1          THE COURT:   Ladies and gentlemen  , we will take a
2  break for lunch until  2 p.m.
3                    (Off the record at 12:54 p.m.)
4                    (On the record at 2:05 p.m.)
5          MR. MONTEMARANO :  I would advise the court we
6  have a preliminary matter we would like to address
7  tomorrow morning, if that's possible .
8          THE COURT:   Yes.  I have a sentencing tomorrow
9  morning at 9 o'clock that doesn't look like it will be
10 too long.  Be here -- I'll adjourn today and have the
11 jury told to be back at  10 o'clock , and everybody
12 should be here ready at 9:45.
13         MS. JOHNSTON:   Your Honor , could we have some
14 notice about these preliminary  matters?
15         THE COURT:   Can you give me a clue about what I
16 should be ready for?
17         MS. JOHNSTON:   In terms of Mr. Montemarano ?
18         MR. MONTEMARANO :  There are certain
19 conversations in the transcript  books provided  by the
20 government  on Tuesday that we believe  involve  matters
21 that are extraneous  to this prosecution  and remarkably
22 inflammatory .
23         For the record , there's a call, and I believe
24 it's on Page 48, where my client discusses taking her
25 dentures out prior to performing oral sex.  I'm really

1 not sure what that has to do with this prosecution , but

2 it's remarkably inflammatory and place s my client in a

3 bad light .

4         THE COURT:  Why don't you flag the pertinent

5 portion s so I know where it is and I can look at it?

6         MR. MONTEMARANO:  I will double check, and I'll

7 get the page number s to Mr. Krinsky before we close

8 today .

9         MS. JOHNSTON:  We would like to get the page

10 number s.

11         THE COURT:  Give everybody what they need .

12         MR. MONTEMARANO :  I will give it to Mr.

13 Johnston .

14         THE COURT:  Yes .  Just make sure you give me a

15 copy or the designation of what it is , and I'll look at

16 it , Ms. Johnston can look at it , and we'll talk about

17 it tomorrow morning .

18         Anything else , preliminarily, before I bring the

19 jury in?

20         MR. MARTIN:  Yes , Your Honor .

21         THE COURT:  Wait a minute .  Mr. McKnett had his

22 hand up.

23         MR. MCKNETT :  I will be part of Mr.

24 Montemarano 's presentation .  I have two conversation s

25 I'm concerned about .

1          THE COURT:   If you would, before you go today,
2    just give me a scrap of paper, and I can flag it and
3    take a look at it overnight.
4          Mr. Martin.
5          MR. MARTIN:   Yes.  This is in regards to the
6    testimony of Detective Martini, Your Honor.  I have
7    asked the court reporter to give me copy of his
8    testimony.  I'm going to move to strike it tomorrow
9    morning for two reasons, the first being I think that
10   he was inconsistent in his answers regarding Aiesha
11   Goodwin.  At one point I recall him saying, "she told
12   me," and at another point I recall him saying,
13   "Detective Grant told me."
14         The second point is, I think that his testimony
15   violates Crawford in so many ways.  I want to go and
16   read Crawford tonight and make a formal presentation on
17   the record tomorrow, but I want to do that after seeing
18   his testimony, and the court reporter has been kind
19   enough to tell me that she's going to try to get the
20   transcript of his testimony transcribed.
21         THE COURT:   All right.  Okay.  Anything else?
22         Ready for the jury?
23         MS. GREENBERG:   Yes, Your Honor.
24         THE COURT:   Who is the next witness?
25         MS. GREENBERG:   There's a stipulation, Your

1  Honor , and I will get the witness .

2            THE COURT:   Okay .

3                 (Jury returns at 2:10 p.m. )

4            THE COURT:   You may proceed .

5            MS. JOHNSTON:   Your Honor , before the government

6  calls its next witness , the parties have reached a

7  stipulation . It is marked as Exhibit Stipulation 1,

8  and it reads as follows: "The parties hereby stipulate

9  that Government Exhibit Drugs 1, recovered from the

10 vehicle driven by Learley Goodwin on or about November

11 25 of 2003 , was analyzed by forensic chemists and was

12 determined to contain 29.14 grams of the controlled

13 substance cocaine base , commonly known as 'crack.'"

14           THE COURT:   All right .

15           MS. GREENBERG:   Your Honor , the government calls

16 Horace Smith to the witness stand .

17 Thereupon,

18                    **HORACE SMITH** ,

19 having been called as a witness on behalf of the

20 Plaintiff, and having been first duly sworn by the

21 Courtroom Deputy, was examined and testified as

22 follows:

23                  <u>**DIRECT EXAMINATION**</u>

24           BY MS. GREENBERG:

25 Q.    Could you state your name?  And spell your last

1  name for the record, please.

2  A.      Horace Smith.   S-M-I-T-H.

3  Q.      If you could, sit as close to that microphone as

4  you can get.  It's a big courtroom; you want to make

5  sure that the jurors in the back row can hear you.

6          Can you hear me okay?

7  A.      Yes.

8  Q.      Sir, where did you go to high school?

9  A.      Eastern.

10  Q.      And what town is that located in?

11  A.      Northeast Washington, D. C.

12  Q.      Did you grow up in  Washington, D. C.?

13  A.      Yes.

14  Q.      Did you graduate from high school?

15  A.      Yes.

16  Q.      What did you do after high school?

17  A.      I went into the military.

18          MS. GREENBERG:  Can everybody back there here

19  him.?

20          BY MS. GREENBERG:

21  Q.      Please try not to let your voice drop off.

22          Where did you -- what branch of the military did

23  you go into?

24  A.      The U. S. Army.

25  Q.      What did you do for the   U. S. Army?

1  A.      Communications Specialist.

2  Q.      You're discharged?

3  A.      Yes.

4  Q.      Was that honorably?

5  A.      Yes.

6  Q.      How old were you when you got out of the     Army?

7  A.      23.

8  Q.      What was your highest rank you achieved?

9  A.      E-4.

10 Q.      What did you do after the     Army?

11 A.      I went to technical school.

12 Q.      Where was that?

13 A.      Rockville,  Maryland.

14 Q.      I'm actually having trouble hearing you.

15 A.      Rockville,  Maryland.

16 Q.      What technical school was it?

17 A.      Technical Education Center.

18 Q.      Did you start using drugs?

19 A.      Yes.

20 Q.      Were you using drugs at this period of time     when

21 you were going to school?

22 A.      Yes,  I was.

23 Q.      What kind of drugs?

24 A.      Crack cocaine.

25 Q.      When did you start using crack cocaine?

1  A.      Around 19 years old.

2  Q.      I'm sorry?

3  A.      Around when  I was 19.

4  Q.      Did you steal to support your habit?

5  A.      Yes.

6  Q.      Specifically, did you have a larceny conviction

7  in June of 1995?

8  A.      yes, I did.

9  Q.      And a forgery conviction in   September of 1995?

10  A.      Yes, I did.

11  Q.      And a credit card fraud conviction in 1997?

12  A.      Yes.

13  Q.      And larceny in 1997?

14  A.      Yes.

15  Q.      And burglary and grand larceny in    August of

16  1997?

17  A.      Yes.

18  Q.      And are those -- do you remember the dates

19  specifically ,or are you just saying that's about the

20  proximate time?

21  A.      I don't remember the specific dates.  Those

22  years are the approximate time.

23  Q.      Did you serve some time for the burglary and

24  grand larceny?

25  A.      Yes, I did.

1  Q.      Before we get to that -- actually, did you ever

2  use a false name?

3  A.      No.

4  Q.      Do the names -- does the name    "Joe  Smith" or

5  "Thomas  Smith " do they mean anything to you?

6  A.      "Thomas" is my middle name.

7  Q.      Do you ever recall using the name    "Joe?"

8  A.      "Joe?"  That was a name    I used when  I was

9  younger.

10 Q.      How young were you when you used that name?

11 A.      Growing up in my teens.

12 Q.      Does that explain how those names ended up on

13 your rap sheet?

14 A.      Yeah ,it could.

15 Q.      Did you also have a nickname that your friends

16 called you?

17 A.      Yes.

18 Q.      What was that?

19 A.      "Jody."

20 Q.      How did you do in school when you were using

21 drugs?

22 A.      Sporadic.  Fairly good at times.

23         MS. GREENBERG:   Your Honor, can I move the

24 microphone up?  Even counsel --

25         THE COURT:   I'm having a hard time hearing him

1  myself.

2        Ms. Greenberg,  I couldn't hear what he said his

3  nickname was.  Could you ask him that again?

4        BY MS. GREENBERG:

5  Q.    What was your nickname, sir?

6  A.    Jody.

7  Q.    If you could continue with how you were doing in

8  school, at technical school.

9  A.    Fairly good.  Pretty good.

10 Q.    Were you making good grades?

11 A.    Yes.

12 Q.    Did you stop going to school after a particular

13 period of time?

14 A.    I finished school.

15 Q.    Did you have to take a break for anything?

16 A.    Yeah.  I had some issues with drugs.

17 Q.    Was it after you got out of jail for the 1997

18 conviction that you got some help with drugs?

19 A.    Say it again?  I didn't hear you.

20 Q.    Let me ask it this way.  Did you end up getting

21 help with your drug problem in or about 1997?

22 A.    Yeah.

23 Q.    Could you tell the jury about that?

24 A.    I was in a long-term treatment program.

25 Q.    Was that a result of the 1997 conviction?

1  A.      Yes.

2  Q.      What happened after your long-term treatment

3  program?  Was that in jail?

4  A.      Yes, it was.   I continued it when   I got out.

5  Q.      How did you continue the treatment when you got

6  out?

7  A.      I was in a recovery program in    Virginia, and

8  independent living at Oxford House.

9  Q.      Oxford House?

10 A.      Yes.

11 Q.      Did you end up relapsing while you were in

12 treatment?

13 A.      No.

14 Q.      You didn't end up using drugs again?

15 A.      Not during treatment.   Afterwards.

16 Q.      Okay.  Tell the jury what happened when you

17 relapsed.

18 A.      I relapsed when   I was actually in the Oxford

19 House.

20 Q.      In the what house?

21 A.      In the Oxford House.

22 Q.      Okay.  And did you seek any help for that

23 relapse?

24 A.      Yeah.   I went back in treatment.

25 Q.      How did you get back into treatment?

1  A.       Detox .

2  Q.       Did anybody assist you with that?

3  A.       No.

4  Q.       Were you still going to school?

5  A.       Not at that time.

6  Q.       Did you end up going back to school?

7  A.       Yeah.

8  Q.       Did you graduate?

9  A.       Yes.

10  Q.      What year did you graduate?

11  A.      I graduated in '93 from the Technical Education

12  Center.

13  Q.      Did you get a degree?

14  A.      Yes.

15  Q.      What degree was that?

16  A.      Electronics Engineer.

17  Q.      After you finished your rehabilitation, did you

18  get employment?

19  A.      Yes.

20  Q.      Approximately -- if you -- approximately what

21  year did you get your degree in electrical engineering?

22  A.      '93.

23  Q.      What year did you finish with your rehab

24  program?

25  A.      That was after.  That was during '97-98.

1 Q.      Did you receive your conviction in 1997?

2 A.      Yes.

3 Q.      How long were you in jail for that conviction?

4 A.      Until 2000.

5 Q.      Did you continue rehab after you got out of jail

6 for that conviction?

7 A.      Yes.

8 Q.      How long did you continue rehab?

9 A.      For a period of six months or more.

10 Q.      What were you doing for employment in 2000?

11 A.      I was working as a Network Engineer.

12 Q.      How long did you continue to have that job?

13 A.      Until approximately 2003, early.

14 Q.      What was the name of the company that you worked

15 for?

16 A.      Genesis.

17 Q.      Where were they located?

18 A.      Fairfax, Virginia.

19 Q.      Had you sold drugs, also, to support your habit

20 before you began working in 2000 as an engineer?

21 A.      Yeah.  Prior to my incarceration.

22 Q.      What kind of drugs did you sell?

23 A.      Crack cocaine.

24 Q.      What quantities were you buying?

25 A.      Which period of time are you talking about?

1  Q.      I'm talking about prior to 2000.

2  A.      Small quantities.   Ounce.

3  Q.      Would you also use the quantities that you

4  bought?

5  A.      At one time, yes.

6  Q.      And again, taking you back to before you went to

7  rehab -- before you went to jail in 1997 and continued

8  in rehab through 2000, you had dealt drugs?

9  A.      Before 1997?

10 Q.      Before 1997.

11 A.      Yes.

12 Q.      Again, what kind of quantities are we talking

13 about?

14 A.      Upwards to an ounce.

15 Q.      Were you also using drugs during that period of

16 time?

17 A.      Yes.

18 Q.      Did something happen with your job in or about

19 January of 2003?

20 A.      Yeah.   I was laid off.

21 Q.      So, what did you do for work?

22 A.      At that point -- for a period of time    I was

23 looking for a job, and    I was collecting unemployment.

24 Q.      Did you pick up any side contracts?

25 A.      Yeah.   I had one short contract with the

1  Smithsonian.

2  Q.      When did that end?

3  A.      Around April 2003.

4  Q.      Did you begin to get involved in the cocaine --

5  cocaine base business again?

6  A.      Yes.

7  Q.      Could you tell the jury how that happened?

8  A.      Around May 2003   I was approached by my cousin to

9  get involved with him and to sell crack cocaine on

10 numerous occasions.

11 Q.      Who is your cousin?

12 A.      Raynard  Dorsey.

13         THE  COURT:   What was the name?    I didn't get the

14 name.

15         BY MS.  GREENBERG:

16 Q.      Could you repeat the name?

17 A.      Raynard Dorsey.

18 Q.      I know it's difficult, but the closer you get to

19 the microphone the less   I'll have to interrupt you.

20         Okay.  Tell the jury about that conversation

21 that you had with   Mr. Dorsey.

22 A.      He approached me in reference to some business

23 he was doing involving selling cocaine on more than one

24 occasion.  The first occasion    I refused to get

25 involved, and he approached me on other occasions in

1  reference to individuals he was involved with selling

2  cocaine.

3  Q.     Did you decide to take him up on his suggestion

4  to get involved?

5  A.     Eventually, yes.

6  Q.     Did Mr. Dorsey talk to you about the specifics

7  at all?

8  A.     Specifically, he mentioned that he was involved

9  with an individual who was supplying him with cocaine,

10 you know, as much as he needed or wanted or was able to

11 obtain.

12 Q.     Who was that individual?

13 A.     Goodwin.   Learley .

14 Q.     Could you repeat that, please?

15 A.     Goodwin.   Learley .

16 Q.     What was your understanding of   Mr. Dorsey's

17 relationship with  Mr. Learley  Goodwin.

18        Was there a family relationship?

19 A.     His aunt on his father's side was in

20 relationship with them.

21 Q.     Did Mr. Dorsey tell you how -- about his

22 dealings with  Mr. Goodwin in connection with his

23 request that you join into this business?

24 A.     Yes.

25 Q.     What did he tell you?

1 A.      That he was receiving cocaine on a regular

2 basis.

3          MR. MARTIN:  Objection,   Your Honor.

4          THE COURT:  Can you --

5          MR. MARTIN:  We've approached many times on

6 this.  It's the same objection.

7          THE COURT:  Can you rephrase the question?

8          MS. GREENBERG:  It's 801,   Your Honor.

9          MR. MARTIN:  It is Fifth Amendment and Crawford,

10 Your Honor.

11          THE COURT:  Approach the bench.

12               (At the bar of the Court.)

13          THE COURT:  All right.  Wait a minute.  Just

14 wait a minute.

15          What was he about to -- make sure     I'm

16 understanding what he was about to do that you objected

17 to.

18          MR. MARTIN:  He was going to testify as to what

19 Raynard Dorsey told him about    Learley Goodwin,  I

20 believe.

21          MS. GREENBERG:  The testimony so far is that

22 Raynard Dorsey was trying to get him involved in drugs.

23 Raynard Dorsey was getting drugs from    Mr. Goodwin and,

24 in order to get him to join the conspiracy, he's

25 telling him what he can get and what they can do.  It's

1  a classic coconspirator statement.

2        MR. MARTIN:  You know, that's a rule of law.  A

3  statute.   Mr. Goodwin stands by his right of

4  confrontation as pronounced by the court in     Crawford.

5        THE COURT:  All right.  Overruled.

6              (Back in open court.)

7        BY MS. GREENBERG:

8  Q.     Mr. Smith, if you could now tell the jury what

9  Mr. Dorsey told you from -- in connection with his

10  request that you join in the drug business with him and

11  Mr. Goodwin.

12  A.     He told me that he was getting cocaine on a

13  regular basis; the quality was very good.

14  Q.     What kind of cocaine was he getting?

15  A.     Crack.

16  Q.     Did he tell you how long he'd been getting it?

17  A.     He'd been getting it prior to informing me --

18  numerous months before.

19  Q.     Did he tell you the quantity that he was

20  getting?

21  A.     On average, an eighth of a kilo every couple of

22  days -- every few days.

23  Q.     Was this cooked cocaine or uncooked cocaine that

24  he was getting?

25  A.     It was cooked.

1  Q.      What did he tell you about the quality?

2  A.      That it was very good.  The individuals liked

3  it.

4  Q.      Now, you mentioned ed that   Mr. Dorsey knows   Mr.

5  Goody through his aunt,   Tiffany Vessels; is that

6  correct?

7  A.      Yes.

8  Q.      Are you related at all to   Ms. Vessels?

9  A.      I'm related to  Raynard  Dorsey.

10  Q.      I'm sorry?

11  A.      I'm related to  Raynard.  His aunt is on his

12  father's side.

13  Q.      Do you have a common grandfather?

14  A.      No.

15  Q.      Do you know who his grandfather is?

16  A.      Yes.

17  Q.      Who is that?

18  A.      His name is  Chico .

19  Q.      Do you know where he lived?

20  A.      He lived on,  I believe, Aries, Northeast.

21  Q.      Where was  Mr. Dorsey living at the tame you had

22  this conversation?

23  A.      Raynard was living at 60   M Street, Southwest.

24  Q.      Did Mr. Dorsey ever stay with his grandfather?

25  A.      At one point, yes.

1 Q.      And his grandfather's name is?

2 A.      Chico .

3 Q.      Now, these conversations are occurring in the

4 spring of 2003; is that correct?

5 A.      Yes.

6 Q.      Did you have any money to buy the drugs that     Mr.

7 Dorsey was discussing with you?

8         Do you want some water?

9 A.      No.

10        Yes,  I had received a check from a car accident

11 that  I was involved in.

12 Q.     How much did you receive?

13 A.     It was around $4,000.

14 Q.     So what did you decide to do?

15 A.     I decided to go in with    Raynard  and invest in

16 selling drugs.

17 Q.     What happened next?

18 A.     We began to -- we set up a purchase.  The first

19 purchase was in northeast Washington,    D. C.

20 Q.     Could you give the jury the general location in

21 northeast  Washington,  D. C. where this purchase was set

22 up for?

23 A.     Outside Giant parking lot, off Eastern Avenue.

24 Q.     Did Mr. Dorsey tell you who he called to

25 purchase the drugs?

1  A.       Yes.  He had called   Mr. Goodwin's son.

2  Q.       Why was that?

3  A.       To meet.

4  Q.       How much were you purchasing?

5  A.       A quarter of a key.

6  Q.       Of what?

7  A.       Two eighth of keys.

8  Q.       Of what?

9  A.       Crack cocaine.

10 Q.       And what happened on that first occasion?

11 A.       We met outside of the parking lot.      Raynard got

12 out of the truck to meet with the individual -- his

13 son, and he got in the car with them and purchased the

14 crack cocaine, came back to the truck, gave me mines,

15 and we took off.

16 Q.       What was  Mr. Goodwin's son's name?

17 A.       Sonny.

18 Q.       Did you see him on that date?

19 A.       Yes.

20          THE  COURT:  What was the name again he said his

21 name was?

22          THE  WITNESS:  Sonny.

23          THE  COURT:  Sonny.  Okay.

24          BY  MS. GREENBERG :

25 Q.       Did you see   Mr. Dorsey go to Sonny's car to get

1  the drugs?

2  A.      Yes.

3  Q.      What kind of car was Sonny driving?

4  A.      A green  Honda.

5  Q.      How much crack did you purchase that day?

6  A.      A quarter of a key.  It was in two eighth of

7  kilos.

8  Q.      And how much money did you pay for the crack

9  cocaine?

10 A.      Approximately $3,800.

11 Q.      Could you describe for the jury what this looked

12 like, the crack cocaine that you bought on that date?

13 A.      It was in the shape of a cookie -- a large

14 cookie.

15 Q.      Was it hard?  Soft?

16 A.      It was hard.

17 Q.      What color was it?

18 A.      Brownish-white.

19 Q.      Brownish-white?

20 A.      White.

21 Q.      And what did you do with that "cookie?"

22 A.      Broke it down into smaller quantities to sell.

23 Q.      How did it sell?

24 A.      It sold relatively fast.

25 Q.      Did you get any report back on the quality?

1  A.      Yeah.  It was a good quality.

2  Q.      Approximately how much did you make -- would you

3  make on a cookie -- a quarter kilo of crack cocaine?

4  A.      Upwards of maybe $6,000, or a little over

5  $6,000.

6  Q.      Did you continue to meet there and get crack

7  cocaine from Sonny, along with    Mr. Dorsey?

8  A.      Yeah, on several occasions.

9  Q.      Based on your discussions with    Mr. Dorsey, who

10  did you understand that he was getting the crack

11  cocaine from?

12  A.      Mr. Learley.

13  Q.      Mr. Learley who?

14  A.      Goodwin.   Learley.

15  Q.      I'm sorry?

16  A.      Goodwin.   Learley.

17  Q.      What relation was    Learley to Sonny?

18  A.      His father.

19  Q.      How many times did you meet    Mr. Dorsey and Sonny

20  at the Riggs Road and Eastern location to get crack

21  cocaine?

22  A.      Numerous occasions.

23  Q.      Could you give the jury an approximation?

24  A.      Upwards of three to five times.

25  Q.      Would you always meet him there?

1 A.        Yes.  When we met with him, yes.

2 Q.        Did you ever purchase crack cocaine from him at

3 Chico's  house?

4 A.        Not from Sonny.

5 Q.        Now, would you ever talk on the telephone to let

6 Mr.  Dorsey or anyone else know that you were ready for

7 more crack cocaine?

8 A.        Say again?

9 Q.        Would you ever call   Mr.  Dorsey up on the

10 telephone to let him know that you were ready for more

11 crack cocaine?

12 A.        Yes.  Raynard  would contact   Mr.  Learley  himself.

13 Q.        And would you contact   Mr.  Dorsey?

14 A.        Yes.

15 Q.        How would you tell him that you were ready for

16 crack cocaine and how much you wanted?

17 A.        We didn't speak over the phone.  If we wanted an

18 eighth a key,  I would say  I wanted to meet him up on

19 Eighth Street.

20 Q.        Did you ever use any other expressions?

21 A.        We'd reference "T-shirts" or things of that

22 nature.

23 Q.        Would you ever say "crack cocaine" or --

24          MR. MARTIN:  Objection.

25          THE COURT:  Wait a minute.

1          MR. MARTIN:  Leading.

2          THE COURT:  Don't lead him.

3          BY MS. GREENBERG:

4  Q.     Would you ever use words directly relating to

5  drug trafficking on the phone?

6  A.     No.

7  Q.     Why not?

8  A.     You never knew who would be listening, that's

9  why.

10 Q.     Did you ever talk to Sonny directly when he made

11 these deliveries?

12 A.     On occasion.

13 Q.     Do you know what he looks like?

14 A.     Yes.

15 Q.     Did there come a time that   Mr. Dorsey was not

16 available to put you in connection with    Mr. Goodwin

17 where he was in the hospital for a while?

18 A.     Yes.  Around   June.

19 Q.     Do you remember the date exactly?

20 A.     Not the exact date, no.

21         MS. GREENBERG:   Your Honor, if  I may approach.

22         THE COURT:  You may.

23         BY MS. GREENBERG:

24 Q.     Showing you what's been marked as Miscellaneous

25 2 for identification only.

1           Does this document refresh your recollection

2 about what date  Mr. Dorsey entered the hospital?

3 A.      Yes.

4 Q.      What date was that?

5 A.      June 17.

6 Q.      Of what year?

7 A.      2003.

8           MR. WARD:  What was the date again?

9           MS. GREENBERG:    June 17, 2003.

10          MR. WARD:  Thank you.

11          BY MS. GREENBERG:

12 Q.     Given that  Mr. Dorsey was not available to

13 arrange these transactions for you, what did you do?

14 A.      I tried to contact   Mr. Learley  through either

15 Chico  or someone else at the Aries Street  location.

16 Q.      How did that go?

17 A.      On numerous occasions    Chico  and another

18 individual's girlfriend would call     Mr. Learley  on

19 behalf of me to purchase drugs.

20 Q.      Who was the girlfriend that you mentioned?

21 A.      Vicki.

22 Q.      What happened when you went to the Aries Street

23 address and asked them for drugs?  Would you get drugs?

24 A.      Yes.

25 Q.      How did you get drugs?

1  A.        They would coordinate the deal, and    Mr. Learley

2  would come over.  At first,    I wouldn't deal with them

3  directly.   I would get the drugs through them after      I

4  gave them the money.

5  Q.        Would they charge you extra at all for brokering

6  the deal?

7  A.        Yeah, they would.

8  Q.        How much extra?

9  A.        It was not a fixed amount.  It would sometimes

10 be in drugs.   I would give them drugs.

11 Q.        Approximately how many times did you buy -- what

12 were you purchasing?  Let me ask you this.  What were

13 you purchas ing?  What type of drugs?

14 A.        Eighth a key.

15 Q.        What kind of drugs?

16 A.        Crack cocaine.

17 Q.        How many times did you use Chico or his

18 girlfriend, Vicki, to get drugs from    Mr. Goodwin?

19 A.        About three or four times.

20 Q.        Just to be clear.  Would you be at the Aries

21 Street address when   Mr. Goodwin would show up?

22 A.        Yes.

23 Q.        How would you get drugs?

24 A.        Through Vicki or Chico.

25 Q.        And would they give you the drugs before or

1 after  Mr. Goodwin showed up?

2 A.      After.

3 Q.      And you said you got an eighth of a kilo how

4 many times?

5 A.      Three or four times.

6 Q.      That was all crack cocaine?

7 A.      Yes, it was.

8 Q.      While  Mr. Dorsey was in the hospital, did you

9 get drugs from anyone else besides through      Mr. Goodwin

10 and Tiffany and  Chico ?

11 A.      Yes.

12 Q.      Who did you get drugs from?

13 A.      Some Dominicans in   New York.

14 Q.      Could you tell the jury what happened with the

15 Dominicans  in New York?

16 A.      After one successful purchase,    I went back up

17 there to purchase drugs and lost my money, basically,

18 through the deal.

19 Q.      What happened?

20 A.      The deal was arranged to give my money to a

21 mutual individual to get the drugs and deliver them

22 back, and that never transpired.

23 Q.      How much money had you given them?

24 A.      Around $7,000.

25 Q.      Did you talk to   Mr. Dorsey after this situation,

1  where you lost $7,000, about your need to get drugs

2  locally?

3  A.      Yes.   I told him about that.

4  Q.      Could you tell the jury what you and    Mr. Dorsey

5  discussed?

6  A.      That he was going to arrange for me to deal with

7  Mr. Learley directly.

8  Q.      Did he tell you what he would tell    Mr. Goodwin

9  in order to get that accomplished?

10 A.      Yes.   That, you know,   I was his cousin, and

11 everything would be all right.

12 Q.      How much money did you have left at this point

13 for drug purchases?

14 A.      Around $2,000.

15 Q.      What happened next?

16 A.      I subsequently met with   Mr. Learley and

17 purchased an eighth of a key.     I gave him around

18 $2,000.  He credited me the additional $1,800 to bring

19 back once  I finished.

20 Q.      When you say "an eighth of a key," is that a

21 kilogram?

22 A.      Yes.

23 Q.      Of what type of drug?

24 A.      Crack cocaine.

25 Q.      Where did you meet with   Mr. Goodwin?

1  A.        At Chico's house.

2  Q.        That's the Aries Street address?

3  A.        Yes.

4  Q.        Did you have a discussion directly with him at

5  that time?

6  A.        Yes.

7  Q.        What did the two of you discuss?

8  A.        The purchase of the drugs.

9  Q.        Did you have a way to get a hold of    Mr. Goodwin

10 again?

11 A.        Yes.

12 Q.        What was that?

13 A.        Pager.

14 Q.        How did you get his pager number?

15 A.        He gave it to me.

16 Q.        Do you see the person that you've mentioned as

17 "Learley Goodwin" in the courtroom today?

18 A.        Yes.

19 Q.        Could you identify him by what he is wearing and

20 where he's sitting?

21 A.        He's sitting right here with the brown shirt on,

22 and brown suit and glasses.

23         MS. GREENBERG:   Let the record reflect the

24 witness has identified the defendant,    Learley Goodwin.

25         MR. MARTIN:  No objection.

1          THE COURT:  The record will so indicate.

2          BY MS. GREENBERG:

3  Q.      Did you continue to have meeting with     Mr.

4  Goodwin to obtain crack cocaine?

5  A.      Yes.

6  Q.      Where would you meet him?

7  A.      I'd meet him up at Eastern Avenue, outside of

8  the parking lot at Giant, and on Aries Street.

9  Q.      How does the Eastern Avenue, outside of Giant,

10 relate to where you and     Mr. Dorsey would meet Sonny?

11 A.      Excuse me?

12 Q.      You said that you met Sonny at Riggs Avenue and

13 Eastern.

14 A.      Yes.

15 Q.      How does that relate to where you met     Mr.

16 Goodwin?

17 A.      It's the same location.

18 Q.      Same location?

19 A.      Yeah.

20 Q.      Right by the Giant?

21 A.      Yeah.

22 Q.      Anywhere else that you would meet     Mr. Goodwin?

23 A.      On Aries Place -- Aries Street in Northeast.

24 Q.      Would you talk on the phone with     Mr. Goodwin

25 before you met him to get drugs?

1  A.        Yes.

2  Q.        How would you let him know what you wanted?

3  A.        In terms of wanting to meet him on "Eighth

4  Street" or purchase a certain amount of "T-shirts."

5  Q.        Similarly, would you ever mention specific drug

6  terminology when you talked to him on the phone?

7  A.        No.  Never.

8  Q.        Why not?

9  A.        Because of the ability to -- for your phone to

10 be tapped.

11 Q.        Did you explicitly talk about that, or that was

12 implicit?

13 A.        That was implicit.

14 Q.        What would  Mr. Goodwin drive when he met you?

15 A.        Gold-colored Escort.

16 Q.        Where would he carry the drugs?

17 A.        Normally just in a plastic trash bag.

18 Q.        Could you describe that for the jury?

19 A.        A large plastic trash bag.

20 Q.        Where would he keep the trash bag?

21 A.        In the middle compartment of the car between the

22 seats.

23 Q.        How would you pay him?

24 A.        Cash.

25 Q.        And what type of drugs were you purchasing?

1  Large or small quantities?

2  A.      Relatively large quantities.

3  Q.      Did you ever see  Mr. Goodwin distribute drugs to

4  others?

5  A.      On occasion.

6  Q.      What kind of drugs?

7  A.      Crack cocaine.

8  Q.      What kind of weight?

9  A.      Smaller quantities.

10  Q.      How many times?

11  A.      Numerous occasions.

12  Q.      Would you say under ten?  Over ten?

13  A.      Under ten.

14  Q.      I'd like to show you what's been marked as

15  Goodwin  Exhibit 27.

16          If  I may approach,  Your  Honor.

17          THE  COURT:  You may.

18          BY  MS.  GREENBERG:

19  Q.      Did  I show you this Pepsi bottle in preparation

20  for your testimony here today?

21  A.      Yes.

22  Q.      Had you mentioned a  Pepsi bottle that you had

23  seen in connection with  Mr. Goodwin?

24  A.      Yes.

25  Q.      In connection with this one, are you aware that

1   the top comes off and there is a compartment in there?

2   A.      Yeah.

3   Q.      Had you seen  Mr. Goodwin with something like

4   this before?

5   A.      Yes, I have.

6   Q.      Could you explain that to the jury?

7   A.      I've seen him over at Aries Place with a      Pepsi

8   bottle that had a compartment in it with drugs in the

9   inside.

10  Q.      Did you ever see him give anyone drugs from

11  inside the  Pepsi bottle?

12  A.      Yes.

13  Q.      What type of drugs?

14  A.      Crack cocaine.

15  Q.      Did you ever get crack cocaine from     Mr. Goodwin

16  personally from inside the   Pepsi bottle?

17  A.      No.

18  Q.      Why not?

19  A.      I wasn't buying the small quantity that fits in

20  there.

21  Q.      How many times between mid  -May, when  Mr. Dorsey

22  went into the hospital, as you previously testified,

23  and early  August, how many times did you receive crack

24  cocaine directly from   Mr. Goodwin?

25  A.      Upwards of ten times or more.

1  Q.      What kind of quantity?

2  A.      Eighth a key and above.

3  Q.      So the smallest quantity that you got -- it's

4  your testimony -- was eighth a kilo of crack cocaine?

5  A.      Yeah.

6  Q.      What was the largest amount of crack cocaine

7  that you bought from   Mr. Goodwin?

8  A.      A kilo.

9  Q.      Of crack cocaine?

10  A.      Yes.  It was powder.

11  Q.      What was the largest amount of crack cocaine in

12  terms of quantity you got from   Mr. Goodwin?

13  A.      Half a key.

14  Q.      Now, you mentioned you got powder cocaine from

15  Mr. Goodwin.  When did you get that?

16  A.      Late July or early  August.  Around the first of

17  August, 2003.

18  Q.      How much did that kilo of cocaine cost?

19  A.      $26,000.

20  Q.      What did it look like?

21  A.      Duct tape.  Black duct tape, in the form of a

22  brick.

23  Q.      Did you know how to cook cocaine into crack

24  cocaine?

25  A.      Yes.

1  Q.      Could you tell the ladies and gentlemen of the

2  jury how you do that?

3  A.      You use baking soda; you cook it in a Pyrex jar

4  with water until it becomes hard.

5  Q.      Did you cook the cocaine that you got from      Mr.

6  Goodwin?

7  A.      Yes, I did.

8  Q.      How did it turn out?

9  A.      I didn't think I got as much as     I should.

10  Q.      I'm sorry?

11  A.      I didn't think  I had gotten as much as    I should

12  back in the solid form.

13  Q.      Did you talk to  Mr. Goodwin about it?

14  A.      Yes, I did.

15  Q.      Could you tell the jury about your discussions

16  with him regarding this kilogram of cocaine?

17  A.      I informed him that   I only got back a certain

18  amount, and at that time he wanted to meet with me to

19  show me how to cook it in a certain way, but       I had

20  already cooked it all so it was too late for that.

21  Q.      Did he give you any advice about what you could

22  use to make it better?

23  A.      Yeah.  Use vodka.

24  Q.      Did he say what kind of vodka?

25  A.      Odessa.

1  Q.      What did he say the Odessa vodka would do?

2  A.      It would help it come back better.

3  Q.      When were you arrested?

4  A.      August 3rd -- approximately   August 3rd of 2003.

5  Q.      Did you have drugs on you at the time of the

6  arrest?

7  A.      Yes.

8  Q.      How much drugs did you have?

9  A.      A little over 60 grams.

10  Q.      Of what?

11  A.      Crack cocaine.

12  Q.      From where did you get that crack cocaine?

13  A.      Mr. Learley.

14  Q.      Was that already cooked, or that was from the

15  kilo he gave you that wasn't cooked yet -- the kilo he

16  sold you that wasn't cooked yet?

17  A.      It was cooked from the kilo that    I bought from.

18  Q.      So it was from the kilogram of powder that you

19  just described.

20  A.      Yes.

21  Q.      You still had 60 grams of crack cocaine that you

22  had cooked up.

23  A.      Yes.

24  Q.      Did you -- in connection with that arrest in

25  September of that year, did you reach an agreement to

1 plead guilty to the charges against you in       Washington,

2 D. C.?

3 A.      Yes.

4         MS. GREENBERG:    Your Honor, if I may approach

5 again.

6         THE COURT:  You may.

7         BY MS. GREENBERG:

8 Q.      Handing you what's been marked as A-4.      I'll

9 direct  your attention to the   last page.

10        Is this your plea agreement with the     U. S.

11 Attorney's office in Washington,    D. C.?

12 A.      Yes, it is.

13 Q.      Does it require you to cooperate with the     United

14 States?

15 A.      Yes.

16 Q.      That was part of your agreement?

17 A.      Yes.

18 Q.      What is your understanding of what your

19 cooperation was pursuant to that agreement means?

20 A.      To cooperate within the guidelines set forth

21 within the bounds of the law.

22 Q.      In terms of your testimony.  What does that

23 require you to do?

24 A.      To be truthful.

25 Q.      Who gets to decide how much of a reduction you

1 get?

2 A.      Ultimately, the judge.

3 Q.      Did you ever talk to  Mr. Goodwin about where he

4 got his drugs from?

5 A.      On one occasion, yes.

6 Q.      What did he tell you?

7 A.      Somewhere in  Texas.

8 Q.      Did you ever see  Mr. Goodwin with a gun?

9 A.      No.

10 Q.      Did he ever talk to you about guns?

11 A.      On occasion, he asked me if   I could get a hold

12 of some.

13 Q.      What did you tell him?

14 A.      That  I would work on it.

15 Q.      Court's indulgence.

16         I'd like to show you, sir -- it's a little bit

17 bulky -- what's been marked as    CH-1.

18         Take your time.  And if you could look at      CH-1

19 and just put your initials, with this pen and today's

20 date, which --  Ms. Merez , is it the fifteenth or the

21 sixteenth?

22         THE CLERK:  The fifteenth.

23         BY MS. GREENBERG:

24 Q.      Put your initials, and tell the jury who you

25 recognize on this board, if anyone.

1 A.      (Witness indicating.)

2 Q.      I'm sorry.  You indicated a person on the bottom

3 row.

4 A.      Sonny.

5 Q.      If you could put the date of 6/15.

6 A.      (Witness indicating.)

7 Q.      The second picture -- and it's sonny.  Is there

8 anyone else you recognize?

9 A.      (Witness indicating.)

10 Q.     You indicated a picture in the middle of the

11 board.  Who is that?

12 A.     Mr. Learley .

13 Q.     Anyone else that you notice, that you recognize?

14 A.     (No response.)

15       MS. GREENBERG:   Court's indulgence.

16       Your Honor, I think  I messed up the procedure

17 here.  With counsel's agreement,    I forgot to note that

18 he shouldn't write on the tape, and    I just transfer it

19 to the board during the tape.

20       No further questions,   Your Honor.

21       THE COURT:  All right.  Cross-examination?

22       MR. MARTIN:  Thank you,   Your Honor.

23       Your Honor, this may be a while.    I don't know

24 if you want to take a break here --

25       THE COURT:  Le t's see how long you go.

1          MR.  MARTIN:  Okay, sir.

2                    **CROSS-EXAMINATION**

3          BY MR. MARTIN:

4  Q.     Horace  Smith.  You're known as "Horace     Smith;"

5  right?

6  A.     Yes.

7  Q.     You're also known as "Jody?"

8  A.     Yeah.

9  Q.     And you're also known as "  Thomas  Smith?"

10  A.     That's my middle name.

11  Q.     And you're also known as "  Joe  Smith?"

12  A.     No.

13  Q.     And  you're known as "Jody X?"

14  A.     No.

15  Q.     And you're known as "Horace     Smith?"

16  A.     No.

17  Q.     So how many names are you known by?

18  A.     "Horace  Smith, "Jody," or "Joe."

19  Q.     So you've got three different names.

20         How should we call you today?

21  A.     You can call me Horace     Smith.

22  Q.     Horace  Smith it is.

23         Ms. Greenberg had asked you right at the

24  beginning whether or not you were convicted of larceny

25  -- convicted of larceny by check in     Fairfax County in

1  1995, and  I think you agreed that you were, but you

2  didn't indicate which county that was.  That was in

3  Virginia; correct?

4  A.      Fairfax County.

5  Q.      In Fairfax County.  And you were also convicted

6  of forgery of checks in   Arlington County in 1995; isn't

7  that correct?

8  A.      Yes.

9  Q.      You were convicted of credit card fraud in

10 Fairfax County in 1997; isn't that correct?

11 A.      Yes.

12 Q.      And you were convicted of larceny in     Alexandria

13 in January of 1997; is that correct?

14 A.      Yes.

15 Q.      And you were convicted of burglary and grand

16 larceny in  Virginia in 1997; is that correct?

17 A.      Yes.

18 Q.      Those are just the crimes you were caught doing;

19 is that correct?

20         MS. GREENBERG:  Objection.

21         BY MR. MARTIN:

22 Q.      Well, you were supporting a habit at that time;

23 isn't that true?

24 A.      Yes.

25 Q.      In order to support that habit, you had to

1 engage in drug --   I mean, in activity to support it;

2 right?

3 A.      Yes.

4 Q.      In 2003 you were using drugs again; is that

5 correct?

6 A.      Yes.

7         No.

8         2003?  No.

9 Q.      You were using drugs -- well, when did you stop

10 using drugs?

11 A.      2001.

12 Q.      In 2001.

13         So you were just using or distributing drugs

14 most recently to survive; is that your testimony?

15 A.      Yes.

16 Q.      You weren't using it to support your habit.

17 A.      No.

18 Q.      Now, I think Ms. Greenberg also mentioned that

19 you had met with her today prior to testifying; is

20 that correct?

21 A.      No, I haven't met with her today.

22 Q.      She didn't show you?

23 A.      That was yesterday.

24 Q.      That was yesterday?  You've met with    Ms.

25 Greenberg several times though, haven't you?

1   A.        Approximately three times.

2   Q.        Three times.

3             And you've met with some of the agents involved

4   in this case as well; right?

5   A.        Yes.

6   Q.        Each time you've met with them, you gave them

7   information; correct?

8   A.        Correct.

9   Q.        And they asked you questions; right?

10  A.        Correct.

11  Q.        Sometimes they corrected you on things you said;

12  correct?

13  A.        No.  They may have clarified things.

14  Q.        They clarified -- excuse me, but at no time

15  during any of these meetings or these debriefings was

16  your testimony or your statements ever recorded; is

17  that correct?

18  A.        Correct.

19  Q.        Okay.  And nobody took a camera or videotape and

20  videotaped you while you were giving them information;

21  correct?

22  A.        Correct.

23  Q.        And with respect to the notes that were taken.

24            You were never shown the notes and asked to read

25  it and then confirm its accuracy; correct?

1  A.       Correct.

2  Q.       But when you came in today -- before you came in

3  today, you rehearsed your testimony; right?

4  A.       No.

5  Q.       You didn't rehearse your testimony?

6  A.       No.

7  Q.       You didn't go over the questions with    Ms.

8  Greenberg yesterday that you were going to be asked

9  today?

10 A.       Yesterday.

11 Q.       And you went over your testimony because the

12 government  decides whether or not you've met your

13 requirements under the plea agreement; correct?

14 A.       Yes.

15 Q.       And with respect to that plea agreement.  It

16 requires that you not only testify but, as she said,

17 that you testify truthfully; right?

18 A.       Correct.

19 Q.       Mr. Goodwin is sitting over here.  He's not the

20 one who decides whether or not you testify truthfully,

21 does he?

22 A.       No.

23 Q.       No.

24          Ms. Greenberg is going to decide that, isn't

25 she?

1  A.      No.

2  Q.      But the government, you would agree, is the one

3  who has to make the motion for you to get the benefit

4  of this plea agreement; correct?

5  A.      I don't understand what you're saying.

6  Q.      Do you have the plea agreement in front of you?

7  A.      No.

8          MR. MARTIN:   Ms. Greenberg, could you give me a

9  clean copy so that   I might show it to him?     I think it

10 is an exhibit.

11         MS.  GREENBERG:  Here you go.

12         MR . MARTIN:   Your Honor, may  I approach?

13         THE  COURT:  You may.

14         BY MR.  MARTIN:

15 Q.      Take a few moments, sir.

16         If you will,  Mr. Smith, look over that document.

17 And after you've looked it over, especially the last

18 page, where signatures appear,    I want you to look up so

19 I know you're finished.    I'll tell you what,  Mr. Smith.

20 Why don't you go to the last page and just look at the

21 signatures there on Page 9 and Page 8 and tell me if

22 you recognize -- well, page 9, specifically.

23         Tell me if you recognize any signatures on that

24 page.  The very last page, sir.

25 A.      Yeah, that's my signature.

1  Q.      That's your signature, and it's dated September

2  30, 2003; isn't that right?

3  A.      Yeah.

4  Q.      And the front of the document is dated September

5  23, 2003; correct?

6  A.      Yes.

7  Q.      It's addressed to your attorney; isn't that

8  correct?

9  A.      Yes.

10 Q.      And if you turn to Paragraph 5, it says -- if

11 you go there on Page 3, it talks about you cooperating

12 truthfully; correct?

13 A.      Yes.

14 Q.      It says, "truthfully, completely and fully;"

15 correct?

16 A.      Yes.

17 Q.      And near the bottom of that -- three or four

18 lines from the bottom -- it talks about the government

19 making a motion pursuant to Section 5(K)(1); correct?

20 A.      Yes.

21 Q.      And your attorney explained to you that that's a

22 motion that would reduce your offense level, didn't

23 she?

24 A.      Yes, possibly.

25 Q.      Possibly.

1          And that possibly turns on the condition that
2  you satisfy the government and that you've cooperated
3  successfully; correct?
4  A.      Correct.
5  Q.      It also makes reference on the third line from
6  the bottom of 5-A to 18 U.S.C., 3553(E).
7          Do you see that?
8  A.      Yes.
9  Q.      And that motion,  I'm sure your attorney told
10 you, would allow the government to ask the judge to
11 sentence you below the statutory minimum; isn't that
12 correct?
13 A.      I'm not sure about that.
14 Q.      You're not sure about that?
15 A.      I don't know the code.    I don't know the
16 legalese.
17 Q.      Forget the legalese.  The point being that you
18 hope by testifying you're going to do less time in jail
19 than you would otherwise have to do without this
20 motion; is that correct?
21 A.      Correct.
22 Q.      Your testimony here -- part of the deal is
23 you'll tell them what they want to know about    Learley
24 Goodwin in exchange for doing less time in jail; right?
25 A.      No.

1  Q.       Go back to Page 9.

2  A.       (Witness indicating.)

3  Q.       That's not your signature?

4  A.       Yes, it is.

5  Q.       Raynard  Dorsey, you said, is your family member;

6  right?

7  A.       Yes.

8  Q.       And you said you met with   Mr. Goodwin at Aries

9  Place; right?

10  A.       Yes.

11  Q.       That's  James  Williams' house, isn't it?

12          You know him as Chico?

13  A.       I know him as Chico, yeah.

14  Q.       That's Chico's house?

15  A.       Yes.

16  Q.       And Chico is  Tiffany Vessels' dad; correct?

17  A.       Correct.

18  Q.       And  Tiffany Vessels is   Raynard  Dorsey's --   I

19  think you said cousin, but that's his aunt?

20  A.       Aunt.

21  Q.       And she is related to Chico; right?

22  A.       Yes.

23  Q.       That's the house where you were getting the

24  drugs; right?

25  A.       Correct.

1 Q.      And that's the house where you saw that      Pepsi

2 bottle with  the false bottom; right?

3 A.      Correct.

4 Q.      That is also the place where      Raynard  Dorsey

5 stays from time to time; isn't that correct?

6 A.      Yes.

7 Q.      And Raynard  Dorsey has a white   Cadillac, doesn't

8 he?

9 A.      At one point he did.

10 Q.      He had a white   Cadillac at one point.

11         And you know that   Raynard  Dorsey is cooperating

12 with the government just like you; right?

13 A.      No, I'm not aware of that.

14 Q.      You're not aware of that?

15 A.      No.

16 Q.      Have you spoken to   Tiffany Vessels since you

17 were arrested?

18 A.      No.

19 Q.      Have you spoken to   Chico  since you were

20 arrested?

21 A.      No.

22 Q.      Have you spoken -- have you seen the indictment

23 in this case since you were arrested?

24 A.      No.

25 Q.      So you don't know if any of your family members

1  are involved in this other than you.  That's your

2  testimony.

3  A.      Correct.

4  Q.      Well, let's get back to this plea agreement and

5  the terms of the agreement.

6          You said,  I believe, that what you're supposed

7  to do is testify truthfully; is that right?

8  A.      Yes.

9  Q.      Is that correct?

10  A.      Yes.

11  Q.      And Ms. Heather  Shayner  negotiated on your

12  behalf, and she worked out the terms of this plea

13  agreement; right?

14  A.      Yes, as my attorney.

15  Q.      Right, as your attorney.

16          She represented you during, the bargain, the

17  give and take; right?

18  A.      Correct.

19  Q.      Do you think the truth is something that should

20  be bargained for?

21  A.      I don't have an opinion on the truth.  The truth

22  is what it is.

23  Q.      That's not the question.

24          Do you think the truth is something that should

25  be bargained for?

1          MS.  GREENBERG:  Objection,   Your  Honor.

2          THE  COURT:  Sustained.

3          BY MR. MARTIN:

4 Q.     So you didn't come forward to testify today of

5 your own free will.  You came because you have a sort

6 of Damocles  hanging over your head, and that is jail

7 time.

8          MS.  GREENBERG:  Objection.

9          THE  COURT:  Sustained.

10          BY MR.  MARTIN:

11 Q.     Were you subpoenaed to appear here today?

12          MS.  GREENBERG:  Objection.

13          THE  COURT:  Sustained.

14          BY MR.  MARTIN:

15 Q.     Mr. Smith, you would agree with me that there's

16 nothing that  Mr. Goodwin can do to reduce your jail

17 time.

18          Would you agree with that?

19 A.     Yes.

20 Q.     Only the government can help you in that regard;

21 right?

22 A.     Correct.

23 Q.     And you would also agree with me that     Mr.

24 Goodwin is not a family member; correct?

25 A.     Correct.

1  Q.      And you would also agree with me that      Learley

2  Reed  Goodwin -- as far as you're concerned -- is

3  somebody that you're never going to see again; right?

4  A.      I don't know.

5  Q.      You don't know?

6  A.      No.

7  Q.      Do you hope to see him again?

8  A.      No.

9  Q.      Besides  Ms. Greenberg, did you also meet with

10 Agent  Eveler  or Mr.  Sakala  in this case?

11 A.      Yes.

12 Q.      How many times did you meet with them?

13 A.      Two or three times.

14 Q.      They showed you pictures of different people

15 that they were interested in; is that correct?

16 A.      Correct.

17 Q.      And you told them what you knew about those

18 different people; right?

19 A.      Correct.

20 Q.      Did they show you pictures of Chico?

21 A.      No.  I never saw a picture of Chico.

22 Q.      Did they show you pictures of    Raynard?

23 A.      Yes.

24 Q.      Did they show you pictures of any of your other

25 family members besides    Raynard?

1  A.      No.

2  Q.      Just  Mr. Goodwin; right?

3  A.      It was numerous pictures.

4  Q.      But they showed you   Mr. Goodwin's picture, as

5  well; right?

6  A.      Yeah.

7  Q.      Now, you had mentioned something also about

8  going up to  New York to get drugs.

9          That wasn't a connection that had anything to do

10  with  Learley  Goodwin, was it?

11  A.      No.

12  Q.      That was through your own contacts and

13  connections, wasn't it?

14  A.      Yes.

15  Q.      You knew how to do that because you know your

16  way around the streets, don't you?

17  A.      Correct.

18  Q.      Now, you've been charged,    I guess, through an

19  Information, if  I remember correctly, here in     Maryland.

20          I don't want to misstate myself here, but you

21  were not placed on the same indictment with the rest of

22  the defendants in this case; is that correct?

23          MS.  GREENBERG:  Objection,   Your Honor.

24          Misstating the evidence.  It was a     Washington,

25  D. C. charge.

1        MR.  MARTIN:  That's correct.

2        THE  COURT:  Sustained.

3        BY MR.  MARTIN:

4 Q.      You were charged by a criminal Information in

5 Washington,  D. C.; right?

6 A.      Correct.

7 Q.      And you were charged by yourself; right?

8 A.      No.  Someone was with me.

9 Q.      One other person was with you?

10 A.      Yes.

11 Q.      But you weren't charged in   Maryland, were you?

12 A.      No.

13 Q.      So you weren't charged in the federal system

14 here in Greenbelt; right?

15 A.      Correct.

16 Q.      And you weren't charged in Upper Marlboro in

17 Prince  George's  County; right?

18 A.      No.

19 Q.      And you didn't only deal here in   Maryland and  D.

20 C.; you also purchased drugs in   New York, and you

21 weren't charged with that either, were you?

22 A.      Correct.

23 Q.      That was all part of the consideration that you

24 got for your cooperation; right?

25 A.      Correct.

1  Q.      Indeed, further consideration that you got      was
2  the fact that while this is pending you're not locked
3  up, are you?
4  A.      Correct.
5  Q.      You're out on the street every day; right?
6  A.      Correct.
7  Q.      And you will continue to be out on the street as
8  long as the government is satisfied with your
9  cooperation; right?
10 A.      I don't know.
11 Q.      Well, do you expect to walk out of here today?
12 A.      Correct.
13 Q.      You think you're doing all right; correct?
14 A.      I'm doing what  I need to do.
15 Q.      You're doing what you need to do.  Exactly.
16         Your indulgence, please, sir.
17         THE COURT:  That's all right.
18         BY MR. MARTIN:
19 Q.      Now, with respect to   Raynard  Dorsey.  You've
20 already established his relationship to you.
21         Would it be fair to say that    Learley  Goodwin is
22 not really your friend; this is not somebody that you
23 hang out with and go to the bar with, is it?
24 A.      No.
25 Q.      And Raynard  Dorsey is somebody you expect to see

1  again; right?

2  A.      I'm not certain of that.

3  Q.      You're not sure about that either?

4          You expect to see the rest of your family

5  members, though; right?

6  A.      Yes.

7  Q.      Do you have children?

8  A.      Yes.

9  Q.      Did you testify before the Grand Jury?

10  A.     No.

11         MR. MARTIN:   Court's indulgence just a second,

12  Your Honor.

13         BY MR. MARTIN:

14  Q.     But for  Raynard  Dorsey, is it fair to say that

15  you would have never known of    Learley Reed   Goodwin?

16  A.     Correct.

17         MR. MARTIN:   I have nothing further,   Your  Honor.

18         THE  COURT:  Any further cross?

19         MR. MONTEMARANO:  Just a couple questions,    Mr.

20  Smith, if you don't mind.

21                    **CROSS-EXAMINATION**

22         BY MR. MONTEMARANO:

23  Q.     You and  I have never met before; correct?

24  A.     Say again?

25  Q.     You and  I have never met before?

1  A.      No.

2  Q.      If I understood your testimony, you said your

3  first purchase from   Mr. Goodwin was a quarter key of

4  crack; correct, sir?

5  A.      Incorrect.

6  Q.      One time you bought a quarter key of crack?

7  A.      At one point.

8  Q.      Okay.  I'm sorry.   I must be getting the order

9  mistaken.

10        Now, you have testified you have sources for

11 drugs other than   Mr. Goodwin; correct?

12 A.      Yeah.

13 Q.      And you've bought kilogram lots of cocaine in

14 the past?

15 A.      Yes.

16 Q.      What is a kilogram of cocaine -- plain, regular

17 powder cocaine -- going to cost you?

18 A.      It cost me, at the time, $26,000.

19 Q.      $26,000.

20 A.      Mm-hmm.

21 Q.      Okay.  And that you would then cook into crack;

22 correct, sir?

23 A.      Yes.

24 Q.      You would have how much crack -- after you

25 cooked that key, or kilogram, of cocaine, how much

1 crack would you end up with?

2 A.      Monetarily?  Or what are you talking about?

3 Are you talking about monetarily or --

4 Q.      How much weight?

5         How much crack would you end up with?

6 A.      It varies.  You could end up with anywhere from

7 26 ounces to 28 ounces.  It depends on how it -- the

8 cocaine is -- how it cooks.  It's not a set amount.

9 Q.      Not a set amount.

10        Generally speaking, you're going to end up with

11 less crack than you began with cocaine?

12 A.      Generally.

13 Q.      Excuse me?

14 A.      Generally, yeah.

15 Q.      Generally.

16        Okay.  At one point you said you bought a

17 quarter key of crack from    Mr. Goodwin for $3,800;

18 correct?

19 A.      No.

20 Q.      No?

21        You bought a key -- quarter key of crack from

22 Mr. Goodwin for $3,800.  Is that your testimony?

23 A.      No.

24 Q.      You didn't say that you gave him $2,000 and he

25 fronted you the other $1,800?

1 A.      I said that was in reference to an eighth of a

2 kilo.

3 Q.      You said it was two eighths?

4 A.      That was the first occasion that we met with

5 him, Raynard and myself.

6 Q.      I don't understand.  How much did -- how much

7 did you buy?

8 A.      On what occasion?

9 Q.      On that occasion.

10 A.      Which occasion, specifically, are you talking

11 about?

12 Q.      The $3,800.  When he allegedly --

13 A.      It was an eighth a key.

14 Q.      And it cost you how much?

15 A.      I gave him $2,000.  I owed him $1,800.

16 Q.      That was only for an eighth of a key?

17 A.      Yes.

18         MR. MONTEMARANO : No further questions,  Your

19 Honor.

20         MR. HALL:  I have no questions,  Your Honor.

21         THE COURT:  Anyone else?

22         MR. MITCHELL:  No questions,  Your Honor.

23         THE COURT:  Mr. Ward?

24         MR. WARD:  Yes,  I do have a couple,  Your Honor.

25 Thank you.

1                      **CROSS-EXAMINATION**

2           BY MR. WARD:

3 Q.        Mr. Smith, when you started out as an addict,

4 you were not selling.  Initially, you were just copping

5 and using; is that correct, sir?

6 A.        Correct.

7 Q.        And I think the crimes you talked about were

8 larceny, credit card fraud, burglary, grand larceny --

9 those were the kinds of crimes that you were committing

10 in order to support your habit; is that correct, sir?

11 A.        Correct.

12 Q.        And you hung out with other addicts, too,      I

13 would suppose; is that correct?

14 A.        On occasion.

15 Q.        Huh?

16 A.        On occasion.

17 Q.        On occasion.

18           That was typical addict crime:  Larceny, credit

19 card fraud, grand larceny; is that right?

20 A.        In my case, yeah.

21 Q.        In your case, yes.

22           Did you ever have any drug dealings with      Lavon

23 Dobie?

24 A.        I don't know that name.

25 Q.        You've never heard that name?

1 A.      No.

2 Q.      How about  Becky?

3 A.      Say again?

4 Q.      Becky Dobie.

5 A.      No.

6 Q.      Ever hear that name?

7 A.      No, I never heard that name.

8 Q.      I'm going to ask the lady on the end to stand

9 up, please.

10        Take a look at that lady and tell us if you know

11 her.

12 A.      No, I don't.

13        MR. WARD:   Okay.  Thank you, sir.

14        That's all.

15        THE COURT:  Anyone else?

16        All right.  Redirect?

17        MS. GREENBERG: Yes,  Your Honor.  I'll be brief.

18                   **REDIRECT EXAMINATION**

19        BY MS. GREENBERG:

20 Q.    Mr. Smith,  I want to clear up what    Mr.

21 Montemarano  brought up.  There might be some confusion.

22        The first time that you went with    Mr. Dorsey to

23 get drugs, how much were you purchasing?

24 A.     A quarter key, in quantities of two eighth a

25 keys.

1  Q.      Could you explain to the jury what you mean by

2  the "two eighth of a keys?"

3  A.      Two separate cookie-like substances.

4  Q.      Were you getting both?

5  A.      No.  I was getting one of them.

6  Q.      Who was getting the other one?

7  A.      Raynard  Dorsey.

8  Q.      Would you ever be able to buy a quarter key for

9  $3,800?

10 A.      No.

11 Q.      What does that price relate to?

12 A.      An eighth of a key.

13 Q.      Just to be clear.  A key -- we're talking about

14 kilograms of crack cocaine?

15 A.      Yes.

16 Q.      You also testified in cross-examination by    Mr.

17 Martin that you met with   Mr. Eveler -- Detective   Eveler

18 or Sergeant  Sakala on two or three occasions; is that

19 correct?

20 A.      Yes.

21 Q.      And you also testified earlier in that testimony

22 that you met with me on two or three occasions; is that

23 correct?

24 A.      Correct.

25 Q.      Does that make a total of four to six occasions,

1 or two to three total when we were all at the same

2 meeting?

3 A.      Total two to three.

4 Q.      Okay.  So in other words,    I was with one of the

5 officers when you talked to me.

6 A.      Yes.

7 Q.      And so the total times we met and talked were

8 two or three times?

9 A.      Yes.

10 Q.      Did anyone on behalf of the government ever tell

11 you what you should say?

12 A.      No.

13 Q.      How would these meetings go, if you could just

14 explain to the jury, when we would meet in connection

15 with your testimony here today?

16 A.      They would annotate what    I recollected.

17 Q.      What do you mean by "annotate" what you

18 recollected?

19         We would ask you questions?

20 A.      They you would ask me questions of my

21 involvement in this situation and annotate them on a

22 notepad.

23 Q.      Oh.  In other words, we'd take notes.

24 A.      Yes.

25 Q.      Did we ever tell you -- strike that.

1          Who gave the information in connection with

2  these meetings?  Myself, the detectives, or you?

3          MR. MONTEMARANO:  Objection,   Your Honor.

4          Leading.  This is not a multiple choice exam.

5          THE COURT:  Overruled.

6          THE WITNESS:  Say again?

7          BY MS. GREENBERG:

8  Q.     Who gave the answers in response to the

9  questions?  Myself, detectives, or you?

10  A.     I did.

11  Q.     When you talked about the pictures, could you

12  describe to the jury how are these -- were these

13  pictures shown to you?

14  A.     In a large binder, or book, with multiple other

15  pictures.

16  Q.     Would it be safe to say there was over 100

17  pictures?

18  A.     Yeah.

19  Q.     How were they shown to you?

20  A.     Randomly, asking to identify anybody    I would

21  recognize throughout the book.

22  Q.     Did you tell us which you did recognize and

23  which you didn't recognize?

24  A.     Yes.

25  Q.     Now, the false bottom   Pepsi can that   Mr. Martin

1  asked you that you saw over at Aries.

2          When did you see it?  Approximately when?

3  A.      What time period?

4  Q.      Yes.

5  A.      Probably  May or June of 2003.

6  Q.      Who had it when you saw it?

7  A.      Mr. Learley .

8  Q.      What was he doing with it?

9  A.      Retrieving crack cocaine from it.

10 Q.      For what purpose?

11 A.      To sell.

12 Q.      Were you there for the transaction?

13 A.      I seen the retrieval of it, and    I stood by, and

14 when the transaction was going on.

15 Q.      Was it to someone other than you?

16 A.      Yes.

17 Q.      But you observed it?

18 A.      Yes.

19 Q.      Did you know the person who was purchasing the

20 crack cocaine, Mr. Goodwin?

21 A.      No.

22 Q.      And Mr. Martin also asked you if you were

23 charged in this case or if you were charged in

24 Washington,  D. C.

25          When were you charged with the crimes to which

1 you pled guilty to?

2 A.       In August 2003.

3 Q.       That's when you were arrested?

4 A.       Yeah.

5 Q.       And your plea agreement's dated September 2003?

6 A.       Yes.

7 Q.       Well before this case started?

8 A.       Yes.

9 Q.       And did you admit, in connection with that plea

10 agreement, your dealings with    Mr. Goodwin?

11 A.       Yes.

12         MS. GREENBERG:    Court's indulgence.

13         Nothing further,   Your Honor.

14         THE COURT:  All right.  Anything -- any recross?

15         MR. MONTEMARANO:  Court's indulgence, please.

16         Your Honor, since it 3:15, could we just talk

17 about it over the break, since y   our ho nor is going to

18 be breaking soon anyway?

19         THE COURT:  All right.

20         MS. GREENBERG:  For brief cross,   Your Honor?

21         THE COURT:  You make up your mind so we can get

22 him finished and get him out of here.    I don't want to

23 give you too much more energy.

24         MR. MARTIN:   I appreciate my brethren's advice,

25 but I'm going to pass on the redirect    Your Honor.

1          THE  COURT:  Recross.

2          MR.  MARTIN:   I'm sorry.  Recross.

3          THE  COURT:  Your pass is accepted.

4          Ladies and gentlemen, we'll take a recess until

5  25 minutes of four.

6                        (Jury excused at 3:19 p.m.)

7                        (Witness excused from the stand.)

8                        (Off the record at 3:19 p.m.)

9                        (On the record at 3:44 p.m.)

10         THE  COURT:  Counsel , I have been advise d that ,

11  through  some  snafu, the  person  to be  sentence d tomorrow

12  can't be here . So, I do not have a  sentenci ng at 9:00 .

13  Now  I can  bring  the  jury  in  earlier  and I can  spend

14  more  time  on  preliminary  matter s.  I can  start  at 9:30

15  and start  with  you  at 9:00  on preliminary  matter s.

16         I see  heads  shaki ng.

17         MS.  JOHNSTON:   I would  ask  that  the  court  not  do

18  that .  We  have  three  witness es comi ng  in  from  out  of

19  state  who  are  arrivi ng  late  tonight , so  we  will  be

20  meet ing  with  them  at 8 o'clock , and  I based  those

21  meet ings  based  on  the  10 o'clock  start .

22         THE  COURT:   I will  leave  it  on  10:00.

23         Do  you  want  me  to  meet  with  you  at 9:30  on

24  preliminary  mat ters?

25         MS.  JOHNSTON:   I would  prefer  to do  it  at 9:45 .

1            THE  COURT:   I've  gotten  one  note  from  Mr.

2  McKnett , and  if  you  can  give  me  your  additional  matter s

3  --

4            MR.  MCKNETT:   Your  Honor , Mr.  Montemarano  has

5  written  his  on  the  bottom  of  my  note .

6            THE  COURT:   So  that 's  what  I  need ?  I  will  do

7  that .

8            MS.  JOHNSTON:   The  only  thing  we  would  ask  is

9  that  we  are  able  to  finish  with  this  witness  today ,

10  because  we  has  a  7  o'clock  flight  to  Ohio .

11            THE  COURT:   If  we  can  stop  talk ing , we  can  get

12  him  in  and  out .

13            MR.  MCKNETT:   Your  Honor , just  for  the  record , I

14  have  provide d  a  copy  of  my  note  to  the  government .

15            THE  COURT:   Are  we  ready  for  the  jury ?

16            MS.  GREENBERG:    Yes , Your  Honor .

17            THE  COURT:   Bring  them  in .

18             What 's  the  nam e  of  the  next  witness ?

19            MS.  GREENBERG:   S pecial  Agent  Kyle  Fulmer .

20                  (Jury  return s  at  3 :46  p.m. )

21            THE  COURT:   You  may  proceed .

22            THE  CLERK:   If  you  will  raise  your  right  hand

23  for  me , please .

24  Thereupon,

25                         **KYLE  FULMER** ,

1 having been called as a witness on behalf of the

2 Plaintiff, and having been first duly sworn by the

3 Courtroom Deputy, was examined and testified as

4 follows:

5          THE CLERK:   If you would state your name  for the

6 record?

7          THE WITNESS:   My name is Kyle, K Y L E, Fulmer,

8 F U L M E R.

9                    **DIRECT EXAMINATION**

10          BY MS. GREENBERG:

11 Q.       Sir, where are you employed?

12 A.       With the Federal Bureau of Investigation.

13 Q.       In what capacity?

14 A.       I'm a Special Agent.

15 Q.       Can you tell the jury, sir, some of your

16 background, training, and experience s with the FBI?

17 A.       Well, prior to the FBI, I was a police officer

18 in the state of Ohio for approximately  seven year s, and

19 I've been in the FBI almost ten year s now.

20 Q.       What are the nature of your -- general ly, the

21 nature of your duti es and responsibilities ?

22 A.       I was previous ly assign ed to the Wash ington, D.

23 C. field office with the Safe Street s Task Force.

24 Q.       If I could stop you there.

25          What is the "Safe Street s Task Force?"

1  A.      Basically , it's a group of FBI agent s and

2  Metropolitan  Police  Department  officer s that work on a

3  violent  crime  and gang s task force  in the District of

4  Columbia , and we wind up work ing in the Maryland  and

5  Virginia  suburb s as well .

6  Q.      As part of your work on that squad , did you

7  investigate  narcotic s activity ?

8  A.      Yes .

9  Q.      Was it in this capacity  that you were work ing on

10 October  17 , 2002 ?

11 A.      Yes .

12 Q.      Have you since move d from the area ?

13 A.      Yes .

14 Q.      You're  still a member  of the FBI?

15 A.      Yes .  I'm out of the Cleveland  division  now , the

16 Toledo , Ohio  office .

17 Q.      Closer  to back home ?

18 A.      A little  bit .

19 Q.      That wasn't a result  of any problem s here .   It

20 was just a natural  --

21 A.      No .  It was an OP transfer  -- O ffice of

22 Preference  transfer .

23 Q.      That 's where  you want ed to go?

24 A.      Correct .

25 Q.      Could  you tell the jury , on or about  October  17 ,

1  2002, while you were a special agent with the FBI

2  assigned to the Safe Streets Task Force, did you

3  execute a D. C. Superior Court search warrant at 1323

4  Anacostia Road, Apartment No. 4, Southeast, in

5  Washington, D. C.?

6  A.      Yes.

7  Q.      At approximately what time did you execute that

8  search warrant?

9  A.      It was sometime right after noon.

10  Q.      I'd like to show you -- and put up on the screen

11  -- do you recognize what is depicted in P-68?

12  A.      Yes. That's a photograph of the front door of

13  that apartment.

14  Q.      Did you knock on that door?

15  A.      Yes.

16  Q.      Could you describe to the jury how you knocked

17  and attempted to gain entry?

18  A.      If you'd like me to demonstrate, I could do

19  that.

20  Q.      Sure.

21  A.      Basically, I performed the knock and announce.

22  We got to the building; we came in the front door.

23  There's actually a front -- exterior front door to that

24  building. You walk up a flight of steps, and it's the

25  first door on the right. I banged on it as hard as I

1   could (witness indicating) very similar to that, and
2   probably actually much louder; yelled, "Police, search
3   warrant" about three times, and waited for the door to
4   be answered.
5   Q.      What happened?
6   A.      No one answered the door, and we breached the
7   door at that time.
8   Q.      Were there any concerns you had about being
9   observed down the hallway?
10  A.      Yes.  The information that we had with reference
11  to this residence specifically is that there were
12  surveillance cameras on the exterior of the building,
13  and I believe in the hallway as well, and in fact there
14  were.
15  Q.      You observed these surveillance cameras?
16  A.      Yes.
17  Q.      Was there anyone inside the particular location?
18  That would be 1323 Anacostia Road, No. 4, Southeast,
19  Washington D.C. when you entered the apartment on
20  October 17, 2002?
21  A.      Yes.
22  Q.      And who was there?
23  A.      A male identified as "Richard Johnson," and also
24  a female by the name of "Bridget Reeder."
25          THE COURT:  What was the second name?

1          THE WITNESS:   Bridget Reeder, R E E D E R.

2          By MS. GREENBERG:

3  Q.      The first name was Richard Johnson?

4  A.      Correct.

5  Q.      What was your role in connection with the search

6  warrant?

7  A.      I was the seizing agent and the knock and

8  announce -- basically, the team leader that day.

9  Q.      When you say "seizing agent," could you describe

10 to the jury what you mean?

11 A.      There was approximately -- somewhere between

12 seven to nine agents and/or detectives that were

13 present during that search warrant.  Once we begin a

14 search of the residence, and items are identified that

15 are going to be seized as evidence, I will come,

16 observe them, photographs will be taken of them, and

17 then I will seize them, place them in a bag, label them

18 with the case number, date, where they were located,

19 and then I'll list that on the -- what's called the

20 FD-597.  It's a property inventory sheet.

21 Q.      So the practice for somebody -- a law

22 enforcement agency finds an item, notifies the seizing

23 agent, who comes over and seizes the items.  That's

24 standard operating procedure as far as you know in the

25 FBI?

1  A.      It's standard operating procedure for our task
2  force, yes.
3  Q.      That's to enable one person to come into court
4  instead of however many are at the scene?
5  A.      That's part of it, yes.
6  Q.      So, based on your work in law enforcement, is
7  that also the way that some police departments conduct
8  their business?
9  A.      Yes.
10 Q.      So the items that were seized that day, they
11 were actually physically taken by you?
12 A.      Yes.
13 Q.      Did you observe P-69?  Did you observe this
14 particular exhibit?
15 A.      Yes.
16 Q.      It says, "Room D."
17         Could you describe to the jury what that means?
18 A.      Part of the procedures -- when we would execute
19 search warrants, we would come into the residence --
20 and this would be any residence that we search -- we'll
21 take -- we'll label each room, give it a letter
22 designation, and then take what we call pre-search
23 photographs and then post-search photographs, as well
24 as items -- photographs of the items of evidence.
25 Typically, drugs, guns, or quantities of U.S. currency

1    that we would typically seize.

2            What you see in this photograph here is one of

3    our letters that we put up in that specific room, and

4    this is a pre-search photograph of Room D.

5    Q.      Where is Room D in relation to the front door

6    that we just saw?

7    A.      That is the front door right there that you see.

8    Q.      Right here?

9    A.      That's correct.

10   Q.      So this is right inside the doorway?

11   A.      That's correct.

12   Q.      I'm going to point to an item.

13           Do you see the white bottle with the black cap?

14   A.      Yes, I do.

15   Q.      Do you recognize that as one of the items that

16   you seized?

17   A.      Yes.

18   Q.      Could you tell the jury what that is?

19   A.      It's a false container. It's a can of

20   Fix-A-Flat that has a -- the bottom of the can

21   unscrews, and there's a false compartment, basically a

22   void inside the can where items can be secreted.

23   Q.      Have you seen that in connection with your work

24   in narcotics trafficking?

25   A.      Many times.

1 Q.      What is that false compartment typically used
2 for?
3 A.      Narcotics.
4 Q.      Do you remember the brand name on this item?
5 A.      I think it's Gunk.  Like, Gunk Fix-A-Fl at.
6 Q.      Are you sure of that, or do you need to refer to
7 your notes?
8 A.      I could refer to my notes.
9 Q.      R?
10 A.      Yeah.  It was item 13:  One Gunk Fix-A-Flat
11 false container located in Room D on table by myself.
12 Q.      Did you make those notes at or about the time of
13 the search warrant?
14 A.      This was at the time of the search warrant.
15         Again, the notes that I'm looking at is just a
16 copy of the inventory.
17 Q.      This bottle here, the tall bottle with the white
18 liquid and the cap.  Did you seize that item?
19         Looks like a bottle of liquor?
20 A.      Not that I'm aware of.
21 Q.      You wouldn't necessarily seize a bottle of
22 liquor, would you?
23 A.      No.
24 Q.      Liquor is legal here in Washington, D. C. and
25 Maryland?

1  A.      Yes.

2  Q.      But does that appear to you to be a bottle of

3  liquor?

4  A.      Yes.

5  Q.      Do you remember what type of liquor it was?

6  A.      No, I certainly don't.

7  Q.      Did you -- it's kind of a bad picture.  I'll put

8  it up.

9          What's depicted in P-70?  Do you recognize that?

10  A.      Yeah.  That's a small digital scale that was

11  also located right there.

12  Q.      Can you show us on P-69 where that scale was?

13  A.      Yes.

14  Q.      Or can you describe where it was.

15  A.      When I touch the screen here, will it --

16  Q.      It should.

17  A.      Approximately right there.  Just above the green

18  mark there.  (Witness indicating.)

19  Q.      For the record, that's right next to the false

20  container Gunk can?

21  A.      Correct.

22  Q.      Actually, if you're looking at the picture to

23  the right?

24  A.      That's correct.

25  Q.      Could you tell the jury what is depicted in

1 P-71?

2 A.      This is a box of .38 caliber handgun ammunition

3 -- ammunition that was located in a closet, on a shelf.

4 Q.      And you marked that as Item 12.

5         Was that also in Room D, the room we were

6 talking about?

7 A.      Yes.  It was also in Room D, inside the closet.

8 Q.      And P-72.  Could you tell the jury what is

9 depicted in P-72?

10 A.      This is a black -- I wouldn't call it leather,

11 but maybe pleather bag that zips up in the middle there

12 that contained a number of items, to include some

13 handgun ammunition, I believe two black masks with

14 holes cut where the eyes and the mouth, I believe,

15 would be, as well as some other items, from what I

16 recall.

17 Q.      Where was that black pleather bag located?

18 A.      That was also in Room D, on the floor, very

19 close to that closet.

20 Q.      And is Room D an open area as soon as you walk

21 into the house?

22 A.      Right.  The apartment as a whole is relatively

23 small.  As you enter the apartment, the door swings in

24 and to the right, and where you would come into is

25 basically a common area that it seems that it would be

1  somewhat of a, like, little very small dining room, but

2  it's completely open to a living room area.  And the

3  kitchen was off to the left, and the kitchen was

4  basically like a hallway leading to a back area, and

5  then the bedroom was off to the left, and then the

6  closet was straight ahead.

7  Q.      And P-73.  Is that just a better shot of the

8  .357 Magnum ammunition inside the black leather bag?

9  A.      That's correct.

10 Q.      That would be P-73.

11         P-74.

12 A.      This is a handgun box and ammunition that was

13 located in the living room area right as you look -- as

14 you're looking from the door, you would see the couch.

15 It was right on the left-hand side of the couch, on a

16 coffee table.

17 Q.      So, walking in the door, the first room you see

18 is Room D?

19 A.      Correct.

20 Q.      And then attached to it, is that the living room

21 you're talking about now?

22 A.      Correct.

23 Q.      Which you termed Room E?

24 A.      Correct.

25 Q.      This was out in plain sight in Room E, what's

1 depicted in P-74?

2 A.      The way it's depicted is exactly the way it was

3 sitting when we entered the apartment.

4 Q.      Again, not a great picture, but could you tell

5 the jury what's depicted in P-75?

6 A.      This is a Colt .38 caliber handgun that was

7 loaded, and this was located right on the coffee table,

8 right in front of the couch in the living room area.

9 Q.      Again, in plain view?

10 A.      That's correct.  Just how it is there is how it

11 was when we entered.

12 Q.      And P-76.

13 A.      This photo depicts holding the handgun with the

14 revolver open where you can actually see that it was

15 loaded with six rounds.

16 Q.      Are we still in the same location, the living

17 room?

18 A.      Yes.  Actually, what you're seeing is me holding

19 the gun right over the coffee table next to another

20 false container right there.

21 Q.      Okay.  Getting to that.

22      Is that -- actually, could you mark where you

23 see the false container?

24 A.      Yes.  Right there.  (Witness indicating.)

25 Q.      You've put a green mark on that?

1 A.       Correct.

2 Q.       Can you tell us what the false container is

3 labeled?

4 A.       That was a Brute by Faberge green can that,

5 again, had a screw -- an opening at the bottom where

6 you just unscrew it and the bottom comes off.

7 Q.       For the record, this is immediately adjacent to

8 the gun -- the thing separating it from the gun or a

9 set of keys?

10 A.      Correct.

11 Q.      Can you read what kind of Brute can it is?

12 A.      Shaving cream.

13 Q.      This is similar to the Gunk can that you talked

14 about earlier?

15 A.      Yeah.   In that it's a false container and the

16 bottom screws off, yes.

17 Q.      Did you also seize certain documents from this

18 residence?

19 A.      Yes.

20 Q.      And without going through all the documents.

21 Did you review some documents relating to a customer

22 service number, 1-800-937-8997, itemized account for

23 (202) 390-7875 for Voice Stream Wireless?

24 A.      Yes.

25          MS. GREENBERG:   Your Honor, may I approach the

1 witness?

2          THE COURT:   You may.

3          BY MS. GREENBERG:

4 Q.      Showing you what's been marked as Goodwin 31.

5          MR. WARD:   I'm sorry?

6          BY MS. GREENBERG:

7 Q.      Goodwin 31.

8          Are these documents that you seized from the

9 Anacostia Road location during the search warrant?

10 A.      Yes.

11 Q.      And you removed from the original exhibits any

12 of your personal notes on that exhibit?

13 A.      Yes, I did.

14 Q.      That's where there are some little white-outs?

15 A.      Yeah.   On Page 1 on the left and the right.

16 Q.      But you recognize this as the exhibit you

17 seized?

18 A.      Yes.

19          MS. GREENBERG:   Your Honor, I have no further

20 questions.

21          May I publish these exhibits to the jury?

22          THE COURT:   You may.

23          MR. MARTIN:   Madam Government, may I see that

24 before you do?

25                          **CROSS-EXAMINATION**

1          BY MR. MARTIN:

2  Q.      Good afternoon, officer.

3  A.      Good afternoon.

4  Q.      Anthony Martin here.  I represent Learley

5  Goodwin.

6          If I remember correctly, you said when you went

7  in there, the apartment was leased by someone named

8  "Richard Johnson?"

9  A.      No, that's not what I said.

10  Q.      What did you say, sir?

11  A.      He was in the apartment.

12  Q.      He was in the apartment?

13  A.      Correct.

14  Q.      Mr. Johnson did tell you that was his apartment,

15  did he not?

16  A.      No, he did not.

17  Q.      There was someone else in the apartment at the

18  time you arrested him; correct?

19  A.      That's correct.

20  Q.      There was a female?

21  A.      Correct.  Bridget Reeder.

22  Q.      There was no indication -- strike that.

23          When you got in there, he wasn't dressed, was

24  he?

25  A.      No, he wasn't.  Neither of them were.

1  Q.      In fact, the woman was somewhat hysterical. She
2  wanted to put on her clothes; correct?
3  A.      Eventually. Yeah, she wanted to put on her
4  clothes immediately, and we let her.
5  Q.      And Mr. Johnson put on some clothes that were
6  out in the living room area; correct?
7  A.      Correct.
8  Q.      And in fact, both of their clothes were in the
9  living room area; is that correct?
10 A.      Correct. There was a lot of clothes, actually.
11 Q.      By all indications, the clothing that you saw in
12 the closet was the same size as Richard Johnson;
13 correct?
14 A.      No.
15 Q.      The shoes that were in the closet. Those all
16 were the same size as Mr. Johnson, too, weren't they?
17 A.      No.
18 Q.      Was there any indication, or at any time did you
19 measure the clothing to see if they fit Mr. Johnson or
20 not?
21 A.      Well, it's relatively tough to gauge men's
22 clothing. We didn't specifically go out and look at
23 each of the pants size, but I can tell you that we did
24 look at the shoes, and the shoes were of different
25 sizes, from what I recall -- at least some of the pairs

1  that were out in that bedroom where he was located.

2  The specific shoe -- I don't recall the exact size, but

3  all the clothing that he requested to put on was the

4  clothing that was located in the living room, in a ball

5  on the floor, along with the female's clothing.

6  Q.      Johnson told you he was staying there, did he

7  not?

8  A.      He said he was staying there and that a friend

9  of his was allowing him to stay there, but he said his

10 permanent residence was a different location.

11 Q.      Did you look in the refrigerator?

12 A.      Yes, we did.

13 Q.      And there was food in the refrigerator?

14 A.      I don't recall much, but I believe there was

15 stuff in there.

16 Q.      Did you look in the cupboards?

17 A.      Yes.  Absolutely.

18 Q.      There was food in the cupboards?

19 A.      I don't recall much food being in the cupboards,

20 but, like, some plates and different things like that.

21 Q.      You seized various items that were shown to you,

22 and you said there was a bag and there was a gun and

23 there was some ammunition and the like; correct?

24 A.      There was quite a bit of -- I can't recall

25 exactly how many items, but I think we had about three

1   pages -- three pages -- two and a little bit more.  So,

2   two and a half pages of items.

3   Q.      Do you remember the very first exhibit photo

4   that you were shown?  I believe that was the one with

5   the various cans --

6   A.      Correct.

7   Q.      -- and so forth on top.  I think that was P-69.

8   It was a photo of Room D.  And there was a table there?

9   A.      Correct.

10  Q.      There were some cans and bottles with false

11  bottoms and the like?

12  A.      Right.

13  Q.      With respect to those cans and bottles, did Mr.

14  Johnson tell you those were his?

15  A.      No.  Mr. Johnson didn't have really much to say

16  to us that day.

17  Q.      Did you send those to the forensic lab to

18  examine for fingerprints?

19  A.      No.

20  Q.      Okay.  So there is no indication, as far as

21  you're concerned, that Mr. Learley Reed Goodwin's

22  fingerprints were on any of those cans; correct?

23  A.      No.

24  Q.      And the same can be true with respect to -- the

25  same can be said with respect to the bottles as well.

1 You don't have any fingerprint analysis indicating that

2 Mr. Goodwin at any time handled any of those, do you?

3 A.      No.  Not that I recall, no.

4 Q.      The handgun that you were shown earlier -- the

5 photo of the handgun -- same thing.  Was that sent to a

6 forensic lab?

7 A.      It was.  I don't recall exactly what the

8 analysis was on that.

9 Q.      Do you remember if it was sent to the lab at

10 Quantico to determine whether or not there was any DNA

11 on it?

12 A.      I don't recall that we asked for DNA.  Just

13 fingerprint evidence.

14 Q.      With respect to that handgun, you don't recall

15 any fingerprint analysis coming back indicating that

16 Mr. Learley Reed Goodwin ever handled that gun, do you?

17 A.      No.  I don't recall any fingerprint evidence

18 coming back on it at all.

19 Q.      You said that there were various size clothing

20 in the closets and shoes as well.

21      Did you send any of those to Quantico for DNA

22 analysis?

23 A.      No.

24 Q.      So there's no indication that Mr. Goodwin, at

25 any time, owned any of those clothing -- any of that

1 clothing that was in that apartment ; correct ?

2 A.      No.   I couldn't say that he was wearing any of

3 the clothing or anything like that , no.

4 Q.      And other than the fact that Mr. Richard Johnson

5 told you that a friend was letting him stay there , you

6 have no reason to believe that Learley Reed Goodwin

7 stayed there , did you ?

8 A.      Well , we did locate several items of paperwork

9 bearing his name .   We also spoke with the resident

10 manager .   At a later date we interviewed her -- I

11 believe her name was Marry McCarter or something like

12 that .   This was sometime later when we were attempting

13 to execute a grand jury subpoena on Bridget Reeder , and

14 she indicated that she actually worked for Mr. Goodwin

15 at that time and that she knew that Richard would stay

16 up in the apartment at times.

17 Q.      In fact , the resident manager told you she

18 worked for Learley Reed Goodwin , because you found out

19 that Mr. Goodwin owned that building ; is that correct ?

20 A.      No.   She told me he owned it.

21 Q.      That's what I said .   You found out that he owned

22 the building ; right ?

23 A.      I found out when I spoke with her .   I think you

24 were indicating I found out prior to that , but I found

25 out -- I knew prior to that , but no one had told me .   I

1  knew from a check of records, and she told me that day

2  that in fact she worked for him.

3  Q.      And as the resident manager, I would take it

4  that she had access to other apartments as well;

5  correct?

6  A.      I couldn't really tell you that.  I'm not her

7  boss.

8  Q.      You're not her boss.  But as the owner of the

9  building, were you able to find -- did you determine

10 that there was other mail and other apartments, or

11 other parts of the building that might have had Mr.

12 Goodwin's name on it?

13 A.      I had a search warrant for that particular

14 apartment.  How could I search the other apartments?

15 Q.      I'm just asking if you went into the resident

16 manager's apartment or any place elsewhere you might

17 have seen out in the plain -- in plain view other

18 documents that had his name on it.

19 A.      No.  When I was at Ms. McCarter's apartment, I

20 didn't see any mail out in plain view with his name on

21 it.  No, I don't think I would.

22 Q.      Now, the documents that you said you found in

23 that particular apartment.  You said you found Mr.

24 Goodwin's name on it.

25 A.      Correct.

1 Q.      Did it also have his address for that particular

2 apartment?

3 A.     I don't recall. I think it may have had other

4 addresses. There might have been multiple addresses,

5 actually.

6 Q.      Did the resident manager actually indicate to

7 you which one of the apartments that she used herself,

8 if she used any?

9 A.      Well, she was in No. 2, right as you walk in the

10 door, on the right-hand side. I mean, I assumed that

11 she lived there. She answered -- she was in a robe and

12 appeared to be residing there.

13 Q.      Was this on the first, second, or third floor of

14 the building?

15 A.      First. There's only two floors to the building.

16 There's four apartments in the building.

17 Q.      So it's a quad?

18 A.      Correct.

19 Q.      Were there any empty apartments in that

20 building?

21 A.      I don't recall if there was any empty apartments

22 at the time.

23 Q.      You said Richard Johnson didn't make any

24 statements; is that correct? He didn't have much to

25 say?

1 A.      He didn't really have much to say.  He provided

2 us his date of birth, his Social Security number, his

3 address where he said he was -- what he said was his

4 permanent address; and Mrs. Reeder didn't really have a

5 lot to tell us either.

6 Q.      Now, you said you found some articles of

7 clothing for different size.  I think you said that

8 there was some that was larger than the others or

9 different shoe sizes.

10 A.      There was lots of clothes in that apartment.

11 Q.      Did you see any documentation or paperwork with

12 the name "Michael Thurman" on it?

13 A.      Michael Thurman?  No, not that I recall.

14 Q.      Not that you recall.  Did you at any time hear

15 Mr. Richard Johnson mention Michael Thurman's name as

16 being the resident of that apartment?

17 A.      No.

18         MR. MARTIN:   Thank you, officer.

19         THE COURT:   Additional cross?  Anyone?

20         MR. HALL:   No, Your Honor.  I have no cross.

21         MR. MITCHELL:   No, Your Honor.

22         MR. WARD:  No, Your Honor.  Thank you.

23         THE COURT:   Redirect?

24                      **REDIRECT EXAMINATION**

25         BY MS. GREENBERG:

1   Q.        Defense counsel asked you about Mr. Johnson, who
2   was at the apartment, and you indicated that he was not
3   the owner, he was just staying there, according to your
4   investigation, on that day.
5   A.        Correct.
6   Q.        And based on your investigation, did you
7   determine who owned the apartment?
8   A.        Who owned the building?
9   Q.        Yes.
10  A.        Yes.  Mr. Goodwin did.
11  Q.        You indicated that you recovered a number of
12  items with his name on that; is that correct?
13  A.        Yes.  From what I recall, there was different
14  items with his name on it, and we just -- we pulled a
15  lot of documents from the rear of the -- the rear --
16  it's almost like an enclosed porch on the back of the
17  building, on the back of the -- that apartment.  Like,
18  the hallway, that's kind of the kitchen, and it leads
19  to a back room, and there was a number of documents
20  that we seized back there, as well.
21  Q.        Court's indulgence.
22            Now, your case file.  Did you turn that over to
23  Detective Eveler in connection with his investigation?
24  A.        I didn't turn it over, but one of my partners
25  that I used to work with did.

1 Q.      You didn't specifically bring the items that we

2 were presenting here as evidence before the jury; is

3 that correct?

4 A.      No. I actually hadn't seen that case file until

5 earlier today when I arrived here at the building.

6 Q.      You understand, being an FBI agent for so many

7 years, we try and limit what we show the jury to get

8 them out of here before the year 2006 expires.

9        MR. WARD:   Objection, Your Honor.

10       THE COURT:   Sustained.

11       BY MS. GREENBERG:

12 Q.      Showing you, for identification only, because I

13 don't want to take up more time, Miscellaneous 3,

14 Miscellaneous 4 -- I'm not going to introduce them into

15 evidence.

16       Your Honor, may we approach?

17              (At the bar of the Court.)

18       MS. GREENBERG:   Your Honor --

19       THE COURT:   Wait, wait, wait.

20       MS. GREENBERG:   All I want to do is -- he

21 crossed him and said there were a number of documents

22 with Learley Goodwin's name on these. I don't want to

23 introduce these; I just want to rehabilitate him that

24 he retrieved these documents.

25       MR. MARTIN:   There are other names on here as

1 well.

2          MS. GREENBERG:   Your Honor, we will connect them

3 up later.  We can connect them up later.  I just want

4 him to identify these are documents that he found with

5 the search warrant.

6          THE COURT:   They will be identified and

7 identified only.

8          MS. GREENBERG:   So he doesn't have to come back

9 from Ohio and we don't have to waste a half hour.

10          MR. MARTIN:   He said there wasn't anything with

11 Thurman's name on it.

12          THE COURT:   You haven't even looked at it.

13          MS. GREENBERG:   Your Honor, we're not seeking to

14 admit them now.  I just didn't want to take the time to

15 have all counsel looking at all these exhibits which,

16 of course, have been available for years.

17          THE COURT:   Is there an objection?

18          MR. MARTIN:   Well, there's no objection, but I'd

19 like to --

20          MS. GREENBERG:   Once we get them authenticated

21 --

22          MR. MARTIN:   I'd like to recross.

23          THE COURT:   You can recross.

24          MS. GREENBERG:   He can ask Detective Eveler

25 later.

1          MR. WARD:   Your Honor, there's no purpose.   How

2 are we suppose d to go through the evidence when there

3 is all this paper sitting around?

4          THE COURT:   They will be present ed with an

5 exhibit number, but they won't be offered at this time.

6 Correct?

7          MS. GREENBERG:    Correct.

8          THE COURT:   All right.   You may inquire.

9               (Back in open court.)

10         BY MS. GREENBERG:

11 Q.     Sir, so we don't have to bring you back from

12 Ohio.   Would you look at Miscellaneous 3 and tell me --

13 you're referenci ng two document s in the name of Learley

14 Goodwin.

15         Are those some of the document s you're refer ring

16 to?

17 A.     Yes.   This is Item 9 I've labeled "miscellaneous

18 document s and court document s in the name of Learley

19 Goodwin locate d in Room B shoe box, by S/A Fulmer."

20 Q.     Do you recall what Room B was?

21 A.     B is the rear room off the kitchen, as I

22 indicated.

23 Q.     If you could authenticate Miscellaneous 4.   Is

24 that also from the search warrant that we're talk ing

25 about here today?

1  A.       Yes.

2  Q.       What is that?

3  A.       This is described as "numerous document s, phone

4  records, number s, owe sheet s, located on a table and

5  Room D by S/A Lockhart and myself."

6  Q.       That room D was the room we saw those picture s

7  in when you first walked in the door?

8  A.       That's correct.

9  Q.       You didn't review each and every one of those

10  document s, did you?

11  A.       No, I haven't seen those.

12  Q.       In how many year s?

13  A.       A while.

14  Q.       Three year s?

15  A.       Three year s, yeah.

16  Q.       Now, you also were asked some question s about

17  fingerprint analyses.

18  A.       Correct.

19  Q.       Why wouldn't fingerprint analyses come back to

20  you?

21  A.       I'm sorry?

22  Q.       Why wouldn't these fingerprint analyses come

23  back to you?

24  A.       Why wouldn't they come back to me?

25  Q.       Yes.

1  A.      They would.  It's just -- I don't recall  there

2  being  fingerprint s that were positive  to my

3  recollection .  I would  have that  in the case file if in

4  fact that were the fact .

5  Q.      Is that a term that 's used -- "of value ?"

6  "Fingerprint s of value ?"  Have you heard that term

7  before ?

8  A.      Yes .

9  Q.      That  mean s fingerprint s that somebody  can --

10        MR. MARTIN :  Objection .

11        MS. GREENBERG:  What does that mean ?

12        THE COURT:  Wait a minute .  Wait a minute .

13        Are you withdraw ing the question ?

14        MS. GREENBERG:  Yes , Your Honor .

15        THE COURT:  You're going to ask it again ?

16        BY MS. GREENBERG:

17 Q.      What does that mean , "of value ?"

18 A.      You could have finger print s all over an object ,

19 but they have to be of value or enough ridge s, enough

20 ridge detail on the print s in order for them  to be

21 analyze d and identifi ed.

22 Q.      Is that unusual in your experience  not to get

23 fingerprint s of value off item s like these ?

24 A.      No.  It's actual ly more the norm than it is to

25 get fingerprint s back on item s.

1  Q.      So, relating to the jurors what they see on TV,
2  how does that --
3  A.      Yeah.  It's completely --
4          MR. MONTEMARANO:  Objection, Your Honor.
5          THE COURT:  I'm sorry?
6          MR. MONTEMARANO:  I'm not sure how the special
7  agent knows what the jurors see on TV.
8          MR. WARD:  I'm not sure what they watch on TV.
9          THE COURT:  Just ask a different question.  You
10 can get it another way.
11         Sustained.
12         BY MS. GREENBERG:
13 Q.      Sort of common parlance is you can get
14 fingerprints off of anything.  Based on your law
15 enforcement experience, how do you -- do you agree with
16 that?
17 A.      No.  I would -- I mean, just to use my -- the
18 entire time I've been in law enforcement, I think of
19 the many weapons that I have been present and seized,
20 or items that we have submitted for fingerprints, and I
21 would say less than five percent of the time do you get
22 fingerprints back.  At least in my experience in
23 working in law enforcement, when I have submitted items
24 for fingerprint analysis, it's rare that you get
25 fingerprint -- usable prints back that can be

1 identified.

2          MS. GREENBERG:   No further questions, Your

3 Honor.

4          THE COURT:   Any recross?

5          MR. MARTIN:   Just a second, Your Honor.

6          May I approach, Your Honor?

7          THE COURT:   You may.

8                    **RECROSS EXAMINATION**

9          BY MR. MARTIN:

10 Q.      What is the correct term to address you by?  Is

11 it "Special Agent?"

12 A.      Agent.  It doesn't matter.

13 Q.      All right.  I'm showing you what's been marked

14 as Government's Exhibit -- I guess's it's 39.

15 A.      Okay.

16 Q.      It has a number of documents in it; correct,

17 sir?

18          One of the documents you see there is a business

19 card.

20 A.      Correct.

21 Q.      Do you remember me asking you earlier if you saw

22 anything with Michael Thurman's name on it?

23 A.      No.  You asked me if I was told anything about

24 Michael Thurman, I think.  I don't recall seeing

25 anything with Thurman's name on it.

1 Q.     It's been too long, though, for you to remember;

2 right?

3 A.     I don't recall that name coming up at all.

4 Q.     Do you see anything there with the name

5 "Thurman" on it now?

6 A.     It says, "Goodwin and Thurman, food service s

7 specialist s."

8 Q.     And you said you went in that apartment, I

9 think, on October 17, 2002, and there were various

10 document s you said you found in there?

11 A.     Yes.

12 Q.     These are the document s; right?

13 A.     These are some of them, yes.

14 Q.     These document s were found in a rear room -- a

15 room behind the kitchen; isn't that correct?

16 A.     That's correct.

17        MS. GREENBERG:   Your Honor, if we could have an

18 exhibit number, because there are two exhibit s in two

19 different place s.

20        THE COURT:   Yeah.  If you could make that clear.

21        MR. MARTIN:   I think I did say, this is

22 Government 's Exhibit 39.

23        MS. GREENBERG:   It's the white sticker, counsel,

24 with this case number on it.

25        MR. MARTIN:   I see.  What I'm looking at now is

1  Government 's Exhibit  -- it says  Miscellaneous  3.

2            MS. GREENBERG:   Yes.

3            MR. MARTIN:    Miscellaneous  3.

4            MS. GREENBERG:    Thank you .

5            BY MR. MARTIN:

6  Q.      And there are some other names in here , as well ?

7  A.      Correct .

8  Q.      One of those names being "Tiffany Vessels," I

9  think ?

10           MS. GREENBERG:    Your Honor , I'm happy, if

11 counsel wants, to introduce  that exhibit if he's

12 reading from it , but we need to introduce  that exhibit

13 if he's reading from it .

14           MR. MARTIN:   I'm just asking him if there are

15 other names in here .

16           MS. GREENBERG:    Your Honor , I'll withdraw it .

17           BY MR. MARTIN:

18 Q.      You will admit , agent , that there are other

19 names that were found in that apartment  other than Mr.

20 Goodwin 's name ; right ?

21 A.      Yes .

22 Q.      Indeed , when I asked you before whether you

23 found out anything in there indicating that Michael

24 Thurman might have been in there , you had said that you

25 didn't see anything with Michael Thurman 's name on it ;

1  in fact , there  was  something  with  --

2        MS.  GREENBERG:    Object  to  the  compound  nature  of

3  the  question .

4        THE  COURT:    Sustained.

5        BY MR. MARTIN:

6  Q.      You  will  admit  that  there  is  something  in  here

7  with  Michael  Thurman 's  name  in  there ; correct ?

8  A.      There 's  something  that  says  "Thurman "  on  it.

9  Q.      These  documents  that  you  found  in  this  back  room

10  also  included  the  names  and  addresses  of  some  other

11  individuals  besides  Mr.  Thurman  and  Mr.  Goodwin , did  it

12  not ?

13  A.      I  don't  know .  Again , I  haven't  seen  them  in

14  years.

15  Q.      How  about  if  I  just  bring  it  over  to  you  and  ask

16  you  to  peruse  it , rather  than  me  reading  this  piece  by

17  piece ?

18  A.      That  would  be  great .

19  Q.      That 's  okay  with  the  government .

20        What  I'm  now  looking  at  is  Miscellaneous  4.

21  A.      I'll  look  through  it.

22  Q.      When  you're  finished , just  look  up.

23  A.      Okay .

24        MS.  GREENBERG:    Your  Honor , at  this  point  I

25  think  it 's  simpler  if  we  just  move  in  Miscellaneous  3

1  and  4 .

2          THE  COURT:   Any  objection ?

3          MR.  MARTIN:    No  objection .

4          THE  COURT:   It  will  be  received .

5          MS.  GREENBERG:    Thank  you .

6          BY MR. MARTIN:

7  Q.      Officer , would  it  be  fair  to  say  that  these  are

8  different  paper s  and  document s  related  to  different

9  individuals  that  were  found  in  that  rear  room ?

10  A.      There 's  different  name s  for  different

11  individuals .  There 's  Mr.  Goodwin 's  name s; there 's

12  document s  for  a  business  that  is  associate d  to  Mr.

13  Goodwin  as  well .

14          There 's  a  lot  of  document s  in  here .   That 's

15  correct .

16  Q.      Is  there  a  driver 's  license  in  there , as  well ?

17  A.      There 's  a  driver 's  license  in  here .   Correct .

18  Q.      That  does n't  have  Mr.  Goodwin 's  name  on  it ;

19  correct ?

20  A.      No .

21  Q.      There  are  other  document s, as  I  said  before ,

22  add ressed  to  other  people  at  the  same  address ?

23  A.      No .  Different  address es.

24  Q.      When  you  found  these  document s, they  weren't  in

25  any  particular  order , were  they ?

1 A.       No, not all of them.  I mean, some of them were.

2 But, these specifically  in here?  No.

3 Q.       Tell us, agent.  When you found  them, were they

4 boxed and cataloged?

5 A.       No.

6 Q.       How did you find them?  Were they just strewn

7 about?

8 A.       No.  They were in different  boxes in different

9 locations.  From what I recall, some of the boxes on

10 one side had different  items in it, and then there

11 would be some paperwork  in them.  There was also -- I

12 mean, it's not like it was a bunch of documents in

13 boxes only back there.  There was other items, and if I

14 recall maybe some yard work material  or equipment  or

15 something  like that back there as well.

16 Q.       The resident  manager that you spoke to.  You

17 said she was in the first apartment  when you came in?

18 A.       Number 2.

19 Q.       Number 2.

20          Did you ask her at any time if she had ever

21 stayed upstairs  in the other apartment?

22 A.       No.

23          MR. MARTIN:   I have nothing  further, Your Honor.

24          Thank you, sir.

25          THE COURT:   Anything  further?

1          MS.  GREENBERG:    No, Your  Honor.

2          THE  COURT:   Well, unless  you  have  a  four-minute

3  witness, we  will  recess  for  the  day.

4          Ladies  and  gentlemen , please  return , and  we  will

5  have  testimony  resuming  at  10  o'clock  tomorrow  morning.

6          Counsel , please  stay  behind  one  second.

7               (Witness  excused  at  4:27  p.m.)

8               (Jury  excused  at  4:27  p.m.)

9          THE  COURT:   All  right .  Counsel , are  there  any

10  other  preliminary  matters  other  than  these  transcript

11  references  and  Mr.  Montemarano 's  intended  motion  with

12  regard  to  the  striking  of  the  testimony  of  Officer

13  Martini?

14          Mr.  Montemarano , are  there  any  preliminary

15  matters  we  will  be  hearing, other  than  your  motion  with

16  regard  to  Officer  Martini  and  the  two  --  I  think  three

17  excerpts  from  the  transcripts  that  there 's  objections

18  to?  Are  there  any  other  matters  that  you  anticipate

19  being  preliminary  matters  tomorrow  morning?

20          MR.  SUSSMAN :  I'd  ask  the  government  if  they

21  think  they're  going  to  get  to  Detective  Sakala

22  tomorrow.

23          MS.  JOHNSTON:   I  don't  believe  so.

24          MR.  SUSSMAN :  There  will  obviously  be

25  preliminary  matters  with  pending  questions  about  his

1 limit s of his testimony , his expertise , thing s of that
2 nature .

3      THE COURT:   All right . Well , it sounds to me
4 like I'll have enough time between 9:45 and 10:00 to
5 resolve these matter s. If you think I need more than
6 that , then now is the time to tell me.

7      MS. JOHNSTON:   Your Honor , there is only one
8 issue that the government -- well , really , sort of two
9 related issue s that the government would like to bring
10 up, and that is that Mr. Montemarano , in his opening
11 statement , made reference to some business of Ms.
12 Martin 's and the fact that she had inherited some
13 money . We have not received any discovery from defense
14 counsel concern ing any evidence , any document s or other
15 physical evidence -- tangible evidence that they intend
16 to introduce during trial . We were entitle d to that
17 prior to trial . We are asking the court to compel them
18 to give it to us at this point in time , and certain ly
19 not at the beginning of their case . We're entitle d to
20 have it prior to trial so if there 's something we need
21 to address in our case in chief , we can do that . We
22 haven't received that .

23      Like wise , Mr. Montemarano made reference s to,
24 "Where is John Martin ?"  Well , the court and government
25 know s where Mr. Martin is, as does Mr. Montemarano .

1   He's serving a 31-year sentence for his involvement in

2   this conspiracy. We think it was an inappropriate

3   comment at that time, and we will make a motion in

4   limine to preclude him from asking any of the agents

5   about where Mr. Martin is. Perhaps the government

6   shouldn't, but it's an improper question. We would

7   probably deal with that in terms of instructions if

8   it's appropriate, but the government's main concern is

9   the fact that we have not received any tangible items

10  that any defendant wants to introduce at trial. We're

11  entitled to it, and we would like the court -- I

12  recognize it's a long trial to give it -- make sure we

13  get it so that we can deal with it in our case in chief

14  if we think it's appropriate.

15         I've also advised defense counsel that the

16  government is hoping we will be in their case sometime

17  around July 17 and suggested that if they're going to

18  do subpoenas they even do them for the week of July 11

19  and put the people on standby. I have tried -- I will

20  keep the court abreast, as I did defense counsel, that

21  if we finish with the witnesses scheduled for tomorrow,

22  the government believes we're on track to finish its

23  case so that they could start around the eighteenth.

24  Now, that may change depending on how quickly Agent

25  Sakala and the surveillance agents get through all of

1   the wiretap materials.

2          THE COURT:   All right.

3          MS. JOHNSTON:   I'm raising that, because we are

4   entitled -- we were entitled to have that discovery

5   prior to the commencement of trial.

6          THE COURT:   Mr. Montemarano.

7          MR. MONTEMARANO:   Your Honor signed an order

8   this week, as Ms. Martin's counsel, with the forfeiture

9   matter that the government has been going around,

10  regarding the seizure of about $7,000 from her.   I

11  received that at the MS-13 hearing on Monday from Mr.

12  Biddell.   The documents -- it's my understanding many

13  of the documents have been provided to the government,

14  but those which I intend to use I will have organized

15  and provide to the government well before the end of

16  next week.   As I said, I should have those early this

17  week.

18         THE COURT:   All right.

19         MR. MARTIN:   There is one other thing, Your

20  Honor, and I'm not sure how this is going to play out.

21  There were some witnesses called and some statements

22  made, and during the course of their testimony my

23  client has indicated to me that he would like to call

24  this person to rebut that and this person to rebut

25  this.   Of course, when we gave our list of expected

1  witness es that you read to the juror s, at least one or

2  two of those name s were not included on that list.  I

3  doubt that any of the juror s know any of these people ,

4  but still .

5       THE COURT:  If anybody contemplate s any

6  witness es that were not reveal ed to the jury , you need

7  to tell me so I can ask the jury now.  I don't want to

8  wait until the end of the trial .

9       MR. MARTIN:  Yes, sir .  I will also have that

10 for you tomorrow morn ing.  I'm going to firm that up

11 with Mr. Goodwin , and I want to get that out of the

12 way.

13      THE COURT:  Please , all counsel , if you have any

14 contemplation  of witness es whose name s were not

15 dis close d to this jury , let know me know so I can

16 inquire of the jury whether anyone know s them , and also

17 if there 's name s like "John Brown" or something , please

18 tell me something about that person so that if it's a

19 common name I can give them some limit ers that would

20 make them comfortable  that they don't know that person .

21      MR. MARTIN:  Yes, sir .

22      MR. MONTEMARANO :  Your Honor, as to the John

23 Martin issue .  I was not intend ing to bring up Mr.

24 Martin 's sentence , regard less how much I might want to.

25      THE COURT:  Somehow I didn't think  you were

1 going to do that.

2        MR. MARTIN:    Thank you, Your Honor.

3        THE COURT:   Yeah.  I think you should be careful

4 not to ask a question like that.  That somehow implies

5 that there's something mysterious about his absence.

6        MR. MONTEMARANO:  I'm not sure how to answer

7 that, inasmuch as Mr. Martin had access to my client's

8 home and my client's business, as has been testified to

9 by witnesses already in a week of trial.  I think

10 pointing the finger at Mr. Martin is entirely

11 appropriate.  However, pointing to his having been

12 convicted or what kind of sentence he received is

13 clearly wrong, and I wasn't going to go down that

14 second part of the road.

15        THE COURT:  I'm not going to let you go down

16 there, and Ms. Johnston will be hollering if you try.

17        MS. JOHNSTON:   Your Honor, what was clearly

18 wrong was for him to say, in opening statement, "Where

19 is John Martin?  Why isn't the government calling

20 him?", which is what he said in his opening statement.

21 I'm paraphrasing, but it specifically made reference as

22 to why the government wasn't calling him.  "Where is

23 John Martin?  Why isn't the government calling him?"

24 That was improper, and the government is moving to

25 exclude any of those kind of questions from any of the

1  case  agent s.

2          THE COURT:    That  kind  of  argument   should  not  be

3  made , Mr.  Montemarano .   You  know  that.

4          Anything  further ?

5          Okay .   We  will  see  you  tomorrow  at  9:45 .

6                      (Off  the  record  at  4:35  p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **CERTIFICATE**

2

3        I, Tracy Rae Dunlap,    RPR , CRR , an Official Court

4  Reporter for the United States District Court of

5  Maryland, do hereby certify that I reported, by machine

6  shorthand, in my official capacity, the proceedings had

7  and testimony adduced upon the Jury Trial Proceedings

8  in the case of UNITED STATES OF AMERICA versus PAULETTE

9  MARTIN, et al, criminal Action Number     RWT-04-0235 on

10 June 15, 2006.

11

12       I further certify that the foregoing     248 pages

13 constitute the official transcript of said proceedings,

14 as taken from my machine shorthand notes, of said

15 proceedings.

16

17       In witness whereof, I have hereto subscribed my

18 name, this 15th day of June     2007 .

19

20                    _____

                     TRACY RAE DUNLAP, RPR , CRR
21                   OFFICIAL  COURT REPORTER

22

23

24

25