```
 1           UNITED STATES DISTRICT COURT OF MARYLAND
                       SOUTHERN DIVISION
 2
   -----------------------x
 3 UNITED STATES OF AMERICA  :
            Plaintiff        :
 4                           :
                             :
 5 vs                        :Criminal Action:    RWT-04-0235
                             :
 6                           :
   PAULETTE MARTIN, et al    :
 7          Defendants.      :
   -----------------------x
 8

 9                      Friday, June 16, 2006
                        Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11 Proceeding before the HONORABLE ROGER W. TITUS, United
   States District Judge, in courtroom 4C, commencing at
12 9:48 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS THE TESTIMONY AND PROCEEDINGS
15      OF THE CASE AS RECORDED   AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD  SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR          (301) 344-3912
25 Official Court Reporter
                      I N D E X
```

1

2                              DIRECT   CROSS      REDIRECT

3
  Mark  Walston              21       49
4
  Robert  Strause            51       66
5
  Heath  Guillotte           73
6
  Michael Thurman            86
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                          Page

24 Reporter's Certificate                   253

25 Concordance                              254

1          MR. SUSSMAN:  Your Honor, Ms. Harden is not

2   here.  I haven't spoken with her, but I will waive her

3   presence for purposes of legal argument.

4          THE COURT:  All right.  We're not going to take

5   any testimony.

6          MR. MONTEMARANO:  Ms. Johnston and I have just

7   spoken; we have resolved the issue concerning my

8   objection to the telephone call.

9          THE COURT:  Good.

10         MS. JOHNSTON:  Your Honor, let me explain to the

11  court, because the transcript books as well as the CD

12  have already been introduced through Agent Sakala with

13  your instruction to the jury, but Mr. Montemarano 's

14  problem was with the call that begins on Page 45, which

15  is B-357.

16         THE COURT:  Which volume is that in?

17         MS. JOHNSTON:  Volume 1.

18         THE COURT:  I have them all marked.

19         Wait a minute.  One second.  On Page 47?

20         MS. JOHNSTON:  No, Your Honor.  The call begins

21  on Page 45, and Agent Sakala, when going through these

22  calls for the fifteenth time the other day, recognized

23  that the transcript in the book has not been edited.

24  The call on the CD has been edited.  The only portion

25  that the jury's going to hear begins on Page 52 at the

1 top of Page 52.

2        THE COURT:   All right .

3        MS. JOHNSTON:   We had no intention  of playing

4 that  graphic  portion .  What I would  propose  to do is

5 keep  in the  transcript  books and the court  exhibit  Page

6 45, which  gives  the  date  and the  time  of the  call , and

7 then  just  remove  Pages  46 through  51.

8        THE COURT:   I think  Mr. Ward  is coming  in.

9        All right .

10        MR. WARD:   Good morning , Your  Honor .  Sorry  for

11 the delay .

12        THE COURT:   We haven't  done  anything , Mr. Ward .

13 All we're  talking  about  is the  government  and Mr.

14 Montemarano  have  resolve d their  difference s with  regard

15 to call  number  B-357.

16        MR. WARD:   Thank  you , and I apologize , sir.

17        MS. JOHNSTON:   What  I would  request  doing  is

18 leaving  the  first  page , Page  45, which  gives  the  date

19 and the  time  of the  call , removing  Pages  46 through  51,

20 and the  agent  will  explain  that  those  page s had to do

21 with  part  of the  call  that  we're  not  playing  and that 's

22 why they've  been  remove d.

23        We would  remove  it from  the  court  exhibit , as

24 well  as all  of the  transcript  book s.

25        THE COURT:   Is that  acceptable , Mr. Montemarano .

1          MR. MONTEMARANO :  Yes, Your Honor.

2          Just so the record is clear, I have no reason to

3   think Ms. Johnston did it on purpose.  From the view of

4   the defense, the effect it would have  on my client

5   would have been significant.

6          THE COURT:  Your motion is done.  Your motion is

7   granted to exclude that, with consent of the

8   government, and that  will not be before the Jury.

9   Those pages will be removed   from all copies --   please

10  be certain that that's done, Ms. Johnston.

11         All right.  We have a couple of other matter s.

12         Mr. McKnett , you had matter s in Book s 2 and 3,  I

13  believe.

14         MR. MCKNETT:  That's correct, Your Honor.

15         THE COURT:  Let's take your first one.

16         MS. JOHNSTON:  I'm not able to agree to remove

17  those.

18         THE COURT:  What is your reason for want ing to

19  exclude what's on Page 408, Mr. McKnett ?

20         MR. MCKNETT :  Your Honor, the entire

21  conversation  is not a conversation  that has to do with

22  any allegation s of drug activity  or anything else.  It

23  has to do with the fact that Ms. Martin has been

24  accused  of a homicide  and she's talk ing to other people

25  during the course of this call, including my client --

1  talking about other people in the course of this call

2  and talking to my client about this homicide and

3  detectives that have come from California to

4  investigate the murder and that she's named as a

5  suspect of the murder. I'm sure the court is aware of

6  the contents.

7         It doesn't do anything to advance the

8  government's case with regard to the charges pending in

9  this case. What it does is add a whole new level of

10  accusation concerning a murder -- a violent crime which

11  has nothing to do with this case. It would tend to, I

12  think, add to the aspect in the mind of the jury that

13  would cause them to be more inclined to convict than it

14  would be without this conversation, because it's an

15  inflammatory conversation. The subject matter of it is

16  inflammatory.

17         While I'm sure the government will be able to

18  explain why it believes this conversation should be

19  relevant, it's not necessary, and the court should look

20  at whatever purpose the government thinks this

21  conversation has. Can the government accomplish the

22  same purpose without it? I think the government can.

23         THE COURT: All right. Is there any intention

24  to play this recording today?

25         MS. JOHNSTON: No, Your Honor. That's in Volume

1  2, on Page 400 of the call.  It will be quite a while

2  before we get to that.  It occurs on April 28.

3         THE COURT:   What is your position about this?

4         MS. JOHNSTON:   Your Honor, the government  --

5  first of all, it does not say that Ms. Martin is a

6  suspect in the homicide.  Counsel for Ms. Martin

7  brought out this whole notion of Mr. Brim's homicide in

8  his cross-examination of Mr. King.  The government left

9  it very limited in terms of its direct on Mr. King.  We

10  merely asked him if his father had passed away and when

11  that was, and he said his father had been killed and

12  that was the extent of it.  Mr. Montemarano went into

13  all this stuff about Mr. Brim, but this call does not

14  say Ms. Martin's a suspect.  What it says is that the

15  police were here.

16         It is important, because it shows the

17  relationship between Ms. Ali and Ms. Martin and the

18  fact that both Ms. Ali and Ms. Martin know all of these

19  individuals, and Ms. Martin is confiding in Ms. Ali

20  about her opinion about different things.  In

21  particular, on Page 409 --

22         THE COURT:  Let me do this.  I think I hear what

23  your positions are.  It's not going to a offered today.

24  Let me read this over, and give me at least one day's

25  notice before you intend to present this recording;

1 I'll consider it and we'll debate it and resolve it

2 then.

3         MS. JOHNSTON:   That's fine, Your Honor.

4          Likewise, I think with the second call that Mr.

5 McKnett had an issue with --

6         THE COURT:   What's your issue on the second

7 call, Mr. McKnett, in Volume 3?   I think it's at Page

8 --

9         MR. MCKNETT:   Page 543.

10        THE COURT:   Page 543.   I have that here.

11        MR. MCKNETT:   Your Honor, I have specifically

12 focused in on the language, "and I need you to sign

13 this thing 'Billy Joe,' because they have an

14 authorization that the policy was received, just a

15 paper."

16        Well, first of all, by statement this refers to

17 insurance fraud which is the subject of the next trial.

18 The person who's being talked to by Ms. Martin is not

19 named Billy Joe.   It's an allegation of an attempt to

20 facilitate an insurance fraud which does absolutely

21 nothing to advance the government's position in this

22 case except to, again, raise in the minds of the jury

23 that there's other bad acts going on here with these

24 people.

25        THE COURT:   All right.   I think I understand

1 your position .

2          Ms. Johnston , what's your position ?

3          MS. JOHNSTON:   Your Honor , this is a call

4 between Ms. Martin and Ms. Dobie .  In this call , on the

5 very first page , Ms. Martin is telling Ms. Dobie how

6 they can't have anybody coming to the house anymore

7 because the Takoma Park Police  had a meeting , "and just

8 to be on the safe side , you know , what little tickets I

9 did have I had to take them to the school ."

10          This is extremely important , because we have

11 surveillance  two days before of Ms. Martin and Ms. Ali

12 moving things to the school .  She then goes on --

13          THE COURT:   That 's a different  call .

14          MS. JOHNSTON:    No , Your Honor .  542 and 543 ,

15 that's one call .

16          THE COURT:   Oh, okay.  542?  A ll right .

17          MS. JOHNSTON:   Then they go on to -- Ms. Dobie

18 says that she has to meet Ms. Martin at the school .  As

19 we said before , there may be some  incident al things

20 about  insurance  policies .  It doesn't say anything  in

21 terms of whether  it's fraudulent  or not .  It doesn't

22 even say "insurance  policy ."  It just mentions  a

23 policy , and there's a paper , and then they talk about

24 meeting at the school .  It would  be literally

25 impossible  to, I guess , cut out the part about  where

1  Paulette Martin says, I want to bring you a birthday
2  gift and I need you to sign this thing "Billy Joe ,"
3  because they have to have an authorization that the
4  policy was received.

5       THE COURT:  Mr. McKnett, this one isolate d
6  snip pet in here doesn't really tell very much about the
7  insurance aspect of this case at all.  I mean , if I'm
8  reading it over as a juror, it doesn't make any sense
9  at all.  It doesn't look like it's raisi ng any question
10 about an insur ance fraud scandal.

11      MR. MCKNETT:  Your Honor, it raise s a question
12 in the juror s' minds.  What 's it about?  It encourage s
13 speculation about other possible bad act s.  And de spite
14 what Ms. Johnston says, the conversation reads very
15 smooth ly without that one sentence.  It says early on
16 Ms. Martin 's going to the school.

17      THE COURT:  Let me ask Ms. Johnston.  Is it
18 possible to excise this from the record ing?

19      MS. JOHNSTON:  Your Honor, quite frankly ,
20 anything is possible , but the problem with it is this.
21 If we excise that, then it will look to the jury like
22 Ms. Dobie may be going to the school the pick up drug s.
23 It may leave an improper inference in term s of the
24 jury.

25      THE COURT:  Let me do the same thing with this.

1  Let me look it over in detail.  Give me at least a

2  day's notice before you intend to play this so I can

3  consider the question.

4        Anything further on the recordings?

5        All right.  Mr. Martin, I believe you had a

6  matter -- before you do that.  Mr. Sussman, your

7  client's here now.

8        MR. SUSSMAN:  That's correct, sir.

9        THE COURT:  Ms. Harden, you need to be sure

10  you're here on time.  You have a right to be present

11  during all the proceedings.  Your counsel waived it for

12  the purposes of this discussion we were having, but I

13  want you to -- you are waiving your right to be present

14  for the few minutes you weren't here.

15        DEFENDANT HARDEN:  No, I'm not.  I was here.  I

16  was downstairs.  I didn't realize you got started.  Oh,

17  I'm sorry.  I didn't realize you got started at quarter

18  till.

19        THE COURT:  Well, your attorney waived your

20  right to be present for just a few moments.  Do you

21  understand that?

22        DEFENDANT HARDEN:  Right.  He told me.

23        THE COURT:  Please be on time.  I want you to

24  be able to participate in this case.

25        DEFENDANT HARDEN:  I will, but I didn't realize

1  we were here at a quarter to ten.  Thank you.

2        THE COURT:  All right, Mr. Martin.

3        MR. MARTIN:  Yes, sir.  I had a chance, thanks

4  to the efforts of Ms. Dunlap, last night to review the

5  transcript with respect to Detective Martini's

6  testimony.  Your Honor may recall that I've objected to

7  the double hearsay nature of that testimony, and I

8  misspoke when I approached the bench and said he relies

9  on the Fifth Amendment.  Obviously, it's the Sixth

10  Amendment in a confrontation clause and Your Honor, I

11  think, at the bench had said to me, well, Mr. Martin

12  you opened the door by asking the question who.  I

13  thought I hadn't.  But looking at the transcript, Your

14  Honor's recollection clearly was better than mine.

15  Nevertheless, I still stand on my objection, because it

16  is an implicating statement.

17        THE COURT:  You're asking to strike the entirety

18  of his testimony.

19        MR. MARTIN:  Well, certainly that part that

20  deals with the double hearsay where, "Grant told me."

21        THE COURT:  Specifically, tell me what it is you

22  want to exclude.

23        MR. MARTIN:  The part that I'd like to exclude

24  -- if I could turn the court's attention, if you have a

25  copy of the transcript --

1          THE  COURT:   Yes , I have  it  in  front  of  me.

2          MR.  MARTIN:   I'm  looking  now  at  Page  52.  This

3  is where  I  think  it  starts.   I  have  it  highlighted , but

4  unfortunately  I  don't  have  --

5          THE  COURT:   Just  tell  me  where  you  are.

6          MR.  MARTIN:   I'm going  to  try  to  find  it  .   It

7  looks  like  Line  3, Question:  "Who  gave  you  that

8  information ?"

9          Answer :  "It  was  his  17  year-old  daughter  that

10  was  in  the  vehicle .   She  said  that 's  where  her  father

11  kept  it ."

12          Moving  down  to  Line  9.  Question:  " You  didn't

13  find  Mr.  Goodwin 's  fingerprints ."

14          Then  we  go  over  to  Page  53, the  first  line .

15  Question:  "You  never  mentioned  it  in  your  report ."

16          Answer:  " I  don't  believe  I  did ."

17          Hen  we  go  on  to  Page  65, Line  7.  Question:

18  "Just  to  make  absolutely  certain .   Your  testimony  is

19  that  Mr. Goodwin 's  daughter  told  you  her  dad  keeps

20  drugs  in  the  bottle ."

21          And  further  down  he  answers , beginning  at  Line

22  10, " I  said  that  she  related  information  to  us  that

23  that 's  where  her  dad  kept  it .   She  spoke  those  words  to

24  Detective  Grant , and  Detective  Grant  spoke  those  words

25  to  me ."

1          It seems to me, Your Honor, that this is double

2   hearsay.  This goes beyond just the typical hearsay

3   where the government says it's 801(d)(2)(E) statement

4   of a coconspirator in furtherance of the conspiracy.

5   As far as I know, Iesha goodwin has never been indicted

6   in this case, and there's no information to suggest

7   that Iesha Goodwin was involved in drug dealing.  So,

8   to say that this is a coconspirator exception I think

9   is a stretch.

10          What we really have here -- I know the hearsay

11  rule has pretty much been emasculated, but Your Honor

12  you've got double hearsay here.  You don't have Martini

13  hearing it.  You have him saying Grant related that to

14  him, and it's not even in his report.  I would suggest

15  that the reliability of it is such that this comes

16  closer to Crawford than what the government is

17  suggesting to you.

18          Crawford, you will remember, is a case where the

19  wife apparently made an implicating statement regarding

20  her husband, and the court said that that clearly was

21  testimonial because it was a statement that was being

22  made to a law enforcement officer that later on was

23  used.  Well, that's exactly what we have here, except

24  this time we have the daughter making a statement and

25  the government saying, well, the daughter is part of

1 this conspiracy and there's no indication of that. So

2 I would ask that any reference to the daughter be

3 stricken and that the jury be instructed to disregard

4 the alleged statement made by the daughter.

5        THE COURT:  All right. Ms. Johnston and Ms.

6 Greenberg.

7        MS. GREENBERG:  Your Honor, what is -- the

8 difference here between a question that calls for

9 hearsay and whether the government has to argue

10 coconspirator statements is that it was defense

11 counsel's questioning that elicited the hearsay

12 testimony which was an honest answer to the counsel's

13 question. What counsel did not refer the court to is

14 the earlier questions. First of all, at the bottom of

15 Page 51 --

16        THE COURT:  Wait a minute. Let me get there.

17        Okay.

18        MS. GREENBERG:  The witness was asked, "And as a

19 result of your search, you found these drugs in a

20 plastic container; correct?"

21        He answered, "Well, while on the scene, we

22 received an indication why the -- where to look for the

23 drugs."

24        It's clearly indicating that law enforcement was

25 looking for the drugs. There was a number of --

1   probably  earlier  on  Page  51,  Your  Honor ,  there 's  a

2   discussion  about  what  amount  of  time  had  pass ed  before

3   the  drug s  had  been  found .   Mr.  Martin  is  clear ly

4   indicati ng  that  law  enforcement   agent s  were  look ing  for

5   the  drug s ;  the  witness  agreed .

6           Then  he  refer s  to ,  on  Page  52,  "While  on  the

7   scene  we  received  indication  where  to  look  for  the

8   drug s ."   He 's  clear ly  referring  to  law  enforcement

9   search ing  the  vehicle .   He  asks  a  very  open  question ,

10  and  he  got  the  honest  answer .   Who  gave  you  the

11  information ?   And  the  witness  honest ly  took  that  as

12  "you "  mean ing  law  enforcement  .

13          "Who  gave  you  the  information ?"

14          "It  was  his  17  year -old  daughter  that  was  in  the

15  vehicle .   That 's  where  she  said  her  father  kept  it ."

16          The  discussion  here  is ,  how  did  you  know  to  look

17  in  this  Pepsi  bottle ,  and  he  said  we  received  an

18  indication .   Not  "me "  and  not  "I, "  but  "we."    He

19  answered  honest ly  to  a  question ,  a  very  open -end ed

20  question .   Counsel  has  to  live  with  the  answer .   He

21  went  back  to  it ,  and  just  to  make  absolute ly  certain

22  told  you  --  if  you  go  to  Page  65,  Line  7: "J ust  to  make

23  absolute ly  certain .   Your  testimony  is  that  Mr.

24  Goodwin 's  daughter  told  you  that  her  dad  keep s ," and  he

25  said ,  "No.   I  said  that  she  related  that  information  to

1  us," which is exactly the series of questions on Page

2  52. Specifically, now that you're asking me,

3  specifically it was to Detective Grant.

4       Detective Grant is available. Mr. Martin can --

5  he's going to be testifying later on in the trial. Mr.

6  Martin can ask him about that. But this witness was

7  answering questions honestly, posed to him by defense

8  counsel. It does not entitle him to strike the hearsay

9  answers that he elicited from this witness in response

10 to his questions.

11       THE COURT:  Mr. Martin.

12       MR. MARTIN:  Your Honor, then I would ask that

13 you reserve until such time as Detective Grant in fact

14 is put on the witness stand.

15       As far as I'm concerned, at this point we've got

16 two invisible witnesses. Rather than make a decision

17 now, I would ask the court to wait until the government

18 connects this up and I've had an opportunity to --

19       THE COURT:  I'm going to deny your motion now

20 without prejudice for you to raise it again when

21 Detective Grant is here. These are questions that were

22 asked by the defense, and I don't see how there's a

23 basis for me to strike testimony that you elicited from

24 this witness that he answered you truthfully. So I'm

25 going to deny your motion now. You can certainly raise

1  it again , should  Detective  Grant  testify , and  you  can

2  examine  him .

3       MS.  GREENBERG:   Your  Honor , just so  the  court  is

4  clear .  We don't  believe  there 's any  obligation  that  we

5  need  to connect  it up to Detective  Grant .

6       THE  COURT:   I didn't  say there  was .  You  can

7  raise  the issue  if you think  somehow  the  jury  or  the

8  court 's been  mis led  if you  get  something  different  from

9  Detective  Grant .

10       MR.  SUSSMAN :   Judge , I know  you  ruled , but  I

11  weigh ed  in on this  issue  and  I think  that  I'd like  to

12  be heard  on this , because  what  I think  transpire d  here

13  was that this -- the court  talk ed about  "ambush "

14  previous ly.  This  was a terrible  piece  of evidence  that

15  was not in the Jenks  that  I'm sure  Ms.  Greenberg  knew

16  about , and there  was no heads -up , and  I'm not  sure

17  whether  she caution ed her officer  to avoid  testify ing

18  that  way , because  it clear ly was hearsay .  It was  what

19  Grant  was told by somebody  else , and  it's not  just  a

20  run of the mill  piece  of evidence .  It's a pretty  hard ,

21  devastati ng kind  of evidence .

22       He testifi ed -- the appropriate  testimony  would

23  have been  as a result  of information  we received , we

24  went  in there , and that  was the extent  of it .  I

25  believe  an experience d officer  was wait ing  to drop  this

1  on Mr. Martin, and that at the first opportunity he

2  did.  It's clearly hearsay and it's not subject to any

3  exception.

4         THE COURT:  He was not asked the question by the

5  prosecutor.  And to suggest he was lying in wait for a

6  question from a defense attorney, I don't find that to

7  be the case here.  I mean, think --

8         MR. SUSSMAN:  Was he cautioned not to mention

9  it?  That is the question.  Frequently when we have a

10 piece of evidence like that, a witness is admonished

11 not to mention it in the course of -- that's a mistrial

12 situation in various cases when they talk about

13 incriminating information coming from a third party.

14        THE COURT:  I don't have any indication that

15 that was deliberately done in this case.

16        MR. SUSSMAN:  Well, Ms. Greenberg can talk to

17 whether that was discussed in terms of the pretrial

18 preparation.  This is -- as Ms. Johnston has said, this

19 investigation has been going on for two years.

20 Presumably, the government was aware of that statement,

21 and it wasn't a surprise to them.  Presumably, also,

22 that a 12-year veteran of the police force who has gone

23 to numerable things would know that's not the kind of

24 information that you're permitted to put in front of a

25 jury, and that was my objection to it.  The problems --

1  just because you ask a question doesn't allow a witness

2  to come up with anything they wish -- when the door is

3  open, not anything can come in, and that's exactly what

4  the story was here.   That's why I think the jury should

5  be told that that was objectionable  hearsay and that

6  sentence should be stricken.

7        THE COURT:   All right.  Anything further?

8        Okay.  I have denied the motion.

9        Are we ready for the jury?

10       MS. JOHNSTON:   Yes, sir.

11       THE COURT:   Are they here?

12       THE CLERK:   Yes.

13       THE COURT:   Okay, bring them in.

14              (Jury returns at 10:09 a.m.)

15       THE COURT:   Good morning, ladies and gentlemen.

16       Ms. Johnston, we're ready to proceed.

17       MS. JOHNSTON:   Thank you, Your Honor.   The

18  government  would call Mr. Mark Walston.

19  Thereupon,

20                    **MARK  WALSTON**,

21  having been called as a witness on behalf of th    e

22  Plaintiff, and having been first duly sworn by the

23  Courtroom Deputy, was examined and testified as

24  follows:

25       THE CLERK:   Some of the counsel are having a

1 little problem seeing the witness es over the monitor ,

2 so I'm going to ask you to sit up as straight as you

3 can and speak into that micro phone in front of you and ,

4 if you would , state your name for the record .

5          THE WITNESS:   It's Mark Walst on.

6                    **DIRECT EXAMINATION**

7          BY MS. JOHNSTON :

8 Q.      Mr. Walston, good morn ing.

9          Where are you employ ed?

10 A.      Southwest  Airline s.

11 Q.      What do you do for Southwest  Airlines ?

12 A.      I'm a custodian  of records .

13 Q.      How long have you been employ ed by Southwest

14 Airline s in that capacity ?

15 A.      Eight  year s.

16 Q.      What are your duti es and responsibilities  as a

17 custodian  of records ?

18 A.      To respond  to subpoena s for passenger  records ,

19 and to compile  them and submit  them and then  testify .

20 Q.      As a records  custodian , are you familiar  with

21 the records , both paper  and electron ic, that are

22 maintain ed by Southwest  Airlines  and create d and

23 maintain ed by Southwest  Airline s in the ordinary  course

24 of their business ?

25 A.      Yes , I am.

1  Q.      Have you had occasion to testify previously as a

2  records custodian?

3  A.      Yes, I have.

4  Q.      In regards to this case, were you requested to

5  provide records via subpoena to the investigative

6  agencies during the course of this investigation?

7  A.      Yes, I was.

8  Q.      I'm going to show you two sets of records marked

9  as Government's Exhibit R-9 and R-10.

10         R-9 and R-10, counsel.

11         Do you recognize those records?

12  A.      Yes, I do.

13  Q.      Are those Southwest Airlines records --

14  A.      Yes, they are.

15  Q.      -- for particular flights and particular

16  passengers?

17  A.      Yes.

18  Q.      I'm going to leave a copy of those exhibits with

19  you and take them back and put them up on the monitor

20  so we can all see them together.

21         First of all, with regards to Government's

22  Exhibit R-9.  That's a rather thick package of

23  documents.

24         Could you tell us why we seem to have a lot of

25  documents in reference to that record?

1 A.      It's actually two reservations that go together,
2 but it's the whole reservation history.
3 Q.      When you say, "the whole reservation history,"
4 does that have anything to do with the tabs at the top
5 of the record?
6 A.      Yes, it does.
7 Q.      What records do we have in this packet that's
8 marked as R-9 relating to the tabs at the top?
9 A.      The first tab is what we call "past history"
10 which is the actual reservation history with the
11 booking, payment, contact information, etcetera.
12 Q.      Are some of these records repetitive in terms of
13 the information that's set forth?
14 A.      In this past history, yes.  To make it a little
15 easier we've broken it down into different tabs.  So
16 there's like a Payment Tab which shows you just
17 strictly payment information, Ticketing Information
18 which is the itinerary, and Itinerary and Usage of the
19 ticket so it's a little easier to understand.
20 Q.      If we could look at the front page of this and,
21 beginning at the very top.  What's the PNR number?
22 A.      The PNR is the passenger name record or your
23 reservation number   MJ94B.
24 Q.      Underneath that it lists a passenger name.
25 A.      Correct.  Actually, there's two passengers on

1  this reservation that you're pointing at, and the first

2  passenger on the reservation is a Learley Goodwin.

3  Q.      Okay. If we go further over, does it give us

4  the information in terms of the flight?

5  A.      For the flight information it shows it's booked

6  for a flight on December 27, 2001, Flight 2180 from

7  Baltimore/Washington to Houston.

8  Q.      The booking date. Is that when the reservation

9  was made?

10 A.      Correct.

11 Q.      As well as the time for the reservation was

12 made?

13 A.      Yes. That is in central standard time.

14 Q.      Now, at the bottom -- then there's a column

15 marked "Remarks." Does that information have anything

16 to do with the tickets and who booked them?

17 A.      It's just notes that the reservation agent may

18 have put in. Some of it is just standard that

19 automatically goes in there.

20 Q.      Nothing of significance there in terms of this

21 particular reservation?

22 A.      Nothing that I can see, no.

23 Q.      Now if we look at the bottom box, it's entitled

24 "Fare."

25 A.      Correct.

1  Q.      What does that box tell us?

2  A.      That's the break down of the type of fare that

3  was purchase d.

4  Q.      Now, PAX count and the number 2 refer s to what?

5  A.      Passenger count, which is two.

6  Q.      Then we have a base fare and total fare.

7  A.      Correct.

8  Q.      Was that for one flight or two?

9          Strike that.

10         Was that for both passenger s or for --

11 A.      That's for two.

12 Q.      And then underneath that we have a 1 and a 2.

13 The 1 as H7RNR, and 2 as MZ7RNR.

14         Do you see those two column s?

15 A.      Yes, I do.

16 Q.      What is that information that's associate d with

17 those two line s?

18 A.      That's the type of fare that they got.  They're

19 two different seven -day advance fare s.

20 Q.      Excuse me?

21 A.      They're two different type s of seven -day advance

22 fare s.

23 Q.      So that's a code that Southwest Airlines use d in

24 term s of what fare is charge d?

25 A.      Correct.

1    Q.       Then we have an -- it says, "Itinerary Date."

2             If you could, just explain to us what the rest

3    of the information is in that box in reference to what

4    flights were booked.

5    A.       The itinerary dates goes with the fare, and it

6    just shows that there was a reservation for December 27

7    of 2001 from Baltimore to Houston, and then December 29

8    for a return from Houston to Baltimore.

9    Q.       If we look at the second page. Is this -- does

10   this page also summarize the booked itinerary?

11   A.       Yes, it does.  The top box there actually breaks

12   down the whole itinerary that was originally booked.

13   Q.       Could you tell us what that itinerary was?

14   A.       It's December 27, 2001, Flight 2180 from

15   Baltimore to Houston, and the return flight on December

16   29, 2001, Flight 1592 from Houston to Nashville, and

17   then a connecting flight, Flight 80, from Nashville on

18   to Baltimore.

19   Q.       Across those columns there's a "Received From"

20   column?

21   A.       Correct.

22   Q.       What does that refer to?

23   A.       That is the person that they spoke to making the

24   reservation.

25   Q.       And then there's a "Cancelled On" column.  What

1 does that refer to?

2 A.      That particular portion of the reservation for

3 the return was cancelled.

4 Q.      Then if we go down here, we see a column that is

5 marked -- I'm pointing at it -- I think "9N Remarks."

6 A.      Correct.

7 Q.      Okay.  What does that refer to?

8 A.      That's just another record of a contact where

9 there was a reservation that was changed.

10 Q.      And then, "Phone Information."  Can you tell us

11 where that information comes from?

12 A.      When you make a reservation, whether online or

13 by telephone, they will ask for a contact phone number,

14 and that's the number that was given.

15 Q.      And "Received From" is the individual who -- at

16 least the name used by the individual who provided that

17 telephone number?

18 A.      Correct.

19 Q.      And then passengers.

20 A.      The passengers is the list of the names of the

21 passengers who are on the reservation.

22 Q.      Now, would -- back at the time, December of

23 2001, were individuals required to present photo

24 identifications to pick up these tickets and board the

25 planes?

1  A.     As far as southwest is concerned, you only have

2  to show ID if you're checking bags.

3  Q.     So you would not have had to check ID back in

4  2001?

5  A.     Only if you were checking bags.

6  Q.     Turning to page --

7  A.     That's --

8         MR. MARTIN:   Objection.

9         THE COURT:   To what?

10        BY MS. JOHNSTON:

11 Q.     Do you want to correct your answer?

12 A.     I was just going to say that's just as far as

13 Southwest is concerned.

14 Q.     Turning to Page A-3.

15        Again, at the top, do we have the same flight

16 information?

17 A.     Correct.

18 Q.     Further down there's a reference to phone and

19 address.

20        Can you explain to us where that information

21 comes from?

22 A.     The phone number and the address is something

23 they will ask for, because this ticket was paid for

24 with a credit card.  So, they would ask for the billing

25 information to verify for payment.

1 Q.      Okay.  What was the billing information

2 provided?

3 A.      It's 9002 Bexhill Court, Hyattsville Maryland,

4 20783.

5 Q.      Who was that received from according to the

6 records?

7 A.      It shows that the purchaser's name was a Learley

8 R. Goodwin.

9 Q.      Now, if we turn to -- does that PNR, the

10 reservation payments that begins at the bottom of Page

11 3.  Does that continue on the top of Page 4?

12 A.      Yes, it does.

13 Q.      What information was obtained, or what credit

14 card number was used to book this flight?

15 A.      This is a Visa.

16 Q.      How do you know that?

17 A.      It says vendor ID is BA, which is Bank of

18 America, which is Visa.

19 Q.      Is a credit card number depicted here?

20 A.      Yes, it is.

21 Q.      Is that the number that comes across the top,

22 beginning "429?"

23 A.      Yes, ma'am, that's it.

24 Q.      Do you know whether or not the address and name

25 on that card were verified with the credit card company

1  before Southwest issued the tickets?

2  A.      Yes, it was.

3  Q.      How do we know that?

4  A.      In the credit card billing information, the

5  lower right-hand corner of that box, it says, "Address

6  Verification Complete."

7  Q.      If you were unable to verify the address given

8  by the person making the reservation, what would

9  Southwest do?

10  A.     They would contact the cardholder to verify that

11  it was authorized, and there would be some notes in the

12  reservation summary.

13  Q.     And the next two columns just tell us that

14  they're ticketless reservations; is that fair to say?

15  A.     Correct.

16  Q.     Now, are there -- if we go back to starting on

17  A-9. Are the records a little bit less repetitive and

18  easier to understand?

19  A.     Yes.

20  Q.     Let's go to Page A-9.

21         Do they all contain the same information?

22  A.     Correct.

23  Q.     Looking at Page A-9. If you could, explain to

24  us what we're looking at here, starting at the very

25  top.

1  A.      This is strictly the payment tab, so it's going

2  to show all payments for this particular reservation.

3         It's the same PNR number that you mentioned in

4  the beginning. The first passenger is Learley Goodwin.

5  There's two passengers. The credit card billing says

6  two tickets purchased for a Learley Goodwin and a

7  Michael Thurman.

8  Q.      Traveling on the same flight at the same time?

9         MR. MARTIN:   Objection.

10         THE WITNESS:   That particular -- it doesn't show

11  that on this particular page.

12         THE COURT:   Sir, don't answer when there's an

13  objection pending.

14         What's the objection?

15         MR. MARTIN:   Leading.

16         THE COURT:   Don't lead him.

17         Sustained.

18         BY MS. JOHNSTON:

19  Q.      Let's go through it. Go through it line by line

20  with the credit card billing and tell us what's on each

21  line. Begin with the first box.

22  A.      In the first box it says, "credit card purchase

23  for Learley Goodwin."

24  Q.      What is that number 4294041080667588?

25  A.      That is the credit card number.

1  Q.      Is that the same credit card number that the

2  previous record showed was verified coming back to the

3  9002 Bexhill Court, Hyattsville, Maryland address?

4  A.      Yes, it is.

5  Q.      And that was for which passenger traveling under

6  what name?

7  A.      Learley Goodwin.

8  Q.      And the transaction date was what date?

9  A.      December 20, 2001.

10  Q.      If we go to the next box. Is that travel by a

11  different passenger?

12  A.      Yes, it is.

13  Q.      Was it on the same reservation number?

14  A.      It's on the same reservation, yes.

15  Q.      That would be this number that I'm referring to

16  here, MJ9N4B?

17  A.      Correct.

18  Q.      The same one that appears at the top of the

19  page?

20  A.      Correct.

21  Q.      And what credit card number was used to pay for

22  the passenger traveling under the name Michael Thurman?

23  A.      It's 4294041080667588.

24  Q.      Is that the same credit card number that was

25  used for the passenger traveling under the name Learley

1 Goodwin?

2 A.      Yes, it is.

3 Q.      Is that the same credit card number that you

4 verified as coming back to 9002 Bexhill Court,

5 Hyattsville, Maryland?

6 A.      Yes, it is.

7 Q.      Now, where we have another box under "credit

8 card billing." Could you tell us what that third box

9 refers to?

10 A.      It's an additional charge under the same credit

11 card for Michael Thurman, which was -- when the

12 reservation was changed, there was an additional

13 charge.

14 Q.      Did he change his outgoing flight to Houston or,

15 based upon the records, was it his return flight to BWI

16 that was changed?

17 A.      That's in the upcoming pages, but it was the

18 return.

19 Q.      Again, was that change paid for with the same

20 credit card number?

21 A.      Yes, it was.

22 Q.      That's what the credit card number is, that

23 first number that appears next to the number under the

24 credit card billing; is that correct?

25 A.      Correct.

1  Q.     At the bottom then do we have a summary of the

2  charges?

3  A.     Correct.

4  Q.     And Page A-10.  If you could, tell us what we're

5  looking at here.

6  A.     This is the payment portion for the change in

7  the reservation.

8  Q.     The change on the return flight for Mr. Thurman?

9  A.     Correct.  On December 29, 2001.

10  Q.     Now, if we go to Page A-11.

11        At the top, we have the same reservation number;

12  is that correct?

13  A.     Correct.

14  Q.     Then we have a new box that's called "Ticket

15  Information."

16        Could you describe for us what's in that "ticket

17  information" box?

18  A.     This particular tab is the ticketing information

19  and ticketing history of what happened with that

20  ticket.  The first box shows a ticket for Learley

21  Goodwin and it shows the itinerary flying out on

22  December 27, 2001 from Baltimore to Houston, returning

23  on the 29th of December from Houston to Nashville and

24  Baltimore, and it shows under the activity that the

25  outbound was --

1  Q.      If I could just interrupt you before you get to

2  the activity.

3        The "sold itinerary." Was that what was booked

4  on the booking date of December 20, 2001?

5  A.      Correct.

6  Q.      And the flight from BWI. Is that listed next to

7  Coupon 1, Flight 2180?

8  A.      Yes, it is.

9  Q.      I'll just highlight that here on the exhibit.

10       Have I highlighted the outgoing flight from BWI

11 to Houston?

12 A.      Correct.

13 Q.      Now, if we go to "Coupon Activity." What is

14 that information provided?

15 A.      It shows the activity for the coupon for the

16 ticket.

17 Q.      The 1 refers to what?

18 A.      The outbound segment.

19 Q.      Which is what I've highlighted?

20 A.      The first coupon.

21 Q.      What I've highlighted above?

22 A.      Correct.

23 Q.      What does it tell about Coupon 1?

24 A.      It shows that it was flown.

25 Q.      Does it tell us what date it was flown?

1  A.       December  27th  2001.

2  Q.       Is that  what  I've  highlight ed?

3  A.       Yes.

4  Q.       Does  it  show  --  what  does  it  tell  us  in  term s  of

5  Coupon  2 and 3  for  the  return  flight s?

6  A.       It  show s  that  those  ticket s  --  the  funds  for

7  that  ticket , since  it's  electron ic, were  exchanged .

8  Q.       If  we  go  to  the  next  box  that  begin s  at  the

9  bottom  of  that  page  referenc ing  passenger  Michael

10  Thurman .  Can  you  tell  us  what  that  tell s  us?  Let  me

11  turn  to  A-12.   Again , Coupon  1  is  for  which  flight ?

12  A.       It's  for  Flight  2180  on  December  27, 2001,

13  Baltimore  to  Houston .

14  Q.       Then  if  we  go  down  to  coupon  activity , what  does

15  that  tell  us  about  that  outgoing  flight  2180 ?

16  A.       It  show s  that  Coupon  1  was  flown  on  December  27,

17  2001.

18  Q.       What  happened  to  the  return  flight ?

19  A.       The  funds  were  exchanged .

20  Q.       If  we  go  to  the  next  box , what  does  that

21  concern ?

22  A.       It  show ed  a  --

23  Q.       What  passenger  does  it  concern ?

24  A.       It  show s  Michael  Thurman , and  it  show s  a

25  reservation   for  December  29, 2001, Flight  1592,

1  Baltimore to Nashville, and then connecting to Flight

2  80 Nashville to Baltimore.

3  Q.      Was that ever flown?

4  A.      No, it wasn't.  Those funds were actually

5  exchanged also.

6  Q.      If we go to A-13, what does that tell us about

7  Mr. Thurman's reservation?

8  A.      It's a reservation for Michael Thurman for

9  December 5th of 2002, Flight 1347, from Houston to

10  Baltimore.

11  Q.      What date is it for?

12  A.      December 5th of -- I mean January 5th of 2002.

13  Q.      Is that what I'm highlighting here?

14  A.      Correct.

15  Q.      What happened with that ticket?

16  A.      It shows that Coupon 1 was flown on January 5th.

17  Q.      If we could go to the next document.

18          This exhibit is handwritten as B-1.  Can you

19  tell us what we're looking at here?

20  A.      B-1 is a new reservation.  You can see by the

21  PNR number.  It's MU6KC7.  The funds that we had in the

22  first reservation for Mr. Learley, when they were

23  exchanged, they were exchanged through this

24  reservation.

25  Q.      The funds that were used for the reservation for

1  Mr. Goodwin that was made with Mr. Thurman for the
2  return flight were moved into this ticket.
3  A.      Correct.
4  Q.      What is this a reservation for?
5  A.      It was booked on December 29, 2001 for flight on
6  December 30, 2001.
7  Q.      Is that what I've highlighted here?
8  A.      Correct.  That's Flight 2792, Houston to
9  Baltimore.
10  Q.      Then are we able to tell from this page and the
11  next page how it was paid for?
12  A.      On that page it says the purchaser is Learley R.
13  Goodwin and payment is on Page B-3.
14  Q.      Before you go to B-3.  Again, we have a phone
15  number listed here, and an address?
16  A.      Correct.
17  Q.      Was that information that note the answer was
18  correct.
19  Q.      Was that information that was in the file or
20  provided by the person making the reservation?
21  A.      It's the billing address.
22  Q.      Excuse me?
23  A.      It's the billing address provided in the
24  reservation.
25  Q.      That's the address that I've highlighted?

1 A.        Correct.

2 Q.        You said, if we go to the next page, that

3 actually gives you the payment information; is that

4 correct?

5 A.        In that box on the bottom, yes.

6 Q.        What does that tell us in terms of how this

7 reservation was paid for?

8 A.        It shows a charge of $582 on a credit card

9 4294041080667588.

10 Q.        Is this in reference to the preceding page, or

11 is this in reference to the booking that is in the OSI

12 remarks comment?

13 A.        It's all the same reservation.

14 Q.        All the same reservation?

15 A.        Correct.

16 Q.        It's all being paid for, both Thurman and

17 Goodwin tickets?

18 A.        In this case it's just -- in this reservation

19 it's just Mr. Learley -- Mr. Goodwin.

20 Q.        In looking at that box on Page B-3, there's a

21 reference to Mr. Thurman. Can you explain that?

22 A.        It shows that there was a phone call and they

23 asked for an itinerary to be sent to that E-mail

24 address that's listed, and the person that they claim

25 they talked to was somebody by the name of Thurman.

1  Q.      And the E-mail address you're talking about is

2  in this?

3  A.      Correct.

4  Q.      On Page B-4.  What do we have there?

5  A.      It's just showing that they were ticketless

6  reservations.

7  Q.      Again, on Page B-5.  Is that a summary of the

8  fare information?

9  A.      Yes, it is.

10  Q.      Similarly with the payment records, once again,

11  on Page B-6; is that correct?

12  A.      Correct.

13  Q.      Again, is the credit card noted on that page?

14  A.      Yes, it is.

15  Q.      Would that be 4294041080667588 ?

16  A.      Yes, it is.

17  Q.      Was that verified?

18  .       Was there an authorization  code received  from

19  the credit card company?

20  A.      Yes, there was.

21  Q.      What's that authorization  number?

22  A.      It's 029690.

23  Q.      The number I've highlighted here?

24  A.      Correct.

25  Q.      Again, it shows  on Page B-8 that  we  have  a

1 repeat of the credit card billing information; is that

2 correct?

3 A.      Correct.

4 Q.      It looks like in the middle column here there is

5 another exchange of tickets; is that correct?

6 A.      Correct.  The exchange for that first ticket is

7 the ticket number.  The former payment number reference

8 references back to that first ticket in the original

9 reservation.  And then --

10 Q.      If we could go to B-10.  What does B-10 tell us

11 here?

12 A.      B-10 is the ticket activity.

13 Q.      And this is on the second reservation for the

14 new return flight; is that correct?

15 A.      Correct.

16 Q.      On this ticket information, the passenger named

17 Goodwin was booked to fly when?

18 A.      Initially, December 29, 2001, Flight 1592,

19 Houston to Nashville; and then connecting to Flight 80,

20 Nashville to Baltimore.

21 Q.      Was that flight flown?

22 A.      No, it was not.

23 Q.      Underneath that we have a second box.  Does that

24 reference the same passenger, Learley Goodwin?

25 A.      Yes, it does.

1  Q.      The same reservation number?

2  A.      Same reservation number.

3  Q.      That's that PNR number; is that correct?

4  A.      Correct.

5  Q.      That would be MU6KC7?

6  A.      Correct.

7  Q.      What does that second box tell us in terms of

8  what new reservation Mr. Goodwin had?

9  A.      It shows the reservation for a flight on

10 December 30, 2001, Flight 2792 from Houston to

11 Baltimore.

12 Q.      That continues on the next page; is that

13 correct?

14 A.      Correct.

15 Q.      What does that tell us?

16 A.      It shows that that coupon was flown.

17 Q.      On what date?

18 A.      December 30th 2001.

19 Q.      In your own words, could you summarize for us

20 what happened in this transaction?

21 A.      Including both PNRs? Both reservations?

22 Q.      Yes.

23 A.      Let's look at the activity.

24 Q.      It might be easier for me -- do we have a pad

25 and an easel?

1       If I could, Your Honor, use this?  If I could

2  have Agent Snyder set it up for me.

3       THE COURT:   All right.

4       BY MS. JOHNSTON:

5  Q.    What I'm going to ask you to do, Mr. Walston, is

6  write the date the initial reservation was made, then

7  the date, flight number, and the names of the

8  passengers who flew from BWI to Houston, and then the

9  date and time of the return flights and the name of the

10 passenger on that particular return flight.

11      Can you do that for me?

12 A.    Sure.

13      MS. JOHNSTON:   Your Honor, may I have the

14 witness step down?

15      THE COURT:   You may.

16      MS. JOHNSTON:   Put the date of the -- why don't

17 we use "I.R." for "Initial Reservation" and put the

18 date.

19 A.    (Witness indicating.)

20      MR. WARD:   Counsel, if you could keep your voice

21 up.  I can't hear you.

22      BY MS. JOHNSTON:

23 Q.    What are those initials you put at the top?

24 A.    I put B- --

25      COURT REPORTER:   You're going to have to speak

1  into the microphone.  You're going to have to   repeat

2  your answer.

3       THE WITNESS:   I put the initials "B K D" to

4  stand for "booked."

5       BY MS. JOHNSTON:

6  Q.     What passengers were booked on December 20 of

7  2001?

8  A.     Learley Goodwin and Michael Thurman.

9  Q.     Can you write them straight across from the

10 initial reservation?  Just put "Goodwin" and "Thurman."

11 A.     9Witness indicating.)

12 Q.     Next, put the date that there was actually a

13 flight from BWI to Houston that was flown.  What was

14 the date of that flight

15 A.     (Witness indicating.)

16 Q.     Who flew on that flight?

17 A.     (Witness indicating.)

18 Q.     You can write it bigger.

19 Q.     Underneath Flight 2180, if you just write "BWI"

20 to "HOU" for Houston.

21 A.     (Witness indicating.)

22 Q.     Now if you could put the return flights that

23 were actually flown.

24 A.     (Witness indicating.)

25 Q.     And the return flight for Mr. Goodwin.

1  A.      (Witness indicating.)

2  Q.      Is that before -- what date was the return

3  flight for Mr. Goodwin?

4  A.      This is December 30, 2001.

5  Q.      Could you maybe write it here but put an arrow

6  to reflect that it came in between Mr. Thurman's trips

7  out and back?

8  A.      (Witness indicating.)

9  Q.      You could just -- and then just put your

10  initials at the bottom of that page and date it with

11  today's date.

12  A.      (Witness indicating.)

13  Q.      We'll have this marked as the next miscellaneous

14  exhibit to be Miscellaneous 5.

15          If you could then resume the witness stand --

16  oh.  Before you do that, why don't we put up -- never

17  mind.  Just go back up there.  That's fine.

18          These tickets that we've just discussed were all

19  paid for with the same credit cart card; is that

20  correct?

21  A.      Correct.

22  Q.      All coming back to the same address?

23  A.      Correct.

24  Q.      If we could turn to Government's Exhibit R-9 and

25  R-10 -- Agent Eveler, would you remove that?

1          Showing you what's been marked as R-10.   Are

2 these similar but shorter records for another trip that

3 was taken?

4 A.       Correct.

5 Q.       And the reservation number.  Is that present

6 here?

7 A.       Yes, it is.

8 Q.       What is that number?

9 A.       It is F4BX7G.

10 Q.       And the first passenger name on that

11 reservation?

12 A.       It's Michael Thurman.

13 Q.       How many passengers?

14 A.       Two passengers.

15 Q.       And the flight number?

16 A.       It's Flight 1592, Houston to Nashville, and it

17 actually connects, but it's on March 22, 2002.

18 Q.       Again, do we have the same kind of information

19 here concerning what the fare was?

20 A.       Correct.

21 Q.       What was the fare?

22 A.       It was a YL fare.

23 Q.       What is does that mean?

24 A.       That's our full fare.

25 Q.       We have the booked itinerary that begins at the

1 bottom of the first page?

2 A.      Correct.

3 Q.      What's the flight number?

4 A.      1592, Houston to Nashville on March 22, 2002.

5 Q.      Does that information continue the itinerary at

6 the top of the next page?

7 A.      Yes, it does.

8 Q.      What does that tell us?

9 A.      Shows a connecting flight in Nashville to

10 Baltimore, Flight 2464, again on March 22, 2002.

11 Q.      Now, under passengers -- strike that.

12         Under phone, again, do you have information

13 concerning what number was used to book the

14 reservation?

15 A.      That was -- there's a phone number that was

16 given as a contact phone number.

17 Q.      That's actually the contact number?

18 A.      That's a contact number.

19 Q.      That's given by the person making the

20 reservation?

21 A.      Correct.

22 Q.      And then the names of the passengers.  Are those

23 listed as well?

24 A.      Yes, they are.

25 Q.      That would be whom?

1  A.      Michael Thurman and Rodney Green.

2  Q.      Again, you don't actually know whether the

3  person who used those tickets was actually Mr. Thurman

4  or Mr. Green or Mr. Goodwin for that matter, do you?

5  A.      No, I don't.

6  Q.      If we could go to Page C-4. Was this a credit

7  card billing?

8  A.      No, it was not.

9  Q.      How was it paid for?

10 A.      It was paid for with cash.

11 Q.      Were the tickets issued?

12 A.      Yes, they were.

13 Q.      Is that information displayed in the second box

14 that we have on this page?

15 A.      Yes, it is.

16 Q.      Is that what I've highlighted?

17 A.      Yes.

18 Q.      Now we get to the ticket information on Page

19 C-5.

20         What does this tell us for the passenger named

21 Michael Thurman in relation to his ticket?

22 A.      It showed he had a reservation for March 22,

23 2002, Flight 1592, Houston to Nashville.

24 Q.      Is that what I've highlighted here?

25 A.      Correct.

1          Connecting on Flight 2464, Nashville to

2   Baltimore.

3   Q.      Was that ticket flown?

4   A.      Yes, it was.

5   Q.      That's what I've highlighted here?

6   A.      Correct.

7   Q.      Is the same information available for the

8   passenger named Rodney Green?

9   A.      Yes, it is.

10  Q.      Was he traveling on the same flight?

11  A.      Yes, he was.

12  Q.      Were those flights, likewise, flown?

13  A.      Yes, they were.

14          MS. JOHNSTON:   I have no further questions of

15  this witness.

16          THE COURT:  All right.  Any cross-examination?

17          MR. MARTIN:   Briefly, Your Honor.

18                    **CROSS-EXAMINATION**

19          BY MR. MARTIN:

20  Q.    Sir, you were shown R-10 recently, and I'm not

21  sure exactly how to work this so I'm going to ask to

22  approach the witness, if that's okay with you Your

23  Honor.

24          THE COURT:   You may.

25          BY MR. MARTIN:

1  Q.     With respect to R-10.  I don't recall  you being

2  asked  any question s about  which  credit  card  was  used

3  for  this  particular  flight .

4       I see  you  have  it  in  front  of  you .

5       Are  you  able  to  determine  from  look ing  at  R-10

6  which  credit  card  was  used?

7  A.     This  particular  reservation  was  paid  for  in

8  cash .

9  Q.     That  one  was  paid  for  in  cash .  And  with  respect

10  to  the  other  reservation  that  was  made .  You  said  that

11  was  made  on  a  credit  card  that  went  to,  I  think ,  9002

12  Bexhill  Court ?

13  A.     Correct .

14  Q.     And  you  have  no  way  of  know ing  whether  a  Learley

15  Goodwin  live s  at  9002  Bexhill  Court , do  you ?

16  A.     No ,  I  don't .

17  Q.     You've  never  met  Mr.  Learley  Reed  Goodwin , have

18  you ?

19  A.     No .

20  Q.     I  think  your  testimony  was  that  no  ID  had  to  be

21  shown  at  the  time  the  passenger  actual ly  board ed  the

22  plane ;  is  that  correct ?

23  A.     Unless  they  were  check ing  bag s .

24       MR. MARTIN:    I  have  no  further  question s .    Thank

25  you .

1        THE  COURT:    Any  redirect ?

2        MS.  JOHNSTON:    No,  sir .

3        THE  COURT:    All  right .   You  may  step  down .

4  Thank  you  very  much .

5                    (Witness  excused  at  10:49  a.m. )

6        MS.  JOHNSTON:    Your  Honor ,  may  that  witness  be

7  excused ?

8        THE  COURT:    Yes .

9  Thereupon,

10                **ROBERT  TRAVIS   STRAUSE** ,

11  having  been  called  as  a  witness  on  behalf  of  th      e

12  Plaintiff ,  and  having  been  first  duly  sworn  by  the

13  Courtroom  Deputy,  was  examined  and  testified  as

14  follows:

15        THE  CLERK:    I  need  you  to  sit  up  a  little  bit

16  and  state  your  name   for  the  record .

17        THE  WITNESS:    Robert  Travis  Strause .

18        THE  CLERK:    Spell  your  last  name  for  me .

19        THE  WITNESS:    S  T  R  A  U  S  E.

20                **DIRECT  EXAMINATION**

21        BY  MS.  JOHNSTON:

22  Q.    Good  morn ing ,  Lieutenant   Strause .

23  A.    Good  morning .

24  Q.    Where  are  you  employ ed?

25  A.    I'm  a  lieutenant   with  the  Orange  County

1 Sheriff's office in Orange, Texas.

2 Q.      Can you give us an idea of where Orange, Texas

3 is located?

4 A.      It's the last county on Interstate 10 at the

5 Texas/Louisiana border.

6 Q.      You mentioned Interstate 10. I know it's an

7 interstate, but what areas does it -- do you use it to

8 connect?

9 A.      It basically runs from the Mexican border all

10 the way to, I believe, Florida.

11 Q.      How long have you been employed with the Orange

12 County law enforcement?

13 A.      This is starting on my tenth year.

14 Q.      Can you describe some of your experience,

15 training and background?

16 A.      For ten years I've worked as a narcotics officer

17 for the Orange County Sheriff's Department. Prior to

18 that I was a narcotics interdiction officer with the U.

19 S. Coast Guard.

20 Q.      Calling your attention to January 21 of 2004.

21 Were you working on that date?

22 A.      I was engaged in criminal patrol efforts along

23 Interstate 10 on the westbound side.

24 Q.      What you mean by criminal control activities?

25 A.      It's criminal patrol it's basically we stop

1  vehicle s for traffic violation s, speed ing , traffic

2  infraction s and from there we conduct roadside

3  inter view s to detect any type of narcotic s or

4  contraband , trafficking , weapon s and explosive s.

5  Q.      Based on your experience s is Interstate 10  a

6  highway that 's frequent ly use d by people engage d in

7  drug trafficking  or other illegal activities ?

8  A.      Yes, ma'am .  From the information  I've had

9  through past experience  and train ing , it's one of the

10 largest  narcotic s transportation  corridor s in the

11 United States .

12 Q.      Do you know what time of day you were work ing ?

13 A.      I believe it was 4:20 p.m.

14 Q.      Describe for us -- strike that .

15         Were you in a uniform ed car ?

16 A.      No .  We were in an unmark ed vehicle .

17 Q.      Were you by yourself or with any other officer s?

18 A.      I was work ing with Sergeant Richard Clark .

19 Q.      Describe for us what you -- what observation s

20 you made that afternoon .

21 A.      I observe d a maroon -in-color van head ing

22 westbound on Interstate 10 .  The van was -- black

23 smoke , basically , was comi ng out of the back of the

24 van .  The van cross ed over from one lane into the other

25 lane without signal ling , which is the actual arrest ,

1  failure to maintain a single lane, and it was also

2  being operated onto the    shoulder of the interstate,

3  which is also a violation.   That's why we pulled the

4  van over.

5  Q.     What occurred when you pulled the van over?

6  A.     I walked up to the passenger side of the vehicle

7  to speak with the driver.   Once I approached the

8  passenger side of the vehicle, I immediately observed

9  the crack between the air bag -- the air bag and the

10  dashboard.   There were carpet fibers sticking out of

11  that crack.

12  Q.     What's the significance of that to you?

13  A.     From past experience with hidden compartments in

14  vehicles, I know that the interior of the compartments

15  are often lined with carpet to help the installation

16  and removal of the packages -- to make them slide

17  easier in and out of the compartment.

18  Q.     Continue with what you did after you made that

19  observation.

20  A.     Once I made the observation, I explained the

21  traffic violation to the driver and asked him to exit

22  the vehicle.   Once he was outside of the vehicle, I

23  spoke to him about the traffic violation, and then I

24  asked him where he was going to.

25  Q.     How many people were in the vehicle?

1  A.       There were two.

2  Q.       Do you recall the names of those two

3  individuals?

4  A.       Thurman and Moore.

5  Q.       Who was the driver?

6  A.       Thurman.

7  Q.       Did there come a time when you actually searched

8  the vehicle?

9  A.       Yes, ma'am, there did.

10  Q.       Describe how it is that you came to search it.

11  A.       Once I spoke with the driver, he indicated that

12  they were driving to Houston to get the vehicle

13  serviced, from Washington, D.C., which I thought was

14  implausible, and I spoke to the passenger and there

15  were some inconsistencies in their story which led me

16  to ask for consent to search the vehicle.  I did ask

17  for consent, and the driver of the vehicle gave verbal

18  consent to search.

19  Q.       Describe what you discovered during the course

20  of your search.

21  A.       As soon as I walked up to the vehicle, I opened

22  and entered the vehicle.  I immediately smelled

23  mothballs, which sometimes people use as a cover scent

24  to cover the smell of cocaine, marijuana, and such as

25  that.  I pushed on the air bag, and when I did it

1  opened up and I could see that there was a hidden
2  compartment in the air bag. While I was looking at the
3  air bag, I smelled a strong odor of raw marijuana
4  coming from the area between the driver and passenger
5  seat. I looked above the center, between the driver
6  and passenger seat, and saw a -- how they customize
7  vans, they have shiny boards and lights and stuff up
8  there.
9          There was a light fixture, and I pulled down on
10 the light fixture and I heard an electric noise, and I
11 observed the hydraulic ramp being actuated. It folded
12 down the center section of the lights, and I looked up
13 there with my flashlight and observed a plastic vacuum
14 packed bag. I pulled it over where I could see it and
15 observed that it contained approximately two pounds of
16 marijuana. I removed that.
17         We handcuffed the driver and the passenger and
18 we removed the vehicle from the scene, took it to our
19 mechanic's shop, where we located a third hidden
20 compartment -- electronically-operated hidden
21 compartment. In that hidden compartment we located, I
22 believe, $26,980, along with two pistols and some
23 ammunition.
24 Q.     What was done with the two individuals that you
25 had on the side of the road?

1  A.      Say that again.

2  Q.      What happened to the two individuals on the side

3  of the road?

4  A.      They were arrested for possession of marijuana

5  and unlawfully carrying a weapon.

6  Q.      Do you know whether or not they ever went to

7  trial?

8  A.      No.  But I do know that -- I believe they pled

9  guilty.  It did not go to trial.

10  Q.      You don't know whether they've ever gone to

11  court on those charges, as far as you know?

12  A.      No, ma'am.

13  Q.      In addition to seizing the two guns and the

14  marijuana, did you also seize some other items from the

15  vehicle?

16  A.      Yes, ma'am.  There was numerous receipts and

17  paperwork that was located in the paperwork that we

18  seized, also.

19  Q.      Let me show you first of all, and put it up on

20  the screen -- have you had occasion to look at these

21  exhibits before coming into court?

22  A.      Yes, ma'am, I have.

23  Q.      First, beginning with P-234.  Do you recognize

24  that exhibit?

25          MR. WARD:  I'm sorry.  What is the number,

1 ma'am?

2          MS. JOHNSTON:   P-234, Mr. Ward.

3          THE WITNESS:   That's a photograph of the rear of

4 the Chevy van that we stopped on the interstate.

5          BY MS. JOHNSTON:

6 Q.       Does that accurately depict the van and where it

7 was when you stopped it on the interstate?

8 A.       Yes, ma'am.

9 Q.       In fact, do we have a reference to Interstate 10

10 in the background?

11 A.       Yes.

12 Q.       Let me show you P-235.

13          Do you recognize this photograph?

14 A.       Yes, ma'am.

15 Q.       What is that?

16 A.       The license plate that was displayed on the

17 vehicle.

18 Q.       Is it unusual, based on your training and

19 experience, to see D.C. dealer tags down in your area?

20 A.       Yes, ma'am.  That's the first time I think I've

21 ever saw that.

22 Q.       Next, let me show you what's been marked as

23 Government's Exhibit P-236.

24          Do you recognize that exhibit?

25 A.       Yes, ma'am.  That's the air bag hidden

1 compartment  -- electronically -operate d hidden

2 compartment .

3 Q.      Were you able to see the carpet fiber s you were

4 referring  to?

5 A.      Yeah . Like , if you look on the left at the top

6 part of the --

7 Q.      You can hit the --

8 A.      Oh, you already did.  Just put that last arrow

9 -- you can see carpet fiber s there , and that would have

10 been stick ing out right here on the bottom portion .

11 That last arrow is when I walk ed up to the window .

12 Also , there was some visible --

13 Q.      Do you want me to clear that ?

14 A.      Yes , please .

15 Q.      All right .  There you go.

16 A.      There were some visible right where that green

17 dot is.

18 Q.      Some of the carpet fiber s?

19 A.      Yes, ma'am .

20 Q.      Let me show you what 's been mark ed as

21 Government 's Exhibit  P-237 and ask you if you can tell

22 us what's depict ed in this photograph .

23 A.      That 's the rear electron ic compartment  that was

24 locate d -- if you can picture  the inside of a van , all

25 the way to the rear there 's normally  a clothe s hang er

1  -- a rod where clothes hang on.  Above that there's

2  speakers and air ducts for the air conditioning.  The

3  section between the two speakers is where this is

4  located.  It pulls straight out, and there's like a

5  drop box behind it.  That's where money and weapons

6  were located.

7  Q.     What are we looking at here in this picture?

8  A.     That's actually -- we couldn't get it to

9  activate.  We could tell it was there, but we had to

10 unscrew the front.  There were screws there and just

11 below that mark.  We unscrewed them and slid the whole

12 -- the entire drawer out, and behind that drawer is

13 where all the money was located.

14 Q.     You say, "all of the money."  Does this

15 photograph accurately depict the way the money was

16 bundled?

17 A.     Yes, ma'am.  That's how we found it.

18 Q.     Could you describe for us how much money it was

19 and how it was packaged?

20 A.     Like I said, I believe it was $26,980.  It was

21 packaged in $1,000 increments and wrapped up in small

22 rubber bands.

23 Q.     What was the denomination of the bills?

24 A.     $20 bills.

25 Q.     Do you recognize any of the other items in that?

1  A.      Yes, ma'am.   The black box to the far right-hand

2  side of the screen where the yellow dot is is a small

3  electronic scale -- digital scale.

4  Q.      What is the significance of that to you?

5  A.      We commonly find digital scales with people who

6  are involved in illegal distribution of narcotics,

7  marijuana, cocaine such as that.

8  Q.      Is there any significance to the way the money

9  was packaged?

10 A.      Yes, ma'am.   The majority -- I would say like 99

11 percent of the cash seizures that we made, the money is

12 divided up into $1,000 increments to speed the counting

13 process.

14 Q.      The counting process for whom?

15 A.      For the -- on the other end whenever the

16 narcotics are purchased.

17 Q.      Let me show you what we've marked as

18 Government's Exhibit P-282.

19         Do recognize this photograph that's been marked

20 as P-282?

21 A.      Yes, ma'am.   From the left to the right would be

22 the pistol and ammunition.   Above that would be the

23 digital scales.   To the right of the digital scales is

24 all the currency.   Below the currency is the second

25 pistol and two magazines that contained live

1  ammunition , and to the right of that is the bag

2  contain ing the marijuana .  It's not a very good

3  picture , but --

4  Q.     In regards to the two gun s that were recovered .

5        Do you recall the model and make and caliber of

6  those gun s?

7  A.     No .  I think one was a Sigma .  I'm not sure .

8  It's been so long .

9  Q.     Do you have your file with you ?

10 A.     No .  I didn't bring it in here .  No , I did not .

11 Q.     Court 's indulgence  one moment .

12        If I could have this mark ed as the next

13 miscellaneous  numb er for identification  purpose s only ,

14 Miscellaneous  6 .

15        Counsel , this is M iscellaneous  6 .

16        MR. MARTIN:   If I can see it for a second .

17        MS. JOHNSTON:  Sure.

18        BY MS. JOHNSTON:

19 Q.     Do you recognize  this document ?

20 A.     Yes, ma'am .  That 's my report .

21 Q.     Would review ing your report refresh your memory

22 in term s of the caliber  and make  of the pistol s that

23 you seize d?

24 A.     One black -in-color  Smith & Wesson  9mm

25 semiautomatic  pistol with one magazine .  The serial

1  number being A718831 ; one black-in-color .380 Caliber
2  semiautomatic pistol , and two loaded magazine s, serial
3  number BKK4080 .
4  Q.     In addition to seizing those items, did you also
5  seize a number of document s?
6  A.     Yes, ma'am , I did.
7  Q.     I'm going to show you what's been marked as
8  Government 's Exhibit s OC-1, 2, 3, 4, 5, 6, 7, 8 and 9 .
9         Do you recognize those document s?
10 A.     Yes, ma'am . These were all removed by myself
11 from the van -- the interior of the van .
12 Q.     Government 's Exhibit O.C. 1 through 9 , and O. C.
13 10 . Could you tell us what that is?
14 A.     That's a photo copy of Mr. Moore's Washington
15 driver 's license and Mr. Thurman 's Maryland driver 's
16 license .
17 Q.     I believe there's a second page in there can.
18 Can you tell us what the second page contain s?
19 A.     The second page is a Washington D. C. driver 's
20 license , and the name of Xavier Delante Moore.    It's a
21 photo copy, actual ly.   The second one is a Department of
22 Consumer and Regulatory Affair s, like a license for a
23 motor vehicle sale sman , for Lobo's Discount Auto in the
24 name of Michael Thurman , and there's a Department of
25 Motor Vehicle s registration certificate -- a partial

1  certificate, and the only thing I can read off of there

2  is D7428.

3  Q.      Was that the tag that was on the vehicle?

4  A.      Yes, ma'am.

5  Q.      Was that vehicle released?

6  A.      No, ma'am.  It was seized.

7  Q.      Let me put them up on the screen so everyone can

8  see them.  First of all, the first page of O.C. 10.

9  Those are actual copies of the driver's licenses that

10 were provided to you at the time?

11 A.      Yes, ma'am.

12 Q.      Then the second page.  Is that a second copy of

13 Mr. Moore's driver's -- second photo copy of Mr. Moore's

14 driver's license?

15 A.      Yes, ma'am.

16 Q.      Calling your attention to the other two

17 documents.  The tag number.  Was that -- where is that

18 on this screen?

19         Which document refers to the tag number of the

20 vehicle?

21 A.      The one I just touched.  The one on the far

22 left.

23 Q.      Okay.  Are you able to read the discount car

24 center's full title?

25 A.      No.  "O's Discount Car Center," but I believe

1  that's -- from seeing the card, I believe it's Lobo's

2  Discount Car Center.

3  Q.      Do you recall if it's the same name as was on

4  Mr. Thurman's --

5  A.      Yes, ma'am, it is.

6  Q.      It was the same name?

7  A.      Lobo's Discount Auto.

8  Q.      That's the card that Mr. Thurman presented to

9  you at the time?

10  A.      Yes, ma'am, he did.

11  Q.      In addition to that, I'm going to put on the

12  screen O.C. 2. If you could tell the -- let me pull it

13  out of the envelope. If you could, tell the ladies and

14  gentlemen of the jury  what this document is.

15  A.      It's the Department of Motor Vehicles -- from

16  the government of the District of Columbia. It says

17  its a temporary registration for dealer tag number

18  D7248 for the business Lobo's Discount Car Center, 1124

19  Florida Avenue, Washington, D. C.

20  Q.      Is that the tag number that was on the vehicle

21  that you stopped?

22  A.      Yes, ma'am.

23         MS. JOHNSTON:  Court's indulgence one moment.

24         I have no further questions of this witness.

25         THE COURT:  Cross-examination.

1          MR. MONTEMARANO :   Thank you, Your Honor .

2               **CROSS-EXAMINATION**

3          BY MR. MONTEMARANO :

4 Q.       Good morning, Lieutenant Strause .

5          How are you?

6 A.       Fine .

7 Q.       When you made this stop back in January of 2004 ,

8 you've were a sergeant , or you've been promoted since

9 then ?

10 A.      Yes .

11 Q.     Congratulation s.

12 A.      Thank you .

13 Q.     I'm not familiar with Texas law, so I will ask

14 you a few question s.

15          Would it be correct that it's illegal to

16 transport a firearm in the state of Texas ?

17 A.      It actually was .  They've actually change d the

18 law since then .

19 Q.     On January 21st 2004 , when you pulled over the

20 van in question , that would have been illegal --

21 A.      Correct .

22 Q.     That there were two firearm s.  That was two

23 separate offense s?

24 A.      There was one offense for each person in the

25 vehicle .  They were both, I believe , charge d with the

1 same offense.

2 Q.      Okay.  And of course it's illegal to be

3 possessing just short of two pounds of marijuana;

4 correct?

5 A.      Yes, sir, it is.

6 Q.      And to be transporting it?

7 A.      Yes, sir.

8 Q.      And unless I'm -- now, the firearms were loaded?

9 A.      There was two magazines loaded with ammunition.

10 I don't recall  -- I'd have to look at my report to see

11 if they were loaded.

12 Q.      Do you want to go ahead and look at it?  Please.

13 A.      Evidently they weren't loaded, or I probably

14 would have annotated it in my report.

15 Q.      Okay.  So your recollection is you don't believe

16 they were loaded.

17 A.      Correct.

18 Q.      But there were magazines with them?

19 A.      Yes, sir.

20 Q.      The magazines had live rounds in them?

21 A.      Yes.

22 Q.      The magazines fit the respective weapons they

23 were located with; correct, sir?

24 A.      Yes.

25 Q.      So unless I'm very wrong -- when you carry --

1  do you  carry  a firearm  professionally ?

2  A.      Yes, sir .

3  Q.      You don't  have  one  here  today ?

4  A.      Oh , no .

5  Q.      When  you're  on  duty ?

6  A.      Yes , I do .

7  Q.      Do you mind  if I ask  you what  kind  of  firearm

8  they  issue  you  in  the  Orange  County  Sheriff 's

9  Department ?

10 A.      We  purchase  our  own . It's a  Glock  .45.

11 Q.      So you have a .45 Caliber?

12 A.      Yes.

13 Q.      Unless  I'm  very  wrong ,  based  upon  your  train ing

14 and  your  experience ,  tak ing a  magazine  and a  firearm ,

15 (snaps fingers),  it take s about  that  long ?

16 A.      Yes .

17 Q.      Then  you pull  back  the  slide  and get  a round  in

18 the  chamber  and  it is,  for  lack  of a better  term , good

19 to  go?

20 A.      Yes, sir .

21 Q.      Okay .

22         Now , as  a part  of  your  training  and experience

23 as a  law enforcement  officer , you  have  at least  a

24 pass ing  familiarity  also  with  federal  law?

25 A.      Yes , I do .

1 Q.     And you're familiar with a law called "felon in

2 possession ?"

3 A.     Yes.

4         MS. JOHNSTON:    Objection .

5         Beyond the scope of direct .

6         THE COURT:   Where are you going with this ?

7         MS. JOHNSTON:    Your Honor , perhaps we should

8 approach .

9         THE COURT:   All right , come to the bench .

10                     (At the bar of the court.)

11        MS. JOHNSTON:    I'm object ing because it 's

12 totally irrelevant whether this officer know s what the

13 federal law s are .

14        THE COURT:   Where are you going with this ?

15        MR. MONTEMARANO :  Sure .   Mr. Thurman , when

16 arrested , it's my understand ing had a conviction from

17 Montgomery County for robbery with a dead ly weapon .

18 That make s him a felon in possession .   I'd like to ask

19 this officer if he's aware of the law and that these

20 firearm s in the possession of Mr. Thurman would have

21 made him a felon in possession .

22        THE COURT:   So what ?

23        MR. MONTEMARANO :  That 's basically what the

24 government know s about the record .   The officer know s

25 about the law .   I'm going to put it in front of the

1  jury at some point.  I'd like to be clear on this, and

2  I'm just wanting to go further so I can proffer where

3  I'm going with it.  I'll  go further  and that as far as

4  he's aware -- as Ms. Johnston asked, there's never been

5  a trial on this.  As far as  he's aware, there's never

6  been federal  charges on this, and he's never  testified

7  at a court  proceeding.  She opened  the door to all of

8  this by asking, have these cases been resolved.

9        MS. JOHNSTON:  I   asked  him about  the charges

10 that he placed.  I asked him about -- he arrested  them

11 and he placed charges against  them.  I asked him

12 whether  he knew about  any disposition.  He said he

13 thought  they pled guilty.  The charge  is still

14 outstanding  in terms of Mr. Thurman  as far as  I know.

15 But this notion of introducing  evidence that there

16 could have possibly  been federal  charges creates an

17 inference  that maybe  somebody did something  for him

18 back then when he was not in government  custody.

19 Nothing's ever -- it's totally irrelevant.

20        THE COURT:  Mr. Montemarano, I don't see how

21 it's relevant what this officer knows and whether  he

22 could have or should have been charged with federal

23 charges.  He's a county  officer.  The gentleman was

24 charged with something  which he thinks he's pled guilty

25 and may or may not be true.

1          MR. MONTEMARANO :   I want to ask him if charge s

2 had been brought for felon in possession .

3          THE COURT:   I'm going to sustain the objection .

4          MR. MONTEMARANO :   Thank you , Your Honor .

5                    (Back in open court .)

6          BY MR. MONTEMARANO :

7 Q.      As Ms. Johnston asked you.   You 've never

8 testifi ed in a trial or court proceed ing concern ing Mr.

9 Thurman ; correct , sir ?

10 A.     That 's correct .

11         MR. MONTEMARANO :   Court 's indulgence , please .

12         Pass the witness , Your Honor .   Thank you .

13                    **CROSS-EXAMINATION**

14         BY MR. MARTIN:

15 Q.     Good morn ing , lieutenant .   Anthony Martin here

16 on behalf of Mr. Goodwin .

17 A.     All right .

18 Q.     I just want to make sure we've got the date

19 correct .   This occurred on January 21 , 2004 ?

20 A.     Yes, sir .

21 Q.     If I heard your testimony correct , the

22 controlled substance s that were found in the van was

23 marijuana .

24 A.     That 's correct .

25         MR. MARTIN:   Nothing further .   Thank you .

1          MR. HALL:   I have no question s, Your Honor .

2          MR. MITCHELL:   No question s, Your Honor .

3          MR. WARD:   I have no question s, Your Honor .

4  Thank you .

5          THE COURT:   Any redirect ?

6          MS. JOHNSTON:   No, sir .

7          THE COURT:   All right thank you .  You may step

8  down , officer .   Thank you very much .

9               (Witness excused at 11:16 a.m. )

10         MS. JOHNSTON:   Your Honor , our next witness

11 would be Officer Heath Guillotte .

12         THE COURT:   Is this a short witness or long

13 witness ?

14         MS. JOHNSTON:   Your Honor , he will probably be

15 the same length as the last witness .

16         THE COURT:   All right .  Well , let 's start him at

17 least .

18 Thereupon,

19                    **HEATH GUILLOTTE** ,

20 having been called as a witness on behalf of the

21 Plaintiff , and having been first duly sworn by the

22 Courtroom Deputy, was examined and testified as

23 follows:

24         THE CLERK:   If you would , state your name  for

25 the record .

1          THE WITNESS:  Heath   Guillotte .

2          THE WITNESS:   What ?

3          THE CLERK:   What  is  it?

4          THE WITNESS:   Heath  Guillotte .

5          THE CLERK:   Spell  the  last  name  for  me.

6          THE WITNESS:   G U I L L O T T E .

7                    **DIRECT EXAMINATION**

8          BY MS.  JOHNSTON:

9  Q.       Troop er  Guillotte , good  morn ing .

10 A.       Good  morn ing .

11 Q.       Where  are  you  employ ed?

12 A.       Louisiana  State  Police .

13 Q.       How  long  have  you  been  employ ed  with  the

14 Louisiana  State  Police ?

15 A.       Since  January  of  '98.

16 Q.       During  those  eight  year s, what  position s have

17 you  held  with  them ?

18 A.       I was  a patrol  --  regular  patrol  troop er  up

19 until  November  of  2002, and  I was  transferred  into  our

20 Criminal  Patrol  Unit .

21 Q.       Prior  to start ing  with  the  Louisiana  State

22 Police  in January  of  1998, did  you  have  other  law

23 enforcement  experience ?

24 A.       Yes, ma'am , I did .

25 Q.       Where  did  you  work ?

1 A.      The Franklin Police Department in Franklin ,

2 Louisiana .

3 Q.      Where is Franklin , Louisiana ?

4 A.      Approximately 50 miles south of Lafayette .

5 Q.      Where is that in relation to the Texas / Louisiana

6 border ?

7 A.      Lafayette is at mile post 103 . So , it's 103

8 miles from Texas , and then 50 miles south of that is

9 Franklin .

10 Q.      What were your duty assignment s with the

11 Franklin Police Department ?

12 A.      I start ed off as a patrol officer and work ed

13 narcotic s for a couple of year s , and then supervisor .

14 Q.      How many year s of narcotic s experience do you

15 have ?

16 A.      Two .

17 Q.      Once you came to the Louisiana State Police , you

18 indicated you did regular patrol and then you got move d

19 to a different division ?

20 A.      Yes, ma'am .

21 Q.      What was the new division you were move d to?

22 A.      Criminal Patrol Unit .

23 Q.      Could you describe for us what you do in the

24 Criminal Patrol Unit ?

25 A.      We patrol the major inter state s and U. S.

1 highways in the state looking for the traveling

2 criminal on those highways and interstates.

3 Q.    Calling your attention -- strike that.

4       In doing that kind of work, are you in a marked

5 car or unmarked car; uniformed or un-uniformed?

6 A.    Fully marked patrol car, and in uniform.

7 Q.    Calling your attention to June 16 of 2004.

8       Were you working on that date?

9 A.    Yes, ma'am, I was.

10 Q.    Were you by yourself?

11 A.    Yes, ma'am.

12 Q.    Calling your attention to the early morning

13 hours of June 16, 2004.

14       Did you have occasion to make a traffic stop?

15 A.    Yes, ma'am, I did.

16 Q.    Approximately what time was that?

17 A.    At 0657 hours in the morning.

18 Q.    Where were you working at that hour?

19 A.    I was on I-10 near mile post 109.

20 Q.    That's Interstate 10?

21 A.    That's correct.

22 Q.    That's a road that goes down through Houston, or

23 to the Houston area?

24 A.    Correct.

25 Q.    What did you -- what observations did you make?

1  A.       I observed a tan motor home traveling in the

2  left lane eastbound on I-10, and I observed the motor

3  home cross the white fog line onto the shoulder of the

4  roadway and then return back to its lane.

5  Q.       Why did that come to your attention?

6  A.       Well, I was concerned that maybe the driver was

7  falling asleep or intoxicated or having some kind of

8  difficulties that caused it to leave the travel lane.

9  Q.       What did you do at that time?

10  A.       I got behind the motor home, turned on my

11  emergency lights, and made a traffic stop on the

12  vehicle.

13  Q.       How many people occupied the vehicle?

14  A.       Two.

15  Q.       Do you recall who those two people were?

16  A.       Yes, ma'am.

17  Q.       Who were they?

18  A.       Marcus Thurman and Mr. Weathersby.

19          Michael Thurman, I believe his name was, and Mr.

20  Weathersby.

21  Q.       Who was the driver?

22  A.       The driver was Mr. Thurman.

23  Q.       What occurred once you stopped the tan motor

24  home?

25  A.       I approached the passenger side of the vehicle

1  and asked the driver to step to the rear of the vehicle

2  with his driver's license.

3  Q.       Why do you approach the passenger side if you're

4  asking the driver to get out?

5  A.       Because I don't want to get hit by a car on the

6  driver's side of the vehicle.

7  Q.       Did Mr. Thurman comply with your request?

8  A.       Yes, ma'am. He did step out of the vehicle and

9  meet me at the rear of the motor home.

10  Q.      What occurred once you got him to the rear of

11  the motor home?

12  A.       I again asked for his driver's license. He said

13  he didn't have one. He gave me an auto dealer's I.D.

14  card that identified him, and he said he left his

15  driver's license in Shreveport, Louisiana.

16  Q.      The auto dealer's I.D. card. Did it have a

17  photograph of Mr. Thurman on it?

18  A.       Yes, ma'am.

19  Q.      Do you know where -- do you recall the name of

20  the dealership?

21  A.       No, ma'am, I don't.

22  Q.      How about the location of the dealership?

23  A.       Washington, D. C.

24  Q.      After he presented that identification to you,

25  did you have any further conversation with him?

1 A.      Yes, ma'am.  I asked him where he was going and

2 where he was coming from.  He said he had been

3 traveling since March and was on his way back to

4 Washington, D. C. from Houston, Texas.  He said that he

5 had been in Houston visiting relatives and he and his

6 passenger were on their way back for a family get-

7 together in Washington, D. C.

8 Q.      Did you have any contact with the passenger of

9 the vehicle?

10 A.      Yes, ma'am, I did.  I spoke to the passenger,

11 asked him where they were going and where they were

12 coming from.  He gave me the same story as Mr. Thurman.

13 He said he was going to be coming back to Houston

14 Sunday and that Mr. Thurman was going to be bringing

15 him to Houston.

16       I went back and spoke with Mr. Thurman again,

17 and he said he wasn't sure when the passenger was going

18 to be going back home to Houston.

19 Q.      Did you take any enforcement action at that

20 time?

21 A.      I retrieved the passenger's I.D. and went back

22 to my patrol unit and ran a check to see if either of

23 the subjects were warranted.

24 Q.      What was the result of that check?

25 A.      They were not.

1 Q.      What did you do at that point?

2 A.      I filled out a Consent to Search form.  I felt,

3 because of Mr. Thurman's nervousness when he gave me

4 his I.D. -- his hands were shaking and he was real

5 nervous; I smelled the odor of burnt marijuana as I was

6 talking to him, and I felt that there may be some sort

7 of criminal activity taking place.  So, I filled out a

8 Consent to Search form.

9 Q.      Did Mr. Thurman give you consent to search?

10 A.      When I originally asked him for consent to

11 search, he did.  After I explained the form to him and

12 had him read the form to make sure he understood it, at

13 that point he asked me if he could refuse, and I told

14 him yes, he could.  He said, well, I want to refuse.

15 Q.      Did that end your investigation?

16 A.      Did it end my investigation?

17 Q.      Yes.

18 A.      No, ma'am, it did not.

19 Q.      What did you do at this point?

20 A.      I contacted our K-9 officer, who came to the

21 scene and ran his dog around the vehicle.

22 Q.      What were the results of that?

23 A.      He advised me that the dog indicated to the

24 presence -- the odor of narcotics on the vehicle around

25 the vehicle.  At that point he explained to Mr. Thurman

1  what took place, and we searched the vehicle.

2  Q.     Was anything recovered from the vehicle?

3  A.     Yes, ma'am.  My partner assisted me in the

4  search, and we re covered a small duct-taped package

5  located underneath the stove in the natural void of the

6  motor home.

7  Q.     Did you determine what was in that duct-taped

8  package?

9  A.     Cocaine.

10  Q.     How did you make that determination?

11  A.     Our narcotics agents field-tested it.

12         MR. SUSSMAN:   Objection.

13         Hearsay.

14         THE COURT:   Sustained.

15         Ask another question.

16         BY MS. JOHNSTON:

17  Q.     Have you had occasion to see cocaine before?

18  A.     Numerous times.  Yes, ma'am.

19  Q.     When you began your search of the motor home or

20  camper, did you notice anything that got your attention

21  inside the camper?

22  A.     Yes, ma'am, I did.  I noticed a roll of duct

23  tape on the bed of the motor home.

24  Q.     Why was that significant to you?

25  A.     Many, many times that I've discovered cocaine

1  in vehicles, it's been wrapped in duct tape.

2  Q.      Were you present when the duct-taped package was

3  removed from where it was located?

4  A.      Yes, ma'am, I was.

5  Q.      Where was it located?

6  A.      It was under the stove, in the cabinets, in a

7  natural void.

8  Q.      What did you and your partner do with it once

9  you had it removed from that void?

10  A.      I took my pocket knife, cut the duct tape and

11  saw white powder.

12  Q.      Was there any significance to you to the fact

13  that there was white powder inside the duct tape?

14  A.      Yes, ma'am.

15  Q.      What was that?

16  A.      I believed it was cocaine.

17  Q.      What did you do with the package at that time?

18  A.      Secured it and placed Mr. Thurman and his

19  passenger under arrest.

20  Q.      What was done with the package after you placed

21  Mr. Thurman and his partner under -- Mr. Weathersby

22  under arrest?

23  A.      It was secured in the trunk of my unit.

24  Q.      Where did you take it?

25  A.      To West District Narcotics Office in Lafayette.

1 Q.      What was done with it there?

2 A.      It was turned over to the narcotics agents.

3 Q.      Were you present with them when they conducted

4 any tests on it?

5 A.      No, ma'am, I was not.

6 Q.      Let me show you what's been marked as

7 Government's Exhibit P-233A, B, C and D.

8          Have you seen these pictures earlier this

9 morning?

10 A.      Yes, ma'am.

11 Q.      We'll put them up on the screen then and ask you

12 to tell us what we're looking at.

13 A.      That is a picture of the rear of the motor home

14 that I stopped.

15 Q.      I will zoom in on that.

16          The tag on that vehicle.  Do you recall whether

17 or not that was a dealer tag?

18 A.      Yes, ma'am, it was.

19 Q.      What state or area issued that tag?

20 A.      Washington, D. C.

21 Q.      Government's Exhibit P-233B.  What is that?

22 A.      That is a picture of the front of the motor home

23 I stopped.

24 Q.      And P-233C.

25 A.      That is the driver's side of the same motor

1 home.

2 Q.      P-233D.

3 A.      That is the package located inside the motor

4 home.

5 Q.      Is this picture taken before or after there was

6 a slit in the package?

7 A.      Excuse me, ma'am?

8 Q.      Is this picture taken before or after you slit

9 open the duct-tape?

10 A.      After.

11 Q.      Are we able to see the white powder substance

12 you're referring to?

13 A.      I'm not sure if this area where the slit is is

14 the white powder or not.  I can't see it clear enough.

15 Q.      I'll bring it up to you so you can see if it's a

16 little clearer.

17 A.      I'm not sure if this is the cellophane or white

18 powder.

19 Q.      Excuse me?

20 A.      I'm not sure if this area here is cellophane or

21 white powder.

22 Q.      Let me put it on the screen, and you can touch

23 the screen and point to the area you're talking about.

24          Can you show us what area you're talking about?

25          You're not sure whether it's the slit or the

1 cellophane?

2 A.      Right in the center of the slit.

3 Q.      Other than that slit, is the package in the same

4 condition as when you recovered it?

5 A.      Yes, ma'am.

6 Q.      Do you recall what the weight of the package

7 was?

8 A.      .75 pounds.

9 Q.      Excuse me?

10 A.      .75 pounds.

11 Q.      Did you have any conversation with Mr. Thurman

12 after you recovered the package?

13 A.      Yes, I did.

14 Q.      What was that conversation?

15 A.      After recovering the package, I placed him under

16 arrest and advised both he and his passenger of their

17 Miranda rights and asked them about the cocaine in the

18 vehicle.  Mr. Thurman said if there was any cocaine in

19 the vehicle it was for his nose is what he said, and I

20 took that to mean personal use.

21      I asked him about that particular package, and

22 he said that was a package that was a part of a 10-kilo

23 shipment that he took from Houston to Washington and it

24 didn't cook into crack cocaine, so he brought it back

25 to Houston and forgot to remove that small package out

1 of the vehicle.

2 Q.      Was Mr. Thurman charged with that offense?

3 A.      Yes, he was.

4 Q.      Do you know whether or not he actually made it

5 to court or what happened to those charges?

6 A.      No, I do not.

7        MS. JOHNSTON:   I have nothing further.

8        THE COURT:   Cross-examination.

9        MR. MONTEMARANO:   No questions, Your Honor.

10        MR. MARTIN:   Mr. Goodwin has no questions for

11 this witness, Your Honor.

12        MR. HALL:   No questions, Your Honor.

13        THE COURT:   Anyone else?

14        MR. MITCHELL:   No questions, Your Honor.

15        MR. WARD:   No questions.

16        THE COURT:   Thank you very much.   You may step

17 down, officer.

18              (Witness excused at 11:30 a.m.)

19        THE COURT:   We will take a recess until ten

20 minutes of 12.

21              (Jury excused at 11:30 a.m.)

22              (Off the record at 11:30 a.m.)

23              (On the record at 11:52 a.m.)

24        THE COURT:   Ready for the jury?   Bring them in.

25              (Jury returns at 11:54 a.m.)

1          THE  COURT:    You  may  proceed .

2          MS.  JOHNSTON:    Your  Honor ,  our  next  witness

3  would  be  Michael  Thurman .

4          THE  COURT:    All  right .

5          MR.  WARD:   Michael  Turner ?

6          MS.  JOHNSTON:    Michael  Thurman .   He's  in

7  custody .

8  Thereupon,

9                    **MICHAEL  THURMAN**  ,

10  having  been  called  as  a  witness  on  behalf  of  the

11  Plaintiff,  and  having  been  first  duly  sworn  by  the

12  Courtroom  Deputy,  was  examined  and  testified  as

13  follows:

14          THE  CLERK:    I  need  you  to  state  your  name  for

15  the  record.

16          THE  WITNESS:    Michael  Thurman.

17                    **DIRECT  EXAMINATION**

18          BY  MS.  JOHNSTON:

19  Q.     Good  morning,   Mr.  Thurman.

20  A.     Good  morning.

21  Q.     How  old  are  you?

22  A.     31.

23  Q.     Where  did  you  grow  up?

24  A.     Washington,  D.   C.

25  Q.     How  far  did  you  go  in  school?

1  A.        Graduated.

2  Q.        Graduated from where?

3  A.        Wheaton High.

4  Q.        What year did you graduate from high school?

5  A.        '94.

6  Q.        Are you currently incarcerated?

7  A.        Yes.

8  Q.        Is that as a result of your involvement in this

9  drug conspiracy?

10 A.        Yes.

11 Q.        Have you ever been incarcerated before?

12 A.        Yes.

13 Q.        When was that, approximately?

14 A.        1999.

15 Q.        For what?

16 A.        Armed robbery.

17 Q.        When were you released?

18 A.        June 2001.

19 Q.        When you were released from prison, what area

20 did you live in?

21 A.        Baltimore County.

22 Q.        Did you get employment when you were released?

23 A.        No, ma'am.

24 Q.        Have you ever used any drugs?

25 A.        Yes.

1  Q.      What kind of drugs have you used?

2  A.      Marijuana, cocaine and "  E" pills.

3  Q.      What do you mean by "'  E pills?'"

4  A.      I don't understand the question.

5  Q.      What is an " E pill?"

6  A.      Oh.  Ectasy.

7  Q.      Approximately how old were you when you started

8  using drugs?

9  A.      16 or 17.

10  Q.      Ever receive any treatment for your drug use?

11  A.      No, ma'am.

12  Q.      Now, when you got out of prison in    June of 2001,

13  did you use drugs after that release?

14  A.      Yes.

15  Q.      What kind of drugs did you use after you got out

16  of prison in  June of 2001?

17  A.      Marijuana, cocaine, " E" pills.

18  Q.      When you say "cocaine," are you talking about

19  powder cocaine or crack cocaine?

20  A.      Powder.

21  Q.      Now, if you weren't working after you got out of

22  jail in 2001, how did you obtain your drugs?

23  A.      Friends.

24  Q.      Did there come a time after you were released

25  when you began selling any drugs?

1  A.      Yes.

2  Q.      Approximately how soon after you got out of

3  prison did you start selling drugs?

4  A.      In between the three to five months.

5  Q.      What kind of drugs did you start selling?

6  A.      Crack and powder.

7  Q.      Excuse me?

8  A.      Crack and powder cocaine.

9  Q.      How did you get involved in selling crack and

10  powder cocaine?

11  A.      I don't understand the question.

12  Q.      Well, where did you get the crack or the powder

13  initially when you started selling it?

14  A.      Oh.  Through a mutual friend.

15  Q.      Who was that friend?

16  A.      Tony.

17  Q.      Where did you know   Tony from?

18  A.      Another mutual friend,   Jeff.

19  Q.      Jeff and  Tony.

20          Were they from  Baltimore County?

21  A.      No, from  Washington,  D. C. and  Prince George's

22  County.

23  Q.      What general area in   Washington,  D. C.?

24  A.      Southeast.

25  Q.      Who was that   Tony or  Jeff?

1  .        Who lived in that area?

2  A.       Oh, Jeff.

3  Q.       Where was  Tony from?

4  A.        Prince George's  County.

5  Q.       You said you started getting it through      Tony.

6           Was  Tony also a user of drugs?

7  A.       Yes, user and seller.

8  Q.       And how -- what conversation did you have with

9  Tony that resulted in your starting to sell drugs?

10  A.       Can you --

11  Q.       Did you have a conversation with     Tony about

12  using drugs and/or selling drugs?

13  A.       Yes.  Yes.

14  Q.       Could you describe for us generally what you

15  discussed?

16  A.       Just how we can make some money and if      I knew

17  any way we can get some product or anything cheaper.

18  Q.       What quantity of drugs were you getting through

19  Tony initially?

20  A.       We were getting, like, 8-balls and quarters.

21  Q.       When you say an "8-ball," what do you mean by

22  that?

23  A.       Three -- three grams.

24  Q.       What would you do with the three grams that you

25  would get?

1  A.      Break it down and sell it.

2  Q.      What quantities would you break it into, and      how

3  much  would you sell it for?

4  A.      Like $10s and $20s and so forth.

5  Q.      Approximately what would you pay for an 8-ball?

6  A.      About $125 to $150.

7  Q.      How much would you be able to make if you sold

8  it -- broke it down and sold it?

9  A.      About $300.

10  Q.      So you would double your money?

11  A.      Yeah.

12  Q.      Was that crack or cocaine that you were buying

13  8-alls of, or both?

14  A.      Both.

15  Q.      The crack as opposed to the powder.

16          What denomination was the crack sold in?

17  A.      The same.

18  Q.      The powder, too, was also $10s and $20s?

19  A.      Yeah.

20  Q.      That refers to the amount of money you would

21  charge somebody for it?

22  A.      Right.

23  Q.      How many $10s or $20s could you get out of an

24  8-ball?

25  A.      Around the same.

1 Q.      The same whether it was crack or powder?

2 A.      Right.

3 Q.      What would be the number?

4 A.      Oh, about $300.

5 Q.      In addition to selling you the 8-ball crack or

6 the 8-ball powder, did you use any of that as well?

7 A.      Yes.

8 Q.      In addition to 8-balls, you also got quarters?

9 A.      Right.

10 Q.      Could you tell us what a "quarter" is?

11 A.      Seven grams.

12 Q.      Does that refer to a quarter of an ounce?

13 A.      Yes.

14 Q.      An "eighth" refers to an eighth of an ounce?

15 A.      Yes.

16 Q.      What would you pay for a quarter, or seven

17 grams?

18 A.      $300.

19 Q.      Was the price the same if it was crack or

20 powder?

21 A.      Yes.

22 Q.      Did you know -- when you were getting these

23 8-balls and quarters through    Tony, did you know where

24 he was getting it at first?

25 A.      No, not at first.

1 Q.      Now, how long were you getting it through      Tony

2 before you found out where it came from?

3 A.      About a month.

4 Q.      What conversation did you have with      Tony after

5 that first month about where he was getting his drugs?

6 A.      I just went with him on a trip to get it.  There

7 wasn't really no --    I just went with him to purchase

8 it.

9 Q.      Where did you go with Tony to pick up the drugs?

10 A.      Southeast.

11 Q.      Where in Southeast?

12 A.      Anacostia  Road.

13 Q.      Do you recall the address on      Anacostia  Road?

14 A.      Not right offhand.

15 Q.      What kind of establishment was it that you went

16 to?

17 A.      Apartment building.

18 Q.      Do you remember how many apartments were in the

19 building?

20 A.      Four.

21 Q.      Did you go to the apartment, or did you meet

22 whoever it was outside?

23 A.      To a particular one.

24 Q.      What apartment did you go to?

25 A.      Upstairs one.

1 Q.      Can you describe the outside of the building for

2 us?

3 A.      Like a brick building with a front door leading

4 to the hallway, and you can go upstairs or downstairs.

5 Q.      How many flights of stairs would you go up?

6 A.      One flight.

7 Q.      Okay.  When you got to the top of the stairs,

8 where would the apartment be that you went into?

9 A.      On the right.

10 Q.      How many apartment doors were up there?

11 A.      Two.

12 Q.      And then there two on the bottom level?

13 A.      Yes.

14 Q.      When you went into that apartment upstairs --

15 this first time when you went with     Tony -- who was

16 there?

17 A.      Several people, and   Mr. Goodwin.

18 Q.      Do you remember the names of any of the other

19 people?

20 A.      No, ma'am.

21 Q.      You said " Mr. Goodwin."

22          Do you see  Mr. Goodwin in the courtroom?

23 A.      Yes.

24 Q.      Would you identify him for the record by

25 something he's -- by his appearance?

1  A.        Right here with the glasses.   (Witness

2  indicating.)

3  Q.        Okay.  Well, we have any number of people

4  sitting here with glasses.  Could you -- using me and

5  counting over from me, which person is it?

6  A.        Fourth.

7  Q.        Okay.  What is he wearing?

8  A.        Like, a greenish suit.

9  Q.        Okay.  I would ask the record to reflect the

10  witness has identified the defendant,     Learley  Goodwin.

11         MR.  MARTIN:  No objection.

12         THE  COURT:  The record will so indicate.

13         BY MS.  JOHNSTON:

14  Q.        Was that the first time you met    Mr.  Goodwin?

15  A.        Yes.

16  Q.        What happened in his apartment?

17  A.        I was with a guy --   Tony -- went to purchase

18  some drugs.

19  Q.        Were you present during the transaction?

20  A.        Yes.

21  Q.        What drugs were purchased?

22  A.        Some crack and powder cocaine.

23  Q.        How much was purchased?

24  A.        About a half an ounce altogether.

25  Q.        Who gave  Tony the total of the half ounce of

1 drugs?

2 A.       Mr. Goodwin.

3 Q.       Did you see where he got it from?

4 A.       Yes.

5 Q.       Where did he get it from?

6 A.       At this time it was on the table.

7 Q.       What room was the table in?

8 A.       The living room.

9 Q.       Can you describe the inside of that apartment

10 for us?

11 A.       When you come in the door, the kitchen's to the

12 left; the living room and dining room to the right.

13 Q.       Do you know -- did  Tony pay  Mr. Goodwin for the

14 drugs when he received them?

15 A.       Yes.

16 Q.       How much was paid for them?

17 A.       All together it was about $600.

18 Q.       Did you receive any of those drugs?

19 A.       Yes.

20 Q.       What did you receive?

21 A.       I received half.

22 Q.       Half of?

23 A.       The half.

24 Q.       Of the?

25 A.       Half ounce.

1  Q.      You would have gotten a quarter ounce?

2  A.      Yes.

3  Q.      Do you recall whether or not that was powder or

4  crack cocaine, or both?

5  A.      It was both.

6  Q.      What did you do with the drugs you received?

7  A.      Resold and used.

8  Q.      So if you got a quarter ounce, we're talking

9  about roughly seven grams?

10  A.      Yes.

11  Q.      And you were able to repackage that and sell it;

12  is that correct?

13  A.      Yes.

14  Q.      Let me show you two photographs and ask you if

15  you recognize the location.

16          Showing him  P-68 and P-69.    P-68 and  P-69.

17          MR.  WARD:   Thank you.

18          BY MS.  JOHNSTON:

19  Q.      Do you recognize that location?

20  A.      Yes.

21  Q.      What location is that?

22  A.      The apartment that we met at.

23  Q.      I will put them up on the screen.

24          Is that the outside door of the apartment?

25  A.      Yes.

1  Q.      What area do we see on P-69?

2  A.      Like a dining room are, the table.

3  Q.      And the door there.  What door is that?

4  A.      The front door.

5  Q.      Excuse me?

6  A.      The front.

7  Q.      Was there -- were you introduced to    Mr. Goodwin

8  at that time?

9  A.      Yes.

10 Q.      By what name were you introduced to him?

11 A.      Mike.

12 Q.      Did you have any nicknames that people called

13 you?

14 A.      "Cadillac  Mike."

15 Q.      How was  Mr. Goodwin introduced to you?

16 A.      As "Goody."

17 Q.      During the time that you were there, did you

18 have any particular conversation with    Mr. Goodwin about

19 drugs?

20 A.      Yeah.

21 Q.      What was that conversation?

22 A.      About knowing people where we can get them for a

23 lower price.

24 Q.      How did that come up in the conversation if you

25 were just meeting  Mr. Goodwin for the first time?

1  A.      Because  Tony had already -- had talked to him or

2  whatever about knowing somebody that could find it for

3  a lower price.

4  Q.      Okay.  Then let's back up for a moment.

5          Before you went with   Tony to pick up drugs from

6  Mr. Goodwin, had you and   Tony had a conversation about

7  drugs and getting them at cheaper prices?

8  A.      Yes.

9  Q.      Describe that conversation for us.

10  A.      Just a conversation about getting -- I guess

11  getting money so that   I can get it out of town for a

12  lower price.  We just needed somebody to, you know, go

13  with us or whatever.

14  Q.      Did you have money -- enough money to go out of

15  town and buy larger quantities of drugs?

16  A.      No, ma'am.

17  Q.      The most that you were spending at a time to buy

18  drugs at that time was how much?

19  A.      Anywhere from $150 to $300.

20  Q.      What did  Tony say when you discussed trying to

21  get someone to go in with you to go get larger

22  quantities of drugs?

23  A.      Can you repeat the question?

24  Q.      What, if anything, did   Tony say when you had

25  this discussion about trying to find someone to go in

1 to get more drugs?

2 A.     Oh.  That he had someone that had the money to

3 be able to get, you know, a big quantity of drugs if     I

4 knew a connect.

5 Q.     What did you tell   Tony?

6 A.     That  I had family and friends out of state.

7 Q.     Where were your family and friends?

8 A.     Houston,  Texas.

9 Q.     Had you brought drugs from    Houston,  Texas

10 before?

11 A.     No, ma'am.

12 Q.     Well, how did you know that your friends or

13 family in  Houston,  Texas would be able to help you?

14 A.     Because  I've been in  Texas before, and   I just --

15 I knew different friends and family that had a drug

16 connection that was cheaper to get drugs closer.

17 Q.     Had you seen drugs in   Texas before?

18 A.     Yes.

19 Q.     And who were these family members or friends

20 that you knew who were involved in drugs?

21 A.     It was several, but a few in particular was

22 Steve.

23 Q.     Steve was a relative or friend?

24 A.     Steve was a relative, and one of the    Steves  was

25 a friend.

1  Q.      So there were a couple of   Steves  in  Texas;  is

2  that correct?

3  A.      Yes.

4  Q.      Do you know the last names of the    Steves ?

5  A.      One was my cousin,   Ross, and the other one was

6  Campbell.

7  Q.      So we had  Steven Ross and   Steven Campbell?

8  A.      Right.

9  Q.      So you had this discussion with    Tony, and that's

10 before you met  Mr. Goodwin; is that correct?

11 A.      Yes, ma'am.

12 Q.      When you go and pick up the half ounce from     Mr.

13 Goodwin at the apartment on    Anacostia , what discussion

14 did you have with  Mr. Goodwin at that time concerning

15 drugs?

16 A.      Just about what kind of prices we can get and if

17 we can get it cheaper, and just to, like, check into it

18 -- sort of look into it, basically.

19 Q.      Who asked you to look into it?

20 A.      Oh.  Mr. Goodwin.

21 Q.      What quantities of drugs did you and     Mr. Goodwin

22 discuss?

23 A.      Bricks.

24 Q.      What's a "brick?"

25 A.      Oh.  A kilo.

1  Q.      Are there other names for kilos?

2  A.      There's several names.

3  Q.      Okay.  What are those -- some of those names for

4  kilos?

5  A.      There's "white girls," "cakes," "pies" -- it can

6  be several different, you know --

7  Q.      Do you usually just call them kilograms of

8  cocaine?

9  A.      Bricks or keys.

10 Q.      Was there discussion of what kind of price or

11 how much money  Mr. Goodwin could contribute to getting

12 these kilos?

13 A.      It was dependent on the cheaper price where we

14 can get them for.

15 Q.      What arrangements, if any, did you make with      Mr.

16 Goodwin when you met with him that first time?

17 A.      I don't understand the question.

18 Q.      Okay.  After you had that -- let me rephrase it.

19         After you had that discussion, what did you do?

20 A.      Oh.  I proceeded to make phone calls and talk to

21 my relatives and friends.

22 Q.      Who did you call?

23 A.      Cousin.  Steven Ross.

24 Q.      What discussion did you have with   Mr. Ross?

25 A.      To check and see if he can get any keys for a

1  good price, and how soon, and who do we talk to, and a

2  good quality.

3  Q.      When you had that conversation with    Mr. Ross on

4  the phone, did you talk as you just told us:  Can you

5  tell us what price you can get keys for?  Or did you

6  use different language in speaking with him on the

7  phone?

8          MR. MARTIN:  Objection.

9          Compound and leading.

10         THE COURT:  Rephrase the question.

11         BY MS. JOHNSTON:

12 Q.      How did you discuss it over the phone with your

13 cousin, Mr. Ross?

14 A.      What's the prices we can get for, say, keys or

15 birds.

16 Q.      Did he give you prices over the phone?

17 A.      He wouldn't know exactly what the price we get

18 them for -- depend who we deal with -- but he gave us a

19 price range.

20 Q.      What was the price range he gave you?

21 A.      Anywhere from $15,500 to $17,500.

22 Q.      Now, as a result of that discussion with your

23 cousin, Mr. Ross, did you have further discussions with

24 Mr. Goodwin?

25 A.      Yes.

1 Q.      Where did you have those discussions with him?

2 A.      Back at the apartment building in Southeast.

3 Q.      The one on Anacostia Road?

4 A.      Yes, Anacostia Road.

5 Q.      Who was present for those discussions?

6 A.      Me, him, and other people and Tony.

7 Q.      Do you recall who some of those other people

8 were that were in the apartment from time to time?

9 A.      Tiffany, and -- I can't recall no more.

10 Q.      Who was "Tiffany" in relation to Mr. Goodwin?

11        MR. MARTIN:  Objection.

12        BY MS. JOHNSTON:

13 Q.      If you know.

14 A.      His girlfriend.

15 Q.      How do you know that?

16 A.      From seeing them interact.

17 Q.      What were your discussions with Mr. Goodwin

18 after you got the price from Steve Ross?

19 A.      That I pretty much had everything in motion.

20 Just had to go down there, you know, talk about it and

21 make deals and final arrangements.

22 Q.      Were any arrangements made to go to Texas?

23 A.      Not at that time.

24 Q.      Did there come a time when arrangements were

25 made to go to Texas?

1  A.       Yes, ma'am.

2  Q.       Approximately how long after you had this

3  discussion were arrangements made?

4  A.       30 to 60 days.

5  Q.       Approximately what time of year was that?

6  A.       Late.  Late.  End of the year.

7  Q.       The end of what year?

8  A.       '01.

9  Q.       Excuse me?

10 A.       '01.  2001.

11 Q.       What were the arrangements that were made?

12 A.       To fly -- to fly down to   Houston.

13 Q.       Who was to fly down to   Houston?

14 A.       Me and  Mr. Goodwin.

15 Q.       Who made those arrangements?  The travel

16 arrangements.

17 A.       You mean obtaining the tickets?

18 Q.       Who obtained the tickets -- made the

19 reservations?

20 A.       Oh.  Mr. Goodwin.

21 Q.       Did you -- did there come a time when you

22 actually traveled to   Texas?

23 A.       Yes.

24 Q.       Do you recall the date of the travel?

25 A.       No, I can't recall the date.

1  Q.      What airline did you travel on?

2  A.      Southwest.

3  Q.      Who traveled with you?

4  A.      Mr. Goodwin.

5  Q.      Who paid for the tickets?

6  A.      We picked them up.    I'm not sure who paid.   Mr.

7  Goodwin.

8  Q.      Did you pay for the tickets?

9  A.      No, ma'am.

10 Q.      Do you know how they were paid for?

11 A.      No, ma'am.

12 Q.      Court's indulgence one moment.

13         I'm going to show you what's been marked as

14 Government's Exhibit R9 and ask you if this refreshes

15 your recollection of when you traveled to    Houston with

16 Mr. Goodwin.

17 A.      Yes.

18 Q.      On what date did you travel to    Houston?

19 A.      12/27/2001.

20 Q.      Were there any difficulties in getting to

21 Houston?

22 A.      No, ma'am.

23 Q.      Where did you go once you arrived at the     Houston

24 airport?

25 A.      Were picked up by my cousin,    Steven Ross.

1  Q.      Where did  Mr. Ross take you?

2  A.      To the Hood to meet the guy.

3  Q.      Did you say, "to the Hood?"

4  A.      Yeah.

5  Q.      Okay.

6  A.      Oh.  Well, to  Marcolin .  To, like, the south

7  side of  Texas, or the north side.

8  Q.      To where?

9  A.      To the north side of   Houston,  Texas.

10  Q.      What was the name of the area or the street?

11  A.      Marcolin .

12  Q.      Can you spell that for us, please?

13  A.      Not correctly.

14  Q.      Okay.

15  A.      M-A-R-C-O-L-I-N.

16  Q.      Whose house did you go to initially?

17  A.      Steve's.  Steve   Campbell.

18  Q.      Had you met  Steve -- you knew   Steven  Campbell

19  before this trip down there; is that correct?

20  A.      Yes.

21  Q.      Who was present when you got to    Mr. Campbell's

22  house?

23  A.      Both.  His friend Darren and another guy that      I

24  don't know the name.

25  Q.      Was Mr. Goodwin with you when you went to    Steve

1  Campbell's house?

2  A.      Yes.

3  Q.      How about Steven Ross?

4  A.      Yes.

5  Q.      What occurred when you got to   Mr. Campbell's

6  house?

7  A.      We talked outside the house for a few minutes,

8  introducing everyone, then we proceeded to go into the

9  house and into the garage part of the house.

10  Q.      What conversation took place there?

11  A.      We were just talking about what we came down

12  for, the prices for the keys, the quality and be able

13  to supply it, and the demand.

14  Q.      Excuse me?

15  A.      Be able to -- like, would they be willing to be

16  able to keep supply.

17  Q.      Who participated in that conversation?

18  A.      Mr. Goodwin and  Steve Campbell.

19  Q.      You recall what prices they discussed?

20  A.      It depends on the quality, but it was anywhere

21  from $15,500 to $17,500.

22  Q.      And was that for delivery to   Washington,  D. C.

23  or pickup in  Houston?

24  A.      That was pickup in   Houston.

25  Q.      What quantities of drugs -- of cocaine were

1 discussed?

2 A.      Starting out it would be five.

3 Q.      Who made the statement that starting out it

4 would be five?

5 A.      Mr. Goodwin.

6 Q.      Was there any discussion about the arrangements

7 in terms of whether the money would be delivered first

8 or the drugs?

9 A.      It was like -- it was a bunch of different ideas

10 going on, so it was up in the air until we made the

11 final -- the final decision.

12 Q.      What was the discussion generally about the

13 procedure?

14 A.      Can you rephrase the question?

15 Q.      You said there was some different ideas being

16 thrown about before you all reached a conclusion.

17 A.      Yes.  Oh.  It was like driving down, using      UPS

18 -- there was a couple of different ways.

19 Q.      What was decided upon initially?

20 A.      Sending everything.

21 Q.      If you're sending everything, was there a

22 discussion about whether the drugs would be sent to

23 Washington first, or the money would be sent to      Houston

24 first?

25 A.      It would be the money sent first.

1  Q.      You also indicated there was a discussion about

2  quality.

3  A.      Right.

4  Q.      Can you describe what -- how that discussion

5  proceeded?

6  A.      I'm just saying, like, the quality of it,

7  because you want the better   quality to do what you need

8  to do with it.

9  Q.      What do you mean, "do with it?"

10  A.      Like if you're going to cook it up in crack, or

11  sniff it or whatever, you've got to have a good quality

12  for the customers.

13  Q.      Was the cocaine that Mr . Campbell was going to

14  provide, was that powder cocaine or crack cocaine?

15  A.      Powder.

16  Q.      While you were in his home having these

17  discussions, was anything shown to you?

18  A.      Yes.

19  Q.      Could you describe that?

20  A.      Several kilos of cocaine.

21  Q.      Where were they?

22  A.      They were in the garage.  They were in the back

23  of a car that he had in the garage.

24  Q.      Can you describe for us how you happened to see

25  those?

1  A.       They were really, like, out in the open, and

2  then once he popped the trunk you could see the ones he

3  had in the trunk.

4  Q.       Were any of those tested that day while you and

5  Mr. Goodwin were there?

6  A.       Yes.

7  Q.       Describe that process.

8  A.       Looked at it.  Rubbed it in the fingers.       I

9  sniffed it.  That's how much it was tested.

10  Q.       Who rubbed it in between their fingers?

11  A.       Mr. Goodwin.

12  Q.       Do you know why you would rub it between your

13  fingers?

14  A.       I guess to see if --

15         MR. MONTEMARANO :  Objection,  Your  Honor.

16         BY MS. JOHNSTON:

17  Q.       Mr. Thurman, you can't testify in    terms of

18  guessing something.

19  A.       Oh, okay.

20  Q.       Had you seen that process done?

21  A.       Yes.

22  Q.       Why do you rub it between your fingers?

23         MR. MONTEMARANO :  Objection,  Your  Honor.

24         He's already stated he doesn't know.  He said he

25  guessed.

1            THE COURT:  If he knows, he may answer.

2            BY MS. JOHNSTON:

3  Q.      If you know, why do you rub it between your

4  fingers?

5  A.      To see if it's going to dissolve.

6  Q.      Why do you need to know if it's going to

7  dissolve?

8  A.      So when you try to cook it up.

9  Q.      Why is it important that it dissolve when you

10 cook it up?

11 A.      Well, so it will break down when you're trying

12 to cook it up in crack form.

13 Q.      Was any cocaine purchased at that time?

14 A.      No, ma'am.

15 Q.      I want to show you two pictures, Government's

16 Exhibit  P-265 and P-266.

17         Do you recognize that address?

18 A.      Yes.

19 Q.      What is it?

20 A.      That's  Steve's old house.

21 Q.      Excuse me?

22 A.      Steve's old house.  It wasn't a child day care

23 back then.

24 Q.      When you say, " Steve's old house," which    Steve

25 are you referring to?

1  A.      Campbell.

2  Q.      In terms of your meeting in    December of 2001,

3  was this the residence where you met with him?

4  A.      Yes.

5  Q.      Is there something different about the residence

6  as it appears in these two pictures than the way it was

7  when you met with him with    Mr. Goodwin back in 2001?

8  A.      It wasn't a day care and it had a garage that

9  opens.

10 Q.      Can we see the garage on the picture, P-265?

11 A.      No.

12 Q.      Can we see where the garage was?

13         If you could --you can take your finger, and

14 when you touch the screen it will leave a mark.   Show

15 us where the garage is -- was back then.

16 A.      (Witness indicating.)

17 Q.      So the day care signs and the changing of the

18 garage.   Are those the only two differences you notice

19 about the house itself?

20 A.      The paint.

21 Q.      Excuse me?

22 A.      The paint color.   It wasn't them light, bright

23 colors then.

24 Q.      And 266.   Is that the same house?

25 A.      Yes.

1  Q.      Do you know when   Mr. Campbell left that house?

2  A.      I'm not sure of the exact date.

3  Q.      Did you meet with him more than once at that

4  location?

5  A.      That particular trip?

6  Q.      On that particular trip.

7  A.      Yeah.

8  Q.      Well, after that particular trip, did you ever

9  return to  Houston and go back to that location?

10  A.      That location at the house -- a house further

11  down the street is his mom's house.

12  Q.      Let me show you  P-.

13          Do you recognize   P-267?

14  A.      Yes.

15  Q.      What residence is that?

16  A.      That's his mother's.

17  Q.      Is that the second location where you met with

18  Mr. Campbell --

19  A.      Yes.

20  Q.      -- during the time you were dealing with him?

21          After the meeting with   Mr. Campbell where these

22  discussions occurred, was there an agreement as to what

23  the first delivery would be?

24  A.      Yes.

25  Q.      How much?

1 A.      Oh.  It was said we were going to purchase

2 around five.

3 Q.      Was any money delivered that day?

4 A.      No.

5 Q.      How much would the five kilograms of cocaine

6 have cost, approximately?

7 A.      $90,000.

8 Q.      Did you have even $1,000 to your name at that

9 point?

10 A.      No, ma'am.

11 Q.      Who was to provide the money, based on the

12 conversations?

13 A.      Mr. Goodwin.

14 Q.      How did you get back to   Maryland?

15 A.      Flew.  Took a plane.

16 Q.      Did you and  Mr. Goodwin fly together?

17 A.      No.   I flew back at a later time.

18 Q.      When did  Mr. Goodwin fly back?

19 A.      Like a day or two before the end of the year.

20 Q.      How do you remember that it was before the new

21 year -- before New Year's Day?

22 A.      Because the year was coming up, and he had to

23 get back for, like, a grand opening of a store.

24 Q.      He had to get back for what?

25 A.      A grand opening of a restaurant.

1  Q.      Do you recall the name of the restaurant?

2  A.      D. C.'s Finest.

3  Q.      Where was that located?

4  A.      Rhode Island Avenue.

5  Q.      Were you originally scheduled to fly back at the

6  same time?

7  A.      Yes.

8  Q.      Again, who changed the flights?

9  A.      Mr. Goodwin.

10 Q.      Why did you stay down there longer?

11 A.      To tie up some loose ends and then try to figure

12 out the arrangements on the transportation and so

13 forth.

14 Q.      Who did you have those discussions with?

15 A.      Steven Ross and Steven Campbell and another guy.

16 Q.      What was the other guy's name?

17 A.      I'm not sure of the name.

18 Q.      Why was this other guy involved in the

19 discussions?

20 A.      Because he worked inside of the United Parcel

21 Service.

22 Q.      UPS?

23 A.      Yes.

24 Q.      Why was it important that he be involved in the

25 discussions?

1  A.      Because he had the way to get the drugs back and

2  forth being undetected.

3  Q.      Do you recall the date you flew back to

4  Maryland?

5  A.      No, ma'am.

6  Q.      Let me show you again what have been introduced

7  as Government's Exhibit R-9.

8          Did you fly Southwest coming back?

9  A.      Yes, ma'am.

10 Q.      Court's indulgence one moment.

11         Does this refresh your recollection of the date

12 you flew back?

13 A.      January 5th 2002.

14 Q.      Once you got back to   Maryland, did you have any

15 contact with  Mr. Goodwin?

16 A.      Yes.

17 Q.      How would you get in touch with    Mr. Goodwin?

18 A.      Telephone, or either go past wherever he was at.

19 Q.      What different locations would you go by to see

20 Mr. Goodwin?

21 A.      Several.

22 Q.      Excuse me?

23 A.      Different locations.

24 Q.      Where were these different locations?

25 A.      Like, a restaurant, the building.  You know, any

1   place he was at at the time where we needed to talk.

2   Q.      Who would tell you where to come to meet him?

3   A.      He would.

4   Q.      You said the restaurant.  You're referring to

5   D. C.'s Finest?

6   A.      Yes.

7   Q.      Can you tell us where that was located?

8   A.      Rhode Island Avenue, Washington,   D. C.

9   Q.      What part of  Washington, D. C.?

10          Northwest?  Northeast?

11  A.      Oh, northeast.

12  Q.      Do you know the cross street that it was near?

13  A.      Not right offhand.

14  Q.      So, you met him there.

15          Where were some of the other locations?

16  A.      Anacostia  Road.

17  Q.      Now, the location on   Anacostia  Road.

18          Is that the apartment you identified?

19  A.      Yes.

20  Q.      Did that have any nickname?

21  A.      The "Ponderosa."

22  Q.      Who called it the "Ponderosa?"

23  A.      Everybody.

24  Q.      Everybody, including  Mr. Goodwin?

25  A.      Yes.

1  Q.      Who are some of the people that you knew -- who

2  called it the "Ponderosa?"

3  A.      The guy  Tony that introduced us, and anybody

4  that pretty much came in contact with -- around him.

5  Q.      The people that you came in contact with down

6  around there.  Did you ever see them with drugs?

7  A.      Yeah.

8  Q.      Were those people drug users?

9  A.      Some.

10  Q.      How about the others?

11  A.      It was,  I guess, sellers.

12  Q.      Did you ever see any of those people supplied

13  with cocaine by anyone?

14  A.      I can't understand the question.

15  Q.      The question is, while you were there and you

16  would see people who used drugs and other people who

17  sold drugs, did you ever see where they got their

18  drugs?

19  A.      Oh.  Yes.

20  Q.      Where would they get their drugs?

21  A.      From Mr. Goodwin.

22  Q.      What kind of drugs would you see    Mr. Goodwin

23  give to them?

24  A.      Crack and powder.

25  Q.      Did you ever see where he kept it?

1 A.      Different places.  On the table, in tool boxes

2 -- in different locations.

3 Q.      This is on  Anacostia  Road at the "Ponderosa?"

4 A.      Yes.

5 Q.      You're referring to the apartment where you

6 first met him?

7 A.      Yes.

8 Q.      What about other apartments in that building?

9 A.      Repeat it.

10 Q.      Did you ever go into other apartments in that

11 building with  Mr. Goodwin, or was it just the same

12 apartment?

13 A.      Same apartment.

14 Q.      Once you returned, did you have any discussions

15 with Mr. Goodwin about what had occurred in     Texas at

16 the end of 2001?

17 A.      Just that it was -- there were --    Steve  Campbell

18 was ready whenever we got our stuff together, and I

19 told  him about the plan about getting it up here

20 through  UPS.  So,  I just gave him the last details and

21 then we went from there.

22 Q.      You gave who the last details?

23 A.      Mr.  Goodwin.

24 Q.      What were those details?

25 A.      That we can do everything by    UPS.

1  Q.      What was  Mr.  Goodwin's response when you told

2  him that you were able to do it by     UPS?

3  A.      We were going to just try it and see if it

4  worked because, you know, that wasn't the best idea or

5  the best way to go with it.

6  Q.      Why not?

7  A.      Because it had a chance of getting caught.

8  Q.      You said you were going to do a test.  Describe

9  for us what test was done.

10 A.      The first purchase.  Like, the first purchase.

11 Q.      How many kilos was the first purchase?

12 A.      It ran two and a half to five.

13 Q.      Was the money sent first?

14 A.      Yes.

15 Q.      Where did the money come from?

16 A.      Mr.  Goodwin.

17 Q.      How much money was it, approximately?

18 A.      $45,000 to $90,000.

19 Q.      Excuse me?

20 A.      $45,000 to $90,000.

21 Q.      Depending whether it was two kilos to five

22 kilos?

23 A.      Yes, ma'am.

24 Q.      You don't recall what the first shipment was

25 exactly?

1  A.      No, ma'am.

2  Q.      How was the money packaged?

3  A.      Wrapped up in plastic and tape and put inside of

4  a parcel box.

5  Q.      Who actually delivered it to the    UPS to have it

6  shipped down?

7  A.      I did.

8  Q.      Do you recall what address you mailed it to?

9  A.      I can't recall the exact address, but it was

10  addressed wherever    Steve was going to be able to pick

11  it up.

12  Q.      So it was an address provided by    Mr. Campbell?

13  A.      Yes.

14  Q.      Any problems with the money getting to    Mr.

15  Campbell?

16  A.      No, ma'am.

17  Q.      What happened after you sent the money?

18  A.      He sent the package back.

19  Q.      Do you know what address that package was sent

20  to?

21          Did you know the address?

22  A.      Oh, that it was sent back to?

23  Q.      Yes.

24  A.      The first time it was 28    Gilray Court.

25  Q.      Is that an address associated with you?

1  A.      Yes.  That's where   I stayed at.

2  Q.      What was in the package that you received?

3  A.      The cocaine that was purchased.

4  Q.      What did you do with it?

5  A.      Took it down to the District.

6  Q.      Do you recall where you took the first load?

7  A.      To the apartment in Southeast?  The apartment

8  building in Southeast.

9  Q.      On Anacostia ?

10 A.      Yes.

11 Q.      Was there any other apartments in Southeast that

12 you delivered it to, or just that one on      Anacostia ?

13 A.      Yes, ma'am.  Just that one.

14 Q.      Who did you deliver it to at the apartment?

15 A.      Mr. Goodwin.

16 Q.      What was done with it then?

17 A.      It was checked and cooked up, and that was it.

18 Q.      Who cooked it up?

19 A.      Mr. Goodwin.

20 Q.      Were you present when he cooked it up?

21 A.      When he started.

22 Q.      Did you -- how much did you see him cook up?

23 A.      Probably about a quarter key.

24 Q.      Can you describe how he cooked it up?

25 A.      On the stove, in a beaker, in like a Pyrex --

1  like a measuring cup.

2  Q.      What did  Mr.  Goodwin use to cook it up, in

3  addition to the Pyrex beaker on the stove?

4  A.      Like, water, baking soda...

5  Q.      Did he use any other liquids with it?

6  A.      Like, gin.

7  Q.      Were you surprised that he used gin?

8  A.      I never seen it before.

9  Q.      Oh?  Did you have any conversation with him

10 about using some kind of liquor?

11 A.      Yeah.   I've never seen it done before until     I

12 seen him do it.

13 Q.      What did he tell you?

14 A.      It, like, pulls out the oils and stuff in the

15 drugs.

16 Q.      Were you paid or compensated for that first

17 delivery?

18 A.      Not at the moment.

19 Q.      What do you mean, "not at the moment?"

20 A.      Not when  I took it back, like, the next day or

21 so.

22 Q.      Who paid you the next day or so?

23 A.      Goodwin.

24 Q.      What did he pay you?

25 A.      $1,000 per key.

1  Q.      Was that $1,000 paid in cash or in drugs?

2  A.      Cash.

3  Q.      This is the first time?

4  A.      Yes.

5  Q.      Had you ever had that much cash of your own

6  before that time at one occasion?

7  A.      Yes.

8  Q.      Were there any problems with that first test

9  shipment?

10 A.      No, ma'am.

11 Q.      So what happened after the first test shipment?

12 A.      He said, we'll do it again.

13 Q.      Do you know how many times it was done again?

14 A.      Once before it didn't go -- it got caught up.

15 Q.      So there was another shipment?

16 A.      Yes.

17 Q.      Did you follow the same procedure of you getting

18 the money from  Mr. Goodwin and you mailing the money?

19 A.      Right.

20 Q.      And how was the money -- the money that was sent

21 down there --

22 A.      Right.

23 Q.      -- was it all in a pile, or was it separated out

24 and counted?

25          How was it packaged?

1  A.       Already counted, like, in stacks.

2  Q.       What kind of stacks was it in?

3  A.       Some, maybe, was $10,000 stacks and some, maybe,

4  was $5,000 stacks.

5  Q.       Do you know who counted the money before it was

6  put in the box?

7  A.       Mr. Goodwin.  Then  I recounted it.

8  Q.       All right.

9           Do you know how much money was sent down on that

10 second trip?

11 A.       About -- approximately about $90,000.

12 Q.       Did drugs come back in the same procedure?

13 A.       Yes.

14 Q.       Where were the drugs delivered on the second

15 trip?

16 A.       It was to my house.  Again, the house    I was

17 staying at again.

18 Q.       How much drugs came back the second time?

19 A.       Around five.

20 Q.       Was that equal to the price, that $90,000 or so

21 that was sent down?

22 A.       Yes.

23 Q.       What did you do with the five kilos that came in

24 on the second trip?

25 A.       Once they were delivered,    I waited a while then

1  contacted  Mr. Goodwin.  Then I proceeded to meet him

2  somewhere downtown; called him once    I get close to the

3  area.

4  Q.      Do you recall exactly where you met him on the

5  second trip?

6  A.      At the restaurant.

7  Q.      D. C.'s Finest?

8  A.      Yes, ma'am.

9  Q.      What did you do at the restaurant?

10 A.      Basically, just talking.  Showed him the cooler

11 that it came in.  Basically, that's all.  Just really

12 talking and saying, you know,    I made it through --    I

13 mean, just confirmation.  Just, you know, we're happy

14 that it made it.

15 Q.      You said it was in a cooler?

16 A.      Yeah.

17 Q.      Describe how it was packaged.

18 A.      When  I got it or once   I took it?

19 Q.      Once you got it.

20         When you received it, what did it look like?

21 A.      Oh.  It was inside of a little cardboard box,

22 like the box the cooler came in, just wrapped up in

23 brown -- in a paper used to cover packages, and the

24 cooler was taped shut, you know what I mean?  So it

25 would be sealed.  So there wouldn't be nothing to leak

1 out.  So there would be no smell to detect it.

2 Q.      So the cocaine was actually packaged inside the

3 cooler inside the cooler box?

4 A.      Yes.

5 Q.      Right?

6 A.      Right.

7 Q.      Once you showed it to   Mr. Goodwin at the

8 restaurant, did you leave it there or take it with you?

9 A.      I left it there.

10 Q.      Was there any cooking done there at the

11 restaurant of that cocaine?

12 A.      No, ma'am.

13 Q.      Was it in the cooler when you left it?

14 A.      Yes.

15 Q.      Do you know how many shipments were done like

16 this with  UPS before there was a problem?

17 A.      One more.

18 Q.      On that third shipment did you follow the same

19 procedure?

20 A.      Following the same procedure on the way down,

21 but the procedure on the way up didn't make it.

22 Q.      What do you mean?

23         How much money did you send down?

24 A.      About $90,000 again.

25 Q.      Again, was this your money?

1  A.      No, ma'am.

2  Q.      Whose money was it?

3  A.      Mr. Goodwin's.

4  Q.      If it was  Mr. Goodwin's money, why were you

5  getting $1,000 a kilo from him?

6  A.      That was, like, the going rate to get paid for

7  my part  I was doing.

8  Q.      For doing the transportation?

9  A.      Huh?

10  Q.      For arranging the transportation?

11  A.      Right.

12  Q.      So you sent the money down the same way as you

13  usually do.

14  A.      Right.

15  Q.      Where was the shipment to come back to?

16  A.      It was either to the house    I was staying at or

17  the address that   I had in Southeast.

18  Q.      The address in Southeast.  That was different

19  from the  Anacostia  apartment?

20  A.      Yes, ma'am.

21  Q.      That address in Southeast.  Where was it in

22  relation to the restaurant?

23          Was it near the restaurant,   D. C.'s Finest?

24  A.      Yes.

25  Q.      Why were you using a different address?

1  A.       Just in case, you know, because we already had

2  did a couple of times in case the police was on and

3  everything, you didn't want to use the same address and

4  make it hot.

5  Q.       What happens after you send the money?

6  A.       The drugs was supposed to have been sent off,

7  but I never received them.

8  Q.       What do you do when they don't come?

9  A.       I wait a while to see if they going to come or

10 if the police come and if the police had caught it in

11 between, and  I called the person --   I called  Steve

12 Campbell and the guy that's working at     UPS for a

13 tracking number to track the package.

14 Q.       Did you get a tracking number?

15 A.       Yes.

16 Q.       What did you find out?

17 A.       That the tracking number was no good.

18 Q.       What do you do at that point?

19 A.       I tried to investigate a little more.     I called

20 a person to try to find out why the tracking number

21 wasn't working.  So, a series of phone calls back and

22 forth to realize pretty much that it wasn't coming.

23 Q.       Was that a problem for you?

24 A.       Yes.

25 Q.       Why was it a problem for you?

1  A.      Because  I was responsible for the shipment and

2  the drugs, and  I didn't have any -- either.

3  Q.      What?  You didn't have either what?

4  A.      The money or the drugs.

5  Q.      You were responsible to who for that?

6  A.      Mr.  Goodwin.

7  Q.      What did you do eventually when the package

8  didn't show up?

9  A.      Several hours later  I go down to the

10  "Ponderosa."

11  Q.      And who's there?

12  A.      Mr.  Goodwin.

13  Q.      What conversation did you have with    Mr.  Goodwin?

14  A.      The same conversation   I had with my cousin and

15  Steve  Campbell and the   UPS guy about what we thought

16  happened to the package or what could have happened and

17  so forth.

18  Q.      What did  Mr.  Goodwin say when you told him you

19  didn't have the money or the drugs?

20  A.      That we had to figure out what happened.  We had

21  to figure out something to figure out you know had to

22  figure out what happened what went wrong or that

23  someone somebody did something.

24  Q.      Do you recall   Mr.  Goodwin saying anything

25  particular concerning that event, other than you had to

1 figure out what happened?

2 A.      Oh.   I needed to go down there and check into

3 it.

4 Q.      Why did he say you needed to go down there and

5 check into it?

6 A.      Because it was my connect, my family, my friends

7 and my problem.

8 Q.      Was there any discussion about the money that

9 Mr. Goodwin had lost?

10 A.      Yeah, because we had to get the money or the

11 drugs back.

12 Q.      Who had to get them?

13 A.      Well, I did.

14 Q.      Did you -- what did you did after that

15 conversation with  Mr. Goodwin?

16 A.      The next morning  I flew to  Houston.

17 Q.      What occurred in  Houston?

18 A.      A series of meetings with my cousin Steve, the

19 UPS guy, trying to determine where it went wrong or

20 what happened.

21 Q.      Were you able to determine what happened to the

22 drugs?

23 A.      Not really what happened.    I had to assume,

24 because no one had an answer.

25 Q.      What did you do after you investigated what

1  happened?

2  A.      After a day or two,   I realized  I won't be able

3  the recover the money or the drugs, so I came back --      I

4  flew back to  Washington.

5  Q.      Did you have a conversation with    Mr. Goodwin

6  when you got back without the money or the drugs?

7  A.      Yes.

8  Q.      What was that conversation?

9  A.      That somebody screwed us over and the police

10  didn't catch it.  It was -- you know, somebody screwed

11  us over, because if the police had caught it, they

12  would have came, and that we needed to find a new way

13  and a way to make up for that money -- that loss we

14  took.

15  Q.      During that discussion with    Mr. Goodwin, what

16  new way did you all come up with?

17  A.      Driving.

18  Q.      Who was to drive?

19  A.      I was.

20  Q.      What -- initially, when you went down there by

21  car, what vehicle did you drive?

22  A.      A rental car.

23  Q.      Who gave you the money to go back down and get

24  more drugs?

25  A.      Mr. Goodwin.

1  Q.      How were you going to -- how were you making up

2  for the money he had lost?

3  A.      By getting -- keep going to get more quantities

4  and not really making any profit or getting paid off of

5  it.  Just continue -- just to keep running.

6  Q.      When you started driving -- during the time that

7  you drove down there, you indicated you drove rental

8  cars?

9  A.      Yes.

10  Q.     Did you drive other vehicles, too?

11  A.      Personal vehicles and vehicles that were

12  supplied to me, and rental cars.

13  Q.      All right.  The first time you drove down there,

14  were you by yourself or with someone?

15  A.      Friend of mines from   Baltimore was with me.

16  Q.      Who was it who went with you on the first trip?

17  A.      Rodney green.

18  Q.      Any trouble on that first trip?

19  A.      Yes.

20  Q.      Okay.  Approximately when was that first trip?

21  A.      I'm not sure of the time.

22  Q.      What?

23  A.      I'm not sure of the date and time.

24  Q.      Do you recall that particular trip with     Mr.

25  Green?

1  A.      Yes.

2  Q.      What kind of vehicle were you in?

3  A.      A Chrysler Concord.

4  Q.      Was that a rental vehicle?

5  A.      Yes.

6  Q.      Who rented the vehicle?

7  A.      Julio Martinez.

8  Q.      Who's Julio Martinez?

9  A.      He's the best friend of my best friend's

10 brother.

11 Q.      The best friend of your best friend's brother?

12 A.      Right.

13 Q.      Who is your --

14 A.      Oh.  Antoine  Jones.

15 Q.      Antoine  Jones is your best friend?

16 A.      Right.

17 Q.      And Antoine's brother is who?

18 A.      Rashard  is  Julio's best friend.

19 Q.      Rashard  Jones?

20 A.      Yes.

21 Q.      So, Julio  Martinez is  Rashard  Jones' best

22 friend?

23 A.      Right.

24 Q.      And Antoine  Jones is your best friend?

25 A.      Right.

1  Q.      Why did you need to have   Julio  Martinez assist

2  you with renting the car?

3  A.      Because he knew some friends that worked at the

4  Budget rental car that can get a deal and we could rent

5  a car without a credit card and so forth.

6  Q.      Did Mr. Martinez in fact rent the car for you?

7  A.      Yes.

8  Q.      I'm going to show you what's been marked as

9  Government's Exhibit R-4.

10          Do you recognize that document?

11 A.      Yes.

12 Q.      What is that?

13 A.      The rental agreement.

14 Q.      Did you keep a copy of that in the vehicle while

15 you were driving it?

16 A.      Yes, ma'am.

17 Q.      Does that refresh your recollection concerning

18 the date you would have gone out in the vehicle?

19 A.      Yes.

20 Q.      What date was it that you picked up the rental

21 vehicle?

22 A.      2/2/02 -- 2/12/02.

23 Q.      Let me show it to you again.

24          Can you read the date when it went out?

25 A.      Oh.  3/12/03.

1  Q.      Does that sound about right to you?

2  A.      Yes.

3  Q.      I'm putting it up on the screen.

4          Does it indicate who the person was who leased

5  the car -- the renter?

6  A.      Julio.

7  Q.      Is that the  Mr. Martinez you're referring to?

8  A.      Yes.

9  Q.      Is that his home information there, his home

10 number and his home address?

11 A.      Yes.

12 Q.      And his date of birth?

13 A.      Yes.

14 Q.      Did Mr. Martinez go with you to   Texas?

15 A.      When we left?

16 Q.      When you left in the vehicle, was    Mr. Martinez

17 in the vehicle?

18 A.      No, ma'am.

19 Q.      Who drove to  Texas with you?

20 A.      Me and  Rodney.

21 Q.      Did you take anything with you when you went to

22 Texas?

23 A.      Money.

24 Q.      Okay.  How -- about how much money did you take

25 on this trip?

1  A.      $90,000.

2  Q.      Was it always $90,000?

3  A.      No.  It varied from $90,000 to $180,000.

4  Q.      Depending upon what?

5  A.      How many keys  I was purchasing.

6  Q.      Who gave you the money for each of these trips

7  you made to  Texas?

8  A.      Mr. Goodwin.

9  Q.      Did all of the money come from   Mr. Goodwin for

10 all of the trips?

11 A.      Sometimes it did and sometimes it didn't.

12 Q.      Well, for this trip in particular do you recall

13 if all of the money came from   Mr. Goodwin?

14 A.      On this trip in particular   I picked it up all

15 from him, yes.

16 Q.      Do you know where he was getting the money from?

17 A.      For this trip in particular I didn't know

18 exactly where he was getting it from.      I assumed.

19         MR. MONTEMARANO :  Objection.

20         BY MS. JOHNSTON:

21 Q.      Again, Mr. Thurman, you can't testify as to what

22 you assume.

23 A.      Okay.

24 Q.      Mr. Goodwin delivered the money to you --

25 A.      Yes.

1  Q.       -- or you picked it up from him?

2  A.       Right.

3  Q.       How was it packaged and put in the vehicle?

4  A.       In behind the seat in different stash cans that

5  I had.

6  Q.       Can you describe the stash cans that were used

7  to take the money down there?

8  A.       False bottom cans like Fix-a-Flat, hair spray

9  and different household cans.

10  Q.       Where did you get those different kinds of

11  household cans?

12  A.       Mr. Goodwin.

13  Q.       Let me show you again P-69.

14           Do you recognize any of the items that are on

15  that table there?

16  A.       Yeah, the Fix-a-Flat can.

17  Q.       Let me put it up on the screen and you can show

18  us the Fix-a-Flat can.

19           Again, this picture is from the    Anacostia

20  apartment, the "Ponderosa;" correct?

21  A.       Yes.

22  Q.       And if you could point to the Fix-a-Flat can.

23  A.       (Witness indicating.)

24  Q.       And that's where you put the yellow lines on?

25  A.       Yes.

1  Q.      How does that work?

2          Where's the false compartment in it?

3  A.      In the bottom.  The bottom unscrews.

4  Q.      Let me show you a couple of items here that have

5  been marked as Government's Exhibit 32 and 33.

6          Do you recognize those items?

7  A.      Yes.

8  Q.      What are they?

9  A.      Stash cans.

10 Q.      Was it cans like this that you used for the

11 money?

12 A.      Yes, and hair spray cans.

13 Q.      Hair spray cans?

14         Any other others you can think of?

15 A.      Fix-a-Flat, hair spray, and he even had soda

16 bottles.

17 Q.      How did the soda bottles work?

18 A.      They pulled apart.

19 Q.      Can you describe that for us?

20 A.      They pulled apart in the middle.

21 Q.      Did they have soda in them?

22 A.      In the tops and the bottoms, but not in the

23 middle.  The middle was hollow.

24 Q.      Who gave you these containers?

25 A.      Mr. Goodwin.  Some  I later purchased at a store.

1  Q.      Where would you purchase them?

2  A.      Called -- a store called Starships.

3  Q.      Excuse me?

4  A.      A store called Starships.

5  Q.      How did you learn about that store?

6  A.      By making runs, going up and down, and other

7  people --  Steve  Campbell and different people.

8  Q.      Okay.  Let me show you what's been marked and

9  introduced as Government's    Exhibit 27.

10         What's that?

11  A.      A stash bottle.

12  Q.      Is that similar to the ones that you got from

13  Mr. Goodwin?

14  A.      Yes.

15  Q.      Did you have any difficulties on your way down

16  to Houston in the rental car with the money in the

17  various stash locations and in the panels or

18  compartments?

19  A.      No.  We made it down safely.

20  Q.      Where did you arrive?

21  A.      In Houston.  In  Houston,  Texas.

22  Q.      What did you do once you got to    Houston?

23  A.      Got a hotel and then went around to     Marcolin .

24  Q.      When you went around to    Marcolin , did you take

25  the money with you at that time?

1 A.      Yes.

2 Q.      Did you have any problems before you went to

3 Marcolin ?

4 A.      No.  Not before  I went to  Marcolin , no.

5 Q.      What happened when you got to    Marcolin ?

6 A.      I went to look for my cousin and    Steve  Campbell

7 and to go see my family members.

8 Q.      Were  Mr.  Campbell and   Mr.  Ross around?

9 A.      Not at that particular moment.  We had to come

10 back later.

11 Q.      You said you also met with other family members?

12 A.      Yes.

13 Q.      Was  Mr.  Green with you at the time?

14 A.      Yes.

15 Q.      Where did you go from?

16 A.      We went back to the hotel and to get something

17 to eat.

18 Q.      Who left the hotel to get something to eat?

19 A.      Me and  Mr.  Green.

20 Q.      Okay.  Did you still have the money at that

21 time?

22 A.      Yes.

23 Q.      Did there come a time when something happened to

24 you while you were in the vehicle?

25 A.      Oh.  That was, like, later on that night when     I

1  was going to see a friend.

2  Q.      So let me get the chronology correct.  After you

3  went around to  Marcolin  and went back to the hotel to

4  get something to eat, you went out with     Mr. Green to

5  get something to eat?

6  A.      Right.  Yes, ma'am.

7  Q.      Returned to the hotel?

8  A.      Yes.

9  Q.      And then who went out later that night?

10 A.      I went out later on that night.

11 Q.      Where is the money at the time you go out?

12 A.      Still stashed in the car.

13 Q.      What happens when you go out that night?

14 A.      I was on my way over to a friend's house, and     I

15 was robbed --  I was attempted to get robbed.

16 Q.      Describe for us what occurred.

17 A.      I pulled up, was starting to park and

18 everything, and two guys walked up on me and asked me

19 for my money and my car.

20 Q.      Were they armed?

21 A.      Yes.

22 Q.      What were they armed with?

23 A.      Handguns.

24 Q.      What did you do when they asked you for your

25 money and your car?

1  A.      Proceeded to give them the money out of my

2  pockets and, like, the watch and bracelet    I had on, and

3  my keys to my car, and just about everything    I had in

4  my pockets, and my clothes because they took my clothes

5  and my shoes.

6  Q.      Were you injured during that event?

7  A.      Yes.

8  Q.      Describe your injuries.

9  A.      To my back, leg.  Scratches, cuts.

10 Q.      Where did those come from?

11 A.      Because once they took my car, there was a fence

12 separating an apartment complex and car dealership, and

13 they told me so I couldn't see,    I guess, which way they

14 went or whatever,   I had to jump over this, like, barbed

15 wire fence down into these new cars.  So when      I jumped

16 over, I fell into the -- into a new car through the

17 windshield -- the back windshield.

18 Q.      Why did you jump over the fence and fall into

19 the car?

20 A.      Jump or get shot.

21 Q.      Do you recall the date of that incident?

22 A.      No, I don't recall the date.

23 Q.      Let me show you what's been marked -- what

24 happened after you fell into the car?

25 A.      I got about -- got out of the parking lot of the

1  dealership and went to a hotel where they called the

2  police and ambulance.

3  Q.      Were you dressed at this time?

4  A.      No.  I just had my boxer shorts on and socks.

5  Q.      Do you recall the date of that incident?

6  A.      No, I don't recall the actual date.

7  Q.      Let me show you what's been marked as

8  Government's Exhibit R-11.

9          Did you file a police report?

10  A.      Yes.

11  Q.      Do you recognize this as being a     Houston Police

12  Department printout?

13  A.      Yes.

14  Q.      Is there a date and reference as to when the

15  incident occurred?

16  A.      Yes.

17  Q.      What was the date of the incident?

18  A.      3/17/02.

19  Q.      Does it indicate who the complainant or the

20  victim was?

21  A.      Me.  Myself.

22  Q.      Where were you taken?

23  A.      To Memorial Hospital in   Houston,  Texas.

24  Q.      How long were you in the hospital?

25  A.      For several hours.  Until the next day,

1  probably.

2  Q.      Well, you can't testify as to "probably."

3  A.      It was the next day, because it happened at

4  night.  So,  I got released the next morning.

5  Q.      When you get released the next morning, who

6  picked you up?  Or did you take a car somewhere?

7          Did you take a cab or were you picked up?

8  A.      Oh.  My cousin picked me up, because     I didn't

9  have a car.  The car was stolen.

10  Q.      And your cousin would have been who?

11  A.      Steven Ross.

12  Q.      Where did you go at that point?

13  A.      We went back to the hotel first.

14  Q.      Was Mr. Green still at the hotel?

15  A.      Yes.

16  Q.      Did you tell him about what happened?

17  A.      Yes.  Well, he already knew.

18  Q.      Were you ever contacted by the police after you

19  got released from the hospital about the car?

20  A.      Yes.  Well, yes and no because we contacted

21  them.

22  Q.      So you called the police.

23  A.      Right.

24  Q.      What information did you get about the vehicle?

25  A.      That the car was in a parking lot not too far

1   from the scene where   I got robbed at.

2   Q.      Did you go down there?

3   A.      Yes.

4   Q.      Were you able to get into the car?

5   A.      Yes.  The car was open.

6   Q.      What did you find in the car?

7   A.      That the car was -- there was nothing wrong with

8   the car.  The stash cans and the money behind the seat

9   was still there.

10  Q.      Were you relieved to see that?

11  A.      Yes.

12  Q.      Where did you go at that point?

13  A.      Trying to get a locks  mith to get -- cut a key to

14  the car, because my keys was took when they took the

15  car.

16  Q.      Were you able to get a lock   smith?

17  A.      No.  Because of the year and the make of the

18  car, you can't just cut a key to it.

19  Q.      Who did you contact next?

20  A.      A Chrysler dealership in    Houston,   Texas.

21  Q.      Were they able to assist you with the key?

22  A.      Yes.   I got the car towed there, and the car was

23  about to get the key cut but you need a key code from

24  when you buy the car saying you're the owner of the

25  car, and that's where the problem came since the rental

1 agreement wasn't in my name.

2 Q.      So, what happened?

3 A.      The dealership called Budget and let Budget know

4 it was an unauthorized driver driving the car and

5 getting a key, so they wouldn't release it to me.  So      I

6 had to call  Julio and get him to fly down to      Texas to

7 get the car to pick up the car.

8 Q.      Did Julio actually do that?

9 A.      Yes.

10 Q.      What happened when Julio got here?

11 A.      When Julio got there, we went to pick up the car

12 from the dealership.

13 Q.      Who's "we?"

14 A.      Oh.  Me,  Steven Ross,  Rodney, and  Julio.

15 Q.      What happened when you got to the dealership?

16 A.      Got to the dealership; he showed them his

17 driver's license and  I. D.; they called Budget and

18 confirmed who he was -- who he said he was, and they

19 let us pick up the car.

20 Q.      Let me show you what's been marked as

21 Government's Exhibit   R-6 and ask you if you recognize

22 this document.

23        R-6, counsel.

24 A.      Yes.  This is the receipt or the invoice from

25 getting the key.

1 Q.      Is that in your name?

2 A.      Yes.

3 Q.      Did you get a copy of this when you were down

4 there getting the key?

5 A.      Yes.

6 Q.      All right.

7         THE COURT:  Ms. Johnston?

8         MS. JOHNSTON:  Yes, sir.

9         THE COURT:  Are we at an appropriate --

10        MS. JOHNSTON:  If  I can just go two questions

11 with this document.

12        THE COURT:  All right.

13        MS. JOHNSTON:  Thank you,   Your Honor.

14        BY MS. JOHNSTON:

15 Q.      Looking at Government's Exhibit R6, is your name

16 on that document?

17 A.      Yes.

18 Q.      What address is that that you used there?

19 A.      My uncle's house.

20 Q.      All right.  And the date that you got the key is

21 what date?

22        Is that the invoice date?

23 A.      Yes, 2/15/02.

24        No.  The day I picked it up?

25 Q.      Yes.

1  A.       Oh.  3/18.

2  Q.       3/18?

3  A.       Yes.

4  Q.       How much did you have to pay?  Do you recall?

5           Can we see it on this document?

6           Let me zoom in.

7  A.       $101 .98.

8  Q.       What did you do with   Mr. Julio?

9           Did he remain there with you all in     Texas?

10  A.      No.   I took him back to the airport.

11  Q.      The same day he got there?

12  A.      Yes.

13          MS. JOHNSTON:   Your Honor, that's a good place

14 to break.

15          THE COURT:  All right, we will recess until

16 2:15.

17                  (Off the record at 1  :06 p.m.)

18                  (On the record at 2  :17 p.m.)

19          MR. MONTEMARANO :  Two things we would like to

20 bring to  Your Honor's attention.

21          THE COURT:  Yes.

22          MR. MONTEMARANO :  First,  Ms. Greenberg has just

23 filed a combined response relative to the jury

24 instructions.  There are about ten or so at issue.

25          THE COURT:  Okay.

1          MR. MONTEMARANO : We'd like to discuss them

2 Tuesday at lunchtime among ourselves and get our ducks

3 in a row and have that as a date.     I'm guessing we

4 might want to ask the court for an extra half hour at

5 lunch to make sure so we are all together in one place

6 and can continue sorting these things out.

7          MS. JOHNSTON:    Your Honor, the government

8 opposes that.  They have Mondays.

9          THE COURT:  Let me see if you really need an

10 hour and a half.   I'll talk to you about that     Monday

11 morning.

12          MR. MONTEMARANO : Secondly, we understand that

13 Detective  Sakala  will be called later today, and we

14 would like to voir dire him out of the presence of the

15 jury.

16          THE  COURT:  On what?

17          MR. MONTEMARANO : His qualifications.

18          MS. JOHNSTON:    Your Honor, he is not going to

19 get on today.  Not at the rate we're going, no.

20          MR. MONTEMARANO : Fair enough.  Better early

21 than late.

22          Thank you, Your Honor.

23          THE COURT:  Bea, you may bring the jury in.

24                    (Witness resumes the stand.)

25                    (Jury returns at 2 :20 p.m.)

1           THE COURT:  You may proceed.

2           BY MS. JOHNSTON:

3 Q.      Mr. Thurman, when we broke for lunch you were in

4 Texas and you had gotten the car back with the key?

5 A.      Yes.

6 Q.      All right.  And you had sent    Mr. Martinez back

7 to Maryland; is that correct?

8 A.      Yes, ma'am.

9 Q.      What happened -- at that point in time do you

10 still, then, have the money for the drug transaction?

11 A.      Yes.

12 Q.      What happens at that point?

13 A.      I drop him off at the airport and start off to

14 go back towards the hotel.  Then    I was in a car

15 accident and back in the hospital.

16 Q.      Was anyone with you when you had the car

17 accident?

18 A.      No, ma'am.

19 Q.      Was it the same car?

20 A.      Yes.

21 Q.      How long were you in the hospital that time?

22 A.      One day.

23 Q.      What happened to the car?

24 A.      It was towed from the scene.

25 Q.      Let me show you what's been marked as    R-5 and

1  ask you if you can identify that picture.

2          Do you recognize that photograph?

3  A.      Yes.

4  Q.      What is that?

5  A.      The Chrysler Concord   I was driving.

6  Q.      Are we able to see any damage on that car?

7          Let me put it up on the screen.

8          Where is the damage on the vehicle?

9  A.      The front.

10  Q.      Were you -- did you get back -- was the money

11  still in the car at the time of the accident?

12  A.      No, it was in the hotel.

13  Q.      What did you do when you got out of the

14  hospital?

15  A.      Waited at the hotel to figure out what was my

16  next move and how   I was going to get around, because      I

17  didn't have any   I. D. because they took my    I. D. and

18  everything, so   I couldn't rent another car or get on a

19  plane. So,  I just made calls to    Steve and everybody to

20  check and see what   I could do to try to finish what      I

21  came here to do and to get home.

22  Q.      Did you finish what you came there to do?

23  A.      Yes.

24  Q.      What did you do -- how much drugs did you pick

25  up on that trip?

1  A.      Five and a half to seven.

2  Q.      How did you get it back to this area?

3  A.      Since the car had got totalled then and then

4  couldn't drive back,  I was going to try the   UPS method

5  one more time.

6  Q.      Were you successful in sending it by     UPS?

7  A.      Yes.

8  Q.      Where did you have it sent to?

9  A.      This was to my house again.

10  Q.      How did you get back from    Houston?

11  A.      I flew.

12  Q.      What about  Mr. Green?

13  A.      We both -- we flew together back.

14  Q.      Where did you get the money to fly back?

15  A.      It was wired to me.

16  Q.      Did you make any calls before you had the money

17  wired to you?

18  A.      I called back up to   Washington,  D. C. to  Mr.

19  Goodwin.

20  Q.      What was your conversation with     Mr. Goodwin when

21  you called back up there?

22  A.      That  I needed money to pay for the flights and

23  to get back and all the money that     I had spent since   I

24  was in the car accident for hotel and stuff because I

25  had to stay down there longer than    I was supposed to.

1 Q.      What did  Mr. Goodwin tell you?

2 A.      He'll get somebody to wire it to me.

3 Q.      Was money wired to you and   Mr. Green?

4 A.      It was wired to my cousin and   Mr. Green.

5 Q.      Why was it wired to your cousin and not to you

6 directly?

7 A.      Because my  I. D. and everything was stolen.

8 Q.      Let me show you what's been marked as

9 Government's Exhibit   R-3 and introduced in evidence.

10        Do you see that money -- Western Union money

11 transfer?

12 A.      Yes.

13 Q.      Do you recognize that?

14 A.      Yes.

15 Q.      What is that?

16        You have to speak into the --

17 A.      Oh.  The sheet saying he received the money to

18 pick it up.

19 Q.      Who actually picked up the money?

20 A.      Steven  Ross.

21 Q.      Were you with him when he picked it up?

22 A.      Yes.

23 Q.      Does that reflect the location where you picked

24 it up?

25 A.      Yes.

1  Q.      And the amount of money that you all received?

2  A.      Yes.

3  Q.      How much money was it?

4  A.      $587.50.

5  Q.      Can you read the writing on this?

6          How much  money does it say it was?

7  A.      Oh.  $687.

8  Q.      Do you know who actually went to Western Union

9  and sent that money to you?

10 A.      No.

11 Q.      How soon after you spoke to   Mr. Goodwin did you

12 learn that the money was being wire-transferred?

13 A.      A couple hours.

14 Q.      Let me show you another page of Government's

15 Exhibit R-3.

16         Do you recognize that Western Union?

17 A.      Yes.

18 Q.      Were you with  Mr. Green when that money was

19 picked up?

20 A.      Yes.

21 Q.      Was that picked up at the same place as the

22 payment to  Mr. Ross?  The Western Union that   Mr. Ross

23 received.

24         Do you recall?

25 A.      It was a different location.

1  Q.      Once you picked up the money, did     Mr.  Ross give

2  you the money?

3  A.      Yes.

4  Q.      What did you and   Mr.  Green do with the money?

5  A.      Purchased plane tickets, paid for the hotel and

6  other things we needed to get ready to leave, and get a

7  police report so I can get on the plane.

8  Q.      Let me show you Government's Exhibit Goodwin 15.

9          Do you see these two Western Union documents?

10 A.      Yes.

11 Q.      And the first one that    I'm showing you

12 indicates a sender of "   Richard Willis."

13         Do you see that?

14 A.      Yes.

15 Q.      The date is March 18 of '02?

16 A.      Yes.

17 Q.      Same date as when they were picked up?

18 A.      Yes.

19 Q.      Do you know a   Richard Willis?

20 A.      Yes.

21 Q.      Who is  Mr. Willis?

22 A.      A friend of   Mr.  Goodwin's.

23 Q.      Where did you meet    Mr. Willis?

24 A.      At the "Ponderosa."

25 Q.      That apartment in    Anacostia ?

1  A.       Yes.

2  Q.       And then the second one in there is another

3  Western Union transfer?

4  A.       Yes.

5  Q.       Okay.  Who was the sender on this one?

6  A.       Tiffany Vessels.

7  Q.       Who is  Ms. Vessels?

8  A.       Mr. Goodwin's girlfriend.

9  Q.       How did you get back to   Maryland?

10  A.       Once  I received the police report so    I can get

11  on the plane, we flew.

12  Q.       Do you remember what airlines you flew on?

13  A.       Southwest.

14  Q.       I want to show you Government's Exhibit R-10 and

15  ask you if that refreshes your recollection concerning

16  what date you flew.

17  A.       Yes.

18  Q.       What date did you fly back?

19  A.       March 22, '02.

20  Q.       You didn't have any problems on the flight, did

21  you?

22  A.       No.

23  Q.       Once you got back, did there come a time when

24  that  UPS package arrived?

25  A.       Yes, the following day.

1  Q.      What did you do once you got back here and the

2  package arrived?

3  A.      Contacted  Mr.  Goodwin.

4  Q.      Did you eventually meet with    Mr.  Goodwin?

5  A.      Yes.

6  Q.      Where did you meet with him and what did you

7  give him?

8  A.      I met with him at the "Ponderosa" and gave him

9  five and a half to seven keys.

10 Q.      How did you package them to send them up?

11 A.      In a cooler.

12 Q.      The same way they were packaged before?

13 A.      Yes.

14 Q.      How did you make other -- once you turned them

15 over to  Mr.  Goodwin, did you receive any payment from

16 him for those?

17 A.      No.  I was to wait until he sells them to make

18 money.

19 Q.      Excuse me?  Can you repeat that?

20 A.      I was to wait until he sells them and make some

21 money.  Then  I can get paid.

22 Q.      Do you recall what he paid you for that trip

23 that involved the carjacking and the car accident?

24 A.      I can't recall the exact amount.

25 Q.      Did he pay you in cash or with drugs?

1 A.        Probably had both.

2 Q.        Now, after the -- this incident, did you

3 continue to make trips to    Texas?

4 A.        Yes.

5 Q.        Do you know about how many trips you made to

6 Texas when you picked up drugs and brought drugs back?

7 A.        Five.   Five to eight.

8 Q.        Five to eight?

9 A.        Yes.

10 Q.        On those trips, did   Mr.  Green go with you on all

11 of the trips?

12 A.        No.

13 Q.        Did other people go with you?

14 A.        Other peoples.

15 Q.        Who were some of the people who traveled on some

16 of the trips with you?

17 A.        Katherine  Demara .

18 Q.        Who's Katherine   Demara ?

19 A.        My girlfriend.

20 Q.        Who else?

21 A.        Xavier Moore,   John  Irby and Antoine   Jones.

22 Q.        Antoine  Jones?  Is that the Antoine J   ones you

23 told us about this morning?

24 A.        Yes.

25 Q.        Your best friend?

```
 1  A.      Yes.

 2  Q.      Who is  Mr.  Irby ?

 3  A.      A friend of  Mr.  Goodwin's.

 4  Q.      How did you meet   Mr.  Irby ?

 5  A.      Through  Mr. Goodwin.

 6  Q.      What's his  first  name?

 7  A.      John.

 8  Q.      Does he go by any nicknames?

 9  A.      "John  D."

10  Q.      And you mentioned   Xavier Moore.

11          Who is  Mr. Moore?

12  A.      My friend.

13  Q.      Did you meet   Mr.  Moore through   Mr.  Goodwin?

14  A.      No.

15  Q.      Does  Mr.  Moore go by any nicknames?

16  A.      "Zay."

17  Q.      When you went on these additional  trips, what

18  vehicles did you use?

19  A.      A Cadillac  SDS , conversion van, and a mobile

20  home.

21  Q.      The  Cadillac  SDS .  Whose vehicle was that?

22  A.      It was mines, but it was in Antoine    Jones' name.

23  Q.      Why did you have it in    Mr. Jones 'name?

24  A.      Because  I couldn't acquire tags in my own name.

25  Q.      Do you know how many trips you made in the
```

1  Cadillac?

2  A.      Two to three.

3  Q.      Did you have any incidents when you made the

4  trips in the  Cadillac?

5  A.      No.

6  Q.      Do you recall who went with you when you drove

7  the Cadillac down there?

8  A.      I went by myself once, and Antoine and      Rodney.

9  Q.      When you went down in the   Cadillac, where would

10  you carry the money?

11  A.      In between the seats and trunk.

12  Q.      Was it packaged as you described for us this

13  morning?

14  A.      Sometimes it was and sometimes it wasn't.

15  Q.      Did you use those containers we discussed this

16  morning when you used the   Cadillac to go take the money

17  --

18  A.      No.   I just put them between the seats.

19  Q.      Was the money bundled?

20  A.      Yes.

21  Q.      What was the range of the money -- the amount of

22  money you took down there on the two to three trips you

23  made in the  Cadillac?

24  A.      $90,000 to $180,000.

25  Q.      If you were taking $90,000, approximately how

1  much cocaine were you bringing back?

2  A.      Five to six keys.

3  Q.      If you were taking $180,000, how much cocaine

4  were you bringing back?

5  A.      Ten to 12.

6  Q.      When you were using your   Cadillac, who was

7  providing the money?

8  A.      Mr. Goodwin.

9  Q.      Did he provide all of the money to go down when

10 you used the  Cadillac?

11 A.      Yes.

12 Q.      Did there come a time when someone else was

13 providing money?

14 A.      Yes.

15 Q.      When did that occur?  Before or after the

16 incident with the rental car and the car carjacking?

17 A.      After.

18 Q.      Was it after the rental car?  Was the     Cadillac

19 the next car that you used to make the trips?

20 A.      Yes.

21 Q.      And during the time that you used the    Cadillac,

22 for each one of those trips did all of the money come

23 from Mr. Goodwin?

24 A.      No.

25 Q.      When did that change?

1  A.       I'm not sure of the date.

2  Q.       Okay.  Describe for us how it changed.

3  A.       I met him at certain locations and we waited on

4  other people to bring money.

5  Q.       Okay.  Who's -- you said, "  I met him."

6           Who did you meet?

7  A.       Mr. Goodwin.

8  Q.       And you said at certain locations.

9           What locations?

10 A.       The school.

11 Q.       What school?

12 A.       On South  Dakota Avenue.

13 Q.       Who told you to meet at that school?

14 A.       Mr. Goodwin.

15 Q.       Did you go with  Mr. Goodwin, or did you both

16 arrive  in separate vehicles at the school?

17 A.       Separate vehicles.

18 Q.       Do you recall what kind of vehicle    Mr. Goodwin

19 would be driving at that time?

20 A.       I can't recall.

21 Q.       How did you know to go to the school?

22 A.       Because we met there before.

23 Q.       Excuse me?

24 A.       Because we met there before.

25 Q.       What were the circumstances that you met there

1  before?

2  A.      Same circumstances.  Just somewhere to meet at.

3  Q.      Okay.  Had you gotten money from anyone -- when

4  you met him there on the prior occasions before you

5  went there to get money from other people, did you see

6  anyone at the school?

7  A.      It would be several people there, like the same

8  ones that be at the "Ponderosa" and different people he

9  was meeting that was coming to see him.

10  Q.      Where was this school located?

11  A.      In Washington,  D. C.

12  Q.      I want to show you what's been introduced as

13  Government's Exhibit   P-184.

14          Do you recognize this photograph?

15  A.      Yes.

16  Q.      What is that?

17  A.      The school.

18  Q.      Which school?

19  A.      Paula's.

20  Q.      Now, you indicated there came a time when you

21  went to that school and other people came to give money

22  to  Mr.  Goodwin and you.

23  A.      Right.

24  Q.      Who was it that came to give money to you and

25  Mr.  Goodwin?

1  A.       Oh.   Paula.

2  Q.       Had you met  Paula before that time?

3  A.       Like, once or twice.

4  Q.       Where did you meet her originally?

5  A.       The school.

6  Q.       Who introduced you to her?

7  A.       Mr. Goodwin.

8  Q.       Do you see her here in the courtroom?

9  A.       Yes.

10 Q.       Would you identify her for the record, where

11 she's seated in relation to me?

12 A.       The second person in the blue shirt, looks like.

13 Q.       Excuse me?

14 A.       In the blue shirt.

15 Q.       Okay.  Is there another color on her top

16 garment, too?

17 A.       Yellow.

18 Q.       We'd ask the record to reflect the witness has

19 identified  Paulette  Martin as " Paula."

20         THE  COURT:  The record will so indicate.

21         BY MS.  JOHNSTON:

22 Q.       What occurred at the school when you went there

23 with  Mr.  Goodwin to pick up money from other people?

24 A.       Just went there, then waited for -- waited to

25 get -- all the money to get there, and he had his half

1 and then she came with her half.

2 Q.      Do you know approximately how much money she

3 brought?

4 A.      I know approximately.

5 Q.      Did money come from anybody else other than      Mr.

6 Goodwin or  Ms. Martin?

7 A.      No.

8 Q.      What did you do with the money when you received

9 it from both of them?

10 A.      Took it to where   I was staying and proceeded to

11 get ready to go out of town.

12 Q.      What would you do with the money there?

13 A.      Stash it in the car.

14 Q.      And this is in the   Cadillac?

15 A.      Yes.

16 Q.      How many times did you meet    Ms. Martin at the

17 school while you were taking your shipments in the

18 Cadillac?

19 A.      One or two.

20 Q.      And when you made those trips, what did you do

21 with the drugs when you came back?

22 A.      Brought them back and gave them to     Mr.  Goodwin.

23 Q.      Did you actually ever hand the drugs to      Ms.

24 Martin during the trips in the     Cadillac?

25 A.      No.

1 Q.      Any discussions with  Mr. Goodwin concerning who

2 he was going to give the drugs to?

3 A.      Can you repeat the question?

4 Q.      Did you have any discussion with   Mr. Goodwin

5 about who was getting the drugs?

6 A.      Oh, yes.

7 Q.      What was that discussion?

8 A.      One-half to him and half to her.

9 Q.      In terms of the money that you took down, do you

10 know how much of the money came -- what portion of the

11 money came from her and what portion came from     Mr.

12 Goodwin?

13 A.      Half would be $90,000.

14 Q.      If it was $90,000?

15 A.      Half would be $90,000 out of $180,000.

16 Q.      So on these trips, now you were taking about

17 $180,000?

18 A.      Yes.

19 Q.      In addition to making the trips -- strike that.

20         In the trips in the   Cadillac, did anything out

21 of the ordinary happen?

22         Have any car accidents?

23         MR. MONTEMARANO :  Asked and answered,   Your

24 Honor.

25         THE WITNESS:  No.

1          THE COURT:  Overruled.

2          BY MS. JOHNSTON:

3 Q.       Any other traffic stops or any     carjackings  or

4 anything like that?

5 A.       No.

6 Q.       Everything went smoothly on those trips?

7 A.       Yes.

8 Q.       Did there come a time when you changed from

9 using the  Cadillac to another vehicle?

10 A.      Yes, to a conversion van.

11 Q.      How did you obtain the conversion van?

12 A.      Through " John D." and  Mr. Goodwin.

13 Q.      Explain that to us.

14         What do you mean by "through" them?

15 A.      It was brought to me by "  John D.", and  Mr.

16 Goodwin told him to bring it to me.

17 Q.      Had you known "John   D." or  John Irby before he

18 brought you the conversion van?

19 A.      Yes.

20 Q.      Had you ever seen him at the     Anacostia

21 apartment?

22 A.      Yes.

23 Q.      Ever see him with drugs?

24 A.      Yes.

25 Q.      Under what circumstances did you see him with

1  drugs?

2  A.      Getting drugs to sell.

3  Q.      Who was he getting the drugs to sell from?

4  A.      Mr. Goodwin.

5  Q.      Do you recall the first trip you made in the

6  conversion van?

7  A.      Yes.

8  Q.      Who was with you on the first trip?

9  A.      Mr. Irby.

10  Q.      I'm going to put on the screen there for you --

11  if you could look at that, Government's Exhibit P-234.

12          Do you recognize that vehicle?

13  A.      Yes.

14  Q.      What vehicle is that?

15  A.      That's the conversion van.

16  Q.      Now, there is a  District of  Columbia tag on

17  there that says, "D . C. Dealer."

18          Do you know what dealership that tag was for?

19  A.      Lobo's Discount.

20  Q.      Whose car dealership was that?

21  A.      Mr. Goodwin's.

22  Q.      Anyone else go with you on that first trip other

23  than John Irby?

24  A.      No.  Just me and  John Irby.

25  Q.      Where were you going initially on that trip?

1  A.      Louisiana.

2  Q.      Why were you going to   Louisiana?

3  A.      To a deal they had previously had done or

4  something.

5  Q.      How did you know that there had been a deal that

6  was previously done or set up?

7  A.      That was the information   I was given.

8  Q.      Who gave you that information?

9  A.      Mr. Goodwin and " John D."

10  Q.      Do you know where you went to in    Louisiana?

11  A.      I'm not sure of the city.

12  Q.      What occurred in   Louisiana?

13  A.      We got to   Louisiana to meet the guy we were

14  supposed to meet, but the deal didn't go through, so we

15  sat there for a couple of days and decided that the

16  deal wasn't going to go through, so we had to make

17  other arrangements or go back home.

18  Q.      What were the other arrangements that you made?

19  A.      I called my friend and family in     Houston.

20  Q.      What occurred -- when you say you called your

21  friends and family, who did you call in     Houston?

22  A.      Steven Ross and  Steven Campbell.

23  Q.      What happened when you called   Mr. Ross and  Mr.

24  King?

25  A.      They was like, come there and be ready for us.

1  Q.      Can you explain that to me?

2  A.      I called them and told them that we made a trip

3  to Louisiana, that the deal fell through, and    I still

4  was trying to get some product.  So he said if     I come

5  down, he'll be able to supply me.

6  Q.      Did you and  Mr. Irby then go down to  Houston?

7  A.      Yes.

8  Q.      How much drugs did you get from    Mr. Campbell?

9  A.      Five and a half.

10  Q.      When you went down there -- where was the money

11  stored on this first trip when you went to     Louisiana

12  but had to go on to   Houston?

13  A.      In the spare tire.

14  Q.      Have any problems with that?

15  A.      What do you mean?

16  Q.      Well, let me back up.

17          Describe for us how you put the money in the

18  spare tire.

19  A.      Oh.  Break the tire off the rim and put it in.

20  Then get the tire flipped back on the rim at a tire

21  shop.

22  Q.      Once you delivered the money, how much cocaine

23  did you pick up from   Mr. Campbell on that trip?

24  A.      About five and a half.

25  Q.      How did you -- where did you put them in the van

1  to bring them back?

2  A.      Back in the spare tire.

3  Q.      Did you have any problems with putting them back

4  in the spare tire?

5  A.      I couldn't get the tire to go on the rim.

6  Q.      What did you do?

7  A.      Took it to Sears Automotive.

8  Q.      What did they do there?

9  A.      Put the tire on the rim and blew it up.

10  Q.      Court's indulgence for a moment.

11          Now, did you have any problems coming back on

12  that trip?

13  A.      Got pulled over for speeding.

14  Q.      Any search of the vehicle when you got pulled

15  over for speeding on that trip?

16  A.      Can you repeat it?

17  Q.      This is your first trip in the van?

18  A.      Yes.

19  Q.      How many trips did you make in the van?

20  A.      Five or more.

21  Q.      On this -- when you got pulled over for

22  speeding, did they find the drugs in the conversion

23  van?

24  A.      No.

25  Q.      You got a ticket?

1  A.       I didn't;  Mr. Irby did.

2  Q.       When you got back, what did you do with the

3  vehicle?

4  A.       Met Mr. Goodwin.

5  Q.       Do you recall where you met him on this trip?

6  A.       The shop.  Lobo's.

7  Q.       Why did you meet him at Lobo's on this trip?

8  A.       When we called him, that's where we were at.

9  Q.       What was done with the van when you got to

10 Lobo's?

11 A.       Spare tire  tooken  from under the bottom and the

12 tire cut open.

13 Q.       Who did you give the drugs to?

14 A.       Mr. Goodwin.

15 Q.       Now, the money for that trip.  Do you know where

16 it came from?

17 A.       Mr. Goodwin.

18 Q.       Anyone else contribute money to that first trip

19 in the conversion van?

20 A.       No, not that one.

21 Q.       The remaining trips in the conversion van.

22          Were you on all of those trips in the conversion

23 van?

24 A.       Repeat it.

25 Q.       Were you on all of the trips in the conversion

1  van going down to   Texas?

2  A.      Yes.

3  Q.      So there were at least four or more trips;

4  correct?

5  A.      Yes.

6  Q.      When you made those four or more other trips,

7  was Mr. Irby with you on those trips?

8  A.      He was with me on one more trip.

9  Q.      Anything happen on that trip?

10  A.      No.

11  Q.      Did Mr. Irby ever have any problems when he

12  traveled between here and   Louisiana or here and   Texas?

13  A.      Not with me.  He was with someone else.

14  Q.      When he traveled and had a problem, was that

15  before you started using the conversion van or while

16  you were using the conversion van?

17  A.      While.

18  Q.      Was it after -- it was after the first trip you

19  made with him?

20  A.      After the second trip   I made with him.

21  Q.      Then let's talk about the second trip that you

22  made in the conversion van.

23          Mr. Irby was with you?

24  A.      Yes.

25  Q.      Anyone else?

1 A.       A female friend of mines.

2 Q.       Who would that be?

3 A.       Chante .

4 Q.       Any difficulties -- strike that.

5          Where did you get the money to take on that

6 second trip in the conversion van?

7 A.       Mr. Goodwin.

8 Q.       And did you see   Ms. Martin deliver any money for

9 that trip?

10 A.      No.

11 Q.      Do you know about how much money you took on the

12 second trip?

13 A.      About $180,000.

14 Q.      Did have any problems on the second trip

15 delivering the money or picking up the drugs?

16 A.      No.

17 Q.      When you take down about $180,000, how many

18 kilos do you bring back?

19 A.      Ten or 12, depending on the price.

20 Q.      Where would you store them in the conversion van

21 when you were bringing them back?

22 A.      Spare tire.

23 Q.      Did there come a time when the conversion van

24 was equipped with hidden compartments?

25 A.      Yes.

1  Q.      Was that after you made your second trip down

2  there?

3  A.      Yes.

4  Q.      Do you recall exactly when it was that they were

5  put into the vehicle?

6  A.      I can't recall the exact date or month.

7  Q.      You indicated after that second trip that     Mr.

8  Irby made with you that Mr.   Irby had a problem; is that

9  correct?

10 A.      Yes.

11 Q.      Could you describe for us what happened to     Mr.

12 Irby?

13         MR. WARD:  Objection,   Your Honor.

14         I think he said he wasn't with him at that time.

15         BY MS. JOHNSTON:

16 Q.      How did you learn about what happened to     Mr.

17 Irby?

18 A.      Goodwin.

19 Q.      Okay.  What did   Mr. Goodwin tell you?

20 A.      That Mr. Irby crashed in   Louisiana.

21 Q.      Crashed?

22         Did he tell you what kind of vehicle he crashed

23 in?

24 A.      I can't recall the vehicle.

25 Q.      What else did   Mr. Goodwin tell you about it?

1  A.      That he flipped the car and he crashed and they

2  didn't get a chance to do what they was supposed to do

3  down in  Louisiana either.

4  Q.      What did  Mr. Goodwin ask you to do?

5  A.      Wait for  Michael  Jackson to bring me the money

6  they had down in   Louisiana.

7  Q.      And to do what with the money?

8  A.      That had the money   I already had in   Houston.

9  Q.      Mr. Jackson was going to bring you the money

10  where?  Back here in   Maryland, or in   Houston?

11  A.      In  Houston.   I was already in   Houston.

12  Q.      How did you get contacted by    Mr. Goodwin?

13  A.      Cell phone.

14  Q.      Did you wait for   Mr. Jackson to bring the money

15  to  Houston?

16  A.      Yes.

17  Q.      Had you known   Mr. Jackson at that time?

18  A.      Yes.

19  Q.      Where did you know him from?

20  A.      Mr. Goodwin.

21  Q.      And where did you -- where were you introduced

22  to him?

23  A.      At the "Ponderosa."

24  Q.      What was the condition of    Mr. Irby?

25  A.      He was in the hospital with broken bones and

1 fractures.

2 Q.      Did Mr. Jackson get down to you with the money?

3 A.      Yes.

4 Q.      What did you do once he got there with the

5 money?

6 A.      Picked him up from the bus station and then took

7 him back to the bus station later on that day so he can

8 catch a bus back to  Washington,  D. C.

9 Q.      What did he give you when he got up there?

10 A.      $20-30,000.

11 Q.      What did you did with that money?

12 A.      Added that to what   I had.

13 Q.      Okay.  What did you get -- was there somebody

14 with you on that trip other than --

15 A.      Antoin e Jones and --

16 Q.      Anyone else that you can recall?  Or just     Mr.

17 Jones?

18 A.      Antoine  Jones and Katherine    Demara .

19 Q.      Any difficulties getting back on that trip?

20 A.      No.

21 Q.      I'm going to show you what's been marked as

22 Goodwin No. 22.

23          It's Page 1 in Goodwin 22, counsel.

24          The bottom of Goodwin 22, Page 1.

25          Do you recognize the medical center reference

1  there?

2  A.      Yes.

3  Q.      How you know that medical center?

4  A.      That was the medical center that "   John  D." was

5  at.

6  Q.      Is there a number for "John    D." listed

7  underneath it?

8  A.      Yes.

9  Q.      While I have this exhibit here, let me ask you

10 another question about this exhibit.  On the very next

11 page there's another reference to another medical

12 center.

13         Do you recognize that?

14 A.      No.

15 Q.      Do you recognize the name "   John  D." under there?

16 A.      Yes.

17 Q.      There's -- on another page there's an address.

18         Do you recognize that address and the telephone

19 number?

20 A.      Yes.

21 Q.      Whose is that?

22 A.      My mother's address.

23 Q.      And telephone number?

24 A.      Yes.

25 Q.      On that page there's a number of 889-6771-5000.

1          Do you recognize that?

2 A.     Yes.

3 Q.     How do you recognize that?

4 A.     It's Xavier Moore's pager number -- no, house

5 number.

6 Q.     The "5000."  What does that refer to?

7 A.     My code.

8 Q.     Finally, on this page here, there's a notation,

9 "Call Mike" at the top, with a telephone number (202)

10 409-3452, with a dash and "5000."

11          Do you recognize that information?

12 A.     Yes, one of my cell phone numbers.

13 Q.     And the 5000.  What was that?

14 A.     My code.

15 Q.     Your code for communicating with whom?

16 A.     Mr. Goodwin.

17 Q.     So you've gotten the money from   Michael Jackson,

18 you've picked up the drugs -- any problems coming back

19 with those in the conversion van?

20 A.     No.

21 Q.     Where were they placed in the conversion van?

22 A.     In side -- in the side of the lighting panel.

23 Q.     Did you make several other trips in the

24 conversion van?

25 A.     Yes.

1  Q.      On any of the -- who went with you on the other

2  trips in the conversion van?

3  A.      Katherine Demara and Antoine Jones, Xavier

4  Moore, Jeff Holler.

5  Q.      Who?

6  A.      Jeff Holler.

7  Q.      Okay.  On these additional trips in the

8  conversion van, where did you get the money?

9  A.      Mr. Goodwin.

10 Q.      Ever pick up any money from    Ms. Martin for the

11 other trips in the conversion van?

12 A.      No.

13 Q.      How many times did you pick up money from     Ms.

14 Martin to take to   Texas to get drugs?

15 A.      One or two.

16 Q.      When you said one to two, was it one time or two

17 times, Mr. Thurman?

18 A.      Two.

19 Q.      What were the circumstances of the second time

20 that you picked up money from her?

21 A.      I don't understand the question.

22 Q.      The second time that you picked up money from

23 her, what vehicle were you operating?

24 A.      Oh.  The conversion van.

25 Q.      Where did you pick up the money from her?

1  A.       At the school.

2  Q.       Was anyone present when you picked up the money

3  from her at the school?

4  A.       Xavier Moore was with me, and    Mr. Goodwin.

5  Q.       Excuse me?

6  A.       Xavier Moore was there with me.

7  Q.       Was there anyone there with    Ms. Martin?

8  A.       Mr. Goodwin.

9  Q.       Do you know how much money you picked up from

10  her and from him on that trip?

11  A.       $90,000 each.

12  Q.       Was that in cash?

13  A.       Yes.

14  Q.       Mr. Goodwin or  Ms. Martin ever give you a check

15  for the money that you were to take down to      Texas?

16  A.       No.

17  Q.       Now, on the trips in the conversion van, these

18  additional trips, did you ever have any problems on any

19  of those trips?

20  A.       Coming back.

21  Q.       Okay.  Well, while you were in    Texas, when you

22  took the $180,000 down, did you pick up the cocaine --

23  ever any problems with getting the cocaine?

24  A.       I couldn't get all that    I came for.

25  Q.       What do you mean by that?

1  A.       Instead of getting ten,    I only got six.

2  Q.       What did you do?

3  A.       I was waiting around so    I decided instead of

4  waiting, to send the six back and just bring the four

5  up later.

6  Q.       How did you send them back up?

7  A.       With Xavier Moore and Katherine    Demara .

8  Q.       Was Mr. Jones with them on that trip?

9  A.       Yes.

10  Q.       Did they have any difficulties getting back?

11  A.       Can't hear you.

12  Q.       Did they have any difficulties on their way

13  back?

14  A.       No.

15  Q.       Did you eventually get the other -- the

16  additional kilograms?

17  A.       Yes.

18  Q.       How did you get them back up there then?

19  A.       The conversion van was brought back down to me.

20  Q.       Who brought the conversion van back down to you?

21  A.       Antoine  Jones.

22  Q.       Any problems going back with those additional

23  four kilos?

24  A.       No.

25  Q.       Did you make additional trips in the conversion

1  van?

2  A.      Yes.

3  Q.      Do you recall any trips where there was a

4  problem with the van on the way back?

5  A.      It was a trip on the way back, but    I wasn't with

6  them.

7  Q.      Did you learn about a problem on the trip on the

8  way back that you weren't with them?

9  A.      Yes.  I was called on a cell phone saying they

10 struck a deer in  Virginia.

11 Q.      What were the circumstances that caused you to

12 still be in  Texas and somebody else to drive the

13 conversion van back?

14 A.      Because  I was still waiting on the additional

15 drugs.

16 Q.      How many -- how much was in the van when you

17 sent them back and you remained in     Texas the second

18 time?

19 A.      Seven to ten.

20 Q.      Who contacted you in    Texas and told you what had

21 happened?

22 A.      Antoine, Katherine...

23 Q.      Okay.  What did they tell you had happened?

24 A.      That they -- a deer jumped out in front of them

25 on  I-81 and it totalled the van, or the van wasn't

1  drivable.

2  Q.      What did they have to do with the van?

3  A.      They had to get it towed to a hotel that night.

4  Then in the morning they got it towed to      Maryland.

5  Q.      Let me show you what's been introduced as      OC-3

6  and ask you if this document refreshes your

7  recollection in terms of when that problem with the van

8  occurred.

9  A.      Yes.

10  Q.      What date did that occur?

11  A.      November 30, '03.

12  Q.      What month is it?

13         What number month is it?

14  A.      Oh.   October.   Ten.   10/30.

15  Q.      Were the drugs discovered or taken by the police

16  during that problem with the van?

17  A.      No.

18         MR. MARTIN:   Your Honor?  Excuse me, ma'am.

19         The objection at this point is      I've lost track

20  of the relevant time frame.  Could you tell us when

21  he's talking about at this time?

22         THE COURT:  Could you clarify the time frame?

23         BY MS. JOHNSTON:

24  Q.      These trips began in early 2002; is that

25  correct?

1  A.       Yes.

2  Q.       And the trips to  Texas ended when?

3  A.       '04.

4  Q.       In terms of the trip you've just described where

5  they had to get the conversion van towed, on or about

6  what day did that occur?

7  A.       10/30/03.

8  Q.       During this time period, in addition to meeting

9  Mr. Goodwin at  Anacostia  Road and the time period being

10 2003, did you ever meet him in any other locations?

11 A.       Yes.

12 Q.       What other locations?

13 A.       Shepherd Road.  Chillum Road,

14 Q.       Any other locations you can recall?

15 A.       And at  Larry's house.

16 Q.       Do you know where  Larry's house was?

17 A.       Yes.

18 Q.       Who is  Larry?

19 A.       His son.

20 Q.       Do you recall where he lived?

21 A.       Not the address.

22 Q.       How often did you meet   Mr. Goodwin at  Larry's

23 house?

24 A.       On several occasions.

25 Q.       For what purpose were you meeting him at     Larry's

1 house?

2 A.      To pick up money, to drop off drugs, and to

3 purchase drugs.

4 Q.      Now, when you went to  Ms. Martin's school --

5 Paula's School of Performing Arts -- was that to pick

6 up money, or to deliver drugs, or both?

7 A.      Both.

8 Q.      Now, after this incident where the truck hits a

9 deer October 30 of 2003, did you continue to make

10 trips?

11 A.      Yes, once the van was fixed.

12 Q.      You used the van -- continued to use the van?

13 A.      Yes.

14 Q.      Did there come a time around    Thanksgiving of

15 2003 when you were in   Texas and received information

16 concerning  Mr. Goodwin?

17        MR. MARTIN:  Objection.  Compound.

18        BY MS.  JOHNSTON:

19 Q.      Were you in  Texas around   Thanksgiving of 2003?

20 A.      Yes.

21 Q.      And while there in   Texas, were you -- did you

22 receive information by telephone concerning       Mr.

23 Goodwin?

24 A.      Yes.

25 Q.      What information did you receive about      Mr.

1 Goodwin?

2 A.      He got arrested.

3 Q.      Who called and gave you that information?

4 A.      I called looking for him.

5 Q.      Okay.  Where did you call looking for him?

6 A.      The "Ponderosa,"  Larry's house, his house,

7 Paula.

8 Q.      Excuse me?

9 A.      I say Paula.

10 Q.      And where did you get   Paula's number?

11 A.      Mr. Goodwin.

12 Q.      Were you able to speak to anyone at those

13 different locations?

14 A.      Yes.  Tiffany, Paula and  John.

15 Q.      "John" being  John  Irby?

16 A.      Yes.

17 Q.      What did  Tiffany tell you about where    Mr.

18 Goodwin was?

19 A.      That he was arrested.

20 Q.      Did you have any further conversation with her

21 about that?

22 A.      No.  Where he was being held at, and they didn't

23 know, you know, when he was coming out or the situation

24 was at that moment.

25 Q.      That's what  Ms. Vessels told you?

1  A.      Yeah.

2  Q.      You said you had a conversation with    Ms. Martin;

3  is that correct?

4  A.      Yes.

5  Q.      Was it one conversation or more than one

6  conversation?

7  A.      More than one.

8  Q.      What were you discussing with    Ms. Martin?

9  A.      What to do.  Like, if to come back home or to

10  wait because we didn't know the circumstances of his

11  arrest, and  I didn't want to move around with drugs

12  when it could have been something waiting for me when        I

13  got back.

14  Q.      Why did you call  Ms. Martin asking her what to

15  do?

16  A.      Because that was who   I was supposed to call if

17  something happened.

18  Q.      Who told you to call her if something happened?

19  A.      Mr. Goodwin.

20  Q.      That time those drugs you were picking up.  Who

21  provided the money for these drugs in November 2003?

22  A.      Mr. Goodwin.

23  Q.      What advice did  Ms. Martin give you?

24  A.      Wait and see what happened.

25  Q.      Did you wait?

1  A.      Yes.

2  Q.      About how long were you waiting there?

3  A.      About three weeks.

4  Q.      During those three weeks, did you have

5  additional conversations with    Ms. Martin?

6  A.      Yes.

7  Q.      What were you discussing with her as you waited

8  down there for three weeks?

9  A.      Just what was the update on his case or the

10  situation.  You know, if he was getting bailed out,

11  what to do.  Was   I supposed to bring the money or bring

12  the dope back.

13  Q.      What did Mr.  Martin tell you to do?

14  A.      Just told me to, you know, wait.

15  Q.      Well, did you ever get -- you said you stayed

16  there for about three weeks?

17  A.      Yes.

18  Q.      What did you do at that time?

19  A.      Just waited.  Then   I came back home.

20  Q.      Okay.  Why did you come back home?

21  A.      Because  I wasn't going to come back up with no

22  drugs, because  I didn't know the situation.  And then

23  we just at a standstill, so there was no point in me

24  still staying down there.

25  Q.      So you left the money and the drugs in    Texas?

1  A.       Yes.

2  Q.       When you got back, where was    Mr. Goodwin?

3           Was he still in jail or out of jail?

4  A.       He was still in jail.

5  Q.       Did there come a time when he got out of jail?

6  A.       Yes.

7  Q.       Where did you see him once he got out of jail?

8  A.       At the "Ponderosa."

9  Q.       Did you have any discussion with him about what

10 had happened to him and his arrest?

11 A.       Yes.

12 Q.       What did he tell you?

13 A.       That he was at the restaurant meeting somebody,

14 and the police ran down somebody and set him up.

15 Q.       Did he tell you who had set him up?

16 A.       He said the guy's name, but    I didn't know him.

17 Q.       What was the name that he gave you?

18 A.       Raynard .

19 Q.       Did you know who  Raynard  was at that time?

20 A.       I knew of him.

21 Q.       And what did you know of    Raynard ?

22 A.       Who he was related to and so forth.

23 Q.       Who was he related to?

24 A.       Tiffany Vessels.

25 Q.       At that point in time had you ever seen him?

1  A.       Yes,  I seen him before.

2  Q.       What did you mean when you said you didn't know

3  him except by the name?

4  A.       I just knew him by that's his name.  You know,      I

5  never actually had any dealings or talked to him or

6  spoke to him.

7  Q.       Did you make any trips to   Texas after  Mr.

8  Goodwin got out of jail?

9  A.       Yes.

10  Q.       When he told you that   Raynard  had set him up,

11  did he say anything else about that?

12  A.       I don't understand the question.

13  Q.       Well, what was his demeanor or his attitude when

14  he told you  Raynard  had set him up?

15  A.       Oh, he was mad about it.

16  Q.       Did you make any trips to   Texas and bring back

17  drugs after that occurred?

18  A.       Yes.

19  Q.       What vehicle do you use?

20  A.       The conversion van.

21  Q.       Who goes with you?

22  A.       Xavier Moore.

23  Q.       Describe the circumstances of how you and      Mr.

24  Moore left here and went to    Texas.

25  A.       Just went to go pick up the money and drugs that

1  we had left the last trip.

2  Q.      Were you going to pick up the money and the

3  drugs?

4  A.      We was going to go pick up either or, but we

5  ended up picking up the drugs.

6  Q.      Did you have a conversation with    Mr. Goodwin

7  before you went back down there?

8  A.      Yes.

9  Q.      What was that conversation?

10  A.      We need to go get that so we can get money

11  circulating for the money lost and the time lost.

12  Q.      Were you given anything to take down on that

13  trip to  Texas?

14  A.      That trip?  No.

15  Q.      Anything happen on that trip on your way back

16  down to  Texas?

17  A.      Not on that trip.  That was on, like, the last

18  trip.

19  Q.      Okay.  When you went down there on that -- on

20  this trip, sometime between    Thanksgiving and before you

21  got arrested in   Texas; is that correct?

22  A.      Yes.

23  Q.      So, when you go down there with    Mr. Moore, do

24  you pick up the drugs that were due from the money that

25  you left there around    Thanksgiving?

1  A.        I picked up some of it.

2  Q.        Do you know about how much you brought back?

3  A.        Six.

4  Q.        Okay.  Where did you take the six kilos?

5  A.        Shepherd.

6  Q.        What is  Shepherd?  What's there?

7  A.        The house on  Shepherd Avenue?    Geri  Ford.

8  Q.        Okay.  Who lived there?

9  A.        Geri  Ford.  Well,  I used to live there too.

10  Q.        Why did you take the drugs there?

11  A.        Because it was a place to meet him at.  It was

12  safe.

13  Q.        Who did you deliver the drugs to?      Geri ?

14  A.        No.  Mr.  Goodwin.

15  Q.        What did  Mr.  Goodwin do with the drugs when you

16  gave them to him there?

17  A.        Put them in his car and left.

18  Q.        Shortly after that, did you make another trip to

19  Texas?

20  A.        Yes.

21  Q.        Was there a problem with the drugs you had

22  brought back?

23  A.        Yes.

24  Q.        What was the problem with the drugs you had

25  brought back?

1  A.      They wouldn't cook up right.

2  Q.      How did you know that?

3  A.      Once you try to cook it, it won't -- it won't

4  harden correctly.

5  Q.      Who did you watch try to cook it?

6  A.      Mr. Goodwin.

7  Q.      What did  Mr. Goodwin say when it wouldn't cook

8  up?

9  A.      That it was bad.  That it wasn't the quality

10 they're used to getting, and we need to get them to

11 give us -- to replace it or get some new one.

12 Q.      Was he -- again, what was his demeanor when he's

13 saying that the drugs wouldn't cook up?

14 A.      Oh, he was upset.

15 Q.      What method did he use to cook them up?

16 A.      With the Pyrex and the beakers and the gin and

17 the baking soda.

18 Q.      Where was it that he was cooking this batch up

19 that wasn't cooking right?

20 A.      Larry  Lane's house.

21 Q.      Were you present when that was being done?

22 A.      Yes.

23 Q.      You said, though, however, you dropped it off to

24 him at  Shepherd Road?

25 A.      Yes.

1  Q.      Whose house was that?

2  A.      Geri Ford's.

3  Q.      Okay.  Geri Ford.  Is that a male or female?

4  A.      Female.

5  Q.      What was her husband's name?

6  A.      John.

7  Q.      The cooking wasn't done at that location?

8  A.      No.

9  Q.      How many -- had you been to   Larry Lane's house

10 before this incident where the cocaine doesn't cook up

11 well?

12 A.      Yes.

13 Q.      How many times had you been there before the

14 problem with the cocaine?

15 A.      Several.

16 Q.      Who was present when you were there on those

17 several other occasions?

18 A.      Mr. Goodwin, Tiffany Vessels,  Larry Lane.

19 Q.      Did you ever go there when   Mr. Goodwin was not

20 present?

21 A.      Yes.

22 Q.      For what purpose?

23 A.      To see  Larry.

24 Q.      To see  Larry for what?

25 A.      To pick up drugs.

1  Q.       Why would you go see   Larry to pick up drugs?

2  A.       Because  Mr. Goodwin was busy.

3  Q.       How would you know to go see    Larry instead of

4  Mr. Goodwin?

5  A.       I would call, or he would tell me.

6  Q.       Who would tell you?

7  A.       Mr. Goodwin.

8  Q.       Can you describe the house?    Larry Lane's house?

9  A.       It's, like, row houses.  Attached.

10  Q.      Do you know -- do you recall the street that

11  it's on?

12  A.       Ortho- something.  Ortho- something.

13  Q.       Excuse me?

14  A.       It's something with an "  O."  I don't know how to

15  pronounce it.

16  Q.       Let me show you what's been marked as

17  Government's  P-138 and ask you if you recognize this

18  photograph.

19  A.       Yes.

20  Q.       Again, what is that a photograph of?

21  A.       The front of  Larry's house.

22  Q.       Can you describe the inside of the house for us?

23  A.       When you come in the door, it's the living room,

24  then dining room, then kitchen.

25  Q.       Have you ever been upstairs or downstairs in the

1  house?

2  A.       Been downstairs.

3  Q.       Is there a basement in the house?

4  A.       Yes.

5  Q.       What was kept in the basement?

6  A.       Drugs, bags, supplies.

7  Q.       Where would those drugs and supplies -- where

8  were those drugs and supplies kept?

9  A.       In tool boxes.

10  Q.      I want to show you a couple of government's

11  exhibits and ask you if you recognize these items.

12         Showing you Government's Exhibit    P-154, 155, 156

13  and 157.  Take a moment and look at these pictures.

14         Do you recognize any of those photographs?

15  A.       Yes.

16  Q.       Where were they taken in?

17  A.       In the basement of   Larry's house.

18  Q.       Do you recognize the items in the photographs?

19  A.       Yes.

20  Q.       What are they?

21  A.       Tool boxes.

22  Q.       Were those tool boxes kept locked or unlocked?

23  A.       Locked.

24  Q.       Did you have a combination to get into those

25  tool boxes?

1  A.        No.

2  Q.        Who opened them -- were they ever opened when

3  you were there?

4  A.        Yes.

5  Q.        Who opened them?

6  A.        Mr. Goodwin.

7  Q.        Is that a picture of one of the tool boxes

8  opened?

9  A.        Yes.

10  Q.        Do you recognize the things that are in the tool

11  box?

12  A.        Bags and crack.

13  Q.        Could you show us where the crack is?

14  A.        (Witness indicating.)

15  Q.        Showing you 156.

16          Again, is that another tool box that's been

17  opened?

18  A.        Yes.

19  Q.        Was Mr. Goodwin present whenever those boxes

20  were opened when you were there?

21  A.        Yes.

22  Q.        Just so the jury can see -- P-157.  Is that

23  another one of the tool boxes?

24  A.        Yes.

25  Q.        So you've gotten back with this cocaine.

1            Where is  Mr.  Goodwin cooking it at    Larry's

2  house?

3  A.      In the kitchen.

4  Q.      What happens when it doesn't cook up?  What does

5  he tell you to do?

6  A.      I call  Steve.

7  Q.      What conversation --    Steve who?

8  A.      Campbell.

9  Q.      What conversation do you have with      Steve?

10  A.      Letting him know that the drugs wasn't the

11  quality that we needed or wanted.

12  Q.      What did he say?

13  A.      That the drugs was all right and it was supposed

14  to be the quality.  He said he would work with us, but

15  he was acting like he didn't really want to work with

16  us.

17  Q.      What did  Mr.  Goodwin -- strike that.

18            Did you relay the conversation to    Mr.  Goodwin?

19  A.      Yes.

20  Q.      Did Mr.  Goodwin talk to   Mr.  Campbell?

21  A.      Not at that time.

22  Q.      What happens as a result of that telephone

23  conversation?

24  A.      I was about to make a trip down.

25  Q.      Who told you to make a trip down there?

1  A.      He did.

2  Q.      Who's "he?"

3  A.      Mr. Goodwin.

4  Q.      What did he tell you in terms of going down

5  there?

6  A.      We needed to get that straight what we -- get

7  that deal straight from the bad drugs and to get the

8  rest of the drugs he owed us but that he said he didn't

9  owe us.

10 Q.      How many kilos did  Mr. Goodwin think  Mr.

11 Campbell owed you?

12 A.      Four.

13 Q.      And did you agree with   Mr. Goodwin that  Mr.

14 Campbell owed four kilos?

15 A.      Yes.

16 Q.      What conversation did you have then with      Mr.

17 Goodwin about you going down to     Texas?

18 A.      That we was going to go down there and see if he

19 was going to make good off the deal.

20 Q.      Who was going to -- who was supposed to go down

21 there?

22 A.      Me and  Xavier.

23 Q.      Did  Mr. Goodwin give you anything to take with

24 you when you went down there?

25 A.      Money and two guns.

1  Q.      Where were you when   Mr.  Goodwin gave you more

2  money and two guns?

3  A.      In  Larry  Lane's house.   In the  basement.

4  Q.      How much money did he give you?

5          Do you recall?

6  A.      $30,000.

7  Q.      Why was he giving you $30,000 if    Mr.  Campbell

8  was supposed to make good on the bad stuff and still

9  owed you four kilos?

10  A.      To get extras.

11  Q.      Where were you when he gave you the guns?

12  A.      In the basement.

13  Q.      The basement of whose house?

14  A.      Larry  Lane's.

15  Q.      Could you see where he got the guns from?

16  A.      Out of a tool box.

17  Q.      Out of one of the tool boxes --

18  A.      Yes.

19  Q.      -- that  I just showed you?

20  A.      Yes.

21  Q.      Do you recall which one it was?

22  A.      No.

23  Q.      What did he do with the two guns he got out of

24  the tool box?

25  A.      Gave them to me.

1  Q.      Was Mr. Moore present then?

2  A.      Yes.

3  Q.      Why was he giving -- what did he tell you the

4  reason was he was giving you guns to take with you?

5  A.      In case it didn't go right, we can make it

6  right.

7  Q.      What did you do with the guns he gave you?

8  A.      Put them in a stash spot to the van.

9  Q.      And the money that you had.  Where did you put

10 that?

11 A.      In a stash spot also.

12 Q.      And who went in the van on this trip down to

13 Texas?

14 A.      Me and  Xavier Moore.

15 Q.      What happens on your way down there?

16 A.      We were having problems with the van, and then

17 we got pulled over in Orange County,    Texas.

18 Q.      What kind of problems did you have with the van?

19 A.      Transmission.

20 Q.      How did you know you were having problems with

21 the transmission?

22 A.      The engine light, and the way it was driving.

23 It kept getting hot, so we had to pull over every so

24 many hours.

25 Q.      During that trip down in    Texas, were you stopped

1  by the  Texas police?

2  A.      Yeah, by the Orange County Police.

3  Q.      Were you arrested?

4  A.      Yes.

5  Q.      Did they find the guns and the money?

6  A.      Not off the initial stop, no.

7  Q.      No?  Okay.

8          Well, did they subsequently find the guns and

9  the money?

10  A.      Yes.

11  Q.      That was in different hidden compartments?

12  A.      Yes.

13  Q.      Were you charged with possession of those guns,

14  as well as the marijuana that they recovered?

15  A.      Yes.

16  Q.      Once you were -- was   Mr. Moore also arrested?

17  A.      Yes.

18  Q.      Were you released at any point in time?

19  A.      We bonded out in three to five days.

20  Q.      How did you get bonded out?

21  A.      Mr. Campbell bonded us out.

22  Q.      What did you do once you got bonded out?

23  A.      Stayed at a hotel for a couple of days, then

24  went back to  Houston.

25  Q.      How long did you stay in    Houston?

1  A.        Three to four weeks.

2  Q.        Was Mr. Moore staying in   Houston with you?

3  A.        Yes.

4  Q.        What did you do after those three or four weeks

5  were up?

6  A.        Just trying to figure out how we were going to

7  get back and make up for the loss we just took again.

8  Q.        Did you talk to   Mr. Goodwin after you got

9  released?

10 A.        Yes.

11 Q.        What was your conversation with    Mr. Goodwin

12 after you got released?

13 A.        Letting him know what had happened.

14 Q.        What was his reaction when you told him what had

15 happened?

16 A.        He was upset.

17 Q.        When you got back to   Maryland -- this is in 2004

18 at this point; is that correct?

19 A.        Yes.

20 Q.        Did you have contact with    Mr. Goodwin then?

21 A.        Yes.

22 Q.        What's your contact with him then?

23 A.        Let him know everything about the stop and

24 arrest that   I couldn't tell him over the phone and

25 trying to figure out how we're going to come up with a

1  new plan to continue making money.

2  Q.      Was he concerned that you had -- that      Mr.

3  Campbell still owed you kilos?

4  A.      Yes.

5  Q.      What was the conversation about that?

6  A.      That we needed to -- we needed to see if he was

7  going to pay us our money or give us some drugs.

8  Q.      Did you ever give   Mr.  Goodwin -- during the

9  whole time since you introduced him in December 2001 up

10  through 2004, did you ever give     Mr.  Goodwin  Mr.

11  Campbell's telephone numbers?

12  A.      Yes.

13  Q.      Were you ever present when    Mr.  Goodwin called

14  Mr.  Campbell?

15  A.      Yes.

16  Q.      How did they talk on the phone?

17          How did  Mr.  Goodwin talk on the phone when you

18  were present for these conversations?

19  A.      Talk, you know, normal.  Like, you know, they

20  just talking business.

21  Q.      When they talk, he talked business and would

22  say, where are my five kilos of cocaine?

23  A.      No.  He wouldn't say that.

24  Q.      How would they talk on the phone?

25  A.      Like, in codes.  Where's what you owe me, or

1  them four birds or whatever we were calling them at the

2  time.

3  Q.      Okay.  When you say whatever you were calling

4  them, what do you mean by that?

5  A.      Because you can give it any name when you're

6  talking.   I mean, just to make up a name for it.

7  Q.      And you just make up something during the call?

8  A.      Yeah.  You can just say anything.  Four     CDs.

9  Four tickets.  Anything.

10 Q.      Did you make any trips to   Texas to see  Mr.

11 Campbell after that?

12         Your arrest in  Texas.  Did you go back to see

13 Mr. Campbell?

14 A.      No.

15 Q.      During this time, did you have conversations

16 with Mr. Goodwin about whether -- about drugs coming

17 from other places?

18 A.      Yes.

19 Q.      What were those discussions?

20 A.      That they had a shipment coming from, like, El

21 Paso.

22 Q.      What did he tell you about the shipment from     El

23 Paso ?

24 A.      When it got here, it wasn't good.

25 Q.      Excuse me?

1  A.      When it got here, it wasn't a good shipment.

2  Q.      Okay.  Who told you that?

3  A.      He did.

4  Q.      What did -- did he tell you how it got here or

5  who it came from?

6  A.      Yes.

7  Q.      What did he tell you about that?

8  A.      That  Tiffany had picked it up and Kelly had made

9  the deal.

10 Q.      Who was "Kelly?"

11 A.      I'm not sure of his last name.  A   Spanish guy

12 that he dealt with.

13 Q.      Okay.  How did you know "Kelly" was a    Spanish

14 gay that he dealt with?

15 A.      I seen him before.

16 Q.      Where did you see him before?

17 A.      At the shop and in different locations around

18 Washington,  D. C.

19 Q.      When  Mr. Goodwin told you that this cocaine had

20 came from Kelly with   Tiffany, that some of it was bad,

21 what did he ask you to do?

22 A.      Find new transportation and return it.

23 Q.      Did you ask him why he wanted you to return it

24 instead of letting   Ms. Vessels take it back to Kelly?

25 A.      No, I didn't ask that.

1  Q.      During your conversations with    Mr. Goodwin, did

2  you learn whether or not    Ms. Vessels had made more than

3  one trip?

4  A.      Yes.

5  Q.      Do you know about how many trips    Ms. Vessels

6  made to see Kelly in    Texas to get drugs?

7  A.      The only one   I'm aware of is one.

8  Q.      Is that the one you're describing with the bad

9  cocaine?

10  A.      Yes.

11  Q.      Do you know if she went alone or if she went

12  with someone else?

13  A.      She went with someone else.

14  Q.      Who was the person she went with?

15  A.      Doug.

16  Q.      Excuse me?

17  A.      Doug.

18  Q.      Did you know "Doug?"

19  A.      Yes.

20  Q.      Where did you meet    Doug?

21  A.      At the shop.

22  Q.      Who introduced you to    Doug?

23  A.      Mr. Goodwin.

24  Q.      Do you know whether or not    Doug made any other

25  trips other than this trip with    Ms. Vessels with the

1   bad cocaine?

2   A.      I'm not aware.

3   Q.      When Mr. Goodwin asked you to get another

4   vehicle and take bad cocaine back, were you able to get

5   another vehicle?

6   A.      Yes.

7   Q.      What vehicle did you get?

8   A.      A RV.

9   Q.      How did you get that  RV?

10  A.      From a dealership in my sister's name.

11  Q.      Do you recall where that dealership was?

12  A.      In Washington,  D. C.

13  Q.      Do you recall the name of that dealership?

14  A.      Jimmy's.

15  Q.      Can you describe the vehicle that you purchased?

16  A.      26' mobile home.

17  Q.      Why did you purchase it in your sister's name?

18  A.      Because  I couldn't get any tags or credit in my

19  name.

20  Q.      Showing you what's on the screen and has been

21  introduced as Government's Exhibit P-233(    A).

22          Do you recognize that vehicle?

23  A.      Yes.

24  Q.      What is that?

25  A.      The mobile home.

1 Q.      How many trips to  Texas did you make in the

2 mobile home?

3 A.      One.

4 Q.      Who was with you when you made that trip?

5 A.      Xavier Moore and Katherine    Demara .

6 Q.      Did you take anything with you on that trip?

7 A.      The bad drugs.

8 Q.      Did you take any guns with you on that trip?

9 A.      No.

10 Q.      Why not?

11 A.      Because it was a trip that was already talked

12 about and it wasn't no threat.

13 Q.      How many trips did you actually take guns with

14 you to  Texas?

15 A.      Twice.

16 Q.      When was the other -- you have described one of

17 those circumstances; is that correct?

18 A.      Yes.

19 Q.      When was the other circumstance?

20 A.      Because when  I had been robbed and stuff before.

21 So I thought it would be safer.

22 Q.      When -- this is some time when?  Between your

23 Texas arrest in  January of 2004 and before    June 16 of

24 2004; is that correct?

25 A.      Yes.

1 Q.      Where do you go when you get to    Texas?

2 A.      I stop off in  Houston, see my family, and then    I

3 go to El Paso .

4 Q.      Was  Ms. Vessels with you on this trip?

5 A.      No.

6 Q.      How did you know who -- strike that.

7         Why did you go to El Paso?

8 A.      To return the bad drugs.

9 Q.      Why in El Paso and not in    Texas?

10 A.      Because that's where it was picked up, in El

11 Paso.

12 Q.      Who lived in El Paso?

13 A.      Kelly.

14 Q.      Where did you meet Kelly in El Paso when you got

15 there?

16 A.      At a -- when  I first got there, at a truck stop.

17 Q.      And where did he direct you to?

18 A.      A mobile home park.

19 Q.      Do you recall the name of the mobile home park?

20 A.      Road Runner.

21 Q.      How long did you stay at the mobile home park?

22 A.      Seven or more days.

23 Q.      What conversation did you have with    Mr. Kelly

24 once  you got to the mobile home park?

25 A.      About switching the bad drugs off for good drugs

1 and how long would it take, and that was pretty much

2 it.

3 Q.      What did he tell you concerning switching the

4 drugs?

5 A.      He was going to talk to the people and take it

6 back where he got it from.

7 Q.      Did he tell you where he had gotten it from?

8 A.      Yes.  Across the border.

9 Q.      "Across the border" meaning where?

10 A.      Mexico.

11          MS. JOHNSTON:   Your Honor, I don't know if the

12 court wants to take a break at this point.  We can.

13          THE COURT:  Great.  We will recess until a

14 quarter of four.

15                    (Jury excused at 3:31 p.m.)

16                    (Off the record at 3  :31 p.m.)

17                    (On the record at 3  :46 p.m.)

18          THE COURT:  Bring them in.

19                    (Witness resumes the stand.)

20          MS. JOHNSTON:   Your Honor, I expect we're going

21 to be playing at least one, maybe four calls from the

22 wiretap.   I would advise the court that the agent and

23 our legal assistant have removed the pages we talked

24 about this morning from the books, so they are no

25 longer in there.

1          THE  COURT:  All right.

2          MR.  MONTEMARANO :  Just using Book One,   Ms.

3  Johnston?

4          MS.  JOHNSTON:  No, not just using Book One.

5  There are calls in other books.  If the court will

6  instruct the jury just to turn to the transcript books

7  that area being used.

8          THE  COURT:  You will be playing them with this

9  witness?

10          MS.  JOHNSTON:  Yes.  And not to look at any of

11  the other transcripts, because they are not all in the

12  first volume.

13          MR.  MONTEMARANO :  Your  Honor,  I would object for

14  the record that if the books go to the jury, they

15  should not have those pages which are still subject of

16  debate between the parties.  The court has reserved

17  ruling on them.

18          THE  COURT:   I will instruct the jury that they

19  should only look at the pages    I'm going to tell them to

20  look at, and they should turn them back in and not look

21  at any other pages.   I think they're going to follow

22  the instructions I give them.    I don't think they're

23  going to disregard my instructions, so I will give them

24  that instruction.

25          MR.  MONTEMARANO :  Thank you,  Your  Honor.

1          THE COURT:  How much longer do you think you

2 will be with this witness?  The rest of the day?

3          MS. JOHNSTON:  Yes,  Your Honor.

4          THE COURT:  We will be resuming on    Tuesday at

5 10:00.

6          MR. HALL:  Counsel, were you indicating you were

7 going to do those calls this afternoon?

8          MS. JOHNSTON:   I may get to all of them in this

9 afternoon.  I will get to one in the next ten minutes.

10          MR. HALL:  Okay.

11          THE CLERK:  Are you ready?

12          THE COURT:   Yes.

13               (Jury returns at 3  :48 p.m.)

14          THE COURT:   All right, you may proceed.

15          BY MS. JOHNSTON:

16 Q.    While you were in El Paso,   Mr. Thurman, where

17 did you stay?

18 A.    The RV park.

19 Q.    Do you recall the name of the    RV park?

20 A.    Road Runner.

21 Q.    I'm going to show you what's been marked as

22 Government's Exhibit R-8.

23          Now, disregarding the stationery sheet, do you

24 recognize the receipt that's on there?

25 A.    Yes.

1 Q.      In whose name is that?

2 A.      Mines.

3 Q.      What was the date of that receipt?

4 A.      4/2/04.

5 Q.      Does it indicate some payments for multiple days

6 that you were there?

7 A.      Yes.

8 Q.      How did you pay for the space at the    RV park?

9 A.      Cash.

10 Q.      Who gave you the cash?

11 A.      Mr. Goodwin before   I left.

12 Q.      Excuse me?

13 A.      Mr. Goodwin before   I left.

14 Q.      While you were down there, did you receive

15 anything else -- any other items from    Mr. Goodwin?

16 A.      While  I was down there?

17 Q.      Yeah.  Do you recall ever getting anything

18 mailed to you by Express Mail?

19 A.      Oh.  A Dealer tag.

20 Q.      For what purpose were you sent a Dealer tag?

21 A.      Because the paper tag had expired.

22 Q.      I want to show you what's marked as Government's

23 Exhibit Goodwin 10.

24        There are two pieces of paper there.  Do you

25 recognize the Express Mail receipt?

1  A.       Yes.

2  Q.       Who was that sent to?

3  A.       Myself.

4  Q.       Do you recognize that address in north Houston,

5  Texas?

6  A.       Yes.

7  Q.       What was that?

8  A.       My cousin address.

9  Q.       Who was the sender?

10 A.       Lobo's Discount.

11 Q.       Now, there's another green sheet in there.  Do

12 you recognize any names on there?

13 A.       My name.

14 Q.       Do you recognize a number under your name?

15 A.       Pager number and cell phone.

16 Q.       Let me put it up on the screen so the jury can

17 see it.

18 Q.       Is that the mail receipt we just discussed?

19 A.       Yes.

20 Q.       And you got a permanent plate?

21 A.       Yes, a Dealer tag.

22 Q.       A Dealer tag; is that correct?

23 A.       Yes.

24 Q.       And then the little green sheet we talked of --

25 if you could read off your numbers and tell us which

1  one was your pager and which was your cell?

2  A.      837-8356 is my pager and (301) 213-4934 was my

3  cell.

4  Q.      In addition to receiving the Dealer tag while

5  you were still there, did you speak with      Mr.  Goodwin on

6  the telephone periodically?

7  A.      Yes.

8  Q.      Do you know how many times you spoke to him?

9  A.      No.

10  Q.      What was the nature of your conversation?

11  A.      To let him know the status and what was going

12  on.

13  Q.      What were the things you told him?

14  A.      That  I was waiting to see the guy Kelly again,

15  and  I was waiting for him to exchange the bad for good.

16  Q.      Have you had occasion to listen to some recorded

17  conversations when we met in preparation for your

18  testimony?

19  A.      Repeat your question.

20  Q.      Did you have an opportunity, when we were

21  preparing for your testimony, to listen to some

22  conversations?

23  A.      Yes.

24  Q.      Were you able to identify the voices in those

25  conversations?

1 A.      Yes.

2 Q.      Your Honor, I would like to play call B-2581,

3 which is on  CD 1, and if  I could distribute the

4 transcript books at this time.

5        THE COURT:  All right.  Ladies and gentlemen, as

6 before,  I want to advise you that the evidence that

7 you're receiving and considering is the recording that

8 you're hearing.  The transcript is being provided to

9 you by the government to assist you.  If in any way you

10 think the transcript is different than what has been

11 played, it's what you heard that governs.

12        In addition, let me advise you that the notebook

13 that you're going to be handed has more than just this

14 one phone call in it, and  I instruct you only to look

15 at the pages covering this conversation today because

16 we have not yet ruled on the other conversations in

17 those notebooks.  So, please do not look at any other

18 part of the notebook other than the pages that you have

19 identified to you.  So, keep them closed until you hear

20 what that page number is.

21        MS. JOHNSTON:   The call number is call B-2581.

22 It begins on page 276 of -- the transcript book is,      I

23 believe, volume Two.

24        Your Honor, may  I approach the witness and give

25 him a copy of the transcript book?

1          THE COURT:  What was the page number again?

2          MS. JOHNSTON:  276, I believe.

3          THE COURT:  276?  All right.

4          MS. JOHNSTON:  276.  It's B-2581.

5          Counsel, we're going to play call B-2581.  It's

6  on page 276, which is Volume Two of the transcript

7  book.  Page 276.  There's a Baits number at the bottom

8  of each page.

9          Okay.  If we could play the call, Agent    Eveler.

10          (Audio recording begins playing at 3    :56 p.m.)

11          (Audio recording stops playing at 3    :57 p.m.)

12          BY MS. JOHNSTON:

13  Q.     Who were the voices we heard on that recording?

14  A.     Mine and Mr. Goodwin.

15  Q.     Voices marked "M.T." and "L.G.?"

16  A.     Yes.

17  Q.     Does that match the voices we heard on the

18  recording?

19  A.     Yes.

20  Q.     When you say that you're waiting for your cousin

21  and you just talked to him, who are you referring to?

22  A.     Kelly.

23  Q.     Was he in fact your cousin?

24  A.     No.

25  Q.     Why did you use the term "cousin?"

1  A.      So I won't have to say his name.

2  Q.      And then you said that he had to go over to "the

3  main park."

4          What were you referring to when you said, "the

5  main park?"

6  A.      Mexico.

7  Q.      Then Mr. Goodwin says to you, "So they're

8  exchanging the clothes?"

9          Did you have any clothes you were returning in

10 El Paso, Texas?

11 A.      No.

12 Q.      What did you understand him to be asking you?

13 A.      About the bad drugs.

14 Q.      Then you say that you're waiting to see -- to

15 see him.  Who were you waiting to see?

16 A.      Kelly.

17 Q.      Then you tell him he "had to go wash his clothes

18 in Mexico."

19         What were you telling   Mr. Goodwin in that

20 phrase?

21 A.      That he had to go take the drugs back to     Mexico

22 to try to get an exchange.

23 Q.      The term "wash his clothes" refers to what?

24 A.      Change.

25 Q.      Then at the end,   Mr. Goodwin calls you his man.

1  "My man."  What does that term mean?

2  A.     He's mine.  Like, it's all right.     I'm handling

3  the job.

4  Q.     After that call did you continue to be in     Texas

5  -- in El Paso waiting for the drugs to be exchanged by

6  Mr. Kelly?

7  A.     Yes.

8  Q.     How long did you stay there?

9  A.     Seven to -- seven to ten days.

10  Q.     What did you do after those seven to ten days?

11  A.     After  I waited, then nothing had followed

12  through with Kelly,   I went back to El Paso --   I mean,  I

13  went back to   Houston.

14  Q.     Who went back to   Houston with you?

15  A.     Xavier Moore and Katherine     Demara .

16  Q.     Where did you stay in    Houston?

17  A.     In a  RV park.

18  Q.     In the same camper?

19  A.     Yes.

20  Q.     How long were you,   Ms. Demara  and Mr. Moore in

21  the  RV camp in   Houston?

22  A.     All together?  Several months.

23  Q.     During that time you were there, did you have

24  any communications with    Mr. Goodwin?

25  A.     Yes.

1  Q.      What was the nature of those communications?

2  A.      We were waiting to hear from Kelly.  Then     I had

3  to go back to El Paso and pick up the drugs.

4  Q.      Did you ever hear from Kelly?

5  A.      No.

6  Q.      Ever go back to pick up the drugs?

7  A.      No.

8  Q.      While you were in    Houston in the   RV camp, did

9  there come a time when you received information

10  concerning events that had happened up in      Maryland and

11  D. C.?

12  A.      Yes.

13  Q.      Do you recall who you received that information

14  from?

15  A.      Tiffany Vessels.

16  Q.      What was the conversation that you had with     Ms.

17  Vessels?

18  A.      That  Mr. Goodwin and everybody got locked up,

19  and they raided all the spots.

20  Q.      They raided where?

21  A.      All the different locations.

22  Q.      Do you know approximately when that was?  That

23  conversation.

24  A.      I'm not sure of the exact time.  Around      June.

25  Q.      Do you recall getting arrested on or about      June

1  16 of 2004?

2  A.      Yes.

3  Q.      What state did you get arrested?

4  A.      Lafayette, Louisiana.

5  Q.      Was your conversation with  Ms. Vessels about the

6  arrest and the raids on all the locations before you

7  got arrested in  Louisiana?

8  A.      Yes.

9  Q.      During that conversation -- strike that.

10         In addition to talking to  Ms. Vessels, did you

11 talk to  Mr. Goodwin at all after  Ms. Vessels told you

12 about the arrest but before you returned to     Maryland?

13 A.      No.

14 Q.      How did you get back to   Maryland?

15 A.      I flew.

16 Q.      You flew back to  Maryland from where?

17 A.      Houston.

18 Q.      What did you do with the camper?

19 A.      I left it parked at my grandmother's.

20 Q.      Before flying back from   Houston to  Maryland,

21 what if any effort did you make to drive back?

22 A.      One.

23 Q.      Can you describe that effort?

24 A.      Me and my -- me and a friend from     Houston was

25 driving back when we got pulled over in Lafayette,

1  Louisiana.

2  Q.      Let me back up for a second.

3          What happened to  Mr. Moore and  Ms. Demara ?

4  A.      Ms. Demara caught the Greyhound home.  Then a

5  couple of months later  Xavier caught the plane home.

6  Q.      Did both of them leave   Houston before you left

7  in the camper and got stopped in    Louisiana?

8  A.      Yes.

9  Q.      Who was you with when you got stopped in

10 Louisiana?

11 A.      Marcus Weathersby.

12 Q.      Where were you going?

13 A.      To  Maryland.

14 Q.      Did you have any cocaine with you at that time?

15 A.      Yes.

16 Q.      What cocaine did you have with you?

17 A.      The cocaine that  Marcus Weathersby had.

18 Q.      Where did  Mr. Weathersby have his cocaine?

19 A.      In a side panelling of the    RV.

20 Q.      What happened when you were stopped in

21 Louisiana?

22 A.      We were stopped, they said, for the tag plate,

23 and they asked to search the vehicle.     I told them no.

24 Then they called the k-9 unit.

25 Q.      What happened then?

1  A.      They say the K-9 alerted at the front door, and

2  then they proceeded to check the vehicle.

3  Q.      Did they find anything in the vehicle?

4  A.      Yes.

5  Q.      What did they find in the vehicle?

6  A.      Like, a quarter key of the bad dope.

7  Q.      Where was that in the vehicle?

8  A.      Like, in between the stove and the sink.

9  Q.      Was that in a concealed department or

10 compartment or in a regular space in the camper?

11 A.      Concealed.

12 Q.      Why was that still in the van if you returned

13 the bad drugs to Kelly?

14 A.      Because when we returned it, we didn't count it

15 away and we thought it was all of it, and it was a

16 piece that had stuck down in there and we didn't know

17 it was there.

18 Q.      What about the cocaine that   Mr. Weathersby had

19 with him?

20 A.      That was not recovered.

21 Q.      How much was it that   Mr. Weathersby was bringing

22 back?

23 A.      Nine ounces.

24 Q.      Were you arrested then?

25 A.      Yes.

1  Q.      Were you eventually let out on bond?

2  A.      Yes.

3  Q.      When you got out on bond, where did you go?

4  A.      To Homer, Louisiana.

5  Q.      Excuse me?

6  A.      To Homer, Louisiana then to  Houston.

7  Q.      Okay.  Why did you go to Homer,    Louisiana?

8  A.      Because  I had to get from where we at to get

9  back to  Houston to -- to get ourselves together to get

10 back to  Houston.

11 Q.      How did you get from Homer,    Louisiana back to

12 Houston?

13 A.      The RV.

14 Q.      So they released the camper to you after you

15 took the drugs out of it?

16 A.      Yes.

17 Q.      Who posted your bond for you there in    Louisiana?

18 A.      Marcus Weathersby.

19 Q.      Do you recall how much bond was?

20 A.      No.

21 Q.      And then you get back to   Houston?

22 A.      Yes.

23 Q.      How do you eventually get home?

24 A.      Airplane.

25 Q.      What happened in terms of   Mr. Weathersby?  Was

1 he charged?

2 A.       No.

3 Q.       Why not?

4 A.       Because  I said it was mines.

5 Q.       In fact, was that your cocaine that was in the

6 vehicle that they seized?

7 A.       No.  It was part of the -- what    I was taking

8 back.

9 Q.       It was in your possession?

10 A.       Yes, it was in my possession.   Yes.

11 Q.       Did you realize that that cocaine was still in

12 the car -- that bad cocaine was still in the car?

13 A.       No, not until they searched the vehicle and

14 found it.

15 Q.       When you were taking -- when you originally left

16 Maryland with the camper with the bad cocaine, do you

17 know whether or not   Mr. Goodwin still had one or two of

18 the bad kilos with him?

19 A.       I'm not sure.

20 Q.       Well, you indicated that it didn't cook up very

21 well.

22 A.       Right.

23 Q.       Did you see him trying to cook it up?

24 A.       Yes.

25 Q.       What happened to it?

1   A.      It wouldn't get hard.

2   Q.      So at least that portion that he tried to cook

3   up, that -- did that stay with him or did you repackage

4   --

5           MR. MARTIN:  Objection,   Your Honor.

6           Asked and answered.  Leading.

7           THE COURT:  Well, take the leading part out and

8   ask it again.

9           BY MS. JOHNSTON:

10  Q.      What was done with that cocaine that didn't get

11  hard?

12  A.      Still in his possession.

13  Q.      And what happened -- what residence were you in

14  when that didn't cook up?

15  A.      Larry  Lane.

16  Q.      Who was with you there?

17  A.      Myself and  Mr. Goodwin.

18  Q.      When you get back to   Maryland after you've been

19  released in  Louisiana, do you have any contact with

20  anyone associated with   Mr. Goodwin?

21  A.      Tiffany Vessels and "  John  D."

22  Q.      "John  D." being  Mr. Irby?

23  A.      Yes.

24  Q.      Are you familiar with Lobo's Discount Car Lot?

25  A.      Yes.

1   Q.      Do you have any identification associated with

2 that facility?

3 A.      A salesman license.

4 Q.      Excuse me?

5 A.      A salesman license.

6 Q.      Could you describe for us how you got that

7 salesman license?

8 A.      Through the shop and  Michael  Jackson.

9 Q.      Excuse me?

10 A.      I say through the shop and   Michael  Jackson.

11 Q.      Who at the shop helped you get it?

12 A.      Michael Jackson and   Learley  Goodwin.

13 Q.      Who is " Michael  Jackson?"

14 A.      The guy that did all the paperwork for the shop.

15 Q.      And was the -- what kind of business was

16 conducted at the shop?

17 A.      Auto body and minor repairs.

18 Q.      Could you describe the extent that there was

19 actual car business going on there?

20 A.      Explain the question.

21 Q.      Okay.  Let me try it again,   Mr. Thurman.

22        Who  actually did any minor repairs and body shop

23 work there?

24        MR. MARTIN:  Objection to the form of the

25 question.

1          THE COURT:  Rephrase it.

2          BY MS. JOHNSTON:

3  Q.      Do you know who actually did the body repair

4  work and the minor repairs --

5          MR. MARTIN:  Objection.

6          THE COURT:  Overruled.

7          BY MS. JOHNSTON:

8  Q.      -- and the mine or repairs you've just

9  described?

10 A.      Lobo and a couple of guys he had working for

11 him.

12 Q.      Did this man,  Mr. Lobo, own the business?

13 A.      No.

14 Q.      Who owned the business?

15 A.      Mr. Goodwin.

16 Q.      In addition to listening to -- strike that.

17         In addition to  Mr. Kelly and  Steven  Campbell,

18 did you learn whether or not   Mr. Goodwin had any other

19 sources for cocaine?

20 A.      Yes.

21 Q.      Who were -- how did you learn that information?

22 A.      By just being around.

23 Q.      Being around whom?

24 A.      Mr. Goodwin.

25 Q.      Who were the other sources of cocaine that you

1  learned about?

2  A.      It was different people.

3  Q.      Can you give us the names of those different

4  people, please?

5  A.      "Cuban," and a guy in   Louisiana.

6  Q.      "Cuba?"  Can you describe   Cuba for us?

7  A.      Brown-skinned Cuban.

8  Q.      Do you know what nationality he was?

9  A.      Cuban.

10  Q.      And where did you -- where did you meet him?

11  A.      I met him at the shop.  Different places.

12  Q.      Who introduced you to him?

13  A.      Mr.  Goodwin.

14  Q.      You said you met him where?  At the shop?

15  A.      Yes.

16  Q.      "The shop" referring to what?

17  A.      Lobo's Discount.

18  Q.      If  I could, Your Honor, I'd like to play two

19  more calls for this witness at this time.      I would like

20  to play call 47.

21          THE  COURT:  And the page number?

22          MS.  JOHNSTON:  Call 247 is on Page 5 of Volume

23  One.

24          (Audio recording begins playing at 4    :10 p.m.)

25          (Audio recording stops playing at 4    :12 p.m.)

```
 1          BY MS. JOHNSTON:

 2 Q.       Did you recognize those voices,    Mr. Thurman?

 3 A.       Yes.

 4 Q.       Whose voices were they?

 5 A.       Mr. Goodwin and Cuban.

 6 Q.       By looking at the voices, which one is    Cuba's?

 7          Who how is it identified?

 8 A.       M-1.

 9 Q.       Take this pen that   I'm giving you and, next to

10 M-1 in the transcript on Page 5, write "    Cuba," and then

11 put your initials and today's date.

12 A.       (Witness indicating.)

13 Q.       June 16.

14          If we could also play call 5763, which is going

15 to be on -- court's indulgence, please.

16          573 is on Page 461.

17          THE COURT:  Volume Three?

18          MS. JOHNSTON:  Volume Three,    Your Honor.

19          THE COURT:  All right.

20          (Audio recording begins playing at 4    :14 p.m.)

21          (Audio recording stops playing at 4    :15 p.m.)

22          BY MS. JOHNSTON:

23 Q.       Mr. Thurman, did you recognize the voices in

24 that call?

25 A.       Yes.
```

1  Q.       Who were they?

2  A.       Mr. Goodwin and  Cuba.

3  Q.       Again, if you could -- the voice that you

4  identified as " Cuba" is identified in the transcript by

5  what letters?

6  A.       "U. M."

7  Q.       Could you write next to "  U. M." the name " Cuba,"

8  and put your initials and the date?

9  A.       (Witness indicating.)

10 Q.       While we have the equipment out, play call

11 A-1415, and that would be on Page 415 -- starts on Page

12 415.

13          (Audio recording begins playing at 4    :17 p.m.)

14          (Audio recording stops playing at 4    :18 p.m.)

15          BY MS.  JOHNSTON:

16 Q.       Did you recognize those voices,    Mr.  Thurman?

17 A.       Yes.

18 Q.       Whose voices are they?

19 A.       "John  D." and  Paula.

20 Q.       Are they correctly identified in the transcript

21 as Paulette  Martin and  John  Irby ?

22 A.       Yes.

23 Q.       If we could turn to Page 129 which,    I think, is

24 in Volume One, call B-915.

25          THE  COURT:  What page again?

1          MS. JOHNSTON:  It should be page 129,    Your

2   Honor.

3          THE COURT:  129.

4          (Audio recording begins playing at 4    :19 p.m.)

5          (Audio recording stops playing at 4    :20 p.m.)

6          BY MS. JOHNSTON:

7   Q.     Mr. Thurman, did you recognize the voices in

8   that call?

9   A.     Yes.

10  Q.     Who were they?

11  A.     Paula and Maurice.

12  Q.     Do you know Maurice's last name?

13  A.     Bowman.

14  Q.     If you could, take the trial exhibit and write

15  his last name next to "Maurice    LNU."

16  Q.     (Witness indicating.)

17  Q.     How do you know  Mr. Bowman?

18  A.     From the shop, and   Mr. Goodwin.

19  Q.     When you say, "the shop," what are you talking

20  about?

21  A.     Lobo's.

22  Q.     Finally, I'd like to play call   B-469, which is

23  on Page 60.

24         Could you turn that volume to Page 60,     Mr.

25  Thurman?  Do you have it open?

1        (Audio recording begins playing at 4  :21 p.m.)

2        (Audio recording stops playing at 4  :22 p.m.)

3        BY MS. JOHNSTON:

4 Q.    Mr. Thurman, did you recognize the voices in

5 that telephone call?

6 A.    Yes.

7 Q.    Who were they?

8 A.    Paula and  Tiffany.

9 Q.    Are they correctly identified in the transcript?

10 A.    Yes.

11 Q.    We started these calls with a reference to   Cuba

12 as being one of the other sources for   Mr. Goodwin.

13        Are there other people whom you learned

14 delivered cocaine to  Mr. Goodwin?

15 A.    Rephrase the question.

16 Q.    Okay.  You mentioned  Cuba as someone else who

17 provided cocaine to  Mr. Goodwin.

18 A.    Mm-hmm.

19 Q.    You have to say "yes" or "no" for the record,

20 please.

21 A.    Oh.  Yes.

22 Q.    Were there -- do you know anyone else who

23 provided cocaine to  Mr. Goodwin?

24 A.    No.

25 Q.    In terms of  Ms. Martin.  Do you know whether   or

1  not she had other sources of cocaine in addition to the

2  cocaine that she was getting from    Mr. Goodwin and the

3  cocaine you brought back from    Texas when they pooled

4  their money?

5  A.      Yes.

6  Q.      Who else did she get cocaine from?

7  A.      I'm not sure.

8  Q.      How do you know that she had other sources of

9  cocaine?

10 A.      Because sometimes he got it from her.

11 Q.      How do you know that sometimes he got it from

12 her?

13 A.      Because he had called her, or go and get it from

14 her.

15 Q.      Would you be with him when he would go get it

16 from her?

17 A.      Once.

18 Q.      One time.  Can you give us a time frame in terms

19 of when that one time was that you went with them?

20         Was it before or after your arrest in    Texas with

21 the conversion van?

22 A.      Before.

23 Q.      Was it before or after you started to go to

24 Texas in 2002?

25 A.      After.

1  Q.       Where did you go with him to get it from      Ms.

2  Martin?

3  A.       Her house.

4  Q.       Where was her house?

5  A.       Montgomery County.

6  Q.       Can you describe the house that you went to to

7  get the cocaine?

8  A.       It was, like, in a   cul-de-sac.

9  Q.       Excuse me?

10 A.       It was in a   cul-de-sac.

11 Q.       Was it a row house?  A townhouse?  An apartment?

12 A single family home?

13 A.       Single family home.

14 Q.       Can you describe it?  New?  Old?

15 A.       Fairly new.

16 Q.       Big?  Small?

17 A.       Medium.

18 Q.       Let me show you what's been marked as

19 Government's Exhibit P-2.

20          Do recognize the house that's depicted in P-2?

21 A.       Yes.

22 Q.       What is that?

23 A.       Paula's house.

24 Q.       Is that the house that you went with     Mr. Goodwin

25 to pick up cocaine?

1  A.      Yes.

2  Q.      How much cocaine did he pick up there?

3  A.      I'm not sure of the amount.

4  Q.      How do you know that he picked up cocaine?

5  A.      Because when we left and got back to the other

6  spot, he had cocaine to give me.

7  Q.      Excuse me?

8  A.      Once we left and got back to the other place, he

9  had cocaine to give me.  We didn't come with no

10 cocaine.

11         MR. MONTEMARANO :  Objection,  Your Honor.

12         Move to strike may.

13         We be heard at the bench?

14         THE COURT:  Approach the bench.

15              (At the bar of the Court.)

16         MR. MONTEMARANO :  At best it's an educated

17 guess.  It  is not a basis for knowledge.  He went with

18 her.  After that  Mr. Goodwin didn't give any indication

19 the cocaine he then had to give to this witness was

20 from my client.  Therefore,   I would move --  I objected

21 and moved to strike this entire line of testimony

22 regarding obtaining cocaine from   Ms. Martin.  He

23 neither saw it, nor did   Mr. Goodwin make an admission

24 regarding it.

25         MS. JOHNSTON:  He said that's why he went there

1   with Mr. Goodwin.   I mean, I'll go back over it again.

2   If counsel wants,   I will go through the conversation

3   that he had with   Mr. Goodwin and why they went there

4   and where they went, that they had to go there to get

5   the cocaine and then came back and that he got the

6   cocaine from  Mr. Goodwin.  That's all perfectly

7   admissible, and they can cross-examine him.

8          There is nothing wrong with him saying what he

9   said.  It's not inadmissible hearsay.  It's

10  circumstances.  He had a conversation with      Mr. Goodwin.

11  We needed to go get the cocaine.  They went to      Ms.

12  Martin's house.   I don't know if he saw it there or

13  not.

14          Then when they left there they went back to a

15  location --   I'll ask him where they went back to -- and

16  he got cocaine.   I don't think there's anything wrong

17  with this jury to hear those circumstances.  There is

18  nothing in it that's hearsay.

19          MR. MARTIN:  Your Honor, I would move  to strike

20  as well, unless there's some foundation laid that he

21  either saw --

22          THE COURT:  I'm going to strike the    last answer

23  and make a ruling as she's indicated.

24          MS. JOHNSTON:  Circumstantial.

25          THE COURT:  -- she will tie it up.

1                    (Back in open court.)

2         THE COURT:  Ladies and gentlemen, disregard the

3  last answer.  There will be some additional questioning

4  on this subject.

5         You may proceed.

6         BY MS. JOHNSTON:

7  Q.    Mr. Thurman, how many times did you go to that

8  house that we've just identified?

9  A.    Once.

10 Q.    Who did you go there with?

11 A.    Mr. Goodwin.

12 Q.    Did you have a conversation with   Mr. Goodwin

13 before you went there on that one occasion?

14 A.    Yes.

15 Q.    Okay.  What was your conversation with    Mr.

16 Goodwin before you went to   Ms. Martin's house?

17 A.    We had to go past there to pick up something.

18 Q.    Did he tell you what the "something" was that

19 you had to go there to pick up?

20 A.    Yes.

21 Q.    What did he tell you it was?

22 A.    Cocaine.

23 Q.    Do you recall whose vehicle you went in to go to

24 Ms. Martin's?

25 A.    I don't recall what vehicle it was in.

1  Q.      Do you know whose vehicle it was?

2  A.      The one from the shop.

3  Q.      When you say, "the one from the shop," what shop

4  are you referring to?

5  A.      Lobo's Discount.

6  Q.      Can you describe for us how many cars there were

7  there and who used the cars and how they were passed

8  around?

9  A.      It was several cars there and we drove which one

10 was working.

11 Q.      Does that include  Mr. Goodwin as well?

12 A.      Yes.

13 Q.      When you got to -- who drove to    Ms. Martin's

14 house?

15 A.      I drove.

16 Q.      Who went inside  Ms. Martin's house?

17 A.      Both of us.

18 Q.      When you went inside, other than    Ms. Martin, did

19 you see anyone else there?

20 A.      A unknown person.

21 Q.      You don't recall who that person was?

22 A.      No.

23 Q.      Can you describe that person?

24 A.      Brown skin.  Older.

25 Q.      Male or female?

1  A.       Male.

2  Q.       Were you introduced to him?

3  A.       Yes.

4  Q.       Do you recall his name?

5  A.       No.

6  Q.       Other than being brown skin, do you know whether

7  he was  American or a different nationality?

8  A.       Different nationality.

9  Q.       Okay.  What nationality was that?

10  A.       I'm going to say maybe    Spanish.

11  Q.       Is that based on the way he spoke?

12  A.       Yes.

13  Q.       And approximately how old was he?

14  A.       50 years old.

15  Q.       Do you recall his hair at all?

16  A.       Grey and black.

17  Q.       Was that the only time you saw that individual?

18  A.       Yes.

19  Q.       Once you're there, you are introduced to this

20  man.

21          What if anything do see happen between    Ms.

22  Martin and  Mr. Goodwin?

23  A.       They just talked, and then they leave out.

24  Q.       They leave out where?

25  A.       Leave out of the room we were in.

1  Q.      Excuse me?

2  A.      Leave out of the room we were in.

3  Q.      Okay.  And what happened -- who stays in the

4  room you're in?

5  A.      I did, and the guy.

6  Q.      The guy with the  Spanish accent?

7  A.      Yes.

8  Q.      Do they both come back to the room?

9  A.      Yes.

10  Q.     Do either of them have anything when they come

11  back to the room?

12  A.      They have a bag.

13  Q.      Who has a bag?

14  A.      Mr. Goodwin.

15  Q.      Is there any conversation about what's in the

16  bag?

17  A.      No.  We just got ready to leave.

18  Q.      Okay.  How long were you there, do you think?

19  A.      15 minutes.

20  Q.      When you left, who left?

21  A.      Oh.  Me and  Mr. Goodwin.

22  Q.      Were you driving when you left?

23  A.      Yes.

24  Q.      Where did you and  Mr. Goodwin go?

25  A.      To the "Ponderosa."

1 Q.      Okay.  Did you make any stops in between leaving

2 Ms. Martin's and going back to the "Ponderosa?"

3 A.      Not that  I can recall.

4 Q.      When you got back to the "Ponderosa," who went

5 inside?

6 A.      Me and  Mr.  Goodwin.

7 Q.      Did  Mr.  Goodwin take anything inside with him?

8 A.      Yes, the bag.

9 Q.      Once he got inside with the bag, what happened

10 there?

11 A.      I used the phone.  Then he got me some cocaine

12 ready.

13 Q.      Who got you cocaine?

14 A.      Mr.  Goodwin.

15 Q.      Okay.  Was it powder or crack?

16 A.      Powder.

17 Q.      Did you see where he got it from?

18 A.      Out the bag.

19 Q.      Out of what bag?

20 A.      They had with them.

21 Q.      The bag that he picked -- where did he get the

22 bag that he took the cocaine out of?

23 A.      From  Ms. Martin.

24 Q.      Can you describe the size of that bag?

25 A.      How?  Like, size?

1  Q.      Yeah, the size.  Or describe what kind of bag      it

2  was.

3          Was it a little sandwich baggy?  Was it a brown

4  paper bag?  Was it a   *Giant*  bag?

5  A.      Shopping bag.

6  Q.      Was it a large a shopping bag --

7  A.      Yes.

8  Q.      -- as opposed to a grocery store bag?

9  A.      Yes.

10 Q.      Could you describe how it looked from the

11 outside when he carried it out?

12 A.      Like a shopping bag with some type of -- some

13 type of products inside of it.

14 Q.      But you didn't actually see what was inside when

15 he carried it out of the house?

16 A.      No.

17 Q.      What did he take out of that bag that he gave to

18 you?

19 A.      Powder cocaine.

20 Q.      Do you know approximately how much he took out

21 of that bag and gave to you?

22 A.      He gave me two ounces.

23 Q.      While you were there, did he give any of that

24 powder cocaine to anyone else in your presence?

25 A.      No.  I left.

1 Q.      Did Mr. Goodwin ever say to you how much he had

2 gotten from Ms. Martin?

3        MR. MONTEMARANO : Objection, Your Honor.

4        Asked and answered.

5        THE COURT: Overruled.

6        BY MS. JOHNSTON:

7 Q.      After you returned to the "Ponderosa," did you

8 have any conversation with    Mr. Goodwin about how much

9 he had picked up from    Ms. Martin on that trip?

10 A.      No.

11 Q.      That was the only time you went to that

12 residence?

13 A.      Yes.

14 Q.      And the only time that you were with    Mr. Goodwin

15 when he picked up from    Ms. Martin; is that correct?

16 A.      Yes.

17 Q.      Did you have any other conversations with      Mr.

18 Goodwin concerning getting drugs from      Ms. Martin that

19 you recall?

20 A.      No.

21 Q.      I don't know if the court would like to stop

22 here.   I know it is 4 :30.

23        THE COURT:   I promised this jury we would be

24 better than  Amtrak, so we will recess today.

25        Ladies and gentlemen, please return on      Tuesday

1  at 10 o'clock.  Remember, we're off on      Monday.  Once

2  again, please follow my instructions not to discuss

3  this case among yourselves or with anybody else until

4  we resume again on    Tuesday.  You're excused now.

5          Counsel, remain behind.

6          MS.  GREENBERG:    Your  Honor, where would   you like

7  the books?

8          THE  COURT:  Recover the books.

9          MS.  JOHNSTON:  It might be better if the court

10  maintains those transcript books, because      I don't know

11  if some of them wrote in them or not.  If so, we

12  shouldn't be privy to their notes.

13          THE  CLERK:  Can they just leave them here?

14          THE  COURT:  Bea will take care of it.

15                      (Jury excused at 4  :35 p.m.)

16          THE  COURT:  Counsel, on    Tuesday I have an

17  initial status conference with counsel in a 14-

18  defendant case and a -- that's not your fault.

19  Somebody else in your office's fault.

20          MS.  JOHNSTON:  No, but    I think  I may be on that

21  case now.

22          THE  COURT:  Oh, wonderful.

23          I only get the large defendant cases  in this

24  courthouse.  In any event,    I have a conference with

25  counsel in that case at 9 o'clock.  Knowing how easy it

1 is to get 14 lawyers to agree on anything,      I'm not sure

2 it's going to -- how long it's going to last, but if

3 you have preliminary matters on      Tuesday, be here by,

4 you know, a quarter of ten.      I'm reasonably optimistic

5 I can get 14 lawyers to get their calendars out to pick

6 a date for a trial, but that's what      I'm doing at 9

7 o'clock on   Tuesday.

8        MR. MCKNETT :   Your  Honor?

9        THE COURT:  Yes.

10        MR. MCKNETT :   I understand we're going to get to

11 Detective  Sakala  on Tuesday.  There are motions pending

12 that will affect his -- may affect his testimony.

13        THE  COURT:  You mean like renewed motions on

14 him?

15        MR. MCKNETT :   There were motions that were filed

16 concerning expert testimony.

17        MR. MONTEMARANO :   Your Honor did not rule.  You

18 deferred to when the witness took the stand.

19        THE COURT:  Uh-oh.  It's a witness by witness

20 matter.  Sure.

21        MR. MARTIN:   Your  Honor, an administrative

22 matter. With respect to    Mr. Thurman's testimony today,

23 I would like to get authorization to file a      CJA 24 and

24 ask Madam Court Reporter if she would transcribe that

25 for me so that over the weekend      I would have an

1 opportunity to look at that.  He said a lot of things.

2 It's far beyond the cross-examination that      I had

3 initially planned, and it would be very helpful to the

4 defense to have that.

5         MS. JOHNSTON:   Your Honor, Mr. Martin has been

6 sitting there with is computer typing very quickly

7 throughout, but it's not an issue for the government

8 other than we will order a copy if court orders it.        I

9 just hate to see our court reporter's weekend --

10        THE COURT:  Do you really want to ruin Tracy's

11 weekend?

12        MR. MARTIN:  No, I don't.  In fact, she's been

13 so kind to me,  I even hesitated saying it, but      I've got

14 an obligation to  Mr. Goodwin.

15        THE COURT:  Well,  I have no problem signing the

16 thing, but  I can't guarantee   Tracy.  All right?

17        MR. MARTIN:  Yes.

18        MR. MONTEMARANO :  Do we have some indication on

19 additional witnesses for    Tuesday?

20        MS. JOHNSTON:  Technically, it's not due until

21 the day before, but you already have those witnesses.

22 I've given them to you in terms of Agent      Aske  from the

23 FBI.  Then whether we start with Agent      Sakala  with the

24 calls, and we will interrupt him with the

25 surveillances.  So, they will come in chronological

1 order.  You have the names of at least the first three

2 or four surveillance agents.

3          MR.  MONTEMARANO :  Do you think we will get

4 beyond those on  Tuesday?

5          MS.  JOHNSTON:   I don't think we will get beyond

6 those on  Tuesday, and  I think may have again done it

7 for those --

8          THE  COURT:  How much more direct do we have of

9 this witness?

10          MS.  JOHNSTON:  Maybe 20 minutes or half an hour.

11          THE  COURT:  So I assume there will be five or

12 ten minutes of cross-examination.

13          MR.  MONTEMARANO :  At least.  Maybe 15,   Your

14 Honor.

15          THE  COURT:  All right.  Well, as   I said, be

16 here.

17          MR.  WARD:  Are we going to go through the

18 airline tickets again line by line?

19          THE  COURT:   I never knew so much about air

20 Southwest  Airline's booking process.

21          Counsel, we are adjourned.    I will see you on

22 Tuesday at quarter of ten with any minor remaining

23 preliminary matters.  See you then.

24                    (Off the record at 4  :39 p.m.)

25

1                    **<u>CERTIFICATE</u>**

2

3        I, Tracy Rae Dunlap,    RPR , CRR , an Official Court

4   Reporter for the United States District Court of

5   Maryland, do hereby certify that I reported, by machine

6   shorthand, in my official capacity, the proceedings had

7   and testimony adduced upon the Jury Trial Proceedings

8   in the case of UNITED STATES OF AMERICA versus PAULETTE

9   MARTIN, et al, criminal Action Number    RWT-04-0235 on

10  June 16, 2006.

11

12       I further certify that the foregoing    252 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17       In witness whereof, I have hereto subscribed my

18  name, this 18th day of June 2006.

19

20

21                         _____

22                         TRACY RAE DUNLAP, RPR , CRR
                           OFFICIAL  COURT REPORTER
23

24

25