```
1              UNITED STATES DISTRICT COURT OF MARYLAND
                        SOUTHERN DIVISION
2
   ------------------------x
3  UNITED STATES OF AMERICA  :
            Plaintiff        :
4                            :
                             :
5  vs                        :Criminal Action:    RWT-04-0235
                             :
6                            :
   PAULETTE MARTIN, et al    :
7            Defendants.     :
   ------------------------x
8
                        Tuesday, June 20, 2006
9                       Greenbelt, Maryland

10     The above-entitled action came on for a Jury Trial
   Proceeding before the HONORABLE ROGER W. TITUS, United
11 States District Judge, in courtroom 4C, commencing at
   10:06 a.m.
12
           THIS TRANSCRIPT REPRESENTS THE PRODUCT
13         OF AN OFFICIAL REPORTER, ENGAGED BY
           THE COURT, WHO HAS PERSONALLY CERTIFIED
14         THAT IT REPRESENTS THE TESTIMONY AND PROCEEDINGS
           AS RECORDED AND REQUESTED BY COUNSEL.
15
           APPEARANCES:
16
           On behalf of the Plaintiff:
17
           DEBORAH JOHNSTON, Esquire
18         BONNIE GREENBERG, Esquire

19         On behalf of the Defendants:

20         MICHAEL  MONTEMARANO , Esquire
           ANTHONY MARTIN, Esquire
21         MARC HALL, Esquire
           TIMOTHY MITCHELL, Esquire
22         PETER WARD, Esquire
           EDWARD  SUSSMAN , Esquire
23         HARRY  MCKNETT , Esquire

24 Tracy Rae Dunlap,   RPR , CRR              (301) 344-3912
   Official Court Reporter
25
```

1                          I N D E X

2

                          DIRECT      CROSS     REDIRECT   RECROSS
3
   Michael Thurman         3          27        123
4
   Kevin Ashby            137        153        164
5
   Christopher Sakala     177        187        191
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                                Page
23  Reporter's Certificate                         235

24  Concordance                                     236

25

1          THE COURT:   Good morning.   Please be seated.

2          Are we ready for the jury?

3          MS. JOHNSTON:   Government 's ready, Your Honor.

4          THE COURT:   And Mr. Martin, you got your

5  transcript?

6          MR. MARTIN:   Yes, sir.

7          THE COURT:   All right, bring them in.

8          MR. MARTIN:   Thanks to Ms. Tracy Dunlap.

9                  (Witness resumes the stand.)

10                 (Jury returns at 10:08 a.m.)

11         THE COURT:   Good morning, ladies and gentlemen.

12  I hope you had a good weekend.   We're ready to resume

13  now with the direct examination of this witness.

14         You may proceed, Ms. Johnston.

15                  **FURETHER DIRECT EXAMINATION**

16         BY MS. JOHNSTON:

17  Q.     Thank you, Your Honor.

18         Mr. Thurman, when we left off on Friday I was

19  asking you some questions about some different

20  locations.   You previously mentioned Anacostia Road,

21  and the -- you identified a residence a Mr.- -- where

22  Mr. Lane lived as where you met Mr. Goodwin.

23         Were there other locations where you met Mr.

24  Goodwin?

25  A.     Yes.

1  Q.      Can you describe some of those other locations?

2  A.      Can you explain the question?

3          Like, how do you want me to describe it?

4  Q.      Either by address or who lived at the other

5  locations where you met Mr. Goodwin, either to pick up

6  money or to deliver drugs or to pick up drugs.

7  A.      Different places.  The school and what -- --

8  Anacostia.

9  Q.      You remember --

10  A.      Shepherd.

11  Q.      Who lived at Shepherd?

12  A.      Geri Ford and I did.

13  Q.      Do you know if Mr. Goodwin is married?

14  A.      Yes.

15  Q.      Who is he married to?

16  A.      Connie.

17  Q.      Okay.  Have you ever been to the house where

18  Connie lived?

19  A.      Yes.

20  Q.      For what purpose have you been to that location?

21  A.      To meet him, also.

22  Q.      When you say to meet him, for what purpose were

23  you meeting him?

24  A.      To talk.  To pick up money.  To pick up drugs.

25  Q.      Let me show you what's been marked as

1 Government 's Exhibit P-84.

2          Do you recognize that photograph ?

3 A.     Yes.

4 Q.     What is that ?

5 A.     That 's Goodwin 's house .

6 Q.     Who did he live there with ?

7 A.     Tiffany Vessels .

8          A JUROR:   Your Honor , these screens are not

9 working.

10          THE COURT:   Let me explain to you that we 've had

11 a technological failure .  You're going to have to do

12 with what we have today with the TV screens.  We will

13 be switching equipment , but it's not working now.   So

14 if you have trouble seeing that, let us know .

15          BY MS. JOHNSTON:

16 Q.     Was anyone else there when you went to see Mr.

17 Goodwin , other than Ms. Vessels ?

18 A.     No .

19 Q.     I believe on Friday you identified photographs

20 of the Conversion van that you used for the trips to

21 Texas.

22          Do you recall that testimony ?

23 A.     Yes .

24 Q.     When you were -- do you know how many -- strike

25 that .

1           Do you know how many trips to Texas you made in

2 that Conversion van?

3 A.      Five more.

4 Q.      Let me show you on the screen what's already

5 been admitted into evidence as Government's Exhibit

6 OC-1.

7           Can you read that document from?

8 A.      Yes.

9 Q.      Can you tell -- do you recall what that refers

10 to?

11 A.      Tires for the van.

12 Q.      Where did you get the tires for the van?

13 A.      Houston, Texas.

14 Q.      Was that on one of the trips you described for

15 us last week?

16 A.      Yes.

17 Q.      Let me approach and show you a couple of the

18 exhibits that already have been introduced into

19 evidence, OC44 and OC-10-.

20           I want you to see them up close before I put

21 them up on the screen.  It's OC-4 and OC-7, to correct

22 the record.

23           Do you recognize OC-4?

24 A.      Yes.

25 Q.      How about looking up close at OC-7.  Do you

1 recognize that?

2 A.      Yes.

3 Q.      Let me put them up on the screen.

4        In reference to OC-4.  Do see that document?

5 A.      Yes.

6 Q.      Okay.  Is there a date on that document?

7 A.      9/3/2003.

8 Q.      Can you tell us what that document refers to?

9 A.      A part for my motorcycle.

10 Q.      Was that something that you took care of while

11 you were in Texas?

12       MR. MONTEMARANO :   Objection.

13       Leading.

14       THE WITNESS:   Yes.

15       THE COURT:    Sustained.

16       Ask the question.

17       BY MS. JOHNSTON:

18 Q.      Do you recall what that related to and why that

19 receipt would have been in your Conversion van?

20 A.      A part I bought for a motorcycle while I was in

21 Texas.

22 Q.      Whose motorcycle was it?

23 A.      Mines.

24 Q.      Where was that motorcycle kept?

25 A.      Houston, Texas.

1 Q.      At whose house?

2 A.      Steven Campbell's.

3 Q.      Next, let me show you OC-7.

4        Do see that invoice?

5 A.      Yes.

6 Q.      What is the date on that invoice?

7 A.      9/3/03.

8 Q.      It's reference to a U-Haul center.

9        Can you tell us why this receipt was in your

10 vehicle?

11 A.      It was either for trailer rental or trailer

12 hitch.

13 Q.      When did you purchase that trailer rental or

14 trailer hitch?

15 A.      9/3/03.

16 Q.      Where?

17 A.      I purchased it in Landover and dropped it in

18 Houston.

19 Q.      Okay.  You referenced Landover.  Is that a

20 reference to the first -- we have another receipt in

21 there.  Do you see that other receipt?

22 A.      Yes.

23 Q.      What's the date on that other receipt?

24 A.      12/3/03.

25 Q.      Where is that receipt for?

1  A.        Landover  Road.

2  Q.        What  did  you  purchase  at  Landover  Road  on

3  12/3/03?

4  A.        Hitch.

5  Q.        Now, was  that  after  you  rented  the  hitch  or

6  returned  the  hitch  in  Texas  on  September  9  of  2003?

7  A.        That  was  after.

8  Q.        Did  you  ever  use  the  Conversion  van  to  haul  a

9  trailer?

10          MR.  MONTEMARANO:    Objection.

11          Leading.

12          THE  COURT:    Sustained.

13          BY  MS.  JOHNSTON:

14  Q.        During  the  trips  from  Maryland  to  Texas, when

15  you  went  to  pick  up  drugs, was  --  what  did  you  do  with

16  the  trailer  hitch?

17  A.        Pulled  the  --  had  the  bike  and  some  other  things

18  inside  of  it.

19  Q.        All  right.  Do  you  know  on  which  trip  it  was

20  that  you  took  the  bike  --  the  motorcycle  to  Texas?

21  A.        I  took  it  on  several  occasions.

22  Q.        When  you  took  it  on  several  occasions, did  you

23  ride  it  or  did  you  transport  it  by  trailer?

24  A.        By  trailer.

25  Q.        Were  those  trips  when  you  went  down  to  pick  up

1 drugs, or were those separate trips apart from

2 delivering drugs?

3 A.      While.

4 Q.      Now I want to show you what's been marked as

5 Oglethorpe 21 and ask if you recognize that -- let me

6 zoom out here.

7          Do you recognize that piece of paper and that

8 information that's on that exhibit?

9 A.      Yes.

10 Q.     Okay.  Whose information is that?

11 A.     Mines and my mother's.

12 Q.     And the cell phone number?  Whose cell phone

13 numbers are those?

14 A.     Mines and my mother's.

15 Q.     Are you familiar with the name Paul Sinclair?

16 A.     Yes.

17 Q.     Do you know a person named Paul Sinclair?

18 A.     No.

19 Q.     How are you familiar with the name of Paul

20 Sinclair?

21 A.     The phone line at the shop was in that name.

22 Q.     How did you come to know that the phone at the

23 shop was in the name of Paul Sinclair?

24 A.     Bell Atlantic bill.

25 Q.     When did you see a Bell Atlantic bill?

1 A.      At Lobo's Discount , and I seen the name on the

2 Caller ID.

3 Q.      I want to show you what's been marked as Goodwin

4 12-A.  Do you see that document ?

5 A.      Yes .

6 Q.      Do you recognize the name that's on the

7 document ?

8 A.      Yes .

9 Q.      How about the address ?

10 A.      Yes .

11 Q.      What address is that ?

12 A.      For Lobo's Discount .

13 Q.      If we look at the very top , there's a telephone

14 number listed . Let me zoom in on that .

15        Do you recognize the telephone number ?

16 A.      Yes .  That's o ne of the shop 's number s.

17 Q.      What number is it that 's one of the shop

18 number s? If you read it into the record .

19 A.      202-388-9033 .

20 Q.      Did you yourself maintain a bank account at any

21 bank s?

22 A.      I don't understand  the question .

23 Q.      Let me show you what's been marked as

24 Government 's Exhibit R-12.

25        Do you recognize that record ?

1  A.      Yes.

2  Q.      What is that?

3  A.      Bank account from the federal credit union.

4  Q.      Whose bank account is that?

5  A.      Mines.

6  Q.      For what period of time does it cover?  What's

7  the period on the bank statement?

8  A.      03/01/04 to 03/31/04.

9  Q.      Did you have electronic access to that account?

10 A.      Yes.

11 Q.      Now, you testified on Friday about your time in

12 April 2004 in Texas.  Do you recall that testimony?

13 A.      Yes.

14 Q.      What were you doing In Texas in April 2004?

15 A.      In Houston or El Paso?

16 Q.      Well, what -- why were you down in Texas in

17 April 2004?

18 A.      Say again.

19 Q.      Why were you down in Texas in April 2004?

20 A.      I was waiting on a shipment to be returned.

21 Q.      Okay.  Returned from where?

22 A.      El Paso.

23 Q.      Who were you waiting on?

24 A.      Kelly.

25 Q.      What were you waiting for Kelly to do?

1  A.      Exchange some bad drugs.

2  Q.      Where was he exchanging it?

3  A.      Mexico.

4  Q.      If we look at your bank statement, does it

5  indicate where you were at different times during 2004?

6  A.      Yes.

7  Q.      Okay.  Where were you on, say, April 14 of '04?

8  A.      North Parkway, Houston, Texas.

9  Q.      If we go down at the bottom of that page to

10 April 19 of '04, where were you then?

11         Let me scroll over to the date and widen it.

12 A.      North Parkway.

13 Q.      Okay.  Where is that?

14 A.      Houston, Texas.

15 Q.      Similarly, in -- the last entry, April 29 and

16 April 30.  Where were you on those dates?

17 A.      Conrail, Texas and Houston, Texas.

18 Q.      Finally, let me show you -- not "finally," but

19 let me show you what's been marked as Government's

20 Exhibit R-13.

21         Do you recognize the telephone number and the

22 account?

23 A.      Yes.

24 Q.      What's the customer name?

25 A.      HBC, Incorporated.

1  Q.      And the telephone number?

2  A.      202-904-1192.

3  Q.      Whose telephone was that?

4  A.      Mine.

5  Q.      How is it that you came to have a telephone

6  number under the name HBC, Incorporated?

7  A.      Because once you put the phone in your name, you

8  can change it to whatever you want it to be under.

9  Q.      Did you change it to that company?

10  A.      Yes.

11  Q.      Was that a real company?

12  A.      No.

13  Q.      Why did you change it to that company name?

14  A.      So my name wouldn't show up and stuff.

15  Q.      Now, you testified that after you were arrested

16  in Louisiana in June of 2004, and after your release

17  while in Texas, you learned about the arrest of Mr.

18  Goodwin and Ms. Martin and others; is that correct?

19  A.      Can you repeat the question again?

20  Q.      After you were arrested in Louisiana in June of

21  2004, did there come a time when you learned that Mr.

22  Goodwin and Ms. Martin had been arrested?

23  A.      I learned before I was arrested.

24  Q.      All right. Did there come -- after you were

25  released on that arrest, did you eventually return to

1 Maryland ?

2 A.      Yes .

3 Q.      Once  you  return ed  to  Maryland ,  did  you  have  any

4 contact  with  Ms.  Martin ?

5 A.      No .

6 Q.      Did  you  have  any  contact  with  Mr.  Goodwin ?

7 A.      Yes .

8 Q.      Can  you  describe  where  you  --  what  contact  you

9 had  with  him ?

10 A.      Through  telephone  and  visit s .

11 Q.      What  conversation  did  you  have  with  him

12 concern ing  his  arrest ?

13 A.      I don't  understand   the  question .

14 Q.      Let  me  rephrase  the  question .

15        During  your  discussion s or  your  meet ings  with

16 Mr.  Goodwin ,  was  anyone  else  present ?

17 A.      Yes .

18 Q.      Who  else  would  have  been  present ?

19 A.      At  the  house ,  it  was  Tiffany  Vessels  and  John

20 Irby .

21 Q.      Okay .  Was  Mr.  Goodwin  at  the  house ,  or  was  your

22 communication  with  him  by  telephone ?

23 A.      By  telephone .

24 Q.      Did  you  actual ly  visit  with  him  as  well ?

25 A.      Yes .

1 Q.      During the course of that visit or over the

2 telephone, was there any discussion about Raynard

3 Dorsey?

4 A.      Yes.

5 Q.      Did you know Mr. Dorsey?

6 A.      No.  I knew of him.

7 Q.      How did you know of him?

8 A.      Through previous conversation, and Tiffany

9 Vessels.

10 Q.      Did you have any conversations with Mr. Goodwin

11 prior to his arrest in June of 2004 about Raynard

12 Dorsey?

13 A.      Yes.

14 Q.      What was the discussions that you had with Mr.

15 Goodwin after his arrest in June?

16 A.      That Raynard Dorsey was the one that got him

17 locked up before he got arrested this time.

18 Q.      Were you familiar with his earlier arrest?

19 A.      Yes.

20 Q.      Where were you when that happened?

21 A.      Texas.

22 Q.      Is that the arrest you described during your

23 testimony on Friday?

24 A.      Yes.

25 Q.      While he was arrested for that -- in that first

1  instance, who did he communicate  with during that

2  arrest?

3  A.        Paula.

4  Q.        "Paula" being Ms. Martin?

5  A.        Yes.

6  Q.        Moving forward.  Your return after Mr. Goodwin's

7  been arrested.  What conversation did you have with Mr.

8  Goodwin concerning Mr. Dorsey?

9  A.        Oh.  That he was the one got him arrested for

10  the -- got him locked up the first time, and he was the

11  one -- like, the witness in the case.

12  Q.        Were there additional  discussions about Mr.

13  Dorsey with Mr. Goodwin?

14  A.        Yes.

15  Q.        What did Mr. Goodwin tell you?

16  A.        That he need to come to court and so forth, and

17  we need to find somebody to take care of him.

18  Q.        When he said that you needed to find someone to

19  take care of him, what did you understand him to mean?

20           MR. MARTIN:   Objection.

21           THE COURT:   Overruled.

22           BY MS. JOHNSTON:

23  Q.        What did you understand him to mean?

24  A.        To find somebody to get rid of him or kill him.

25  Q.        Did you in fact find someone to kill Mr. Dorsey?

1 A.       No.

2 Q.       Do you know whether or not Mr. Irby did?

3 A.       I'm not sure.

4 Q.       What if any discussion was there concerning how

5 that person would be paid?

6          Do you recall?

7 A.       I don't understand  question.

8 Q.       Other than Mr. Goodwin telling you that you had

9 to find someone to kill him, was there any other

10 discussion about how that person would be paid or how

11 the killing would take place?

12 A.       Oh.  The person would be paid by Tiffany.

13 Q.       Excuse me?

14 A.       The person would be paid by Tiffany.

15 Q.       Do you know where Tiffany is today?

16 A.       No.

17 Q.       When was the last time you saw Ms. Vessels?

18 A.       End of '04.

19 Q.       Did you make any -- strike that.

20          After you had those discussions, did there come

21 a time in April of 2005 when you took steps concerning

22 your own criminal involvement?

23 A.       Yes.

24 Q.       What did you do in April of 2005 -- at the end

25 of April 2005?

1  A.      I don't understand   the question .

2  Q.      Let me back up for a second .

3          Where were you living at the end of 2005 --

4  strike that.

5          Where were you living at the end of April of

6  2005 ?

7  A.      With my mom .

8  Q.      Okay .  Where were you still hanging out at that

9  time ?

10  A.      Anacostia Road and another place in Southeast .

11  Q.      Anacostia Road .  Is that the place you called

12  the "Ponderosa ?"

13  A.      Yes .

14  Q.      And were you still in contact with Mr. Goodwin

15  at that point in time ?

16  A.      Yes .

17  Q.      Who else were you associating with down there at

18  the end of April of 2005 ?

19  A.      Mr. Irby .

20  Q.      At that time , were you wanted in any state s?

21  A.      Yes .

22  Q.      Where were you wanted ?

23  A.      Louisiana and Houston .

24  Q.      Excuse me ?

25  A.      Louisiana and Orange , Texas .

1 Q.      Were those the two incidents that you described

2 here for the jury that occurred in 2004?

3 A.      Yes.

4 Q.      Did there come a time at the end of April 2005

5 when you made contact with any law enforcement

6 officers?

7 A.      Yes.  Once they came past different spots I was

8 staying at.

9 Q.      What did they do when they came past the

10 different spots?

11 A.      Asked the people, and searched the house.

12 Q.      Excuse me?

13 A.      Asked the people was I there, and they searched

14 the houses.

15 Q.      Who told you that?

16 A.      Xavier Moore and this female that I knew house

17 they went past, too.

18 Q.      Were you ever there when they came by these

19 different locations?

20 A.      I was there one time.

21 Q.      Did you talk to them then?

22 A.      No.

23 Q.      What did you do after they came by a few

24 people's houses?

25 A.      My mom -- my mother contacted them.

1  Q.      But what did you do after your mom contacted

2  them?

3  A.      Came in.

4  Q.      Where did you go to meet with them?

5  A.      My mother's house.

6  Q.      Do you remember how many officers were there at

7  your mother's house?

8  A.      Two.

9  Q.      Was one of them Detective Eveler, who's sitting

10  at the end of the table?

11  A.      Yes.

12  Q.      When they came to your mother's house, did you

13  have a conversation with them?

14  A.      Yes.

15  Q.      Were you advised of your rights?

16  A.      Yes.

17  Q.      Did you give them information at that point in

18  time?

19  A.      Yes.

20  Q.      What happened to you then?

21  A.      I was taken into custody.

22  Q.      Have you been in custody ever since?

23  A.      Yes.

24  Q.      As a result of your arrest in late April 2005,

25  were you charged federally with your involvement in

1  this conspiracy?

2  A.     Yes

3  Q.     Were you represented by counsel?

4  A.     Yes.

5  Q.     Let me show you what's been marked as

6  Government's Exhibit A-2.

7         Do you recognize that document?

8  A.     Yes.

9  Q.     What is that?

10 A.     Charging papers.

11 Q.     What did you plead guilty to?

12 A.     Attempt to distribute.

13 Q.     Calling your attention -- let me zoom out here.

14        Do you see the first paragraph?

15 A.     Yes.

16 Q.     What did you -- what was the charge that you

17 pled guilty to?

18 A.     Conspiracy to distribute, and possess with

19 attempt to distribute 5 kilograms or more of cocaine.

20 Q.     On Page 2 of that plea agreement, does it set

21 forth what the maximum and minimum penalty are?

22 A.     No less than ten, and not more than life.

23 Q.     As part of that plea agreement, did you agree to

24 cooperate with the government?

25 A.     Yes.

1  Q.       Are your responsibilities  set forth  in Paragraph

2  5 of that plea agreement ?

3  A.       I don't understand  you .

4  Q.       Your obligation s under  the plea  agreement .   Are

5  they set forth  in that  paragraph ?

6  A.       Yes .

7  Q.       That  has many  little  subparagraph s; is  that

8  correct ?

9  A.       Yes .

10 Q.       What  is your  understand ing of what  you must  do

11 under  the term s of  the plea  agreement ?

12 A.       Tell  the  truth .

13 Q.       All right .   And when you say "tell  the truth ,"

14 what does that  mean  in term s of -- in response  to who

15 do you have to tell  the truth ?

16 A.       Everyone .  Everyone  that  I have  knowledge  of .

17 Q.       What do you expect  to happen  if you ful fill  your

18 term s of the plea  agreement  as is set  forth  in this

19 plea  agreement ?

20        If you live  up to your  end of the plea

21 agreement , what  do you expect  to happen  at the time  of

22 sent enc ing ?

23 A.       A less er  sentence .

24 Q.       Do you have any idea or any expectation  of how

25 low your  sentence  will  go ?

1  A.       No.

2  Q.       Who ultimately makes the decision of whether or

3  not your sentence will be reduced below the range as is

4  set without cooperation?

5  A.       The judge.

6  Q.       What would be the effect if you were to lie in

7  response to -- even a single question posed by anyone

8  here in court?

9  A.       Won't be no consideration.

10 Q.       Would it have any other effect if you were to

11 lie in response to any question here in court?

12 A.       Be charged with perjury.

13 Q.       Would that be in addition to the time that you

14 would get for the conspiracy charge?

15 A.       Yes.

16 Q.       Does that apply to questions asked by defense

17 counsel as well as government counsel?

18 A.       Yes.

19 Q.       Let me show you what's been marked as

20 Government's Exhibit CH-1.

21          You've mentioned a lot of people.  If you could

22 look at this chart and see who of those people are --

23 you recognize on the chart -- I'm going to ask you,

24 without saying anything, to look at the chart and, with

25 this pen, write the names of the people you recognize

1 next to their picture but not on the white tape. Find

2 another spot to write, and then we'll have you explain

3 to the jury what you've written on the diagram after

4 you've finished.

5 A.     The name?

6 Q.     Yeah. Write the name next to the photograph of

7 anyone you recognize.

8 A.     Not on the white tape?

9 Q.     Not on the white tape.

10 A.     (Witness indicating.)

11 Q.     I'm going to ask you to put your initials and

12 the today's date underneath each name you write. Today

13 is June 20.

14 A.     That's it?

15 Q.     Yes. You can identify yourself.

16 A.     (Witness indicating.)

17 Q.     Is that it?

18 A.     Yeah.

19 Q.     I'm going to turn this around and ask you to

20 point and tell the jury who you identified, while I

21 stand behind this.

22 A.     Mr. Goodwin.

23 Q.     Keep your voice up, please.

24 A.     Oh. Mr. Goodwin. Ms. Martin. Mr. Moore, Mr.

25 Irby, Mr. McKenzie, Ms. Vessels, Mr. Campbell, and

1 myself.

2 Q.      On the bottom? Did you identify anybody in the

3 bottom box?

4 A.      Oh, and Larry Lane.

5 Q.      Are those the people that you just testified

6 about here?

7 A.      Yes.

8 Q.      Both today and on Friday?

9 A.      Yes.

10 Q.      Also, you mentioned cousin Steven Ross.

11 A.      Yes.

12 Q.      When you were first interviewed by the police,

13 did you identify him to the police as well?

14 A.      Yes.

15 Q.      Likewise, did you look at photographs with the

16 police and make identifications of these people as

17 well?

18 A.      Yes.

19      MS. JOHNSTON:    Court's indulgence.

20      Your Honor, just for the record, I identified --

21 did not identify this piece of paper. It's Oglethorpe

22 21 so that the record is clear.

23      With that, Your Honor, I have no other

24 questions.

25      THE COURT:  All right. Cross-examination?

1                          **CROSS-EXAMINATION**

2          BY MR. MARTIN:

3  Q.      Mr. Thurman, you would admit, sir, that long

4  before you ever met any of the people that you

5  mentioned who are sitting in this courtroom, you were

6  using drugs; right?

7  A.      Yes.

8  Q.      In fact, you were using drugs since you were 16

9  years of age; correct?

10 A.      Yes.

11 Q.      And you had suppliers since you were 16 years of

12 age; correct?

13 A.      Yes.

14 Q.      In fact, if I remember your testimony correctly,

15 you had friends and family in Texas who were also

16 suppliers; is that not correct?

17 A.      I knew of friends. I ain't had no family that

18 was suppliers.

19 Q.      Well, didn't you tell government trial counsel

20 that you went to Texas to establish a source of cocaine

21 supplying through your cousin Steve?

22 A.      Yes.

23 Q.      So, it's not a mischaracterization to say that

24 you had suppliers in Texas; is it?

25 A.      I don't understand the question.

1 Q.      In addition to your cousin Steve, there was

2 another cousin -- I believe you said Steve Campbell?

3 A.      He's not my cousin.

4 Q.      Okay.  Steve Campbell is a friend?

5 A.      Yes.

6 Q.      And Steve Campbell was also another source for

7 your drug network in Texas; correct?

8 A.      I met him through Steven Ross.

9 Q.      You also knew that these people had sources in

10 Mexico; right?

11 A.      Mexico?  I wasn't sure where their source was.

12 Q.      Eventually, that's where you found out they were

13 getting their drugs from; is that not correct?

14 A.      I had ideas.

15 Q.      You had ideas.

16 A.      Yes.

17 Q.      But didn't Madam Trial counsel ask you several

18 times about El Paso?

19 A.      Yes.

20 Q.      And didn't you tell her -- go ahead, sir.

21 A.      I'm saying yes.

22 Q.      And didn't you tell her that you knew somebody

23 who was going across the border to exchange bad drugs?

24 A.      Yes.

25 Q.      When I asked you whether or not these people had

1 suppliers  in  Mexico  and  you  hesitate d,  you  in fact  knew

2 that  that 's  what  you  testifi ed  to  earlier ;  right ?

3 A.      They're  two  different  people .

4 Q.      Two  different  people .

5        But  you  have  source s  who  have  suppliers  in

6 Mexico ;  is  that  not  correct ?

7 A.      The  person  I  know  of ,  I  don't  know  where  their

8 suppli er  --  there  were  two  different  people  that  she

9 was  talk ing  about .   One  was  Kelly  and  one  was  Steve n.

10 Q.      And  you  have  friends  like  Tony  and  Jeff  and

11 Rodney.   Those  are  your  friends ;  right ?

12 A.      Yes .

13 Q.      And  some  of  those  friends  actual ly  drove  with

14 you  on  your  trip s  from  the  Washington  metropolitan  area

15 down  to  Texas ;  right ?

16 A.      Correct .

17 Q.      And  Xavier  did  that  as  well ;  correct ?

18 A.      Correct .

19 Q.      And  Caitlin  Demara  did  that  as  well ;  correct ?

20 A.      Correct .

21 Q.      By  the  way ,  Caitlin  Demara  is  not  on  here ,  is

22 she ?

23 A.      No .

24        MR. MARTIN:    May  I,  Your  Honor ?

25        THE  COURT:    Yes .

1              BY MR. MARTIN:

2  Q.       Would you recognize Caitlin Demara 's picture ?

3  A.       Yes .

4  Q.       I would ask the record reflect that I am showing

5  Government 's Exhibit CH-1 to the witness .

6              I would ask you to take a look and tell this

7  jury whether or not you see Ms. Demara on this chart .

8  A.       No .

9  Q.       No .

10             Caitlin Demara was somebody that , like Rayshard

11 Jones , had helped you out ; correct ?

12 A.       No .  She was my girlfriend .

13 Q.       She was your girlfriend .

14             But she went with you on the trips to Texas ;

15 right ?

16 A.       Yes .

17 Q.       You also said that you had several address es to

18 ship the drugs to ; correct ?

19 A.       Yes .

20 Q.       One of the address es you used was your mother 's

21 address ; isn't that correct ?

22 A.       No .

23 Q.       You're testify ing that you did not use your

24 mother 's address ?

25 A.       I used Delray Court .  That 's the house I was

1  living at.

2  Q.      Do you remember testifying last week, Friday,

3  June 16, 2006?

4        I call the court's attention to Page 97, if

5  counsel would like to follow.  I'm looking specifically

6  at Line 15.

7        Do you recall testifying last week in front of

8  the ladies and gentlemen?

9  A.      Yes.

10 Q.      Do you remember a series of questions that

11 Madam Trial Counsel had asked you about where were the

12 different addresses you were sending the drugs?

13       MS. JOHNSTON:   Objection.

14       That's not what's in the transcript on this

15 page.  It refers to an exhibit.

16       THE COURT:   Sustained.

17       Can you rephrase it to conform with what's on

18 the page?

19       BY MR. MARTIN:

20 Q.      Let me ask you this.  Did you use your mother's

21 address at any time to store or stash any of your

22 drugs?

23 A.      No.

24 Q.      You also had connections to rent cars; is that

25 not a fact?

1  A.      Yes.

2  Q.      And you rented a car with the help of Julio

3  from Budget; right?

4  A.      Julio.

5  Q.      Julio.

6          And Julio was your best friend's best friend.

7  A.      Correct.

8  Q.      And you also testified, if I remember correctly,

9  that you knew where to buy these false bottom cans;

10 correct?

11 A.      Correct.

12 Q.      And I think you said that that was a place

13 called Starship's; right?

14 A.      Correct.

15 Q.      And you said that Steve Campbell showed you

16 where to buy these cans; is that not correct?

17 A.      I didn't say that.

18 Q.      What did you say?

19 A.      I said I purchased them from Starship's.

20 Q.      You never said it was Steve Campbell that showed

21 you where to buy the cans?

22          Counsel, I'm on Page 57 now.

23          THE COURT:   Page 57 you said?

24          MR. MARTIN:   Page 57.  I'm at Line 20 looking

25 down to Line 25.  Giving counsel a chance to look at

1 the record .

2        BY MR. MARTIN:

3 Q.      Do you recall a series of question s you were

4 asked about Starship's by trial counsel ?

5 A.      Yes .

6 Q.      Do you recall her asking you about Starship's ,

7 specifically ?

8        MS. JOHNSTON:   Objection .

9        That 's not what's in the record .

10       MR. MARTIN:   Your Honor , may we approach ?

11       THE COURT:   You may .

12             (At the bar of the court .)

13       MR. MARTIN:   I'm on Page 57, Your Honor .

14       THE COURT:   I see .

15       MR. MARTIN:   I'm at Line 22 to 25 .

16       THE COURT:   All right .

17       MR. MARTIN:   A store called Starship's . How did

18 you learn about that store ? By making runs, going up

19 and down , Steve Campbell and different people .

20       MS. JOHNSTON:   The government never mention ed

21 Starship's in any question s. Counsel said , do you

22 recall the government asking you about a store name d

23 Starship's . That 's not what's in here . He's taking

24 what was in there out of context .

25       MR. MARTIN:   How did you learn about that store ?

1         Read Line 23.

2         THE COURT:  If the previous question is, where

3  did you purchase it, and he said a store called

4  Starship's --

5         MR. MARTIN:  Your Honor, we're splitting hairs

6  here.

7         MS. JOHNSTON:  No, we're not.

8         MR. MARTIN:  Yes, we are.  What I'm getting at

9  is --

10        THE COURT:  All you have to ask is, do you

11 remember being asked about where you bought it.

12        MR. MARTIN:  Your Honor, I'm trying to

13 establish that Steve Campbell was the source.

14        MR. MONTEMARANO:  Just rephrase your question.

15        Court's indulgence.  If I could, please.

16        THE COURT:  Sure.

17        I think that the problem is a very minor one

18 with the form of your question.  She didn't say, did

19 she, did you know about Starship's.  She asked him

20 where, did you get them.  His answer was, Starhips.

21        MS. JOHNSTON:  The inference is that the

22 government had knowledge of Starship's without this

23 witness providing the testimony.

24        THE COURT:  Just rephrase your question and I

25 think you're okay.

1          MR. MARTIN:   I'm going to ask the question that
2 was asked.

3          THE COURT:   The objection is sustained.   You may
4 rephrase it.

5                    (Back in open court.)

6          BY MR. MARTIN:

7 Q.      How did you learn about Starship's?

8 A.      Just by stopping in.

9 Q.      Didn't you tell the ladies and gentlemen of the
10 jury that you learned about Starship's from Steve
11 Campbell and other people?

12 A.      Yeah.   Like, stopping in because they sell
13 cigarettes, blunt wrappers, and everything.

14 Q.      So you acknowledge then that Steve Campbell was
15 one of the people who led you to Starship's.

16 A.      He could have been, with other friends.

17 Q.      You met with Special Agents Eveler and Snyder on
18 April 28 of 2005 at your mother's house; right?

19 A.      Correct.

20 Q.      And you met with them after your mom had sent
21 notice to them that you were ready to turn yourself in;
22 right?

23 A.      Correct.

24 Q.      And you sat down and you talked with them again
25 on May 5th 2005; right?

1  A.       Correct.

2  Q.       In fact, you met with them several times right

3  here in this building; right?

4  A.       Correct.

5  Q.       You met with them on May 16 as well.

6  A.       I'm not sure of the date, but, yes.

7  Q.       May 26.

8           Do recall how many times you met?

9  A.       I don't recall how many times.

10 Q.       You would agree that it was at least three to

11 five times; right?

12 A.       Yeah, about that.

13 Q.       About that.

14          And I guess each time you met with them, you

15 debriefed them for a couple of hours; right?

16 A.       Correct.

17 Q.       During those debriefings, at no time were you

18 videotaped, were you?

19 A.       Not to my knowledge.

20 Q.       As far as you know, there were no tape

21 recordings either, were there?

22 A.       Not to my knowledge.

23 Q.       At the end of those debriefings, did anybody

24 show you notes or a typewritten transcript and ask you

25 to review it?

1  A.       No.

2  Q.       Prior to your testimony here in this court, you

3  also met with the government, didn't you?

4  A.       Say it again.

5  Q.       Prior to your testimony, which begin last week,

6  you met with the government, didn't you?

7  A.       Yes.

8  Q.       You met with the government to go over your

9  expected testimony; right?

10  A.       Correct.

11  Q.       And you were told, more or less, what questions

12  would be asked of you; right?

13  A.       Some sort.

14  Q.       And the government wanted to get a response to

15  those questions; correct?

16  A.       I can't recall.

17  Q.       You can't recall whether they wanted to hear

18  your response to the questions?

19  A.       No, I can't recall.

20  Q.       You can't recall that, but you recall events

21  that happened back in 2004.

22  A.       Yes.

23  Q.       But you can't recall what happened a week or two

24  ago?

25  A.       I can't recall if they asked me for a certain

1 response .

2 Q.     Well , let me ask you this .  Did any of the

3 lawyer s sitting  here  at  this  table  or  the  table  behind

4 you , did  any  of  them  get  a  chance  to  question  you ?

5 A.     No .

6 Q.     Would  you  have  been  willing  to  talk  to  any  of

7 them  beforehand ?

8 A.     Yes .

9 Q.     Really ?  Did  you  tell  the  government  that ?

10 A.     It  wasn't  a  question  that  was  asked .

11 Q.     You  were  also  told  that  you  would  be  asked  about

12 your  plea  agreement ; right ?

13 A.     Repeat  your  question .

14 Q.     You  were  told  by  the  government  that  you  would

15 be  asked  about  your  plea  agreement ; correct ?

16 A.     Yes .

17 Q.     You  were  told  that  when  you  were  asked  about

18 your  plea  agreement  that  you  would  say , what  I  have  to

19 do  is  tell  the  truth , right ?

20 A.     You  say  I  was  told  that ?

21 Q.     Yeah .  You  were  told  that , weren't  you ?

22 A.     I  was  told  to  be  honest .

23 Q.     Listen  to  the  question .  When  you  met  with  the

24 government , you  went  over  your  plea  agreement ; right ?

25 A.     Right .

1  Q.      And you were told by the government  you would be

2  asked  what were  your  obligation s and responsibilities

3  under  the plea  agreement ; right ?

4  A.      Right .

5  Q.      And you were told that when you were asked that

6  to say that , I was told , or I'm obligate d to tell the

7  truth ; right ?

8  A.      Correct .

9  Q.      And that was the -- that wasn't the only time

10 you were told what to say , was it ?

11 A.      I don't understand  your question .

12 Q.      Well , the question  is this . You were told that

13 certain  question s would  be asked of you by the defense ;

14 correct ?

15 A.      Example  question s.

16 Q.      Example  question s?

17 A.      Example  question s.

18 Q.      And you were told how to respond  to those

19 question s; correct ?

20 A.      No .

21 Q.      No ?  Now , you also  said  with respect  to this

22 plea  agreement  that you have certain  obligation s and

23 that the government  has certain  obligation s; right ?

24       You would agree   to that .

25 A.      Correct .

1  Q.      Isn't it a fact that while the states of Texas

2  and Louisiana were searching for you, you were not

3  aware or you didn't have any reason to believe that the

4  federal -- the United States Attorney's office in

5  Louisiana was looking for you, did you?

6  A.      Are you saying Louisiana?

7  Q.      Yeah.

8  A.      Not to my knowledge.

9  Q.      The United States Attorney's office, as far as

10  you know, in Texas was not looking for you; right?

11  A.      Not to my knowledge.

12  Q.      And the United States Attorney's office in the

13  District of Columbia was not looking for you, were

14  they?

15  A.      Not to my knowledge.

16  Q.      You don't expect to be indicted in any of those

17  jurisdictions as a result of your testimony here, do

18  you?

19  A.      I'm not sure.

20  Q.      You're cooperating; right?

21  A.      Yes.

22  Q.      Don't you think the government is going to let

23  not only the judge know you cooperated but any offices

24  that might inquire?

25  A.      I can't speak for the government.

1  Q.      Is it your expectation that you won't be

2  indicted in any further jurisdiction?

3  A.      The only thing I can do is hope.

4  Q.      I'm sorry, sir?  I didn't hear you.

5  A.      I can hope that I'm not

6  Q.      You can hope that you're not?  But as government

7  trial counsel pointed out, you're facing ten years to

8  life on the charging document that she has shown you

9  earlier; right?

10  A.      Yes.

11  Q.      If you were facing ten years to life in Texas,

12  ten years to life in Louisiana, and ten years to life

13  in the District and ten years to life here in Maryland,

14  that would be a 40-year minimum term, wouldn't it?

15  A.      Yes.

16  Q.      How old are you now, sir?

17  A.      31.

18  Q.      31.  And you know that there is no parole in the

19  federal system; right?

20  A.      Yes.

21  Q.      So you have to do whatever time you get;

22  correct?

23  A.      Correct.

24  Q.      Less credit for good time; right?

25  A.      Yes.

1  Q.      Did you meet with the government over the

2  weekend to discuss your testimony here this morning?

3  A.      No.

4  Q.      You said that Mr. Goodwin flew to Texas with

5  you; correct?

6  A.      Correct.

7  Q.      Isn't it a fact that several people flew with

8  you on your trips from Texas to Washington?

9  A.      Flew back?

10  Q.      Flew back.

11  A.      When the car got wrecked.

12  Q.      On the alleged trip that you took with Mr.

13  Goodwin to Texas, no one else traveled with you;

14  correct?

15  A.      Correct.

16  Q.      Getting back to this plea agreement for a

17  moment.  We know what your obligations are.

18          Do you recall discussing a possible 5(k) motion

19  with your lawyer?  Without telling me what he said, do

20  you remember discussing that?

21  A.      Not the name, no.

22  Q.      Not specifically.  But you know there's a

23  mechanism for reducing your offense level; right?

24  A.      Right.

25  Q.      And you know also that the government can make a

1 motion to get you underneath that statutory minimum as

2 well, that ten years that we were talking about

3 earlier; right?

4 A.      Yes.

5 Q.      That is specifically mentioned in Paragraph 12

6 of your plea agreement, isn't it?

7 A.      I don't have it in front of me, so I'm not sure.

8 Q.      Would you like to see it?

9 A.      If you want me to answer the question.

10      MR. MARTIN:   May I Your Honor?

11      THE COURT:   You may.

12      THE WITNESS:   What do you want me to do?   What

13 was the question again?

14      BY MR. MARTIN:

15 Q.   I asked you about 5(k).   Now I'm asking you

16 about the motion to get you underneath the statutory

17 minimum.

18 A.      That's the motion?

19 Q.      Yes.   That's the cite to it?

20 A.      Yes, that's in Paragraph 12.

21 Q.      You're hoping that by testifying here today that

22 you in fact will get less than ten years; right?

23 A.      Yes.

24 Q.      You don't like being in jail, do you?

25 A.      No.

1  Q.      What's the longest you've ever been in jail
2  prior to this charge?
3  A.      About three years.
4  Q.      Do you have kids, Mr. Thurman?
5  A.      Yes.
6  Q.      How old are your kids?
7  A.      They're 8, 3, and 1 .
8  Q.      You'd like to be able to spend time with them
9  before they grow into adulthood; isn't that true?
10 A.      Correct.
11 Q.      Your mom. Mr. Thurman, is she worried about
12 you?
13 A.      I'm sure she is.
14 Q.      You'd like to be able to settle your mom's mind;
15 right?
16 A.      I couldn't hear the question.
17 Q.      I withdraw the question.
18         The agreement also provides or requires that you
19 give substantial assistance to the government; right?
20 A.      Correct.
21 Q.      That substantial assistance comes in the form of
22 your testimony; correct?
23 A.      Yes.
24 Q.      We've already established that that means that
25 you have to be truthful.

1  A.        Correct .

2  Q.        In determini ng  your  truthfulness , Mr. Goodwin

3  isn't  going  to  decide  if  you're  truthful  is  he?

4  A.        No .

5  Q.        You're  not  going  to  get  any  credit  if  Mr.

6  Goodwin  says  you're  truthful , are  you?

7  A.        I don't  think  so .

8  Q.        No .  You're  not  going  to  get  any  credit  if  I

9  tell  the  judge  you're  truthful , are  you?

10  A.        I don't  think  so .

11  Q.        Suppose  Ms. Johnston  here  were  to  tell  the  judge

12  that  you  were  truthful ?  Do  you  think  you're  going  to

13  get  credit ?

14  A.        Maybe .

15  Q.        You  hope  so ; right ?

16  A.        I hope  so .

17  Q.        Out  of  all  the  lawyer s sitting  here , it's  only

18  the  lawyer s sitting  on  this  side  of  the  table  who

19  determine  whether  you  were  truthful  and  gave

20  substantial  assistance ; isn't  that  correct ?

21  A.        Yes .  I assume  so .

22  Q.        If  they  don't  make  the  motion , and  even  if  the

23  judge  thought  you  were  truthful , you  don't  get  any

24  credit , do  you?

25  A.        I don't  think  so .

1 Q.      Your deal doesn't require that you go down to

2 Texas and testify against your family and friends, does

3 it?

4         I withdraw that question.  I withdraw it.

5         Have you had occasion to talk to Larry Lane

6 since being incarcerated?

7 A.      No.

8 Q.      Have you had occasion to write to Larry Lane

9 since being incarcerated?

10 A.      No.

11 Q.      What about Raynard Dorsey?

12 A.      No.

13 Q.      You said that Mr. Goodwin was upset about his

14 arrest back in November of 2003; correct?

15 A.      Correct.

16 Q.      And you said that Mr. Goodwin said that Raynard

17 Dorsey had set him up; right?

18 A.      Correct.

19 Q.      You never heard Mr. Goodwin say that the drugs

20 in the car were his though, did you?

21 A.      That wasn't the conversation.

22 Q.      Do you recall Mr. Goodwin saying that it was

23 Raynard Dorsey's car?

24 A.      I don't understand  the question.

25 Q.      You don't understand whether or not Mr. Goodwin

1 was driving his car or Raynard Dorsey's car?

2        MS. JOHNSTON:    Objection.

3        Basis and knowledge.

4        BY MR. MARTIN:

5 Q.      Do you know what car Raynard Dorsey drove?

6 A.      No.

7 Q.      You also said that you had gone to Mr. Goodwin's

8 house where he lived with Tiffany Vessels; right?

9 A.      Correct.

10 Q.     Where is that house located?

11 A.     Washington, D. C.

12 Q.     Where?

13 A.     On Farragut.

14 Q.     How did you get there?

15 A.     What do you mean?  Drive.

16 Q.     You drove, or somebody else drove?

17 A.     I drove.

18 Q.     You also talked about the Anacostia Road

19 apartment, I believe 1323.  Do you remember that?

20 A.     Yes.

21 Q.     Isn't it a fact that you had actually lived

22 there for a while?

23 A.     Yes.

24 Q.     While you were living there, you were dealing

25 drugs out of that apartment, weren't you?

1 A.       Excuse me?

2 Q.       You were dealing drugs out of your apartment on

3 Anacostia Road, weren't you?

4 A.       Yes.

5 Q.       When Mr. Goodwin found out about that, he told

6 you that you had to leave; isn't that correct?

7 A.       No.

8 Q.       Didn't you have a confrontation with Ricardo

9 Williams -- do you know Ricardo Williams?   "Little

10 Rick?"

11 A.       Yes.

12 Q.       Didn't you have a confrontation with Ricardo

13 Williams over your selling drugs at 1323 Anacostia?

14 A.       No.

15 Q.       You also testified that you worked at Lobo's;

16 correct?

17 A.       Correct.

18 Q.       As a result of working at Lobo's, you had access

19 to various vehicles; right?

20 A.       Correct.

21 Q.       You also had access to the dealer tags; right?

22 A.       Correct.

23 Q.       And you were dealing drugs out of Lobo's?

24 A.       Correct.

25 Q.       Let me get this straight.   You had friends and

1  family in Texas to supply you with drugs; right?

2         Right?

3  A.     Yes.

4  Q.     You also had a connection at UPS to mail the

5  drugs to Washington, D. C; correct?

6  A.     Well, Steven did.  I didn't.

7  Q.     But you used that connection; right?

8  A.     Yes.

9  Q.     You also had access to rental cars; correct?

10 A.     Correct.

11 Q.     You had friends to help you drive from

12 Washington, D. C. to Texas and back; correct?

13 A.     Correct.

14 Q.     You had all of those contacts, and it's your

15 testimony that that network is not your network but

16 that that's Learley Reed Goodwin's network; correct?

17 A.     Correct.

18 Q.     Including Steve Ross and Steve Campbell; right?

19 A.     Correct.

20 Q.     That's not your network.  That's not the Michael

21 Thurman organization.

22 A.     No.

23 Q.     You know that the government is interested in

24 Learley Reed Goodwin; right?

25 A.     Yes.

1  Q.      And you know that the best way to reduce your

2  sentence is to give them what they want; right?

3  A.      To be honest.

4  Q.      Be honest.

5  A.      Yeah.

6  Q.      Doesn't your agreement require that?

7  A.      Yes.

8  Q.      That's what they want; right?

9  A.      Yes.

10 Q.      And you're going to help them get what they

11 want; right?

12 A.      Yes.

13 Q.      Mr. Thurman, in all of those sessions you had

14 with the government, in all of those debriefings, tell

15 us: At any time did you take a polygraph?

16         MS. JOHNSTON:   Objection.

17         THE COURT:   Sustained.

18         MS. JOHNSTON:   Your Honor, we would ask the

19 court to instruct the jury.

20         THE COURT:   I instruct the jury to disregard the

21 question and answer.

22         MR. MARTIN:   No further questions, Your Honor.

23                  **CROSS-EXAMINATION**

24         BY MR. MONTEMARANO:

25 Q.      Good morning, Mr. Thurman.   How are you?

1 A.      I'm okay.

2 Q.      My name is Michael Montemarano.  I represent

3 Paulette Martin.

4         You and I have never spoken before, have we?

5 A.      No.

6 Q.      Would you mind if I ask you a few questions to

7 add onto what Mr. Martin's asked you?

8         You were just telling Mr. Martin how important

9 it was for you to be honest; correct, sir?

10 A.      Correct.

11 Q.      You want to be honest because you believe that

12 will help you with regard to your sentence; correct?

13 A.      Correct.

14 Q.      And you also want to be honest and tell the

15 truth, because you're under oath; correct, sir?

16 A.      Correct.

17 Q.      It's important that you're under oath; right,

18 sir?

19 A.      Yes.

20 Q.      Because being under oath means you're supposed

21 to tell the truth; right, sir?

22 A.      Yes.

23 Q.      Do you remember being in the Circuit Court for

24 Montgomery County back in 1999?

25 A.      What court?  Like, for what?  What you mean?  I

1 probably went to court several times in '99.

2 Q.      Do you remember being in the Circuit Court fort

3 Montgomery County in 1999?

4 A.      Yes.

5 Q.      That's where you took a plea for armed robbery;

6 correct, sir?

7 A.      Correct.

8 Q.      Armed robbery.  That's taking the possessions of

9 another person from person -- from their body, from

10 their immediate proximity, by violence or threat of

11 violence; right, sir?

12 A.      Correct.

13 Q.      What kind of violence did you use in that

14 robbery?

15 A.      Did who use?

16 Q.      You.

17 A.      I used none.

18 Q.      None?

19 A.      None.

20 Q.      You pled guilty to armed robbery.  So, you pled

21 guilty for doing something you didn't do?

22 A.      I was with the person.

23 Q.      Oh, you were with the person?

24 A.      Yes.

25 Q.      So you didn't do it.  This other person did it.

1  A.       Correct .

2  Q.       You were just there .

3  A.       Yes .

4  Q.       What kind of violence did that person use ?

5  A.       I didn't see the actual robbery .  I was there .

6  Q.       You didn't see it , but you pled guilty ; right ?

7  A.       Right .

8  Q.       You were put under oath in front of a judge in

9  the Circuit Court for Montgomery County ; right ?

10 A.       Yes .

11 Q.       A judge wear ing a black robe just like Judge

12 Titus ?

13 A.       Yes .

14 Q.       You were put under oath and you were asked to

15 tell the truth , weren't you ?

16 A.       Right .

17 Q.       And you pled guilty ; right ?

18 A.       Right .

19 Q.       One of the question s that that judge asked you

20 is , are you plead ing guilty because you are guilty ;

21 right , sir ?

22 A.       Correct .

23 Q.       So you were guilty in 1999 .

24 A.       Yes .

25 Q.       But just not today ?

1  A.       I can't understand you.

2  Q.       Well, you didn't see the violence; you didn't

3  see the person; you were just there.  So, you're not

4  guilty of the robbery?

5  A.       I was driving the car, so I was guilty of the

6  underlying -- of being a accessory.

7  Q.       When you went out with your running mate that

8  day, that was to commit a robbery; right?

9  A.       No.

10  Q.      No?

11  A.      That's my response.

12  Q.      No?

13  A.      No.

14  Q.      If you didn't do anything, why did you go trial?

15          MS. JOHNSTON:   Objection.

16          He mischaracterizes his testimony.

17          THE COURT:   Overruled.

18          MR. MONTEMARANO:   You're presumed innocent;

19  right, Mr. Thurman?

20          MS. JOHNSTON:   Objection.

21          THE COURT:   Sustained.

22          You're arguing with the witness.

23          BY MR. MONTEMARANO:

24  Q.      Thank you, Your Honor.

25          And you served about three years, you said, on

1  that sentence?

2  A.      Correct.

3  Q.      And you got about, what, three years probation?

4  A.      Two, I think.

5  Q.      Two?  You said you were released in 2002; right?

6  A.      One.

7  Q.      2001?

8  A.      Yes.

9  Q.      So you were still on probation when you were

10  arrested in 2004 in Texas?

11  A.      No.

12  Q.      You weren't?

13  A.      No.

14  Q.      But you certainly had been convicted of a

15  felony, and that's armed robbery, and there's no doubt

16  in your mind about that; right, sir?

17  A.      Correct.

18  Q.      When you were arrested in Orange County, Texas

19  by Sergeant Strause, you had about two pounds of

20  marijuana in your vehicle?

21  A.      I wasn't sure.  I'm not sure of the weight.

22  Q.      It wasn't just a little amount.

23          Was it a pound, maybe?  Was it three pounds?

24  A.      It could have been.

25  Q.      Could have been?

1 A.       Yeah.

2 Q.       You've smoked marijuana before; right, sir?

3 A.       Yes.

4 Q.       So you have an understanding, based upon

5 knowledge and experience, of how to use marijuana;

6 right, sir?

7 A.       Correct.

8 Q.       You don't smoke a pound of marijuana in an

9 afternoon, do you, sir?

10 A.       No.

11 Q.       So there's no question in your mind that that

12 pound or two pounds of marijuana, that was

13 distribution; right, sir?

14        Possession with intent to distribute just like

15 you pled guilty to in this case; right, sir?

16 A.       Correct.

17 Q.       So there's no question that's a distribution

18 amount.  That's not personal use.  That's not like,

19 let's go party; right, sir?

20 A.       It could be.

21 Q.       It could?  Okay.

22        Tell me something.  Are you going to take a

23 couple of firearms to that party?

24 A.       Excuse me?

25 Q.       Are you going to take a couple of firearms to

1 that party you could be going to?

2 A.      No.

3 Q.      No?  In fact, those firearms are to protect your

4 distribution of marijuana; right, sir?

5 A.      No.

6 Q.      No?

7 A.      No.

8 Q.      You just happened to have two loaded firearms in

9 your vehicle?

10 A.      It wouldn't happen to have, no.

11 Q.      You didn't happen to have them.  You knew they

12 were there.

13 A.      Yes.

14 Q.      You knew they were loaded.

15 A.      Yes.

16 Q.      And they were there if you needed them; right,

17 sir?

18 A.      Yes.

19 Q.      A firearm, it's fair to say, could be used for

20 the purpose of violence; wouldn't that be fair, sir?

21 A.      Repeat the question.

22 Q.      A firearm would be used for the purpose of

23 violence; wouldn't it, sir?

24 A.      I guess so.

25 Q.      If somebody pulls a gun on you, that's a violent

1 act; wouldn't you agree?

2 A.      Yes.

3 Q.      And when you finally end up speaking to

4 Detective Eveler and the other law enforcement agents

5 in this case in 2005, you had not yet been adjudicated

6 on that case in Texas; correct, sir?

7 A.      I don't understand your question.

8 Q.      In 2005 you turned yourself in?

9 A.      Correct.

10 Q.      Those Texas charges were still pending; correct,

11 sir?

12 A.      Correct.

13 Q.      State court charges, also; correct, sir?

14 A.      Correct.

15 Q.      Federal charges; right?

16        You understood you could have been charged in

17 federal court; right?

18 A.      Yes.

19 Q.      Felon in possession of a firearm, two counts;

20 right, sir? You understood that.

21 A.      Yes.

22 Q.      You understood -- when you took your plea, they

23 advised you of the rights you gave up; right, sir?

24 A.      Yes.

25 Q.      One of those is the right to own or be in

1 possession of a firearm.

2 A.       Correct.

3 Q.       If you can't own or possess one firearm, then

4 you sure can't own and possess two of them; can you,

5 sir?

6 A.       Correct.

7 Q.       But in January of 2004, in Orange, Texas, that

8 wasn't important to you, because you had two firearms

9 in your possession; right?

10 A.      I'm not sure of the date you're talking about.

11 Q.      When you were arrested in Orange, Texas, that's

12 January of '04, was it not?

13 A.      Yes.  Yes, yes.

14       MR. MONTEMARANO:  Court's indulgence, please.

15       I'm going to show you here, sir.

16       MS. JOHNSTON:   Counsel wants to use a document,

17 Your Honor, that's not in evidence.   That's why the

18 government didn't want him to put it on the screen.

19       THE COURT:   Okay.

20       BY MR. MONTEMARANO:

21 Q.      I will show it up here.

22       There is a date there.   What's that date?

23 A.      01/21/04.

24 Q.      January 21, 2004, Orange, Texas, Orange County

25 Sheriff's Department.   Does that sound familiar?

1  A.       Right .

2  Q.       So you would agree that was January of '04;

3  right , sir?

4  A.       Right .

5  Q.       I'd like to take your mind to June of 2004 .

6  That's when you were in Louisiana ; right , sir?

7  A.       It sounds about right , but I'm not sure of the

8  exact date .

9  Q.       Give me June of '04?

10 A.       Well , I'm listening .

11 Q.       June 16 , give or take ?  That's when Trooper

12 Guillotte of the Louisiana State Police pulled you

13 over ; correct , sir?

14 A.       I was pulled over .  I'm not sure of his name .

15 Q.       And that's when his search of your -- you were

16 driving the Conversion van; correct , sir?

17 A.       No.

18 Q.       The motor home .  I'm sorry , the motor home ?

19 A.       Correct .

20 Q.       In fact , let's talk about -- excuse me for a

21 moment .  I'm sorry to change subject s on you .  I forgot

22 something .

23        That Conversion van that you were driving.

24 That's the one you were driving in Texas in January ;

25 right , sir?

1 A.       Yes.

2 Q.       And that's the one with how many different

3 hidden compartments?

4 A.       Three.

5 Q.       Those hidden compartments were to facilitate the

6 concealment of your drugs and your guns; right, sir?

7 A.       They were there to hide drugs and guns.

8 Q.       They just happened to have drugs and guns in

9 them?

10 A.       Excuse me.

11 Q.       Did the compartments just happen to have drugs

12 and guns in them?

13 A.       No.

14 Q.       In fact, when you put the drugs and guns in the

15 van, you put them in the compartments on purpose;

16 right?

17          They didn't just fall in the compartments, did

18 they?

19 A.       No.

20 Q.       One of them was up in the ceiling; right?

21 A.       In the back, yeah.

22 Q.       Yes.

23          Now, let's go back to Louisiana.  You're busted

24 by Trooper Guillotte; right?

25 A.       Yes.

1 Q.     Right, sir?  And he does a search of your motor

2 home; correct, sir?

3 A.     Yes.

4 Q.     And he finds in the motor home, beneath the

5 stove, a nine ounce package of cocaine; correct, sir?

6 A.     Correct.

7 Q.     And not meaning to retread the same ground, but

8 you're an experience d user of cocaine; correct, sir?

9 A.     Correct.

10 Q.     You've been using it for many year s; correct?

11 A.     Correct.

12 Q.     Based upon your knowledge and experience of the

13 use of cocaine, you would agree that nine ounce s is a

14 distribution  amount; correct, sir?

15 A.     It could be.

16 Q.     Well, you're not going to be taking to that same

17 party nine ounce s of cocaine; right, sir?

18 A.     It could be.

19 Q.     It could be.  Well, you used to buy cocaine, you

20 said, before Mr. Goodwin, and you'd buy eight ball s;

21 right, sir?

22 A.     Right.

23 Q.     That's three grams; right, sir?

24 A.     Correct.

25 Q.     And if you got nine ounce s, do you know how many

1 ounces -- how many grams are in an ounce?  Do you

2 recall?

3 A.      Yes.

4 Q.      How many?

5 A.      Around 28.

6 Q.      About 28.  So it's 9 x 28, and that would be 252

7 grams of cocaine; right, sir?

8 A.      I'm not sure of the math.

9 Q.      Okay.  Well, let the jury do their own math.  If

10 my math serves, that's 84 eight-balls; right, sir?

11 A.      I'm not sure of the math.

12 Q.      I'm not sure either.  Let the jury do the math

13 themselves.

14        You said you would buy one eight-ball and go out

15 and distribute it, but you're telling us now with 84

16 eight-balls, you're not sure that's distribution

17 amount; is that correct, sir?

18 A.      I didn't say I wasn't sure, but I said it could

19 be.

20 Q.      Okay.  So you are sure, aren't you, Mr. Thurman?

21 A.      I answered the question.

22 Q.      But you didn't have the guns that time, did you?

23 A.      No.

24 Q.      Okay.  So now you've got a cocaine felony in

25 Louisiana, and that's never been adjudicated; correct,

1  sir?

2  A.      Correct.

3  Q.      It's still open and still pending.

4  A.      Correct.

5  Q.      Do you know you're facing state charges in

6  Louisiana for cocaine distribution, which is a felony;

7  right?

8  A.      Correct.

9  Q.      And you're facing federal charges in Louisiana;

10 correct, sir?

11          MS. JOHNSTON:   Objection.

12          Unless counsel knows of some pending charges the

13 government is not aware of.

14          MR. MONTEMARANO:  I will rephrase the question.

15          THE COURT:   Rephrase the question.

16          The objection is sustained.

17          BY MR. MONTEMARANO:

18 Q.      You could face federal charges in Louisiana.

19          My apologies.  You could face federal charges in

20 Louisiana?

21 A.      Yes.

22 Q.      You have not been charged with federal charges

23 in Louisiana; correct, sir?

24 A.      Correct.

25 Q.      Just like you haven't been charged with federal

1  charge s in Texas ; correct , sir ?

2  A.      Correct .

3  Q.      You were bus ted in January of 2004 in Texas ;

4  correct , sir ?

5  A.      Correct .

6  Q.      You didn't say anything about Learley Goodwin ,

7  did you , to the police ?

8  A.      No .

9  Q.      You didn't say anything about Paulette Martin ;

10 correct , sir ?

11 A.      Correct .

12 Q.      You didn't say anything about anybody in this

13 courtroom except for yourself ; right , sir ?

14 A.      Correct .

15 Q.      And then in Louisiana , in 2004 , again , that

16 would be June ; correct , sir ?

17 A.      Yes .

18 Q.      You didn't say anything about Learley Goodwin .

19 A.      You were just talk ing about Louisiana .

20 Q.      No .  I thought I was asking about Texas .

21 A.      No .  You said Louisiana .

22 Q.      I should start paying attention to what I'm

23 saying.   I apologize .   Thank you , Mr. Thurman .

24       If you didn't say anything about Mr. Goodwin or

25 Ms. Martin or anybody else in Louisiana in June of

1  2004, it's also fair to say you didn't say anything

2  about anybody else in January of '04 in Texas.  Is that

3  also a fair statement?

4  A.      Correct.

5  Q.      And then you got out on bail in Louisiana and

6  you came back to the D. C. area; correct, sir?

7  A.      Correct.

8  Q.      And you were on the street for about ten months,

9  until about April; is that right?

10 A.      Could be.

11 Q.      Give or take?

12 A.      Yeah, give or take.

13 Q.      More than nine and less than 11, something like

14 that?

15 A.      Yes.

16 Q.      You said when you got back to D. C. -- we're

17 going to say D. C.  You were in this area.

18         When you got back to D. C. you learned that

19 people you knew had been busted; correct, sir?

20 Arrested?  Like Mr. Goodwin.

21 A.      I knew before I returned to Washington.

22 Q.      You knew before you returned to Washington.

23 A.      Yeah.

24 Q.      Okay.  Even though they had been arrested, you

25 kept going down to Anacostia.  So you didn't need Mr.

1  Goodwin to continue doing drug work down there, did

2  you?

3  A.      There wasn't no drugs.  They moved.

4  Q.      None at all?

5  A.      Not after that.

6  Q.      That's what you're telling us today; right, sir?

7  A.      Yeah.

8  Q.      And though your pending two out-of-state charges

9  and you understand Mr. Goodwin's been arrested, at no

10  time during June of 2004 did you contact the

11  authorities to tell them about what you knew about drug

12  activity in the D. C. area; is that a fair statement,

13  sir?

14  A.      Correct.

15  Q.      In July of 2004, pending these two out-of-state

16  charges, you did not contact the authorities in any

17  jurisdiction concerning what you knew about drug

18  activity in the D. C. area; is that a fair statement,

19  sir?

20  A.      I don't understand the question.

21  Q.      Same question as for June, but for July.  In

22  July you didn't call the cops; right?

23  A.      No.

24  Q.      And in August?

25  A.      I don't think so, no.

1  Q.      September?

2  A.      No.

3  Q.      See where I'm going here?

4          It wasn't until April; right, sir?

5  A.      Right.

6  Q.      April of 2005; right, sir?

7  A.      Right.

8  Q.      When you saw the police coming around; correct,

9  sir? Right? You saw them coming around the area;

10 right?

11 A.      Yes.

12 Q.      And you were scared; right?

13 A.      Of some sort.

14 Q.      Of some sort?

15 A.      Yes.

16 Q.      Did you like your three years in jail in

17 Montgomery County?

18 A.      I don't think anybody likes being locked up.

19 Q.      So it would be reasonable to say you were scared

20 of going back to jail; right?

21 A.      Of some sort.

22 Q.      Some sort.

23          You sat down, you spoke to law enforcement,

24 Detective Eveler, the gentleman down here in the

25 brownish jacket and the yellow and dark red tie --

1  A.      Yes.

2  Q.      -- on the end of the table?

3  A.      Yes.

4  Q.      You told him what you knew; is that a fair

5  statement?

6  A.      Yes.

7  Q.      At that point you were arrested and taken into

8  custody; correct, sir?

9  A.      Correct.

10  Q.      And then an attorney was appointed to represent

11  you?

12  A.      Correct.

13  Q.      That would be Mr. White.  His name is on the

14  plea agreement you were looking at with Ms. Johnston;

15  correct, sir?

16  A.      That's my second attorney.

17  Q.      Your second attorney?

18  A.      Yes.

19  Q.      Who was your first attorney?

20  A.      Karen Call.

21  Q.      Mr. White talked to you -- when was Mr. White

22  appointed to represent you?  Do you recall?

23  A.      I'm not sure of the date.

24  Q.      How long after the April arrest?  Would it be a

25  month later or two months later or three months later?

1  A.      Under a month.

2  Q.      It had to be before September 28, because that's

3  the date on the plea agreement; isn't it, sir?  Does

4  that sound right?

5  A.      Yes.  It's before.

6  Q.      Certainly in the time before the plea agreement

7  was offered to you by the government, you and he

8  discussed what a plea would involve, did you not?

9  A.      Correct.

10 Q.      And he discussed the contents of the plea

11 agreement; correct?  He went through it with you.

12 A.      Yes.

13 Q.      When you went to court to enter a plea of

14 guilty, the judge went through it with you, did he not?

15 A.      Yes.

16 Q.      Was it Judge Titus?

17 A.      Yes.

18 Q.      Okay.  And he went through in detail all of the

19 rights you're giving up; correct, sir?

20 A.      Correct.

21 Q.      He went through all of the charges against you;

22 correct, sir?

23 A.      Correct.

24 Q.      He went through all of the potential penalties;

25 correct, sir?

1  A.      Correct.

2  Q.      Long before that, Mr. White had done all the

3  same things; right?

4  A.      Yes.

5  Q.      Mr. White's a smart guy, isn't he?

6          MS. JOHNSTON:   Objection.

7          MR. MONTEMARANO:  Goes to the witness' state of

8  mind, Your Honor.

9          THE COURT:   Sustained.

10          MR. MONTEMARANO:  Did you like Mr. White?

11          MS. JOHNSTON:   Objection.

12          THE COURT:   Sustained.

13          THE WITNESS:   I never thought about it --

14          THE COURT:   No, no, no.  Don't.  I've sustained

15  the objection.

16          THE WITNESS:   Okay.

17          BY MR. MONTEMARANO:

18  Q.      Did you think Mr. White was doing a good job for

19  you?

20  A.      There was no way, really, to know.

21  Q.      I'm sorry?

22  A.      There was no way, really, of knowing if he was

23  doing a good job.

24  Q.      No way to know?

25          Did he tell you about some of the charges that

1 hadn't yet been brought against you and that weren't in

2 the plea agreement ?

3 A.      Not to my knowledge .

4 Q.      Not to your knowledge .  So in spite  of his  vast

5 experience , he didn't tell you about  the other  charge s

6 that you could be facing; correct , sir ?

7 A.      What , the charge  I had already  been  arrested

8 for ?

9 Q.      Or any other  charge s.

10 A.      Just the charge  I was charge d with now and the

11 charge s I had .

12 Q.      Did he explain  to you that there 's a mandatory

13 penalty  under  Section  851 of the U. S. Code that could

14 have been filed against  you ?

15      MS. JOHNSTON:    Objection .

16      That 's a misstatement  of the law .

17      THE COURT:    Sustained .

18      MR. MONTEMARANO :  Your Honor , can we be heard  at

19 the bench ?

20            (At the bar of the Court.)

21      MS. JOHNSTON:    Your Honor , he has no prior  drug

22 conviction  so he could  not have  gotten  an enhance d

23 penalty  under  851 .  The government  is quite  upset  with

24 now both defense  counsel  is making  totally

25 inappropriate  comments in  front  of the jury .   Before

1  the court recesses for its morning break, I'm going to

2  ask the court for an instruction.   This court has not

3  determined that they are reliable indicia as to whether

4  a witness is being truthful, so they should, in way,

5  shape or form, consider that at all.   I'm going to ask

6  the court to do that.

7         What Mr. Montemarano said is totally

8  inappropriate.   This witness does not have a prior

9  conviction for a drug felony.

10         THE COURT:   Is there something that I don't know

11  about?

12         MR. MONTEMARANO:   Is Ms. Johnston done?

13         I asked to approach, and she came up here and

14  started approaching.   If I may, Your Honor.

15         THE COURT:   You have equal time.   You may

16  proceed.

17         MR. MONTEMARANO:   Thank you.

18         Initially, I would move to strike Ms. Johnston's

19  comments before the jury regarding any misstatement of

20  the law which my statement was not, and I would request

21  the court to so instruct the jury.   The government made

22  a tremendous issue about speaking objections.   The

23  court ordered there would be no speaking objections.   I

24  assume that that ruling applies to Ms. Johnston as

25  well, and I therefore think I'm entirely within my

1 right s to request  this .

2         It's your 's call  as to the  851  notice .  He has

3 two prior  felony  narcotic s  arrest s yet  to be

4 adjudicate d.  If in this  case  he were  to be  adjudicate d

5 on either  or both  prior  to the  resolution  of this  case ,

6 he would  have  one ,  leading  him  to a mandatory  minimum

7 of 20 year s  or ,  two ,  leading  him to a mandatory  minimum

8 of life .

9         THE  COURT:   Neither  one  of those  thing s  have

10 happened .

11         MR.  MONTEMARANO :   It could  have  happened  had  he

12 not  entered the  plea  agreement .

13         THE  COURT:   I don't  think  it 's a fair  question

14 to ask  that .

15         MR.  MONTEMARANO :   I think  it 's a fair  question

16 to discuss  with  him  any  competent  lawyer , and I will

17 proffer  myself  as  perhaps  an  example  of that  with  the

18 kind  of experience  that  Andy W hite  has .  He was  a

19 federal  prosecutor  for  many  year s before  he  was  a

20 defense  attorney , and  he  was  a very ,  very  talent ed

21 attorney  and  a very  personable  guy , which  is why  I was

22 try ing to  establish  the  relationship , and  Your  Honor

23 object ed to my  question s  to that .  I think  it 's

24 entire ly  appropriate  to ask  him , was  he  inform ed of

25 this , and  did  he  understand .  If  he  says  no , well ,

1 perhaps I am --

2          THE COURT:   I don't think  it's proper  to get

3 into a question  of an 851 notification  when there is no

4 present  basis to  give  an 851 notification .

5          MR. MONTEMARANO :   There would be.   That could

6 been  filed  before  trial .   Therefore , it's going  to be

7 speculative  until  after  the trial  begins.

8          THE COURT:   His trial  is over .   He's pleaded

9 guilty .

10          MR. MONTEMARANO :   At the time  he was negotiating

11 the plea  it was not  speculated.

12          THE COURT:   It certainly would  be speculative ,

13 because  he had no underlying  conviction  upon which he

14 could  give  an 851 notice .   I have sustained the

15 objection .   I'm going  to deny your motion  to strike .   I

16 think  what she said was appropriate , and I'm not going

17 to give  any further  instructions to the jury.   I've

18 sustained  the objection .

19          MR. MONTEMARANO :   Is the motion  to strike

20 regarding Ms. Johnston 's comment  --

21          THE COURT:   All she said was there was no legal

22 basis  for the question .

23          MR. MONTEMARANO :   She said it was a misstatement

24 of the law .   That 's rather  inflammatory .

25          THE COURT:   There have been plenty  of objections

1  that I have sustained that the jury has heard some

2  minor explanation of it.  I don't think that that's

3  anything that requires a curative instruction.

4       MS. JOHNSTON:  I would ask the court to consider

5  the government's request for an instruction --

6       THE COURT:  How much more do you have to go, Mr.

7  Montemarano?

8       MR. MONTEMARANO:  Five or ten minutes.

9       THE COURT:  I thought we would take a break.

10 I'm not going to go back to redirect until after the

11 break, and I'll deal with the objection to the

12 polygraph.

13      MS. JOHNSTON:  If I understand the court, you're

14 going to allow Mr. Montemarano --

15      THE COURT:  Let's stop the "Ocean City" and go

16 back to your cross-examination and take a break.

17                 (Back in open court.)

18      BY MR. MONTEMARANO:

19      At the time you and Mr. White were discussing

20 your plea agreement, you had two unadjudicated felony

21 narcotics charges; correct, sir?

22 A.    Correct.

23 Q.    Did, at any time, Mr. White discuss the

24 possibility of you being adjudicate -- those being

25 adjudicated before this case could resolve?

1 A.       I don't understand   what you mean.

2 Q.       Did he ever talk to you about the possibility

3 that you would be extradite d to Texas and/or Louisiana

4 to face and resolve those charge s before the federal

5 charge s in this court were resolve d?

6 A.       Possibility .

7 Q.       Possibility .

8         Did he explain to you what that would mean to

9 you in term s of your possible  sentence ?

10 A.      We didn't get that far.

11 Q.      You didn't get that far?

12 A.      No.

13 Q.      So you were never told about the possibility of

14 a sentence on one of those --

15        MS. JOHNSTON:   Objection , Your Honor.

16        MR. MONTEMARANO :  -- and how it would affect

17 this  sentence ?

18        MS. JOHNSTON:   Objection .

19        THE COURT:   Sustained .

20        MR. MONTEMARANO :  Thank you, Your Honor.

21        Court 's indulgence , please .

22        THE COURT:   You may.

23        BY MR. MONTEMARANO :

24 Q.      Your nickname is C adillac Mike ; correct , sir?

25 A.      Correct .

1  Q.      Where does that come from?

2  A.      What do you mean, where it come from?

3  Q.      Why Cadillac Mike?  Did you drive a Cadillac?

4  A.      Yes.

5  Q.      How many did you own?

6  A.      Say again.

7  Q.      How many did you own?

8  A.      One.

9  Q.      Was that prior to making the acquaintance  of

10 Learley Reed Goodwin?

11 A.      You saying before or after?

12 Q.      Before.

13 A.      No, after.

14 Q.      After.  So you weren't known as Cadillac Mike

15 before?

16 A.      No.

17 Q.      You told us about how you kept a motorcycle in

18 Texas; is that correct, sir?

19 A.      Correct.

20 Q.      Where did you keep it?

21 A.      Steven Campbell's house.

22 Q.      Did you have any property that you owned in

23 Texas?

24 A.      That I owned?

25 Q.      Yes.

1  A.      No.

2  Q.      That would be the same Steve Campbell who's

3  involved in these drug deals that you told us about;

4  correct, sir?

5  A.      Correct.

6  Q.      That would be the same drug deals that went bad;

7  correct, sir?

8  A.      Some of them.

9  Q.      Two of them; right?

10 A.      Yes.

11 Q.      The first one that went bad, that's when the

12 money was shipped by UPS down to Houston; correct, sir?

13 A.      Correct.

14 Q.      You were supposed to get drugs shipped back;

15 correct, sir?

16 A.      Correct.

17 Q.      When you ship things, you've got to have

18 addresses on them; is that correct, sir?

19 A.      Right.

20 Q.      Addresses to and from; right, sir?

21 A.      Depends what you're saying "from."

22 Q.      It's got to have an address; right?

23 A.      Yes.

24 Q.      It's got to have a return address; right?

25 A.      Yes.

1  Q.      And those address es and those ship ment s.   Did

2  any of those address es involve your home or your

3  residence ?

4  A.      Yes .

5  Q.      What address would that have been , if you

6  recall ?

7  A.      The Delray Court .

8  Q.      Who live s there ?

9  A.      I used to live -- no one lives there now .

10 Q.      Okay .   When you were us ing that address , who

11 live d there ?

12 A.      My girlfriend and me .

13 Q.      Your girlfriend and you ?

14 A.      Yes .

15 Q.      That would be Ms. Demara ?

16 A.      No .

17 Q.      Different girlfriend ?

18 A.      Yes .

19 Q.      So you entrusted $90,000 to UPS more than one

20 time ; correct , sir ?

21 A.      Correct .

22 Q.      And you entrusted , or somebody in Texas , excuse

23 me , entrusted about five kilogram s of cocaine -- about

24 11 pounds of cocaine to UPS on several occasion s; is

25 that correct , sir ?

1  A.      Correct.

2  Q.      That would be until the last occasion when the

3  cocaine did not arrive; correct, sir?

4  A.      Correct.

5  Q.      And then the one deal went bad; correct, sir?

6          You never got the coke; right?

7  A.      Right.  That's the one you were talking about.

8  Q.      And you went down to Texas to talk to the

9  people; correct, sir?

10 A.      Correct.

11 Q.      And you couldn't get a hold of Mr. Campbell, or

12 it's Mr. Ross?

13 A.      I don't recall saying I couldn't get a contact

14 on any of them.

15 Q.      You got in contact with them, and basically you

16 never got your cocaine; correct?

17 A.      Correct.

18 Q.      $90,000; correct, sir?

19 A.      Correct.

20 Q.      Based upon your vast experience in the drug

21 trade -- you understand the drug trade is a rather

22 violent enterprise; is that a fair statement, sir?

23 A.      Correct.

24 Q.      That's why people tend to carry loaded firearms

25 in their Conversion vans; right, sir?

1  A.        Maybe.

2  Q.        When you mess up the money in a drug deal, you

3  don't tend to get sued, do you?

4  A.        No.

5  Q.        People tend -- what's the phrase? -- to "bust a

6  cap" in you; right, sir?

7  A.        Some people.

8  Q.        Some people.

9            And I guess sometimes you need a reason to do

10 that; right, sir?

11 A.        Some people would.

12 Q.        Would $90,000 be a reason for that, sir?

13 A.        It could be to some people.

14 Q.        It could be to some people.

15           Would it be to you?

16 A.        No.

17 Q.        How much did you take from the victim in that

18 robbery in Montgomery County?  What was the total loss

19 to that person?

20 A.        I can't recall.

21 Q.        Was it $90,000?

22 A.        I can't recall.

23 Q.        Was it a lot less than $90,000?

24 A.        I'm sure it was less.

25 Q.        A lot less; correct?

1 A.      I can't recall the amount, but I'm sure it was

2 less than $90,000.

3 Q.      Okay.  And to begin in this business enterprise

4 with Mr. Goodwin you told us about, you were a

5 purchaser of eight balls; correct, sir?

6 A.      Correct.

7 Q.      $150 a pop, give or take?

8 A.      Yes.

9 Q.      Maybe as low as $125?  That's what we would call

10 in the business, "nickel and dime" drug dealing; right,

11 sir?

12 A.      Could be, yes.

13 Q.      And that would make you, of course, the person

14 of first resort for Mr. Goodwin to go to when he wants

15 to start buying cocaine by the kilogram; is that right,

16 sir?

17        That's what you told us.  Isn't that a fair

18 statement, sir?

19 A.      Repeat the question.

20        MS. JOHNSTON:   Objection.

21        BY MR. MONTEMARANO:

22 Q.      You're buying eight balls.  That's eighth of an

23 ounce; right, sir?

24 A.      Right.

25 Q.      You told us Mr. Goodwin wanted to get large

Page 83

1  amounts; right, sir?

2  A.      Right.

3  Q.      And your first deal was five kilograms; correct,

4  sir?

5  A.      Yes.

6  Q.      Without intending to bore anyone with the math,

7  you would agree that five kilograms would be about 175

8  ounces of cocaine; right, sir?

9  A.      I'm not sure of the math.

10 Q.      Let's assume it's 175 -- we'll let the jury do

11 their own math again.  We should give you calculator

12 and not pads next time.

13         There's 8 eight-balls in a gram -- in an ounce;

14 right, give or take?

15 A.      Yeah, give or take.

16 Q.      In fact, an eight-ball comes from an eighth of

17 an ounce; right?

18 A.      I'm not sure where it came from.

19 Q.      Your understanding is it's around an eighth of

20 an ounce; right?

21 A.      Yes.

22 Q.      Give or take.  Eight times 175 -- I'm lost now.

23 1,300-some eight balls; right?  If you've got 175

24 ounces of cocaine, that's, like, 1,300 eight-balls;

25 right?

1        MS. JOHNSTON:    Objection  on relevance .

2        THE  COURT:   How  is  this  relevant ?

3        MR.  MONTEMARANO :   Pardon  me?

4        THE  COURT:   How  is  this  relevant ?

5        MR.  MONTEMARANO :   If  the  court  will  permit  me  a

6  little  bit  of  leeway .   One  more  question ?

7        THE  COURT:    One  more .

8        BY  MR.  MONTEMARANO :

9  Q.      Two  more ,  excuse  me.

10        How  often  are  you  buying  these  eight  balls  from

11  Mr.  Goodwin ?

12  A.      Once  every  week  or  two .

13  Q.      Once  every  week  or  two .

14  A.      Yes .

15  Q.      Let 's  assume  it  was  once  every  week .   It  would

16  take  you ,  if  my  math  serve s,  something  over  26  years  to

17  buy  that  much  cocaine  from  Mr.  Goodwin ;  right ,  sir?

18  A.      I'm  not  sure  of  the  math .

19  Q.      Well ,  52  week s  in  a  year ,  1,300  eight  balls  --  a

20  ballpark  26  year s.

21        He  come s  to  you  to  get  five  kilogram s  of

22  cocaine ;  right  sir ?

23  A.      He  didn't  come  to  me  to  get  five  kilogram s  of

24  cocaine .

25  Q.      Court 's  indulgence   just  for  moment ,  please .

1          Was Xavier Moore  in the Conversion  van when you

2 were busted in Texas?

3 A.      Yes.

4 Q.      At this time, did Mr. Moore know Mr. Goodwin --

5 A.      Yes.

6 Q.      -- and some of the other people from Anacostia?

7 A.      Yes.

8 Q.      He didn't say anything about those people to the

9 police when he was busted with you in Texas, did he?

10 A.      No.

11 Q.      You told us at one point that you discussed it

12 with Larry Lane; right?

13          Larry Lane is a drug dealer, too, is he not?

14 A.      Correct.

15 Q.      He's the one that told you there was drugs in

16 toolboxes at Mr. Goodwin's; right?

17 A.      Repeat the question.

18 Q.      He told you there were drugs hidden in toolboxes

19 at Mr. Goodwin's home, did he not?

20 A.      No.  I observed that.

21 Q.      You observed that?

22 A.      Yes.

23 Q.      Was Mr. Lane there?

24 A.      Yes.

25 Q.      You told us that you have no expectation  of how

1 low a sentence you're going to get in this case;

2 correct, sir?

3 A.      Correct.

4 Q.      Except that it's going to be on a motion made by

5 the government; correct, sir?

6 A.      Correct.

7 Q.      You have at least one expectation, do you not,

8 sir?

9 A.      Of getting a lower sentence?

10 Q.      The plea agreement says you will get a ten-year

11 mandatory minimum sentence; correct, sir?

12 A.      Yes.

13 Q.      Mr. White, your defense attorney, told you the

14 only way you can get under the mandatory minimum is if

15 a motion is made by these folks, the government

16 attorneys; right, sir?

17 A.      Yes, it was discussed.

18 Q.      That was discussed.

19       Judge Titus can't do it, even if he wants to,

20 can he?

21 A.      I don't think he can.

22 Q.      None of these attorneys, no matter how quiet or

23 talkative they are, can do it for you either, can they,

24 sir?

25 A.      Not to my knowledge.

1  Q.      You don't expect to get a mandatory minimum of

2  ten years in this case, do you?

3  A.      I don't know what I'll get.

4  Q.      You don't expect to get much more than ten years

5  either, do you, sir?

6  A.      I hope not.

7  Q.      In fact, you expect less than ten years at the

8  very least, and you don't know how much less.  So, you

9  do have an expectation, don't you, sir?

10  A.      I would hope so.

11         MR. MONTEMARANO:  No further questions, Your

12  Honor.  Thank you.

13         THE COURT:   Ladies and gentlemen, we will take a

14  recess until five minutes after 12.

15                      (Jury excused at 11:45 a.m.)

16                      (Off the record at 11:45 a.m.)

17                      (On the record at 12:05 p.m.)

18         THE COURT:  We have a juror who is getting cold,

19  so I asked if we can turn the meat locker air

20  conditioning down for a short while.

21         MS. JOHNSTON:   Your Honor, I don't know when the

22  court wanted to address the government's request for an

23  instruction.  We would ask for an instruction at the

24  end of cross-examination.  There was a reference to a

25  polygraph exam and, under the law, polygraph exams are

1 -- the willingness  to take  one  is  not  admissible ,

2 because  the  court s  have  determine d  that  polygraph s  are

3 not  reliable .   I  think  that  instruction  is  important

4 because  of  the  mention  that  was  made .

5        MR.  MARTIN:   Your  Honor ,  I  am  familiar  with  the

6 Fourth  Circuit 's  ruling  in  the  case  of --

7        THE  CLERK:   Are  you  ready ?

8        THE  COURT:   Wait  one  second .

9        THE  COURT:   Okay .   What ?

10       MR.  MARTIN:   I  am  familiar  with  the  Fourth

11 Circuit 's  holding  in  United  States  versus  Rue,  and  my

12 understand ing  of  that  hold ing  is  that  evidence  that  a

13 witness  has  taken  or  agreed  to  take  a  polygraph  test  or

14 the  test  result s  are  not  admissible .

15       I  didn't  ask  him  if  he  took  one .   I'm  sorry .   I

16 didn't  ask  that  the  test  result s  be  admitted .   I  didn't

17 ask  him  whether  or  not  he  had  taken  or  agreed  to  take  a

18 polygraph .   What  I  asked  him  was :   And  at  no  time  did

19 the  government  give  you  a  polygraph .   I  didn't  ask  him

20 if  he  had  taken  it  or -- strike  that .   I  did  ask  him  if

21 he  took  it -- whether  or  not  he  agreed  to  take  one .

22       It  seem s  to  me  that  the  question  itself  is  not

23 contrary  to  Rue  that  it  is  consistent  or  at  least  an

24 exception -- a  narrow  one  in  that  the  polygraph  test

25 itself  is  not  being  sought  to ,  you  know ,  impeach  his

1  credibility  as much as  it is to show that the
2  government  had no independent  way of corroborati ng the
3  story that he was telling.
4       THE COURT:  Well, your question  is elevati ng the
5  status of polygraph s way above the legal status in the
6  Fourth Circuit , and it was not a proper question  and I
7  sustained  the objection .  The Fourth Circuit has made
8  it very plain that whether  a witness has agreed  to take
9  or has taken and pass ed a polygraph test is simply
10 inadmissible .  For example, U. S. versus  Her rera said
11 that the fact a witness has agreed to take a polygraph
12 test is the  improper bolstering  which should be kept
13 from the  jury.
14      MR. MARTIN:  I didn't ask if he had agreed to
15 take one.  I asked  -- I understand , Your Honor .
16      THE COURT:  I don't think  that it was a proper
17 question .  I sustain ed the  objection , and I will advise
18 the jury that they should dis regard  any consideration
19 of polygraph s.
20      MS. JOHNSTON:  I want the court to tell them
21 that polygraph result s are or the willingness  to take a
22 polygraph  is not admissible  evidence , because  the
23 court s have determine d that they are not reliable ,
24 which is set forth in any number  of case s.  While they
25 can dis regard  the question , this notion that it should

1  be apprised of why -- it wasn't a technical reason why

2  the court struck it, but the court should specifically

3  tell them that that is not admissible evidence in

4  court.  The reason it's not admissible is because it's

5  not been determined to be reliable by the court, and

6  there are any number of Fourth Circuit cases that I can

7  cite to the court from the Criminal Handbook.

8          THE COURT:  I have the handbook in front of me.

9          MS. JOHNSTON:  Your Honor, on Page 449 it is

10  replete with cases.  The Fourth Circuit has

11  consistently disapproved polygraph evidence, including

12  evidence that a witness has taken or agreed to take a

13  polygraph test.  It cites the --

14          THE COURT:  The absence of consensus says it's

15  reliable.

16          MS. JOHNSTON:  United States versus Shepherd --

17  and counsel knew that this kind of information was not

18  appropriate --

19          THE COURT:  Look, I've already ruled on it.  I

20  will be glad to give a cautionary instruction.  I want

21  them to understand why the court has sustained the

22  objection with respect to polygraph exams, and that is

23  because such testimony or evidence is inadmissible, and

24  the courts have concluded that there is an absence of

25  consensus that polygraph tests are reliable.

1           MR. MARTIN:   I need to respond to the last
2  point.   On the break, I went into the library.   I
3  didn't know that -- I knew the test results were not
4  admissible, but I never thought there was any
5  prescription against asking somebody whether or not
6  there was independent corroboration.   Until this break,
7  I didn't know that, and I just read this.
8           THE COURT:   I understand.   I'm not slapping you
9  around; I'm just saying that I sustained the objection.
10          MR. MONTEMARANO:   I would object, Your Honor, on
11  behalf of Ms. Martin, to the nature of the cautionary
12  instruction.   We extended the cautionary instruction
13  Your Honor gave.   Even if that's the Fourth Circuit
14  law, that's something for lawyers.   I do not believe it
15  is appropriate to be addressing questions of
16  reliability or lack thereof to the jury, anymore than
17  why certain evidence is excluded is given to the jury.
18          Would it be appropriate, when Detective Eveler
19  takes the stand, for me to suggest that he tried to get
20  a statement out of my client and it was suppressed by
21  Your Honor?
22          THE COURT:   I don't think I'm going to go into
23  the whole theory of why they are not admissible,
24  because I don't think the jury needs to know that, but
25  I will tell the jury that it is not -- courts have

1  conclude d that polygraph examination s -- the result s of

2  them and whether somebody took one or whether somebody

3  did not take one is not admissible in a federal

4  criminal trial under any circumstance s and they should

5  disregard any discussion of it, period.

6           MR. MONTEMARANO : That's as far as Your Honor is

7  going to go?

8           THE COURT:  That's as far as I'm going to go.

9  We're going to get the jury back in here and get

10 roll ing.

11          MR. SUSSMAN : May I suggest you might soften it?

12 You might say to the jury that the fact they may have

13 heard the use of polygraphs by law enforcement , but

14 they're not permitted in court --

15          THE COURT:  I'm going to give what I said I

16 would give.

17          All right , bring them in.

18                (Jury return s at 12:13 p.m. )

19          THE COURT:  Ladies and gentlemen , before we

20 begin with redirect examination of this witness , I

21 want ed to just mention to you that I had made a ruling

22 during the cross-examination  of this witness where a

23 question was asked about a polygraph examination . I

24 want to remind you and instruct you again that in

25 federal court , evidence that a person has taken or has

1 not taken, or the results of a polygraph examination,

2 are absolutely inadmissible and may not and must not be

3 considered by you in any way, shape or manner. Thank

4 you.

5       You may proceed.

6       MR. HALL:  Your Honor, actually, before we get

7 to that, a couple of us had some additional questions

8 on cross.

9       THE COURT:  Oh, okay.  Sure.  I'm sorry.

10       MR. HALL:  Thank you, Your Honor.  If I may.

11       **CROSS-EXAMINATION**

12       BY MR. HALL:

13 Q.     Sir, earlier this morning the government showed

14 you a chart. Do you recall that?

15 A.     Yes.

16 Q.     It's Exhibit CH-1, or Chart 1; correct?

17 A.     I guess.  Yes.

18 Q.     It has a series of photographs of people who

19 were involved in this case; is that correct?

20 A.     Yes.

21 Q.     You identified those individuals you know;

22 right?

23 A.     Yes.

24 Q.     And I assume that at some point in your

25 debriefings by the law enforcement officers you've also

1  been shown photograph s of people involve d in this case ?

2  A.      yes .

3  Q.      You don't know this gentleman who I just put my

4  hand on his shoulder , do you ?

5  A.      No.

6          MR. HALL:   Thank you , Your Honor .

7          THE COURT:   Any other cross-examination ?

8          MR. MITCHELL:   Yes , Your Honor .

9                    **CROSS-EXAMINATION**

10         BY MR. MITCHELL:

11  Q.      Good afternoon .  My name is Timothy Mitchell and

12  I represent Derrick Bynum .

13          I don't want to repeat the question s that my

14  co-counsel asked you , but referring to the chart that

15  you look ed at .  Did you recognize my client who I'm

16  put ting my hand on here , Derrick Bynum ?

17  A.      No.

18  Q.      You were also asked , I beli eve it was on Friday ,

19  question s about being at Mr. Goodwin 's house and see ing

20  people comi ng in and out and referring to people who

21  are user s and seller s.

22          Did you ever see Mr. Bynum come in and out Mr.

23  Goodwin 's house ?

24  A.      No.

25  Q.      The prosecutor 's also show ed you picture s, I

1  assume , in these session s that they had with you to
2  find out what you did and didn't know and what they
3  need ed to know .
4       Did you ever see a picture of Mr. Bynum or
5  recognize him from before ?
6  A.     Did I recognize him ?
7  Q.     Yeah . Did you recognize Mr. Bynum 's picture s in
8  any of the picture s they gave to you ?
9  A.     No .
10 Q.     Has the government asked you to come here to
11 give testimony about Mr. Bynum ?
12 A.     No .
13 Q.      Is it your understand ing that you won't get any
14 extra cooperation , as you were asked by your
15 co-counsel , about whether or not if you gave
16 information about Mr. Bynum that you would get more
17 cooperation , credit s, or get some time off your
18 sen tence ?
19 A.     You asked me , did they tell me that ?
20 Q.      Is it your understand ing that you're here to
21 give information about Mr. Bynum and therefore get some
22 time , perhaps , off your sentence ?
23 A.     No .
24      MR. MITCHELL:    No further question s.
25      THE COURT:   Mr. Ward .

1                    **CROSS-EXAMINATION**

2          BY MR. WARD:

3  Q.      I have a couple,  Your Honor.  Thank you.

4          Afternoon,  Mr. Bynum .

5  A.      Good afternoon.

6  Q.      Mr. Bynum --

7  A.      Thurman.

8  Q.      Thurman.  I'm sorry.  My mistake.

9          Mr. Thurman, you were asked by   Mr. Montemarano ,

10 sitting here, if at the time you were busted in      Texas

11 if you were still on probation or parole from the state

12 armed robbery conviction; is that right?

13 A.      Correct.

14 Q.      You said that you were not?

15 A.      Right.

16 Q.      That was not the first trip you took down the

17 roads go Texas, was it?

18 A.      No.

19 Q.      When you first started going down the back roads

20 to Texas,  you were still on probation or parole for the

21 armed robbery conviction, weren't you?

22 A.      Yes.

23 Q.      Now, you have testified to your long drug use

24 over a period of years, and that included powder

25 cocaine; is that correct, sir?

1  A.      Correct.

2  Q.      And you talked about how you would buy an

3  eighth, which  I understand is an eighth of an ounce or

4  three grams; is that correct?

5  A.      Correct.

6  Q.      And you would buy that for resell; is that

7  correct?

8  A.      And personal use.  Correct.

9  Q.      And personal use.

10        An 8-ball is not -- the purchase of an 8-ball is

11 not inconsistent with personal use, is it?

12 A.      I can't hear you.

13 Q.      I said the purchase of an 8-ball is not

14 inconsistent with simply buying for personal use.

15 A.      Correct.

16 Q.      In fact, you did that many times yourself.

17 A.      Correct.

18 Q.      Okay.  Now, you talked about a trip that you

19 took with  John Irby down to  Louisiana to buy drugs.  Do

20 you remember that?

21        The deal didn't go through for some reason;     I

22 don't recall what it was.

23 A.      Correct.

24 Q.      Do you recall that trip?

25 A.      Yes.

1  Q.      All right, sir.

2          How much money did you take down on that

3  occasion?

4  A.      About $90,000.

5  Q.      About $100,000?

6  A.      About $90,000.

7  Q.      Oh, $90,000?  I'm sorry.

8          Was that the occasion when the money was hidden

9  inside the spare tire?

10 A.      Correct.

11 Q.      All right, sir.

12         And the deal in  Louisiana didn't go through, and

13 I understood you to say that you then called      Houston

14 and talked to some of your family or buddies there, and

15 they said something to the effect of, come on down and

16 we'll be able to take care of you; is that right?

17 A.      Correct.

18 Q.      And you did go down to   Houston, and you got,   I

19 think you said -- testified five-and-a-half or six

20 keys?

21 A.      Correct.

22 Q.      Okay.  And a key,  I think we can agree, is about

23 2.2 pounds approximately; is that right?

24 A.      I don't know the math but, yes.

25 Q.      Okay.  So you get five-and-a-half or six of

1  those and you put those inside -- back inside the spare

2  tire?

3  A.      Correct.

4  Q.      And brought them back to    Maryland?

5  A.      Correct.

6  Q.      I think you were telling us that on the way back

7  Mr. Irby was driving and he was pulled over for

8  speeding but the police never found the drugs because

9  they were inside the spare tire; is that right, sir?

10 A.      Correct.

11 Q.      And when you got back to    Maryland,  I think you

12 said at some point that the tire was cut open in order

13 to get the five-and-a-half to six keys out; is that

14 right, sir?

15 A.      Correct.

16 Q.      And  Mr. Goodwin, or whoever it was, then had to

17 go buy a new tire; is that right, sir?

18 A.      Correct.

19 Q.      Let me ask you this.  You said that after you

20 picked up the dope in    Houston, the five-and-a-half to

21 six kilograms, that, as    I understood it, you were

22 putting them -- the dope inside the tire, but you had

23 to take the tire to Sears to get it remounted; is that

24 right, sir?

25 A.      To get air put into it.

1  Q.      To get air put into it?

2  A.      Yes.

3  Q.      Okay.  And did you say anything to the --      I

4  thought you said to be remounted.

5  A.      No, to get air put into it.

6  Q.      Okay.  And did you say anything, or did the

7  person who remounted it -- who put air into it say

8  anything to you about, there's something inside this

9  tire that doesn't feel right because it's, you know,

10 five-and-a-half or six times, .2 pounds?

11 A.      Well, actually,  I wasn't the one that talked to

12 the guy that put air in it, so    I don't know what he

13 said.

14 Q.      Okay.  All right, sir.

15         In any event, you also talked about the -- about

16 Lobo's; is that right, sir?

17 A.      Correct.

18 Q.      And Lobo's did do some legitimate business; is

19 that correct, sir?

20 A.      Yes, of some sort.

21 Q.      They had mechanics on the -- on duty there; is

22 that right, sir?

23 A.      Yes.

24 Q.      And if people had a problem with their car, they

25 could bring it in and have it repaired; is that

1  correct, sir?

2  A.      Correct.

3  Q.      So it wasn't only dopers who hung out there as

4  you testified; is that right, sir?

5  A.      Correct.

6  Q.      Now, you testified that Katherine    Demara , your

7  girlfriend, went down to    Texas with you on one or more

8  of these -- shall we call them buying trips; is that

9  correct, sir?

10  A.      Correct.

11  Q.      And are you telling us -- did you tell us, or

12  did you mean to imply that Katherine    Demara  had no idea

13  what she was doing?

14  A.      Correct.

15  Q.      That she didn't know that this was a dope run?

16  A.      Correct.

17  Q.      Okay.  And she has not been charged in

18  connection with those dope runs; is that correct, sir?

19  A.      Correct.

20  Q.      Did you, when you talked to the government,

21  bring up the issue of whether or not she would be

22  charged?

23  A.      No.

24  Q.      Did you expect that she would be charged?

25  A.      I didn't know what to expect.

1  Q.      Huh?

2  A.      I didn't know what to expect.

3  Q.      Did you discuss that with your attorney, Andy

4  White, a former Assistant    United States Attorney

5  himself, the fact you didn't want Katherine to get

6  busted too?

7  A.      No.

8  Q.      Is it part of the deal, or is it part of your

9  deal, according to your understanding of the deal --

10 whether it's in writing or not, is it your

11 understanding that if you do what the government thinks

12 is the  "right t hing" that she won't, in fact, be

13 charged?

14 A.      That wasn't discussed or in the deal.

15 Q.      That's certainly your expectation; is that

16 correct, sir?

17 A.      I hope so.

18 Q.      You hope so.

19         And you did tell the government that she went

20 down there with you on several trips.

21 A.      Correct.

22 Q.      What did you tell the government about     Lavon

23 Dobie?

24 A.      Excuse me?

25 Q.      What did you tell the government about     Lavon

1  Dobie, also known as "  Becky"  Dobie?

2  A.     I don't know who you're talking about.

3  Q.     You never heard the name    Lavon  Dobie or " Becky"

4  Dobie before?

5  A.     No.

6  Q.     No?

7         Let me ask the lady on the end to stand there.

8                     (Ms. Dobie stands.)

9         BY MR. WARD:

10  Q.    Take a look at that lady.    (Defendant Dobie

11  stands.)  You ever see her before?

12  A.     No.

13         MR. WARD:  Let the record reflect that    I asked

14  Lavon  Dobie to stand.

15         I don't think I have any further questions.

16  Thank you,  Mr. Thurman.

17         THE COURT:  Any additional  cross-examination ?

18         MR. SUSSMAN :  No.  I have  nothing .

19                     **CROSS-EXAMINATION**

20         BY MR. MCKNETT :

21  Q.     If I may,  Your  Honor.

22         Good afternoon,  Mr. Thurman.

23  A.     Good afternoon.

24  Q.    Mr. Thurman,  I want to ask you some questions

25  about your early involvement with drugs.

1          You started using drugs when you were 16;

2 correct?

3 A.      Yeah.   Around that time.

4 Q.      And you're 31 now; right?

5 A.      Correct.

6 Q.      So that would be around 1991?

7 A.      Yes.

8 Q.      When did you stop using drugs?

9 A.      '04.

10 Q.     When in '04?

11 A.      I'm not sure of the date, but    I stopped on and

12 off when  I was locked up the first time.  So, on and

13 off.  It wasn't just straight until '04.

14 Q.     So you stopped when you were in jail?

15 A.      And when  I was on the street, too, on and off.

16 Q.     You just stopped using drugs completely --

17 A.      Yes.

18 Q.     -- sometime in '04.

19 A.      That's the last time, yes.

20 Q.     Excuse me?

21 A.      That's the last time, yes.

22 Q.     But you don't recall when in '04?

23 A.      Not the exact month and time, no.

24 Q.     You don't know if it was January or    December.

25 A.      Mid-year.

1  Q.      Mid-year?

2  A.      Yeah.

3  Q.      Summertime?

4  A.      Yeah, around the summer.

5  Q.      When you started using drugs, you were using

6  cocaine powder; is that correct?

7  A.      No.  When  I started using drugs,   I was using

8  marijuana.

9  Q.      Okay.  After you started using marijuana, did

10 you start using cocaine powder?

11 A.      Yes, sometime later.

12 Q.      When was that?

13 A.      A year or so later.

14 Q.      Around '92?   '93?

15 A.      Yes.

16 Q.      How much were you buying when you first started

17 using cocaine powder?  How much were you buying at a

18 time?

19 A.      $30-40 worth.

20 Q.      What was that in a quantity?

21 A.      I don't know.

22 Q.      Weight?

23 A.      I don't know the weight -- exact weight.  It was

24 like just, like, a $30-40 bag.

25 Q.      How many times were you buying those $30 or $40

1  bags?

2  A.      Maybe once every weekend.

3  Q.      So you were just using it on weekends?

4  A.      Yes.

5  Q.      Did you start using crack cocaine?

6  A.      No.

7  Q.      Never?

8  A.      No.

9  Q.      Never used crack cocaine?

10 A.      No.

11 Q.      Were you buying the powder cocaine from this

12 gentleman named " Tony" of  P. G. County for your own

13 personal use?

14 A.      Yes.

15 Q.      When you were buying it, you found if you bought

16 a little more that you'd get a better price; correct?

17 A.      Not really.

18 Q.      Not really?

19 A.      No.

20 Q.      Didn't you say earlier on    Thursday that there

21 came a time when you realized that if you had more

22 money available you could buy more and get a better

23 deal?

24 A.      That was for weight, not for small amounts.

25 Q.      What do you consider "weight?"

1  A.      Keys.

2  Q.      When you first started buying from    Tony of  P.  G.

3  County, were you buying keys?

4  A.      No.

5  Q.      What were you buying?

6  A.      We were buying maybe 16 -- basically, we were

7  just chilling and getting high together.

8  Q.      Well, you started buying to sell; right?

9  A.      Afterwards, yes.

10  Q.     And you were still buying from    Tony; right?

11  A.     Yes.

12  Q.     How much were you buying from    Tony when you

13  started to resell crack -- powder cocaine, excuse me?

14  A.     An 8-ball.

15  Q.     An 8-?

16  A.     Yes.

17  Q.     You were buying one 8-ball to use; correct?

18  A.     To use and sell.

19  Q.     Maybe  I'm confusing you and myself with my

20  question.  Let me rephrase it.

21         When you bought an 8-ball from    Tony -- strike

22  that.

23         Did you start buying 8-balls from    Tony for your

24  own personal use first?

25  A.     No.

1  Q.      An 8-ball would be roughly 3 ounces -- 3 grams;

2  correct?

3  A.      Give or take, yes.

4  Q.      When did you start buying 8-balls from      Tony?

5  A.      I don't remember the exact date or time.

6  Q.      Do you remember what decade it was?

7  A.      Probably '01.

8  Q.      So you never sold drugs until '01.

9  A.      Well, maybe a bag of weed or something.

10 Q.      Before '01.

11 A.      Yes.

12 Q.      And you started selling powder cocaine in '01.

13 A.      Correct.

14 Q.      Do you remember what month in '01?

15 A.      No.

16 Q.      Again, was it   January?

17 A.      Towards the end of the year.

18 Q.      End of the year.    December of 01?

19 A.      No.  I'm saying the end of the year.  From

20 October to  December.

21 Q.      October to  December?

22 A.      Yeah.  Anywhere in that time frame.

23 Q.      The first time you bought cocaine from      Tony to

24 sell, how much did you buy?

25 A.      An 8-ball.

1 Q.      And you used some of that 8-ball?

2 A.      Yes.

3 Q.      And you sold some of the 8-ball?

4 A.      Yes.

5 Q.      The part that you sold.  Strike that.

6         How much did you pay   Tony for an 8-ball?

7 A.      I'm not sure of the exact price.  Anywhere from

8 $125 to $150.

9 Q.      When you stop buying eight balls from     Tony?

10 A.      A couple weeks after   I started buying from him.

11 Q.      You only bought 8-balls from    Tony for a couple

12 of weeks?

13 A.      Yeah.  Maybe two to three weeks.

14 Q.      The portion of the 8-ball that you didn't use

15 yourself, how did you repackage it?

16 A.      In bags.

17 Q.      What size bags?

18 A.      I don't know the size.

19 Q.      Well, how much of the 8-ball did you use?

20 A.      Maybe a gram.

21 Q.      So you would have about 2 grams left; correct?

22 A.      Yes.

23 Q.      And then you would repackage that into bags;

24 correct?

25 A.      Correct.

1  Q.      How many bags would you repackage that 2 grams

2  into?

3  A.      Ten or more.

4  Q.      How much would you sell each of those bags for?

5  A.      $10 or more.

6  Q.      $10 bags?

7  A.      Or more.

8  Q.      How much more?

9  A.      Give or take.  Depends on the person where he

10 is.

11 Q.      I'm sorry,  I couldn't understand the last part.

12 Give or take?

13 A.      Give or take the person and where are you.

14 Q.      So it was whatever you could convince somebody

15 to pay you for it?

16 A.      Correct.

17 Q.      $20?

18 A.      I mean, $10 or $20.

19 Q.      So if you had 2 grams, give or take, and you

20 divided that into 10 bags, each bag would have about

21 2/10 of a gram; correct?

22 A.      I'm not sure on the math, but yes.

23 Q.      It sounds about right, doesn't it?

24 A.      I'm going by you doing the math.

25 Q.      Divide two by ten.

1  A.        That's what I'm saying.      I'm agreeing.

2  Q.        Who did you sell to?      I don't mean the names,

3  but who did you sell to?

4  A.        Different people   I came in contact with.

5  Q.        How did they know you were selling cocaine?

6  A.        People you hung around or party with or

7  anything, you know, you come in contact with.

8  Q.        People on the street people, at parties; people

9  at clubs?

10  A.        People you hang out with in your neighborhood,

11  at the club.  You know, there's many places.

12  Q.        So you would just put the word out?

13  A.        Around people that I know.  If you got high,

14  they got high.

15  Q.        Did you have a constant supply of cocaine?

16  A.        No.

17  Q.        How did people know when you had cocaine?

18  A.        When they seen me.

19  Q.        Let's talk about when you're buying from     Tony.

20           You bought from   Tony for two to three weeks you

21  said.

22  A.        Correct.

23  Q.        How many times did you buy from      Tony?

24  A.        Anywhere from one to three.

25  Q.        I'm sorry?

1  A.       Anywhere from one to three times.

2  Q.       One to three times?

3  A.       Yes.

4  Q.       Over a two- to three-week period?

5  A.       Correct.

6  Q.       When you were selling those little baggies, it

7  didn't take long to sell out, did it?

8  A.       Sometimes.

9  Q.       Take a couple of days at most; right?

10  A.       Sometimes.

11  Q.       Did it ever take more than a couple of days?

12  A.       Yes.

13  Q.       How much longer than a couple of days would it

14  take you to sell $10 to $20 doses of cocaine?

15  A.       A few days.

16  Q.       A few days.

17          So if you bought from   Tony for two to three

18  weeks, and you bought from him one to three times, and

19  it took three days on average to sell all those drugs,

20  that means more than half of the time you were selling

21  -- more than half the time you were buying drugs from

22  Tony you didn't have any drugs; right?

23  A.       Well, half the times   I was in the house.     I

24  didn't come around or move around because     I didn't have

25  a vehicle.

1  Q.      You needed a vehicle to sell drugs?

2  A.      I needed to move around to go get them.

3  Q.      When you were selling them, you didn't need a

4  vehicle did you?

5  A.      I walked around.

6  Q.      You sold them out of your pocket -- out of a

7  stash somewhere?

8  A.      I still have to move around.

9  Q.      I'm sorry?

10  A.      I still have to move around.

11  Q.      When you were selling, did you go to your

12  customers?

13  A.      Somewhat, because we meet up in these spots

14  where everybody be at in a club, parties, different

15  places.

16  Q.      Excuse me.   I didn't mean to interrupt.

17          You would go a place where you thought you'd

18  find customers; right?

19  A.      Correct.

20  Q.      Then they'd come to you; right?

21  A.      Correct.

22  Q.      I want to come back to the numbers again.      I

23  apologize if  I'm confusing you a little bit;    I'm

24  confusing myself a little by sometimes.

25          You bought from Tony one to three times.

1  A.      Correct.

2  Q.      You bought from   Tony for about three weeks.

3  A.      Correct.

4  Q.      So you bought from   Tony, at the most, on

5  average, once a week.

6  A.      Correct.

7  Q.      You would use part of it, right?

8  A.      Yes.

9  Q.      You would sell part of it; right?

10 A.      Correct.

11 Q.      It would take you three days, on average, to

12 sell out the part you didn't use yourself; right?

13 A.      Correct.

14 Q.      There's seven days in a week; right?

15 A.      Correct.

16 Q.      So more than half of the time you were selling

17 drugs that you bought from    Tony, you didn't have any

18 drugs.

19 A.      Correct.

20 Q.      Then you would go to a place when you did have

21 drugs, where you knew there would be customers; right?

22 A.      Correct.

23 Q.      The customers would come to you.

24 A.      We would see each other, yes.  Correct.

25 Q.      Your customers weren't reselling, were they?

1  A.      No.

2  Q.      They were using; right?

3  A.      Correct.

4  Q.      Because the quantities they were buying from you

5  was too small for resell; right?

6  A.      Correct.

7  Q.      Mr. Thurman,  I want to change the topic just a

8  little bit.  You talked -- you testified last week

9  about being present when powder was cooked into crack.

10         Do you remember that?

11 A.      Yes.

12 Q.      It's a simple process; isn't it?

13 A.      Of some sort.

14 Q.      Excuse me?

15 A.      Of some sort.

16 Q.      You're familiar with the process; right?

17 A.      Yes.  I've seen it done.

18 Q.      And you could do it yourself if you wanted to,

19 couldn't you?

20 A.      Possibly.

21 Q.      Did you ever do it yourself?

22 A.      No.

23 Q.      You watched people do it?

24 A.      Right.

25 Q.      It's fairly simple; right?

1  A.      Yes.

2  Q.      It calls for powder cocaine; right?

3  A.      Yes.

4  Q.      And baking powder; right?

5  A.      Yes.

6  Q.      And a liquid of some sort; correct?

7  A.      Correct.

8  Q.      What liquid?

9  A.      Water.  Alcohol.  Depends who's cooking it.

10 Q.      Then you put it in containers; right?  A Pyrex

11 jar or something like that; right?

12 A.      Correct.

13 Q.      You heat it up; right?

14 A.      Correct.  And what happen -- does it crack?

15 Like, drop out of the liquid into the bottom of the

16 container?

17 A.      No, no, no, no.

18 Q.      How does the crack form?

19 A.      From cooking it.

20 Q.      You just cook away all the liquid?

21 A.      It forms of some sort.

22 Q.      But when you're finished cooking it, there's no

23 liquid left; correct?

24 A.      Yeah.  It's liquid and then drugs.

25 Q.      And the crack is a little -- they call it a

1  rock; right?

2  A.      Yes.

3  Q.      Because it looks kind of like a little rock;

4  right?

5  A.      Yes.  Correct.

6  Q.      It's a fairly simple process; right?

7  A.      Correct.

8  Q.      It doesn't take all much time, does it?

9  A.      No.

10  Q.      It doesn't take a whole lot of equipment, does

11  it?

12  A.      No.

13  Q.      And crack is consumed by smoking; correct?

14  A.      That's one way.

15  Q.      It's the most common way, isn't it?

16  A.      Correct.

17  Q.      Have you ever seen crack smoked?

18  A.      Who, me?  Yes.

19  Q.      It's a fairly simple process, too, isn't it?

20  A.      I would figure so.

21  Q.      Excuse me?

22  A.      I would figure so.

23  Q.      I'm sorry,  Mr. Thurman,  I couldn't understand

24  you.

25  A.      Yes.

1  Q.      It takes a crack pipe; correct?

2  A.      That's one of the items, yes.

3  Q.      Can you describe a crack pipe for us?

4  A.      Like a pipe.  It's different tubes.  Different

5  people --  I'm not a crack smoker.

6  Q.      You've seen it smoked; right?

7          You take a piece of the rock and you put it in

8  the pipe; right?

9  A.      I never watched the whole process.     I seen

10 somebody smoke, but   I didn't sit there just taking heed

11 to everything they were doing.

12 Q.      I'm not asking for you to give a seminar.      I

13 want to follow the process.

14          People have a pipe; right?

15 A.      Correct.

16 Q.      They put the crack in the pipe; right?

17 A.      Correct.

18 Q.      They put a match or some flame under the pipe;

19 right?

20 A.      Correct.

21 Q.      And the crack dissipates and evaporates, and

22 they inhale the fumes.

23 A.      Correct.

24 Q.      That's not a very difficult thing to do, is it?

25 A.      Not to my knowledge.

1  Q.      Mr. Thurman, just one more short area, if    I may.

2          I want to follow up on a question that    Mr.

3  Montemarano  asked you.  How much -- you've testified to

4  all your activities involved in drug trafficking.

5          How much total quantity did you actually move?

6  A.      I'm not sure of the total numbers.

7  Q.      Can you estimate?  25 kilograms?

8  A.      25 or more.

9  Q.      30?

10 A.      25 or more.

11 Q.      30?  Would that be too much?

12 A.      No.

13 Q.      35?

14 A.      Could be.

15 Q.      Could it be 40?

16 A.      35 or more.

17 Q.      Well, could it be 40?

18 A.      I'm not sure of the exact numbers.

19 Q.      35 or more?  Maybe 40?  Maybe more?

20 A.      Yes.

21 Q.      Your sentence is controlled in large part by the

22 amount of drugs you're responsible for; right?

23 A.      Yes.

24 Q.      And the more drugs you're responsible for, the

25 longer your potential sentence; correct?

1  A.       Yes.  To my knowledge, yes.

2  Q.       So if you took responsibility in your plea

3  agreement for 40 or more kilograms, you'd have a fairly

4  lengthy sentence, wouldn't you?

5  A.       I'm not sure.

6  Q.       Well, it would be a lot longer than a potential

7  sentence for taking responsibility for 15 kilograms,

8  wouldn't i t?

9  A.       I'm not sure.    I never looked at the guidelines.

10  Q.       Excuse me?

11  A.       I never looked at the guidelines, so     I'm not

12  sure which one makes it higher or lower.

13  Q.       You never looked at the guidelines?

14  A.       Not to see if it makes a 40 or difference from

15  five to 40.

16  Q.       You entered go into a plea agreement; right?

17  A.       Yes.

18  Q.       It requires you, without the assistance of the

19  government, to serve a sentence of at least 10 years;

20  correct?

21  A.       Correct.

22  Q.       And you had an attorney for that; right?

23  A.       Correct.

24  Q.       And you're telling us that you and your lawyer

25  never discussed the sentencing guidelines?

1  A.      We discussed it for that amount, not for the

2  amount you're saying.  You're saying how would      I know

3  the difference of 40 or five what     I'm being charged

4  with.

5  Q.      So you knew that you were responsible for 40 or

6  more kilograms; right?

7  A.      Yes.

8  Q.      But you and your lawyer managed to reach an

9  agreement with the government for you to take

10 responsibility for only 15 kilograms; correct?

11 A.      Yes.

12 Q.      Yes?

13 A.      Yes.

14 Q.      15 is a whole lot less than 40, isn't it?

15 A.      Yes.

16 Q.      Thank you,  Mr.  Thurman.

17         MR.  MARTIN:   Your  Honor, may  I approach briefly

18 just to make a record?     I don't want to make an

19 argument in front of the jury.

20         THE  COURT:  All right

21              (At the bar of the Court.)

22         MR. MARTIN:    I didn't want to object during   Mr.

23 McKnett's  cross-examination but, on behalf of     Mr.

24 Goodwin,  I feel compelled to, because the quantity is

25 going to be something that the jury has to consider.

1  If the jury finds that   Michael  Thurman was involved in

2  this organization with   Learley  Goodwin, then it has a

3  spillover effect here, and the quantity, obviously, is

4  going to be something that is attributed to      Mr.

5  Goodwin.  So,   I wanted to note for the record that      I

6  objected to that line of questioning.  There it is.

7            I didn't want to do it during his

8  cross-examination.

9         MS. JOHNSTON:   Your Honor, quite frankly, what

10 the jury is going to be asked to find is whether or not

11 there was 5 kilograms or more.      Mr. Thurman has

12 repeatedly testified there has been 5 kilograms on each

13 one of these trips.

14         THE COURT:   I think your objection is too late.

15 I'm going to overrule it in any event, but you can make

16 a record.  You've made a record.

17                  (Back in open court.)

18         THE COURT:  Is there any further

19 cross-examination?

20         All right, you may proceed.

21                  **REDIRECT EXAMINATION**

22    BY MS. JOHNSTON:

23 Q.    Just a few questions.

24      Mr. Thurman, the 8-balls that you got.  How much

25 money did you make by selling some of the 8-ball and

1  using some of it, generally speaking?

2  A.      Anywhere from maybe $100-175.

3  Q.      Above and beyond what you paid for it.

4  A.      Yes.

5  Q.      That allows you still to keep some to smoke

6  yourself?

7  A.      Yes.

8  Q.      Or to consume yourself,    I mean.

9  A.      Yes.

10 Q.      In addition to that, the people that you sold it

11 to, where would you meet those people?

12 A.      Associates' house, clubs, and different -- just

13 hangouts.

14 Q.      These were -- you said "hangouts?"

15 A.      Yes.

16 Q.      And these -- were some of these people people

17 that you knew?

18 A.      Yes.  Or associate with.

19 Q.      Socialized with?

20 A.      Yes.

21 Q.      Hung out at the clubs with?

22 A.      Yes.

23 Q.      Were you able to do that on a regular basis with

24 these 8-balls that you received from either      Tony or

25 other people?

1  A.      Yes, the majority of the time.

2  Q.      In terms of  Tony.  Once you purchased some

3  8-balls from  Tony, what did you and   Tony do from that

4  point forward?

5  A.      I don't understand the question.

6  Q.      Well, you -- in response to   Mr. McKnett's

7  questions, you said that you had purchased some 8-balls

8  from  Tony; is that correct?

9  A.      Yes.

10  Q.     Did there come a time when    Tony introduced you

11  to someone else whom you started getting the drugs

12  from?

13  A.      Yes.

14  Q.      Who was that?

15  A.      Mr. Goodwin.

16  Q.      Counsel also asked -- one of defense counsel

17  asked you about   Ms. Demara .

18          When you first met with Detective     Eveler  in your

19  mother's home, did you tell them that     Ms. Demara  was on

20  trips?

21  A.      Yes.

22  Q.      Did you provide information about where she

23  could be located?

24  A.      Yes.

25  Q.      Did you make any effort to hide her identity?

1  A.      No.

2  Q.      In addition to that, did you disclose      Steve

3  Campbell and   Steve  Ross?

4  A.      Yes.

5  Q.      In terms of the trips involving -- there was

6  some question about the trips involving      Mr. Campbell.

7          You indicated there were two deals that had

8  problems; is that correct?

9  A.      Correct.

10  Q.      Okay.  What was the first deal that had

11  problems?

12  A.      The drugs that got lost in the mail.

13  Q.      Was that before or after you started driving

14  back and forth?

15  A.      That was before.

16  Q.      And the second deal with   Mr. Campbell that had a

17  problem.  What was the nature of that problem?

18  A.      The quality.

19  Q.      Is that the problem that you were trying to

20  address when you were stopped in      Texas in the

21  Conversion van?

22  A.      Yes.

23  Q.      Who provided the guns you took with you then?

24  A.      Mr. Goodwin.

25  Q.      In addition to   Stephen Campbell and those two

1 problems, was there problems with another source of

2 supply in  Texas?

3 A.      In El Paso.

4 Q.      Who was that source of supply?

5 A.      Kelly.

6 Q.      Had you made any trips for   Mr. Goodwin taking

7 drugs from Kelly to   Maryland?

8 A.      No.

9 Q.      What was your involvement?

10 A.      To return the drugs.

11 Q.      Had you had any knowledge or contact with      Mr.

12 Kelly before  Mr. Goodwin sent you down there to return

13 the drugs?

14 A.      I had knowledge of him.

15 Q.      From whom?

16 A.      Mr. Goodwin.

17 Q.      Had you known him -- did you know him yourself

18 before  Mr. Goodwin mentioned Kelly to you?

19 A.      No.

20 Q.      In addition to that, were you ware of other

21 sources of supply that   Mr.  Goodwin had?

22 A.      Can you rephrase the question?

23 Q.      Let me rephrase the question.

24        You also discussed going to   Louisiana with  Mr.

25 John  D. or  John  Irby .  Do you recall those discussions?

1 A.      Correct.

2 Q.      Who sent you with  Mr. Irby to go to Louisiana to

3 pick up drugs?

4 A.      Mr. Goodwin.

5 Q.      Did you know who the source was in    Louisiana for

6 those drugs?

7 A.      No.

8 Q.      Similarly, in 2004, during the time with the bad

9 drugs in El Paso and the earlier trip to    Texas, did you

10 have any conversations with    Mr.  Goodwin about an

11 individual named "  Cuba?"

12 A.      Yes.

13 Q.      Okay.  Who was  Cuba?

14 A.      Another player.

15 Q.      Is he, in fact, the voice you recognized in some

16 of the calls  Friday?

17 A.      Yes.

18 Q.      Had you known -- had you had any contact or

19 knowledge of  Cuba before  Mr. Goodwin told you about

20 him?

21 A.      No.

22 Q.      There was a discussion during cross-examination

23 about  Raynard  Dorsey, and in response to one of,    I

24 think,  Mr. Martin's questions, you said that    Mr.

25 Goodwin had said   Raynard  Dorsey set them up.

1        What did you mean by that phrase?

2        What did you understand    Mr. Goodwin to be

3 telling you when he said    Dorsey had set him up?

4 A.      That the police know about the deal going down.

5 Q.      There was also questions about someone named

6 Ricardo Willis   or "Little Rick?"

7 A.      Yes.

8 Q.      Who is Little Rick?

9 A.      He lived in an apartment in    Anacostia   building.

10 Q.      In the apartment that you identified from the

11 pictures last   Friday, or a different apartment?

12 A.      At "Ponderosa."

13 Q.      In the same apartment that you identified?

14 A.      Yes.

15 Q.      How did you meet Little Rick?

16 A.      Through  Mr. Goodwin.

17 Q.      What was -- how did   Mr. Willis or Little    Rick

18 make his living?

19 A.      Working for   Mr. Goodwin.

20 Q.      Do you know what he did for    Mr. Goodwin?

21 A.      Worked down at the shop, and drugs.

22 Q.      Now, you mentioned the Lobo's, and you had an

23 identification saying you were a salesman at Lobo's.

24 Do you recall that?

25 A.      Yes.

1  Q.      You actually do work at Lobo's?

2  A.      Me, personally?  No.

3  Q.      Why did you have a salesman's card from Lobo's?

4  A.      To get the dealer's tag.

5  Q.      Excuse me?

6  A.      To be able to use the dealer's plate.

7  Q.      Who gave you the dealer plates to use?

8  A.      Mr. Goodwin.

9  Q.      While you -- how often did you go to Lobo's?

10 A.      Sometimes every day and sometimes, you know,

11 once a month.

12 Q.      Ever see any drugs at Lobo's?

13 A.      Yes.

14 Q.      Who did you see with drugs at Lobo's?

15 A.      Mr. Goodwin.

16 Q.      Anyone else?

17 A.      Myself.

18 Q.      Any other people that you recall?

19 A.      Ms. Vessels.  Rick.

20 Q.      Little Rick we just talked about?

21 A.      Yes.

22 Q.      Anybody else?

23 A.      And Mr. Irby.

24 Q.      Excuse me?

25 A.      Mr. Irby.

1  Q.      And the drugs that you had.  Was that powder

2  cocaine, or crack, or both?

3  A.      Both.

4  Q.      And the drugs you saw   Mr. Goodwin with?

5  A.      Both.

6  Q.      And there was some discussion about the

7  toolboxes at  Larry Lane's house.  Do you recall those

8  questions?

9  A.      Yes.

10 Q.      Who unlocked the toolboxes at    Larry Lane's house

11 while you were there?

12 A.      Mr. Goodwin.

13 Q.      What was inside those toolboxes that    Mr. Goodwin

14 unlocked at  Larry Lane's house?

15 A.      Drugs.

16 Q.      What kind of drugs?

17 A.      Crack and powder.

18 Q.      Would crack cocaine -- did you also sell that

19 from time-to-time?

20 A.      Yes.

21 Q.      Was that before or after you met    Mr. Goodwin?

22 A.      After.

23 Q.      What quantity of crack did you get from     Mr.

24 Goodwin that you sold?

25 A.      Various amounts from small to big.

1  Q.      Can you give us an idea of the small amount?

2  A.      From 8-ball to a ounce.

3  Q.      Those would generally be the quantities you

4  would get from  Mr. Goodwin?

5  A.      Correct.

6  Q.      Now, with the 8-ball of crack that you got, what

7  did you do with that?

8  A.      Resell it.

9  Q.      How would you resell an 8-ball of crack?

10  A.      The same way.    I got it for a low price and sell

11  it for a high price.

12  Q.      Would you break it down before you sold it?

13  A.      No.

14  Q.      You would sell the whole thing as one piece?

15  A.      Yes.

16  Q.      Who would you sell it to?

17  A.      Different clientele that came around to the shop

18  or over to the building.

19  Q.      Did you sell that differently than the way you

20  sold the powder?

21  A.      At the time it was the same.

22  Q.      The same way?

23  A.      Yes.

24  Q.      Did you also go to clubs and sell the crack?

25  A.      No.

1  Q.      Just the powder at the clubs?

2  A.      Right.  That was at the beginning.

3  Q.      Court's indulgence.

4          When you say, "at the shop," in terms of dealing

5  the crack, what "shop" was that?

6  A.      Lobo's Discount.

7  Q.      Again, where did you get the drugs to sell at

8  Lobo's?

9  A.      From Mr. Goodwin.

10  Q.      When you first went to -- strike that.

11          When you first started getting kilos from    Mr.

12  Campbell, were they always paid for in advance?

13  A.      Yes.

14  Q.      And you mentioned the quantity of $90,000.

15  A.      Yes.

16  Q.      Did you have that kind of cash?

17  A.      No, ma'am.

18  Q.      Who provided the cash?

19  A.      Mr. Goodwin.

20  Q.      Prior to the meeting between    Mr. Goodwin and  Mr.

21  Campbell in   Texas, had you ever had $90,000, or even

22  $20,000 of your own money to go out and buy a kilo or 5

23  kilos of cocaine?

24  A.      No, ma'am.

25  Q.      Court's indulgence.

1          I have nothing further.

2          THE COURT:  Any recross?

3          MR. MONTEMARANO :   None on behalf of  Ms. Martin,

4 Your Honor.

5          MR. MARTIN:  None from  Mr. Goodwin.

6          MR. HALL:  No,  Your Honor.

7          MR. MITCHELL:  No,  Your Honor.

8          MR. WARD:  No.  Thank you, sir.

9          THE COURT:  All right.  Ladies and gentlemen,

10 we'll take a luncheon recess at this time.  Please

11 return at five minutes after two.

12                    (Jury excused at 12  :55 p.m.)

13                    (Off the record at 12:55 p.m.)

14                    (On the record at 2:09 p.m.)

15          THE COURT:  Please be seat ed.  Counsel , while

16 you were having a nice , luxurious  lunch hour , I was

17 doing a temporary  restrain ing order  hear ing, so I had a

18 restrain ed lunch hour .

19          Ready for the jury ?

20          MS. GREENBERG:   Mr. Montemarano  is not here .

21          THE COURT:  Oh?

22          MR. HALL:  He left his jacket downstairs .

23          THE COURT:  There 's a jacket wait ing on him on

24 the second floor .  There he is now.

25          They said you left without  your jacket .

1          MR. MONTEMARANO: No.  I was in the lavatory.

2          THE COURT:  Mr. Montemarano, I had a lovely

3  lunch hour handling a temporary restraining order.

4          I also want you to know that I have a sentencing

5  that's scheduled for 4:00, but I've told it to trail

6  this case.  So, when adjourn for the day, clear out,

7  because I have to do a sentencing.  Don't dally,

8  because I have to go right into a sentencing.

9          All right.  Anything further?  We'll call the

10 next witness.

11         MR. MONTEMARANO: One very brief matter, Your

12 Honor.  The defense spoke concerning the ten

13 outstanding jury instructions that were not resolved

14 one way or the other, and I will get a letter to Mr.

15 Krinsky in the next day or two letting him know which

16 ones we agree to and which ones we don't.  It broke

17 about half and half.

18         THE COURT:  I'm going through what the

19 government gave me, which includes both objected to and

20 un-objected to instructions, and I'm going to start

21 doing my own repairs to it and make some preliminary

22 judgments, and perhaps in a week or ten days from now I

23 will give everybody a marked up version of where I

24 think I am so we can start reflecting on it.

25         MR. MONTEMARANO: I know I'm speaking for the

1 defense in suggesting to the court that with regard to

2 the ones we are objecting to, the defense would like to

3 be heard on the record.

4          THE COURT:  I will have a charge conference and

5 we will he go through them one page at a time.

6          All right, ready for the jury?  Bring them in.

7          MS. GREENBERG:   Your Honor, to save time, may

8 the witness approach the witness stand?

9          THE COURT:  I couldn't hear you.

10          MS. GREENBERG:   May the witness approach the

11 witness stand while the jury is coming in?

12          THE COURT:  Oh, yes.

13                    (Jury returns at 2:13 p.m.)

14          THE COURT:  You may proceed, Ms. Greenberg.

15          MS. GREENBERG:   Your Honor, the government calls

16 Special Agent Kevin Ashby to the witness stand.

17          MR. WARD:   Who is the witness?

18          MS. GREENBERG:   Kevin Ashby.

19 Thereupon,

20                    **KEVIN ASHBY**,

21 having been called as a witness on behalf of the

22 Plaintiff, and having been first duly sworn by the

23 Courtroom Deputy, was examined and testified as

24 follows:

25          THE CLERK:   I need you to state your name  for

1 the record .

2          THE  WITNESS:    My  name  is  Kevin  Ashby .

3          My  last  name  is  spelled  A  S  H  B  Y.

4                    **DIRECT  EXAMINATION**

5          BY  MS.  GREENBERG:

6 Q.       Sir , where  are  you  employed?

7 A.       I'm  employed  with  the  FBI  in  Washington , D.  C.

8 out  of  the  Washington   field  office .

9 Q.       What  is  your  position  with  the  Federal  Bureau  of

10 Investigation ?

11 A.       I'm  a  special  agent .

12 Q.       Could  you  give  this  jury  some  idea  about  your

13 background , training  and  experience , please ?

14 A.        I've  been  an  agent  for  approximately   17  and  a

15 half  years .   My  entire  career  has  been  working  criminal

16 work  --  bank  robberies , fugitives , and  primarily

17 narcotics  and  narcotics-related  offenses .   I'm

18 currently  assigned  on  a  Safe  Streets  Task  Force  which

19 investigates  violent  street  gangs  or  organizations ,

20 crews , operating  in  Washington , D.  C., primarily

21 narcotics-related  offenses . and  the  attendant   violence

22 that  goes  along  with  that .

23 Q.       Was  that  your  employment  on  October  17, 2002 ?

24 A.       Yes , it  was .

25 Q.       During  the  course  of  your  employment  as  a

1  special agent with the Federal Bureau of Investigation

2  doing narcotics work, have you executed search

3  warrants?

4  A.      Yes.

5  Q.      Numerous search warrants?

6  A.      Hundreds of search warrants.

7  Q.      Did you conduct a search at a place known as

8  Lobo's Discount Car Center, 1124 Florida Avenue,

9  Northeast, in Washington, D. C.?

10 A.      Yes, I did.

11 Q.      Could you give the jury some idea about what

12 time you started on that date?

13 A.      We actually made entry, or conducted a knock and

14 announce and made entry, right around 12:30 -- right

15 around lunchtime.

16 Q.      What time did you complete your search of that

17 location?

18 A.      A little before 3:00 p.m.

19 Q.      Did you have any particular authority for

20 conducting a search warrant at Lobo's Discount Car

21 Center?

22 A.      Yes. We had a search warrant from Superior

23 Court for that location.

24 Q.      When you say "Superior Court," could you tell

25 the jury who's the person that authorized the search of

1 that location?

2 A.      A Superior Court judge in the District of

3 Columbia.  You also have district court in there, but

4 this one was through Superior Court.

5 Q.      So you had court authority to execute the search

6 warrant?

7 A.      That's correct.

8 Q.      Could you describe -- let me show you up on the

9 screen P-90A.  Could you describe what's depicted in

10 P-90A?

11 A.      That is the front of the Lobo's Car Center.  The

12 black gray door, kind of there in the middle of the

13 screen, that's kind of --

14 Q.      Where my pen is right there?

15 A.      Yes.  That would have been the front door,

16 although that's not how we made entry.  We made entry

17 over here to the right -- on the far right of the

18 screen, there's like a black --

19 Q.      Is this where my pen is, over here?

20 A.      Exactly.

21 Q.      Reflecting the far right side of P-90A?

22 A.      Correct.

23 Q.      What did you do before you gained entry to the

24 Lobo's Discount Car Center, if anything?

25 A.      Well, we stacked up further west of the

1  location , which would be to the far left of the photo ,

2  and approach ed on foot , myself and my team , which

3  consisted of approximately eight other agent s and/or

4  MPD detective s we work with , and we walk ed right along

5  the face of that build ing . I do remember -- my

6  recollection -- this was almost four year s ago , but my

7  recollection is there was a security camera or what

8  look ed like a security camera somewhere in the vicinity

9  of the front door , which is right in the middle of the

10 screen .

11 Q.      Where my pen is in the middle of the picture ?

12 A.      Correct .  It was either right above it or right

13 to the side , I don't remember .  I do remember one of

14 the agent s in our group was about 6'6" -- he was a big

15 guy .  He had a hal ogen light, and  he knock ed that

16 camera down to make sure the residents or anyone who

17 was inside would n't see us comi ng .

18       We approach ed all the way across the front of

19 the build ing to the right -- far right of the screen

20 where there was like a gate -- a chain link gate/fence

21 kind of thing which was open .  When we got there , the

22 lead agent basically announced the police presence and

23 that we were there with a search warrant , and we made

24 entry .

25 Q.      Show ing you what's depict ed in P-90B.

1          Can you describe what is that to the jury?

2  A.     That's the back -- that's, like, the back view

3  of the building, the Lobo's building.  You're kind of

4  where this camera -- the camera angle, you're standing,

5  like, in the middle of the back lot there looking at

6  the back of the building.  To the left is -- if you

7  look at the left of this photo, that's kind of the

8  gate we came through.

9  Q.     Where my pen is?  Where this blue --

10  A.     Correct.

11  Q.     -- top is on this white?

12  A.     Generally, yes.  To the left there.

13  Q.     If I put P-90A back on the screen, how does

14  P-90A relate to P-90B?

15          Starting with P-90A.  Did you walk through this

16  area where it says, "No Parking?"

17  A.     Yes.

18  Q.     How does that relate to P-90B?

19  A.     It's just a mirror image.  This is -- it's now

20  on the far left side versus being on the far right on

21  the other photo.

22  Q.     You entered, is it your testimony, right where

23  this door is -- where this back door is?

24  A.     Yes.  After we came through the gate there, we

25  walked around.  There were some people milling around

1  out here back where these cars were some agents went to

2  deal with them and others went in through door which is

3  now in the center of your photograph that's open and

4  secured that as well.

5  Q.      You mentioned knocking down the surveillance

6  camera.  Why was that a concern to you?  Were you the

7  team leader?

8  A.      I was, yes.

9  Q.      Why was it a concern to you that you might have

10  been observed?

11  A.      We didn't want anyone to know we were coming,

12  for safety for us, as well as --

13  Q.      What kind of warrant were you executing?

14  A.      Narcotics Unit.

15  Q.      Showing you P-91.  Do you recognize what's

16  depicted in that picture?

17  A.      Yes.

18  Q.      What is that?

19  A.      That's just the interior shot of the main office

20  area, I guess, inside the little structure where I

21  showed you before.

22  Q.      Was this area part of your search?

23  A.      Yes.

24  Q.      Did you search these file cabinets, the black

25  one and the, I guess, gray?  Would you describe that as

1 a gray one depicted on the picture?

2 A.      Gray or white, yes.  I personally didn't search

3 them all, but I was there when my team did.

4 Q.      Were you the seizing agent?

5 A.      Yes.

6 Q.      Can you explain to the jury what your role was

7 as a seizing agent on that date?

8 A.      What the seizing agent does, at least as far as

9 the FBI is concerned, is once we gain entry to a

10 place, we will label all the rooms with letter

11 designations so we will know where -- you know, in the

12 future we can go back and remember what room is what,

13 rather than just saying, for example, "bedroom."

14 Because many houses have bedrooms, you label one A, B,

15 C, and D.  It's a lot more special.  Then the agents

16 will photograph the residents or, in this case, the

17 business prior to any searching.

18      Once all the photographs are completed, we'll

19 start the searching.  Agents will fan out and search

20 everything.  When they find things, if it's of value

21 for contraband, like drugs, a gun, you know, money,

22 anything of value, I, as the seizing agent, will go and

23 view that and place -- I'll see it right where the

24 agent who is locating it finds it, a photograph will be

25 taken of it, and it will be given to me and I will

1  actually take custody of it and log it into our

2  evidence vault.

3  Q.      Is that your role as a seizing agent?

4  A.      That's correct.

5  Q.      Someone else finds it and then you seize it?

6  A.      Correct.

7  Q.      Have you understood that that is the procedure

8  working with the local agents in this jurisdiction,

9  also?

10  A.     I don't know what the jurisdiction -- what they

11  do in this jurisdiction.

12  Q.     That's how you operate?

13  A.     That's how we do it in D. C.

14         MS. GREENBERG:   If I may approach the witness,

15  Your Honor.

16         THE COURT:   You may.

17         MS. GREENBERG:   Showing you what's been marked

18  as Goodwin 32 and Drugs 44.

19         Do you recognize these two exhibits?

20         MR. WARD:   I'm sorry.  That's Goodwin 32?

21         MS. GREENBERG:   Goodwin 32 and Drugs 44.

22         THE WITNESS:   Yes, I recognize both of them.

23         BY MS. GREENBERG:

24  Q.     Could you describe for the jury what is in the

25  bag marked as Goodwin 32?

1  A.     Goodwin is a Gunk can, I guess, and the brand

2  name of a puncture seal can that has a false bottom on

3  it.

4  Q.     And Drugs 44?

5  A.     Drugs 44 are what was inside Goodwin 32.

6  Q.     How did you know that Drugs 44 was inside

7  Goodwin 32?

8  A.     Because my name is on it and I was the seizing

9  agent.

10 Q.     Was it obvious, looking at Goodwin 32 --

11        MR. MONTEMARANO: Object to leading, Your Honor.

12        THE COURT:   Sustained.

13        Ask it another way.

14        BY MS. GREENBERG:

15 Q.     When you looked at Goodwin 32, what could you

16 see?

17 A.     At the time of the search warrant?

18 Q.     Yes.

19 A.     You couldn't see anything.  It was just a can.

20 Q.     What did you have to do to recover Drugs 44?

21 A.     You had to unscrew the bottom of the can.

22 Q.     Could you describe to the jury where on the

23 picture before them, which has been pre-marked as P-91,

24 you located Goodwin 32, which contained Drugs 44?

25 A.     You want to raise that picture up a little bit,

1 but that white or gray cabinet.  The bottom -- yeah,

2 right there.  See where the fire extinguisher is?

3 Right there where you have your pen.  That bottom

4 drawer of the lower cabinet there.  Inside there.  It

5 was just laying in there.

6 Q.     Showing you what's been marked as P-92.

7        Can you tell the jury what is depicted in that

8 picture?

9 A.     That's the drawer open with, presumably, the

10 can.  I don't think it was a very good photo, but it

11 was laying right in there.

12 Q.     Is that where my pen is right there, to the far

13 right side of the picture?

14 A.     Again, as best as I can tell.  It's not a very

15 good photograph, but, yes.

16 Q.     Subsequent to recovering this can with the

17 drugs, did you cause pictures to be taken of it?

18 A.     Yes.

19 Q.     Showing you what's been marked as P-96.

20        Can you tell the jury what's depicted in that?

21 A.     That's the can, obviously, with the bottom

22 removed.

23        That's the detective who actually located it

24 with the baggy pulled out -- a baggy pulled out that

25 contains -- you can see it in there, and they're either

1 dark green or gray.  Based on my experience, at the

2 time, I believed that to be crack cocaine.

3 Q.      What is depicted in P-96A?

4 A.      Again, it's just another photo with the bottom

5 screwed off, and you're looking down into the can and

6 another -- it looks like one baggy is already out and

7 there's still another baggy in the -- actually still in

8 the can.

9 Q.      And P-96B?

10 A.      There you have the can laying there with the top

11 -- excuse me, the bottom screwed off and laying there

12 as well with all the crack cocaine laid out in its

13 various baggies pulled out of the can.

14 Q.      Before I seek to publish this to the jury,

15 Special Agent Ashby, how does Drugs 44 differ from

16 appearance from what is depicted in P-96B?

17 A.      The Drugs 44 there are all pulverized.  That's

18 how they come back from the lab after analysis.  The

19 ones in the photograph are obviously chunked up, still

20 in that form.

21 Q.      Did you make a record of the number of bags and

22 the types of bags that were recovered originally from

23 Goodwin 32?

24 A.      Yes.

25 Q.      How are the number of bags different than what

1 is depicted in Drugs 44?

2 A.    I think the number is off by two.  I'm not 100

3 percent sure.

4 Q.    Could you tell the jury what was recovered from

5 inside Goodwin 32 at the scene; the types and number of

6 bags?

7 A.    You can see there are several -- I think there

8 was six of these dark green or gray little Ziplocs.

9 You had four, I think, clear bags there.  Then I think

10 you had the two -- you can see these light blue or

11 light green bags as well.

12 Q.    So a total of 12 bags of crack cocaine recovered

13 from inside this Gunk can?

14 A.    I believe so, yes.

15        MS. GREENBERG:   Your Honor, with that, may I

16 publish Goodwin 32 and Drugs 44 to the jury?

17        THE COURT:   Yes, you may.

18        BY MS. GREENBERG:

19 Q.    Did you notice anything about the shape of those

20 little baggies when you first recovered them?

21 A.    The shape of the baggies?  Which baggies are you

22 referring to?

23 Q.    The shape of what was inside the baggies.

24 A.    Yeah.  Well, I can give my opinion on what it

25 is.  It looks like crack cocaine.  I would say it's

1 crack versus powder. Even though powder can be

2 compressed, this looks like crack. It looks like --

3 you can still see the one at the top there is curved

4 and looks like it was peeled right out of the bottom of

5 -- probably out of a Pyrex measuring cup, where it's

6 cooked -- commonly cooked into crack.

7 Q.     So this pie shape here. How do you explain that

8 on the one to the far right?

9 A.     Well, I mean, I was actually referring to the

10 one on the top. That one, to me, is more clear. The

11 other one in the clear bag. That one.

12 Q.     In the blue bag?

13 A.     No, the clear bag next to it. To the right.

14 That one. You can see that's clearly my opinion coming

15 from the bottom of some kind of Pyrex cup or something,

16 but this other smaller chunk beneath it, you can't

17 really tell. That could just be chunked off -- flaked

18 off.

19 Q.     The one you were talking about that would come

20 from the Pyrex. Just for the record, is the clear

21 baggy closest to the top of the Gunk can on P-96B?

22 A.     Correct.

23 Q.     After you recovered this -- could you tell the

24 jury approximately how much, with the packaging -- with

25 the plastic baggies, how much did this suspected crack

1 cocaine weigh out to be?

2 A.      With the baggies and the heat seal, which we

3 placed it in, I think it weighed at about 80 grams.

4 Q.      After it was netted out, without the packaging?

5 A.      Without the packaging and weighed out by the DEA

6 lab, it came out to 56 -- I think 56 grams.

7 Q.      Next I want to ask you if you recognize -- I

8 know it's a bad picture, but what is depicted in P-93?

9 A.      That's going to be a little gray, again, or dark

10 green Ziploc bag inside a clear Ziploc bag, with an

11 apple on it. It's got a little chunk of crack on it as

12 well, but the photo is pretty blurry. It was taken too

13 close.

14 Q.      The apple is right here?

15 A.      Correct.

16 Q.      So approximately midway --

17 A.      Back a little bit up from the picture. It's

18 red. It's the only red in the photograph.

19 Q.      Showing you what's been marked as Drugs 45.

20      How does that compare to what the jury sees up

21 on the screen?

22 A.      Okay. Again, it's been pulverized for analysis,

23 so it doesn't look anything like that now.

24 Q.      What is depicted in the picture on the screen?

25 Does it relate at all to this?

1 A.      Yes.   The packaging  you have, the apple -- the

2 Ziploc  bag with  the  red  apple  on  it  and  the  little  dark

3 gray  or  dark  green  Ziploc,  that  contained  the  drugs.

4       MS. GREENBERG:    Your  Honor,  may  I  publish  Drugs

5 45 to  the  jury?

6       THE COURT:    Yes,  you  may.

7       BY  MS.  GREENBERG:

8 Q.      Showing  you  P-91.

9       Can  you  show  the  jury  where  Drugs  45  was

10 recovered,  the  exhibit  going  around  to  the  jury  now?

11 A.      That  was  recovered  out  of  the  top  drawer  out  of

12 the  taller  gray  or  black  cabinet,  just  to  the  left  of

13 the  smaller  white  one  where  the  Gunk  can  was.

14 Q.      Where  my  pen  is  here?

15 A.      Correct.

16 Q.      This,  again,  is  the  office  inside  Lobo's?

17 A.      Correct.

18 Q.      If  I  may  approach  again.

19       What's  been  marked  as  Goodwin  33.   Does  this

20 relate  at  all  to  your  search  warrant  at  that  location?

21 A.      Yes.

22 Q.      What  is  Goodwin  33?

23 A.      This  is  a  can  --  Liquid  Wrench  lubricant  can,

24 also  with  a  false  bottom,  which  was  recovered  in  that

25 same  office  there.

1  Q.      Was there anything recovered from inside this

2  can?

3  A.      No.  It was empty.

4  Q.      Did you continue to search the rest of the shop?

5  A.      Yes.

6  Q.      I'm going to ask you what is depicted in P-94.

7  A.      That's a box that contained some loose and

8  miscellaneous ammunition that was recovered in kind of

9  the storage area just to the right of that main

10 building we were previously in.

11 Q.      And P-95, which I'm putting up on the screen

12 now?

13 A.      That's a digital scale -- a small digital scale

14 that was also recovered in that same little storage

15 area there to the right of the office building.  It was

16 recovered right next to all the ammunition.

17         MS. GREENBERG:   If I could approach one more

18 time, Your Honor.

19         THE COURT:   You may.

20         BY MS. GREENBERG:

21 Q.      Goodwin 34 and Goodwin 35.  How did they relate

22 to what the jury's seeing on the screen now?

23 A.      This is them.  This is the box.  Goodwin 34 is

24 all the loose ammunition -- box of ammunition.

25 Q.      And Goodwin 35?

1  A.      Goodwin 35 is that digital scale.

2  Q.      When the search warrant was conducted, how were

3  Goodwin 34, the ammunition, in relation -- and Goodwin

4  35.  How close were they?

5  A.      They were just on a shelf in that little storage

6  area.

7          MS. GREENBERG:  Your Honor, I'm going to publish

8  Goodwin 33, 34 and 35, and I have no further questions

9  for this witness.

10         THE COURT:  You may.

11         Any cross-examination?

12         MR. MARTIN:  Yes, Your Honor.  With the court's

13  permission, if I could do my cross from here?

14         THE COURT:  You may.

15                       **CROSS-EXAMINATION**

16         BY MR. MARTIN:

17  Q.      Agent Ashby, good afternoon to you.  Tony Martin

18  on behalf of Mr. Goodwin.

19         Calling your attention back to the execution of

20  the search warrant back on October 17, 2002.  If I

21  understood correctly, you were the seizing agent;

22  correct?

23  A.      That's correct.

24  Q.      In that capacity, you had a certain role, and

25  that role was almost like in a supervisory capacity

1  with respect to the other agents on the scene; right?

2  A.      For the most part, that's correct.

3  Q.      There's a salesperson protocol that takes place

4  when there is a seizure of items from the premises; is

5  that correct?

6  A.      You might need to be a little more specific on

7  that.

8  Q.      Would it be accurate to say that the officers

9  would be expected to wear latex gloves before they

10  touched any of the items that were just shown to you?

11  A.      Yes, that is correct.

12  Q.      That was done in this particular instance;

13  correct?

14  A.      Yes.

15  Q.      They did that because some of these items would

16  be expected to be sent to the lab for forensic

17  analysis; correct?

18  A.      That would be the call of the lead case agent.

19  But, yes.

20  Q.      They would also do that so some of the items

21  picked up would not be contaminated; correct?

22  A.      Yes.  Correct.

23  Q.      To keep their DNA off items where other DNA

24  might be there?

25  A.      That could be a reason as well, yes.

1  Q.      When you went in there on October 17, 2002, you

2  didn't see Learley Reed Goodwin there, did you?

3  A.      I didn't see him then.  I still don't know what

4  he looks like to this day.

5  Q.      There was a gentleman there by the name of

6  Michael Jackson; right?

7  A.      I remember that name, yes.

8  Q.      You had an opportunity to speak with Mr.

9  Jackson?

10  A.      I believe I did.  That's correct.

11  Q.      You spoke to some of the other individuals who

12  were at Lobo's on that day; right?

13  A.      I might have.  There was, like, 12 people there.

14  I don't remember everyone I spoke to.

15  Q.      Do you remember speaking to a Hispanic male?

16  A.      There were several there.  You need to be more

17  specific.

18  Q.      Do you remember speaking to someone by the name

19  of "Lobo?"

20  A.      Mr. Lobo was there, yes.  I think he was the

21  owner.  Yes, I did speak to him.

22  Q.      With respect to the various items that you were

23  shown, specifically some of these cans with the false

24  bottoms, like Exhibit Goodwin 33.  You didn't actually

25  designate that Goodwin 33.  You just described it as an

1 item that was seized on your return; correct?

2 A.      Correct.  Goodwin 33 is a label.  The U. S.

3 Attorney labeled it for a court exhibit.

4 Q.      In other words, the government labeled that as

5 Goodwin 33?

6 A.      Correct.

7 Q.      That's what they called it.

8 A.      That is correct.

9 Q.      You didn't call it Goodwin 33.

10 A.      No.

11 Q.      You didn't call it Lobo 33.

12 A.      No.  I believe it was referred to as Item 2 on

13 my inventory sheet.

14 Q.      The drugs were sent, I presume, to Quantico for

15 testing?

16 A.      No.  They were sent to the DEA Mid-Atlantic

17 laboratory.

18 Q.      And I take it that the baggies were also sent to

19 the forensic lab with the drugs that they were found

20 in.

21 A.      All the drugs were sent, just as they were

22 seized, to the DEA lab.

23 Q.      And the cans as well; correct?

24 A.      The cans were not sent to the DEA lab.

25         No.  They would have been sent -- they were sent

1 to the -- I take that back.  I'm not sure if the cans

2 went to the DEA lab.  I know the cans ultimately ended

3 up at the FBI Fingerprint Lab, but the drugs were

4 analyzed at the Mid-Atlantic laboratory.

5 Q.    With respect to the fingerprint lab.  Do you

6 know if the results ever came back?

7 A.    I don't know what the results were, no.

8 Q.    If the results had come back, they would have

9 gone to the U. S. Attorney?

10 A.    I would hope so.

11 Q.    Would it have been your responsibility to send

12 it to the U. S. Attorney?

13 A.    No.  That would have been the case agent's

14 responsibility.

15 Q.    As far as you know today, Mr. Learley Reed

16 Goodwin's fingerprints never came back on any of those

17 items seized on October 17, 2002; is that correct?

18 A.    I have no idea what the results of the prints

19 were.

20 Q.    Just to make sure I've got your testimony

21 crystal clear.  You testified you believed that Lobo

22 was the owner, or at least the operator of that

23 particular shop on that day?

24 A.    On that day he was, yes.

25        MR. MARTIN:   Nothing further, Your Honor.

1          Well, just a second, Your Honor.   Nothing

2 further, Your Honor.   Thank you.

3          THE COURT:   Further cross-examination ?

4          MR. HALL:   No, Your Honor.

5          MR. MITCHELL:   No, Your Honor.

6          MR. WARD:   No questions, Your Honor.   Thank you.

7          THE COURT:   Mr. Sussman.

8                    **CROSS-EXAMINATION**

9          BY MR. SUSSMAN:

10 Q.      Good afternoon, agent.

11          Prior to the October 17, 2002 search, is it fair

12 to say that you had no involvement in this particular

13 case?

14 A.      None whatsoever.

15 Q.      And would I be accurate to say that sometimes

16 extra manpower is needed, and you kind of get called

17 into service with connection to a search?

18 A.      That's correct.

19 Q.      So it was on October 17?

20 A.      That's correct.

21 Q.      The reason you can do that is because you're

22 experienced in executing these kinds of warrants.

23 A.      That's it, partly.

24 Q.      And partly because narcotics warrants tend --

25 the execution of them tend to be fairly standard.

1  Would  that  be  accurate ?

2           MS.  GREENBERG:     Objection .

3           THE  WITNESS:     They're  fairly  standard .

4           BY MR.  SUSSMAN :

5  Q.       Well , executing  one warrant  is  somewhat  standard

6  to the  next.

7  A.       I don't know  if I would  agree  with  that .

8  Q.       Okay .   In terms  --  the kinds  of things  you  look

9  for when  you're  executing a  narcotics  warrant .   They

10 tend  to be  fairly  standard , would  you  agree  to that ?

11 A.       What  you're  looking for ?   Yes .

12 Q.       The first  thing  you're  looking for  is  drugs ;

13 right ?

14 A.       It's a narcotics  warrant , yes .

15 Q.       That  involves  large  quantity  and  small

16 quantities ; correct ?   Paraphernalia A.      Drug ,

17 paraphernalia  , yes .

18 Q.       Trace  elements  of drugs ?

19 A.       Yes .

20 Q.       You mentioned paraphernalia .   That  can  consist

21 of a wide  variety  of items ; correct ?

22 A.       That's  correct .

23 Q.       You're  looking  for firearms ?

24 A.       If it's a gun  warrant .   But, yes .

25 Q.       Well , even  on a narcotics  warrant ?

1  A.      If you find it, sure.

2  Q.      That includes ammunition?

3  A.      Yes.

4  Q.      Tools related to weapons?

5  A.      Yes.

6  Q.      Manuals related to weapons?

7  A.      Yes.

8  Q.      Cases related to weapons?

9  A.      Yes.

10 Q.      Documents related to weapons?

11 A.      Yes.

12 Q.      You mentioned the drug paraphernalia.  That also

13 would include a wide variety of items; correct?

14 A.      Yes.

15 Q.      Packaging of drugs?

16 A.      Yes.

17 Q.      Scales?

18 A.      Yes.

19 Q.      Measuring spoons?

20 A.      Yes.

21 Q.      Sometimes strainers?

22 A.      Yes.

23 Q.      Some people use mixers, coffee grinders, things

24 of that nature?

25 A.      Yes.

1  Q.       And your search would also include things that

2  would perhaps involve personal use of drugs.  Would

3  that be accurate, as well?

4  A.       It could.

5  Q.       Rolling paper?  Pipes?  Things of that nature?

6  A.       Yes.

7  Q.       Another thing that you would be looking for in a

8  narcotics warrant would be signs of wealth; would that

9  be accurate?

10  A.       Yes.

11  Q.       Money, obviously.

12  A.       Yes.

13  Q.       Jewelry?

14  A.       Yes.

15  Q.       Electronic equipment like big screen TVs, things

16  of that nature?

17  A.       Possibly, yes.

18  Q.       Okay.  Documents related to expensive cars?

19  A.       Correct.

20  Q.       Additionally, you look for particular evidence

21  in the form of paper; is that right?

22  A.       Yes.

23  Q.       Some of the records now are kept on computers;

24  is that accurate?

25  A.       Somewhat, yes.

1  Q.      If you see a computer, would you be likely to

2  seize a computer?

3  A.      More than likely, yes.

4  Q.      The FBI has the ability to download the computer

5  and even perhaps scrape the hard drive to retrieve data

6  from it; is that correct?

7  A.      That's correct.

8  Q.      With regard to paper. Is it fair to say it's a

9  little difficult to read through everything on the

10 scene?

11 A.      That's correct.

12 Q.      The procedure would be to seize documents that

13 look like they might have evidentiary significance; is

14 that right?

15 A.      That's correct.

16 Q.      Then you can kind of go over them later on to

17 see what they really yield.

18 A.      Correct.

19 Q.      That would include address books.

20 A.      Yes.

21 Q.      That would show --

22         MS. GREENBERG:   Your Honor, I'm going to object.

23 We've gone on quite sometime, but this is well outside

24 the scope of direct.

25         THE COURT:   How far are you going to go with

1  this, Mr. Sussman?

2          MR. SUSSMAN:   About one and a half more minutes.

3          THE COURT:   Stay within that.

4          BY MR. SUSSMAN:

5  Q.      Documents related to financial records?

6  A.      Absolutely.

7  Q.      Things that might list names of suppliers;

8  correct?

9  A.      That could be.

10 Q.      Customers?

11 A.      Sure.

12 Q.      Things having to do with financial resources;

13 correct?

14 A.      Yes.

15 Q.      It would be fair to say that it's a rare warrant

16 that you find all of these things; is that correct?

17 A.      That would be correct.

18 Q.      It would also be fair to say that it's the rare

19 execution of a warrant where you find none of these

20 things.

21 A.      I would say -- well, more often than not, the

22 less of those items than more.  Yeah, unfortunately.

23         MR. SUSSMAN:   Thank you.

24         THE COURT:   Any further cross?

25         Any redirect?

1          MS. GREENBERG:   Briefly, Your Honor.

2               **REDIRECT EXAMINATION**

3          BY MS. GREENBERG:

4  Q.     Special Agent, in your experience, have you ever

5  done these types of warrants that counsel is asking you

6  about and come up empty?

7  A.     Sure we have.

8  Q.     Do you use other means to proceed in trying to

9  build evidence to present to a jury?

10 A.     Absolutely.

11 Q.     Have those prosecutions resulted in --

12         MR. MONTEMARANO:   Objection, Your Honor.

13         THE COURT:   Sustained.

14         BY MS. GREENBERG:

15 Q.     You have been able to, absent the search warrant

16 evidence, present substantial evidence to a jury --

17         MR. MONTEMARANO:   Objection, Your Honor.

18         MS. GREENBERG:   -- utilizing other investigative

19 methods.

20         THE COURT:   Sustained.

21         BY MS. GREENBERG:

22 Q.     In connection with a search warrant. Is that

23 your only means of getting evidence?

24 A.     Absolutely not.

25 Q.     How do you pursue other means -- have you

1  pursued other means when these warrants come up empty?

2  A.       Absolutely.

3  Q.       Evidence that can be presented in court?

4         MR. MONTEMARANO:   Objection.

5         THE COURT:   Sustained.

6         MS. GREENBERG:   Your Honor, may we approach?

7         THE COURT:   Yes.

8              (At the bar of the Court.)

9         MS. GREENBERG:   Your Honor, Mr. Sussman went

10  through a litany of things that the witness can get

11  from -- that this witness could get from a warrant.  He

12  went well beyond the scope of direct, and I am briefly

13  trying to bring back that there is evidence that can be

14  used in court.

15        THE COURT:   I think you've already got the fact

16  that evidence is devised through a variety of other

17  means.

18             The question that I think is raised leading to

19  objections is the status of that other evidence and

20  whether it's admissible or not.  I don't think we need

21  to go into that.

22        MS. GREENBERG:   Evidence that can be presented

23  but --

24        THE COURT:   You may ask him about other

25  investigative techniques   and other means they use to

1 develop evidence, but whether it gets admitted or not

2 is not something I think we should not go into.

3         MS. GREENBERG:   May I at least, Your Honor, have

4 permission to go into things such as recordings?

5         THE COURT:   Certainly.

6         MR. SUSSMAN:   I'm going to object to that.

7         THE COURT:   Mr. Sussman, you went into this

8 great, long list of things they look for when they go

9 in.   That's fine.   I granted you some latitude, and I

10 think she can have latitude to ask what other things

11 they do.   What I've got to cut you off from doing is

12 whether they get admitted or not.   I certainly think,

13 in light of your cross-examination, that she can be

14 allowed to develop what other evidence they look for in

15 drug cases.

16         MR. SUSSMAN:   I confined all of my questions to

17 the procedures in a narcotics warrant.

18         THE COURT:   I understand.

19         MR. SUSSMAN:   I think she makes him an expert

20 within witness with regard to general investigative

21 techniques.

22         THE COURT:   We're not getting expert testimony.

23 He's talking about what he does in his experience.

24 That's my ruling, all right?

25                 (Back in open court.)

1          BY MS. GREENBERG:

2   Q.      Special  Agent  Ashby,  given  your  testimony  that

3   you  have  encountered  with  search  warrants  no  evidence

4   that  that  was  not  a  successful  investigative  technique ,

5   could  you  tell  this  jury  some  of  the  investigative

6   technique s you've  used  in  connection  with  your  work

7   when  a  search  warrant  doesn't  work  out ?

8   A.      There  are  a  variety  of  thing s we  can  do.  We  can

9   try  to  send  in  a  cooperating  witness  or  witness

10  undercover ; we  can  conduct  surveillance ; we  can  try  to

11  get  court -ordered  wiretap s of  any  electron ic  device s

12  they  have .

13  Q.      Court -authorize d wire taps .  Could  you  explain  to

14  the  jury  what  the  common  terminology  for  that  is?

15  A.      Wiretap .  That 's what  I  refer  to  it  as s.  Title

16  3  wiretap .

17          We  can  continue  to  develop  cooperating

18  witness es , or  informant s continue  feed ing  us

19  intelligence  so  we  can  do  pro active  enforcement .  Those

20  are  some  of  the  main  ones  right  off  the  top  of  my  head .

21          MS. GREENBERG:   No  further  question s, Your

22  Honor .

23          THE  COURT:   Any  recross ?

24          MR. MARTIN:   No  recross  for  Mr. Goodwin .

25          MR. HALL:   No , Your  Honor .

1          THE COURT:  All right , you may step down .  Thank

2 you very much , agent .

3                    (Witness excused at 2:46 p.m. )

4          MS. JOHNSTON:  Your Honor , the government would

5 recall Sergeant Christopher Sakala at this time .

6          MR. MCKNETT :  Your Honor , there is a procedural

7 matter I'd like to discuss at the bench in regard to

8 Detective Sakala .

9          THE COURT:  All right , come up to the bench .

10                   (At the bar of the Court.)

11         MR. MCKNETT :  Your Honor , prior to trial I filed

12 a motion requesting the scope and content of Detective

13 -- I keep calling him "Agent" -- Detective Sakala 's

14 potential testimony having to do with whether or not

15 he's testify ing as an expert or a fact witness or both

16 at any particular time .  I'm not sure if this is the

17 appropriate time to address that , because I don't know

18 what the government intends to call him for at this

19 point .

20         MS. JOHNSTON:  I apologize .  I thought I made it

21 clear to counsel .  We will be calling him to start

22 playing the wiretap call s.  I expect that during those

23 wiretap call s he will be testify ing concern ing his

24 opinion of those conversation s and of -- he will also

25 testify to a surveillance that -- I'm going to

1  introduce  camera  evidence  through  him,  some  of  the  pole

2  evidence .

3        I  have  advised  counsel  we  will  interrupt  his

4  testimony, given the   fact  we  have  three  volumes  of

5  calls and  I  think  700  pages.  So  as  not  to  --  we  will

6  call  surveillance  agents  to  testify  as  to  the

7  appropriate  surveillances  during  the  testimony .  So,  we

8  will  be  recessing  his  testimony .

9        In  terms  of  him  being  an  actual  fact  witness .

10  There  is  a  surveillance   in  early  March  that  he  made  an

11  observation .  He  will  be  testifying  about  that ,  and  he

12  will  be  testifying  in  terms  of  some  of  the  pole  cameras

13  and  that  those  were  pole  cameras  made  on  a  given  day  at

14  a  given  time ;  and  he  may  identify  people  or  vehicles  in

15  those  pole  cameras.   That  would  be  the  extent  of  his

16  factual  testimony .

17        His  expert  testimony  will  be  based  on  the  calls

18  and  who  the  voices  are  and  what  they're  saying  and  what

19  terms  are  being  used  for  drugs,  much  as  he  did  in  the

20  first  trial ,  only  with  different   --  mostly  different

21  calls  in  this  trial .

22        THE  COURT:   If  my  recollection   is  correct ,  you

23  have  not ,  thus  far  with  him  on  the  stand ,  gone  into  the

24  specifics  of  the  drug  language .

25        MS.  JOHNSTON:    That  is  correct .

1          THE COURT:   Do you intend to do that?

2          MS. JOHNSTON:   I intend to qualify him.

3          THE COURT:   Do you want the qualification  to be

4  that?

5          MR. MONTEMARANO:   We requested  voir dire  outside

6  of the presence  of the jury on Friday.

7          THE COURT:   Why do you need to voir dire him

8  outside  of the jury?

9          MS. JOHNSTON:   I don't think  they need to voir

10  dire him at all.

11          MR. MCKNETT:   Your Honor, with all due respect,

12  this is a different  trial.

13          THE COURT:   I understand.  Tell me what legal

14  authority  you have -- the proposition  that you are

15  entitled to voir dire  him on qualification s outside  the

16  presence  of the jury.

17          MR. MCKNETT:   Your Honor, I think it's Mr.

18  Montemarano  who raised the question s about his

19  qualification s as an expert.  I don't necessarily

20  intend  to challenge  his credentials  as an expert.  The

21  essence  of my challenge  is the content  of his testimony

22  as it goes to interpretation  of codes and conversation s

23  and whether  or not that is appropriate  "expert

24  testimony " on behalf  of Sergeant?   Detective ?

25          MS. JOHNSTON:   Sergeant .

1        THE COURT:   Sergeant .   They kicked him upstairs .

2        MR. MCKNETT :   The last time I was in court with

3   him , he had a different  rank , and I'm having  trouble

4   adjusting .

5        My concern  is that that portion  of the argument

6   should  be done  outside  of the presence  of the jury ,

7   because  these are  matter s that should  not be before  the

8   jury .

9        MR. MONTEMARANO :   My view , Your Honor , if I

10  might , is that the good detective  -- there I go again .

11  The good sergeant  will be testify ing as to opinion s.

12  If these opinion s are based upon his knowledge  and

13  expertise  and train ing and experience , that's one

14  thing .   If, however , as at the last trial , these

15  opinion s are based upon conversation s with cooperat ors,

16  codefendant s who have pled out , etcetera , it is

17  information  coming from within this conspiracy .   If he

18  is testify ing that way , then he  is breach ing these

19  defendant s' right s under Crawford  to confrontation  of

20  the ultimate  witness , which  is the cooperat or or the

21  codefendant  or whom ever .

22        For that reason , we believe  that it is

23  appropriate  to clarify  out of the presence  of the jury

24  whether  this information  come s to Detective  Sakala

25  prior to the initiation  of his investigation , upon

1 which we believe he can testify as an expert witness,

2 whether or not we like it, or after or during the

3 inception of this investigation, or during the course

4 of this investigation, which we submit is not

5 admissible and should never be in front of the jury.

6 We, therefore, have requested that it be done outside

7 of the presence --

8         MS. JOHNSTON:   They're not entitled to have his

9 direct examination put before the court outside the

10 presence of the jury so they can decide whether or not

11 there should certain questions because they think he's

12 relying upon information cooperators have provided him.

13 His testimony is going to be based upon his knowledge

14 and experience, not Cooperator X told him this or

15 Cooperator Y told him this.

16         Your Honor has heard from five cooperators who

17 have testified.   Agent Sakala hasn't been present for

18 their testimony, but certainly he could rely upon what

19 they have said in terms of the information they have

20 provided in the past.   Counsel has already cross-

21 examined those witnesses.   Clearly, he is allowed to

22 rely on all of his experience, including information he

23 got from cooperators in other cases.   Part of his

24 training and experience is interviewing people engaged

25 in drug trafficking, and that's the bases upon which he

1 is giving his opinion .

2        MR. MONTEMARANO :  Ms. Johnston  is con flating  two
3 distinct  proposition s --

4        THE COURT:  Mr. Montemarano , I understand  your
5 position . This is the proffer  area , including
6 yesterday 's ruling  from  the Supreme  Court , that has it
7 all fresh in our minds . I don't believe  that she
8 intends  to elicit  testimony  from this witness  about
9 what some other defendant  in this case told him, but
10 let's see if that bridge get s cross ed.  If it does ,
11 I'll stop it.  That's what will I do, except  to the
12 extent  that it may come  in under  a coconspirator
13 exception .  I don't believe  that you're  entitle d to
14 have him qualifi ed outside  the presence  of the jury.

15        MR. MONTEMARANO :  Just so the record  is clear .
16 Anything  he says that came  from anybody  involve d in
17 this case , by definition , cannot  be coconspirator
18 because  it's not in furtherance .  By the time he's
19 talk ing to them --

20        THE COURT:  It depends  on when it took place  and
21 how it took place .  I mean , you know , whether it's
22 within  furtherance  of the con spiracy  is something  I
23 can't make a blanket  ruling  on.

24        MR. MONTEMARANO :  Absolute ly , Your  Honor .

25        By talk ing to Chris  Sakala , the conspiracy  is

1 done, isn't it?  People are in custody.

2      THE COURT:  I don't know  that until I know what

3 you're talking about.

4      MR. MCKNETT:  Your Honor, if I can give an

5 example.  The essence of my motion is based on the

6 distinction between evidence -- between testimony,

7 based on information that the sergeant will proffer,

8 based on his expertise, his training, and his

9 experience outside of this case -- prior to this case.

10      What I'm concerned about is that while the

11 government, I'm sure, would not ask him, did so and so

12 tell you --

13      THE COURT:  I don't want to have you up here all

14 afternoon.  I will permit her to qualify him consistent

15 with what Mr. Montemarano has said.  If  he starts to

16 give opinion that goes outside the scope of that and to

17 what extent, if any, we will properly address it when

18 we get there.  I don't think  you're entitled to have

19 him proffered outside of the presence of the jury.

20      I will permit her to qualify him in the presence

21 of the jury.  When we get to a specific effort on his

22 part to interpret some recording, if there is something

23 that you think raises a Crawford issue, we will address

24 that issue when we get to it.  He's fully qualified --

25 I can't say -- I won't say he's "fully qualified."  He

1  may be fully qualified.  He was fully qualified once

2  before as having the competence, based upon his

3  knowledge, training and experience, to be able to tell

4  me what somebody means when they talk about "tickets"

5  or, you know, meet you at 8th street and things like

6  that, and he's perfectly capable of doing that.  If we

7  get into something where we're crossing the line, we'll

8  cross that bridge when we get to it.

9        MR. SUSSMAN:  Sir, if I could.  To the extent

10  that his opinion is based on what was told to him --

11        THE COURT:  Push Mr. McKnett out of the way.

12        MR. MCKNETT:  I take up more room than I should,

13  Your Honor.

14        MR. SUSSMAN:  It's not just Crawford.  Under 705

15  of the rules, they talk about the background the expert

16  is relying upon and what other people have told him in

17  forming his opinion.  We are entitled to that kind of

18  information.  That's the rule.  That's not just a

19  Crawford issue.

20        THE COURT:  I can't make a blanket ruling until

21  I know what his opinion is going to be.

22        MR. SUSSMAN:  It's not so much the opinion

23  itself; it's the basis for the opinion.  That sort of

24  ties into the request that I had made earlier on for a

25  16(g) disclosure.

1          THE COURT:   At some point if he tender ed a basis

2  that he cross es the line of Crawford -- I can't address

3  that question until I've heard the question s.

4          MR. SUSSMAN :  I would just point out the kind of

5  disclosure I requested under Rule 56, the nature of his

6  opinion and the basis for his opinion , and that would

7  have obviate d do ing this on the fly , and that was my

8  hope .

9          MR. WARD:   Your Honor , if I may just add . The

10  problem I see with not admitting examination s with the

11  juror s present is because he is an expert , his

12  testimony has impact far great er than that of any

13  "witness ."  If he begin s to stray , one says -- Your

14  Honor says if he begin s to stray you'll cut him off at

15  that point . The problem is that once that bell 's rung ,

16  it's in the jury 's mind and it cannot be unrung .

17          THE COURT:   We're talk ing about two different

18  thing s.  She will be permitted to qualify him as an

19  expert about any opinion s being given whatsoever ,

20  subject to your cross-examination , before I determine

21  that he's capable of giving opinion s about what these

22  record ings mean .

23          MR. WARD:   All right , sir.

24          THE COURT:   If we get to the point where there

25  is a concern and we have a Crawford problem or

1 something , I'll address it when we get there , but I

2 don't think there's a blanket problem with him giving

3 general opinion testimony about the meaning of various

4 terms used by those who may or may not be used in drug

5 trafficking , and that's what I'll hear her

6 qualifications on.

7        MS. JOHNSTON:   Your Honor , he will also be

8 giving opinions based on the calls and surveillance

9 that a drug transaction occurred . Again , that would be

10 the same thing .  It's based on the content of the calls

11 --

12        THE COURT:   I will permit you to qualify him at

13 that time , all right ?

14              (Back in open court .)

15        MR. MONTEMARANO :   Your Honor , will you note my

16 objection , just so the record is preserved?

17        THE COURT:   Yes , you have one .

18        (Witness resumes the stand at 2:59 p.m. )

19        THE COURT:   Detective Sakala , you're already

20 under oath .

21              **FURTHER DIRECT EXAMINATION**

22        BY MS. JOHNSTON:

23 Q.    Sergeant Sakala , I'm going to ask you to give

24 the ladies and gentlemen of the jury   a summary of your

25 narcotics background and training in detail at this

1 time.

2 A.      My first assignment s to narcotic s -- I had three

3 temporary assignment s from 1981 to 1987 with what was

4 then the Narcotic s Section of the Montgomery County

5 Police Department.  In 1987 I was transferred to the

6 Narcotic s Section in the Montgomery County Police

7 Department and was there until 1989.  Those two year s I

8 did what would I guess would be call ed more basic

9 narcotic s investigation s:  Hand-to-hand purchase s,

10 controlled purchases working with informant s, search

11 warrant s, that type of thing.

12         In 1989 --

13 Q.      Let me interrupt you there.  You've used a

14 couple of term s there.  You said you did hand-to-hand

15 trans action s.

16         What does it mean to engage in a hand-to-hand

17 transaction?

18 A.      That's actual ly purchasi ng narcotic s direct ly

19 from a drug deal er yourself.

20 Q.      What kinds of drug s were you work ing with in '87

21 to '89?

22 A.      In '87, when I first came in, PCP was pretty

23 big, powder cocaine, and marijuana to a certain extent,

24 though we didn't do a lot of marijuana case s.  Then in

25 late '87 or early '88, crack became probably the drug

1   of preference replacing PCP.

2   Q.      "Crack" meaning cocaine base?

3   A.      Cocaine base, yes.

4   Q.      You also mentioned controlled purchases during

5   your first assignment to narcotics cases. Can you

6   describe "controlled purchases?"

7   A.      That's a purchase of drugs using a cooperator or

8   informant, where you provide the money -- "you" being

9   the police department provides the money to an

10  informant, and the informant is     searched to make sure

11  he or she doesn't have anything on them.   When they

12  come back, they don't have the money you gave them and

13  they have drugs that they purchased from the

14  individual, and you search them again to make sure that

15  they don't have money. Essentially, the money goes in

16  and the drugs come back in a controlled environment.

17  Q.      You also mentioned search warrants?

18  A.      Yes.

19  Q.      Were you involved in the execution of search

20  warrants and to the obtaining of search warrants from a

21  court officer?

22  A.      Yes. For my entire career, search warrants --

23  I've probably done -- maybe written -- probably written

24  over 1,000, and certainly probably even more

25  participated in that.

1  Q.      After you add that to your stint, what did you

2  do after 1989?

3  A.      '89 I was transferred to the Major Narcotic

4  Offender Section, which was a relatively newly formed

5  unit for the police department that was designed to

6  target entire organizations -- higher level drug

7  dealers that the other narcotics officers didn't have

8  the time or resources to investigate.

9  Q.      How did those investigations differ from the

10 ones you were initially involved in?

11 A.      They're much more complex and usually longer

12 term. You're not -- a lot of times you're not dealing

13 -- you have no way into your target. You have someone

14 who is believed to be a major trafficker, and you need

15 to develop the investigation from scratch. You're not

16 handed an informant who says, this person is a

17 trafficker.

18         There's no time limits. If it takes two years

19 to investigate, that's what it takes. We had a lot

20 more freedom, a lot more resources, and we weren't

21 under the pressure that a lot of the regular narcotics

22 investigators have to do cases week in and week out.

23 Q.      How long were you assigned to that unit?

24 A.      All the way until 2004 -- 2005. Last year.

25 Q.      Did you work exclusively narcotics cases then

1  from roughly 1988 to 2005?

2  A.      From 1987 to 2005, yes.

3  Q.      The first time, when you were doing more

4  hand-to-hands and smaller cases.  Does the use -- are

5  you able to do -- strike that.

6          Are you able to use hand-to-hands as frequently

7  when you were doing the larger investigations?

8  A.      I'm sorry?

9  Q.      Were you able to use hand-to-hand transactions

10  as frequently to resolve a case when you were doing

11  larger organizations than the smaller ones?

12  A.      Normally in the smaller cases, you utilize buys

13  either yourself or informants more frequently.  When

14  you get up to larger organizations and larger dealers,

15  buys are often an ineffective tool to get to those

16  people.

17  Q.      Why is that?

18  A.      There's several reasons, but the main reason is

19  money.  One of the main reasons is money.  I can buy

20  two or three grams from a small dealer and the police

21  department has money to fund that.  If I go to someone

22  who's dealing kilos, the police doesn't have the money

23  to fund letting $25,000 walk, so to speak, at a time.

24  Q.      What do you mean about by letting $25,000 walk?

25  A.      Give $25,000 to an individual for a kilo, and

1  you take your kilo and they take the money.  That's

2  just not a practical way to do investigations.

3  Q.    Why wouldn't you just arrest someone if you were

4  selling them a kilo?

5  A.    If someone is dealing that kind of weight or

6  that large, to arrest that person would bring an end to

7  the investigation.  It really doesn't go after the

8  organization, which is what you want.  You want to know

9  who their distributors are and you want to know who the

10 people they're receiving it from.  Investigating a

11 large dealer it's much more beneficial to go after the

12 entire organization instead of just one person.

13 Q.    Are there any differences in the difficulty with

14 locating cooperating witnesses or informants in terms

15 of a larger investigation than investigating a smaller

16 level dealer?

17 A.    Sure.

18 Q.    Could you describe those?

19 A.    Someone dealing on the street -- someone dealing

20 small amounts is probably more frequently or more

21 likely to come in contact with someone who might

22 provide information to the police.  A larger dealer is

23 going to have a smaller circle of individuals or

24 friends that they deal with.  Those persons -- that

25 person's circle of friends -- there may not be any

1 cooperat ors in that group . So what you end up doing is
2 going down the food chain , so to speak . Maybe in the
3 circle of friends , you may , you know , come across
4 someone who is a cooperator . Frequent ly, you might
5 have a cooperator inform ed that they may not be next to
6 your target but may be insulated or one or two step s
7 away from that , and you work up from there .
8 Q.      You indicated that you 've done over 1,000 search
9 warrant s?
10 A.      Probably close to that or more , yeah .
11 Q.      Can you give us an idea of how many hand-to-hand
12 transactions you 've actual ly engaged in over the time
13 of your career ?
14 A.      Yeah . Either myself or through an informant ,
15 certain ly in the hundreds, if not over 1,000 .
16 Q.      In addition to that , after -- with cooperating
17 informant s, as well as people you 've arrested , did you
18 have occasion to inter view those folk s?
19 A.      Yes . As a matter of fact , that 's where you get
20 some of your best information is after you arrest them
21 or everyone with cooperating individuals , you inter view
22 them as to what 's going on. For instance, what are the
23 current price s? What are the current drug s being sold ?
24 What's going on on the street . Those are the people
25 who are actual ly down in the business es you 're

1 investigating.  They're quite often the best sources of

2 information.  Through talking to hundreds and hundreds

3 of people, either witnesses, informants, defendants

4 through the years, that's quite often where you get

5 your best education.

6 Q.     In addition to that, what other investigative

7 techniques have you had occasion to use in your 26

8 years of experience -- 28 years of experience?

9 A.     About 17 or 18.

10 Q.     I'm sorry.  My math is not good.

11 A.     Pretty much anything that's available.  We've

12 certainly used a lot of wiretaps over the years -- what

13 we call "wiretaps" or electronic surveillance.

14      We've used closed-circuit televisions, what

15 people know as a room "bug" -- microphones in rooms --

16 and GPS tracking devices, aerial surveillance, cell

17 phone tracking.  As technology moves on, other avenues

18 open for us.  But anything that's available, you use at

19 your disposal.  Sometimes things work and sometimes

20 they don't.

21 Q.     You testified previously about using things such

22 as Title 3 wiretaps.

23 A.     That would be the rare exception to the rule.

24 Q.     Have you had occasion to participate prior to

25 this wiretap investigation in other wiretap

1  investigation s?

2  A.      Yes .

3  Q.      Can you give us an idea of how many of those

4  you've participate d in?

5  A.      I would say investigation s -- probably around a

6  dozen while I was in narcotic s.  Actual ly obtain ing

7  affidavit s?  Prob ably around two dozen .  Probably

8  around a dozen case s involving  electron ic surveillance s

9  over the year s.

10  Q.      In terms of those .  Have you had occasion  in

11  those prior case s to listen to the conversation s as

12  they were going  on in realtime ?

13  A.      Yes .

14  Q.      Okay .  And to analyze them then and afterwards ?

15  A.      Yes .

16  Q.      What kinds of thing s do you look for in term s of

17  analyzing  the conversation s and determini ng whether

18  they're pertinent  conversation s or non- pertinent

19  conversation s?

20  A.      It's not real difficult after listening  for a

21  while , and I don't even know that it require s any

22  special train ing.  Almost  anybody  know s what a normal

23  conversation  sounds like .  We have them every  day .

24  When you start hear ing conversation s that don't sound

25  normal , then you know that they 're probably  talk ing

1   about something other than what the conversation is

2   about.

3          You might have some indications that the person

4   drops their voice and says things like, do you

5   understand me?  In general, it's the conversation that

6   doesn't make sense, and they start talking and then you

7   start seeing that pattern of call after call after call

8   after call.  It could be a different word used on, you

9   know, different wiretaps.  But once you know what

10  you're looking for, it becomes fairly obvious.  It's

11  not all that hard.  We like to think it's rocket

12  science, but it's really not.

13  Q.     Well, at least not based on your experience?

14  A.     No, not at all.

15  Q.     Based on your experience, have you had occasion

16  to testify in court concerning -- as an expert

17  concerning the way drug transactions are conducted and

18  the way drug traffickers speak to each other?

19  A.     Yes.

20  Q.     In what courts have you been qualified as an

21  expert in those areas?

22  A.     Federal court in Maryland; Circuit Court in

23  Montgomery County; I believe Florida, California, and

24  D. C.  I have been -- and possibly the Eastern District

25  of Virginia, but I'm not sure about that.

1          MS. JOHNSTON:    Your Honor, the government would

2   present Detective Sakala as an expert in the area of

3   drug trafficking business and the use of code language

4   by drug traffickers.

5          THE COURT:   All right.  Cross-examination  on

6   qualifications?

7          MR. MONTEMARANO:  Court's indulgence, please.

8                    **CROSS-EXAMINATION**

9          BY MR. MONTEMARANO:

10  Q.     Good afternoon, Detective Sakala -- Sergeant

11  Sakala.  How are you?

12  A.     Fine, thank you.

13  Q.     You listen to a conversation.  It doesn't sound

14  "normal;" correct?

15  A.     Yes.  Some conversations don't sound normal.

16  Q.     Based upon conversations that don't sound

17  normal, you determine that there is something

18  underlying the plain meaning of the words in the

19  conversation; correct?

20  A.     Yes.  It can happen that way, yes.

21  Q.     It seems like it's rocket science, but it's

22  really not?  Your words.

23  A.     That's correct.

24  Q.     Conversations that just don't make sense;

25  correct?

1 A.      I said that's one of the indicators , and then

2 you continue on from there .

3          MR. MONTEMARANO :  Can we be heard at the bench ,

4 Your Honor ?

5          THE COURT:   Excuse me?

6          MR. MONTEMARANO :  May we be heard at the bench ?

7          THE COURT:   You may .

8               (At the bar of the Court.)

9          MR. MONTEMARANO :  If I understand the sergeant 's

10 testimony , he has provided us two thing s.  He has

11 provided us with the fact that thing s don't make sense

12 and don't sound normal without defining for us what

13 "normal " is and what "sense " is.  On top of that , he

14 has said that it's really not rocket science and not a

15 matter of expertise .  So, we need an expert why?

16          THE COURT:   Isn't it sort of like when a brain

17 surgeon says that -- a head surgeon says, after a while

18 it's just , you know , cutting bone and putting screw s in

19 and putting it back together .  It's not rocket science

20 anymore , because he's been doing it so long that it's

21 easy .

22          It seem s to me that -- I don't want to let his ,

23 perhaps , inartful description of it as "not being

24 rocket science " that it involve s no application of

25 experience  and expertise .  I can listen to one of these

1   nonsensical  recordings  and not have a clue what the
2   people are talking about , and I think he has more than
3   a clue because of his experience .  While he may say
4   it's not rocket science , he's applying the long amount
5   of experience  -- he may not have gotten a Ph.D. in drug
6   trafficking  ,but he's had enough experience  with
7   knowing when it makes no sense to look at it and say ,I
8   can make sense out of this because I've dealt with this
9   kind of conversation  before .
10          MR. MONTEMARANO :  Your Honor 's point is well
11  taken .  Do we not then require  further  qualification
12  from the government ?  Because what he's given us isn't
13  enough for this court to rule , in my humble opinion .
14          THE COURT:  I hear your objection .
15          MS. JOHNSTON:  I didn't know  they were
16  objecting .  If they're objecting , I'll ask him some
17  more question s.  I will be glad to accommodate  counsel
18  with more questions .
19          THE COURT:  Ask some more question s.
20          MR. WARD:  Before we go , let me put my two cents
21  worth in .  I don't think , with all due respect , that
22  Your Honor 's analogy to brain surgery is  apt in this
23  case .
24          THE COURT:  I could have said hip surgery .
25          MR. WARD:  The ordinary  person doesn't have

1 experience with respect to, you know, even if it's

2 orthopedic surgery or whatever it is. The ordinary

3 person does have a lifetime of experience listening to

4 conversations and telling whether or not it sounds out

5 of the ordinary or unusual. Despite -- well, I'll put

6 that aside. It seems to me we have a pretty bright

7 jury here and a pretty able jury, and why they can't

8 tell whether or not a conversation sounds out of the

9 ordinary or unusual escapes me.

10        THE COURT:  Mr. Ward, the bottom line with any

11 expert testimony is whether or not the person brings

12 special knowledge. That's the subject of their

13 testimony is that it can be of assistance to the jury.

14 It certainly seems to me what I've seen in this case

15 already and what I've seen in an earlier case that it

16 would be of assistance to the jury to have someone who

17 is understanding of this type of conversation to

18 explain what is meant by terms that don't make any

19 sense otherwise.

20        If they started speaking Spanish terms in the

21 middle of it, it would certainly be nice to have

22 somebody who may speak Spanish to say what it means to

23 be a gringo or whatever it may be.

24        MR. MONTEMARANO:  Your Honor, with all due

25 respect. Going bo back to the pretrial motion -- our

1 pretrial motions.

2          THE COURT:  Counsel, let me let Ms. Johnston

3 finish qualifying him.  Do you want further

4 qualifications?  She will give further qualification.

5               (Back in open court.)

6               **FURTHER DIRECT EXAMINATION**

7          BY MS. JOHNSTON:

8 Q.      Sergeant, during those dozen or so wiretaps

9 before this one, did you have occasion to listen to

10 conversations?

11 A.      Yes.  I've listened to thousands or tens of

12 thousands of calls, I'm sure.

13 Q.      When you listened to those calls, were you

14 required or were you able to form an opinion as to

15 whether or not the calls were drug-related?

16 A.      Yes.

17 Q.      Were your opinions concerning those

18 conversations accepted in court in regards to the fact

19 that the conversations were drug-related?

20 A.      Yes.

21 Q.      During the course of your listening to those

22 hundreds of hours or tens of thousands of

23 conversations, were there things that you looked for in

24 order to form an opinion as to whether or not a

25 conversation is drug-related?

1  A.       Yes.

2  Q.       What are the things that you look for in terms

3  of listening to the conversation?

4  A.       There's lingo that you can use.  One of the

5  things that you need when you're ordering drugs for the

6  most part is you need a number to identify what

7  quantity or price and numbers are a good indication,

8  but they're simple things.  If someone orders two and a

9  half tires -- no one buys half a tire.  That's probably

10 a good indication that that has nothing to do with

11 actually buying a tire.

12 Q.       Other terms such as an eighth of this.  Is that

13 something that you would use in your understanding and

14 experience?

15 A.       You're going to look for common drug terms.

16 They're not going to use cocaine or marijuana, but

17 you're going to look at things that are commonly

18 referring to drugs.  For example, I want to go down to

19 8th Street; I'll meet you on 16th Street; or, I'll meet

20 you on 32nd Street.

21 Q.       And those opinions that you reach are that those

22 phrases refer to drug quantities?

23 A.       Quantities and prices.

24 Q.       Is that based upon your training and experience

25 in the previous wiretaps that you've done and your

1 previous interviews of cooperating witnesses and your

2 own involvement in drug transactions?

3 A.      Sure. Yes.

4 Q.      Are those the kinds of opinions that you've

5 offered in court before as an expert witness?

6 A.      Yes.

7 Q.      Now, in terms of -- you used the phrase that

8 it's "not rocket science." How would an ordinary

9 citizen know that 8th Street doesn't refer to 8th

10 Street?

11 A.      They probably wouldn't in that particular case.

12 But if they heard reference to three and a half tires,

13 the average citizen would go, I don't think they're

14 ordering tire.

15 Q.      In terms, however, of the overall -- all of the

16 conversations that you've listened to in this

17 particular case, do they always use terms like "two and

18 a half tires?"

19 A.      No. No. They can use any number of items to

20 get their message across.

21 Q.      Have you used your -- do you use your own

22 experience of 17 years and the other cases -- drug

23 cases that you've worked to interpret the wiretap

24 conversations and the surveillances that were observed

25 in this case?

1 A.       Sure.

2          THE COURT:   Any further cross-examination   on

3 qualification s?

4          MR. MONTEMARANO :   Court 's indulgence , please .

5                         **CROSS-EXAMINATION**

6          BY MR . SUSSMAN :

7 Q.       In no particular  order , Your Honor ?

8          Good afternoon , sergeant .

9 A.       Good afternoon .

10 Q.       Sergeant .  I don't know  which is higher, and

11 that 's why I had an unsuccess ful military  career .

12          Detective ?

13 A.       That 's fine .  It does n't matter  to me.

14 Q.       In terms  of the bas is of your opinion  in this

15 case .  You talk ed about  your experience  talk ing to

16 cooperator s and informant s; correct ?

17 A.       Correct .

18 Q.       And you have  to make subject ive judgment s

19 whether  those  guys or women  are tell ing you the truth ;

20 right ?

21 A.       Sure .  Sure .

22 Q.       If any of your opinion  -- you listened  to all of

23 the wiretap s in this case , correct , at some point ?

24 A.       I listened  to them  as they were intercept ed.

25 The next  day I probably  listened  to them  ten , 12 time s,

1  yes.

2  Q.      You mentioned your opinion, and part of it will

3  be based on what you heard in those wiretaps; right?

4  A.      Yes.

5  Q.      Did you also -- is your opinion at all based on

6  what cooperators in this case have told you?

7  A.      I would say, no.  I would say the more

8  appropriate would be the opinion was confirmed by the

9  cooperators, but it was not based on it, no.

10  Q.      So whatever cooperators told you in connection

11  with this case doesn't figure in your opinion?

12  A.      No.

13  Q.      That would include non-witnesses who might have

14  talked to you about this case?

15  A.      Sure.  If that's what you're referring to.

16  Q.      I was talking about either people who have

17  testified, will testify, or will not testify.

18  A.      Okay.

19  Q.      Is your opinion in any way a function of the

20  events that occurred in this case?

21  A.      Sure.  If you know particular events going on,

22  whether it's surveillance, a buy, you know, whatever,

23  that would, you know, certainly help explain the

24  conversation you're listening to.

25  Q.      Okay.  And it's fair to say that many of the

1 events in this case you didn't personally witness.

2 A.      That's correct.

3 Q.      So your information comes from potentially a

4 police report?

5 A.      No.  I wouldn't say that.  I'd probably say a

6 telephone conversation involving other officer.

7 Q.      You're talking to an officer who was on the

8 scene; correct?

9 A.      Correct.

10 Q.      That officer may be relating information that

11 was eventually told him by another officer; is that

12 right?

13 A.      Yeah.  I could say potentially, unless I know.

14 Specifically, I couldn't tell you whether he saw it

15 firsthand or not.

16 Q.      Your information is a compendium of sources, it

17 would be fair to say; right?

18 A.      It can be, yes.

19 Q.      Then you've got to put your subjective judgment

20 on those sources to indicate -- to form your opinion;

21 is that right?

22 A.      All right.  I'm not sure what you're getting at

23 with that.  Try that again.

24 Q.      Well, you don't have to be sure what I'm getting

25 at.  Your opinion comes from your subjective judgment

1 of all that information ; is that right ?

2 A.      Yes .

3 Q.      Thank you .

4        MR. MONTEMARANO :  If I might , Your Honor .

5        THE COURT:   You may .

6        MR. MONTEMARANO :   Thank you .

7                    **CROSS-EXAMINATION**

8        BY MR. MONTEMARANO :

9 Q.      Let me see if I understand . Certain parts of

10 the coded language you look for are , in essence , terms

11 of art in the drug business , like the number eight

12 referring to eighths being an eighth of a kilogram or

13 an ounce ; correct ?

14 A.      Correct .

15 Q.      Other numbers which sort of appear at random ,

16 like 62 or 125 , because 62 grams is a sixteenth of a

17 kilogram , isn't it?

18 A.      Yes .

19 Q.      And 125 is an eighth of a kilogram ; right ?

20 A.      That 's correct .

21 Q.      Okay . Would it also be fair to say there is

22 other language which has no specific relation to the

23 parameters of the drug trade like numbers do ; correct ?

24 A.      That 's correct .

25 Q.      And there 's certainly language that has no

1 bearing on the kinds of drugs being dealt with, like a

2 case I once had where they referred to heroin and

3 cocaine as Helen and Charlie, and that    wouldn't be real

4 difficult; right?   You wouldn't need expertise to

5 figure that out.

6 A.    I don't know about that case, but I would think

7 something like that might become obvious.

8 Q.    Isn't it fair to say that the words used as

9 coded language in a particular case, be it this one or

10 any other, often are words that have never been used in

11 your experience before?

12 A.    Yes.  I would say on every wire you probably

13 hear a new code word.

14 Q.    It's also fair to say that in your experience,

15 the number of code words used for, for example,

16 cocaine, is almost endless.

17 A.    It is endless.

18 Q.    Basically, it only has to be a noun.

19 A.    It could be anything you want.  I could say

20 every time you say the word "cup," that means --

21 Q.    Cup.  Car.  Carpet.  Those are just a few;

22 right?

23 A.    Yes.

24 Q.    And it goes on from there?

25 A.    Yes.

1  Q.     And you're a narcotic s detective ; correct ?

2  A.     I was .

3  Q.     You were , I'm sorry , for 17 year s.

4  A.     Correct .

5  Q.     It's fair to say that that is your area of

6  expertise in terms of your train ing and experience as a

7  police officer .

8  A.     Yes .

9  Q.     And by comparison , without , in any way , shape or

10 form intend ing to demean your experience, D etective

11 Sakala , you don't know bank robber ies in the same way .

12 A.     No.  That 's correct .

13 Q.     I'm a criminal defense attorney .  So if you come

14 to me with a tax problem , I'm lost .  That would n't

15 surprise you either , would it?

16 A.     I don't know your background .  But if you say

17 so, I'll take your word for it .

18 Q.     My question is the follow ing.  When you listen

19 to a wiretap , it's based upon suspicion of drug

20 activity ; correct ?

21 A.     No , that is not correct .  A wiretap is based on

22 probable cause on the affidavit before a judge .  It 's

23 not suspicion .

24 Q.     It's based upon probable cause .  You have a

25 belief that people on the wiretap -- the people you're

1  tapping, the people calling, them are involved in drug

2  activity; correct?

3  A.      There is probable cause to believe that person

4  is involved in narcotics activity, yes.

5  Q.      That probable cause stems from what you've

6  written in an affidavit to the judge; correct?

7  A.      Correct.

8  Q.      And it stems from your investigation; correct?

9  A.      Correct.

10  Q.      Ultimately, when you go to the judge, you're

11  saying to the judge, I believe these people are

12  involved in drug activity; correct?

13  A.      We present the affidavit to the judge.

14  Q.      You don't believe they're involved in drug

15  activity?

16  A.      You said -- you asked --

17        MS. JOHNSTON:   Your Honor, if Mr. Montemarano

18  would allow the witness to finish his answers.

19        THE COURT:   Allow him to finish his answers.

20        THE WITNESS:   The affidavit stands or falls on

21  its own.  We have to take an oath and swear to the

22  affidavit.  The judge makes the determination whether

23  there is probable cause or not.

24        BY MR. MONTEMARANO:

25  Q.      You kind of stand there and twiddle your thumbs

1  while the judge goes through the affidavit ; right ?

2  A.       We wait for the judge to sign it .

3  Q.       My question is not what you say to the judge ,

4  because you don't say anything , but at the time you go

5  to the judge you have what you understand to be a well-

6  found ed belief that these people -- the target s of your

7  investigation  -- are involve d in drug activity ; is that

8  a fair statement ?

9  A.       Yes .

10 Q.       Thank you .

11          That is based upon your investigation ; correct ?

12 A.       Based upon the affidavit , yes .

13 Q.       And then when you listen to the call s, you

14 already have a belief that these people are involve d in

15 drug activity ; correct ?

16 A.       That 's correct .

17 Q.       And therefore , you believe that people who speak

18 with these people are involve d in drug activity .

19 A.       No , I would n't say that 's correct .   No .

20 Q.       You suspect that the people speak ing with them

21 are involve d in drug activity ; correct ?

22 A.       The phrase I would probably say is , I believe

23 that there are people that they talk to, but certain ly

24 not everybody they talk to is going to be involve d in

25 narcotic s.   If you limit it to being some of the people

1  who they talked to, I would agree with that statement.

2  Q.      Okay.  Often they are speaking about subjects

3  which you do not understand; correct?

4  A.      Initially, yes.

5  Q.      And there are people often who come into a

6  wiretap who you did not know before you heard them on

7  the wiretap; correct?

8  A.      That is correct, I would say.

9  Q.      Therefore, you've not interviewed these people;

10  correct?

11  A.      That's correct.

12  Q.      And you don't know about their background?

13  A.      I would say that's -- if we don't know the

14  person, I would say that's correct.  Once they're

15  identified, certainly we know the background.

16  Q.      Certainly, even the people you identify, you

17  don't know everything about them; right?

18  A.      Correct.

19  Q.      So it just might be that if you listen to a call

20  with someone you do or don't know about prior to the

21  inception of the wiretap that the "cups" or the "cars"

22  or the "carpets" might just be cups; might just be

23  cars; and might just be carpets; right, detective?

24  A.      Sure.

25          MR. MONTEMARANO:    No further questions, Your

1  Honor.

2        MR. MITCHELL:   Just to follow up briefly, Your

3  Honor.

4              **CROSS-EXAMINATION**

5        BY MR. MITCHELL:

6  Q.      Just to follow up with what Mr. Montemarano just

7  said.

8        These words that are used could be what they

9  really are; correct?

10 A.      There is no doubt that in many conversations,

11 the words are what they really are.

12 Q.      And to get back to your characterization of your

13 investigation of this.  It's not rocket science; right?

14 A.      It's not a difficult task in many circumstances.

15 Q.      But in your determination of what these words

16 mean, it isn't a science either, is it?

17 A.      No.

18 Q.      It's your guess work.

19 A.      No.

20 Q.      It's not guess work?

21 A.      That is correct.

22 Q.      So you know for certain -- if someone is

23 referring to a cup, you know for certain what that cup

24 -- what that word actually means.

25 A.      I would say in the vast majority -- the

1  overwhelming  majority  of  the  conversation s , yes , I  know

2  for  certain  exact ly  what  they're  referring  to .

3  Q.      You  know  without  question  that  100  percent  of

4  the  time  is  that  item  that  you  suspect .

5  A.      In  the  vast  majority  of  the  conversation s , it's

6  without  question , it's  without  doubt , and  there  is  no

7  doubt  in  my  mind  exact ly  what  they're  referring  to .

8  Q.      But  it's  still  your  own  guess work , because  you

9  don't  see  it .  You  only  hear  it .

10 A.      I  didn't  say  it  was  guess work .  There 's  no  doubt

11 in  my  mind .  It's  not  a  guess .  It's  not  an  estimation .

12 I  know  to  my  mind , to  a  moral  certainty , what  they're

13 talk ing  to .

14      MR. MITCHELL:    Thank  you .

15      MR. MARTIN:   Your  Honor , I  know  we're  going  out

16 of  turn  here , so  if  I  could  just  ask  him  a  couple  of

17 question s .

18      THE  COURT:   Hurry  up .

19      MR. MARTIN:   Very  good .

20      THE  COURT:   We've  covered  this  garden  pretty

21 thorough ly , but  go  ahead .

22                    **CROSS-EXAMINATION**

23      BY MR. MARTIN:

24 Q.      Sergeant , you  would  admit  that  with  respect  to

25 some  of  the  phone  conversation s, these  people  met  and

1  talked to each other, other than on the phone; right?

2  A.      Yes.

3  Q.      Based on your experience, it wouldn't be unusual

4  for somebody to have a follow up conversation that just

5  segued on to an earlier conversation that you weren't

6  able to hear; right?

7  A.      Sure.  That's not unusual.

8          MR. MARTIN:   Nothing further.  Thank you.

9          THE COURT:  All right.  Are we all --

10         MR. MCKNETT:  Your Honor, I just -- just very

11  briefly.

12                      **CROSS-EXAMINATION**

13         BY MR. MCKNETT:

14  Q.      Sergeant -- I got it right; right?

15  A.      Sure.

16  Q.      Sergeant Sakala, you just said that in the

17  overwhelming majority of conversations you know exactly

18  what the people are talking about to a moral certainty.

19  A.      Yes.

20  Q.      But it comes down to your opinion of what

21  they're saying, right, because you weren't there.

22  A.      It depends on what you mean by "there."  I'm

23  certainly listening to the conversations that are

24  taking place, but I'm not standing next to the person.

25  So, I don't know what you mean by "there".

1 Q.      Well, if someone were to say -- I have to use

2 Mr. Montemarano 's words -- I have six cups here.

3 You're not there; right?

4 A.      Based on one conversation?

5 Q.      You're not there; right?

6 A.      Based on the conversation where one person says

7 six cups, I wouldn't offer an opinion.

8 Q.      Were you there?

9 A.      In your hypothetical?

10 Q.     Yes.

11 A.     I guess I wasn't there, if you're telling me I

12 wasn't there.

13 Q.     But suppose someone later told you that the word

14 "cups" meant cocaine.

15 A.     Okay.

16 Q.     You would then go back and re-read the

17 conversations, wouldn't you? Or listen to them again?

18 A.     Perhaps.

19 Q.     Then you would form an opinion as to whether the

20 word "cups" -- when someone said, I have six cups here,

21 whether that was a reference to cocaine, or maybe an

22 innocent reference to cups; right?

23 A.     If I only had one conversation to form an

24 opinion on, I probably wouldn't render an opinion on

25 the a conversation. If I had 10,000 conversations

1 regarding cups, I might render an opinion.  It would
2 depend on the conversations.
3 Q.     Suppose someone else says, I'm going -- I've got
4 a cup; oh, good.  Hold those six cups for me because
5 I'm coming over to get them.
6 A.     Okay.
7 Q.     And then later somebody says "cups" meant
8 cocaine.  Now you have two conversations.
9 A.     Okay.
10 Q.     Well, it's -- it might be a bit out of the
11 ordinary for people to say, I have six cups; oh, hold
12 them for me and I'll come get them.  That's kind of an
13 unusual conversations, isn't it?
14 A.     I guess it could be.
15 Q.     Now you're going to go back and you're going to
16 re-listen to the conversations; right?  And now you're
17 going to see two conversations that say "cups."
18 A.     Okay.
19 Q.     Now, suppose there's a third conversation with
20 other people and one of those people says, I picked up
21 eight cups.  Do you want them?  On this one you decide,
22 we're going to find out and -- you go and you do a
23 surveillance and you observe a drug transaction, okay?
24 A.     Okay.  If I observe the drug transaction, okay.
25 Q.     It turns out the conversation in that -- the use

1  of the words in that conversation meant cocaine.

2  A.      Okay.

3  Q.      Now, it's quite possible you're now going to go

4  back and re-listen to those other recordings and you're

5  going to say, "cups" might mean cocaine in all these

6  conversations; right?

7  A.      I think you've only given me two conversations,

8  if I'm following this hypothetical, and the first

9  conversation didn't offer to tell me what it was, and

10 in the second one we made a stop and seized cocaine.  I

11 think in that case the second conversation we might

12 have some inclination that "cups" refers to cocaine.  I

13 don't know that I would infer, based on two

14 conversations, to the first conversation, if I

15 understand the example correctly.

16 Q.      Let's assume the third conversation -- let's

17 assume in the first two conversations --

18 A.      Okay.

19 Q.      -- the same person says, I have six cups.  Then

20 that person says, I just got six cups.  Do you want

21 them?  And then in the third conversation, the same

22 person says -- to someone not in the first two

23 conversations -- I have six more cups.  Do you want

24 them.  That person says yes, and you decide you're

25 going to do a surveillance, okay?  You now have a

1 conversation  between  Person  A and  Person  C talking

2 about  cups, all right ?

3          Are  you  following  me, or am  I confusing  you?

4 A.      I am  not  following  you.

5 Q.      The  first  conversation  Person  A and  Person  B.

6 Person  A says , I have  six  cups  here , okay ?

7 A.      Okay .

8 Q.      In the  second  conversation  between  P erson  A and

9 Person  B, Person  A says , I've  got  six  cups .  Do  you

10 want  them ?

11          Okay?

12 A.      Okay .

13 Q.      In the  third  conversation  between  P erson  A and

14 Person  C, Person  A says , I just  got  eight  cups .  Person

15 C says , I'll  come  get  them .

16          Okay ?

17 A.      Okay .

18 Q.      So y ou  do  a surveillance   on person s A and  C --

19 A.      Okay .

20 Q.      -- and  you  see  a drug  deal .  Okay ?

21 A.      Okay .

22 Q.      You  see  Person  C go  get  cocaine .  You  now  have  a

23 situation  where  you  have  found  a situation  where  the

24 word  "cups" has  been  used  as code  word  for  cocaine ;

25 right ?

1  A.      It would appear to be, yes.

2  Q.      Now, you go back and you examine the first two

3  conversations between Person A and B.  You could easily

4  form the opinion that Person A is talking about cocaine

5  then, too; correct?

6  A.      It could be an indication.  I don't think I'd

7  render an opinion based on three conversations.

8  Q.      Suppose there's a dozen conversations and Person

9  A is always saying "cups."

10         MS. JOHNSTON:  Your Honor, objection.

11         THE COURT:  Mr. McKnett, I think we've got your

12  point.

13         MR. MCKNETT:  May I just --

14         THE COURT:  One or two more.

15         BY MR. MCKNETT:

16  Q.      When you say that in the overwhelming majority

17  of conversations I know exactly what the people are

18  talking about to a moral certainly, what you're saying

19  is that you have based your opinion of what those

20  people are talking about on the circumstances and that

21  your opinion can't be wrong.

22  A.      No.  No, I didn't say that at all.  I said I

23  know for a moral certainty what the overwhelming

24  majority of these conversations are about.  If I don't

25  offer an opinion, I will say I do not know what that

1 conversation  is about .

2 Q.     What you claim to know about these conversation s

3 is based on circumstance s surround ing the

4 conversation s; correct ?

5 A.     That 's correct .

6 Q.     Your observance s of those circumstance s

7 surround ing a conversation ; right ?

8 A.     That is a factor , yes .

9 Q.     Your expertise of other case s --

10 A.     Yes .

11 Q.     -- and what people involve d in this case have

12 told you ; correct ?

13 A.     I think I went over that with Mr. Montemarano .

14 I think other people in the case have confirm ed my

15 opinion .  I do not believe I've bas ed any of my

16 opinion s on what other cooperator s or witness es have

17 told me .

18 Q.     But you have decide d that you know -- what if

19 someone told you your opinion was wrong ?

20 A.     I'm sure there are a lot of people in this room

21 who would say that .

22 Q.     I'm talk ing about people involve d -- suppose you

23 had a conversation where you were firm ly convince d it

24 was a drug conversation involving this case and someone

25 else involve d in this case said , you're wrong .  Would

1 you change your opinion?

2 A.      Oh, no.

3 Q.      You didn't?

4 A.      That has not happened in this case.  No one has

5 had a different opinion of the conversations than I

6 have.  If they did, it would depend on their basis of

7 that belief and the conversation, but I doubt very

8 strongly I would disagree on the meaning of these

9 conversations.

10 Q.      Are you saying that in the 17 years of your

11 experience in drug trafficking investigations, no one's

12 ever disagreed with your opinion?

13 A.      I thought we were talking about the calls in

14 this particular case.  If that's what we're talking

15 about, I stick with the answer.  If you want to go back

16 over other cases, we can talk about that.  Certainly

17 I've made mistakes in my career, as almost everybody

18 has.

19 Q.      In this case you formed your opinions based on

20 the circumstances surrounding a conversation and then

21 your opinions were always -- well, not "always"

22 confirmed, but your opinions, or at least some of the

23 -- about some of the conversations were confirmed.

24 A.      About many of the conversations that the -- my

25 opinion was confirmed by cooperators and other

1 witness es.   That  is  correct .

2            MR.  MCKNETT :   Thank  you .

3            THE  COURT:   Anything  further ?

4            MR.  WARD:   Just  a  couple  of  question s, Your

5 Honor .

6                    **CROSS-EXAMINATION**

7            BY MR. WARD:

8 Q.      Detective , it's  fair  to  say  that  all  of  the

9 person s  intercept ed  on  the  wiretap s  were

10 African-American  s?

11 A.      No,  that 's  not  fair  to  say .   That 's  not

12 accurate .

13 Q.      There  may have  been  one  or  two  who  were  not ?

14 A.      I  have  no  idea , but  I  would  say  it 's  probably

15 quite  a bit  more  than  that .

16 Q.      You  would ?

17 A.      Yes .

18 Q.      I  see .  Would  you  concede , sir , or  would  you

19 agree  with  me  that  some  African- American s , particular ly

20 inner  city  African-American  s,  speak  a  sort  of  street

21 language  or  street  dialect  that  is  not  necessarily

22 comprehensible   to  a  person  such  as  yourself  or  to  me ,

23 who  are  both  white ?

24 A.      If  you're  say ing  that  they  have  an  accent  or

25 speak  in  street  slang , I  would  agree  with  that .

1  Q.      That's what I'm talking about, street slang.

2  A.      Not comprehensible.  I'm not sure I agree with

3  that.

4  Q.      I'm talking a about street slang.

5  A.      I would agree that there are street slang that

6  exists.  It's the incomprehensible part that I have a

7  problem with.

8          MR. WARD:   I see.  I have no other questions.

9  Thank you.

10          THE COURT:  All right.  Anything further?

11          Any redirect on qualifications?

12          MS. JOHNSTON:   No, Your Honor.  We would ask the

13  court to accept Sergeant Sakala as an expert in the

14  area of drug trafficking patterns and the use of code

15  language in those drug trafficking activities.

16          MR. MONTEMARANO:  Our objection remains, Your

17  Honor.

18          THE COURT:   I've heard your objections, and I

19  overrule them.

20          I will accept him as an expert who can give an

21  opinion on the subjects described by Ms. Johnston.

22          MR. WARD:   Your Honor, one further thing.  If

23  this witness is going to testify as both a fact witness

24  and an expert witness, we insist that the government

25  state or designate what part of his testimony they're

1  offering  as  expert  testimony  and  what  part  they're

2  offering  as  non-expert  testimony , and  we  would  ask  the

3  court  to  appropriately   instruct  the  jury  at  the  time

4  the  government  makes  that  designation .

5         MS.  JOHNSTON:   Your  Honor , I  think  I've  done

6  that  up  at  the  bench  in  terms  of  the  surveillances  and

7  the  pole  camera  identifications, and  I  will  make  it

8  clear  in  my  questioning  when  he's  being  asked  questions

9  as  a  fact  witness .

10        THE  COURT:   She  will  make  that  clear  during  her

11 examination , Mr.  Ward .

12        MR.  WARD:   I  just  wanted  to  mention  that , Your

13 Honor .

14        THE  COURT:   Counsel , as  I  mentioned  to  you , I

15 have  a  case  trailing  this  one  for  a  sentencing  today .

16 Let's  take  a  15-minute  recess  and  we'll  go  until  about

17 4:25  and  quit  for  the  day , all  right ?

18               (Jury  excused  at  3:41  p.m.)

19               (Off  the  record  at  3:41  p.m.)

20               (On  the  record  at  3:55  p.m.)

21        THE  COURT:   While  we're  waiting  for  the

22 courtroom  deputy  to  come  in, I  wanted  to  make  certain

23 that  spectators  in  this  courtroom  are  aware  of  the  fact

24 that  cell  phones  in  this  courtroom  are  strictly

25 precluded  from  being  on.   I've  had  three  incidents

1  today of cell phone s going off in this courtroom .  I'm

2  a very patient person , but if they go off again I'm

3  going to exclude you from the courtroom .  So, you make

4  a decision that when you come in this courtroom , cell

5  phone s are off .  If they go off in the courtroom , you

6  will be exclude d from the courtroom because we've got

7  to maintain the decorum of the proceed ings in this

8  courtroom .

9           (Jury return s at 3:58 p.m. )

10          (Witness resume s the stand .)

11       THE COURT:   You may proceed .

12              **FURTHER DIRECT EXAMINATION**

13       BY MS. JOHNSTON:

14 Q.    Detective Sakala , in term s of the conversation s

15 that we're about to listen to.  Did you form opinion s

16 concern ing some of the conversation s?

17 A.    Yes .

18 Q.    Are those opinion s based on each conversation in

19 isolation ?

20 A.    No .

21 Q.    What are your opinion s base d upon ?

22 A.    The totality of the call s intercept ed, which

23 would probably in excess of 10,000 call s.

24       MS. JOHNSTON:   With that , Your Honor , we would

25 like to begin play ing the telephone call s that are

1 contained in Volume 1 --

2          THE COURT:   All right.

3          MS. JOHNSTON:   -- which is referred to as CD-1A

4 as the trial exhibit.  We're going to begin with B-14.

5          THE COURT:   What page number is that on?

6          MS. JOHNSTON:   B-14 is on Page 1.

7          THE COURT:   Page 1?  All right.

8          BY MS. JOHNSTON:

9 Q.     While everyone is getting their books out.

10          Detective Sakala, on what date did the actual

11 intercepts begin in this case?

12 A.     If it wasn't March 8, it was right around there,

13 2004.

14 Q.     I can put up the chart that we used on the first

15 day of trial.

16          Does that tell you when the interceptions

17 actually began?

18 A.     March 8th of 2004.

19 Q.     This first call that we're going to listen to

20 occurred over which telephone line?

21 A.     The B line.  The home telephone line of Paulette

22 Martin.

23 Q.     On what date and time did the first call take

24 place?

25 A.     The first call, or this call?

1 Q.      The call we're going to listen to, B-14.

2 A.      Oh. 15:03 p.m. is 3:03 p.m. on March 8th .

3 Q.      If we could please play that call.

4        (Audio recording begins playing at 4:01 p.m.)

5        (Audio recording stops playing at 4:0 p.m.)

6        BY MS. JOHNSTON:

7 Q.      When you originally heard that on March 8 of

8 2004, did you form an opinion as to the nature of that

9 conversation?

10 A.      No.

11 Q.      Did there come a time during the course of the

12 interceptions when you formed an opinion as to that

13 conversation?

14 A.      Yes.

15 Q.      What was that opinion based upon?

16 A.      The other calls that were intercepted and

17 possibly on surveillance, but primarily on the pattern

18 of calls that we intercepted, and it became -- the

19 nature of the call became clear.

20 Q.      Who were the two people speaking in that call?

21 A.      Paulette Martin and Milburn Walker.

22 Q.      And "Bruce" refers to who?

23 A.      Milburn Walker.

24 Q.      Based upon the information that you've learned

25 throughout the course of this investigation and the

1  other calls you've listened to, do you have an opinion

2  as to what they were discussing when Ms. Martin asked,

3  what size outfit do you want for your godchildren, and

4  both of them are wearing a size 8?

5  A.      Yes.

6  Q.      What is your opinion?

7  A.      Mr. Walker is ordering a quantity of drugs from

8  Ms. Martin; "size 8" refers to the quantity that he's

9  buying from her.

10 Q.      "Both of them" refers to what?

11 A.      One would be crack cocaine, and one is powder

12 cocaine.  One of each.

13 Q.      That is based not only on this call but also on

14 calls that you've listened to?

15         MR. MCKNETT:  Your Honor, I object to that

16 answer.

17         Could we approach?

18         THE COURT:  Yes.

19              (At the bar of the Court.)

20         MR. MCKNETT:  Your Honor, my objection goes to

21 the fact that the witness has crossed the line from

22 expert to fact witness.  It is certainly within his

23 expertise to testify that kind of section has to do

24 with in his expert opinion illegal drugs, but then he

25 goes across the line and interprets facts contained

1 during an investigation  of this case and clothe s them

2 in an expert's  robe .  He is not allow ed to do that .

3          MS.  JOHNSTON:   I don't know  what fact s counsel

4 is talk ing about .  I mean , technically , his

5 identification  of the voice s would be facts , and I will

6 ask him -- if that's what he's object ing to, I can say ,

7 based on your contact with these individuals  and the

8 call s you've listened  to, who was speak ing .  We can do

9 it that way .

10          I think that's also his opinion if that's who

11 they are , based on their identifier s; or if he's

12 talk ing about that it was cocaine and cocaine base ,

13 that is his opinion based on his train ing and

14 experience  and the other conversation s that he's

15 listened to.

16          MR.  MCKNETT :  Your Honor , that's not my

17 objection .  My objection has to do with his

18 presentation  of the conversation , not the

19 identification  of the name s.  What the witness has done

20 -- let me read it from the case in my brief:      Expert

21 testimony  will be aim ed at reveal ing the significance

22 of code d communication , evalu ating the evidence  and

23 particular  difficulti es , warrant ing individual  language

24 by the trial court who is an expert , who is also the

25 case agent .  He goes beyond and  summarize s the belief s

1 about the defendant's conduct based upon his knowledge

2 of the case, and that's exactly what he's done.

3          THE COURT: He's interpreting what was in the

4 conversation by the term, "What size outfit do you want

5 for your godchildren? Both of them are size 8?" "Both

6 of them are size 8."

7          He's giving an interpretation of what that

8 means.

9          MR. MCKNETT: I suggest he needs to be voir

10 dired outside the presence of the jury as to his basis

11 for that opinion. If that opinion is based solely on

12 information gained during the investigation of this

13 case --

14          THE COURT: He is giving that testimony by

15 background and experience. He's also refused to give

16 an opinion based just by listening to one recording.

17 He wants to -- he can give an accurate interpretation

18 of what they meant, and that's what he's done. So, I

19 overruled the objection. I overrule the objection.

20                (Back in open court.)

21          BY MS. JOHNSTON:

22 Q.     If we could go to the next call on Page 2, B-28.

23          Can you tell us, detective, on what date and

24 time this call took place?

25 A.     March 8, 2004, 17:53 hours, or 5:53 p.m.

1 Q.      does the transcript accurate ly reflect the

2 part ies to that call ?

3 A.      Paulette Martin and Derrick Bynum .

4 Q.      If we could play that , please .

5         (Audio record ing begin s play ing at 4:07 p.m. )

6         (Audio record ing stop s play ing at 4:07 p.m. )

7         BY MS. JOHNSTON:

8 Q.      Do you know where the telephone was locate d

9 where Ms. Martin received the call ?

10 A.      This was received at her home . She was home

11 when she received it.

12 Q.      Where is her home ?

13 A.      810 Hayward A venue , Takoma Park , Maryland .

14 Q.      If we could go to call B-35 on Page 3.

15        What is the date and time of this call ?

16 A.      This is on March 8 , 2004 , 20:26 p.m. or 8:26

17 p.m.

18 Q.      Is this part of a series of call s?

19 A.      This is a portion of that . The transcript is a

20 portion of the entire call .

21 Q.      Is it related to call s B-42 and B-47 on the --

22 our next two call s in the book ?

23 A.      That 's correct .

24 Q.      Are the part ies the same in B-35 and B-42?

25 A.      Yes .

1  Q.      The parties in B-47 are whom?

2  A.      B-47 is a male named Cuba LNU.

3  Q.      These calls took place over which telephone

4  line?

5  A.      The B line.  The home telephone line of Paulette

6  Martin.

7  Q.      Located in the residence on Hayward?

8  A.      Hayward Avenue.

9  Q.      What is the time span between the three calls?

10  A.      B-35 is 8:26 p.m.; the next one, B-42 is at 9:41

11  p.m.; and B-47 is 10:18 a.m.

12  Q.      If we could play those three calls, please.

13          (Audio recording begins playing at 4:09 p.m.)

14          (Audio recording stops playing at 4:09 p.m.)

15          (Second recording begins playing at 4:09 p.m.)

16          (Second recording stops playing at 4:10 p.m.)

17          MS. JOHNSTON:   And B-47, please.

18          (Audio recording starts playing at 4:10 p.m.)

19          (Audio recording stops playing at 4:12 p.m.)

20          BY MS. JOHNSTON:

21  Q.      First of all, in that last telephone, where was

22  Mr. Goodwin when he made that call?

23  A.      He was at the residence on Hayward Avenue -- Ms.

24  Martin's residence.

25  Q.      Is that how you were able to intercept that

1 call?

2 A.      Yes.

3 Q.      Calling your attention to those calls.

4        Could you explain to the ladies and gentlemen of

5 the jury what your opinion is in terms of what was

6 discussed in those three calls?

7 A.      In the first call between Paulette Martin and

8 Learley Goodwin, Ms. Martin is asking Mr. Goodwin if

9 she can get a half a sweet potato pie.  By "one half,"

10 she's referring to an ounce, which is  to come from

11 Cuba, which is referenced in the second line there.

12        In the second conversation, she's asking him if

13 he's still coming over; he tells her he will be right

14 there.

15        In the third conversation is when Mr. Goodwin

16 calling Cuba to make arrangements to meet him.

17 Q.      Okay.  Based on your surveillances throughout

18 this investigation, did you determine whether or not a

19 new Giant is located across the street from Prince

20 George's Plaza?

21 A.      Yes.

22 Q.      Based upon your training and experience, did you

23 make a determination as to what kind of drugs that kilo

24 and a half was going to be?

25 A.      Cocaine powder.

1  Q.      In that first conversation, on Page 3, what is

2  the code word that's being used by Ms. Martin to

3  describe the cocaine?

4  A.      "Sweet potato pie."

5  Q.      Again, is that based on this call in isolation?

6  A.      No. In fact, when we first heard this one, we

7  had no idea what they were referring to.

8  Q.      What is your opinion based upon?

9  A.      Subsequent conversations -- hundreds and

10 hundreds.  It will become obvious.

11 Q.      If we could then turn to Page 7 of the book.

12 This would be call B-80.

13          What is the date and time of this call?

14 A.      This was on March 9, 2004, at 1:12 p.m.

15 Q.      So it would be the second day of your

16 interceptions?

17 A.      Yes.

18 Q.      Does the transcript accurately identify the

19 parties to the call?

20 A.      Yes.  It's Paulette Martin and Reece Whiting.

21 Q.      Is call B-82, on Page 8, related to call B-80?

22 A.      Yes.

23 Q.      Who are the parties to the call?

24 A.      The same.  It's Paulette Martin and Reece

25 Whiting.

1  Q.      If we could play those please.

2          (Audio recording begins playing at 4:15 p.m.)

3          (Audio recording stops playing at 4:16 p.m.)

4          MS. JOHNSTON:   If we could play B-82.

5          (Audio recording begins playing at 4:16 p.m.)

6          (Audio recording stops playing at 4:17 p.m.)

7          BY MS. JOHNSTON:

8  Q.      Who are the parties to those -- well, who left

9  the message on Page 7?

10 A.      Reece Whiting left the message on Paulette

11 Martin's home phone.

12 Q.      Do you see that person in the courtroom?

13 A.      Yes.

14 Q.      Could you identify him, for the record?

15 A.      The gentleman seated at the defense table with

16 his glasses on top of his head.

17         MS. JOHNSTON:   We would ask the record to

18 reflect the witness has identified Mr. Reece Whiting.

19         THE COURT:   The record will so indicate.

20         BY MS. JOHNSTON:

21 Q.      Do you have an opinion, based upon your training

22 and experience, as to what Mr. Whiting was requesting

23 of Ms. Martin and what her response was?

24 A.      Yes.  In the first call he's leaving a message

25 for her telling her he wants to buy cocaine from her.

1        In the second call, she's telling him that she
2 doesn't have any and she might have some near the end
3 of the week.
4 Q.    What is the language that you're interpreting to
5 mean that he's looking for cocaine and that she doesn't
6 have any but she'll have it later in the week?
7 A.    In the first call, he refers to the cocaine
8 using the code word "tickets;" and in the second call
9 she tells him that she doesn't have any tickets --
10 excuse me, he doesn't have any printed so he'll have to
11 wait until the end of the week, referring to the
12 tickets he left a message for.
13 Q.    What is it in terms of this investigation and
14 your training and experience that led you to conclude
15 in these particular intercepts that the word "tickets"
16 refers to drugs?
17 A.    Early on in the case we identified "tickets" as
18 a code word for drugs, and that continued to be a
19 pervasive code word all the way through the hundreds
20 and hundreds of calls that we intercepted.
21 Q.    Based on your -- how did you determine that
22 "tickets" were not actual tickets for a movie or for a
23 concert?
24 A.    Yeah.  Again, I think I talked about normal
25 conversations.  When most people order tickets, they

1 identify what it's for and what date it's for and what

2 price it's for and what that they're going to see.

3 That's whole tickets, not half tickets or short

4 tickets.

5          MR. HALL:   Objection to the "half ticket"

6 remark.   It wasn't used in this conversation.

7          THE COURT:   I didn't hear your objection.

8          MR. HALL:   I said, I object to the "half ticket"

9 remark.   There was no mention of it in this

10 conversation.

11         MS. JOHNSTON:   I asked him for his opinion that

12 the word "tickets" refers to drugs.

13         THE COURT:   Overruled.

14         BY MS. JOHNSTON:

15 Q.      You may proceed.

16 A.      There was mention of  short tickets and long

17 tickets.   There would be conversation that -- the

18 conversations did not refer to tickets.   I think

19 there's a conversation we're going to hear about a

20 Peruvian-style ticket.   That would not refer to a

21 normal ticket.

22         Additionally, we found in other conversations no

23 indication that anybody was engaged in any --

24         MR. SUSSMAN:   Objection.

25         THE COURT:   What's the objection?

1        MR. SUSSMAN:   It's a hearsay objection, Your

2 Honor.

3        THE COURT:    Sustained.

4        BY MS. JOHNSTON:

5 Q.    Your basis of your opinion is also based upon

6 other intercepted conversations; is that correct?

7 A.    That's correct.

8 Q.    What was the nature of those other intercepted

9 conversations that led you to conclude that "tickets"

10 was used to refer to drugs in this particular

11 conversation?

12 A.    We had no intercepted conversations regarding

13 legitimate ticket commerce.   There was no evidence

14 during the entire --

15        MR. MCKNETT:   Objection, Your Honor, to the

16 conclusion there was no conversation about legitimate

17 ticket commerce.

18        MS. JOHNSTON:   Your Honor, that's his opinion.

19        THE COURT:   Overruled.

20        BY MS. JOHNSTON:

21 Q.    Please continue.

22 A.    Ticket commerce.

23        Additionally, when we executed search warrants,

24 we looked for any clue or any indication of people

25 selling tickets and found none.

1 Q.      If we could go to call B-129.  What is the date

2 and time of call B-129, on Page 9?

3 A.      This is on March 9, 2004, 7:59 p.m.

4 Q.      If we could play that, please.

5         (Audio recording begins playing at 4:21 p.m.)

6         (Audio recording stops playing at 4:22 p.m.)

7         BY MS. JOHNSTON:

8 Q.      Who are the parties to that conversation?

9 A.      Paulette Martin and Luis Mangual, Jr.

10 Q.      Did you form an opinion as to what they were

11 discussing in that call?

12 A.      Yes.

13 Q.      What is that opinion?

14         MR. MCKNETT:  Your Honor, objection.

15         There is no indication of any code in this

16 conversation.

17         THE COURT:  Overruled.

18         BY MS. JOHNSTON:

19 Q.      Based upon your training and experience and all

20 of the calls you've listened to in this case, did you

21 form an opinion as to if there was anything that was

22 said in this call relating to drug activity?

23 A.      Yes, there is.

24 Q.      What is that?

25 A.      Mr. Mangual was telling Ms. Martin he has

1 cocaine for sale.

2 Q.     Where do you see that?

3 A.     "Everything is good."

4 Q.     To your knowledge, did Ms. Martin -- strike

5 that.

6        During the course of your investigation, did you

7 uncover any evidence of another relationship between

8 Ms. Martin and Mr. Mangual?

9 A.     They certainly knew each other.

10 Q.    Were they in the ticket business together?

11 A.    No.

12 Q.    If we could go to the next telephone call, A-87,

13 on Page 10.  And if we could play that, please.

14       (Audio recording begins playing at 4:23 p.m.)

15       (Audio recording stops playing at 4:24 p.m.)

16       BY MS. JOHNSTON:

17 Q.    Detective Sakala, who is leaving the message on

18 Ms. Martin's answering machine?

19 A.    Ruby Harden.

20 Q.    Do you see Ms. Harden in the courtroom?

21 A.    Yes.

22 Q.    Would you identify her, for the record?

23 A.    She's sitting in the, I guess the second row of

24 the defense, with a tan sweater, second in from the

25 aisle, next to Mr. Sussman.

1          MS. JOHNSTON:    We would ask the record to

2  reflect the witness has identified Ruby Harden.

3          THE COURT:    The record will so indicate.

4          BY MS. JOHNSTON:

5  Q.     Based upon your training and experience, did you

6  make a determination as to whether or not this call

7  concerns drugs?

8  A.     Not directly, no.

9  Q.     In terms of the phrase, "I've got my tractor

10 trailer and I've got to drop off something for a

11 customer." Based on your training and experience, was

12 that legitimate business, or was it a drug customer?

13 A.     I believe the customer she's referring to is

14 she's dropping off a trailer. Ms. Harden is a truck

15 driver, and she was dropping off a trailer for a

16 customer. She's leaving a message for Ms. Martin to

17 get back with her.

18 Q.     When she says, "Heading over that way," is that

19 a reference to where?

20 A.     She's coming over to see -- to be -- will be in

21 Paula's neighborhood -- Paulette Martin's area.

22 Q.     If we could go to the next call, B-149 on Page

23 11, and if we could play that please.

24         (Audio recording begins playing at 4:26 p.m.)

25         (Audio recording stops playing at 4:27 p.m.)

1          BY MS. JOHNSTON:

2  Q.      Who are the parties in that telephone call?

3  A.      Paulette Martin and Derrick Bynum.

4  Q.      There's a reference to "Becky." Do you know who

5  that's referring to?

6  A.      Yes.

7  Q.      Who is that?

8  A.      Lavon Dobie.

9  Q.      Do you see Ms. Dobie in the courtroom?

10 A.      Yes, I do.

11 Q.      Would you identify her for the record?

12 A.      She's the female sitting next to the defense

13 counsel on the far  right-hand side.

14 Q.      We would ask the record reflect the witness has

15 identified the defendant, Lavon Dobie.

16          THE COURT:  All right.  The record will so

17 indicate.

18          MS. JOHNSTON:   May I ask one more question?

19          THE COURT:  Ask your question.

20          BY MS. JOHNSTON:

21 Q.      Based on your training and experience, was there

22 anything significant to you about drug trafficking in

23 the call?

24 A.      Yes.

25 Q.      What was that significance?

1  A.      Ms. Martin said yes, and Mr. Bynum says that

2  he's going to come over anyway, despite the fact that

3  Ms. Dobie is still there.

4  Q.      One more question, Your Honor.  Could I ask him

5  to identify Mr. Bynum if he sees him in the courtroom?

6          THE COURT:   You may.

7          THE WITNESS:    Mr. Bynum is seated with defense

8  counsel in a dark button-up shirt, fourth one from the

9  right side, seated next to  Mr. Whiting.

10         MS. JOHNSTON:    We would ask the record to

11 reflect the witness has identified Derrick Bynum.

12         THE COURT:   All right, the record will so

13 indicate.

14         Ladies and gentlemen , we're going to recess for

15 the day.  I have a sentencing tomorrow morning at 9:00,

16 so we will start tomorrow at 10:00.  I anticipate going

17 to about 4:30 tomorrow, so it will be a normal schedule

18 tomorrow.

19         I would ask that the jury be excused now and,

20 counsel, that you also promptly disappear, because I

21 have a sentencing that was scheduled to start at 4:00.

22                    (Jury excused at 4:28 p.m.)

23                    (Off the record at 4:28 p.m.)

24

25

1                        **CERTIFICATE**

2

3       I, Tracy Rae Dunlap,   RPR , CRR , an Official Court

4  Reporter for the United States District Court of

5  Maryland, do hereby certify that I reported, by machine

6  shorthand, in my official capacity, the proceedings had

7  and testimony adduced upon the Jury Trial Proceedings

8  in the case of UNITED STATES OF AMERICA versus PAULETTE

9  MARTIN, et al, criminal Action Number    RWT-04-0235 on

10  June 20, 2006.

11

12       I further certify that the foregoing    234 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17       In witness whereof, I have hereto subscribed my

18  name, this 4th day of    April 2008 .

19

20

21       _____

         TRACY RAE DUNLAP, RPR , CRR

22       OFFICIAL COURT REPORTER

23

24

25