```
1            UNITED STATES DISTRICT COURT OF MARYLAND
                         SOUTHERN DIVISION
2
    ------------------------x
3  UNITED STATES OF AMERICA   :
            Plaintiff         :
4                             :
                              :
5  vs                        :Criminal Action:   RWT-04-0235
                              :
6                             :
   PAULETTE MARTIN, et al     :
7          Defendants.        :
    ------------------------x
8

9                         Wednesday, June 21, 2006
                          Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11  Proceeding before the HONORABLE ROGER W. TITUS, United
    States District Judge, in courtroom 4C, commencing at
12  10:00 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS THE TESTIMONY AND PROCEEDINGS
15      OF THE CASE AS RECORDED AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
    Tracy Rae Dunlap,   RPR , CRR          (301) 344-3912
25  Official Court Reporter
```

1                          I N D E X

2
                              DIRECT      CROSS    REDIRECT   RECROSS
3  Christopher   Sakala   15,50,94
                              130,168
4
   Sean Deere                 30,78      42,86
5
   Raphael Grant              110        119      128        129
6
   Roger St. Louis                       157      164        168
7
   Gregory  Scheirer          182        187      200
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                                  Page

24  Reporter's Certificate                          207

25  Concordance                                     208

1          MR. McKNETT :  Good morning , Your  Honor.

2          THE  COURT:  Good morning  , Mr. McKnett . Let  the

3 record reflect everybody is here except     Mr. Ward who,

4 once again, is having traffic problems and his arrival

5 is eminent  I'm told.  But go ahead.

6          MR. McKNETT :  Your  Honor , I want to follow up on

7 a motion  I made yesterday concerning    Sergeant  Sakala's

8 testimony .  I would ask the sergeant not be in the

9 courtroom while  I make --

10         THE  COURT:  All right  .

11         MR. McKNETT :  I wrote it down so   I'll be brief,

12 Your  Honor.

13         THE  COURT:  All right  .

14         MR. McKNETT :  Your  Honor, yesterday  I made an

15 objection to  Sergeant  Sakala's  testimony , and in

16 support of the objection  , I read a portion of the

17 opinion in  *U. S. v.* -- I hope  I'm pronouncing it right

18 -- *Dakagjini* .

19         THE  COURT:  Spell it out for me  .

20         MR. McKNETT :  I don't think  I gave a cite for it

21 either  D A K --

22         THE  COURT:  Wait a minute  , A?  A.

23         MR. McKNETT :  D A K A G J I N I.

24         THE  COURT:  All right.  And what's the citation

25 to it ?

1          MR. McKNETT:  The citation is 326   F.3d, 485.

2          THE COURT:  Okay.

3          MR. McKNETT:  It's the Second Circuit, 2002

4 case.  I cited it in my  --

5          THE COURT:  What circuit is it  ?

6          MR. McKNETT:  Excuse me ?

7          THE COURT:  What circuit  ?

8          MR. McKNETT:  The Second.

9          THE COURT:  The Second?  Okay.  All right  .

10          MR. McKNETT:  This morning , I would ask for a

11 continuing objection with respect to the sergeant's

12 testimony on the grounds   I stated yesterday , and also

13 on the ground that when the witness goes beyond

14 interpreting code words summarizing his beliefs about

15 the defendants , collectively their conduct   , based upon

16 his knowledge of the case  .

17          First , the jury may infer that his opinion about

18 the nature of a particular   defendant 's activity was

19 based upon knowledge of the defendant beyond the

20 evidence presented at trial   , because he's testifying as

21 an expert and the jury has been informed that he's

22 allowed to rely on information that may not be

23 presented as evidence in this courtroom.

24          Secondly, because he has been qualified as an

25 expert he gains unwarranted credibility when he

1  testifies with firsthand knowledge as a fact witness.

2       Third, that when he states that he forms his

3  opinions and then had those opinions confirmed by

4  people involved in this alleged conspiracy, which he

5  did, he improperly bolstered the testimony of those

6  witnesses who claim to be involve    d in the alleged

7  conspiracy by suggesting to the jury that he     , as an

8  expert, believes those witnesses to be credible    , and as

9  an expert believes the defendants to be guilty.

10      Fourth, that by so testifying   , he strays from

11 the -- applying reliable    methodology  and conveys his

12 sweeping conclusion s to the jury in violation of the

13 limits  imposed by  Rules 403  and  702.  In fact, by so

14 testifying,  he unfairly provides the government with a

15 continuing closing argument   , in effect , by interpreting

16 the evidence , which is a function to be performed by

17 the government at the end of the case   , or perhaps by

18 this agent at the   end as a case agent , but not as a

19 witness during the course of the trial.

20      Finally -- well , not finally , but close to

21 final.  That by so testifying   , he creates the great

22 risk the jury will be confused and become unable to

23 tell when he is properly relying on his expertise in

24 the area of drug trafficking from when he is relying

25 upon what he has learned in his roles of investigator

1  in this case as case agent   .   And by testifying as he

2  has been , the witness has become not just an expert in

3  drug trafficking but a de    facto expert concerning this

4  case which is something not permitted by     Rule 702  or

5  403.   I base both of th ose argument s, again , on the

6  Dakagjini  case.

7        I'd also want to point out    that a Crawford issue

8  arises when the witness'    testimony is based on what he

9  was told by a cooperat  or or similar person , whether or

10  not his testimony is in the form of a direct quote.      If

11  he is paraphrasing what he was told by a     cooperator or

12  similar person who does not testify in this courtroom,

13  he is in effect relaying hearsay information to the

14  jury without benefit of cross-examination.

15        For all those reasons,    I'd ask the witness be

16  instructed not the testify as he has been    , to strike

17  the testimony that he has given so far    , and if the

18  Court does deny those requests   , I ask for a continuing

19  objection to all such testimony by     Detective  Sakala .

20        THE COURT:  All right.  Before you respond.      Mr.

21  Ward, Mr. McKnett has just made a motion raising the

22  same issue raised yesterday concerning     the ability of

23  Detective --  Sergeant , excuse me --  Sergeant  Sakala  to

24  give his opinion testimony as he's been given     .  So

25  that's what you came in at the end of    .

1          MR.  WARD:   I understand that  , Your  Honor.

2          THE  COURT:   You really need to leave home a

3  little  earlier  .  This is the second time in a row    .

4          MR.  WARD:   Judge , I blew out a tire on the way

5  home last night  .  I had  to go get new tires.

6          THE  COURT:   Okay .  The blown out tire excuse has

7  now been used.

8          MR.  WARD:   I have  my receipt.

9          MR.  HALL:  Does that mean    Your  Honor is offering

10  us tires if we need them like you did the suit     ?

11          THE  COURT:  No,  I don't have tires in my

12  chambers , but the clothing excuse    has been used up , the

13  tire excuse has been used up.

14          Mr.  Sussman , go ahead.

15          MR.  SUSSMAN :  First , could you provide   us with  a

16  list of the unused excuses so we cannot have to      --

17  anyway .

18          Just as an addendum to what    Mr. McKnett said.   I

19  think what the agent's doing is two things.  One, he's

20  summarizing -- he's acting as a summary witness in

21  terms of making inferences that's the jury's      province

22  with regard to what they could intend  .  And  I think as

23  an expert on drugs  , what you do is you say this

24  packaging is consistent with distribut    ive intent, this

25  quantity is consistent with distributive intent      , but

1  you can't read people's minds and you can't talk about

2  their specific intent  .

3       And that's what he's exactly   doing,  saying this

4  is a conversation in which so   -and-so is attempting to

5  purchase drugs.   That's exactly what the rules  , and I

6  think 704 prohibit s in the case law underneath it   , and

7  I would join in   Mr. McKnett 's objection.

8       THE  COURT:  All right.  I'm   going  to assume

9  everybody is joining in that objection.  Remember

10 that's the rule.  Unless   you have  something new and

11 excit ing to tell me , you have joined it.

12      Ms. Johnston , what is your opposition  ?

13      MS.  JOHNSTON:   Your  Honor , first of all , the

14 cases cited by  Mr. McKnett  indeed the  Second  Circuit

15 acknowledged they nevertheless permit such testimony of

16 allowing case agents to testify as experts in addition

17 to being fact witnesses.

18      Sergeant  Sakala  is not being called here to

19 testify as a summary agent.   Mr. McKnett  says it's okay

20 if at the end of the case we call a summary agent to

21 summarize what the witnesses say   , but he wants to

22 exclude  Sergeant  Sakala's  testimony on the basis that

23 he's summarizing hearsay evidence.

24      It became very clear yesterday during the long,

25 tedious questioning of   Sergeant  Sakala that his

1 testimony is based upon his training and experience,

2 his listening to the calls  , his familiarity with

3 surveillance in this case.    What he is doing is

4 testifying  as the 4th Circuit has allowed in  *United*

5 *States versus  Johnson* and *United  States versus  Hopkins* ,

6 a witness to testify about the language of the codes,

7 the surveillances and his opinion based on his training

8 and experience that there was a drug transaction

9 occurred on this date or drug transaction occurred on

10 that date.

11      No different than a police officer testifying

12 that they observed a hand  -to-hand -- they observed an

13 exchange  of items between two people and they concluded

14 that was a hand  -to-hand drug transaction.  He has not

15 summarized any witness' testimony in his limited

16 testimony yesterday  , nor do I believe  he's going  to do

17 that.

18      In terms of the surveillances   , if he was not

19 himself involved in the surveillances    , the agents who

20 were will testify about those surveillances so it is

21 proper to him to rely upon that testimony in this court

22 in forming his opinion as an expert.    There is nothing

23 out of the ordinary in terms of what's being presented

24 with him.

25      His testimony is very limited   , and while we

1   could , under first circuit law   , call him as well as our

2   summary agent to summarize as they did in      Johnson , the

3   role of the defendant   s in the conspiracy and how the

4   organization functioned, the government does not intend

5   to do that with   Detective  Sakala .  If at all , that will

6   be done with the case agent,    Detective  Eveler , at the

7   end of the case.

8          But right now , he is testifying clearly in terms

9   of those conversations, conversations he's been privy

10  to that counsel has had access to    , and to surveillances

11  that he also is familiar with or will be presented here

12  in court .  So there is nothing in terms of any possible

13  Crawford violation.    It is certainly within the realm

14  of his expertise as a  n experience d narcotics officer to

15  give the opinions that he's   given  and what the

16  government intends to elicit through all of these calls

17  throughout the next probably week.

18         THE  COURT:  All right.  Counsel,    I considered

19  this issue yesterday.    I have not heard anything that

20  would cause me to revisit that ruling.    I will deny the

21  motion .  I will  give you a continuing objection to all

22  of the testimony and the opinions being given by

23  Detective  Sakala .  I'll remind you , however , that I'm

24  well aware of the   Crawford decision , and if any

25  specific question requires that he stumble into a

1   violation of  Crawford, you should make a new objection.

2          The testimony that he has given thus far is

3   based upon his review of the conversations that he's

4   overheard , not in a vacuum but in totality   , so he's

5   able to understand what's being said.  If there is any

6   specific question , though , that raises a  Crawford

7   problem,  I'll be glad to hear it when that question is

8   asked.  So the motion is denied.

9          MR. MONTEMARANO :  For the record , Your Honor ,

10  then , I would lodge an objection now or point the     Court

11  to the fact  Detective  Sakala specifically testified

12  yesterday in response to questions on voir dire that

13  his belief after listening to all he     these

14  conversations , based  upon  his expertise , which is

15  acceptable , then was "confirmed" by discussions with

16  cooperators, witness  es, etcetera in this case.  That's

17  the problem .

18         THE  COURT:  Well, he said it was confirmed   , but

19  he already had an opinion, so    he's not basing his

20  opinion  upon it being confirmed by somebody    , as I

21  understand his testimony.

22         MR. MONTEMARANO :  That's correct , but when he

23  says somebody told him   I was indeed correct , this was a

24  drug conversation , he is now bringing in hearsay as to

25  that person's statement.  That's the     Crawford

1  violation.

2       THE  COURT:  That's not the basis of the opinions

3  he's giving and he said   it's not the basis  .  It simply

4  confirms what his opinion is that he's already reached.

5       MS.  JOHNSTON:   Your  Honor , I would note that

6  those statements of the detective were in response to

7  defense counsel's questioning asking him specifically

8  about co -conspirators'  statements.

9       THE  COURT:  Anything further?    We're going to

10  bring the jury in .

11       MR.  McKNETT :  Your  Honor, simply the issue that

12  Mr. Montemarano  made concerning the sergeant's

13  admission that he did consult with other witnesses or

14  other people who have claimed to be involved in this

15  case is exactly what   I -- the issue   I raised in part of

16  my argument about how he has now bolstered the

17  testimony of government witnesses and stated as an

18  expert that they're telling the truth and that the

19  government -- all the defendants are guilty    , which

20  clearly -- why  have a jury  if this agent is going to

21  make all those conclusions?  That's the     province  of the

22  jury , not the  province  of an expert .

23       THE  COURT:  The  province  of the jury will be

24  carefully delineate  d by me in my instructions to the

25  jury , and they will be instructed as they are in all

1  cases that the opinion of an expert is not binding upon

2  them and they have -- they are the    ones that are to

3  decide the facts in this case   , not any individual fact

4  witness or expert witness  , either one .

5       MR. SUSSMAN :  Just to clarify.  Specifically  , I

6  objected to him being a mind reader saying what

7  somebody intended to do.  Is the    Court going to permit

8  him to --

9       THE  COURT:  He's  not mind reading .  He is

10 testifying what is meant by words used during a

11 conversation, conversations which are using coded type

12 of language that he is able to interpret because of his

13 experience in these matters  .

14      MR. SUSSMAN :  I understand that.  But when he

15 extends that to what somebody is planning to do or

16 going to do , he's talking about the intent of --

17      THE  COURT:   I don't think we have gotten to that

18 bridge nor have we crossed it   , but if my understanding

19 is the testimony to date is that he is interpreting

20 what words the witnesses are using during the

21 conversations as to what those words mean and that's

22 it.

23      MR. SUSSMAN :  My recollection was that he went

24 further and testif ied to what somebody was plan  ning to

25 do as a result of the conversation    , and that's what  I

1  think is objectionable  , because  I think --

2      THE  COURT:  If the words themselves reflect

3  somebody 's intention to do something, he can give that

4  opinion .

5      MR.  SUSSMAN :  Well, I think there's  a question

6  about when he --

7      THE  COURT:  If you say  I plan to leave the

8  courthouse at noon today  , it's pretty obvious   that  I

9  have state d what my intent is.  And had he can state

10  that 's what  I meant when  I said 12 :00  sounds good to

11  me, that's  me stating that 12:00's the time    I'm going

12  to leave today.

13      MR.  SUSSMAN :  That's not what we need expert

14  testimony for , as a general rule.

15      THE  COURT:  There are people that use coded

16  language , there are  those that interpret the code  , and

17  that's what he's been qualified to do.

18      MR.  SUSSMAN :  Interpreting the  code,  I haven't

19  objected to that.

20      THE  COURT:  Counsel , I have ruled on the matter.

21  We are ready for the jury.    Ms. Johnston.

22      MS.  JOHNSTON:  No , I am ready to go , Your  Honor .

23  We have been down this road  .

24      MR.  McKNETT :  Your Honor , very briefly , to

25  follow what  Mr. Sussman  said.  When the government

1  played call  B129 at Page  9 --

2          THE  COURT:  Wait a minute.  Let me get it out     .

3          MR.  McKNETT :  Book  1, Page  9, Call  No.  B129.

4          THE  COURT:  I've got to get organized  .  Wait  one

5  second.   What's the  page number , Mr. McKnett ?

6          MR.  McKNETT :  It's  Book  1, Page  9, Your  Honor,

7  Call  B129.

8          THE  COURT:  All right  .

9          MR.  McKNETT :  This is a call  , which  I raised an

10 objection .  There is simply no code language in this

11 conversation.  This is standard    English language used

12 to mean  -- the words are used to mean exactly what they

13 mean and --  but this  witness was asked, what did    Mr.

14 Mangual  mean when he said everything is good?  That is

15 the mind reading function that    Mr.  Sussman  has objected

16 to.

17         THE  COURT:  Mr.  McKnett , I have considered and

18 overruled your objection.  It's as if he said are you

19 my amigo,  and he's asking him  , are you my friend  .  I

20 mean , he is  interpreting  what these words mean as used

21 by the speakers  in the conversation.   I've ruled that

22 he's competent to do that and has the necessary

23 expertise based on his background and experience.

24         All right .  Let's bring the jury in.

25                (Jury returns  at 10 :22 a.m. )

1       THE COURT:   Good morning , ladies and gentlemen.

2 As I mentioned  yesterday , we will be going until about

3 4:30.  Tomorrow morning  , I have  a den tist  appointment

4 so we'll start at   10:00,  as long as my teeth are clean

5 and no cavities  , and I anticipate   that we'll go

6 tomorrow until 4  :30.

7       On Friday , I would like you to discuss your

8 desires when you have a break and tell     Ms. Merez , but

9 I'd like to see if perhaps we can leave a little early

10 on Friday.  What   I may make the price of that    , though ,

11 is that  we start a little early and then we have a

12 little shorter lunch or no lunch i    f we want to get out

13 early .  So talk about that amongst yourselves and let

14 Ms. Merez  know what your pleasure is   , because  Friday

15 afternoons are always a pure pleasure on the highways

16 around here , and so if we can leave a little early    , I

17 will try to do   that.

18       Ms. Johnston , you may proceed.

19              **FURTHER  DIRECT  EXAMINATION**

20       **BY MS. JOHNSTON:**

21 Q.     Detective  Sakala , when we left off yesterday   , we

22 had just finished playing    --

23       THE COURT:  He's got to get up there first.

24              (The  witness resumes the stand.   )

25       BY MS. JOHNSTON:

1  Q.      Detective  Sakala , when we left off yesterday    , we

2  were talking about call    B149 on Page   11.

3         Do you have that in front of you?

4  A.      Yes,  I do.

5  Q.      Volume  1, I might add.

6         In that call , there's a reference to    Becky and

7  you had identified   Ms. Dobi e here in the courtroom.

8  There is also -- was there any significance to     , based

9  on your training and experience   , to Derrick  Bynum 's

10 statement , well , I'm on my way.    I don't give an  F, I'm

11 on my way?

12 A.      Yes.

13 Q.      Okay.  Could you explain that significance to

14 you based on your training and experience?

15 A.      Drug dealers  are people engaged in drug

16 transactions   often  do not want people around who are

17 not involve d in the transaction to witness those   .  So

18 what he's referring to here is whether she was still

19 there, because he was concerned whether she was still

20 there and then he changes his mind a    nd says , I don't

21 care, I'm going  to come over anyway.

22 Q.      Now, you had discussed a couple of words in

23 these first few calls were actually codes for drugs     ,

24 and cocaine in particular.  You remember that

25 yesterday?

1  A.       Yes.

2  Q.       I'm going give you a marker here and ask you to

3  start writing -- it might be easier if    I did -- did the

4  writing.  If you could,   I'm just going to write code up

5  here -- code words.  What was the first one that you

6  told us about yesterday?

7  A.       I believe that was sweet potato pie   , but let me

8  check.  The first one was outfit   , what size outfit.

9  Q.       What page is that on?

10  A.       It's on Page  1.

11  Q.       And the second one?

12  A.       Page  3.  It was sweet potato pie.

13  Q.       And the page number?

14  A.       Page  3.

15  Q.       Was there a third one that we   've heard so far?

16  A.       I believe that was tickets.  On Page      7.

17  Q.       Now, if we could go to the next telephone call    ,

18  which is call  B158 and play that please.

19          (Audio recording begins playing at 10   :24 a.m. )

20          (Audio recording stops playing at 10    :26 a.m. )

21          BY MS. JOHNSTON:

22  Q.       Did you recognize the voice   s in that

23  conversation?

24  A.       Yes.

25  Q.       Who are they?

1  A.        Paulette  Martin and  Lavon  Dobie.

2  Q.        Do you see  Ms. Martin here in the courtroom?

3  A.        Yes.

4  Q.        Would you identify her for the record?

5  A.        She's seated at the defense counsel table in a

6  dark striped top with glasses, second from the aisle.

7            MS.  JOHNSTON:   We'd ask the record to reflect

8  the witness has identified the defendant,     Paulette

9  Martin.

10           THE  COURT:  The record will so indicate.

11           BY MS.  JOHNSTON:

12  Q.        Are we still  on March  9th with this call?

13  A.        Yes.  It was at 10  :45 p.m.

14  Q.        Did you form an opinion based on the

15  conversation as to what   Ms. Martin and  Ms. Dobie were

16  discussing?

17  A.        Yes.

18  Q.        Could you tell us what that opinion is?

19  A.        They're talking about the drugs that     Ms. Martin

20  had sold to  Ms. Dobie for her son  , and Ms. Martin is

21  telling  Ms. Dobie that her son cannot come directly to

22  purchase drugs from her because she doesn't sell drugs

23  to her family 's kids, friends , she's telling  Ms. Dobie

24  that whatever  Ms. Dobie does with the drugs is up to

25  her.

1  Q.      Could you reference particular portions of the

2  conversation -- the transcript that led you to that

3  conclusion?

4  A.      I'm sorry?

5  Q.      Can you reference particular portions of that

6  conversation that led you to that conclusion?

7  A.      Sure.  The first part of the section     where  just

8  because  -- where  Ms. Martin says just cause you're my

9  niece , that ticket you got for your son to go to the

10 show , I would never sell him no tickets to no show

11 myself .  Meaning she wouldn't sell drugs to him

12 directly.

13 Q.      Why do you believe that that's drugs and not

14 tickets to a concert?

15 A.      Ms. Martin was not selling tickets for any

16 legitimate commerce , we found out .  And as we go

17 through the calls , tickets , as we found , was a common

18 code word that was used throughout the wire to

19 reference drug s.

20 Q.      Now, in addition  --

21         MR. MONTEMARANO :  Objection , Your  Honor .

22         Can we be heard at the bench?

23         THE  COURT:  Come to the bench.

24              (At the bar of the Court.)

25         THE  COURT:  What is your objection to?  He

1  already answer ed the question when you objected.

2         MR. MONTEMARANO :  Ms. Martin was not involved in

3  legitimate commerce   involving selling tickets , we found

4  out.  He is testifying "we".  Last time  I looked , "we"

5  is not on the stand , it is only  Detective  Sakala .

6         Secondly , we found out , he's talking about what

7  someone else told him.  This is exactly the point we

8  brought up yesterday and we brought up this morning.      I

9  don't wish to make it sound like that     Your Honor , but I

10  have to phrase it that way if    I hope to preserve the

11  record.

12        I don't really care what he found out.  Those

13  people come in , *Crawford* really gives me that right .  I

14  don't really care what   "we" testifies to, if   Ms.

15  Johnston has 25 witnesses and we have 24 waiting along

16  with Detective  Sakala .  What we -- it's inappropriate,

17  Your Honor , and this is exact  ly the problem with the

18  detective's testimony and exactly the point we were

19  trying to make.

20        THE COURT:  Ms. Johnston.

21        MS. JOHNSTON:  Well, I can a sk him some more

22  questions .  He's familiar with the documents recovered

23  from her residence.  Based upon that , he's reached that

24  conclusion.

25        THE COURT:  Make it clear   --

1          MS.  JOHNSTON:  I t's a term of art he uses.

2          THE  COURT:  Make it clear when you ask him

3     questions,  when he says he's not aware of any tickets

4     it's a result of searches.

5          MS.  JOHNSTON:   I will.

6          MR.  MONTEMARANO :  Ms. Johnston has stepped into

7     the second problem , and that is she has to have an

8     opinion coming into the investigation.      An opinion

9     based upon what he saw in   Ms. Martin's documents is not

10    an opinion , is not expertise in advance of.  It's a

11    conclusion he's come to, based on the investigation    .

12    Those are very different    things,  and we are now

13    confusing the issue of   fact versus expert witness,

14    again as the  defense called to the   Court's at tention .

15         MS.  JOHNSTON:  We are not at all con   fus ing fact

16    with opinion .  He's allowed  to rely upon something more

17    than jus t the  call .  If h e has relied upon his personal

18    knowledge of the investigation   , including the fact he

19    has seen the document  s that were recover  ed from  the

20    search warrant , and it helps him , that is something he

21    relies upon in forming his opinion about what each of

22    these calls mean , just like he doesn't recall on one

23    call in isolation .  He's entitled to rely on his

24    knowledge of the investigation   , in particular his

25    personal knowledge of the investigation     .

1         THE COURT:  You need  to get close r to the  mike

2  or we can't pick it up  .

3         MR. SUSSMAN :  If the detective is  going  to

4  testify in this fashion for all these calls, we're

5  going to be here until August 11.  There is no

6  limitation to the scope and the length of his

7  testimony.

8         MS. JOHNSTON:  Your Honor , the government  has

9  been very limit ed in  what we're asking  .  If we didn't

10  have all these bench conferences and hadn't wa    sted the

11  first 20 minutes of this morning reiterat    ing what we

12  did yesterday --

13         THE COURT:  I've ruled on this issue.  I  've

14  asked  Ms. Johnston , and she's going to make it clear

15  that if he 's testifying that there is no ticket    , that

16  he's basing  that upon not  only  just the  conversations ,

17  but also his personal knowledge of what was seize    d from

18  the residence , which does not indicate any business

19  selling shows or tickets.  All right?

20         And he can base it on his personal knowledge.

21  He is not -- there is not a    *Crawford*  issue as long as

22  he's doing  that.  That's my ruling.  Let's continue

23  with the testimony .

24         MR. MONTEMARANO :  Your Honor, so we're clear.

25  Do you want me, every --    I assume  Detective  Sakala

1 will , in my opinion , and that's my call to make, do

2 this again and again and again.    Your Honor's ruled --

3         THE COURT:  No.   I will give you a continuing

4 objection .

5         MR. MONTEMARANO : S o you don't want me   up here

6 or out of my chair saying, "object," "object     ,"

7 "object."

8         THE COURT:  Not every single time.  As    I already

9 told you , if there is a *Crawford* issue that goes beyond

10 what we just discussed , you can certainly  raise it,  but

11 I don't believe that this is --

12         MR. MONTEMARANO : A Crawford issue of this

13 scope , you do not expect   --

14         THE COURT:  Based upon his personal knowledge

15 ,and he is on the stand and he's available for

16 cross-examination.   I have overruled it.  If he basis

17 it upon what somebody told him   , we may have a *Crawford*

18 problem,  then you should raise that when you think that

19 bridge has been crossed.

20         MR. MONTEMARANO : Thank you .

21             (Back in open court. )

22         BY MS. JOHNSTON:

23 Q.    Detective Sakala , in terms of  rendering your

24 opinion , if you could use the pronoun    "I" instead of

25 "we," that would be inofficial  .

Page 24

1  A.       Okay.   I'm sorry.

2  Q.       In terms of your conclusion that there was no

3  legitimate ticket business   , is that based upon your

4  review of documents that were found in the various

5  locations  during the execution of the search warrants

6  in this case?

7  A.       That was one of the reasons, yes.

8  Q.       Now, if we can go to the -- again   , in that call ,

9  what was , based on your training and experience    , the

10  code word for tickets?

11  A.       It refers to the drugs.

12  Q.       On what page?

13  A.       On Page 12 and  Page 13.

14  Q.       If you could just write next to the word ticket

15  on that chart there those page numbers, please.

16  A.       (Witness indicating.  )

17  Q.       We could go to the next call on Page 14,    Call

18  B159.  Again , is that call also on   March 9th of 2004?

19  A.       Yes, it is.

20  Q.       Approximately what time is that call?

21  A.       11:10 p.m. or 23 :10.

22  Q.       Who are the part ies to  that call?

23  A.       Paulette  Martin and  Luis Mangual , Jr.

24  Q.       If we could play the call please.

25           (Audio recording begins playing at 10    :34 a.m. )

1                    (Audio recording stops playing at 10    :34

2  a.m.)

3          BY MS. JOHNSTON:

4  Q.      If you could also play call A11 on Page 15.

5  When did they have that call?

6  A.      This is the next day, March 10 at 12    :17, a

7  little after noon.

8  Q.      And the parties?  Are they the same parties?

9  A.      The same parties  Ms. Martin and  Mr. Mangual .

10  Q.     If we could play that  , please.

11          (Audio recording begins playing at 10    :35 a.m. )

12          (Audio recording stops playing at 10    :35 a.m. )

13          BY MS. JOHNSTON:

14  Q.     Based upon your train  ing and experience , can you

15  tell us , based upon the first conversation   , what  Ms.

16  Martin was discussing with   Mr. Mangual ?

17  A.      In Call B159 , she's ordering cocaine from

18  Mr. Mangual .

19  Q.     And w hat is the  code word she  is using to order

20  cocaine from  Mr. Mangual ?

21  A.      A box of envelopes.

22  Q.     Are you familiar with search warrants executed

23  at the residence of   Mr. Mangual ?

24  A.      Yes.

25  Q.     In terms of those  , based on your training and

1  experience and a review of those documents    , did you

2  form an opinion as to whether or not he was involved in

3  the station ary business?

4  A.       He was not.

5  Q.       What is the significance of the call the next

6  day at noon on March 10 of 2004?

7  A.       This is  Mr. Mangual  telling  Ms. Martin that he's

8  right behind her as she's driving to her house.       Larch

9  Avenue is the intersecting street for      Hayward .

10 Q.       That's based on your surveillance and your

11 familiarity with that location?

12 A.       Yes.

13 Q.       If we could go to the next call. A116    on Page

14 16.  Well, before we do that, if   I could ask you , let

15 me -- what's the code word in that conversation between

16 Mr. Mangual ?

17 A.       A box of envelopes.

18 Q.       And the page number?

19 A.       Fourteen .

20 Q.       Now , if we can go to the next call B    11 -- A116

21 on Page 16.  Now, that is an    A call.  What does that

22 mean?

23 A.       This is a call that was intercepted over the

24 cellular telephone used by    Ms. Mart in.

25 Q.       What date an d time is that?

1  A.        March 10, 2004 at approximately 1   :26 p.m, 13:26.

2  Q.        Is that approximately an hour and ten minutes

3  after the preceding call   ?

4  A.        Yes.

5  Q.        Who are the parties to this call?

6  A.        John Martin and  Paulette  Martin.

7  Q.        Now if we could play it please.

8            (Audio recording begins playing at 10   :38 a.m. )

9            (Audio  recording stops playing at 10   :39 a.m. )

10           BY MS.  JOHNSTON:

11 Q.        Okay.  Now, in regards to that call, did you

12 notice any error  s in the transcript?

13 A.        Yes.

14 Q.        What w as that?

15 A.        The second line from the bottom where the word

16 nickel is attribute  d to Paulette  Martin.   I don't hear

17 that.  I believe that should have been eliminate    d from

18 the transcript and it was   , but somehow it made it back

19 in.

20 Q.        Did you hear what she said instead of nickel?

21 A.        Just inaudible , I would leave it as.

22 Q.        Why do you use inaudible?

23 A.        A lot of times in conversations   , you just can't

24 make out what's being said  , so we use "unintelligible"

25 or "inaudible."

1  Q.      That call seemed to end abruptly  .  Can you

2  explain what happened with that?

3  A.      My guess is , and I don't know  --

4        MR. HALL:  Objection.

5        BY MS. JOHNSTON:

6  Q.      All right.  Was that something that the agents

7  did or something in terms of the call itself    ?

8  A.      It's just something with the cellular telephone.

9  It just ended.

10        MS. JOHNSTON:   Now, Your  Honor before we proceed

11  to the next call,  B197, we'd like to interrupt   Agent

12  Sakala's  testimony and call   Officer Sean Deere  to

13  testify as to surveillance that was conducted on March

14  10 of 2004.

15        THE COURT:  All right.  All right, you may.

16

17        (Witness excused from the stand at 10    :40 a.m. )

18        MS. JOHNSTON:   Your  Honor , just so the  Court is

19  aware , we will be calling agent   s to te stify with regard

20  to particular surveillances and recalling them if they

21  have additional surveillances.

22        THE COURT:  All right.

23  Thereupon,

24                        **SEAN  DEERE** ,

25  having been called as a witness on behalf of the

1  Plaintiff , and having been first duly sworn by the

2  Courtroom Deputy, was examined and testified as

3  follows:

4         THE CLERK:  Please be seated.    I need you to

5  state your name for the record.

6         THE WITNESS:   Detective Sean Deere.  S E A N,

7  D E E R E.

8         THE CLERK:   Thank you.

9                  **DIRECT   EXAMINATION**

10        **BY MS. GREENBERG:**

11 Q.     Sir, where are you employed?

12 A.     I'm employ ed with the Prince George's County

13 Police Department assigned to the   Major Narcotics

14 Section , currently assigned to   DEA Task Force Group 36.

15 Q.     Are you deputized?

16 A.     Yes .

17 Q.     You have the powers  , duties,  and

18 responsibilities of   a federal agent?

19 A.     Yes , I do.

20 Q.     How long have you been   employed  with the  Prince

21 George's County Police Department?

22 A.     For over 16 years.

23 Q.     Could you  give the jury some kind of idea of

24 your duties and responsibilities?

25 A.     I participate in federal narcotic

1 investigations , local narcotic investigations, have

2 done so for the past ten years.

3 Q.      How long have you worked in the narcotics?

4 A.      Since 1996.

5 Q.      What is your current assignment and    duties  and

6 responsibilities?

7 A.      Working with federal task force with the     Drug

8 Enforcement  Administration in   Washington out of the

9 Washington division office.

10 Q.     Where were you employ  ed in  March of 2004?

11 A.      With the  Prince George's  County  Police Major

12 Narcotics  Section.

13 Q.      Directing your attention back to    March of 2004 ,

14 did you have your own case assignments?

15 A.      Yes,  I did.

16 Q.      Were you also assigned to assist with an ongoing

17 investigation?

18 A.      That's correct.

19 Q.      That was in connection with    Detective  Eveler  and

20 Sergeant  Sakala  and others?

21 A.      That's correct.

22 Q.      What was the nature of the assistance that you

23 were called  on to  provide?

24 A.      We were assisting   Detective  Eveler , who's

25 assign ed to  the  Customs  Task Force , in relation to a

1 drug investigation   Title 3,  where he was intercepting

2 phone calls pursuant to a court order.

3 Q.       Was it just you or was there a lot of other

4 people?

5 A.       Myself and my squad were assigned to assist

6 Detective  Eveler  in surveillance and whatever other

7 assistance was need  ed.

8 Q.       When you say  Title 3  investigation, what are you

9 talking about?

10 A.       Title 3  investigation is a court order that

11 Detective  Eveler  obtained to investigate and intercept

12 phone calls from his main targets.

13 Q.       Specifically if you could go into detail    , what

14 would you and your squad do in order to assist him with

15 that?

16 A.       When he intercepted a phone call that was

17 pertinent to his investigation, we would be assigned to

18 go to a location, set up surveillance that coincided

19 with whatever phone calls he received.

20 Q.       How long did you -- how long was this assistance

21 provided?  Months?  Years?     Weeks ?

22 A.       His investigation was months.

23 Q.       Now , did you become familiar with the different

24 locations?

25 A.       Yes.

1  Q.      And did you become familiar with different

2  players?

3  A.      Yes, I did.

4  Q.      Did you ever get sent out to surveil 810      Hayward

5  Avenue in  Takoma  Park,  Maryland?

6  A.      That's correct.  Several times.  810      Hayward

7  Avenue was one of  Detective  Eveler's  main targets ,

8  which was  Paulette  Martin , seated right here on the

9  end.

10  Q.     Your  Honor may the record reflect -- could you

11  describe what she's wearing please?

12  A.      A pinstriped suit  , she has glass es.

13         MS.  GREENBERG:   Your  Honor , may the record

14  reflect that the witness has identif   ied  the defendant ,

15  Paulette  Martin?

16         THE  COURT:  Yes , the record will so indicate.

17         BY  MS.  GREENBERG:

18  Q.     When you say main target  , are you talking about

19  the  telephone s that you were  intercepting?

20  A.      Yes.

21  Q.      And certain targets -- certain telephones were

22  associated with   Ms. Martin?

23  A.      That's correct.

24  Q.      That's why you went to that address frequently?

25  A.      Correct.

1   Q.      Calling your attention to March 10, 2004.  Were

2   you asked to do surveillance at 810      Hayward  Drive on

3   that date?

4   A.      That's correct.  We were asked to do

5   surveillance .  We were sent to  Paulette  Martin's

6   address , and  I arrived to set up a surveillance van

7   approximately 11  :30 in the morning.

8   Q.      Could you explain to the jury what you saw --

9   let me back  you up .  What kind of vehicle did you go in

10  and how were you dressed and who was there?

11  A.      I was in a surveillance van with video cameras

12  so  I could film her address.

13  Q.      Who was in the van with you?

14  A.      I was by myself.

15  Q.      Were there other surveillance vehicles in the

16  neighborhood?

17  A.      Yes, they were strategically placed around the

18  neighborhood , but  I had the camera fil   ming .

19  Q.      Could you explain to the jury what kind of

20  hi-tech equipment we have here in the     DEA and with the

21  Immigration and   Customs  Enforcement?

22  A.      It's just a typical video camera that's placed

23  on top o f a van and we're able to film from inside.

24  Q.      When we see this surveillance, is there

25  something blocking your view a little bit?

1 A.      The camera's placed inside of a     -- like a vent,

2 and there's louvers  .  So when you zoom in , the louvers

3 will disappear , but if you zoomed out  , you would be

4 able to see the louvers.

5 Q.      So it appears as lines across the     --

6 A.      That's correct.

7 Q.      And did you have any better equipment to use

8 that day?

9 A.      No, that was the only equipment we had.

10 Q.      Not  hundreds  of thousands dollars   of cameras --

11 A.      No.

12 Q.      -- o r secret --

13         MR.  MONTEMARANO :  Objection , Your  Honor .

14         Relevance.

15         THE  COURT:  Sustained.

16         BY MS.  GREENBERG:

17 Q.      In any event , that's what you used that day?

18 A.      Correct.

19 Q.      Could you describe for the jury what you

20 observed while you were out at that location?

21 A.      Approximately 11 :30 I set the van up to

22 videotape, and  I observed a red  Mercedes pull up at

23 approximately 12 :22.  Paulette  Martin  was  driving a

24 Mercedes,  went inside of her residence   .  She parked the

25 vehicle out front and walked inside her residence.

1  Q.      What did you observe next?

2  A.      After that  --

3          MR. MITCHELL:  Objection , Your Honor.

4          He's reading .  I don't know what he's reading.

5          BY MS. GREENBERG:

6  Q.      Are you refreshing your recollection as to times

7  from your report?

8  A.      Yes.  This is my surveillance notes that were

9  taken that day.

10 Q.      Provided in dis covery to  counsel?

11 A.      Yes .

12         MR. SUSSMAN :  Objection.

13         MR. MITCHELL:   Your Honor, I don't believe that

14 we have established that he has no memory of the event.

15         THE COURT:  Why don't you lay a foundation as to

16 his memory.

17         BY MS. GREENBERG:

18 Q.      Do you remember the exact times that these

19 events occurred?

20 A.      Not off the top of my head exactly.  That's why

21 I wrote them down.

22 Q.      Do you remember the events?

23 A.      Yes.

24 Q.      When you say  "12:22," is that based on

25 refreshing your recollection from the notes?

1  A.      That's correct.

2  Q.      If you would  only refresh your recollection as

3  to times and recall the rest from your memory?

4  A.      Yes.

5  Q.      And if you don't remember something   , let us know

6  and I'll ask you to refer to your notes.

7  A.      Okay.

8  Q.      Thank you.  So could you tell the jury what

9  happened at 12 :22?

10 A.      12:22, Paulette  Martin parks her vehicle in

11 front of her address, gets out and goes inside.

12 Q.      Next?

13 A.      Approximately 13 :02 --

14        MR. MITCHELL:   Your Honor , I renew my objection .

15 He continues to read from something   , I can't see what

16 it is .  If he needs to refresh his memory, it's only if

17 he can't remember , and I think the state -- the

18 government has to establish that.

19        THE COURT:  Well, he's indicated at the precise

20 time he's looking for his note for the time of it     .  He

21 remembers if there's something at variance with that     ,

22 we'll deal with it.

23        BY MS. GREENBERG:

24 Q.      What happened next?

25 A.      At 13 :02 a red pickup truck    --

1 Q.      When you say 13 :02 -- military time  ?

2 A.      I'm sorry.  1 :02 in the afternoon  , a red pickup

3 truck pulls up out front that belonged to      Luis  Mangual .

4 Luis  Mangual  exits his pickup truck and walks into

5 Paulette  Martin's residence.

6 Q.      Now, if  I could take you back to your

7 observations.  What type of truck was it?

8 A.      It was a red pickup.

9 Q.      And did you know about this person      Mangual

10 through your investigation?

11 A.      That's correct .  He was one  of  Detective

12 Eveler's  other main targets.

13 Q.      And did you see anything with     Mr.  Mangual ?

14 A.      Yes.  Mr.  Mangual  exited his pickup truck

15 carrying a paper bag  , shopping type bag  , and walked

16 into the house.

17 Q.      How long did he stay in the residence?

18 A.       If  I may look at my notes for the times.  He

19 walked in at 1 :02 and he exit ed the residence at 1 :27.

20 Q.      That's approximately 25 minutes; is that

21 correct?

22 A.      That's correct.

23 Q.      Have you had occasion to review what's been

24 marked for purposes of these proceeding     s as V -1, a

25 videotape ?

1  A.       Yes, I have.

2          MS. GREENBERG:   With t he Court's permission , may

3  I play  the videotape ?

4          THE COURT:  You may.

5          MS. GREENBERG:   Your Honor , this is new

6  equipment , so I might have to stop  .  I'm not sure what

7  the sound is do ing, but  I think they tr ied to  fix that.

8          THE  COURT:   I'll pray for you.

9          MS. GREENBERG:  If  I could just warn everyone  ,

10  there might be a loud   noise .

11          BY MS. GREENBERG:

12  Q.       What are we looking at here?

13  A.       That's Luis Mangual's  pick up.  He pulls up  right

14  behind Paulette Martin's red  Mercedes a nd he pulls away

15  and pulls in front of her   Mercedes.

16  Q.       Are those the louvers you were talking about?

17  A.       Correct. When the  cameras zoom in and out , you

18  can see the louvers .  But when you zoom in , they

19  disappear.

20  Q.       Were you able to get the number on the truck

21  there?

22  A.       That's correct .  His tag number is , if I may

23  look at my notes , 30N 5 91, which is register ed to Luis

24  Mangual .

25  Q.       What state?

1  A.       Maryland.

2           That audio is my radio    when  I keyed up the

3  frequency.

4  Q.       What are we looking at here?

5  A.       This is  Luis Mangual  getting out of his truck

6  with a shopping bag and he walks into     Paulette  Martin's

7  residence.

8  Q.       That's the shopping bag you spoke about earlier?

9  A.       That's correct.

10 Q.       And which entrance does he walk up to?

11 A.       He goes into the side entrance.

12 Q.       Were you familiar with that side    entrance

13 through your investigations?

14 A.       That's correct .  That was the entrance that

15 Paulette  Martin used.

16 Q.       How long did you say he was in there?

17 A.       Approximately  25 minutes.

18 Q.       I'm going to fast forward.  Did you observe

19 anyone in the vehicle with him?

20 A.       No , I did not.

21 Q.       Anyone come in on or out of the residence at the

22 time that you observed him?

23 A.       No.

24 Q.       During the course of your surveillance   , had you

25 seen anyone else driving that red    Mercedes that you

1  observed in front of the house?

2  A.      Yes.   Paulette  Martin's husband or boyfriend,

3  John  Martin.

4  Q.      During the course of your surveillance, h    ad seen

5  anyone else  driving  the red  Mercedes ?

6  A.      No ,  I haven't.

7  Q.      Did you see anyone driving it on that day?

8  A.      No.

9  Q.      Who normally drove the red    Mercedes?

10  A.      Paulette  Martin.

11  Q.      From your observation,    about  what time was

12  Mr. Mangual  leaving the house?

13  A.      He left at 1 :27.

14  Q.      Now, your time here  , is that cued up to any

15  other times , the wiretap times, watch time?

16  A.      It's probably right, you know it's a good time    ,

17  but  I'm not sure if you know the time on my watch was

18  the same as this or.

19  Q.      Through the whole investigation    , did you key up

20  the time s to everything?

21  A.      I'm not sure if they did or not.

22  Q.      Could be a minute or two off?

23  A.      They could be seconds off probably.

24  Q.      Please tell us when you see your next

25  observation from your surveillance on March 10, 2004.

1          Was that your radio   again?

2  A.     Yes.

3          Like  I said, at 1 :27, this is  Luis  Mangual

4  exiting  Paulette  Martin's residence with a shopping bag

5  walking back to his pickup truck.

6  Q.     How does that shopping bag compare with the

7  shopping bag he walked in with?

8  A.     It's the identical shopping bag.

9  Q.     What happens next?

10 A.     He gets in his pickup truck and drives away.

11 Q.     Approximately what time did you terminate

12 surveillance on that date?

13 A.     Approximately 2 :30 in the afternoon.

14 Q.     Did you observe any other activity at the house?

15 A.     No, not that day.

16         MS. GREENBERG:   Your Honor,  I have no further

17 questions for  Mr. Deere .

18         THE  COURT:  Cross-examination   ?

19         MR. MONTEMARANO :  Thank you,  Your Honor.

20                    **CROSS-EXAMINATION**

21         **BY MR. MONTEMARANO :**

22 Q.     Ms. Greenberg was mak   ing a bit of a deal about

23 the time ; correct ?

24 A.     Correct.

25 Q.     If  I understand your testimony correctly    , you

1 did not synchronize your    VCR with your watch with any

2 other whatever clocks were used in the wiretap, et

3 cetera; correct?

4 A.      I'm not sure.

5 Q.      That's a yes or  no question , Detective.  You

6 didn't , did you?

7 A.      I did not, no.

8 Q.      Thank you.

9        And you said you were not sure if it was done by

10 anybody else ?

11 A.      Correct.

12 Q.      But the fact is the time isn't a big deal.      I

13 mean , let's as sume  for the sake of discussion you

14 testified that   Mr. Mangual  arrived at two minutes after

15 1:00 .

16 A.      Yes.

17 Q.      And left at 27 after  ?

18 A.      Correct.

19 Q.      Now, you're clear that the time in between

20 wouldn't vary .  It could have been , let's say,  12:57 ,

21 five minutes before that that he arrived  , for the  sake

22 of discussion if your clock on the    VCR was wrong?

23 A.      If the clock on the   VCR was wrong , but it's not

24 wrong.

25 Q.      So the answer is yes  ?

1          MS. GREENBERG:  Objection.

2          THE COURT:  Sustain ed.

3          BY MR. MONTEMARANO :

4  Q.     If he arrived at  12:57, then he would have left

5  at 1:22 approximately, 1  :23 because he left at --

6          MS. GREENBERG:   I'm going to object to the

7  hypothetical nature of   Mr. Montemarano 's question .

8

9          THE COURT:  W ell, let him get the whole question

10 out.   I haven't heard the whole question.

11          Start your question over  .  Let me get the whole

12 question.

13          BY MR. MONTEMARANO :

14 Q.     If the clock s were wrong and he arrived at   ,

15 let's say , 12:57, five minutes earlier  , then he would

16 have left on that time frame at about    1:22; is that a

17 fair statement ?

18          MS. GREENBERG:  Objection.

19          THE COURT:  Overruled.

20          THE WITNESS:  Mathematically?  Sure.

21          BY MR. MONTEMARANO :

22 Q.     Okay.  I wanted t o establish that.  The fact is

23 that he was there , whether  it was 12:57 or 1 :02, that

24 he arrived  there.  He was there for about 25 minutes;

25 correct?

1 A.      Correct.

2 Q.      That's enough time to share a meal; correct?

3 A.      Sure.

4 Q.      It's enough time to do a lot of different

5 things; correct?

6 A.      Correct.

7 Q.      When he walked in , he had a shopping bag in his

8 hand; correct?

9 A.      Correct .

10 Q.      When he walked out , he had what appeared to   you

11 to be the same shopping bag; correct?

12 A.      That's correct.

13 Q.      You didn't go over and inspect it in his hands    ,

14 so you don't know   --

15 A.      That's correct.

16 Q.      Could have been a different one from where you

17 were sitting ; correct?

18 A.      That's correct.

19 Q.      If my eyes were looking at   the video , you're

20 about 30 , maybe even 40 yards from   Mr. Mangual , a good

21 100 feet ?

22 A.      One hundred feet , yes.

23 Q.      And maybe eve n a little further because he   , at

24 some point , sort of moves distance -- moves to a

25 greater distance from you in the field of vision

1 because you see him , in the film , shrink.

2 A.      We were pretty paral lel.  He walked across.

3 Q.      No , I'm not talking he didn't go from 100      feet

4 to a mile , he went from 100   feet  to maybe 120   feet .

5 A.      That could be fair.

6 Q.      Yeah , maybe he walked around the back of the

7 truck .   He was  90 feet away; correct?

8 A.      Correct.

9 Q.      So at all times , he was good distance away.

10 A.      Define "good distance ".   One hundred feet  is 100

11 feet .

12 Q.      Good enough dis tance  that you could n't be

13 absolutely positive it was the same bag    ; right?

14 A.      It appeared to be the same bag.

15 Q.      It appear ed to be the same bag , and you  could n't

16 be positive  it was the same one ; right?

17 A.      Correct.

18 Q.      So Ms. Martin entertained a visitor in the

19 afternoon at her home on March 10   ; right?

20 A.      That is correct.

21 Q.      2004 ?

22 A.      Correct.

23      MR. MONTEMARANO :  No further questions.

24      MR. MARTIN:   Mr. Goodwin has no questions for

25 this witness , Your Honor.

1          MR. HALL:  No questions , Your Honor.

2          MR. MITCHELL:  Just one question.

3                    **CROSS-EXAMINATION**

4          **BY MR. MITCHELL:**

5  Q.      Following up on the time.  The time that we saw

6  on there , how is that time actually input into the

7  device that you have?

8  A.      Just like your typical video camera.  It's

9  stamped in the video camera  , so you turn the camera

10 off , turn it back on , the time is still going to be

11 correct.

12 Q.      Who did that?

13 A.      At the factory.

14 Q.      The factory input that time?

15 A.      Well , I'm sure on video cameras  , you can pick ,

16 you know , eastern standard time, whatever it is and

17 it's already in there  .  I don't physically put the time

18 in each time  I turn it on.  It's there.

19 Q.      Okay.  Thank you very much.

20         MR. MITCHELL:  No further questions .

21         MR. WARD:  No questions , Your Honor .  Thank you .

22         MR. SUSSMAN :  Just a couple if  I can, sir.

23                    **CROSS-EXAMINATION**

24         **BY MR. SUSSMAN :**

25 Q.      Good morning , Officer.

1  A.        Good morning.

2  Q.        You testified that on March 10, 2004    , you did

3  about three hours of surveillance at 810      Hayward ;

4  correct?

5  A.        That's correct.

6  Q.        Okay.  Do you recall    how times you did

7  surveillance at the    Hayward  Street address?

8  A.        Not exactly.  Several time   s.

9  Q.        Several times , and off the top of your head    , you

10 don't recall the other dates   , I would imagine.

11 A.        I recall one, March 12.

12 Q.        But the other dates that you were there or how

13 long you were there  ?

14 A.        I'd have to refer to my surveillance notes.

15 Q.        And on other particular dates   , you don't recall

16 who came and went; is that right?

17 A.        On the other days?

18 Q.        Yes.

19 A.        I recall some other people that came and went.

20 Q.        You wouldn't recall the times and the amounts of

21 time that they stayed; is that correct?

22 A.        I would.   I wrote them on my surveillance    list.

23 Q.        That's the next question   I want to  ask you.

24           You were run ning a videotape at least on March

25 10; correct?

1  A.      Yes, I was.

2  Q.      But although the videotape records everything    ,

3  you're also taking notes of what's    going on?

4  A.      Sometimes, yes.  Usually    I take notes in my

5  notebook.

6  Q.      It's kind of a log , just for example , at 18 :40,

7  military time , so-and-so walked in , and you describe

8  them or name them , if you know them ; right?

9  A.      Correct.

10 Q.      And you use those as a reference in terms of

11 later testimony if need be, right?

12 A.      That's correct.

13 Q.      Because it's  -- although we talk about

14 refreshing recollection , it's very hard to remember the

15 exact time of thing  s that happened two years ago.

16 A.      That is correct.

17 Q.      And you lean heavily on your written notes to

18 help you remember what occurred; is that right?

19 A.      I lean partially on my written notes.     I

20 remember what occurred  , but the exact times are hard to

21 remember  without logically looking.

22         MR. SUSSMAN :  I have  nothing for the defendant   .

23         MR. McKNETT :  Your Honor , may I consult with  Mr.

24 Montemarano  just for a second  ?

25         THE  COURT:   Yes .

1          MR. McKNETT:  No questions, Your Honor.

2          MS. GREENBERG: We would   excuse this witness  at

3   this time,  but if he would remain close  , there are a

4   few more calls from the March 12 surveillance.

5

6          THE WITNESS:  Y ou may step down.

7              (Witness excused at 11  :03 a.m. )

8              (Witness  resumes the stand  at 11:04 a.m. )

9              **FURTHER  DIRECT  EXAMINATION**

10       **BY MS. JOHNSTON:**

11   Q.     Sergeant  Sakala , when we left off  , we had just

12   played  A116 , which took place at 13  :26, 13:27 hour s.

13   You have a  had chance to review the video that has been

14   introduced into evidence  , the surveillance that

15   occurred and concluded at about 13    :27 hours on that

16   same date ?

17   A.     Yes.

18   Q.     Did you identify the people -- did you identify

19   the individual observed in that video?

20   A.     Mr. Mangual .

21   Q.     Did you form an opinion based upon your training

22   and experience on the content of the calls that -- the

23   two call s that we 've discussed before you left the

24   witness stand as to what   Mr. Mangual  was doing at the

25   residence on March 10 of 2004 at roughly between 11     :30

1  in the afternoon?

2  A.      Yes.

3  Q.      What is your opinion  ?

4  A.      He was delivering a kilogram of cocaine to

5  Ms. Martin.

6  Q.      What is that based upon?

7  A.      The conversations and the surveillance.

8  Q.      Now , if we could now proceed to the next

9  telephone  Call B197 on Page 17.

10         Does that call , likewise , take place on  the same

11 date?

12 A.      Yes.

13 Q.      Who are the parties to that call?

14 A.      John Martin and  Paulette  Martin.

15 Q.      Approximately what time does the call start?

16 A.      1:54 p.m.

17 Q.      What time does it end?

18 A.      2:17 p.m.

19 Q.      So that's roughly a 23  -minute call; is that

20 correct?

21 A.      About that, yes.

22 Q.      Are we going to listen to the entire call here?

23 A.      No.

24 Q.      There's a reference in the transcript that notes

25 transcribed from 12  :12 to 12 :57 .  Can you explain   to us

1 what that is?

2 A.      That's the time   into the call , 12 minutes  and 12

3 seconds , that the transcript starts and 12 minutes      and

4 57 seconds that the transcript ends.

5 Q.      That's  not  the time of the day  , but the  time

6 into the call where the transcript begins    ?

7 A.      Yeah.  That represent  s the duration.

8 Q.      If we could play the call, please.

9       (Audio recording begins playing at 11    :06 a.m. )

10       (Audio recording stops playing at    11:07 a.m.)

11       BY MS.  JOHNSTON:

12 Q.      Based upon your training and experience    , were

13 there any code words used during that conversation?

14 A.      Yes.

15 Q.      What were those code words?

16 A.      T-shirt beginning on the first line.

17 Q.      What page is that?

18 A.      Seventeen .

19 Q.      Is there a particular type of    T-shirt ?

20 A.      There are two referenced in the transcript as a

21 starched  T-shirt an d a Downy T-shirt.

22 Q.      Based on your training and experience    , does that

23 have any significance to you?

24 A.      Yes.

25 Q.      Could you explain the significance of those two

1  terms?

2  A.      The starched  T-shirt would refer to a hard

3  substance , that being starch making a shirt hard    , would

4  refer to crack cocaine  , which is a hard substance, rock

5  hard.

6           The  Downy T-shirt , which would refer to the

7  fabric softener , would refer to a softer    T-shirt , and

8  that would refer to powder cocaine    , which is softer and

9  a powdery consistency.

10  Q.      Is that what  I recorded there on your chart?

11  A.      Yes.

12  Q.      In addition to that, based on your training and

13  experience and listening to that conversation, did you

14  form an opinion as to another portion of that

15  conversation?

16  A.      Yes.

17  Q.      Could you explain what it was about the

18  conversation and what your opinion is    ?

19  A.      The portion , I guess a little over halfway

20  through the transcribed portion   , where  John  Martin

21  refers to the boy , he's instructing  Ms. Martin to bring

22  heroin as well as the crack and the powder cocaine.

23  Q.      In listening to that call, what if any    ,

24  observations did you make in terms of his manner of

25  speech?

1 A.      He was fumbling with the words, stuttering,

2 trying to get his --

3         MR. SUSSMAN: Objection.

4         I think that's beyond the scope of the

5 expertise.

6         THE COURT: Well, rephrase your question.

7         BY MS. JOHNSTON:

8 Q.      What are some of the things you look for as an

9 individual with your background an d training and

10 looking -- listening to conversations to determine

11 whether or not it may be related to drug distribution    ?

12         MR. SUSSMAN: Same objection.

13         I don't think there's any kind of foundation for

14 that, Your Honor.

15         THE COURT: Overruled.

16         THE WITNESS: The flow of the conversation where

17 people seem to be searching for words to say.

18 Stuttering, having a hard time getting their point

19 across to the other person  , and that's what it appears

20 Mr. Martin is doing in that line.

21         BY MS. JOHNSTON:

22 Q.      Based upon your training and experience    , what's

23 the significance of that?

24 A.      That he's speaking in coded con  versations  about

25 drugs.

1  Q.      What was the word that you indicated referred to

2  heroin?

3  A.      Boy is referring to heroin.

4  Q.      Based on your training and experience   , is that

5  an unusual term to be used for the drug heroin?

6  A.      No, it's a very common term.  Boy refer   s to

7  heroin, girl is cocaine, and it's probably something

8  I've seen in just about every wire I    've ever been on.

9  Q.      On that afternoon after   Mr. Mangual left , was

10 there also a conversation with   Mr. Bynum ?

11         If you could turn to A123 on    Page 18.

12 A.      Yes.

13 Q.      Approximately what time did that conversation

14 take place?

15 A.      3:02 p.m. on the  10th.

16 Q.      If we could play that call, please,    Page 18,

17 A123.

18         (Audio recording begins playing at 11    :11 a.m. )

19         (Audio recording stops playing at 11    :11 a.m. )

20         BY MS. JOHNSTON:

21 Q.      Based on your training and experience    and the

22 pattern of these calls , was there any  significant  to

23 you as a drug investigator as to that conversation?

24 A.      Yes.

25 Q.      Could you explain the significance?

1 A.        Ms. Martin had just received a load of cocaine

2 from Mr. Mangual , and in this conversation she's

3 relating it to  Mr. Bynum that that's what she's got.

4 Q.        That would be through what phrase?

5 A.        I just called to say everything's okay.

6 Q.        Based on your training and experience    , the -- do

7 you have an opinion in terms of the length of calls or

8 communications that occurred between people engaged in

9 drug trafficking?

10 A.        Generally , you're going to find short

11 conversations.  That's not always the rule, but

12 generally conversations about drugs   , especially people

13 who do not have social relationship with each other      ,

14 are generally going to be short and to the point.

15 Q.        Based on your training and experience    , people

16 who have a social   relationship  with each other, the

17 portion of the conversation that has to do with drugs;

18 is that lengthy or short?

19 A.        No.  The part about -- could have a ten    -minute

20 call talking about the baseball game    , but the portion

21 dealing with drugs , if there is a portion  , that will be

22 a very short part of the conversation.

23 Q.        Based on your training and experience    , why is

24 that?

25 A.        For fear of interception.  You're not going the

1  talk on the phone for a long period of time about

2  something illegal.

3  Q.      And after this conversation with    Mr. Bynum , was

4  there another call a few moments later?

5  A.      Yes.

6  Q.      Calling your attention to    Page 19 and   Call B204.

7  Who are the par ties to that call?

8  A.      George  Harris and  Paulette  Martin.

9  Q.      If you could play that, please.

10         (Audio recording begins playing at 11   :13 a.m. )

11         (Audio recording stops playing at 11   :13 a.m. )

12         BY MS.  JOHNSTON:

13  Q.      Based upon your training and experience, this

14  call in isolation  , does it have any particular drug

15  meaning ?

16  A.      If it was just this call by itself,    I would say

17  no.

18  Q.      Are there a series of calls between     Mr. Harris

19  and Ms. Martin?

20  A.      Yes.

21  Q.      If we could go to the next call on Page 20,

22  A136.  Now are there a   series of calls involving the

23  parties that are in   A136 ?

24  A.      Yes.

25  Q.      Who are the parties in these calls?

1  A.       In this particular call  , it's Paulette  Martin's

2  voice mail and Johnnie Mae S   hort.

3  Q.       If we could begin by playing    A136 on Page 20.

4           (Audio recording begins playing at 11    :14 a.m. )

5           (Audio recording stops playing at 11    :15 a.m.)

6           BY MS. JOHNSTON:

7  Q.       If we could play the next call, B243 on Page 21.

8  What time does this call take place in relation to the

9  message that was just left?

10 A.       This was at 20 :50 hours , the first one -- 8 :50

11 p.m. and the first one was at 7  :45 p.m.

12          MS. JOHNSTON:  If we could play B244    .

13          (Audio recording  begin s playing at   11:15 a.m. )

14

15          (Audio recording stops playing at 11    :15 a.m. )

16          BY MS. JOHNSTON:

17 Q.       If we could go to   B247 , which is on Page 24.

18          What time is that in relation to the

19 conversation we just heard?

20 A.       This one is at 9  :06 p.m ., which is about six

21 minutes after the one we just heard.

22 Q.       Excuse me ?

23 A.       About six minutes after the one we just heard.

24 Q.       If we could play  B247.

25          (Audio recording begins playing at 11     :16 a.m. )

1          (Audio recording stops playing at 11    :16 a.m. )

2          BY MS.  JOHNSTON:

3  Q.      Finally if we could play    B248 , which is on   Page

4  26.  Likewise , does that call occur on March 10?

5  A.      Yes, at 9 :15 p.m.

6  Q.      Roughly less than ten minutes later?

7  A.      Yes.

8          (Audio recording begins playing at 11    :17 a.m. )

9          (Audio recording stops playing at 11    :17 a.m. )

10         BY MS.  JOHNSTON:

11 Q.      Based on your training and experience    , did you

12 form an opinion as to what was discussed and what took

13 place between   Ms. Short and   Ms. Martin that night?

14 A.      Yes.

15 Q.      Tell the ladies and gentlemen of the jury what

16 that is.

17 A.      Ms. Short called   Ms. Martin, ordered drugs   , and

18 then  went over the to house and picked them up from

19 her.

20 Q.      What was the term used for drugs?

21 A.      One ticket.

22 Q.      On what pages did we see that?

23 A.      It's on Page s 20 and  21.

24 Q.      Now, there is also -- were you familiar    , based

25 upon surveillance at that location    , as to who was

1  residing at  Hayward ?

2  A.       I'm sorry?

3  Q.       Are you familiar with  , based on your

4  surveillance , as to who actually resided at the      Hayward

5  Avenue address during the time of the wiretap?

6  A.       Yes.

7  Q.       Who resided there?

8  A.       When we initially went up  , it was  Ms. Martin who

9  resided in the lower part of the residence and

10  Jacqueline  Terrell  who resided in the ups  tairs  portion

11  of the upper part , and then  during  the wire , John

12  Martin moved into the basement with     Ms. Martin.

13  Q.       So when you say   "the lower part ," you're

14  referring to the basement?

15  A.       That's correct.

16  Q.       Now , if you could write the page numbers down on

17  the board next to the word ticket.

18  A.       (Witness indicating.  )

19  Q.       If we could go back to    Call B244 on  Pages 22  and

20  23.  Who are the parties to this telephone

21  conversation?

22  A.       This is  Paulette  Martin and  Lavon  Dobie.   Becky.

23  Q.       Again , is this just a portion  of the  call that

24  we're hearing?

25  A.       That's correct.

1  Q.      How long was the entire call?

2  A.      Took place from 8:57 p.m. to 9:01 p.m., about

3  four minutes.

4          THE COURT:  What call number is this?

5          MS. JOHNSTON:  Call B244 on Page 22,  Your Honor.

6          THE COURT:  Thank you.

7          MS. JOHNSTON:  If we could play it please.

8          (Audio recording begins playing at 11:19 a.m.)

9

10         (Audio recording stops playing at 11:20 a.m.)

11         BY MS. JOHNSTON:

12 Q.      On Page 23, where  Ms. Dobie says, okay, so we've

13 done already talked, so I'll be able to come in and

14 out.  Based upon your training and experience, is that

15 a significant statement?

16 A.      Yes.

17 Q.      Could you explain the significance?

18 A.      She's telling her, I'm going to be able to come

19 over, get my drugs, and get out because we 've already

20 talked.

21 Q.      If we could turn to  B273, which is on  Page 27.

22 Who are the parties to this conversation?

23 A.      Paulette Martin and  Ruby Harden.

24 Q.      Are there -- what date does it take place?

25 A.      March 11 of 2004.

1  Q.      Are there a series of calls that take place

2  related to the first call,   B273?

3  A.      Yes.

4  Q.      Okay.  If we could play it   , we'll play those

5  series of calls  , then I ask you some questions

6  beginning with  B273 on Page 27 .

7            (Audio recording begins playing at 11   :21 a.m. )

8            (Audio recording stops playing at 11    :21 a.m. )

9            MS. JOHNSTON:  If we could play   B274 on Page 29.

10           (Audio recording begins playing at 11   :23 a.m. )

11           (Audio recording stops playing at 11   :23 a.m. )

12           MS. JOHNSTON:  Then if we could proceed to     Call

13 B305 on Page 3 4.

14           (Audio recording  begins playing at 11 :23 a.m. )

15           (Audio recording stop  s playing at 11 :24 a.m.)

16           MS. JOHNSTON:  And then if we can proceed to

17 call B306 on  Pages 36 and 37.

18           (Audio recording begins playing at 11   :25 a.m. )

19           (Audio recording stops playing at 11   :25 a.m. )

20           MS. JOHNSTON:  If we go could go to the next

21 call, B319 on  Page 38.

22           (Audio recording begins playing at 11   :25 a.m. )

23           (Audio recording stops playing at 11   :25 a.m. )

24           BY MS. JOHNSTON:

25 Q.      Who are  the parties to this call  ?

1  A.        Ruby Harden  and Paulette  Martin.

2  Q.        There's conversation in there by    Ms. Martin

3  about waiting for her    boss and calling her    boss in

4  reference to   Danker's  Furniture .  Do you recall those

5  references?

6  A.        Yes.

7  Q.        In reviewing the intercepted calls    , in between

8  these cal ls, were there any calls w   hen Ms. Martin

9  called someone identified a    s her boss or someone at

10  Danker's?

11  A.        No, she didn't talk to anybody.

12  Q.        And based upon your training and experience,

13  what is  Ms. Martin and   Ms. Hard en trying to   arrange --

14  what is  Ms. Hard en trying to   arrange with   Ms. Martin

15  here.

16  A.        Ms. Harden  is try ing to  arrange to meet   Ms.

17  Martin .  Through the series of calls    , they  eventually

18  decide to -- that   Ms. Harden  is going to park at a

19  shopping center  , go to a shopping center near     Ms.

20  Mart in's residence , and  Ms. Martin will meet her there.

21  Q.        When she make s a reference where she can't get

22  down in there , do you know what that refer   s to ?

23  A.        She's driv ing a  tractor -trailer and she can't

24  get the tractor  -trailer down into the neighborhood.

25  Q.        Now if we could go to call    B279 on Page 30.

1            (Audio recording begins playing at 11    :27 a.m. )

2            (Audio recording stops playing at 11    :27 a.m. )

3       BY MS. JOHNSTON:

4   Q.      Now, did you recognize those voices?

5   A.      Yes.  It's  Paulette  Martin and  Milburn  Walker.

6   Q.      The same  Milburn  Walker you identified in one of

7   the earlier calls we played yesterday?

8   A.      Yes.

9   Q.      There's a reference to   Ms. Martin leaving that

10  evening to go to   Philly .  Based upon your review of

11  this call and then later cal   ls, you determine whether

12  or not  she actually left an  d went to  Philly ?

13  A.      No.  There was no indication that was true.

14  Q.      Now , if we could go to the next call,   B289 on

15  Page 31.  Who are the parties to this conversation?

16  A.      This is  Learley  Goodwin and  Paulette  Martin.

17  Q.      Did you , in reviewing them over the past few

18  days , notice any corrections you   'd like to make to the

19  transcript?

20  A.      Yes.

21  Q.      Could you tell us what that is?

22  A.      In the middle of that long paragraph on Page 31    ,

23  you will see a " UI," which stands for unintelligible    .

24  That should say " Becky."

25  Q.      Is it -- based on your experience, is it unusual

1  for you to make changes right up to the time you

2  testify?

3  A.      We've been through -- excuse me.    I know I've

4  been through these transcripts so many times    , and they

5  probably, on their fourth or    fifth, at least, review.

6  I hate to say it , but you still find  , you know , small

7  things that you miss.

8  Q.      If we could play   B289 on Page 31.

9         (Audio recording begins playing at 11    :29 a.m. )

10        (Audio  recording s tops playing at 11  :32 a.m. )

11        BY MS. JOHNSTON:

12 Q.      Now, the  Tony referred to in this call   , did you

13 identify who the   Tony was?

14 A.      Yes.

15 Q.      Who was it?

16 A.      Anthony Hall .

17        MR. WARD:  I'm sorry , Counsel , could you keep

18 your voice up , please ?

19        THE COURT:   I didn't hear the answer.

20        BY MS. JOHNSTON:

21 Q.      What was your answer?

22 A.      Anthony Hall.

23 Q.      In this conversation or on Page 31   , this long

24 litany from  Ms. Martin, what is she referring to when

25 she refers to her brother's case getting thrown out and

1  --

2  A.      She's talking about his arrest in    Prince

3  George's  County in  November of 2003.

4  Q.      In terms of relaying the conversation about     Tony

5  or Mr. Hall, what was    Mr. -- what was she   telling Mr.

6  Goodwin in regards to    Mr. Hall?

7  A.      Ms. Martin is telling   Mr. Goodwin that  Mr. Hall

8  told  Ms. Martin that if   Mr.  Goodwin had to go to jail,

9  in other words, step back for a minute because of his

10 case in  November of 2003 in    Prince  George's  County,

11 then  Mr. Hall would take care of   Mr.  Goodwin's business

12 while  Mr. Goodwin was in jail, if that's clear.

13 Q.      What is the reaction of    Mr.  Goodwin ?

14 A.      He laughs because   Ms.  Hall -- excuse me  ,

15 Mr. Martin --   Ms.  Martin tells  Mr.  Goodwin  that if he

16 actually said that  , he's going to put   him in  St.

17 Elizabeth's, which is   a psychiatric facility  , that if

18 he actually said  , that that's where   Mr.  Goodwin

19 belongs.

20 Q.      And the reference to my brother.  Who was

21 Ms. Martin referring to?  It's on Page 32    .

22 A.      Mr.  Goodwin .  They refer to each other as

23 brother and sister.

24 Q.      Does that occur throughout the wiretap?

25 A.      Yes .

1  Q.      There's also reference to    Becky and  J.R.  Do you

2  know who those individuals are?

3  A.      Yes.

4  Q.      Okay.  Who are they?

5  A.      I believe  J.R. is  J.R. Rice and  Lavon  Dobie.

6  Q.      Now, you used a phrase -- you refer to the

7  phrase , step back for a minute  .  Based on your training

8  and experience w  , hat does that refer to?

9  A.      That's a common --   I don't know if it's a street

10 slang.  Being stepped back means being put in prison        ,

11 put in jail.

12 Q.      And then there's a reference to that trigger on

13 that hammer.  Based on your training and experience       ,

14 does the term hammer have any significance?

15 A.      It's trigger on a gun  , to keep from pulling the

16 trigger on the gun that she had with her.

17 Q.      Now, on Page 33 , there is a reference to    Cuba.

18 A.      Yes.

19 Q.      Who was  Cuba?

20 A.      Cuba was the individual that we talked about

21 yesterday purchasing the drugs from     Mr. Goodwin  and  Ms.

22 Martin.

23 Q.      That was in the call reference to sweet potato

24 pie or half a sweet potato pie?

25 A.      That's correct.

1  Q.       Now, if we could go to   Call B336 .

2           THE  COURT:   Ms. Johnston , would this be an

3  appropriate time to take a recess   ?

4           MS. JOHNSTON:  It would indeed  , Your  Honor.

5           THE  COURT:  All right  .   We'll recess until ten

6  minutes of 12 :00 .

7                    (Jury excused at 11:36 a.m.)

8                    (Off the record at 11:36 a.m.)

9                    (On the record at 11:52 a.m.)

10          MS. JOHNSTON:   Your  Honor, it's the government's

11 intent to have   Sergeant  Sakala's  stay in the courtroom

12 while the surveillance officers are testifying.       I

13 wanted to put that on the record   .

14          MR. MONTEMARANO :  That would be part of that

15 continuing objection thing.

16          THE  COURT:   I believe it's appropriate that he

17 stay in the  courtroom .

18          THE  CLERK:  Judge, are you ready for the jury   ?

19          THE  COURT:  Yes.  Bring them in.

20                    (Jury returns  at 11 :56 a.m. )

21          THE  COURT:  A ll right,  you may proceed.

22          BY MS. JOHNSTON:

23 Q.      Detective  Sakala , in addition to the calls with

24 Ms. Harden and  Mr. Walker , were there calls on April 11

25 between  Derrick  Bynum  and Paulette  Martin?

1  A.      Yes.

2  Q.      Now, there were a series of call    s that begin on

3  March 11, at roughly 9  :20 in the evening  .

4  A.      Yes.

5  Q.      Calling your attention to    B336, Page 39.  If we

6  could play that call   , please.

7          (Audio recording begins playing at 11    :57 a.m. )

8

9          (Audio recording stops playing at 11    :57 a.m. )

10         BY MS. JOHNSTON:

11 Q.      Now, if we could go to the next call, B341.

12 That  occur s how many minutes after the call we just

13 listened to?

14 A.      About five minutes  ; 9:25 p.m.

15 Q.      If we could play B341.

16         (Audio recording begins playing at 11    :58 a.m. )

17         (Audio recording stops playing at 11    :58 a.m.)

18         MS. JOHNSTON:   Can we play B342 on Page 43?

19 That's less than ten minutes later?

20         (Audio recording begins playing at 11    :59 a.m. )

21         (Audio recording stops playing at 12    :00 p.m. )

22         MS. JOHNSTON:  And  B346 on Page 44, two minutes

23 later .  If we could play that call.

24         (Audio recording begins playing at 12    :00 p.m. )

25

1            (Audio recording stops playing at 12    :00 p.m. )

2       BY MS. JOHNSTON:

3  Q.     Who are the parties to those calls?

4  A.      Paulette Martin and Derrick Bynum .

5  Q.     Based upon your training and experience    , did you

6  form an opinion as to what they were discussing?

7  A.      Yes.

8  Q.      What is that opinion?

9  A.      They were making arrangements for     Mr. Bynum to

10 purchase cocaine from   Ms. Martin.

11 Q.      Could you point out what it was about the

12 various conversations that led you to that conclusion?

13 A.      Yes.  In the first call on    B336 , Mr. Bynum

14 refers -- is telling her   I'll -- you know what   I'll be

15 telling to get me, right?  She says she'll call him

16 back.  The next call on Page 41   , Ms. Martin refers to

17 the amount as being the $62 that    I usually loan you.

18 Sixty-two  is a common term for 62 grams of crack

19 cocaine.  A 62 is a very common street term.

20         She says she has to check and make sure that she

21 has it, and the next call, 342   , she -- Ms. Martin tells

22 Mr. Bynum that she does have it and that     Mr. Bynum says

23 he'll get it  in the morning .  And then the final call

24 on 346 , Ms. Martin just tells   Mr. Bynum  that she will

25 be leaving by quarter of    9:00 in the morning , so he has

1  to come before that.

2  Q.      What did you do as a result of those series of

3  telephone calls?

4  A.      Set up surveillance the next morning on    Ms.

5  Martin's residence.

6  Q.      Were you persona lly involve d in  that

7  surveillance?

8  A.      Yes, I was.

9  Q.      Can you tell us approximately what time you

10  arrived there?

11  A.      A little after seven a.m.

12  Q.      What did you -- what observations -- where did

13  you arrive?

14  A.      810 Hayward  Avenue , Tacoma  Park , Maryland.

15  Q.      When you initially arrived there   , what

16  observations did you make?

17  A.      I s aw the residence,   Ms. Martin's vehicle was

18  parked -- the red   Mercedes was parked in front of it.

19  Q.      What happened after got there?

20  A.      Established surveillance at about 8    :13.  Mr.

21  Bynum  showed up in a min  ivan.

22  Q.      Describe your observations.

23  A.      Mr. Bynum  went into the residence and continued

24  on surveillance , and at approximately 8   :22 hours , so

25  ten minutes later  , he exit ed the  residence , returned to

1 the min ivan and left.

2 Q.      You were looking -- were you looking at

3 something to refresh your recollection concerning the

4 specific times?

5 A.      Just the report for the specific times, yes.

6 Q.      Did you prepare that report?

7 A.      Yes, I did.

8 Q.      Now showing you what's been marked as     P-276.

9 Can you tell us what we're looking at in this

10 photograph?

11 A.      The red vehicle is  Ms. Martin's  red Mercedes

12 Benz facing the rear.  The   van parked directly in front

13 of the red  Mercedes is the van   Mr. Bynum  showed up in

14 that morning.

15 Q.      P-277.

16 A.      Mr. Bynum  walking up to the residence.     The

17 residence is , I believe , not pictured .  It's off to the

18 right of the photograph.

19 Q.      P-278.

20 A.      Just another picture of   Mr. Bynum  walking

21 towards  the residence.

22 Q.      Is that the residence   that  you refer to?

23 A.      That's 810  Hayward  Avenue , yes.

24 Q.      And  P-279.

25 A.      Another picture of   Mr. Bynum  walking from the

1  residence.

2  Q.      Now, when you observed him and looking at the

3  picture , was he carrying anything in his hand?

4  A.      Not tha t I could tell.   I would have to look   --

5  there's another picture --

6  Q.      Let me --  I'll continue with the pictures.

7  P-280.

8  A.      That's another picture of   Mr. Bynum and I can't

9  see his  hands  in that photograph , and off the top of my

10  head , I don't recall specifically if he had something

11  in his hand or not.

12  Q.      You mentioned that you believed he was ordering

13  62 grams of crack cocaine or cocaine base.  Based on

14  your training and experience, how large would 62 grams

15  of crack be?

16  A.      I'm trying to -- it would be a sandwich bag     ,

17  certainly something you could hold in your fist.  Much

18  smaller than a baseball but you could put it in your

19  pocket.  It's not big.

20  Q.      And P-281.

21  A.      That's a picture of   Mr. Bynum 's van.

22  Q.      And you were able to get the tag number on that

23  van?

24  A.      Yes , it's registered to him.

25  Q.      Do you know what address it's registered to him

1  at?

2  A.      I'm sorry ?

3  Q.      Do you know the address that the vehicle is

4  registered to?

5  A.      I believe it's  registered  to him at his  address

6  on Ray Road.

7  Q.      Now, did you make any   effort to stop  Mr. Bynum

8  that morning when you observed him leaving?

9  A.      No.  In fact , I think we were doing this just to

10  identify to make sure it was    Mr. Bynum  coming over.

11  Q.      If you had an opinion that he was picking up 62

12  grams of cocaine base, why didn't you make an effort to

13  stop him at that time?

14  A.      To allow the investigation to continue.

15  Q.      Why is  that important?

16  A.      To identify all  the participants and continue to

17  collect evidence against other people that at that

18  point we still didn't even know who they were.

19  Q.      If we could turn to B357   , which is on Page 45.

20  What is the date and time of this call?

21  A.      March 12, 2004 , at approximately 6  :53 a.m.

22  Q.      Is that actually before you arrived there for

23  your surveillance?

24  A.      Yes, just a little before.

25          (Audio recording begins playing at 12    :05 p.m. )

1        (Audio recording stops playing at 12   :06 p.m. )

2        BY MS. JOHNSTON:

3  Q.      If we could please play B357 on Page 45.

4  A.      I think the call actually starts on Page 52.

5  Q.      No, B357 on Page 45 is the beginning of the

6  transcript.  Is this -- how long was this call?

7  A.      The call was nine minutes and the portion on the

8  CD only covers the last page starting on Page 52.

9  Q.      I believe in the transcript books   , those other

10 -- other than Page 45,   Pages 46 through 51 should be

11 omitted from the transcript books   ?

12       THE COURT:  Y es, that's correct.

13       MS. JOHNSTON:  If we could start it now   , please

14       (Audio recording begins playing at 12   :06 p.m. )

15       (Audio recording stop  s playing at 12 :07 p.m. )

16       BY MS. JOHNSTON:

17 Q.      Who are the part ies in this conversation?

18 A.      Paulette  Martin and  Eugene  Bird .

19 Q.      Based on your training and experience   , what did

20 you determine was going on during the portion that

21 we've listened to?

22 A.      Mr. Bird 's ordering a quantity of cocaine from

23 Ms. Martin.

24 Q.      Can you tell us what portion of that

25 conversation refers to that and what terms?

1  A.      Ms. Martin asks  Mr. Bird  if he wants one or two

2  of the tickets.    Mr. Bird replies that he wants half of

3  the flavored stuff .  Ms. Martin clarifies , a small one

4  like Juanita gets? And then  Mr. Bird says half.  Half

5  the plate. And then   Ms. Martin says, oh, just like the

6  one that  Juanita got the last time .  That would refer

7  to the drug purchase.

8  Q.      What are the codes that are use   d in  that

9  conversation to refer to drugs?

10  A.      The first one  is the tickets , and then the

11  description of half the plate by    Mr. Bird .

12  Q.      Okay.  If you could, write the page number next

13  to tickets up on that chart, Page 52.

14  A.      (Witness indicating. )

15  Q.      And if you -- well, let me take the pen   .  What

16  was the other word that you said referred to drugs?

17  A.      Mr. Bird 's describing it as half the plate.

18  Q.      Half a plate?

19  A.      Half the plate.  Half of a plate.

20  Q.      And the page number?

21  A.      Fifty-two .

22  Q.      And back before when we discussed the call with

23  John Martin ordering the two    T-shirts and the boy,

24  referring to heroin, that was on    Page 17; is that

25  correct?   The reference to the boy.  Was that on the

1  same page?

2  A.      Yes, it is.

3  Q.      Okay.  Now , there is also a reference to

4  flavored stuff.  Did that have any particular

5  significance to you?

6  A.      Cooked stuff.  Flavored.  Crack cocaine means

7  cocaine base.

8  Q.      As opposed to what?

9  A.      Cocaine powder.

10  Q.      Is there any significance to the reference to

11  half a plate?

12  A.      When you cook -- a common way for cocaine powder

13  to be turned into a base i   s it comes out in the form of

14  a small disk .  Sometimes they refer to it as a biscuit.

15  Obviously , it would resemble a plate.

16  Q.      Now , if we could go to the next call    , B380 on

17  Page 55.  When does this call take place in relation to

18  the call that we've just heard?

19  A.      The first call was at 6  :53 a.m.   This is at

20  11:58 a.m. on March 12.

21        MS. JOHNSTON:  If we could play it    , please.

22        (Audio recording begins playing at 12    :10 p.m. )

23        (Audio recording stops playing at 12    :10 p.m. )

24        BY MS. JOHNSTON:

25  Q.      Was that the same two parties?

1  A.       Yeah, it was Paulette Martin and Eugene Bird.

2  Q.       As a result of getting that call, was further

3  investigation conducted?

4  A.       With regard to?

5  Q.       Surveillance on that day.

6  A.       Yes.

7       MS. JOHNSTON:   If I could ask this witness to

8  step down, and I believe we will recall  Sean Deere to

9  testify about the surveillance on March 12.

10      THE COURT:  All right.

11      (Witness excused from the stand at 12   :11 p.m.)

12      (Witness Deere recalled at 12 :11 p.m.)

13                 **FURTHER  DIRECT  EXAMINATION**

14           **BY MS. GREENBERG:**

15  Q.     Sir, you remain under oath from last time    , and

16  I'm going to ask you if you can tell this jury a little

17  bit about your surveillance   .  Did you conduct  any

18  surveillance on March 12 of 2004?

19  A.       Yes, I did.  At approximately 1  0:12 in the

20  morning, I set surveillance up at 810       Hayward.

21  Q.       Why did you do that on that day?

22  A.       I was directed by  Detective  Eveler to set up at

23  Paulette  Martin's residence because he had received

24  some phone calls  , so we set up there for some important

25  meets.

1  Q.      Could you tell the jury  , then , what address that

2  was?

3  A.      810 Hayward  in Takoma  Park.

4  Q.      And were you part of a team on that date again?

5  A.      Yes , part of the surveillance team.

6  Q.      And what was your role that date?

7  A.      To run the surveillance van and the video

8  equipment.

9  Q.      Could you tell the jury your first observation

10 on March 12, 2004 after you set up at 810       Hayward

11 Avenue , Takoma  Park , Maryland , and what time that first

12 observation was?

13 A.      At 10 :47, Paulette  Martin pulled up at her

14 address  and had a male    passenger . They both exit ed the

15 vehicle and went into the residence.

16 Q.      Were you able to videotape that?

17 A.      Yes, I was.

18 Q.      Is that videotape part of what's been pre-marked

19 as Video  4-A?

20 A.      Yes.

21 Q.      Did you  -- a few weeks ago  , did you review this?

22 A.      Yes.  Yes,  I did.

23 Q.      What was  Paulette  Martin driving at that point

24 in time?

25 A.      Her red  Mercedes.

1  Q.      What was your next observation?

2  A.      At approximately 11 :53, a green  Maxima, Maryland

3  registration  MEK 364 pulled up and parked.  A black

4  male exited that vehicle  , who was identified as  George

5  Harris , went into the residence.

6  Q.      And between 10 :47 and 11 :53, did you see anyone

7  else come in or leave the residence?

8  A.      Just Paulette  Martin and  John  Martin.

9  Q.      So going back to 10  :47, you mentioned a  that

10  Paulette  Martin pulled  up in a red  Mercedes with a

11  passenger.  Who was that passenger?

12  A.      John  Martin.

13  Q.      Between 10 :47 and your next observation at

14  11:53, did you observe whether or not anyone left the

15  residence  at 810  Hayward  Avenue?

16  A.      If  I may refer to my notes  , please.

17  Q.      Sure.

18  A.      No, just at 10 :47, red  Mercedes pulled up, they

19  went in the residence  , and then 11 :53, the green  Maxima

20  pulled up.  That's what   I have in my note  s.

21  Q.      Is it correct this video marked as   4-A is keyed

22  up to that 11 :53 time?

23  A.      I think so.

24  Q.      And your testimony is that no one left the

25  residence --  Paulette  Martin and  John  Martin walked in  ,

1  but you didn't see anybody leave the residence?

2  A.      Correct.

3  Q.      Who was it that you identified pulling     up to  the

4  residence  at 11 :53?

5  A.      George  Harris in a dark green    Maxima.

6  Q.      At this time , Your Honor , I would play  Video

7  4-A.

8          (Videotape begins playing at 12    :14 p.m. )

9          BY MS. GREENBERG:

10 Q.      Could you tell the jury what    we're  looking at

11 here on  4-A?

12 A.      The green  Maxima  park s in front of   Paulette

13 Martin's  Mercedes.  The black male identified as     George

14 Harris gets out  , puts his jacket on  , walks inside the

15 residence.

16 Q.      Which door does he enter?

17 A.      In the side door.

18 Q.      Did you continue to make observations on this

19 residence?

20 A.      Yes.

21 Q.      Did you see that same individual leave?

22 A.      Correct.  Approximately 12   :02.

23 Q.      I'm sorry, what time did you -- if you look at

24 the videotape, approximately what time does this

25 individual leave the residence?     Are you refreshing

1 your recollection?

2 A.      Yes, I'm sorry.   I'm sorry, 11 :57 he leaves the

3 residence.   He's in there for four minutes.

4 Q.      And is that reflected on this videotape?

5 A.      Yes.

6 Q.      Could you tell the jury when you see the same

7 individual leave the residence?

8 A.      It's George Harris --  I'm sorry , that's John

9 Martin there , and he's get ting into  the red  Mercedes.

10 Q.      Does he depart the area?

11 A.      Eventually , George  Harris comes out and they

12 speak for a minute or so.

13 Q.      So based on your observations   , approximately how

14 long was  George  Harris in 810   Hayward  Avenue,  Takoma

15 Park,  Maryland ?

16 A.      Approximately four or   five minutes.

17 Q.      Who is that individual?

18 A.      That's George Harris .  He came out and he's

19 talk ing to  John  Martin through the passenger side

20 window of  Paulette  Martin's red  Mercedes .

21 Q.      Just so the record is clear   , is this

22 approximately 11 :59?

23 A.      Yes.

24 Q.      And Mr. Harris  is kneeling  by the  red Mercedes?

25 A.      That's correct.

1  Q.      Who is he talking to?

2  A.      John Martin.

3  Q.      What's happening now?

4  A.      George Harris just finished talking to him   , and

5  then he gets inside of his    green Maxima  and both the

6  red Mercedes and the   Maxima  leave.

7  Q.      What is your next observation during

8  surveillance that date?

9  A.      12:02, a Toyota pulls up,  Maryland , Frank

10 William  Yankee , FWY 828 , pulls up at 12  :02.

11 Q.      What type of car was that?

12 A.      A Toyota .

13 Q.      What did you observe the    Toyota  -- what happene d

14 with the  Toyota ?

15 A.      I'm not exactly sure.  The    Toyota  leaves at

16 12:07.  I didn't know if somebody got out or not.

17 Q.      What happened next?

18 A.      At 2 :54 , the red  Mercedes returns to the

19 residence .  Paulette  Martin gets into the passenger

20 seat and leaves.

21 Q.      What is your next observation?

22 A.      At 18 minutes after   3:00 Paulette  Martin returns

23 by herself and she's driving the red    Mercedes and she

24 goes into the residence.

25 Q.      That would be at 810    Hayward  Avenue , Takoma

1 Park, Maryland?

2 A.      That's correct.

3 Q.      Did you make another observation that afternoon?

4 A.      Yes.  At ten minutes to   4:00, a vehicle pulls

5 up, has Pennsylvania tags , EMD 0507 , and a female exits

6 the vehicle and goes in the residence.

7 Q.      Did you recognize that female?

8 A.      No, I'm not sure who it was.

9 Q.      When you didn't recognize someone on the film    ,

10 what would you do with the information?

11 A.      I would relay it to   Detective  Eveler , who would

12 verify who it was either   by the  videotape or the

13 registration of the vehicle.

14 Q.      So is it fair to say based on your role in     the

15 investigation,  you couldn't identify everyone that you

16 saw?

17 A.      Not exactly everyone.

18 Q.      Is this tape that you reviewed cued up to the

19 ten minutes to  3:00 --

20 A.      I think so.

21 Q.      -- t ime that you talked about  ?

22          MS. GREENBERG :  Your Honor , I'd now play  Video

23 4-B.

24          (Videotap e begins playing at 12  :21 p.m. )

25          BY MS. GREENBERG:

1  Q.      If you could tell the jury what's depicted in

2  this videotape.    I have ten minutes to  4:00; is that

3  correct ?

4  A.      That's correct.

5  Q.      What is occurring here?

6  A.      The vehicle with  Pennsylvania tags pul  ls up,

7  parks in front of the red    Mercedes.  This is the one

8  with the  Pennsylvania tags.

9  Q.      This is the vehicle you spoke about    ,

10 Pennsylvania tag   EMD 0507?

11 A.      Correct.   EMD 0507.   And a  female gets out , goes

12 into  Paulette  Martin's residence.

13 Q.      If you could tell the jury your observations     ,

14 which door does she enter?

15 A.      The side door.

16 Q.      Now, is it reflected on this videotape    ,

17 Government's  Exhibit 4 -B, when this individual leaves

18 the residence?

19 A.      Yes.  She leaves it at 4   :33.

20 Q.      Did you terminate your surveillance shortly

21 thereafter?

22 A.      Correct .  At 4 :45.

23         MS.  GREENBERG :  No further questions  , Your

24 Honor .

25         (Videotape stops at 12  :22 p.m. ).

1          THE COURT:   Any cross-examination?   Any cross?

2          MR. MARTIN:   Court's indulgence.

3                    **CROSS-EXAMINATION**

4          **BY MR. MARTIN:**

5  Q.     Officer, good day.   Anthony Martin.   I represent

6  Mr. Learley Reed Goodwin.

7          Would it be fair to say that you were called to

8  assist Task Force Officer Eveler?

9  A.     Yes.

10 Q.     At the beginning of this investigation    , or would

11 it be more towards the middle?

12 A.     I'm not sure exactly when his in   vestigation

13 started.

14 Q.     All right.  But in any event, the only time you

15 ever went to the   Hayward residence was when you were

16 called by Special Agent Eveler; is that correct?

17 A.     That's correct.

18 Q.     So it would be fair to say that as far as you

19 know anyway, there wasn't a 24   -hour surveillance on

20 that residence; correct?

21 A.     I can't say if there was or was not 24    -hour

22 surveillance.

23 Q.     Well, let me ask you this  :  You said you were

24 part of the  Major Narcotics Section of the   Prince

25 George's County police; correct?

1  A.      That's correct.

2  Q.      How many officer s are in that section?

3  A.      In my section?    Sixteen?    I don't know.   Close

4  to 20.

5  Q.      Close to 20?

6  A.      Yes.

7  Q.      It would be fair to say  , then , you would know

8  everybody who's in that section, right?

9  A.      Yes.

10 Q.      If other s were  work ing with  Special  Agent

11 Eveler , you would know about that  ; right ?

12 A.      Yes.

13 Q.      And were there any others working this

14 particular investigation other than you?

15 A.      That's correct.

16 Q.      So you were the only one?

17 A.      No.   Others were working besides me.

18 Q.      Were others tasked with the responsibility of

19 taking videos in addition to you?

20 A.      That's correct.

21 Q.      In light of the fact that others were tasked

22 with that responsibility, did you have opportunities to

23 debrief with them or talk to them about their

24 observations?

25 A.      Yes.

1  Q.      Would it be fair to say  , then , that there were

2  hundred s of hours  during the course of this

3  investigation when there was no surveillance?

4  A.      I couldn't tell you if there was or was not

5  surveillance at any given time  , how long or --  I can

6  only know  I did.

7  Q.      Well , you had other investigations going on    ;

8  right ?

9  A.      Yes.

10  Q.      You have a limited amount of vans    ; right ?

11  A.      Yes.

12  Q.      You have a limited amount of video     cameras;

13  right ?

14  A.      Define limited amount  .  We have several video

15  cameras.

16  Q.      You don't have an in  exhaustible  supply of video

17  cameras ; do you?

18  A.      We have  several video cameras.

19  Q.      How many is several?

20  A.      We might have ten.

21  Q.      You might have ten  , and Prince  George's  County

22  has , what , 700 ,000 residents?

23  A.      I think closer to 800   ,000.

24  Q.      800 ,000 residents , and you're  responsible  for

25  the entire county; right?

1  A.      That's correct .

2  Q.      You didn't devote all ten   cameras  to this

3  particular house  ; did you?

4  A.      Probably not.

5  Q.      Probably not or you didn't   ?

6  A.      Look, we have a set amount of cameras.  When      I

7  did surveillance , I had a camera .  That's all  I can

8  testify to.

9  Q.      That's all you know?

10  A.      Yes.

11  Q.      But this wasn't the only investigation    ; right ?

12  A.      As far as  I'm concerne d.

13  Q.      Right?

14  A.      No , I have other investigation  s.

15  Q.      The other 19 or 20 off   icers  have other

16  investigations going as well  ; right?

17  A.      Correct.

18  Q.      They had other surveillance   s to  do as well;

19  correct?

20  A.      I can't testify, but probably.

21  Q.      So wouldn't it be fair to say that this place

22  wasn't watched 24 hours a day?

23  A.      I can't testify to that   it was or was not

24  watched 24 hours a day  .  I can  only testify to what    I

25  watched  and the  days  I watched.

1  Q.      All right .   Then with respect to what you

2  watched , you can't say whether or not there were other

3  contacts taking place at that residence other than the

4  people that you saw in that video   ; right?

5  A.      I don't understand the question.

6  Q.      Well --

7  A.      Were there other people --

8  Q.      Perhaps there were other people coming and

9  going?   You wouldn't  know that ; would you?

10  A.      If I wasn't there , it's only lo gical .

11  Q.      You wouldn't have been th  ere unless you were

12  called by the  agent ; correct?

13  A.      Yeah , I was called by the agent.

14  Q.      You don't work 24 hour  s a day , so.

15          MS.  GREENBERG:   Your  Honor , could the witness

16  finish his answer  .

17          THE COURT:   Let him finish.

18          MR.  MARTIN:   The witness may not have understood

19  the question , so I was going to repeat it.

20          BY MR.  MARTIN:

21  Q.      You would not gone there unless you were called

22  by the special agent involved in the investigation;

23  right?

24  A.      That is correct.

25  Q.      So you wouldn't know what else is taking place

1  there unless you're called; right?

2  A.      Correct.  Unless  I'm there,  I won't know what's

3  going on.

4  Q.      Thank you, sir.

5          MR. MARTIN:   I have no further questions  , Your

6  Honor.

7          THE COURT:  Any other  cross?

8          MR. HALL:  No questions  , Your Honor.

9          MR. MITCHELL:  N o, Your Honor.

10         MR. WARD:  A couple,  Your Honor.

11                   **CROSS-EXAMINATION**

12         **BY MR. WARD:**

13  Q.      Detective  Deere, do I understand that your sole

14  involvement in this case was to go out upon call or

15  direction and make observations and    --

16  A.      That's correct.

17  Q.      In other words , do surveillance?

18  A.      Correct.

19  Q.      All right , sir.  Now before you started going

20  out and doing surveillance, were you   , for example ,

21  shown photographs in a book of people who were

22  suspected of being involved in this case   ?

23  A.      I can't recall at this time  , but sure , during

24  the investigation   I've seen photographs of people.

25  Q.      During the investigation.  But let's take    , for

1  example , George  Harris, because you testified about

2  George  Harris a couple of times.  Perhaps your eyes are

3  better than mine , but I didn't really see much of

4  George  Harris on the screen  .

5        But in any event , when you saw a person you're

6  testifying now is  George  Harris , when you first saw

7  him , did you know who it was?

8  A.      I'm not sure  if I knew who it was at the time.

9  Q.      When you went back, you showed the video to

10 other people; is that right?     And they told you that's

11 George  Harris?

12 A.      No.  I've seen a picture of   George  Harris.

13 Q.      Afterwards.  Not before  ; right ?

14 A.      I'm not sure if it was before or after.      I knew

15 that that car belonged to him and     I had seen a picture

16 at a certain time that   I can testify that , in fact ,

17 that was  George  Harris.

18 Q.      With respect to some of the people that you have

19 talked about in observations, when you first saw them       ,

20 you didn't know who they were.

21 A.      That's not true.   I might have --  I knew who

22 Paulette  Martin was before   I saw her.

23 Q.      Yeah.

24 A.      I had seen her picture before    I saw her

25 physically.   I can't say that that happened the same

1  with George Harris or not.  During the investigation    ,

2  I've seen a picture of    George Harris and  I can testify

3  that that was him that    I saw that day.

4  Q.     But you cannot say whether that was before or

5  after you saw  George Harris , the person you now believe

6  to be  George  Harris , in your surveillance; is that

7  correct?

8  A.     I would say more that it was before.  Before     I

9  physically saw him  , I knew who he was.

10  Q.     The last video , you were shown a female arriving

11  in a Pennsylvania -- a car with    Pennsylvania tags.  Who

12  was that ?

13  A.     I do not know .  I can't remember what her name

14  was.  I can't testify to who she is right now.

15  Q.     You didn't know at    that time --

16  A.     No.

17  Q.     -- that you saw her ?

18  A.     Correct.

19  Q.     And you haven't -- as far as you recall    , you

20  haven't learned her name s   ince?

21  A.     I can't recall her name.

22  Q.     All right.  Thank you sir very much.

23         THE  COURT:  Any further cross?

24         All right.  Any re  direct ?

25         MS. GREENBERG:  No,  Your Honor .  May the witness

1  be excused ?

2          THE COURT:  Yes, he may  .  Is he going to be

3  recalled ?

4          MS. GREENBERG:   I don't believe so  , Your  Honor.

5          THE COURT:  All right  .  You may be excused  .

6  Thank you very much  , Officer .

7          (Witness excused at 12  :31 p.m. )

8          (Witness  Sakala  resume s the  stand at 12 :31 p.m. )

9                **FURTHER  DIRECT  EXAMINATION**

10          **BY MS. JOHNSTON:**

11  Q.      Sergeant  Sakala , I may have put the cart before

12  the horse in this instance.  Were there also calls

13  intercepted with  Mr. Harris  on the morning of March 12

14  prior to the time that we observed him on the video?

15  A.      Yes.

16  Q.      Would those be calls  A168 on  Page  53 and  B372  on

17  Page 54?

18  A.      Yes.

19  Q.      During  the course of this -- in reviewing those

20  call s, were  there any -- was there any code words used

21  in either of those two telephone conversations?

22          MR. McKNETT :  Your  Honor , could  I have  the  --

23          MS.  JOHNSTON:  Page 53   and 54 are the two calls

24  A168 and  B37 2.

25          MR. McKNETT :  Thank you.

1          THE  WITNESS:    I do not see any codes words

2 specifically.

3          BY MS.  JOHNSTON:

4 Q.      You heard  Detective  Deere  testify that   Mr.

5 Harris  was in the house for a very brief period of

6 time.

7          Do you recall that testimony?

8 A.      Yes.

9 Q.      Based on your training and experience    , is there

10 any significance to that fact?

11 A.      Yes.

12 Q.      In referring to call   A168 and  B372, in reviewing

13 the call s, did you determine whether or not there was a

14 pattern and practice between    Ms. Martin and several

15 individuals including   George  Harris and  Mr. Bird  and

16 others?

17 A.      Yes.

18 Q.      Can you describe that pattern that you noticed?

19 A.      People would call her to see if they were home.

20 Sometimes they would use code words to identify

21 specific amount s of cocaine  -- or excuse me , a specific

22 amount of drugs or type of drugs.  They would then come

23 by the residence .  They would stay for a very short

24 period of time and then they would leave the residence.

25 Q.      Based on your training and ex   perience,  what's

1  the significance of that?

2  A.      It's indicative of drug trafficking.

3  Q.      Now, in addition to that, did you see the video

4  that was played during  Mr. Deere 's testimony concerning

5  the female operating a car with   Pennsylvania tags?

6  A.      Yes.

7  Q.      Did you recognize that female  ?

8  A.      Yes.

9  Q.      Who was that?

10  A.      Gwendolyn  Levi .

11  Q.      During the same time period, around March 12,

12  March 11, did you intercept telephone calls between     Ms.

13  Martin and  Ms. Levi  that are not included in the

14  transcript book?

15  A.      Yes.

16  Q.      If you could tell us for what reason we didn't

17  include all of the calls between all of these people in

18  the transcript books.

19  A.      For expediency , there are literally   -- I think

20  we intercepted around 10   ,000 calls , and we would be

21  here a long time if we played calls that were not

22  pertinent to this case or not germane.

23  Q.      Based on those -- on intercepted calls between

24  Ms. Martin and  Ms. Levi, including calls that we    're

25  going to hear over the next few day    s, did you form an

1  opinion as to what   Ms. Levi was doing at   Ms. Martin's

2  house?

3  A.     Yes .

4        MR. WARD:   Objection , Your Honor , as to those

5  calls he's already said were not pertinent.

6        THE COURT:  Well, approach the bench   .

7             (At the bar of the Court.)

8        MR. WARD:   I'm not sure  I understand what the

9  government is trying to do here   , but  I suspect some

10 ulterior m otive.  He has testified that h   e had many,

11 many calls that were not pertinent   .  The question then

12 was , well , based on the calls that you heard    and the

13 calls that have been transcribed an   d the other call s,

14 if they're not pertinent  , they can't  -- he can't form

15 any bases for his opinion.

16       MS. JOHNSTON:   I didn't ask him about any

17 non-pertinent cal ls.  I asked him if there were calls

18 between some of the parties   , including  Ms. Martin and

19 Ms. Levi , that are not included in the transcripts      and

20 the calls we're presenting here today   , and he said ,

21 yes , they were .  I said , why weren't they included  .  He

22 said , for expediency , we didn't include all of the

23 calls .  I asked him , well , based upon the calls and the

24 calls we're going to hear subsequent to this time     , did

25 you -- during the course of the next few days   , did you

1  have an opinion as to what    Ms. Levi and  Ms. Martin were

2  doing .

3       THE COURT:   It seems to me  you ought to have him

4  limiting his testimony to interpretation of the lines

5  being used by the parties.  If he   's going to state that

6  based on several conversations he heard code language

7  used which was consistent with that used by those

8  engaged  in the drug trade, he can say that   .  But I

9  think we should try to steer away from     giving an

10 ultimate opinion.  So that's -- to that extent, I will

11 sustain the objection  .

12                    (Back in open court.  )

13      BY MS.  JOHNSTON:

14 Q.     Detective  Sakala , based upon the intercepted

15 calls you reviewed between    Ms. Levi and  Ms. Martin , did

16 you form an opinion as to what    Ms. Levi and  Ms. Martin

17 were engaged in on that date in    March of 2003?

18 A.     Yes.

19 Q.     What was it about their conversation that led

20 you to that conclusion?

21 A.     The conversations identified    Ms. Levi as someone

22 who supplies drugs to   Ms. Martin.

23 Q.     What was the language or code that was being

24 used in their conversation?

25 A.     I believe primarily they identified the drugs as

1  tickets.

2  Q.      In addition  to that , did you have occasion to

3  review items that were seized from    Ms. Levi and  Ms.

4  Levi's residence on or about April 23 o    r 24?

5  A.      Yes.

6  Q.      What do those items include?

7  A.      Her residence was a heroin processing lab for

8  packaging and cutting heroin.

9  Q.      Was that consistent with your opinion of what

10  was going on in the telephone calls?

11  A.      Yes.  Ms. Levi was supplying heroin to    Ms.

12  Martin.

13  Q.      In fact, are there -- will we eventually get to

14  some of those call  s that we've included in this

15  transcript?

16  A.      Yes.

17  Q.      The calls that are being presented to the jury?

18  A.      Yes.

19  Q.      Now , if we could go to page -- to call    B38 4 on

20  Page 56  and  57.  Who are the parties to this call    ?

21  A.      Reece Whiting and  Paulette Martin.

22  Q.      Again , taking place on March 12; is that

23  correct?

24  A.      Yes, at 12 :57 p.m.

25  Q.      If we could play it  , please.

1          (Audio recording begins playing at 12    :38 p.m. )

2          (Audio recording stops playing at 12    :38 p.m. )

3          BY MS.  JOHNSTON:

4  Q.      Based upon your training and experience, do you

5  know what  Mr. Whiting was asking for when he asked if

6  she had heard anything?

7  A.      Yes.

8  Q.      What is that?

9  A.      He's referring to one of two things.     I can't

10  make a determination of exactly which one it is.  He's

11  referring to either   --

12          MR. HALL:  Object , Your Honor.  He doesn't know

13  which of these two things it is   .  I don't think he

14  should be expressing an opinion    .

15          THE  COURT:  D oes he have an opinion or is he

16  speculating ?

17          MS.  JOHNSTON:   Your  Honor , I believe he has an

18  opinion.

19          THE  COURT:  If he has an opinion   , I'll hear the

20  opinion.

21          BY MS.  JOHNSTON:

22  Q.      What is your opinion?

23  A.      He's referring to either   Mr.  Pernell  Philpot

24  returning from  California , or Ms. Tiffany  Vessels

25  returning from   Texas.

1  Q.      Do you have an opinion as to what     Mr. Philpot

2  and Ms. Vessels were transporting at that time     ?

3          MR. HALL:  Objection , Your Honor.

4          THE COURT:  Overruled.

5          THE WITNESS:  They were both obtaining cocaine

6  from different sources  .

7          MS. JOHNSTON:  Now , if we could move on to the

8  next call, B466.  What date and time does this call

9  take place?

10  A.      This was on March 13 at approximately 10    :54 in

11  the morning.

12  Q.      Are there a series of calls that are related to

13  this one?

14  A.      Yes.

15  Q.      If we could play   B466, please.

16          (Audio recording begins playing at 12    :40 p.m. )

17          (Audio recording stops playing at 12     :40 p.m. )

18          BY MS. JOHNSTON:

19  Q.      And again , who are the par ties to  that call?

20  A.      Derrick  Bynum and Paulette  Martin.

21  Q.      If we could go to next call   B467 .  What time

22  does that call take place in relation to the one we

23  just heard?

24  A.      The first one was at 10   :54 a.m.   This is eight

25  minutes later at 11 :02 a.m.

1  Q.      If we could play it , please.

2          (Audio recording begins playing at 12   :40 p.m. )

3

4          (Audio recording   stops playing at 12  :41 p.m. )

5          BY MS. JOHNSTON:

6  Q.      Was that the call with the same parties?

7  A.      Yes .

8  Q.      If we could go  to call B471 on Page 6 2.  Is this

9  call , likewise , on the same day?

10 A.      Yes, it is.

11 Q.      And approximately how soon after    Mr. Bynum

12 explains his problem to  Ms. Martin is this call made?

13 A.      Approximately ten minutes later   , 11 :13 a.m.

14 Q.      And the parties to this call?

15 A.      This is  Paulette Martin and  Luis Mangual .

16 Q.      If we could play it , please.

17         (Audio r ecording begins playing at 12   :41 p.m. )

18         (Audio recording stops playing at 12   :42 p.m. )

19         BY MS. JOHNSTON:

20 Q.      Is there a related call to that on Page 66,

21 B48 7?

22 A.      Yes.

23 Q.      How soon after the preceding call does this one

24 happen?

25 A.      This is about an hour and a half later   , at 12 :39

1  p.m.

2  Q.      If we could play this call  , please.

3          (Audio recording begins playing at 12   :42 p.m. )

4          (Audio recording stops playing at 12   :43 p.m. )

5          BY MS. JOHNSTON:

6  Q.      And A191 on Page 67.   Is that, likewise, with

7  the same parties?

8  A.      Yes.

9  Q.      What time does that occur?

10  A.      2:48 p.m., about two hours after the first one.

11  Q.      If we could play that  , please.

12          (Audio recording begins playing at 12   :43 p.m. )

13          (Audio recording stops playing at 12   :43 p.m. )

14          BY MS. JOHNSTON:

15  Q.      During that afternoon -- morning and afternoon

16  on March 13, was there also a call involving     Mr. Bird?

17  Calling your attention to   B472 on Pages 64  and  65.

18  A.      Yes.

19  Q.      If we could play this as well.

20          (Audio recording begins playing at 12   :44 p.m. )

21          (Audio recording stops playing at 12   :45 p.m.)

22          BY MS. JOHNSTON:

23  Q.      That call with  Mr. Bird occurs during a series

24  of calls with  Mr. Mangual ?

25  A.      Yes.

1  Q.      Now, if we could go back to call    B471 on

2  Page 62.  In terms of the series of calls between     Ms.

3  Martin and  Mr. Mangual  on March 13, did you form an

4  opinion as to what they were arranging and what was to

5  be dropped off on March 13 of 2002?

6  A.      Yes.

7  Q.      And  what's that opinion?

8  A.      Mr. Mangual  was delivering a kil   ogram of cocaine

9  to Ms. Martin.

10 Q.      Calling your attention to    B471, can you tell  us

11 what about that call brings   you to  that conclusion?

12 A.      The first -- the fourth line down    , Paulette

13 Martin said that book was really good that you let me

14 read the other day.  Do you have any    more?  The other

15 day, she referred to a box of envelopes    , not a book.

16 Now she's calling the box of e  nvelopes  a book, which is

17 certainly an indication to me that the book she's

18 talking about and the box of envelopes are not books or

19 boxes of envelopes.

20      She then goes on to relay the story that the

21 person that she's waiting on is a guy whose clutch went

22 out, which refers back to    Derrick Bynum, who was on his

23 way over to her house to pick up when his -- he called

24 her and told  Ms. Martin that his clutch went out.

25 Q.      Based on your training and experience    , what was

1  Mr. Bynum on his way over there to pick up?

2  A.      To pick up the cocaine that Ms. Martin was going

3  to obtain from  Mr. Mangual .

4  Q.      Now, in reference to that call  , I believe you

5  said what term refer  s to drugs .

6  A.      In this call on Page 62 , she's referring to  it

7  as a book.

8  Q.      Does that appear in another one of the    Mangual

9  calls that we've just played?  What    are the pages of

10 that reference?

11 A.      On Page 66 , Paulette  Martin tells  Mr. Mangual

12 that she can -- he can go ahead and bring the book for

13 her to read.

14 Q.      And the page that that is first reference    d is

15 what?

16 A.      Sixty-two .

17 Q.      Now , during those --  during  that  same time

18 period , there's also a call from    Eugene  Bird; is that

19 correct?

20 A.      That's correct.

21 Q.      Now, that call  , were you able to identify the

22 individuals they were discussing?

23 A.      Yes .

24        MR. SUSSMAN :  Ms. Johnston , could you keep your

25 voice up please?

1          MS.  JOHNSTON:  Thank you again   , Mr.  Sussman .

2          MR.  SUSSMAN :  My pleasure.

3          BY MS.  JOHNSTON:

4  Q.      Who were they discussing in   B472 on Page 64?

5  A.      On Page 64 , they're talking about   Estelle  Brim

6  and Steve Brim, Steve  Brim's mother.

7  Q.      Steve --

8  A.      -- Brim's mother.

9  Q.      Estelle  Brim?

10 A.      No, no, no they're talking about    Estelle  Brim ,

11 who is the  Estelle  that they're talking about on the

12 fifth line down , when you talk to Estelle, this is

13 Estelle  Brim.  Further down the page  , she's talking

14 about  Steve  Brim's mother.

15 Q.      Okay.  And in that discussion they're talking

16 about a suit or suit for someone and some money    ?

17 A.      Correct.

18 Q.      Based on your training and experience   , does that

19 have anything do with drug trafficking?

20 A.      Nothing to do with drug trafficking.

21 Q.      The significance of the call is what portion of

22 that call?

23 A.      The second page of the call on Page 65 where    Mr.

24 Bird  orders twice of the same thing that he got before.

25 Q.      Now, also on that evening of March 13, was there

1  another call with   Mr. Bynum ?   Calling your attention to

2  B515 on Page 68.

3  A.      Yes.

4  Q.      If we could play that call   , please.

5          (Audio recording begins playing at 12    :49 p.m. )

6          (Audio recording stops playing at 12    :49 p.m. )

7          BY MS. JOHNSTON:

8  Q.      Based upon your training and experience, what is

9  Ms. Martin telling   Mr. Bynum  in that call?

10 A.      She now has the cocaine for him to come and get

11 it.

12 Q.      Was there surveillance conducted on that date?

13 A.      Yes.

14         MS. JOHNSTON:   Your Honor, at this time we  'd --

15 I don't know if the   Court wants -- we'll call a

16 surveillance agent at this time to discuss March 13.

17 That is  Detective  Scheirer , I believe.

18         THE  COURT:  Is this just one surveillance?

19         MS. JOHNSTON:  Just the surveillance on March 13

20 at this time.

21         THE  COURT:  If we can do this in ten minutes,

22 that's fine.

23         MS. JOHNSTON:   I don't know .  Your  Honor , I've

24 been advised  Detective  Scheirer  is in front of   Judge

25 Messitte , I believe, f or another court proceeding   , so

1  we will play  at least  another call  that relates to the

2  same transaction .

3          THE COURT:  All right.

4          BY MS. JOHNSTON:

5  Q.      Was there a contact between   Ms. Martin and  Mr.

6  Mangual  the morning of the next day,    March 14?

7  A.      Yes.

8  Q.      Would that be the telephone B563 on Page 69?

9  A.      Yes.

10  Q.      If could play that call  , please.

11          (Audio recording begins playing at 12    :51 p.m. )

12          (Audio recording stops playing at 12    :51 p.m. )

13          BY MS.  JOHNSTON:

14  Q.      Based upon your training and experience   , what

15  was the significance of this call?

16  A.      Ms. Martin was checking with   Mr. Mangual  to make

17  sure the money she gave him for the cocaine the

18  previous  day is the correct amount.

19  Q.      Did you determine , based on your training and

20  experience of the review of these calls   , their use of a

21  particular phrase in terms of their drug activity?

22  A.      With regard to this call?    I don't understand.

23  Q.      We've seen  previously  the use of the phrase

24  everything's okay, everything's right.  Did that have

25  any significance to you in terms of these calls?

1  A.      In some calls , it does.  In this particular

2  case , she's just saying are we straight.  In other

3  words , she's check ing to  make sure the money she gave

4  him yesterday was counted correctly and that he agrees

5  with that count and he confirms that everything is

6  straight.

7        MS. JOHNSTON:   Your Honor , this might be an

8  appropriate place to break while hopefully we'll have

9  Detective  Scheirer  so we can pick   up with  the

10  surveillance.

11        THE  COURT:  All right  .  Why don't we take a

12  break until  2 o'clock.

13              (Jury excused at 12:52 p.m.)

14              (Off  the record  at 12 :52 p.m. )

15              (On the record at 2  :04 p.m. )

16              (Jury returns at 2  :04 p.m. )

17        MS.  GREENBERG:   Your Honor , we've got  Detective

18  Scheirer  and  Detective  Grant both  at the same time.

19  Detective  Scheirer  was released   and it made more sense

20  if we could call   Detective  Grant first.

21        THE  COURT:  All right  .  You may proceed.

22  Thereupon,

23                  **RAPHAEL  GRANT** ,

24  having been called as a witness on behalf of the

25  Plaintiff , and having been first duly sworn by the

1 Courtroom Deputy, was examined and testified as

2 follows:

3                   **DIRECT  EXAMINATION**

4        **BY MS. GREENBERG:**

5 Q.      Would you state your name and spell your last

6 name for the court reporter   , please?

7 A.      Detective  Grant , G R A N T, ID 2437 , of the

8 Prince  George's  County  Police  Department.

9 Q.      What is your position with the    Prince  George's

10 County  Police  Department?

11 A.     I'm a detective in the    Narcotic  Enforcement

12 division.

13 Q.      How long have you been so employed?

14 A.      About approximately   one and a half years.

15 Q.      Could you tell the jury some of your duties and

16 responsibilities as a narcotics officer with the     Prince

17 George's  County  Police  Department?

18 A.      To investigate major    traffickers  in Prince

19 George's  County , which is doing search warrants   , doing

20 undercover buys , and assisting street   -level buy s with

21 the Street  Narcotic  Enforcement  Division.

22 Q.      Have you also , as part of your duties and

23 responsibilities , done search  warrants -- searches

24 without warrants , probable cause searches?

25 A.      Yes, ma'am.

1  Q.       How often do you do those?  On a daily?  Weekly?

2  Monthly basis?

3  A.       Weekly basis.

4  Q.       How about surveillances?

5  A.       Surveillance on a daily basis.

6  Q.       Now, I'd like to call you today for two

7  purposes .  I understand you did a number of

8  surveillances .  I'd like to talk to you about your

9  March 13, 2004 , surveillance , but if I could back you

10 up a couple of years before that and talk a lit    tle bit

11 -- it's a lit tle bit out of order , but were you

12 involve d with a Detective  Martini  involving some -- a

13 search and an arrest on November 25, 2003?

14 A.       Yes, I was.

15 Q.       What role did you play in connection with those

16 events on November 25, 2003?

17 A.       On that date , my initial rol e was to --  I had to

18 speak --  the source of my vehicle   -- the confidential

19 informant in my vehicle  , and my initial  role on that

20 day was  just  to control the confidential informant.

21 Q.       What happened on that date?

22 A.       On that date , the confidential informant ordered

23 up a quantity of cocaine from a supplier and that

24 supplier brought the cocaine out to a location in

25 Prince George's County , Maryland.

1 Q.      Do you remember the location?

2 A.      Yes.  It was  Prince George's  Plaza in

3 Hyattsville , Maryland.

4 Q.      What role , if any , did you play in on the scene

5 at the  Prince George's  County  Plaza in  Maryland?

6 A.      On that -- after the stop was done, the

7 detectives were searching the vehicle    , could not find

8 the drugs .  I then went over to the vehicle    , talked to

9 a teenage female who was there    , and from talking to

10 her , I discovered where the drugs were at.

11 Q.      Who was the teenage female?

12 A.      It was the daughter of the target of -- of

13 Detective  Martini 's  investigation .

14 Q.      Do you remember the target's name?

15 A.      I believe  it was  Goody.  Something to that

16 nature.

17 Q.      Could you explain to the jury what it means when

18 you find something?  How did you find it?  What does

19 that mean , in your experience in this case?

20 A.      How'd I find the --

21 Q.      What do you mean by "find"?

22 A.      When  I discovered from talking to the female

23 where the drugs were located,    I then informed   Detective

24 Martini where   the drugs were , I went over and   I found

25 the item , which was a  Pepsi bottle , and pointed out to

1 Detective  Martini,  and detective   Martini  recovered the

2 item which had the cocaine inside of     it.

3 Q.      Did you in any way move the item before you

4 found it?

5 A.      No, I didn't.

6 Q.      Who actually took the item out of the car?

7 A.      Detective  Martini .

8 Q.      Were any of items moved at all before they were

9 found?

10        MR. MARTIN: Objection.  Leading  .  Sorry for not

11 standing .

12        THE COURT:  Sustained.  Ask it   in a different

13 way.

14        BY MS. GREENBERG:

15 Q.      Where was the  Pepsi bottle before you found it?

16 A.      It was in  the vehicle.

17 Q.      Was it in the vehicle when you first approached

18 to search the vehicle?

19 A.      Yes, it was.

20 Q.      Where was it in the vehicle when you first

21 approached to search the vehicle?

22 A.      I believe it was in the center of the vehicle     ,

23 either on the floor or on the center console of the

24 vehicle.

25 Q.      Showing you what's been marked as P    -77.  Do  you

1  recognize  that?

2  A.      Yes, that's  the Pepsi bottle.

3  Q.      Where was the  Pepsi bottle when law enforcement

4  first approach ed the vehicle?

5  A.      In the vehicle.

6  Q.      Where?

7  A.      It looks like it was on the chair   , it looks like

8  on the seat.   I can't really --

9  Q.      Would you like to see this up close?

10 A.      Please.

11         MS. GREENBERG :  May I approach,  Your Honor?

12         THE COURT:  You may.

13         THE WITNESS:  T his looks like it's right there

14 on the backseat in the center towards the -- well     , the

15 front seat towards the scepter console.

16         BY MS. GREENBERG:

17 Q.      That is a shot of the front seat of the vehicle?

18 A.      Yes.

19 Q.      Showing you what's been   previously  marked as

20 Government's  Exhibit  Goodwin 27.   How does that appear

21 to you?

22 A.      It appears , except for when we found   that, it

23 had Pepsi actually inside the top of it to conceal it,

24 but this is the same way as it was when we found it

25 that day.

1  Q.      Directing your attention to    March -- let me back

2  you up.  Where were you employed on November 25, 2003?

3  A.      Prince George's County Police Department

4  assigned to  Narcotic  Enforcement  Division.

5  Q.      How long had you been employed there at that

6  time?

7  A.      In 2003 , I would have been on there

8  approximately five years.

9  Q.      Doing narcotics work?

10 A.      Doing narcotics w ork for approximately three

11 years of the time.  Approximately three years.

12 Q.      Directing your attention to March 13, 2004.

13 Were you assigned to do surveillance that day?

14 A.      Yes, I was.

15 Q.      How did you come to be assigned to do

16 surveillance that day?

17 A.      Detective  Eveler  instructed me to go to a

18 location and conduct surveillance.

19 Q.      Where did you go?

20 A.      To an address on   Hayward  in -- I believe that's

21 Takoma  Park,  Maryland.

22 Q.      What time did you go there?

23 A.      Approximately  3 p.m.

24 Q.      Do you recall the exact house that you were

25 assign ed to  surveil?

1  A.      815 Hayward.

2  Q.      What is the first thing you observed when you

3  were out there on March 13, 2  004?

4  A.      If I could refer to my notes for the exact

5  times.

6  Q.      Certainly.

7  A.      At approximately 3  :15 p.m ., a red  Dodge pickup

8  truck arrived at the location.

9  Q.      Did you see from which location it came?

10 A.      Yes.  It came from   Larch,  which would be from

11 New Hampshire , and th en made a left on to   Hayward

12 [sic].

13 Q.      What did you observe about the red    Dodge pickup.

14 A.      It was occupied two times.  It was a male

15 driving and a female in the passenger seat.

16 Q.      Showing you what's been marked as    P-218.  Do you

17 recognize what's depict ed in  that picture?

18 A.      Yes.  It's the red   Dodge pickup truck arriving

19 that day  with  the male getting out of the driver's

20 door.

21 Q.      Approximately what time did you see the male get

22 out of the driver's door?

23 A.      It's approximately 3  :17 p.m.

24 Q.      Now, were you able to get the tag number -- let

25 me show you the next picture   .  Showing you what  's been

1  marked as  P-19.   From a closer look on that vehicle,

2  were you able to record the tag number?

3  A.      Yes.

4  Q.      What is the tag number   of this vehicle?

5  A.      30N 591

6  Q.      What state?

7  A.      Maryland.

8  Q.      When you saw the male get out of the vehicle at

9  approximately 3 :17, what did you observe happen next?

10 A.      The male then walked around to the right rear

11 passenger door of the vehicle   , got a white bag out of

12 the vehicle , and then walked into the residence.

13 Q.      Showing you what's been marked as P   -220.  Can

14 you tell us what's depicted in this picture?

15 A.      That's the male about to go to the right rear

16 passenger door.

17 Q.      And P -221?

18 A.      That's the male after he got the bag out the

19 passenger door , and then if you can look through    his

20 legs , you can see the bag he's carrying through his

21 legs.

22 Q.      And what did you observe him do next?

23 A.      He was walking towards the residence.

24 Q.      Did you see which door he went into?

25 A.      No.  From the location   I was at , I couldn't see

1  the side door .   I could just see him walking towards

2  the door .

3  Q.      Did you stay that the location 810       Hayward ?

4  A.      Yes,  I did.

5  Q.      What did you see next?

6  A.      At approximately 3  :21 p.m ., the male exited the

7  house carrying the same white bag.

8  Q.      What time was that?

9  A.      3:21 p.m.

10  Q.      What did you observe him do then    ?

11  A.      He put the bag back in the right rear passenger

12  seat and got back into the vehicle.

13  Q.      Could you tell if it was the same bag or not     ?

14  A.      It appear ed to be the same bag  , yes, ma'am.

15  Q.      What did you see next?

16  A.      He got back in the driver's seat and he left the

17  area.

18  Q.      What time , again , did you see him arrive at the

19  residence and get out of the vehicle?

20  A.      It was approximately   three -- he  arrived  at 3 :15

21  p.m.; he got out the vehicle at 3   :17 p.m.

22  Q.      What time did he leave the area?

23  A.      Approximately 3  :23 p.m.

24  Q.      So he was at the residence for a total of how

25  long?

1  A.       From the time he got there to the time he

2  actually left was approximately eight minutes.

3  Q.       Did the  female stay in the vehicle or get out of

4  the vehicle ?

5  A.        She stayed in the vehicle  , ma'am.

6          MS.  GREENBERG:   No further questions  , Your

7  Honor.

8          THE  COURT:  Cross-examination?

9          MR.  MARTIN:  Yes, sir.

10                      **CROSS-EXAMINATION**

11      **BY MR.  MARTIN:**

12  Q.       Good afternoon,  Detective  Grant.  My name's

13  Anthony  Martin and  I represent  Mr. Learley Reed

14  Goodwin.

15          Detective, are you reading from notes?

16  A.       I was re ferring to my notes yes, sir.

17  Q.       Do those notes relate to the November 25, 2003      ,

18  stop that  you talked  about in the beginning of your

19  testimony?

20  A.       No , sir.

21  Q.       You talked a little bit about the     confidential

22  witness that you had at the time, the in     formant .

23  A.       Yes, sir.

24  Q.       His name was  Raynard Dorsey ; right ?

25  A.       I don't recall his name, sir   .  It was detective

1  Martini 's informant.

2  Q.      You don't recall his name but you do recall

3  specifics that happened on that particular day?

4  A.      Yes, sir.   I never knew the informant's --

5  Q.      Answer either yes or no  , Detective .  You recall

6  the incident that happen   ed that day ; right ?

7  A.      Yes, sir.

8  Q.      And Mr. Dorsey you said , if I heard you

9  correctly , was in the car with you.  You were

10  maintaining control over him   ; right?

11  A.      Yes, sir.

12  Q.      And Mr. Dorsey was also the one who told    you to

13  be on the lookout for a white    Cadillac ; right?

14  A.      That's correct , sir.

15  Q.      He told you that that white    Cadillac would be

16  coming at  PG plaza ; is that right?

17  A.      That's correct , sir.

18  Q.      Did Mr. Dorsey at any time tell you that was his

19  car?

20  A.      No, he didn't , sir.

21  Q.      And it's also your testimony that when     Detective

22  Martini  and the search team was having trouble    s looking

23  for the drugs , that it was only that the moment that

24  you came out of your car with    Dorsey?  Is that your

25  testimony?

1  A.       That's  when  I came  out  of  my vehicle   , yes, sir.

2  Q.       You came  out  of  your vehicle  at that  time after

3  speak ing  to  Mr.  Dorsey; right ?

4  A.       I was talking  to him  the whole  time, yes, sir.

5  Q.       And it was after  speak   ing to  Mr.  Dorsey  that  you

6  went over  to help  him  search  for the  drugs  in the

7  vehicle?

8  A.       Yes,  sir.

9  Q.       And it's your  testimony  that  the daughter  of

10  Learley   Reed  Goodwin   was the  one who  told  you to  look

11  in the  Pepsi  bottle.

12  A.       That's correct  , sir.

13  Q.       You remembered  that  even though  that  incident

14  took place  two   and a half years ago   and you have  no

15  notes  with you  today; correct?

16  A.       Yes,  sir.

17  Q.       Prior  to testifying  here this  afternoon  before

18  the ladies and gentlemen  of the  jury, you met  with the

19  government, didn't  you?

20  A.       Yes,  sir.

21  Q.       And they  told you  that   Detective   Martini   had

22  testified , didn't  they?

23  A.       Yes,  sir.

24  Q.       And they  told you  there  was an issue  regarding

25  how they  found  the drugs  that  were in that  white

1  Cadillac ; didn't they?

2  A.      No, they didn't tell me it was an issue.

3  Q.      Well , you knew that you were going to be asked

4  questions about where the bottle was    ; correct?

5  A.      Yes, sir.

6  Q.      And you knew you were going to be asked

7  questions about whether or not it had a false bottom    ;

8  right ?

9  A.      Yes, sir.

10  Q.      And they specifically told you or asked you

11  whether or not you remembered who told you about the

12  drugs in the bottle ; right ?

13  A.      Yes, they asked me.  Yes, sir.

14  Q.      So you knew that question was coming up    ; right ?

15  A.      Yes, sir.

16  Q.      And you knew that   I might ask you about that    ;

17  right ?

18  A.      Yes, sir.

19  Q.      And at no time -- disregard that.

20          And they also told you that there was an issue

21  about  Raynard  Dorsey  and whether he was the one who

22  told you where to look  ; didn't they?

23  A.      No, they didn't say there was an issue with

24  that.  No, sir.

25  Q.      You had no note s to  refresh your recollection

1  about this particular incident   ?

2  A.      No, sir.

3  Q.      How many years have you been on the force?

4  A.      Approximately eight years or eight    and a half

5  years.

6  Q.      How many investigation  s have you been involved

7  in?

8  A.      Over 100.  Hundreds.

9  Q.      Hundreds?

10 A.      At least over a hundred.

11 Q.      A hundred , and you remember details of all those

12 investigations?

13 A.      Yes, I do.  I remember the   ones that are

14 particular s.  Specifically  ones such as a  Pepsi bottle

15 having a false bottom.   I never seen that befor  e.  It

16 was my first time seeing that   and it stuck in my mind.

17 Q.      And you remember the informant's information

18 that was given to you over two    and a half years ago  ,

19 after  these  hundreds  of  investigations?

20 A.      I remember the information about me going over

21 and talking to the daughter   and her telling me where

22 the Pepsi bottle was.

23 Q.      Do you remember what you wore last    Friday?

24 A.      No , I don't.

25         MS.  GREENBERG:  Objection.

1            THE COURT:  Overruled.

2            BY MR. MARTIN:

3  Q.       You've been through the police academy   ; right ?

4  A.       Yes, sir.

5  Q.       At the police academy  , one of the things they do

6  is they go through moot court   ; right ?

7  A.       Yes, sir.

8  Q.       And you practice testifying  ; don't you?

9  A.       Yes, we had mock testify.

10 Q.       Yes.   And you've testified many times in court

11 before ; haven't you?

12 A.       Yes, sir.

13 Q.       And you're trained to look   at the jury when you

14 testify ?

15 A.       Yes, sir.

16 Q.       And how to be persuasive in the presentation of

17 your testimony?

18 A.       Persuasive?   I'm trained to tell the truth.

19 Q.       You're trained to tell the truth.  Exactly.       And

20 in being trained to tell the truth, it's not so much

21 trying to  figure out where counsel is going    , it's just

22 telling it like it is  ; right ?

23 A.       That's correct.

24 Q.       Your job is to make sure that the government

25 gets a conviction  , isn't it ?

1          MS.  GREENBERG:  Objection.

2          THE  COURT:    Approach the bench.

3                (At the bar of the Court.)

4          MR.  MARTIN:    Your  Honor , I will withdraw the

5  question.

6          THE  COURT:  Thank you.

7          MR.  MARTIN:    I would like to move on.

8                (Back in open court.)

9          BY MR.  MARTIN:

10 Q.     With respect to this    Raynard  Dorsey.   Was he in

11 custody prior to your bringing him to     P.G.  Plaza?

12 A.     What do you mean when you say    "custody ," sir.

13 Q.     Was he locked up?

14 A.     Yes, he was locked up.

15 Q.     And  while  he was  locked   up , was he locked up the

16 day before?

17 A.     I don't know when he was actually locked up

18 physically.   I just know he was locked up at the time

19 we did the case.

20 Q.     So you don't remember if   it was  a day or two

21 days before he was locked up.

22 A.     Yeah , and  I don't know when he was physically

23 locked up initially on the first incident, no.

24 Q.     You weren't the one who actually went     and

25 arrested him ?

1  A.      No I wasn't.

2  Q.      Did you record any of   these phone conversations

3  within the 24 hours of this controlled buy?

4  A.      No, I didn't.

5  Q.      You don't know , then , whether he was free to

6  come  and go the day before the controlled buy, do you?

7  A.      The day before?  No,   I don't know the day

8  before, no.

9  Q.      And the particular vehicle in question    , the

10 white  Cadillac , that car wasn't under   surveillance  a

11 day or two before this controlled buy   , was it?

12 A.      No, it wasn't.

13 Q.      You didn't have   Mr. Goodwin  under surveillance a

14 day or two before the controlled buy either    , did you?

15 A.      No, I didn't.

16 Q.      Did you ever ask   Mr. Dorsey  whether there were

17 other people who had access to the white     Cadillac?

18 A.      No, I didn't.

19 Q.      So you don't know if he was the only one who was

20 able to drive that car at the time, do you?

21 A.      No, I didn't.

22 Q.      Did you have a telephone with you on the day you

23 made this stop at   P.G. Plaza?

24 A.      A cellular telephone? Yes,   I did.  Yes,  I did.

25 Q.      During  the stop  of the white  Cadillac , the

1  telephone rang, didn't it?

2  A.       My telephone rang?

3  Q.       Yeah.

4  A.       People on my squad right --   I don't recall if my

5  telephone rang specific ally.

6  Q.       How many people were involved in that arrest?

7  A.       Approximately -- it was my squad     and the

8  emergency services team, so approximately maybe    10, 11

9  people.

10 Q.       Ten or 11 people , and when you left  Mr. Dorsey

11 in the car, who was with him?

12 A.       Detective Piazza came over and sat with Dorsey

13 while I went over to the white    Cadillac.

14 Q.       At that particular vehicle  , the car that

15 Detective Piazza was in, does it have a telephone in

16 it?

17 A.       Detective Piazza came and sat in my vehicle with

18 the informant.

19 Q.       Please, please listen to the question.  The car.

20 The car that  Dorsey was in , and Piazza was in that car ,

21 too?

22 A.       That was my vehicle.

23 Q.       That was your vehicle  ?

24 A.       Correct.

25 Q.       It was your vehicl e.  Did you have a phone on

1  your person when you went over to the white      Cadillac?

2  A.      Yes, I did.

3  Q.      And Detective Piazza did he have a phone?

4  A.      Yes, he did.

5          MR. MARTIN:   I have no further questions  , Your

6  Honor.

7          THE COURT:  A dditional cross-examination?

8          MR. HALL:  No , Your Honor.

9          THE COURT:  Any redirect?

10         MS. GREENBERG:  Briefly , Your Honor.

11                    **REDIRECT EXAMINATION**

12         **BY MS. GREENBERG:**

13  Q.      You were asked some questions about    Mr. Dorsey

14  and his cooperation.  Who was the person or agency that

15  arrested Mr. Dorsey, if you know?

16  A.      I don't know what agency actually arrested him

17  physically on that first occasion.

18  Q.      Were you involved  -- d id you have any role at

19  all in debriefing him or preparing him for this

20  controlled buy ?

21  A.      No, it was Detective Martini .

22  Q.      Did you have any role in   arresting Mr. Dorsey ?

23  A.      No , I didn't.

24  Q.      Did you -- were you the one that had the

25  discussion with  Goody's daughter ?

1  A.        Yes, I was.

2  Q.        Were you the one that went over    and talked to

3  her?

4  A.        Yes, I was.

5  Q.        Do you have a clear recollection of that

6  conversation?

7  A.        Yes, I do.

8  Q.        Any doubt  that it  happened?

9  A.        No.  No, ma'am.

10  Q.        What did that discussion lead you to?

11  A.        The Pepsi bottle with the co  caine in it.

12  Q.        Were you the one that rela   yed that information

13  --

14  A.        Yes.

15  Q.        -- d irectly from  Mr. Goodwin 's daughter?

16  A.        That is correct.

17          MS. GREENBERG:   No further questions  , Your

18  Honor .

19          THE COURT:   Any Recross ?

20          MR. MARTIN:  Brief.

21                    **RECROSS-EXAMINATION**

22          **BY MR. MARTIN:**

23  Q.        Did you write a report that day?

24  A.        No, I didn't.

25          MR. MARTIN:   Nothing further , Your Honor.

1          THE  COURT:  All right.

2          MS.  GREENBERG:   Your  Honor , may the witness   be

3  excused?

4          MR.  MONTEMARANO :  Court's indulgence, please.

5          MR.  MARTIN:  Detective   Grant -- Your  Honor, with

6  the court's permission.

7          THE  COURT:  You may.

8          BY MR. MARTIN:

9  Q.     Detective  Grant , when  Mr.  Goodwin 's daughter

10  allegedly told you this, was there anyone else who

11  heard it?

12  A.     No , I was talking to her by myself.

13          MR.  MARTIN:   Nothing further , Your  Honor.

14              THE  COURT:  T hank you .

15          MS.  GREENBERG:   Your  Honor , the  witness ' next

16  surveillance would be March 22   , if he can be excused

17  for now , subject to recall  .

18          THE  COURT:  All right.  You may be excused.

19              (Witness excused at 2  :27 p.m. )

20          (Witness  Sakala  resumes the stand. )

21          MS.  GREENBERG:   Your  Honor , just for the record,

22  p-221 was up on the screen    and would be moved to be

23  admitted , just  to be clear .

24          THE  COURT:  All right .  It will be received.

25                  **FURTHER  DIRECT  EXAMINATION**

1          **BY MS. JOHNSTON:**

2  Q.      Detective Sakala , were there add itional calls

3  from March 13, 2004?

4  A.      On March 13?  Yes.

5  Q.      Calling your attention to   B-469 on Page 60.    Do

6  you have that call in front of you?

7  A.      Yes.

8  Q.      Who a re the participant  s in that telephone

9  conversation?

10  A.      Paulette Martin  and Tiffany vessels.

11  Q.      Is that an incoming call or an outgoing call?

12  A.      It's an outgoing call.

13  Q.      Outgoing from the residence on    Hayward;  is that

14  correct?

15  A.      That's correct , from the hard line at the

16  residen ce on Hayward  Avenue.

17  Q.      If we could please play   B469.

18          (Audio recording begins playing at 2   :28 p.m. )

19          (Audio recording stops playing at    2:29 p.m. )

20          BY MS. JOHNSTON:

21  Q.      The telephone number that   Ms. Martin cal led, was

22  that a cellular  telephone?

23  A.      Yes, it is.

24  Q.      And did you find any errors in the transcript   ?

25  A.      Yeah on Page 61,   fifth line from the bottom  ,

1 where Tiffany Vessels , it says  -- transcript reads

2 including  Friday , she actually says including travel.

3 Q.     Now, in addition to that, there's a reference to

4 do you know where my brother is.  Do you know who       Ms.

5 Martin was referring to?

6 A.     Yes.

7 Q.     Who was that?

8 A.     Learley  Goodwin .

9 Q.     If we could go to   Call B27 2 on Page 64 .  Who are

10 the parties to this conversation?

11 A.     Paulette  Martin  and Eugene  Bird .

12 Q.     That's the one we played this morning; is that

13 correct?

14 A.     That is correct.

15 Q.     If we could move on to B5  66 on Page 70.  What is

16 the date of the next call?

17 A.     March 14,  2004 .

18 Q.     We moved from March 13 to the 14t   h; is that

19 correct ?

20 A.     That's correct.

21 Q.     Who are the  parties  to this call?

22 A.     Paulette  Martin  and LaNora  Ali .

23 Q.     If we could play it  , please.

24        (Audio recording begins playing at 2    :30 p.m. )

25        (Audio recording stops playing at 2    :30 p.m. )

1        BY MS. JOHNSTON:

2 Q.       If we could play the next call   , B567 .  When does

3 the next call happen in relation to the call     we've just

4 heard?

5 A.       One day later .

6          (Audio recording starts a   t 2:30 p.m. )

7          (Audio  recording  stops at 2 :30 p.m. )

8        BY MS. JOHNSTON:

9 Q.       Based on your training    and experience as well as

10 this call  and  the other calls that we will hear later     ,

11 did you form an opinion as to what was being discussed

12 by Ms. Ali  and  Ms. Martin?

13 A.       Yes.

14 Q.       What were they were dis   cuss ing?

15 A.        Ms. Gardner in the first call, 566, is ordering

16 drugs from  Ms. Martin, ordering just one, being the

17 quantity.  In the second call,     Paulette  Martin  is

18 asking whether she wants to put the previous purchase

19 on the books .   In other words , carr y it to Ms. A li's

20 debt  and Ms. Ali says , no, she's going to the bank now   ,

21 inferring she is bringing money to pay for that one      , so

22 it won't go on her debt.

23 Q.       From what in the conversation did you form your

24 opinion that there was a previous transaction?

25 A.       Correct.

1  Q.      From what in the conversation   ?

2  A.      Oh, on Page 71 where   Paulette  Martin says , you

3  know  I forgot to ask you  , the other one you got the

4  other day , do you want me to put that on the books    ,

5  right , refer ring to  a previous transaction.

6  Q.      Are  you able to -- d o you have  an opinion based

7  on these calls as well as other calls we're going hear

8  what drug was involved in these transactions?

9  A.      Yes.

10 Q.      What drug was it?

11 A.      Cocaine.

12 Q.      Are you able to ascertain or do    you have  an

13 opinion based upon your training    and experience in

14 these calls as well as other calls we'll hear in this

15 trial as to what the quantity of the drugs was?

16 A.      An eight ball.  Eighth of an ounce.

17 Q.      Which would be how many grams?

18 A.      Three point five   grams.

19 Q.      Is there anything in these two call    s in

20 particular that establishes that     quantity ?

21 A.      Not in these two calls in particular, no.  Other

22 than just one , she wants the one.

23 Q.      If we could go to call B572.  Does that -- on

24 Page 72.  Does that also take place on March 14?

25 A.      Yes.

1  Q.      Who are the parties to this call?

2  A.      Paulette Martin and Reece Whiting.

3  Q.      If we could play it , please.

4          (Audio recording begins playing at 2 :33 p.m. )

5          (Audio recording stops playing at 2   :33 p.m. )

6          BY MS. JOHNSTON:

7  Q.      Based on your training   and experience , do you

8  know what  Ms. Martin was referring to when she told      Mr.

9  Whiting  she hadn't heard nothing yet?

10 A.      Yes.

11 Q.      What was that?

12 A.      She's referring to awaiting a shipment of

13 cocaine to come in   and she hadn't heard anything.

14 Q.      If we could go to the   next call, B609 on Page

15 73.  Does that , likewise , take place on March 15 in the

16 morning?

17 A.      Yes, March 15, 10  :08 in the morning  .

18 Q.      If you could play it  , please.

19         (Audio recording begins playing at 2   :34 p.m. )

20         (Audio recording stops playing at 2  :34 p.m. )

21         BY MS. JOHNSTON:

22 Q.      And who are the  parties in that conversation?

23 A.      Paulette Martin and Bruce Walker --  Milburn

24 Walker.

25 Q.      Based upon that call  and the other calls we'll

1  hear between those parties   , did you form an opinion as

2  to what they were meeting about?

3  A.      Yes.

4  Q.      What was that?

5  A.      That Milburn Walker was meeting  Ms. Martin to

6  purchase cocaine from her.

7  Q.      Were you able -- do you know -- were you able to

8  form an opinion as to that particular date      and

9  conversation , what kind of drugs he was ordering from

10  her?

11  A.      No.

12  Q.      Why is that?

13  A.      Not based on this information.

14  Q.      Why is that?

15  A.      The conversation  is not specific enough.

16  Q.      If we could turn to   B647 on Page 74 . Does this

17  call also take place on March 15?

18  A.      Yes.

19  Q.      Play it , please.

20          (Audio recording begins playing at 2    :35 p.m. )

21          (Audio recording stops playing at    2:35 p.m. )

22          BY MS. JOHNSTON:

23  Q.      Who are the parties to that conversation?

24  A.      George  Harris  and Paulette  Martin.

25  Q.      Based on your training   and experience  and the

1  calls that you've heard between   Ms. Martin  and Mr.

2  Harris,  did you form an opinion as to what they were

3  discussing?

4  A.      Yes.

5  Q.      What is that?

6  A.      Mr. Martin  was ordering a quantity of cocaine

7  from -- Mr. Harris  was ordering a quantity of cocaine

8  from Ms. Martin.

9  Q.      Okay.   Is t here any term s that are  used in that

10 conversation to refer to drugs?

11 A.      Yes .  Ms. Martin says what size    out fit do you

12 want for your son ; Mr. Harris  re plie s about an eight.

13 Q.      Would you please make a notation on our chart up

14 there that reference to outfit appears on Page 74.

15 A.      (Witness indicating. )

16 Q.      If we could proceed to the next conversation on

17 March 15, B684 on Page 75.

18         (Audio recording begins playing at 2    :36 p.m. )

19             (Audio recording stops playing at 2    :37

20 p.m.)

21         BY MS. JOHNSTON:

22 Q.      Who are the parties to that conversation    ?

23 A.      Paulette  Martin  and Jo Johnson .

24 Q.      Did you form an  opinion a s to  what Ms. Martin

25 and Ms. Johnson were discussing?

1  A.      Yes.

2  Q.      What was that?

3  A.      Ms. Johnson was ordering $150    worth of cocaine

4  from Ms. Martin.

5  Q.      What was the term used   to refer to that?

6  A.      An outfit , a 150 outfit.

7  Q.      What's the significance of the 150 in front of

8  the outfit?

9  A.      Clothes , as far as  I know , don't come in  a size

10 150.

11 Q.      If you could make a note on the chart what page

12 that phrase appears on.

13 A.      (Witness indicating.  )

14 Q.      We could go to the next call, B669.

15         (Audio recording begins playing at 2   :38 p.m. )

16         (Audio recording stops playing at 2   :38 p.m. )

17         BY MS. JOHNSTON:

18 Q.      Before we discuss that call   , can we also play

19 A231 ?  And how soon after B669 does A231 take place on

20 Page 77?

21 A.      B669 took place at 7  :14 p.m.  and A231 took place

22 at 7 :23 p.m .

23 Q.      If we could play it  , please.

24         (Audio recording begins playing at 2   :39 p.m. )

25         (Audio recording stops playing at 2   :39 p.m. )

1        BY MS. JOHNSTON:

2   Q.      Did you recognize the -- were you able to

3   identify the person speaking with    Ms. Martin in call

4   A231?

5   A.      Yes.

6   Q.      Was that call from her home or from her cell

7   phone?

8   A.      That is a call from her cell phone.

9   Q.      Based upon your review of these two calls as

10  well as the  other calls between these part   ies, did  you

11  form an opinion as to what they were discussing?

12  A.      Yes.

13  Q.      What is that opinion?

14  A.      First call , B669 , LaNora  Ali is informing -- is

15  ordering cocaine from   Ms. Martin in a quantity  , and she

16  specif ies the quantity  as one.  She tells her that    --

17  Ms. Ali tells  Ms. Martin that when   Ms. Martin delivers

18  it , to give her a call   and she will bring it

19  downstairs , meaning the money.

20          In the second call  , A231, it's  Ms. Martin

21  calling into the   Gardner  residence , speaking with  Ms.

22  Ali Gardner 's husband , and telling  Mr. Gardner  to tell

23  his wife that she's downstairs with the     -- doesn't say

24  with the cocaine , but she's downstairs to make the

25  delivery of the drug  s to  Ms. Ali  Gardner .

1  Q.      If we could turn to the   next calls  B679  and

2  B685 , which appear on Page 78   and 79.  Who are the

3  parties  in those two calls?

4  A.      I'm sorry?

5  Q.      Who are the parties to those two calls?

6  A.      Paulette  Martin  and  Derrick  Bynum  on both of

7  those call s.

8  Q.      If we could play those calls   , please , one right

9  after the other.

10         (Audio recording begins playing at 2   :40 p.m. )

11         (Audio  recording stops playing at 2   :41 p.m. )

12         MS. JOHNSTON:   And the next call .

13         (Audio recording begins playing at 2   :41 p.m. )

14         (Audio record ing stops playing at 2  :41 p.m. )

15         BY MS. JOHNSTON:

16  Q.      Based upon your training   and experience, what

17  did those calls involve?

18  A.      Mr. Bynum is going over to   Paulette  Martin's

19  residence on the   15th.  He previously picked up the

20  drugs from her two days before   , going back to pay for

21  them -- for the drugs he's picked up   .

22  Q.      Back in March -- in  March of 2004, did you have

23  -- you or  Detective  Eveler  or any of the other agents   ,

24  have 24 hour surveillance on that residence?

25  A.      No.

1  Q.      Were there any difficulties with actually

2  conducting physical surveillance at that location?

3  A.      Yeah.  I think we will see very   shortly it's a

4  very tight neighborhood.  It's a quiet residential

5  neighborhood, and  vehicles unknown to the area can

6  cause suspicion on the part of the neighbors      and of the

7  target , and unfortunately in this case   , that's exactly

8  what happened.

9  Q.      Before we move on to the   Call B696 on Page 80 ,

10 let me  ask you  a question.  You were present when

11 Detective  Grant testified concerning these photographs

12 P-218, P-219, P -220, and P-221.  Do you recognize the

13 individual depicted in those photographs?

14 A.      Yes.

15 Q.      Who was that?

16 A.      That's  Luis  Mangual , Jr.

17 Q.      Was that consistent with your interpretation      of

18 the telephone  conversations that occurred   on March 12

19 through March 13?

20 A.      Yes.  This surveillance happened -- this

21 delivery  happened after sh  e -- excuse me , after she

22 ordered the drugs  and the calls .  We t hen showed up .

23 She then contacted  Mr. Bynum  to say she  received the

24 quantity  of drug s.

25 Q.      If we could move on to call B   696 on Page 80 of

1  the transcripts .  Who are the parties to this    telephone

2  call ?

3  A.      Paulette  Martin  and  Merta  Martin ez.

4  Q.      Do you know who   Merta  Martinez  is?

5  A.      Yes.

6  Q.      Who is  she?

7  A.      She's the sister of   Emilio  Acharta .

8  Q.      If we could play the call   .

9          (Audio recording begins playing at 2    :44 p.m. )

10         (Audio recording stops playing at 2    :44 p.m. )

11         BY MS. JOHNSTON:

12  Q.      Based upon your training    and experience   and your

13  familiarity , did you have an opinion in terms of what

14  they were talking about with regard to 30 to life or

15  ten to life ?

16         MR. HALL:   Your Honor , I'm going to   object.

17  This is not drug terminology.

18         THE  COURT:   It's not what ?

19         MR. HALL:  This is not drug terminology that's

20  being used here  .   It's simply discussing a legal issue.

21         THE COURT:  Let's see if he has an opinion --

22  has any basis for it.

23         THE  WITNESS: Yes , I do.

24         BY MS. JOHNSTON:

25  Q.      What is that opinion?

1 A.      They're discussing her brother's possible

2 sentence.

3          MR. HALL:   Your Honor, that's exactly why  I

4 objected.

5          THE COURT:  Well, if he's not -- if it's not

6 necessary to interpret it  , we don't need an opinion  ,

7 Ms. Johnston.

8          MS. JOHNSTON:   I don't know whether or not   it's

9 necessary to interpret for a jury  , who are not lawyers ,

10 in terms of what that means.

11          THE COURT:  Well , this is not drug terminology  .

12 It's simply talking about a sentence    of ten to life

13 instead of 30 to life . I don't think we need expert

14 testimony for that.

15          BY MS. JOHNSTON:

16 Q.      Based upon your training   and experience , calling

17 your attention to Page 82  .

18 A.      Yes.

19 Q.      Did you place any significance on the statements

20 that Ms. Martinez made concerning where he had been

21 placed  and someone trying to get information from him?

22 A.      Yes.

23 Q.      What is that opinion  ?

24          MR. HALL:   Again , Your Honor , I'm going to

25 objec t. This is not drug terminology  . This is a

1  discussion about what is going on in this person's

2  case.

3          THE COURT:  All right  .  Sustained.

4          BY MS. JOHNSTON:

5  Q.      Detective, based on your training  and

6  experience , can you tell the ladies and gentlemen of

7  the jury how cooperators are developed in criminal --

8  when you 've got somebody un der arrest pending drug

9  charges?

10 A.      Quite often , when someone's arrested for drug

11 cases, they will choose to cooperate    and provide

12 information to the government    in any number of ways in

13 exchange for consideration on their sentence.  That

14 could be a lesser sentence, a probation   .  It could be

15 any number of things  , depending on the personal

16 circumstances of the person arrested.

17 Q.      Now, based on your training   and experience , when

18 a member of a drug organization is arrested on drug

19 charges, what if any concerns do the other members of

20 the drug conspiracy have as a result of the arrest of

21 one of the participants  ?

22          MR. HALL:  Objection , Your Honor.  May we

23 approach ?

24          THE COURT:  Approach the bench

25                (At the bar of the Court.)

```
 1          MR. HALL:   I didn't want to make a speaking
 2  objection, but this question is designed to      -- what
 3  this question is design  ed to  elicit from  Sergeant
 4  Sakala  is something that falls  , I think , way outside
 5  the purview of what he has been designated as an expert
 6  for.
 7          You're talking about the psychology of people
 8  who are involved in the drug trade.  He's not an expert
 9  on that.  He's here to interpret terms.  These are not
10  terms.  We're talking about legal ramifications of a
11  particular individual's plea agreement   , assuming that's
12  what they were talking about   .  And  this particular
13  question is simply designed to bring out the same sort
14  of information but not ma   king it case specific.    I
15  suggest to the   Court that's still equally
16  inappropriate.
17          MS. JOHNSTON:   Your  Honor, he was qualified as
18  an expert witness not only to testify about drug      words
19  but drug  traffic  patterns  and practices.  He's already
20  testified without objection in terms of how cooperators
21  are developed .
22  This goes to what other members of a drug organization
23  do when they learn one of their members is arrested.
24  That is clearly within his realm of his training      and
25  experience,  and it is an area that would not
```

1  necessarily be known to the jury.  It's certainly

2  within his qualification in terms of his expert     ise of

3  how drug  traffickers  conduct their business.

4  It is part  and practice of the business.  They want to

5  know who the person is  , they want to make certain

6  whether that person is cooperating or not so that they

7  can take step s to  protect themselves.     That's what he's

8  going to say.  It is certainly something that is within

9  his expertise.

10        MR.  MITCHELL :  Can I add something to that  , Your

11  Honor?   I think  what the government   is try ing to  do is

12  also get in from this expert witness that clients     , like

13  other drug organizations   , are potentially using

14  violence or other means to intimidate these people who

15  cooperate.

16        That's what the government is try   ing to  do ,

17  getting from this witness that our clients here subtly

18  are involved in violence   , and that  I think is no

19  purpose of that because you cannot     -- she cannot

20  establish with this witness that all persons in every

21  drug organization involve themselves in violence when

22  they find out someone's cooperating   , and  I don't see

23  how this officer could testify to every single person

24  in every drug organization.

25        THE  COURT:  Step back.    Mr.  Montemarano  wants to

1  say something.  We have a one-person      mike.

2        MR. MONTEMARANO:  Thank   you, Your Honor.   I

3  think that  Ms. Johnston misses the point by suggesting

4  this is pattern  and practice of narcotics

5  organization s.  What this is  a pattern  and practice  of

6  is a prosecutor's office   and law enforcement agency

7  cuts a  deal , what he's  doing at that point is no longer

8  part of his  trafficking  activity .  It is what somebody

9  does to get out of under  , and that includes , in some

10  cases , not telling the truth  .  Do we really want to go

11  down this road?  There are huge numbers of cases about

12  jailhouse snitches who read   newspapers  or stealing

13  newspapers from their cell   mates .  Your Honor , we could

14  spend until August 11 on this topic alone     .

15        MS. JOHNSTON:   Your Honor , I'm not asking him

16  about government practices  .  I'm asking him based on

17  his training  and experience , do people in  -- what

18  actions  or what concerns do people have who are

19  involve d in  the drug trafficking organization when

20  someone gets arrested   and he's going to testify that

21  they -- you know , that they have a concern  , so they

22  take the steps to protect their own business     , to make

23  sure that  -- or to learn whether or not that person is

24  cooperating with the government    , because if it causes a

25  potential danger to them    and their organization.

1          I don't an ticipate  him saying that anyone uses

2  violence in particular   , but merely that it is important

3  for them to find out whether the person is cooperating          ,

4  so that they can protect their business.  That is a

5  practice that you have seen over    and over  in terms  of

6  how drug organizations  , drug conspiracies   operate .

7          When somebody gets arrested   , they want  to be

8  sure that that person isn't cooperating so that they

9  can protect their business.  That's the extent of the

10  opinion based on his experience.  It has nothing to do

11  with trying to inject violence into this case.       It has

12  nothing do with what the government's     practices  are.

13  It has to do with what people engaged in the drug

14  conspiracy do when somebody they know has been

15  arrested.

16          THE COURT:   I'm going to sustain the objection.

17  I think we've gone far enough with this type of

18  testimony.  He's been qualified as an expert in the

19  terminology  and procedure s, techniques   used by those

20  engaged in the drug business   , but I think going to the

21  question of what they do when somebody is arrested       and

22  so forth is going too far   , so I will sustain the

23  objection.

24                  (Back in open court.  )

25          BY MS. JOHNSTON:

1  Q.      The individual being discussed in that call was

2  whom?

3  A.      Emilio E charta.

4  Q.      Calling your attention to call B703   .  On what

5  date  and time does that call take place?

6  A.      March 16 at  1:09 p.m. in the afternoon.

7  Q.      Is that the same date as the preceding call?  Is

8  that the same date   as the  preceding call?

9  A.      Yes.

10  Q.      Emilio E charta,  does he have any nicknames?

11  A.      Yes.

12  Q.      What is that ?

13  A.      Julio.

14  Q.      Call B703 on Page 84  .  Would you please play it?

15         (Audio  recording start  s playing at 2 :56 p.m. )

16         (Audio r ecording stop  s playing at 2 :57 p.m. )

17         BY MS. JOHNSTON:

18  Q.      Again the  Julio refer s to whom?

19  A.       Mr. Echarta .

20  Q.      Based upon your training   and experience , what is

21  Mr. Whiting  referring to when he says he might be able

22  to see something, you know   ?

23         MR. HALL:  Objection , Your Honor.

24         THE  COURT:  Overruled.

25         THE  WITNESS:  He's  going  to look at the

1  paperwork  -- Mr.  Echarta 's court papers to see if   Mr.

2  Echarta  is cooperating.

3         MR.  HALL:  Objection.

4         THE  COURT:  Overruled.

5         BY MS.  JOHNSTON:

6  Q.     Based on your training   and experience , why is

7  that important to the people involved in the drug

8  business?

9  A.     Mr.  Echarta  possessed or possesses information

10 that would be useful to the government in prosecution

11 of people in this case.

12 Q.     Now , if we could turn to the next series of

13 calls beginning with B722.

14        What date does this series of calls B722 through

15 B768 take place ?

16 A.     On March 16, 2004.

17 Q.     What time period?  From when to when?

18 A.     From 3 :35 in the afternoon was the first call    ,

19 and 768 , I believe  -- is that the one you said the last

20 call -- concludes or takes   place at 8 :20 p.m. that

21 evening.   So afternoon, evening on the    16th.

22 Q.     If we could play beginning with B722 on Page 86.

23        (Audio r ecording begins playing at 2   :59 p.m. )

24        (Audio r ecording stops playing at 3    :00 p.m. )

25        BY MS.  JOHNSTON:

1  Q.      If we could go to the ne  xt call, 750 on  Page 87.

2  Who are the parties to the next call?

3  A.      Paulette  Martin  and  Larry  Nunn.

4  Q.      Please play it .

5          (Audio r ecording begins playing at 3   :00 p.m. )

6          (Audio r ecording stops playing at 3   :00 p.m. )

7          BY MS. JOHNSTON:

8  Q.      That call is at what time?

9  A.      6:18 p.m.

10 Q.      If we could go to   Call B751 on Page 88  .   What

11 time is this call?

12 A.      6:19 p.m.

13 Q.      If we could play it.

14         (Audio r ecording begins playing at 3   :00 p.m. )

15         (Audio recording stops playing at 3   :01 p.m.)

16         BY MS. JOHNSTON:

17 Q.      Go to the next call  , B752.  When does that take

18 place in relation to the call we've just heard?

19 A.      Not even a minute later   , 6:20 p.m.

20 Q.      Please play it .

21         (Audio recording begins playing at 3   :01 p.m. )

22         (Audio recording stops playing at 3   :01 p.m. )

23         BY MS. JOHNSTON:

24 Q.      B753.  Is that the next call on Page 90?

25 A.      Yes.

1  Q.      Is that in the same minute time frame?

2  A.      Yes, 6 :20.

3  Q.      Please play 753 on Page 90.

4          (Audio recording start  s playing at 3 :02 p.m. )

5          (Audio recording stops playing at 3    :02 p.m.)

6          BY MS. JOHNSTON:

7  Q.      The next call , B762 , takes place approximately

8  how --

9  A.      At 7 :25 p.m.

10 Q.      Please play that call,   Page 91 .

11         (Audio  recording begins playing at 3   :03 p.m. )

12         (Audio recording stops playing at 3    :03 p.m. )

13         BY MS. JOHNSTON:

14 Q.      The next call , B764.  Again , on the same

15 evening?

16 A.      Yes.  A minute later.  7   :26 p.m.

17 Q.      Please play it , B764 on Page 92.

18         (Audio recording begins playing at 3    :03 p.m. )

19         (Audio recording stops playing at 3    :04 p.m. )

20         BY MS. JOHNSTON:

21 Q.      If you would   go to B765 , who are the part  ies in

22 this call?

23 A.      Paulette  Martin  and John  Martin.

24 Q.      If you could , please play it.

25         (Audio r ecording starts at 3  :04 p.m. )

1          (Audio  recording stops at 3  :04 p.m. )

2          BY MS.  JOHNSTON:

3  Q.      If we could go to the next call, B766    , on Page

4  95.  Again  , on the same date later that evening?

5  A.      Yes.   7:55 p.m.

6  Q.      If we could play it  , please.

7          (Audio r ecording begins at 3  :06 p.m. )

8          (Audio  recording ends at 3  :07 p.m.)

9          BY MS.  JOHNSTON:

10  Q.      And B768 , is that also on the same date     and

11  evening ?

12  A.      Yes, at 8 :20 p.m.

13  Q.      Could you play it  , please?

14          (Audio recording begins at 3  :07 p.m. )

15          (Audio recording stops at 3  :07 p.m. )

16          BY MS.  JOHNSTON:

17  Q.      Based on your training   and experience , are all

18  of those calls related?

19  A.      Yes.

20  Q.      Could you describe to the jury what they relate

21  to?

22  A.      Paulette  Martin is obtaining 81 grams of heroin

23  from  Gwen Levi  and then reselling it to   Larry  Nunn.

24  The transaction took place at her residence on       Hayward

25  Avenue .

1  Q.       If we could go back to B722 on Page 86.

2  A.       Okay.

3  Q.       There's a reference to    Julio.  Who is that

4  referring to?

5  A.       That's  Mr. Echarta .

6  Q.       There's  a reference  to Larry, can you call me

7  later on?

8  A.       Yes.

9  Q.       And then  Ms. Martin will call when he calls?

10  A.       Yes.

11  Q.       And who's the  Larry they're referring to?

12  A.       Larry Nunn .

13  Q.       Now on the next page, Page 87.  What    does Ms.

14  Martin ask  Larry Nunn ?

15  A.    Ms. Martin  is asking how much -- how many

16  tickets he wants, 100 referring to 100 grams of heroin.

17  Q.       What is it that you base your conclusion that

18  tickets , when  Ms. Martin uses that term with    Mr. Nunn,

19  refer s to  heroin?

20  A.       If you look further  , she'll actually change the

21  code words to envelopes    and then they go back   and forth

22  a couple of times between tickets -- excuse me     ,

23  envelopes  and tickets, but the call pattern   , as we'll

24  see, is the drugs going from   Ms. Levi to  Ms. Martin  to

25  Mr. Nunn,  and then when we arrested   Ms. Levi , we

1  recovered the heroin processing plant in her house.

2  Q.      Is that how you  distinguished  tickets in these

3  conversations from tickets in some of the earlier

4  conversations that referred to cocaine?

5  A.      That's correct.

6  Q.      Then if we go to the next telephone call    , page

7  88.  What  is Ms. Martin ordering from   Ms. Levi?

8  A.      She's ordering 106 grams of heroin, 1   00, and

9  then a separate package of six grams    , which she refers

10 to six separate envelopes.

11 Q.      Now, based upon your training    and experience in

12 these conversations , did you form an opinion as to

13 whether or not all of the 106 grams was for      Mr. Nunn ?

14 A.      It was not.

15 Q.      Why do you say that?

16 A.      She wanted six separate grams for herself.

17 Q.      If could go onto the chart that you have behind

18 you and add Page 87 next to the word tickets.

19 A.      (Witness indicating.  )

20 Q.      And Page 88 next to the word envelopes.

21 A.      (Witness indicating.  )

22 Q.      Now, after that conversation when    Ms. Martin

23 gets on the phone with   Mr. Nunn , based on your training

24 and experience is there a change in the quantity of

25 drugs that he wants?

1 A.      Yes.

2 Q.      What is the change?

3 A.      He changes the quantity from 100 grams to 75

4 grams.

5 Q.      Is there also a reference to money in that call?

6 A.      Yes.   Paulette  Martin is -- she says you need to

7 get the money.

8 Q.      Based upon your training   and experience in your

9 view of the calls in this case between    Mr. Martin , Mr.

10 Nunn  and Ms. Martin  and Ms. Levi , did you form an

11 opinion as to whether or not    Mr. Nunn  was being fronted

12 drugs or paying for them before receiving them?

13 A.      He paid cash on delivery to    Ms. Martin .

14 Q.      Now, going to the next conversation on Page 90.

15 Does  Ms. Martin  then contact    Ms. Levi consistent with

16 the change in order by   Mr. Nunn ?

17 A.      Yeah , she immediately calls   Ms. Levi back   and

18 changes the order from 106 down to 81, 75     and then six

19 separate for another person.

20 Q.      Do you know who that person is?

21 A.      No.

22      MS. JOHNSTON:   Your Honor , at this time , if I

23 could ask the officer to step down    and we would call

24 Detective  Roger  St. Louis  to testify concerning

25 surveillance on   March 16.

1        MR. MARTIN:   Your Honor, before we do that  , my

2  client has asked if we could take a brief five     -minute

3  break .

4        THE COURT:  H e has ESP.  I was  think ing

5  precise ly the same thing.  We will take a break until

6  3:30 .

7                  (Jury excused at 3:12 p.m. )

8                  (Off the record  at 3 :12 p.m. )

9                  (On the record at 3:32 p.m. )

10      THE CLERK:  Ready for the jury  ?

11      THE COURT:  Yes.

12      THE CLERK:  Ready,  Judge?

13      THE COURT:  Yes.

14                  (Jury returns at 3  :33 p.m. )

15      THE CLERK:   If you will raise your right hand

16  for m e, please.

17  Thereupon,

18                  **ROGER  ST.  LOUIS** ,

19  having been called as a witness on behalf of the    _

20  plaintiff , and having been first duly sworn by the

21  Courtroom Deputy, was examined and testified as

22  follows:

23      THE CLERK:  Please be seated.  If would state

24  your name for the record.

25      THE WITNESS:  Sure.  Detective   Roger  St. Louis.

1  Just like the city , S T, period , L O U I S.

2          THE COURT:  What was the first name again    ?

3          THE WITNESS:  Roger.

4          THE COURT:  Very nice name.

5                      **DIRECT  EXAMINATION**

6          **BY MS. JOHNSTON:**

7  Q.      Detective  St. Louis , where are you employed?

8  A.      Currently employ ed with the Montgomery  County

9  Police , Special  Investigations  Division.

10 Q.      In what capacity?

11 A.      I work in an undercover capacity.

12 Q.      Are you a  Montgomery  County police officer?

13 A.      Yes, I am.

14 Q.      How long have you been a    Montgomery  County

15 police officer?

16 A.      Been a  Montgomery  County police officer a little

17 over 15 years.

18 Q.      During those 15 years  , have you -- how long have

19 been in your current assignment?

20 A.      My current assignment  , two  and a half months.

21 Prior to that , in the  Narcotics  Section for

22 approximately nine years.

23 Q.      During t hose  nine years , could you describe to

24 us so me of your duties   and responsibilities?

25 A.      I worked in an undercover capacity where we made

1  purchases , acted as drug dealer  s.   A lot of the time

2  was spent conducting interdiction     work,  interdicting

3  narcotics that came into the    Washington metropolitan

4  area.

5  Q.     Calling your attention back to    March 16 of 2003.

6  Were you working on that date?

7  A.     Yes, I was.

8  Q.     Of 2004 , I'm sorry?

9  A.     Yes, I was.

10 Q.     Were you requested to assist    Detective  Sakala

11 and Detective  Eveler in an ongoing investigation?

12 A.     Yes, I was.

13 Q.     Were you involved in that investigation as one

14 of the  lead investigators?

15 A.     No , I was just one of the assistant   s in that.

16 Q.     What kind of assistance were you asked to

17 provide on  March 16 of 2004?

18 A.     March 16, 2004 , I responded to 810   Hayward

19 Avenue , which is  in Takoma Park , Montgomery  County ,

20 Maryland to conduct surveillance on traffic coming in

21 and out of that residence  .  Approximately 7 :48, I

22 observed a tan  Toyota  Camry.   It had  temporary tags ,

23 05683 E, as in  Edward,  A as in  Adam,  pull  up.

24        The vehicle was occupied by subjects    .  One of

25 the subjects  was known to me as   Larry Nunn.   Both

1   subjects  exited  the  vehicle  and  went  into  810   Hayward

2   Avenue using  -- if you're facing the residence   , there's

3   a side door on the right side of the residence.   They

4   both went in  there .

5   Q.     If  I could  interrupt you.   That occurred at

6   about 7 :45; is that correct ?

7   A.     That's correct.

8   Q.     What time did you arrive there to start your

9   surveillance?

10  A.     I arrived there about 7  :30.

11  Q.     Did you get much advance notice that you would

12  be going there?

13  A.     No, not much advance notice.

14  Q.     When you got there  , were you in a marked cruiser

15  or uniform?

16  A.     When  I arrived  there , I was in an unmarked

17  vehicle.

18  Q.     Do you recall where you located your vehicle in

19  relation to  the residence ?

20  A.     Almost  exactly  directly across the street from

21  the residence.

22  Q.     After making that observation of    Mr. Nunn  and

23  his companion, what did you observe after that?

24  A.     After that , I stayed there on surveillance   .  At

25  approximately 8 :20, I then observed a tan   Mitsubishi

1  Gallant.  This  vehicle  had  Pennsylvania tags  , E,

2  Edward , M as in  Mary, D as in  David , 0507.

3          MR.  MARTIN:   Your  Honor , I'm going to object if

4  the witness is reading.

5          BY  MS.  JOHNSTON:

6  Q.      Did you prepare notes   and reports  during  the

7  time of the surveillance?

8  A.      Yes,  I did.

9  Q.      Can you give us an idea of how many other

10 surveillances you've done since    March 16 of 2004?

11 A.      Thousands.

12 Q.      Why do you make notes at the time of the

13 surveillance?

14 A.      Make notes at the time of surveillance so      I can

15 come back  and recall exactly what    occurred.

16 Q.      Are you using your note  s to  refresh your

17 recollection of the events that happened on      March 16 of

18 2004?

19 A.      Yes , so  I can  have the times   and  tag numbers  and

20 such as that.

21 Q.      Otherwise , would it be difficult for you to

22 determine at precisely what time    , whether it be 7 :48

23 or 08:20 , an individual   arrived  at a location?

24 A.      That's correct.

25 Q.      Could you describe for us what vehicle you

1 observed  arrive at 8 :20?

2 A.        Sure.  As  I stated , it was a tan  Mitsubishi

3 Gallant with  Pennsylvania tags   EMD 0507.  The vehicle

4 pulled up in front of the residence   , at which time the

5 subject identified -- th  at I knew to be a  Gwen Levi

6 exited the vehicle  .  She was carrying a duffel bag type

7 bag .  She then walked out of the vehicle   , walked down ,

8 and once again went into the exact same side door that

9 Mr. Larry  Nunn and the unidentified male walked into.

10 Q.        And prior to conducting surveillance in this

11 case, did you  familiarize  yourself with the identities

12 of some of the targets through photographs      and

13 information provided   by the  agents?

14 A.        Yes, I did.

15 Q.        Now, after observing   Ms. Levi  enter the

16 residence, did you make any other observations at that

17 location?

18 A.        Sure.  Approximately 8  :33 , Ms. Levi  and the

19 other unidentified sol --    Mr. Nunn and the unidentified

20 male exit ed  the  residence , walking back to the vehicle.

21 They both got into the vehicle   , they turn ed  the  lights

22 on, at which time they turned it off.

23         Approximately two minutes later    , the

24 unidentified male passenger got back out of the vehicle

25 and went back into the side door of the residence.  He

1  was in there for a very short pe    riod of time ,

2  approximately two minutes   , at which time he came back

3  to the vehicle, went to the back passenger side of the

4  vehicle, leaned in  , and appeared to be looking around

5  in the back of the vehicle.  He then got back into the

6  front seat passenger of the vehicle    and then left.

7           I continued the surveillance there   .  At

8  approximately 9 :15 that evening , Ms. Gwen Levi then

9  exited the residence carrying the same bag   , at which

10  time she walked back to her vehicle   , the tan Mitsubishi

11  Gallant , got into the vehicle  , and then drove away.

12  Q.     Continue .

13  A.     I'm sorry.   I stayed there until about 9   :30 that

14  evening , at which time the surveillance was terminated.

15  Q.     Did you follow either   Ms. Levi or Mr. Nunn 's

16  vehicle to see where they went?

17  A.     No, I did not.

18  Q.     Why not?

19  A.     My job was just to conduct surveillance right

20  there at the house.

21  Q.     Did you report your observations to the case

22  agents?

23  A.     Yes, I did.

24  Q.     Now, you testified concerning the --   Mr. Nunn

25  and his companion coming out of the residence    --

1  A.      Yes.

2  Q.      -- and going into their vehicle    and turning on

3  the light.

4  A.      That's correct.

5  Q.      Were you able to see what they were doing inside

6  the vehicle with the light on?

7  A.      I could not see what they were doing inside.

8  Q.      Other than that observation   , did you make any

9  other observations concerning other people at that

10 location at that time?

11 A.      No.

12         MS. JOHNSTON:   Your Honor , I have no other

13 questions of this witness.

14         THE COURT:  Any cross-examination?

15         MR. MARTIN:  Yes,  Your Honor.

16              **CROSS-EXAMINATION**

17         **BY MR. MARTIN:**

18 Q.      Is it Sergeant  St. Louis ?

19 A.      No, Detective  St. Louis .

20 Q.      I can't promote you?

21 A.      No.

22 Q.      I objected earlier because    I thought you were

23 reading.  Would it be fair to say that it would be hard

24 to remember event  s that happen ed a year or two years

25 ago without looking at your report?

1  A.      Yes, it would be.

2  Q.      Would it also be fair to say that the reason you

3  memorialize or write things down    is so that you can

4  refer back to them later on when you have to come into

5  court  and  testify?

6  A.      That's correct.

7  Q.      So that's a standard practice on the part of

8  police to do that; right?

9  A.      I would say it would be a standard practice on

10  the part of good police officers -- most police

11  officers.  Sometimes notes aren't taken.      I can't

12  explain why they are or why they're not, but as far as

13  for my purposes in this case    , we take notes for such

14  occasions.

15  Q.      And in the report of investigation -- well    , if

16  that's what you call it.  Do you call it a report of

17  investigation?

18  A.      On this  one, it's just  notes  that  I took  so I

19  can recollect my knowledge   .

20  Q.      With respect to those note   s that you take  , you

21  memorialize  those facts that you think are important     ;

22  right ?

23  A.      I'm memorializ ing that  I observe   -- in a case

24  like this , everything that we're observing    , we would --

25  I don't really dictate what     I think is important in

1  this case because   I'm not the case agent.     I put down

2  everything that   I see and then let the case agent

3  determine what they -- from their knowledge of the

4  whole case , what is important to their case.

5  Q.     That's fair.  But in terms of writing down

6  things,  you would  write things down like the time?

7  A.     That's correct.

8  Q.     And you would  write down the date  ?

9  A.     That's correct.

10  Q.     And you would write down people that you

11  observed , if you knew who they were  ?

12  A.     That's correct.

13  Q.     And if you knew names  , you would write the names

14  down ; right?

15  A.     That's correct.

16  Q.     You would write down license plate numbers?

17  A.     Yes.

18  Q.     If you had occasion to talk to someone    , you

19  would write that down?

20  A.     If I talked to somebody.

21  Q.     If you talked to somebody  , and that's the kind

22  of thing that you would learn    at the  academy ; right ?

23  A.     That's the kind of thing you would learn through

24  experience.  The academy will teach you so much    , but

25  most of the stuff will come through experience.

1  Q.      Through experience.    And how long would it take

2  -- how long did it take you   , for example , to determine

3  that it was important to write those things down?

4  Would  it be fair to say after two years you knew that?

5  A.      No , I wouldn't even say that after two years    .

6  It actually took actually doing    more in vestigative  work

7  to realize how important -- the importance      of a lot of

8  things being written down.

9  Q.      Well, you said you were in narcotics for nine

10  years ; right?

11  A.      That's correct.

12  Q.      By the time you reach  ed the eight -year point ,

13  would you have realized that?

14  A.      Yes.

15        MR.  MARTIN:   Nothing further.   Thank you.

16        THE  COURT:  Any further   cross?

17        MR.  HALL:  Very briefly.

18                    **CROSS-EXAMINATION**

19        **BY MR. HALL:**

20  Q.      The passenger in   Mr. Nunn 's vehicle , was that

21  somebody who you were not familiar with?

22  A.      That's correct.

23  Q.      Okay.  So you had an opportunity to look at

24  photographs of other people who were involved in this

25  case , and his features did not strike any familiarity

1  with you; is that right?

2  A.      That's correct.

3          MR. HALL:  That's all, Your Honor.

4          THE COURT:  Redirect?

5          MS. JOHNSTON:  Just one or two questions.

6                    **REDIRECT EXAMINATION**

7          **BY MS. JOHNSTON:**

8  Q.      Detective St. Louis, in your past experience,

9  have there been occasions when you 've not made

10 appropriate notes  and been called to try to recall

11 events?

12 A.      Yes, there has been .

13         MS. JOHNSTON:   I have nothing.

14         THE COURT:  All right.  Thank you.  You may step

15 down.  Thank you very much.

16         (Witness excused at 3  :44 p.m. )

17         (Witness Sakala  resumes the stand.  )

18                 **FURTHER DIRECT EXAMINATION**

19         **BY MS. JOHNSTON:**

20 Q.      Before we leave the events we've just discussed ,

21 I want to show you what's been marked as    Government's

22 Exhibit N-1, and ask you if you're  familiar  with this

23 exhibit.

24 A.      Yes.

25 Q.      Okay.  And what is that?

1  A.        It's a drug ledger.

2  Q.        Do you know where that drug ledger was

3  recovered?

4  A.        Yes.

5  Q.        From where?

6  A.        New York City from the possession of    Moises

7  Uriarte .

8  Q.        Who is  Moises  Uriarte?

9  Q.        The heroin supplier for    Gwendolyn  Levi.

10  Q.        And did  Gwendolyn  Levi have any partners in her

11  heroin business?

12  A.        Yes.

13  Q.        Who was that?

14  A.        William  Turner.

15  Q.        What was he -- did he have anything he was

16  referred to?

17  A.        Yes.

18  Q.        And  in looking at the drug ledger of    Mr.

19  Uriarte,  what if any , indication is there of a drug

20  delivery received by   Mr. Turner  and Ms. Levi in the

21  vicinity of  March 16 of 2000?

22  A.        On March 14 , there's a notation.

23  Q.        If  I could put it up on the screen so everyone

24  can see what you're referring to.      And  in that regard ,

25  were those drugs being delivered here in      Maryland or

1 picked up in  New York?

2 A.      Picked up in  New York.

3 Q.      What is the entr y you're referring to?

4 A.      I gave him 3 /14/04, 1,000.

5 Q.      What does that refer to?

6 A.      One kilogram of cocaine.   One thousand  grams .

7 I'm sorry , one kilogram of heroin  .  I believe  I said

8 cocaine .  It's one kilogram of heroin.

9 Q.      Do you have any indication whatsoever that      Mr.

10 Uriarte  was delivering anything other than heroin to

11 Ms. Levi?

12 A.      No.  The li sted  prices would not match cocaine.

13 The prices match   heroin .

14 Q.      What price are you referring to    there ?

15 A.      It was $60,000 for the kilogram of heroin.

16 Q.      Now , if we could move back on to the calls.

17 Calling your attention to the next call, B778     , which in

18 the transcript begins on    Page 97  and continues through

19 Page 102.

20      Have you reviewed that transcript    and the actual

21 portion of the telephone call that we have available to

22 play in court?

23 A.      Yes.

24 Q.      Is there a discrepancy between this transcript

25 and the portion we're going t   o play?

1  A.       The transcript is longer than the -- is not

2  edited ; whereas the portion we're going to play is

3  edited.

4  Q.       Okay.   And what portion of the call are we going

5  to play?

6  A.       Until Page 99 .  The last thing we'll hear is  ,

7  John Martin saying at the   top, yeah, I know,  young-un.

8  Q.       Again , why is it that you have edited the calls    ,

9  or why is it that we're only playing portions of the

10  call?

11  A.       Just for the sake of saving the    Court's time.

12  This is a six -minute call , and to play the entire call

13  would waste the   Court's time.

14  Q.       Who are the parties to this telephone

15  conversation?

16  A.       Lavon Dobie, " Becky ", and John Martin.

17  Q.       It's taking place over?

18  A.       The home residence or home telephone line on

19  Hayward  Avenue.

20  Q.       If we could play B778   , please.

21          (Audio  recording starts at 3  :48 p.m. )

22          (Audio recording   stops at 3 :50 p.m.)

23          BY MS. JOHNSTON:

24  Q.       Again, wh o again who are the   parties  to this

25  conversation?

1   A.       John Martin  and Lavon  Dobie.

2   Q.       Based upon your training    and experience, what is

3   Ms. Dobie explaining to    Mr. Martin  concerning vehicles

4   used in drug trafficking?

5   A.       They're talking about getting a car, a cheap,

6   inexpensive car so that if you're dealing drugs in your

7   car and the police take it   and it's seized  and

8   forfeited , you're not losing your good car.   Basically

9   you have a throw  -away car to use in your drug

10  trafficking.

11  Q.       Where is that in the conversation?

12  A.       At the bottom of Page 97 where    Ms. Dobie starts

13  talking , take one of those paychecks   , buy a car .   They

14  have nice , used , reliable cars .   You can get a car  .

15  You get the car an  d then my lifestyle  , I try to keep

16  one of them kind of cars anyway to do what     I do in.

17  That way if you got to leave it or if the police take

18  it , like you said , the feds got your car.

19  Q.       You know what her reference was when she said

20  when the feds got his car, referring to     Mr. Martin,  on

21  Page 97.

22  A.       That was , I believe , a reference  to his Takoma

23  Park incident where   --

24           MR. WARD:   I'm sorry , what incident ?

25           THE  WITNESS:    Takoma  Park incident where he was

1  arrested with the 25 kilogram wrap    pers .

2          BY MS. JOHNSTON:

3  Q.      Now, based upon your training    and experience, is

4  it the practice of narcotics officers to seize people's

5  vehicles when they're used for drug trafficking

6  activities?

7  A.      Yes, it is.

8  Q.      If we could go to the next call    , A258, which is

9  on Page 103 .  What is the date   and time of this call?

10 A.      This was on   March 17 at 9 :06 a.m.

11 Q.      Who are the parties?

12 A.      Paulette  Martin  and Learley  Goodwin.

13 Q.      If we could play the call   , please.

14         (Audio r ecording begins playing at 3   :52 p.m. )

15         (Audio r ecording stops playing at 3   :53 p.m. )

16         BY MS. JOHNSTON:

17 Q.      Based upon your training    and experience, what is

18 Ms. Martin asking   Mr. Goodwin,  and what is he advising

19 her?

20 A.      She's inquiring about the couriers that are down

21 in Texas  and when they're going to be getting back with

22 the load of cocaine.

23 Q.      Where do we see that in the conversation?

24 A.      You ain't heard nothing about the tickets yet?

25 Mr. Goodwin  talks about they're stuck in the middle     ,

1  and that later on he says , it's never supposed to have

2  been this long , but so far it's all right.

3  Q.      Based upon your training  and experience , what is

4  he telling her when she says , so far it's all right?

5  A.      It's just taking longer.  Nothing's happened to

6  the people down in  Texas , it's just taking longer than

7  it should.

8  Q.      Is there any significance to you based upon your

9  training  and experience that  Mr. -- when  Mr. Goodwin

10 says I'll come to see you  and give you an update?

11 A.      Yeah , he's going to talk to her in person as

12 opposed to giving her full details on the phone.

13 Q.      If we could get to the next call  , A266.  What is

14 the date  and time of this call?

15 A.      This is on  March 17 at 10 :39 a.m.

16 Q.      Who are the  parties  this call?

17 A.      Paulette  Martin  and Claude  Arnold.

18 Q.      Who is  Mr. Arnold?

19 A.      An associate/friend of   Ms. Martin  and Ms. Levi.

20 Q.      If we could play the call  , please , on 104 , A266.

21         (Audio r ecording begins  playing at 3 :54 p.m. )

22         (Audio r ecording stops  playing at  3 :54 p.m. )

23         BY MS.  JOHNSTON:

24 Q.      In this telephone call between   Ms. Martin  and

25 Mr. Arnold , what are they discussing?

1  A.      They're talking about several things.

2  Initially, they're talking about   Learley Goodwin  is

3  back in town but the couriers are still in     Texas.

4  Q.      Where is that?

5  A.      I -- well on Page 104  , Ms. Martin is saying,    I

6  ain't heard nothing.  Like my brother    , he's back , he

7  say he left on , meaning the couriers  .  He said he 'd

8  have to talk to me when he see me    , which reference s the

9  previous conversation.

10        Then the next -- her next paragraph where she's

11 talking , he had to come on back  , meaning back to

12 Maryland.  He had to see -- he's saying he'll tell me

13 when he see me , so it's apparently something's up

14 there's a hold up or something's wrong    , referring to

15 the load in   Texas.

16 Q.      Then on Page 105  , what is  Ms. Martin discussing

17 with  Mr. Arnold ?

18 A.      At the top of the page  , she's talking where

19 she's got other irons in the fire    , meaning that she's

20 working on other supplies of cocaine    , and then there's

21 a typ o, fourth line down where   Ms. Martin says, like   I

22 said, I know people with something but it's just too --

23 she doesn't say hot  , she says too high for me to be

24 bothered.  Then she says   , it's $26 referring to $26,000

25 per kilogram.

1  Q.      For a kilogram of what?

2  A.      Cocaine.

3  Q.      What is the -- in reference to heroin  , what was

4  the price that we had noted in   Mr. Uriarte 's book?

5  A.      He was selling --  Mr. Uriarte  was selling the

6  kilo of heroin to  Mr. Turner  and Ms. Levi for $60,000  .

7  Q.      As referenced in that notebook?

8  A.      Correct.

9  Q.      Is that consistent with your training   and

10 experience concerning the difference in prices of a

11 kilo of cocaine as opposed to a kilo of heroin?

12 A.      Heroin is much more expen   sive , yes.

13 Q.      Based on your training   and experience, the $26

14 refer s to $26,000?

15 A.      Yes.

16 Q.      And based on your training   and experience , were

17 you familiar with back in 2004  , what the wholesale

18 price of kilos of co  caine were?

19 A.      That's a high price  .

20 Q.      When Ms. Martin says , you lose on that when you

21 can't do nothing what  's she referring to?

22 A.      Mr. Uriarte  paying $26,000 per kilogram  . You

23 can't make any profit on it  , so it's not worth it for

24 her to purchase it at that price.

25 Q.      Is that consistent w  ith your training   and

1   experience  in regard s to the price of   cocaine ?

2   A.      Yes.

3   Q.      Is there a reference to another possible source?

4   A.      Yeah , she's talking about her   Godson going to

5   New York  and then another unknown individual who is

6   being released from prison out of    New York.

7   Q.      Now,  I neglected to  , in preceding conversation

8   on Page  3, there was a reference to tickets.  Was that

9   a code word for drug  s in that conversation?

10  A.      I'm sorry on Page 103?

11  Q.      103.

12  A.      Yes , it is.

13  Q.      If you could write 103 up on our chart next to

14  the word tickets  , I'd appreciate that.

15  A.      (Witness indicating.  )

16  Q.      If we could go to the next call   , A267 , also

17  taking place on  March 17 of 2004.  Do you have     A267, on

18  Page 107, in front of you?

19  A.      Yes.

20  Q.      Who are the parties to this conversation?

21  A.      Paulette  Martin  and Gwen Levi .

22  Q.      If we could play it  , please.

23          (Audio recording begins playing at 4   :00 p.m. )

24          (Audio recording stops playing at 4   :06 p.m. )

25          BY MS.  JOHNSTON:

1 Q.      Going back to Page 107.  The night that they're

2 discussing , is that the night  of that March 16

3 surveillance we just heard   --

4 A.      Yes.

5 Q.      -- about from  Detective  St. Louis ?

6 A.      Yes.

7 Q.      There's a reference on Page 1 to tickets.  Do

8 you see that reference?    On Page 107 , I'm sorry?

9 A.      I see two references, yes.

10 Q.      Based on your training   and experience , do those

11 references have any significance?

12 A.      Talking about drugs.

13 Q.      Okay.  And in particular, when   Ms. Martin says

14 she wants to ride me for one of those tickets     and she

15 already owes me about $3, what is     Ms. Martin telling

16 Ms. Levi in reference t  o Becky?

17 A.      Becky wants  Ms. Martin to front her more    cocaine

18 and she's already --  Ms. Martin  is already carrying a

19 debt with  Becky.

20 Q.      Now, on Page 108 , again , is there a  typo in that

21 transcription?

22 A.      Yes.  Just above the middle of the page where

23 Ms. Levi comes back to the conversation    , she doesn't

24 say talk , she says hello.

25 Q.      And the -- could you make a notation on the

1  chart in reference to tickets being used on Page 107?

2  A.      (Witness indicating.  )

3  Q.      Who is the  "Becky" they're referring to?

4  A.      Lavon  Dobie.

5  Q.      Now, on Page 108 near the bottom of the page      ,

6  Ms. Martin references    Larry  and something about giving

7  papers at another time  .  Based on your training    and

8  experience , what was  Ms. Martin discuss  ing there  with

9  Ms. Levi ?

10 A.      The transaction for the  81 grams of heroin     , the

11 papers refers to money.  It's a common term used by       --

12 I've heard on every wiretap    I've ever been on  , and what

13 Ms. Martin is saying is    I couldn't  give you the money

14 because  Becky was there  , meaning the money   Larry gave

15 to her for 81 grams of heroin.

16 Q.      Now there's also discussions in here about candy

17 and liquor.

18 A.      Yes.

19 Q.      And bowls  -- wrapped bowls   and refrigerators.

20 Based on your training    and experience , are those -- is

21 that discussion related to drugs?

22 A.      No.

23 Q.      What does  is it related to?

24 A.      They're complaining    -- both of them are

25 complaining about   Becky nosing around the residence

1  when -- during the last night   , the previous night that

2  she's going  and nosing around looking at the places

3  that they believe she shouldn't be nosing around.

4  Q.      And candy means candy?

5  A.      Yes.

6  Q.      And liquor means liquor?

7  A.      Yes.

8  Q.      And Moet means,  I guess , champagne?

9  A.      Yes.

10 Q.      Then there's a reference to   Harvey 's house on

11 Page 110.  Who is  Harvey ?

12 A.      Harvey Star Washington,  he's an associate of  Ms.

13 Martin 's.

14 Q.      Calling your attention to Page 1  12.  Based upon

15 your training  and experience, what are  Ms. Martin  and

16 Ms. Levi discussing when they're referencing the fact

17 that  Becky has a husband?

18 A.      Selling drugs, hustling is a common term for

19 selling drugs.

20 Q.      Now if we could go to the   next conversation or

21 series of conversations beginning with B811.  These

22 conversations take place on what date?

23 A.      B811 is on  March 17 at 11 :39 a.m.

24 Q.      Is that conversation related to    B816, 8 22, 23,

25 24, 828 , 836 and 838?

1  A.       Yes.

2  Q.       If we could begin by playing B811 on Page 114

3

4          (Audio recording begins playing at 4    :10 p.m.)

5          (Audio recording stops playing at    4:10 p.m. )

6          BY MS. JOHNSTON:

7  Q.       Who are the  parties  to that call ?

8  A.       Derrick  Bynum  and Paulette  Martin.

9  Q.       What time  does that  call take place?

10 A.       11:39 a.m.

11 Q.       If we could play  B816, please.

12          (Audio r ecording begins  playing  at 4 :10 p.m. )

13          (Audio r ecording stops  playing  at 4 :11 p.m. )

14          BY MS. JOHNSTON:

15 Q.       What time is that call?

16 A.       That is on the same day  , at 1:11 p.m.

17 Q.       Before we go into the related calls, B822    , was

18 there surveillance conducted on that date,      March 17?

19 A.       Yes.

20          MS. JOHNSTON:   If I could ask the  Detective

21 Sakala to step down   and we'll call  Detective Scheirer

22 to testify concerning the   March 17  surveillance.

23          (Witness excused from the stand at 4    :11 p.m. )

24 Thereupon,

25                    **GREGORY  SCHEIRER** ,

1 having been called as a witness on behalf of the

2 Plaintiff , and having been first duly sworn by the

3 Courtroom Deputy, was examined and testified as

4 follows:

5                   **DIRECT   EXAMINATION**

6     **BY MS.  GREENBERG:**

7 Q.     Would you state your name   and spell your last

8 name for the court reporter   , please?

9 A.     Gregory  William  Scheirer , S C H E I R E R.

10 Q.     And sir, where are you employed?

11 A.     I'm employed by the   Prince George's  County

12 Police  Department.

13 Q.     How long have you been employed with the     Prince

14 George's  County  Police  Department?

15 A.     For the last eight years.

16 Q.     As such , what are your duties   and

17 responsibilities?

18 A.     I'm currently assigned to the   Major  Narcotics

19 Division.  Our main responsibility is to investigate

20 large scale drug operations, money laundering   , drug

21 importations in   and around  Prince George 's County.

22 Q.     What is your current position in the     Major

23 Narcotics  Section for  Prince George's  County Police

24 Department?

25 A.     I hold the rank of corporal   and I'm assigne d to

1  duty rank of detective.

2  Q.       How long have you been a detective?

3  A.       I've been in  Major  Narcotics  for just over four

4  years , and out of  the eight year s, I've been employed

5  -- six of those have been in the     Narcotics  Division.

6  Q.       Now , if I could direct your attention back to

7  the spring of 2004  , actually  March of 2004 , were you

8  employed as a detective with the     Major  Narcotics  Unit

9  for Prince  George 's County at that time?

10  A.       Yes, ma'am , I was.

11  Q.       Did you assist in an investigation along with

12  Detective  Eveler  and Sergeant  Sakala  and Special  Agent

13  Snyder?

14  A.       Yes.

15  Q.       As such , what are your  duties  and

16  responsibilities?

17  A.       During  Detective  Eveler's case , I was assigned

18  surveillance.  My squad  , a group  of detectives ,

19  different days  , different  locations.

20  Q.       And  were you assigned to do surveillance on

21  March 17, 2004?

22  A.       Yes,  I was.

23  Q.       Just  to be clear , did you get much notice when

24  you were sent out on surveillance?

25  A.       Sometimes yes , sometimes no.  Sometimes they

1  could say , you know , tomorrow at this hour  , we want  you

2  to be at this location an  d we can set up , and sometimes

3  it's a frantic phone call  either in  the mid dle of the

4  night or early afternoon  , get to this location as fast

5  as you can.

6  Q.     Do you recall specifically on   March 17 , 2004 ,

7  what kind of notice you got?

8  A.     I think that  was one  of the shorter notices that

9  I was talking of.

10 Q.     When you went out to do surveillance   , were you

11 in marked, unmarked car, dressed as a -- in

12 plainclothes dressed as -- what kind of clothes? Jus    t

13 describe to us .

14 A.     On a routine basis , I report to work dress  ed in

15 plainclothes , blue  jeans,  T-shirts , street clothes , and

16 I only have an unmarked vehicle.  No police radios    , no

17 antennas , just a nondescript car.

18 Q.     So based on your work on surveillance on    March

19 17, 2004, where did you go that day?

20 A.     We were sent to 810    Hayward .

21 Q.     That is in what town?

22 A.     I believe that's  Takoma  Park.

23 Q.     In Maryland?

24 A.     Maryland.

25 Q.     What time did you go there?

1  A.      If I can refresh the times in my note   s.

2  Q.      Certainly.

3  A.      I got to the location at 12   :45 in the afternoon.

4  Q.      What did you observe?

5  A.      I set up surveillance on the residence    and at

6  approximately 1 :12 in the afternoon  , so approximately

7  almost 30 minutes later  , I observed a black   minivan

8  with silver arrive at the location    and a black male

9  exit the driver's seat of the vehicle    and enter the

10 side  entrance  of 810  Hayward .

11 Q.      Showing you wh at's been marked as P  -224.

12         Do you recognize what is depict   ed in  that

13 picture?

14 A.      Yes.  As the individual was exiting his vehicle

15 and walking  up to  the residence , I was  able to use a 35

16 millimeter camera with extended zoom to photograph him      ,

17 and this is one   of those  pictures of him exiting the

18 vehicle.

19 Q.      When you say   "silver ," were you refer  ring to

20 this part  of the van?

21 A.      Yes.

22 Q.      Where my finger is?

23 A.      Black over silver.

24 Q.      The bottom trim of the door?

25 A.      That's correct.

1  Q.      Do you recognize the other vehicle depict    ed in

2  this picture , P-224?

3  A.      The  red  Mercedes ?

4  Q.      Yes .

5  A.      Yes , I do .

6  Q.      How do  you rec ognize the red   Mercedes?

7  A.      That was the vehicle that  was routinely in front

8  of 810  Hayward  and had been relayed to us from

9  Detective  Eveler  as the primary vehicle for the lead

10  defendant.

11  Q.      Who was that?

12  A.      Ms.  Paulette  Martin .

13  Q.      Who did you understand resided at 810     Hayward

14  Avenue?

15  A.      The only  individual   I was made aware of was    Ms.

16  Paulette  Martin .

17  Q.      And  showing you what's been marked as P    -225.

18  Can you tell  the  jury what's depicted in that picture?

19  A.      It's the same black male that exited the    minivan

20  as he approaches 810   Hayward .

21  Q.      And  what did you observe as    he approached 810

22  Hayward ?

23  A.      He went to the side   entrance  and entered the

24  home .

25  Q.      Did you make further observations as to this

1  residence on that afternoon?

2  A.      Approximately five minutes later    , at 1 :17 in the

3  afternoon , the same individual exited the side entrance

4  of the residence, returned to the black      minivan,  got in

5  the driver's seat   and left the area.

6  Q.      Did you make any observation of him after that?

7  A.      I did not.

8  Q.      Is that when your surveillance ended    ?

9  A.      I believe so, yes, ma'am.

10 Q.      At least for that period of time    ?

11 A.      For that period of time.

12 Q.      So we'll see you again?

13 A.      So  I'm told.

14 Q.      Okay.  Court's indulgence.

15         MS. GREENBERG:   Nothing further , Your  Honor.

16         THE COURT:  All right  .  Any cross-examination?

17         MR. MARTIN:  Court's indulgence.

18                      **CROSS-EXAMINATION**

19         **BY MR. MITCHELL:**

20 Q.      Detective  Scheirer , you were called by who to go

21 to investigat e or do the surveillance?

22 A.      On that day , I would have been contacted --    I

23 would not be in direct contact with the listening posts

24 or Detective  Eveler.   I would have been contacted by my

25 super visor .

1  Q.        Okay.  Were you told who to    surveil ?

2  A.        No, sir.  In this case  , I was a surveillance

3  team .  I wasn't privy to any individual's appearance or

4  pictures or who  I was looking for .  My primary

5  responsibility was photograph, document, descriptions

6  of people, descriptions of vehicles   , tag numbers , and

7  that sort.

8  Q.        You weren't told why or what the purpose of the

9  surveillance was  ?

10  A.        No, sir .  Need to know basis  , and I did not need

11  to know that.

12  Q.        And is that why you referred to a black male

13  instead of the name of a person?

14  A.        I don't know  who the individual was.  That's

15  correct , sir.

16  Q.        At the time , you didn't?

17  A.        And I still don't.

18  Q.        The pictures that you saw identified as P     -224

19  and 225.  In your surveillance    and reviewing the

20  pictures , did you see this individual carrying anything

21  to or from the residence?

22  A.        From my recollection  , I don't recall him

23  carrying anything.  If   I did notice it  , I would have

24  put it in my notes.  If the picture can go back up

25  again , we can look at it closer   , but I don't recall

1  that.

2  Q.      That is P -224?

3          MS. JOHNSTON:  P -225.

4          MR. MITCHELL:  225.

5          BY MR. MITCHELL:

6  Q.      Looking at that picture again  , does it appear

7  that this individual is carrying any specific items in

8  his hand?

9  A.      In his hands?  No, sir  , but you can see there's

10  a bulky coat , so there may or may not be something

11  underneath the coat  , but I do not  see anything in his

12  hands .

13  Q.      For example , there could be a sweater under the

14  coat .

15  A.      Hypothetically , there could be a lot of things

16  under the coat  .

17  Q.      Sure.  Hypothetically  , many things other than

18  anything that's drugs or drug related.

19          MS. GREENBERG:  Objection  , Your Honor .

20          THE COURT:   Sustained .

21          You've covered the waterfront.

22          BY MR. MITCHELL:

23  Q.      Looking at these pictures, and based on your

24  surveillance, would you agree with me there wasn't

25  anything unusual about going into a house and coming

1 out of the house,   taking it by itself  ?

2 A.      Sir , you're asking me to go out to make an

3 opinion.   I saw the individual arrive,    I saw him go in

4 the side entrance , I saw him exit .

5 Q.      And then you reported that  ?

6 A.      That's correct.

7        MR. MITCHELL:   No further questions.

8        THE COURT:   Mr. Montemarano ?

9        MR. MONTEMARANO :  May  I, Your Honor?

10                      **CROSS-EXAMINATION**

11        **BY MR. MONTEMARANO :**

12 Q.      Detective , you're working from some note   s in

13 front of you?

14 A.      That's correct , sir.

15 Q.      May I see them please?  That's contained in a

16 report generated subsequent to the surveillance on the

17 17th; correct?

18 A.      That's correct.

19 Q.      And at the same time -- excuse me -- you did

20 surveillance, and did you take written notes of some

21 sort with a pen  and piece of paper?

22 A.      On that day , sir?

23 Q.      Yes .

24 A.      I'm not aware that   I did.

25 Q.      So, how do you report things like license

1  numbers?

2  A.      At this time , we're on a radio  system , and as

3  I'm talk ing to  other members of my squad   , the person

4  that usually had eyes on would not be the person --

5  obviously if you're taking notes    , you can't have eyes

6  on, so we would be relaying this over the radio      and

7  someone else who's   a little fa rther away would be

8  taking the note  s.

9  Q.      So instead of looking down at    the paper  and

10 losing the visual contact with the subject of your

11 attention , in this case my looking at you, you would

12 read out into the radio   those pieces of information you

13 considered important; correct?

14 A.      That's correct , sir.

15 Q.      In essence , the tape of the radio   conversation

16 would provide a record or is somebody writing it down?

17 A.      Someone's writing it down so there would be no

18 tape record er.

19 Q.      So there's someone writing it down   and -- as

20 you're dictating it  , for lack of a better term?

21 A.      In most cases , yes, sir , someone could also be

22 on a cell phone  .  There are a variety of ways we relay

23 information.

24 Q.      In a ddition, we've  a 35 millimeter camera   ,

25 correct , with a zoom lens?

1  A.      Correct .

2  Q.      Which gives you more detail than just a regular

3  lens , and you're taking photographs like this one here      ;

4  right ?

5  A.      That's correct , sir.

6  Q.      And you take photographs to record what you see

7  at that time; correct?

8  A.      That's correct.

9  Q.      Okay.   And notwithstanding the fact that you can

10  see thin gs you're dictating , for lack of a better term   ,

11  into your radio  , what you're seeing  and taking

12  photographs , you're doing all these things to create a

13  multiple record of what's going on   .  Is that a fair

14  statement?

15  A.      I believe that would be fair.

16  Q.      Court's indulgence.

17         You mentioned during your direct examination

18  that among the things you would have written down would

19  be , for instance , if he was carrying something    that is

20  the gentleman in the photograph   ?

21  A.      Once again , if I was eyes on , I wouldn't be the

22  one writing it down  .  It would have been something that

23  I would have relayed.

24  Q.      You would have dictated it?

25  A.      If I had seen something   --

1  Q.      Right .

2  A.      -- I would relay it.

3  Q.      And you would have relayed his clothing?

4  A.      Not necessarily, no, sir.

5  Q.      Height?

6  A.      Not necessarily, no.

7  Q.      Weight?

8  A.      Being the fact that there was only one

9  individual, that wouldn't have been necessary.

10 Q.      Tag number of the vehicle?

11 A.      If I could see it from where   I was, that would

12 be something important that   I would rely, but it's not

13 necessary.  If  I couldn't see it , I would suspect

14 another vehicle would try to pick it up as it left     , but

15 yes, if visible , I would definitely relay it.

16 Q.      Time of day?

17 A.      Would  I relay the time of day?  No, sir.

18 Obviously the people around me are well aware of the

19 time of day.  They're with me.

20 Q.      So somebody is recording the time of day    ; right?

21 In your experience.

22 A.      No, sir.  If we're out on an operation    , we know

23 what time of day it is  .

24 Q.      I mean precise time , like the  arrival, not , you

25 know , down to the minute.  You know, 13 minutes after

1  2:00, that kind of thing , not just around  2 o'clock .

2  A.       Oh, yeah , as we're giving out a piece of

3  information like when a vehicle arrives    , we would say

4  what time of day it is  .  We wouldn't necessarily say

5  it, THE person that's actually receiving information

6  and dictating would write down the time of day    that we

7  said it .

8  Q.       But again, y ou'd say the guy just got   in?

9  A.       Exactly.

10  Q.       And they 'd go, 4:25 ; right ?

11  A.       If it was 4 :25.

12  Q.       Well, 16 -- my watch is a little faster    , I

13  guess , than the courtroom's  .  16:25 is how you 'd

14  probably write it  ; right?

15  A.       Correct , sir.

16        MR. MONTEMARANO :  No further questions  , Your

17  Honor .  Thank you.

18        MR. MARTIN:  Court's indulgence   ?

19        THE WITNESS :  A fternoon.

20                **CROSS-EXAMINA TION**

21        **BY MR. MARTIN:**

22  Q.    Good afternoon, sir.    Anthony  Martin here on

23  behalf of  Mr. Goodwin .

24        Was it  Detective  Scheerer ?

25  A.       Scheirer .

1  Q.      Scheirer .  And you're with the   Prince  George's

2  County  Police  Department?

3  A.      That's correct , sir.

4  Q.      You're in the   Narcotics  Section?

5  A.      Yes, sir.

6  Q.      A long time ago , electronics was  n't the way it

7  is today .  You said you had a radio ; right ?  You said

8  you had a radio; correct?

9  A.      That's correct , sir.

10  Q.      And it wasn't the size of a brick   ; right ?

11  A.      Depending upon what radio   system we were using

12  that day , I actually do still carry a radio    that's the

13  size of a brick.    I believe when we're do  ing close

14  surveillance , we also use a radio   that's 800 megahertz  ,

15  which is more like a   CB.

16  Q.      Okay.  Tell me this.  The one you have on the

17  particular day , which it was the 17th of    March,  you

18  said -- I'm not try ing to  trick you , I can't remember

19  the dates .

20  A.      It's March 17  I've testified to.

21  Q.      On March 17 , did you have what we call a brick   ,

22  or did you have something smaller like this?

23  A.      No , I wish the county   -- Prince  George's  County

24  supplied me with a radio   of that size.  Typically  , sir ,

25  what  I go out with is a radio   -- regular , police -issued

1  radio, which is the size you referred to as a brick   , an

2  800 megahertz radio  , which is about the size of a    CB,

3  just the microphone, and my    NexTel  cell phone.

4  Q.     And the NexTel cell phone , is that provided to

5  you by the county?

6  A.     Yes.

7  Q.     With respect to the other members in the

8  Narcotics  Section , are they also provided cell phones

9  by the county?

10 A.     I believe everybody is, yes, sir.

11 Q.     Everybody?   And this NexTel  phone,  you don't

12 have to dial the number  , you can just click it to

13 connect with somebody else who is on the same

14 frequency ; is that correct?

15 A.     That's correct.

16 Q.     So -- and police officers carry or have these

17 communication devices with them because it's very

18 important that they be able to communicate quickly with

19 one another ; right ?

20 A.     It's one of the reasons  , yes, sir.

21 Q.     Because stale information is really useless

22 information ; right ?

23 A.     I wouldn't classify it  , you know , all stale

24 information is useless  , but...

25 Q.     But certainly the more timely it is    , the better ;

1 right ?

2 A.      Depending upon the case, yes, sir.

3 Q.      If different officers are at the s    ame scene of

4 an arrest or during a search   , wouldn't it be important

5 for them to be in contact with one     another  during that

6 search ?

7        MS. GREENBERG:  Objection  .

8        This is outside of the scope of direct with this

9 witness.

10       THE COURT:  We're get  ting a  little far afield  ,

11 Mr. Martin.

12       MR. MARTIN:  Yes , I know  I am.

13       THE COURT:  You're close.  One more question.

14       BY  MR.  MARTIN:

15 Q.      Are you in the same section with     Detective

16 Grant?

17 A.      I am.

18       MR.  MARTIN:   Nothing further  , Your  Honor .  Thank

19 you.

20       THE COURT:  Any redirect  ?

21       MR.  SUSSMAN :  If I could just ask one minute's

22 worth , sir.

23       THE  WITNESS:  Afternoon  , sir .

24                     **CROSS-EXAMINATION**

25       **BY  MR.  SUSSMAN:**

1 Q.        Good afternoon , Detective.

2          Your section from the    Prince George's County

3 Police was sort   of loaned out to the   Task Force for

4 purposes of this investigation   ; is that correct?

5 A.        Well , Detective Eveler is a  Prince George's

6 County Police Officer.

7 Q.        So in terms of the protocol that you followed

8 the recording and broadcasting, was that a       Prince

9 George's  County protocol or was that something that the

10 Task Force Officer Eveler was using?   If you don't

11 understand my question , I'll see if  I can change it .

12 A.        Let me try to answer it this way    and tell me if

13 I've answered it correctly.    I didn't receive any

14 special training or in  structions  on how to  record

15 information to be passed on    to Detective  Eveler at the

16 end of surveillance.

17          I routinely do what   I was trained  to do , and if

18 there was something wrong or something they wanted

19 differently , in the future they would let me know.

20 Q.        You did  more than  one surveillance in connection

21 with thi s investigation;   is that correct?

22 A.        I did, sir.

23 Q.        So the way you functioned was you broadcast what

24 you saw that was of significance at     the time you saw

25 it; is that right?

1  A.       If I was there with other people, yes.  Yes.

2  Q.       And it was your understanding that -- you were

3  working on a police   band radio ; is that correct ?

4  A.       Depending upon which radio   we were using , yes.

5  Q.       I'm not concerned about which   it was , but

6  generally a radio   you flip on   and off ?

7  A.       Correct.

8  Q.       Okay.   And it was your understanding that

9  somebody at the other end was taking down what you

10 said; is that right?

11 A.       Once again , I would  be speculating whether

12 somebody was writing it down   .  That's the normal way

13 that we would do things  , but it's not the steadfast   .  I

14 mean , each situation has its own circumstances.

15 Q.       Eventually , the information that is broadcast by

16 you was put into some report; is that right?

17 A.       Once again , the reports   would  have been at the

18 responsibility of the case agents   , not mine .  So I

19 don't want to go out   on a limb an d sa y what they were

20 requir ed to  do.

21 Q.       Did you  ever have  a chance to look at those

22 reports or dis cuss those reports?

23 A.       Some.

24          MR. SUSSMAN:   Nothing further.  Thank you.

25          THE  COURT:  A ny further cross?  Okay.  Redirect   ?

1          MS.  GREENBERG:    Your  Honor, briefly.

2                   **REDIRECT  EXAMINATION**

3          **BY MS. GREENBERG:**

4  Q.      In connection with this surveillance on      March

5  17, 2004, did you get the license number on the vehicle

6  that you observed in P  -224?

7  A.      If I can refresh my memory by looking at the

8  notes ?  Again , I don't believe so  .  It's not reflected

9  in the notes , so I would say negative.

10  Q.      What time did you see this particular van with

11  the person depicted on   P-224 and P-225 arrive?

12  A.      As I testified , he arrived  at 1 :12 -- 13 :12 in

13  the afternoon  and stayed approximately five minutes    and

14  departed at 13 :17.

15  Q.      Did you listen to the wiretap call that was at

16  or about this time,  B816 at Page 115 of the jurors'

17  books?

18  A.      I have listened to no wiretap calls regarding

19  this case.

20  Q.      So this is simply based on your observations    ,

21  not on anything you've learned with through the

22  wiretap?

23  A.      I was told to go there  .  I observed it  and I

24  recorded it  and reported it.

25  Q.      Mr. Mitchell was asking you if you observed

1  anything in this individual's hands.  Were you in a

2  location that you could see anything within the      pockets

3  of his coat?

4  A.      No, ma'am.

5  Q.      Underneath his coat?

6  A.      No, ma'am .

7  Q.      In your experience as a narcotics detective,

8  have you  ever  located items on a suspect's body     ,

9  person?

10  A.      Oh, absolutely.

11         MR.  MITCHELL:  Objection.

12         THE  COURT:  Overruled.

13         THE  WITNESS:  A bsolutely.

14         BY  MS.  GREENBERG:

15  Q.      Could you tell the jury some of the items you've

16  located ?

17         MR.  WARD:   Objection , Your  Honor.

18         THE  COURT:  Sustained.

19         MS.  GREENBERG:   Your  Honor,  Mr. Mitchell opened

20  the door to this line of questioning,    I believe.

21         THE  COURT:  It's been opened just so far     and I

22  have shut it.

23         MS.  GREENBERG:  All right.

24         THE  COURT:  It can't be opened any further.

25  It's not going to be opened any further.

1          MS.  GREENBERG:  No further questions      Y, our

2   Honor.

3          THE  COURT:  Any recross?      All right .  You may

4   step down.

5                    (Witness was  excused at 4 :31 p.m. )

6          THE  COURT:  We're right on time  , 4:30 p.m.    I

7   will see you tomorrow morning at     10 o'clock , ladies and

8   gentlemen .

9          Counsel , stay behind for just a moment.

10                   (Jury excused at 4:32 p.m.)

11                   (Witness excused at 4  :32 p.m. )

12         THE  COURT:   Counsel , a c ouple of scheduling

13   matters .  As I mentioned , I have  a den tist  appointment

14   tomorrow , but it's early .  It's 8 o'clock , but I don't

15   want to have the jury sitting around waiting for me to

16   escape from the den  tist .  Do you anticipate any

17   preliminary matters tomorrow?  If anybody does     , I mean ,

18   I will be ready to sit down at the bench at quarter of

19   10:00, so if there is anything that needs to be taken

20   up, ad ministrative,  preliminary matters or otherwise    , I

21   will be glad to do that  , but I will be here for sure

22   right  off stage left at 9 :45.   If there's  any

23   preliminary matters , I'll do crossword puzzles    and I'll

24   see you at   10:00 .

25         A couple of scheduling matters    , I think

1  successfully move d a matter involving   Mr. McKnett 's

2  client in another matter that's    scheduled  for  9 o'clock

3  on Friday to  8 o'clock on  Friday.   I'm try ing to  see if

4  I can have this whole operation escape a little early

5  on Friday , if I can do it.

6       I'm contemplat ing that  we would start at   9:00 or

7  we could trail this sentencing that    I have at  8:00,

8  unless there's a problem.     I think the only people we

9  haven't tracked down on are the prosecutor    s in this

10 case.

11      MS. JOHNSTON:   Your Honor , there is a problem

12 with that in that we are flying in witness    es from

13 Wyoming .  They're getting in late    Thursday night.    Ms.

14 Green berg was going to meet with them    Friday morning so

15 we could  get them on the stand    Friday  and  testify .   We

16 plan ned  to do that in the time.

17      THE COURT:   They're g etting here  Thursday night ?

18      MS. JOHNSTON:  They're getting in late      Thursday

19 night.

20      THE COURT:  Meet with them early    Friday morning ?

21      MS. JOHNSTON:   Your Honor , it would be helpful

22 if we had more advance notice   .  They also are

23 travelling with a time difference as well, so     ...

24      THE COURT:  Do the best you can.     I want to try

25 to see if  I can get started early on    Friday.

1          MS.  JOHNSTON:  Will do  .

2          MR.  SUSSMAN :  How late do you think you're going

3 to go , sir?

4          THE  COURT:  The latest   I want ed to go is 2 :30 or

5 3:00, if not earlier  .  It depends on what   I can work

6 out with this other matter   .  Now, the same thing  I'm

7 going to try to do on   Friday, June 30 , especially  since

8 that's a major holiday weekend.    I have a matter that's

9 scheduled for  9:00 now .  I'm trying to get it moved to

10 8:00 so I can start at  9 o'clock on  Friday and then

11 hopefully get out of here in the early afternoon    , not

12 late afternoon, on   Friday the  30th.

13          MS.  JOHNSTON:  Does that mean the   Court is not

14 going to break for lunch on those days?  Because we are

15 trying to  stay on schedule with the   Court's time frame

16 in terms of completing --

17          THE  COURT:  I will let you know more  , because

18 I'm not sure if that matter that I   've got a  9:00 that

19 will move to  8:00 , but if  I can do it , that 's what I'd

20 like to try to do is have us from go from    9:00 to 2:00

21 or 2:30 at the latest  , and maybe have just a short

22 couple of break  s in there to have people not pass out.

23          MR.  MONTEMARANO :  And the very same thing on the

24 30th?

25          THE  COURT:  On the what  ?

1        MR. MONTEMARANO: The same thing on the  30th,

2  9:00 to 2:30?

3        THE COURT:  I'm going to try to do that.     I

4  mean, don't go to the bank on it yet. I'm trying to do

5  that because it's nice to get out of here before 4     :30

6  or 5:00 on a Friday, especially on a holiday weekend    .

7  I know some of you are  coming from downtown  Greenbelt

8  and have to go somewhere else to get home that's not

9  close, so I respect that, too.

10        MR. MARTIN:  Very quickly,  Your Honor.  With

11  respect to July 21st.  Are you still scheduled --

12        THE COURT:  I am scheduled, and  I need it

13  because  I hurt so.  As  I said, I am 99 and 44/100

14  percent sure we are not sitting on July 21.

15        MR. MARTIN:  Judge Roberts downtown has your

16  name, and I told him  I was in trial , but I might be

17  able to do it on that day in the afternoon.

18        THE COURT:  You can do it  .  I'm going to be

19  under anesthesia, so   -- or else my law clerk can

20  preside on the 21st.

21        MR. MARTIN:  If he's more defense-oriented    , I

22  don't have any objection.

23        THE COURT:  I'll see you tomorrow morning   .  If

24  there's a ny preliminary matters  , I will be available at

25  9:45, and I will ask that the marshals who have      the

1  defendant s in custody to be available at 9    :45.

2        MS. JOHNSTON:    Your Honor , we will be in our

3  office .  We won't be coming over here at 9     :45 unless

4  somebody tells us  .

5        THE COURT:  I f somebody calls  you and tells you

6  there's  a preliminary matter.  Otherwise,    I will see

7  you at

8  10 o'clock.

                    (Off the record at   4:37 p .m.)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **CERTIFICATE**

2

3        I, Tracy Rae Dunlap,    RPR , CRR , an Official Court

4   Reporter for the United States District Court of

5   Maryland, do hereby certify that I reported, by machine

6   shorthand, in my official capacity, the proceedings had

7   and testimony adduced upon the Jury Trial Proceedings

8   in the case of UNITED STATES OF AMERICA versus PAULETTE

9   MARTIN, et al, Criminal Action Number    RWT-04-0235 on

10  June 21, 2006.

11

12       I further certify that the foregoing    206 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17       In witness whereof, I have hereto subscribed my

18  name, this 25th day of March 2008.

19

20                        _____

                          TRACY RAE DUNLAP, RPR , CRR
21                        OFFICIAL COURT REPORTER

22

23

24

25