```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                        SOUTHERN DIVISION
 2
   ------------------------x
 3 UNITED STATES OF AMERICA  :
            Plaintiff        :
 4                           :
                             :
 5 vs                        :Criminal Action:    RWT-04-0235
                             :
 6                           :
   PAULETTE MARTIN, et al    :
 7          Defendants.      :
   ------------------------x
 8

 9                         Friday, June 23, 2006
                           Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11 Proceeding before the HONORABLE ROGER W. TITUS, United
   States District Judge, in courtroom 4C, commencing at
12 9:17 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS THE TESTIMONY AND PROCEEDINGS
15      OF THE CASE AS RECORDED AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR              (301) 344-3912
25 Official Court Reporter
```

1                              I N D E X

2

3                         DIRECT     CROSS    REDIRECT   RECROSS
   Christopher   Sakala   3,47,67
4                         121

5  Raphael Grant         40

6  Colleen  Muldoon      61

7  David  Chatfield      72        89       100        103

8  Ella  Kubicz          107       117

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                          Page

24 Reporter's Certificate                   167

25 Concordance                              178

1          THE COURT:  Good morning  , ladies and gentlemen.

2 Sorry we didn't get precisely on time at     9 o'clock , but

3 I had a sentencing that took little bit longer than        I

4 thought.  If you like this drill   , I propose to do the

5 same thing next   Friday , which is more important because

6 that's  July 4th weekend, so I will --    I have a matter

7 that I've moved from  9:00 to 8:00 next  Friday , and next

8 week's matter is shorter   , much shorter, so we should be

9 right off and running at   9:00 next  Friday and get you

10 out of here early.

11          All right .  You may proceed , Ms. Johnston.

12               MS. JOHNSTON:  T hank you.

13               **FURTHER  DIRECT  EXAMINATION**

14          **BY MS. JOHNSTON:**

15 Q.     Detective  Sakala , yesterday we had covered a

16 number of calls  , and then there were some

17 surveillances.   I would like to go a little bit out of

18 order this morning  , but if we could , do you recall the

19 testimony yesterday concerning    the March 16th

20 surveillance at   Hayward  that was conducted?

21 A.     Yes.

22          THE CLERK:  It's not on that one?

23          MS. JOHNSTON:  No, it's not on that one.  The     TV

24 screen is remaining blue.

25          THE CLERK:  It's on the witness.

1          MS.  JOHNSTON:  Is it on yours,   Detective  Sakala ?

2          THE  WITNESS:   Yes, it is.

3          THE  CLERK:   I'll have to call  , because  I don't

4 know what's wrong.

5          BY  MS.  JOHNSTON:

6 Q.       At any rate,  Detective  Sakala , did you hear the

7 testimony concerning surveillance that was conducted on

8 that dat e and a gentleman arriving on    March 26?

9 A.       Yes.

10 Q.       Did you have occasion to view the photographs

11 that have been marked as   Government's  Exhibits  227A, --

12 marked as  P-227,  P-227A and  P-227B.  Do you see those

13 three photographs?

14 A.       Yes.

15 Q.       Based upon your review of those photographs and

16 your familiarity with the case and other surveillances      ,

17 do you recognize the individual depicted in those three

18 photographs?

19 A.       Yes.

20 Q.       Who is that?

21 A.       That's  Eugene  Bird .

22 Q.       Based upon your training and experience and the

23 telephone calls you intercepted --

24          MS.  JOHNSTON:   Your  Honor , may  I publish these

25 to the jury since we can't put them on the screen     ?

1          THE COURT:  Yes.

2          BY MS. JOHNSTON:

3  Q.     Based upon your training and experience and the

4  intercept of calls involving   Mr. Bird as well as

5  surveillance , did you form an opinion as to what

6  occurred on  March 26 involving   Mr. Bird ?

7  A.     Yes.

8  Q.     What was that?

9  A.     Mr. Bird was over there to purchase cocaine from

10 Ms. Martin.

11 Q.     What -- do you know that's why   Mr. Bird was

12 there ?

13         MR. MONTEMARANO :  Objection , Your  Honor.

14         BY MS. JOHNSTON:

15 Q.     Based upon what intercepted calls did you base

16 that opinion?

17 A.     As -- I think it was on  Tuesday or maybe early

18 Wednesday , we had heard a call between   Mr. Bird and Ms.

19 Martin where he had ordered a half a plate from     Ms.

20 Martin , the same as  Juanita gets , and we had heard

21 other calls where he had ordered drugs from her   .  That

22 was a pattern that we saw throughout the wire.

23 Q.     Are there additional calls with    Mr. Bird that we

24 did not include in this transcript book?

25 A.     Yes.

1 Q.     Because he's  not a defendant present here in the

2 courtroom; is that correct?

3 A.     That's correct.

4 Q.     In addition to that  , we also heard surveillance

5 that took place on or about   March 29 after the series

6 of calls that we played between    Ms. Harden and  Ms.

7 Martin.  Do you recall that testimony yesterday

8 afternoon?

9 A.     Yes.

10 Q.     Let me show you the photographs P   -28A, B, C, D,

11 E and  F and ask you to look at those photographs.  Do

12 you recognize the woman that's depicted in those

13 photographs?

14 A.     Yes.  It's Ruby Harden  , with the exception of

15 P-228 B, where there's no woman depicted.

16 Q.     Now in addition to recognizing    Ms. Harden, did

17 you recognize any vehicles that are depicted in those

18 photographs?

19 A.     In 228 B, C, D, E and  F is Paulette  Martin's red

20 Mercedes.

21 Q.     You are familiar with that from various

22 surveillances?

23 A.     Yes.

24     MS. JOHNSTON:   Your  Honor , if  I could publish

25 P-228 A to the jury.

1          THE COURT:    You may.

2          MS. JOHNSTON:  As well as   P-228 C, D, E and  F,

3  which depict  Ms. Harden.

4          BY MS. JOHNSTON:

5  Q.      Now, based upon your training and experience    ,

6  was Detective  Mussleman 's testimony consistent with

7  your opinion that you rendered yesterday?

8  A.      Yes.

9  Q.      Okay .  Did you form an opinion based upon his

10 testimony of the surveillance taken     --

11         MR. SUSSMAN :  I'm going to object  , Your  Honor .

12 He's forming an opinion that's been placed in evidence

13 and seen by everyone.    I don't think that's an

14 appropriate subject for an opinion.

15         MS. JOHNSTON:   I'll rephrase the question.

16         THE COURT:  Rephrase the question.

17         BY MS. JOHNSTON:

18 Q.      Was there anything about   Detective  Mussleman's

19 testimony that was inconsistent with the opinion that

20 you rendered yesterday concerning the drug transaction

21 that  occurred  on March 29 between  Ms. Harden and  Ms.

22 Martin ?

23         MR. SUSSMAN :  Same objection  , Your  Honor.

24         MR. WARD:   Objection , Your  Honor .

25         THE  COURT:   A pproach the bench

1                  (At the bar of the Court.)

2          MR. WARD:   Your Honor, that's clearly a jury

3 question .  He's now vouching for his own testimony and

4 for the testimony of   Mussleman .

5          MS. JOHNSTON:   I merely asked him if there was

6 anything in that testimony that changed his opinion     .

7 He's not vouching for anyone.

8          THE COURT:  He's giving opinions on drug

9 conversations , not make giving opinions on ultimate

10 questions for the jury.

11          MS. JOHNSTON:  He's also qualified as an expert

12 on how drug traffickers conduct their business and

13 that's the basis for the questions    , just not drug

14 trafficking  conversations.

15          THE COURT:  Ask your questions how drug

16 traffickers do their business   .  I don't want him

17 usurping questions for the jury that do that.

18          MR. SUSSMAN :  I might  -- what the question is

19 she's going to ask  , because  I can't see the question at

20 this point.   Obviously  Ms. Johnston doesn't like the

21 testimony  Officer  Mussleman  gave , but you've got   -- I

22 don't think she can rehabilitate him by him giving an

23 opinion about what   Officer  Mussleman  saw and whether

24 he's right in what he saw or he's wrong in what he saw      .

25 His testimony is his testimony   .

1        He's already testified what he believed was

2  going to occur.   He's going to come back now and say

3  that despite  Officer  Mussleman 's testimony , he still

4  believes what he's going to say before in that's what

5  he said .

6        MS. JOHNSTON:    I disagree with  Mr.  Sussman .

7  Detective  Mussleman  testified just as we had

8  anticipated he'd testify yesterday.   There was nothing

9  about his testimony that was different.       I've asked

10  this officer the same questions that    I've asked in

11  terms of previous surveillances.   There was

12  surveillance you heard    -- the surveillance was

13  consistent with what you heard in the telephone calls        ,

14  or did you have an opinion to what occurred based upon

15  the surveillance.

16      THE  COURT:  Whether or not the surveillance is

17  consistent with what's heard on the phone call     s is a

18  question for the jury to decide.

19      MS. JOHNSTON:  I 've asked the other questions

20  with other witnesses --

21      MR.  SUSSMAN :   There's a continuing objection to,

22  obviously , all this line of testimony.  We've all noted

23  that we think it's objectionable, and for the purpose

24  of moving this along   we're not  jumping  up like jacks in

25  the box every time it comes up.  This, specific     ally, I

1   would object to in addition to the standard objection.

2          THE COURT:    I'm going to sustain the objection.

3                 (Back in open court.)

4          BY MS. JOHNSTON:

5   Q.     In addition to the telephone calls that were

6   interpreted involving   Ms. Harden that occurred on    March

7   29, were there also other calls involving other members

8   of this conspiracy that took place on that date?

9   A.     Yes.

10  Q.     In terms of those other calls   , have you reviewed

11  them and have you formed opinions what was going on

12  with those calls , similar to what you   concluded

13  regarding  Ms. Harden and  Ms. Martin?

14  A.     Yes.

15  Q.     If we could then move to that other series of

16  calls that occurred on   March 29 of 2004 , beginning with

17  the calls B2095  and 2100 that occurred on -- that are

18  found on  Page 226 and 227.

19         THE CLERK: Excuse me , Ms. Johnston . Could I

20  get you just to put something up on the screen? We're

21  trying to check the  TVs to see if everything is working

22  now, please.

23         MS. JOHNSTON:    Thank you.

24         THE CLERK: Got it?

25         MS. GREENBERG: It's on this one.

1          THE CLERK:  Okay .  Thank you.

2          BY MS. JOHNSTON:

3 Q.      Calling your attention to call B2095    and 2100.

4          Are those two calls related?

5 A.      Yes.

6 Q.      Do those calls take place on the same date as

7 the calls involving  Ms. Harden and Ms. Martin?

8 A.      Yes.

9 Q.      Who are the participants involve   d in 2095  and

10 2100?

11 A.      Paulette Martin and   Milburn  Bruce  Walker.

12 Q.      What time frame did those calls take place?

13 A.      The first call was 1  :04 p.m. and the second call

14 was 1 :45 p.m.

15 Q.      If we could please play  Call 2095.

16          (Audio recording begins playing at 9   :29 a.m. )

17          (Audio recording stops playing at 9   :29 a.m.)

18          MS. JOHNSTON:  If we could play B2100.

19          (Audio recording begins playing   at 9 :29 a.m. )

20          (Audio recording stops playing at 9   :29 a.m. )

21          BY MS. JOHNSTON:

22 Q.      Now, who are the speakers in that call?

23 A.      Both cal ls it's  Paulette  Martin and   Milburn

24 Bruce  Walker.

25 Q.      Based upon your training and experience and your

1  review of other calls in conducting this call    , did you

2  form an opinion as to what was being arranged in these

3  two calls?

4  A.      Yes.

5  Q.      What was that ?

6  A.      Mr. Walker  was arranging a meeting with    Ms.

7  Martin to purchase cocaine from her.

8  Q.      Approximately how soon -- strike that.

9          On what time of the day did these cal   ls take

10 place?

11 A.      The first one is 1  :04 and the second one is

12 1:45.

13 Q.      All on  March 29?

14 A.      Yes.

15 Q.      Similar, was there a series of calls that took

16 place on  March 19 between  Ms. Martin,  Mr. Nunn and  Ms.

17 Levi?  On March 29?

18         MR.  WARD:   I'm sorry , are you doing  March 19  or

19 March 29 ?

20         MS.  JOHNSTON:   March 29 .

21         THE  WITNESS:  Yes , there was.

22         BY  MS. JOHNSTON:

23 Q.      Calling  your at tention  to the calls beginning at

24 A672 on  Page 218.  Is there a series of related calls

25 that take place on that date?

1  A.      Yes.

2  Q.      What are those call numbers that are related?

3  A.      A672, A674, B2093, 2149, 2152, 2155, and 2159.

4  Q.      Over what pe riod of time did those calls take

5  place ?

6  A.      The first call is on  the 29th at 12:30 in the

7  afternoon, that's  A672, and the  last call is at 7 :18

8  p.m. later that evening.

9  Q.      If we could b egin by playing  Call A672 on  Page

10  218.

11         (Audio recording begins playing at 9    :31 a.m. )

12         (Audio recording stops playing at 9    :32 a.m. )

13         BY MS.  JOHNSTON:

14  Q.      If we could go to the next call, A674    , on Page

15  219.  In reference to this call    , how many parties are

16  there to the call?

17  A.      There are actually three parties.  However, the

18  pertinent parties , there  are two , Larry  Nunn and

19  Paulette  Martin.

20  Q.      In this instance , is the entire call on the    CD

21  and in the transcript book  ?

22  A.      Yeah.  It's actually two calls together   .  The

23  Larry  Nunn call  is a call waiting call that comes in     ,

24  but the machine , the intercept machine  , did not break

25  it up so it all runs as one call.

1  Q.      Even though it's actually two calls?

2  A.      That's correct.

3  Q.      At what time in the call is the    Larry  Nunn

4  portion of the call?

5  A.      Two minutes and 36 seconds in.

6  Q.      That would be on Page 221   ?

7  A.      Yes.

8  Q.      Okay.  And on Page 221  , does it reference   the

9  click over to call waiting?

10 A.      Yes, it does.

11 Q.      If we could play just that portion of the call,

12 please.

13         (Audio recording begins playing at 9   :33 a.m. )

14         (Audio recording stops playing at 9   :33 a.m. )

15         BY MS. JOHNSTON:

16 Q.      If we could go to the    Call B2093 on Page 225.

17 Again, who are the parties to this call?

18 A.      Paulette  Martin and  Gwen Levi.

19 Q.      If we could play it  , please.

20         (Audio recording begins playing at 9   :34 a.m. )

21         (Audio recording stops playing at 9   :34 a.m. )

22         BY MS. JOHNSTON:

23 Q.      If we could now proceed to the next call    , B2149 ,

24 on Page 237.

25         Now , the calls in between    Call B2093 and the

1  next call we're going the play, 2149 on      Page 237 , are

2  they the calls between    Ms. Walker and   Ms. Martin and

3  Mr. Walker  and Ms. Martin and   Ms. Harden  that we've

4  already heard?

5  A.      That's correct.

6  Q.      If we could go to   B2149 on  Page 237.

7          (Audio  recording begins playing   at 9 :35 a.m. )

8          (Audio  recording  stops playing at  9 :35 a.m. )

9          MS. JOHNSTON:  And then if we could go to the

10  next call , B2152.  Is that the one we just play    ed,

11  Counsel?  If we could play 2152 on     Page 2 48.

12          (Audio recording begins playing at 9    :35 a.m. )

13          (Audio recording stops playing at 9    :36 a.m. )

14          BY MS. JOHNSTON:  And then B2155 on the next

15  page, 239.

16          (Audio r ecording starts   playing  at 9 :36 a.m. )

17          (Audio r ecording stops   playing  at 9 :37 a.m.)

18          MS. JOHNSTON: Finally , if we could play  B2951

19  on Page 240.

20          (Audio recording starts   playing  at 9 :37 a.m. )

21          (Audio recording stops   playing  at 9 :37 a.m. )

22          BY MS. JOHNSTON:

23  Q.      Based upon your training and experience    , did you

24  form an opinion as to what was occurring on      March 29 in

25  this instance between   Ms. Martin,  Mr. Nunn and Ms.

1 Levi?

2 A.      Yes.

3 Q.      What is that opinion?

4 A.      During the calls , they're making arrangements

5 for Ms. Martin to purchase 50 grams of heroin from      Ms.

6 Levi , which she then turns around and sells to      Mr.

7 Nunn, and those transactions took place at      her house on

8 Hayward  Avenue in  Takoma  Park.

9 Q.      This would have been on    March 29 of 2004?

10 A.      Yes.

11 Q.      If we could turn to the first call on     Page 218.

12 Based upon your training and experience     , what is  Mr.

13 Nunn  telling  Larry in response to her question    , did you

14 find out?

15 A.      On Page 221?

16 Q.      No, Page 218.

17 A.      I'm sorry . What  Paulette  Martin is asking was

18 she said , Larry , did you find out . She wants to know

19 how much heroin he wants to order    , and Mr. Nunn replies

20 that he's waiting for him to call me back     , meaning h e's

21 waiting for his customer to call him back and let him

22 know , and Ms. Mart in tells him , well , she's waiting on

23 me to call her , meaning  Gwen  Levi is waiting on me to

24 tell her how much heroin she needs    . And if the

25 transaction is not going to take place, she's going to

1  head on to  New York.

2  Q.     Was there any significance to the reference to

3  New York, base upon your training and experience?

4  A.     That's where her heroin source is located    , Gwen

5  Levi's heroin source.

6  Q.     That would be  the individual  whose notebook we

7  have used previously  ?

8  A.     Mr. Uriarte , yes.

9  Q.     Calling your attention to Page 221.  The portion

10  of the call between   Ms. Martin and  Mr. Nunn, what is

11  Mr. Nunn telling Ms. Martin?

12  A.     Mr. Nunn calls back to  Ms. Martin and gives her

13  the quantity of heroin he needs    , which is 50 grams of

14  heroin , referring to his 50 of the tickets.

15  Q.     Fifty  of the tickets refers to what?

16  A.     Heroin , 50 grams of heroin.

17  Q.     If you could please write Page 221 on our chart

18  next  to the word  "tickets ".

19  A.     (Witness indicating.  )

20  Q.     And then the next call that we reference     d was

21  B2093 , which happens approximately how many minutes

22  after the last call?

23  A.     2093 takes place at 12  :52, and the previous call

24  with Larry Nunn was at approximately 12  :44 and the call

25  waiting so about eight minutes later.

1 Q.      The significance there  , the 50 tickets to the

2 show?

3 A.      Yes.

4 Q.      Refers to what?

5 A.      Actually,  I want to correct my   previous  answer .

6 I don't think it's eight minutes    because the  Joan

7 Johnson  call ended at 12  :52.  She clicked back to the

8 call she w as previously  ended at 12 :52, and this call

9 happened immediately after she hung up at 12    :52.  So it

10 wasn't eight minutes  .  She confirms in  Call B2093 , 50

11 grams of heroin to Gwen   Levi.

12 Q.     If you could write Page 225 on our chart    next  to

13 the word  "tickets ".

14 A.      (Witness indicating.  )

15 Q.      And then the calls  B2149, 2152, 2155  and 2159 ,

16 are there any code words used in those calls for drugs?

17 A.      In 2149 , there's no code words used.     Ms. Levi

18 just says she'll be there in about 20 minutes to     Ms.

19 Martin's house.  2152  , it's the same thing except    Mr.

20 Nunn  says he'll be there in about 25 minutes.  And in

21 2155 , again , no code words , just Ms. Levi informing   Ms.

22 Martin that she's parking in front of the house.

23 Q.      And then B2159 ?

24 A.      I'm sorry , the final call between    Ms. Nun n [sic]

25 and Ms. Martin , again , no code words .  He's just

1  informing her that he'll be there in a few minutes.

2  Q.      And those calls , based on the pattern of calls   ,

3  is the basis of your opinion that it    was drug

4  transaction s on that date ?

5  A.      Yes.  Completely consistent.

6  Q.      That happened also on    March 29; is that correct?

7  A.      Yes.

8  Q.      Now , before we go to   March 30  and the calls that

9  occurred on that date  , I think to accommodate the

10  surveillance agents  , we skipped a call that happened on

11  March 27 , or at least one that we intended to play on

12  March 27, B1965.  Do you have that in front of you?

13  A.      What page number is that  ?

14  Q.      Page 216.

15  A.      Yes.

16  Q.      And who are the parties to that call   ?

17  A.      Luis  Mangual  and Paulette  Martin.

18  Q.      And the date and time of the call?

19  A.      That's on the   March 27 at 10 :08 p.m.

20  Q.      If we could play that call, please.

21         (Audio recording begin    playing  at 9:43 a.m. )

22

23         (Audio  recording  stops playing at 9 :43 a.m. )

24         BY MS.  JOHNSTON:

25  Q.      The parties to that conversation    ?

1  A.        Paulette  Martin and   Luis  Mangual .

2  Q.        Based on your  training and experience    , what are

3  they discussing?

4  A.        Ms. Martin is calling   Mr.  Mangual  and asking him

5  -- stating that he had called her and told her that he

6  had gotten some new novels in    , meaning he had received

7  a new shipment of cocaine.  He confirms that he has      ,

8  saying yes, ma'am  .  And then she orders a kilogram to

9  be dropped off the next morning by saying    , if you're

10 not doing anything in the morning    , if you can -- and

11 you're out on the street  , drop one  pass ed here so  I can

12 read them , ordering the drugs.  He confirms it just

13 saying he's in   Richmond.

14 Q.        And the code word for kilogram of cocaine in

15 this call is what?

16 A.        Referred to them as novels.

17 Q.        During this conversation   , did  Ms. Martin give

18 him the name of a particular novel she wanted?

19 A.        No.

20 Q.        Or even an author  for that matter?

21 A.        No .

22 Q.        If you could on the chart   , either find the word

23 "novels " as code word already up there or add it to the

24 list.  That would be on    Page 216.

25 A.        (Witness indicating.  )

1  Q.      Detective  Sakala , we've heard everything

2  reference d in these call s to book, novels and

3  autobiographies .  Are you familiar with the searches

4  that were conducted at both   Mr. Mangual 's residence as

5  well as  Ms. Martin's residence and her school?

6  A.      Yes.

7  Q.      Was there any indication that   Mr. Mangual  was a

8  book seller?

9  A.      No, he was not .

10 Q.      Or a book distributor?

11 A.      No, he was not.

12 Q.      If we could now move forward to March 30 of

13 2004, in particular  Call B2179 on Page 241.  And who

14 are the parties to this conversation?

15 A.      Paulette  Martin and  Derrick  Bynum .

16 Q.      What time does it take place on March 30?

17 A.      Took place at 7 :47 a.m.

18 Q.      If we could play this call, please   .

19         (Audio r ecording begins  playing  at 9 :46 a.m. )

20         (Audio r ecording  stops playing  at 9 :47 a.m.)

21         BY MS. JOHNSTON:

22 Q.      Based upon your training and experience    , what

23 are Ms. Martin and  Mr. Bynum  discussing ?

24 A.      They're  discussing an amount of money that    Mr.

25 Bynum  has paid  Ms. Martin, referring to it in the

1 fourth line down,   Ms. Martin says it's 13,2 in here,

2 meaning there's supposed to be $13,200.

3        Mr. Bynum says to look in there.  She says she's

4 counting it .  She doesn't see the extra   200, saying  I

5 don't see  the extra  two inside , meaning the  miss ing

6 200 .  Mr. Bynum says if it's not by itself  , then it's

7 not in there , referring to the missing $200.

8 Q.      Now, if we could go to the next call, B2245 on

9 Page 243.   Is that call related to the telephone call    ,

10 B2258?

11 A.      Yes, it is.

12 Q.      Okay.  Who are the parties to these calls?

13 A.      Paulette  Martin and  Milburn  Bruce  Walker .

14 Q.      If we could play B2245 on Page 243, please.

15

16        (Audio  recording  begins  playing  at 9 :48 a.m. )

17        (Audio recording  stops playing at 9 :48 a.m. )

18        MS. JOHNSTON:  If we could play B2258.

19        (Audio recording starts   playing at 9 :49 a.m. )

20        (Audio recording  stops playing  at 9 :49 a.m.)

21        BY MS. JOHNSTON:

22 Q.      Based upon your training and experience    , what

23 are Ms. Martin and  Mr. Walker  discussing in those two

24 calls?

25 A.      The first call on the evening of the    30th, Mr.

1 Walker  is checking to see if    Ms. Martin is going to be

2 around in the morning the next day   , and  Mr.  Walker  says

3 he wants to meet before    9:00 or so , around  9:00 .  She

4 says that would be fine.

5        The next morning at 8   :24 , they talk and   Ms.

6 Martin confirms the size   , excuse me , the quantity of

7 drugs that   Mr.  Walker  wants by  saying what  size outfits

8 you want for your kids  , refer ring to  what quantity of

9 drugs do you want.    Mr.  Walker  replies an eight  ,

10 referring to either an eight   h of an ounce or eighth of

11 a kilogram , and  Ms.  Martin then confirms whether he

12 wants powder or crack.   She says eight finished       ,

13 referring to crack  , and  Mr.  Walker  confirms that he

14 does want crack not powder.

15 Q.      Okay.   I think we have the word outfits already

16 up on our chart; is that correct?     If you could write

17 the Page N o. 244 next to it  , please.

18 A.     (Witness indicating.  )

19 Q.     If you could also note the word     "finish " under

20 "outfit ", as referring to crack.

21 A.     (Witness indicating.  )

22 Q.     Calling your attention to the next call,     B2326

23 on Page 245.  Who   are the parties to this call and on

24 what date does it take place?

25 A.     This is  Paulette  Martin and  Luis  Mangual  on

1  March 31 at 4 :17 in the afternoon.

2  Q.      If we could play it  , please.

3          (Audio  recording begins   playing  at 9 :51 a.m. )

4          (Audio recording stops playing a   t 9 :51 a.m. )

5          BY MS.  JOHNSTON:

6  Q.      And again , based on your training and

7  experience , what are  Mr. Mangual  and Ms. Martin

8  discussing in this conversation?

9  A.      Ms. Martin is ordering another kilogram of

10 cocaine from  Mr. Mangual , referring to it in the fourth

11 line down , asking him if he's going to have anymore of

12 those novels tomorrow night or    Friday morning.  He

13 replies,  yes , he will.

14         Ms. Martin then goes on   to say a buddy of mine

15 is coming in for a funeral  , which was not happening  ,

16 and that he heard that the books were real good  , just

17 saying that she wanted another kilogram   , and then she

18 goes on , you think you can grab one -- you think you

19 can grab him one while he's here  , just saying again she

20 wants another kilogram  , and she just wanted to make

21 sure.

22 Q.      Okay.  And again , the code words in that

23 conversation for kilo of cocaine were what?

24 A.      Novels.

25 Q.      Is there another word also used in there for

1  kilo of cocaine?

2  A.      Books on the second reference.

3  Q.      If you could note Page 245 next to    "books" as

4  the code word.  And then also next to    "novels" as the

5  code word.

6  A.      (Witness indicating.)

7  Q.      If we could turn to the next call, B2232 on    Page

8  246, please.  And who are the parties to this

9  conversation?

10 A.      Joan Johnson and  Paulette  Martin.

11 Q.      Who is  Ms. Johnson  in relation to   Ms. Martin?

12 A.      She was an associate/friend.

13 Q.      Are we listening to just a portion of the call?

14 A.      That's correct.

15 Q.      If we could play that portion of the call that's

16 reflec ted on  Page 246.

17         (Audio recording begins playing at 9    :54 a.m. )

18         (Audio r ecording stops   playing  at 9 :54 a .m.)

19         BY MS. JOHNSTON:

20 Q.      Based  on your training and experience    , what are

21 Ms. Martin and  Ms. Johnson  discussing in this portion

22 of the conversation?

23 A.      Drug  transaction between   Ms. Martin and  Ms.

24 Johnson.

25 Q.      Is there any code words used in this

1 conversation?

2 A.      Yes.  The first line that   Ms. Martin's speaking ,

3 she says you told me $75  , meaning you had told me you

4 wanted $75  worth of  cocaine , but  I put two $50

5 quantities of cocaine in the envelope    , referring  to it

6 as tickets.   I put  two, 50envelope tickets in the    --

7 she's saying she  'd given her $100 worth of cocaine as

8 oppose d to the $75.

9         Ms. Johnson didn't ask her if she put a little

10 something in there for her friend    , Orlando,  and Ms.

11 Martin replies , yes , and Ms. Johnson compliments her

12 that she's a remarkable woman.

13 Q.      Now, in terms of the use of the word      "envelope "

14 here , is that used as a code word or just the     method

15 that it was packaged?

16 A.     I think that's just how the drugs were actually

17 packaged inside the envelope.

18 Q.     "Tickets ", what does that refer to?

19 A.     That refer s to  the actual drugs, cocaine.

20 Q.     If you could write the   Page No. 246 next to the

21 code word  "tickets ".

22 A.     (Witness indicating.  )

23 Q.     If you continue with the calls on March      31st,

24 going to  Call 2353 on  Page 247 .  Who are the par ties to

25 this conversation?

1  A.        Paulette  Martin  and   Lavon  "Becky"  Dobie .

2  Q.        What time does this call take place?

3  A.        This was on March 31 at    7 p.m.

4  Q.        And again , are we listening to only a portion of

5  the call?

6  A.        That's correct.   From four minutes and 50

7  seconds in to seven minutes and 32 seconds in      .

8  Q.        If we could play it, please.

9            (Audio  record ing  begins  playing  at 9 :56 a.m. )

10           (Audio recording   stops  playing  at 10:01 a.m. )

11           BY MS.  JOHNSTON:

12  Q.       Based upon your training and    experience,  is

13  there any reference to drug activity in this call by

14  Ms. Dobie?

15  A.        Yes.

16  Q.        Where does that occur and what opinion do you

17  have in reference to    that?

18  A.        On Page 247 , they're talking about her pending

19  court case and   Ms. Dobie says , if I can get my hand on

20  a couple of tickets , I can make out on them  , meaning if

21  I can get my hands on some drugs to sell    , I can make

22  money .

23           The next page on   Page 248 , Ms. Dobie about the

24  fifth reference down says   , Tuesday coming , so that

25  means  I've got to make abracadabra quickly   .   She means

1  I've got  to get  the drug s and sell them quickly the

2  money.

3  Q.      How much money does she need to make?

4  A.      Further down , they're talk ing about paying the

5  lawyer  to keep her on the street and beat the charge    ,

6  and Ms. Dobie s ays the cost for the lawyer is $3,000.

7  Q.      If we could turn to the next call   , B235 4 on Page

8  250.   What i s the date an d time of this call?

9  A.      March 31st , 2004 , at 7 :16 p.m.

10  Q.      Who is it between?

11  A.      Reece  Whiting  and Paulette  Martin.

12  Q.      If we could play this call   , please .

13         (Audio  recording begins   playing at 10: 00 a.m. )

14

15         (Audio  recording stops   playing  at 10 :00 a.m. )

16         BY MS.  JOHNSTON:

17  Q.      Based upon your training and experience     , is

18  there any significance to this portion of the call?

19  A.      Yes.

20  Q.      What is that?

21  A.      Mr. Whiting  is calling to see if   Ms. Martin has

22  drugs to sell by saying  , I'm over here , I'm just

23  wondering , you know .  And Ms. Martin says she doesn't

24  have anything , she says I ain't forgot you.  As soon as

25  I hear something  , meaning as soon as she hears

1 something ab out drugs , you will be the first one    I
2 call .  It's like that,  Brother , it's rough , meaning she
3 doesn't have drugs to sell him   , and then she follows
4 up, if you hear anything  , let me know , meaning if he
5 hears anything on a source of supply   , let her know.  He
6 says that he will.
7 Q.     Now if we could turn to the second volume of
8 calls.  Beginning with call B2383 on Page      251, on what
9 date and time is this call?
10 A.     April 1st , 2004 , at 5 :32 in the morning.
11 Q.     And again , is this just a portion of the call
12 that's transcribed?
13 A.     Yes , from one minute in to two minutes and 30
14 seconds in .
15 Q.     If we could play this  , please.
16         (Audio recording begins   playing  at 10 :02 a.m. )
17             (Audio recording stops   playing  at 10 :04
18 a.m. )
19         BY MS. JOHNSTON:
20 Q.     Who are they referring to here when they talk
21 about  "Becky" ?
22 A.     Lavon  "Becky"  Dobie .
23 Q.     Based upon your training and experience    , is
24 there any significance to the fact that      "Becky 's"
25 coming over in the middle of the night banging on the

1  window ?

2  A.      Yes.

3  Q.      What is that?

4  A.      They're complaining about her coming over to

5  purchase drug s in the middle of the night and the

6  problems it's causing them sleeping and then disturbing

7  peace in the neighborhood.

8  Q.      Also on  April 1st, did a call take place, B2401

9  on Page 253?   Who are the parties to that call?

10  A.      Paulette  Martin and  Derrick  Bynum .

11  Q.      At what time does that call take place on       April

12  1st?

13  A.      2:07 p.m.

14  Q.      If we could  play that call  , please.

15          (Audio r ecording starts   playing  at 10 :05 a.m. )

16          (Audio r ecording stops   playing  at 10 :05 a.m. )

17          BY MS.  JOHNSTON:

18  Q.      Based upon  your training and experience   , what is

19  Mr. Bynum  asking her when he says we    ain't  ready yet?

20  A.      He's looking to purchase another kilogram just

21  like he had purchased the other day.

22  Q.      A kilogram of what?

23  A.      Cocaine.

24  Q.      Now there's a reference to dropping     Mr. John

25  Martin off at the subway.

1  A.        Yes.

2  Q.        Okay.  Are you familiar with whether     Mr. John

3  Martin was employed at that time?

4  A.        Yes , I am.

5  Q.        Where was he working?

6  A.        He was a bus driver for    Metro.

7  Q.        Was it unusual for   Ms. Martin to take him and

8  drop him off?

9  A.        No.  She did that -- well   , I shouldn't say she

10  did it every day.  He had to be at wo    rk twice a day .

11  He had a split shift  .  Some days he would drive  , but

12  frequently she would drop him off so she would have the

13  car.

14  Q.        And the  car that she would use to transport him

15  was what car ?

16  A.        Red Mercedes.

17  Q.        If we could turn to the next -- this call occurs

18  at what time?

19  A.        The one we just heard?

20  Q.        The one we just played  .

21  A.        2:07 p.m. on  April 1st.

22  Q.        B2403 on Page 255 , what time does this call take

23  place?

24  A.        2:09 p.m. on  March --  April 1st.

25  Q.        Who are the parties to this call    ?

1 A.        Paulette  Martin and  George  Harris.

2 Q.        Mr. Harris being who?     Who is  Mr. Harris?

3 A.        Associate, customer of   Ms. Martin's .

4 Q.        If we could play   Call B2403 on Page 259.

5          (Audio recording begins    playing  at 10 :07 a.m. )

6               (Audio  recording stops    playing  at 10 :07

7 a.m. )

8          BY MS.  JOHNSTON:

9 Q.        Based upon  your training and experience    , what

10 are Ms. Martin and  Mr. Harris  discussing in this call?

11 A.         Mr. Harris  is ordering a quantity of cocaine

12 from Ms. Martin , referring to it at the bottom    , she

13 asks what quantities   , saying what show are you    going

14 to.  He confirms the quantity by saying the eight

15 o'clock show , referring to   either  an eighth of kilogram

16 or eighth of an ounce of cocaine.

17 Q.        Could you mark 255 next to that code word     "show "

18 on our board?

19 A.        (Witness indicating.)

20 Q.        Now calling your attention to next call    , B2412.

21 On what date an d time does this call take place?

22 A.        This is  April 1st,  3:37  p.m.

23 Q.        Okay.  And is it the same parties as the call we

24 just listened to?

25 A.        Yes.   Paulette  Martin and  George  Harris.

1  Q.       If we could play call B2412 on Page 257   .

2           (Audio recording begins   playing at 10:09 a.m.)

3                (Audio recording   stops playing  at 10:09

4  a.m.)

5           BY MS. JOHNSTON:

6  Q.       Based upon your training and experience    , what

7  has occurred between   Ms. Mart in and  Mr. Harris?

8  A.       They're discussing money that    Mr. Harris  just

9  paid for the drugs that were referenced in     the previous

10 call.

11 Q.       Is there any significance to    Mr. Harris  saying

12 I'll come back , I'm sorry?

13 A.       Yes.  That he shorted her on the money, she had

14 said I gave him a $ 1.25, meaning $125.  He apologizes

15 and says he's  going to go back there , which would

16 identify the amount in the previous deal as a     n eighth

17 of an ounce of cocaine.

18 Q.       How do you reach that conclusion?

19 A.       From the amount of money  , it would correspond to

20 the eighth that he was talking about in the previous

21 call.

22 Q.       Court's indulgence one moment.

23          If we could go to the next calls in the book,

24 B2414.  Who are the parties to that call?

25 A.       Paulette  Martin and  John Martin , her boyfriend.

1  Q.      Is that related to call B2415?

2  A.      Yes.

3  Q.      As well as 2427?

4  A.      Yes.

5  Q.      On what date  and time period do those three

6  calls take place?

7  A.      All three took place on   April 1st,  the first one

8  at 3 :59 p.m ., and the last one at 4  :21 p.m ., with the

9  space of about 23 minutes.

10  Q.      Do those calls take place before or after the

11  surveillance that   Detective **Schrier**  told us about at

12  the end of the day yesterday where he observed      Ms.

13  Martin writing down his tag number?

14  A.      They took place shortly after he's burned.

15  Q.      He's what?

16  A.      Burned.

17  Q.      And  "burned " is a term --

18  A.      It's a term that we use   , it's on discoveries or

19  surveillance , you're burned , you're toast , you're made.

20  Q.      If we could begin by playing those calls 2414 on

21  Page 2 58.

22         (Audio  recording begins   playing at 10 :11 a.m. )

23              (Audio  recording stops   playing at 10 :11

24  a.m. )

25         BY MS. JOHNSTON:

1  Q.      In looking at  Call B2414 after   Ms. Martin says

2  but they  tried all kinds of vehicle  s, there's a word

3  minimized in par  entheses ?

4  A.      Yes.

5  Q.      What does that refer to?

6  A.      It means that  the monitoring equipment was

7  turned off.  In this case  , the call was a pertinent

8  call.  We had a problem    dur ing the wire that the

9  machine , the monitoring equipment   , would automatically

10  turn off.  It would detect something in the line

11  thinking the call had been terminated    , and then the

12  machine immediately starts a new call   , which is

13  actually the same call  , but it just divides it into two

14  calls so this call rolls into 2415.

15  Q.      If we could play 2415 on Page 259.

16       (Audio recording  begins playing  at 10 :12 a.m. )

17           (Audio recording   stops  playing at  10:13

18  a.m.)

19       BY MS. JOHNSTON:

20  Q.      In those two calls  , what where  Ms. Martin and

21  Mr. Martin discussing?

22  A.      They're discussing   Officer Scheirer 's vehicle ,

23  and Ms. Martin's relating the story of how she

24  discovers the vehicle  .  And on Page 258 , they're

25  talking about whether the vehicle belongs to law

1 enforcement , and Ms. Martin says they drive all kinds

2 of vehicles , referring to law enforcement or police

3 officers .

4          And then further on on Page 259   , in the next

5 call , Mr. Martin is talking about the neighbor causing

6 a commotion by saying there it go   , there it go , that

7 that's not good either  , referring that that draws

8 attention to everybody that they knew the car was

9 there , including the police  , so they would want to keep

10 it low -key.

11 Q.     Now, going back to Page 258   , there's a reference

12 to an individual named   Mike .

13 A.     Yes.

14 Q.     Did you determine who that was a reference to?

15 A.     That's  Mr. John  Martin's brother  , who's a police

16 officer with  Metro politan  Police  Department.   They're

17 -- Paul ette 's talking about giving the tag to    Mike to

18 run it to see who owns the -- who the car belongs to      .

19 Q.     If we could go to the next call,    B 427.  Who are

20 the parties to this call?

21 A.     Paulette  Martin and Mary Carole.

22 Q.     Who is  Mary Carole ?

23 A.     A friend of  Ms. Paulette  Martin's who she would

24 refer to as her daughter.

25 Q.     If we could play it now  .

1          (Audio r ecording begins playing at 10   :15 a.m. )

2          (Audio recording   stops  playing at   10:16 a.m.)

3          BY MS. JOHNSTON:

4  Q.      Based upon your training and experience    , what is

5  Ms. Martin asking   Ms. Carole to do in this call?

6  A.      She's giving her the tag of the vehicle that she

7  spotted and asking   Mike, the  MPD officer , to run it and

8  find out if the car is a police car   , referring to it as

9  a it's an authority figure on    Page 261 , and then again

10  on Page 26 2, that she wants to know if it's an

11  authority figure , meaning that she wants to know if

12  it's a police car.

13  Q.      Now, based upon your training and experience    , is

14  there any significance   to Ms. Martin's instructions on

15  Page 26 1 to make up some kind of lie?

16  A.      Yes.  She's telling  Mary to make up a story or

17  tell Mary -- to have  Mary  tell  Mike an untrue story

18  about  how or why they need to know about the tag.

19  Q.      I want to show  you what's been marked as

20  Government's  Exhibit  Hayward  2 and ask you if you're

21  familiar with this calendar   , 2004 calendar.

22  A.      This is a calendar that was retrieved from

23  Paulette  Martin's residence.

24  Q.      Calling your attention in particular to the page

25  with the red tab.  Do you recognize any of the

1  information on that page?

2  A.      Yes.

3  Q.      What is that?

4  A.      This contains the tag that was relay   ed to Mary

5  Carole  in Call 2427, Virginia  John  King Adam 7402.

6  Q.      I'm going  to put it up on the screen so everyone

7  can see that.

8          During this time  , did you -- was there -- based

9  upon your review of the intercepted cal    ls, were there

10  any calls placed by   Ms. Martin to local police

11  authority , either  Takoma  Park police or the   Prince

12  George's  County police or the    Montgomery  County police?

13  A.      No, there were not.

14  Q.      Now , if we could turn to the next call    , B2429

15  on Page 26 3.  What date does this call take place?

16  A.      This was on  April 1st at   4:24 p.m.

17  Q.      The same date   as these calls  we've  been playing?

18  A.      Yes .

19  Q.      Including the calls   about  the surveillance

20  officer?

21  A.      Yes.

22  Q.      And the calls with   Mr. Harris ?

23  A.      Yes.

24  Q.      And the earlier call with    Mr. Bynum ; is that

25  correct?

1  A.        That's correct.

2  Q.        Okay.  If we could play  B2429 on  Page 26 3.

3            (Audio r ecording begins  playing  at 10 :19 a.m. )

4            (Audio r ecording stops  playing  at 10 :20 a.m.)

5            BY MS.  JOHNSTON:

6  Q.        Based upon your training and experience     , what

7  are Ms. Martin and  Mr. Bynum  discussing in this call?

8  A.        They're talking about a couple of things on      Page

9  263.  Mr. Bynum  says he's on his way over   , and then he

10  starts to ask did you  , and then she finishes the

11  sentence , get the other ticket you wanted    , referring to

12  did she get the kilogram of cocaine he wanted in

13  addition to his regular purchase of 62.

14            She says no, not yet.   I told you  I have to pay

15  for those tickets when   I get them .  In other words ,

16  they're not fronted , so she has to pay for the entire

17  kilo gram, and she has to wait   a minute until the show   ,

18  mean ing she has to wait   until she  has the money t o

19  purchase the entire kilogram   .

20            On the top of  Page 26 4,  Mr. Bynum  is talking

21  about another source of cocaine that she might be

22  interested in , saying do you want to try some

23  Peruvian- style tickets.   Ms. Martin  says she's not

24  interested in another source   , saying I don't want

25  nothing from no island  .

1  Q.      Now, again , we've had some code words used here.

2  If you could reflect on the chart the page numbers for

3  the word  "ticket " on Page 263  and "show" on Page 263

4  and "ticket " on Page 26 4.

5  A.      (Witness indicating.  )

6          MS.  JOHNSTON:   Your Honor , at this time , we're

7  going to recess his testimony to bring in     Detective

8  Grant to do some surveillance observations he made on

9  April 1st.

10         THE  COURT:  A ll right.

11         (Witness excused at 10  :22 a.m. )

12         (Witness  resumes the  stand at 10 :23 a.m. )

13         MS.  GREENBERG:   Your Honor, this witness has

14  testified before.  H  e is still under oath  , if this's

15  satisfactory .

16         THE  COURT:  He remains under oath.

17                 **FURTHER  DIRECT  EXAMINATION**

18         **BY MS.  GREENBERG:**

19  Q.      Sir , were you also conducting surveillance in

20  connection with  Detective  Eveler  and the other agents  '

21  investigation on or about    April 1st,  2004?

22  A.      Yes, ma'am.

23  Q.      And were you conducting surveillance that day

24  where?

25  A.      810 Hayward  Street.

1  Q.      Are you familiar as to   whether  or not  any other

2  agent s that day were conducting surveillance?

3  A.      If I can refer to my notes  , I can will tell you

4  the agents .  Myself and  Detective  Scheirer .

5  Q.      Do you recall if anything in particular happen     ed

6  to Detective  Scheirer  that day ?

7  A.      Yes .  His surveillance was lo   cated by the -- by

8  someone in  Detective  Eveler's  wiretap investigation.

9  Q.      About the surveillance  s that you're about to

10 testify to the jury , did your surveillances occur

11 before, during , or after  Detective  Scheirer  got noticed

12 by the targets of the investigation?

13 A.      After.

14 Q.      Did that change how you did things?

15 A.      Yes, it did.

16 Q.      How was that?

17 A.      We didn't stay on the location anymore.  We

18 stayed off -site , which there was a church a c   ouple of

19 blocks away , and Detective  Eveler would tell us when he

20 wanted us to drive by the location and get tag numbers

21 or see what was going on.

22 Q.      So you wouldn't -- you didn't sit outside     , you

23 just drove by ?

24 A.      Exactly.

25 Q.      Was there a pole camera operating     at the

1  residence ?

2  A.       Yes , there was.

3  Q.       Could you see your vehicle going by on the pole

4  camera ?

5  A.       Yes, you can .

6           MS. GREENBERG:   Your Honor , that's already

7  introduced into  evidence.   I don't think , because  of

8  the technological difficulties   , we need to play it a  t

9  this time .

10          BY MS. GREENBERG:

11  Q.       Did you make a record of what    you observed?

12  A.       Yes, ma'am.

13  Q.       Just to be clear , you indicated   -- what time did

14  your surveillance start that day   ?

15  A.       It started at 3 :07 p.m.

16  Q.       What does that reflect?  Does that re    flect the

17  time you went over to the church?

18  A.       Right.  It's the time   I'm in the area do ing the

19  surveillance, yes.

20  Q.       But your testimony is you didn't start do    ing the

21  drive -by --

22          MR. MONTEMARANO :  Objection.

23          BY MS. GREENBERG:

24  Q.       Did you start doing the drive  -bys before or

25  after  Detective  Scheirer  got notice d?

1  A.      After.

2  Q.      What was the time of the first    drive- by you did?

3  A.      I did a drive- by at 3 :23 p.m. and a   drive- by at

4  4:42 p.m.

5  Q.      Could you tell the jury what you    observed i n the

6  area of 810  Hayward  Avenue , Tacoma  Park , Maryland .

7  A.      There was a green   Nissan  Maxima  there , and a

8  black male driver got out and enter    ed the residence.

9  Q.      Were you able to photograph    or record that?

10  A.      No.

11  Q.      But whatever rec ordation  is on the pole camera?

12  A.      That 's correct .

13  Q.      What observation did you make at approximately

14  4:42 p.m .?

15  A.      It was a black  Nissan  Quest  with Maryland tags

16  ADD 42 W parked at the residence   .

17  Q.      What residence are we talking about?

18  A.      I'm sorry , 810  Hayward  Street.

19  Q.      Did you get the tags on the green     Nissan  Maxima ?

20  A.      No , I didn't.

21  Q.      Did you personally conduct any research into who

22  the car was registered to?

23  A.      The  Nissan  Quest ?

24  Q.      Yes.

25  A.      Yes.   I probably ran it when    I got back to the

1 station that night.   I did run it and   I attached it to

2 my surveillance notes.

3 Q.      And pro vided  that to whom ?

4 A.      Detective  Eveler .

5 Q.      Thank you.

6        MS. GREENBERG:   No further questions  , Your

7 Honor.

8        THE COURT:  Any cross-examination?

9        MR. MONTEMARANO :  None , Your Honor .  Thank you.

10       MR. MARTIN:  Mr. Goodwin has none  , Your  Honor.

11       MR. HALL:  No , Your Honor .

12       MR. MITCHELL:  No , Your Honor .

13       MR. WARD:   No, thank you , Your  Honor.

14          THE COURT:  A nyone else?  All right  .  You

15 may step down.  Thank you very much.

16       (Witness excused at 10  :27 a.m. )

17       THE COURT:   Ms. Johnston , why don't we take a

18 morn ing recess now?  Let's resume at quarter of 11    :00.

19            (Jury excused at 10:27 a.m. )

20            (Off the record  at 10 :27 a.m. )

21            (On the record at 10  :47 a.m. )

22       MR. SUSSMAN :  Can we have a moment to raise a

23 brief matter?

24       THE COURT:  Yes.

25       MR. SUSSMAN :  Your Honor , as the  Court recalls ,

1   I object ed to a certain line  of questions  as regards to

2   Detective  Sakala , and I specifically objected to it    ,

3   although  I believe that we've preserved the notion that

4   there's a sustaining objection to the nature of his

5   testimony.

6          THE  COURT:  There's a continuing objection to

7   his testimony interpreting the meaning of the words in

8   these phone  calls .

9          MR.  SUSSMAN :  Well, I think it exceeds the coded

10  words is our understanding and gets out to the

11  transactions what's actually occurring behind the

12  closed doors  and the like .  I just want to clarify -- I

13  want to make a special objection.  It's not something

14  that  I find something particularly egregious    , but the

15  continuing objection remains --

16         THE  COURT:  Y ou have a continuing object  ion.

17  I've permitted him to be    qualified to give opinions

18  about the  meanings of the words used and    about the

19  nature of the drug business and how people conduct

20  them.

21         What  I have drawn the line is at is a ruling     I

22  don't want him giving an interpretation of something

23  that is for the prov  ince of the jury , but he's

24  certainly able to , like a  Spanish translator , tell me

25  what this language means and to explain the nature of

1 the drug business  , and you have a continuing objection

2 to that.

3          MR.  SUSSMAN :   Thank you , sir.

4          THE  COURT:  Counsel  , I'm up here sipping orange

5 juice , not coffee , because I have a bad, bad cold.  So,

6 I'm looking forward to going home and going to bed when

7 we finish today.

8                   (Witness  Sakala  resumes the stand.  )

9          MR.  HALL:  Your  Honor , while we're waiting   for

10 the jury , I wanted to alert the   Court of one thing.  On

11 Tuesday , Judge  Williams has scheduled a very brief

12 motion .  He was going to schedule it    during the lunch

13 break , but  I wanted to inform the   Court that he does

14 expect me over at his courtroom at    1 o'clock.

15          THE  COURT:  At lunchtime?

16          MR.  HALL:  Yes , at 1 o'clock.

17          THE  COURT:  All right.  We'll get you out of

18 here.  Remind me that morning.

19          MR.  HALL:  I will remind you that morning.

20          THE  COURT:  So  I don't get you in contempt of

21 court  with my colleague .

22          MR.  HALL:  I f I do get held in contempt  , you

23 will be the first to hear about it    .

24          THE  COURT:  W e'll bail you out.

25          THE  CLERK:  Judge, are you ready   ?

1          THE COURT:  Yes.

2                  (Jury returns at 10 :50 a.m. )

3          THE COURT:  You may proceed.

4          MS. JOHNSTON:  Thank you.

5                  **FURTHER DIRECT EXAMINATION**

6          **BY MS. JOHNSTON:**

7  Q.      Detective Sakala , you just heard the testimony

8  of Raphael Grant ; is that correct?

9  A.      Yes.

10 Q.      Are you familiar with   the two vehicles he

11 described?

12 A.      Yes.

13 Q.      Whose vehicles were they?

14 A.      The first on e was George Harris ; the second one ,

15 the van , was Derrick Bynum 's.

16 Q.      If we could go back to the calls    --

17         THE COURT:  I didn't hear the second one,   Ms.

18 Johnston.

19         THE WITNESS:  Derrick Bynum .

20         THE COURT:  Derrick Bynum , okay.

21         BY MS. JOHNSTON:

22 Q.      If we could go back and continuing with calls on

23 the evening of  April 1st, 2004 , calling your attention

24 to B2436 , that call is on  Page 26 5.  Again , are we

25 listening to just a portion of that telephone call?

1  A.       Yes.

2  Q.       Who are the parties to that call?

3  A.       Paulette Martin and LaNora Ali.

4  Q.       If we could please play it.

5           (Audio r ecording begins playing at 10   :51 a.m. )

6           (Audio  recording stops playing at 10   :51 a.m. )

7           BY MS. JOHNSTON:

8  Q.       Based upon your training and experience    , what's

9  the significance  of this call?

10 A.       The first line there  , Paulette Martin is asking

11 Ms. A li the size of and the amount of the drugs she

12 wants to purchase  , referring to as just the one

13 magazine.   Ms. Ali says she has to make sure   , meaning

14 that she has to check with somebody else.        Paulette

15 Martin says , I need to know that because    I may have

16 some people in here and then    Ms. Ali says she'll call

17 her back.

18 Q.       Based upon your training and experience    , what 's

19 the significance of there being other people in      Ms.

20 Martin's house?

21 A.       Because she's -- what she's going to do is

22 prepare the amount ahead of time   , so when Ms. Ali comes

23 over , she can just hand her the package without doing

24 it in front of everybody else.

25 Q.       The term  "magazine ", then , refers to what?

1  A.      Quantity of cocaine.

2  Q.      Could you add  "magazine " to our list of code

3  words?   I don't believe it's up there yet.

4  A.      (Witness indicating. )

5  Q.      We could go to the next call  , B2443.  What date

6  and time does this call take place?

7  A.      This is the same date  , April 1st,  2004 , at 7 :19

8  p.m.

9  Q.      Is it related to call   B2448  on Page 267 ?

10  A.      Yes.

11  Q.      Who are the parties to those two calls    , B2443

12  and B2448?

13  A.      Paulette  Martin and  Luis  Mangual .

14  Q.      When do they take place?

15  A.      The first  one takes place at 7  :19 p.m ., and the

16  second one at 7:51 p.m. on   April 1st .

17  Q.      If we could proceed to play B24   43 on  Page 26 6.

18          (Audio  recording begins playing at 10   :54 a.m. )

19          (Audio recording  stops playing at 10 :54 a.m. )

20          MS.  JOHNSTON:  If we could play the next call   ,

21  B2448 on  Page 267 .

22          (Audio  recording begins  playing at 10:54 a.m. )

23          (Audio recording  stops playing at 10 :54 a.m. )

24          BY MS.  JOHNSTON:

25  Q.      Based on your training and experience    , what are

1 Ms. Mart in and  Mr.  Mangual  arranging in these two

2 calls?

3 A.     Mr.  Martin  is ordering another kilogram of

4 cocaine .  On the fourth  line down on  Page 26 6, she

5 refers to as , do you still have the  *Reader's  Digest*  I

6 was going to ask you about yesterday   .  I believe  the

7 last code  word she use d in the previous calls was

8 novels, now it's  *Reader's  Digest* .

9      Mr. Mangual  says , I sure do.  And then further

10 down , she says that  she'd like  to get it tonight  , that

11 night , the  1st, if she can , and Mr.  Mangual  says he

12 would call her back  .  And the next call on 267  , about

13 -- I guess  about a half hour later  , Mr.  Mangual  is on

14 his way over to the house with the drugs.

15 Q.     All right.  And based upon your training and

16 experience , are these calls related to the call we

17 heard before the break  , Call B2429 on  Page 263 and 26 4

18 between Ms. Mart in and Mr.  Bynum ?

19 A.     Yes , where she was try ing to get all her money

20 together to pay  for the  kilogram,  this would be the

21 continuation.

22 Q.     Calling your attention to B2506   , if we could

23 play that call , please , on Page 27 1.  When does this

24 call take place?

25 A.     This takes place on the next day   , April  2nd, a

1  little after noon , at 12 :22 p.m.

2  Q.      And is this call , based on your training and

3  experience , related to the calls between Mr.      Mangual

4  and Ms. Mar tin?

5  A.      Right .  She received the drug  s the previous

6  night , and now they're getting together the next day to

7  sell to  Mr. Bynum  the} kilogram she just receive  d.

8  Q.      If we could play B2506 on     Page 27 1.

9          (Audio recording begins   playing  on 10 :56 a.m. )

10         (Audio recording  stops  playing at  10 :57 a.m. )

11         BY MS.  JOHNSTON:

12  Q.      And the time of that call is what?

13  A.      I'm sorry ?

14  Q.      The time of that call was what?

15  A.      12:22 p.m. on  April  2nd.

16  Q.      Now , did you have occasion to review a pole

17  camera video in relation to that telephone call    ?

18  A.      Yes,  I have.

19  Q.      If you could -- we  've heard the  term " pole

20  camera ".  Could you explain to the ladies and gentlemen

21  of the jury what a pole camera is?

22  A.      Yes.  It's a essentially    -- not to be overly

23  simplistic  -- a camera that sits on a pole.  It's a

24  video camera that we had establish    ed in  the

25  neighborhood of   Ms. Martin's house that had a view of

1  the front street portion off to her left    .  As you view

2  the videotapes , you will see her porch and many -- and

3  many instances , the door that has been referenced   , the

4  basement door , is as if you're walking up to the house

5  from right to left on the    video  screen is around to the

6  right side of the house.

7        That is monitored back.  That video picture is

8  monitored back at our -- the listening     post, and we're

9  able to , in a certain extent  , control the camera by

10  allowing it to zoom and pan and tilt to a certain

11  extent.  It's not an instantaneous movement on the

12  camera , and we're able to see what's going on in front

13  of the  house given if there's enough light.

14        In some circumstances  , the picture's good enough

15  to get tag numbers ; in other cases  , it's not .  And that

16  camera is then attached to a time   -lapse  VCR , which runs

17  all the time.  When the tapes run out    , we change it.

18  The time -lapse VCR allows us to use a regular videotape

19  which might only be two to three hours    , and that can go

20  depending on  how the  VCR is set  up to  8, 12 or  even  24

21  hours , which is why sometimes when you watch the tape

22  from the pole cam , the image  will be  -- appear jumpy

23  because the  VCR is only tak ing a  picture , capturing a

24  frame off the video image  , say every second or every

25  half second or every two seconds    , whatever it's set at.

1 Q.      During what period of time did you have the pole

2 camera in operation outside of    Ms. Martin's address?

3 A.      Yeah.  We set it up on    March 20  and it ran

4 continually until the end of the -- until the arrest on

5 June 1st.

6 Q.      Now, were there any difficulties you      experienced

7 with the operation of the pole camera?

8 A.      Yes.  In fact, you watch some of the tape     s, the

9 screen will go blue  , which mean  the signal  is traveling

10 over tel ephone  lines , back from the camera to our

11 monitoring spot  , so if we lost a telephone line or if

12 it disconnected, if someone forgot to change the tape       ,

13 the tape would get taped over.  So there were problems.

14 It wasn't a perfect system.

15 Q.      If we could  , then  -- did you review a portion of

16 the video was retrieved from the pole camera on      April

17 2nd of 2004?

18 A.      Yes.

19      MS. GREENBERG :  Now with the  Court's permission ,

20 we're going  to try to play it.    I don't think that the

21 one television screen is working so we only have one

22 monitor for the jury.

23      Your Honor , may our technical person see if she

24 can jog that one  ?

25      THE COURT:  S ure.  Come on up.

1        MS.  JOHNSTON:  Thank you  , Your  Honor.

2        BY  MS.  JOHNSTON:

3  Q.     Could  you tell  us what we're observing     here  in

4  the video?

5  A.     On the  far left side of  the screen  is the porch

6  for  the residence the 810     Hayward .  You can see the

7  sidewalk going  up the stairs   , the side doors around to

8  the right .  In the  front of the house   , you see  Mrs.

9  Martin 's red  Mercedes  Benz parked to the curb.

10        The vehicle  pulling up is  Mr.  Bynum  parking on

11 the far right side of the screen.  And as you can see,

12 we're manual ly moving  the camera a little bit to get a

13 better picture of his vehicle   , and th at's done from the

14 listening post.

15 Q.     Do you recall  the description  of his vehicle?

16 A.     It's a pickup truck.    I don't recall  the exact

17 tag.  It was later located, the vehicle, at his

18 residence.

19 Q.     We're going speed it up a little bit here.

20 A.     Mr.  Bynum  exiting the vehicle.

21        (The  video  is playing  throughout.    )

22        THE  WITNESS:   As he approaches the right  side of

23 the house , he  moves  around  toward  the base   ment  door on

24 the right  side of  the picture.

25        BY  MS.  JOHNSTON:

1  Q.       Can we speed forward a little bit?

2  A.       That was probably one of our surveillance cars

3  driving by right then.

4  Q.       Why do you say that?

5  A.       Because of the incident with   Detective  Scheirer ,

6  we moved everybody --   I had moved everybody out of the

7  neighborhood and didn't place any cars in the

8  neighborhood so we wouldn't have any further

9  difficulties with being burned   .  So then when someone

10 would show up , we would have them go by the house and

11 obtain the tag number.

12 Q.       Is  Mr.  Bynum  returning from the area of the

13 basement door back to the -- back to the truck?

14 A.       And he departs the area in his vehicle.

15 Q.       Were surveillance agents sent to any location

16 that afternoon?

17 A.       Yeah , we sent them over to his address on    Ray

18 Road to confirm the truck was there    , and  I believe it's

19 registered to him at the residence at the     address  on

20 Ray Road.

21 Q.       If we could just pause the video here and we'll

22 come back to that in a few moments.   In addition to

23 those  calls  and transaction with   Mr.  Bynum , were there

24 also a series of calls involving    Gwendolyn  Levi and

25 Larry  Nunn  and  Ms.  Martin on April    2nd as well?

1 A.       Yes, starting with call 2461.

2 Q.       What are the group of calls that relate to their

3 contact on  April 1st and April 2nd  of 2004?

4 A.       I'm sorry  I didn't hear that.

5 Q.       What are the calls that relate to call B2461?

6 A.       2461, 62, 2512, 2524  , 2531.

7 Q.       Okay.  Now at what date and t  ime does call B2461

8 on Page 268 take place?

9 A.       That starts at 7 :51 p.m. on the  1st and the last

10 call is on  April 2nd  at 1 :37 p.m.

11 Q.       If we could play those calls beginning with

12 **B**2461, what is the date and time of that call?

13 A.       I'm sorry, yeah  I was wrong.  10 :26 p.m. is the

14 first call in this series on    April 1st on 2461.

15 Q.       Who the are the pa  rties to  this call ?

16 A.       Larry  Nunn  and  Paulette  Martin.

17 Q.       If we could play it as well.

18         (Audio r ecording begins playing at 11   :06 a.m. )

19         (Audio  recording stops   playing  at 11 :07 a.m. )

20         BY MS.  JOHNSTON:

21 Q.       Calling your attention to the next call,      B246 2,

22 on Page 270.  At what time does that call take place in

23 relation to the call we've just listened to?

24 A.       This is -- this takes place immediately after

25 Paulette hangs up.  She    calls Gwen Levi.

1  Q.      If we could play this call  , please.

2          (Audio r ecording begins playing at 11   :07 a.m. )

3          (Audio recording   stops  playing at 11 :08 a.m. )

4          BY MS.  JOHNSTON:

5  Q.      Now , if we could -- were those the two calls on

6  April 1st ?

7  A.      Yes.

8  Q.      If we could play -- turn the    Call B2512 on   Page

9  272.  Is call the next day?

10  A.      Yes, it is.  The morning of --     I guess noon on

11  April 2nd  at 12 :39 p.m.

12  Q.      If we could play 2512 at    Page 27 2.

13          (Audio r ecording begins   playing at 11 :08 a.m. )

14          (Audio recording   stops  playing at 11 :08 a.m. )

15          BY MS.  JOHNSTON:

16  Q.      And B2524 on  Page 27 3, the time of that call?

17  A.      1:13 p.m. on the   2nd.

18  Q.      If we could please play that call.

19          (Audio r ecording begins   playing at 11 :09 a.m. )

20          (Audio recording   stops  playing at  11 :09 a.m. )

21          BY MS.  JOHNSTON:

22  Q.      And B2531 on  Page 27 4, what time is that call?

23  A.      1:37 p.m. on the   2nd.

24  Q.      If we could play it  , please.

25          (Audio recording begins playing at 11    :09 a.m.)

1          (Audio recording stops playing at 11   :09 a.m.)

2          BY MS. JOHNSTON:

3 Q.       Based upon your training and experience, did you

4 form an opinion as to what occurred between     Ms. Martin,

5 Ms. Levi , and Mr. Nunn on April 2nd  of 2004?

6 A.       Yes.

7 Q.       What is that?

8 A.       The previous night  , Mr. Nunn  had ordered 50

9 grams of heroin from   Ms. Martin.  She made the

10 arrangements to get the heroin from    Ms. Levi.  That was

11 delivered to her the next day on    April 2nd .  She then

12 turned around and sold that heroin to     Mr. Nunn .

13 Q.       Okay.  If we could go back to    Page 268.  Is

14 there a code word used in reference to the 50 grams of

15 heroin?

16 A.       Mr. Nunn says , in the fourth line down  , 50 of

17 those tickets , referring to 50 grams of heroin.      Ms.

18 Martin confirms 50.  And they discuss in the morning      ,

19 and then  Mr. Nunn  says that that amount may change.

20 What is the deadline  , meaning what's -- when do you

21 need to know by  , and Ms. Martin just says call her

22 early in the morning if that's going to change.

23 Q.       Could we write  Page No. 268 next to the word

24 "tickets " on the board?

25 A.       (Witness indicating.  )

1  Q.      On Page 270 , is that request relayed to    Ms.

2  Levi?

3  A.      Yes.  She calls   Ms. Levi and orders 50 of those

4  passes for the show  , referring to the 50 grams of the

5  heroin , and she also alerts her as    Mr. Nunn has alerted

6  Ms. Martin that that may change in the morning and if

7  it does, Ms. Martin will let    Ms. Levi know , and Ms.

8  Levi says , that's fine , just let me know before    10:00 .

9  Q.      The phrase used in that call?

10  A.      50 passes for the show.

11  Q.      Okay.  You want to make a notation of that code

12  on the board, if it's not there already?     I think

13  there's a reference to    "show"?

14  A.      Page number?

15  Q.      The page number for that one is    Page 270?

16  A.      (Witness indicat ing.)

17  Q.      Now, based upon your training and experience     ,

18  what's the significance of the two calls    , B2512  and

19  B2524?

20  A.      During call 2512 , Ms. Levi is telling   Ms. Martin

21  that she's leaving from her area now    , meaning up in   Elk

22  Ridge , to come down and she   's riding  with her buddy ,

23  who is  William  Turner , because she doesn't have

24  transportation , and they confirm the time that she will

25  be there , before 1 :30 p.m.

1 Q.        And B2524?

2 A.        Ms. Levi tells  Ms. Martin that she's parking

3 now, meaning she's in front of the address on       Hayward.

4 Q.        When we get to the call with   Mr. Nunn that

5 happens after  Ms. Levi arrived, is there any codes used

6 in that call in reference to the drugs?

7 A.        Yes.   Ms. Martin has now changed it from 50

8 tickets, which is what   Mr. Nunn had ordered , to say

9 that I have that magazine you asked me to get     , meaning

10 that I have the 50 grams of heroin.      Mr. Nunn did not

11 -- had not asked for a magazine.   And then      Mr. Nunn

12 finishes the conversation by saying he'll be there in

13 about 15 minutes.

14 Q.        And the code word for drugs?

15 A.        Magazine.

16 Q.        Do you want to write the page number    , I think

17 magazine 's up there , Page 27 4?

18 A.        (Witness indicating.  )

19        MS. JOHNSTON:   Your Honor , if I could ask the

20 witness to step down briefly so we could call        Detective

21 Muldoon .

22        THE COURT:  You may.

23        MS. JOHNSTON:  Thank you.

24        (Witness  excused  from the stand at 11  :14 a.m. )

25 Thereupon,

1                    **COLLEEN MULDOON** ,

2 having been called as a witness on behalf of       the

3 Plaintiff , and having been first duly sworn by the

4 Courtroom Deputy, was examined and testified as

5 follows:

6          THE CLERK:  We need you the state your name for

7 the record.

8          THE WITNESS:  Corporal   Colleen  Muldoon ,

9 M U L D O O N.

10                    **DIRECT   EXAMINATION**

11          **BY MS. JOHNSTON:**

12 Q.      Where are you employed,   Corporal  Muldoon ?

13 A.      I'm with the   Prince  George's  County police

14 department.

15 Q.      How long have you been employed there?

16 A.      I've been employed there for almost 18 years.

17 Q.      Could you tell us briefly what your experience

18 has been as a   Prince George 's County police officer?

19 A.      I worked on patrol area in the     Hyattsville   area

20 for about two years  , and then   I was in narcotics for

21 the last 15 years.

22 Q.      Could you describe what kinds of cases you

23 worked in in the narcotics section?

24 A.      I've  worked on the conspiracy squad   , where we

25 identify and target known drug criminals    .  I've also

1 worked in our  diversion  unit .  There we have identified

2 and tried to target people who may be diverting illegal

3 -- legal drugs illegally  , like prescription drugs  , and

4 now I'm on the conspiracy squad again where    I'm working

5 on long -term investigations on known drug dealers.

6 Q.     Have you had occasion to participate in

7 surveillances of individuals?

8 A.     Yes, ma'am.

9 Q.     Calling your attention to   April 2nd  of 2004 ,

10 were you working that day?

11 A.     I was.

12 Q.     What was your assignment on that date?

13 A.     That day , Detective  Eveler  requested that myself

14 and my partner , Pam Krueger,  to go an address in

15 Hyattsville .  We went to -- the address was 1513     Ray

16 Road in  Hyattsville , and we were there to look for a

17 vehicle , a gold  Chevy pickup truck.

18 Q.     Approximately what time did you arrive at that

19 location?

20 A.     About ten after  1:00 .

21 Q.     What observations did you make when you got

22 there?

23 A.     We did observe a gold pickup truck parked right

24 in front of 1513  Ray Road in  Hyattsville .

25 Q.     What was the tag number on that gold pickup

1  truck?

2  A.       Let me check my note  s.   The tag number on that

3  vehicle was 578  , N as in  Nora,  464.

4  Q.       Who was that vehicle registered to?

5  A.       That vehicle is register   ed to Derrick  Louis

6  Bynum .

7  Q.       At what address?

8  A.       At that same address, ma'am   , at 1513  Ray Road ,

9  Apartment 102  , in Hyattsville .

10 Q.       I want  to show you what  's been marked as

11 Government's  Exhibit P -6.

12 A.       Yes, ma'am.   That's the apartment build    ing

13 there.

14 Q.       And does that accurately depict the way the

15 building appeared on the date you were there?

16 A.       Yes, ma'am.

17 Q.       Were you able to see anything    in that photograph

18 that looks  familiar  to you?

19 A.       There looks to be a vehicle over to my

20 right-hand side that could be a    --

21          MR.  WARD:   Objection to what it could be  , Your

22 Honor.

23          THE  WITNESS:  It looks to me like it's a    --

24          MR.  MITCHELL:  Objection.

25          MR.  MARTIN:  Objection.

1           THE COURT:  State what you   observe,  not what you

2  think it was.

3           BY MS. JOHNSTON:

4  Q.      In viewing P -6, is there anything familiar that

5  you recognize in the vehicle -- in the picture other

6  than the location?

7  A.      The back end of a gold pickup truck.

8  Q.      Is there anything different about the back end

9  of the gold pickup truck that we see in     P-6 and the one

10 you observed on that date   , on the date of your

11 surveil lance,  April  2nd  of  2004?

12 A.      There is no difference.

13 Q.      And P -7, what is that ?

14 A.      That's the front entrance of 1513    Ray  Road.

15 Q.      Now, after you concluded your observation of

16 that vehicle, were you given a second assignment?

17 A.      Yes, ma'am.  Detective    Eveler  requested that we

18 go down to  Hayward  Avenue in  Takoma  Park and  -- to get

19 a tag off of a gold  , four -door vehicle.

20 Q.      Approximately what time did you go to the

21 vicinity of  Hayward  Street?

22 A.      We were there about 1  :30.

23 Q.      And did you -- what kind of surveillance did you

24 set up there?

25 A.      Myself and  Detective  Krueger  were in a min ivan.

1  We were just told to drive by and get the tag and not

2  to stay there , to leave right away.

3  Q.     If we could -- have you had occasion to review

4  the pole camera  video that was shot of that day?

5  A.     Yes, ma'am.

6  Q.     Do you recognize anything on the vehicle?     On

7  the video, I'm sorry?

8  A.     I recognize the car that   I saw us going by the

9  house and turning around and coming back   , and that's

10  when we got the tag off the vehicle.

11  Q.     And the  vehicle is depicted as well in the

12  video?

13  A.     Yes.

14  Q.     If we could play that video   , please , that would

15  be Video 10 , for the record.

16           (Video  is being  played.)

17           THE  WITNESS:   We didn't get there until 1   :30.

18           BY MS.  JOHNSTON:

19  Q.     Do you recognize that vehicle   ?

20  A.     Yes, ma'am.

21  Q.     Okay.   Which one do you recognize?

22  A.     The front one, but it wasn't parked there when

23  we went by.   The front one is the gold vehicle.

24  Q.     Do you recognize that vehicle th   at's pulled

25  behind the red   Mercedes ?

1 A.       Yes, ma'am , that's the  vehicle that we got the

2 tag off of.

3 Q.       The same one that we saw arrive in to park     ?   A.

4 Excuse me ?

5 Q.       The same vehicle that we saw previously arrive

6 in to park?

7 A.       Yes, ma'am, it is.  That's us now coming down in

8 the minivan .

9 Q.       Were you able to get the tag number off the

10 vehicle?

11 A.       Once we -- the tag was blocked   , but then we got

12 it again when we tu  rned around and we came back up

13 Hayward  and we were able to get the tag.

14 Q.       Did you maintain any   stationary  surveillance in

15 the area?

16 A.       No, ma'am.  We were told to leave the area right

17 away .  That's us coming back up the hill getting the --

18 us , I mean myself an d Detective  Krueger .

19 Q.       What tag number did you get off of the gold

20 vehicle?

21 A.       That tag number was a   Maryland tag , H as in

22 Henry , W as in  William , F as in  Frank , 752.

23 Q.       Who is that vehicle registered to?

24 A.       That's co-owned by   Juanita  Turner and  William

25 Turner.

1          MS.  JOHNSTON:    I have  no further questions of

2  this witness.

3          THE  COURT:  A ny cross-examination?

4          MR.  MONTEMARANO :  No.

5          MR.  MARTIN:    Mr. Goodwin has none.

6          MR.  HALL:  No,  Your  Honor.

7          MR.  MITCHELL:  No,   Your  Honor.

8          MR.  WARD:   No, Your Honor .  Thank you.

9          THE  COURT:  All right.  You may step down.

10  Thank you , Officer .

11                 (Witness  excused  at 11 :24 a.m. )

12                 (Witness  Sakala  resumes the stand.  )

13                 **FURTHER  DIRECT  EXAMINATION**

14          **BY MS.  JOHNSTON:**

15  Q.      Sergeant  Sakala , did you also , likewise , review

16  that video?

17  A.      Yes.

18  Q.      Are you familiar with the vehicle that was

19  identified by  Detective  Muldoon ?

20  A.      Yes.  We had seen it several time    s.

21  Q.      Who is  William  Turner?

22  A.      That's  Dog Turner, Gwen  Levi's partner.

23  Q.      Now, calling your -- continuing with    April 2nd,

24  were there additional calls that were intercepted on

25  April 2nd ?

1  A.       Yes.

2  Q.       Calling your attention to call B2576 on      Page

3  275.  Is that , likewise , related to  Call B2590  --

4  A.       Yes , it is.

5  Q.       -- o n Page 278?

6  A.       Yes , it is.  On what date and time did those two

7  calls take place?

8  A.       April 2nd,  2004 .  The first one is at 21  :47 and

9  the second one is a few minutes later -- excuse me      ,

10  yeah , at 9 :47, the second one is about an hour later at

11  10:44 p.m.

12  Q.       Are the parties the same?

13  A.       Yeah -- no.

14  Q.       Who are the parties?

15  A.       Hold on.  Yes.  It's   Luis  Mangual , Paulette

16  Martin , and -- both calls.

17  Q.       If we could play those two calls    , please , B2576

18  on Page 27 5.

19            (Audio  recording begins   playing  at 11 :26 a.m. )

20            (Audio recording   stops  playing at 11 :27 a.m.)

21            MS.  JOHNSTON:  Then B2590 on    Page 278 , if we

22  could play that  , please .

23            (Audio r ecording starts   playing  at 11 :27 a.m. )

24            (Audio recording   stops  playing  at 11 :27 a.m. )

25            BY MS.  JOHNSTON:

1  Q.      Based upon your training   and experience , what

2  are Mr. Mangual  and Ms. Martin discussing in those two

3  calls?

4  A.      Ms. Martin  is ordering a kilogram of cocaine

5  from Mr. Mangual  for her brother , Learley  Goodwin , who

6  is at the residence on   Hayward  Avenue.

7  Q.      Page 27 5, what is the reference to   Mr. Goodwin ?

8  A.      Fifth line down, okay  , my brother was here  , he

9  wanted a ticket.

10  Q.     And "ticket " again refers to?

11  A.     A kilogram of cocaine.

12  Q.     Could you write the page number on    the  board

13  next to the word   "ticket "?

14  A.     (Witness indicating.  )

15  Q.      Is that  what  the discussion in both of those

16  calls has to do with?

17  A.     Yes.

18  Q.      In between those two calls  , there was another

19  call on  Page 27 6

20  A.     Yes.

21  Q.      Based upon your training and experience and

22  review of the call, does it reflect where     Mr.  Goodwin

23  was on  April 2nd  during these calls with -- between    Ms.

24  Martin and  Mr.  Mangual ?

25  A.      He was at the residence on    Hayward  Avenue ,

1  Paulette  Martin's house.

2  Q.      Now, this call has already been    played  for the

3  jury , but have you reviewed this call    --

4  A.      Yes.

5  Q.      -- referring to  B2581 on  Page 27 6?

6  A.      Yes.

7  Q.      Now , based upon -- you were not privy to     Mr.

8  Thurman's testimony here in court; is that correct?

9  A.      That's correct.

10  Q.      Listening to this call and reviewing the

11  transcript, did you   form an opinion as to what    Mr.

12  Goodwin  and  Mr. Thurman were discussing?

13  A.      Yes.

14  Q.      What is your opinion?

15  A.      This has to do with the bad cocaine     Mr.  Goodwin

16  got , or low quality cocaine.     Mr. Thurman is down

17  trying to swap it out or get his money back    , and  the

18  middle of the page or a little bit below the page where

19  Mr. Goodwin  asks , so they're exchanging the clothes    .

20  He's asking if they're going to change the low quality

21  kilograms for better quality.

22  Q.      Does he indicate in that call where they had to

23  go change the clothes?

24  A.      Yeah.  Near the bottom of the page    , Mr. Thurman

25  says they had to go wash his clothe    s in Mexico, meaning

1 that they had to swap kilograms in    Mexico .

2 Q.     What is the code word being used in this call to

3 refer to cocaine?

4 A.     They refer to the cocaine as    "clothes ".

5 Q.     Okay.  Could you add that to our chart and the

6 page numbers?  Page 27  6.

7 A.     270?

8 Q.     276.

9 A.     (Witness indicating.  )

10     MS. JOHNSTON:   Your Honor, we have some

11 witnesses here from   Wyoming , so to make sure they get

12 on and get  off the  stand , if could recess   Detective

13 Sakala 's testimony  --

14     THE COURT:  V ery well.

15     MS. JOHNSTON:   -- a nd get them on now  , we would

16 appreciate it.

17     THE COURT:  That's fine.

18     MS. JOHNSTON:  Thank you  , Your Honor.

19     THE COURT:  Want to do it right now?  All right.

20     (Witness excused at 11  :31 a.m. )

21 Thereupon,

22                **DAVID  CHATFIELD** ,

23 having been called as a witness on behalf of the        _____

24 Plaintiff , and having been first duly sworn by the

25 Courtroom Deputy, was examined and testified as

1 follows:

2                         **DIRECT  EXAMINATION**

3          **BY MS. GREENBERG:**

4 Q.      Could you state  and spell your last name for the

5 jury, please?

6 A.      David  Chatfield, C H A T F I E L D.

7 Q.      Where are you employed  , sir?

8 A.      I'm a state trooper with the    Wyoming  Highway

9 Patrol.

10 Q.     Did you travel to   Maryland last evening?

11 A.     I did.

12 Q.     How did you travel here?

13 A.     By airplane.

14 Q.     What airline?

15 A.     Frontier.

16 Q.     Did anything unusual happen -- did anything

17 happen during your travels  ?

18          MR. MARTIN:  Objection.

19          MR. MONTEMARANO : Proffer at the bench  , Your

20 Honor?

21          THE COURT:  A pproach the bench.

22                  (At the bar of the Court.)

23          THE COURT:  W ell?

24          MR. MARTIN:   I can't understand where she's

25 going with this.

1          MS. GREENBERG:   Your Honor, they lost his

2  luggage.  He's dressed in jeans and a shirt.  I wanted

3  him to explain why he wasn't dressed    .

4          MS. MONTEMARANO :  With all due respect  , he's not

5  an attorney.  He's not obligated -- he could come off

6  of surveillance and they look like this   .

7          MR. MARTIN:  Nobody cares  .

8          MS. GREENBERG:   Your Honor, so he can explain

9  why he's dressed the way h  e's dressed.

10         THE COURT:  O verruled.

11         You can ask him why he's   not dressed in  uniform,

12  period, and he can explain.

13                  (Back in open court.)

14         BY MS. GREENBERG:

15  Q.     Trooper, is there something about your dress you

16  would like to explain to the jury?

17  A.     Yes.  My luggage was lost by the airline last

18  night which contained my suit.

19  Q.     When do you  expect  to get your luggage back?

20  A.     6:30 this afternoon.

21  Q.     Where do you  expect  to be t onight ?

22  A.     In Cheyenne .

23  Q.     Could you give the jury a little bit about your

24  background, train ing, and experience?

25  A.     I've been a state trooper with the     Wyoming

1 Highway Patrol for 12 years.   Before that   , I went to

2 college at the   University of   Nebraska in   Lincoln ,

3 graduated from high school in     Nebraska.

4 Q.      What are your duties and responsibilities as a

5 Highway patrol trooper for the   state of   Wyoming?

6 A.      Basically to patrol the highways.

7 Q.      Were you so employed on March 11, 2004?

8 A.      Yes.

9 Q.      Could you tell the jury   , did you pull over a

10 vehicle that date?

11 A.      I did .

12 Q.      For what?

13 A.      For speeding.

14 Q.      To direct your attention   , was it a   Honda  Accord?

15 A.      Yes , it was  a tan  Honda  Accord.

16 Q.      What kind of plates?

17 A.      It had  California license plates.

18 Q.      Do you recall the number?

19 A.      I don't.

20 Q.      Would anything refresh your recollection as to

21 the number?

22 A.      My report.

23      MS.  GREENBERG:   Your  Honor , if  I may approach

24 the witness.

25      THE  COURT:  You may.

1          MS.  GREENBERG:   The next miscellaneous number,

2 please .

3          BY MS.  GREENBERG:

4 Q.      Handing you what's been marked as    Miscellaneous

5 No. 7 for identification purposes.

6          MR.  MONTEMARANO :  May I see it , please?

7          BY MS.  GREENBERG:

8 Q.      Was there a report made about this incident?

9 A.      Yes.

10 Q.      And who actually made that report?

11 A.      I made my own report and    I believe there's

12 another report by   Special Agent Seals.

13 Q.      Would looking at that refresh your recollection?

14 A.      Yes.

15 Q.      Hand you what's been marked as    Miscellaneous  7.

16 Looking at that  , does that refresh your recollection

17 about what the vehicle was that you pulled over    , what

18 the tag number was?

19 A.      Yes.

20 Q.      What is the tag number?

21 A.      Five , F as in  Frank , C as in  Charley, V as in

22 Victor , 728.

23 Q.      What did you pull that vehicle over for?

24 A.      Speeding.

25 Q.      Who was  driving  the vehicle?

1 A.        Perry Davis.

2 Q.        Who was the  passenger ?

3 A.        Pernell  Philpot .

4 Q.        Did you obtain consent to search the vehicle?

5 A.        Yes.

6 Q.        By whom?

7 A.        By both subjects.

8 Q.        Just to give the jury some kind of idea about

9 where we are, we're in   Wyoming; is that correct?

10 A.        Yes.

11 Q.        What highway?

12 A.        On  Interstate 80.

13 Q.        What kind of highway is   Interstate 80?

14 A.        It's a  trans -country highway that runs from    San

15 Francisco to   New York.   Interstate highway  , two lanes

16 each way.

17 Q.        Major highway, minor highway?

18 A.        Major interstate highway.

19 Q.        Where does it run from  ?

20 A.        It runs from  San Francisco to  New York.

21 Q.        Is that the main route between those two

22 locations?

23 A.        Yes.

24 Q.        Did you discover anything unusual during your

25 consent search of this vehicle?

1 A.        I did.

2 Q.        What did you discover?

3 A.        I discovered some fa  lse compartments in the car,

4 some manufactured compartments.

5 Q.        Can you describe to the jury where you located

6 these manufactured compartments?

7 A.        There was one in the place where the air bag

8 could be , and then there were two in the backseat area

9 on each side wall.

10 Q.        On the side wall of the car?

11 A.        On the side wall of the rear passenger seat on

12 the side wall of the car, yes.

13 Q.        Did you cause a video to be made of your stop     on

14 this date --

15 A.        Yes.

16 Q.        -- o f this  Honda  Accord?

17 A.        Yes.

18 Q.        Did you review that complete videotape prior to

19 your testimony today  ?

20 A.        Yes.

21 Q.        Cold you explain to the jury how the videotape

22 system on your vehicle works?

23 A.        It's a dash mounted camcorder, basically, that

24 is wired through  the car so that when   I turn on my

25 emergency light  s, the camera kicks on to start   , and

1  then it remains on until    I turn it off , and  I also have

2  a body recorder on me that    I turn on that records what

3  I'm saying.

4  Q.     So the recording is fairly lengthy?

5  A.     Yes.

6  Q.     And did you  review this whole tape  , Video  2,

7  prior to your testimony?

8  A.     Yes.

9  Q.     Does it fairly and accurately record the events

10 of that day?

11 A.     It does.

12 Q.     Is there a portion that    reflects  your discovery

13 of something in a compartment?

14 A.     Yes.

15 Q.     If you could describe to the jury what happened

16 at that particular moment.

17 A.     Oh.  In one of the compartments on the driver's

18 side , we found several cellophane packages    .  We removed

19 one, tested that package for drugs   , and it was

20 presumptively positive for cocaine.

21 Q.     When you say  "we," who  are you talking about?

22 A.     Another trooper was on scene with me    , his name

23 was Jim Hess .

24      MS. GREENBERG:   Your Honor , if I could play that

25 portion  of the  Video  2 now.

1          THE COURT:  You may.

2          (Video begins playing at 11  :38 a.m. )

3          BY MS.  GREENBERG:

4  Q.      What are we seeing here?

5  A.      That's the car , and both  Trooper  Hess  and  I

6  searching , and that's the package that    I've just

7  located in the rear wall of the car that     I set on the

8  trunk there.

9  Q.      Okay .  Just to clear it up  , where are you coming

10 out of?

11 A.      I'm coming out of the   driver's  side door with a

12 -- kind of a white package in my hand.

13 Q.      Is that date on the time stamp on the videotape

14 correct , march 11, 2004 , about  3 o'clock p.m.

15 A.      Yes.

16 Q.      And that package is wh  at you got from the hidden

17 compartment?

18 A.      Yes.

19 Q.      What did you do after you located that hidden

20 compartment and that one package?

21 A.      Called for agents from the   Division of  Criminal

22 Investigation  to come out and follow up on the case.

23 Q.      What happened next?

24 A.      After they arrived , we tow ed the vehicle back to

25 a state shop where we searched it further.

1  Q.      Did you subsequently continue to search that

2  vehicle?

3  A.      Yes.

4  Q.      And what , if anything , happened as a result of

5  the continued search?

6  A.      We removed four other packages from that

7  compartment.

8  Q.      And the shape and size of each package?

9  A.      Was approximately a kilo of cocaine.

10  Q.      And showing you what's been marked as     P-177.

11  Could you identify what that is for the jury?

12  A.      That's a picture of the same vehicle from the

13  front , inside our state shop.

14  Q.      And P-178 , could you describe what we're s    eeing

15  here?

16  A.      The metal piece is the door latch on the

17  doorjamb on the passenger side of the vehicle.   The

18  lower part shows -- it's in here sideways    , it shows the

19  vertical.

20  Q.      I'm going to try this  .

21  A.      Yes.

22  Q.      Is that easier?

23  A.      That's more correct, yes.   The part on the right

24  now shows the side molding of the car    , which --

25  Q.      That right there?

1 A.      Yes.  And that is aftermarket glue that is where

2 the compartment is.

3 Q.      Just for the record , that's approximately the

4 middle -- right below the middle part of the picture?

5 A.      Right where your finger is.

6 Q.      Yes.  For the record , my finger is the middle

7 part of the picture.

8        Was that the  first indication , the glue that you

9 had , that there might be a hidden compartment?

10 A.      No.  I found the compartment    -- of that

11 compartment , but I found the air bag compartment prior

12 to that.

13 Q.      What caused  you to  find the air bag compartment?

14 A.      When I was searching the vehicle  , I noticed that

15 all of the screws  that held the  glove compart ment in

16 had a lot of tooling on them  , or marks , that showed it

17 had been off and on quite often.

18 Q.      What happened  when you looked inside the glove

19 box?

20 A.      When I was able to pull the glove com   part ment

21 out , I was able to see some manufacturing that was not

22 part of the vehicle , and so  I was able to determine

23 that that was aftermarket   and was probably some kind of

24 false compar tment built in.

25 Q.      And subsequent to that that you noticed the

1  glue ?

2  A.      Yes.

3  Q.      Which side of the car was the glue noticed on?

4  A.      It was actually on both sides  .  That picture

5  there is on the passenger side   , but it was on both

6  sides.

7  Q.      P-179 , what does that reflect?

8  A.      That is the compartment broken open and there's

9  an electronic h ydraulic  arm down toward the bottom of

10 the picture.

11 Q.      Is that this black bar with the silver on it?

12 A.      Yes.

13 Q.      And what does that h ydraulic  arm do?

14 A.      When some kind of button was pushed inside the

15 car , it was designed to swing that arm open and     open

16 that access  to that area inside   there.

17 Q.      Did you locate the button?

18 A.      No.  We located the wire that did that    , but not

19 the button.

20 Q.      How did that  hydraulic  arm compare to what you

21 located inside the glove compartment   ?

22 A.      It was about the  same .  Hydraulic  arms on both

23 sides and in the glove compartment    -- or in the air bag

24 compartment.

25 Q.      What we're looking at here    is  the driver's side?

1 A.      Yes.

2 Q.      And was there anything located in the

3 compartments in the -- start with the glove compartment

4 -- in the glove compar  tment?

5 A.      In the glove compart ment ?  No.

6 Q.      And in the passenger side?

7 A.      No.

8 Q.      Concealed there.

9 A.      No.

10 Q.      And so all fi ve packages were locate  d in  the

11 concealment area on the driver's side?

12 A.      That's correct.

13 Q.      And reflected in   P-180?

14 A.      That's the same compartment on the drive    r's side

15 just a different view.

16 Q.      And does this show what you observed when you

17 got that open?

18 A.      Yes.

19 Q.      And does this package -- how does that compare

20 to what we saw on the videotape?

21 A.      That's probably the same package.

22 Q.      And P-181?

23 A.      Another --  same picture , just a different angle.

24 Q.      And P-18 2?

25 A.      That's the vehicle on the side of the road with

1  the -- one of the packages on the trunk lid.

2  Q.      And what is reflected in   P-183?

3  A.      That is the trunk lid of the    Honda in the state

4  shop with all five packages on the hood and the test

5  kits that we used on top of the packages.

6  Q.      Now, did you also locate documents as a result

7  of your investigation from this car?

8  A.      Yes.

9  Q.      Did you provide those to anyone in connection

10  with th is investigation ?

11  A.      Yes.  They were all turned over to    Special  Agent

12  Seals.

13  Q.      Can you explain to the jury how that works     , why

14  you turned  over this -- these documents and other items

15  to Special  Agent seals?

16  A.      Basically because   I'm a --  I work the road ,

17  patrol the highways , that's the main part of my job    .

18  And whenever we run into a felony criminal matter     , such

19  as transportation of drugs  , we turn that over to an

20  investigator , and he's the investigator that works for     ,

21  in the state of   Wyoming , the Division of  Criminal

22  Investigations.

23      MS. GREENBERG:   Your Honor , if I may approach

24  this witness .

25      THE COURT:  Y ou may.

1          BY MS. GREENBERG:

2 Q.     Showing you what's been marked as     Wyoming  1.

3 Are these the document  s that were located from that

4 vehicle in connection with yours and     Mr. Seals ' search?

5 A.     Yes.

6 Q.     Could you read  who the person  is on this

7 particular exhibit from    Honda of  Oakland?

8 A.     Pernell  Philpot .

9 Q.     And the next , the Virginia  Uniform  Summons?

10 A.     Pernell  Philpot .

11 Q.     And the  Northland's  Route , Inc., N O R T H L A N

12 D, account in whose   name?

13 A.     Pernell  Philpot .

14 Q.     And the  Texas  Department of   Public  Safety

15 citation in whose name?

16 A.     Pernell  Philpot .

17 Q.     And a  Honda of  Oakland document in whose name?

18 A.     Pernell  Philpot .

19 Q.     Now, as a  result  of your activities that day   ,

20 did you cause anyone to be arrested?

21 A.     Yes.

22 Q.     And who was -- who did you cause to be arrested    ?

23 A.     Pernell  Philpot  and Perry Davis .

24 Q.     Is Pernell  Philpot  on these doc uments,  for

25 example , the Virginia  Uniform  Summons , could you

1 compare the name and date of birth to the person       you

2 arrested as  Pernell  Philpot ?  Is that the same person?

3 A.      Yes , it is.

4 Q.      Could you provide for the record what the date

5 of birth is  for that individual?

6 A.      January 15, 1962.

7 Q.      And a description?

8 A.      5'4", 26 5 pounds, black male  .

9 Q.      And did you cause anyone else to be     arrested?

10 A.      Yes.

11 Q.      Who else ?

12 A.      Perry Davis.

13 Q.      Could you give us his date of    birth  and

14 description?

15 A.      His date of birth is October 6, 1982, 5'10", 150

16 pounds, black male.

17 Q.      What did  you do  with the drugs that you

18 discovered from the hidden compart    ment  in  this  Honda

19 Accord?

20 A.      I turned those over to    Special  Agent  Seals.

21         MS. GREENBERG:    Your  Honor , if I may , again ,

22 approach .

23         THE  COURT:  Y ou may.

24         BY MS. GREENBERG:

25 Q.      Showing you wh at's been marked as Wyoming    2.

1  Did you have an opportunity to review this last evening

2  when you arrived?

3  A.      Yes.

4  Q.      I'm not going to pull everything out of the bag    ,

5  but you  reviewed  everything in this bag?

6  A.      Yes.

7  Q.      Taking a  representative sample out of this bag     ,

8  could you tell this jury what's in this bag?

9  A.      That was part of the packaging of the cocaine.

10 Q.      Could you explain to the jury how the cocaine

11 was packaged?

12 A.      It was wrapped in cellophane with layers of

13 masking agents.

14 Q.      What is this silver substance here?

15 A.      That's duct tape.

16 Q.      What , if any , connection did that have to the

17 kilograms that you seized from the     Honda  Accord that

18 date?

19 A.      It was wrapped in duct tape also.

20 Q.      What is this white object here?

21 A.      Dryer sheets.

22 Q.      How does that relate at all   , the dr yer sheet s,

23 to the objects that you seized that day?

24 A.      That would be one   of the  masking agent s in the

25 wrappings.

1 Q.      And showing you this , then , do you recognize

2 that as connected with the seizure from that date?

3 A.      I don't recall that.

4        MS. GREENBERG:   Your Honor , if I may publish the

5 two exhibits that he talked about   , the duct tape  and

6 the fabric softener , to the jury.

7        THE COURT:  You may.

8        BY MS. GREENBERG:

9 Q.      I'm showing you what's been marked as      Drugs 43 A,

10 43B, 43 C, 43D, and 43 E.

11        Do you recognize those exhibits?

12 A.      That's the bricks of cocaine taken out of the

13 wrapping  and everything.

14 Q.      Do they differ in their appearance today from

15 the date that you seized them?

16 A.      Yes.  They're not all wrapped up and some of

17 them have been broken out of their brick form.

18        MS. GREENBERG:   Court's indulgence.

19        No further questions   , Your Honor }.

20        THE COURT:  Cross-examination   ?

21        MR. MONTEMARANO :  Thank you , Your  Honor.

22                    **CROSS-EXAMINATION**

23        **BY MR. MONTEMARANO :**

24 Q.      Afternoon,  Trooper .

25 A.      Yes.

1  Q.       Afternoon,  Trooper  Chatfield .  How are you?

2  A.       Good.

3  Q.       Frontier  managed to lose your    luggage; right?

4  A.       That's correct.

5  Q.       But you brought your memory, right?

6  A.       I did.

7  Q.       You don't know who this person is    , do you?

8  A.       I do not.

9  Q.       And showing you  P, for  Papa , 18 2, which is the

10 photograph of the vehicle after it's been stopped      ,

11 that's the  Honda you all stopped?

12 A.       Yes.

13 Q.       On the left side   of the photograph here  , we see

14 two lanes and a median -- excuse me   , and a shoulder ,

15 the vehicle sitting on the shoulder; is that correct?

16 A.       That is correct.

17 Q.       These two lanes would be vehicles headed

18 eastbound?

19 A.       Yes .

20 Q.       These are the two eastbound  , so we're out

21 somewhere at the end of the picture now, east?

22 A.       Yes.

23 Q.       And then there's a grassy median?

24 A.       Yes.

25 Q.       And then  I'm going  to assume  two westbound lanes

1 and a shoulder as well  ?

2 A.      Yes.

3 Q.      The Honda was going east and you're going west?

4 A.      Yes.

5 Q.      So you were actually off to the left side of

6 this photograph on the westbound lanes; correct?

7 A.      At what time?

8 Q.      When you first saw the vehicle   .

9 A.      Yes.

10 Q.      And you went -- you saw it coming towards you,

11 you looked at it; correct?

12 A.      Yes.

13 Q.      And then you saw it   pass you ; correct?

14 A.      Yes.

15 Q.      And as it came towards you   , you had activated

16 your front radar and that's on your cruiser?

17 A.      Yes.

18 Q.      Or your patrol vehicle?

19 A.      Yes.

20 Q.      What kind of vehicle?

21 A.      It's a  Ford  Crown  Victoria.

22 Q.      You sail by in your   Crown  Vic.  Y ou get nothing

23 on your front radar  .  The vehicle you see pass you from

24 10 to 15 yards away  , and then you activate your  rear

25 radar ; correct?

1 A.      Yes.

2 Q.      Your rear radar tells you they're doing 78 miles

3 an hour correct?

4 A.      Yes.

5 Q.      What's the posted speed limit?

6 A.      75.

7 Q.      It was clear, dry and sunny on that day    ; right?

8 A.      Yes, it was.

9 Q.      Just like that , and for 78 in a 75 zone   , you

10 stopped them; correct?

11 A.      Yes.

12        MR. MONTEMARANO :  No further questions  , Your

13 Honor.

14        THE COURT:  A ny further  cross?

15        MR. SUSSMAN :  Just briefly.

16                     **CROSS-EXAMINATION**

17        **BY MR. SUSSMAN :**

18 Q.      After you stopped them,    Trooper, you checked

19 their license and registration?

20 A.      I did.

21 Q.      All valid?

22 A.      Yes.

23 Q.      And then you we began to interview them    ; is that

24 correct ?

25 A.      Yes.

1  Q.      Based on your interview  , you asked for consent

2  to search the vehicle?

3  A.      Yes.

4  Q.      And they both consented  .  That was your

5  testimony?

6  A.      Yes.

7  Q.      Do you have a written consent from them?

8  A.      No.

9  Q.      Did you have consent forms in your vehicle at

10  that time?

11  A.      I believe  I do.

12          MR.  SUSSMAN :  Thank you.  Nothing further.

13          MR.  MITCHELL:  Just a few  , Your  Honor.

14          MR.  MARTIN:  If  I may,  Counsel.

15          MR.  MITCHELL:  It will work.

16          MR.  MARTIN:  Thank you.

17                     **CROSS-EXAMINATION**

18          **BY MR.  MARTIN:**

19  Q.      Trooper  Chestfield ?

20  A.      Yes.

21          MR.  MONTEMARANO :   Chatfield .

22          BY MR.  MARTIN:

23  Q.      Chatfield .

24          With respect to the vehicle  , did you have a

25  printout of the radar?

1  A.      There is no such thing.

2  Q.      There is no such thing?

3  A.      No.

4  Q.      That's just for  Breathalyzer , I think.

5  A.      Correct.

6  Q.      And the documents that you were shown in

7  Miscellaneous 101 , those were all  the documents you

8  found in the vehicle that day; right?

9  A.      No.  There was probably more  .  We turned

10 everything over to the   Division of  Criminal

11 Investigation.

12 Q.      Everything that you were shown in there was

13 everything that you actually seized out of there?

14 A.      Everything they seized out of the vehicle

15 included everything that was in the vehicle.

16 Q.      Right.  So either you or your partner   , I'm

17 talking about  Miscellaneous 101 , if I could show it to

18 him because  I don't  want him to be confused  .  Remember

19 when government trial counsel showed you a bunch      of

20 papers --

21 A.      Yes.

22 Q.      -- that had someone's name on it?

23 A.      Yes.

24 Q.      Did you actually pull these papers out of the

25 car?

1  A.      We pulled everything out of the car, looked

2  through everything , then put everything back the wa    y it

3  was and turned it over to the     Division of  Criminal

4  Investigation.

5  Q.      Thank you , sir .

6          MR. MARTIN:  I have  nothing further.

7          MR. MITCHELL: C ouple of questions , Your  Honor.

8          MR. HALL:  Actually , I had a question.    I know

9  you're anxious.

10                    **CROSS-EXAMINATION**

11      **BY MR. HALL:**

12 Q.      Trooper , you don't know this individual to my

13 left, do you?

14 A.      I do not.

15 Q.      Thank you.

16                    **CROSS-EXAMINATION**

17      **BY MR. MITCHELL:**

18 Q.      Trooper  Chatfield , you work for the    Wyoming

19 Highway  Patrol; correct?

20 A.      I do.

21 Q.      As part of your duties, they're to keep the

22 highways safe ; is that correct ?

23 A.      Yes.

24 Q.      And part of that is to monitor traffic and

25 monitor speeds ; correct?

1 A.      Yes.

2 Q.      The speed limit , if I understand , is 75 miles an

3 hour?

4 A.      That's  correct.

5 Q.      On Highway 80 through   Wyoming , at least where

6 you were?

7 A.      Yes.

8 Q.      This was at  Mile Post 39 2; correct?

9 A.      Yes.  Somewhere in there.  39   4, maybe.  39 4 -- I

10 belie ve the stop was at 39  4.

11 Q.      394.  And you see a vehicle coming into your

12 radar , and in one of your reports indicate that you

13 estimated the speed of about 80 miles per hour    ; is that

14 correct ?

15 A.      That's correct.

16 Q.      That's about fi ve miles over the speed limit?

17 A.      Yes.

18 Q.      When you got a reading based on your radar    , it

19 was 78 miles an hour; correct?

20 A.      Correct.

21 Q.      That's three miles an hour over the speed limit    ?

22 A.      Correct.

23 Q.      Now, you 've been a trooper how long?

24 A.      Twelve  years.

25 Q.      And is it your experience that someone traveling

1 three miles an hour over the speed limit would be an

2 unsafe driver on the highways?

3 A.      Not in particular, no.

4 Q.      And did you determine this speed of this vehicle

5 to be unsafe on the road causing others to be unsafe?

6 A.      I determined it in violation of the law.

7 Q.      Three miles an hour over the speed limit    ?

8 A.      That's correct.

9 Q.      And that was enough -- that was a concern of

10 yours enough to stop this vehicle?

11 A.      Yes.

12 Q.      Because of the unsafe driving?

13 A.      Because of the violation of law.

14 Q.      And the violation was three miles an hour over

15 the speed limit ?

16 A.      Correct.

17 Q.      It have anything to do -- did your stop have

18 anything to do with the fact that the vehicle was

19 traveling with  California plates as opposed to     Wyoming

20 plates?

21 A.      A little bit.

22 Q.      What was the reason why you stop   ped the car

23 because of  California plates as opposed to three miles

24 an hour over the speed limit?

25 A.      I stopped it for three miles an hour over the

1 speed limit but the   California plates just drew my

2 attention.

3 Q.      Why is that?

4 A.      Because we get a lot of drug traffic from

5 California.

6 Q.      Is that what you were looking for on this day?

7 A.      Not in particular.    I was looking for a lot of

8 things, but I'm always looking for drugs and felons and

9 speeders and anything else that comes along.

10 Q.      Did it also have anything to do with the fact

11 that there were two   African- American males in the car?

12 A.      No.

13 Q.      That didn't factor into your reasons for

14 stopping the vehicle?

15 A.      I didn't identify that until after the stop.

16 Q.      You didn't give the driver a speeding ticket,

17 did you?

18 A.      No, I did not.

19 Q.      You gave them a warning.

20 A.      That's  correct .

21 Q.      But you didn't stop at that point and let them

22 go, did you?

23 A.      No, I did not.

24 Q.      You didn't  -- you began to interrogate them,

25 correct, about where they were going and where they

1 were coming from?

2 A.      No.  That happened -- that was a conversation

3 that happened during the time     I was writing the --

4 Q.      That's what  I mean , at the time after you gave

5 the warning , you began to have this conversation with

6 them; correct?

7 A.      No, that was  during the writing of the warning

8 out and the checking on the license.

9 Q.      I stand corrected.  So while you were writing

10 the ticket , you beg an to inter rogate them as to where

11 they were coming  , where they were going?

12 A.      No.  I had a conversation with them about where

13 they were coming from.

14 Q.      Why did it matter to you where they're coming or

15 where they were going?

16 A.      It's just conversation to keep people interested

17 and not feel like they're being overburdened by me or

18 anything else.   I just talk to people.    I talk to

19 everybody  I stop.

20 Q.      Does it matter where they were coming and where

21 they were going  , considering what they were doing    ,

22 travel ing three miles an hour over the speed limit?

23 A.      Usually, no , but in this case it did  , yes.

24 Q.      Because?

25 A.      Because they had two different reasons for what

1  they were doing and where they    coming  from and where

2  they were going to  , so it became suspicious.

3  Q.     Was there a reason to find out where they were

4  going or where they were coming   , in your opinion?

5  A.     Excuse me ?

6  Q.     Is there a reason   to find  out?

7         MS. GREENBERG:  Objection.

8         THE COURT:  Overruled.

9         BY MR. MITCHELL:

10 Q.     Did you have  a reason to find out where they

11 were coming or where they were going base    d on the fact

12 you saw  California plates?

13 A.     It wasn't based on the fact th   at I saw

14 California plates  .  I standardly  ask people where

15 they're coming from and going to on every traffic stop.

16 Q.     And wouldn't it be safe to say you were looking

17 to find  out if  they were , in fact , involved in this

18 drug trafficking as you indicated before?

19 A.     Not in particular, no.    I ask everybody that

20 question.  If suspicion arises    , then yes.

21 Q.     It had nothing do with the fact that they were

22 African-American males?

23 A.     No.

24        MR. MITCHELL:   No further questions  .

25        THE  COURT:   Any further cross  ?

1          MR. WARD:  I have none,  Your  Honor .  Thank you.

2          THE  COURT:  All right.   Any redirect?

3          MS.  GREENBERG:  Briefly  , Your  Honor.

4                    **REDIRECT  EXAMINATION**

5          **BY MS. GREENBERG:**

6  Q.      Prior to stopping the vehicle, could you tell

7  who was driving or who was a passenger in the vehicle    ?

8  A.      No.

9  Q.      Could you tell that they were male or female?

10 A.      No.

11 Q.      Could you tell whether they were black or white?

12 A.      No.

13 Q.      Is it your practice to stop vehicles that are

14 going over the speed limit?

15 A.      Yes.

16 Q.      And what caused you to talk to the driver and

17 passenger in connection   with obtaining  consent in this

18 case?

19 A.      It's a normal practice of ours  , and  I had them

20 actually come back to my vehicle because     I saw lot of

21 initial nervous ness on their part.

22 Q.      Could you explain to the jury the factors that

23 led you to ask for consent?

24 A.      The driver told me that they were    traveling  --

25 that he was -- he was -- had flown to    Oakland from

1  Maryland and  -- to visit the uncle of the passenger   .

2  Q.      Just to be clear , the driver is ?

3       MR. MARTIN:  Objection.

4       THE WITNESS:  Per ry Davis .

5  Q.      Continue .

6  A.      He h ad flown to  Oakland , and now was driving

7  with the passenger's uncle's car back to      Maryland , and

8  then -- and lived in   Maryland.

9       Then when  I spoke to the passenger   , the

10  passenger said that both he and the driver had       driven

11  this car from  Maryland to  California , and they were

12  both driving it back to    Maryland , and then they were

13  both -- either one of them was going to drive it back

14  or both of them was going to drive it back to

15  California .  So one of them said they had flown to

16  California , the other one said they had   driven the  car

17  to California.

18  Q.      And in your training and experience    , what did

19  that lead  you to  believe?

20  A.      In almost all the interdiction cases we run

21  across , we begin to get different stories from two

22  different people in the car about how they got

23  somewhere or went somewhere   , basically because th  ey're

24  lying about  what  they did to hide the fact that they're

25  doing something   illegal.

1 Q.       You mentioned nervous  ness on the part  of the

2 driver .  Could you explain that to the jury?

3 A.       Yes .  The driver showed his hands were shaking

4 when I pulled him over  , which is beyond the normal

5 nervousness  of a motoring public  , and then wh ile he

6 while he was back in my car and     I was speak ing to him ,

7 he had trouble  swallowing,  he was  constantly  pulling at

8 his pants , which are all above and beyond the normal

9 nervousness  we see from people.

10 Q.       And defense counsel asked you about whether or

11 not you filled out a consent form and got written

12 consent, and you said no.     Have you reviewed   the

13 videotape d interview as evidence    in this case?

14 A.       Yes.

15 Q.       And is there video  taped  evidence  of this

16 consent?

17 A.       Yes.

18 Q.       In other words , you had a microphone on?

19 A.       Yes.

20 Q.       And based  on your prior review   of the  tape , were

21 both the driver  's and pass enger's  consent video

22 recorded?

23 A.       Yes , they were.

24 Q.       Did you see any need for gett   ing a written ,

25 formal consent  ?

1 A.      No.

2          MS. GREENBERG:   No fu rther questions , Your

3 Honor.

4          THE COURT:  Any further rec  ross?

5                      **RECROSS-EXAMINATION**

6          **BY MR. MONTEMARANO :**

7 Q.      Just so I'm clear.   Trooper Chatfield , I read

8 your report .  It doesn't say anything in there the

9 Honda you stop stopped was tailgating    ; correct?

10 A.      Correct .

11 Q.      No illegal lane   changes ; c orrect?

12 A.      That's c orrect.

13 Q.      Didn't cut off any other drive   rs; correct ?

14 A.      That 's correct .

15 Q.      Didn't swerve from lane to lane; correct?

16 A.      That's correct.

17 Q.      Didn't run off onto the shoulder or anything

18 like that ; is that correct?

19 A.      That's c orrect.

20 Q.      It was going 78 in a 75?

21 A.      That's correct .

22          MR. MARTIN:  Mr. Goodwin  as no questions.

23          MR. HALL:  Nothing further  , Your Honor.

24                      **RECROSS-EXAMINATION**

25          **BY MR. MITCHELL:**

1  Q.       Trooper Chatfield , when I asked you if the

2  purpose for stopping this car was perhaps something

3  other than speeding,   I asked you if , did it factor into

4  your reason for stopping the vehicle the fact that the

5  driver was  African-American male.     I recall your answer

6  was no; is that correct?

7  A.      That's correct.

8  Q.       In response to the government's question    s, you

9  said that it -- you didn't know the actual identity of

10 the driver ; is that correct?

11 A.      That's correct.

12 Q.       So in response to my question   , was that you did

13 not know who the identity of the driver was and that's

14 not why --  I'm confused.

15 A.      Sounds like it.

16 Q.       This was at two o'clock in the afternoon?

17 A.      Yes.

18 Q.       Broad daylight?

19 A.      Yes.

20 Q.       Nothing affecting your view of this vehicle?

21 A.      Correct.

22 Q.       And where were you parked    -- or I'm sorry , where

23 were  you when you saw this vehicle initially?

24 A.       I was in the slow lane  , or driving lane , of the

25 westbound traffic traveling at about 65 miles an hour.

1  Q.      Where was this vehicle in relation to yours?

2  A.      It was on the eastbound side.

3  Q.      So it was coming the other direction?

4  A.      Coming towards me, yes.

5  Q.      And did you have the opportunity to observe the

6  vehicle?

7  A.      I did.

8  Q.      There was nothing  obstructing  your view?

9  A.      No.

10 Q.      So did you see the actual driver of this vehicle

11 and his passenger as you were    passing by this car?

12 A.      No.  I saw the plates and the car.

13 Q.      So you're able to see plates   , distinctly

14 California , but you couldn't see inside the vehicle

15 through the windshield?

16 A.      No.  I have very little time  , when you're

17 traveling 65  and the other vehicle is traveling

18 approximately 80 miles an hour   , to see a lot .  So you

19 concentrate  on certain things   so that you can identify

20 the car so you can pull over the right car.

21 Q.      And identifying that there's an    African-American

22 male driving the car doesn't assist you in finding that

23 car?

24 A.      No.

25 Q.      You're in  Wyoming; correct?

1  A.      I am.

2          MR. MITCHELL:   No further questions.

3          THE COURT:  A nything further ?

4          MR. WARD:  I have  no  questions.  T hank you , Your

5  Honor.

6          THE COURT:  All right.  Anything further   ?

7          MS. GREENBERG:   Your  Honor , may the witness be

8  excused ?

9          THE COURT:  H e may , and hopefully  he finds his

10 suitcase.   You are excused .

11              (Witness excused at 12  :06 p.m. )

12 Thereupon,

13                      **ELLA  KUBICZ** ,

14 having been called as a witness on behalf of the

15 Plaintiff, and having been first duly sworn by the

16 Courtroom Deputy, was examined and testified as

17 follows:

18                  **DIRECT  EXAMINATION**

19          **BY MS. GREENBERG:**

20 Q.      If you could state your name and spell your name

21 for the court reporter  , please .

22 A.      My name is  Ella  Kubicz .  My last name is spelled

23 K U B  I  C Z.

24 Q.      Where are you employed, ma'am?

25 A.      I'm employed by  Wyoming  State  Crime  Laboratory.

1  Q.      If you could sit as close to your microphone as

2  you can.

3         Can everyone in the jury hear her?

4         What is the nature of your employment?

5  A.      I am a supervising chemist at the crime

6  laboratory.

7  Q.      Could you give the jury some idea of your

8  background, training and experience as a chemist for

9  the Wyoming -- state of  Wyoming?

10 A.      I gain a masters in  chemistry  and then  Ph.D. in

11 organic chemistry after  I was invited to  United States,

12 because I obtained my education in   Poland.  I was

13 invited to  United  States to perform post  -doctoral

14 research work at   University of  Wyoming in  Laramie .

15        I spent two  years there and  I was hired by the

16 state as forensic toxicologist.    I was trained by both

17 Department of   Health in  Cheyenne , Wyoming and crime

18 laboratory in regards to forensic chemistry and

19 toxicology.

20        I also was trained by   FBI  Academy in the same

21 regards and  Drug Enforcement  Administration.

22 Q.      Do you teach chemistry  ?

23 A.      Yes, I do.

24 Q.      Have you testified as an expert before in courts

25 in  Wyoming?

1 A.      Yes, I did.

2 Q.      State court?

3 A.      State courts in  Wyoming , all sort of courts.

4 Federal court, district.

5 Q.      So you 've also testified in federal court     in

6 Wyoming?

7 A.      Yes, I did.

8 Q.      Have you testified as an expert in forensic

9 toxicology as well as chemistry and scientific

10 evidence?

11 A.      Yes.   I was qualified as expert in those three

12 areas.

13       MS. GREENBERG:   Your Honor , I move to admit this

14 witness , Ella Kubicz , as an expert in forensic

15 toxicology, chemistry  , and forensic science.

16       MR. MONTEMARANO : No voir dire , Your Honor.

17       THE COURT:  Any cross-examination?

18       MR. HALL:  No , Your Honor.

19       THE COURT:  All righ t.  She's qualified and will

20 be permit ted to express opinions in those three fields.

21       BY MS. GREENBERG:

22 Q.      Did you receive some evidence from an agent by

23 the name of  Pat Seals in connection with your work as     a

24 forensic chemist in   Wyoming?

25 A.      Yes, I did.

1 Q.      I'd like to direct your attention     --

2          MS. GREENBERG:  I f I may approach the witness   ,

3 Your Honor.

4          THE COURT:  You may.

5          BY MS. GREENBERG:

6 Q.      Did you review certain   evidence  in my office

7 last evening ?

8 A.      Yes.

9 Q.      Showing you wh at's been marked as   Drugs 43 B,

10 43A, B, C, D -- I'm sorry , let many correct the record.

11          Drugs 43,  Drug 43 B, Drug 43 D, Drug 43 C, and Drug

12 43A.  Did you review those exhibits?

13 A.      Yes , I did.

14 Q.      Are those exhibits that you analyzed?

15 A.      Yes, they are.

16 Q.      And also did you review the packaging that's

17 contained in Wyoming   2?

18 A.      Yes, I did.

19 Q.      Could you tell the jury how you know these are

20 the same drugs that you analyzed    ?

21 A.       I can recognize all these exhibits by my

22 initials on the packaging   , also by the laboratory case

23 number item number  , and  I recognize my handwriting on

24 the packaging.

25 Q.      Now, could you tell the jury how you came into

1 contact with these exhibits?

2 A.      The case was  admitted in  Wyoming  State  Crime

3 Laboratory in March 15 of 2  004, and  in April  9th of  --

4 April of 2004  , I requested this evidence  for analysis

5 and  I worked this.

6 Q.      Did it look as it appeared today?

7 A.      No.  They looked differently.  They were packed

8 differently.    I placed this white powder in this

9 packaging , so I mark  "contents from " to recognize the

10 fact th at  I place d  the contents from original packaging

11 into this plastic bag.

12 Q.      Showing you what's been marked as     P-183.  Could

13 you tell the jury how that relates -- that picture

14 relates to the packages that you first got?

15 A.      On the picture   that you  showing everybody is the

16 original evidence origin   ally packed , and this is how   I

17 received when   I start working this case.

18 Q.      And what did you do after you received these

19 exhibits?

20 A.      After  I received these exhibits   , I de scribe

21 every and each item in this case separately.       I opened

22 this packaging and    I weigh the contents of this

23 packaging separately.

24 Q.      How are the -- what was inside these packages

25 that we observe on   P-183?

1 A.       As far as  I remember, there were several

2 packaging items inside of every package.  All the

3 common denominator was the every    item  in this case was

4 wrapped in  Saran- like plastic wrap , and inside there

5 were several layers of softeners, duct tapes    , and other

6 type of packaging.  A paraffin   -like wax and the latest

7 container was a plastic bag and inside was a white

8 powder.

9 Q.    Did you review what was in the box    labeled  as

10 Wyoming  2 last evening?

11 A.       Yes , I did.

12 Q.    Does that contain the packaging that were around

13 these five bags of white powder?

14 A.       It does.

15        MS.  GREENBERG:    Your  Honor , may  I approach the

16 witness ?

17        THE  COURT:  You may.

18        BY MS.  GREENBERG:

19 Q.    Showing you representative samples from this.

20 Could you explain to the jury what's in this bag?

21 A.       This particular bag contains of the -- part of

22 the packaging that original evidence was packed with     ,

23 and this particular part of the packaging is this

24 paraffin wax , the items were secured or packed.

25 Q.    Another part of the packaging from     Wyoming 2 ?

1 A.      Yes.  This is another part of packaging.  Food

2 saver plastic bags and softener tissues used      --commonly

3 used for laundry.

4 Q.      And the other part that the representative

5 sample from Wyoming    2?

6 A.      Yes, that's the next part of the same packaging.

7 This is the duct tape wrapping or packaging      this

8 evidence was also wrapped with.

9 Q.      Without going through each and every      item  that

10 was in Wyoming   2, did you review each and every bag of

11 packaging to determine   if it had the same lab number    as

12 the lab number which you provided    to it?

13 A.      Yes, I did.

14 Q.      Do each of these little bags have your bag

15 number?

16 A.      Yes.  All the packaging has the same laboratory

17 number as these items and as was mentioned in my

18 report.

19        MS. GREENBERG:   Your Honor, may I publish the

20 one bag with the fabric softener, the one bag with the

21 duct tape, and the one bag with the paraffin wax?

22        THE COURT:  You may.

23        BY MS. GREENBERG:

24 Q.      ting to the bags in front of you with the white

25 powder in them , could you tell the jury what you did

1 with the five separate packages of white powder that

2 you were  provide d to analyze?

3 A.     I have to state that our laboratory is

4 accredited laboratory  , so our procedures is widely

5 accepted in  forensic  community in this country.  The

6 analysis  I performed is divide  d in two stages.

7        The first is pres  umptive tests, which consists

8 of the color tests, and then definitive     testing is

9 performed using analy  tical  instrument ation .  In this

10 case , I performed gas chromatography analysis with mass

11 spectrometry .

12 Q.     Now , with each -- in connection with your test    s,

13 did you perform the same tests on each of these bags?

14 A.     Yes.   I perform the same tests on each and every

15 bag.

16 Q.     And the bags in front of you comport with the

17 bricks that are on  P-183?

18 A.     That's correct.

19 Q.     Did you weigh each brick without the packaging

20 before you performed the test?

21 A.     Yes, I did.

22 Q.     Starting with the first brick that you weighed    ,

23 could you tell the jury what the weight was of the

24 powder in one of these bricks   , and then go -- without

25 -- if you could go through the weight without the

1 packaging for each item.

2 A.       Okay.  Can  I refresh my memory with copy of my

3 --

4 Q.       Certainly .

5        MS. GREENBERG:    Your  Honor , may  I approach with

6 Miscellaneous  8?

7        THE  COURT:  You may.

8        BY MS.  GREENBERG:

9 Q.       Is this your   identification r  eport for this

10 particular analysis?

11 A.       Yes, it is.

12 Q.       If you could tell the  jury  , please , the weight

13 of each of these bricks without the packaging     ?

14 A.       Brick N o. 1A weighs 1 ,001.9 of  a gram.

15 Q.       And your  1A for our purposes is 43   C.

16 A.       My item  1B weighed 1 ,370.8 of  a gram.

17 Q.       And for our purposes  , that's  Drugs 43 B.

18 A.       Item  1C weigh ed 1,342.7 of  a gram.

19 Q.       And for  our purposes,  that's 43 A -- Drugs 43 A.

20 I'm sorry , Ms. Perez.  T hese are all  Drugs 43 .  If I

21 said 43 , I meant drugs.  Thank you.

22 A.       Item 1 D weighed 1 ,337 of a  gram.

23 Q.       And for our purposes  , that's  Drugs 43.

24 A.       And Item 1E, I recorded the weight 1  ,364 .2 of  a

25 gram.

1  Q.      For our purposes , that's Drugs 43 B.

2          And your initials are on the seals of all these

3  exhibits?

4  A.      Yes, they are on every bag.

5  Q.      Are they in the same condition as when you --

6  after you analyzed them?

7  A.      Yes, they are.

8          MS. GREENBERG:   Your Honor , may I publish Drugs

9  43D to the jury ?

10         THE COURT:  You may.

11         BY MS. GREENBERG:

12 Q.      Now, getting back to the   tests that you

13 performed on these bags  , you performed a test on each

14 of these five separate bags?

15 A.      Yes, I did.

16 Q.      You kept it in the same condition as the

17 wrapping that it was on this picture    P-183?

18 A.      Yes.

19 Q.      And what's the first test you performed?

20 A.      The first test was presumptive test   , which was

21 the color test using the   cobalt thiocyanate   reagent .

22 Q.      Did the result s of the color test s remain the

23 same for each of these fi   ve pa ckages?

24 A.      Yes.

25 Q.      What was the result  of the color test?

1  A.      The reagent turned from a clear liquid     -- not

2  clear, I'm sorry.  There was marquee reagent was also

3  used to test this white   powder.  The cobalt thiocyanate

4  originally is p ale pink color, and in the presence of

5  this particular white powder  , it turn ed to blue.  Blue

6  specks.

7  Q.      What does that mean?

8  A.      That means that probably    I have a cocaine in

9  this case.

10 Q.      Did you run  a confirmatory test?

11 A.      Yes, I did.

12 Q.      What was that confirmatory test?

13 A.      I found the same fragments in the spectra of

14 this unknown substance as in certified laboratory

15 standard for cocaine hydr   ochloride.

16 Q.      Was that the same for each bag?

17 A.      Yes, it was.

18 Q.      So based on your testing  , what did you conclude

19 was contained in each one of the exhibits that     I just

20 showed you  Drugs 43, 43 A, B, and C, and D?

21 A.      In all five bags, I identified this white powder

22 as co caine.

23         MS. GREENBERG:   No further questions of this

24 witness, Your Honor.

25         THE COURT:  All right  .  Any cross-examination?

1          MR.  MONTEMARANO :  Thank you , Your  Honor.

2                    **CROSS-EXAMINATION**

3          **BY MR.  MONTEMARANO :**

4  Q.      Good afternoon , Ms. Kubicz .  How are you?

5  A.      Good afternoon .  I'm fine.

6  Q.      I guess  Frontier  didn't lose your luggage.

7          You were talking about your lab being

8  accredited ; is that correct?

9  A.      That's correct.

10 Q.      That means you're run under certain specific

11 stringent standards  ; is that correct?

12 A.      That's correct.

13 Q.      So the results you obtain in your tests can be

14 obtain ed in  another lab on that same sample; correct?

15 A.      That's correct.

16 Q.      And that's because given a similarity    , or given

17 the same unique tests, equipment, reagents     , and

18 chemicals , you should get the very same result off of

19 the same sample no matter w  here it's done; correct?

20 A.      That's correct.

21 Q.      Whether it's  Wyoming, Maryland or  Poland; right ?

22 A.      That's correct.

23 Q.      But it won't tell you where the cocaine came

24 from, will it ?

25 A.      No.

1  Q.      It won't tell you where it's going   ?

2  A.      No.

3  Q.      Won't tell  you who owns it ?

4  A.      No.

5          MR. MONTEMARANO :  No further questions  , Your

6  Honor.

7          MR. MARTIN:  Mr. Goodwin has no questions of

8  this witness.

9          MR. HALL:  No questions  , Your Honor.

10         MR. MITCHELL:  None.

11         MR. WARD:  No, thank you,  Your Honor.  No

12 questions.

13         THE COURT:  Any redirect  ?

14         MS. GREENBERG:  N o, Your Honor .  May the witness

15 be excused ?

16         THE COURT:  Y ou may.  Have a safe trip back to

17 Wyoming.

18              (Witness excused at 12  :22 p.m. )

19         THE COURT:  Counsel, let's take a recess until

20 20 minutes of  1:00 .

21              (Jury excused at 12:23 p.m.)

22              (Off  the record  at 12 :23 p.m. )

23              (On the record at 12:41 p.m.)

24         THE COURT:  C ounsel , before we bring the jury

25 in , I wanted to talk to you about what time to start

1 next week on Tuesday.   I had a matter that would have

2 made it so  I couldn't start before   10:00 , but  I could

3 start before  10:00,  if you'd like.

4         MR. SUSSMAN :  H ow much  before 10:00?

5         THE  COURT :  I could do  9:00 , 9:30.

6         Ms. Johnston, how are we on the schedule?

7         MS. JOHNSTON:   Your  Honor, my schedule has us

8 finishing the calls with the interruptions by the end

9 of next week.   I had hoped to be maybe closer to

10 halfway through the calls.  We're not far off    .  We're

11 at Page 279.   I think there is 630 pages or thereabouts

12 of calls.

13         THE  COURT:  Do we need some extra time?      I can

14 start early if you want.

15         MS.  JOHNSTON:  What   I was thinking was that we

16 do have witnesses coming in   , I think , from  New  York on

17 Monday --  Monday night  to testify Tuesday or  Tuesday

18 morning.   I don't have any problem starting at 9     :30.

19         THE  COURT:  Let's start at 9   :30 unless anybody

20 from the defense has a problem with that.   All right      .

21 I'll tell the jury 9  :30, okay?  And we'll start on

22 Friday next week at   9:00 .

23         MR.  MONTEMARANO :  Your  Honor.

24         THE  COURT:  9 :30, on  Tuesday.

25         MR.  WARD:  Every day  or  just  Tuesday ?

1          THE COURT:  Just  Tuesday.

2          MR. MONTEMARANO :  An d 9 o'clock on  Friday ?

3          THE COURT:  On  Wednesday , I could also start at

4 9:30 if we need to  , and Thursday I have a -- we're

5 going to have to start at   10:00 because  I have  a guilty

6 plea at  9:00 and Friday we'll start at   9:00 .

7          MS. JOHNSTON:   Your Honor , we would prefer to

8 start Wednesday at  10 o'clock.   I think the  Court has a

9 matter at  9:00 on Wednesday.

10          THE COURT:  All right  .  That's fine.  But we'll

11 start Tuesday at 9 :30.

12          MR. MONTEMARANO :  A nd we should plan on quitting

13 on Friday at  2-ish , the same no lunch  , two-break

14 schedule ?

15          THE COURT:  Yeah , two breaks and out of here.

16          MR. MONTEMARANO :  I just want to double check  .

17          THE COURT:  G ets you almost the  same  amount of

18 time.

19          MR. MONTEMARANO :  I'm not questioning that  .

20               MS. GREENBERG:  J udge , what time are we

21 starting on  Thursday?

22          THE COURT:   I have a guilty plea at   9:00, so

23 unless  I set world speed record  , I could probably do

24 9:45.

25               (Jury returns at 12 :46 p.m. )

1                  (Witness  Sakala  resumes the stand.  )

2          THE  COURT:  Ladies and gentlemen, before we

3   proceed , I wanted to tell you this  .  On Tuesday , we

4   will begin at 9 :30, and as I said earlier , I planned to

5   do the same drill next   Friday we're do ing today so we

6   can get you out of here early for the    4th of July

7   weekend.  You may proceed.

8          MS.  JOHNSTON:  Thank you,   Your  Honor.

9                  **FURTHER  DIRECT  EXAMINATION**

10         **BY MS.  JOHNSTON:**

11  Q.     Detective  Sakala , I think  when we left off , we

12  had just fin ished April 2nd .  Calling your attention to

13  April 3rd of 2004 , are there some calls that we've

14  selected for playing to the jury?

15  A.     Yes, there are.

16  Q.     Calling your attention to A770.  Is that the

17  next call?

18  A.     Yes.

19  Q.     That's on  Page 279?

20  A.     Yes.

21  Q.     Is that part of a series of telephone calls?

22  A.     Yes.

23  Q.     Who are the parties to those telephone calls?

24  A.     Paulette  Martin and  Larry  Nunn,  and then  Gwen

25  Levi in subsequent calls.

1  Q.      What are the calls that go together in addition

2  to A770?

3  A.      B2618, 2648, 2649, 2658, 2661.

4  Q.      Over what time period do those calls take place?

5  A.      The first call , A770, takes place on  April 3rd

6  at 12 :12 , and the last call takes place on the same day

7  at 7 :19 p.m.

8  Q.      If we could please begin with A   770 on  Page 27 9.

9  If we could play that call  , please.

10         (Audio r ecording begins  playing at  12 :48 p.m. )

11         (Audio recording   stops playing at 12 :49 p.m. )

12         BY MS. JOHNSTON:

13  Q.      The ne xt call, B2618 , on  Page 280.  What time

14  does that take place in relation to the first call?

15  A.      It takes place at 1  :33 p.m ., about an hour and

16  15 minutes later.

17  Q.      If we could play  B2618 on  Page 280.

18         (Audio r ecording begins  playing at 12 :49 p.m. )

19         (Audio recording s  tops playing at 12 :49 p.m. )

20         BY MS. JOHNSTON:

21  Q.      The next call,  B2633 -- s trike that , not 2633  --

22  2649 on  Page 280 .

23  A.      2648?

24  Q.      2648 -- Thank you , Detective  Sakala -- on Page

25  28 4.

1          (Audio  recording begins   playing  at 12:50 p.m. )

2          (Audio recording   stops playing at 12:50 p.m.)

3          MS.  JOHNSTON:  N ow if we could proceed to    B2649

4  on  Page 28 5.

5          (Audio r ecording  begins playing at 12:51 p.m. )

6          (Audio recording   stops playing  at 12:51 p.m. )

7          BY  MS.  JOHNSTON:

8  Q.      Then  Call  B2658 at   Page 28 6,  what time does this

9  call take place?

10 A.      7:10 p.m. on   April 3rd .

11 Q.      If we could play the call   , please .

12          (Audio r ecording begins   playing at 12:51 p.m. )

13          (Audio recording   stops playing  at 12:51 p.m.)

14          BY MS.  JOHNSTON:

15 Q.      And Call B2661 on  Page 28 8.  If we could play

16 that call , please .

17          (Audio r ecording starts   playing at 12:52 p.m. )

18          (Audio recording stops playing    at 12:52 p.m.)

19          BY MS.  JOHNSTON:

20 Q.      Going back to the first call, A   770,

21 preliminar ily, did you form an opinion as to what

22 occurred on April  3 of 2004 between   Ms. Martin,  Mr.

23 Nunn and Ms. Levi?

24 A.      Yes.

25 Q.      What is your opinion?

1  A.      Ms. Martin was obtaining 50 grams of heroin from

2  Ms. Levi to sell to   Mr. Nunn.

3  Q.      If we could go , then , to A770.  First of all  , in

4  terms of the a  house keepi ng matter.   In the front of

5  Volume  1, there is a chronology or index of intercepted

6  calls .   Are you familiar with that?

7  A.      Yes, I am.

8  Q.      And calling your attention to Page 12 of that

9  index , is there a mistake made in the listing of      Call

10  A770?

11  A.      Yes, there is.

12  Q.      On Roman  Numeral Page 12.  And what is the

13  mistake in the index?

14  A.      The telephone in the index is described as a

15  telephone conversation between     Paulette  Martin and  Luis

16  Mangual  on April 3 at 12 :12.  The conversation is

17  actually a conversation between     Paulette  Martin and

18  Larry Nunn on April 3  at 12 :12.

19  Q.      Now , if we could get back to the    Call A770 on

20  Page 279.  Based on your training and experience      , were

21  any code words used during that conversation?

22  A.      Yes.

23  Q.      Okay.  What word and how is it used?

24  A.      About the middle of the conversation there,

25  Larry  Nunn  asks , when you get a chance, check and see

1  if she ain't have any more tickets.  Referring to see

2  if Gwen Levi has any more heroin.   Paulette Martin

3  confirm s the amount as being 50 more tickets  , meaning

4  50 grams of heroin , and Larry Nunn says , I'm going to

5  see now about that.   I said make sure she d  o;

6  otherwise , she's going to  go check on the money  for the

7  customer , and he wanted to make sure   Gwen could do it.

8  Q.     Could you make a notation on our chart there

9  next to the word  "tickets " for Page 279?

10 A.      (Witness indicating.  )

11 Q.     If we could then move to   Call B2618 on  Page 280.

12 If you could explain to us  , based on your training and

13 experience , what codes are used in this call and how

14 they're used .

15 A.     Paulette  Martin , the second line , talking to

16 Gwen Levi says , Larry was  wondering  if they could get

17 some more of those novels to read   , changing the code

18 word from  "tickets " to  "novels " from the previous

19 conversation ; and in other words , saying that  Larry was

20 wonder ing if you had any  more heroin to sell  .

21      And then  Gwen continues the conversation later

22 down saying , I just came from the library and    I had

23 some other book s in the back of the car  . I was getting

24 ready to take them back  , saying yes , she does have

25 heroin for sale  , and then  Paulette goes , let  me know

1  how many -- let me see how    many novels  they want and

2  I'll let you know  .   In other words , let me check with

3  Larry and find out how much heroin he wants.

4  Q.     If you could , next to the word   "novels ," enter

5  Page 280.

6  A.     (Witness indicating.  )

7  Q.     And then if we could go to   Call B2648.  Based on

8  your training and experience   , what are they discussing

9  -- Ms. Levi and Ms. Martin  discussing in that call?

10  A.     The second  sentence,  we've gone the previous

11  calls "tickets " and  "novels ," we're now back to

12  "tickets ".  Gwen says , you want  to leave me -- you want

13  me to leave  the tickets and go on about my    -- and she

14  cuts herself off , I'll see you tomorrow  .  Saying that

15  I'll leave the heroin   with you , I'll  go on about my

16  business and  I'll get the money from you at another

17  time.

18        Paula says, yeah, whatever.  If you want to    , we

19  can do it that way.  Saying that    Gwen can leave the

20  heroin with her  , she'll get the money from   Larry , and

21  then pay  Gwen on another day  , and then  Gwen concludes

22  that that way  I ain't going to make another trip over

23  there , meaning  I'm not going to come over and pick the

24  money up  just for that.

25  Q.     If we could make a notation on our    chart , Page

1  284, for the term  "tickets".

2  A.       (Witness indicating. )

3  Q.        And then  Call B2649 on  Page 28 5.  What -- based

4  on your training and experience   , what does  Ms. Martin

5  tell Mr. Nunn ?

6  A.        Well, third sentence in the conversation      ,

7  Paulette's saying  , yes, she's going   to bring me 50

8  tickets anyway , she's going   to leave the tickets here

9  for the show .  Meaning that  Gwen is going   to bring the

10  50 grams of heroin and she's going leave the heroin

11  with me for you.

12  Q.       Now, if you could enter    Page 28 5 on the chart

13  next to the word   "tickets".

14  A.       (Witness indicating. )

15  Q.        And based upon your training and experience      ,

16  what does  Mr. Nunn  tell  Ms. Martin concerning what's

17  going to be done with those tickets?

18  A.        Near the bottom  , he says, I ain't  heard nothing

19  from them , referring to his customers   , so he doesn't

20  know exactly what's going on or what's for sure

21  happening,  but they  ain't  going to go to waste or

22  nothing , meaning the heroin isn't going to go     to waste ,

23  so it gets sold one way or another.

24  Q.       In fact , above that , does he reference how it

25  might get handled if he doesn't hear from his

1 customers?

2 A.      He'll end up getting them tomorrow himself,

3 referring to the heroin  , getting it the next day   .

4 Q.      When we look at  Call B2658 on  April 3rd  on Page

5 287, there is a reference to    Ms. Levi coming down the

6 street; is that correct?

7 A.      Yes.

8 Q.      What time is that call?

9 A.      That was at 7 :10 p.m.

10 Q.      If I could have V Number   9, please.  Have you

11 had occasion to view what's been marked as V      -9?

12 A.      Yes,  I have.

13 Q.      What is that?

14 A.      It's a pole cam tape for    April 3rd,  2004 , from

15 1:30 p.m. to 9 :30 p.m.

16 Q.      Did you make -- did you review it?

17 A.      Yes.

18 Q.      And make any observations concerning the time

19 frame around 7 :10 p.m .?

20 A.      Yes.

21 Q.      Okay.  What were you able to    observe ?

22 A.      About 7 :11 p.m ., Gwen Levi arrived at the

23 residence.

24 Q.      Now, are there any difficulties in seeing the

25 vehicles and the actual people getting in and out of

1 the vehicle?

2 A.      If you had just the tape, yeah, you would have

3 difficulty, but with the conversation   and the tape ,

4 it's clear it's  Gwen Levi , though , showing up.

5 Q.      Your conclusion is based upon the calls as well

6 as the video?

7 A.      Correct.

8 Q.      And do you know approximately what time    Ms. Levi

9 departed the residence?

10 A.      About 17 minutes after,   so there about six

11 minutes.

12 Q.      Excuse me?

13 A.      She was there about six minutes.

14 Q.      If we could go the next set of calls   , calling

15 your attention to   B2663 [sic].

16 A.      Yes.

17 Q.      Is that call , which appears on  Page 28 1, a call

18 in a series of calls?

19 A.      Page 28 8?

20 Q.      No, Call B2633 on  Page 28 1.  Is that call

21 related to?

22 A.      Okay .  I'm sorry .  I didn't know we were

23 finished with the other series, 2661.

24 Q.      Before we move on you're -- if we could go to

25 Call B2661 , the last call in this series    , the April 3rd

1 series with  Ms. Martin and  Ms. Levi , based on your

2 training and experience  , is there any significance

3 about that call?

4 A.     Yes.

5 Q.     What is that?

6 A.     There's a problem with the weight of the heroin

7 and Ms. Levi had left the residence  , and Ms. Martin

8 calls her and  Ms. Levi says , it must be mine , it must

9 be my machine , meaning my scale  , and Paulette  Martin

10 says , I've done put it on  two different machines  ,

11 meaning she's weighed the heroin on two different

12 scales.

13 Q.     And how soon after  Ms. Levi is observed

14 departing from the residence does this call take place?

15 A.     Two minutes.

16 Q.     Now , if we could go to the next series of calls

17 beginning with 2633 on  Page 281 , and is that call

18 related to other calls?

19 A.     Yes.

20 Q.     Okay.  What are the other calls that are part of

21 the series that begin with  Call B2633 on  Page 28 1?

22 A.     2634, 2659 , A894, B2952, 2953,  2957, 2958 , and

23 2959.

24 Q.     Who are the parties in those various calls?

25 A.     Paulette  Martin, Derrick  Bynum , Claude  Arnold ,

1 and I believe that's it.

2 Q.      Do those calls take place over two different

3 days?

4 A.      Yes.  They start on   April 3rd  and conclude on

5 April 7.

6 Q.      If we could begin with   B2633 , what is the date

7 and time of that call?

8 A.      That's on  April 3rd  from 3 :48 p.m.

9 Q.      And the part ies to  that conversation?

10 A.      Paulette  Martin and  Derrick  Bynum .

11 Q.      If we could play  B2633 on  Page 28 1.

12       (Audio r ecording begins playing at   1:03 p.m. )

13       (Audio recording stops playing at    1:04 p.m. )

14       BY MS. JOHNSTON:

15 Q.      If we could do the next call   , B2634 on  Page 28 3,

16 what is the date and time of this call?

17 A.      April 3rd,  2004 , at 3 :50 p.m.

18 Q.      How soon is this after the one we just heard?

19 A.      Immediately thereafter.  It's the next call.

20 Q.      If we could please play   B2634 .

21       (Audio recording starts playing at 1    :04 p.m.)

22       (Audio recording stops playing   at 1:05 p.m. )

23       BY MS. JOHNSTON:

24 Q.      If we could go to the next call,    B2659 , on  Page

25 287.  What is the date and time of this call?

1   A.        Same date , April 3rd,  2004, 7 :16 p.m.

2   Q.        If we could play the call   , please.

3             (Audio r ecording starts  playing at 1:06 p.m. )

4             (Audio recording  stops playing  at 1 :06 p.m.)

5             BY MS. JOHNSTON:

6   Q.        Now, calling your attention to the next call     .

7   A894 on Page 29 4.  What date and time does this call

8   take place?

9   A.        April 7, 2004 , at 10 :19 a.m.

10  Q.        And who are the parties?

11  A.        Paulette  Martin and  Derrick  Bynum .

12  Q.        If we could play the call   , please .

13            (Audio r ecording begins  playing at 1:07 p.m. )

14            (Audio recording  stops playing  at 1:08 p.m. )

15            THE  COURT:  What page was that   , Counsel ?

16            MS. JOHNSTON:   Your Honor , that was on  Page 29 4.

17            BY MS.  JOHNSTON:

18  Q.        If we could go to the next call in series     B2952

19  on  Page 296.  W ho are the part ies to  this call ?

20  A.        Paulette  Martin and  Claude  Arnold.

21  Q.        Who is  Mr. Arnold?

22  A.        A friend/associate of   Ms. Martin and  Ms. Levi's.

23  Q.        If we could play  B2952 on  Page 296.

24            (Audio r ecording begins  playing at 1:09 p.m. )

25            (Audio recording   stops playing  at 1:09 p.m. )

1          BY MS. JOHNSTON:

2  Q.      Then Call B2953 on  Page 29 7.   Is that between

3  the two parties?

4  A.      Paulette Martin and  Claude  Arnold  again.

5  Q.      How much time goes by in between the calls?

6  A.      About five minutes.

7  Q.      If we could play  B2953 on  Page 29 7, please.

8          (Audio r ecording begins   playing  at 1:10 p.m. )

9          (Audio recording   stops  playing  at 1 :11 p.m. )

10          BY MS. JOHNSTON:

11  Q.      Going to the next call  , B2957 on  Page 29 9.   Who

12  are the parties to this call   ?

13  A.      Paulette  Mart in and  Derrick  Bynum .

14  Q.      If we could play the call  , please.

15          (Audio r ecording begins   playing  at 1:11 p.m. )

16          (Audio recording   stops  playing at  1:11 p.m. )

17          BY MS. JOHNSTON:

18  Q.      And B2958 on Page 300  , when does that call take

19  place?

20  A.      3:26 p.m. on  April  7.

21  Q.      Immediately after the preceding call?

22  A.      Yes.

23  Q.      And the parties are who?

24  A.      Derrick  Bynum  and Paulette  Martin.

25  Q.      If we could play  B2958 on Page 300  .

1          (Audio r ecording begins  playing  at 1 :12 p.m. )

2          (Audio recording stops playing at    1:12 p.m. )

3      BY MS. JOHNSTON:

4  Q.      And B2959 , what is  B2959 on  Page 301?

5  A.      It's a  message left  by Paulette  Martin on

6  Derrick  Bynum's  answering machine or cell phone at 3

7  p.m. on the 7th.

8  Q.      If we could play it  , please , on Page 301.

9          (Audio r ecording begins  playing  at 1 :13 p.m. )

10         (Audio recording   stops  playing  at 1 :13  p.m.)

11     BY MS.  JOHNSTON:

12  Q.     Based upon your training and experience, did you

13  form an opinion as to what's occurring during this

14  series of calls?

15  A.      Yes.

16  Q.      What is that?

17  A.      Some of the cocaine that   Ms. Martin had sold to

18  Mr. Bynum , Mr. Bynum was -- said that the quality was

19  very poor , being one step above artificial.  She then

20  makes arrangements to get the cocaine back from        Mr.

21  Bynum and resell that cocaine to   Mr. Arnold , where I

22  believe it was two  -eighths of a kilogram that he's

23  going to pay $3,300 for each one   , but only pay  for one ,

24  the first one , and have the other one fronted to him.

25  Q.      Now , if we could looking at     B2633 on  Page 28 1.

1 Can you identify what part of that particular call

2 supports your opinion?

3 A.      Just below , or about a third up from the bottom     ,

4 where Derrick Bynum says , whoever  you went to , don't go

5 back.  Whoever you went to   , don't go back because they

6 -- they -- I'm refunding everybody.  Meaning whoever

7 Ms. Martin got the cocaine from    , he should not go back

8 because he's having to refund all his customers because

9 of the low quality and    Ms. Martin asks what?

10       He goes on to say it's one step away from being

11 artificial , meaning it's one step away from not being

12 cocaine.  She says that she has not had any other

13 problems or any other complaints    , and they go on to

14 talk about Mr.  Bynum says , how would you know about any

15 other complaints , on Page 28 2, because you told me    I

16 was the only one.   Ms. Martin says that she had let

17 someone else try it  , and she goes on to tell him to

18 bring it back and he just   says , okay.  He doesn't say

19 he's going to  or not .

20 Q.      Based upon the series of conversations    , were you

21 able to determine what drug was    the bad drugs in this

22 case , or the artificial   -- almost artificial?

23 A.      Two eighths  of a kilogram , or quarter kilogram

24 of crack cocaine.

25 Q.      Now, if we could turn to the next call,      B2634,

1  on Page 283.   Is there anything in this call that

2  supports your opinion that   Mr. Bynum  was returning bad

3  crack cocaine ?

4  A.     She calls up , "she" being  Ms. Martin , called

5  Derrick  Bynum  back and tells him that her brother    ,

6  "Goody" Learley  Goodwin,  had got five of them   , meaning

7  five kilograms from them   , and he  ain't  had no

8  complaints last night.

9  Q.     And what does  Mr. Bynum  want do with the portion

10 of cocaine --

11 A.     He's  about to come over  , pick it up .  He wants

12 to pick it up -- he wants   Ms. Martin to take   Mr. Bynum

13 to those people so they can kind of have a face    -to-face

14 confrontation or conversation about whether the stuff's

15 good or not , and  Ms. Martin says she's not going to do

16 it, and -- doesn't want do that   , just  to bring the

17 cocaine back to her.

18 Q.     Likewise in  Call 2659 on  Page 28 7?

19 A.     Paulette  says to  Mr. Martin --  Mr. Bynum , I've

20 been waiting here all the time   , you ain't  got here , and

21 Mr. Bynum  says , I didn't tell you   I was going to bring

22 it back , and  Mr. Bynum  just says , I'll call you back.

23 Q.     Then the  calls  move from  April 3rd  to April  7 of

24 2004; is that correct?

25 A.     Yes.

1  Q.      Calling your attention to    Page 29 4.  What a re

2  they discussing in this call,    Mr. Bynum and Ms. Martin?

3  A.      Ms. Martin says she's been out of town and they

4  haven't --  Mr. Bynum hasn't been able to get a hold of

5  Ms. Martin.

6  Q.      Is there discussion of a different cell phone

7  number?

8  A.      Yes. A private number she refers to it  , which is

9  just another cell phone that she had.

10  Q.      And there's a reference to crib.

11  A.      That's referring to her house on top of    Page

12  295, and they conclude the call with    Mr. Bynum just

13  saying he's going to go by there   .  He says his car is

14  finished being worked on  , go see  Ms. Martin at her

15  house.

16  Q.      Then on that same date  , B2952 , the call between

17  Ms. Mart in and  Mr. Arnold , based on your   opinion, how

18  does this call relate to the discussion     just described

19  between  Ms. Martin and  Mr. Bynum ?

20  A.      She call s -- in Call 2952 on  Page 29 6, she calls

21  Mr. Arnold and tells him that he has a -- she has a

22  ticket  I need to you to move  , about mid dle of the page

23  there , meaning she has some cocaine    that  she wants him

24  to sell .  And then she turns in the background and has

25  a conversation with   Mr. Bynum and says , how soon do you

1  think you can get back    over, here meaning how    soon do

2  you think you can retrieve the drugs and bring them

3  here.

4          She goes back to the conversation with    Mr.

5  Arnold.  She says , I've been shopping .  I've been

6  waiting on somebody else  , meaning  I've been waiting on

7  someone else to get cocaine from   , and Ms. Martin says

8  that he can't --  Mr. Arnold says  we can't wait  and Ms.

9  Martin says , that's fine , and they hang up.

10 Q.     Then B2953 , the immediate next call  , is that

11 also between  Ms. Martin and  Mr. Arnold ?

12 A.     Yes.  This is where they    identify  the quantity

13 of cocaine they've been talking about   , beginning of the

14 conversation .  I know somebody w  here I may be able to

15 get , you know , a c ouple of them tickets .  How many of

16 them do you want , referring -- asking   Mr. Arnold how

17 much cocaine does he want. He says    , I can take two ,

18 but I can only pay cash for one.  In other words    , he

19 can pay cash for one he   wants the  other one fronted or

20 provided on consignment to   him.

21         Further down , he says , you know what size   I'm

22 talking about  -- this is Mr. Arnold .  You know what  I

23 mean , I want two , and Paulette  Martin identifies it  ,

24 you want two size  eights for our  Goddaughter , and we've

25 switched just in those lines from tickets     -- she's

1  talking about tickets to now clothing to size     eights

2  for the  Goddaughter .  And she asks again  , you want two

3  size  eights,  and he says , yes , and

4  Ms. Martin says , it's $33 referring to $3,300   , which

5  would be the price for an eighth of a kilogram of

6  cocaine .  And he reiterates he can only pay for one     and

7  she says that's not a problem.

8  Q.     Based upon your training and experience  , did you

9  form an opinion as to whether it's co    caine or cocaine

10 base?

11 A.     On additional conversations  , we're going to see

12 -- we're going to be clear it's cocaine base    .  We're

13 talking about crack.

14 Q.     I believe you testified earlier that     Mr. Bynum

15 was receiving kilograms from    Ms. Martin?

16 A.     Yes.

17 Q.     Is that inconsistent with the quantity being

18 offered to or that   Mr. Arnold wants from  Ms. Martin?

19 A.     No.  He's returning what's left of the kilogram     ,

20 which is a quarter kilogram he's got left.

21 Q.     Now, you referred to the term "ticket",     I

22 believe, on  Page 296; is that correct,    as a code word

23 for drugs ?

24 A.     Yes.

25 Q.     Then also on 29 7, could you write that on our

1  chart , please?

2  A.       (Witness indicating  .)

3  Q.       We have a reference to clothing   , or two size

4  eights for your   Goddaughter.  W ould you note that , Page

5  297?  Just tell us what words you're associating it

6  with .

7  A.       Outfit .  (Witness indicating.  )

8  Q.       And then the next calls will be played    B2957 ,

9  2958 .  And in those two calls  , is there a general

10  discussion with -- between   Ms. Mart in and  Mr. Bynum

11  about refunding his money?

12  A.       Yeah.  In 2957  , she calls  Mr. Bynum to find out

13  where he's at  .  He hadn't left yet.  Middle of the

14  page , or just below  , she actually has a background

15  conversation talking to a person named    Skip , that's  Mr.

16  Arnold's nickname  , telling you can come back    later on,

17  then.  Then she goes back to him   , and Mr. Bynum  says

18  come on as soon as possible.

19  Q.       In reference to that call  , was there a -- did

20  you review the pole camera marked as    Video 12 to

21  determine whether   or not Mr. Arnold was  ,in fact , at

22  the residence at the time of this conversation?

23  A.       Yes.

24  Q.       Or shortly thereafter?

25  A.       He arrived at 3 :22  and departed at 3 :27.

1 Q.      Now --

2           MR. MONTEMARANO : Objection , Your Honor .  Could

3 we be heard at the bench  ?

4           THE  COURT:  Y ou may .

5                  (At the bar of the Court.)

6           THE  COURT:  What is your objection  ?

7           MR.  MONTEMARANO :  I was mulling over how to

8 address this with regard to the previous testimony

9 concerning the pole camera.  Sergeant      Sakala  just

10 testified that from the pol   e camera he could not

11 determine who came to the house.

12 He offered us , with regard to the last series of calls    ,

13 a supposition, permit me, "guess    ," as to who these

14 people were based upon the conversations     , not based

15 upon the pole camera.  He cannot testify from the pole

16 camera .  I, therefore , suggest that this is more of the

17 same thing , and for that reason   I am both objecting to

18 this as well as the previous one    and mov ing to  strike

19 the previous one.

20           MS.  JOHNSTON:  I can  go ahead and play  Video 12 .

21 The detective will recognize the car of     Mr. Arnold as

22 well as  Mr. Arnold, based upon his ga   it and the  way he

23 walks.

24           THE  COURT:  You can cross-examine him if he

25 states that he recognizes him.

1        MR. MONTEMARANO :  He just said he couldn't from

2 the pole camera.

3        MS. JOHNSTON:   Your Honor , that was different

4 video at a different time of day.  He's already

5 explain ed there are problems with these videos in terms

6 of the  camera angle, and sometimes --

7        THE COURT: Whether he can or can't rec   ognize

8 him from a particular pole camera video is a question

9 that you can inquire on   cross- examination.  He can

10 testify if he recognizes him  .  He can do it on direct ,

11 and you can cross  -examine him about it.

12        MR. MONTEMARANO :  Thank you , Your Honor.

13        THE  COURT:  You can justify the basis for it and

14 we can move on.

15        MR. MONTEMARANO :  Thank you .

16        THE COURT:  O verruled .

17              (Back in open court.  )

18        BY MS. JOHNSTON:

19 Q.    Detective  Sakala , did you have occasion to

20 review  Government's  Exhibit V -12?

21 A.    Yes.

22 Q.    We're going to put it   in the  machine so you can

23 take a look at it.

24              (Videotape begins at 1  :25 p.m. )

25        BY MS. JOHNSTON:

1  Q.      If you could describe what we're    observing here .

2  A.      This is  Paule tte Martin's  Mercedes.  T his is

3  Claude  Arnold  and his  Thunderbird pulling up  .

4  Q.      Had you seen him operating that     Thunderbird on

5  numerous occasions?

6  A.      Yes.

7  Q.      What is  the  time that he arrives there?

8  A.      3:22 p.m.

9  Q.      Was there anything in particular about     Mr.

10  Arnold that distinguished him from other people in

11  terms of the way he walked and approached the

12  residence?

13  A.      Some people walk differently, park differently      ,

14  some people park on different sides of the street      , you

15  got  to know the patterns of the people coming.

16  Q.      Is that him coming out and    going  back into the

17  residence?

18  A.      That's correct.

19  Q.      Do you recall  approximately what time he departs

20  the residence?

21  A.      He should leave at about 3   :27.   That's him

22  returning to his vehicle.

23  Q.      We can stop the video now.

24          (Videotape stops at 1   :27 p.m. )

25          BY MS.  JOHNSTON:

1  Q.      Going back to the series of calls that we
2  played, after B2958 on Page 300, again, is this,   again,
3  a discussion between   Ms. Martin and  Mr. Bynum
4  concerning the bad --
5  A.      Yeah.  On Page 300, Mr. Arnold is trying to tell
6  him to bring the drugs back.  S   he want s to give him his
7  money back , and he's not really -- he's just saying
8  don't worry about it.  She's still try   ing to  convince
9  him to  bring  the drugs back so he can give them to      Mr.
10 Arnold.
11 Q.      And then finally on   B2959 , is that the message
12 she leaves for him?
13 A.      Yeah.  In fact, she says in the message that
14 Skip is going to take it  , meaning  Mr. Arnold is going
15 to take the drugs , it's not a problem , and just leaves
16 the message that he'll   get his money back and it's not
17 going to be a problem , that  Mr. Arnold will take the
18 drugs.
19 Q.      Now, those calls happen  , then , April 3rd  and
20 April  7; is that correct ?
21 A.      Yes.
22 Q.      On those two days?
23 A.      Yes.
24 Q.      In between , do we also have some other calls
25 that were taking place    during  the interim with other

1 people?

2 A.      Yes.

3 Q.      Calling your attention to   B2784 on  Page  289.

4 What is  the date and time of that call    and  who are the

5 parties  in this call?

6 A.      This was on  April  5th,  2004,  at  1:11 p.m.

7 between  Paulette  Martin and   George  Harris.

8 Q.      And if we could play   B2784 on  Page 289.

9        (Audio recording begins   playing  at 1:29 p.m.)

10        (Audio  recording stops   playing  at 1:29 p.m.)

11        BY MS.  JOHNSTON:

12 Q.     Then  B2787 on  Page 290.  Who are the part  ies to

13 that call?   I'm sorry,  Detective  Eveler [sic].   Who are

14 the parties to the call,   B2787 on  Page 290?

15 A.      Paulette  Martin and  Milburn  Bruce  Walker  at 1:32

16 p.m.  on the 5th of  April.

17 Q.     The same date  and close in time to the call with

18 Mr. Harris  and  Ms. Martin?

19 A.      Yeah about  20 minutes  later.

20 Q.     If we could play  that call as well.

21        (Audio recording be gins playing at  1:30 p.m.)

22        (Audio recording   stops playing  at 1:30 p.m.)

23        BY MS.  JOHNSTON:

24 Q.     And based upon your training and experience,

25 what were the purposes of the calls between    Mr.  Harris

1  and Ms. Martin and  Mr. Walker  and Ms. Mart in?

2  A.      They were making arrangements to come over to

3  the residence to purchase drugs from her.

4  Q.      Now , if we could turn our attention to     B2790 on

5  Page 29 1.  What is the date and time of this call?

6  A.      It's on  April 5th, 2004 , at 1 :44 p.m.

7  Q.      Who are the parties to this call  ?

8  A.      Tiffany Vessels and Paulette  Martin.

9  Q.      If we could play this call  , please.

10         (Audio r ecording begins  playing  at 1 :31 p.m. )

11         (Audio recording stops playing at 1    :33 p.m.)

12         MR. MARTIN:   Your Honor , no need to approach  ,

13  just a  continu ing objection on  Rule 106 .  I think this

14  may be another one of those problems.

15         THE COURT:  All right.

16         MS. JOHNSTON:  Detective --

17         THE COURT: Did you want to   approach ?

18         MR. MARTIN:  No.   I don't think it's necessary  .

19  I think the record reflects.

20         THE COURT:  All right.

21         BY MS. JOHNSTON:

22  Q.      Again , are you playing just a portion of the

23  call?

24  A.      Yes.

25  Q.      How long was this call?

1  A.      Sixteen -- yeah, 16 minutes.  Six minutes   , I'm

2  sorry.

3  Q.      How did you determine only to play this portion

4  of the call?

5  A.      The rest of the call just wasn't pertinent to

6  the case here.

7  Q.      Could you tell  us, based on your training and

8  experience , what is pertinent to this case in this

9  conversation?

10  A.      Tiffany  Vessels is on another phone while she's

11  talking to  Paulette  Martin , that's the background

12  conversation you hear.  She's on the phone with       Learley

13  Goodwin,  and Mr. Goodwin  is directing her to a location

14  in the residence to find something and then take that

15  something to bring it to    Paulette  Martin on  Hayward

16  Avenue.

17  Q.      Were you able to determine what that something

18  was?

19  A.      Not de finitively , no.

20  Q.      And who  is Tiffany  Vessels in relation to    Mr.

21  Goodwin?

22  A.      Learley  Goodwin 's girlfriend.

23  Q.      Do you know where they resided?

24  A.      In Washington,  D. C. -- Farragut  Place , I

25  believe.

1   Q.       Now if we could go to the next call,      B2827, on

2   Page 293.

3            Who are the part ies to  this call ?

4   A.       Paulette  Martin  and   Luis  Mangual .

5   Q.       What 's the date  and time of this call?

6   A.       On April  5th , 2004 , at 6 :30 p.m.

7   Q.       If we could play this call, please    , Page 29 3.

8            (Audio r ecording begins   playing  at 1 :35 p.m. )

9            (Audio recording   stops  playing  at 1 :35 p.m.)

10           BY MS.  JOHNSTON:

11  Q.       Detective  Sakala , did you form an opinion based

12  on your training and experience as to what      Ms. Martin

13  and Mr. Mangual  were discussing in this call?

14  A.       Yes.

15  Q.       What is that?

16  A.       She's calling him t o find out if he had any

17  cocaine for sale.

18  Q.       And what is the code she uses for cocaine in

19  this call?

20  A.       She says did you have any   more of those

21  Ferragamo  shoes in your clothing store   , meaning does he

22  have any cocaine   that  he can sell her.

23  Q.       Now , based upon your review of these search

24  warrant items recovered from    Mr. Mangual's house, what ,

25  if any , evidence did you find that he operated a

1  clothing store ?

2  A.      Did not operate a clothing store.

3  Q.      Do you have any evidence    that he was a wholesale

4  distributor or   sold Ferragamo  shoe s in any way?

5  A.      He had nothing do with the shoe business.

6  Q.      If you could please write    "Ferragamo  shoes " on

7  the board as  a drug code and   put Page 29 3.

8  A.      (Witness indicating.  )

9  Q.      If we could proceed to    Call B3019 on Page 302.

10 What is the date and time of this call?

11 A.      This is on April 8, 2004   , at 8 :12 a.m.

12 Q.      Who are the parties to this call   ?

13 A.      Paulette  Martin and  Eugene  Bird .

14 Q.      If we could please play   B3019 on Page 302 of the

15 transcript book.

16         (Audio r ecording begins  playing  at 1 :37 p.m. )

17         (Audio recording  stops  playing  at 1 :38 p.m.)

18         BY MS.  JOHNSTON :

19 Q.      Detective  Sakala , based upon your training and

20 experience , what  is it that  Ms. Martin  is dis cussing

21 with Mr. Bird  during this conversation   ?

22 A.     Ms. Martin is telling   Mr. Bird  about the -- her

23 distrust  -- or, well , she's  worried a bout  Derrick

24 Bynum .  She goes on , two-thirds of the way down   , to say

25 if anything ever happened to me    , that's who , meaning if

1 anybody -- if she was ever murdered or killed.

2          MR. MONTEMARANO : Objection , Your Honor. May we

3 approach ?

4          THE COURT:  Y ou may.

5                (At the bar of the Court.)

6          MR. MONTEMARANO :  Your Honor , when an attorney

7 says to the  Court , "with all due respect  ," that's

8 usually the code word where something bad     , the attorney

9 is about to say , but I say it nonetheless.  With all

10 due respect , I don't want to phrase it this way    , but I

11 have to preserve the record for my client.     This is

12 exactly what the defense was complaining about.  This

13 is far afield with regard to drug expertise.  This is

14 purely based upon his investigation and his view of

15 Derrick  Bynum , based upon his discussions with    a

16 cooperator  or cooperators.  It has nothing to do with

17 his expertise an d his years of training  .  For that

18 reason , I would both object and move to strike.

19          MR. MITCHELL:  Further, there is nothing in that

20 phone call that would give anybody the impression that

21 there was anything physical that she was concerned

22 about.  It could be financial    , it could be

23 embarrassment; i t could be getting her in trouble    ,

24 getting arrested.  But to come to the conclusion that

25 it's physical -- she's concerned about her physical

1 health in some manner -- is way beyond the scope and,      I

2 think, prejudicial.    I don't see how he could come to

3 that conclusion.

4        MR. WARD:   I would move on behalf of all

5 defendants to order the   Court to strike that

6 characterization from the record and instruct the jury

7 that they must disregard it.

8        MS. JOHNSTON:    Your Honor , I expected the

9 witness to say that he was discussing with      Mr. Bird the

10 incident that had happened with    Mr. Bynum  with the bad

11 cocaine.   I didn't expect him to go into that kind of

12 detail.   I don't have any objection to the    Court

13 striking his response and telling the jury to disregard

14 it, and  I will ask him a leading question and leave it

15 at that .   That's wh at I expected  to do.

16        THE COURT:   I will  grant the motion, and   I will

17 instruct the jury to disregard it.

18        MR. MONTEMARANO : On behalf of the defense  , we

19 accept  Ms. Johnston's explanation  , but we request the

20 Court instruct   Ms. Johnston  to , shall we say , advise

21 Sergeant  Sakala  to be a bit more circumspect in the

22 future with regard to this kind of thing     .

23        THE COURT:  First of all  , I'm going to sustain

24 the objection.   I'm going to grant the    Motion to

25 Strike , and  I'll tell them to disregard it.  There is

1  not going to be that   much  more testimony today.  She

2  can certainly confer with him and give him a lesson not

3  to go over that kind of material.

4          MR. MONTEMARANO :  Thank you , Your  Honor .

5                  (Back in open court.  )

6          THE  COURT:  The objection is sustained.

7          Ladies and gentlemen  , disregard the last remark

8  about murder, please.  Do not consider that.

9          BY MS. JOHNSTON:

10 Q.     During the incident that   Ms. Bird and Mr.- --

11 Ms. Martin and Ms. Bird are discussing, is that the bad

12 cocaine that we had discussed that -- the conversations

13 on April --

14         MR. SUSSMAN :  Objection , Your Honor.   Ms.

15 Johnston is doing exactly what she wasn't supposed to

16 do which is summarize the testimony asking about the

17 question .

18         THE  COURT:  O verruled.

19         BY MS. JOHNSTON:

20 Q.     Is that the incident that   Ms. Martin and  Mr.

21 Bird are discussing in this call  ?

22 A.     Yes.  That's the cause of   Ms. Martin's concern

23 is the bad deal or bad   drugs that we discussed about in

24 previous  calls.

25 Q.     If we could move on to the next call   , B3056 , on

1 Page 304.

2          Who are the parties to that call   ?

3 A.       Paulette  Martin and  George  Harris.

4 Q.       Is it accurately re flected  on the  CD?

5 A.       Yes.

6 Q.       Is there any particular code words used in that

7 call?

8 A.       No.  He's just saying that he's going to stop

9 by.

10 Q.      If we could go to call B3082 on Page 305.  On

11 what date does this call take place?

12 A.      This was on April 8, 2004  , at 5:07 p.m.

13 Q.      Is this the first of a series of calls involving

14 Ms. Martin,  Mr. Nunn, and Ms. Levi?

15 A.      Yes.

16 Q.      Okay.  What are the calls that are all related?

17 A.      B3082,  3083, A926, B3180,  E321, B3188,  3189,

18 E345, B3190, A934 and B3191.

19 Q.      You referenced  E calls .  What does the  "E" refer

20 to?

21 A.      By this time , we were also intercepting the

22 cellular telephone of  Gwen Levi.  The E call is  E line

23 designates calls intercepted on her telephone.

24 Q.      What's the time span of these calls?

25 A.      The first call was on April 8, 2004    , at 5:07

1 p.m. and the last call  , which is actually A940   , is on

2 April 9  at 7 :57 p.m.

3 Q.       If we could begin then with B3082    , which is on

4 Page 305.  Who are the parties to this call    ?

5 A.        Paulette  Martin  and  Larry  Nunn .

6 Q.        If we could play it  , please.

7          (Audio r ecording begins   playing  at 1 :45 p.m. )

8          (Audio  recording stops   playing  at 1 :45 p.m. )

9          BY  MS.  JOHNSTON:

10 Q.       Go to 3083 on  Page 306.   When does this call

11 take place in relation to the preceding call    ?

12 A.        Right after the call.    It was 5 :08 p.m. to  Gwen

13 Levi.

14 Q.        If we could play this call   , Page 306.

15          (Audio  recording begins   playing at  1 :45 p.m. )

16          (Audio  recording stops   playing at 1 :46 p.m. )

17          MS.  JOHNSTON:   The next call, B3087 on Page 308.

18          (Audio recording   begins playing  at 1 :46 p.m. )

19          (Audio recording   stops playing  at 1 :47 p.m. )

20          MS.  JOHNSTON:  And the next call   , A926 , on  Page

21 310.

22          (Audio r ecording begins   playing at 1 :47 p.m. )

23          (Audio  recording   stops playing at 1 :47 p.m. )

24          MS.  JOHNSTON:  The next call   , B3180 , on Page

25 312.  If we   could play it , please.

1           (Audio re cording begins  playing  at 1:47 p.m. )

2           (Audio recording  stops playing  at 1:48 p.m. )

3           BY MS. JOHNSTON:

4  Q,       Then E321 on Page 313.  Who are the parties to

5  this call?

6  A.        Gwen  Levi and  Claude  Arnold.

7           (Audio r ecording begins  playing  at 1:48 p.m. )

8           (Audio recording  stops playing  at 1:49 p.m. )

9           BY MS.  JOHNSTON:

10 Q.        B3188 , again , is taking place on the same date

11 as the  preceding call , April 9th?  B 3188 ?

12 A.        Yes, it takes place at 6  :38 on  4/9, April  9th.

13 Q.        If we could please play 3188 on Page 315.

14          (Audio  recording begins  playing  at 1:50 p.m. )

15          (Audio recording  stops playing  at 1:50 p.m. )

16          BY MS. JOHNSTON:

17 Q.        And if we  could  go to the next call  , B3189 .

18          When  we  look at that transcript on   Page 317 ,

19 there is a  -- under  the call number , there is a slash

20 and the number E344.  What does that mean,     Detective

21 Sakala ?

22 A.      That means it was intercepted on both of those

23 lines .  On the  B line , it was call 3189  ; on the  E line ,

24 it was call  E344.

25 Q.        Okay.

1  A.       The two phone s are talk ing to  each other.

2  Q.       Again on  the  same day , April  9th?

3  A.       Yes , at  6 :45 p.m.

4  Q.       If we could play the call, please.

5           (Audio r ecording begins  playing at 1 :51 p.m. )

6           (Audio recording  stops playing at  1:51 p.m. )

7           BY MS. JOHNSTON:

8  Q.       And the next call  , E345 , on  Page 320 does that

9  take place similarly on   April  9th?

10  A.      Yes .  This is the next call on   Gwen's line .

11  After she hangs up , she calls  Mr. Arnold.

12  Q.      Immediately after she hangs up?

13  A.      Yes.

14  Q.      If we could please play E 345 on Page 320.

15          (Audio  recording begins  playing at 1 :53 p.m. )

16          (Audio recording stops playing   at 1 :53 p.m. )

17          BY MS. JOHNSTON:

18  Q.      The next call , B3190 , or E347, on  Page 321 , when

19  does that happen in relation to the previous call?

20  A.       Immediately  thereafter , after the call we just

21  heard.

22  Q.      If we could play B3190 on Page 321    .

23          (Audio r ecording starts  playing at 1 :53 p.m. )

24          (Audio recording  stops playing at 1 :54 p.m.)

25          BY MS. JOHNSTON:

1 Q.      The next call , A934, on Page 323 , what's the

2 time of this call?

3 A.      This was on the  9th at 6 :46 p.m.

4 Q.      If we could play it  , please.

5          (Audio r ecording begins  playing at 1 :55 p.m. )

6          (Audio recording  stops playing at  1:55 p.m. )

7          BY MS. JOHNSTON:

8 Q,      calling your attention to   Call B3191 on Page

9 324.  What time does this call take  place?

10 A.      6:50 p.m.

11 Q.      If we could play it  , please.

12         (Audio r ecording starts  playing at 1 :56 p.m. )

13         (Audio recording  stops playing at  1:56 p.m. )

14         BY MS. JOHNSTON:

15 Q.      The next call , A940, on Page 325.

16 A.      That was at 7 :57 p.m. on the  9th.

17 Q.      Okay.  You may play it  .  Thank you.

18         (Audio r ecording begins  playing at 1 :56 p.m. )

19         (Audio recording  stops playing at  1:56 p.m. )

20         BY MS. JOHNSTON:

21 Q.      In addition to these calls  , did you also have

22 occasion to review the pole camera?

23 A.      Yes.

24 Q.      And that would be  Government's  Exhibit V -14; is

25 that correct?

1 A.      Yes.

2 Q.      Okay.  Well, if we could start with the calls

3 first.  The first call, B3082 on  Page 305.  Initially

4 -- strike that.

5        Preliminarily, did you form an opinion as to

6 what occurred on  April -- between the calls on   April 8

7 and the last call that occurred on   April 9th of 2004?

8 A.      Yes.

9 Q.      What is that?

10 A.      Mr. Nunn  contacted  Ms. Martin and ordered 30

11 grams of heroin.   Ms. Martin relayed that order to    Ms.

12 Levi.  Ms. Levi was at a hairdresser in    Washington,

13 D. C. and didn't have a car to    transport the heroin up

14 to Ms. Martin's residence.  She then reached out to     Mr.

15 Arnold, Claude  Arnold, gave him the 30 grams of heroin    ,

16 who then transported it to the house on     Hayward, gave

17 it to Ms. Martin.  Ms. Martin, in turn, gave it to  Mr.

18 Nunn.

19 Q.      In looking at  B3082 on Page 305 , is there

20 anything in that call that    supports your conclusion

21 that it  was 30 grams of heroin?

22 A.      Second line, Mr. Nunn says 30 of those.

23 Q.      Now, the next call , B3083, between  Ms. Martin

24 and Ms. Levi, happens a minute after the preceding call

25 or immediately after it?

1  A.       Yes.

2  Q.       Okay.  And what is the code word used in this

3  call between  Ms. Levi and  Ms. Martin?

4  A.        Ms. Martin tells  -- in the second line there  ,

5  Ms. Martin  tells  Ms. Levi that  Larry , meaning  Larry

6  Nunn,  wants a bottle of those vitamins with 30

7  multivitamins , referring to the 30 grams of heroin.

8  Q.       If you could write on our   code list "vitamins "

9  and Page 306.

10  A.       (Witness indicating.  )

11  Q.       Are you familiar with the items re   covered  from

12  Ms. Levi's house on   Digger's  Lane?

13  A.       Yes.

14  Q.       In Elk Ridge,  Maryland?

15  A.       Yes.

16  Q.       Any indication in reviewing those items that      Ms.

17  Levi was involve d in  the distribution of multivitamins?

18  A.       No, she was not.

19  Q.       Now , if we could go to the next call, B3087     ,

20  that happens approximately how many minutes later?

21  A.       About four minutes later  , at 5 :11 p.m.

22  Q.       Is there anything in this call that supports

23  your conclusion that he was ordering heroin?

24  A.       Fourth line down , Ms. Martin tells   Mr. Nunn  that

25  she would have to be here in the morning     , meaning  Gwen

1  Levi would try to be there in the morning    .  And then at

2  the end of the call  , near the bottom of the page   , she

3  confirms that it is a sure thing.  In other words, a

4  deal is going to happen   , and Mr. Nunn  assures her that

5  it is.

6  Q.     Is there a code word used for drugs in this

7  call?

8  A.     No, I do not see one.    Oh, I'm sorry , in the

9  middle of the p age.   Ticket s.

10  Q.     If you could write 308 next to our code word

11  "tickets " on the board.

12  A.     (Witness indicating.  )

13  Q.     Beginning with call   A926 , is that call on   April

14  9th, is that the first of the   April  9th calls?

15  A.     Yes, at April  9th at 4 :02 p.m.

16  Q.     Many what -- at what time?

17  A.     4:02 p.m.

18  Q.     Okay.  And is there anything    drug-related in

19  that particular call?

20  A.     Mr. Nunn  confirms  it's for 30 grams of heroin   ,

21  saying it's a 30  .  Ms. Martin  doesn't hear him he

22  repeats it's 30 tickets  , referring  to 30  grams of

23  heroin.

24  Q.     If you could write Page 310    next to " tickets " on

25  the board .

1 A.       (Witness indicating  .)

2 Q.       There's a reference on Page 312 to having to

3 pick up  John by  Ms. Martin .

4          Do you know what   she's referring to?

5 A.       I'll try to pick up   John?

6 Q.       Page 312 .

7 A.       Again, dealing with his work at the     Metro,

8 providing rides to him  .

9 Q.       Now if we could got to    E321 on  Page 313.    Based

10 upon your training and experience    , what is  Ms. Levi

11 asking  Mr. Arnold to do?

12 A.       Yeah.  The middle of the page, she's -- there's

13 a mistake in the tran  scription  where it says , Gwen  Levi

14 says I don't have a chance to page.  What she actually

15 says is , I don't have transportation.  Not chance to

16 page .  It's I don't have transportation  .

17          And Ms. Levi tells   Mr. Arnold that he's at the

18 hairdresser's and that she doesn't have a ride     , and

19 he's asking her to take up ticket    s.

20 Q.       Who is asking whom  ?

21 A.       I'm sorry .  Ms. Levi is asking   Mr. Arnold to

22 take tickets up to   Ms. Martin's house  , at the  bottom,

23 saying you can take the tickets up there    , too, for  me ,

24 if you want to .  I'm at the hairdresser's.     Saying you

25 can take the heroin  up to Ms. Martin's house.

1  Q.      If you would make a notation on Page     313 next  to

2  the word  "tickets ".

3  A.      (Witness indicat ing.)

4  Q.      There's a reference   in there  to sister,  sister .

5  Who does that refer to?

6  A.      Ms. Martin and  Ms. Levi would both refer to     Mr.

7  Arnold as brother  , and he would refer to both of them

8  as sister, sister  .  So that reference there to sis is

9  refer ring to  Ms. Martin.

10  Q.      Then  if we could  go on to call B3189 on    Page

11  317.   Ms. Levi refers to her brother -- my brother

12  coming to see you.    Who is the brother they're

13  referring to?

14  A.      Mr. Arnold.

15  Q.      Okay.  And is there a drug code reference     d in

16  that call?

17  A.      About halfway -- about four or five lines up

18  from the bottom,   I gave him the tickets for you   , Ms.

19  Levi says , meaning  I gave  him the 30 grams of heroin to

20  give to  Ms. Martin.

21  Q.      And does that, likewise, occur again on     Page

22  318?   The reference to tickets for heroin?

23         Calling your attention to seven lines up from

24  the bottom on   Page 318 .

25  A.      Yes, I'm sorry.   I'm a little slow.   She says --

1  Ms. Levi says , he came past here  , meaning  Mr. Arnold ,

2  came back past hire at   4 o'clock  and got the heroin  ,

3  got the ticket s.

4  Q.      If you could write 317 and 318 on the board.

5  A.      (Witness complies.)

6  Q.      Then if we could go to call B3190 on Page 321.

7  There is a reference in there   , Ms. Martin asks   Ms.

8  Levi , do you  want me to give him the papers for that?

9  Based on your training and experience    , what is  Ms.

10 Martin asking  Ms. Levi?

11 A.      She's got the --  Ms. Martin has the money for

12 the heroin purchase and   she's asking  Ms. Levi whether

13 Ms. Levi wants  Ms. Martin to give the money to    Claude

14 Arnold or whether   Ms. Martin should hold on to    it.

15 Q.      What does  Ms. Levi tell her to do?

16 A.      She says to hold on to it  , not give it to   Claude

17 Arnold .  She says , no, you don't have to.

18 Q.      Then on A 934 Page 323.   There is a call between

19 Ms. Martin and   Mr. Arnold discussing where he

20 references her as   Sis.

21 A.      Yes.

22 Q.      Is that a common term he used when he spoke with

23 Ms. Martin?

24 A.      Yes, h e would call her   Sis frequently.

25 Q.      Okay.  Now on   Page B3191 , what is -- based upon

1  your training and experience   , what is  Ms. Martin

2  telling  Mr. Nunn at roughly ten minutes to    7:00 ?

3  A.      She tells  Mr. Nunn that she's going to drop it

4  and leave it , meaning  Ms. Levi is going to drop the

5  heroin and leave it with her   .  Then the second part ,

6  she says she just now called   , and she's sending it by

7  somebody , meaning somebody else is bringing it    ,

8  referring to  Mr. Arnold , is bri nging it because she is

9  at the  hairdresser's,  meaning  Ms. Levi is still at  the

10 hair dress er's.

11 Q.      Did you have a an opportunity to view V   -14 , the

12 pole camera video for    April 9th?

13 A.      Yes.

14 Q.      In your reviewing that   , were you able to

15 identify vehicles that were coming and going?

16 A.      Yes.

17 Q.      Can you tell us approximately what times and

18 what vehicles you observed   , or who you observed

19 associated with those vehicles arrive at the residence

20 and depart?

21 A.      At approximately   7 o'clock , Mr. Arnold arriv ed

22 in his  Thunderbird,  and he stayed there until 7   :38

23 when he left.

24 Q.      Do you recall whether   or not the time he was

25 there the video reflects whether    or not  Ms. Martin left

1  and returned during the time period?

2  A.      I don't recall  if she did or not.

3  Q.      Okay.

4          MS. GREENBERG:   Well, Your Honor, I notice what

5  the time is.   I don't know if the  Court wants me to

6  play the video now or if we'll wait until      Tuesday.

7          THE COURT:  Is this the video for this date?

8          MS. JOHNSTON:  Yes.

9          THE COURT:  Go ahead and play the video and

10  we'll finish up with that.

11             (Video begins playing at 2  :07 p.m.)

12          THE WITNESS :  This is  Mr. Arnold's  Thunderbird

13  pulling up and he parks in the same place he usually

14  does.

15          BY MS. JOHNSTON:

16  Q.      This video is going rather fast.  Can you

17  explain to us why it does that?

18  A.      I think  Detective  Eveler  had it a little faster

19  there.  But it's broken up  .  If you see the image

20  appears choppy , that's because of the time lapse.  If

21  you look at the N  o. 8 in the upper , left-hand corner ,

22  that means the time lapse recorder was set to record in

23  an eight -hour period .  It doesn't re -record constantly .

24  It records a frame every sec  ond or half sec ond.

25  Q.      So what we've see there is     Mr. Arnold ; is that

1 correct ?

2 A.      Yes.  He parked his car and walked up to the

3 residence.

4 Q       Now if we could fast forward it.

5         What are w e observing here?

6 A.      This is Ms. Martin lea ving the residence going

7 to her red  Mercedes , and I believe  she talked about it ,

8 going  to pick up her boyfriend  , Mr. John  Martin , from

9 work.

10 Q.      And this is at the time reflected there  , roughly

11 7:08?

12 A.      Yes.

13 Q.      In the evening.  If we could fast forward it

14 again, please.

15        Now , based upon the video  , where is  Mr. Arnold

16 at this time ?

17 A.      He's still in the house.

18 Q.      Was there someone else living in the house?

19 A.      Jac queline  Terrell , and that's probably  -- I

20 can't be a hundred percent sure  , but th at's probably

21 her car right in front of  Mr. Arnold's.

22 Q.      Based on your review of the calls, do you      know

23 whether  or not  Mr. Arnold knew  Ms. Terrell?

24 A.      Yes.  They would --  Ms. Martin would frequently

25 remind him to say hello to   Jack ie or something along

1 those lines , indicating they knew each other.

2 Q.      That person we just saw  , did they walk into the

3 Hayward  address?

4 A.      A Hayward  address , not the  Hayward  address.

5 They went to a neighbor.

6 Q.      Okay.   What are we observing here?

7 A.      Mr. Arnold is walking out to his car,    I believe.

8 Q.      Okay .  What is he doing now?

9 A.      Making a  U-turn like he normally does an   d

10 leaving the area.

11 Q.      If we could fast forward.

12         Your  Honor , we're moving it as fast as we can

13 here.

14         What are we observing here?

15 A.      This is  Ms. Martin returning home in the red

16 Mercedes .

17 Q.      Is someone else with her in the car?

18 A.      I believe you're going to see    Mr. Martin  is

19 going to be w ith her.

20         MS. JOHNSTON:   That concludes the portion of the

21 video,  Your  Honor.

22         THE COURT:  All right.  We will recess today and

23 resume on  Tuesday at 9 :30.  Thank you very much.

24                         (Jury excused at 2  :15 p .m.)

25                         (Off the record at 2:15 p.m.)

1                        **CERTIFICATE**

2

3        I, Tracy Rae Dunlap,   RPR , CRR , an Official Court

4   Reporter for the United States District Court of

5   Maryland, do hereby certify that I reported, by machine

6   shorthand, in my official capacity, the proceedings had

7   and testimony adduced upon the Jury Trial Proceedings

8   in the case of UNITED STATES OF AMERICA versus PAULETTE

9   MARTIN, et al, Criminal Action Number    RWT-04-0235 on

10  June 23, 2006.

11

12       I further certify that the foregoing    167 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17       In witness whereof, I have hereto subscribed my

18  name, this 25th day of March 2008.

19

20                        _____

                          TRACY  RAE  DUNLAP,  RPR ,  CRR
21                        OFFICIAL COURT REPORTER

22

23

24

25