```
 1           UNITED STATES DISTRICT COURT OF MARYLAND
                       SOUTHERN DIVISION
 2
    ------------------------x
 3  UNITED STATES OF AMERICA  :
             Plaintiff        :
 4                            :
                              :
 5  vs                        :Criminal Action:    RWT-04-0235
                              :
 6                            :
    PAULETTE MARTIN, et al    :
 7           Defendants.      :
    ------------------------x
 8

 9                      Tuesday, June 27, 2006
                        Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11  Proceeding before the HONORABLE ROGER W. TITUS, United
    States District Judge, in courtroom 4C, commencing at
12  10:05 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS THE TESTIMONY AND PROCEEDINGS
15      OF THE CASE AS RECORDED AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
    Tracy Rae Dunlap,   RPR , CRR            (301) 344-3912
25  Official Court Reporter
```

1                           I N D E X

2

3                      DIRECT    CROSS   REDIRECT   RECROSS
    Christopher  Sakala  6,139,157
4
    Jeff Rachel          38
5
    Jordan  Polvere      49     63     72
6
    Michael Conner       73     89     93        95
7
    Randy  Kucsan        97     132
8
    Kathleen  Meterko    152    156
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                         Page

24  Reporter's Certificate                  193

25  Concordance                             194

1          THE COURT:  We are still   missing  the foreman , so

2  we can take up preliminary matters until our missing

3  foreman gets here.

4          Mr. Montemarano , you have something  ?

5          MR. MONTEMARANO :  Your Honor, since  Your Honor

6  live s in Montgomery  County and probably doesn't

7  subscribe  to the  Baltimore  Sun --

8          THE COURT:   I do sub scribe  to Baltimore  Sun.

9  Every day.   What am  I supposed to know about what was

10  in the  Baltimore  Sun today?

11          MR. MONTEMARANO :  There was a copy in my copy in

12  Howard  County that mentions both    Mr. Ward and  Ms.

13  Johnston by name.

14          THE COURT:  Oh, yeah,  I read  it.

15          MR. MONTEMARANO :  I just wanted to make sure the

16  Court's aware.  I 'm not saying the jury needs to be

17  voir dired  or anything like that.   I just thought it

18  should be  brought  to Your Honor's attention.

19          THE COURT:  No, I've read  the article.   I know

20  what the issue is in the case.

21          MR. MONTEMARANO :  Thank you,  Your Honor.

22          THE COURT:  No.  I've already read my   Baltimore

23  Sun.  I heard long ago that if you live in    Montgomery

24  County and you really want to find out what's really

25  going on in the state of   Maryland, especially, you

1 better subscribe to the    Baltimore  Sun and the

2 Washington  Post, because sometimes they each scoop each

3 other.   So I read both papers.    I'm reading them at 5

4 o'clock in the morning before    I head out.

5        Ms. Johnston.

6        MS. JOHNSTON:   Your  Honor, there were two calls

7 that Mr. McKnett had issues with.  One was    B4786.

8        THE  COURT:  4786?

9        MS. JOHNSTON:  4786, which is on    Page 408, and

10 the  Court asked to be notified a day in advance.     I

11 don't think we'll get to it by the end of the day

12 today, but we certainly will get to it tomorrow.

13        THE  COURT:  Let's take a look at that call and

14 see what the problem is.

15        MS. JOHNSTON:  There was a second one, B6986.

16        THE  COURT:  6986 at what page?

17        MS. JOHNSTON:  That call will be later this

18 week.

19        THE  COURT:  What page is that?

20        MS. JOHNSTON:  That page is 542 note it was 542.

21        THE  COURT:  Is this a question of playing more

22 of it than you have designated or is it a question

23 about the call being admitted at all?

24        MS. JOHNSTON:   I think Mr. McKnett  can address

25 it better than   I can.   I think it has to do with the

1  content of the call.

2          THE  COURT:  All right.

3          THE  CLERK:  We're ready.

4          THE  COURT:  Our last juror has arrived.

5          Page 408 --

6          MS.  JOHNSTON:  Page 408.  Yes, sir.

7          THE  COURT:  -- is the first one?

8          MS.  JOHNSTON:  Was the first one.

9          THE  COURT:  All right.  And you don't think you

10  will get to that today?

11          MS.  JOHNSTON:  We could get to it by the end of

12  the day.  I'm not absolutely sure.  We may not because

13  we have some witnesses to call in the middle, but        I

14  just wanted to put the   Court on alert.

15          THE  COURT:  Well, since we are getting off to a

16  late start,  I'll take a look at that.   Mr. McKnett , if

17  you can be ready on a moment's notice to address your

18  concerns on that, but let's get the jury in and start

19  now.

20          The schedule for today is a normal schedule.

21  I'll go until about 4  :30.  Tomorrow, we'll start at

22  10:00.  I have a judge's meeting.  One opportunity to

23  discuss this would be at the end of the day tomorrow,

24  but we may reach this by the end of the day tomorrow.

25          MS.  JOHNSTON:  We will absolutely reach the

1  first call sometime tomorrow.

2          THE COURT:  Let's do this.    I have a guilty plea

3  at 9 o'clock tomorrow.  It won't take that long, so why

4  don't we assemble for preliminary matters at quarter of

5  10:00 tomorrow and we'll take it up then.  All right,

6  bring them in.

7                  (Jury returns at 10  :10 a.m.)

8          THE COURT:  Good morning  , ladies and gentlemen.

9  We will go today until about 4   :30, in which will resume

10 tomorrow at  10:00 .  So,  I'll give you that update.     Ms.

11 Johnston you may proceed  .

12                 (Witness  Sakala  resume s the  stand. )

13              **FURTHER  DIRECT  EXAMINATION**

14         **BY MS. JOHNSTON:**

15 Q.     Detective  Sakala , if I could call your attention

16 to the next call  , B3294 on Page 326 .  Is that call part

17 of  sever al related calls?

18 A.     Yes.

19 Q.     Who are the parties to the    Call 3294 on  Page

20 326?

21 A.     Claude  Arnold  and Paulette  Martin.

22 Q.     And on what date  and time did that call take

23 place?

24 A.     That was on  April 12 at 8:35 in the morning,

25 2004.

1 Q.       If we could play B3294, please.

2          (Audio recording begins playing at 10    :11 a.m. )

3          (Audio recording stops playing at 10     :12 a.m. )

4          BY MS. JOHNSTON:

5 Q.       And the next call , E574 on  Page 328.  Does that

6 call take place on the same date?

7 A.       Yes.  At 1 :24 in the afternoon.

8 Q.       Who are the parties to this call   ?

9 A.       Gwen Levi and  Claude Arnold.

10 Q.       And did you , in reviewing this for the fourth or

11 fifth time , notice any typ os in th is transcript?

12 A.       Yes.

13 Q.       Could you tell us where that is   , refer ring to

14 Page 328?

15 A.       The very last line on   Page 328 where  Arnold

16 says , pay him for what he owes.  He actually says    , pay

17 him for one of those  , and then continuing on on the top

18 of 329 should read, still owes him for one.

19 Q.       If we could play the call, please.

20          (Audio recording be  gins pl aying at 10 :13 a.m. )

21          (Audio recording   stops playing at 10  :14 a.m.)

22          BY MS. JOHNSTON:

23 Q.       And then if we could go to   Call B3379 on Page

24 331.  What's the date   and time of this call ?

25 A.       This is the next day, April 13   , at 8 :41 in the

1  morning.

2  Q.      And the parties to this call?

3  A.      Paulette Martin and Claude Arnold.

4  Q.      If we could play it , please.

5          (Audio recording begins playing at 10  :15 a.m. )

6          (Audio recording  stops playing at 10 :16 a.m.)

7          BY MS. JOHNSTON:

8  Q.      Based upon your training  and experience what is

9  Mr. Arnold discussing with  Paulette Martin and with

10 Gwen Levi in those three calls?

11 A.      He's talking about the low quality cocaine that

12 he obtained from  Ms. Martin reference d -- that she got

13 back from  Derrick Bynum , had sold him the two  -eighths

14 of a kilo . And during the series of calls , he's

15 telling her that he's having problems selling the

16 cocaine because of quality issues  , and he wants her to

17 do something about it. She take  s the cocaine back,

18 recooks it, and then makes arrangements for him to come

19 back on the morning of the  13th and pick it up.

20         I think on  Friday , we had talked about whether

21 it was powder or crack  , and I think in these series of

22 calls , you will see  -- or I believe they're clearly

23 talking about crack . When she talks about taking the

24 drugs back to the kitchen to remake them  , and then she

25 can't do it while the room  mate 's there.

1  Q.       Looking at  Page 326 , there is a reference to an

2  individual named   Jackie .

3  A.       Yes.

4  Q.       Who is  Jackie ?

5  A.       That's  Jackie  Terrell, w ho's the roommate of   Ms.

6  Martin.

7  Q.       Where did she live in the house?

8  A.       She lives in the upstairs portion   , which would

9  encompass the kitchen.

10 Q.       Based upon your training   and experience , when

11 Mr. Arnold says in that same page that    I need some

12 assistance from you because you know    I've been having a

13 little trouble .     What is he telling her?

14 A.       He's talking about he needs her to help him on

15 the quality of the drugs because the quality of drugs       ,

16 he's having a hard time selling it.  He's got what he

17 owes her , referring to  I got the rent money, but he's

18 not making any profit on what he's selling because       of

19 the low quality of the crack.

20 Q.       Okay.  Is there any other references that you

21 rely on on  Page 327?

22 A.       No, that's pretty much what he's talking about

23 there.

24 Q.       If we'd  go to  Page 328 , this call you've

25 identified as being between    Mr. Arnold  and Ms. Levi .

1   Again, there's a reference to   Sissy.  Who would that
2   be?
3   A.     He's telling  Gwen  Levi  about his conversation
4   with  Paulette  Martin.  Sis sy's  Paulette  Martin.
5   Q.     Is there anything  in this conversation that led
6   you to  your conclusion that   Mr.  Arnold  was having
7   problems with the crack cocaine that he had gotten from
8   Ms. Martin?
9   A.     The first paragraph where he's speaking   , she's
10  got to take it back to the kitchen because    I was
11  getting different readings, you know.  He's saying that
12  Paulette  Martin's got to take the crack back to the
13  kitchen,  recook  it to make it better quality.
14  Q.     Again, is there a reference to   Jackie, or the
15  roommate?
16  A.     Yeah.  In the next section there   , they're
17  talking about she may not be able to do anything to
18  until tonight or early tomorrow because her roommate's
19  around, meaning that  Paulette is not going   to be able
20  to get into the kitchen to redo the crack because
21  Jackie Terrell  is there.
22  Q.     Then again on Page 331.  Based on your training
23  and experience, is there language in that call that
24  supports your opinion?
25  A.     Yeah.  The fourth section down   , Paulette  Martin

1  says, I've prepared  that and  changed it around  , so if

2  you can stop and get it now before  I leave, it'll be

3  good.  Meaning she's taken  the coke and added

4  additional cocaine to make it higher quality   , and that

5  he should be able to sell it.

6  Q.      Have you had an opportunity to review the pole

7  camera to see if , in fact , Mr. Arnold  and his vehicle

8  arrived shortly after that telephone call?

9  A.      Yes.

10  Q.      Before we get to the vehicle   , let's play another

11  call so we don't have to put the video in     and out.

12  Call B3383 on  Page 38 3.  On what date does this call

13  take place?

14  A.      April 13 at 9 :45 a.m.

15  Q.      So it would have been after the call     between  Ms.

16  Martin  and  Mr. Arnold; is that correct?

17  A.      That's correct.

18  Q.      Who are the part ies to  this call?

19  A.      Derrick Bynum and Paulette  Martin -- I'm sorry ,

20  Derrick  Bynum  and John  Martin.

21  Q.      Is there an error in the index in reference to

22  this call , which is in Volume   1?

23  A.      Yes.

24  Q.      Looking at Page 14  , Roman  Numeral  XIV, reference

25  Call B3383 .  What should that say?

1  A.      It should -- this is a conversation between

2  Derrick  Bynum  and John  Martin , not  Paulette  Martin.

3  Q.       If we could play the call, please.

4          (Audio recording begins playing at 10    :20 a.m. )

5          (Audio recording   stops playing at 10   :21 a.m. )

6          BY MS. JOHNSTON:

7  Q.       Based upon your training    and experience , what

8  was  Mr. Bynum  telling  Mr. Martin  in this call?

9  A.       He was telling   -- Mr. Bynum  was telling   Mr.

10 Martin  to tell  Paulette   that  he w as coming by to pickup

11 drug s.

12 Q.       Like wise , did you review the videotape in

13 reference to this call?

14 A.       Yes.

15 Q.       If we could play what's been marked as     Video 18.

16          At approximately between what time period do we

17 see  Mr. Arnold  arrive?

18 A.       He arrives about 9  :15 that morning.

19             (Videotape begins playing at 10    :22 a.m. )

20          BY MS. JOHNSTON:

21 Q.       Do you  recognize that vehicle?

22 A.       Yeah , it's  Mr. Arnold 's Thunderbird , and he will

23 park it  in his customary manner.

24 Q.       What do you mean  , "he'll park in his customary

25 manner?"

1   A.      He always seem s to come and park on the right

2   side of the road  and not always directly para  llel to

3   the curb . And when he leave s, he make s a three -point

4   turn and heads back down the way he came in.

5   Q.      Again , what are we observing here?

6   A.      That's Mr. Arnold returning from the direction

7   of the house  and returning to his vehicle.

8   Q.      Based upon your train  ing and experience, how

9   large would that eighth of a kilo of crack cocaine be?

10  A.      It's 125 grams , so not overly large.  Certainly

11  it can be concealed in a pocket.

12  Q.      Similarly, did you -- is this the three    -point

13  turn you're talking about with    Mr. Arnold ?

14  A.      Yes.  He should lea  ve back down towards   Larch .

15          MR. WARD: Excuse me  , Your Honor.

16          May I ask that the record reflect that the time

17  shown on this video is 9  :23 a.m .?

18          MS. JOHNSTON: Certain  ly.

19          THE COURT: Yeah , I think it was 9 :22 a minute

20  ago , but it's 9 :23 now.

21          MR. WARD: Yes.  But he called at 9  :45,

22  supposedly , to make a pick-up.  That's wh  y I wanted to

23  point that out.

24          BY MS. JOHNSTON:

25  Q.      That was Mr. Arnold ; is that correct  ?

1  A.        Yeah.

2  Q.        The call from  Mr. Arnold  occurred at what time?

3  A.        At 8 :41 .  The call at 9 :45 is  Mr. Bynum , not  Mr.

4  Arnold .

5  Q.        And if we fast forward the video to    --

6  approximately what time will we see    Mr. Bynum 's car

7  arrive ?

8  A.        9:48 , he'll arrive.

9  Q.        That would be approximately how many minutes

10 after his call?

11 A.        Three minutes after his call.

12 Q.        Okay .  If we could fast forward to that time.

13           Do you recognize the vehicle that's in the

14 video?

15 A.        It's one of  Mr. Bynum 's vehicles.

16 Q.        Where is he going there?

17 A.        He's going to the right side of that residence

18 towards the basement door.

19 Q.        That would have occurred how many minutes past

20 the last call we heard  ?

21 A.        About three minutes.

22 Q.        If we were to continue   watching  the video , would

23 we see him exit?

24 A.        Yeah , he leaves a few minutes later.  He's not

25 there long.

1 Q.      I think we just missed him.

2        Fair to say he's -- looks like less than a

3 minute?

4 A.      Yes, back out to his vehicle.

5              (Videotape stops playing at   10:28 a.m.)

6        BY MS. JOHNSTON:

7 Q.      If we could return to the telephone calls again

8 on April 13  on Page 334.  What date  and time does this

9 call take place?

10 A.      Call B3416  is on the 13th, that same    day, at

11 4:14 in the afternoon.

12 Q.      Who are the parties to this call?

13 A.      Paulette  Martin  and George  Harris.

14 Q.      If we could play the call  , please.

15        (Audio recording begins   playing  at 10:29 a.m. )

16        (Audio recording stops playing at 10    :29 a.m.)

17        BY MS.  JOHNSTON:

18 Q.      Based upon your training   and experience , what

19 are Mr. Harris and  Ms. Martin discussing?

20 A.      Mr. Harrison  [sic] is arranging to  meet Ms.

21 Martin at  her residence to get a quantity of drugs

22 described as "eight   sundresses ".

23 Q.      Could would you please add   sundresses  to the

24 list of code s or the page number  , if it's already up

25 there?  Page 334?

1  A.       (Witness indicating.  )

2  Q.       If we could  go to the next call  , A10 note the

3  hear the record  .  Who are the part ies to this

4  conversation?

5  A.       Ruby  Harden  leaving a message for    Paulette

6  Martin.

7  Q.       If we could play it  , please.

8           (Audio recording  begins  play ing at 10 :30 a.m. )

9           (Audio  recording stops playing at 10   :30 a.m. )

10          BY MS.  JOHNSTON:

11  Q.       To your knowledge  , was there a return call made

12  on April 15 of 2004 to   Ms. Harden  from Ms. Martin?

13  A.       I'm sorry.  Did you ask, is there a    follow-u p

14  call ?

15  Q.       Was there a return call made on April 15   , based

16  upon your review of the calls?

17  A.       I don't know without looking at the logs   .  It's

18  not on the list here.

19  Q.       Okay.  If there had been one   , would you have

20  included it?

21          MR.  SUSSMAN :  Objection .

22          MS.  JOHNSTON:  S trike that.

23          Do we have a copy of the B1 logs, please?

24          Can we have the next miscellaneous number?

25          For identification purposes only   , Your  Honor ,

1  Miscellaneous  9.

2         BY MS . JOHNSTON:

3  Q.        What are the logs , if you could describe for the

4  jury what the logs are.

5  A.        One of the legal requirements on any wiretap or

6  electronic surveillance is that you keep track of all

7  your interceptions.  In the old days   , we used to do it

8  by hand with paper   and pencil or pen.  You would keep

9  track of the date   and time of the calls , the part ies to

10 that call , and a synopsis of the call as best you could

11 as you were listening to it   , and whether the call was

12 minimized, how many times it was minimized    , and whether

13 it was pertinent to the investigation.

14        With the computerized system  , that's mostly done

15 for you.  The times are recorded by the machines       and

16 the monitor simply has to type in a synopsis as he or

17 she is listen ing to it.  So the  ELSUR log s, as we call

18 them , stand for  Electronic  Surveillance logs .  So every

19 line intercept will have a listing of every call

20 intercepted , whether it's pertinent or not    and what

21 it's about , date  and time.

22 Q.        If you could read through those    B logs  and see

23 if there was a call made.

24        MR. SUSSMAN : Court's indulgence  .  One moment.

25        THE  WITNESS:  The dates for the    15th, I'm sorry ?

```
 1          MR. SUSSMAN:  If the witness could just --
 2          THE COURT:  Hold on.
 3          BY MS. JOHNSTON:
 4 Q.       Have you reviewed the log?
 5 A.       Yes, but the dates for the   15th and 16th are
 6 missing from this book  , so I still can't answer the
 7 question .
 8 Q.       All right.  Well , we'll see if we can take care
 9 of that on a recess,   Agent Sakala , and get back to that
10 call.  In the meantime  , let's continue with the calls
11 on April 15.  The next call  , B3609 at  Page 337.  Who
12 are the parties to this call?
13 A.       This is  Learley  Goodwin  and  Paulette  Martin.
14 Q.       And the time of the call?
15 A.       This was on April 15 at 2  :35 in the afternoon.
16 Q.       If we could please call -- play this call.
17          (Audio recording begins playing at 10   :34 a.m. )
18          (Audio recording stops playing at 10   :35 a.m.)
19          BY MS. JOHNSTON:
20 Q.       Based upon your training   and experience , what is
21 this discussion between   Ms. Martin  and Mr. Goodwin ?
22 A.       The first line there , the third line down  , Ms.
23 Martin is asking  Mr. Goodwin  whether  -- she doesn't
24 know whether he knows anybody with no tickets      , meaning
25 does he know anybody who's got cocaine for sale      , and he
```

1  says no.  Then he goes on to talk about his situation
2  down the way , referring to the cocaine in    Texas.  He's
3  saying , I finally got the transportation   , meaning  I
4  finally straightened out or got someone to drive the
5  drugs from  Texas up to  Maryland , and then she puts him
6  on hold.
7  Q.     If we could then go to the next call,     B3625 , on
8  Page 338.  Again , does this call take place on April
9  15?
10 A.     Yes.  At 3 :34 in the afternoon.
11 Q.     It's between whom?
12 A.     George  Harris and  Paulette  Martin.
13 Q.     If we  could  play this call.
14        (Audio recording begins play   ing at 10 :36 a.m. )
15        (Audio recording   stops playing at 10  :36 a.m. )
16        BY MS.  JOHNSTON:
17 Q.     Based  on your training   and experience , what are
18 Ms. Martin  and Mr. Harris discussing in this call?
19 A.      Mr. Harris,  the fourth line down  , is it okay for
20 me to stop past your office today, meaning can      I come
21 by your house to pick up drugs, and     then she goes on to
22 caution him about he needs to start picking up once a
23 week , to not be calling there    and having people run in
24 and  out because of the traffic causes suspicion.
25        And then at the end of the call   , he identifies

1  the quantity he wants by almost whispering two size

2  eights, referring to two either eighth of    a kilogram or

3  eighth of an ounce , quantities of cocaine , and she

4  confirms it by saying two size eight dresses.

5  Q.     If you could make a notation on our code chart

6  there next to the word dresses,    Page 338.

7  A.     (Witness indicating. )

8  Q.     Now, that call occurred on April 15; is that

9  correct ?

10 A.     Yes.

11 Q.     The next call on our list  , B3862 on Page 340 ,

12 occurs on what day   and between what parties?

13 A.     Three days later , on the  18th -- April 18, 2004 ,

14 at 3 :18 in the afternoon.

15 Q.     If we could play --   and who are the parties?

16 A.     Paulette  Martin  and Larry  Lane.

17 Q.     If we could now play it.

18     (Audio recording begins playing at 10    :38 a.m. )

19     (Audio  recording stops playing at 10    :38 a.m. )

20     BY MS.  JOHNSTON:

21 Q.     Based upon your training   and experience , what

22 are Ms. Martin  and Mr. Lane dis cussing  in this call?

23 A.     Mr. Lane is asking  Ms. Martin if she knows where

24 anybody's  got a supply of cocaine.    Ms. Martin says ,

25 ain't  no tickets or nothing nowhere  , and then he goes

1  on to say , if you get some tickets  , meaning if you get

2  some cocaine , can you look out for your nephew a

3  little , referring to him.  Meaning keep me in mind

4  because  I want drugs , too.

5          And then she goes on to say  , that's what she's

6  been working on , finding a new  source  of cocaine ,

7  trying to get some tickets  , and then she goes

8  complaining that   Learley  Goodwin  has let everything go

9  down to nothing , referring to the drug business  , go

10  down to nothing.

11  Q.      Okay.  And if you could,  Goody referring to  Mr.

12  Goodwin?

13  A.      Learley  Goodwin.

14  Q.      If you could , next to the word tickets  , write

15  Page 340 on our chart.

16  A.      (Witness indicating.  )

17  Q.      We could go to the next call,   B3925 , on Page

18  342.  What is the date   and time of this call?

19  A.      This is  April 19, 3 o'clock in  the afternoon,

20  2004.

21  Q.      If we could play this call  , please.

22          (Audio recording begins playing at 10   :40 a.m. )

23          (Audio  recording stops playing at 10   :40 a.m. )

24          BY MS. JOHNSTON:

25  Q.      Based upon your training   and experience , what is

1  Mr. Martin telling Mr. Harris in this call?

2  A.      Mr. Harris is looking for Ms. Paulette Martin.

3  Mr. John Martin says that she's not there  , meaning

4  Paulette's not home , and that there are no drugs to be

5  purchased , saying I don't think nothing's going down.

6  Q.      Okay . Now, if we go to the next call , B3942 on

7  Page 344. Do you have that in front of you    ?

8  A.      Yes.

9  Q.      Who are the parties to that call?

10 A.      Paulette Martin and Learley Goodwin.

11 Q.      Again , if we go back to our index in Volume    1,

12 was there a typographic  al error concerning the parties

13 to this call on Page 15  , or XV, of the index?

14 A.      Yes, there is.

15 Q.      What is that?

16 A.      In the index, I believe it refer s to the call

17 being between Luis Mangual and Paulette Martin.

18 Q.      Who are the correct parties?

19 A.      Paulette Martin and Learley Goodwin?

20 Q.      If we could please play Call B3942 on Page 344.

21         (Audio recording begins playing at   10:41 a.m. )

22         (Audio recording stops playing at   10:41 a.m. )

23         BY MS. JOHNSTON:

24 Q.      Based upon your training  and experience , what

25 are Ms. Martin and Mr. Goodwin discussing in this call?

1 A.      Second line down , Ms. Martin is asking   Mr.

2 Goodwin  if he knows anybody with a source of cocaine     ,

3 saying, you don't know anybody else with ticket    s, bro?

4 Meaning you don't know anybody else with cocaine for

5 sale? Then she goes on to say that     Luis, meaning  Luis

6 Mangual , hasn't had no tickets for about two weeks     ,

7 meaning that he's been out of cocaine     , too , for about

8 two weeks.

9 Q.     That is the same   Mr. Mangual  from whom she's

10 obtaining novels   and  sunglasses   and oranges?

11 A.      Correct.  Well  --

12 Q.      Using those terms?

13 A.      She's ordering them in the phone conversation     ,

14 but she's not actually obtaining those things.

15 Q.     If you could note on   the chart next to tickets   ,

16 Page  344.

17 A.     (Witness indicating.  )

18 Q.     Calling your at  tention  to B3953 on  Page 345 .

19 Does this call also take place on     April 19?

20 A.      Yes.

21 Q.      At what approximately what time    ?

22 A.      At 7:39 p.m.

23 Q.      Who are the  parties to  this call ?

24 A.      Ruby Harden and  Paulette  Martin.

25 Q.      If we could play the call    , please.

1           (Audio recording begins playing at 10    :43 a.m. )

2           (Audio recording    stops playing at 10   :44 a.m. )

3       BY MS.  JOHNSTON:

4  Q.       In regards to  this call , how long was this call?

5  A.       The call was ten minutes.

6  Q.       Has it been edited for playing here in court    ?

7  A.       Yes.

8  Q.       What portions did we play?

9  A.       The first section is from the beginning of the

10 call to one minute and two seconds in    , and the second

11 section is from eight minutes and four seconds to the

12 end of the call.

13 Q.       And based upon your training    and experience ,

14 what was the relevance of the portions that we played?

15 A.       They're talking about   -- Ms. Harden  and Ms.

16 Martin are talking that   Ms. Martin doesn't have any

17 cocaine to sell  Ms. Harden . The bottom of Page 345,    I

18 don't have any tickets  , referring to  I don't have any

19 cocaine.  Then on  Page 346 , the paragraph there where

20 Paulette Martin is talking about   Goody having a

21 problem , meaning that  Goody's not being able to get any

22 cocaine either.

23          And then she goes on to say  , he's been having a

24 problem getting ticket s, talking about  Goody, again

25 Learley Goodwin , having a problem getting tickets    , and

1  the people that got them are so sky   -high , meaning the

2  people that have cocaine   , their prices are high that

3  it's not worth it to -- for them to purchase it     , and

4  that we're working on that   , meaning working on getting

5  new cocaine.

6        Then in the last   excerpt,  she just reassert s the

7  same thing , I'm working on that ticket thing now    , I'm

8  working on getting cocaine.

9  Q.     If you could note on the chart    Pages 345  and 346

10 next to the word tickets.

11 A.     (Witness indicating.  )

12 Q.     There 's also a reference in   Call B3953 by  Ms.

13 Martin to having been to    Florida  and back to   Augusta.

14 During this time frame  , was the pole camera operating

15 at her residence?

16 A.     Yes.

17 Q.     Based  on your review of the pole camera tape,

18 did you determine whether   or not  she had , in fact ,

19 traveled  out of state during this time period?

20 A.     No, she did not travel.

21 Q.     Now if we could turn to the next call,    A1219 ,

22 which takes place on what date?

23 A.     This is on  April 21, 2004 , at 5 :54 p.m.

24 Q.     Who are the parties to this call   ?

25 A.     Learley  Goodwin  and Paulette  Martin.

1  Q.      If we could play this call, please.

2          (Audio recording begins playing at 10   :46 a.m. )

3          (Audio recording   stops playing at 10  :47 a.m.)

4          BY MS. JOHNSTON:

5  Q.      Again , based on your training   and experience ,

6  what does the word   "ticket " refer to here?

7  A.      A source of supply of cocaine.      Paulette says

8  you ain't heard nothing about no tickets   , meaning you

9  don't have anybody who can sell us cocaine   , and Mr.

10 Goodwin  goes on to talk about   getting somebody out of

11 jail that might be able to help them on that.

12 Q.      Now if we could go to the next two calls   , A1224

13 and A1226 , beginning on  Page 348.  On what date   and

14 time do these two calls take place?

15 A.      April 21st , 2004 , at 7 :12 p.m.

16 Q.      And the second one,   A1226?

17 A.      Yeah.  Same day at 9  :01 p.m.

18 Q.      Who are the parties to these calls?

19 A.      The first one is  Paulette  Martin and LaNora Ali,

20 and the second one is   Paulette  Martin,  LaNora  Ali, and

21 John Martin.

22 Q.      Could we please play A1224 on   Page 348 ?

23         (Audio recording begins playing at 10   :48 a.m.)

24         (Audio recording stops playing at 10   :48 a.m.)

25         BY MS. JOHNSTON:

1  Q.      And then if we could play    A1226 on  Page 34 9.

2          (Audio recording begins playing at 10    :48 a.m. )

3          (Audio recording stops playing at 10     :49 a.m.)

4          BY MS. JOHNSTON:

5  Q.      Now , based upon your training    and experience ,

6  what is being discussed between    Ms. Martin  and Ms. Ali

7  on April 21st of 2004?

8  A.       They're talking about getting     -- Ms. Ali buying

9  an eighth of an ounce of cocaine from    Ms. Martin , based

10 on conversations she's having with somebody else    , which

11 would  indicate to me that she's buying it for somebody

12 else.   And then they go on to discuss the price of the

13 purchase being put on   Ms. Ali's tab , and they go ahead

14 and clarify to make sure there that it   's $125 , not

15 $150, that was put in the book.

16 Q.      Based upon your training    and experience , is $125

17 consistent with the purchase of an     eighth of an ounce

18 of cocaine or cocaine base?

19 A.      Yes.  Eighth of an ounce of cocaine, yes.

20 Q.       Now, also do  you have an opinion , based upon the

21 preceding call with   Ms. Martin  and Mr. Goodwin where

22 they're looking for tickets    and this call both

23 occurring on the same date where    Ms. Martin has

24 provided  Ms. Ali with a ticket or a quantity of

25 cocaine , as to whether   or not  those calls are

1  inconsistent?

2  A.      No.  They're very consistent  .  They're talking

3  about two different thing  s.

4  Q.      Okay .  If you could explain it to the jury.

5  A.      In the previous calls  , Ms. Martin  is looking for

6  a source of cocaine  , referring to tickets as a kilogram

7  quantity of cocaine she want  s to buy for someone.  Here

8  is talking about a smaller amount that she's actually

9  selling .  So even though they use the same ticket    , in

10  the previous conversation  , she's trying to find a

11  source , in this one she's selling to a customer.

12  Q.      In that same regard  , base d upon your training

13  and experience, is that eight ball   , or eighth of an

14  ounce , a quantity that is for -- can with used for

15  distribution?

16  A.      For distribution  , typically someone would take

17  that , break it into smaller amounts    , and then sell

18  those  amounts.

19  Q.      Would they also keep some of that for personal

20  use as well?

21  A.      If they're user  s, yes , they would .  Otherwise ,

22  they just make more profit.

23  Q.      And is there an indication in    Call A1224 , based

24  upon your training   and experience , as to what  Ms. Ali

25  was intending to do?

1 A.      Middle of the page  , Paulette  Martin confirms

2 that you just wanted one ticket    , and Ms. Ali says ,

3 that's -- I'm going to make a phone call    , meaning she's

4 going to talk to somebody else before she clarif    ies the

5 amount of drug s she wants to purchase.

6 Q.      If we could keep our chart straight at      Page 348

7 for -- next to the code word    "tickets ".

8 A.      (Witness indicating.  )

9 Q.      I think that's the only page.  Now, in regards

10 to t he  call on Page 350  , there  was a  discussion of the

11 price --

12 A.      Yes .

13 Q.      -- i s that correct?  Have you had occasion to

14 review  Government's  Exhibit  Hayward  7?

15 A.      I'm  sorry?

16 Q.      Have you had  occasion to review   Government's

17 Exhibit  Hayward  7?

18 A.      Yes.

19 Q.      Is there a reference in    Hayward  7 consis tent

20 with the discussion of the book?

21 A.      Yes.  The first red tab shows a purchase for

22 $125 by  Ms. Ali that would fit into where   Ms. Martin is

23 referencing putting a    $1. 25 in the book.

24 Q.      Let me put it on the screen so every    one can see

25 what you're talking about   .

1         In reference to  Hayward  7, where was that

2 recovered?

3 A.       Paulette  Martin's residence.

4 Q.       The same place where   we had the pole camera up?

5 A.       Yes, yes.

6 Q.       First of all , is her name at the top of the

7 page ?

8 A.       It says  LaNora , and then the column is divided

9 down the middle between two sets of figures being add     ed

10 and subtracted.

11 Q.       If we look at -- which column are you looking

12 at , the first or  the second column ?

13 A.       You're looking at the col   umn on the left page,

14 right-hand side , so now on the screen on the left-hand

15 side of the screen.  If you look at the bottom of where

16 the screen is now, the very bottom will show a balance

17 of 150.  Then $125   will be added to that , and that will

18 be a -- bring her bill back to 275    , and that's the

19 notation she's referring to on Page 350.

20         MR. SUSSMAN : Ms. Johnston, could   we get the

21 exhibit  number ?

22         MS. JOHNSTON:    Hayward  7.

23         BY MS. JOHNSTON:

24 Q.       Now if we could go to the next call    , B4108 , on

25 Page 352.  Who are the parties to this call?

1  A.        Paulette  Martin  and George  Harris.

2  Q.        On what date  and time does it take place?

3  A.        April 22, 2004 , at 4 :40 in the afternoon.

4  Q.        If we could please play B4108.

5            (Audio recording begins playing at 10    :55 a.m. )

6            (Audio recording stops playing at 10     :55 a.m. )

7            BY MS.  JOHNSTON:

8  Q.        Again the reference to ticket   s in this call

9  refers to what?

10  A.       Cocaine.

11  Q.        What is  Ms. Martin telling   Mr.  Harris ?

12  A.       That the middle of the page there    , she says  I

13  don't have any tickets.    I stopped for a few minutes   ,

14  meaning  I don't have any cocaine to sell.     I stopped

15  for a while because   I had  to deal with some important

16  business , and then  in the next paragraph , she says

17  tickets are kind of scarce anyway    , a lot of people

18  calling me , meaning that supplies of cocaine are tight

19  and a lot of her customers are calling her.

20  Q.        When she says  I'm try ing to  get it back together

21  now , what's she referring to?

22  A.       Another supply of cocaine.

23  Q.        Now, if you would  write Page 352 next to our

24  word  "tickets " on the board.

25  A.       (Witness indicating.  )

1 Q.      Again , there's a reference to being out of town.

2 Based upon your review   of the pole cameras , was Ms.

3 Martin out of town at this time?

4 A.      She says  I may have to run out of town for the

5 weekend , but she did not.

6 Q.      And above that , there's a reference to  , I had to

7 run out of town, s  imilarly .

8 A.      Yeah, s he did not do any traveling    dur ing this

9 time period.

10 Q.     If we could go to   Call B4175 on Page 358   --

11 strike that , I think  I skipped a call.

12        If we could go to   Call B4153 on Page 356.  What

13 date  and time does this call take place?

14 A.      This is  4/23/2004 at 9 :57 a.m.

15 Q.     Who are the  parties to  this call ?

16 A.      Paulette  Martin  and Claudette  Philpot .

17 Q.     Who is  Ms. Claudette  Philpot  related to?

18 A.      She is the wife of   Pernell  Philpot , who was

19 arrested in  Wyoming.

20 Q.     If we could  please  play B4153.

21        (Audio recording starts   playing  at 10 :58 a.m .)

22        (Audio recording stops   playing  at 10 :58 a.m. )

23        BY MS. JOHNSTON:

24 Q.     Now, based upon your training   and experience ,

25 what is  Ms. Martin asking   Ms. Philpot  in this call?

1  A.       She's asking  Ms. Philpot  if anybody's taken over

2  her husband's drug business.

3  Q.       And the code word being used here?

4  A.       Fourth line  down, n she says is there anyone

5  handling the ticket business  , meaning anybody handling

6  the drug business.  Next section   , anybody handling that

7  ticket business of your husband's   , meaning anybody

8  handling the drug business of your husband?  Or is it

9  just dead now?  Initially  , she re plies , yes , but then

10  she change s the answer to no , that nobody's handling

11  the drug business.

12  Q.       And if you could write Page 356 on the board

13  next to the word  "tickets ".

14  A.       (Witness indicating.  )

15  Q.       If we could go then to   Call B4175 on Page 358.

16  Who are the parties to this conversation?

17  A.       Milburn Bruce Walker and Paulette  Martin.

18  Q.       What date  and time does this call take place?

19  A.       This is on April 23, 2004  , at 1 :56 p.m.

20  Q.       If we could play the call, please   .

21          (Audio recording begins   playing at 11 :00 a.m. )

22          (Audio recording stops playing at 11    :00 a.m. )

23          BY MS. JOHNSTON:

24  Q.       Based upon your training   and experience , what

25  are Ms. Martin  and Mr. Walker  discussing during this

1  call?

2  A.      Walker is ordering a quantity of powder cocaine

3  and crack cocaine from   Ms. Martin.

4  Q.      On what do you base that conclusion   ?

5  A.      The middle of the call where   Ms. Martin says ,

6  what kind of ticket do you want   , because  I don't have

7  any really unmade tickets  , meaning the only thing    I

8  have is crack.   I don't have any powder.     And then she

9  goes on to say , I may have a small one -- small    , you

10  know , meaning unmade , so she may have a small amount of

11  powder , and then Mr. Walker orders a small unmade   ,

12  meaning a small amount of powder  , and probably at least

13  a size eight of made  , meaning an eighth of a kilo or

14  eighth of an  ounce of crack cocaine .

15  Q.      Again , is this inconsistent with her calls where

16  she's looking for tickets where she's discussing not

17  having any tickets?

18  A.      No, not at all.

19  Q.      Why not?

20  A.      You know, she's trying to find a source of

21  cocaine in the kilogram quantity    , and here we're

22  talking probably  something  less of that that she's

23  telling.

24  Q.      Now if we could go to the next two calls    , B4183

25  and B4223 , on Page 36 1 and 362 and 36 3.  Are these

1  calls between the same parties?

2  A.      Yes.  Paulette Martin  and Lavon  "Becky" Dobie .

3  Q.      What date  and time do they t he calls take place?

4  A.      If first one is on April 23, 2004  , at 2 :56 in

5  the afternoon ; and the second is on the same day at

6  7:32 p.m.

7  Q.      If we could please play B4183 on Page 361.

8          (Audio recording starts playing at 11   :02 a.m. )

9          (Audio recording stops playing at 11    :03 a.m. )

10         BY MS. JOHNSTON:

11  Q.     If we could go to the next call  , B4223.

12         (Audio recording begins playing at 11   :03 a.m. )

13         (Audio recording stops playing at 11    :03 a.m. )

14         BY MS. JOHNSTON:

15  Q.     What are  Ms. Dobie  and Ms. Martin discussing in

16  these two telephone intercepts?

17  A.      Again,  Ms. Martin again is searching for

18  additional sources of supply of cocaine    , and the third

19  on page 36 1 on the third excerpt down , she goes,  I was

20  call ing to see what happen ed to the show.   I thought we

21  were going to have a ticket.  A couple of people called

22  me, I told  them there w as nothing I could  do.   I

23  thought we would be at one   of your shows by now ,

24  meaning  I thought you would have a supply of cocaine by

25  now , and then she goes on to call or try to reach the

1 person that she's in contact with about supplying the

2 cocaine.

3       That continues on to   Page 36 2 on -- at  Call

4 4223.  At the end , bottom of   Page 36 2, she says --

5 "she" being  Ms. Dobie --  says , all right , because you

6 didn't even -- they weren't able to give you    no kind of

7 tickets , were they ?  Meaning  Ms. Martin's source  , and

8 then Ms. Dobie says , okay, I'll give him a call then  .

9 And they're just , again , both conversations are talking

10 about finding another source of cocaine.

11 Q.     The phrase  "no kind of tickets  ," what does that

12 refer to?

13 A.     Drugs.  No kind of drugs.

14 Q.     Meaning what drugs?

15 A.     Cocaine they're talking about here.

16 Q.     If we could -- why is it cocaine   and not heroin?

17 A.     When they talk about heroin  , it becomes more

18 obvious , and I think we'll see that later  .  But in this

19 particular context , they're talking about cocaine.     Ms.

20 Martin's heroin source was fine.  It was her cocaine

21 source that was the problem.

22 Q.     If you can write on the board    Page 361  and 36 2

23 next t o the code word   "tickets ".

24 A.     (Witness indicating.  )

25 Q.     These calls occurred -- ended the    evening  of

1 April 23 of 2004 ; is that correct?

2 A.      Yes.

3 Q.      Are you aware of where   Ms. Levi 's source was?

4 A.      New York City.

5 Q.      All right.   And for what purpose was   Ms. Levi  in

6 New York City?

7 A.      Ms. Levi was in  New York  City to buy heroin from

8 her heroin source.

9 Q.      Ms. Levi was a supplier of heroin to   Ms. Martin?

10 A.      That's correct.

11 Q.      Did you  and other agents send a  surveillance

12 team to  New York on  April 23 of 2004  ?

13 A.      Yes.  I sent a -- people out to surveil   Ms. Levi

14 in anticipation that she would be traveling to     New York

15 to pick up heroin from her source.

16      MS. JOHNSTON:   Your Honor , if we could recess

17 his testimony at this time    and call the detectives

18 involved in that event  .

19      THE COURT:  A ll right.  You may.

20      MS. JOHNSTON:  Thank you  , Your Honor.

21      (Witness excused at 11  :06 a.m. )

22 Thereupon,

23                          **JEFF  RACHEL** ,

24 having been called as a witness on behalf of      the

25 plaintiff , and having been first duly sworn by the

1 Courtroom Deputy, was examined and testified as

2 follows:

3                      **DIRECT  EXAMINATION**

4       **BY MS. JOHNSTON:**

5 Q.      Sir, please state your full name    and occupation.

6 A.      Corporal Jeff Rachel.  I'm with the  Montgomery

7 County  Police  Department.

8 Q.      And how long have you been employ   ed with  the

9 Montgomery  County  Police  Department?

10 A.      Sixteen  years.

11 Q.      In what capacity?

12 A.      I'm current ly the  corporal in the   Drug

13 Interdiction  Unit.

14 Q.      Could you  explain the   experience  you 've had in

15 the narcotics area, please   ?

16 A.      Received extensive training in drug recognition

17 and participated in several interdiction schools over

18 the past six years that    I've been in narcotics.

19 Currently trained   and certified as a dog handler in the

20 drug interdiction   unit.

21 Q.      When you say a   "dog handler,"  you presently work

22 with a dog that detect   s the presence of drugs  ?

23 A.      Yes.

24 Q.      Calling your att ention back to April 23 of 2004   ,

25 where were you assigned on that date?

1  A.      I was part of a surveillance team that was sent

2  to the area of 5844   Digger Lane in  Elk Ridge,  Maryland.

3  Q.      Who resided at that location?

4  A.      Gwen Levi.

5  Q.      Approximately what time did you arrive there?

6  A.      We initiated a surveillance at about midnight.

7          THE CLERK:   I'm sorry , some of the juror  s are

8  having difficulty hearing him  .  Could you slide  up to

9  the mike a little bit for me?  Thank you.

10         BY MS. JOHNSTON:

11 Q.      Did there come a time when some activity

12 occurred at that location?

13 A.      Yes.

14 Q.      Can you describe the   activity that you  observed

15 there on April 23?

16 A.      The following morning  , Gwen Levi  and another

17 female identified as   Donna  Johnson , left in  a

18 Mitsubishi  Gallant, drove to a gas station down the

19 street, came back  , and then they left   and went to a

20 service station in   Ellicott  City.

21         They left their vehicle to receive some type of

22 repair  and went  and had breakfast at a nearb  y diner.

23 They stayed there for a period of time.   Returned.

24 Retrieved the vehicle.  Made a couple more stops an    d

25 then returned back to their house on    Digger  Lane.

1  Q.      Did there come a time later on April 23     when

2  they left  Digger  Lane  and proceeded to travel out of

3  state?

4  A.      About  1 o'clock in the afternoon that same day    ,

5  they left that address   and proceeded north on

6  Interstate 95 towards   New York City.

7  Q.      Were you involved in the   surveillance up to   New

8  York City and in New York City?

9  A.      Yes.

10 Q.      Were you doing  surveillance alone or were other

11 people with you?

12 A.      I was part of  a surveillance  team.

13 Q.      Can you describe for the ladies and gentlemen of

14 the jury how a surveillance team works?

15 A.      When you -- a particular target is identified,

16 probably a minimum of five or six detectives in

17 different unmarked vehicles will participate in the

18 surveillance , whether it's in a small area or a long

19 distance , passing the vehicle off as from one detective

20 to the next to avoid de  tection by the target.

21 Q.      Where did you  follow} Ms. Levi 's vehicle to?

22 A.      New York City.  All the way to the end of the

23 turnpike , and we entered  New York City.   I think it was

24 East 155th  Street.

25 Q.      Any -- were you  given any assistance  in New York

1 City with the surveillance?

2 A.     Yes.  Detective  Snyder had contacted   Customs in

3 New York , who assisted us with the surveillance there     ,

4 since they were familiar with   New York City  and we were

5 not.

6 Q.     Could you describe what observations you made

7 while you were in   New York  City on April 23 of 2004?

8 A.     Very crowded.

9 Q.     Were you there in rush  -hour traffic?

10 A.     Yes.

11 Q.     Eventually did you position your vehicle in a

12 particular location?

13 A.     Yeah.  They stopped at the    Furniture  Queen, a

14 store.

15 Q.     Do you know approximately where it was located?

16 A.     It was in the 3000 block of    East 155th  Street ,

17 an area of  Third  Avenue , somewhere along there.    I

18 parked my van on an adjacent road    , which was across

19 from a vacant lot  , and took some video of the store    ,

20 and I moved to the same street    and got -- tr ied to get

21 in better positioning   and got some more video.

22 Q.     Can you tell us generally what you observed on

23 that date ?

24 A.     The vehicle park ed in front of the store or near

25 the front  of the  store with  Donna  Johnson in the

1 vehicle , and Gwen went into the store  , was there for a

2 period of time , came back out  .  They drove down the

3 street, switched drivers.     Donna  Johnson had gone into

4 a near by McDonald's , came back , and they also went to

5 some type of  Express store in the area.

6 Q.     A what kind of store?

7 A.     Some type of  Express , and then the vehicle

8 returned to the  Furniture  Queen.

9 Q.     All right.  Did you make observations once it

10 returned to the   Furniture  Queen?

11 A.     Yes.  Went back inside , retrieved  something from

12 the trunk , went back into the store  , and then came out

13 a pe riod of time  --

14 Q.     Who went into the trunk?

15 A.     Gwen .

16 Q.     "Gwen" referring to   Ms. Levi?

17 A.     Yeah.

18 Q.     What did she take out of the trunk   ?

19 A.     Some type of object  ; I don't recall exactly.

20 Q.     Where did she go?

21 A.     Into the furniture store.

22 Q.     Were you able to videotape portions of your

23 surveillance?

24 A.     Parts of it yet  , yes.

25 Q.     What difficulty did you have that you weren't

1  able to videotape the whole thing?

2  A.      The camera would cut off at certain -- after a

3  certain period , then I'd have to  shut  it off , take the

4  battery  out, put it back in , turn it back on again  .  So

5  I didn't -- it's not the best    video  ever shot.

6  Q.      Do we have that video here today?

7  A.      Yes.

8  Q.      Have you reviewed   Government's   Exhibit  Video 22?

9  A.      Yes.

10  Q.      Is that the video that you took while you were

11  in New York ?

12  A.      Yes.

13  Q.      If we could play the video  , and if you could

14  tell us what -- where the vehicle is     and who is being

15  shown in the video as it plays.

16        (Video  begins playing at 11  :14 a.m. )

17        THE  WITNESS:  We parked across the street in

18  front of a vacant lot in front    of the  Furniture  Queen.

19  Taking video -- there's the video   , the Mitsubishi w ith

20  Donna  Johnson sitting in   it.

21        BY MS.  JOHNSTON:

22  Q.      That's the  vehicle there?

23  A.      Yes.   That's when they   initially  had stopped

24  there .  I'm just trying to get the street     and a shot of

25  the store.    That's the store.

1  Q.      Does the video reflect the accurate date     and

2  time?

3  A.      Yes.   That's the vehicle again.  Looks like    I'm

4  trying to get a close up .  I'm trying to check at the

5  same time to get a shot   again of Gwen coming back to

6  the car .   That's why it kind of pans around try   ing to

7  pick up her.

8          The car again , trying to get a close-up of the

9  occupant in the car.  More of the car.     I should switch

10  locations here briefly.  More of the storefront.  Now

11  I've switched location s.  Now I'm on the same street  ,

12  opposite side of the street  , down the block from the

13  Furniture  Queen.

14          Trying to get a shot of    Gwen Levi leaving the

15  store.  That's  Donna there in the front seat of the

16  Mitsubishi .  Okay.  Gwen has returned to the vehicle

17  and is in traffic heading away from the store.

18  Q.      That's the vehicle there?

19  A.      Yes.   That's the vehicle right there.

20  Q.      You were not able to videotape her getting into

21  the vehicle?

22  A.      No.

23  Q.      Was there traffic going in between you     and the

24  vehicle at that point  ?

25  A.      Yes.  That's her passing my vehicle.   Now

1 they're stopped near the    McDonald's.  It's just a block

2 and a half away from the    Furniture  Queen.  It wasn't

3 far at all.  This vehicle stopped near them.  That's

4 Donna getting out of the driver's seat,    Gwen getting

5 in.  She looks back,    shut s the door.

6 Q.      Now the object that was taken out of the trunk

7 is still in the trunk at this point; is that correct?

8 A.      Yes.

9 Q.      You mentioned the   Express store.  Is that that

10 $.99 Express store?

11 A.      Yes.  That's where the vehicle is parked.

12 Close-up of the tag.

13 Q.      That was  Pennsylvania tags on the vehicle; is

14 that correct?

15 A.      Yes.  The vehicle has returned to the    Furniture

16 Queen.

17 Q.      Can we see the vehicle in this portion of the

18 video?

19 A.      I think  it's in between the van there    and the

20 last car in the line.    I'm going t o reposition my

21 vehicle again here in a second to be -- now    I'm down

22 the street.  Same side  , but farther down.  Close-up of

23 the tag as they're parked at the    Furniture  Queen.

24      At this point , I believe  Gwen  has already

25 retrieved  the object from the trunk    and gone into the

1  store  and  I'm attempting to get a shot of her as she

2  exits , hopefully with something  , is what  I'm trying to

3  do.  But  I'm unsuccessful.

4  Q.     What do you mean  "you're unsuccessful  "?

5  A.     Because of difficult  y with  the camera.  Getting

6  the actual picture or of her coming out.

7  Q.     Were you able to see her coming out of the

8  store ?

9  A.     Yes.

10  Q.     What d id she have with her when she came out of

11  the store?

12  A.     It looked like a clothes box that had been

13  wrapped up like a present.

14  Q.     Where was it placed?

15  A.     In the trunk , and she got into the driver's side

16  of the vehicle  and drove  off.

17  Q.     Okay.  You were not able to capture that on

18  video?

19  A.     No , I was not.

20  Q.     Is that one of those things that sometimes

21  happens when you're videoing surveillance?

22  A.     Yep.  Faulty equipment.

23  Q.     Does your video continue to the point where they

24  leave in the vehicle?

25  A.     Yes.

1  Q.      Okay.

2  A.      It should cut off here shortly.

3              (Videotape ends at 11 :20 a.m. )

4       BY MS. JOHNSTON:

5  Q.      After you observed her place the package -- the

6  present in the vehicle, did you continue your

7  surveillance of her at that time?

8  A.      Yes.  With  the  ICE  Detectives  from   New  York

9  also.

10 Q.      And  describe  for  us  what  --  where  you  went    ,

11 where  you  followed   Ms.  Levi  and  Ms.  Johnson.

12 A.       Initially  went  around  the  block  once    and  then

13 ended  up  going  to  a  gas  station    ,  a  Shell  station ,  and

14 they  drove  to  an  apartment  building.      I  don't  remember

15 the  exact  address.

16          They  parked  near  an  intersection    ,  went  in  the

17 building  for  approximately  20  or  30  minutes      ,  came  back

18 out  and  left ,  and  ended  up  southbound  on  95.      I  kind  of

19 got  lost  at  that  point  because     I  went  to  go  get  gas  at

20 the  end   and  ended  up  catching  up  with  them  at  a  rest

21 stop ,  southbound  95.

22 Q.      Did  surveillance  --  did  you  maintain

23 surveillance   on  them  from  that  point?

24 A.      The  entire  time,  yep.

25 Q.      And  did  there  come  a  time  when  they  were

1  stopped?

2  A.      Yes.  Enter ing  the  state  of   Maryland , they were

3  stopped by  Maryland  State  Police.

4  Q.      Did you part icipate  in that stop?

5  A.      No.

6  Q.      Did other members  , to your knowledge  ?  Did other

7  members of the surveillance team   ?  Were they involve d

8  in the stop or was it done by the state police?

9  A.      State police.

10  Q.      Did you have  any contact with the people at the

11  Furniture  Queen at that point?

12  A.      No.

13  Q.      Did other people have contact with the people at

14  the Furniture  Queen?

15  A.      The detectives in   New York d id, I believe.

16          MS.  JOHNSTON:   I have no further questions of

17  this witness.

18          THE  COURT:  Cross-examination   ?

19          MR.  MONTEMARANO :  None from   Ms. Martin , Your

20  Honor.

21          MR.  MARTIN:   Mr.  Goodwin  has no questions  , Your

22  Honor.

23          MR.  HALL:  No questions.

24          MR.  MITCHELL:  No , Your  Honor.

25          MR.  WARD:  No , thank you , Your  Honor .

1        THE COURT:  A ll right.  You may step down.

2                (Witness excused at 11 :22 a.m. )

3        THE COURT:   Ladies and gentlemen , let's take a

4  morning recess now  .  We will resume at   20 minutes of

5  12:00.

6                (Jury excused at 11:22 a.m.)

7                (Off the record at 11:  22 a.m. )

8                (On the record  at 11 :43 a.m. )

9        THE COURT:  Are we ready for the jury?

10       All right, bring them in.

11               (Jury returns at 11 :44 a.m. )

12       THE COURT:   You may proceed.

13       MS. JOHNSTON:   Your Honor , the Government would

14  call Jordan Polvere .

15  Thereupon,

16                    **JORDAN  POLVERE** ,

17  having been called as a witness on behalf of the     _____

18  Plaintiff , and having been first duly sworn by the

19  Courtroom Deputy, was examined and testified as

20  follows:

21                  **DIRECT  EXAMINATION**

22       **BY MS. JOHNSTON:**

23  Q.     Please state your full name and   occupation.

24  A.     Jordan Polvere , P O L V E R E, Special Agent

25  with the Department of  Homeland Security Office of

1  Inspector  General.

2  Q.      How long have you been employed by the

3  Department of  Homeland  Security?

4  A.      Less than two years  , just under two year  s.

5  Q.      What did you do before that?

6  A.      Prior to that , I was a  Customs  Agent for

7  approximately seven years  , and prior to that , I was a

8  Deputy U. S.  Marshall  for two years.

9  Q.      What is your experience as a   Customs  Agent?

10 A.      As a  Customs  Agent , I worked on narcotics

11 investigations as well as money laundering

12 investigations.

13 Q.      In what particular area?

14 A.      In the  New York/New  Jersey area.

15 Q.      Calling your attention to April 23 of 2004    , were

16 you employed by  Customs at that time  ?

17 A.      Yes , I was.

18 Q.      Where were you assigned on that date?

19 A.      New  York office.

20 Q.      Did there come a time when your office was

21 contacted by  Agent  Snyder from  Maryland  and asked for

22 assistance?

23 A.      Yes, the afternoon of April 23 of    '04.

24 Q.      What were you asked to do?

25 A.      I was asked to help in a surveil   lance,  that they

1   may be -- that   they will  be surveilling a vehicle

2   possibly coming into   New York in the later evening

3   time , and I was asked to help when they got into      New

4   York to hel p with  the surveillance.

5   Q.      Did you , in fact , assist  with the surveillance?

6   A.      Yes , I did.

7   Q.      Were you by yourself or with other individuals?

8   A.      I was with a group of individuals from my

9   off ice.

10  Q.      Where did you conduct your surveillance?

11  A.      We began the surveillance in -- right at      the

12  George  Washington  Bridge , as the  vehicle entered   New

13  York.

14  Q.      That was along with   the agents from   Maryland?

15  A.      That's correct.

16  Q.      Where did the -- what was the focus of the

17  surveillance in   New York?

18  A.      The focus was we began the surveillance at

19  approximately 5 :30 , and we were advised of the vehicle     .

20  They were surveilling a tan    Mitsubishi with

21  Pennsylvania tags   EMD 0507 , and we -- as the vehicle

22  enter ed the George  Washington  Bridge , our team picked

23  up surveillance on the vehicle    and we took  over  the

24  lead surveillance from the    Baltimore agents.

25  Q.      Where did the vehicle    eventually go?

1  A.       The vehicle  eventually  went to  Third  Avenue ,

2  3009  Third  Avenue , and parked right in front of a store

3  called the  Furniture  Queen.

4  Q.       Where is that in relation to    155 th Street?

5  A.       That's in the  Bronx,  New  York , and it's north of

6  it.

7  Q.       Excuse me?

8  A.       It's in the  Bronx,  New  York.

9  Q.       What observation s did you make outside the

10  Furniture  Queen?

11  A.       Well , the vehicle pulled in front of it.   There

12  were two  driver s in the -- there was a driver in the

13  vehicle  and a passenger in the vehicle  , and the driver

14  got out  of the  vehicle  and entered the store.

15  Q.       Did you continue your observations of the

16  activities there?

17  A.       Yes,  I did .

18  Q.       Describe what you observed.

19  A.       The passenger remain ed in the pass enger  car , the

20  driver went into the store  , and about 20 minutes later  ,

21  she came out of the store  , got back into the vehicle

22  and headed south   -- drove off southbound on    Third

23  Avenue.

24  Q.       What did you all do at that point    ?

25  A.       We follow ed the  vehicle southbound on    Third

1   Avenue , and she --  and she pulled over to the left a

2   few blocks up ahead on   West Chester  Avenue on the

3   corner , parked the vehicle at a metered spot    , and the

4   driver  and the passenger alternated going into

5   McDonald's .  One stayed in the car  , the other one went

6   into  McDonald's an d they  took turn s.

7   Q.      Where did they go from there?

8   A.      About half an hour later   , when they were both

9   back in the vehicle  , they got back into the vehicle     and

10  they drove -- they squared around the block     and pulled

11  up back onto  Third Avenue in front of the   Furniture

12  Queen store.

13  Q.      Did anyone exit the vehicle when they returned

14  to the  Furniture  Queen?

15  A.      Yes, the driver did.

16  Q.      Where did the driver go?

17  A.      The driver went to her trunk, opened the trunk     ,

18  and pulled out a large cardboard    box , took it out of

19  the trunk  -- i t was a fairly big box of considerable

20  weight  -- and  brought it into the store    -- in the

21  Furniture  Queen store.

22  Q.      You maintained your surveillance while she was

23  in the store?

24  A.      Yes, we did.

25  Q.      What did you next see  ?

1  A.      We couldn't see anything  in the store , but we

2  saw her exit the store  , about  ten minutes later  ,

3  carrying a smaller box   -- a smaller , gift-wrapped box ,

4  which she then placed in her trunk    and got  back in to

5  the vehicle  and drove off.

6  Q.      Now, did you maintain surveillance on the

7  vehicle as they left the area?

8  A.      The New York team include -- myself   and the rest

9  of the  New York team remained surveillance on the

10 Furniture  Queen , and  the  Baltimore team went with the

11 vehicle  and headed southbound.

12 Q.      In terms  of the  team that you remained with by

13 the  Furniture  Queen, what actions did you take?

14 A.      We just kept -- we kept a good eyeball on the

15 Furniture  Queen store , and  a few minutes later  , the

16 vehicle actually came back to the store, pulled up in

17 front of it , and  the driver again got out of the car,

18 went into the store  , and  came back out two minutes

19 later and drove off again  , and  again we remained -- the

20 New York team remained in place on the store    and the

21 Baltimore team went with the    vehicle .

22 Q.      Now, when the vehicle came back, was it same

23 woman who went back in the store?

24 A.      Yes, it was.

25 Q.      Did she have anything with her that last time

1  when she went in   and  out?

2  A.        No, no .

3  Q.       Just the big box you saw her carry in     and  then

4  the gift -wrapped package you saw her brought out     ?

5  A.        Correct.

6  Q.       Both were in the trunk at some point     ?

7  A.        Yes.

8  Q.       After the vehicle leaves at that point, do you

9  have any contact with any of the people at the

10  Furniture  Queen ?

11  A.        Yes.

12  Q.       Could you describe how   you came to have contact

13  with them ?

14  A.       A little before  8 o'clock , it appeared the store

15  was closing .  It was about ten to  8:00, and  the store

16  -- a couple of the workers came outside    .  They were

17  starting to put the gates down on    the store , so we

18  approached them  and we talked to somebody who said he

19  was the manager there  , and we asked him if we could

20  search his store  , and he gave us consent to search his

21  store.

22  Q.       Who was that individual?

23  A.       He identified  himself  first as  Moises  Perez,  and

24  we later learned that    -- he later then identified

25  himself as  Juan  Rojas  Castro .  Later on , I didn't know

1  this, but I heard he had a different name of   Moises

2  Echarte or ...

3  Q.      Uriarte?

4  A.      Uriarte, yeah.

5  Q.      Who conducted the search of the    Furniture  Queen?

6  A.      I did, along with the other agent  s.

7  Q.      Could you describe for us generally the     interior

8  of the store?

9  A.      It was a very deep store  .  It was very narrow ,

10  but very deep , and there was furniture piled up on both

11  sides of the store .  And it was a very narrow pathway   ,

12  you had to make your way back to go into the whole

13  store , and in the back of the   store,  there was a small

14  office.  The door was open  , and there  was an office in

15  there with a desk   and file cabinets.

16  Q.      What was it you were looking for?

17  A.      We were look ing for  the cardboard box that we

18  saw Ms. Levi bring into the store earlier.

19  Q.      Ms. Levi?

20  A.      Ms. Levi , sorry.

21  Q.      Before we go any further  , let me just show you

22  what's been marked as   CH-1.  The individual that you

23  described as the manager of the store    , is he depicted

24  on Government's   Exhibit  CH-1?

25  A.      Yes.  He 's in the  top right over here  .  (Witness

1 indicating. )

2 Q.      If you could, write his name next to it      --

3 A.      All right.

4 Q.      -- and your initials.    And then let me give you

5 a thinner marker to write with, or a pen.   That's eve       n

6 better .

7 A.      Write his name  and my initials?

8 Q.      Yes.  Write his name   and your initials.

9 A.      (Witness  indicating. )

10 Q.      Do you  recognize  Ms. Levi  as well?

11 A.      Yes .

12 Q.      Would you write her name    and your initials next

13 to her picture?

14 A.      (Witness indicating.  )

15 Q.      During the course -- once    you  received consent

16 to search the   Furniture  Queen , describe the search that

17 was conducted.

18 A.      We searched the entire store   , and then when we

19 walked our way back towards the office   , I, along with

20 the other agents , saw the cardboard box    -- the large

21 cardboard box sitting right on the floor in the back

22 office in plain   view.

23 Q.      Let me show you what's been marked as

24 Government's  Exhibit P -131.   What do we see in this

25 photograph?

1 A.      In that photograph  , we see the box  -- the

2 cardboard box.

3 Q.      Is that the area you described as the office?

4 A.      That's correct.

5 Q.      And P-132?

6 A.      That was the box with the money in it.

7 Q.      Okay.  Do you know approximately how much money

8 was in that box ?

9 A.      Yes.  There was $250,439 in the box.

10 Q.      In cash?

11 A.      In cash; correct.

12 Q.      Do you know how it was wrapped?

13 A.      I don't recall the exact increments of      each

14 wrapping, no.

15 Q.      Does it appear as it appeared when you opened

16 the box?

17 A.      Yes.

18 Q.      And P-133.

19 A.      That's just another picture of the box.

20 Q.      Is there anything in particular about the box

21 that's noted on this photograph?

22 A.      Yes.  There was the marking of $261,500 on the

23 box.

24 Q.      And P-134?  What do we see in this photograph?

25 A.      That was just some cutting agents that we saw in

1  the office.

2  Q.      Is the box also depicted in that    ?

3  A.      Yeah, in the bottom  , left corner.

4  Q.      Let me show you what's been marked as

5  Government's   Exhibit  NY-4 and ask you if you recognize

6  this item.

7  A.      Yes.  That's the cardboard box   , and that's the

8  amount , the 26 1,500 that   I mentioned.

9  Q.      And there appears -- the box  , of course,  has

10 been broken up   and there's some black powder on it    .

11 Can you tell us what the black powder is?

12 A.      The black powder , I believe , is from the testing

13 that was done for   finger prints of the box.

14 Q.      In addition -- once you found the box with all

15 of that money in it   , did you continue to search the

16 office area ?

17 A.      Yes, we did.

18 Q.      Calling your attention to P   -135.  Can you tell

19 me what's depicted in that photograph?

20 A.      That's a file cabinet i   n the same office   that

21 we're talking about.

22 Q.      That thing next to that   , is that a mattress?

23 A.      Yes, it is.

24 Q.      The bottom drawer is open   .  What's the

25 significance of the bottom drawer?

1  A.       In the bottom draw er, we found some narcotics   .
2  We found approximately a kilogram of heroin     and about
3  20 grams of cocaine.
4  Q.       Showing you  P-136.  What's depicted in this
5  photograph?
6  A.       That's actually just more -- that's just bags
7  that the nar cotics  and cutting agents were in.
8  Q.       And  P-137 ?  What do we see in this photograph?
9  A.       That is the heroin   and cocaine  in the gift
10 wrap ping that  I mentioned before  .
11 Q.       You mentioned gift wrapping before in relation
12 to a different package; is that correct?
13 A.       That's correct.
14 Q.       What package was that?
15 A.       That was the one that   Gwen Levi walked out of
16 the store with  and put in her trunk when she left the
17 store.
18 Q.       This one  was one  you re covered in  the store?
19 A.       Correct .  That's one that we recover  ed from the
20 file cabinet in the office.
21 Q.       When you recovered it  , was it all wrapped up?
22 A.       Yes.
23 Q.       Approximately how much heroin was recovered in
24 that?
25 A.       I think it  was 1 ,007 grams , just over a key.

1  Q.      Now in addition to that  , did you see some other

2  items in the residence or from Mr.    Uriarte ?

3  A.      Yes, we did.  We  -- also in the office  , we

4  seized a notebook.

5  Q.      Let me show you what's been marked as

6  Government's  Exhibit  NY-1, and ask  if you recognize the

7  notebook.

8  A.      Yes,  I do.

9  Q.      Is that the notebook had that you seized    ?

10 A.      From the office; correct   .

11 Q.      These laboratory numbers were not on it at the

12 time , were they?

13 A.      No, they were not.

14 Q.      Other than that  , does it appear to be in the

15 same condition as when you    seized  it, except for the

16 red line markings on it   ?

17 A.      Yes.

18 Q.      Those would have been done by some laboratory

19 person?

20 A.      Correct.

21 Q.      And  why did you seize this    book?

22 A.      From my experience working drug case    s, the  way

23 it's written , it appears to be a drug ledger.  The

24 format with money   and amounts  and dates  and it's pretty

25 clear that it's a narcotics ledger.

1  Q.      Okay.  Let me put this page up so you can

2  explain to the jury what it was about, this ledger that

3  made it clear to you -- or this document that made it

4  clear to you that it was a drug ledger.

5        What is written in the first column?

6  A.      I gave dog , or dog gave me , and I don't know

7  what " dog" is , but referring to somebody who gave him

8  or took away drugs , and it shows a date , and it shows

9  an amount  and usually in grams , and then it show  the

10 tally of how much he paid for it or how much he got      ,

11 and it adds numbers  and takes away the numbers.

12 Q.      In addition to that  , did you also seize what's

13 been marked as  Government's  Exhibit  NY-2 and NY-3?

14 A.      Yes.  This is a small digital scale.

15 Q.      Why did you seize that?

16 A.      Because this is the type of scale that is often

17 used to weigh amounts of drugs when they're dividing it

18 up.

19 Q.      And NY-3?

20 A.      This was a cell phone from   Mr. Rojas .

21 Q.      Okay.  Mr. Rojas.  Rojas Castro  or Mr. Uriarte ?

22 A.      Uriarte .

23 Q.      What  was done in terms of this phone once you

24 seized it?

25 A.      When we took that phone, the   Baltimore  agents ,

1 Agent Snyder, they had access -- they had phone records

2 and access to phone records that    Gwendolyn Levi had

3 been calling earlier that day    and prior to that

4 meeting . So we did a test call on that -- we did a

5 test call to the number that they had phone records on

6 to see if that phone would ring to show that it was the

7 phone that  Ms. Levi was calling.

8 Q.      To set  up the  meet ing that  day ?

9 A.      Correct.

10 Q.     Were you aware that they had wiretap up at th    is

11 time?

12 A.     Yes.

13 Q.     And that they were monitoring   Ms. Levi 's calls ?

14 A.     Correct.

15 Q.     In fact , when he made the test call  , did it ring

16 and work as expected?

17 A.     Yes . The phone rang when we did the test call    .

18 Q.     That phone came from  Mr. Uriarte ?

19 A.     Yes.

20       MS. JOHNSTON:   I have no further questions of

21 this witness.

22       THE COURT:  A ny cross?

23       MR. MONTEMARANO : Court's indulgence, please.

24                      **CROSS-EXAMINATION**

25       **BY MR. MONTEMARANO :**

1  Q.      Good afternoon, Special Agent Polvere.  How are

2  you?

3  A.      Fine, thank you.

4  Q.      When you approached  Mr. -- it was  Uriarte

5  ultimately?

6  A.      Yes.

7  Q.      But at first blush , it was  Mr. Castro or  Mr.

8  Rojas?

9  A.      The first name he gave us was   Moises  Perez.

10 Q.      I thought it was  Juan Rojas Castro?

11 A.      No.  If you look at back at the record  , I said

12 his first name was  Moises  Perez, then he later

13 identified  himself as  Juan Rojas Castro.

14 Q.      Finally you identified him?

15 A.      I did not identify him a s Uriarte.  The agents

16 from Baltimore subsequently identified him.

17 Q.      Let's call him  Mr. Uriarte .

18 A.      Okay.

19 Q.      The manager , that's the gentleman who identified

20 himself to you  as the  manager;

21 A.      Correct.

22 Q.      When you approached him , how many other people

23 were with you?

24 A.      Two.

25 Q.      So a total of three?

1  A.        Yes.

2  Q.        All sworn officers?

3  A.        Yes.

4  Q.        Plainclothes or uniforms?

5  A.        Plainclothes.

6  Q.        Show badges?

7  A.        Yes.

8            MS. JOHNSTON:  Objection  .  May we approach at

9  the --

10                   (At the bar of the Court.)

11           MS. JOHNSTON:   Your Honor , counsel's engaging a

12 pattern of cross-examination where they're attempting

13 to elicit information concerning the validity of the

14 stop and the consent.  That is an issue that's not for

15 this jury.   I suspect these questions are   going to go

16 along the lines of the questions that were heard of the

17 Wyoming officer last week concerning his basis for the

18 stop, whether he saw the race of the individuals,

19 whether -- you know, what was his probable cause for

20 the basis of the traffic stop last week.  Those

21 question s are  irrelevant to the issue before the jur    y.

22 In fact , it's misleading to the jury to present to them

23 issues concerning consent.  If they're going       to

24 continue along this line    and the Court's going to

25 permit it , the Court -- the government  is going to

1    request the  Court to instruct the jury the    Court is the

2    one who determine s the legality of any searches    and

3    seizures and  the Court has made that ruling in this

4    case.

5         THE  COURT:  Where are you going with this   , Mr.

6    Montemarano ?

7         MR.  MONTEMARANO :  For starters , there's  no

8    chance on  God's green E arth I'm going near issues of

9    race or national origin  .  I think we all know what that

10   part of the  Bronx is like .  For starters , it's

11   predominantly  all Hispanic or  black  or --

12        THE  COURT:  Where are we going?  Are you going

13   into the search ?

14        MR.  MONTEMARANO :  I don't have stand  ing to  go

15   into the search .  I was tr ying to  get standing with

16   regard to their approach to   Mr. Uriarte .

17        THE  COURT:  Well , I'm not going to let you   ,

18   through questioning  , try to call into question the

19   search.  There's been no issue raised with respect to

20   the search .

21        MR.  MONTEMARANO :  I wouldn't have stand  ing to

22   challenge the search  , but I think  I am entitled to

23   inquire of this officer regarding    their approach to  Mr.

24   Uriarte , whether a -- as to the na   ture of the

25   conversation,  and as to the information that he freely

1  gave them whether or not there was a consent to      search

2  form executed.   We have not been provided with one.

3  Then  I  was  going  to tend er  that with a question

4  relating to any other information that he      provided  them

5  at that time.

6        MS.  JOHNSTON:   I'm going to ask the   Court to

7  instruct this jury that the    Court -- that t he issues

8  concerning the   propriety  or the legality of any search

9  or seizure in this case is a question for the      Court,

10  and the Court has ruled that this evidence is

11  admissible.   It's misleading to the jury.

12        MR.  MONTEMARANO :   I did not suggest that    I was

13  going to question the legitimacy or propriety -- excuse

14  me , legality or propriety of the search   .   Those are  Ms.

15  Johnston's words.    I think  I can  handle my own case.    I

16  appreciate her assistance   , but  I just don't think

17  that's an appropriate place for me to go    , and I am not

18  going to go there .   I think I'm entitled to ask

19  questions that do relate to the issues of legality      and

20  propriety, based   -- so as to establish the nature of

21  the interaction between the law enforcement      and  Mr.

22  Uriarte .

23        THE  COURT:  What do you mean by "nature     and

24  interaction?"  They talked to each other    ?

25        MR.  MONTEMARANO :  T hey talked to each other   .   He

1  had provided consent . He made certain admissions,   and

2  I think those admission s are important as to what they

3  don't include , which is where  I was thinking of  going .

4        THE COURT: If you want to talk about what he

5  didn't include , that's fine , but I don't want to go

6  down the road of trying to subliminally litigate with

7  this jury the validity of the search   or the validity of

8  the consent.

9        MR. MONTEMARANO :  I wouldn't have stand  ing to

10 challenge the search  , Your Honor.

11       THE  COURT:  I recognize  that .

12       MS. JOHNSTON:  T he jury doesn't know that  .

13          THE  COURT:  I don't want you to

14 indirectly do what you're not entitled to do     direct ly.

15       MR. MONTEMARANO :  I'm not sure  I understand.   I

16 think it would be more appropriate   , with all due

17 respect , to permit counsel for the lead defendant to

18 ask questions , and if a question in the singular is

19 objectionable , I'm certain  Ms. Johnston knows how t  o

20 make an objection  and we can go that way.  But

21 questioning my entire approach to this witness      ...

22       THE COURT: Well, all  I want to say is  I agree

23 with Ms. Johnston that we're not going to directly or

24 indirectly challenge the validity of this search or the

25 validity of the consent or the ad   missibility of  this

1 evidence , which is in evidence before this jury.

2          MR. MONTEMARANO :   I've not challenged that  .  I

3 have not filed any motions --

4          THE COURT:  Y ou're close to a line which    I'm

5 asking you not to cross.

6          MR. MONTEMARANO :   I understand that , Your Honor.

7 I respectfully submit that   I'm not going to cross that

8 line , but there are things close to that line which     I

9 need to ask about. As the    Court has probably figured

10 out over two and so weeks of trial,   I tend to ask

11 questions on cross in a very deliberate manner    .  I tend

12 to focus my questions on a very small topic.        Ms.

13 Johnston hasn't perfectly drawn the line in the sand

14 and asked me if this is a line in the sand.

15          THE COURT :   I appreciate that  .

16          MR. MONTEMARANO :   Your Honor , before we break

17 this up , I just want to make one comment    .  I would

18 object to any stops and to the propriety of those

19 stops, particularly as it relates to the     Wyoming police

20 officer because, as   I recall, those questions were

21 directed toward his credibility.     They weren't directed

22 to the credibility   of the  stop .

23          THE COURT:   I'm not going to  give an in struction

24 to the jury at this time about searches     and so forth .

25 I can deal with those in my final in   struction s or, if

1  it becomes necessary, as   of the  question that cross  es

2  the line, all right?  If the question   crosses the  line

3  and I need to  do it,  I'll do it.  So far , I don't think

4  I need to do it.

5           MR.  MARTIN:  Very good  , sir.

6           MS.  JOHNSTON:   Your  Honor , there is an agreed

7  upon instruction concerning that issue in the jury

8  instructions.

9           THE  COURT:   I'm familiar with that  .

10             (Back in open court.  )

11          BY MR.  MONTEMARANO :

12 Q.      Special  Agent  Polvere , I think we left you on

13 the street corner in front of 3009    Third  Avenue  in

14 front  of the  Furniture  Queen speaking to  Mr.  Uriarte ,

15 who had identified himself as the manager    with you and

16 two other sworn law enforcement officer   s, is that a

17 fair statement of where we were?

18 A.      Yes.

19 Q.      At that  point,  you requested  Mr.  Uriarte  for

20 consent to search the   store ; is that correct  ?

21 A.      Yes.

22 Q.      Which consent you understood him to be able to

23 give because he had identified himself    as the  manager ;

24 is that correct?

25 A.      Correct.

1  Q.      At that the point, he gave you consent?

2  A.      He gave us verbal consent.

3  Q.      Verbal consent so there's   no written form;

4  correct?

5  A.      We showed him a written form  .  We read it to

6  him.  We filled it out, and he refused to sign the

7  form, but he did give us verbal  , and I noted that on

8  the consent  form as well that he refused to sign it   ,

9  but he just didn't want to put his name down  , but he

10  gave us verbal consent.

11  Q.      He gave you verbal consent   and it was not

12  recorded in any other way by video or tape or anything

13  like that?

14  A.      No, sir.

15  Q.      And then you went  and searched the  Furniture

16  Queen; correct?

17  A.      We searched the store; correct.

18  Q.      And during your search , you produced  -- not to

19  belabor Ms. Johnston's direct questions  , but

20  approximately a kilogram of cocaine   ?

21  A.      Correct.   No, a kilogram of heroin.

22  Q.      I'm sorry, a kilogram  of heroin.  I was doing

23  the math in my next question  , I apologize , about a

24  kilogram of heroin , about 1,007 grams?

25  A.      Yes.

1  Q.      Just un der an ounce of cocaine  , about 27 grams?

2  A.      Correct.

3  Q.      And about a quarter of a million dollars    ?

4  A.      250,4 39.

5          MR. MONTEMARANO :  No further questions  , Your

6  Honor .  Thank you.

7          MR. MARTIN:   Mr. Goodwin has no questions  , Your

8  Honor .

9          THE COURT: A ny further  cross?

10         MR. HALL: No , Your Honor .  Thank you.

11         MR. MITCHELL: No , Your Honor.

12         MR. WARD: No , Your Honor .  Thank you.

13         THE COURT: Any redirect  ?

14         MS. JOHNSTON: Just  one question .

15                     **REDIRECT  EXAMINATION**

16         **BY MS. JOHNSTON:**

17  Q.     That $250,000 came from the box that you saw     Ms.

18  Levi take into the store  ?

19  A.      Correct.

20         MS. JOHNSTON:   Okay.  I have  nothing further.

21         THE COURT:  All right.  Any recross?

22         Thank you.  You may step down.

23                  (Witness excused at 12  :09 p.m. )

24         MS. GREENBERG:   Your Honor , the government will

25  call Trooper  Michael  Conner .

1 Thereupon,

2                          **MICHAEL   CONNER** ,

3 having been called as a witness on behalf of       the

4 Plaintiff , and having been first duly sworn by the

5 Courtroom Deputy, was examined and testified as

6 follows:

7                    **DIRECT   EXAMINATION**

8      **BY MS. GREENBERG:**

9 Q.      Could you state your name   and spell your last

10 name for the court reporter   , please?

11 A.      Trooper  First Class Conner, C O N N E R, the

12 Maryland  State Police.

13 Q.      And sir , could you give the jury some idea about

14 your background, training   and experience?

15 A.      Yes, ma'am.   I am an eight  and a half year

16 veteran of the  Maryland  State Police .  I have attend ed

17 the Maryland  State Police Academy .  I have also

18 attend ed the Proactive  Enforcement  Training , Interstate

19 Criminal  Enforcement  Training , different a reas  of drug

20 interdiction  train ed over my eight -year career.

21 Q.      What is your current employ  ment ?

22 A.      Currently employed by the   Maryland  State  Police

23 assigned to the  Proactive  Criminal  Enforcement  Team.

24 Q.      What doe s that  mean ?

25 A.      It's just -- actually, it's a team of specially

1  trained troopers that are designed to be aggressive on

2  the interstates locating criminals in light of     9/11.

3  Q.      What was your employment on April 23, 2004?

4  A.      A member of this team.

5  Q.      As such, were you in a marked or an unmarked

6  unit?

7  A.      In an unmarked p atrol car.

8  Q.      What was your area of responsibility?

9  A.      Interstate 95 in  Cecil County, Maryland.

10  Q.      As a  Maryland state trooper?

11  A.      Yes, ma'am.

12  Q.      Were you called by agents connected with this

13  case for  assistance  with a federal investigation?

14  A.      Yes, ma'am .

15  Q.      As part of that investigation on the evening of

16  April 23, to the early morning of April 24, 2004, did

17  you participate in pulling over a specific vehicle?

18  A.      Yes, ma'am.

19  Q.      Showing you what's been marked as P    -124.  Do you

20  recognize  that vehicle?

21  A.      Yes, ma'am.

22  Q.      That is a 2000  Mitsubishi  Gallant with

23  registration  EMD 0507?

24  A.      I can't exactly see the tag on this, but it

25  appears to be the same vehicle.

1  Q.        Is that the vehicle that you pulled over?

2  A.        Yes, ma'am.

3  Q.        You videotaped that; is that correct?

4  A.        Yes, ma'am .

5  Q.        So we have a picture   and a videotape to clarify

6  any issues; is that correct?

7  A.        Yes, ma'am.

8  Q.        Did you have any state violations which you

9  observed this vehicle conduct on its way down

10  Interstate 95?

11  A.        Yes, ma'am.  Two traffic violation   s.

12  Q.        What were they?

13  A.        Speeding  and a tag light viol  ation .

14        MR. WARD:  I'm sorry , what was the second one  ?

15        THE  WITNESS: A tag light   -- a rear  tag light .

16        MR. WARD:  Tag light.    Thanks .

17        BY MS. GREENBERG:

18  Q.        Could you explain to the jury where the vehicle

19  was when you stopped the vehicle?

20  A.        Southbound  Inter state 95 at the 101 mile marker    ,

21  would be -- the closest town would be    North East , would

22  be just north of the   Chesapeake  House rest area.

23  Q.        Did you manage to get a video of that stop?

24  A.        Yes, ma'am.

25  Q.        How is it that you managed to get a video of

1  that stop ?

2  A.      All of our cars are equipped with an in    -car

3  camera system.  As soon as     I activate my energy

4  equipment , the camera begins to record.

5  Q.      When does the camera stop recording?

6  A.      When I manually stop it.

7          MS. GREENBERG:    Your Honor , may I approach?

8          THE COURT:    You may.

9          BY MS. GREENBERG:

10 Q.      Showing you what's been marked as     Video 22 -A,

11 and which is further marked    Maryland State Police stop.

12 Is that something that you    observe d at some point prior

13 to these proceedings here today?

14 A.      Yes, ma'am.

15 Q.      And does that accurately reflect the stop of

16 this vehicle that you conducted on April 22, 2    004 and

17 April --  I'm sorry , April 23, 2004 , to April 24 , 2004?

18 A.      Yes, ma'am.

19 Q.      The whole thing is about 30 minutes long?

20 A.      I'm not sure of the exact time    , but

21 approximately 30 minutes.

22 Q.      It goes until after you leave the scene?

23 A.      Yes, ma'am.

24          MS. GREENBERG:    Okay.  I'd like to , at this

25 time , Your Honor , introduce the exhibit but only play a

1  portion for the jury.

2          THE COURT: Y ou may .

3                (Videotape begins at 12  :14 p.m. )

4          BY MS. GREENBERG:

5  Q.     What is happening here  ?

6  A.     At this time , I'm stopping the vehicle

7  southbound on  Inter state 95  at the 101 mile marker just

8  north of  Exit 100.

9  Q.     What do we see ?  What is that green sign up on

10 the right-hand side  , towards  the mid dle  of the screen?

11 A.     That is the  North East exit sign.

12 Q.     And the time on this  is 4/24/04  at approximately

13 28 minutes into that day; is that correct?

14 A.     Yes, ma'am.

15 Q.     So 00 :28.  And who is that ?

16 A.     That is myself.

17 Q.     And just to be clear , this is just after

18 midnight on the  24th of  April --

19 A.     Yes, ma'am.

20 Q.     -- 2004 ?  What are you doing here?

21 A.     Making contact with the driver  , identifying

22 myself , stating the purpose of the traffic stop     and

23 requesting license   and registration.

24 Q.     Did you smell anything upon approaching the car?

25 A.     Not that  I recall.

1  Q.        Did you see anything?

2  A.        I did notice that there was just a   , I believe , a

3  purse on the backseat.      I believe a pink purse was on

4  the backseat.

5  Q.        There 's a gentleman on the passenger side of the

6  vehicle.   Who is that?

7  A.        Detective  Sergeant  Paul  Quill  of  the   Maryland

8  State  Police.

9  Q.        What is his job with the   Maryland  State  Police?

10 A.        He is a -- at that time  , was a detective

11 sergeant commander for the major violat    ors unit for the

12 state police .   He was also my point of contact     on this

13 evening for this operation.

14 Q.        Does he have any responsibility for K     -9s?

15 A.        No, ma'am , he does not.

16 Q.        That would be somebody else?

17 A.        Yes, ma'am.

18 Q.        Did you identify the person that was the driver?

19 A.        Yes, ma'am , I did.

20 Q.        Who w as that person  that she  identif ied herself

21 as?

22 A.        She identified herself as   Donna  Johnson.

23 Q.        And the passenger?

24 A.        As Bern ice Carter.

25 Q.        Did you later learn a different name for the

1 passenger?

2 A.      Yes, ma'am.

3 Q.      And do you remember that name?

4 A.      No, ma'am , I do not.

5 Q.      What is happening here?

6 A.      Okay .  At this point , I've had the driver exit

7 the vehicle because she was not the owner of the

8 vehicle.   I confirmed her identity.

9       Now  I'm back in my patrol car conducting a

10 driver's license wanted check    , as I also begin a

11 written warning for the traffic violation.   Detective

12 Sergeant  Paul  Quill is making contact with the

13 passenger.   That is    Trooper  Catalano [ph.], who  has

14 arrived on scene  .  He is our  K-9  handler.

15 Q.      How did the  K-9  handler end up there?

16 A.      He was also requested by myself to be there.

17 Q.      What was the weather like that night?  Was it

18 hot?  Cold?

19 A.      I don't remember it being extremely cold.   It

20 was pretty comfortable.

21 Q.      Did you make any observations of the driver     and

22 her demeanor?

23 A.      She was very shaken.  At one    point,  I believed

24 she was going to   pass out over the guardrail from fear    ,

25 not from .. .

1  Q.      Can we see that on the video or is it off the

2  video?

3  A.      I believe it's just off screen.  She sits on the

4  guardrail.

5  Q.      What is going on here with the passenger?

6  A.      From talking to  Detective  Sergeant  Paul  Quill,

7  she was retrieving   --

8          MR. MITCHELL:  Objection.

9          BY MS. GREENBERG:

10 Q.      Without getting into what  Sergeant  Quill told

11 you, could you tell us what she's do    ing here?

12 A.      She's retrieving her driver's license    , her

13 identification from the trunk.

14 Q.      Showing you what's been marked as     Levi-6,  could

15 you tell us what that is?

16 A.      This is the  Mead  Five  Star  binder that she

17 removed from her trunk -- from the     trunk o f that

18 vehicle.

19 Q.      That we saw on the screen just before?

20 A.      Yes .  It's in her hand at this point in this

21 video .

22 Q.      What's happening here  ?

23 A.      At this point , a narcotics  K-9  was initiated by

24 TFC Catalano  and his  K-9 partner , Bruno .  Bruno has

25 just alerted to the trunk of the vehicle for present

1 narcotics.    TFC Catalano  is giving  Bruno  his reward .

2 It would be the toy.

3 Q.      Based on  the  dog hitting on the trunk  , what did

4 you do next?

5 A.      Conducted a search of the vehicle   , a hand search

6 of the vehicle.

7 Q.      Does that come up on the videotape   ?

8 A.      Yes, ma'am.

9 Q.      Is this just prior to your search?

10 A.      I've actually began the search.

11 Q.      Oh, is that you in the background there?

12 A.      That's myself entering on the driver's seat --

13 driver's side door.

14 Q.      Is that an area the dog hit also?

15 A.      I don't recall if the dog alerted on that side

16 or not .  I do recall the dog alerting to the trunk.  At

17 this point , I'm trying to retrieve the keys.  The

18 passenger had the keys on her.

19 Q.      Are you wearing gloves in this video?

20 A.      Yes, ma'am.

21 Q.      Why are you wearing gloves?

22 A.      Just to protect any object    I may touch from

23 latent  prints so my print s are not  transferred  to that

24 object.

25 Q.      You picked up a birthday    -- a wrapped present  .

1  Did you know anything about that?

2  A.     I was told that there was a package that was put

3  into the car.

4         MR. WARD:  Objection to what he was told  , Your

5  Honor.

6         THE COURT:  Sustained.  Just rephrase the

7  question.

8         BY MS. GREENBERG:

9  Q.     Did you put the  purpose ly put the package back

10 in the trunk?

11 A.     To open it, yes, ma'am.

12 Q.     Did you continue searching?

13 A.     Yes, ma'am.

14 Q.     Showing you  Levi-8 --

15        MS. GREENBERG :  If I may approach , Your Honor.

16        THE COURT:  Y ou may.

17        BY MS. GREENBERG:

18 Q.     How does  Levi-8  compare to what we're seeing on

19 the film?

20 A.     That is the present wrapping that was covering

21 the box that contained the heroin inside.

22 Q.     What are we seeing here?

23 A.     I am opening up the box for view of the camera.

24        MR. WARD:  Excuse me , Ms. Greenberg , we can't

25 see.  Thank you.

1          BY MS. GREENBERG:

2  Q.       And you're holding it up.  What is inside?

3  A.       There are packages of heroin.

4  Q.       Showing you what's been marked as -- does this

5  keep going on after you find the heroin where you're

6  looking in the --

7  A.       Yes, ma'am .  I continue to search the vehicle.

8  Q.       And it goes on until you actually leave the

9  scene?

10  A.       Yes, ma'am.

11  Q.       What did you do with these two ladies?

12  A.       They were transported to the    JFK  Memorial

13  Highway  Barrack , where  I released custody of them   ,

14  along with all the property   , to U. S. Customs.

15  Q.       So the birth date   and the actual fingerprinting

16  and the identity of both individuals was done by

17  somebody other than you?

18  A.       Yes, ma'am.

19  Q.       Showing you what's been marked as    P-125.   Can

20  you tell me what that reflects   ?

21  A.       It reflect s the  packages of heroin that was

22  inside of the present.

23  Q.       And is that how it appeared when you opened the

24  gift-wrapped box , which is  Levi-8 ?

25  A.       Yes, ma'am.

1  Q.      Was the car taken in addition to the individuals

2  -- the two women  and the car?

3  A.      Yes, ma'am.

4  Q.      Were the bags weighed?

5  A.      Yes, they were.

6  Q.      Did you recognize the substance?

7  A.      Yes, ma'am.  It appeared to me to be heroin.

8  Q.      During the inventory search    -- before we get to

9  that, I'd like to approach.  Show  ing you Levi-1, could

10 you read that name  and number  into the record?

11 A.      This says  Paula, 240-418-2329.

12 Q.      Levi-2 ?

13 A.      Read the whole thing?

14 Q.      Is it a --

15 A.      It's like a --

16 Q.      Could you tell pus the date on that.

17          MR. WARD: Excuse me  , can we get some

18 information as to what it is  ?

19          BY MS. GREENBERG:

20 Q.      These are in connection to the inventory search

21 of the car that day; is that correct?

22 A.      Yes, ma'am.

23          MR. WARD:  What  is it?  A bag?  A bomb in a

24 book?

25          BY MS. GREENBERG:

1  Q.       Could you tell counsel what that   is, please?  Is

2  it a piece of paper?

3  A.       It's a piece of paper dated   4/23.  It says, my

4  balance, 222,600, gave   me $2,300 , and then after the

5  math problem is 1 ,300 --  I'm sorry.

6  Q.       You can stop reading  .  We'll go through the rest

7  of these  and I'll put it up on the screen so   counsel

8  can see that.   Levi-3 is what?

9  A.       It's a  Hallmark 2002 calendar book.

10  Q.      Levi-4 ?

11  A.       Also a calendar book named    Bernice Carter.

12  Q.      And  Levi-5?

13  A.       A small  composition notebook.

14  Q.       Putting Levi-2 on the screen so counsel can see

15  it.  Could you tell the jury the date upon on this    ?

16  A.       It says  4/23.

17  Q.      How does that comport with the date on which you

18  conducted this stop?

19  A.       The date  I made the stop was   4/24, actually 30

20  minutes into  4/24.

21  Q.      This says , my  BAL, $220,600?

22  A.       Yes, ma'am.

23  Q.      Gave me  "2,300, 138 ,000 ?"

24  A.       Yes, ma'am.

25  Q.      How much did the drugs weigh that you seized in

1  the video ?

2         MR. WARD:  Objection , Your Honor , unless he

3  weighed them.

4         BY MS. GREENBERG:

5  Q.      Did you weigh  the drugs?

6  A.      I did not.

7         MR. WARD:   I object.

8         THE COURT:  Sustained.

9         BY MS. GREENBERG:

10 Q.      The total here is?

11 A.      "358,600."

12 Q.      Gave him?

13 A.      "261,500."

14 Q.      And what date is that?

15 A.      "4/23."

16        MR. MARTIN:   Your Honor , objection.   I think the

17 exhibit speaks for itself  .

18        THE COURT:  O verruled.

19        BY MS. GREENBERG:

20 Q.      The date of that?

21 A.      "4/23."

22 Q.      And his BAL?

23 A.      "263,270."

24 Q.      And what's  written under there?

25 A.      "138,000."

1  Q.      For a total of?

2  A.      "401,270. "

3  Q.      And is this a sub traction  here?

4  A.      Yes, ma'am.

5  Q.      What is that?

6  A.      "261,500. "

7  Q.      For a final number of?

8  A.      "139,770. "

9         MS. GREENBERG:   Court 's indulgence.

10         THE COURT:  You may.

11         BY MS. GREENBERG:

12  Q.      Showing you what's been marked as     NY-1 on the

13  screen.  You mentioned there's a reference to 2      ,300

14  here.

15  A.      Yes, ma'am.

16  Q.      Could you read in   NY-1 what is reflected here  ?

17         MR. MONTEMARANO :  Objection , Your Honor.

18         MR. HALL:  Objection.

19         MR. MONTEMARANO  :  He's never seen this document.

20         MS. GREENBERG:   Your Honor , it's already been

21  introduced into evidence   .

22         THE COURT:  I t's in evidence.

23         MR. WARD:  There may have been   , Your Honor , but

24  there's  no testimony he ever looked at it or even saw

25  it.

1         THE COURT:  S ustained.

2         BY MS. GREENBERG:

3  Q.      You mentioned that you seized the drugs from

4  that gift wrapped package that day   .

5  A.      Yes, ma'am.

6  Q.      What did  you to  with the drugs?

7  A.      They were given to  U. S. Customs  Agents.

8  Q.      Showing you what's been marked as    Drugs -2.

9  Looking at the front of this   and then looking at   the

10  individual bag , do you recognize this exhibit?

11  A.      Can I see it ?

12  Q.      Yes.

13  A.      This brown  paper  bag on top is the brown paper

14  bag provided  Customs so they could place the bag   gies of

15  heroin inside .   This is a Customs heat -sealed bag.

16  Q.      How do the attachment  s that says 23 plastic

17  bags , how does that relate to your stop that day    ?

18  A.      These were the 23  , 100 -gram bags of heroin that

19  were inside the cardboard box.

20  Q.      So then the actual drugs    --

21  A.      The bottom portion of the larger bag is the

22  actual heroin.

23  Q.      That you seized on that date from the    Mitsubishi

24  Gallant?

25  A.      Yes, ma'am.

1          MS. GREENBERG :  No further questions , Your

2 Honor.

3          THE COURT: Cross-examination  ?

4          MR. MONTEMARANO :  No , thank you , Your  Honor.

5          MR. MARTIN:  Briefly , Your  Honor.

6                         **CROSS-EXAMINATION**

7          **BY MR. MARTIN:**

8 Q.      Trooper  Conner .

9 A.      Yes, sir.

10 Q.     Sir, I represent  Mr. Learley Reed Goodwin.  My

11 name is  Anthony  Martin.

12         Is it correct that you stop   ped this  particular

13 vehicle because you were asked to do so?

14 A.     I was given information that this vehicle

15 contained approximately two kilograms of heroin      and was

16 asked to assist  Customs with a traffic stop; yes, sir.

17 Q.     So you had intend  ed to stop this  vehicle at some

18 point ; is that not correct?

19 A.     Yes, sir.

20 Q.     So when you told this driver that you were

21 pulling her over for speeding, that really didn't

22 matter .  You were going to pull her over at some point

23 any way; right?

24 A.     She actually was speeding along with the tag

25 light violation.    I obtained those two violations to

1  assist in prosecution.

2  Q.     So when -- let me ask you this  :  You said she

3  actually was speeding.  Did you follow her     and clock

4  her by your speedometer, or did you use a radar?

5  A.     A laser , handheld.

6  Q.     A laser?

7  A.     Yes , sir.

8  Q.     And there i s no printout on that  ; is there?

9  A.     No, sir.

10  Q.     So we have to take your word for it that she was

11  speeding that day; right?

12  A.     Yes, sir .

13  Q.     With respect to her tag light being out    , you

14  gave her a ticket for that?

15  A.     A warning.

16  Q.     A warning?

17  A.     Yes, sir.

18  Q.     Did you give her a warning also for speeding?

19  A.     Yes, sir.

20  Q.     Is it customary when you're giving someone a

21  warning  for speed ing to  have the driver get out of the

22  car?

23  A.     Yes, sir.

24  Q.     For speeding?

25  A.     Yes, sir.

1 Q.      Officer, isn't it a fact that you really stopped

2 these ladies only because you were asked to do so       and

3 not because she was speeding  ?

4         MS. GREENBERG: Objection , asked and answered.

5         THE COURT:  Sustained.

6         MR. MARTIN:  Isn't it a fact -- nothing further,

7 Your Honor.

8         THE COURT:  Any  further  cross ?

9         MR. HALL:  Just one question.

10                    **CROSS-EXAMINATION**

11      **BY MR. HALL:**

12 Q.      Trooper, you indicated that  , and we saw in the

13 video , a K-9 unit arrived at some point  .

14 A.      Yes, sir.

15 Q.      Where did that  K-9 unit come from?

16 A.      He's also a member of the    Proactive Crime

17 Enforcement  Team.

18 Q.      Where are they stationed?

19 A.      With me , in the same crossover at the 10   1 mile

20 marker.

21 Q.      I assume that since the  K-9 unit arrived , the

22 K-9 unit had  -- fairly promptly , the K-9 unit had

23 already been dispatched before the stop occurred     ?

24 A.      No, sir . He was sitting right there  .  We were

25 only about a mile down the road from where       I stopped

1 her.

2 Q.      Okay.  So the K-9 unit was already in position;

3 is that what you're saying?

4 A.      And then I called for him , yes, sir.

5 Q.      Then you called .  Okay.  Thank you.

6                    **CROSS-EXAMINATION**

7           **BY MR. MITCHELL:**

8 Q.      Trooper Conner, the video that we saw earlier  ,

9 that is the equipment   locate d in your trunk ; is that

10 correct?

11 A.      The camera itself is   --

12 Q.      The camera is up there?

13 A.      -- i n the windshield .

14 Q.      Where it records sit  s in the trunk ?

15 A.      The VCR is lock ed in a vault in the trunk  ; yes,

16 sir.

17 Q.      Do you have access to the key  s to that vault?

18 A.      No , I do not.

19 Q.      That's someone else  ?

20 A.      That's a supervisor.

21 Q.      You wouldn't be able to reproduce that on your

22 own , do anything with that on your own; correct?

23 A.      I would have to request a cop  y to be made.

24 Q.      Okay.  Thank you very much.

25           MR. MITCHELL:   No further questions.

1                          CROSS-EXAMINATION

2           BY MR. WARD:

3 Q.      The warning that you issued was a single ticket?

4 A.      A single warning, yes, sir.

5 Q.      That was for speeding?

6 A.      For speeding  and a tag light vi olation.

7 Q.      Did you issue a repair order?

8 A.      No, sir . She was -- actual ly, the vehicle was

9 register ed in Pennsylvania.   I could not issue a safety

10 equipment  repair order on an out  -of-state vehicle.

11 Q.      Even though the vehicle is    operating  on Maryland

12 highways?

13 A.      That's right , sir .  I can either issue them a

14 written warning or citation.  Because it's a tag light     ,

15 most people don't know their tag light is out until the

16 police tell them , so I issue them a warning  .  If it

17 would have been a taillight  , it could have been a

18 different story possibly.

19           MR. WARD:  Thank you very much  .

20           THE COURT:  Any further  Cross?  Any  Redirect ?

21           MS. GREENBERG:  Briefly , Your Honor.

22                      REDIRECT  EXAMINATION

23           BY MS. GREENBERG:

24 Q.      Sir, counsel asked you whether or not    you had

25 knowledge of information from the agents     and  whether or

1 not you saw various violations.  What was your

2 understanding of what you were supposed to do that day?

3 A.      My understanding was to make the traffic stop    ,

4 look as close as routine as possible   , and I was also

5 asked to obtain a violation on that vehicle    , if

6 possible.  If not possible, we would cross that bridge

7 when we got to it  , but I had two violations on the

8 vehicle, stop ped the vehicle for that  , and then the

9 case unfold ed from there.

10 Q.      Did you have a bas  is to  conduct a traffic stop

11 with this vehicle?

12 A.      Yes, ma'am.

13 Q.      Under  Maryland  state law?

14 A.      Yes, ma'am.

15 Q.      Did the agents make you privy at all to what was

16 discussed in the wiretap  ?

17         MR. MITCHELL:  Objection.

18         THE COURT:  Overruled.

19         THE WITNESS:  I was told that the vehicle   --

20         THE COURT:  No, no.  Just did   -- that's a yes or

21 a no.

22         THE WITNESS:  Yes.

23         BY MS. GREENBERG:

24 Q.      Did they disclose any specific conversations    ,

25 yes or  no?

Page  94

1 A.      Yes.

2 Q.      But the basis on which you stop  ped the  car was

3 what?

4 A.      Traffic  violations .

5        MS. GREENBERG:   Your  Honor , I neglected to --

6 our evidence control person told me     I neglected to ask

7 one other inventory  search .

8        BY MS. GREENBERG:

9 Q.      Showing you  Levi-7 .  What is this item?

10 A.      A cellular phone.

11 Q.      Could you read for the jury the number on the

12 back there , if you can see it?

13 A.      It's 202 -487-1373.

14        MS. GREENBERG:   No further questions of this

15 witness , Your  Honor .

16        THE  COURT:  Any further  Cross.

17        MR. MONTEMARANO : One question , Your  Honor , if I

18 might.

19                    **RECROSS-EXAMINATION**

20        **BY MR. MONTEMARANO :**

21 Q.      How fast was the vehicle going?

22 A.      73 in a 65.

23        MR. MONTEMARANO :  Thank you.

24                    **RECROSS-EXAMINATION**

25        **BY MR. MARTIN:**

1 Q.      And you were to make a traffic stop  , if at all

2 possible --  I'm sorry , you were to stop   her for a

3 traffic violation if at all possible    ?

4 A.      Yes, sir.

5 Q.      And you knew that the people calling you were

6 from which agency  ?

7 A.      U. S. Customs.

8           MR. MARTIN:  Nothing further.    Thank  you.

9           THE COURT:  All right  .  You may step down  .

10 Thank you very much  , Trooper.

11           THE WITNESS:  Thank you  , Your  Honor .

12           (Witness excused at 12  :37 p.m. )

13           MS. GREENBERG:   Your  Honor , we will next call

14 Detective  Randy Kucsan .

15           Your  Honor , what time would you like to break   ,

16 just so  I can ...

17           THE COURT:  Five minutes of  1:00 .  Ladies and

18 gentlemen , we're going to recess at precisely five

19 minutes of  1:00 because one of the attorneys in the

20 case has another matter in another courtroom at       1:00,

21 so he can't do  two courtrooms at once.

22 Thereupon,

23                    **RANDY  KUCSAN** ,

24 having been called as a witness on behalf of      the

25 plaintiff , and having been first duly sworn by the

1 Courtroom Deputy, was examined and testified as

2 follows:

3                   **DIRECT  EXAMINATI ON**

4     **BY MS.  GREENBERG:**

5 Q.     If you would , state your name  for the record .

6 A.     Randy Kucsan .

7 Q.     Spell your last name for us   .

8 A.     K  U  C  S  A  N.

9 Q.     Sir , where are you employed  ?

10 A.     Montgomery  County  Police.

11 Q.     If you could use that microphone    and keep your

12 voice up.

13 A.     Montgomery  County  Police.

14 Q.     What is your employment with the   Montgomery

15 County  Police?

16 A.     I am a  Narcotics  Detective.

17 Q.     How long have you been narcotics detective?

18 A.     Twelve  years.

19 Q.     As such, could you  give the jury some idea about

20 your background, training   and experience?

21 A.     I became a police officer in 1989.  After    I

22 graduated from the   Montgomery  County  Police  Training

23 Academy , I was assigned to the   Bethesda  District as a

24 patrol officer for approximately three years.  After

25 that , I was assign ed to the  Bethesda  District as a

1  Special  Assignment  Team Officer for approximately two

2  years.  After that , I was assigned to our    Narcotics

3  Division.

4  Q.      How long have you been doing narcotics work?

5  A.      For about 12 years.

6  Q.      As part of your duties   and responsibilities,

7  were you also assigned to a group known as      HIDTA ?

8  A.      Yes, I was .

9  Q.      Could you explain to the jury what that is?

10  A.      HIDTA  is a multi -agency narcotics task force   ,

11  and the task force  I was assigned to was under the

12  supervision of the drug enforcement ad    ministration .

13  Q.      And what was your employment in    April of 2004?

14  A.      I was a  Montgomery  County Narcotics  Detective

15  that was assigned to a   HIDTA  investigation as a   Task

16  Force  Officer.

17  Q.      Did you work directly with the case agents on

18  that case?

19  A.      I did, yes.

20  Q.      Who were the case agents that you worked with?

21  A.      Chris Sakala , Steve Snyder , and Tom Eveler .

22  Q.      Were you working on that case on a daily basis?

23  A.      Yes, I was.

24  Q.      In fact , was your office located along with

25  theirs?

1  A.      Yes.

2  Q.      Court's indulgence.

3          Do you have any experience in   conducting  search

4  warrants?

5  A.      Yes.

6  Q.      What is your experience in conducting search

7  warrants?

8  A.      I've conducted  and participated in  hundreds  of

9  search warrants , both at the state  and federal level.

10 Q.      Have you had any experience as a seizing agent?

11 A.      Yes, I have.

12 Q.      Have you had any experience in drafting search

13 warrant affidavits?

14 A.      Yes.

15 Q.      And in being the af  fiant?

16 A.      Yes, I have.

17 Q.      Were you the seizing agent for a particular    case

18 known as 5844  Digger's  Lane on April 24, 2004?

19 A.      Yes, I was.

20 Q.      What city  and state is that in?

21 A.      Elk Ridge, Maryland.

22 Q.      Who lived there , based on the information you

23 obtained?

24 A.      Gwendolyn  Levi .

25 Q.      Who was there when you got there?

1  A.        William  Turner.

2  Q.        Do you know  where  Gwendolyn  Levi  was?

3  A.        She was under arrest.

4  Q.        That is on April 24, 2004?

5  A.        Yes.

6  Q.        As a result of  what?

7  A.        A traffic stop returning to   Maryland from  New

8  York.

9  Q.        You were familiar with that as part of your

10 overall investigation with these agents?

11 A.        Yes.

12 Q.        And i f I show you what's been previously marked

13 as P -22, could you tell the jury   what 's depicted on

14 that Exhibit P -22?

15 A.       That's the  row of townhouses or con   dominiums

16 that includes 5844   Digger's  Lane.

17 Q.       And we see he re, is that correct -- maybe    I

18 should take it out of its   plastic  and zoom in a little

19 bit on it.   Is that --

20 A.       Yes .

21 Q.       -- 5842?

22 A.       Yes, t o the left.

23 Q.       So 5844?

24 A.       Yes , right there.

25 Q.       Even though it's obscured a little by the tree     ,

1 it's the one right   next to the   5822 -- sorry 5842?

2 A.      Yes.

3 Q.      So it's this door be  hind this  tree right there?

4 A.      Yes.

5 Q.      You were the seizing agent for that location?

6 A.      Yes,  I was.

7 Q.      Could you tell the jury what happened -- okay.

8 Just put us in the time frame  .  How long after  Ms.

9 Levi 's arrest by the   Maryland   State  Police on I -95 did

10 you conduct this search?

11 A.      Almost  immediately.

12 Q.      Why was that?

13 A.      The plan was not to execute the search warrant

14 until  Ms. Levi's arrest occurred.   So, we were notified

15 when her arrest occurred    and then we served the search

16 warrant.

17 Q.      Did you have authority for conduct    ing that

18 search?

19 A.      Yes.

20 Q.      Did you have authority from a judge    ?

21 A.      Yes.

22 Q.      What happened when you went to the residence?

23 A.      The Howard  County  Police  Swat  Team made the

24 initial entry into the residence    , and after they --

25 after that team made their protective sweep, they

1 exited  and advised me that there was one person in the

2 residence  and that person was   William Turner , and then

3 at that point was a search team that entered the

4 residence  and began the search   and seizure of the

5 evidence.

6 Q.      Could you tell  me what is depicted on P  -23?

7 A.      This is a picture of -- it's a plastic shopping

8 bag that contained numerous    Ziploc baggies which in

9 turn contained heroin.

10 Q.      When you say plastic baggy, what area of this

11 picture are you talking about   ?

12 A.      Right where the card is  , where Number 15 is.

13 That 's the  white shopping bag.  It's on top of a

14 cardboard box  and that is actually a closet in the

15 foyer area of the residence.

16 Q.      If you're entering the front door   , where is this

17 closet in relation to the rest of th   e residence?

18 A.      Immediately to your left  .

19 Q.      Where my  finger is on the edge of this picture   ,

20 there 's a --  it looks like a little doorway    and a black

21 door .  Can you tell us what that door is?

22 A.      That would be the front door   .

23 Q.      Then you turn the corner    and this is the hallway

24 closet?

25 A.      Yes.

1  Q.      And we're refer ring to  this white plastic bag

2  with Number 15.  What was in that?

3  A.      Multiple  Ziploc  baggies , and those baggies

4  contained heroin.

5  Q.      Handing you what's been marked as    Drugs -5 --

6          MS. GREENBERG:  I f I may approach the witness   ,

7  Your Honor.

8          THE COURT:  Yes.

9          BY MS. GREENBERG:

10 Q.      Would you tell us what that is?

11 A.      Yes.  This is the contents   of the white plastic

12 baggy in the picture.

13 Q.      I will publish that to the jury with the    Court's

14 permission in a second  , but will you describe for the

15 record what is reflected   in that bag?

16 A.      These are numerous small   Ziploc baggies that are

17 -- that each contained heroin.

18 Q.      And there's little  red pieces of paper on there.

19 What are those?

20 A.      I believe these are --   I believe they're from

21 the chemist.

22 Q.      They weren't on the item when you located it?

23 A.      No.

24         MS. GREENBERG:   Your Honor , if I may publish

25 Drugs -5 to the jury .

1          THE COURT:   You may.

2          BY MS. GREENBERG:

3  Q.     Could you tell the jury what's depicted -- could

4  you explain what  Card-15 means?   What is that ?  Is that

5  something  that was there in the house when you showed

6  up?

7  A.     No.  The personnel that are assigned to do the

8  search , when they locate an object that they deem has

9  evidentiary value, we provide them with a note card       and

10 on the note card , the person that found them writes

11 their initials , and then we also assign that card a

12 number as we make our way around    and collect the

13 evidence.

14 Q.     Who collect ed  the evidence?

15 A.     I collected it.

16 Q.     Is that in what capacity?

17 A.     I was the collector   and responsible for the

18 seizure of the evidence.

19 Q.     Is that  typically referred to as a se   izing

20 agent?

21 A.     Yes.

22 Q.     So your testimony is you didn't    personal ly find

23 all these things , but somebody marked where it was     and

24 you came back  and got it.

25 A.     Yes.

1 Q.      And that 15 is denoting what number was assigned

2 to that particular exhibit   ?

3 A.      Yes.

4 Q.      Showing you what's been marked as P   -24.  Could

5 you tell the jury what that is?

6 A.      That's the same bag as the   previous photo.  It's

7 now remov ed from the closet  and opened  and it shows the

8 partial contents of the bag.

9 Q.      I asked you about those red tags on    Drug s-5.  Do

10 those red tags appear on P  -24?

11 A.      No.

12 Q.      So how does P-24 relate to the appearance of the

13 drugs as you found them?     Is that how you found the

14 drugs?  Is that what they looked like?

15 A.      Yes , just like that.

16 Q.      In that white bag?

17 A.      Yes.

18 Q.      Did you continue to search for items in the

19 residence?

20 A.      Yes.

21 Q.      Showing you P -25.  Could you tell the jury what

22 is reflected in that picture?

23 A.      That's a n overall shot of the master bedroom on

24 the second level.

25 Q.      Where is this in relation to the closet that we

1  just saw on the front of this?

2  A.      If you were sort of in the closet    and you would

3  stand facing away from the closet, you would be

4  pointing up toward the stairs.  Go up one flight of

5  stairs  and the master bedroom is to your right.

6  Q.      Did you recover certain items in that room?

7  A.      Yes.

8  Q.      Showing you what's marked as    P-26.  Can you tell

9  us what's reflected there?

10  A.      That is a photo of a wooden jewelry box.  Inside

11  the jewelry box was several small plastic baggies

12  containing marijuana.

13  Q.      Where was this item located in the house?

14  A.      It was on a night stand in the master bedroom.

15  Q.      The picture that we just saw   ?

16  A.      Yes.

17  Q.      Could you tell me  , please , what's been   premarked

18  as Drugs -7?

19        MS. GREENBERG:  I f I may approach again  , Your

20  Honor.

21        THE COURT:  You may.

22        BY MS. GREENBERG:

23  Q.      Do you recognize that exhibit   , and how does it

24  relate to what the jury's seeing on the screen?

25  A.      Yes.  This is the   plastic bagg y with the

1 marijuana .

2          MS. GREENBERG :  If I may publish  Drugs -7 to the

3 jury .

4          THE  COURT:   You may.

5          BY MS.  GREENBERG:

6 Q.       And  P-27.  Could you tell us what we're seeing

7 here?

8 A.       Again, this is a wooden jewelry box.  Inside the

9 wooden jewelry box is a plastic baggy containing

10 marijuana.

11 Q.       Where was this item located that has the number

12 you gave it as 24  ?

13 A.       It was also on a dresser in the master bedroom.

14          MS.  GREENBERG:   Your  Honor ,  if I may  approach

15 the witness .

16          THE  COURT:  Y ou may.

17          BY MS.  GREENBERG:

18 Q.       Showing you what's been marked as    Drugs -4.  How

19 does this relate to what the jurors are seeing on the

20 screen?

21 A.       This is the plastic bag of marijuana that was in

22 the jewelry box.

23          MS.  GREENBERG:   Your  Honor ,  if I may publish

24 Drugs -4 to the jury, please.

25          THE  COURT:  You may.

1           BY MS. GREENBERG:

2  Q.      Showing you what's been marked as     P-28.  Could

3  you tell the jurors what we're seeing on the screen

4  here?

5  A.      That's a photograph of assorted doc    uments that

6  were located in   the master bedroom.

7  Q.      Did y ou seize those doc   uments ?

8  A.      Yes.

9  Q.      And they're reflected on this screen    ?

10  A.      Yes.

11  Q.      And the bed sheet there   , does that comport to

12  the bed sheet that we saw in the overall shot of the

13  bedroom ?

14  A.      Yes, it does.

15           MS.  GREENBERG:    Your  Honor , if  I may approach .

16              THE  COURT:  Y ou may.

17           BY MS.  GREENBERG:

18  Q.      Showing you what's been marked as     Digger's Lane

19  8, 9, 10 and  11.  Could you tell the jurors how these

20  relate to the -- what they're seeing    on the screen  and

21  then we will go over them individually     on  the screen?

22  A.      These  were documents, photographs    and address

23  books that were locat   ed in  the master bedroom.

24  Q.      Tagged with your item Number 25 all together?

25  A.      Yes.

1  Q.       You didn't give a separate number to each of

2  these pieces of paper?

3  A.       No.

4  Q.       Putting up on the screen what's been marked as

5  Digger's Lane 8.

6         MR. WARD:  I'm sorry , Digger's --

7         MS. GREENBERG:   Digger's Lane  8.

8         MR. WARD:  Eight.

9         MS. GREENBERG:   Your Honor , it's kind of faint

10  here.  I might have to approach the witness again.

11  It's faded with time.

12         THE COURT:  All right  .  You may.

13         BY MS. GREENBERG:

14   Q.    Could you read into the record the -- this is a

15  Sprint Nokia phone , and could you read the telephone

16  number on that phone, please  ?

17  A.       202-487-1373.

18  Q.       In whose name ?

19  A.       Bernice Carter.

20  Q.       I'll put it up on the screen so everyone can see

21  it.  Even better than  I thought is that if for the

22  number  you just read ?

23  A.       Yes.

24  Q.       And it's for a  Nokia  handset?

25  A.       Yes.

1  Q.     And there's an attached bill  ?

2  A.     Yes.

3  Q.     Could you tell the jury what's reflected in

4  Digger's Lane  9?

5  A.     That's a photograph of   Gwendolyn  Levi  and

6  William  Turner.

7  Q.     Who did you understand them to be in relation to

8  the residence?

9  A.     I'm sorry?

10 Q.     How did  you understand   these two individuals to

11 be related to the residence?

12 A.     The residence was -- it belonged to    Gwendolyn

13 Levi  and when we executed the search warrant    , William

14 Turner was present at the residence.

15 Q.     Showing you  Digger's Lane 10.    I'm going to

16 reference some telephone numbers for you.  Could you

17 tell the jury who's referenced here under     Friday, the

18 7th of  January,  the name  and number?

19 A.     Becky , (240) 351-3388.

20 Q.     And under  January 28?

21 A.     Becky , (202) 832-6217 and (240) 351-3388.

22 Q.     And under  Wednesday,  April  5th?

23 A.     Goody,  546-2529.

24 Q.     And right above  Friday, July 4?

25 A.     Paula,  301-343  --

1  Q.      I'm sorry , could you read that again?

2  A.      Paula .

3  Q.      Go a head.

4  A.      (301) 434-3545, (202   ) 276-1891.

5  Q.      On October 27?

6  A.      Goody, (202 ) 235-1012.

7  Q.      Are there numbers right underneath there?

8  A.      Yes.  333.

9  Q.      Digger's Lane 11  , put it up on the screen.

10 Could you tell the jury what this is?

11 A.      Sprint -- a  Sprint phone invoice in the name of

12 Bernice  Carter  for (202) 487-1373.

13         MS. GREENBERG:   Your Honor , I just have a couple

14 more questions  and then we'll break.

15         THE COURT:  A couple is all you're going    to get.

16         BY MS. GREENBERG:

17 Q.      What is reflected in   P-29?

18 A.      That is a  Pelouze digital scale .

19 Q.      Where was that located?

20 A.      Locat ed in  a kitchen cabinet.

21 Q.      Showing you  Digger's Lane 1, how did that relate

22 to what the jury is seeing on   the screen?

23 A.      That 's the digital scale locate  d in the kitchen

24 cabinet.

25 Q.      Why did you seize this digital scale?  What

1 relation at all did that have to do with drug

2 trafficking?

3 A.    Typically , that type of scale is used to weigh

4 drugs.

5        MS. GREENBERG:   Your Honor, I -- given that it 's

6 five of  and we're finished  with the up stairs part of

7 the house at least for now  , I think it's a  good time to

8 break.

9        THE COURT:  All right  .  We will  take a recess

10 now until  five minutes after   2:00.

11                  (Jury excused at 12:57 p.m.)

12                  (Off the record at   12:57 p.m. )

13                  (On the record at   2:09 p.m. )

14                  (Witness resumes the stand at 2  :09 p.m. )

15       THE CLERK:  Ready for the jury?

16       THE COURT:  Yes.

17                  (Jury returns at 2 :11 p.m. )

18       MR. WARD:   Your Honor , before we begin  , may

19 counsel approach ?

20       THE COURT:   Yes.

21                  (At the bar of the Court.)

22       MR. WARD:  I'm sorry , I didn't notice it before

23 -- I notice that counsel for the   government  has brought

24 in a table from   God knows where, because we couldn't

25 get one the other day that was of any size.   In any

1  event , they've done that  , put that up in front   of the

2  jury box  and are displaying on it the drugs that they

3  have seized.   I object to that.  The drugs are in

4  evidence .  The jury has had an exhibit to them.  They

5  don't need to have a constant display sitting in front

6  of them , which was the only purpose it's there for, to

7  impress the jury.   I object to it being displayed to

8  the jury in this fashion.

9       MS. GREENBERG:  Judge , this is the toolbox

10 seized from  the basement of   Digger's  Lane with various

11 items that are located inside the toolbox,    and they're

12 up there because there were a number of items that were

13 from the tool box, and it's  logistically  --

14       THE COURT:  Are these the exhibit   s you're about

15 to review with the witness?

16       MS. GREENBERG:  Yes.

17       THE COURT:  Your objection is overruled.

18       MR. WARD:  Does the government intend to leave

19 them up there ?

20       THE COURT:  I assume you  intend  to have the

21 witness come up   there.

22       MS. GREENBERG:  We will have the witness testify

23 to them  and put them back in the toolbox.

24       THE COURT:  I think you're a bit premature.

25       MR. WARD:  I was simply being cautious   .

1                       (Back in open court.  )

2           BY MS. GREENBERG:    Your Honor , may I proceed?

3           THE COURT:  Y ou may proceed.

4           BY MS. GREENBERG:

5   Q.      Detective Kucsan , did you also seize from the

6   evidence an item that's been marked as      Drugs 6?

7   A.      Yes.

8   Q.      Did you review this at the luncheon break?

9   A.      Yes , I did .

10  Q.      Was there a picture taken of this particular

11  exhibit?

12  A.      No.

13          MS. GREENBERG:    If I may approach the witness.

14          THE COURT:  You may.

15          BY MS. GREENBERG:

16  Q.      Showing you what's been marked as      Drugs 6.

17          Can you tell the jury what this is?

18  A.      It's a small , clear , Ziploc baggy containing

19  heroin.

20  Q.      And from where did you recover this exhibit?

21  A.      From Digger's Lane.

22  Q.      And you recovered this exhibit as the se    izing

23  agent?

24  A.      Yes.

25          MS. GREENBERG:    Your Honor , if I may publish

1  this to the jury?

2         THE COURT:   You may.

3         BY MS. GREENBERG:

4  Q.      Was there a basement area as to    Digger's Lane?

5  A.      Yes.

6  Q.      Did you try as best as you could    to get a

7  representative photo of that basement area?

8  A.      Yes, I did.

9  Q.      Showing you Government's  Exhibit P-30.

10         Could you describe what that is?

11 A.      That's a photograph of the basement area taken

12 from the far side , opposite the stairs.

13 Q.      And P-31?

14 A.      Again , a photograph of the basement.  That's

15 taken from the opposite   angle as you came down the

16 stairs.

17 Q.      Your Honor , if I may approach again.

18         Showing you what's been marked as P-30, P-31.

19 If you put these two pictures -- could you put these

20 two pictures together the give the jury an idea of how

21 the basement looked on that date?    And please refer to

22 the number on the exhibit.

23 A.      They're not actually going to meet.  They would

24 be something like that.

25 Q.      Please explain that.  Is there a gap between the

1  two?

2  A.       Yeah.   These are the two opposite walls.

3  Q.       Of the basement?

4  A.       Yes.

5  Q.       That's the best  over all that you have of the

6  basement , putting those two pictures together     --

7  A.       Yes.

8  Q.       -- f or the two of the walls?

9  A.       Yes.

10  Q.      And  direct ing your attention first to P   -30.  Did

11  you locate anything -- any items of evidentiary value

12  in the area depicted under    P-30?

13  A.      Yes.

14  Q.      And  could you explain where you located the item

15  to the jury  and then I'll show them --   I'll  show you

16  the item?

17  A.      Just to the left of the small bar    , there is a

18  storage area  and you can see the access door in the

19  photograph.

20  Q.      Is that where my pen is now?

21  A.      Yes.

22  Q.      And  that's to the -- if we're looking at     the

23  picture , to the right  of the light  and to the left of

24  the bar chair ?

25  A.      Yes.

1  Q.      So it's that little door there that you're

2  speaking about?

3  A.      Yes.

4  Q.      What's behind that little door?

5  A.      That accesses  a storage area underneath the

6  stairs.

7  Q.      Did you locate anything in the storage area?

8  A.      Yes.

9  Q.      Showing you what's been marked as    Government's

10 Exhibit P -32.

11         Can you identify what that is?

12 A.      It's a shopping bag containing    Mannitol .

13 Q.      Where did you locate that?

14 A.      In the storage area under the stairs.

15 Q.      That we just looked at in the prior picture     ?

16 A.      Yes.

17         MS.  GREENBERG:   Your  Honor , if  I may approach

18 again.

19         THE  COURT:  You may.

20         BY MS.  GREENBERG:

21 Q.      Showing you what's been marked as    Digger's Lane

22 4.

23         How does that relate to what the juror     s are

24 seeing on their -- on the picture right now?

25 A.      That 's the  bag in the photograph.

1  Q.      When you open up this bag  , what is contained

2  inside?

3  A.      Numerous packages of   Mannitol .

4  Q.      Showing you a representative of what's in that

5  bag.

6          Could you read for the record what's on that

7  item?

8  A.      "Mannitol ."

9  Q.      Could you tell whether that's empty or full?

10 A.      This is full.  Original packaging.

11 Q.      And does it feel particularly light   ?

12 A.      Yes.

13 Q.      Does that substance  , to your knowledge  , have any

14 weight while in that container?

15 A.      Yes.

16 Q.      Fairly lightweight  ?

17 A.      It's lightweight, yes.

18 Q.      It appear s to be like a soap bar; is that

19 correct?

20 A.      Yes.

21         MS. GREENBERG:   Your Honor , if I could publish

22 Digger's Lane  4 to the jury.

23         THE COURT:  You may.

24         BY MS. GREENBERG:

25 Q.      Show ing you what's been marked as P   -33.

1          Could you identify that for the jury?

2  A.     Yes.  That's a box full of    Mannitol .

3  Q.     Like we just saw on the    Digger's  Lane

4  Exhibit 4?

5  A.     Exactly.

6  Q.     Where was that located  ?

7  A.     Also located in the storage area under the

8  stairs.

9  Q.     Showing you what's been marked    --

10         MS.  GREENBERG:  A gain , if I may approach , Your

11  Honor.

12         THE  COURT:   You  may.

13         BY MS.  GREENBERG:

14  Q.     As Digger's  Lane 3 .  It's kind of big.  There's

15  a marking on it  , Digger's Lane   7.  Do you see that down

16  here?

17  A.     Yes.

18  Q.     Could you tell the jury what's in this big      ,

19  white -covered box?

20  A.     That is the cardboard box you see on the

21  photograph  and that is  -- the box itself is full of

22  Mannitol .

23  Q.     What is the -- is the white wrapping with the

24  evidence marker ?  Is that different than   how the  box

25  was originally found  ?

1 A.        Yes.

2 Q.        How did that get done?

3 A.        The box was found as it is in the photograph    ,

4 and the white paper was put on by the police.

5 Q.        And the lit tle bars that we're   seeing, Digger's

6 4, how was that box   Digger's Lane 7, those little bars

7 in that box?

8 A.        That box is completely full of bars of      Mannitol .

9 Q.        Completely packed ?

10 A.       Completely.

11         MS.  GREENBERG:    Your  Honor , I don't think we

12 need to pub lish that , but it is , of course , available.

13         THE  COURT:  All right.

14         BY MS.  GREENBERG:

15 Q.       Could you tell us why you seized    Mannitol?   What

16 relevance , if at all , it has to drug investigations?

17 A.       It's commonly used as a cutting agent for

18 heroin.

19 Q.       And this amount  , is that typical or atypical for

20 the is amount you  've seen in  searches?

21 A.       It's atypical.

22 Q.       Could you explain ?

23 A.       I've never seen that much   Mannitol  in a search

24 warrant s cene  in 17 years.

25 Q.       Did you further conduct a search   of the  basement

1  area at 5844  Digger's  Lane?

2  A.      Yes.

3  Q.      Showing you what  , perhaps , is  a  bad  picture.

4  Send it around to the jury  .  Could you tell us

5  generally what is depicted in    Government's   Exhibit

6  P-34?

7  A.      This is a dark photograph of the utility room.

8  The utility room housed a washer     and dryer that you may

9  be able to see to your right.  There's a hot water

10  heater to your left.  It also had some shel     ving for

11  storage  and in particular it had a --

12  Q.      Is that the washer you're speaking of    ?

13  A.      Yes.

14  Q.      And the shel ving unit is behind?

15  A.      Behind  and also to your far left  , where that

16  basket would be.

17  Q.      What is in the middle area here?

18  A.      In the middle area  , there's a  Workmate workbench

19  and also a small green table.

20  Q.      And what were your observations of the area

21  that's depict ed in  P-34 as you enter  ed the  utility

22  room?

23  A.      The utility room seem  ed to be set up in the form

24  of a heroin processing area or heroin    seizing  center.

25  Q.      What do you mean by that?

1 A.      The workbench  and  the table were full of

2 implements  and para phernalia  used to process heroin  ,

3 and also included heroin itself    and cutting agent

4 Mannitol  as well.

5 Q.      You mentioned a  workbench . Did you try  and get

6 a better picture of that?

7 A.      Yes.

8 Q.      And  some  of the items that were on    the

9 workbench ?

10 A.      Yes.

11 Q.      Showing you P -35.  Could you explain what that

12 is?

13 A.      That's a partial photograph of the    workbench  I

14 was speaking about.  The bag is a large     Ziploc  bag and

15 that's full of  Mannitol .

16 Q.      Similar to the kind that we saw in the bars    , but

17 just in a bag?

18 A.      Yes.

19 Q.      Did you seize the   workbench ?

20 A.      No.

21 Q.      P-36.

22 A.      Another partial picture of the    workbench,  and

23 that includes a red   dish and a spoon.  The bench

24 itself , the dish , and the spoon all contain heroin

25 residue.

1  Q.      P-37.

2  A.      That is a box that includes a digital scale that

3  was located on one of the shelves in the utility room.

4  Q.      And showing you what's been marked as    Digger's

5  Lane 2.

6          MS. GREENBERG:  I f I may approach again  , Your

7  Honor .

8          THE COURT:   You may.

9          BY MS. GREENBERG:

10 Q.      Could you tell the jury how    Digger 's Lane  2

11 relates to the picture we're seeing up on the screen?

12 A.      Yes .  The scale is the photograph on the screen.

13 Q.      Just to be clear  , this is  different  than the

14 scale that was upstairs in the bedroom?

15 A.      Yes.   In the kitchen.

16 Q.      And again , is your view of seizing this

17 particular scale  , is it the same or different than

18 seizing the other scale?

19 A.      The same.

20 Q.      That was for what?

21 A.      That type of scale is commonly used to weigh

22 drugs.

23 Q.      P-38.

24 A.      That 's a photograph  of one of the shelves  , and

25 that particular shelf had boxes     and bags of plastic

1  baggies,  Ziploc  baggies, latex   gloves , and filtration

2  respiration  masks.

3  Q.       Did you see seize certain of these items?

4  A.       Seized all of them.

5  Q.       What are baggies   and fil tration  masks used for?

6  A.       The baggies are used to store drugs    , and the

7  mas ks themselves   are used for protection when you're

8  processing heroin.

9  Q.       P-39, w hat is depicted?

10  A.       That is a box that contains a   n electronic scale  ,

11  which is the -- which is in the black.  That also was

12  on one of the   shelving  units in the utility room.

13  Q.       And  P-40, what is depicted there?

14  A.       That's a photograph of a    strainer.  That was

15  also located in the utility room.

16  Q.       Did you seize the strainer also?

17  A.       Yes.

18  Q.       And  what is the strainer used for?

19  A.       That strainer is used to take heroin that's in a

20  compressed form   and/or the  Mannitol,  which is in a

21  compressed form  , to sift or filter it down  , both of

22  them into a powder form.

23  Q.       That's consistent with -- those are consis     tent

24  with  your observation of the utility room     ?

25  A.       Yes.

1  Q.      All those items were in the utility room     ?

2  A.      Yes.

3  Q.      P-41?

4  A.      That's a toolbox that was located in the utility

5  room.

6  Q.      Is that particular   toolbox  marked as  Digger's

7  Lane 12 over at the table?

8  A.      Yes.

9          MS. GREENBERG:   If I could ask at this time   ,

10 Your  Honor  -- the witness is  miked up -- if he could go

11 over  and explain to the jury what he located within

12 Digger's  Lane 12.

13         THE  COURT:  All right.  You may.

14         MR.  HALL:  Your  Honor , may those counsel who

15 want to approach the evidence table so we can see     ?

16         THE  COURT:  Certainly.  You  -all can come over  ,

17 if you'd like.  I would ask the witness to either speak

18 up very loudly or be given a   mike . Oh , he's got a

19 mike.  Good.

20         MS. GREENBERG:  Already took care of that.

21         THE  COURT:  You already took care of that    .

22 Okay.

23         BY MS. GREENBERG:

24 Q.      This  toolbox  marked as  Digger's Lane 12 , could

25 you tell the jury where that was located?

1  A.      This toolbox was located in the utility room on

2  the floor near the   workbench .

3  Q.      If you could describe , starting with  Digger's

4  Lane 12 A, which if  I've lived right will be here

5  somewhere.  Digger's Lane 12   A, could you tell the jury

6  what this is, please?

7  A.      This is just a large   Ziploc baggy and it's full

8  of numerous other   Ziploc baggies.

9  Q.      Prior to court today   and some time ago , had you

10  opened it to detect if it had any odor?

11  A.      Yes.

12  Q.      Did it ?

13  A.      Yes, it does.

14  Q.      Is that consistent with your experience in drug

15  trafficking?

16  A.      Yes.

17  Q.      How is that ?

18  A.      It's a very strong chemical odor.

19       MS. GREENBERG:   Your Honor , if I may publish

20  Digger's Lane 12 .

21       THE COURT:  Yes, you may.

22       BY MS. GREENBERG:

23  Q.      Digger's Lane 12  B?

24  A.      It's a strainer.  It has residue on it.  Again    ,

25  this strainer is used to take the heroin     and the

1   Mannitol  and to make it into a -- from a solid form

2   into a powder form.

3          MS. GREENBERG:  And  again , if I could just

4   publish all these as he explains them   , Your Honor .  Is

5   that satisfactory ?

6          THE COURT:  Yes , you may.

7          BY MS. GREENBERG:

8   Q.       Digger's Lane 12 C?

9   A.       It's a filtration mask.

10  Q.       Similar to the  ones we saw in the earlier

11  pictures?

12  A.       Yes.

13  Q.       And again , what is it used for  ?

14  A.       Just for personal protection when you're    , you

15  know , handling drugs.

16  Q.       Why ?  What happens?

17  A.       Well , you don't really  want to, you know, have

18  these odors or be breathing the effects of the drugs.

19  Q.       Digger's Lane  12D?

20  A.       Again , this is a large   Ziploc baggy  and it just

21  contains numerous other   Ziploc  baggies.

22  Q.       Digger's Lane 12 E?

23  A.       Two boxes of large   Ziploc  baggies.

24  Q.       How are they utilized in the drug trade?

25  A.       To store drugs  and for distribution.

1  Q.      Dig's Lane 12 F?

2  A.      Just a n ordinary spoon , has residue on it.

3  Q.      Digger's Lane 12 G?

4  A.      These are just more large   Ziploc baggies.

5  Q.      Digger's Lane 12 H?

6  A.      This is a bag of  Mannitol .

7  Q.      That was inside the   toolbox ?

8  A.      Yes.

9  Q.      Digger's Lane 12 K?

10 A.      These are ordinary playing cards.

11 Q.      How are ordinary playing cards utilized in

12 drug -making , heroin processing?

13 A.      For example , you'd be able to, you   know ,

14 manipulate or move the c  utting agent or the heroin to

15 various positions.

16 Q.      So is that why you seized these items?

17 A.      Yes.

18 Q.      And lastly , did you also seize 12  L, 12I and 12 J

19 from that  toolbox?

20 A.      Yes.

21 Q.      What , if anything , were these items , based upon

22 your observations  , utilized for?

23 A.      When the heroin was processed    and after the

24 cutting agent was added, the -- that mixture was

25 moistened  and it was inserted into metal tubes    , or

1 pipes , and that pipe served as a mold   .   And  what  they

2 did after that was inserted the bol    t into the tube.

3 Q.      You're  referring now   to 12 I; is that correct?

4 A.      Yes.   Inserted the bolt into the tube     and  then

5 took this screwdriver, 12   J.

6 Q.      This is 12 L, the hammer?

7 A.      It's a rubber mallet  , and struck the bolt using

8 the hammer and the screwdriver, and that compressed the

9 heroin into a more solid form.  And then as it would

10 dry, it would be -- the heroin would be extracted from

11 the pipe or the tube, and it was essentially a solid at

12 that point.   And then it was cut   up for redistribution.

13 Q.      Is there anything about the    Exhibit 12 J that

14 supports your description of this to the jury?

15 A.      This screwdrive r, and you can see when it comes

16 around , from being struck by hammer onto the bolt     , the

17 tip of it is blunted from being struck so many times.

18 Q.      All of these items in the 12 series were locat     ed

19 in that toolbox ; is that  correct?

20 A.      That's correct.

21      MS. GREENBERG:   Your Honor , if I could ask

22 Special  Agent  Eveler , when the items come around   , to

23 put them back in the    toolbox.

24      THE COURT:   You may.

25      MS. GREENBERG:  Thank you.

1                    (Witness resumes the stand.   )

2          BY MS. GREENBERG:

3 Q.     Could you tell the jury what's depicted in P    -43?

4 A.     That's a small green table that was also in the

5 utility room next to the    workbench .

6 Q.     Did you seize that small green table?

7 A.     No.

8 Q.     P-42.  Could you tell the jury what's depicted

9 in that?

10 A.     Right b ehind the card there  , it's a heat sealer.

11 Q.     What do you mean by heat seal?     What is a heat

12 sealer?

13 A.      It enables you to seal plastic baggies    , for

14 example.

15 Q.     And how is that utilized in the drug trade   ?  A.

16 Just as  I said.  It provides a double layer of

17 protection aside from the    Ziploc  itself .  It also heat

18 seal s the baggy.

19          MS. GREENBERG :  Your Honor , if I may approach .

20          THE COURT:  Yes , you may.

21          BY MS. GREENBERG:

22 Q.     Showing you  Digger's Lane 13.

23          How does that relate to what the jury is seeing

24 up on  the screen?

25 A.     That 's the  item that's in the photograph.

1  Q.       The heat sealer?

2  A.       The heat sealer, yes.

3  Q.       Did you seize any money from this residence?

4  A.       Yes.

5  Q.       How much did you seize?

6  A.       $27,782.

7  Q.       I'm sorry , what was that again?

8  A.       $27,782.

9  Q.       Without  going  through each   and every location

10 about where money was seized   , could you  give us an

11 example of where a particular amount of money was

12 seized ?

13 A.        Yes.   There were two -- money was seized in

14 three different locations.    Two  black trash bags

15 containing money were seized from the master bedroom.

16 The third location was a second bedroom    , and money was

17 seized there that was stored in a plastic jar.

18 Q.       So black trash bags   and a plastic jar?

19 A.       Yes.

20 Q.       Was it a plastic   pretzel- type jar?

21 A.       Yes.

22 Q.       Without going through each    and every count of

23 the mon ies that were seized, could you give the jury

24 some kind of idea about what denominations you      're

25 seeing in your seizure?

1  A.      There were multiple denominations but primarily

2  there were  20s , 10s, 5s and  1s.

3  Q.      Were they packaged in any kind of way?

4  A.      They were bundled together with    rubber  bands.

5          MS. GREENBERG:  Court's indulgence.

6          No further questions  , Your  Honor.

7          THE  COURT:  Cross-examination   ?

8          MR.  MONTEMARANO :  Thank  you , your  Honor.

9                        **CROSS-EXAMINATION**

10         **BY  MR.  MONTEMARANO :**

11 Q.      You have 17 years service as a police officer;

12 correct,  Detective  Kucsan ?

13 A.      Yes.

14 Q.      Twelve  years narcotics; correct, sir?

15 A.      Yes.

16 Q.      Hundreds of search warrants in which search

17 warrant -- searches pursuant to warrants which you've

18 participated in ?

19 A.      Correct , yes.

20 Q.      About how many as a seizing agent?

21 A.      I'm not sure.

22 Q.      Guess.

23 A.      I'm not sure.

24 Q.      Twenty ?  More?

25 A.      Probably more, yeah.

1  Q.      Forty ?

2  A.      I'm not sure.    I really never started counting.

3          MS. GREENBERG:    Excuse me.    Your Honor , my case

4  agent here is reminding me that on this picture      , we

5  might not have said when you seized drugs    , you seized

6  drug s, that 's what you seiz ed, is that correct, from

7  that exhibit,  P-36?

8          THE  WITNESS:   I'm s orry?

9          MS. GREENBERG:   P-36, did you seize the residue

10 from that?   I'm sorr y.   P-36 is up on the screen   .

11         THE  WITNESS:   Yes.

12         MS. GREENBERG:   I'm sorry to  change in

13 midstream.  Was that -- that was seized?

14         THE  WITNESS:   I'm not sure.

15         MS. GREENBERG:   The residue?

16         THE  WITNESS:   The residue?   I'm not sure.

17         MS. GREENBERG:   Showing you what's been marked

18 as Drugs 3.  I apologize , Your  Honor.  Did that come

19 from the Digger's Lane residence?

20         THE  WITNESS:   Yes.

21         MS. GREENBERG:   Is that residue from what we're

22 seeing up on the screen?

23         THE  WITNESS:   Yes.

24         MR. WARD: Objection , Your  Honor.

25         He said he doesn't know.

1          THE  COURT:  If he knows  , he may answer.  If he

2 does not know , he may not.

3          MR.  WARD:   I thought he said he didn't know if

4 it was seize d.

5          MS.  GREENBERG:   I apologize .

6          THE  COURT:  Are you finished  ?

7          MS.  GREENBERG:  Yes , Your Honor.

8          THE  COURT:  All right.   I believe  he indicated

9 he knew the answer.

10          MS.  GREENBERG:  Yes , he did , Your  Honor .

11          THE  COURT:   There was an objection that he was

12 not aware of -- did not know.

13          MS.  GREENBERG:  Do you know where the    Drugs  3

14 came from , sir?

15          THE  WITNESS:   Yes.

16          MS.  GREENBERG:  Where did it come from?

17          THE  WITNESS:   The residue on the plate.

18          MS.  GREENBERG:  Thank you,   Your  Honor.   I

19 apologize .

20          MR.  MONTEMARANO :   Are  you done ?

21          MS.  GREENBERG:  Yes .

22          BY  MR.  MONTEMARANO :

23 Q.    I think we left off somewhere over 20 searches

24 where you were seizing agent; is that a fair  statement?

25 A.    Yes.

1  Q.      Maybe 30, maybe even 40  , you're not sure;

2  correct?

3  A.      Correct.

4  Q.      Based upon your training   and your experience --

5  considerable experience as    a seizing agent in search

6  warrants , you would agree that it is important -- no,

7  vital , that you take  a careful record of everything

8  that you seize in the execution of su    ch a warrant;

9  correct?

10 A.      Yes.

11 Q.      And you take into custody  , when you come through

12 the door , all the people in the residence; correct?

13 A.      Yes.

14 Q.      For issues of officer safety    and security as

15 much as anything else; correct?

16 A.      Yes.

17 Q.      And because you believe people in a location

18 that you're  searching  pursuant to a warrant in a drug

19 investigation may well have something to do with

20 narcotics trafficking; is they a fair statement?

21 A.      Yes.

22 Q.      So I'd like you , if you would take a moment  ,

23 please take  your time , I'd like you to  look around the

24 courtroom , look at  all the folks o ver here , the folks

25 at this table here  , the folks at these two tables,

1 okay?  We'll ignore the spectators for now.

2        Do you see anybody you saw at     Digger's  Lane when

3 you executed that search warrant?

4 A.      No, sir.

5        MR.  MONTEMARANO :   No further questions  , Your

6 Honor.

7        MR.  MARTIN:   Mr.  Goodwin  has no questions for

8 this witness .

9        MR.  HALL:  N o questions , Your  Honor.

10        MR.  MITCHELL:  N one , Your  Honor.

11                    **CROSS-EXAMINATION**

12        **BY MR.  WARD:**

13 Q.      Detective, not to  , as they say , beat a dead

14 horse to death, but when you were first asked by      Ms.

15 Greenberg if the residue from     the  place was seized, it

16 was very possible that you said    "I don't know "; is that

17 right?

18 A.      I believe  I said  I'm not sure.

19 Q.      You're not sure.  Well  , how did you know that

20 that stuff was -- that you were shown after that is the

21 residue that was seized?

22 A.      I recall seizing that residue after     I was shown

23 it.

24 Q.      After you were shown it  , that caused  you to

25 remember ?

1  A.      Yes.

2  Q.      I see.  Now , let me ask you this  :  The  plastic

3  bags , these are not something that are manufactured

4  strictly for drug trade  , are they?

5  A.      The Ziploc  baggies?

6  Q.      No.

7  A.      No.

8  Q.      I mean , any one of  us in  this courtroom might

9  have small  and large plastic bags in our homes.     I can

10  assure you  I do , and I ain't in the drug business  ; is

11  that right, sir?

12  A.      That's right.

13  Q.      What about scales?  Are you suggesting that this

14  kind of scale that was found is something that's

15  manufactured exclusively for the drug business?

16  A.      Am I suggesting that?

17  Q.      Yeah.

18  A.      No.

19  Q.      So, a scale like that -- putting aside these

20  circumstances that we just testified about, but simply

21  finding a scale like that is not necessarily indicative

22  of carrying on the drug business -- the scale itself.

23  Is that right , sir?

24  A.      That's right.

25  Q.      Are you aware the scales like that are used in

1 the jewelry business  , for example , to weigh diamonds

2 and other jewels?

3 A.     No.

4 Q.     In other words , you don't know.  You're not

5 saying they're not --

6 A.     I don't know that.

7 Q.     And you don't know any of the other businesses     ,

8 legitimate businesses  , in which a small scale of that

9 type might probably  is going to be used.

10 A.     Not in particular, no, sir.

11 Q.     You only come across them in connection with the

12 drug business?

13 A.     Yes.

14 Q.     The fact that a telephone number appeared in a

15 directory that you found does not in     and of itself

16 indicate some drug connection  , does it?

17 A.     No.

18 Q.     It could simply be a friend  ; is that right , sir?

19 A.     Yes.

20     MR. WARD:   I think that's all  I have , sir.

21 Thank you.

22     THE COURT:  All right,   thank you .

23     Any further cross?  Any redirect   ?

24     MS. GREENBERG:  N o, Your Honor .  Thank you .

25     THE COURT:  All right .  You may step down ,

1 Officer .   Thank you very much.

2          (Witness excused at 2  :42 p.m. )

3          MR.  MONTEMARANO :   Court's indulgence, please.

4          MS.  GREENBERG:   Your  Honor , Mr.  Montemarano

5 wants m e to advise the  Court that this  is one of the

6 agent s that's recurring from different search warrants      .

7 He has a different search warrant   .  He will be recalled

8 later this week.

9          THE  COURT:  All right  , that's fine.

10          MS.  JOHNSTON:   Your  Honor , recall agent  Sakala .

11                (Witness  Sakala  resume s the  stand. )

12              **FURTHER  DIRECT  EXAMINATION**

13      **BY MS.  JOHNSTON:**

14 Q.    Agent  Sakala , during your  previous  testimony  , I

15 had asked you in reference to the call     , the message

16 left by  Ms.  Harden  on  April 19 , I asked you to review

17 the logs for  Line  B.

18          Let me also provide you  , for identification

19 purposes only , Miscellaneous  10, th e logs for  Line A.

20          Did you have occasion to review     those ?

21 A.    Yes, I did.

22 Q.    Did you locate the missing pages from     Log  B?

23 A.    Yes.

24 Q.    Where were they?

25 A.    They were in the   Log  A book.

1  Q.      Based upon reviewing those logbooks, did it

2  refresh your memory as to whether or not there was any

3  return call made to  Ms. Harden  by Ms. Martin on or

4  about  April 19?

5  A.      Yes.  April 15.

6  Q.      Well , let's be sure we have the right date.

7  That would be  Call A10 46?

8  A.      April 19 , I'm sorry,  yes.

9  Q.      Calling your attention to   Call A1046, 3 :36, do

10 you have that call in front of you    ?

11 A.      Yes, that is  April 1 5th, yes.

12 Q.      Base d upon your review   of the  logs , was there a

13 return call made by   Ms. Mar tin?

14 A.      There were no calls between the two between the

15 15th and  the 19th .

16 Q.      May  I have  NY-1, please?  Y ou heard the

17 testimony of  Trooper  Conner  here this morning?

18 A.      Yes.

19 Q.      Have you had occasion also to review again      NY-1,

20 the ledger from   New York?

21 A.      Yes.

22 Q.      And based upon your training    and experience , did

23 you form an opinion as to whether there was any

24 coordination or corresponding entry in      NY-1 in terms of

25 the seizure that was made on     April -- the early morning

1  hours of April 24?

2          MS. JOHNSTON:  Court's indulgence, one moment.

3  Putting it up on the screen here.

4          THE WITNESS:  Yes.

5          BY MS. JOHNSTON:

6  Q.      Okay.  What entry is that?

7  A.      If you look under the date 4/23/2004, reflects a

8  balance that  Gwen Levi and  William Turner owed of

9  $220,600.  Then it reflects a distribution of 2,300

10 grams of heroin for which they were charged $138,600,

11 resulting in a new balance of 358,000 -- $358,600.

12

13          Then further down, it reflects the payment of

14 $263,270.  I can't quite read the -- gave me $97,100 on

15 the 23rd.  I can't --  I think it says, you gave me or

16 he gave me.  I can't really see it there.  You gave me

17 $97,100.  Over to the right, you also see the 4/23 of

18 the $261,500, which is actually a miscount of the money

19 that she had.  And then the new balance is $263,270.

20 And continues on down for the final   , what he's co ming

21 up with , the figures aren't   right,  but what he's co  ming

22 up with is $139,770  .  It reflect s the distribution   of

23 the 2 ,300 grams.

24 Q.      Now , furthermore , you heard the testimony of

25 Trooper  Conner  concerning the pass  enger  in the vehicle

1 being  Bernice  Carter.

2 A.      Yes.

3 Q.      Have you had occasion to review the      video  that

4 we saw this morning that were played through      Jeff

5 Rachel of the surveillance in      New York , as well  as the

6 video from  Trooper  Conner 's police vehicle?

7 A.      Yes.

8 Q.      Did you recognize the women on those two videos?

9 A.      Yes.

10 Q.      Who were they?

11 A.      Donna  Johnson , and then the woman referred to as

12 Bernice  Carter,  actually her real name is      Gwendolyn

13 Levi .

14 Q.      Was that an alias that she had used?

15 A.      Yeah .  It was the  ID she was using at the time

16 of her arrest.

17 Q.      Also , there was a  Sprint  Spectrum telephone bill

18 identif ied in  the name of  Bernice  Carter.  Do you

19 recall that  testimony  this morning?

20 A.      Yes.

21 Q.      And the telephone number associated with that,

22 the Sprint  Spectrum telephone call, did you recognize

23 that telephone number?

24 A.      Yes, t hat was actual ly the  E line , the last

25 telephone n umber 1373 , that was  actually  the telephone

1  we were intercept ing that  was in the name of    Bernice

2  Carter.

3  Q.      That would be  Digger's  Exhibit  11, which is on

4  the screen here?

5  A.      Yes.

6  Q.      And the number at   the  top , that was the number

7  you were --

8  A.      That is  the  E line that we were intercepting.

9  Q.      During the events of April 23  , were you actually

10 intercepting calls between    Ms. Levi  and Mr. Uriarte  in

11 New York ?

12 A.       Yes, we were .  That's why  we had  establish ed

13 the surveillance.

14 Q.      And in regards to the traffic stop by    Officer

15 Conner,  based on your training   and experience , why was

16 it requested that he do a traffic stop?

17 A.      We wanted  to make the traffic stop look as

18 normal as possible  , that totally unconnect  ed to the

19 intercept so we could continue the investigation      and

20 stimulate conversation about the arrest    , locate

21 additional individuals that were involved in the

22 conspiracy.

23       If the -- if the stop was solely based upon the

24 wire of the people thought   that 's what it was , we

25 wouldn't have been able do that   , so the instruction  s to

1 the trooper were to make it seem as unrelated to any

2 other investigation , in other words , make it look like

3 a random stop , make it look that way as much as

4 possible.

5 Q.     Was that the reason for having the dog come     ?

6 A.     Sure, yeah . We knew  exactly where the drugs

7 were , but we did that for the show for the defendants.

8 Q.     In fact , as a result of that traffic stop    , was

9 anyone actually arrested    and charged?

10 A.     Yes.  Gwen Levi and Donna Johnson were both

11 arrested.

12 Q.     As a result of that, did that -- what effect did

13 that have on your interception of calls over     Ms. Levi's

14 telephone?

15 A.     I believe  I want to say we continued

16 interception for a day or maybe a day    and a half , but

17 obviously  since we had the telephone   , the only thing we

18 were  getting were cellular -- excuse me   , telephone

19 messages left on her phone   during that  time period  and

20 then I think  that Sunday , we ceased  the interception of

21 that telephone .

22 Q.     You also heard testimony from -- also heard

23 testimony from detective    Kucsan  concerning executing

24 the search warrant at   Digger's  Lane shortly after   Ms.

25 Levi  had been arrested  .  Do you recall that testimony   ?

1 A.      Yes.

2 Q.      Are you familiar with the in  dividual  whom he

3 referred to as  William  Turner?

4 A.      Yes.

5 Q.      Based upon your involvement in the

6 investigation , based upon your training   and exper ience,

7 was Mr. Turner arrested that night   ?

8 A.      No.  We had had quite a bit of discussion about

9 that.  He was located inside the residence    , and at that

10 point , to make it look as though it was -- the stop was

11 only connect ed to the traffic stop  , we made the

12 determination at that point to not charge him at that

13 point  and he was released.

14 Q.      Was he subsequently arrested    and charge d in this

15 case?

16 A.      Yes, he was.

17 Q.      I want to just show you    CH-1 and ask you if you

18 recognize  Ms. Levi  and Mr. Turner on this chart?

19 A.      They're in the far upper  , right-hand corner  , the

20 female un derneath  Mr. Uriarte  is Gwendolyn  Levi, and

21 then the male underneath    Mr. Uriarte  is William  "Dog"

22 Turner.

23 Q.      Those would be these two individuals here?

24 A.      Yes.

25 Q.      In  the heroin box.

1 A.       In the heroin box.

2 Q.       Now, as a result of the police activity that

3 night, were in fact, a series of calls generated over

4 the wiretap that you still had in effect?

5 A.       Yes.

6 Q.       And that wiretap was on what telephones?

7 A.       At that time, we were still up on  Ms. Martin's

8 home phone, one of her cellular telephones and two

9 cellular telephones of  Mr. Mangual.

10 Q.       If we could turn our attention now B4245 on        Page

11 364.  Do you have that call in front of you    ?

12 A.       Yes.

13 Q.       And who are the parties to this call?

14 A.       Paulette Martin and  Kevin Scott.

15 Q.       What date and time does this call take place?

16 A.       It's on April 24, 2004  , at 8:12 in the morning.

17 Q.       Who is Kevin Scott?

18 A.       He either is or at least referred to as a son of

19 Gwendolyn Levi.

20 Q.       Page 36 4, Call B4245, and this call took place

21 at 8 o'clock in the morning?

22 A.       Yes.  I guess about eight hours after the

23 arrest.

24 Q.       Was this an incoming call to    Ms. Martin or a

25 call that she made from her residence?

1  A.      This is an outgoing call to   Kevin  Scott,

2  following up a call from him with a call     where  the call

3  had dropped.

4  Q.      If we c ould  play B4245 , please.

5          (Audio recording begins playing at 2    :54 p.m. )

6          (Audio recording stops playing at 2    :59 p.m. )

7          BY  MS.  JOHNSTON:

8  Q.      Based upon your training    and experience , can you

9  tell what's being discussed in the call?

10 A.      Yes.  Kevin  Scott is telling   Paulette  Martin

11 about the search warrant at the residence on      Digger's

12 Lane  and  at the residence was    Dog Turner  and that the

13 police let him go , and they go back   and forth several

14 times try ing to  figure out where   Gwen  is , Gwen  Levi,

15 they don't know about her arrest yet    , and  try ing to

16 figure out where her   and Donna  Johnson are at , and  they

17 speculate as to whether she's laying low or what's

18 going on with her .   And they  keep trying her phone but

19 haven't been able to get through to her yet.

20 Q.      Could you give us examples in the conversation

21 from which you base that conclusion?

22 A.      Bottom of  Page 36 4, Kevin  Scott describing they

23 tore up the apart ment, they went by their house  , the

24 apartment,  talking  about the  residence on  Digger's

25 Lane , the old man was sitting there  .   That's  Dog

1  Turner.  He said he was jus   t a guest , mean ing he  didn't

2  live there , so they escorted him out   .  That's the

3  police escorted him   out.   I understand they ransacked   ,

4  tore everything up  , that 's the police searching the

5  house  and she was nowhere to be found   , mean ing  Gwen  was

6  not there.

7         They go on to middle of    Page 36 5, Kevin  Scott

8  saying , you know , my understanding  , you know , they all

9  -- all in the vicinity of any other.  Talking about

10 where she was supposed to be but no one can find her      ,

11 that being  Gwen  Levi .  Bottom of page 36  5, talking

12 about  William  Turner , let him roll , meaning the police

13 released him.

14         Middle of  Page 36 6, they're  talk ing what about

15 was in the house  , whether she had any drug   s in the

16 house, heroin.   Paulette  Martin sa id she had some

17 clothing  and items  in there , Kevin  Scott  saying he d oes

18 not know.   He doesn't know if there were any drugs in

19 the house.

20 Q.     So clothes  and items  is a code word?

21 A.     That's what she's asking  , did she have any

22 clothes  and item there?  Obviously she would have

23 clothe s in her house  , but she's specifically talking

24 about heroin.

25         At the bottom of the page  , Kevin  Scott  says they

1  were traveling , mean ing that  were coming back from    New

2  York with  the heroine,  refer ring to  Donna  Johnson  and

3  Gwen  Levi,  and  then the next page  , they're still try  ing

4  to figure out what  's going on , and  they take it as   a

5  good sign that   William  Turner  was not arrested  , meaning

6  it may not be related to a big investigation if they

7  didn't really arrest him.

8  Q.      If you could then  , on our chart there  , if we

9  don't already have the code clothes   , add the code

10 clothes  and Page No. 366.  Clothes , I believe , may be

11 up there already.  Number 14.  On your chart.

12 A.      (Witness indicating.  )

13 Q.      Base d upon that telephone call  , would it be fair

14 to say that your tactics worked?

15 A.      So far they have, yes.

16 Q.      Going to the next call, B4312 on    Page 371.  Does

17 this next series of calls also take place on April 24?

18 B4312 on  Page 37 1.

19 A.      Yeah.  The series takes place on the    24th.

20 Q.      Is this a group of related calls?

21 A.      Yes , it is.

22 Q.      What are the call numbers that are related?

23 A.      4312, 4313, 4316, 4317, 4321, A1282, B    4330,

24 4363 .

25 Q.      And they all take place on April 24; is that

1  correct?

2  A.      Yes.  April 24 between 1  :07 p.m. and 11 :11 p.m.

3  Q.      If we could begin by turning to the first call,

4  B4312.  The time of that call?

5  A.      That's at 1 :07 p.m.

6  Q.      Who are the  parties to  that call ?

7  A.      Paulette  Martin and  Learley  Goodwin.

8  Q.      If we could play the call  , please.

9          (Audio r ecording begins playing at 3  :03 p.m. )

10         (Audio recording stops playing at    3:04 p.m. )

11         BY MS. JOHNSTON:

12 Q.      The next call, B4313 on   Page 37 2, takes place

13 how soon after the previous call?

14 A.      Right after the call  , three minutes later  , at

15 1:11 p.m.

16 Q.      Who are the parties?

17 A.      Paulette  Martin  and Learley  Goodwin again .

18 Q.      If we could play it  , please.

19         (Audio recording begins   playing at 3 :04 p.m. )

20         (Audio recording  stops playing  at 3 :05 p.m. )

21         BY MS. JOHNSTON:

22 Q.      The next call , B4316 , takes place how many

23 minutes later?

24 A.      First one is at 1  :11  and the other one is at

25 1:26 , about 15 minutes later.

1  Q.      If we could play  B4316.

2          (Audio r ecording begins  playing  at 3 :05 p.m. )

3          (Audio recording  stops  playing  at 3 :05 p.m. )

4          BY MS. JOHNSTON:

5  Q.      The next call , B4317 on Page 375 , does that

6  happen -- is that the next call in the sequence      on this

7  telephone line?

8  A.      Yes.

9  Q.      It happens approximately how many minutes after

10 the one we just listened to?

11 A.      It's 1 :35 p.m ., so about nine minutes later.

12 Q.      Who are the participants in this call?

13 A.      Paulette  Martin  and Claude  Arnold.

14 Q.      If we could play it  , please.

15         (Audio recording begins   playing  at 3 :06 p.m. )

16         (Audio recording  stops  playing  at 3 :06 p.m.)

17         BY MS. JOHNSTON:

18 Q.      Go to  the next call , B4321 on  Page 37 6.   What is

19 the time of that call  ?

20 A.      That's at 2:10 p.m., about a half hour after the

21 last call.

22 Q.      Who are  the parties to  this call ?

23 A.      Paulette  Martin  and Learley  Goodwin.

24 Q.      If we could play it  , please .

25         (Audio r ecording begins   playing at  3 :06 p.m. )

1          (Audio recording stops playing at 3    :06 p.m. )

2          BY MS. JOHNSTON:

3 Q.      As a result of that call  , were surveillance

4 units sent out?

5 A.      Yes.

6 Q.      Where were they sent to?

7 A.      Larry Lane's house in  Oglethorpe .

8 Q.      If we could interrupt the testimony at this time

9 and call a surveillance agent   .

10         THE COURT:   You may.

11         (Witness ex cused from the stand at 3  :07 p.m. )

12 Thereupon,

13                    **KATHLEEN  METERKO ,**

14 having been called as a witness on behalf of the          _____

15 Plaintiff , and having been first duly sworn by the

16 Courtroom Deputy, was examined and testified as

17 follows:

18                    **DIRECT  EXAMINATION**

19    **BY MS. GREENBERG:**

20 Q.      Good afternoon . Could you state your name    and

21 spell your last name for the court reporter     , please?

22 A.      Kathleen  Meterko , M E T E R K O.

23 Q.      Where you employe d and in what capacity?

24 A.      I'm a Prince George's County Police  Officer  and

25 I work in the  Narcotic s Enforcement  Division.

1 Q.      What is your current rank?

2 A.      Corporal .

3 Q.      Were you so employed on or about April 24, 2004?

4 A.      Yes , I would you say was.

5 Q.      Could  you give  the jury some idea about your

6 background , training , and experience?

7 A.      The academy is where everyone begins.      I was in

8 the basic academy for six months.  You learn everything

9 from Maryland state laws to patrol tactics     and firearms

10 skills , driving skills.    I've also  received  training

11 while in the   Narcotic  Enforcement  Division from a

12 number of agencies  , Drug Enforcement  Administration,

13 Customs,  and the training has ranged from wiretap

14 training , interceptive wire communications, money

15 laundering, undercover operations.

16 Q.      And how long have you been   a law enforcement

17 officer  in the narcotics enforcement area?

18 A.      Seven years.

19 Q.      As such , have you done surveillances?

20 A.      Yes,  I have.

21 Q.      Did you assist detectives in connection with

22 this case, detectives -- well    , Sergeant  Sakala , Special

23 Agent  Snyder , and Detective  Eveler  in connection  with

24 investigations   in this case?

25 A.      Yes,  I did.

1  Q.       And specifically did you assist them on April

2  24, 2004?

3  A.       Yes.

4  Q.       Could you tell the jury what you did -- let me

5  back up for a second   .  On April 24, 2004 , what time did

6  you conduct a surveillance?

7  A.       Approximately 2 :30 in the afternoon.

8  Q.       Could you tell the jury what you did at

9  approximately 2 :30 in the afternoon on April 24, 2004?

10  A.       I was directed to do a spot check at 846

11  Oglethorpe  in Washington , which entailed simply driving

12  past that residence   and jotting down anything    I

13  observed.

14  Q.       Is that in the northwest sec   tion  of town?

15  A.       Yes.

16  Q.       And did you go out to the location that you just

17  mentioned 846   Oglethorpe , O G L E T H O R P E, Street ,

18  Northwest  Washington  D. C.?

19  A.       Yes.

20  Q.       Could you tell the jury what you observed?

21  A.       As I drove past the residence   , which was on my

22  right , I observed a small red   Mercedes  Benz  in front of

23  that residence on the street   , and there was a female in

24  the driver's seat  .  And on the sidewalk in front of

25  846 , there was a gentleman standing on the sidewalk      and

1 they were having a conversation.

2 Q.      Did you get a description of the gentleman       at

3 all?

4 A.      I didn't know if he was a black male or       Hispanic

5 male.

6 Q.      Did you notice anything particular about the

7 Mercedes Benz, what type of car it was  , what type of

8 Mercedes it was?

9 A.      I don't know the model  , but I know  it's the

10 two-door convertible.

11 Q.      How was the convertible top?

12 A.      It was down.

13 Q.      Did you manage to get a license plate?

14 A.      No.

15 Q.      Did you observe what this female     and male were

16 doing while by the   Mercedes  Benz  convertible?

17 A.      I observed them talk  ing to  one another.

18 Q.      Did you stop?

19 A.      No.

20 Q.      And why not?

21 A.      I think that would call attention to my

22 surveillance.

23 Q.      Did you get anymore information about the car or

24 the individuals?

25 A.      No.

1          MS.  GREENBERG:    No further questions  , Your

2 Honor .

3          THE  COURT:   A ny cross- examination?

4                    **CROSS-EXAMINATION**

5          **BY  MR.  MONTEMARANO :**

6 Q.      You took notes on that day, did you not?

7 A.      Yes , I did.

8 Q.      And those notes were a reasonably complete     and

9 accurate description of what you observed    ?

10 A.      Yes .

11 Q.      Do you have them with you?

12 A.      No , I don't .

13 Q.      Do you recollect  writing a nything about  having

14 seen  any sort of hand  -to-hand transaction or anything

15 of that sort ?

16 A.      Not in my notes.

17 Q.      You didn't , right?

18 A.      Correct.

19          MR.  MONTEMARANO :  No further questions  , Your

20 Honor .

21          THE  COURT:   Any further  --

22          MR.  HALL:  N o questions , Your  Honor.

23          MR.  MARTIN:   Mr.  Goodwin  has no questions  , Your

24 Honor .

25          THE  COURT:   Anyone else?  Any redirect?

1          MS. GREENBERG: No , Your Honor.

2          THE COURT: All right . You may step down .

3 Thank you very much,   Corporal.

4                (Witness excused at 3 :12 p.m. )

5          MS. JOHNSTON:   Your Honor , we would recall

6 Detective Sakala .

7          (Witness Sakala resume s the stand at 3:13 p.m. )

8                   **FURTHER DIRECT EXAMINATION**

9          **BY MS. JOHNSTON:**

10 Q.     Detective Sakala , was there a telephone call

11 short ly after 2 :30 on April 24 of 2004?

12 A.     Yes.

13 Q.     Calling your attention to A1282 on    Page 37 7.  Is

14 that the next call in this series that we're playing

15 now?

16 A.     Yes.

17 Q.     Approximately what time does that call take

18 place?

19 A.     2:35 p.m. on the afternoon of the    24th of  April.

20 Q.     If we could please play A1282 on    Page 37 7.

21          (Audio record ing begins playing 3:13 p.m.   )

22          (Audio recording stops playing at 3:14    p.m. )

23          BY MS. JOHNSTON:

24 Q.     If we could go to the next call   , B4330 on  Page

25 378.  At what time does this call take place?

1  A.      4:49 p.m. on the same date  , the 24 th.

2  Q.      Who are the  parties to  this call?

3  A.      Paulette  Martin a nd LaNora  Ali .

4  Q.      Again , is this another excerpt from a rather

5  lengthy call?

6  A.      Yes.  It's a three  -minute call , but it starts at

7  a minute 25  and goes to a minute 32.

8  Q.      Why did you decide just to present that small

9  portion of the call?

10  A.      It's the pertinent part of the conversation.

11  The rest of the stuff would not be germane to the case.

12  Q.      If we could please play B4330.

13          (Audio  recording begins  playing  at 3 :14 p.m. )

14          (Audio recording  stops playing  at 3 :14 p.m. )

15          BY MS.  JOHNSTON:

16  Q.      If we could go to the next call, B4363 on     Page

17  379.  Again , this call takes place on April 24; is that

18  correct?

19  A.      Yes.  At 11 :11 that night.

20  Q.      Who are the  parties to  this call?

21  A.      Learley  Goodwin  and Paulette  Martin.

22  Q.      If we could please play B4363.

23          (Audio r ecording begins playing at 3   :15 p.m. )

24          (Audio recording  stops playing  at 3 :15 p.m. )

25          BY MS.  JOHNSTON:

1   Q.      Based upon your training   and experience in this

2   series of telephone calls, did you form an opinion as

3   to what took place on April 24 of 2004 between      Ms.

4   Martin  and Mr. Goodwin ?

5   A.      Yes.

6   Q.      What is that?

7   A.      Mr. Goodwin  informed  Ms. Martin that   Cuba , the

8   source that we talked about last week    , source of

9   cocaine that we talked about last week    , had two kilos

10  of cocaine .  And through a series of calls   , they

11  discussed whether they should purchase them or not.

12          They agreed to   and Ms. Martin drops off the

13  money for her part of the purchase with      Larry Lane at

14  the house on  Oglethorpe , and then Mr. Goodwin

15  subsequently goes   and get s the cocaine  and delivers it

16  to Ms. Martin that night  .

17  Q.      If you  could, refe rring to the calls , tell us

18  what in the calls serves as the basis for your opinion.

19  A.      If you look at the first call is 4312 on      Page

20  371.  Mr. Goodwin  asks whether , did you e ver find

21  anything about the tickets  , mean ing Ms. Martin  -- to

22  Ms. Martin , meaning a supply of drugs  .  She says , no.

23  He says , I just talked to   Cuba .  He says he's got two  ,

24  meaning just talk ed to  Cuba and Cuba's  got two

25  kilograms of cocaine  .  Then they go on to discuss that

1 they don't want   Cuba's cocaine because it doesn't come

2 wrapped in kilo packages.

3        When kilos come, ordinarily when they're first

4 brought into the country  , they will be wrap ped in  a --

5 some type of very tight wrapping paper  , could be duct

6 tape , it could be plastic  , it could be a wax covering  ,

7 but it's very -- a very recognizable    as the  original

8 wrapping of the kilogram  , indicating that that kilo has

9 not been tampered with  .  It hasn't been cut , it's of

10 the original quality that they would expect   .

11        And what  Mr.  Goodwin  and  Ms.  Martin are saying  ,

12 Paulette is saying  , yeah , but that stuff of   Cuba 's , you

13 know , and Mr.  Goodwin's  saying , yeah , I know exactly

14 what you're saying  , and then  Ms.  Martin says , you know ,

15 if they're in the regular container    , meaning if they

16 have the same original wrapping material   , that would be

17 something the -- that would be something that she would

18 be interested.

19        Mr.  Goodwin  says , that's the whole key right

20 there , meaning that's the determination of whether the

21 cocaine is going to be of good quality or not is the

22 wrapping paper.    Ms.  Martin reiterates in the regular

23 container.  You can tell him    I said so , you know , that

24 ain't right.

25        And then on top of   Page 37 2, Mr.  Goodwin  says ,

1  I'm going to go  get with them  and talk to them , and if

2  it's , like , in the regular container  , meaning if the

3  cocaine is still original wrapping  , still  original duct

4  tape , how it originally come  s in the country , that's

5  good.  If not, he goes , if not , tell  him  to shove it ,

6  meaning if it's been taken out of the original

7  contain er, put in a  Ziploc  baggy or some other way  ,

8  that indicates it's been adult   erated , then they're not

9  going the buy it.

10 Q.      Before we move on  to the next call , the term

11 tickets in this call refer  s to what?

12 A.      Cocaine.

13 Q.      Any particular quantity of c   ocaine ?

14 A.      The first reference is tickets is just cocaine

15 in general , and then it's -- he's got two  , meaning two

16 kilograms , but the  word tick et is use d in  that

17 sent ence.

18 Q.      Now, you talked  about packaging .  Based upon

19 your training  and experience , that packaging of cocaine

20 is original packaging when it come   s into  the country?

21 A.      That's correct .  In fact , you can see it from

22 the packag ing of the  Wyoming packages , a very good

23 example of what we're talking about.

24 Q.      Is there , based on your training   and experience,

25 a particular  unit or quantity that is wrapped in that

1 manner?

2 A.     Normally , the thing you will see    is one

3 kilogram , 2.2 pounds , 1,000 grams.

4 Q.     So you wouldn't wrap an eight ball in that kind

5 of packaging?

6 A.      Oh, no, no, no.  When they  're talking about

7 original packaging , they're not talking about anything

8 more or less than   -- a kilogram is  what they're

9 discussing.

10 Q.    If you could write   Page 371 on our board  next  to

11 the word tickets.

12 A.    (Witness indicating.  )

13 Q.    And then if we could go on to   Call B4313.  Is

14 there anything in this call that supports your

15 opinion --

16     THE  COURT:  Before we go on  , why don't w e take

17 an afternoon break until 25 of    4:00.

18              (Jury excused at 3:20 p.m.)

19              (Off the record  at 3 :20 p.m. )

20              (On the record at 3  :36 p.m.)

21     THE  COURT:  Counsel , remember we're going to

22 convene tomorrow  morning at 9 :45 and with the jury at

23 10:00  so we can take up any preliminary matters then.

24              (Witness resumes   the stand. )

25              (Jury returns at 3  :37 p.m. )

1        THE COURT:  You may proceed.

2        BY MS. JOHNSTON:

3  Q.      I think , Detective  Sakala , you were explain ing

4  what was in the closet that led you    to the conclusion

5  that Ms. Martin  and Mr. Goodwin  did a drug transaction

6  on April 24 of 2004.

7  A.      Yes.

8  Q.      On Page 273 .

9  A.      Yes.  Again, this is   Mr. Goodwin  calling  Ms.

10  Martin back after he's checked with    Cuba.  Fourth line

11  down , Mr. Goodwin  says, he said it was in the regular

12  wrapper , meaning the cocaine was in the original

13  wrapping material.    Ms. Martin says, okay  , we can go

14  then , meaning , okay , we'll make the purchase.

15        Then they go on to talk about getting the money

16  together.    Mr. Goodwin  asks what time are you going to

17  be home?   Ms. Martin , I'm home now , and then they go on

18  to Ms. Martin says , I can leave it with   Jackie, meaning

19  she can leave the money with    Jackie .

20  Q.      That would be her roommate who lived upstairs?

21  A.      Jacqueline  Terrell, if she wasn't there.  Yeah

22  if Ms. Martin had to go out.

23  Q.      And the call with  Mr. Arnold, what is the

24  significance of that call on    Page 37 5?

25  A.      Ms. Martin  is telling Mr. Arnold  that she is

1  going to -- may have some good news    , meaning that she

2  may be receiving a shipment of cocaine     and has to do

3  with her brother had called her.

4  Q.      Brother referring to whom?

5  A.      Mr. Goodwin.   They were waiting to see what's

6  what -- what's going on.

7  Q.      Were you familiar with   Larry's house   during the

8  course of this investigation?

9  A.      On Ogelthorpe , yes.

10 Q.      As a result of that call  , surveillance was sent

11 there , you heard  Ms. Materko testify ; is that correct ?

12 A.      Yes.  After we got   Call 4321 on 376.

13 Q.      And are you -- how many red    Mercedes

14 convertibles did you identify during the course of this

15 investigation ?

16 A.      Just Paulette  Martin's  Mercedes.

17 Q.      On Page  377, Ms. Martin advises    Mr. Goodwin  at

18 2:35 that she left the tickets at     Larry's.  What does

19 "tickets " mean in this call  ?

20 A.       In this case , she's talking about she dropped

21 the money at  Larry Lane's house on   Oglethorpe .

22 Q.      What is that base  d upon?

23 A.      The whole series of calls.  What they're doing     ,

24 they're buying cocaine from    Cuba  and they would need

25 money to do that.

1  Q.      And then the last call  , B4363 on  Page 379.

2  That's significant based on your training      and

3  experience because that shows what?

4  A.      He's calling  Ms. Martin to see if she's at home   .

5  He's made the transaction with   Mr. Cuba  and is bringing

6  the cocaine by.

7  Q.      Then if we could go to the next call, B4385 on

8  Page 380.  When does this call take place?

9  A.      This is the next morning  , the -- after she

10 received the cocaine that previous night.

11 Q.      The delivery from   Mr. Goodwin  occurred shortly

12 after what time?

13 A.      11 o'clock at night.

14 Q.      And this call takes place at what time?

15 A.      9:33 the next morning.

16 Q.      Who are the  parties to  this call ?

17 A.      Paulette  Martin  and Claude  Arnold.

18 Q.      The same  Claude  Arnold whom she spoke to in the

19 middle of the call  s with Mr. Goodwin --

20 A.      Yes.

21 Q.      -- f rom the day before  ?

22 A.      Yes.

23 Q.      Now, on -- if we could please play this call      and

24 then  I'll ask you some questions about it.

25         (Audio recording begins playing at 3    :41 p.m. )

1          (Audio recording   stops  playing  at 3:41 p.m.)

2          BY MS. JOHNSTON:

3 Q.       And based upon your training   and experience, did

4 you form an opinion as to what   Mr. Arnold and Ms.

5 Martin are discussing?

6 A.       Yes.  They're talking to two different things   .

7 One at the beginning of the conversation   , they're

8 talking about the shipment of coke that she just got      ,

9 and that he's going to come   over and get some.  And in

10 the second part, they're talking about   trying to get a

11 hold of  Gwen Levi.

12 Q.       If we could discuss the first part on     Page 380,

13 are there any codes used during that conversation?

14 A.       Yes.  Fourth line down , she goes, I got those

15 fliers for the shows   I was telling you about.  He

16 didn't hear her.  She repeats it, I got the fliers for

17 the show  I was telling you about  , meaning I've received

18 cocaine that we were talking about yesterday.  Then he

19 says he's going be there in 25 or 30 minutes.       She

20 inquires as to how much cocaine he wants     , saying what

21 do you want?  One or two fliers?     And then it goes back

22 to the same thing before  .  Can pay for one , he wants

23 the second one fronted.     And then the conversation

24 switches to  Gwen Levi.

25 Q.       Okay.  Well, before we turn to the conversation

1  with Ms. Levi, would you add fliers to your list of

2  codes if it's not up there already?

3  A.      (Witness indicating.  )

4  Q.      Based upon this portion of the call    and previous

5  calls with  Mr. Arnold,  did you form an opinion as to

6  whether he was paying for th   e drugs when he received

7  them or if he was getting fronted any drugs?

8  A.      In the previous transaction    , he paid for an

9  eighth of a kilogram   and got fronted an eighth a

10  kilogram.  In this one   , they don't identify the amount

11  that he was picking up   , other than he's going to pay

12  for one  and get the other fronted to him or provided on

13  consignment.

14  Q.      Based upon your training    and experience , why was

15  it not necessary for them   , either one of them  , to

16  mention a particular quantity in this call?

17  A.      They would know based on previous dealings      .

18  They had no doubt in either one of their minds talking

19  about quantit y-wise.   There is no need to mention it.

20  Q.      You indicated that you    believed  the remainder of

21  the call is related to   Ms. Levi .  Could you explain to

22  us where you form that opinion?

23  A.      Yeah.  Bottom of   Page 380 , Claude  Arnold says ,

24  I've been calling  and calling , talks about he's been

25  calling  Gwen Levi 's cellular telephone.  Next page    , on

1  Page 38 1, Paulette Martin, that guy ain't been calling

2  me back.  I don't know why he don't call me back    .

3  She's refer ring to William Turner.  She's been calling

4  him and he's not calling back   and can't get an answer

5  on either one of the lines  .  Mr. Arnold says, just hope

6  he don't --  I'm not surprised not hearing from him     ,

7  meaning it's not unusual that     Mr. Turner doesn't call

8  back.

9           A lot of times when they go up   , a lot of times

10 when they go to  New York, they get cut off  , meaning

11 their cellular phones don't work up there     and -- from

12 the system is the way he talks about it     , and then they

13 just go on to talk if they're gone two to three days

14 without calling  , then they're going have to start

15 worrying  about it.

16 Q.      If we could turn to the next call, B4393 on     Page

17 382.  Does this call take place on the same date?

18 A.      It takes place on the same date, yes.

19 Q.      Okay.  At what time?

20 A.      10:17 in the morning.

21 Q.      And if we could please play -- strike that    .

22         Who are the parties to this call    ?

23 A.      Paulette Martin and LaNora Ali.

24 Q.      If we could please this telephone call.

25         (Audio recording begins    playing at 3:47 p.m. )

1          (Audio recording   stops  playing  at 3:47 p.m.)

2          BY MS. JOHNSTON:

3  Q.      Now, based on your training   and experience , what

4  is Ms. Martin telling  Ms. Ali in this call?

5  A.      They're talking about   Gwen  and how no one's been

6  able to get a hold of her.     Kevin  Scott,  her son's ,

7  been -- has not been calling   Paulette  Martin back so

8  they can't really -- at this point   , they still don't

9  know what's going on.

10          And they talk about   Smack , or Skip , who's

11  referenced to  Claude  Arnold  and how him  and  Gwen  Levi

12  were -- had been best friends for 40 years   , but again ,

13  there they're still just talking -- they don't know

14  what happened , just that something went down on     Friday

15  night , which was the search warrant that was executed

16  on her residence .

17  Q.     If we could turn to   Call B4426 on page 38  6.

18  What date  and time does this call take place?

19  A.     This is on the same day  , the 25th , 3:23 in the

20  afternoon.

21  Q.     Okay . Who are the  parties to  this call?

22  A.     Paulette  Martin  and Reece  Whiting.

23  Q.     If we could play it  , please.

24          (Audio recording begins playing at 3   :49 p.m.)

25          (Audio recording stops playing at 3   :49 p.m.)

1

2          BY MS. JOHNSTON:

3  Q.      Based upon your training   and experience , did you

4  form an opinion as to what was being discussed between

5  Ms. Martin  and Mr. Whiting ?

6  A.      Yes.

7  Q.      What is that?

8  A.      The second line down  , Ms. Martin says,  I don't

9  have no tickets now , means  I don't have any  drugs ,

10 cocaine , right now.   And Mr. Whiting says, yeah  , he

11 knows , that's what he wanted to talk to her about.        I

12 wanted to talk to you about something that's going     to

13 resolve  that problem , meaning he's got another source

14 of cocaine to tell her about.     And then she says she

15 will wait there at the house on    Hayward  for him to come

16 over and talk about it.

17 Q.      All right.  Now  , could you please write    Page 38 6

18 next to the word   "tickets " on our chart ?

19 A.      (Witness indicating.  )

20 Q.      If we could go to the next call  , B4430 , on Page

21 387.  Does this call , likewise , take place on April 25?

22 A.      April 25 at 4 :48 the afternoon.

23 Q.      Who are the parties to this call   ?

24 A.      Paulette Martin  and LaNora Ali .

25 Q.      If we could play this call  , please.

1          (Audio recording begins   playing at 3:51 p.m.)

2          (Audio recording   stops playing at 3:51 p.m.)

3          BY MS. JOHNSTON:

4   Q.     Based upon  your training and  experience , did you

5   form an opinion as to what was being discussed in this

6   call?

7   A.     Yes.

8   Q.     What was that ?

9   A.     Paulette  Martin informs   LaNora  Ali that  Gwen's

10  been arrested , stating she's locked up  , and then she

11  goes on to talk -- tell   Ms. Ali that she believes  Ms.

12  Martin believes it's related to the arrest of      Emilio

13  Echarte  in Florida  and that  Echarte  is an in formant  who

14  had informed on   Ms. Levi .

15  Q.     And the  Echarte  is referred to by what name?

16  A.     On Page 38 7, he's referred to as    Julio .

17  Q.     And what drug was   Mr. Echarte  arrested for ?

18  A.      His case in   Florida involved manufacture of

19  PCP.

20  Q.     What is  PCP?

21  A.     Phencyclidine.   It's a hallucinogenic  , old

22  animal tranquilizer   Schedule I narcotic.

23  Q.     Calling your attention to    Page 388 .  Ms. Martin ,

24  about the middle of the page  , initially says , but she

25  wasn't involved in that  , and then she continues she

1  just introduced him to the people that want   ed the

2  recipe to the sweet potato pie   .  Based on your training

3  and experience , what is  Ms. Martin advising   Ms. Ali?

4  A.     She's saying that    -- Ms. Martin  is stating that

5  Gwen Levi was not involved directly in the case    , and

6  that they had introduced -- she --    Gwen Levi had

7  introduced  Mr. Echarte  to the people in   Florida  and Mr.

8  Echarte  was going to be the person making the      PCP ,

9  mixing  it up , referring to it as they wanted the recipe

10 for the sweet potato pie   .  That's what  Mr.  Echarte  was

11 doing  in that case .

12 Q.     So the recipe for  the sweet potato pie refers to

13 what?

14 A.     The recipe for   PCP , phencyclidine  .

15 Q.     That's different    from  the other reference   s to

16 sweet potato pie  ; is that  correct ?

17 A.     Correct.  This is not referr   ing to  cocaine.

18 Q.     That is based upon what?

19 A.     Based upon the case that    Mr. Echarte  was

20 involved in.  It was not cocaine.

21 Q.     Now , if we could go to the next call    , B4438 , on

22 Page 389.  What date   and time does this call take

23 place?

24 A.     This is on the same date at 8   :11 p.m ., a little

25 later that evening.

1  Q.      Who are the parties to this call  ?

2  A.      Paulette Martin and John Martin.

3  Q.      If we could play it , please.

4          (Audio recording begins  playing  at 3:55 p.m.)

5          (Audio recording  stops  playing  at 3:55 p.m.)

6          BY MS. JOHNSTON:

7  Q.      Based upon your training  and experience an d your

8  knowledge of the wire , what was  Ms. Martin telling  Mr.

9  Martin in this call?

10 A.      She was confirm ing that Reece Whiting had come

11 to her residence as he had previously planned to do to

12 discuss the new source of cocaine  , and he's saying that

13 Mr. Whiting  just left.

14 Q.      Now , if we go to the next call, B4442  , on what

15 date an d time does this call take place?

16 A.      This is on April 25, 2004  , at 8:48 in the

17 evening.

18 Q.      The same date  as the  previous call with  Mr.

19 Whiting ; is that correct  ?

20 A.      Yes.  The same series of calls.

21 Q.      If we could please play  B4442 .

22         (Audio  recording starts  playing at 3:56 p.m. )

23         (Audio recording stops playing at 3:56 p.m.)

24         BY MS. JOHNSTON:

25 Q.      The Kevin  referred to in this call is who  ?

1  A.       Kevin  Scott.

2  Q.       The person to be visited in    Baltimore is who?

3  A.       Gwen  Levi .

4  Q.       Who is giving advice about whether or not a

5  lawyer can visit any day?

6  A.       Mr. Whiting  is disagreeing with the opinion that

7  an attorney can't visit    and saying that the attorney

8  can visit any time.

9  Q.       Now, if we could go to call A1300 or    D1884 at

10  Page 39 2.  What date does this call take place?

11  A.       This was on the 26th  , the next day , at 7 :53 in

12  the morning.

13  Q.       This call is between whom?

14  A.       Paulette  Martin  and Luis  Mangual .

15  Q.       If we could play this call   , please.

16         (Audio r ecording begins playing at 3   :57 p.m. )

17         (Audio recording   stops  playing  at 3 :57 p.m.)

18         BY MS. JOHNSTON:

19  Q.       Based upon your training   and experience , what is

20  Mr. Mangual  telling  Ms. Martin in this call?

21  A.       Middle of the page  , he says , I should have a

22  call -- should have a call for   you to day, meaning  I

23  should have drugs to sell you today    , so it should be

24  today he's letting her know.

25  Q.       If we could go to the next call, B4454 on    Page

1   393.   On what date  and time does this call take place?

2   A.      Same date , April 26 at 10 :19 in the morning.

3   Q.      Who are the parties to this call   ?

4   A.      Paulette Martin and George Harris.

5   Q.      If we could play it  , please.

6           (Audio r ecording begins playing at 3   :58 p.m. )

7           (Audio recording  stops  playing  at 3 :58 p.m.)

8           BY MS. JOHNSTON:

9   Q.      Now, in this call , based upon your training   and

10  experience , is Ms. Martin referencing a message she had

11  previously left?

12  A.      Yeah.  Just that appears to be that he's

13  returning the call  , but there  seems to  be confusion

14  about the message she left    and what he thought it

15  meant.

16  Q.      What does she say it meant in this call   ?

17  A.      I called you to let you   know everything  was

18  okay.  They don't really go into any further detail as

19  to what that means though.

20  Q.      Now , calling your attention to B4399 on     Page

21  385, an interception  that  occurred on April 25 of 2004   ,

22  the day after  Mr. Goodwin delivered the kilogram.  Was

23  that a message that was left for    Mr. Harris by Ms.

24  Martin?

25  A.      Yes.

1 Q.      Okay.  Is that what's referenced in this call

2 we've just played?

3 A.      Yes.  It was the day before  , that would seem to

4 be the logical inference  .

5 Q.      Calling your attention to B4461.

6        Who are the parties to  this call?

7 A.      This is the followup call with    Paulette  Martin

8 and George  Harris.

9 Q.      At what time does this take place in relation to

10 the telephone conversation that we just listened to?

11 A.      This is about three hours later  , at 1:07 in the

12 afternoon.

13 Q.      Who are the parties to this call   ?

14 A.      Paulette  Martin  and George  Harris.

15 Q.      Could replay it  , please ?

16        (Audio recording begins  playing  at 4:00 p.m.)

17        (Audio recording  stops  playing  at 4:00 p.m.)

18        BY MS. JOHNSTON:

19 Q.      And based upon your training   and experience ,

20 what are  Mr. Harris  and Ms. Martin  discussing in this

21 call?

22 A.      He's ordering  a quantity of cocaine from her,

23 she confirms the amount  , middle of the page says  , okay,

24 then , look , what size  dress do you want  for your

25 daughter ?  That means  how much  cocaine do you want  .

1 Mr. Harris says, two size eights, referring to two

2 either eighth of a  kilogram or eighth of an ounce  , and

3 then he says it again  , two size  eights.

4 Q.    What's the  code  word used for drugs in this

5 call?

6 A.    Dress.

7 Q.    If you would  please write the page number next

8 to that code word.

9 A.    (Witness indicating.  )  398?

10 Q.    395.  Based upon your training an   d experience ,

11 did you note any similarity between the quantity of

12 dresses for his daughter  , sundresses  for his wife , or

13 tickets  Mr. Harris  orders from  Ms. Martin?

14 A.    Did  I notice any --

15 Q.    Any similarity between the number or quantity of

16 dresses for his daughter,   sundresses  for his wife , or

17 tickets that he orders from   Ms. Martin?

18 A.    Most of the calls seem to contain the    number

19 eight.

20 Q.    Based upon  your training  and experience , what's

21 the significance of that  ?

22 A.    It's a common division of drugs   .  Like I said ,

23 it's either an eighth of a kil   ogram, or eighth of an

24 ounce .  It's a common quantity sold in the drug trade.

25 Q.    In reviewing the transcript book as well     as the

1 CD, did you note that we had neglected to add a call

2 that occurred on  April 26 to the transcript book    and

3 the CD?

4 A.    Yes.

5 Q.    I want to show you what's been marked as    CD-3

6 and Government's  Exhibit B -44 -- show you  Government's

7 Exhibit B4456 and CD-3.  And is this an accurate copy

8 of the  original  recording of  Call B4456 on  CD-3?

9 A.    Yes, two calls are on here.

10 Q.    What's the other call that's on there?

11 A.    B8040.

12 Q.    Is that another call that we omitted from the

13 original  CD and  in the transcript book?

14 A.    Yes.

15 Q.    And B4456 occurred on what date    and  time?

16 A.    That was on  April 26 at 10 :26 a.m.

17 Q.    Is the transcript that's been mark    ed with

18 Government's  Exhibit B4456 an accurate transcript of

19 that call?

20 A.    Yes.

21 Q.    Similarly , would  B8040  -- is the recording of

22 Call B8040 accurate on    CD-3?

23 A.    Yes.

24 Q.    Is the transcript identified as    Government's

25 Exhibit B8040 an accurate transcript of that call    ?

1  A.      Yes.

2  Q.      What day did B8040 take place on?

3  A.      That was later in the wire on    May 28 at  5:38

4  p.m.

5          MS. JOHNSTON:   Your Honor , with the  Court's

6  permission , we would like to play   Call B4456 at this

7  time  and distribute the transcript to the jury, please.

8          BY MS. JOHNSTON:

9  Q.      In reference to  Call B4456 , what date  and time

10 did that take place?

11 A.      It was on  April 26 in the morning at   10:26 a.m.

12 Q.      Who are part ies to  this call ?

13 A.      Paulette  Martin  and Kevin  Scott , Gwen  Levi 's

14 son.

15 Q.      If we could play this call   , please .

16         MR.  HALL:   Your  Honor , before the call is

17 played , I have an objection  .

18         Could we approach  ?

19         THE  COURT:  Y ou may.

20              (At the bar of the Court.)

21         MR.  HALL:   Your  Honor , my objection is the

22 individual.  This call is with someone who's never been

23 charged in this case  , and I would suggest to the   Court

24 is therefore not a co  -conspirator , and that this

25 transcript would therefore be hearsay    .  So, I'm

1  suggesting that for that reason   , it shouldn't come in.

2        MS. JOHNSTON:   Your Honor, it is -- one of the

3  parties to the call is  Paulette Martin.  The

4  conversation that is ad  missible  certainly  as to Ms.

5  Martin's statements.   Mr. Scott's testimony is

6  therefore admissible to put in context what     Ms. Martin

7  is saying.

8        It's not being offered for the truth of what     Mr.

9  Scott said but to put in context what     Ms. Martin is

10  saying.  In addition   -- so it would be ad  missible   only

11  on that basis.  He may or may not be a co   -conspirator ,

12  I don't know that he is,   but the  conversation in terms

13  of what  Ms. Martin says is admissible,    and to the

14  extent that what   Mr. Scott says is what precipitates

15  her speaking, it is admissible to show the context of

16  what she's saying.

17        It could also alternatively be considered an

18  admission on her part based on the way the conversation

19  goes.

20        MR. MONTEMARANO :  H ow is it ad missible  if it's

21  not a co -conspirator , Your Honor ?

22        MS. JOHNSTON:  It's not be  ing admit ted for the

23  truth of what's being said  .  It's be ing admitted for

24  the truth of what she says in response     to him .

25        MR.  MONTEMARANO :  T hat's hearsay when it's a

1  conversation with a third party.

2        THE COURT:   Mr. Montemarano , why does it have to

3  be a conversation between co   -conspirators   if it's a

4  statement made in   furtherance   of the conspiracy ?

5        MR. MONTEMARANO :  Other than this government has

6  to proffer a basis why this is in furtherance of the

7  conspiracy.   Not everything she has said between the

8  first day  of the  indictment   and  the last day of the

9  indict ment is  necessarily admissible   .

10       MS. JOHNSTON:   Your Honor , it would be jus t like

11  if Ms. Martin was expect   ing a pack age containing

12  cocaine  and she called  UPS to see when the package was

13  to arrive.   Her statement would be ad   missible,  and what

14  the UPS statement   is would be ad missible  to put in

15  con text what she was saying  .  Otherwise , we wouldn't

16  have half of these   conversations   in here.

17       MR. WARD:   Your Honor , I suggest that's

18  bootstrapping.  As   I understand that exception, that is

19  it's not hearsay because it -- it is sometimes used or

20  it can be used to explain a course of conduct.  Why did

21  you go to such  and such a place?   I went to such  and

22  such a place because   I received certain information

23  from Michael  Montemarano . That's not explain  ing the

24  course of action  .  This doesn't explain her course of

25  action .  This explains what she's actually saying here   .

1          MR. HALL:  It's a two-party conversation, and

2  one of those two individuals  , their words are not

3  admissible.

4          MR. MONTEMARANO :  If the third party , Your

5  Honor , is a neutral person or in   essence,  for  lack  of  a

6  custodian of information , like for instance the   UPS

7  officer that  Ms. Johnston used in her example who's

8  providing con text to her call to set up a delivery or a

9  pickup  and is the person at the other end of the line   ,

10 it could be a voice recording for all that mattered   .

11 That would be , perhaps , acceptable.          This is a

12 conversation, a give  and take with a person, the person

13 who has an understanding or meaning of what    Ms. Martin

14 says and who is then saying things which   Ms. Martin  is

15 then reacting to.  That make   s this  third party's

16 conversation hearsay.  We don't have that person here

17 to be cross -examined.

18          THE COURT:  I'll tell you what, counsel.  Let me

19 consider this matter.   I'll review this  and review the

20 rules a nd let's resolve this  and I'll rule on it

21 tomorrow morning.

22          MR. MONTEMARANO :  F air.

23          MR. HALL:  A ll right .  That's fine.

24          MS. JOHNSTON:   I would suggest the   Court then

25 might want to stop at this juncture, because     I think

1  we're two calls away from getting    into the calls

2  involving Ms. Ali's disputed conversation.    I think

3  there are two or three calls between the call

4  immediately after this one which involves M    r. Whiting

5  and is related to this call , so ...

6        THE COURT:  You 're concerned  you're going to

7  lose the context without this call   ?

8        MS. JOHNSTON:  Y es, sir .  I think this call is

9  -- I can play it.  If the   Court wants us to,   that's

10  fine .  I just want to advise the   Court that we will

11  quickly be approaching on those other calls.

12        THE COURT:  What  I'd like to do is go as close

13  to 4 :30 as we can with what we can get through without

14  objection.   I will review this in the meantime   .

15        MR. MONTEMARANO :  W hile we're here.    Your  Honor ,

16  would y ou like us here earlier than    9:45 in case  Your

17  Honor is free a little earlier   , since we are now hav  ing

18  other matters than the 9   :45 we suggested?    I'm just

19  asking.

20        THE COURT:  It depends on how long    it takes me

21  to f inish my guilty plea.    If I'm finish ed with  my

22  guilty plea   faster  than 45 minutes -- if you can get

23  here at 9 :30 and pace the room for a minute   , we'll be

24  ready .  All right?

25                 (Back in open court.  )

1          BY MS. JOHNSTON:

2  Q.      Detective Sakala, we'll pass  Call B4456 for the

3  time being  and let's go the  Call B4506.

4          On Page 39 6, on what date  and time did that call

5  take place ?

6  A.      It took place on  April 26 at 7 :09 p.m.

7  Q.      Who are the  parties to  this call ?

8  A.      Paulette  Mart in and  Reece  Whiting.

9  Q.      Okay.  And if we could play the call, please.

10         (Audio r ecording begins playing at 4  :12 p.m. )

11         (Audio recording  stops  playing  at 4 :12 p.m. )

12         BY MS.  JOHNSTON:

13  Q.     Now if we could go to the next call  , B4515 , on

14  Page 39 7.

15         Do you have that call in front of you   ?

16  A.     Yes.

17  Q.     What date  and time did that take place?

18  A.     The same day at 9 :26 p.m.

19  Q.     Who are the parties to this telephone

20  conversation?

21  A.     Paulette  Martin  and Michael  Jackson.

22  Q.     Mr. Jackson,  he's not been charged in this case    ,

23  has he?

24  A.     No, he has not.

25  Q.     If we could please play B4515 on    Page 39 7.

1          (Audio recording begins playing at 4:13 p.m.)

2          (Audio recording stops playing at 4:14 p.m.)

3          BY MS. JOHNSTON:

4  Q.      Now, in Call B4515 on Page 397, did you form an

5  opinion as to what was being discussed by -- between

6  Ms. Martin and Michael Jackson?

7  A.      Yes.

8  Q.      And what is that?

9  A.      Mr. Jackson is telling Ms. Martin that a friend

10 of his just came in from out of town.    Ms. Martin asks

11 how much are the tickets for the show, meaning what

12 price does he have for cocaine   he has for sale.    Mr.

13 Jackson replies he wants 25, referring to it as

14 $25,000.   Ms. Martin says she'll let him know.

15 Q.      $25,000 for what -- based on your training    and

16 experience, what quantity of drugs is that for?

17 A.      That would be per one kilogram of cocaine.

18 Q.      What is the code word they use in this

19 conversation to refer to kilos of cocaine?

20 A.      Ms. Martin says how much are tickets for the

21 show, how much, meaning how much are the kilograms.

22 Q.      Would you make a notation on our chart as to

23 Page 397?

24 A.      (Witness indicating.)

25 Q.      Now, in that same call, Ms. Martin -- after Mr.

1  Jackson  repeats he came back from out of town    , Ms.

2  Martin says so everything okay?  Based upon your

3  training  and experience , what is  Ms. Martin asking   Mr.

4  Jackson in that call?

5  A.      She's asking -- is he okay   , meaning he arrived

6  without any arrest or any problems or anything like

7  that .  Everything is fine.

8  Q.      Meaning what?

9  A.      Meaning the source   -- Mr. Jackson 's friend who

10 came in from out of town with the cocaine     , everything's

11 fine and okay with him , and then she goes on   to ask him

12 about the price.

13 Q.      Now , if we could go to the next call, B5533     on

14 Page 39 8.  What date an d time does this call take

15 place?

16 A.      This was on  April 27, 2004  , at 7 :57 in the

17 morning.

18 Q.      Who are the parties to this conversation?

19 A.      Paulette  Martin  and Luis  Mangual .

20 Q.      Could  we play this call, please  ?

21         (Audio recording begins   playing at 4 :16 p.m. )

22         (Audio recording   stops  playing at 4 :16 p.m. )

23         BY MS. JOHNSTON:

24 Q.      Based upon your training    and experience , what is

25 Mr. Mangual  advising  Ms. Mar tin of in this call ?

1 A.        He now has cocaine for sale.

2 Q.        Was there surveillance done the previous day to

3 corroborate that information?

4 A.        Yes.

5 Q.        Did that surveillance involve   Ms. Martin ?

6 A.        The previous day?  No,   I do not believe so  .

7 Q.        Who was involv ed in  that surveillance  ?

8 A.        The delivery of drugs that   Mr. Mangual  received.

9 Q.        Now, if we could go to the next telephone call     ,

10 A1363  on Page 39 9.

11          Do you have that call in front of you    ?

12 A.        I'm sorry , the call number again   ?

13 Q.        I'm sorry.  Call   A1363, on Page 402.

14          Do  you  have that call in front of you?

15 A.        Yes.

16 Q.        Before we get to that  , if we could just briefly

17 look at  Call B4562 on  Page 399  and Call B4599 on Page

18 401.

19          Are you familiar with those two calls?

20 A.        Yes.

21 Q.        Okay.   And who are they between?

22 A.        Paulette  Martin  and Milburn  Bruce  Walker.

23 Q.        Do they use any particular codes in those two

24 calls?

25          MR. MONTEMARANO :   Your Honor , I object.

1           Can we approach?

2           MS. JOHNSTON:   I can play the calls , Your Honor ,

3 if that's the objection.

4           MR. MONTEMARANO :  That is .

5           BY MS. JOHNSTON:

6 Q.        Okay .  Then go t o B4562 on  Page 39 9.

7           What date an d time did this call take place?

8 A.        April 27, 2004 , at 12 :39 in the afternoon.

9 Q.        Who are the  parties to  this tele phone

10 conversation ?

11 A.        Paulette  Martin  and Milburn  Bruce  Walker .

12 Q.        If we could play this call  , please .

13           (Audio r ecording begins playing at 4   :18 p.m. )

14           (Audio recording   stops  playing  at 4 :19 p.m. )

15           BY MS. JOHNSTON:

16 Q.        What are Ms. Martin  and Mr. Walker  discussing in

17 this call?

18 A.        Mr. Walker  is try ing to  ascertain if  Ms. Martin

19 is going to be home   and she says , no, and he'll call --

20 he's going to call back.

21 Q.        What time did this call take place?

22 A.        The next call -- this one was at 12   :39.  The

23 next one is at 5  :55.

24 Q.        The call  at 5:55 , is that  Call B4599 that

25 appears on Page 401?

1  A.      Yes.

2  Q.      And who are the parties to this call   ?

3  A.      Paulette Martin and Milburn Walker again.

4  Q.      If we could play this call.

5          (Audio recording begins playing at 4   :19 p.m. )

6          (Audio recording   stops playing  at 4:19 p.m. )

7          BY MS. JOHNSTON:

8  Q.      What are Ms. Martin  and Mr. Walker  discussing in

9  this call ?

10 A.      He's ascertaining if she's home.  She is     and

11 he's going to come by.

12 Q.      Let's turn to call A1363.  On what date     and time

13 does this call take place?

14 A.      This was on  April 28 at 9 :53 in the morning  , the

15 next day.

16 Q.      Is this call part of a series of calls that are

17 related to each other?

18 A.      Yes, it is.

19 Q.      What are the other calls related to this call    ?

20 A.       First one is A1363  , B4758 , then A1407,  B4786,

21 4804 and 4806.

22         MS. JOHNSTON:   Your Honor , I don't know if the

23 Court wants me to start playing this series of     calls or

24 if you would like to wait.

25         THE COURT:  Go ahead.

```
1           BY MS. JOHNSTON:

2  Q        Okay.  Let's turn first to A1363 on Page 402      and

3  403.  Before we do that   , what's the  time frame of this

4  series of calls?

5  A.        The first call , A1363, is the morning of the

6  28th at 9 :53 a.m.   And the last call is on  April 28 at

7  11 o'clock at night or a little after 11 o'clock at

8  night.

9  Q.        They all happened on   the same day?

10 A.        No, they do not all happen on the same day.

11           I'm sorry.  Yes, they do all happen on the same

12 day.   April 28.

13 Q.        Between 9 :53 in the morning and 11   :11 at night ;

14 is that correct?

15 A.        That's correct.

16 Q.        Who are the parties to these conversations?

17 A.        Paulette  Martin , LaNora  Ali , Larry  Nunn are the

18 three parties in the different call   s.

19 Q.        If we could be gin with A1363 on Page 402  .  Who

20 are the  parties to  this conversation?

21 A.        LaNora  Ali and  Paulette  Martin.

22 Q.        If we could play A1363 at this time.

23           (Audio recording begins playing at 4    :21 p.m. )

24           (Audio recording   stops  playing  at 4 :22 p.m. )

25           BY MS.  JOHNSTON:
```

1 Q.       Going to the next call  , B4758 , on Page 404  and

2 405.  At what time does this call take place?

3 A.       The same day , the 28th , at 5 :15 p.m.

4 Q.       Who are the  parties to  this call?

5 A.       This is  Paulette  Martin and  Larry  Nunn.

6 Q.       If we could play this call, please.

7            (Audio r ecording begins  playing  at 4 :22 p.m. )

8            (Audio recording  stops playing  at 4 :23 p.m. )

9            BY MS. JOHNSTON:

10 Q.      Calling your attention to the next call, A1407       ,

11 on Page 406.

12            What time does this call take place?

13 A.       Same day , 28th at 7 :22 p.m.

14 Q.       Who are the parties to this call  ?

15 A.       Paulette  Martin  and  Larry  Nunn .

16 Q.       If we could play this call  , please.

17            (Audio r ecording begins  playing  at 4 :23 p.m. )

18            (Audio recording  stops playing  at 4 :24 p.m. )

19            MS. JOHNSTON:   Your Honor , I believe  the Court

20 would like to stop with our playing the calls at this

21 point.

22            THE COURT:  Is this --   does that finish this

23 series of calls ?

24            MS. JOHNSTON:  No , it does not , Your Honor , but

25 there's  a call that counsel has objected to.

1          THE COURT:  All right.  We'll recess    and take

2  this issue up tomorrow morning.  Ladies and gentlemen,

3  I will see you tomorrow morning at    10:00 a.m.  I have a

4  matter prior to that  , so we that's why we can't start

5  any earlier.  See you then.

6                 (Off the record at 4  :25 p .m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **CERTIFICATE**

2

3       I, Tracy Rae Dunlap,   RPR , CRR , an Official Court

4  Reporter for the United States District Court of

5  Maryland, do hereby certify that I reported, by machine

6  shorthand, in my official capacity, the proceedings had

7  and testimony adduced upon the Jury Trial Proceedings

8  in the case of UNITED STATES OF AMERICA versus PAULETTE

9  MARTIN, et al, Criminal Action Number    RWT-04-0235 on

10 June 27, 2006.

11

12      I further certify that the foregoing 1   92 pages

13 constitute the official transcript of said proceedings,

14 as taken from my machine shorthand notes, of said

15 proceedings.

16

17      In witness whereof, I have hereto subscribed my

18 name, this 15th day of March 2008.

19

20                        _____

                          TRACY  RAE  DUNLAP,  RPR ,  CRR
21                        OFFICIAL COURT REPORTER

22

23

24

25