```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                       SOUTHERN DIVISION
 2
   ------------------------x
 3 UNITED STATES OF AMERICA  :
            Plaintiff        :
 4                           :
                             :
 5 vs                        :Criminal Action:    RWT-04-0235
                             :
 6                           :
   PAULETTE MARTIN, et al    :
 7          Defendants.      :
   ------------------------x
 8

 9                       Wednes day, June  28, 2006
                         Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11 Proceeding before the HONORABLE ROGER W. TITUS, United
   States District Judge, in courtroom 4C, commencing at
12 9:31 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS THE TESTIMONY AND PROCEEDINGS
15      OF THE CASE AS RECORDED AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD  SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR              (301) 344-3912
25 Official Court Reporter
```

1                          I N D E X

2
                                DIRECT      CROSS      REDIRECT    RECROSS
3
    Christopher   Sakala   53,103
4
    Raphael  St.  Louis     96          100         102         103
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                                       Page

24  Reporter's Certificate                               205

25  Concordance                                          206

1          THE COURT:  Counsel , when we recessed yesterday   ,

2 we had some preliminary matters we needed to sort

3 through before the jury come   s in at 10:00, so  I'm --

4 let's first take up the question of the      Government's

5 Exhibit  B-4456 , which is the additional transcribed

6 call of  April 26, 2004 , between  Paulette  Martin and

7 Kevin  Scott,  the son of  Gwen Levi.

8          I heard some preliminary arguments about this

9 yesterday.   I said  I would take it under advisement.     I

10 have since received a letter   , that  I assume counsel

11 have , from  Ms. Johnston dated    June 27 , to which  she

12 attaches  various authorities  , which she contends would

13 permit the admissibility of this exhibit.

14          Who wishes to speak on this for the defense   ?

15          MR.  HALL:   Your  Honor,  I do.   I received a copy

16 of counsel's letter yesterday evening    , and  I had an

17 opportunity this morning to look at the cases that

18 counsel has cited , and  I would suggest   to the Court

19 that a distinguishing feature of the majority of these

20 in which a statement is allowed to place       another

21 statement  in context concerns incidents where it is the

22 defendant's statement and somebody who is not a

23 co-conspirator.

24          In this particular case  , the situation that   I

25 find myself in is that my client is not a participant

1  to the phone calls involving the phone call that's in

2  question.

3          THE COURT:   But why is that -- the statements   in

4  these phone calls by   Paulette Martin admissible as the

5  statements of a conspirator during the course of and in

6  furtherance of the conspiracy   ?

7          MR. HALL:   Well , Your Honor, obviously her

8  statement is ad missible,  and what counsel has argued is

9  the entire call should come in   .   And what  I'm

10  suggesting to the   Court is , is that while it may be

11  able to co me in in reference to one individual here at

12  the table, it shouldn't come in -- should not b     e

13  admissible  as to my client , because my client is not a

14  participant to the phone call   , and I don't have an

15  opportunity to cross  -examine --

16          THE COURT:   This is a statement of a   co-

17  conspirator.

18          MR. HALL:   Excuse me , Your  Honor ?

19          THE COURT:   This is a statement of a   co-

20  conspirator.

21          MR. HALL:   One of the two parties is a   co-

22  conspirator . The other party is not a   co-conspirator .

23          THE COURT:   But the testimony of the other --

24  the transcription of the conversation of the other

25  party to the call is not being offered for the truth of

1  what was said , and it is necessary to have that side of

2  the conversation to put in context what's being said by

3  Paulette  Martin ; isn't it ?

4           MR.  HALL:   Well , Your  Honor , I disagree that

5  it's necessar ily not being offered for the truth.

6           THE  COURT:  What would you propose that    I do ,

7  delete all of the references to    Mr. Scott  and just play

8  a conversation where    Paulette  Martin talks to herself  ?

9           MR.  HALL:   Well , Your  Honor --

10          THE  COURT:   Otherwise , it would make what

11  Paulette  Martin says during this phone call

12  nonsensical ; wouldn't it ?

13          MR.  HALL:   I disagree  that it  necessarily makes

14  it nonsensical.  The fact remains that     I don't have an

15  opportunity to cross  -examine this other  individual   , and

16  therefore , I suggest that his comments should not come

17  in.  Now,  I don't know if  Mr. Montemarano  has a

18  different take since it's his client's conversation

19  that would come in even under my suggestion of

20  redacting it.  The only other suggestion     I could give

21  the  Court would be to give a limiting instruction that

22  that conversation comes in only in reference to     -- or

23  the I'll call it the non  -conspirator statement only

24  comes  in for a limited purpose.

25          THE  COURT:  Why would not what you're saying

1 apply to a lot of other phone calls that we've been

2 listening to ?

3          MR. HALL:  Well , Your Honor , it -- I would have

4 to go back and look.  In many of the conversations      ,

5 obviously , do involve  co-conspirator s.

6          THE  COURT:  I mean , they're not all between

7 conspirators.  Some of these calls are between people

8 who have not been charged with anything      .

9          MR. HALL:  There very well may be.    I'd have to

10 go back and look and see whether there are, but this is

11 the one  I've objected to because it specifically makes

12 reference to my client.

13          THE  COURT:  My question is this  :  Assuming that

14 I share your concern that the jury needs to understand

15 and sort out what consideration they're supposed to

16 give to the statements made by parties to these

17 conversations, would it not be more appropriate for me

18 to give an instruction at the end of the case that

19 says, let's talk about these recordings?

20          Now,  I'm instructing you that    insofar  as the

21 statement of a person charged to be a member of the

22 conspiracy is concerned, you may consider that

23 testimony for all purposes because it is ad     missible  as

24 a statement of a   co-conspirator  made ...

25          On the other hand , with re spect  to other parties

1  of these conversations who are not charged as

2  conspirator s in this case , you may consider that not

3  for the truth of what is said but only     for the fact

4  that it was said, and to place in context what the

5  conspirator said.

6          Now, why would that not be as a general

7  instruction across the board rather than focusing on

8  this one conversation because it --     I'd have to go ba ck

9  through these three volumes to pull them out     , but there

10 are other conversations that have the same issue as

11 this one , if I remember correctly , in the sense that

12 there are conversations with people who are not charged

13 with any criminal conduct at all or participation in

14 any conspiracy who are parties to conversation     s that

15 would be indistinguishable under the legal     principles

16 that we're talking about from this one     .

17         MR. HALL:   Your Honor, first of all , I believe

18 you're correct.    I'm sure there are other conversations

19 which do not involve a   co-conspirator,  and I certainly

20 would not have -- well,   I won't endorse the exact

21 wording of the proposed instruction that you gave,     I

22 certainly would have no problem with an instruction

23 being given at the end  , which is limiting to that

24 effect .

25         And hopefully before we got to the end of the

1  case , we could come up with an instruction that would

2  be acceptable to everyone   , because  I do think that that

3  should be pointed out to the jury if that call is going

4  to come in.

5         THE COURT:  All right.    Mr. Sussman .

6         MR. SUSSMAN :  Your Honor, I don't  think that the

7  methodology that you've suggested is really work     able

8  for two reasons.  First of all   , as I understand  it, you

9  don't have to be a charged conspirator to have your

10 statement be admissible  .

11        THE COURT:  C orrect.

12        MR. SUSSMAN :  So there are people who    had

13 conversations who are not charged in a conspiracy that

14 may be cooperators or whatever   , but are probably

15 co-conspirator s under 801 , whatever the provision is.

16        The second thing is , I think a lot of us have

17 just not cared particularly about certain

18 conversations , and for that reason have not objected    ,

19 and those conversations come in substantively.     I don't

20 think the jury can parse out who are the conspirators    ,

21 who aren't the co-conspirator s.  I think the only

22 workable way is if there is an objectionable phone call

23 is to deal with that on an individual basis and take

24 out whatever is the appropriate thing to take out.

25        THE COURT:  Well , my inclination --   I want to

1  hear from anybody who wants to be heard on this, but my

2  inclination is to say that the objection is not well

3  taken for the reasons given by what     I've already said

4  and what's in  Ms. Johnston's letter.

5        What  I'm really asking is if any kind of

6  explanatory  instruction advising the jurors of the

7  basis upon which the transcribed calls have been

8  admitted is appropriate, would that not be appropriate

9  at the end of the case rather than at the time of a

10  specific phone call  , because the jury might be in a fog

11  as to why do you tell us this about that phone call but

12  not the other   ones.

13        Mr.  Montemarano .

14        MR.  MONTEMARANO :  Thank you , Your  Honor .  Since

15  it's my client's voice  , allegedly , in this call,   I

16  think my concern is a little different than those of

17  Mr. Hall , who  I completely join his observations but     I

18  would like to speak to a couple of the observations the

19  Court has made.

20        Initially , Your  Honor has pointed to the

21  question of why this call as opposed to others taken

22  into its logical  , and of course rather silly extension     ,

23  that would suggest that because we have not objected to

24  a question by  Ms. Johnston we   are therefore conceding

25  that for the next month a   nd a half , the government can

1  ask leading questions.

2          We make objections to those    matters  which we

3  find objectionable.  For    millions  of reasons , other

4  calls have not been objected to either by myself or by

5  my brother counsel.  So the fact that we are objecting

6  to this one as opposed to any other -- there was one

7  shortly after this one yesterday when it was first

8  sought to be introduced allegedly with a    Michael

9  Jackson , rather distin ctive name , that we didn't object

10 to, and there are reasons for it    I'm not going share

11 with the Court or the government.    I will tell the

12 Court there are compelling reasons that    I did not.

13 That's my call.  That's why    I'm --

14      THE COURT:  No, I'm not  tarring  and feathering

15 anybody for failure to object.  Don't    worry about that .

16      MR. MONTEMARANO :  I'm saying what this is not a

17 what's -good -for -the -goose , what's -good -for -the -gander

18 sort of analysis.    I am talking about this call  , and if

19 it's the only one   I ever objected to  , my argument is no

20 less applicable , I believe .

21          Secondly , I think that the   Court at the very

22 leas t, as a threshold issue  , has to require of the

23 government  some basis for its admissibility because the

24 one provide d to this  Court is disingenuous   and extreme .

25          THE  COURT:  Why is it disingenuous   ?

1           MR. MONTEMARANO :   I'm going  to ex plain that ,

2  Your Honor.  To suggest that they want to bring in      Mr.

3  Scott  -- we will assume it's   Mr. Scott  talking  -- Mr.

4  Scott 's verbiage to provide a context to    Ms. Martin's

5  statements , which come in under 801   (d)(2) E, arguably ,

6  as being a part of the conspiracy and     even if I concede

7  that part --  but  I don't think the government has made

8  out why they believe they are    co-conspirator   statements

9  in the course of the conspiracy   , number one , because

10 they 've not made any showing that     Mr. Scott is a

11 co-conspirator,  although uncharged  .

12          But even if  Ms. Martin's statements were

13 admissible in and of themselves to suggest      Mr.  Scott

14 should come in to provide context is   , well , gee , I

15 wouldn't want to speak in a broad brush terms     , but

16 almost laughable .   It is sort of like saying  , judge ,

17 we'd like to provide a dictionary to the jury    , but we

18 don't want to suggest that the definitions contained

19 therein  should be admissible for the truth.

20          How else are these things being brought before

21 the Court except for the truth of the comments therein

22 to provide context  .

23          THE  COURT:  What would you  have me do ?  Have

24 this recording and transcript edited to take out

25 everything that   Kevin Scott said ?

1          MR.  MONTEMARANO :   Absolutely.   It cannot be any

2 other way , because we cannot cross  -examine Mr. Scott

3 unless the government is proffer   ing that Mr. Scott will

4 be taking the stand.   That   's the  simple fact .   Okay?

5 The fact is , if they don't believe that    Mr. Scott 's

6 statements are use  able in  any way, shape or form

7 regarding their truthfulness or to show the truth of

8 Ms. Martin's statements, then they don't come in.

9 The simple fact is there is no question that's how

10 they're seek ing to  use them .   And because they're

11 seek ing  to use them that way  , they can't come in.

12 It's the  **horse or the lemon**  .   They don't get it in

13 either way.

14          THE  COURT:  A nybody else before   I hear from the

15 government ?

16          MR. MITCHELL:   Last comment , Your  Honor.   I want

17 to state the obvious.   You're asking    Mr.  Montemarano ,

18 Mr. Hall  what should you do  ?   How should you handle

19 this ?   You instruct the government if they want the

20 call in , bring in  Mr. Scott .   It's simple.

21          THE  COURT:   All right.   Ms. Johnston ?

22          MS. JOHNSTON:   Your  Honor, I sat here , and now

23 I've been -- the government has been called

24 "disingenuous " and raising laughable issues.   No

25 counsel sitting on that side of the room has cited a

1  single case to support their position that the       Court

2  should redact this conversation in some way, shape or

3  form.

4        We have provided the case -- the     Court with any

5  number of cases say  ing that  this call is admitted in

6  its entirety to place in context the statements made by

7  Ms. Martin.  It would be nonsensical to play that call

8  without the other side of the conversation.  It is

9  clearly admissible under    Fourth Circuit authority,

10 First Circuit  authority , and Third Circuit  authority

11 that we've cited to the   Court in its entirety.

12        It is clear that it is a statement of     Ms. Martin

13 in furtherance of the conspiracy.      She is concerned.

14 She needs to know what's going on.  Her source of

15 heroin has disappeared and she's concerned    -- she now

16 knows she's been arrested  .  She is concerned , as we've

17 heard Detective  Sakala  testify about  her concerns

18 previously , for another individual involve   d in the

19 drugs, Mr. Echarte , when he got arrested  , to find out

20 was the person cooperating   , what's going on with that

21 case .  It's a very real concern of people operating a

22 drug conspiracy .  So the call is relevant in that way.

23 You can't play her conversation without his      .  It

24 doesn't make any sense to do that    , nor should we be

25 require d to bring in  Mr. Scott .

1          These are  wonder ful proposals and thoughts of

2    defense attorneys , none of which are support  ed by any

3    legal authority , so I would ask the court to dismiss

4    them.

5          THE  COURT:  Let me ask you this  .  The  Crawford

6    ruling essentially deals with   testimonial  statements.

7          What's the government  's position as to whether

8    what  Scott says is a  testimonial s tatement ?

9          MS. JOHNSTON:  It is not testimon  ial, and we

10   cited for the  Court the  Third Circuit,  which addresses,

11   I think, this exact issue   in reference to wiretap

12   calls .  In addition to that , the more recent case

13   that's just come out  in the last week or two from the

14   Supreme  Court I can't recall the case.  There was a   911

15   call --

16         THE  COURT:  That's  *Davis v.  Washington* .

17         MS. JOHNSTON:   -- as not being  testimonial,  and

18   I th ink that  is very akin  to what we have here,

19   something that is going on   in realtime  that is recorded

20   that is not done in terms of an investigation.

21         THE  COURT:  What is your position as to whether

22   this call differs in any material respect from that of

23   other calls that are between a   co-conspirator,  whether

24   charged or not , on the one hand and somebody who is not

25   a co-conspirator ?

1             MS.  JOHNSTON:    Your  Honor , I believe that a jury
2  could find   Mr.  Scott  to be a  co-conspirator .  I think
3  Mr.  Sussman  correctly state d the  law that whether the
4  conspirator is charged or uncharged is immaterial     , and
5  that if the   Court gives an instruction   , that it should
6  not be couch ed in terms of people who are charged   . I f
7  the jury finds somebody is a   co-conspirator,   they can
8  use that -- those statements against everyone.
9             THE  COURT:  Let's just as  sume  that either this
10  call or another call involves somebody who is     , by
11  anybody's imagination  , not  a  co-conspirator?
12             MS.  JOHNSTON:  There will be one of those    , Your
13  Honor .
14             THE  COURT:   I call up a car   -- I want to rent a
15  car and I call Hertz  Rent-a-Car, and it's a
16  conversation  between me and   Hertz  Rent-a-Car.
17             MS.  JOHNSTON:    Your  Honor , there is a call where
18  Ms.  Dobie  calls  the  Montgomery  County  Detention  Center
19  trying to  get information in relation to    Ms.  Levi . So
20  that -- clearly , you have somebody who is not a member
21  of the  conspiracy being contacted   . So, there are a
22  couple of calls like   that.
23             I think the   Court can fashion an instruction
24  that says that calls have been admitted.   They are
25  statements  of members of the conspiracy   .  If you find

1  someone to be a member of the conspiracy    , you may

2  consider that call as evidence against all members of

3  the conspiracy.  In   the e vent that you determine

4  somebody is not a member of the conspiracy, you can

5  consider those portions  , their statements and the

6  calls , only to put in context the conversations of

7  people who are members of the conspiracy.

8          THE  COURT:   Okay.   All right.

9          MS.  JOHNSTON:  S o I think that can be couched   ,

10  but  I don't think now is an appropriate time to do

11  that .  I think that would be confus   ing to  the  jury , and

12  I believe that there is evidence from which they could

13  conclude  Mr.  Scott  is a  co-conspirator.

14          In fact , yesterday we played a call on    Page 36 4

15  where  Mr.  Scott  talk s to  Ms.  Martin  about the  old man

16  still being in the apartment   , and  Ms.  Scott  [sic] asks

17  him -- Ms. Martin asks him whether   or not  Ms.  Levi  had

18  some of the clothes or items in there    , and he responds

19  he doesn't know.  He's not for sure.

20          So it is clear that   Mr.  Scott, at least based on

21  the testimony of   Detective Sakala , knew that  Ms.  Martin

22  was -- he gave an opinion that    Ms.  Martin was referring

23  to the heroin and drugs being in the apartment     .  So

24  there is an argument or basis from which the  jury could

25  conclude that   Mr.  Scott  is assisting and is a knowing

1 participant in this conspiracy.  So there is a basis

2 for them to find that in terms of    Mr. Scott.

3        THE  COURT:  All right  .

4        MR.  MONTEMARANO:   Very briefly , Your  Honor.   I

5 simply must point the   Court to fact that once    counsel

6 depicted the government's position in rather broad

7 term s, the  government changed its position.       Ms.

8 Johnston made my argument.

9        She 's now provided a basis by which she thinks

10 Ms. Martin's statements are admissible.  Whether or not

11 I like it , she's made a showing and the   Court can rule

12 upon that.   I don't speak for any co-counsel because    ,

13 of course , it's my client , but arguably that is a basis

14 for th ose statements,   submission under 801  (d)(2) E,

15 although  I'm sure my brother counsel would disagree.      I

16 understand that.

17        They 've now also stated that without my client    ,

18 without these statements of    Mr. Scott, it makes no

19 sense .  They 're saying , Judge , they want  Mr. Scott 's

20 statements to come in to show their truthfulness      , and

21 therefore the truthfulness of    Ms. Martin's statements.

22 They're trying to bootstrap them in.

23        Those are two very different situations    .  My

24 client's arguably come in because under the

25 co-conspirator   exception.   Mr. Scott 's cannot , by

1  bootstrapping , and they have now agreed with counsel

2  that the reason they're s  eeking to  bring them in is to

3  demonstrate truthfulness.

4        Lastly , because  I try  to maintain a fair measure

5  of credibility  with this  Court , I have not  brought the

6  word "Crawford " up.  My understanding of   Crawford is

7  that it  is a privilege regarding cross-examination of

8  statements prepared in anticipation of litigation      ,

9  police reports, statements to police officers,

10  etcetera . And if they are not prepared in that

11  fashion , and I think the  Davis case makes that clear   ,

12  that's in essence , an excited utterance in a 911 call    .

13        But using the 911 call as an example   , I would

14  argue that this   Court could parse out statements of

15  questions posed.   You don't need those.  There are

16  answers . We know what that thing is   , like an add ress.

17  And as to other statements by the 911     operator,

18  coaxing, prodding , whatever , would be inadmissible

19  because they would be going to show that this answer

20  necessarily is  truthful  in response to this question.

21        THE  COURT:  All right.  Anything further   .

22        MR.  SUSSMAN :  Just briefly .  I disagree with  Ms.

23  Johnston as to methodology.    I think the question   as to

24  whether  Scott is  a co-conspirator   is a preliminary

25  question to the   Court .  I don't think it's   a jury

1  question.

2          THE  COURT:  All right  .  Mr. Ward ?

3          MR.  WARD:   I adopt the arguments of my

4  co-counsel ; however , I want to add this comment.   If

5  the Court decides that it is appropriate to play this

6  tape before the jury,   I respectfully suggest that it

7  would be proper to instruct them   , either  -- I think

8  preferably before the tape is played    , and certainly to

9  do so then at the end of the case.

10         The reason  I say they ought to be instructed now

11  is because if this was a tape -- a case where there was

12  one tape being played or two tapes being played or even

13  three, here we have literally it seems like      hundreds .

14  Maybe it's just my viewpoint, but if the    Court waits

15  until  the  conclusion of this case  , which is weeks down

16  the road, the force of the    Court's instruction is going

17  to be totally lost in this mor    as of telephone calls.

18         So while  I do not concede the point,    I think if

19  the Court is going to allow the call in, it is

20  appropriate to give an instruction now before it comes

21  in, and  I think --   I do also think an appropriate

22  instruction would be at the end of the case     , too.

23  Thank you , Your  Honor .

24         THE  COURT:  Ms. Johnston.

25         MS.  JOHNSTON:   Your  Honor , I would only suggest

1   to the  Court that the call be played now.       I don't

2   think there's any reason to give a particular

3   instruction, particularly in light of the fact that the

4   Court and the jury could find that    Mr. Scott  is a

5   co-conspirator  based upon the previous call   , and the

6   evidence  that 's already before them through    Detective

7   Sakala  that  established that he talked in code with     Ms.

8   Martin .

9          They were concerned about what had happened at

10  Ms. Levi's house  , he referred to as his mother   , that it

11  had  been ransacked  , that he could n't find anyone , that

12  they use d  the  code word of   "clothe s" to refer to the

13  drugs in the house, that they were traveling     , and that

14  now here he is calling -- speaking with her at least

15  one other time discussing with her what     Ms.

16  Levi's status is and how they're going to handle that

17  problem , that that would be sufficient evidence the

18  Court could make a preliminary finding as well as       --

19  and the jury could find him to be a     co-conspirator .

20          Furthermore , I don't think any  of the cases that

21  we've cited require an instruction at the time that the

22  call was played , and that the  Court could address the

23  problem to the extent the law requires it in closing

24  instructions .

25          THE  COURT:  All right  , Counsel .

1          MR.  MONTEMARANO :   Ms. Johnston has made a

2  statement beyond what anything    I've been able to

3  address, Your  Honor.   I think  I need to address it.

4  She's referred to   Detective  Sakala's testimony.

5  Detective  Sakala has misidentified   Mr. Scott  as Gwen

6  Levi's son , which he's not.    Gwen Levi's son is  Craig

7  Scott.

8          MS.  JOHNSTON:   Your  Honor , she has more than one

9  son .  I think the   Court know s that from the previous

10 trial .

11          THE  COURT:   I don't know that to be the case,

12 Mr. Montemarano.

13          MR.  MONTEMARANO:   It's my understanding  , Your

14 Honor.

15          THE  COURT:   I presided over the trial of her

16 son .

17          MR.  MONTEMARANO:   When we've discussed this  , we

18 have seven reasonably competent attorneys here    .  Nobody

19 has quarrelled with that interpretation when it's being

20 kicked around the table.

21          THE  COURT:   Counsel , I am going to overrule the

22 objection.   I believe that the -- this call as with

23 many, many others is fully admissible on     Paulette

24 Martin because it's a statement by a     co-conspirator

25 during the course and in further   ance of the conspiracy ,

1  and it's  admissible  as to her and as to all of her

2  co-conspirator s.

3        I further conclude that in the context of this

4  call , and at least one previous call of    Mr. Scott, that

5  he would at least arguably a   co-conspirator,  albeit

6  uncharged .  But even if he were not , that his

7  statements during this phone call are necessary to

8  provide proper context to the statements made by

9  Paulette  Martin.

10        It is clearly not   testimonial  in nature.  The

11  Supreme  Court decision in   *Davis v . Washington*  makes

12  this contrast.  The protections of    *Crawford* apply only

13  to testimonial  statements , and in the context of the

14  *Crawford* case what was excluded was evidence from an

15  interrogation which was directed solely at establishing

16  a past crime , whereas the call on that case    , the 9 /11

17  call, was ordinarily designed primarily to describe

18  current circumstances requiring police    assistance,  and

19  the -- this is clearly not within the four corners of a

20  *Crawford* violation or   *Davis v . Washington* .

21        So I will admit it,   I will not give a special or

22  separate instruction at this time.     I will consider ,

23  however , giving instructions to the jury at the end of

24  the case as to the proper consideration by the jury of

25  the recorded conversations.

1          Now, we have another issue raise    d by Mr. McKnett
2  on Call No. B4786.   Mr. McKnett,  I will  be glad to hear
3  you on that.
4          MR. MCKNETT:   Your Honor, if  I could -- 4786 is
5  a conversation between my client and    Ms. Martin in
6  which Ms. Martin,  I think  -- venting might be an
7  appropriate word here    -- is venting about a person
8  named  Estelle,  whom  Ms. Martin believes has talked to
9  police investigators concerning a murder.
10          THE  COURT:  Maybe you can help me.  Who is
11  Estelle ?
12          MR. MCKNETT:   I'm not --
13          THE  COURT:   I don't recall there being an
14  Estelle  mentioned in testimony prior to this.     I mean,
15  I'm not -- it's not perfect up here    , but I don't recall
16  hearing an  Estelle  mentioned.
17          MR. MCKNETT:   Estelle --  if I understand this
18  conversation correctly,    Estelle  is Estelle  Brimm,
19  who --
20          THE  COURT:  Okay.
21          MR. MCKNETT:   -- m ay have been either the wife
22  or ex-wife of the person who was murdered     , who is  Steve
23  Brimm, who if the  Court may recall , is the father or
24  stepfather of  Nathan  King , who  was one  of the
25  witnesses.

1          THE COURT:  Okay.  All right.

2          MR. MCKNETT:  She --

3          MR. MONTEMARANO:  She's King's mother.

4          MR. MCKNETT:  Nathan King.

5          THE COURT:  Estelle is Nathan King's mother?

6          MS. JOHNSTON:  Your Honor, if I could interrupt

7  just a moment.  Back during one of the first few days

8  of trial, Nathan King testified as a cooperator.   Mr.

9  King testified that his mother was   , indeed, Estelle

10  Brimm, that his father was   Steven Brimm, that Steven

11  Brimm had been supplying cocaine to   Ms. Martin here ,

12  that he took over for his father after he    had a stroke,

13  that his -- he was arrested in    October of 2 003, and his

14  father was murdered in   November of 2003 .

15          MR. MONTEMARANO:  Thank you, Ms. Johnston.

16          MR. MCKNETT:  Thank you,  Your Honor.  And thank

17  you, Ms. Johnston.

18          Your Honor, the -- while not named specifically

19  -- not identified by name in this conversation, my

20  reading of the conversation is that the murder being

21  talked about is the murder of   Steven Brimm, who died

22  under unclear circumstances,   I think is the best way to

23  say that.  There was initially a concern   .

24          THE  COURT:  He was murdered in his driveway  , if

25  I remember correctly.

1          MR. MCKNETT :  Shot in his   drive way.   There was

2 initial concern   that it  may have been drug  -related.

3 There was also concern that it may have been the nature

4 of a domestic problem that led to his death.   My

5 concern here,   Your  Honor, is that the conversation

6 relates to the murder of a government witness    , who may

7 have been according to the government    , allegedly

8 involved in drug dealing with    Ms. Martin.

9          The conversation connects    Ms. Martin and my

10 client and several other people named in the

11 conversation who are also    co-conspirator s as possibly

12 involved in that murder that    Estelle  thought that.  She

13 told the police that and the police were investigating

14 that possibility.

15          That, as  I understand it, turned out to be

16 untrue , but the conversation raises the inference that

17 maybe one  -- at least one or maybe more of these

18 defendants were involved in the murder of another

19 person who was connected with this conspiracy.

20 There is no other evidence of that.   There is no proof

21 of that.

22          There will be no testimony to that effect.  But

23 that is , I think , highly inflammatory , and I think the

24 Court needs to analyze the situation    in light of  Rule

25 403 , and I think what the   Court needs to do pursuant to

1  403 is first analyze   and determine the probative value    ,

2  if any , of this conversation.   The only probative value

3  I can see in connection with this conspiracy case is

4  that association amongst some of the members of the

5  alleged conspiracy.

6        Now, that  I don't think is a problem for the

7  government  to prove with other evidence.  There are 48    1

8  or 82 other conversations that the jury will hear that

9  will establish the relationship at least to the extent

10  that the people know each other or know of each other.

11  The possible inflammatory   and unfair prejudicial value

12  of this evidence,   I think, is extreme.

13        As  I said , we're talking about a murder of

14  someone who allegedly   was connected with this alleged

15  conspiracy.   I think the  Court has to balance those two

16  and then look to see if the   Court can get this evidence

17  in through some other fashion   , and  I think it's clear

18  the government can't through the other 48    1

19  conversations , through surveillances  , through the

20  arrests, through the evidence that was seized.

21        Some of the evidence is in the form of notebook,

22  ledgers , and such that have names  , addresses , phone

23  numbers, quantities  .  There is no problem for the

24  government to establish relationship    , and that is the

25  only value of this conversation.     I think the probative

1   value is vastly outweighed by the unfair prejudice        and

2   the inflammatory nature   of the subject of this

3   conversation , and therefore should be stricken in its

4   entirety.

5          MR. WARD:  I think also to be factored in the

6   balancing process is we already have testimony from

7   Nathan -- was it   King?

8          THE   COURT:  Nathan  King.

9          MR. WARD:  We also have   TV testimony from him

10  about his father going over    to the estranged wife's

11  house --  I assume she was estranged  , and finding a

12  boyfriend, she handing the boyfriend a gun, there

13  apparently being a threat to the deceased   .  So I think

14  that works strongly in favor of the argument as to

15  prejudice.

16         THE  COURT: All right.   Ms. Johnston.

17         MS. JOHNSTON:  Thank you,   Your Honor.

18         First of all , in terms of Mr. Ward 's last

19  comments , it was on cross -examination that counsel

20  tried to  bring out the fact  , or tried to establish that

21  Mr. Brimm was killed by his wife's e   stranged  wife's

22  boyfriend or  male friend, and   in essence what   Mr. King

23  testified to was a previous incident that his father

24  had relayed to him.

25         This call is part of a series of calls in which

1 Ms. Ali and Ms. Martin  and Mr. Nunn discuss getting

2 fabricated time sheets for   Mr. Nunn to provide to the

3 Los Angeles  Police Department.   In fact,  there's a

4 reference -- we haven't played all of those calls    , but

5 there's a reference in one of the calls with     Ms. Ali in

6 terms of making the time -- making sure that it says

7 11/30 on it -- with   Mr. Nunn, I'm sorry , that it has to

8 be for the weekend of 11   /30, and so there are -- the

9 calls go back  and forth between  Ms. Ali at her place of

10 employment  and Ms. Martin about setting up the fax

11 machine an d getting station ary and there will be some

12 documents introduced of that -- those time sheets       and

13 that  stationary.

14        THE   COURT:   These are to fabricate time sheets

15 to do what ?

16        MS. JOHNSTON:   To provide   Mr. Nunn, a heroin

17 customer of  Ms. Martin , with an alibi of for the time

18 period that is being investigated    by the Los Angeles

19 County  Police  Department.

20        THE COURT:   These would be time sheets that

21 would  what ?  I mean --

22        MS. JOHNSTON:   Either   PTK Associates or  Paula's

23 School of  Performing  Arts that will say   Mr. Nunn was

24 working there.

25        THE COURT:   Oh, okay.

1          MS.  JOHNSTON:  They were providing an al    ibi.

2          THE  COURT:    Remember , for 37 years , I filled out

3  time sheets , so I'm not sure, you know  , when you talk

4  about time sheets  , what  kind of  time sheet you're

5  talking about.

6          MS.  JOHNSTON:  Time sheets or pay stubs showing

7  when you worked  and that those were done.  So, what

8  this call in particular establishes is that     Ms. Martin

9  and Ms. Ali -- or that  Ms. Ali is familiar w ith all of

10  the people involved -- many of the people involve    d in

11  the conspiracy , including  Larry Nunn, including  Mr.

12  Philpot, who is now arrested   and in Wyoming, including

13  the references to  Granny's house, 804   Nicholson , where

14  we've  heard testimony about drug transactions being --

15  drugs being  delivered  there by  Mr. King.

16          Importantly , on Page 409 , Ms. Martin tells  Ms.

17  Ali that I told them  I don't know nothing about the

18  man , referring to  Steve Brimm , no more than he bought

19  clothes from me for his son   and all , and that they

20  wanted to know what  did I know about his  wife, and then

21  that they had t he information about  Nicholson  Street.

22          It's very important because if she is in that

23  phrase saying that he bought clothes from her   , again

24  hiding her drug relationship with   Mr. Brimm, and I

25  believe  Detective  Sakala will testify about that.  It

1  is important in terms of maintaining their drug

2  conspiracy to protect   Mr. Nunn through doing  the time

3  sheets , and therefore , the fact that  Ms. Ali -- Ms.

4  Martin is providing her with this information    , not

5  wanting to tell her in front of her husband all goes to

6  show Ms. Ali's knowing involvement.

7         In terms of the fact of the murder    , the Court

8  can give an instruction    and I would suggest to the

9  Court it would be appropriate --

10        THE COURT:   I was going to ask you would it not

11  be appropriate before this call is played to advise the

12  jury that no person on trial in this case has been

13  charged with, is under investigation for    , nor is there

14  any allegation of any murder   ?

15        MS. JOHNSTON:   Your Honor , I believe  Mr. Nunn is

16  a suspect in the murder in   California, so  I don't know

17  that that would be actually correct   , but I think the

18  Court could fashion an instruction that would say,

19  you're about to hear a call that reference    s the  murder

20  of Steve Brimm in California.   I must instruct you that

21  no one in this case is on trial or has been charged in

22  relation -- no one in this courtroom has been charged

23  or is being prosecuted in relation to that offense    , and

24  you are not to consider that murder as any evidence

25  against these individuals as being introduced to show

1 the relationship of the parties  .  And I think that

2 would remedy the concern that    Mr. McKnett  has because

3 they've  already heard about the murder so they're

4 already aware of it.

5       THE COURT:  Mr. McKnett,  why would that not

6 remedy the problem you're raising   ?

7       MR. MCKNETT:  Your Honor, could  I -- I will

8 address the  Court's question , but I'd like to  ask Ms.

9 Johnston a question  , if I could.  She made a reference

10 to 11/30.  Would you tell me where that is in this

11 transcript?

12       MS. JOHNSTON:  It was a call with    Mr. Nunn, not

13 in that  particular  call.  There is a another reference    ,

14 and I thought  I corrected it .  On Page 414 , it's a call

15 -- I thought it was  with Ms. Martin but it's with    Mr.

16 Nunn .

17       MR. MCKNETT:  That is a conversation that    I have

18 not objected to , Your Honor.

19       MS. JOHNSTON:  Right.

20       MR. MCKNETT:  That information is not in the

21 conversation that   I'm objecting to the transcript    I'm

22 objecting to.

23       MS. JOHNSTON:   I apologize .  I thought  I made

24 that clear , Mr. McKnett .

25       MR. MCKNETT :  Your Honor , I apologize , I've

1 forgot ten the  Court's question.

2        THE  COURT:   My question  was why is not a

3 cautionary instruction sufficient to cure any question

4 with respect to unfair prejudice   , to advise the jury

5 before this call is played  , that they will hear in this

6 conversation some indication about an investigation of

7 a murder .  And  I advise them that no defendant on trial

8 in this case is being charged with or      -- with  a murder ,

9 and they should not consider any suggestion of a murder

10 in any adverse way to any defendant.

11        MR.  MCKNETT :  Well , Your  Honor , because  --

12        THE  COURT:  Would that not clear up any question

13 of prejudice?

14        MR.  MCKNETT :  Your  Honor , I think the quick

15 answer to that is it's like saying ignore t    he elephant

16 in  the  corner of the room.  The jury will hear this

17 rather heated conversation  , at least on the part of   Ms.

18 Martin's part about this murder    and how she's a suspect

19 in it , about how  Estelle  thinks that she did it or

20 she's responsible for it  , and how the  police are

21 investigating her for this murder, that the police

22 think that she may have a part in it    , and then saying

23 just ignore that.  Just ignore that an    d nobody's

24 charged with it .

25        Well , people know that sometimes people

1   literal ly get  away with murder.  We see it on

2   tel ev ision  all the time.  It doesn't mean the jury

3   won't -- there won't be a carryover    effect  in the minds

4   of the jury at some level from hearing about -- hearing

5   this conversation   and about this murder.

6           I would point out that everything that     Ms.

7   Johnston has referred to as the need to get this in

8   such , such as the fact that   Ms. Martin referred to the

9   address on Nicholson, the   fact  that she talked about

10  clothes , which  Ms. Johnston says is a code word for

11  drugs, that's all come in before     and will come in again

12  in other conversations.  There is no need for this

13  transcription.

14          There is --  I also would like to point out that

15  Ms. Martin does just about all the talking in this

16  conversation.  All my client does is    , in a fair reading

17  of her comment , indicate  that she's not aware of this.

18  She's asking questions.    At t he bottom of Page 408  , Ms.

19  Martin is complaining that   Ms. Brimm , E stelle , gave

20  Homicide in  California her name  .  Ms. Ali 's response to

21  that is, what?

22          Ms. Martin goes on ab  out lots of  things.   I can

23  read down.   Ms. Ali says, hello  .  She says , what ?

24  What?   Mm-hmm , mm-hmm, what?  What?     Mm-hmm , mm-hmm.

25  What are they doing   here?   Ms. Ali doesn't know what's

1  going on with this.  This is a particularly

2  inflammatory conversation.

3         The content  -- at least the evidentiary content

4  the government refers to has been add   uced  from previous

5  conversations,  from previous witnesses  , and will be

6  adduced again from different witnesses    and different

7  conversations.  There is simply no need for this

8  conversation.

9         While , at a minimum , an instruction would be

10 necessary  and I think appropriate   -- appropriate  and

11 absolutely necessary, that puts the cart before the

12 horse.

13        If there's no conversation, there is no need for

14 instruction.  The jury doesn't need to hear this to

15 reach the conclusion   the government wants it to   and I

16 think it should be stricken   .

17        THE  COURT:  A ll right.  Tell me again  .  Estelle

18 Brimm  is what relation to what person?

19        MR. MCKNETT :  Estelle  Brimm  is the mother of

20 Nathan  King --

21        THE  COURT:  The mother of  Nathan  King .  Okay.

22        MR. MCKNETT :  -- who testified about this murder

23 and I think , if I may be just complete.   I may be

24 wrong , but  I expect that when   Sergeant  Sakala  talks

25 about this case, he will specifically refer to      Nathan

1  Brimm  by name .

2          THE   COURT:   Nathan  King?

3          MR.  MCKNETT :   I'm sorry.   Steve n  Brimm  by name

4  as the murder victim being referred to    , and  there will

5  be a reference to tie that up with the previous

6  witness,  Nathan  King . And  tie up the fact that    Estelle

7  is Nathan  King 's mother , which just adds to the

8  inflammatory nature of this conversation    .

9          MR. MONTEMARANO :   I join  Mr.  McKnett 's comments .

10 I would further direct the    Court's attention to   Rule

11 403.   I think the prejudicial value   , especially in

12 terms of  my client's participation  , far exceeds the

13 probative value.

14         When it is remembered  , the government will

15 adduce 400 phone calls   and 500 -some  pages of material.

16 I mean , I've lost count, quite honestly.  One more call

17 of this nature is necessary to their case?     I think

18 not.  Beyond that, when the defense tried to provide

19 some sort of alternate  , quite honestly , nefarious

20 suggestion regarding   Mr.  Brimm 's death relating to

21 personal issues  , trying to in essence discredit him    and

22 by implication his son  , the "Cocaine  Cowboy," Mr.  King ,

23 the government was up in arms how this wasn't this kind

24 of murder.  In fact  , actually , it's a drug -- the

25 government , in essence,  has laid the groundwork for our

1 objection to this by objecting   .

2        THE  COURT:  D idn't the defense lay the

3 ground work by raising the whole question about how he

4 died ?

5        MR. MONTEMARANO :  The Court would not permit us

6 to go there.   I think it  is only fair in that the

7 defense is not permitted to add   uce this through  Mr.

8 Brimm , his testimony --

9        THE  COURT:  Well, yo u did adduce testimony that

10 there was some kind of domestic squabble     .

11        MR.  MONTEMARANO :  Merely a domestic squabble.

12 Not -- the  Court precluded us from going where we --

13 upon consideration  , discussion among defense counsel

14 had sought to go.   I respectfully submit this is

15 equally fair  and would be appropriate to exclude this

16 testimony -- this call  .

17        THE  COURT:  Anything further , Ms. Johnston ?

18        MS. JOHNSTON:  No , Your Honor .

19        MR. MONTEMARANO :  I have nothing further  .

20        If I could speak  to Mr. McKnett .

21        MS. JOHNSTON:   Your Honor , just one matter while

22 he's speaking to  Mr. McKnett . Hopefully he can listen

23 and speak because it is getting late.     Ms. Martin  is

24 not implicated in this call as a suspect.  It is rather

25 the notion that the police are here    , they're talking to

1 all of our  co-conspirator s, and she's concerned about

2 that because she's upset that now there are police

3 contacting them  and what effect is that going to have

4 in terms of their drug conspiracy business    and that is

5 the way  the government intends to use it   , not t o say

6 Ms. Martin was involved in a murder.  More her concern

7 and outrage that the police are looking at them all.

8         THE  COURT:  Mr. Sussman .

9         MR. SUSSMAN :  T he question  I would ask is  , the

10 words are one thing on   the transcript .  I'm concerned

11 about what  Agent  Sakala's  proffer is going to be in

12 terms of his testimony  , how he explains this call.    I

13 think that  --

14         THE  COURT:  Well, we're going to cross that

15 bridge  when we get  to it.   I've  got a jury waiting   and

16 that's  not the issue  before me .  The issue before me

17 is, can this recording be played at all    .

18         MR. SUSSMAN :  If the  Court rules it can  ,

19 obviously  it can.

20         THE  COURT:   I will  deal with the  issue of how

21 Detective  Sakala  explains it when   we get to that

22 bridge.

23         MR. WARD:   I am going to ask he be instructed

24 not t o blurt out his answer before we get to    that.   I

25 don't want him jumping across the bridge     while we're

1  standing on one side.

2       THE COURT:   Ms. Johnston , before you get ready

3  to cross that bridge , let me know  so I can have a bench

4  conference .  We will deal with that issue also  .  The

5  last word , Mr. McKnett .

6       MR. MCKNETT : Let me point out   that the  Court

7  has  indicated  that a lot of the information about the

8  Steven  Brimm  murder was brought out on   cross-

9  examination.   I just wanted to remind the   Court that

10  none of those questions were asked by me.     I did  not

11  bring out any of that information.

12       THE COURT:   I understand.

13       MR. MCKNETT :  If the Court should rule against

14  my motion  and allow this transcript in  , I would make a

15  Motion for  Severance on behalf of   Ms. Ali .

16       THE COURT:  All right  .  Well , that motion is

17  denied.

18       All right.  With regard to the objection to

19  recording  number  B4786, I am going to overrule the

20  objection.   I conclude that the probative value is

21  substantially outweighed by the danger of unfair

22  prejudice.  Ms. Johnston has articulated very

23  significant reasons why this recording is appropriate.

24  There may very well be other recordings that support

25  the same thing , but that does not mean that it's not

1  admissible.   I don't think there's a question of it

2  being unduly cumulative.

3       I believe that the question of prejudice that

4  would arise out  of this can be cured by an instruction

5  that I can give to the jury  and what I intend to tell

6  the jury is that they are going to hear in this

7  conversation reference to an investigation of a murder      ,

8  and I want -- they may recall that they heard testimony

9  that Steve Brimm , the stepfather  of Nathan King, had

10 been murdered.

11      I want to advise them that no defendant on trial

12 in this case is being charged with any murder     and they

13 should not consider the murder of    Steve Brimm in any

14 way, shape or manner in their consideration of this

15 evidence.

16      MR. WARD: With all due respect   , Your Honor , I

17 would ask that the instruction be expanded to say they

18 are not charged  and not expected to be charged  .

19      THE  COURT:  I don't know if  I can go that far.

20 I know there's been no charges.

21      MR. WARD: The government has said there is no

22 suspect .

23      THE  COURT:  Well, t his is not the same

24 government  that's investigating the murder,    so I'm not

25 sure that  Ms. Johnston can vouch for the   California law

1  enforcement authorities that there is no investigation.

2  Most murders are under investigation until they're

3  charged .

4      MR. WARD:  T he problem is , Your Honor , with all

5  due respect,  we're not trying this case in   California .

6  We're trying it here  .  And in this court   and in this

7  case , my client is not suspected   , and I don't think any

8  client is suspected   and I think the government has

9  already made that position clear.     I would respectfully

10 suggest , and I take exception to that   , the Court does

11 not add the word   "suspected. "

12     THE COURT:  Ms. Johnston.

13     MS. JOHNSTON:   Your Honor, I really , as I

14 indicated to the   Court , I think very clearly   Mr. Nunn

15 is a suspect in that murder case   , and I think if  Ms.

16 Martin provided a false alibi for him   , she would also

17 be a suspect , at least as an accessory after the fact

18 in that case. So   I don't know that it's proper to    --

19     THE COURT:   I'm not going to go as far as saying

20 that nobody's being suspected.     I will certainly say

21 that nobody is charged   and that they may not   and should

22 not give any consideration to any possible murder

23 charges as to any defendant in this case    .

24     MR. SUSSMAN :  Could  I request  that the Court say

25 "not alleged to be involved   ?"  And being on that

1  formalistic line, it sounds like the lawyer on the

2  courthouse steps  saying , my client hasn't been indicted

3  or formally charged  , which  always  comes up a little bit

4  short.

5      MS. JOHNSTON:  Again , there's a problem with no

6  one is allegedly -- alleged to have been involve    d in

7  that homicide because as   I've told this  Court, there is

8  one co-conspirator  who is a suspect   and if Ms. Martin

9  provided a false alibi  , she would be an accessory after

10  the fact.

11      THE  COURT:   I can simply say that no one has

12  been charg ed in  this or any other court who is on trial

13  with this case for any murder in this case.

14      MR. MCKNETT :  Your  Honor , the government wants

15  it both ways now.  They want to bring in the

16  information about the murder but they don't want the

17  Court to instruct that these defendants    , and

18  particularly my client  , is not now  and never has been a

19  suspect in that murder.  Again   , I renew my motion for a

20  mistrial .

21      THE   COURT:  All right .  Your motion is denied  .

22  All right.   I will give a cautionary instruction    and I

23  will advise the jury that no   defendant  on trial in this

24  case has been charged in this or any other court with

25  the murder of  Steve Brimm .  They are not to consider

1  that in any way adversely to any defendant on trial in

2  this case, period.  That's what    I will tell them.  Any

3  other preliminary matters?    I think we're done.

4        MS. JOHNSTON:   Your Honor , just so the   Court

5  knows , we were at the point of playing that call when

6  we recessed .

7        THE  COURT:  Which one?  This one  ?

8        MS.  JOHNSTON:  This one.

9        THE  COURT:  So I can give that instruction

10  before you start.

11        MS. JOHNSTON:  Yes .  I wanted to make the   Court

12  aware  -- also , Your Honor , I expect we will finish

13  Detective  Sakala's  testimony sometime either    --

14  hopefully by the end of the day or sometime this

15  afternoon , which would mean it would be time for    cross-

16  examination.

17        We do not have for defense attorneys copies of

18  all of the calls to be played  .  They have their own set

19  of calls .  If there are other calls they want to play    ,

20  we would like to know what calls they are because we

21  may have hearsay objections to those calls if they

22  choose to play them  ; and two , we have not been provided

23  with them a final transcript of any of those calls.

24        In discovery , they were given draft    tran scripts

25  of calls , but no transcripts have been finalized    .

1   We're going  to object to use of transcripts that have

2   not been finalized  , so if they have transcripts that

3   they have made final, that's fine --

4           THE   COURT:  Let me ask  Mr. Montemarano .  Is

5   there any intention   --

6           MR.  WARD:  That's a bridge that ought to be

7   crossed if we come to it.

8           THE  COURT:   I couldn't hear you  , Mr. Ward.

9           MR.  WARD:   I said , may I suggest , most

10  respectfully, that that   's a bridge that ought to be

11  crossed if  and when we come to it  .

12          THE  COURT:   Well , my question is , does -- is

13  there any intention on the part of the defense to have

14  recordings played by   Detective  Sakala ?  If so , why is

15  there  any problem with identifying what those are so

16  that they can be appropriately prepared for playing     ?

17  And if there's transcripts  , the transcripts  can be

18  placed in  suitable form for circulation to the jury    ?

19          MR. MARTIN:   Anthony  Martin on behalf of   Mr.

20  Goodwin .

21          I certainly know  , off the top of my head  , there

22  are at least  two ; and  I need  to go back through my

23  notes to see if there are others.

24          The government had indicated   , I think late last

25  week , that they were not as far along in their

1  anticipated presentation of the evidence through      Mr.

2  Sakala as they had hoped to be    and had predicted that

3  they would probably   finish  sometime toward the end of

4  this week .  For that reason , I had continue d to take

5  notes , as opposed to add  ing to  the predicates   I already

6  have.

7          The bottom line is this  , Your  Honor .  I need to

8  go through my notes  .  I need to identify those

9  particular  pages.   I don't know that   I can  give them

10  that this afternoon, but    I think  I can at lunchtime

11  because  I can do a search very quickly.

12         THE  COURT:  All right  .

13         MR.  MARTIN:   I can't speak for the others   , but

14  for myself , I know there are at least two.

15         THE  COURT:   I don't  want to have any prejudice

16  to any defendant at all   .   I want  you  to have all the

17  liberty you may   want to  exercise to have him play any

18  additional selected recordings you want    , but  I want

19  this trial to move along at a reasonable pace      .

20         I am going to request that    defense attorneys who

21  have recordings that they want to have available to be

22  played , notify  Ms. Johnston by the en  d of today so that

23  those recordings can be segregated    , made available for

24  playing , and that any transcript  s can  be updated ,

25  reviewed , and made available for the jury.

1          MS. JOHNSTON: Your Honor  , one of the problems

2 with it is we don't --  I mean, we don't -- we have

3 marked and introduced into  evidence those calls  and the

4 portions of the calls that we believe are relevant. We

5 don't have --  I mean , we're going to -- if they give    us

6 a list , we'll be able to pull those recordings   .  But if

7 the Court is suggest ing that  the government prepare

8 transcripts of --

9          THE COURT: You have draft transcript  s; is that

10 correct?

11          MS. JOHNSTON: We may .

12          THE  COURT:  If you have them , you have them.

13 If you don't have them  , you don't have them.  All    I'm

14 saying is that you need to tell the government --

15 you're not going  to be bound by it .  You may not decide

16 to play all the recordings you've identified   , but at

17 least make the universe of recordings that you want to

18 have available for  Detective  Sakala to play  and

19 inter pret to  Ms. Johnston by the end of the day.

20          MS. JOHNSTON: One of my concerns   , Your Honor ,

21 is there may be calls they want to play that were not

22 transcribed or they may want to play portions of call     s

23 that were not transcribed.

24          THE COURT:  I understand.

25          MS. JOHNSTON: If they want to introduce them as

1 evidence , they need to provide the transcripts.

2        THE COURT:  We will cross that technological

3 bridge when we get to it  , but if there is already a

4 government draft transcript we can fix up, fine     .  But

5 if there isn't , then counsel , you're going  to need  to

6 put together your   own transcript , because these

7 recordings without the transcript are going to be far

8 less significant in the minds of the jury without it       ,

9 so I think we ought to be certain that we have

10 transcripts available if we can.

11        MR. WARD:  Your Honor , so th at I'm clear , we're

12 talking about tapes other than what have been played.

13 I want to ask them to replay a tape that's already been

14 played .

15        We're not concerned about that   , are we,  Ms.

16 Johnston?

17        MS. JOHNSTON:  That's   correct.  W e're not

18 concerned about something being replayed     .

19        THE  COURT:  If you want to replay something

20 that's already been played that has a transcript      , there

21 is no problem whatsoever.

22        MR. WARD:  I want ed to be clear .

23        THE  COURT:  All I'm talk ing about is if you

24 have a phone call that has been record    ed that has not

25 been played by the government     and you want to p lay for

1 Detective  Sakala because you belie ve that would  be of

2 assistance to you , that's fine .  Just make sure we

3 don't do this  and have huge technological gaps try   ing

4 to find it  and so forth when  he's called.

5        MS. JOHNSTON:   Your Honor , that would apply also

6 to the  un-tran scripted  portions.  There were calls

7 where we only played portions of them.  What was not

8 played , we --

9        THE   COURT:   That's correct .

10        MS. JOHNSTON:    -- is not part of.

11        THE  COURT:  Make sure you notify the government

12 by the end of the day.

13        All right.

14        MR. MARTIN:   Your Honor , if we notify the

15 government by the end of the day    and they don't have

16 transcripts of complete calls but only have the

17 excerpts,  and the  Court is requir ing us  to have the

18 transcripts,  I don't see how we're going to be able to

19 --

20        THE   COURT:  I don't know if  I can require  you

21 to have a transcript .  I'm telling you , if I were in

22 your shoes , I would want a transcript because    I would

23 not to want to have this call that    I think is of such

24 great significance not transcribed    when the jury is

25 back there deliberating.  It's up to you   .  I can't

1 force you to make a transcript , but it certainly would
2 be helpful if you have one  .
3         MR. MONTEMARANO :  The transcripts  don't go back
4 to the jury ; correct ?
5         THE COURT:  They can take the transcripts back   .
6 Yes.
7         MR. MONTEMARANO :  They're not  in evidence,  Your
8 Honor.
9         MS. JOHNSTON:   Your Honor , I believe -- we would
10 ask the  Court -- they have the books  , and some of them
11 have made note s in the book s.  If the Court gives them
12 an instruction that the transcripts are not evidence      --
13         THE COURT:  I see no reason why they can't have
14 the transcripts of the calls during deliberations.
15 They have been advised of what those transcripts are
16 and that they are -- that the evidence is the recording
17 itself .  They can have the recordings played  , but I'm
18 not going to  get to  that issue now.  I've got to get
19 this jury in here .  I told them  10 o'clock  and we're
20 way over time now  .
21         MR. MONTEMARANO :  Mr. McKnett  rose before  I did .
22 He has something he needs to    address.
23         MR. MCKNETT :  Your Honor , I did want to remind
24 the Court that I have one more  Motion in  Limine
25 pending .  It concerns B9686 .  It comes up on Page   543.

1  We're still some time away from that   .  It's a challenge

2  to a very brief portion to that.

3          THE  COURT:  That's in a different binder   ; isn't

4  it?

5          MR.  MCKNETT :  It's in a different bind   er.

6          THE  COURT:   I've got it flagged.

7          MS.  JOHNSTON:   Your  Honor , the  Court may be able

8  --

9          THE  COURT:  What was the number   again -- page

10 number ?

11         MR.  MCKNETT :  It's at Page 543  , Your  Honor.  T he

12 conversation starts at Page 543.

13         MS.  JOHNSTON:   Your  Honor , the  Court may be able

14 to take that up at   the  lunch break.

15         THE  COURT:  Right .  Let me do that then  , because

16 this jury has been out long enough.

17         What  I'm going do , I'm going bring the jury in

18 now .  I'm going  to tell them  that we're going  to begin

19 with a recording  , but  I want  to give them a cautionary

20 note in regard to that   instruction  before they hear it  ,

21 and I will then tell them that no defendant in this

22 case has been charged in this or any other court with

23 this murder  and that they are not to consider this

24 murder as to any defendant in this case.

25         MS.  JOHNSTON:  Just so the record is clear   .

1  When I said that Detective Sakala would be done -- we

2  anticipated he would be done by the end of this week      .

3  We meant "done ," including all cross-examination     and

4  redirect.  That was what our    schedule was projecting.

5       THE COURT:   When do you anticipate his direct

6  will be finished ?

7       MS. JOHNSTON:   I think sometime this afternoon.

8       THE COURT:  All right .

9       MR. MONTEMARANO :  Your Honor , may I be heard?

10       THE COURT:  Certainly .

11       MR. MONTEMARANO :  With regard to the question of

12  --

13       THE COURT:  You can always be heard     .

14       MR. MONTEMARANO :  With regard to the question of

15  transcripts  and calls .

16       THE COURT:  Yes .

17       MR. MONTEMARANO :  The understanding that was

18  conveyed to us is that    Sergeant Sakala would be

19  complete on direct tomorrow.    I fell asleep working on

20  his cross last night after    I left the office after

21  9:00 .  I was intending to complete it tonight     ,

22  including those transcripts of calls that    I intend to

23  use to insure that   I have transcripts that   I'm happy

24  with, and identification of all those calls  .  If the

25  Court is expecting it before the close of business

1  today, it is not going to happen.

2       THE COURT:  First of all, if you want to defer

3  the cross-examination of   Detective  Sakala , we can hear

4  some other witnesses   and then have him cross  -examined .

5  If you're not ready , I'm not going to  worry about that .

6       MR.  MONTEMARANO :  That's what  I would need , Your

7  Honor , because we have two weeks of testimony that     I

8  have to sort of assim  ilate .

9       THE COURT: H ave we got enough witness  es to fill

10  today with  Detective  Sakala  and anybody else?

11       MS.  JOHNSTON:   Your  Honor , no .  We have one

12  surveillance  agent  -- as we told defense counsel  , we

13  have one surveillance agent   and Detective  Sakala  for

14  today.   That's it.

15       THE  COURT:  If we keep talking  , we won't have

16  any time at all for them today.

17       MS.  JOHNSTON:  We have two witness  es who have

18  scheduling problems next week who we need to get on

19  before close of business   Friday .  So, that's where

20  we're at.

21       THE  COURT:   Mr. Montemarano , if you're not ready

22  to cross-examine  him today , other people can cross

23  examine to the extent they wish to.     I want to try to

24  get the day filled  --

25       MR.  MONTEMARANO :  I understand , Your  Honor.

1          THE COURT:  -- and not waste the  jury's time.

2 So, I am going  to be very lenient with you if you need

3 additional time .  If y ou want to continue your   cross-

4 examination the next day  , that's fine.

5          MR. MONTEMARANO :  I don't w ish the Court to  see

6 me as  lackadaisical o r other wise , but  I want to point

7 out to the  Court that there are two weeks that     I have

8 to sort of get my grip on.

9          THE COURT:  All right , bring the jury.

10          MR. SUSSMAN :  T he Court is aware that the first

11 order of business is going to be the     Sakala  proffer .  I

12 thought  we were  going  to come to the bench on that.

13          THE COURT:  Got to play the call first.

14               (Jury returns at 10  :31 a.m.)

15               (Witness resumes the stand.)

16          THE COURT:  Good morning  , ladies and gentlemen

17 of the jury.   I'm sorry about the late start  .  I had  to

18 deal with some   administrative  matter s with the

19 attorney s in the case .

20          You are about to hear   record ing B4786 , and  I

21 want to give you a cautionary note concerning this

22 conversation.  You will hear in he    re a mention of

23 somebody being murdered  .  The person who they're

24 talking about is   Steve Brimm , who is the   father  --

25 stepfather , that is , of Nathan King, who you 've heard

1  testimony from earlier in this trial.

2       Estelle -- the "Estelle" referred to in this

3  conversation is the mother of    Nathan King.  I want to

4  advise you that no defendant in this case has been

5  charged in this or any other court with the murder of

6  Steve Brimm, and you are not the consider the

7  unfortunate death of   Mr. Brimm in any way, shape or

8  manner in any adverse way against any defendant in this

9  case.

10       You may proceed.

11              **FURTHER DIRECT EXAMINATION**

12       BY MS. JOHNSTON:

13  Q.     Detective  Sakala, I think when we left off

14  yesterday, we were playing a series of related calls;

15  is that correct?

16  A.     That's correct.

17  Q.     Those calls began with   Call A1363 between  Ms.

18  Ali and Ms. Martin on   April 28, at 9 :53 a.m.; is that

19  correct?

20  A.     Yes.

21  Q.     Then we call played a call between    Ms. Martin

22  and Mr. Nunn.

23       Do you recall that call also on    April 28?

24  A.     Yes.

25  Q.     If we could  -- and then we played a second call

1 between Ms. Martin and Mr. Nunn, also on April 28, of

2 2004; is that correct?

3 A.      Yes.

4 Q.      If we could go now to   B84786.

5         At what time does call take place   , and on what

6 day?

7 A.      That's on April 28, 2004  at 9:33 p.m.

8 Q.      Who are the parti es to this call ?

9 A.      Paulette Martin, Ulysses Ali, and LaNora Ali.

10 Q.      If we could  please play  B4786, beginning on  Page

11 408.

12         (Audio recording begins playing at 10   :33 a.m. )

13         (Audio recording  stops playing  at 10:37 a.m.)

14         BY MS. JOHNSTON:

15 Q.      Is there another call on   April 28th,  later that

16 evening , between  Ms. Martin and another individual?

17 A.      Yes.

18 Q.      When does that call take place?

19 A.      That's call B4804 . At 11:11 p.m. , on Page 413.

20 Q.      Who are the parties on that call   ?

21 A.      Paulette Martin  and Larry Nunn.

22 Q.      If we could please play B8404 on Page 413.

23         (Audio recording begins playing at 10   :37 a.m. )

24         (Audio recording  stops playing  at 10:38 a.m. )

25         BY MS. JOHNSTON:

1   Q.       What happens to the call there at the end?

2   A.       The machine inadvertently separated the call    --

3   the one call into two calls  .  So, this call is actually

4   continue d into B4806.

5   Q.       Did you actually miss part of the call?

6   A.       I don't believe we missed conversation.  It just

7   splits the call in two.

8   Q.       If we could go to the next call,    B4806, on Page

9   414.  W ho are the parties on this call?

10  A.       It's a continuation  .  It's Paulette  Martin  and

11  Larry  Nunn .

12  Q.       It occurred immediately after the preceding

13  call?

14           Did it occur immediately after the previous call

15  or as part of the    previous  call ?

16  A.       It's part of the previous call.  If you took

17  4804 and 4806 is actually one call.

18  Q.       If we could please play call    B4806 on Page 414.

19           (Audio recording begins playing at 10    :39 a.m. )

20           (Audio recording   stops  playing  at 10 :39 a.m.)

21           BY MS. JOHNSTON:

22  Q.       Based upon those series of    call s, did you form

23  an opinion as to what was occurring between       Ms. Ali ,

24  Ms. Martin , and Mr. Nunn?

25           MR. SUSSMAN :  Objection , Your  Honor.

1          THE  COURT:   Approach the bench.

2                (At the bar of the Court.)

3          THE  COURT:   Ms. Johnston?

4          MS.  JOHNSTON:  Yes, sir.

5          THE  COURT:   What is your proffer as to what you

6    anticipate this witness will say?

7          MS.  JOHNSTON:    I expect this witness to say that

8    during the first conversation    Ms. Martin  and Ms. Ali

9    were discussing getting    --

10          THE  COURT:  Getting what  ?

11          MS.  JOHNSTON:  Getting letterhead    and faxing

12   that.  T he purpose of the series of calls was for     Ms.

13   Martin to provide a time    sheet  -- time document for   Mr.

14   Nunn  in relation to the murder of    Mr. Brimm  that

15   occurred on or about   November 30 , and that's why the

16   reference was to that weekend   of 11/30.  He's been

17   instructed not to reference anyone in      terms of Ms. Ali

18   or Ms. Martin being involved in that murder    , but  I

19   expect his testimony will be along the lines that      I

20   just said.

21          THE  COURT:  All right.

22          MR. SUSSMAN :  Well, this has the look   and smell

23   of two people concocting   an alibi  or a homicide .  I

24   don't think -- first of all  , it's been objected to  , and

25   it's been ruled to be admissible   .  What I would request

1 is this  is not a proper subject for this witness'

2 testimony .  He's an expert on narcotics   .  We should

3 just pass over   it and move  on to the  next series of

4 calls , and then  he doesn't get to comment on it.  It

5 speaks for itself.

6         Anyone else join in on this?

7         MR. McKNETT :  I will join in  Mr. Sussman 's

8 motion.  Clearly , this is from  Detective  Sakala's  point

9 of view , an attempt on the part of   Mr. Nunn , Ms. Martin

10 and Ms. Ali to concoct an alibi excuse for a murder.

11         MR.  WARD:  It implicates them as access  ories

12 after the fact , at least.

13         MR. MCKNETT :  Exactly.

14         MR. MONTEMARANO :  Far beyond the extent to which

15 the Court admitted   Sergeant  Sakala's  testimony as an

16 expert concerning drug language    and the operation of

17 the drug organization.  This is so far afield.     ..

18         MR. MCKNETT :  This undermines the   Court's

19 instruction.  What the government instructed is --

20         THE  COURT:  Let me hear   Ms. Johnston.

21         MR. MCKNETT :  They are now made suspects.

22         MS. JOHNSTON:   I don't believe that the

23 government  here has anything to do with whether    they

24 are a suspect.  It shows that    Ms. Martin is -- excuse

25 me, Mr. Ward .

1          MR. WARD:  I didn't say a ward.

2          MS. JOHNSTON:  No .  You smirked  and laughed  and

3  shrugged your shoulders.

4          MR. WARD:  No , I didn't  smirk.   I was getting an

5  Excedrin headache.

6          THE COURT:  Please finish.

7          MS. JOHNSTON:  Yes , Your Honor.

8          That Ms. Martin is attempting to protect     and

9  offer assistance to her major heroin drug customer     , and

10  that's why it is relevant in this case in terms of      Ms.

11  Ali .  It shows her knowledge    and her relationship with

12  her co-conspirator , Ms. Martin , and it's important for

13  that basis.

14          MR. McKNETT :  This is alibi -- whether they are

15  charged or not   --

16          THE COURT:  Counsel, stop, stop,    stop , stop .

17          I'm going to sustain the objection.  Detective

18  Sakala is qualified   to and has giv en extensive

19  testimony interpreting coded language between people

20  involved in the drug trade    and giv ing  explanatory

21  information concerning people involved in the drug

22  trade.

23          While it might be a close call   , this testimony

24  would be aided by him giving an opinion that what

25  they're trying to do is to protect a heroin customer     .

1           I think that in light of the nature of this

2   conversation about a murder   , that to allow him to give

3   testimony that they are helping their customer with

4   time sheets to cover up a murder is going to do exactly

5   the opposite of what my cautionary instruction did     , and

6   I think that would not be proper.

7           MS. JOHNSTON:    Your Honor , I would like

8   permission , one , to follow up with some questions

9   concerning , I think , the initial call with   Ms. A li

10  where she was calling from her place of employment      .

11          Also in the call that's the     subject  of the

12  dispute,  B4786 , Ms. Martin made statements about her

13  relationship with   Mr. Brimm  and having to do with the

14  clothing business .  So, I would like to follow up on

15  that.

16          THE COURT:    You can ask in reference to the

17  clothing business .  Really , clothing ?  That's fine .

18          MR. MCKNETT :   Your Honor , I would like to renew

19  my Motion for   Severance based on the content of these

20  last few transcripts    and Ms. Johnston's proffer as to

21  what the detective would have said.     I am now in a

22  position where   I have to deal with the government's

23  complication s that my client was involved with    Mr. Nunn

24  and what  Ms. Martin were doing with regard to these

25  facts .

1        It would be part of my defense that    Ms. Ali's

2   connection with   Ms. Martin  and the letterhead is

3   completely  and factually separate from what    Mr. Nunn

4   was do ing.  When  I do that , the government , I expect ,

5   will argue that   I have open ed the door to bring in the

6   government's theory that these are    , in fact , connected ,

7   and the only way they can be connected would be in

8   further ance of an at tempt  to provide an   alibi  for Mr.

9   Nunn .

10       I am now in a position where    I have been

11  significantly impaired in my ability to defend my

12  client  and I would ask for a severance based on that

13  fact.

14       MS.  JOHNSTON:   Your Honor,  I think it is

15  relevant in terms of   Ms. Ali , because it goes to show

16  Ms. Ali's knowledge of the fact that    Ms. Martin does

17  not have a legitimate business   , that she's not

18  operating a legitimate business in terms of the opening

19  statement made by   Mr. Martin  -- by Mr. Montemarano  on

20  Ms. Martin , that he was a legitimate business person.

21       Here we have  Ms. Ali .  It shows her knowledge

22  that  Ms. Martin was not involved in a business     and

23  she's assisting her in that regard   , which goes to her

24  knowledge  and her understanding   and what her dealings

25  with  Ms. Martin were.

1           THE  COURT:  All right.

2           MS.  JOHNSTON:    I intend to argue that she

3 assisted.

4           THE  COURT:   I will deny the  Motion for

5 Severance.

6           Ms. Johnston , will you please advise    Detective

7 Sakala  of my ruling so   he doesn't wander into it.

8           MS.  JOHNSTON:    I will.

9           MR.  McKNETT :  May I follow up ?

10          MR.  MONTEMARANO :  May  I follow up?

11          THE  COURT:  Y ou're going to have to speak up.

12          MR.  MCKNETT :   I will make an argument   , both by

13 referring to the government's own evidence    , other

14 transcripts , and the testimony of my client probably

15 that she was , in fact , involved with  Ms. Martin in what

16 at least she believed to be a legitimate business       at

17 the same time of these conversations.

18          When  I do that, the government will then be in a

19 position to offer rebuttal    and I point out , as  Ms.

20 Johnston said , that the government believes that my

21 client was involved in a nefarious act with      Ms. Martin

22 to set up an alibi for a murder.     I would ask the

23 Court , since my  Motion for  Severance has been denied   ,

24 that the  Court instruct the government that it not make

25 that kind of an argument.  That it not be able to argue

1 that my client was involved in an attempt to set up an

2 alibi for Larry Nunn in order to absolve him of **to come**

3 **police** any the murder of    Steven  Brimm .

4        MS. JOHNSTON:  The problem with that    , Your

5 Honor , is we don't know what the defense is going to

6 put on.  If he is   going  to put on something in terms of

7 her having a legitimate business    , then I think we are

8 allowed to establish that she     assisted her in

9 falsifying documents.

10        THE  COURT:  We will cross that bridge.  Let me

11 know if there is a bridge that you don't want her to

12 cross.  She may not get to the bridge --

13        MS. JOHNSTON:   Your  Honor , while we're up here,

14 I may as well save us a trip.

15        I am showing him   Hayward 35.  It is a fax ed

16 document recovered from   Ms. Martin's house that

17 references  Larry Nunn as an employee of   Ms. Martin,  PTK

18 Associates , and shows the date 11  /30 --

19        MR. MONTEMARANO :  I object to this point  , or at

20 least  or observe  to the  Court  that  unless  this

21 detective is a seizing agent in the search of 810

22 Hayward,  the government will have to tie this up

23 through  the seizing agent , which  I as sume  you're going

24 to be able to do.

25        MS.  JOHNSTON:  We will call the seizing agent

1 from 810  Hayward  --

2          THE  COURT:   Then  you're  not  going  to    --

3          MR.  MONTEMARANO :   Based  upon  that  proffer   , I

4 guess  my  objection  ought  to  be  held  in     abeyance , but  I

5 -- for  the  record , I'm  feel ing  obligated   to  object  at

6 this  point.

7          MS.  JOHNSTON:    I  will  --  not  only  is  it   in  your

8 discovery , it's  in  the  exhibit  book  that  you  were

9 given.

10          MR.  MONTEMARANO :   It  might  well   be.

11          MR.  WARD:   In  closing , Your  Honor, part  of  my

12 arguments  I  made  reference  to  this  case  not  being  tried

13 in  California  but  being  tried  here.    I  was  somewhat

14 emphatic  in  my  argument  .   I  meant  no  disrespect  to  the

15 Court .   If  the  Court  was  offended,    I  apologize.

16          THE  COURT:  Oh,  all  right.   You  haven't  gotten

17 close  to  offending  me  yet  , Mr.  Ward .

18          MR.  WARD:   I  wanted  to  make  sure  .

19          THE  COURT:  Y ou've  got   to  try  harder  than  that.

20          MR.  WARD:   I've  offended  a  lot  of  other  people

21 here , I'm  sure.

22          MR.  SUSSMAN :  When  it  come  s  to  offending  people  ,

23 I'm  the  best.

24          THE  COURT:  You're  going    to  offend  this  jury  if

25 we  don't  get  back .

1          MR.  SUSSMAN :   I join in  Mr.  McKnett 's objection.

2          THE  COURT:  Your objection is joined in     and

3  overruled.

4          MR.  MCKNETT :   Your  Honor , at the  end  of this

5  testimony , I'm going  to renew my motion  .  I will  just

6  get up  and  say , I renew my motion  , but  I won't say my

7  Motion for  Severance.

8          THE  COURT:   Ms.  Johnston , I will leave the

9  husher  on until  Detective  Sakala  has been advised.

10         MS.  JOHNSTON:  Oh, absolutely.

11             (Back  in open court.  )

12         HE  COURT:   You may proceed.

13         MS.  JOHNSTON:  Thank you  , Your  Honor.

14         BY  MS.  JOHNSTON :

15  Q.     If we could,  Detective  Sakala , go back to

16  yesterday's calls.  On   Page 402  and  403  and during this

17  telephone conversation  , Ms. Ali  and  Ms. Martin are

18  discussing  -- or Ms. Ali  is advising  Ms. Martin about

19  how to get a fax machine   and how the set  it up; is that

20  correct?

21  A.     That's correct.

22  Q.     Indeed , on the second page  , Ms. Ali  indicates

23  she will work with the fax machine until     Ms. Martin can

24  get it straightened out; is that correct?

25  A.     Yes.

1 Q.      The next call is a call between    Ms. Martin  and

2 Mr. Nunn; is that fair to say?

3 A.      Yes.

4 Q.      And that relates to time sheets; is that

5 correct?

6 A.      Yes.

7 Q.      In this instance , "time sheets " did not refer to

8 drugs; did it?

9 A.      No, it did not.

10 Q.      In fact, that call is related to the later calls

11 that we've just played; is that correct?

12 A.      Yes.

13 Q.      Including  A1407  and then the subsequent call of

14 B4804  and 4806; is that correct?

15 A.      Yes.

16 Q.      In those three calls   --

17       MS.  GREENBERG:  Page numbers for the jury,

18 please.

19       BY MS.  JOHNSTON:

20 Q.      Page numbers 413   and 414 , and the first call

21 being on Page 404   and 406.

22       Now, having listened to those calls    , have you

23 also had occasion to review documents that were

24 recovered from   Ms. Martin's residence at    Hayward  during

25 the execution of the search warrant on    June 1st of

1  2004?

2  A.      Yes.

3  Q.      Showing you what's been marked as      Hayward  35.

4          Do  you  recognize  those  two pages?

5  A.      Yes.

6  Q.      Is one of -- what are they?

7  A.      It's a fax cover sheet from      Paulette  Martin to

8  Jeffrey  Leslie  and an attachment for a time sheet.

9  Q.      The first page of that fax sheet    , are you

10 familiar with that area code?

11 A.      Yes.

12 Q.      Where is that area code?

13 A.      California.

14 Q.      What is the l etterhead on that fax sheet?

15 A.      The  Embassy  Suites hotel.

16 Q.      The second page of that fax sheet is what?

17 A.      It is a time sheet   -- a weekly time sheet for

18 Larry  Nunn for the week ending 11/30/03.

19         MR.  MONTEMARANO :  Objection .

20         Basis for knowledge.

21         THE  COURT:  Lay a foundation.

22         THE  WITNESS:   I'm reading it.

23         MS.  JOHNSTON:  He's reading it.    I can put the

24 document -- let me put the document up so everyone can

25 see it.

1             BY MS. JOHNSTON:

2  Q.      Beginning at the top of that fax sheet, is there

3  a name of the employee  ?

4  A.      Yes.

5  Q.      Who's the name of the employee?

6  A.      Larry  D. Nunn .

7  Q.      Does it indicate what time period or what week

8  this is for?

9  A.      For the week ending November 30, 2003.

10 Q.      Then do they list hours in    and hours out for

11 each day of the week?

12 A.      Yes.

13 Q.      Through November 30 of 2003; is that correct?

14 A.      Yes.

15 Q.      On the bottom of this  , does it indicate who   Mr.

16 Nunn was employed by?

17 A.      On the sheet on the far right  , there's a

18 signature of  Paulette  Martin.

19 Q.      Have you become familiar with her signature

20 during the course of this investigation     and

21 prosecution?

22 A.      Yes.

23 Q.      Do you recognize that as her signature?

24 A.      It looks like her signature.

25 Q.      Underneath , there's tiny , tiny print .  Can you

1  read that?

2  A.      Yes.

3  Q.      What does that say?

4  A.      Mr. Nunn's official start of employment with      PTK

5  Associates was 1-   -- looks like 1-5 of   '04.  Could be

6  1-3 of  '04.

7  Q.      The date on that   Hayward 35 , in terms of the

8  time period for the time sheet, is that consistent with

9  the reference to 11/30 in the    last call that we played

10  for the jury?

11  A.      Yes.

12  Q.      Going back to  Call 478 6 on Page 408 through 412.

13         Were you  familiar  with the names that were being

14  mentioned by  Ms. Martin during that  conversation?

15  A.      Yes.

16  Q.      In particular , calling your attention to the

17  first page, the reference to    "Estelle " refers  to whom?

18  A.      Estelle  Brimm .

19  Q.      And Gene Bird , at the top of  Page 409 , refers to

20  whom?

21  A.      "Gene  Bird " is  Eugene  Bird.  He's a customer   /

22  associate of  Ms. Martin.

23  Q.      And then when we go to the middle of the page,

24  Ms. Martin makes  statements about  not  knowing  nothing

25  about the man no more than he bought  clothes from me or

1 for his son  and all .

2          Do you know who she was talking about  in that

3 portion of the conversation?

4 A.    She's talking about the man being    Steve  Brimm

5 and I don't know the name of his son.  His wife was

6 Bridget  Brimm -- his current wife.

7 Q.    Based upon your training   and experience , did you

8 form an opinion as to whether or not    Ms. Martin

9 accurately described   the relationship with   Mr. Brimm

10 when she said that she didn't know anything about him

11 or that he bought clothes from    me for his son  and all ?

12          MR. MONTEMARANO :  Objection , Your Honor .

13          Basis for knowledge  .

14          May we approach ?

15          THE COURT:  O verruled.

16          THE WITNESS:  She was not being truthful.

17          BY MS. JOHNSTON:

18 Q.    Based upon your training   and experience , what

19 was her relationship with    Mr. Brimm ?

20 A.    He was a cocaine source for her in    California.

21 Q.    Now, there are reference  s to other individuals

22 here , including  Mr. Philpot  and a "Larry ," in addition

23 to Mr. Bird .

24 A.    Yes.

25 Q.    On Page 411 , there is a reference to    Lou and

1  Louis.

2       Based upon your training   and experience , are

3  drug -- persons engaged drug trafficking concern     ed when

4  the police are investigating any kind of matter?

5  A.     Sure.  They want to stay below the radar     and are

6  concern ed whenever the police are around.

7  Q.     So it doesn't matter what the police may be

8  investigating ?

9  A.     That's correct.

10 Q.     Okay.  What is important to them    , based upon

11 your training   and experience , is what?

12 A.     Is that they've come to the attention of the

13 police for whatever reason.

14 Q.     What is  Ms. Martin doing -- what is   Ms. Martin

15 advising  Ms. Ali  that she has done in reference to

16 Louis  and Mr. Bird  and Mr.- -- the other people that

17 she mentions in this letter?

18 A.     She's warning them that the police are around,

19 referring to it at the top of Page 412.     I done put

20 them all on notice.

21 Q.     Based on your training   and experience , it has

22 nothing to do with the crime they're inv     estigating, but

23 more about   --

24       MR. MONTEMARANO :  Objection , Your  Honor.

25       BY MS. JOHNSTON:

1 Q.      Based on your training   and experience , why is

2 she warning them?

3 A.      Because the police are around    and they're

4 engaged in illegal drug trafficking activities    and if

5 the police are around, they may just     -- because they're

6 investigating one thing doesn't mean they won't stumble

7 across something else.

8 Q.      At the  bottom  of Page 411 , the reference to

9 Louis  and my brother refer to    whom?

10 A.      Luis  Mangual  is "Louis " and  "Brother " is  Learley

11 Goodwin.

12 Q.      Before we move on   to the next questions  , let's

13 go back to the call that we had provide    d to the jury,

14 B4456 as an add  -on call.   That would be on     CD -3.

15        Do you have a copy of that transcript in front

16 of you?

17        B4456 , that is a separate call on a separate

18 piece of paper that we passed yesterday.

19 A.      Yes , I do have it.

20 Q.      On what date   and time does this call take place?

21 A.      This was on  April 26, 2004 , at 10 :26 a.m.

22 Q.      Just to put it in chronological order    , was this

23 call before or after call B4506 on     Page 39 involving

24 Mr. Whiting  and Ms. Martin?

25 A.      This is before.

1   Q.       On the same day?

2   A.       On the --  I believe so.

3   Q.       If you could check.

4   A.       What's the page number for 4506  ?

5   Q.       The page number is 39  6.

6   A.       Yeah.  4506 occurred on the 26th at 7    :09, and

7   4456 occur red the  same day at 10 :26 in the morning.

8   Q.       7:09 in the evening for the second call between

9   Mr.  Whiting  and Ms. Martin that we  've already heard?

10  A.       That's correct.

11  Q.       If we could please play   Call B4456.

12           (Audio  recording begins playing at 11  :00 a.m. )

13           (Audio recording   stops  playing  at 11 :03 a.m. )

14           BY MS.  JOHNSTON:

15  Q.       On the  first page of that call -- unfortunately    ,

16  the pages aren't numbered  , but on  Page 1 of that call ,

17  the "Brother " being referred to by   Ms. Martin is who ?

18  A.       That refer s to Reece  Whiting.

19  Q.       And on Page 2 , Mr. Scott  makes a statement about

20  this guy , he's cooking over here right now.

21           Based on your training    and experience , does that

22  have anything to do with drugs?

23  A.       I can't tell.   I don't know.    Based on just that

24  blurb , I don't know who he's referring to.

25  Q.       All right.   And so you don't have an opinion

1  concerning what that refers to; is that fair to say?

2  A.      No.

3  Q.      Further down , there's a mention of   Reece .

4          Who's the  "Reece " that Ms. Martin is referring

5  to?

6  A.      Reece  Whiting.

7  Q.      Based upon your investigation   , did you determine

8  whether  or not  he was authorized to practice law in the

9  state of  Maryland at the time of this event?

10 A.      Could find no evidence of that.

11 Q.      On the third page of that call   , there is a --

12 Ms. Martin asked  , did anyone talk to the other half

13 yet.

14         Based on your training    and experience an d your

15 knowledge of the investigation    , do you know who she was

16 speaking of ?

17 A.      Yes.

18 Q.      Who was that ?

19 A.      William  "Dog" Turner.

20 Q.      Did you know  where he was at the time of this

21 conversation?

22 A.      No.

23 Q.      Further down , Mr. Scott  says he might be burnt.

24         What is  Mr. Scott  advising  Ms. Martin of when he

25 says that?

1  A.       Similar thing to he might be    "hot;" he might be

2  "warm."   He might be drawing the attention of the

3  police.   In other words, they're talking about whether

4  they want to treat him with care    and caution if they

5  come across him.

6  Q.       On the very last page  , Ms. Martin asks   Mr. Scott

7  to keep her p osted.

8          Based upon your training   and experience, why

9  would someone -- do you have an opinion as to     why

10 someone in  Ms. Martin's position would want to be kept

11 posted as to  Ms. Levi's matter?

12 A.       Yes.

13 Q.       What is that?

14 A.       She had done a lot of drug deals with     Ms. Levi

15 and certainly she would want to keep track of what's

16 going on in her case to know if there's something that

17 she should be concerned about    , whether  Ms. Levi would

18 cooperate with the government.

19 Q.       Court's indulgence.

20         Now , if we could go to the next telephone call,

21 A1415 , on Page 415.  What is the time of this call?

22 A.       This is on the 29th of April   , 2004 , at 8:37 in

23 the morning.

24 Q.       Who are the parties to this call?

25 A.       John  Irby and Paulette  Martin.

1  Q.       If we could play it  , please.

2           (Audio record ing begins playing at 11  :06 a.m. )

3           (Audio recording   stops playing at 11  :11 a.m. )

4           BY MS. JOHNSTON:

5  Q.       Detective  Sakala , based upon your training    and

6  experience , did you form an opinion as to whether or

7  not any of this conversation was relate    d to the drug

8  trafficking activities of   Ms. Martin  and other members

9  of the conspiracy  ?

10 A.       Yes,  I did.

11 Q.       What is that opinion?

12 A.       It is related to their drug   activities .

13 Q.       Could you explain to us what in the conversation

14 and how it's related to the drug trafficking activity?

15 A.       In the first couple of pages    Mr. Irby  and Ms.

16 Martin are talking about the people that have -- that

17 work for  Mr. Goodwin  at his -- the  Lobo's dealership ,

18 and how you have to be careful about who works for you.

19 They switched the conversation on    Page 417 over to why

20 you have to be careful.

21 Q.       What is it in that conversation that tells you

22 they're talking about why you have to be careful?

23 A.       In the  fourth  line down , Paulette  Martin says,

24 you see  Goody  and his livelihood just need to be

25 watching , putting strangers in certain places.   In

1 other words, since he's a drug dealer    , you have to be
2 careful around strangers.
3        Mr.  Irby  agrees , and  then  the  next  section   , she
4 goes on to say in certain livelihoods   , that being drug
5 dealing , you got to watch, dot all your    Is, cross all
6 your Ts because they have so many slick ways out there      .
7 That means the police have so many ways to investigate
8 you , to ease them  MF-ing things in on you  , you 'd be
9 surprised .
10        In other words  , the police have so many ways to
11 get informants   and cooperators   in close to you.  You
12 have to be   careful having too many strangers around you
13 in the drug business.
14 Q.     Further  down  there's  a reference to two
15 individuals who  Mr.  Irby  refers to as "Dumb & Dumber."
16        Based upon your training   and experience   and the
17 other conversations, do you know who     "Dumb & Dumber "
18 are referring to?
19 A.     Yes.
20 Q.     Who is that?
21 A.     Michael  Thurman and  Xavier  Moore,  two of the
22 couriers working for   Mr.  Goodwin .
23 Q.     And there is also a reference    to "them two other
24 guys with the van  ," and he cuts off .   It goes  BA.
25 A.     Yes.

1 Q.      Was there a van stopped with   Mr. Thurman  and Mr.

2 Moore during  the course of this investigation?

3 A.      Yes.

4 Q.      That would be the incident that this jury heard

5 from from  Mr.  -- that  Mr. Thurman  would have provide  d

6 to this jury; is that correct?

7 A.      Yes.

8 Q.      Hat is  Mr. Irby  saying in relation to   Mr.

9 Thurman  and Mr. Moore ?

10 A.      He goes on on the bottom of 417    and  the bottom

11 of 418 to talk about how   Mr. Moore  and Mr. Thurman  want

12 to party and enjoy  the social aspects  , I guess , if you

13 want to call it that  , of the job they're doing.

14 Whereas , he is much more --   "he" being  Mr. Irby  -- is

15 much more business  -oriented .  He wants to get down

16 there  and do it  -- do what has to be done in the way of

17 the mov ing of the drugs or money back    and forth  and get

18 back , and he doesn't like hanging out   and do ing all the

19 social partying aspect   s that the younger guys   , Mr.

20 Thurman  and Mr. Moore,  like to do.

21 Q.      At the bottom of   Page 418, Mr. Irby  is referring

22 to some dude who's always calling back needing more

23 cash.  Based upon your training    and experience  and your

24 knowledge of the intercepted calls    and activities, who

25 was he referring to there?

1 A.      Mr. Thurman. Supposedly, it could be also  Mr.

2 Moore, but he's calling -- complain  ing that the

3 couriers always need more cash for some problem they've

4 encountered.

5 Q.      Okay.  And at the top of the page  , again,

6 there's a reference to   "Dumb & Dumber," referencing,

7 again, the same two individuals  , Mr. Thurman  and Mr.

8 Moore?

9 A.      Yeah.  Initially talks about two individuals    ,

10 and he specifically -- identifies that person as old    ,

11 tall boy who  would be -- Mr. Thurman  is the taller  one.

12 Q.      And the reference at the bottom by    Mr. Irby that

13 they cleaned that office out   , he's refer ring to  an

14 office where?

15 A.      Lobo's.

16 Q.      Okay.  If we could go to the next call,   B4842.

17        Is this part of a series of calls?

18 A.      Yes.

19 Q.      Okay.  What calls are related to    B4842?

20 A.      4842, then 4861  and D2330, B4888, and

21 B4890/D2352, then  B4891, and B49 10/D2359.

22 Q.      Between what time span do these calls take

23 place?

24 A.       The first call takes place on   April 28 at 12 :40

25 in the afternoon , and last call is on   April 29 at 5 :34

1  in the afternoon.

2  Q.      The first call takes place when   , if you look at

3  the transcript?

4  A.      I'm sorry.   The synopsis    I have here has the

5  wrong date.   On the transcript  , it's April 29.

6  Q.      Who are the parties to the first call on      April

7  29, B4842?

8  A.      The first call was all    Paulette  Martin  and

9  Learley  Goodwin.

10  Q.      What time does that take place?

11  A.      That's at 12 :40 in the afternoon on the 29th.

12  Q.      If we could play   B4842 , please.

13          (Audio recording begins playing at 11    :16 a.m. )

14          (Audio recording   stops playing  at 11 :19 a.m.)

15          BY MS. JOHNSTON:

16  Q.      If we could go to the next call,    B4861, on Page

17  424.  It's also referenced as D2330.   What does       D2330

18  refer to?

19  A.      That's the   D line which was   Luis  Mangual 's --

20  one of his cellular telephones   , so we actually

21  intercepted this call on    Paulette  Martin's home phone

22  and on  Luis  Mangual 's cellular telephone.

23  Q.      If we could play this call, please.

24          (Audio r ecording begins playing at 11    :20 a.m. )

25          (Audio recording   stops playing  at 11 :20 a.m. )

1          BY MS. JOHNSTON:

2 Q.      If we could go to the next call,    B4888.  At what

3 time does this call take place   ?

4 A.      This is on the 29th at 3  :48 p.m.

5 Q.      And who are the part ies to  this call?

6 A.      Paulette  Martin and  Learley  Goodwin.

7 Q.      If we could please play this portion of the

8 call .

9          (Audio reco rding begins playing at 11  :20 a.m. )

10          (Audio recording  stops  playing  at 11:20 a.m. )

11          BY MS. JOHNSTON:

12 Q.      The next call,  B4890 or D2352 , on  Page 426

13 takes place at what time?

14 A.      Later that afternoon on the   29th.   After she

15 hangs up with  Mr. Goodwin,  she then calls   Mr. Mangual .

16 Q.      If we could play  B4890 on  Page 426.

17          (Audio r ecording begins  playing at 11 :21 a.m. )

18          (Audio recording  stops  playing at  11 :21 a.m. )

19          BY MS. JOHNSTON:

20 Q.      And then  B48 91 on  Page 427 , what date  and time

21 is that call?

22 A.      After she hangs up with   Mr. Mangual , she calls

23 Mr. Goodwin  -- Learley  Goodwin at 3 :52.

24 Q.      And if we could play  B4891 on  Page 427.

25          (Audio recording begins playing at 11    :22 a.m. )

Page  80

1          (Audio recording   stops  playing  at 11:22 a.m. )

2          BY MS. JOHNSTON:

3  Q.     And then the next call,   B4910 or D2359 on  Page

4  428, what time does that call take place?

5  A.     The 29th at 5:37 p.m.

6  Q.     Who are the parties?

7  A.     Paulette  Martin  and Luis  Mangual .

8  Q.     If we could play that call.

9          (Audio recording begins playing at 11   :22 a.m. )

10         (Audio recording   stops  playing  at 11:22 a.m.)

11         BY MS. JOHNSTON:

12  Q.    Based upon your training and experience, did you

13  form an opinion as to what took place between      Ms.

14  Martin,  Mr. Goodwin, and Mr.   Mangual  that evening?

15  A.     Yes.

16  Q.    What is that?

17  A.     Ms. Martin ordered a kilogram of cocaine from

18  Mr. Mangual .  Mr. Goodwin  then asked her to get another

19  one for him.  Ms. Martin called   Mr. Mangual  back to

20  order another , but he did not have another one   , just

21  had hers , which he delivered to her that evening.

22  Q.     If we could go back  , then , to first call  B4842

23  on Page 421.

24         On Page 421 , when  Mr. Goodwin  says, you know  ,

25  when I went to pick  up the lunch up for you from      Cuba,

1  I was supposed to get one for myself the next day.

2          Based on your training   and experience , did you

3  form an opinion as to what   Mr. Goodwin was telling  Ms.

4  Martin?

5  A.      Yes.

6  Q.      What is that?

7  A.      He's talking about that when he went     and got the

8  kilogram of cocaine from    Cuba for  Paulette in the deal

9  we heard yesterday , that he was supposed to go back     and

10 get another one for himself the next day    , but now he

11 can't get in touch with    Cuba to pick  that up.

12 Q.      Was there a code word used for that kilo of

13 cocaine?

14 A.      "Lunch ," referring to the kilogram.

15 Q.      If you could write that on our board     along with

16 Page 421.

17 A.      (Witness indicating.  )

18 Q.      And then there's a discussion on page -- at the

19 bottom of Page 421 continuing into 422.  Again     , who is

20 Ms. Martin discussing with    Mr. Goodwin ?

21 A.      She starts in there talking about    Reece  Whiting

22 and the conversation we had yesterday where he had come

23 over to talk to her about another source of cocaine     ,

24 but she had not heard back from him.  She then goes on

25 to relay the story about    Estelle  Brimm and what she is

1 telling people , the investigators  from  California.

2 Q.     In that page , there's also a reference that

3 Larry is  furious .  Based upon the content of the call,

4 do you know whether she was talking about     Larry  Lane or

5 Larry  Nunn ?

6 A.     She's talking about   Larry  Nunn .

7 Q.     That's based upon what on Page 422?

8 A.     The prior conversations  intercepted.

9 Q.     There's a reference that    Larry is  furious , and

10 then she says , "Lionel 's brother ."

11        Do you know who   Lionel  was?

12 A.     Yes.

13 Q.     Who is that?

14 A.     That's  Lionel  Nunn , Larry's brother.

15 Q.     Again, based upon your training    and experience,

16 is the concern   Ms. Martin expressed here the same

17 concern you discussed before   , generally being concern   ed

18 about the police contacting you for any matter when

19 you're engaged in drug trafficking?

20 A.     That's correct.

21        MR. MONTEMARANO :  Objection , Your  Honor .

22        Asked  and answered.

23        THE  COURT:  Overruled.

24        THE  WITNESS:  That's correct.

25        BY MS.  JOHNSTON:

1  Q.      Then when we go to the last page, 423    , is there

2  a reference to drug trafficking on that page?

3  A.      Yes.  Middle of the conversation there    , on Page

4  423 , she says  Luis -- I know  Luis  got tickets but  ain't

5  got any from him yet.    I'm not quite finished with the

6  tickets  I got  the other day , but I know he's got

7  tickets .  Meaning , Luis  Mangual  has cocaine for sale

8  but she's not quite ready    because she hasn't got rid of

9  the tickets from the other day.

10  Q.      Tickets referring to   what?

11  A.      Cocaine.

12  Q.      If you could write Page 423 on our board next to

13  the word tickets.

14  A.      (Witness indicating.  )

15      MR. MCKNETT :  Your  Honor , while that's

16  happening , may  I renew the motion   I made at the bench

17  based upon the reasons   I stated ?

18      THE   COURT:  Yes, and  I'll adopt the same

19  ruling.

20      MR. MCKNETT :  Thank you.

21      BY MS. JOHNSTON:

22  Q.      Now if we could go to the    next call.

23      THE  COURT:  No , we're not .  We're going  to take

24  a morning recess until quarter of 12    :00 .

25      MS.  JOHNSTON:   I was just hoping to get through

1  this series first  , Your  Honor .

2                    (Jury excused at 11:27 a.m.)

3                    (Off  the  record   at 11 :27 a.m. )

4                    (On the  record  at 11 :48 a.m. )

5         THE  COURT:   For whatever it's worth  , I looked at

6  the pre -sentence report for whatever that's worth.       He

7  has a half-brother named    Kevin .   It looks like he is,

8  in fact, the son of   Ms. Levi, for whatever that's

9  worth.

10         All right.  Ready for the jury?  Bring them     in.

11         (Witness resumes the stand at 11   :48 a.m. )

12         MS. JOHNSTON:   Your Honor , we're going  to jump

13  around to get a surveillance agent  in because he's due

14  in Montgomery  County  Circuit  Court  this afternoon at

15  2:00  or 2 :30.

16         THE  COURT:   That's fine.

17         MS.  JOHNSTON:   I told counsel  I would be doing

18  that.

19         THE  COURT:   I will  be breaking right on the

20  money close to  1 o'clock , because there's a meeting

21  that begins at  1 o'clock.

22         MS.  JOHNSTON:   I think we will be all right   .

23         THE  COURT:   I will cut you off in mid   -word .

24         (Jury returns at 11  :50 a.m. )

25         THE  COURT:  You may proceed.

1          BY MS. JOHNSTON:

2  Q.     Detective Sakala, when we left off, we were at

3  Call B4861 on Page 424.  Do you have that before you      ?

4  A.     Yes.

5  Q.     Was there any code  language used between   Ms.

6  Martin  and Mr. Mangual  in that call?

7  A.     Yes.

8  Q.     What is that?

9  A.     Ms. Martin  says, when you come this evening   ,

10  bring me one of those books that you say you picked up

11  at the  Borders bookstore for me.  She's say    ing she

12  wants hi m to bring a kilo of cocaine to her that night.

13  Q.     Page 424, next to the code word   "book", which  I

14  think is at the bottom of that page   .

15          I believe on the preceding page   , Ms. Mart in told

16  Mr. Goodwin  that she hadn't gotten any    --

17          MR. MARTIN:   Objection .  Leading.

18          MS. JOHNSTON:   Let me rephrase.

19          BY MS. JOHNSTON:

20  Q.     What did  Ms. Martin just tell   Mr. Goodwin  on the

21  previous page in reference to drugs?

22  A.     She said she didn't need any an   d she hadn't

23  quite finish ed with the drugs , referring to  them as

24  "tickets ," that she had got the other day.

25  Q.     Based upon your training   and experience , was

1 there anything inconsistent about her then    , a short

2 time -- a couple hours later  , ordering another kilo

3 from  Mr.  Mangual ?

4 A.       No.

5 Q.       Why not?

6 A.       During the previous call   , Mr.  Goodwin  had told

7 her that she was having -- he was having a hard time

8 getting cocaine from    Cuba , who was another source of

9 theirs .

10        Acting upon that information    , she did what any

11 prudent business person would    and secured another

12 supply of cocaine before it ran out from      Mr.  Mangual .

13 So she took information    Mr.  Goodwin  had and acted on

14 it.

15 Q.       And if we go to the next call   , B4888 on Page

16 425.

17        Based  on your train ing  and experience , what does

18 Mr.  Goodwin  ask  Ms.  Martin  to do in that call?

19 A.       During the call  , Mr.  Goodwin  asks  Ms.  Martin  to

20 get a kilogram of cocaine for him    , from  Mr.  Mangual

21 also.

22 Q.       And the next call on   Page  526 .  Was there any

23 code language used in that call?

24 A.       Yes.  The  fourth  line down , Ms.  Martin  says  , my

25 brother told me  , referring to   Mr.  Goodwin,  to ask you ,

1  do you have an extra copy of one of those books    .   In

2  other words , do you have another kilogram for him.      Mr.

3  Mangual  says , no , I just got rid of the last one a

4  little while ago .  All I got is yours .  Meaning , I

5  don't have any other kilograms    , all I have is the one

6  I'm bringing you.

7  Q.      The code word there for kilograms is?

8  A.      A copy of books.

9  Q.      If you could write   Page 426 next to   "books " on

10 the chart, please.

11 A.      (Witness indicating.  )

12 Q.      If could go to the next call   , B4891.

13         What does  Ms. Martin tell   Mr. Goodwin  in this

14 call?

15 A.      She's relaying the information back to     Mr.

16 Goodwin  that  Mr. Mangual  doesn't have anymore

17 kilograms , saying in the second line   , I just got  Louis .

18 Meaning , Mr. Mangual .  He said he just sold the last

19 Alicia  Keys  autobiography .   Meaning , he just sold his

20 last cocaine .  Mr. Goodwin  acknowledges that  .  Then Ms.

21 Martin says that he's going to get resupplied soon      ,

22 referring to see if he could go up to the library to

23 get some more.

24 Q.      And the code word in that conversation for kilos

25 -- kilogram of cocaine is what?

1  A.       The Alicia  Keys  autobiography.

2  Q.       I believe we may have autobiography already up

3  there as a code.  If you could write down      Page 427.

4  A.       (Witness indicating.)

5  Q.       Based on the last call we played   , B4910, did you

6  have occasion to look at the pole camera videotapes?

7  A.       Yes.

8  Q.       What time is this call?

9  A.       5:37 p.m.

10  Q.      If we could -- if I could show you what's been

11  marked as  Government's  Exhibit V -25.  Was there any --

12  is there any problem or difference about this video --

13  if you could pause it just a second     -- and the video

14  that we've seen before?

15  A.       Yes.

16  Q.       Could you explain that to the jury?

17  A.       The vehicles  and people in the vehicle will seem

18  to be moving at a rather   frenetic  pace .  If you notice

19  the timer on this recording  , the time lapse  VCR was set

20  for 18 hours , which would explain the difference

21  between this tape  and the other tapes we've seen.

22  Q.       What's the effect of setting it for 18 hours?

23  A.       The tape will last longer.

24  Q.       If we could play it  , please.

25                (Videotape  begins playing at 11 :55 a.m. )

1          BY MS. JOHNSTON:

2 Q.      What do we see here?

3 A.      It's Mr. Mangual 's truck  and him hurriedly

4 moving into the house carrying a bag.

5 Q.      His motion does not reflect how he walked into

6 the house?

7 A.      No, I would assume his   gait  was rather normal.

8 Q.      Were you able to tell if he was carrying

9 anything?

10 A.      He was carrying a bag when he went in.       Mangual

11 and Ms. Martin  --

12          MR. MARTIN:   Objection.

13          THE COURT:  What's the basis of the objection    ?

14          MR. MARTIN:   What was the question  , Your Honor?

15 I don't think there was a question pending.

16          MS. JOHNSTON:   I had asked him -- rewind it    and

17 I'll phrase the question   .

18          MR. MARTIN:   No, no, no.  If there was  , I didn't

19 hear it .  That's all.  Go ahead.    I didn't realize it.

20          THE WITNESS:   I'm sorry , I thought you had asked

21 me to describe what   I was seeing.

22          BY MS. JOHNSTON:

23 Q.      If you  could  describe what you're seeing in the

24 video .

25 A.      Ms. Martin and Mr. Mangual  come out to the car  .

1 They walk over to his truck briefly.  He's still

2 carrying a bag.    And he departs in his red truck    and

3 she walks back towards the house.

4              (Videotape stops playing at 11:57 a.m.)

5        MS. JOHNSTON:    With the  Court's permission , we'd

6 like to move forward to    May 16 to accommodate a

7 surveillance agent who is required in     Montgomery  County

8 Circuit  Court this afternoon.

9        THE COURT:  That's fine.

10        MR. WARD:  I'm sorry , what?

11        MS.  JOHNSTON:  We're going to move forward to

12 Volume  3 of the calls .  This is V olume  3, beginning

13 with call  A1670 on Page 525.

14        BY MS.  JOHNSTON:

15 Q.       Detective  Sakala , do you have   A1670, Page 525 in

16 Volume  3, in front of you ?

17 A.       Yes.

18 Q.       What date did that call take place?

19 A.       May 16, 2004.

20 Q.       Were there a s eries  of related calls that took

21 place on  May 16 of 2004?

22 A.       Yes.

23 Q.       What are those call numbers?

24 A.       A16 70 , B6863,  A1674,  A1675,  A1684.

25 Q.       What's the time period for these calls?

1  A.      The first one was on the 16th at 5    :50 p.m ., and

2  the last one is on   the 17th at 6 :44 a.m. the next

3  morning.

4  Q.      Now if we could begin with the first call    ,

5  A1670.  Who are the parties    to this tel ephone  call?

6  A.      Paulette  Martin  and LaNora  Ali .

7  Q.      If we could please play    A1670.

8          (Audio r ecording begins    playing  at 1 2:00 p.m. )

9          (Audio recording   stops playing  at 12 :00 p.m.)

10 BY MS.  JOHNSTON:

11 Q.      If we could go to the next call, B6863    , at  Page

12 527.  Who are the parties to this call?

13 A.      Paulette  Martin  and John  Martin.

14 Q.      And again , what time does it take place in

15 relation to the call we just heard?

16 A.      About eight minutes later at 5    :59 p.m.

17 Q.      If we could play it  , please.

18         (Audio recording begins    playing  at 12 :00 p.m. )

19         (Audio recording   stops playing  at 12 :00 p.m. )

20         BY MS.  JOHNSTON:

21 Q.      If we could go to the ne  xt call , A1674 , on Page

22 528.  Is that between the same parties    , Paulette  Martin

23 and John Martin ?

24 A.      Yes.

25 Q.      How close in time does that  occur?

1  A.        Immediately after the preceding call.

2  Q.        At approximately what time?

3  A.        Six o'clock.

4  Q.        If we could play call   A1674 on Page   528.

5            (Audio r ecording begins playing at 12   :01 p.m. )

6            (Audio recording   stops  playing  at  12:02  p.m.)

7            BY MS. JOHNSTON:

8  Q.        If we could go to the next call  , A1675 , on Page

9  531.  Who are the part  ies to  this call?

10 A.        Paulette  Martin  and John Martin.

11 Q.        What time does this call take place?

12 A.        6:47 p.m.

13 Q.        If we could play it  , please.

14           (Audio reco rding begins playing at 12   :02 p.m. )

15           (Audio recording   stops  playing at  12:04 p.m. )

16           BY MS. JOHNSTON:

17 Q.        If we could play call   A1684 on Page 533  , please.

18 Before we play it , if we could , what's the date   and

19 time of that call?

20 A.        This is the next morning  , the 17th , at 6 :44 in

21 the morning.

22 Q.        Who are the  parties to this call?

23 A.        Paulette  Martin  and Milburn  Bruce  Walker .

24 Q.        Who is  Mr. Walker ?

25 A.        One of  Ms. Martin's customers.

1  Q.      If we could play  A1684 on Page 533 .

2        (Audio r ecording begins playing at 12   :04 p.m. )

3        (Audio recording stops playing at    12:05 p.m. )

4        BY MS. JOHNSTON:

5  Q.      Agent  Sakala , did you have occasion to review

6  the pole camera , in particular the video that's been

7  marked as 28 , to see if there was any activity at    Ms.

8  Martin's residence in relation to these calls?

9  A.      Yes.

10  Q.      Do you know approximately what time the activity

11  took place?

12  A.      I don't have that marked down.  It's on the

13  tape .  I know it's sometime after   6 p.m.  on the  16th.

14  Q.      If we could please play  Video 28 , and if you

15  could describe for us what observations you made in

16  reviewing that video.

17        (Video tape  begins  playing at 12  :06 p.m. )

18        THE  WITNESS:  This is   LaNora  Ali pulling up ,

19  parking in front of the house    and going into the

20  residence.

21        BY MS. JOHNSTON:

22  Q.      Again , this is one of those fast tapes?

23  A.      Correct.   It's LaNora  Ali and Ms. Martin coming

24  out carrying bags putting them in the truck     and pulling

25  off.

1 Q.      What the time do they pull off?

2 A.      6:15 p.m.

3         BY MS. JOHNSTON:

4 Q.      As a result of those calls   and that

5 surveillance, or those observations from the pole

6 camera , was surveillance asked to assist with this

7 portion  of the  investigation?

8 A.      Yes.

9 Q.      What was the surveillance agent asked to do?

10 A.      Directed to go to   Paula's  School of  Performing

11 Arts in  Washington,  D. C.

12 Q.      Now, prior to the first call we played    , A1670 ,

13 that occurred at 5  :50 p.m, had you had any information

14 that  Ms. Martin would be moving anything to the school?

15 A.      No.

16             (Videotape stops playing at 12:07 p.m.)

17       MS. JOHNSTON:   If I could recess   Detective

18 Sakala's  testimony  and call  Detective  St. Louis back to

19 the stand.

20       THE COURT:  All right.

21       (Witness excused at 12  :07 p.m. )

22       (Witness  resumes the stand at 12  :08 p.m. )

23       MS.  JOHNSTON:   Your  Honor , I don't know  if the

24 Court wants  him  re-sworn .

25       THE  COURT:  N o.

1        You remain under oath,   Detective.

2                  **DIRECT EXAMINATION**

3        BY MS. JOHNSTON:

4 Q.      Detective St. Louis, just as a refresh er, by

5 what police department are you employed?

6 A.      Sure.  Montgomery  County  Department of  Police ,

7 Special  Investigation  Division.

8 Q.      In addition to the surveillance you spoke about

9 the other day , did you also have   occasion to assist

10 Detective  Sakala and Detective  Eveler  and  Agent  Snyder

11 with a further surveillance on or about    May 16 of 2004?

12 A.      Yes, I did.

13 Q.      Can you tell us at approximately what time did

14 you take action?

15 A.      Approximately 6 :40 p.m. on  May 16, 2004 , I

16 responded to 5559   South  Dakota  Avenue  in  Washington,  D.

17 C., which is  Paulette's  School of  Performing  Arts.

18 Upon arriving , I observed a bluish  -gray  Ford  Explorer

19 parked out front at 5553   South  Dakota  Avenue .  Within

20 two minutes of being there   , I observed then a subject

21 later identified , or actually  I knew , to be  LaNora  Ali

22 exit the  Paulette's  School of  Performing  Arts followed

23 by Paulette  Martin.

24        Ms. Ali walked back to the vehicle    and got into

25 the vehicle , at which time   Ms. Martin then locked up

1   the School of  Performing  Arts.  She then walked back to

2   the vehicle , got into the vehicle , and then they both

3   drove away.   I attempted to follow them  , but I was

4   across the street   and I had just gotten there   and I got

5   stuck at a light.

6   Q.      Approximately what time did you arrive in that

7   area?

8   A.      I arrived there at 6  :40 and approximately -- at

9   approximately 6 :40, and approximately 6 :42 is when they

10  exited the business.

11  Q.      When you arrived at 6  :40, was the gray  Ford

12  Explorer already there?

13  A.      It was already there   and it was unoccupied.

14  Q.      Did you determine who it was registered to?

15  A.      At that time  I did, but I don't recall who at

16  this particular moment.

17  Q.      Excuse me?

18  A.      I don't recall at this particular time who it

19  was registered to.

20  Q.      So when you got there  , the vehicle  was

21  unoccupied?

22  A.      Yes, it was.

23  Q.      Where was it in relation to the location that

24  you were responding to?

25  A.      It was just a couple of doors down from the

1  School of  Performing  Arts.

2  Q.      Let me show you a picture marked as     P-184.  Let

3  me  zoom  out so you can see the whole picture.

4          Do you recognize that building?

5  A.      Yes.

6  Q.      What is it?

7  A.      That's  Paula's  School  of  Performing  Arts, 5559

8  South  Dakota  Avenue.

9  Q.      Is that the target location you were focused on?

10  A.      Yes, it was.

11  Q.      When you mentioned you observed    Ms.  Ali  coming

12  out  of the  front door  --

13  A.      That's correct.

14  Q.      -- where is the front door   on this picture?

15  A.      The front door is  --

16  Q.      If you could maybe describe it for us or looking

17  at the picture , is it to the left or the right   ?

18  A.      It's to the left.  It's kind of    glary .

19  Q.      Let me take it out of the plastic   , it will be

20  more clear.

21  A.      Yeah .  The front door is to the left   , and then  I

22  guess that's paint or window    right there .  (Witness

23  indicating.)

24  Q.      Who did you observe coming out first?

25  A.      I observed  Ms. Ali exit the business first.

1 Q.       She was followed by whom?

2 A.       Ms. Martin.

3 Q.       Who locked the door?

4 A.       Ms. Martin locked the door.

5 Q.       Were you able to obtain any photographs that

6 day?

7 A.       Yes, I did.   I took two photographs  .   One photo

8 is the vehicle as it's parked there    , and the second

9 photo is the vehicle as it's being     driven  away.

10 Q.      Let me show you what's been marked as P    -41.

11 A.       P-41 is the first photo   I took when  I arrived.

12 The vehicle was parked there unoccup    ied.

13 Q.       Approximately how far away from the front of

14 Paul ette 's School of  Performing  Arts is that vehicle?

15 A.       Just maybe two doors down.   Two, three doors

16 down.

17 Q.      And then P -41A, what is that?

18 A.       That 's the  vehicle actually as it's being    driven

19 away occupied by   Ms. Ali  and  Ms. Martin.

20 Q.      Who 's driving the vehicle?

21 A.       Ms. Ali .

22 Q.      Were you -- you weren't able to    follow  the

23 vehicle once it left?

24 A.       No , I was not.

25 Q.       Did that conclude your surveillance on that

1 date?

2 A.      Yes, it did.

3       MS. JOHNSTON:   I have no further questions of

4 this witness.

5       THE COURT:  A ny cross-examinat ion?

6       MR. MCKNETT :   Your Honor , I have just a couple.

7                    **CROSS-EXAMINATION**

8       BY MR. MCKNETT :

9 Q.      Good afternoon.   Is it -- how should  I refer to

10 you?  Detective?

11 A.      Detective  St. Louis .  That's correct.

12 Q.      Detective  St. Louis,  with regard to your

13 surveillance at the   South Dakota Avenue address, if   I

14 understand correctly  , by the time you got there   , the

15 Explorer was already parked there?

16 A.      This's correct.

17 Q.      You didn't see anybody carry anything in    , did

18 you?

19 A.      That's correct.

20 Q.      You saw  Ms. Ali exit; correct?

21 A.      That's correct.

22 Q.      And she went  straight  to her vehicle; correct?

23 A.      Correct.

24 Q.      Was she carrying anything?

25 A.      Just a purse.

1  Q.      Then you saw  Ms. Martin leave shortly

2  thereafter; right?

3  A.      That's correct.

4  Q.      They both got in the vehicle   ?

5  A.      Yes.

6  Q.      And they drove away ?

7  A.      That's correct .

8  Q.      That's all you saw?

9  A.      That's all  I saw.

10 Q.      Did anybody do surveillance at    Hayward  after

11 that evening?

12 A.      I don't recall if it was done   .  I wasn't a part.

13 Q.      To the best of your knowledge   , did anyone do a

14 surveillance of  Ms. Ali later that evening?

15 A.      I was only involved with this one surveillance.

16 Q.      So you wouldn't know if one was done    ?

17 A.      That's correct.

18 Q.      So you don't know whether anybody followed     Ms.

19 Ali or that vehicle back to her house, do you?

20 A.      I'm pretty sure nobody followed her from right

21 there because  I was the only person there at the time    ,

22 so if anybody followed her after that   , I don't know

23 because  I terminated my part   of the  surveillance then.

24 Q.      So you know you didn't  ?

25 A.      That's correct.

1  Q.      You don't know if anybody else did    ?

2  A.      That's correct.

3          MR. McKNETT :   Thank you.

4          THE COURT:  A ny other cross?

5                    **CROSS-EXAMINATIO N**

6          BY MR. MONTEMARANO :

7  Q.      You didn't see  Ms. Martin carry anything out of

8  5559 ; did you , Detective?

9  A.      Just her purse.

10 Q.      Didn't do a trash run on the dumpster behind

11 5559?

12 A.      My extent was those two minutes.

13         MR. MONTEMARANO :    No further questions  , Your

14 Honor.  Thank you .

15         MR. MARTIN:   None from  Mr. Goodwin , Your Honor .

16         MR. HALL:  No questions , Your Honor .

17         THE  COURT:  All right .  Any redirect ?

18         MS. JOHNSTON:   Just a matter of housekeeping  ,

19 Your Honor.

20                  **REDIRECT EXAMINATION**

21         BY MS. JOHNSTON:

22 Q.      Let me show you what's been marked as    P-231 and

23 P-232.  Do you see those photographs?

24 A.      Yes , I do .

25 Q.      Are those enlargements of what    I previously

1  identified as  B-41  and  B-41A?

2  A.      That's correct.

3          MS.  JOHNSTON:   Your  Honor , to keep the record

4  clear , we introduce  P-231  and P-232 as  I think we have

5  another picture marked as P  -231.

6          THE  COURT:  All right.  Okay.

7          MS.  JOHNSTON:   I have  no  further  questions.

8          MR.  MONTEMARANO :  Just  one , Your  Honor.

9                      **RECROSS  EXAMINATION**

10          BY MR.  MONTEMARANO :

11  Q.      You didn't approach the   Explorer  and  look  inside

12  of it ; did you?

13  A.      No.

14          THE  COURT:  All right.  You may step down.

15  Thank you,  Detective.

16                  (Witness  excused at 12 :15 p.m. )

17                  (Witness  Sakala  resume s the  stand. )

18              **FURTHER  DIRECT  EXAMINATION**

19          BY MS.  JOHNSTON:

20  Q.      Detective  Sakala , based upon those telephone

21  calls  and  the surveillance  , both your review of the

22  pole camera   and  the surveillance we've just heard

23  about , did you form an opinion as to what occurred on

24  May 16 of 2004 between   6:00  and  7:00  in the evening?

25  A.      Yes.

1  Q.      Could you describe for us what that opinion is?

2  A.      Give me one minute.    I'm sorry .  I'm just

3  getting back to my page.

4          Yeah.  In the series of calls   , Paulette  Martin

5  became aware that   there  was a neighborhood meeting to

6  discuss traffic to   and from her house , and it was going

7  to be with the   Takoma  Park Police  Department.  She

8  became  worried  there  would  be a search warrant executed

9  on the  residence.  S he then moved all of her activities

10 -- drug activities   and took the drugs   and assorted

11 para phernalia  to her school on   South  Dakota  Avenue and

12 had called  Ms.  Ali  to help her do that  .

13 Q.      Calling your attention to the first call    , A1670.

14         Can you tell us what in that call support     s the

15 opinion that you just provided?

16 A.      She just calls  Ms. Ali  on Page 525  and tells

17 her , you got to come take me to the school.      I got to

18 take something there  , and then she just concludes that

19 it's very important.

20 Q.      Calling your attention to the bottom of Page

21 525 , Ms. Martin's statement  , when you're coming in the

22 front door , just say , Paula , you got those that we're

23 going to go show our girlfriends   .

24         Does that statement by   Ms. Martin to  Ms. Ali

25 have any  significance  in terms of your opinion?

1 A.      Yes.

2       MR. MONTEMARANO :  Objection , Your Honor.

3       May we be heard at bench  ?

4       THE COURT:  C ome up to the bench.

5           (At the bar of the Court.)

6       MR. MONTEMARANO :  Without intending to sound

7 quite so  hectoring,  as I'm sure this will.  Once again   ,

8 Detective  Sakala  goes far beyond any sort of expertise

9 concerning drug conversation   , coded  language ,

10 distribution, etcetera.

11       What he presumably is going to say   , I would

12 proffer , is that there is some notion that    Ms. Martin

13 is try ing to  keep it secret from other people   , perhaps

14 her roommate  Jackie Terrell .  If that is so , that has

15 nothing to do with this detective's expertise.  They

16 can call  Ms. Terrell .  They  can call -- they can't call

17 Ms. Martin , I guess.  This is just far, far afield.

18       MS. JOHNSTON:   Your Honor, Detective Sakala gave

19 his opinion that  , based on a ser ies of calls  and the

20 surveillance, he believed she moved drug     materials  and

21 the drug business from her home to the school   .  I asked

22 him what was the   basis of his opinion .  This is one  of

23 the things he relied upon in reach   ing that  opinion , and

24 I think he's going to point out     what s erves  as the

25 basis of his opinion  , that that's what they did that

1 day.

2          THE COURT:  All right  .  The objection is

3 overruled .

4                    (Back in open court.  )

5          BY MS. JOHNSTON:

6 Q.       Detective  Sakala , did  that  statement of  Ms.

7 Martin's about just saying that you're -- you've got

8 those -- that we 're going to go show our girlfriend,

9 did that  have  any significance , in your opinion  , that

10 you formed that they were moving the drug business to

11 the school?

12 A.       Yes.

13 Q.       What is that?

14 A.       Ms. Martin is at the house with    Ms.  Terrell --

15 Jacqueline  Terrell  -- so she needs an excuse to load up

16 Ms. Ali's car w ith all these packages , and that's the

17 excuse she's telling   Ms. Ali to say when she comes in  :

18 You  got  those that we're going to show our girlfriends    .

19          Then they would take the items to the car.

20 Q.       Then if we go to  Page 528 , the call s between  Ms.

21 Martin  and  John  Martin.

22          Is there anything in that call which you re    lied

23 on  to form your opinion that she was moving the drug

24 business to the    school ?

25 A.       This call a nd a previous call where she tells

1  John she's going to call her back on the cell phone is

2  usually an indication that they're going to talk of

3  something of a criminal nature   .

4  Q.      Why do you say that?    Her telling him , I will

5  call you back on   Page 527 ?

6  A.      In my experience , most narcotics   traffickers

7  believe that a cellular tel  ephone communication is more

8  secure  and less  like ly to be intercepted than a hard

9  line.

10 Q.      If we go to the cell phone on Page 52   8, could

11 you describe for us what in that call served as a basis

12 for your conclusion that   Ms. Martin  and Ms. Ali moved

13 the drug business to the school?

14 A.      The second line down  , she goes , yeah , I'm going

15 to move those tickets   and everything to the school of

16 mine because  I understand they're going   to have a

17 neighborhood meeting  .  Meaning , she's going to take the

18 drug s to  the school because   of the  neighborhood

19 meeting.

20         Then she goes on that the meetings -- in the

21 second grouping  , she says the meeting's going on in

22 here because they see a lot of boxes here     and clothes.

23 But those things   I have of  Kevin 's are  legit, referring

24 to Kevin  Scott's clothes being legitimate   .   The other

25 things she's going move to the school are not

1 legitimate .

2 Q.      And the word  "tickets " refers to  what  there?

3 A.      Drugs.

4 Q.      The word  "clothes ," there .  What does that refer

5 to?

6 A.      Clothes.  She's actually talking about clothes

7 there.

8 Q.      If you could write  Page 528 on  the board next to

9 the word  "clothes. "

10 A.      (Witness indicating.  )

11 Q.      Then if we  could  continue with the call on   Page

12 529 , if there was anything in that portion    of the call

13 that supports your conclusion   .

14 A.      She goes on to - - just they discus the

15 neighborhood meeting   and John  Martin , near the top

16 third  says , you need  to do that as soon as possible   .

17 Meaning , you need to clean out the house as soon as

18 possible .

19       And he goes on to say  that because  of the mere

20 fact  Takoma  Park , referring to his experience with the

21 Takoma  Park  Police  Department , where he was stop ped

22 with  the kilogram wrappers  .

23       Then  Ms. Mart in goes , you don't have no papers

24 or anything you need me to move   ?  Refer ring to  drugs or

25 money that she needs to move   , that  Ms. Martin might

1  have stored at the house.     He directs her to a file

2  cabinet , and she says she will take them.

3          The last line on the page on 529    , Mr. Martin

4  says , we'll be clean as rain.

5  Q.      Were there any terms used in that -- on that

6  page that refer s to drugs?

7  A.      I don't see anything other than papers     , which I

8  would say probably refers to money.        It says papers or

9  anything, but  I wouldn't  classify  that as a code word.

10  Q.     Excuse me?

11  A.      I wouldn't classify the word    "anything " as a

12  code word , though.

13  Q.     Bas ically,  you believe papers refers to?

14  A.     Money.  She's say ing , do you have any money or

15  drug s in the house that you need me to move.

16  Q.     And the  phrase  "clean as rain ."  What does that

17  refer to?

18  A.      That there won't be anything in the house

19  drug -wise  to incriminate them if the police actually do

20  search it.

21  Q.     To your knowledge  , Ms. Martin wasn't

22  participating in the neighborhood meeting based on this

23  call?

24  A.      No.  She was -- she had learned about it from

25  Ms. Terrell,  who learned about it from a neighbor.

1  Q.      And then if we could go to the next call   , A1675.

2          Does this call take place then before or after

3  the surveillance we just heard you describe by

4  Detective St. Louis ?

5  A.      After.  She's saying she's there with    LaNora ,

6  and that she had already taken everything away.

7  Q.      This call is made over her cell phone?

8  A.      Yes.  This is  Paulette  Martin's cellular

9  telephone.

10 Q.      Do you know where she actually is at the time

11 she makes this call?

12 A.      Either at the school where she just took

13 everything away or after she left the school.  She just

14 says , I went and took everything away .  So, in  the  area

15 of the school.

16 Q.      And the time is consistent with the surveillance

17 that  Roger  St. Louis sa w; is that correct  ?

18 A.       Yes.  I think he was there at 6  :40.  This is

19 6:47.

20 Q.      In terms of Page 532 of that call    , Ms. Mar tin

21 references the back door.

22          Do you know what door she's referring to?

23 A.      She's talking about the basement door   , and she's

24 talking about somebody    -- she believes a neighbor has a

25 camera that's looking at that door.

1 Q.     Then the next call   on the next morning at 6  :45

2 in the morning , A1684.  Was there anything in that call

3 that assisted with your opinion?

4 A.     Yeah.  This is actually   -- there will be quite a

5 few calls , but she's telling   Mr. Walker  that she's

6 moved all the drug  s to the school  and that they will be

7 doing their business from this point forward     .  If they

8 need to do transactions , it will have to be at    the

9 school.

10 Q.     In that regard on Page 533   , are there any code

11 words used in reference    to drugs?

12 A.     Yeah.  The first long paragraph with    Ms. Martin ,

13 she tells  Mr. Walker  that she's going to have to start

14 seeing h im at the school because the neighbors is

15 complaining about people running in     and out , talking

16 about the traffic at the school   , and they had a meeting

17 last night with the   Takoma  Park  police talking about

18 the neighbors .

19       Then she says it had nothing to do with the

20 tickets .  Mean ing, the drugs .  Then she tr ies to  tell

21 Mr. Walker  that it has to do with the guy bringing

22 clothes , refer ring to  Kevin  Scott bringing clothe  s to

23 her house.

24 Q.     Any code in there for drugs?

25 A.     Tickets.

1 Q.       If you could make that notation on our chart,

2 Page 533.

3 A.       (Witness indicating.  )

4 Q.       The term  "clothes " used here , based on  your

5 training  and experience  and your knowledge of the

6 wiretap , refers to what ?

7 A.       Clothes.

8 Q.       On Page 533 , Ms. Martin says , sometimes they

9 come looking for one thing    and find another.

10        Based on your training   and experience , what is

11 she referring to?

12 A.       She is trying to tell -- trying to convey to      Mr.

13 Walker that  the police would search her house looking

14 for illegal clothes  , and that in searching for illegal

15 clothes , they would find drugs.

16 Q.       Now, before we go on to the other calls on      May

17 17, if we can go back in time to the second volume on

18 page -- I believe we left   off -- we were at  Page 429 ,

19 Call B4954.

20        Who are the parties to this call?

21 A.       Paulette Martin  and Milburn  Bruce  Walker .

22 Q.       What date  and time does it take place?

23 A.       The 30th, about two weeks prior to the series of

24 calls we just talked about   , at  10 a.m.

25 Q.       If we could play it  , please.

1          (Audio r ecording begins playing at 12   :29 p.m. )

2          (Audio recording   stops  playing at 1 2:29 p.m. )

3          BY MS. JOHNSTON:

4 Q.     Based upon your training   and experience,  what is

5 Ms. Martin  and Mr. Walker  discussing in this call  ?

6 A.      Mr. Walker 's ordering a quantity of crack

7 cocaine from  Ms. Martin.

8 Q.     What is the code word used for that?

9 A.     Ms. Mart in says , what show do you want to go to   ,

10 asking him how much cocaine   , and he says eight.  She

11 then goes , you want to go to eight shows   , and he says

12 okay , and then she needs to identify it as crack or

13 powder , and she goes on the show that's already a    , and

14 she cut herself off   and she continues with the shows

15 they already having  .  Meaning , the cocaine  that's

16 already cooked.

17 Q.     Referring to what?

18 A.     Crack cocaine.   And then Mr. Walker  confirms

19 that .  Right.  The  one s with , and whatever word he uses

20 I can't make out  , but h e's refer ring to  ones that have

21 been tran sformed  as oppose d to one s with  nothing .

22 Q.     Based on your training   and experience , what is

23 he ordering in this call?

24 A.     A quantity of crack cocaine  , and the "eight "

25 would be either an eighth of   a kilo or eighth of an

1  ounce.

2  Q.     If you could , next t o the word  "shows " indicate

3  Page 429 on our chart.

4  A.     (Witness indicating.  )

5  Q.     Now , if we could go to the next call   , which is

6  in Volume  3 on Page 431.

7         Do you have that call in front of you    ?

8  A.     Yes.

9  Q.     Is that one of a series of related calls?

10 A.     Yes.

11 Q.     What are the calls that are related to call

12 B5065 on Page 431  ?

13 A.     5065, 5072,  5073, 5074 , and  5097.

14 Q.     Over what time period do they take place?

15 A.     The first call is on   May 1st at 10 :48 a.m ., and

16 the last one is the same day at 2   :04 p.m.

17 Q.     So we're talking roughly three hours, three     and

18 a half hours?

19 A.     A little over three hours   , yeah.

20 Q.     The part ies to  the first call  , B5065 , on Page

21 431?

22 A.     Paulette  Martin  and Learley  Goodwin.

23 Q.     If we could play B5065   , please .

24        (Audio recording begins   playing  at 12 :31 p.m. )

25        (Audio recording   stops playing  at 12 :31 p.m. )

1          BY MS. JOHNSTON:

2  Q.      If we could go to the next call, B5072.

3          What's the date  and time of this call?

4  A.      The same day , 11:44 in the morning.

5  Q.      Who are the  parties to  the call ?

6  A.      Paulette  Martin  and Learley  Goodwin.

7  Q.      If we could play it  , please.

8          (Audio r ecording starts   playing  at 12 :32 p.m. )

9          (Audio recording   stops playing  at 12 :32 p.m. )

10         BY MS. JOHNSTON:

11 Q.      And  the  next call, B5073 , on Page 434 , what time

12 does it take place in relation to the call we just

13 heard?

14 A.      11:45 a.m ., just after the  previous  call.

15 Q.      Who are the part ies to  that call ?

16 A.      Paulette  Martin  and Michael  Jackson.

17 Q.      If we could play it please.

18         (Audio r ecording begins   playing  at 12 :33 p.m. )

19         (Audio recording   stops playing  at 12 :33 p.m. )

20 BY MS. JOHNSTON:

21 Q.      The next call , B5074 , on Page 435 , what time

22 does this call take place in relation to the one we

23 just heard?

24 A.      Just after it , at 11 :46 a.m.

25 Q.      Who are the parties on this call    ?

1 A.      Paulette  Martin  and  Learley  Goodwin.

2 Q.      Could  we  play  it , please ?

3        (Audio record ing  begins  playing  at 12 :34 p.m. )

4        (Audio recording   stops  playing  at 12 :34 p.m. )

5        BY MS.  JOHNSTON:

6 Q.      Then B5097 takes place at what time on     May 1st?

7 A.      2:04 p.m.

8 Q.      Approximately how soon -- how close in time to

9 the previous call?

10 A.      A couple of hours after the last call.

11 Q.      If we could please play B50 -- strike that    .

12        Who are the  parties to  the call ?

13 A.      Paulette Martin  and  Learley  Goodwin.

14 Q.      If we could please play B5097 on     Page 436.

15        (Audio recording begins playing at 12    :34 p.m. )

16        (Audio recording   stops  playing  at 12 :35 p.m. )

17        BY MS.  JOHNSTON:

18 Q.      Based upon your training an   d experience , did you

19 form an opinion of what's being discussed in this

20 series of calls?

21 A.      Yes.

22 Q.      What is that?

23 A.      Learley  Goodwin is looking for a source for

24 cocaine , and  Ms. Martin tells her about a previous

25 conversation   I think we had heard yesterday with

1  Michael  Jackson  and  that  he  had  cocaine  for  sale  for

2  $25,000 a kilogram  .  They have an additional

3  conversation , Ms. Martin  and  Mr. Goodwin,  where it's

4  clear that  Mr. Jackson  and  Mr. Goodwin  did  not  come  to

5  an agreement on the  volume.

6  Q.     If we could go starting with   B5065 on Page 431  ,

7  if you could point out what in that conversation is

8  supportive of your opinion.

9  A.     Page 431 , Mr. Goodwin  is saying , I got a bun ch

10 of friends looking for some tickets   .  In other words  ,

11 he's got some  customers looking for   cocaine , but he

12 can't find none nowhere  .   Meaning , he can't find a

13 source.

14      Then Mr. Goodwin asks Ms. Martin whether she

15 knows anyone  , saying you  ain't heard a thing or you

16 can't hear a thing , and Ms. Martin says not from   Louis .

17 I'll call  and see what's going on  .

18 Q.     "Louis " referring  to whom?

19 A.     Luis  Mangual .

20 Q.     If you could note on   the board Page 431 next to

21 the code word  "tickets ".

22 A.     (Witness indicating.  )

23 Q.     In reference to  the next call , B5072 on Page

24 432 , is the code word   "tickets " used again?

25 A.     Yes.  Ms. Martin calls  Mr. Goodwin  back  and

1 tells her that   Mike-Mike.   Meaning, Michael  Jackson,

2 had call it had other day    and said that he had some $25

3 tickets, refer ring to  $25,000 kilograms.

4 Q.      That was a reference -- was that a reference to

5 Call B4515 on  Page 39 7 that was made on   April 26 of

6 2004?

7 A.      That's correct.

8 Q.      The tickets refers to what?

9 A.      Cocaine kil ogram.

10 Q.      Based upon your training   and experience, do you

11 have an opinion as to whether    or not  $25,000 is a --

12 was a good price for wholesale cocaine back in 2004?

13 A.      It was -- it would be a high price, so it would

14 not be a good price if you were looking to buy.   It

15 would be a good price if you could sell it at that.

16 Q.      Could you note on our chart there   , Page 432 next

17 to the word  "tickets".

18 A.      (Witness indicating. )

19 Q.      And then the next call  , B5073 on Page 434.    What

20 is it about this call that supports your opinion that

21 they were discussing getting kilos from     Mr. Jackson?

22 A.      Paulette  Martin is calling   Michael Jackson  and

23 telling him that   Learley  Goodwin is looking for a

24 ticket, fourth line down , saying your pop s is look ing

25 for a ticket, refer ring to  Mr. Goodwin.   I told him you

1  may know someone  , or you had one or two for $25    .

2  Meaning , he had one or two kilograms for $25,000    .  She

3  asked him to give   Mr. Goodwin a ring , and Mr. Jackson

4  says he's got t  o talk to his man.

5  Q.      "His man" referring  to whom?

6  A.      The person who would have the cocaine   .

7  Q.      If you could note Page 434 next to the     "ticket "

8  on the code chart  .

9  A.      (Witness indicating.  )

10  .      Call  B5074  .  Is there any particular code used

11  in that call?

12  A.      No.

13  Q.      What is  Ms. Martin telling   Mr.  Goodwin  in that

14  call?

15  A.       She said she's got in touch with     Mr. Jack son

16  and Mr. Jackson  told her that   Mr. Jackson  was going to

17  call his man.

18  Q.      Then if we go to B  5097  .  If you could , describe

19  what's in that call that supports your opinion that

20  they were discussing getting kilos of cocaine?

21  A.      They talk in the beginning  , Mr.  Goodwin  and Ms.

22  Martin , about  Mr. Jackson  and the problems with it

23  being too high a price  , saying the time we didn't get

24  the tickets wholesale    and got them -- he get them for    ,

25  he said it wasn't selling.  Again    , referring to the

1  $25,000 price being too high   .   Then  Mr.  Goodwin  goes  on

2  to talk about another source that he's worked out    , but

3  the problem is the transportation of the drugs from the

4  source to him.

5  Q.      Where is that language on   Page 436?

6  A.      The bottom of the page  .  The only problem is

7  getting it , getting it back.  That's the problem.      Then

8  the top of Page 437  , as soon as  I can  work  that  out .

9  Meaning , the transportation  .  The first time  I'm going

10 to go myself .  Meaning , for the first transaction he

11 would  actually  go to where the source is at himself     and

12 take care of everything.

13       And then they go on to talk about   , other than

14 that -- other than this new source    , the tickets are all

15 the same , that's about the fifth line down   .  Meaning ,

16 other than that new source   , he's working on   the price

17 is all  the same , and that being it's too high   , and Ms.

18 Martin talks about retiring from the drug business.

19 Q.      Now, in terms of the word    "tickets ," if you

20 could note on the chart both    Page 436  and 437.

21 A.      (Witness indicating.  )

22 Q.      On Page 437 , Ms. Martin , about the middle of the

23 page , references the game.  Based on your training      and

24 experience , do you know what she's referring to there?

25 A.      The drug business she's talking about.

1  Q.     Now, if we could go to call    B5116 on  Page 438.

2         Re there two related calls here?

3  A.     Yes, 5116 and 5118.

4  Q.     Who are the parties to those calls?

5  A.     Paulette  Martin  and Lavon  "Becky" Dobie.

6  Q.     What date an d time do they take place?

7  A.     The first one's on   May 1st at 5 :10 p.m , and the

8  second one  is on the same day at 5  :37 p.m.

9  Q.     Who's the party on the second call?

10 A.     John  Martin  and Lavon  "Becky" Dobie.

11 Q.     If we could play call    B5116 on  Page 438 .

12        (Audio  recording begins   playing  at 12 :43 p.m. )

13        (Audio recording   stops playing  at 12 :43 p.m. )

14        BY MS. JOHNSTON:

15 Q.     And B5118 on Page 4  40, who are the parties to

16 that call?

17 A.     John  Martin  and Lavon  "Becky" Dobie.

18 Q.     If we could play it  , please.

19        (Audio rec ording begins   playing  at 12 :44 p.m. )

20        (Audio recording   stops playing  at 12 :44 p.m. )

21        BY MS. JOHNSTON:

22 Q.     If you could describe for us -- strike that    .

23        Did you form an opinion  , based upon those two

24 calls , what Ms. Martin  and Ms. Dobie  were arranging?

25 A.     Ms. Mart in, in  the third line down or third

1  grouping , tells  Ms.  Dobie  that  she 's  just  gotten  a

2  small  amount  of  drugs  from  a  friend  in      Bethesda ,

3  referring  to   it  as  I  got  a  couple  little  things  for  me      .

4  Then  Ms.  Dobie  asks  Ms.  Mart in  to  bring  her  a  small

5  one , saying  jump  in  the  car    and  bring  me -- run  me  a

6  small  one   and  bring  it  here.     Ms.  Martin  agrees  to   ,

7  referring  to  the  small  one    , referring  to  a  quantity  of

8  drugs .

9          In  the  second  call  , Mr.  John   Martin  tells  Ms.

10 Dobie  that  Ms.  Paulette   Mart in  is  on  her  way  to   deliver

11 to  her , to  Ms.  Dobie .

12 Q.      If  we  could  go  to  the  next  call    , B5124   on  Page

13 441.

14          Who  are  the  parties  to  this  call?

15 A.      Paulette   Martin   and  Reece   Whiting .

16 Q.      What  date   and  time  does  it  take  place?

17 A.      It's  May  1st,  8:03  p.m.

18 Q.      If  you  could  play  it   , please .

19          (Audio  recording  begins   playing  at  12 :45  p.m. )

20          (Audio  recording  s   tops  playing  at  12 :45  p.m. )

21          BY  MS.  JOHNSTON:

22 Q.      Based  upon  your  training    and  experience , who  are

23 Ms.  Martin   and  Mr.  Whiting  discussing  on  Page  441?

24 A.      Gwen  Levi.

25 Q.      "Seven  Locks ."   Do  you  know  what  that  refers  to?

1  A.      Yes.

2  Q.      What is that?

3  A.      It's a common nickname for the    Montgomery  County

4  Detention  Center located on   Seven Locks  Road.

5  Q.      If we could go to the next call    , B5300 on Page

6  443.

7          What is the date an  d time of this call?

8  A.      This is on   May 3 rd at 1 :37 p.m.

9  Q.      Who are the parties?

10 A.      This is  Paulette  Martin  and  Milburn   Bruce

11 Walker .

12 Q.      If we could play B5300   , please .

13         (Audio  recording starts   playing  at 12 :46 p.m. )

14         (Audio recording   stops  playing  at 12 :46 p.m. )

15         BY MS.  JOHNSTON:

16 Q.      Based upon your training    and experience , what

17 are Ms. Martin  and Mr. Walker  discussing in this call?

18 A.      Mr. Walker 's ordering a quantity of crack     and

19 powder from   Ms. Martin.

20 Q.      What are the terms or the language in the call

21 that lead  you to  that conclusion?

22 A.      The first part of the call   , Mr. Walker  asked  Ms.

23 Martin if she's going    to be home , and she replies , yes.

24 She then asks a question to determine what kind of

25 drugs he's looking for   , but she mixes her code words in

1   the sentence saying  , what  kind  of  outfits  are you

2   looking for   for the show , instead of what kind of

3   tickets for the show or outfits    for your  godson .  She

4   kind of combine s the two  and says , outfit s  for the

5   show.   Then he wanted the size   8.  T he hand's already

6   done , which refers to quantity of crack cocaine    , either

7   an eighth of a kilo or eighth of an ounce    .  Then he

8   wants a sixteenth of a    -- either an ounce or a

9   sixteenth of a kilogram of powder in addition to the

10  first quantity.

11  Q.     And the code word used for   drugs  here?

12  A.     Yes.  The first one is "outfits   " and there's

13  "hand's already  done ," but outfits is what she uses.

14  Q.     If you could write Page 443 next to "outfits" up

15  on the board.   I think  "outfits " is on the first page  .

16  A.     (Witness indicating.)

17  Q.     Now if we could go to the next call,    B5336 , on

18  Page 444.  Who are the parties to this call?

19  A.     This is  Paulette  Martin  and Lavon  "Becky " Dobie .

20  Q.     On what date   and time does this call take place?

21  A.     On 5/3/2004 at 6 :36 p.m.

22  Q.     How long is this call?

23  A.     This call in total is 14 minutes.

24  Q.     Are we , again , just playing a portion of the

25  call?

1  A.        No, we are not  .  We're not plying the entire

2  call , we're just pla ying a portion.

3  Q.        We're  just playing a portion  ?   What portion of

4  the call are we playing?

5  A.        From the beginning to the two minutes and 12

6  seconds in.

7  Q.        Did you notice in reviewing it whether there

8  were any error  s in the transcript?

9  A.        Yes.

10 Q.        Where is that?

11 A.        On Page 446 , the middle of the page  , has  "Becky "

12 Dobie  saying that she had on that thing   , and then it's

13 unintelligible .  She actually says that thing they had

14 bonded out that she was running on.

15 Q.        Okay .  And on this page , there are some

16 notations concerning other transcribed portions; is

17 that correct?

18 A.        That's correct.

19 Q.        So what are the other transcribed portions we

20 are  listen ing to  as we listen to this recording?

21 A.        The  second section goes from two minutes and 43

22 seconds to three minutes    and 34 seconds, and the   third

23 goes from five minutes    and 17 seconds to seven minutes.

24 Q.        If we could please play    B5336 beginning on Page

25 444.

1          (Audio recording begins playing at 12    :50 p.m. )

2          (Audio recording s  tops  playing  at 12 :55 p.m. )

3          BY MS.  JOHNSTON:

4 Q.      Detective , based on your training    and

5 experience , do you know what   Ms. Martin   and Ms.  Dobie

6 were discussing beginning on Page 444?

7 A.      Yes.

8 Q.      Beginning with Page 444   .  Was there any

9 reference to drugs on that page   ?

10 A.      Yes.

11 Q.      Can you describe what it is?

12 A.      "Becky " Dobie,  about three quarters of the way

13 down , says you have tickets for the half street,

14 referring to a   quantity of cocaine as the half street    ,

15 half ounce , or half gram.  Is that   -- that's the one by

16 the Hard Rock Cafe , Ms. Dobie says,  identifying  the

17 cocaine  further as she wants crack cocaine   .  Ms. Martin

18 says she's got one left  .

19          Then  on the top of Page 445  , Ms. Dobie  says , I

20 got to get your nephew  , referring to her husband   , a

21 ticket .  Meaning , a quantity of cocaine.  He wanted to

22 do the  Hard Rock Cafe .  Meaning , he wants crack.

23 Q.      If you could write on our chart    Page 444  and

24 Page 445 next to the code word    "ticket ".

25 A.      (Witness indicating.  )

1  Q.      There's a discussion in that call about      Ms.

2  Levi.  Based on your training   and experience  and your

3  review of other calls  , was Ms. Martin being truthful

4  with Ms. Dobie about her knowledge of   Ms. Levi?

5          MR. MONTEMARANO :  Objection , Your  Honor.

6          MS. JOHNSTON:   I'll rephrase the question.

7          BY MS. JOHNSTON:

8  Q.      In reviewing the telephone call   , was there any

9  reference based upon your training    and experience  and

10 your  review of previous calls who was being discussed

11 in this call?

12 A.      Yeah.  The second half focuses on     Gwen  Levi.

13 Q.      Based upon your review of    previous  calls, at the

14 time of this call , did Ms. Martin already know about

15 Ms. Levi's arrest?

16 A.      Yeah.  I think we've actually just played a few

17 of them.   Ms. Martin knew that she was arrested     and

18 that she was at   Seven  Locks.

19 Q.      Those calls included   the had cal ls with  Mr.

20 Scott  that we 've played yesterday   and this morning?

21 A.      Yes.

22 Q.      There's a reference on Page 444 to     "Dog" and

23 "Smack"?

24 A.      Yes.

25 Q.      Who are those individuals?

1 A.      "Dog" is William  Turner , Gwen  Levi's partner ;

2 and "Smack " is Claude  Arnold, a long -time friend of  Ms.

3 Levi.

4 Q.      Okay.  What is  Ms. Dobie  saying with reference

5 to -- based upon your training   and experience , what 's

6 Ms. Dobie  telling  Ms. Martin on  Pages 446  and 447 when

7 she discuss es Ms. Levi?

8 A.      On 446?

9 Q.      Pages  446 and  447.

10 A.      They're talking about   Ms. Levi  and that she had

11 been out on bond  and they were --  Ms. Dobie,  in the

12 middle of the paragraph  , she was talking about that she

13 was out on bond , that she was running on  .  Meaning , she

14 was a fugitive , had been a fugitive , and Ms. Dobie

15 says , I don't know if you knew that  , but that's why  I

16 was asking if it  was a new charge or if they just got

17 her on the old charge.

18      In other words , Ms. Dobie  is try ing to find out

19 if the  arrest  of Ms. Levi is relate d to the fact of an

20 old charge , which she  was a fugitive  on, or a new

21 charge.

22 Q.      Based upon your training   and experience , would

23 that be important to somebody engaged      in drug

24 trafficking?

25 A.      If you had done transactions with that person      ,

1  obviously that person would have information for the

2  government that could hurt you.

3  Q.       Calling your attention to    Page 447.

4          Based on your training    and experience , what is

5  Ms. Dobie  describing for   Ms. Martin in this portion of

6  the call?

7  A.       She's actually talking about the old case that

8  Ms. Levi was arrested on   , the case in  Montgomery

9  County , and describes it as   a crazy case anyway  ,

10 driving an  F-ed up tag , broken tail lights, and dirty .

11 Meaning , your license plates aren't correct    .  You've

12 got a broken taillight  and you're carrying drugs    and

13 then the police put the siren on    and you keep going  .

14 Meaning , Ms. Levi didn't immediately stop    .

15         Then she goes about the drugs that    Ms. Levi had

16 on her that she didn't hide them or    toss  them out the

17 window , Ms. Dobie  says , I don't mean no bricks because

18 you can't conceal them nowhere   .  I'm talking about a

19 sandwich bag with less than 20    , but she doesn't finish

20 the sentence , but she's refer  ring to  less than 20

21 gram s, so she's saying  Ms. Levi should have concealed

22 them , hid the drug s in the car , or tossed them out the

23 window when she had the opportunity.

24         MR. WARD:  Objection , Your Honor.

25         THE  COURT:  Objection to what?

1          MR.  WARD:   His  characterization  or  his

2  assumption  that  somebody  was  going  to  toss  something

3  out  the  window.

4          THE  COURT:   Overruled.

5          BY  MS.  JOHNSTON:

6  Q.       The  term  "bricks ,"  based  upon  your   training  and

7  experience , refers  to   what?

8  A.       That  would  refer  to  kilograms  of  cocaine     , which

9  would  be  much  more  difficult  to  hide  or  conceal  in  a

10  traffic  stop.

11  Q.       Okay.   I  don't  know  if  we  have  the  word      "bricks "

12  up  on  the  board  yet  as  a  code  word.   If  we  don't     , if

13  you  could  add  it  with  the  page  reference.   Check  the

14  second  page   and  make  sure.

15          Detective   Sakala , is  it  on   the  sec ond  page ?  If

16  you  could  just  double  check    and  make  sure  it's  not

17  there.

18  A.       No.

19  Q.       Then  please  add  it  .  That's  Page  447.

20  A.       (Witness  indicating.  )

21          MS.  JOHNSTON:    Your  Honor , that  could  conclude

22  my  questions  on  that  conversation     , and  I  know  the

23  Court's  schedule.

24          THE  COURT:  All  right  .  Ladies  and  gentlemen   ,

25  we'll  take  a  recess  for  lunch  until  ten  minutes  after

1  2:00.

2                    (Jury excused at 1 :01 p.m. )

3                    (Off the record at 1:01 p.m.)

4                    (On the record at 2 :13 p.m. )

5          MR.  MONTEMARANO :  A preliminary matter  , Your

6  Honor.

7          THE  COURT:  Yes, sir.

8          MR.  SUSSMAN :  Something with regard to a    Jenks

9  inquiry.  There was a lot of grand jury on     Detective

10 Sakala , who will finish up at some point   , and it was

11 blank.

12         THE  COURT:  What?

13         MR.  SUSSMAN :  A lot of the pages in our grand

14 jury on the  Jenks were blank .  Obviously , they've been

15 redacted .  For purposes of the record, we would request

16 that the government furnish the   Court with the actual

17 page for in camera review.  Obviously   , the government's

18 position is that they're not relevant    to us.  And while

19 I trust them implicitly , it's a trust  we verify , and we

20 would like a review of those by the    Court when the

21 Court get s the  opportunity.

22         MS.  JOHNSTON:   I would like to  advise the Court

23 that the portion s that are redacted generally involve

24 people that are not involved in this trial.

25 Particularly they involve conversations between     Mr.

1  Mangual  and his  co-conspirator  s who are not on trial

2  here; conversations with   Mr. Barber, with   Luis  Mangual ,

3  Sr., with any number of people    and  not people that are

4  on trial here ; or calls between   Ms. Levi  and her son ,

5  Craig  Scott , or Ms. Levi  and Ms. Johnston,  or Ms. Levi

6  and Mr. Turner ; calls that , again , Agent  Sakala  has not

7  referenced or discussed here in court    .  So, those

8  portions of that testimony were redacted.

9        Also , they  may have been redacted if he

10  summarized any information cooperators provided     and

11  relayed that to the grand jury because that would not

12  -- he has not testified here about what corroborators

13  told him , so those are the thing  s that were redacted

14  from his grand jury testimony   , which is several hundred

15  pages long because he testified before the grand jury      ,

16  I think , five or six times.

17        So there's some that was redacted having to do

18  with insurance  fraud that also is not subject of this

19  trial.   I don't believe that counsel is entitled to an

20  in camera review unless    they've  showed the government.

21        THE  COURT:  Is there some indication that

22  something has been held back that shouldn't have     ?  But

23  if there's not , I'm not sure  I want to be   the

24  supervisor of  redacting.

25        MS.  JOHNSTON:   I certainly am prepared if the

1 Court wants --

2       THE COURT:  If you wish to reserve the issue for

3 appellate review, then perhaps we can have the

4 unredacted  transcript filed under seal so that it's

5 there if an appellate court wants to look at it      and see

6 if the redactions were proper.

7       MR. MONTEMARANO :  We respectfully submit that

8 that is an analysis which in the first instance must be

9 introduced  to the trial court knowing the     case .  And

10 while I appreciate  Your Honor's desire not   to be --

11       THE COURT:  A ll right .  I guess I can't get out

12 of this.

13       MS. JOHNSTON:   I would appreciate if counsel

14 could cite some authority for that that says that the

15 Court has to --

16       THE COURT:  I'm not going to  do it  now .  Why

17 don't we  -- instead of delaying this jury like we did

18 this morning , if anybody want s to give me authority on

19 the notion that  I should do a review of the    unredacted

20 transcript to be satisfied that the redactions are

21 within the scope of the redactions given by     Ms.

22 Johnston, please give it to    me .  If we're going to

23 proceed on that basis , I will -- if  I'm satisfied that

24 there's authority for me to do it   , then we'll do it  .

25       MR. MARTIN:  Well, I don't know that there's any

1  legal authority.    I haven't had an opportunity to look

2  at the issue .  I wasn't with my brother counsel when

3  they were discussing this  , but there's a practical side

4  to this as far as   I'm concerned , and that is it look s

5  like I'm going to be leading off with the     cross-

6  examination of   Detective  Sakala .  If there is something

7  in there that the   Court thinks that we should be

8  entitled to , then  I'd like to see it before    I begin my

9  cross-examination.

10       MR. WARD:  Another practical consideration   , Your

11  Honor , is that if the   Court does not review it    and make

12  a determination , and  the Court of  Appeals makes a

13  determination later on  , if there is an appeal  , that we

14  should have been afforded the opportunity to use

15  portions, then we end up going through this whole

16  ten-week mess again,   I suggest.   I mean , it seems to me

17  to be such an elementary    and basic proposition that   --

18       THE COURT:  Why don't  I do this?  I'll consider

19  whatever argument you want to make on the notion they

20  need to do this.  Give me an unedited    and an edited

21  version of the transcript  , and I'll decide , after  I

22  look at it, whether  I can do what you want me to do   .

23  In the meantime , let's get this jury in.

24       I have three administrative matters to bring to

25  your attention .  First,  the foreman of the jury asked

1  to have some little   stick ies to put on things so they

2  can go back to things they want to look at.  We gave

3  them that.

4         The second thing the jury  asked -- and I think

5  they may be  misinformed  -- they asked to have  Ms.

6  Johnston please turn your microphone back on after

7  bench conferences.

8         You don't turn it off, do you   ?

9         MS. JOHNSTON:   I turn the microphone off for

10 bench conferences , Your Honor.

11        THE  COURT: Doesn't it -- when   I mute it  --

12        MS. JOHNSTON:  If  I'm wearing this microphone up

13 at the bar, it would project what    I'm saying , because

14 this microphone , I don't think , is hooked  up.

15        THE  COURT:  I t doesn't get hush  ed by the muting ?

16        MS. JOHNSTON:  No.

17        THE  COURT:  Well , they've asked me to remind you

18 to please remember to turn it back on.

19        MS. JOHNSTON:   I would rather be reminded to

20 turn it back on than to   leave it on  at the bench.

21        THE  COURT:  The third administrative matter they

22 were complaining about you   , but they should have been

23 complaining ab out me.  They said , please have  Ms.

24 Johnston wait a few moment  s after we come in  and sit

25 down before she proceeds   , so they can get their notes

1   out .   I think  that 's my problem .   So, I will not let

2   you proceed until   I look over there and they look

3   happy.

4           MR.  MONTEMARANO :   Your  Honor , we can provide you

5   the authority you requested now.

6           THE  COURT:  Now ?

7           MR.  MONTEMARANO :  Now .

8           THE  COURT:  O kay .  Give it to me now.

9           MR.  MONTEMARANO :  18  U.S.C., S ection  3500 --

10          THE  COURT:  Wait a minute.

11          MR.  MONTEMARANO :  18  U.S.C. , Section 3500 of the

12  Jenks  Act , Subsection  C.

13          THE  COURT:  Okay.   I'll look at it.

14          MR.  MONTEMARANO :  The  Court shall order the

15  United  States to deliver a copy of that material.

16  There is also  Fourth  Circuit  authority , and I would

17  point the  Court to *United  States  v. Silva* , 745  F.2d --

18          THE  COURT:  Wait.  Slow down.

19          MR.  MONTEMARANO :  *United  States  v. Silva* ,

20  S I L V A , 745  F.2d 840-845 , it's a  Fourth  Circuit

21  case , 19 84, construing the   Jenks  Act , Subsection  E, for

22  echo.   The witness' grand jury testimony    is considered

23  a statement that must be produced.     It's Page 102 of

24  the most recent  --

25          THE  COURT:   I'll take a look at it.

1          In the  meantime, the   jury  is coming in .

2               (Jury returns at 2  :21 p.m. )

3          THE  COURT:  Ladies and gentlemen, we have given

4 you some  Post-It notes , or whatever you call it   , for

5 your use.   I hope it will assist you.

6          I have discussed with the parties your      questions

7 about turning  mikes back on after bench conferences     .

8 We will try to make sure that's done     .

9          And if you have not been fully ready when you     've

10 been seated  and the parties have   started , that's

11 because  I have told them to start   .  So, that's a

12 problem for me.  So   I will look very carefully over

13 there , and if nobody is not ready  , sort of say , hold on

14 a minute ; because  I'm the one that's saying, go.      She

15 goes when  I say go.

16          Are you ready?

17          A JUROR:  Y es.

18          THE  COURT:  You may proceed   .

19               (The witness  resume s the stand. )

20          BY MS.  JOHNSTON:

21 Q.     Detective  Sakala , could  I call your attention to

22 B5530 on  Page 38 .  Not 38 .  I'm sorry .  On Page 450 of

23 Volume  3.

24 A.     (Witness indicating.  )

25 Q.     Before we play 5530  , the preceding call B5412 on

1  Page 449 , is that included on this    CD?

2  A.      Yes, it is.

3  Q.      That was between   Mr. Harris  and Ms. Martin; is

4  that correct?

5  A.      That's correct.

6  Q.      Now if we could go to next call    , B5530, on Page

7  450.   What is the date of that call   ?

8  A.      May 5th, 2004.

9  Q.      Is this call part of series of calls?

10  A.      Yes.

11  Q.      What are the other calls that relate to call

12  B5530?

13  A.      5531, 5552, 5735, 5754, 5763.

14  Q.      Over what time period did these calls take

15  place?

16  A.      First call is  May 5th, 2004 , 12:21 p.m ., and the

17  second one is on May   6 at 5 :45 p.m.

18  Q.      That would be the last call in the series?

19  A.      Yes.

20  Q.      Who are the parties on    Call B5530 on Page 450?

21  A.      Paulette  Martin  and Learley  Goodwin.

22  Q.      If we could please play    Call 5530.

23          (Audio recording begins playing at 2    :24 p.m. )

24          (Audio recording stops playing at 2     :25 p.m.)

25          BY MS.  JOHNSTON:

1  Q.        If we could go to the next call   , B5531 , what

2  time does this call take place in relation to the one

3  we just heard?

4  A.        Right after the previous call she calls --     Ms.

5  Martin calls  Mr. Goodwin  back.

6  Q.        Who are the parties -- if we could play B5531.

7          (Audio recording begins   playing at 2:25 p.m. )

8          (Audio recording  stops playing at  2:25 p.m. )

9          BY MS. JOHNSTON:

10  Q.        And the next call, B5552  , on Page 453.  What is

11  the time on this call in relation to the last one?

12  A.        This is a couple hours after the previous call.

13  Q.        Who are the parties  ?

14  A.        Ms. Martin  and Mr. Goodwin  again.

15  Q.        If we could play B5552.

16          (Audio recording begins playing at    2:26 p.m. )

17          (Audio recording   stops  playing  at 2:26 p.m.)

18          BY MS. JOHNSTON:

19  Q.        I believe the next call on that series is 5735      ,

20  which is on Page 456  .

21  A.        Yes.

22  Q.        Who are the parties to that call?

23  A.        Paulette  Martin  and Learley  Goodwin.

24  Q.        And what time does that take place?

25  A.        This is almost   4 o'clock -- 3 :56 in the

1  afternoon the same day.

2  Q.      If we could play it  , please.  B 5735.

3  A.      I'm sorry ?

4  Q.      Excuse me .

5  A.      This is the next day,   I'm sorry.

6  Q.      Okay.  If we could -- if we could play B5735,

7  please.

8          (Audio recording begins playing at 2   :27 p.m. )

9          (Audio recording  stops  playing  at 2 :28 p.m.)

10         BY MS. JOHNSTON:

11 Q.      Then if we could go to the next call, B5754     on

12 Page 459.  This call also occurs on May 6; is that

13 correct?

14 A.      Yes.  May  6 at 4 :42 in afternoon.

15 Q.      Who are the parties?

16 A.      Paulette  Martin  and Learley  Goodwin.

17 Q.      If we could play it  , please.

18         (Audio r ecording  begins playing at 2  :28 p.m. )

19         (Audio recording   stops  playing  at 2 :28 p.m. )

20         BY MS. JOHNSTON:

21 Q.      If we could go to the next call   , B5763 , on  Page

22 461.

23         Calling your attention to the top of the

24 transcription .  Does it indicate who the speakers are?

25 A.      The transcript indicates   Learley  Goodwin  and an

1 unidentified male.

2 Q.      Have you since been able to identify the voice

3 of the unidentified male?

4 A.      It's the same male by the name of     Cuba.  That's

5 all we've identified him as.

6 Q.      So the transcript should changed to reflect that

7 it is Cuba; is that correct?

8 A.      Yeah.  Cub a, last name unknown.

9 Q.      If we could please play B5763 on     Page 46 1.

10        (Audio  recording begins playing at 2   :29 p.m. )

11        (Audio recording   stops  playing  at 2 :30 p.m. )

12        BY MS.  JOHNSTON:

13 Q.      Based  on your training  and experience , did you

14 form an opinion as to what was being discussed between

15 Ms. Mart in, Mr.  Goodwin,  and then  Cuba?

16 A.      Yes.

17 Q.      Could you describe for the ladies and gentlemen

18 of the jury what that is,    referencing the calls  ?

19 A.       Ms. Martin  and Mr.  Goodwin  were making

20 arrangements to buy a half kilo of cocaine from     Cuba.

21 They were going to split it   , and Ms. Martin was loaning

22 Mr.  Goodwin $3,000  to pay for his half.

23 Q.       If you could , referencing the calls beginning

24 with B5530 on Page 450   , is there any reference in that

25 call to drugs?

1 A.      On the t hird line , Mr. Goodwin  is saying , just

2 wondering  if you found  any tickets .  Meaning , if you

3 found any cocaine.   Ms. Martin says , I'll call , Louis .

4 Meaning , Luis Mangual .  Then Mr. Goodwin  says he was

5 going to tell her  Cuba just called ; in other words ,

6 Cuba had just contacted him  , and Mr. Good win was just

7 checking with  Ms. Martin to see if she needed any.  She

8 replies that she do  esn't, saying no , I'm not quite

9 ready yet .  Meaning , she still has cocaine  .

10       That's about it as far as the talk with     Cuba.

11 Q.      The word "tickets ", is that the code word in

12 this conversation   that refer s to  drugs ?

13 A.      Yes.

14 Q.      Could you please note Page 450 on our chart next

15 to the word  "tickets "?

16 A.      (Witness indicating.  )

17 Q.      The next call , B5531.  When does that call take

18 place in relation to the one we just heard?

19 A.      Right after she calls him back    and changes her

20 mind.

21 Q.      What does she say in the call?

22 A.      She's asking if  Cuba will do a half a kilo    and

23 Mr. Goodwin  says check  and find out.

24 Q.      What's the  phrase that refer s to half a kilo?

25 A.      Half a sheet cake.

1 Q.      Based upon your training   and experience, is it
2 unusual for somebody who is not finished with their
3 drugs yet to order more drugs?
4 A.      No.  No.  You're keeping supply.  You don't want
5 to run out.  That 's the wors t thing you want to do.
6 Q.      If you put on our code list   , if cake is there  ,
7 write Page 452 , or add it to the list of codes.
8 A.      (Witness indicating.  )
9 Q.      Now, in reference to   Call B5552 on Page 453, is
10 there -- what , if anything,  does  Mr. Goodwin  ask Ms.
11 Martin to do in reference to a drug transaction?
12 A.      What he's trying to do is get his funds together
13 so they can split the kilo like they had talked about
14 before , third line down , he's saying, maybe   I get one
15 and we split it together.    I was try ing to get the ends
16 together , and she says , no problem.
17         And then  Mr. Goodwin  goes, so we can do it like
18 that.  I ain't even want to , so he won't have no
19 excuse , you know , and what he's referring to is again
20 he wants the kilogram wrapped in its original
21 container , so if they had just ordered a half a
22 kilogram , then that would  give Mr.- -- Cuba the
23 opportunity to possibly dilute the quality    of the
24 cocaine.  He wants to avoid that situation.  So if they
25 order the  whole kilogram , then  Mr. Cuba won't have any

1  excuse .  In other words  , it will still come in the

2  original container.

3  Q.      Then again , were any other code words used in

4  that call?

5  A.      No , I don't see any.

6  Q.      If we could continue with the next call,      I

7  believe it was B5735.  Again, in that call   , is Mr.

8  Goodwin  just reporting the status of his negotiations

9  with Mr. Cuba?

10 A.      Yes.  Page 456, fourth section down    , he's

11 complaining that he was having a hard time

12 understanding   Cuba , which as we heard in the previous

13 call , he is very difficult to understand with his

14 accent.  He has a very heavy accent    , but on Page 457 ,

15 he reiterates that he wants the cocaine packaged in its

16 original containers  , telling him in the middle of the

17 page , see what happened is when     I stressed th at we

18 wanted the dresses packed the way they come in     .

19 Mean ing , he want s the kilograms pack ed in  their

20 original containers.

21      Then further down  , Mr. Goodwin  says because we

22 don't want them packed no other way.  Again, he want      s

23 the kilograms  pack ed in  the original way , and if

24 they're not , then he doesn't want them.    He's saying if

25 there's my  positive,  I'll call you .  Anyway , when he

1 gets information, he'll let    Ms. Martin know.

2 Q.      Is there a code word use  d for drugs on that

3 page ?

4 A.       Yes , he's referring to the kilograms as

5 dresses .

6 Q.      If you could write Page 457 next to the code

7 word "dresses ."

8 A.       (Witness indicating.  )

9 Q.      Then if we go to next call,    B5754, on Page 459.

10 And what is  Mr. Goodwin  reporting to   Ms. Martin in that

11 call?

12 A.     Mr. Goodwin  says he 's reporting that he spoke to

13 Mr. - -- spoke to  Cuba about the sixth line down    , Mr.

14 Goodwin  says , like  I said , the whole thing is you know

15 that it's wrapped properly   , again , referring to the

16 kilograms being wrapped properly.

17        Then  Mr. Goodwin  said , so he told  me to come on.

18 In other words  , Mr. Cuba said , okay , that's fine.  Come

19 on and we'll do the deal.  Then    Mr. Goodwin  goes , I was

20 trying to  go half down the middle   , and  in the shipment

21 of "dress es."  Meaning , he was try ing to  split the

22 money with  Ms. Martin for a half a kilogram each     but he

23 says  he's about three short  .  Meaning , $3,000 short in

24 his half , and he want s to  know if he can borrow it from

25 Ms. Martin .  Ms. Martin confirms the amount by saying    ,

1  grand , confirming the $3,000.

2  Q.      In that call , is there a code for the kilo of

3  cocaine?

4  A.      He refers to  -- there's the second part  , the

5  shipment of dresses.

6  Q.      Okay .  Put, next to the word  "dresses ", Page

7  459.

8  A.      (Witness indicating. )

9  Q.      Then in the last call  , B5753, on Page 461,  what

10 is the significance of that call?

11 A.      This is the call where  Mr. Goodwin  is at  Ms.

12 Martin's house  and calls  Cuba , and they're trying to

13 make arrangements to meet   and they don't come to any

14 concrete arrangements  , and it's included with   Mr.

15 Goodwin  -- Mr. Cuba saying he will hold the cocaine for

16 them for  Mr. Goodwin,  but they would call him later.

17 Q.      Is there any code word us  ed in  that call ?

18 A.      Mr. Goodwin  refers to the cocaine as sugar.

19 Hold that sugar for me.

20 Q.      If we could write sugar   up on our board as

21 another code word  , if it's not there already  ,

22 indicating  Page 462 .

23 A.      (Witness  indicating. )

24 Q.      Now if we could go to   Call  B5560 on Page 454.

25        Who are the parties to that conversation?

1  A.        Paulette  Martin  and  Bruce  Milburn  Walker .

2  Q.        On what date   and  time did  that  take  place?

3  A.        May 5th at 3 :21 p.m.

4  Q.        If we could  play  that   , please.

5          (Audio  recording  begins   playing  at 2 :40 p.m. )

6          (Audio recording   stops  playing  at 2 :40 p.m. )

7          BY  MS.  JOHNSTON:

8  Q.        Based upon  your  training  an   d experience , what

9  are  Mr.  Walker  and  Ms.  Mart  in discussing  in  that  call?

10  A.        Mr.  Walker  is  ordering  a  quantity of  cocaine

11  from  Ms.  Martin ,  referring  to it   as  a size  8 for

12  Grandma  Jones .

13  Q.        If we could  turn  to the  very  next  call,      Page

14  455,  B5728,  on what date   and  time does  that  call  take

15  place ?

16  A.        May  6 at 3 :38 p.m.

17  Q.        Who are  the  part  ies to  this call?

18  A.        Paulette  Martin  and  LaNora  Ali .

19  Q.        Again ,  are we merely  playing  a  portion  of  that

20  call?

21  A.        Yes.

22  Q.        If we could  please  play  B5   728.

23          (Audio re cording  begins   playing  at 2 :41 p.m. )

24          (Audio recording   stops  playing  at 2 :41 p.m. )

25          BY  MS.  JOHNSTON:

1  Q.      Based upon your training    and experience  , what is

2  Ms. Martin asking    Ms. Ali in that call?

3  A.      Whether she wants cocaine when she comes      out,

4  Q.      The code word for cocaine is?

5  A.      Tickets.

6  Q.      If we could please turn to -- if you could turn

7  to the chart   and write Page 455 next to the word

8  "tickets ".

9  A.      (Witness indicat ing.)

10 Q.      If we could move on to calls B5801    and 5802 on

11 Page 463  and Page 46 4, are you familiar with those two

12 calls?

13 A.      Yes.

14 Q.      Who are the  parties in th ose two calls?

15 A.      George  Harris  and Paulette  Martin.

16 Q.      In particular , in reference to call B5802 on

17 Page 46 4, is there -- if we could play that call,

18 please , B5802 on  Page 46 4.

19         (Audio  recording  begins playing at 2  :42 p.m. )

20         (Audio  recording   stops playing  at 2 :42 p.m. )

21         BY MS. JOHNSTON:

22 Q.      What is  Ms. Martin discussing with    Mr. Harris ?

23 A.      They had agreed to meet in a previous call     and

24 she's calling him back to find out how much drugs he

25 wants.  He identifies as the    8 o'clock show referring

1  to either an eighth of an ounce or eighth of a kilogram

2  of cocaine.

3  Q.      When looking at calls B5804 on    Page 465  and B581

4  on Page 46 4 -- s trike that .

5          Looking at B5804 on    Page 46 5, did you f orm an

6  opinion based upon those call -- that call we've just

7  heard with  Mr. Harris  and the call on  Page 46 5 as to

8  what occurred between    Ms. Martin  and  Mr. Harris ?

9  A.      Yes.

10  Q.      What is that ?

11  A.      He came over to buy cocaine from her    , and 5804

12  he's telling her   I'm just  around the corner.

13  Q.      If we could go to   Call B5818 on  Page 46 6, what

14  is the date  and time of that call?

15  A.      May 7, 2004 , at 1 :18 p.m.

16  Q.      Who are the parties to that call?

17  A.      Paulette  Martin  and Learley  Goodwin.

18  Q.      And this call is taking place day after the

19  previous calls involving the discussion about     Cuba?

20  A.      Yeah, that's correct.

21  Q.      If we could play it  , please.

22          THE COURT:  What was the call number again    ?

23          MS. JOHNSTON:   B5818 on  Page 46 6.

24          THE COURT:  All right . Got it.

25          (Audio recording begins   playing  at 2 :43 p.m. )

1           (Audio recording   stops  playing  at 2 :43 p.m. )

2           BY MS. JOHNSTON:

3  Q.      If we can go to the next call, B5982    , on  Page

4  467.

5           Who are the parties to this call?

6  A.       Paulette  Martin  and Lavon  "Becky " Dobie .

7  Q.       Is Call B5986 the next call beginning on     Page

8  475 related to the call B5982 at 467?

9  A.       Yes, it is.

10 Q.      If we could play those two calls    , please .

11 First , B5982 on Page   467.

12          (Audio recording begins    playing at 2 :44 p.m. )

13          (Audio recording   stops  playing  at 2 :52 p.m.)

14          BY MS. JOHNSTON:

15 Q.      Could you go to   the next call , B5986 on  Page

16 475?

17          What time does this call take place in relation

18 to the one we've just heard?

19 A.      The first call takes    place at 9 :04 in the

20 morning; and the second   one is  9:41, about 35 minutes

21 late r.

22 Q.      If we could play it -- who are the part    ies to

23 this call ?

24 A.       An unknown male   and Paulette  Mart in.

25 Q.       If we could play it  , please.

1          (Audio r ecording begins playing at 2  :52 p.m. )

2          (Audio recording   stops  playing  at 2 :53 p.m.)

3          BY MS.  JOHNSTON:

4  Q.      Going back to the first lengthy call   .  Is that

5  an  unredacted  call?

6  A.      Yes.

7          It is a redacted call,   I mean.

8  Q.      It is a redacted call?

9  A.      Yes.

10 Q.      How long was the actual telephone call?

11 A.      You have what we heard  , and add  nine minutes   and

12 30 seconds to that  .

13 Q.       What are  Ms. Dobie and  Ms. Martin discussing in

14 this telephone call?

15 A.       In the beginning of the call   , they start talking

16 about  Mr. Goodwin,  Learley Goodwin , on Page  468.  Ms.

17 Martin , at the top of the page  , is  saying,  Goody , don't

18 need no problems  .  You know , I guess , for tickets .

19 But , Goody don't need to be   bothered with   nobody  he

20 don't know .  The  attorney told him to leave it alone

21 for a minute .  Mean ing, because  of his pending case in

22 Prince  George's  County , Mr.  Goodwin  should not be

23 dealing with people he do  esn't  know right now.

24          Further down , Ms. Dobie  even expands that

25 further.   Ms. Martin says if you don't  know them all

1  these years , then you don't need to know them now     , and

2  Ms. Dobie  says  even  further  a little bit down   , if you

3  ain't  --  even  though  he  may  know  them   , if  he  ain't  been

4  dealing  with  them  ,  don't  even  start.   In other  words   ,

5  even  if you know the person   , if you neither currently

6  dealing drug s with  them , you shouldn't be start   ing to

7  deal drug s with  them.

8  Q.       Why  is  that , based  on  your  training    and

9  experience?

10  A.       Because  the  person  may  be  a  cooperator  working

11  for the police  , which is  what they're talking about at

12  the  top of   Page 469.

13  Q.       What reference has to do with the police    ?

14  A.       That's going to be at the top of    Page 469.

15  Q.       Explain it.

16  A.        Ms.  Dobie,  the  first  line  on  the  top    of  Page 469

17  says, if  they mad at him  , it ain't  no question they mad

18  because they had him  , refer ring to  the police or law

19  enforcement.   In other words    , if the police are mad at

20  him , there  ain't  no  question  they're  mad  because  they

21  had him.    In other  words, they had arrested him, and

22  they di dn't get him .  Meaning , they didn't get him with

23  what they wanted to get him with    , so they're definitely

24  going to send someone   .   Meaning , the police are going

25  send an informant or cooperator to     do whatever they

1  can.

2          And there's a typ o on  the  next sentence where

3  Ms.  Dobie  says , they're definitely going to send

4  someone out  the back avenue   , that's not what she says   .

5  The word  "avenue " is wrong there .  It's they're

6  definitely going   to send someone back at him   .  Meaning ,

7  the police are going to send an informant     or  cooperator

8  back at him to get additional evidence.

9  Q.     Does that conversation continue through    ?

10  A.     Yeah.  Well then the conversation    eventually

11  changes  to they're going to meet to do a drug

12  transaction , and  it goes on for several pages where

13  they talk about different locations     and  why some will

14  work  and some won't.

15  Q.     On  Page 47 1, is there a reference to church

16  people?

17  A.     Yeah.  On  Page 470  and  471, they're talking

18  about the church people being out there in reference to

19  if they're do ing a drug transaction  , all  the  people at

20  church would notice it    and they  would  be  sticking  out.

21  Q.     Is that all there is in that conversation?

22  A.     They go on for several pages    and finally agree

23  to meet at her school   , and  Ms. Martin says she's going

24  to call back.

25  Q.     Indeed , is the next call the call back from     Ms.

1 Martin ?

2 A.     Yes.  She talks to t  he unknown male try ing to

3 get a message to   "Becky " to try to meet her  , being  Ms.

4 Martin , at the school.

5 Q.     If we could go to   Call B6180 on  Page 478.

6        What date and time does this call take place?

7 A.     It's on May 10 at 6  :52 p.m.

8 Q.     Who are the parties to this conversation?

9 A.     Paulette  Martin  and an  unknown male.

10 Q.     If we could play it  , please.

11       (Audio r ecording begins  playing  at 2 :57 p.m. )

12       (Audio recording   stops  playing  at 2 :57 p.m. )

13       BY MS.  JOHNSTON:

14 Q.     Do you know the location being refer    red  to in

15 that call referred to as    Larry's ?

16 A.     Residence on  Ogle thorpe .

17 Q.     If we could go to next call  , B6189.  What  date

18 and time -- does that take place on the same date as

19 the call we just heard  ?

20 A.     Yeah , same date , 8 :13 p.m.

21 Q.     Who are speakers in this call?

22 A.     Paulette  Martin  and Learley  Goodwin.

23 Q.     Again , are we only listen  ing to  a portion of the

24 call?

25 A.     That's correct.

1   Q.       If we could please play B6189 on      Page 479.

2            (Audio recording   begins  playing  at 2:58 p.m. )

3            (Audio recording   stops  playing at 2: 59 p.m. )

4            BY MS. JOHNSTON:

5   Q.       Based upon your training   and experience , what

6   are Ms. Mart in and  Mr. Goodwin  discussing in this call   ?

7   A.       They're talking about get  ting a  source of

8   cocaine  and much  they have left .  Ms. Martin 's

9   saying she's not quite out of cocaine    , saying -- Mr.

10  Goodwin  says you need them to  , too, and Ms. Martin

11  says , no -- or says , not really .  Well , you know , I

12  ain't quite , but  I was just taking it easy with the

13  other .  Meaning , she could buy some or she could not.

14                Either way she could go   and, then  Mr.

15  Goodwin  says I need to go , too , but only halfway  ,

16  referring to half a kilogram.  Then he goes on to refer

17  trying to  get a hold of   "Dumb & Dumber " to do that

18  again. He's talking about calling    Michael  Thurman  in

19  Texas :  But it's getting late in the day   , and I may not

20  be able to get anyone  .  Meaning , he may call down there

21  but he may not be able to get a hold of them.

22  Q.       Any code words there used for kilos or cocaine    ?

23  A.       Tickets.

24  Q.       Okay .  If you could write   Page 479 next to our

25  code word  "tickets ".

1  A.       (Witness indicating.  )

2  Q.       If we could go to the   next call , B6198 , on  Page

3  481.  What is the date   and time of this call?

4  A.       May 10, 2004 at 8  :43 p.m.

5  Q.       Who are the parties to this call?

6  A.       Ruby Harden and  Paulette  Martin.

7  Q.       If we could play   it, please.

8           (Audio r ecording begins   playing  at 3 :00 p.m. )

9           (Audio recording   stops  playing  at 3 :01 p.m. )

10          BY MS.  JOHNSTON:

11 Q.       Based upon your training    and experience , what

12 are Ms . Harden and  Ms. Martin discussing in this call    ?

13 A.       Ms. Harden  is try ing to  arrange a purchase of

14 cocaine from  Ms. Martin.

15 Q.       Okay . Could you point out what portions of the

16 conversation refer to that?

17 A.       Two-thirds of the way  down Page 481 , Ruby Harden

18 says , oh girl . So , look, did you get those tickets in    ?

19 She's referring  to, did she have cocaine  .  Ms. Martin

20 says , yes , but she doesn't have transportation   .  Again ,

21 the problem with  Ms. Harden  is she drives a

22 tractor -trailer  and she can't get the tractor   -trailer

23 down into the neighborhood  .  Ms. Martin is telling her

24 she doesn't have her car, so she can't get out of the

25 neighborhood to meet   Ms. Harden.

1          Then they go on   to discuss that   Jackie   Terrell
2 is there  and she's got company in the    house  and that
3 Ms. Martin doesn't want    to arouse any curiosity or
4 suspicion on the part of    Ms. Terrell  and her friends ,
5 and then Ms. Harden  identifies the amount she needs as
6 one saying  I just need one.
7 Q.     The code word for drug  s in this call?
8 A.     "Tickets " again.
9 Q.     Could you write   Page 481 next to the word
10 "tickets " there.
11 A.     (Witness indicating.  )
12 Q.     Now if we could turn our attention to the next
13 call, 6229 , on Page 48 3.
14          Is that call part of a series of calls     between
15 Ms. Martin  and Ms. Dobie ?
16 A.     Yes.
17 Q.     What are the other calls that are related to
18 B6229 ?
19 A.     6230 and 62 45.
20 Q.     What's the date  and time of the first call,
21 6229?
22 A.     May 11, 2004 , at 7 :19 in the morning.
23 Q.     The part ies to  that call?
24 A.     Paulette  Martin,  Lavon "Becky " Dobie, and  her
25 husband.

1  Q.      If we could play?

2  A.      Actually it  is -- her husband is not in this

3  transcribed portion.

4  Q.      Is he in the  untranscribed  portion?

5  A.      That's correct.

6  Q.      If we could please play   B6229 on Page 48 3.

7          (Audio r ecording begins playing at 3   :03 p.m. )

8          (Audio recording   stops playing at  3:05 p.m.)

9          BY MS. JOHNSTON:

10 Q.      Now, if you could go  on to the next  call , B6230 ,

11 on Page 48 5.

12         Does this call , likewise , take place on May 11?

13 A.      It does .  The CD on this call , I do not believe  ,

14 is edited.

15 Q.      Okay .  So we  have  portions of transcribed

16 portions are reflected in the transcript book beginning

17 on Page 48 5?

18 A.      That's correct  .  From one minute 46 seconds to

19 two minutes and 39 seconds  .

20 Q.      Based upon your review of the call   , that is a

21 pertinent portion of the call for your testimony here?

22 A.      That's correct.

23 Q.      I would ask  Detective  Eveler  to play B6230  ,

24 starting at 1 :46 into the call  and finishing at 2 :39.

25         (Audio recording begins playing at 3   :06 p.m. )

1          (Audio recording  stops  playing  at 3:07 p.m.)

2          BY MS. JOHNSTON:

3  Q.       If we could go to the next call, B6245, on       Page

4  487.   What date and time does this call take place?

5  A.       May 11, 2004 at 8  :45 a.m.

6  Q.       Who are the part ies to  this call ?

7  A.        Lavon  "Becky" Dobi e and Officer  Carr, and  an

8  Officer  Carter at the   Montgomery  County  Detention

9  Center.

10 Q.       Where is this call being made from?

11 A.       Ms. Dobi e is at the house on   Hayward .

12 Q.       If we could play this call, please    , B6245 on

13 Page 48 7.

14         (Audio r ecording begins  playing  at 3 :07 p.m. )

15         (Audio recording  stops  playing  at 3 :13 p.m.)

16         BY MS. JOHNSTON:

17 Q.       If we could go back to the first of those calls,

18 B6229 , on Page 48 3.

19         Did you form an opinion as to what    Ms. Dobi e and

20 Ms. Martin were discussing in the excerpt we heard from

21 B6229 on  Page 48 3?

22 A.       They're talking about whether    Ms. Martin is

23 looking for a supply of heroin    , and the fourth line

24 down , or fourth section down   , Ms. Martin says, somebody

25 called me looking for them tickets like      Gwen did ,

1  referring to it as -- referring to the heroin.       I told

2  them, the person that calls, that    I don't know nobody

3  with those kind of -- that had a show like that.       I

4  don't know.

5         And then Ms. Dobie says that she has 50 grams of

6  heroin.  She's  saying, I just got 50 of them , but I'm

7  down about  10 or 15  herself  now.   I found someone that

8  got done rid of them .  Meaning  that she sold some of

9  the 50 grams of heroin that she got.

10         They go on - - I'm sorry .  They go on to discuss

11  the price of -- the price is identified at the bottom

12  of  Page 48 3 as $100 a gram , and the second line on   Page

13  484, Ms. Martin says that   I don't think he'll pay that  .

14  Meaning , $100 a gram.  It's too much  , and that they

15  were paying at $75 a gram  , which is the  price she was

16  looking for.

17 Q.     Based upon other intercepted calls between    Mr.

18  Nunn  and Ms. Levi  and Ms. Martin, did you form an

19  opinion as to what price they were receiving the grams

20  of heroin from  Ms. Levi for?

21 A.     Yes.  The prices were as   Ms. Levi got the heroin

22  for $ 65 a gram for  Mr. Uriarte .  She sold it to  Ms.

23  Martin for $75 a gram.   Ms. Martin sold  it to Mr. Nunn

24  for $85 a gram .

25         MR. MITCHELL:   What was the last thing again?

1          What was  the last thing you said  ?

2          THE  WITNESS:  The last price   Ms. Martin sold   it

3 to Mr. Nunn for  was $85 a gram.

4          BY MS. JOHNSTON:

5 Q.        What code word is used for the heroin?

6 A.        "Tickets ".

7 Q.        Okay.  If you could write    Page 48 3 next to the

8 code word  "tickets ".

9 A.        (Witness indicating.  )

10 Q.       On Page 48 4, there's also a reference at the

11 bottom to  "hot tickets. "

12          Do you know what  Ms. Martin was asking  Ms. Dobi e

13 in that portion  of the  call?

14 A.       No, I do not.

15 Q.       If we could turn to the next call, B 6230.

16          Is there a discussion between    Ms. Martin  and Ms.

17 Dobie concerning  Ms. Ali?

18 A.       I'm sorry .  I didn't hear that.

19 Q.       Is there a discussion in B6230 between     Ms. Dobi e

20 and Ms. Martin concerning   Ms. Levi ?

21 A.       Yes, there is.

22 Q.       On the first page , there's a reference to   Gwen

23 and a reference to   "Dog". Based on your training   and

24 experience  and the calls , who are they referring to?

25 A.       Gwen Levi is Gwen , and "Dog" is William  "Dog"

1 Turner.

2 Q.      Further down , there's a discussion by   Ms. Dobie

3 about she don't know if she's going do a five or      a dime

4 up there .

5        Based on your training   and experience , what is

6 she saying?

7 A.      She didn't know if she was going to do five

8 years or ten years.

9 Q.      Then if we go to   the last call in that series,

10 B6245 on  Page 48 7.

11        Are you familiar with the locations that are

12 discussed in this call?

13 A.      Yes.

14 Q.      What are those locations?

15 A.      They're actually calling in to the    Montgomery

16 County  Detention  Center on  Seven Locks Road in

17 Rockville .   The other location mentioned is the actual

18 new detention center referred to     as the Clarksburg

19 facility .   It's also , I think , referred to in other

20 calls as the  "boys' facility ."   When they're talk ing

21 about , you're at the wrong jail  , she's at Clarksburg .

22 That's the two jails they're talking about.

23 Q.      In terms of the   -- once the new jail open  ed in

24 Clark burg back at this time  , in 2004 , what was the

25 Seven  Locks facility used for?

1  A.      They're actually still used for the same thing.

2  When prisoners initially come in  , they go to  Seven

3  Locks  for processing.  If they are going to be held for

4  any length of time at all  , either b ecause  they didn't

5  make bond or they are awaiting transfer     to someplace

6  else , they are transferred    up to  the  Clarksburg

7  facility within a week to ten day    s.

8  Q.      I believe on  Page 490  there is a reference by

9  Ms. Dobie that  Gwendolyn  Levi may be in a federal hold   .

10         Based on your training    and experience , do you

11  know what a   "federal  hold " refers  to ?

12  A.      Yes.

13  Q.      What does that mean  ?

14  A.      That 's the  hous ing of a federal prisoner in a

15  state facility , which  is what's done in this area    .

16  There are no federal jails   , so to speak , so federal

17  prisoners are housed in local facilities.

18  Q.      Okay.  And then if we go on to Page   492 --  at

19  the bottom of 491   and the top of 49 2, there's a

20  discussion about investigator credentials.

21  A.      Yes.

22  Q.      The name referred to is   Cass ie Johnson.

23  A.      Yes.

24  Q.      Did you determine whether or not     Lavon  Dobie 's

25  -- what her legal name was?

1  A.      It's Lavon Parker Dobie.

2  Q.      On Page 492 there is a reference by  Ms.

3  Dobi that she's an investigator for the courts.

4         Did you find any evidence in reviewing the

5  search warrant materials that   Ms. Dobie was ever

6  employed by any court system as an investigator?

7  A.      No.

8         MS. JOHNSTON:   Your Honor, I don't know if the

9  Court wants to take its break.

10        THE COURT:  Yes .  Why don't we take a recess

11  until 25 of  4:00.

12               (Jury excused at 3:18 p.m.)

13        THE COURT:  Counsel , stay behind.

14        Ms. Johnston, I've looked at the  Jenks Act , and

15  I've looked at the   Silva case , and also the  Roseborough

16  case.  It would appear it would be appropriate for me

17  to look at an  unredacted  transcript.

18        MS. JOHNSTON:   Your Honor , I was hoping to  save

19  the Court some time .  I have already asked that we make

20  copies .  As I said , there are several hundred pages.

21  I've asked that they be made before the end of the day

22  for the  Court.

23        THE COURT:  All right.

24        MR. WARD:   A little light reading for tonight,

25  Judge.

1          MS. JOHNSTON:   I was just instructing our

2 assistant to have my legal assistant to start making

3 the cop ies for the Court in the even t the Court decided

4 it wanted to review it .

5          THE COURT:   Yeah .  It would appear that   I

6 should .  I need to have the redacted version     and

7 unredacted  version .

8          MS. JOHNSTON:  Absolutely  , Your  Honor.

9          THE COURT:   Fine .  We'll be back at , what did  I

10 say?  25 of?  25 of.

11               (Off the record  at 3 :22 p.m. )

12               (On the record at 3 :37 p.m. )

13          THE COURT:   Ms. Johnston , when will those

14 transcripts be available  ?

15          MS. JOHNSTON:  They're copying them right now     .

16          THE COURT:  I f you want , you can  have them take n

17 straight to my chambers.

18          MS. JOHNSTON:  Will do.

19          THE COURT:  All right  , bring them in.

20               (Witness resumes the stand.  )

21               (Jury returns at 3 :38 p.m. )

22          THE COURT:  Is everybody ready?

23          Okay , you may proceed.

24          BY MS. JOHNSTON:

25 Q.    Detective  Sakala , could we turn our attention to

1   the next call, B6295 , on Page 49 4?

2            Do you have that call in front of you?

3   A.      Yes.

4   Q.      Who are the parties to this call?

5   A.      Paulette Martin and Learley Goodwin.

6   Q.      What is  the date  and time of the call?

7   A.      May 11 , 2004 , at 3 :01 p.m.

8   Q.      If we  could  play the call , please.

9            (Audio r ecording begins playing at 3   :39 p.m. )

10           (Audio recording   stops  playing  at 3 :39 p.m. )

11           BY MS.  JOHNSTON:

12  Q.      What are -- during the conversation   , did you

13  determine whether   or not  any of that conversation had

14  to do with drug trafficking?

15  A.      Yes, it did.

16  Q.      What is that?

17  A.      At the  bottom of  Page 49 4, where  Mr.  Goodwin

18  says , I want to talk to  , what you call it  , Friday .  Mr.

19  Goodwin  clarifies he's talking about    Cuba .  What he's

20  referring to there is on    Friday , Cuba will have cocaine

21  for them.

22  Q.      And there's a reference to   Tiffany  Goody .  Do

23  you know who  "Tiffany  Goody " refers  to?

24  A.      Yeah.   I think she's saying , did you say

25  Tiffany,  Goody?  And that's referring to   Tiffany

1 Vessels.

2 Q.      Now if we could go to call B6306 on     Page 49 7.

3        Again , Detective Sakala , where I've skipped some

4 of the shorter   calls with people not on trial here   .

5 Those calls are accurately on the     CD as you testified

6 the first day of trial  ; is that correct?

7 A.      Yes.

8 Q.      Okay .  If we could go now   to B6306 on  Page 49 7.

9        Who are the parties to this call?

10 A.     Paulette  Martin  and LaNora  Ali .

11 Q.     What date  and time does it take place?

12 A.     This is on May 11, 2004  , at 4 :35 in the

13 afternoon.

14 Q.     If we could play it  , please.

15        (Audio r ecording begins  playing  at 3 :41 p.m. )

16        (Audio recording stops playing at    3:42 p.m.)

17        BY MS. JOHNSTON:

18 Q.     Based upon your training an   d experience , is

19 there any discussions relating to drug    s in this call?

20 A.     Yes.

21 Q.     What is that?

22 A.     Two very short sentences  , as most of the

23 conversation is about personal matters unrelated     to

24 drugs , but the bottom two-thirds of the way down on

25 Page 29 7, LaNora  Ali says , I'm going to come by to see

1  you this evening , and then on  Page 49 8, in the middle

2  of the personal conversation, two-thirds of the way

3  down , Ms. Ali says , well , all right .  One this time ,

4  identifying the amount of cocaine she wants.

5  Q.     Then the conversation about a    Kevin  Scott and

6  clothing .

7         Based upon your review of other calls   , is that

8  at all drug -related?

9  A.     It is not related to drugs at all.

10 Q.     Did you make a determination during the course

11 of the  investigation if   Mr. Scott  actually was involved

12 in selling of clothing  ?

13 A.     He was involved in selling of clothing.

14 Q.     If we could go to   the next  call, B63 30 on Page

15 500.  What date   and time is this interception?

16 A.     This is on page -- excuse me   , may 11, 2004 , at

17 6:42 p.m.

18 Q.     Who is intercepted?

19 A.     It's  Ruby  Harden  leaving a message for    Paulette

20 Martin.

21 Q.     If we could play it  , please.

22         (Audio r ecording begins  playing  at 3 :44 p.m. )

23         (Audio recording   stops playing at  3 :44 p.m. )

24         BY MS.  JOHNSTON:

25 Q.     Based on your review of the telephone calls      and

1 surveillances  and items seized from various residences    ,

2 did you form an opinion as to whether or not     Ms.

3 Harden  had any other business relationship      with  Ms.

4 Martin?

5 A.      No, she did not.

6 Q.      If we could go to the next telephone call     ,

7 B6369 , on Page 501.  Who are the parties to this call?

8 A.      Lavon  Parker  Dobie -- I'm sorry .  What call was

9 it?

10 Q.      B6369 on Page 501 .

11 A.      Lavon  Parker  Dobie , Paulette  Martin , and Goldie

12 Dobie, who is  Lavon  Parker  Dobie 's husband.

13 Q.      What date  and time does this call take place?

14 A.      May 11 at 10 :13 at night.

15 Q.      If we could play   Call B6369 on Page 501.

16        (Audio r ecording begins playing at 3   :45 p.m. )

17        (Audio recording   stops  playing  at 3 :46 p.m.)

18        BY MS.  JOHNSTON:

19 Q.      Based upon your train  ing and experience,   did you

20 determine whether   or not  there was any discussion about

21 illegal drugs in this conversation?

22 A.      Yes, there was.

23 Q.      If you would  please explain with reference    s to

24 the transcript.

25 A.      During the conversation   , "Becky " Dobi e is

1  talking about another source of cocaine that her

2  husband , Goldie Dobie , has arranged .  Right at the

3  start of the conversation about the other tickets    , your

4  nephew said that just one of the people said any day

5  now .  Meaning  that the source would come through with a

6  supply of cocaine any day now    and could be tonight,

7  tomorrow, any day now  , "Becky " says.

8         Then at the end , Goldie  actually gets on the

9  phone  and talks about the source   , saying he's on home

10  confinement , and as soon as he comes off  .  Meaning , as

11  soon as he comes off home confinement    , we're really

12  going to be all right , which means we're really going

13  to be suppl ied with  cocaine at that time  .  It finishes

14  up with , yeah , we're really going to be all right    as

15  soon as he comes out  .  Meaning , we'll be fine as far as

16  the supply of cocaine as soon as he comes out of home

17  confinement .

18  Q.     Calling your attention    -- first of all , the word

19  "tickets " refer s to drugs; is that correct?

20  A.     That's correct.

21  Q.     If you could please make a notation of 501

22  somewhere near the word   "tickets " on that  sheet.

23  A.     (Witness indicating.  )

24  Q.     And then there's also a reference in the middle

25  of that page to   "candy " or to "hard rock taffy ."

1  A.       Yes.

2  Q.       Based on your training   and experience , do either

3  of those terms have anything to do with drugs?

4  A.       Becky's talking about crack here   , but I don't

5  know the context of what she's discussing   .  She's

6  talking about the crack we ordered   , did they ever bring

7  them , but then you can't make out what she says     , so I

8  don't know the exact context of what she's talking

9  about.

10 Q.      In terms  of the  words  "tickets " here , they refer

11 to -- about them other tickets   , and the nephew said any

12 day now.

13         Who is the nephew that was being referred to?

14 A.       Goldie  Dobie,  who subsequently gets on the phone

15 and refer s to Paulette  Martin as  Aunty .

16 Q.       The tickets referenced there is to?

17 A.       Drugs.  Cocaine.

18 Q.       Do you know whether   or not  Goldie  Dobie was

19 actually the nephew of   Ms. Martin?

20 A.       I don't think either one of them are any

21 relation.  The case was full of people who refer to

22 each other in a relative way   ; brother, sister, aunt,

23 uncle .  I'm not sure there are very many people who are

24 related at all  .  It's just how they referred to each

25 other.

1  Q.       If we could go to   the next call , B6435 , on Page

2  503.

3           What date does this call take place?

4  A.       May 12, 2004 , at 6 :38 p.m. -- excuse me   , 4:38

5  p.m.

6  Q.       That would be the   next day?

7  A.       Yes.

8  Q.       Who are the part  ies to  this call?

9  A.       Paulette  Martin  and Lavon  "Becky " Dobie.

10  Q.      If we could please play   Call B6435 on Page 503.

11          (Audio r ecording begins   playing  at 3 :49 p.m. )

12          (Audio recording   stops  playing  at 3 :52 p.m. )

13          BY MS.  JOHNSTON:

14  Q.      Based upon your training   and experience , what

15  are Ms.  Dobi e and Ms. Martin discussing in this call?

16  A.       They're discussing that   Ms. Dobi e has  someone

17  who has ten ounces of cocaine for sale for    $900 to

18  $950, and  Ms. Martin , after they --  after  much

19  confusion about what they're exactly talking about does

20  not purchase cocaine that way   , would only purchase it

21  in the full kilogram amount.

22  Q.      If you could reference   in the call , indicate

23  where those references that support your opinion take

24  place beginning on Page 503.

25  A.       If you start on Page 503,   Ms. Dobie,  the third

1 line down , says , I need you to look at some tickets.

2 Which one?  Some tickets .

3        Then  Ms. Martin , first thing , said , heroin ?

4 Refer ring to , you're talking about the    ones -- excuse

5 me , not talking about heroin here.  She thinks it's the

6 ones that is cocaine  .  She's try ing to  clarify , you

7 talking  about the  one like you used to get?  Yeah.

8 What color are they?

9        Then at  the bottom , Ms. Martin is try ing to  find

10 out  the price .  She says , how much  is it for the

11 up-front tickets , front -seat tickets , refer ring to  a

12 kilogram of cocaine.  Then    Ms. Dobie says , I think

13 there's ten left.

14        Then  Ms.  Martin t hinks that she's not talking

15 about kilograms   and says again , how much  is it for the

16 whole front -- the full front   -seat tickets again ?

17 Saying , how much  for a kilogram.

18        Top of Page 504 , Ms. Dobie says , it's not full .

19 Meaning , it's not a full kilogram  .  Then Ms. Martin

20 goes , no, I don't want anything like that.    I was

21 looking out for my brother  .  I was thinking about him,

22 baby.

23        Further down on  the page  -- a little bit below

24 the halfway part , Ms. Martin says , they got some small

25 tickets , huh?  Still try ing to  clarify the amount

1 they're talking about.    Ms. Dobie says , ten of them.

2 Ms. Mart in says , no, I'm not  interested in no   -- and

3 Ms. Dobie says , you know what   I'm talking about ?   And

4 Ms. Martin  -- this is where she confuses what they're

5 talking about with heroin  .

6         She says , like , again?   And Paulette says , no ,

7 like you get .   And Ms. Dobie says the whole thing , ten

8 whole ones.   Again , there's confusion.    Ms. Martin now

9 thinks she's talking about ten kil   ograms .   So she goes ,

10 okay, that's wh at I'm  saying.  How much that?  How much

11 are they asking for that?

12         Top of Page 505.    Then Ms. Dobie says , $9-950 ,

13 refer ring to  $90 0-$950.  That confuses   Ms. Martin .   She

14 says nine or nine-fifty ?   Then she realizes they're not

15 talking about kilos  .   Ms. Dobie says , I can probably

16 get them .   He's saying  950.   Then Ms. Martin is again

17 saying, no,  I thought you meant the big   ones, the

18 kilograms, not ounces  .   And Ms. Dobie says $9-950 .

19 Okay.   I misunderstood .   Ms. Martin :   I thought you

20 meant the big tickets  .

21         Then they go on in the discussion how they're

22 not going  to buy the kilograms parsed out because    of

23 the previous problems they've had with cocaine not

24 being of good quality  .   Even though she doesn't go    into

25 it here , that's what she's referencing    .

1        Then the third line from the bottom on Page 505
2 -- actually, it says, I don't know  nobody...
3        Then she goes, people I know want  the up-front
4 tickets.  In other words, people such as herself or    Mr.
5 Goodwin are going to want the whole kilogram   , not
6 parcelled down into   ounces.
7        Lavon Dobie then goes they want the whole.  They
8 definite ly, the people  you know, I never bothered  with
9 nobody like that  .  Meaning, I've never purchased small
10 amounts of the  ounce quantities.  She wants to buy it
11 in the whole k ilogram  quantities.
12 Q.     How do you know  in this call it's ten ounce?
13 A.     The $9-950 is the price for an ounce.  The     $900
14 to $950  would b e the price for an ounce  , and refer ring
15 to the ounce of cocaine.
16 Q.     If you could mark on our board the reference     s to
17 "ticket s" that occu rred in  this conversation beginning
18 with Page 503 .
19 A.     (Witness indicating.  )
20 Q.     And 504  and  505.
21 A.     (Witness indicating.  )
22 Q.     Now if we could turn to the next call, B6445.
23        Is this call related to several other calls     ,
24 6445 on Page 507 ?
25 A.     Yes.

1  Q.      What are the other calls that --

2  A.      6445, 6446,  6450, and  6571.

3  Q.      What time period do those four calls take place    ?

4  A.      First  one takes place  on May 12 at 5 :51 p.m.,

5  and the last call , 6571, takes place on   May 13 at  1:38

6  p.m.

7  Q.      If you could begin by turning to the first call,

8  B6445 , page 507 , who are the part ies to  this call?

9  A.      Paulette  Martin  and Larry Nunn.

10  Q.     If we could play this   call, please.

11         (Audio r ecord ing begins  playing  at 3 :58 p.m. )

12         (Audio recording stops playing   at 3 :58 p.m. )

13         BY MS.  JOHNSTON:

14  Q.     Now if we can go to   the next  call , B6446 .

15         What time does this call take place in relation

16  to the  one we've  just heard?

17  A.      About a little bit over a half hour later.

18  Q.     Okay.

19  A.      6:33 p.m.

20  Q.     Is it the next call that was actually

21  intercepted over the telephone line?

22  A.      Yes, it was.

23  Q.     So there  weren't  any calls in between?

24  A.      No.

25  Q.     If we could please play -- who are the part     ies

1  to B6446?

2  A.       Larry Nunn and Paulette Martin.

3  Q.       If we could please play 6446 on Page 509    .

4           (Audio recording begins  playing at 3:59 p.m. )

5           (Audio recording  stops playing at 3:59 p.m. )

6           BY MS. JOHNSTON:

7  Q.       And Call B6450 occurs at what time in relation

8  to the call we've just heard?

9  A.       It occurs at 7 :01 p.m., which is about a half

10 hour after the last call  .

11 Q.       Who are the parties to this call?

12 A.       Paulette Martin and Lavon "Becky" Dobie.

13 Q.       If we could play B6450  , which is on Page 511.

14          (Audio recording begins playing at 4  :00 p.m. )

15          (Audio recording  stops playing at 4:03 p.m. )

16          BY MS. JOHNSTON:

17 Q.       If we could turn to the next call, B6571.  On

18 what date  and time does this  call take place?

19 A.       May 13, 2004 , at 1 :38 in the afternoon  .

20 Q.       Who are  the part ies to  this call?

21 A.       Paulette Martin and Larry Nunn.

22 Q.       If we could please play B6571 on Page     **514**.

23          (Audio recording begins playing at 4  :03 p.m. )

24          (Audio recording   stops playing at 4 :04 p.m. )

25          BY MS. JOHNSTON:

1  Q.      Based upon your training   and experience , what's

2  being discussed in these calls between     Ms. Martin  and

3  Mr. Nunn  and Ms. Martin   and Ms. Dobie?

4  A.       Ms. Martin has received    60 grams of heroin from

5  William  Turner , and she's try ing to sell it for $85 a

6  gram to  Lavon  Dobie and/or Larry  Nunn.

7  Q.      William  Turn er, is  he also known by another

8  name?

9  A.      Dog.

10 Q.      If we could turn to the next call, B6445    .

11         Can you tell us what in this call serves as a

12 basis for your opinion?

13 A.      The fourth line down  , Ms. Martin is talking

14 about she's got tickets that they said are $80      .  The

15 girl has to get $5  , so $85 for the total price  .  If she

16 is going to bring them from    Baltimore , talking about

17 bringing the tickets from    Baltimore , then she

18 identif ied the amount as being  , I think , maybe about

19 100 left .  That changes in subsequent calls.     Mr. Nunn

20 says he's  to going make a -- some calls real soon or

21 real quick  and Ms. Martin t ells him to call her back.

22 Q.      Again , the term  "tickets " is used to refer to

23 what?

24 A.      In this case heroin.

25 Q.      If you could please write Page 507 next to the

1  term "heroin " on the board.

2  A.      (Witness indicating. )

3  Q.      Looking at the next call,   B5446 on Page 509 ,

4  could you explain to us what in this call supports your

5  opinion?

6  A.      Paulette Martin receives a call back from    Larry

7  Nunn.   Third line down , Ms. Martin says she now calls

8  back .  She only has -- they only have 60 -- she only

9  has 60 tickets left.  Someone just called her back

10  probably , so she's identifying the amount now with 60

11  grams of heroin .  And she's calling the   -- little bit

12  up from the bottom , about the sixth line up  , Ms. Martin

13  says, I told her bring them in anyway   .  Meaning , I told

14  the person with the heroin to bring them anyway  ; I may

15  be a able to find someone that wanted them   , I don't

16  know.  Meaning , she may be able to find a customer    and

17  they're try ing to get the money to get   Gwen out .

18  Meaning they're try ing to get the money to   assist  in

19  Gwen's defense or bail.

20  Q.      On that page again  , the term  "tickets " refers to

21  what?

22  A.      They're talking about the 60 tickets left     as 60

23  grams of heroin.

24  Q.      If you could write Page 509 next to the word

25  "tickets " on the chart .

1  A.        (Witness indicating.  )

2  Q.        If we could go to next call  , B6450 , on Page 511.

3          Could you indicate   to us what in that call

4  supports your opinion they were discussing tickets --

5  heroin from  Ms. Levi  and Mr. Turner ?

6  A.        Ms. Martin , at the second group  , saying , I got

7  somebody --  I know someone that got so  me of the  same

8  kind of tickets for the show as    Gwen had , identifying

9  them as heroin , but they're  front-seat tickets are $85,

10  meaning $85 a gram.

11          Ms. Dobie  says that's not a bad price.  Further

12  down , they was a friend of your   Godmother's , that's

13  identifying  that Mr. Turner, Godmother -- her  Godmother

14  is Gwen  Levi .

15          Then  Ms. Dobie is asking about the quality of

16  the heroin and saying, third line  up from  the bottom ,

17  do they know  what kind of number or whatever  ?  She's

18  trying to identify the quality of the heroin.

19          Ms. Martin says , the same kind.  They are still

20  some that they had  .  Meaning , it was still some that

21  Gwen had.  That's what   I'm saying .  They're from your

22  Godmother , again identifying   William  Turner as the

23  source of the heroin.

24  Q.        On Page 512?

25  A.        Page 512,  fourth  line down from the bottom   .

1 That's , again , Ms. Dobie talking about the quality  .

2 She's saying , I mean , I did appear to be  , you know ,

3 because looks are   deceiving, and  that is all .  In other

4 words , you can't tell the quality   of the heroin just by

5 looking at it.

6        The next grouping of   Paulette  Martin  is,  again ,

7 identifying the quantity that she has    , saying at the

8 end of that saying , he got whole group want to go to

9 the show, 60 people.  That's 60 grams of heroin.   Then

10 fourth line down from there   , there's a  typo where  Lavon

11 Dobie says , do me a favor.  Dam  n, I don't know how to

12 -- see if you can  .  And the transcript reads  , I got the

13 old number.  It says   -- she actually  says , I got Dog's

14 number , meaning  William  Turner.   Then go on  to talk to

15 Claude  Arnold.

16 Q.    If you could reflect on the chart the page

17 numbers where   "tickets " is used.  Page 511.

18 A.    (Witness indicating.  )

19 Q.    And then if we could go to next call    , B6571 in

20 that series , if you could tell us what in this call

21 supports your view  , your opinion.

22 A.    This is just a continuing call with    Paulette and

23 Larry Nunn where she's   identifying  she has 60 grams for

24 sale .  There's fourth line down   , she left those 60

25 tickets here with me  , mean ing that  she actually has

1  them right now , the 60 grams of heroin.

2  Q.      Further down on Page 514  , there's a reference to

3  a girlfriend going to   California , and white boy's

4  girlfriend  Mississippi.

5        Do you know who that refers to?

6  A.      "White  boy" is Nathan  King .  White boy's girl is

7  Elizabeth  Evans .  And girlfriend going to   California ,

8  that's  talking  about  Estelle  Brimm .

9  Q.      If you could write on the chart at Page 514     ,

10 next to the code word   "60 tickets ".

11 A.      (Witness indicating.  )

12 Q.      If we could go to   A1648 on  Page 518.  What time

13 does this interception take place?

14 A.      This is on May 14 at 1  :07 in the afternoon.

15 Q.      Who is intercepted?

16 A.      Ruby Harden  is leaving  a message for  Paulette

17 Martin.

18 Q.      If we could play that call  , please.

19        (Audio r ecording begins  playing  at 4 :11 p.m. )

20        (Audio recording   stops  playing at 4 :11 p.m. )

21        BY MS. JOHNSTON:

22 Q.      Based upon your training   and experience , what is

23 Ms. Harden  asking  Ms. Martin about?

24 A.      She's leaving a message for   Ms. Martin telling

25 her she wants to buy cocaine to her    , referring to those

1 tickets.

2 Q.      If you could make a notation of    Page 518 .

3 A.      (Witness indicating.  )

4 Q.      If we could go to the next call, B6695    , on Page

5 519.  What date   and time of that call?

6 A.      May 14, at 5 :34 in the evening.

7 Q.      Okay.  Who participated in that telephone

8 conversation?

9 A.      Paulette  Martin  and Derrick  Bynum .

10 Q.      If could play it  , please.

11        (Audio r ecording begins   playing  at 4 :12 p.m. )

12        (Audio recording   stops  playing  at 4 :12 p.m. )

13        BY MS.  JOHNSTON:

14 Q.      Based upon your training   and experience  and your

15 review of all of these calls, what's the conversation

16 between  Mr. Bynum  and Ms. Martin about?

17 A.      Mr. Bynum  is check ing to  see if she's got any

18 cocaine for sale  , and Ms. Martin is telling him she

19 does not.

20 Q.      Turning to the next call, B   6783 , on Page 520.

21 Do you have that call in front of you?

22 A.      Yes.

23 Q.      Is that  one of a series of calls that take place

24 on May 15 of 2004?

25 A.      Yes.

1  Q.      What's the date  and time of the first call?

2  A.      May 15 at 12 :52 p.m.

3  Q.      What are the other related calls?

4  A.      6784, 6804, 6807 , and 68 -- no , 6807.

5  Q.      Who are the parties in those conversations     ,

6  those four conversations?

7  A.      Paulette  Martin  and Learley  Goodwin.

8  Q.      I believe you gave the time of the first call

9  May 15 at 12 :52 p.m.  What 's the  time of the last call

10 in that series of four telephone calls?

11 A.      The same date , 6:26 p.m, May 15.

12 Q.      If we could begin by playing those calls    , B6783

13 on Page 520.

14         (Audio r ecording begins  playing  at 4 :13 p.m. )

15         (Audio recording  stops playing at  4 :14 p.m.)

16         BY MS. JOHNSTON:

17 Q.      Turning your attention to the next call    , B6784.

18 How soon does this call take place in relation to the

19 preceding call?

20 A.      It's the next call on the   B line.  It took place

21 about a half hour later at 1   :27 p.m.

22 Q.      The  part ies are  the same ?

23 A.      Yes.

24 Q.      If we could play B6784 on Page 521.

25         (Audio r ecording begins  playing  at 4 :14 p.m. )

1        (Audio recording  stops  playing  at 4 :14 p.m. )

2        BY MS. JOHNSTON:

3  Q.      Going to  the next call , B6804 , on Page 522.

4        Does this call take place later on the same

5  date?

6  A.      Yes.  At 5 :48 p.m. , between  Paulette  Martin  and

7  Learley  Goodwin.

8  Q.      If we could play it , please.

9        (Audio r ecording begins  playing at 4 :15 p.m. )

10        (Audio recording stops playing   at 4 :15 p.m. )

11        BY MS. JOHNSTON:

12  Q.      Going  to the next call  , B6807 , on Page 523.

13  When does that call take place?

14  A.      The same day , 6:26 p.m.

15  Q.      Who are the parties?

16  A.      Paul ette Martin and  Learley  Goodwin.

17  Q.      If we could play it  , please.

18        (Audio r ecording begins  playing at 4 :15 p.m. )

19        (Audio recording  stops  playing at 4 :15 p.m. )

20        BY MS. JOHNSTON:

21  Q.      In relation to that last call   , did you have

22  occasion to review the pole cam in this case?

23  A.      I'm sure  I did.   I don't have a notation of it

24  though.

25  Q.      Let's go back to the first of the    calls in this

1 series starting with   B -- in regard to these calls   , did

2 you form an opinion as to what took place between      Ms.

3 Martin  and Mr. Goodwin  on May 15 of 2 004?

4 A.      Yes.

5 Q.      What is that?

6 A.      Ms. Martin  and Mr. Goodwin  talk about obtaining

7 cocaine from  Cuba, and  initially  Ms. Martin says she

8 can't go off all the way   , meaning she can't buy a

9 kilogram  . She change s that to purchasing a kilogram    ,

10 and that buy is set up for    Mr. Goodwin  to buy from   Mr.

11 Cuba late r that  evening.    Mr. Goodwin  comes by the

12 house , picks up money from   Ms. Martin , and then

13 deliver s the  kilo to her later   on that night.

14 Q.      If we could  -- in terms of looking at the call  s,

15 is there any particular language beginning with      B6783

16 that is the basis for the opinion you've just given us?

17 A.      Yes.  Fourth line down  , Page 520 , Cuba --

18 Learley  Goodwin says  Cuba 's saying he  has a supply of

19 cocaine.   Mr. Goodwin  asks , need  one, mean ing do  you

20 want a kilogram?    Paulette  Mart in says , no, not  one.   I

21 can't go all the way.

22 Q.      What does that phrase mean   , she can't go all  the

23 way?

24 A.      She can't buy a full kilogram   , so she's not

25 interested in it.

1  Q.      Are you familiar with the term    "fronting "?

2  A.      Yes.

3  Q.      Based on these calls , what was  Mr. Goody  and Ms.

4  Martin's relationship with   Mr. Cuba ?

5  A.      They were paying cash.  It becomes even cleare    r

6  he was not fronting cocaine to them   , they were paying

7  cash for it.

8  Q.      Then in  Call B6784 , which happens , I guess , a

9  half hour later , how does that affect your opinion?

10  A.      Ms. Martin changes her order   , changes her mind ,

11  tells  Mr. Goodwin that she will go all the way    , meaning

12  she will buy a kilogram.

13  Q.      Page 522 .  Is there anything in that call that

14  supports your conclusion that there was a meeting      and a

15  delivery that night?

16  A.      Ms. Martin calls  Mr. Goodwin  to see if he was

17  still coming over to pick   up the  money .  Mr. Goodwin

18  says , I wasn't meet ing  him until  7:00, so I wasn't

19  coming over there until before then  .  And Mr. Goodwin,

20  I'm getting re ady to  come over in a few minutes to    --

21  mean ing to  Hayward .

22  Q.      If we go to the next call  , B6824 , on Page 524.

23  What time does this call take place?

24  A.      This is at 11 :06 on the  15th -- 11:06 p.m. on

25  the night  of the  15th after  Mr. Goodwin  would have

1  dropped off the cocaine to Ms. Martin.

2  Q.      Who are the parties to this call?

3  A.      Paulette Martin and Claude Arnold.

4  Q.      Okay. If we could play it, please.

5          (Audio recording begins playing at 4:19 p.m.)

6          (Audio recording stops playing at 4:19 p.m.)

7          BY MS. JOHNSTON:

8  Q.      Based upon your training and experience, what is

9  Ms. Martin advising Mr. Arnold of in this telephone

10 call?

11 A.      She's cooking crack and letting the crack cakes,

12 as she refers to them, cool off and in the morning, you

13 will be good to go, meaning in the morning, it will be

14 good to come over and pick up the crack from her.

15 Q.      And what is the term used for "crack" in that

16 call?

17 A.      She refers to, I fixed those cakes.

18 Q.      Could you add the Page 524 next to the code

19 "cakes?"

20         If it's already up there, add it as a code.

21 It's Page 524.

22 A.      (Witness indicating.)

23 Q.      The next series of calls beginning on Page 525

24 and continuing through call A1684, which ends on Page

25 534.

```
 1          Were those the calls we played this morning?
 2 A.     Yes.  This is the calls where they move    d the
 3 drug s from Ms. Martin's house to the school.
 4 Q.     Could we then pick up with    Call B6931 , on Page
 5 535?
 6          What's the date an  d time of the   Call B6931 on
 7 Page 535?
 8 A.     It's on  May 17 at 2 :54 p.m.
 9 Q.     Who are the parties to the call?
10 A.     Paulette  Martin  and Reece  Whiting .
11 Q.     If we could play the call   , please.
12          (Audio r ecording begins   playing at 4 :21 p.m. )
13          (Audio recording   stops playing  at 4 :21 p.m. )
14          BY MS. JOHNSTON:     '
15 Q.     Based on your training   and experience  and your
16 investigation,  who is Ms. Martin referring to here?
17 A.     Fourth line down  , she's refer ring to Gwen Levi
18 as the  girl that's going   to get 25 year s to  life.
19 Q.      If we could go to the next call   , B6935 , on Page
20 536 .  What is the date  and time of that call?
21 A.     This is 5 :17  -- May 17 at 3 :07 in the
22 afternoon.
23 Q.     This is the day after the move of everything to
24 the school; is that correct   ?
25 A.      Correct.  The next day after they moved
```

1  everything.

2  Q.      Who is the party to this conversation?

3  A.      Paulette Martin and Milburn Bruce Walker.

4  Q.      If we could play this call  , please.

5          (Audio r ecording begins  playing at 4:22 p.m. )

6          (Audio recording   stops playing at 4:23 p.m.)

7          BY MS. JOHNSTON:

8  Q.      In that telephone conversation   , it referenced

9  the studio refer  s to where?

10  A.      I'm sorry,  which part?

11  Q.      The conversation   B6935 on  Page 536 and 537,

12  there are reference s to the studio .

13  A.      Yes.

14  Q.      What are they referring to?

15  A.      The school on  South Dakota  Avenue.

16  Q.      Based on your training   and experience  and your

17  analysis of all of these calls  , what is  Mr. Walker

18  asking  Ms. Martin to do?

19  A.      He wants to get buy cocaine from her     , but she

20  doesn't have a ride to go   over to  the studio , so he's

21  going to pick her up  .

22          On Page 537 he's going  to pick her up  and run

23  her over to the studio so they can do the deal there.

24  Q.      Indeed , Call  B6937 on page 538?

25  A.      Yes.  He's calling her --   "he" being  Mr. Walk er,

1   is calling Paulette Martin to tell her that he's front

2   of her house to pick her up.

3   Q.      If we could Call A1703 on Page 539. Is there

4   another call that's also associated with this call?

5   A.      Yes.

6   Q.      What call is that?

7   A.      B6948.

8   Q.      Who are the parties in these two calls  , A1703

9   and B6948?

10  A.      The first call , Ruby Harden leaves a  message for

11  Paulette Martin . In the second call it's  Paulette

12  Martin and Ruby Harden .

13  Q.      The first call is  A1703. Over which line does

14  that call take place?

15  A.      That's over her cellular telephone   -- Ms.

16  Martin's cellular tel ephone, the A line.

17  Q.      The return ed call is over what line?

18  A.      The B line . The hard line at  Hayward .

19  Q.      What is the date  and time of the first -- the

20  message that's left on in   Call A1703 on Page 539?

21  A.      The first one is on the 17th at 4  :56 in the

22  afternoon , and the second  one is at 4 :59.

23  Q.      If we could please play   A1703 on  Page 539.

24          (Audio r ecording begins  playing at 4 :25 p.m. )

25          (Audio recording   stops playing at 4 :25 p.m. )

1          BY MS. JOHNSTON:

2 Q.      Likewise , if we could turn to call    B6948 on  Page

3 540 and play that call.

4          (Audio r ecording begins   playing  at 4 :25 p.m. )

5          (Audio recording   stops  playing at 4 :26 p.m. )

6          BY MS. JOHNSTON:

7 Q.      Based upon your training   and experience , what

8 were  Ms. Martin  and Ms. Harden  discussing in the

9 message in the phone call?

10 A.      The first phone call , Ruby  left a message that

11 she wanted to buy cocaine  , referring to it as a ticket    ,

12 and pick up the ticket today   , if she could.

13 Q.       If you could please write    Page 539 on the chart

14 next to the word   "ticket ".

15 A.      (Witness indicating.  )

16 Q.      And then going to the actual conversation that

17 took place on  May 17 on Page 540  .

18          If you could  , explain what   Ms. Martin is telling

19 Ms. Harden  in that conversation.

20 A.      Fifth line down , Ms. Martin says , I got in last

21 night but close d the shop down for a minute  .  Meaning ,

22 she's had to stop selling cocaine for a little bit to

23 get things reorganized  .

24          Then she goes on to say  , they had a meeting  ,

25 referring to the   Takoma Park neighborhood  meeting  about

1  the traffic to   and  from her house  .  She goes  on  to say ,

2  and said there was a lot of traffic here    , which had

3  nothing to do with the tickets here    , of course,  meaning

4  there's a lot of traffic to    and from the house that   had

5  nothing  to do with the drug business   .

6           The guy from  Baltimore , refer ring to  Kevin

7  Scott,  had been bringing a lot of clothes over     there ,

8  and the clothes are   legit,  as oppose d to  the drug

9  business , which is  not.

10          So she goes , they had a meeting again   , referring

11 to the  Takoma  Park meet ing and , you know , just to be on

12 the safe side   she cleared  out , meaning she took

13 everything out an  d took it to the stud  io, which  is what

14 she says in  the next line   when she says , I'm probably

15 going to be having my   shows at the school, but    I don't

16 have transportation right now until    I get organized.

17          Again, we have the problem here that  she doesn't

18 have  a car to get to the school   , and  Ruby  Harden  drives

19 a truck  so she can't get down    there  to pick her up to

20 take her to the school  .  So, that's where they're at

21 right now.

22 Q.     That would have been the car    that  in a previous

23 call  Mr. Martin  was us ing to  go to work?

24 A.      That's correct.

25 Q.      In this particular call   , the word  "tickets " is

1 used as a code word for drugs?

2 A.      Yes.

3 Q.      Could you write  540 next to the word "t ickets "

4 on our chart.

5 A.      (Witness indicating.  )

6 Q.      The reference to   "my shows at school  ."  What

7 does that refer to?

8 A.      She's move d the drug s to  the school  and she will

9 be do ing all  the  drug dealing there.

10 Q.      If we could write the word "shows" or "show"

11 wherever it shows up on our list of code words.      Number

12 18 , I think it is there,   Detective  Sakala .

13 A.      (Witness indicating.)

14        THE  COURT:  Is this a good break point now    ?

15        MS.  JOHNSTON:  Yes , it is , Your  Honor .

16        THE  COURT:   Ladies and gentlemen,   I have matter

17 at 9 o'clock tomorrow , so we will resume tomorrow at    10

18 o'clock.  You're excused  .

19        Counsel , remai n.

20              (Jury excused at 4  :29 p.m. )

21              (Witness excused from the stand.   )

22        THE  COURT:  Counsel, it looks like the very next

23 call is  Mr. McKnett 's next problem call.

24        MS.  JOHNSTON:  That's correct   , Your  Honor .

25        THE  COURT:  Do  you want to tell me what --   I

1  assume your problem from this  , if I noted correctly  , is

2  because it  has the reference to insurance in it.

3         MR. MCKNETT :  Your Honor , the only problem   I

4  have with this is on Page 543.  It's the third      p.m.

5  down.  She tells  Ms. Dobie, because I want to bring  you

6  a birthday  gift , and then the next sentence is what    I

7  have a problem with  .  I need you to  sign this thing ,

8  Billy Jo , because they have to have an authorization

9  that the policy was received  , just the paper.

10        That's a reference , I believe , to Trial 4 is the

11  facts of that case which would be t   o insurance  fraud .

12  They're talking about a policy  .  If the name Billy Jo,

13  which is not  Ms. Dobie 's name.  She's telling   Ms. Dobie

14  to sign a false name to an authorization form     ,

15  apparently related to an insurance policy.  It's got

16  nothing  to do with this trial.

17        It raises a question in the minds of the jury as

18  to what this is all about.     When I first raised this  ,

19  the government said  , without that  it wouldn't read

20  properly , but it reads perfectly properly.  It reads

21  people come by here at night   , so forth , inaudible , and

22  then it says :  But anyway , I'm on my way to class  ; I'm

23  stopping through there  , and then it's inaudible  .  Ms.

24  Martin says , because  I want to bring  you a birthday

25  gift.  Ms. Dobie says , so I have to meet you at the

1   school .   Then it reads perfectly clearly.

2         I realize  it's in a direct reference to

3   insurance fraud , but it's going to cause us a slight

4   bit of confusion , at least a slight bit of confusion  ,

5   on the part of the jury  .   They're go ing to  wond er

6   what's that all about.     It  appears  to be something

7   that's not straightforward    and aboveboard , and it's

8   going t o raise a prejudicial negative in    ference  that

9   there's something else going on here that's not proper.

10  It clearly has nothing to do with this case.  It can be

11  easily taken out  , and  I think it should be.

12         THE  COURT:   Ms. Johnston.

13         MS.  JOHNSTON:   I think it's rather innocuous in

14  what's written there.   There is nothing there that     says

15  there's anything about any kind of false insurance

16  policy.  It's merely that she needs to sign something    .

17  Ms. Martin isn't just want   ing to  bring her a birthday

18  gift .  She has another motive  .

19         THE  COURT:   Mr. McKnett , I'm incline d to agree

20  with Ms.  Johnston.  T his is  innocuous.

21         MR.  MCKNETT :   Your  Honor , the rule doesn't say

22  irrelevant   information   is in nocuous.  Y ou can leave it

23  in .

24         THE  COURT:   It's innocuous in the sense     that

25  it's not indicating some other  area  of criminal

1  activity on its  face.  It's part of the conversation  .

2  It's con textual .  All they're  talk ing about is a policy

3  being received  and just sign a paper.  It's not --   I

4  don't see how this can produce any    prejudice to  any

5  defendant in this case.

6        MR. MCKNETT :  Part of the prejudice comes from

7  the fact that  Ms. Martin  wants  Ms. Dobie  -- I believe

8  it's  Ms. Dobie .  I hope  I have that -- want  s to  sign

9  somebody else's name to an authorization form.  It's

10  the government -- it's innocuous    .  It doesn't advance

11  this case at all.  It's a simple thing to take it out

12  of there , and it avoids any confusion    and any negative

13  inference s in the minds of the jury.

14        THE  COURT:  How , mechanically , could this be

15  taken out ?

16        MR.  MCKNETT :  It could be whited out   , Your

17  Honor.  It could be -- this page could be reprinted.

18  It's in a computer.  All they   'd have to do is go to

19  that page , take out that sentence  , and print the page

20  and substitute it in the book for the jury.  It would

21  take ten minutes.

22        THE  COURT:  P robably more than that.

23        MR.  MCKNETT :  I'll  volunteer to replace the

24  pages , Your  Honor.

25        THE  COURT:  Never volunteer.

1          MR. MCKNETT:  I didn't say to do it  .  I said  I
2  would volunteer  to replace the pages.
3          THE COURT:  Ms. Johnston.
4          MS. JOHNSTON:   Your Honor, as a practical -- it
5  doesn't -- that sentence in there is not pertinent or
6  relevant to the government's case in terms of
7  establishing drug relationships.  It is part of the
8  context of the conversation that goes to meeting at the
9  school to show that they're going to meet.
10 Detective  Sakala  is not going to just say anything
11 about that particular phrase.    I don't know that i  t
12 says she is to sign  Billy  Jo's name or if  Billy  Jo is a
13 reference to who  the policy is for  .  I certainly don't
14 think counsel or  I or anyone else should be touching
15 the juror s' book s to  replace any kind of page in there    .
16         Could my agents redact the telephone call   ?  I'm
17 sure that if  I asked them , they would figure out a way
18 to do that , although the  CD in evidence is probably a
19 CD that can't be rewritten  .  So, we may have to replace
20 it.
21         THE COURT:  I am going to overrule the
22 objection .
23         MR. WARD: O kay.  Well, I -- certainly , I have a
24 piece of the action as far as the objection.
25         THE COURT: You are , as per my order , part of

1 the action on this.

2        MR. WARD:  While  I certainly wish the   Court had

3 rule d the other way , I certainly understand what the

4 Court's Order is.   I would ask that the witness be

5 cautioned that when he's asked   , what do you make to

6 that , that he not say this is part of an insur     ance

7 fraud.

8        THE COURT:  He's here , and I think he knows how

9 to hear and knows that  I don't want to go into   the

10 fourth part of this case on   the insurance  conspiracy .

11 So, we're not going to go there.

12        THE WITNESS:  Neither do   I, Your Honor.

13        MS. JOHNSTON:  Your Honor  , one of the things  I

14 am concerned about  , because we will finish these call   s

15 in rather short order tomorrow   , depending on  what time

16 we get started , since we did get a late start today    .

17 It would be helpful to know what t    he anticipated  length

18 of cross-examination is    going to be  tomorrow .

19        Does the government need to have another witness

20 here tomorrow or should    we expect  the remainder of the

21 day is going to be set in --

22        THE COURT:  What is an estimate of the defense

23 in terms of cross-examination   ?

24        MR. MONTEMARANO :  Your Honor , at this point ,

25 although  I will  be most of the night making the final

1 decision  and figuring things out in light of     Your

2 Honor's suggestion with regard to transcripts      and Ms.

3 Johnston's very appropriate comments that those calls

4 we intend to use need to be both identified     and

5 transcripts need to be finalized   .

6        At this point , I would anticipate merely

7 crossing Sergeant Sakala on what he has testified to   ;

8 and it would be my intention at this point to recall

9 him in my case a nd as a defense adverse witness with

10 regard to other calls unplayed by the government.

11        That will enable me to finish isolating the

12 calls , because  Mr. McKnett and I are coordinating which

13 calls we wish to use   and then  that will give us time to

14 finalize transcripts before we put the good sergeant on

15 the stand.

16        THE COURT:  Is the short version of what you

17 just said that your   cross will be relatively brief?

18        MR. WARD:  That's a  relative question -- a

19 relative term,  Your Honor .

20        THE COURT:  E verything is relative.     I mean , I

21 want to make sure that   Ms. Johnston is not sitting here

22 without a witness.

23        MR. MONTEMARANO :  F or me , an hour.

24        THE COURT:  Sounds like you intend to have more

25 fun with him on the defense case     and less fun tomorrow.

1          MR. MONTEMARANO :   I'm guessing an hour or so

2  tomorrow.

3          THE COURT:   Ms. Johnston , plan accordingly.

4          MS. JOHNSTON:    Your Honor, there's six other

5  defense attorneys to   cross- examine him .

6          MR. MARTIN:   It's a sleeping graph.    I think

7  each counsel after that will spend less time.       I

8  thought  I was going to need   --

9          THE COURT: If you plan it by order   , that will

10  be the case ; otherwise , you will be redun  dant.

11          MR. MARTIN:   An hour, hour and 15 minutes  .  I'm

12  sure Mr. Montemarano  is going to touch upon different

13  guideposts  I will have touched .  Maybe 40, 45 minutes .

14  I, too , had anticipated calling   -- I keep calling  him

15  "special agent. "   I can't help it .  I had  anticipate d

16  the  good sergeant in my case in chief.

17          THE COURT: He's very special  , but he's a

18  sergeant.

19          MR. MONTEMARANO :  Special agent .  He's  kind of

20  like a special agent.

21          MR. MARTIN:   I guess between the two of us   ,

22  we're talking two hours.

23          MR. MONTEMARANO :  Your Honor , I assume we're

24  going  to be about another hour   .

25          THE COURT:   You're going t o finish this book  ?

1          MS. JOHNSTON:   I'm going to finish this book,

2 yes.

3          THE COURT:  Counsel , I have a 9 o'clock guilty

4 plea tomorrow which I will try to be efficient on.

5          Did you anticipate any preliminary matters   ?  I

6 don't want the jury s itting here for half an hour    while

7 we go through unanticipated matters   .

8          MR. MITCHELL:   I do , Your Honor , perhaps.

9          THE COURT:   What I want to tell you , then , is

10 everybody should be here at 9   :30 .

11          MR. MITCHELL:   Let me say , it may not really be

12 pertinent until the following day for what     I'm hearing.

13 I understand , talking with  Ms. Johnston , they're going

14 to get to the search warrants of my client's house     ,

15 perhaps tomorrow or the next day   .  If so,  I have a 403

16 issue with some of the evidence that could be brought

17 in.

18          THE  COURT:  Let me know what it is   .

19          MR. MITCHELL:   I'm going to get a -- my detailed

20 motion to the government   this evening .

21          THE COURT:  Do you have a written    one?

22          MR. MITCHELL:   Yes.

23          THE COURT:  All right. Well  , the sooner , the

24 better .

25          MR. MITCHELL:   More things for you to read.

1        MR. MONTEMARANO : More things for   Mr. Krinsky

2 to read.

3        THE COURT: Now, now , now. He and I will review

4 with great care the grand jury   redactions .

5        All right. Be here at 9  :30 , and you may listen

6 to how eloquently   I do guilty pleas . Hopefully I will

7 be finished shortly after 9  :30. If everythin g goes off

8 on time  and I can deal with any preliminary matter   s,

9 there's no question at 10 o'clock   , in walk s the  jury.

10        MS. JOHNSTON:   Your Honor , just for scheduling

11 purposes . Mr. Mitchell's aware of this  , but we have

12 two officers , Officer Humble and Officer  Hubert , that

13 we need to get on by the end of the week because of

14 their vacation schedules  . We anticipate calling them

15 this week , and probably Moises Uriarte would be the

16 other witness.   I think that will cover the rest of the

17 week.

18        We also are still  awaiting discovery from   Mr.

19 Montemarano  concerning the records that he intends to

20 use in his case that were promised to us probably a

21 week or so ago.

22        MR. MONTEMARANO : By Tuesday  anyway, yes.

23        MS. JOHNSTON: If we could at least get those by

24 the end of the week  , we would appreciate it very much.

25        THE COURT:   Ms. Johnston , only you know the

1  answer to this.  Are we on time on the government's

2  timetable ?

3        MS. JOHNSTON:  We will see if we get finished

4  with Sergeant Sakala and these other witnesses that    I

5  mentioned  by the end of the day   Friday , and we are on

6  schedule , though  I didn't plan on the date that's

7  required for your surgery  .  So, we are pretty close t  o

8  being on schedule.

9        THE COURT:  When  you anticipate -- when is your

10  target for when the government rests    ?

11        MS. JOHNSTON:  Our target for turning    over  to

12  the defense  -- quite  frankly , that's because we have a

13  forfeiture  aspect .  When the jury reaches a verdict   ,

14  hopefully  they will reach for  feiture.   I would expect

15  we need to finish our case    -- we need the  Court to

16  address 404 (b) issues , and I would expect we would rest

17  sometime beginning the week ending July 11     so we could

18  get into the defense case that week.

19        THE COURT:  All right.

20        MR. MONTEMARANO :  That 's the  week after next?

21        MS. JOHNSTON:  T hat 's the  week after next  ,

22  depending on how fast we    get the searches in   and the

23  404 (b) evidence.

24        THE COURT:  Anything further  , Counsel?

25              (Off the record  at 4:42 p.m.)

**CERTIFICATE**

1

2

3      I, Tracy Rae Dunlap,   RPR, CRR, an Official Court

4  Reporter for the United States District Court of

5  Maryland, do hereby certify that I reported, by machine

6  shorthand, in my official capacity, the proceedings had

7  and testimony adduced upon the Jury Trial Proceedings

8  in the case of UNITED STATES OF AMERICA versus PAULETTE

9  MARTIN, et al, Criminal Action Number   RWT-04-0235 on

10  June 28, 2006.

11

12      I further certify that the foregoing   204 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17      In witness whereof, I have hereto subscribed my

18  name, this  2nd day of  April 2008.

19

20                     _____

                       TRACY RAE DUNLAP, RPR, CRR
21                     OFFICIAL COURT REPORTER

22

23

24

25