```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                      SOUTHERN DIVISION
 2
    ------------------------x
 3  UNITED STATES OF AMERICA  :
             Plaintiff        :
 4                            :
                              :
 5  vs                       :Criminal Action:    RWT-04-0235
                              :
 6                            :
    PAULETTE MARTIN, et al    :
 7         Defendants.        :
    ------------------------x
 8

 9                        Thursday, June  29, 2006
                          Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11  Proceeding before the HONORABLE ROGER W. TITUS, United
    States District Judge, in courtroom 4C, commencing at
12  10:01 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS THE TESTIMONY AND PROCEEDINGS
15      OF THE CASE AS RECORDED AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD  SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
    Tracy Rae Dunlap,   RPR , CRR          (301) 344-3912
25  Official Court Reporter
```

1                       I N D E X

2
                                DIRECT    CROSS
3
  Christopher   Sakala           6          58
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
                                                        Page
23  Reporter's Certificate                               224

24  Concordance                                          225

25

1          THE COURT:   Counsel, I have ground my way

2  through endless grand jury transcripts, am almost

3  finished, and I will be able to advise you of whether

4  there's any un-redactions that need to be done before

5  cross-examination begins.  I have also just received

6  from counsel for Mr. Bynum a Motion to Exclude

7  Prejudicial Evidence.  There's always some humor in a

8  case, and this one involves some pictures.  Seriously,

9  I'd like to see the pictures, Ms. Johnston.

10         MS. JOHNSTON:   Yes, sir.

11         THE COURT:   The issue here is whether there

12  should be an exclusion on the basis of prejudice of a

13  -- what appears to be a pig being killed, and I see

14  that the case of *United States v. Hamm* is being cited,

15  so I'll look at that with interest, but I need to see

16  the picture so I can --

17         MS. JOHNSTON:   I have them here.  I can put them

18  up on the screen, or if the Court would like to see

19  them...

20         THE COURT:   Just let me see them.

21         MS. JOHNSTON:   I would advise the Court we're

22  going to try to get this detective in before

23  cross-examination is in because she's in a masters

24  program at Johns Hopkins and is required to be in class

25  all day tomorrow and is on vacation next week.

1          THE  COURT:    When  do  you  anticipate   that  the  --

2          MS.  JOHNSTON:    Your  Honor ,  as  soon  as  we  finish

3  the  call s  with  Detective   Sakala ,  I'd  like  to  call  him

4  to  get  him  on  and  off .

5          THE  COURT:    So  I  really  need  to  look  at  this

6  issue .

7          MS.  JOHNSTON:    We  would ,  of  course ,  like  to  be

8  heard  on  this  issue  when  the  Court 's  ready .

9          THE  COURT:    I'm  not  going  to  do  it  now .    You

10  plan  to  file  a  written  response  to  this  motion ?

11          MS.  JOHNSTON:    No ,  Your  Honor .

12          THE  COURT:    It  just  got  dropped  on  my  lap ,  so  I

13  assume  you  don't  have  an  instant  response .

14          MS.  JOHNSTON:    Your  Honor ,  I  read  the  motion .

15  Quite  frankly ,  the  case s  cite d  are  support ive  of  the

16  government 's  position  in  this  case  and  there 's  not  much

17  argument .

18          THE  COURT:    Is  this  the  full  universe  of

19  picture s  that  were  seize d?

20          MS.  JOHNSTON:    Those  are  the  full  universe  of

21  the  picture s.

22          THE  COURT:    Are  there  other  picture s?

23          MS.  JOHNSTON:    Of  Mr.  Bynum  with  a  gun ?    Those

24  are  the  only  picture s  of  Mr.  Bynum  with  a  gun .    They're

25  certain ly  relevant  in  this  case .

1          THE COURT:  All right.  I'll -- when we take a

2  break, I'll let you know how we can proceed and dispose

3  of this issue.  Anything else before we call the jury

4  in?  All right.  Bring them in.

5          THE COURT:  We do have them all here, I assume.

6          We're going to take a count of the jurors.

7          Ms. Johnston while she's looking for the jury,

8  is it your view that the picture of the pig should come

9  in?

10         MS. JOHNSTON:  Yes, Your Honor.  I certainly --

11 I have a basis to tell the Court that, and I think the

12 Court needs to know some more circumstances.

13         THE COURT:  Okay.

14         THE CLERK:  We're ready.

15         THE COURT:  Yes, bring them in.

16         (Witness Sakala resumes the stand at 10:04 a.m.)

17         THE COURT:  Did you all have a chance to look

18 at, by the way, yesterday's decision of the Fourth

19 Circuit?

20         MS. JOHNSTON:  No.

21         THE COURT:  It addressed, albeit slightly in a

22 different context, grand jury-redacted transcripts.

23         MS. JOHNSTON:  I know I tried to go on Westlaw

24 and find it, but I didn't have the cite.

25         THE COURT:  It's on the court's Web site.

1        MS. JOHNSTON:   I didn't do that, Your Honor.   I

2 tried Westlaw.   It wasn't there on Westlaw.

3        THE COURT:   I keep myself entertained up here

4 reading recent decisions, so that's what I saw

5 yesterday.

6        MR. SUSSMAN:   Is this something we should read

7 today?

8        THE COURT:   It's a yesterday's decision.   It has

9 to do with grand jury, among other things, redacted

10 grand jury testimony.   It's not inconsistent with what

11 I've ruled.

12              (Jury returns at 10:06 a.m.)

13        THE COURT:   Good morning, ladies and gentlemen.

14 Are we ready?   Don't want to jump start too fast now.

15        All right.   You may proceed, Ms. Johnston.

16        MS. JOHNSTON:    Thank you, Your Honor.

17              **FURTHER DIRECT EXAMINATION**

18        BY MS. JOHNSTON:

19 Q.     Detective Sakala, yesterday we left off, I think

20 we had finished calls on May 17.

21        Now, calling your attention to May 18, in

22 particular call B6986 on Page 542.   Are you familiar

23 with that telephone call?

24 A.     Yes.

25 Q.     Who are the parties to that telephone call?

1  A.      Paulette Martin and Lavon "Becky" Dobie.

2  Q.      Is the next call, A1708, between the same

3  parties?

4  A.      Yes, it is.

5  Q.      Is that, likewise, related to the previous call,

6  B6986?

7  A.      Yes.

8  Q.      And if we could please play B6986?  Before we

9  play it, what time does this call take place?

10  A.      This is on May 18 at 6:09 in the morning.

11  Q.      Please play the call.

12         (Audio recording begins playing at 10:07 a.m.)

13         (Audio recording stops playing at 10:09 a.m.)

14         BY MS. JOHNSTON:

15  Q.      Now, if we could turn to the next call, A1708.

16  What time does that call take place in relation to the

17  one we just heard?

18  A.      The first one is at 6:09 a.m.  This one is 6:27,

19  so just 20 minutes later.

20  Q.      If we could play that call, please.

21         (Audio recording begins playing at 10:09 a.m.)

22         (Audio recording stops playing at 10:09 a.m.)

23         BY MS. JOHNSTON:

24  Q.      Based upon your training and experience, what

25  was Ms. Martin and Ms. Dobie discussing in call B6986?

1  A.      Ms. Martin is relating the story to Ms. Dobie

2  about the neighborhood meeting with the Takoma Park

3  Police Department concerning traffic to and from her

4  school, and then telling her how she had moved the

5  cocaine, or her drugs, to -- excuse me, traffic to and

6  from her house on Hayward, and that house she had moved

7  the drugs to the school.

8          Near the bottom of the page, where she says,

9  just to be on the safe side, what little tickets I did

10 have, I took them to my business.

11         Then on Page 543, Ms. Dobie tells Ms. Martin she

12 needs to meet her at the school, then, to do a drug

13 transaction, and they agree to meet.

14         In the next call, Ms. Martin's just telling Ms.

15 Dobie that she's on her way to school, and Ms. Dobie

16 says she'll meet her there.

17 Q.     If we could go, first of all, to our board and

18 add Page 542 next to the word "tickets" as a place

19 where that word is used.

20 A.      (Witness indicating.)

21 Q.     In reference to Page 542, Ms. Martin describes

22 how people were saying that people come up and pull in

23 and park and park on the wrong side of the street and

24 run in and out.

25         Based upon your training and experience and

1  review of the pole camera s, was that activity occurring

2  at her residence ?

3  A.      Yes , it would be on occasion .

4  Q.      Have we seen exhibit s of -- example s of that in

5  the pole camera tape s that we play ed?

6  A.      Yes .

7  Q.      Based upon your train ing and experience , is that

8  activity significant to you as a narcotic s

9  investigator ?

10 A.      That frequent traffic in and out of a residence

11 where people stay for short periods of time s is

12 perfect ly consistent and indicative of drug

13 trafficking .

14 Q.      If we could go to next call , A1715.

15         MR. WARD:   I'm sorry , what page ?

16         MS. JOHNSTON:   On Page 546.

17         BY MS. JOHNSTON:

18 Q.      What date and time does this call take place ?

19 A.      On May 18, at 10:44 in the morn ing .

20 Q.      Who are the parti es to this call ?

21 A.      Again , Paulette Martin and Lavon "Becky" Dobie .

22 Q.      If we could play this call , please .

23         (Audio record ing begin s play ing at 10:12 a.m. )

24         (Audio recording stop s playing at 10:14 a.m.)

25         BY MS. JOHNSTON:

1  Q.      In this call, what are Ms. Dobie and Ms. Martin

2  discussing?

3  A.      They're talking about trying to get in to visit

4  Gwen Levi at the detention center and find out whether

5  her case is a new -- part of a new investigation  or

6  related to her old warrant.

7  Q.      In reference -- is this related to the earlier

8  jail call that we had heard yesterday on or about Page

9  487; is that correct?

10 A.      Yes.  The Ms. Price she's talking about is the

11 person she knows who would get her into visitation at

12 Seven Locks.

13 Q.      If we look back at Call B6245 on Page 487 on the

14 top of Page 489, was there an aside made to Ms. Martin

15 while Ms. Dobie was on the phone with the woman at the

16 detention center?

17 A.      Yes.

18 Q.      Where is that on page 489?

19 A.      At the very top of 489, Ms. Dobie says in the

20 background to Ms. Martin, no, I don't need to change.

21 Put it all on my bill.

22 Q.      Have you reviewed documents recovered from Ms.

23 Martin's residence?

24 A.      Yes.

25 Q.      Showing you what's been marked as Government's

1 Exhibit Hayward 7.

2          MR. WARD:   I'm sorry, Government's Exhibit?

3          MS. JOHNSTON:   Hayward 7, Mr. Ward.

4          BY MS. JOHNSTON:

5 Q.      Are there pages in that book that reference Ms.

6 Dobie?

7 A.      Yes.

8 Q.      If I could, let me put it up on the screen so

9 you can explain to the ladies and gentlemen of the jury

10 what we're looking at.

11          If you could explain it.

12 A.      The right page is the initials PD for "Becky"

13 Dobie.  And you will see a running total of amounts

14 owed by "Becky" to Paulette.  A lot of the transactions

15 will have date notations, and where the amounts are

16 added to the total are drugs that she received, and

17 where payment amounts are subtracted from the total are

18 payments she's made.

19 Q.      And in looking at some of the figures there, 125

20 appears on numerous occasions.  What does 125 refer to

21 based upon your training and experience?

22 A.      The 125 refers to an eighth ounce of cocaine,

23 and I think we've seen that price referenced in other

24 calls we've listened to.

25 Q.      Then, likewise, there's a 500 at the top.  Based

1  on your training and experience, is that a figure of

2  significance to you?

3  A.      That would be for a half ounce of cocaine.

4  Q.      Are there other pages, for example, on this page

5  example is there a distinction made in terms of whether

6  Ms. Martin was paid or not paid or given credit and

7  whether there were any items of clothing purchased

8  separate from the drug transactions?

9  A.      Yeah.  There's little notes that Ms. Martin puts

10 on there, didn't pay, and then there's a notation, I

11 think near the bottom that's the didn't pay.  And then

12 there's a notation, I think near the bottom on that

13 page, that references the amount being added to the

14 bill is for clothes.

15 Q.      For example, what is this?  Oh, you can't see

16 what I'm pointing to right here.  What is --

17 A.      Suit.

18 Q.      And again, up here at the top?

19 A.      Suit.

20 Q.      Based on your training and experience and your

21 knowledge of this investigation, do those notations

22 with the word "suit," in your opinion, refer to drugs?

23 A.      No.  Those refer to clothes, and I think when

24 you look at Ms. Ali's totals, she even keeps a separate

25 running tab for drugs and clothes in two separate

1 columns.  I think Ms. Ali's is in the first red tab on

2 the next page, I believe.  On the left side.  Yeah,

3 right there.

4 Q.     What are we looking at here?

5 A.     On the left side of the page is a running tally

6 for clothes, and on the right side of the page is a

7 running tally for drugs.

8 Q.     You can tell that based upon the figures?

9 A.     Yeah.  If you look at the last two numbers on

10 the left side, the 1433, and at the very bottom, the --

11 I think the last total on the drugs is 225.  I can't

12 see.  275?

13       If you move forward to the last red tab in the

14 book, you will see those totals carried forward, the

15 1433 and 275, and under the 275, she even lists

16 "tickets," referring to drugs.

17 Q.     Above it?

18 A.     Above it for Ms. Ali.

19 Q.     So they're separate calculations for Ms. Ali?

20 A.     That's correct.

21 Q.     If we could go back to the next call, Call

22 B7022, on Page 548, and who are the parties to this

23 call?

24 A.     Paulette Martin and Learley Goodwin.

25 Q.     On what date and time does this take place?

1 A.      May 18, 2004, at 12:54 in the afternoon.

2 Q.      If we could play this call, please.

3        (Audio recording begins playing at 10:19 a.m.)

4        (Audio recording stops playing at 10:23 a.m.)

5        BY MS. JOHNSTON:

6 Q.      In this call, what are Ms. Martin and Mr.

7 Goodwin discussing?

8 A.      The primary focus of the conversation deals with

9 the May 15 purchase of cocaine from Cuba. He goes --

10 and the fact that they're short money, that Mr. Cuba's

11 claiming that they shorted him money. At the bottom of

12 the page, 548, Mr. Goodwin says, after I picked up the

13 ticket the other day, meaning after he got the cocaine

14 from Cuba, top of Page 549, says Knucklehead called me

15 back, meaning Cuba called him back, and tells me it was

16 too short, meaning it was either $200 or $2,000 short

17 on the amount.

18        And then they go on, "they" being Mr. Goodwin

19 and Ms. Martin, go on to discuss her count of the money

20 and her recollection of what she'd given to Goodwin,

21 Mr. Goodwin, to give to Cuba. Near the bottom of Page

22 549, Mr. Goodwin starts talking about how hopefully he

23 won't have to deal with this anymore, and that saying I

24 think this might be the last week we have to be

25 bothered with this anyway, meaning that his supply in

1  Texas, the problem down there may be solving itself.
2          They go on to say in the middle of Page 550
3  anyway, I think we might -- this is Mr. Goodwin --
4  everything might start to break real soon.  I'm working
5  on that.  Again, referring to the situation with the
6  bad cocaine being swapped in Texas, and they agree --
7  Ms. Martin also during the call offers to split half,
8  and the next sentence, "I'll split half of it with
9  you," meaning the shortage of the money she will take
10 half, he will take half.  That way Mr. Goodwin doesn't
11 get stuck with the full amount of the shortage.
12 Q.      Then on Page 551, does Ms. Martin again
13 reference her neighborhood problems?
14 A.      Yeah.  This goes into the middle of Page 551.
15 She's relating again to Mr. Goodwin the problems at the
16 meeting with the Takoma Park Police Department and the
17 neighbors complaining about traffic coming to and from
18 the house, and that there's a problem with the
19 neighborhood.
20 Q.      Now, in that portion of the call on 551, Ms.
21 Martin indicates that the tickets, that there hadn't
22 been any traffic coming in there because the tickets
23 for Harvey's show, because she "ain't had none." Is
24 that consistent with your interpretation of the
25 previous call where she told Ms. Dobie that the small

1  ticket s she had she had to move to the school ?

2  A.      Yeah.   Everything was moved to the school to

3  stop the drug traffic to and from the house.

4  Q.      And if you could mark on our board Page 548  and

5  Page 551 next to the word "ticket s".

6  A.      (Witness indicati ng.)

7  Q.      Again, look ing at both the call with Ms. Dobie

8  where she says she just had some small ticket s she

9  move d to the school, in this call where Mr. Goodwin

10  says, after I pick ed up the ticket the other day, what

11  is the difference in term s of the ticket that's being

12  discuss ed in the call s between Ms. Martin and Mr.

13  Goodwin and Ms. Martin and say Ms. Dobie or Ms. Ali ?

14  A.      It's different amount s, and depend ing on who

15  you're talk ing -- who you're talk ing to in the

16  conversation and the context of the conversation, the

17  ticket could mean a kilogram or it could mean, you

18  know, an eight ball or an eighth of an ounce, but it's

19  the context of the conversation and who you're talk ing

20  to. You know the word "ticket" is a generic word that

21  she's using for drug s.

22  Q.      You have given an opinion in reference to the

23  call s with Mr. Goodwin and Ms. Martin that ticket

24  refer s to kilogram s. What is that based upon ?

25  A.      In this particular case, it refer s to the

1 kilogram he picked up from Cuba on May 15.

2 Q.      And the tickets. When she's speaking with Ms.

3 Dobie in the previous call where she said she had only

4 a few small tickets left, referred to what?

5 A.      That's just drugs -- she's saying she moved --

6 whatever amount of drugs she had, she moved them to the

7 studio.

8 Q.      Based upon your training and experience, is that

9 interpretation based upon the roles of the respective

10 parties --

11 A.      Sure. The parties have to know what they're

12 talking about, and I think as we saw yesterday, if

13 they're talking about something different than what

14 they're normally talking about, there can be confusion

15 even among the parties as to what they're talking about

16 because the code words get a little confusing. So it

17 can is sometimes be difficult for the participants to

18 know exactly what the other person is saying.

19 Q.      If we could go to the next call, B -- Court's

20 indulgence.

21      If we could move ahead -- strike that.

22      Let's go to next call, B7029, on Page 553 and

23 554. Who are the parties to this call?

24 A.      Paulette Martin and George Harris.

25 Q.      Again, who is George Harris?

1  A.      One of Ms. Martin's drug customers.

2  Q.      What date and time does this call take place?

3  A.      May 18 at 1:30 in the afternoon.

4  Q.      If we could play it, please.

5          (Audio recording begins playing at 10:29 a.m.)

6          (Audio recording  stops playing at 10:30 a.m.)

7          BY MS. JOHNSTON:

8  Q.      Based on your training and experience, is Ms.

9  Martin providing the same information to Mr. Harris?

10 A.      Yes, she is just relating the story again that

11 the story she's told her other customers about the

12 neighborhood meeting and she's moved everything to the

13 school.

14 Q.      If we could go to call B7104 on Page 555.  Is

15 that call related to two other calls involving Ms.

16 Dobie and Ms. Martin?

17 A.      Yes.

18 Q.      What are those other calls?

19 A.      7104, 7167, and A1731.

20 Q.      On what date and time period do they take place?

21 A.      The first one was on May 18 at 9:24 p.m., and

22 the last one was on the next morning, May 19, at 10:51

23 a.m.

24 Q.      If we could play those three calls, beginning

25 with B7104 beginning on Page 555.

1        (Audio record ing begins play ing at 10:31 a.m. )

2        (Audio recording  stop s playing  at 10:31 a.m. )

3        BY MS. JOHNSTON:

4 Q.      Proceed ing to Call B7167 on Page 558 .  What time

5 is this call ?

6 A.      This is the next morn ing , at 7:04 in the morn ing

7 on May 19 .

8 Q.      If we could play it , please .

9        (Audio record ing begin s playing at 10:32 a.m. )

10        (Audio recording  stop s playing at 10:34 a.m. )

11        BY MS. JOHNSTON:

12 Q.      Then the next call , A1731 on Page 560 .   What

13 time does this take place on May 19 ?

14 A.      That 's late r the same morn ing at 10:51 in the

15 morning .

16 Q.      If we could play it , please .

17        (Audio record ing begin s playing at 10:34 a.m. )

18        (Audio recording  stop s playing at 10:36 a.m.)

19        BY MS. JOHNSTON:

20 Q.      Based upon your train ing and experience , what

21 were Ms. Martin and Ms. Dobie discussing in that series

22 of call s?

23 A.      They had made arrangements  in the call s the

24 night before on the 18th , and the next morn ing, to meet

25 at Ms. Martin 's school down in D. C. to sell a quantity

1  of cocaine to Ms. Dobie who was going to give it to her

2  son, Ta'Vaughn.

3  Q.      If you could, in terms of B7104, identify what

4  portion of that call is significant in reaching your

5  opinion.

6  A.      I guess about the fifth line up from the bottom

7  on Page 555, Ms. Dobie says you will be able to meet me

8  at the school, and Ms. Martin replies, can we do it

9  early in the morning, and they decide to meet early in

10  the morning.  Dobie is supposed to call her early.

11  Q.      Then on Page 558?

12  A.      About the middle of the page, Ms. Dobie's saying

13  Ta'Vaughn -- that's her son -- came and asked me what

14  time she was going to take care of that, Mom, please

15  don't lay down and go to sleep and forget.  She says,

16  I'm not going to go sleep, I'm going to call.  And Ms.

17  Martin says, you need the tickets like you got

18  yesterday; identifying the amount of cocaine.  Ms.

19  Dobie identifies it as like the one you gave me for my

20  birthday.  They go on to agree to meet later on.

21  Q.      When Ms. Dobie references, "like one of them you

22  gave me for my birthday," referring to the previous

23  day, Ms. Martin says, "I only have that kind," what is

24  she telling Ms. Dobie?

25  A.      She either has only that kind, either crack or

1  powder.  She doesn't have both.  They don't identify

2  which one in particular it is.

3  Q.     If you could write Page 558 next to the word

4  "tickets" on our chart.

5  A.     (Witness indicating.)

6  Q.     Then the last call is just a discussion of their

7  trying to meet; is that correct?

8  A.     Yeah.  There's a discussion of Ms. Martin coming

9  by where Ms. Dobie's at to see the baby, and Ms. Dobie

10  would then follow her to the school.

11  Q.     If we could go to the next call on Page 563,

12  call B7224.  Do you have that call in front of you?

13  A.     Yes.

14  Q.     What date and time does that call take place?

15  A.     This was the same day, May 19, at 9:20 at night.

16  Q.     Who are the parties to the call?

17  A.     Paulette Martin and LaNora Ali.

18  Q.     If we could play that call, please.

19        (Audio recording begins playing at 10:39 a.m.)

20        (Audio recording stops playing at 10:39 a.m.)

21        BY MS. JOHNSTON:

22  Q.     What are Ms. Martin and Ms. Ali discussing in

23  that call?

24  A.     They're talking about Ms. Ali's asking whether

25  there was any additional information on the neighbors

1 complaining.  Specifically, on the fourth line down,

2 Ms. Ali says, You haven't heard anything else about the

3 lady next door or anything; and Ms. Martin replies, no,

4 and she doesn't want to bring it up with Jackie Terrell

5 to cause additional suspicion.

6         At the bottom of the page, she says, I don't

7 even want to stress that issue with girlfriend

8 upstairs, referring to Ms. Terrell, and the next page,

9 564, that that might cause suspicion if she brought

10 that up.

11 Q.    If we could turn to the next call, B 7258 on

12 Page 565.  What's the date and time of this call?

13 A.    This is on 5/2 -- May 20, 2004, at 1:05 p.m.

14 Q.    Who are the parties to this call?

15 A.    Paulette Martin and Learley Goodwin.

16 Q.    Does this call relate back to call B7022 of Page

17 548 that we played earlier this morning?

18 A.    Yes, it does.

19 Q.    In what respect?

20 A.    This is the -- relating back to the shortage of

21 the money paid to Cuba for the last kilogram they got.

22 Q.    If we could please play B7258 on Page 565.

23       (Audio recording begins playing at 10:41 a.m.)

24       (Audio recording stops playing at 10:41 a.m.)

25       BY MS. JOHNSTON:

1  Q.      Based on your training and experience, what are

2  Mr. Goodwin and Ms. Martin discussing in this call?

3  A.      They're talking about the money that was paid to

4  Cuba on May 15 for the kilogram they received, and I

5  think in the previous call they didn't identify the

6  amount of the two, whether it's $200 or $2,000.  In

7  this call they identified it as $2,000.

8          Ms. Martin says, I don't feel comfortable about

9  the other guy talking about two big dollars, meaning

10 thousand dollars, as opposed to $200.  Then she goes on

11 to talk about how the money was banded together and

12 there might have been a mistake in the counting by Mr.

13 Cuba where she had a smaller denomination on top and

14 larger denominations on the bottom.

15         At the bottom of the page, Mr. Goodwin

16 reiterates that he's hoping to have the Texas situation

17 straightened out so that as soon as I work out the

18 transportation, meaning I don't have to be bothered

19 with this anyway, talking about transporting the

20 cocaine back from the source in Texas.

21         At the top of Page 566, Ms. Martin's just,

22 again, talking about the money being counted and how

23 she had counted it three times.

24 Q.      Was there another call between Mr. Goodwin and

25 Ms. Martin later on May 20?

1  A.      Yes.

2  Q.      What time was that call?

3  A.      It was at 1:10 p.m. on the 20th.

4  Q.      Okay.  Calling your attention to B7259 on Page

5  567.  Can we play that call, please?

6          (Audio recording begins playing at 10:43 a.m.)

7          (Audio recording  stops playing at 10:43 a.m.)

8          BY MS. JOHNSTON:

9  Q.      What is Ms. Martin discussing with Mr. Goodwin?

10  A.      It's the same thing she told him in a previous

11  call.  I guess she just forgot about it, but it's the

12  same thing about the neighbors calling and talking

13  about the traffic and about how she's moved everything

14  to the studio.  It's just more of the same thing that

15  she's told Mr. Goodwin again.

16  Q.      If we could go to the next call on B7264 on Page

17  569.  Who are the parties to this telephone

18  conversation?

19  A.      This is Paulette Martin and King Lanor.

20  Q.      Did you determine who King Lanor is?

21  A.      He's a car salesman.

22  Q.      If we could play this call, please.

23          (Audio recording begins playing at 10:45 a.m.)

24          (Audio recording  stops playing at 10:46 a.m.)

25          BY MS. JOHNSTON:

1  Q.      Based upon your training and experience, what's

2  the significance of this telephone call?

3  A.      She's talking about a new Mercedes she's

4  ordering.  In the middle of Page 569, there's a mistake

5  in the transcript where King Lanor says the color,

6  because I'm finally getting ready to actually -- and

7  it's not "bill the parts," it's "build the cars" is

8  what he says.  She's just ordering -- confirming the

9  order for the new Mercedes, fully-equipped, and she's

10 going to pay for it in cash.

11 Q.      Based upon your training and experience, what's

12 the significance of her paying for it in cash?

13 A.      Drug dealers frequently use their narcotics

14 proceeds, which are cash, to buy such things as

15 automobiles.

16 Q.      Did you ever determine what the approximate

17 price of that vehicle was?

18 A.      Yeah.  I'm sure we did.  Off the top of my head,

19 I don't know the exact number, no.

20 Q.      She indicated the current color of the car.  Are

21 you familiar with that?

22 A.      Yes.  She said she wanted the same red that her

23 current Mercedes had.

24 Q.      That Mercedes we've seen on the pole camera

25 videos and the other surveillance videos; is that

1  correct?

2  A.      Yes.

3  Q.      If we could go to the next call, B7324.

4          On what date does this call take place, Page

5  571?

6  A.      It's the next day, May 21, at 7:40 in the

7  morning.

8  Q.      Are there a series of calls that take place on

9  May 21 that are related to call B7324?

10  A.      Yes.

11  Q.      What is that series of calls?

12  A.      7324, 7346, 7360, 7365, 7385, 7396, 7406 and

13  A1820.

14  Q.      If you could give us the time frame of all of

15  those calls, what time do they start and when is the

16  last one?

17  A.      The first one starts the morning of the 21st at

18  7:40 a.m.  And the last one takes place that same day

19  at 8:03 p.m.

20  Q.      Okay.  If we could begin by looking at the first

21  call, B7324.  This interception involves who?

22  A.      This is a message Lavon Dobie leaves on Paulette

23  Martin's home phone.

24  Q.      If we could play it, please.

25          (Audio recording begins playing at 10:48 a.m.)

1          (Audio recording  stops playing at  10:49 a.m.)

2          BY MS. JOHNSTON:

3 Q.     Going to the next call, B7346.  At what time

4 does this call take place?

5 A.     Same morning -- same day at 12:13, just after

6 noon.

7 Q.     Who are the parties to this conversation?

8 A.     Paulette Martin and Lavon Dobie.

9 Q.     There is a reference on the top of the

10 transcript page to an Anthony LNU, "Last Name Unknown."

11          is he in the transcribed portion of the call

12 that we are going to hear?

13 A.     No, he is not.

14 Q.     If we could please play 7346 on Page 572.

15          (Audio recording begins playing at 10:49 a.m.)

16          (Audio recording  stops playing at 10:50 a.m.)

17          BY MS. JOHNSTON:

18 Q.     Going to the next call, B7360 on Page 574.

19          What time does this call take place  ?

20 A.     2:32 that afternoon  .

21 Q.     Who are the parties to this call?

22 A.     Paulette Martin, Lavon "Becky" Dobie, and

23 Eleanore LNU.

24 Q.     If we could play the call, please.

25          (Audio recording begins playing at  10:51 a.m.)

1          (Audio recording  stops playing  at 10:53 a.m.)

2          BY MS. JOHNSTON:

3  Q.      The next call, B7385?

4  A.      That's 2:47 in the afternoon, same day.

5  Q.      On Page 577?

6  A.      Yes.

7  Q.      Same parties, Ms. Ali and Ms. -- strike that.

8  This is Ms. Ali and Ms. Martin; is that correct?

9  A.      That's correct.

10 Q.      If we could play this call, please, on Page 577.

11         THE COURT:   Page 65 or 85?

12         MS. JOHNSTON :  7365, on Page 577.

13         (Audio recording begins playing at 10:53 a.m.)

14         (Audio recording  stops playing at 10:54 a.m.)

15         BY MS. JOHNSTON:

16 Q.      Going to the next call, B7385, on Page 578.

17         What time does this call take place?

18 A.      4:06 in the afternoon same day.

19 Q.      Who are the parties?

20 A.      Paulette Martin and Lavon "Becky" Dobie.

21 Q.      If we could play this call, please.

22         (Audio recording begins playing at 10:54 a.m.)

23         (Audio recording  stops playing at 10:55 a.m.)

24         BY MS. JOHNSTON:

25 Q.      The next call, B7396, on Page 579.  What time

1 does this call take place?

2 A.      5:30 p.m., same day.

3 Q.      If we could play this call, please.

4        (Audio recording begins playing at 10:55 a.m.)

5        (Audio recording stops playing at 10:56 a.m.)

6        BY MS. JOHNSTON:

7 Q.      The next call, B7406, on Page 581.  What's the

8 time of this call in relation to the previous call?

9 A.      It's about six minutes later.

10 Q.      The same parties, Ms. Martin and Ms. Dobie?

11 A.      Yes, that's correct.

12 Q.      If we could play the call, please.

13        (Audio recording begins playing at 10:56 a.m.)

14        (Audio recording stops playing at 10:56 a.m.)

15        BY MS. JOHNSTON:

16 Q.      And the next call, A1820, on Page 582.  What

17 time does this call take place?

18 A.      This is the same day at 8:03 p.m.

19 Q.      So it would be a couple of hours later; is that

20 correct?

21 A.      That's correct.

22 Q.      Who are the parties to this call?

23 A.      Paulette Martin and John Martin.

24 Q.      If we could play the call, please.

25        (Audio recording begins playing at 10:57 a.m.)

1          (Audio recording   stops playing  at 10:58 a.m.)

2          BY MS. JOHNSTON:

3 Q.     Based upon your training and experience  in that

4 series  of call, did you form an opinion  as to what --

5 why Ms. Dobie  and Ms. Martin  were meeting  at the

6 school?

7 A.     Yes.

8 Q.     What is that?

9 A.     Ms. Dobie  was buying  an amount  of cocaine  from

10 Ms. Martin , and the series  of calls goes on all day

11 long until they finally  get down there later that

12 evening.

13 Q.     Had you, yourself , participated  in surveillances

14 at the school  on occasion?

15 A.     I believe  so, yes.

16 Q.     You reviewed documents  recovered  from the

17 school; is that correct?

18 A.     Yes.

19 Q.     Based upon your training  and experience , was the

20 school  an active  dance  studio  at the time of these

21 calls?

22          MR. MONTEMARANO :  Objection , Your Honor.

23          MR. HALL:  Objection , Your Honor.

24          THE COURT:  Can you restate  the question?

25          MS. JOHNSTON:   Based upon your review  of the

1  document s seize d and the surveillance s that were

2  conduct ed at the school , did you form an opinion as to

3  whether or not it was a functional dance studio at the

4  time ?

5            MR. HALL:   Objection .

6            MR. MONTEMARANO :   Objection .

7            May we be heard at the bench ?

8            MS. JOHNSTON:   I will withdraw the question ,

9  Your Honor , to save time and move on.

10           THE COURT:   All right .

11           BY MS. JOHNSTON:

12  Q.    Calling your attention to the next series of

13  call s, B7429, start ing on Page 584 .   Who are the

14  parti es to this telephone call ?

15  A.      Paulette Mart in and Learley Goodwin .

16  Q.      On what date does this call take place ?

17  A.      This was on the same date , the 21st , at 8:41

18  p.m.

19  Q.      The call that we just heard where Ms. Martin

20  said she was down at the school with "Becky" was at

21  what time ?

22  A.      I think the last call was a little after 8:03

23  p.m.

24  Q.      Who are the parties to this call at 8:41 p.m. on

25  May 21?

1  A.        Paulette  Martin  and  Learley  Goodwin .

2  Q.        If  we  could  play  the  call , please .

3            (Audio  recording  begins  playing  at  11:00  a.m. )

4            (Audio recording   stops  playing  at  11:01  a.m. )

5            BY  MS.  JOHNSTON:

6  Q.        In  this  call , where  was  Ms.  Martin  by  the

7  time --

8  A.        This  is  the  B  line , so  she  was  at  home  on

9  Hayward .

10  Q.        And  the  "Cuba"  they're  referring  to.  Is  that

11  the  same  Cuba  we've  discussed  throughout  these  calls?

12  A.        Yes.  It's  the  source  of  cocaine  for  them .

13  Q.        If  we  could  go  to  the  next  call , A1825, on  May

14  -- also  on  May  21st.  What  time  is  this  call ?

15  A.        10:06  p.m. the  dame  same  day .

16  Q.        Is  this  now  on  her  cellular  phone ?

17  A.        Yes, it  is .

18  Q.        If  we  could  please  play  A1825, on  Page  585.

19            (Audio  recording  begins  playing  at  11:01  a.m. )

20            (Audio recording   stops  playing  at  11:02  a.m. )

21            BY  MS.  JOHNSTON:

22  Q.        Based  upon  your  training  and  experience , what

23  are  Ms.  Martin  and  Mr.  Martin  discussing  in  this  call ?

24  A.        Ms.  Martin  is  telling  Mr.  Martin  that  she's  at

25  the  school  meeting  with  Learley  Goodwin  to  discuss

1  something, that Larry Lane had picked her up at home

2  and taken her to school because Mr. Goodwin wanted to

3  talk to her.

4          Then on the top of Page 586, Mr. Martin is

5  telling Ms. Martin to bring an amount of drugs, saying,

6  okay.  Well, bring me two T-shirts when you come,

7  referring to an amount of drugs for her to bring from

8  the school to him at the residence on Hayward.

9  Q.      Was that a code that we had heard before in

10 calls between Ms. Martin and Mr. Martin?

11 A.      Yes.

12 Q.      If you would write Page 586 next to T-shirt

13 which I believe is right there on the front page.

14 A.      (Witness indicating.)

15 Q.      And the "Larry" referred to in that call was

16 Larry who?

17 A.      Larry Lane.

18 Q.      If we could turn to the next call, B7676.

19 What's the date and time of this call?

20 A.      It's on May 25 at 7 o'clock in the morning.

21 Q.      Who are the parties to this call?

22 A.      Paulette Martin, John Martin, and Lavon "Becky"

23 Dobie.

24 Q.      If we could play this call, please.

25          (Audio recording begins playing at 11:04 a.m.)

1          (Audio recording stops playing at  11:06 a.m.)

2          BY MS. JOHNSTON:

3  Q.      What are Ms. Martin and Ms. Dobie discussing in

4  this call?

5  A.      They're talking about a couple of things.  First

6  off, they're -- on Page 587 they're talking about the

7  transfer of Gwen Levi from Seven Locks jail to the

8  Clarksburg Boyd's facility, which is the same jail, and

9  that she had been transferred up there, and had gone on

10 to discuss on page 588 whether anybody had been to

11 visit her or not.

12         Near the bottom of Page 588, they're talking

13 about arrest of Claude Arnold.

14 Q.      What is his nickname again?

15 A.      Smack.  "Becky" Dobie goes, Smack's out.  Ms.

16 Martin says, no.  And then they're talking about him

17 going in front of a parole board, which Ms. Dobie says

18 he definitely -- he will definitely go in front of the

19 ratification board, referring to the parole board, and

20 they're talking about whether that would be today.  Ms.

21 Martin had talked to his girlfriend, Apple, who is

22 Marvia Apple White.

23 Q.      Page 589.  Is there a different topic discussed

24 on this page?

25 A.      Ms. Dobie tells Ms. Martin that she needs to

1  meet her at the school, meeting at Paula's studio down

2  in D. C. -- Washington, D. C.

3  Q.      For what purpose does she tell her she needs to

4  meet her?

5  A.      She doesn't identify the purpose, but that's the

6  location where the drugs were moved to at that point.

7  Q.      If we could turn to the next call, A1887, on

8  Page 590.

9          What's the date of this call?

10  A.      May 25, 2004, at 1:19 in the afternoon.

11  Q.      Is this related to two other calls?

12  A.      Yes.

13  Q.      What are the two calls this is related to?

14  A.      B7709 and 1895.

15  Q.      Who are the parties to these calls?

16  A.      Paulette Martin and Larry Nunn.

17  Q.      And the time frame of the three calls?

18  A.      The first one's on the 25th at 12:19, and the

19  last one, a little over an hour later, at 1:24 p.m.

20  Q.      If we could play these calls, beginning with

21  A1887 on Page 590.

22          (Audio recording begins playing at 11:08 a.m.)

23          (Audio recording stops playing at 11:09 a.m.)

24          BY MS. JOHNSTON:

25  Q.      Going to the next Call B7709 on Page 592,

1 approximately  how  soon  after  the  preceding  call  does

2 this  one  take  place?

3 A.     About  20  minutes  --  22  minutes  after  the  first

4 call.

5 Q.     If  we  could  play  B7709  on  Page  592.

6        (Audio  recording  begins  playing  at  11:10  a.m.)

7        (Audio  recording  stops  playing  at  11:10  a.m.)

8        BY  MS.  JOHNSTON:

9 Q.     And  then  the  next  call,  A1895.   What  time  does

10 this  call  take  place?

11 A.     At  1:24  p.m.  on  the  same  day.

12 Q.     If  we  could  please  play  A1895.

13        (Audio  recording  begins  playing  at  11:10  a.m.)

14        (Audio  recording  stops  playing  at  11:10  a.m.)

15        BY  MS.  JOHNSTON:

16 Q.     Based  on  that  series  of  three  calls,  did  you

17 form  an  opinion  as  to  what  Ms.  Martin  and  Mr.  Nunn  were

18 doing?

19 A.     Yes.

20 Q.     What  is  that?

21 A.     She's  selling  an  amount  of  heroin  that  she

22 received  from  William  Turner.   The  calls  we  had  heard

23 about  yesterday?   She's  selling  an  amount  of  that

24 heroin  to  Larry  Nunn.

25 Q.     If  we  could  turn  to  Page  590.   Are  there  any

1  particular reference s that support that conclusion ?

2  A.     Yeah . It's about the fourth line down . Mr.

3  Nunn asks , Do you still have any of them ticket s left ?

4  He's referring to the 60 grams of heroin she receive d

5  from William Nunn in the call s we heard about

6  yesterday . Ms. Martin replies , I might have about 30

7  or 40 of them because I've been sell ing them

8  individual , mean ing she might have 30 or 40 grams of

9  the heroin left ; and say ing that they've been try ing to

10  raise money to get her a lawyer , say ing that she 's been

11  using the pro ceeds to pay for the legal fee s.

12  Q.     Refer ring to whom ?

13  A.     Gwen Levi .

14  Q.     I'm not sure if you mis spoke earlier . From whom

15  did you get the heroin ?

16  A.     This is the heroin that she got from William

17  Turner in the call s we heard about yesterday , the 60

18  grams she identifi ed, and that 's what they're

19  referenci ng that she only has 30 or 40 grams left .

20  Q.     When she says she's " sell ing them individual ,"

21  what does she mean ?

22  A.     One at a time .

23  Q.     One gram at a time ?

24  A.     Yeah .

25  Q.     If you could , write Page 590 up on our board

1 next to the word "tickets".

2 A.      (Witness indicating.)

3 Q.      Calling your attention to B7709.  Is there

4 further language in that call that supports your

5 opinion?

6 A.      On the fourth line down, Ms. Martin says, Are

7 you home yet?  Have you collected the money for the

8 tickets?  Meaning, do you have the money for the drugs.

9 Q.      Could you write Page 592 next to the word

10 "tickets" on our list?

11 A.      (Witness indicating.)

12 Q.      In the final call, there's a reference to Fifth

13 and Kennedy Street.  Do you know where that was in

14 relation to where Mr. Nunn was residing?

15 A.      No, I do not.  From the call, she's identifying

16 where she's at and telling him to come on outside.  So,

17 it would indicate it's close to his residence.

18 Q.      If we could, we'll go ahead and skip Call B7747.

19 You've listened to that call; is that correct?

20 A.      Yes.

21 Q.      Who was leaving the message for whom?

22 A.      Paulette Martin is leaving a message for George

23 Harris.

24 Q.      On what date and what hour was that message

25 left?

1  A.      May 25 at 6:44 p.m.

2  Q.      Now, going to the next morning and call, B7782,

3  on Page 595.  What time is that call?

4  A.      This is the next morning at 6:23 a.m.

5  Q.      Who are the parties to this call?

6  A.      George Harris and Paulette Martin.

7  Q.      If we could play that call, please.

8          (Audio recording starts playing at 11:14 a.m.)

9          (Audio recording  stops playing at 11:14 a.m.)

10         BY MS. JOHNSTON:

11 Q.      Based upon your training and experience, what is

12 Mr. Harris telling Ms. Martin in this call?

13 A.      He's ordering a quantity of cocaine, either an

14 eighth of a kilo or an eighth of an ounce, from her and

15 he's referring to it as two size 8 dresses.

16 Q.      Could you write Page 595 next to "dresses" on

17 our chart, please?

18 A.      (Witness indicating.)

19 Q.      Calling your attention to the next call, B7804.

20 What date and time does this call take place?

21 A.      This is May 26 at 10:23 a.m.

22 Q.      Who are the parties to this call?

23 A.      Paulette Martin and Milburn Bruce Walker.

24 Q.      If we could please play B7804 on Page 596.

25         (Audio recording starts playing at 11:15 a.m.)

1          (Audio recording  stops playing at 11:16 a.m.)

2          BY MS. JOHNSTON:

3  Q.      And then is there a followup call to that, B7810

4  at Page 598?

5  A.      Yes.

6  Q.      If we could go back to B7804.  Based upon your

7  training and experience, what is Mr. Walker discussing

8  with Ms. Martin?

9  A.      He's trying to order a quantity of crack cocaine

10 from her.

11 Q.      Continue.

12 A.      At the bottom of Page 596, he says, You don't

13 have a shirt, huh?  And Ms. Martin says, what size

14 shirt?  And then Mr. Walker says, eight of them.  Then

15 she says, let me see.  Then he identifies it as crack

16 instead of powder by saying, "with the finished."  In

17 other words, with the cooked.  Ms. Martin says she will

18 check and call him right back.

19 Q.      If you could write Page 596 and 597 next to the

20 word "shirt" where it appears on our chart.

21 A.      (Witness indicating.)

22 Q.      You've written it next to the word T-shirt?

23 A.      T-shirt.

24 Q.      Okay.  Based upon your training and experience,

25 how did you know that wasn't a real shirt?

1  A.       The calls that Mr. Walker and Ms. Martin

2  established a pattern that he was a customer of hers,

3  and then even in this particular call, ordering a

4  finished shirt would make absolutely no sense in, I

5  guess, the shirt business, but it makes perfect sense

6  in the drug business.

7  Q.       Also, at the top of Page 597, was there any

8  significance to her question, what size shirt?, and his

9  response, eight of them?

10  A.       Eight of them was identifying the quantity.  But

11  it's also earlier in the conversation talking about

12  being at the school, which is where the -- she said she

13  would need to be able, and the only thing stored at the

14  school was not a quantity of shirts, it was drugs.

15  Q.       Based upon these series of calls, did you form

16  an opinion as to where Ms. Martin was conducting her

17  drug transactions after May 16 of 2004?

18  A.       She conducted them -- the majority of them at

19  the school, but she also -- there's evidence from this

20  call she did keep some small amounts on hand.  She's at

21  home at the address of Hayward at this time.  It's a B

22  line call and she's checking to see if she still has

23  enough to fill his order.

24  Q.       Based upon your review of the items seized from

25  her residence at Hayward, were any drugs seized from

1  that  location ?

2  A.      In relation  to what  was  seized  at  the  school ,

3  there  was  a smaller  amount  seized  at  the  residence  on

4  Hayward .

5  Q.      If  we  could  go  to  next  call , B7815 , on  Page  599 .

6  What's  the  date  and  time  of  this  call ?

7  A.      May  26 , 2004 , at  12:19  p.m. , a  little  after

8  noon .

9  Q.      Who  are  the  parties ?

10  A.      LaNora  Ali  and  Paulette  Martin .

11  Q.      If  we  could  play  the  call , please .

12          (Audio  recording  begins  playing  at  11:20  a.m. )

13          (Audio  recording  stops  playing  at  11:21  a.m. )

14          BY  MS.  JOHNSTON :

15  Q.      Based  upon  your  training  and  experience , what

16  are  Ms.  Ali  and  Ms.  Martin  discussing  in  the  beginning

17  of  this  call ?

18  A.      In  the  very  beginning , Ms.  Ali  starts  asking

19  her , were  you  able  to  get , and  then  Ms.  Martin  cuts  her

20  off  saying , yeah , I  have  it , yeah , I  have  it , referring

21  to  an  amount  of  cocaine  that  she  was  going  to  sell  to

22  Ms.  Ali .

23  Q.      And  then  there 's  further  discussion  on  Page  600

24  and  601  involving  Mr.  Goodwin ; is  that  correct ?

25  A.      Yes .

1  Q.      What was Ms. Martin advising Ms. Ali in

2  reference to Mr. Goodwin?

3  A.      They're talking about the dispute that she's

4  involved -- that Ms. Martin and Mr. Goodwin are

5  involved with with the financing of these shows and

6  entertainment attorney that she's hired to -- that

7  she's paid to try to work on getting her money back to

8  put the shows on.

9  Q.      Is that is the same money that you had testified

10 several days ago that Mr. Goodwin and Ms. Martin had

11 invested in a concert?

12 A.      That's correct.

13 Q.      To your knowledge, was that concert ever held?

14 A.      No, it did not occur.

15 Q.      Now, if we could go to next call, B7876.  Again,

16 is this call one in a series of calls that takes place

17 on May 26?

18 A.      Yes.

19 Q.      Who are the parties to this call?

20 A.      Paulette Martin and Lavon "Becky" Dobie.

21 Q.      What are the other calls associated with call

22 B7876?

23 A.      7888, 7889, and 7891.

24 Q.      If we could begin by playing -- strike that.

25         What time frame is covered by these calls?

1 A.      The first call is on May 26, 2004, at 7:23 p.m.,

2 and on the last one is on the same date at 8:49  p.m.

3 Q.      If we could begin by playing B7876 on Page 602.

4        (Audio recording begins playing at 11:23 a.m.)

5        (Audio recording  stops playing at 11:24 a.m.)

6 BY MS. JOHNSTON:

7 Q.      Going to the next call, B7888 on Page 604.   What

8 time does this call take place?

9 A.      8:36, about an hour after the first one.

10 Q.      If we could play it, please.

11        (Audio recording begins playing at 11:25 a.m.)

12        (Audio recording  stops playing at 11:25 a.m.)

13        BY MS. JOHNSTON:

14 Q.      The next call, B7889, on Page 606.   If we could

15 play that call.

16        (Audio recording begins playing at 11:26 a.m.)

17        (Audio recordings tops playing at 11:26 a.m.)

18        BY MS. JOHNSTON:

19 Q.      And B7891, on Page 608.   What time does this

20 take place in relation to the previous  call?

21 A.      It took place three minutes later.

22 Q.      Who are the parties?

23 A.      John Martin and "Becky" Dobie again.

24 Q.      The same as the previous call?

25 A.      Yes.

1  Q.      If you could play B7891, on Page 608.

2          (Audio recording begins playing at 11:27 a.m.)

3          (Audio recording  stops playing at 11:27 a.m.)

4          BY MS. JOHNSTON:

5  Q.      Based upon your training and experience , what

6  are Ms. Dobie and Ms. Martin trying arrange in these

7  calls?

8  A.      They're arranging to meet at the school in

9  D. C. so Ms. Dobie can purchase a quantity of cocaine

10 from Ms. Martin.

11 Q.      Were there any particular code words used in

12 this series of calls?

13 A.      I don't think so .

14 Q.      Does the fact that there were not any code words

15 used affect your opinion concerning the nature of the

16 meeting?

17 A.      No.  Prior to Ms. Martin moving the drugs to the

18 school, I can't recall a time she ever met anybody at

19 the school.  After she moved the drugs to the school,

20 almost all the meetings took place at the school.  That

21 would be the reason for going there, especially at

22 night.

23         MS. JOHNSTON:   Your Honor, I don't know if the

24 court wants to take its morning recess now before I go

25 into the --

1          THE  COURT:   We will  take  a  recess  until  quarter

2  of  12:00.

3               (Off  the  record  at  11:28 a.m.)

4               (On the record at   11:45 a.m.)

5          THE  COURT:   Mr. Montemarano , you have  a  matter?

6          MR.  MONTEMARANO :  I don't know  if Judge  Blake 's

7  chamber s has  contact ed  your  chamber s.

8          THE  COURT:   No.

9          MR.  MONTEMARANO :  Ms. Childs,  her  secretary ,

10  thought  she  might .  The judge  would  like  me  to

11  participate  in a conference  call  as  soon  after  1:00  as

12  possible .

13          THE  COURT:   We will  make  that  happen .

14          MR.  MONTEMARANO :  Just  so we  break  on  time .

15          THE  COURT:   What  I want  to  tell  you  is, I'm

16  contemplati ng having  the  jury  take  a  one  and  a half

17  hour  lunch  so that  I can  have  some  time  with  you  to

18  deal  with  the  motion  raise d by Mr.  Bynum 's counsel  and

19  also  deal  with  the  grand  jury  transcript  issue .

20          I can  tell  you  I have  look ed -- I'm  almost  done ,

21  I mean , going  through  the  redaction s.  In  many  case s,

22  there  are  some  redactions  that  were  under done .  In

23  other words , the  redact ed material  was  the  answer , but

24  the question  was  left  in.  In  some  other  case s, there

25  are  a whole  series  of  answer s given  with  the  question s

1  taken out, and I'm going to put the question s back in.

2          It may be that my un-redaction s are so limited

3  that I can simply read them to you so that we don't

4  delay the commence ment of cross-examination.   Nothing

5  that I saw was, you know, a great revelation but, you

6  know, I'm general ly comfortable with the redaction s the

7  government has made.   Some of them were made

8  erroneous ly.

9          The re was some  under-redact ing or over-redact ing

10  a little bit where, like, the question wasn't put in,

11  but that's pretty much what I found so far.   I will be

12  glad to hear argument when we take -- sometime during

13  that one and a half hour break on the question of the

14  photograph s that Mr. Mitchell has filed a motion on.

15          MS. JOHNSTON:   Your Honor, I expect to finish my

16  direct examination in probably the next 10 to 15, 20

17  minute s, and I understand that Officer Humble is not

18  here, and that we have not been able to get in touch

19  with him.   He was original ly told to be here at 2:00.

20  So, we're going to be ready for cross very short ly.   I

21  want ed the court to be aware of that fact.

22          THE COURT:   Let me ask the defense.   Are you

23  able to begin your cross-examination  without having the

24  very limited number of un-redaction s that I'm going to

25  do?

1          MR. MONTEMARANO:  Yes, Your Honor.

2          THE COURT:  All right.  Well, what I would

3  propose we do is this:  We will take a one and a half

4  hour lunch.  As far as the jury is concerned, we'll

5  take a one hour lunch.  As far as we're concerned, I

6  will come back and we will deal with the photographs

7  that were -- Mr. Mitchell has raised a question about,

8  and I will attempt to finally resolve the redaction

9  issue.

10         Now, I anticipate that the easiest way, so you

11  can get moving with your cross-examination  of Sergeant

12  Sakala, is that I think I will simply read to you the

13  things I would un-redact.  Many of them are simply

14  questions, because I don't know how you figure out what

15  the answer means without having the question.  I don't

16  think you're going to find that the redactions that I

17  would un-redact would be of major moment to any

18  cross-examination , but let's do that.

19         We'll get the jury back in now, and I will break

20  for lunch shortly before 1:00 so you can be on your

21  conference  call.

22         MR. MONTEMARANO:  Thank you, Your Honor.

23         THE COURT:  I will tell the jury to come back at

24  2:30, and we will -- whatever time works with when we

25  actually break, and then we'll have you come back after

1  a one hour break at lunch.  All right?  Are we ready?

2          MS. JOHNSTON:   Yes, sir.

3          THE COURT:   All right, bring them in.

4          (Witness resumes the stand at 11:49 a.m.)

5          (Jury returns at 11:51 a.m.)

6          THE COURT:   Everyone ready?

7          Okay, you may proceed.

8          BY MS. JOHNSTON:

9  Q.      Detective Sakala, I think the day before

10 yesterday we discussed two calls that had been omitted

11 from the transcript book and omitted from the original

12 CD; is that correct?

13 A.      Yes.

14 Q.      In fact, you identified CD-3 as containing those

15 two calls; is that correct?

16 A.      Yes.

17 Q.      Was one of those calls B8040?

18 A.      Yes, it is.

19 Q.      What date and time did call B8040 take place?

20 A.      That's on May 28 t 5:33 p.m.

21         MS. JOHNSTON:   If we could, Your Honor,

22 distribute those transcripts, and then we will play

23 call B8040, which doesn't have a page number since we

24 forgot to include it in the book.

25         (Notebooks distributed to the jury.)

1          BY MS. JOHNSTON:

2  Q.      Who are the parties to the Call B8040 on May 28?

3  A.      Paulette Martin and LaNora Ali.

4  Q.      And if we could please play Call B8040.

5          (Audio recording begins playing at 11:53 a.m.)

6          (Audio recording stops playing at 11:53 a.m.)

7          BY MS. JOHNSTON:

8  Q.      Based upon your training and experience, the

9  references on the first page to "jerk" and "cooking"

10 had nothing to do with drugs, did it?

11 A.      No.  Nothing to do with drugs at all on the

12 first page.

13 Q.      Was there any reference in this call, based on

14 your training and experience, that had to do with

15 drugs?

16 A.      Yes.

17 Q.      What is that?

18 A.      Page 2, fourth line down, Ms. Ali says, okay --

19 excuse me.  The second line down, she asks, Are you

20 going to be home this evening?  Ms. Martin says, Yes,

21 I'll be here.  Ms. Ali says, You know, for my thing --

22 there's a pause -- and then she says, thing, and I'm

23 going to bring you money for my clothes.  The "thing"

24 is a reference to cocaine.

25 Q.      Calling your attention again to Government's

1  Exhibit Hayward 7.  Is there anything in Hayward 7 that

2  corroborates your opinion?

3  A.      There are two things that corroborate the calls.

4  Under "tickets" on the far, right-hand side of the

5  screen, you will see an entry for $125 reflecting the

6  distribution of an eighth of an ounce of cocaine that

7  took place between the dates of May 23 and May 28.

8  That would correspond to the call we heard just before

9  the break for the May 26 transaction.

10        And then the second corresponding is a payment

11  of $300, which you see reflected on May 28 underneath

12  the column for "tickets," and there's also a payment

13  for $80 on May 28 underneath the clothes category,

14  which corroborates the phone call.

15  Q.      Now, if we could go to the next call, B8064, on

16  Page 610.  Do you have that call in front of you?

17  A.      Yes.

18  Q.      Who are the -- what's the date and time of this

19  call, B8064?

20  A.      It's May 28 at 9:05 p.m.

21  Q.      The parties to this call?

22  A.      LaNora Ali, Reece Whiting and Paulette Martin.

23  Q.      So it's later in the evening of the previous

24  call?

25  A.      That's correct.  LaNora Ali, at this time, is at

1  the residence on Hayward Avenue.

2  Q.      If we could please play B8064 on Page 610.

3          (Audio recording begins playing at 11:56 a.m.)

4          (Audio recording stops playing at 11:57 a.m.)

5          BY MS. JOHNSTON:

6  Q.      Based upon your training and experience, is

7  there any conversation related to the drug activities

8  in this call?

9  A.      Yes.

10 Q.      What is that?

11 A.      Page 611, middle of the page, Mr. Whiting says,

12 Speaking of that, did any of them tickets ever come in?

13         He's asking Ms. Martin whether she's received a

14 shipment of cocaine.  Ms. Martin says, No, not yet.

15 Q.      Could you write Page 611 next to our code word

16 "tickets" on the board?

17 A.      (Witness indicating.)

18 Q.      If we could go to next call, B8110 on Page 612.

19 On what date and time does this call take place?

20 A.      This is on May 29 at 11:05 in the morning.

21 Q.      Who are the parties to this telephone call?

22 A.      Paulette Martin and LaNora Ali.

23 Q.      If we could play it, please.

24         (Audio recording begins playing at 11:58 a.m.)

25         (Audio recording stops playing at 11:59 a.m.)

1          BY MS. JOHNSTON:

2 Q.      Based upon your training and experience, is

3 there any discussion of drugs between Ms. Martin and

4 Ms. Ali in this call?

5 A.      Yes.

6 Q.      Where is that?

7 A.      Top of Page 613, Ms. Ali says, but I need

8 another dress, referring to a quantity of cocaine, and

9 that's further identified by Ms. Martin saying that

10 she's been to the school already this morning where her

11 drugs are stored. She was at the school this morning

12 at 6 o'clock in reference to the request for the dress.

13 Q.      The "Becky" she refers to as being with her at

14 the school is "Becky" who?

15 A.      Yeah, she was at the school with Lavon Dobie.

16 Q.      Could you write Page 613 next to the word

17 "dresses" on our code list?

18 A.      (Witness indicating.)

19 Q.      Based upon your familiarity with the items

20 seized from Hayward, were there any dresses found at

21 Hayward -- not -- strike that -- not at Hayward, at

22 Paulette's school?

23 A.      No, there were not.

24 Q.      If we could go to the next call, B8183. On what

25 date and time is this call?

1  A.      This is on May 29, 2004, at 9:19 p.m.

2  Q.      Who are the parties to this call?

3  A.      Paulette Martin and Learley Goodwin.

4  Q.      If we could play this call, please.

5          (Audio recording begins playing at 12:01 p.m.)

6          (Audio recording stops playing at 12:01 p.m.)

7          BY MS. JOHNSTON:

8  Q.      What are Mr. Goodwin and Ms. Martin discussing

9  in this call?

10 A.      In the first part of the conversation, Mr.

11 Goodwin's, about middle of the page, saying I don't

12 know, I was just wanting any tickets around, meaning

13 does Ms. Martin have a source or know someone who's got

14 kilograms of cocaine for sale.

15         Ms. Martin says, no, not to her knowledge.   And

16 then Mr. Goodwin goes to talk about the couriers that

17 are still in Texas, saying those people are supposed to

18 have been here today but he hasn't heard anything.   And

19 then Ms. Martin makes a reference to first of the month

20 coming up, referring to the day which welfare checks

21 are distributed or mailed out that people receive them

22 and that they would be able to sell their drugs to

23 those people.

24         Mr. Goodwin agrees that that's, I guess,

25 inconvenient, referring to, "ain't that a B."

1          In the second half of the conversation , on Page

2 615 , they just talk about doing another transaction

3 with Cuba .  Ms. Martin just says if she's going to do

4 it again , it would only be for a fourth of the way ,

5 meaning that she would only do it for a quarter of a

6 kilogram .

7 Q.     Above that Ms. Martin says , I'm just doing mine

8 a little bit at a time .  What does she mean by that ?

9 A.     Selling the drugs that she has little by little .

10 Q.    If you could , on our chart , note the code word

11 "ticket " again on Page 614 .

12 A.     (Witness indicating .)

13 Q.    Detective Sakala , I neglected to ask you before

14 when we had Hayward 7 .  Did you find notations in here ,

15 based upon your training and experience , that would

16 indicate Ms. Martin was selling large quantities of

17 cocaine to some customers ?

18 A.     Yes .

19 Q.    Let me just show you a page from that book .  Can

20 you -- do you have an opinion as to what's reflected on

21 this page in her notebook ?

22 A.     Yes .

23 Q.    If you could explain it to the jury .

24 A.     The column reflects sales and payments by

25 person , by the name of Bop -- what appears to be Bop --

1  reflecting on 8/20, August 20, that she supplied half a

2  kilogram of cocaine, and then on 8/31, he paid $12,500

3  for that half kilogram, and then further payments and

4  distributions are delineated down the column.

5  Q.     Based upon your training and experience, would

6  that indicate Ms. Martin had fronted this particular

7  individual that quantity of drugs?

8  A.     Correct.

9       MR. MONTEMARANO:  Objection, Your Honor.

10      Leading.

11      THE COURT:  Rephrase the question.

12      MS. JOHNSTON:   Okay.

13      BY MS. JOHNSTON:

14  Q.     Based upon your training and experience, what do

15  those calculations indicate to you?

16  A.     On 8/20, she fronted a half a kilogram, or

17  provided on consignment, a half a kilogram of cocaine

18  to this individual.  She carried that debt for 11 days

19  until he paid $12,500 towards that debt.

20  Q.     And that left a balance of how much?

21  A.     $250.

22  Q.     What is the next $12,750 indicate?

23  A.     Another distribution of another half kilogram,

24  to bring the total up to $13,000 followed by payment of

25  $10,000, to bring the balance back down to $3,000s.

1  Q.      The next $12,750 indicate s what?

2  A.      Another distribution on September 2 of '03 of

3  another kilogram , to bring the total back up to

4  $15,750 .

5  Q.      In reference to the telephone calls here , was

6  this just a sampling of the calls that you'd

7  intercept ed?

8  A.      That 's correct .

9  Q.      If I could have the next miscellaneous  number ,

10 I'd ask you to just initial and date the chart list

11 that we've compile d over the last week and a half .

12 Miscellaneous  11, and if you could just initial and

13 date it , please .

14 A.      (Witness  indicati ng.)

15 Q.      Consist s of three pages ; is that correct ?

16 A.      That 's correct .

17 Q.      Just initial the other two pages .

18 A.      (Witness  indicati ng.)

19      MS. JOHNSTON:   Your Honor , with that , the

20 government  has no further question s of this witness .

21      THE COURT:   All right .  Cross- examination .

22      MR. MONTEMARANO :  Yes , Your Honor .  If I could

23 have Hayward  7, please .

24      THE COURT:   Ladies and gentlemen  , by the way,

25 this witness has proceed ed on the basis that there

1  would be no cross-examination   until all of his

2  testimony was done.  The fact that there was no

3  cross-examination   previous ly was by agreement  and by my

4  direction so that all the cross-examination  will now

5  occur at once.

6                    **CROSS-EXAMINATION**

7           BY MR. MONTEMARANO :

8  Q.      Good afternoon, Sergeant Sakala.  How are you?

9  A.      Fine.  Good afternoon.

10  Q.      Drawing your attention to what was just up on

11  the board from Hayward 7, the page with "Bop."

12          Is it your testimony those transactions  reflect

13  transfer s of drug s for money; is that correct, sir?

14  A.      That's correct.

15  Q.      Let's start from the beginning, at the top of

16  the page.  I'm going to put it up on the board here --

17  I mean up on the ELMO.

18          MR. WARD:   What is the exhibit number?

19          MR. MONTEMARANO : This is Hayward 7.  I'm sorry,

20  Mr. Ward.

21          BY MR. MONTEMARANO :

22  Q.      Correct me if I'm wrong, but at no time during

23  your surveillance  did you encounter  -- "you" mean ing

24  law enforcement  -- encounter a person name d Bot, B O T;

25  correct?

1  A.      I think it's Bop, B O P.

2  Q.      Oh, Bop?

3  A.      I think that's what it's saying, but it could be

4  Bot, I guess.

5  Q.      I'll give you another one.  How about Box?

6  A.      Could be Box also.

7  Q.      Okay.  We'll call him Bop, because that's the

8  name you used, because you don't really know him; is

9  that right?

10  A.      Correct.

11  Q.      You've never seen this person; is that correct?

12  A.      I don't know that I've seen this person.  I

13  don't know who that is.

14  Q.      As far as you know, you've never seen him?

15  A.      I don't know who Bop is; that's correct.

16  Q.      And then these are numbers here; correct?

17  A.      That's correct.

18  Q.      There's no -- I don't see any dollar signs;

19  correct?

20  A.      That's correct.

21  Q.      So you're assuming these are monetary

22  transactions; correct?

23  A.      Some are monetary transactions and some are

24  distributions of drugs reflected in the costs of the

25  drugs.

1  Q.      Well, a transaction  giving  somebody  something

2  for money is what I call a monetary  transaction.  These

3  are all monetary  transactions  whether  or not they're

4  paid for at the time of the transfer  is made; right?  I

5  mean buying something.

6  A.      Some are monetary  involving  money and some are

7  involving  drugs, so I would not call them monetary.

8  Q.      Okay.  These go back to, according  to the date

9  here, 8/2 of '03?

10  A.      I would --

11  Q.      9/2 of '03?

12  A.      I would agree  it's nine.

13  Q.      Eight, nine, sometime  in the autumn  of '03;

14  correct?

15  A.      Correct.

16  Q.      Don't mind my going  back to the beginning.  You

17  initiated your  investigation  of Ms. Martin, as you

18  testified to several  times, somewhere  in '01 to '02; is

19  that a fair  statement?

20  A.      No, I don't think  that is fair.  I would say her

21  investigation  began at the conclusion  of the previous

22  case, which probably  -- well, yeah I guess -- it's

23  probably  accurate  the first information  came late '02,

24  I would say.

25  Q.      Do you recall  saying  it was as early  as 1997 you

1 were investigating Ms. Martin?

2 A.      I did not say that, and I certainly was not

3 investigating her in '97.

4 Q.      Okay. It's fair to say that the information

5 regarding Ms. Martin that you began with was

6 information provided by Juan Encarnacion?

7 A.      That was -- that would be fair, yes.

8 Q.      And Mr. Encarnacion is, for lack of a better

9 term, a known drug dealer; correct?

10 A.      He's a convicted drug dealer, yes.

11 Q.      Convicted drug dealer at that point.

12        You've talked to him. He's been convicted

13 already; correct?

14 A.      When we first talked to him, I don't know  if he

15 had been convicted, but he certainly subsequently has

16 been convicted. Yes.

17 Q.      You're not sure if you talked to him before  or

18 after he copped a plea?

19 A.      I would be willing to -- my guess is we probably

20 talked to him before. That's the normal practice.

21 Q.      And that conversation with him is with the

22 assistance of his attorney; correct?

23 A.      Yes.

24 Q.      You're currently a sergeant in patrol,

25 Montgomery County Police Department; correct, sir?

1   A.      That's correct.

2   Q.      Prior to that, you served in narcotics for

3   approximately 18 years; is that correct, sir?

4   A.      '87 to 2005, whatever that works out to be.

5   Q.      About 18 -- nineteen, maybe?  I wouldn't want to

6   short-sell you.  Something over 15 and under 20; is

7   that fair, sir?

8   A.      That's fair.

9   Q.      You have a great deal of experience in

10  narcotics; is that correct, sir?

11  A.      I've been in it a long time.

12  Q.      You joined the Montgomery County Police

13  Department in?

14  A.      1981.

15  Q.      So it would be fair to say the substantial

16  portion -- the major portion of your time in the

17  Montgomery County Police Department was in narcotics;

18  correct, sir?

19  A.      Yes.

20  Q.      You don't have any -- be fair to say you have

21  expertise in narcotics; is that a fair statement?

22  A.      Yes.

23  Q.      In fact, you've been qualified as an expert

24  witness in certain things relating to narcotics

25  investigation; is that correct?

1 A.      Yes, sir.

2 Q.      It would be fair to say you don't have a

3 particular expertise in white collar crime; is that

4 correct?

5 A.      I wouldn't say that.

6 Q.      You've not been doing 18 years of fraud

7 investigation; have you, sir?

8 A.       I've been doing money laundering

9 investigations, which most people would consider a

10 white collar crime, yes.

11 Q.      You have been doing 18 years of fraud

12 investigation?

13 A.      Money laundering investigations.  You asked

14 about whether I had any expertise with white collar

15 crime.  Some people would consider money laundering

16 investigations white collar crimes, so I would have a

17 certain amount of experience with that.

18 Q.      Your money laundering investigations were

19 related to narcotics investigations?

20 A.      They were related to the laundering of narcotics

21 proceeds, yes.

22 Q.      So the answer is, yes, they're related to

23 narcotics investigations; right, sir?

24 A.      Yes.

25 Q.      Thank you.

1        Now, you've testified concerning observations

2 made during the investigation of Ms. Martin; correct,

3 sir?

4 A.      Yes, I have.

5 Q.      You're the case agent.  You're familiar pretty

6 much with everything that went on during this

7 investigation; correct, sir?

8 A.      I'm one of the case agents, and I'm fairly

9 familiar with most of the things that happened.

10 Q.      As part of your role as a case agent, you also

11 undertook to assist in the monitoring of the wiretaps

12 of the various telephones that were tapped in this

13 case; correct, sir?

14 A.      That is correct.

15 Q.      There were six separate lines tapped; is that

16 correct, sir?

17 A.      That is not correct.

18 Q.      Five?

19 A.      That is correct.

20 Q.      I'm sorry.  I keep forgetting I can't count that

21 high.  A and B, Ms. Martin's cell, Ms. Martin's land

22 line home phone; is that correct, sir?

23 A.      That is correct.

24 Q.      C line was?

25 A.      C line was one of the cellular telephones that

1  was carried by -- carried and used by   Luis Mangual .

2  Q.      D line ?

3  A.      Another cellular telephone carried and used by

4  Luis Mangual .

5  Q.      E line ?

6  A.      Cellular telephone used and carried by Gwen

7  Levi .

8  Q.      The original wiretap went up -- that's the term

9  of art in the business ; correct , sir ?  You can go up on

10 the line ; correct ?

11 A.      That's a common phrase , yes .

12 Q.      Your wiretap began , unless I'm wrong , on the 8th

13 of March ?

14 A.      It was beginning of March .  The logs would

15 reflect the exact time and a date .

16 Q.      The logs .  That would be Miscellaneous  9 as Ms.

17 Johnston referred to them ?

18 A.      I think that's the miscellaneous  number they

19 were given .

20 Q.      That would be these ?  This is my copy .  Ms.

21 Johnston ?  This would reflect the logs?  The A line on

22 top .

23 A.      Yes , this would be the A line log .

24 Q.      The first call would be A-1; right ?

25 A.      The first call was intercept ed on March 8 at

1  12:03, shortly after noon.

2  Q.      This would be the A and the B line logs;

3  correct, sir?  Do you want to look at the last page

4  just to refresh your recollection?  Does that seem like

5  that's about where the B line ends?

6  A.      Yes, it does.

7  Q.      So this book by itself is all the phone calls

8  off of Ms. Martin's two lines; correct, sir?  I mean if

9  -- as I tell you this is the entire log?

10  A.      If that's as you're representing, that would

11  represent all the logs for those two calls.

12  Q.      It's not there's a page missing, but that

13  doesn't really matter.

14  A.      Okay.

15  Q.      So we have all of these calls, and these are

16  just off of Ms. Martin's.

17          About how many calls were there on the C and D

18  and E lines total, if you can guess?  If don't know,

19  you don't know.

20  A.      Yeah, I don't know.  There were not -- Ms.

21  Martin's, there were probably more calls on hers than

22  the other lines, so without looking at the logs, I

23  couldn't give you an exact number.

24  Q.      The A and B lines were about 10,000 calls, give

25  or take?

1  A.      Might be over 10,000 thereabouts.

2  Q.      The other would be over 5,000 anyway?

3  A.      I want to say there was probably -- could be

4  about 5,000.  There was about 3,000 on one.  It may

5  total 5,000.

6  Q.      That would be in spite of the fact that you went

7  down on the E line, Ms. Levi's, when she was arrested;

8  correct?

9  A.      We did go down on hers after she was arrested

10  yes.

11  Q.      Because nobody's using that phone.  In fact,

12  that phone is sitting in an evidence locker at some

13  point after the date of her arrest; correct?

14  A.      That's correct.

15  Q.      Correct me if I'm wrong.  Now, let me -- back

16  up.  I'm getting ahead oaf myself.  I'm sorry.

17          At the culmination of a narcotics investigation,

18  you generally have something that is colloquially known

19  as a raid day; correct?

20  A.      I've never heard it termed that way, but

21  certainly that would be a proper description.

22  Q.      Okay.  I have.  That's the day when you execute

23  search and seizure warrants as to various residences

24  and places of business, et cetera; correct, sir?

25  A.      I would assume so, yes.

1 Q.      And the raid day in this case, was what date, if

2 you can recall?

3 A.      The first day of the -- most of the raids, we

4 had done some before -- was   June 1st, 2004.

5 Q.      Just so the ladies and gentlemen of the jury

6 have the correct time frame on this.  The last call Ms.

7 Johnston played with you, B8183, located at Page 614 of

8 Volume III of the book was on what date, Sergeant

9 Sakala?

10 A.      May 29, 2004.

11 Q.      That would be two days, give or take, before you

12 executed search and seizure warrants on all the places

13 that you did on the 5th of June; right?

14 A.      Yes.

15 Q.      Prior to raiding -- prior to June 1 -- prior to

16 June of 2004, would it be fair to say that you did not

17 have objective evidence of a single drug transaction in

18 this investigation?

19 A.      That would be completely unfair.

20 Q.      It would be unfair?

21 A.      That's correct.

22 Q.      Okay.  Were there any controlled buys from --

23 let's look at Ms. Martin for now.  Were there any

24 controlled buys with Ms. Martin?

25 A.      Ever?

1  Q.      With Ms. Martin in this investigation  from ,

2  let's say, late '02 you said?

3  A.       '02 when we began?  Yes.

4  Q.      Can you give an approximate  date  for  the ladies

5  and gentlemen of the jury   so we understand  the time

6  frame?

7  A.      Yes.

8  Q.      Number  one?

9  A.      We arrested  Mr. Encarnacion  in November  of '01,

10 but he didn't begin cooperating  until  sometime  in 2002.

11 And my recollection  was it was later in 2002 than

12 beginning .

13 Q.      What date would you like to use?  July 1?

14 A.      End of 2002 would be accurate .

15 Q.      November  1?

16 A.      I don't know   the exact date .  I would have  to go

17 back and look at the reports.

18 Q.      From that date at the end of 2002 through but

19 not including raid day, June 1, 2004 , did you undertake

20 to effect a single controlled  buy with Paulette  Martin?

21 A.      I don't think  during that time period we made

22 any controlled  buys from Ms. Martin .

23 Q.      By the same question , you didn't undertake  any

24 controlled  sales with Ms. Martin ; correct ?

25 A.      If you're referring to a controlled  sale as in

1 selling her narcotics, then the answer would be no, we

2 did not.

3 Q.    So the ladies and gentlemen of the jury

4 understand, a controlled buy is where you use it either

5 with an undercover agent or a cooperating witness, for

6 instance, Mr. Encarnacion to sell drugs to someone;

7 correct?

8 A.    No, that is not a proper definition of a

9 controlled buy.

10 Q.    I'm sorry.  That's a controlled sell; isn't it?

11 A.    No, it's not a controlled sell either.

12 Q.    You're the expert.  Why don't you tell the

13 ladies and gentlemen of the jury    what a controlled buy

14 is?

15 A.    A controlled buy would be the use of a

16 cooperator only, not an undercover officer, where the

17 informant is searched prior to the buy, is given a

18 known amount of currency, is observed going directly to

19 either a house or to a meeting with an individual.

20 Immediately thereafter, the individual is searched

21 again, and the person is found to be free of the money.

22       In other words, the money is gone and having a

23 known quantity of drugs.  So, no matter who the person

24 is, they are simply being used as a vehicle that

25 transports money to the buy and drugs away from the

1  buy.   The under cover  person  that  you  reference d,  that's

2  a  direct  --  that  would  be  called  a  direct  hand-to-hand

3  purchase,  not  a  controlled  buy.

4  Q.      Then  I  mixed  up  the  terms.   My  apologi es.

5       To  continue  from  there.   The  direct  hand-to-hand

6  sell,  or  a  controlled  sell  would  be  the  very  same  thing

7  but  instead  of  get ting  drug s  from  the  target,  you  would

8  be  get ting  money  from  the  target  and  giving  to  the

9  target  the  drug s.   Would  that  be  a  fair  statement ?

10  A.      A  controlled  sell  would  be  the  opposite  of  a

11  controlled  buy,  yes.

12  Q.      Didn't  do  one  of  those  either ?

13  A.      No,  that's  correct.

14  Q.      That's  four  different  vehicle s  that  you  didn't

15  use.   Controlled  buy,  controlled  sell,  direct  buy,

16  direct  sell;  correct,  sir?

17  A.      During  that  time  period,  I  belie ve  none  of  those

18  four  thing s  happen ed;  that's  correct.

19  Q.      You  testifi ed  --  now,  going  back  to  your  role  as

20  the  case  agent.   Part  of  what  you  did  as  case  agent  is

21  to  review  all  of  the  telephone  calls;  is  that  a  fair

22  statement ?

23  A.      Yes.   That's  one  of  the  thing s  we  do.

24  Q.      In  add ition  to  monitoring  some  of  them,  you

25  listen ed  to  them  once  after  they  had  been  monitored  and

1 recorded; correct?

2 A.      Yes.

3 Q.      In fact, you listened to them all, I would say,

4 probably more than one time?

5 A.      That is very true, yes.

6 Q.      Maybe as many as five times each?

7 A.      On the pertinent calls, it could be as many as

8 five times each; the non-pertinent calls it could be

9 just once.

10 Q.     At least once on every call; correct?

11 A.      I would say I probably listened to every call at

12 least once, yes.

13 Q.     If my math is correct, and I'm sure it isn't,

14 there are about 500 calls, give or take, in these three

15 transcript books that the jury has been given?

16 A.      I think it's under 500, but about 500 would be

17 accurate.

18 Q.     481 or something like that? Let's use 500 as a

19 round number because we've got these guys, too, and

20 these are the calls that you think demonstrate that Ms.

21 Martin is dealing large scale quantities of drugs; is

22 that a fair statement?

23 A.      That is a fair statement.

24 Q.     You stated that calls in your view -- that

25 you've stated that calls that are pertinent, in your

1 view, are calls that don't seem normal; is that

2 correct, sir?

3 A.      That's correct, sir.

4 Q.      Calls that don't make sense?

5 A.      That is certainly one of the indicators.

6 Q.      In fact, you just used the phrase, doesn't make

7 sense with regard to -- court's indulgence, please.

8         Just earlier today, doesn't it make sense with

9 regard -- I think it was to the shirt business.  Do you

10 remember telling that -- saying that earlier today?

11 A.      Yes, I do.

12 Q.      And you said that by contrast, this call makes

13 perfect sense in the drug business; correct, sir?

14 A.      That's correct.

15 Q.      That would be perfect sense to you based upon

16 your training and experience; correct, sir?

17 A.      Yes, it makes perfect sense to me.

18 Q.      You're investigating --

19         MS. JOHNSTON:   Your Honor, if I could ask Mr.

20 Montemarano to let the witness finish his answers

21 before he starts the next question, please.

22         THE COURT:   Yeah.  If you would just --

23         THE WITNESS:   The call makes perfect sense to me

24 as a drug call, yes.

25         BY MR. MONTEMARANO :

1  Q.      That's based upon your training and experience

2  as a drug investigator?

3  A.      Sure.   Yes.

4  Q.      You'd agree you have no particular expertise in

5  the shirt business; do you?

6  A.      No, I do not.

7  Q.      Your dad wasn't a tailor; mom wasn't a

8  haberdasher; right?

9  A.      I think haberdashers make hats; don't they?

10  Q.      No, I think it's clothing.

11  A.      Okay.   Then that would show that I don't have a

12  certain amount of expertise in the shirt business.

13  That's correct.

14  Q.      It would be fair to say you have no way of

15  knowing whether something like that makes any sense in

16  the shirt business; is that a fair statement?

17  A.      I guess there's -- it's conceivable that

18  somewhere in the shirt business that might make sense.

19  Q.      Because you're looking at this for drugs; right,

20  sir?   This call that we talked about earlier today?

21  A.      I don't know if I'm looking for drug activity.

22  I'm certainly looking at the calls and what they mean,

23  but I'm not saying let me look at this call and let me

24  find drug activity.   That's not accurate.

25  Q.      Indeed, it's because of your view of these

1  transactions  as  involving  drug  activity  that  you  said

2  there  was  no  evidence  of  legitimate  conduct ;  is  that

3  correct , sir ?

4  A.      With  regard  to  this  call , there  is  no  evidence

5  that  Ms.  Martin  was  involve d  in  the  shirt  business .

6  Q.      Actual ly , you  said  there  was  no  evidence  of

7  legitimate  commerce  in  response  to  a  question     by  Ms.

8  Johnston  last  week ; correct , sir ?

9        MS.  JOHNSTON:    Objection .   Objection .

10       What  call  is  he  talk ing  about ?

11       MR.  MONTEMARANO :  I  didn't  say  it  refer red  to  a

12  call .

13       THE  COURT:   Well --

14       MR.  MONTEMARANO :   Shall  I  rephrase , Your  Honor ?

15       THE  COURT:   Pardon  me ?

16       MR.  MONTEMARANO :   Shall  I  rephrase ?

17       THE  COURT:   Yes , rephrase .

18       MR.  MONTEMARANO :   Thank  you , Your  Honor .

19       I  withdraw  the  question .

20       BY  MR.  MONTEMARANO :

21  Q.      You  said  in  response  to  a  question  by  Ms.

22  Johnston  with  regard  to  the  wiretap  that  -- back  when

23  you  began  your  testimony  last  week , there  was  no -- in

24  your  view , there  was  no  evidence  of  legitimate  commerce

25  being  under taken  by  Ms.  Martin .

1          Do you remember saying that?

2  A.     I don't think I said that. I don't recall

3  saying it and putting that in that broad of terms. No,

4  I do not recall saying that was unqualified, that she

5  never engaged in legitimate commerce.

6  Q.     Your view of Ms. Martin's involvement in the

7  drug business, as you testified, is because as you've

8  stated last week, because you're sure; is that a fair

9  statement? About her involvement in the drug business?

10 A.     I'm sorry. You're going to have to rephrase

11 that. I don't understand what you're saying.

12 Q.     Sure. You testified as to the lack of commerce

13 involving Ms. Martin. Do you recall saying that?

14 A.     Again, I don't recall saying that Ms. Martin

15 ever or never engaged in a legitimate commerce. I

16 certainly don't think that, and I think we've talked

17 about legitimate sales of clothes that she told this

18 morning. If I said that -- and I certainly don't think

19 I did -- I certainly misspoke. So, if that answers

20 your question...

21 Q.     You've stated that, in your view, drug

22 investigations and their relationship to deciphering a

23 wiretap are not rocket science; is that a fair

24 statement?

25 A.     That's correct.

1  Q.      In fact , it's based upon your expertise  and your

2  knowledge  that you can demonstrate  or you can  testify

3  that you're sure about  what  these call s mean ; is that a

4  fair  statement , sir ?

5  A.      Yes , I am sure .

6  Q.      In fact , you're so sure  that you testifi ed last

7  week that you could define the nature  of call , you

8  could ascertain  its mean ing to a moral  certainty .   You

9  used those words ; did you not , sir ?

10 A.      I used the words  moral  certainty , but not  in

11 the context  you just asked .  I said when  I offer  an

12 opinion , it will be to a moral  certainty , not I can't

13 look at every  conversation  and tell you what it was

14 about .   In fact , I told you there were call s, and I

15 said I cannot  tell you what they're  talk ing about .

16 Q.      Court 's indulgence , please .

17         Do you have  the transcript  book s up in front of

18 you , sir ?

19 A.      Yes , I do .

20 Q.      I'd like you to turn to Volume  II, if you would

21 be so kind .  First  call , Page  251.   Call  B2383  on April

22 1.  Do you recall  listening  to that call in the past ?

23 A.      Yes .

24 Q.      Do you recall  having  it play ed before  the jury ?

25 A.      Yes .

1  Q.      That was last week, was it not?

2  A.      Probably, yes.

3  Q.      I'm not sure either.  This is a call that you

4  said involved "Becky" Dobie, that would be Lavon Dobie,

5  coming over to her house in the middle of the night

6  wanting drugs; correct, sir?

7  A.      Yes.

8  Q.      And you say that to a moral certainty, this call

9  involved "Becky" Dobie wanting drugs in the middle of

10 the night; correct, sir?

11 A.      Coming over to the house and causing a ruckus,

12 yes.

13 Q.      At the bottom of the page, Page 251, read what

14 Paulette Martin says.

15 A.      Paulette Martin says, and then she had **Faggy**

16 standing.  I said "Becky", please, she don't want

17 anything.  She don't want anything.

18 Q.      Continue on the top of 252.

19 A.      You want me to continue reading?

20 Q.      Please?

21 A.      She just wanted to come by her here and tell me

22 she heard Mumpsy Bumpsy got shot six times, and then

23 she called him.  She could have called me on the phone.

24 She said she did but I didn't answer.

25 Q.      Okay.  Ms. Martin says in that call specifically

1  that "Becky" Dobie didn't want anything other than to

2  tell her about Mumpsy Bumpsy being shot; is that a fair

3  statement?

4  A.      That is a fair statement.

5  Q.      Yet you have testified that to a moral

6  certainty, this is a call involving "Becky" Dobie

7  coming over and asking for drugs.

8  A.      No, that's not what I said.  I said it was  Mr.

9  Martin and Ms. Martin complaining about "Becky" coming

10  over at all hours of the  night, which is what the whole

11  call is about, so they were using the last night as the

12  tip of the iceberg of the problem.

13  Q.      Court's indulgence, please.

14          Another common tool, beyond the control and

15  undercover or direct buys and sells that we discussed

16  earlier, is observations looking for evidence of street

17  sells; is that correct, sir?  Is that a correct

18  statement, sir?

19  A.      I'm not sure what you mean, but surveillance

20  certainly is a common tool.

21  Q.      Part of surveillance is oftentimes you go to a

22  place where people are known to sell drugs; correct,

23  sir?

24  A.      Yeah.  There are people who do that, yes.

25  Q.      Also, you go to -- attempt to observe a person

1  you believe is selling drugs.  Wherever that person
2  happens to be, you follow the person around; is that a
3  fair statement, sir?
4  A.     That is a fair statement.
5  Q.     Also, you can see what's known as a hand-to-hand
6  purchase; correct, sir?
7  A.     I wouldn't say often, but it is possible.
8  Q.     It's certainly possible.  In addition to
9  hand-to-hand sells, you often see other peripheral
10 conduct which is indicative, in your view, as a trained
11 drug investigator of narcotics activity; correct, sir?
12 A.     Yes, you will see that.
13 Q.     A classic example of that is a person standing
14 on a corner doing what's called "steering;" correct,
15 sir?
16 A.     Called what?
17 Q.     Steering.  Touting?
18 A.     Never heard either one of those terms.
19 Q.     Where a person might be hanging on a street
20 corner telling people where they can get drugs?
21 A.     That I have not observed.  I'm sure it does
22 happen, but I have not observed it.
23 Q.     Okay.  You ought to come to Baltimore, then.
24        In addition, there are people on a street corner
25 who are lookouts; correct, sir?

1 A.        Yes, sir.

2 Q.        And a common phraseology in that context is

3 having people yell "5-0;" correct, sir?

4 A.        "5-0" would refer to the police.

5 Q.        They would want to let people know the police

6 are on the way; correct, sir?

7 A.        Or are there, yes.

8 Q.        Or are there; correct, sir?

9 A.        Yes.

10 Q.        We had none of that in this case; correct, sir?

11 A.        We have no one yelling 5-0.

12 Q.        We have no surveillance on street corners;

13 correct, sir?

14 A.        No.  I know we've done a lot of surveillance,

15 and I'm sure there were street corners involved, so

16 that would be incorrect.

17 Q.        No.  No.  Surveillance as far as people standing

18 out -- as far as lookouts on street corners as

19 surveillance.  None of that.  No surveillance like

20 that; correct, sir?

21 A.        I'd have to go through all the reports.  I could

22 not say we have never seen a lookout as part of this

23 case.  There were probably dozens, if not hundreds of

24 surveillances, so I could not offer an opinion.

25 Q.        Let me direct your attention to the pole cam

1 video s.  We've seen half dozen of those , what, eight ,

2 ten , twelve ?

3 A.      Somewhere around there , yes .

4 Q.      Nobody out there yelling, 5-0; correct ?

5 A.      No , I think we heard testimony about a neighbor

6 yelling and screaming about a car.  They did not yell

7 5-0, but they pointed out to -- I don't know what they

8 said , but they said something to Ms. Martin that

9 alerted her to do it.

10 Q.      That would be Detective Schrier sitting there in

11 an unmarked SUV with Virginia plate s; is that correct ,

12 sir ?

13 A.      That 's right .

14 Q.      That is in a neighborhood where we know we have

15 a neighborhood watch of some sort; correct , sir?

16 A.      I have no idea if there 's a neighborhood watch

17 there at all.

18 Q.      Well there was a meeting that was described in

19 some of the later phone calls, people meeting and talk

20 about what Ms. Martin may or may not be doing in her

21 home; correct , sir?

22 A.      There was a meeting that was discussed.  I have

23 no idea if this was a neighborhood watch meeting.

24 Q.      I'm not saying neighborhood watch with a capital

25 N and capital W.  There were at least some concerned

1 citizens who noticed something out of sorts.

2 A.      Yes, I would agree with that.

3 Q.      Thank you.

4       In addition, if I understand correctly, starting

5 in late '02, when this investigation really ramped up,

6 during that time, there were no seizures of drugs from

7 Ms. Martin, until at some point later, if at all;

8 correct, sir?  Certainly not through, "'til the first

9 of June?"

10 A.      There were no seizures of Ms. Martin during that

11 time period until the raids.  I would agree with that.

12 Q.      Okay.  Detective Schrier suggested doing a trash

13 run during one of these surveillances; correct, sir?

14 A.      Yes.

15 Q.      In fact, he also said he lifted 15 bags of

16 trash; is that correct?  He said he went through 15

17 bags of trash.  It wasn't from the P.G. County Police

18 where he took the stuff; did he?

19 A.      No.

20 Q.      Tell me.  What day do they pick up trash on

21 Hayward?

22 A.      I don't know.

23 Q.      How many days a week do they pick it up?

24 A.      I don't know.

25 Q.      Between March 8, when you went up on the wire,

1  and June 1st, when you raided Hayward and all these

2  other places, that's about -- if my math serves, that's

3  about 12 weeks?

4  A.     It was about three months.

5  Q.     Yeah, okay.  Assuming it's 12 weeks, would you

6  assume they pick up trash at least once a week?

7  A.     Most places, yes.

8  Q.     That's at least 12 times trash that has been put

9  out on Hayward during this time; is that correct?

10  A.     No.  I would have no idea.  I have no idea if

11  that was the only time, or if she put it out once a

12  week.

13  Q.     I didn't say Ms. Martin.  I said 12 times the

14  trash has been put out on Hayward; correct?

15  A.     Again, I don't know.  I don't know if there was

16  nobody putting out trash; if they took their trash to

17  the dump.  I just don't know.  I can review the tapes.

18  Off the top of my head, I don't know.

19  Q.     It would be reasonable to assume that people

20  might well put out trash --

21  A.     Yes.

22  Q.     -- on trash day?

23  A.     Yes.

24  Q.     You don't need 18 years in narcotics

25  investigation experience to ascertain that; is that a

1 fair statement?

2 A.     I agree with that, but you're asking me that 12

3 times people put out trash, and I can't agree with

4 that.

5 Q.     Would the question make you more comfortable if

6 I said probably?

7         MS. JOHNSTON:   Objection.

8         THE COURT:   Mr. Montemarano, I think you're

9 arguing with the witness.  I think you've made your

10 point.

11        MR. MONTEMARANO:   Fair enough, Your Honor.

12        BY MR. MONTEMARANO:

13 Q.     You did one trash run?

14 A.     We did one.  I don't know if we did another one,

15 but I know we did the one.

16 Q.     During this time, there was a male living at Ms.

17 Martin's home on Hayward; correct?

18 A.     During the second latter half of the wire, Mr.

19 John Martin moved in; in the first half, there was not

20 a male living there.

21 Q.     So ladies and gentlemen of the jury   understand,

22 John Martin is an African-American  male about how old?

23 A.     He's probably in his 50s.

24 Q.     Okay.  About Ms. Martin's age, give or take?

25 A.     I would assume, yes.

1 Q.     And he's living there with Ms. Martin; correct?

2 A.     Again, during -- sometime in probably April --

3 mid-April, he moved in, so.

4 Q.     So you knew he moved in; correct?

5 A.     Yes, we knew.

6 Q.     You knew he had a prior relationship with Ms.

7 Martin; correct?

8 A      He had a relationship prior to moving in, yes.

9 Q.     During prior years; is that a fair statement?

10 A.    Yeah. I don't know if we knew that at the time.

11 Q.    Okay. Ultimately, you ascertained that;

12 correct?

13 A.    Yes. They've known each other for a number of

14 years.

15 Q.    You ascertained that at some point before June

16 1st. If you don't know, you don't know. It's okay.

17 A.    Yeah. I know we found that out, but I just

18 don't know when we found that out.

19 Q.    Okay. And when he moved in, did you do sort of

20 an investigation regarding Mr. Martin?

21 A.    I'm sure we did. I'm sure as soon as we

22 identified him, we, you know, tried to find out

23 everything we could about him.

24 Q.    And it would be fair to say that during that

25 investigation, you ascertained he had been arrested in

1 August of 2002; correct?

2 A.     Yes, we did.

3        MS. JOHNSTON:    Objection.

4        THE COURT:   Basis?

5        MS. JOHNSTON:   It assumes facts not in evidence.

6        MR. MONTEMARANO:  I'm asking the detective if he

7 knows.

8        THE COURT:   All right.

9        THE WITNESS:    There was an arrest of him.  I'm

10 not sure your date's right, but I'd have to go back up.

11 He was arrested in Takoma Park.

12       BY MR. MONTEMARANO:

13 Q.     Summer?  Maybe it was July?

14 A.     Correct.

15 Q.     Just so the ladies and gentlemen of the jury

16 know, we're talking about the same thing.  This is an

17 arrest where there is a large plastic garbage bag in

18 the backseat of his vehicle; is that correct, sir?

19 A.     Yes.

20 Q.     In that large plastic garbage bag, sitting in

21 plain view in the back seat of his vehicle.  Tell the

22 ladies and gentlemen of the jury    what was in the

23 garbage bag.

24 A.     Kilogram wrappers.  Approximately  25.

25 Q.     Approximately 25  kilogram  wrappers of cocaine;

1 correct, sir?

2 A.      Yes.  Well, of cocaine residue.   The cocaine had

3 been removed.

4 Q.      The packages were for cocaine.

5 A.      That's correct.

6 Q.      There were residue on them?

7 A.      That's correct.

8 Q.      You've testified earlier regarding the nature

9 and shape of a wrapper, and we've heard testimony

10 during this trial how you can sort of fit the wrapper

11 back together and there is the brick of cocaine but for

12 the brick?

13 A.      Yes.

14 Q.      They have all used duct tape and plastic wrap;

15 is that correct?

16 A.      Yes.

17 Q.      Those wrappers were in the format -- is that how

18 they come off the boat?

19 A.      How they come into the country.

20 Q.      How do they come into the country?  By air?

21 A.      By land, air, sea, yes.

22 Q.      Whatever.  That's how they get here?

23 A.      Yes.

24 Q.      I'm sure the ladies and gentlemen of the jury    --

25 let's be clear.  Cocaine is not indigenous to the

1 United States of America.

2 A.     It is not.  As far as I know, it is not

3 manufactured anywhere in the U. S.

4 Q.     It comes from coca leaves.  Coca plants are not

5 grown anywhere in the U. S.

6 A.     That's correct.

7 Q.     So it comes here from somewhere, and that's the

8 discussion that you related to us, I'm going to say it

9 was maybe yesterday or the day before, concerning

10 original wrapping and desire for original wrapped

11 cocaine; correct, sir?

12 A.     Yes.

13 Q.     Twenty-five of them?

14 A.     Mr. Martin's car, there were approximately 25,

15 yes.

16 Q.     He moved in about when?

17 A.     It was near the middle of the wire.  I want to

18 say April -- mid-April, 2004.

19 Q.     Would that be before or after Detective Schrier

20 -- he's a detective; isn't he?

21 A.      Yes.

22 Q.     Detective Schrier's trash run?

23 A.     I don't know.  I don't recall the date of the

24 trash run, but I don't know.

25 Q.     Okay.  And the result of that trash run were a

1  two-pound box of baking soda; correct?

2  A.      Yes.

3  Q.      A perfectly legal product, purchasable at pretty

4  much any hardware or grocery store in the Washington,

5  D. C. - Metropolitan area, fair statement?

6  A.      Yes.

7  Q.      No cocaine wrapper?

8  A.      No, not that I'm aware.

9  Q.      No Pyrex dishes or glass dishes with cocaine

10 residue?

11 A.      That's correct.

12 Q.      No measuring implements or spoons or strainers

13 or anything like that with cocaine residue?

14 A.      That's correct.

15 Q.      No packaging material for cocaine, like small

16 viles or small Ziplocs or anything like that?

17 A.      I believe that's accurate.

18 Q.      Court's indulgence, please.

19         You testified earlier today, I believe, or

20 late yesterday, actually, about there being heroin that

21 Ms. Martin obtained from Mr. Turner.

22 A.      Yes.

23 Q.      And that would be William Turner; correct?

24 A.      Yes.

25 Q.      William Turner who is the known associate of

1  Gwen Levi; correct?

2  A.      Yes.

3  Q.      Gwen Levi, so the ladies and gentlemen of the

4  jury remember, is the woman who was arrested with 2.3

5  kilogram s of raw heroin being transport ed back from New

6  York; correct?

7  A.      That is correct.

8  Q.      And 2.3 kilogram s would be just about three

9  pounds, give or take; correct?

10  A.      Yeah.  It's probably actual ly more than that.

11  It's 2.2 per kilogram.

12  Q.      Excuse me, more like five pounds?

13  A.      I would say it's probably close r to five than

14  three, yes.

15  Q.      A lot of heroin?

16  A.      It's a lot of heroin, yes.

17  Q.      And Ms. Levi 's name was found in Mr. Uriarte's

18  ledger; correct?

19  A.      Ms. Levi 's name was found in the ledger, is that

20  what you said?

21  Q.      Yes.

22  A.      I don't think  her name was found in the ledger,

23  no.

24  Q.      Was there not a transaction  that reflec ted her

25  purchase  of this heroin?

1  A.      I think Ms. Levi was referred to as the pronoun

2  "her".  I gave her, not her name.

3  Q.      And there was a transaction in that ledger that

4  pretty much matched up to the amount of money written

5  on the box that the money was transported to New York

6  in; correct?

7  A.      Yeah, the money amounts.

8  Q.      It turned out the count was off?

9  A.      The count was a little off, yes.

10  Q.      Mr. Turner was at Ms. Levi's home when it was

11  searched.  That's the Digger's Lane address; correct?

12  A.      That's correct.

13  Q.      In those three books, there is not a single call

14  between Mr. Turner and Ms. Martin; is that correct?

15  A.      Say that again.

16  Q.      In these books, these transcript books, these

17  three black, spiralled-bound books reflecting the 500

18  calls that the jury has been provided with, there's no

19  calls between Paulette Martin and William Turner?

20  A.      Not in these books, no.

21  Q.      Court's indulgence, please.

22          Now, you testified repeatedly concerning the

23  transactions allegedly taking place between George

24  Harris and Milburn Walker and Ms. Martin; correct?

25  A.       Yeah.  Between George Harris and Ms. Martin,

1 and Ms. Martin and Mr. Walker, yes.

2 Q.      My mistake.   Between George Harris and Ms.

3 Martin, and between Milburn Walker and Ms. Martin;

4 correct?

5 A.      Yes.

6 Q.      You stated that those transactions all were

7 characterized by the number eight.

8 A.      Quite a few of the conversations are preceded by

9 the number eight; some are not.

10 Q.     Often characterized by the number eight?

11 A.      Yes.

12 Q.     Size eight? Eight of? Is that correct, sir?

13 A.      Yes.

14 Q.     You think the number eight means something to

15 you because it might mean an eighth of a kilogram;

16 correct?

17 A.     It might be an eighth of a kilogram or eighth of

18 an ounce.  In some circumstances you're able to

19 determine what that amount is based on with other

20 calls, some you cannot.

21 Q.     Repeatedly, you've said to us while you were

22 testifying, if I understood you correctly, that you

23 don't know if it's an eighth of a kilogram or one-

24 eighth of an ounce; correct?

25 A.     That is correct.

1  Q.      A kilogram is approximately  35 ounces; is that
2  correct?
3  A.      A little over 35, yes.
4  Q.      So an eighth of a kilogram is 125 grams?
5  A.      Yes, it is.
6  Q.      An eighth of an ounce is about, shall we say,
7  about three grams?
8  A.      3.5 grams.
9  Q.      3.5.
10         How do those numbers relate?  Factor of about
11  40.
12  A.      Relate to each other?
13  Q.      Each other.
14  A.      125 is larger than 3.5.
15  Q.      By a factor of?
16  A.      I'd have to do the math, but it's larger.
17  Q.      Close to 40 times as much; right?
18  A.      That could be true.
19  Q.      Indeed, you've also remarked on the number 125;
20  correct, sir?
21  A.      In relation to the eighth of a kilogram?
22  Q.      You testified in relation to the significance  of
23  the number 125; correct, sir?
24  A.      In regards to?
25  Q.      Pricing.

1 A.      Prices, yes.  $125?  Is that what you're

2 referring to?

3 Q.      Yes, sir.

4 A.      Yes.

5 Q.      That's over here.  If we were to turn this into

6 a little chart, that's a rough price for an eighth of

7 an ounce of cocaine.

8 A.      That's correct.

9 Q.      Also known as an eight ball.

10 A.      That's correct.

11 Q.      So if you hear 125, you cannot tell the ladies

12 and gentlemen of the jury , to a moral certainty , if

13 it's an eighth of a key or an eighth of an ounce,

14 right?

15 A.      If I hear 125 referring to a dollar amount, I

16 would say it's related to an eighth of an ounce, not an

17 eighth of a key.

18 Q.      We're talking coded language.  Someone could be

19 using dollars and meaning grams and vice versa;

20 correct, sir?

21 A.      They could be.  They did not in this

22 circumstance.

23 Q.      Because you were not a participator in these

24 conversations, or is that just your educated opinion?

25 A.      That is my opinion, yes.

1  Q.      125 grams of cocaine indicated intent, under all

2  circumstances, to distribute cocaine?

3  A.      Yes.

4  Q.      $125 worth of cocaine.  Personal use?

5  A.      How much cocaine are we talking about?

6  Q.      $125 worth.  That's an eight ball.  You've

7  already said that's a reasonable price.

8  A.      In this circumstances, an eighth of an ounce,

9  that would be indicative of possession of intent to

10 sell.

11 Q.      It would be indicative of possession with intent

12 to sell?

13 A.      It would be indicative of possession with intent

14 to sell, yes.

15 Q.      It's not possible a person would buy an eight

16 ball for personal use?

17 A.      I'm not saying it's not possible.  It is

18 possible.  It's not likely, no.

19 Q.      During this time, you-all undertook all this

20 surveillance; correct?  You had the pole cam up at

21 Hayward; correct?

22 A.      Yes, we did.

23 Q.      When you would hear phone calls that you thought

24 meant something related to your investigation, you

25 would call the surveillance officers on-call and get

1  them scooped over to Hayward to watch what's going on;
2  is that correct, sir?
3  A.     No.  If we heard something that surveillance
4  could be useful and we thought was important, then we
5  would, but not on every call.
6  Q.     I didn't say on every call.  When you thought it
7  was important, you can get officers over there to
8  surveil Hayward; correct?
9  A.     Again, the determination is   not just is it
10 important, because I would have loved to have
11 surveillance every day on everything, but you cannot do
12 that.  So the only consideration  is not just whether
13 it's important.
14 Q.     Surveillance would even go to other places;
15 correct, sir?
16 A.     That's correct.
17 Q.     For instance, the March 29 transaction with --
18 excuse me, the March 29 meeting with Ms. Martin and Ms.
19 Harden; correct?
20 A.     That's correct.
21 Q.     Which you've testified to was a drug
22 transaction; correct?
23 A.     Yes, I have.
24 Q.     You heard Detective Musselman testify that what
25 was transferred was a piece of paper; correct?

1 A.      No.  I heard that's all he could  see was a piece

2 of paper .

3 Q.      As far as  he knows, what  was transferred  was a

4 piece  of paper ; correct ?

5 A.      What  he saw  was a piece  of paper .

6 Q.      Do you recall  how far away Detective  Musselman

7 was from this  hand-to-hand  transfer ?

8 A.      I don't recall  what  he said .  My recollection

9 was that  he was  not overly far .

10 Q.      Did I ask him on direct  -- on cross , I think  he

11 said  15 to 20 feet ?

12 A.      I don't recall  exactly what  he said .

13 Q.      With all this  opportunity  to undertake

14 surveillance  -- and you did undertake  it when you

15 thought  it was  important ; correct , sir ?   Did anybody

16 ever offer  --

17 A.      I'm sorry .  If that  was a question , again , the

18 answer  is no, that  is not correct .

19 Q.      You undertook  some  surveillance , fair  statement ?

20 A.      That  is fair .

21 Q.      Did any  of your  surveillance  ever extend  to

22 Milburn  Walker ?

23 A.      Yes .

24 Q.      Did any  of your  surveillance  extend  to Milburn

25 Walker  other  than his  trips to 810 Hayward ?

1 A.      Yes.

2 Q.      Where did you see him?

3 A.      We did surveillance at Mr. Walker's residence.

4 We also saw Mr. Walker on the day of the raids at the

5 school on South Dakota Avenue.

6 Q.      Same question concerning Mr. Harris, George

7 Harris.  Other than his trips to Hayward --

8 A.      Yes, we did.

9 Q.      Where?

10 A.      We did surveillance on Mr. Harris at his

11 residence, and I believe -- I would have to check the

12 reports, there was surveillance done on him in

13 Washington, D. C.

14 Q.      Court's indulgence, please.

15         You testified earlier today you thought the

16 significance of the discussion between Ms. Martin and

17 Mr. Goodwin related to welfare checks; is that correct?

18 A.      Yes.

19 Q.      That's because, for lack of a better term,

20 welfare checks are sent out and cashed, people are

21 flush and have money to spend on whatever they want to

22 spend money on?

23 A.      It's a common -- very common in the drug trade

24 that people want to sell the drugs at the beginning of

25 the month because of that, yes.

1   Q.        Mr. Harris was employed, was he not?

2   A.        Yes, I believe he was.

3   Q.        Mr. Walker was employed, was he not?

4   A.        I believe he was.  I'm not as sure as I am with

5   Mr. Harris.

6   Q.        Let me ask you a different question.

7   A.        Sure.

8   Q.        Was either one of them on welfare?

9   A.        I don't know.

10  Q.        Anybody else related to this case that you're

11  aware of on welfare?

12  A.        I have no idea if any of her customers or

13  anybody in this case was getting assistance.

14  Q.        Court's indulgence, please.

15            Do you recall the words "entertainment attorney"

16  crossing Ms. Martin's lips during the time of the

17  wiretap?

18  A.        Yes.

19  Q.        Do you recall her referring repeatedly to

20  needing an entertainment attorney; correct?

21  A.        Yes.

22  Q.        She was speaking to an entertainment attorney;

23  correct?

24  A.        Yes.

25  Q.        And meeting an entertainment attorney; correct?

1  A.      Yes.

2  Q.      Did you ever follow her to any of those

3  meetings?

4  A.      No.  I should say --

5  Q.      I'm sorry?

6  A.      I do not believe so.  It's possible we did, but

7  I do not believe we did.

8  Q.      Do you know which entertainment attorney or

9  attorneys she met with?

10  A.      We identified the attorney.  I don't remember

11  his name as I sit here.  I'd have to look back at the

12  calls and logs.

13  Q.      Would the name Spencer Boyer ring any bells?

14  A.      Yes, it does, and that could be the name that

15  sounds familiar.

16  Q.      Court's indulgence.

17          Page 17 of the A log.  Refresh your

18  recollection, if I could.

19  A.      Sure.

20  Q.      Taking a look at the log.  This would assist you

21  in recalling; would it not, sir?

22  A.      Yes, it would.

23  Q.      See the highlighted call there?

24  A.      Yes.

25  Q.      Can you give the ladies and gentlemen of the

1 jury the date and time of the call?

2 A.      The date was March 18, 2004, at 5:49 p.m.

3 Q.      And the number of the call from the A line?

4 A.      She received an incoming call from (240)

5 535-0666.

6 Q.      The A number?

7 A.      Oh, (202) 277-8177 is the A line.

8 Q.      It's identified as Call A301?  I'm not asking

9 the questions very well.  I'm sorry.

10 A.      That's correct.

11 Q.      When we're talking about this call, we can refer

12 to it as A301?

13 A.      Sure.

14 Q.      And A301 is not in the book; correct?   It's in

15 Volume Book 1 on March 19; is that correct?

16 A.      Correct, probably, yes.

17 Q.      March 18, I'm sorry, and she references an

18 entertainment attorney by the name of Spencer Boyer and

19 gives his phone number; correct?

20 A.      That's what the synopsis reflects.

21 Q.      You've reviewed these synopses to insure they

22 are, reasonably speaking, accurate; correct?

23 A.      Yes.

24 Q.      There are places in the logs where you have

25 corrected things that you think are incorrect?

1  A.        Yeah.  We will put a note in there if we think

2  the monitor has made a mistake in the synopsis  .

3  Q.        Wrong name and wrong time?

4  A.        Correct.

5  Q.        In fact, you put your name after that note that

6  says "case agent;" correct?

7  A.        That's correct.

8  Q.        While we're talking about entertainment

9  attorneys -- that's on March 18 -- I'd like you to

10 turn, if you could, please, to Page 560, which I

11 believe has been -- no, excuse me, Book 2, Volume II,

12 Page 399.  It's Call B4562; correct, sir?

13 A.        Yes.

14 Q.        And you recall that in Call B4562 -- what's that

15 date, if you could?

16 A.        That was on April 27, 2004, at 12:39 p.m.

17 Q.        In that call, Ms. Martin refers to her

18 entertainment attorney again; correct?

19 A.        Yes, she does.

20 Q.        That's five weeks after the March 18 call;

21 right?  More than five weeks?

22 A.        Maybe six weeks, yes.

23 Q.        Maybe six weeks.  I'd like you to turn to Page

24 516 in Book 3.

25           Can you give the ladies and gentlemen of the

1  jury the date and time of the call?

2  A.     Call A1731 was intercepted on May 19, 2004, at

3  10:51 a.m.

4  Q.     In that call, there's a reference to the

5  "entertainment attorney?"

6  A.     Yes, there is.

7  Q.     And that's three weeks after the call on Page

8  399; right?  The April 27 call?

9  A.     Yeah.  About three weeks, yes.

10  Q.     Last, I invite your attention to Page 599, which

11  is Call B7815.  Do you see that, sir?

12  A.     Yes, I do.

13  Q.     Date and time of the call, please?

14  A.     Call B7815 was intercepted on May 26, 2004, at

15  12:19 p.m.

16  Q.     Is there a reference to an entertainment

17  attorney in that?

18  A.     Yes, there is.

19  Q.     That's six days before the raids?

20  A.     About that, yes.

21  Q.     Without belaboring the obvious.  There is a huge

22  number of calls in the logs where Ms. Martin discusses

23  musical acts; is that a fair statement?

24  A.     That is a fair statement.

25  Q.     The one musical act who comes up most often

1 would be Aretha Franklin; correct?

2 A.     I haven't quantified it, but it wouldn't

3 surprise me, because she talked about Ms. Franklin a

4 lot.

5 Q.     You didn't count, and I'm not sure I recall from

6 my count.  How about she comes up very often?

7 A.     That is correct.

8 Q.     Other musical acts come up; is that correct?

9 A.     Yes.

10 Q.     They are musical acts, which, for lack a better

11 term, an African-American woman in her 50s might be

12 interested in; is that a fair statement?

13 A.     I would have no idea about that.

14 Q.     There are no country and western acts; right?

15       MS. JOHNSTON:    Objection.

16       THE COURT:   Overruled.

17       BY MR. MONTEMARANO:

18 Q.     No Garth Brooks?

19 A.     I hate to say it, but I guess I'm getting old.

20 I was not familiar with all the acts, so I am not

21 familiar with their specialty of music.  I am familiar

22 with Ms. Franklin.

23 Q.     I'm afraid we might be of the same generation,

24 Sergeant Sakala.

25       With some of the other acts, if you recall,

1 Beyonce?

2 A.      Yes, that was mentioned.

3 Q.      R. Kelly?

4 A.      Yes.

5 Q.      Oh, heavens,  I'm having  trouble  remembering  some

6 of the others.  Alicia Keys.  In fact, she's mentioned

7 in one of the books; isn't she?

8 A.      That's correct.  I don't know  if she was

9 mentioned as part of the music acts, but she could have

10 been.

11 Q.      Well, there are lots?

12 A.      There are lots of them.

13 Q.      There's so many, you can't name them all; is

14 that correct?

15 A.      Not without going through and making a list,

16 that's correct.

17 Q.      That would be something you might expect to see

18 if someone was involved in legitimate  commerce

19 involving the music industry?

20 A.      Yes, I would say that's possible.

21         MR. MONTEMARANO:  Your Honor, if we could.

22         THE COURT:  Oh, that's right.  Yes.

23         Ladies and gentlemen, we're going to take our

24 recess now.  I have some matters to attend to that are

25 going to take a little bit longer than normal, so I

1  will see you back here at 2:30.

2            (Off the record at 12:59 p.m.)

3        THE COURT:  Counsel, I will see you back here at

4  2 o'clock.  In connection with the 2 o'clock:  Ms.

5  Johnston, I would like most to hear from you on the

6  photograph question about the dead pig.

7        MS. JOHNSTON:  Your Honor, certainly I think

8  when the Court hears the circumstances and why it's

9  relevant --

10       THE COURT:  No. make sure you -- the dead pig

11  stands in a different category than the gun being

12  pointed at the dead pig.

13       MS. JOHNSTON:  Your Honor, perhaps the Court

14  would also -- I'd like to refer the Court to the Fourth

15  Circuit decision in *United States versus Grimmond* --

16       THE COURT:  Wait a minute.  You're going too

17  fast for me.  All right.

18       MS. JOHNSTON:  G R I M M O --

19       MR. MITCHELL:  I'm sorry I can't hear.

20       MS. JOHNSTON:  I will give you the cite, Mr.

21  Mitchell.  It's at 137 F.3d 823.  It's not about

22  photographs, but it's about evidence that the defendant

23  had shot two individuals --

24       THE COURT:  All right.

25       MS. JOHNSTON:  -- which was determined to be

1  admissible .  It's 137 F.3d 823 .  The defendant 's last

2  name is Grimmond , G R I M M O N D, but we will explain

3  the circumstance s to the Court .  The Court does n't have

4  those  circumstance s in front  of it.

5        THE COURT:   I already  have pull ed the Hamm case

6  and the another  one I opened  up, the *US v. Rose ,* which

7  I have  from  the First  Circuit  that's cited --

8        MS. JOHNSTON:   Your Honor,  I would  also  suggest

9  that the Court  also look  at --

10       THE COURT :  You're going  too fast .

11       MS. JOHNSTON:   The Van Meter  case , a Fourth

12  Circuit  case that goes  to, I guess what counsel  is

13  call ing this other  crime s evidence,  although  I don't

14  think  this is another  crime necessarily  because  you may

15  be able to shoot  a pig on your  own property , but the

16  Powers case having  to do with  limited  instruction s, the

17  case s that  he cite d.

18       THE COURT:   All right .  We will look  at the

19  case s that  they've  cite d.

20       MS. JOHNSTON:   I may have  some  other  case s.

21       THE COURT:   All right .

22       MR. MITCHELL:   Another  issue, Your  Honor .  I

23  understand  that  the government  intends  to bring  this

24  evidence  in between  our cross-examination   of Detective

25  -- Sergeant  Sakala .

1          THE COURT:  Mr. Mitchell, Mr. Montemarano  is
2 going to turn into a pumpkin right in front of us.
3          MR. MONTEMARANO:  I've got another couple of
4 moments, Your Honor.  I'd like to hear this.
5          THE COURT:  All right.  I didn't want to cut you
6 off.
7          MR. MITCHELL:  I would just note an objection to
8 that, because I think it would draw --
9          MS. JOHNSTON:  Mr. Mitchell, let me interrupt
10 you.  I don't intend to interrupt the cross-examination
11 to put on the detective.  Had he been here when we
12 finished our direct, I would have put him on then.
13 Since you're in cross-examination, you're going to
14 finish your cross-examination, and so if that's the
15 issue --
16          THE COURT:  Counsel, I will see you at 2
17 o'clock.
18               (Off the record at 1:02 p.m.)
19               (On the record at 2:06 p.m.)
20          THE COURT:  Mr. Montemarano, are you and Judge
21 Blake all resolved?
22          MR. MONTEMARANO:  Copasetic.
23          THE COURT:  All right.  Mr. Mitchell, I have
24 your motion.  Your client is charged with a firearms
25 violation; correct?

1          MR. MITCHELL:   That's correct.

2          THE COURT:   What is your objection to these

3 pictures?   I've got your motion, but do you want to add

4 anything?

5          MR. MITCHELL:   Well, Your Honor, I don't want to

6 add too much more to this, but the objection is the

7 unfair prejudice that the pictures depict depicting the

8 shooting of a pig is going to have on a jury when

9 they're evaluating whether Mr. Bynum is guilty of the

10 drug offense and also the felon in possession.   And in

11 addition to that, it's cumulative evidence because they

12 already have --

13          THE COURT:   Is not it powerful evidence of the

14 crime with which he stands charged; i.e., possession by

15 a felon?   It doesn't show the felon part, but it shows

16 the possession; correct?

17          MR. MITCHELL:   Correct.   So is the gun and the

18 ammunition that they are going to introduce, and that

19 is all too powerful when they're going to hold this big

20 gun up with the ammunition and perhaps even put it near

21 or in the jurors' hands.   That's extremely powerful.

22          THE COURT:   How does the government --

23          MR. MITCHELL:   This is unfair --

24          THE COURT:   How does the government contend with

25 an argument that you might make that, well, they may

1  have found this gun here, but he didn't know it was

2  there or it was somebody else's gun and on and on and

3  on?  This is something that connects your client to the

4  gun; isn't it?

5      MR. MITCHELL:  That argument is going to be

6  there irregardless of the pictures, but the pictures

7  create an emotional response by the jury, not response

8  of determining whether or not the gun was actually in

9  his house, but how dare someone shoot a pig.

10     THE COURT:  Well, it is powerful evidence of his

11  actual possession of a firearm; isn't it?  As opposed

12  to --

13     MR. MITCHELL:  Not necessarily.

14     THE COURT:  As opposed to circumstantial

15  evidence of possession of a firearm.

16     MR. MITCHELL:  Not necessarily.  I don't know  if

17  you've seen the pictures.

18     THE COURT:  Yeah, I have.  I have them right in

19  front of me.

20     MR. MITCHELL:  It does show him with an object

21  in his hand.  It does appear to be a gun, but there's

22  -- I don't know that the government is going to tie in

23  that object in his hand to the gun in this case.

24     THE COURT:  Well, let me --

25     MR. MITCHELL:  They can't even tie that in to

1 this -- these picture s being taken after his conviction

2 in 1999. I think there 's a number of issue s, but the

3 biggest issue that I have is a picture of the dead pig,

4 which appear s to be a shotgun wound to the head.

5 That 's going to evoke a very emotional response by the

6 jury, which is going to be unfair ly prejudicial to Mr.

7 Bynum.

8        THE COURT:  All right . Let me do one thing so

9 we can all be talk ing on the same page.

10        Ms. Johnston , these picture s. You 've again

11 given these to me. Are those the originals you int end

12 to offer?

13        MS. JOHNSTON:  Those are the originals.  They

14 were recovered from Mr. Bynum 's house on or about June

15 1st 2004 dur ing the execution of the search warrant , at

16 the same time as a 9mm Glock handgun was recovered from

17 that house.

18        THE COURT:  Before you go further , I want to

19 make sure the record is clear . I have in front of me

20 five picture s, and I'm going to put a little mark on

21 the back of them and you can put them more

22 appropriately when we're done, but I need to label

23 them. How do you intend to label these as exhibits?

24        MS. JOHNSTON:  Your Honor , we had labeled them

25 Government 's Exhibit Bynum -3.

1          THE COURT:   It's Bynum-3.  So it would be, like,
2 A, B, C, D, E?
3          MS. JOHNSTON:   We could do it that way, Your
4 Honor.
5          THE COURT:   I'm going to label as A -- let me
6 ask you this.  They appear to be five pictures, two of
7 which are duplicates of each other.  So, this is really
8 a grand total of three pictures.  Would you agree that
9 that's the case?
10         MS. JOHNSTON:   I don't have the originals in
11 front of me.  My copies look as though that may be the
12 case.
13         THE COURT:   What I would intend to do, because I
14 don't want to have potentially cumulative evidence in
15 front of the jury, only one of these would be proper.
16 If there's two of them, I think -- I think you should
17 only get one.  You have the agent testify that there
18 were two copies of it, but I don't want to let them
19 think that, oh my gosh, this guy took four pictures of
20 something as opposed to two.
21         MS. JOHNSTON:   I understand.
22         THE COURT:   The first thing I'm going to do is
23 I'm -- there's a picture from far away of him aiming a
24 gun at a pig.
25         MS. JOHNSTON:   Yes, Your Honor.

1          THE COURT:   There's two versions of that.  I'm

2 going to label them A and B.  Then C and D I'm going to

3 label as the ones where it is just shows his shirt and

4 the gun aimed at a pig.

5          MS. JOHNSTON:   I think I'm putting them --

6          THE COURT:   I'll make that C and D.

7          MS. JOHNSTON:   Okay.  I think I have two of them

8 on the screen, Your Honor.

9          THE COURT:   Then E is the picture of the dead

10 pig.

11          MS. JOHNSTON:   I have the two here.  The bottom

12 one on the screen would be the one the Court's marked

13 as A and B, and the top one is the one the Court's mark

14 as C and D; is that correct?

15          THE COURT:   The top one I've labeled C and D,

16 and the bottom one A and B.

17          MS. JOHNSTON:   Then the last one?

18          THE COURT:   The last one of the dead pig is E.

19          All right.  Tell me why all of them are

20 appropriate to be admitted.

21          MS. JOHNSTON:   Your Honor, as I said, these

22 pictures were recovered from Mr. Bynum's residence at

23 the same time that a 9mm, loaded Glock handgun was

24 recovered.  What is important to note is the

25 government, in the picture, also appears to be a

1  semiautomatic  weapon  consistent  with  the  appearance  of

2  a 9mm Glock.  So, it's --

3       THE COURT:  Would there be testimony to that

4  effect?

5       MS. JOHNSTON:  It would be something you could

6  observe if you saw the gun.  I don't know that I'm

7  going to ask the search agent if it appears to be a

8  same or similar gun.  There might be objections to that

9  question.  At any rate, Your Honor, the defendant is

10  charged with two gun violations.  One is a possession

11  of the firearm as a convicted felon, and the second

12  count is that he possessed that firearm in furtherance

13  of the drug conspiracy.

14       In this case DNA was done on that gun and there

15  was no DNA found that matched Mr. Bynum's.  Defense

16  counsel, I believe, intends to argue there aren't any

17  fingerprints and there aren't -- there isn't any DNA

18  found on the weapon.  Clearly -- and we suggested to

19  defense counsel that the government would be willing

20  not to admit pictures if the defendant and his counsel

21  were willing to stipulate that he owned and possessed

22  that firearm and knew how to fire it.  Counsel and his

23  client have every right to, and they've refused that

24  offer of a stipulation.  Therefore, it is the

25  government's position that these pictures are certainly

1  relevant  evidence  and  extreme ly  important  evidence  to

2  show  that  Mr.  Bynum  possess ed  a  firearm  and,  indeed ,

3  that  he  knew  how  to  operate  the  firearm ,  which  is

4  important  in  term s  of  the  924 (c)  count ,  which  charge s

5  that  he  possess ed  it  in  furtherance  of  the  drug

6  conspiracy .   It's  certain ly  evidence  that  he  knew  how

7  to  dis charge  a  firearm  is  relevant  in  terms  of  whether

8  or  not  he  possess ed  it  in  furtherance  of  the  --

9        THE  COURT:   Tell  me  about  the  pig .

10        MS.  JOHNSTON:   The  pig ?  That  show s  he  know s  how

11  to  use  the  gun .   You  look  at  the  picture s  in  sequence

12  and  you  can  tell  that  Mr.  Bynum ,  from  those  picture s  --

13  they  establish  that  he  not  only  possess ed  the  gun  but

14  knew  how  to  use  it ,  which  is  extreme ly  important  in

15  term s  of  the  924 (c)  count .

16        Furthermore ,  the  Court  can  give  a  curative

17  instruction  --  limiting  instruction  tell ing  them  that

18  they  can  --  what  the  limited  purpose  of  the  evidence  is

19  and  that  they  should  not  be  influenced  by  the  nature  of

20  the  picture .   The  Court  give s  limiting  instruction s  all

21  of  the  time .   We  cite d  the  Grimmond  case  to  the  Court ,

22  which  was  not  a  photograph  case  but  was  a  case  where

23  evidence  of  actual  shoot ing s  was  admissible  to  show

24  that  the  defendant  possess ed  the  firearm  in  a  922 (g)

25  case .   The  Court  allow ed  evidence  of  actual  shoot ing s

1  by the defendant -- uncharged shootings by the

2  defendant on other occasions, to show that he possessed

3  a firearm in violation of 922(g) here.

4        Here we don't have him pointing the gun at any

5  individuals. Here we have him in photographs depicted

6  using the firearm, which shows his knowledge of

7  weapons, his possession of a weapon similar in

8  appearance to the one that the jury is going to see,

9  which was seized from his house, and also that he knew

10 how to use the weapon, which is significant in terms of

11 the -- it might not be significant in terms of the

12 922(g) charge, but is certainly significant in proving

13 that he was possessing a gun in furtherance of a drug

14 conspiracy.

15       I appreciate Mr. Mitchell's concern. We did

16 give them the alternative. The Court can give a

17 limiting instruction, which has worked in cases with

18 more egregious-type evidence, such as Grimmond and such

19 as *United States versus Van Meter* where evidence of

20 another sexual assault was introduced. The notion of

21 the prejudicial effect of this picture can certainly be

22 cured and has repeatedly been cured in other cases by a

23 limiting instruction given by the Court.

24       We should be able to refute an argument that

25 they didn't find his fingerprints on the gun. They

1 didn't find his DNA on the gun because there will be
2 evidence that there was DNA found on, I believe, Ms.
3 Dobie's -- one of her firearms. We ought to be able to
4 refute it. These are pictures from his house in his
5 possession and we think it's properly admissible.
6          THE COURT: All right. Mr. Mitchell.
7          MR. MITCHELL: Simply because the government
8 will have some difficulty in proving their case doesn't
9 mean that they then have a blank check to bring in any
10 evidence however objectionable, however prejudicial to
11 what. So what they're suggesting is, if they're having
12 a little trouble or the defense is going to raise some
13 argument, then they can bring whatever they want. As
14 far as I know, there's no case anywhere that's going to
15 suggest that they have a right to do that.
16          These pictures are highly prejudicial because
17 they'll evoke an emotional response by the jury which
18 will cause them to act in an irrational manner, not
19 looking at the gun itself and thinking whether or not
20 he has the ability to fire it or possess it. They're
21 going to be thinking about a dead pig as defenseless,
22 and who knows who on the jury is very emotional to
23 that.
24          There are a lot of people who will find any
25 killing of an animal very, very difficult to deal with.

1  These picture s are just not simply show ing my client

2  knows how to fire a gun . It's to evoke an emotional

3  response in order to get a conviction and it has

4  nothing to do with whether or not they have a good or

5  bad case .

6         MR. MARTIN:  Your Honor , I don't really have a

7  dog in this fight , but I'd like to make some comments

8  on this .

9         THE COURT:  Make them quick ly , because I've got

10 other thing s to do between now and 2:30.

11        MR. MARTIN:  Really fast here . I've look ed at

12 the motion . I haven't stud ied this in de tail , but it

13 seem s to me , with respect to the time frame , the

14 government has a problem . I don't know how the

15 government is going to prove that he had this weapon

16 prior to the conviction .

17        Second , with respect to use . I'm not sure use

18 is even relevant under 922(g); and third , this business

19 about a curing instruction . You know , whenever I hear

20 the government say that , I can't help but think of the

21 Wizard of Oz when they finally see the man behind the

22 curtain and he says ignore that man behind the curtain .

23 Nobody is going to do that .

24        As a practical matter , and to avoid an appellate

25 issue , I think the Court should err on the side of the

1  defendant  on  this  one  and  certain ly  not  let  in  the  last

2  picture  of  the  dead  pig  with  the  blood , because  that

3  does n't  do  anything  but  appeal  to  the  emotion s  of  the

4  juror s.  I  think  Mr. Mitchell  has  a  good  argument  on

5  the  evidence  as  well , Your  Honor :  Fairness  dictate s

6  that  that  not  come  in.

7         MR. MCKNETT :  Your  Honor , if  I  may  be  heard  very

8  brief ly  on  behalf  of  Ms. Ali .  I  object  to  these

9  picture s, particular ly  the  last  picture  of  the  dead

10  pig , because  of  the  unfair  spill over  effect  that

11  picture  may  have  on  Ms. Ali  and  the  other  defendant s.

12         First , the  government  has n't  been  able  to

13  establish  it's  a  real  gun  in  the  picture ; second , they

14  can't  prove  when  the  picture s  were  taken .  If  the

15  picture s  were  not  taken  before  Mr. Bynum 's  conviction ,

16  then  they're  irrelevant  to  the  felon  in  possession

17  charge .  By  allowing  the  government  to  bring  the

18  picture s  in  now , the  Court  is  allowing  the  government

19  -- is  not  requiring  the  government  to  prove  every

20  element  of  the  crime , which  is  possession  of  a  handgun

21  after  a  felony  conviction .  They're  now  shifting  the

22  burden  of  proof  to  the  defendant  to  show  that  the

23  picture s  were  taken  before  the  conviction  for  a  felony .

24  For  those  reason s, I  believe  the  picture s  should  not  be

25  brought  in.

1        MR. MONTEMARANO :  I join Mr. McKnett  in as much

2   as my client  is on the phone  with Mr. Bynum  more than

3   anyone  else , and I'm sure there  will be evidence  that

4   her daughter  was romantically  involve d with Mr. Bynum .

5   I think  the spill over effect  is all greater  with

6   respect  to Ms. Martin .

7        Furthermore , I don't think  the government  can

8   meet the evidentiary  burden  that it has to sustain  to

9   admit  any photograph , and that is does this picture

10  fair ly represent  the event s in question  on the day and

11  time .  They can't place  it time -wise .  They can't say

12  who fire d the gun .  It's a pose d photograph .  One only

13  needs  to remember  the famous  photograph  of Patty

14  Hears t, which  we later  learn ed was her in a bank

15  carry ing an empty  AK-47.  Same  problem .

16       THE COURT:  Ms. Johnston .

17       MS. JOHNSTON:   I think  all the reason s why we

18  need the dead pig picture  is because  counsel  is now

19  argui ng we can't show that 's a real gun .  That 's what

20  these  picture s show .  Whether  it happened  before  or

21  after  his conviction  is irrelevant .  These  picture s are

22  relevant  to show his knowledge , his possession , his

23  ability  to possess  a firearm .  It is particular ly

24  relevant  in this case because  the argument  is going to

25  be made no finger prints  or DNA on the gun .

1            Furthermore , this Fourth Circuit -- whether

2  counsel like s it or not , the Fourth Circuit in much

3  more egregious case s than this , have said that an

4  instruction -- a limiting instruction to the jury is

5  adequate to address any potential prejudice , and I cite

6  the Grimmond case which was ex -- more prejudicial  than

7  these picture s, I think all the government 's evidence ,

8  quite frankly , was prejudicial , but there was actual

9  evidence of shoot ings on other occasion s.

10           And in Van Meter , of other sexual assault s -- of

11  a sexual assault on a different occasion , and the Court

12  has repeat edly held that cautionary instruction s

13  general ly obviate any such prejudice in reference to

14  such evidence . And counsel , quite frankly , has n't

15  cite d a case for the Court that says that a curative

16  instruction was not sufficient . So I would ask the

17  Court to admit the photograph s as-is.

18           THE COURT:   All right . Well --

19           MR. MITCHELL:   I prom ise to be real brief . The

20  government cite s the Grimmond case . Grim mond case is

21  not applicable . It does n't even deal with photograph s.

22  It's 404(b) evidence .

23           THE COURT:   It does deal with the same rule .

24           MR. MITCHELL:   It deal s with the same rule , but

25  it's not photograph s the jury is going to look at.

1  There  was  no  photograph s  of  dead  people  that  they  were

2  going  to  be  using .   It  was  evidence  of  404 (b)  prior

3  act s .   So  the  Grimmond  case  does  not  assist  the

4  government   in  any  way .

5           THE  COURT:   All  right .   With  regard  to  the  five

6  photograph s  that  are  before  me , which  I  have  labeled

7  and  we  will  follow  this  label ing  A , B , C  and  D , and  E ,

8  the  A  and  B  are  duplicate s , so  I  will  consider  them  to

9  be  a  single  picture  and  deal  with  them  as  a  single

10  picture .   The  same  thing  with  C  and  D .

11           The  question  before  me  require s  application  of

12  Rule  403 , and  I  conclude  that  all  of  the  picture s  are

13  of  prob ative  value .   The  fact  is  that  all  of  these

14  picture s  create  some  prejudice .   The  question  under  the

15  rule  is  whether  the  prejudice  is  unfair , and  I  have  to

16  make  a  bal ance  between  the  probative  value  and  whether

17  it's  substantially   outweigh ed  by  the  danger  of  unfair

18  prejudice .

19           I  conclude  that  with  regard  to  these  picture s

20  that  there  is  a  danger  of  unfair  prejudice  that

21  outweigh s  the  prob ative  value  with  regard  to  the

22  picture  of  the  dead  pig , and  this  could  certain ly  raise

23  passion s  and  emotion s  about  those  who  don't  like

24  cruel ty  to  animal s  and  thing s  of  that  nature .

25           I  do  not  find  that  to  be  the  case  with  the

1 photograph s A through D, but I don't want the jury to

2 be given four copies of two picture s, so I will admit A

3 and C, I guess , and hold back B and D.  Yeah , it will

4 be A and C come in , B and D should not come in in term s

5 of these original  photograph s.

6        With respect  to them , however , I won't preclude

7 the government  from eliciting  testimony  from a seizi ng

8 agent  or whoever  -- however  these are going to come in

9 that there were two copies of them locate d.  There

10 should be no reference  made to the picture  of the dead

11 pig .  So that is my ruling  on that .

12        Let me deal with the grand  jury question .  I

13 have conduct ed my gatekeeper  function  of review ing the

14 redact ed transcript s.  I'm not quite sure how best to

15 bring this about .  I have not found anything  in the

16 category  of a smoki ng gun that will sudden ly cause

17 somebody  to reject  all of Detective  Sakala 's testimony .

18 Nothing  close to that .  There are some redaction s that

19 I think should be un- redact ed.  Do you all have your

20 grand  jury transcript s in front of you ?

21        MR. SUSSMAN :  Will you refer to them by date ,

22 sir ?

23        THE COURT:  Yes , I'm going to.  The first I'm

24 referring  to is May 5th, 2004 .

25        MR. MITCHELL:  Your Honor , may I take a moment

1  to grab my --

2          THE COURT:   Sure, go ahead.

3          MR. MITCHELL:   You can continue.

4          THE COURT:   I should direct your attention to

5  Page 65.  There is language at the top of that page

6  that starts with someone's messing with their car.  I

7  think on further reflection, the government might have

8  perhaps wanted to redact that as well, but just so you

9  won't be in complete suspense, it has to do with GPS

10 tracking, and there's going to be no testimony of that

11 in this case.

12         MS. JOHNSTON:   I don't anticipate any.

13         THE COURT:   Nor was there any from Detective

14 Sakala, so I want you to know that was the last part of

15 some stuff that was redacted that should have been

16 redacted as well, so I don't have any problem with

17 that.  That's all I have in that volume.

18         The next one I have is May 19, and I have no

19 concerns with the redactions in that volume.

20         The next volume is in the volume for January 19,

21 2005.  This is the first time that a problem occurs all

22 over the case in one of the later transcripts.  The

23 question is deleted that ends on the top of Page 6, and

24 I see no way for the defense to properly understand

25 these answers without getting the questions.  Somebody

1 did a lot of deletions of questions and put it this

2 way.

3        You recall we had a debate about Kevin Scott

4 talking to Paulette Martin and the government very

5 aptly said, we have to have context from the two sides

6 of the conversation.  I don't see how you cannot have

7 the questions, so the question, if counsel wants to

8 listen to me, which begins --

9        MR. MONTEMARANO:  Excuse me, Your Honor.

10        THE COURT:  -- bottom of Page 5.

11        MR. MONTEMARANO:  What page are we on?

12        THE COURT:  Bottom of Page 5, top of Page 6.

13 You will see that your redacted version at the top of

14 Page 6 has, "traffic king offenses?"  Correct?

15        MR. MONTEMARANO:  Yes.

16        THE COURT:  You don't have the question.  The

17 question begins on the previous page, and it is --

18 listen carefully -- and what I'll probably need to have

19 the government do is to supply these pages without

20 these redactions that I'm putting back in.

21        MR. MONTEMARANO:  Your Honor, I don't see your

22 reference.  You're on Page 5, going on to Page 6?

23        THE COURT:  Page 5 should be blank in your

24 version, all right?

25        MR. MONTEMARANO:  Which date is this again?

1          THE COURT:   The date is January 19, 2005.

2          Are you with me now?

3          MS. JOHNSTON:   The Court is referring to the

4    question at the bottom of the page.

5          THE COURT:   The bottom of Page 5 has the

6    beginning of the question that ends, and you do see the

7    ending of it on the top of Page 6; correct?  The

8    question is -- I'll read you the question so it will

9    now make sense.

10          Question:  In connection with your training and

11    experience, do you have experience in narcotics?

12          And then it goes to next page where you have,

13    trafficking offenses?

14          All right.   Later on Page 35, for some reason,

15    part of a question is in here but not the rest of it.

16    What you have begins on Line 12 with other agents in

17    this case.

18          MS. JOHNSTON:   What page are you on?

19          THE COURT:   Page 35.  The rest of the question,

20    which is not terribly momentous is:  Now, jumping ahead

21    to the forfeiture allegations in the indictment.  Did

22    you, along with the other agents in this case, estimate

23    how much in dollar value the proceeds of the drugs

24    which you believed -- and that's the rest of the

25    question.  All right?  I have nothing else in that

1  volume.

2           In the transcript of September 21, 2005, there

3  are some pages from my transcript that are completely

4  missing. I don't know whether they -- it was just a

5  bad copy job or whether they were deleted, but the

6  pages that I do not have at all, and I don't know

7  whether defense counsel has them at all are 25, 27, and

8  31. If you have them --

9           MR. MONTEMARANO: No.

10           THE COURT: I don't.

11           MR. MITCHELL: No, we don't.

12           THE COURT: Ms. Johnston.

13           MS. JOHNSTON: Did the Court have them in the

14  original?

15           THE COURT: Yes. So I don't know. And whether

16  they -- whether you intended to redact the whole page

17  --

18           MS. JOHNSTON: Yes, sir.

19           THE COURT: You did?

20           MS. JOHNSTON: Yes, sir.

21           THE COURT: Well, then, I may need to take a

22  look at those pages then. Wait a minute. What was the

23  pages of redaction of all of Page 25?

24           MS. JOHNSTON: Your Honor, because they don't

25  concern charges against any of these defendants. It's

1  discussing  the  evidence  as  to  Ms.  Levi  and  Ms.  Johnson .

2       THE  COURT:   All right .  Page  27.  Let  me  take

3  look  at  that .

4       MS.  JOHNSTON:   Again ,  Page  27  is  not  an  event

5  that  Detective  Sakala  gave  testimony  about .  That  was

6  evidence  about  Mr.  Martin  provided  by  somebody  else .

7  Detective  Sakala  didn't  testify  concern ing  that

8  incident .

9       THE  COURT:   All right .  And  the  basis  for  the

10  government 's  deletion  of  Page  31?

11       MS.  JOHNSTON:   Your  Honor ,  I don't  have  any

12  problem  with  dis closi ng  Page  31,  given  the  bottom

13  portion  that  talk s  about  Mr.  Bynum .  That  should  have

14  been  included .  I  think  it's  redundant  to  what's  said

15  later ,  but  we  will  provide  them  a  copy .

16       THE  COURT:   Page  31,  just  so  you  can  be  ready  to

17  continue  your  --  I'll  read  it  to  you .  It's  not  that

18  long .  It  begin s  at  the  top  with  that  Ms.  Levi  was

19  bring ing  ticket s/heroin  for  Mr.  Martin .  Excuse  me .

20  Ms.  Levi  was  bring ing  the  heroin  for  Mr.  Martin .

21       Question :  Okay .  And  again ,  the  reference  was

22  to  12  ticket s;  is  that  correct ?

23       Answer :  That 's  correct .

24       Question :  And  the  ticket s,  again ,  would  refer

25  to  what ?

1         Answer:  That would be 12 grams of heroin.

2         Question:  Now, if we could turn to Count 18 and

3  Defendant Claude Arnold on April 7, 2004, and the

4  telephone number.  Is that the same residential

5  telephone land line for Mr. Martin?

6         Answer:  Yes, it is.

7         Question:  What cause does that refer to?

8         Answer:  Around this date, we had intercepted

9  calls between Ms. Martin and another customer named

10 Derrick Bynum, and Mr. Bynum was complaining about the

11 quality of cocaine.  Crack cocaine that he had received

12 from Ms. Martin that he couldn't sell it, it was of low

13 quality.  Mr. Bynum returned the crack cocaine to Ms.

14 Martin, and then Ms. Martin, instead of returning it to

15 her supplier, turned around and gave it to Mr. Arnold

16 to sell two eighths of a kilo at $3,300 each.  He

17 subsequently also complained about the -- and that's

18 the end of the page.

19     All right.  That's all I have to address in that

20 volume.

21     On February 1, 2006, Page 12, there's a answer

22 with no question, so the question, counsel is:

23     Question:  And why wouldn't you want him to know

24 he was under investigation at that stage of the

25 investigation?

1        That's what's missing, and I would ask that the

2   government, when I'm finished with this, supply revised

3   copies of these pages to counsel for the defense.

4        All right.  The next page, Page 20.  All the

5   questions need to be put back in on this page.  The

6   question on Line 11 of Page 20 is:  Question:  And if

7   we could go to Count 6 and Count 7.  Are those -- are

8   those also a call and a distribution  that are

9   associated with each other?

10       On Line 20, the question is:  And what happens?

11       On Lines 24 and 25, the question is:  Now, if we

12   could look at Count 8 and Count 9.  Are those counts

13   related as well?

14       On Page 21 --

15       MR. MCKNETT:  Your Honor, I apologize for

16   interrupting, but I think at the top of Page 20 there

17   is a question missing as well, Lines 1 and 2.

18       THE COURT:  Top of Page 20?  You're correct.

19   Yeah.  The question is:  And if you could describe the

20   calls that were intercepted that form the basis for

21   Count 4.

22       On Page 21, at the top of the page, the question

23   on Lines 2 and 3 is:

24       Question:  If you could describe for us the

25   evidence  in terms of Counts 8 and 9.

1          On Page 24, there are -- the question on Line 6

2 is:  Count 11?  That's the question.

3          MR. MITCHELL:   Count 11?

4          THE COURT:  On Line 9, the question is:  Are you

5 on Count 12 or Count 11?

6          Answer:  Oh, I'm sorry.  There's not much there.

7          Line 16 goes on, and there's just a colloquy

8 about, where are you?

9          Question:  Okay.  Go to Count 12.  I'm sorry.

10          MS. JOHNSTON:   Does the court want us to provide

11 an un-redacted copy of that?

12          THE COURT:  Yes.  Un-redact that page.

13          MS. JOHNSTON:   Excuse me?

14          THE COURT:  Un-redact that page.  That's fine.

15 That's fine.  See I'm proving to you all that I

16 actually did look at this.

17          All right.  On Page 33 there's a question

18 missing at the beginning on Line 16.

19          Question:  Now, if we could go to Count 16,

20 which, again, is a count from the previous indictment,

21 and if you could summarize Count 16 and Count 17, which

22 go together.  I think you sort of touched on that, but

23 if you could discuss those in a little more detail.

24          That's the redaction that I think you ought to

25 have.

1          The next area is Page 42, beginning on Line 3.

2 There's a question, answer, and question.  I'll read

3 those to you:

4          Question:  And the next count, Count 24, that

5 happens on May 11 between Mr. Riley and Mr. Mangual?

6          Answer:  Yes.

7          Question:  Can you describe that conversation?

8          On Lines 16 and 17, the question is:  And Count

9 25, between Mr. Mangual and Donnell Barry.

10         On Page 43, the redacted question on Line 5 is:

11 And Count 26, the May 13 contact between Mr. Mangual

12 and Mr. Barber.

13         On Line 22, the redacted question is:  And Count

14 27.

15         On Page 49, you were given part of a question,

16 and the missing part that you did not get is this.  The

17 question was:  So that corroborated his information,

18 which is part of the information that I have approved

19 the redaction of?

20         Answer:  Yes.

21         Now, if we could turn to the forfeiture

22 allegations, and then it goes on in this instance.   It

23 looks like the answer there really is a question.

24         MS. JOHNSTON:   I think, Your Honor, they added

25 the question to the answer, yes, rather than --

1          THE  COURT :   That 's  more  of  the  question ?   Okay .

2 So  now  you  have  all  of  t he  question .   That 's  all  I  have

3 in  that  volume .

4          I  then  run  into  a  real  train  wreck  with  the  next

5 transcript .   April  12  has  virtually  every  question

6 omit ted , and  I  can  spend  the  rest  of  the  afternoon  with

7 the  jury  reading  those  question s  to  you , but  I  did  not

8 see -- I  saw  a  couple  of  redaction s -- no .   I  mean ,

9 this  is  the  transcript  I  believe , Ms.  Johnston , that

10 was  the  basis  for  the  last  sup erceding  indict ment  that

11 relate s  to  this  trial  group ; correct ?

12          MS.  JOHNSTON:    That 's  correct , Your  Honor .

13          THE   COURT:    I  didn't  see  any -- let  me  take  a

14 look .   It  was  almost  100  percent  was  redaction  of

15 question s.

16          MS.  JOHNSTON:    That 's  correct , Your  Honor ,

17 because  it's  the  government 's  position  that  the

18 government 's  question s, particular ly  when  they  say ,

19 call ing  your  attention  to  count  such  and  such , was  that

20 count  such  and  such  in  the  previous  indict ment  has

21 nothing  do  with --

22          THE  COURT:    I  know .

23          MS.  JOHNSTON:    -- the  detective 's  answer s.   Nor

24 does  it  put  it  in  context , quite  frankly .

25          THE  COURT:    I  think  it's  really  necessary  for

1 these people to be fishing anything other than blind to

2 know what the question is that they're reading the

3 answers to.  I'll take one more look at this, but I

4 don't believe that there's anything in this transcript

5 that was redacted other than questions.

6         MS. JOHNSTON:   Your Honor, that's not correct.

7 We redacted Page 70 in this.

8         THE COURT:   Let me take a look -- Page 70?

9         MS. JOHNSTON:   Page 7-0, your Honor.

10         THE COURT:   That redaction is okay.  I'm sorry.

11 That one is okay.

12         MS. JOHNSTON:   I don't know about the rest of

13 them --

14         THE COURT:   It begins on the bottom of Page 69,

15 and that redaction is approved.

16         MS. JOHNSTON:   I just apologize.  I'm looking at

17 our original transcript, some of which still have the

18 redactions in and some of which they've removed them to

19 make a copy for the Court yesterday.  The bottom of

20 Page 69 was also redacted.

21         THE COURT:   Yes -- no.  I said that was all

22 right.  If you let me know any other --

23         MS. JOHNSTON:   Page 64.  There's a redaction at

24 the bottom of Page 64.

25         THE COURT:   Let me take a look.  Wait a minute.

1  That's a question?

2          MS. JOHNSTON:   Yes, sir.

3          THE COURT:   On 64?

4          MS. JOHNSTON:   Sixty-four looks to be a question

5  at the bottom.

6          MS. JOHNSTON:   Sixty-three, we redacted.

7          THE COURT:   It's a question?

8          MS. JOHNSTON:   Sixty-three, we redacted.   Has to

9  do with Mr. Bynum's criminal history, which Detective

10  Sakala didn't testify about here on Page 63, so that

11  was redacted.

12          MS. JOHNSTON:   Page 58, we've redacted.

13          THE COURT:   I think they -- it may be a close

14  call, but I think the redaction on 63 should be

15  un-redacted.

16          MS. JOHNSTON:   Excuse me?

17          THE COURT:   I think you should give them Page

18  63.   What was the other page?   Page 58?

19          MS. JOHNSTON:   Page 58, there's a redaction on

20  -- Your Honor, that, again, is the question for sure on

21  Page 58.

22          THE COURT:   It's what?

23          MS. JOHNSTON:   It's trying to get to the same

24  spot in terms of the previous transcript that we were

25  referencing.

1          THE COURT:   I think they should get the full
2 page.
3          MS. JOHNSTON:   You want them to have the whole
4 page?
5          THE COURT:   Yes.  Are there any other areas of
6 redaction other than just questions being deleted?
7          MS. JOHNSTON:   I don't know.  I don't know, Your
8 Honor, because -- let me look at Page 36.  My paralegal
9 is trying to find the redactions in the redacted copy,
10 because as I said --
11          THE COURT:   Page 36.  I show that should be
12 given to them, the redaction on that page.
13          MS. JOHNSTON:   There's a redaction on that page?
14          THE COURT:   Let me take a look at it again then.
15 I've looked at it before.
16          MS. JOHNSTON:   That's fine, Your Honor.  It goes
17 nothing to the substance of Detective Sakala's
18 testimony.
19          THE COURT:   All right.  If you can prepare a
20 corrected redacted version of this transcript and
21 provide it promptly to counsel for the defense.
22          MS. JOHNSTON:   You want them to have everything
23 except for --
24          THE COURT:   The ones I just told you were okay
25 to be redacted.  They were the ones later on.

1          MS.  JOHNSTON :   The  last  few  page s  that  we

2  discuss ed .

3          THE  COURT:   Near  the  end .   It  was  --  wait  a

4  minute .

5          MS.  JOHNSTON:   Just  so  the  record  is  clear ,  the

6  Court  didn't  find  any  substantive  materials  that  were

7  not  redact ed .

8          THE  COURT:   No , no .   I  don't  find  anything

9  terribly  substantive  about  what  was  done .   As  I  said ,  I

10  don't  think  there 's  any  smoki ng  gun s  that  I  found ,  but

11  I  did  feel ,  in  fairness ,  that  to  be  reasonably

12  consistent  with  what  I  said  before  about  the  Kevin

13  Scott  and  Paulette  Martin  conversation ,  that  they  at

14  least  ought  to  know  what  on  earth  the  question  is .   But

15  all  the  other  redaction s  are  approve d .

16          All  right .   Are  we  ready  for  the  jury ?

17          MR.  WARD:   If  I  may  say  something  on  behalf  of

18  all  counsel ?

19          THE  COURT:   I  can't  hear  you , sir .

20          MR.  WARD:   Just  say  on  behalf  of  all  counsel ,  we

21  thank  the  Court  for  the  time  it  spent ,  and  we

22  appreciate  the  Court 's  effort .

23          THE  COURT:   Can  you  write  me  a  note  for  me  to  my

24  wife ?

25          MR.  WARD:   Yes, sir .   I  just  want  to  say  that  if

1  the government 's had any rationale  for its great bulk

2  of its redaction s, they entire ly escape me , but perhaps

3  Ms. Johnston could explain to Your Honor .

4        THE COURT:  I have every --

5        MS. JOHNSTON:   Your Honor ?

6        THE COURT:  We're not going to get into that .  I

7  have review ed the redaction s.  I find where there were

8  substantive redaction s, they were very appropriate .  I

9  had no difficulty with it, because there 's a large

10  number of redaction s I haven't mention ed here .  What

11  I'm asking to put back are for the most part question s,

12  and I have re store d that and you've got that .

13        MS. JOHNSTON:   Thank you very much .

14        THE COURT:  Don't succumb to the temptation .

15        MS. JOHNSTON:   Your Honor , I just want ed the

16  record clear , because I don't want there to be

17  allegation s that the government did anything that was

18  not proper .

19        THE COURT:  No .  No .  I don't think that there

20  was anything they did that was improper .  I find the

21  redaction s to be appropriate .  I've exercise d my

22  function under the Jenks Act to review it.  I have done

23  so , and I'm going to direct that the -- I have read to

24  you , for the most part , the one s that have been

25  redact ed .  The balance of them are simply question s

1  that we can provide you reasonably promptly.

2          MR. SUSSMAN:  Judge, if I might.  While I was

3  drafting a note to your wife, I didn't hear whether you

4  mentioned October 24, 2005.  That was clean, or --

5          THE COURT:  October 24?

6          MR. SUSSMAN:  27, I'm sorry.

7          THE COURT:  October -- wait a minute.  There

8  were some transcripts that had no problems with the

9  redactions at all.  If I didn't mention it, I had no

10 problems with the redaction.

11         Counsel, any problems?

12         MR. MITCHELL:  Two minutes.

13         THE COURT:  Sure.  We'll take two minutes right

14 now.

15              (Off the record at 2:50 p.m.)

16              (On the record at 2:56 p.m.)

17         THE COURT:  Bring them in.

18         (Witness Sakala resumes the stand at 2:56)

19         (Jury returns at 2:57 p.m.)

20         THE COURT:  All set?  Mr. Montemarano, you may

21 resume.  Before you do so, ladies and gentlemen, I

22 wanted to remind you, as I think I told you earlier

23 this week, we are going to do the early Friday

24 departure drill tomorrow.   I have moved a 9 o'clock

25 matter to 8 o'clock.   I'll have you in here at 9:00,

1 and we will get you out of here by 2:00.  If you don't

2 get out, I will be trampling you as you get out the

3 door, because I have plans to leave town as well.  So,

4 we will do the 9:00 to 2:00 drill tomorrow.

5          Mr. Montemarano, you may proceed.

6          MR. MONTEMARANO:  Thank you, Your Honor.

7          BY MR. MONTEMARANO:

8 Q.       Sergeant Sakala, could I ask you please to pick

9 up Transcript Book 3 and turn to Page 563?  Let me know

10 when you're there.

11 A.       Okay.

12 Q.       Do you recall that telephone call being played

13 yesterday?

14 A.       Yes.

15 Q.       This is the call between Ms. Ali and Ms. Martin,

16 and you described the conduct of the callers relating

17 to a concern about Ms. Terrell being suspicious;

18 correct?

19 A.       Yes.  That's referenced to girlfriend at the

20 bottom of Page 563.

21 Q.       Girlfriend upstairs, that would be Jackie

22 Terrell; correct?

23 A.       Jacqueline Terrell, yes.

24 Q.       She lives at 810 Hayward as well; correct?

25 A.       That is correct.

1  Q.      Then you, in response to a question from Ms.

2  Johnston, I believe, discuss something about not

3  wanting to have drug dealers -- not wanting to have

4  attention drawn to their affairs or anything like that.

5          Does that seem like a fair statement?

6  A.      I don't recall saying that, but that's certainly

7  an accurate statement.

8  Q.      Okay. Could you now turn to Page 599? Are you

9  there?

10 A.      Yes, sir.

11 Q.      Thank you. Don't tall call me, sir. It makes

12 me feel older than I already am.

13         On Page 599, that's another call that's a few

14 days later. That's on the 26th of May; is that

15 correct?

16 A.      That is correct.

17 Q.      In the earlier call, we didn't tell the jury --

18 so the record is clear. That earlier call would have

19 been -- the one on 563 would have been on the 19th,

20 just one week before; correct?

21 A.      That's correct.

22 Q.      At the bottom of Page 599, this is Ms. Martin

23 and Ms. Ali again; right?

24 A.      Yes, it is.

25 Q.      The third statement from the bottom -- the third

1  separate  part  from  the  bottom  of  the  page , Ms.  Martin

2  is  speak ing ;  correct ?

3  A.       That 's  correct .

4  Q.       She  says , okay .  Now , look .  I  may  not  be  here ,

5  but  I'm  going  to  leave  it  --  if  I  leave , I'll  leave  it

6  out  for  y'all  to  get  here .  I  will  leave  it  with

7  Jackie .

8          Is  that  correct ?

9  A.       That 's  correct .

10  Q.       And  Jackie  Terrell , who  live s  at  810  Hayward , is

11  the  only  Jackie  you're  aware  of  to  this  case  relating

12  to  this  investigation ;  is  that  correct ?

13  A.       That 's  correct .

14  Q.       So  a  week  later , Ms.  Martin  is  leaving  thing s

15  with  Ms.  Jackie .  Is  that  what  she 's  say ing ?

16  A.       I  don't  know   the  rationale , but  it  indicate s  she

17  is  going  to  leave  something  with  Jackie  for  Ms.  Ali .

18  Q.       Calling  your  attention  to  earlier  call s  during

19  the  wiretap  on , let 's  say , Ms.  Martin 's  cell  phone .

20          For  example , do  you  recall  there  being  repeat ed

21  conversation s  with  Ms.  Martin  --  between  Ms.  Martin  and

22  other  individuals   including  Ms.  Ali  concern ing  Ms.

23  Terrell 's  drinking ;  correct ?

24  A.       Ms.  Terrell 's  drinking ?

25  Q.       Drinking .

1          MS.  JOHNSTON:    Objection.

2          THE  COURT:    What's  the  basis?

3          MS.  JOHNSTON:    Your  Honor, may  we  approach  the

4  bench?

5          THE  COURT:    You  may.

6               (At  the  bar  of  the  Court.)

7          MS.  JOHNSTON:  Your  Honor, I'm  going  to  object

8  to  reference s  to  call s  that  are  not  in  evidence,

9  because  they're  not  before  the  jury.   Counsel  made  some

10  general  reference s  before  lunch  to  "entertain ment

11  attorney."   The  government  didn't  object  to  those, but

12  if  counsel  --

13          THE  COURT:    Those  were  in  the  transcript s.

14          MS.  JOHNSTON:    There  were  some  in  the

15  transcript s.   He  also  reference d  some  in  the  logbook,

16  but  I  didn't  object  to  that.

17          The  government  is  object ing  to  reference s  to

18  call s  that  are  not  in  evidence, because  there's  --  I

19  mean, your  question  --  it's  not  relevant  what's  not

20  before  this  jury.   Certain ly, if  counsel  want s  to

21  question  him  about, didn't  you  hear  such  and  such  in

22  this  call  and  that  didn't  change  your  opinion, they

23  could  use  some  call s  to  establish  that.   But  to  try  to

24  introduce  hearsay  evidence  not  about  what  witness es

25  said  or  what  person s  said  in  call s  on  other  occasion s

1   -- those  conversation s  are  not  admissible   unless

2   there 's  some  basis  under  the  law  to  admit  them .   But

3   the  conversation s  that  the  government   has  introduced

4   have  all  come  in  as  admission s  of  parti es  or  as

5   co-conspirator 's  statement s  or  to  put  in  context   the

6   statements   of  co-conspirator s .   So ,  that 's  the

7   government 's  objection .

8        I  don't  think   it's  a  proper   way  to  cross -examine

9   this  witness ,  to  question   him  about  call s  that  are  not

10  in  evidence ,  unless  he's  going  to  reference   particular

11  call s  and  say ,  well ,  does n't  this  call  affect  your

12  opinion .   Then  it  would  not  be  being  used  for  the  truth

13  of  what's  in  it  but  how  it  affected  -- whether  it  has

14  an  effect  on  his  opinion .   But  to  make  general

15  statement s  about  what 's  in  other  call s ?   The  government

16  does  not  think  that  is  appropriate .

17        THE  COURT:   And ?

18        MR.  MONTEMARANO :   And  I  think  Ms.  Johnston 's

19  point s  regard ing  the  potential   use  of  the  call s  are

20  well  taken .   Had  she  wait ed  a  couple  or  three  question s

21  -- not  that  she 's  obligate d  to ,  but  had  she  wait ed  for

22  a  couple  or  three  question s ,  her  concerns   might  well

23  have  been  allayed .

24        THE  COURT:   Where  are  you  going ?   You're  not

25  going  to  go  much  farther .

1          MR. MONTEMARANO :  I understand  that .  The simple

2  fact is that I would  proffer  to the Court  -- there  are

3  numerous  calls concern ing  concerns  evinced  by Ms.

4  Martin  relative  to Ms.  Terrell 's health , her  drinking ,

5  et cetera .  I am going  to simply  ask the sergeant  if he

6  recall s that .  If he does  not , then  I will  take his

7  answer , and when  we recall  him as our  witness , there

8  are calls we intend  to play  relat ing to  this .

9          I am seek ing to  set a foundation  here and  now .

10  If he does  remember , I can  inquire  further .  I am not

11  going  to reference  date s --

12          THE  COURT:   Why is that  appropriate  to do?

13          MR. MONTEMARANO :  Just  like the  entertain ment

14  attorney .  I'm try ing to  differentiate .  I think  Ms.

15  Johnston  --  where  the entertain ment  attorney  came  up

16  here  in this  --  in the  call , the bodi es  of call s, what

17  we will  call the  government  call s, the ones  they've

18  release d, refer  to other  entertain ment  attorney s.  If

19  he had  not remembered , I would  not have  reference d

20  them .  He said  he did .

21          Here  is a similar  situation .  I am referenci ng

22  reference s to Ms.  Terrell .  If he do esn't  remember

23  them , I stop  there .  I will  play the  call s on my  dime .

24  If he does  remember , then  we'll  go further , but I

25  certain ly --  it is not  inappropriate  to inquire .  We

1  have certainly laid the foundation.  Indeed, Ms.

2  Johnston has done it for us with his familiarity with

3  the calls and the number of times he has listened to

4  them, and I am entitled to inquire of this witness of

5  his recollection.  He is, after all, the case agent.  I

6  would not go so far as to get into things he doesn't

7  know because he doesn't know them.

8           THE COURT:  Let me hear from Ms. Johnston.

9           MS. JOHNSTON:  Your Honor, first of all, his

10  recollection of other calls that are not in evidence is

11  not relevant in terms of what he is saying here.

12  Counsel is going to say, don't you recall call such and

13  such?  Whether there was a discussion about Ms.

14  Terrell's health, does that affect your opinion?  WE

15  did not call this detective and put in calls that are

16  hearsay.  If that's what counsel's planning to do in

17  this case --

18           THE COURT:  We haven't gotten to that bridge

19  yet.

20           MS. JOHNSTON:  I want it clear on the record now

21  so we don't have an issue about, well, then I would

22  have cross-examined the witness this way if I had known

23  that.

24           THE COURT:  You've put them on notice that

25  you're going to make that objection.

1          MR. MCKNETT:  Your Honor, I'd like to be heard

2 on this as well.  The witness is testifying, as the

3 Court recalls, as a fact witness and as an expert

4 witness.  These questions go to his basis of his

5 opinion as an expert.

6          He has testified that his opinion -- Ms. Martin

7 is leaving a package of cocaine with Ms. Terrell for my

8 client to pick up.  That's his opinion.  He is not

9 testifying as a fact witness in that case.  Everything

10 he testified about, he has reviewed all the

11 transcripts, all the calls and all the information

12 that's been obtained during the course of this trial as

13 the basis for his opinion.  These questions go to the

14 weight that the government -- the jury should give in

15 evaluating his opinion as an expert.

16          MS. JOHNSTON:  I'm not objecting if counsel

17 wants to ask him, well, you've given this opinion.

18 You're aware that there were calls where Mr. Terrell is

19 discussed as an alcoholic, and that doesn't affect your

20 opinion.  We're still going to say this to make it

21 clear that that is being used to go to the basis of his

22 opinion and not to be introduced as substantive

23 evidence, because if they're trying to introduce it as

24 substantive evidence.  It's hearsay, and it's not

25 coming in.

1          MR. MONTEMARANO :  I will be glad to, if that's

2 how to make Ms. Johnston happy.

3          THE COURT:  Your objection is sustained.  She's

4 just given you a road map.

5          MR. MCKNETT :  I don't believe that the question

6 goes to whether or not the people who are talking about

7 -- in this example, Ms. Terrell's drinking problems --

8 is a question of entering it for the fact of her

9 drinking problem.  It's being introduced for the fact

10 that these people talked about it.  They thought she

11 had a drinking problem.

12          MS. JOHNSTON:  That would be admissible hearsay.

13          THE COURT:  I sustained the objection.

14          Mr. Montemarano, you have a road map of how to

15 do this without getting in trouble with Ms. Johnston.

16              (Back in open court.)

17          MR. MONTEMARANO :  A moment, Your Honor, please.

18          THE COURT:  You may proceed.

19          MR. MONTEMARANO :  Thank you.

20          Your Honor, may we approach?

21              (At the bar of the Court.)

22          THE COURT:  You're going to put this jury to

23 sleep.  Yes?

24          MR. MONTEMARANO :  I wish I would have gotten

25 here before lunch.  I would have found those calls.  I

1  cannot put my fingers on them right now.  I am not

2  going to ask the jury to sit there while I riffle

3  through 2,500 pages of logs.  What I am going to do is

4  dig them up between now and when Mr. McKnett

5  cross-examines him, and I think Mr. McKnett will be

6  more than happy to go into those questions.

7      Is that a fair statement, Mr. McKnett?

8      MR. MCKNETT:  It's a fair statement, but I would

9  need to have time to meld that information into my

10  cross-examination.

11      MR. MONTEMARANO:  Certainly.

12      THE COURT:  Start melding.

13      MR. MCKNETT:  Your Honor, I don't know what Mr.

14  Montemarano is going to be asking me to put in there.

15      THE COURT:  Are you finished?

16      MR. MONTEMARANO:  Oh, no.  I've got a bit more

17  to do.  What I'm saying is, I don't think Mr. McKnett

18  is going to be doing it today.  He and I can talk, and

19  I will find those things.

20      THE COURT:  Okay.

21      (Back in open court.)

22      BY MR. MONTEMARANO:

23  Q.    Let me ask the question this way, Sergeant

24  Sakala.  Do you recall that prior to these two calls we

25  just discussed that are on Page 560 to 590 of the

1  transcript  book,  the  third  transcript  book,  prior  calls

2  during  the  wiretap  where  Ms.  Terrell's  drinking  was

3  discussed  by  Ms.  Martin  and  anybody  else?

4  A.       Yes.

5  Q.       Would  that  affect  your  opinion  relative  to  a

6  need  or  a  desire  to  be  secretive  regarding  Ms.  Terrell?

7  A.       No.  I  don't  think  her  drinking  had  anything  to

8  do  with  that.

9  Q.       You've  testified  that  in  your  view  you  could

10  determine  code  words  within  the  context  of  this  wiretap

11  based  upon  words  that  don't  make  sense  in  the  context

12  of  the  conversation;  is  that  correct,   sir?

13  A.       Yes,  that's  one  indication.

14  Q.       And  where  they  do  make  sense  to  you,  you  have

15  therefore  determined  that  the  use  of  a  particular  word

16  that  might  have  been  a  code  word  in  another  situation

17  actually  doesn't  deal  with  drugs?

18  A.       I'm  sorry.  Could  you  say  that  one  again?  I

19  lost  you.

20  Q.       Sure.  Let's  use  the  word  "suit."  You've

21  testified  that  is  a  code  word  for  drugs  on  certain

22  occasions;  correct?

23  A.       On  certain  occasions,  yes.

24  Q.       It's  over  here  on  your  list.  I  don't  know   how

25  many  times,  but  a  few  times  more  than  once?

1  A.        Yes.

2  Q.        Yet earlier -- no, yesterday, I believe, at Page

3  489, there is the discussion of a suit.  If you could

4  turn to that.  So the record is clear, the call

5  beginning on  Page 487.  It's from the B line on May 11;

6  correct, sir?

7  A.        Yes.

8  Q.        I must have the wrong page number.  I'll have to

9  come back to it.  I'm sorry, Detective -- I mean,

10  Sergeant.

11        Let me ask you a few other question s concern ing

12  our discussion  earlier today.  Do you remember  our talk

13  about -- oh, okay.  Can you go to the first  transcript

14  book on Page 64?  Remember that call between  Ms. Martin

15  and Eugene  Bird?

16  A.        Yes.

17  Q.        It's very early in the wiretap  on the 13th of

18  March, correct?

19  A.        Yes.

20  Q.        You determine d that the discussion  of clothe s in

21  this call did not involve drug s; correct ?

22  A.        That 's correct .  Nothing to do with drug s.

23  Q.        But Estelle Brim, that 's Steve Brim's wife ;

24  correct ?

25  A.        No.

1  Q.      Ex-wife ?

2  A.      Ex-ex-wife , yes .  His first wife , I believe .

3  Q.      A former wife of the late Steve Brim ?

4  A.      Correct .

5  Q.      The mother of Nathan King , I believe ?

6  A.      I believe so , but it wouldn't surprise me if she

7  was a stepmother .

8  Q.      Stepmother .  Related by blood or close to it --

9  A.      Correct .

10  Q.      -- to Nathan King .  There 's a family

11  relationship .

12  A.      Yes .

13  Q.      But 291 doesn't make any sense in terms of your

14  training and experience relating to drugs .  It's not

15  like 125 ; correct ?

16  A.      The number 291 would have no significance in a

17  drug transaction normally .  That 's correct .

18  Q.      You remember all these ledgers ; correct ?

19  A.      Which ledgers ?

20  Q.      I'll name them .  There 's Mr. Uriarte 's ; correct ?

21  A.      Yes .

22  Q.      There 's the ones set out in Hayward -7 ; correct ?

23  A.      Yes .

24  Q.      These are all , in essence , what are called in

25  the trade , tally sheets ; correct ?

1  A.       Tally sheets, yes.

2  Q.       And what it means is, I have a certain amount of

3  money that I'm owed; I am paid some money; the

4  remaining amount owed.   It's like balancing a

5  checkbook; right?

6  A.       That's correct.  Keeping track of who owes you

7  what.

8  Q.       If somebody doesn't pay all the money they owe

9  you for whatever purpose, you get odd numbers; correct?

10 A.       You can, yes.

11 Q.       So this 291 could be a drug transaction;

12 couldn't it?

13 A.       No, it cannot.

14 Q.       Not under any possible --

15 A.       Not under any circumstances would I classify the

16 conversation on Page 64 as drug conversation.

17 Q.       Okay.  Ms. Johnston has kindly handed me, once

18 again, Hayward-7.   Remember this?

19 A.       Yes.

20 Q.       I'd like you to look at the monitor, if you

21 could.  I'd like to show you some pages that I've

22 posted with my purple Post-Its.  See this page?

23 A.       Yes.

24 Q.       Is there a name of a person at the top of this

25 page?

1  A.      It says:  Bop, clothes.

2  Q.      Clothes, and then the numbers there?  That's a

3  tally; correct?

4  A.      It looks like they're adding up numbers.  I

5  wouldn't refer to it as a tally.  It looks like they're

6  adding up numbers on the left and right side.

7  Q.      On the flip side of the same page --

8  A.      Yes.

9  Q.      -- is there a name there?

10  A.      Bop.

11  Q.      On 4/9/04, the wire was up; wasn't it?

12  A.      Yes.

13  Q.      Going back further.  Do you see the name next to

14  the purple Post-It?

15  A.      No, I don't see where you're referring to.

16  Q.      Right there.

17  A.      Gilbert Williams.

18  Q.      Do you know who Mr. Williams is?

19  A.      Yes, I do.

20  Q.      He's a concert promoter in North Carolina, is he

21  not?

22  A.      I don't know if he's a concert promoter, but I

23  know he was someone connected with them in the concert

24  business.  I don't know his official occupation.

25  Q.      Someone related to the entertainment business

1  involved in some way, shape or form?

2  A.      He was somehow involved with Ms. Martin, yes.

3  Q.      In fact, he was involved with Ms. Martin to the

4  degree that she gave him $150,000 with regard to the

5  promotion of a tour for a band called Levert; correct?

6  A.      The band called what?

7  Q.      Levert, L E V E R T.

8  A.      I don't know what the band was called or the

9  exact contract.  I know there was a wire transfer and

10 I'm not sure you're right on the amount for the amount

11 of money.

12 Q.      You think it was more than 150?

13 A.      My recollection is it was $100,000, but I would

14 have to go and look at the wire transfer.

15 Q.      Okay.  You've told us this Bop or Bot or Box,

16 and it's pretty clear from these other writings that

17 that first thing Ms. Johnston showed you probably is

18 Bop.

19 A.      That's what I thought, Bop.

20 Q.      That's what you thought and this is one of the

21 reasons because this is in the same book.  It's Bop

22 again, right?

23 A.      That is one reason, yes.

24 Q.      You've not tracked down Bop yet; have you?

25 A.      Bop is -- no, we have not identified him or her.

1  Q.      Can you tell us what it says here in the oval?

2  A.      It says, Bop, and it looks like a telephone

3  number.

4  Q.      That's a 240 area code?

5  A.      It would appear to be, yes.

6  Q.      Thank you very much for your time, Sergeant.

7          MR. MONTEMARANO:  Pass the witness, Your Honor.

8          THE WITNESS:   Thank you.

9          THE COURT:   Thank you.

10         MR. MARTIN:   Court's indulgence.

11                      **CROSS-EXAMINATION**

12         BY MR. MARTIN:

13 Q.      Good afternoon, Sergeant Sakala.

14 A.      Good afternoon.

15 Q.      Sergeant Sakala, it would be fair to say that

16 during your 18 years as a police officer, that during

17 your time as a narcotics investigator, that you have

18 become familiar with a broad array of investigative

19 tools; right?

20 A.      I've actually been a police officer about 25

21 years, but I would agree with that statement, yes.

22 Q.      Well, I stand corrected.

23         Some of those tools include wiretaps?

24 A.      Yes.

25 Q.      Wired cooperators?

1 A.      Wired cooperators?

2 Q.      In other words, you place a wire on somebody

3 during a controlled buy?

4 A.      Consensual monitoring, yes.

5 Q.      Electronic bugging devices that you might place

6 inside of a car?

7 A.      GPS tracking devices, yes.

8 Q.      You would also have the ability to place a

9 camera inside of a car, too; wouldn't you?

10 A.      I have not done that, but I know it can be done.

11 Q.      And you've seen that done in other cases?

12 A.      Not in cases I've been personally involved in,

13 but I know.

14 Q.      You're familiar with it?

15 A.      Yes, I am.

16 Q.      You're also familiar, of course, with pole

17 cameras?

18 A.      Yes.

19 Q.      Camcorders?  Handheld --

20 A.      Yes.

21 Q.      You're also familiar with -- you've already

22 talked about controlled buys and all of these tools are

23 available to you and they were available to you during

24 the course of this investigation; right?

25 A.      Some are available and some are not.

1  Q.      Well, you were part of a federal task force;

2  were you not?

3  A.      That's correct.

4  Q.      Certainly you could have asked the federal

5  government to provide you with anything that you

6  thought you might have needed to make your

7  investigation more effective?

8  A.      I don't know that the federal government could

9  have provided a person who could make a controlled buy.

10 That person doesn't exist, the person doesn't exist.

11 The federal government has no ability to create a

12 cooperator where there is none.

13 Q.      Well, Luis Mangual, at some point, was

14 cooperating with you; was he not?

15 A.      Luis Mangual has never cooperated with us.

16 Q.      I thought your -- what about Juan Encarnacion?

17 Wasn't he cooperating with you at some point?

18 A.      He has cooperated, yes.

19 Q.      If I recall your testimony, he was arrested

20 sometime in November of the year preceding his

21 cooperation; correct?

22 A.      No, 2001 he was arrested.

23 Q.      When did he start cooperating?

24 A.      At the end of 2002.  I think we've -- near the

25 end of that year.

1  Q.      So is it your testimony that none of the people

2  who were on any of the indictments that might have been

3  related to this investigation were at your disposal or

4  potential use as cooperating witnesses?

5  A.      No.  We were talking about controlled buys.

6  Certainly some of them could be interviewed and provide

7  information, but Mr. Encarnacion was not in a position

8  to make a controlled buy.

9  Q.      Let me ask you this:  Were there any people

10  involved in the investigation who early on decided to,

11  as they say in the street, flip?  That is, cooperate

12  with the government.

13  A.      You'd have to talk about specific individuals

14  because there's been quite a few cooperators throughout

15  this case, so I'm not sure who you're referring to.

16  Q.      I'm not sure either.  You're the expert, and

17  you're involved in the investigation, and I thought you

18  might remember.  You don't recall that?

19  A.      Mr. Encarnacion was the first cooperator we had.

20  As things progressed to this day, other cooperators and

21  witnesses have come to our attention that we've used.

22  Q.      Let me get straight to the point.  At no time

23  did you try to do a controlled buy with Learley

24  Goodwin; isn't that correct?

25  A.      If you mean by me personally, that is correct.

1 If you mean by the investigators , that would be

2 incorrect .

3 Q.     You or any of the investigator s who were

4 involve d in this particular investigation never

5 attempt ed to do a controlled buy with Learley Goodwin ;

6 isn't that correct ?

7 A.     Again , we would have to define what the

8 investigators are.  If we're talk ing about November ,

9 2003 , that would be incorrect .  If we're not talk ing

10 about those investigator s, that would be correct then .

11 Q.     Thank you .  In addition to that , at some point ,

12 it's fair to say during the course of this

13 investigation , you became aware of where Learley

14 Goodwin live s, right ?

15 A.     Yes .

16 Q.     And that was 1351 Constitution Avenue ; right ?

17 A.     No , I do not believe so .  I think we had his

18 residence as Farragut Place .

19 Q.     Well , Mr. Goodwin , you will admit , own ed several

20 build ings ; right ?

21 A.     He did own several build ings , yes .

22 Q.     You did , at some point , arrest him .  Well , maybe

23 not you , but one of the other agent s involve d in this

24 investigation arrested him ; right ?

25 A.      I believe he was arrested at his residence on

1  Farragut , that  is  correct .

2  Q.      That  wasn't  the  question .   He  was  arrested ;

3  right ?

4  A.      Yes .

5  Q.      At the  time  of his  arrest , I take  it  that  his

6  wallet  and  other  identification  papers  were  taken  from

7  him; correct ?

8  A.      I don't know , but  that  would  be  normal  practice ,

9  yes .

10  Q.      Do you  recall  whether  or not  in his  wallet  there

11  was  a driver 's  license ?

12  A.      I don't  even  know  if he had  a wallet  on him  when

13  I know  he was  arrested .

14  Q.      I'm  sorry , sir .   I couldn't  hear  you .

15  A.      I do not  know  what  was on him .   I don't know   if

16  he had  wallet  on him .   I certainly  don't  know  if he had

17  a driver's  license  on him .

18  Q.      Let  me ask  you  this :   You're  familiar  with  this

19  investigation , as you  demonstrated  over  these  last  few

20  days  before  the  ladies  and  gentlemen  of the  jury   .   You

21  know  that  Mr.  Goodwin  owned  a house  on Constitution

22  Avenue ; correct ?

23  A.      I believe  this 's  correct , yes .

24  Q.      And  you  also  know  that  he owned  the  building

25  over  in Anacostia .

1  A.      No, I don't know that I know that.  I know he

2  owns a bunch of properties.  Constitution Avenue sounds

3  familiar; the others, I couldn't tell you where they're

4  at.

5  Q.      Well, did you place a surveillance at any of

6  these different residents to see which one he actually

7  lived at?

8  A.      I'm sure we did the surveillance on Farragut or

9  followed him to there.  I don't think we put

10 surveillances on particular residences looking for him,

11 no.

12 Q.      Wouldn't that be something that would be very

13 important in terms of doing an investigation, finding

14 out exactly where someone lives?

15 A.      We knew where he lived on Farragut.

16 Q.      You believe that's where he lived?

17 A.      That's where he was arrested.  That's where we

18 did the search warrant.  The other places, I just don't

19 know about.

20 Q.      All right.  I'm not going to argue with you.

21          So you go into Farragut, and when you go into

22 Farragut, you see some items; correct?

23 A.      I was not present at these search warrants at

24 Farragut.

25 Q.      You're familiar with the items that were seized

1  out  of  the  residence  at  Farragut ?

2  A.      Some  of  them , yes .

3  Q.      Did  you  have  a  chance  to  review  the  evidence  in

4  this  case  prior  to  your  testimony ?

5  A.       I've  looked  at  some  of  the evidence;   certain ly

6  not  all  of  it .

7  Q.      You  would  be  familiar  with  those  item s  that  were

8  taken  out  of  Farragut  and  sent  to  the  forensic  lab ,

9  right ?

10  A.      Some  of  the  item s , yes .

11  Q.      With  respect  to  the  items  that  were  taken  out  --

12  let  me  ask  you  specifically .  There  was  a  bag  that

13  contain ed  what  the  government  de scribe d  as  cocaine .  I

14  think  it's  Drug s  31 .  Do  you  have  a  copy  of  the  exhibit

15  list ?

16  A.      No , I  do  not .

17         MR.  MARTIN:   Madam  Government , could  we  give  him

18  a  copy  of  that ?

19         MS.  JOHNSTON:   You  can  certain ly  give  him  your

20  copy , Counsel .  If  you  need  a  copy , at  the  end  of  our

21  document s --

22         MR.  MARTIN:   I  don't  need  a  copy .  I  thought  it

23  might  be  easier  for  him  during  his  testimony .

24         BY  MR.  MARTIN:

25  Q.      Do  you  remember  a  bag  of  cocaine  being  taken  out

1  of Farragut Place?

2  A.       I remember a large amount of cocaine. I don't

3  know if that's the bag you're talking about.

4  Q.       Okay. Well, with respect to that bag or any of

5  the other items that were taken out of Farragut Place,

6  do you recall any of that being sent to forensics for

7  fingerprints?

8  A.       Yes, I'm sure it did. I think we've sent -- I'd

9  have to look at the latent analysis, but I think we've

10 sent hundreds and hundreds of items to our lab for

11 latent evidence. Latent examination, I'm sorry.

12 Q.       None of the items, as far as you can recall

13 today, that were taken out of Farragut had Mr.

14 Goodwin's fingerprints on it; did it?

15 A.        We recovered no usable latent prints out of the

16 hundreds and hundreds, no matter what, from what

17 location, there were no usable latents recovered.

18 Q.       Some of the things that you would look for were

19 scales and ledger books and some of the other things

20 that you testified to earlier, I think in your

21 testimony last week.

22 A.       I think that's what all the search warrant

23 agents -- officers would look for.

24 Q.       Did you find any scales in Farragut, if you can

25 recall?

1          MS. JOHNSTON:   Objection.   Your Honor, the

2    witness has already testified he didn't do the search

3    at Farragut.

4          MR. MARTIN:   Your Honor, I think the witness has

5    also testified he reviewed the evidence in this case

6    and he was proffered as an expert and he sat in here

7    during everyone else's testimony.

8          THE COURT:   I will overrule this objection, but

9    I think you can go too far with this witness, if he

10   didn't do the seizure.

11         MR. MARTIN:   May I approach the witness, Your

12   Honor?

13         THE COURT:   Yes, you may.

14         MR. MARTIN:   Let the record reflect I'm

15   approaching the witness and I'm giving him a copy of

16   the government's exhibit list.

17         BY MR. MARTIN:

18   Q.    Now, you went into a number of different places.

19   If you look at the exhibit list on Page 2.

20   A.    I don't think I participated in any of the

21   search warrants in this case.   I'm sorry.   No, I don't

22   think I did.

23   Q.    Did you have opportunity to look at any of the

24   evidence taken out of --

25   A.    That I did do, yes.

1 Q.      That you did do.  Well, let me ask you this:  Is

2 it fair to say that Mr. Goodwin did not have a

3 residence at 9002 Bexhill Court in Adelphi?

4 A.      I think that's fair to say, yes.

5 Q.      Is it also fair to say that there's no

6 indication that Mr. Goodwin ever lived at 1513 Ray Road

7 in Hyattsville?

8 A.      I think that's fair to say, yes.

9 Q.      Is it also fair to say that Mr. Goodwin didn't

10 live at 85844 Digger's Lane in Elk Ridge, Maryland?

11 A.      I think that's fair to say, yes.

12 Q.      And he didn't live at 7427 Ninth Street NW,

13 Washington, D. C.

14 A.      No, he did not.

15 Q.      You said that he lived at 38 -- at 36 Farragut

16 Place, and you're certain of that; correct?

17 A.      I think that's my recollection what the search

18 warrant affidavit, I think that's what we asserted, and

19 I believe that's true, yes.

20 Q.      Well, you say that.  But at the same time, you

21 say you didn't do any of the searches or you didn't

22 execute any of the warrants; correct?

23 A.      That's true, but that's certainly not the only

24 way to establish residency.

25 Q.      Well, you never went in there and saw any

1  picture s of his clothing in there ; did you ?

2  A.    I didn't go into any of the search warrant s, so

3  I certain ly did not see any clothi ng in Mr. Goodwin 's

4  residence .

5  Q.    And you don't recall see ing the driver 's license

6  at the time of his arrest or any picture s of that

7  driver 's license ?

8  A.    As I said , I was n't there when he was arrested .

9  I don't know  if he had a driver 's license or a wallet

10 or what he had on him at the time of his arrest .

11 Q.    So that in all fairness , Sergeant Sakala , you

12 can't say to any degree of any certainty to the ladies

13 and gentlemen of the jury  that he live d at Farragut

14 Place ; isn't that a fact ?

15 A.    I would not agree with that .

16 Q.    You can say to a degree of certainty ?

17 A.    That 's my belief , yes , and I think you will hear

18 evidence of that .

19 Q.    That 's your belief , but that 's not what I asked

20 you .  I asked you if you could say to any degree of

21 certainty .

22 A.    In my mind , yes , I believe that 's where he

23 live d.

24 Q.    Would you believe that if you saw a driver 's

25 lice nse with a  different  address ?

1  A.       No.   In fact , his driver 's license would mean

2  absolute ly nothing  to me.

3  Q.       Would  the absence  of clothe s  mean  nothing  to you

4  as well ?

5  A.       No.  No, I didn't say that . I said the

6  driver 's lice nse,  and  the  absence  of  clothe s  -- if he

7  does  not  have  clothe s  at a residence , that would  mean

8  something , but  I don't know   that  that 's the  case  with

9  Mr. Goodwin .

10 Q.       You don't  know  that  because  you didn't  go in

11 Farragut  Place ; correct ?

12 A.       That 's correct .

13 Q.       Now , with  respect  to the  November  25 , 2003 ,

14 arrest  of Mr. Goodwin .  You weren't  there  for that ,

15 were  you ?

16 A.       No, I was  not .

17 Q.       The  only  thing  you know  about that  is what  you

18 heard  Detective  Martini  -- I can't  remember  if he's a

19 patrolman , but  the  agent  who came  in .

20 A.       I did not  hear  Detective  Martini  testify , but  I

21 am familiar  with the  incident .

22 Q.       And  you heard  Sergeant  Grant  testify  as well ?

23 A.       No, I did not .

24 Q.       You didn't ? There  were  -- let me ask  you this:

25 Based  on your  train ing  and  experience , is it easier  to

1 take fingerprint s off of a smooth surface like glass

2 than it is off of a rough surface like a gnarled handle

3 of a gun?

4 A.     The gnarled handle of a what?

5 Q.     Gun.

6 A.     I would say the glass would be easier, the

7 glass.

8 Q.     The glass would be easier.  Would it also be

9 easier to take finger print s off of a plastic bottle, as

10 opposed to the gnarled handle of a gun?

11 A.     I don't know about plastic.  I don't think I've

12 had much success with plastic, so probably neither one

13 of them are very good.

14 Q.     I'm sorry, sir.  I didn't hear.

15 A.     Probably neither one of those surface s are very

16 good for latent s.

17 Q.     You're not a fingerprint s expert.

18 A.     I am not, no.  You had nothing to do with the

19 November 25, 2003, arrest?

20 A.     Nothing do with it.

21 Q.     Now, going back to the Farragut Place address.

22 If you would look at Page 34, Sergeant Sakala, at the

23 very top of what's marked as Goodwin 13.

24 A.     Oh, on the exhibit list?

25 Q.     Yes, please.  Page 34, if you would.  At the

1  very top, it says, Goodwin 34 - money wrappers?

2  A.     Yes.

3  Q.     Again, understanding that you're not an expert

4  with forensics, but as an expert in narcotics

5  investigations, would you agree with me that paper

6  items are the kinds of things that often would be sent

7  to a forensic lab because fingerprints can be lifted

8  off of that?

9  A.     I would not agree with that.

10 Q.     So it is your testimony that paper is not a good

11 medium to find fingerprints?

12 A.     That would be my testimony, yes.

13 Q.     Have you had any training in fingerprint

14 analysis?

15 A.     Fingerprint analysis?  No.

16 Q.     And looking again on Page 34 of the exhibit

17 list, Goodwin 23.  In the house, you found three --

18 well, it says here that three boxes of baking soda was

19 found; right?

20 A.     Yes.  Oh, wait a minute.  Yes.

21 Q.     There's no indication that that was sent to a

22 forensic lab for fingerprint analysis either; right?

23 A.      It may have been.  I'd have to look at the

24 latent request.  Off the top of my head, I don't know.

25 Q.     Let me ask you this.  You sat in this courtroom

1  through a great portion of this trial. You didn't see

2  any fingerprint exhibits with Mr. Goodwin's

3  fingerprints on it admitted to date; have you?

4  A.      Yeah. As I think I said, we got no latents in

5  any of the things we submitted.

6  Q.      You also did a search of -- strike that.

7          Did you review the evidence in the October 17,

8  2002, search of Lobo's Discount Auto?

9  A.      No, I did not.

10 Q.      Did you have anything to do with that search?

11 A.      No, I did not.

12 Q.      And you wouldn't know, then, whether or not the

13 ammo and scale or any of those items were sent to

14 forensics for fingerprints?

15 A.      I've never seen anything from that search. I

16 have no idea.

17 Q.      You would agree that Mr. Goodwin doesn't live at

18 810 Hayward avenue; would you not?

19 A.      I would agree with that, yes.

20 Q.      You would also agree that there weren't any pole

21 camera videos of Mr. Goodwin entering and leaving 810

22 Hayward; would you not?

23 A.      I would disagree with that.

24 Q.      None were shown here in court, were they?

25 A.      I don't know what was shown with other

1 witness es .   There  were  none  shone  by  mine , but  I  know

2 they  exist .

3 Q.       Those  that  exist , were  they  -- they  were  give  to

4 the  government ?

5 A.       What  do  you  mean  given  to  the  government ?

6 Q.       Well , you  were  the  lead  agent  on  this  case ,

7 right ?

8 A.       Yes .   Well , no , I  was  one  of  the  three , yes .

9 Q.       You  were  one  of  the  three ?

10 A.       Right .

11 Q.       You  would  give  the  government   whatever  evidence

12 you'd  gather  in  this  case ; right ?

13 A.       I'm  a  little  confused .   I  mean , I  am  part  of  the

14 government , so  I'm  not  giving  it  to  myself .   The  tape s

15 are  in  discovery .   There 's  copies .

16 Q.       Let  me  be  more  precise  with  my  question .   Did

17 you  hand  the  video s, all  the  evidence   that  you  got  in

18 this  case , to  the  prosecutor s for  review ?

19 A.       Yes .

20 Q.       That  includes   the  10,000  plus  call s that  we've

21 discuss ed  here ; right ?

22 A.       All  the  call s are  in  discovery , yes .

23 Q.       So  that  also  would  include  the  video  that  you

24 say  exist s show ing  Mr.  Goodwin  entering   and  leavi ng  810

25 Hayward ; right ?

1  A.      Yes.

2  Q.      And you would agree with me that none of those

3  videos are listed here on this exhibit sheet; right?

4  A.      I have not been through the exhibit list, but I

5  will take your word for it.

6  Q.      Why don't you take a minute and look.  When you

7  finish, you can look up.

8  A.      (Witness indicating.)  Under the description s of

9  videos starting on Page 55 continuing on to 56 and

10  continuing to 57 of Video 1, 3/28, I do see it listed,

11  Video 27, with  Learley Goodwin being at  Hayward.   I

12  would also say that  without looking at the  logbook,

13  it's entirely possible  that Mr. Goodwin is contained in

14  other  videos, but the government  chose not to play

15  those  portions for whatever  reason.

16  Q.      How long did this investigation  take place,

17  Sergeant?

18  A.      We began, I think I said, at -- near the end of

19  2002.

20  Q.      2002.  And the arrest took place in June, 2004;

21  right?  That's two years.

22  A.      One and a half.  Almost two years, yes.

23  Q.      Almost two years.  So in two years, there is one

24  video that is listed showing Mr. Goodwin going to

25  Hayward place?

1  A.      Mr. Goodwin's name is listed.  The video -- he

2  may be on the other videos.

3  Q.      Now, Mr. Goodwin, I take it from your testimony,

4  is also known by various names, right?

5  A.      Yes.

6  Q.      He's also known as Goody?

7  A.      Goody, yes.

8  Q.      And the government shared with -- or you're

9  familiar with the items seized at Digger's Lane?

10  A.      I'm sure I've seen most of them, yes.

11          MR. MARTIN:   May I approach the witness, Your

12  Honor?

13          THE COURT:   You may.

14          BY MR. MARTIN:

15  Q.      Showing you what's been marked as Government

16  Exhibit No. Digger's Lane 10.  Specifically, I'm on

17  April 2000.  I call your attention to April 5th.  Can

18  you see that there?

19  A.      Yes.  Wednesday, the 5th, at the bottom?

20  Q.      Right.  Can you see the phone number there?

21  A.      Yes.

22  Q.      Whose name is above that phone number?

23  A.      Goody.

24  Q.      Just read the number into the record?

25  A.      546-5429.

1 Q.      Did you have occasion to see this prior to the

2 trial starting?

3 A.      I'm sure I probably have.

4 Q.      Did you call that number to see if that was

5 Learley Goodwin's number?

6 A.      No.

7 Q.      But there are other people in this investigation

8 besides Learley Goodwin who have the last name Goodwin,

9 right?

10 A.      His ex-wife.  Though, I don't know  if you say in

11 the investigation  her name came up, but I don't believe

12 she was a target.  That's Constance Goodwin.  If there

13 are other others, they're escaping me right now.

14 Q.      Was there a Tony Goodwin that you recall?

15 A.      I think a Tony Goodwin was mentioned in a call

16 that we played in court here.  He certainly wasn't a

17 target.  I don't know  who that is.

18 Q.      Was there a Eugene Goodwin that you recall?

19 A.      Not that I recall.

20 Q.      These are the phone numbers with the name

21 "Goody" that might have appeared in that phone book or

22 any other.  You never made any attempt to call those;

23 right?

24 A.      We did not call that number, no.

25 Q.      With respect to Mr. Goodwin's phones.  You

1 didn't have a Title III wiretap put on his phones; did

2 you?

3 A.     We did not.

4 Q.     Going back to the videotapes for a moment.

5 Sergeant, bear with me.

6         You don't have any videotapes with Mr. Goodwin

7 and this mysterious Cuba, do you?

8 A.     I believe that's true.

9 Q.     And you don't have any videotapes of Learley

10 Reed Goodwin receiving drugs from Michael Thurman; do

11 you?

12 A.     No.

13 Q.     And you don't have any videotapes of Learley

14 Reed Goodwin picking up drugs from Xavier Moore, do

15 you?

16 A.     No.

17 Q.     And you don't have any videotapes of Learley

18 Reed Goodwin picking up drugs from Gwen Levi; do you?

19 A.     I believe that's accurate, yes.

20 Q.     Now, there was also a reference to Tiffany

21 Vessels. Do you recall that?

22 A.     There have been several references to her, yes.

23 Q.     Who is Tiffany Vessels?

24 A.     She is a girlfriend of Mr. Goodwin.

25 Q.     Do you remember you going through one of the

1 phone calls, I think it was B2790 on Page 291?   I'm not

2 sure which volume that's in, but you could look and I

3 may -- I may be able to give you, I think, it's Page

4 291.

5 A.     It's in the second volume.

6 Q.     Have you found that?

7 A.     Yes.

8 Q.     This conversation was just an excerpt of a much

9 larger conversation; is that correct?   A much longer

10 conversation.

11 A.     It's an excerpt of a six-minute conversation, so

12 it's four minutes of the six-minute conversation, if

13 this is correct.

14 Q.     In that conversation there, who's speaking?

15 A.     Paulette Martin and Tiffany Vessels.

16 Q.     Just give me a moment to go over there.   Would

17 you agree with me -- what was this conversation about?

18 A.     If I recall correctly, Ms. Vessels is searching

19 for something while she's on the phone with another --

20 she's on the phone with Ms. Martin, but she's on a

21 second phone with Mr. Goodwin.   She's directing her to

22 some location inside the residence to pick up something

23 and take it to Ms. Martin on Hayward.

24 Q.     I might have misunderstood you when you

25 testified to this.   Was your testimony that Ms. Vessels

1  was going to 810 Hayward?

2  A.     Yes.

3  Q.     You didn't call for a surveillance  to see if Ms.

4  Vessels actually showed up at 810 Hayward, did you?

5  A.     I don't know if we did have surveillance  out

6  that day.  My recollection  -- I don't recall  if we had

7  surveillance  out there or not.

8  Q.     Ms. Vessels wasn't stopped  for speeding or a tag

9  violation  or anything  like that after  leaving 810, was

10  she?

11  A.     She was not stopped  as far as  I know, no.

12  Q.     You don't know if she ever went there; do you?

13  A.     I could look at the pole cam, but off -- sitting

14  here, as I said, I do not know.

15  Q.     You don't know, and that's because  you've got

16  the conversation , but without  the video, all you can do

17  is make an assumption ; right?

18  A.     No.  I think the reason  we didn't  put

19  surveillance  out there, if we didn't , or I haven't

20  looked at the pole cam, is because  the action  happening

21  here was indeterminate .  It just wasn't that important .

22  Q.     Now, you also testified that in many of these

23  conversation s, there was a discussion  concerning

24  tickets.  Is it your testimony  that all of those

25  conversation s regarding ticket s are bogus?  That is,

1  not relating to any specific performance s?

2  A.      Only the ones that we've talk ed about here.

3  There are conversation s about real ticket s that took

4  place during the wire.

5  Q.      In fact , there were legitimate conversation s

6  regard ing the entertain ment industry , would n't you

7  agree with that ?

8  A.      That would depend on your definition of the word

9  "legitimate ," but there were conversation s about the

10 entertain ment industry , yes.

11 Q.      Let 's break this down . You said that there were

12 over 10,000 phone call s; right ?

13 A.      There were over 10,000 activation s, yes.

14 Q.      And we've got about -- I count ed about 381 phone

15 call s here , and my count could be off , but would you

16 agree with me that it's somewhere between 380 and maybe

17 500 phone call s?

18 A.      Yeah . I think the count should be around 450

19 something , but that would fall within the range , yes.

20 Q.      Around 450. I'm not very good with math , but of

21 the 450, if you count this index here , 43 phone call s

22 involve Learley Goodwin . That's 43 phone calls either

23 made to him or that he made . Would you agree with

24 that ?

25 A.      That he was -- that I would agree that that

1  sounds  like  a  number .  I  haven't  done  the  math  that  he

2  was  a  participant  in  the  conversation ,  but  I  would

3  agree  there  are  other  conversation s  that  involve  him .

4  Q.     Right .  There  are  other  conversation s  where  he 's

5  reference d ,  right ?

6  A.     That 's  correct .

7  Q.     So  assuming  that  they're  somewhere  between  450

8  phone  call s ,  you  would  agree  that  50  phone  call s  is  a

9  minuscule  amount  of  call s  in  relation  to  10 ,000 ;  would

10 you  not ?

11 A.     I  would  not  term  Mr.  Goodwin 's  interception s  as

12 being  minuscule ,  no ,  not  in  relation  to  anything  in

13 this  case .

14 Q.     We're  talk ing  about  the  quantity  of  call s ,  the

15 number ?

16 A.     There  are  far  more  telephone  call s  that  --  where

17 he  was  intercept ed  that  are  not  in  these  book s ,  so  I

18 don't  know  what  that  number  is .

19 Q.     Those  call s  are  not  in  book s  because  those  call s

20 were  not  germane  to  the  drug  investigation ;  isn't  that

21 a  fact ?

22 A.     That 's  true .  There  were  also  redundant  call s

23 that  were  eliminate d .

24 Q.     During  your  investigation  and  your  listening

25 into  these  phone  conversation s ,  you  became  familiar

1  with one Ron Hood; isn't that true?

2  A.      Which Ron.

3  Q.      Ron Hood?

4  A.      Yes.

5  Q.      You also became familiar with Ron Hayes; right?

6  A.      Yes.

7  Q.      Ron Hood is involved in the entertainment

8  industry; is he not?

9  A.      I don't know.  The phone calls were about the

10 entertainment business with Ron Hood or about Ron Hood.

11 What he really does, I have no idea.

12 Q.      You've never had occasion to talk to Mr. Hood?

13 A.      Somebody may have interviewed him; I did not.

14 Q.      What about Ron Hayes?  Did you have a chance to

15 check out whether or not he's involved with the

16 entertainment industry?

17 A.      I have not.  Again, as an investigator or

18 someone may have talked to him.  I have not.

19 Q.      But you did agree this morning during

20 cross-examination with Mr. Montemarano that there was

21 an entertainment attorney who was contacted by Ms.

22 Martin; isn't that a fact?

23 A.      That is correct.

24 Q.      I presume that you checked out his credentials

25 to see if, in fact, he was really a lawyer?

1  A.      I don't know  that we did, but I have  no doubt

2  that he was.

3  Q.      It would be fair to say that Mr. Goodwin  was

4  pursuing commercial  activity  or a joint  venture, if you

5  will, in the entertainment  industry.

6  A.      I would  agree  with  that statement, yes.

7  Q.      And he had  invested  money  in that regard; had he

8  not?

9  A.      I would  agree  with  that, yes.

10 Q.      Do you  also  recall  in these  many  conversations

11 whether  or not  there  was a discussion  about  the

12 cancellation  of shows?

13 A.      I remember  that  Ms. Franklin  got sick.  They saw

14 it on the news, and they  saw  it on the news that  she

15 had  cancelled  shows.

16 Q.      As a result  of the cancellation  of shows, there

17 was a dispute  over  money; wasn't  there?

18 A.      I don't think  -- I don't  believe  the dispute

19 over money  was  related  to the cancellation  of shows,

20 no.

21 Q.      So it's your  testimony  that -- well, let me ask

22 you this:  Do you  recall  whether  or not Mr. Goodwin

23 actually  invested  money  toward  the Aretha  Franklin

24 tour?

25 A.      No, I do not  recall  that at all.

1   Q.      Did you ever look into whether or not Ms.

2   Franklin, in fact, had a tour scheduled at the time?

3   A.      The money they invested had nothing to do with

4   the Aretha Franklin tour.  What I was referencing, they

5   had saw on the news that she had gotten sick and she

6   had cancelled her shows.  The money they invested had

7   been wired to a Gilbert Williams.  What exact show or

8   shows was never clear that that investment was going

9   towards.

10  Q.      Did you investigate Mr. Williams?

11  A.      We interviewed Mr. Williams.

12  Q.      It was determined that Mr. Williams really was a

13  promoter, was it not?

14  A.      I don't know.  I would not agree with that

15  assessment, no.

16  Q.      Well, would you agree that Mr. Williams was

17  involved in the performance industry?

18  A.      I would agree that Mr. Williams received money.

19  Whether he received it under false pretenses or was

20  actually part of the entertainment business, I don't

21  know.

22  Q.      Mr. Goodwin sought to get his money back from

23  Mr. Williams, didn't he?

24  A.      I don't know.  I know Ms. Martin was very angry

25  and wanted her money back.

1  Q.       It's also been establish ed by the government

2  that Mr. Goodwin had a discount auto business .

3          Do you remember Lobo's Discount s?

4  A.       Yes .

5  Q.       Did you ever have occasion to investigate Lobo 's

6  to see whether or not it was a legitimate business ?

7  A.       I'm sure we have , but I did not personally.

8  Q.       You did not . So you don't know whether or not

9  there was any records at the Department of Regulatory

10 Affair s in D. C. concern ing Lobo 's?

11 A.       I have no idea .

12 Q.       You don't know who the president of Lobo 's is?

13 A.       I do not .

14 Q.       Or the vice president ?

15 A.       No , I do not .

16 Q.       Or the treasurer ?

17 A.       No , I do not .

18 Q.       You are aware , though , that on the day that the

19 government went there back in October , I believe it was

20 2002 , Mr. Goodwin was not present there .

21 A.       I am not aware of that .

22 Q.       You're not aware of that .

23          Did you review the evidence related to Lobo's?

24 A.       I think I said previous ly , I've never seen any

25 of the evidence from Lobo 's.

1 Q.      You also testified that Ms. Martin referred to

2 Mr. Goodwin as her brother in various conversations; is

3 that correct?

4 A.      That is correct.

5 Q.      But Ms. Martin didn't only refer to Mr. Goodwin

6 as her brother, she referred to many people as her

7 brother; didn't she?

8 A.      She referred to two other individuals, Reece

9 Whiting and Claude Arnold, as her brother.

10 Q.      And let me ask you this:  You said 25 years

11 you've been a police officer?

12 A.      Twenty-five years in August, yes.

13 Q.      Twenty-five years in August.  So that takes you

14 back to 1981?

15 A.      Yes.

16 Q.      And during that period of time, you've had

17 substantial contact with different communities; right?

18 A.      With different communities?

19 Q.      Yeah, different communities, different ethnic

20 communities?

21 A.      Sure.

22      MS. JOHNSTON:  Objection on relevance.

23      MR. MARTIN:  Your Honor, if I have to approach

24 on this, I will, but I think if she bears with me, she

25 will see where I'm going.

1          THE COURT:   Overruled.

2          We'll see where you go.

3          BY MR. MARTIN:

4  Q.    Isn't it common in African-American  communities

5  to refer to one another as "brother" and "sister?"

6  A.    I believe so, yes.

7  Q.    So you will admit that the term "brother" is not

8  something that is used exclusively by Ms. Martin when

9  she's referring to Learley Reed Goodwin?

10 A.      Yes, but the way I -- I would not agree with

11 the characterization  that that is part of the ethnic.

12 She would tell people that is her brother.

13 Q.    Did you have occasion  to talk with Raynard

14 Dorsey?

15         MS. JOHNSTON:   Objection.

16         MR. MARTIN:   I'm asking --

17         MS. JOHNSTON:   Objection.

18         THE COURT:   What's the basis?

19         MS. JOHNSTON:   Your Honor, if we can approach

20 the bench.

21              (At the bar of the Court.)

22         MS. JOHNSTON:   Your Honor, cross-examination  is

23 not to be a fishing expedition  into what the

24 government's case is or what the government has or

25 doesn't have.  This witness did not mention Raynard

1 Dorsey -- did not testify about Mr. Dorsey.

2        It is irrelevant whether or not he ever spoke to

3 him.  It is also beyond the scope of his direct

4 testimony.  The government has been very liberal here

5 in allowing Mr. Martin broad scope in terms of, you

6 know, did he see this stuff in this search warrant and

7 did he look at these documents, after he said he didn't

8 participate in any search warrants.  He's looking at

9 the exhibit list and asking him questions about

10 exhibits that have not been introduced.  What he's

11 asking him now is way beyond the scope of direct, and

12 it's irrelevant to his testimony here.

13        MR. MARTIN:  Your Honor, I think I would respond

14 to that by saying this witness can be called by me, if

15 that's what you want me to do in my case in chief.  Or,

16 in the interest of judicial economy, you can allow me a

17 broader scope than would normally allow.

18        THE COURT:  That is not the question.

19        MR. MARTIN:  One of the things I'm trying to

20 show, and I guess our defense on this particular charge

21 is that the drug bust that took place on November 25,

22 2003, was a setup, and Mr. Dorsey actually set up Mr.

23 Goodwin.  Those weren't Mr. Goodwin's drugs, and I

24 think I should be allowed to see if this witness knows

25 anything about Raynard Dorsey.

1          MS. JOHNSTON:   This witness has already said he

2    wasn't involved in the November 23 -- he didn't hear

3    Detective Martini's testimony.  And what he knows or

4    doesn't know -- I couldn't call him in this, because it

5    would call for hearsay information.

6          MR. MARTIN:   I'm asking him what he does know.

7    I'm asking him if he did speak with Dorsey.  If he said

8    he didn't, that's the end of that and I can't go any

9    further.

10          MS. JOHNSTON:   There is no relevance to it.

11          THE COURT:   I will allow him to answer the

12    question, did he talk to him.  Beyond that, I don't

13    think it goes any further.

14          MR. MARTIN:   Your Honor, if he has talked to

15    him, I should be able to explore to what extent --

16          THE COURT:   I expect the answer is going to be

17    no.

18          MS. JOHNSTON:   Your Honor, no, the answer is

19    going be yes, because he has been interviewed by the

20    government.  I would ask the Court to reconsider,

21    again, the fact that he has interviewed him or not is

22    not relevant here.  More than that, it leaves the

23    position with the jury that he knows something from Mr.

24    Dorsey that the government doesn't want them to hear,

25    but it's inadmissible evidence whatever he talked to

1  Mr. Dorsey about.

2         THE COURT:   I've reconsidered, and I sustain the

3  objection.

4         MR. MARTIN:   Okay.

5              (Back in open court.)

6         BY MR. MARTIN:

7  Q.    Do you remember -- well, strike that.

8         Go to Page 432, if you would be so kind,

9  Sergeant Sakala.  That's call B5072.

10        Are you there, sir?

11 A.    Yes, I am.

12 Q.    You remember testifying about this particular

13 conversation?

14 A.    Yes.

15 Q.    Do you remember telling the ladies and gentlemen

16 of the jury that this was a call between Ms. Martin and

17 Michael Jackson?

18 A.    Yes.

19 Q.    I'm going --

20 A.    No, I did not say this was a call -- I said this

21 was a call between Paulette Martin and Learley Goodwin.

22 Q.    I'm sorry.  That's right, and Learley Reed

23 Goodwin.

24        Standby, sir.  I'm sorry.  It's Page 397, Call

25 4515.  Hopefully my notes are a little more accurate

1 this time.

2          Do you see it, sir?

3 A.      Yes, I do.

4 Q.      That is a call allegedly between Ms. Martin and

5 Mr. Jackson; right?

6 A.      Yes.

7 Q.      And you had occasion to listen to that; correct?

8 A.      Yes.  I think we played this in court.

9 Q.      Right.  We played that in court.

10          Now, it's your testimony to a degree of -- I

11 don't know if you can call this to a "degree of moral

12 certainty," but you're certain that that's Michael

13 Jackson?

14 A.      I believe this to be Michael Jackson.

15 Q.      Why do you believe that?

16 A.      I don't know how we did the identification on

17 this, whether it was through his nickname of Mike-Mike,

18 or if somebody else had talked to Michael Jackson.  I

19 don't know how this call was identified as Michael

20 Jackson.

21 Q.      You're assuming that that's Michael Jackson on

22 that call; correct?

23 A.      That's correct.

24 Q.      But you didn't tell the ladies and gentlemen of

25 the jury that you were assuming that that was Michael

1  Jackson when you testified earlier, did you?

2  A.      Did I tell them I was assuming?

3  Q.      Yeah.

4  A.      No, I did not.

5  Q.      Now, if you would go the Call B5763 on Page 461.

6          Do you have that, sir?

7  A.      Yes, I do.

8  Q.      In this conversation, I believe your testimony

9  was that Mr. Goodwin was discussing picking up a half

10  kilo.  Do I have that correct?  I don't want to

11  misquote you.

12  A.      I don't think that's accurate.  I'd have to look

13  at the preceding calls.  I think this is a call with

14  Cuba, and I think they're picking up a full kilo.

15  Q.      A full kilo?

16  A.      I believe that's correct.  I'd have to go back

17  and look at previous calls to see what he and Paulette

18  agreed on.  Yes.  This is the -- she's getting half,

19  and he's getting half.  They're talking about going

20  down the middle with a half shipment of dresses where

21  she's loaning him $3,000.  So, no, you would be

22  incorrect.  That's a full kilo.

23  Q.      Turn to Page 462.

24  A.      Yes.

25  Q.      Do you see at the very top of 462, they're

1  talking about 100 bucks?

2  A.     I see Mr. Cuba has unintelligible, but not

3  unintelligible 100 bucks.

4  Q.     You would agree that a kilo or even a half kilo

5  doesn't cost a hundred bucks; right?

6  A.     I don't think that's what that says, but I would

7  agree with that, yes.

8  Q.     Would it be fair to say that Cuba is difficult

9  to understand?

10 A.     I think Cuba is as -- has a very heavy accent,

11 yes.

12 Q.     So as a result of the difficulty in

13 understanding what Cuba is saying, sometimes

14 assumptions have to be made as to what he's saying or

15 trying to convey; isn't that accurate?

16 A.     I wouldn't say that, no. I certainly haven't

17 used any assumptions on what he said. It's either --

18 Q.     Did you transcribe these conversations?

19 A.     Some I've transcribed. I've reviewed all of

20 them. I've made corrections, so in every conversation,

21 I would have to say, yes, I've had a hand in it.

22 Q.     So when you made the corrections, as you did

23 here in court, you made those corrections based on your

24 knowledge and your experience and your training of what

25 you believe or concluded was being conveyed; right?

1 A.      No, I did not.  I listened  to the calls with  the

2 transcripts.  I would make corrections.  I would give

3 them to a secretary  to have the corrections made.   I

4 would listen to the calls again and just go back and

5 forth, and that's gone on probably  from day one.

6 Q.      You also testified that some of the things that

7 you heard said by Ms. Martin were not true.

8 A.      Yes.  I agree.

9 Q.      For example, Ms. Martin, as far as  you know,

10 never went to Atlanta when she said she was going to;

11 right?

12 A.      That's correct.

13 Q.      Sometimes  when she told people she was going to

14 classes, she didn't go; right?

15 A.      No, I think that's incorrect.  I think she did

16 go to classes.

17 Q.      No, no, no.  I didn't say that she never went.

18 I said sometimes  when she told people she was going to

19 classes.

20 A.      I don't think so .  I think the times when she

21 said she was going to classes, I think she was actually

22 going to classes.  At least  in the calls we played

23 here.

24 Q.      Well, you will agree with me that sometimes  she

25 told people things that weren't true?

1 A.      That is correct.

2 Q.      Do you remember one particular conversation

3 where she was talking to someone about drugs being bad,

4 and she said something to the effect, well, Goody got

5 five and he had no problems with it?  Do you remember

6 that conversation?

7 A.      Yeah.  I believe it was a conversation with

8 Derrick Bynum.

9 Q.      Well, whomever.  You didn't hear any

10 conversation with Mr. Goodwin and Ms. Martin regarding

11 his getting five?

12 A.      No, I did not.  We did not.

13 Q.      Michael Thurman, I believe the other gentleman

14 who testified was Horace Smith, and I think Nathan

15 King, if I have the names correct.  Do you remember

16 those gentlemen?

17 A.      Yes.

18 Q.      Were you present for any of their interviews?

19 A.      I was not.  Oh, for their interviews?  Yes, I

20 was.

21 Q.      None of those interviews were recorded, were

22 they?

23 A.      Recorded?  No.

24 Q.      And none of those --

25 A.      Recorded as in?

1  Q.       Tape recorded.

2  A.       Tape recorded?  No.

3  Q.       No camcorder either?

4  A.       Correct.

5  Q.       After the interviews were over, you didn't -- or

6  any agents who were present didn't give their notes to

7  the interviewees to ask them to read it and correct it;

8  correct?

9  A.       Give the notes to the people we were talking to

10 to have them review them?  No.  No, that's not normal

11 practice.

12 Q.       It's your testimony that you can tell the

13 difference between a discussion regarding an eighth of

14 an ounce and an eighth of a gram.  Is that what --

15 A.       I don't think  I ever testified about an eighth

16 of a gram.

17 Q.       Well, in listening  -- I don't have  a specific

18 conversation, and I don't want counsel jumping up if

19 you don't recall, then I might as well ask the

20 question, do you remember --

21 A.       I didn't testify at any point about an eighth of

22 a gram during this trial.

23 Q.       You would agree with me that with respect to the

24 pole camera, that that pole camera is at a pretty good

25 distance from the people who were seen on it; would you

1 not?

2 A.      Yeah.  I don't know  how far the camera is.  I

3 don't know  which pole it was actually on, but yeah,

4 it's a couple hundred fee t maybe.  I don't know.

5 Q.      It's hard to see details; wouldn't you say?

6 A.       Yeah.  Especially  with time lapse recordings it

7 is, yes.

8 Q.      And you can't see things  like license plate

9 number s.  I mean, even  with my bad eyes, I was able to

10 determine  that that might be hard to do.

11 A.      You can -- we were able near the -- probably

12 about half way through to be able to zoom in the camera.

13 It took some -- it took a good touch, but you were able

14 to get license plate s on some cars depend ing on where

15 they park ed on the street.

16 Q.      With the use of your hands , and if you could

17 just describe for the record -- and I want to make sure

18 the ladies and gentlemen of the jury   can see you.

19 Would you indicate to them a typical brick ?  Its

20 dimension s?  I mean, you know , would it be about ten

21 inches apart ?  Twelve inches apart ?  Half inch wide?

22 Three inches  wide ?  How would you describe it with your

23 hands  so they can see?

24 A.       Well, the best way to describe it is it depends

25 on the thickness  of the brick.  A very thin kilo is

1  going wider and longer.  A thick --

2  Q.     If you hold up your hand for a minute.

3  A.     If you allow me to finish.  A brick -- if you

4  think of a regular kilo will be the size of a brick.

5  That's about -- if you get that thick, it will look

6  about like a brick.  I think we saw pictures of it

7  during the Wyoming stop.  That's about what they look

8  like, but there is no uniformity.  It doesn't has to be

9  12" by 6" by 4".  I've seen all different sizes.

10 Q.     And its weight, for those of us like myself?

11 A.     2.2 pounds.

12 Q.     2.2 pounds.

13        Were you present when Mr. Goodwin was arrested?

14 A.     No.  I think I said that a couple of times.  I

15 was not present when he was arrested.

16 Q.     Well, there were at least two arrests.  I was

17 talking about the most recent one?

18 A.     I was not present at any of his arrests.

19 Q.     Do you know whether the garbage at either

20 Farragut or Constitution Avenue was looked at by

21 Investigators?

22 A.     I do not believe we obtained garbage in this

23 case.  The previous investigations with PG County and

24 the FBI, I do not know if they obtained garbage from

25 his locations.

1  Q.      The conspiracy is alleged to exist from '97 to

2  2004, if I remember correctly.  Is that your testimony?

3  A.      I don't think I've testified anything about the

4  length of the conspiracy.

5  Q.      Your involvement in the investigation was from

6  2002 to 2004?

7  A.      Until the present.

8  Q.      And continuing?

9  A.      Correct.

10 Q.      So it would be fair to say that you've invested

11 quite a bit of time in this case; would it not?

12 A.      Yes, that's fair to say.

13 Q.      And it's taken -- has it helped you in getting

14 promoted?

15 A.      No.  In fact, it hurt me in getting promoted.

16 Q.      And you were the one who helped the government

17 in identifying the major alleged conspirators in this

18 case; right?

19 A.      Again, the term government.  I helped in

20 identifying people.  I don't know what you mean by the

21 government, but I was one of the people who assisted in

22 identifying people involved, yes.

23 Q.      Well, the prosecutors -- you helped identify the

24 people that you thought the prosecutors should look at?

25 A.      Yes, sure.

1  Q.      And you determine d the organizational  structure ;
2  didn't  you ?
3  A.      No .  I think  the  organization  determine s the
4  organization  structure .  I have  nothing  do with  it .
5  Q.      Let me ask you this :  Going over to this chart
6  here , for the record , I'm showing  the witness  Chart  1.
7  You review ed this after it was put together  by the
8  government ; right ?
9  A.      Yes .
10 Q.      And you agreed  with it; right ?
11 A.      I believe  it accurate ly reflect s the  structure
12 of the organization , yes .
13 Q.      That 's based  on the time  that you put  into  this
14 investigation ; right ?
15 A.      It has nothing  to do with  the time  I put  into
16 this  investigation .
17 Q.      Those  were based  on the conclusion s and the
18 assumptions  made in this case ; right ?
19 A.      No .  The amount  of time  I put  into  the
20 investigation  has nothing  to do with  the size  or shape
21 of an organization .
22 Q.      I didn't  ask you about  your  time .  This time  I
23 asked  you about  the assumptions  and conclusion s you
24 made .
25 A.      The answer  is no .  It has nothing  to do with  it .

1 Q.      You're convinced that you're correct, that

2 you've correctly concluded the level of involvement of

3 each person here, seated in at this table and behind

4 me; correct?

5 A.      I have never said anything about the level of

6 involvement.

7 Q.      You were the one who presented the case to the

8 Office of the United States Attorney; weren't you?

9 A.      I was one of the case investigators that worked

10 the case in conjunction with the U. S. Attorney.

11 Q.      You've been on the force for 25 years; correct?

12 A.      Yes, in August.

13 Q.      And you've testified, would it be fair to say,

14 many times in court?

15 A.      Many times, yes.

16 Q.      And you've had the same kind of give and take

17 that you and I are having now many times before;

18 correct?

19 A.      Sure.  Yes.

20 Q.      You were trained at the academy on how to be a

21 witness; weren't you?

22 A.      I was not.

23 Q.      But you've had a lot of experience as a witness?

24 A.      Yes.

25 Q.      How many times would you estimate you've

1 testified?

2 A.     If you count traffic court, which is where you

3 get, I guess, your most experience because you're there

4 a lot, every case there's probably thousands and

5 thousands of cases, obviously some shorter than others.

6 Q.      It would be fair to say, an obvious I think to

7 everyone, here that you've met with the prosecutor s

8 prior to testifying today and prior to testifying last

9 week; right?

10 A.     Oh, sure.  Yes.

11 Q.     It would also be fair to say you've never met

12 with me to discuss your testimony in this case; right?

13 A.     I would be happy to meet with you, but no, we

14 have not.

15      MR. MARTIN:   Thank you, Sergeant Sakala.

16      I have nothing further, Your Honor.

17      THE WITNESS:   Thank you, Mr. Martin.

18      THE COURT:  All right.  Any additional

19 cross-examination ?

20      MR. HALL:  Thank you, Your Honor.

21                  **CROSS-EXAMINATION**

22      BY MR. HALL:

23 Q.     Good afternoon, Sergeant.

24 A.     Good afternoon, Mr. Hall.

25 Q.     If I understand correctly, you indicated that

1  all totaled, there were about 10,000 phone calls

2  intercepted in this case; is that right?

3  A.      Okay.  Going back to 10,000 activations.  Not

4  necessarily all are phone calls.

5  Q.      Okay.  Some of those may have been calls that

6  just went into an answering machine where there were

7  not two individuals talking; correct?

8  A.      Busy signals, calls that don't get connected,

9  any number of things.

10  Q.      Out of those 10,000 activations, as you called

11  it, you and the U. S. Attorney's office took out the

12  450 to 500 phone calls that the two of you decided was

13  most pertinent to this case; is that right?

14  A.      There were other people besides the two of us,

15  but yes, that's essentially correct.

16  Q.      Well, let's say the law enforcement and the

17  U. S. Attorney's Office.

18  A.      I would agree with that assessment, yes.

19  Q.      And out of those, there are about -- correct me

20  if I'm wrong, about 12, 13, 14 calls that were used

21  here during the past week involving my client, Reece

22  Whiting.  Would that be correct?

23  A.      I don't know the number, but that number sounds

24  about right where he was a participant.

25  Q.      All right.  And that includes at least one phone

1  call that I can recall off the top of my head -- and

2  again, correct me if I'm wrong -- in which all he did

3  was leave a message on Ms. Martin's phone; correct?

4  A.      Yes.  That could be correct, yes.

5  Q.      We're going to go through a couple of the calls.

6          All right.  Now, let my ask you, Sergeant.  If

7  you would -- do you have your book of telephone

8  interceptions there?

9  A.      Yes, I do.

10  Q.      Let me ask you to take out Volume I.  Do you

11  have that handy, sir?

12  A.      Yes, I do.

13  Q.      I'm going to ask you, actually, to turn to

14  Page 1, the very first phone call, B14.

15          Do you have that?

16  A.      Yes, I do.

17  Q.      Okay.  As I go through these calls, if you've

18  found the page, you can just look up and I'll go ahead

19  and ask you the question.

20          Now, I believe that you testified after that

21  call was played -- first of all, this call happened on

22  March 8, 2004; correct?

23  A.      Correct.

24  Q.      Okay.  And it was Call B14; correct?

25  A.      Correct.

1  Q.      So that "B" indicates that it was on Ms.

2  Martin's home phone line; correct?

3  A.      Yes.

4  Q.      As opposed to the A calls that would be on her

5  cell phone; right?

6  A.      That's correct.

7  Q.      I believe that it was your testimony and your

8  opinion that based upon what you heard in that phone

9  call, that the individual known as Milburn Walker was

10  attempting to order up some drugs from her; is that

11  correct?

12  A.      Yes.

13  Q.      I believe you testified that that was the amount

14  this individual attempting to buy was an eight ball;

15  correct?

16  A.      I don't think I said that.

17  Q.      Okay. Well, let me direct your attention down

18  to five lines from the bottom. Ms. Martin apparently

19  says both of them size eight; is that correct?

20  A.      That's correct.

21  Q.      Okay. And would it be a better characterization

22  of your testimony that the use of the term "eight"

23  could mean several different amounts; is that right?

24  A.      Two different amounts, either an eighth of a

25  kilo or an eighth of an ounce.

1  Q.      Okay.  All right.  Now, let me direct your

2  attention -- now that was on the 8th of March; correct?

3  A.      Yes.

4  Q.      Let me direct your attention to Page 3 of the

5  transcript book.  That's Call B35; correct?

6  A.      Yes.

7  Q.      That's also on March 8; correct?

8  A.      Yes.

9  Q.      That's a call between Ms. Martin and Mr.

10 Goodwin; correct?

11 A.      Yes.

12 Q.      If my memory serves me correctly, I believe that

13 after reading that phone call, and Call B42 on the next

14 page and B47 on the following page, that you had

15 expressed an opinion as to all three of those calls

16 grouped together; is that correct?

17 A.      I believe that's correct, yes.

18 Q.      Okay.  And am I correct that your opinion was

19 there was an attempt to set up a deal for, I believe

20 you testified, one and a half kilograms; is that right?

21 A.      Yes.

22 Q.      Okay.  Let me direct your attention to Page

23 No. 8.  Let me direct your attention to Page 8, and

24 that is a phone call that happened the very following

25 day, the 9th; is that correct?

1  A.       That's correct.

2  Q.       And that phone call was between Ms. Martin and

3  my client, Mr. Whiting; correct?

4  A.       Yes.

5  Q.       The -- in that phone call, it was your testimony

6  that my client was attempting to purchase some -- what

7  was referred to as tickets; is that right?

8  A.       Tickets for the concert, yes.

9  Q.       Right.  At that time Mr. Whiting was told that

10 there was nothing available; is that right?

11 A.       That is correct.

12 Q.       In fact, I believe the language used by Ms.

13 Martin is, he said he don't have any printed, so you

14 just have to wait 'til I get some, probably toward the

15 end of the week; correct?

16 A.       Correct.  So we have two sets of phone calls

17 with two other individuals, Mr. Milburn Walker, in

18 which he was able to purchase drugs; correct?

19 A.       Yeah, I'm not sure that that's accurate.

20 Q.       Well, go back to B14.

21 A.       He ordered the drugs on Page 1.  I don't know

22 that there's a call saying he got them.

23 Q.       Okay.  But we do know that he put in an order

24 for drugs; is that correct?

25 A.       That is correct.

1  Q.      Okay.   Mr. Whiting was not able to do that;

2  correct?

3  A.      That is correct.

4  Q.      Let me ask you to then look at Page 17 of the

5  transcript book.   Do you have that, sir?

6  A.      Yes.

7  Q.      That's a phone call that's referred to as B197;

8  correct?

9  A.      Yes, it is.

10  Q.      Okay.   And that happened the very next day on

11  the 10th of March; is that right?

12  A.      The last call was the 9th.   This is the 10th.

13  Yes, sir.

14  Q.      In that call, it's your testimony that Mr. John

15  Martin ordered up some drugs; is that correct?

16  A.      Yes.

17  Q.      In fact, I believe it was your testimony that he

18  ordered -- we don't know what the amount is, but he

19  ordered one soft and one hard.   Wasn't that your

20  testimony?

21  A.      One "downy" and one "starch."

22  Q.      Right.   "Starch" meaning hard, and the "downy"

23  meaning soft?

24  A.      Correct.

25  Q.      Which we would -- I believe your testimony was

1  that that  would  mean  powder  and  crack; right?

2  A.      Correct.

3  Q.      Okay.

4  Q.      Also  on  that  same  day, I believe, if I'm

5  correct, we have  a  series  of  phone  calls between  Ms.

6  Martin  and  a  Mr.  Short; is that  correct?

7  A.      Who?

8  Q.      A gentleman  by  the  name  of  Short; is that

9  correct?

10  A.       Johnnie Short  is  a  female.

11  Q.      You're  correct.  Johnnie Mae Short  .  Ms.  Short.

12  Those  were  also  on  the  10th; is that  correct?

13  A.      If  you give  me a  page  number, I can  tell  you.

14  Q.      Page  21 would  be  the  first  of  the  phone  calls.

15  A.      That  is  correct.  They  were  on  the  10th.

16  Q.      There  were  two  other  phone  calls  after  that  on

17  Page  24?

18  A.      Yes.

19  Q.      And  Page  26; correct?

20  A.      That  is  correct.

21  Q.      Again, those  were  a  series  of  phone  calls  in

22  which  it's  your  opinion  that  somebody  was  attempting  to

23  order  up  some  drugs; is that  right?

24  A.      Well, even  more  so  with  Johnnie Mae Short.  From

25  the  conversations, it's  pretty  clear  she's  at  the

1 residence picking them up.

2 Q.      All right.  It's your testimony, then, that --

3 it's your opinion as an expert, then, that there were

4 drugs available on the 10th; is that correct?

5 A.      Yes.

6 Q.      All right.  Well, let me ask you to jump ahead a

7 few days, then, to the 12th of March, and I will give

8 you a page number.  If you go to Page 45 in the book,

9 we have a conversation which is call No. B357; is that

10 right?

11 A.      Yes.

12 Q.      And that was on the 12th Of March?

13 A.      Yes, it was.

14 Q.      And that was a phone call between Ms. Martin and

15 a Mr. Eugene Bird; is that right?

16 A.      That is correct.

17 Q.      I believe it was your opinion that when you were

18 asked about this call before, that Mr. Bird was

19 ordering up some drugs; is that right?

20 A.      Yes.

21 Q.      Now let me direct you to Page 56.  Page 56 is

22 call B384; is that right?

23 A.      Yes, it is.

24 Q.      That's a call between Ms. Martin and Mr.

25 Whiting; correct?

1  A.       That's correct.

2  Q.       In that call, it was your opinion that Mr.

3  Whiting was attempting to get some drugs; is that

4  right?

5  A.       He was trying to find out if she had any for

6  sale.

7  Q.       Right.  In fact, let me ask you if you'd go down

8  about six lines where Mr. Whiting says, you heard

9  anything yet?

10         Is that right?

11  A.       Yeah.  Actually, I'm not sure I did testify that

12  this was about having a sell.  I believe this was about

13  something else I testified it was.

14  Q.       You don't think this was a drug-related call?

15  A.        I do think it was a drug related call.  I don't

16  think it was a characterization we stated a couple of

17  minutes ago.

18  Q.       Well, let me ask you this.  Would you agree with

19  me that in reference to this particular call, that Ms.

20  Martin told Mr. Whiting that she didn't have any drugs

21  available?

22  A.       Again, I don't think that's what they're talking

23  about, and I don't think that's what I testified to

24  this call being about.

25  Q.       Okay.  So it's your testimony that when Mr.

1  Whiting says, You heard anything yet? And she says,

2  no, not yet. He says, Okay. And she says, Hopefully

3  they should be back here tonight or tomorrow.

4          Are you saying that that is not reference to an

5  attempt by Mr. Whiting to purchase drugs?

6  A.     I think it's an attempt by him to find out the

7  status of either Mr. Philpot or the couriers in Texas,

8  and I think that's how I testified to when this came

9  up.

10 Q.     Mr. Philpot would be the gentleman who was

11 arrested in Wyoming; correct?

12 A.     That's correct.

13 Q.     And the folks from Texas would be -- I assume

14 you're referring to Mr. Thurman; right?

15 A.     This may have been Tiffany Vessels who was in

16 Texas at this time.

17 Q.     All right.

18 A.     It was couriers in Texas bringing drugs back,

19 yes.

20 Q.     The point was it was in reference to somebody

21 trying to bring drugs back; is that right?

22 A.     That is correct.

23 Q.     Okay. Would you agree with me that she goes on

24 in the phone call to say that -- near the very end of

25 that page she says, As soon as I do, I'll call you.

1          Is that right?

2 A.      Yes, she does.

3 Q.      You would agree with me that there is no phone

4 call from Ms. Martin to Mr. Whiting after that point in

5 time, is there?

6 A.      I can't say that.  I can say we did not

7 intercept a telephone call.  Whether she made it from

8 another phone, I can't say.

9 Q.      Okay.  But as far as the phone calls that are

10 part of your wiretap, you do not have a phone call from

11 Ms. Martin back to Mr. Whiting after this phone call,

12 do you?

13 A.      Not with reference to this incident.

14 Q.      All right.  Let me direct your attention to Page

15 62.

16          Do you have that, Sergeant?

17 A.      Yes, I do.

18 Q.      And that is a call that happened on 13th of

19 March, did it not?

20 A.      Yes, it did.

21 Q.      That was a phone call between Ms. Martin and Mr.

22 Mangual; correct?

23 A.      Yes, it was.

24 Q.      I believe it was your testimony that Ms. Martin

25 was trying to set up a deal with Mr. Mangual; is that

1 right?

2 A.      Yes.

3 Q.      Okay.  Again, at least  insofar  as the  calls  that

4 were played here in court, there's no phone call back

5 to Mr. Whiting saying that she has anything; is that

6 correct?

7 A.      That's correct.

8 Q.      Let me direct you to Page 72.  Do you have that

9 page, Sergeant?

10 A.      Yes, I do.

11 Q.      That's a phone call on the 14th; correct?

12 A.      That is correct.

13 Q.      And that is between Mr. Whiting and Ms. Martin;

14 right?

15 A.      Yes.

16 Q.      And that would be two days after the

17 conversation  she had with Mr. Mangual; correct?

18 A.      Two days or one day?

19 Q.      Let's go back and take a look, then.

20 A.      It's one day after.

21 Q.      You're correct.  It was the 13th, so this would

22 be the following day; right?

23 A.      Yes.

24 Q.      Would you agree with me on this call on Page 72

25 that, again, Ms. Martin tells Mr. Whiting that she

1 hasn't heard anything; is that correct?

2 A.     That's correct.

3 Q.     Again, there is no offer on her part to sell him

4 anything; is there?

5 A.     No, there is not.

6 Q.     Okay.  Now, let's jump ahead to Page 137.  That

7 happened on -- do you have that page, Sergeant?

8 A.     Yes, I do.

9 Q.     I don't want to get ahead of you.

10       That happened on the 19th of March; correct?

11 A.     That's correct.

12 Q.     Again, was a phone call between Ms. Martin and

13 Mr. Whiting; correct?

14 A.     Yes.

15 Q.     Okay.  In that phone call, there's, again, a

16 reference to him trying to, as it's referred to, get

17 tickets or the ticket thing, I believe, is the word

18 used.  Is that right?

19 A.     Yes, that's part of the conversation.

20 Q.     Again, Mr. Whiting is told that she hasn't heard

21 anything; is that right?

22 A.     She says I haven't heard nothing on the ticket

23 thing yet, yes.

24 Q.     Okay.  All right.  Now, if you go back to Page

25 135 and 136, which was Call 988 and Call 1000, wasn't

1 it your testimony that she had just set up a deal with
2 Mr. Harris, George Harris?
3 A.      In these two calls, I don't know if I said set
4 up a deal or set up a meet, but I would agree they were
5 setting up a deal. If I didn't testify to that, I
6 would agree with that assessment.
7 Q.      In fact, call 1000, it appears that Mr. Harris
8 has actually arrived there at her house; doesn't it?
9 A.      That's correct.
10 Q.      He makes a reference to being outside; correct?
11 A.      That's correct.
12 Q.      That would be the same day that she, again, told
13 Mr. Whiting that she didn't have any tickets available;
14 right?
15 A.      She said she hasn't heard anything on the ticket
16 thing, yes.
17 Q.      All right. Sergeant, let me ask you -- I
18 believe that we're going to be moving into the next
19 transcript book and we're going to go forward to the
20 time period of April 25, 2004. I want to ask you about
21 a series of phone calls that happened on Page 386,
22 which is call 4426.
23        Tell me when you have that one, Sergeant.
24 A.      I have Page 386 in front of me.
25 Q.      Okay. Page 386 is a phone call between Ms.

1  Martin  and  Mr.  Whiting  again;  correct?

2  A.       That's  correct.

3  Q.       Again,  there's  a  discussion  --  strike  that.

4         Let  me  ask  you  this.   Mr.  Whiting  gives  a

5  greeting;  correct?   That's  how  the  phone  call  starts?

6  A.       He  gives  a  what?

7  Q.       A  greeting.   He  says,  Yeah,  baby?

8  A.       Yes.   Yes.

9  Q.       And  Ms.  Martin  answers,  oh,  you  know  what?   I

10  was  going  to  tell  you,  I  don't  have  no  tickets  now.

11         Is  that  correct?

12  A.       That's  correct.   That's  what  she  says.

13  Q.       Okay.   And  Mr.  Whiting  says  something  about  that

14  he  may  be  able  to  resolve  that;  is  that  right?

15  A.       Yes.

16  Q.       There's  another  phone  call  between  the  same  two

17  individuals  on  Page  390;  is  that  right?

18  A.       Yes.

19  Q.       And  that  occurred  substantially  later  in  the

20  day;  is  that  right?

21  A.       Yes.   Well,  this  actually  is  later  in  the

22  evening.   It's  almost  9  o'clock  at  night.

23  Q.       Excuse  me,  sir?

24  A.       The  second  call  is  almost  at  9  o'clock  at  night,

25  at  8:48.

1  Q.      The first call was at 9:30 in the morning?

2  A.      The first call was at 3:23 in the afternoon.

3  Q.      Three in the afternoon  and almost nine -- 9:30

4  at night; right?

5  A.      8:48.

6  Q.      Almost 9:00 at night?  Okay.

7          And it appears to be a -- in some ways, would

8  you agree with me it appears to be continuation  of the

9  same discussion?

10  A.      No.

11  Q.      You don't agree with that?

12  A.      I do not.

13  Q.      Okay.  Well, let me ask you this, Sergeant.  Is

14  there a reference in that second phone call to a

15  previously held discussion  between  these  two people?

16  A.      To a reference?  I'm sorry.  I didn't hear you.

17  Q.      Is there a reference  in that phone call and the

18  one on Page 390 to the fact that they had spoken

19  earlier?

20  A.      I believe they spoke earlier when he came over

21  at the end of -- on Page 386, he says he's coming over,

22  and I think the reference  on Page 390 is to the

23  conversation  they had at the address on Hayward.

24  Q.      All right.  There's also a conversation  on phone

25  call 466, and I'll give you the page number in just a

1  second .   That  is  one  which  is  --  it's  in  the  book  --

2  it's  the  loose  leaf  one  that  was  given  out  earlier .   Do

3  you  have  that ?

4  A.      Call  B4456 ?

5  Q.      4466 ,  I  should  say .

6  A.      I  have  4456 .

7  Q.      Right .   That 's  the  one  between  Mr.  Scott  and  Ms.

8  Martin ;  is  that  right ?

9  A.      Yes .

10  Q.      In  that  phone  call ,  Ms.  Martin  makes  reference

11  to  the  fact  that  Mr.  Whiting  had  been  there ;  is  that

12  right ?   Mr.  Scott  and  Ms.  Martin .   Ms.  Martin  makes

13  reference  to  the  fact  that  Mr.  Whiting  had  been  there ?

14  A.      I  believe  so ,  if  you  could  point  me  to  the

15  reference  without  me  looking  through  this  whole  thing .

16  Q.      About  halfway  through  the  first  page  of  that

17  phone  call ,  Ms.  Martin  says ,  My  brother  was  here  last

18  night .   That 's  an  attorney .

19  A.      Yes .   That 's  a  reference  to  him  being  there ,

20  yes .

21  Q.      All  right .   Now  --

22      MR.  MARTIN:   Your  Honor ,  forgive  me.   My  client

23  has  to  go  to  the  bathroom .

24      THE  COURT:   Well ,  I  was  about  to  interrupt  Mr.

25  Hall  and  ask  him  how  much  more  you  have  to  go .

1            MR.  HALL:   Well , certain ly probably  another  20

2 minute s or so.

3            THE  COURT:   We're  going  to do that  tomorrow .

4            MR.  HALL:   That 's fine , Your  Honor .

5            THE  COURT:   I have matter s at 5:30 , so my day is

6 not over  yet , but this  jury 's day is over .

7            Stay  behind .

8            Ladies and gentlemen  , we will  see  you  at  9

9 o'clock  sharp . We do our  quick  drill  tomorrow .

10            Counsel , stay behind .

11                 (Jury  excused  at 4:38 p.m. )

12            THE  COURT:   Counsel .  Counsel , attention  please .

13 I have a matter at 8 o'clock  tomorrow , which  should n't

14 be terribly  long .  Does  anybody  have  any  anticipation

15 that there  will  be  any  preliminary  matter s?  Well , just

16 in case --

17            MR.  MONTEMARANO :  Would  you  like  one ?

18            THE  COURT:   No , I don't  want  one .  What  I want

19 to do is to have  this  jury  believe  that  we can  actual ly

20 be on time .  So , I would  ask  you  all  to be  present  and

21 ready  to go at a quarter  of 9:00 .

22            MR.  MONTEMARANO :  I have  a -- I will  try , Your

23 Honor .  I may  be  running  a tiny  bit  behind .

24            THE  COURT:   I mean , just  be  here  ready  to

25 launch , because  if somebody  has  something  they  really

1   have to bring up, I want to get it brought up and

2   resolved.

3          MS. JOHNSTON:   Your Honor, we have copies of the

4   pages that the Court wanted included.   There is a copy

5   for the Court in case the Court wants to review it to

6   see if we've forgotten anything.

7          THE COURT:   That's fine.   If you can distribute

8   that to defense counsel.

9          Yes, ma'am?

10         MS. JOHNSTON:   If we could get an estimate of

11  how long cross-examination is going to be tomorrow,

12  because we, quite frankly, had an interpreter here with

13  a witness today.

14         THE COURT:   Counsel, how long do you anticipate

15  your additional cross will be tomorrow?

16         MR. HALL:   I have -- I think I have another 20

17  minutes.

18         MR. MITCHELL:   Your Honor, I would guess

19  somewhere in the range of about a half hour, but I've

20  never stuck to the time.

21         THE COURT:   I understand.

22         Mr. Ward?

23         MR. MITCHELL:   A range of a half hour, so assume

24  a little bit more than that.

25         THE COURT:   Mr. Ward?

1          MR. WARD:  Certainly that -- sir, it depends on
2  how much sleep I get and how inspired I feel tomorrow.
3          THE COURT:  All right.  Any other estimates of
4  cross-examination?  Mr. McKnett?
5          MR. MCKNETT:  Your Honor?
6          THE COURT:  Mr. Sussman?
7          MR. MCKNETT:  I'm going to say an hour and hope
8  I'm less.
9          THE COURT:  All right.  It sounds to me like
10 we'll burn up the morning, for sure up to noon with
11 cross.  Am I -- does that sound --
12         MR. WARD:  I think that's reasonable, Your
13 Honor, yes.
14         MR. SUSSMAN:  You're not going to lunch
15 tomorrow?
16         THE COURT:  No.  We're going to have two
17 20-minute breaks, and off we go at 2 o'clock.  So it --
18 if you have a witness that you need to call tomorrow,
19 Ms. Johnston, we'll take that witness and resume the
20 cross-examination after it if you want to.
21         MS. JOHNSTON:  Okay.  I will talk with the
22 witness and see if that works out.
23         THE COURT:  Counsel, please understand that if
24 Ms. Johnston has an out-of-state or incarcerated
25 witness --

1          MS. JOHNSTON:   Your Honor, he's in state.   It's

2 just we had hoped to get him on today, because he has

3 classes at Hopkins tomorrow that only -- it's a

4 master's program that only meets periodically.

5          THE COURT:   I will work with counsel to take any

6 witness out of order.   Counsel, be aware that we may

7 interrupt the cross-examination for a witness.

8          MR. MONTEMARANO:   Your Honor, on point of view

9 of the defense.   There are logistical issues.   It's not

10 a perfect world.   We would only ask that, for instance,

11 Mr. Hall's cross not be interrupted.

12          THE COURT:   I won't interrupt somebody's cross.

13 It will be a break between cross-examinations, all

14 right, if we do that.

15          MR. MONTEMARANO:   That's all we want to be clear

16 on.

17          THE COURT:   All right.   Counsel, we will see you

18 tomorrow.

19               (Off the record at 4:41 p.m.)

20

21

22

23

24

25

1                          **CERTIFICATE**

2

3        I, Tracy Rae Dunlap,   RPR , CRR , an Official Court

4  Reporter for the United States District Court of

5  Maryland, do hereby certify that I reported, by machine

6  shorthand, in my official capacity, the proceedings had

7  and testimony adduced upon the Jury Trial Proceedings

8  in the case of UNITED STATES OF AMERICA versus PAULETTE

9  MARTIN, et al, Criminal Action Number    RWT-04-0235 on

10 June  29 , 2006.

11

12       I further certify that the foregoing 2    23 pages

13 constitute the official transcript of said proceedings,

14 as taken from my machine shorthand notes, of said

15 proceedings.

16

17       In witness whereof, I have hereto subscribed my

18 name, this  7th day of April 2008.

19

20                          _____

                           TRACY  RAE  DUNLAP ,  RPR ,  CRR
21                         OFFICIAL COURT REPORTER

22

23

24

25