```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                      SOUTHERN DIVISION
 2
   ------------------------x
 3 UNITED STATES OF AMERICA  :
            Plaintiff        :
 4                           :
                             :
 5 vs                        :Criminal Action:   RWT-04-0235
                             :
 6                           :
   PAULETTE MARTIN, et al    :
 7          Defendants.      :
   ------------------------x
 8

 9                          Friday, June  30, 2006
                            Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11 Proceeding before the HONORABLE ROGER W. TITUS, United
   States District Judge, in courtroom 4C, commencing at
12 9:03 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS TESTIMONY AND PROCEEDINGS    AS
15      RECORDED AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL MONTEMARANO, Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD SUSSMAN, Esquire
        HARRY MCKNETT, Esquire
24
   Tracy Rae Dunlap, RPR, CRR              (301) 344-3912
25 Official Court Reporter
```

```
 1                     I N D E X

 2                        CROSS

 3 Christopher Sakala          4

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22                                          Page

23 Reporter's Certificate                    180

24 Concordance                               181

25
```

1          THE COURT:   I think we're down one juror right

2 now, but let's see if that's changed.

3          MS. JOHNSTON:   Your Honor, we had some

4 discussions last night, and the witness who's at Johns

5 Hopkins and on vacation next week we've decided just to

6 call him on Tuesday, July 11.

7          THE COURT:   Okay.

8          MS. JOHNSTON:   We don't have to interrupt

9 cross-examination.

10         MR. MONTEMARANO:   Regarding scheduling, Your

11 Honor, is it your intention to do next Friday what you

12 have done the last two Fridays?   Not that we need an

13 answer now, but I wanted to bring it to the Court's

14 attention sooner is better than later.

15         THE COURT:   It's a good question because --

16 maybe.   I have a dentist appointment at 8:00 and I've

17 got a sentencing at 9:00 that I'm going to try to move,

18 and I don't know  what success we've had in trying to do

19 it.   If we -- if I have success in it, I'll try to

20 start at 9:00 and do the same thing.   Worst case

21 scenario is it's at 10:00 and I'm not going to go all

22 the way until 4:30 on a Friday.

23         MR. MONTEMARANO:   Just asking, Your Honor.

24         THE COURT:   We'll start next week on Wednesday

25 at 10:00.

1        THE CLERK:   They're here.   Are you ready?

2        THE COURT:   Yeah.   Bring them in.

3        (Witness resumes the stand at 9:06 a.m.)

4        (The jury returns at 9:06 a.m.)

5        THE COURT:   Good morning, ladies and gentlemen.

6 We're on our Friday drill today.   I'm going to get you

7 out of here by 2:00.   We will resume next Wednesday at

8 10:00, and I'm going to try to see if we can do the

9 same thing next Friday, maybe, but I've got one

10 scheduling issue I've got to work out, and I'll let you

11 know next week on that.

12        MR. HALL:   Thank you, your Honor.

13        BY MR. HALL:

14 Q.     Sergeant, I believe when we left off yesterday,

15 we were talking about a series of phone calls on April

16 25 and 26.   Do you recall that?

17 A.     Do you have a page number?

18 Q.     Yeah.   Let me direct you to Page 386, Call

19 B4426.

20 A.     386?

21 Q.     Yes.

22 A.     Okay.

23 Q.     Do you have that call?

24 A.     Yes.

25 Q.     I believe that you had expressed an opinion that

1 you believed that Mr. Whiting was going to come over to

2 Ms. Martin's house following that phone call, that that

3 was the implication; is that correct?

4 A.      Yes.

5 Q.      Okay.   Now, I've noticed that in past

6 circumstances, when two individuals that are alleged to

7 be part of this conspiracy were meeting, that a number

8 of times you or somebody else at the listening post

9 would dispatch someone to do surveillance; is that

10 correct?

11 A.      Sometimes we would, yes.

12 Q.      And there was no surveillance set up on this

13 particular occasion with the thought that Mr. Whiting

14 might be coming over, was there?

15 A.      I don't know without looking at the surveillance

16 reports.   I couldn't tell you.

17 Q.      And you -- at the time there was a pole video

18 camera providing individual taped recording of people

19 going in and out of the house; is that correct?

20 A.      That is correct.

21 Q.      Okay.   And you would agree with me that there's

22 been no video shown here in the courtroom of Mr.

23 Whiting coming over that day, has there?

24 A.      I do not know.   I haven't been in here the whole

25 time, but it has not been shown with me.

1  Q.      During the time you've been in here, nothing has

2  been shown; is that right?

3  A.      That's correct.

4  Q.      Okay.  Now, let me jump ahead to one of the

5  other calls in the series we were talking about

6  yesterday that occurs on Page 390.  It's call B4442 for

7  the record.  Do you have that one?

8  A.      Yes, I do.

9  Q.      There's a discussion in that phone call of an

10 individual not being able to go to see Gwen Levi at the

11 Baltimore jail; is that correct?  No one could go in to

12 see her on Sunday?

13 A.      Yes, that's correct.

14 Q.      Okay.  And are you aware that at the Baltimore

15 city jail, that there is no visiting allowed on Sundays

16 even for attorneys?

17 A.      No, I am not familiar with that.

18 Q.      You're more familiar with the visiting

19 practices, I guess, at Seven Locks or --

20 A.      I don't even know that I'd go that far.  I'm not

21 familiar with the visiting practices of either jail.

22 Q.      All right.  Now, do you recall yesterday we also

23 talked about a Telephone Call No. 4456, which was on a

24 loose piece of paper that was handed out to the jury?

25 A.      Yes.

1  Q.      Okay.  And I believe you expressed in the answer

2  to one of the government 's question s that Mr. Whiting ,

3  to your knowledge , was not admitted  to the bar

4  anyplace ; is that correct ?

5  A.      I don't know  if I said  anyplace .  I think

6  Maryland , but .

7  Q.      Okay.  You did  check Maryland ?

8  A.      Yes.

9  Q.      Are you aware whether  or not  Mr. Whiting went to

10 law school?

11 A.      I can't say that I am , no.

12 Q.      Okay.  All right .  That 's fine .  All right .

13 Now , let me ask you to jump forward  to Page 396, Call

14 4506 .  Tell me when  you have that  one .

15 A.      I have  it .

16 Q.      Okay.  Now , in that telephone call , there  is

17 some discussion  of Mr. Whiting  taking a look at the

18 charge s against  Ms. Levi ; is that  correct ?

19 A.      That  is correct .

20 Q.      Okay.  Now , as a police officer , I am well  aware

21 of the fact  that you , any number  of time s, would  have

22 fill ed out  a chargi ng document  when you've made  an

23 arrest  on somebody ; is that  correct ?

24 A.      That 's correct .

25 Q.      And in state  court , the procedure  is get a

1 charging document, you take it to the commissioner, it
2 becomes part of the district court file; is that right?
3 A.      That's correct.
4 Q.      Okay.  And that's a matter of public record; is
5 it not?
6 A.      I believe so.  I'm not a hundred percent, but I
7 believe that it is public record.
8 Q.      Okay.  Now, I want to direct your attention not
9 to a specific phone call for a few minutes but to a
10 period of time mid-May of 2004.  Would you agree with
11 me that there were a series of phone calls in which Ms.
12 Martin expressed concern about a neighborhood meeting?
13 A.      Yes.
14 Q.      And the gist of that -- of those phone calls was
15 that a number of neighbors had had a meeting with the
16 Takoma Park police; correct?
17 A.      Correct.
18 Q.      And that as a result of that, you expressed some
19 opinions that Ms. Martin moved her operation drug
20 business, whatever you want to call it, from the house
21 on Hayward to the studio, which is in Washington,
22 D. C.; is that correct?
23 A.      That is my opinion.  I think that's what she
24 said, yes.
25 Q.      Would you agree with me that there were a number

1  of phone calls in which she had contact with either

2  individuals who may be on trial here or other

3  individuals in which she repeated that story?

4  A.     That is correct.

5  Q.     Okay. And would you also agree with me that if

6  somebody is in the drug business, that moving the

7  location of their operation from one place to another

8  is a rather significant event?

9  A.     Yeah. I would say you could say that, yes.

10 Q.     Well, your customers would need to know where

11 they could meet you, right?

12 A.     Yeah. I don't know that I'd say your customers

13 necessarily need to know where you keep your drugs, but

14 certainly they need to know where to meet you, yes.

15 Q.     And it certainly would have been a significant

16 event in your investigation, something you would

17 certainly have taken note of, right?

18 A.     Sure, and we did, yes.

19 Q.     And would you agree with me that following the

20 relocation, that there is no record in any of the calls

21 that were played before the jury of Ms. Martin telling

22 Mr. Whiting that she had relocated her drug operation?

23 A.     I believe that's accurate, yes.

24 Q.     In fact, if you turn to Page 535, which would be

25 in the third of the books, Ms. Whiting speaks to Mr.

1   -- I mean, excuse me, Ms. Martin speaks to Mr. Whiting

2   that day, does she not? In the call on Page 535?

3   A.      Yes, she does.

4   Q.      Okay. And that would be the 17th of May;

5   correct?

6   A.      Yes.

7   Q.      That would be the day after she moved

8   everything; correct?

9   A.      Yeah, I believe the 16th, yes.

10  Q.      Okay. Now, I believe you indicated that your

11  investigation in this case was about two years in this

12  case?

13  A.      Prior to the arrest. It continued after.

14  Q.      The bulk of the arrest or as Mr. Montemarano

15  called it, raid day, was the 1st of June, 2004; is that

16  correct?

17  A.      Yes.

18  Q.      I belief it was the 1st.

19  A.      Yes, 1st and 2nd.

20  Q.      First and second. And the investigation would

21  have been two years prior to that; correct?

22  A.      A little less than two years.

23  Q.      Little less than two years. Okay. And so, out

24  of this -- would you agree with me that out of this

25  two-year time period, you had a wiretap going for about

1 three months of it?

2 A.      Yes.

3 Q.      And would you also agree with me that during

4 this three-month time period that there has not been

5 played in front of this jury a single phone call in

6 which Ms. Martin and Mr. Whiting make an agreement and

7 Mr. Whiting buys drugs, set a price and set a time and

8 place to meet?

9 A.      I would agree with those parameters, yes.

10 Q.      Okay.  Now, I want to show you an exhibit that

11 has been introduced.  This is referred to as Hayward-7.

12 Are you familiar with this particular document?

13 A.      yes, I am.

14 Q.      Okay.  And for the record, this is a notebook;

15 correct?

16 A.      Correct.

17 Q.      Okay.  And in the notebook, I believe you

18 testified earlier that there were a series of figures

19 which you gave the opinion were drug transactions --

20 drug tallies or figures; is that correct?

21 A.      Correct.

22 Q.      Okay.  Now, would you agree with me also, and

23 feel free to take a look at the book again if you need

24 to, that there's a lot of things in this notebook?

25 A.      I agree with that, yes.

1  Q.      Okay.  There is phone numbers and addresses?

2  A.      Yes.

3  Q.      Okay.  There's notes that somebody has written

4  such as to-do lists or reminders of various things; is

5  that correct?

6  A.      That is correct.

7  Q.      And some of the phone numbers may be people that

8  we've heard about during the course of this case and

9  some of them may be totally unrelated; is that correct?

10 A.      They may be people we have not heard about.

11 Q.      Okay.  There's also phone numbers for businesses

12 in here, right?

13 A.      There may be.  I don't recall  off the top of my

14 head.

15 Q.      Let's take a look.

16         For example on this page, which would be the

17 back of the fourth page of the book, do you see a phone

18 number for a doctor, for example?

19 A.      Are you talking about the top line here?

20 Q.      Yes.

21 A.      It says Dr. Shu or Shub and appears to have a

22 phone number.

23 Q.      Has a phone number; correct?

24 A.      Yes.

25 Q.      On very next page, there's a phone number.  It

1  says Larue Hill, or there's a name Larue Hill and phone
2  number. And what does it say above Larue Hill right in
3  the middle of the page?
4  A.      Seamstress Larue Hill and then a phone number.
5  Q.      Okay. And just another example of a business
6  that might be in here, what is the name and phone
7  number at the top of the very next page after that?
8  A.      Looks like Amtrak. I think it might say
9  convention, and then it has a series of phone numbers
10 followed by times underneath.
11 Q.      Appears to be train times; right?
12 A.      I don't know.
13 Q.      It may be?
14 A.      Could be.
15 Q.      Now, let me show you another page. There's a
16 notation of children's clothes; is that correct?
17 A.      It says children's clothes, sweaters for self,
18 and then it has paren, Larry, just for Paula's
19 information, and then it's got what may be a poem of
20 some type.
21 Q.      Okay. Let me show you this page. Do these --
22 read down to the phone number and what it says there.
23 A.      Underwear/silk/top -- oh, top L; bottom M; two
24 dash packs of T-shirt; four underwear, bottom M; one
25 black belt; socks, black, brown, blue, gray; sleepwear,

1  silk.  1-800-584-3666.

2  Q.    You would agree with me, would you not, those

3  appear to be reference s to clothing; wouldn't you?

4  A.    I would agree that that reference right there

5  does, yes.

6  Q.    No reason to believe that underwear has -- is a

7  drug code; right?

8  A.    Not with that context, no.

9  Q.    Would you also agree with me that in that book,

10 there is no notation for Reece Whiting's phone number?

11 A.    I was looking through that this morning and I

12 think it might be in there.  I'd have to look.

13 Q.    Do you think it is?  Could you find it?

14 A.    If you give me the book.  I'd have to look

15 again, but I think it is.  I may be wrong.

16 Q.    Handing him the book.

17 A.    I do not see it.

18 Q.    Okay.  Now, Mr. Whiting was arrested on June

19 1st; is that correct?

20 A.    I don't remember  if he was arrested on the 1st

21 or the 2nd.  One of those two days yes.

22 Q.    He was arrested at the beginning of June; right?

23 A.    Yes.

24 Q.    No drugs were found on him when he was arrested;

25 were they?

1  A.      I'm not aware of any, no.

2  Q.      And nothing found at the house where he was

3  living?

4  A.      I do not believe we searched his house.

5  Q.      Okay. All right. And would you agree with me,

6  out of the universe of phone calls that were played

7  here in court, all of Mr. Whiting's phone calls were

8  with Ms. Martin; is that correct? The ones we played

9  in court?

10  A.      I believe that is correct, yes.

11  Q.      There is no phone calls between Mr. Whiting and

12  Mr. Goodwin; right?

13  A.      There were no phone calls played in court

14  between Mr. Whiting and Mr. Goodwin; that is correct.

15  Q.      The same would be true for Mr. Bynum, Ms. Dobie,

16  Ms. Harden; is that correct?

17  A.      There were no phone calls played in court

18  between those individuals.

19  Q.      That's what I'm asking you. Finally, there was

20  one phone call in which Ms. Ali answered the phone at

21  Ms. Martin's house; is that right?

22  A.      Yes, there was.

23  Q.      And Mr. Whiting and Ms. Ali exchanged

24  pleasantries; is that right?

25  A.      That's correct.

1  Q.     You would agree with me that there was no

2  discussion of drugs in that phone call between Ms. Ali

3  and my client, Mr. Whiting; is that right?

4  A.     Yeah.  I think she just answered the phone and

5  put Ms. Martin on.  That's my recollection.

6  Q.     Let me direct you to the phone call then.  Look

7  on Page 610, Call 8064 on May 28, 2004.

8  A.     Yes, that's -- she answers the phone.  They talk

9  briefly and then Ms. Martin gets on the line.

10 Q.     Okay.  So it's just an exchange of pleasantries

11 between those two?

12 A.     That's correct.

13 Q.     Thank you.

14        MR. HALL:  That's all I have, Your Honor.

15        THE COURT:  All right.  Mr. Mitchell?

16                    **CROSS-EXAMINATION**

17        BY MR. MITCHELL:

18 Q.     Good morning, Detective Sakala.

19 A.     Good morning.

20 Q.     I'm sorry, it's Sergeant Sakala; correct?

21 A.     Yes.

22 Q.     I'm going to try not to repeat a lot of the

23 questions, but I'm going to direct your questions to

24 issues that relate to my client, Derrick Bynum.

25        Going back to your qualifications and how you

1  came to your opinion , you based all of your opinion s on

2  your train ing and experience ; correct ?

3  A.       Train ing , experience  and the phone call s

4  themselves  and document s recovered , I think I've been

5  asked  about .

6  Q.       Right .  But reach ing that opinion , you look  to

7  your train ing and experience  to come up with  theori es

8  of what these  call s meant ; correct ?

9  A.       That is certain ly part of it , yes .

10  Q.       And these  theori es that you came to result ed in

11  your opinion s that you present ed to the jury ; correct ?

12  A.       I'm sorry , could you say that one more time .

13  Q.       The theori es that you reach ed on each one  of

14  these phone call s result ed in your expert opinion  to

15  the jury ; correct ?

16  A.       I would  agree with that , yes .

17  Q.       Because really , they're theori es because  you

18  certain ly don't know exact ly what the call ers were

19  say ing ; correct ?

20  A.       I would  dis agree with that .

21  Q.       Well , I mean , you -- at least as far as  I know ,

22  there are very few people  that can actual ly read minds ;

23  correct ?

24  A.       As far as  I know , that 's correct .

25  Q.       You could n't read the minds  of these  call ers?

1   A.      That is correct.

2   Q.      And you weren't present for any of the phone

3   calls, so you didn't see what they did?

4   A.      I was as present as either participant was to

5   the phone call.

6   Q.      But I'm saying you weren't inside the house or

7   next to these people to watch what they were doing.

8   A.      Neither was the other person on the other phone

9   line, so I was as present as you could be for a phone

10  call.

11  Q.      For example, when Ms. Martin was speaking, you

12  weren't standing next to her listening to her and

13  watching her directly?

14  A.      I was not standing next to Ms. Martin when she

15  was on the phone, that's correct.

16  Q.      Would you also agree with me you couldn't really

17  say for certain what it is that individuals were

18  physically doing when they got off the phone or even

19  when they were on the phone because you weren't there?

20  A.      That's not correct.

21  Q.      So would you -- are you saying, then, that you

22  know what Ms. Martin did within her home?

23  A.      There are times, yes.

24  Q.      You watched her in her home?

25  A.      No.

1 Q.      How would you know what she was doing Inside her
2 home if you weren't watching?
3 A.      To provide an example, you can hear background
4 noise of what she's doing.  She will describe what
5 she's doing.  That's not in every case to say what
6 she's physically doing Besides talking on the phone,
7 but there are certain instances where you can tell
8 exactly what she's doing.
9 Q.      When she's not on the phone, you have no idea
10 what she's doing.
11 A.      When she is not on the phone, that is correct.
12 I think your question said when she was on the phone,
13 but when she is not on the phone, that is correct.
14 Q.      Okay.  Now, because you've reached these
15 theories, is there any chance that your theories might
16 be slightly off, might be slightly different than what
17 you reached -- how you reached your opinion?  Or are
18 you certain that your opinions are, without fail,
19 correct?
20 A.      I'm not sure what you mean by theories, but I am
21 confident in the opinions I've stated here in court,
22 yes.
23 Q.      Okay.  Now, relating to Mr. Bynum, when was the
24 first time that you learned of Mr. Bynum within this
25 conspiracy?

1  A.       He was identified pretty early on.  We had

2  intercepted calls, I think, and had him as Bo or Bolo,

3  but I think very early on I went down to the

4  surveillance and observed Mr. Bynum, and that's how we

5  initially identified him.  His name probably, and I'm

6  sure did, probably come up on the pin registers that

7  were up before we were intercepted, but that would just

8  be as a subscriber to telephone.

9  Q.       Let's go to how you identified Mr. Bynum.

10          Did you ever speak to Mr. Bynum?

11  A.       I've heard him speak, yes.

12  Q.       No.  Did you ever speak directly to him during

13  the period of your investigation?

14  A.       Yes, I have, as a matter of fact.

15  Q.       Directly?

16  A.       Yes.

17  Q.       How did that come about?

18  A.       During a court-ordered test.

19  Q.       I don't understand.

20  A.       I spoke with Mr. Bynum during a court-ordered

21  test.

22  Q.       Okay.  Was that in one of these phone calls or

23  was this a direct --

24  A.       It was a direct result of an order issued by

25  this court.

1  Q.      The first recorded phone call that was played

2  here was March 9; is that correct, 2004?

3  A.      The first recorded phone call was on March 8.

4  Q.      I'm sorry, March 8. Of Mr. Bynum? I'm saying

5  Mr. Bynum's first recorded phone call was March 9; is

6  that correct?

7  A.      That's not correct. He was intercepted on March

8  8, Call B28 on Page 2.

9  Q.      I stand corrected. And the last phone call was,

10 I believe, sometime in May. May 14? Was that his last

11 recorded phone call on the wiretap? If you want, I can

12 give you the page reference. Would that help?

13 A.      I believe that -- I'm checking the dates prior

14 to that to make sure.

15 Q.      It was Page 519. 6695 -- B6695. Would you

16 agree with me that was the last recorded phone call

17 that was played to the jury?

18 A.      I'm sorry, the date you had again?

19 Q.      It's Page 519. May 14.

20 A.      I would agree that was the last call played in

21 court. Without consulting the logs, I would not say

22 that's the last call intercepted. That was the last

23 call that was played for the jury.

24 A.      Yes.

25 Q.      It was your opinion that he was buying cocaine

1  from Ms. Martin?

2  A.      That is correct.

3  Q.      It was also your opinion that he was selling

4  this -- these drugs to others; correct?

5  A.      The amounts he was buying would indicate

6  selling, yes.

7  Q.      During this period of time when you had that

8  opinion, did you ever get a wiretap on Mr. Bynum's

9  phone?

10 A.      No, we did not.

11 Q.      And why is that?

12 A.      I don't know that that was one of the goals of

13 the investigation.  It would certainly be

14 counterintuitive in an investigation.  You don't

15 normally go, what we call, down the food chain; in

16 other words, get wiretaps on someone's customers and in

17 Ms. Martin's case, we went up, we got wiretaps on her

18 source.

19 Q.      Okay.  So were you just not concerned with what

20 he was doing?

21 A.      I think the fact that he's here would say we are

22 -- we were concerned with what he was doing.

23 Q.      You weren't concerned about whether or not your

24 opinion that he was selling drugs was actually correct

25 or not?

1  A.      I don't think  I was  concerned  about  my  opinion ,

2  no .

3  Q.      Did  you  ever  investigate  anyone  that  he  may have

4  sold drug s to?

5  A.      We may have , yes .

6  Q.      Did  you  even  get  a  name ?

7  A.      We may have .

8  Q.      Were  any  of  those  name s --

9         MS.  JOHNSTON:    Your  Honor ,  if  I  could  ask  that

10 the  witness  be  allow ed  to  finish  his  answer .

11        THE  COURT:    Yeah ,  don't  interrupt .

12        THE  WITNESS:    As  I  sit  here  now ,  I  can't  say  we

13 have ,  but  we  certain ly  may have  explore d  that

14 possibility .

15        BY  MR.  MITCHELL:

16 Q.      And  do  you  know  what  he  was  actual ly  sell ing  to

17 these  unknown  people ?

18 A.      Do  I  know ?   I'm  sorry .

19 Q.      What  he  was  sell ing  to  these  unknown  people ?

20 A.      I don't know  that  we've  identifi ed  customer ,  no .

21 Q.      Now ,  with  Mr.  Bynum --  with  Ms.  Martin ,  you  did

22 a number  of  investigative  technique s.   Did  you  utilize

23 the  same  technique s  with  Mr.  Bynum ?

24        Let  me  go  through  a  list  of  thing s  that  you've

25 done  and  I  want  to  see  if  you've  done  that  with  Mr.

1  Bynum .   For example , as I recall , you did a trash run

2  of Ms. Martin 's house .  Did you do that for Mr. Bynum ?

3  A.      I think Mr. Bynum lived in an apartment , so I

4  don't think we did , no.

5  Q.      Did you do any surveillance  of him by sending

6  officer s out to watch his dealing drug s with these

7  unknown  people ?

8  A.      Yes , we did .

9  Q.      You did ?  And did they come back with report s of

10  him selling drug s to anybody ?

11  A.      I'd have to look at the report s to say what they

12  came back -- the observation s they came back with .

13  Q.      Offhand , do you know ?

14  A.      I do not know , no.

15  Q.      Do you have any picture s of him selling drug s to

16  these  unknown people ?

17  A.      I do not believe so, no.

18  Q.      Did you ever set up a pole camera for Mr.

19  Bynum 's residence  to watch what he was doing ?

20  A.      We did not .

21  Q.      What about sending any officer s to go out and

22  take videos of him or follow him to wherever he was

23  going to selling these drug s to unknown people ?

24  A.      Again , we did surveillance  of him .  I don't know

25  if there 's videotape  in that surveillance  .  I'd just

1   have to look at the reports.

2   Q.      Okay.  Did you ever locate anyone, arrest

3   anyone, and get them to cooperate against Mr. Bynum?

4   A.      I want to say yes, that Bynum's name has been

5   mentioned by cooperators, but I cannot -- as I sit

6   here, I cannot recall who, but I want to say yes.

7   Q.      I am sure -- I am certain that you would want to

8   say yes because that would certainly help the

9   government, but do you know that?

10  A.      My recollection is that Mr. Bynum has been

11  identified in our photo book by individuals, yes.

12  Q.      But you don't know who those are?

13  A.      Not as I sit here.  I certainly could find out

14  for you.

15  Q.      Did you get any undercover officers to go and

16  buy drugs from Mr. Bynum?

17  A.      Oh, and I do want to correct my -- I do know

18  names of people who have told us about Mr. Bynum, and

19  I'm sorry your second question?  Your question now?

20  Q.      The second question is, did you ever get anyone

21  undercover to buy any drugs from Mr. Bynum?

22  A.      I do not believe so.  That's correct.

23  Q.      What about putting a GPS on his car to follow

24  him where he was going?

25  A.      We did not do that, no.

1  Q.      Is there any particular  reason why if you had

2  this interest  in Mr. Bynum , you didn't utilize  any of

3  these technique s to confirm  the opinion s that you

4  reach ed as a result  of your theori es?

5  A.      I think you will see evidence  later in the trial

6  that will corroborate  my opinion .

7  Q.      I'm not asking that .  I'm asking why didn't you

8  utilize  these  technique s?

9  A.      I'm tel ling you , we did get corroborati ng

10  evidence .  That's why I dis agree with your question  is

11  what I'm say ing .

12  Q.      All right .  Any of the other thing s that you do

13  as part of your determination  to reach your opinion s is

14  you look to see if there 's any other communication

15  between  the co-conspirator s; correct ?  And that will

16  help solidify  relationship s between the parti es;

17  correct ?

18  A.      Yeah .  I'm not sure what you mean by other

19  communication s.

20  Q.      Well , on the wiretap s, you don't have Mr. Bynum

21  speak ing to any of the other individuals  seated at this

22  table except  for Ms. Martin ; is that correct ?

23  A.      I don't know  if I could say that 's correct .  Off

24  the top of my head , I can't recall  whether he ever

25  spoke to anybody  else , but it 's certain ly possible  that

1 there were times that somebody got on the phone with

2 him.

3 Q.      Well, for example, you don't have him on any

4 recorded phone calls speaking with Luis Mangual, for

5 example?

6 A.      No, I don't think he spoke with Mr. Mangual.

7 Q.      Or Mr. Echarte or Mr. King or any of these other

8 phone calls you've played?

9 A.      Not with Mr. Echarte, and I do not believe with

10 Mr. King either.

11 Q.      The only person that you have him recorded and

12 played for the jury is speaking with Ms. Martin; is

13 that correct?

14 A.      I believe that's accurate, yes.

15 Q.      As far as -- so because there's no other

16 conversation with any of these other individuals, you

17 don't have him calling them -- any of the other

18 co-conspirators  -- co-defendants here to buy or sell

19 drugs or exchange money or anything else that you've

20 been talking about throughout the course of this trial;

21 correct?

22 A.      I believe that statement is accurate, yes.

23 Q.      Okay.  Now, one of the things that you played

24 for the jury is some pole camera -- while he's getting

25 this tape ready, there were some pole camera pictures

1 taken , correct ?  For example , I think that's -- correct

2 me if I'm wrong .  Is this one of the videos -- this was

3 Video 6 .  I think it was April -- that says March 30.

4       MS. JOHNSTON:   Your Honor , can we approach the

5 bench for a moment, please ?

6                 (At the bar of the Court.)

7       MR. MITCHELL: I  apologize Your Honor .  Working

8 with technology .

9       MS. JOHNSTON:   And I wait for Mr. Ward to get up

10 here so I don't get in any trouble .  Your Honor , I'm

11 not objecting to what counsel's doing, but this is a

12 video that has not been identified by anyone as a video

13 on a particular date , so it's not been admitted  into

14 evidence , so it's not like --

15       THE COURT:   Is this one you played before ?

16       MS. JOHNSTON:   No, it is one we have not played

17 before , so I think counsel needs to show him the video

18 and ask him if he's familiar  with that video and then

19 move to play it.  We also don't know what times Mr.

20 Mitchell wants played , so that's -- these are all just

21 practical  considerations .

22       I don't want it confusing  with the jury that

23 this is a video that's been previously played for them .

24 It's got a government 's exhibit  sticker on it.  We

25 didn't play it for any number of reasons , one being

1  moving the case along more than anything else, so there

2  are a number of videos that have been marked but have

3  not been played, so,

4          MR. MITCHELL:   All right.  I can skip this one.

5          THE COURT:   I mean, do you want to play another

6  one?

7          MR. MITCHELL:   Let me explain the purpose --

8  yeah, they can play another one.  Any one of the four,

9  ask them to cue up for my cross is fine.  I'm simply

10 going to ask Detective Sakala to explain how he

11 certainly knows that that's him, this individual,

12 little small individual on the screen and whether he

13 knows for certain that Mr. Bynum was carrying drugs,

14 how he can identify drugs on his person.

15         THE COURT:   Would it be easier for you to play a

16 tape that's already been played of Mr. Bynum?

17         MR. MITCHELL:   That will be fine.

18         MS. JOHNSTON:   I don't want him pulling this

19 tape back now because it looks to the jury like the

20 government has objected to the presentation of this

21 tape.  I don't object.

22         MR. MITCHELL:   No.  I'll just explain that

23 technical difficulties and we'll move on to the next

24 one.

25         THE COURT:   I agree with the government.  If the

1 tape hasn't been played, then you get to mention that

2 to the witness.

3          MS. JOHNSTON:  Ask him to identify the tape and

4 then you can proceed.

5          THE COURT:  That's fine.  Just ask him to

6 describe the tape.  If there's another tape you want to

7 have played --

8          MR. MITCHELL:  I've given them a list.  All

9 right.

10          MS. GREENBERG:  The list doesn't have times.

11 The surveillance logs have the times.

12          MR. WARD:  I have a most pressing question.

13          THE COURT:  Yes.

14          MR. WARD:  Judge, I need to visit the facilities

15 down the hall.

16          MR. MITCHELL:  Why don't we take a brief recess

17 and I'll work with them on these videos.

18          THE COURT:  All right.

19          MR. WARD:  Before I get up, you know.

20          THE COURT:  You mean you want to break before

21 you --

22          MR. WARD:  No.

23          THE COURT:  Can you wait until Mr. Mitchell

24 finishes?

25          MR. WARD:  I don't know.  How long are you going

1  to be?

2          MR. MITCHELL:   A while.

3          THE COURT:   How long is a while?

4          MR. MITCHELL:   Another 25, 30 minutes.

5          THE COURT:   Can you hang on for that time?

6          MR. WARD:   I don't know.

7          MR. MITCHELL:   I have no problem with if we take

8  a brief recess and we can -- I can work with them on

9  the videos.

10         THE COURT:   This is awful early with take a

11 recess.

12         MR. WARD:   I don't mind missing the

13 scintillating cross.

14         THE COURT:   I can guarantee you, you will not be

15 cross-examining without a potty break.   We will take

16 care of you.

17         MR. MITCHELL:   The problem is, Your Honor, I

18 don't have control over their videos.   I don't have

19 them.   I couldn't take them home.

20         THE COURT:   If you know what the other videos

21 you want to play --

22         MR. MITCHELL:   It lists Video 6 and it shows

23 video of Derrick Bynum.   Now, if they want me to sit

24 down and go through these times, that's fine, but I

25 gave them prior notice this morning and assumed that

1  they know the times when my client comes in.

2          MS. JOHNSTON:  If we could have -- one thing

3  that needs to be clear.  For the record, defense

4  counsel have had copies of all of these videos

5  available to them.

6          THE COURT:  I understand.  Why don't we resume.

7  All you have to do is clarify with this one witness

8  this is not one that you played before and do you

9  recognize this tape and you're safe.

10         MS. JOHNSTON:  That's fine.

11                  (Back in open court.)

12         THE COURT:  All right.  We're ready to proceed,

13  ladies and gentlemen.  We had to work out some

14  technical issues on the tape, but I think we're ready

15  to go now.

16         BY MR. MITCHELL:

17  Q.    Sargent Sakala, if I'd like to  ask you, can you

18  identify any particular video?

19  A.    I believe I did on direct, if you give me a

20  minute.  This is Derrick Bynum's vehicle arriving and

21  him going inside.

22  Q.    Okay.  Now, you just gave the opinion that Mr.

23  Bynum pulled up in a truck; is that correct?

24  A.    That's correct.

25  Q.    And then walked into Ms. Paulette Martin's

1  house?

2  A.      Yes.

3  Q.      Now, was there any particular identifying

4  features that gave you the opinion that that was Mr.

5  Bynum?

6  A.      No.  I relied on other information.

7  Q.      Which was?

8  A.      The phone call saying he was coming over the

9  next morning to pick up a quantity of drugs, and then

10 that vehicle being observed at his residence later in

11 the day.

12 Q.      And so it would be your theory, your assumption,

13 that the individual in that picture is who you believe

14 it was, not necessarily that you saw that was Mr. Bynum

15 and could identify him; is that correct?

16 A.      On all the information I have, I believe that

17 was Mr. Bynum entering the -- arriving in the vehicle

18 and entering the house.

19 Q.      But it's merely your theory; correct?

20 A.      If I had only the video, I don't know that I

21 would give an opinion based on everything I had.  I'm

22 confident that's Mr. Bynum.

23 Q.      Correct.  So looking at an individual on that

24 pole camera, it's very difficult to actually identify

25 facial features; correct?

1 A.      Yes, I would agree sometimes that's the case,

2 but there are other videos where it's -- the person is

3 readily identifiable.

4 Q.      Sure.  And there were occasions where you

5 focused in on the person because you could zoom;

6 correct?

7 A.      Correct.

8 Q.      But in that case, it looks like an individual,

9 African-American, driving a vehicle which you believe

10 to be Mr. Bynum's truck?

11 A.      Looking just at that video, it was a person

12 generally matching Mr. Bynum's description driving a

13 vehicle registered to him that generally appears to be

14 the same vehicle.  Going on no other information.

15 Q.      To save some time, there were some other videos

16 that were played for the jury with Mr. Bynum walking up

17 to Ms. Martin's house.  Would your opinion be the same

18 for all of those, that it appeared as though it were

19 him but it's no close-up?

20 A.      Again, if there was no other information -- for

21 example, on some of those calls, we had surveillance

22 out that identified Mr. Bynum, but if there was no

23 other information, I would agree with that, but I think

24 with videos we played, there was other information we

25 relied upon for identification.

1 Q.      So again, it's merely your theory based on other

2 factors that have come into play?

3 A.      You know, I don't know if I would go with my

4 theory, because if someone says I'm out front, if Mr.

5 Bynum calls and goes I'm out front, and we see him out

6 front, I don't know that I would classify it as a

7 theory.  I guess you can, but I certainly would not.

8 Q.      Would you also agree with me, moving into these

9 phone calls, that one of the things that you looked for

10 to reach your theories to determine the quantity of

11 drugs, the amount paid, is you look for numbers and

12 references to amounts to help you identify what amount

13 they're talking about.  Would you agree with that?  A.

14 Yes, sometimes.

15 Q.      For example, when you heard the word eight ball

16 or eight, size eight, if it was also associated with

17 some type of figure, that would help you determine

18 whether it's an eighth of an ounce or if it's an eighth

19 of a kilo?

20 A.      Yes.  If you had a money amount to go with that

21 eighth, it would make it much easier to identify the

22 amount.

23 Q.      And you would expect to hear from those talking

24 about the purchase and sale of drugs to have some type

25 of reference to an amount.  Would you agree?

1  A.        No, I would not agree with that.

2  Q.        Would you agree that there should be some type

3  of discussion about payment, or at least some reference

4  to it in some of these calls, at least you would expect

5  to find, would you not?

6  A.        I would not agree with that.

7  Q.        Why would you not agree with that?

8  A.        I think we've seen call after call where people

9  arrange drug deals in this case and no amount of drugs

10 or money is mentioned.  For example, if you know that

11 I'm your customer and every time I come over, I buy an

12 ounce to, pick a number, and I pay $1,000 for that,

13 there's certainly no need for me to call you and say,

14 hey, I'm coming over to pick up that ounce or use a

15 code word.  I'd just say I'm coming over to see you,

16 and you'd know exactly what it's for.        So I do not

17 agree that you need a code word in every conversation       .

18 Q.        I'm not saying in every conversation, but you're

19 looking for that; aren't you?

20 A.        I think you said every conversation, but we're

21 looking for that.

22 Q.        If I misspoke -- you're looking to find some

23 interaction between the two which would reference the

24 amount of drugs or amount of money to exchange; right?

25 A.        Yes.

1         MR. MITCHELL:   Now, could I approach the board,

2 Your Honor?

3         THE COURT:   You may.

4         BY MR. MITCHELL:

5 Q.    Let's see if I can work with you on this chart

6 here.  I'm going to have you reference some of the

7 calls for Mr. Bynum.  If you could turn to Page 2, B28.

8 Is there any reference to an amount in that call?

9 A.    In this call, there is not.

10 Q.    B28.

11        What about Page 11, B149?  Is there any

12 reference to an amount of money?

13 A.    I'm sorry, the page again?

14 Q.    Page 11.  Is there any reference to an amount of

15 money in that call?  A dollar figure of any kind?

16 A.    No, there is not.

17 Q.    What about Page 18, A123?  Any dollar figure

18 discussed in that phone call?

19 A.    Yes, there is.

20 Q.    What is that?

21 A.    If I could go back and just check and make sure

22 on the previous call so I can make sure my answer is

23 correct.  I would like to change my answer.  No, there

24 is not.

25 Q.    What about B336 on Page 39.  Is there any

1 reference to any dollar figure there in that call?

2 A.      There is not a mention of money in this call.

3 Q.      Turn to Page 41, B341.  Is there any mention of

4 any money or dollar figure in that phone call?

5 A.      Ms. Martin says $62 I usually loan you; however,

6 she's not referring to money.

7 Q.      So there is no reference to a dollar figure,

8 again, in that call, in your opinion?

9 A.      There is no reference to the price for the

10 cocaine she's talking about, I would agree with that.

11 Q.      Okay.  Page 43, B342.  Is there any discussion

12 of a dollar figure in that phone call?

13 A.      No, there is not.

14 Q.      Page 44, B346.  Is there any discussion of a

15 dollar figure or price in that phone call?

16 A.      No, there is not.

17 Q.      Page 58, B466.  Is there any discussion of a

18 dollar figure in that phone call?

19 A.      No.

20 Q.      Page 59, B467.  Is there any discussion of a

21 dollar figure or price in that phone call?

22 A.      No, there is not.

23 Q.      Turning to Page 68, B515.  Is there any

24 discussion of a price or dollar figure in that phone

25 call?

1  A.      Again, if I could flip back a couple pages and
2  make sure.  No, there is not.
3  Q.      Turning to Page 78, B679.  Same question.  Is
4  there any discussion of a dollar figure in that?
5  A.      No, there is not.
6  Q.      Page 79, B685.  Same question.
7  A.      No, there is not.
8  Q.      Now, Page 114, B811.
9  A.      I have the call in front of me.
10 Q.      It's the same question.
11 A.      No.
12 Q.      To save time here.
13 A.      No, there is not.
14 Q.      Page 115, B816.  Is there any reference to an
15 amount of money or dollar figure?
16 A.      No, there is not.
17 Q.      B822, Page 116.  Is there any reference to money
18 or price figure in that?
19 A.      Again, this is similar to a previous call, Ms.
20 Martin is saying $62.  That is a reference to the
21 amount of cocaine Mr. Bynum is buying, not the price.
22 Q.      Page 118, B824.  Is there any reference to money
23 or price in that phone call?
24 A.      No, there is not.
25 Q.      All right.  Page 123, B838.  Any reference to

1 price or dollar figure in that?

2 A.      No, there is not.

3 Q.      Page 123, I'm sorry page -- we did that one.

4 Page 124, B876. Is there any reference to dollar

5 figure or price?

6 A.      No, there is not.

7 Q.      Turning to Page 127, B888. Is there any price

8 or figure in that phone call?

9 A.      No, there is not.

10 Q.      Page 128, B897. Any discussion of a price or

11 dollar figure in that phone call?

12 A.      No, there is not.

13 Q.      Page 160, A406. Is there any discussion of

14 price or dollar figure in that phone call?

15 A.      I'm just checking it. No, there is not.

16 Q.      Turn to Page 187, B1511. Is there any

17 discussion of price or dollar figure in that?

18 A.      There's no discussion of price, no.

19 Q.      Now, turning to Page 253, B2401. Is there any

20 discussion about price or value -- money value in that

21 phone call?

22 A.      No.

23 Q.      Page 263, B2421. Is there any discussion of

24 price or dollar figure in that phone call?

25 A.      The only reference I see is where about

1 two-thirds of the way down, Ms. Martin says no, not

2 yet. I told you I have to pay for those tickets when I

3 get them. I have to just wait a minute 'til the show.

4 That's the only discussion about money that I see.

5 Q.      Is there any value that you could reach from

6 that statement?

7 A.      There is no amount mentioned.

8 Q.      Page 271, B2506. Same question. Is there any

9 monetary value or money discussed?

10 A.      No.

11 Q.      Page 281, B2633. Is there any monetary value or

12 money discussed in that phone call?

13 A.      Money is discussed, but they do not identify the

14 value.

15 Q.      Page 283, B2684. Is there any monetary value or

16 amount discussed in that phone call?

17 A.      Money is discussed, but the value -- the value

18 is not mentioned.

19 Q.      Page 287, B2659. Is there any discussion of a

20 dollar figure or price in that phone call?

21 A.      No, there is not.

22 Q.      Turn to Page 294, A894. Is there any discussion

23 of price or value in that phone call?

24 A.      I don't know if this is what you're referring

25 to, but there is a discussion of her paying her taxes,

1  but I don't think  that's what you're looking for.

2  Q.    But there's no -- she may have said she's going

3  to pay something, but there's no dollar figure or

4  quantity of amount of money?

5  A.    No.  I think this time you asked me was there

6  any discussion of value.  That would be the closest it

7  comes to it.

8  Q.    Okay.  Page 299, B2957.  Is there any discussion

9  about monetary value or price in that phone call?

10  A.    No.

11  Q.    Turn to Page 300, B2958.  Is there any

12  discussion of price or value in that phone call?

13  A.    Yes.

14  Q.    Quantity amount?

15  A.    The quantity amount is not identified.  Ms.

16  Martin says, I want to give you your money back.  You

17  don't have do that -- middle of the page.

18  Q.    Is there an amount that she said she is going to

19  give back?

20  A.    The amount is not identified, no.

21  Q.    Page 301, B2959.  Is there an amount that's

22  discussed, a quantity amount, dollar figure in that

23  phone call?

24  A.    The amount of money is not identified.

25  Q.    Page 333, B33.  Dollar figure discussed there, a

1 dollar figure discussed, or quantity amount, money

2 discussed in that phone call?

3 A.      No.

4 Q.      All right. Finally Page 519. I believe it's in

5 the third book, B6695. Is there any dollar figure or

6 amount discussed in that phone call?

7 A.      No.

8 Q.      Would you agree with me looking at this Chart 34

9 of the phone calls Mr. Bynum made with Ms. Martin, they

10 never discuss an amount of money that is in reference

11 to any of the drugs?

12 A.      I would not agree with that. They do not

13 identify the amount of money, but they do discuss an

14 amount of money.

15 Q.      What I asked you was can you identify a dollar

16 figure in any of these 34 phone calls?

17 A.      Again, I'm trying to answer your question. You

18 asked me if they discussed money, and I do not agree

19 with that. They did discuss money. They did not

20 identify the money. I do agree with that.

21 Q.      They did not identify a dollar figure?

22 A.      In those phone calls we looked at, that's

23 correct.

24 Q.      Now, in assessing an amount of drugs that you

25 believe your theory was exchanged between parties, one

1 of the things you have to analyze is the amount that

2 they're discussing; is that correct?

3 A.      That is not correct.  You don't need to know the

4 amount of money.  If they say the amount of drugs to

5 identify the amount of drugs; in other words, if I say

6 I want a kilogram, it's not necessary for me to know

7 what the price is to know that I want a kilogram.

8 Q.      Okay.  But if -- would you agree with me that if

9 there is a figure, that's called a ticket and there's

10 no dollar figures involved in this, you would have to

11 look to something else to try to figure out what it is;

12 is that correct?

13 A.      I would look to something else, not just the

14 price, but would certainly be something that is an

15 indicator.

16 Q.      One of the things you would look for is price, a

17 dollar figure, so you can assess whether or not size

18 eight, for example, is an eighth of an ounce or it's an

19 eighth of a kilo.

20 A.      I would agree that is an indicator, but it's

21 certainly not the only one.

22 Q.      No, I would agree with you.  It's not the only

23 thing you look for, but that's one of the things you

24 look for, and if there were figures discussed in any of

25 these 34 phone calls, you would certainly have

1 testified about it and used it as part of your opinion
2 to the jury?
3 A.     I would agree that.
4 Q.     And one of the reasons that you would reach the
5 opinion that dollar figures are important is because
6 people who are in the business of buying and selling
7 drugs don't just give it away. They expect some dollar
8 figure in exchange, and they're going to discuss that.
9 Would you agree with that?
10 A.     I would say the vast majority of drugs are paid
11 for, but certainly people do give them away sometimes.
12 Q.     Well, certainly they would do that perhaps to
13 get someone addicted so that they would get a new
14 customer. Wouldn't that be one of the techniques that
15 a dealer would use to get people to sell drugs to them?
16 A.     I have never -- I know that's a popular theory
17 on TV. I've never seen that in my experience, but I
18 guess that it would be a reason.
19 Q.     Maybe I'm watching too much TV.
20       If I could get Hayward -7.
21       MR. WARD:  I was wondering if this would be an
22 appropriate time for the matter we discussed at the
23 bench.
24       THE COURT:  We will take a recess until 10:30.
25            (Jury excused at 10:14 a.m.)

1                    (Off the record at 10:14 a.m.)

2                    (On the record at 10:35 a.m.)

3          THE CLERK:   Are you ready for the jury?

4          THE COURT:   Yes.

5          (Witness resumes the stand at 10:35 a.m.)

6          (Jury returns at 10:36 a.m.)

7          THE COURT:   Mr. Mitchell, you may proceed.

8          MR. MITCHELL:   Thank you very much, Your Honor.

9          BY MR. MITCHELL:

10 Q.      All right.  Continuing, Sergeant Sakala.  I'm

11 going to put up here for the ladies and gentlemen of

12 the jury, this has been marked as Hayward-7.  Are you

13 familiar with this spiral notebook here?

14 A.      Yes.

15 Q.      And what did you -- did you form an opinion as

16 to what the spiral notebook contained?

17 A.      It contains a lot of things.

18 Q.      Was there any references to any drug

19 transactions, in your opinion, within this document?

20 A.      Yes.

21 Q.      As I understand your opinion, when this was

22 initially identified that this was a document that Ms.

23 Martin was using to determine quantities and prices of

24 drugs; is that correct?

25 A.      No, I don't think she used that book to

1 determine quantities or prices.  I think she used it to

2 record sales to some customers.

3 Q.      Have you had a chance to look at that and are

4 familiar with it to determine whether or not there's

5 any reference to Mr. Mitchell in this Hayward-7 spiral

6 notebook?

7 A.      Since I was wrong on Mr. Whiting, I would prefer

8 to look through it again to see if Mr. Bynum's name is

9 in there.

10 Q.     You want to look at it, or do you want me to put

11 it up on the screen?

12 A.     Either way you want to do it.  I think it would

13 be a little bit quicker for me to flip through it.

14      MR. MITCHELL:   May I approach the witness, Your

15 Honor?

16      THE COURT:   You may.

17      THE WITNESS:   I do not see an obvious reference

18 to Mr. Bynum.

19      BY MR. MITCHELL:

20 Q.    I assume no other unobvious reference to Mr.

21 Bynum there either; correct?

22 A.     Well t, here are a lot of phone numbers that

23 aren't marked, so I would say there is no obvious

24 thing.  I did not see his name mentioned in that book.

25 Q.     Okay.  And like, for example, you don't see

1 anything like this in there with a number of figure s

2 such as these , which I believe you had referred to as

3 perhaps identify ing some type of quantity ; correct ?

4 There 's nothing in there with Mr. Bynum 's name similar

5 to this ?

6 A.    I do not see any -- any reference s to Mr. Bynum .

7 And to be accurate , I did not identify that page as

8 drug figure s.

9 Q.    I'm going to show you what government has mark ed

10 as Hayward -9. Are you familiar with this ?

11 A.    I believe it's another book that came out of Ms.

12 Martin 's residence .

13 Q.    Are you familiar with whether or not Mr. Bynum 's

14 name is contain ed within this calendar of 2003 ?

15 A.    I am not .

16 Q.    Would it be easier for me to do this on the

17 screen or do you want to look at it and determine

18 whether Mr. Bynum 's name come s up?

19 A.    Which ever way you want to do it . I think it

20 might be easier , again, for me to do it myself.

21      MR. MITCHELL:   May I approach the witness ?

22      THE COURT:   You may .

23      THE WITNESS:   I have found him in this book .

24      Do you want me to continue and look for other

25 reference s?

1          BY MR. MITCHELL:

2  Q.      That's his telephone number?

3  A.      That's his name and a telephone number -- two

4  telephone numbers below it.

5  Q.      If you would agree, that's January 10, 2003?

6  A.      I would agree that's what's written, yes.

7  Q.      Have you had a chance to look at the rest of the

8  year of this?

9  A.      I stopped once I found the first reference to

10 his name.

11 Q.      If I could ask you if you see it again at any

12 point in time in that book.

13 A.      The only additional reference I see is to Bose

14 shop with a phone number, but I do not know if that

15 refers to Mr. Bynum or not.

16 Q.      Did you reference that page?

17 A.      It's right here.

18 Q.      You're talking about this number right here?

19 A.      That's correct.

20 Q.      Bose as in the speakers?

21 A.      That's the way it is spelled, that's correct.

22 Q.      Would you agree with me this is a calendar of

23 2003?

24 A.      It appears to be a 2003 calendar, yes.

25 Q.      There appears to be references all the way

1 through December of 2003.

2 A.      Yes.

3 Q.      And even something here on January, 2004.  And

4 would you agree with me that it's not a far leap to

5 assume that this calendar was used day -- as a daily

6 calendar throughout the year of 2003?

7 A.      I would disagree with that.  There are things in

8 there that occurred in 2004 that she has written in

9 there.

10 Q.      Okay.  But it was at least some type of date

11 book that was being used; correct?

12 A.      It is a 2003 calendar.

13 Q.      And in this book and in the other ledger, that

14 little notebook also identified as Hayward-7, you found

15 one reference to Mr. Bynum?

16 A.      Yes.  His telephone numbers were in there.  We

17 marked them.

18 Q.      Over a two-year period?

19 A.      I did not say that.  I said the -- it was in

20 there.

21 Q.      Okay.

22 A.      I do not know when those numbers were written in

23 there.  There are things that were written in there

24 contemporaneous to our wire, so I know she was using

25 that probably in April, May.  There is reference to a

1 traffic accident that her son had. That occurred

2 during the wire.

3 Q.    This 2003 calendar and this other ledger, one

4 reference to Mr. Bynum?

5 A.    I believe that's accurate, yes.

6 Q.    No list of amounts and dollars or drugs in

7 either of these two documents; correct?

8 A.    No, there are amounts listed for drugs.

9 Q.    I'm sorry?

10 A.    None that I can attribute to Mr. Mitchell.

11 Q.    I stand corrected. That's what I meant to ask.

12       One of the things that you would look for as an

13 investigator, in your opinion and in your experience,

14 is you would look for someone to keep a record of what

15 someone is buying and selling; correct?

16 A.    That is common, yes.

17 Q.    And that's because memories fade and people in

18 the business want to insure that they're getting the

19 right money and they're giving the right things;

20 correct?

21 A.    Yes. If you have a non-cash customer, it is

22 common that sometimes both parties will keep track of

23 how much is owed. But there's no reference to Mr.

24 Bynum being issued anything here -- strike that.

25       There's no reference to any amounts of drugs or

1  amount s of money being received in either of these two
2  document s?
3  A.      There is nothing that I can attribute to Mr.
4  Bynum .  That 's correct .
5  Q.      One of the code words that you reference d with
6  Mr. Bynum were ticket s; correct ?
7  A.      I'm sure she probably did use ticket s without
8  look ing at a specific conversation , but she used that
9  with everybody , so it would n't surprise me.
10 Q.      Are you familiar with --
11         MS. JOHNSTON:   Objection , Your Honor .  Counsel 's
12 going to show something that 's not in evidence, that we
13 haven't been privy to.  If we could approach the bench .
14         MR. MITCHELL:   Well, I will allow -- while I ask
15 my series of question s, I will allow them to take a
16 look at this .
17         MS. JOHNSTON:   Your Honor , may we approach the
18 bench , please ?
19         THE COURT:   All right .
20              (At the bar of the Court.)
21         THE COURT:   I don't know what document he 's
22 get ting ready to -- what document is that ?
23         MS. JOHNSTON:   When he put s something up on the
24 document present er in front of the jury that 's not in
25 evidence , that 's a problem , improper .

1          THE  COURT:   Don't  put  it  on  the  view  box.

2          MR.  MITCHELL:    That's  fine.   I'll  ask  him  about

3 it.

4          THE  COURT:   What  is  it  you're  going  to  ask  him

5 about?

6          MR.  MITCHELL:    It's  the  Office  of  National  Drug

7 Policy  printout  of  their  purpose  and  policies.

8          THE  COURT:   What's  the  relevance  of  that?

9          MR.  MITCHELL:   Within  that,  they  have  the  number

10 of  street  terms  for  different  drugs.   I  simply  want  to

11 ask  him  if  he's  familiar  with  this  organization  and  if

12 he's  familiar  with  street  terms  such  as  ticket,  which

13 are  listed  here.

14          THE  COURT:   All  right.   I'll  let  you  go  a  little

15 bit,  but  don't  put  that  on  the  view  box.

16          MR.  MITCHELL:   Okay.   I'll  ask  him.

17          THE  COURT:   You  can  ask  him  if  he's  familiar

18 with  this  view  box  (sic).

19          MS.  JOHNSTON:   Your  Honor,  can  we  be  here  heard?

20 I  don't  know  when  this  report  was  done.   I  don't  know

21 what  time  frame  it  covers  --

22          MR.  MITCHELL:   Last  updated  April,  2003.

23          MS.  JOHNSTON:   That  would  be  before  the  wiretap

24 conversations  in  this  case.   That  does  not  indicate

25 that  those  were  words  that  were  being  used  during  the

1  time of the wiretap.

2        THE COURT:  I don't see how you can use this

3  unless he decides to recognize it as authoritative.  If

4  he doesn't recognize it as authoritative, you're at an

5  end.

6        MR. MONTEMARANO:  He's entitled to ask him in

7  terms of his expertise if he's familiar with it.  It's

8  like quizzing an expert about treatises; isn't it?

9        THE COURT:  You can ask him whatever questions

10  you want, but I'm not going to let you use this

11  document unless he, himself, acknowledges that he is

12  familiar with it as an authoritative matter in the

13  field.

14        MR. MITCHELL:  Okay.

15        THE COURT:  If he's not, then that's the end of

16  the inquiry.  All right?

17        MR. MITCHELL:  All right.

18              (Back in open court.)

19        BY MR. MITCHELL:

20  Q.    Sergeant Sakala, I want to ask you if you are

21  familiar with the White House Office of National Drug

22  policy.  Are you familiar with that organization?

23  A.    Am I familiar with it?

24  Q.    Yes.

25  A.    Probably not.  I might have heard of it, but.

1  Q.      Okay.  If could play B2429.  If you could turn

2  to Book 1, Pages 263-264, and in a minute, I'm going to

3  have you listen to another phone call.

4          I had the occasion to go back and listen to

5  these phone calls and there was one thing that really

6  struck me on this phone call.

7          MS. JOHNSTON:   Objection, Your Honor, to counsel

8  discussing what struck him in a telephone call.

9          THE COURT:   Let him finish his question and then

10 we'll -- where are you going with this question?  Wait

11 a minute.  Don't answer him.  What was your question?

12         MR. MITCHELL:   I haven't even gotten there yet.

13         THE COURT:   Ask a question.

14         MR. MITCHELL:   I'm about to.  That was the next

15 statement.

16         THE COURT:   I don't want him answering a

17 non-question.  Answer a -- propose a question.

18         MR. MITCHELL:   Okay.

19         BY MR. MITCHELL:

20 Q.      In that phone call --

21 A.      Okay.  Again, your page number and book number

22 are not correct.  I'm trying to clarify the call.

23 Q.      I'm sorry, it's 263.  Is that not -- B2429?

24         THE COURT:   In Book 2.

25         BY MR. MITCHELL:

1 Q.     Oh, is it Book 2?  I'm sorry.  I stand

2 corrected.  Book 2.  Page 263-264.

3 A.     B2429?

4 Q.     Correct.

5 A.     I have that in front of me.

6        THE COURT:  What page?

7        MR. MITCHELL:  263, in Book 2.

8        THE COURT:  All right.

9         BY MR. MITCHELL:

10 Q.     Now, in this phone call on Page 264, third line

11 down, you state -- it's stated here, Derrick Bynum, do

12 you want to try some Peruvian-style tickets; correct?

13 A.     On Page 264?

14 Q.     I believe it's 264.

15 A.     264, top of the page, he says that, yes.

16 Q.     And if I recall your testimony, your opinion of

17 that was that he was referring to whether or not Ms.

18 Martin was looking for another source of cocaine.  Do I

19 stand -- is that correct, or --

20 A.     That is correct.

21 Q.     -- correct me if I'm wrong.

22 A.     That is correct.

23 Q.     If we could listen to that portion of the phone

24 call, which comes at about 30 seconds into the call.

25 I'm going to have you listen to that again.

1          (Audio recording begins playing at 11:02 a.m.)
2          (Audio recording stops playing at 11:03 a.m.)
3          BY MR. MITCHELL:
4  Q.     All right.  I want to ask you if it's possible
5  that what he is actually saying is do you want to try
6  some Peruvian-style chicken.  Listen to the
7  conversation again.
8          (Audio recording begins playing at 11:03 a.m.)
9          (Audio recording stops playing at 11:03 a.m.)
10         BY MR. MITCHELL:
11 Q.     Listening to it again, would you not agree with
12 me that what it sounds like is he's asking if she would
13 like to try some Peruvian-style chicken?
14 A.     No, I would not agree with that.
15 Q.     Are you familiar with what Peruvian-style
16 chicken is?
17 A.     No.
18 Q.     You ever been to the restaurant Senor Chicken,
19 located at 7970 New Hampshire Avenue in Hyattsville?
20 A.     I don't think so, no.
21 Q.     Are you familiar with their menu?
22 A.     If I've never been there, no, I'm not familiar
23 with their menu.
24 Q.     Are you familiar or are you -- would you agree
25 or disagree that there is such a thing as

1 Peruvian-style   chicken ?

2 A.      I have no idea.

3 Q.      You would strongly disagree that that reference

4 was to chicken not tickets?

5 A.      I do not agree with that interpretation  of that

6 conversation , that's correct .

7 Q.      At any time during this investigation  of Mr.

8 Bynum , did you ever stop him for or detain him at any

9 time during this period of your investigation  and find

10 any drugs on him?

11 A.      I believe the answer to that would be yes.

12 Q.      I'm not talking about the search warrant .

13 A.      You said any time.

14 Q.      I'm saying your investigation . Your -- during

15 your investigation  of this, did you stop him, detain

16 him, and find any drugs on him?

17 A.      He was stopped , detained, and arrested on the

18 1st of June.  I believe there was drugs in his house ,

19 yes.

20 Q.      That was the search warrant ?

21 A.      Yes.

22 Q.      But before that -- during the time of all these

23 phone calls, during the time that we've been listening

24 to, the jury's been listening to, did you ever stop

25 him, detain him, and find the drugs that you say he was

1  talking about in these phone calls?

2  A.      Prior to his arrest, he was not stopped or

3  detained during the wire.

4  Q.      And you didn't stop or detain him and find any

5  amount of currency on him as well; correct?

6  A.      He was not stopped or detained at all prior to

7  his arrest.

8         MR. MITCHELL:   Sergeant Sakala, I appreciate the

9  time you've spent on this, looking at all the evidence.

10        I have no further questions of this witness.

11        THE COURT:   Thank you.

12        MR. WARD:   Your Honor, may I just get something

13 from Mr. Trusty?   Thank you.

14                    **CROSS-EXAMINATION**

15        BY MR. WARD:

16 Q.      Good afternoon, Sergeant.

17 A.      Good afternoon.

18 Q.      You know who I am and you know who I represent;

19 don't you?

20 A.      That's correct.

21 Q.      All right, sir.   Now, I've been intrigued by the

22 outset of this case by the phrase, a moral certainty,

23 that you used and you told this jury that you are

24 testifying to the matters that you -- have testified

25 about to a moral certainty; is that correct, sir?

1 A.      Yes.

2 Q.      I'm not sure I've ever heard any witness use

3 that phrase before.  What do you mean by "a moral

4 certainty"?

5 A.      It means I'm confident in my opinion.  There is

6 no doubt in my mind.

7 Q.      Does it relate to the legal concepts of maybe

8 preponderance of the evidence  ?

9 A.      I would not relate it to that, no.

10 Q.      Clear and convincing evidence?

11 A.      I think I just said I would not relate it to

12 that, no.

13 Q.      You're not saying that your moral certainty is

14 beyond a reasonable doubt  , are you?

15 A.      I'm not saying that at all.  I'm saying I'm

16 confident in my opinion; there is no doubt my mind.

17 Q.      All right, sir.  Let's explore your opinions.

18 You said at the outset of this case that hustler meant

19 somebody who was involved in the drug business; is that

20 right, sir?

21 A.      It is a common term, yes.

22 Q.      It's a common term for other things, too; isn't

23 it?

24 A.      Yes.

25 Q.      Okay.  So one can be a hustler and let's say be

1  out on the street corner selling her favors and that

2  would be referred to in police language as a hustler or

3  in common language as a hustler; is that right, sir?

4  A.    If you're referring to a prostitute, I've never

5  heard the term hustler referred to as a prostitute, no.

6  Q.    You have never heard the term hustler related to

7  a prostitute?

8  A.    I have not, no.

9  Q.    You've heard of Hustler magazine, I guess,

10 although I'm sure you don't subscribe to it.  You have

11 heard of it; right, sir?

12 A.    Yes, I have.

13 Q.    Does that feature drug dealers?

14 A.    I'm sorry?

15 Q.    Does that feature drug dealers?

16 A.    I don't read the magazine, but I do not believe

17 it does.

18 Q.    You've never seen the cover of it?

19 A.    I may have.  To be perfectly honest with you, I

20 haven't thought about that in a long time.

21 Q.    Lots of scantily clad young ladies?

22 A.    That is my recollection of what the focus of the

23 magazine would be, yes.

24 Q.    When they refer to hustler there, they ain't

25 talking about drug dealers; are they?

1  A.       I don't think so , no.

2  Q.       All right , sir .  Now you've used some code words

3  and you've told this jury that in the context -- you

4  said , first of all , the code words are always something

5  that have to be consider ed in context ; is that right ,

6  sir ?

7  A.       General ly , yeah .  It would be very difficult to

8  without having the context .

9  Q.       You did not identify the word "rock s:  As a code

10 word ; is that correct , sir ?

11 A.       The word what ?

12 Q.       Rock s, R O C K S.

13 A.       I think there was conversation where the word

14 rock is mention ed .

15 Q.       Rock ?

16 A.       Yes .

17 Q.       You've also heard rock s in term s of, oh, look at

18 the rock on her finger ; right ?  Referring to diamonds .

19 A.       Yes , I have heard that .

20 Q.       All right , sir .  How about the term rock s as big

21 as light bulbs.  Have you ever heard that ?

22 A.       Rock s as big as light bulb s?

23 Q.       Yes .

24 A.       In reference to describ ing what ?

25 Q.       In the context of this case .

1  A.     I have not heard rocks compared to light bulbs.

2  Q.     All right, sir.  And you've not heard drugs

3  compared to light bulbs; is that correct, sir?

4  A.     I don't believe I have, no.

5  Q.     All right, sir.  How about jewelry?  In the

6  context of this case, is jewelry a code word for drugs?

7  A.     I do not believe there was any references to

8  drugs by referring to it as jewelry in this case.

9  Q.     You did see plenty of reference to jewelry;

10 didn't you?

11 A.     There were references, yes.

12 Q.     And we'll come to that in a minute.  What about

13 aquamarines.  Do you know what an aquamarine is?  A

14 precious stone that you might have in a ring?

15 A.     No, I do not.

16 Q.     All right, sir.  But in the context of this

17 case, aquamarines, your concept of moral certainty,

18 does not equate with drugs; is that right, sir?

19 A.     I don't think we -- the term aquamarine was used

20 to refer to drugs, no.

21 Q.     All right, sir.  What about flowers?  Have you

22 ever heard drugs -- let's say in the context of this

23 case, have you ever heard drugs referred to as flowers?

24 A.     I think there was a reference to sugar, but not

25 flowers, and I don't recall any references to flowers

1 meaning drugs in this case.

2 Q.      When I say flowers, I may have gotten confused.

3 I mean F L O W E R S, the kind of thing that is grown

4 in the garden, you pick and smell, not flour that

5 comes, you make bread out of, but flowers that come the

6 ground that you pick, you smell.  You have not

7 identified that as a code word for drugs in the context

8 of this case; have you, sir?

9 A.      I do not believe so, no.

10 Q.      All right, sir.  Now, you were one of the how

11 many case agents?  Did you say three?

12 A.      There are three primary, yes.

13 Q.      Three primaries, and you're one of those three

14 primaries; is that correct sir?

15 A.      That is correct.

16 Q.      You've been in this case pretty much since its

17 inception; is that correct, sir?

18 A.      Since late 2002, I think we've decided.

19 Q.      And would it be fair to say that you are

20 familiar with just about every aspect of the case?

21 A.      I wouldn't say that.  I'm familiar with a lot of

22 aspects.

23 Q.      A lot of aspects with the case.  Let's talk

24 about Becky Dobie as an aspect of this case.  You know

25 her to be a addict, drug addict; is that correct, sir?

1 A.      I do not.

2 Q.      You remember listening to a number of these

3 tapes when Becky Dobie sounded like she was just as

4 high as could be?

5 A.      Yes.

6 Q.      You do. Did you think that that perhaps had

7 something to do with drug ingestion?

8 A.      I don't know if it's drugs or alcohol. I have

9 no idea.

10 Q.      I see. You remember the one tape that was

11 played that I think it's at Page 503 when Paulette

12 Martin is talking to Becky Dobie on the phone, all of a

13 sudden there's dead silence, and Paulette says, Becky?

14 Becky? Becky? And finally, Becky sort of comes to.

15 Do you remember that conversation?

16 A.      Yes, I do.

17 Q.      Do you think that had anything to do with drug

18 use?

19 A.      I have no idea.

20 Q.      I see. You heard references to my client saying

21 something about when she -- this was in the context of

22 talking about keeping her grandparents out of the

23 nursing home, saying that she'd do pretty much anything

24 to keep her grandparents out of a nursing home? Do you

25 remember that conversation?

1  A.        Yes, I do.

2  Q.        All right, sir.  And she said in that case -- in

3  that particular conversation, and you know I've

4  committed plenty of crimes, and like I say, I'd do

5  anything to keep them out of a nursing home; is that

6  right, sir?

7  A.        I don't know if she used those exact words, but

8  I would agree that's a proper characterization  of the

9  call, yes.

10 Q.        And you do know that my client has a record and

11 criminal convictions; is that right, sir?

12 A.        yes.

13 Q.        She has never, never been convicted of a drug

14 trafficking offense; is that correct, sir?

15 A.        I do not know her record as I sit here.  She may

16 or may not have.  I don't know.

17 Q.        You're one of the case agents and you don't know

18 what her record is?

19 A.        I do not know the record of every defendant  in

20 this case, no, and certainly not hers.

21 Q.        Could you check on that maybe during the break

22 and when we come back afterwards I'll ask you again?

23 A.        I'm sure you've been provided copies, but I'm

24 sure Ms. Johnston and I can look for it.

25 Q.        Okay.  Well, we'll do that, then we'll bring you

1 back again and you can tell us whether or not my client

2 has ever been convicted for drug trafficking.

3       You're not familiar with her record; is that

4 right, sir?

5 A.     Not the specific crimes she's been charged with.

6 Q.     I'll save that until you come back after you've

7 refreshed your recollection.

8       Let's talk about these tapes that we've heard

9 many hours of. Do I understand that you, at the

10 outset, reviewed all the logs pertaining to the

11 different lines that were being tapped?

12 A.     It was part of my daily duties, yes.

13 Q.     And you would look to see if the synopsis of

14 what was written next to a call by the person who was

15 monitoring the call; is that correct, sir?

16 A.     I would listen to the call and review the

17 synopses, yes.

18 Q.     All right, sir. And if you found any

19 discrepancy between what you heard on the tape and what

20 was put down by the monitoring officer, you would

21 correct that; is that right, sir?

22 A.     No.

23 Q.     No?

24 A.     No.

25 Q.     All right. There were a couple of places on the

1 tapes where I noticed your name, where you would say,

2 for example, unknown female or unknown male was

3 actually, you know, Fred Smith or Joan Smith or

4 whatever, and your name Sakala.  You did do that,

5 didn't you?

6 A.     That is correct, but I did not correct the

7 monitor's logs.  I would add a note that would clarify

8 what the call was about or what I believed it was

9 about.

10 Q.    If you found anything in the logs that did not

11 match what you heard on the tapes, did you make any

12 note of that on the logs or elsewhere?

13 A.     Normally, again ,yes, especially if it was what

14 I thought was a big deal or a grievous area, for

15 example, when you say unknown female, and I knew

16 unknown female from the voice was Jane Doe, but there

17 were certainly other mistakes that were so minor, I

18 didn't worry about.

19 Q.    How many calls would you say altogether that

20 you, as you went along, you looked at and you listened

21 to the call itself and you looked at the synopsis that

22 was put down by the monitoring officer or agent?

23 A.     How many calls on daily basis or how many calls

24 total?

25 Q.     All together.

1 A.      I think there is probably over 10,000

2 activations in this case.

3 Q.      All right, sir.  Now, how did you decide, sir,

4 which tapes to transcribe for the jury to hear?

5 A.      The calls that -- how did we select the calls

6 that were played for the jury?

7 Q.      Yeah.

8 A.      We went through -- I believe the first process

9 we went through the pertinent calls that related to the

10 defendants who were going to trial or who were

11 scheduled to go to trial.  We then compared them to

12 things like surveillances things that we thought were

13 important to the case, and then starting with a very

14 large number of calls, we started whittling it down to

15 the calls that we thought were the most important to

16 the case and that would prove the case before a jury,

17 and keeping in mind the length of time that was going

18 to be necessary to play the calls.

19 Q.      That was because, as you said a number of times,

20 you didn't want to tie up too much of the Court's time;

21 is that right, sir, that you whittled them down?

22 A.      It's a lot of calls, yes.

23 Q.      I understand.  And when you say you we went

24 through and decided this, who is "we"?

25 A.      I think the people who had input would have been

1  myself , Detective  Eveler , Agent  Snyder , Ms.  Johnston ,

2  Ms.  Green berg , and  there  certain ly  could  have  been

3  other  people  who  had  input .

4  Q.     I see .  And  who  had  the  ultimate  decision  as  to

5  what  tape s  should  be  play ed  before  this  jury ?

6  A.     The  ultimate  decision  of  what  evidence  is

7  present ed  rest s  with  the  prosecuting   attorney s.

8  Q.     Ms.  Johnston  and  Ms.  Green berg ; is  that  correct ,

9  sir ?

10  A.     That 's  correct .

11  Q.     Now , in  select ing  these  tape s , the  concern  was

12  to  put  on  the  strongest   case  the  government   had  against

13  the  defendant s; is  that  right , sir ?

14  A.     Sure , that 's  a  consideration .

15  Q.     Yes .  And  to  present  as  complete  a  picture  of

16  the  defendant s' alleg ed  involve ment  as  possible  to  the

17  finders  of  fact , or  in  this  case , the  jury ; is  that

18  correct , sir ?

19  A.     I would  say  complete  picture  with  regard  to

20  their  criminal   conduct , not  complete  picture  as  to  the

21  defendant .

22  Q.     I'm  sorry .  I meant  criminal  conduct .

23     And  I suppose  one  of  your  concerns , sir , was

24  that  the  defendant s  be  given  also  a  fair  trial , that  is

25  they  would  be  fair ly  confront ed  with  the  evidence

1  against them so that they would have a fair trial?

2  A.      That was never a concern of mine.

3  Q.      Never a concern of yours that the defendants

4  have a fair trial?

5  A.      There was never a doubt in my mind that that was

6  going to happen.  That was not a concern, no.

7  Q.      Oh, I see.  Again, this is by a moral certainty

8  you were convinced that they would get a fair trial.

9  A.      I've been involved in a number of trials, and in

10 the trials I've been involved in, I think the defendant

11 has always gotten a fair trial.

12 Q.      I see.  In your judgment anyway; right?

13 A.      In the Court's judgment also.

14 Q.      I see.  Let's look at a few of the calls we went

15 through yesterday.  I'm not going to go through all of

16 them, but -- you will be glad to hear, but I will go

17 through some of them.

18         I want to start with Book 1, and another Page

19 11.  This is call B149, and this is the call between

20 Paulette Martin and Derrick Bynum.

21 Q.      Do you have that in front of you, sir?

22 A.      Yes I do.

23 Q.      You recall this was played and you offered your

24 opinion about it; right?

25 A.      Yes.

1   Q.      In this case, it appears that Becky is at

2   Paulette Martin's house; is that right, sir?

3   A.      That is correct.

4   Q.      And Mr. Bynum wants to come over for some reason

5   on some kind of business; is that right, sir?

6   A.      He wants to come over and make a drug deal.

7   Q.      And he is told that Becky is at the house; is

8   that right, sir?  That's what Paulette Martin said?

9   A.      Yes.  She said -- I'm sorry.  I was reading the

10  call, so I couldn't answer your question.

11  Q.      I'm sorry?

12  A.      Yes.  The answer is it appears that she is still

13  there.  Derrick Bynum asks if she's still there and Ms.

14  Martin says, uh-huh.

15  Q.      Mr. Bynum's response is, well, I'm on my way.  I

16  don't give a fuck, pardon me, but that's the language

17  on the thing.  I'm on my way.  In other words, I don't

18  care if Becky is there, I'm going to come over and do

19  my business; is that right, sir?

20  A.      That is correct.

21  Q.      Would you conclude from that response that he

22  really didn't want Becky to know his business, but his

23  business is so urgent, he's coming over anyway?

24  A.      I would agree with that, yes.

25  Q.      And Becky was charged as a co-conspirator of

1 his, yes?

2 A.      One of her charges is a member of the

3 conspiracy, that is correct.

4 Q.      A co-conspirator of Mr. Bynum's?

5 A.      That is correct.

6 Q.      He didn't want her knowing his business?

7 A.      On this particular day, that is correct.

8 Q.      I see.

9        The next call I was going to refer to had do

10 with the business of keeping her parents out of a

11 nursing home and getting into her crimes, but we're

12 going to come back to that later after you've had a

13 chance to refresh your recollection.

14        Let's turn to Page 97 in Book 1, a conversation

15 between Lavon Dobie and John Martin; is that right,

16 sir?  I mean, do you see that, sir?

17 A.      Yes.

18 Q.      This is where apparently, according to what is

19 here, Becky Dobie is saying something about the feds

20 got your car?  And I guess that's referring to the

21 arrest of Mr. Martin that he talked about, was it

22 Takoma Park or something?

23 A.      Yes.

24 Q.      But his car was forfeited or seized by the

25 federal authorities; is that correct, or do you know?

1  A.      I don't believe that's correct.  I know that's

2  what she's saying, but I don't think  that's correct.

3  Q.      She's saying she thought the feds had seized his

4  car; is that correct, sir?

5  A.      That is correct.

6  Q.      Then she goes on to talk about how Mr. Martin

7  can get a car and he can get a reliable Hoopty for $500

8  or less.  I assume Hoopty means some kind of a, you

9  know, a car; is that right, sir?

10 A.      Some type of what?

11 Q.      A car.  Cheap car?

12 A.      Yeah.  Hoopty is a common name for an

13 inexpensive car.

14 Q.      Yeah, inexpensive car.  And she goes on to say

15 something to the effect that -- let me find it right

16 here.  Something about when I do my business, I don't

17 use my good car, I use the hoopty because if it's --

18 then if it's forfeited or grabbed by the feds, I don't

19 have to worry about it.

20 A.      She does not use that language, but that is

21 essentially what she's saying.

22 Q.      Essentially what she said, and your opinion was,

23 sir, to a moral certainty, that what she meant was that

24 when she did the drug business, which you claim she was

25 doing -- the prosecution claims she was doing.  When

1 she did the drug business, she used a hoopty because

2 she didn't want her car to be seized by the feds; is

3 that right, sir?

4 A.     Yeah, I think she also talks about her car had

5 been seized before.

6 Q.     Yeah, she does as a matter of fact.  You know,

7 don't you, sir, that it was seized in Henrico County,

8 Virginia, with connection with a larceny charge against

9 her?

10 A.     I don't think her car was seized.

11 Q.     You don't think it was seized?

12 A.     No.  I think they just had it in a tow lot and

13 she never went to pick it up.

14 Q.     Do you know that or are you guessing that?

15 A.     I don't know that.

16 Q.     Maybe that's something else you can look up

17 while we're on recess and when we bring you back, we'll

18 ask you that, too.

19      MS. JOHNSTON:   Objection, Your Honor.

20      Counsel has the access to the same records.

21      THE COURT:  Mr. Ward, I'm not going to have him

22 be given homework assignments as a witness, so ask him

23 questions.

24      MR. WARD:  Your Honor, I'm simply asking him to

25 refresh his recollection by any means.

1          MS. JOHNSTON:    Your Honor, if counsel wants to

2    refresh his recollection, he's free do so at this time.

3          MR. WARD:    Well, to quote someone, I don't want

4    to waste a lot of the Court's time, Your Honor, so I'll

5    move on.

6          MR. MARTIN:    Your Honor, objection.

7          BY MR. WARD:

8    Q.      Sir, let's look at Page 107, which is a

9    several-page call, A267, and this is, I believe, a call

10   between Paulette Martin and Gwen Levi that was played

11   for this jury.

12          Do you see that, sir?

13   A.      Yes.

14   Q.      All right, sir.  Now, in this call -- you

15   remember this call; is that right?

16   A.      Yes.

17   Q.      All right, sir.  In this call, Ms. Martin is

18   complaining to Gwen Levi about what a damned nuisance

19   my client is, Lavon Dobie; is that right, sir?

20   A.      She's complaining about Ms. Dobie looking around

21   in her house where Ms. Martin thinks she shouldn't be

22   looking.

23   Q.      Would you accept the characterization being a

24   nuisance?

25   A.      She does not complain about her being a

1  nuisance .   She  complain s  about  her  look ing .

2  Q.      She  said  if  you  go  in --

3          MS.  JOHNSTON:    Objection  to  counsel  not  letting

4  the  witness  finish .

5          MR.  WARD:   I  thought  he  had  finish ed .

6          I  beg  your  pardon .

7          BY  MR.  WARD:

8  Q.      Do  you  want  to  finish , sir ?

9  A.      She  complain s  about  Ms.  Dobie , for  lack  of  a

10  better  word , mak ing  herself  at  home  in  Ms.  Martin 's

11  house  and  look ing  in  thing s  that  perhaps  a  guest  of  the

12  house  should n't  be  look ing  into .

13  Q.      For  example , she  complain s  she  went  into  my  case

14  and  pull ed  that  candy  out ; is  that  right , sir ?

15  A.      I'm  sorry .  What  page  are  you  look ing  at ?

16  Q.      108 , at  the  top .

17  A.      Yes .

18  Q.      In  your  opinion , sir , as  an  expert , you  said

19  that  candy , in  that  case , meant  just  exact ly  that ,

20  candy  and  not  drug s .  Is  that  right , sir ?

21  A.      I  don't  know  if  I  testifi ed  to  that , but  I  would

22  agree  with  that .

23  Q.      You  would  agree  with  that .  All  right .  Paulette

24  Martin  also  complain ed -- this  is  at  Page  108 -- she

25  has  a  habit  of  going  in  my  cabinet s , taking  out  my

1  liquor, the best of my liquor, my Moet, and giving it
2  out, and you know, just going in my -- when she went
3  off in that thing, and I said, what you asked her,
4  what, even you asked her what she was doing. So again,
5  she's complaining about, if not being a nuisance, at
6  least doing things that she shouldn't be doing or
7  making herself at home; is that right, sir?
8  A.      That's correct.
9  Q.      All right, sir.
10         And Paulette Martin continues, and I'm not used
11  to people like that just coming into a people's place,
12  going into things. I don't care how close of a friend
13  I am to anybody; is that right, sir?
14  A.      That's what she says, yes.
15  Q.      And then she says at the next response by
16  Paulette Martin, uh-huh, so you know, she -- what she's
17  been saying about you, I think she just thought you
18  meant Larry or something, but that's why I said I have
19  to, you know, give you those papers at another time.
20  Is that what she said?
21  A.      Yes.
22  Q.      Now, isn't she saying there -- you said, by the
23  way, papers was a code word for money; is that right,
24  sir?
25  A.      What she's saying there, when she's using the

1  term  "papers",  she's  referring  to  money,  yes.

2  Q.      What  she's  saying  there  in  substance  is  I  had  to

3  give  you  the  money  at  another  time  because  Becky  was

4  there  and  I  didn't  want  Becky  to  see  me  giving  the

5  money.

6  A.      Yes,  essentially.

7  Q.      In  other  words,  I  don't  want  Becky  in  my

8  business?

9  A.      Essentially,  that's  what  she's  saying,  though

10  not  using  those  words.

11  Q.      All  right,  sir.  Thank  you.

12         Now  we  come  to  Page  120,  Call  B829.  This  is,

13  again,  a  call  between  Paulette  Martin  and  Lavon  Dobie.

14         Down  at  the  bottom  of  Page  120,  we  hear  Lavon

15  talking  to  somebody  in  the  background  about  you  need  to

16  get  the  manager's  special.  Don't  get  ten-piece

17  nuggets.  The  manager's  special  is  20  pieces  of  nuggets

18  for  $10.99,  end  quote;  is  that  correct?

19  A.      Yes.

20  Q.      I  take  it  you're  not  suggesting,  sir,  that

21  nuggets  has  anything  to  do  with  drugs?

22  A.      I  did  not  testify  to  that,  no.

23  Q.      And  the  manager's  special  has  nothing  to  do  with

24  drugs;  is  that  right,  sir?

25  A.      I  did  not  testify  to  that,  no.

1  Q.      And $10.99 is not being used in context of a

2  drug transaction ; is that correct , sir ?

3  A.      I do not think so , no.

4  Q.      All right , sir .  And then Lavon Dobie says that

5  box of hard rock taffy that I left around there , and

6  you said that in the -- in this context , you

7  interpret ed hard rock taffy to be drug s; is that right ,

8  sir ?

9  A.      Crack cocaine , yes .

10  Q.      Because she had the word rock in there ?

11  A.      It's a common way to de scribe crack cocaine .

12  Q.      Hard rock taffy ?

13  A.      Yes .

14  Q.      I see .  That 's something that you hear common ly?

15  A.      Yes , I've heard this many time s.

16  Q.      How many more time s in every one of these

17  transcript s that you've compar ed, and in fact , in every

18  one of the call s that you look ed at in the log s, the

19  10 ,000 or whatever it was call s, how many time s again ,

20  other than this , did you see hard rock taffy referring

21  to drug s?

22  A.      I think Ms. Dobie uses the term hard rock candy

23  in at least one maybe two other occasion s.

24  Q.      One or two .  So in one place,  candy does n't mean

25  anything .  It's --

1  A.      The taffy or candy doesn't mean anything.  It's
2  the hard rock.
3  Q.      And because it says hard rock candy, that means
4  something?
5  A.      In this particular instance, this drug here is
6  actually identified in calls with Milburn Walker where
7  he orders a quantity of crack cocaine, and Ms. Martin
8  sells it to her.  So this drug here is actually
9  identified in several calls.
10 Q.      What, this hard rock taffy?
11 A.      No, as crack cocaine.
12 Q.      As crack cocaine?
13 A.      That's correct.
14 Q.      So because you have references to crack cocaine,
15 it is your conclusion that this hard rock taffy also
16 refers to crack cocaine?
17 A.      No.  What I'm talking about, the specific amount
18 of drugs that she's telling Ms. Martin she wants was
19 actually sold to Mr. Walker, and that actual amount is
20 referred to in other conversations and identified by
21 other code words to refer to crack cocaine.
22 Q.      Sir, Page 166, Call A423.  This was a call that
23 was played for the jury.  It took place on March 22,
24 beginning at 12:39 p.m., and continuing into 12:49 p.m;
25 is that correct, sir?

1  A.       Did you say 12:39 to 12:49?

2  Q.       Correct.

3  A.       Yes, that is correct.

4  Q.       And the bulk of this call has to do with

5  gambling; is that right, sir?

6  A.       I don't know about the bulk, but there is a fair

7  amount that's still excerpted in the book dealing with

8  gambling.

9  Q.       Huh?  I'm sorry?

10  A.       There is a fair amount that deals with gambling.

11  Q.       That's right and Becky Dobie is telling Paulette

12  Martin that if they go at gambling, they're talking

13  about $15,000, a $15,000 cut, one guy wants $16,000,

14  you know somebody left with $15,000 so forth.  So, a

15  lot of money; right, sir?

16  A.       Yes.

17  Q.       Basically, what Dobie says is she and her

18  husband get involved in these gambling operations and

19  there's a lot of money.

20  A.       Her and her husband would go gambling, yes.

21  Q.       All right, sir.  Let's look at Book 2, Page 251.

22  This is Call B2383, date April 1, call beginning at

23  05:32.

24  A.       Yes.

25  Q.       This is between Paulette Martin and John Martin;

1 is that correct, sir?

2 A.      Yes.

3 Q.      Paulette Martin says, Becky woke me up at 1:30,

4 and John Martin says who? Becky? Uh-huh. Is that

5 correct, sir?

6 A.      Yes.

7 Q.      And then Paulette goes on at the bottom of the

8 page, and then she had a "faggy standing. I'm not sure

9 what that means, but does "faggy standing" have

10 anything to do with drugs?

11 A.      I think that's a person she's talking about.

12 Q.      What?

13 A.      I think the reference that you're talking about

14 at the bottom is referring to a person.

15 Q.      Oh. You mean like a homosexual person?

16 A.      I have no idea.

17 Q.      Oh, okay. I said Becky, please, but she don't

18 want anything. She don't want anything. She just want

19 to come by here and tell me heard Mumpsy Bumpsy got

20 shot six times and then she called him, but she could

21 have called me on the phone, but said she did but I

22 didn't answer; is that right, sir?

23 A.      Yes.

24 Q.      Now, I recollect, sir -- you tell me if I'm

25 wrong, but your testimony was this was a drug-related

1 call.   That was your opinion  to a moral  certainty; is

2 that  right, sir?

3 A.      This call is related  to drugs, yes.

4 Q.      It is?  So when Paulette  Martin  says she don't

5 want anything.  She don't want anything.  Isn't she

6 talking about drugs or anything  else?

7 A.      No, she's identifying that  particular  person --

8 that particular  visit  for the reason  that Becky  came

9 by.

10 Q.     I'm not sure.  You have to explain  that to me

11 because  I'm not qualified.  She says she don't want

12 anything.  Isn't she telling John Martin  Becky  came  by.

13 All she wanted to do was tell me about  Mumpsy  Bumpsy,

14 but she didn't  want anything  else?

15 A.     The very fact that she said she didn't want

16 anything  would, to me, identify  that she didn't want to

17 come by here to get drugs, she just wanted to tell me

18 that Mumpsy  Bumpsy  got shot.  If you read  the entire

19 call, you can see it's complaining about    Becky  in the

20 middle of the night, and    there are a series  of phone

21 calls, some  of which we played in court  dealing  with

22 Becky  coming by at all hours of the night.

23 Q.     So if somebody  came up to me on the street  and

24 says, I want to sell you a $10 bag of heroin, and I say

25 I don't want it, that's a drug conversation  to you?

1  A.       That is a drug conversation, yes.

2  Q.       Does that make me a co-conspirator or something?

3  A.       I wouldn't make a guess on that, no, but

4  certainly if someone offers to sell you drugs and you

5  turn them down, that is a drug conversation.

6  Q.       I see.  Turn to Page 361, please, Telephone Call

7  B4183, the date is April 23, '04, and time is 14:56; in

8  other words, 2:56 in the afternoon.  Do you see that,

9  sir?

10  A.       Call B4183?

11  Q.       4183; correct.

12  A.       Yes.

13  Q.       This is, again, between Paulette Martin and

14  Lavon Dobie?

15  A.       Yes, it is.

16  Q.       Paulette Martin says, I thought we was going to

17  have a ticket.  A couple people called me, but

18  apparently she doesn't have a ticket.  So apparently

19  Dobie is trying to buy a ticket on this occasion;

20  right, sir?

21  A.       I don't think that's what's going on in this

22  call, no.

23  Q.       What do you think is going on?  Let me strike

24  that.

25           Are you saying this is not a drug-related call?

1 A.      I didn't say that.  I said your characterization
2 of the call, I did not --
3 Q.      You tell us what you think was going on based on
4 your --
5 A.      Middle of page, she says I'm calling Girl-Girl
6 to see what happened to the show.  I thought I was
7 going to have a ticket.  A couple of people called me.
8 I told them there was nothing I could do.  I thought we
9 would be at one of your shows.
10       What she is saying is that Ms. Dobie is working
11 on a source of cocaine for them.  There's other calls
12 that we've played, so it's not talking about Ms. Dobie
13 buying drugs from Ms. Martin.  It is about Ms. Martin
14 checking with Ms. Dobie to see if her source of cocaine
15 has come through.
16 Q.      Oh, I see.  So when she says we're going to be
17 at one of your shows, now this makes Lavon Dobie the
18 supplier.  Is that what you're saying?
19 A.      I think I characterized it, but again, I can
20 certainly repeat myself.  What she's saying is what Ms.
21 Dobie is -- Ms. Martin is checking into with Ms. Dobie
22 is whether the source of drugs that Ms. Dobie is trying
23 to locate has come through yet.  Ms. Martin is saying I
24 thought we'd be at one of your shows by now, meaning I
25 thought your source was going to come through.  That's

1 what she's saying.

2 Q.      There is no evidence that the guy she was

3 working on back on April 23 ever did come through; is

4 that right?

5 A.      Yes, there is.

6 Q.      There is?  We'll get to that.  And then Becky

7 Dobie goes on and says, a guy I want to see the thing,

8 want to see the jewelry.  Now, jewelry in this context,

9 is that referring to drugs or is that referring to

10 jewelry as it's commonly understood?

11 A.      She's referring to the source of cocaine or

12 source of drugs being the person the guy who wants to

13 also see the jewelry, so she's identifying someone who

14 also wants to see the jewelry.

15 Q.      Yes, but jewelry as it's used there, is jewelry

16 as we commonly understand it?

17 A.      Yes.

18 Q.      All right, sir.

19         Now, let's see, I may have one or two in Book 3.

20 I don't know.  Yes, I think I do.  The one I was going

21 to refer to was the one on Page 503 where Paulette

22 Martin saying Becky?  Becky?  Becky?  That is the call

23 I referred to before, right?

24 A.      Yes, it is.

25 Q.      I don't have to go over that again?

1 A.      I'm sorry.

2 Q.      I said I don't think we need to go into that

3 again.  Now, you played a call or maybe one or more

4 calls which had to do with Gwen Levi being in the

5 Howard County Detention Center or something, and Lavon

6 Dobie calling to find out what was going on.  And I

7 think saying that she was an investigator or made a

8 representation that she was an investigator; is that

9 right, sir?

10 A.      Ms. Levi was in the Montgomery County Detention

11 Center when Ms. Dobie made that call, yes.

12 Q.      You have no evidence that Ms. Dobie ever did go

13 out there and see Ms. Levi; is that right?

14 A.      That's correct.

15 Q.      So it was all talk, in other words; right?

16 A.      I would not say that, no.

17 Q.      Well, she didn't go.

18 A.      That's correct.

19 Q.      Is that right?

20 A.      That's correct.

21 Q.      Now, I want to look at the -- I want to refer to

22 the logs.  I think you've been referring to the logs

23 before.

24         MS. JOHNSTON:   Marked as Government's

25 Miscellaneous 9 and 10 for identification.

1          MR. WARD:   That's what I thought.

2          BY MR. WARD:

3   Q.      But I want to ask you a few questions related to

4   the logs.  Do you have the logs?

5   A.      No, I do not.

6   Q.      Do we have them, please?   Thank you.

7          Now, let me understand, these logs were

8   something that you listened to as they were produced

9   day by day; is that correct, sir?

10  A.      I listened to the telephone calls.  The logs

11  record the information.

12  Q.      That relate to the logs; is that right, sir?

13  A.      Yes.

14  Q.      You would check the call against what was

15  reported in the synopsis by the officer who was sitting

16  there operating the machine?

17  A.      Yes.

18  Q.      Okay, sir.  And when you went to decide which

19  transcripts to produce for the jury's benefit in this

20  case, you started basically with those logs, picked out

21  which ones?

22  A.      I don't think we used these logs, no.

23  Q.      What, did you go to just your memory?

24  A.      No, we have a listing of pertinent calls which

25  is a little bit more efficient than the logs.

1  Q.      Okay.  But that's made up from the logs; is that

2  right, sir?

3  A.      It's one of the things that goes in it, yes.

4  Q.      So although  you didn't rely directly on the

5  logs, you didn't go back to the logs.  You had gone to

6  the logs, made a list of what you deemed to be

7  pertinent  calls, and that was the list that you used in

8  pairing what  has been played before this jury; is that

9  correct, sir?

10 A.      That's probably  an accurate  description, yes.

11 Q.      Well, probably  accurate.  Is it accurate?

12 A.      It's not exactly what we did, but --

13 Q.      Tell us how it's not accurate, sir.

14 A.      If I was allowed to finish.  It's a good summary

15 of what  we did.  As I explained  before, there was a lot

16 of other  steps in between that we went through.

17 Q.      I want was giving you a summary  because  I didn't

18 want to waste the Court's time.  Sir, let me refer you

19 to Line A, Call A502.

20         MS. JOHNSTON:   Your Honor, may we approach  the

21 bench, please?

22         THE COURT:   You may.

23              (At the bar of the Court.)

24         MS. JOHNSTON:   I'm going to continue, because

25 Mr. Montemarano  and Mr. Hall are having their own

1 conference  back  there , but  I don't know   if  counsel  is

2 going  to ask  him  to  summarize  what  was  said  in  that

3 particular  call  on  Line  A.   Again , it's  not  admitted

4 into  evidence  here  before  this  jury.

5       If  there  is  a  call  that  they  think  they  should

6 cross -examine  this  witness  about , then  they  should  have

7 that  call  and  that  transcript  as  opposed  to  a  summary ,

8 which  he  reviewed , but  didn't  necessarily  write

9 himself .  So I'm  objecting  to  anyone  using  what  is  said

10 in  that  log  as  what's  said  in  that  call  if  it's  a  call

11 that's  not  been  played  yet.

12       MR. WARD:   Your  Honor , he  is  testifying  as  an

13 expert , and  I respectfully  suggest , and  I think  the  law

14 is  amply  clear , that  any  documentation   or  any

15 information   he  used  in  arriving  at  his  expert  opinion ,

16 quote -unquote , is  fair  game .

17       MS.  JOHNSTON:   My  point  is  he  did  not  use  this

18 particular  call  to  form  the  opinion s that  he's  given

19 here  in  this  court  if  it's  not  one  that  was  played  yet.

20       THE  COURT:   If  he  didn't  use  this  call  in

21 forming  his  opinion , how  can  you  cross -examine  him

22 about  it ?

23       MR.  WARD:   First  of  all , he  went  through  all  the

24 transcript s, the  entire  10 ,000  call s, and  from  those  he

25 made  selection s.   That  is  a  process  of  I use  this  one,

1  I don't use this one,   I suggest .   I think I'm entitled

2  to ask him if there are ones he didn't use and why he

3  didn't use them.

4          THE COURT:   Why he didn't select them for being

5  played to the jury in this case?

6          MR. WARD:   Exactly.

7          THE COURT:   He's already indicated that was a

8  decision made with counsel.

9          MR. WARD:   I know, but I want to know why.

10         THE COURT:   You're not going to put the

11 prosecutor on the stand and ask her that question, are

12 you?

13         MR. WARD:   No, but I've got this witness on the

14 stand.   Your Honor, he's an expert.   I mean, I'm

15 entitled to question him about anything that he

16 reviewed or relied on.   I mean, that's black letter

17 law.

18         MS. JOHNSTON:   The problem is he didn't say he

19 reviewed -- he didn't testify that he reviewed -- he

20 relied upon this particular call.   I don't know what's

21 in the call.   Again, I'm concerned we're getting into

22 issues of introducing hearsay that's not admissible.

23         THE COURT:   Mr. Ward, ask him if he relied upon

24 this particular call and the witness answers he gave.

25 Depending on what his answer is, we will see where we

1  go.

2       MR. WARD:   My point is, for reasons that I think

3  have some bearing on his opinion in this case, he chose

4  not to rely on this document and the pair, and I want

5  know why he didn't --

6       THE COURT:   You can ask him that.

7       MS. JOHNSTON:   My concern is getting into the

8  substance.

9       THE COURT:   I don't want to get into the

10 substance of the call.

11      MS. JOHNSTON:   Or the note that contains a

12 summary of what the call is about.   That would be

13 hearsay.

14      THE COURT:   If you really want to get into this

15 call, you're going to have to play the call.

16      MR. WARD:   I don't have the call.   It was never

17 --

18      MS. JOHNSTON:   So the record is clear, the

19 defense counsel has had copies of all of these calls

20 since many, many months, if not over a year ago, so I

21 just want that on the record.

22      MR. WARD:   Let's put this on the record:   I

23 wasn't even in the case a year ago, number one.

24      THE COURT:   Mr. Ward, I don't think you can go

25 too far with this area of inquiry.   It depends on what

1  his answers are, so you may ask him whether he relied

2  upon this call in forming the opinions that he gave in

3  this call.

4              (Back in open court.)

5        BY MR. WARD:

6  Q.      Have you looked at that log?

7  A.      Call A502?  Yes, I have.

8  Q.      And you recall reading that.  Looking at it now

9  and refreshing your recollection, do you recall having

10 read that log and listening to that tape earlier when

11 you were back in the beginnings of this case?

12 A.      I do not recall this call specifically, no.

13 Q.      But it's certainly one that you -- since you

14 testified to this jury you've listened to these calls

15 day by day and you did listen also to the actual calls

16 in conjunction with the logs.  This is certainly in the

17 logs and it's certainly one of the calls that you would

18 have listened to?

19 A.      I'm sure I have listened to it, I just do not

20 recall it.

21 Q.      All right, sir.  Do you recall this being a --

22 well, it is.  It's a conversation between Paulette

23 Martin and Gwen Levi; is that correct, sir?

24 A.      That's what the logs indicate, yes.

25 Q.      And you recall whether there's any discussion in

1 that --

2         MS. JOHNSTON:   Objection.   The witness has

3 already said he doesn't recall that call.

4         THE COURT:   Sustained.

5         MR. WARD:   Well, I'll have to call him back and

6 play it in my case then.

7         MS. JOHNSTON:   Your Honor --

8         MR. WARD:   We do have it.

9         MR. MARTIN:   8502 is on that disk.

10         MR. WARD:   Good.   Can we play 8502?

11         MS. JOHNSTON:   Your Honor, can we approach the

12 bench, please?

13                 (At the bar of the Court.)

14         MS. JOHNSTON:   I'm going to object to the

15 playing of this call.   The witness has said he does not

16 recall this call, so therefore, it could not have

17 served as a basis for his opinion; and therefore,

18 playing the call does nothing at this juncture in terms

19 of cross-examining him.   It introduces hearsay

20 testimony that may or may not be admissible.

21         Certainly if it's not a statement made in

22 furtherance of the conspiracy, it is not admissible in

23 this trial at this time.

24         THE COURT:   I don't know anything about the

25 call.   What's the call?   Who are the parties to the

1 call?

2       MR. WARD:  It's a call between Gwen Levi and

3 Paulette Martin in which they talk about not wanting

4 Becky to be involved in their business at all.  Now,

5 Your Honor, when a witness is called, I suggest the

6 other -- the opposing party, when an expert witness is

7 called, the opposing party is entitled to question him.

8       THE COURT:  How long is the call?

9       MR. WARD:  How long is the call?  I've got

10 several calls.  I'm going to go into the same thing,

11 the same base basic thing.

12       THE COURT:  That's what I'm asking you, how long

13 is the call?

14       MR. WARD:  I think about three minutes, but I've

15 got a whole bunch of them I can play.  If we need to do

16 that, I will.

17       MS. JOHNSTON:  We were not given a list of calls

18 prior to -- I think the Court asked them yesterday to

19 provide a list of the calls.  There is no transcript.

20 I don't think counsel has proffered a transcript for us

21 to play.

22       My concern is really the question of whether or

23 not this call is admissible.  Certainly if there was a

24 call and this witness -- and the point was to say that

25 this witness didn't take that call into consideration

1 and maybe they should have and that might have changed

2 their opinion, that then it would be admissible to play

3 without regard to the truth of the matter asserted

4 therein.

5         In this instance, the witness has said, one, he

6 doesn't remember that call; two, he didn't rely upon

7 that call, so therefore he could not have relied on

8 that call in forming his opinion. So the call is being

9 offered for what at this point?

10         Either the question of -- has to be being

11 offered for the truth of what's asserted in there,

12 which gets us then to the question of whether or not

13 it's hearsay, and admissible hearsay at that point.

14         MR. WARD:  I don't need an offering for the

15 truth of what's asserted.  Simply, to explain why he

16 did what he did.  Your Honor, if an expert is called

17 and reviews certain data and then chooses to rely on

18 this data, in my right hand, I'm certainly entitled to

19 ask him, well, if you relied on that, why didn't you

20 rely on this?  Why did you simply ignore this?

21         THE COURT:  Mr. Ward, I asked counsel to provide

22 the government with identification of recordings they

23 wanted to play or refer to, and you apparently didn't

24 do that; is that correct?

25         MR. WARD:  That's correct.

1          THE COURT:   We have a trial that needs to be

2   tried within a reasonable period of time, and we're

3   going to be here forever if we're going to have

4   surprise recordings brought up that have not been

5   noticed to the government.

6          MR. WARD:   How is this a surprise to the

7   government?   This is their evidence that they gave me.

8          THE COURT:   Mr. Ward, it is not a surprise   when

9   I told defense counsel what  to do prior to

10  cross-examination, which was to let the government   know

11  what, if any, specific recordings they wished to play.

12  So that we would not have this problem regarding --

13         MR. WARD:   All right, sir.

14         THE COURT:   We would be able to play it on a

15  moment's notice, and if there's a chance to use it or

16  have one prepared.

17         MR. WARD:   Your Honor, it's not my wish to play

18  the recording.

19         THE COURT:   Well, if you don't want to play it

20  and you've already asked him did he consider it and he

21  said no, we move on.

22         MR. WARD:   The question is, why didn't you

23  consider it.

24         THE COURT:   You can ask him that if you want.

25         MS. JOHNSTON:   If the question is a question of

1 refreshing the witness' recollection of what was in the

2 call, the government doesn't have any objection if -- I

3 appreciate my concern as well as the Court's concern

4 about scheduling.

5          If he wants to play these calls for the witness

6 before witness gets on the stand so that he can say,

7 well, he didn't consider call such- and -such. Why

8 didn't you consider it. That way he's refreshing his

9 recollection as he would try to do it with if the log

10 was unsuccessful because of the witness' lack of a

11 memory.

12          THE COURT: Mr. Ward, we're going to be coming

13 up pretty soon on a break. Do you know what calls you

14 want to ask this witness about?

15          MR. WARD: Yes.

16          THE COURT: Well, then, what we'll do is on that

17 break, you can play those calls to that witness, and

18 when we come back, you can ask him about those calls.

19          MR. WARD: All right. Let me --

20          MR. MCKNETT: Your Honor, while we're here on

21 this topic --

22          THE COURT: I cannot hear you.

23          MR. MCKNETT: While we're here on this topic and

24 I'm coming up last, it had been my intention -- it was

25 my understanding that because he is an expert, we are

1 allowed to cross-examine him on the basis for the

2 opinions he holds and also cross-examine him on the

3 facts or events that he chooses to discuss in

4 formulating his opinion.

5          THE COURT:   That's why I asked all of you to

6 notify the government of any additional calls you

7 wanted to play.

8          MR. MCKNETT:   I don't intend to play any

9 additional calls during the cross-examination.

10 However, I did -- depending on his answers, if I ask

11 him, for instance, what are the questions I intend to

12 ask him that has to do with an event in which my client

13 was involved, to ask him if he remembers -- the Court

14 may recall there's a conversation about letterhead and

15 faxes and time sheets.

16          THE COURT:   Right.

17          MR. MCKNETT:   I'm going to ask him if he recalls

18 any other conversations that concern Ms. Ali and Ms.

19 Martin and the preparation of letterheads.   And then

20 depending on if he says, yes, then I'm fine.   If he

21 says, I don't remember, then I intended to refer him to

22 a couple of calls in the logs.   Not play them.

23          THE COURT:   Do you have any specific calls you

24 want to play?

25          MR. MCKNETT:   I don't want to play them.   I just

1    want to refer him to them to refresh his recollection .

2        THE COURT:   Ask him question .

3        MS. JOHNSTON:   I think the problem becomes is

4    what's in the log may not refresh the detective 's --

5    his memory concerning what the calls were about because

6    sometimes the logs were erroneous , and what he would

7    need to do would be hear the call to fresh his

8    recollection .

9        It would mean not playing it for the jury , but

10   playing it for him so as to refresh his recollection  so

11   he can answer the question .   That 's the problem .

12       MR. MCKNETT :   Your Honor , there are two problems

13   with Ms. Johnston' s response  whether he remembers what

14   he relies on now -- whether he remembers now what he

15   relied on then is not the issue .  We can refresh his

16   recollection  as to what his opinion was.

17       Then the second thing is he's already testified

18   that he's reviewed all these logs, and when he found a

19   discrepancy , he would put a note in the log that there

20   was a discrepancy .  None of the calls that I'm

21   referring  to indicate  any discrepanci es between what he

22   heard then and what's in the logs now.

23       THE COURT:   Mr. Sussman wants to say something .

24       MR. SUSSMAN :   It seems it's a common problem .

25   Maybe since they can be refreshed with these calls,

1 maybe if we took our last break, they played the calls

2 for the guy.

3          THE COURT:  That's what I'd already said.

4          MR. SUSSMAN:  See, I miss things back there.

5          MS. JOHNSTON:  What I must tell the Court is the

6 government does not necessarily have those calls

7 conveniently handy.

8          THE COURT:  I understand.  That's why I asked to

9 have this notification given.  All right.  Counsel,

10 what I'm going to do is in a few minutes, we'll --

11 you're nowhere near the end of your cross; is that

12 correct?

13          MR. WARD:  Nowhere near.

14          THE COURT:  All right.  Well, continue on for

15 five or so minutes, ten minutes, then I'll take a

16 20-minute break and we'll come back.  And during that

17 20-minute break, I want you to play for the detective

18 the calls you want to play.

19          MR. WARD:  We have them.  Mr. Martin can produce

20 those.

21          MR. MONTEMARANO:  While we're up here, I would

22 like to put on the record my objection to the calls

23 being played.  I understand Ms. Johnston --

24          THE COURT:  Played to the jury or played to the

25 witness?

1          MR. MONTEMARANO :  To the jury.

2          THE COURT:  I'm not playing them to the jury.

3 Your objection is sustained.  You didn't need to make

4 it.  Any other -- any calls you want to ask him about

5 he needs to listen to to refresh his recollection about

6 if he took it into account or whether he relied upon

7 it, you can play it for them.

8          MR. MONTEMARANO :  If I may make a --

9          MR. MCKNETT :  If I may make a suggestion to

10 speed this up a bit.  If Ms. Johnston and I could ask

11 that he look at the log entries, and if they appear to

12 be accurate, there wouldn't be any need to play the

13 tape.

14          THE COURT:  This not playing tape is fine with

15 me.

16          MR. MCKNETT :  That's a summary of my precise

17 point, Your Honor.

18          MR. WARD:  I would ask that he listen to the

19 tape compare it to the log, and if there is any

20 discrepancy, he noted that.

21          MS. JOHNSTON:  He didn't remember the call.

22          THE COURT:  All right, counsel.  Proceed.

23               (Back in open court.)

24          BY MR. WARD:

25 Q.     Detective Sakala -- I'm sorry.  Sergeant Sakala,

1  on Line E, which was the line for Gwen Levi, whose line

2  you tapped, isn't it a fact, sir, that there are no

3  calls from my client, Lavon Dobie, to Gwen Levi?

4  A.      I believe that is accurate, yes.

5  Q.      And as to Mr. Mangual, Luis Mangual, whose line,

6  Line D, was also tapped, and whom you've ID'd as Mr.

7  Mangual as a supplier, isn't it a fact, sir, that there

8  are no calls from my client, Becky Dobie, to Luis

9  Mangual?

10 A.      There were no intercepted calls between the two,

11 that's correct.

12 Q.      All right, sir.  One of the tapes that was

13 played was in Book 1 at Page 289.

14 A.      I'm sorry, the page number again?

15 Q.      Book 1, page -- I'm sorry.  Book 1, Page 31.  Do

16 recall this being played sir?  This call?  It occurred

17 -- it's B289.  It occurred on March 11, 2004, beginning

18 at 13:22, that's 1:22 p.m.  Do you remember that?

19 A.      Yes, I do.

20 Q.      All right, sir.  And in, or rather, on Page

21 0032, Ms. Martin said in part, this -- this is about

22 ten lines up.  It begins, I said, quote, now -- do you

23 see where that is, sir?

24 A.      Yes.

25 Q.      I said, "now, you haven't seen J. R. since

1  you've been home.  Why would he, out of the clear blue

2  sky, ask you anything about Becky, Tony?  He said last

3  time he saw Becky she was shaking like a leaf, and I

4  said, yeah, I guess so.  I said, she's probably shaking

5  to keep her from pulling that trigger on that hammer

6  she had with her.  And he said, huh?  End quote.

7          Do you remember that, sir?

8  A.      Yes.

9  Q.      All right, sir.  And do you remember your

10 opinion about the trigger on the hammer and what that

11 signified to you to a moral certainty?

12 A.      I don't even know if that's code, but yeah, I

13 know what it means.  I know what I testified to, yes.

14 Q.      What did you testify to, sir?

15 A.      Pulling the trigger on the gun.

16 Q.      All right, sir.  Now, did you ever, in your

17 review of documentation related to this case, including

18 the logs themselves and the calls that you've listened

19 to that related to the logs, did you ever hear any call

20 in which it was suggested that that statement by

21 Paulette Martin was a joke to the person that she had

22 made that representation to?  That is a joke about

23 Becky having a gun or a hammer and pulling the trigger?

24 A.      I don't know that it's identified as a joke or

25 not a joke.

1  Q.      You don't?

2  A.      There's no indication  one way or another.  If

3  you're asking me does it --

4  Q.      On this call.

5  A.      Yeah, in this call, no, and I'm not aware if

6  this reference s.

7  Q.      I'm asking you, sir --

8  A.      I'm not aware of the reference with Anthony Hall

9  in other calls that you were asking me about either.

10 I'm not aware of that either.

11 Q.      Well, you heard this call played; right?  The

12 one I just read?

13 A.      Yes.

14 Q.      My question is to you, sir:  Do you recall

15 another telephone call at or around the same time as

16 the one I just read in which it was suggest ed by

17 Paulette Martin that what she had told this person

18 about Becky having a hammer and Paul pull ing the

19 trigger was said as a joke?

20 A.      No, I do not.

21 Q.      You simply don't recall it or are you saying it

22 didn't happen?

23 A.      I'm saying I don't recall  it.

24 Q.      Okay.  If you were to hear a call to that

25 effect , would that have any effect on your opinion that

1 you expressed in this court, sir?

2 A.     It would have no effect on my opinion that she's

3 saying she's probably shaking to keep from pulling the

4 trigger on the gun.  That would not change that

5 opinion.  If you're saying there's another call where

6 that's a joke, I don't think  I expressed an opinion one

7 way or another, so the answer is no, I do not think it

8 would effect my opinion.

9 Q.     You don't think it would effect your opinion.

10 All right, sir.

11        In going through the logs and listening to the

12 corresponding calls, sir, you recall a number of

13 telephone calls dealing with jewelry and furs and rocks

14 as big as light bulbs referring to jewels?

15 A.     I recall references to jewelry.  The light

16 bulbs, I think you asked me about before, and I don't

17 recall that.

18 Q.     But you do recall reference  to jewelry and furs?

19 A.     I'm trying to think if I recall a reference to

20 furs and there may have been.  I do not recall.

21 Q.     But with respect to the jewelry that you do

22 recall, the context of those references was with regard

23 to Becky Dobie selling or offering for sale jewelry

24 that she had stolen?

25 A.     There were calls to that -- about that, yes.

1 Q.      I asked you before about aqua marine, and let me

2 ask you: Do you recall a couple of telephone calls

3 referring to the fact that Becky Dobie had offered for

4 sale some $8,000 aqua marine earring s that she had

5 stolen for $800?

6 A.      She had jewelry for sale.  What type s and

7 price s, I do not recall.  I know there was discussion

8 of that.

9 Q.      All right, sir.  Are you familiar with the fact,

10 sir, that when Ms. Dobie's house was raid ed pursuant to

11 a search and seizure warrant, they found in the house

12 probably a couple of hundred items of jewelry?

13 A.      There was jewelry recovered.  I don't know  the

14 exact amount.

15 Q.      Hum?

16 A.      There was jewelry recovered.  I don't know  the

17 exact amount.

18 Q.      It was a number.  It wasn't one or two; is that

19 correct?

20 A.      That's correct.

21 Q.      It was quite a substantial  number?

22 A.      It was a lot of jewelry.

23 Q.      And most of it was in small glassine envelope s;

24 is that correct?

25 A.      I don't know.  I don't remember.  No.

1  Q.      Hum?

2  A.      I do not remember.

3  Q.      Were you there, by the way, at the raid?

4  A.      I was not.

5  Q.      So you wouldn't remember it anyway.  We'll have

6  to get to that through other witnesses.

7          Do you know, as one of the three case agents in

8  this case, that the jewelry that was taken from Ms.

9  Dobie's house was taken by Customs with the intent of

10  --

11          MS. JOHNSTON:  Objection.

12          MR. WARD:  To forfeit?

13          MS. JOHNSTON:  Objection.

14          THE COURT:  Sustained.

15          MR. WARD:  All right.  All right.  Your Honor, I

16  think we've identified the -- some calls that we need

17  to get into as we discussed at the bench.

18          THE COURT:  All right.  Ladies and gentlemen,

19  we'll take a recess until 12:35.  And then we will go

20  nonstop until 2:00 and you're out of here.

21              (Jury excused at 12:10 p.m.)

22          THE COURT:  Ms. Greenberg.

23          MS. GREENBERG:  My quick question is -- if

24  counsel could stay a moment.  We went on time estimates

25  here yesterday.  We have a witness here.  Is it safe to

1 say we can release that witness based on time

2 estimates?

3          THE COURT:   Mr. Ward is just warming up and we

4 have two more cross-examinations to go and you may have

5 some redirect.  You may release him.

6          MS. JOHNSTON:   Your Honor, I'm going to direct

7 Sergeant Sakala to stay in the courtroom and listen to

8 any calls.

9          THE COURT:   So he can say whether he remembers

10 them or he considered them or anything else, that's

11 fine.

12          MS. JOHNSTON:   For whatever calls they want to

13 play.

14          THE COURT:   Whatever you want him to listen to.

15 All right.  See you at 12:35.

16          MR. MCKNETT:   Your Honor, I had suggested that I

17 refer to them that he could review the log and see if

18 they're accurate.

19          MS. JOHNSTON:   We can do that with Mr. McKnett's

20 calls while they're trying to find these calls.

21                    (Off the record at 12:12 p.m.)

22                    (On the record at  12:41 p.m.)

23                    (Witness resumes the stand.)

24                    (Jury returns at 12:44 p.m.)

25          THE COURT:   You may proceed, Mr. Ward.

1          BY MR. WARD:

2   Q.     Sergeant, I placed up there Hayward-7, the

3   notebook that was recovered, I believe, from Ms.

4   Martin's house.

5   A.     Yes.

6   Q.     I believe you testified yesterday about phone

7   intercepts you believe related to Becky Dobie; is that

8   correct, sir?

9   A.     Yes.

10  Q.     Would you -- I mean, since the pages are not

11  numbered, let me just put the page up.  Ask you if you

12  can turn to that page, please.

13  A.     Can you give me an idea where in the book it is?

14  Q.     Oh, I'm sorry.

15  A.     You can put it back up there.  I'm sorry I may

16  have it.  Is it this page?

17  Q.     That's it.  That's exactly it.  Now, before we

18  get into the details, in the context of this case and

19  particularly with respect to Ms. Dobie, $125 refers to

20  an eighth of an ounce?

21  A.     That's correct.

22  Q.     Which is how many grams?

23  A.     3.5.

24  Q.     All right.  And that is not -- that amount is

25  not inconsistent with use by a drug user or an addict;

1 is that correct?

2 A.      The amount purchased would be inconsistent for

3 if they were using an entire amount, but if they were

4 using it and selling part of it to pay for what they

5 were using, it would not be inconsistent.

6 Q.      Are you saying that somebody with a long-term,

7 heavy habit would not buy $125 worth, an eighth, and

8 personally use it?

9 A.      A long-term, heavy habit, I would assume.

10 Q.      Let me finish.  Over a period of several days?

11 A.      If that's what you're saying, yeah.  I would

12 disagree with that.  A long-term, heavy user would not

13 stockpile cocaine for several days.  They would use it

14 as long as they got it.  If they've got $20, they would

15 go buy a rock and smoke it.

16 Q.      You never found any amounts larger than $125, or

17 an eighth, with respect to Ms. Dobie; is that correct?

18 A.      That is incorrect.

19 Q.      Huh?

20 A.      Incorrect.

21 Q.      Incorrect.  Let's go through it, sir.  It starts

22 out at the top, B.D.  And first of all, you're assuming

23 that B.D. is Becky Dobie; is that correct?

24 A.      That, and one of the conversations where she

25 tells her to put it on my bill.

1  Q.      Yeah.  All right.  It starts out owe 390 suit, S

2  U I T; is that right, sir, the top?

3  A.      Yes.

4  Q.      Now, is -- you're not suggesting that suit is a

5  quantity of drugs; is that correct?

6  A.      I am not.

7  Q.      Okay.  So apparently she bought a suit?

8  A.      I have no idea what that means.

9  Q.      Okay.  Well, it was 390 bucks anyway, and it

10 appears that on -- I can't read, I think it's 11/17,

11 she paid 200 on account, and that brought her balance

12 down to 190; is that correct?

13 A.      She paid 200 and brought it down to 190.  Yes.

14 Q.      Then there was another payment of 100, bringing

15 it down to 90?

16 A.      Yes.

17 Q.      And then it looks like 12/5, I'm not sure how

18 that fits in, but 10/3, got 125.  That's an eighth,

19 correct?

20 A.      10/5, got 125.

21 Q.      10/5, yeah, and then 10/11, six days later,

22 again, got 125; is that right, sir?

23 A.      Yes.

24 Q.      A total of 250.  I can't read what that says.

25 It looks like J something.  But anyway.

1  A.        Something paid.  Joy paid maybe.

2  Q.        Appears $100 paid, bringing it down to a balance

3  of 150, and then on 10/18, there is a charge of 125,

4  taking that to 275.  A subsequent undated payment of

5  100, bringing it down to 175; am I correct so far?

6  A.        Yes.

7  Q.        And then we have on 10/21, a charge of 125,

8  making a total owed of 300, 10/23 minus 75, and I'm not

9  sure I understand what all this crossing out is.  But

10 in any event, 11/1 looks like a charge of 125; is that

11 correct?  And then below that, minus 35.

12 A.        She has a lot of cross-outs, so I'm not sure

13 what she's referring to there.

14 Q.        And then 11/2, it appears a charge of 125 and

15 then a payment of 60?

16 A.        Yes.

17 Q.        11/4, 125.  11 something, I can't read that,

18 150.  And 11/9, 125, a total of 400; is that correct,

19 sir?

20 A.        Yes.

21 Q.        That then carries forward to the top, right-hand

22 column; is that right?

23 A.        Appears to be, yes.

24 Q.        In other words, a payment of 125 -- I'm sorry.

25 A charge 125 on November 13, a total of 525, a payment

1   on the same date of 300, bringing you down to 225, and

2   another charge undated of 125. 11/17, it appears the

3   total is 350. Payment of 200 bringing you down to 150,

4   and then a payment of 45, and then this next one is a

5   -- it appears a payment of 125, 25, 25, bringing it

6   down -- I'm sorry, those are charges. 125, 25, 25,

7   175. Now, $25, what's -- in terms of narcotics

8   transactions and the context of this case, what's a $25

9   transaction?

10  A.      It means that whatever drugs that she got were

11  either worth $25, or she paid $100, put up 25 on her

12  bill, which is probably a little bit more likely since

13  the 125 is the overwhelming charge.

14  Q.      Twenty-five would be a real small amount. I

15  mean, if 125 is three point something grams, then 25

16  would be proportionately less, I assume?

17  A.      It would be less, yes.

18  Q.      Okay. And then we have, that's 175, a payment

19  of 75, bringing down to a balance of 100. There's 125.

20  Apparently that's a charge, and another charge of 125,

21  plus another charge of 25 for a total of 250, but --

22  and as we go down, most if not all -- here's another

23  $90 suit. It appears that on that page, other than the

24  suit at $390 in the upper left-hand corner, the highest

25  charge is 125; is that correct?

1  A.      That appears to be correct, yes.

2  Q.      Okay.  Let's go to the -- it's about the second

3  page forward.  First of all, we end up with -- at the

4  bottom of the page we were just talking to, we end up

5  with a balance of $615.  Do you see that?

6  A.      $615, yes.

7  Q.      And then we go to this next page.

8          Do you have this, which says B.D. at the top?

9  A.      Yes.

10 Q.      And then we have, again, going down this column,

11 and I'll just skip down, 125 it looks like, 135 -- now,

12 does 135 signify, in the context of this case, a drug

13 charge?  I mean, is there something -- like an eighth

14 or whatever that's equivalent to $135?

15 A.      It's what she paid on.  I believe that looks

16 like -- I can't make out the fourth day of whatever

17 month they're talking about.

18 Q.      740, that's right.  She paid 135, leaving a

19 balance of 605; is that right?

20 A.      That's right.

21 Q.      Then we have another charge of 125, 125, 125,

22 125, 125, 125, 125, 125, 125, Wednesday up with a

23 balance in the first column of 555, and we take that

24 forward and then there's payment of $500; is that

25 correct?

1 A.        Yes.

2 Q.        And then again 125, 125, looks like 25, 25, 125,

3 125, 125?

4 A.        I think you skipped a distribution there.  The

5 1,000 is not highlighted on your copy, right in the

6 middle.

7 Q.        (Indicating.)

8 A.        Right there.

9 Q.        1,000?

10 A.        Yes.

11 Q.        Right.  And that's 2/3.  Now, do you know

12 whether there were other, from your investigation and

13 your knowledge of this case, there were other monetary

14 transactions between Ms. Dobie and Paulette Martin,

15 that is, other than Dobie?

16 A.        I do not know.

17 Q.        Well, we have -- we do have a $350 thing up here

18 that is a suit or $390; is that right, sir?

19 A.        That is correct.  That's the notation.

20 Q.        And then we have another $90 suit down here.

21 A.        That is the notation, I believe.

22 Q.        Okay.  So, there is no notation next to the

23 $1,000, but you have no basis for saying to a -- a

24 moral certainty that $1,000 represents strictly

25 narcotics or drugs?

1 A.      It's a common price for an ounce of cocaine.

2 Q.      I'm sorry?

3 A.      It was a common price for the ounce of cocaine.

4 I would note the non-cocaine purchases entries are

5 noted with clothing, whereas the cocaine entries are

6 not noted at all.

7 Q.      So your assumption, then, is that this $1,000

8 relates to a one-ounce deal, right?

9 A.      Yes.

10 Q.      And then we've got 25, 125, 125, 125, 25, and

11 then it looks like from then on, there are simply

12 payments reducing it down to --

13 A.      That's correct.

14 Q.      -- a balance of 2640, and we don't go anywhere

15 from there; is that right, sir?

16 A.      Yes.

17 Q.      All right, sir.  Give me a moment.

18        Let me just clarify a question I asked you

19 earlier, and that was if there was a statement on one

20 of those tapes to the effect of the business about the

21 hammer and trigger was a joke, that would not alter

22 your opinion at all.

23 A.      I did not offer an opinion as to whether that

24 comment was a joke.  I offered opinion of what the

25 hammer -- trigger on the hammer meant.

1  Q.      I see.  But if there was a comment made known to

2  you that that comment about the trigger and the hammer

3  was said as a joke, would that alter your opinion that

4  trigger and hammer meant a gun?

5  A.      No.  I don't see how it would.

6          MR. WARD:   Okay.  That's all I have at this

7  point.  Thank you.

8          THE COURT:   Thank you.

9          Mr. Sussman.

10                     **CROSS-EXAMINATION**

11          BY MR. SUSSMAN:

12  Q.      Good afternoon, Sergeant.

13  A.      Good afternoon.

14  Q.      At the beginning of your testimony, you

15  indicated the basis of your opinions, and one of the

16  things you said was that your opinions weren't just

17  based on the wiretaps and sells, but on the totality of

18  the investigation; is that right?

19  A.      That there were other things that figured in,

20  yes.

21  Q.      Okay.  And is it fair to say that the more you

22  know in terms of the investigation, the better the

23  quality of your opinions?

24  A.      I would agree with that, yes.

25  Q.      Okay.  Now, among the things that you relied on

1 were the numerous searches that had been done in this

2 case?

3 A.     Yes.

4 Q.     A lot of surveillance that was reported to you;

5 is that correct?

6 A.     Yes.

7 Q.     And surveillance you, yourself, did?

8 A.     Yes.

9 Q.     Pin registers, you talked about those earlier

10 on; is that right?

11 A.     Yes.

12 Q.     And they allowed you to see who was calling who?

13 A.     They established patterns between telephones,

14 not necessarily who's making the calls.

15 Q.     You had phone bills to look at?

16 A.     Yes.

17 Q.     So there is a whole variety of information

18 available to you. And that all helped form the base of

19 your opinion; is that correct?

20 A.     That's correct.

21 Q.     Okay. Now, the one exception you made was that

22 none of your opinion was based on any interviews with

23 cooperating witnesses; is that right?

24 A.     That's correct.

25 Q.     Now, during the course of your duties in

1  connection with this case, you did interview

2  cooperating witnesses; is that right?

3  A.      I've interviewed some of them, yes.

4  Q.      You spent some hours discussing things with

5  them; is that right?

6  A.      That's correct.

7  Q.      And it's your testimony that you can totally put

8  anything those folks told you out of your mind during

9  the course of your testimony?

10 A.      I never testified to that.

11 Q.      But you're testifying you're not relying on

12 anything they told you during the course of those

13 debriefings?

14 A.      That's correct.

15 Q.      You indicated that your involvement in the

16 investigation began in late-2002; correct?

17 A.      That's correct.

18 Q.      And the arrests and searches were conducted en

19 masse in June 1st, June 2nd of 2004; isn't that right?

20 A.      There were some arrests and searches then, yes.

21 Q.      Well, there were approximately 25, 30 arrests or

22 more in June of 2004; right?

23 A.      I don't know the number, but there were arrests

24 on that day, there were arrests before that day, and

25 there were arrests after that day.

1 Q.      You recall that 33 people were indicted when the
2 case first came down; weren't they?
3 A.      They were not indicted on that day, no.
4 Q.      So there are about 33 people in indicted; is
5 that right?
6 A.      That's right.
7 Q.      And there are other people who were involved,
8 perhaps not on the chart, who are also involved in this
9 conspiracy in your opinion; is that right?
10 A.      Yes.
11 Q.      There are people who would agree to plead
12 earlier before arrests were made; is that right?
13 A.      Before June 1st?  I don't think we had any
14 guilty pleas before June 1st.  There may be, but I
15 don't -- as I sit here, I can't remember any guilty
16 pleas before then.
17 Q.      There are people clearly who, in your mind and
18 in your opinion, were involved but not part of the
19 indictment.
20 A.      Yes.
21 Q.      Okay.  There are people who you couldn't
22 identify; is that right?
23 A.      Correct.
24 Q.      There are people, in one case, Steven Brim,
25 who's dead; is that right?

1  A.       Yes, he was dead.

2  Q.       So the number of actual people who might have

3  been participating in this conspiracy might have been

4  as high as 40 or more; is that right?

5  A.       Yeah.  I don't know what the total number would

6  be, but it would be more than 30, I guess.  33.

7  Q.       You're aware that the conspiracy is charged to

8  have begun in 1997; is that correct?

9  A.       That sounds right, yes.

10  Q.       Okay.  And you played no role in the

11  investigation between 1997 and 2002; is that right?

12  A.       I would not say that.  There were things that I

13  did in other investigations that became part of this

14  investigation, so it would depend, I guess, on your

15  definition of role.

16  Q.       Let me ask this:  You had indicated at least a

17  number of times that your participation in this

18  investigation began in 2002; is that correct?

19  A.       That is correct.

20  Q.       You actually are using information or are privy

21  to information that occurred between 1997 and 2002 in

22  your opinion?

23  A.       That's correct.

24  Q.       Some of that information you got from other

25  people; is that right?

1 A.      Between  '97  and  2002 .

2 Q.      What  was  going  on  --

3 A.      Oh , yes .   I'm  sorry , yes .

4 Q.      Because  they  were  more  active  in  the

5 investigation   than  you  were ; is  that  right ?

6 A.      Well , it's  just  that  --

7 Q.      It's  yes  or  no .   They  were  more  active  than  you .

8        MS.  JOHNSTON :    Objection , Your  Honor .

9        THE  COURT :   One  person  at  a  time , all  right ?

10 Let  him  finish  and  then  you  ask  your  question .

11        MR.  SUSSMAN :   I  asked  the  question .

12 Q.      Were  those  people  more  active ly  involve d  in  the

13 investigation   than  you  were  between   '97  and  2002 ?

14 A.      Okay .

15        THE  WITNESS :   Your  Honor , I  cannot   answer  that

16 question  yes  or  no .   If  I  could  explain .

17        THE  COURT :    Answer  the  way  you  want .

18        THE  WITNESS :    Thank  you , Your  Honor .   There  were

19 thing s  that  happened   between   1997  and  2002  that

20 subsequent ly  became   part  of  this  investigation , so  they

21 were  involve d  in  doing  whatever   they  were  do ing .   But

22 as  our  investigation   progress ed , we  were  able  to  tie

23 event s  that  happened   back  during  the  time  frame  to  the

24 current   investigation .

25        BY  MR.  SUSSMAN :

1  Q.      It's fair to say that your information

2  concerning those years principally came from other

3  people; is that right?

4  A.      A lot of it did, yes.

5  Q.      And you have no way of ascertaining for sure

6  where their information came from; is that right?

7  A.      No, I know where a lot of their information came

8  from, yes.

9  Q.      Well, you -- one police officer may tell you

10 something he heard from another police officer.  That's

11 frequently the case; isn't that right?

12 A.      No, I don't think we -- if you're asking what we

13 relied -- that we relied on what one police officer

14 told us that another police officer said, if that

15 occurred, we would go back to the original police

16 officer and verify the information and go back to the

17 source.

18 Q.      During the curse of your testimony, didn't you

19 frequently rely on police reports that you read during

20 the course of your investigation?

21 A.      I don't think so.  It's possible though.

22 Q.      Well, in circumstances where you talked about

23 searches -- you relied upon searches and surveillances,

24 you didn't personally participate in all those searches

25 and surveillances; is that correct?

1  A.      That is correct.

2  Q.      In every one of those cases, you talked to the

3  officer who's involved in that search or surveillance?

4  A.      I think every officer we could identify, yes,

5  we've talked to every one we could identify.

6  Q.      That would avoid any confusion about what had

7  occurred actually?

8  A.      Yes.  Go back to the source, yes.

9  Q.      Let me ask some questions about the code.  I

10  recall that Mr. Montemarano asked you some questions

11  about direct buy or undercover buy and you were very

12  specific in correcting him; is that right?

13  A.      Yes.

14  Q.      Because those are specific terms that police

15  officers use; is that right?

16  A.      That is correct.

17  Q.      The reason you they use specific terms is you

18  don't get confused when you're referring to something

19  everybody knows what you're talking about?

20  A.      They refer to specific identifiable techniques.

21  Q.      Right.  The police officers have a code; isn't

22  that right?

23  A.      We have jargon, yes.

24  Q.      So when -- and that's pretty common in every

25  business; is that correct?

1 A.      I believe so, yes.

2 Q.      And one of the things -- one of the reasons you

3 do it is so everybody's talking a common language, so

4 you all know what you're talking about.

5 A.      It's probably just that there are specific terms

6 that are unique to any individual career.

7 Q.      The police have a "10 code;" isn't that right?

8 A.      Yes.

9 Q.      And there's "1 code" for officer in trouble?

10 A.      Yes.

11 Q.      And everybody who's a police officer in the

12 metropolitan area really has got to know that?

13 A.      Well that would be -- no. Different from

14 different departments.

15 Q.      Well, there's some attempts to uniform -- make

16 that code uniform, right?

17 A.      There's actually a push now towards plain talk

18 language since 9/11, so the codes were always different

19 and that was a problem and now it's a push towards

20 plain talk.

21 Q.      When the codes get different, people can't

22 understand one; is that correct?

23 A.      That's correct.

24 Q.      In terms of the coded language, is it fair to

25 say that all the codes you listed that the codes seem

1  to be whatever word popped into someone's head?

2  A.     I think that's probably a fair representation,

3  yes.

4  Q.     I mean, it would sort of be like asking, I need

5  one of those what chamacallits; right?

6  A.     Yes.

7  Q.     And people use the same word to mean different

8  things?

9  A.     People use the same word to mean different --

10  I'm not sure I understand that.

11  Q.     Well, somebody could say ticket and mean heroin,

12  someone could say ticket and mean crack, someone could

13  say ticket and mean cocaine?

14  A.     I agree with that, yes.

15  Q.     And depending on the way the word was used, it

16  might refer to different quantity or even a different

17  drug; is that right?

18  A.     That is correct.

19  Q.     And it would seem from that testimony the

20  various people in this conspiracy would not be able to

21  talk to one another in all cases; is that right?

22  A.     If they had not previously talked or did not

23  know each other, and wouldn't even be a conspiracy, it

24  would be difficult to talk in code with someone you

25  don't know.

1  Q.      In fact, people on the wiretap who are charged

2  together might not understand what each other were

3  talking about in this context; is that right?

4  A.      That's not unusual where even people they know,

5  they can't get the -- one person will understand the

6  conversation meaning one thing and one person will

7  understand it to mean something else.

8  Q.      Well, the question I asked you was specifically

9  from your listening to the wiretaps, is it your opinion

10 that people in this conspiracy might well not be able

11 to understand one another when they spoke in that code?

12 A.      Yes. I think we saw that example, was it

13 Monday, with the conversation between Ms. Martin and

14 Ms. Dobie.  There was confusion.

15 Q.      So the answer is yes?

16 A.      I said yes.  Yes.

17 Q.      And difficulties in the code make your job a

18 little bit more difficult in interpreting it; isn't

19 that fair?

20 A.      If people spoke and said cocaine, it would be

21 easier, yes.

22 Q.      And things that make your job more difficult,

23 would it be fair to say, make it more prone to error?

24 A.      No.  I don't agree with that.  I would say some

25 conversations are more difficult to interpret.

1  Q.      Now, it's clear from the investigation, and this

2  has been going over some, that Mrs. Martin sold

3  clothing at Hayward Lane; is that right?

4  A.      I believe that's accurate.

5  Q.      And in fact, you were aware that when Hayward

6  Lane was searched in early June of 2004, that clothing

7  was found; is that right?

8  A.      I believe so, but I'm not 100 percent sure.  I'm

9  not a hundred percent, but I believe so.

10  Q.      If I might approach the --

11          THE COURT:   You may.

12          BY MR. SUSSMAN:

13  Q.      Sergeant, I'm showing you what's been marked as

14  P-104 for identification and ask if that's a

15  representation of the basement or downstairs of the

16  Hayward Lane address?

17  A.      I've never been there, but I have seen this

18  picture.

19  Q.      And you recognize it as such?

20  A.      I believe so, yes.

21  Q.      If I might put that on the -- can you see that

22  on the monitor?

23  A.      Yes, I can.

24  Q.      It's fair to say that this depicts a rack, and I

25  mean that literally, a rack of clothing, some plastic

1 bags and -- a substantial amount of clothing; is that

2 right?

3 A.      Yeah.  If you move it over a little bit, you can

4 see it a little bit better, I believe.

5 Q.      I'm sorry?

6 A.      Can you move the picture over a little bit?

7 Q.      Is that better?

8 A.      Yes, thank you.

9 Q.      Okay.  And fair to say that the picture depicts

10 a rack of clothing with plastic bags and the like?

11 A.      They're hanging clothes, yes.

12 Q.      That would be consistent with the way -- loosely

13 consistent with the way the clothing is displayed in a

14 store?  Would that be consistent with?

15 A.      I don't know.  I don't know if that's her

16 clothes or but it is clothes.

17 Q.      Okay.  Now, on the bottom of the picture, you

18 note -- I'm going to move it up a little bit here.  You

19 note that there's a number of shoes displayed; is that

20 right?

21 A.      Yes.

22 Q.      That would be consistent with the way shoes

23 might be displayed in a shoe store?

24 A.      I would not say that.

25 Q.      Well, if you look closely, would you agree with

1  me that there's one shoe of each kind being displayed

2  there?

3  A.    I don't know that I can say that.  It's

4  possible.

5  Q.    Well, let me ask you this:  During the course of

6  your investigation, you didn't uncover the fact that a

7  number of one-legged people lived at Hayward Lane; is

8  that fair?

9  A.    I think both the people -- all three people at

10  Hayward Lane had two legs.

11  Q.    Two legs.  Okay.  And you're also aware that --

12  clearly that Ms. Martin was, and Mr. Bynum I think for

13  that matter, were promoting concerts; is that right?

14  A.    No, that's not correct.  They had invested money

15  in a concert.  They were not promoting it.

16  Q.    All right.  Well, I don't want to parse words

17  with you.  They were trying to get concerts off the

18  ground.  Would that be accurate?

19  A.    They had invested in what they believed was a

20  concert, yes.

21  Q.    In fact, when looking at some of the documents

22  you seized, you saw listings -- there were listings for

23  theatrical agents; right?

24  A.    I do not recall that, no.

25  Q.    Do you recall names, kind of in phone books,

1  like  Luther  Vandross?

2  A.       No.

3  Q.       You don't recall that?

4  A.       I do not.

5  Q.       These are names that would have struck you in

6  terms of your investigation; is that right?

7  A.       Luther  Vandross?

8  Q.       Yes.

9  A.       I don't know  that that would have had any

10  particular  importance.

11  Q.       If you saw that in a log that you took in a drug

12  raid, a ledger or phone book that might have -- as an

13  experienced drug investigator, that might have piqued

14  your attention; would that be fair?

15  A.       I don't know  that I would, no.

16  Q.       Do you recall seeing the name Lou Rawls?

17  A.       No, I do not.

18  Q.       These were names that would have had no

19  significance to you in the course of your

20  investigation?

21  A.       If Mr. Rawls was purchasing cocaine from Ms.

22  Martin, it might; but otherwise, no.

23  Q.       Otherwise, it's just a name?

24  A.       That's correct.

25  Q.       Like, Boo, or what have you?

1  A.        Correct.

2  Q.        Okay.  Now, Ms. Martin, in her conversations

3  with some of the people on the wiretap, had no --

4  wasn't bashful about talking about these concerts; is

5  that right?

6  A.        She was not.

7  Q.        Okay.  In fact, in terms of a call, and I

8  reference you to a call between Ms. Martin and Ms.

9  Harden that occurred on April 19, that's Book 2, Page

10 335.

11 A.        I'm sorry, the page again?

12 Q.        335, I think.

13 A.        335?

14 Q.        I'm sorry, I'm wrong about that page.  Well, let

15 me ask it like this:  You recall a call on April 19 --

16 I know this is difficult, but where -- that was played

17 where you eliminated a substantial part of that call,

18 there were about eight or nine minutes redacted from

19 that call, a call on April 19th, and if you want to use

20 your book to refresh your recollection.

21 A.        April 19?

22 Q.        April 19, yes.

23           MS. GREENBERG:    345.

24           MR. SUSSMAN:    That's it.  Everybody's helping

25 me.

1          BY MR. SUSSMAN:

2 Q.      Did I at least have the right book?  Book 2,

3 345.

4 A.      Yes, I have it here.

5 Q.      My point is there was a substantial redaction in

6 that -- in the playing of that call, some seven, eight

7 minutes?

8 A.      Yeah.  It's a ten-minute call and there's

9 probably --

10 Q.      Just ballpark?

11 A.      Yeah.  About -- maybe two minutes here, maybe

12 three.

13 Q.      That were played?

14 A.      Correct.

15 Q.      Right.  So there's a portion that wasn't played.

16 And you recall that that portion featured significant

17 conversation about Aretha Franklin and a summer concert

18 tour?

19 A.      I do not recall.

20 Q.      You have no recollection of that?

21 A.      No.

22 Q.      And there's nothing that would refresh your

23 recollection concerning that?

24 A.      If I heard the call.

25 Q.      Now, but it's your recollection that in these

1 calls, Ms. Martin wasn't frequently spoke about the

2 concert?

3 A.      Yes, I would agree with that.

4 Q.      She spoke about the concert to some people more

5 than others; would that be accurate?

6 A.      That's probably true.  I would say she talked a

7 lot to a lot of people, but I'm sure there's somebody

8 she didn't talk to about it.

9 Q.      In point of fact, she talked differently to

10 different people.  You must have noticed that during

11 the course?

12 A.      Yes, I did.

13 Q.      There was some people she was shorter and curter

14 with?

15 A.      Yes.

16 Q.      And some people she was more chatty with?

17 A.      Yes.

18 Q.      And the latter group are the people she was more

19 prone to talk about Aretha Franklin and the concert

20 tour and entertainment classes and things of that

21 nature; is that fair?

22 A.      I'm sorry, could you repeat that?

23 Q.      Probably not.  Let me try to do it this way:  In

24 terms of the longer conversation, she was more likely

25 to be talking about business and the business of

1  entertain ment  and  the  problem s  with  entertain ment
2  lawyer s  and  agent s  and  thing s  of  that  nature ?
3  A.       Some  of  those  call s  were  very  long , yes .
4  Q.       And  you  recall  call s  about  problem s  about  Aretha
5  Franklin  being  too  big  to  get  on  stage  or  too  big  to
6  fit  into  dress es  or  thing s  of  that  nature ?
7  A.       Yes , there  could  have  been  call s  like  that .
8  Q.       And  talk  about  concert  tour s  in  Kansas  City  and
9  Atlanta .   You  recall  those  conversation s?
10  A.      I  recall  Kansas  City ; I  do  not  recall  Atlanta .
11  Q.      Point  of  fact , there  was  a  listing  in  one  of  the
12  journal s  you  took  from  Mr.  Goodwin 's  home  or  office
13  that  had  the  listing  of  a  theater  in  Kansas  City .   Do
14  you  remember  that ?
15  A.      I  think  it's  the  Midland  Theater  in  Kansas  City .
16  Q.      Then  it  was  the  Midland  Theater ?
17  A.      I  don't  know  if  it's  listed , but  that  was  the
18  theater  that  they  discuss ed .
19  Q.      You  recall  a  listing  for  a  phone  listing  for  a
20  theater  in  Kansas  City ?
21  A.      No , I  do  not .   I  recall  they  talk ed  about  a
22  theater  in  Kansas  City .
23  Q.      Ms.  Martin  was  also  involve d  with  pro motion  of
24  -- well , strike  that  -- in  term s  of  some  involve ment
25  with  fashion  show s  that  were  being  put  on ; is  that

1 correct ?

2 A.      That is not correct .

3 Q.      Well , during the course of your investigation ,

4 you came across a guy named Harvey Star Washington ;

5 isn't that right ?

6 A.      Yes .

7 Q.      He was named as a potential witness or a name

8 that was read off to the jury earlier when this trial

9 started .

10 A.      Yes .

11 Q.      He is a guy who promotes fashion shows in D.C.

12 and around the country ; isn't that right ?

13 A.      I don't know about around the country.   I do

14 know he has done at least one in the Washington area .

15 Q.      And the one he did in Washington that you're

16 referring to was done in November of 2003 ; isn't that

17 right ?

18 A.      It was sometime before we went up .  I don't know

19 the exact time.

20 Q.      When you "went up", that means before the

21 wiretap started?

22 A.      That's correct .

23 Q.      The investigation was proceeding before the

24 wiretap started?

25 A.      That's correct .

1  Q.      So that would be during the period of the active

2  investigation in this case,    November, 2003?

3  A.      Yes.

4  Q.      You were aware of it, and you were aware it was

5  held tat Convention Center; is that right?

6  A.      No, I do not know where it was held.

7  Q.      Never saw a brochure?  Never found a brochure?

8  A.      I have seen a brochure,   I just don't recall.

9  Q.      You recall Ms. Martin was featured in that show

10  as an honoree?

11  A.      I'm aware that's what the flier said, yes.

12  Q.      No police officers   attended that show?

13  A.      I have no idea.

14  Q.      Certainly not on official business?

15  A.      I have no idea.

16  Q.      You have no idea.  There was frequent talk on

17  the wiretaps about clothing and tickets and shows;

18  correct?

19  A.      Yes.

20  Q.      And considering  the fact that there was

21  legitimate business concerning shows and clothing,

22  which you've conceded; correct?

23  A.      No, I'm sorry, I have not conceded there was

24  legitimate business concerning clothes and shows.

25  There was business concerning clothing and shows.  I

1   have not offered my opinion. I don't think you asked

2   about the legitimacy of it.

3   Q.      Whatever you might think about clothing and

4   shows, that was clearly not the focus of this trial; is

5   that correct?

6   A.      That's correct.

7   Q.      So there was -- there were discussions about

8   buying clothing and show promotion and shows and that

9   like on the wiretap; isn't that right?

10  A.      That is correct.

11  Q.      You've conceded earlier, I believe, that some of

12  that conversation on the wiretaps was legitimate

13  conversation; isn't that right?

14  A.      I didn't use the word legitimate, no, I did not.

15  Q.      Well, I'll use the word.   Would you concede some

16  of that conversation -- at least some of it was

17  legitimate conversation?

18  A.      I would agree that it's about investing money,

19  which may or may not be legitimate, into concerts and

20  clothing, which may or may not have come from a

21  legitimate source, that meaning not stolen, was

22  discussed on the wire.

23  Q.      But in terms of this narcotics investigation,

24  you had to sort out what was narcotics-related and what

25  wasn't from those conversations; is that right?   A.

1 That's correct.

2 Q.     That made your job a little bit more difficult;

3 is that correct?

4 A.     I don't know if it made it more difficult.   It

5 was pretty obvious when she was talking about the

6 shows.   Like you said, she was very open about it.

7 Q.     But there were some calls where you didn't know

8 whether they were really referring to clothing or

9 drugs; isn't that right?

10 A.     I don't think we really ever had that

11 difficulty, no.

12 Q.     Okay.   But weren't there calls that you didn't

13 use because you weren't clear as to what was being

14 discussed?

15 A.     No.

16 Q.     I thought -- hadn't you mentioned one back --

17 well, the calls you eliminated were calls you were

18 certain were legitimate discussions; correct?

19 A.     I did not say that either, no.

20 Q.     When you use the word "legitimate", you're

21 talking about breaking some law somewhere; isn't that

22 right?

23 A.     That's correct.

24 Q.     Things that aren't the focus of this case or

25 this trial at least; is that correct?

1  A.       That's correct.

2  Q.       And if someone was buying clothing -- whatever

3  you might think about the source of that clothing, the

4  conversation, at least, was not drug-related; is that

5  fair to say?

6  A.       I would agree with that, not drug-related in

7  that the source of the conversation with clothes was

8  buying clothes and not selling drugs.

9  Q.       Now, and a suit meant a suit?

10  A.       In most circumstances, yes.

11  Q.       Now, I remember at the beginning of your

12  testimony, you said that deciphering the code wasn't

13  rocket science; correct?

14  A.       That's correct.

15  Q.       In fact, the opinions you give aren't science at

16  all, are they?

17  A.       I would agree with that, yes.

18  Q.       Okay. You can't -- you're not certain that you

19  have all of the information out there; is that right?

20  A.       I am certain I probably do not have every bit of

21  information out there.

22  Q.       In numerous instances, you have to rely on

23  others to provide you the information; isn't that

24  right?

25  A.       I'm not sure. In reference to what?

1 Q.      Well , when you talk  to an officer  who did  a

2 search , he may be rely ing  on information  that was  given

3 to him by another  officer ; is  that  right ?

4 A.      I do not believe  that's accurate .  I would  be

5 rely ing  on the person  who did  the search  to accurate ly

6 report  and bring  back  what he's search ed  on the

7 residence .

8 Q.      When a search  is under taken , there  are  nine , ten

9 officer s do ing  that  search  at least ; isn't  that  right ?

10 A.      There  is  one officer  who is  responsible  for

11 collect ing  all  the evidence  from  the house .   The nine

12 or ten officer s are  not  responsible  for  that .

13 Q.      That 's just  part  of the search .   There  are  other

14 thing s that  happened  in the course  of the search  as

15 well ?

16 A.      Other  thing s that  happened  be sides  the search ?

17 Q.      During  the course  of the  search  other  than  just

18 the recovery  of evidence .   There  are people  there ,

19 there  are event s occurring ; isn't  that  true ?

20 A.      One officer  is  responsible  for identifying  the

21 people  who are there .   There 's one officer  who is

22 responsible  for collect ing  evidence .   That 's the

23 officer  you would  talk  to .

24 Q.      You consider  that officer  to be an  infallible

25 observer  and source  of information ; isn't  that  right ?

1  A.        I can't say that, no.

2  Q.        So if that officer is wrong, the information

3  you've gotten is incorrect; is that right?

4  A.        If the officer was wrong and he relayed that

5  wrong information to me, and I used that wrong

6  information, then it's possible, yes.

7  Q.        There's also the possibility that you can

8  misunderstand the information as it's related to you;

9  isn't that true?

10 A.        That, I do not believe is true.  I would make

11 sure I understood.

12 Q.        No problems in communication ever?

13 A.        I didn't say that.

14 Q.        Okay.  And in terms of the hundreds of opinions

15 you gave, there's no mathematical way to assess a

16 batting --

17 A.        I'm sorry?

18 Q.        You can't compute a batting average for how

19 often you're right and how often you're wrong; isn't

20 that correct?

21 A.        If you're asking would I give a percentage to

22 how often I'm right or how often I'm wrong?

23 Q.        I know the percentage you would give, but nobody

24 else can objectively make a percentage estimate      as to

25 -- it's never been done before in your case; has it?

1  A.      I'm not sure what you're referring to or what

2  you're asking.

3  Q.      Okay.  I'll move along then.

4          Your opinions about Ms. Harden and her -- what

5  she was doing were based on the totality of the

6  investigation; correct?

7  A.      They were taking a lot of things into

8  consideration, yes.

9  Q.      During the investigation, there was no evidence

10 that Ruby Harden even met with any alleged

11 co-conspirator other than Paulette Martin; is that your

12 understanding?

13 A.      Of the known conspirators, I would agree with

14 that.

15 Q.      And that didn't effect your ultimate opinion; is

16 that correct?

17 A.      Did it effect my opinion?  No.

18 Q.      I asked you, that had no effect on your ultimate

19 opinion?

20 A.      Probably not, no.

21 Q.      During the course of your investigation, your

22 information was that Ms. Harden never had any telephone

23 contact with any of the 40 or so people that were

24 potentially co-conspirators in this case other than

25 Paulette Martin; is that right?

1  A.      I am not aware of any telephone contact that she

2  had.  She may have; I am not aware of any.

3  Q.      As you sit here, you can't direct me to any

4  phone log or any surveillance or phone bill that points

5  out that Ms. Harden had a phone conversation with

6  anyone else; is that right?

7  A.      That is correct.

8  Q.      Okay.  And that doesn't effect your opinion; is

9  that correct?

10  A.      That is correct.

11  Q.      How many -- numerous searches were conducted

12  during the course of this case; is that right?

13  A.      Yes.

14  Q.      Can you tell me how many?

15  A.      I can give you an approximate number.

16  Q.      Yeah, that's good enough.

17  A.      Probably 40 or 50.

18  Q.      Forty or 50.  And in the course of those 40 or

19  50 searches, is it fair to say that the police failed

20  to turn up an address book or diary that had Ms.

21  Harden's current phone number or address?

22  A.      I do not know if that's accurate or not.

23  Q.      Well, if you can you point me to a ledger, phone

24  book, or other paper that was recovered in any of those

25  searches that has Ms. Harden's phone number and

1 address ?

2 A.      I cannot  as I sit here , no.

3 Q.      That fact doesn't effect your opinion either ?

4 A.      No.  Obvious ly they had each other 's phone

5 number .

6 Q.      Okay .  During the course of the investigation ,

7 you didn't locate any drug ledger s that had Ms.

8 Harden's name ; is that correct ?

9 A.      That is accurate , yes.

10 Q.      And that doesn't effect your opinion either ?

11 A.      No.

12 Q.      And you're aware that during the course of the

13 investigation , her home was searched ; is that correct ?

14 A.      That is correct .

15 Q.      It's fair to say that that search revealed no

16 drug , drug paraphernalia,  drug ledger s of any kind ; is

17 that right ?

18 A.      That is accurate , yes.

19 Q.      That doesn't e ffect your opinion either ?

20 A.      It does not .

21 Q.      Now , how long did you have surveillance  on 810

22 Hayward ?

23 A.      It would depend on the day .

24 Q.      I mean over what period of time .

25 A.      Probably at some point during the investigation ,

1  it was probably over one and half years.  I don't know .
2  Whenever she moved in there -- I think she was in there
3  when we started, so I'm sure surveillances started
4  around that time on occasions, and then counted all the
5  way through to the end.
6  Q.     Is it fair to say that none of the surveillance
7  reports indicate Ms. Harden's presence at 810 Hayward
8  Lane?
9  A.     Her presence at the house?
10 Q.     That's correct.
11 A.     I think that's accurate.
12 Q.     That doesn't effect your conclusions either; is
13 that right?
14 A.     That's correct.
15 Q.     Would the same thing be true about the dance
16 studio on South Dakota Avenue?
17 A.     I believe there was no surveillance with her at
18 that location.
19 Q.     Can you point to -- you believe that she was
20 seen that the location?
21 A.     No, I said I believed there was no surveillance
22 --
23 Q.     So at the same -- I'm sorry.
24 A.     -- that would put her at that location, that's
25 correct.

1 Q.      In the course of the 10,000 or so wiretaps, were
2 there any calls between Paulette Martin or any the
3 intercepted lines, five of them, in which Ms. Harden
4 did not -- well, strike that.  Let me say that in
5 English.
6        Any of those calls in which Ms. Harden did not
7 participate in which her name was mentioned by other
8 people on the phone?
9 A.      Yes, I'm sure there are.
10 Q.      Well, you're sure there are.  Can you point us
11 to any?
12 A.      Not as I sit here.  I'd have to go through the
13 logs, but I'm sure Ms. Martin talked about Ruby to
14 other people, mentioned her name.
15 Q.      You should have time to locate those
16 conversations.
17 A.      You have the copies of the logs.
18 Q.      I'm asking -- I'm asking the question.  I'm
19 asking if you can point to one.
20 A.      As I sit here?  No.  Not without going through
21 the logs.
22 Q.      Now, there were certain -- during the course of
23 the wiretap, there were certain events that you would
24 consider significant events in the life of the
25 conspiracy; would that be accurate?

1 A.      Sure.

2 Q.      The Digger's Lane search, would that be a big

3 event?

4 A.      It was an event, yes.

5 Q.      The arrest of Gwen Levi with 2.2 kilograms of

6 heroin, that's a pretty big event  ; is that right?

7 A.      It is an event, yes.

8 Q.      And that guy, Pernell Philpot was going 73 in a

9 70 zone or whatever it was, and he got stopped and

10 arrested in Wyoming with a substantial  amount of

11 cocaine; is that right?

12 A.      Yes.

13 Q.      And things like that are the news of the

14 conspiracy; is that fair to say?

15 A.      Is what?

16 Q.      It's front-page news in a drug conspiracy, who

17 got arrested and where and what; is that right?

18 A.       I don't know  what you mean by "front-page

19 news," but I would not agree with that, no.

20 Q.      On the wiretaps, there was not a lot of

21 discussion about whether the republicans would lose the

22 White House or the Congress or whether the war in Iraq

23 was going badly.  The news -- the front-page news among

24 the people talking is what happens in the course of the

25 conspiracy.

1 A.      Okay.  Now, I think I understand  what you're

2 saying as front-page news.  What people  are talking

3 about?

4 Q.      Yes.

5 A.      Yes, people talked about those things.

6 Q.      Is it fair to say in the conversations between

7 Ms. Harden and Ms. Martin, there was no conversation

8 whatsoever  about any of these events occurring?

9 A.      I believe that's accurate.

10 Q.      That doesn't have any effect on your opinion

11 either, does it?

12 A.      No, it does not.

13 Q.      During the surveillance  of Hayward Lane, it's

14 accurate to say no police officer  that you're aware of

15 ever saw drugs actually changing hands outside Hayward

16 Lane; is that right?

17 A.      I believe that's accurate, yes.

18 Q.      Whatever was happening was happening behind

19 closed doors, right?

20 A.      We never observed it.

21 Q.      Okay.  Never saw any drugs being left off in the

22 garbage cans or the trash bags; right?

23 A.      I believe that's accurate,    yes.

24 Q.      Never saw drugs being left in the flower pot or

25 anything like that?

1  A.      Yeah, I don't think  we ever  saw  any  actual  drug

2  transactions.

3  Q.      Okay.  And in terms of a discussion  that was had

4  between  Ms. Harden  and Ms. Martin that occurred  on

5  March 11, 2004, and I will  direct  you, hopefully

6  correctly this time, to Book 1, Page 35.

7          Could  you take  a look  at that, please?   When

8  you've  got it just --

9  A.      I have it.

10 Q.      In the middle  of the page,  your  testimony  has

11 been  that that  was a drug-related   conversation; is that

12 right?

13 A.      Yes.

14 Q.      Okay.  In the middle  of the page,  there's a

15 discussion  about  leaving something  out on the  mat  under

16 the  front  door  mat; is that  correct?

17 A.      I'm sorry, what  page?

18 Q.      Thirty-five.  Middle  of the page.

19 A.      Ms. Harden  says, it's that  way with  me, too.

20 You  don't  have  a mat  in front  of the  door, do you?

21 Q.      The clear  implication  of that  is that  Ms. Harden

22 is asking  Ms. Martin  if she would  leave  something  under

23 the mat; is that  right?

24 A.      Yes.

25 Q.      And it's your  conclusion  that despite  all the

1  observation s that have been made , that they were

2  talk ing about leavi ng drug s under the front door mat ;

3  right ?

4  A.     Yes.

5  Q.     That would have been pretty unusual about the

6  observations  about and the observation s of other police

7  officers about what was transpiri ng at Hayward Lane; is

8  that right ?

9  A.     No , I did not testify to that .

10  Q.     So a lot of drug s being left in flower pot s and

11  under mat s and thing s of that nature ?

12  A.     No.  I said we did not see it , but I can not say

13  we didn't see , so I don't know  if it's unusual or not .

14  Q.     You would have note d if someone was pick ing up

15  something  from under a mat or hidden location .  That

16  would have been a surveillance  worthy of a note during

17  the surveillance ?

18  A.     I do not know that that would be note d.  I don't

19  know if you can see the mat , which would be by the side

20  door .  I don't know  if that 's visible from the street .

21  Q.     In term s of the general way that the drug s are

22  sold , you'd agree with me that drug deal ers maximize

23  their profit s when they sell small er amount s; is that

24  right ?

25  A.     Yes.

1  Q.      And but it's a cost benefit analysis because

2  when you sell smaller amounts, you face more risk;

3  isn't that right?

4  A.      I would agree with that, yes.

5  Q.      And smaller amounts are associated with drug

6  users; isn't that right?

7  A.      Very small amounts, yes.

8  Q.      Well, it would be -- in your experience, there

9  was some discussion on the wiretaps about welfare

10 checks being cashed; isn't that right?

11 A.      Yes.  Well, they referred to the first of the

12 month, and my interpretation was that was dealing with

13 welfare checks.

14 Q.      Consistent with your experience that the cashing

15 of -- that welfare recipients don't usually pool their

16 money and go out and buy keys of cocaine or heroin or

17 whatever; is that right?

18 A.      That's correct.

19 Q.      Generally, people are going to buy small amounts

20 for use; isn't that right?

21 A.      People who are going to take their money from

22 welfare checks and buy drugs with them.  It could be a

23 large amount or small amount.

24 Q.      Consistent with that kind of retail business,

25 would it be consistent with a lot of people coming to

1 and from your -- the location where you're dealing; is
2 that right?
3 A.       If you're dealing in very small amounts, yes,
4 it would increase your traffic.
5 Q.       That's exactly one of the problems that the
6 community noted in connection with Ms. Martin's
7 residence; isn't that right?
8 A.       Yes.
9 Q.       Earlier in testimony, you said that $100, $125
10 amount was consistent, in your opinion, with
11 distribution; is that right?
12 A.       Yes.
13 Q.       But to really make an opinion and form the
14 opinion about that, you have to know something about
15 the drug habits of persons who receive that quantity of
16 drug; is that right?
17 A.       I think you have to know something about the
18 drug trade, not about the person receiving them.
19 Q.       For example, there are a lot of people in this
20 society who are drug users who are accountants.  I'm
21 trying to avoid saying lawyers.  I don't want to say
22 doctors, but people -- professional people; isn't that
23 right?
24 A.       Yes.
25 Q.       And they're generally not out on the street

1 buying dimes and 20s when they're buying drugs; is that
2 right?
3 A.      That's not true.
4 Q.      I said generally.
5 A.      I would say that's not true.
6 Q.      You don't think they could acquire their drugs
7 -- it's not your experience they can acquire their
8 drugs at an office, at a setting at a club, where
9 someone will tell sell them 100 bucks a weekend or
10 whatever?
11 A.      I'm sure they could, but your question dealt
12 with who buys on the street corner, and I know from
13 experience that professional people will often buy
14 drugs on a street corner.
15 Q.      You think it's more common than not that they're
16 --
17 A.      It's more common than you're alleging it to be.
18 It's very common.
19 Q.      I didn't allege that it was unknown, but I'm
20 saying people with 100 or $150 can gain access to drugs
21 in different ways; isn't that right?
22 A.      I would say it's almost the exact opposite.  A
23 well-known person probably doesn't have a lot of drug
24 dealers they can go to, and it's very easy to drive up
25 to the anonymous dealer on the street, whereas if

1  you're in the drug trade, you could probably go to any
2  of your friends or other dealers and pick up, so I
3  would say your analogy is probably the exact opposite
4  of what it should be.
5  Q.     If somebody who -- a professional person who has
6  a drug habit or is what they call a recreational user
7  wanted drugs for a weekend, that person would likely go
8  right out in the street and be buying from the first
9  guy out on wherever the drug strip is locally; correct?
10 A.     Yes, that's very, very common.
11 Q.     They don't have a connect or hookup or find a
12 way to get drugs other than through the street?
13 A.     I won't say that they don't, but it's very, very
14 common, they would just go to an area of town whether
15 it's in Baltimore, Washington, Montgomery County,
16 Prince George's County where they know drugs are sold.
17 They can drive up to someone, make the purchase, and be
18 on their way.
19 Q.     Let me turn your attention, if I can, to March
20 29.  Do you recall that particular day?
21 A.     Yes.
22 Q.     Now, there was a series of phone conversations
23 between Ms. Martin and Ms. Harden; correct?
24 A.     That's correct.
25 Q.     And those calls culminated in a meeting; is that

1 right?

2 A.      Yes.

3 Q.      Now -- and it's fair to say that in terms of

4 your surveillance, that's the only time during the

5 course of this investigation that you can point to in a

6 situation where the police actually saw them meeting;

7 is that right?

8 A.      I believe that's true, yes.  When you say

9 "them," you mean Ruby Harden and Ms. Martin?

10 Q.      One of the good things about the wiretap is not

11 only can you listen in, but you can -- well, let me

12 find the word.  You can actually know certain events

13 that are going to occur before they occur; isn't that

14 right?

15 A.       You know where certain things are going to take

16 place, yes.

17 Q.      And get the police there to watch it or to do

18 whatever the police think the appropriate thing to do

19 is; right?

20 A.      Quite often, that is the case, yes.

21 Q.      That was the case in connection with this event;

22 isn't that right?

23 A.      Yes.

24 Q.      And it was my understanding, and hopefully yours

25 as well, that Officer Musselman was dispatched to the

1  parking lot on New Hampshire -- correct that, a

2  shopping center on New Hampshire Avenue; is that

3  correct?

4  A.      Yes.

5  Q.      And you weren't there?

6  A.      No, I was not.

7  Q.      But Officer Musselman is an experienced

8  narcotics officer; is that right?

9  A.      I believe that's true, yes.

10 Q.      Were you here for his testimony?

11 A.      Yes.

12 Q.      Perhaps 15, 16 years of narcotics experience?

13 Would that be consistent with your recollection?

14 A.      I don't know.  I don't remember the number of

15 years, but quite a few.

16 Q.      Quite a few.  And he was able to position

17 himself 15 to 20 feet from Ms. Martin's Mercedes Benz;

18 is that right?

19 A.      Again, I think I testified I don't remember the

20 exact amount, but I do remember he was in close

21 proximity.

22 Q.      In terms of a surveillance, that's about as

23 close as you can get; right?

24 A.      It's pretty close, yes.

25 Q.      And most people who are doing dirty business are

1  careful they're not doing it around somebody who could

2  be watching; is that right?

3  A.      I would say that's a general rule, yes.

4  Q.      Okay.  And it was his testimony, which you heard

5  here, that he saw Ms. Martin pass a piece of paper to

6  Ms. Harden; is that correct?

7  A.      That is correct.

8  Q.      And his testimony didn't effect your opinion

9  either?

10 A.      No, it did not.

11 Q.      Okay.  In fact, it didn't have much effect on

12 your sworn testimony either, because in terms of your

13 participation  in this case, you recall testifying

14 before the grand jury on October 27 of 2004?

15 A.      It sounds like one of the dates, yes.

16 Q.      And do you recall testifying about this event?

17 A.      I'd have to look at the transcript whether this

18 event was on that day or one of the other days.

19 Q.      Okay.  And Page 52.  October 27.  And at the

20 time that you were testifying about the events of March

21 29 -- just indulge me one moment to get an extra copy,

22 sir.  We'll do it the easy way.

23      MR. SUSSMAN:  If I might approach.

24      THE COURT:  You may.

25      THE WITNESS:  Yes.

1           BY MR. SUSSMAN:

2  Q.      Okay.  You recall testifying in front of the

3  grand jury on October 27, 2004?

4  A.      Yes.

5  Q.      Under oath, just kind of a court proceeding;

6  right?

7  A.      I'm sorry?

8  Q.      You were under oath just as you are today?

9  A.      That is correct.

10 Q.      And since you hadn't actually seen the events of

11 March 29, necessarily, you had to rely on something

12 other than your own observations; is that right?

13 A.      That's correct.

14 Q.      Did you have the report of investigation of --

15 that was made in connection with the case?

16 A.      There are a lot of reports made.  Which one are

17 you referring to?

18 Q.      Well, I'm referring to the ROI for that date,

19 but did you -- had you discussed the matter with

20 Officer Musselman before you testified?

21 A.      No, I had not.

22 Q.      Had you read reports before you testified?

23 A.      Regarding this incident?

24 Q.      Regarding this incident.

25 A.      I don't recall if I had or not.  I could have,

1  but I don't recall .

2  Q.      Well , it's a pretty serious matter going in

3  front of the grand jury and testify ing; don't you

4  think ?

5  A.      Do I consider it a serious matter ?

6  Q.      That was my question , yes, sir .

7  A.      I've done it quite a few time s.  I don't know

8  that I consider it a serious matter .  It is certain ly

9  --

10  Q.      Put your hand up, take an oath and tell the

11  truth ?

12  A.      I certain ly consider it an important court

13  proceed ing, but serious implies something ominous , and

14  I don't know that I would classify it that way .

15  Q.      Serious when people 's live s are at stake , don't

16  you consider it that way?

17  A.      Yes .

18  Q.      Can we agree that when you put your hand up to

19  take an oath , that it's serious ?

20  A.      Okay .  I will go with your definition .  Again , I

21  guess I don't consider it as serious as you're

22  imply ing.  The grand jury appearances , I've been before

23  them quite a few time s, so it's -- I don't want to say

24  routine , but I just don't consider it as serious , but

25  certain ly taking an oath to tell the truth , I would say

1  is serious.

2  Q.      Okay.  And during the course of your testimony,

3  you testified about the event that we just discussed;

4  is that correct?

5  A.      In front of the grand jury?  Yes.

6  Q.      That was the single, as we said, the single

7  surveillance of Ms. Harden by the authorities; is that

8  right?

9  A.      Yes.

10  Q.      And during the course of your testimony, you got

11  the date wrong.  You said March 21; is that right?

12  A.      I either got the date wrong or the court

13  reporter heard me wrong; one or the other, yes.

14  Q.      But we get dates wrong.

15  A.      Yes.

16  Q.      But specifically, despite Officer Musselman's

17  specific observation, you told the grand jury that Ms.

18  Martin passed a package to Ms. Harden; isn't that what

19  you said?

20  A.      Yes, I did say that.

21  Q.      And that was wrong?

22  A.      I don't think it's wrong, no.

23  Q.      That wasn't a mistake on your part?

24  A.      It was not a mistake.  She passed a package

25  containing cocaine to Ms. Harden.

1 Q.      And you're as certain of that as you are of

2 everything else you've testified in this case?

3 A.      I'm very certain of it, yes.

4 Q.      Thank you.   I have nothing further.

5       THE COURT:   Okay.   Mr. McKnett.

6       MR. MCKNETT:   Your Honor, for scheduling, may I

7 approach for a moment?

8       THE COURT:   Yes, you may.

9             (At the bar of the Court.)

10       MR. MCKNETT:   Your Honor, my understanding is

11 the Court wants to end this about 2 o'clock.

12       THE COURT:   Correct.

13       MR. MCKNETT:   We've got about 18 minutes on the

14 clock, and my cross will take significantly longer than

15 that.   There are places where I can comfortably break.

16 When I get close to 2 o'clock and I'm at one of those

17 points, I can just break and we can continue on

18 Wednesday morning.

19       MS. JOHNSTON:   Your Honor, I would advise the

20 Court we are now a full day behind schedule based on

21 the length of cross-examination, so the Court knows

22 that.

23       THE COURT:   This is a major witness.

24       MS. JOHNSTON:   Right.   Well, in terms of if

25 counsel is asking to cut it off now --

1        THE  COURT:    I  certain ly  will  have  to  break

2  around   2  o'clock   and  I  appreciate .

3        MR.  MCKNETT :    It's  with  the  discretion   of  the

4  Court .   If  the  government   would  prefer   that  we  break

5  now .

6        MS.  JOHNSTON:    No , I  prefer   we  use  every

7  possible   minute  we  have .

8        THE  COURT:    We'll  go  until  five  of.

9        MR.  MCKNETT :    Five  of ?   A  comfortable   break

10  point , so  I  will  get  as  close  to  five  of.

11        MS.  JOHNSTON:    Just  as  we  do  at  4:30.

12        MR.  WARD:   Let  me  sway  respect  to  the  ruling  the

13  Court  made  earlier   on  my  cross-examination   of  Sakala .

14  I  will , over  the  weekend , prepare   a  written  proffer  of

15  what  I  proposed  and  I  think  that  --

16        THE  COURT:   Okay .

17                   (Back  in  open  court .)

18                   **CROSS-EXAMINATION**

19        BY  MR.  MCKNETT :

20  Q.      Good  afternoon , Sergeant .

21  A.      Good  afternoon .

22  Q.      Sergeant , I  want  to  follow  up, first  of  all ,

23  with  a  subject  that  Mr.  Ward  touch ed  on . It's  your

24  opinion   as  an  expert  that  an  eight  ball  is  not  a

25  personal   use  quantity   of  cocaine ?

1  A.        I didn't say it wasn't.  I said it is

2  indicative of possession with intent.  It is within the

3  realm of conceivability that it could be.

4  Q.      So a person who is buying an eight ball could be

5  either a user or someone who sells or both?

6  A.       I would say that it is possible that the person

7  is using.  In my experience, I have not seen that, but

8  it is in the realm of possibilities.

9  Q.       Were you here when Michael Thurman testified?

10  A.       I was not.

11  Q.       Well, if Michael Thurman had testified in this

12  courtroom that he had been a user and that he bought

13  eight balls for his personal use --

14          MS. JOHNSTON:   Objection, that misstates the

15  testimony of Mr. Thurman.

16          MR. MCKNETT:  It does not, Your Honor.

17          MR. MARTIN:  Objection.  Not to you.  Just

18  arguing in general in front of the jury.

19          THE COURT:  I don't know that that's consistent

20  with what he said.

21          MS. JOHNSTON:   Excuse me, Your Honor.

22          THE COURT:  Approach the bench

23                  (At the bar of the Court.)

24          THE COURT:  We've got an objection from Mr.

25  Martin.

1          MR.  MARTIN:   Sorry  about  that .

2          THE  COURT:   You  object ed .

3          MR.  MARTIN:   My  objection  was  that  we  sometimes

4  don't  play  well  in  the  sand box , and  it  does n't  look

5  good  in  front  of  the  jury , so  it  was n't  correct ed .

6          THE  COURT:   We're  all  up  here  out  of  the

7  sand box .

8          MR.  MCKNETT :   The  only  reason  I  said  it  does  not

9  in  response  to  Ms.  Johnston 's  inappropriate  comment

10  that  I  had  mis state d  the  testimony , which  I  had  not .

11          MS.  JOHNSTON:   I  belie ve  he  --

12          THE  COURT:   What  don't  you  believe  --

13          MS.  JOHNSTON:   Mr.  Thurman  very  specifically

14  testifi ed  that  people  buy  eight  ball s , they  keep  some

15  to  use  and  they  sell  the  rest  of  that , so  they  have

16  more  money t o  buy  drug s .   It  was  very  specific  in  his

17  testimony .   Counsel  has  a  transcript  that  the  Court

18  allow ed  them  to  get  over night  of  Mr.  Thurman 's

19  testimony , I  believe , so  they  could  be  prepare d  to

20  cross -examine  him .

21          It  is  my  recollection  that  that  is  very

22  specifically  what  he  said .   He  never  said  user s  buy  it

23  just  to  use .   They  buy  it , they  keep  some  to  use  and

24  they  keep  some  to  sell .

25          MS.  GREENBERG:   My  recollection  comport s  with

1  Ms.  Johnston 's.

2         MR.  MCKNETT :   My note s --

3         THE  COURT:   Why don't  we do this ?   My  memory  is

4  not  perfect .   If there 's a transcript  that's  prepared ,

5  why  don't  you locate  the  transcript  over the  weekend

6  and  resolve  the  question .

7         MR.  MCKNETT :   That 's fine .   Your  Honor ,  I would

8  ask  the Court  to instruct  the government  not to make

9  speak ing objections .

10         THE  COURT:   All right .   I will a sk both  sides

11  that .   Both  sides .   Let 's do that ,  but  I'll  defer

12  ruling  on the  objection  by the  government  over  the

13  weekend ,  and  you can  come  back  on Wednesday  and  you  can

14  take  it up.

15         MR.  MARTIN:   It's the  first  time  the Court

16  sustained  my  objection .

17              (Back  in open  court .)

18         BY MR.  MCKNETT :

19  Q.     Sergeant ,  we'll  come  back  to that .   Let  me  ask

20  you  some  specific  question s about  an eight  ball .

21         An eight  ball ,  if I understand  it ,  is about

22  three ,  three  and  a half ?

23  A.     It 's 3.5  grams .   It 's an eighth  of an  ounce .

24  Q.     Three  point  five  grams  scientifically ,  but

25  sometimes  drug  deal ers don't  always  sell  a full  3.5

1 gram eight ball?

2 A.      Sure.  And sometimes they might sell more.  It's

3 their scale, whatever their   scale is.

4 Q.      If they can stretch it by shorting somebody a

5 little bit, then they make more money, right?

6 A.      That's possible.  I don't know if you'd keep

7 your customers, though, if you did that.

8 Q.      Well, it's a risk of the business.

9 A.      Yes.

10 Q.      Now, we know how much an eight ball weighs.  How

11 big, physically, is an eight ball?

12 A.      Not as big as an eight ball.  Smaller than,

13 like, a ping-pong.  I'm trying to look around the

14 courtroom.  Some of the candy on the U. S. Attorney's

15 desk there might be representative  size.

16      MR. MCKNETT:  The government has proffered or

17 offered their candy dish.  Your Honor, may I approach?

18      THE COURT:  As long as you give it back.  We

19 don't want the prosecutor s to starve to death.

20      MR. MCKNETT:  I will give it back.  I don't know

21 what the witness will do with it.

22      BY MR. MCKNETT:

23 Q.      Could you please pick one out that you think is

24 an eight ball size?

25 A.      I don't know  the weights of these, so they might

1  be denser or something , but something around this size .

2  Q.     So they would weigh about three , three and a

3  half grams ?

4  A.     Correct .

5  Q.     And look something like this ?

6  A.     Yes , and the look could be different , depending

7  on whether it 's powder or crack .

8         MR. MCKNETT :  Your Honor , I guess for the

9  record , we are talking about a piece of Jolly Rancher ,

10 watermelon- flavored , hard candy . I don't know  if we

11 should submit this into the record or not , Your Honor .

12        THE COURT:   I think the jury can observe it.

13 They've seen it .

14        MR. MCKNETT :  Then I will return it , in tact , to

15 the government .  Ms. Johnston insists that I keep it ,

16 Your Honor .

17        THE COURT:   It's professional  courtesy .

18        MR. MCKNETT :  Thank you , Ms. Johnston .

19        THE COURT:   I notice you put it in your pocket

20 though .

21        MR. MCKNETT :  I did , Your Honor , for safekeeping

22 only .

23        BY MR. MCKNETT :

24 Q.    I keep wanting to call you detective , and I

25 apologize .  It's sergeant and -- detective -- sergeant

1  is correct ; right ?

2  A.      That is correct .

3  Q.      I've previously  known you as a detective  --

4  A.      That 's correct .

5  Q.      -- that 's the problem I'm having , and I

6  apologize .  It's not -- an eight ball is not wrapped up

7  in clear cellophane  like a --

8  A.      It can be , but usually  not .

9  Q.      It's usually a piece of plastic or paper fold ?

10  A.      Ziploc baggy nowadays.

11  Q.      Ziploc bags .  Okay .

12         Sergeant , let me just run quickly , and I

13  apologize for repeating , but I just want to get the

14  framework here .   There were more than 10,000

15  activation s; is that correct ?

16  A.      That 's correct .

17  Q.      And some of them didn't have any conversation  on

18  them ?

19  A.      That 's correct .

20  Q.      Some of them were just incomplete calls?

21  A.      Some were data stream s, some were busy signals ,

22  for whatever reason they did not contain  conversation .

23  Q.      Without asking you for an accurate  precise

24  account , it's fair say that there were thousands  of

25  actual  conversation s; correct ?

1   A.      I think that's probably true, yes.

2   Q.      And of the thousands of actual conversations,

3   there were approximately 480 that were transcribed for

4   review in this case; correct?

5   A.      No.  We transcribed a lot more.  I think we only

6   played about that number in court here.

7   Q.      Okay.  We played about 480?

8   A.      Yes.

9   Q.      And transcripts were prepared for use in this

10  court of those conversations; correct?

11  A.      Yes.

12  Q.      Of that 480 approximate number of calls, about

13  two dozen involved Ms. Ali or her husband; correct?

14  A.      Again, I haven't done a count, but that sounds

15  to be an accurate estimation.

16  Q.      It's going to be about five percent of the calls

17  that were played in this courtroom.

18  A.      I'll trust your math, okay?

19  Q.      Thank you.  And all of those calls were on the A

20  or B lines; correct?

21  A.      That's correct.

22  Q.      Those were the lines that Ms. Martin used her

23  cell phone and her home hard line phone?

24  A.      Yes.

25  Q.      None of the calls were on Mr. Luis Mangual's

1  line, phone line; were they?

2  A.      No, they were not.

3  Q.      On either of the lines that he used?

4  A.      No, they were not.

5  Q.      None of those calls were on the line used by

6  Gwen Levi?

7  A.      That is correct.

8  Q.      I just want the be real clear with regard to the

9  logs that have been talked about the -- Miscellaneous 8

10 and 9.

11       MS. JOHNSTON:   Miscellaneous 9 and 10.

12       MR. MCKNETT:   Miscellaneous 9 and 10.

13       BY MR. MCKNETT:

14 Q.      I believe you said you reviewed all the log

15 entries; correct?

16 A.      That was part of my daily duties was to review

17 the logs on previous days and listen to the logs, yes.

18 Q.      The logs were prepared by call people who were

19 actually listening to the conversation; correct?

20 A.      Yes.

21 Q.      And as they mentioned, they would take notes as

22 to what was going on in the conversations; correct?

23 A.      Yes.

24 Q.      At the end of the day or the next day, as you

25 said you would listen to the same calls; correct?

1  A.      Either that day or the next day, yes.

2  Q.      And then you would compare what you heard with

3  what the -- monitoring agent, is that what you call it?

4  A.      A monitor.

5  Q.      A monitor.  You would review what the monitor

6  wrote in summary fashion about the calls; correct?

7  A.      As I'm reviewing the call, I'm reading their

8  synopsis, yes.

9  Q.      Okay.  And as you reviewed their synopsis, if

10 you thought you heard something that differed from

11 their synopsis, you would make a notation; correct?

12 A.      If it was significant, yes.

13 Q.      The articles of speech, you wouldn't worry about

14 that?

15 A.      If it was a non-pertinent call that was related

16 to nothing, I might not do anything.

17 Q.      But if you heard a noun that was written one way

18 and you thought it was a different noun, you would make

19 a note that you thought it was a different noun.  If it

20 was pertinent?

21 A.      If it was pertinent and it changed, you know,

22 the meaning of the call.  Specifically, I think I used

23 that more to identify people, so when I would go back

24 and look at the logs, I wouldn't just see unknown

25 female.  I would know this call is with Becky Dobie or

1  whoever because you just go back and look at these

2  calls, one unknown female, the monitor may not know the

3  name.  It makes it difficult to keep the call straight.

4  Q.     In fact, there was, I think, one call when the

5  monitor said it was -- an   unidentified male was using

6  the phone at Ms. Martin's house and you noted it was

7  actually Ms. Ali's husband Ulysses; correct?

8  A.     Yes, that's true.

9  Q.     In preparing for this trial, with reference to

10 these 480-some calls, you participated in the process

11 of selecting them; correct?

12 A.     Yes.

13 Q.     And then after the transcripts of those calls

14 were prepared, you reviewed them for accuracy; correct?

15 A.     Yes.

16 Q.     I think you said you reviewed some of them for

17 as many as four or five times?

18 A.     Some of them more than that.  I've reviewed them

19 a lot.

20 Q.     Some of them, as you heard them today, well,

21 heard them at trial, not necessarily today, but

22 sometime during the course of this trial, as you heard

23 them, you would point out inaccuracies?

24 A.     That's correct.  And I hate to say it, if I

25 heard them again, I would probably make more

1 correction s, yes.

2 Q.     It's an ongoing process ; correct ?

3 A.     Yes.

4 Q.     If kept -- if you listened to them tonight , you

5 might hear something else ?

6 A.     I would agree with that , yes.

7 Q.     You've testifi ed before concern ing the

8 investigation;  haven't you ?

9 A.     Yes , I have .

10 Q.     You've testifi ed at the grand jury about eight

11 time s?

12 A.     I don't think  that many time s, but it could be.

13 I think the number is five in front of the grand jury ,

14 but it may be eight .

15 Q.     Okay .  And you've testifi ed in prior proceed ings

16 concern ing this case ; correct ?

17 A.     Testified  in one other trial , yes.

18 Q.     And your opinion s concern ing the inter action s

19 between  the defendant s in this case have remained

20 constant  and consistent  throughout  all your testimony ;

21 correct ?

22 A.     I don't know  that I've testifi ed to that , but I

23 believe  that 's probably accurate . I know some of the

24 earlier  grand jury proceed ings , there might be a

25 difference , but I'd have to look at the testimony .

1 Q.      Okay.   Now, with regard to your testimony,

2 you're testifying as both a fact witness and as an

3 expert witness with regard to this case; correct?

4 A.      Yes.

5 Q.      And when you testify as a fact witness, you're

6 testifying concerning what you know to be a fact

7 because you observed it; right?

8 A.       I believe that's a definition of a fact

9 witness, yes.

10 Q.      And when you testify as an expert, you're

11 testifying as to your opinions about what was going on

12 between the defendants in this case; correct?

13 A.      Yes.

14 Q.      Your opinions are based not only on what you

15 personally observed as a fact witness, but also upon

16 what you learned from other sources; correct?

17 A.      Correct.

18 Q.      And upon your training and your expertise;

19 correct?

20 A.      That's correct.

21 Q.      So for instance --

22          THE COURT:   Mr. McKnett, are you just about at a

23 --

24          MR. MCKNETT:   I'm just about, Your Honor.   If I

25 can finish this one little section.

1            THE COURT:    You may finish that one section.

2            BY MR. MCKNETT:

3    Q.      So when you testified, for instance, that on May

4    29, 2004, in Call No. B8110 on Page 612 -- if you want

5    to look it up, that's fine.

6    A.       Yes.

7    Q.       Do you have it there?

8    A.       Yes, I do.

9    Q.       It's fair to say you testified as a fact witness

10   that Ms. Ali told Ms. Martin that she needed another

11   dress; correct?   That's what she said?

12   A.       Yes.

13   Q.       But then you further testified as an expert that

14   that somehow meant that what Ms. Ali meant was that she

15   was telling Ms. Martin that she wanted a quantity of

16   drugs; correct?

17   A.       Correct.

18   Q.       And you are so sure of your expert opinions

19   that, as you said earlier, that in the overwhelming

20   majority of the conversations, you know exactly what

21   the people are talking about to a moral certainty;

22   correct?

23   A.       Yes.

24            MR. MCKNETT:   Your Honor, this would be a good

25   spot.

1          THE COURT:  All right.  Ladies and gentlemen ,

2 recess now until 10 o'clock on Wednesday .  I want to

3 thank you, as I said at the beginning of the trial and

4 I will tell you again now and at the end of the trial ,

5 for your service .  I know what a sacrifice this is.

6 I'm sure that July 4th this year will have a special

7 meaning for you in light of what I told you about the

8 declaration of independence , whose anniversary we

9 celebrate , about the right of trial by jury being taken

10 away by the King of England .  You now know one of the

11 basic princip les of the Declaration of Independence ,

12 and I thank you for your service .

13          Please remember , and this is a long weekend and

14 people may want to talk to you about what on earth

15 you've been doing, that you should n't discuss this case

16 with anyone else nor among yourselves  until you have

17 ass embled  together  as a deliberati ng jury at the end of

18 the case .  Thank you very much .  Have a nice 4th of

19 July weekend .

20          (Jury excused at 2:04 p.m.)

21

22

23

24

25

1                       **CERTIFICATE**

2

3       I, Tracy Rae Dunlap, RPR, CRR, an Official Court

4   Reporter for the United States District Court of

5   Maryland, do hereby certify that I reported, by machine

6   shorthand, in my official capacity, the proceedings had

7   and testimony adduced upon the Jury Trial Proceedings

8   in the case of UNITED STATES OF AMERICA versus PAULETTE

9   MARTIN, et al, Criminal Action Number    RWT-04-0235 on

10  June 30, 2006.

11

12      I further certify that the foregoing    179 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17      In witness whereof, I have hereto subscribed my

18  name, this 21st day of April 2008.

19

20

21                          _____

22                          TRACY RAE DUNLAP, RPR, CRR
                            OFFICIAL COURT REPORTER
23

24

25