```
 1              UNITED STATES DISTRICT COURT OF MARYLAND
                        SOUTHERN DIVISION
 2
    ------------------------x
 3  UNITED STATES OF AMERICA  :
             Plaintiff        :
 4                            :
                              :
 5  vs                        :Criminal Action:    RWT-04-0235
                              :
 6                            :
    PAULETTE MARTIN, et al    :
 7            Defendants.      :
    ------------------------x
 8

 9                         Wednes day, July  5, 2006
                           Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11  Proceeding before the HONORABLE ROGER W. TITUS, United
    States District Judge, in courtroom 4C, commencing at
12  10:03 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS THE PROCEEDINGS AS RECORDED AND
15      REQUESTED.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD  SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
    Tracy Rae Dunlap,   RPR , CRR              (301) 344-3912
25  Official Court Reporter
```

1                            I N D E X

2                         DIR   CROSS   REDIR    RECROSS
   Chris  Sakala                 8      100      164
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                              Page

23  Reporter's Certificate                      178

24  Concordance                                 179

25

1          THE  COURT:   We  have  a  preliminary  matter ?

2          MS.  JOHNSTON:   Only  this ,  Your  Honor .  We  have  a

3    witness  who  is  going  to  be  out  of  town  July  7th  through

4    14th .  We  hope  to  finish  our  case  next  week  --

5    hope fully ,  early  next  week ,  although  maybe  I'm

6    optimistic.  It  may   be  later  next  week .  He  is  a

7    witness  to  testify  about  the  1986  search  warrant s  that

8    were  executed   involving  Paulette  Martin ,  and  her

9    subsequent  conviction   in  relation  to  one  of  those  two

10   search  warrant s.  They  both  happened  in  June  of  '86.

11   At  some  point  today ,  we'd  ask  the  court  to  address  it.

12   Not  address  it  now ,  but  maybe  come  back  early  from  the

13   lunch  break  or  let  the  jury  have  a  long er  lunch  break ,

14   or  at  the  end  of  the  day.

15         THE  COURT:   What  am  I  suppose d  to  address ?

16         MS.  JOHNSTON:   The  admissibility   of  the  evidence

17   under  rule  404(b) .

18         THE  COURT:   Okay .

19         MS.  JOHNSTON:   Of  her  1986.

20         THE  COURT:   Okay .

21         MS.  GREENBERG:   Judge ,  the  remainder  of  the

22   404(b)  witness es  are  scheduled  for  next  week .  Some

23   have  to  be  flown  in.  So,  to  the  extent  that  we  can

24   address  all  of  them  at  one  time ,  that  would  be  help ful.

25         THE  COURT:   Okay .

1          MR. MONTEMARANO :   I would  just  note  for  the

2  court's edification  that  I was  informed of this  when  I

3  arrived here  today , and  I don't have  the  appropriate

4  paperwork  that  I would  probably  want  to  review  before

5  speaking  to  this .

6          THE  COURT:   Right .  Well , you  know  I'm going  to

7  want  to have  enough  time  to deal  with  it  in  a

8  meaningful  way , so  I'm not  going  to  be  able  to  do  it

9  today , I don't think .  Let  me  just  say  what  I'm

10  contemplating for  schedule  for  the  rest  of  this  week  is

11  concerned .   Today  I'll  be  going  until  right  before  1

12  o'clock , because  there 's a  judge 's meeting  at  1:00 , and

13  I will  go  to  4:30  or  so  because  I have  a  telephone

14  status  conference  at  5:00 .   Tomorrow  I have  a

15  sentencing at  9:00, so  we'll  start  at  10:00 , but  I

16  don't think  the  sentencing  is  going  to  take  a  long  time

17  so we  can  take  up  preliminary  matters  at  9:45  if you

18  want  to trail  this  sentencing.

19          I don't know  if that 's going  to  be  enough  time

20  to deal  with  the  404(b)  issue  or  not .

21          MS. JOHNSTON:   Your  Honor , there  are  pleadings

22  filed  in reference  to  the  404(b) .

23          THE  COURT:   Okay .  I'll  have  to  dig  them  out ,

24  then .

25          MS.  JOHNSTON:   We  do  have  the  one  witness  who

1  needs to get on tomorrow because of his vacation.

2       THE COURT:  Let's do this.  Counsel and the

3  parties should be here and ready to go at 9:30, and as

4  soon as my sentencing is over, I'll go off the bench,

5  you come up to the table, and I'll come back on the

6  bench and we will resume at 9:30 plus or minus when my

7  sentencing is over and we will address those issues at

8  that time.

9       Make sure that counsel for the defense knows

10 exactly who the witnesses are.

11      MS. JOHNSTON:  We will give them --

12      THE COURT:  Are the names of these witnesses

13 divulged in the existing papers?

14      MS. JOHNSTON:  Not necessarily in the pleadings

15 that were filed but certainly in the paperwork that

16 counsel's received concerning the 404(b).  They're also

17 on the witness list that was read at the beginning of

18 the trial.

19      THE COURT:  Okay.  It's all going to be 404(b)

20 issues On all of these witnesses?

21      MS. JOHNSTON:  On all of them.

22      THE COURT:  How many witnesses are there as to

23 the 404(b) issue?

24      MS. JOHNSTON:  There are probably eight or ten

25 witnesses that have 404(b) issues.  We have one that

1  needs to testify tomorrow --

2        THE COURT:  All right .

3        MS. JOHNSTON:  -- because he's going to be out

4  of town .

5        THE COURT:  You let defense counsel know who

6  that is .

7        MS. JOHNSTON:  I will let them know who that is.

8        THE COURT:  Just for my information , who is the

9  witness ?

10        MS. JOHNSTON:  Your Honor , the witness is

11  Detective Shelton Robert s .

12        THE COURT:  Shelton Robert s?

13        MS. JOHNSTON:  I believe that's his name .

14        THE COURT:  With what police department ?

15        MS. JOHNSTON:  He was with the Metropolitan

16  Police Department in Washington , D. C.  I'm check ing my

17  order of proof to make sure -- Shelton Robert s .

18        THE COURT:  All right .

19        MS. JOHNSTON:  He's testify ing concern ing June

20  10 and June 26 , 1986 search warrant s that were executed

21  at a residence where Ms. Martin was residing , and Ms.

22  Martin pled guilty in relation to one of those search

23  warrant s .

24        THE COURT:  All right .  I'll get out paper s that

25  address that question , and let's see if we can take it

1  up at 9:30 tomorrow.

2         Any problem with the defense doing that?  Okay.

3  Well, as I said, I can't guarantee you it will be 9:30

4  on the button, but it will be close.

5         Ready for the jury?

6         MR. SUSSMAN:  What about Friday, sir?

7         THE COURT:  I'm sorry.  Friday I have a dentist

8  appointment, but I should be out of it pretty quick.

9  I'd like to do the same Friday drill of 9 o'clock to

10 2:00.  The 9 o'clock start may be a little -- slightly

11 shaky, but I think it should be okay.  It depends on

12 how much drilling my dentist does, but I should be

13 okay.

14        Ready?  Bring them in.  .

15        (Witness Sakala resumes the stand at 10:09 a.m.)

16        (Jury returns at 10:09 a.m.)

17        THE COURT:  Good morning, ladies and gentlemen.

18 I hope you had a nice Fourth of July weekend.  Remember

19 when you saw all those fireworks going up there, one of

20 those was the grievances we had with the King was trial

21 by jury, and you're seeing now how that works.

22        Let me tell you what the schedule I'm going to

23 try to follow the rest of this week is going to be.  We

24 should go today to 4:30 or quarter of five, because I

25 have a conference at 5:00, so we won't go any later

1 than that today. Tomorrow I have a sentencing at 9

2 o'clock in another case, so we'll start at 10:00

3 tomorrow and go to 4:30, quarter of five at the latest.

4 On Friday, unless there is a problem, I'm going to go

5 our Friday drill again, which means we will start at

6 9:00, take two breaks, and adjourn at 2:00 so we can

7 get you out at a decent hour.

8         With that, I think we're back to Mr. McKnett.

9         MR. MCKNETT:   Thank you, Your Honor.

10        THE COURT:   You may proceed.

11                 **FURTHER CROSS-EXAMINATION**

12        BY MR. MCKNETT:

13 Q.     Good morning again, sergeant.

14 A.     Good morning, Mr. McKnett.

15 Q.     Sergeant, when we left off last week, we had

16 established, I believe, that you're testifying as both

17 a fact witness and as an expert witness.

18 A.     That's correct.

19 Q.     As a fact witness, you testify to things you

20 observe.

21 A.     That's correct.

22 Q.     As an expert, you testify as to the opinions you

23 form from the things you observe.

24 A.     That's correct.

25 Q.     I believe we established that you reviewed the

1  transcript s, each of them at least  once .   Excuse  me.

2  You reviewed all the intercept s at least  once?

3  A.     Yes .

4  Q.     Some of them , several  time s -- as many as  five

5  or six -- I think you said maybe seven  times in some

6  cases?

7  A.     Some of them.    Quite a few time s, yes.

8  Q.     And that even  as we proceed ed through  the trial ,

9  you would find a mis statement , punctuation,  a word out

10 of place , somet hing like that,or   the wrong word

11 sometimes .

12 A.     Yes .

13 Q.     And we've establish ed also  that  your opinion s as

14 an expert are to a moral  certainty .

15 A.     I am confident  in them , yes.

16 Q.     I want to turn your attention  now to the

17 relationship  between Ms. Martin  and to my client ,

18 LaNora Ali, who is sitting  back -- would you stand  up

19 for a second , Ms. Ali?

20      (Defendant Ali stands and then is seated.)

21      BY M R. MCKNETT :

22 Q.     Thank  you.

23      In addition  to what you believe  was a drug -

24 related  relationship , they also had a friend ly

25 relationship , didn't they?

1  A.       Yes, they did.

2  Q.       They would socialize together?

3  A.       Yes, they did.

4  Q.       Ms. Ali and her husband would go to Ms. Martin's

5  house for dinner, to hang out, to do what friends do --

6  A.       Yes.

7  Q.       -- in each other's houses.  Ms. Martin liked to

8  cook, didn't she?

9  A.       She did cook, yes.

10  Q.      And she would cook things, if you remember, such

11  as turkey wings, potato salad, and sweet potato pie?

12  A.      Yes.

13  Q.      In that context, "sweet potato pie" meant sweet

14  potato pie; correct?

15          MS. JOHNSTON:   Objection, unless we know what

16  context he's talking about.

17          THE COURT:   See if you can focus in on --

18          MR. MCKNETT:   In the context in which Ms. Martin

19  cooked sweet potato pie --

20          MS. JOHNSTON:   Objection.

21          THE COURT:   Overruled.

22          THE WITNESS:   There were times when she used the

23  term "sweet potato pie" when she was actually referring

24  to sweet potato pie.

25          BY MR. MCKNETT:

1 Q.      Sometimes , a pie is just a pie .

2 A.      That 's correct .

3 Q.      In fact , there was one series of conversation s,

4 if you remember -- and if not , I'll move on -- on the

5 nineteenth of March of 2004 in which there were a

6 series of call s about Ms. Ali and her husband being at

7 Ms. Martin 's house eat ing din ner the night before .

8 Remember that ?

9 A.      I don't remember  the date , but I'm sure that did

10 happen dur ing the intercept .

11 Q.      And sometimes Ms. Martin and Ms. Ali would do

12 what friends do :  They would gossip on the telephone .

13 A.      Yes .

14 Q.      They would talk about other people ?

15 A.      Yes .

16 Q.      They would talk about shop ping ?

17 A.      Yes .

18 Q.      They would talk about current event s?

19 A.      Yes .

20 Q.      They would talk from , time -to-come , about the

21 fact that Ms. Martin was attempt ing to move to a

22 different house .  Do you remember that ?

23 A.      Yes , I'm sure they talk ed about that .

24 Q.      In fact , there was conversation s about Ms.

25 Martin try ing to have a house built somewhere .

1          Do you remember that?

2  A.     Yes, she was having a house built.

3  Q.     They would talk about things like Ms. Martin

4  having to register her car and it being difficult

5  because she hadn't submitted a change of address notice

6  to the Department of Motor Vehicles.

7          Do you recall that?

8  A.     I don't know if I recall that, but it's

9  certainly possible they talked about that.

10 Q.     And they talked about traveling?

11 A.     Yes.

12 Q.     They talked about clothes?

13 A.     Yes.

14 Q.     They talked about all the things that friends

15 would talk about; correct?

16 A.     Yes, I think that's accurate.

17 Q.     Was there one conversation, if you recall, on

18 March 17, 2004 in which Ms. Martin and Ms. Ali talked

19 about a number of things, and then Ms. Ali mentioned

20 that she would stop over later that night?  Remember

21 that one?

22 A.     No, not without looking at the logs.

23 Q.     Would the log refresh your recollection?

24 A.     It might.

25          MR. MCKNETT:  May I retrieve the log, Your

1  Honor?

2          THE COURT:   You may.

3          MR. MCKNETT:   may I approach, Your Honor?

4          THE COURT:   You may.

5          MS. JOHNSTON:   Your Honor, just so the record is

6  clear, he's referring to a copy of what's been marked

7  for identification as Government's Exhibit

8  Miscellaneous  9.

9          MR. MCKNETT:   That's correct.

10          THE COURT:   All right.

11          BY MR. MCKNETT:

12 Q.      Finished?

13 A.      Yes.

14 Q.      Do you still need it?

15 A.      No.

16 Q.      Does that refresh your recollection about that

17 conversation?

18 A.      I don't remember  that particular  conversation,

19 no, but that's what the synopsis reflects is what you

20 said.

21 Q.      They're talking about a number of things, and

22 then Ms. Ali said she was going to stop over later.

23 A.      That's correct.

24 Q.      In fact, I think she said can "they" stop over

25 later.

1  A.      That's what the synopsis reflects.

2  Q.      That would be accurate to the best of your

3  knowledge, wouldn't it?

4  A.      Without listening to the call, you know, I don't

5  know, but it should be accurate.

6  Q.      Did you notice that you hadn't made any

7  notations about any inaccuracies or any additions you

8  wanted to make in that log entry?

9  A.      I did not notice any notation, but that wouldn't

10 be something -- whether it's "they" or "she," that

11 wouldn't be something I would correct.

12 Q.      That's fine.  That's fine.

13         Then we did actually see that -- hear about that

14 visit from, who was it?  Detective Marcus Jones back

15 two Thursdays ago.  Do you recall his testimony?

16 A.      If that was the date, yes.

17 Q.      He testified -- were you here for his testimony?

18 A.      Yes, I was.

19 Q.      He testified, did he not, that he was doing a

20 surveillance at 810 Hayward that evening  -- that

21 afternoon and eviening; correct?

22 A.      If that was the date.  I don't recall the date.

23 He did testify seeing Ms. Ali over there, yes.

24 Q.      And he testified -- if you recall, he got there

25 about 5:30, set up his position -- I'm not trying to

1 lock you into the times, but does this sound --

2 A.      It sounds right, yes. I don't know the exact

3 date and time, but I remember him testifying to Ms. Ali

4 coming over, yes.

5 Q.      He said after he had been there for a time, he

6 saw a driver -- saw a vehicle drive up a; correct?

7 That vehicle was -- I'm sorry. I was making a compound

8 question there.

9 A.      Yeah. I don't recall what his testimony was

10 about that.

11 Q.      Do you recall him testifying that a vehicle

12 registered to Luis Mangual arrived that afternoon?

13 A.      I do believe he testified about that, yes.

14 Q.      That the driver entered the residence; correct

15 --

16 A.      Yes.

17 Q.      -- stayed for a time, and then left.

18 A.      Yes.

19 Q.      And then later he saw another vehicle arrive,

20 and that vehicle was registered to Ms. Ali. Do you

21 recall that?

22 A.      Yes.

23 Q.      And he saw a tall black male about 50 years old

24 and a black female about 50 years old exit the vehicle

25 and enter the residence; correct?

1  A.      Yes.

2  Q.      And he testified that they entered the residence

3  by the front door.  Do you recall that?

4  A.      I don't recall that.  He might have said that.

5  I just don't recall him saying which door they used.

6  Q.      And then at some time later, I believe, he

7  testified he saw those two same individuals leave the

8  residence, re-enter the vehicle, and drive away.

9  A.      Yes, I recall that.

10  Q.      Do you recall -- do you have the transcript book

11  there with you?

12  A.      Yes, I do.

13  Q.      Can you turn to transcript B836?

14  A.      Is that Book 1?

15  Q.      I believe it's Book 1.

16   A.      B306?

17  Q.      836.  I apologize.  I didn't mark the page

18  number.  Page 122.

19  A.      B836, on Page 122?  I have that, yes.

20  Q.      In that conversation, Ms. Martin -- this takes

21  place at 6:20; correct?

22  A.      Yes.

23  Q.      And it appears in this conversation that Mr.

24  Mangual tells Ms. Martin that he's on his way; correct?

25  A.      Yes.

1  Q.      And then Ms. Martin tells him -- says to him

2  that if LaNora and those are in, just go on in the

3  back.  We'll go in the back.  You know, right in the

4  back area?

5  A.      That is correct.

6  Q.      It would appear that whatever was going on

7  between Ms. Martin and Mr. Mangual that Ms. Martin

8  didn't want LaNora and them to know about it, wouldn't

9  it?

10  A.      Yes, it does.  I would agree with that.

11  Q.      Ms. Martin and Ms. Ali did errands for each

12  other, didn't they?  As best as you know from --

13  A.      I'm sure they did, yes.

14  Q.      And it would appear from the wiretaps and

15  observations and such that Ms. Ali and her husband --

16  Ulysses Gardner.  Are you familiar with his name?

17  A.      Yes.

18  Q.      Mr. Gardner is Ms. Ali's husband; is that

19  correct?

20  A.      That is correct.

21  Q.      They bought clothes from Ms. Martin, didn't

22  they?

23  A.      Yes.

24  Q.      Sergeant, I'm going to ask you some questions

25  now about specific conversations.  If you can keep that

1 book handy, it might be helpful.

2         I'm going to ask you first about call B566

3 which, is on Page 70 of Book 1. Do you see that there?

4 A.      Yes, I do.

5 Q.      In that conversation, the fact is that Ms. Ali

6 says, oh, okay, 'cause you know, you know just what;

7 correct?

8 A.      That is correct.

9 Q.      It's your opinion, as you stated earlier, back

10 on June 21st, that Ms. Ali and Ms. Martin were

11 discussing a previous purchase of cocaine,

12 specifically, an eight-ball. That was your testimony,

13 was it not?

14 A.      I don't remember talking about previous

15 purchase. Ms. Ali is telling Ms. Martin she wants just

16 one.

17 Q.      And "one," in your opinion, was -- maybe my

18 notes are wrong about the previous purchase, but your

19 testimony was that she was talking about an eight-ball

20 quantity of cocaine; correct?

21 A.      I don't know if I said it in this conversation,

22 but the other conversations in the drug ledger indicate

23 that's her normal amount was an eight-ball. I don't

24 know that I said an eight-ball in this one, but that's

25 probably what it was.

1  Q.       And that would be your opinion as an expert;

2  correct?

3  A.       That is correct.

4  Q.       But the fact is that she just said, you know,

5  just what?

6  A.       That's what she said, yes.

7  Q.       Then on the next page, B567, you have testified

8  that that's a -- I'm sorry.  I misread my notes.

9          On B566 your testimony was that they were

10 discussing a purchase of drugs, and then on call 567 --

11 B567, which is where you testified they were discussing

12 a previous purchase of cocaine in an eight-ball

13 quantity; correct?

14 A.       That is correct.

15 Q.       I apologize for the confusion on my part.

16 Again, the fact is, the facts are on the page; correct?

17 That's what they said.

18 A.       Yes.

19 Q.       And it's your opinion that they were talking

20 about an eight-ball quantity of cocaine and whether or

21 not Ms. Martin or Ms. Ali was going to put it on the

22 books, so to speak, which is, I guess, fronting it?

23 A.       Just add it to her debt or whether she's going

24 to pay cash for it, yes.

25 Q.       Again, that's your opinion.

1 A.        Yes, it is.

2 Q.        Let's turn to Page 138, which is call A367.  Do

3 you have that there?

4 A.        Yes, I do.

5 Q.        Do you need a second to look at it?

6 A.        Yes.  I'm sorry.  I don't need it.

7 Q.        Okay.  This is one of three calls I think you

8 testified to as a series, A367, B1233, and A394.

9 A.        I'm sorry.  Do you have a page number for the

10 last one?

11 Q.        A394.

12 A.        Do you have a page number?

13 Q.        Page 158.

14 A.        Yes.

15 Q.        Your testimony concerning A367 was that Ms.

16 Martin and Ms. Ali were talking about a sale of cocaine

17 by Ms. Martin to Ms. Ali; correct?

18 A.        Yes.

19 Q.        Five was your opinion; correct?

20 A.        That is correct.

21 Q.        The facts are what's on the page; correct?

22 A.        Yes, and what's on the CD.

23 Q.        I want to be clear on one part of this.  I'm

24 sorry.  The facts are on the CD, and this is as

25 accurate a transcription of the CD as could be

1 prepared ; correct ?

2 A.      Yes .

3 Q.      The second entry for L.A. :  ' Cause you know what

4 I want .  That 's in quotation s ; right ?  That 's not what

5 Ms. Ali is telling Ms. Martin , is it?

6 A.      You're correct .  I would not have the quotation s

7 on there .  That 's -- they should not be on there .

8 That 's just what she says .

9 Q.      So it's your testimony that the person Ms. Ali

10 is talking about in the first entry -- strike that .

11       In the first entry , Ms. Ali is talking to Ms.

12 Martin because this is an excerpt of the entire

13 conversation ; correct ?

14 A.      That 's correct .

15 Q.      And Ms. Ali tells Ms. Martin , I told her I was

16 coming by to get some pig's feet because that 's all I

17 could think of , and she said , "oh.  Call me before you

18 come by;" right ?

19       And then Ms. Martin says , Mm-hmm .  And Ms. Ali

20 continue s on , "'Cause you know what I want."  You're

21 saying that Ms. Ali is not referring to the person she

22 was talking to Ms. Martin about ?

23 A.      No .  She 's not referring to that at all .  The

24 first part is dealing with a conversation she 's

25 relating , that 's what she told Jackie Terrell  as the

1  reason she came by.  Again, the quotes, both in the

2  first section and the second section, should not be

3  there.  She doesn't say, "Oh, call me before you come

4  by."  She doesn't say that.  She just says what she's

5  telling Jacqueline Terrell.   The only thing she could

6  think of was to say that she was coming by to get some

7  pig's feet.  Then in the second part she's telling Ms.

8  Martin, 'cause you know what I want.

9  Q.    Couldn't it just as easily be -- you've

10 identified the other person as Jackie Terrell   which,

11 again, is your opinion; correct, because she's not

12 named in this transcript.

13 A.    I'd have to listen to the whole call, but I'm

14 pretty sure that's who she was talking about.   There

15 was a running, oh, I guess, a theme through a lot of

16 the calls with Jackie Terrell.  Whenever somebody would

17 come by, Jackie Terrell would always ask them to bring

18 her cigarettes or liquor or make them run errands.  So,

19 that's what they're talking about there.

20 Q.    Wouldn't that make it very reasonable to read

21 this as, "'Cause you know what I want," as simply a

22 continuation  of what Ms. Ali was telling Ms. Martin,

23 that Ms. Terrell said, oh, call me before you come by

24 'cause you know what I want.

25 A.    Yeah.  I'd like to listen to the call again, but

1 I don't think  that's how the call sounds.

2 Q.    It's your opinion that these quotation marks are

3 misplaced?

4 A.    If you continue through the rest of the call,

5 yes, and the other two calls that go with it.

6 Q.    Well, there's a section missing,  again, from the

7 call; right?

8 A.    There's a section  that was not transcribed.

9 That is right.

10 Q.    There is about 23 seconds taken out; correct?

11 A.    It's a small part, but I would agree.  I don't

12 know the exact math.  Yes.

13 Q.    So other things were said in those 20 seconds,

14 and then Ms. Ali said, So if you ain't there, is it all

15 right if I get some; correct?

16 A.    Yes, that's correct.

17 Q.    And there was a reference  to pig's feet in the

18 beginning of that conversation; correct?

19 A.    Yes, there was a reference to pig's feet.

20 Q.    And Ms. Martin was known to cook pig's feet.

21 A.    I don't know if I would know that.  No.

22 Q.    Well, in your experience, is it usual in the

23 drug trade to allow a drug customer to go into the

24 dealer's supply of drugs and help herself?

25 A.    Yes.  I've seen that happen.  If you are very

1 close friends, yes.

2 Q.     That's not usual, is it?

3 A.     The normal relationship between a drug seller

4 and drug customer, if that was all there was, yes, I

5 would say that would be unusual.

6 Q.     Let's look at the next conversation at B1233,

7 Page 140. Do you have that there?

8 A.     Yes, I do.

9 Q.     Let me interrupt for just a second. The

10 reference to pig's feet in the prior conversation.

11 That was not a drug reference, was it?

12 A.     No, it was not.

13 Q.     In this conversation, B1233, the reference to --

14 is it in here, or I may be getting ahead of myself.

15 Let's not get to that. Let's stick with 1233. Ms.

16 Martin says, and the fact is -- Ms. Martin says, okay.

17 I fixed your thing. I have it with me, so you can just

18 call me; correct?

19 A.     Yes.

20 Q.     It was your opinion that Ms. Martin was telling

21 Ms. Ali that Ms. Martin had cooked crack for Ms. Ali.

22 A.     That's correct.

23 Q.     Well, if on March 20, which is the date of call

24 A367, Ms. Ali said she was coming over to help herself

25 to get some, then it doesn't seem to follow that on the

1  next day Ms. Martin would be telling Ms. Ali that she

2  fixed her thing and had it with her and Ms. Ali should

3  just call her.

4  A.      I don't understand  your question.

5  Q.      You said that on the previous  call, A367, Ms.

6  Ali was telling Ms. Martin -- asking  permission  from

7  Ms. Martin to come over and get some that day.

8  A.      If she's not there, she's asking if she can get

9  some.

10  Q.      Did you have surveillance  at Ms. Martin's house

11  that day?

12  A.      I would have to look at the surveillance

13  report s.  I don't know.

14  Q.      You never had surveillance  on Ms. Ali --

15  direct ly on Ms. Ali, did you?

16  A.      That is incorrect.

17  Q.      Did you have a surveillance  specifically

18  direct ed at Ms. Ali?

19  A.      Yes.

20  Q.      When was that?

21  A.      I don't remember  the date, but I remember  the

22  circumstance s as to what it was about.

23  Q.      Okay.  I think we'll probably  get to that.  Let

24  me try to keep these in chronological  order.

25          So Ms. Ali is asking Ms. Martin, on March 20, if

1  she can come over and get some even if Ms. Martin is

2  not there?

3  A.      That's correct.

4  Q.      The next day, Ms. Martin is telling Ms. Ali that

5  she had her thing -- Ms. Ali's thing with Ms. Martin.

6  A.      That's correct.

7  Q.      So it would appear that either Ms. Ali didn't go

8  over and get something the day before, despite saying

9  she would, or we're talking about two different things.

10  A.      Either I would agree with that, that either she

11  didn't go over there, or she did go over there and

12  order another amount.  But I would agree with that

13  assessment, yes.

14  Q.      We don't know if Ms. Martin was there when Ms.

15  Ali went over or if Ms. Ali went over at all, do we?

16  A.      That's correct.  Without looking at either the

17  pole cam log, which I think would have been active on

18  this date or surveillance, I do not know.

19  Q.      I'm sorry.  Did you say it was active or

20  inactive?

21  A.      It went active on the 20th, so it should have

22  been running on the next day or during the first call.

23  What time it went active, I'd have to look at the log.

24  Q.      If you turn to Page 158.  Is call A394, again,

25  on March 21st?

1 A.      I have it, yes.

2 Q.      And that call is, again, March 21st, as I said,

3 and Ms. Martin starts out at the middle of the page

4 talking about, I can't wait, LaNora, till I get my

5 house.  I'm so sick of that, I don't know what to do,

6 which is a reference to Ms. Martin trying to have a

7 mouse built, I believe.  If you know.

8 A.      Yes, it is.

9 Q.      And then Ms. Martin says, it's in the trunk of

10 my car.  Just call me, I'll come outside and hand you

11 the bag out of the trunk; correct?

12 A.      Yes.

13 Q.      We're talking about an eight-ball in your

14 opinion?

15 A.      That would be her normal amount, looking through

16 the drug ledger.

17 Q.      So would it be necessary to package up an

18 eight-ball as we saw is the size of a piece of

19 prosecutor's candy the other day -- package that up in

20 a bag and then put it in the trunk of a car?

21 A.      It would depend on where Ms. Martin is keeping

22 her drugs.  If she had them in the trunk, yes.  I don't

23 know what would be normal for her on this particular

24 day.

25 Q.      If it had been clothes, it would have been also

1  -- could easily have been described as it's in the bag

2  in the trunk of my car; correct?

3  A.      She could have had clothes in the trunk of her

4  car, yes.

5  Q.      In that conversation, "two juices" is not a

6  reference to drugs.

7  A.      No, it is not.

8  Q.      "Necklace" is not a reference to drugs; correct?

9  A.      That's correct.

10  Q.     But, "hand you the bag out of the trunk of my

11  car" is a drug reference in your opinion?

12  A.      Yes, it is.

13  Q.      We turn now to call B2436 on Page 265.

14  A.      Is that in Volume II?

15  Q.      I apologize.  I didn't mark that one.

16  A.      Yes, it's in Volume II.  B2436, on Page 265.

17  Q.      Then again, the fact of this transcript is that

18  Ms. Martin and Ms. Ali are talking -- Ms. Martin

19  mentions one magazine.  Ms. Ali says, that's what I got

20  to make sure.  Ms. Martin says, I need to know that

21  'cause I have -- I may have some people in here.  And

22  then later on Ms. Martin says, I'll call you back;

23  correct?

24  A.      That's correct.

25  Q.      And it is your opinion that "one magazine" is a

1 reference to a quantity of cocaine?

2 A.      That's correct.

3 Q.      And that when Ms. Ali says, "that's what I got

4 to make sure," she is saying she has to check with

5 somebody else; correct?

6 A.      That's what she says, yes.

7 Q.      She didn't say she had to check with somebody

8 else, did she?  She said, "That's what I got to make

9 sure."

10 A.      Yes.

11 Q.      It's your opinion she was saying she had to

12 check with somebody else.

13 A.      Okay, yes.

14 Q.      And then it was your opinion that Ms. Martin is

15 saying to Ms. Ali that Ms. Martin wants to know how

16 much Ms. Ali wants so she can get it ready and just

17 hand it to her without other people noticing.

18 A.      That's correct.  She's come prepared ahead of

19 time, so she'll have it ready.

20 Q.      What she said was, I need to know that because I

21 may have some people in here; correct?

22 A.      That is what she said, yes.

23 Q.      And the other part was your opinion.

24 A.      That is correct.

25 Q.      Is there anything else in this conversation that

1  leads you to the two conclusion s you just state d?  One,

2  that Ms. Ali was asking for the quantity of drug s; and

3  two , that Ms. Martin want ed to get it ready without

4  anybody else notici ng?

5  A.      Not in this conversation , but obvious ly in other

6  evidence that was seen during the case leads me to my

7  opinion .

8  Q.      Have you seen another conversation  like this ?

9  A.      Where she order s drug s?

10  Q.      No , where this conversation  -- this similar

11  conversation  where , in your opinion , Ms. Martin is

12  tell ing Ms. Ali to let her know how much she want s so

13  that Ms. Martin can get it ready in advance and have it

14  ready so that no one else will notice .

15  A.      There were several conversation s.  I don't know

16  the exact amount where Ms. Martin would want to know

17  the exact amount ahead of time so she could get it

18  ready .  Whether it was with Ms. Ali or not , I don't

19  recall .  We've listened to them in court .  I don't

20  recall whether it was that exact one with just her .

21  Q.      You don't recall any other conversation  of this

22  nature between Ms. Mart in and Ms. Ali ?

23  A.      There may very well have been .  We've listen ed

24  to them in court , but I don't recall  whether there was

25  one of a similar nature .  I just heard one where she

1  talked about getting it ready ahead of time.  So if you

2  want to say, was there ever any conversation between

3  Ms. Martin and Ms. Ali  where she prepared  it ahead of

4  time, the answer would be yes   .

5  Q.     But there's nothing specifically  in this

6  conversation  that leads you to believe  that Ms. Martin

7  -- Ms. Ali is ordering drugs and that Ms. Martin wants

8  to know how much so she can get it ready  in advance  so

9  that no one else will see her give it  to Ms. Ali?

10 A.     That's my opinion of what she says.  That's what

11 I believe she's saying.  So, yes, there is something in

12 that conversation  that leads me to believe  that.

13 Q.     Was there a surveillance  on this day?

14 A.     Again, without looking at the surveillance  log,

15 I don't know .  There certainly was a pole cam

16 operating.

17 Q.     Sergeant, are you aware -- has it come to your

18 attention  that when people -- two people are talking

19 about something, a subject or an object, a person, and

20 they both know what the subject is, they tend to talk

21 in kind of a shorthand?

22 A.     If I understand  what you're saying, I would

23 agree with that, yes.

24 Q.     They don't have to specify exactly what they're

25 talking about, because they know what they're talking

1  about; correct?

2  A.      That's correct.

3  Q.      It's your opinion in these conversations that

4  Ms. Martin and Ms. Ali are talking about drugs;

5  correct?

6  A.      In many of the conversations, yes.

7  Q.      Even though they don't specify exactly what it

8  is they're talking about.

9  A.      I don't think anybody during -- over 10,000

10  interceptions activations, I don't think anybody ever

11  used the term "drugs" or said drugs straight out.

12  Q.      Let's turn to Page 348, call A1224.  Do you have

13  that there?

14  A.      Yes, I do.

15  Q.      This is 20 days later from the previous call.

16  This is on April 21st, '04; correct?

17  A.      Yes.

18  Q.      Ms. Martin asks Ms. Ali, you just wanted one

19  ticket, and then Ms. Ali says, that's -- I'm going to

20  make a phone call.  Ms. Martin says, okay.  Let me

21  know; correct?

22  A.      Yes.

23  Q.      Is this one of the other calls you were

24  referring to when I talked about it?

25  A.      I'm sorry.

1  Q.      The call on April 1st about conversations about

2  Ms. Martin getting things ready in advance.

3  A.      I don't know if she's going to get it ready in

4  advance.  She just wants to know the quantity of

5  cocaine Ms. Ali wants.

6  Q.      Okay.  Do you know who Ms. Ali called?

7  A.      I do not.

8  Q.      Do you know if Ms. Ali called anybody?

9  A.      I do not.

10 Q.      Now, let's turn to the Page 349, the next page,

11 call A1226, which is about -- a little less than two

12 hours after the previous call; correct?

13 A.      Yes.

14 Q.      Bear with me for a moment.  I'm trying to find a

15 page in Exhibit Hayward 7.  The page I'm looking for is

16 the page out of this book in which there were two short

17 lists -- here they are.  Do you see that there?

18 A.      Yes, I do.

19 Q.      This is the book out of Hayward -- 810 Hayward,

20 Ms. Martin's house; correct?

21 A.      Yes.

22 Q.      This was seized as part of the investigation in

23 this case.

24         Now, in the call in A1224 --

25 A.      1226.

1  Q.      1226.  I'm sorry.

2          Is it your testimony that on Page 350 -- prior

3  to that, they had been talking about some thing, then

4  Ms. Ali changed the subject, and it was your testimony

5  that Ms. Martin was asking -- Ms. Ali was asking Ms.

6  Martin about what price she put in the book, because

7  Ms. Ali told her, I wanted the whole thing but I only

8  wanted part of it.  And then there's a conversation

9  about the wrong price in the book and so forth, the

10  $1.25.  Your testimony was that $1.25 was actually

11  $125?

12  A.      Yes.

13  Q.      Did you see any such entry for April 21st 2004

14  in this book, Hayward 7?

15  A.      Yeah.  I think you're on the wrong page, but I

16  think if you go back to the previous red tab there will

17  be an entry that fits in that date frame that's

18  undated.

19  Q.      Previous red tag?  Okay.

20  A.      There should be a red tab at the top.  Is this

21  the page?  No, it is not.

22  Q.      Okay.  That was the previous red tab.  And we

23  looked at the next previous red tab.  That's not it,

24  either?

25  A.      No, it is not.

1  Q.      And the previous red tab.  Is that the one?

2  A.      No, I don't believe that's the one.  If you flip

3  it over -- turn the page, it's the next page, I

4  believe, on the left-hand side of the book.

5  Q.      Is this the one?

6  A.      Yes.

7  Q.      And somewhere on here is an entry, you believe,

8  for April --

9  A.      If you look on the right side of the page, you

10  will see an entry for 4/19 for $125.

11  Q.      $125.

12  A.      Higher up.

13  Q.      That's the one you're referring to?

14  A.      No, I'm not.  Higher up.  Higher up.  Right

15  there.

16  Q.      Right there.  I don't know  if I can zoom this or

17  not?

18  A.      Without seeing the book, I don't know  if that is

19  9 or 19.

20  Q.      Is that too blurry?

21  A.      It's too blurry for me to --

22  Q.      Still  too blurry?

23          Would you like to look at the book?

24  A.      I would like to look at the book, yeah.

25          MR. MCKNETT:  May I approach, Your Honor?

1        THE COURT:   You may.

2        THE WITNESS:   I can't -- I still can't make it

3   out.  It could be an '09, could be a 19, but that sets

4   the date -- the first date of the range I was talking

5   about.  And then further down you will see an entry for

6   125.  And then further down you will see an entry on

7   4/29 for 125.  The 125 before is the one I was

8   referring to.

9        BY MR. MCKNETT:

10  Q.      Thank you.

11          That would be $125, in your opinion?

12  A.      Yes.

13  Q.      Can we turn now to number -- to Page 378?  And

14  that's call B-4330.

15          Do you have that there?

16  A.      Yes, I do.

17  Q.      And this is a very short extract of the longer

18  call; correct?

19          It's a three-minute call, and this is about -- I

20  can't estimate the time, but it's only four comments?

21  A.      That's correct.

22  Q.      You've decided this is pertinent; correct?

23  A.      I'm sorry?

24  Q.      This is a pertinent call?

25  A.      It is a pertinent call, yes.

1  Q.      And a pertinent  call  that relate s to drug

2  trafficking ?

3  A.      That's correct .

4  Q.      Which  part  of  this  call  relate s to  drug

5  trafficking , in  your  opinion ?

6  A.      I'm wait ing  on  my brother to  take  care  of  some

7  business .  If you  recall , this  was  during  a  time  when

8  Mr.  Goodwin  was  obtain ing  a  quantity  from  Mr.  Cuba .

9  Q.      It was also during a time when Ms. Ali  and  Ms.

10 Martin and Mr.  Gardner and Mr. Goodwin were involved      or

11 were  attempt ing  to  become  involve d  in  the  entertain ment

12 business ; correct ?

13 A.      I don't think  either  LaNora  Ali  or  Mr.  Gardner

14 had anything  to do with that  deal .

15 Q.      With  what , the  entertain ment  business ?

16 A.      That's correct .

17 Q.      They  had nothing  to do wit h it?

18 A.      I don't think  they had any sort  of  investment  at

19 all , other  than  they would  talk  about  it -- Ms.  Martin

20 would  talk  about  it with Ms.  Ali  and  Mr.  Gardner,  but  I

21 don't think  they had any  investment  in it at all .

22 Q.      It's your  opinion  they didn't  have  any financial

23 investment ; is that  correct ?

24 A.      I don't think  they had any type  of  interest  in

25 it at all other  than  just  to talk  about  it .  If they

1  did, it certainly did not come through in the

2  conversation.

3  Q.     You don't recall a conversation in which Ms.

4  Martin states that she wanted Mr. Gardner to be her

5  spokesman for the business?

6  A.     No, I do not.

7  Q.     If that conversation existed, would that change

8  your opinion in any way?

9        MS. JOHNSTON:   Objection.

10       THE COURT:   Overruled.

11       THE WITNESS:   I don't think so. No. Because if

12 they had that conversation, that would be the extent of

13 it. Again, the entertainment business was -- from the

14 intercepts, appeared to be solely from Ms. Martin and

15 Mr. Goodwin and other individuals. I don't think Ms.

16 Ali or Mr. Gardner had anything to do with it.

17       BY MR. MCKNETT:

18 Q.     You don't recall conversations between Mr.

19 Gardner and Mr. Goodwin about Ron Hood and Ron Hayes?

20 A.     I don't recall one, but I'm sure they talked

21 about it. She talked about Ron Hood and Ron Hayes with

22 everybody.

23 Q.     Ron Hood and Ron Hayes are the two people who

24 were supposedly promoters.

25 A.     I don't know -- I have no idea. Other than

1  getting money from them, I'm not sure what their job

2  would be.

3  Q.      It turned out maybe nobody was quite sure what

4  they were doing?

5  A.      That's correct.

6  Q.      That is, they were painting themselves as being

7  involved in the entertainment business to Ms. Martin;

8  is that correct?

9  A.      That's correct.

10 Q.      You don't recall Mr. Gardner talking to Mr.

11 Goodwin about the entertainment   business?

12 A.      They had -- I don't know if we intercepted a

13 conversation like that, but I know on at least one

14 occasion they were at -- "they" being Mr. Gardner, Ms.

15 Ali, Ms.  Martin and Mr. Goodwin.  They were at the

16 house on Hayward having a discussion about what they

17 should do about the problem, and Mr. Gardner offered

18 advice.  Whether we intercepted the conversation  with

19 Mr. Goodwin, I don't recall  that, but I know a meeting

20 took place where they discussed it.

21 Q.      But even if that -- even if Mr. Gardner and Ms.

22 Ali were involved with Ms. Martin in attempting to get

23 into the entertainment business, that wouldn't change

24 your opinion about the nature of this call.

25 A.      No, that would not.  This is referring  to the

1 deal with Cuba that she's waiting on.   Specifically, I

2 think she's waiting for him to deliver the kilo.

3 Q.      She doesn't use the word kilo, does she?

4 A.      No.  As I said.  During the entire wire, we

5 never intercepted a direct reference to drugs, no.

6 Q.      All we know is that Ms. Martin told Ms. Ali that

7 she was waiting for her brother, Mr. Goodwin, to take

8 care of some business?

9 A.      That's not all we know; that's what's in this

10 conversation, though.

11 Q.      In this excerpt that you thought was pertinent,

12 that's all we have; correct?

13 A.      No, it is not.  There are other calls dealing

14 with the business with her brother, but in this

15 transcript that's the only excerpted part.  But that's

16 not all we have about that reference.

17 Q.      The question was in this conversation, in this

18 excerpt, which you testified is the pertinent part of

19 this conversation?

20 A.      Yes, that is correct.  That is the pertinent

21 part of this conversation.

22 Q.      In this four-line entry of this longer excerpt,

23 in this longer conversation, all we know is that Ms.

24 Ali thinks that she might go out for crabs, and she

25 invites Ms. Martin to share in the crabs; right?

1  A.      I don't know  what  Ms.  Ali  knows.   I  know  that's

2  what's  said.

3  Q.      I'm sorry.   I think  I may have  confused  --  I'm

4  not  sure  I  understand  your  answer.

5  A.      Okay.   I  thought  you asked  me  what  Ms.  Ali

6  knows, and  I  said  that  I don't know  what  she knows

7  about  this  reference.   I  just  know  what's  said.

8  Q.      So  you don't  know  that  Ms.  Ali  knew  what  Ms.

9  Martin  was  talking  about  --

10  A.     No.

11  Q.      -- when  she  said  it?

12  A.     No, I do not.

13  Q.      I want  to  talk  now  about  Page  387,  B4430.   This

14  is on April  25, at  about  4:48  in  the  afternoon.

15          Do  you  have  that  there?

16  A.     Yes, I do.

17  Q.      It starts  out  with  Ms.  Ali  asking  about, you

18  hear  from  Gwen?   And  I believe  you  testified  it's a

19  reference  to  Gwen  Levi; correct?

20  A.     Yes, it  is

21  Q.      When  was  Ms.  Levi  arrested?

22  A.     April  24th, around  midnight  or  thereabouts.

23  Q.      Okay.   So  Ms.  Ali  is  asking  Ms.  Martin  if  she

24  heard  from  Gwen; correct?

25  A.     Yes.

1  Q.      And Ms. Martin says, she locked up; correct?

2  A.      That is correct.

3  Q.      Then Ms. Ali reacts with surprise.

4  A.      She says, really?

5  Q.      And in the transcript, if you listen, it sounds

6  like, "really?"

7  A.      Yes.  I would agree this is news to her.

8  Q.      And then Ms. Martin proceeds to explain to Ms.

9  Ali about Gwen getting arrested; correct?

10 A.      Yes.

11 Q.      Is it your testimony that Ms. Ali knew that Ms.

12 Levi was involved in drug distribution?

13 A.      I don't think  I've testified to that, no.

14 Q.      I'm sorry.  Is it your opinion that Ms. Ali knew

15 about Ms. Levi being involved in drug distribution?

16 A.      My opinion is yes, but not based on these

17 conversations.

18 Q.      What's your -- what is your opinion based on?

19 A.      Other information.

20 Q.      Other information that's been presented to the

21 jury?

22 A.      I do not believe the jury has heard that

23 information.

24 Q.      In this conversation, Ms. Martin tells Ms. Ali

25 that she thinks that Ms. Levi got arrested because she

1 was involved with the Julio thing; correct?

2 A.      That is correct.

3 Q.      And that Julio thing was again?

4 A.      The arrest of Emelio Echarte in Florida.

5 Q.      So that would indicate, at least with regard to

6 Ms. Levi's arrest, Ms. Ali was not aware that she was

7 doing anything illegal, correct, because Ms. Ali didn't

8 know why Ms. Levi was arrested.

9 A.      That doesn't indicate she didn't know she was

10 doing anything illegal.  It indicates she didn't know

11 why she was arrested.

12 Q.      But Ms. Martin tells Ms. Ali about the Julio

13 thing and how Ms. Martin thinks that Ms. Levi got

14 arrested because of the Julio thing.

15 A.      That's what Ms. Martin is saying, yes.

16 Q.      And about the only factual statement after that

17 that Ms. Ali makes about Ms. Levi is on Page 388, when

18 Ms. Ali says, I liked her, too.  Seems like she's an up

19 front person.  But she -- and then, damn.

20       Everything else in this conversation is

21 information that Ms. Martin is giving to Ms. Ali;

22 correct?

23 A.      Yes, I would say that's the primary focus of the

24 conversation is Ms. Martin telling Ms.- -- giving -- I

25 guess one defense attorney called it "the front page

1  news " to Ms. Ali.

2  Q.      And Ms. Ali, at least  in this conversation ,

3  didn't know Ms. Levi had been arrested ?

4  A.      That 's correct .

5  Q.      Didn't know why she had been arrested .

6  A.      That 's what she says , yes .

7  Q.      And didn't challenge  in any way Ms. Martin 's

8  explanation  of why Ms. Levi was being arrested , did

9  she ?

10  A.      No , I don't think  she challenge s it at all.

11  Q.      Again , this is like gos sip .

12  A.      I guess it would depend on what gos sip is.  But ,

13  yes , it certain ly could be per ceived that way .

14  Q.      Can you turn now to Page 402 , call 1363 .  I

15  think these are -- this is one of the start of a series

16  of call s in which you say you testifi ed, I believe --

17  and if I'm wrong , correct me, please .  You testifi ed

18  that Ms. Ali , Ms. Martin and Larry Nunn were involve d

19  in creati ng a phony time sheet for Mr. Nunn ; is that

20  correct ?

21  A.      Yes .

22  Q.      That 's your testimony .

23  A.      Yes .

24  Q.      And we saw that time sheet -- I forget the

25  exhibit number , but it was place d up on the screen ;

1  correct ?

2  A.      That is correct .

3  Q.      At Page 402 , the discussion  there is between  Ms.

4  Ali and Ms. Martin about Ms. Martin buying an answering

5  service for the place ; correct ?

6  A.      Yes .

7  Q.      And then Ms. Ali says , just by a fax .  Buy a fax

8  machine so everything will just look official when you

9  doing this business , because everything coming from the

10  same address ; correct ?

11  A.      That is what she says , yes .

12  Q.      Then later on , Ms. Ali says , just buy a fax .

13  Just buy you a fax .  It could be on the same number ,

14  just like at home .  And then they go on with Ms. Martin

15  later saying she's not up to anything , getting ready to

16  go to the school .  And then Ms. Ali talks about the

17  phone number which would appear to be the phone number

18  to be used on the fax machine ; correct ?

19  A.      I'm sorry .  Where are you referring ?  I've lost

20  you .

21  Q.      Okay .  Bottom of Page 402 .

22  A.      Okay .

23  Q.      Ms. Martin says she's just getting ready to go

24  in the school here .  Then Ms. Ali talks about a phone

25  number ; correct ?

1  A.      Yes.

2  Q.      That appears to be the phone number that is to

3  be used on a fax machine; correct?

4  A.      On the letterhead, yes.

5  Q.      There's no mention of letterhead in here, is

6  there?

7  A.      I think that's what they're talking about,

8  preparing that -- Ms. Ali is talking about preparing --

9  I'd have to a look -- if you have the exhibit again,

10  it's probably on that letterhead.

11  Q.      Okay.  Now, the next call, B4758, is a call

12  between Larry Nunn and Ms. Martin; correct?

13  A.      Yes, it is.

14  Q.      That's on the same day, April 28, and it's about

15  -- well, the first call between Ms. Ali and Ms. Martin

16  was at 9:53 in the morning, and the call between Mr.

17  Nunn and Ms. Martin is about 5:15 in the afternoon.  So

18  that's seven and a half hours?

19  A.      Yes, about that.

20  Q.      In this call there is no reference to Ms. Ali,

21  is there?  I'm talking about 4758 now.

22  A.      I do not believe so, no.

23  Q.      So the reference toward the bottom, where Larry

24  Nunn says, do I still need -- do I still need her to

25  fill it in, that is not a reference to Ms. Ali, is it?

1  A.      I don't believe so.

2  Q.      In this conversation, Ms. Martin and Mr. Nunn

3  are talking about getting time sheets from Office Depot

4  or Staples; correct?

5  A.      Correct.

6  Q.      They're not talking about letterhead and they're

7  not talking about fax machines.

8  A.      No, they are not.

9  Q.      And Mr. Nunn says he is going to bounce -- I'll

10 be right out there and get them, which means in your

11 opinion that he will run over to Home Depot -- Office

12 depot or Staples and get some time sheets; correct?

13 A.      Yes.

14 Q.      And then he says, do I still need her to fill it

15 in?  He's referring to someone other than Ms. Ali;

16 correct?

17 A.      Again, I believe so.  I do not know who he's

18 referring to.

19 Q.      Then turn, please, to A1407, which is Page 406.

20 Same day.  We are now at 9:22 -- 7:22 in the evening;

21 correct?

22 A.      Correct.

23 Q.      Again, it's between Ms. Martin and Mr. Nunn.

24 A.      Yes.

25 Q.      Correct?

1 A.        Yes, it is.

2 Q.        Ms. Martin agrees that he got the time sheets;

3 correct?

4 A.        Where are you reading from?

5 Q.        That's in the middle of the page.

6 A.        On 406?

7 Q.        406, the third line down.

8 A.        Yes.

9 Q.        Says, yeah, I've go them.  Matter of fact, they

10 doin' them now.  That's not a reference to Ms. Ali, is

11 it?

12 A.        No, I do not believe that.

13 Q.        Then Ms. Martin mentions, okay, they have them.

14 And then Mr. Nunn says, yeah, they, they -- again,

15 we're not talking about Ms. Ali, are we    ?

16 A.        I do not believe he's talking about Ms. Ali in

17 that reference, no.

18 Q.        Again, Ms. Martin says, Okay.

19        Now, look now whenever they first name and you

20 do stutters, she does fax me over to my number and then

21 she explains how the fax machine is on because she left

22 it on when -- she left it   on when she left her house;

23 correct?

24 A.        Yes.

25 Q.        Again, they're not referring to Ms. Ali faxing

1 anything over, are they?

2 A.     I don't know who the she is she's referring to

3 but she's not referring to Ms. Ali faxing this.  It's

4 referring to Ms. Mr. Nunn faxing the time sheets over

5 the Ms. Martin.

6 Q.     There's another call, same day at call B4786 at

7 408, Page 408 and that's at 9:33.

8 A.     Yes.

9 Q.     This call really is -- doesn't fit into the flow

10 about the fax machines and so forth.  This is a call

11 about Ms. Martin complaining about someone named

12 Estelle giving her number to somebody.

13 A.     I don't think that's an accurate statement, no.

14 Q.     You do think it does fit into the flow about the

15 fax machine?

16 A.     I think it fits into the flow of the series of

17 conversations, yes.

18 Q.     Well, there's no mention of fax machines, letter

19 heads or such in this conversation, are there?

20 A.     There is the whole series of calls is not just

21 about the fax machine.

22 Q.     But my question was in this call there is no

23 mention of letterhead, fax machines or similar things,

24 is there?

25 A.     That question is inaccurate.  I would agree with

1 that .  In your  previous  statement , whether  it fits with

2 the flow of calls is with the one I had a problem with .

3 Q.      This  is a call  in which  Ms. Martin  is, for  lack

4 of a better  term , venting  about  Estelle ; correct ?

5 A.      I would  agree  with  that  assessment , yes .

6 Q.      She is not happy  with  Estelle  and called  up her

7 friend  Ms. Ali  to vent  about  Estelle ; correct ?

8 A.      And  I would  agree  with  that  and provide

9 information  to Ms. Ali , too , yes .

10 Q.      That 's your  opinion .

11 A.      Well  she does  provide  a lot  of information .

12 Q.      She does ?

13 A.      That 's a fact , I think .

14 Q.      Now  if we turn  to Page  413 , call  B4804 , it's now

15 11:11 p.m.  the  same  day ; correct ?

16 A.      That 's correct .

17 Q.      And  Ms. Martin  is back  on the  phone  with  Mr.

18 Nunn ; correct ?

19 A.      Yes .

20 Q.      And  it appears  that  what  they're  talking  about

21 is whether  or not  the  fax that  Ms.- -- that  Mr.  Nunn

22 sent  got  through  to Ms. Martin ; correct ?

23 A.      Yes .

24 Q.      She asks , she 's ready  to --

25 A.      I'm sorry?

1 Q.       She states, "I'm getting ready to go check on it

2 right now;" right?

3 A.       Yes.

4 Q.       Are you aware of any phone calls between Ms.

5 Martin and -- excuse me a second.   May I consult with

6 Mr. Montemarano?

7          Do you remember any conversations -- I apologize

8 I may have the name wrong between Ms. Martin and Gill

9 Williams in which Mr. Williams is asking Ms. Martin to

10 send him something on her letterhead?

11         MS. JOHNSTON:    Objection.

12         MR. MCKNETT:   I asked him if he all recalled a

13 conversation, Your Honor.

14         THE COURT:   Overruled.

15         THE WITNESS:    Okay.   Could you give me the

16 Question one more time?   I want to make sure I'm

17 accurate.

18         BY MR. MCKNETT:

19 Q.       I may have the name wrong.

20 A.       No.   I know Gill Williams, yes.

21 Q.       I may be talking about Spencer Boyer.    I

22 apologize.   I'm not sure, but do you remember any

23 conversations between Ms. Martin and either one of

24 those two gentlemen in which that gentleman asks Ms.

25 Martin to send him something on her letterhead.

1          MS. JOHNSTON:   Objection.

2          May we approach the bench, please?

3          THE COURT:   You may.

4                (At the bar of the Court.)

5          MS. JOHNSTON:   Again, we have this problem with

6    him asking him a question to recall.  Do you recall a

7    conversation that is not in evidence that contains

8    hearsay statements?  It's being introduced only for the

9    truth of whatever is in that statement at this point,

10   so I'm going to object.  I would ask the court to give

11   -- if the court is going to allow this question to give

12   some kind of instruction to the jury that the -- that

13   what he's asking him to recall is not in evidence

14   before this jury and that they shouldn't consider it

15   for the truth of what's contained in that statement.

16         MR. MCKNETT:   First of all, I just asked him if

17   he remembered the conversation.   The instruction is

18   fine.

19         THE COURT:   Is the conversation that you're

20   asking him about, one that's been played?

21         MR. MCKNETT:   No, it hasn't.

22         THE COURT:   It hasn't?

23         MR. MONTEMARANO:   It will be.

24         MS. JOHNSTON:   I don't know that it will be

25   played because it's hearsay and it wouldn't be

1 admissible  hearsay , but we'll  cross  that  bridge  when  we

2 get  to  it .

3        THE  COURT:   What  is  the  basis  for  asking  him  a

4 question  about  a  call  that  has  not  been  played?

5        MR.  MCKNETT :   This  provides  an  alternative

6 explanation  for  the  conversations  between  Ms.  Martin

7 and  Ms.  Ali .   There  is  a  conversation  between  Mr.

8 Martin  and  Ms.  Martin  and  --  I  apologize .   It's  either

9 Mr.  Williams  or  Mr.  Boyer, Spencer  in  which  he

10 specifically  --  they  talk  about  dates, and  he  asks  her

11 to  send  him  something  on  her  letterhead .

12        THE  COURT:   Do  you  have  this  specific

13 conversation  you're  talking  about ?

14        MR.  MCKNETT :   I  do .

15        THE  COURT:   Is  it  transcribed?

16        MR.  MCKNETT :   It's  being  transcribed .

17        It's  in  the  log , Your  Honor .

18        THE  COURT:   It's  hard  for  me  to  rule  in  a

19 vacuum .

20        MR.  MCKNETT :   If  I  could  finish .   Well , let  me

21 just  paint  the  picture  here .   In  the  next  conversation ,

22 Ms.  Martin  calls  Ms.  Ali  and  asks  her  to  prepare  a

23 letterhead .

24        THE  COURT:   Let  me  ask  Ms.  Johnston  this

25 question .   I  recognize  what  your  objection  is , but  if  I

1   understand  t correct ly, Sergeant  Sakala  has  testifi ed

2   and  given  opinion s based  upon  his  review  of  all  of  the

3   record ings , certain  of  which  have  been  select ed  and

4   play ed by  the  government .   I  understand  Mr.  McKnett  is

5   -- he want s to  question  about  some  other  conversation s

6   which  he  has  listened  to and  which  he  has  considered  in

7   form ing  the  opinion s he's  given  and  want s to  ask  him

8   about  whether  he  had  considered  them  in  form ing  these

9   opinion s.

10       MS.  JOHNSTON:   The  problem  is , that 's not  what

11   counsel  has  proffered  to  the  court .   They 've proffered

12   they  want  to  intro duce  an  alternative   interpretation

13   for  the  recordings , which  is  something  they  can  do  in

14   their  case  in  case  chief .

15       In  term s of  Agent  Sakala .   He  testifi ed  about

16   the  mean ings  of  the  conversation s in  this  courtroom .

17   He  testifi ed he  listened  to  all  the  conversation s.   He

18   did  not  testify  that  all  the  other  conversations   serve d

19   as  a  bas is for  his  opinion .   He  testifi ed that  the

20   conversation s he  play ed here  in  court , as  well  as

21   surveillance , as  well  as  document s that  he 's review ed

22   serve  as  the  basis  for  his  opinion .

23       Many  time s I  asked  him , "What  was  the  bas is of

24   your  opinion ?"  And  that  was  the  basis  he  gave , because

25   otherwise  it  would  have  been  object ed  to  if  it  was

1 based on something that wasn't introduced in evidence .

2 But here what counsel is trying to do is introduce

3 substantive evidence of their theory to refute Agent

4 Sakala 's testimony , and they need to do that in their

5 case .

6        THE COURT:  The transcript will be the guide , I

7 suppose .  It is opinion testimony , an opinion based

8 upon his review of all of the recordings and that by

9 taking into account all of the recordings he's able to

10 form an opinion based on selective recordings; is that

11 right ?

12        MR. MONTEMARANO :  Which is exactly the way he

13 responded to Mr. McKnett , Your Honor .

14        THE COURT:  If he has reached an opinion on

15 something in selective recordings that haven't been

16 placed in evidence which is X and Mr. McKnett wishes to

17 cross -examine him with regard to some other

18 conversations that have not been played , that would

19 undermine his opinion that it was X, which is that not

20 --

21        MS. JOHNSTON:  He can certainly cross -examine

22 this witness about whether or not another conversation

23 affected or changed his opinion or if he took it into

24 account , but they can't get into the substance of that

25 conversation through this witness which is what they're

1  doing -- Well, do you remember this conversation about

2  X, Y and Z being offered? -- so that the jury hears

3  what that conversation was about, which is not

4  admissible for --

5          THE COURT:   Why would it not be admissible for

6  the purpose of challenging the strength of his

7  opinions?

8          MS. JOHNSTON:   They can question him about

9  whether or not he considered it and whether or not it

10 affected his opinion.

11         THE COURT:   Why can't he ask him, isn't it a

12 fact that in conversation 101 that the witness stated X

13 in that conversation, which is inconsistent with your

14 opinion that you've just given?

15         MS. JOHNSTON:   I don't have a problem with that.

16 My problem is that they can't introduce the

17 conversation as evidence, because it's hearsay.

18         THE COURT:   They can use the content of the

19 conversation to cross-examine him.

20         MS. JOHNSTON:   To cross-examine the witness

21 about with whether or not that formed his opinion.  Of

22 course, what he's doing is he's summarizing something

23 that's not in evidence here, and the witness is saying

24 --

25         THE COURT:   First of all, I'm assuming as an

1 officer of the court you are not going to provide an

2 inaccurate summary of the conversation .

3          MR. MCKNETT :  I'm quoting directly from the

4 wiretap .

5          THE COURT:  In other words , I don't want you to

6 read the whole conversation into the record or play it

7 at this time , but I certainly think you can ask him

8 about the fact during conversation 101, witness X said

9 Y about Z, and isn't that inconsistent with the opinion

10 you've given here today ?

11          MR. MCKNETT :  That's what I'm doing.

12          THE COURT:  To that extent , the objection  is

13 overruled .

14          MS. JOHNSTON:  The problem with it is is he --

15 if he's vote quoting verbatim from the wiretap , Agent

16 Sakala has already said there may have been

17 inaccuracies.  These were drafts.  They went back over

18 these conversations and determined which ones were

19 pertinent and not pertinent .

20          THE COURT:  My ruling does not permit him to go

21 reading the whole thing into the record , which he can .

22 What you can do is if the witness in a conversation

23 said something that you believe , as counsel for your

24 client , is inconsistent , the opinion that he's offered

25 undermines the opinion you may inquire to that extent .

1          MR. MCKNETT:  I can proffer Your Honor where I'm

2 going with this right now.  The question I asked was,

3 do you remember a conversation between Ms. Martin and

4 I've now recollected, with the help of counsel, it was

5 Gill Williams, in which Mr. Williams and Ms. Martin

6 discussed certain dates and Mr. Williams asked Ms.

7 Martin to send him something on her letterhead.

8          She then called in the next call, and the next

9 one or two calls she then called Ms. Ali and asked her

10 to prepare a letterhead.  It had nothing to do with

11 drugs.  I'm going to ask him if he remembered those

12 conversations and if they --

13          THE COURT:   You may do that.

14          MR. MCKNETT:  If those conversations occurred,

15 would that change his opinion in any way?

16          THE COURT:   He may say no, but you may inquire.

17                  (Back in open court.)

18          MS. JOHNSTON:   Your Honor, the government's

19 objection is withdrawn.

20          THE COURT:   Thank you.

21          BY MR. MCKNETT:

22 Q.    Detective, I think my last question was to the

23 effect do you remember a telephone conversation between

24 Ms. Martin and my recollection has now been refreshed

25 it was Gill Williams -- Gilbert Williams in which Ms.

1  Martin  and  Mr.  Williams  discussed  certain  dates

2  pertaining  to  shows  and  Mr.  Williams  asked  Ms.  Martin

3  to  send  him  something  on  her  letterhead?

4  A.     I  do  not  recall  that  specific  conversation,  no.

5  Q.     Is  there  something  that  would  refresh  your

6  recollection,  perhaps  the  wiretap  logs?

7  A.     I  could  look  at  the  logs  if  you  had  a  specific

8  call  in  mind  and  see  if  it  does.

9        MR.  MCKNETT:   Again,  Your  Honor,  I  apologize.

10  May  I  retrieve  the  log?

11        THE  COURT:   You  may.

12        MR.  MCKNETT:   May  I  approach,  Your  Honor?

13        THE  COURT:   You  may.

14        BY  MR.  MCKNETT:

15  Q.     Are  you  finished  with  the  book?

16  A.     Yes,  I  am.

17  Q.     Thank  you.

18  A.     The  logs  do  not  refresh  my  recollection  but  they

19  do  reflect  what  you're  asking.

20  Q.     That  Mr.  Williams  asked  Ms.  Martin  to  send  him

21  something  on  her  letterhead;  correct?

22  A.     That  is  what  the  summary  says,  yes.

23  Q.     And  the  very  next  call  is  one  in  which  Ms.

24  Martin  called  Ms.  Ali  and  asked  Ms.  Ali  to  prepare  a

25  letterhead;  correct?

1 A.      Actually, I'd have to look at the logs again.  I
2 didn't look at the next call.

3       MR. MCKNETT:  May I approach again, Your Honor?

4       THE COURT:  You may.

5       BY MR. MCKNETT:

6 Q.      Just hang onto that for a second.

7 A.      Yes.  That is the next call.

8 Q.      The next call is one in which Ms. Martin calls
9 Ms. Ali and asks to have Ms. Ali prepare letterhead for
10 her; correct?

11 A.      That's what the summary says, yes.

12 Q.      And then later on there were a couple of other
13 calls in which Ms. Ali and Ms. Martin discuss what
14 address to put on the letterhead; correct?

15 A.      The logs reflect one additional call.

16 Q.      The address the logs reflect that the address on
17 the letterhead would be the address for?

18 A.      South Dakota A venue.

19 Q.      Paula's School of Performing Arts; correct?

20 A.      Yes.

21 Q.      There are no calls, are there, between Mr. Nunn
22 and Ms. Ali in the logs and to the best of your
23 recollection.

24 A.      To the best of my recollection, I believe there
25 were no calls intercepted between Ms. Ali and Mr. Nunn.

1  I believe that's accurate.

2        MR. MCKNETT:  May I retrieve the book, Your

3  Honor?

4        THE COURT:   You may.

5        BY MR. MCKNETT:

6  Q.     Are you finished with that?

7  A.     Oh, you tell me.

8  Q.     So far.

9        Sergeant, let's turn to call B5116, which is on

10 Page 438, and that's on May 1st.

11 A.     I'm sorry, what page number?

12 Q.     438.

13 A.     438?

14 Q.     Yes.

15 A.     All right.

16 Q.     Do you have that there?

17 A.     Yes.

18 Q.     This is a call between Ms. Dobie and Ms. Martin;

19 correct?

20 A.     Yes, it is.

21 Q.     There's a reference to "LaNora" in the middle of

22 that page.  Do you see that?

23       "LaNora was carrying on so, Honey."

24       Do you see that?

25 A.     Yes.

1  Q.      Are you -- did you see any or do you remember

2  any calls between Ms. Martin and Ms. Ali in which Ms.

3  Ali was carrying on by I take to mean and I'll ask your

4  opinion complaining, criticizing,

5  A.      I'm in the sure what she means there without

6  hearing the call again I don't know  if what she means

7  when she says LaNora is carrying on.

8  Q.      Well, this I believe is in your opinion  and this

9  was a call between Ms. Dobie and  Ms. Martin about

10  drugs; correct?

11  A.      Yes, it is.

12  Q.      And this is, I believe, during the time when it

13  was your opinion that there was a shortage of drugs;

14  correct?

15  A.      Ms. Martin was having a hard time getting drugs,

16  yes.

17  Q.      It would appear that in this conversation

18  assuming your opinion is correct that Ms. Martin was

19  telling Ms. Dobie that Ms. Ali was upset about

20  something; correct?

21  A.      I didn't say that.  She could have been.

22  Q.      Would that with be your opinion?

23  A.      No I didn't offer that opinion.

24  Q.      So you don't have any idea what Ms. Martin was

25  referring to, do you about Ms. Ali carrying on so?

1 A.      No, I don't think  I offered  any opinion  about

2 LaNora  in that  conversation .

3 Q.      Do you have  an opinion ?

4 A.      No, I do not.  That's what I said .  Without

5 hearing  the call  and listening  to the whether or not he

6 will  call , I don't know .

7 Q.      You're  not aware  of any calls in which  Ms. Ali

8 was carrying  on  with  Ms.  Martin ?

9 A.      Again , that  would  depend  on what  she means by

10 "carrying  on."  I'm sure  there  could  have  been calls.

11 If you mean   "carrying  on," she  went  on and on about

12 something .  I'm sure  there  could  have  been .

13 Q.      Okay .  But  you don't  know  what  she's talking

14 about ?

15 A.      I do  not .

16 Q.      Would  you turn  to Page  497 , please , Call B6306 .

17         Do you  see that  there ?

18 A.      Yes , I do .

19 Q.      That 's on May  11 ; correct ?

20 A.      Yes .

21 Q.      Again , it's between  Ms. Ali  and Ms. Martin  and

22 you said  toward  the bottom  of the page  about  two-thirds

23 of the way  down , Ms. Ali  where  Ms. Ali  says  I'm going

24 to come  by, see you this  evening , you in your  opinion

25 Ms. Ali  was telling  Ms. Martin  that  she was -- she

1  wanted to come by to get drugs.

2  A.      Yes.

3  Q.      Now, the fact is all Ms. Ali said was, I'm going

4  to come by to see you this evening?

5  A.      She says other things but.

6  Q.      That's all she said there, correct?

7  A.      In that one sentence that is what she said.

8  Q.      And then later on she says, toward about

9  two-thirds of the way down the next page, Ms. Ali says,

10 all right.  Well one this time.  What have you got good

11 over there?  You still bringing clothes; correct?

12 A.      That's correct.

13 Q.      And it's your opinion that if you take that

14 first sentence I'm going to come by see you this

15 evening and combine it with, all right well one this

16 time, that means that Ms. Ali was telling Ms. Martin

17 that she wanted to come over that evening to pick up a

18 quantity of drugs.

19 A.      That is correct.

20 Q.      There's nothing else in this conversation  in

21 your opinion relating to drugs; correct?

22 A.      That's correct.

23 Q.      And when in that very same sentence Ms. Ali

24 continues to talk about what you got good over there?

25 You still bringing clothes?  That was not drug-related.

1 A.      That has nothing to do with the first part of
2 her statement, no.
3 Q.      And that she was talking about Kevin, who is
4 what, Kevin Scott?  It's on the bottom of Page 498?
5 A.      Yeah I'm just looking at the previous page.  The
6 Kevin that Ms. Martin refers to on page 498 would be
7 Kevin Scott, yes.
8 Q.      He's the person who was selling clothes;
9 correct?
10 A.      He brings clothes -- brought clothes to Ms.
11 Martin, yes.
12 Q.      For Ms. Martin to sell?
13 A.      Yes.
14 Q.      If would turn to page --
15      THE COURT:  Mr. McKnett, how much more do you
16 have with this witness?
17      MR. MCKNETT:  I would say ten to 15 minutes.
18      THE COURT:  All right.  Let's take a morning
19 recess then.  We will recess until a quarter of 12.
20               (Jury excused at 11: 26 a.m.)
21               (Off the record at 11:26 a.m.)
22               (On the record at 11:47 a.m.)
23      THE COURT:  You may be seated.  Bring them in,
24 Bea.
25               (Jury returns at 11:48 a.m.)

1          THE COURT:   You may proceed .

2          BY MR. MCKNETT :

3 Q.      Sergeant , let's turn to Page 525 .  It's call

4 A1670.   It took place on May 16, '04, at about 5:50.

5          Do you have that there ?

6 A.      Yes , I do.

7 Q.      This is a call in which Ms. Martin calls Ms. Ali

8 and tells Ms. Ali that she wants Ms. Ali to leave her

9 husband home and come take me to the school .  I got to

10 take something there and Ms. Ali says , uh-huh .   Then

11 the conversation   continue s, and I'll come to that a

12 moment .

13         That 's what it says ; correct ?

14 A.      That is what it said , yes .

15 Q.      And then Ms. Martin says , I got to work on

16 something .  Then -- I've got to work on something .   And

17 then Ms. Ali says , okay .  Ms. Martin then says then I'm

18 going past your house and take something ; correct ?

19 A.      That 's what she says , yes .

20 Q.      It appear s that what Ms. Martin is saying is, I

21 got to work at something at her house which is where

22 she's calling from ; correct ?

23         It's a two-part question .  Ms. Martin is at her

24 house at the time this call take s place ; correct ?

25 A.      Yes .

1  Q.      And it appears that she says -- when she says, I

2  got to work on something, she's saying she's got to

3  work on something at her house; correct?

4  A.      I don't know where she's saying she's got to

5  work on something at her house.  That's what she says,

6  yes.

7  Q.      Well she says I got to work on something then

8  I'm going past your house; correct?

9  A.      No.  I think what she's saying when you look at

10  the whole thing is I've got to take something to the

11  studio and then I'm going to take something to your

12  house.  I don't think she has to work on something at

13  her house.  I don't think that's what she's saying.

14  Q.      Do you think she's saying she has to work on

15  something at the studio?

16  A.      I think she's saying she has to take something

17  to the studio, yes.

18  Q.      And work on it?

19  A.      No.  What's she's saying is she is taking

20  something to the studio, yes.

21  Q.      What she says -- this's your opinion but what

22  she says is, I've got to take something there which is

23  take something to the studio; right?

24  A.      Yes.

25  Q.      And then she says, I've to work on something;

1 right?

2 A.     Yes.

3 Q.     And then she says, then I'm going past your

4 house and take something; correct?

5 A.     Yes.

6 Q.     And then she tells at the bottom of that page

7 tells Ms. Ali when you coming in the front door just

8 say Paula, you got those that we're gonna go show our

9 girlfriends; correct?   That's what she says?

10 A.     Yes and again the problem with the quotations I

11 would not have -- she doesn't say, "Paula, you got to

12 take those things.   I would take the quotations out.

13 Q.     She's telling Ms. Ali in effect to lie to Ms.

14 Terrell; correct?

15 A.     That's correct.

16 Q.     Ms. Martin doesn't tell Ms. Ali, I got to take

17 drugs to the studio, does she?

18 A.     She does not use the word drugs, no.

19 Q.     She doesn't say anything in this conversation

20 that would lead Ms. Ali to know what it was

21 specifically that Ms. Martin had to take to the studio,

22 does it?   It just says "something."

23 A.     Something.   And the only other thing she says

24 is, it's very important.

25 Q.     Okay.   Take something to the studio and it's

1 very important that she take something to the studio?

2 A.    Yes.

3 Q.    But she doesn't indicate in any way in this

4 conversation what it is she's talking about.

5 A.    Not in this conversation, no.

6 Q.    If I remember correctly, this is a period of

7 time when John Martin was using Ms. Paula Martin's

8 vehicle to get back and forth to work; correct?

9 A.    On occasion he would and on this particular

10 occasion I believe he did, yes.

11 Q.    That's why Ms. Martin couldn't take something to

12 the studio without Ms. Ali's or somebody else's help?

13 A.    Correct. She did not have a vehicle.

14 Q.    Then in the next conversation -- not the next

15 one. Let's see. Let's go to 16 -- yes. It is the

16 next conversation 1674, Page 528. This is a

17 conversation between Ms. Martin and John Martin;

18 correct?

19 A.    Yes, it is.

20 Q.    And in this conversation Ms. Martin says to John

21 Martin, I'm going to move those tickets and everything

22 to the school; correct?

23 A.    Yes.

24 Q.    That would indicate that she's moving more than

25 just drugs to the school; right?

1  A.       Yeah, she is moving more than just drugs.

2  Q.       Now if I remember correctly, when the studio was

3  searched -- that was, what, June 1st?

4  A.       Yes, it was.

5  Q.       Drugs were found in the studio; correct?

6  A.       A lot of drugs, yes.

7  Q.       May I consult for a second?

8  A.       Yes.

9  Q.       And it was I guess depending on your opinion you

10 could describe it as less than a kilogram total?

11 A.       I don't know the exact weight but it could have

12 been.  It could have been over a kilo.  I'd have to

13 look at the drug report.

14 Q.       Didn't you testify the grand jury that it was

15 less than a kilo?

16 A.       I may have if you have my testimony that might

17 refresh my recollection.

18 Q.       Thank you.

19         May I do that, Your Honor?

20         THE COURT:   Yes, you may.

21         MR. MCKNETT:   May approach the witness, Your

22 Honor?

23         THE COURT:   You may.

24         BY MR. MCKNETT:

25 Q.       Detective, I'm showing you what appears to be a

1  transcript  of  testimony  on  February  1st  of  this  year

2  and  I'll  direct  your  attention  to  Page  54.

3           MS.  JOHNSTON:   Counsel,  what  page  was  that?

4           BY  MR.  MCKNETT:

5  Q.      54.

6           Does  that  refresh  your  recollection?

7  A.       Yes,  I  did  say  --  as  to  what  I  said,  yes.

8  Q.       So  earlier  this  year  you  testified  to  the  grand

9  jury  that  it  was  how  much?

10  A.       I  think  I  say  in  there  either  a  half  a  kilo  or

11  quarter  kilo  of  cocaine,  or  maybe  in  between  --

12  somewhere  in  between.

13  Q.       So  in  between  a  quarter  and  a  half.

14  A.       I  think  that's  what  I  testified  to  there,  yes.

15  Q.       Do  you  want  to  look  at  it  again?   I  don't  want

16  to  misstate  your  testimony.

17  A.       No,  I  do  not.

18  Q.       So  it  would  be  a  quarter  and  a  wit  was  between  a

19  quarter  and  a  half  kilogram  of  cocaine?

20  A.       Yes.

21  Q.       And  a  kilogram  is  brick-shaped?   You  said  the

22  other  day  it  was  --

23  A.       A  kilogram  is  1,000  grams.   A  kilogram  can  be

24  brick-shaped.   It  could  also  be  any  shape  you  want.

25  Q.       Just  for  descriptive  purposes,  if  it  had  been  in

1  the brick shape it would be literally in the shape of a

2  brick?

3  A.      That is correct.

4  Q.      And a half of a brick would be literally half

5  that size, which would -- a brick is about six inches?

6  Eight inches?

7  A.      I testified before it could be any size or

8  shape, but it's going to equal 1,000 grams.

9  Q.      I understand that.  But just for descriptive

10 purposes, I don't want to say it was in that shape at

11 the studio because it may or may not have been.  But if

12 it had been in the shape of brick then a brick is about

13 six inches long?

14 A.      Again bricks come in all shapes and sizes, and

15 just because one brick is six inches, another one could

16 be ten inches.  It could be an inch thick or it could

17 be three inches thick.  "Brick" is a generic term.  It

18 does not refer to a specific size or shape.

19 Q.      Let's talk in terms of a building brick.  The

20 bricks that people use to build houses.

21 A.      Okay.

22 Q.      That's the brick about six inches long; correct?

23 A.      I would guess.  Six or eight inches, yeah.

24 Q.      Okay.  Maybe two inches thick?

25 A.      Two or three, yes.

1  Q.      And about three inches wide.

2  A.      Sounds about a good approximation, yes.

3  Q.      If cocaine -- if a kilogram of cocaine was

4  shaped -- was packaged in that shape, that's about the

5  size a kilogram of cocaine would be; correct?

6  A.      It can be, yes.

7  Q.      So a half of a brick would about three and a

8  half, four inches by 12, and two and a half by three?

9  A.      It can be, yes.

10  Q.      And quarter of a key would be half of that

11  again; correct?

12  A.      Yes.

13  Q.      So it's a relatively small package; correct?

14  A.      It can be, yes.

15  Q.      It can be.

16          We saw a video of Ms. Ali and Ms. Martin

17  carrying packages out of her house this day, correct,

18  the afternoon of May 16?

19  A.      Yes.

20  Q.      And they were carrying several bags; correct?

21  A.      That is correct.

22  Q.      Shopping bags.  Department store bags.

23  A.      Yes, they appeared to be.

24  Q.      How many -- could you see mow each of them had?

25  A.      It looked at least like at least two.  It could

1 have been three.  I think we've tried to put it on

2 freeze frame and trying to, you know, identify specific

3 bags and all we can say is they appear to be similar to

4 shopping wag bags with handles.

5 Q.     And each person -- Ms. Martin and Ms. Ali -- had

6 at least two bags in each hand?

7 A.     It appeared to be.

8 Q.     And there could have been more.

9 A.     It could have been more.  They could have only

10 had one bag, too.  They were carrying bags.

11 Q.     Somewhere from in those bags, whether it was two

12 bags or four bags or six bags, that each of them

13 carried, somewhere in those bags was a quarter key of

14 cocaine.

15 A.     The exact amount I don't know, but the cocaine

16 was among other things were in those bags, yes.

17 Q.     Okay.  So either a quarter -- maybe up a to

18 half.

19 A.     Again, it wasn't one brick found at the studio

20 it was many, many different packages.  So, the amount

21 is correct but it's not a brick.

22 Q.     Well the search was several days later; right?

23 A.     The search was on June first.

24 Q.     So that's -- this incident took place on May 16.

25 A.     Yes.  But if you're saying the same drugs that

1  were recovered in the school, the quarter to half kilo

2  that they were not in brick form they were in numerous

3  maybe a hundred different packages I can't remember how

4  many different packages but they were not in a brick

5  form if you're saying the same drugs were moved.

6  Q.      When they were recovered, they had been broken

7  down and repackaged into different packages?

8  A.      They were broken down and packaged in different

9  sizes, yes.

10 Q.      You have no idea what shape they were in on May

11 16, do you?

12 A.      No.  No.

13 Q.      So it could have been just a quarter?

14 A.      It could have been ten kilos I don't know  how

15 much was in the bag that they move today the school on

16 that day.

17 Q.      But you testified that it was between a quarter

18 and a half a kilogram; correct?

19 A.      I did not.  I testified that the drugs recovered

20 at the school were between a quarter and a half kilo.

21 I did not testify as to how much was moved by Ms.

22 Martin and Ms. Ali on that day.

23 Q.      Okay.  Then on to call -- there's an

24 intermediate call in which number B6863 -- let me just

25 interrupt that.  Strike that for a second.

1        The call I referred to, A1670, was one of a

2 series of calls that afternoon; correct?

3 A.      1670  Yes.  It began a series.

4 Q.      And it went from A1670, 1674, 1675 and so forth;

5 correct?

6 A.      Yes.

7 Q.      B6863.  I'll take them in sequence.   The next

8 call in sequence was 6863, and that was just a short

9 call in which basically Ms. Martin gets a call from

10 John Martin that says, I'll call you back.

11 A.      Yes.

12 Q.      Then the next substantive call is the same day

13 and it's a minute later after the call from John

14 Martin.  Again, it's John Martin calling, and that's

15 the one where Ms. Martin tells Mr. Martin that she's

16 moving those tickets and everything to the school and

17 as you just testified there was more than just drugs

18 being moved to the school?

19 A.      There was a lot of assorted paraphernalia, yes.

20 Q.      Well, paraphernalia is a kind of dangerous term.

21 A.      Packaging, scales, drug containers.  Things

22 associated with the drug trade were   recovered at the

23 school.  Again, the exact makeup of the packages that

24 were moved on that day I can't say.  I can only say

25 what's recovered in the school.

1  Q.      So we're talking about two different  incidents

2  on May 16.  Ms. Martin told John Martin she was taking

3  the tickets and everything?

4  A.      She was moving the -- my opinion is she was

5  telling him she was moving the drug operation  to the

6  school.

7  Q.      On June 1st, what you would describe, I believe,

8  as the drug operation was recovered; correct?

9  A.      That's correct.

10 Q.      You don't know what was in those bags on May 16,

11 do you?

12 A.      I don't know the exact makeup of the bags, no.

13 Q.      Were there clothes found tat school?

14 A.      I don't know.

15 Q.      So you don't know exactly what was in those bag,

16 do you?

17 A.      I do not know the exact composition of the bags.

18 My opinion is that the bags contained drugs and

19 assorted paraphernalia and that similar things we re

20 covered at the school that seem to match what was on

21 the video contained such items.

22 Q.      The bags themselves were department store bag,

23 shopping bags, and goodies.

24 A.      Similar size and shape.

25 Q.      Lord and tailor that kind of stuff, right?

1  A.      That's correct.

2  Q.      They had the store's names on the size of them,

3  some of the bags?

4  A.      They may have.  I'd have to look at the bags.

5  Q.      You don't know that Ms. Ali knew what was in

6  those bags, do you?

7  A.      I have an opinion, but there is no conversations

8  intercepted where Ms. Ali identifies the contents of

9  the bags.

10  Q.      So you don't know that she knew what was in the

11  bags, do you?

12  A.      Again, I have an opinion.  But based on the

13  conversations I cannot say that, no.

14  Q.      So you don't know that she knew what was in the

15  bags.

16  A.      Again, in my opinion is I'm firmly confident

17  that she knew what was in the bags based on entire

18  case.  In these series of conversations Ms. Martin

19  never tells her the contents of the bags if that's as

20  clear as I can be.

21  Q.      Well she doesn't tell her the contents of the

22  bag in any conversation.

23  A.      No, I would disagree with that.  In the

24  conversations with John Martin I think she clearly

25  identifies the contents as being drugs.  She does not

1  say specifically other than moving everything she

2  doesn't say specifically I'm moving this scale I'm

3  moving this package I'm moving this amount of drugs.

4  There is no conversation in which Ms. Martin tells Ms.

5  Ali what's in the bag bags.

6  A.     I would agree with that.  That's what I've said.

7  Q.     In that same conversation -- is it 1674?  In

8  A1674 they talk about a Mr. Scott -- Kevin bringing

9  clothes to her house; correct?

10  A.     Yes.

11  Q.     And that raising concerns amongst the neighbors

12  apparently; correct?

13  A.     That is what Ms. Martin says, how she

14  characterizes it.

15  Q.     And she says that they see lot of boxes coming

16  here and clothes but those things of Kevin's is legit;

17  correct?

18  A.     Yes.

19  Q.     And the packages that we saw on the tape that

20  Ms. Ali and Ms. Martin were carrying out were clothing

21  store packages, weren't they?

22  A.     No.  Oh, well I'm sorry yes they were packages

23  shopping bag packages.  Again I'd have to look at the

24  specific bag to see if they were clothing store bags.

25  Q.     I want to talk to you about the next call which

1  would be A1675, Page 531.  This a conversation  between

2  Mr.  John Martin  and Ms.  Martin;  correct?

3  A.      Yes, it is.

4  Q.      And it's at 18:47, that  same  evening , May 16;

5  correct?

6  A.      Yes.

7  Q.      Just to put this in context  the first  call

8  between  Ms.  Martin  and Ms.  Ali  was at 5:50 on the

9  sixteenth;  correct?

10  A.      First  call  was at 5:50, yes.

11  Q.      Then  the short  very short  call between  Mr.

12  Martin  and Ms.  Martin  was at 5:59.  The next  call

13  between  Mr.  Martin  and Ms.  Martin  was at 6 o'clock , and

14  then  the next  call A1675  was at 6:47 that  same  evening ;

15  correct?

16  A.      Yes.

17  Q.      You testifi ed, I believe,  that this is a call

18  between  Mr.  Martin  and Ms.  Mart Martin  and it took

19  place  when Ms.  Martin  was in Ms.  Ali's vehicle ;

20  correct?

21  A.      I don't know  I said  the vehicle .  I may have .

22  She's with  LaNora  Ali  just based  on what  she's say ing

23  there .

24  Q.      I thought  you said  Ms.  Martin  was  riding  with

25  Ms.  Ali  from  the school .

1  A.      I could have.  I think I also said I don't know

2  exactly where they were at when this conversation  took

3  place.

4  Q.      Okay.  Just wanted to clarify one thing.  Later

5  in this conversation, page 0532 Ms. Martin says, I'm

6  getting ready to get on the elevator and then Mr.

7  Martin says okay I heard the buzz they that would

8  indicate they were just getting into the studio, isn't

9  it?

10  A.      No.  This is after -- there is no elevator

11  associated with the studio.  this would have been

12  sometime after.  Whether they were still in the car or

13  I don't even know if Ms. Ali has an elevator in her

14  apartment building.

15  Q.      Okay.  There was surveillance at Hayward on the

16  16th of May, wasn't there?

17  A.      I do not believe so, no.  I'd have to look at

18  the surveillance  log but not regarding this {e}

19  {c5e7b9}, no.

20  Q.      Wasn't there a surveillance  that showed Ms. Ali

21  arriving at Ms. Martin's house in her explorer  at

22  6:note {witz} 6:12 p.m, government  exhibit -- it was a

23  video.

24  A.      Pole cam remarks yes.

25  Q.      V 28.

1 A.       Yes.

2 Q.       That would show that she arrived at 6:12;

3 correct?

4 A.       That is whatever time the video shows, yes.

5 Q.       I believe the video shows that she was seen

6 carrying bags to the vehicle at 6:15.

7 A.       That sounds about right.  It was very -- she was

8 in and out very quickly.

9 Q.       So that would indicate, wouldn't it, that Ms.

10 Ali didn't package anything up, didn't put anything in

11 the bags she just went in the house, Ms. Martin said

12 something to the effect, this is the stuff I want to

13 move, Ms. Ali, and they helped her carry it to the car?

14 A.       I don't know if it would indicate that, but she

15 certainly was not in the house very long where she

16 would be packaging stuff up.

17 Q.       Now, let's go to Page 563.

18 A.       Page 563?

19 Q.       Yes.  That's call B7224.  I just wanted to refer

20 to this briefly.  That's on May 19.  At the bottom of

21 that, Ms. Martin says to Ms. Ali, I don't even want to

22 stress that issue with girlfriend upstairs.  And "that

23 issue," I believe, is the neighborhood meeting.  And

24 Ms. Martin is again telling Ms. Ali, as she told other

25 people, about not really wanting to get Ms. Terrell

1  involved in any of her activities.

2  A.      No, that's not what she cease saying.  My

3  opinion is what she's saying is Ms. Ali is asking

4  whether there's been any news with regard to the

5  neighbor, and what she's telling -- Ms. Martin is

6  telling Ms. Ali is that she doesn't want to bring it up

7  with Jacqueline Terrell to draw attention that she's

8  concerned about that issue again.  So, I think that's

9  what she's saying there.

10  Q.      Okay.  Again, she's not talking to Ms. Terrell

11  about things she doesn't want to.

12  A.      She doesn't want to draw attention that she's

13  concerned about the neighborhood watching her

14  activities.  She doesn't want to bring that to Ms.

15  Terrell's attention.

16  Q.      Call B7259, 0567.  That's at May 20.  It's about

17  1:10 in the afternoon, and Ms. Martin is talking to Mr.

18  Goodwin; correct?

19  A.      That is correct.

20  Q.      In the middle of that big block paragraph there

21  she says, basically, that the only people who are

22  coming to her -- she says, "ain't no traffic really

23  been coming here no more for Kevin's clothes.  And then

24  she says, and my kids and LaNora and Ulysses.

25          What she's saying there -- isn't it true she's

1  telling Mr. Goodwin that the only people coming by her

2  house are her family and Ms. Ali and her husband,

3  Ulysses?

4  A.     She's saying there's been no traffic for Kevin's

5  clothes, and the people coming by were her kids,

6  LaNora, and Ulysses.  Yes, that's what she's saying.

7  Q.     So, her kids and her friends are coming by the

8  house.

9  A.     She doesn't say anything about friends.  She

10 just says friends,  LaNora, and Ulysses.

11 Q.     Whom we've established are her friends?

12 A.     They are some of her friends, yes.

13 Q.     If you would turn now to Page 57, call B7324,

14 which took place on May 21, about 7:40 in the morning.

15        That was the first of a series of calls;

16 correct?

17 A.     Yes.  Do you have the numbers?

18 Q.     B7346, B7365, B7385, B7396.

19 A.     Oh, yes.  Yes, it was.

20 Q.     Okay.  And there were two more.  B7406, and

21 A1820.

22 Q.     The one I wanted to refer to -- a couple of them

23 I wanted to refer to specifically are B7365, which is

24 on Page 577.  I wanted to clarify something on this

25 one.  This is a call in which Ms. Martin is talking to

1  Mr.- -- Ms. Ali, and she says -- she's talking about

2  Ms. Martin had to meet Goody over there at Brentwood.

3  And then she says one of his friends had to take a

4  test. That had nothing to do with drugs, did it?

5  A.      Nothing to do with drugs at all. She was

6  referring to the test at MVA.

7  Q.      Brentwood is where the MVA driver testing

8  station is; correct?

9  A.      Yes.

10 Q.      And then later, in call B7385, Page 578, later

11 the same day -- it's now 4:06, and Ms. Martin is

12 talking to Ms. Dobie again, and she says that LaNora is

13 picking me up and we are going out to Ruth's and eat

14 crabs.

15         Do You see that?

16 A.      Yes, I do.

17 Q.      Was there a surveillance that would confirm that

18 Ms. Martin and Ms. Ali went anywhere that day?

19 A.      I don't know if there is. I'd have to look at

20 the surveillance log. I don't know.

21 Q.      This conversation, at least insofar as it refers

22 to Ms. Ali picking her up and they're going to Ruth's

23 to eat crabs. That was not drug-related, was it?

24 A.      No, it was not.

25 Q.      Do you know who Ruth is?

1  A.      Ruth's could be a location.  A restaurant.  I

2  don't know.

3  Q.      On Page 579, call B7396.  Same day, May 21.

4  It's now 5:30, and again Ms. Martin is talking to

5  Ms. Dobie again, and she repeats that -- well, she

6  doesn't repeat this.  She says she's just been out of

7  here with LaNora just brought me back because getting

8  crabs to eat this evening.

9          That was not drug-related conversation, was it?

10  A.      No, it was not.  That part of the conversation

11  was not drug-related.

12  Q.      Right.  It's your opinion that the rest of it

13  may have been.

14  A.      My opinion is that there is drug-related

15  conversation there, yes.

16  Q.      Again, we don't really know if Ms. Ali ever

17  actually went and got Ms. Martin to go out and get

18  crabs, do we?

19  A.      Only Ms. Martin says she did.  That's -- we

20  certainly -- I certainly -- someone could look at the

21  pole cam and see if it reflects Ms. Ali bringing her

22  back or picking her up.

23  Q.      Okay.  Can we go to Page 599, call B7815.  It's

24  now May 26, and it's 12:19 in the afternoon.  This is a

25  conversation which you say is partly drug-related.  I

1 think you said the part where Ms. Ali says, around the

2 middle of Page 599, were you able to get -- and then

3 Ms. Martin talks over her and says, yeah, I have it.

4 Unintelligible.  Yeah, I have it.

5          Right?

6 A.       Yes.

7 Q.       It was your testimony, I believe, that that part

8 constituted a conversation between Ms. Ali and Ms.

9 Martin in which Ms. Ali was asking Ms. Martin if she

10 was able to get some drugs and that Ms. Martin said

11 yes.

12 A.       That is correct.

13 Q.       That's your opinion; right?

14 A.       That is my opinion, yes.

15 Q.       Then they talk about -- the next comment there

16 by Ms. Ali is they're talking about Nantuckets at the

17 wholesalers $.99.  Do you know what that was in

18 reference to?

19 A.       I probably do if I listen to the whole call, but

20 nothing to do with drugs.

21 Q.       Nantuckets are maybe a kind of clothing?  Shoes?

22 Something like that?

23 A.       I have no idea what it is.

24 Q.       Then there was a portion of the transcript that

25 was not transcribed and it was --

1  A.       That's correct.

2  Q.       -- 16 minutes long.  It was not transcribed.

3  A.       The call 16 minutes long?

4  Q.       Well, it says the transcribed portion of -- I'm

5  sorry.  Maybe I misread this.

6  A.       The call is about five minutes long.

7  Q.       You're right.  You're right.  And it was just --

8  did I say 20?  I'm sorry.  I should have said

9  "seconds," not "minutes."  The transcribed portion --

10 the next transcribed portion.

11 A.       Yes.  The next transcribed is about 16 seconds.

12 Q.       Right.  Ms. Ali says, we'll be by there later on

13 this evening; correct?

14 A.       Yes.

15 Q.       She didn't say, I'll be by, but she says, we'll

16 be by.

17 A.       That's correct.

18 Q.       And then Ms. Martin says, I may not be here, but

19 I'm going to...going to leave -- if I leave -- if I

20 leave out for -- before, you all get here, I'll leave

21 it with Jackie.

22          Right?

23 A.       Yes, she does.

24 Q.       And then Ms. Ali asks what Ms. Martin is going

25 to do, and she talks about having to go see the

1  entertainment lawyer and so forth; correct?

2  A.      That is correct.

3  Q.      Is it your opinion that Ms. Martin was going to

4  leave a package of drugs with Ms. Terrell to deliver to

5  Ms. Ali when Ms. Ali got there?

6  A.      Something containing the drugs, yes.

7  Q.      Are you aware of any other circumstances in

8  which Ms. Martin used Ms. Terrell to deliver drugs to

9  somebody?

10 A.      I don't know that I am, no.  I don't know that

11 she did on this occasion either.

12 Q.      So you don't know if this was a drug

13 transaction?

14 A.      I don't know if it happened that's correct.

15 Q.      You do not know that Ms. Martin ever used Ms.

16 Terrell to deliver drugs except for this possible

17 instance.

18 A.      I do not know.  The only thing I was going to

19 say is the logbook has an entry around this date that

20 would tend to confirm that this happened, but that

21 could be for another transaction.

22 Q.      So this may not even be a drug transaction.

23 A.      I think they're talking about that.  What I'm

24 saying is, I don't know if it actually was consummated.

25 Q.      And Ms. Terrell is the woman that Ms. Martin and

1  Ms. Ali would talk about as basically somebody they

2  didn't want to be around, because she kept -- have you

3  ever heard of the word "nooge?"  Do you what a nooge

4  is?

5  A.      Yeah.  I would agree with that.  Also during the

6  wiretap there were frequently times where Ms. Martin

7  prepared a package  to be transferred to someone    while

8  other people were there.  So, it certainly was not

9  unusual for her to conceal drugs in another item to

10  hand people so people wouldn't know what's going on.

11  Q.      But Ms. Terrell was a person that -- a nooge is

12  somebody who just kind of gets in your business and

13  wants to do favors and just takes advantage.

14  A.      I would agree with that definition of a "nooge,"

15  and that was part of the complaints that they had with

16  Ms. Terrell, yes.

17  Q.      Call B8040.  This, I believe, was one of the

18  inserted calls.

19          Do you have that there?

20  A.      Yes, I do.

21  Q.      This was a call -- it starts out talking about

22  jerk.  In this instance, "jerk" is food.  It's jerk

23  chicken; correct?

24  A.      Yes.

25  Q.      And they're talking about somebody cooking jerk

1  and selling out before 12 o'clock; right?

2  A.      y.

3  Q.      That's not a reference to cooking crack or

4  anything like that.

5  A.      No, it is not.

6  Q.      On the next page -- my pages aren't numbered, I

7  apologize, but the second page of this conversation, at

8  the top, where Ms. Ali says, yes, it is.  And then

9  asks, you going to be home this evening?  Ms. Martin

10 says, yeah, I'm gonna be here.  And Ms. Ali says, okay.

11 You know, you know my thing, and I'm bring you your

12 money for my clothes.

13         Now, it was your testimony that what Ms. Ali was

14 saying was that she was coming over to get drugs and to

15 give Ms. Martin money for clothes.

16 A.      That is correct.

17 Q.      Can you read that to say in your opinion,

18 assuming thing -- this is a reference to drugs and it's

19 your opinion it is; correct?

20 A.      Yeah, it is.  Yes.

21 Q.      Can't you read this to say, okay, you know, I'm

22 bringing money for my drugs and I'll bring you money

23 for my clothes?

24 A.      Not if you look at the ledger which I think

25 shows a payment for clothes and a payment for drugs and

1  also shows a receipt for drugs.

2  Q.      Well, I'm looking at the ledger, and it's right

3  here.  What it shows is -- if I can get this larger --

4  under -- I believe your testimony was that in the

5  left-hand column LaNora was the clothes column.

6  A.      I believe so, yes.

7  Q.      And the right-hand column, tickets, is the drug

8  column --

9  A.      That is correct.

10 Q.      -- with relation to Ms. Ali, in your opinion.

11 A.      That's correct.

12 Q.      Well, it shows a payment in both columns for May

13 28.

14 A.      It shows a distribution of $125 worth of cocaine

15 and a payment of $300 for cocaine on May 28.  It shows

16 a payment of $80 on clothes on May 28.

17 Q.      Isn't there a minus sign?  If you look at that,

18 it says 275; right?

19 A.      Correct.

20 Q.      Plus 125.

21 A.      That's the $125 worth of drugs, yes.

22 Q.      Total 400.

23 A.      That's correct.

24 Q.      And then minus 300.

25 A.      That's correct.

1  Q.      Leaves a balance of 100.

2  A.      That's correct.

3  Q.      So it wasn't a distribution of drugs on May 28,

4  was it?  It was, in your opinion, a payment for drugs.

5  A.      No, that's incorrect.  It's both.  The $125 is

6  the distribution; the 300 is the payment.

7  Q.      So you're saying that at some prior date there

8  was a running balance of $275?

9  A.      That is correct.

10 Q.      And then you're saying that from here down,

11 +125, total 400, -300, balance 100, that all relates to

12 May 28?

13 A.      Yes, sir.

14 Q.      So Ms. Martin saw a need to do a cash

15 transaction and then go back and write it down?

16 A.      She distributed $125, which she would put down,

17 and then she would subtract a $300 payment, and that

18 gives her the new balance.  There would be no need for

19 her to write 528 and then write 528 again.

20 Q.      If she distributed a quantity of drugs from 125?

21 A.      Yes.  She's just keeping track of the drugs that

22 are going in the amount of the bill.  Ms. Ali picked up

23 another eighth of an ounce and paid another $300 on her

24 bill.

25 Q.      It's your testimony that this represents a new

1 transaction  on May  28?

2 A.     It represent s a distribution  of an eighth  of an

3 ounce , yes.

4 Q.     And then  Ms. Ali  paid $300  on May  28.

5 A.     Yes , that's  what  it  shows.

6 Q.     So your  testimony , if I follow , is that  Ms. Ali

7 paid  cash  for a new  distribution ?

8 A.     No , I'm not  say ing  that  at all .  Her  bill  was

9 $275 .  Ms. Ali  got an eighth  of an ounce , and that

10 brought  the bill  up to $400 .  Ms. Ali  then  pays her

11 $300  to bring  her  running  tab  down  to $100 .

12        Maybe  I'm not  saying  it clear , but  I think  it's

13 pretty  straightforward .

14 Q.     So would n't  it have  been  simpler  to just  write

15 down  275 and then  do a separate  transaction , whatever

16 it was , for 125 and then  subtract  the balance  175 from

17 the 275 without  going  through  these  intermediate  steps ?

18 A.     That  would -- you could  do it that  way .  That 's

19 not the way she chose  to do it .  She 's keep ing  track  --

20 she's  putting  the $125  to figure  out what  the total

21 bill  is , and then  I'm ass uming  she 's say ing , Ms. Ali ,

22 you owe me $400  now , and Ms. Ali  is now  pay ing  her

23 $300 .

24 Q.     You choose  to interpret  this  in a way  that  would

25 increase  the amount  of drug s that  Ms. Ali  bought ; is

1  that correct?

2  A.      I'm not choosing to interpret it any way.  The

3  increase shows what it shows.  It shows the

4  distribution of an eight of an ounce.

5  Q.      That's your opinion of what it shows; right?

6  A.      That's correct.

7  Q.      You weren't there?

8  A.      I was not present during the transaction, no.

9  Q.      And at least the arithmetic would have been

10 simpler without writing down these intermediate steps.

11 A.      I disagree with that, and that's clearly not

12 what she's done on other pages.

13 Q.      Let's turn now to Page 610, call B8064 on May

14 28, the same day.  The only reason I mention this is

15 that Ms. Ali answers the phone.

16 A.      Yes.  I guess we talked about it with Mr. Hall.

17 That's correct.

18 Q.      And then the rest of the -- this substantive

19 part of the conversation was Ms. Ali was -- at least

20 not on the transcript and the CD was not a part of

21 that; correct?

22 A.      I think the entire call is on the CD.  I'm not

23 sure what you're asking.

24 Q.      Well, in the first part it looks like Mr.

25 Whiting calls the Martin residence and Ms. Ali answers

1 the phone.  He asks to talk to Paula, Mr. Whiting des,

2 and Ms. Ali and Mr. Whiting just say hi, how you doing?

3 A.      Yes, I agree with that.  I'm saying the entire

4 call is on the CD.  It's not excerpted.

5 Q.      The only part that Ms. Ali played in that call

6 was to answer the phone and say "hello" and give the

7 phone to Ms. Martin.

8 A.      Yes, I would agree with that.

9 Q.      And then on page 612, call B8110, May 29 at

10 11:05 in the morning.  A little while ago this morning

11 I asked you, and you agreed, that people who are

12 involved in a conversation who are aware of the subject

13 matter of the conversation tend to talk in a kind of a

14 shorthand.

15 A.      Yes, I agree with that.

16 Q.      Well, let me ask you a question about this

17 conversation.  At the top of Page 613, Ms. Ali says,

18 but, um, I need to get another dress.  Ms. Martin says,

19 okay.  Ms. Martin says, okay.  Yeah.  So, with the ties

20 for -- and then interrupted by Ms. Martin.

21       Do you see that part?

22 A.      Yes.

23 Q.      I believe it was your testimony that when Ms.

24 Ali said, I need another dress, she was telling Ms.

25 Martin that she wanted more cocaine.

1 A.      That's correct.

2 Q.      And then -- what was your opinion on the portion

3 where Ms. Ali says, yeah.  Okay.  Yeah.  So, with the

4 ties for.

5 A.      She then goes on to say she's been to the school

6 already that morning.

7 Q.      No.  I'm sorry.  One line above that, when Ms.

8 Ali is talking.  Ms. Ali says, okay.  Yeah.  So, with

9 the ties for.

10 A.     I don't know  what she's referring to there.

11 Q.      When you listen to that tape, it sounds like Ms.

12 Ali may not have been finished on that first line but

13 that Ms. Martin interrupted her.

14 A.     That's what --

15 Q.      Ms. Ali said, but I need to another dress.  And

16 then Ms. Martin interjected, okay, before Ms. Ali might

17 have been finished with what she was going to say.

18 A.      I don't know  if Ms. Ali was finished or not.

19 She just says she needs another dress.  Ms. Martin says

20 okay.

21 Q.      On the transcript, it's written up as if Ms. Ali

22 had finished her statement.

23 A.      There is a period at the end of the sentence,

24 yes.

25 Q.      Well, let's assume that Ms. Ali wasn't finished

1  with her statement  and that Ms. Martin  interrupt ed her

2  because  Ms. Martin  knew -- as soon as Ms. Ali  said

3  "dress" Ms. Martin  knew what Ms. Ali  was talking  about.

4  A.     I think  she knew  exact ly what  she was  talk ing

5  about.

6  Q.     Let 's assume  that  she was  going  to say,  I need

7  to another  dress  shirt .

8        MS. JOHNSTON:    Objection .

9        Assume s fact s not  in evidence .

10       MR. MCKNETT :   It's a hypothetical  to an  expert ,

11 Your  Honor .

12       THE COURT:    Over ruled .

13       BY MR.  MCKNETT :

14 Q.     Let 's assume  that  Ms. Ali  was going  to say,  but ,

15 um, I need  to another  dress  shirt ,  okay?

16 A.     Okay .

17 Q.     And then  Ms. Martin  interrupt ed her ,  because  Ms.

18 Martin  knew  that  Ms. Ali  was  referring  to dress  shirt s.

19 And then  Ms. Ali  continued ,  yeah.  Okay .   Yeah ,  so with

20 the ti es for  Ulysses  -- it was  her  husband  -- and  Ms.

21 Martin  interrupt ed again ,  because  Ms. Martin  knew  that

22 Ms. Ali  was referring  to dress  shirt s with  ti es for  Ms.

23 Ali 's husband ,  Ulysses .

24 Q.     Let 's assume  that 's what  she intend  today  say?

25 A.     Are you  tell ing me to assume   that 's what  she

1 intended to say and assume this call is not about

2 drugs?

3 Q.     I'm asking you to assume exactly what I've asked

4 you to assume and nothing more.

5 A.     I think you said to assume what she said and

6 assume it's not about drugs.

7 Q.     Assume that Ms. Ali was going to say, I need

8 another dress shirt; and assume that she was going to

9 say, with the ties for Ulysses.   Okay?

10 A.     Okay.

11 Q.     If that were the case, would that change your

12 opinion about the meaning of this call?

13 A.     If Ms. Ali had said those things and Ms. Martin

14 still followed it up with she's already been to the

15 school already that morning, no, it would not, because

16 that's what she moved the drug business, not the

17 clothing business, to the school.   The drug business

18 was at the school.   The clothing business, I think as

19 we saw in the pictures, was still at Hayward.

20 Q.     So it's your opinion that even if Ms. Ali had

21 intended to say, I need to another dress shirt with the

22 ties for Ulysses, that would not have changed your

23 opinion.

24 A.     No, not at all.   That's not what she said.   But

25 even if she had said that, as long as Ms. Martin's

1 reaction was one of meaning she had to go to the school

2 to get what Ms. Ali wants, going to the school -- and I

3 think as we saw in numerous conversations, she went

4 down there to pick drugs up, not clothes.

5 Q.     Are you telling the ladies and gentlemen of the

6 jury that the only accurate interpretation of all of

7 these conversations that we've heard is your

8 interpretation?

9 A.     I'm telling you what my opinion is.

10 Q.     And that if they should come to different

11 opinions that they would be wrong?

12 A.     I'm telling you what my opinion is.

13       MS. JOHNSTON:   Objection.

14       THE COURT:   Sustained.

15       Don't argue with the witness.

16       MR. MCKNETT:   I have nothing further, Your

17 Honor.

18       THE COURT:   Is there redirect?

19       MS. JOHNSTON:   Yes, Your Honor, I'm afraid so.

20                    **REDIRECT EXAMINATION**

21       BY MS. JOHNSTON:

22 Q.     Detective Sakala, I'm going to jump around a

23 little bit here.  Hopefully you can stay with me.

24       Let's talk first about Mr. McKnett's

25 questioning, because that's fresh in our minds, and

1  then we'll go back to last week's cross-examination .

2        In terms of those last few question s about

3  Hayward 7 and that ledger . Counsel seem ed to have

4  problem s follow ing your math .

5        MR. MCKNETT :   Objection .

6        MR. MARTIN:    Objection .

7        BY MS. JOHNSTON:

8  Q.      Strike that .

9        Let me find the page here .  This was the last

10 page he had shown you ; is that correct ?

11 A.      Yes .

12 Q.      Okay .  And you indicated that that reflect s

13 another April transaction  and **a** payment on the drug

14 tab ; is that correct ?

15 A.      That 's correct .

16 Q.      If we were to go back to the other page that has

17 LaNora at the top ?

18 A.      Yes .

19 Q.      Okay .  At the bottom of that page , are there

20 notation s that reflect drug transactions  --

21 calculation s in a similar manner ?

22 A.      Yes .

23 Q.      Okay .  And if you could explain that to the

24 jury .

25 A.      Where she adds to the total , most common ly $125

1  -- when I say "she," Ms. Martin adds to the total, and

2  that reflects a distribution of an eighth of an ounce

3  which I think even in the conversations show that's the

4  price she was charging for an eighth of an ounce.  And

5  where she subtracts from total reflects a payment on

6  that bill.

7  Q.     Calling your attention to where we have a

8  balance of 225.  What comes after that?

9  A.     The 125 looks like a distribution to bring the

10 new drug bill to $350.

11 Q.     What do we have at that?

12 A.     It is a $200 payment on five -- whatever the

13 date is there -- and reflecting another new total of

14 $150.

15 Q.     Then what do we have after that?

16 A.     You have another distribution of an eighth of an

17 ounce for $125, to bring the new total of up to $275,

18 which is carried forward to the next page where it says

19 "tickets."

20 Q.     And that is separate from the transactions

21 involving clothes; is that correct?

22 A.     Yes.  In fact, the -- I think clothing

23 transactions have different notations indicating

24 clothing.

25 Q.     Counsel asked you questions about the drugs that

1   were recovered from the school.  Other than a half -- a

2   quarter to a half a kilo of cocaine powder, was there

3   other cocaine base recovered from the school?

4   A.      Yes.  Crack.  Cocaine.  A lot of crack was

5   recovered.  Like I said, packaging -- a lot of

6   packaging materials, scales, things associated with the

7   drug trade.

8   Q.      And heroin as well; is that correct?

9   A.      Yes, that's correct.

10  Q.      And you mentioned that the -- were the drugs

11  packaged along one lump chunk?

12  A.      No.  They were packaged ready for sale in

13  packages down to -- a tenth of a gram, I believe is the

14  smallest, and all the way up to an eighth of a kilo

15  which I think was the largest.

16  Q.      I want to show you two exhibits, Government's

17  Exhibits South Dakota 1 and Government's Exhibit South

18  Dakota 15.

19          Do you recognize those two shopping bags?

20  A.      I do.

21  Q.      Okay.  What are they?

22  A.      They're the two bags that were recovered from

23  the business that contained a lot of the drugs.

24  Q.      Does that refresh your recollection as to

25  whether they were store shopping bags?

1 A.      One is a Hallmark card bag and the other is a

2 green plaid bag.

3 Q.      Now, in that same light, with regard to the call

4 that was call A1670, on Page 525 on May 16. Do you

5 have that one in front of you?

6 A.      Yes.

7 Q.      At the bottom of that call, does Ms. Martin give

8 instructions to Ms. Ali in terms of how to deal with

9 Jackie Terrell?

10 A.      Yes. She instructs her to just tell her that,

11 Paula, you got to get those things We're going to go

12 show our girlfriends, which I think we established was

13 not the truth.

14 Q.      Did Ms. Ali, in response to that, ask Ms. Martin

15 why she should lie to Ms. Terrell?

16 A.      She does not.

17 Q.      Now, if we go to call B8110 on Page 612 and 613.

18 I think you just reviewed that with counsel; is that

19 correct?

20 A.      Yes.

21 Q.      And in reference to that particular call. You

22 didn't hear anything that sounded like a dress shirt,

23 did you?

24 A.      I didn't hear -- no, I did not. She does not

25 say that.

1  Q.      What is the significance  of the fact that it was

2  -- that she had already been to the school?

3  A.      That she been to the school where she kept the

4  drugs.  That means she did not have any drugs at the

5  house.  In other words, she would have to go back to

6  the school again.

7  Q.      Also, if I could call your attention to call

8  B7365, on Page 577.

9          Do you have that call in front of you?

10 A.      I do.

11 Q.      Okay.  And what did Ms. Martin tell Ms. Ali that

12 she had to do?

13 A.      Ms. Martin tells her that she's waiting on

14 Becky, because she had to go to the school for

15 something.

16 Q.      And Ms. Ali didn't ask her what for, did she?

17 A.      No, she did not.

18 Q.      And in terms of calling your attention to B7224

19 on Page 563 and 564.  In this call, who inquires about

20 the meeting and the lady next door?

21 A.      Ms. Ali is bringing it up and asking, you

22 haven't heard anything else about the lady next door or

23 anything; asking, again, if there was any news on the

24 neighborhood  meeting and, I guess, the talk about the

25 traffic to and from Ms. Martin's house.

1  Q.       When Ms. Martin says that she didn't want to

2  stress the issue with the girlfriend upstairs on Page

3  564, what advice does Ms. Ali give to Ms. Martin?

4  A.       She agrees with that: Right, right. Don't.

5  She's agreeing with Ms. Martin's decision not to bring

6  it up with Ms. Terrell.

7  Q.       Then what does Ms. Ali say?

8  A.       Ms. Ali is telling her to leave it alone.  In

9  other words, don't bring it up again.  Don't stress it,

10 just like Ms. Martin said.

11 Q.       Now, if we could go back to your cross-

12 examination from last week.

13         There were questions that Mr. Montemarano asked

14 you about controlled buys or undercover officers making

15 buys.  Could you explain to the ladies and gentlemen of

16 the jury why there were no controlled buys made in this

17 case?

18 A.       In order to make a controlled buy, you need a

19 cooperating person or someone who can make it for you.

20 In the case of Ms. Martin, we had no such person.

21 There was none to make a controlled buy.

22 Q.       Can you just advise or describe why it is you

23 did not have any person who could make a controlled buy

24 from Ms. Martin?

25 A.       There were no person cooperating with the

1  government at that time who was in a position to make

2  such a buy. We just didn't have that resource

3  available to us. Hence, we couldn't make a controlled

4  buy.

5  Q.     Now, in terms of Juan Encarnacion. Where was he

6  once he started cooperating?

7  A.     He was incarcerated. Obviously, if he was

8  incarcerated, he couldn't make a controlled buy.

9  Q.     Likewise. Later on, once Mr. Thurman began

10 cooperating, that was well after everyone was arrested?

11 A.     That was well after everyone was arrested and he

12 was incarcerated, also.

13 Q.     Mr. Montemarano asked you questions also about

14 lookouts --

15 A.     Yes.

16 Q.     -- and whether or not there were lookouts.

17 A.     Yes.

18 Q.     What kind of drug distribution organization

19 usually involves lookouts?

20 A.     It will be a small operation working -- I think

21 he's talking about a street corner. It would be

22 typical of someone standing on the street selling, you

23 know, $10, $20 rocks and someone looking out for the

24 police coming down the street.

25 Q.     Are you familiar with the term "open air drug

1  market s?"

2  A.      Yes.

3  Q.      Would that be something you would see in an open

4  air drug market?

5  A.      Yes. That would be a frequent occurrence, and I

6  think Mr. Montemarano used the term "5-0." When they

7  see the police, the lookout would yell "5-0" and

8  everybody would scatter.

9  Q.      Based upon your opinion, was the drug conspiracy

10  involving Ms. Martin and Mr. Goodwin a street level

11  open air drug market distribution?

12  A.      No, it was not.

13  Q.      Why not?

14  A.      They were dealing much larger quantities.

15  They're certainly not going to be doing large

16  transaction, sometimes dealing hundreds of thousands of

17  dollars standing on a street corner.

18  Q.      Well, you've also testified, however, they were

19  selling smaller quantities to -- Ms. Martin was selling

20  smaller quantities, and I think we've heard testimony

21  that Mr. Goodwin was also selling smaller quantities.

22          Does that fact change your opinion in terms of

23  why it didn't involve an open air drug market?

24  A.      No. The fact that they sold smaller quantities

25  to some customers is really of no consequence. They

1  sold  small  quantiti es  to  all  their  customers  and  never

2  sold more than  a  $10 or  $20  rock,     then that  might come

3  into it, but   clear ly  they  were  sell ing  amount s  larger

4  than  that .

5  Q.     The  individuals  who  were  involve d  in  this

6  conspiracy , in particular  the people  Ms.  Martin  was

7  distributing  to I think  you've  testifi ed  about , who  are

8  some  of those  people ?

9  A.     Who  are  they ?

10  Q.     Yeah .  By name , who  are  some  of the  people  Ms.

11  Martin  distributed  the  small er  quantiti es  to?

12  A.     Milburn  Walker , George  Harris , LaNora  Ali , Lavon

13  Dobie,  Roland  C arey, Darr yl  Geiger,  Jean  --  Joan  --

14  I've for got  Joan 's  last  name  -- Orlando , Johnnie Mae

15  Short .   There 's  a  lot  of  customer s.

16  Q.     Based  upon  your  review  of  the  call s  and  the

17  evidence  in  this  case , were  those  individuals  with  whom

18  she  had  had  a  long stand ing  relationship ?

19  A.     Yes .  It  was  clear  that  she  had  a  long - stand ing

20  relationship  with  all  those  people .

21  Q.     Would  it  be  fair  to  say  that  there  weren't

22  stranger s  coming  up  knock ing  on  the  door  asking  to  buy

23  $20  rock s?

24  A.     They  were  not .  She  knew  all  of  them  by  name  and

25  was  friends  with  many  of  them .

1  Q.      Now, we've also -- you played -- we played

2  excerpts of some calls here; is that correct?

3  A.      Yes.

4  Q.      Are the full calls available should anyone want

5  to question you about those full calls?

6  A.      Yes.

7  Q.      Now, Mr. Montemarano asked you about Mr. Turner.

8          Do you recall those calls last week about Mr.

9  Turner?

10 A.      Yes.

11 Q.      Did you have occasion to participate in

12 preparing for a trial involving Mr. Turner and his role

13 in this conspiracy?

14 A.      Yes, we did.

15 Q.      Let me show you a group of transcripts, as well

16 as a CD, and ask you first if you recognize these

17 transcripts.

18         If we could pass a copy to counsel, please.

19         Showing you first what's been marked as

20 Government's B3780, referring to the transcript.

21         Do you recognize that transcript?  You can take

22 it out and look at it.

23 A.      Yes.

24 Q.      Do you recognize that transcript?

25 A.      Yes.  It's a call between Paulette Martin and

1 William Turner.

2 Q.      Showing you next what's marked as B4997.

3        MR. MCKNETT:  Excuse me.  Ms. Johnston, we in

4 the back row haven't gotten our transcripts.

5        MS. JOHNSTON:   I'm just having him identify

6 them.

7        THE WITNESS:  This is a call they intercepted on

8 April 30 with Claude Arnold, William Turner and

9 Paulette Martin.

10       BY MS. JOHNSTON:

11 Q.      Showing you -- what's the date of that call?

12 A.      April 30.

13 Q.      If I could show you the next one, B6442.

14 A.      This is a call on May 12 between William Turner,

15 Claude Arnold and Paulette Martin.

16 Q.      Showing you A1849.

17 A.      A call between Paulette Martin, John Martin and

18 Jackie Terrell on May 23.

19 Q.      And B7538?

20 A.      A call between Paulette Martin and Kevin Scott

21 on May 23.

22 Q.      And A1934?

23 A.      A call on May 27 between Paulette Martin, John

24 Martin, Kevin Scott, and William "Dog" Turner.

25 Q.      Does CD-4 reflect that those calls are recorded

1  on that CD?

2  A.      Yes, it does.

3         MS. JOHNSTON:    Okay.  If we could, Your Honor,

4  distribute those transcripts to the jury while we play

5  these calls, please.

6         I think all counsel have copies now.

7         THE COURT:   You may.

8         BY MS. JOHNSTON:

9  Q.      All right.  If we could go first to call B3780.

10        What is the date and time of this call?

11  A.      This was on April 17, 2004 at 3:19 in the

12  afternoon.

13  Q.      Just so that everyone's clear, is this before or

14  after Ms. Levi gets stopped with the 2.3 kilograms of

15  heroin?

16  A.      This is before.

17  Q.      Okay.  If we could play the call, please.

18        (Audio recording begins playing at 12:51 p.m.)

19        (Audio recording  stops playing at 12:53 p.m.)

20        BY MS. JOHNSTON:

21  Q.      The voices in that call were whom?

22  A.      Paulette Martin and William Turner.

23  Q.      The dog.  What is "dog?"

24  A.      "Dog" is his nickname.  People call him Dog.

25  Q.      The girl that Ms. Paula -- Ms. Martin was trying

1 to catch up with was whom?

2 A.      Gwen Levi.

3 Q.      Okay.  And Gwen Levi's relationship  with Mr.

4 Turner and Ms. Martin was what?

5 A.      With Mr. Turner, she was a partner  in the heroin

6 business.  With Mr. Turner, she also had a personal

7 relationship with him.  Ms. Levi was Ms. Martin's

8 heroin supplier.

9 Q.      And Ms. Levi was a partner  of Mr. Turner; is

10 that correct?

11 A.      That's correct.

12 Q.      So that call occurred before Ms. Levi's arrest;

13 is that correct?

14 A.      I'm sorry?

15 Q.      That call took place before Ms. Levi's arrest?

16 A.      That's correct.

17 Q.      If we could go to the next call, B4997.  What is

18 the date and time of this call?

19 A.      This was on April 30, 2004, at 3:04 p.m.

20 Q.      Is this before or after Ms. Levi's arrest?

21 A.      This is after.

22       MS. JOHNSTON:    If we could play this call,

23 please.

24       (Audio recording begins playing at 12:54 p.m.)

25       (Audio recording  stops playing at 12:56 p.m.)

1        BY MS. JOHNSTON:

2  Q.      Who are the parties to that call?

3  A.      Claude Arnold and William Turner.

4  Q.      Where is that call placed from?

5  A.      Mr. Turner is at the house on Hayward calling

6  out to Mr. Arnold.

7  Q.      Were you able to hear -- did you recognize Ms.

8  Martin's voice at all?

9  A.      You could hear Paulette Martin in the

10 background.

11 Q.      The "dog" again is the nickname for Mr. Turner;

12 is that correct?

13 A.      That's correct.

14 Q.      This occurs before or after Ms. Levi's arrest?

15 A.      This is after her arrest.

16 Q.      Is that consistent with your opinion last week

17 concerning Mr. Turner delivering drugs to Ms. Martin?

18 A.      Yes.  I think after this you saw her trying to

19 sell the heroin he had dropped off to her.

20 Q.      If we could go to the next call, B6442.

21         What's the date and time of this call?

22 A.      This was on May 12, 2004, at 5:48 p.m.

23 Q.      If we could -- who are the parties to this call?

24 A.      William Turner, Claude Arnold and Paulette

25 Martin.

1          MS. JOHNSTON:   Okay.  If we could play this
2 call, please.
3          (Audio recording begins playing at 12:57 p.m.)
4          (Audio recording  stops playing at 12:59 p.m.)
5          BY MS. JOHNSTON:
6 Q.      What are -- where is Mr. Turner when this call
7 is placed?
8 A.      Again, he's back at the residence on Hayward
9 Avenue.
10 Q.      Are you able to tell from that call whether or
11 not Ms. Martin is present?
12 A.      Yes.  She actually places the call.  And then
13 when Mr. Arnold answers, she transfers the phone to Mr.
14 Turner.
15 Q.      This call would have taken place after Ms.
16 Levi's arrest and before Ms. Martin moved the stuff
17 down to the school; is that correct?
18 A.      That is correct.
19 Q.      Is there anything in here that is consistent
20 with your opinion that Mr. Turner brought heroin over
21 to Ms. Martin?
22 A.      Yeah.  In fact, he tells Mr. Arnold that he's
23 got drugs for him.  And eventually, after going back
24 and forth, Mr. Arnold agrees to come to the house on
25 Hayward to see Mr. Turner.

1          MS. JOHNSTON:    Your Honor, I know the court

2 wanted to recess a few minutes before one.

3          THE COURT:   All right.   Ladies and gentlemen,

4 we'll take a recess now until ten minutes after two.

5                    (Jury excused at 1:00 p.m.)

6                    (Off the record at 1:00 p.m.)

7                    (On the record at 3:19 p.m.)

8          THE COURT:   I'm told that an arrival is eminent,

9 but we will see.   Assuming that we get started shortly,

10 I'm going to probably go until a quarter of five to try

11 and make up a few minutes of time.

12         MR. MONTEMARANO:   We're starting at 9:30

13 tomorrow?

14         THE COURT:   Yeah, trailing my sentencing.   I'll

15 be on the bench at 9 o'clock -- well, assuming we have

16 a defendant here at 9 o'clock.

17         MR. MCKNETT:   Your Honor, on the court calendar,

18 it shows you have a sentencing Friday morning as well.

19         THE COURT:   That's been moved.   We haven't

20 caught up with the court calendar yet.   As a matter of

21 fact, it may be gone by now.

22         The defendants are on their way.   For some

23 reason, they're not using the elevator.

24                    (Defendants arrive at 3:23 p.m.)

25         THE COURT:   Bring the jury in.

1                    (Witness resumes the stand at 3:24 p.m.)

2                    (Jury returns at 3:24 p.m.)

3          THE COURT:  Good afternoon, ladies and

4   gentlemen.  Sorry we had such a long lunch hour.  I was

5   not having a three martini or something.  You may

6   recall, when the trial began, I suggested to you that

7   you take the escalator to this floor and that that way

8   you wouldn't have any inadvertent contact with people.

9   Well, there's probably a secondary reason I should have

10  been thinking about.  Not all the time do the elevators

11  in this building work, and this was one of those days

12  when one of them decided not to work well, and that

13  made some of the people involved in this trial

14  unavoidably absent.  They're present now, and they're

15  happy to be off the elevator.  So, we are all ready to

16  proceed.  Sorry about the delay.

17          You may proceed.

18          BY MS. JOHNSTON:

19  Q.     Detective Sakala, if we could go to the next

20  call, A1849.

21          Do you have that transcript in front of you?

22  A.     I do.

23  Q.     What's the date and time of that call?

24  A.     That took place on May 23, 2004, at 1:29 in the

25  afternoon.

1  Q.      Who are the parties to this call?

2  A.      Paulette Martin, John Martin, and Jacqueline

3  Terrell.

4  Q.      If we could play this call, please.

5          (Audio recording begins playing at 3:26 p.m.)

6          (Audio recording stops playing   at 3:28 p.m.)

7          BY MS. JOHNSTON:

8  Q.      Detective Sakala, the "dog" reference there by

9  Mr. Martin is whom?

10  A.      William Turner.

11  Q.      Where was Mr. Martin when he received this call?

12  A.      That is the telephone line of Jacqueline  Terrell

13  at Hayward.

14  Q.      So he would have been in the residence?

15  A.      He was in the residence  at Hayward.

16  Q.      Is that an example of -- was that the full

17  recording that we heard of that call?

18  A.      Yes, it was.

19  Q.      Based upon that call and the many calls that

20  we've just played a portion of, is this indicative  of

21  some of the types of conversation  that you would have

22  excluded  where we just played portions of the call?

23  A.      Yes.

24  Q.      What portion of this would you have excluded?

25  A.      Everything, really, about the pedicure  and

1 playing just the part where -- the top of Page 2 where

2 Mr. Martin is telling Ms. Martin that William Turner

3 had come by.

4 Q.     Now, if we could go to next call, B7538.

5        Do you have that call, as well, in front of you?

6 A.     Yes, I do.

7 Q.     What's the date and time of that call?

8 A.     This is May 23, 2004, at 3:01 p.m.

9 Q.     Is this a call on the same date, shortly after

10 Ms. Martin finished talking to Mr. Martin?

11 A.     Yes.

12 Q.     If we could please play this call.

13        (Audio recording begins at 3:29 p.m.)

14        (Audio recording  stops playing at 3:30 p.m.)

15        BY MS. JOHNSTON:

16 Q.     In this portion of that conversation, who is Ms.

17 Martin speaking to?

18 A.     Paulette Martin and Kevin Scott. She's speaking

19 to Kevin Scott.

20 Q.     Who is Kevin Scott?

21 A.     The son of Gwendolyn Levi.

22 Q.     Is he involved in that clothing business?

23 A.     He's involved in a clothing business, yes.

24 Q.     In this call, the reference to your momma's

25 friend refers to whom?

1  A.       William  Turner.

2  Q.       If  we  could  go  to  the  next  call,  A1934,  on  Page

3  -- not  on  any  page  -- separate  call.

4           Do  you  have  that  transcript  in  front  of  you?

5  A.       Yes,  I  do.

6  Q.       What's  the  date  and  time  of  this  call?

7  A.       May  27,  2004,  at  2:56  in  the  afternoon.

8  Q.       Who  are  the  parties  in  this  conversation?

9  A.       Paulette  Martin,  John  Martin,  Kevin  Scott  and

10  William  Turner.

11  Q.       If  we  could  play  it,  please.

12           (Audio  recording  begins  playing  3:31  p.m.)

13           (Audio  recording  stops  playing  at  3:35  p.m.)

14           BY  MS.  JOHNSTON:

15  Q.       Detective  Sakala,  is  this  another  call

16  demonstrating  Ms.  Martin's  knowledge  and  association

17  with  Mr.  Turner?

18  A.       Yes,  it  is.

19  Q.       In  this  call,  just  so  the  record  is  clear,  there

20  is  a  discussion  about  $450  in  an  envelope  with  Kevin's

21  name  on  it.

22           Are  you  familiar  with  that  portion  of  the  call?

23  A.       Yes.

24  Q.       What  does  that  refer  to?

25  A.       That  refers  to  money  that  she  left  with  John

1  Martin to give Kevin Scott for clothes.

2  Q.      In this call where Ms. Martin discusses that

3  money and that call, is there any hesitation on her

4  part in terms of describing what it's for?

5  A.      No.  It's for clothes, not drugs.

6  Q.      Excuse me?

7  A.      It's not drugs.

8  Q.      And Mr. Washington, to your knowledge, was never

9  involved in her drug business; is that correct?

10  A.      Mr. Scott.

11  Q.      Mr. Washington.

12  A.      Oh, Harvey Star Washington?  No, he was not

13  involved in the drug business.

14  Q.      She references, Harvey bought a shirt?

15  A.      Yes.  That's Harvey Star Washington she's

16  referring to.

17  Q.      And Kevin was the individual who was the son of

18  Ms. Levi --

19  A.      Yes.

20  Q.      -- and also who sold clothes?

21  A.      That's correct.

22  Q.      Do those calls represent some of the calls that

23  discuss, or in which Mr. William Turner -- Dog --

24  participates with Ms. Martin?

25  A.      Yes.  Primarily, after Ms. Levi was arrested.

1  Q.      And do those calls support your -- have any

2  effect on your opinion that Ms. Levi received

3  additional  heroin from Mr. Turner after Ms. Levi was

4  arrested ?

5  A.      They don't have an effect , other than they

6  corroborate my opinion that Mr. Turner was the source

7  of the heroin that she was trying to sell to Ms. Dobie

8  and Mr. Nunn .

9  Q.      Now , there was also some discussion , both with

10 Mr. Montemarano  and Mr. McKnett , about Guilty

11 Productions  and an individual  associate d with that

12 business ?

13 A.      Yes .

14 Q.      Who was the individual  associate d with that

15 business ?

16 A.      Guilty Productions is  own ed or part own ed by

17 Gilbert  Williams .

18 Q.      Based upon the call s and the information  that

19 you've received  during this investigation , what do you

20 -- what is your understand ing of the relationship

21 between Ms. Martin and that business ?

22 A.      She had wire transferred , I think -- again , I

23 think it was $100,000 to an account that he had control

24 over that was suppose d to go as an investment  towards

25 some type of show .

1 Q.      Who was involved in that investment?

2 A.      Mr. Goodwin -- Learley Goodwin.

3 Q.      Is that based on some of the calls we've heard

4 over the last two weeks?

5 A.      Yeah.  Some of those calls.  But there were a

6 lot of calls that she talked about putting on shows.

7 Q.      Based upon your training and experience and

8 those calls, as well as some of the calls that were

9 referenced in the logs during cross-examination that we

10 did not play, did you form an opinion as to whether or

11 not those funds were drug proceeds?

12 A.      Yes, I did.

13 Q.      What is that?

14 A.      That they were in part proceeds from drug sells.

15 Q.      Based upon your training and experience, someone

16 active in a drug conspiracy.  What do they have to do

17 with their proceeds?

18 A.      You have to spend them.  I mean, there's --

19 there is no reason to be involved in the drug trade --

20 I shouldn't say there is no reason.  The primary reason

21 for being involved in the drug trade is to make money.

22 And when you make the money, you spend it.

23 Q.      Now, there were also some questions from Mr.

24 McKnett about faxing letterhead for Ms. Martin between

25 Ms. Martin and Ms. Ali.

1          Do you recall those calls?

2 A.     Yes.

3 Q.     Did you form an opinion as to what Ms. Ali was

4 assisting Ms. Martin with during any letterhead

5 production or faxing materials in relation to that

6 $100,000 investment in some production?

7 A.     Yes.

8 Q.     What is that opinion?

9 A.     Ms. Ali was making a letterhead for a fax cover

10 to make it appear as though the fax was coming from a

11 legitimate business, that being Paula's School of

12 Performing Arts. Ms. Ali was assisting Ms. Martin in

13 that -- doing it for her, essentially.

14 Q.     Based upon your training and experience, what

15 does -- how does that assistance fit into the

16 laundering of those drug proceeds?

17 A.     I think the call that Mr. McKnett was

18 referencing is that Mr. Williams wanted a fax --

19 something faxed with her business logo on it or company

20 name, and to assist him in the, I guess the investment

21 of the money that she had sent to him, and Ms. Ali

22 prepared the cover sheet -- made the cover sheet for

23 Ms. Martin to fax to Mr. Williams.

24 Q.     Were you ever able to determine whether or not

25 that company was an actual company?

1  A.      Yeah.  I don't know  if it's PTK Associates that

2  was on the fax cover sheet, Paula's School of

3  Performing Arts.  Neither one was not a functioning,

4  legitimate  business during our intercept or any time

5  recently.

6  Q.      Did you find any evidence that Ms. Ali or her

7  husband had invested in that transaction with the

8  individual  running Guilty Productions?

9  A.      No, not at all.

10  Q.      In reference  to Mr. Goodwin.  Mr. Martin asked

11  you questions about whether or not Mr. Goodwin resided

12  at Bexhill Court, Ms. Martin's residence, at one point

13  during this conspiracy.

14          Do you recall that question?

15  A.      I'm sorry.  What was it?

16  Q.      Mr. Martin had asked you last week whether or

17  not you had found any evidence that Mr. Goodwin resided

18  at Bexhill  Court, Ms. Martin's earlier residence.

19          Do you recall that?

20  A.      Yeah.  I don't know  if he actually resided or if

21  he had been there.  I thought the question was, had he

22  been to the residence.

23  Q.      In addition to that, he asked you if he had ever

24  resided or lived at Ray Road.

25  A.      Right, right, right.

1  Q.      And your response was, no, he hadn't.

2  A.      That's correct.  He listed a whole series of

3  residences belonging to other people, and Mr. Goodwin

4  did not reside at those places.

5  Q.      Is the fact that Mr. Goodwin didn't reside at

6  Mr. Bynum's house at Ray Road, or Ms. Martin's house on

7  Bexhill Court,  or Ms. Dobie's residence, or Ms. Ali's

8  residence in any way affect your opinion concerning the

9  contents of the calls?

10  A.      No.  He resided at his house on Farragut.  The

11  other places I wouldn't expect him to reside at.

12  Q.      Why wouldn't you expect him to reside at other

13  coconspirators' residence?

14  A.      Because those were other people's houses and not

15  his residence.

16  Q.      He also asked you a question about the driver's

17  license address.

18  A.      Yes.

19  Q.      Do you recall that?

20  A.      Yes, I do.

21  Q.      I believe you said that that wouldn't be

22  significant  to establish residence.

23          Can you explain why not?

24  A.      It's not unusual in the drug trade for people to

25  have different addresses listed on their driver's

1 license.  I'm sure Ms. Martin's probably did not list

2 Hayward Avenue as her residence.  It's not unusual at

3 all.  In fact, most of the time, I would say it's

4 probably more normal for the residence where they

5 actually live to not be on the driver's license.  Most

6 drug dealers don't make it a practice of keeping the

7 MVA information as of their current address up to date.

8 Q.      Counsel asked you -- Mr. Martin, Mr. Goodwin's

9 attorney, asked you a question about call B4515, which

10 is a call where you ID'd the speaker as Michael

11 Jackson.  Do you remember that call?

12 A.      Yes, I do.

13 Q.      Does it matter to you whether it was Michael

14 Jackson or some unknown person who had that

15 conversation with Ms. Martin?

16 A.      If Mr. Jackson was on trial, it would.  Mr.

17 Jackson is not on trial.  You could as easily replace

18 the name Michael Jackson as FNU LNU, first name

19 unknown, last name unknown.  His name is not material

20 to the trial.

21 Q.      It doesn't change the meaning of that call?

22 A.      I'm sorry?

23 Q.      It does not change the meaning of that call?

24 A.      No.

25 Q.      Likewise, I think that call was referenced and

1  related to B5072 on Page 432.

2  A.      Yes.

3  Q.      Do you have that call in front of you?  That

4  would be in Book 3.

5  A.      The page number again?

6  Q.      Page 432.

7  A.      Yes, I have it in front of me.

8  Q.      Is the preceding call with Michael Jackson

9  discussed in that call?

10  A.      Yes.  In fact, Ms. Martin refers to the caller

11  as "Mike-Mike" which I'm sure led to the identification

12  as -- was one of the contributing factors to identify

13  the previous caller as Michael Jackson.

14  Q.      In this call, what is Ms. Martin telling Mr.

15  Goodwin in reference to the previous Michael Jackson

16  call?

17  A.      He's telling her Mike-Mike's got kilograms for

18  sale for $25,000 each, referring to it at the top of

19  the paragraph there as saying, he said they some $25

20  tickets, so he may still have some.  I don't know.

21  Q.      So, it wouldn't matter whether it was Michael

22  Jackson or somebody else who goes by the name of Mike-

23  Mike?

24  A.      It would not matter one bit.

25  Q.      Counsel also asked you some questions about your

1 time of the investigation  and the time of the

2 conspiracy .  Do you recall that ?

3 A.     Yes .

4 Q.     Okay .  And your investigation  start ed

5 approximately  when ?

6 A.     In this case , we start ed near the end of 2002 .

7 Q.     And the conspiracy  charge goes back to when ?

8 A.     In '97 , I believe .

9 Q.     Could you explain to the ladies and gentlemen of

10 the jury what the difference  is between the time your

11 investigation  start s and the time the conspiracy

12 start s?

13 A.     As you're , you know , conduct ing an

14 investigation , a lot of time s historical  incident s will

15 come to your attention  that at the time that they

16 occurred may not have -- the context may not have been

17 known to law enforcement .  So , you develop cooperator s,

18 you uncover evidence that put s incident s that may have

19 occurred before you start the investigation.     It put s

20 it in context as part of the current  conspiracy .

21      You know , you find a witness or cooperat or who

22 was involve d with the people , say, prior to the

23 beginning of 2002 when we became  involve d.  Then they

24 will provide  incident s or information  on thing s that

25 might have happen ed in '97 , '98 , '99 .  So , when you

1 begin the investigation  is not -- it's not going to

2 correlate  to when the conspiracy  begin s.

3 Q.      Did you obtain  such  information  in this  case

4 going back to 1997?

5 A.      Yes.  And probably  earlier , too.

6 Q.      In that regard , were  there  some  incident s that

7 you did not -- or event s that you didn't  know about

8 before  they happened  but learn ed of subsequent ly?

9 A.      Yes.

10 Q.      Can you give us exam ples of those ?

11 A.      I can give you two glari ng example s.  We were up

12 on the wire intercept ing call s when Mr. Phil pot was

13 arrested  in Wyoming .  We had no idea , at the time he

14 was arrested , what had occurred .  In fact , we did not

15 find out until  several  day s later , maybe  even a week

16 later .

17        The second  is, we were  up intercept ing call s in

18 March  2004 and were  not aware  that Mr. Goodwin  had been

19 arrested  by the Prince  George's  County  Police

20 Department  in November  of 2003 .  We did not become

21 aware of that  incident  until  sometime  dur ing the wire ,

22 and then  we were able to go back  and put historical

23 significance  to that event .

24 Q.      So even  though  one of the case  agent s in this

25 case , Detective  Eveler , is a member  of the Prince

1  George's County Police Department, you had -- neither

2  he, nor any other member of this investigation had

3  knowledge of the November 2003 arrest of Mr. Goodwin;

4  is that correct?

5  A.     We had no idea.  That may seem like we should

6  have, and perhaps we should have, but a lot of times in

7  law enforcement or the government, the right hand does

8  not know what the left hand is doing, even though we

9  should.  A lot of times it's just not the case.

10 Q.     So that you and other members of this

11 investigation did not orchestrate either Mr. Philpot's

12 stop in Wyoming or Mr. Goodwin's arrest and seizure of

13 crack from him in November of 2003.

14 A.     That's correct.  We had nothing to do with

15 either event, and we didn't find out about the events

16 until after they occurred.

17 Q.     Likewise, we heard testimony here about search

18 warrants executed at an apartment in Anacostia known as

19 "the Ponderosa" and Lobo's car dealership back in

20 October of 2002.

21       Were you aware of those search warrants when

22 they were executed?

23 A.     I do not believe -- certainly, we were not aware

24 of the search warrants when they were executed.  At

25 some point, probably a year, year and half later, we

1  became aware of them, but we had nothing to do with

2  that investigation.

3  Q.      Those were done independent of this

4  investigation?

5  A.      That's correct.

6  Q.      And was that information you then learned after

7  the fact?

8  A.      Yes.

9  Q.      Similarly, the seizure from Mr. King in Indiana.

10        Was that something that was orchestrated by this

11  investigation, or was that done independent by the

12  highway patrol officers?

13  A.      That was done independent by the highway patrol.

14  We had no hand in that whatsoever.

15  Q.      Likewise, we heard testimony about Mr. Thurman

16  and his difficulties, his stops in Texas and

17  Louisiana.

18  A.      We had nothing to do with that or his travails

19  in Texas either.  It was all independent of us.

20  Q.      When did you actually learn about those events,

21  and who told you about those?  Do you recall?

22  A.      I want to say the first time we learned about

23  Mr. Thurman and those events was sometime after the

24  arrest, during the grand jury investigation portion of

25  this case.

1 Q.      In terms of Mr. Goodwin.  There was some

2 questions asked you of surveillance  and identification

3 of Mr. Goodwin.  I want to call your attention  to May

4 15 of 2004.

5        There was a series of calls -- I believe that

6 began at B6783, on Page 580.  If you could  look at that

7 page and tell me if I'm right or wrong in terms of --

8 well, I'm wrong on the page, that's for sure.  B6783.

9 Let me find the page number for you.

10        MR. MARTIN:  Page 520.

11        BY MS. JOHNSTON:

12 Q.      Counsel tells me it's on 520.  Thank you,

13 counsel.

14        Was that one of a series of four calls between

15 Mr. Goodwin and Ms. Martin on May 15?

16 A.      Yes.

17 Q.      The last call being B6807, on Page 523; is that

18 correct?

19 A.      That's correct.

20 Q.      In that call, what does Mr. Goodwin and Ms.

21 Martin agree is going to happen on May 15?

22 A.      This is a transaction for cocaine from Cuba, and

23 the last call is Mr. Goodwin telling Ms. Martin he's

24 coming by to pick the money up.

25        MS. JOHNSTON:   If we could play Video 27.

1            (Video begins playing at 3:51 p.m.)

2            BY MS. JOHNSTON:

3  Q.     This would reflect the same date and time?

4  A.     Yes, a short time after the call.

5  Q.     Can you tell us what we're looking at here?

6  A.     This is a close-up -- a close-up of the

7  residence on Hayward, and you just saw -- now we're

8  zooming back out.

9  Q.     Can you back that up, please?

10 A.     This is him actually leaving the house, I

11 believe.  There's him going to the house.  There he

12 goes.  That's Mr. Goodwin going to the house.

13 Q.     Was he carrying anything on his way in?

14 A.     Yes.  He was carrying a bag.

15         That was him leaving again with a bag.

16 Q.     Okay.  Thank you.

17            (Video stops playing at 3:52 p.m.)

18         THE WITNESS:  Again, just based on the video,

19 you could not say.  But based on the video and the

20 telephone conversations, I feel confident that was Mr.

21 Goodwin.

22         BY MS. JOHNSTON:

23 Q.     There was a subsequent telephone conversation,

24 was there not, a couple of days later, B7022, on Page

25 548?

1  A.      Yes.

2  Q.      And then B7258, on Page 568.  Do  those calls

3  relate also to what Mr. Goodwin was doing at the

4  residence on May 15?

5  A.      Yeah.  This is confirmation  of the delivery from

6  -- the kilogram they got from Cuba.  If you recall,

7  they talk about the missing money for that deal.

8          I think -- if you give me one minute -- I

9  thought there was another call.  Oh, yes, with Mr.

10 Arnold.  The very next call, B6824.  That's pretty much

11 more confirmation  or more direct where she's talking

12 about fixing the cakes and they would be ready the next

13 morning.

14 Q.      That would be on Page 524?

15 A.      That's on 524, yes.  That shows she had received

16 the delivery.

17 Q.      You were also questioned concerning Ms. Harden

18 and the transaction  that occurred on March 29.

19         Do you recall those questions?

20 A.      Yes.

21 Q.      Calling your attention  to that incident.  Were

22 you aware of Detective Musselman's report and

23 observation before you provided your testimony?

24 A.      No.  I still have not seen his report.

25 Q.      You were familiar with his testimony; is that

1 correct?

2 A.      Yes, that's correct.

3 Q.      Did his testimony in any way affect your opinion

4 concerning what occurred on that date?

5 A.      No.  I think it corroborates the opinion.

6 Q.      Why do you think it corroborates the opinion?

7 A.      He went to the location where they agreed to

8 meet; he observed an exchange, and they departed.  I

9 would expect that's all he would see.

10 Q.      You would expect what was all he would see?

11 A.      I would be stunned if he had actually seen the

12 drugs go from one person to another.  I don't want to

13 say it's never happened, but it would be so rare.  I

14 certainly can't think of a time I've ever seen that.

15 Q.      Just one moment, please.  If we could go back to

16 those calls on March 29, in particular, call B2131 on

17 Page 235.

18         Do you have that in front of you?

19 A.      Yes.

20 Q.      That would be in Book 2, I believe.

21 A.      Book 1, yes.

22 Q.      Book 1?  Okay.  I believe you mentioned when you

23 testified originally that in the first call on Page 232

24 that Ms. Harden left a message asking for what?

25         MR. SUSSMAN:  Objection, Your Honor.

1          This is redirect.  Any reference to calls are
2  outside of cross-examination.
3          THE COURT:  Approach the bench.
4               (At the bar of the Court.)
5          THE COURT:  All right.  State your objection.
6          MR. SUSSMAN:  I made no reference to the
7  specifics of the conversations in cross-examination.  I
8  just mentioned what was observed by Officer Musselman
9  and the officer's comments -- sergeant's comments about
10  him and testimony with regard to the grand jury.  I
11  don't think redirect is a chance to play these calls
12  again and go through them again.  Find something
13  specifically that relates to my cross-examination.
14          THE COURT:  Turn your wire off.
15          MS. JOHNSTON:  What I'm attempting to show is
16  what is the basis for his opinion and why he maintains
17  -- why he continues to maintain the opinion in spite
18  of what counsel asked him on cross-examination about
19  this observation.  I think I'm entitled to show what it
20  is and why he still has that same opinion and why it's
21  not changed.
22          MR. SUSSMAN:  He indicated on direct and my
23  cross-examination he wasn't changing his opinion, that
24  his opinion wasn't affected by the evidence that -- or
25  the testimony of Musselman.  We're just going through

1  it again repeatedly .

2          THE COURT:   I will over rule the objection .

3          If you go much further , I may sustain it.

4          MS. JOHNSTON:   I'm trying to just hit on a few

5  point s and move on.

6          THE COURT:   Keep it limited .

7                  (Back in open court .)

8          BY MS. JOHNSTON:

9  Q.       Detective , using call s B2132 , on Page 232 , as

10 well as B2139 , on Page 235 .

11         Could you tell us what in those call s cause s you

12 to maintain your opinion and voice your opinion that

13 what the detective saw was consistent with your opinion

14 of the call s?

15 A.       In the first call , Ms. Hard en leave s a message

16 and she refer s to what she want s as being ticket s for

17 some other people :  I got a couple more people

18 interest ed so, you know , just bring me the same ticket ,

19 okay ?  So, she's referring to ticket s.

20         In the subsequent call on Page 235 , ticket s are

21 not mention ed.  Ms. Martin then take s the message left

22 for ticket s and asks Ms. Hard en, what size suit do you

23 want for your little boy ?  And then Ms. Hard en says ,

24 about the same one .  Again , she's referring back to her

25 original message as ticket s.

1        So you have, essentially, the same conversation

2 being taking place where the noun or pronoun is changed

3 for drugs.  One is tickets, and then the second one is

4 a suit.

5 Q.     Do you have a piece of paper up there?  A plain

6 piece of paper?

7 A.     Yes.

8 Q.     Counsel had you demonstrate what an eight-ball

9 was with one of our pieces of candy up here, and I

10 think it was a Jolly Rancher?

11 A.     Yes.

12 Q.     It was a watermelon flavor, but this is a cherry

13 one.  Could you demonstrate why it is that what the

14 detective saw -- if you just use one piece of paper?

15 A.     Yes.

16 Q.     If you could demonstrate why it is what the

17 detective saw is consistent with your opinion that it

18 was a drug transaction?

19 A.     If I handed you this, it would look like a piece

20 of paper.  As you can see, it conceals the candy

21 inside.  It's that simple.

22 Q.     Mr. Hall asked you a number of questions about

23 Mr. Whiting.  Do you recall those questions?

24 A.     Some of them.

25 Q.     Some of them?  In response to his questions, you

1  indicated  that  there  was  no  series  of  calls  that

2  established,  in  your  opinion,  that  an  actual  drug

3  transaction  took  place  between  Mr.  Whiting  and  Ms.

4  Martin  during  the  wiretap.

5          Do  you  recall  that  testimony?

6  A.      Yes.

7  Q.      Did  you  form  an  opinion  as  to  why  there  was  no

8  drug  transaction  between  Mr.  Whiting  and  Ms.  Martin?

9          MR.  HALL:   Objection,  Your  Honor.

10         May  we  approach?

11         THE  COURT:   Yes,  you  may.

12                 (At  the  bar  of  the  Court.)

13         MR.  HALL:   I'm  objecting  because  I  don't  know

14  where  counsel  is  going  with  this.   I  don't  know  if  this

15  is  going  to  lead  into  a  discussion  of  my  client's

16  priors  or  what.   So,  that's  why  I  objected.

17         MS.  JOHNSTON:   I  don't  think  it's  going  to  have

18  anything  to  do  with  his  priors,  although  those  --  that

19  would  be  a  404(b)  issue  the  court  has  to  address  at

20  some  point.

21         MR.  HALL:   Yes,  I  understand  that.

22         MS.  JOHNSTON:   I  expected  him  to  say  that  there

23  are  any  number  of  reasons  why  somebody  is  still  owed

24  her  money  for  other  transactions  and  that  they  were

25  worried  about  dealing  with  him  and  concerned  about  what

1  he might do and things of that sort.

2      MR. HALL:  It's the being leery about dealing

3  with him that goes right to the issue of 404(b),

4  because he has a number of prior convictions in the

5  past, and he's always flipped and become a cooperating

6  witness, and at this point the 404(b) hasn't been ruled

7  upon.  I think it's premature to broach that with this

8  witness, and I also think that -- I realize he's an

9  expert witness, but I think to -- I think, based upon

10  what's there in the phone calls, it's extremely

11  speculative on the sergeant's part to offer an opinion

12  as to why a successful transaction didn't happen.

13      MS. JOHNSTON:  I can rephrase the question and

14  ask a general question concerning, based on his

15  training and experience in drug conspiracy cases are

16  there -- what are the reasons that people sometimes

17  will not deal with particular --

18      THE COURT:  That I think you can do.

19      MS. JOHNSTON:  That's fine.

20      THE COURT:  Rephrase it that way.

21          (Back in open court.)

22      BY MS. JOHNSTON:

23  Q.    Detective Sakala, based upon your training and

24  experience, do you have an opinion as to why in a drug

25  conspiracy or a drug organization an individual might

1  not sell drugs to another member of the conspiracy at a

2  particular time?

3  A.      Yes.  It's fairly common.

4  Q.      What are some of the reasons why that person

5  might not sell drugs to a particular coconspirator?

6  A.      The most common reason where a customer is cut

7  off, so to speak, is an unpaid debt.  That's not

8  unusual at all.  There certainly could be any number of

9  reasons why the person refuses to sell to someone.

10 They might think they're working for the government or

11 any number of reasons, but the number one, most common,

12 is that the person owes money to the source.

13 Q.      Also based upon your training and experience,

14 can an individual in a drug organization or drug

15 conspiracy have different roles other than buying and

16 selling the drugs?

17 A.      Oh, sure.  Everybody's got their own job to do.

18 Q.      What are some of those other roles?

19 A.      I think we've talked about quite a few of them.

20 Whether it's a lookout on a corner; someone who's

21 laundering drug proceeds; somebody who's maybe

22 supplying documentation to indicate somebody else is

23 doing an illegal job; someone providing cover that

24 would indicate they're doing a legal job; somebody who

25 supplies paraphernalia to the person, whether it's

1 scales, baggies, cutting agents.  There's a lot of ways

2 that people can be involved in the conspiracy without

3 just buying drugs.  They could provide expertise in an

4 area which would be useful.

5 Q.     Based on your training and experience, was Mr.

6 Whiting providing any expertise to Ms. Martin?

7        MR. HALL:  Objection, Your Honor.

8        THE COURT:  Wait a minute.

9        Restate the question.  I want to make sure I

10 heard it right.

11       BY MS. JOHNSTON:

12 Q.     Based upon your training and experience and your

13 review of these calls, was Mr. Whiting providing any

14 assistance to Ms. Martin?

15 A.     Yes.

16       MR. HALL:  I still object, although that's not

17 exactly the same question.

18       THE COURT:  It's a better question.

19       Overruled.

20       THE WITNESS:  Mr. Whiting had experience with

21 the legal profession, the law profession, and he was

22 able to provide information to Ms. Martin that would be

23 useful to her in the way that only someone familiar

24 with that profession would be able to.

25       BY MS. JOHNSTON:

1  Q.      Can you give us example s of that ?

2  A.      Sure .  By look ing over the paperwork  for Mr.

3  Echarte , he certain ly would be able to determine  in

4  that paperwork  whether Mr. Echarte was cooperating  with

5  the government .  He would certain ly be able to

6  determine  the fact s and circumstance s of the arrest  of

7  Ms. Levi , whether  it was related  to something  to do

8  with Mr. Echarte  or whether  this was a brand new charge

9  relating  to something  done with Ms. Martin , which would

10 certain ly cause Ms. Martin  some  concern .

11 Q.      There was also a question  about surveillance  of

12 Mr. Whiting  at Hayward .

13        Are there other way s other  than having  a

14 surveillance  team out there or using  a pole camera  to

15 determine  whether  or not Mr. Whiting  was present ?

16 A.      Yes .  You could  hear him on the phone  in the

17 background .  She could  tell somebody  else that , I just

18 spoke  to Reece , or Reece  was just here .  In fact ,

19 that' s what she does  in this case .  I think  she tell s

20 someone  that Reece  had just left .

21 Q.      If we look at call B4438 on Page -- if we look

22 at call B4438 on Page 389 , is that an  example  of his

23 verification  of his presence  at the house  without

24 having  actual  surveillance ?

25 A.      Yes .  I believe  this was when Mr. Whiti ng was

1 coming over to speak to her about a new source of

2 cocaine. He tells -- in a previous call, he tells Ms.

3 Martin he's coming over to talk about it; a period of

4 time goes by, and then Ms. Martin tells somebody else

5 -- that being John Martin -- that Reece just left.

6 Q.    You mentioned him coming over to talk about a

7 new source of supply. Is that another way in which

8 someone participates in an organization?

9 A.    Sure. I think we talked about Estelle Brim

10 making introductions, and every time she introduces

11 somebody for a ticket she wants to get paid. That's a

12 common way to facilitate a conspiracy or a drug

13 enterprise would be putting a buyer and seller

14 together.

15 Q.    Now, in terms of surveillance. Was surveillance

16 significantly curtailed at --

17        MR. MONTEMARANO: Objection.

18        Leading.

19        BY MS. JOHNSTON:

20 Q.    Let me rephrase it.

21        As a result of Detective Shrier's being observed

22 by Ms. Martin on April 1st, what happened to the

23 surveillance in terms of Hayward?

24 A.    We were very, very cautious and judicious in our

25 use of surveillance, not only just on Hayward but

1   anywhere .   The  last  thing  we  would  want  to  do  would  be

2   to  alert  the  target s  of  the  investigation   that  they

3   were  under  investigation   which  could  result  --  and  in

4   most  instance s  result s  --  in  them  what  we  call

5   "dumping"  their  phone s  that  we  were  intercept ing ,  which

6   would  have  been  a  huge  set back  for  us .   As  a  result ,  we

7   were  very  cautious  when  we  sent  surveillance   out .

8   Q.      Okay .   Now ,  Mr.  Bynum 's  attorney ,  Mr.  Mitchell ,

9   asked  you  about  --  brought  out  the  fact  that  you  hadn't

10  done  a  trash  run  at  Mr.  Bynum 's  residence .

11        Could  you  explain  why  you  would n't  do  a  trash

12  run  at  his  residence ?

13  A.      I  think  I  said  he  lives  in  an  apartment  complex ,

14  which  would  pretty  well  preclude  that .   Even   if  we  had

15  the  opportunity ,  I don't  know   that  that  would  have  been

16  a  main  focus  of  the  investigation   to  do  a  trash  run  on

17  one  of  her  customers .   We  would  probably   --  I  think ,

18  as  I  explained ,  we  would  go  up  the  ladder  and  we  might

19  have  done  a  trash  run  at  Mr.  Mangual 's  house ,  if  that

20  was  possible .   It  was  not .   Or  Ms.  Levi 's  house .   I

21  think  we'd  probably  try  one  at  Ms.  Levi 's  house ,  but  it

22  just  was  not  a  priority  to  do  a  trash  run  at  Ms.

23  Martin 's  customers '  house .

24  Q.      Could  you  explain  why ?

25  A.      The  baki ng  soda  box  that  we  recovered  from  Ms.

1 Martin would not be something you would see -- expect

2 to see in Mr. Bynum's trash if the crack was already

3 cooked.  Again, the evidence we were getting on Mr.

4 Bynum was pretty strong at that point, and to go and

5 get a trash run if it was possible, which it wasn't, I

6 just would not have ranked it as a high priority in the

7 investigation.

8 Q.     Mr. Bynum's attorney, Mr. Mitchell, as well as

9 some of the other defendants, asked about contact

10 between their respective client and some of the other

11 coconspirators.

12        Do you recall those questions?

13 A.     I do.

14 Q.     I'm going to show you what's been marked, which

15 we will introduce as Government's Exhibit CH-1.  Let me

16 pull this over here.

17        Mr. Ward, I apologize.  I'm going to pull this

18 over.  Perhaps you could get up for this line of

19 questioning so you could see.

20        If you could, describe for the ladies and

21 gentlemen of the jury, using that chart, why

22 individuals such as Mr. Bynum may not know other

23 coconspirators other than Ms. Martin.

24 A.     Primarily, he was dealing with Ms. Martin, who

25 he would know.  In the drug trade, generally people are

1   very secretive, and I think we've seen it in the calls

2   that one person doesn't want somebody else knowing

3   their business.  Certainly it is no business of Mr.

4   Bynum's that Ms. Martin share who her source is.  In

5   fact, that would be counterproductive to Ms. Martin.

6   Because if she introduces -- if Ms. Martin introduced

7   her source to Mr. Bynum, she might get cut out.  So,

8   there's absolutely no reason for Mr. Bynum to know that

9   her source would be Mr. Mangual or Ms. Levi or anything

10  else.  Then, just further apart, you get two or three

11  steps away from individuals.

12          It would be rare for everybody to know everybody

13  else in the conspiracy.  I don't know that I've ever

14  seen that happen.  Each person has their own job to do,

15  and it's not like a corporation where the employees are

16  published somewhere.  Everybody is doing their own job

17  or their own part in the conspiracy to make money or to

18  do whatever they're doing, and it's certainly not

19  germane to Mr. Bynum what Mr. Uriarte is doing in New

20  York or that he's even in New York.  It's just -- you

21  would never see something like that.

22  Q.      In that regard, we've also heard conversations

23  and questions about people who -- some of these people

24  did know each other; is that fair to say?

25  A.      Yes.  Some people do have -- you have to know

1  some people, yes.  You certainly don't know everybody.

2  Q.      For example, Ms. Ali knew Ms. Martin and knew

3  some of the other individuals that are on that chart;

4  is that correct?

5  A.      Yes, I'm sure she did.

6  Q.      Mr. Goodwin and some of the other folks; is that

7  correct?

8  A.      That's correct.

9  Q.      Now, given the fact that they knew each other,

10  do you have an opinion as to whether or not they would

11  actively engage in drug transactions in front of people

12  who were friends?

13  A.      Are you talking generally or --

14  Q.      Generally, first.

15  A.      I would say no.  Again, in the drug trade, just

16  because I know you, Ms. Johnston, and I'm getting, say,

17  drugs from John Doe, and all three of us know each

18  other, that doesn't mean I want to do drug deals in

19  front of you.  It puts a lot of trust in you for me to

20  do that.  It exposes me to your possible cooperation;

21  it exposes me to maybe you knowing I've got a large

22  amount of drugs or a large amount of money that you may

23  want to rob me of.  It makes -- in the drug business,

24  it makes no sense to expose your business to anybody

25  more than you have to.

1          It's very common, again, but people who know
2   each other personally but may not want to know each
3   other -- may not want to share the drug business.  Mr.
4   Mangual coming over to Ms. Martin.  He may know some of
5   the people there, but that doesn't mean he wants to do
6   drug transactions in front of those people.
7   Q.     Why is that?
8   A.     Again, it exposes him to possible criminal
9   problems.  He's doing a crime in front of witnesses.
10  If you think of that in the way that drug dealing is a
11  crime, you wouldn't want to rob a bank in front of
12  witnesses if you didn't have to, and you don't want to
13  deal drugs in front of witnesses if you don't have to.
14  Q.     Even if they're your friends?
15  A.     Even if they're your friends.  Absolutely.
16  Q.     Now, in terms of Mr. Bynum.  We spent a lot of
17  time with counsel going over calls, or at least some of
18  the calls; is that fair to say?
19  A.     Yeah.  We went over a lot of calls, yes.
20  Q.     And we did -- you did up this chart here that
21  says dollar figure ($) and dollar question mark ($?).
22  You see that in front of you?
23  A.     Yes.
24  Q.     I think a couple of calls that he did not go
25  over with you was of call B34 on Page 34.

1          Do you have this in front of you?

2          If you look at that call, and then I'll -- in

3 call B34, Page 34, they do -- do they discuss a

4 quantity of drugs in that call?

5 A.     I'm sorry.  Your page number again?

6 Q.     I believe it's Page 34, but let me check.

7          No, that would not be right.

8          Court's indulgence one moment.

9          Let me instead try B822 on Page 116.

10          Do you have that call in front of you?

11 A.     Yes.

12 Q.     In that call, is there a discussion of money or

13 drugs?

14 A.     Drugs, yes.

15 Q.     Okay.  What is the reference to drugs there?

16 A.     This is, I need the other one too ASAP.  What?

17 Ms. Martin says.  Derrick Bynum says, the other one.

18 The $62.  He's referring to the 62 grams of crack

19 cocaine.

20          This is the transaction for the kilogram and the

21 62 grams of crack cocaine.

22 Q.     So that reference was dollars, not money.

23 A.     That was drug amounts, not money.

24 Q.     So that was a drug code --

25 A.     Correct.

1 Q.      -- which we may have missed on our board,

2 perhaps.

3 A.      Perhaps.

4 Q.      Does he also -- is there at least one or two

5 other calls where he references 62 as being the drug

6 quantity that he wants from Ms. Martin?

7 A.      Correct.  Or she said it.  One of the two of

8 them says it.

9 Q.      Was there some discussion of money between Ms.

10 Martin and Mr. Bynum during some of these calls?

11 A.      Oh, there's quite a few discussions about money.

12 Returning money -- him having give money back to his

13 customers; her getting money to buy the cocaine from

14 her source.  So, they talked about money a lot.

15 Q.      If we could look at B1709 on Page 210.

16        Did you form an opinion as to whether or not}

17 this call was about money?

18 A.      Yes, it is.

19 Q.      What's the amount of money it's about?

20 A.      It's 14-something.

21 Q.      If you could write on Mr. Mitchell's chart here,

22 Mr. Bynum's attorney, that call number.

23 A.      Anywhere?

24 Q.      Anywhere you would like to put it in there, and

25 the amount of money that was discussed.

1  A.      (Witness indicating.)

2  Q.      Just to be clear.  Was that the amount of money

3  that was actually paid or was this a joke?

4  A.      This is a joke.  It was -- I believe -- my

5  opinion is, he had told her the money was short -- told

6  her one figure, just messing with her.  And then after

7  she counted, she found out the money was correct, so

8  they have a little joke about it.

9  Q.      Then if we go to call B2179, on Page 241.

10         Do you have an opinion as to whether or not that

11 was about money?

12 A.      Yes.  This is about $13,200.

13 Q.      What is the discussion here?

14 A.      He delivered money to her, and Ms. Martin goes,

15 it's $13,200 in here.  Then they go on to discuss the

16 $200 being missing.

17 Q.      If you -- did Mr. Mitchell include that call up

18 on his chart about money?

19 A.      I do not see it, no.

20 Q.      If you could write that on the chart, as well.

21 A.      (Witness indicating.)

22 Q.      I believe on cross-examination you indicated

23 that there was no need for them to talk about prices on

24 the phone; is that correct?

25 A.      Yeah.  There would be no reason to talk about

1  it.

2  Q.     Why is that?

3  A.     They knew exactly what they were talking about.

4  The price is not going to change. His normal 62 grams,

5  he knows what the price is. He certainly doesn't need

6  to reiterate it on the phone and make the conversation

7  sound worse than it is -- sound like drugs. And

8  certainly the price of a kilogram is not going to

9  change for him. So, they know what they're talking

10 about.

11 Q.     Not only with Mr. Bynum, but is so with some

12 other individuals?

13 A.     Yes. If you look at all the Mr. Mangual calls,

14 when he brings over books, apple sauce, auto-

15 biographies, Versace sunglasses, Ferragamo shoes. In

16 none of those conversations do they ever talk about

17 price.

18 Q.     We did have a few calls where there was some

19 discussion about money in addition to the two here with

20 Mr. Bynum; is that correct?

21 A.     Yeah. They talked about money a lot.

22 Q.     If we can look at B2412 on Page 257, which is in

23 Book 3. Who is the party to this call?

24 A.     Is this Page 257?

25 Q.     Let me check. Should be Page 257, call B2412.

1 A.       This is Paulette Martin and George Harris.

2 Q.       In that call, is there -- in the other calls

3 with Mr. Harris, was there ever a discussion of price?

4 A.       No, there was not.  There was discussions of

5 quantity.  I believe this is the only call where they

6 discussed price.

7 Q.       What's the issue in this call in terms of money?

8 A.       He didn't pay her enough, so he -- she calls him

9 back after he -- after the transaction, she calls him

10 back and tells him that.  Then he apologizes and

11 actually comes back to make good on the payment.

12 Q.       Also, if we look at call Page 565, call B7258.

13 A.       Page 565?

14 Q.       Again, in this call, who are speaking in this

15 call?

16 A.       This is Paulette Martin and Learley Goodwin.

17 Q.       Again, is there a discussion of money in this

18 call?

19 A.       This is one of the Cuba deals where he claims

20 that the money provided by Mr. Goodwin for the kilogram

21 was $2,000 short, and they have a discussion about the

22 missing money.

23       There was also previous calls where she actually

24 goes over in great detail how she bundled the money up

25 for this deal and how she doubts there was $2,000

1  missing.

2  Q.      Based upon your training and experience  and

3  review of the calls, when was it that Ms. Martin

4  discussed money over the phone with any of her

5  customers or her partners?

6  A.      The only reason you would need one is when

7  there's a problem.  Obviously, when something is short

8  and someone doesn't get paid enough.

9  Q.      Again, I believe there was perhaps another

10  example with Mr. Bynum concerning returning the drugs,

11  call B2958, which is on -- court's indulgence -- on

12  Page 300.  There's a series of calls?

13  A.      Yes.

14  Q.      Okay.  Again, why is there a discussion about

15  money in those calls?

16  A.      Ms. Martin is telling Mr. Bynum to bring the

17  drugs back and, I'll give you your money back.

18          This is the drugs that she then turns around to

19  sell, the two eighths of a kilo that she turns around

20  to sell to Mr. Arnold for $3,300 each.

21  Q.      Counsel also brought out Hayward 7, that little

22  notebook in terms of Mr. Bynum.  Do you recall that?

23  A.      Yes.

24  Q.      Can you explain to us what significance  if any

25  it has to you that Mr. Bynum's not referenced in that

1 notebook ?

2 A.    I don't put a lot of significance that he's not

3 in there , because he's a cash customer .  It's clear

4 from the conversation s that he is paying for the drug s

5 as they come , or at least on a very short period of

6 time .  I think the $13,200 was the next day or two day s

7 after the kilogram purchase .

8       I would n't expect him to be in there unless for

9 some reason she was keep ing track of the amount of

10 drug s she told .  The book was use d to keep track of the

11 money she was owe d.

12 Q.    Based upon the call s, did you find any call s

13 that indicated Mr. Bynum ran a debt with her ?

14 A.    No .

15 Q.    Now , calling your attention to call B6435 , on

16 Page 503 .

17       Do you have that call in front of you ?

18 A.    Yes , I do .

19 Q.    Who are the parti es to that call ?

20 A.    This is Paulette Martin and Lavon "Becky" Dobie .

21 Q.    Counsel asked you about rock s and stolen

22 jewelry .

23       Do you remember those question s?

24 A.    Yes .

25 Q.    Did you form an opinion , quite frankly , as to

1  whether or not Ms. Dobie was involved with stolen

2  jewelry?

3  A.       Yes, she had stolen jewelry.

4  Q.       Does that in any way affect your opinion

5  concerning her involvement in drugs?

6  A.       No, not at all.

7  Q.       Indeed, does this call reflect of her

8  involvement in drugs or jewelry?  Calling your

9  attention to Page 503.

10  A.       Yeah.  I think this is in reference to Ms. Dobie

11  getting an additional source of supply for Ms. Martin.

12  And then if they go -- as you go through the

13  conversation with Ms. Martin, there's some confusion

14  whether Ms. Dobie's source has kilograms or something

15  smaller and whether it's heroin or cocaine, and

16  eventually it becomes clear to Ms. Martin that Ms.

17  Dobie's source has ounces of cocaine for sale for 950

18  which Ms. Martin declines to purchase, because she

19  doesn't want to break them down.

20  Q.       That price line refers to what quantity of

21  drugs?

22  A.       An ounce of cocaine.

23  Q.       Now, jumping back a little bit to Ms. Harden.

24           In addition to ordering drugs, did Ms. Martin

25  have any discussions with Ms. Harden concerning her

1 moving things to the school?

2 A.     Yes, she did.  She told them she moved all the

3 operation to the school.  Like all her customers, she

4 informed that she had cleaned everything out.

5 Q.     Court's indulgence one moment.

6        If I could call your attention to Page 540 and

7 541.

8        Do you have that call in front of you?

9 A.     I do.

10 Q.    Is that the call where Ms. Martin explains to

11 Mr. - --

12       MR. SUSSMAN:  Objection.

13       Your Honor, these are calls that weren't

14 referenced in the cross-examination.

15       THE COURT:  Approach the bench.

16             (At the bar of the Court.)

17       MS. JOHNSTON:  Your Honor, I can rephrase the

18 question.

19       THE COURT:  Okay.  Rephrase the question.

20       MS. JOHNSTON:  Let me do that, so it will save

21 us some time.

22       MS. JOHNSTON:  Does this call in any way

23 corroborate or --

24       MR. SUSSMAN:  It's the same objection, Your

25 Honor.

1          THE COURT:  I'll sustain that.

2          Rephrase the question.

3          BY MS. JOHNSTON:

4  Q.     Okay.  In reference to this call.  Does this

5  call have any effect on your opinion concerning the

6  March 29 incident, the surveillance with the detective?

7  A.     Yes.

8  Q.     Could you explain how this call corroborates

9  your opinion going back to March 29?

10         MR. SUSSMAN:  I object again, Your Honor.  This

11 is just a back door way of getting it in.

12         THE COURT:  Sustained.

13         I think that the form of the question can be

14 fixed.  Restate the question.

15         BY MS. JOHNSTON:

16 Q.     Okay.  Based upon your training and experience,

17 what is the significance of call B6948 as it relates to

18 your opinion concerning drug transactions occurring

19 between Ms. Harden and Ms. Martin?

20 A.     There is a series of calls -- this one included

21 -- after she moved everything to the school, Ms. Martin

22 informed her drug customers and/or associates of what

23 she had done.  In contrast to people she had a non-drug

24 relationship where she never mentioned the incident,

25 this matches the same pattern where she is informing

1  Ms. Harden that everything has been moved to the school

2  and that's where they're going to have to do their

3  business from that point on.

4  Q.      During the course of their conversation, did Ms.

5  Harden question anything Ms. Martin was saying?

6  A.      No, not at all.  She was just said, okay.

7  Q.      If I could just briefly go back to Ms. Ali and

8  Ms. Martin.

9          Calling your attention to the call on Page 387

10 that counsel reviewed with you this morning.

11         Do have that call in front of you?

12 A.      I do.

13 Q.      Counsel asked you what -- asked you about your

14 conclusion that Ms. Ali knew Ms. Levi was involved in

15 drugs.

16         Do you remember that question?

17 A.      Yes.

18 Q.      Okay.  What was the basis for your conclusion

19 that Ms. Ali knew Ms. Levi was involved in drugs?

20 A.      I'm sorry.  Could you rephrase the question?  I

21 want to make sure I hear the question correctly.

22 Q.      My question is: This morning, Mr. McKnett asked

23 you whether or not you had an opinion as to whether Ms.

24 Ali knew Ms. Levi was involved in drugs.

25         Do you recall that question?

1   A.      Yes, I do.

2   Q.      My question to you is, what is the basis for

3   your conclusion or your statement to Mr. McKnett that

4   Ms. Ali knew that Ms. Levi was involved in drugs?

5   A.      Information I received from other individuals.

6   Q.      If you could look at the call on Page 387.

7           Do you have that call in front of you?

8   A.      Yes.

9   Q.      Calling your attention to, oh, a third up from

10  the bottom where after Ms. Ali asked, what happened?

11  What does -- how does Ms. Martin answer that question?

12  A.      I think she's involved with that Julio thing.

13  Q.      Did Ms. Ali ask her what Julio thing?

14  A.      No, she did not.

15  Q.      Do you know what the Julio thing refers to?

16  A.      Yes.

17  Q.      What does that refer to?

18  A.      That's Mr. Echarte's arrest in Florida in a PCP

19  case that involved Ms. Levi.

20  Q.      And then Ms. Martin goes on to explain what

21  about Mr. Julio in the next portion?

22  A.      Ms. Martin is going on to say that she believes

23  Mr. Echarte is the informant or had informed upon Ms.

24  Levi saying, I think Julio's told on her. I really do,

25  because every time I talk to Julio's sister, who's

1   Merta, she would ask me about the lady.

2         That's what she's talking about.  And "the lady"

3   being Gwen Levi.  So, Ms. Martin is telling Ms. Ali

4   that Julio's sister is trying to get information about

5   where Gwen Levi is from Ms. Martin.

6   Q.      What does Ms. Ali asked Ms. Martin that she did

7   with that information?

8   A.      She asked whether she relayed that -- Ms. Ali

9   asked Ms. Martin whether she relayed that information

10  to Gwen.

11  Q.      Then if we go to Page 388, and Ms. Martin

12  explains she wasn't involved in that and how does --

13  what does Ms. Martin say in terms of Ms. Levi's

14  involvement with Mr. Echarte?

15  A.      Ms. Martin says she wasn't involved in that

16  meeting.  She wasn't directly involved and wasn't

17  directly involved in the PCP arrest down in Florida.

18        Ms. Martin goes on to say she just introduced

19  him to the people -- meaning Mr. Echarte to the people

20  -- that wanted the recipe to the sweet potato pie.  And

21  what she's saying is that she's telling Ms. Ali that

22  Mr. Echarte was the person who -- Gwen introduced Mr.

23  Echarte to the people in Florida to manufacture the

24  PCP:  In other words, the sweet potato pie.

25  Q.      Does a transcript accurately record Ms. Ali's

1  response?

2  A.      Yes.

3  Q.      Ms. Ali asked Ms. Martin, what's wrong with you?

4  Somebody a recipe for sweet potato pie?

5  A.      No, she does not.  She makes no reference to --

6  obviously, it's not illegal to get a recipe for sweet

7  potato pie which would indicate she knows it's not

8  about sweet potato pie.

9         MS. JOHNSTON:    I have no further questions.

10        THE COURT:    All right.

11        Recross.

12                 **RECROSS EXAMINATION**

13        BY MR. MONTEMARANO:

14  Q.      Good afternoon, Sergeant Sakala.  How are you?

15  A.      Fine.  How are you, sir?

16  Q.      Just fine.  Just a few questions to proceed from

17  those Ms. Johnston asked you.

18        You stated early on in your redirect testimony,

19  in response to one of Ms. Johnston's questions, that in

20  your view, PTK Enterprises -- that was a business of

21  Ms. Martin's; correct?

22  A.      I think it's PTK Associates.

23  Q.      PTK Associates.

24        You said in your view it was not a -- just a

25  moment, please -- not a functioning, legitimate

1  business ; correct ?

2  A.       Correct .

3  Q.       And that 's based upon ?

4  A.       A number of thing s, certain ly not the least of

5  which were  the intercept s.

6  Q.       Okay .  You're certain ly aware that people are

7  allow ed to do business  under Maryland  law in almost any

8  form , aren't  they ?

9  A.       In any form  of business ?

10  Q.       Well , you can do business  as an individual ;

11  correct ?

12  A.       Correct .

13  Q.       You can do business  as a partnership ; correct ?

14  A.       Correct .

15  Q.       You can do business  as a corporate  entity ;

16  correct ?

17  A.       Yes .

18  Q.       There are  multiple  kinds  of corporate  entiti es;

19  correct ?

20  A.       I suppose  so , yes .

21  Q.       Public ly trade d, private ly own ed and so forth;

22  correct ?

23  A.       Yes .

24  Q.       Depend ing  on the  sort  of business  entity  you

25  choose  depends  on whether  or not  you file  paper s with

1 the state ; correct ?

2 A.      I guess.   You know , whatever  business  you

3 choose .   That 's a business 's decision .

4 Q.      You can use another  name  for a business  other

5 than your own name ?

6 A.      Certain ly.   Yes .

7 Q.      You can file that without  filing  separate  tax es

8 for that business .   You can file it under  one of the

9 Schedule s append ed to your form  1040  with the IRS;

10 correct ?

11 A.      You can file as a sole proprietorship , yes .

12 Q.      That 's exact ly what I was going to suggest , a

13 sole proprietorship .

14        So it's not the lack of paperwork  that suggest s

15 that PTK is not a business ; right ?

16 A.      In fact , it is the seizure  of some  of the

17 paperwork  that clear ly show s it is not a legitimate

18 business .

19 Q.      Ms. Martin  does make phone  call s repeat edly over

20 the wiretap  with suppliers  of clothi ng, does she not?

21 A.      She talk s to two individuals :  Kevin  Scott , and

22 another  individual , Marsha W est.   Those  are the only

23 two that I'm aware  of she got clothe s from .

24 Q.      You don't recall  call s with clothi ng suppliers

25 in other  state s?

1 A.      No, I do not.

2 Q.      Certainly, if there are clothes being ordered,

3 and discussions, you don't recall -- strike that.

4        You don't recall phone calls discussing sizes

5 with persons other than Kevin Scott or Marsha Jean

6 West.

7 A.      No.  Those are the only two people I'm aware she

8 got clothes from.

9 Q.      You don't recall phone calls discussing the

10 sizes, colors, styles?

11 A.      Yes, with Marsha West and Kevin Scott.

12 Q.      Oh.  Other than those  other people.

13 A.      As far as  supplies and  clothes?  No, I do not.

14 Q.      During the time of the wiretap from the 8th of

15 March on, you tapped Ms. Martin's home phone; correct?

16 A.      Correct.

17 Q.      And that would be the B line?

18 A.      Yes.

19 Q.      And her cell, the A line; correct?

20 A.      That's correct.

21 Q.      Those are not the only phones she has access to;

22 is that a fair statement?

23 A.      That is a fair statement.

24 Q.      In fact, just on one of the calls Ms. Johnston

25 just referenced you to, A1849 -- do you still have

1  that transcript in front of you?

2  A.    Is that one of the new ones?

3  Q.    I was going to put the transcript up so you and

4  I can read it together.

5       Do you see the outgoing to?

6  A.    Yes.

7  Q.    Do you see that number?

8  A.    Yes.

9  Q.    That would be --

10  A.    I think that's Jackie Terrell's telephone.

11  Q.    So that would be the phone at 810 Hayward;

12  correct?

13  A.    Yes.

14  Q.    But upstairs?

15  A.    I don't know where in the residence it's

16  located.  I would assume it's upstairs.  That's where

17  she lived.

18  Q.    You didn't tap that phone.

19  A.    No, we did not.

20  Q.    At some point, it's your testimony that the drug

21  business was moved to the school on South Dakota

22  Avenue; correct?

23  A.    Yes.

24  Q.    There's a phone on South Dakota?

25       If you know.

1  A.      I know we had a pin register on it for a length

2  of time.  We discontinued the pin register at some

3  point in time for inactivity.   So, I don't know  whether

4  there was an active phone at the time of the -- she

5  moved the clothes there.  So the answer would be that

6  there could have been, but I don't know.

7  Q.      And it would be fair to say that since you're

8  not sure of or not there was an active phone there you

9  certainly didn't undertake to tap it; right?

10 A.      We did not intercept calls on that line, no.

11 Q.      That would have been just been -- I mean, with a

12 wiretap ongoing, adding phone lines is something  you

13 could do; correct?

14 A.      If there's evidence to -- for your affidavit,

15 yes.

16 Q.      Absolutely.  In fact, that's what you did.  You

17 added Mr. Mangual's two lines; correct?  You added Ms.

18 Levi's lines?

19 A.      Ms. Levi's line -- one line?

20 A.      Yes.

21 Q.      Excuse me.  Court's indulgence, please.

22         And with regard to the suppliers of clothes.

23 You weren't part of the search paper; is that correct?

24 A.      Correct.

25 Q.      Did you ever, ever go and view the physical

1  evidence taken from Hayward?

2  A.      I'm sure I have.

3  Q.      Was among that physical evidence -- Mr. Sussman,

4  in his questions to you, showed you some photographs

5  from this search of Hayward?

6  A.      Somebody did.  I guess it's Mr. Sussman.

7  Q.      There were a series of single shoes on the floor

8  not matched pairs, it appeared.

9  A.      That's correct.

10 Q.      And there were racks of clothing?

11 A.      I think there was one rack.

12 Q.      There was one rack in the photo.  The fact is,

13 there were many other racks in there.  Several of them.

14 A.      I was not there.  I have no idea.

15 Q.      You have no idea.  Since you have no idea about

16 any other racks, let's talk about the rack we see in

17 the photograph.  Did you ever inspect those clothes?

18         MS. JOHNSTON:   Objection.

19         Beyond the scope of redirect.

20         MR. MONTEMARANO:   This goes to --

21         THE COURT:   Somehow this is within the scope?

22         MR. MONTEMARANO:   This goes with regard to the

23 "nonexistent business" of Ms. Martin.

24         THE COURT:   Overruled.

25         BY MR. MONTEMARANO:

1 Q.      Did you ever go to those racks with -- the

2 contents of 810 Hayward, the basement where Ms. Martin

3 lived, were in the government's possession after the

4 search.  Fair statement?

5 A.      No, that's not a fair statement.

6 Q.      Well, you all went through the door; correct?

7 A.      Correct.

8 Q.      Guns and badges and all that kind of stuff.

9        MS. JOHNSTON:   Objection.

10       THE COURT:   Sustained.

11       Rephrase it.

12       BY MR. MONTEMARANO:

13 Q.      A search of 810 Hayward is undertaken on the 1st

14 of June, 2004; correct?

15 A.      Yes.

16 Q.      At which point the government law enforcement

17 agents who undertook the search -- and there are

18 probably eight or ten of them, I would imagine.

19       MS. JOHNSTON:   Objection.

20       He wasn't there.

21       MR. MONTEMARANO:   If he knows.

22       MS. JOHNSTON:   Again, beyond the scope of

23 redirect.

24       THE COURT:   Overruled.

25       Make sure you ask him if he knows.

1          BY MR. MONTEMARANO :

2 Q.       Do you know ?

3 A.       No, I do not.

4 Q.       Based upon your training and experience, and in

5 your 18 years of narcotics enforcement, it would be

6 fair to assume there would be about eight to ten agents

7 for the search of a primary residence in a case such as

8 this.

9          MS. JOHNSTON:   Objection.

10         THE COURT:   Sustained.

11         What's the basis for that ?

12         Sustained.

13         BY MR. MONTEMARANO :

14 Q.      Okay.  Some police officers  went to Hayward on

15 the 1st of June ; is that a air statement ?

16 A.      That's correct.

17 Q.      And those police officers, however many there

18 were, had access to everything in Hayward ; correct ?

19 A.      Yes.

20 Q.      And with the authority granted by the warrant

21 for the search of Hayward, they were able to seize and

22 take away everything they thought to be of importance ;

23 correct ?

24 A.      They could seize everything that's listed in

25 what we call Schedule A of the warrant.

1 Q.      Those would be things that you believed were

2 relevant to Ms. - -- the prosecution of Ms. Martin; fair

3 statement?

4 A.      No.   They were very specific items that you can

5 search and seize, and it's not what we say is relevant.

6 There's a very defined list of what can and cannot be

7 seized.

8 Q.      That's absolutely correct.   That's a bad

9 question.   Let me rephrase the question.

10      When you provide to a judicial officer a search

11 warrant affidavit, a proposed search warrant Schedule A

12 would be attached to it; correct?

13 A.      That is correct.

14 Q.      And when you compile Schedule A, you or

15 whichever agent happens to compile it, you would put on

16 Schedule A everything that you believe will be on the

17 premises to be searched that is relevant to your

18 prosecution of the person who is the target of the

19 search.

20 A.      Yes.

21 Q.      Things relating to a drug prosecution; correct?

22 A.      That is correct.

23 Q.      And while you're there you are certainly able to

24 look at and view other things which are there which may

25 or may not be relevant to the prosecution of the

1 person.

2 A.      That is correct.

3 Q.      And the clothes might well not be listed on

4 Schedule A; correct?

5 A.      I do not believe they were, no.

6 Q.      But they were certainly there; correct?

7 A.      According to that picture, yes.

8 Q.      Certainly, someone could have looked at them;

9 correct?

10 A.      I'm sure somebody did look at them.

11 Q.      And look at the labels inside; correct?

12 A.      I don't know if they looked at the labels, but

13 I'm sure the clothes were searched for drugs.

14 Q.      And they certainly could have looked at the

15 labels, couldn't they?

16 A.      They certainly could have looked at them, yes.

17 Q.      Among the things seized from Hayward would be

18 this list about halfway through Hayward 7.

19 A.      I'm sorry.  You're saying --

20 Q.      This is Hayward 7.   You've seen this before?

21 A.      Yes.

22 Q.      It's a listing of clothing; is that correct?

23 A.      This is a list of clothes.  That's what it

24 appears to be.

25 Q.      What is the number there, 8005436330?

1   A.        I do not know .

2   Q.        Court 's indulgence , please .

3             Among the other thing s in Hayward 7 was Mr.

4   Williams ' name ; correct ?

5   A.        Yes .  That would be Gilbert Williams of Guilty

6   Productions.   Th at's Gilbert Williams .  I'm assuming

7   that 's Guilty Productions,  yes .

8   Q.        Did you check that number ?

9   A.        I did not , no .

10  Q.        832 area code .  Does that mean anything to you ?

11  A.        No , it does not .

12  Q.        If I suggest to you that a 704 area code is

13  North Carolina , you probably would n't have any reason

14  to argue with that , would you ?

15  A.        No .  I don't know .

16  Q.        And you said you believe that Mr. Williams is a

17  person who Ms. Martin wire d you said $100,000 ?

18  A.        I think it's $100,000 we have the records but I

19  think it's $100,000 .

20  Q.        You do have the records in fact the government

21  sought the return of that money didn't they ?

22  A.        We sought --

23            MS. JOHNSTON:   Objection .

24            THE COURT:   Approach the bench .

25            MS. JOHNSTON:   I'll withdraw my objection , Your

1  Honor .

2          THE  COURT:   All right .   You may  answer .

3          THE  WITNESS:   We  attempt ed  to  seize  the  money ,

4  but  Mr.  Williams  had  wire d  it  to  another  account .

5          BY  MR.  MONTEMARANO :

6  Q.      He  told  you  he  had  spent  it , didn't  he?   He

7  spent  it  on  the  Gerald  LeVert  Father  and  Son  Tour ;

8  correct ?

9  A.      No , he  did  not .   I  have  not  spoke  with  him , so  I

10  don't  know  what  he  said  he  did  with  the  money .   I  know

11  it  was  wire d  out  of  the  account  just  a  few  day s  before

12  we  were  going  to  seize  it .

13  Q.      Did  you  ever  see  a  letter  from  Mr.  Williams  to

14  Ms.  Johnston  relating  exact ly  to  that  topic ?

15  A.      No , I  have  not .

16          MR.  MONTEMARANO :   Your  Honor , if  we  could .   You

17  said  you  want ed  to  quit .

18          THE  COURT:   Yeah .   You're  not  finish ed?

19          MR.  MONTEMARANO:   I'm  not  finish ed , but  I  can

20  stop  here .

21          THE  COURT:   Let's  stop  here  at  this  point .

22          Ladies  and  gentlemen , as  I  mention ed  to  you , I

23  have  another  matter  at  9:00  tomorrow  so  we  will  start

24  at  10:00 .   Please  continue  to  follow  my  strong

25  recommendation  that  you  take  the  escalator s  so  that  we

1  do not have missing jurors tomorrow.

2                        (Jury excused at 4:48 p.m.)

3                        (Off the record at 4:48 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE**

2

3        I, Tracy Rae Dunlap,   RPR , CRR , an Official Court

4  Reporter for the United States District Court of

5  Maryland, do hereby certify that I reported, by machine

6  shorthand, in my official capacity, the proceedings had

7  and testimony adduced upon the Jury Trial Proceedings

8  in the case of UNITED STATES OF AMERICA versus PAULETTE

9  MARTIN, et al, Criminal Action Number    RWT-04-0235 on

10 July 5, 2006.

11

12        I further certify that the foregoing    177 pages

13 constitute the official transcript of said proceedings,

14 as taken from my machine shorthand notes, of said

15 proceedings.

16

17        In witness whereof, I have hereto subscribed my

18 name, this 24th day of April 2008.

19

20

21        _____

22                     TRACY  RAE  DUNLAP,  RPR , CRR
                     OFFICIAL   COURT REPORTER

23

24

25