```
1            UNITED STATES DISTRICT COURT OF MARYLAND
                      SOUTHERN DIVISION
2
  ------------------------x
3 UNITED STATES OF AMERICA  :
          Plaintiff         :
4                           :
                            :
5 vs                        :Criminal Action:    RWT-04-0235
                            :
6                           :
  PAULETTE MARTIN, et al    :
7         Defendants.       :
  ------------------------x
8

9                          Thursday , July 6, 2006
                           Greenbelt, Maryland
10
       The above-entitled action came on for a Jury Trial
11 Proceeding before the HONORABLE ROGER W. TITUS, United
   States District Judge, in courtroom 4C, commencing at
12 9:58 a.m.

13     THIS TRANSCRIPT REPRESENTS THE PRODUCT
       OF AN OFFICIAL REPORTER, ENGAGED BY
14     THE COURT, WHO HAS PERSONALLY CERTIFIED
       THAT IT REPRESENTS THE PROCEEDINGS AS RECORDED AND
15     REQUESTED.

16     APPEARANCES:

17     On behalf of the Plaintiff:

18     DEBORAH JOHNSTON, Esquire
       BONNIE GREENBERG, Esquire
19
       On behalf of the Defendants:
20
       MICHAEL  MONTEMARANO , Esquire
21     ANTHONY MARTIN, Esquire
       MARC HALL, Esquire
22     TIMOTHY MITCHELL, Esquire
       PETER WARD, Esquire
23     EDWARD SUSSMAN , Esquire
       HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR              (301) 344-3912
25 Official Court Reporter
```

1                          I N D E X

2                          DIR   CROSS    REDIR     RECROSS
  Shelton Roberts          147   160      172       175
3
  Moises  Uriarte          180   206      213       215
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                              Page

23 Reporter's Certificate                       226

24 Concordance                                  227

25

1            THE COURT:   Is Mr. Sussman here?

2            MR. MCKNETT:   I think he's on the phone trying

3  to reach his client.

4            MR. MARTIN:   He's been on the cell phone for the

5  last half hour, 40 minutes trying to reach his client.

6            THE COURT:   Yesterday was the elevators.   Today

7  it's illness.

8            MR. MARTIN:   Next are the locusts.

9            THE COURT:   Don't talk that way.   It'll happen.

10  I think I saw Mr. Sussman.

11            THE COURT:   Good morning, Mr. Sussman.

12            MR. SUSSMAN:   Good morning, sir.

13            THE COURT:   Can you give me an update as to what

14  you know right now.

15            MR. SUSSMAN:   I spoke to my client after Mr.

16  Krinsky spoke to me, and she said she had a doctor's

17  appointment.   I said it requires more urgent attention

18  than that.   She said she would be going to the

19  emergency room.   The closest one -- she lives in

20  Dunbar.   I don't know the hospitals up there.

21            Since that, I told her to call me when she gets

22  to the hospital.   I have not heard from her.   I don't

23  know -- at that time, it was probably about 30 minutes

24  ago, and I'm not able to reach her on her cell.   I

25  don't know if she's in the hospital -- I really don't

1  know where she is right now.  The last time I spoke

2  with her, she was going to leave.

3          THE COURT:  Do you know what the nature of the

4  problem is?

5          MR. SUSSMAN:  She was sick yesterday, and

6  apparently everybody noticed it but me, who is

7  generally fairly insensitive, and she has chills,

8  swollen glands, she was -- had intestinal -- she

9  mentioned that a couple of times about that being

10 problems.  She wasn't looking well is the consensus.

11 But past that, I can't.

12         MR. MCKNETT:  Your Honor, for what it's worth, I

13 sit next to Ms. Harden during the trial, and it was

14 obvious to me yesterday she was in distress.  She was

15 complaining about feeling very, very poorly yesterday.

16         THE COURT:  You're much more sensitive.

17         MR. SUSSMAN:  Almost everybody is, Judge.

18         We had discussed various options to try to save

19 time.  I have no problem with her legal matters,

20 waiving her presence with the legal matters, 404(b)

21 issues and some other things.

22         MS. GREENBERG:  She actually has no standing in

23 the 404(b) issues, so that was the government's

24 position.

25         THE COURT:  Well, yeah.  I think I can hear

1 argument s on 404(b) issue s without her presence , but

2 any testimonial matter , she's either going to have to

3 waive it or she's got to be here .

4      MR. SUSSMAN : One of the thing s we discuss ed --

5 Sergeant Sakala is still on the stand , and I had some

6 plan s to cross -examine him further . We could move him

7 off and move on to other thing s that don't direct ly

8 concern my client . I would want her -- to reach her

9 explain the situation, and have her , through some way ,

10 make a waiver for Your Honor .

11      THE COURT: Let me say this : I was thinking

12 about this before I came on the bench , and it seem s to

13 me I've got several option s , hope fully she will call

14 you and tell you they just gave her a magic pill and

15 she's on the way , but I don't know  if that's going to

16 happen .

17      If she de sire s to waive her right to be present

18 during the proceed ings while she's attending  to her

19 illness , I would strong ly believe that that waiver

20 ought to be at least effectuated  by her on the

21 telephone so that I could personally address her so she

22 understand s what she's waiving. So, you're wait ing to

23 hear from her ; is that correct ?

24      MR. SUSSMAN : That 's correct . Just for the

25 Court 's information , I would advise her that a waiver

1   would be okay as long as  these  matter s were  peripheral

2   to her  own  case , search es of people 's  premises ,  thing s

3   of  that  nature .   I  would  certain ly not  advise  waiver  if

4   the  matter s were  direct ly --

5        THE  COURT:   Well , we  can  cross  that  bridge  when

6   we  get  to  it.   It  may  be  that  with  some  cooperation  by

7   all  parti es  we  could  deal  with  matter s  that  are  mostly

8   not  germane  to  her , and  she  could  waive  to  that  extent ,

9   but  I  want  to  make  certain  that  if  there  is  a  waiver ,

10  that  I  address  her  personally ,  even  if  it's

11  tel ephonically,   and  we  can  put  it  on  the  speak er  and

12  have  it  on  the  record .

13        The  only  other  option  if  we --  if  she 's  just  not

14  going  to  appear  is  to  issue  a  bench  warrant  and  force

15  her  to  come , which  I  don't  want  to  do  if  somebody  is  in

16  the  hospital , so  that 's  not -- does n't  seem  to  be  an

17  option , but  I  don't  know   how  serious  it  is.   I  could  go

18  to  the  hospital  because  I  stub bed  a  toe , I  could  go  to

19  the  hospital  because  I  have  a  life -endangering

20  condition .   I  don't know   what  her  situation  is.

21        The  only  other  option  I  see  is  to  sever  her  from

22  this  case , which  is  not  a  pleasant  option .   So, those

23  are  my  musi ngs , but  let  me  hear  from  Ms. Johnston  as  to

24  what  her  solution  is  to  this  problem .

25        MS.  JOHNSTON:   Your  Honor , well , quite  frankly ,

1  if she had a flu or stomach virus, most people would go

2  see their family doctor and could have done it last

3  night if she was that ill.  And I probably sound more

4  insensitive than Mr. Sussman sounded earlier in terms

5  of not noticing her.  I knew she was wrapped up

6  yesterday, and quite frankly, it's usually a little

7  chilly in this courtroom.  Many of us are sitting here

8  huddled, not under blankets, other than Ms. Harden, but

9  I believe that -- I don't hear that it's a

10 life-threatening illness.  It sounds like it may be

11 some kind of flu or something along that line.  I

12 certainly don't think a severance is appropriate in

13 this case.

14      THE COURT:  No, that's the last option on my

15 list.

16      MS. JOHNSTON:  The government would suggest

17 that, perhaps, the most practical way to handle this is

18 to proceed with the legal argument on the 40 -- all of

19 the 404(b) evidence.  The Court's heard enough of the

20 case at this point to, we believe, make rulings in

21 terms of the 404(b) evidence.

22      We would then elect to proceed, get Ms.

23 Harden on the phone, if we have to call Bayview

24 Emergency and get their emergency room to get her on

25 the phone and waive her presence, for example.  One

1   witness we have to call today is Shelton Roberts, who

2   is involved in the 1986 searches of residence where Ms.

3   Martin was living selling drugs, call him.  That has

4   nothing to do whatsoever with Ms. Harden.

5        We also have Moises Uriarte, who was a source of

6   the heroin in New York who could testify.  He won't

7   have anything to do with Ms. Harden. He was scheduled

8   to be our next witness.  We would -- we had planned,

9   then, to go to Paula's School of Performing Arts, that

10  search, and then search of Hayward, but I think Mr.

11  Sussman may want Ms. Harden present for those searches

12  because they are more closely associated with his

13  client.

14       THE COURT:  It sounds to me like what we should

15  do, and I assume, Mr. Sussman, you are -- I don't know

16  that client has the right to be present during a legal

17  argument, but to the extent that she has any right to

18  be present on the presentation of the 404(b) arguments,

19  do you waive her presence for that?

20       MR. SUSSMAN:  I will waive her presence for

21  that.

22       THE COURT:  Plus, I don't think the 404(b)

23  evidence has -- I don't think she has a dog in that

24  fight.  I mean, that's not an issue affecting her.

25       MS. JOHNSTON:  That's correct, Your Honor.

1        THE COURT:  All right.  Well, let's do this.
2  Mr. Sussman is your cell phone on?  You have my
3  blessing to turn it on.
4        MR. SUSSMAN:  It is.  I would ask if it's all
5  right for the Court if I excuse myself during the
6  argument to get better reception, and I will try the
7  Bayview thing if I can't get her also.
8        THE COURT:  Then if everybody is in agreement,
9  what I'm going to do is I'm going to, first of all,
10  tell the jury or have Bea tell the jury that there's a
11  delay because a party is ill and we're addressing it
12  and we'll keep them posted.  But in the meantime, I'll
13  tell them we're hearing argument on some other matters,
14  and hopefully we'll know what the answer is by 10:30,
15  and I'll give them an update.  But I'll just tell Bea
16  to tell them we're going to be a delayed start because
17  of the illness of one of the parties and we will advise
18  them as soon as the question of that person's illness
19  is better known.
20        MS. JOHNSTON:  Your Honor, as I said, we have
21  those two witnesses who will be here by 10:30 prepared
22  to go that are totally unrelated to Mr. Sussman, and
23  then we can discuss which search locations he would
24  prefer.  We have a third -- we have another cooperator,
25  Emilio Echarte, who also has nothing do with Ms.

1  Harden , so we have witness es.  I just need some

2  advance notice in term s of the search officer s.

3         THE COURT:  Mr. Sussman , you have my bless ing to

4  turn your cell phone on , and at appropriate time s, if

5  you need to go out and just check and see if there 's a

6  call , you may do so.  Since you're waivi ng her right ,

7  to the extent she has one at all , to be present during

8  the legal argument , and you have my bless ing to absent

9  yourself periodically  to check on her status .

10         MR. MCKNETT :  Your Honor , just for the Court 's

11  schedule , there is an issue that I would like to be

12  heard on before  Sergeant Sakala return s to the witness

13  stand .  It arose yesterday , and I thought about it last

14  night , and I think I need to address it with the Court

15  this morn ing .

16         THE COURT:  What is the nature of the issue ?

17         MR. MCKNETT :  It has to do with the -- well , it

18  has to do with the sergeant 's testimony about the basis

19  for some of his opinion s that he testifi ed to

20  yesterday .

21         THE COURT:  Can you give me a more -- another

22  clue ?

23         MR. MCKNETT :  The sergeant is sitting here , Your

24  Honor .

25         THE COURT:  Oh, oh.  Okay .

1          MR. MCKNETT:  I'm being a bit cryptic.

2          THE COURT:  Sergeant, do you want to absent

3 yourself from the courtroom for a moment, please?

4          (Sergeant Sakala excused from the courtroom.)

5          THE COURT:  You may proceed.

6          MR. MCKNETT:  If I may proceed, Your Honor.  If

7 the Court will recall  early in the case before we

8 started the actual trial, I had filed on behalf of all

9 defendants a Motion to Exclude Expert Testimony on

10 Daubert grounds, and also on proffered hearsay grounds.

11          In response to questioning during the hearing on

12 that argument on that motion, the sergeant testified

13 that he did not form any of his opinions on information

14 he received from other people involved in the case.  He

15 said he formed his opinions from other information, and

16 then when he talked to the individuals, the informants,

17 cooperators and such, they confirmed his opinion, so

18 that information was not the basis for his opinion.

19          I took that, I think legitimately, so I took

20 that to be, in effect, one of the rules of engagement

21 that I could question him about the basis for his

22 opinions and reasonably expect that he would maintain

23 that same position.

24          Yesterday when I was questioning him about the

25 -- his opinion about the nature of the relationship

1   between my client, LaNora Ali, and Gwen Levi, he stated

2   -- I can't quote him verbatim, but he said that he had

3   the opinion that my client knew that Ms. Levi was

4   involved in the drug trafficking business from

5   information he received outside of the conversation we

6   were referring to, and then if I remember correctly, he

7   tried to kind of encouraged me to ask the next question

8   about what was the basis for that opinion and I didn't

9   ask that next question.

10          However, when Ms. Johnston redirected her

11  questioning toward the sergeant, she asked him what is

12  the basis of that opinion.  And he said that he formed

13  the opinion concerning the -- he formed his opinion

14  concerning my client's knowledge of Ms. Levi's drug

15  activities from information he received from other

16  people and that is almost verbatim.

17          So in effect, the sergeant changed the rules of

18  engagement in the course of his testimony.  I believe

19  that reopens the argument that I made initially that he

20  has now elevated hearsay evidence that he received from

21  other individuals to the level of expert opinion, which

22  is impermissible, I believe, pursuant to Crawford, and

23  also by general hearsay rules.  He can't do that.

24  That's exactly what he's done.

25          I think the key -- the only solution the Court

1  has would be -- I would ask at this point in the

2  alternative to either strike his testimony because we

3  now don't know what the foundation is for his opinion s.

4  He's contradict ed himself and has now admitted that he

5  has form ed his expert opinion s based on hearsay he has

6  received from other individuals involve d in this case ,

7  so that , I think , should cause the court to consider

8  striki ng his testimony .

9       I don't think a curative instruction would solve

10  the problem because , again , it's unringing the bell .

11  The jury has heard the sergeant testify that he

12  believe s certain thing s about my client based on

13  information he received from other people . That bell

14  cannot be unrung by any instruction .  The only other

15  option , I think , would be to grant a mis trial , a

16  severance of my client at this stage .

17       THE COURT:  All right .  Well , Mr. McKnett , my

18  understand ing is that Sergeant Sakala was call ed, among

19  other thing s, as an expert witness to express opinion s,

20  as I recall them , to two broad general area s.  One was

21  to act as an expert to inter pret the lingo used during

22  these conversation s.  And in giving an opinion about

23  the lingo use d in these conversation s, he said he

24  could n't do that in isolation look ing at one

25  conversation alone , but he considered the totality of

1   all of the conversation s.  And based on the totality of
2   all the conversation s and based upon his judgment and
3   experience , he could give an opinion of what was being
4   said in these otherwise potential ly nonsensical
5   conversation s.  Second area was to give expert opinion
6   about the way s in which people conduct the drug
7   business and that was based upon his general background
8   and experience .

9        I think that's a correct description of what he
10  was permitted to testify about .  Now , he may have been
11  asked some question s that veer ed to the edge s of those
12  areas of expertise , but let me hear from Ms. Johnston .

13        MS. JOHNSTON:   Your Honor , first , let's be clear
14  about what happened here in term s of his direct
15  examination .  Detective Sakala was very clear he was
16  testify ing based upon his background and train ing and
17  his interpretation of the call s in con text with the
18  other call s and the surveillance s, and that any
19  information he got from cooperator s was something that
20  was corroborative of his testimony .

21        And in his direct examination , he testifi ed
22  consistent with that .  It was during Mr. McKnett 's
23  cross-examination when Mr. McKnett asked him whether --
24  asked him if he had an opinion as to whether or not Ali
25  knew Gwen was involve d in drug s, and this was in

1  response  to  Mr.  --  that  was  Mr.  McKnett 's  question .

2  I'm  paraphrasing  it  based  upon  my  notes.  And  he  said ,

3  yes ,  he  had  an  opinion .

4        So  that  was  something  that  came  out  on

5  cross-examination ,  and  then  Mr.  McKnett  twice  asked  him

6  about  what  was  the  basis  of  that  opinion ,  and  the  --

7  Detective  Sakala  was  very  careful  and  said  that  he  had

8  other  information  and  left  it  that  general .

9        In  redirect  examination ,  I  asked  him  about  that .

10  My  question  was  not  objected  to  by  Mr.  McKnett ,  and

11  certainly  my  question  was  proper  in  light  of  the  fact

12  that  he  opened  that  door  and  in  asking  the  detective  if

13  he  had  an  opinion  as  to  whether  Ali  knew  Gwen  was

14  involved  in  drugs.  And  so  I  asked  him ,  and  he  said

15  that  he  had  gotten  information  from  other  sources.

16        And  that  was  the  extent  of  it.  Not  any

17  testimony  about  what  other  people  told  him ,  but

18  certainly  what  happened  here  was  as  a  result  of

19  questions  Mr.  McKnett  asked  him  on  cross-examination .

20  He  asked  him  whether  or  not  the  detective  had  an

21  opinion  as  to  whether  Ali  knew  Gwen  was  involved  in

22  drugs.  Certainly  that  was  not  something  that  we

23  covered  on  direct  examination ,  something  that  he  asked ,

24  and  the  detective  was  --  and  then  he  asked  him  what  the

25  basis  of  that  opinion  was .

1        And certainly I was permitted to follow up on

2   those questions that he asked. That certainly is

3   nothing improper about that and --

4        THE COURT: Well, let me say this: I am not

5   inclined to grant the motion for the reasons stated by

6   Ms. Johnston, but what I would prefer to do is to take

7   your motion under advisement and look at the

8   transcript, because when an objection is not made right

9   then and there and it's fresh in my mind, I don't have

10  perfect recall. And what I'd like to do is to take a

11  look at the specific exchanges that we're talking about

12  which would start with your cross-examination, Mr.

13  McKnett, and then her redirect to see whether we have

14  an issue or not.

15       I'm inclined to think that since this is

16  something that arose on cross-examination, that it

17  would not serve as a basis for striking his entire

18  testimony or severing your client, but I don't want to

19  cross that bridge finally. I'd rather do it carefully.

20  So let me ask Ms. Dunlap, at her convenience, because

21  we're going to be here a long time together, to put

22  together for me the testimony that she -- that he gave

23  on Mr. McKnett's cross-examination and the redirect

24  that the government elicited.

25       MR. MCKNETT: I was referring to yesterday.

1         THE  COURT:   Okay.   So what  we really  need  to  see

2 is yesterday 's brilliant  cross-examination   by Mr.

3 McKnett  followed  by the  government  's redirect  on that

4 issue ; right?

5         MR. MCKNETT :  Yes , Your  Honor .  While  it's still

6 fresh  in my mind , may  I respond  to what  Ms.  Johnston

7 said ?

8         THE  COURT:   Sure , sure .

9         MR. MCKNETT :  Your  Honor , the reason  I asked  the

10 question  -- part  of the reason  I asked  the question

11 about  the basis , I think  if I remember  correct ly, I

12 asked  him if there  was anything  in the transcript s that

13 caused  him to have  the opinion  that Ms. Ali knew  about

14 Ms. Levi 's drug  deal ing activities .  And if I remember

15 correct ly, he indicated  not in the transcript s or the

16 other  evidence , but there  was other  information  that he

17 reli ed on.

18         Now , I didn't  pursue  that because  I was n't sure

19 what  the answer  would  be; and second ly, because  he had

20 already  said at the motion s hear ing that  he did not

21 base  any of his opinion s on what  he was told  by other

22 people  involve d in this case , so there  was absolute ly

23 no expectation  and no reason  for me to expect  that  he

24 would  then refer  to what  he was told  by other  people

25 involve d in this case .  That 's exact ly what  he

1 testified to.

2 　　　　THE COURT:   My problem , Mr. McKnett , is I just

3 don't recall it with absolute precision . I'd like to

4 take a look at the written words on a transcript , so

5 I'm going to take no action on your motion at this

6 time, but I'll consider it further . Okay . All right ?

7 Mr. Sussman , did you have any success ?

8 　　　　MR. SUSSMAN :   I have nothing additional , sir.

9 　　　　THE COURT:   Nothing ? All right .

10 　　　　MR. MCKNETT :   Your Honor , may I just , if I may

11 just inquire . Does the Court intend to rule on that

12 before the sergeant return s to the stand ? I still have

13 recross to do.

14 　　　　THE COURT:   I'll have to ask Ms. Dunlap.

15 　　　　MS. JOHNSTON:   Your Honor , I could -- this

16 happened when Mr. McKnett was question ing Agent Sakala

17 in reference  to Call B4330 , so that might help our

18 court reporter  find that portion of his redirect ,

19 because his redirect was quite lengthy .

20 　　　　THE COURT:   Right .

21 　　　　MS. JOHNSTON:   His cross-examination  was quite

22 lengthy .

23 　　　　THE COURT:   Well , Ms. Dunlap has been busy

24 late ly, but Ms. Dunlap, what is your estimate of when

25 you will be able to get that?

1          COURT REPORTER:   Just that portion,  Judge,  I can

2 have that for you first thing in the morning.

3          THE COURT:   Well, let me see if   I can address it

4 first thing in the morning.     It may very well  be  we

5 have to drag Sergeant  Sakala  back a second time if we

6 can't get it resolved,   but I'll do my level  best  to get

7 this resolved quickly.     Who wants to present  arguments

8 on that?  Mr. Montemarano ?

9          MR. MONTEMARANO :   Thank you , Your  Honor .

10 Court 's indulgence .   Initial  -- I'm not  saying  this to

11 criticize Ms. Johnston  in any way , shape , or form , but

12 I want the Court to understand , when we receive d that

13 massive provision of  Jenks , Mr. Robert s -- Shelton

14 Robert s is not identifi ed as one  of the  potential

15 government  witness es , so I don't know   that  I have Jenks

16 identifi ed to him relative  to these  former  search es .

17          MS. GREENBERG:   Your Honor , just  to  shortcut

18 this , Your  Honor , it 's the  404(b)  that  we sent  out  a

19 week  before .

20          MR. MONTEMARANO :   Okay .

21          MS. GREENBERG:   One  week  before  trial .   It was

22 in there .

23          MR. MONTEMARANO :   Week  before  trial ?

24          MS. GREENBERG:   The  month  before .

25          MR. MONTEMARANO :   The  month  before  trial  I have .

1 I have a letter referencing my client's prior

2 conviction of possession of an unregistered firearm and

3 ammunition, possession of intent to distribute cocaine

4 on December 11th, 1986, and her receiving a 15-year

5 sentence, so the extent that we have something beyond

6 that.

7        MS. GREENBERG:   There was a huge stack of police

8 reports for the 404(b).  Judgment convictions and

9 police reports.

10       MR. MONTEMARANO:  Okay.  I do not -- I

11 apparently did not bring that with me.  I might have it

12 identified differently in my file.  We'll leave that

13 alone for the moment.

14       MS. GREENBERG:   One of my paralegals is making a

15 copy for Mr. Montemarano.

16       MR. MONTEMARANO:  Thank you, Ms. Greenberg.

17 That all being said, we have made -- we have objected

18 to the government's use of 404 beginning with the

19 original motions filed back in 2005.  We then

20 reiterated it based upon the government's provision of

21 404(b) material in Motions in Limine filed in her --

22 and prior to the filing of the government's 404(b)

23 material in early May.

24       Simply put, I respectfully submit to the Court

25 that the government has not met its burden, which is at

1 all time s its burden , to demonstrate  to this Court as

2 to why 404(b) evidence , or this particular  404(b)

3 evidence , is usable . It is always the government 's

4 burden , and this Court is obligate d to require from the

5 government  an explanation  of how this fits in.

6 So that one of the possible  exception s to 404(b) does

7 not --

8        THE COURT:  Let me interrupt  you , Mr.

9 Montemarano .  I don't like to interrupt  counsel , but I

10 think because of what you just said , and because  of the

11 language  of the rule , I ought to have you sit down and

12 have the government  tell me which exception  they're

13 rely ing upon , and then you can respond  intelligent ly to

14 what is.

15        MR. MONTEMARANO :  Thank you , Your Honor .

16        THE COURT:  Just one moment .

17        MS. GREENBERG:  Your Honor , in our motion s

18 response  as to the theory of admissibility , the Fourth

19 Circuit, as we state d, at Page 10 of our motion has

20 indicated  that 404(b) evidence  can be admissible  under

21 multiple  bases .

22        There 's two circuit s, the 6th Circuit  and the

23 10th Circuit which have different  analysis which say we

24 have to precise ly articulate  the purpose  for which the

25 evidence  is sought  to be admitted .  However , even those

1 circuit s where it's apparent from the record what the

2 basis is, the Court has allowed it.

3       What I'd like to do for the argument, Your

4 Honor, is sort of go over the prior convictions we seek

5 to introduce relying on, of course, on the Fourth

6 Circuit authority for why it is admissible, and if the

7 Court determine s that it's appropriate to file the

8 Sixth and the follow the Sixth and Tenth Circuit rather

9 than Fourth Circuit, which allows multiple base s.

10 Although the Fourth Circuit hasn't ruled on the

11 specific issue, what we can do --

12       THE COURT:   I don't think the Fourth Circuit has

13 said, I don't have to follow the rule, but I mean, the

14 exception to the usual exclusion of this, at least

15 insofar as its being sought to prove the character of a

16 person in order to show action in conformity there with.

17 These exception s are there.

18       I have to figure out how it come s in under one

19 of the exception s.  Now, perhaps I don't have to pin

20 you down on precise ly which one it is.  Maybe you can

21 tell me it's five of them or whatever the case may be,

22 but I think it would be appropriate to our discussion

23 of this that you tell me how you believe that it come s

24 within the exception as a whole.

25       MS. GREENBERG:   Absolute ly, Your Honor.  And as

1   the Fourth Circuit said in *United States v. Queen*, that

2   list under 404(b) is not exhaustive, and if the Court

3   looks to Footnote 3 of that decision, some of the other

4   bases for which prior act evidence was admissible under

5   Fourth Circuit law is there's a bunch of cases cited

6   there and some other incidents are admissible to prove

7   knowledge of the drug trade.

8        That's the *Sanchez* case that's cited in Footnote

9   3 of *Queen*; show intent to distribute narcotics, that's

10  the *Ford* case cited in Footnote 3 of *Queen* and the *Boyd*

11  case, which is to show motive and nature of the

12  defendant's relationship with co-conspirators.

13       Starting with the first witness, you will have,

14  Your Honor, Mr. Roberts.  Mr. Roberts was involved in

15  the case in which Ms. Martin was convicted in 1986 for

16  which she received a 15-year sentence.  It was later

17  reduced, but it involved a search at Ms. Martin's

18  residence on 8th Street and drugs were being sold from

19  that residence.

20       And a confidential informant bought cocaine from

21  -- I'm sorry, Your Honor, it's two searches, but the

22  one I'm going to speak about specifically, which is in

23  the Complaint, is approximately $100,000 of cocaine and

24  crack cocaine or numerous small baggies throughout the

25  residence.  Also, documentation for an insurance claim

1 for one of the victim companies, over $7,000, drug

2 paraphernalia, a .32 caliber handgun and ammunition.

3          That is very similar to this case, Your Honor,

4 in which Ms. Martin has alleged to have large

5 quantities of cocaine and crack cocaine for

6 distribution, large amounts of cash, and of course, as

7 you -- the Court knows, it's not coming up in this

8 case, but a related insurance issue.  And these

9 searches were both in June of 1986.

10          Mr. Montemarano said in his opening on behalf of

11 Ms. Martin that she was a concert promoter, that she

12 was an entrepreneur, and that drug dealing was a young

13 person's game, and that she only sold small amounts to

14 support her addiction.  Given that defense, Your Honor,

15 this evidence is highly relevant, highly probative, and

16 as the Court is aware, 404(b) is a rule of inclusion,

17 not exclusion.

18          We are not introducing this evidence to prove

19 bad character.  We're introducing this evidence as

20 highly probative as to Ms. Martin's involvement in this

21 conspiracy, and in this conspiracy is -- starts back in

22 1997, and she received this conviction in 1986 for very

23 similar conduct to what occurred in this case.

24          The second conviction as to Ms. Martin -- I'm

25 sorry, the second incident, Your Honor, the 1986, was a

1   conviction  of  that  1994  was  not  --  the  second  one  I'm

2   speaking  about  is  not  a  conviction .  If  I  misspoke ,  I

3   apologize ,  but  the  second  incident   involved  a  search  in

4   1994,  just  three  years  before  the  incidents  we're

5   talking  about ,  in  this  case ,  directly  at  Paula 's  School

6   of  Performing  Arts.

7            Ms.  Martin  was  present  at  the  time  of  the

8   search ,  and  officers  recovered  heroin  from  a  portfolio

9   with  Ms.  Martin 's  pictures ,  a  scale ,  and  Ziploc

10  baggies.   In  addition  to  the  other  reasons  to  which

11  this  evidence  is  highly  probative  is  that  in  this  case ,

12  we  have  cooperators  that  bought  drugs  from  Paula 's

13  School  of  Performing  Arts.

14           We  wiretap  calls  in  which  drugs  were  moved  to

15  Paula 's  School  of  Performing  Arts.   We  have  a  search  of

16  Paula 's  School  of  Performing  Arts,  so  that  is  in

17  addition  to  the  reason  I  stated  for  the  1986  conviction

18  and  the  underlying  conduct  coming  into  evidence .

19           So  I  think  in  this  case ,  given  the  nature  of  the

20  charge ,  the  nature  of  the  prior  act ,  and  the  role  of

21  Ms.  Martin  in  this  conspiracy ,  in  light  of  --

22  especially  in  light  of  her  defense  that  this  evidence

23  is  highly  probative  as  to  all  prongs  of  the  404(b)

24  rule ,  as  well  as  to  prove  as  under  the  *Sanchez*  case  Ms.

25  Martin 's  knowledge  of  the  drug  trade  on  which  she

1  claim s  that  she  is  a  mere  user  who  distribute s  small

2  amount s  of  narcotic s .

3          THE  COURT:   All  right .

4          MS.  GREENBERG:   Your  Honor ,  I  will  stop  there

5  and  perhaps  deal  with  each  defendant .

6          THE  COURT:   Okay .

7          MR.  MONTEMARANO :   Thank  you,  Your  Honor .   Thank

8  you ,  Ms.  Greenberg .

9          Your  Honor ,  with  all  due  respect  to  Ms.

10  Green berg ,  who  I  have  been  contend ing  with  for  year s,

11  if  I  hear  the  government  say  one  more  time  that  Rule

12  404(b)  is  a  rule  of  inclusion  and  not  exclusion ,  with

13  all  due  respect ,  it  will  be  me  and  not  Ms.  Harden  who

14  is  losi ng  his  breakfast .

15          The  simple  fact  is  under  the  very  schematic

16  draw ing  before  the  Court  drawn  by  Ms.  Greenberg ,  the

17  Fourth  Amendment  is  rule  of  inclusion .   Everything  is  a

18  rule  of  inclusion  unless  you  don't  meet  its  standard ,

19  whereupon  it  is  obvious ly  a  rule  of  exclusion ,  and  that

20  is  exact ly  what  we  have  here .   Let  us  start  with  the

21  government 's  initial  --

22          THE  COURT:   It's  an  exception  to  a  rule  of

23  exclusion .

24          MR.  MONTEMARANO :   Fair  enough .   And  with  regard

25  to  the  government 's  initial  attempt  to  seek  **suck er**  in

1   the Fourth Circuit , I would point the Court to the

2   second page of my Motion in Limine regarding Rule 404

3   where we discuss the question of probative value cited

4   to the Fourth Circuit decision in *Hernandez* at 975

5   F.2d. When the defendant denys his involvement in the

6   charged offense , the 404(b) evidence becomes much more

7   probative and relevant relative to the questions of

8   involvement .

9        THE COURT:   How is it not responsive to the

10  argument , as I recall you made , or statements you made

11  in opening statement , that your client was a mere user ?

12       MR. MONTEMARANO :   I didn't say that . I said my

13  client sold drugs . There is no question she dealt

14  drugs . We have , for lack of a better term in opening

15  argument , admitted to the necessary elements of Section

16  846 and Section 841 offense . Not 846 , I'm sorry ; 841

17  that she dealt drugs .

18       The question may well be amount . The government

19  cannot bring in 404(b) , which is pure propensity

20  evidence under this analysis to show that she did

21  something which she has admitted to doing . That is

22  plain character evidence . There is question about it .

23  That 's the reason they are seeking to bring it in .

24       My client is not denying that she dealt drugs .

25  Therefore , that she may have dealt drugs in the past is

1  absolute ly  exterior   to  any   analysis   of  whether   or  not

2  she's  guilty  of  deal ing  drug s .   And  that  she  may  have

3  dealt  large  amount s  in  the  past  or  may  have  had

4  possession  with  intent  to  distribute  of  larger  amount s

5  in  the  past  is  not  probative  of  her  possession   at  this

6  point .   That  is  pure  propensity  evidence .

7          That  is  like  say ing , well , she  did  it  before ,

8  she  obvious ly  did  it  here .   One  thing  the  government

9  does  not  argue  in  attempt ing  to  tie  them  together  is

10  any  sort  of  similarity  between  the  offense s .   There  has

11  to  be  some  level  of  similarity .   There  has  to  be  some

12  level  of  uniqueness .   Otherwise , it  is  plain  propensity

13  evidence  and  the  circuit s  are  unanimous  in  their

14  agreement  regard ing  that .

15          Court 's  indulgence , please .   The  simple  fact  is,

16  Your  Honor,  that  my  client  may  have  had  large  amount s

17  of  drug s  in  1984  or  1986  is  not  relevant  in  any  way ,

18  shape , or  form  to  her  possession  of  large  amount s  here

19  and  now  to  it  being  her  possession  versus  someone

20  else 's , there  is  clear  joint  and  several  possession  of

21  drug s  in  the  residence  at  Bexhill  -- rather  at

22  Nicholson  and  in  the  School  of  Perform ing  Art s, the

23  South  Dakota  add ress .

24          There  are  other  people  who  had  access  to  it , we

25  will  demonstrate  that .   It  is  clear  Mr. Martin , John

1 Martin, who I know has previously been convicted of

2 this before this Court, had access to both locations.

3 The drugs were, as I understand from the government's

4 evidence, not in plain view. There were several of

5 those can safes that had drugs in them, an Aqua Net

6 can, for example.

7         These are all things that argue against the

8 question of my client's specific knowledge and

9 participation in large amounts of dealing. This kind

10 of evidence is simply not persuasive of that question.

11         Court's indulgence, please. The simple fact is

12 in any kind of balancing test, under Rule 403, as

13 required by **House**, which is the -- I think the leading

14 case on Rule 404, this simply cannot be understood to

15 come in. The simple fact is they cannot use it to show

16 motive where a defendant fails to place motive in

17 issue. They cannot use it to show identify because

18 there's no question regarding her identity.

19         The government says, well, we have many ways to

20 get it in. That's very true, but a lot of them don't

21 apply to this case, and the only reason that they can

22 demonstrate to this Court is to show that because she

23 may have dealt large amounts of drugs in the past and

24 was convicted for that once and was arrested for that a

25 second time and not convicted, based upon those two

1  events, she is clearly dealing large amounts now.

2  What is plain is that she has not learned her lesson

3  and has continued to deal.

4          But this is simply not probative of her

5  possession of a large amount and knowledge of a large

6  amount now because she may have some other time, and

7  there is simply not enough commonality between the

8  offenses as charged in this conspiracy to be able to

9  bring in an offense that is 10 and a half years old at

10  best, the 1986 conviction, or the criminal propensity

11  argument concerning evidence three years old.

12          There are cases that -- I did not write an

13  extraordinarily long Motion in Limine, but Your Honor,

14  I've argued this in front of the Fourth Circuit, I have

15  written a 30-page appellate argument on this. With all

16  due respect, there are places where seven months is far

17  too long.

18          There's places where somebody's dealing drugs in

19  one instance and dealing drugs in another instance --

20  this is a 5th Circuit case, and the name of it escapes

21  me right now, where the defendant is dealing drugs. He

22  has it in a condom in his mouth, and he removes the

23  condom from his mouth. He takes out the crack and he

24  serves the undercover. And in prior arrests, without

25  those particular indicia, six months before was shown

1 to -- was clearly found by the Fifth Circuit not to be

2 probative.

3          It's simply drug dealing that's propensity

4 unless he's dealing it in the very same way on the

5 prior, dealing it out of his mouth using a rubber.

6 It's not indicative and the government cannot show that

7 sort of length.

8          For that reason, with all due respect, it's not

9 very different than the government in an arson case

10 showing there were prior fires at a defendant's place

11 of business, that there were fire -- prior insurance

12 claims at the place of business.  That's simply not

13 enough.  That is pure propensity evidence, oh, he's

14 committed other arsons in the past, he must be

15 committing another arson now, and that's what they're

16 trying to show.

17          THE COURT:  Let me ask you this, Mr.

18 Montemarano:  You responded to my question about your

19 opening statement by saying that what you conceded on

20 behalf of your client was she had sold drugs, that the

21 real issue was quantity of drugs.

22          MR. MONTEMARANO:  Yes.

23          THE COURT:  So, would it be fair to say that you

24 have placed at issue whether your client is a

25 small-time drug dealer in small quantities versus a

1 large-quantity drug dealer as alleged by Indictment in
2 this case and you've placed that in issue?
3       MR. MONTEMARANO: I think it's a fair statement,
4 yes.
5       THE COURT: Why would not evidence of prior drug
6 selling activities be germane to the question of
7 whether she's selling significant quantities of drugs?
8       MR. MONTEMARANO: That question today, or in
9 terms of this case, there's two parts of that question
10 of whether or not she's selling large amounts now.
11 Number one, are there large amounts present? Well, we
12 see that that's true. I proffered to the Court that
13 the government is going to seek to bring in and will do
14 so, because my Motion to Suppress has been denied, the
15 results of the search of Paula's School of Performing
16 Arts was about 600 grams of cocaine, you know, around a
17 pound and a half, split almost evenly between crack and
18 powder, seized from that business. That's plainly a
19 distribution amount.
20       I don't think I'm going to get very far
21 cross-examining Sergeant Sakala on whether or not
22 that's a distribution amount. Okay? So there's no
23 question there's a distribution amount there that's
24 going to come in. The government has that.
25       The second question is my client's knowledge of

1 participation .   This  is  not  probative , 1994  or  1986  of

2 her  knowledge  or  her  participation   in  this  conspiracy .

3 It  is  pure  character   evidence .   Did  it  before , did  it

4 now .   There  is  nothing .   There  is  no  particular

5 pattern , like  if  they  are  going  to  show  that  the  drugs

6 were  secreted  in  a  certain  place  back  then  and  secreted

7 in  the  same  place .

8         THE   COURT:    What  about   its  relevance   to  just

9 general   knowledge   of  the  drug  trade ?

10        MR.  MONTEMARANO :   We've  not  placed -- general

11 knowledge  of  the  drug  trade  is  not  a  material  issue

12 today  because  we've  admitted  it  in  opening .   That 's  not

13 a  material   issue .   No  more  than  identity .   If  they

14 said , well , it  shows  that  it  was  Paulette  Martin .

15 Well , so  there  was  some  other  Paula  at  Bexhill ?   There

16 was  some  other  Paula  at  Nicholson  -- I  mean  Hayward ?

17 There  was  some  other  Paula  at  South  Dakota ?   That's  not

18 a  question;  that 's  a  red  herring .

19        The  simple  fact  is  it  was  character  evidence .

20 She  was  a  big  scale  drug  dealer  once .   She's  a  big

21 scale  drug  dealer  now .   They  have  to  show  something

22 using  the  same  kind  of  pattern  and/or  practice  that

23 there  was  an  arrest  of  people  from  a  prior  case

24 relating  to  the  same  pattern  of  conduct .   They  can't  do

25 that .

1            This is pure propensity evidence, Your Honor,
2   because they haven't given you anything else because
3   she knew it then, she knows it now.  If that's not
4   character evidence, Your Honor, then there is no
5   character evidence that is pure propensity.  If she did
6   it before, she's going to do it again.  We've copped
7   that she's doing it, and now they're saying, oh, she
8   did it before in a big manner, they can't show that
9   now.  They're going to have to show it some other way.
10           They've got a huge leg up the ladder.  With all
11  due respect, I would be a fool to ignore that.  Six
12  hundred grams of cocaine is the 600-pound gorilla.  For
13  lack of beater term, it's a problem the defense has
14  without a doubt.  Throwing this in vitiates the effect
15  of that.  They will convict based upon propensity.
16  There is no question whatsoever.
17           She did it before, it doesn't matter how much
18  there was now.  We're going to convict her of doing it
19  again.  The Court is creating a problem, and the
20  government is seeking to have the Court create a
21  problem by admitting this evidence where there should
22  be no problem.  This case should be tried upon the
23  evidence, not upon my client's character, as
24  questionable as it may be.
25           THE COURT:  All right.  Ms. Greenberg.

1          MS. GREENBERG:   Your Honor, I will be brief and

2     be happy to answer any questions the Court has, but it

3     was Judge Niemeyer in *Queen* that called 404(b) a rule

4     of inclusion, not the government, at Page 994 of that

5     opinion citing prior Fourth Circuit cases, and also

6     Judge Niemeyer said, as a rule of inclusion, the rules

7     list is not exhaustive, citing *U.S. v. Rawle* in the

8     cases I cited before.  Mr. Montemarano --

9          THE COURT:  Let me ask you this, Ms. Greenberg:

10    I'm looking at *Queen* and the standard that he

11    formulated in that case in dealing with evidence of

12    prior acts and dealing with 404(b) and Rule 403 is that

13    it becomes admissible if it meets the following

14    criteria, and then he enumerated four criteria.

15         First, the evidence must be relevant to an

16    issue, such as an element of the offense and must not

17    be offered to establish the general character of the

18    defendant.  In this regard, the more similar the prior

19    act in terms of physical similarity or mental state to

20    the act provided, the more relevant it becomes.

21         Second, the act must be necessary in the sense

22    that it is probative of an essential claim or element

23    of the offense.

24         Three, the evidence must be reliable; and four,

25    the evidence probative value must not be substantially

1  outweigh ed  by  conclusion   or  unfair  prejudice   in  the

2  sense  that  it  tends  to  subordinate   reason  to  a  motion

3  on  the  fact -find ing  process .   That's  the  standard  of

4  *Queen ,*  as  I  understand   it.

5        MS.  GREENBERG:   Yes, sir .

6        THE  COURT:   I'm  assuming  that  factor  three  is

7  probably  really  not  an  issue  here .

8        MR.  MONTEMARANO :   We  stipulate , Your  Honor .

9        THE  COURT:   We  really  need  to  focus  on  (a)  how

10  is  the  evidence  relevant  to  an  issue , (b)  how  is  it

11  probative  of  an  essential   claim  or  an  element  of  the

12  offense , and  (4),  which  really  is  taking  me  back  to

13  403 , the  weigh ing  of  the  prejudicial   effect  and  so

14  forth .

15        MS.  GREENBERG:   Your  Honor , I  think  as  to  No.  1 ,

16  Mr.  Montemarano  made  our  best  argument  for  us.  This  is

17  a  question  of  whether  or  not  she  knew  that  there  was  --

18  she  had  knowledge  of  drug  transactions  and  drug

19  deal ing .  There  is  nothing  more  probative  in  this  case

20  than  prior  incident s  where  drug s  were  seize d  from  Ms.

21  Martin 's  house  and  a  business .

22        THE  COURT:   But  how  is  that  an  issue  in  this

23  case ?

24        MS.  GREENBERG:   Your  Honor , the  question  is

25  whether  or  not  she  is  a  drug  deal er , whether  she  is

1 part of this conspiracy , we have introduced  -- we have

2 introduced evidence , and will introduce evidence about

3 her drug dealings from Paulette 's School of Performing

4 Arts and from her house about people coming and going

5 there , about that is how she conduct s her drug

6 business , that she 's dealing large quantiti es of

7 cocaine , crack cocaine , and heroin , and in these two

8 prior incident s we have exact ly that .

9        There is nothing that is more probative and

10 relevant -- you could n't do a fact situation for a law

11 school class that is more on point of 404(b) as these

12 two prior incident s involving Ms. Martin . One is at

13 her house where they recover large quantiti es of drug s,

14 drug paraphernalia,  money indicative of her involve ment

15 in drug trafficking showing her knowledge of drug

16 trafficking , and she pleads guilty to it .

17        Then the second is --

18        THE COURT:  How do we differentiate between that

19 evidence being view ed as , well , she 's done it before ,

20 she 's doing it again ?

21        MS. GREENBERG:  Because it goes to knowledge ,

22 Your Honor , and it goes to intent .  It does n't just go

23 to the fact that , oh, she is a drug deal er , she might

24 have dealt drug s out in Indian apolis once .  We're not

25 say ing that .  We're say ing she 's in this area , she 's in

1  her house, she's dealing the same kind of drugs, the

2  same kind of situation that we have here.

3       It goes to the knowledge and intent that is not

4  only important in every case, but even more important

5  here because of what Mr. Montemarano said, and I didn't

6  even go into how similar these cases are in terms of

7  the 1994 warrant because she said in that situation

8  that the money seized was from a show. Is that

9  correct; Ms. Johnston? The money was related to a

10 show. I'll get the exact quote for the Court.

11      Again, indicative of her dealing drugs back in

12 1994, indicative of her knowledge, indicative of what

13 we are -- what the charges are here. I'm sorry, Your

14 Honor. The '86 warrant, Your Honor. She said --

15 Court's indulgence.

16      Again, we're not saying, Your Honor, that

17 there's some general allegation that she's a drug

18 dealer. We have here her house and her school, similar

19 conduct here, which is highly probative of her

20 involvement in this case, and specifically if I could

21 direct Mr. Montemarano's attention to Mr. Roberts'

22 report from June 26, 1996, search warrant, Ms. Martin

23 said, here this is the money I collected from my show

24 Saturday.

25      And again, what we're dealing with here is not

1 character .  It's similar  conduct  going  to show  intent

2 and knowledge  based  on these  two acts.  This is just

3 like *United States v. Mark*.  This is just the  kind  of

4 evidence  that  is incredibly  probative  because  of its

5 similarity  and because  of its relation  to this  case,

6 especially  in light  of the defense  in this  case.

7        MR. MONTEMARANO :  Your  Honor , just  so we're

8 clear , the "large  amount  of drugs" in 1986  was  less

9 than  two ounces.  Under  60 grams, a tenth  of the

10 amount .

11        Once  again , where  is the pattern ?  Where  is the

12 huge  amount  of drugs?  I think  we are going  to

13 reasonably  concede  that  a pound  and a half  is a huge

14 amount .  Two  ounces  is very  different .  But  that  she's

15 using  her home ?  She lives  there .  She's  a drug  addict ,

16 a drug  dealer  dealing  to friends  or -- dealing  on a

17 large  basis , you'd  visit  at your  home .  How  is that  any

18 sort  of -- that 's what  you would  expect .         Well,

19 if they  said  she had  it in her car , she had  it on

20 person .  Where  else ?  Where  else  is something  unique

21 and different?  She kept  it under  the third  rose  bush

22 in the street  last  time  .  Pattern.  Conduct .  Relative

23 to this , relative  to that .  We can  draw  a line  between

24 them .  Drug  dealing  here , drug  dealing  there  just  ain't

25 enough  and they  can't  give  you  any  more  than  that

1   because  there  isn't  anymore .

2        There  isn't  any  more  than  that .   The  fact  there

3   may  have  been  drugs  at  the  school  is  the  barest  bit  of

4   commonality , but  there 's  no  showing  it  was  hidden  in

5   the  same  place ,  there 's  no  showing  it  was  or  wasn't  an

6   ongoing  business  at  this  time .   Nothing  of  that  sort

7   have  they  proffered  to  the  Court .

8        It's  plainly  propensity  evidence  and  it  doesn't

9   get  over  the  Rule  403  hurdle .   Your  Honor , elucidated

10  from  *Queen*  the  elements .   They  can't  show  it  as

11  anything  more  than  character .   Once  a  drug  dealer ,

12  always  a  drug  dealer .   That 's  how  they  seek  to  prove

13  these  cases  by  404 .

14       It  is  chapter  and  verse .   It's  like  Page  3  of

15  the  U.S.  Attorney 's  handbook .   Your  Honor , we've  got  a

16  prior  conviction ; let 's  bring  it  in .   That 's  why  the

17  first  thing  they  say  is  it 's  a  rule  of  inclusion

18  because  that 's  the  way  they  have  to  argue  it   because

19  they  don 't  have  any  more .   If  you  look  at  this  under

20  Rule  403 , I  would  like  the  government   to  explain  to  us

21  how  it  is  relevant  that  my  client  possessed  two  ounces

22  of  cocaine  in  1986  to  the  fact  that  she  may  have

23  possessed  --  Court 's  indulgence   --  26  ounces , 25  ounces

24  of  cocaine  and  cocaine  base  in  19  --  excuse  me  --  2004 .

25  That 's  18  years  later , Judge .

1          Oh, I know.  It's the conspiracy which goes back

2  to '97.  Do we have a seizure in '97?  '98?  '99?  The

3  first seizure I heard about that could be in any way,

4  shape or form bootstrapped to my client -- for the

5  record, please get this, Ms. Dunlap.  I am not

6  conceding my client's relation to this, but the first

7  thing we heard was -- and brother counsel has been here

8  listening to the evidence with me -- the arrest of John

9  Martin with the 25 kilogram wrappers in July of '02.

10          That was the earliest evidence -- actual

11  evidence other than a cooperator saying, oh, well I

12  sold it to her way back then and I got it from her.

13  No, let's talk about hard facts.  Physical evidence.

14  We got 25 wrappers cocaine residue on them.  I'll

15  concede they're cocaine wrappers.  I will probably

16  argue they are cocaine wrappers in my closing.  I

17  certainly made that clear in cross-examining the

18  witnesses earlier.

19          THE COURT:  Okay.

20          MR. MONTEMARANO:  Where is the commonality,

21  Judge?

22          THE COURT:  All right.

23          THE COURT:  Mr. Sussman, do you have anything

24  new to report?

25          MR. SUSSMAN:  No, sir.

1          MS. GREENBERG:   Your Honor, I'm sorry, I want to

2   make sure the Court has the correct facts because those

3   are not the correct facts.   I have an affidavit from

4   Shelton Roberts, if the Court wants to receive it, and

5   we put this in our Motion's Response.   The street value

6   of the drugs was over one hundred thousand dollars.

7   That's how much we're dealing with here from the 1986

8   conviction.   In addition to that, there was over

9   $7,000, assorted drug paraphernalia, and other items

10  very similar to the case as in this case.

11         And Your Honor, cited in the *Queen* case is

12  *United States v. Mark* where the Court held that the

13  evidence of a defendant's involvement in prior drug

14  transactions was admissible to prove intent.   We have

15  intent here and we have knowledge.   They've put that in

16  issue.   We have very similar circumstances here, which

17  is incredibly probative.

18         THE COURT:   They have not put at issue intent to

19  sell.   What they've put in is how much.

20         MS. GREENBERG:   In terms of the quantity, Your

21  Honor, they're saying she was a small-time dealer and

22  that she dealt small quantities to support her own

23  habit.   What we have here is a completely different

24  situation from the witness testimony and from --

25         THE COURT:   Maybe I'm having a disconnect, but

1  Mr. Montemarano  minimize d  the  value  of  the  drug s  seize d

2  in  the  earl ier  search  and  you're  now  say ing  it's  worth

3  how  much ?

4      MS.  GREENBERG:   Over  $100,000 .  Your  Honor , I

5  would  proffer  up  to  the  Court  a  Statement  of  Fact s,

6  which  was  in  large  part  incorporated   into  our  Response

7  from  what  was  recovered  from  Paulette  Martin 's  search

8  warrant .  Specifically , Your  Honor  I'll  read  to  you

9  what  is , again , in  our  Motion 's  Response .

10      I  want ed  the  Court  to  have  the  accurate  fact s.

11  One  of  the  search es  conduct ed  in  connection  with  that

12  1986  case , they  approach ed  the  door  on  8th  Street .  It

13  was  opened  by  Ms.  Martin .  She  opened  the  front  door

14  using  the  name  of  Paul ette  Murphy  at  that  time .  They

15  found  narcotic s  on  the  first  floor , cash  and  drug

16  paraphernalia .  They  found  two  plastic  bag s  contain ing

17  a  white  powder  substance  from  the  solid  form  rock      under

18  the  sofa  and  behind  a  brown  chair  in  living  room .

19      Two  more  plastic  bag s  were  recovered  under  a

20  table  in  the  living  room .  Over  $7,000  in  cash  from  a

21  red  suitcase , as sort ed  drug  paraphernalia   from  several

22  location s  throughout  the  house .  And  they  estimate d  the

23  street  value  of  the  drug s  at  over  $100,000 .

24      Now,  Ms.  Martin  says  she  didn't  know ingly

25  participate  in  this  drug  conspiracy  and  she's  put  that

1  in issue . She says she's a small-time user who deals
2  small quantities of cocaine . We have two incidents in
3  which she is involved in selling drugs from her house
4  and large quantities of drugs, over $100,000 , were
5  recovered as well as large quantities of cash and
6  additionally an incident at the school .
7      From Mr. Montemarano 's own statement , he says
8  that the search warrant at the school , that his defense
9  is going to be she didn't know how it was packaged,
10  that it was in these little cans, and she didn't know
11  it was there . Both of these incidents are highly
12  probative to show her knowledge and intent in
13  connection with this case . There couldn't be more
14  probative evidence, more reliable evidence under 404(b)
15  than those two incidents relating to Ms. Martin .
16      And just to conclude , Your Honor , Mr.
17  Montemarano threw in there the business about the time
18  and made a little gesture about the start of the
19  conspiracy . Well , in *United States v. White ,* and I
20  will be happy to give the Court the cite, 405 F.3d 208 ,
21  Judge Quarrels recognized that -- the Fourth Circuit
22  approved of his recognizing that for 404(b) purposes,
23  you look to when the start of the conspiracy , when the
24  conspiracy started .
25      And Judge Quarrels admitted 404(b) evidence that

1  occurred  ten  years before  the  start  of  the  conspiracy

2  in another  drug  case  to  show  that  it  was  somewhat

3  remote  in  time .   It  was  probative  as  to  intent  and

4  prior  drug  dealings  involving  the  defendant .   Very

5  similar  to  this  case .

6          Your  Honor , there  couldn't  be  a  more  404(b)

7  on-point  situation  than  these  two  incidents  with  Ms.

8  Martin , especially  as  I  said , again , in  light  of  her

9  defense .   But  just  because  it  occurred  ten  years before

10  the  start  of  the  conspiracy , *United  States  v.  White ,*

11  right  on  point , and  all  these  cases  cited  in  *Queen*  as

12  to  why  you  should  admit  prior  drug  transactions .

13          Mr.  Montemarano  raises  his  concern  about  the

14  concern  that  he  has  that  it  would  be  character

15  evidence .   The  *Queen*  case  cites  two  protections  against

16  that .   One , the  Court  will  give  a  limiting  instruction ,

17  if  one  is  requested  by  defense  counsel .   We  have  no

18  objection  to  that .   That  explains  the  purpose  for  which

19  the  evidence  is  admitted  and  the  jury  can  follow  that .

20          Two , the  advance  notice , which  this  was  given

21  over  a  month  before  trial  started , which  is  going  on

22  two  months  now  before  the  first  evidence  is  introduced,

23  and  the  Fourth  Circuit  said  when  404(b)  is  administered

24  according  to  these  rules , it  will  not , we  believe , be

25  applied  to  convict  a  defendant  on  the  basis  of  bad

1  character .   This  is  just  what  the  rule  speak s  to ,  these

2  two  act s  related  by  Ms.  Martin .

3        THE  COURT:   The  last  word .

4        MR.  MONTEMARANO :   Thank  you ,  Your  Honor .   Your

5  Honor  asks  how  does  it  show  intent ?   Ms.  Greenberg 's

6  response  has  been  to  argue  intent ,  intent ,  intent ,  and

7  has  yet  to  answer  the  Court 's  question .   We've  not

8  place d  intent  at  issue .   We've  not  place d  knowledge  at

9  issue .

10       THE  COURT:   You've  place d  intent  to  sell  a  lot

11 drug s  at  issue ,  haven't  you ?

12       MR.  MONTEMARANO :   I  think  that 's  a  fair

13 statement .   We  have  place d  the  question  of  degree  of

14 involve ment .   If  that  is  the  basis ,  because  that 's  the

15 only  one  I've  heard  --  it's  not  a  question  of  identity

16 or  knowledge  or  anything  like  that .

17       If  that 's  the  reed  upon  which  the  government

18 balance s  its  argument ,  it  is  a  slender  one  indeed .   And

19 the  question  then  become s  does  possess ing  this  amount

20 ten  year s  before  the  start  of  the  conspiracy  and  18

21 year s  before  the  seizure  of  this  amount ,  because  again ,

22 the  case  she  cite s  to ,  *White* ,  talk ing  about  intent

23 admitted  it ,  it  was  ten  year s.   That 's  remote  in  time ,

24 but  we'll  let  it  in  for  purpose  of  intent .

25       We've  not  place d  that  kind  of  intent  at  issue

1 and the  only  time  we  have  with  a  large  amount , which  I

2 I'm  going  to  concede , is  '02  which  is  16  years  after

3 the  arrest  and  seizure .  Repeatedly , I  have  referred  to

4 the  amounts  of  drugs, the  government  has  yet  to  address

5 the  question  of  amount .

6        With  all  due  respect , I  think  there 's  the

7 question  of  objective  and  subjective  evidence .

8 Objectively , let's  talk  about  how  many  grams  of  what

9 kind  of  drug  were  seized .  600 -- and  I  proffer  around

10 60 .  That  is  my  understanding .  I'm  proffering  that  as

11 an  officer  of  the  court .  I don't  have  that  paperwork

12 with  me , but  the  government  has  scurried  away  from  that

13 argument .  All  they  want  to  talk  about  is  the  street

14 value .

15        With  all  due  respect , Your  Honor , you've  been

16 sitting  as  a  U.S.   District  Court  Judge  long  enough

17 now , have  heard  enough  drug  evidence  to  know  that  there

18 is  almost  any  number  an  expert  witness  can  justify

19 based  upon  the  time , based  upon  availability  at  that

20 point  in  time , as  to  what  the  "street  value "  of  an

21 amount  of  drugs.  Let's  talk  about  something  we  can  all

22 agree  on .

23        What's  the  weight ?  Because  if  the  street  value

24 of  this  two  ounces  is  over  100  grams  and  depending  on

25 what  kind  of  drugs  and  how  it's  packaged , that  might

1  well be possible .   What's the street value of 600 grams

2  of cocaine ?   Because depending on the way it's packaged

3  and all that , it might be several millions of dollars .

4  And once again , we have that disconnect .

5        I submit to the Court that they cannot get over

6  the relevance prong in 403 if that's all they can say

7  is it's relevant to the intent to sell a large amount .

8  That is purely criminal propensity .   They've already

9  gotten the large amount in here , 600 grams are going to

10 come in.   That's a huge selling , no question

11 whatsoever , amount .   A couple of ounces is arguable as

12 to an amount .

13       THE COURT:   Why wouldn't a contemporary

14 cautionary instruction to the jury advising them of the

15 limited purpose for which the evidence is admitted be

16 sufficient ?

17       MR. MONTEMARANO :  Because ultimately,   you end up

18 mixing apples and oranges.   We've conceded possession

19 with intent , and the intent to deal small amounts .   The

20 government is now seeking to bring in another

21 possession with conviction for the purpose of proving a

22 conspiracy .   Ms. Greenberg just said it.   There's no

23 conspiracy conviction in '86.

24       They are seeking to bootstrap a single , finite

25 event , date and time and location possession with

1  intent, because those are all elements of possession of

2  --

3       THE COURT:  I'm not sure they're offering it so

4  much for conspiracy.  It's to show an intent to deal in

5  large quantities.

6       MR. MONTEMARANO:  Once again, it is not

7  probative of an intent to deal in large quantities.

8  The fact that she may have had a significant amount,

9  I'm not going to call two ounces an insignificant

10 amount, but that she may have had two ounces in 1986.

11 I submit that the jury will not be able to get that out

12 of their minds.  It goes back so far, it will permit

13 them to draw the broad brush, the huge ark of Paulette

14 Martin, drug dealer in '86, Paulette Martin drug dealer

15 in '06.  They're going to do it, Judge.  A limiting

16 instruction just won't be enough.

17      MS. GREENBERG:  Your Honor, just for the record,

18 there are search warrants.  Mr. Montemarano is

19 referencing the second one, the Affidavit they read

20 from, where the officer was referencing $100,000 was a

21 quarter kilo of relatively pure -- most of it was

22 relatively pure cocaine.

23      THE COURT:  What are the dates of the two

24 searches?

25      MS. GREENBERG:  They're both in 1986.

1          MR. MONTEMARANO:   Make sure I'm not mistaken.

2  Which one was the one she was found guilty of?  Which

3  one?  The quarter key or the two ounces?  That's what

4  I'm asking.  Because if I'm mistaken, then you know, my

5  bad, Judge.  I'm not going to question that for a

6  second.  My understanding is her finding of guilt was

7  on the two ounces.

8          MS. GREENBERG:   Well, Your Honor, both of them

9  are relevant under 404(b), the two search warrants.

10         MR. MONTEMARANO:   They're not the same day,

11  they're not the same place.

12         MS. GREENBERG:   They are the same place.

13         THE COURT:   One was two ounces and one was what?

14         MS. GREENBERG:   About a quarter kilogram, Your

15  Honor, and most of it was 84 -- most of it was between

16  84.8 and 84.9 percent pure.  The first search warrant

17  was June 10, 1986, and the   second one was June 26,

18  1986.  And Court's indulgence, I can tell it -- I can

19  look at the judgment and conviction.  It's the June

20  10th, 1986, incident in which Ms. Martin pled guilty.

21         THE COURT:   What was the amount in that search?

22         MS. GREENBERG:   That was, Your Honor, the

23  Affidavit I just read to you.

24         THE COURT:   With the $100,000 street value.

25         MS. GREENBERG:   Yes, Your Honor.

1          THE COURT:   Was that the quarter kilo?

2          MS. GREENBERG:   Yes, Your Honor.

3          THE COURT:   Mr. Sussman, any new information?

4          MR. SUSSMAN:   No, sir.

5          THE COURT:   Have you reached her?

6          MR. SUSSMAN:   No, sir.

7          THE COURT:   Okay.

8          MR. MONTEMARANO:   Your Honor, I think you can

9    also make an independent finding that that $100,000 is

10   not a credible amount.  We've heard testimony for three

11   weeks now that a quarter kilo sells for ten grand, give

12   or take.  Certainly not 100 grand.  I mean, where is

13   that number coming from without, shall we say, a little

14   inflation?

15          THE COURT:   All right.  Now, how many other

16   types of evidence are you offering beyond the '86

17   searches that we're going to be addressing the same

18   issue on.

19          MS. GREENBERG:   There are the two '86 searches,

20   Your Honor, involving Mr. Roberts that both relate --

21   they are both charged in that one case.  The quarter

22   kilo, which was the -- what happened, Your Honor, is

23   they found that amount, and then they went back to a

24   magistrate and got an additional search warrant.

25          That's where they found the ounces quantity that

1  Mr. Montemarano is referring to, the 39 plastic bags,

2  which weighed approximately five ounces.  That was the

3  second search warrant, so we have a quarter kilo, and

4  then five ounces in the same month in 1986, which were

5  charged and then Ms. Martin was convicted relating to

6  those -- pled guilty relating to those charges to

7  possession of an unregistered firearm and possession to

8  distribute cocaine on December 11, 1986.

9       She received a 15-year sentence for that and the

10 second one as to Ms. Martin was at Paulette's School of

11 Performing Arts in 1994, from which officers recovered

12 heroin, a scale, and Ziploc baggies from the school.

13 Those are the two relating to Ms. Martin, and those are

14 the only two we seek to introduce as to her.

15      THE COURT:  All right.  How about as to other

16 defendants?

17      MS. GREENBERG:  Your Honor, there's a lot.

18      THE COURT:  Oh, okay.  All right.  Well, let me

19 take a morning recess.  Mr. Sussman can make some

20 additional efforts to see what we can do with

21 contacting his client, and then I can come back and see

22 if I can address these issues.  Mr. Ward, did you want

23 to raise something?

24      MR. WARD:  I have a similar 404(b) issue, but we

25 can take it up --

1          MR. SUSSMAN:  I want to point out I neglected to

2 tell the Court I have a 12:45 scheduling conference in

3 front of Judge Williams.

4          THE COURT:  12:45?

5          MR. SUSSMAN:  Yes.

6          THE COURT:  Is this a long one or short one?

7          MR. SUSSMAN:  It's a contempt hearing.  It's

8 someone who won't answer questions.  He's been held in

9 contempt before and nothing's changed.

10         THE COURT:  All right.  Well, let me take a

11 recess until 11:20 and see what you can do, Mr.

12 Sussman, because the first question when I come back

13 is, have you got an update?  You might try to contact

14 the emergency room and see if they can get her to turn

15 her cell phone on or something because I really need to

16 resolve issue.

17         MR. SUSSMAN:  Well, just so the Court's -- she

18 had a doctor's appointment, and when I pressed upon her

19 the urgency, she might have moved up that appointment

20 or spoken to her own private doctor, as Ms. Johnston

21 suggested, and I don't know who that would be, but I'll

22 continue.

23         THE COURT:  Well, keep trying and I'll see you

24 at 11:20.

25              (Off the record at 11:03 a.m.)

1                    (On the record  at  11:29  a.m. )

2          THE  COURT:   Mr.  Sussman ,  am  I  correct  that  there

3 is  no  additional   information   about  your  client ?

4          MR.  SUSSMAN :   Correct ,  Your  Honor .

5          MS.  JOHNSTON:   Your  Honor ,  the  government ,  at

6 this  time ,  is  going  to  ask  the  Court  to  issue  a  warrant

7 for  her  arrest .   She  is  not  present  here .   Mr.  Sussman ,

8 I  believe ,  has  called  the  hospital   that  she  indicated

9 she  was  going  there  to,  and  he  has  not  located  her

10 there .   There  has  been  no  indication  she  is  in  dire

11 need  of  medical  assistance .   She  has  not  appeared  at

12 this  point  in  time .   We  would  ask  the  Court  to  issue  a

13 warrant  for  her  arrest  at  this  point .

14          The  Court  can  always  rescind  that  warrant  if  she

15 happen s  to  show  up,  or  if  he  has  some  proof  that  she

16 needed  emergency  medical  treatment  for  some  serious  or

17 life  threatening   injury .   We  don't  have  that  here .   She

18 has  flu-like  symptom s,  and  he  has  not  been  able  to  be

19 in  touch  with  her  in  the  last  several  hour s,  and  I  am

20 assuming  he  has  not  had  any  contact  to  verify  she  was

21 at  Bayview  Hospital ,  which  is  where  she  said  he  was

22 going .

23          THE  COURT:   Let  me  tell  you  what  I  am  going  to

24 do .   I  don't  know   if  we  are  dealing  with  somebody  who

25 is  simply  using  a  mild  cold  or  something  as  an  excuse

1  not to show up for trial, which is not acceptable, or

2  whether she, in fact, has an emergent medical condition

3  that's necessitated her absence from the courtroom.

4       First of all, I've got a jury sitting out there

5  doing nothing, and I'm not happy about that.  Mr.

6  Sussman, has -- Mr. -- who was it that the quarter of

7  one matter?

8       MR. SUSSMAN:  Me.

9       THE COURT:  Mr. Sussman has a quarter of 1:00

10  matter before another judge, which means I would have

11  to break for lunch by quarter of in any event, and I

12  would ordinarily take an hour and 15 minutes plus or

13  minus for lunch.  I think what I ought to do is, first

14  of all, tell the jury, have a nice, long lunch hour,

15  and I will give them a final update on what we're going

16  to do at 2 o'clock.

17       In the meantime, I want to have Mr. Sussman make

18  every conceivable effort to contact her or whatever

19  hospital she claims to be in.  She should be informed,

20  Mr. Sussman, that her failure to appear today is an

21  extremely serious matter, and simply you don't call and

22  say, gee whiz, I'm sick today without significant

23  medical condition reasons justifying that.    I'm

24  expecting that she's going to tell you just to not

25  incur my difficulties with me, that she, in fact, has

1 been admitted to a hospital with a serious medical

2 condition that necessitate d her absence . And if that's

3 not the case , she simply went to an emergency room

4 because she could n't get to see her doctor faster , and

5 she 's got something that 's readily treatable with cold

6 medicine or something , that she needs to understand

7 that she can't do that , and that I'm expecting her to

8 be here bright and early tomorrow morning at nine

9 o'clock , ready to proceed with trial . And if she

10 does not do that , then I will change her condition s of

11 release so that she will be guarante ed to be here . I

12 don't want to have to do that . I don't know whether

13 she 's skati ng across a line or whether she 's a sick

14 woman , so I'm not going to make that decision now .

15        What I'd like do is I'll make that decision at

16 2:00 . All I know is she says I didn't feel good and

17 she didn't look real good yesterday , and in the absence

18 of her proffering some explanation for her failure to

19 appear , I'll issue a bench warrant , and if they try to

20 serve her and she 's strap ped to a hospital bed , well ,

21 maybe we'll refrain from do ing that , but I have no way

22 of know ing which it is now , and I hope in the next two

23 and a half hour s, we can find that out . But I'm not

24 going to issue a bench warrant now .

25        I will issue one today if I haven't got any

1 further explanation because this trial is going to have

2 to go forward , but in the meantime , I don't see how I

3 can possibly have this jury sit there with not knowing

4 what's going on, so I would propose that to tell the

5 jury we have an issue with a party is ill, we may not

6 be able to restart . I'll know for sure by 2:00 . And

7 at 2 o'clock we deal with it .

8         If you do reach her , Mr. Sussman , and she wants

9 to waive her presence , I'm going to need to have her on

10 the phone doing that in this courtroom , and we'll hook

11 her up, and the staff here will help you get that done.

12         MR. SUSSMAN : That would be under the

13 circumstance s we spoke about before .

14         THE COURT: Yes, yes. In the meantime , I would

15 -- I don't want to waste the time of all these people

16 who have come here today , other than the jury , which

17 I'm going to tell to go take a long lunch hour . I want

18 to deal with any other preliminary -matter-type issue s

19 and 404(b) issue s on anything else that's coming down

20 the pike in this case so we can use my bench time

21 efficient ly for all concerned to address these issue s.

22         I think it would be best if I were to have the

23 courtroom deputy advise the juror s, not me, because I

24 don't want to get them into the who's sick and

25 speculati ng about that kind of a thing , so unless you

1  would --

2          MR. MONTEMARANO :  We agree , Your Honor .

3          THE COURT:  -- prefer that I tell them, I'm

4  going to request Ms. Merez , with your approval , to

5  advise the juror s that because of the illness of one of

6  the parti es, we are going to not need them until 2:00,

7  and at 2:00, we will know whether we need them at all

8  for the rest of the day or not.

9          But Mr. Sussman , as I said before , your client

10  needs to understand that , you know , taking 15 people

11  off the street and giving them jury duty for something

12  that 's not a very well -document ed excuse is something

13  that -- the real thing she needs to worry about is that

14  (a) a mar shal is going to come get her and bring her in

15  here whether she like s it or not and (b) her re lease

16  status could be changed to where she 's incarcerate d.

17  So that's what she needs to be concerned about .

18          MR. SUSSMAN :  As long as the Court 's not taking

19  any action now .

20          THE COURT:  I'm not taking any action right now,

21  but at 2 o'clock , if we are in the present status of

22  thing s, I will issue a bench warrant and tell them to

23  go get her .  And unless she 's tied to a gurney with

24  tube s in here , she 's got to be back here at 9 o'clock

25  in the morn ing .  Or some significant medical

1 explanation given for failing to appear, because this

2 is not a small trial, it is a very big trial with an

3 awful lot of people who are being inconvenienc ed by

4 this.

5          All right y. Have Ms. Merez tell the jury they

6 can be excused until 2 o'clock. We will have a final

7 decision then on whether we can proceed at 2:00 or

8 whether we have to just come back at 9 o'clock

9 tomorrow. But trust me, unless your client is in

10 extremis, we will be with her at 9 o'clock tomorrow.

11 All right. Now, let me -- Mr. Montemarano?

12          Before you go, I will have Ms. Merez communicate

13 that to the jury. I don't see any -- unless she were

14 to walk through here in five minute s how we could

15 possibly have anything in front of this jury before

16 2:00, so we will excuse the jury until 2:00. Yes, sir.

17          MR. MONTEMARANO : If I could prevail upon the

18 Court for forty more seconds to supplement my argument.

19          THE COURT: Sure. What did you just give me?

20          MR. MONTEMARANO : Pardon me?

21          THE COURT: What did you just give me, Clerk.

22          MR. MONTEMARANO : I gave Your Honor, your clerk

23 Mr. Krinsky, some research I did regard ing this 404(b)

24 issue in a brief to the Fourth Circuit about six month s

25 ago. In particular, I asked them to Xerox. I provide d

1  to the Court and I provided to the government as well

2  in the section regarding the argument on intent, and I

3  knew there was something rattling around in my brain

4  that I just couldn't lay my hands on, sort of like one

5  of those claw machines, and I managed finally to

6  extract the argument from the mass of this research.

7         When the defendant denys purely the criminal

8  act, 404(b) evidence is not admissible as intent is

9  often inferable from the act itself. We don't have 60

10 grams here, and we're going to be tap-dancing around

11 the question of intent when you deal with large

12 amounts.

13        The seizure, assuming it comes in and the jury

14 believes my client knew about it, in and of itself

15 proves intent. Six hundred grams of cocaine simply

16 isn't a personal use kind of amount. It doesn't matter

17 if it's all coke, all crack, or anywhere in between,

18 and that's the exact situation we have here.        And

19 the cases I -- I mean, I've read these cases too many

20 times. The Neary case is a question of a restaurant

21 fire, and there's multiple points of origin, there's

22 accelerants used. The Appellate Court said, look, this

23 is clearly arson. He said he didn't do it, intent

24 ain't the question. It's plainly an arson, if he did.

25 This wasn't started accidentally. This wasn't an

1  electrical  fire.  It's all  the  character istic  hallmark s

2  of  an  arson  with  the  multiple  point s of  origin, the

3  accelerants, the insurance    claim follow ing  it.  The

4  question  is, did  he do it?  We can't  bring  in  404, it

5  will  pollute  the well.

6       In  the  sound --

7       THE  COURT:   In  the  example  you gave , would  the

8  answer  be different  if the  arson  statute  were  divide d

9  into  categori es of value  so that  an arson  of $500  or

10 less was  one crime  or punishable  one  way , and  an arson

11 of $500  was another , and you came  in and said, I  don't

12 dispute  that  I burn ed  the  place , but  you  do put  in

13 issue  whether  you intend ed to  burn  $500  or more .

14       MR.  MONTEMARANO :   I  believe  that  if  you  set  a

15 fire  at  a  commercial  establish ment , that  it's  plain

16 that  more  than  $500  of damage  will  be the  foreseeable

17 result  of start ing  a fire  with  multiple  point s of

18 origin  and the  use  of accelerant s.  It's  almost

19 inconceivable  that  this  situation  be otherwise .  That

20 para llel s entire ly with  our  situation  here.

21       If  you believe  I'm in  possession  of 600  grams  of

22 cocaine , it is  inconceivable  that it  is  not  intent  to

23 deal  large  amount s, and  the question  -- there  may or

24 may  not  have  been  a prior  arson  in which  I was  involve d

25 in or  a  prior  drug  deal ing which  I  was  involve d  in is

1 purely character evidence.  It is not dispositive of

2 issue in this case.  That may have been something once

3 before.  It does not make it so here.

4          THE COURT:  Let's come back to this case.  Your

5 client is charged, among others, with conspiracy

6 relating to drugs.

7          MR. MONTEMARANO:  Yes.

8          THE COURT:  Under the *Mark* case, by simply

9 pleading not guilty, she's placed at issue knowledge

10 and intent.  That's what the Fourth Circuit said.  You

11 have said that in your opening statement, you've

12 conceded that she is a user who occasionally sold small

13 quantities, something to that effect.

14          MR. MONTEMARANO:  Yes.

15          THE COURT:  Clearly you're putting at issue by

16 your opening statement whether she had knowledge and

17 intent to sell large quantities of drugs, which is what

18 is alleged.

19          MR. MONTEMARANO:  Yes.

20          THE COURT:  Why is not that knowledge and intent

21 question having been placed at issue that way, why is

22 not the earlier transaction involving a -- you may

23 argue whether it is large or not, but large quantity of

24 drugs not admissible to show knowledge and intent?

25          MR. MONTEMARANO:  Because the denial in this

1  case is, in essence, trumped by the amount of drugs in

2  this case.

3          THE COURT:   Explain that to me again.

4          MR. MONTEMARANO:   The denial of intent in this

5  case is, for the purpose of 404(b) analysis, ultimately

6  trumped by the seizure of 600 grams of cocaine in her

7  place of business, which removes intent as a reasonable

8  question, that she may have placed it at issue by her

9  denial, which the Court's view, which I don't

10  necessarily agree with because we agreed to an intent

11  to distribute.  The question of amount is, in essence,

12  proven for the government's purposes as like a thumb on

13  the scale the 600 gram --

14          THE COURT:   When the jury gets the verdict form

15  and they're supposed to figure out what quantity to

16  fill in, how does your concession play into that?  The

17  government has an obligation to prove the range of drug

18  quantity on the verdict form that we've all agreed is

19  appropriate.

20          MR. MONTEMARANO:   If they argue anything other

21  than a 600-gram seizure on June 1, 2004, at 5559 South

22  Dakota, I think their time is wasted before the jury.

23  That's what they need to focus upon, and whether or not

24  my client did it before is purely a question of

25  criminal propensity.

1          It is not a question of this intent -- of intent

2    in this case , and that has been drawn through almost

3    every kind of criminal conduct from threat s against

4    witness es , where it can't be shown they were made by a

5    defendant in a witness threatening case , to question s

6    of arson , threat s of arson , which show a propensity to

7    solve dispute s by the use of fire , but are not

8    dispositive of whether or not this case was an arson in

9    this instance .

10         This is exact ly what the government tries to do

11   and this is the reason . The Court needs not to buy

12   into this . It is a weak argument when juxtapose d with

13   the balance of the evidence , and for that reason under

14   403 , it is simply not relative -- relevant or

15   dispositive of the question of my client 's intent to

16   deal large amount s, now that she may well have done it .

17         That is pure criminal propensity without some

18   kind of , as I argue d earlier , some kind of common

19   scheme , some kind of unique signature element to the

20   offense , bank robber s to who use president s' mask s --

21   president s' face s for masks, that kind of thing .

22   Without that kind of thing , it's simply other criminal

23   conduct , and that 's not what 404(b) was intend ed to

24   include . Thank you , Your Honor .

25         THE COURT:  Any last words from the government ?

1          MS. GREENBERG:   Unless the Court has any

2  questions, Your Honor, no.

3          THE COURT:   All right.  Well, I've considered

4  the very well-presented arguments of both sides on this

5  issue, and the Fourth Circuit has spoken rather clearly

6  on how to resolve questions of 404(b) issues, which

7  have to be taken into account in connection with Rule

8  403 as well, and has enunciated in the *Queen* case the

9  four factors that I've discussed with counsel, and let

10  me say several things.

11          First of all, in the *U.S. v. Mark* case, which is

12  943 F.2d 444, the Court addressed this issue, and as

13  Ms. Greenberg pointed out, referred to this as being an

14  inclusionary rule, which admits all evidence of other

15  crimes relevant to an issue in the trial, except that

16  which tends to prove only criminal disposition, or as I

17  might paraphrase it, if they did it before, they're

18  doing it again, that that would not be appropriate.

19          In the *Mark* case, the Court specifically pointed

20  out that a defendant's knowledge and intent are clearly

21  elements which the prosecution must establish to prove

22  a conspiracy.  The same conspiracy alleged in this

23  case, I believe.  And considered those issues of

24  knowledge and intent to be placed in issue by a plea of

25  not guilty.  And the Court also noted that where such

1  acts were  sufficient ly related , the relevance  of the

2  evidence  derive s from  the defendant s having  possess ed

3  the  same  state  of  mind  in the commission of both the

4  extrinsic  act and the    charge d offense .

5         The  Court  went  on to  note  that  the  government  is

6  correct  in argui ng  that  the  extrinsic  act  evidence

7  offered  did not  address  a pure ly collateral  matter  but

8  rather  support ed  the  government 's central  theory  that

9  the defendant  was  not  an  innocent  friend  of the

10  co-defendant 's , was  rather  a major  cocaine  distributor

11  respons ible  for  the  transaction  at  issue .

12         The  Court  went  on to  also  note  that  the  evidence

13  was  certain ly relevant  in  establish ing  Mark 's knowledge

14  and  intent , and  then  address ed  the  403  factor  that  --

15  and  observe d , as  has  been  repeat edly  observe d , that  all

16  incriminating  evidence  is  inherent ly prejudicial .  But

17  the  question  under  Rule  403  is  whether  the  evidence  has

18  potential  to cause  undue  prejudice ..

19         Now , in  the  *Queen*  case , Judge  Niemeyer  for  the

20  Fourth  Circuit  return ed  to  address  the  same  question s

21  that  were  address ed  in  the  earlier  decision  of  the

22  Fourth  Circuit  in  the  *Mark*  case , and  enunciate d  this

23  four -part  test  that  was  based  upon  a fair ly exhaustive

24  analysis  of  the  decision s on  this  issue  and  indicated

25  that  there  are  four  matter s to  be  considered , one  of

1  which is conceded in this case and that is that test

2  must be reliable.

3       And the question is whether or not the evidence

4  of these drugs seized in 1986 would be admissible under

5  these criteria.  The first criteria is the evidence

6  must be relevant to an issue, such as an element of the

7  offense, and must not be offered to establish the

8  general character of the defendant.  And Judge Niemeyer

9  went on to point out, in this regard, the more similar

10 the prior act is, in terms of physical similarity or

11 mental state to the act provided, the more relevant it

12 becomes.

13      I conclude that the evidence of the prior

14 searches is relevant to an issue, and that issue is

15 knowledge and intent of the defendant, and it is the

16 evidence at issue is not being offered to establish

17 general character of the defendant, and I conclude that

18 the prior act is very similar, if not identical, to the

19 act provided, and therefore it's more relevant than it

20 otherwise would be.

21      Second factor is the act must be necessary in

22 the sense that it is probative of an essential claim

23 for an element of the offense, and because the charge

24 in this case requires proof of knowledge and intent, it

25 is indeed probative of an essential element of the

1  offense .

2        Finally , the fourth factor  -- I'm skip ping over

3  the third because it's concede d -- the probative value

4  must not be substantially  outweigh ed by confusion  or

5  unfair prejudice  in the sense that it tends to

6  subordinate reason to emotion in the     fact -find ing

7  process .

8        I believe that the probative value here is

9  substantially  outweigh ed by any potential  for confusion

10  or unfair prejudice , and my intention  is that at the

11  time that the testimony  is offered , to give a

12  contemporaneous  cautionary  instruction  to the jury

13  advisi ng them of the limited  purpose for which it's

14  being received , and that it's not being offered nor

15  should it be considered  by them in any way as being

16  receive d to prove the character  of a person in order  to

17  show action  and conformity  there with , which I may try

18  to put in less tongue -twisting  English when I give the

19  cautionary  instruction  with due apolog ies to the

20  author s of the Federal Rule s of Evidence , so that is my

21  ruling on your issue , Mr. Montemarano .

22        MR. MONTEMARANO :  So the record is clear .  Does

23  this ruling apply to all three part s of the evidence

24  that the government  seek s to bring in?  There are two

25  piece s of evidence  from 19 86.

1          THE COURT:   Right.

2          MR. MONTEMARANO:   June 10 and June 26.   My

3 client was only convicted of the June 10th offense,

4 that's what's on the JNC that was provided to me over

5 the break by Ms. Johnston, for which I thank her.   And

6 the third is a non-adjudicated seizure in 1984 where

7 the charges apparently were dismissed.   I want to be

8 clear what Your Honor is making a ruling on.

9          THE COURT:   I'm ruling on both.

10          MR. MONTEMARANO:   All three?

11          THE COURT:   Yes, all of them.

12          MS. GREENBERG:   Your Honor, just so the record

13 is clear, we're not sure whether the Court misspoke as

14 to the probative and prejudice weighing that t    he Court

15 finds -- did the Court specifically find that the

16 probative value of the evidence is not substantially

17 outweighed by confusion and --

18          THE COURT:   I thought I had done that, but I'll

19 do it again.   Under Rule 403, I've concluded that the

20 probative value is substantially outweighed by the

21 danger of unfair prejudice and the reason that I'm

22 concluding that, among others, is that I will admit it

23 with a contemporaneous cautionary instruction that

24 would --

25          MS. JOHNSTON:   Your Honor, I don't mean to

1 interrupt , but I believe what the Court is saying is

2 that whatever prejudice there is can be cured by a

3 limiting instruction , so the Court is not finding that

4 the probative value is substantially outweighed so as

5 to justify exclusion of the evidence ?

6        THE COURT:   No .  No .  Let me make it clear .  As

7 the cases have said , evidence like this is prejudicial .

8 The question is whether it's unfairly prejudicial , and

9 it would not be unfairly prejudicial if I admit it with

10 a contemporaneous limiting instruction , and that's my

11 intention , and I will try to work on some

12 contemporaneous limiting instruction that I can share

13 with you so you-all can pick it apart before the person

14 takes the stand .

15        MR. MONTEMARANO :   Thank you , Your Honor .

16        THE COURT:   All right .  Try to give you a fair

17 airing on that one .

18        Now , are there other 404(b) matters on your

19 client , Mr. Montemarano ?

20        MR. MONTEMARANO :   No those are the only ones I'm

21 aware of regarding Ms. Martin .  Thank you for

22 permitting me to air my views .

23        THE COURT:   My pleasure to listen to it .

24        MS. JOHNSTON:   Your Honor , before we move on to

25 the other 404(b) , which Ms. Greenberg is going to

1 handle, I am charged with the duty of calling these

2 witnesses, in particular Shelton Roberts, the 1986

3 search warrants, which he himself did.  He leaves

4 tomorrow morning on vacation.

5          THE COURT:   Tomorrow morning at what time?

6          MS. JOHNSTON:   At -- I believe he leaves at 10

7 o'clock.

8          THE COURT:   Oh.

9          MS. JOHNSTON:   I would ask the Court, in any

10 event, to call him this afternoon with or without Ms.

11 Harden's presence.  It is a 404(b) incident that has

12 nothing whatsoever to do with her, so I wanted to bring

13 that to the Court's attention because if the Court

14 would like to give an instruction before he testifies,

15 I think the Court can safely do that inasmuch as it

16 does not affect Ms. Harden and we don't have -- that

17 would be the government's position.

18          THE COURT:   Mr. Sussman, what is position on

19 whether I should proceed to hear the seizing office in

20 the '86 searches of Ms. Martin's premises without your

21 client present?

22          MR. SUSSMAN:   Without any contact from my

23 client, I'm afraid that I can't waive her presence, so

24 that my answer would have to be that I would personally

25 oppose it.

1          THE COURT:  Let me cross that bridge at 2

2  o'clock.  That's the best I can do.

3          MR. SUSSMAN:  If I contact my client, I will

4  bring this matter up and advise her that --

5          THE COURT:  You need to tell her of the Court's

6  displeasure at her not being here unless there's a good

7  and sufficient reason, but you need to also inquire of

8  her as to whether she's willing to, on the record, on

9  the telephone, make a waiver tailored as we previously

10  discussed so it would not affect her rights.  All

11  right?

12          MR. SUSSMAN:  I will try to do both.

13          THE COURT:  Okay.

14          MR. MONTEMARANO:  Your Honor, just so the Court

15  is clear, I just informed Ms. Johnston that assuming

16  the government rests by tomorrow, which would be the

17  14th and Detective Roberts is available the following

18  week, in my view, because it relates to my client, the

19  Court -- we could, in essence, recess the defense,

20  whomever it might be, for the purpose of putting the

21  detective on in -- that's not in any way, shape, or

22  form waiving my objection to it actually coming in,

23  but as a logistical matter, the  gentleman is entitled

24  to his vacation.

25          THE COURT:  That's another solution.

1          MS. JOHNSTON:   I'm not so sure the other six
2  defendant s would agree to interrupt ing their case if we
3  happen to be in their case .

4          THE COURT:   Is there any object ion among the
5  remain ing six defendant s to doing that?

6          MR. MARTIN:   No, Your Honor .

7          MR. HALL:   No, Your Honor .

8          THE COURT:   Well , we'll work around it.   He's
9  leavi ng on how long a vacation ?

10          MS. JOHNSTON:   He's leavi ng tomorrow through the
11  14t h, next Friday .

12          THE COURT:   He get s to take a vacation .   I
13  don't , but you know .

14          MS. JOHNSTON:   I appreciate that.   We were
15  hopi ng to move the case along , and certain ly don't want
16  to interfere with the defendant s' case , so should we
17  wait until 2 o'clock ?   Because he's here.

18          THE COURT:   Yeah , we'll cross that bridge at 2
19  o'clock .   Since I told the jury I'd like to tell them
20  what 's going on at 2 o'clock , we'll recess in time for
21  Mr. Sussman to get to what he needs to do in front of
22  Judge Williams , was it, I think ?

23          MR. SUSSMAN :   Yes, sir .

24          THE COURT:   At quarter of 12:00.   I'll recess --
25  quarter of 1:00, excuse me.   I'll recess at, like , 20

1 of, so you can get there on time, and what I'll ask

2 you-all to do is to get back here by five minutes of

3 2:00, so I can go in here and find out what's going, on

4 make some decisions, and we can call the jury in and

5 send them home or not send them home.

6       And frankly, because I don't think they need to

7 know who's sick, I will simply tell Bea to tell them to

8 go home unless somebody wants me to personally do it.

9 I don't want them to infer anything from the fact that

10 one person's not here.  Let them speculate when they go

11 home after they've reached their verdict as to who it

12 was that was sick.  Let them speculate as to which

13 elevator broke down yesterday, too.

14      MR. WARD:  Of course, if they come into court,

15 it will be pretty apparent to them who's not here.

16      THE COURT:  That's why I said I'm not going to

17 do it that way.  That's why I'm going to have Ms. Merez

18 tell them to go home, so at 2 o'clock, I want to be in

19 a position to have Ms. Merez go back and say, sorry

20 about that, the person didn't get well, so we're going

21 to see you on Friday morning at 9 o'clock.

22      MS. GREENBERG:  Your Honor, if we could then,

23 today, use whatever time we have to finish up the

24 404(b) because we have some outstanding witnesses.

25      THE COURT:  I'm not going to waste anybody's

1  time .   You've  got  my  undivide d  attention , so -- what  is

2  the  next  404(b)  issue ?

3        MS. GREENBERG:    Your  Honor , next  on  our  response

4  was  Mr. Goodwin .  He has  one  conviction  relating  to  a

5  federal  conviction .  It  was  a  case  by  Judge  Kaufman ,

6  which  was  pass ed  on  to  Judge  Mallets  in  this  district

7  up  in  Baltimore .  He  was  sentence d  on  March  17, 19 88,

8  to  a  15-year  sentence  for  conspiracy  to  possess  with

9  intent  to  distribute  cocaine .

10        Specifically , Mr. Goodwin , his  stepson , Larry

11  Lane , who  is  also  a  co-defendant  on  this  case , and  his

12  wife  were  charge d  with  conspiracy  to  distribute  cocaine

13  and  distribution  of  cocaine  based  on  an  under cover  DEA

14  case .

15        Your  Honor , I  think  that  the  best  thing  to  do  is

16  that  we  actual ly  have  a  transcript  regard ing  the

17  statement  of  fact s  to  which  Mr. Goodwin  agreed  to  on

18  the  record  under  oath  before  Judge  Mallet s, and  I  think

19  that 's  the  best  indicat or  of  what  the  agreed -upon  fact s

20  were  on  this  case , so  the  Court  can  analyze .

21        THE  COURT:   Is  this  a  guilty  plea  stipulation ?

22        MS.  GREENBERG:   Yes , Your  Honor , and  I'll  read

23  it  to  the  Court .  Counsel , it's  on  Page  39  of  the

24  transcript , specifically  -- of  course , we  will  call

25  witness es  to  prove  this  up , but  I  want  Your  Honor  to

1  understand  what  the  case  was  about  from  the  agreed-upon

2  facts.

3         In  April  of  1987  into  May  of  1987,  an  individual

4  named  Sheila  Hall  came  into  the  Drug  Enforcement

5  Administration   office  in  Washington,  D.  C.  She  met  with

6  Detective  Fanny  Johnson,  who  is  the  witness  in  our

7  case,  the  undercover  detective.   And  during  that

8  meeting,  Ms.  Hall  advised  Detective  Johnson  that  she

9  knew  of  several  individuals  in  Maryland  --  the

10  Washington,  D.  C.  suburbs  and  Maryland  that  were

11  engaged  in  trafficking  in  cocaine.

12        Ms.  Hall  gave  the  name  of  those  individuals,

13  including  the  defendant,  Learley  Goodwin,  Larry  Lane,

14  and  Mr.  Goodwin's  wife,  Constance  Goodwin.   Based  on

15  that  information,  she  initiated  an  investigation   into

16  the  activities  of  Learley  Goodwin  and  others.

17        On  May  4,  Detective  Johnson  had  Sheila  Hall

18  place  a  call  to  the  residence  of  Learley  Goodwin  at

19  1302  Chillum  Road,  and  for  the  purpose  --  and  the

20  purpose  for  that  call  was  to  set  up  the  purchase  for  a

21  half  ounce  of  cocaine.   Detective  Johnson  was  on  the

22  line  when  Sheila  Hall  made  that  call  and  listened  to

23  the  conversation  between  Sheila  Hall  and  Learley

24  Goodwin.

25        During  that  conversation,  Learley  Goodwin  stated

1 that he, in fact, would be willing to sell to a friend

2 of Sheila Hall a half ounce of cocaine for the purchase

3 price of $1,000.  An agreement as to the time and place

4 for the buy was set.  After that, Detective Johnson

5 arranged for surveillance at the 1302 Chillum Road

6 residence of Learley Goodwin.

7        She then, in the company of Sheila Hall, went to

8 that Chillum Road residence and was introduced to

9 Constance Goodwin as Wendy, and she introduced herself

10 as Wendy, her undercover name, as the person who wanted

11 to buy cocaine.  They went inside.  The individual,

12 Learley Goodwin, was on the phone.

13        He paused during one conversation on the phone,

14 and Your Honor, he addressed Detective Johnson and told

15 Detective Johnson that he was trying to keep his

16 workers straight.  Constance Goodwin then took Sheila

17 Hall and Detective Johnson on a brief tour of the

18 residence, and after a short time came back to the

19 kitchen area.

20        At this time, the defendant, Learley Goodwin,

21 had a digital scale, and he placed on the scale a

22 quantity of white powder substance, which weighed in

23 excess of 14 grams, which is approximately half an

24 ounce of cocaine.  He then gave the half ounce of

25 cocaine to Detective Johnson and Detective Johnson gave

1  him $1,000 .  They left the residence  a short  time  after

2  that .

3         During  the  course  of  that  brief  tour  of  the

4  residence , there  were  numerous  items, including  a

5  number  of  silk  dresses  in  the  residence  that  had  price

6  tags  on them , a  lot  of  merchandise , telephones,

7  stereos, and that   types  of  things .  Sheila  Hall  then

8  told  Detective  Johnson  it's  very  common  for  the

9  Goodwins  to  accept  merchandise in  trade  for  cocaine

10  rather  than money   when  somebody  comes  to  the  house  to

11  buy  cocaine .

12         After  that  May 4  purchase , a  week  later  on  May

13  11, Detective  Johnson , through  Sheila  Hall  again ,

14  arranged  for  the  purchase  of  another  half  ounce  of

15  cocaine  with  Learley  Goodwin .  They  were , at  this  time ,

16  to  meet  in  a  Big  Boy  restaurant , which  was  a  Capital

17  Plaza  on  Route  450  in  Hyattsville  near  the  B.W.

18  Parkway .

19         Again , Detective  Johnson  set  up  surveillance   on

20  that  location, went  with   Sheila  Hall  to  the  Big  Boy

21  restaurant.   After  they  arrived, they  went  inside  the

22  restaurant .  Sheila  Hall , at  the  direction  of  Detective

23  Johnson , and  while  she  was  standing  there , placed

24  several  calls  to  the  beeper  of  Learley  Goodwin .   After

25  having  received  no  response  to  the  calls  to  the  beeper,

1 Sheila Hall at Detective Johnson's direction, placed a

2 call to the residence. Learley Goodwin was at the

3 residence, and at that time, he said he wasn't going to

4 be coming to the Big Boy, Larry Lane would, in fact,

5 arrive at the Big Boy and have the half ounce of

6 cocaine for Detective Johnson to purchase.

7       He indicated he would be driving a blue Toyota

8 vehicle, described him, and that description was given

9 to Detective Johnson, who in turn, gave it to

10 surveillance agents. Shortly after that, Larry Lane

11 did show up in a blue Toyota vehicle, and after some

12 conversations and introductions, gave to    Detective

13 Johnson a half ounce of cocaine,    again, for $1,000.

14       Your Honor, the similarity in this case is clear

15 that Mr. Goodwin was distributing  quantities of

16 cocaine, that he used his stepson, Larry Lane, in

17 connection with this drug business. We have drugs

18 seized from Oglethorpe. We have witnesses who

19 testified that he used his son in connection with the

20 drug business, and that he had workers who assisted him

21 with the sale of cocaine, as is clear from the

22 information  from Lobo's and from Anacostia  Road.

23       This is clearly reliable. Mr. Goodwin admitted

24 to those facts. They're the facts that Detective Fanny

25 Johnson is going to testify to, although now she goes

1  under a different name. She's gotten remarried. It's

2  the same detective, and it's clearly probative under

3  404(b), very similar to the acts charged in this case.

4  Thank you.

5        THE COURT:  All right. Mr. Martin.

6        MR. MARTIN:  Good afternoon, Your Honor. On

7  behalf of Learley Goodwin, there are three points that

8  I'd like to make in response to the government. The

9  first has do with remoteness. The second has to do

10  with similarity, and the third point would be with

11  respect to 403 analysis.

12        Remoteness, Your Honor. This transaction or

13  series of transactions that the government has referred

14  to took place from, I believe it was May 4, 1987, to

15  August 13, 1987, and that was some 15 years up to the

16  point where the government started to become aware that

17  Learley Goodwin was allegedly involved in the

18  conspiracy that he's now on trial for. That's 15

19  years.

20        And while I understand that 404(b) does not have

21  any specific time limit or cutoff period as to when

22  things may be admitted, the Court, in its discretion,

23  can determine whether or not that is too far removed

24  and remote, and we would suggest to the Court that it

25  is in terms of its similarity, its relationship to

1  what's taking place now.

2        There are some factors that are, in fact,

3  different.  To begin with, this was, as I understand

4  it, powder and it only involved Mr. Goodwin at a

5  street-level.  That is what the government was talking

6  about earlier, just him.  Now he's involved in what's

7  described as not a street-level-type operation, but an

8  upper-level conspiracy involving heroin, crack and

9  powder cocaine.

10        So, obviously what he's charged with today is

11 substantially more onerous than what he was charged

12 with then, and as a street dealer to bring in something

13 that involves a small amount of cocaine and try to link

14 it to what's taking place today, I would argue to the

15 Court that that is not so similar a thing, that it is

16 different in some respects.

17        Finally Your Honor, there's no way around this

18 business about the prejudice, and I understand that

19 everything that the government does is prejudicial to

20 the defense, but to bring that in --

21        THE COURT:  How is it unfairly prejudicial?

22        MR. MARTIN:  I was just going to say how it's

23 unfairly prejudicial.  To bring it in suggests to the

24 jury that in no way that can be rebutted by us, that

25 because he was involved in drugs in the past, that he's

1 involved in drugs again today.  And then in 1987, we're

2 talking about a total of 150 grams of cocaine.  Today

3 the government is talking about kilos, multiple kilo, s

4 and hundreds of thousands of dollars, and so I would

5 suggest to the Court that when somebody is a marijuana

6 and cocaine dealer, and this case involved marijuana

7 and cocaine, the 1987 case, and to extrapolate that

8 over to what he's doing today, suggests that, you know,

9 if you're involved with something small, you must be

10 involved with something big.

11        And for that reason, we would argue that the

12 probative value of this is outweighed by whatever

13 prejudicial effect, and even a curing instruction, as

14 I've said in the past, isn't going to undo that.

15        THE COURT:  All right.

16        MS. GREENBERG:  Your Honor, just briefly as to

17 the remoteness.  Mr. Goodwin was sentenced on March 17,

18 1988, to a 15-year federal sentence, so he wasn't out

19 for much time when this conspiracy began in 1997.  And

20 as I previously cited to the Court the *White* case, in

21 which the Fourth Circuit affirmed Judge Quarrels'

22 decision that the -- Judge Quarrels looked to how much

23 time there was before the start of the charged

24 conspiracy, and he had a 404(b) incident that was ten

25 years before.

1        In this case, with have a conspiracy that

2   started in 1997. This conviction and conduct was back

3   into 1988 and we're talking about the same analysis

4   that Judge Quarrels did; and further, Mr. Goodwin

5   couldn't have gotten involved much prior to then

6   because he was serving his federal sentence for this

7   conviction. So the remoteness in time is belied by the

8   fact of the length of the conspiracy, the amount of

9   time it took us to go to trial, and also the amount of

10  time that Mr. Goodwin was in jail.

11       Additionally, Your Honor, the acts are similar.

12  This is very similar to the conduct Mr. Thurman

13  described about Mr. Goodwin selling smaller quantities

14  of cocaine and cocaine base and his activities out of

15  Lobo's, his activities out of Anacostia Road. So it is

16  very similar to buying large quantities, selling

17  smaller quantities. That's what Mr. Goodwin did.

18  That's what Ms. Martin did, and it's very similar to

19  this case and any prejudicial effect can be addressed

20  by a limiting instruction as to what the nature of this

21  evidence is being introduced for.

22       MR. MARTIN: The only other point that I would

23  make in response to that, briefly, Your Honor, is that

24  of that 15-year sentence, it's my understanding that

25  Mr. Goodwin served less than seven years. I believe it

1  was six and half years.

2       THE COURT:  It was a 15-year sentence and he

3  served seven years?

4       MR. MARTIN:  That's what he tells me.

5       THE COURT:  This is a federal sentence.

6       MR. MARTIN:  I didn't understand that either

7  because it occurred after 1984.

8       MR. MARTIN:  In any event, he didn't serve the

9  full 15 years.

10      MS. GREENBERG:  Your Honor, even seven years

11 would have been 1995, which is two years before the

12 start of the charged conspiracy.

13      THE COURT:  Now, what is the evidence?  You read

14 to me a stipulation, but what is the evidence that you

15 intend to offer on this?

16      MS. GREENBERG:  The detective's testimony, Your

17 Honor.  The undercover detective.

18      THE COURT:  Okay.

19      MS. GREENBERG:  And the judgment of conviction.

20      THE COURT:  All right.  Well, I think that with

21 regard to the matter involving Mr. Goodwin, that it is

22 essentially a government -- the same analysis that I

23 just applied to the evidence with respect to Ms.

24 Martin.  There are some slight wrinkles to it, but the

25 bottom line is that this is a charge of conspiracy,

1    that the prior acts involved here are probative of an

2    issue that is clearly put at issue by a plea of not

3    guilty, which would be, at a minimum, knowledge and

4    intent, and that with an appropriate cautionary

5    instruction, I believe that it would satisfy the four

6    factors under the test adopted by the Fourth Circuit in

7    the *Queen* case.

8            It is evidence that is relevant to an issue,

9    which as I said is the knowledge and intent that is

10   essential to proof of a conspiracy charge. It's not

11   being offered to establish general character of the

12   defendant, and the prior act is very similar to the act

13   to be proved here, and therefore it's become highly

14   relevant.

15           I conclude also under the second test that it is

16   necessary in the sense that sit probative of an

17   essential element of the offense, namely the knowledge

18   and intent element. There doesn't appear to be any

19   dispute about reliability of the testimony. And

20   finally, it's -- the final factor is whether its

21   probative value is substantially outweighed by

22   confusion or unfair prejudice in the sense it intends

23   to subordinate reason to emotion in the fact-finding

24   process.

25           There is no question that the evidence is

1 probative for the reason s I've just given , and while

2 any evidence of this nature is prejudicial , the

3 question under this test as well as under Rule 403 is

4 whether it is unfair prejudice , and in this case , I

5 believe that any prejudice , much less any unfair

6 prejudice can be attenuated or eliminate d by the giving

7 of an appropriate cautionary instruction , which I will

8 give . So I will deny the motion on -- with respect to

9 Mr. Goodwin .

10       What's the next ?

11       MS. GREENBERG:   Your Honor , the next , if Mr.

12 Hall is ready , the next is Mr. Whiting . There were

13 four prior act s, and I think I'll make it easier for

14 the Court and Mr. Hall by just address ing the last two .

15 Just so Your Honor is aware , our motion talk ed about a

16 1968 conviction for marijuana and a 1974 conviction in

17 federal court in connection with the Liddy Jones

18 operation . We will not seek to admit those , and I'll

19 focus on the most recent convictions of Mr. Whiting .

20       THE COURT:   All right .

21       MS. GREENBERG:   Of course , y our Honor , we

22 reserve the right , if Mr. Whiting testifi es, to go into

23 those , but for 404(b) purpose s, we'll just go with the

24 last two convictions .

25       THE COURT:   Okay . So what are those two ?

1          MS. GREENBERG:   Your Honor, the first one is a

2  conviction that Mr. Whiting received on November 6,

3  1987.  He received a sentence of eight years, three

4  months based on -- actually, the conviction was in 1987

5  based -- the judgment was in 1987 based on a conviction

6  in 1986 in Mexico for possession of cocaine.

7          Specifically, he was arrested for possessing

8  over seven kilograms of cocaine and scales in Mexico.

9  The documents that we obtained from the Mexican

10  government, which were provided to counsel, talked

11  about a search of a hotel room.  Mr. Whiting had no

12  luggage other than the box of cocaine.  Mr. Whiting was

13  arrested on an anonymous tip.

14          And when questioned by the Mexican police, he

15  admitted that somebody in Mexico named Jorge Gonzalez

16  sold him the cocaine, and he was convicted for -- they

17  have a -- of course here, Your Honor, that amount of

18  cocaine would be possession with intent to distribute,

19  but in Mexico it was simple possession charge.  Again,

20  it was over seven kilograms of cocaine and scales that

21  were recovered from Mr. Whiting in his hotel room.

22          Subsequently, Mr. Whiting was arrested in 1994

23  and convicted in the Eastern District of Virginia for

24  his role as an organizer for a large conspiracy to

25  import heroin.  He was sentenced to 186 months

1  incarceration , later reduced , through a Rule 35 , to 72

2  month s incarceration . And Your Honor , that case was

3  based on Mr. Whiting 's recruit ing friends to serve as

4  courier s to import heroin into  the United States from

5  Thailand.

6         One courier was arrested  in San Francisco after

7  she flew back into the United States from Tokyo with

8  over eight kilogram s of 89 percent pure heroin as well

9  as business cards in Mr. Whiting 's name . Mr. Whiting

10 not only pled guilty , he cooperate d with the

11 government , and that was the basis for the Rule 35

12 reduction .

13        Your Honor , in this case , Mr. Whiting 's role in

14 aid ing and abet ting the conspiracy is twofold . He,

15 one , is a lawyer , and he assist s Ms. Martin when people

16 are arrested , and he also talk s about get ting a

17 suppli er for the group . This evidence is key to show

18 his intent , his knowledge of the drug conspiracy , and

19 how he is involve d in this drug conspiracy .

20        Mr. Hall , in his opening  statement , like ned Mr.

21 Whiting to a rubber tire that got caught on a fish ing

22 line , said he wasn't a big fish , he wasn't a small

23 fish . He wasn't a fish at all . He was a rubber  tire ,

24 and that he was -- if he was a lawyer and he was

25 helping her with people that got arrested , and that was

1 the extent of his involvement and knowledge about the

2 conspiracy.

3         This evidence is crucial to show knowledge and

4 intent, given Mr. Whiting's defense in this case, if it

5 wasn't already admissible, Your Honor, under the Fourth

6 Circuit law. Generally when intent and knowledge are

7 always an issue, but given what Mr. Whiting was trying

8 to do, to aid and abet this drug conspiracy, it's

9 essential for these convictions to be introduced.

10 They're reliable, he admitted to them, and they are not

11 remote in time, the 1986 and 1994, from this

12 conspiracy.

13         Unless the Court has any questions, those would

14 be the two we would offer.

15         THE COURT:  All right.  Mr. Hall.

16         MR. HALL:  Thank you, Your Honor.  First of all,

17 I -- let me address each one separately rather than

18 lumping them together, and then we can go through the

19 elements as outlined in the *Queen* case.  First of all,

20 focusing on the 1986 conviction, which occurred in

21 Mexico.  Just let me correct one thing factually.

22 Despite the fact that counsel referred to an admission

23 on the part of my client that was actually a trial, and

24 I think the documents from Mexico, which have been

25 provided to me and translated the -- would reflect.  I

1  think what counsel was referring to is an admission to

2  or a statement to the Mexican authorities.

3        The first thing I want to make a point about

4  this case, that I think makes it completely different

5  than the case that's before this Court, and I think

6  it's important that in the Court in examining the -- I

7  think the Court needs to examine what has been produced

8  in this case in this courtroom so far in reference to

9  my client's conduct to really examine how this alleged

10  404(b) evidence would fit in.

11       First of all, the case in 1986 was undoubtedly a

12  case in which my client was going to, I'm most certain,

13  allegedly smuggle the cocaine to the United States. He

14  certainly wasn't bringing the cocaine to Mexico. That

15  would be like bringing coals to New Castle, so it was a

16  case involving a smuggling operation. There is nothing

17  in what has been adduced so far in this trial which

18  would remotely place my client in the position of

19  engaging in any type of similar conduct.

20       What the Court has heard is evidence involving

21  alleged attempts by him to purchase drugs from Ms.

22  Martin, some questions on her part concerning charging

23  documents and the like, but factually it's quite

24  different than this case. What I would suggest to the

25  Court that since it is factually so different than what

1  has been presented in this case, that the 1986

2  conviction in Mexico fails the first test because it

3  isn't relevant to an issue that has -- that is at stake

4  here.

5       What my client is charged with here is whether

6  or not he conspired to even possess with intent to

7  distribute or to distribute cocaine, and I would

8  suggest to the Court simply the fact that this involved

9  a cocaine case in Mexico does not make it similar, does

10  not improve -- does not prove his intent, and

11  therefore, fails the first prong of the *Queen* test in

12  that it is not relevant to one of the issues that's

13  before the Court here.

14       I would suggest to the Court that within the

15  various roles that people can have in drug trafficking,

16  someone involved in a smuggling operation is quite

17  different than the alleged role that my client has in

18  the case that's before the Court.

19       I would also suggest the same thing is true of

20  the 1994 conviction in the Eastern District of

21  Virginia. In that case, and in what I have received

22  from the government as part of the 404(b) evidence, was

23  an appellate opinion from one of the co-defendants, who

24  Mr. Whiting had cooperated against, which explains in

25  some detail what occurred in that case that what my

1 client allegedly did was that he recruited an

2 individual to bring in a bag or a shipment of heroin

3 from Thailand and through Tokyo to the United States.

4         That individual was stopped at Customs and ended

5 up being arrested.  Mr. Whiting ended up cooperating

6 against that individual and -- cooperating in some

7 fashion in that case eventually, and -- but again, that

8 is a smuggling case.  It's case in which my client is

9 involved with recruiting an individual to go to another

10 country, and under some disguise of a business

11 transaction, bring drugs into the United States.

12 Again, that's very different than what the Court has

13 here.

14         My client was not involved in recruiting anyone

15 to do anything.  Again, what the Court has heard thus

16 far is that my client allegedly made several phone

17 calls to Ms. Martin in which he attempted to purchase,

18 and he answered some questions involving charging

19 documents and legal issues, but I think the Court can

20 see that what the -- what has been shown to this jury

21 so far is a very different type of behavior than either

22 the Mexico --

23         THE COURT:  How is it?

24         MR. HALL:  Well, it's different because my

25 client was acting as either someone to recruit

1  individuals  to smuggle  or to smuggle  drugs himself  as

2  in the Mexico  case .  Just  because  it  involve s  drugs , I

3  would  suggest  to the  Court , is simply  not  enough .

4        THE  COURT:  But  when  you've  got  decision s that

5  allow  this  in because  it  shows  knowledge  of the  drug

6  business , why  would  it not  be admissible  for  that  as a

7  minimum ?

8        MR. HALL:  Because  the  --  what  I'm  saying  to the

9  Court  is that  it  still  --  it  has to be relevant  to an

10 issue .  Now , we're  not  dealing  with  the  situation  where

11 there  is some  quantity  of drugs  which  my client  has

12 been  caught  with  in this  case  in which  the  question  of

13 intent  to distribute , for  example , would  be at issue .

14 And  therefore , the  showing  that  he had  a prior

15 conviction  before  for  a quantity  of drugs  and  intended

16 to distribute , that  therefore  this  evidence  would  prove

17 his  intent  to distribute .

18        What  I'm  saying  to the  Court  is that  I think  the

19 Court  has to be cautious  in the  use  of the  word

20 "knowledge  of the  drug  trade " because  that  come s very

21 close , I suggest  to the  Court , to the  fourth  element  of

22 the  *Queen*  case , which  is propensity  or using  this  as

23 some  type  of reflection  on Mr. Whiting 's character , and

24 I would  suggest  to the  Court  that  allow ing  --

25 considering  what  has been  shown  in this  case  so far ,

1 allowing two convictions  to come in showing that in the

2 1980s he was a drug dealer, in the 1990s he was a drug

3 dealer, and therefore  he must be a drug dealer at this

4 point in time.

5        I would suggest to the Court that the term

6 "general knowledge of the drug trade," it still has be

7 relevant to a specific issue in this case, and I'm

8 suggesting to the Court that these two prior

9 convictions, considering the fact that they're

10 smuggling cases, considering the fact that he played a

11 very different role than what is alleged here, is

12 simply not enough and therefore  should be excluded.

13        I also would suggest to the Court that it should

14 be excluded because the -- even with a cautioning

15 instruction, I'm suggesting to the Court that two prior

16 convictions of this type is simply too prejudicial  to

17 allow in, and that it's going to have the very effect

18 which 404(b) is not supposed to have, and that's to

19 show a propensity.

20        I realize the government  is not going to get up

21 there and argue that what I just said about him having

22 been a drug dealer this decade and that decade and

23 therefore this one, but it can't help but go off like a

24 light bulb in a juror's mind when they hear that about

25 two very serious, very large quantity  drug operations

1  that Mr. Whiting was involved in, and then in this

2  case, in which he has not been connected with any drugs

3  thus far, and I suggest to the Court based upon my

4  review of the evidence, there will not be a seizure

5  coming into this case involving Mr. Whiting that the

6  probative value is just simply going to be outweighed

7  by the prejudicial effect if this is allowed in.

8           THE COURT:  All right.  Ms. Greenberg?

9           MS. GREENBERG:  Your Honor, briefly, and again,

10  I will be happy to answer any questions the Court has.

11  This is not a different role.  These prior incidents

12  involve Mr. Whiting supplying drugs for a conspiracy

13  going to Mexico, getting large quantity of drugs,

14  sending people to Thailand to get a large quantity of

15  drugs, the wiretap conversations show that he was

16  talking to Paulette Martin about sources of supply.

17  That was Sergeant Sakala's testimony.

18           This is not different than this case, and it

19  goes to show Mr. Whiting's knowledge, as the Court

20  correctly pointed out, not only his knowledge of drugs

21  and involvement in the drug conspiracy, but knowledge

22  of sources and sources of supply and it's incredibly

23  probative of his involvement in this conspiracy.

24  Thank you.

25           MR. HALL:  Can I just say one more thing to the

1 Court, just in response to what counsel just said?

2       THE COURT:   Sure.

3       MR. HALL:   We are talking about, therefore, one

4 line in one phone call, and that is the call in which

5 my client, in reference to the ticket, says I might be

6 able to do something about that and that's it.  And I

7 would suggest to the Court that's simply too thin a

8 reed to let this type of evidence go in before the

9 jury.

10       THE COURT:   Anything else, Ms. Greenberg?

11       MS. GREENBERG:   Nothing.

12       THE COURT:   Okay.  I believe that the proper

13 application of the factors set forth in *Queen* to the

14 admissibility against Mr. Whiting of his prior Mexican

15 cocaine conviction and his conviction in the Eastern

16 District of Virginia participation in a cocaine

17 conspiracy are admissible under Rule 404(b) and proper

18 application of Rule 403.

19       The evidence is certainly relevant to the issue

20 of knowledge and intent and is not being offered to

21 establish the general character of Mr. Whiting.  The

22 act is necessary in the sense that it is probative of

23 an essential claim for an element of the offense.  In

24 this case, the charged conduct is that of a conspiracy

25 and knowledge and intent is an element.

1        There's -- there can be little question about
2  the reliability of these two matters, both are based on
3  court decision s, and finally on the question of
4  probative value and whether it's not substantially
5  outweigh ed by confusion or unfair prejudice , I conclude
6  that the evidence is probative for the reason s I just
7  gave , and that that probative value is not
8  substantially outweigh ed by confusion or unfair
9  prejudice because it is not unfair ly prejudicial in the
10 first place , and second ly, whatever prejudice there may
11 be, unfair or otherwise , will be attenuated by me
12 giving a care ful and contemporaneous limiting
13 instruction , so I will over rule the objection with
14 respect to the evidence proffered by the government as
15 to Mr. Whiting .
16        Mr. Mitchell , is there 404(b) on the next one ?
17 Okay . What is your --
18        MR. MITCHELL:   Can we pass on Mr. Bynum for a
19 moment ?
20        MS. GREENBERG:   Your Honor , we do have one on
21 Ms. Dobie .  I had discuss ed some possible resolution
22 with Mr. Mitchell , so if we could move on to Ms.
23 Dobie and then we'll --
24        THE COURT:   Mr. Ward , are you ready to go?
25        MS. GREENBERG:   Mr. Ward ?

1        THE COURT:  Mr. Ward?

2        MR. WARD:  I'm ready to go.  Do you want to hear

3 from me, Your Honor?

4        THE COURT:  Certainly let me find out from Ms.

5 Greenberg what it is.

6        MR. WARD:  Right.  I have received from the

7 government certified documents, or at least a copy of

8 what I presume to be certified copies of documents from

9 the Circuit Court for Baltimore City showing that on

10 September 21, 1989, a Lavon Parker pled guilty to Count

11 I of Indictment No. 18806411, in which she and two

12 others were charged with wearing, carrying, and

13 transporting a handgun on or about their person.

14        It appears from additional documents that the

15 government gave me that there was a burglary at 114

16 South Fulton Avenue in Baltimore City.  Certain things

17 were taken from the premises.  I think a set of car

18 keys, and I'm not sure what else, and although it's not

19 clear, whoever the parties were that were involved in

20 that, it appears they were not arrested at the premises

21 but sometime afterwards.

22        Number one, we have a remoteness issue in that

23 the offense took place -- was alleged to have taken

24 place on or about January 28, 1988, and the conviction

25 was on August 28, 1988.  Number two, we have a total

1  dissimilarity  with  regard  to  the  offense s.   The  offense

2  to  which  that  person  was  pled  guilty  incidentally ,  and

3  was  convict ed  on  that  guilty  plea ,  was  simply  carry ing

4  a  handgun .   That 's  all .   On  or  about  the  person .

5         In  this  case ,  of  course ,  we  have  a  drug

6  trafficking  offen se.   There 's  nothing  in  the  first  case

7  to  indicate  that  it  had  anything  at  all  to  do  with  drug

8  trafficking  or  that  the  handgun  was  possess ed,  as  is

9  one  of  the  charge s  in  this  case .

10         THE  COURT:   What  was  the  offense  --  Mr.  Ward,

11  what  was  the  offense  of  conviction  we're  talk ing  about ?

12         MR.  WARD:   Simply  carry ing  a  handgun .

13         THE  COURT:   So  it's  a  handgun  violation .

14         MR.  WARD:   It's  a  handgun  violation  I

15  understood ,  Your  Honor .   I'd  be  happy  to  give  you  the

16  --  well ,  I  don't  remember  it  offhand ,  and  the  cite  is

17  not  on  the  indict ment ,  and  as  of  course ,  it's  not

18  required  to  be .   In  any  event ,  that  was  the  --  it's

19  actual ly  Article  27,  Section  36  B.   That  was  the

20  offense  of  conviction ,  so  we  have  a  complete

21  dissimilarity  of  type  of  offense .

22         We  have  --  in  addition  to  that ,  we  have  a

23  question  of  their  identity .   The  person  name d  is,  as  I

24  said ,  Park er,  and  I  don't  know  how  the  state  propose s

25  --  the  government  propose s  to  go  about  provi ng  that  the

1 person convicted in that case that entered the guilty
2 plea and the person here are one and the same person.
3 I will leave it to the government to enlighten the
4 Court on that.

5        In any event, assuming arguendo, that it is the
6 same person, I think that this a completely dissimilar
7 offense on a very remote date simply is not admissible
8 under 404(b) and does not even meet the first criteria
9 set out in *Queen*, which is that the prior offense be
10 related to an issue in this case. All we have in the
11 prior offense is possession of a handgun. Nothing
12 about drugs, nothing about in furtherance of drug
13 activity, and I suggest that that is so totally
14 dissimilar that it doesn't even meet, of course, the
15 first criterion under *Queen*.

16        As to the matter of necessity, I can't really
17 argue on that because the necessity that the government
18 is required to show completely eludes me. I don't know
19 how all the prior offense is necessary to be introduced
20 into this case. I think all that can be drawn from
21 what the government is proposing, assuming they can
22 prove identity, is that the person on January 28, 1988,
23 simply possessed a handgun, and assuming they can prove
24 it in this case, Lavon Dobie possessed a handgun
25 allegedly in furtherance of a drug trafficking crime.

1  If that's not propensity , I don't know  what is.  Simply

2  the fact that possession  of a handgun .  I'll wait to

3  hear  the government 's response .

4        THE COURT:  Let me hear  from Ms. Greenberg .

5        MS.  GREENBERG:    Your Honor , Mr. Ward says the

6  two offense s are  complete ly dis similar , but what  this

7  404(b) evidence  goes  to Count 61, in which  Ms. Dobie  is

8  charge d with  know ing  and  intelligen tly  possess ing  a

9  firearm  in furtherance  of  a drug  trafficking  crime , we

10  have  to prove  as part  of  this  offense  that  she

11  know ingly  and  intentionally  possess ed a firearm .  Based

12  on her  testimony  in another  proceed ing  involving  her

13  husband , I believe  that  she's going  to say they  were

14  her son's gun s, they  were  not  her guns, and  that  she

15  mere ly move d them  and  that  is  why her DNA  is  on  them.

16        In the  prior  incident , your Honor , an officer

17  approach ed a car  that  he belie ved to be involve d in a

18  burglary .  It was  occupi ed by Ms. Dobie  and  two  male s,

19  one  of which  was her husband , Goldie  Dobie  , and  he

20  specifically  saw Ms. Dobie  hold ing  two  load ed handgun s,

21  specifically  a Smith  and Wesson,  Model  49, .38 caliber

22  weapon , and  a .38 Caliber  Armenius ,

23  A R M I N I U S, both  of which  were  load ed, Your  Honor .

24        He saw her  hold ing  the  two handgun s, and  that  is

25  the substance  of  the charge s in this  case , that  is  the

1 substance  of the 404(b)  testimony .  We intend to

2 introduce  nothing  about  the burglary , simply  that  she

3 possess ed these two firearm s, and it is incredibly

4 probative  of her possession  of these  firearm s in

5 connection  with this drug conspiracy  simply  as to that

6 one count , and we don't object  to a limiting

7 instruction  that this is simply  as to the 924(c) charge

8 as to Ms. Dobie .

9        In connection  with --

10       THE COURT:  What element  of the offense  under

11 the count -- what is it, Count  61 you say?

12       MS. GREENBERG:   Sixty-one  require s know ing and

13 intentional  possession  of a firearm .

14       THE COURT:  All right .

15       MS. GREENBERG:   I expect , based  on her prior

16 sworn  testimony , she is going  to say before  a judge  up

17 in Baltimore , in connection  with her husband 's parole

18 violation  or supervised  release  violation , that  she's

19 going  to say they were her son's gun s and she move d

20 them , so therefore  this evidence  is incredibly  relevant

21 to her know ingly  and intentionally   possess ing a firearm

22 element  as part of Count  61 of the indict ment .

23       It's not introduced  as part of the drug

24 conspiracy .  It is simply  for that one charge , and in

25 this case , the fact that her DNA is on the gun does n't

1  help us if she's going to say that she moved them for

2  her son, but the fact that she possessed guns on a

3  prior occasion is incredibly probative.  The prejudice

4  is limited, but we're not going to introduce any

5  evidence of the burglary, and simply that an officer

6  saw her with those two guns in the car.

7          THE COURT:  All right.  Mr. Ward?

8          MR. WARD:  Well, of course the element that the

9  government conveniently leaves out is not simply the

10 possession, but knowing possession.  It's the

11 possession in furtherance of the drug trafficking

12 crime.  That is not an element of which she was

13 convicted in the past, so simply proving that she

14 possessed a gun is not the offense charged.  Proving

15 that she possessed the gun under certain circumstances,

16 that is in connection with a drug trafficking crime, is

17 the crux of the government's case and --

18         THE COURT:  Let me ask you this, Mr. Ward:  The

19 crime charged by the state of Maryland in the 1988

20 conviction was what?

21         MR. WARD:  It was --

22         THE COURT:  You gave me the section number but I

23 forget what that section number is.

24         MR. WARD:  It's Article 27, Section 36(b).  Your

25 Honor, now that the code has been changed around, I

1  don't know  what  the  comparable  code  is, but  it's -- I'm
2  sorry it's 36B(b). And  the  charge  is  that  the
3  defendant s, it name s all  three  on or about  the  date s of
4  the  offense  set  forth  above , being  January  28, 1988, at
5  the  location  set  forth  above , that  being  114  South
6  Fulton  Avenue  in  Baltimore   City  unlawfully  did  wear ,
7  carry  and  transport  a  handgun  upon  or about  their
8  person s contrary  to  the  form  of  the  Act  of  Assembling ,
9  and  such  a  case  may  have  been  provided  --
10        THE  COURT:   It's  a  conceal ed  weapon  charge  then ?
11        MR.  WARD:   Sir ?  I'm  sorry ?
12        THE  COURT:   It's  a  con cealed  weapon  charge ?
13        MR.  WARD:   It's  not  even  conceal ed  according   to
14  the  government 's  statement , but  it's  simply  carry ing  a
15  weapon .
16        Now , as  said , there 's  nothing  --  there  is  no
17  evidence  --  there 's  not  going  to  be  any  evidence  --  the
18  government  has  no  evidence  that  drug s  were  ever  found
19  in  this  vehicle  or  on  the  person  from  whom  the  gun s
20  were  taken  or  upon  anybody  else  in  the  vehicle .   That 's
21  entire ly  out  of  that  first  case .
22        I  think  it's  glari ngly  apparent  that  the
23  government  skip ped  over  the  identification   issue .   I
24  assume  they  intend  to  bring  an  officer  in  to  identify
25  my  client  as  being  the  same  person  with  whom  the  gun s

1  were taken .  I don't know .  But that 's certain ly an

2  issue in the case .  For all those reason s, Your Honor ,

3  I think that the prejudice does not -- is not over come

4  and cannot be over come by an instruction  in this case .

5  For those reason s, that evidence  ought not be admitted .

6          THE COURT:  All right .  Well, I will  announce  my

7  ruling on this when we return at five minute s of 2:00 .

8  Mr. Sussman  is not here , so I assume  he's --

9          MR. MONTEMARANO :  He left , Your Honor , while Mr.

10  Ward was argui ng and asked me to inform  the Court .

11          THE COURT:  Okay .

12          MS. GREENBERG:  Your Honor , the only one we have

13  left now is Mr. Bynum and I will  speak with Mr.

14  Mitch ell at the break .

15          MR. WARD:  I'm sorry , Your Honor .  I thought he

16  just got tire d of listening  to me talk .  I was a little

17  upset .

18          THE COURT:  I enjoy hear ing you talk, Mr. Ward .

19  It's a pleasure  to listen  to you any time .

20          I will -- now assuming  that we don't have Ms.

21  Harden sitting  here at 2:00 , I will continue  to address

22  these and any other legal issue s you have so that we

23  wear out our reservoir  of preliminary  matter s, and so

24  if there 's any other matter s that require  legal

25  argument  that I can -- am or can reasonably  get

1 prepared for, I will be glad to take those up.

2      But at five minutes of 2:00, I'm going to get a
3 weather report from Mr. Sussman on what's going on with
4 his client. We will take action appropriate with the
5 jury. I will conclude the matter with Mr. Ward's
6 client, and then I will take up the matter with Mr.
7 Bynum. I believe that will be all the 404 matters; is
8 that correct?

9      MS. GREENBERG:   Yes, sir.

10      THE COURT:   All right. We will see you at five
11 minutes of 2:00.

12           (Off the record at 12:43 p.m.)

13           (On the record at record at 2:01 p.m.)

14      MS. GREENBERG:   Your Honor, as to the remaining
15 404(b) issue, I think it will take all of two minutes
16 when the Court is ready.

17      THE COURT:   Let's hear about Mr. Sussman's
18 client first.

19      MR. SUSSMAN:   Well, Judge, you'll be happy to
20 hear I've located my client, and I spoke to the
21 personnel at the emergency room at Bayview Hospital,
22 part of John Hopkins. She's been there since the
23 morning. They had her listed under Arden with an A. I
24 spoke to the woman, that's why they didn't locate her.

25      THE COURT:   They had her listed as what?

1          MR. SUSSMAN:  Arden with an A instead of Harden

2  with an H.  I spoke to Ms. Harden.  I spoke to someone

3  in the emergency department.  I explained to them the

4  circumstances.  She is prepared to waive.  I told her

5  to standby, that the call from the Court, I thought

6  that's how the Court wanted to do that.

7          THE COURT:   What is her medical status now?

8          MR. SUSSMAN:  She has not been seen.  The

9  symptoms reports, I can report them, but what that

10 means is -- I play cards with doctors, but I don't

11 think I can proffer what it all means.

12         THE COURT:   Well, you've discussed with her

13 waiving presence  in the proceedings  today?

14         MR. SUSSMAN:  I discussed with her -- what I

15 told her, Your Honor, was that the matters we would

16 take up this afternoon would be matters that did not

17 directly concern her.  I believed it would be the

18 search of Ms. Martin's premises and one going back

19 quite a ways.  And that was by design that we would

20 avoid issues that touched her directly.

21         I also told her that the Court obviously would

22 tell the jury something about her health and why we're

23 going on in the fashion we're going on so she would not

24 be prejudiced in that way and she seemed agreeable, but

25 obviously the Court would probably want to speak with

1 her , and I told her to standby .

2          THE COURT:   All right .

3          MR. SUSSMAN :   I don't know   the best way to do it

4 for technology .

5          THE COURT:   We would have to place a call from

6 here to her and visit , go over the speak er system .

7 Just give her the number .  Before you call , I want to

8 take up another issue .  Mr. Montemarano , you had an

9 issue with regard to the juror ?

10          MR. MONTEMARANO :   I think Mr. McKnett would like

11 to address the Court .

12          THE COURT:   Okay .

13          MR. MCKNETT :   Your Honor, at lunch -- I'm not

14 sure if the Court has been in the attorney lounge

15 downstairs .

16          THE COURT:   Oh, I've spent many an hour in

17 there .  I use d to do what you do .  I keep on brag ging

18 about that conference room being such a love ly place

19 that you would n't expect in a courthouse .

20          MR. MCKNETT :   As the Court will recall , there is

21 an entry way , a corridor that goes straight back .  There

22 are two conference room s at the back of that unit , and

23 adjacent and to the left of the larger conference room

24 is a computer room .  The entrance s from the computer

25 room -- the entrance to the computer room and to the

1  larger  conference  room  are ,  I  would  estimate ,  eight  to

2  ten  feet  apart .

3         Several  of  us ,  myself ,  Mr.  Montemarano ,  Mr.

4  Hall ,  were  in  the  large  conference  room  at  lunch .   We

5  had  been  in  there ,  I  would  estimate ,  three  to  four

6  minute s .   We  were  discuss ing  matter s  that  had  been

7  discuss ed  this  morn ing  on  the  record  out  of  the

8  presence  of  the  jury .   We  were  discuss ing ,  for  example ,

9  the  Court 's  rulings  on  some  of  the  rulings  the  Court

10  had  made .

11         We  were  discuss ing  the  need  and  mechanism  for

12  obtain ing  transcript s  for  possible  future  use ,  and

13  there  may  have  been  one  or  two  other  topic s ,  but  they

14  all  related  to  matter s  that  had  been  matter s  of  record

15  out  of  the  presence  of  the  jury .   After  about  three  or

16  four  minute s  of  that  conversation ,  we  heard  a  voice

17  comi ng  say  hello ?   Hello ?   Comi ng  from  what  I  thought

18  was  at  the  main  door way  into  the  lobby  o f  the

19  courthouse .

20         I  got  up  from  my  seat ,  which  was  at  the  end  of

21  the  large  table  in  the  larger  conference  room  closest

22  to  the  door  and  start ed  to  walk  toward  the  entrance .

23  As  I  pass ed  the  door  to  the  conference  room ,  which  is

24  on  my  right  at  this  point ,  the  computer  room ,  the  --

25  excuse  me ,  the  computer  room ,  a  person  approach ed  me

1    from right rear and started talking to me saying,

2    hello?

3           I wanted to let you know I'm in here.  And I

4    turned and I didn't immediately recognize the person.

5    I knew I had seen the person before, but I didn't

6    immediately recognize her.  She continued to talk to me

7    and tell me that she had been in the computer room the

8    entire time.  She didn't say it, but it was obvious she

9    had heard us talking because she was the person who had

10   been saying hello?  Hello?  I want you to know I'm in

11   here.

12          She continued to explain that she had been in

13   the computer room.  She claimed that a court clerk had

14   taken her into the computer room so she could use the

15   computer.  While she was saying that, I realized that

16   she was, in fact, a juror and she was -- she had been

17   the alternate juror that is now sitting, I think, as

18   Juror No. 8.

19          She had been Alternate No. 1, and she replaced

20   the former Juror No. 8.  If I said anything to her at

21   all in that couple of seconds, it was why are you here,

22   or words to that effect, but that was before I

23   recognized her as a juror.  I believe I said, who are

24   you?  And as soon as I said that, I recognized her as a

25   juror and I stopped talking to her.

1        She continued talking to me saying, I know we're
2  not supposed to talk to you, but the clerk said I could
3  be in here, and the clerk brought me in and used the
4  computer because at that point she left the entire
5  area.
6        MR. MITCHELL:  Mr. Martin and I were walking in
7  chatting about similar issues as she was walking out.
8  I don't know about Tony.  I didn't recognize her
9  either.
10        MR. MCKNETT:  Your Honor, I've talked to fellow
11  counsel, not all of them but most, and I think it's our
12  consensus opinion that this juror must be stricken.
13  She has been -- whether she realizes it now or not, she
14  has been privy to conversations about matters that are
15  not matters that go to the jury.  We don't know -- the
16  Court can address this.  We don't know if she's talked
17  to any of the jurors about this yet, but the fact
18  remains that she has heard us discuss matters that are
19  not juror matters.
20        THE COURT:  Mr. McKnett, yesterday I had the
21  elevator.  Today I have --
22        MR. MCKNETT:  It's the week for bizarre
23  occurrences.
24        MR. HALL:  There's a dark cloud over us, Your
25  Honor.

1          (The following proceedings were held with      Ms.

2 Harden via telephone.)

3          THE COURT:  It's been one of those weeks, but

4 Ms. Harden is on the phone, so what I'd like to do is

5 take a break from this problem and deal with the other

6 problem.  Can you hook her up, Bea, so her and I can

7 talk?

8          THE CLERK:  I'm hoping I have her hooked up.

9 Ms. Harden?

10         DEFENDANT HARDEN:  Yes?  Yes?

11         THE COURT:  Ms. Harden, can you hear me?  This

12 is Judge Titus.

13         DEFENDANT HARDEN:  Yes.  How are you?

14         THE COURT:  Good afternoon.

15         DEFENDANT HARDEN:  Good afternoon.

16         THE COURT:  Ms. Harden, can you tell me what

17 your current status is?

18         DEFENDANT HARDEN:  Right now, I'm in the -- they

19 just called me back to the triage area, so I guess soon

20 I'll be going back to see a doctor.  She said it's not

21 going to be soon.  I've been here since about 11

22 o'clock.  I was sick yesterday.  I have -- my glands

23 are swollen up, my neck is swollen on the right side,

24 I'm having chills.  I'm dizzy, nauseated, I have

25 diarrhea, and all these things were going on yesterday.

1  I haven't eaten in a few days because I can't swallow.

2  So I'm trying to find out what's going on and get

3  something for it.

4          THE COURT:  Well --

5          DEFENDANT HARDEN:  Somebody from there called

6  here, but they had spelled my name wrong, the lady said

7  so --

8          THE COURT:  First, Ms. Harden, I want to explain

9  to you that you really can't decide on your own

10 initiative to simply not show up for court.

11         DEFENDANT HARDEN:  I didn't decide on my own, I

12 called your office this morning.

13         THE COURT:  I understand, but you simply cannot

14 announce to somebody you're not coming.  You need to do

15 significantly more than that.  If you have a medical

16 reason that prevents you from attending the court, you

17 need to have something from a physician that would

18 clearly indicate that this is a very urgent

19 circumstance.  Not just any illness is going to excuse

20 you from being able to attend court.

21         But I -- what I want to discuss with you now is

22 this.  Mr. Sussman tells me he has spoken to you.  As

23 you know, can you hear me?  Ms. Harden?

24         DEFENDANT HARDEN:  Yes, I'm here.

25         THE COURT:  As you know, we have seven defense

1 attorney s, two prosecutor s, and 15 juror s and a host of

2 witness es who had ass embled today for these

3 proceed ings .  We would like to be able to continue , but

4 you have a right under the United States Constitution

5 and under the Federal Rule s of Criminal Procedure to be

6 present at all trial proceed ings in your case .

7        We are contemplati ng having testimony this

8 afternoon from witness es who would be relating to

9 evidence developed at an earlier time against Ms.

10 Martin and --

11        MS. JOHNSTON:   Your Honor , the other witness --

12 I think we'll only go get two witness es in today .   The

13 other witness would be Moises Uriarte , who was the

14 heroin suppli er from New York who does not personally

15 know Ms. Harden .   And if she --

16        DEFENDANT HARDEN:   Sir , that's fine .  I had

17 asked Mr. Sussman -- I thought he was going to waive my

18 right -- waive my appearance anyway --

19        THE COURT:   Ms. Harden , you need to understand

20 --

21        DEFENDANT HARDEN:   -- the right way , and it

22 turn s out it's screw ed up anyway .

23        THE COURT:   Ms. Harden , I want to make certain

24 that you make the decision yourself .

25        DEFENDANT HARDEN:   Yes , I did .  I'm really --

1  I'm ill.  I've been sitting at this hospital all day

2  waiting to be seen.  I was going to go to my doctor,

3  but Mr. Sussman said this morning I had to go to the

4  hospital instead, and I could have been seen and

5  treated and out of here now instead of sitting here all

6  day, and then they tell me it's going to be a while

7  before I'm seen.  But yeah, it was my decision to waive

8  my right.  I have to get medical treatment.  I

9  definitely have to get medical treatment.

10        THE COURT:  Well, what I'm asking you is this,

11 Ms. Harden:  I don't want to put you in an unfair

12 situation or violate any of your Constitutional or

13 legal rights.  You have a right to be present at all

14 trial proceedings involving this case unless you

15 affirmatively decide to waive that knowingly and

16 voluntarily.

17        Do you understand you have that right?

18        DEFENDANT HARDEN:  Yes.

19        THE COURT:  Do you desire to give that right up

20 for the proceedings I've described to you today, which

21 would involve some evidence seized in 1986 from Ms.

22 Martin and from --

23        DEFENDANT HARDEN:  Yes, I do.

24        THE COURT:  -- and from Moises Uriarte, the

25 purported seller of heroin from New York City?

1              DEFENDANT HARDEN:  Right.  I don't know  him

2 anyway.

3              THE COURT:  All right.  Now just a minute.  Your

4 counsel wishes to say something.

5              MR. SUSSMAN:  Just to add --

6              THE COURT:  Mr. Sussman, you're going to have to

7 speak into a mike.  She won't hear you.

8              MR. SUSSMAN:  I believe Mr. Uriarte does not

9 know and has not mentioned Ms. Harden in any of his

10 previous testimony.

11              THE COURT:  That's correct.  There is no -- Mr.

12 Uriarte will not give any testimony that mentions the

13 name of your client as far as I understand.

14              MS. JOHNSTON:  That's correct, Your Honor.  Now,

15 I don't know -- I'm hoping with the other matter we

16 have to take up, that that will take us at least later

17 in the day, but we have those two witnesses available

18 to testify today unrelated, unconnected to Ms. Harden.

19              THE COURT:  All right.  Now, Ms. Harden, there's

20 one other matter that is likely to come up today, and

21 that is that a member of the jury panel inadvertently

22 overheard some conversations between several defense

23 attorneys about this case.  I'm going to have to deal

24 with that issue and that -- the resolution of that

25 issue may result in me excusing that regular and

1 replacing that juror with an alternate juror.

2        Your counsel is present and is able to address

3 that issue.  I believe the defense attorneys are all of

4 the view that the juror should be excused because the

5 juror overheard some conversations between the defense

6 attorneys.  I have not yet heard from the government.

7 That issue is before me for decision and I really can't

8 begin to hear any further testimony until I've dealt

9 with that issue.

10        Do you understand you have a right to be present

11 for that aspect?

12        DEFENDANT HARDEN:  Yes, I do.

13        THE COURT:  And do you wish to waive your

14 presence for that?

15        DEFENDANT HARDEN:  I'll waive my presence, yes.

16        THE COURT:  All right.  Now, Ms. Harden --

17        DEFENDANT HARDEN:  Yes.

18        THE COURT:  Go ahead.

19        DEFENDANT HARDEN:  Hello?

20        THE COURT:  Ms. Harden, you need to understand

21 that I'm expecting you to be here at 9 o'clock

22 tomorrow morning.  It's not acceptable to simply call

23 and say you can't come.  Do you understand that?

24        DEFENDANT HARDEN:  Right.  Well, let me ask you

25 this:  When you're sick or something goes wrong, then

1 what do you do?  Actually, like I said, I'm trying to

2 do the right thing and all this doing is creating

3 bigger problems.  What do you do?  Life is life and

4 things happen.  I didn't ask for this.  It happened.

5          THE COURT:  All right.  I understand that.

6          DEFENDANT HARDEN:  I called your chambers, I

7 called Mr. Sussman, and I called my former pretrial

8 agent trying to notify everybody of what was going on.

9 I was sick there yesterday.  You know, it's not

10 pretend.  It's not make-believe.  It's actually

11 happening, and I really had no intention of sitting in

12 this emergency room.

13          MR. SUSSMAN:  I'm sorry, Ms. Harden?

14          DEFENDANT HARDEN:  What do you do?

15          MR. SUSSMAN:  Ms. Harden, if you just wait up

16 for a second, I think the judge will explain to you

17 what he wants.

18          THE COURT:  Ms. Harden, what you need to do is,

19 number one, anticipate you're going to see medical

20 personnel today who can tell you what's wrong and what

21 you need to do about it.

22          DEFENDANT HARDEN:  Well, I'm here now to get

23 that done.  I've been here since 11 o'clock.

24          THE COURT:  I understand that.  You need to be

25 certain that they provide you written documentation of

1 what it is that is wrong with you, and you need to get

2 written documentation from them as to whether or not

3 you can be permitted to come to trial tomorrow. You

4 should make certain that information is given to your

5 attorney, Mr. Sussman.

6        Mr. Sussman knows how to get a hold of me and my

7 law clerk, and we can deal with that issue, but you

8 need to -- that can't simply come tomorrow morning. I

9 mean, you have to get this information in the hands of

10 your lawyer today so that I can deal with it

11 appropriately with this large group of people here, all

12 right?

13        DEFENDANT HARDEN: Well, that's fine. As soon

14 as I get out of here, I will get that done.

15        THE COURT: All right. Mr. Sussman?

16        MR. SUSSMAN: Your Honor, I would suggest that

17 Ms. Harden make herself available by phone this

18 afternoon. I will talk to her after I get out of

19 court.

20        DEFENDANT HARDEN: The only problem is in the

21 hospital, just like in the court, you cannot have the

22 phone on because it interferes with the equipment that

23 they have here.

24        MR. SUSSMAN: We can work it out and arrange to

25 meet after you leave -- arrange to talk after you leave

1  the  emergency  facility .

2         DEFENDANT  HARDEN:   Okay .   Fine .

3         THE  COURT:   Ms.  Harden , your  counsel  will  be

4  provided  with  number s  from  me  and  my  law  clerk  and  will

5  discuss  with  him  how  best  to  deal  with  this  issue , but

6  you  should  be  certain  to  get  written  documentation  of

7  what  is  wrong  and  written  documentation  as  to  whether

8  there 's  any  urgent  medical  condition  that  precludes  you

9  from  being  present  here  tomorrow , and  that  information

10  needs  to  be  in  the  hands  of  your  lawyer  today  so  that  I

11  can  act  on  it  today .

12         DEFENDANT  HARDEN:   Okay , great .

13         THE  COURT:   All  right ?  Well , Ms.  Harden,  I  will

14  accept  your  partial  waiver  of  your  right  to  be  present

15  for  the  limited  purpose s  of  hear ing  from  the  two

16  witness es  that  Ms.  Johnston  has  announced  will  be

17  coming  before  me , as  well  as  deal ing  with  the  question

18  with  regard  to  this  juror .  I'll  accept  your  waiver  for

19  those  purpose s  only .  Whether  it  extends  beyond  this  or

20  not  will  be  something  we  will  have  to  have  a  further

21  discussion  about .

22         DEFENDANT  HARDEN:   Okay.  All  right .  Thank  you .

23         THE  COURT:   Thank  you .

24         DEFENDANT  HARDEN:   Okay , bye .

25         MR.  SUSSMAN :  See  how  easy  it  was ?

1          (Ms. Harden has disconnected and no longer

2 present for the following proceedings.)

3          THE COURT:   Now, Ms. Johnston, what is your

4 position with respect to the juror that overheard this

5 conversation?

6          MS. JOHNSTON:   Your Honor, one, I think the

7 Court needs to bring the juror in.

8          THE COURT:   That's what I intend to do.

9          MS. JOHNSTON:   And ask the juror what the

10 circumstances were that led for her to be in the

11 lawyer's lounge.   Two, what was it that she overheard,

12 will what she overheard affect her ability to be fair

13 and impartial, and has she disclosed it to any other

14 jurors, and then the government can take a position on

15 defense counsel's request.

16          THE COURT:   You read my mind.

17          MR. WARD:   Your Honor, I would simply add that

18 there's a large sign on the door itself.

19          THE COURT:   Attorney's lounge.

20          MR. WARD:   Saying this is for use of attorneys

21 only.

22          THE COURT:   Yeah.

23          MR. MONTEMARANO:   For attorneys involved in

24 matters before this Court.

25          MR. MCKNETT:   Your Honor, I don't know if the

1 Court would want to inquire into this at this point,

2 but she did claim that a court clerk took her into the

3 attorney lounge and directed her to the computer and

4 told her she could use it.

5        THE COURT:  Well, first of all, I don't know

6 whether somebody might have thought she was an

7 attorney, so.

8        MR. MARTIN:  Then only had three semesters of

9 law school.

10       THE COURT:  It's obvious to me there's three

11 subjects that I need to discover with this juror, so

12 let's bring in the juror.  What is it, No. 12 now?

13       MR. HALL:  I thought we decided it was No. 8.

14       MR. MCKNETT:  It was former Alternate No. 1, who

15 has taken the place of Juror No. 8.

16       THE CLERK:  I think it's Juror No. 140.

17       MR. MCKNETT:  Yes, Juror No. 140.

18       THE COURT:  Juror No. 140, she is now Juror No.

19 12.  All right.  I have will have her take the stand.

20       MS. JOHNSTON:  Your Honor, could the juror take

21 the jury box?  I think it's a little bit less onerous.

22       MR. WARD:  Then we can't hear her on this end.

23       (Juror enters the room and takes a seat in the

24 jury box.)

25       THE COURT:  Give her a handheld mike.

1        BY THE COURT:

2 Q.      Good afternoon, ma'am.  I have been advised by

3 some of the attorneys in the case that apparently you

4 were in the attorney's conference room and may have

5 heard some conversations between the attorneys about

6 this case.  I wanted to ask you several questions, how

7 it come to pass that you were in the attorney's

8 conference room?

9 A.      The clerk let me in, the clerk downstairs.  I

10 forget what her name is.  The jury clerk.

11 Q.      All right.

12 A.      I had asked Bea if there was a computer in the

13 building and she said she didn't know, go ask the jury

14 clerk, so I did and she said I could go use that room.

15 And no one was in there.

16 Q.      All right.  Well, without regard to how you were

17 there, tell me what did you hear in the conversations

18 that you overheard.

19 A.      I just heard a couple of the men come in, and I

20 immediately sang out hello and got up and walked out

21 and said, you know I just want you to know I'm here,

22 and I'm leaving now that you're here.  I wasn't sitting

23 there -- as soon as I heard them come in.  I sung out

24 and let them know I was there.

25 Q.      Well, how long were they there and you there at

1 the same time?

2 A.      Less than a minute.

3 Q.      What conversations, if any, did you hear between

4 the attorneys?

5 A.      I actually didn't hear anything particular.

6 They were just talking, but I didn't hear exactly what

7 they were saying.

8 Q.      Did you hear any words at all?

9 A.      Yeah.  I heard somebody say something about the

10 judge and somebody say, well, I'm not going to tell you

11 that, and that was all I heard.

12 Q.      Anything else you recall hearing?

13 A.      No.

14 Q.      After you left the attorney conference room and

15 returned to the room with your fellow jurors, did you

16 discuss with your fellow jurors what had happened?

17 A.      I just said that I was -- everybody asked what

18 people did over that long break.  I said I was able to

19 get use of a computer here.

20 Q.      Did you discuss with your fellow jurors that you

21 had been present where some defense attorneys were?

22 A.      I said that some of the attorneys came in and I

23 immediately had to leave -- let them know I was there

24 because of your instructions about not talking to them.

25 Q.      All right.  So you did not --

1 A.      It  just  happened .

2 Q.      You  did  not  tell  any  of  your  fellow  juror s

3 anything  you'd  heard ?

4 A.      No , because  I don't  think   I heard  anything

5 substantive .

6 Q.      Do  you  recall  whether  you  heard  entire  sentence s

7 or  not ?  Did  you  hear  the  essence  of  the  conversation ?

8 A.      No .  What  I  just  explained  to  you  was  all  that   I

9 remember  hear ing , and  some  laughter , and  that  was  that .

10 Q.      Do  you  recall  hear ing  whether  the  conversation

11 was  happy  or  unhappy ?

12 A.      It  was  sort  of  razz ing , seem ed  like .

13 Q.      It  was  what ?

14 A.      Like  a  jocular  sort  of  exchange .

15 Q.      All  right .

16      THE  COURT:   Counsel , do  you  have  any  other

17 question s  that  you  would  like  me  to --

18      MR.  MONTEMARANO :  No , Your  Honor .

19      THE  COURT:   -- submit  to  this  juror ?  All  right .

20 You  may  return  to  the  jury  room .   Thank  you  very  much .

21      THE  CLERK:   She  should  not  discuss  --

22      THE  COURT:   Do  not  discuss  our  discussion  or

23 anything  about  this  with  anybody  in  that  jury  room .

24      JUROR:   Okay .

25      MR.  MARTIN:   Oh .

1          THE CLERK:   Did you want her to come back?

2          MR. MARTIN:   There is one question, Your Honor,

3  and I don't know how you want me to do this, if you

4  want me the approach you first.

5          THE COURT:   Come up here and tell me what you

6  want to ask.

7                  (At the bar of the Court.)

8          MR. MARTIN:   I think she said that there was

9  another juror, if she would just give us the juror's

10 name, if she knows.

11         THE COURT:   Another juror?

12         MR. MARTIN:   Didn't she say she spoke to another

13 juror?

14         THE COURT:   She said she spoke to the other

15 jurors.

16         MR. MARTIN:   No, no, no.  I thought she said she

17 did talk to another juror when they asked, what did you

18 do during the long lunch break.

19         THE COURT:   She said she went to use the

20 computer.

21         MS. JOHNSTON:   She didn't say a particular

22 juror.  She said when they all got back together, they

23 were talking about what they did at lunch, and she said

24 she got to use a computer.

25         MR. MARTIN:   If she could tell us who that juror

1 was.

2      THE COURT:   I don't think  there's a specific

3 juror who asked  that  question .

4      MS. JOHNSTON:   I don't think  there's any basis

5 based  on her testimony  to question  any other  juror s.

6 She's made  it clear  in term s of what  she told  them --

7      THE COURT:   She said it was a  general  discussion

8 about  what  they  did  at  lunch , which  is  appropriate , and

9 her answer  was she had  gone  and used  the  computer .

10      MR. MONTEMARANO :  While  we're  here , I'd  like  to

11 supplement  Mr. McKnett 's comment s because  this  may

12 evoke  further  questions  on the  part  of  the  Court .  She

13 suggest s she was  there  for  less  than  a minute .  After

14 she left  and we --  the three  of us, Mr. Hall , Mr.

15 McKnett  and I, were  a little  dumbfound ed there  had  been

16 a civilian,  let alone  a juror  from  our  case , in the

17 room .  We look ed at each  and said  how  long  was  it  that

18 she had  to be listening  to us, because  she clear ly came

19 in before  we did , and  Mark  and I look ed at each  other

20 and said --  almost  said  in unison , half  a sandwich .  We

21 had both  eat en half  a sandwich .  I am not  that  fast  an

22 eat er, and Mark  and I had  time  to finish  half  of our

23 sandwich es.  It had  to be at  least  three  min utes  just

24 to eat  just --  no way  it's possible --  if not  long er.

25      THE COURT:   Counsel , you're  not  going  to be

1 heard on the transcript.

2          MR. MARTIN:  Tim, go ahead.  I'll segue.

3          MR. HALL:  It was only because just picking up

4 on that same point that Mr. Montemarano was just

5 making.  The impression I got from what she said was

6 that she called out as soon as we walked in.  Clearly

7 it was not as soon as we talked in.  I want to make

8 clear that in reference to what Mr. Montemarano was

9 just saying, it was definitely three or four minutes.

10          THE COURT:  She was another room away from you.

11 I mean, I'm familiar with this --

12          MR. MONTEMARANO:  We're sitting at that end of

13 the table, Your Honor.

14          THE COURT:  Excuse me?

15          MR. MONTEMARANO:  We're sitting at the end of

16 the big table next to the open door.

17          THE COURT:  The biggest room?

18          MR. MONTEMARANO:  We're not -- you know, we're

19 not speaking sotto voce or anything of that sort.

20          MR. MCKNETT:  We're inside a room, inside a

21 room.

22          THE COURT:  Big Latin words.

23          MR. MONTEMARANO:  Italian.

24          MR. MCKNETT:  Your Honor, I can confirm the time

25 frame.  I had bought a bowl of soup.  I had been able

1  to come in the room, sit down, open up the bowl of

2  soup, put crackers in it, and eat maybe a third of the

3  bowl of soup before she -- I heard her voice saying

4  hello, hello, and it was about the same time Mark is

5  eating his sandwich, Michael is eating his sandwich,

6  and we're having a conversation while we were eating.

7  It had to be at least three or four minutes.

8         MR. MARTIN:  I didn't walk in right behind Mr.

9  Montemarano, Mr. McKnett or Mr. Hall.  We walked in --

10 it had to be a good three to five minutes after they

11 left here because I was trying to find a stipulation

12 for Ms. Greenberg.  So there was at least a gap of

13 three minutes, if not five, between your arriving down

14 there and my coming with Mr. Mitchell.

15        MR. MONTEMARANO:  Your Honor, I suggest you

16 might want to inquire of Ms. Smith, the jury

17 commissioner, to find out if she took her in there,

18 because I find the notion that this Court's personnel

19 would --

20        THE COURT:  Listen.  I certainly am going to

21 inquire about it.  I don't think I need to make that

22 inquiry before I decide what do with this jury.

23        MR. MCKNETT:  It may affect the credibility

24 ruling.

25        MR. MONTEMARANO:  I find it difficult to believe

1  -- I'm not criticizing Ms. Smith one way or the other.

2  If she didn't know any better, that's fine.  I find it

3  difficult to believe that she had done it.

4          MR. MARTIN:  That's exactly why, Your Honor, I

5  wanted to know which juror she had spoken to because it

6  went to the credibility question.  It seems the Court

7  gave short shrift of that and didn't give much credence

8  to that and I dropped it.

9          THE COURT:  I believe her statement was that the

10 jurors simply said, what did you do at lunch, and it

11 was a general discussion of what they had done at

12 lunch, and she said he had used the computer.

13         MS. JOHNSTON:  She continued and said she had

14 used the computer and then had to leave because of the

15 attorneys entering.  She wasn't supposed to have

16 contact with them.

17         THE COURT:  Lisa Rosenthal is in the back.

18         Ms. Rosenthal, could you come up here?

19         MR. WARD:  While we're waiting for Ms.

20 Rosenthal, Your Honor, let me just say I don't want my

21 silence on this issue to be misconstrued.  I was not

22 present.

23         THE COURT:  You indeed join in everything.

24         MR. WARD:  No, I was not present.

25         THE COURT:  Lisa, you heard about this juror.

1 Do you know anything about this?

2         MS. ROSENTHAL:    Other than Bea giving me a

3 heads-up that something had happened?  That's why I

4 came up.

5         THE COURT:    You don't have any knowledge about

6 what may have happened?  She certainly would indicate

7 that someone in the jury office had directed her to the

8 jury lounge.  That shouldn't happen.

9         MS. ROSENTHAL:    Correct.  But it did happen.

10        THE COURT:    It may not have happened.  I don't

11 know.  Did it happen?

12        MS. ROSENTHAL:    It happened.

13        THE COURT:    It did happen.

14        MS. ROSENTHAL:    It happened I was told that the

15 instructions that were given, that room that has

16 Internet access, and if nobody is in there, you can use

17 it.  If there's anybody in there, you have to leave.

18        THE COURT:    Okay.  Perhaps that's why she said

19 hello.  The issue here is whether she was there for a

20 long time or a short time.  All right.  Well, we

21 shouldn't do that again.  All right.  Okay.  Counsel,

22 I'm going to --

23        MS. GREENBERG:    Judge, before we depart, if you

24 do excuse her, could just let her know that it's not --

25 she seems to be concerned that she's following all the

1 Court's Order s the Court gave her , and following

2 instruction s --

3         THE COURT:   Oh , yes .

4         MR. MCKNETT :  Your Honor , if I could just be

5 heard brief ly.  My concern is that she 's now

6 amplify ing, like I said , she said she does n't know if

7 she heard anything substantive .  She does n't think she

8 heard anything sub stantive, and we don't know what she

9 heard .  All I know is that we were discuss ing rulings

10 made by the Court out of the presence of the jury ,

11 issue s that were not -- may or may not come before the

12 jury , and then we had -- we talk ed about a process of

13 acquiring transcript s possibly for further use .

14         That in itself would have taken more than a few

15 seconds she de scribe d, but by her own admission , she

16 does n't know if she heard anything substantive , and she

17 may have and she may not real ize that until --

18 literal ly until jury deliberation s, and she may real ize

19 that what she heard is substantive stuff that she

20 should not be considering , and there 's no way to

21 pre vent that even with a curative instruction .  I hate

22 to ask the Court --

23         THE COURT:   So far she says she didn't hear

24 anything .

25         MR. MCKNETT :  She said she does n't know if she

1  heard  anything  substantive,  and  there's  no  way  for  us

2  to  know  if  she  did  or  not,  and  we  may  not  find  that

3  out.   She  may  not  realize  it  until  something  is  said  in

4  closing  argument.   I  hate  to  ask  the  Court  to  strike  a

5  juror,  but  we  have  a  couple  more,  and  I  think  to

6  protect  the  right  of  the  defendants  from  jury

7  consideration  of  improper  matters,  this  juror  has  to  be

8  stricken.

9       MS.  JOHNSTON:   I  think,  quite  frankly,  the  Court

10 can  ask  her  if  she  happens  to  recall  anything  that  she

11 heard.   That's  all  that  is  required,  unless  counsel  is

12 going  to  proffer  they  were  discussing  something  in

13 there  that  was  essential  to  their  case.

14      THE  COURT:   At  least  she  didn't  hear  them  say,

15 Judge  Titus  was  a  fool  or  something  like  that.

16      MR.  MONTEMARANO:   With  all  due  respect,  Your

17 Honor,  let's  assume  for  the  sake  of  discussion  that  we

18 said  that.

19      THE  COURT:   That's  a  pretty  good  assumption,

20 isn't  it?

21      MR.  MONTEMARANO:   Actually,  it  isn't.   Your

22 Honor,  let's  assume  we  did.   You  would  not  hold  that

23 against  us.   You're  chuckling  about  it,  and  the  reason

24 is  --

25      THE  COURT:   I'm  supposed  to  have  a  thick  skin.

1          MR. MONTEMARANO : With all due respect , Your

2 Honor , it's your job, our job to disagree with you .

3          THE COURT:   Absolute ly.

4          MR. MONTEMARANO : You would not , therefore , hold

5 it against us.

6          THE COURT:   No.

7          MR. MONTEMARANO : That 's not a dynamic or

8 calculus she can understand .

9          THE COURT:   I'm going to have further limited

10 inquiry with her.

11                    (Back in open court.)

12          BY THE COURT:

13 Q.       You must feel like you're in the hot seat , and I

14 didn't want to leave you there too long . First of all,

15 if someone direct ed you to go there , I don't want you

16 to think that you've done something wrong . So not to

17 worry that you've been taken to    the wood shed , but my

18 obligation as the person presidi ng over the trial is to

19 make sure that juror s base their decision s sole ly upon

20 the evidence in the case .

21          As you know from your experience in this case to

22 date , we do a lot of thing s outside the presence of the

23 jury, that 's because we have to figure out what 's the

24 right thing for the jury to consider and what's not the

25 right thing for the jury to consider . I have to rule

1  on question s of law and thing s like that , and it's
2  important  that we keep this barrier between those who
3  are the fact -finder s from the person who 's making the
4  law decision s that may relate to factual issue s that
5  should n't come before you for one reason or not
6  another .
7          What I'm try ing to ascertain  is, -- without
8  regard to how you got in that room -- and it's not your
9  fault that you were direct ed there , so please don't
10 feel bad about that .  I'm try ing to ascertain  whether ,
11 through content  or tone or anything  in the essence of
12 what you heard , even though you didn't hear complete
13 sentence s, you heard anything  that would potential ly
14 affect  your ability  to be a fair and impartial  juror
15 who 's focused  sole ly upon the evidence  that you've
16 heard and see n in this courtroom .  So that 's the reason
17 I'm asking  you some question s.
18         When you were direct ed in there , were you given
19 any instruction s on what to do if anybody  came in?
20 A.       No .
21 Q.       You weren 't ?
22 A.       No .  They just said if there 's -- if there 's a
23 computer  that 's not in use , I could use it.
24 Q.       So nobody  told you to leave  if somebody  came in?
25 A.       I don't recall  get ting any particular

1  instruction s to do anything .  As soon as I heard

2  voice s, I thought I better make myself known .

3  Q.     I've been discussing with some of the attorney s

4  who were there that I understand have some concern that

5  you may have been there long er than you may have

6  thought and may have heard more than you may think as

7  you sit there now .  Do you recall the tenor of the

8  conversation s at all ?

9  A.     Not more than what I de scribe d.  I mean , I was

10  busy reading something , you know , from my work , so all

11  of a sudden I real ized somebody had just come in , and

12  that 's all I had heard was , like , somebody joki ng with

13  somebody as I just de scribe d about .

14  Q.     When they were joki ng --

15  A.     I didn't even know if they were talk ing about ,

16  you know , this case or something totally unrelated .

17  They were just joki ng about the judge said something ,

18  and somebody said what ?  And they said , I'm not going

19  to tell you , and that was all I remember hear ing , and

20  then I got up and walk ed out of that cubicle in the

21  back and , you know , show ed myself and left .  Pick ed up

22  my thing s and left .

23  Q.     Okay .

24  A.     That 's really all I can say because I wasn 't

25  really pay ing attention .  As soon as I became aware

1 they were in there and they could be some of the

2 lawyers in this case, I thought I'd better hustle out

3 and let them know I'm here, so I called out to them.

4 Q.     So when they did come in, were you aware the

5 moment they came in that they had come in?

6 A.     Well, I mean I heard voices, but I didn't know

7 who else used that room, since I had never been in

8 there.

9 Q.     Were you busy working on the computer when you

10 heard the voices?

11 A.     Oh, yeah, I was back in this little cubicle,

12 kind of in the back.

13 Q.     Were you concentrating on what you were seeing

14 on the computer?

15 A.     Yeah.   I was reading a congressional research

16 service report.

17 Q.     Oh, that's wonderful stuff to read.

18        And so could it be that they were there a little

19 bit longer than you thought?

20 A.     They could have been there another minute or so,

21 yeah.   I mean, I --

22 Q.     But without regard to the precise length of time

23 that they were there and you were there, the most that

24 you can tell me that you overheard is there was some

25 laughter and --

1  A.       And that little exchange.

2  Q.       -- something about the judge's ruling?

3  A.       Or saying something.

4  Q.       You don't remember the substance of it at all?

5  A.       I don't think there was any substance referred

6  to, or if it was it was in some, you know, lawyer

7  jargon that I didn't perceive.

8  Q.       Okay.

9  A.       I mean, that's all I can say.

10         THE COURT:  All right.  Counsel, anything

11  further you wish to have me inquire about?

12         All right.  You may return to the jury room.  As

13  I said, this conversation is between you and me and not

14  to be shared with your fellow jurors.  All right?

15         JUROR:  Okay.

16         THE COURT:  Thank you.

17              (Juror excused at 2:38 p.m.)

18         MR. MCKNETT:  Your Honor, if I may speak for Mr.

19  Hall and Mr. Montemarano.  The conversation, as

20  described by the juror, didn't happen.  No one said

21  those things.

22         MR. MITCHELL:  What I can tell Your Honor is Mr.

23  Martin and I were walking in as she was walking out,

24  and I recall us talking kind of in that -- in --

25  talking about the 404(b) and issues related to that, so

1   it is possible that maybe she heard us talking as she

2   was walking out, maybe that's what she remembers.  I

3   don't know.

4          THE COURT:  I don't find anything fundamentally

5   inconsistent that what you-all communicated to me, as

6   you should, as officers of the court and what she said.

7   She may have been there as long as three minutes, but

8   this woman sounds like she was ensconced with the

9   congressional record on the computer reading it, at no

10  time hear anything substantive, didn't share what

11  little she heard with her fellow jurors, so I'm not

12  sure there's a basis for excusing her.

13         MR. MITCHELL:  Just for the record, I think it

14  was Mr. Martin talking about the judge, not me.

15         MR. MARTIN:  Anyway, I don't want to go there.

16         MR. MCKNETT:  May the record be clear it was not

17  me who laughed, Your Honor.

18         MR. WARD:  And I wasn't there.

19         THE COURT:  Well, we now have new directions in

20  the jury office about where to send jurors.

21         MR. MCKNETT:  Your Honor, may I just follow up?

22         THE COURT:  Yes.

23         MR. MCKNETT:  My concern, as I expressed it at

24  the bench, is not with what she realizes she heard

25  today.  She said -- I wrote it down as quickly as I

1  could .   I don't think   I heard   anything   substantive   and

2  what she said from   the box   tended to   support   that , but

3  she doesn't   know   exactly what   it is   she heard   and we

4  don't   know .

5          THE COURT:   Well , what   she heard   made   no sense

6  to her .

7          MR. MCKNETT :   Today .   But two , three , four weeks

8  from   now when   we're   making   closing   arguments   or the

9  next day   when   she's   in the   jury room   deliberating the

10  verdicts , she   may realize   that   what   she heard   was

11  substantive   and   now   we have   in the   jury room   evidence

12  -- facts   that   are   not   part   of the   record .

13          THE COURT:   All right .   Mr. McKnett , I think   it

14  would   be speculation   for   you to   go there .   I can

15  certainly inquire   of   this   juror   again at a later   time

16  to see   if she   now   realizes   she heard   something , but

17  I've inquired   of her as much as   I think   I can   do

18  without   intimidating   a juror   about   what   took place , and

19  I have   not heard   from   her mouth   anything   that   would

20  indicate   to me   that   she has   heard   anything   that has

21  affected   her   ability   to be a fair   and   impartial   juror ,

22  and I explained   it to her , so she   understood   why I was

23  asking   the question s .

24          MR. MONTEMARANO :   Your Honor , on behalf   of Ms.

25  Martin , that   would   be perfectly   acceptable .   While I

1  would wish to suggest, being mindful of the record,

2  that I agree with the Court, I think that at this

3  point, further questioning might well be --

4        THE COURT:   Intimidating?

5        MR. MONTEMARANO:   If not intimidating, how about

6  just reinforcing this in her memory that she starts

7  searching it, what was it that they said.  While I'm

8  not agreeing with Your Honor's decision, which appears

9  to be made, not excuse the juror, I would be perfectly

10 happy at this point if you were to simply permit us to

11 bring it to your attention again if we think it's

12 appropriate if something else comes up relative.

13        THE COURT:   If something else comes up, you let

14 me know.  Ms. Johnston, do you have anything else?

15        MS. JOHNSTON:   Your Honor, only that I thought I

16 had requested up at the bench that the Court ask her if

17 she could set aside that incident and if any of that

18 comes back to her mind, set aside any thoughts and

19 render a fair and impartial verdict based upon the

20 evidence in the case.  I think that makes the record

21 clear, and I don't know that the Court asked her that

22 question.  I probably should have reminded the court.

23        THE COURT:   I can certainly ask her that.

24        MS. JOHNSTON:   I don't think there's any basis

25 at this point in time for the Court to excuse this

1  juror for cause.

2        THE COURT:  All right .  I'll bring her in and

3  ask her that one last question , and I'll ask her if you

4  -- if after further reflection you think this there's

5  some concern , you think about what you heard , you let

6  me know .  All right .  Bring her back in.

7        (Juror No. 140 returns to the jury box .)

8        BY THE COURT:

9  Q.    I just have one or two more quick questions for

10 you .  I thank you for your patience .  You've indicated

11 that you really didn't hear anything of any substance

12 that you can recall , and what I wanted to ask you is,

13 do you think you can put out of your mind and disregard

14 what took place today and render a verdict based solely

15 upon the evidence in this case and disregard anything

16 you may have heard ?

17 A.    Sure , because I didn't think I heard anything

18 substantive .

19 Q.    Let me ask you one other thing , if you just make

20 a little pledge to me .  If you wake up in the middle of

21 the night sometime between now and the end of this

22 trial , and you suddenly say, you know, now I remember

23 more of what I heard , or now I think I know what was

24 important about what I heard and you do have a concern

25 about it , I want you to tell me about it.

1          So if suddenly, you know, some dots get

2 connected and you suddenly realize that you did hear

3 something, I want you to be able to tell me that, and I

4 want you to be able to tell me whether you think it

5 would give you a concern in your own mind as to your

6 ability to be fair  to both sides in this case and

7 render a fair and impartial verdict.  Okay?  So we're

8 going to finally get you-all back in here shortly.

9          Thank you very much.

10                (Juror excused at 2:45 p.m.)

11     THE COURT:  All right.  Counsel, what I propose

12 to do is to -- I think I can stop 404(b) rulings for

13 now.  I think that the testimony today of the first

14 witness I've already ruled upon.  The second one, I

15 don't make a ruling like that on.

16     MS. GREENBERG:  Your Honor, I'm going to make it

17 easy for you because Mr. Mitchell and I made an

18 agreement.  We agreed to the pending motion, just so

19 the record is clear, that the 1990 charge against Mr.

20 Bynum, the 1991 charge, the 1992 charge, and the 1994

21 charge referenced in the government's motion would not

22 be introduced in the governments 's case in chief.

23          If Mr. Bynum takes the stand, we would, of

24 course, be free to use that as the Court allows in

25 cross-examination.  We've agreed that the 1996 charge

1  could be admissible  as  404(b) , and  of  course  the  July

2  20 , 2000 , is  within  the  time  period  of  the  conspiracy ,

3  so the  only  issue  left , then , is  Mr.  Whiting  -- the

4  Court 's rulings  on  Ms.  Dobie 's argument .

5       THE  COURT:   I'm  going  to  reserve  ruling  on  Ms.

6  Dobie 's argument  because  I don't  want  this  jury  cooling

7  their  heels  any  longer .

8       MS.  GREENBERG:   Is  that  correct , Mr.  Mitchell ?

9       MR.  MITCHELL:   Yeah , I wanted  to  say , Your

10  Honor , that  is  our  agreement .

11       THE  COURT:   Mr.  Sussman ?

12       MR.  SUSSMAN :  Obviously, the  Court  is  going  to

13  tell  the  jury  something  about  Ms.  Harden ?

14       THE  COURT:   Yeah .   What  I propose  to  do  -- tell

15  me  if  this  is  something  you're  comfortable  with  is  to

16  indicate  to  them  that  Ms.  Harden  became  ill  and  she  is

17  seeking  medical  attention  as  we  speak .   We're  quite

18  hopeful  that  she  will  be  back  here  tomorrow  morning .

19  We  have  dealt  with  other  legal  matters  today  in  her

20  absence , and  she  has  waived  her  right  to  be  present  for

21  the  proceedings  today .

22       MR.  SUSSMAN :  I would  prefer  --

23       THE  COURT:   Unless  you  want  me  to  not  mention

24  the  waiver .

25       MR.  SUSSMAN :  I would  prefer  you  keep  the  waiver

1  out, and I prefer, if you would, that you tell them

2  that in a large trial like this, that we often go

3  forward and we just go into evidence that doesn't

4  directly concern that particular defendant.  The waiver

5  makes it look like you're a little indifferent to the

6  proceedings.

7        THE COURT:  I can do it either way.

8        MR. SUSSMAN:  My preference would be the latter.

9        THE COURT:  If she's not here tomorrow, we'll

10  have another problem.

11        MR. SUSSMAN:  Today's problems are today's.

12        THE COURT:  All right.  Mr. Montemarano?

13        MR. MONTEMARANO:  One other thing.  When we

14  broke yesterday, the Court may recall that I was

15  cross-examining Sergeant Sakala, and that won't

16  continue until it looks like tomorrow.  Or maybe even

17  Tuesday, who knows?  I would request that the Court

18  inform the jury that we are going to be breaking with

19  detective -- Sergeant Sakala to bring other witnesses

20  in because of scheduling issues or something like that.

21        THE COURT:  Okay.

22        MR. MONTEMARANO:  I wouldn't want them to think

23  that I was done or indifferent to continuing my cross.

24        THE COURT:  That's fine.

25        MR. MONTEMARANO:  Thank you.

1        THE COURT:  All right.   I will not indicate any

2   waiver on Ms. Harden's part , but I will indicate what

3   we've been doing.

4        MS. JOHNSTON:   One other thing , Your Honor , so

5   it's clear on the record .  I know Mr. Sussman and I

6   discussed Detective Roberts, who we're going to be

7   calling to testify , was actually charged in the

8   District of  Columbia , but was acquitted  of some  charges

9   back in about 1990.  I don't think  that it's something

10  that's subject  to cross-examination , but I just wanted

11  to put that on the record .

12       THE COURT:  All right .  Okay .  Ready for the

13  jury now?

14       MS. JOHNSTON:   Yes, sir .

15       THE COURT :  All right .  Bring them in.

16            (Jury returns at 2:50 p.m. )

17       THE COURT:  Good afternoon , ladies and

18  gentlemen .  We've had a bumpy start today.  My

19  apologies to you .  I wanted to tell you that the reason

20  for the delay is that one of the defendants , Ms.

21  Harden, became ill and she's currently receiving  some

22  medical care .  We are hopeful that she will be

23  returning with us tomorrow , but I have taken up the

24  time while we were dealing with that question with some

25  other legal matters, so we have been working on other

1 matter s until we resolve d the question of her absence ,

2 but she won't be here today . She 's been excused by me ,

3 but I'm hope ful and anticipate that she will return

4 tomorrow .

5        The second thing I want ed to tell you was that

6 we're going to interrupt the examination of Sergeant

7 Sakala , who was on the stand yesterday when we broke ,

8 to take two witness es who will have scheduling issue s ,

9 so we will be resuming the examination -- or concluding

10 the examination of Sergeant Sakala tomorrow or whenever

11 we get to it , next week , but today we're going to hear

12 from an officer -- a gentleman who has just taken the

13 stand , and you will hear more about that in a minute .

14 All right .

15        MS. JOHNSTON:    Thank you , Your Honor .   The

16 government would call Shelton Robert s.

17 Thereupon,

18                 SHELTON  ROBERTS ,

19 having been called as a witness on behalf of the          _____

20 Plaintiff , and having been first duly sworn by the

21 Courtroom Deputy, was examined and testified as

22 follows:

23                 **DIRECT EXAMINATION**

24        BY MS. JOHNSTON:

25 Q.     Good afternoon , Mr. Roberts .

1  A.       Good afternoon, ma'am.

2  Q.       Where are you currently employed?

3  A.       By the Department of Defense, Walter Reed Branch

4  as police officer.

5  Q.       And how long have you been employed by the

6  Department of Defense at Walter Reed Hospital as a

7  police officer?

8  A.       Approximately 15 years.

9  Q.       What did you do prior to that time?

10  A.       I was employed by the Metropolitan Police

11  Department.

12  Q.       For how many years?

13  A.       Approximately 20 years, 21 years.

14  Q.       Calling your attention back to 1986, do you

15  remember what your assignment was back in 1986?

16  A.       Yes, I do.

17  Q.       What district were you assigned to?

18  A.       Assigned to the 4th District.

19  Q.       What unit?

20  A.       Narcotics branch, the vice unit.

21  Q.       Could you describe for us your experience in the

22  vice area, in particularly narcotics area?

23  A.       Well, we had -- I had at least, like, a thousand

24  cases -- narcotics cases in the District of Columbia,

25  so I had pretty good experience in narcotics as far as

1 dealing with narcotics.

2 Q.      Now, back in 1986, could you describe for us the

3 manner and the means that you would conduct narcotics

4 investigations?

5 A.      Yes.  The way we operated once we get an

6 assignment, myself and other officers, would go out and

7 sit on the site and watch for -- see what kind of

8 activity goes on, and later myself, we the undercover

9 person or special informant, would make a controlled

10 buy at this particular location after which I got five

11 days to get a search warrant.

12 Q.      Now, you said you would either make an

13 undercover buy or use a special informant.  What do you

14 mean by an undercover buy?

15 A.      Well, I simply mean I used to purchase drugs

16 myself.

17 Q.      You would go in in an undercover capacity?

18 A.      Yes, I would.

19 Q.      When you used the special informant, could you

20 describe that procedure?

21 A.      A special employee is a person who is hired by

22 the police department, who worked for the police

23 department just for money purposes only, who provides

24 information concerning drug activity.

25 Q.      How would you utilize a special informant to

1  make a purchase from a particular location?

2  A.      Well, first of all, before you go onsite, you

3  search that person and make sure they have no drugs on

4  them you, give them money.  Normally we mark the money,

5  and you watch them go in the premises and come out the

6  premises.  Whatever they bring back, you field test it

7  positive or negative substance.

8  Q.      Were you using that procedure and process back

9  in June of 1986?

10  A.      Yes, I was.

11  Q.      Are you familiar with an investigation that was

12  done on June 10th of 1986 at 5408 Eighth Street,

13  Northwest in Washington, D. C.?

14  A.      Yes, I vaguely remember that.

15  Q.      Did you also follow up that investigation with

16  subsequent activity on June 26 of 1986?

17  A.      That is correct.

18  Q.      Okay.  Did you prepare reports and affidavits at

19  that period of -- back at that time period relating to

20  those events?

21  A.      Yes, I did.

22  Q.      Would reviewing those reports assist you in

23  recalling some of the particulars of those events?

24  A.      Yes.

25  Q.      I'm going to show you what's been marked as

1  Government 's Exhibit  Miscellaneous   13 for

2  identification   purpose s only .

3         Do you  recognize   those  document s?

4  A.      Yes , I do , ma'am .

5  Q.      Are those  your  report s and  statement s relating

6  to the  event s of  June  10 of  1986 ?

7  A.      Yes , they  are .

8  Q.      And  June  26 of  1986 ?

9  A.      That  is correct .

10 Q.      Now , calling  your  attention   first  to June  10th

11 of 1986 .  Could  you  explain  to the  ladies  and gentlemen

12 of the  jury  what  you did  on June  10th  of  1986 ?

13 A.      Yes .  On June  10th , myself  and  other  member s of

14 the 4th  District  Vice  Unit  executed  a search  warrant  at

15 5408  Eighth  Street  Northeast  for  narcotic s.

16 Q.      When  you say  "a search  warrant ," was  that  an

17 order  sign ed by a judge ?

18 A.      Yes , it was .

19 Q.      Based  upon  your  earlier  investigation   at that

20 location ?

21 A.      And  a controlled  buy , yes .

22 Q.      Could  you  de scribe  for us what  happened  when you

23 executed  the  search  warrant ?

24 A.      Well , we knock ed on the  door  and a female

25 officer  did  gain  entry .  Once  she  got  in , we all  rush ed

1  in and searched the premises.

2  Q.      What was recovered from the premises?

3  A.      Assorted white powder substance that later

4  tested as cocaine. Also, white rock type form known as

5  crack was recovered, also along with cash.

6  Q.      Can you tell us approximately how much cash was

7  recovered?

8  A.      On June 10th?

9  Q.      Yes, sir.

10  A.      Approximately $7,000.

11  Q.      And approximately how much cocaine, whether it's

12  powder or crack, was recovered? Can you tell us that?

13  A.      It had a street value of $100,000 what we was

14  valuing it as.

15  Q.      Can you describe how it was packaged?

16  A.      In a clear white bag, small bag.

17  Q.      Were there multiple small bags?

18  A.      Yes, there was, ma'am.

19  Q.      And in looking at -- did you submit those drugs

20  to property and ultimately to the DEA to be tested?

21  A.      Yes, I did.

22  Q.      In looking at the report of that test, does that

23  refresh your recollection concerning the various number

24  of packages that were submitted?

25  A.      Yes, I do.

1  Q.      Can you describe those package s that were

2  submitted ?

3  A.      Okay .  There was 25 large bags contain ing white

4  powder substance that were field tested , and there was

5  28 small er bags that contained a white powder

6  substance , and in addition , there was five larger bags

7  contain ing a white powder substance .  There was another

8  bag contain ing a white powder substance , and there also

9  were 22 additional small bags contain ing white powder

10 substance , all tested positive for cocaine .

11 Q.      When you say "tested positive ," do you mean

12 field tested positive ?

13 A.      Field test ed as cocaine , yes .

14 Q.      In addition , were they analyze d by the DEA

15 chemist ?

16 A.      Yes .

17 Q.      What were they determine d to be?

18 A.      Cocaine .

19 Q.      In reference to that incident , when the female

20 officer approach ed the door first , who answered the

21 door ?

22 A.      Ms. Paul ette Murphy -- Martin .

23 Q.      Do you see her here in court ?

24 A.      Yes , I do.

25 Q.      Would you identify her to the record ?  Using me,

1 where is she, counting over?

2 A.      To your left, with red, sitting beside of

3 counsel with the dark suit on between the two gentlemen

4 there.

5        MS. JOHNSTON:   We would ask the record reflect

6 that the witness has   identified Paulette Martin.

7        THE COURT:  The record will so indicate.

8        BY MS. JOHNSTON:

9 Q.      Did you know her by a nickname back then?

10 A.     Yes, I did.

11 Q.     What was that?

12 A.     Reds.

13 Q.     After -- did you arrest Ms. Martin on that date?

14 A.     Yes, I did.

15 Q.     Was she released after she was processed?

16 A.     Yes, she was.

17 Q.     Did there come a time when you returned to that

18 very same address in the month of June, 1986?

19 A.     Yes, I did.

20 Q.     Approximately when was that in June of 1986?

21 A.     Approximately two weeks later, on June 26.

22 Q.     What was your reason for returning to that

23 residence on June 26 of 1986?

24        MR. MONTEMARANO:  Objection to the hearsay.

25        THE COURT:  I don't know if it's going to elicit

1 a hearsay response or not.

2          BY MS. JOHNSTON:

3 Q.     For what purpose did you go there on June 26,

4 1986?

5 A.     I got a complaint that Reds was --

6          THE COURT:  No, no, no.

7          MR. MONTEMARANO:  Objection.

8          THE COURT:  Sustained.

9          BY MS. JOHNSTON:

10 Q.     Based upon the information you received, what

11 did you do on June --

12 A.     Executed another search warrant on the premises,

13 ma'am.

14 Q.     Did that search warrant, was that signed by a

15 judge in the District of Columbia?

16 A.     Yes, it was.

17 Q.     Where did you execute that search warrant?

18 A.     5408 Eighth Street, Northeast.

19 Q.     The same address you had been at two weeks --

20 approximately two weeks earlier?

21 A.     That's correct.

22 Q.     Who was present in the residence when you went

23 there to execute the second search warrant?

24 A.     Ms. Martin, along with other people.

25 Q.     What was seized from the residence when you

1  returned there on June 26 of 1986?

2  A.     A white powder substance field tested for

3  cocaine, also some cash, and then a .25 Caliber handgun

4  I remember.

5  Q.     If you could describe for -- looking at your

6  reports, if you could describe for us the quantity of

7  cocaine that was recovered as well as -- and how it was

8  packaged.

9  A.     There was 39 bags containing a white powder

10 substance.   There was one large bag containing a white

11 powdered substance along with three additional bags

12 containing a white powder substance.

13 Q.     Was there -- based on your training and

14 experience, was there any significance to the drugs

15 being packaged in many smaller plastic bags?

16 A.     Well, the smaller bags are sold for smaller

17 amount; the larger bags are definitely sold for more

18 money.

19 Q.     Based on your training and experience, were

20 those quantities for personal use or for distribution?

21 A.     Distribution.

22 Q.     On June 26, was Ms. Martin also arrested at that

23 time?

24 A.     Yes, she was.

25 Q.     Did she, at that time, make any statements

1 concern ing  the  incident ?

2 A.       Yes ,  I  think  she  did .

3 Q.       Well ,  in  that  regard ,  when  you  executed  that

4 warrant ,  I've  asked  you  about  the  quantity  of  drug s.

5 What  about  the  amount  of  money  that  was  seize d  on  June

6 26  of  1986?

7 A.       $75  and  $97  recovered  that  day ,  also  $4,516 ,

8 three  different   amount s.

9 Q.       What ,  if  anything ,  did  Ms.  Martin  say  in

10 reference  to  the  --

11 A.       She  said  that  her  ex-husband  had  a  key  to  the

12 premises  and  maybe  the  stuff  belong s  to  him .

13 Q.       That  statement .  Was  that  made  on  the  first  time

14 you  were  there  or  the  second ,  if  you  could  review  your

15 report s?

16 A.       I  think  it's  the  second  time  we  was  there .

17 Q.       Would  you  review  your  report s  and  make  sure  on

18 which  date  she  made  that  statement ?

19 A.       That  statement  was  made  the  first  time .

20 Q.       And  that  would  have  been  on  June  10th ?

21 A.       Yes ,  it  was .

22 Q.       And  then  call ing  your  attention  to  the  second

23 incident  on  June  26  of  1986 .  First  of  all ,  on  June  26

24 of  1986 ,  were  any  drug s  recovered  from  her  person ?

25 A.       Yes ,  there  was .

1 Q.      Approximately  how  many  of  the  plastic  bags  were
2 recovered  from  her  person ?
3 A.      There  were  three  plastic  bags  recovered  from
4 inside  her  blouse  pocket .
5 Q.      On  that  occasion ,  did  she  make  any  statement s?
6 A.      Yes ,  she  did .
7 Q.      What  was  the  statement s  she  made  on  the  second
8 incident ?
9 A.      She  said  the  money  she  collect ed  from  a  show
10 that  she  had  or  something  like  that .
11 Q.      In  that  regard ,  did  Ms.  Martin  provide  you  with
12 information  concern ing  her  employ ment  back  in  1986 ?
13 A.      Yes ,  she  did .
14 Q.      Okay .  What  information  did  she  provide  you  with
15 regard  to  her  employ ment  in  1986 ?
16 A.      She  said  she  own ed  or  work ed  at  an  Arts  School
17 call ed  Paula 's  School  of  Art  or  something  like  that .
18 Q.      What  address  did  she  provide  you  for  that
19 business ,  Paulette 's  School  of  Art ?
20 A.      South  Dakota  Avenue ,  Northeast .  5549  South
21 Dakota  Avenue ,  North east .
22 Q.      Do  you  have  a  report  in  front  of  you  that  would
23 refresh  your  recollection  concern ing  the  exact  address ?
24 A.      Yes .
25 Q.      Would  you  review  that  report ?

1  A.      The address of the location of the school?

2  Q.      The exact name that she gave you of the school

3  as well as its address.

4  A.      Okay. It says, Paulette's School of Art.

5  Q.      And the address that she provided for that

6  school?

7  A.      5559 South Dakota Avenue, Northeast, Washington.

8  Q.      Was Ms. Martin indicted?

9  A.      Beg your pardon?

10 Q.      Was Ms. Martin indicted and charged with those

11 two offenses in a single case?

12 A.      Yes, she was, ma'am.

13 Q.      I want to show you what's been marked as

14 Miscellaneous 12. Do you recognize this document?

15 A.      Yes, I do, ma'am.

16 Q.      What is that document?

17 A.      United States Court Disposition for a person, in

18 particular Ms. Paulette Martin.

19 Q.      Does it indicate whether or not Ms. Martin pled

20 guilty

21 A.      Yes, it does.

22 Q.      What does it indicate?

23 A.      That she pled guilty to possession with intent

24 to distribute a controlled substance, 21-U.S.C. 8141-B

25 on June 10th 1986.

1  Q.      Is that the same date that you executed the

2  first search warrant?

3  A.      Yes, it is.

4          MS. JOHNSTON:   Court's indulgence.

5          I have nothing further, Your Honor.

6                    **CROSS-EXAMINATION**

7          MR. MONTEMARANO:

8  Q.      Good afternoon, Mr. Roberts.

9  A.      How you doing, sir?

10 Q.      Your current position?  What rank do you go by?

11 A.      Officer.

12 Q.      Officer.  So I can call you officer?

13 A.      Sure.

14 Q.      Thank you.

15         Ms. Johnston asked you about the amount of drugs

16 seized in the first search; correct, sir?  Remember

17 that question?

18 A.      Yes, she did.

19 Q.      You didn't give us an amount.  You told us --

20 you said it was a street value of $100,000; is that

21 correct, sir?

22 A.      I gave you how many bags that were recovered

23 also.

24 Q.      What was the amount, like weight?  That's how we

25 usually measure drugs; isn't it?

1  A.      Not how we, but how DEAs might  handle  it.   No,

2  we go by the bags, send  it  to  DEA, and  they  do  the

3  rest.

4  Q.      I'm sorry?

5  A.      On the DEA form, they do have the weight on

6  here.

7  Q.      Okay.  Why don't you tell us how much  in the

8  weight of drugs was seized?

9  A.      Okay.  One of them says 39.969  grams, six grams

10 found, one says 2,2144 ounces, eight  ounces, one says

11 36,183.9 grams, and the last says rock form was 5985.5

12 grams in four plastic bags.

13 Q.      Is that for June 10th?

14 A.      This  one  is --

15 Q.      That's June 27; isn't it?

16 A.      I'm sorry, that would be the second  arrest.

17 Let's go to the first one.

18 A.      Sorry about that.

19 Q.      That's quite all right.

20 A.      Okay.  On this one on June 10th, the weight  is

21 not listed here on June 10th.

22 Q.      You have the same documents I do.  I'm going to

23 invite your attention  to this one document.   You have

24 one that looks like that?

25 A.      Let me see.  No, sir, I don't have  that.  No,

1  sir.  At this time, I do not have that.

2  Q.     Okay.  I'll tell you what, Ms. Johnston, this --

3  you guys gave me this.  Ms. Johnston has given me an

4  extra copy.

5  A.     Okay.

6  Q.     And she gave this to me, so you would agree this

7  looks like the kind of documents you guys used to

8  generate when you made drug arrests back when you

9  worked for the MPD; correct?

10  A.     From the DEA, yes.

11  Q.     Okay.  And so we're clear,  this is 1986.  This

12  would be approximately  20 years ago?

13  A.     Yes.

14  Q.     So as we sit here today, you probably have no

15  independent  recollection  of the events,  you have to

16  look at the documents to recall the weights and

17  amounts?

18  A.     Definitely.

19  Q.     You did a lot of search warrants when you worked

20  for the MPD?

21  A.     Yes, I did.

22  Q.     So keeping them all separate and apart without a

23  little assistance  isn't very easy; right?

24  A.     We only use a search warrant when you're going

25  to court or something like that.

1  Q.      How many search warrants do you suppose you

2  executed during your time with the MPD?

3  A.      Other 1,000 search warrants.

4  Q.      Looking at the piece of paper that   Ms. Johnston

5  provided to give  to you, let's talk about the weights

6  of the amounts of drugs.

7  A.      Okay.

8  Q.      Bag A or Section A.  That talks about how much

9  in way of drugs?

10 A.      Right.  The net weight and the weight after.

11 Q.      Well, why don't we talk about the weight after.

12 A.      Okay.  It says 88000.235 millimeters, whatever

13 that stands for.

14 Q.      That's with packaging?

15 A.      Ziploc bag, that's correct.

16 Q.      The net weight would be the actual drugs;

17 correct?

18 A.      Yes.

19 Q.      That's why that number is less; right?

20 A.      I don't do these calculations here.

21 Q.      Net weight was what?

22 A.      The net weight was 75,572.2 milligrams.

23 Q.      Okay.  And translated into grams, that would be

24 75 grams, give or take, right?

25 A.      Once again, I don't do the calculations, sir.

1  Q.      We'll use the numbers that we have here.  75,572
2  milligrams.  1000 grams, you divide by 1000, and it
3  would be about 75 grams, 76 grams; right?
4  A.      I'm not a chemist, sir.  I don't know what it
5  is.
6  Q.      How about B?  What was the net there?
7  A.      B says 15,964.9 milliliters.  That's net.
8  Q.      Okay.  And how about C?
9  A.      64,468.9 milliliters.
10 Q.      How about D?
11 A.      We have after weight, but not a net weight.
12 Q.      That would be because?
13 A.      I have no idea.  I don't do this.
14 Q.      Why don't you look at the second column?
15 A.      Oh, that's just the bags, plastic bags,
16 paraphernalia.
17 Q.      No drugs?
18 A.      Paraphernalia, no.
19 Q.      And then E?
20 A.      The net weight was 7,362.8 milligrams, and the
21 after weight is 13,294.9 milligrams.
22 Q.      I'm going to ask you to assume for the sake of
23 discussion that these numbers all represent the grams
24 dividing by 1000.  We have 75 and a half, and about 16,
25 right?  You're going to give me, what, 91 adding those

1  together ?

2          MS. JOHNSTON:   Objection , Your Honor .

3          May we approach ?

4          THE COURT:   Yeah .

5                  (At the bar of the court .)

6          MS. JOHNSTON:   This witness has testifi ed he

7  does n't know what that net weight is and counsel --

8  what counsel is using is the net weight , which is a

9  calculation based upon the percentage and purity .   The

10  weight --

11          MR. MONTEMARANO :   That's not what he said it

12  was .   I asked him and he agreed .

13          MS. JOHNSTON:   If the Court look s at it , the

14  Court will see the weight after testing corresponds to

15  the weight found after the testing , and that weight is

16  based upon the purity analysis .   So, what counsel --

17  first of all , this witness can't really say that whose

18  represent , but I have sort of let it go , and my look ing

19  at those figure s is what he is using is not the correct

20  figure s.   But because the net weight is the purity of

21  the cocaine in each content , not the weight of the

22  substance that was tested .   Otherwise , you would n't

23  have a weight after testing being high er.   As the Court

24  can see in look ing at the weight after is high er than

25  the net weight .   The net weight is not the weight of

1 the drugs less the packaging .

2          THE COURT:   It looks like she's right , Mr.

3 Montemarano .

4          MR. MONTEMARANO :   Without a calculator , Your

5 Honor .

6          THE COURT:   I did the math in my mind.   She's

7 correct .

8          MR. MONTEMARANO :   Your Honor , I hate to say that

9 she's probably right , but she may be , but I don't wish

10 this to sound quite as testy as it does , but I don't

11 think it's Ms. Johnston 's place to testify .   I asked

12 the witness what this meant .   He agreed with me.   She

13 shouldn't have agreed that's his problem .   Let me

14 finish my cross .   She can certainly rehabilitate .   If

15 he doesn't know , he doesn't know , but I hope she won't

16 be leading him .

17          THE COURT:   I don't want you to mislead him .

18          MR. MONTEMARANO :   I would presume .   I don't know

19 what this means.

20          MS. JOHNSTON:   Neither does the witness .

21          THE COURT:   All right .   Well --

22          MS. JOHNSTON:   Other than he agreed with him

23 that it says net weight , so there is not a foundation

24 for him to interpret these figures , and so I'm

25 objecting to any further question of this witness based

1  upon these figures.

2          THE COURT:  How much more do you plan to go?

3  You've already got him to concede something that he

4  wasn't supposed to concede.

5          MR. MONTEMARANO:  I will use the other column

6  and we'll add up these numbers.

7          MS. JOHNSTON:  The weight after testing?

8          THE COURT:  The weight after.  The weight after

9  is what you ought to be using.

10         MR. MONTEMARANO:  Then that's what I'll use.

11  That's perfectly fine.

12         THE COURT:  Okay.  Thank you.

13              (Back in open court.)

14         BY MR. MONTEMARANO:

15  Q.    Officer Roberts, let's try this again.  Ms.

16  Johnston has pointed out we're using the wrong column

17  weight after the weight that was seized, the net weight

18  is talking about the actual weight of drugs when

19  related to the purity of the total amount seized.

20  Let's talk about the total amount seized.  The first

21  one's 88,023?

22  A.    That's correct.

23  Q.    That was A; B is 18,092; correct?

24  A.    That's correct.

25  Q.    These are all milligrams again?

1   A.      Correct.

2   Q.      C is 8,761?

3   A.      Yes.

4   Q.      D is still no drugs.  Right?

5   A.      That's correct.

6   Q.      And E, 13,294?

7   A.      That's correct.

8   Q.      These are all milligrams; correct?

9   A.      That's correct.

10  Q.      So let's add up our milligrams here.  88 and 18,

11  want to call that 106 for the sake of discussion?

12  A.      If you want to.

13  Q.      And about another nine?  115?

14  A.      Okay.

15  Q.      And another 13.128?

16  A.      Okay.

17  Q.      You were in narcotics enforcement for how long,

18  if you recall?

19  A.      Working vice and stuff, approximately six years.

20  Q.      Okay.  How many grams are in an ounce?

21  A.      Beg your pardon?

22  Q.      How many grams are in an ounce?

23  A.      Thirty-two grams in an ounce?

24  Q.      Twenty-eight?

25  A.      Twenty-eight, well, whatever.

1  Q.      For the sake of discussion , call that four

2  ounce s, 128 grams , if that's 128 grams ?  Does that work

3  for you ?

4  A.      Like I said , I'm not a chemist , sir .  I'm trying

5  to answer the questions best I can .

6  Q.      If it were four ounce s, for the sake of

7  discussion , what's the street value of four ounce s of

8  cocaine ?

9  A.      That all depends on the purity of it , sir .

10 Q.      In your year s of enforci ng narcotic s law s in the

11 United States of America and the District of  Columbia ,

12 was there ever a time when you found cocaine to sell

13 for $25,000 an ounce ?

14 A.      Not in my tenure , no .

15 Q.      Did you fill out an Affidavit related to this

16 case , or a criminal Complaint , a Statement of Fact s?

17 Do you have a Statement  of Fact s there ?

18 A.      On June 10th ?  Yes .

19 Q.      The last line , the last sentence , can you tell

20 us what it says ?

21 A.      It says street value of the drug s is $100,000 .

22 Q.      And right underneath  that is what ?

23 A.      My name .

24 Q.      Your signature ; correct , sir ?

25 A.      That is correct .

1 Q.      What's it say right underneath that?

2 A.      Sworn before me and ascribed in presence, June

3 11, 1986, June 10th.

4 Q.      Below that is what?

5 A.      A U.S. Magistrate's name.

6 Q.      You told a U.S. Magistrate under oath under

7 penalty of perjury that four ounces of cocaine has a

8 street value of $100,000?

9 A.      That amount came from the Moore's Division of

10 Narcotics.  That's where our we get our estimates from,

11 sir.

12 Q.      You didn't tell a U.S. Magistrate that it was

13 worth $100,000?

14 A.      According to this, yes.

15 Q.      That's what I thought.  How many people were in

16 the house when you searched it on the 10th of June?

17 A.      Several people.

18 Q.      Several?

19 A.      Several.

20 Q.      Several means different things to different

21 people.  Can you give me a number, sir?

22 A.      Several people.  More than two.  More than that.

23 Q.      Five?

24 A.      Approximately five, could have been.

25 Q.      And the drugs were located behind the sofa;

1  correct?

2  A.      The drugs were located all over the house, sir.

3  Q.      Behind a sofa, underneath a chair?  Underneath a

4  cushion?

5  A.      Sofa cushion, that's what it says, yes.

6  Q.      Okay.  And the second time you searched the

7  premises, how many people were there?

8  A.      I don't know the exact number.  More than one

9  and more than two.

10  Q.      Four or five again?

11  A.      Possible.

12  Q.      A lot of other people there, too.  They were all

13  arrested as well, too; correct?

14  A.      No, sir, I never said that.

15  Q.      Was anybody arrested?

16  A.      Yes, sir.

17  Q.      Besides Ms. Martin?

18  A.      Not to my knowledge, no.

19  Q.      You bust a house, there's drugs everywhere in

20  separate packages, you arrested one person?

21  A.      That is correct.

22          MR. MONTEMARANO:  Pass the witness, Your Honor.

23          MR. MARTIN:  Mr. Goodwin has no questions for

24  this witness, Your Honor.

25          MR. HALL:  No questions, Your Honor.

1          MR. MITCHELL:   No, thank you.

2          MR. WARD:   No questions, Your Honor.   Thank you.

3          THE COURT:   Anyone else?   All right.   Redirect?

4          MS. JOHNSTON:   Just a few questions.

5                    **REDIRECT EXAMINATION**

6          BY MS. JOHNSTON:

7  Q.     Detective Roberts, who was the one person who

8  was present on both times you went in the house?

9  A.     The person that was present was Ms.- --

10         MR. MONTEMARANO:   Objection, Your Honor, on

11 basis of knowledge.

12         Can we approach?

13         MS. JOHNSTON:   I'll rephrase my question.   I

14 don't think it's necessary.

15         BY MS. JOHNSTON:

16 Q.     On the two occasions when you went into that

17 house on June 10th and June 26 of 1986 to execute the

18 search warrant, who was the person that you found there

19 on both of those occasions?

20         MR. MONTEMARANO:   Objection, Your Honor, basis

21 for knowledge.   Can we approach?

22         BY MS. JOHNSTON:

23 Q.     Were you present when you executed the search

24 warrants on both of those days?

25 A.     I certainly was.

1   Q.      Do you see the person you identified  here in the

2   courtroom  as the woman you knew then as    Paulette

3   Murphy?

4   A.      Yes, I do.

5   Q.      Was she present on those two occasions, June

6   10th and June 26, when you executed the search warrant

7   at the residence?

8   A.      On both days, that's correct.

9   Q.      On the second occasion, where was cocaine

10  removed from?

11  A.      On the second one?  Some removed from her

12  person.

13  Q.      Indeed, counsel was asking you about street

14  value.  Do you sell the drugs -- how do you calculate a

15  street value?

16  A.      What we do, they get the drugs to cut them up

17  more.

18          MR. MONTEMARANO:  Objection, Your Honor.  He's

19  already stated he didn't calculate it in his answer.

20  Can we approach?

21          THE COURT:  He can say how, in general terms,

22  one calculates values.

23          BY MS. JOHNSTON:

24  Q.      What was the procedure or process you used to

25  calculate street value?

1  A.      The procedure  in the 4th  District , all drugs you

2  get , you combine  them and you call Moore's Division .

3  They got a --

4          THE COURT:   I don't want you to tell us what

5  somebody told .  You just answer  the question  with

6  regard  to how you general ly come  up with  a value , not

7  what you did in this case .

8          THE  WITNESS:   Based  on my knowledge .  That's

9  all .

10          BY MS.  JOHNSTON:

11  Q.      Okay .  Do you use some  reference   materials   as

12  well ?

13  A.      That 's correct .

14  Q.      In addition  to that , you mention ed  the purity  of

15  the drug s .

16  A.      That 's correct .

17  Q.      Is that  something  that you calculate d or the

18  chemist  does ?

19  A.      Chemist  calculate s that .

20  Q.      What effect  does purity  of the drug have  on

21  whether  or not you can cut it or expand  the amount  of

22  drug s you have ?

23  A.      The purity  increase s the value  of the street

24  value  of the drug s itself .

25  Q.      In regards  to that June 10th  incident  for which

1  counsel  put  up  the  figure s  on  the  board ,  is  that  the

2  charge  that  Ms.  Martin  pled  guilty  to?

3  A.      That  is  correct .

4       MS.  JOHNSTON:    I  have  nothing  further .

5                   **RECROSS  EXAMINATION**

6       BY  MR.  MONTEMARANO :

7  Q.      With  regard  to  the  June  26  seizure .  She  didn't

8  plead  guilty  to  that ;  did  she ?

9  A.      Not  to  my  knowledge ,  sir .

10  Q.      Okay .   And  Ms.  Johnston  asked  you  several  time s

11  in  this  question  now ,  was  Ms.  Martin  present  on  both

12  times .   She's  not  allow ed  to  lead ,  but  I'll  lead .   She

13  was  sitting  there  both  times ;  was n't  she ?

14  A.      She  was  there  both  time s,  yes .

15  Q.      Fine .   You  said  you  don't  know  how  many  people

16  were  there  the  first  time ;  correct ?

17  A.      True .

18  Q.      You  don't  know  how  many  people  were  there  the

19  second  time ;  correct ?

20  A.      True .

21  Q.      You  don't  know  the  name s  of  the  people  who  were

22  there  the  first  time ;  correct ?

23  A.      Yes,  I  do.

24  Q.      All  the  names?

25  A.      I  don't  know  all  the  names,  but  we  sent

1  subpoenas to them, yes, sir.

2  Q.     You don't know names of the people who were

3  there the second time?

4  A.     No, I don't.

5  Q.     You can't tell us sitting here today whether or

6  not anybody was there, other than Ms. Martin, on the

7  10th and the 26th; correct, sir?

8  A.     I can only tell you Ms. Martin was there

9  personally.

10  Q.     But you can't tell us if anybody else would have

11  been there?  For all you know, it was same people both

12  times; correct?

13  A.     No, sir, it wasn't the same people.  It was the

14  same subpoenas out because I delivered subpoenas

15  myself.

16  Q.     Subpoenas?

17  A.     Subpoenas, yes.

18  Q.     You searched the premises on the 26th based on a

19  subpoena?

20  A.     A search warrant.  Yes, there were people there

21  the first time.  The first time we searched, there were

22  several people there.  The U.S. Attorney gave me

23  several subpoenas to serve those people, to meet with

24  them in court, sir.  I served the subpoenas to those

25  people later.

1  Q.      What were their names?

2  A.      I don't know, sir.

3  Q.      So you're sure it wasn't the same people, but

4  you don't know their names?

5  A.      No, sir, I don't know their names.

6  Q.      You don't have it written down anywhere with

7  you?

8  A.      No, sir, I do not.

9  Q.      What were you wearing that day?

10 A.      Casual clothes, sir.  No problem.

11         MR. MONTEMARANO:  No further questions.

12         THE COURT:  You may step down, Officer.  Thank

13 you very much.

14         MS. JOHNSTON:  Your Honor, may the officer be

15 excused?

16         MR. MONTEMARANO:  Yes, Your Honor.

17         THE COURT:  You may be excused.

18              (Witness excused at 3:23 p.m.)

19         MS. GREENBERG:  Your Honor, the next witness,

20 we'll need to consult with the Marshals Service.  I

21 don't know if the Court wants to take a break.

22         THE COURT:  We will take a 15-minute break, and

23 counsel, stay behind for just one second.  I want to

24 ask you something.

25              (Jury excused at 3:23 p.m.)

1          THE  COURT:   Counsel ,  I  wanted  to  talk  to  you

2  about  tomorrow .   You  recall  I  told  you  I  had  a  dentist

3  appointment   tomorrow  at  8:00.   I  have  moved  it  to  7:15 ,

4  so  it's  conceivable   that  we  could  start  as  early  as

5  8:30 ,  if  you  want  to  try  to  pick  up  some  time  lost .   I

6  don't know   if  that  will  cause  the  jury  to  pass  out  or

7  not ,  or  Mr.  Ward  to  pass  out  from  long  travel .

8          MR.  WARD:   Your  Honor ,  I  will  probably  arrange

9  to  stay  overnight  in  Greenbelt .

10          THE  COURT:   We  have  a  very  nice  attorney

11  conference   room  downstairs .   You  can  stay  down  there .

12  It  has  Internet  service  and  everything .   You  can  stay

13  down  there  in  the  attorney  lounge .

14          MR.  MARTIN:   Your  Honor ,  Mr.  Goodwin  wants  to

15  know  if  he  can  go  to  the  dentist  with  you.   He's  got  a

16  loose  cap ,  and  he's  been  complaining  about  it  for  the

17  last  two  days ,  and  I've  told  him  to  try  to  hold  out

18  until  the  weekend  to  see  if  he  could  see  somebody  at

19  the  jail .

20          THE  COURT:   All  right .   Is  anybody  interested  in

21  trying  to  start  before  9:00 ?

22          MR.  HALL:   Your  Honor  that  provides  me  a  little

23  bit  of  a  problem  because  I  have  to  drop  my  daughter  off

24  at  her  day  camp ,  but  I  can  call  my  wife  and  see  if  she

25  can  do  it .   I  can't  remember  what  my  wife 's  schedule  is

1 tomorrow .

2        THE  COURT:   What  I'm  going  to  do ,  I should  be

3 here  very  comfortably   for  a  9  o'clock   start ,  and

4 perhaps  even  before .   What  I'd  like  to  do  is  have  the

5 jury  in  the  box  at  9  o'clock ,  so  if  there  are  any  other

6 preliminary   issue s  I  need  to  deal  with  tomorrow

7 morn ing ,  I  will  be  here  at  quarter  of  9:00.   All  right ?

8 So  quarter  of  9:00,  we  will  deal  with  preliminari es.

9                (Off  the  record   at  3:26  p.m. )

10               (On  the   record   at  3:41  p.m. )

11               (Jury  returns  at  3:43  p.m. )

12        MS.  GREENBERG:    Your  Honor ,  we  next  call  to  the

13 stand  Moises  Uriarte ,  and  we  have  an  inter preter   here

14 to  assist  Mr.  Uriarte  as  need ed ,  but  as  the  Court  may

15 recall ,  he  does  speak  English ,  just  if  necessary .

16        THE  COURT:   We  will  first  swear  the  interpreter

17 who  will  assist  him  if  he  needs  it.

18               (Interpreter   sworn .)

19        THE  CLERK:   Please  state  your  name   for  the

20 record .

21        INTERPRETER:   Glad ys  Segal ,  federal ly-certifi ed

22 court  interpreter .

23        THE  CLERK:   Now  we  have  to  swear  the  witness ;

24 right ?

25 Thereupon,

1                    **MOISES  URIARTE** ,

2 Having been called as a witness on behalf of     the

3 Plaintiff , and having been first duly sworn by the

4 Courtroom Deputy, was examined and testified as

5 follows:

6                    **DIRECT EXAMINATION**

7          BY MS. GREENBERG:

8 Q.      Sir , could  you  state your name   and  spell  your

9 last  name  for  the  court reporter ?

10 A.      Moises  Uriarte .

11 Q.      Could  you  spell  "Uriarte " for  her , please ?

12 A.      U  R  I  A  R  T  E.

13 Q.      What  language  is  your  native  language ?

14 A.      Spanish .

15 Q.      Do  you  speak  English ?

16 A.      Yes , I  do, ma'am .

17 Q.      And  do  you  understand  that  there 's  a  translate r

18 here  in  case  you  have  any  difficulty ?

19 A.      Yes, ma'am .

20 Q.      Especially  with  the  legal  part  of  our  language .

21 A.      Yes, ma'am .

22 Q.      So please  call  on  her  if  you  need  help  with  any

23 question s, okay ?

24 A.      Yes , I  will , ma'am .

25 Q.      Now , have  you  use d  any  other  name s  be sides

1  Moises  Uriarte ?

2  A.      Yes, ma'am .

3  Q.      Could  you  tell  the  jury  what  name s  you've  used?

4  A.      Alex  Zapada  and  Juan  Rojas  Castro.

5  Q.      Why  did  you  use  other  name s?

6  A.      Because  I  was  illegal ly  in  this  country .

7  Q.      Where  were  you  born ?

8  A.      Nicaragua .

9  Q.      When ?

10  A.      January  5th,  1974.

11  Q.      And  when  did  you  enter  into  the  United  State s?

12  A.      2001 .  It  was  between  2001  and  2002 .

13  Q.      When  did  you  come  into  the  United  States ?

14  A.      Oh  the  first  time  in  1986 .

15  Q.      The  question  I  asked  was  --  I'll  try  and  go

16  slow er  --  when  did  you  enter  the  United  States ?

17  A.      1986 .

18  Q.      Did  you  get  deport ed?

19  A.      Yes, ma'am .

20  Q.      What  year  did  you  get  deport ed?

21  A.      1998 .

22  Q.      And  was  that  prior  to  your  arrest  by  us , by  the

23  federal  authoriti es  here  in  Maryland ?  You  came  back  to

24  the  United  States  prior  to  your  arrest ?

25  A.      Yes , ma'am.

1  Q.      Where were you arrested by the federal court
2  authoriti es?

3  A.      New York .

4  Q.      What part of New York ?

5  A.      In the Bronx , ma'am .

6  Q.      Where were you living at that time ?

7  A.      In the Bronx .

8  Q.      How long had it been that you were living in the
9  Bronx from when you had been deport ed?   In other words ,
10 how long had you been back in the United States before
11 you were arrested ?

12 A.      About two year s, I can say .

13 Q.      And you were here illegal ly?

14 A.      Yes, ma'am .

15 Q.      Did you receive any convictions prior to the
16 time that you were deport ed?   Had you been convict ed
17 here in the United States ?

18 A.      Yes, ma'am .

19 Q.      Of what ?

20 A.      Drug felony .

21 Q.      Where was that drug felony ?

22 A.      In New York , ma'am .

23 Q.      And did you go to trial or did you plead guilty ?

24 A.      I plead ed guilty .

25 Q.      And were you arrested in connection with our

1 case here in Maryland ?

2 A.     Yes, ma'am .

3 Q.     Did you reach a plea agreement with the

4 government ?

5 A.     Yes, ma'am .

6       MS. GREENBERG:     Your Honor , may I approach the

7 witness ?

8       THE COURT:   You may.

9       BY MS. GREENBERG:

10 Q.     Showing you what's been marked as Government 's

11 Exhibit A-3 .

12       Do you recognize the front page of that exhibit ?

13 A.     Yes, ma'am .

14 Q.     Do recognize your signature on this signature

15 page , Page 9?

16 A.     Yes, ma'am , that 's my signature .

17 Q.     Do you recognize the signature on Page 11?

18 A.     Yes, ma'am , that 's my attorney 's.

19 Q.     What is this document , A-3 ?

20       Do you know what that document is?

21 A.     That 's the plea agreement .

22 Q.     Is that what it says here on the first line ?

23 Confirm s the plea agreement ?

24 A.     Yes, ma'am .

25 Q.     And as part of the plea agreement , did you agree

1 to cooperate with law enforcement authorities?

2 A.      Yes, ma'am.

3 Q.      Could you tell this jury what you understand

4 that cooperation to mean?  What do you have to do?

5 A.      Just tell the truth, nothing by but the truth.

6 Q.      In response to whose questions?

7 A.      Your questions.

8 Q.      How about when these guys ask you questions?

9 A.      Them, too.  To tell the truth.

10 Q.      Is there any difference?

11 A.      Excuse me?

12 Q.      Is there any difference?

13 A.      No.  Just to tell the truth.

14 Q.      Who decides what your sentence will be?

15 A.      My judge.

16 Q.      Who is that?

17 A.      Your Honor, Roger Titus.

18 Q.      Any other promises made to you outside this plea

19 agreement?

20 A.      No, ma'am.

21 Q.      In connection with your activity in the Bronx in

22 New York, did you meet an individual by the name of

23 Dog?

24 A.      Yes, ma'am.

25 Q.      And did you meet somebody that was known to you

1  as Dog's girlfriend ?

2  A.      Yes, ma'am .

3  Q.      How did you meet Dog?

4  A.      I met him through a friend of mine from

5  Nicaragua .

6  Q.      And who is that person ?

7  A.      Morazon .

8  Q.      Is that spelled M O R A Z O N?

9  A.      Yes, ma'am .

10  Q.      And how did you know Morazon ?

11  A.      Another friend of mine . I met him over there .

12  Q.      From where ?

13  A.      From Nicaragua , too .

14  Q.      And how did Morazon know Dog?

15  A.      I believe they were in jail in the United States

16  before .

17  Q.      And why do you believe that Morazon and Dog were

18  in jail together ?

19  A.      Because Morazon told me.

20  Q.      Did you talk to Morazon and Dog regarding any

21  business ?

22  A.      Yes, ma'am .

23  Q.      And what business did you talk about ?

24  A.      About drug business .

25  Q.      What kind of drugs?

1 A.      Heroin business.

2 Q.      And what was the conversation?  What was the

3 discussion about?

4 A.      That I would supply him with heroin, you know,

5 once he got, you know, here in New York.

6 Q.      I'm sorry, I had trouble understanding?

7 A.      That I would supply him with heroin when I met

8 with Dog.

9 Q.      And who were you supplying with heroin?

10 A.      Dog.

11 Q.      And did Morazon want to supply -- to be a part

12 of this?  Was he involved?

13 A.      He was back in Nicaragua, so he wasn't here in

14 the United States.

15 Q.      Is that why he didn't do the business with Dog?

16 A.      Exactly, ma'am.

17 Q.      Now, did Dog state a quantity that he wanted

18 from you at the first conversation?

19 A.      At first, said it could be any quantity he said.

20 Q.      I'm sorry what?

21 A.      He said any quantity.  He didn't tell me a

22 specific what -- how much -- the amount of what he

23 wanted.

24 Q.      Just so we can get the timing right, you were

25 arrested in April of 2004?

1  A.       Yes, ma'am.

2  Q.       How -- approximately  how long before your arrest

3  was this conversation  with Dog?

4  A.       I can say about a year and a half or two.

5  Q.       One and half to two years?

6  A.       Yes, ma'am.

7  Q.       Did you get the heroin for Dog?

8  A.       Yes, I did.

9  Q.       How did you get the heroin for Dog?

10  A.       I got it for who or --

11  Q.       From whom?

12  A.       A guy named Juan Carlos.

13  Q.       I'm sorry, what was his name?

14  A.       From Juan Carlos.

15  Q.       Juan Carlos?

16  A.       Yes, ma'am.

17  Q.       How did you know Juan Carlos?

18  A.       Through a  friend of mine, through Morazon.

19  Q.       Through Morazon?

20  A.       Yes, ma'am.

21  Q.       Where would you meet Juan Carlos to get the

22  drugs?

23  A.       I would meet him at Toys R Us in New Jersey to

24  get it and bring it back to the Bronx.

25  Q.       Toys R Us in New Jersey, and then bring it back

1  to the Bronx?

2  A.      Yes, ma'am.

3  Q.      How would the heroin be packaged?  Would you

4  describe that to the jury?

5  A.      Yes, ma'am.  Wrapping paper.

6  Q.      Wrapping paper?

7  A.      Yes, ma'am.

8  Q.      How did that start?

9  A.      Well, it started since, you know, he waited for

10  me in Toys R Us, he figure he went in and bought a

11  present, so he wrap it up in wrapping paper and just

12  give it to me like that.

13  Q.      From what store?

14  A.      Toys R Us.

15  Q.      Was the heroin cut before you got it?

16  A.      Not that I know of, ma'am.

17  Q.      Would you cut the heroin?

18  A.      Sometimes.

19  Q.      Could you explain to the jury how you would

20  package -- how would it look when you got it into the

21  gift wrap?  How would the heroin look?  Small bags?

22  Big bags, in one --

23  A.      Small bags of 100 grams.

24  Q.      Is when you got it?

25  A.      No, I got it -- I packed it up in small bags of

1 100 grams.

2 Q.     We'll start the jury with how it looked when you

3 got the heroin from Juan Carlos.   What did it look like

4 in the gift wrapping?

5 A.     A whole box of powder.   There was a whole bag,

6 you know, wrapped up, powder.

7 Q.     Was it hard?   Was it soft?

8 A.     Soft.

9 Q.     Was it in multiple bags or one bag?

10 A.     Sometimes one bag, two bags.

11 Q.     Larger bags?

12 A.     Yeah.   It depends on the quantity.

13 Q.     How much would you typically buy from Morazon?

14 A.     From Juan Carlos?

15 Q.     I'm sorry, from Juan Carlos.

16 A.     Sometimes one or two kilos, three.   It depends.

17 Q.     Ever less than one kilogram?

18 A.     Well, when we first started and after that, no.

19 Q.     How much did you pay for one kilogram of heroin?

20 A.     Fifty thousand, $55,000.

21 Q.     What would do with the heroin that you got from

22 Juan Carlos after you received it?

23 A.     I gave it to Dog and to Dog's girl.

24 Q.     Well, backing us up, would you keep it in the

25 same container or would you change it?

1  A.      I would change it.

2  Q.      Could you tell the jury what you did with the

3  package to change it?

4  A.      I wrapped it up in little bags of 100 grams and,

5  wrap it up in a gift wrapping.

6  Q.      Would you add anything to it before you would

7  wrap it up?

8  A.      Sometimes I would cut it.

9  Q.      Could you explain to the jury what "cut" is?

10  A.      It starts with an M, but little soap bars.

11  Q.      What would you do with those?

12  A.      Add it up in 100 grams, you know, the little

13  small bags, add some cut in there.

14        MS. GREENBERG:   Your Honor, may I approach the

15  witness?

16        THE COURT:   You may.

17        BY MS. GREENBERG:

18  Q.      Showing you a portion of what's been previously

19  put into evidence as Digger's Lane 4.

20        Do you recognize this?

21  A.      Yeah, that's the cut that I used to cut the

22  heroin.

23  Q.      It says Mannitol on the front; is that correct?

24  A.      Yes.  Manito, we call it in Spanish.

25  Q.      Was this the same things you used to cut the

1 heroin?

2 A.      Yes, ma'am.

3 Q.      From where did you get this?

4 A.      I got it from a grocery store in the Bronx.

5 Q.      I'm sorry, could you repeat that?

6 A.      From a grocery store in the Bronx.

7 Q.      They sell those at a grocery store?

8 A.      Yes, ma'am.

9 Q.      And how much of that substance would you put on

10 the heroin in terms of ratio?

11 A.      Depends.  30 grams?  You know, 40?  It depends

12 on the quantity, too.

13 Q.      What would that do with respect to the drugs

14 that you got?

15 A.      Add more profit to the -- up my profit.

16 Q.      If you get a kilogram for 50,000 or $55,000 a

17 kilogram of heroin, how much would you sell it to Dog

18 or Dog's girl for?

19 A.      $60,000, $65,000.

20 Q.      Could what you provided be cut again?

21 A.      Yes, ma'am, I believe so.

22 Q.      I'd like to show you what's been previously

23 marked into evidence as Video 22.  If you could look at

24 that screen, either that one or the one on your witness

25 stand, and tell me if you recognize what's depicted in

1  Video  22.

2                   (Video  begins  playing  at  3:56  p.m.)

3          BY MS.  GREENBERG:

4  Q.       Do  you  recognize   that?

5  A.       That's  the  furniture   store.

6  Q.       Whose   furniture   store  is that?

7  A.       My  furniture   store.

8  Q.       Were  you  working  there  in April  of  2004?

9  A.       Yes,  I was  working  there.

10  Q.       How  would  you  get  the  drugs  to  Dog  and  his  girl

11  that  you  got  from  Juan  Carlos?

12  A.       Can  you  repeat   the  question?

13  Q.       You  got  drugs  from  Juan  Carlos  and  you  sold  them

14  to  either  Dog  or  his  girl.   How  would  you  get  the  drugs

15  to  Dog  or  his  girl?

16          Ms.  Interpreter,  the  question  is, he  got  drugs

17  from  Juan  Carlos  and  he  provided  the  drugs  to  Juan  and

18  --  to  Dog  and  his  girl.   How  would  he  get  the  drugs  to

19  Dog  and  his  girl.

20  A.       Used  to  take  a  taxi  and  just  wait  for  him  some

21  places  in  New  York,  like  a  McDonald's,  Burger  King,  nd

22  give  it  to  them,  hand  it  in  to  them.

23  Q.       How  about  the  Furniture   Queen?

24  A.       Yeah,  we  would  do  it  in  the  furniture   store.

25  Q.       Who  would  come  to  meet  you  there?

1 A.        Dog's girl.

2 Q.        Did you ever see if she had anyone with her?

3 A.        Well, she -- I believe she did, because she say

4 I got somebody waiting for me.

5 Q.        The day you were arrested, did you have a

6 conversation with Dog's girl?

7 A.        Yes, ma'am.

8 Q.        What was supposed to happen on that date?

9 A.        She called me.

10 Q.       To do what?

11 A.       To do the transaction for -- I would give her

12 the drugs, she hand me some money.

13 Q.       I'm sorry, what?

14 A.       I will give her the drugs and she will give me

15 some money.

16 Q.       What kind of drugs?

17 A.       Heroin.

18 Q.       How much did Dog's girl ask you for?

19 A.       Well, at the time or before that?

20 Q.       Before she came up, how much did she want?

21 A.       The most that I had, she said.

22 Q.       Did she give you an amount that she wanted?

23 A.       Not really.  She says whatever you have, you

24 know, I want to get it.

25 Q.       Did you reach an agreement about how much to

1 give her?

2 A.      That time, I think it was four  or five kilos,

3 but I didn't have  that at the time.

4 Q.      How much did you have to provide  to her?

5 A.      I have three.

6 Q.      Three what?

7 A.      Kilos of heroin.

8 Q.      Did you give her all three kilogram s of heroin?

9 A.      No, ma'am.  I gave her two.  Two and a half, I

10 think.

11 Q.      Why is that?

12 A.      Because I had not cut the other one, so I can't

13 want to give it to her.

14 Q.      Did she arrive on that date, the date you were

15 arrested?

16 A.      Yes, ma'am.

17 Q.      Did she bring anything  with her?

18 A.      A box of money.

19 Q.      Just to be clear, that was April 23, 2004?

20 A.      Yes, ma'am.

21 Q.      Did you record this money in your ledger?

22 A.      Yes, ma'am.

23 Q.      Showing on the screen what's been pre-marked  as

24 NY-1.  Could you tell the jury what that is?

25 A.      That's the book I kept records of the money she

1  gave me and the drugs that I gave her.

2  Q.      Were Dog and Dog's girl your only customers?

3  A.      I have more -- one or two more.

4  Q.      Are records of their transactions in this book?

5  A.      Yes, ma'am.

6  Q.      Who was your biggest customer?

7  A.      Dog.

8  Q.      Let's start here.  The first entry is January

9  29, 2004, and then it says, 1021G, and then a dollar

10  figure.  Could you explain to the jury what that is?

11  A.       That is what it says I gave Dog.  And then it

12  says 1,021 grams, that's a kilo and 21 grams, and the

13  money that he gave me.

14  Q.      This number up here 44,920.  What does that

15  mean?  Do you see it right here at the top of the page?

16  A.       That should be the amount that I gave -- the

17  amount of drugs I gave Dog.  That should be the amount

18  of money.

19  Q.      Just to be clear, you gave Dog on January 29,

20  2004, 1,021 grams; is that your testimony?

21  A.      Yes, ma'am.

22  Q.      How much did those -- did that 1,021 grams cost

23  Dog?

24  A.      $61,260.

25  Q.      And you added that to an existing 44,920 to get

1  106,180?

2  A.      Yes, ma'am.

3  Q.      What is that 44,920?   What does that mean?

4  A.      I believe that's another amount of drug I gave

5  him.

6  Q.      Did you have dealings with Dog before January

7  29, 2004?

8  A.      Yes, ma'am.

9  Q.      For approximately how long?

10  A.      I don't remember exactly how long, but it was

11  approximately one year.

12  Q.      Let me ask you this way: Before you were

13  arrested in April 2004, how long had been delivering

14  heroin to Dog?

15  A.      About a year, year and something.

16  Q.      Can you give this jury an estimate in terms of

17  quantity between April of 2003 and January 29 of 2004

18  how much heroin you delivered to Dog or Dog's girl?

19  A.      I believe about 20 kilos of heroin.

20  Q.      Twenty kilograms of heroin?

21  A.      Yes, ma'am.

22  Q.      Between April of 2004 -- April, 2003, and

23  January 29th of 2004?

24  A.      Yeah, I believe so.

25  Q.      Is it correct, sir, in this ledger, that you

1 recorded the transactions that you gave either Dog or

2 Dog's girl by date and by amount? After -- from

3 January 29 up until the date of your arrest?

4 A.    Yes, ma'am.

5 Q.    Just to walk us through this to get some more

6 examples. Dog gave me, 2-4-04, and a dollar figure.

7 What does that mean?

8 A.    The day he showed up and he gave me that amount

9 of money.

10 Q.    And this reference here, short 2,850 and 40,000

11 what does that mean? I'm sorry. Do you see that

12 reference there, short 2,850 and 40,000?

13 A.    Yeah, he was short almost $3,000.

14 Q.    He was supposed to give you more?

15 A.    Yes, ma'am.

16 Q.    And here on February 4th, you provided 1040 G.

17       What does that mean?

18 A.    A kilo of 40 grams of heroin.

19 Q.    And the $62,400?

20 A.    That was the amount we charge him.

21 Q.    And these continued down here with similar

22 notations?

23 A.    Yes, ma'am.

24 Q.    Have you reviewed this ledger before?

25 A.    Yes, ma'am.

1  Q.     Does this reflect  -- is it correct in this

2  column here, when you provided him drugs and this

3  column here is the running total of what was paid and

4  what was owed to you?

5  A.     Yes, ma'am.

6  Q.     Okay.  Now, if we could jump ahead to April 23,

7  2004.  Is that all your handwriting that we've seen so

8  far?

9  A.     Yes, ma'am.

10  Q.     What does this mean up at the top?

11  A.     Dog's account.  That's what it means.

12  Q.     In Spanish?

13  A.     Yes, ma'am.

14  Q.     Now, we have April 23, 2004, as the date you

15  were arrested?

16  A.     Yes, ma'am.

17  Q.     Okay.  You have here she owed me.  You have her

18  I gave her, she owed me.  Who are you referring to

19  there?

20  A.     Dog's girl.

21  Q.     Do you know her name?

22  A.     Now I know it.  Gwendolyn Levi.

23  Q.     And here it's got a reference for 4-23-2004,

24  $220,600, your balance.  Is that how much they owed

25  you?

1  A.       Yes, ma'am.

2  Q.       And do you see that part, it says, I gave you

3  April 23, 2004, 2300?

4  A.       I gave her two kilos and 300 grams.

5  Q.       2.3?

6  A.       Yes, ma'am.

7  Q.       2300 grams for how much?

8  A.       $138,000.

9  Q.       For a total balance of? Can you see that there?

10  A.       $358,600.

11  Q.       And you have different calculations here, and

12  down here at the bottom, there's a reference to

13  261,500.  What does that reflect?

14  A.       She gave me 261,500.

15  Q.       How did she give you $261,500?

16  A.       In the box she gave me that day.

17         MS. GREENBERG:  Your Honor, if I may approach?

18         THE COURT:  You may.

19         BY MS. GREENBERG:

20  Q.       Showing you what's been marked as NY-4.  Does

21  that appear to be the box similar to the box that you

22  got from Ms. Levi?

23  A.       Yes, ma'am.

24  Q.       And this number that was written on it.

25  A.       Yeah.  That's the amount of money that was

1  suppose d to be there .

2  Q.      261,500 ?

3  A.      Yes, ma'am .

4  Q.      Did you have an opportunity to count that money ?

5  A.      No, ma'am .

6  Q.      Showing you what's been marked as Levi -8, do you

7  recognize that wrapping paper ?

8  A.      That 's the wrapping paper I give to her .

9  Q.      I'm sorry .  What is this wrapping paper ?

10  A.      I will give her the heroin .  I will wrap it up

11  like that .

12  Q.      Is this the wrapping paper you used on April 23,

13  2004 ?

14  A.      Yes, ma'am .

15  Q.      "Over the hill ?"

16  A.      Yes, ma'am .

17  Q.      Showing you what has been marked as Drugs -2,

18  although these have certain black markings on that ,

19  does that appear similar to the baggies you used to

20  wrap the heroin ?

21  A.      Yes, ma'am .

22  Q.      And is this similar in size and substance to

23  what you provided to Dog 's girl that date ?

24  A.      Yes, ma'am .

25  Q.      Now , why didn't you sell Gwen the addition al

1 amount that was in your furniture store? Why didn't

2 you sell her the additional heroin that was in your

3 furniture store?

4 A.     Because I didn't have the chance to cut that

5 one.

6 Q.     Where did you cut your drugs?

7 A.     I used to rent rooms and cut it in there.

8 Q.     Where would you get rooms?

9 A.     Like houses, rent a room houses.

10     MS. GREENBERG:   Your Honor, if I may approach

11 again.

12     THE COURT:   You may.

13     BY MS. GREENBERG:

14 Q.     Could you tell the jury what NY-3 is?

15 A.     That's the phone that I was using to call Dog's

16 girl.

17 Q.     Have you reviewed this phone and saw Dog and

18 Dog's girl on your phone?

19 A.     Yes, ma'am.

20 Q.     And NY-2, what is that?

21 A.     That's the scale that I used to make the 100

22 grams bags.

23 Q.     I'm sorry, it was used to what?

24 A.     To pack up the small little bags, 100 grams.

25 Q.     Is this scale capable of weighing 100 gram

1 quantiti es?

2 A.     Yes, ma'am .

3 Q.     Where was this scale kept by you?

4 A.     I had it in the store that day.

5 Q.     I'm sorry?

6 A.     I had it in the store that day I got arrested.

7 Q.     In the Furniture Queen store?

8 A.     Yes, ma'am .

9 Q.     Now , did you estimate , based on your ledger , how

10 much drug s you sold to Gwen and Dog between January of

11 2004 and when you were arrested on April 23 , 2004?

12 A.     Almost 20 kilo s of heroin .

13 Q.     Of heroin ?

14 A.     Yes, ma'am .

15 Q.     And did anyone work for you to cut the drug s?

16 A.     No .  I did it myself .

17 Q.     Why not ?

18 A.     I trusted myself better .

19 Q.     You didn't trust anybody else ?

20 A.     No, ma'am .

21 Q.     Did anyone repackage the drug s for you ?

22 A.     I did it .

23 Q.     Base d on your conversation s with Dog and Gwen ,

24 did you know what they were do ing with the drug s?

25 A.     I believe they were sell ing it .

1 Q.      Where ?

2 A.      Down here , Maryland , Baltimore .

3 Q.      Do you know who they sold it to?

4 A.      No, ma'am .

5 Q.      Do you know if they cut it or someone else did ?

6 A.      They did cut it.

7 Q.      How do you know that ?

8 A.      Because they asked me for some cut one day so I

9 believe d there was cut in it.

10 Q.     What kind of cut did you give them ?

11 A.     The same one you just show ed me , man ito.

12 Q.     Just so the record is clear , what I show ed you

13 before , NY-4 ?

14 A.     Yes, ma'am .

15 Q.     You provided them box es just like this ?

16 A.     Yes, ma'am .

17 Q.     Did you tell them where you got it?

18 A.     No .

19 Q.     How many of these little soap -size Mannitol

20 (sic) did you give them ?

21 A.     About 15, 20.

22 Q.     About 15 or 20?

23 A.     Yes, ma'am .

24 Q.     Do you know after they cut the drug s what they

25 did with the drug s?

1  A.       They were selling it.

2  Q.       Do you know who they sold them to?

3  A.       No, ma'am.

4  Q.       Do you know any of the people that were

5  customers or buyers from them?

6  A.       No, ma'am.

7  Q.       Have you ever met anybody else associated with

8  their heroin conspiracy?

9  A.       No, ma'am.

10  Q.       Do you recognize any of the people sitting here

11  in the courtroom?

12        MR. MITCHELL:   Objection.

13        Can we approach?

14              (At the bar of the Court.)

15        THE COURT:   Your objection is?

16        MR. MITCHELL:   There is a report where Mr.

17  Uriarte is shown a bunch of photos, a number of photos

18  in which he recognizes people because he was locked up

19  with them, one of which is my client, and I believe --

20        MS. GREENBERG:   I'm just saying do you recognize

21  any of these people prior to April 2004.

22        MR. MITCHELL:   No.  You said, do you recognize

23  any of the people.

24        MS. GREENBERG:   I will rephrase it.

25        MR. HALL:   My client was locked up with him,

1 too.

2          MR. MITCHELL:   I think the question is

3 objectionable because it leaves it open to where.

4          THE COURT:   Prior to your arrest in this case,

5 were you acquainted with any of the persons in this

6 courtroom?

7             MR. MITCHELL:   That will be fine.  Thank you.

8                    (Back in open court.)

9          BY MS. GREENBERG:

10 Q.      Just to clarify, Mr. Uriarte.

11 A.      Yes, ma'am.

12 Q.      Prior to your arrest in April of 2004, had you

13 had any occasion to meet any of the people that you see

14 here in this courtroom?

15 A.      Yes, ma'am.

16 Q.      Prior to your arrest in April, 2004?

17 A.      No, ma'am.

18 Q.      Had you had any occasion to meet anybody that

19 worked with or dealt with Gwen or Dog?

20 A.      No, ma'am.

21 Q.      Just to be clear, we're talking about the amount

22 of drugs from when you first met Dog until the time

23 that you started keeping a ledger, approximately how

24 many drugs, kilograms of heroin, had you provided to

25 him?

1 A.      It was more than 20.  I don't know  the exact

2 amount.

3 Q.      Between  January  of 2004 and  the time you were

4 arrested  in April  of 2004, all  of those  amounts are

5 recorded here; is that  correct?

6 A.      Yes, ma'am.

7 Q.      In the  middle  column  where  we see, for  example,

8 2.225 and  2.300.  That's all  recorded in your  ledger;

9 is that  correct?

10 A.      Yes, ma'am.

11 Q.      Could  you  give  the  jury an  approximate  amount,

12 in case they  don't  want  to add up the number s, between

13 January  of 2004 and April  of 2004 in addition  to what

14 you just said what  you dealt  to Dog and Gwen?

15 A.      Twenty  kilos of heroin.

16 Q.      Approximately?

17 A.      Yes, ma'am.

18        MS. GREENBERG:   No further  question s, Your

19 Honor.

20        THE  COURT:  Cross-examination ?

21        MR. MONTEMARANO:   Court's indulgence  for a

22 moment, Your  Honor.

23        THE  COURT:  All right.

24              **CROSS-EXAMINATION**

25        BY MR. MONTEMARANO :

1  Q.      Good afternoon, Mr. Uriarte.  How are you?

2  A.      How you doing, sir?

3  Q.      Let me see if I can get this straight.  You came

4  to this country illegally; correct?

5  A.      Yes, sir.

6  Q.      Started dealing drugs?

7  A.      Yes, sir.

8  Q.      Got convicted; correct?

9  A.      Excuse me?

10 Q.      Got convicted?

11 A.      In this charge?

12 Q.      In New York?

13 A.      Yes.  For the first time.

14 Q.      About 1998?

15 A.      1997.

16 Q.      '97?

17 A.      Yes.

18 Q.      What was the sentence you received?

19 A.      Three to life, I think, I believe it was.

20 Q.      Three to?

21 A.      Life.

22 Q.      Three to life?

23 A.      Yes.

24 Q.      Three years to life?

25 A.      Three years to life.

1  Q.      So you're still on parole or probation?

2  A.      I got deported, so I don't know how that worked.

3  Q.      You then came back to the U.S.?

4  A.      Yes, sir.

5  Q.      That's the second time you entered illegally;

6  correct?

7  A.      Second time, sir.

8  Q.      And started dealing drugs again?

9  A.      Yes, sir.

10 Q.      You just told Ms. Greenberg, in response to her

11 question, you thought you sold about 20, 2-0?

12 A.      Yes, sir.

13 Q.      Kilograms of heroin to Gwen and Dog; correct?

14 A.      Yes, sir.

15 Q.      Do you remember testifying here in this court --

16         MS. GREENBERG:   Your Honor, may we approach?

17              (At the bar of the Court.)

18         MS. GREENBERG:   Your Honor.

19         THE COURT:   Wait until Mr. Mitchell gets here.

20         MS. GREENBERG:   Ms. Johnston also pointed that

21 out to me.  In the ledger, I've counted it a zillion

22 times, and I've talked to this witness at least three

23 times.  It's 18.7, in the ledger between January and

24 April, kilograms of heroin.  There's a typographical

25 error in the transcript where she didn't hear 18 and

1 she wrote 80.  It's not the witness ' --

2          MR. MONTEMARANO :  I see 50 to 55.  Your question

3 was how much he sold to them and that was 20.  I was

4 going to clarify that he told this court , before Judge

5 Titus, a different number back in November , I guess .

6          MS. GREENBERG:   I thought he was going to go

7 into the 80 where it was suppose d to be 18.  That's

8 fine .

9          THE COURT:  Objection is withdrawn .

10          MR. MONTEMARANO :  Objection is withdrawn , Ms.

11 Greenberg ?

12          MS. GREENBERG:   That 's fine .  Go ahead .

13          BY MR. MONTEMARANO :

14 Q.     Do you remember testify ing here on Tuesday , 22nd

15 of November , 2005 , about six months ago ?

16 A.     Yes, sir .

17 Q.     Do you remember being asked how much heroin you

18 sold Gwen and Dog ?

19 A.     I remember being asked that , yes, sir .

20 Q.     Do you remember what you told the Court ?

21 A.     I think it was approximately 20 kilo s.  I don't

22 remember the question that I gave at that time .

23 Q.     You read English ?

24 A.     Yes, sir .

25 Q.     Okay .  So you can read this ?

1  A.      Yes, sir.

2  Q.      What does that say right there?

3  A.      Fifty-five kilos.

4  Q.      Fifty to 55 kilos?

5  A.      Yes, sir.

6          MR. MONTEMARANO:   No further questions, Your

7  Honor.

8          MR. MARTIN:   Mr. Goodwin has no questions for

9  Mr. Uriarte.

10         MR. HALL:   No questions, Your Honor.

11         MR. MITCHELL:   No questions, Your Honor.

12         THE COURT:   Anyone else?

13         Any redirect?

14         MR. WARD:   I'm sorry?

15         THE COURT:   Oh, you do?   Thank you.

16                     **CROSS-EXAMINATION**

17         BY MR. WARD:

18  Q.     I'm just sort of interested, sir.   Since you

19  came back illegally the second time, how much money did

20  you make off your drug dealing operations?

21  A.      Well, honestly, the most money that I ever made

22  was Juan Carlos.

23  Q.      Huh?

24  A.      Juan Carlos, who was the one who made the most

25  money than me.

1 Q.      Well, yeah, I'm sure Juan Carlos made money

2 because he was selling to you.

3 A.      Yes, sir.

4 Q.      The question is how much did you make all

5 together?

6 A.      Well, I didn't have a -- I didn't have an

7 average all together how much I make, but.

8 Q.      Hum?

9 A.      I don't have an average of what I made all

10 together, but I did make money.

11 Q.      It sounds to me like you made about ten grand a

12 kilo.

13 A.      Not myself.

14 Q.      Huh?

15 A.      Five, $5,000.

16 Q.      Let's say $5,000 a kilo.

17 A.      Yes, sir.

18 Q.      And you gave -- you estimate you sold as much as

19 55 kilos?

20 A.      Yes, sir.

21 Q.      Of course you paid taxes on all that money,

22 right?

23 A.      No, sir.

24 Q.      Oh, you didn't?  Oh, I see.

25         That was what helped you to buy your furniture

1  store; isn't that correct, sir?  All the money you made

2  on drugs?

3  A.       Well, the furniture store was a family business,

4  so it wasn't really mine.   I worked there.

5  Q.       You worked there?

6  A.       Yes, sir.

7  Q.       You got paid for working there?

8  A.       Yes, sir.

9  Q.       And the 55 times $5,000 went into your pocket,

10 you didn't pay any taxes on it?

11 A.       No, sir.

12 Q.       No what?  No, you didn't pay taxes, or no, it

13 didn't go into your pocket?

14 A.       What?  Can you repeat the question, please?

15 Q.       My question is you said, no.  My question is,

16 did you mean, no, that you didn't pay taxes on it, or

17 did you mean no, that the money didn't go into your

18 pocket?

19 A.       Some money did go into my pocket.  I didn't pay

20 taxes because I was illegally in this country.  That's

21 why.

22 Q.       You didn't pay taxes because you were illegal?

23 A.       Yes, sir.

24 Q.       Some went into your pocket.

25 A.       Yes, sir.

1 Q.      I assume the rest you gave to charitable causes,

2 like the church and things like that; is that right?

3 A.      Well, I helped, you know, my family.

4 Q.      You helped your family?

5 A.      Yes, sir.

6 Q.      Are they illegal, too?

7 A.      No, they're legal.

8 Q.      They're legal?

9 A.      Yes, sir.

10        MR. WARD:   Okay.  All right, sir.  Thank you.

11        THE COURT:   Any other cross?  Any redirect?

12        MS. GREENBERG:   Briefly, Your Honor.

13                   **REDIRECT EXAMINATION**

14        BY MS. GREENBERG:

15 Q.     This is your ledger; correct?

16 A.     Yes, ma'am.

17 Q.     You start recording in this ledger the

18 transactions with Dog starting on January 29, 2004?

19 A.     Yes, ma'am.

20 Q.     Based on this $44,000 figure, had you had prior

21 transactions with Dog?

22 A.     Yes, ma'am.

23 Q.     Did you keep a record of that?

24 A.     At the level, no.

25 Q.     So that is no longer in existence?

1  A.      No.

2  Q.      And you estimated a certain amount based on the

3  transactions prior to January 29, 2004?

4  A.      On this book.

5  Q.      But you don't have an exact quantity?

6  A.      No, ma'am.

7  Q.      So prior to January 29, 2000, how many kilograms

8  are we talking about?

9  A.      I believe it's 20.

10 Q.      Just to be clear.  That's just an estimate?

11 A.      Yes, ma'am.

12 Q.      But the amounts for -- from January 29, 2004,

13 are listed on Page 1 of this that you gave Dog, this

14 sheet right here?

15 A.      Yes, ma'am.

16 Q.      If we're clear, the numbers here 1021G, 1040G,

17 633G, 1500G, down here, 1065G.

18         What do they all relate to?

19 A.      Heroin.  Kilos.

20 Q.      And in terms of grams?

21 A.      Yes, ma'am.  A kilo and 65 grams.

22 Q.      That's a little over a kilogram?

23 A.      Yes, ma'am.

24 Q.      Not to take the jury's time, but the same thing

25 is on the back of this page?

1  A.       Same thing.

2  Q.       And you changed it in the middle of the page,

3  start having "her" reference.  Two is, gave her, for

4  example, with this 2200.

5  A.       Dog's girl.

6  Q.       Who is that?

7  A.       Gwendolyn Levi.

8  Q.       But this is still on Dog's account?

9  A.       Yes, ma'am.

10 Q.       So all these figures here in the middle column

11 starting on this page from 2000 down to 2650, what do

12 they relate?

13 A.       Kilos.

14 Q.       And lastly, account to Dog, Dog's account, is

15 this the last page of your transactions?

16 A.       Yes, ma'am.

17 Q.       So they basically go from January 29, 2004, to

18 April 23 of 2004; is that correct?

19 A.       Correct.

20 Q.       And is that in addition to the approximately 20

21 kilograms you previously testified to?

22 A.       Yes, ma'am.

23          MS. GREENBERG:  Nothing further, Your Honor.

24          THE COURT:  Any recross?

25                      **RECROSS EXAMINATION**

1          BY MR. MONTEMARANO :

2 Q.       Do you have your plea agreement , sir?

3 A.       Not here , sir .

4 Q.       Have you discuss ed with Mr. Barber the potential

5 sentence you might receive ?

6          MS. GREENBERG:    Your Honor , this is outside the

7 scope of redirect .

8          THE COURT:    Approach the bench

9                (At the bar of the Court.)

10          THE COURT:    How is this proper recross ?

11          MR. MONTEMARANO:    I'm simply clarifying what she

12 asked --

13          THE COURT:    How is this -- is somehow this

14 predicate d upon redirect ?

15          MR. MONTEMARANO:    This is predicate d on her

16 redirect and the potential sentence .   We now went from

17 20 up to 40 .

18          MS. GREENBERG :   Your Honor, I was asking him to

19 clarify what Mr. Montemarano crossed him on, the 55

20 kilograms.   I was asking him to clarify, since he

21 refused even to -- that's all I did.   It was based on

22 his prior testimony , so it was within the scope of

23 cross-exami nation,   and this is outside the scope of

24 redirect .

25          MR. MONTEMARANO :   Based upon her clarification ,

1   I have determined that investigating the potential

2   sentence based upon his plea agreement would be

3   entirely reasonable.  If the Court says I can't do it,

4   obviously I can't, Your Honor.

5         THE COURT:  How far are you going with this line

6   of questioning?

7         MR. MONTEMARANO:  I was going to ask him the

8   potential sentence he was going to receive.  I was

9   going to ask him a few follow-up questions following up

10  on Mr. Ward's questions.  I think I have ten questions

11  total.

12        THE COURT:  I'm going to sustain the objection.

13              (Back in open court.)

14        MR. MONTEMARANO:  Court's indulgence.

15        MR. MONTEMARANO:  Court's indulgence, please.

16        THE COURT:  You may.

17        MR. MONTEMARANO:  Nothing further, Your Honor.

18  Thank you.

19        THE COURT:  All right.  You may step down.

20              (Witness excused at 4:26 p.m.)

21        THE COURT:  Counsel approach the bench

22              (At the bar of the Court.)

23        THE COURT:  Is Sergeant Sakala available to be

24  further examined?

25        MS. JOHNSTON:  Yes, Sergeant Sakala is

1  available .  I will advise the Court that we have two

2  witness es we have to get on tomorrow  because  of

3  vacation  schedule s.  They will be -- one will be

4  definite ly out of order .  This 's the chemist  Gervasoni .

5  He's going to testify about some  of the drug s we

6  haven't  introduced  yet from the search  warrant s and the

7  other  one is Detective  Hubbard .

8         Sergeant  Sakala  is here and is available  for his

9  recross -examination , but it's 4:30 now.

10        THE COURT:   It's 4:29.  I have a status

11  conference  in a civil case at 5:00 .  I could go long er,

12  unless  you all have had enough of this case for today .

13        MS. JOHNSTON:   I don't think  we've had enough of

14  this case for this week .

15        THE COURT:   No, we haven't .

16        MS. JOHNSTON:   We've had about four hour s of

17  testimony  between  these two day s; however , I would note

18  that the Court was very narrow in term s of Ms. Harden 's

19  waiver  of her appearance  here .

20        THE COURT:   That 's correct .

21        MS. JOHNSTON:   I don't know  where counsel  is

22  going .

23        THE COURT:   You are correct .  Thank you for

24  remind ing me of that .  Okay .  We are going to recess .

25  The jury is asking to tell them what my anticipate d

1 schedule is for next week, and let me tell you what I'm

2 planning to tell them.  Tuesday, I'm going to be

3 starting at 10:00 because I have an ugly civil motion

4 at 9:00.  Somebody wants to depose the county executive

5 of Prince George's County.

6           MS. JOHNSTON:   That ought to be interesting.

7           THE COURT:   Yeah.

8           MR. MONTEMARANO:   Can we come and watch?

9           THE COURT:   Wednesday, I have a sentencing of

10 another defendant in this case.

11           MS. JOHNSTON:   Who is that?

12           THE COURT:   Mr. Farmer.

13           MS. JOHNSTON:   Oh, okay.

14           THE COURT:   So we have to start at 10:00.  I

15 have a -- it's either a hearing on pending motions or

16 guilty plea, in a case on Thursday.  So we will start

17 at 10:00, and on Friday, I'm going to see if I can do

18 the schedule of 9:00 to 2:00.

19           MS. JOHNSTON:   I would just notify Court that we

20 are behind my schedule, and my schedule, quite frankly,

21 taking into account we have to have a forfeiture

22 proceeding as well if there is a guilty finding, and I

23 believe that will be contested, so we are behind

24 government's schedule at this point in time.  I still

25 hope to rest next week, although if we have more

1  illness es and more elevator s stuck .

2       THE COURT:   If we get seriously  behind , we will

3  start  talk ing  about  start ing  early  and  run ning  late .

4  Next  week ,  I have  9:00 --  I have  block ed  out  9 o'clock

5  matter s , and  going  from  10 o'clock  to  4:30  every  day .

6  Except  on  Friday .  I will  recess   today .

7       Where 's  Mr. Sussman ?  You haven't  heard  anything

8  further  from  your  client ?

9       Have  you  heard  anything  further  from  your

10  client ?

11       MR. SUSSMAN :  I've  gotten  some  call s , but  I

12  haven't  pick ed  it  up .  I was  wait ing  until  we

13  adjourn ed .

14       THE COURT:   Why don't  I dis charge  the  jury  and  I

15  won't  leav e  the  bench .   Why don't  you  find  out  what  the

16  stat us  is .   I want  to make  sure  you  have  a way  to

17  notify  me  and  my  law  clerk .

18       MR. SUSSMAN :   I was  try ing to  get  your  fax

19  number  because  you  said  you  want ed  some  paperwork .

20       THE  COURT:   That 's  true .

21       MR. SUSSMAN :   As  soon  as  we  break ,  I will   check .

22       THE COURT:   I will  break  the  jury .   Stay  behind .

23            (Back  in  open  court .)

24       THE COURT:   Ladies  and gentlemen  , we're  going  to

25  conclude  the  testimony  today  with  that  witness .   I will

1 resume tomorrow at 9:00, and we will go to 2:00, plus

2 or minus -- 2:30 at the worst, with two breaks.    You

3 asked about next week.  Next week is a day we're

4 sitting, as you know, four days of the week.

5         On Tuesday, Wednesday, and Thursday, we'll start

6 at 10:00 because I have 9 o'clock matters on those

7 three days.  On Friday, the 14th, a drill day.  I'm

8 going to try to do the Friday drill, starting at 9:00

9 and ending at 2:00.

10         Now, that is subject to change, and if any

11 change occurs, I will let you know right away, but I

12 anticipate that we'll have a full day beginning at 9:00

13 on Monday -- excuse me, Tuesday, and that we'll go

14 until 4:30.  All right.  You're excused for the day.

15 Please do not discuss the case amongst yourselves or

16 with any other persons until you return.

17              (Jury excused at 4:31 p.m.)

18         THE COURT:  Mr. Sussman, did you say -- did you

19 say there's something on your cell phone?

20         MR. SUSSMAN:  Well, no.  There's some restricted

21 calls.  If the court will allow me, I will step

22 outside.

23         THE COURT:  Do you want to step outside and see

24 if you have an update?

25         MR. SUSSMAN:  That's what I will try to do.  I

1  asked for your fax number .  I have the chamber s number .

2       THE COURT:  You want me -- I'll give it to you .

3  It's (301) 344-3888.

4       MS. JOHNSTON:  May the interpreter  be excused ?

5       THE COURT:  Yes, ma'am .  Thank you very much .

6       MR. MONTEMARANO :  Your Honor , can I address

7  defense Counsel about witness es for tomorrow ?

8       THE COURT:  Yes .

9       MS. JOHNSTON:  Your Honor , before counsel does

10 that , while Your Honor is still here , if for some

11 reason Ms. Harden has a note that her doctor says she

12 can't come to court tomorrow , I would like the Court to

13 get a waiver from her so that we can proceed with

14 testimony not involving her directly , and that would be

15 the testimony of Gervasoni , the chemist having to deal

16 with the analysis of drug s that were not seize d from

17 her that I think she was , at one point , willing to

18 stipulate or has stipulate d to some of these find ings .

19       MR. SUSSMAN:  We stipulat ed to the chemist .

20       MS. JOHNSTON:  Right .  But it has to do with

21 people who have not stipulate d as to their drug s.  Ms.

22 Dobie , and I think Mr. Goodwin haven't stipulate d to

23 all their drug s.

24       It also has to do with Detective Hubbard , I

25 believe , who is the Takoma Park officer who arrested

1  Mr. Bynum in 1999, and then we would like to proceed

2  with the search warrant s at Paula 's School of

3  Performing Arts at Hayward and, if necessary , we would

4  go to Oglethorpe from there, but I don't think we'll

5  get that far, and Mr. Echarte 's testimony .

6         MR. SUSSMAN : You don't need me.

7         MS. JOHNSTON:  Mr. Echarte does not know Ms.

8  Harden , but I don't want us to lose another day in

9  court .

10         THE COURT:  No, I don't intend to.

11         MS. JOHNSTON:  If Ms. Harden is willing to --

12         THE COURT:  Mr. Sussman , you've got to impress

13  upon your client that some note from an emergency room

14  physician 's assistant that says Ms. Harden needs bed

15  rest and can't come to court for a week or something is

16  not going to do the job.

17         MR. SUSSMAN : Well , let me just take it one step

18  at a time .

19         THE COURT:  Let's see what it is . She needs to

20  understand I take very seriously her requirement to be

21  here . And I really need something very power ful that

22  would indicate that that 's simply not possible .

23         MR. SUSSMAN : Your Honor , I think she took that

24  requirement . She's been making appearances for two

25  year s. I think she was really not engage d yesterday

1 because she felt so badly, and I think she woke up

2 feeling horrible and thought she was doing the right

3 thing.

4          THE COURT:  Hopefully with the short session

5 tomorrow and the whole weekend to recover until

6 Tuesday, she will be fine.  But impress upon her that

7 she can't call up and say, gee, I don't feel good and I

8 can't come.

9          MR. SUSSMAN:  I will, sir, and I will try to get

10 whatever paperwork they gave her.

11          THE COURT:  I'm working on something here, so

12 you go out and make your phone call and tell me what --

13 you come back and tell me what you find out because if

14 we can address it today, I'd like to.

15          MR. SUSSMAN:  I will see what I can get.  If

16 she's got paperwork, I will have it faxed to you.

17          MS. JOHNSTON:  If she can't be here, I would

18 like a waiver.

19          MR. SUSSMAN:  I will try to do that.

20                  (Off the record at 4:35 p.m.)

21                  (On the record at 4:39 p.m.)

22          MR. SUSSMAN:  I have Ms. Harden on the phone.

23 She has not been seen.  Crisis in emergency medicine.

24 Given that situation, I expressed -- I don't know if

25 she can hear me.  I expressed a concern that you want

1 her here at 9 o'clock tomorrow, that we could do

2 something similar, if worse came to worse that we did

3 today, but that would not be anyone's desire. She has

4 not been seen. I'll -- you know, I will instruct her

5 to do what you suggest. Do you want the paperwork once

6 she gets seen faxed directly to you?

7          MS. JOHNSTON:   My suggestion is she bring

8 whatever paperwork she has tomorrow morning.

9          THE COURT:   I think she should come here with

10 her paperwork.

11          MS. JOHNSTON:   If she were in a life-threatening

12 or serious injury, she would have been seen.

13          THE COURT:   This is my alma mater, Johns

14 Hopkins. I can't believe they would make her sit in an

15 emergency room all day long if she were an emergent

16 patient.

17          MR. SUSSMAN:   It depends on what comes in on any

18 given day.

19          THE COURT:   Tell her I expect her to be here

20 tomorrow and she should bring whatever note she has

21 with her and we will deal with it, but she really has

22 to be here.

23          MR. SUSSMAN:   I'm sorry, Your Honor.

24          THE COURT:   All right.

25               (Off the record at 4:40 p.m.)

1                        **CERTIFICATE**

2

3        I, Tracy Rae Dunlap,   RPR , CRR , an Official Court

4   Reporter for the United States District Court of

5   Maryland, do hereby certify that I reported, by machine

6   shorthand, in my official capacity, the proceedings had

7   and testimony adduced upon the Jury Trial Proceedings

8   in the case of UNITED STATES OF AMERICA versus PAULETTE

9   MARTIN, et al,   Criminal Action Number   RWT-04-0235 on

10  July 6, 2006.

11

12       I further certify that the foregoing    225 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17       In witness whereof, I have hereto subscribed my

18  name, this  24th day of April 2008.

19

20

21                        _____

22                        TRACY RAE DUNLAP, RPR, CRR
                          OFFICIAL  COURT REPORTER
23

24

25