```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                      SOUTHERN DIVISION
 2
    ------------------------x
 3  UNITED STATES OF AMERICA  :
            Plaintiff         :
 4                            :
                              :
 5  vs                        :Criminal Action:    RWT-04-0235
                              :
 6                            :
    PAULETTE MARTIN, et al    :
 7          Defendants.       :
    ------------------------x
 8

 9                         Friday , July 7 , 2006
                           Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11  Proceeding before the HONORABLE ROGER W. TITUS, United
    States District Judge, in courtroom 4C, commencing at
12  8:52 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS THE TESTIMONY AND PROCEEDINGS
15      OF THE CASE AS RECORDED   AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD  SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
    Tracy Rae Dunlap,   RPR , CRR          (301) 344-3912
25  Official Court Reporter
```

1                        I N D E X

2
                                 DIR          CROSS     REDIR        RECROSS
3
    Richard   Gervasoni      43,54        47,61
4
    George  Hubbard          130          159       170          173
5
    Chris  Sakala            177
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                                          Page

23  Reporter's Certificate                           216

24  Concordance                                      217

25

1          MR. SUSSMAN:  Does Your Honor want the morning

2 health report?

3          THE COURT:  We got a voice mail from you.  Any

4 update?

5          MR. SUSSMAN:  The only update I have is I spoke

6 to Ms. Harden at 8:10.  She called me, she said she was

7 running a little late.  She had gastric disturbance as

8 part of the package, and she was indisposed, but she

9 should be here right at 9:00.

10         THE COURT:  I'm going to be dealing with legal

11 matters until 9:00.

12         MS. JOHNSTON:  Your Honor, I apologize.  I

13 thought we were starting at 9:00.

14         THE COURT:  No, no, I said I would be here a

15 quarter of.

16         MR. WARD:  You only have to come 50 yards.

17         THE COURT:  Counsel, I have distributed to all

18 of you a cautionary instruction regarding the testimony

19 of Shelton Roberts.  I hope I spelled it right.  Please

20 look at that because I want to discuss that with you

21 when we get everybody assembled.

22         MS. JOHNSTON:  That instruction is fine with the

23 government.

24         THE COURT:  All right.

25         MR. WARD:  Your Honor, if I may.  I wonder if

1  the Court shouldn't say at the end, accordingly

2  instruct, you may consider this evidence but only for

3  the limited purposes that I have just described, and

4  you may give it such weight as you think is

5  appropriate.

6         THE COURT:  I think that's appropriate for the

7  final instructions, but this is just an interim

8  instruction.  I want to make sure they know it's

9  admitted for one purpose, but not for the other.

10        MR. WARD:  All right, sir.

11        MR. MONTEMARANO:  If the defendants could be

12  heard, Your Honor.

13        THE COURT:  Certainly.

14        MR. MONTEMARANO:  There has been no evidence

15  that Ms. Martin occupied the premises.  Using the word

16  occupied, if you use the dictionary definition, she

17  certainly occupied  it because she was there on those

18  two days.  There has been no evidence that she rented,

19  no evidence she lived there, no evidence regarding

20  personal papers or any other indicia of

21  ownership/tenancy.

22        THE COURT:  What would you propose I put down?

23        MR. MONTEMARANO:  I'm mulling that over as we

24  speak, but I want it put on the record that I think

25  that is a less than --

1          THE COURT:   I mean, occupied is about as benign

2 as I could make it.   I didn't say owned, but I didn't

3 say rented by.   I didn't say lived in.   She certainly

4 was occupy -- occupying it on the two occasions when

5 they went there.

6          MR. MONTEMARANO:   How about occupied by Paulette

7 Martin and others, because there is testimony of that?

8          MS. JOHNSTON:   It doesn't make any -- that's not

9 the issue here.   The issue is what the evidence has to

10 do with Ms. Martin.   The Court's not trying to

11 summarize the evidence or try to be all-inclusive in

12 terms of what the evidence was.   You would -- the Court

13 should then add and occupied others where -- we could

14 have the Court describe the cocaine that was found and

15 the gun that was found on one occasion.   I don't think

16 adding others does anything to the instruction.

17          MR. MONTEMARANO:   The others takes away from the

18 suggestion in occupied that there is some kind of

19 ownership or tenancy because that is part of the issue,

20 the problem, whatever you want to call it.

21          THE COURT:   By the way, for appellate review

22 purposes, I'm going to direct that one copy of this

23 draft instruction be filed as the Court's draft

24 instruction so that the record will be clear what we're

25 talking about.

1          MR. MONTEMARANO :  No objection  from the defense ,

2  Your Honor .  I submit  that it is the whole  question  of

3  occupancy ; i.e., her ownership  of the premises  involved

4  in this case at Bexhill  -- South  Dakota  that creates

5  the problem  for the defense , and I would  submit  that

6  suggesting  in any way , shape or form a parallel  nature

7  to her occupancy  of the 9th Street  address  is just not

8  an accurate  recitation  of the facts, and too parallel

9  the two is something  the Court  should  seek  the avoid .

10  And for that reason , if you suggest  occupied by her and

11  others, it makes clear the distinction  between  Bexhill

12  or Hayward  of which  there  is no question  about

13  occupancy  or --

14          THE COURT:   I'll put in and others.   It's an

15  innocuous  change .

16          MS. JOHNSTON:   Your Honor , that has nothing do

17  with the instruction , and quite  frankly , the residence

18  on Hayward  is not owned by Ms. Martin .  She occupied

19  that .  We're not going  to -- that 's argument  for him to

20  argue  that there  were others in the house  and that

21  maybe  the drugs weren't  hers.

22          THE COURT:   Ms. Johnston , I'm going  to put it in

23  and others.   I don't think  that 's a big deal and --

24          MR. MONTEMARANO :   Thank  you , Your Honor .

25          THE COURT:   -- I would  just as soon  get this so

1 that there's not any serious objection , but I've tried

2 to faithfully follow the rule and to take one of the --

3 I don't want to say anything unkind about the language

4 drafting of this rule , but having been a rule writer

5 for many years, I don't like the language of this rule ,

6 but I tried to put in non-tongue-twisting language what

7 the command of this rule means in language that a

8 normal human being can understand .

9       Now , Mr. McKnett , have you been given a copy of

10 this transcript ?

11      MR. MCKNETT :  No , I haven't , Your Honor .

12      THE COURT:  Let me give it to you . I didn't

13 realize you didn't have a copy . David .

14      MS. JOHNSTON:  Your Honor , we have not received

15 a copy either .

16      THE COURT:  Okay . How many counsel want copies

17 of this transcript that relates to Mr. McKnett 's issue

18 on detective -- Sergeant Sakala 's testimony ? Do you

19 all want it?

20      MR. MONTEMARANO :  I want a copy as well , Your

21 Honor .

22      THE COURT:  All right . It will take a little

23 longer .

24      MR. HALL:  We can share .

25      THE COURT:  We will have them for you in a few

1  minute s, so we can deal with that issue .  I will tell

2  you this , while we're maki ng copies for you , Mr.

3  McKnett  it does  appear  that  the whole  question  of him

4  having  an opinion  about  that  subject  was  never  given  by

5  him on direct  and was  only raise d by you on cross , and

6  that  he said  he didn't  have  an opinion  or had  not  given

7  an opinion , excuse  me , in his direct , and  then  when  you

8  asked  him for  it , he says , well , I do have  an opinion

9  a, nd when  he was  asked  what  the basis  was , he says ,

10  well , other  matter s not  in evidence .  So, I think  the

11  subject  of his additional  opinion  was  brought  out  by

12  you on cross .

13       MR.  MCKNETT :  Your  Honor  I'm sure  that 's

14  accurate , but the  -- I think  the crux  of my argument  is

15  that  he had  already  been  asked  that  question  when  he

16  was  being  voir dire d as to whether  or not  he was  an

17  expert , and his answer  then  was  that  he did  not  rely  on

18  any statement s from  other s involve d in the case  that

19  form ed the basis  of his opinion .

20       THE  COURT :  That 's correct , because  the opinion s

21  he gave  on direct  were  ones  that  were  limited  as he

22  indicated , but on your  cross,  you asked  him to give  an

23  opinion  in an area  that  he had  not  wandered  into .

24       MR.  MCKNETT :  Your  Honor , I want  to be clear .

25  I'm not  talk ing about  what  he said  yesterday  on direct

1 or recently on direct.  I'm talking about early on in

2 the trial when he was being voir dired --

3         THE COURT:   On his voir dire, correct.

4         MR. MCKNETT:   -- as an expert, he was asked

5 specifically whether or not he had based his opinions

6 -- any of his opinions as an expert in this case on

7 information he received from others involved in the

8 case.  His answer was unequivocal, no, he did not.  He

9 formed his opinions based on the information, his

10 expertise, training, so forth and other information he

11 received during the case.  I'm sorry, the --

12         THE COURT:   I think his opinions were limited to

13 the totality of all the recorded conversations so he

14 could figure out, looking at them as a whole, what on

15 earth was being talked about in apparently coded

16 conversation, plus his background and experience, plus

17 the surveillances --

18         MR. MCKNETT:   Your Honor.

19         THE COURT:   -- which are in evidence.

20         MR. MCKNETT:   Mr. Martin just pointed out to me

21 that the witness is in the courtroom, and I think just

22 for everybody's sake, it might be a good idea --.

23         THE COURT:   Excuse me.  I didn't know that.

24 Sorry to exclude you again, Sergeant.

25         MR. MCKNETT:   Your Honor, I may not be making

1  myself  clear , but  I  remember  the  question s  when  he  was

2  being  voir dire d -- we  had  original ly  challenge d  his

3  status  as  an  expert  as  proffered  by  the  government , and

4  during  the  voir  dire , he  was  asked  to  de scribe  the

5  basis  for  his  opinion s -- any  of  his  opinion s  that  he

6  intend ed  to  adduce  during  this  trial .

7         He  said  that  his  opinion s  were  form ed  on  his

8  train ing , his  expertise , and  the  information  gathered

9  during  the  course  of  this  investigation .  He  was  then

10  asked  his -- the  basis  for  his  opinion  in  any  way --

11  his  opinion s  were  in  any  way  based  on  information  he

12  received  from  other  individuals  in  this  case , and  he

13  said  no .  He  said  he  reach ed  his  opinion s  as  an  expert

14  without  discuss ing  the  case  with  other s  involve d  in  the

15  case , cooperator s , informants  and  such .  He  said  then

16  when  he  talk ed  to  them , they  corroborate d  his  opinion .

17         So  I  was -- when  I  asked  him -- I  was  simply

18  asking  him  the  same  question , the  question  to  which  he

19  had  answered  previously , no , his  opinion s  are  not  based

20  on  information  he  received  from  cooperator s , informant s

21  or  other s  involve d  in  this  case .  I  think  I'm  entitle d

22  to  rely  on  him  giving  the  expectation  that  he  will  give

23  the  same  answer  to  the  same  question .  He  didn't .  He

24  changed  his  answer .

25         THE  COURT:  No , no , the  problem  is  you  will  have

1  to see the transcript .   The transcript  of your

2  cross-examination   of Sergeant  Sakala  had a question ,

3  and we'll have the exact  question  in a moment , but the

4  essence  of it was , the relationship  between  Ms. Ali and

5  who was the other  person ?   I can't  remember  what it

6  was .

7         MS.  JOHNSTON:    Ms.  Levi .   Ms.  Levi .

8         THE  COURT:    It was a question  about  the

9  relationship  between  the two of them .

10        MR.  MCKNETT :   Yes .

11        THE  COURT:   And you asked  him about  that

12  relationship , and he said I have not given  an opinion

13  about that .   He hadn't  given  an opinion  at all , and

14  then  you asked  him for it .

15        MR.  MCKNETT :   Yes , I did , Your  Honor .

16        THE  COURT:   Well , you asked  him an opinion  that

17  was outside  the subject  area that he had testifi ed to

18  on his direct  and which  was limited  in his direct

19  testimony  to the subject  area s of knowledge  that he --

20  you were advise d he was rely ing upon .   When  you asked

21  him for an opinion  that was outside  the scope  of his

22  direct , he said he haven't  given  an opinion  on that

23  subject , and then  you said well , essentially , give it

24  to me .

25        MR.  MCKNETT :   Yes , I did .

1           THE   COURT:   And then when you asked  him what  the
2  basis  of  it  was ,  he very  candid ly told  you  it  was  on
3  other  stuff  I got  in  the  investigation .
4           MR.  MCKNETT :   Your  Honor ,  I didn't  ask  him  -- I
5  did not  ask  him  the  basis  for  his  opinion .   I just  went
6  on.
7           THE  COURT:   Oh,  no.   You  did.
8           MR.  MCKNETT :   I don't  have   a transcript .   It  was
9  on Ms.  Johnston 's redirect  that  he made  the  statement
10  that  he based  his  opinion  on --
11           THE  COURT:   Other  information .
12           MR.  MCKNETT :   What  other  people  told  him.
13           THE  COURT:   Right .
14           MR.  MCKNETT :   I think  in all  fairness ,  I am
15  entitle d  to  rely  on  the  fact  that  he  had  previous ly
16  state d  under  oath  that  he  did  not  base  any  of  his
17  opinion s  on  what  other  people  involve d  in  the  case  told
18  him.
19           THE  COURT:   That  is what  he consistent ly did  on
20  direct ,  in  the  opinion s  he  gave  on  direct ,  but  on
21  cross ,  he  was  asked  for  an opinion  that  went  out side
22  the  scope  of where  he  had  circumscribe d  himself  in  his
23  direct  opinion  testimony .
24           MR.  MCKNETT :   He  testifi ed  that  as  an expert ,  he
25  had  an opinion  about  what  my client  knew  about  Ms.

1 Levi's actions.

2        THE COURT:   Only because you asked him that
3 question.

4        MR. MCKNETT:   That's true.   I asked him that
5 question because he had already been asked that
6 question or a similar question when he was being voir
7 dired, and the answer to that question was, I did not
8 rely on information told to me by other peoples
9 involved in this case to form the basis for my opinion.

10        THE COURT:   I don't have the transcript that
11 that was voir dire.   I don't recall the voir dire going
12 into that intense detail of the specific opinion about
13 the relationship between Ms. Levi and Ms. Ali.

14        MR. MCKNETT:   I can proffer to the Court that he
15 did say that, and I wrote it down and highlighted it
16 because it's critical that his opinions not be based on
17 hearsay information unsupported otherwise by people
18 involved in this case.

19        THE COURT:   They were not supported by hearsay
20 on his direct opinions.   It was only an opinion you
21 asked him for on cross where he did that.

22        MR. MCKNETT:   It doesn't change the fact, Your
23 Honor, that he already testified that he did not base
24 any of his expert opinions on information   --

25        THE COURT:   The expert opinions he was going to

1   give were going to be expert opinion s based on two
2   subject s:   Interpretation  of the words use d on the
3   record ed conversation s, and second ly, the nature of the
4   drug business  and how people conduct it.   Those were
5   the two area s of his expertise .   Those were the two
6   areas that he specifically  testifi ed to, at least on
7   his direct .   He was n't asked on direct to give any
8   opinion s about do these two people know each other .
9          MR. MCKNETT :   Your Honor is absolute ly correct ,
10  but I -- again , I'm going back to when he was voir
11  dire d as an expert in which he flat ly state d that none
12  of his opinion s were based on thing s told to him --
13  none of his opinion s as an expert .
14         THE COURT:   None of the opinion s that he
15  anticipate d giving  on direct , that's correct .
16         MR. MCKNETT :   No, he didn't say that .   He said
17  none of his opinion s were based on information  told to
18  him by other s in this case .   That was a flat --
19         THE COURT:   Mr. McKnett , it's like a radiologist
20  get s up on the stand and gives exhaustive  testimony
21  interpret ing x-ray s, and on cross-examination , he's
22  asked what 's your opinion of Ocean City, and he says , I
23  think it's a dump. Now he gave an opinion about Ocean
24  City that was asked about on cross-examination .
25         I don't understand  how that kind of an opinion

1  asked  of  an  expert  who  gave  carefully  circumscribe d

2  testimony  on  direct  somehow  is  changed  drastically  by

3  the  fact  that  on  cross-examination  ,  he  is  asked  a

4  different  opinion  .   He  was  asked  an  opinion  that ,

5  frankly ,  I  think  there  could  have  been  a  very

6  legitimate  basis  to  object  to  the  question  you  asked

7  because  it  is  asking  for  information  that ,  in  essence,

8  would  be  based  upon  hearsay .

9        MR.  MCKNETT :   Your  Honor ,  Mr.  Sussman  I  think  is

10  --  Mr.  Sussman  want ed  to  make  some  comment s.

11        THE  COURT:   Mr.  Sussman ,  where  is  your  client ?

12        MR.  SUSSMAN :   She 's  at  the  Hyattsville  exit .

13  She  just  call ed  me.

14        THE  COURT:   She 's  at  Hyattsville ?   That 's  a  long

15  way  away .

16        MR.  MONTEMARANO :   That 's  a  half  an  hour .

17        THE  COURT:   Well ,  it  depends  on  whether  you're

18  being  follow ed  by  the  state  police  or  not .

19        MR.  MONTEMARANO :   She 's  a  trucker ,  Your  Honor .

20  I  submit  the  Court  can  take  judicial  notice  that  the

21  speed  limit s  are  mere ly  advisory  if  you're  used  to

22  driv ing  an  18-wheel er.

23        THE  COURT:   Mr.  Sussman ,  your  client  needs  to

24  understand  she 's  skati ng  very  close  to  a  line  that  is

25  going  to  result  in  her  being  detain ed.   She  can't

1 choose to show up at the time of her choosing.

2        MR. SUSSMAN:  I don't think she's doing that,

3 Your Honor.  As I said before, she called me at 5:00 in

4 the morning when she got out of the hospital.  I mean,

5 people get sick.  I mean, large trials are like small

6 towns.  Things happen to people during the course of

7 the trial.  It's unfortunate it happened to Ms. Harden,

8 but it happens to jurors and sometimes even

9 prosecutors.

10        THE COURT:  What is the next witness this

11 morning, Ms. Johnston?

12        MS. GREENBERG:  Your Honor, it is a chemist, and

13 Ms. Harden did stipulate to the drug stipulation.  The

14 chemist is offering testimony as to Ms. Dobie's

15 residence -- Ms. Dobie's residence and a residence

16 associated with Mr. Goodwin.

17        MR. SUSSMAN:  Obviously, I would waive.  We've

18 stipulated.

19        THE COURT:  Why don't you get your client on the

20 phone and we'll get her to waive with respect to the

21 chemist; correct?

22        MS. GREENBERG:  Yes, sir.

23        THE COURT:  What's the next witness after the

24 chemist?

25        MS. GREENBERG:  Although she stipulated,

1 certain defendants didn't stipulate. The drug

2 stipulation only contained the ones that everybody

3 stipulated to, and the chemist is testifying as to the

4 non -- some of the non-stipulated evidence. The next

5 witness is Mr. Bynum's search of and arrest as to his

6 residence.

7        THE COURT: Those would be matters that don't

8 pertain to your client. Mr. Sussman, why don't you

9 talk to your client, and as her counsel, discuss with

10 her whether she should or would want to waive her

11 presence.

12        MR. SUSSMAN: I don't think there's going to be

13 any problem with waiver. I'll get her on the phone.

14        THE COURT: I want to make sure you have the

15 chance to consult with her yourself, and then I want to

16 get her on the phone and get on the record that she

17 waives her presence with respect to the chemist and

18 with respect to Gene --

19        MS. GREENBERG: George Hubbard as to the search.

20        MR. SUSSMAN: I will do that, and I trust the

21 Court will accept my representations.

22        THE COURT: I would like to get it on the

23 record, but I would like to -- I'm going to have to

24 have her state it on the record that she did waive it.

25 Make sure she understands her constitutional right, her

1 right under the Federal Rules to be present, and that

2 she's willingly waiving it.

3          MS. JOHNSTON:   The government would ask that

4 that waiver be done on the record before, and I hate to

5 be -- if we're on appeal.

6          THE COURT:   Mr. Sussman, call her.  I'll do

7 other matters here for a minute.  Call her.

8          MR. SUSSMAN:   I did want to speak to Mr.

9 McKnett's matter if I can, because I think -- I got

10 into this as well.  My understanding was that Detective

11 -- Sergeant Sakala --

12          THE COURT:   Mr. Sussman, I hate to cut you off

13 on that issue, but I'm going to give you the

14 transcripts and we can talk about it on a break.

15 Secondly, I don't want this jury cooling its heels any

16 longer than I have to, so let's get your client on the

17 phone, get the waiver done, get the chemist in, get the

18 search agent in, and then we can move on.

19          MS. GREENBERG:   Your Honor, I can suggest that

20 he use the Court's phone, that way when he's talking to

21 her, it can just --

22          THE COURT:   Oh.

23          MS. JOHNSTON:   And if I might mention the fact

24 that our one television over there has nothing but

25 static on it, so.

1          THE COURT:  Oh, all right.

2          MR. MCKNETT:  Your Honor, I did want to also

3 mention -- I take it the Court wants to get the jury in

4 here now.

5          THE COURT:  Yes.

6          MR. MCKNETT:  We will take this up at the break,

7 perhaps --

8          THE COURT:  We will take this up --

9          MR. MCKNETT:  -- at some point before the

10 sergeant gets on the stand.

11          THE COURT:  Yes, I will resolve it before

12 Sergeant Sakala resumes the stand.

13          MR. MCKNETT:  Thank you.

14          THE COURT:  We simply have to get this -- when

15 did you anticipate calling Sergeant Sakala again?

16          MS. JOHNSTON:  We would like to get him done.

17          THE COURT:  Sometime this summer?

18          MS. JOHNSTON:  We are now on discretionary

19 recross-examination as a result of the government's

20 brief redirect examination on Wednesday.

21          THE COURT:  I think he's a head of a patrol

22 division; isn't he?

23          MS. JOHNSTON:  He is indeed, Your Honor.

24          THE COURT:  Okay.  Mr. Sussman, your client's

25 cell phone doesn't answer.  It goes directly into voice

1 mail, and the mailbox is full.

2          MR. SUSSMAN:  That was the number she called me

3 on.

4          THE COURT:  How long ago did she call you?

5          MR. SUSSMAN:  Well, I can exactly tell you.

6 9:08.

7          THE COURT:  Counsel, we will advise the jury

8 that someone has been delayed in traffic and we will

9 resume as soon as we can begin.  We won't tell them who

10 is stuck in traffic, but somebody's stuck in traffic.

11          MR. MCKNETT:  Your Honor, I have reviewed the

12 transcript.

13          THE COURT:  Okay.  Well, let me ask you this:

14 Have all counsel reviewed this transcript?

15          MR. MARTIN:  Yes, sir.

16          MR. HALL:  Yes, Your Honor.

17          THE COURT:  It's Mr. McKnett's primary issue.

18 Mr. McKnett, I direct your attention to Page 4.

19          MR. MCKNETT:  Yes, Your Honor, I see that.

20          THE COURT:  And on Line 2, you asked the

21 question, now, is it your testimony that Ms. Ali knew

22 that Ms. Levi was involved in drug distribution, and

23 his answer was, I don't think I've testified to that,

24 no.  Now that's consistent with his voir dire

25 examination and qualifications on the opinions he was

1 going to express. It's consistent with the limitations
2 placed on his testimony.

3          And then you said, I'm sorry, is it your opinion
4 that Ms. Ali knew about Ms. Levi being involved in drug
5 distribution?  Only when he's pressed did he answer the
6 opinion.  My opinion is, yes, but not based on these
7 conversations.  And then you asked him again, well,
8 what is it based upon, and he said other information.
9 And you know, you pressed him again.

10          Other information that's been presented to the
11 jury?  He said, I do not believe the jury has heard
12 that information.  So I mean, you forcefully opened the
13 door to him giving opinion testimony outside the scope
14 of his qualifications and outside the scope of the
15 permissible basis for that series of opinions he gave
16 on direct.

17          So, why is it not a situation where you opened
18 the door to that by pressing him to give an opinion in
19 an area that he had declined to go into on direct and
20 on cross?

21          MR. MCKNETT:  Because previously with being voir
22 dired, Your Honor, he testified without equivocation
23 that none of his opinions were based on information he
24 received from individuals involved in this case.

25          THE COURT:  None of his opinions that he was

1 prepared to offer on direct and which he did give on

2 direct.

3         MR. MCKNETT:  He didn't qualify that.  He said

4 none of his opinions.

5         THE COURT:  Well, you know, how is this any

6 different than the hypothetical I gave you about a

7 radiologist who testifies about x-rays endlessly on

8 direct and somewhere in the middle of his

9 cross-examination, he's asked about Ocean City, and he

10 says I think it's a dump?

11         Now, clearly that's outside the scope of his

12 expertise on qualifications as a radiologist.

13         MR. MCKNETT:  I didn't ask -- the Court's

14 question about Ocean City is unrelated to the x-rays,

15 the medical treatment, or that expertise at all.  I

16 asked him a question specifically related to his

17 expertise, his opinions as an expert, and he had

18 previously said none of his opinions are based on

19 information he received from other individuals involved

20 in this case.

21         I also would point out, Your Honor, that it

22 wasn't -- I didn't ask him what his opinion was based

23 on.  That was the government's question.  And what he

24 gave was an opinion based on hearsay.  It's not only a

25 Crawford violation because it was hearsay apparently

1 obtained during -- by a police officer in the

2 investigation of this case in which he sought to obtain

3 information to be used during the presentation of this

4 case.

5        It's also a hearsay violation in and of itself

6 because he is telling us what other people told him.

7 That is not expert opinion. That is simply relaying

8 hearsay information to the Court. That is a violation

9 of the hearsay rule. It doesn't -- I did not invite

10 him to present evidence that is barred by the rules of

11 evidence. He has simply elevated hearsay opinion to

12 the status of expert opinion now because he's

13 testifying as an expert.

14        THE COURT:  Well, experts routinely testify on

15 the basis of hearsay information that's deemed reliable

16 by those in the field in which they give opinions.

17        MR. MCKNETT:  That's true, Your Honor.

18        THE COURT:  I'm not suggesting we can suddenly

19 disregard Crawford, but he gave opinions on his direct

20 based upon the totality of all the recordings that he

21 listened to as well as the surveillance information and

22 based -- and based on his experience and knowledge in

23 the field.

24        MR. MCKNETT:  It's not information available to

25 experts in the field. It would have been -- let's

1  assume  --  I don't know .  Let's assume  it was  Ms.  Levi

2  who  said  that .   That  is not  --  information  received

3  from  Ms.  Levi  or  somebody  else  is  not  the  basis  for  an

4  expert  opinion  --

5         THE  COURT:   Mr.  McKnett , I  would  be  sympathetic

6  to  your  argument  if  he  had  given  opinion s  on  direct

7  examination  that  clear ly  involve  going  outside  the

8  scope  pf  the  knowledge  he  announced  that  he  would  base

9  his  opinion s  upon , but  that 's  not  what  happened .

10        He  gave  a  series  of  opinion s  on  his  direct

11  examination  that  were  appropriately  circumscribe d  in

12  accordance  with  what  he  said  on  his  voir  dire , and  it

13  was  only  on  his  cross-examination  when  he  was  press ed

14  several  time s  to  give  an  opinion  about  something  that

15  he  gave  a  response  to  your  question .   I  don't  see  how

16  that  create s  a  Crawford  violation  when  you  were  the  one

17  that  solicited  it, not  the  government .

18        MR.  MCKNETT :  Your  Honor , first  of  all , I  didn't

19  solicit  that  answer .

20        THE  COURT:   You  press ed  him  for  the  opinion .

21  You  press ed  him  for  the  basis  of  the  opinion .

22        MR.  MCKNETT :  I  asked  him  if  i  t  was  information

23  present ed  to  the  jury , and  he  said , no, and  I  move d  on.

24  I  did  not  press  him  for  the  base  of  his  opinion .

25        MR.  MONTEMARANO :  The  information  from  other

1  individuals   in  response   to  Ms.  Johnston 's  question   on

2  Page  126 , that 's  the  problem .   That 's  the  Crawford

3  violation .   That  is  precise ly  what  Crawford   speak s  to ,

4  and  he  slip ped  it  in  when  he  had  been  voir  dir ed  on

5  that , and  he  said  specifically , my  expertise   is  based

6  upon  information   not  involving   other   individuals , which

7  specifically   speak s  to  the  whole  question   that  we  voir

8  dire d  him  at  length   about  his  reference   to  cooperator s ,

9  et  cetera .

10      It  was  specifically   because   he  made  those

11  representation s  to  us  and  to  the  Court  on  voir  dire

12  that  he  was  admitted   as  an  expert .  He  cannot   then

13  having   been  grant ed  leave  to  testify   as  an  expert  slip

14  in  inappropriate   base s  for  expertise .  It  may  be  a

15  reason   he  honest ly  believe s  it .

16      THE  COURT:   Mr.  Montemarano , take  a  look  at  the

17  redirect   by  the  government   on  this  issue .  Where  she

18  invite d  Sergeant   Sakala   to  go  back  to  the  question   he

19  was  asked  on  cross  about  the   conclusion   that  Ms.  Levi

20  and  Ms.  Ali  knew  each  other   and  their  involve ment  in

21  drug s , and  he  was  asked , do  you  remember   that  question ?

22  She  asked, what  was  the  basis  of  it?  He  asked  to

23  rephrase  it .

24      And  the  next  thing  he  says  is , and  my  answer  to

25  the  question   -- excuse  me .  And  at  the  bottom  of  Page

1 125 of the transcript I have in front of me at Line 23

2 and my question to you is what is the basis for your

3 conclusion or your statement that Ms. Ali knew that Ms.

4 Levi was involved in drugs, and the answer was,

5 information I received from other individuals, which

6 was the same response he gave to you.

7        MR. MONTEMARANO: That is not the same response

8 -- I'm sorry for interrupting. That is not the same

9 response, and I respectfully submit to the Court if

10 that was the answer he'd given in voir dire, he

11 wouldn't have been an expert, because that's not going

12 to permit him to testify.

13        THE COURT: He answered on his cross-examination

14 what's it based on: Other information.

15        MR. MONTEMARANO: Other information.

16        THE COURT: Other information that's been

17 presented to the jury? No.

18        MR. MONTEMARANO: There may be information that

19 is not Crawford violative, but also is not admissible

20 before the jury for a lot of different reasons.

21        THE COURT: Let me do this. I've heard eloquent

22 argument from counsel for the defense; let me hear from

23 Ms. Johnston.

24        MS. JOHNSTON: Your Honor, this is simply

25 outrageous argument by counsel.

1          THE COURT:  Just tell me why it's outrageous .
2          MS. JOHNSTON:   Well , it's mind boggli ng to the
3  government , because quite frankly , when Detective
4  Sakala was voir dired , he knew what opinion s he was --
5  what question s he was going to be asked on direct .  We
6  proffered  him as an expert in particular  areas  in
7  interpreting  the code language  and in term s of the
8  manner  and mean s in which  drug  traffick ers  conduct
9  activity .
10          The Court admitted  him on that basis .  He made
11  it very clear what the basis of those opinion s were .
12  On direct  examination , he testifi ed about  those
13  opinion s.  On redirect  examination  -- on
14  cross-examination   by Mr. McKnett , he is asked if he
15  gave an opinion  about  is it your -- and it wasn't even
16  opinion , it was a question .  Is it your  testimony  that
17  Ms. Ali knew that Ms. Levi was involve d in drug
18  distribution ?  His answer  was , I don't think  I've
19  testifi ed to that , no.
20          So he didn't  give an opinion  on direct
21  concern ing the relationship  between  Ms. Ali and Ms.
22  Levi , and Mr. McKnett then asked  him , is it your
23  opinion  that Ms. Ali knew about  Ms. Levi being  involve d
24  in drug distribution ?  That 's not asking  for an expert
25  opinion .  There  it's asking  him whether  he had an

1 opinion .

2        It would be the same thing as asking any

3 individual , do you have an opinion if Mr. Jones knew

4 Mr. Smith ?  And he said , my opinion is yes , but not

5 based on these conversation s.  Made it very clear at

6 that point in time to Mr. McKnett that his opinion was

7 not based upon the conversation s that he had heard .

8 Mr. McKnett should have let it drop right then , but Mr.

9 McKnett didn't do that .  He press ed the detective .

10        What is your opinion based on?  Detective

11 Sakala , when he was being voir dire d, could not have

12 anticipate d that he was going to be asked on

13 cross-examination   if he had opinion s about what

14 individual defendant s knew or didn't know about each

15 other , what their relationship s were with or without

16 each other .

17        Mr. McKnett went on and asked the question ,

18 which he just told the Court he did not ask , which is

19 what is your opinion based on?  He said , other

20 information .  And then Mr. McKnett went further and

21 asked him other information that 's been present ed to

22 the jury ?  He said , no, I do not believe the jury has

23 heard that information .  On redirect , and without

24 objection I might note , the government asked him the

25 series of question s that begin s on Page 125 .

1          Counsel asked you about your conclusion that Ms.
2  Ali knew Ms. Levi was involved in drugs.  Do you
3  remember that question?  Yes.  Okay.  What was the
4  basis for your conclusion that Ms. Ali knew Ms. Levi
5  was involved in drugs?  And Sergeant Sakala said, I'm
6  sorry, would you rephrase the question, I want to make
7  sure I heard the question correctly.
8          The question is that this morning, Mr. McKnett
9  asked you whether or not you had an opinion as to
10  whether Ms. Ali knew Ms. Levi was involved in drugs.
11  Do you recall that question?  Yes, I do.  And my
12  question to you is, what is the basis for your
13  conclusion or your statement to Mr. McKnett that Ms.
14  Ali knew that Ms. Levi was involved in drugs?  His
15  answer:  Information I received from other individuals.
16          The government didn't ask him at that point what
17  did other individuals tell you.  At that point, based
18  on Mr. McKnett's questions, the government was allowed
19  to have that detective explain what the basis of his
20  opinion was so that the jury didn't believe that the
21  government was somehow not providing them with
22  additional information.  There was materials that the
23  government did not provide as a result of the
24  cross-examination questions.
25          There is nothing in here testimonial in nature

1 in terms of what other individuals told him. So, this

2 notion that there's some kind of Crawford violation is,

3 in the government's position, without merit.

4 Furthermore, the questions were not objected to either

5 by Mr. McKnett, so now several days later to come in --

6 the day after that testimony to come into the court and

7 now say somehow all of Sergeant Sakala's testimony has

8 to be stricken is certainly not supported by the

9 record, and indeed this is classic example of Mr.

10 McKnett, being quite frankly, not knowing the answer to

11 his question and asking the question and then --

12        MR. MCKNETT:   Objection, Your Honor.

13        MS. JOHNSTON:   -- and then rather than letting

14 it go, specifically asking the sergeant what was the

15 basis for his opinion, allowing the government then to

16 put in at least the source of his information but not

17 the substance of that information, and we believe that

18 there's no -- that the Court should deny Mr. McKnett's

19 motion, certainly to the extent that he's asking the

20 Court to strike the entire testimony of Sergeant

21 Sakala.

22        MR. MCKNETT:   Your Honor, if I may respond.

23 First of all, as to the timeliness argument. I would

24 point out that if my recollection is correct, Sergeant

25 Sakala was the last witness on that day. The

1  information   I'm  complaining  of  was  produced  literally

2  minutes  before   he  left  the  witness  stand  and  minutes

3  before  the  session  was  over  that  day.   And  I  raised  the

4  issue  before  we  went  back  into  the  trial.   So  as  far  as

5  timeliness,  it  may  not  have  been  at  the  very  second,

6  but  it  was  within  minutes,  and  I  think  there  is  ample

7  precedent  that  an  objection  made  that  quickly  is

8  timely.

9       Secondly,  the  question  I  asked  --  I  did  not  ask

10  the  question  not  knowing  what  the  answer  was  going  to

11  be.   I  asked  the  question  knowing  what  the  answer

12  should  have  been.   The  answer  should  have  been

13  something  other  than  what  people  told  him,  because  he

14  said  on  voir  dire  that  he  formed  all  of  his  opinions

15  about  this  case  without  information  --  without  talking

16  to  the  cooperators  or  informants  or  anyone  else  and

17  they  simply  confirmed  his  opinion.

18       I  had  every  reason  to  expect  he  would  give  the

19  same  answer  the  second  time  he  was  asked  the  question

20  as  he  gave  the  first  time  he  was  asked  the  question  and

21  he  didn't.   That's  the  issue  that  I'm  raising.   He

22  changed  his  answer,  he  broadened  without  prompting.   He

23  broadened  the  base  of  information  he  relied  upon  to

24  form  his  opinion,  and  by  doing  that,  he  included

25  improper  information,  hearsay  information  which  cannot,

1  under any circumstance s, be corroborate d according to

2  the Daubert standards .  It is simply elevati ng hearsay

3  evidence to the level of expert opinion and that is not

4  allow ed.

5          MR. MONTEMARANO : Your Honor , very brief ly.

6          THE COURT:  Very brief .

7          MR. MONTEMARANO : Let's go back to your

8  radiologist .  You admit him based upon his expertise ,

9  his train ing, to give certain testimony .  On cross or

10  redirect , wherever during his testimony , he now

11  provides a different basis for his opinion not based on

12  train ing and experience prior to his analyzi ng this

13  patient .

14         He decides , I don't really like this patient .

15  He's from Ocean City.  I think it's a dump, people from

16  that dump don't really de serve a lot of concern on my

17  part .  He's now given us a different rationale .  It's

18  not an exceptional -- acceptable rationale .  If that

19  was the rationale provide d in voir dire , he would n't

20  have been admitted as an expert .

21         The difference is there 's a very clear

22  difference between my 20 year s as a radiologist and

23  train ing and experience , and I don't like people from

24  O.C.  I mean , the dis connect there is pal pable .  The

25  problem here is we have a dis conne ct between what I

1  knew coming in as a narcotics officer and what I've

2  learned in the wiretap.   That's the argument we made

3  before Sergeant Sakala took the stand.

4         We said, Judge, we're going to have a problem

5  with this guy. He's going to be blurring the line

6  between fact and fiction.   He's going to be blurring

7  the line between expertise prior and expertise gained

8  during the investigation because you can't ignore the

9  fact of things you learned during the investigation.

10 I respectfully submit that there is no way not to

11 understand that some of what Detective Sakala thinks

12 about, let's say, Paulette Martin is based upon the

13 fact that there were huge seizures of drugs from her

14 evidence.

15        THE COURT:   Mr. Montemarano, Ms. Harden has

16 arrived.  We need to get this jury in here.  I think a

17 more apt analogy, perhaps I was giving a bad one with

18 Ocean City, is you have someone on the stand qualified

19 in the field of radiology, and suddenly gives, on

20 cross-examination, an opinion on pediatrics that he's

21 not been qualified for and it comes in.

22        Counsel, I'm going to -- with all due respect to

23 eloquent argument, I'm going to deny Mr. McKnett's

24 motion.  I think that the testimony elicited from

25 Sergeant Sakala on cross-examination was elicited by

1 the defense .  It was an opinion that perhaps was

2 objectionable , but no objection was made .  It was

3 elicited by defense counsel himself and only when

4 pressed did he say what his opinion was based upon , and

5 under the circumstance s, I find no basis for granting

6 the motion and your motion is denied .

7       MR. MONTEMARANO :  For the record , the defense

8 will be permitted a retrospective  and pro spective

9 continui ng objection ?

10       THE COURT:  You already have a continui ng

11 object ion on that you have already made on Sergeant

12 Sakala .  That continui ng objection is alive and well ,

13 but you need to understand  that it's based upon the

14 voir dire  exam ination producing a ruling by the Court

15 that he was qualifi ed to give an opinion on the

16 language used in these conversation s, and the nature of

17 the drug business , and whether he 's qualifi ed to do

18 that or not .

19       But you do not have a continui ng objection if

20 you ask him about his opinion about racetrack s or

21 something .  So make sure you -- if there 's a new basis

22 for objection , you need to raise it anew , but a new

23 question of whether he 's qualif ied to give opinion s

24 within the subject s that I 've permitted  is a continui ng

25 objection  that you do not need to reassert .

1          All right , counsel , anything  further ?  I intend
2  to bring the  jury  in .  I intend  to first  give  them
3  404(b) cautionary  instruction  about  Mr. Roberts .
4          Now , Ms. Harden , you need  to understand  that  you
5  need  to be in this court  on time  and I recognize  you
6  have an illness , but we can't  simply  bring  this huge
7  operation  to a halt  unless  there 's something  really
8  serious .  So, please  understand  that  this trial  is
9  going  to resume  on Tuesday  at 10 o'clock  and you should
10 be here  by no later  than  quarter  of 10:00  on Tuesday ,
11 all right ?
12         MS. HARDEN:   Fine .  Thank  you .  I'm  normally
13 here  on time .  I have  a contagious  thing  as that
14 paperwork  is going  to tell  you , and I didn't  get out  of
15 the hospital  until  five  o'clock  this  morn ing .
16         THE  COURT:   All right .  We're  ready  to proceed ?
17         MS. JOHNSTON:   Yes , Your  Honor .
18         MS.  GREENBERG:   May  we set  up the evidence  over
19 there  while  the  jury  is comi ng in?
20         THE  COURT:   Yes , certain ly.
21         MS.  JOHNSTON:   I would  just  like  the record  to
22 reflect  that  Ms. Harden  was diagnose d with  having  a
23 strep  throat , given  an antibiotic , and I believe
24 Tylenol  for her condition , and I would  just  like  the
25 record  to reflect  that  if Ms. Hard en is late  for

1  another  court  proceeding ,  the  government  will  move  to

2  revoke  her  condition s  of  re lease  for  the  trial .

3           THE  COURT:   I  think  I've  communicate d  to  her  the

4  need  to  be  here  on  time  on  Tuesday ,  and  you  know ,  Mr.

5  Sussman ,  I'm  sure  you  can  advise  her  that  that  is  a

6  possibility  that  the  government  will  make  that  motion ,

7  and  I  would  grant  it .   She  needs  to  make  sure  she 's

8  here .

9           I  will  direct  that  the  document  that  she

10  furnish ed  from  the  Bayview  campus  of  John s  Hopkins  be

11  place d  in  the  record  so  that  it 's  clear  what  was  the

12  nature  of  the  illness .   Does  anybody  want  a  copy  of

13  this ?   Ms.  Johnston ,  do  you  want  a  copy  of  this ?

14           MS.  JOHNSTON:   No, sir .   I'm  satisfi ed  that  it 's

15  filed .

16                    (Jury  returns  at  9 :39  a.m. )

17           THE  COURT:   Good  morn ing ,  ladies  and  gentlemen  .

18  Sorry  for  the  late  start .   Moving  this  battleship

19  sometimes  is  hard  to  get  it  maneuvered  into  place  at

20  precise ly  the  moment  I  want ed  to  start ,  but  sometimes

21  our  high ways  and  byways  don't  work  well .

22           Before  we  begin  testimony  today ,  I  want ed  to

23  refer  you  back  to  some  testimony  you  heard  yesterday .

24  Yesterday  you  heard  the  testimony  of  Officer  Shelton

25  Robert s  concern ing  se arch e s  made  of  premises  occupi ed

1  by Paulette Martin and others in 1986 and of her plea

2  of guilty to a plea charge of possession with intent to

3  distribute cocaine. This testimony was admitted but

4  only for a limited purpose that I will now explain to

5  you.

6         Our evidence rules state that, and I quote

7  "evidence of other crimes, wrongs or acts is not

8  admissible to prove the character of a person in order

9  to show action in conformity therewith." Simply put,

10 this language of the rule means that evidence of other

11 crimes, wrongs or acts may not be used to demonstrate

12 that a person has a certain character, and that because

13 of that character, such person is likely to have

14 committed the offense charged in this case.

15        The evidence rules provide, however, that such

16 evidence, and I quote "may be admissible for other

17 purposes, such as proof of motive, opportunity, intent,

18 preparation, plan, knowledge, identity or absence of

19 mistake or accident." I have ruled that the testimony

20 of Officer Shelton Roberts is admissible but only for

21 these other limited purposes. Accordingly, I instruct

22 you that you may consider this evidence but only for

23 the limited purposes that I have just described.

24        All right. You may proceed, Ms. Greenberg.

25        MS. GREENBERG:  Thank you, Your Honor.

1         Your Honor, at this time, before we begin with

2    the witness, the Court will be happy to know the

3    parties have reached some stipulations.  I don't want

4    to read them at this time, but I would like to

5    introduce them on the record and give a general

6    description of what they contain.

7         THE COURT:  All right.  You may do so.  I will

8    explain it to the jury.  Ladies and gentlemen, parties

9    can reach agreement on facts, and when they do that,

10   it's called a stipulation, and this is in lieu of

11   testimony.  You should accept this as true, what's

12   being read to you as a stipulation.  There will be a

13   longer version that will be placed in evidence that I

14   can refer to later, but Ms. Greenberg is going to

15   summarize what the stipulation is.

16        Mr. Ward, did you have an issue?

17        MR. WARD:  I'll wait for the stipulations.

18        MS. GREENBERG:  Your Honor, the first

19   stipulation relates to the telephone records and the

20   various telephone records and the various subscribers

21   associated with this case, and there's a lengthy

22   document containing those telephone numbers and the

23   subscribers.

24        The second stipulation relates to motor vehicle

25   records and relates to who was the registered owner of

1 various motor vehicle s, and the third stipulation

2 relate s to chemical analyses of various items taken

3 from various search warrant s connect ed with this case,

4 and that those item s were determine d to contain

5 controlled substance s.

6         Your Honor, we have at least some chemist s that

7 will come testify as to non-stipulate d item s, and the

8 first chemist is here today to testify.

9         THE COURT: All right. Mr. Ward, did you have a

10 --

11         MR. WARD:  I did with regard to this next

12 witness, Your Honor.

13         MS. GREENBERG:   There is 2, 3, and 4.  Two being

14 the telephone stipulation, three being the vehicle

15 stipulation, and four being the chemical analysis

16 stipulation, Stipulation s 2, 3, and 4.

17         THE COURT:  All right.

18         MR. MITCHELL:  I need to speak to counsel before

19 that's publish ed to the jury.

20         THE COURT:  Pardon me?

21         MR. MITCHELL:  Before that's publish ed to the

22 jury, I need to speak to counsel.

23         THE COURT:  Do you want to approach the bench?

24 Oh, you want to speak to Ms. Greenberg.  All right.

25         MR. MITCHELL:  Yeah.

1          THE  COURT:   Mr.  Ward,  you  have  an  issue?

2          MR.  WARD:   We  need  to  come  up.

3          THE  COURT:   Approach  the  bench.

4                (At the bar of the Court.)

5          MR.  WARD:  I  believe,  Ms.  Greenberg  --

6          THE  COURT:   Wait  until  all  counsel  get  here.

7          MR.  WARD:   I'm  sorry.

8          THE  COURT:   I'll  tell  you  when  you  can  go.

9          All  right,  go.

10          MR.  WARD:   I  believe  Ms.  Greenberg  said  this

11  next  witness  is  going  to  testify  regarding  CDS  seized

12  from  Ms.  Dobie's  house.

13          MS.  GREENBERG:   Yes.

14          MR.  WARD:   I  have  a  copy  of  the  crime  lab

15  analysis  report,  and  it  appears  that  the  examiner  was  a

16  **Jocelyn**  Santor,  S A N T O R.

17          MS.  GREENBERG:   Santos.

18          MR.  WARD:   Oh,  Santos.

19          THE  COURT:   You're  going  to  tell  me  this  is  not

20  Ms.  Santos?

21          MR.  WARD:   It  doesn't  look  like  Ms.  Santos

22  unless  she's  undergone  a  sex  change  operation,  Your

23  Honor.

24          MR.  MONTEMARANO:   Gender  reassignment.

25          MR.  WARD:   I'm  sorry,  gender  reassignment.   I

1  would  like  some  explanation .

2        MS. GREENBERG:   Yes, your  Honor .   This  is  the

3  head  of  the  lab .   He  is  Ms. Santos'  supervisor  , and  he

4  is  confident  in  his  opinion s  as  to  her  work  not  only

5  from  the  time  it  was  done  and  now , and  he  is  certain  --

6        MR. WARD:   I  certain ly  object .   He's  not  the  man

7  who  unseal ed  the  stuff , according  to  this  report  that  I

8  have , the  bag s  that  came  out  of  the  laboratory .   He's

9  not  the  man  who  reseal ed  them , and  he's  not  the  man  who

10 perform ed  the  analyses .

11       MR. MONTEMARANO :   He  does n't  counter sign  the

12 report .

13       MR. WARD:   Precise ly.   He  does n't  counter sign

14 these  report s, at  least  that  I  can  see .   That 's  my

15 first  objection .

16       My  second  objection  is  to  this  evidence  being

17 put  in  before  the  actual  object s  that  were  seize d

18 themselves  have  been  put  in .   It  seem s  to  me  it's  out

19 of  order .

20       THE  COURT:   We're  going  to  have  a  lot  of  thing s

21 not  in  precise  chronological  order  in  this  trial , Mr.

22 Ward .   Obvious ly, if  --  put ting  aside  your  first

23 objection , this  would  come  in  subject  to  a  motion  to

24 strike  if  they  don't  actual ly  offer  the  item s

25 themselves .

1          MR. WARD:   I would ask the Court to instruct the

2    jury that it is coming in subject to being linked up.

3          MS. GREENBERG:   That's fine.

4          THE COURT:   But I think your first objection

5    goes to the weight.  This is a supervising chemist in

6    this case having direct supervisory authority over this

7    person, and I think that would go to the weight of the

8    -- to be given to it by the jury.

9          MR. WARD:   The document I have says that the

10   reviewing person is Paula Wolf, W O L F.

11         THE COURT:   Why don't you, on voir dire of this

12   person's qualifications, inquire into that.  If the

13   answer is he has no basis for the opinion, then we'll

14   deal with it, but that's the case.  All right.  I will

15   give an instruction that this is being offered prior to

16   receipt of the actual evidence that he's testifying to,

17   subject to being linked up.

18         MR. WARD:   Thank you, sir.

19              (Back in open court.)

20         THE COURT:   Ladies and gentlemen, you're going

21   to hear some testimony momentarily from a chemist with

22   respect to certain drugs that was obtained.  Those

23   drugs are not yet before you because this evidence is

24   being taken slightly out of turn because of people's

25   vacation and those schedules, and it is being received

1 subject to being linked up with the evidence  that it's

2 relating to.

3          All right.  You may proceed.

4          MS. GREENBERG:   Your Honor, at this time, I will

5 call Richard Gervasoni to the witness stand.

6          MR. WARD:   I'm sorry?

7          MS. GREENBERG:   Gervasoni.

8 Thereupon,

9                    **RICHARD  GERVASONI**,

10 having been called as a witness on behalf of the           _____

11 Plaintiff, and having been first duly sworn by the

12 Courtroom Deputy, was examined and testified as

13 follows:

14                    <u>**DIRECT EXAMINATION**</u>

15          BY MS. GREENBERG:

16 Q.     Sir, could you state your name  and spell your

17 last name for the jury, please?

18 A.     My name is Richard P. Gervasoni,

19 G E R V A S O N I.

20 Q.     If perhaps you could just bend that microphone a

21 little closer to you.  It turns out to be a big room as

22 you start to talk.

23          Where are you employed?

24 A.     I'm the chief forensic scientist for the

25 Montgomery County Crime Laboratory in Rockville,

1 Maryland .

2 Q.      Can everybody hear him okay ?

3        What does that mean ?

4 A.      Basically , I'm the lab director  of laboratory ,

5 but I also function as a drug analyst as circumstance s

6 determine .

7 Q.      As lab director , what are your duties and

8 responsibilities ?

9 A.      Pretty much I'm responsible  for running the

10 laboratory , all facets of the laboratory as far as

11 budget , ordering  supply , hiring people .  We have two

12 sections in our laboratory ; a DNA analysis  section  and

13 a drug analysis  section .

14 Q.      How people do you supervise ?

15 A.      There are four drug analyst s and three DNA

16 analyst s.

17 Q.      So basically  this is your shop ?

18 A.      Yes, ma'am .

19 Q.      What training and experience  do you have for

20 your job currently ?

21 A.      I have a bachelor  of science  degree  in chemistry

22 from St. Vincent's  College  in Latrobe , Pennsylvania ; a

23 master of forensic  science  degree  from George

24 Washington  University .  I originally underwent  an

25 on-the-job six-month  training program  in drug analysis

1 with the New Jersey State Police Crime Laboratory in

2 1971.

3      I have been a forensic drug analyst for three

4 years with the  New Jersey State Police , two years with

5 the New York State Police in Albany , New York , and I

6 have been the chief forensic scientist with Montgomery

7 County now for over 30 years.

8 Q.     Have you -- do you teach chemistry ?  Have you

9 taught chemistry ?

10 A.     I have taught both an Introduction  to Forensic

11 Science course at Montgomery College , and also at

12 Shepherd College in West Virginia .  I also taught a

13 general Chemistry course for 18 years at Capitol

14 College .

15 Q.     How many drug cases would you say that you have

16 been -- have you testified as an expert witness ?

17 A.     Yes, ma'am .

18 Q.     Approximately  how many times?

19 A.     I would say somewhere over 600 times.

20 Q.     Have you personally  analyzed drug cases?

21 A.     Yes, ma'am .

22 Q.     Approximately  how many times?

23 A.     I would estimate somewhere over 25,000 cases.

24 Q.     Read other analyses of people under your

25 supervision ?

1 A.      Yes, ma'am.

2 Q.      And approximately how many times?

3 A.      In our laboratory, it's standard procedure to

4 technically review and administrative ly review every

5 case, both drug s and DNA. I would be the technical

6 administrative reviewer on all case s, unless I'm not

7 present at the laboratory.

8 Q.      In connection with your testimony as an expert,

9 have you been certifi ed as an expert in federal court

10 in the district of Maryland?

11 A.      Yes, ma'am.

12 Q.      Have you been certifi ed as an expert before

13 Judge Titus?

14 A.      Yes, ma'am.

15      MS. GREENBERG:   Your Honor, I would move that

16 Mr. Gervasoni be certified as an expert in drug

17 analysis and examination and be allow ed to offer his

18 testimony in this case.

19      THE COURT:   Anyone wish to ask question s on the

20 his qualification s?

21      MR. WARD:   May I ask what the Court 's ruling was

22 the last time, sir? I'm joking, Judge.

23      THE COURT:   You may.

24      MR. WARD:   Your Honor, may I get into the issue

25 that we rais ed?

1          THE COURT:   You may.

2          MR. WARD:   Thank you, sir.

3                    **CROSS-EXAMINATION**

4          BY MR. WARD:

5  Q.      Mr. Gervasoni, good morning.

6  A.      Good morning.

7  Q.      My name is Peter Ward.  I have a copy of the

8  crime laboratory CDS evidence transmittal and

9  laboratory report in this case about which I understand

10  you are going to testify.

11          Now, it appears from this form that the actual

12  analysis was conducted by a Jocelyn J. Santos?

13  A.      That's correct.

14  Q.      Where is Ms. Santos?

15  A.      She is on vacation visiting family in the

16  Philippines.

17  Q.      I see.  Who is a Paula Wolf?

18  A.      Paula is another drug analyst in our laboratory.

19  Q.      I see.  In the space provided on the form where

20  it says "reviewed by," the name Paula Wolf appears.

21  Does that mean Paula Wolf is the person who reviewed

22  this analysis?

23  A.      As I mentioned briefly in my previous testimony,

24  we do two separate reviews; one's a technical review

25  and one's an administrative review.  The technical

1  review involves checking all the work done in a case,

2  all the charts, all the notes taken by the analyst, and

3  confirming that the results the analyst reached is

4  consistent with the notes and the tests that have been

5  performed.

6        The second review is an administrative review,

7  and the administrative review is strictly checking

8  basically the typing on the final report to show that

9  the typed report is the same as the written report that

10 the analyst has set forth to the secretary. What you

11 see with Ms. Wolf's signature there is the

12 administrative review.

13 Q.      You are the person who conducted the technical

14 analysis?

15 A.      Technical review, yes, sir.

16 Q.      Now, it appears from the report that the objects

17 that were seized and analyzed were seized on June 1 of

18 '04. Do you have a copy of the report in front of you,

19 by the way?

20 A.      Could you just read the number on the top left

21 -- top right, excuse me 06-19 -- 04, rather?

22 Q.      04-1906, I'm sorry.

23 A.      906. Okay.

24 Q.      And it appears that the objects were seized on

25 June 1 of '04; is that correct?

1  A.      Yes, sir.

2  Q.      And there's a date that says today's date, June

3  7, '04.  Do you know what that date is, sir?

4  A.      I don't have personal knowledge, but based on

5  our policies in the lab -- in the department, not the

6  laboratory, excuse me, that would be the date that the

7  paperwork was filled out.

8  Q.      Okay.  All right.  Now, it appears that the --

9  is there a day date on here that shows when these

10 objects were received in the Montgomery County Crime

11 Laboratory?

12 A.      Not on that particular form, no, sir.

13 Q.      Not on this form?

14 A.      That's correct.

15 Q.      You're not able to give us the date?

16 A.      We have a chain of custody record that I have in

17 my folder that would indicate that.

18 Q.      All right, sir.  And it appears that the seal

19 was broken, according to this form, by Jocelyn Santor

20 (sic) on October 15 of '04; is that correct, sir?

21 A.      Yes, sir.

22 Q.      And that means that whatever was submitted was

23 unsealed by her for the purpose of preparing it for

24 analysis; is that correct, sir?

25 A.      That's correct.

1  Q.      You had no participation  in that unsealing; is
2  that correct, sir?
3  A.      That's correct.
4  Q.      And you did not see the objects in the manner in
5  which they were actually submitted to the laboratory?
6  A.      I may have passed by her bench, but actually
7  observing the individual items and actually knowing
8  that she was analyzing that item at that particular
9  time, no, sir.
10 Q.      All right, sir.  Usually, there's a reseal date.
11 Is there a reseal date on here?
12 A.      Yes, sir.  On the bottom, the second blank from
13 the bottom of the report, it says resealed by, and it
14 has Ms. Santos' signature and the date.
15 Q.      I'm sorry.  I overlooked that.
16 A.      10-15, so she apparently conducted the
17 examination on 10/15?
18 A.      Yes, sir.
19 Q.      You had no participation whatsoever in the
20 conducting of whatever examination she conducted?
21 A.      That's correct.
22 Q.      Okay, sir.  I'm somewhat puzzled by -- well,
23 maybe I'll come into that later.
24         When you conducted your analysis, sir, it was
25 strictly of documentation; is that correct?  Your

1 technical review?

2 A.      Yes, sir.  I did not perform any analysis at

3 all.

4 Q.      Okay.

5 A.      On this particular case, what I did was just

6 review her notes, her charts, and confirmed the fact

7 that the results that she had obtained were consistent

8 with the tests that she had run.

9 Q.      And did you, in connection with that technical

10 review, sir, actually look at whatever it was that had

11 been submitted?

12 A.      No, sir.

13 Q.      Okay.  So let me just give you a hypothetical

14 situation.  If, for example, an item, let's say a

15 playing card, was submitted with what was supposed to

16 be a trace amount of drugs on there.  You didn't see

17 that playing card?

18 A.      No, sir.

19 Q.      You didn't analyze the drugs?

20 A.      That is correct.

21 Q.      You simply saw what Jocelyn Santor (sic) wrote

22 down about the playing card?

23 A.      That is correct.

24 Q.      And did you actually, upon review, determine

25 what tests had been conducted?

1 A.      Based on her notes and based on the charts that

2 she obtained from running it on several of the

3 instruments, that would be my basis.

4 Q.      I see.  Now, your instruments, sir, are required

5 to be certified by the State Health Commissioner of the

6 State of Maryland; is that correct, sir?

7 A.      Not really, no.

8 Q.      Is there any regular -- I don't know what you'd

9 call it -- check up done on the machines to calculate

10 them for accuracy purposes?

11 A.      Yes, sir.

12 Q.      I see.  Did you check with respect to the --

13 first of all, do you know which machines she -- Ms.

14 Santos used in the course of her analysis?

15 A.      Yes, sir.  Based on the charts that are in her

16 analysis packet and her file folder, I would be able to

17 tell which instruments were used.

18 Q.      I see.  Do you have any knowledge, or did you

19 determine when any calibration had been done on those

20 machines prior to the testing?

21 A.      No, sir.

22 Q.      If the calibration had not been done and the

23 machines were off somewhat, then the resulting test

24 clearly would have been off, too; is that correct, sir?

25 A.      It's not that simple.

1 Q.     Well, I understand  it's not that simple , but  in

2 layman 's term s?   I mean , if my speedometer  is off and I

3 think  I'm driving 15 miles an hour , the fact is I'm not

4 driving 15 miles an hour  because  my speedometer 's off.

5 A.     It's not quite the same with the instruments .

6 If they're not running proper ly, you would  know right

7 off the bat .  You're not going to get erroneous

8 report s.   You either  just don't get result s is

9 basically  what happen s.   You don't get result s.   You're

10 not going -- it's not going to give you a heroin

11 spectrum  if you're running a cocaine  or something  like

12 that .   Only if the, you know , contamination   issue is

13 involve d.

14 Q.     But the fact of the mat ter is you don't know

15 whether  or not these machine s had been proper ly

16 calibrate d prior to the tests being done or when they

17 had been calibrate d prior to the test s being done ?

18 A.     It's standard operati ng procedure  in our

19 laboratory that at least month ly an auto tune is done ,

20 and this is to check all the mechanism s in the

21 instrument .  Daily , we run a known mixture  of heroin ,

22 cocaine , and THC, which is the ingredient  in marijuana

23 on our gas chromatograph mass spectrometer   is what

24 we're discuss ing here , just to verify that the

25 instrument  is work ing as it should .

1 Q.       I see.   And that's the  standard  operating

2 procedure , but  the  point  is  in  this  case , you  did  not

3 go  back  and  independent ly  confirm   that  the  standard

4 operati ng  procedure   had  indeed  been  follow ed?

5 A.       That's  correct .

6 Q.       All  right .

7         MR.  WARD:   At  this  point , Your  Honor , I  have  no

8 other  question s.   Thank  you .

9         THE  COURT:   All  right .

10        MS.  GREENBERG:    Brief ly , Your  Honor .

11                   **FURTHER  DIRECT  EXAMINATION**

12        BY  MS.  GREENBERG:

13 Q.       To  be  clear , Mr.  Gervasoni , your  testimony  is

14 you  review ed  Ms.  Santos ' result s  when ?

15 A.       The  technical  review  would  have  been  either  the

16 same  day  or  the  day  after  her  analysis  would  have  been

17 complete d.

18 Q.       Did  you  review  it  again  before  coming  to  court ?

19 A.       Yes, ma'am .

20 Q.       Were  you  able  to  tell  from  review  of  the  records

21 that  you  had  done  the  technical   review ?

22 A.       Yes, ma'am .

23 Q.       How  were  you  able  to  tell  that ?

24 A.       My  initial s  are  on  each  page  of  the  work  sheet s

25 from  the  --  each  case  that  was  involve d.

1  Q.      She is under -- she is one of your employee s; is

2  that correct ?

3  A.      Yes, ma'am .

4  Q.      Are you able to tell the procedure that she

5  utilize d from your review of the document s?

6  A.      Yes, ma'am .

7  Q.      How does that relate to your standard operati ng

8  pro cedure ?

9  A.      Our standard operati ng procedure , as far as

10 analysis is done , is there are a set number of test s

11 that need to be run before a positive result can be

12 report ed . With the technical review , I am review ing

13 the fact that each of those test s were run , that she

14 has a hard copy of the result s of the analysis from

15 running it on the various instruments , and they are

16 present in the file folder .

17 Q.      That was done in the case that Mr. Ward asked

18 you about ?

19 A.      Yes, ma'am .

20 Q.      And in fact , in all the case s that you're

21 talk ing about to this jury about today ?

22 A.      Yes, ma'am .

23         MR. WARD:   Objection .

24         Oh, I'm sorry .  I withdraw that .

25         BY MS. GREENBERG:

1  Q.      The document that you referred to with the lab

2  number on it, what is that document?  What is it

3  called?

4  A.      Could you clarify -- all of our documents have

5  the lab numbers on them.

6  Q.      Is there document that is produced by your

7  office indicating the results of the laboratory

8  analyses?

9  A.      Yes, ma'am, our laboratory report.

10  Q.      Your laboratory report?  Is that a record that's

11  made at or about the time of the analysis?

12  A.      At the completion of the technical review, yes,

13  ma'am.

14  Q.      Is it kept in the ordinary course of business?

15  A.      Yes, ma'am.

16  Q.      I'm going to ask you with each case to refer to

17  the laboratory report, and it is a document kept in the

18  ordinary course of your business?

19  A.      Yes, ma'am.

20  Q.      Now, Mr. Ward also asked you about the machines

21  and whether or not they were operating properly.  Is

22  that something that you would be aware of as head of

23  the lab?

24  A.      Yes, ma'am.

25  Q.      At the times that you're talking about, the

1  review of these substance s that you're about to explain

2  to the jury, were the machine s operati ng proper ly?

3  A.      Yes, ma'am.

4  Q.      And you mention ed a particular test, the gas

5  mass speck -- I always mis pronounce that.  Could you

6  say it for me?

7  A.      Gas chrom atograph mass spectrometer.     The

8  acronym is  GCMS, just to be on the easy side.

9  Q.      For that test, you need a machine; is that

10 correct?

11 A.      It is an instrument, yes, ma'am.

12 Q.      Your testimony is that's check ed daily?

13 A.      Yes, ma'am.

14 Q.      If it was inoperable,  that has -- has that ever

15 happen ed in your lab?

16 A.      Oh, yes.

17 Q.      Who take s care of get ting that fix ed?

18 A.      We have two people that will handle min or issue s

19 with the instruments , and if whatever they know how to

20 do and can do does n't work, we call the vendor in to

21 repair it.

22 Q.      Is that something you're aware of as head of the

23 lab when that happen s?

24 A.      Yes, ma'am.

25 Q.      Did that happen with any of the analyses you're

1 about to talk about today?

2 A.      It may have happened, but if there was an issue,

3 it was fixed before the analysis was complete.

4 Q.      How do you know that?

5 A.      Again, based on the charts that are obtained

6 from the instrument, if the instrument's not working

7 properly, you're not going to get positive results.

8 Q.      Are there tests that you perform on these drugs

9 that don't involve the use of a machine?

10 A.      Yes, ma'am.

11 Q.      What are those tests?

12 A.      These are our preliminary testing procedures.

13 Basically, we start out with screening color tests.

14 These are simple little reagents that will turn colors

15 with different types of drugs.  It's a very quick and

16 easy, down and dirty way to eliminate classes of drugs

17 and give some indication of what type of drug we're

18 looking at, so we're not wasting a lot of time just

19 trying to test the whole spectrum of drugs at one time.

20      Secondly, we would move on to a process known as

21 thin layer chromatography.  Chromatography, basically

22 in chemistry, means separation, and what we're doing is

23 taking -- at this point, we have a pretty good idea the

24 type of drug we're looking at.  If we're not sure, we

25 can use several standards in our thin layer process,

1  but thin layer chromatography basically involves a

2  glass plate that is covered on one side with a white

3  powdery substance.

4          We'll take an extract of known standards and

5  extracts of our samples, and these are spotted -- the

6  solvent extract is spotted with little capillary tubes

7  on the bottom of the plate. First the standard,

8  several samples, another standard if we're using more

9  than one standard.   These are placed in solvent system,

10  just a series of organic liquids.

11          The organic liquid will just rise up the plate,

12  much if you put a little piece of paper towel on the

13  edge of the sink, it will eventually all get wet. It's

14  called capillary action.   Once the liquid reaches the

15  top of the plate, it's removed from the solvent system,

16  dried and sprayed with die.   What we're looking for is

17  a comparison of the known samples versus the standards

18  in order for a positive result.     The samples have to

19  travel the same distance up the plate as the known

20  standard and have to be the same color with the

21  standard.   And if they are not, then we would not

22  consider that a positive result. At the conclusion of

23  those tests, we then move on to the instruments because

24  the instruments are a confirmatory test. We will put a

25  result out on a drug other than marijuana, if it's not

1  run on either the GCMS, or other instrument we use for

2  confirmation called the infrared spectrometer.

3  Q.      Starting with the presumptive color test, is

4  that basically what the officers in the field refer to

5  as a field test or color test?

6  A.      Yes, ma'am. Our tests are very similar to what

7  the officers use when they're performing field tests.

8  Q.      Would you -- how often would -- you said that

9  the presumptive color test comes back with a known

10 controlled substance, such as cocaine or heroin and

11 then the confirmatory test?

12         MR. WARD:  Objection, Your Honor.

13         THE WITNESS:  No, that's not true.

14         THE COURT:  Wait a minute.

15         MS. GREENBERG:  Is that often or rare?

16         MR. WARD:  I'm objecting, Your Honor.

17         What happens in other cases has no bearing on

18 what happened in this case, I suggest.

19         THE COURT:  Overruled.

20         MS. GREENBERG:  Your Honor, he raised the issue.

21         THE COURT:  Overruled.

22         THE WITNESS:  It does happen occasionally.

23 Again, these are just screening tests. There are a

24 number of drugs that may give the same color with that

25 particular reagent. I personally think after years of

1 experience where somebody starting out new might look

2 at a particular color and think it could be that drug,

3 having all that experience, sometimes you can say,

4 well, you know, even though it gives the same color,

5 it's not as intense.  It's not the exact same color,

6 and you know, you can make some distinction s.

7        But again, this is just like a little road map

8 to set us in the right direction, and even if we're not

9 sure that the color is exactly the same or not, that

10 will come out in the wash as we move further along the

11 analytical process.

12        BY MS. GREENBERG:

13 Q.      But fair the color test is a presumptive test,

14 so presumptively, it is  that drug.  Is that fair to

15 say?

16 A.      That is correct.

17        MS. GREENBERG:  Your Honor, at this time, I

18 would, again, offer Mr. Gervasoni as an expert in drug

19 analysis and examination and allow him to give his

20 opinion s about the substance s that were submitted in

21 this case.

22        MR. WARD:  I do have one more question based on

23 what was asked by Ms. Greenberg.

24        THE COURT:  You may.

25                **FURTHER CROSS-EXAMINATION**

1          BY MR. WARD:

2  Q.      You said that sometimes people who do the

3  so-called field tests can misinterpret them basically.

4  I mean, you didn't use that word, but that's what I

5  understood to be the effect of what you said; is that

6  correct?

7  A.      That's a possibility.

8  Q.      This would be particularly true with someone who

9  is not a chemist or does not have, for example,

10 experience doing such results in a laboratory setting;

11 is that correct, sir?

12 A.      It does happen like that; yes, sir.

13 Q.      I mean, for example, a police officer who has no

14 training at all in chemistry might very well misread or

15 misinterpret what shows up on a field test; is that

16 right, sir?

17 A.      Yes, sir.  It can happen.

18 Q.      Just by way of explanation so the jury

19 understands, a field test is you have a little tube

20 with some chemical in it, and you take a little bit of

21 the powder or whatever it is you believe, and you drop

22 it in.  And if it's one controlled substance, it turns

23 a certain color, or if it's another one, it turns a

24 different color.  Is that basically what it is?

25 A.      Yes, sir.

1  Q.      Thank you.

2  A.      There's a whole series of those.

3          MR. WARD:   I understand.  Thank you.

4          I submit, Your Honor.

5          THE COURT:   He will be permitted to testify as

6  an expert in forensic chemistry.

7          MS. GREENBERG:   If I could direct your

8  attention, Mr. Gervasoni, to Goodwin 26 and Goodwin 31.

9          MR. WARD:   I'm sorry.  Could you give me those

10 again?

11         MS. GREENBERG:   They would be Goodwin 26 and

12 Goodwin 31.  And for housekeeping purposes, Your Honor,

13 we will tie that up when we get to the search at  36

14 Farragut Place, Northwest, Washington, D. C.  So 26 and

15 31 relate to the search of 36 Farragut Place,

16 Northwest, Washington, D. C.

17         BY MS. GREENBERG:

18 Q.      Mr. Gervasoni, were those two items, Goodwin 26

19 and Drugs 31 analyzed by your laboratory and reviewed

20 by you?

21 A.      Do you have an exhibit number that I can refer

22 to for my work?

23 Q.      Certainly.

24 A.      Excuse me.  You said it was Goodwin 26 and 31?

25 Q.      Yes.

1 A.        I've got the tags.

2 Q.        Thank you. Could you tell us what those two

3 exhibits are?

4 A.        Which one are you asking about first?

5 Q.        First with Goodwin -- Drugs 31.

6 A.        Thirty-one was submitted to our laboratory under

7 Laboratory Case No. 04-1902 and listed as Exhibit 1.

8 It was a heat-sealed plastic evidence bag containing

9 plastic wrappers, containing a brown-colored plastic

10 wrapper, containing a tan-colored, brick-shaped

11 substance. There was a key stamped on one side of the

12 so-called brick and a shallow hole on the other.

13 Q.        I'm sorry, what shape was it in?

14 A.        A key, like a skeleton-type key.

15 Q.        And what shape was the powder?

16 A.        It was a hard, thin, brick-type substance.

17 Q.        I apologize for interrupting. Please continue.

18 What was done with Drugs 31?

19 A.        With 31, a two-chemical color test, screening

20 test that we described earlier were run. This was also

21 run on thin layer chromatography, and a final

22 confirmation run on the GCMS, which I eluded to before

23 as the gas chromatograph mass spectrometer.

24 Q.        Was it also weighed?

25 A.        Yes, ma'am. The total weight was 969.53 grams.

1  Q.      And what was the result of the chemical analysis

2  for Drugs 31?

3  A.      It was positive for cocaine.

4  Q.      Did you take that any further to analyze the

5  percentage of cocaine?

6  A.      No. In our laboratory, our policy is not to

7  determine percent purities.

8  Q.      So you have no analysis as to the purity of that

9  particular item?

10 A.      No, ma'am.

11 Q.      But your opinion as to whether or not it

12 contained cocaine was what?

13 A.      It definitely did contain cocaine.

14 Q.      Goodwin 26. Could you tell the jury about that?

15 A.      Goodwin 26 was also submitted under Laboratory

16 Case No. 04-1902, listed on our report as Exhibit No.

17 4, and it consisted of a glass bowl containing a

18 residue. The residue, or the bowl, was rinsed with

19 methyl alcohol and that rinse was analyzed.

20 Q.      In what condition was the bowl when your office

21 received it?

22 A.      It was submitted in our original evidence bag.

23 No indication from the notes that it was in any kind of

24 broken condition, that it was whole.

25 Q.      What did you do with the items that you obtained

1 from the bowl, the substance that you obtained from the

2 bowl?

3 A.     The substance was analyzed using chemical color

4 test, thin layer chromatography, and the GCMS and was

5 positive for cocaine.

6 Q.     What was the amount in the bowl, which is marked

7 as Goodwin 26?

8 A.     It's a trace amount.

9 Q.     What is the difference when you say something

10 has a detectable amount of cocaine versus trace

11 amounts?  What's the difference in that analysis?

12 A.     When we talk about a trace or residue, it's an

13 amount that is not weighable or is less than 0.01

14 grams.  Our scales that we use are balances that we use

15 in the laboratory for weighing minimally will weigh .01

16 grams.  So if it's not weighable or weighs less than

17 .01, it's listed as a trace or residue.

18 Q.     That's based on the substance you were actually

19 able to obtain from Goodwin 26?

20 A.     Yes, ma'am.

21 Q.     What happened to Goodwin 26 after you analyzed

22 it?

23 A.     It was sent to our forensic services section for

24 fingerprint analysis.

25 Q.     In what condition was it when you got it back?

1 A.       The bowl had been broken.

2          MS. GREENBERG:    Your Honor, I would now publish

3 Goodwin 26 and Drugs 31.

4          THE COURT:    You may.

5          BY MS. GREENBERG:

6 Q.       While I'm walking that over to the jury, can you

7 explain with Drugs 31, did you seek to determine how

8 much of this powder was actual cocaine versus cut in

9 terms of your analysis?

10 A.       No, ma'am.

11 Q.       I'm now going to refer you to the items that the

12 agent is putting in front of you.

13          For housekeeping purposes, Your Honor, these

14 will be the items that will be introduced relating to

15 846 Oglethorpe Street, Northeast, Washington, D. C.

16 Again, that will be related to 846 Oglethorpe Street,

17 Northeast, Washington, D. C.

18          Starting with Drugs 19.  Do you need a lab

19 number for that, sir?

20 A.       No.  It's fine.

21 Q.       Can you tell the jury what's contained in Drugs

22 19?

23 A.       Drugs 19 is -- was submitted under our

24 Laboratory No. 04-1907, and listed as Exhibit 11.  And

25 Exhibit 11, Drugs 19 consisted of various types of

1 plastic bags, 23 of them in fact, which all contained a

2 brownish-yellowish substance.

3 Q.      What did you do with Drugs 19?

4 A.      Drugs 19 was weighed.  The total weight -- each

5 of the packages were weighed individually.  The total

6 weight of all of them together was 156.51 grams.  Each

7 of the substances, all 23 were tested using the

8 chemical color test described previously.  They were

9 also run on the thin layer chromatography.

10       There were two instruments that were used on

11 these exhibits.  Each of the packages that were

12 similar, there were four packages that are with Ziploc

13 bags that contained different sizes of Ziploc bags, et

14 cetera.  Each of the groups were analyzed separately on

15 the infrared spectrometer and it was determined that

16 each of those groups were positive for cocaine base,

17 and then all of them were composited and run on the

18 GCMS for a final result.

19 Q.      What is the common name for cocaine base?

20 A.      It's commonly known as crack.

21 Q.      Referring to Government's Exhibit Drugs 19,

22 approximately 156 grams of cocaine base as you've just

23 testified, how did you determine to make that a

24 separate exhibit from this location that we're talking

25 about here?  I mean, how did you -- how does your lab

1  divide  up  the  exhibit s  that  it  get s?

2  A.       These  were  submitted  and  package d  by  the

3  off icers  and  it  was  submitted  as  one  case .  So  it  came

4  into  us  as  a  case ,  each  one  of  these  was  package d

5  separate ly .  So,  Exhibit  No.  11  that  we  just  mention ed,

6  which  is  Drug s  19 ,  was  --  this  is  the  way  these  drug s

7  were  package d  and  submitted  to  the  laboratory .

8  Q.       So  in  other  words ,  that 's  how  you  get  it  from

9  the  agency ?

10  A.       Yes,  ma'am .

11  Q.       While  we're  on  that  subject ,  what  is  the

12  procedure  for  your  lab  when  the  drug s  is  submitted  by

13  an  agent?   What  is  your  chain  of  custody ,  thing s  like

14  that ?

15  A.       When  a  case  submitted  to  the  laboratory,  it  is

16  submitted  --  suppos ed  to  be  submi tted  in  a  seal ed  form ,

17  general ly  in  the  plastic  bag s  which  we  have  in  front  of

18  us  here .  If  the  evidence  is  too  large  to  fit  in  the

19  plastic  bag s,  they're  place d  in  either  paper  bag s  or

20  box es .  The  plastic  bag s  are  heat  seal ed.

21       The  box es  and  bag s  would  be  taped  general ly  with

22  evidence  tape ,  but  mas king  can  also  be  used .  The

23  seal ed  evidence ,  along  with  a  request  for  analysis  and

24  along  with  the  chain  of  custody  form  indicati ng  who  had

25  the  evidence  when ,  are  all  submitted  to  the  laboratory .

1  When they're submitted to the laboratory, they're

2  assigned a laboratory number.

3        They're signed into the lab both on our chain of

4  custody form and we also have a computer system to do

5  that. The evidence is then placed in a laboratory

6  vault. It remains in our laboratory vault until the

7  chemist removes it for analysis. After the analysis,

8  obviously before the analysis, bags are opened, the

9  evidence is removed, the evidence is analyzed.

10        After the evidence is analyzed, all the

11  packaging is marked with the laboratory number, the

12  date -- not the date, the exhibit number, and the

13  initials of the analyst. All the evidence is placed in

14  their original evidence bags. If it's a plastic bag,

15  it's reheat sealed, and paper or boxes are taped,

16  placed back in the vault, and they remain there for

17  disposition.

18  Q.    Are you able to tell without going through each

19  and every exhibit the exhibits you're testifying about

20  here today, which are on that cart, were they

21  originally heat sealed back by someone in your office?

22  A.    When the evidence comes into the laboratory, the

23  three sides of the bag are sealed by the manufacturer.

24  The officer involved will seal the top of the bag after

25  the evidence is submitted. In order not to destroy the

1 officer's seal, we would cut off the bottom of the bag,

2 place the piece that was cut off inside the evidence

3 bag, and at the conclusion of the analysis, heat seal

4 the part that we had just cut off, place the initials

5 -- our initials and the date that we sealed it across

6 that heat seal.

7 Q.      And is that what was done with the evidence that

8 you're testifying to today?

9 A.      Yes, ma'am.

10 Q.      So it is in the same condition as after the

11 analysis by a laboratory?

12 A.      Yes, ma'am.

13 Q.      So the jury can understand, Drugs 19A, what is

14 contained in that bag?

15 A.      There are two evidence bags.  The original

16 evidence bag has the red label on it.  A request was

17 made to have the original packaging.  I mentioned that

18 there were 23 individual packets containing this

19 substance.  There was a request to have those 23

20 packets fingerprinted, so we removed the drugs from the

21 original packaging, placed it in new Ziploc bags or

22 other packaging from the laboratory, and the original

23 bags were sent to our forensic services section to

24 determine if any fingerprints were present.  And the

25 second bag, which has a black label and blackened

1  plastic bags in it are the bags that were processed for

2  fingerprints.

3         MS. GREENBERG:   Your Honor, may I publish 19 and

4  19A to the jury?

5         THE COURT:   Yes, you may.

6         BY MS. GREENBERG:

7  Q.     Sir, while I'm doing that, if I can direct your

8  attention to what is marked as Government Exhibit Drugs

9  20 and ask you to explain to the jury that is.

10  A.     State's Exhibit Drugs 20 is also submitted under

11  the laboratory Case No. 04-1907, listed as our Exhibit

12  No. 9.  It consisted of a total of 20 various plastic

13  baggies, each containing chunks of white substance.

14  Each of those was weighed individually and tested

15  individually.

16  Q.     What were the tests conducted on those -- that

17  item?

18  A.     The total weight of the substances came out to

19  353.32 grams, as I said, each of these weighed and

20  analyzed individually.  The chemical color tests were

21  used, thin layer chromatography, infrared

22  spectrophotometry, and the final test was the    GCMS.

23  Q.     What were the results of those analyses?

24  A.     This substance was positive for cocaine

25  hydrochloride.

1  Q.      What is contained in Government 's Exhibit Drugs

2  20A, which should be attached to Drugs 20?

3  A.      Twenty A would be the original packaging that

4  this -- these substances were in.  Again, these

5  evidence bags, the original packaging, was sent over to

6  our forensic services section for fingerprint

7  processing.

8         MS. GREENBERG:   Your Honor, if I may publish

9  Drugs 20 and have the agent obtain Drugs 21 and 26  for

10  the witness' review.

11        THE COURT:   Yes, you may.

12        BY MS. GREENBERG:

13  Q.      Starting with Drugs 21, could you tell the jury

14  what that is?

15  A.      This also is evidence submitted under Laboratory

16  Case No. 04-1907, listed as our Exhibit No. 4, and

17  Drugs 21 is a heat sealed plastic evidence bag, which

18  contains a large Ziploc bag.  And in that Ziploc bag

19  was a trace of white powder.

20  Q.      Drugs 26?

21  A.      Drugs 26, also under Laboratory Case No.

22  04-1907, our Exhibit No. 5, and it consisted of a --

23  what I call a sergeant safety tube.  It's hard plastic

24  tube in which we put sharp objects.  This contained a

25  glass tube containing a residue.

1  Q.      A residue of what, sir?

2  A.      Just a white residue, and it tested positive for

3  cocaine.

4          MS. GREENBERG:   If I could now publish those to

5  the jury, Your Honor, and ask the agent to provide the

6  witness Drugs 22, Drugs 25 and Drugs 27.

7          THE COURT:   You may.

8          MS. GREENBERG:   Publishing Drugs 26 and 21.

9          BY MS. GREENBERG:

10 Q.      Sir, could you tell the jury what's in front of

11 you as Drugs 22, Drugs 25 and Drugs 27?

12 A.      Drugs 22 submitted under Laboratory Case No.

13 141907 -- excuse me 04-1907, listed as our Exhibit No.

14 3.  Again, a heat-sealed evidence bag containing a

15 regular bag -- excuse me it is a Ziploc bag containing

16 vegetation.  Total weight of the vegetation was 77.72

17 grams and the vegetation was positive for marijuana.

18 Q.      Drugs 25 and also please 25A, which should be

19 attached.

20 A.      Twenty-five is also Laboratory Case No. 04-1907,

21 our Exhibit No. 7.  This consisted of a number of

22 plastic bags each containing vegetation.  There were a

23 total of five plastic bags.  The total weight of the

24 vegetation in all -- well, these are separated as 7A,

25 7B and 7C for each of the three packets.

1          Seven A consisted of three Ziploc bags, total

2 weight of those bags or the vegetation in those bags

3 was 338.48 grams, 7B was just a large Ziploc bag with

4 vegetation, total weight 422.20 grams, and the

5 vegetation in the third Ziploc bag was .85 grams.  Each

6 of these was analyzed individually and found to be

7 positive for marijuana.

8 Q.     Do you have a 25A there which might relate to 25

9 -- how 25 was packaged?

10 A.     Yes, ma'am.  Twenty-five A is a black bag which

11 contained the Ziploc bags that I just referred to that

12 contained the vegetation.

13 Q.     Just to be clear.  Drugs 27.  Is that contained

14 in this big suitcase here?  If we could just take that

15 out to show the jury.  Is that Drugs 27?

16 A.     Yes, ma'am.

17 Q.     Is that the analysis that you related to that

18 was positive for marijuana?

19 A.     I haven't spoken about this item yet.

20 Q.     Okay.  You can speak about this item.  Thank

21 you.

22 A.     Government 27, Drugs 27 is listed as Laboratory

23 Case No. 04-1907 and our Exhibit No. 8.  It contained a

24 total of ten various bags containing vegetation.  Each

25 of the bags of vegetation were analyzed individually.

1 The total weight of all the vegetation was 3,231.18

2 grams, and they all were tested positive for marijuana.

3 Q.     The substance in 22, 25 are the same substance

4 as contained in this black suitcase?

5 A.     Yes, ma'am, they're all marijuana.

6 Q.     Marijuana?

7       Your Honor, for the jury's purposes, what I'd

8 like do is publish 22 and 25 but not the black

9 suitcase.

10       THE COURT:   You may.

11       BY MS. GREENBERG:

12 Q.     Sir, if we can turn to Government Exhibit Drugs

13 23.

14 A.     Drugs 23, also Laboratory Case No. 04-1907,

15 listed as our Exhibit 6.

16 Q.     What analyses did you perform on that?

17 A.     This consisted of five small bags containing a

18 tan-colored substance.   These were broken down into 6A,

19 B, C, D and E.   Six A weighed a total of .41 grams;

20 6B,.32 grams; 6C, 0.07 grams; and 6D and E were both

21 trace amounts of substance.   These were all analyzed,

22 substance 6A, the 0.41 grams was positive for cocaine

23 base; 6B, 0.32 grams cocaine hydrochloride; 6C, 0.17

24 grams cocaine base, and the two items that contained a

25 trace were both positive for cocaine.

1          MS. JOHNSTON:   Your Honor, at this time, if I
2 could publish Government Exhibit Drugs 23 and ask the
3 agent to provide the witness with Government Exhibit
4 Drugs 24.
5          THE COURT:   You may.
6          BY MS. GREENBERG:
7 Q.      Could you tell the jury what Government Exhibit
8 Drugs 24 is?
9 A.      Drugs 24, also Laboratory Case No. 04-1907
10 listed as Exhibit No. 2.   This consisted of a
11 heat-sealed plastic evidence bag containing a
12 sifter-type object which had some residue and also some
13 cream-colored substance scraped from it.
14 Q.      I'm sorry, did you say a weight?
15 A.      A total weight of the material scraped from the
16 sifter was 0.39 grams and it was positive for cocaine
17 base.
18 Q.      Again, we're talking about the same tests you
19 previously described to this jury run on that
20 substance?
21 A.      Yes, ma'am.
22          MS. GREENBERG:   Your Honor, at this time, I'd
23 like to publish Government's Exhibit Drugs 24 and ask
24 the special agent provide the witness with Government
25 Exhibit Oglethorpe 2.

1          THE COURT:   You may.

2          BY MS. GREENBERG:

3  Q.     Would you tell the jury what Oglethorpe 2 is?

4  A.     Oglethorpe 2 was submitted under laboratory Case

5  No. 04-1907, listed as our Exhibit Number 1.  It was a

6  sealed box containing eight Pyrex measuring cups.

7  These were extracted and run as a composite and were

8  positive for trace amounts of cocaine.

9  Q.     How did you extract those?

10 A.     We basically just used methyl alcohol and then

11 rinsed the materials and then combined them and run the

12 test on the methanol extract.

13 Q.     Were you able to get a weight on this?

14 A.     No, ma'am.  Trace amounts.

15 Q.     How many bowls were there?

16 A.     Eight.

17 Q.     Your Honor, again, perhaps what we could do here

18 with Oglethorpe 2 is just give the jury an example.

19        You said bowls.  Did you mean measuring cups?

20 You said bowls.  You mean measuring cups?  On this

21 particular one, there's a white thing on the bottom.

22 What is that?

23 A.     I think it's more scratches than anything else.

24 Q.     More scratchy?  When these were analyzed,

25 though, you were able to obtain some results from

1  certain of these measuring cups?

2  A.      Yes, ma'am.

3  Q.      And they were tested positive for what?

4  A.      Cocaine.

5  Q.      There's a broken one in here. Were these items

6  whole when you received them?

7  A.      I'm not sure.

8  Q.      There is no indication in the report if any were

9  broken?

10  A.      No, ma'am.

11  Q.      That happens in transporting them back and

12  forth?

13  A.      Sometimes, yes, ma'am.

14  Q.      Especially like this. All right.

15          For housekeeping, Your Honor, this relates to

16  7427 Ninth Street, Northwest. Again, these relate to

17  7427 Ninth Street, Northwest.

18          MR. WARD:  I'm sorry. We're on to Ninth Street

19  now?

20          MS. GREENBERG:  Your Honor, I believe Mr. Ward

21  had a question for the Court.

22          THE COURT:  He just said are you moving on to

23  Ninth Street.

24          MS. GREENBERG:  7427 Ninth Street, Northwest.

25          If we could start with Drugs 29A. Do you have

1 that in front of you?

2       MR. WARD:  I'm just taking a look at it.  Thank

3 you.

4       BY MS. GREENBERG:

5 Q.    Do you have that in front of you?

6 A.    Yes, ma'am.

7 Q.    These are the questions you answered for Mr.

8 Ward earlier; is that correct.

9       MR. WARD:  I'm sorry?

10      MS. GREENBERG:  These particular -- this

11 particular search is the questions you were answering

12 for Mr. Ward earlier; is that correct?

13      MR. WARD:  I'll stipulate.

14      THE WITNESS:  I don't know.

15      BY MS. GREENBERG:

16 Q.    Were you relating to 04-1096?

17 A.    Yes, ma'am, that's correct.

18      MS. GREENBERG:  Your Honor, I'd like to

19 approach.

20      THE COURT:  You may.

21      BY MS. GREENBERG:

22 Q.    Showing you what's been marked as Miscellaneous

23 14.  Is that the lab report you were referring to

24 earlier that was a business record kept by your office?

25 A.    Yes, ma'am.

1 Q.      That relates to the substances that you're about

2 to review?

3 A.      Yes, ma'am.

4       MS. GREENBERG:  Your Honor, at this time, I'd

5 like to introduce Miscellaneous 14 as an exhibit.

6       MR. WARD:   I have no objection.

7       THE COURT:   You may.

8       BY MS. GREENBERG:

9 Q.      Now, if you could start with Drugs 29A, could

10 you tell the jury what that is, please?

11 A.      This is a Ziploc -- a heat-sealed plastic bag

12 containing several items.  On the outside of the bag,

13 you have Government's 29A and 29B.  I'm not sure which

14 one refers to which.

15 Q.      What is reflected in 29A and B in front of you?

16 A.      That's correct.  This is -- under Laboratory No.

17 04-1906, listed as Exhibit No. 4, and Exhibit No. --

18 Q.      Is that on the screen in front of you?  I'm

19 sorry to interrupt.

20 A.      Yes, ma'am.

21 Q.      What was the results of your analyses?

22 A.      This is broken down into Exhibits 4A and 4B.

23 Four A is a Ziploc plastic bag containing a

24 brownish-tan powder.  The results of the analysis were

25 that this powder was positive for heroin.  Total weight

1 was 11.65 grams.

2 Q.     And 29B relates to your Exhibit No. 4B contained

3 on Miscellaneous  14?

4 A.     Four B was 44 small  Ziploc  bags containing small

5 amounts of a tan powder.  All this powder was combined

6 as one sample, and the total weight of the powder was

7 .24 grams, and the analysis showed that the powder was

8 positive for a mixture of heroin and cocaine.

9       MS. GREENBERG:   Your Honor, at this time, I

10 would like to publish Government 's Exhibits 29A and 29B

11 and ask that the witness be provided Government  Exhibit

12 Drugs 30.

13       THE COURT:   You may.

14       BY MS. GREENBERG:

15 Q.     What is contained in Government 's Exhibit 30,

16 Drugs 30.

17 A.     Drugs 30 is under Laboratory Case No. 04-1906,

18 Exhibit No. 3, and this consisted of a brown bag

19 containing a box which has tan colored powder.  Total

20 weight of the powder was .31 grams, and the powder was

21 positive for heroin and cocaine.

22 Q.     If I could direct your attention to Government 's

23 Exhibit Dobie 9.

24       Could you tell the jury what's contained in

25 Government 's Exhibit Dobie 9 and  what your lab number

1  was for that exhibit?

2  A.    This is also under Laboratory Case No. 04-1906,

3  listed as Exhibit No. 6 on this report.

4  Q.    Showing up on the screen to your right; is that

5  correct?

6  A.    Yes, ma'am.

7  Q.    How did you analyze -- did you analyze this in

8  the same manner you've been testifying to?

9  A.    Yes.

10         MR. WARD:   Objection.  Your Honor, he didn't

11 examine it -- didn't analyze it.

12         BY MS. GREENBERG:

13 Q.    Did your lab analyze this in the manner you've

14 been testifying to?

15 A.    Yes, ma'am.

16 Q.    What was the results of the analysis?

17 A.    Again, this was a box which contained a small

18 amount of trace amount of powder.  The powder was

19 positive for a mixture of cocaine and heroin.

20 Q.    What is the lab number on this exhibit?

21 A.    04-1906, exhibit No. 6.

22 Q.    If we could go to Dobie 10 relating to Lab

23 Number -- Item No. 7 under this lab report.

24 A.    Yes, ma'am.  This consisted of a brown-colored

25 scale.

1          MR. WARD:   I'm sorry, what is your lab number?

2          THE WITNESS:   It's Exhibit No. 7.

3          MR. WARD:   Thank you.  I'm sorry.  I didn't hear

4  you.

5          BY MS. GREENBERG:

6  Q.      What is Government 's Exhibit Dobie 10?

7  A.      It is a small, brown-colored scale which had a

8  residue on it, and that residue was positive for

9  cocaine and heroin.

10 Q.      When you give your opinion that the residue was

11 positive for heroin and cocaine, I'm not taking you

12 back over, that is based, again, on all the tests that

13 you previously testified to this grand jury?

14 A.      Yes, ma'am.

15 Q.      Performed under your direction by somebody in --

16 on your staff?

17 A.      Yes, ma'am.

18 Q.      And you personally -- when you testify you

19 personally reviewed not only the results at the time

20 but you also reviewed the results prior to coming to

21 court?

22 A.      Yes, ma'am.

23         MS. GREENBERG:   Your Honor, if I could publish

24 Dobie 10 and ask the agent to provide Dobie 13 to the

25 witness.

1          THE COURT:   You may.

2          BY MS. GREENBERG:

3 Q.      Was Dobie 13 analyzed by your office under this

4 item number?

5 A.      Yes, ma'am.  Dobie 13, Laboratory Case No.

6 04-1906, Exhibit No. 11, and Exhibit No. 11 consisted

7 of several different items.  There was a Ziploc plastic

8 bag with a residue, a metallic measuring spoon, a brown

9 plastic container plus playing cards, tissue, metallic

10 clips, various other items.

11         The Ziploc bag with the residue, the metallic

12 measuring spoon, and the brown plastic container were

13 analyzed as a composite, and the amount that was

14 obtained was just a trace amount, but it was positive

15 for cocaine and heroin.

16 Q.      How did you -- when you say "composite," could

17 you explain again how you made up -- how your office

18 made up that composite?

19 A.      These items were just rinsed again with methyl

20 alcohol, and those rinses were just added together, and

21 the test was done on those on the extracted alcohol.

22         MS. GREENBERG:   Your Honor, if I could publish

23 Dobie 13 to the jury and ask the agent to provide the

24 witness Dobie 15, please.

25         THE COURT:   Yes, you may.

1          BY MS. GREENBERG:

2 Q.      Would you tell the jury what Dobie 15 is, the

3 lab number, and what item number?

4 A.      Dobie 15 is Laboratory Case No. 04-1906, Exhibit

5 No. 2, and this is another scale which contained

6 residue, trace amounts of material found on the scale

7 were positive for cocaine and heroin.

8          MS. GREENBERG:   Your Honor, may I publish Dobie

9 15 and ask the agent to provide the witness with Dobie

10 11, please?

11         THE COURT:   Yes, you may.

12         BY MS. GREENBERG:

13 Q.      Does that have the same lab number?

14 A.      Yes, ma'am.  04-1906, exhibit No. 8, and this

15 consisted of a metallic box, which had a residue in it,

16 and residue was positive for cocaine.

17 Q.      How did you test the metallic box?

18 A.      Excuse me?

19 Q.      How would you test a metallic box?

20 A.      Again, this was rinsed with methyl alcohol, and

21 that alcohol extract was what was analyzed.

22         MS. GREENBERG:   Your Honor, may I publish Dobie

23 11 and ask the agent to provide the witness with Dobie

24 14, please?

25         THE COURT:   Yes, you may.

1          BY MS. GREENBERG:

2 Q.      What item number is this under your Lab Report

3 04-1906?

4 A.      Dobie 14 is Exhibit No. 5.

5 Q.      Does it contain both 5A and 5B?

6 A.      Yes, ma'am.  Five A consisted of a Sharp's

7 container with a razor blade, and the razor blade was

8 rinsed with methyl alcohol and was found to contain

9 heroin and cocaine.  Five B is a series of items, a

10 deck of cards, plastic spoons, a cloth bag, and some

11 plastic bags containing a residue.  There was a total

12 of .15 grams that was extracted, and I shouldn't say

13 extracted -- removed from the plastic bags.  Total

14 weight was .15 grams, and the powder was positive for

15 heroin and cocaine.

16      MS. GREENBERG:  Your Honor, if we could publish

17 Dobie 14 to the jury.

18      THE COURT:  Yes, you may.

19      BY MS. GREENBERG:

20 Q.      While I'm doing that, at the bottom of

21 Government's Exhibit Miscellaneous 14, there is a name

22 here, Paula Wolf.  Do you see that on your screen?

23 A.      Yes, ma'am.

24 Q.      Can you tell the jury who Paula Wolf is?

25 A.      Paula Wolf is another analyst at the laboratory,

1 and her signature appears in that location because she

2 administratively reviewed this report showing,

3 basically, her signature was that -- showing that the

4 typed results on the final report correspond to the

5 written laboratory report that Ms. Santos had prepared.

6 Q.      Where -- is your signature on this document?

7 A.      No, ma'am.

8 Q.      Had your signature been on internal papers

9 related to this case?

10 A.      My initials appear on all the notes of Ms.

11 Santos under the section on those notes that indicate

12 technical review.

13 Q.      So those would be referred to in your office as

14 the work papers?

15 A.      Yes, ma'am.

16 Q.      You reviewed the work papers at the time of

17 these analyses?

18 A.      Yes, ma'am.

19 Q.      All three locations that we talked about today?

20 A.      Yes, ma'am.

21      MS. GREENBERG:   Your Honor, while I'm publishing

22 -- may I publish Dobie 14 and have the witness testify

23 about Dobie 12?

24      THE COURT:   Yes, you may.

25      BY MS. GREENBERG:

1  Q.      Would you tell us if Dobie 12 is under the same

2  lab report and what item number it is, please.

3  A.      Dobie 12 is our Laboratory Exhibit No. 9,

4  consisted of a plastic bottle with a red cover, and

5  it's marked Inositol, and it contained a white residue.

6  Q.      Were you able to determine if that was a

7  controlled substance?

8  A.      There was a trace amount of material in that

9  particular bottle, and no controlled substances were

10 detected.

11 Q.      Thank you.

12         What is Inositol?

13 A.      The bottle was marked Inositol.  One of the

14 tests that Ms. Santos ran, which was on the infrared

15 spectrometer, showed that the material that she found

16 in my Exhibit No. 9 was positive for Inositol.

17 Inositol is a non-controlled substance, but it is found

18 very often in --

19         MR. WARD:  Objection, Your Honor, unless it

20 relates specifically to this case.

21         THE COURT:  I couldn't hear you, Mr. Ward.

22         MR. WARD:  I said, I'm objecting to what may be

23 done -- may be found in other cases and ask that he be

24 confined to this case.

25         MS. GREENBERG:   Your Honor, he's talking about

1 what he knows from his expertise, what the substance is

2 used for.

3          THE COURT:   Overruled.

4          BY MS. GREENBERG:

5 Q.      You may continue.

6 A.      Inositol is found very often mixed with cocaine

7 in cocaine samples.

8          MS. GREENBERG:   Your Honor, may I approach the

9 witness again?

10          THE COURT:   You may.

11          BY MS. GREENBERG:

12 Q.      You testified about Government's Exhibit

13 Miscellaneous 14 being a business record.   You've

14 previously testified as to that, and that was up on the

15 screen next to you.   If I could show you Government's

16 Exhibit Miscellaneous 15.

17          Is that a similar business record that's kept at

18 or about the time of the events recorded on it and

19 maintained by your office?

20 A.      Yes, ma'am.

21          MR. WARD:   May I see it, please?

22          MS. GREENBERG:   This goes to Mr. Martin.

23          BY MS. GREENBERG:

24 Q.      Miscellaneous 16 -- without going through the

25 whole litany of questions -- is that a business record

1 kept by your office?

2 A.     Yes, ma'am, it is.

3        MR. WARD:   Does that have anything do with me,

4 Miss?

5        MS. GREENBERG:   Your Honor, may I approach Mr.

6 Ward?

7        MR. WARD:   Thank you.

8        MS. GREENBERG:   Your Honor, I provided to the

9 clerk now Miscellaneous 14, 15 and 16.

10       BY MS. GREENBERG:

11 Q.    Sir, you testified about cocaine and cocaine

12 base.

13       Are you familiar with how cocaine is converted

14 into cocaine base?

15 A.    Yes, ma'am.

16 Q.    Could you tell the jury about that?  How is that

17 chemically done?

18 A.    Cocaine hydrochloride is commonly thought of as

19 powder cocaine.  The powdered cocaine, the cocaine

20 hydrochloride can just be dissolved in water and baking

21 soda can be added to it.  The baking soda causes the

22 hydrochloride salt, as we call it, to break down and

23 form a base -- cocaine base.

24       Well, cocaine base is not is soluble in water.

25 It does not dissolve in water, and at that point, the

1  insoluble cocaine base would just form in that water

2  solution and can be removed and dried.

3  Q.      What is cocaine base -- how is that related to

4  the cocaine?  What is the end result?

5  A.      Chemically, they're both cocaine.  Generally,

6  you would find cocaine in the hydrochloride or the salt

7  form because it's soluble in water.  All drugs,

8  legitimate or illegitimate are in the salt form because

9  our bodies of water system, in order for the drug to be

10 effective, it needs to be able to dissolve in your

11 circulatory system to do whatever it's supposed to do.

12      If the cocaine base would not dissolve in water,

13 it would not be very effective to take and ingest

14 orally because it doesn't dissolve in water.  It's not

15 going to really pass through your circulatory system,

16 but cocaine base does have one property and that is

17 that it burns very readily and it's used to be smoked.

18 Q.      Is cocaine base commonly referred to, I think as

19 you said before, crack cocaine?

20 A.      Yes, ma'am.

21 Q.      You mentioned baking soda.  Have you ever -- in

22 terms of your chemical analysis, could other liquids be

23 added to the process with the baking soda cocaine plus

24 a liquid in the conversion process?

25 A.      Sometimes, depending on the recipe that's being

1 used, or if not an exact recipe is used, too much

2 baking soda is put into the process.

3 Q.     What happens if too much baking soda --

4        MR. MARTIN:    Objection.

5        If he could be allowed to finish his response.

6        THE COURT:   Let him finish his answer.

7        THE WITNESS:   The baking soda will not dissolve

8 -- all the baking soda will not dissolve in water, so

9 as the cocaine base is formed, you're getting a mixture

10 of the cocaine base and the undissolved baking soda.

11 If the person involved wants to have a more pure form

12 of the cocaine base, one way to do that would be to use

13 some type of organic solvent.

14        Cocaine base is extremely soluble, and organic

15 solvents, baking soda is not, so that's a means of

16 separating out the baking soda from the cocaine base.

17        BY MS. GREENBERG:

18 Q.     Can you give me some examples of what you mean

19 by "organic solvent?"

20 A.     Alcohol.   Any type of alcohol.   Ether.

21 Chloroform.   These are the ones we would generally use

22 in our laboratory, so they're the ones that come to

23 mind.

24 Q.     Would any type of liquor work, or would it have

25 to be a particular type of liquor?

1  A.      Alcohol ?  Again , you could  use  ethyl  alcohol ,

2  which  is  a  drinking  alcohol , any  form  of  it .  We  don't

3  have  a  whole  lot  of  that  in  our  laboratory , so  we  would

4  use  methanol  or  something  like  that .

5  Q.      Would  the  liquor  have  to  be  clear  liquor , or

6  could  it  be  a  colored  liquor ?

7  A.      Probably  would n't  make  any  difference , but  I

8  would  assume  you  would  prefer  clear  so  you're  not

9  adding  color  to  your  materials .

10        MS.  GREENBERG:   Court 's  indulgence .

11        No  further  question s.

12        THE  COURT:   All  right .  This  is  an  opportune

13  time  to  take  a  morn ing  recess .  We  will  recess  until

14  11:15.

15              (Jury  excused  at  10:57  a.m.)

16              (Off  the  record  at  10:57  a.m. )

17              (On  the  record  at  11:17  a.m. )

18        MS.  GREENBERG:   Your  Honor , may  I  --  I  neglect ed

19  to  cover  one  area  at  the  end .  It  will  just  take  a

20  minute  or  two .

21        THE  COURT:   Sure .  All  right .

22        THE  CLERK:   You  ready ?

23        THE  COURT:   Yes .

24              (Jury  return s  at  11:18  a.m. )

25              (Witness  resumed  the  stand .)

1        THE COURT:   You may proceed, Ms. Greenberg.

2        MS. GREENBERG:   Your Honor, just a housekeeping

3  matter to not have to bring Mr. Gervasoni back.

4        BY MR. GREENBERG:

5  Q.      Sir, did you also review certain items reflected

6  on Miscellaneous 17 and Miscellaneous 18?

7        For housekeeping purposes, this relates to the

8  next witness, Your Honor, involving a search in 1999 at

9  7219 Flower Avenue, No. 203, and a car located at that

10  residence.

11        I'M showing you 17 and 18.  Is that your

12  signature on there, sir?

13  A.      Yes, ma'am, it is.

14  Q.      On Miscellaneous 17 and Miscellaneous 18, are

15  the analyses that were performed by your laboratory the

16  same analyses that you just spoke to this jury about

17  relating to cocaine, cocaine base, also known as crack

18  cocaine and marijuana?

19  A.      Yes, ma'am.

20  Q.      Could you start with Miscellaneous 17 and tell

21  the jury what was determined to be contained in those

22  substances by amount and type of drug?

23  A.      In Miscellaneous 17, there were three items

24  listed.  Item No. 1, 11.65 grams marijuana; Item No. 2,

25  147.12 grams of cocaine base; and No. 3, 4.68 grams of

1 cocaine .

2 Q.     Miscellaneous  Item 18?

3 A.     Miscellaneous  18, Item No. 1, trace  cocaine ;

4 Item No. 2, trace  cocaine ; Item No. 3 , 57.88 grams  of

5 cocaine  base .

6      MS. GREENBERG:   No further  question s, Your

7 Honor .   Thank  you .

8      THE COURT:  All right .  Cross-examination  ?

9      MR. MONTEMARANO :   Thank  you , Your  Honor .

10                    **CROSS-EXAMINATION**

11      BY MR. MONTEMARANO :

12 Q.     Good  morn ing , Mr. Gervasoni .

13 A.     Yes, sir .

14 Q.     Good  to meet  you .  Based  upon  your  question s

15 that you were  asked  in voir dire  between  Ms. Greenberg

16 and Mr. Ward , would  it be fair  to say  that  you , at one

17 time , serve d as a -- as an exam iner  in the  same  role

18 that Ms. Santos  did , that  the  report s Mr. Ward  was

19 quizzing  you about  before  you became  a supervisor ?

20 A.     Yes, sir , I still  do on occasion .

21 Q.     Still  do on occasion .  You've  been  in this

22 business  for about  how long ?

23 A.     Thirty-five  year s.

24 Q.     Okay .  So it would  be fair  to say you were  --

25 you did that  kind  of examination  for more  than  a

1 decade ?

2 A.      Yes, sir .

3 Q.      More  than  two  decades ?

4 A.      Yes, sir .

5 Q.      Okay .  So you've got  a vast  wealth  of experience

6 doing  this  sort  of  thing ; is  that  a fair  statement ?

7 A.      Yes, sir .

8 Q.      Okay .  Would  it  be  fair  to  say  that  in your

9 experience , it  is  not  uncommon  to  receive  -- well ,

10 strike  that .  Let 's  start  back  from  the  beginning .

11       You  were  asked  by  Ms.  Greenberg  as  to  how  the

12 materials  are  received  by  you  in  the  lab .  Remember

13 that  question ?

14 A.      Yes, sir .

15 Q.      And  you  said  you  divided  up,  based  on  the  tests,

16 but  you  get  it  packaged  together  by  the  police , as  you

17 describe  the  way  it  was  seized ; is  that  a fair

18 statement ?

19 A.      Yes, sir .

20 Q.      And  it  would  be  fair  to  say  that  the  drugs

21 seldom , if  ever , are  loose ?  They're  always  in some

22 kind  of  packaging ?

23 A.      Yes, sir .

24 Q.      Plastic  bags ; correct ?

25 A.      Correct .

1  Q.      Vials?

2  A.      Yes, sir.

3  Q.      In your experience, it's probably more common

4  than not that drugs are packaged especially in small

5  packages and lots of small packages; correct?

6  A.      We get them in varying sizes, very small up to

7  generally gallon-size Ziplocs.

8  Q.      Just so we're clear, sometimes the packaging is

9  loose like paper or tape or things like that, too;

10  correct?

11  A.      That's correct.

12  Q.      Based upon your training and knowledge and

13  experience over these 35 years, would it be fair to

14  suggest that it's not uncommon that when you receive

15  drugs to be tested, still in their packaging, in an

16  envelope that you need to unseal that, it has been --

17  it has not come directly from the seizing officer to

18  the lab?

19  A.      That's correct.

20  Q.      In fact, sometimes it goes and gets

21  fingerprinted first; isn't that a fair statement?

22  A.      If it's a drug container, our policy and our

23  department policy is that it will come to us first.  We

24  empty the drugs from the original container and then

25  that container is then packaged by us and sent for

1  fingerprints.

2  Q.      So you treat it very carefully so as not to

3  disturb any potential fingerprints on the packaging; is

4  that correct?

5  A.      That's correct.

6  Q.      You repack the packaging; is that correct?

7  A.      That's correct.

8  Q.      Then it goes through your same chain of custody

9  procedures to the fingerprint lab; is that correct?

10 A.      Correct.

11 Q.      At that point it's out of your custody and you

12 don't know what happens to it, and presumably it's

13 going to be tested?

14 A.      That's correct.

15         MR. MONTEMARANO:  No further questions, Your

16 Honor.   Thank you.

17                    **CROSS-EXAMINATIONn**

18         BY MR. MARTIN:

19 Q.      Good morning, Mr. Gervasoni.  My name is Tony

20 Martin, sir, and I represent Mr. Goodwin here.

21         Bear with me a little bit.  You talked a little

22 about cocaine base, and would it be fair to say that

23 there are various forms of cocaine base?

24 A.      Chemically, no.

25 Q.      Wouldn't you agree that the paste from the cocoa

1 leaf is also cocaine base?

2 A.      That's correct.

3 Q.      Would you also agree that the freebasing that

4 became infamous, I guess, in the 1980s with the

5 comedian, Richard Pryor, is also a form of cocaine

6 base?

7 A.      They're all cocaine base, yes, sir.

8 Q.      So when you said in response to Ms. Greenberg's

9 question that crack was cocaine base, that wasn't quite

10 accurate.  There are different forms of cocaine base;

11 right?

12 A.      She asked if cocaine base is known as crack, and

13 it -- you know, it -- crack is a slang term that's used

14 for a way that cocaine base is made.

15 Q.      Usable.  Crack is a usable form of cocaine base?

16 A.      Right.

17 Q.      And one of the distinctive features of that is

18 that it's smokeable; right?

19 A.      That's correct.

20 Q.      But you didn't test to determine whether any of

21 the drugs taken was smokeable, any of the cocaine base

22 that you tested in your lab, did you?

23 A.      No, sir.

24 Q.      With respect to - if I might look at

25 Miscellaneous  15 and 16 for a moment, Madam Government,

1 if you have it available .

2        With respect to the analysis that was done , you

3 just tested for the presence of cocaine ; is that

4 correct ?

5 A.      No, sir .  It depended on the exhibit .  On some ,

6 it was just for cocaine and others .  It was whether it

7 was cocaine base or cocaine hydrochloride .

8 Q.      Well , you didn't test to determine whether or

9 not there were other chemicals added to that , did you ?

10 A.      No, sir .

11 Q.      So we don't know what percentage of cocaine was

12 in that compound or that mixture that was seized ; do

13 we ?

14 A.      That 's correct .

15       MS. GREENBERG:   Here you are , Mr. Martin .

16       MR. MARTIN:   Thank you , ma'am .

17       BY MR. MARTIN:

18 Q.      Calling your attention to both 15 and 16 .  Let's

19 go to -- if I could put this on the screen , maybe we

20 can get this up here .  Can you see that , sir ?  I'm

21 going to try to zoom this -- that 's just the opposite ,

22 isn't it ?  Can you see that ?

23 A.      Yes, sir .

24 Q.      Do you see here where my finger is ?  Can you --

25 let's see .  See here where it says Exhibit 1 ?  Can you

1  see that?

2  A.       Yes, sir.

3  Q.       And it says 969.53 grams of cocaine; correct?

4  A.       That's correct.

5  Q.       But we don't know if that's cocaine base; do we?

6  A.       Let me check the notes here, please.  No, we do

7  not.

8  Q.       And we don't know that because we don't know if

9  there's sodium bicarbonate in there; do we?

10  A.       No.  We can -- if we have a relatively pure form

11  of cocaine and it's not mixed with other substances, we

12  can pretty much determine whether it's one or the

13  other, but this one was fairly weak.

14  Q.       So we don't know if this particular cocaine was

15  smokeable, and we don't know if there was baking soda

16  in there; correct?

17  A.       That's correct.

18  Q.       Court's indulgence.

19          Now, with respect to the drugs that were seized

20  and that was published to the jury, when you got them,

21  were they in plastic bags or did you put them in

22  plastic bags?

23  A.       They were received -- most of the items were

24  received in the heat sealable evidence bags that

25  they're presently in, and inside those bags were

1 various  contain ers.   Now , some  of those  contain ers we

2 request ed  to send  for  fingerprint s, and  in  those

3 instance s, those  were  removed  from  the  original

4 contain ers and place d  in  bags from  the  laboratory  so

5 the  original  contain ers could  be  sent  for  fingerprints .

6 Other  than  that ,  as  you  see  them  package d  now  is  how

7 they  were  package d  when  we  received  them .

8 Q.      Okay .  Well , let 's  talk  about  the  sequence .  Did

9 they  go  to  the  fingerprint  lab  before  or  after  they

10 came  to  your  lab ?

11 A.      The  department  policy  is  packaging  come s  to  our

12 laboratory , we  remove  the  drug s  from  the  original

13 packaging , and  then  package  up  those  item s  to  be  sent

14 for  fingerprint s.

15 Q.      When  you  do  that , of  course  you  wear  late x

16 glove s  so  that  your  finger print s  are  not  transferred;

17 right ?

18 A.      That 's  correct .

19 Q.      That 's  very  important  because  you  don't  want  to

20 contaminate  any  of  the  packaging ; right ?

21 A.      That 's  correct .

22 Q.      Okay .  Now , with  respect  to  your  laboratory .

23 You  talk ed  a  little  bit  about  it , but  you  didn't  tell

24 us  whether  or  not  you  actual ly  calibrate d  the  machine s

25 that  do  the  testing .  Do  you  do  that , sir ?

1  A.       No, sir.  Well, let me clarify.  We have people

2  assigned to do that on days -- there might be days --

3  we're a small laboratory.  There might be days where

4  I'm the first one in and I'm going to analyze drugs

5  that day, and I will calibrate the instrument.  So, I

6  have done it.  Generally, I do not.

7  Q.       Okay.  And you didn't testify today as to

8  whether or not that machine was calibrated on June 1st,

9  2004.  You didn't testify that it was done on that day;

10 did you?

11 A.       No.

12 Q.       And you don't have any paperwork to show that

13 the machine was calibrated on that day; do you?

14 A.       Not with me.  That's correct.

15 Q.       Now, you also, if I heard you correctly, say

16 that you were Ms. Santos' supervisor?

17 A.       Yes, sir.

18 Q.       Did you hire Ms. Santos?

19 A.       Yes, sir.

20 Q.       And you're responsible for her supervision?

21 A.       Yes, sir.

22 Q.       You've been in charge of the lab for how many

23 years, sir?

24 A.       Thirty.

25 Q.       So, your performance is based on the competency

1  of the laboratory over all and the people within it; is

2  that correct?

3  A.      I would say so, yes, sir.

4  Q.      With respect to controlled testing. Do you have

5  that done at the lab?

6  A.      Excuse me?

7  Q.      Controlled testing. In other words, where

8  samples are sent that are known to contain trace

9  elements of controlled substances. In other words, to

10 determine the accuracy of the lab. Do you have

11 controlled testing? I don't know how else to describe

12 it.

13 A.      Each of our analysts, whether it be DNA or drug

14 analysts, are proficiency tested twice a year where we

15 receive unknown samples from an outside agency to

16 determine if we can analyze the materials correctly.

17 Q.      That's an independent lab, it's not a government

18 agency?

19 A.      That's correct.

20 Q.      I take it that Ms. Santos was recertified within

21 that time frame that you mentioned?

22 A.      Yes, sir. We do it every six months.

23 Q.      You've worked for the government for at least

24 the last, I think you said, 30 -- 35 years?

25 A.      Thirty-five years, yes, sir.

1  Q.      And you testify exclusively for the government,

2  don't you?

3  A.      I believe so.  I can't think off the top of my

4  head of having testified for defense.

5  Q.      Right.  The judge didn't call you today to

6  testify; did he?

7  A.      No, sir.

8          MR. MARTIN:   I have no further questions.

9          MR. HALL:  Your Honor, I have no questions of

10 Mr. Gervasoni.

11         MR. MITCHELL:   No questions, Your Honor.

12         MR. WARD:  I have a couple, Your Honor.

13                    **CROSS-EXAMINATION**

14         BY MR. WARD:

15 Q.      Mr. Gervasoni, since all of the testing about

16 which you have testified was actually done by Ms.

17 Santos, I wanted to ask you a little bit about her and

18 her background and qualifications.

19         What education does she have in the field of

20 chemistry?

21 A.      She has a bachelor's degree in chemistry.  I

22 can't remember the name of the school, but it's a

23 Filipino school -- college.

24 Q.      I see.  When was she hired by you, sir?

25 A.      She started working with us in --

1 Q.      I mean approximately .  I don't need an exact

2 date .

3 A.      1998 .

4 Q.      1998 .  Do you know what prior experience she had

5 had before  -- in the field before coming to Montgomery

6 County ?

7 A.      Yes, sir .  She was employed as a drug analyst

8 with the Maryland State Police Laboratory in

9 Pikesville , I believe for 13 years before she came to

10 our laboratory .

11 Q.      All right , sir .  Now, the form which is in

12 evidence as Government 's Miscellaneous 4, that is the

13 Laboratory Report 04-1906, states above the signature

14 of Ms. Santos :  I hereby certify the above-described

15 material was analyzed by me under procedures approved

16 by the Department of Health and Mental Hygiene; is that

17 correct ?

18 A.      Yes, sir .

19 Q.      And are those the standards that your laboratory

20 follows or do you have your own standards ?

21 A.      These -- the standards we use are -- or the

22 procedures we use have been approved by the Department

23 of Health and Mental Hygiene .

24 Q.      All right , sir .  And it also states, I continue ,

25 I am certified by the State Department of Health and

1 Mental Hygiene as an individual qualified under the

2 standards approved by that department to analyze

3 controlled dangerous substances, and it continues on

4 with other matters.

5       Do you know when Ms. Santos was approved by the

6 state or certified by the State Department of Mental

7 Hygiene?

8 A.      Actually, she was -- had to be approved twice

9 because the certification only applies to the

10 laboratory, so she was certified when she worked with

11 the state police in Maryland, and as soon as she began

12 her employment with Montgomery County, we submitted the

13 required paperwork to have her certified with the State

14 Department of Health and Mental Hygiene in our

15 laboratory.

16 Q.      That would have been in 1998 when she joined?

17 A.      That's correct.

18 Q.      Is certification an ongoing or repetitive

19 process? That is, under State Health and Mental

20 Hygiene regulations, is certification required on an

21 ongoing basis?

22 A.      For this certification from the State Department

23 of Health and Mental Hygiene, no. All you need is that

24 original one. The only way you would have to renew it

25 is if you changed laboratories within the state of

1  Maryland .

2  Q.      All right , sir .  You have already said that you

3  are her -- and have been her supervisor  since  she came

4  with Montgomery  County or since she joined  Montgomery

5  County ; is that  right , sir ?

6  A.      Yes, sir .

7  Q.      And as supervisor , I assume  that  you have  the

8  responsibility   to periodically   review  an employee 's

9  work  and to eval uate  an  employee 's work ; is that

10  correct , sir ?

11  A.      Yes, sir .

12  Q.      Can you recall  any  occasion s in  the  past  when

13  you've  had  to , let's say ,  order  retesting  with regard

14  to  Ms.  Santos ?

15  A.      No, sir .

16  Q.      Can you recall  any  occasion s in  the  past when

17  you've  had  to  comment  on her  compliance   with  an

18  administrative   standard  of  the  laboratory ?

19  A.      No, sir .

20  Q.      Now , is  the  laboratory   itself  audited  on  an

21  ongoing  basis  by either  the  State  Department   of  Mental

22  Hygiene  --  I'm  sorry , State  Department   of  Health  and

23  Mental  Hygiene  of  Maryland  or  some  other  independent ,

24  qualifi ed  laboratory   approve d  by  the  State  Department

25  of  Health  and  Mental  Hygiene ?

1  A.        No, sir.

2  Q.        So, the -- so in the 30 years you've been there,

3  neither the State Department of Mental Health and

4  Hygiene or some other laboratory approved by them has

5  not come in and done an order of the laboratory and

6  approved its operating procedures and so forth?

7  A.        That's correct.

8  Q.        So you're sort of self-auditing?

9  A.        Yes, sir, and that's one of the reasons we use

10 proficiency testing.  It's one method of testing each

11 of our analysts, and again, we do it twice a year, even

12 though once a year is the only requirement in the

13 forensic field.  And that's, you know, it's proficiency

14 testing.

15 Q.        Nobody ever looks over your shoulder and says,

16 hey, you're doing this wrong, or you're doing that

17 wrong, or we think you should do this or do that?

18 A.        No, sir.  There's standards that are set up out

19 there.  Nobody is really checking to see that we're

20 following those standards.

21 Q.        Okay.  Now, let's turn to some of the exhibits

22 that you were shown, sir.

23        First of all, do we have 4C, I think it is the

24 laboratory report.  Thank you, sir.  Now, as I

25 recollect and certainly the jury's recollection is what

1  control s, you were asked  the difference  between  a

2  detectable  amount  and a trace  amount ; is that  correct ,

3  sir ?

4  A.     It was something  to that  effect .

5  Q.     Something  to that effect.    And as I understood

6  your  testimony  with  respect  to trace  amount  or your

7  definition , it is something  that  is so small , it is

8  less  than  .01 grams , so it really  cannot  be weigh ed by

9  your  scale s.

10  A.     That 's correct .

11  Q.     All right , sir .   And if it weigh s more  than  0.1

12  grams , it is classifi ed as some  other  manner ?

13  A.     We would  actual ly designate  the weight  that  we

14  had received .

15  Q.     All right , sir .   Do see Item  No. 1 there , sir ?

16  Exhibit  No. 1 on the line , first  line ?

17  A.     Yes, sir .

18  Q.     All right , sir .   Now , behind  the word  "cocaine "

19  is typed  in par enthese s "trace ;" is that  correct , sir ?

20  A.     Yes, sir .

21  Q.     Do I assume  correct ly that  is something  that  Ms.

22  Santos  would  have  put there  as she did the testing  or

23  after  she did the testing ?

24  A.     Yes, sir .

25  Q.     All right , sir .   Under  weight  found , sir , what

1 does it say?

2 A.      8.62 grams.

3 Q.      According to your definition of trace, 8.62

4 grams is not a trace; is that correct, sir?

5 A.      That's correct.

6 Q.      Do you know what she meant when she put down

7 8.62 grams and then put trace? Do you know whether she

8 meant trace or whether she meant something else?

9 A.      Yes, sir. The total weight of this exhibit, the

10 powder that weighed in this particular exhibit was 8.62

11 grams. Upon the analysis, the amount of cocaine

12 determined was extremely weak and just -- we just felt

13 it's unfair to give the impression that there's 8.62

14 grams of a quantity of powder that is strongly cocaine

15 or at least relatively strong and in actuality, in this

16 particular instance, was very, very weak, so, you know,

17 sort of gives the impression that there really was a

18 very small amount of cocaine present in this particular

19 sample.

20 Q.      It certainly would have been unfair to leave the

21 jury with the impression that it was 8.62 grams of

22 cocaine; is that correct, sir?

23 A.      That's correct.

24 Q.      I'm glad you clarified that. Thank you.

25         All right, sir. Let me just look at my notes

1  for a second.  You talked about a lot of small glassine

2  or plastic bags that were parts of the various exhibits

3  that were submitted; is that correct, sir?

4  A.     Yes, sir.

5  Q.     And you said that -- I believe that a number of

6  those plastic bags had traces of controlled dangerous

7  substances in them; is that correct, sir?

8  A.     Yes, sir.

9  Q.     That would seem to indicate, would it not, sir,

10 that the bags had, at one time, held controlled,

11 dangerous substances, and had been emptied, which had

12 been emptied out or used; is that correct, sir?

13 A.     Yes, sir.

14 Q.     Okay.  For example, if a drug addict bought a

15 dime bag on the street, took it home and emptied the

16 stuff out, snorted the stuff, fired it up, whatever

17 they do with it, you would expect to find traces in the

18 bag?

19 A.     That's correct.

20 Q.     All right, sir.  Now, is it a fact, sir, that

21 with respect to the exhibits that were shown to you by

22 Ms. Greenberg, you don't know, other than the fact that

23 the form says that they were seized at 7427 9th Street,

24 you don't know where any of those items were found?

25 A.     That's correct.

1  Q.       You don't know if they were found in the

2  basement, in the attic, in the kitchen, in the bathroom

3  or where?

4  A.       That's correct.

5  Q.       That would not be important to you?

6  A.       That's correct.

7  Q.       With respect to 29B -- I'm sorry, do you have

8  that in front of you, sir?

9  A.       I don't have those numbers.

10  Q.       Do you recall that your testimony was that it

11  consisted of 44 small Ziploc bags, each with traces of

12  powder?

13  A.       I knew there was an item like that.  I don't

14  know particularly which item.

15  Q.       Let's get that for you, then, please.  I don't

16  want to have you guessing.

17          This heat-sealed envelope, as I understand it,

18  contains both 29A and 29B, but it's 29B that I'm

19  focusing on, sir.  The question is, is 29 -- does 29B

20  consist of a number of small, plastic, Ziploc-type

21  bags?

22  A.       That's correct.

23  Q.       Okay.  And that's -- that has your laboratory

24  number, I believe, 4B?

25  A.       That is correct.

1 Q.      Is that correct, sir?

2 A.      Yes, sir.

3 Q.      You were able to weigh a detectable amount of

4 both heroin and cocaine, .24 grams; is that correct

5 sir?

6 A.      Yes, sir.

7 Q.      As I understand it, you're not saying that there

8 was 2.4 grams in any one of those bags?  You're saying

9 that the total of the residue left in each of those 44

10 bags totalled .24 grams.

11 A.      That's correct.

12 Q.      Again, that would be consistent, would it not,

13 with let's just say an addict   buying a quantity of

14 drugs in those bags and then emptying them out, using

15 the drugs, and then putting the bags aside, leaving a

16 small trace quantity in each?

17 A.      Yes, sir.  Each of the bags just had very small

18 quantities in it.

19 Q.      Yes, sir.  Four A was a bag, which was 11.65

20 grams of heroin.

21 A.      Yes, sir.

22 Q.      All right, sir.  Do I understand that   that was

23 not tested for purity?

24 A.      That's correct.  We don't test anything for

25 purity in our laboratory.

1  Q.      I see.  Were you able to get any indication ,

2  because  you  testifi ed  just  a  few  minute s  ago ,  if  that

3  something  was  very  weak  and  it  was ,  therefore ,

4  character ized  as  a  trace .

5         If  you  can't  say  percentage -wise ,  with  respect

6  to  4A  and  the  11.65  grams ,  say  whether  the  quantity  of

7  heroin  was  weak  or  not ?

8  A.      No,  sir .  Some  other  substance s  were  found  in

9  there ,  which  would  indicate  that  it  wasn't  pure ,

10  obvious ly.  But  as  to  the  extent  of  how  pure  that  was ,

11  we  would  not  know .

12  Q.      All  right .  Thank  you .

13         Now ,  the  scale s  that  you  talk ed  about .  I  think

14  it  was  Dobie  10,  which  was  your  item  Exhibit  7  -- or

15  from  which  Exhibit  7  was  derive d.  You  recall  that

16  those  trace s  were  found  on  a  scale ?

17  A.      Yes,  sir .

18  Q.      All  right ,  sir .  Now,  is  that  a  scale

19  manufactured  and  sold  sole ly  for  the  purpose  of

20  measuring  quantiti es  of  controlled ,  dangerous

21  substance s?

22  A.      I  don't  think  so .  I'm  sure  you  can  purchase  it

23  for  whatever  reason  you  want .

24  Q.      Would  you  expect  jeweler s  to  use  a  scale  like

25  that  to  weigh  diamonds  or  other  precious  stone s?

1  A.      It's a possibility .

2  Q.      The same goes , I guess , for the other scale that

3  was found , which was ?

4  A.      Number two .

5  Q.      I believe Exhibit 2 .  Or Dobie Exhibit 15 ,

6  Exhibit 2 on your report .  There were trace s of coke

7  and heroin ; is that correct , sir ?

8  A.      That 's correct .

9  Q.      All right , sir .  Now , let 's talk about Dobie 13

10  for a moment where trace s were found .  I think that 's

11  your Exhibit 11 as shown on the screen .  May I see

12  that , Detective ?  Thank you , sir .

13          MR. WARD:   May I show this to the witness ?

14          THE COURT:   You may .

15          BY MR. WARD:

16  Q.      Do you remember testify ing about that , sir ?

17  A.      Yes, sir .

18  Q.      All right , sir .  If I may .  Within this

19  heat -sealed bag , there are several play ing cards ; is

20  that correct , sir ?  The kind you sit down and play , I

21  don't know , Poker or Bridge or something with ; is that

22  correct ?

23  A.      That 's correct .

24  Q.      There look s like a couple of lottery receipt s.

25  Do you see them here ?

1  A.        Yes, sir.

2  Q.        Pair of tweezers; is that right?

3  A.        Yes, sir.

4  Q.        Pair of toenail clippers?

5  A.        Yes, sir.

6  Q.        D. C. Lottery-inscribed pencil; is that right,

7  sir?

8  A.        Yes, sir.

9  Q.        A common kitchen item measuring spoon.  Looks

10 like a half teaspoon; is that correct, sir?

11 A.        Yes, sir.

12 Q.        And then what looks like a -- I don't know.  Is

13 it a plastic or tin lid of some kind?

14 A.        I think it's a -- yeah, it's just some sort of a

15 little -- yes, metal lid.

16 Q.        Okay, sir.  It's my understanding, based on your

17 testimony, that all of those items were washed in some

18 kind of a, I think you said methyl alcohol rinse or

19 solution.

20 A.        Methyl alcohol, yes, sir.

21 Q.        And that was for the purpose of washing off any

22 residue?

23 A.        Yes, sir.  Not all those items were rinsed.

24 Q.        Not all of them?

25 A.        No.  Not the cards or the papers.  It was just

1  the measuring spoon, the -- that metal cap and there's

2  a small Ziploc bag in there also.

3  Q.      A small Ziploc bag.  All right, sir.  And that

4  was to be my next question.  Which items were which.

5  You've just answered that.  In any event, whatever was

6  rinsed, including the small plastic bag, only a trace

7  was found; is that correct, sir?

8  A.      Yes, sir.

9  Q.      You have no way of telling whether that trace

10 came from the spoon, the little, I don't know, like a

11 tin lid or something or the bag?  You have no way of

12 knowing where that trace came from?

13 A.      That's correct.

14 Q.      All right, sir.  It could have certainly come

15 just from the bag?

16 A.      Could have come from either one or all of them.

17 Q.      And if it came from the bag, that again, would

18 not be inconsistent with, let's say, an addict bringing

19 home a dime bag or whatever it was, emptying it out,

20 using it and putting the bag aside?

21 A.      That's correct.

22 Q.      All right, sir.  Thank you.

23         Now, Dobie Exhibit 14, which was, I believe,

24 your Exhibit 5.  I'm sorry to put you through all this

25 trouble, Detective.  Actually 5A.  Thanks.

1          MR. WARD:   Now, if I may, Your Honor.

2          THE COURT:   You may.

3          MR. WARD:   Thank you.

4          BY MR. WARD:

5    Q.     In this heat-sealed bag, sir, which is Dobie

6    Exhibit 14, it appears we have some kind of plastic

7    tube with a label that says "Sergeant Safety Tube;" is

8    that correct, sir?

9    A.     Yes, sir.  We use that for sharp objects so that

10   people don't injure themselves while transporting the

11   evidence or using it.

12   Q.     All right, sir.  There's a little pumice stone,

13   the kind that you use in the bathtub to rub a callus

14   off your foot; is that right, sir?

15   A.     Yes, sir.

16   Q.     A ballpoint pen; right?

17   A.     Yes, sir.

18   Q.     Again, there appear to be several playing cards

19   in there; is that right?

20   A.     Yes, playing cards, papers,

21   Q.     A little round tin, the kind that would hold

22   pastels or something that you would buy in the

23   drugstore; is that right, sir?

24   A.     Yes, sir.

25   Q.     A plastic, small plastic spoon?

1  A.       That's correct.

2  Q.       Numerous papers; is that right?

3  A.       Yes, sir.

4  Q.       A small cloth bag?

5  A.       Yes, sir.

6  Q.       I believe there were also some plastic bags in

7  here, or do you recall?

8  A.       There are some small Ziplocs also.

9  Q.       All right.  Now, I think there was a razor blade

10 in here, too.

11 A.       Yes.  The razor blade is in the Sergeant's

12 Safety Tube.

13 Q.       I see.  That's so I don't cut myself when I pick

14 it up.

15          Now, the razor blade, I think you said, was 5A;

16 is that right, sir?

17 A.       Yes, sir.

18 Q.       Huh?

19 A.       Yes, sir.

20 Q.       And that was what had an unmeasurable amount of

21 heroin and cocaine.  In other words, a trace of heroin

22 and cocaine; is that correct, sir?

23 A.       Yes, sir.

24 Q.       The other items -- as I understand it, the other

25 items that were tested collectively had .15 grams of

1 heroin and cocaine; is that correct, sir?

2 A.     Yes, sir.  There were principally the -- there's

3 Ziploc bags in there.

4 Q.     The five Ziploc bags.  Now, you don't know, I

5 assume, whether the .15 grams of heroin and cocaine

6 came from one of the bags, two of the bags, or all five

7 of the bags; is that correct?

8 A.     That's correct.

9 Q.     But that is barely -- not barely.  That is above

10 a trace.  How do you characterize that as a detectable

11 quantity?

12 A.     Yes, sir.

13 Q.     Okay.  But you don't know if it was simply since

14 that 1.15 grams could have been divided up between the

15 items that were tested, you don't use, for example,

16 each bag had simply a trace in it, for example, the

17 glassine bag?

18 A.     Yes, sir.

19 Q.     That, again, could would not be inconsistent

20 with an addict buying a glassine bag for a fix,

21 emptying it out, using it whichever way it was used,

22 and then putting the bag aside with simple trace?

23 A.     That's correct.

24 Q.     All right, sir.  You were shown a bag of

25 Inositol.

1  A.       It was a bottle that was labeled Inositol that

2  had trace amount s of white powder in it.

3  Q.       I'm sorry . Could you spell that for me?

4  A.       I N O S I T O L.

5  Q.       Inositol ?

6  A.       Inositol .

7  Q.       What is Inositol ?  I mean , I don't need a long ,

8  complicate d chemical answer , but --

9  A.       It's something you can buy in health store s and

10  mix it, and I don't know what it's suppose d to do.

11  It's sort of like a vitamin kind of thing , but you

12  know, we see it quite frequent ly in the lab.

13  Q.       But it's something that has legitimate uses as ,

14  for example , does baking soda ; is that right ?  I mean ,

15  to bake cake s?

16  A.       That 's correct .

17  Q.       All right , sir.  And as you said , it is a

18  non -controlled substance .  You don't need a doctor 's

19  prescription  to walk in a health store and buy a bottle

20  of Inositol ; do you?

21  A.       No, you do not.

22        MR. WARD:   Let me just check one thing first .

23        If the Court would bear with me just one moment ,

24  please .

25        Mr. Gervasoni , I think that's all I have , except

1  now I can't find my copy of my report.

2          Oh, here it is.  Thank you, Madam Prosecutor.

3          Thank you, Mr. Gervasoni.

4          THE COURT:  All right.  Any further

5  cross-examination?

6          MR. MCKNETT:  Just a few questions, Your Honor.

7                    **CROSS-EXAMINATION**

8          BY MR. MCKNETT:

9  Q.      Good morning.

10 A.      Good morning.

11 Q.      I want to ask you a couple of questions, if I

12 may, about the format of the lab reports themselves.

13         Do you have one there?  Any one will do.

14 A.      Sure.

15 Q.      I'm going to put up this one.  The report is

16 divided up into sections; correct?

17 A.      That's correct.

18 Q.      I want to refer to them as they appear on the

19 page.  There's a top section up here.  Who fills that

20 in?

21 A.      That whole top section, except for the

22 laboratory number, which is on the upper right-hand

23 corner, lab number.

24 Q.      That's here?

25 A.      The lab number is put in there by the laboratory

1  personnel.  The rest of that section is filled out by

2  the officer involved.

3  Q.      In this case, it would appear to be a detective?

4  A.      Papalia.

5  Q.      Detective Papalia?

6  A.      Yes, sir.

7  Q.      Do you know him?

8  A.      Yes, sir.

9  Q.      He's Montgomery County, I believe?

10 A.      Yes, sir.

11 Q.      So he fills in these lines?  The officer, agency

12 phone number, and then defendant suspect line; correct?

13 A.      Yes, sir.

14 Q.      I'm sorry.  I keep hitting the wrong button

15 here.  There's a next section, which is in this box

16 here.  Who fills in that box?

17 A.      That would also be filled in before it comes to

18 the laboratory by the officer involved.

19 Q.      So that would have been either Detective Papalia

20 or someone else working with him?

21 A.      That's correct.

22 Q.      Then we have the next box, which is here, which

23 starts out with exhibit number, complete description,

24 suspected substance.  Who fills in this portion?

25 A.      That's also filled in by the officers.

1  Q.      Then there's a very narrow box here, it says lab

2  use only, and that's the line that indicates when --

3  the analyst?  Is that the proper term --

4  A.      Yes, sir.

5  Q.      -- actually goes into the exhibit and takes out

6  whatever there is in there to be analyzed; correct?

7  A.      That's correct.

8  Q.      In this case, it was Jocelyn Santos?

9  A.      Yes, sir.

10  Q.      Then there's another box that, again, starts

11  with exhibit number, but then it goes to weight found

12  and substance found.  Who fills in that box?

13  A.      This is typed in by our secretary.  That

14  information she obtains from our written laboratory

15  results.

16  Q.      And in this case, the written laboratory results

17  would have been written by Analyst Santos.

18  A.      That's correct.

19  Q.      There's one entry here, and it appears to be an

20  entry made by Ms. Santos.  It appears to be her name

21  there.  Do you see that?

22  A.      Yes, sir.

23  Q.      Am I correct on that?  Does that appear to be

24  her name?

25  A.      Yes, sir.

1  Q.      What would that indicate?

2  A.      The reason is that sometimes the description of

3  the officers in that upper block is not complete, or

4  they may list a number of items on one line, so what we

5  do is divide them up, like in this particular case, Ms.

6  Santos took Exhibit No. 4 and divided it into A and B,

7  and Exhibit No. 5A and B, so that when you look at the

8  lower results of the report, you will see that there is

9  a result for a 4A and a 4B, just to clarify what's

10  going on from the top part of the report and the

11  bottom.

12  Q.      So just to make sure I'm clear, the numbers one,

13  two, three, four, five, they were apparently written by

14  Detective Papalia?

15  A.      Yes, sir.

16  Q.      And Ms. Santos would have broken it down into

17  5A, 5B, she would have written that on there, and I

18  think put her initials adjacent to it?

19  A.      Yes.  And then her name and date after that.

20  Q.      That's just a record-keeping thing so there was

21  a proper chain of custody?

22  A.      Well, it's a situation of we try to make the

23  results of our findings correspond to what's submitted

24  above.  And again, there's several items listed on each

25  line.  So to break down the fact that we have a 4A and

1 a 4B, you have some understanding of what 4A and 4B

2 means when you look at that report.

3 Q.      Because the officer had put down at Line 4, he

4 had put down two different things.

5 A.      That's correct.

6 Q.      You couldn't analyze them both at the same time,

7 you have to analyze them separately; correct?

8 A.      Yes.

9 Q.      I want to talk to you also about -- I wanted to

10 ask you also about the use of the word trace.  That's a

11 term of art in your field; correct?

12 A.      Probably has different meanings for different

13 people, but go ahead.

14 Q.      I wanted to ask you about something.  When Mr.

15 Ward was asking you about the use of the word "trace,"

16 I think he described it in his question as 0.1 grams,

17 but shouldn't it actually be .01 gram?

18 A.      He did say .01 once or twice and .1 once or

19 twice, but our scales go down to .01, so a trace could

20 be anything less than that, or maybe something that's

21 just barely .01, and it's, you know, hardly registering

22 on the scale.  We would just report that as a trace.

23 Q.      It becomes so small that it's really difficult

24 to measure it with great precision?

25 A.      That's correct.

1  Q.      And a trace, just to be clear, is a quantity

2  that would be less than 0 -- see, I almost did it, less

3  than .01 grams.

4  A.      That's correct.

5  Q.      0.1 grams is one-tenth of a gram; is that

6  correct?

7  A.      Yes.

8  Q.      How many grams are there in an ounce?

9  A.      There are 28.35 grams per ounce.

10  Q.      So 0.1 gram would be 1/28th of an ounce or

11  approximately?

12  A.      One gram would be 1/28th of an ounce, so you're

13  at .01 would be 1/2800s of an ounce, I guess.

14  Q.      What would .01 grams be in relation to an ounce?

15  A.      That would be 1/2800th of a gram.  One over

16  2800.

17  Q.      It would take 2,800 of them to make up one

18  ounce?

19  A.      That's correct.

20  Q.      So a trace is essentially large enough to see

21  and to measure -- I mean, to analyze, but not really

22  large enough to be worth trying to weigh it?

23  A.      That's correct.

24          MR. MCKNETT:  Thank you.

25          THE COURT:  Any further cross?

1          All right .  Any redirect ?

2          MS. GREENBERG:   No , Your Honor .

3          THE COURT:   All right .  You may step down .

4 Thank you very much .

5               (Witness excused at 12:09 p.m. )

6          THE COURT:   We will take a recess until 12:30 ,

7 and we will resume .

8               (Jury excused at 12:09 p.m.)

9               (Off the record at 12:09 p.m. )

10               (On the record at 12:35 p.m. )

11          THE COURT:   All right .  Ready to proceed ?

12          MR. WARD:   Yes, sir .

13          THE COURT:   All right .  Is your next witness

14 ready to go , Ms. Greenberg ?

15          MS. GREENBERG:   Yes, sir .

16               (Jury return s at 12:37 p.m. )

17          MS. GREENBERG:   Your Honor , the government call s

18 George Hubbard to the witness stand .

19 Thereupon,

20                    **GEORGE  HUBBARD** ,

21 having been called as a witness on behalf of the          _____

22 Plaintiff , and having been first duly sworn by the

23 Courtroom Deputy, was examined and testified as

24 follows:

25                    **DIRECT EXAMINATION**

1          BY MS. GREENBERG:

2    Q.     Could state your last name and spell your last

3    name for the jury, please?

4    A.     My last name is Hubbard, H U B B A R D.

5    Q.     First name?

6    A.     George.

7    Q.     Where are you employed, sir?

8    A.     I'm currently employed with the Washington

9    Suburban Sanitary Commission Police Department.

10   Q.     As what?

11   A.     I am currently the Acting Deputy Chief of

12   Investigations for the police department.

13   Q.     Are you retired, sir, from another job?

14   A.     Yes, ma'am.

15   Q.     What was your previous job?

16   A.     I was a police officer with the City of Takoma

17   Park Police Department, Takoma Park, Maryland.

18   Q.     Could you tell us when you started without the

19   -- when you started out in law enforcement, what year?

20   A.     1976, ma'am.

21   Q.     As what?

22   A.     I started out as a civilian dispatcher when I

23   was 17.

24   Q.     After that?

25   A.     I was hired as a police officer with Takoma Park

1 in 1979 and I remained with the agency until I retired

2 in 2004.

3 Q.      What was your position when you retired, sir?

4 A.      I was captain -- had the rank of captain, and I

5 was division commander in charge of the Support

6 Services Division for Takoma Park.

7 Q.      So you reached the rank of captain?

8 A.      That's correct.

9 Q.      Directing your attention to the time period of

10 November, 1999. What was your rank at that time?

11 A.      I was a detective sergeant.

12 Q.      As detective sergeant, what were your duties and

13 responsibilities?

14 A.      At that particular time, we were responsible for

15 all major crime that occurred within the boundaries of

16 Takoma Park Police Department, which included the

17 investigation of homicides, robberies, burglaries, drug

18 offenses, vice, narcotics, as well as all internal

19 investigations with the agency, which includes internal

20 cases against employees conducting misconduct as well

21 as EEO-style investigations.

22 Q.      If you could get that microphone as close to

23 your mouth as you can get it. You're fairly tall, even

24 while sitting. That would be great. Thank you.

25 Did you have people working for you at that time?

1  A.      Yes, ma'am.

2  Q.      Did you also conduct your own investigations?

3  A.      Yes, ma'am.

4  Q.      Directing your attention to November 12, 1999,

5  do you recall your activities in connection with your

6  position as a detective sergeant with the City of

7  Takoma Police Department at 7219 Flower Avenue,

8  Apartment 203, in Takoma Park?

9  A.      Yes, ma'am.

10  Q.      Have you reviewed your paperwork that's

11  available to you with relation to those activities?

12  A.      Yes, I have.

13  Q.      Did you have authority to do any searches at the

14  residence I just mentioned, 7219 Flower Avenue,

15  Apartment 203, in Takoma Park, Maryland?

16  A.      Yes, ma'am I did.

17  Q.      Without telling us what you told the judge --

18  that's not an issue here -- did you develop information

19  from which the judge gave you authority to enter that

20  house and execute the search warrant?

21  A.      Yes.

22  Q.      Did you have an understanding as to who lived

23  there?

24  A.      Yes, I did.

25  Q.      Who was that?

1 A.        Mr. Derrick Bynum.

2 Q.        Did you seize evidence pursuant to that search

3 warrant on that date?

4 A.        Yes, I did, ma'am.

5 Q.        Did you take pictures while you were conducting

6 your search of that residence?

7 A.        Pictures were taken, that's correct.

8 Q.        Did you also search a vehicle in connection with

9 that?

10 A.        Yes, I did.

11 Q.        Were pictures taken of that?

12 A.        Yes, ma'am.

13 Q.        Were the pictures maintained as part of your

14 case file in this case?

15 A.        Yes, they were.

16 Q.        But the other items such as the items seized,

17 were they maintained, to your knowledge?

18 A.        To my knowledge, they have since been destroyed.

19 Q.        Is that the typical procedure when a case is

20 closed?

21 A.        Yes, ma'am.

22 Q.        And this case had been closed by a guilty plea;

23 is that correct?

24 A.        That's correct.

25 Q.        And how about the inventory sheets, the

1  paperwork , the  search  warrant  sheet s, the  affidavit s.

2  Are  they  still  around ?

3  A.        Yes , they  are .

4  Q.        Have  you  review ed  them  to  refresh  your

5  recollection  about  what  occurred  in  1999 ?

6  A.        Yes, ma'am  I have .

7  Q.        Are  you  prepared  to  tell  the  jury  about  that

8  search  warrant  of  the  house  and  the  --  the  search  of

9  the  house , the  apartment , and  the  vehicle ?

10 A.        Yes, ma'am .

11 Q.        Direct ing  your  attention  to  what's  been

12 previous ly  mark ed  as  P-238 .  Could  you  tell  the  jury

13 what  we're  see ing  here  on  the  screen ?

14 A.        This  is  actual ly  a  photograph  of  the  apartment

15 build ing  locate d  at  7219  Flower  Avenue .  It  show s  the

16 address  above  the  door , and  the  front  door , it  leads

17 into  the  front  hall way  of  the  build ing .

18 Q.        Please  tell  the  jury  what  you  did  with  respect

19 to  the  --  let  me  first  show  you  --  I  apologize , P-239 .

20 What  is  that ?

21 A.        That 's  an  apartment  door  that  is  in  the  hall way

22 on  the  second  floor , and  I  believe  it  is  to  be

23 Apartment  203 , although  I  cannot  see  a  number  on  that

24 picture .

25 Q.        But  you  review ed  these  picture s  before  trial  and

1  that  appear ed  to  be  the  Apartment   203 ?

2  A.       That 's  correct .

3  Q.       And  did  you  --  is  that  the  apartment   for  which

4  you  had  the  authority  to  search ?

5  A.       Yes,  ma'am .

6  Q.       And  could  you  tell  the  jury  what  you  did  with

7  respect  to  Apartment  203  at  7219  Flower  Avenue   in

8  Takoma  Park  on  November  12,  1999?

9  A.       After  knock ing  on  the  door , and  also  if  you  look

10  to  the  right , there 's  actual ly  a  little  doorbell .

11  Q.       Where  my  pen  is  right  there ?

12  A.       After  knock ing  and  ring ing  that  doorbell  and

13  get ting  no  response  and  announci ng  our  presence , we

14  then  force d  open  the  door  to  the  residence  to  execute  a

15  search  warrant .

16  Q.       Who  was  there ?

17  A.       There  were  some  uniform ed  officer s  from  Takoma

18  Park , there  were  some  investigator s  from  my  own  agency ,

19  as  well  as  some  investigator s  from  --

20          MR.  MITCHELL:   Object ion .

21          Can  we  approach ?

22          THE  COURT:   All  right .

23          MS.  GREENBERG:   Your  Honor , I  can  rephrase  the

24  question .

25          BY  MS.  GREENBERG:

1  Q.      Who was inside the apartment when you entered?

2  A.      When I entered the apartment, two individuals

3  were located -- they emerged from a rear bedroom, one

4  being Mr. Bynum and another individual who went by the

5  nickname Cookie.

6  Q.      How were they dressed?

7  A.      They weren't.

8  Q.      What did you do then?

9  A.      They were both forced down onto the ground until

10 we secured the apartment to make sure there wasn't

11 anyone else inside the residence, and then I spoke with

12 both of the individuals, Mr. Bynum, as well as this

13 individual nicknamed Cookie; and they then checked as

14 far as -- one individual was checked for warrants, and

15 he got dressed.  And when there was no warrants, he

16 left the premises.

17       Mr. Bynum identified himself as the occupant of

18 the residence and sole resident.  He got dressed, was

19 allowed to leave the building or the apartment, but he

20 elected to stay outside the apartment while we

21 searched.

22 Q.      In what area did he stay?

23 A.      He was in the hallway right outside the door.

24 Q.      Do you see Mr.- -- the person you identified as

25 Mr. Derrick Bynum in the courtroom?

1  A.       Yes, ma'am , I do.

2  Q.       Could  you  identify  him  by  where  he  is  sitting

3  and  what  he  is  wearing?

4  A.       He's  wearing  a  kind  of  a  gray  and  white

5  checkered  shirt , direct ly  between  two  gentlemen  with

6  glass es.

7          MS.  GREENBERG:    Your  Honor , may  the  record

8  reflect  that  the  witness  has  identifi ed  Derrick  Bynum ?

9          THE  COURT:    The  record  will  so  indicate .

10          BY  MS.  GREENBERG:

11  Q.       Show ing  you  what's  been  mark ed  as  P-240 , which

12  is  your  Item  No.  9  on  your  inventory .

13          Can  you  tell  the  jury  what  is  reflect ed  in  that

14  picture ?

15  A.       It's  United  States  curr ency,  various

16  denomination s.

17  Q.       How  does  that  relate  to  your  search  on  that  date

18  November  12 , 1999?

19  A.       It  was  seize d  in  the  apartment .   I'd  have  to

20  refer  to  the  paperwork  to  remember  exact ly  where  it  was

21  seize d.

22  Q.       If  you  --  do  you  have  the  paperwork  with  you ?

23  A.       Yes, ma'am .

24  Q.       Please  let  us  also  know  if  that  refreshes  your

25  recollection  as  to  the  amount .

1 A.      By looking at the tag that's on there and

2 looking at the inventory, it would be United States

3 currency, and the total amount was approximately $2,497

4 that actually was seized from Mr. Bynum after he had

5 placed it back into his pants pocket before leaving the

6 apartment.

7 Q.      Now, just so we understand, certain of the

8 pictures that relate to this search.  Can you tell

9 where this picture was taken?  Was it at the apartment

10 or at your office afterwards?

11 A.      That's actually a photograph that is at our

12 office afterwards.  You know, I can tell because of the

13 background that's used in the photograph.

14 Q.      Could you explain to the jury your

15 picture-taking procedure in connection with the search

16 warrant so they can understand in looking through these

17 various pictures?

18 A.      When we enter into a residence, we take

19 photographs before we begin the search just to show the

20 condition of the apartment as much as we possibly can

21 before moving anything or beginning any of the search.

22 If we find items of interest or significance at the

23 scene, they are then often photographed right where

24 they are located, or if they've been moved, where they

25 now are sitting inside the apartment.

1        They are then later, during an inventory process

2   back at police station on another date, photographed

3   again, and then usually those tags are there that give

4   the case identifier as well as the item number which

5   would correspond to the impound paperwork.

6   Q.       So some of the pictures you reviewed for your

7   testimony today are inside the apartment and some, like

8   this, are back after the search warrant; is that

9   correct?

10  A.       That's correct.

11  Q.       The same procedure for the search of the vehicle

12  that we talked about?

13  A.       Yes, ma'am.

14  Q.       Did you make a record of the denominations that

15  is reflected in P-240 of the different bills?

16  A.       Yes, I did.

17  Q.       Could you tell the jury what that is?

18  A.       Four $100 bills, two $1 bills, ten $50 bills,

19  sixty $20 bills, twenty-nine $10 bills, twenty-one $5

20  bills, and a total of $2,497.

21  Q.       Showing you what's been pre-marked as

22  Government's Exhibit P-241 -- well, first, what is

23  reflected in P-241?

24        Where are we in the apartment here?

25  A.       You're in a bedroom of the residence.  It had

1 two bedrooms, what I normally call the master bedroom

2 and a second bedroom, and this is a photograph of one

3 of the closets of the bedroom.

4 Q.     In which bedroom?

5 A.     I believe that's bedroom two, which would not be

6 the master bedroom.

7 Q.     That would be the master bedroom?

8 A.     That is not -- I don't believe that's the master

9 bedroom.

10 Q.     How is the apartment situated from when you walk

11 in?

12 A.     From the front door, you actually -- it's kind

13 of a straight shot all the way back.  It's a little bit

14 offset to the left.  There's a living room that the

15 door opens into, and then there's a dining room on the

16 left-hand side, a kitchen to the right, and then

17 straight down the hallway there are two bedrooms, one

18 to the left and one to the right, and there's also a

19 bathroom back there as well.

20 Q.     Did you seize a particular item from this

21 closet?

22 A.     There was an item seized from that closet, yes,

23 ma'am.

24 Q.     Directing your attention to the top portion of

25 this closet where there's a stereo.  Did you end up

1  taking a more close-up picture of that?

2  A.      Yes, ma'am.

3  Q.      Is that what is depicted in P-242?

4  A.      That is correct.

5  Q.      Directing your attention to this white box on

6  the right speaker on the right side of the picture.

7  Did you end up seizing that box?

8  A.      Yes, ma'am.

9  Q.      What are we seeing in P-243?

10  A.      That's actually a better photograph of the box

11  itself.

12  Q.      On top of the stereo, which was on the top of

13  the closet?

14  A.      Yes, ma'am.

15  Q.      And it's this white box here that says,

16  M A G D E S I A N S?

17  A.      Yes, ma'am.

18  Q.      Did you take a picture of what was located

19  inside that white box?

20  A.      Yes, ma'am, we did.

21  Q.      Showing you P-244.  Could you describe to the

22  jury what we're seeing here?

23  A.      That's the items that were recovered inside that

24  shoe box.  There is a larger bag of what looks like a

25  beige, rock-like substance, and next to that is another

1 baggy with a green vegetable substance, and you will

2 see some packages with an apple on it that are

3 individual, empty, Ziploc-style baggies.  To the left

4 of that is another small baggy of a white, rock-like

5 substance, and an electronic scale is at the bottom of

6 the picture, and there were some other items as well

7 inside the box.

8 Q.    Showing you what's been marked as P-245.  What

9 are we seeing in this picture?

10 A.    That's the same box and items, probably a little

11 better picture of the larger bag of what I believed at

12 that time was crack cocaine.

13 Q.    This says free eight by ten.  Do you see that on

14 there?

15 A.    Yes.  That was a, like, a gift or a photograph

16 card advertisement that was addressed to the Derrick

17 family.

18 Q.    The Derrick family?

19 A.    That's correct.

20 Q.    And we see these two pictures of things with

21 apple on them.  What were they?

22 A.    Those are empty, Ziplocs -- small Ziploc

23 baggies.

24        MS. GREENBERG:   May I approach?

25        THE COURT:   You may.

1        BY MS. GREENBERG:

2  Q.      How does what we're seeing on P-245 relate to a

3  drug analysis report which has been pre-marked as

4  Miscellaneous 17?

5  A.      Well, in this photograph and on that form, Item

6  No. 1A is heat-sealed bag containing one plastic bag

7  containing green leafy substance suspected as

8  marijuana, and that would be in that photograph, the

9  item on the far right.

10 Q.      Okay.

11 A.      Item No. 2 is a heat-sealed bag containing one

12 plastic bag containing numerous rock-like substances

13 suspected of CDS crack cocaine, and that would be the

14 picture that's in the left, more center of the screen,

15 the larger bag.

16 Q.      Could you tell the jury what the resulting

17 weight was from the lab report that's in Miscellaneous

18 No. 17?

19 Q.      The crack cocaine.

20 A.      On No. 2 was 147.12 grams.

21 Q.      Anything else on that report relate to the

22 picture we're seeing here?

23 A.      Item No. 3 is a heat-sealed bag containing the

24 one plastic bag containing white powder, rock-like

25 substance suspected as crack cocaine.

1 Q.      Would you like me to move the picture up?

2 A.      It's there, it's just right above the larger

3 bag.

4 Q.      The smaller bag with the white powder substance

5 in it?

6 A.      Correct.

7 Q.      And Item 4 and 5 relate to marijuana and that

8 was also connected with the search that date; is that

9 correct?

10 A.      That's correct, from a different location.

11 Q.      Inside the same residence?

12 A.      Inside the same residence.

13 Q.      Based on your training and experience, what did

14 that big bag with the chunks in it appear to you to be?

15 A.      Crack cocaine.

16 Q.      Showing you what's B-246.  Can you tell the jury

17 what we're looking at here?

18 A.      That's a red-colored jacket, and on top of the

19 jacket is a heat-sealed bag containing United States

20 currency that was found with the jacket.

21 Q.      Where was the jacket located in relation to your

22 search of this apartment?

23 A.      That was in the closet in bedroom two.

24 Q.      What are we seeing in P-247?  It's Item No. 3 on

25 your item and on our Exhibit P-247.

1  A.      That's approximately  $7,000  in  cash  that  was

2  found  in  the  red  Eddie  Bauer  jacket  that  was  depicted

3  in  the  photograph  before.

4  Q.      Although  we  can  see  on  here  the  various

5  denominations,  did  you  do  a  count  of  the  denominations

6  as  part  of  your  search  on  that  date?

7  A.      Yes,  ma'am.

8  Q.      Could  you  tell  the  jury  the  count  of  what  we're

9  seeing  in  P-247?

10  A.      Thirty-nine  $100  bills,  sixty-two  $50  bills,  for

11  a  total  of  approximately  $7,000.

12  Q.      All  100s  and  50s?

13  A.      Yes.

14  Q.      Did  you  recall  seeing  P-248  as  part  of  this

15  search,  which  is  Item  No. 4  on  your  list?

16  A.      Yes,  ma'am.

17  Q.      Were  items  seized  from  that  coat?

18  A.      Yes,  there  was  United  States  currency  seized

19  from  that  as  well.

20  Q.      And  from  one  part  of  the  jacket  or  two  parts  of

21  the  jacket?

22  A.      There  was  actually  two  locations  in  the  jacket.

23  Some  currency  was  taken  from  the  left,  outside  pocket

24  of  the  jacket  as  well  as  an  interior  pocket  of  the

25  jacket.

1 Q.      Showing you what's been pre-marked as P-249.  Do
2 you recognize that?  It's Item No. 5 on your list.
3 A.      That's the currency that was recovered from the
4 left, outside pocket of the jacket.
5 Q.      Did you record the denominations of that
6 currency?
7 A.      Yes, ma'am.
8 Q.      Could you tell the jury what it was?
9 A.      Twenty $20 bills, six $10 bills, eleven $5
10 bills, one hundred eighty-five   $1 bills, for a total of
11 approximately  $700.
12 Q.      What is reflected in P-250?
13 A.      Could you raise the -- just so I can see the
14 tag.
15 Q.      Oh.  Item No. 6.  Sorry about that.
16 A.      That's U. S. currency that came from the left
17 interior pocket of the green-colored jacket  .
18 Q.      Can you tell the jury the denominations, please?
19 A.      Twenty-eight  $5 bills, two $50 bills, one $100
20 bill, forty $10 bills, fifty-three $20 bills, totalling
21 $1,800.
22 Q.      I'm showing you what's been marked as P-251,
23 which is your Item No. 7.  Could you tell the jury what
24 that is?
25 A.      That's a blue-colored Polo sports bag that was

1  recovered  from  the  closet  of  the  residence  .

2  Q.      From  which  closet  was  it  recovered ?

3  A.      The same with the drugs, the closet number -- in

4  bedroom two .

5  Q.      Did  you  open  up  the  bag ?

6  A.      It  was  actually  opened  by  another  search  member ,

7  but  yes ,  I  did  see  what  was  in  it .

8  Q.      Were  you  the  seizing  agent ?

9  A.      Ultimate ly ,  that 's  correct .

10  Q.      So  you  took  custody  of  these  exhibit s ?

11  A.      Yes, ma'am .

12  Q.      Show ing  you  what 's  been  mark ed  as  P-252 ,  which

13  is  your  Item  7.   Could  you  de scribe  to  the  jury  what

14  we 're  see ing  in  this  picture ?

15  A.      It 's  two  handgun s  as  well  as  ammunition  and  a

16  small  bottle  of  gun  oil ,  a  holster ,  that  were  inside

17  the  blue  Polo  sport  bag .

18  Q.      Could  you ,  for  the  record ,  state  the  type s  of

19  gun s  that  were  in  the  bag ?

20  A.      One  was  a  Sturm  Ruger  brand  police  Security  Six

21  .357  Magnum  revolver ,  and  it  was  load ed  with  six

22  rounds .   It  was  chrome  in  color  with  wooden  grip s.

23        And  the  second  was  a  Smith  &  Wesson ,  Model  19-3 ,

24  .357  Magnum ,  dark  blue  in  color  with  black  rubber

25  grip s,  and  it  was  also  fully  load ed  with  .357  rounds .

1   Q.      This bottle, which has the little red mark in

2   it, I think you described it, but could you just

3   describe what we're seeing there for the record?

4   A.      It's a small bottle of gun oil that's used for

5   the lubrication of the weapons.

6   Q.      Were these firearms designed to operate as a

7   gun, typically operates by expelling a projectile by

8   means of an explosive?

9   A.      Yes, ma'am.

10  Q.      Directing your attention now to P-253.  Could

11  you tell the jury what we're seeing here?

12  A.      It's a large plastic bottle that was filled with

13  currency inside the residence.

14  Q.      Where was this located?

15  A.      If I could look at my notes.  I believe that was

16  actually in a -- the master bedroom, but let me just

17  check, if you don't mind.

18  Q.      No, sure.  Go ahead.  For your reference, I

19  believe it's Item 16.

20  A.      It actually came from the closet in the bedroom

21  listed as No. 1.

22  Q.      Showing you what's been marked as P-254, could

23  you tell the jury what we're seeing here?

24  A.      That is approximately $2,378 in various

25  denominations of U. S. currency.

1  Q.      From where was this seized?

2  A.      That was from the bottle that was depicted in

3  the photograph before.

4  Q.      Did you make a record of the currency depicted

5  in P-254?

6  A.      Yes, ma'am.

7  Q.      And what were the denominations?

8  A.      One hundred, eighty-three $5 bills, eighty-one

9  $10 bills, one hundred thirty-seven $1 bills, eight $2

10 bills, twenty-five $20 bills, for a total of $2,378.

11 Q.      Now, finding all this, did you take any action

12 with respect to Mr. Bynum's freedom in the hallway?

13 A.      Yes, ma'am.

14 Q.      What did you do?

15 A.      I placed him under arrest.

16 Q.      As part of the search of the house, did you

17 recover additional items -- documents?

18 A.      Yes, ma'am.

19 Q.      Were they actually saved? Were they kept in the

20 case file?

21 A.      No, those documents are not. They were part of

22 the evidence that was turned in with all the rest of

23 the evidence, and I do not have them in the case file.

24 Q.      Did you record what they were as part of your

25 work in this case?

1  A.       Yes.

2  Q.       Did they corroborate what Mr. Bynum already told

3  you, that he was the occupant of that residence?

4  A.       Yes, ma'am.

5  Q.       Could you give the jury some examples of the

6  documents, which in your experience, would relate to

7  residency, what you seized?

8  A.       Well, there was bills that were mailed there

9  with his name, such as a Sprint Spectrum bill.  There

10 was a tax return for the previous year in his name in

11 the residence.

12 Q.       How much was reflected on the tax return?

13 A.       If my memory serves me, it was about $10,000

14 total income for the year, but I can look at my

15 records, if you want.

16 Q.       If you could fresh your recollection, please.

17 A.       Yeah, it's listed on Item 12 on my inventory as

18 1998 tax return for Derrick Bynum.  Total:  $10,605.

19 Q.       Were there any papers reflecting third-party

20 names?

21 A.       There was some paperwork in an envelope that we

22 found in one of the closets with a person's name other

23 than Mr. Bynum.

24 Q.       Who was that?

25 A.       The name Paulette Martin.

1  Q.      Was it just Paulette Martin, or was it connected

2  with anybody else?

3  A.      It was in an envelope with papers for Mr. Bynum.

4  I don't recall whether or not it was an item that had

5  both of their names on it.

6  Q.      Where was it located?

7  A.      If you give me a moment.

8  Q.      If you could refer to Location 8 and see if that

9  refreshes your recollection.

10  A.      That was from the closet of bedroom two inside

11  the residence.

12  Q.      Now, did you also recover additional ammunition

13  from that residence?

14  A.      Yes, ma'am.

15  Q.      Where did you recover the additional ammunition?

16  A.      They were actually in a cabinet or a dresser

17  that all the furniture had been moved from both of

18  those bedrooms and was now into the dining room or

19  kitchen area, and that was found in one of the cabinets

20  out in the -- that's now in the kitchen area -- dining

21  room.

22  Q.      In addition to searching the residence, did you

23  search the vehicle?

24  A.      Yes, ma'am.

25  Q.      Referring to P-255.  Do you recognize that?

1  A.      It's a 1994 Pontiac  Bonneville  with that

2  Maryland  tag that I seized and later  searched.

3  Q.      Who was this vehicle  registered  to?

4  A.      Mr. Bynum.

5  Q.      What are we looking at in P-256?

6  A.      That's another  photograph  of that same vehicle,

7  just a different  side of it, and it's at our Public

8  Works Facility  in Takoma  Park.

9  Q.      Could you tell the jury what we're seeing in

10 P-257?

11 A.      That's a photograph  of the trunk area of that

12 vehicle  prior to it being  searched.

13 Q.      This is at the scene?

14 A.      I'm sorry?

15 Q.      This is at the scene?

16 A.      No.  This is at our Public  Works  Facility.

17 Q.      Did you end up seizing any items from this

18 trunk?

19 A.      Yes, ma'am.

20 Q.      Could you tell the jury what you seized?

21 A.      One of the items that was seized was the

22 Pringle's potato  chips can that is seen in the left

23 corner of the trunk of the vehicle.

24 Q.      What are we seeing in P-258?

25 A.      That's a photograph  of the can actually in the

1  trunk.  The lid has been removed, and if you can look

2  down inside the can, the can doesn't go -- the bottom

3  doesn't go all the way down to the normal level.

4  Q.    It's considered a false bottom?

5  A.    That's correct.

6  Q.    And P-259?

7  A.    That's actually a picture after the can has been

8  removed and the search was completed and we were back

9  at police headquarters.  That's laying on a table in

10  our office, the same can except the bottom has now been

11  removed and you can see the bottom to the right of the

12  photograph, and you're actually looking at the opening

13  of the bottom of the can.

14  Q.    And 260?

15  A.    Same can in our office.  It's on its -- standing

16  up with the bottom back on it.

17  Q.    And just to be clear, what we're seeing in 260

18  is what is depicted in P-257, in the corner part of

19  that trunk?

20  A.    That's correct.

21  Q.    Is that what the trunk appeared like when you

22  opened up the trunk?

23  A.    Yes, ma'am.

24  Q.    So that was right in there?

25  A.    Yes, ma'am.

1  Q.      What is this thing here where the Nike shoe box

2  is on top of it?

3  A.      That's actually a child safety seat.

4  Q.      261.   What are we looking at here?

5  A.      That's the right rear passenger portion of the

6  vehicle, the interior behind the passenger seat is the

7  floorboard and it depicts a Gunk flat tire sealant-type

8  can.

9  Q.      Is this how the car appeared on the right rear

10 passenger seat with the Gunk can at the time that you

11 saw it?

12 A.      Yes, ma'am.

13 Q.      If we show P-262, what is reflected there?

14 A.      The Gunk can also had a false bottom that was

15 opened, and inside there was actually a piece of paper

16 towel or tissue paper, and then when you removed that,

17 there was all these individual bags of crack cocaine

18 inside there.

19         MS. GREENBERG:   Court's indulgence.

20         Your Honor may I consult with the clerk?

21         THE COURT:   You may.

22         BY MS. GREENBERG:

23 Q.      Showing you what's been marked by, I believe,

24 Miscellaneous 18, and I will correct the record later

25 if I'm incorrect, and provide a fresh copy.

1          Do you recognize this crime report?

2  A.     This is from the Montgomery County Police Crime

3  Laboratory.  That's what we used to submit the

4  evidence, and then also get the response back from the

5  laboratory.

6  Q.     Does it relate to the search of this particular

7  vehicle?

8  A.     Yes, ma'am, it does.

9  Q.     Did you submit the Pringle's can, the Gunk flat

10  tire can a, nd some other baggies that were seized from

11  the car?

12  A.     Yes.  The Pringle's can, the Gunk can, and the

13  -- I believe the baggies that are depicted as Item No.

14  3 are what came out of the Gunk can.

15  Q.     Starting with the Pringle's can, which we saw

16  with the false bottom, could you tell us why you

17  submitted that?

18  A.     Well, when examining the Pringle's can, it was

19  empty, but I could see a white, powdery residue inside

20  the can, so I submitted that suspecting that there was

21  a trace of controlled dangerous substance.

22  Q.     That was submitted as Exhibit No. 1 to the lab

23  in relation to this report?

24  A.     That's correct.

25  Q.     What was the result from the laboratory?

1  A.       Trace  amount s  of  cocaine .

2  Q.       From  the  Gunk  can  itself ,  what  were  the  result s

3  of  that ?

4  A.       There  were  also  trace  result s  in  the  can .

5  Q.       From  what  the  jury  is  see ing  on  the  screen ,  what

6  was  the  result s  of  that  analysis ?   What  was  inside  the

7  Gunk  fix  a  flat  can ?

8  A.       It  was  approximately 57.88  grams  of  crack

9  cocaine,  which   that  tested  positive  as  cocaine .

10  Q.       That 's  consistent   with  your  observation s  of

11  what 's  on  here ?

12  A.       Yes,  ma'am .

13  Q.       Show ing  you  what 's  been  marked  as    P-263.   Can

14  you  tell  us  how  that  relates  to  your  analysis     ?

15  A.       That 's  a  Maryland   driver 's  lice nse  for  Mr.

16  Bynum .   That  was  in  the  vehicle  at  the  time  of  search,

17  and  it  was  seized  and  impounded.

18  Q.       Where  was  that  locate d?

19  A.       It  was  in  the  passenger   compartment   of  the

20  vehicle ,  and  I  can  tell  you  exact ly  if  you  give  me  a

21  moment  to  look  at  the  inventory .   It  was  inside  the

22  vehicle  between  the  front  passenger  seat  and  the  door

23  frame .

24  Q.       I'm  show ing  you  --

25          MR.  GREENBERG:   If  I  may  approach  again ,  Your

1  Honor.

2          THE COURT:   You may.

3          BY MS. GREENBERG:

4  Q.      Showing you what's been marked as Miscellaneous

5  19, certified court records from Montgomery County,

6  State of Maryland.

7          Can you tell if this relates to the incident

8  that you just spoke about with regard to the search of

9  Mr. Bynum's house and vehicle?

10 A.      Yes, ma'am, it does.

11 Q.      And these are the records relating to the

12 proceedings which started with your search warrant?

13 A.      That's correct.

14 Q.      Could you tell the jury what occurred on April

15 19, 2000, starting with under -- with the defendant

16 right there?

17          MR. MITCHELL:   Objection, Your Honor.

18          The document speaks for itself.

19          THE COURT:   Overruled.

20          BY MS. GREENBERG:

21 Q.      If you could read what happened as a result of

22 your investigation.

23 A.      The defendant placed under oath and withdraws

24 plea of not guilty to Counts No. 1 and 3 of the

25 indictment and enters a plea of guilty to said counts.

1  Do you want me to continue, ma'am?

2  Q.     Please.

3  A.     Court:  Judge Beard advises defendant of his

4  rights, finds the defendant has knowingly,

5  intelligently, and freely waived his right to a jury

6  trial and entered his plea.  Accepts plea and enters a

7  finding of guilty to Count 1, possession of a firearm

8  in drug trafficking, and Count 3, possession with

9  intent to distribute controlled, dangerous substance.

10        Mrs. White, state's attorney, Mr. Wood, defense

11  counsel, and Judge D. Beard.

12        MS. GREENBERG:   Thank you.  Nothing further,

13  Your Honor.

14        THE COURT:  Cross-examination ?

15        THE COURT:   Ms. Greenberg, may I see that last

16  exhibit?

17        MS. GREENBERG:   I'm sorry?

18        THE COURT:  May I see that last exhibit?

19        MS. GREENBERG:   Oh, certainly.

20                  **CROSS-EXAMINATION**

21        BY MR. MITCHELL:

22  Q.    Is it detective?  Sergeant -- what is your

23  current title now?  I want to know how to --

24  A.    My current title is "investigator."  I carry the

25  rank of captain, but that's fine.

1          THE COURT:   Once a captain, always a captain.

2          MR. MITCHELL:   I'll do captain.

3          BY MR. MITCHELL:

4  Q.     Captain, you know, you had applied for and

5  received a search warrant on November 12, 1999.

6          You were present when this was search was

7  conducted; correct?

8  A.     Yes.

9  Q.     The purpose for this search warrant was to

10  collect evidence in reference to controlled dangerous

11  substances that you were looking for; correct?

12  A.     That's correct.

13  Q.      In your serving the search warrant, the purpose

14  of that is to do a thorough search of the house,

15  thorough search of the persons in the house, make sure

16  you've done a very complete job of collecting evidence;

17  correct?

18  A.     Yes, sir.

19  Q.     Some of those things you would be looking for

20  would be controlled dangerous substances,

21  paraphernalia, written documents showing any connection

22  with other people, other things such as that; correct?

23  A.     That's correct.

24  Q.     Am I right? And all these items you were

25  collecting in order to hand over to the state's

1  attorney's office, this would be Montgomery County; is

2  that correct?

3  A.     Yes, sir.

4  Q.     For eventual prosecution?

5  A.     Yes, sir.

6  Q.     Now, you said that there was another individual

7  in the house when you arrived.

8  A.     That's correct.

9  Q.     And that individual, you called him Cookie, but

10 his name was Albert Bradley; isn't that correct?

11 A.     That's correct.

12 Q.     So Cookie was not his real name?

13 A.     It was his nickname.

14 Q.     It was the nickname, but Albert Bradley was in

15 the residence at the same time?

16 A.     That's correct.

17 Q.     If I understand your testimony --

18        MS. GREENBERG:   Your Honor, if we could

19 approach.

20        THE COURT:   You may.

21             (At the bar of the Court.)

22        THE COURT:   By the way, Counsel, while you're up

23 here, my intention is to give the substantially

24 identical instruction on 404(b) when it's over.

25        MS. GREENBERG:   Your Honor, it's within the

1  conspiracy  theory .   It's  part  of  the  conspiracy .

2          MR.  MITCHELL:   I'd  love  an  instruction .

3          THE  COURT:   Within  the  conspiracy  theory ?  I

4  won't  do  it  then .

5          MS.  GREENBERG:   Your  Honor ,  I  caution ed  Mr.

6  Mitchell  a  couple  of  time s.   They  went  in  on  a  murder

7  warrant .

8          THE  COURT:   What ?

9          MS.  GREENBERG:   They  went  in  on  a  murder

10  warrant .  If  he  start s  asking ,  I  think  he's  get ting

11  dangerous ly  close  when  he  asks  him  why  didn't  you  talk

12  to  this  person  and  investigate  this  person ?  They  were

13  investigati ng  a  murder  case .   It  was  only  after  they

14  found  the  drug s  that  they  went  back  and  got  an

15  affidavit  and  search  warrant  for  drug s,  and  I  don't

16  want  to  go  there ,  Your  Honor .

17          I've  been  very  care ful .   I've  given  him  both

18  affidavit s.   I've  told  him  this  issue .   We're  get ting

19  dangerous ly  close .   That 's  why  the  officer  didn't

20  investigate  this  other  person .   I  just  want  to  put  that

21  on  the  record  and  make  sure  we're  clear .

22          THE  COURT:   Is  this  a  murder  investigation  as  to

23  Cookie ?

24          MS.  GREENBERG:   It  was  a  murder  investigation .

25  They  went  in  the  house  on  a  murder  investigation ,

1 that's why they didn't detain anybody, they didn't stop

2 anybody.  They didn't have any basis to do that.  This

3 was not a drug investigation.  I just think he's

4 getting close, and I just want to be very careful.

5         MR. MITCHELL:  Ms. Greenberg is correct and not

6 correct.  She is correct that initially they served a

7 search warrant based on a murder investigation, saw

8 drugs, came back, did another search warrant, and

9 that's when they collected the drugs.

10        What I'm talking about is the search warrant

11 where they asked for drugs and drug paraphernalia.

12 We're I'm not talking about the previous search

13 warrant.  That's not in evidence and it wasn't

14 discussed, and I'm not asking about it.

15        MS. GREENBERG:  It's all happening at the same

16 time.

17        MR. MITCHELL:  No, no, no.  They served the

18 first one.

19        THE COURT:  Perhaps the easiest way to avoid a

20 problem is to have the witness advised not to go there.

21        MS. GREENBERG:  I told him not to go there, but

22 if he starts questioning him why he did thing and why

23 he didn't do things, the correct answer might be when I

24 first went, I wasn't investigating a drug case, so I

25 just wanted to caution Mr. Mitchell.  He's getting

1 awfully close.

2        MR. MITCHELL:   I don't want to be bootstrapped

3 by the threat of them introducing evidence that

4 shouldn't come in by not being able to question why he

5 let some other guy go when he was there looking for

6 drugs, and there were drugs all throughout the house,

7 and they already knew there was drugs all throughout

8 the house.

9        MS. GREENBERG:   Your Honor, the problem is they

10 were on a murder investigation.  That's why they let

11 everybody go.  They found the drug evidence.  That's

12 exactly where I'm going to have to ask this witness to

13 explain why did they let the other person go, and Mr.

14 Bynum stay out in the hall.  That's where he's going.

15        THE COURT:   Do you really want to go there?

16        MR. WARD:   He could certainly be cautioned to

17 say it was another matter, not I didn't go in there for

18 drugs, I went in there for another matter.

19        MR. MITCHELL:   His report says he interviewed

20 the guy.  The guy said he was just helping him move

21 some furniture and he let him go.  He didn't say -- he

22 didn't say in his report, and I would hope that Ms.

23 Greenberg wouldn't create some new evidence, but he

24 didn't let him go because he didn't think he was

25 involved in a murder.

1        His report said he was helping Mr. Bynum move

2 some furniture.  His report didn't say, as Ms.

3 Greenberg would like to characterize, that he let him

4 go because he didn't think that this other guy had

5 anything to do with this murder investigation.

6        MS. GREENBERG:  He let them go before they got

7 the drug search warrant.  That's where we're at.

8        MR. MITCHELL:  It's not crucial.  I can move on.

9 I don't like being bootstrapped like this.

10       THE COURT:  It's a very sharp two-edged sword.

11       MS. GREENBERG:  Your Honor, to be clear, I have

12 highlighted this as much as you can highlight it.  I'm

13 not going to highlight it anymore.

14       MR. WARD:  I think we all assumed that Cookie

15 was a female.

16       MS. GREENBERG:  No, no, no, no, no.

17       MR. MITCHELL:  Let's not go there either.

18       THE COURT:  You're going to move on.

19       MR. MITCHELL:  I'll move on.

20                    (Back in open court.)

21       BY MR. MITCHELL:

22 Q.    Captain Hubbard, going through the house, you've

23 already identified on the pictures that the government

24 has shown you a number of items that you seized; right?

25 You found those throughout your search?

1  A.      That's correct.

2  Q.      These items have subsequently been destroyed?

3  A.      Apparently.

4  Q.      There was no need to retain them, correct,

5  because the case was over with, there wasn't any

6  appeals or subsequent appeals?  It wasn't significant

7  to keep forever; correct?

8  A.      Yes, sir.

9  Q.      In your search of the house, did you find any,

10 like, packing materials for, you know, other than what

11 you found here, but large packing materials for

12 distributing larger amounts of drugs?  You found small

13 little baggies; correct?

14 A.      No.  I mean, there's normal household packing

15 items, but they were in the kitchen, not with the

16 drugs, so I didn't consider that.

17 Q.      Did you find big kilo wrappers?  Are you

18 familiar with that whose are?

19 A.      No, I did not see that, sir.

20 Q.      I assume you're familiar with them in your past

21 experience; correct?

22 A.      I've seen photographs.  I haven't recovered

23 kilos.

24 Q.      Did you find any ledgers indicating any sales of

25 any drugs to any particular individuals?

1  A.       Not that I recall.

2  Q.       What about address books showing names of

3  contact people?  Did you find any of that; do you

4  recall?

5  A.       I'd have to look back through my notes exactly

6  what every item that was seized, but going off my

7  memory, I didn't seize any address books.

8  Q.       If you need to fresh your memory, that's fine.

9  Take a look.

10  A.       Did not seize an address book.  There are some

11  documents here that I have some records.

12  Q.       If it was an address book and seemed significant

13  with names and numbers, would you have noted something

14  like that?  Or would you have just put it down as a

15  miscellaneous  document?

16  A.       Most of it would have been put as miscellaneous

17  documents, but there were also records or photographs

18  of other individuals, but most of it would just be

19  listed as other documents.

20  Q.       Did you find the airline tickets of him

21  traveling anywhere?  Do you recall making any note of

22  something like that?

23  A.       I think there was a travel itinerary that was

24  taken.  I don't recall where that was, but if you give

25  me another second, I'll look back through here.  Item

1 No. 15, I've listed here a travel itinerary for Derrick

2 Bynum, but I couldn't tell you where it was.

3 Q.      Now, in your -- for the ladies and gentlemen of

4 the jury, you're looking at what, your return that you

5 -- the evidence log?

6 A.      I'm actually looking at an assortment of

7 documents, which is also the evidence inventory for the

8 search warrant as well as our impound sheet, which is a

9 little bit more descriptive of the items.

10 Q.      You also indicated there was a letter that was

11 in this inventory.  Now, I assume that that was also in

12 your notes, there was a letter with Paulette Martin's

13 address or name on it you said?

14 A.      There was an envelope, yes, that had some

15 documents in it, and one of the names on the documents

16 was Paulette Martin.

17 Q.      Is that -- are you referring to your notes?

18 A.      Yes, I am.

19 Q.      May I see that?

20 A.      Listed as No. 8, sir.

21 Q.      You have to look at these notes because this is,

22 what, six and half years ago is this period of time, so

23 it's not something that your memory would be fresh?

24 A.      Not to every minor detail, no.

25 Q.      I assume you've had a few search warrants in

1 between that time?

2 A.      Yes, sir.

3 Q.      Your investigation was closed as of this arrest;

4 correct?

5 A.      That's correct.

6 Q.      Anything contained in this conspiracy that is

7 alleged here, you didn't involve yourself in that

8 investigation; did you?

9 A.      I'm sorry, say that again.

10 Q.      You weren't involved in this larger -- this

11 larger investigation of this conspiracy; were you?

12 A.      No, sir.

13 Q.      As of 1999, you were done, and once the case was

14 resolved, you went on to other things?

15 A.      Yes, sir.

16 Q.      Now, you were asked to identify Mr. Bynum, and

17 again, I assume that it's been some time and you've had

18 a few cases since then.  Did you save any pictures or

19 keep any pictures in your notes to refresh your memory

20 as to who Mr. Bynum was?

21 A.      There is nothing in my note file as a photograph

22 of Mr. Bynum, no.

23 Q.      Did you ever meet with the U. S. attorney prior

24 to coming up and testifying and have them show pictures

25 of Mr. Bynum to help you understand who he was?

1 A.      I was shown picture s that were taken of

2 evidence , and of course , one of those picture s is that

3 driver 's license  that was shown .

4 Q.      That was what help ed you refresh your memory ?

5 A.      I had a memory of Mr. Bynum before .  Yes, that

6 ass ist ed with it , as well as I saw a large board of

7 photograph s here .

8           MR . MITCHELL:  Okay.

9           I have no further question s, Your Honor .

10          THE COURT:  Any further cross-examination ?

11           Any redirect ?

12          MS. GREENBERG:   Brief ly, Your Honor .

13                  **REDIRECT EXAMINATION**

14          BY MS. GREENBERG:

15 Q.      Counsel referred you -- counsel referred you to

16 the paperwork that you seize d reflect ed as Item 8.  Do

17 you recall look ing at that ?

18 A.      Yes, ma'am .

19 Q.      Specifically , when you record ed the item that

20 you seize d in the name of -- with the name s Derrick

21 Bynum and Paulette Martin on them , could you tell the

22 jury what else was on that to further de scribe the

23 document s?

24 A.      Well , No. 8 says it's two large envelope s:  One

25 brown envelope date d December 4, 19 95, contain ing

1 assorted papers and documents in the name of Derrick

2 Bynum, and a second brown envelope dated -- it looks

3 like November 2, 1997, with assorted papers and

4 paperwork in the name of Derrick Bynum and Paulette

5 Martin.

6 Q.     Counsel asked you about things like address

7 books and packing materials. Just to be clear. On

8 P-244, were these items that you seized from the shoe

9 box in the closet?

10 A.     That's correct.

11 Q.     Are there drugs here?

12 A.     Yes, there are.

13 Q.     Is there packaging material here?

14 A.     Yes, ma'am.

15 Q.     And a scale?

16 A.     Yes, ma'am.

17 Q.     And specifically, the materials seized from

18 there on Item 17 is approximately 147 grams?

19 A.     Yes, ma'am.

20 Q.     Of cocaine base?

21 A.     147.12 grams.

22 Q.     Cocaine base?

23 A.     Yes, ma'am.

24 Q.     And you've already testified you seized money

25 from the various places in the apartment?

1  A.      Yes, ma'am.

2  Q.      And drugs?

3  A.      Yes, ma'am.

4  Q.      And from the car, you seized the item appearing

5  here of a false bottom Gunk can?

6  A.      That's correct.

7  Q.      That was subsequently determined to be 57.88

8  grams of crack cocaine?

9  A.      Yes, ma'am.

10  Q.      Is that correct?

11  A.      Yes, ma'am.

12  Q.      The last thing you did before the jury is Mr.

13  Bynum admitted to possession with intent to distribute

14  the crack cocaine and possession of the gun; is that

15  correct?

16  A.      That's correct.

17  Q.      Based on your searches that day?

18  A.      Yes, ma'am.

19          MS. GREENBERG:   Nothing further, Your Honor.

20          THE COURT:   Any recross?

21          MR. MITCHELL:   No, Your Honor.

22          THE COURT:   All right.   Captain, you may step

23  down.   Thank you.

24          MS. GREENBERG:   Your Honor, the witness is

25  excused?

1        THE COURT:  Yes, you may.

2             (Witness excused at 1:29 p.m.)

3        MS. JOHNSTON:  Your Honor, at this time, we

4   would like to recall Sergeant Chris Sakala and

5   hopefully finish his recross examination.

6        THE COURT:  All right.

7             (Witness Sakala resumes the stand.)

8                 **RECROSS EXAMINATION**

9        BY MR. MONTEMARANO.

10  Q.    Good afternoon, Sergeant.  How are you?

11  A.    Fine, thank you.

12  Q.    When we last spoke last week, we were talking

13  about the phone taps, as I recall, phone calls you

14  hadn't done -- you told us you hadn't tapped any of the

15  phones at 5559 South Dakota; correct?

16       MS. JOHNSTON:   Objection.

17       Beyond the scope of redirect.

18       THE COURT:  How is that in the scope of the

19  redirect?

20       MR. MONTEMARANO:  I don't believe it is beyond

21  the scope, Your Honor.

22       THE COURT:  Approach the bench.

23             (At the bar of the Court.)

24       THE COURT:  Tell me exactly what the record was

25  again.  I don't have a perfect memory.

1        MR. MONTEMARANO : Let me get this straight , Your

2   Honor .  It's been a week since I was asked to cease my

3   cross so the government  could put on witness es that

4   have other obligations,  and the first question out of

5   my mouth , I get an objection .  I think if I asked 15

6   minute s of question s --

7        THE COURT:  Tell me how it's within the scope of

8   redirect .  That 's her objection .

9        MR. MONTEMARANO : Based upon my note s -- with

10  all due respect , it's been over a week since the

11  government  did --

12       THE COURT:  When was he last on the stand ?

13       MS. JOHNSTON:  He was last on the stand on

14  Wednesday , Your Honor .

15       MR. MONTEMARANO : It was before the holiday ,

16  Your Honor .

17       THE COURT:  That was --

18       MR. MONTEMARANO : Friday , June 30 .  Today is the

19  7th .

20       MS. JOHNSTON:  I think he was on the stand on

21  Tuesday .  On J uly 5th he was on the stand .

22       THE COURT:  July 5th?

23       MS. JOHNSTON:  My note s show he was on the stand

24  July 5th .

25       MR. MONTEMARANO : Day before yesterday ?

1          MS. JOHNSTON:   Yes.

2          THE COURT:   The beauty of computers.  Let's see

3  here.   July 5th.  All right.

4          MS. JOHNSTON:   He was on cross-examination  by

5  Mr. McKnett, redirect by the government, and then Mr.

6  Montemarano did some recross.

7          THE COURT:   Then we had the elevator  failure,

8  and then we had the recross by Mr. Montemarano.

9          MR. MONTEMARANO:  My memory's going, Your Honor.

10 I'm sorry, my memory's going.  I reviewed my notes.  I

11 saw where I was hoping to lay some groundwork as to

12 where I was and ask him then a few more questions

13 relative to the government's questions, but I don't

14 have very much.  I don't know that I will get to the

15 end of the day, if truth be known.

16         MS. JOHNSTON:   Your Honor, recross is

17 discretionary  with the Court.  The Court's been --

18         THE COURT:   I've looked at the redirect.  I

19 mean, there's not a lot.  What do you intend to go

20 into?

21         MR. MONTEMARANO:  I was going to go into the

22 minimized calls with the attorneys, the existence of

23 other phones at Hayward, and 5595 South Dakota.  You

24 know, Your Honor, in all candor, I don't need to do

25 this on cross.  I can do all this in my case

1         THE COURT:  Do it in your case.  From looking at

2  my notes on redirect --

3         MR. MONTEMARANO:  I don't wish to sound

4  flippant, if it would make Your Honor and Ms. Johnston

5  happy.

6         THE COURT:  You're not here to make me happy.

7  You're here to make your client happy.  Don't worry

8  about that.

9         MR. MONTEMARANO:  I know that what I'm saying,

10 if the Court believes this would be more appropriate

11 for me to do this because Sergeant Sakala and I will be

12 commuting for an extended period in my case.

13        THE COURT:  I think you need to do that in your

14 case then.

15        MR. MONTEMARANO:  That's fine.

16        MS. JOHNSTON:  I want it clear that Mr.

17 Montemarano is not doing this to accommodate the Court

18 or the government.  The government's objection is

19 beyond the scope of the redirect.

20        THE COURT:  The government's objection is well

21 taken and I have sustained the objection.

22        MR. MONTEMARANO:  Fair enough, Your Honor.

23               (Back in open court.)

24        MR. MONTEMARANO:  We have no further recross,

25 Your Honor, on behalf of Ms. Martin.

1          THE COURT:   Anyone else have --

2          MR. MARTIN:   Yes, Your Honor.   Just a moment,

3   please.

4                    <u>RECROSS EXAMINATION</u>

5          BY MR. MARTIN:

6   Q.      Good afternoon, Sergeant Sakala.

7   A.      Good afternoon.

8   Q.      I think the last time you were on the stand, if

9   I remember correctly,   was Wednesday; is that correct?

10  A.      I think that that's accurate, yes.

11  Q.      At that time, you were shown a video of May 15,

12  2004.   Do you remember being shown a video?   I think it

13  was Video Exhibit 27 but I'm not sure.

14  A.      I'm not sure either.

15  Q.      It was a video of Mr. Goodwin where you had

16  testified, anyway, that it was Mr. Goodwin getting out

17  of a car, going into a house, and coming back out.

18  Remember that?

19  A.      I recall that now, yes.

20  Q.      You will also recall that that video at the time

21  was on a fast-forward mode; was it not?

22  A.      It was on a time lapse record mode.

23  Q.      It was at a pole camera; is that correct?

24  A.      That is correct.

25  Q.      It was very hard to see the particular features

1 of anyone; is that correct?

2 A.      It was hard to see identifiable features, yes.

3 Q.      The last time I spoke to you, I think we had

4 established there was no surveillance on Mr. Goodwin as

5 far as you were aware; is that correct?

6        Aside from this video that we have here now of

7 May, 2000 --

8 A.      I'm not sure you asked me about that the last

9 time. If you want to ask me that now, the answer would

10 be that is correct, I'm not aware or know of any

11 surveillance on Mr. Goodwin specifically other than

12 when he was at Hayward.

13 Q.      So on May 15, 2004, would it be correct to state

14 that there was no surveillance of Mr. Goodwin leaving

15 one point to arrive at Hayward?

16 A.      I believe that is correct. To be sure, I wanted

17 to check the surveillance log, but I believe that is

18 accurate.

19 Q.      Would it be accurate that there was no video of

20 Mr. Goodwin leaving Hayward on May 15, 2004, and going

21 back to some other point or destination?

22 A.      Other than the pole camera, I believe that's

23 accurate.

24 Q.      Would it also be accurate to state that during

25 your prior testimony, other than the reference to the

1  Cadillac  on  November  25, 2003 , there  was  no  vehicle

2  that  was  specifically  identified  as  being  in  the

3  operation  or  control  of  Learley  Goodwin ; is  that

4  correct ?

5  A.      I don't  even  know  if  we  knew  about  the  Cadillac

6  at  that  time .  I certain ly  don't  recall  it .  He  would

7  primarily , if  he  show ed  up  at  Hayward , be  driven  --

8  there  was  a  vehicle  driven  by  Larry  Lane , and  Mr.

9  Goodwin  would  frequent ly  be  in  that  vehicle , but  he  was

10 a  pass eng er  in  that  vehicle , I belie ve.

11 Q.      He  was  a  pass enger, so  there  was  no  vehicle  that

12 you  could  say  or  that  you're  aware  of  that  specifically

13 was  identifi ed  as  one  that  he  would  operate  on  a

14 frequent  basis ?

15 A.      I think  that 's  accurate , yes .

16 Q.      And  your  assumption  that  the  figure  leavi ng  the

17 vehicle  that  was  depict ed  on  the  video  on  May  15, 2004 ,

18 was  Learley  Goodwin  and  you  based  that  on  the  telephone

19 conversation s  that  you  heard ; is  that  correct ?

20 A.      That  and  the  fact  that  he  --  a  figure  in  the

21 video  match es  Mr.  Goodwin 's  general  physical

22 description , yes .

23 Q.      That  is  your  opinion .

24 A.      Yes , it  is  my  opinion .

25      MR.  MARTIN:   Nothing  further .  Thank  you , Your

1  Honor.

2          THE COURT:   Any further recross?

3          MR. HALL:   Yes, Your Honor, just very briefly.

4                    **RECROSS EXAMINATION**

5          BY MR. HALL:

6  Q.      Good afternoon, Sergeant.

7  A.      Good afternoon, Mr. Hall.

8  Q.      You were asked a couple of questions by the

9  government about the inability of Ms. Martin and Mr.

10 Whiting to set up a deal.  Do you recall that?

11 A.      Yes, I do.

12 Q.      And you were given a couple -- you were asked to

13 give some examples, I should say, of reasons why a deal

14 might not happen between the two people.  Do you

15 remember that question?

16 A.      Yes, I do.

17 Q.      And you gave a couple of examples, and one you

18 gave was an unpaid debt -- for the record, you say yes

19 or no?

20 A.      Yes, that is correct.  Yes, that is a frequent

21 reason why a source would cut off a customer.

22 Q.      And another reason that you gave was someone may

23 be suspicious of the other person s' involvement with

24 the police?

25 A.      Absolutely, yes.

1 Q.      Would it be fair to say that those were just

2 example s that you were giving based upon your knowledge

3 of the drug trade ; is that correct ?

4 A.      I believe in the context of the way the question

5 was asked , that is a fair statement .

6 Q.      Okay . There 's no evidence that there was a

7 prior drug debt between Mr. Whiting and Ms. Martin , for

8 example ; correct ?

9 A.      I would not agree with that .

10 Q.      Would you agree that based upon what has been

11 present ed to the jury , that there is no evidence of a

12 prior drug debt ?

13 A.      I would agree that what has been present ed to

14 the jury to date , there is no evidence of a drug debt .

15 Q.      Would you agree that in the telephone call s

16 between Mrs. Martin and Mr. Whiting in which Mrs.

17 Martin , I'll say , put s him off as to getting drug s for

18 him , that there 's no response on her part about , well ,

19 you owe me money , or I'm not going to get you anything

20 until you're paid up or something like that ?

21 A.      I would agree with that . The lack of pay ing or

22 lack of sell ing could be indirect , but there is no

23 direct comment by Ms. Martin that that 's the reason

24 she's not sell ing him drug s .

25 Q.      Okay . Now , you were also asked about that -- a

1 series of questions by the government  that different  --
2 the people have different  jobs within the drug
3 conspiracy .  Do you recall that line of questions?
4 A.      Yes , I do.
5 Q.      Okay .  And you gave , again , some examples of a
6 person could obviously supply drugs; correct ?
7 A.      That is correct .
8 Q.      A person could be supplying paraphernalia  or
9 cutting agent; correct ?
10 A.      That is correct .
11 Q.      Okay .  And a person could be engaged in money
12 laundering , which would be taking the illegal  profits
13 and funneling it into a legitimate  business; right ?
14 A.      That is correct .
15 Q.      Okay .  And one of the examples you gave was
16 providing some degree of legal advice or legal
17 expertise ; is that correct ?
18 A.      That is correct .
19 Q.      Would you agree with me that Mr. Whiting is not
20 charged with practicing law without a license ; is he?
21 A.      No , he is not .
22 Q.      Now , you were also asked a couple of questions
23 about the surveillance that was done during the -- I'll
24 say the time period of the wiretap .
25 A.      I have been asked about surveillance , yes .

1 Q.      I believe you were specifically  asked, wasn't it

2 a fact that, and I forget the officer's name, forgive

3 me, but there was a police officer  whose identity

4 became known while he was on surveillance, and I

5 believe you made a statement that the surveillance  was

6 somewhat curtailed after that; is that correct?

7 A.      After Detective Schrier's presence became known,

8 yes.

9 Q.      Okay.  And you indicated that there were other

10 methods by which you could ascertain, absent the video,

11 whether or not somebody had been there; is that

12 correct?

13 A.      That is correct, yes.

14 Q.      And one of those would have been conversations

15 on the phone?

16 A.      Conversations on the phone and sometimes you

17 could actually hear people in the background, yes.

18 Q.      And specifically, I believe you were referring

19 to a conversation that had occurred on, I believe it

20 was April 25, in which Ms. Martin had indicated that

21 Reece, or Mr. Whiting, had been there, and I think she

22 refers to him as her brother at some point in that

23 conversation; is that right?

24 A.      I think she says Reece just left out of here.

25 Q.      Reece just left.  Okay.  All right.  And that

1  was your -- you indicated that that would have been

2  evidence to you that he had been there; is that right?

3  A.     I think that was a part of three conversations

4  of my recollection indicating that he had been there,

5  yes.

6  Q.     And another possibility would be that she could

7  have been lying to the person she was speaking to on

8  the phone; is that also correct?

9  A.     Mr. Whiting would have been also lying, then,

10  when he said, I'll be right over, so you would have had

11  to have a series of people lying, yes, that is

12  possible.

13  Q.     Is it not a fact, though, that during this time

14  period of April 25, you did have the pole video or the

15  pole camera in operation?

16  A.     It should have been operating that day, yes.

17  Q.     Okay.  All right.  And if it had been operating,

18  we would have seen whether or not Mr. Whiting was

19  there; is that right?

20  A.     I don't know.  I don't know what the tape shows

21  that day.  I know there was a period of time where they

22  were doing construction on the street where the street

23  was closed down, and during that time period, people

24  had to use the side door, and we were not able -- the

25  pole cam was not able to capture people coming and

1 going from the residence during that time period.

2 Q.     You don't specifically remember if it was that

3 day; do you?

4 A.     I do not know without looking at the log and the

5 tape.

6        MR. HALL:   Thank you.

7        THE COURT:   Any further recross?

8        MR. MITCHELL:   Yes, Your Honor.

9                  **RECROSS EXAMINATION**

10       BY MR. MITCHELL:

11 Q.    Detective Sakala, I want to take you back to our

12 chart, if I could.

13       Do you recall the chart that we did? It's been

14 a few days.

15 A.    Yes, I do recall it.

16 Q.    And you were asked a number of questions about

17 this and you made some notations on here. Do you

18 recall what we were talking about, what I was asking

19 you in order to produce this chart?

20 A.    You asked me a series of questions after each

21 call, sometimes the questions were slightly different.

22 Generally, they focused on whether a specific amount of

23 money was mentioned.

24 Q.    And what was the purpose of determining whether

25 or not a specific amount of money was asked about?

1          MS. JOHNSTON:   Objection.

2          MR. MITCHELL:   Let me lead.

3          BY MR. MITCHELL:

4  Q.     Do you recall that what I asked you was in order

5  to determine amounts of drugs, you oftentimes will look

6  to some figure in a conversation, which will help you

7  put the two together and perhaps come up with your

8  theory how much the drugs were?  Do you recall that?

9  A.     I do recall it, and I think I said before I

10 agree with that.  That is one of the things you look

11 at.

12 Q.     Right.  Now, would you also agree with me that I

13 didn't ask you to review every single phone call Mr.

14 Bynum ever made?

15 A.     The calls you asked me for this chart are listed

16 on the chart.  I don't know if that's every single call

17 he made or not, but they're on the chart.

18 Q.     If the government asked you about three other

19 calls and made it a point and had you put up two here.

20 I want to go through them for a moment.

21        The first call that Ms. Johnston asked you about

22 was B-822.  I don't have a page reference for that, but

23 she didn't have me mark it on here.

24 A.     Have it on Page 116.

25 Q.     I just asked you about that because I assume she

1 was asking you whether that was a dollar figure, which

2 would assist you in determini ng an amount of drug s.

3         MS. JOHNSTON:    Objection  to the phrasi ng of the

4 question  as to why the government  asked  him a question .

5         THE COURT:    Rephrase  the question , if you can.

6         BY MR. MITCHELL:

7 Q.    Ms. Johnston  was asking you about  this chart and

8 asking  you question s regard ing this chart  and the first

9 question  she asked  you was B-822 , which  I did not

10 address .  Do you recall  that question ?

11 A.    What was the question  you're  referring  to?

12 Q.    Well , she first said that I didn't put down

13 B-822  on this chart  and asked  you about  it because  in

14 her question , she said it reference d some  figure .   Do

15 you recall  that question ?

16 A.    I'm sure -- I'm still  not sure I recall  the

17 question  you're  asking , whether  she asked me , but I

18 don't recall  the question .

19 Q.    Let me ask it this way:  If you could  take a

20 look at this chart , do you find B-822 and me asking  you

21 about  that specific  call ?

22 A.    B-822 ?

23 Q.    B-822 , if you could  look  at that chart .   Do you

24 see it?

25 A.    Yes , I do.

1  Q.       We discussed it, did we not?

2  A.       If it's on the chart, that would mean that you

3  asked me a question about the call, yes.

4  Q.       In that question I asked you whether or not

5  there was a dollar figure in that call, which would

6  assist you in coming up with some type of drug amount,

7  and your answer was?  If you can look at the chart.

8  A.       I don't recall the exact question you asked

9  again.  You would change the phraseology again on

10 occasion, but generally, that's what your question

11 concerned was whether they were figure amounts.

12         In response to this question, I referred to the

13 $62 as being referring to the amount of cocaine and not

14 the price.  You then wrote no on the chart.

15 Q.       Because that is not a -- as you just said, it's

16 not a dollar figure.  That would assist you in

17 determining amount of drugs; correct?

18 A.       The amount of drugs is in the call.  I don't

19 need the dollar figure.  I'm not sure I understand.  It

20 says 62 grams -- 62, that's the amount, $62.  I don't

21 need the money figure, so I'm not sure of your

22 question.

23 Q.       The next phone call Ms. Johnston asked you about

24 was B-1709.  That's on Page 210.  Now, I didn't ask you

25 about that call, did I?  Would you agree with me I

1 didn't?

2 A.    I do not see the call on the chart, but to be

3 perfectly frank with you, I don't remember  if you asked

4 me any questions about this call or not.

5 Q.    I can assure you I didn't.  If it's not on the

6 chart, I didn't ask you about it, but --

7        MS. JOHNSTON:    Objection to counsel's

8 testifying.

9        MR. MITCHELL:    I'll move on.  I'm trying to move

10 things along.

11        THE COURT:   Overruled.

12        MR. MITCHELL:    I don't want us to stay beyond

13 2:00.

14        BY MR. MITCHELL:

15 Q.    And in that call, if you could look on the fifth

16 conversation  from the top, what is Mr. Bynum saying in

17 that phone call?

18 A.    Specifically  saying I'm just F-ing with you.

19 Q.    Right.  So, would it be safe to say that you

20 don't know exactly whether this figure that is

21 discussed here is true or false?  Would you agree with

22 me on that?

23 A.    Based on the conversation, I would say it's

24 false.  I mean, it appears that he told her the money

25 was short, that being 14 something, and when Ms. Martin

1  counted it, found out it wasn't, then they have a

2  little joke about it, and he's just saying I'm just

3  messing with you.  So based on the conversation, I

4  would say that he was just messing with her.

5  Q.     So would you, as an expert, rely on something

6  that appears to be false to come up with some figure of

7  quantity of drugs?

8  A.     I would rely on the conversation and what the

9  conversation is about.  It's clear, I think, in the

10 conversation that they're joking with each other.  I

11 think Ms. Martin is aware of that.

12 Q.     Would you, as an expert, then, rely on that

13 joking to come up with a precise, or in a theoretical

14 sense, a precise amount of drugs that they're talking

15 about?

16 A.     I would rely on the conversation taken into

17 context with all the other conversations.  Based on

18 this, whatever he said he was short, I don't think I

19 offered an opinion about that.  I think I offered an

20 opinion.  This showed he paid her money.

21 Q.     So, that call could -- that call could

22 accurately go in this chart as another call in which

23 the figure, whether is one or whether you can rely on

24 one, wouldn't assist you with an actual figure of

25 drugs?

1   A.      I did not say that, no.

2   Q.      I'm asking you, would it be appropriate  to put

3   this call on this chart as another  call in which you

4   could not come up with an actual  quantity  of drugs

5   based on the figure, whatever it is?

6   A.      You put a lot of calls on the chart based on

7   different  questions.  I'm not sure what the chart would

8   represent, but based on this, I think my testimony  on

9   this call, if you have to put it on the chart, that's

10  fine, but I think the call -- I think what I've

11  testified to is this shows Mr. Bynum paid money.  I

12  don't think  I testified to an amount.

13  Q.      So again, if I can refresh  your memory.  I know

14  it has been a few days, but this chart I asked you

15  about was whether  there was a dollar  figure, some

16  quantity  amount, discussed in a phone call that would

17  allow you, as an expert, to come to then correspond  to

18  some type of quantity  of drugs that was being purchased

19  or sold.  Do you recall  that question?

20  A.      As I think I testified several  times, I'll say

21  it again.  I certainly don't mean to argue with you,

22  sir.  Every question  you asked me with a call, nearly

23  every one was slightly different  in that sometimes  you

24  asked me whether  the call contained  money -- references

25  to money, sometimes  you would ask me whether  it

1  contain ed  specific  figure s.   So  without  reviewing  the

2  transcript , I can't tell you what that chart purport s

3  to  show .

4        All  I  can  tell  you  is  if  we're  talking  about

5  Call 1709 what my opinion is.   If based upon that

6  opinion  you  wish  to  put  it  on  the  chart , that 's  fine .

7  I'm not dis agree ing with that .  I know what you're

8  try ing  to  ask , but  I'm  try ing  to  answer  the  question

9  accurate ly.

10 Q.    I don't want to -- I don't want to be labor this

11 either , but my -- my, I think -- are you asking --

12 say ing I asked you different  question s on every one of

13 these  phone  call s?

14 A.    On a lot of questions, you would ask different

15 questions on each phone call.    I know what you were

16 getting at, but   the question s were sometimes   phrased

17 different ly, yes, sir .

18 Q.    And most of the time , I would say same as the

19 last  question , same  question , same  question ?

20 A.    Sometimes  you did say that , yes, sir .

21 Q.    Right .  And understood what I was do ing there ;

22 correct ?

23 A.    I understand  the general  gist of what you would

24 get . Sometimes  you didn't ask that question  to get

25 that  specific  answer , yes .

1  Q.      And you understand  what I'm asking  you right

2  now; correct ?

3  A.      I understand  what you're  asking .  I'm not

4  agreeing to what you're  asking .   Again , my opinion  as

5  to what this call means is based  on a series  of calls

6  and that Mr. Bynum  paid Ms. Martin  for an amount  of

7  cocaine .  I certainly am not saying that the figure  of

8  14 something  is indicative  of the amount  of money  that

9  was paid on that particular  day , or the amount  of

10 drugs .

11 Q.      In other words , you can't  say what is discussed

12 here equals this amount  of drugs, can you ?

13 A.      I have not said that .

14 Q.      I'm saying you can't ; correct ?

15 A.      I have not said that .  I did not say that .  I am

16 not saying that .  That is correct .

17 Q.      I also asked you about B-2179 on Page  241.   Do

18 you recall  being  asked  about that ?

19 A.      I do, yes .

20 Q.      And B-2179 , in your opinion , was an amount  of

21 $13,200.

22 A.      That is correct .

23 Q.      Did you give an opinion  as to how much drugs

24 that corresponded  to, if at all ?

25 A.      I can , if you're  asking .  I don't recall   if I

1  did.

2  Q.      I'm saying did you in your direct examination

3  give an opinion as to how much drugs this related to?

4  A.      I believe my testimony was that this was the

5  payment towards the kilogram Mr. Bynum had received in

6  a previous transaction.  The $13,200 obviously would

7  not be a full payment.

8  Q.      Would that mean he would have gotten a partial

9  loan on this?

10  A.      He could have, yes, or he could have been paying

11  off a prior debt.  I don't know.  This is just

12  reflecting a payment of $13,200.  Actually, it's

13  $13,000 because the $200 is missing.

14  Q.      Let me jump ahead a little bit.

15          I don't know how long want to go, Your Honor.

16          MS. JOHNSTON:  Your Honor, I would ask the Court

17  to go long enough to cover the recross examination.  It

18  shouldn't take too long.

19          THE COURT:  Zip right along and see if we can

20  get this done.

21          BY MR. MITCHELL:

22  Q.      Ms. Johnston also asked you about Hayward-7.

23  That is a document that's become relatively understood

24  by most parties here as the ledger -- there were

25  ledgers within that document.  Do you recall that?

1 A.      I've been asked about that document several

2 times, yes.

3 Q.      And you were asked about that specifically with

4 regard to Mr. Bynum.  Do you recall that?

5        MS. JOHNSTON:   Objection.

6        This is beyond the scope of redirect.

7        THE COURT:  I think we're going a little far

8 afield, aren't we, Mr. Mitchell?

9        MR. MITCHELL:  No.  If I may.  Can we approach?

10        THE COURT:   You may.

11             (At the bar of the Court.)

12        MR. MITCHELL:  I don't know how much closer to

13 redirect I can get.  She brought out Hayward-7.  She

14 asked Detective Sakala why isn't he in Hayward-7?  And

15 he said because he was a cash customer and people keep

16 ledgers in order to track the money owed.  I'm asking

17 about Hayward-7.  How can this not be on cross of

18 redirect?  It's clear as could be.

19        MS. JOHNSTON:   I will withdraw my objection.

20 Hopefully just one or two questions.

21        THE COURT:  I'm hoping, too.

22             (Back in open court.)

23        MS. JOHNSTON:   Your Honor, the objection is

24 withdrawn for the record.

25        BY MR. MITCHELL:

1  Q.      Do you recall being asked about this Hayward -7?

2  A.      Yes, I do.  I have been asked numerous

3  question s.

4  Q.      Do you recall stating that the reason Mr. Bynum

5  isn't in that document  -- within the pages of that

6  document  is because  he was a cash customer ?

7  A.      That 's certain ly a reason , yes.

8  Q.      Now , is your opinion still the same , based on

9  what you just said , that the $13,000 is only a partial

10 payment  and he got a loan ?

11 A.      That is certain ly a reason  why he's not in that

12 book , yes.

13 Q.      I don't think  you understand  my question .  Maybe

14 I'm not being clear .

15 A.      Please.

16 Q.      You said he's a cash customer ; correct ?

17 A.      No , I did not say that .  Based on the

18 conversation s, it appear s to be -- I think the question

19 relating  to is there a reason  why Mr. Bynum is not in

20 the book or could there be a reason .  I don't think  I

21 definitively  said he's not in this book because  he's a

22 cash customer .  I'm saying  he could -- his name could

23 be talli ed in another  book that we did not recover .

24 There are any number  of reason s why his name is not in

25 Hayward -7.

1  Q.      Including  never  buying  drug s;  correct ?

2  A.      That  would  not  be  my  opinion ,  no.

3  Q.      Of  course  it  would n't ,  but  you  said  there  are

4  any  number  of  reason s  why  he's  not  in  that  book ,  and

5  one  of  them  might  be  he's  not  buying  drug s  from  Ms.

6  Martin  because  he's  not  in  there .   Isn't  that  one

7  possibility ?

8  A.      No ,  it  is  not .

9  Q.      So  there 's  any  number  of  reason s  except  the  one

10 you  don't  want  to  accept ?

11 A.      No ,  sir .   My  opinion  is  based  on  the  evidence

12 that  I  have  seen .   I  have  seen  no  evidence  that  would

13 support  your  opinion .   If  that 's  your  opinion .

14 Q.      Let 's  get  back  to  what  you're  character izing  --

15 these  are  your  theori es  based  on  the  conversation s  that

16 you've  had ,  not  your  observation s  of  anybody ,  not  your

17 --

18 A.      That 's  not  correct  sir .

19 Q.      Not  your  observation s  of  people  inside  their

20 home s?

21 A.      That  is  correct .

22 Q.      Not  in  their  minds ?  You  don't  know  what  they're

23 thinking  within  their  minds ;  do  you?

24 A.      No ,  I  do  not .

25         MS.  JOHNSTON:    Objection ,  this  is  beyond  the

1  scope of redirect.

2         THE COURT:  Overruled, but try to stay within

3  the scope.

4         BY MR. MITCHELL:

5  Q.     So when you gave the opinion that it's more

6  likely than not that he wasn't in Hayward-7 is because

7  he was a cash customer is not consistent with your

8  second opinion that $13,200 is only a partial payment

9  and he got a loan for the rest, is it?

10 A.     Yes, it is consistent.

11 Q.     How is it consistent?

12 A.     I just told you.  I can go over it again.  Mr.

13 Bynum could be listed in another book we did not

14 recover.  Ms. Martin may decide not to put that

15 particular debt in the book.  There could be any number

16 of reasons why Mr. Bynum is not in that book and still

17 be a cash customer or still be a person who's recorded

18 debt.  This could have been a short-term debt where he

19 said I'll bring you the cash tomorrow, that she didn't

20 write it down there.  Could be any number of reasons,

21 so yes, I think it is consistent.

22 Q.     In your training and experience, is it your

23 experience based on all your prior arrests, that people

24 who are keeping track of debts just toss those

25 evidences of debts?

1  A.       Toss  them  where ?

2  Q.       Get  rid  of  them ?

3  A.       Yes , it  is  my  experience .  In  fact , I  think  Mr.

4  Uriarte  testified  yesterday  of  him  destroying  one  of

5  his  previous  ledgers.

6  Q.       Is  it  more  often  than  not  when  they're  owed

7  money , they  keep  record  of  it  so  they  make  sure  they

8  get  paid ?

9  A.       I  believe  they  keep  record  of  it  very  carefully.

10  Does  law enforcement  seize  it ?  I  believe  drug  dealers

11  often  keep  records  of  money.     In  most  cases , in

12  probably  the  overwhelming  majority of  drug  cases   I've

13  been  involved  in,   we  are  not  able  to  seize  those

14  records .

15  Q.       There  was  another  call  that  I  actually  missed,

16  and  I'd  like  you  to  turn  to  Page  190, B-1529.

17        MS.  JOHNSTON:     Objection .

18        Beyond  the  scope  of  redirect .

19        THE  COURT:   Mr.  Mitchell , I  think  you're  going

20  pretty  far  afield .

21        MR.  MITCHELL:   All  right .  Court 's  indulgence ,

22  Your  Honor .

23        THE  COURT:   All  right .

24        MR.  MITCHELL:    I  have  no  further  questions .

25        THE  COURT:   All  right .  Any  further  recross ?

1          MR. WARD:  I know everybody is anxious to get

2 out of here, so I'll keep it short.

3          THE COURT:  God bless you.

4          BY MR. WARD:

5 Q.       Sergeant, you recall when you were asked on

6 that, you were asked on Tuesday -- pardon me, on

7 Wednesday, on redirect by Ms. Johnston about a

8 telephone call, B-6435 at Page 503?  I'm not sure which

9 volume that is, but in any event, you stated that she

10 did, indeed, have stolen jewelry that was found in her

11 apartment.  But you also said that there was a

12 reference in that call to Dobie getting additional

13 something or having lined up or found an additional

14 source of supply who had ounces for $950.  Do you

15 remember that call?

16 A.       Yes, I have it in front of me.

17 Q.       That was what she was saying to -- allegedly to

18 Ms. Martin; is that correct, sir?

19 A.       That is correct.

20 Q.       All right.  Now, would it be reasonable to

21 conclude, sir, that this other source was somebody

22 outside this conspiracy, the one that's being tried

23 now?

24 A.       I have no idea.  I don't know who the person is.

25 Obviously if that person is offering drugs for sale to

1  people  in  this  conspiracy ,  I  think  by  definition  that

2  make s  them  a  part  of  this  conspiracy ,  but  I  don't  know

3  who  that  person  is .

4  Q.    Well ,  that's  a  legal  conclusion ,  with  all  due

5  respect  to  your  expertise,  I'm not  sure  you're

6  qualif ied  to  make .

7         MS.  JOHNSTON:   Object ion  to  counsel's  comments  .

8         THE  COURT:   Sustained .

9         MR.  WARD:   Then  I  object  to  the  answer  and  ask

10  that  it  be  stricken  and  the  jury  be  instruct ed  to

11  dis regard  it .

12        THE  COURT:   Dis regard  everything .

13        MR.  WARD:   Pardon ?

14        THE  COURT:   Dis regard  the  question ,  her

15  objection ,  the  answer ,  the  whether  or  not  he  will

16  thing .  Dis regard  the  whole  thing .   It  is  stricken  from

17  the  record .   It  is  gone .

18                     **RECROSS  EXAMINATION**

19        BY  MR.  WARD:

20  Q.    Let  me  ask  you  this :  If  it  was  somebody  who  was

21  in  the  conspiracy  that 's  charge d  here ,  would n't  she

22  have  said  to  Ms.  Martin ,  oh ,  by  the  way ,  you  know ,  Fred

23  Jones  has  ounce s  for  $950  or  John  Smith  has  ounce s  for

24  $950  or  Pookie  somebody  has  ounce s  for  $950 ?   Would n't

25  that  be  reasonable  and  rational  to  conclude ,  sir ?

1  A.      No.

2  Q.      Oh, it wouldn't?  I see.  That doesn't fit in

3  with your theory of the case, is that why?

4  A.      No.  I think you asked me whether it would be

5  reasonable, and it would be completely unreasonable for

6  someone to identify a source of cocaine to somebody

7  else.  I think I've testified before that would be

8  contrary to drug business.

9  Q.      You're telling this jury that my client called

10 Paulette Martin, with whom she is alleged to be a

11 co-conspirator in the indictment and told her that she

12 had a source of supply, but for reasons of secrecy,

13 didn't want to tell her co-conspirator who that person

14 was?  That's what you're saying?

15 A.      She doesn't identify the person.  Whether she

16 wanted to do it or not --

17 Q.      Is that what you're saying?

18 A.      I'm sorry, Mr. Ward, if I may finish.

19 Q.      Maybe you if you could  answer my question.

20         THE COURT:  Mr. Ward, let him finish the

21 question -- answer, please.

22         THE WITNESS:  She does not identify the person's

23 name in this call.  She does in previous calls describe

24 the person.  However, her not wanting to or not

25 identifying the person is not unusual at all.

1         BY MR. WARD:

2 Q.     So that's what you're telling this jury to

3 answer my question?

4 A.     I just answered the question.  I can go over it

5 again, sir, if you'd like.

6 Q.     Is there any evidence, sir, in any of the

7 subsequent conversations that you're familiar with

8 involving my client to show that there was ever any

9 deal consummated by her with respect to this other

10 source and the ounces for $950?

11 A.     No, there is not that I'm aware of.

12         MR. WARD:  I see.  Well, thank you very much.

13         THE COURT:  Any further recross?

14         MR. SUSSMAN:  Just a little, Judge, but I get so

15 few chances.

16                 **RECROSS EXAMINATION**

17         BY MR. SUSSMAN:

18 Q.     Turning to the events of March 29, 2004.  Do you

19 your testimony about those events?

20 A.     Yes.

21 Q.     That's the meeting of Ms. Martin and Ms.

22 Harden in the parking lot on New Hampshire Avenue;

23 correct?

24 A.     That is correct.

25 Q.     Just to clarify a couple of things.  You weren't

1  there that day?

2  A.      That is correct.

3  Q.      Detective Musselmann.  He was there that day?

4  A.      That is correct.

5  Q.      Okay.  And in police parlance, he is known as an

6  eyewitness; is that correct?

7  A.      I think that's the common -- I don't know the

8  police parlance, but he was an eyewitness.

9  Q.      In common parlance?

10  A.      Common parlance, yes.

11  Q.      From a police perspective, eyewitnesses are

12  considered to be generally good things in an

13  investigation?

14  A.      Generally it can be, yes.

15  Q.      Based on your training and experience, do you

16  know any reason why Detective Musselmann would be

17  unable to observe relatively simple events and record

18  them accurately?

19  A.      Do I know of any reasons he can't see and record

20  things?

21  Q.      That's correct.

22  A.      No.

23  Q.      Okay.  And you were present in court when he

24  testified; correct?

25  A.      Yes, I was.

1  Q.      And he described generally the events where Ms.

2  Martin's car was parked and the conversation occurring

3  and --

4  A.      I'm sorry. The conversation occurring?

5  Q.      Occurring between Ms. Martin and Ms. Harden?

6  A.      I don't know if he described the conversation.

7  I think he just saw that they had conversation.

8  Q.      Well, there seemed to be a conversation. That's

9  what I meant. He couldn't hear anything?

10  A.      That's my recollection, yes.

11  Q.      He was fairly close for surveillance, 15 or 20

12  feet away?

13  A.      I would agree with that, yes.

14  Q.      Which you would estimate, which is the distance

15  you and I are from each other roughly?

16  A.      Yes it could be, yes.

17  Q.      And he testified that he saw small -- he saw a

18  piece of paper pass and he was consistent in that

19  testimony?

20  A.      That's my recollection, yes. I agree with that.

21  Q.      Okay. On redirect, you and Ms. Johnston did a

22  little demonstration involving a large folded up piece

23  of paper; is that correct?

24  A.      Yes.

25  Q.      Okay. Was that something spontaneous or

1 something that had been discussed prior to your

2 testimony?

3 A.      We had not discussed it.

4 Q.      Okay. Am I correct in terms of Detective

5 Musselmann's testimony that he was never asked to

6 demonstrate with any large piece of paper; is that

7 correct?

8 A.      His testimony in the courtroom or beforehand?

9 Q.      His testimony in the courtroom.

10 A.      I do not recall him being asked that, no.

11 Q.      And he never described any large, folded-up

12 piece of paper during his testimony; did he?

13 A.      He described -- he just said a piece of paper.

14 He did not further describe it.

15 Q.      He never described Ms. Harden attempting to hide

16 or conceal anything during the course of his testimony,

17 either; did he?

18 A.      I don't recall anything like that.

19      MR. SUSSMAN:   Thank you very much.

20      MR. MCKNETT:   I'm afraid so, Your Honor.

21      THE COURT:   Go to it.

22                    **RECROSS EXAMINATION**

23      BY MR. MCKNETT:

24 Q.      Sergeant, when you were being questioned by Ms.

25 Johnston, you talked about the status of PTK. Do you

1 recall that testimony ?

2 A.      I think so.  If I recall the question , it was

3 about the business Ms. Martin --

4 Q.      Yeah , the business PTK.

5 A.      I think I recall the question , yes.

6 Q.      You were asked about the PTK business and

7 Paula 's School of Performing Arts business ; correct ?

8 A.      I think she asked about both of those .

9 Q.      I didn't write down your exact words , but I

10 think you said something to the effect that you did not

11 consider either of them to be legitimate business es at

12 the time of this investigation ?

13 A.      I would agree with that .  I don't know  if I used

14 that term , but I would agree with that .

15 Q.      In your opinion , they were not ?

16 A.      They were not function ing business es as a legal

17 enterprise , yes.

18 Q.      During the course of this investigation , a large

19 -- very large number of documents were obtain ed by the

20 government ; weren't they ?

21 A.      Yes .

22 Q.      Either by seizure and in a search or by

23 subpoena ; correct ?

24 A.      Correct .

25 Q.      And there were bank records obtain ed in the name

1  of PTK?

2  A.      Yes.

3  Q.      Correct?

4  A.      Yes, there were bank accounts she had.

5  Q.      So at least to some degree, Ms. Martin was

6  presenting PTK productions or whatever it was as a

7  legitimate business to other people; correct?

8  A.      I wasn't asked that question, but I would agree

9  she did represent that as her business.

10 Q.      And she at least represented it to a bank and

11 opened up an account in the name of that business; is

12 that correct?

13 A.      She opened up an account. I don't know what she

14 told the bank.

15 Q.      Do you recall being asked questions about guilty

16 productions?

17 A.      I have been asked some questions. I think it

18 was Mr. Montemarano might have asked some questions.

19 Q.      I think it may have come up again in redirect of

20 Ms. Johnston.

21 A.      I don't recall.

22 Q.      In any event, you do recall guilty productions?

23 A.      Yes.

24 Q.      That was the business apparently run by Gilbert

25 Williams?

1 A.      I believe so, yes.

2 Q.      And you said, I believe, that Ms. Martin -- that

3 in your opinion, Ms. Martin and Mr. Goodwin, was it,

4 had sent money?

5 A.      No.  The money was wired from one of Ms.

6 Martin's accounts.  I think I said Mr. Goodwin was a

7 partner in that business venture, if you want to call

8 it, with Ms. Martin, but the money was, I believe,

9 wired from one of Ms. Martin's accounts.

10 Q.      Okay.  But you were -- you did say, I believe,

11 that to the best of your knowledge, neither of my

12 clients, Ms. Ali or her husband, Ulysses Gardner,

13 elicited any of the money?

14 A.      I do not believe they are involved in that at

15 all, no.

16 Q.      You talked about the call, and I don't have  the

17 call number, but it was at Page 563 and 564.  That was

18 the call, if you remember correctly, between Ms. Ali

19 and Ms. Martin in which they agreed not to bring it up

20 with Ms. Terrell, meaning they didn't want to talk to

21 Ms. Terrell about the neighbor having a problem with --

22 for some reason.

23 A.      Yes.

24 Q.      Now, Ms. Martin was a tenant to Ms. Terrell;

25 wasn't she?

1 A.      Yes, I believe she rented the downstairs and she

2 probably had full house privileges.

3 Q.      It makes sense a tenant would not want to remind

4 her landlord that some of the neighbors were unhappy

5 with the tenant?

6 A.      In the general context, not pertaining to this

7 particular case.  I would agree that could be a reason

8 the tenant wouldn't want a landlord -- I think in this

9 case, which is more specific, that Ms. Martin just did

10 not want to draw any more attention to the issue than

11 was necessary.

12 Q.      One reason would be that a tenant doesn't want

13 to annoy the landlord at the risk of being evicted; is

14 that correct?

15 A.      In a hypothetical case, that could be a reason.

16 In this case, I think it was more direct than that.

17 Q.      Well, it's your opinion it's more direct.

18 A.      That's correct.  It is my opinion.

19 Q.      And finally, I want to talk to you, and I'm

20 we're all glad to hear the word finally.  I want to

21 talk to you about the two bags that were presented to

22 you.  They're South Dakota 1 and South Dakota 15.  Do

23 you recall them?

24 A.      Yes.

25 Q.      I don't think we need to bring them out.  One of

1 them was a Hallmark -- Hallmark is a store that sells

2 cards and such?

3 A.      Yes, a Hallmark bag and I think a green plaid

4 bag.

5 Q.      And a green plaid bag.  And you testified, I

6 believe, that those were the same bags that my client,

7 Ms. Ali, and Ms. Martin were carrying on May 16 when

8 they were, in your terms, moving the business to the

9 school?

10 A.     I did not say they were the same bags.

11 Q.     I wanted to be clear with that.  I broke that

12 down and wanted to be sure.

13        You don't know if they were the same bag, do

14 you?

15 A.     No.  I think I testified they matched the same

16 size and physical description appeared to be the same.

17 I did not say they were the same.

18 Q.     Okay.  They appeared to be the same bags, but

19 those are common bags; aren't they?

20 A.     I don't know whether they're common or not.  The

21 jury can see them and --

22 Q.     If you shop at Hallmark --

23 A.     If you shop at Hallmark, I'm sure you've

24 probably got a lot of them at home.

25        MR. MCKNETT:  I take it back, Your Honor.  Now

1  finally .   I apologize .

2         THE COURT:   Mr. McKnett , we all are facetious

3  about these thing s, but you take your time .   I want you

4  to adequate ly ask your question s.

5         MR. MCKNETT :   I appreciate that , Your Honor .

6         THE COURT:   Don't worry about me.

7         BY MR. MCKNETT :

8  Q.        Sergeant , I want to talk to you about the drug s

9  that were found at the school .   You testifi ed that

10  there were -- there was a quantity -- in addition to

11  the quantity of powder cocaine that you and I talk ed to

12  previous ly, there was also a quantity of crack cocaine .

13  A.        There was both , yes.

14  Q.        And there was also a relative ly small amount of

15  heroin found there ?

16  A.        I think this 's accurate , yes.

17  Q.        Now , we know how large an eight ball of powder

18  is.   It's the size of a piece of can ; correct ?

19  A.        Yes .

20  Q.        And is it fair to say that the total quantity of

21  drug s, powder , crack , and heroin that was recovered

22  from the school was something less than 700 grams ?

23  A.        I would n't dis agree with that .   I'd have to look

24  at the drug report , but that sounds about right .

25  Q.        Most of it was crack or powder and the smallest

1  amount was heroin; correct?

2  A.     Again, I don't know the exact amount, but I

3  would agree that's probably accurate.

4  Q.     Is it fair to say that it was about -- again,

5  without trying to pin you down to any specific -- about

6  half and half powder and crack?

7  A.     Again, without seeing the exact numbers, I don't

8  know, but there was a significant amount of each one,

9  so that's probably a good estimate.

10 Q.     Okay. Thank you. How much volume would a --

11 say a quarter kilogram of crack cocaine?

12         MS. JOHNSTON:   Objection, beyond the scope of

13 redirect.

14         THE COURT:   Mr. McKnett, I think that's outside

15 the scope.

16         MR. MCKNETT:   Your Honor, Ms. Johnston did talk

17 about the crack cocaine that was recovered.

18         THE COURT:   Ask this one more question.

19         MR. MCKNETT:   That would have been the last

20 question on that topic.

21         THE COURT:   That's the last question. Go for

22 it.

23         MR. MCKNETT:   Can I ask that question, Your

24 Honor?

25         THE COURT:   Ask the question.

1          BY MR. MCKNETT :

2  Q.      Approximately  how  much  volume  would  a  quarter

3  kilogram  of  crack  cocaine  be  compose d  of ?

4  A.      250  grams .

5  Q.      Well , the  size .  A  fist ?  A  softball ?  A  tennis

6  ball ?

7  A.      Could  be  a  softball , yeah .  I  mean , I  think  the

8  jury  will  actual ly  see  the  crack , so  I  mean  they  --

9  it's  --  softball  would  probably  weigh  250  grams , but  it

10  weigh s  250  grams .

11  Q.      They're  about  the  same  size ?

12  A.      Could  be .  Could  be  a  little  bigger .

13  Q.      You're  right , they're  going  to  see  that

14  probably , that 's  why  I'm  not  look ing  for  great

15  precision  right  now.

16  A.      Correct .

17  Q.      But  just  to  put  it  in  context .

18          And  those  quantiti es  of  drug s, the  powder  and

19  the  crack , were  recovered  --  at  least  a  lot  of  it  was

20  recovered  in  those  hidden  contain ers, correct , at  the

21  school ?

22  A.      I  don't  know .  I  wasn't  there .

23  Q.      You  didn't  see  it ?

24  A.      I've  seen  it .  I  don't  know  where  the  -- or  what

25  the  exact  state  was  when  they  were  recovered .   There  are

1 picture s represent ed.  I'm sure Detective **Cussan** will

2 testify as to how it appear ed.  I just don't recall .

3        MR. MCKNETT :  You don't recall ?  That 's fine .

4 Thank you .

5        THE COURT:  Any re-redirect ?

6        MS. JOHNSTON:   Yes , Your Honor , just a few

7 question s.  No , the government  is finish ed with

8 Detective  Sakala .  We have no other question s to ask

9 him .

10                    (Witness excused .)

11        THE COURT:  All right .  Sergeant  Sakala , you can

12 now go back to patrol duty subject  to being recall ed at

13 a later time .  You're excuse d, ladies and gentlemen  .

14 We will recess  now until Tuesday  at 10 o'clock .

15        Counsel  should be here at 9:45 for any

16 preliminary  matter s.

17        Have a nice weekend , and please do not discuss

18 this among yourselves  or with anybody  else until

19 deliberation s begin .

20             (Off the record  at 2:20 p.m.)

21

22

23

24

25

1                                  **CERTIFICATE**

2

3        I, Tracy Rae Dunlap,   RPR , CRR , an Official Court

4    Reporter for the United States District Court of

5    Maryland, do hereby certify that I reported, by machine

6    shorthand, in my official capacity, the proceedings had

7    and testimony adduced upon the Jury Trial Proceedings

8    in the case of UNITED STATES OF AMERICA versus PAULETTE

9    MARTIN, et al,   criminal Action Number   RWT-04-0235 on

10   July 7, 2006.

11

12       I further certify that the foregoing 2    15 pages

13   constitute the official transcript of said proceedings,

14   as taken from my machine shorthand notes, of said

15   proceedings.

16

17       In witness whereof, I have hereto subscribed my

18   name, this 21st day of April 2008.

19

20

21                        _____

22                        TRACY RAE DUNLAP, RPR , CRR
                          OFFICIAL  COURT REPORTER
23

24

25