```
1            UNITED STATES DISTRICT COURT OF MARYLAND
                        SOUTHERN DIVISION
2
   ------------------------x
3  UNITED STATES OF AMERICA   :
            Plaintiff         :
4                             :
                              :
5  vs                        :Criminal Action:    RWT-04-0235
                              :
6                             :
   PAULETTE MARTIN, et al     :
7            Defendants.      :
   ------------------------x
8

9                       Thursday, July 13  , 2006
                        Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11 Proceeding before the HONORABLE ROGER W. TITUS, United
   States District Judge, in courtroom 4C, commencing at
12 9:30 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS TESTIMONY AND PROCEEDINGS     AS
15      RECORDED AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD  SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR              (301) 344-3912
25 Official Court Reporter
```

```
1                          I N D E X

2                    DIRECT      CROSS    REDIRECT    RECROSS

3  Det  John Shea    31          60       107         116

4  Colleen  Muldoon  130         201      227

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                               Page

23  Reporter's Certificate                       231

24  Concordance                                  232

25
```

1        THE  COURT:   Mr.  Montemarano , you've  got  a

2 preliminary  matter ?

3        MR.  MONTEMARANO :   Yes, Your  Honor .  I think  I'm

4 obligate d to make  a record  regard ing this , and what  the

5 Court  choose s to  do with  this  is  the Court 's decision .

6 Yesterday  afternoon  when  we complete d our  court  day , I

7 asked  Ms. Greenberg  for  a list  of witness es for  the

8 day .  Ms. Greenberg  said  she  had  a list  but  she  need ed

9 to get  it  with  Ms. Johnston .  I turn ed --

10        THE  COURT:   What ?  Just  repeat  the  last  thing .

11 I could n't  hear .

12        MR.  MONTEMARANO :   I then  turn  and  wait ed for  Ms.

13 Johnston  to complete  her  conversation .  She  was

14 stand ing at  the white  table  there  speaking  with  the

15 witness  who was  then  on direct  examination , Detective

16 Shea,  and they  spoke  for  several  minute s review ing

17 piece s of evidence , or apparently  review ing -- I was

18 not  privy  to  the  conversation  going  through  them  as

19 they  put  them  in  the  box.

20        I know  the  Local  Rule  107.14  permit s a witness

21 to be spoken  with  while  the  witness  is  on direct  or

22 cross .  It does  not , however , permit  a witness '

23 testimony  to be discuss ed while  the  witness  examination

24 has  been  commence d.  I, therefore , submit  to the  Court

25 that  at least  there  is  a question  on the  part  of the

1  defense what was being discuss ed in light of the length

2  of the conversation , and I'm obligate d to make a record

3  regard ing that .

4         THE COURT:   All right .   You've made your record .

5         MS. JOHNSTON:   Your Honor , after Mr. Shea

6  finish ed his testimony , he stood up there .   He turn ed

7  to me and said , kick me.   I said , what do you mean ,

8  kick me?   He said , tomorrow , I'm going to ask you on

9  the stand why you told me to kick you so he can testify

10 to the jury .   He testifi ed I think -- excuse me.

11 Detective Shea would you please step out ?

12        He explained to me that he had made a mis take ,

13 that an eight ball is not one and a half grams, like he

14 testified.   He said it was 324, 325 grams.     I don't

15 know what he told me.     That was the extent of our

16 conversation  in term s of what was going on.   We

17 gathered up the evidence , made sure we had all of the

18 evidence , and that was it .   That 's the extent of it .   I

19 don't imagine  there 's anything  in that conversation

20 that violate s the rule s.

21        THE COURT:   All right .

22        MR. MONTEMARANO :   Based upon the length of the

23 conversation , Your Honor , long enough that I, at least

24 at one point , thought about being rude and going over

25 and asking Ms. Johnston  to get it so the rest  of us

1  could leave --

2         THE COURT:  I'll let you kick Detective Shea

3  when he comes in today.

4         MR. MONTEMARANO:  I wouldn't presume to kick

5  Detective Shea, Your Honor.

6         MS. JOHNSTON:  Your Honor, I mean we had some

7  casual conversation.  I've known Detective Shea for

8  probably -- almost as long as he's been a police

9  officer.

10        THE COURT:  I don't find this to be a momentous

11 conversation that involves a violation of the rule.

12 Even if it were, it's a minor technical one and does

13 not call for any action by the Court.  As I said, Mr.

14 Montemarano, as I'm sure you will when you

15 cross-examine him, you will give him a nice kick, so

16 that's fine.

17        MR. MONTEMARANO:  Thank you, Your Honor.  I

18 appreciate that.

19        THE COURT:  You will do a wonderful job with his

20 cross-examination.

21        MR. MONTEMARANO:  Your Honor, this wasn't hello,

22 how are you?  I, therefore, thought it was appropriate

23 to make a record.  I have not leveed any sort of

24 accusations.  I thought it was appropriate for the

25 government to put a proffer on the record.

1          THE COURT:  All right.  It's done.

2      Now, I had --

3          MR. MONTEMARANO:  Mr. Mitchell has a question.

4          THE COURT:  Yes.

5          MR. MONTEMARANO:  Mr. Mitchell pointed out to

6  me, and I think he is correct, inasmuch as they

7  discussed his testimony what an eight ball is, I don't

8  think it is appropriate to go back to that.  Their

9  testimony is that an eight ball is a gram and a half.

10         THE COURT:  They may not go back to that.  You

11 will, but they won't.  That may do it on redirect.

12 That subject is passed as far as I'm concerned.  All

13 right?

14         MR. MONTEMARANO:  Thank you.

15     Now, I believe --

16         MS. JOHNSTON:  I intend to ask him what he said

17 to me after court and that he said, "Kick me."  I'm

18 going to ask him to explain, why did you say that to

19 me, so he can explain that.  I think that that's

20 perfectly permissible.  There's nothing in the rule

21 that says the government cannot talk to witnesses while

22 it's on direct examination about their testimony.

23     What they're going to cover in the witness'

24 testimony, clearly that is not covered by the rule.

25 Once they are turned over for cross, then the

1  government is not permitted to talk to them about their

2  testimony or what to expect on cross-examination .

3        MR. MONTEMARANO : Local Rule 17.14. It's found

4  on Page 21 of the most recent printed version of the

5  local rules, amended at the end of 1994, that I

6  reviewed in the library this morning . It specifically

7  says , you may speak with a witness during examination .

8  You may not discuss the witness ' testimony .

9        It appears that the witness initiated a

10  conversation about his testimony seeking to correct or

11  clarify it . Any question directed to that is therefore

12  in breach of the rule and in breach of the Court 's

13  directive . I submit that it is entirely within the

14  rule -- it is exactly what the rule discusses . You

15  cannot go back and fix the problem that you realize and

16  discuss with the witness .

17        MS. JOHNSTON: Just so the record is clear , Your

18  Honor , I didn't discuss with the witness what his

19  testimony was going to be . He said to me, kick me, and

20  I said to him in terms of that subject matter , kick

21  you ? He said , yeah , kick me . I said , I'm going to ask

22  you in -- your very first question on the stand is,

23  what did you say to me when you finished your testimony

24  yesterday ? Kick me . And I'm going to ask you why, and

25  it was obvious to why he was going to say that , but I

1  did not tell him what to say, anything of that sort.

2         He made that comment to me and that was the

3  extent of it. We packed up the evidence, made sure

4  everything was there, made some jokes about the fact

5  that he had been here, I think, four days without

6  getting on the stand during this trial, and he was

7  surprised he had gotten on at all yesterday.

8  In terms of the length of the conversation, since

9  counsel seems to be so concerned about the length of it

10 --

11        MR. MONTEMARANO:  I'm sorry.

12        THE COURT:  I'm just going to take a quick look

13 at the local rule and I'll defer action on this.  This

14 is not a momentous matter, in my judgment, based on

15 what's been related to me by the government, but I did

16 want to make sure I had the chance to hear from Mr.

17 Martin.

18        MR. MARTIN:  Thank you, Your Honor.

19        THE COURT:  Is there any other matter other than

20 this one that anybody wants to be heard on?  All right.

21 Mr. Martin, let me hear you on this matter here.

22        MR. MARTIN:  May it please the Court, Your

23 Honor.

24        THE COURT:  Is the government going to  file a

25 written opposition, or are you going to respond orally?

1          MS.  JOHNSTON:   Your  Honor , there  is  nothing  in
2  here  really  to  respond  to.   There  is  no  case  law  --
3          THE  COURT:   Let  me  hear  from  Mr.  Martin .   Why  do
4  you  want  this  information  in?
5          MR.  MARTIN :  First  off , before  I  get  into  why  I
6  want  it , I  think  the  question  yesterday  was  whether  or
7  not  there  was  any  authority  to  support  this , and  I
8  would  submit  to  the  Court  that  there  are  at  least  two
9  pillar s , and  very  important  pillar s , that  this  rest s
10  on.   The  first  is  constitutional   and  the  second  is
11  statutory .
12          I  call  the  Court 's  attention   to  *Brady  v.*
13  *Maryland* , which  I  am  --  I  know  everyone  in  the
14  courtroom  is  familiar  with , and  there  is  a  due  process
15  requirement , of  course , that  the  prosecution  dis close
16  evidence  favorable  to  an  accused  upon  request  when  such
17  evidence  is  material .   And  I  would  submit  this  is
18  material  to  the  defense , and  I'm  going  to  go  into
19  reason s  as  to  why  that  is.   The  second  part  of  Brady
20  that  is  important  here  is  that  we're  also  entitle d  to
21  information  that  could  be  use d  to  impeach  government
22  witness es .
23          The  second  pillar  that  we're  going  to  be  resting
24  on  or  do  rest  on  is  the  statutory  one , and  the
25  statutory  one  can  be  found  at  rule s , which  of  course  is

1 the discovery rule, A1(e), which talks about document s
2 and object s. And it says, upon a defendant 's request,
3 the government must permit the defendant to inspect and
4 to copy or photograph paper s, document s, data within
5 the government 's possession, custody or control.
6        Now, Your Honor, we've had each and every one of
7 these people either listed as witness es, take the stand
8 or we anticipate that they're going to be called in the
9 defense 's case in chief.
10       THE COURT: Well, three of them have already
11 complete d testimony.
12       MR. MARTIN: Your Hono r, may I finish? Plea se,
13 sir, please. With respect to the three that may have
14 testifi ed, already testifi ed, we would still proffer to
15 the Court one of us may call some or all of these
16 people. The important point here is whether or not
17 there has been any collu sion on the part of these
18 witness es, and I specifically asked Mr. Thurman whether
19 or not at any time he had been house d or incarcerate d
20 with Mr. Smith. He deni ed that.
21       And the question now come s up with respect to
22 Larry Lane, who is also listed as a government witness,
23 and I have it on information that I've not been able to
24 confirm that the two of them, that is Larry Lane and
25 Michael Thurman, may very well have been house d

1  together .   I went  to  serve  a  subpoena  on  the  US

2  Marshal's downstairs , and they would  not  accept  the

3  subpoena .

4         Now , Your  Honor , in  light  of  the  fact  that  the

5  government  and  the  US Marshal's  service  is  part  of  the

6  government  has  exclusive  access  and  custody  of  this

7  information , the  only  way  that  I  can  get  it  is  with  a

8  court  order , and  in  determini ng  what  is  material  to  the

9  defense , I  think  no  one  knows  that  better  than  the

10  defense .

11        So  the  government  can't  argue  that's  not

12  material  to  our  case , and  it  certain ly  is  information

13  that  can  be  used  by  us  to  impeach  these  gentlemen .

14  Now , I'm  sorry  I  cut  the  Court  off , but  I  didn't  want

15  to  lose  my  train  of  thought , which  is  so  easy  for  me  to

16  do .  If  Your  Honor  has  a  question  or  you  would  like  the

17  government  to  respond , I'll  be  happy  to  answer  your

18  question  or  respond  to  whatever  they  have  to  say .

19        THE  COURT:   Well , I  mean , do  you  have

20  information  that  indicate s  that  witness  did  not  testify

21  truth fully  about  contact  with  the  other  witness ?

22        MR. MARTIN:   No .   That's  what  I'm  trying  to  get .

23  The  information  that  I  have  regard ing  two  of  these

24  people , not  necessarily  Horace  Smith  and  Michael

25  Thurman , but  with  respect  to  Larry  Lane  and  Michael

1   Thurman is an issue that may very well up when and if

2   Mr. Larry Lane takes the stand.  And what I'm saying,

3   Your Honor, is I think that this is important

4   information that could be used to impeach this

5   particular witness should he take the stand and deny

6   that he's met with him, or I can point out to the

7   jurors that there was an opportunity for collusion

8   because these gentlemen were housed together.  Even if

9   for a brief period of time.

10        THE COURT:  Being housed in the same facility is

11  not the same as being housed in the same cell.

12        MR. MARTIN:  That's correct, but I wouldn't know

13  whether or not they were transported in the same

14  vehicle, I wouldn't know if they were transported

15  together in what is sometimes referred to -- kept

16  together and sometimes what's referred to as a rat's

17  cage.  I wouldn't know anything, Your Honor, unless I

18  had the document.

19        THE COURT:  Why was this motion not filed until

20  yesterday or the day before?  Why was it so late being

21  filed?

22        MR. MARTIN:  The motion is late in being filed,

23  Your Honor, because it was only a day and a half ago

24  that I discovered, through informal information, that

25  Mr. Michael Thurman and Larry Lane were apparently

1 housed together at a place called Allegheny, which I'm

2 not even familiar with. I guess it's in Pennsylvania.

3 I didn't know that before.

4        MR. MONTEMARANO: Your Honor, if I could

5 supplement Mr. Martin's motion, because I think I am

6 sort of part of the cause of it. Mr. Martin brought up

7 the question of access to these witnesses to each

8 other, and I turned to him immediately and said go ask

9 the marshals for a Form 129. He looked at me and said

10 what is a Form 129?

11        THE COURT: That's what I said when I got this

12 motion, but now I know what it is.

13        MR. MONTEMARANO: During 2005, I tried a case

14 before Judge Blake in Baltimore. My client informed me

15 that a jailhouse snitch, whom he did not know was, in

16 essence, creating a narrative out of whole cloth based

17 upon his contact with a client of mine who was a

18 co-defendant of a client of mine who had been separate.

19 I turned to the marshals, with whom I have a very good

20 relationship because, well, we sort of all live

21 together.

22        THE COURT: All part of one big family.

23        MR. MONTEMARANO: One big family, that's a fair

24 statement, your Honor. And one of them said to me, go

25 ask Ted -- meaning Ted Stoler, who supervises prisoner

1 operation s in Baltimore -- for a Form 129 , and I went

2 downstairs and Mr. Stoler , he hand ed it to me , and it

3 show ed the witness and co-defendant had been house d in

4 and they're all held together in that facility . So I

5 was able to demonstrate that the defendant -- I mean

6 the witness was lying .

7         Now , I will tell the Court , to provide a full

8 narrative , that subsequent to that , that witness wrote

9 a letter to a friend of my client , who then provided

10 the letter to my client , saying he had made this all up

11 out of who le cloth based upon his conversation s with

12 the co-defendant , exact ly what I was seek ing to

13 establish on cross , and that led to Judge Blake

14 gran ting a motion for new trial in advance of

15 sent encing .

16         So this is extraordinarily vital . This is a

17 public record , or public enough that a CJA attorney

18 asking for this , it should be routine . This should not

19 be the subject of a motion or subpoena .

20         THE COURT:   I'm told the form has a lot of

21 confidential information on it .

22         MR. MARTIN:   It can be saniti zed , Your Honor ,

23 and I point ed that out to the mar shal when she told me

24 there was some privacy information act on that .   I

25 said , fine , you can sanitize that , give it to me , and

1 if I have any questions, the judge can review it in

2 camera.

3        THE COURT:  I'm not confident that the form,

4 even if it's provided to you, is going to be very

5 helpful for you.

6        MR. MARTIN:  She said that as well.  She said

7 you will need more for the Form 129.  I keep saying

8 she.  I don't want to refer to her as a cat.  I can't

9 remember her last name.

10        THE COURT:  Elizabeth Quick.

11        MR. MARTIN:  Ms. Quick.  Okay.  And you don't

12 have to be 68 to have your memory fail.      In any event,

13 she told me what she would need, and that is a motion.

14 So in response to your question,    why is it, Mr. Martin,

15 that you're filing this so late, I didn't think  I was

16 going to need a motion to get this information.  I

17 thought I would be able to go downstairs and just get

18 it.

19        And I want to supplement what Mr. Montemarano

20 said, as long as we're talking about anecdotes.  I had

21 a client once who was downstairs and he was privy to a

22 conversation where Mr. Mitchell's client was the

23 defendant in a case, and because my client had

24 overheard that information, he was able to take the

25 stand and talk about the collusion that took place

1 between two of the government 's witness .  And Mr.

2 Mitchell , you may very well remember that case .  It

3 just occurred to me .  And I think a not guilty verdict

4 was return ed .

5        MR. MITCHELL :  Well , we were hopi ng for that .

6        MR. MARTIN:   What did happen ?

7        MR. MITCHELL:   Right .  There was dis cussion  down

8 in the holi ng cell and on the bus on the   way back .  I

9 concur with my fellow counsel .  I think this is

10 important  information .

11        THE COURT:   Let me hear from the government .

12 I've heard from , I think , virtually  every defense

13 attorney .

14        MS. JOHNSTON:   Your Honor , if I understand

15 correct ly, Counsel is look ing for this information  so

16 that they could impeach or attack the credibility  of

17 the witness es, including Mr. Thurman , Mr. Smith , Mr.

18 Lane and Mr. Echarte .  Three of those witness es have

19 already  testifi ed.

20        Mr. Echarte , who is the most recent of those

21 witness es, I don't believe was asked if he was house d

22 or had any contact with the other three people on this

23 list , so quite frankly , they didn't lay a foundation  in

24 term s of Mr. Echarte in regards to Mr. Lane , he has not

25 yet testifi ed, and perhaps if he is call ed to testify ,

1  they might , in some way , be able to use that

2  information  to attack  his  credibility .

3         In terms of Mr. Thurman , he was asked a question

4  about  having  contact  with  some  people , and  I don't

5  remember  the  exact  question  because  it's  been  a couple

6  of weeks ago , and  he said  he  had  not  had  contact  with

7  whoever  he  was  asked  about .  I don't  know   if  the  people

8  he  was  asked  about  are  the  people  on  this  list .

9  Certain ly Mr. Thurman  has  only  been  incarcerate d  since

10  the  spring  of 2005 , I believe , so going  back  to  2002 ,

11  really , is  irrelevant   here .

12        Mr.  Thurman  has  only  been  in  the  federal  custody

13  since  spring  of 2005 .  I can  get  the  Court  the  exact

14  date  because  he  was  arrested  under  a criminal complaint

15  in  this  case .  Mr.  Smith, as far as we know, hasn't

16  been  incarcerated.  H e was  out  on  release  or  has  been

17  out  on  release,   so  he  would  not  have  been  in  contact

18  with these people.

19        So Mr.  Echarte  -- one , a foundation  wasn't  laid

20  with  Mr.  Echarte .  He doesn't  even  know  Mr.  Thurman ,

21  did  not  identify  him  in  court  when  he  was  shown  the

22  chart .  Mr.  Smith  hasn't  been  incarcerated .   Mr.

23  Thurman  has  already  been  incarcer ated since  2005 .  So ,

24  the  only  possible  person  Mr.  Thurman  could  have  had

25  contact  with  is  Mr .  Lane .

1          Indeed, they knew about these witnesses before
2 they testified, Mr. Thurman testified, I believe at his
3 -- over a couple of days, and I think his testimony
4 actually went over the weekend because counsel was able
5 to obtain a copy of his direct examination.  If they
6 wanted to cross-examine Mr. Thurman in relation to
7 this, they should have requested this information
8 before he took the stand because he would have had an
9 opportunity to address it.
10         To get the information now and try somehow to --
11 I don't know how they would introduce it and how it
12 would be relevant without giving Mr. Thurman an
13 opportunity to respond to any questions concerning
14 possible impeachment or attacking his credibility
15 through showing he was with Mr. Lane.
16         We would suggest to the Court that in terms of
17 Mr. Lane, the Court can defer ruling on that, you know,
18 until such time that Mr. Lane is called to testify, if
19 he is called to testify.  I don't know he's going to be
20 called to testify in this case, and so we would suggest
21 to the Court they should have gotten it before Mr.
22 Thurman testified.  There is nothing they can do with
23 it now in terms of Mr. Thurman.  Mr. Smith hasn't been
24 incarcerated.  Mr. Echarte, they didn't found a lay
25 foundation with, and Mr. Lane has not yet been called.

1            THE  COURT:   You  say  Smith  has  not  been

2  incarcerate d?

3            MS.  JOHNSTON:   Mr.  Smith  has  not  been

4  incarcerate d  as  far  as  we  know .

5            THE  COURT:   There  would  be  no  Form  129  on  him  at

6  all .

7            MS.  JOHNSTON:   I  don't  know ,  going  back  to  2002 ,

8  but  I  don't  believe  he's  been  incarcerate d.   I  think

9  he's  been  out  pend ing  sentenci ng  in  the  District  of

10  Columbia  because  he's  cooperate d.

11            Again,  they  didn't  lay  a  foundation   with  these

12  witness es.   You  can't  just  not  ask  them  any  question s

13  and  then  say  oh ,  introduce  this  to  show  they  were

14  house d  together .   They  have  a  right  to  be

15  cross -examine d,  they  have  a  right  to  respond ,  and  the

16  government  has  a  right  to  rehabilitate  the  witness .

17            For  example  Mr.  Thurman  made  the  same  statement

18  --  in  essence ,  gave  the  same  testimony  to  the  agent s

19  before  he  was  arrested ,  and  so  we  would  have  been  able

20  to  rehabilitate  him  by  introducing  those  statement s

21  extensively ,  so  it  is  too  late  is  the  government 's

22  position  in  regards  to  Mr.  Thurman .   Again ,  if  Mr.  Lane

23  is  called,  and  I  don't  know  that  he  is  going  to  be

24  call ed  in  this  case .   If  he  is  call ed,  then  the

25  government  would  not  object  to  them  having  access  to

1  Mr. Lane's 129 because they might be able to use that

2  in some manner in terms of cross-examining him. As I

3  said, Mr. Echarte, there has been no foundation made.

4  He was cross-examined yesterday and the day before.

5       THE COURT: All right. Mr. Martin.

6       MR. MARTIN: Your Honor, with respect to the

7  scope of the request from calendar year 2002 to the

8  present, I just put 2002 in there to be safe. I

9  couldn't remember exactly how long some of these people

10  might have been incarcerated, and so the fact that I

11  put 2002 I think is of no moment. I think it could

12  have been worse if I had went the other way and didn't

13  make it broad enough. So that was out of an abundance

14  of caution, and I'm not sure that the government really

15  has a strong argument on that point.   With respect

16  to Michael Thurman, I would suggest two things: One,

17  there's no reason why the defense can't call him as a

18  witness that I'm aware of; and two, I asked Michael

19  Thurman on cross-examination whether or not he had any

20  contact with Horace Smith who, at the time, I thought

21  was incarcerated and now I remember, yes, he did walk

22  out of the courtroom.

23       THE COURT: So your motion doesn't -- it's not

24  applicable to Smith at all then, right?

25       MR. MARTIN: With respect to Smith, it's not

1 applicable , but I would suggest I did lay a foundation

2 to determine whether or not he had engaged collusion

3 with anybody else regarding his testimony .

4        THE COURT:   Right , but 25 percent of your motion

5 has just been denied because Mr. Smith doesn't have a

6 Form 129 .  Let's work on the other three quarters.

7        MR. MARTIN:   Well , Larry Lane .  Let's move

8 straight to Larry Lane .

9        THE COURT:   He's on the government 's witness

10 list , but he hasn't been called; is that correct ?

11        MR. MARTIN:   He hasn't been called , and I have

12 it on information that they, Michael Thurman and Larry

13 Lane , have been housed together .  I need this

14 information .  I need these documents and the related

15 information attached to it so I can cross-examine him

16 on the question of whether or not there was an

17 opportunity for he and Michael Thurman to speak , and

18 two, whether or not they talked about this particular

19 case .  You know , once I establish --

20        THE COURT:   The form is not going to tell you

21 that .

22        MR. MARTIN:   Your Honor, he may not admit that

23 to me , but then it's up to the fact-finder to determine

24 whether or not it's credible , whether it's believable

25 that these two men who are incarcerated for the same

1  reason  talked  about  sports  and  everything  else  but

2  didn't  talk  about  this  case.  And  I  think  that  the  jury

3  applying  their  common  sense  is  going  to  find  that

4  that's  hard  to  believe.

5         THE  COURT:   Why  are  you  entitled  to  it  on  Emilio

6  Echarte?

7         MR.  MARTIN:   I  don't  know  that  I  am.

8         THE  COURT:   Well,  there's  another  25  percent  of

9  the  motion,  because  he's  off  the  stand,  he  hasn't  been

10  asked  about  it,  he  hasn't  denied  any  conversations  with

11  anybody.  I  don't  see  how  you're  entitled  to  it  on

12  Emilio  Echarte.

13         MR.  MARTIN:   That's  fine,  Your  Honor.  I  will

14  concede  that  point,  but  I'm  not  stopping  anybody  else

15  here  from  making  that  argument.

16         THE  COURT:   We're  down  to  Larry  Lane,  who  may

17  testify,  and  Michael  Thurman,  who  did;  right?

18         MR.  MARTIN:   Correct.

19         THE  COURT:   Well,  what  I  will  do  is  I  will  ask

20  the  marshal's  service  to  provide  me  Forms  129  on

21  Thurman  and  Lane.  I'll  look  at  them,  and  I  may  and  may

22  not  permit  you  to  see  them.  They  do,  I  am  advised  by

23  the  marshal's  service,  have  considerable  amount  of

24  information  that's  not  public.

25         If  I  look  at  it  and  determine  that  something  on

1 there would be of possible assistance to the defense, I
2 will evaluate it for redaction, and if I can give you
3 -- if I can give you something in redacted form, I will
4 give it to you in redacted form. I can't tell you
5 right now without looking at this form whether I will
6 be sympathetic or not, but I can certainly ask the
7 marshal's service to provide me the form so I can look
8 at it in camera review.

9        MR. MARTIN:  Very good, sir. I would ask you to
10 look at more than the 129.

11       THE COURT:  Your motion asks for the 129. What
12 else do you want?

13       MR. MARTIN:  There are forms attached to the
14 129.

15       THE COURT:  If they're attached to it, they're
16 part of it.

17       MR. MARTIN:  Let me take that back because I
18 haven't seen the file. I understand the Form 129 is
19 one of several papers that refer to the movement and
20 housing of these individuals and -- what was her name
21 again, Your Honor?

22       MS. JOHNSTON:  Ms. Quick.

23       MR. MARTIN:  I understand from Ms. Quick that
24 she had actually copied some of the information for me
25 and then on second thought had decided, hey, you know

1 what.

2          THE COURT:   Now that she's copied it, she can

3 provide it to me for in camera review.

4          MR. MARTIN:   What I'm asking the Court is not

5 just to look at the Form 129, but also any papers that

6 may be with it.

7          THE COURT:   I will be glad to ask Ms. Quick if

8 there are any other forms or documents that evidence

9 the location of a prisoner.

10          MR. MARTIN:   I can't ask for more than that,

11 Your Honor.

12          THE COURT:   We've got to get this --

13          MR. MARTIN:   You're not granting the motion,

14 you're going to review it.

15          THE COURT:   I'm not granting the motion.  I'm

16 going to ask that it be provided to me, period, and I

17 will rule on it, but I will clearly look at it with

18 enough intelligence and further discussion with counsel

19 so that if Larry Lane gets called, it will be resolved

20 before Larry Lane testifies.

21          MR. MARTIN:   Thank you, Your Honor.

22          MS. JOHNSTON:   Your Honor -- do you having in

23 else on this matter?

24          MR. MONTEMARANO :   Yes.

25          MS. JOHNSTON:   Okay.

1          MR. MONTEMARANO :  Just so the Court is clear ,
2 because I unfortunate ly did not provide  enough
3 information  to Mr. Martin based  on my experience , what
4 I got from Mr. Stoler was a piece  of paper , a printout
5 from their computer .  At the top , it had the name  and
6 the marshals 's number  and the date the person came  into
7 federal  custody  and essentially we have a release date,
8 if the person  had be en release d.

9          In my case , my person  was still  in custody  and
10 it gave a listing , line by line , and in the left-hand
11 column , it was where he was on a certain date , and on
12 that date where he went to, from here  to there , and the
13 next line was from there to somewhere  else .

14        THE COURT:  I will  confer  with Ms. Quick and I
15 will make  sure I have in front of me what appear s to be
16 what you're interested in.    I'll see whether it's
17 appropriate to release it at all, or in redacted form.

18          MR. MONTEMARANO :  Beyond  the DOB and marshal 's
19 number , I don't recall  anything  even questionably
20 private .

21        THE COURT:  We're speaking  in the dark about
22 something .  I haven't seen the document , so I can't do
23 it without  that , but with respect  to the Motion for
24 Disclosure  of Movement , it is deni ed as to Horace  Smith
25 because  he's not  in custody  and there  isn't any such

1  form, and it's denied as to Emilio Echarte because he's

2  finished testifying, and has never testified about

3  where he was or whether he talked to anybody.

4         MS. JOHNSTON:   Your Honor, in regards to that

5  matter, the government would like an opportunity to

6  review those documents that the Court gets and speak to

7  the court ex parte concerning Mr. Thurman.

8         THE COURT:   Well, speak to Ms. Quick.  Make sure

9  you tell Ms. Quick -- you need to confer with Ms.

10 Quick, and that's fine with me.

11        MS. JOHNSTON:   You don't have any problem -- the

12 Court doesn't --

13        THE COURT:   I have no problem with you

14 conferring with Ms. Quick.  She's part of the

15 Department of Justice and you can talk to her.  I need

16 to understand what the form is and what it has in it

17 and I will look at it.

18        MR. MARTIN:   Your Honor I would object to any ex

19 parte communication regarding Michael Thurman or any

20 other witness in this matter.  I think the Court can

21 confer with Ms. Quick.  I don't see why the government

22 has to tell Ms. Quick what to tell the Court.  We would

23 object to that.

24        THE COURT:   Ms. Quick, you know, is entitled to

25 have some legal assistance in dealing with this matter.

1  That's what the US Attorney's Office is for.

2       MR. MARTIN:  I don't think it should be

3  government trial counsel in this particular case.

4       THE COURT:  I'm going to look at them first,

5  okay, and then we'll see what happens.  So I'm going to

6  ask Ms. Quick to provide them to me and I'll look at

7  them.

8       MS. JOHNSTON:  Your Honor, on the other matter,

9  I have the local rule in front of me.

10      THE COURT:  I have the local rule in front of

11  me, and I don't agree -- I'll steal your thunder.

12      MS. JOHNSTON:  Thank you, your Honor.

13      THE COURT:  I have the local rule right here,

14  thanks to the computer.  And what it says is unless

15  otherwise ordered by the Court, during all breaks and

16  recesses, counsel may speak with the witness while

17  conducting direct examination on the witness, but with

18  the exception below may not discuss testimony with the

19  witness, including while the witness is on cross    ,

20  redirect or recross.    That's not what happened.

21      Your objection is noted, and the first question

22  out of the box is going to be, why did you kick me?  I

23  didn't see any violation of the rule.  I don't see any

24  corruption of this witness by what took place.

25      Mr. Sussman.

1          MR. SUSSMAN:   Along that line.   I respectfully

2   -- going back to the detective.

3          THE COURT:   Mr. Sussman, can I interrupt you for

4   just one second?

5          Bea, have you got them all here?

6          THE CLERK:   I'm going to find out.

7          MR. SUSSMAN:   I stood before, and I wasn't

8   recognized on this issue.   I disagree with Your Honor

9   about the testimony in this case, and that's a big

10  issue in this case.

11         THE COURT:   About what testimony?

12         MR. SUSSMAN:   About whether an eight ball, which

13  is, as I understand it, not in the Encyclopedia

14  Britannica or Webster's dictionary is one and a half,

15  or three grams, or 3.4 grams.   The officer made the

16  statement, Ms. Johnston obviously didn't like it, which

17  is not unexpected.   She tried to clean it up.   He was

18  insistent.

19         On his 22 years, I think it's an asked and

20  answered question, apart from the issue of -- I think

21  that the rule is designed to avoid those kinds of

22  situations.   I would ask if the Court -- reading the

23  local rule, that the Court tell all witnesses now not

24  to discuss their testimony with anyone, and I think

25  we've been a little lax.   The jurors are not advised --

1          THE COURT:   First of all --

2          MR. SUSSMAN:   --  along those lines either.

3          THE COURT:   I don't find a violation of the

4  local rule.   I don't find a violation of the

5  sequestration rule, and this is a witness simply saying

6  whoops, I made a mistake, and it's going to be

7  corrected.   You can have a field day with it on

8  cross-examination  that he didn't know what it was and

9  he made a mistake, but he's entitled to correct his

10  testimony while he's on his direct examination.   This

11  would not be the first time I've seen a witness on

12  direct come back in the afternoon and say I made a

13  mistake what I said in the morning, and I want to

14  correct it now.

15          MR. SUSSMAN:   If the Court's ruled, fine.   But I

16  would ask that all witnesses be told that they are not

17  to discuss their testimony with anyone.   That is the

18  ground rules I've already played on under during

19  trials.

20          THE COURT:   I invoked the rules on witnesses and

21  witnesses are not to discuss their testimony with each

22  other.   The local rule governs what you can do with a

23  witness who's on the stand.

24          MR. SUSSMAN:   Well --

25          THE COURT:   I've made my ruling, and that's all

1  I can do for you.

2        MR. SUSSMAN:  Then I just want to clarify what

3  can the witness discuss when he's off the stand?

4        THE COURT:  The local rule governs what the

5  answer to that question is.

6        MR. SUSSMAN:  When the witness is on direct

7  testimony, he can discuss his testimony?

8        THE COURT:  During a break and recess, Counsel

9  may speak to the witness while conducting direct of the

10 witness.  All right?

11       MR. SUSSMAN:  Certainly that changes when direct

12 is finished.

13       THE COURT:  When direct is finished, absolutely.

14       MR. SUSSMAN:  Then I ask that all witnesses be

15 admonished not to discuss their testimony at the point

16 the direct is over.

17       THE COURT:  I will consider your request.

18       Bea, are they all here?

19       THE CLERK:  Yes, they're here.

20       THE COURT:  All right, let's go.

21       MS. JOHNSTON:  Your Honor, with the Court's

22 permission, we will start our testimony down here with

23 the evidence.

24       THE COURT:  That's where you were when we

25 adjourned.  That's fine.

1               (Witness Shea resumes the stand.)

2        MS. JOHNSTON:   I think I'll have him on the

3 stand when we first start.

4        THE COURT:   All right.

5               (Jury returns at 10:02 a.m.)

6        THE COURT:   You may proceed.

7        MS. JOHNSTON:   Thank you, Your Honor.

8               **CONTINUING DIRECT EXAMINATION**

9        BY MS. JOHNSTON:

10 Q.     Good morning, Detective Shea.

11 A.     Good morning.

12 Q.     We ended your testimony yesterday, and as the

13 jury was walking out, what comment did you make to me?

14 A.     I told you to kick me.

15 Q.     Could you explain to the jury why you told me to

16 kick you?

17 A.     Yes.  I made a mistake yesterday when you asked

18 the question about an eight ball, the origin, or why

19 it's called an eight ball.  It's actually an eighth of

20 an ounce, which is 3.5 grams, and I believe I told you

21 it was 1.5.

22 Q.     Is that based on your 22 years of experience?

23 A.     Yes, ma'am.

24 Q.     If I could can ask you to please step down, keep

25 your voice up.  I don't know if we have a handheld

1  microphone for you, but if you keep your voice up, and

2  we will go back to where we were when we left off.  I

3  think when we left off yesterday, we were talking about

4  the plaid bag that is depicted in P-203.

5  A.      Yes, ma'am.

6  Q.      Now, in addition to that plaid bag with the

7  contents of the baggies that we went over yesterday,

8  was there also another bag inside the box?

9  A.      Yes, ma'am.  There was a Hallmark bag, and in

10 two, you can see the picture in 202, you can see the

11 top of the purple bag.

12 Q.      In P-202, then, we see the box and both of the

13 bags; is that correct?

14 A.      Yes, ma'am.

15 Q.      Now, let me show you what's been marked as

16 Government's Exhibit SD-15, South Dakota 15.  Do you

17 recognize that exhibit?

18 A.      Yes, ma'am.  This is the Hallmark bag which was

19 located inside of that Cook's champagne box.

20 Q.      Calling your attention, then, to Page 204.  What

21 are we looking at in Photo 204?

22 A.      These are the contents that were inside of this

23 Hallmark bag.

24 Q.      Can you describe what those contents were?

25 A.      Sure.  There was a scale -- individual scale.

1  There was some false bottom cans, Soft & Dry can, false

2  bottom can that had ten individual baggies that had a

3  weight of 8.4 grams, and then there was a Right Guard

4  false bottom that's right there, had four baggies with

5  7.6 grams, a spray starch.

6  Q.      Of what?

7  A.      Oh, cocaine. I'm sorry, cocaine. The spray

8  starch false bottom can was empty. A Noxema can was

9  also empty, and then there was a Cordon Blue container.

10 Q.      Before we move on to that, what is this here?

11 I'm referring to P-204.

12 A.      That's a black plastic bag that had three

13 individual Ziploc baggies in it. The first Ziploc

14 baggy had two smaller Ziplocs in it with the total

15 weight was 3.1 grams, and the second Ziploc baggy had

16 four smaller Ziploc bags in it that weighed 1.8 grams,

17 and then there was a third bag, a third Ziploc bag that

18 had eight smaller Ziploc bags, 29.4 grams of cocaine.

19 All of that was cocaine.

20 Q.      Then you mentioned another container was also in

21 that Hallmark bag.

22 A.      Yes. It was a cordon -- a cordon container that

23 had three large Ziploc baggies, and in each of those

24 baggies, the first bag had three smaller Ziploc

25 baggies.

1  Q.      Calling your attention to P-206, is that the

2  container you're referring to?

3  A.      Yes, ma'am.  And there's three individual Ziploc

4  baggies in there, and each bag had an amount -- a

5  smaller Ziploc bag in it.

6  Q.      Then P-207, what do we see there?

7  A.      That's a top view looking down into the top of

8  that particular container.

9  Q.      And all of those items disregarding, what's

10 shown in P-205, was recovered inside of the Hallmark

11 bag; is that correct?

12 A.      Yes, ma'am.

13         JUROR:  Excuse me.  Could you drop the bag for a

14 second so we can see those photos?

15         MS. JOHNSTON:   I'm sorry.

16         BY MS. JOHNSTON:

17 Q.      Do the pictures, beginning with P-204,

18 accurately depict the drugs as they were located in the

19 Soft & Dry can, and the drugs that came from the Right

20 Guard can, and the drugs that were in the black bag?

21 A.      Yes, ma'am.

22 Q.      Then do pictures P-206 and P-207 show the drugs

23 as they were when you recovered them?

24 A.      Yes, ma'am.

25 Q.      Now let me show you some exhibits.

1        Beginning, first of all, with Government's

2 Exhibit South Dakota 6.  What is that?

3 A.     That's the scale that is shown in this picture,

4 204, right here.

5 Q.     Is that similar to the scales that were

6 recovered at other places in the school?

7 A.     Yes.

8 Q.     What kind of scale is it?

9 A.     This is a titanium -- titanium digital scale.  A

10 mini-slim.

11 Q.     Let me show you Exhibit South Dakota 8, if you

12 can describe what that item is?

13 A.     It's -- on the appearance, it just looks like a

14 can of shaving cream, but it actually has a false

15 bottom and you unscrew the bottom and -- (witness

16 indicating).

17 Q.     That one, when you recovered it, was there

18 anything inside?

19 A.     The Noxema can was empty.  This one was empty.

20 Q.     And SD -- South Dakota 7, I believe that is.

21 A.     This is spray starch can.  The same as the

22 Noxema can.  It's false bottom.

23        MS. JOHNSTON:  Your Honor, with the Court's

24 permission, may we publish those items?

25        THE COURT:  Yes, you may.

1        MS. JOHNSTON:   If we could maybe start one in

2   the first row, one in the back row, that might help

3   move them about a little bit.

4        BY MS. JOHNSTON:

5   Q.      Now, you mentioned the drugs that were recovered

6   there.  I want to show you Government's Exhibit South

7   Dakota 13, and also show you Drugs 17.  In reference to

8   Drugs 17, does that contain all of the drugs that were

9   recovered from the various items found in the Hallmark

10  bag?

11  A.      Yes.  These are all of the drugs that are in one

12  bag that came out of each of these containers, and

13  inside you will notice that I have my locater slip that

14  describes what and where everything came from.

15  Q.      Are the individual packets marked with a No. 9

16  followed by a letter?

17  A.      Yes.

18  Q.      In reference to, for example, south Dakota 13.

19  Is the No. 9 reflected on there with a letter for the

20  corresponding drugs in Drugs 17?

21  A.      Yes.  At the top here, it says Item 9E, so you

22  would look at this packet, and each one has a letter,

23  like this has 9C.  You have to shake these around to

24  look for -- 9E, and whatever has a 9E came from this

25  can.  Nine C would with one of these others.

1 Q.      Again, the Right Guard can.  Did that open

2 similar to the false bottom cans we're passing to the

3 jury?

4 A.      Yes.  If you move it around in the container,

5 you can see it is similar to those cans.

6 Q.      Again, what was recovered, according to your

7 notes, in the Right Guard can, Government's Exhibit 13

8 -- SD-13?

9 A.      The Right Guard can had four baggies that had a

10 total weight of 7.6 grams.

11 Q.      Of cocaine?

12 A.      Yes, ma'am.  I'm sorry, cocaine.

13 Q.      Then showing you the Soft & Dry can.  Again,

14 what drug exhibit does that correspond with in

15 Government's Exhibit 17?

16 A.      The Soft & Dry can is labeled 9D, D as in David.

17 Q.      What was found inside there, if we look at Drugs

18 17?

19 A.      The Soft & Dry can had ten baggies -- ten small

20 baggies in here with a total weight of 8.4 grams.

21 Q.      And are those drugs part of what's in this bag?

22 A.      Yes.  Nine D is right here.  Right below the

23 red, it will say 9D.

24 Q.      Next let me show you South Dakota 11.  If you

25 could tell us what that is.

1  A.      It's the Cordon container -- I'm probably not
2  pronouncing that.   It's Cordon Blue container.   And
3  inside that container was three large Ziploc baggies,
4  and each of the three baggies had smaller baggies
5  inside.
6  Q.      Let me show you what's Government  Exhibit  South
7  Dakota 11A.
8  A.      That let me set this down for a minute.   You see
9  the larger Ziploc baggies are up here, and you can see
10 the smaller Ziploc baggies.
11 Q.      Again, why would the drugs be packaged in the
12 smaller Ziploc baggies and then put in a larger bag?
13 A.      Matter of organization  to know how much you have
14 and how much it's worth, and each individual  baggy has
15 a certain price.   You could -- a person could sell this
16 as a whole to know if you had certain -- let's just,
17 for the purpose of just explaining this to you, if I
18 knew I had 10.1 gram rocks in each, or one in each of
19 those bags, and I had ten of them, I would know those
20 are commonly $20 rocks on the street.   Because 10.1
21 grams is worth $20 on the street, so if I had that on
22 here, I would know that I would have $200 here.   By the
23 time I'm done selling this larger bag, I should have
24 $200, so I'd sell each one of those for $20.
25 Q.      Alternatively,  could you sell them as a group at

1 wholesale price?

2 A.     You could sell them at wholesale if you came up

3 with a customer.  When you purchase this, it all

4 depends on who you are and who you know and how well

5 you're dealing with the person.  If a person is not

6 known to the dealer, generally doesn't --

7          MR. WARD:   Your Honor, we object, to testimony

8 --

9          MS. JOHNSTON:   I'll -- I will continue, Your

10 Honor.  I'll go to another question.

11          THE COURT:  Pardon me?

12          MS. JOHNSTON:   I'll go on to something else.

13          MR. MCKNETT:   Could we have the testimony

14 stricken?

15          MR. WARD:   On the basis of expertise, Your

16 Honor.  There's been no qualification.

17          THE COURT:   I'll strike the response, and let's

18 move on to another subject.  Disregard the response,

19 ladies and gentlemen of the jury  .

20          BY MS. JOHNSTON:

21 Q.     Have you seen small bags like that before?

22 A.     Yes, ma'am, I have.

23 Q.     Court's indulgence.

24          Now, looking at the bags in Government's Exhibit

25 17, which contains the drugs from all of the exhibits

1  out of the Hallmark bag, there are different size bags

2  in here?

3  A.      Yes.

4  Q.      Those would have been put -- strike that.

5          So there are a variety of sizes of bags in here?

6  A.      Yes, ma'am.

7  Q.      These bags today that are soft today, are they

8  similar -- showing you South Dakota 1, how do those

9  little tiny bags compare to these little tiny bags that

10 are in the bigger bag marked with an apple?

11 A.      They're very close and similar in size.  The

12 only difference is these are brand new, and these

13 appear to be used or have been used.

14 Q.      When you recovered these bags with the drugs in

15 them, were they black like this?

16 A.      No.

17 Q.      Based on your experience, what is the black

18 powder?

19 A.      Fingerprint powder.  Someone tried to lift

20 fingerprints off this.

21 Q.      And those bags were found, then, in this bottle,

22 it looks like a champagne bottle?

23 A.      Champagne bottle container.

24 Q.      Now, did that container have a false bottom or

25 was that just a regular champagne bottle?

1  A.       It's just a regular  -- the top pops off.

2  Q.       Again, are there corresponding numbers on the

3  exhibit to indicate which part of Drugs 17 came out of

4  that can?

5  A.       Yes.

6  Q.       And what are the numbers?

7  A.       This one has 9A, B and C, so each of the three

8  bags that were inside of here got their own number; 9A,

9  9B and 9C.

10  Q.       And then finally, I think in P-204, you

11  referenced the black bag that had drugs --

12  A.       Yes.

13  Q.       Let me show you South Dakota 14.  What is that?

14  A.       This is the black bag that is shown in this

15  picture, 204, right here, and it had -- inside of it,

16  it had three Ziploc baggies, larger Ziploc baggies, and

17  the first one had 3.1 grams, and it had two additional

18  smaller Ziploc baggies inside of it.  So, the same as

19  those larger Ziploc baggies and containing smaller ones

20  with cocaine in them.

21  Q.       And again, is there a 9F and G referenced to the

22  contents of Government's Exhibit Drugs 17?

23  A.       Yes.  Nine F and G in the corner.

24         MS. JOHNSTON:   Your Honor, with the Court's

25  permission, may I publish these exhibits to the jury?

1          THE COURT:   You may.

2          MS. JOHNSTON:   While we're doing that, if I

3  could read to the jury the portion of the stipulation

4  that all the parties have agreed to, that these drugs

5  that were obtained from the Hallmark bag; Government's

6  Exhibit Drugs 17, 9A through 9C from the champagne tin,

7  total 40.64 grams of cocaine; 9D from the Soft & Dry

8  can, 3.62 grams of cocaine base; 9E, 7.01 grams of

9  cocaine came from the Right Guard can; 9F was 25.46

10  grams of cocaine base; and 9G was 0.83 grams of cocaine

11  from the plastic bags recovered from Paula's School of

12  Performing Arts.

13          BY MS. JOHNSTON:

14  Q.     I believe I did it earlier today, but so the

15  record is clear, I think the first one I asked you

16  about was P-203.  Again, does that show the plaid bag

17  we discussed yesterday?

18  A.     Yes, ma'am.

19  Q.     Now, if I could move on to ask you to look at

20  the picture on the screen there, P-210.  Do you

21  recognize that?

22  A.     Yes.  That's a scale.

23  Q.     Where is that scale?

24  A.     That scale is -- once you walk from the

25  reception area past the office into the hall, it's

1  sitting in that little chair right there in front of

2  you.  The mirrors -- if you remember, the mirrors that

3  are on the wall, they were, like, right at the base of

4  that mirror.  That's, like, the chair rail, and above

5  that is the mirror.

6  Q.      And do one of the other pictures that we used

7  yesterday depict where that chair is located?

8  A.      It was in the back of the hall.  If you're

9  saying the back, that would be towards the office.  Q.

10 Let me show you P-186, if I can put that up on the

11 screen and see if that's the photograph you were

12 looking for?

13 A.      Yes.  That's -- do you see, there's the chair

14 right there, the green chairs, and there's the mirror,

15 and there's the office.

16 Q.      Why did you seize the -- does P-10 accurately

17 depict the scale as you observed it on that date?

18 A.      Yes.

19 Q.      Showing you what's been marked as Government's

20 Exhibit South Dakota 4.  Can you tell us what that is?

21 A.      It's a scale.  It pretty much balances out --

22 you put a weight that you're trying to achieve on one

23 side -- either side, and then you would just stack

24 whatever your drugs or whatever on this side to get --

25 and once it becomes even, the longer line in the middle

1  actually lets you know that you have the same weights.

2  Q.      Why would you seize that?

3  A.      It's used in the trade of weighing out the

4  product to make sure you have the same amount.

5  Q.      Let me show you Government's Exhibit P-205.

6  That's going to come up on the screen.  Do you

7  recognize that photograph?

8  A.      Yes.

9  Q.      What is that?

10  A.      That's a brown box that was located under a

11  table.  It is the back, left corner of the dance hall,

12  there's a brown box.  And inside of the brown box was

13  this black bag here which contains -- I listed it as a

14  black overnight bag, and it contained Aqua Net false

15  bottom can with 23 Ziploc baggies with crack, total

16  weight of 76.9 grams, three of the scales were digital

17  scales, US currency bonds, $2,000 bands that you would

18  wrap the money in, commonly what a bank would use, Bank

19  of America envelopes, 45 bags of heroin, total weight

20  of 25.3 grams, a bag with several Ziploc baggies.

21  Q.      Now, going back to the Aqua Net can.  How many

22  bags did you recover in there?

23  A.      It was 23 Ziploc bags with crack.

24  Q.      What was the weight of the crack?

25  A.      76.9 grams.

1  Q.       I hesitate  to ask you to do the  math , but  did

2  the -- can you give us an approximate   how  much  was  in

3  each  one  of  those  bags?

4  A.       In  the  bags --

5           MS.  GREENBERG:     Detective   Shea , do you want  a

6  note  pad ?

7           THE  WITNESS:    Please , and  a pen .

8           BY MS.  JOHNSTON:

9  Q.       Twenty-three   bags  and  76 grams ;  is  that  correct ?

10 A.       Yes, ma'am .

11          MS.  JOHNSTON:    Your  Honor , for  the  record , he's

12 -- the  witness  is going  to  use  his  blackberry   that  I

13 think  has  a calculat or  on  it .

14          THE  WITNESS:    3.3 grams .

15          COURT  REPORTER:    What  was  it  again ?

16          THE  WITNESS:    3.3 .

17          BY  MS.  JOHNSTON:

18 Q.       For  each  bag ?

19 A.       Yes .

20 Q.       First  of  all , what  are we  look ing  at  on  the

21 board  in  P-205 ?

22 A.       That 's  the  Aqua  Net  can .

23 Q.       Just  so  the  record  is  clear , it  look s  like  we

24 have  two  government   exhibit s  mark ed  as  P-205 .  For  the

25 record , we  will  make  the  one  on  the  board  P-205 A

1 because it came from the black bag, and P-205.

2 A.      That's the Aqua Net can that came out of this

3 bag.

4 Q.      Does that accurately reflect how the bags looked

5 when you emptied the Aqua Net can?

6 A.      Yes.

7 Q.      Let me show you what's been marked as

8 Government's Exhibit Drugs 12. Do you see those two

9 items?

10 A.      Yes. This is the Aqua Net false bottom and

11 these are 23 bags that were located inside.

12 Q.      The bags that they were originally in, are they

13 part of the Aqua Net container?

14 A.      Yes. They're in this Aqua Net container.

15 Q.      Found in the bag seen in P-205A?

16 A.      Yes.

17 Q.      It looks as though there is some of that black

18 powder on the container and the bags that were

19 separated?

20 A.      Yes.

21 Q.      But each one of those -- each one of the 23 bags

22 contained roughly 3.3 grams; is that correct?

23 A.      On the street, eight ball. Eighth of an ounce.

24 Q.      Would have fit in these bags; is that correct?

25 A.      It would have fit in these bags, yes. The bags

1  are different sizes.  You can see that some of them

2  would have to be crammed in there pretty tight for it

3  to fit in the smaller ones, but you shove that in

4  there.

5        MS. JOHNSTON:   If you can put, with the Court's

6  permission, publish Government's Exhibit Drugs 12 to

7  the jury, please.

8        THE COURT:   You may.

9        MS. JOHNSTON:   Thank you, Your Honor.

10       BY MS. JOHNSTON:

11  Q.     While we're publishing Drugs 12 to the jury,

12  again, the parties have stipulated that these materials

13  were analyzed by the chemist and determined to be as

14  follows:  Government's Exhibit Drugs 12, an Aqua Net

15  can contained 64.5 grams of cocaine base commonly known

16  as crack.

17        Detective, when you weighed them, did you take

18  them out of the little baggies or did you weigh them in

19  their entirety with the plastic wrapping?

20  A.     With the plastic wrapping, that's why I say

21  total weight.  When I say total weight, I mean that

22  includes the packaging.

23  Q.     And the stipulation is based upon -- in looking

24  at Stipulation 4, is that based upon the weight done by

25  the forensic chemist once they've removed it?

1 A.      Right.  Once the chemist removes it, they take

2 it out of the bags.

3        MR. MARTIN:   Objection.

4        THE COURT:   What was this?

5        MR. MARTIN:   Objection as to what the chemist

6 did.

7        THE COURT:   All right.  Sustained.

8        BY MS. JOHNSTON:

9 Q.      Now, calling your attention to the next exhibit,

10 South Dakota 9.  Can you tell us what those items are?

11 A.      These are three digital scales slim, compact,

12 easy to carry around.  More modern than the even-weight

13 scale.  They were also located in this bag.

14 Q.      Where they the same as the previous scale that

15 you've shown to the jury?

16 A.      Yes.

17        MS. JOHNSTON:   If you could publish those to the

18 jury as well, with the Court's permission.

19        THE COURT:   You may.

20        MS. JOHNSTON:   Thank you.

21        BY MS. JOHNSTON:

22 Q.      In reference to the scales, the parties -- all

23 of the defendants and the government have stipulated

24 that the three digital scales were analyzed by a

25 forensic chemist and determined to contain a detectable

1  amount  of  cocaine .

2          Now  going  back  to  our  black  bag .   Look ing  at

3  what's  been  mark ed  as  Drug s  13 .   Do  you  recognize   that

4  item ?

5  A.      Yes .

6  Q.      What  is  that ?

7  A.      That 's  the  Bank  of  America  envelope , the  money

8  envelope  that  contain ed  45  bag s  of  heroin .   The  small er

9  bag s  here  together   in  the  same  evidence  bag  with

10  envelope  are  the  bag s  direct ly  inside  it  and  the

11  content s  in  that  little  bag  has  been  taken  out  and  put

12  into  a  larger  bag .

13  Q.      Now , the  --  how  many  Bank  of  America  envelope s

14  are  in  there ?

15  A.      Just  one  Bank  of  America  envelope .

16  Q.      How  many  of  those  little  baggi es  was  inside  the

17  Bank  of  America  envelope ?

18  A.      The  small  Ziploc s , there 's  45  small   Ziploc

19  baggi es  there .

20  Q.      Did  they  all  contain  heroin ?

21  A.      Yes .   It 's  the  brown ish  powder  here .

22  Q.      Approximately   how  much  did  you  weigh  that  out  to

23  be  when  you  seize d  it ?

24  A.      My  total  weight  was  25.3  grams .

25  Q.      Again , including   the  packaging ?

1  A.       Yes, ma'am .

2  Q.       And they all fit in the Bank of America

3  envelope ?

4  A.       Yes, ma'am .  These are certainly smaller

5  baggies.

6         MS. JOHNSTON:   If you could , with the Court's

7  permission , may we publish Drugs 13 to the jury ?

8         THE COURT:   Yes , you may .

9         MS. JOHNSTON:   Thank you .

10         MR. MONTEMARANO :  Ms. Johnston , what was that

11  last exhibit number ?

12         MS. JOHNSTON:   Drugs 13 .

13         MR. MONTEMARANO :  Thank you .

14         MS. JOHNSTON:   You're welcome .

15         And while we're publishing that to the jury , I

16  will read again from the stipulation agreed upon by all

17  defendant s and the government in reference to

18  Government Exhibit Drugs 13:   The parties have agreed

19  that it was analyzed and determined by a forensic

20  chemist to contain 18.88 grams of heroin .

21         BY MS. JOHNSTON:

22  Q.       Now, you mentioned some other items that are

23  part of South Dakota 3.  If you could describe them --

24  just pull them out and show the jury and tell the jury

25  what's in here .

1  A.      These are the money bands.  You get $2,000, you

2  take a band and wrap it around it, just similar to what

3  the bank would do.  Easy to count.  Make it easy to

4  organize so that you can count each of the bands and

5  you know what you've got.

6  Q.      What else is in all of these bags here?

7  A.      Ziploc baggies.  More Ziploc baggies of

8  different sizes that were located inside that bag.

9  There's a bank envelope with no markings, just a white

10 -- that also has smaller -- the smaller Ziploc baggies

11 inside of that, several Ziploc baggies.

12 Q.      Similar, again, to the size of the ones that you

13 described as having eight balls?

14 A.      Yes.  These were even smaller than that.

15 Q.      Some are smaller?

16 A.      Right.  These are.

17 Q.      What else do we have in here?

18 A.      In here, more of the same.  More Ziploc bags.

19 Unused Ziploc bags with an apple on them on the outer

20 Ziploc.  Different sizes.  All different sizes.

21 Ranging from small, medium to large.

22 Q.      And in this bag?

23 A.      Bigger Ziploc baggies.  This one has a card

24 inside of it and shopping bags, black shopping bags,

25 Q.      Similar to the one that you've recovered some of

1  the drugs in?

2  A.      Yes, more bags.

3  Q.      And this being another size of the baggies?

4  A.      Yes.

5  Q.      And this bag?

6  A.      More Ziploc baggies of all different shapes and

7  sizes.

8  A.      Quite a few Ziplocs.  And the bags a quarter of

9  the way full of Ziploc baggies.

10  Q.      The kind of drugs that were recovered in with

11  the Ziploc bags in this bag was what?

12  A.      Heroin.  Heroin and cocaine.

13  Q.      The Aqua Net can that we've previously shown the

14  jury; is that correct?

15  A.      Yes, that can there had the cocaine in it and

16  the envelope that you have had the heroin in it.

17  Q.      This would be powder cocaine or crack?

18  A.      That's crack cocaine.

19  Q.      You mentioned yesterday that there was an

20  individual whom you saw out front trying to come

21  inside.  Do you recall that testimony?

22  A.      Yes, ma'am.

23  Q.      Who was that individual?

24  A.      That was Milburn Walker.

25  Q.      He did not have a key for the premises; is that

1  correct ?

2  A.      No, ma'am .

3  Q.      Was any search conduct ed of him and or his

4  vehicle ?

5  A.      Yes, both .  Conduct ed a search of Mr. Walker and

6  found he had a gold -colored bracelet , a black nylon

7  bracelet , two sets of keys, a Mickey Mouse watch ,

8  mint s, sunglasses , wallet with various IDs, $286 , two

9  lace s a draw string for his pant s, a black hat , a cell

10  phone , a fanny pack with personal item s.  Search of the

11  fanny pack show ed a One Touch bottle with four Ziploc

12  package s contain ing white powder .

13  Q.      Let me show you first what's mark ed as P-283.

14  That will be up on the screen there .  Do you recognize

15  that photograph ?

16  A.      Yes .

17  Q.      What are we look ing at there ?

18  A.      There is the OneTouch bottle , which is use d with

19  diabetic s for their testing strip s, and there 's the

20  white powder substance that was inside of this package ,

21  or inside of that OneTouch bottle that were inside of a

22  fanny pack he had , and that 's his identification .

23  Q.      Are you able to see a portion of the fanny pack

24  on that picture , P-283?

25  A.      Yes , right here .  It's on this corner here .

1 Q.    Let me show you P-284.  Can you tell us what

2 we're looking at on P-284?

3 A.    That looks like the contents of -- that is the

4 contents of what the fanny pack had.

5 Q.    Let me show you Walker-1.  Do you recognize this

6 item?

7 A.    Yes.  This is a shaving bag that was located

8 inside of the trunk of this car.  It had a black bag

9 containing cocaine, marijuana and suspected heroin.

10 Q.    Government's Exhibit Walker-2, what is that?

11 A.    That's his fanny pack.  That's the fanny pack.

12 Q.    And then showing you what's been marked as Drugs

13 18.  Can you tell us what all those items are in Drugs

14 18?

15 A.    These are the OneTouch containers.  There was

16 one -- only one of these OneTouch containers was

17 located in the fanny pack.  The rest of these were

18 located in here, in his shaving kit that was inside of

19 the trunk of his car.  They there are Altoids mints,

20 boxes, paraphernalia, this was some rolling paper, and

21 the drugs that were inside.

22 Q.    Are those some of the items that are depicted in

23 the photograph as well as on the screen, which I

24 believe is P-284?

25 A.    Yes.  You can see the Altoids mint contents.

1  There's one there.  And there's the OneTouch cans that

2  are in here, and I'm not -- that Altoids can, the

3  smaller of the Altoids cans -- he had different size

4  Altoids cans, a larger one and smaller one -- two

5  OneTouch for your test strips.

6  Q.     And all of the items were removed from either

7  the shaving kit or the fanny pack and --

8  A.     Yes, ma'am.

9  Q.     -- and packaged together?

10  A.     Yes, ma'am.

11  Q.     Are those items in substantially the same

12  condition they were in when you recovered them but for

13  what they did at the lab?

14  A.     Yes.

15  Q.     In terms of Walker 1.  Looks like we have some

16  other personal items in there; is that fair to say?

17  A.     Yes.  You have cigarettes, some little items,

18  here another scale.  I mean, it has -- it's a little

19  pocket scale.  You would flip that out and hook the

20  little bowl --

21  Q.     If you could maybe step over closer to the jury

22  so they can see how it works.

23  A.     Hook the little bowl to it, and this little

24  slide here -- I've got to do a little repair here.  You

25  put what you want to weigh in this little bowl here,

1   and then you would slide this little weight ,

2   counter weight to the other end until it just -- it

3   would -- it would keep doing until this little arm came

4   up to being level, such as I have it here .

5          You could see how it's kind of , like , floating.

6   That means that it's -- there's -- it's whatever this

7   weight is , which is zero , you see the little indicator

8   there on that edge there . It will tell you what the

9   weight is for , whatever you have in this , for lack of a

10  better word , the bowl here . And if it's down like

11  this , it means it's too heavy , that what you have in

12  there , you have to slide that scale forward or this

13  little counter weight until you get it to where it's

14  just floating like that .

15         And that would mean that , of course , there's

16  nothing in there , so it's saying there was nothing in

17  there , but if we had a weight in there , you would slide

18  that until it became -- so if it was up like that , it

19  meant that you had to slide the scale . But that's just

20  a little pocket scale to measure out , and then it folds

21  into itself , and you put it in your pocket .

22  Q.     If we could have a sticker , we'll mark the scale

23  as Walker -1A and it in the plastic bag .

24  A.     That's just a container to keep things in .

25  Inside of this , I think at one time this was probably a

1  mint container for breath mints.   More Ziploc baggies.

2  Q.      For convenience sake, we'll put both the scale

3  and the little container containing baggies, small

4  baggies, into the exhibit marked as Walker-1A.

5  A.      This is a bottle with some white residue.

6  Without a field test kit, I wouldn't know what that is.

7          MR. WARD:   Objection based as to the   previous

8  objection, Your Honor.

9          BY MS. JOHNSTON:

10 Q.      So the materials of significance, including the

11 scale and the baggies as well as some of the items,

12 were marked as Government's Exhibit Drugs 18.   You've

13 also gone into the leather pouch there.

14 A.      Yeah, and there's a cutting board with some

15 white residue.

16 Q.      Then the Walker-2, other than the items that

17 were removed for testing, are there other personal

18 items in there?

19 A.      A bottle of cologne.   Just a bottle of cologne,

20 some hand lotion, some breath strips.

21 Q.      Not plastic baggies?

22 A.      Not plastic bags.   Some hand lotion.   Here is a

23 piece of paper here with a website on it.

24         MR. SUSSMAN:   Ms. Johnston, could you --

25         BY MS. JOHNSTON:

1   Q.      Could you please speak up?

2   A.      This is a piece of paper with a website, an

3   Internet site on it and a phone number.  And a couple

4   of toothpicks.

5   Q.      And the items that you determined were of

6   evidentiary value were submitted to the lab?

7   A.      Yes.

8   Q.      With the exception of Walker-1A?

9   A.      With the exception of those, yes.

10          MS. JOHNSTON:  Your Honor, if I could publish

11  Drugs 18 and Walker-1A to the jury at this time.

12          THE COURT:  You may.

13          MS. JOHNSTON:   Thank you.

14          Your Honor, again, while we're publishing Drugs

15  18 to the jury, I would like to read again from the

16  stipulation all of the parties have agreed and

17  stipulated that the contents of Drugs 18, the bag

18  that's being passed to the jury now, contained a

19  substance containing a detectable amount of marijuana,

20  cocaine and cocaine base, commonly known as crack.

21  Specifically, 6.95 grams of marijuana, 2.67 grams of

22  cocaine hydrochloride, 0.3 grams of cocaine, and .85

23  grams of cocaine base, commonly known as crack, and

24  that those items were recovered from Milburn Walker on

25  or about June 1st of 2004.

1          BY MS. JOHNSTON:

2  Q.      Detective, I believe I'm finished with my

3  questions for you.

4          Court's indulgence one moment.

5          You mentioned seeing the mirror in the dance

6  studio.  Did you observe any other items that were

7  consistent with an ongoing dance studio operation?

8  A.      No.

9  Q.      You mentioned the other day --

10          MR. MONTEMARANO:  Objection, Your Honor, move to

11  strike.  Basis for knowledge.

12          THE COURT:  Overruled.

13          BY MS. JOHNSTON:

14  Q.      Yesterday, you also mentioned some boxes of

15  crackers.  If I can put this board up very briefly.

16  Calling your attention to P-195.  Were you able to tell

17  what kind of crackers they were?

18  A.      I don't remember  the brand name, but they were

19  the little round soup crackers.  The reason I know is

20  because all of the ones that were by the piano.  I

21  searched -- I actually went through those crackers.

22  They were the small, like, oyster-type crackers.

23  Q.      Are you able to see them --

24  A.      I can't make it out at all off of this picture,

25  but I remember.  I want to say that -- I'm not 100

1  percent  certain , but I want to say they were , like ,

2  member 's mark from Sam's Club .

3  Q.     If you could resume the witness stand , please .

4        MS . JOHNSTON:   I have no further question s for

5  this witness at this time .

6        THE COURT:  Cross-examination ?

7        MR . MONTEMARANO :   Thank you , Your Honor .

8                   **CROSS-EXAMINATION**

9        BY MR . MONTEMARANO :

10 Q.    Good morn ing , Detective Shea .  How are you ?

11 A.    Good morn ing , sir .  I'm fine .

12 Q.    Seventeen  year s in narcotic s; correct ?

13 A.    Yes .

14 Q.    Twenty-two  year s as a police officer ?

15 A.    Yes .

16 Q.    And you spent six months or so at the academy ?

17 A.    Yes .

18 Q.    Where you acquired  train ing experience  in

19 basic s, but to be very honest , most of what you know is

20 experience  while on the street ; is that a fair

21 statement ?

22 A.    A lot of it , yes .

23 Q.    I'd like to get clear on a couple of thing s Ms.

24 Johnston asked you about .  You're the seizi ng officer ;

25 aren't you ?

1 A.      At this location .

2 Q.      We're going to be talking about the search of

3 5559 South Dakota Avenue on the 1st of   June, 2004,

4 commenci ng at approximately 6:45 a.m.    That's what you

5 testified to; correct?

6 A.      That's correct.    Yes, sir.

7 Q.      No other date and time ?  You hadn't been there

8 before you haven't been there since ; correct ?

9 A.      I had driven past it before for surveillance

10 purpose s, but never inside .

11 Q.      In fact , the reason you were inside is because

12 you were hand ed a key by Detective Eveler ; correct ?

13 A.      Yes .

14 Q.      Had you not receive d the key, you were going to

15 break the door down ; right ?

16 A.      That 's with a search warrant , yes .

17 Q.      No , you were going to break the door down and

18 you were allow ed do that because you had a search

19 warrant ; correct ?

20 A.      Yes .

21 Q.      You were there to search the premise ; correct ?

22 A.      That 's correct .

23 Q.      The photo s you took accurate ly depict what you

24 saw there on that day ; correct ?

25 A.      Yes .

1  Q.      Would it be fair to say that when you came

2  through the door, what the place looked like would be

3  more or less Photograph P-194?  For the record, I'm

4  going to show it to you, then show it to the folks on

5  the jury, and that's this big overall picture here?

6  A.      That's the dance hall, yes.  That's a picture of

7  the dance hall.

8  Q.      And P-195.

9  A.      That's midway through the dance hall, so you

10 could get to the back.

11 Q.      And P-196?

12 A.      That would be this left, back corner, yes.

13 Q.      Okay.  So, showing you that P-194, -5, and - 6

14 photos, are these three here across the top.  And those

15 are what we would call, for lack of a better term, an

16 overview of what you saw?  Wide angle; correct?

17 A.      Yes.

18 Q.      And then the other photographs were

19 progressively and successively closer-up shots;

20 correct?

21 A.      It was evidence located, yes.

22 Q.      There are also some closer shots of the

23 bookshelves.

24 A.      There was evidence on the bookshelves.

25 Q.      There would be specific -- I always have trouble

1  with that word -- specific shots of specific items of

2  evidence; correct?

3  A.      Yes.

4  Q.      Those would be the ones located by the searching

5  officers; correct?

6  A.      They would be located, yes.

7  Q.      Those items would be located by the searching

8  officers, then they would put that famous little three

9  by five card with the number next to it; correct?

10 A.      They would fill out the slip of paper.

11 Q.      You use little slips of paper?

12 A.      We use slips of paper, yes.

13 Q.      I guess it's Montgomery County officers that use

14 three by five cards.  That was yesterday, I'm sorry.

15 That's based on your training and experience, you're

16 told this is how we're going to do it; correct?

17 A.      Yes.

18 Q.      Because you're directing the search because

19 you're ultimately responsible; correct?

20 A.      Yes.

21 Q.      That's why you're here testifying; correct?

22 A.      Team leader, yes, sir.

23 Q.      Team leader, that was your words.  Now, based

24 upon the search warrant, you were therefore able to go

25 into containers located at 5559 South Dakota; correct?

1   A.      Yes.

2   Q.      You were able to look inside of boxes?

3   A.      Yes.

4   Q.      You were able to look behind things?

5   A.      Yes.

6   Q.      Under things?

7   A.      Yes.

8   Q.      On top of things?

9   A.      Yes.

10  Q.      And you've testified to many of the things that

11  you seized; correct?

12  A.      Yes, sir.

13  Q.      Many of the things that you saw; correct?

14  A.      Yes, sir.

15  Q.      Now, correct me if I'm wrong.  You saw a number

16  of scales, electric and at least one balance scale;

17  correct?

18  A.      Yes.

19  Q.      Total number of -- was it three?

20  A.      What, scales?

21  Q.      Scales.

22  A.      No.  It's been -- it was more than three.  There

23  were three digital scales located inside of the black

24  overnight bag.

25  Q.      Inside of the bag?

1  A.      Inside the bag.  There were two more digital

2  scales located inside of a two-drawer file cabinet.

3  Q.      Inside of the cabinet?

4  A.      In Paula's -- what I labeled as Paula's office

5  in the bottom drawer.

6  Q.      Well, Ms. Martin wasn't there, was she?

7  A.      No.  Not at the time of the search, no.

8          There was the older balancing scale so that's a

9  total of six so far.

10 Q.      This is the balancing scale?

11 A.      Yes.  That's the one that was in the green chair

12 in the dance hall, and there was another scale in the

13 Hallmark bag that was inside the dance hall, back left

14 corner inside the Cook's champagne box.  It was inside

15 of the Hallmark bag, And that appears to be it so a

16 total of seven.

17 Q.      Seven.  That's -- seven scales located

18 throughout the premises.  But scales are legal, are

19 they not?

20 A.      Sorry?

21 Q.      Scales are legal, are they not?

22 A.      Yes.  They're legal, yes.

23 Q.      You can go out and buy one today; correct?  You

24 don't need a warrant; correct?

25 A.      No, sir.  They have a purpose.

1  Q.      You can go out and buy one?

2  A.      Yes, you can.

3  Q.      And you talked about finding a number of these

4  empty cans:  The Soft & Dry, Aqua Net, Noxema.  There's

5  a name from the past.  Are those the only three?  Am I

6  missing something?

7  A.      You're missing some.  There was the Aqua Net,

8  then there was a Soft & Dry.  There was a Right Guard,

9  a spray starch, a Noxema, and According to You

10 container.

11 Q.      So there would be about five or so?

12 A.      About five.  If you're counting, the container

13 that's six.

14 Q.      Six.

15 A.      The champagne container would be six, but that

16 didn't have a false bottom.

17 Q.      This has a false bottom, you say?

18 A.      Yes.  Is that the -- is that spray starch?

19 Q.      Yes.  Value Plus Spray Starch.

20 A.      It was empty at the time, yes.

21 Q.      Now, this is not within your area of expertise,

22 but based upon your examination of this, you would

23 agree this is commercially manufactured, this isn't

24 homemade; correct, sir?

25 A.      I would agree to that.

1 Q.      It's got this foam rubber insert inside the lid?

2 A.      Yes.

3 Q.      Or the bottom?

4 A.      Yes.

5 Q.      It's got a foam rubber top, so whatever bounces

6 right inside couldn't broken or shouldn't be broken;

7 correct?

8 A.      Yes.

9 Q.      It's got a plastic-threaded insert inside the

10 neck; correct?

11 A.      Yes.

12 Q.      That matches up with the plastic threading on

13 the lid --

14 A.      Yes.

15 Q.      -- correct?   This would be, we'd agree,

16 commercially available?

17 A.      I've never purchased one in my private life, but

18 yes, I would have to agree with you that you could

19 purchase it somewhere.

20 Q.      This isn't illegal?

21 A.      Not to my knowledge, no.

22 Q.      To save a little time with the folks of the

23 jury, because I wouldn't wish to belabor the point, it

24 would be fair to say those other cans were all

25 substantially the same, all commercially available, all

1 commercially manufactured; correct?

2 A.      Yes.

3 Q.      That's also legal.

4        Speaking of commercially available, have you

5 ever been to Home Depot?

6 A.      Yes.

7 Q.      You'd agree that hanging on the ceiling at a

8 store like the Home Depot, there are signs; plumbing,

9 electrical, hardware; correct?

10 A.      Yes.

11 Q.      When you came through the door at 5559 South

12 Dakota on the 1st of June of 2004, at approximately

13 6:45 a.m. in the morning with your warrant, there were

14 no signs of that sort hanging on the walls; correct?

15 A.      No.

16 Q.      Or from the ceiling; correct?

17 A.      No.

18 Q.      It didn't say cocaine here, cane base there,

19 heroin here; is that a fair statement?

20 A.      That's a fair statement.

21 Q.      None of this illegal stuff, drugs, et cetera, in

22 plain view; is that a fair statement?

23 A.      Excluding -- well, I mean, the drugs, no, but

24 that scale was in plain view, the old scale.

25 Q.      Even I remember the name Ohaus from high school

1 chemistry , maybe college  chemistry , it's commercial

2 venture .   These  guys make  scale s, lot s of  scale s.   It's

3 a common  name ; correct ?

4 A.      Yes .

5 Q.      So people  who  have  scale s  for  illegal  purpose s

6 often  by Ohaus  scale s, as  do  person s  who  often  by

7 scale s  for  legal  purpose s; fair  statement , sir ?

8 A.      Fair  statement .

9 Q.      If  I'm walk ing  down  the  street  with  this  in  my

10 hand , you're  not  going  to  bust  me ?

11 A.      Not  just  that  scale , no .

12 Q.      That 's not  evidence  of  plain  view  drug  activity

13 is it?   This  by itself ?

14 A.      Not  drug  activity .   Suspicion .

15 Q.      If  I'm  walk ing  down  the  street , you  think  it's

16 suspicion  -- that  suspicious  that  I'm  carry ing  a  scale ?

17 Know ing  nothing  else , just  the  scale ?

18 A.      It  could .   It  would  catch  my  at tention .

19 Q.      You  could n't  search  me  because  of  that ; could

20 you ?

21 A.      I  would n't  search  you  because  of  that , no .

22 Q.      The  reason  that  that  got  grab bed  up  and  all  this

23 other  stuff  got  search ed , got  look ed  into  and  all  that

24 is  because  of  the  warrant ; correct ?

25 A.      That  and  what  was  re covered .

1  Q.      The reason that you found it is because you had
2  a warrant that permitted you to look for it; correct?
3  A.      Yes.
4  Q.      If a person were to have walked in, let's say
5  you on May 31st at 6:45 in the morning without a
6  warrant, it would be fair to say there was no drugs in
7  plain view; correct?
8  A.      Correct.
9  Q.      In your 17 years in narcotics, have you ever had
10 occasion to have any kind of evidence from a search and
11 seizure warrant you have participated in fingerprinted?
12 A.      Yes.
13 Q.      Your answer was yes?
14 A.      Yes.
15 Q.      And that's because, in your experience, not that
16 you're a fingerprint expert or anything like that, but
17 Detective, it would be fair to say that a metal --
18 smooth, clean, metal surface like this can is the kind
19 of surface from which fingerprints are easily found;
20 correct?
21 A.      Sometimes.
22 Q.      Sometimes.  And the only way you're going to
23 find it is by fingerprinting it; right?
24 A.      Yes.  You have to fingerprint in order to find
25 it; correct.

1 Q.      And nothing was; correct?

2 A.      I'm sorry?

3 Q.      And nothing was, that you're aware of, were

4 fingerprint ed?

5 A.      Yes, some of the item s I testifi ed to earlier

6 were fingerprint ed; that can in particular was not

7 because it was empty.

8 Q.      Court 's indulgence , please .

9         You said there were a piano on the location when

10 you --

11 A.      There was a piano and an organ , yes.

12 Q.      Two of them?

13 A.      Yes .

14 Q.      Just two?

15 A.      That 's all I recall , yes.

16 Q.      Okay . You didn't test them; did you? By test ,

17 did you see if they were operable ?

18 A.      I did not , and I don't remember if any of the

19 team member s actual ly -- well, the organ that was in

20 the back , left corner had -- it was just covered , had ,

21 I mean , paper s, box , records on it. It show s in one of

22 the picture s. The piano was up near the front near the

23 office , and I check ed the cracker s. I don't remember

24 -- I don't recall picking it up and a play ing. I'm not

25 very musically inclined .

1 Q.      Unless I'm wrong, the organ probably had a plug

2 -- would need to be plugged in to operate; correct?

3 A.      I don't know. I don't recall  if it had a plug

4 or if it was an older organ.

5 Q.      All right.  You said there was stuff on top of

6 it; correct?

7 A.      Yes.

8 Q.      Be also fair to say that you went through the

9 stuff on top of it?

10 A.      The documents and stuff, yeah.

11 Q.      So it would be fair to say that with the

12 expenditure of a small amount of time, stuff could be

13 removed from the organ and it could be rendered

14 operable, whether or not it needed to be plugged in if

15 it were operable.

16 A.      I was actually there to search for drugs.  I

17 wasn't there to test musical equipment, sir.

18 Q.      Fair enough.  Thank you.

19         Did you involve yourself in any pre-raid

20 observations prior to entering the premises on June 1st

21 at 6:45 in morning?

22 A.      Yes.

23 Q.      For how long?

24 A.      Maybe we were there for about approximately  an

25 hour.  I was there for an hour.

1 Q.      From about 5:45 until about 6:45?

2 A.      Yes.

3 Q.      And it would be fair to say now, Mr. Walker

4 arrived sometime after you commenced your search?

5 A.      Approximately 7:50.

6 Q.      For the sake of discussion, he arrives at 5:50,

7 tries to get in, you might well have arrested him;

8 correct?  Fair statement?

9 A.      Yes.

10 Q.      Anybody who's coming in or going out, you're

11 going to arrest?

12 A.      Going to detain.

13 Q.      Going to detain.

14 A.      Mr. Walker had an arrest warrant.

15 Q.      Oh.  Likewise, it would be fair to say anyone on

16 the premises would have been detained and searched?

17 A.      Would have been detained.

18 Q.      And searched?

19 A.      Yes.

20 Q.      So you can't tell us, other than that window of

21 about an hour for the search, who frequented Paula's

22 School of Performing Arts; is that a fair statement?

23 A.      I can't tell you; no, sir.

24 Q.      You can't tell us how many people frequented it?

25 A.      Between the morning of --

1  Q.      Excepting that time window, you can't tell us
2  how many people frequented Paula's School of Performing
3  Arts?
4  A.      Between the morning of 5:45 in the morning and
5  6:45 in the morning; no, sir, other than that little
6  window.
7  Q.      You don't know who, how many times, when, which
8  dates, which times, or anything like that; correct?
9  A.      No.
10 Q.      It wasn't your case.  You were there to be the
11 seizing agent for this search; correct?
12 A.      I was involved in the case a little bit, but
13 that was my purpose was to search that location.
14 Q.      You testified that in response to one of Ms.
15 Johnston's last questions, that in your view, there was
16 no evidence of ongoing dance or anything like that at
17 the school, based upon your view of it; is that a fair
18 statement?
19 A.      Is that the one you objected to, or someone
20 objected to?
21 Q.      No, I think you were permitted to answer it.
22 A.      I do, yeah.  It didn't --
23 Q.      Didn't appear.
24 A.      No.
25 Q.      You'd admit you're a narcotics detective; right?

1 A.      I also have three daughters that attend quite a

2 few dance recitals, sir.

3 Q.      Here?

4 A.      Not at that particular school; no, sir.

5 Q.      But there is an open floor there; isn't there?

6 A.      Yes, sir.

7 Q.      And in your direct testimony, without any

8 bidding from Ms. Johnston, you described it as a dance;

9 didn't you?

10 A.      I said a dance hall.

11 Q.      Dance hall.  And that looks like a dance floor,

12 doesn't it, based upon your experience with your

13 daughters?

14 A.      I mean it's hard, it's not like carpet.  It's a

15 tile floor, I'll give you that.   Dance floor, I'm going

16 to have to disagree with you.

17          MR. MONTEMARANO:  No further questions, Your

18 Honor.  Thank you.

19          THE COURT:  All right.

20          MR. MARTIN:  Mr. Goodwin has no questions, Your

21 Honor.

22          MR. HALL:  I have no questions, Your Honor.

23          MR. MITCHELL:  None, Your Honor.

24          MR. WARD:  No questions, sir.

25          MR. SUSSMAN:  I've got a few.

1                    **CROSS-EXAMINATION**

2          BY MR.  SUSSMAN :

3 Q.      Good  morning , Detective .

4 A.      Good  morning , sir .

5 Q.      Just  some  general  questions  about  the  search .

6 In addition  to  the  items  that  you  find , you  tear  up  a

7 drug -- a suspected  drug  premises  pretty  well ; would

8 that  be  fair  to  say ?

9          MS.  JOHNSTON:   Objection  to  the

10 characterization .

11         THE  COURT:   Sustained .

12         MR.  SUSSMAN :  It's  not  meant  to demeaning .   It's

13 just  meant  to  ask  the  question .

14         THE  COURT:   Sustained .   You  can  rephrase  the

15 question .

16         BY MR.  SUSSMAN :

17 Q.      You're  looking  for  drugs  in  any  place  you  can

18 find  them ; is  that  right ?

19 A.      I  like  to  do  a system  systematic  search , and  as

20 you  can  see , drugs  can  be  hidden  anywhere .   False

21 bottom  cans , boxes , bags , so  yes , there  is , believe  it

22 or  not , there 's  a  system  to  a  search .   How  you  search .

23 Q.      Right .   But  one  of  the  things  you're  looking  for

24 is  secret  panels  in  the  floor  and  the  ceiling  and  the

25 walls ; isn't  that  right ?

1 A.       Yes.

2 Q.       So if there's a suspicion  of that, you're  not --

3 you're  not adverse  to tearing  up a wall or a ceiling  to

4 find it; right?

5          MS. JOHNSTON:    Objection.

6          THE COURT:   Sustained.

7          BY MR. SUSSMAN:

8 Q.       Will you tear up -- you pull down panelling  in

9 the ceiling  to find drugs?

10         MS. JOHNSTON:    Objection.

11         THE COURT:   Overruled.

12         THE WITNESS:    If it's a drop-ceiling, you'd lift

13 it up and look.  You don't have to take every panel.

14 You can lift it up and with a flashlight  and the aid of

15 a ladder, you can pretty much  scan the area.

16         BY MR. SUSSMAN:

17 Q.       The point of my question  is you can look at

18 whatever  you think you might find evidence; is that

19 correct?

20 A.       I try to search  everywhere.

21 Q.       That's your first concern  and not necessarily

22 the condition  of the premises?

23 A.       No, that's why you take the picture  before  you

24 search  so that you have -- you can see what it looked

25 like before.

1 Q.     Your first responsibility  is to do what's

2 necessary  to find the evidence  you're looking for; is

3 that right?

4 A.     We're there to find evidence  and we're -- yes.

5 Q.     All right .  Now, let me ask some of the things

6 you found in there .  You found small scales, is that

7 your testimony ?

8 A.     Yes, sir .

9 Q.     And in terms of your experience , that's pretty

10 much a staple  tool in the drug distribution  trade;

11 right?

12 A.     Yes, it is a tool.

13 Q.     And from your experience , that's not an

14 unexpected thing to fine; is that correct ?

15 A.     No, it's not unexpected, no.

16 Q.     Now, let me just get back to during your direct ,

17 you mentioned briefly wanting to either  kick yourself

18 or be kicked, and I want to be specific  about that .

19 Which was it?  Did you want to be kicked or did you

20 want to kick yourself ?

21 A.     I wanted to be kicked for making that mistake

22 there .

23 Q.     And your mistake was basically  on a couple of

24 occasions you said that an eight ball was 1.5 grams or

25 thereabouts , right ?

1 A.      On one occasion, I said an eight ball was 1.5.

2 Q.      Now, first of all, these terms are not -- these

3 are street terms; right?

4 A.      Yes.  I mean, it's a street term for an eighth

5 of an ounce.

6 Q.      It's fair to say that to your understanding, the

7 Bureau of Standards hasn't adopted these terms as

8 official terms in any of their publications; is that

9 right?

10 A.      Not to my knowledge, no.

11 Q.      And in actuality, on the street what is

12 considered to be an eight ball can vary quite a bit;

13 isn't that true?

14 A.      It's pretty standard.  I mean, the weights could

15 vary a little.

16 Q.      That's what I meant.

17 A.      The cost could vary.  Like I testified, it

18 depends on who you are or who you know.  It could be

19 more or it could be less.

20 Q.      Oh, right.  For example, a dime bag could vary

21 in weight depending on who is selling to whom?

22 A.      A dime bag is currently, in my experience,

23 refers to marijuana, and it's a small Ziploc bag, and

24 it means $10.

25 Q.      Not a specific weight necessarily?

1  A.      No.  It's close, but it's --

2  Q.      Sure.  You've heard the term lid?

3  A.      Lid?  That's a film canister that usually would

4  be packed with marijuana laced with PCP or parsley.

5  It's also been referred to as parsley.

6  Q.      Not a specific weight either?

7  A.      No.

8  Q.      Exact weights are more likely to be used in

9  quantity; is that correct?  If you don't understand

10 what I mean, I'll try to rephrase that.

11 A.      Can you rephrase that?  I don't want to make a

12 mistake.

13 Q.      Someone who is buying kilograms is much more

14 likely to be precise about the weights they're getting

15 than these smaller amounts; right?

16 A.      No, I believe it's up to the individual,

17 depending on how tedious a person's system, how they

18 cut their product down for sale.  You know, one dealer

19 could possibly, you know, each time you buy a product

20 from him, you get the exact same weight and it's not

21 uncommon for you to buy from another dealer who is not

22 as conscientious about his weight and you could get --

23 the weights would vary.

24 Q.      You think when people are buying kilograms,

25 there is a large variation in the weights they are

1 willing to accept?

2 A.      Not kilograms, usually that's smaller.

3 Q.      No, it's much more common to see bigger weights

4 be more precise --

5 A.      In the kilogram range, yes.

6 Q.      I'm sorry, there was a misunderstanding.

7 A.      I'm sorry.  I'm misunderstanding you.

8 Q.      When they're buying serious weight, that's when

9 they're precise about --

10 A.      Pretty much, yes.

11 Q.      In the smaller amounts, you say these weights

12 tend to vary, on a percentage basis, quite a bit?

13 A.      Yeah.  It's not really that much of a

14 fluctuation, but there's a fluctuation there.

15 Q.      When you talk about tenths of gram, those are

16 pretty large percentage swings; aren't they?

17 A.      Tenths of gram?

18 Q.      Yes.

19 A.      I don't think so, no.

20      MR. SUSSMAN:  Okay, fine.  Thanks.

21      THE COURT:  Any additional cross?

22      MR. MCKNETT:  Yes, Your Honor.

23                    **CROSS-EXAMINATION**

24      BY MR. MCKNETT:

25 Q.      Good morning, sir.  It's "detective;" is that

1 right?

2 A.      That's fine.  Yes.

3 Q.      Detective, just to follow up on what Mr.

4 Sussman asked you about.  You described an eight ball

5 -- ultimately described it as 3.5 grams, or 1/8 of an

6 ounce; right?

7 A.      Yes.

8 Q.      There were some packages you referred to, these

9 little baggies that were recovered from the dance

10 studio.  You said some of them weighed 3.3 grams; is

11 that correct?

12 A.      Yes, and that's considered -- by the analogy,

13 that could be considered an eight ball.

14 Q.      That would include the weight of the package as

15 well, didn't it?  Would that include the weight of the

16 envelope as well as the weight of the contents?

17 A.      Well, that's what you're talking about.  I

18 calculate it as an estimate for 76.9 grams with 23

19 Ziploc bags.  That was an estimate.  I didn't

20 individually weigh each one.  That calculation was done

21 right there.

22 Q.      I understand that.  I understand that.  But you

23 came up with an average?

24 A.      Yeah, the average.

25 Q.      Of 3.3 grams?

1  A.       Yes.

2  Q.       And that included the packaging?

3  A.       That would have been off of my total, yeah,

4  76.9.

5  Q.       Okay.  So 3.3 grams -- I want to be clear, 3.3

6  grams included the contents of the baggy and the baggy

7  itself?

8  A.       The 76.9, yes, did.

9  Q.       Okay.  Am I confusing you?

10  A.       No, I understand what you're saying, but that

11  was the estimate.  I mean, I didn't weigh each of the

12  individual 23 Ziplocs.

13  Q.       So you had the overall weight of all the drugs

14  and all the packages?

15  A.       Right.

16  Q.       You divided that by what number?

17  A.       Twenty-three.

18  Q.       And the average weight of the individual baggy

19  was 3.3 grams, and that included the weight of the

20  contents of the baggy and the weight of the baggy

21  itself?

22  A.       The average did, yes.

23  Q.       The average.  Thank you.

24           Detective, you mentioned and described several

25  drug exhibits, and do you have your --

1  A.      I have my notes.

2  Q.      Tell me if I've got too many here, Drugs 12 --

3  A.      Can you describe -- I don't have what --

4  Q.      You don't have them labeled?

5  A.      I don't have them labeled.

6  Q.      There was the Aqua Net can.

7  A.      The Aqua Net can, false bottom can.

8  Q.      Right.

9  A.      That's the one with the 23 Ziploc bags.

10 Q.      There was -- I just have Drugs 13 identified as

11 18.88 grams of heroin in little baggies.

12 A.      That should have been in an envelope, in a Bank

13 of America envelope with 45 baggies.

14 Q.      Okay.

15 A.      But my total weight was 25.3.

16 Q.      For now, I want to identify so we can get on the

17 same page.

18 A.      Sure.

19 Q.      Next I had 2.79 grams of crack.

20 A.      2.9?

21 Q.      2.79.

22 A.      Can you tell me what it was in?

23 Q.      I'm not sure.  That's why I was asking.

24 A.      Perhaps we didn't get to that one.

25 Q.      We'll come back to that one.  Then there was a

1 box.  I think  the  box  was  on  a  shelf.

2 A.      The -- that  would  have  been  the  champagne   box?

3 Is  that  what  you're  --  or  the  --

4 Q.      I  think  it  was  the  box  on  a  shelf.

5 A.      A mailbox?  Priority  mailbox  contain ing  the  two

6 Ziploc  bag s  with  cocaine  total ling  253.8  locate d  in

7 Paul a's  office.

8 Q.      That  would  be  it.

9 A.      Okay.

10 Q.      Then  there  was  a  bag,  I  had  it  Drug s  16.   A  bag

11 contain  contain ing  approximately  205  grams  of  powder

12 cocaine.   Does  that  sound  familiar?

13 A.      A bag  with  powder  cocaine?   No.

14 Q.      No?

15 A.      Not  unless  you  --  if  you  tell  me  what  it  was  in

16 --

17 Q.      Let  me  try  this  a  different  way.

18        There  was  the  drug s  that  were  found  on  Milburn

19 Walker;  correct?

20 A.      Yes.

21 Q.      But  they  really  were  --  that  was  just  fortuitus.

22 You  hadn't  planned  to  go  there  and  arrest  Milburn

23 Walker;  had  you?

24 A.      No.

25 Q.      He  just  show ed  up?

1  A.      He showed up.

2  Q.      He was actually arrested outside the studio;

3  wasn't he?

4  A.      He was pulling on the door as we opened it.

5  Q.      So the drugs recovered from Milburn Walker

6  aren't really part of the search and seizure at the

7  dance studio?

8  A.      No.

9  Q.      Let me turn first to the Express mailbox.  Is

10  that available?

11        MR. MCKNETT:   May I approach the witness, Your

12  Honor?

13        THE COURT:   You may.

14        BY MR. MCKNETT:

15  Q.      This has been marked as drugs Exhibit 15,

16  Detective.

17  A.      Yes, sir.

18  Q.      I just want to talk to you about that for a

19  little bit.  The box, as it exists now, has been

20  collapsed; right?

21  A.      Yes.

22  Q.      It wasn't collapsed when you found it; was it?

23  A.      No.  The picture showed it was --

24  Q.      I don't have color pictures, but I think the

25  black and whites will work.  That's the box there;

1  isn't it?

2  A.      Yes.

3  Q.      Right there?

4  A.      Yes, sir.

5  Q.      That's in the shape that it was in when you

6  found it; correct?

7  A.      Yes, sir.

8  Q.      That's P-188, and there was nothing unique about

9  that box when you first saw it, was there?

10 A.      Sergeant Huskins is the one that actually

11 located it, but when I walked in and first seen it in

12 that condition, no, it didn't.

13 Q.      It looked like a box that showed up in the mail

14 and somebody had put it on a shelf?

15 A.      Yes, sir.

16 Q.      Due to your training and expertise, then, with

17 the contents of the search warrant and such,        you

18 decided that that --  not you personally, but somebody

19 on your team decided you should look in that box?

20 A.      Yes.

21 Q.      And you did and you found what?

22 A.      253.8 grams of crack cocaine.

23 Q.      I'm showing you now what's marked as P-189.   Do

24 you see that?

25 A.      Yes, sir.

1  Q.      Particularly, this item here, do you know what

2  that is?

3  A.      That's a book safe and it has on the back strap

4  it's <u>The Bounty</u>.

5  Q.      It has, excuse me, <u>The Bounty</u>?

6  A.      <u>The Bounty</u>.

7  Q.      The name of the book?

8  A.      Yes, I guess it's supposed to look like a book.

9  Q.      Do you have that book handy?

10         MR. MCKNETT:   May I approach the witness, Your

11  Honor?

12         THE COURT:   Yes, you may.

13         BY MR. MCKNETT:

14  Q.      Detective, this has been marked as South Dakota

15  2.  This is the book we're talking about; correct?   A.

16  Yes, sir.

17  Q.      It has <u>The Bounty</u> on the back?

18  A.      Yes, sir.

19  Q.      Do you remember the shape that was in when it

20  was recovered?

21  A.      Judging by the marks on it, I'm going to say

22  that it was locked and we pried it open.

23  Q.      It was locked and secured?

24  A.      And we pried it open.

25  Q.      The cover is missing, but the cover was on it

1 when it was recovered; wasn't it?

2 A.      I don't believe so.

3 Q.      You don't believe so?

4 A.      I don't believe so, no.

5 Q.      Detective, I'm showing you what's been marked as

6 the chart, and it's Government's Exhibit P-189.  This

7 is the color version of the photograph that I put up on

8 the screen a moment ago; right?

9 A.      Yes.

10 Q.      Can you tell by looking at that picture whether

11 or not the cover is on the front of that book -- book

12 safe?

13 A.      Do you mean the back strap or the cover?  The

14 side covers?

15 Q.      Let me be more specific.

16 A.      Okay.

17 Q.      The way the book looks now, the back looks like

18 a book?

19 A.      That's the back strap.

20 Q.      This looks like a book?

21 A.      Side cover.

22 Q.      But this doesn't look like a book?

23 A.      No.

24 Q.      This is a metal casing -- door.  But you can't

25 tell from looking at the picture whether or not there

1  was a cover.

2  A.      No.  Can't from that picture, no.

3  Q.      It looks like there had been a cover on here at

4  one point; correct?

5  A.      Judging by -- there may have been, but at the

6  time or -- I believe -- my best recollection is that's

7  the way we received it right there.

8  Q.      Okay.  If it had been laying on that shelf,

9  metal cover side down, it would have looked just like a

10  book laying on the shelf; right?

11  A.      Could have.

12  Q.      Nothing unique about it to draw your attention

13  to it?

14  A.      That's correct.

15  Q.      Again, you were in there looking for things like

16  this?

17  A.      Yes.

18  Q.      Because they may or not contain evidence of drug

19  trafficking; correct?

20  A.      Yes, sir.

21  Q.      Detective, I'm going to show you what's been

22  marked as Drug Exhibit 12, which is the Aqua Net can.

23          MR. MCKNETT:  May I approach, Your Honor?

24          THE COURT:   You may.

25          BY MR. MCKNETT:

1  Q.      That's not really an Aqua Net can, is it?

2  A.      No, sir.  It's a false bottom can.

3  Q.      The purpose of which is to hide things; correct?

4  A.      That's correct.

5  Q.      But if it's -- if it has the bottom in it, which

6  I don't think it does right now.

7  A.      The bottom's off of it.

8  Q.      If it had the bottom in it and it was sitting on

9  a shelf somewhere, like in somebody's bathroom, there

10 would be nothing about that that would draw your

11 attention to it, is there?

12 A.      I would still check it, but I mean, it looks

13 normal, but through my experience, I have a habit of

14 checking all cans.

15 Q.      Sure.  That's your job.

16 A.      Yes.

17 Q.      But for the average person, there is nothing

18 unique about that or unusual about it that would draw

19 their attention to it, it would serve the purpose for

20 which it's made; right?  It would hide things?

21 A.      Conceal things, yes.

22 Q.      When you searched that, you found drugs in it;

23 correct?

24 A.      Yes, sir.

25 Q.      Where was that bag -- that Aqua Net can found?

1  A.       It was located in the dance hall, in the back
2  left corner inside of a brown box located in that black
3  bag sitting on the floor there.   That black overnight
4  bag.
5  Q.       This bag here?
6  A.       Yes, sir.
7  Q.       It was inside of a bag inside of this bag?
8  A.       Inside that bag, which was inside of a brown
9  box, in the back left corner of the dance hall.
10  Q.       So this bag was in a box?
11  A.       Yes.
12  Q.       Was the box closed when you got there?
13  A.       I don't believe so, no.   Detective Black located
14  that.
15  Q.       In any event, this bag was in a box, and in this
16  bag was the Aqua Net can?
17  A.       Yes.
18  Q.       So the Aqua Net can was not visible until you
19  opened the box and then opened this bag; correct?
20  A.       Yes.
21  Q.       Finished with it?
22  A.       Yes, sir.
23  Q.       So am I.
24  A.       Thank you.
25  Q.       Detective, you described a champagne tin.   Was

1  that the --

2  A.      It was a protective  housing for a champagne

3  bottle.  It's a metal can.

4  Q.      And this is the can.  I believe it's been marked

5  as South Dakota -1; correct?

6  A.      I have to look at it, yes, sir.  Yeah, I'm

7  sorry.  That can was located in the dance hall in the

8  back, left corner inside of a Hallmark bag, which was

9  inside of a Cook's champagne box on the top left of the

10  table.  On the top of the table.

11  Q.      So inside this -- well, this is not a safe

12  container; is it?

13  A.      No, that's just a protective  can for a bottle of

14  champagne.

15  Q.      And you could buy this in most liquor stores?

16  A.      That's a fair statement, yes.

17  Q.      And it would have a bottle of champagne in it?

18  When you buy it, you would hope and maybe drink the

19  champagne and then keep this as a keepsake?

20  A.      That's a fair statement yes, sir.

21  Q.      Inside of this, you found -- not you personally

22  --

23  A.      No, I actually found that .

24  Q.      This?  You found the drugs?

25  A.      Yes.

1 Q.      This can was in?

2 A.      The Hallmark bag.

3 Q.      This bag?

4 A.      Inside that bag with other items,    yes.

5 Q.      With other items and this bag is marked -- is

6 this marked as an exhibit.

7        MS. JOHNSTON:   Yes.

8        BY MR. MCKNETT:

9 Q.      I don't see a tag.  I'm sure it's on here

10 somewhere.  Do you have a number?

11 A.      I think it's on the front of the bag.

12 Q.      So South Dakota 11 was inside of South Dakota

13 15, which was inside of what?

14 A.      A Cook's champagne box.

15 Q.      Do we have that box?

16 A.      No, but I know there's a picture of it on one of

17 those boards.

18 A.      It would be with -- the picture would show the

19 multicolored green bag there, the green, red and white

20 bag also.  No, sir, it's not on this board.

21 Q.      It's not on this board, and I don't think  it's

22 on this board.

23 A.      No, sir, not on this board.

24 Q.      Must be on a different board.  This is it.

25 A.      That's it, yes, sir.

1  Q.        South  Dakota  P -- excuse  me,  strike  that.

2             Government  Exhibit  P-202.  So  inside  this  can --

3  A.        Inside  that  can.

4  Q.        -- container  were  drugs.  The  tin  container  was

5  closed  when  you  found  it; correct?

6  A.        Yes,  I  believe  so.

7  Q.        Had  the  lid  on  it, and  that  was  in  this?

8  A.        Along  with  other  items,  there  were  other  items

9  in  that  bag  also.

10  Q.        And  other  items  and  then  this  bag  was  in  this

11  box.

12  A.        Yes.  The  picture  shows  it.

13            MR.  MCKNETT:  Your  Honor,  I  have  a  few  more

14  minutes  to  go.  I  didn't  know  if  you  wanted  to  take  a

15  break.

16            THE  COURT:  If  you  have  a  few  more  minutes  to

17  go, we  will  see  you  in  20  minutes.

18            MR.  MCKNETT:  Might  be  five  or  ten.

19            THE  COURT:  No.  Let's  take  a  recess  until  20

20  minutes  of  12:00.

21                 (Jury  excused  at  11:30  a.m.)

22                 (Off  the  record  at  11:30  a.m.)

23                 (On  the  record  at  11:52  a.m.)

24                 (The  witness  resumes  the  stand.)

25                 (The  jury  returns  at  11:53  a.m.)

1          THE COURT:   Ladies and gentlemen  , while  you're

2 getting your seats, I wanted to tell you that today we

3 will go until about 4:15 because I have a sentencing at

4 4:30, so we will get you out of here for sure before

5 4:30 today.  You may proceed.

6          BY MR. MCKNETT:

7 Q.     Detective , in Government's  P-199, what are we

8 looking at here?

9 A.     That's the Honeywell box.

10 Q.     The Honeywell ?

11 A.     Honeywell  heater box.

12 Q.     It appears that somebody is taking something out

13 of that box; is that correct ?

14 A.     It's my hand , I believe.

15 Q.     Okay.  And what are you removing from the

16 Honeywell box?

17 A.     What am I taking out of there?

18 Q.     Yes.

19 A.     That's a black bag.

20 Q.     We see a black bag; right?

21 A.     I believe it's -- I think it's the black , yes.

22 Q.     And then on P-200, we have your hands again?

23 A.     Yes, I believe so.

24 Q.     Same box.  Here's the bag; correct?

25 A.     Yes.

1 Q.       And out of the bag is coming this package ;

2 correct ?

3 A.       Yes .

4 Q.       And then on P-198, if I have it in proper order ,

5 this is the content s of the black bag ?

6 A.       No .

7 Q.       No ?  Have I got them --

8 A.       Stay back .  Go back to that picture there .   I

9 didn't mean to yell at you .

10 Q.       That 's okay .

11 A.       If you raise the picture up a little higher , see

12 down at the bottom where it says Pelon is?

13 Q.       Yes .

14 A.       Okay .  That 's a Pelonis , that 's in the China

15 cabinet .  The box es look very similar .

16 Q.       Okay .  I've confused the box es.  Let me go back ,

17 then , to P-200 .  This is the Honeywell box .  How did

18 you describe this ?  The white thing in the middle here ?

19 A.       That 's cocaine .

20 Q.       Okay .  So it was -- that appear s to be in a

21 plastic bag ?

22 A.       Yes .  It look s like it's in a Ziploc bag .

23 Q.       Ziploc bag ?

24 A.       Inside of a black , plastic bag inside of the

25 box .

1 Q.       The black plastic bag is opaque.  You can't see

2 through it?

3 A.       No.

4 Q.       It's in a box.  The box was closed, was it or

5 not?

6 A.       I believe so.  I mean, I'll tell you who found

7 that.  That's the Pelonis box; right?

8 Q.       I think we're looking at the --

9 A.       Honeywell?

10 Q.      -- the Honeywell.

11 A.      Okay.  Just bear with me one second, please.

12 Detective Black located that.

13 Q.      Okay.

14 A.      So, he located it and I went and recovered it,

15 took pictures.

16 Q.      You don't know if the box was opened or closed

17 when he recovered it?

18 A.      I believe when I went to it, it was in its --

19 back in its original state and it was -- the top was

20 down.

21 Q.      The top was down?

22 A.      Yes.

23 Q.      Okay.

24 A.      Yes.

25 Q.      I'll come back, then, to the Pelonis box, which

1  is P-198.  This is the Pelonis box here; right?

2  A.      Yes.

3  Q.      This is the top of it open?

4  A.      Yes.

5  Q.      This is the contents of it?

6  A.      Yes.

7  Q.      Is that your hand?

8  A.      I'm not sure.  The watch doesn't look familiar.

9  That could have been Detective North's hand.

10  Q.      Okay.  The contents of this plastic bag here --

11  strike that.

12          This plastic bag was inside the Pelonis box;

13  correct?

14  A.      Yes, sir.

15  Q.      And do you recall if the Pelonis box was open or

16  closed?

17  A.      The same -- Detective North located it, and when

18  I got there, I believe it was closed by the time I had

19  went to that -- to photograph it and collect it.

20  Q.      Okay.  P-203, this will show us, I believe, the

21  champagne box.

22  A.      Inside the Cook's champagne, right.

23  Q.      Do you know where that box is?

24  A.      The box?

25  Q.      Yes.

1  A.      I didn't take it.  I just took the two bags.

2  Q.      You just brought the contents?

3  A.      The contents, right, the two bags that were
4  inside -- I didn't bring the box.

5  Q.      We're looking at one of the bags here; correct?

6  A.      Yes, that's the green, red and white bag.

7  Q.      We've seen that before?

8  A.      It contained a bunch of smaller Ziploc baggies.

9  Q.      Right.  But this bag, this multicolored bag was
10  inside this box; correct?

11  A.      Right.  That bag -- the red -- the green, red
12  bag along with a Hallmark bag were both inside of that
13  Cook's champagne box.

14  Q.      We saw the Hallmark bag just a few minutes ago
15  just before the recess; correct?

16  A.      Yes, sir.

17  Q.      Inside this bag, you found what you testified
18  was drugs?

19  A.      No.  Several Ziploc baggies.

20  Q.      Without drugs?

21  A.      Without drugs.  The hallmark bag is the one that
22  contained the drugs.

23  Q.      Okay.  So in this bag, you had baggies that were
24  empty; and in the Hallmark bag, we had drugs.

25  A.      Drugs, scales, false bottom cans, black plastic

1  bag with more drugs.

2  Q.      What's this bag down here?

3  A.      Which bag?  That's inside of the green, red and

4  -- it contains Ziploc baggies.

5  Q.      So the baggies were in this bag?

6  A.      They were scattered throughout.  Some in there

7  and then some just sitting loosely in that bag.

8  Q.      This bag was inside this bag, which was inside

9  this box?

10  A.      Yes.

11  Q.      And this box was closed?

12  A.      No.  It was open with the bags sticking out of

13  the top of it.

14  Q.      When you saw it?

15  A.      Yeah.  I have recovered that bag.  I located it

16  and recovered that bag.

17  Q.      P-204, there are several containers here;

18  correct?

19  A.      Yes.

20  Q.      There's the Right Guard can we've seen, this is

21  a spray starch?

22  A.      Yes.

23  Q.      Did we see that?

24  A.      I can see it.  I can tell by the V at the bottom

25  of your pen there, that's the spray starch can.  That

1 was empty.

2 Q.      I'm sorry, did I interrupt you?

3 A.      No, no.

4 Q.      This is the Noxema can; correct?

5 A.      Yes.

6 Q.      This is the Soft & Dry can?

7 A.      Yes.

8 Q.      Now, as we look at them on the picture, they're

9 all opened up?

10 A.      Yes.

11 Q.      But that was done for your purposes?

12 A.      That was done by me.

13 Q.      When they were discovered, they were closed?

14 A.      They were closed and I opened them when I took

15 the photo to show the contents.

16 Q.      And these are the contents here, here, perhaps

17 over here.

18 A.      That's a scale, and if you look down in the top

19 of the Soft & Dry, you will see the contents of the

20 Soft & Dry.

21 Q.      Inside?

22 A.      Yes.

23 Q.      These are the lids. There's the lids for the

24 Soft & Dry. This is a lid for one of them. This is a

25 lid for one of them; correct?

1  A.      Yes, sir.

2  Q.      When they were discovered, the contents were in

3  the containers and the containers were closed?

4  A.      Yes.

5  Q.      And to all intents and purposes, these looked

6  like the legitimate items that you would buy in a

7  grocery store or beauty supply shop or something like

8  that?

9  A.      Yes, sir.  That's what they looked like.

10 Q.      That's what they're supposed to look like,

11 right?  They're hiding things?  They're safes?

12 A.      For all intents and purposes, yes.

13 Q.      Where were these found?

14 A.      Those were inside the Hallmark bag, which was

15 inside of that Cook's champagne bag, along with the

16 green, red and white bag.

17 Q.      So once again, the drugs were in the containers,

18 and the containers were closed and sealed and the

19 containers were in a Hallmark bag and the Hallmark bag

20 was in the champagne box?

21 A.      Yes, sir.  On the top of the table.

22 Q.      Right here.

23 A.      Right.  That box was on top of the table and in

24 the back left corner.

25 Q.      You can see the ship.  On the side there?

1  A.        Yes, sir.

2  Q.        And P-205, this, I think -- correct me if I'm

3  wrong -- is the black bag we saw a few minutes ago?

4  A.        Yes.  That is the black bag that I labeled it as

5  overnight bag inside of a brown box in the dance hall

6  in the back left corner.

7  Q.        This was the box it was in when you discovered

8  it; correct?

9  A.        Yes.

10  Q.        The bag appears to be closed?

11  A.        The bag was closed.

12  Q.        Was the box closed?

13  A.        I'm not sure.  That was located by Detective

14  Black, but it could have been and I would have

15  positioned it like that so that my picture would

16  reflect that it had the black bag inside of the brown

17  box.

18  Q.        So it may have been in the condition the picture

19  reflects, but it may have been closed?

20  A.        Yeah, I mean, that -- obviously I wanted to make

21  sure that the picture reflected the black bag inside

22  the brown box.

23  Q.        Inside the black bag was?

24  A.        That was the Aqua Net false bottom can with 23

25  Ziplocs.

1 Q.      That's the picture I'm showing you, which now

2 has been re-marked as P-205A; correct?

3 A.      Yes, sir.

4 Q.      So once again, we have the drugs that were

5 inside the can that had the lid closed, and the can was

6 in this bag which is inside this box.

7 A.      Yes.

8 Q.      Looking at P-208.  This is the champagne bottle

9 container?

10 A.      Yes.

11 Q.      We talked about that earlier; right?

12 A.      Yes, sir.

13 Q.      Where was that champagne bottle container?

14 A.      That was inside of the Hallmark bag inside of

15 the Cook's champagne box.

16 Q.      So once again, we have these contents inside

17 this container sealed with this lid inside the Hallmark

18 bag, which was inside this box?

19 A.      Yes, sir.

20 Q.      Detective, it appears that all the drugs that

21 were recovered were hidden before you discovered them;

22 correct?

23 A.      Yes.

24 Q.      And they were hidden in multiple layers.  They

25 were hidden in items that could be described as safes

1  except for the Express mailbox and the book safe,

2  everything else appears to have been in safe containers

3  inside of bags inside of other bags inside of boxes; is

4  that a fair description?

5  A.      All except -- well, yeah, except for the box

6  that was in the heater box, the Pelonis box.

7  Q.      Except for the heater box?

8  A.      Inside the China cabinet.

9  Q.      That was -- let me see if I can find that

10 quickly.  That was not the Honeywell heater?

11 A.      No, it's the one that's in the China closet next

12 to the SOS?

13 Q.      That's the Pelonis box?

14 A.      Yes, sir.

15 Q.      That was under this shelf here?

16 A.      That's a shelf that was a China cabinet and you

17 know the China cabinet has, like, the bottom part and

18 the part where the glass doors cover.

19 Q.      Right.

20 A.      It was on the bottom shelf there.

21 Q.      So this item here was inside this box which was

22 inside this cabinet?

23 A.      The glass doors were closed.

24 Q.      And the doors were closed and it was right below

25 this shelf here?

1  A.       Yes, sir.

2  Q.       Thank you, Detective.

3  A.       Sure.

4          THE COURT:   All right.   My any redirect?

5          MS. JOHNSTON:   Just a few questions.

6                   **REDIRECT   EXAMINATION**

7          BY MS. JOHNSTON:

8  Q.       Detective, calling your attention to drugs --

9  what was marked as Drugs 13, which was the heroin and

10 the little baggies.

11         Do you recall that exhibit from the black bag?

12 A.       Yes, ma'am.   That was in the back left corner

13 that was inside the black bag which was inside the

14 brown box.

15 Q.       How much heroin was that?

16 A.       There were 45 individual heroin baggies and

17 total weight was 25.3.

18 Q.       That wasn't in the safe; was it?

19 A.       No.   That was inside that black bag in the Bank

20 of America money envelope.

21 Q.       As it's attached here?

22 A.       Yes, ma'am.

23 Q.       And all of those safes; the Soft & Dry can, the

24 Right Guard can, and the ones that didn't have drugs in

25 it, the Noxema, they all were -- all they required was

1 a screw on it; is that right?

2 A.    Yes, ma'am.  Just twist.

3 Q.    So they were not locked where you had to pry

4 open, like the book?

5 A.    That's correct.

6 Q.    In regards to the -- these two bags, they were

7 found with handles on it, like this referring to South

8 Dakota 1 and South Dakota 15; is that correct?

9 A.    Yes, ma'am.

10 Q.    And in fact, when you recovered them, you said

11 you personally observed these two bags; is that

12 correct?

13 A.    Yes, ma'am.

14 Q.    And the two bags, when you recovered them,

15 weren't sealed in a box; were they?

16 A.    They weren't sealed in the box.  The box -- the

17 top part of the box had been, you know, sitting up like

18 that, and the bags were just as you see in that

19 picture.

20 Q.    Let me show the picture to the jury.  You're

21 referring to P-202; is that correct?

22 A.    Yes, ma'am, the one on the top.

23 Q.    Does that picture, P-202, first of all, was that

24 box on the floor or where was it?

25 A.    That box was on top of the table in the back

1 left corner.

2 Q.      Okay.  That picture, P-202, accurately depicts

3 the way it was situated when you observed it?

4 A.      Yes, ma'am.

5 Q.      With the two bags sticking out of the top?

6 A.      Yes, ma'am.

7 Q.      And the Hallmark bag, that wasn't closed or

8 sealed in any way; was it?

9 A.      No, ma'am.

10 Q.      Do you remember if the other plaid bag was

11 zipped closed or open?

12 A.      I don't recall.  It may have been zipped.

13 Q.      And this other black bag, this black bag when

14 you recovered it, South Dakota 3, it had handles on it

15 like this, too; didn't it?

16 A.      Yes, ma'am.

17 Q.      Now, Mr. Montemarano asked you if those cans

18 were legal.  Are they legal to possess?

19 A.      I believe so, yes.

20 Q.      Based on your -- is it legal to possess them

21 with cocaine in them?

22 A.      No, ma'am.

23 Q.      Likewise, with the scales, you can't have scales

24 with cocaine or heroin residue on them; can you?

25 A.      No, ma'am.

1 Q.      Similarly with the little baggies; is that

2 correct as well?

3 A.      That's correct as well.

4 Q.      Fingerprints. Some of these items were sent for

5 fingerprints; is that correct?

6 A.      Judging by the black powder on them, yes, ma'am.

7 Q.       That would have been a decision you didn't

8 make, but Detective Eveler or Agent Snyder?

9 A.      One of the case agents made it, yes, ma'am.

10 Q.      One of the case agents made that decision.  Is

11 it your experience that you frequently get fingerprints

12 off of these kind of containers and baggies that have

13 drugs in them?

14 A.      I would say more rare than it is common.

15 Q.      Now, in terms of the dance studio, you indicated

16 you didn't believe it was a functioning dance studio;

17 is that correct?

18 A.      That's correct.

19 Q.      And you indicated you had three daughters who

20 went to dance school?

21 A.      Yes, ma'am.

22 Q.      Could you describe for us some of the reasons

23 why or things that were missing that caused you to say

24 it wasn't functioning?

25 A.      The first thing that I believe is the storage

1 over the equipment that was stored in the back would

2 pose a hazard for a dance studio if a person were to be

3 dancing and tripped and fall and they would hit

4 themselves on the amount of storage, the A contraction

5 unit, the lawn mower, and that group of stuff.

6         The instruments or the music, they were just

7 taking such a long time, that would have taken such a

8 long time to clear off, and they didn't appear as if

9 they had been used in quite some time, and the amount

10 of, for lack of a letter better term, clutter that, and

11 that was sectioned off and the opening as Counsel

12 described it, the dance hall would not have enough room

13 for anyone to dance.

14 Q.     And in your experience, do they store cracker

15 boxes in dance studios?

16         MR. MONTEMARANO:   Objection, Your Honor.

17         MS. JOHNSTON:    I'll withdrew that question.

18         BY MS. JOHNSTON:

19 Q.     Mr. Sussman asked you some questions about drug

20 quantities and where you searched.  In this case, did

21 you tear open the walls or the ceilings of the dance

22 studio?

23 A.     No walls were torn, to my knowledge.  We may

24 have -- there was -- above the office, there were some

25 boxes.  One of the photos show we did get up there and

1 look in those boxes, but we didn't tear anything up,

2 no, ma'am.

3 Q.     Was there a bathroom in the studio?

4 A.     Yes, ma'am.

5 Q.     Were any of these cans, the Soft & Dry or the

6 Noxema, found in the bathroom?

7 A.     No, ma'am.

8 Q.     They were all found in the areas you described

9 for us?

10 A.     Yes, ma'am.

11 Q.     In terms of drug quantities, Mr. Sussman had

12 asked you some questions about whether you were more

13 concerned about weight, if you're a dealer involved

14 with kilograms, than if you're a dealer involved with

15 smaller quantities. Do you recall those questions?

16 A.     Yes, ma'am.

17        MR. SUSSMAN:  I don't think that's the question

18 I asked, Your Honor.

19        THE COURT:  Well, let her finish the question.

20        BY MS. JOHNSTON:

21 Q.     In terms of smaller quantities, are scales still

22 used by people to measure their -- the drugs they're

23 selling or purchasing?

24 A.     Yes. Most of the time, yes, ma'am.

25 Q.     Is that important to have a scale in -- if

1  you're selling or -- if you're selling drugs or

2  purchasing them for resell?

3  A.     Yes, ma'am.

4        MR. MONTEMARANO:  Objection, Your Honor, basis

5  of knowledge.

6        THE COURT:  Sustained.  You can lay foundation

7  for it.

8        BY MS. JOHNSTON:

9  Q.     The eight ball.  Is that based on your

10  experience?  Is that a quantity that one would use a

11  scale with?

12  A.     Yes.  That's an eighth of an ounce.

13  Q.     Is it important to know generally how much drugs

14  you're selling if you're involved in that business?

15  A.     Yes.  You -- yes, you would want to know the

16  weight versus the amount so that you don't lose money.

17  Q.     The weight versus the amount of money?

18  A.     Money that you're charging so that you don't

19  lose money.

20  Q.     Now, I think he also asked you about the little

21  maybe -- one of them asked you about the little tenth

22  of a gram?

23  A.     Yes.

24  Q.     That would not be a quantity that you would

25  ordinarily weigh; is that correct?

1 A.      No.   If you're a user, you know what a tenth of

2 a gram looks like.   I mean, it's about the size of a

3 pencil eraser.   That's pretty close.   You eyeball that.

4 I mean, but most of the time, that's -- that is at its

5 lowest form.   It's not broken down anymore.   It's a $20

6 piece, one-tenth of a gram, it sells for $20, so that's

7 at its smallest form that it comes.

8 Q.      And you said a user would eyeball it, they

9 wouldn't need the scales; is that correct?

10 A.      A user that has -- I mean an addict would --

11 knows.

12         MR. MARTIN:   Your Honor, objection.   701.

13         THE COURT:   Overruled.

14         THE WITNESS:   An addict who, in my training and

15 experience, and the ones that I have worked with and

16 have used them, use drugs know what they're buying.   I

17 mean, they can look at it, and even a detective's been

18 on the job and has purchased it for a while can eyeball

19 and pretty much tell you close.   Not exactly, but close

20 to the size of a 20.

21         BY MS. JOHNSTON:

22 Q.      Drugs can't -- is it different if someone's

23 buying the drugs to sell them?

24 A.      Is it different?

25 Q.      In terms of whether they eyeball it or use a

1 scale.

2 A.      The majority of them use a scale because you

3 don't want to get ripped off.  You're not an addict,

4 the difference between an addict and a person who sells

5 drugs is an addict is an addict and has to use the

6 drugs.  The person who is selling it, most of the time,

7 is not using the product that they're selling.  They're

8 in it for the profit.  So, they want to make sure that

9 they're not getting ripped off and that they're selling

10 the right --

11 Q.    I believe the response to one of the questions

12 you said if it was somebody who dealt with -- if it was

13 somebody they dealt with all the time, they wouldn't be

14 so concerned about weighing it.

15 A.      Right.  I mean, as time as you get to know

16 people and you get to -- in the drug field, a certain

17 amount of trust develops there that, okay, I've

18 purchased from you a couple of times, five or ten

19 times, and I'm getting the good things each time, so we

20 develop a trust, and then it comes to the point where I

21 may not use a scale or, you know, depending on if I

22 think it looks bad or something is wrong, then I would

23 use a scale to try and prove my point.

24       MS. JOHNSTON:   I have no further questions.

25       THE COURT:   All right.  Any recross?

1                    **RECROSS-EXAMINATION**

2           BY MR. MONTEMARANO :

3 Q.      You just stated in response to Ms. Johnston 's

4 question , Detective Shea , that an addict would be

5 buying drugs to use whereas a seller would be in it for

6 the "profit ;" isn't that correct ?

7 A.      Most of the time , yes . The person that 's

8 selling it is in it for the profit .

9 Q.      Pose you a hypothetical based on your training

10 and experience ?

11 A.      Sure .

12 Q.      Buy ten units of a drug , let's say powder

13 cocaine . Take eight of them , you empty them out and

14 you add some cut . You then fill up those ten bags with

15 the contents of the eight after you use the other two .

16 Do you understand ?

17 A.      Okay . Let me understand you right .

18 Q.      You buy ten .

19 A.      Buy ten .

20 Q.      You snort two .

21 A.      Snort two , so now you're at eight .

22 Q.      You've got eight left . You pour eight onto a

23 piece of glass . You can add some cut , you can buy

24 Mannitol anywhere ; right ? Mannitol 's legal ; right ?

25 A.      Yes .

1 Q.      Mannitol is a cut for cocaine; correct?

2 A.      Yes.

3 Q.      You add some Mannitol, you cut it up, you refill

4 the ten bags?

5 A.      You refill the ten bags.

6 Q.      And you go off and resell the ten bags.

7 A.      Most likely, if you were doing that, you would

8 have a scale unless you were eyeballing it.  Could it

9 be done?  Yes.

10 Q.      In fact, they call that juggling; right?

11 A.      If you're -- continuing.  If you're an addict,

12 you're going to use more than two bags.

13 Q.      Maybe.

14 A.      Most likely.

15 Q.      Maybe you don't have any money, and that's a way

16 of feeding your addiction.

17 A.      Okay.

18 Q.      Basically for free.  You buy your ten bags for

19 whatever ten bags are costing.  You sell ten bags for

20 whatever the same amount of money and the two that you

21 use, and you can burn people because people are now

22 getting a shorted amount; correct?  That's not unknown

23 in the drug trade?

24 A.      No, that's not unknown, but it depends if you

25 don't do that to somebody, that if you're a user/seller

1  to support your habit, as he's saying, you don't do

2  that to your regular customers because they realize,

3  you know, that what's happening because you're selling

4  to an addict.  An addict is going to know that you --

5  you're cutting your product.

6  Q.      But certainly, and especially in the inner city

7  context, regular customers, regular buyers are as a --

8  are not necessarily the only way things go; correct?

9  A.      No.  I mean, there's people that come up every

10 day to a seller that don't know that seller, so that

11 seller could possibly sell one of your diluted bags.

12 Q.      You have a regular seller sells goods of varying

13 quality from time to time depending on the quality of

14 his supplier; correct?

15 A.      That and depending on your seller.

16 Q.      Big city drug organizations routinely pay people

17 who are slingers or pitchers on the street corner in

18 drugs because those people are addicts; correct?

19 They're not in it for the profit; are they?

20       MS. JOHNSTON:   Objection to the inner city

21 reference.

22       THE COURT:   Sustained.

23       MR. MONTEMARANO:  If you know.

24       MS. JOHNSTON:   Objection.

25       MR. MONTEMARANO:  May we approach, Your Honor?

1          THE  COURT:    Sustained .

2          MR.  MONTEMARANO :   May  we  approach ?

3          THE  COURT:    Yeah .

4                (At the bar of the Court.)

5          MR.  MONTEMARANO :   Yes, sir .  I don't understand .

6          MS.  JOHNSTON:    This  is  not  an  inner  city  case .

7  We're  not  here  trying  a  case  that  happened  on  the

8  street s  of  Baltimore  city .

9          THE  COURT:    Objection  to  using  the  inner  city

10  term .

11          MR.  MONTEMARANO :   Wash ing ton , D. C. , 20011 .

12  It's  a  Washington  address .  We're  not  in  the  suburb s.

13  He  may  be  from  the  suburbs ,  but  certain ly  he  has  an

14  understand ing  or  knowledge  of  how  thing s  are  done .   I

15  don't  understand   that  the  Court  believe  that 's

16  demean ing  or  something ?

17          MS.  JOHNSTON:    He's  a  Prince  George's  County

18  detective .  I  don't  know   how  much  information   he  has

19  about  the  inner  city .  Also ,  I  didn't  ask  him  about  --

20          THE  COURT:    I  think  you  can  ask  the  same  kind  of

21  a  question ,  and  the  question  was  inner  city  or  out er

22  city  or  suburban  or  whatever .

23          MR.  MONTEMARANO :   Fair  enough .   Thank  you .

24                (Back in open court.)

25          BY  MR.  MONTEMARANO :

1  Q.      In your experience, it's not unusual that people

2  who sell drugs are paid by their distributor   in drugs;

3  is that correct?

4  A.      Very little amount to sell  .  It goes back to the

5  trust.  It's an addict.    This person's out there for a

6  reason,  and they're selling to support  their habit.  So

7  you know, it's basically  your addict who is pretty bad

8  and who is out there -- it more or less  insulates the

9  dealer.  That way, if the addict sells to an undercover

10 officer, there's a possibility  that the dealer won't be

11 identified because of the addict -- the police arrest

12 the addict.  So, yes, it's done for a couple of

13 reasons.

14 Q.      Are you done?

15 A.      Yeah.  Sorry.

16 Q.      No.  Not at all.  Going back to my question.

17 That's a person -- that addict you were just talking

18 about is  a person who sells and who is not in it for

19 profit; correct?

20 A.      I'm going to disagree with you because they are

21 in it for the profit, if they don't sell and they don't

22 get any money or they don't get paid.  So it is a

23 profit, but it's an addict who is doing it.

24 Q.      You stated in response to one of Ms. Johnston's

25 questions that, in your experience, it's more rare than

1 not that you get finger prints off the items that you

2 seize.

3 A.        Yes.

4 Q.        Even like a can.  But unless I'm very wrong, how

5 many agents were involved in the search, if you would

6 refresh my recollection?

7 A.        In the search of my location?

8 Q.        Yes.

9 A.        It was me --

10 Q.        Just a ball park.  Six?  Seven?  Something like

11 that?

12 A.        Probably about five.

13 Q.        Five.  And using these photographs we've already

14 looked at -- these big shots up here at the top of the

15 books on the shelves, for example?

16 A.        Yes, sir.

17 Q.        And these, for the record, are P-187 and 188.

18 And you found this box here with drugs; correct?

19 A.        Yes.

20 Q.        Were the book safes on the shelf?

21 A.        Just one.

22 Q.        One?

23 A.        It was in that picture, it's on the top shelf.

24 Q.        Okay.  On the top shelf.  About how many books

25 would you say were on these shelves?

1 A.      I didn't count them, sir.

2 Q.      Dozens?  Scores?  Maybe a hundred?

3 A.      I'm not sure.  I mean, there's quite a few.

4 I'll agree with you there.

5 Q.      Will you give me lots?

6 A.      Lots.  That's fine.  I'll give you lots.

7 Q.      You found the drugs in two items on those

8 shelves, but that didn't prevent you from searching

9 every single item on those shelves; correct?

10 A.      All those books were checked, yes.

11 Q.      So we don't bore the jury, with regard to every

12 location inside 5559, every area within that premises,

13 you searched everything; correct?

14 A.      Tried, yes.

15 Q.      Or tried.  You didn't find drugs in everything;

16 correct?

17 A.      Not in everything, no, sir.

18 Q.      You didn't find drugs in half of the things you

19 searched, did you?

20 A.      No.

21 Q.      Didn't find probably drugs in ten percent of the

22 things you searched?

23 A.      I mean, percentages, I would say.

24 Q.      The fact is, you don't know.

25 A.      No.  I don't have it broken down into

1 percentages.  I know what we did find.

2 Q.     You searched everything  to be sure; right?

3 A.     Yes.

4 Q.     Because  that's the  way you do the  job

5 effectively  --

6 A.     Yes.

7 Q.     -- correct?

8 A.     Yes, sir.

9 Q.     And after  having  searched every  one  of these

10 items, you're  sure  where  the drugs  were; correct?

11 A.     Yes.

12 Q.     And you're  sure  where  the drugs  weren't;

13 correct?

14 A.     95 percent  sure, yes, sir.

15 Q.     And in assuming that, you  had, for  example, or

16 if it had been done, that  Aqua  Net can had been

17 fingerprinted,  you'd be sure  about  it having

18 fingerprints or not; right?

19 A.     Twenty-two  years, I'm not a fingerprint expert,

20 sir.  I would assume  that -- I would  do my best  to find

21 it.  If I fingerprinted it, I would  do my very best.

22 Q.     I mean, if you got it fingerprinted,  the experts

23 in fingerprinting, if you submit it --

24 A.     Yes.

25 Q.     -- it's going  to get  printed, and assuming  that

1   it's printed correctly, you'll find whatever prints are

2   on it; correct?  They will find whatever prints are on

3   it?

4   A.      There could have been smudges, there could have

5   been fingerprints  on there that aren't recognizable .   I

6   don't know , sir.

7   Q.      You don't know because it wasn't printed ;

8   correct ?

9   A.      I didn't print anything .  The case agents were

10  the ones who made that determination .

11  Q.      Absolutely.

12          MR. MONTEMARANO :  No further questions.

13          THE COURT:   Any further recross ?

14          MR. MARTIN:   No, Your Honor.

15          MR. HALL:  No, Your Honor.

16          MR. SUSSMAN :  I've got one.

17                      **RECROSS-EXAMINATION**

18          BY MR. SUSSMAN :

19  Q.      Detective , I want to clarify something .  We were

20  talking about  search procedures, and I talked about the

21  reference  you made to find things in terms of

22  thoroughness .   You don't gratuitously bust anything up

23  before you do a search ; is that correct ?

24  A.      We try not to bust anything up, no, sir .

25  Q.      To the extent that you believe or have some

1 suspicion that the drugs are hidden in the walls or
2 floorboards or ceiling, you have to do what's necessary
3 to find the evidence you're looking for?
4 A.      Hypothetically, if there's a hole in a wall, I
5 do my best to look in that hole, and you know, stick my
6 hand in there without destroying anything.  But if you
7 have to pull it back a little bit or take out a little
8 section, then I would do that yes, sir.
9 Q.      You're not trying to destroy anything or damage
10 anything unnecessarily, but you are trying to find what
11 you're looking for?
12 A.      Yes, sir.
13 Q.      Okay.  Now, and that's just the thoroughness of
14 the search procedure; correct?
15 A.      Well, the -- my particular procedure can -- the
16 way I do it is I clear a section in a room, and what I
17 mean by clear is I take everything out of there and
18 then that's my clean zone.  That's where after I search
19 something, whether it be clothes, whatever the article
20 is, after I'm sure that -- or I'm satisfied there is
21 nothing there, I take it out, that little section that
22 I've cleared out, so when I'm done with the room
23 initially, everything would look like it would be in a
24 pile.
25 Q.      I think you're misunderstanding my intentions

1 here.  I'm just trying to say that when you walk out of

2 the premises, you're hopeful that you have found what

3 there was -- what was to be found; is that correct?

4 A.      Yes, sir.

5 Q.      Now, with regard to the drug thing, I think Ms.

6 Johnston asked a couple of questions, and is it the sum

7 of your testimony that you -- if you're a drug user,

8 you basically rely on eyeballing the drugs; is that

9 right?

10 A.      Sometimes.  I mean, a person -- that was

11 referring to the smallest -- one-tenth of a gram.

12 Q.      Is that yes?

13 A.      Sometimes.

14 Q.      Sometimes.  If you're a drug seller, more often

15 than not, you have a scale?

16 A.      More often, unless you've developed a trust --

17 let's say you and I were in the trade and we had been

18 dealing with each other for X number of years and I

19 trusted you and you gave me no reason not to trust you,

20 there may be times when I didn't -- I wouldn't bring a

21 scale because I trusted you.  We have a trust.

22 Q.      But before we develop that trust, I certainly

23 had a scale, right?

24 A.      I would think you would, yes, sir.

25 Q.      Thank you, sir.

1          MR. MCKNETT:  If I may, Your Honor.

2          THE COURT:   You may.

3                      **RECROSS-EXAMINATION**

4          BY MR. MCKNETT:

5    Q.      Detective, Ms. Johnston asked you about the

6    Hallmark bag and the green, blue --

7    A.      Red, green, and white.

8    Q.      Multicolored bag.

9    A.      Yes, sir.

10   Q.      You don't know how those bags got into the

11   studio; do you?

12   A.      No, sir.

13   Q.      Now, if someone happened to walk past the boxes,

14   the champagne box that contained those bags and look

15   down into it, the person wouldn't see drugs, would she?

16   A.      No.

17   Q.      You would see a Hallmark bag, the multicolored

18   bag, the trash bag?

19   A.       It wasn't sealed, but I can speak to that

20   because I located that bag.  It was closed, but you

21   know how the middle is kind of touching but the edges

22   would be open, but I mean, I didn't --

23   Q.       If you walked by it and you looked down, you

24   might see the Hallmark bag, you might see part of the

25   green, blue, white bag?

1  A.      You could see the top of the -- if you look at
2  the picture, you could see the top of the green, red,
3  white bag and the top of the Hallmark bag, and I mean,
4  if you looked down into the Hallmark bag through the --
5  near the worn corner, you may catch a glimpse of
6  something.

7  Q.      The glimpse -- you wouldn't catch a glimpse of
8  drugs?

9  A.      They were pretty much, you know, covered with --
10 in the container and in the black bag.

11 Q.      Right.  And if someone happened to be carrying
12 those bags, the Hallmark bag and the other multicolored
13 bag, and looked down into them, all the person would
14 see would be the Aqua Net can, maybe a trash bag?

15 A.      I think it would be difficult to see it if a
16 person was carrying it as you've described.

17 Q.      You wouldn't see drugs even if you looked down
18 into the bags when you were carrying it; would you?

19 A.      If it were shifted, it would be difficult to see
20 it, yes.

21 Q.      If the contents of the bags on June 1st, 2004,
22 were the same as the contents of the bags when they
23 were taken into the studio?

24 A.      Yes.

25 Q.      And we have no idea whether that's true or not;

1 do we?

2 A.        Repeat -- I'm sorry.

3 Q.        We have no idea whether the contents of the bags

4 as found on June 1st, 2004, were the same contents at

5 the time that the bags were taken into the studio.

6 A.        I don't know what was taken.

7 Q.        No one knows what was in those bags when they

8 were taken into the studio.

9 A.        I don't know.  I don't know if anyone else would

10 know.  The person who carried the bag in may know.

11 Q.        Only the person who packed the bags and we don't

12 know who that was, do we?

13 A.        I don't know.  No, sir.

14        MR. MCKNETT:   Thank you.

15        MS. JOHNSTON:   Nothing further.

16        THE COURT:   All right.  You may step down.

17 Thank you very much.

18        (Witness excused at 12:32 p.m.)

19        MS. GREENBERG:   Your Honor, we will call

20 Sergeant Tim Muldoon as the government's next witness.

21 While he's doing that, Special Agent Snyder is going to

22 put some items on the table.

23        MS. JOHNSTON:   Court's indulgence a moment,

24 please.

25        Your Honor we will next be calling Colleen

1  Muldoon.   There are two Muldoons  in the case, Your

2  Honor, but it seems that Mr. Muldoon has decided maybe

3  to go to lunch early.

4         THE COURT:  So does she have the rank of

5  sergeant as well?

6         MS. JOHNSTON:   No, she has a rank of corporal,

7  so if the Court will bear with me.

8         (Witness Colleen Muldoon resumes the stand.)

9                    **DIRECT  EXAMINATION**

10        BY MS. JOHNSTON:

11  Q.    Corporal Muldoon, would you please state your

12  full name for the record?

13  A.    Corporal Colleen Muldoon, M U L D O O N.

14  Q.    Where are you employed?

15  A.    With the Prince George's County Police

16  Department.

17  Q.    How long have you been so employed?

18  A.    For almost 18 years now.

19  Q.    You testified previously in this case, I

20  believe, about a surveillance; is that correct?

21  A.    Yes, ma'am.

22  Q.    Just so the jury recalls, what is your narcotics

23  experience?

24  A.    I've been in the narcotic enforcement division

25  for a little over 15 years.  I have worked in long-term

1 investigation s identify ing co-conspirator s.  I've
2 work ed on wiretap s, Title IIIs.  I've also done a lot
3 of surveillance s and search warrant s of that sort.
4 Q.     In term s of search warrant s, have you had
5 occasion to obtain search warrant s and execute your
6 fair share of search warrant s during all of those
7 year s?
8 A.     Yes, ma'am .
9 Q.     Calling your attention to on or about June 1st
10 of 2004 , were you asked to assist Detective Eveler with
11 the continuation of the investigation of Ms. Martin and
12 her associate s?
13 A.     Yes, ma'am .  I was asked to be a part of a
14 search warrant located at 846 Oglethorpe Street in
15 Washingt on, D. C.
16 Q.     Would that be in Northeast Washington ?
17 A.     That would be, ma'am .
18 Q.     What was your responsibility in regards to the
19 execution of the search warrant at 846 Oglethorpe
20 Street ?
21 A.     I would take photograph s of any evidence that
22 was found , and I would actual ly recover it and tag it ,
23 and then I actual ly -- when I was done with all that , I
24 brought it back to Montgomery County where we were
25 collect ing all the evidence at that time .

1  Q.      What do you mean by tag the evidence?

2  A.      We would -- I would, once they -- one of our

3  search teams would find an item, it was my

4  responsibility  to go there and take the pictures, they

5  would write down where they found it, what time it was,

6  who found it, put it in the bag, and then I would put

7  it down and would take it from them and write on our

8  return exactly what was found and what was recovered

9  and that would -- that's what I mean by tagging it.

10 Q.      When -- about how many agents did you have there

11 assisting you with the search?

12 A.      We had about six.

13 Q.      Was there anyone in the residence when you got

14 there?

15 A.      There was nobody home when we got there.

16 Q.      Did anyone come while you were in the process of

17 searching?

18 A.      No.  No one came to the house.

19 Q.      Could you describe how the search was conducted?

20 Were there officers designated to particular areas?

21 A.      That's correct.  Once we secured the residence,

22 we went into the residence, we took some photos of how

23 it looked prior to us searching.  Then I designated

24 officers or agents to search a certain area of the

25 house.

1  Q.      Can you describe for us what was at that

2  location?  Apartment?  Single family home?

3  A.      It was attached like a row, hometown-house kind

4  of thing.  It was three stories, consists of a

5  basement, a first floor, and a second floor.

6  Q.      Did you take pictures to show the overall layout

7  of the house?

8  A.      Yes, ma'am.

9  Q.      In addition to that, did you prepare any

10  sketches or charts?

11  A.      I did do a diagram.

12         MS. JOHNSTON:   Your Honor, if I could ask the

13  witness to step down.  We're going to be using some

14  photo boards with her.

15         THE COURT:   Yes, you may.

16         MS. JOHNSTON:   Thank you.

17         BY MS. JOHNSTON:

18  Q.      Detective Muldoon, I'm going to ask you to keep

19  your voice up nice and loud so everyone can hear you.

20         I'm going to give you a laser pointer.  First of

21  all, beginning with the first photograph, P-138, if you

22  could tell us what we're looking at there.

23  A.      This is Oglethorpe Street here and this is the

24  front entrance to the address.  The apartment -- the

25  house that we were looking at.

1  Q.      Did you prepare a diagram of the first floor of

2  the residence ?

3  A.      I did .

4  Q.      Let me show you CH-6 .

5          Do you recognize that diagram ?

6  A.      That 's my diagram .

7  Q.      I'm going to put it up on the overhead so you

8  can see it on the monitor .  If you could , using that

9  diagram , describe for the ladies and gentlemen of the

10 jury the layout of the first floor .

11 A.      I guess as you walk in the front door , the

12 stairwell is there .  You have a living area on this

13 side .  Then there 's a walkway this way that goes into ,

14 like , a small little hallway , and then there 's , like , a

15 table here .  The kitchen , of course , is in this area ,

16 the stairs to the basement goes down and there 's a

17 small bathroom here .  There is an exit door here -- no ,

18 I'm sorry , it's about right here , an exit door .

19 Q.      Leading out to the back ?

20 A.      Leading out to the back , yes .

21 Q.      If we could then look at P-139 .  Describe what

22 that is in relation to the chart of CH-6 .

23 A.      P-139 is in that living room area , it's against

24 the wall .  That couch would be , like , right about there

25 on that wall .

1  Q.      And P-140.  What do we see in P-140?

2  A.      That's exactly when you walk in the front door,

3  that refrigerator is right -- as you can see the

4  stairwell in the picture.

5  Q.      You can use the laser on the picture as well?

6  A.      Okay.  This is the stairwell I was referring to

7  earlier.  As you walked in the front door, there is a

8  refrigerator.  This is the hallway that goes into the

9  back or the kitchen and the eating area is --

10  Q.     And I'm going to the next picture, P-142.

11  A.     This picture?

12  Q.     Yes.

13  A.      This is a picture of the eating area that I

14  referred to in the diagram right there.  As you walk

15  down, this is where the table -- the kitchen table is.

16  Q.     And P-141, what is that?

17  A.      This area here is the walkway that I was

18  mentioning earlier that you walked into the kitchen

19  area or the eating area -- I'm sorry, the eating area

20  that's shown in this picture here.

21  Q.     P-142?

22  A.     Yes, ma'am.

23  Q.     You would be out of numerical order on the

24  chart; is that right?

25  A.     Yes, ma'am.

1  Q.       Then going to P-143, what do we see here?

2  A.       This is the kitchen area, which is right there.

3  The kitchen area in the house.

4  Q.       And then the bottom picture on the far left,

5  P-144.  What is that?

6  A.       This is the back exit.  As you can see, here is

7  the shades, the blinds, the blinds there, and then

8  there is this door area here, and that would be right

9  on the side here, this kitchen area right there.

10 Q.       Referring to P-143?

11 A.       Correct.

12 Q.       Now, in regards to Government 's Exhibit P-142,

13 the far picture on the second row.

14 A.       This picture here?

15 Q.       Yes.  What is that on the table?

16 A.       This is a monitor that we had discovered.  It

17 was -- I don't know if it was filming, but it was

18 monitoring.  It had cameras.  There were cameras

19 located on the outside of the house, the front door,

20 and then at the back door, so anyone inside the house

21 could see who was at the doors, and that one monitor

22 was on this table.

23 Q.       In the eating area?

24 A.       Yes, ma'am.

25 Q.       Do we see it again in P-141 as well on the

1 table?

2 A.      Yes, ma'am, it's right there.

3 Q.      Now, on chart CH-6, there appear to be names.

4 Can you explain what the names mean?

5 A.      Yes, ma'am.  The names here are the names of the

6 agents or officers that were actually searching in

7 those locations.

8 Q.      Why don't we stay with the kitchen for a while.

9 Did you recover some items in the kitchen?

10 A.      Yes, ma'am.

11 Q.      If I could have Oglethorpe 2, 3, 4, 6, 7, 8 and

12 Drugs 24.  Showing you first what's been marked as

13 Oglethorpe 2.  Do you recognize this box?

14 A.      No.  You have to open it up.

15 Q.      Do you recognize what's inside the box?

16 A.      Inside the box are six Pyrex measuring cups, all

17 of them are glass, which have some sort of residue on

18 the bottom of them.

19 Q.      Do you want to count them to make sure you have

20 the number?

21 A.      Eight.  I have eight.

22 Q.      One of them appears to have been broken.

23 A.      Yes, ma'am.

24 Q.      Was it broken when you recovered it?

25 A.      No.

1  Q.      What was done with these exhibits?

2  A.      These exhibits were taken to Montgomery County

3  with the rest of all the items, and they were put into

4  evidence and checked for any CDS residue on them.

5  Q.      Calling your attention to our photographs --

6  now, are they depicted in any of the photographs?

7  A.      They're here on this shelf.  I don't know what P

8  number that is, ma'am.

9  Q.      For the record, P-151.

10 A.      They're on the bottom shelf here, and the

11 cabinet, which was located right about here on this

12 cabinet there.

13 Q.      Referring to P-143?

14 A.      Yes, ma'am.

15 Q.      Why did you seize the Pyrex bowls?

16 A.      To me, when they had the residue on the bottom,

17 they were also stored with baking soda along with a

18 scale.  They were all in that one area, and it was to

19 -- where someone normally would use that kind of stuff

20 to make cocaine.

21 Q.      To make what kind of cocaine?

22 A.      To make cocaine base or crack cocaine.

23 Q.      Let me show you what's next marked as

24 Government's Exhibit Oglethorpe 3, do you recognize that

25 exhibit?

1  A.      These are the two baking soda boxes that are

2  depicted in the picture here that was recovered with

3  the Pyrex.

4  Q.      And Oglethorpe 4, tell us what Oglethorpe 4 is.

5  A.      It's a scale -- it's a weigh scale. Again, it

6  was recovered in the same location as the others. I

7  don't know if you can see the picture. I don't think

8  you can see the scale in there, but it was recovered in

9  that same area.

10 Q.      Referring to P-151.

11 A.      Yes, ma'am, in the kitchen area.

12 Q.      Now, while we're up here, I want to -- let me

13 show you what's been marked as Exhibit P-152, which was

14 previously admitted during the testimony of Chemist

15 Gervasoni. Do you recognize Drugs 24?

16 A.      Yes. This is the -- a sifter that was recovered

17 and it's depicted in this picture right there. It had

18 cocaine residue on it. It was recovered from on top of

19 the refrigerator.

20 Q.      Why did you seize that item?

21 A.      Because it had cocaine residue on it. It used

22 -- you can also use a sifter just to sift down any kind

23 of -- just to make the cocaine smoother before you

24 start tinkering with it, I guess.

25 Q.      And where in relation in the kitchen was it?

1  A.      You can't see where that refrigerator is  in the

2  picture .   It's in the refrigerator  up front .   There's

3  another refrigerator  in the kitchen that's not

4  depict ed.

5  Q.      In the same general area?

6  A.      It was in the refrigerator , yes, ma'am .

7  Q.      On to p of the refrigerat or?

8  A.      Yes .

9  Q.      In the general area that's depict ed as P-143 in

10 the kitchen ?

11 A.      Yes, ma'am .

12 Q.      In addition to recovering  those item s, did you

13 also recover some document s from the kitchen area?

14 A.      Yes .  There were some document s in the kitchen

15 drawer that we went through .

16 Q.      I'm going to show you what's been mark ed as

17 Government 's Exhibit Oglethorpe 6.  And ask you if you

18 can identify Government 's Exhibit Oglethorpe 6.

19 A.      These are two pads that was recovered from the

20 drawer in the kitchen area .   They have phone number s,

21 name s on there , like a telephone book .   There's some

22 calculation s in there , mathematical calculation s.   A

23 lot of phone number s.

24 Q.      Now, a drawer in which room?

25 A.      I'm sorry , in the kitchen , in the -- I belie ve

1  it's that corner drawer right there in the back.

2  Q.      Referring again to P-143?

3  A.      Yes.

4  Q.      Let me also show you Government 's Exhibit 7 and

5  ask you if you recognize that exhibit.

6  A.      This, again, is another pad that was recovered

7  in that same drawer in the kitchen. It has, again,

8  several numbers and names inside of it. There's some

9  other things in the back as well.

10 Q.      There are some green tabs on there and maybe

11 some tabs on the previous exhibit. Were those on there

12 when you recovered it?

13 A.      No, ma'am. There was nothing on there. There

14 was no tabs.

15 Q.      Let me next show you Oglethorpe No. 8. Do you

16 recognize these receipts and documents?

17 A.      Yes, ma'am. Again, these documents were

18 recovered from that same drawer. It has --

19 Q.      Let me put some up on the screen so the jury can

20 see it. If you need to see them up close, I'll bring

21 them down to you while I'm walking over there. In

22 regards to -- were these in these little plastic

23 envelopes when you seized them?

24 A.      No. The drawer's like a junk drawer, kind of

25 thing -- we all kind of have them. It was all sort of

1 shoved in that drawer.  They were kind of all over the

2 place.

3 Q.      What did you do with the contents of the drawer?

4 A.       Everything was seized, things that we did see

5 and that we thought were important, they were seized

6 and packaged and brought back to Montgomery County.

7 Q.      In preparation  -- in those bags, for example,

8 from this particular drawer, did you put anything in

9 that bag so you would know where the items came from?

10 A.      Right.  As I explained earlier, the officer who

11 did the search would go ahead and write down on there

12 the time and date recovered, what they recovered and

13 where they found it, and that was all stuck in the bag,

14 so that these items came from that one bag.

15 Q.      In preparation for your testimony, did you meet

16 with Detective Eveler and myself and actually go

17 through the bags and pick out these particular items?

18 A.      Yes.  Yes, we did.

19 Q.      Are you able to see that?

20 A.      I'm going to have to come by you, ma'am.  I

21 can't read it.  I know what they are.  They're

22 receipts.  They're Wal-Mart receipts.  There's a Jack

23 in the Box receipt.  The only thing I can't read is the

24 dates or areas in which they were --

25 Q.      Let me bring them to you.  If you could

1  generally describe them to the jury.  We can always

2  publish them to the jury.

3  A.      Okay.  This is a Riggs Bank receipt, actually,

4  after making deposits.  There is the rose from Union

5  Station.  There is a Shell Food Mart here from Atlanta

6  -- LA is -- what state is LA?

7          JUROR:   Louisiana.

8          MR. WARD:  I'm sorry, we can't hear the witness.

9          MS. JOHNSTON:   Please continue with your

10  testimony.

11         THE WITNESS:   I can't remember what some of my

12  states are.

13         MR. SUSSMAN:   Your Honor --

14         MS. JOHNSTON:   If you would, speak loudly.

15         THE COURT:   Counsel?

16         MR. MARTIN:   I'm wondering.  Is all this part of

17  Exhibit 1?

18         MS. JOHNSTON:   They're part of Exhibit 1.  It

19  might be easier if I have her resume the witness stand

20  briefly, and then we'll come back down here if that's

21  easier for counsel.  You resume the witness and stand,

22  and I will put them up there where everyone can see

23  them.  There is a monitor up there.

24         BY MS. JOHNSTON:

25  Q.      Again, looking at Oglethorpe 8.  You mentioned

1  that there were a series of receipts.  Can you see the

2  date and time of this receipt?

3  A.      '04.

4  Q.      Where is that receipt?

5  A.      I'm sorry, it's in Texas -- from Texas.  It's

6  from Mercantile in Texas that receipt's from.

7  Q.      Are you able to read the date on that?

8  A.      '04.  03/27/04.

9  Q.      What kind of receipt does this appear to be?

10  A.      That is a receipt from Friday, March 19, 2004,

11  at 3:00 in the morning for unleaded gasoline.  Customer

12  order for -- I guess it's a dinner party -- dinner for

13  buffet table served at March 15 of '04 at 6:00 in the

14  evening.

15  Q.      Was this ticket --

16  A.      From Texas.

17  Q.      Let me put it up on screen for a second.

18  A.      It looks like it's for food.

19  Q.      At the same place as the last one, the Golden

20  Corral?

21  A.      Yes, and that's on 3/15/04.

22  Q.      Does it give you the location of that Golden

23  corral?

24  A.      Texas.  El Paso, Texas.

25  Q.      What is the next receipt?

1  A.        Murphy  USA  in  Dallas ,  Texas .

2  Q.        The  date  of  that  one ?

3  A.        Is  3 / 18 / 04.

4  Q.        The  next  one ?

5  A.        Town  &  Country ,  and  that  is  also  in  Texas .   The

6  date  on  that  is  3 / 18 / 04.

7  Q.        How  about  this  one ?

8  A.        Gas  on  3 / 19 / 04  in  Tenne ssee .

9  Q.        This  is  from  Wal-Mart  in  --  I  guess  at  the

10  bottom  --  I  can't  see  the  bottom ,  ma'am .   There  is  a

11  date .   I  don't  see  a  location .   The  date  on  there  is

12  March  7  of  '04.

13  Q.        Does  it  give  you  an  area  code  for  the  manager ?

14  A.        Oh ,  area  code  is  318 ,  and  I  do  not  know  where

15  that  come s  back  to .

16  Q.        You  mention ed  the  Jack  in  the  Box .

17  A.        Yes .   On  March  7  of  '04.

18  Q.        And  then  some  bank  receipt s ?

19  A.        Yes ,  ma'am .   From  Wash ington ,  D. C.

20  Q.        There  are  a  couple  of  those ;  is  that  correct ?

21  A.        From  Washington ,  D.C.  area ,  yes ,  ma'am .

22  Q.        And  the  bank  on  those  bank  cards  is ?

23  A.        Rig g's  Bank .

24  Q.        And  then  the  one  that  you  were  having  a  problem

25  with ,  I  believe .   Recognize  this  one ?

1  A.        Yes.

2  Q.        Let me zoom in.  Can you see the date on that?

3  A.        03/06/04.

4  Q.        Again, in March of '04; is that correct?

5  A.        Yes, ma'am.

6  Q.        And the location?

7  A.        Athens, AL is -- I want to say Alabama.

8  Q.        Okay.  You're not sure what state it is?

9  A.        I can't remember.

10 Q.        That's okay.

11 A.        That sounds silly.

12 Q.        Then we have another one -- another receipt.

13 Again, what's the date on this receipt?

14 A.        3/6/04.

15 Q.        And the --

16 A.        That's in Georgia.

17 Q.        These all came out of the same drawer; is that

18 correct?

19 A.        Yes, ma'am, they did.

20 Q.        In addition to those exhibits, I want to show

21 you a couple more we've marked as Oglethorpe 8A.

22           Do you recognize this exhibit?

23 A.        Can you pull that back, the camera?

24 Q.        I will indeed.

25 A.        Oh, that's for a Budget Rental Car receipt and

1  --

2  Q.      Whose name is that receipt?  I still can't see

3  it.  McKenzie -- is that O L T O N, Olton?

4  Q.      Where was that vehicle rented?

5  A.      Is that D. C.?  I don't know if you can move it.

6  Can you move the --

7  Q.      Where do you see that it's rented from?

8  A.      Washington, D. C.  Thank you, ma'am.

9  Q.      What is the time -- does it reflect on there the

10 date it went out?

11 A.      I went out on March 20 of '04 at 12:27 in the

12 afternoon, and it came back at three -- I'm backwards.

13 It went out on 3/5/04, and it came back in on 3/20/04.

14 Q.      This receipt was recovered from?

15 A.      Again, in that drawer in the kitchen.

16 Q.      Let me show you the next exhibit, Oglethorpe 8B.

17 Again, is that another document recovered from the same

18 drawer?

19 A.      Yes, ma'am.  It's from a tire store, and it's a

20 receipt from a location in Las Cruces, New Mexico.

21 Q.      What's the date of that receipt?

22 A.      3/10 of '04.

23 Q.      What does it indicate was purchased?

24 A.      Used tire wheels.  I don't know what the rubber

25 stem is.

1  Q.      You don't know what the rubber stem is?

2  A.      No.  I guess it's that little thing.

3  Q.      Let me show you the next exhibit, Government's

4  Exhibit 8C.  Again, where did this come from?

5  A.      In that drawer in the kitchen.

6  Q.      I'll bring it up to you.  Can you tell us,

7  before I put them on the screen, generally what kind of

8  document documents these are?

9  A.      Okay.  These are hotel from Red Roof Inn and the

10 Comfort Inn receipts.

11 Q.      I'll put it on the screen so everyone can see

12 them.  Beginning with the first one, the Red Roof Inn

13 receipt.

14 A.      That's in El Paso, Texas, and the date on there

15 is March 7 through the -- is it the -- the 10th.  March

16 7 through March 10 of '04.

17 Q.      Who was the individual the room was registered

18 to?

19 A.      Tiffany Vessels.

20 Q.      How was the room paid for?

21 A.      I need you to --

22 Q.      How was it paid for?

23 A.      Cash.  For the third night, it says cash.  Cash.

24 Yes, ma'am.

25 Q.      Show you the Comfort Inn bill.  Do you recognize

1 that bill?

2 A.      Yes, ma'am.  Again, that was recovered in the

3 drawer in the kitchen.

4 Q.      In whose name is the room rented?

5 A.      Can you focus in?  Okay.  It's Tiffany Vessels.

6 Q.      What was the date on this one?  Arrival date,

7 departure date?

8 A.      Arrival date is 3/14/04; departure date is

9 3/18/04.

10 Q.     And let me show you -- do you recognize this

11 Comfort Inn bill?  Let me zoom in.

12 A.      Yes, ma'am.  Again, that item was recovered from

13 the drawer in the kitchen.

14 Q.     Who is the room registered to?

15 A.      Tiffany Vessels.

16 Q.     Where is this hotel?

17 A.      In El Paso, Texas.

18 Q.     What's the time period covered by this?

19 A.      March 11 of '04 through March 13 of '04.

20 Q.     Court's indulgence.  One minute.

21        Let me show you next what's marked as

22 Government's Exhibit Oglethorpe 8.

23        Do you recognize this item?

24 A.      Yes, ma'am.  That was also recovered in the

25 drawer in the kitchen.

1  Q.      Again, when it was recovered, the yellow tabs,
2  were they on it?
3  A.      No, ma'am.  The yellow tabs were not on there.
4  Q.      Why would you seize something like Oglethorpe
5  8D?
6  A.      It had telephone numbers inside it with names.
7  Q.      Now, was any search conducted of the second
8  floor?
9  A.      Yes, ma'am.
10  Q.      Did you similarly draw a rough diagram of the
11  second floor?
12  A.      Yes, ma'am.
13         THE COURT:  Ms. Johnston, we're going to go to
14  the second floor at 2:10 p.m.
15         MS. JOHNSTON:  That's fine.  Thank you, Your
16  Honor.
17                 (Jury excused at 1:03 p.m.)
18                 (Off the record at 1:03 p.m.)
19                 (On the record at 2:11 p.m.)
20         THE COURT:  Counsel, are you ready for the jury?
21  Here comes the jury.
22                 (Witness resumes the stand.)
23                 (Jury returns at 2:13 p.m.)
24         THE COURT:  Ms. Johnston, I think we're ready to
25  go upstairs.

1          MS. JOHNSTON:   Unfortunately I don't think  that

2 microphone is working quite the way we had hoped.  With

3 the Court's permission, I'll try to --

4          BY MS. JOHNSTON:

5 Q.      Corporal Muldoon, before we broke for lunch, we

6 were getting ready to go up to the second floor.  Do

7 you recall that?

8 A.      Yes, ma'am.

9 Q.      Let me give you give you the laser pointer

10 again.  Looking at CH-7, which will be up on the

11 monitor, can you describe for the ladies and gentlemen

12 of the jury what we're looking at?

13 A.      Could you move the camera back just a little

14 bit?

15 Q.      Oh, sure.

16 A.      This is the second floor of the house.  This is

17 the stairwell coming up.  It comes up again on here,

18 and then you have the platform area right here.  The

19 front bedroom here, we identified it as Bedroom No. 3.

20 There was a bedroom to the front of the house, and

21 Bedroom No. 2, and then in this back corner is Bedroom

22 No. 1, and then the landing goes around this way here,

23 and then there's the back room there.

24 Q.      Now, in terms of the three bedrooms, could you

25 describe whether there are master bedrooms or who

1 occupied the bedrooms?

2 A.      Well, none of the bedrooms had their own

3 bathroom in there.  They were just all normal-size

4 bedrooms.  The front bedroom here, it looked to us like

5 it was decorated for a female child, and then this

6 front bedroom here was decorated for boy child, and

7 then the back bedroom was decorated for an adult.

8 Q.      That's based on the furnishings?

9 A.      Yes, the furnishings.

10 Q.      The bedrooms are marked on your diagram as what?

11 A.      Three for the girl's and two for the boy's.

12 Q.      I'm looking at our photograph beginning with

13 P-145.  Can you describe what's depicted in that in

14 relation to your diagram?

15 A.      The first picture here is a picture of the front

16 of the back room there on that landing.  This would be

17 the front bedroom, which would have been the girl's

18 bedroom here, the back in this corner, there would be

19 the front boy's bedroom, and this is where we

20 considered the adult room.

21 Q.      And then going to the next picture, P-246.

22 What's depicted there?

23 A.      This is the Bedroom No. 1, which we identified

24 as being an adult room.  This is looking in from the

25 closet here, looking out into corner to back.

1  Q.      And the next picture, P-147?

2  A.      In this room, it's the same room.  Again, this

3  is the doorway leading into the room.  This is a closet

4  here.  The bedroom is -- the bed is right there.  And

5  that main Bedroom No. 1.

6  Q.      What is that on top of the chest?

7  A.      That, again, is one of those monitors that we

8  discovered.  The other monitor, again, was downstairs.

9  It depicted anybody at the back door.

10 Q.      And P-148?

11 A.      This closet here is actually this closet there.

12 It's just a picture of the closet in the room.

13 Q.      And P-149.

14 A.      P-149 is this one here, and we recovered a

15 bullet -- a nine millimeter bullet on the shelf of this

16 closet.  After we took all the stuff down, we covered a

17 bullet.  This is just the shelf we actually lifted it

18 up, and that ledge that was sitting on it, we couldn't

19 get a good picture of it when we were searching, so

20 that's why that bullet there is on the ledge where that

21 shelf is.

22 Q.      And the last picture, P-150.  What's depicted in

23 that?

24 A.      This is a shoe box.  It has marijuana residue on

25 it.  It came from underneath the bed.

1  Q.     If I could show you what's been marked as

2  Oglethorpe 1 and ask if you can identify that exhibit.

3  A.     Yes, ma'am.  This is -- actually, it's a .32

4  caliber bullet.  I stand corrected.  This is the bullet

5  that was recovered here from the bedroom.

6  Q.     That's in P-149?

7  A.     Yes, ma'am.

8         MS. JOHNSTON:  Okay.  With the Court's

9  permission, may we publish that to the jury?  It's in a

10 sealed envelope.

11        THE COURT:  Yes, you may.  You should start with

12 our foreperson.

13        THE WITNESS:  I apologize.

14        BY MS. JOHNSTON:

15 Q.     Corporal Muldoon, so that we keep everything

16 going the same way.  If we could, then did you also

17 search the basement area of this residence?

18 A.     Yes, we did.

19 Q.     Again, did you make a chart of the basement area

20 of the residence?

21 A.     Yes, ma'am.  I did do a diagram of the basement.

22 Q.     Okay.  Put it up on the screen.  And do you

23 recognize that chart?

24 A.     That is the diagram I drew depicting the

25 basement.

1 Q.      Again, if you could explain the layout of the

2 basement.

3 A.      This is a stairwell there.  As you're coming

4 down the steps, there's a small landing here.  As you

5 walk down here, it's kind of open here, but along this

6 wall, there was a lot of electronics equipment, a lot

7 of things still in boxes.  You walk into this room

8 here, as we identified as Basement Room No. 2.  It was

9 -- this is -- right here is the front of the house.

10 You can see it on the front.  There's a picture of the

11 front.

12 Q.     Let me bring that board back, since -- showing

13 you what's been marked as P-138.

14 A.      The basement window right there where the front

15 of the car is at the very front, when you see where it

16 says dresser, it would be right there.  That's the

17 front, just to give you guys an idea of where

18 everything is.

19         Then when you walk into the back area, we

20 identified this room as Basement Room No. 3.  There was

21 -- there's a back door here.  An exit to go out and

22 over here.  There's a washer and dryer area with all

23 kinds of soap.

24 Q.     If you can step back so the jurors can continue

25 to see the screen while you're explaining what's

1 depicted.

2          Calling your attention to the photographs.   And

3 so the record is clear, identified someone has advised

4 me that I may have identified Picture P-146 or 143 as

5 246 or 243.

6          MS. JOHNSTON:   Ms. Greenberg, what number is it?

7          MS. GREENBERG:   146.

8          BY MS. JOHNSTON:

9 Q.      It should be P-146, not 246 in the record.   If

10 we could now start with P-153, and tell us what we're

11 looking at in relation to your diagram.

12 A.      This is a -- I call it a workout area.     It's

13 right here in  Basement Room No. 1.  Here would be the

14 workout bench, and the bicycle would be  right there.

15 In the back is a small table.   That's what we're

16 looking at here.

17 Q.      And in regards to P-154, what do we see there?

18 A.      Okay.  On this weight bench here, there is a

19 brown suitcase, and then on top of that is a locked red

20 toolbox, and that's what this is.  This is the bench

21 here with the brown suitcase, and the red lock toolbox.

22 Q.      That's depicted also on P-153?

23 A.      Yes, ma'am.

24 Q.      Did you find several toolboxes in different

25 areas of the basement?

1  A.      Yes, ma'am.

2  Q.      Were they all found in the basement?

3  A.      They were all found in the basement.

4  Q.      Focusing in on Government's Exhibit P-154.  Let

5  me show you what's been marked as Government's Exhibit

6  Oglethorpe 9, which I believe is your 19.  Do you

7  recognize this toolbox?

8  A.      Yes, ma'am.

9  Q.      Was it locked when you recovered it?

10 A.      It was locked and we pried it open.  It was

11 locked in right there?

12 A.      If I can get my notes.

13 Q.      Yes, if you would like to retrieve your search

14 warrant notes, that's fine.

15         And you also mentioned a brown suitcase in

16 P-154.  Is that depicted on the photographs?

17 A.      Yes, ma'am.  The brown suitcase is on the bottom

18 part.  The toolbox is sitting on top of that.

19 Q.      And P-163.  What does that depict?

20 A.      That is the brown suitcase.  It's opened up and

21 we recovered within that brown suitcase there was a ski

22 mask in there, there was a bulletproof vest, which is

23 that white thing here, and then there were was some

24 ammunition here.

25 Q.      Was that live ammunition from what you could --

1 A.      Yes.  I believe it was .45 caliber  ammunition .

2 Q.      Now , if we could return to the toolbox ,

3 Oglethorpe  9, which is , I believe , your Search Item No.

4 19; is that correct ?

5 A.      Yes, ma'am .

6 Q.      Calling your attention  to Photograph  P-155 , if

7 you could describe what we're looking at there .

8 A.      On this top portion here , when you opened it up ,

9 it has this part here , the top part of the toolbox ,

10 that's what you're looking at here , and there we

11 recovered  cocaine .  There's a whole bunch of different

12 size s and baggi es.  If I could take a look .

13 Q.      Go right ahead .

14 A.      There 's a couple of big baggi es of cocaine here .

15 I think those were both hydrochloride  and cocaine base,

16 which is the powder and the crack cocaine .

17 Q.      Let me show you what 's been previous ly admitted

18 as Dobie (sic) 19 and 19A.

19       MS. GREENBERG:   Could you repeat that ?

20       MS. JOHNSTON:   Drug s 19 and 19A.

21       MR. WARD:   I'm sorry , is it Dobie or is it

22 drug s?

23       MS. JOHNSTON:   It's Drug s 19 and 19 A.   I

24 mis spoke , Mr. Ward , and Ms. Greenberg  was kind enough

25 to correct me .

1          BY MS. JOHNSTON:

2 Q.      Do you recognize those exhibits?

3 A.      Yes, ma'am.

4 Q.      What are those?

5 A.      These are the cocaine that was recovered from

6 the toolbox, this particular toolbox.

7 Q.      While we're doing that, let me also show you

8 Drugs 20.  Do you recognize this as well?

9 A.       Right.  This is the other portion of the cocaine

10 that was recovered from that same toolbox.

11 Q.      Can you -- you mentioned that was both crack and

12 -- crack cocaine or cocaine base and hydrochloride.

13 Can you tell us, 20A, what that is?

14 A.      What I have here is the hydrochloride and what I

15 have here --

16 Q.      In Drugs 19?

17 A.      In 19, this is the crack cocaine.

18          MR. MARTIN:   Objection, 701 again.

19          BY MS. JOHNSTON:

20 Q.      Is that based on your experience and your

21 observations?

22          MR. MARTIN:   Objection, Your Honor.  May I

23 approach, please?

24          THE COURT:   You may approach.

25               (At the bar of the Court.)

1        MR. MARTIN:   Your Honor, briefly, because I

2   don't want to be up here long.   I notice police

3   officers are coming up.   They're testifying under their

4   general knowledge, experience, et cetera.   It sounds

5   like it's a backdoor attempt to get them in as expert

6   witnesses.   Even if she is an expert witness regarding

7   police matters, she's not a chemist, she's not a

8   pharmacologist, there is no indication or evidence that

9   she tested this stuff.   She didn't taste it.

10       THE COURT:   Is there a stipulation on this?

11       MR. MARTIN:   No, there is no stipulation.

12       MS. JOHNSTON:   The chemist, Richard Gervasoni,

13   testified previously they were crack and they were

14   cocaine.   It was a little bit out of order.

15       THE COURT:   If you've already got it in through

16   Gervasoni, don't ask her what it is.   You say what it

17   appears to be, but leave it for the expert.

18       MS. JOHNSTON:   I thought that's what she said,

19   that it appeared to be.

20       THE COURT:   Just leave it to appearances.   Thank

21   you.

22              (Back in open court.)

23       BY MS. JOHNSTON:

24   Q.    What does Government's Exhibit 19 appear to be

25   to you?

1 A.       It appears to be crack cocaine.

2 Q.       And you mentioned different size packages.

3 Could you describe the different size packages you see

4 in there?

5 A.       On this side, they look like they're bigger

6 pieces and then you have some smaller ones in there.

7 Just different packaging and different sizes for

8 resell.

9 Q.       Now, bags that they were originally packaged in,

10 are those the ones that are attached with the black

11 powder?

12 A.       Yes.

13 Q.        Do you know what the black powder, why the

14 black powder is done?

15 A.       For fingerprints.

16       MS. JOHNSTON:   If we could publish Drugs 19 to

17 the jury at this time, Your Honor.

18       THE COURT:   You may.

19       MS. JOHNSTON:   Thank you.

20       BY MS. JOHNSTON:

21 Q.       Next, if I could show you Drugs 20.   What does

22 that appear to be to you?

23 A.       It appears to be cocaine hydrochloride.

24 Q.       Again, in terms of that package, when you

25 recovered it, is that depicted in photograph P-155 or

1  P-156?

2  A.      It's going to be in this, and -- in both, I

3  believe.  There's some little -- yeah.  There's some in

4  the front and then there's some at the bottom, so in

5  those pictures, you will see cocaine.

6  Q.      So Drugs 20 was on the top as well as some of it

7  in the bottom?

8  A.      In the bottom portion of it.

9  Q.      And going back to the top, we -- of the toolbox,

10  you indicated was your Exhibit R-9; is that correct?

11  A.      My exhibit R-19.

12  Q.      R-19?

13  A.      Yes, ma'am.

14  Q.      What else did you recover from that toolbox?

15  A.      Also recovered from that toolbox was ammunition,

16  both in 380 ammunition, there was a .22 caliber

17  Deringer inside the toolbox.  There was a .22 hollow

18  point ammunition.  There was some Viagra pills.  There

19  was two magazines with ammunition in it.  There was

20  also a .380 handgun recovered inside the toolbox.

21  Q.      Let me show you a series of exhibits, then, in

22  reference to the toolbox.  First, if you could publish

23  Drugs 20 to the jury.

24         Now, you mentioned a firearm; is that correct?

25  A.      Yes, ma'am.

1  Q.      Where was the firearm recovered?

2  A.      I'm sorry?

3  Q.      Where were the firearms recovered?

4  A.      They would be recovered -- you can actually see

5  them in this picture.  In this top corner here is the

6  Deringer, a small gun, and then right there you can see

7  the handle.

8  Q.      Let me show you Government's Exhibit 13B and ask

9  you if you recognize that firearm, Government's Exhibit

10  Oglethorpe 13B.

11  A.      I don't think  13B is in this one.

12  Q.      Court's indulgence one moment.

13          Showing you what's been marked as Government's

14  Exhibit Oglethorpe 9, if you could identify that

15  exhibit.

16  A.      That is the weapon that you see in the top

17  corner, the .22 Derin -- I'll get it right.

18  Q.      Okay.  Was that loaded or unloaded when you

19  recovered it, if you recall?

20  A.      I don't recall.

21  Q.      Let me next show you what's been marked as

22  Oglethorpe 9B.  If you can, tell us what 9B is.

23  A.      This is going to be the other handgun that we

24  recovered.  It's going to be the .380 handgun.

25  Q.      Do you recall whether that gun was loaded or

1 unloaded?

2 A.      I don't remember.

3 Q.      All right.  Is it depicted in the photograph

4 P-156?

5 A.      Yes, ma'am.  It's right there underneath the

6 bag, partially underneath the bag.

7 Q.      You also mentioned that there were some bullets

8 recovered from that same toolbox in the bottom shelf;

9 is that correct?

10 A.      Yes, ma'am.

11 Q.      Let me show you what's been marked as Oglethorpe

12 9C.

13 A.      Right.  This is the hollow point -- .22 hollow

14 point ammunition that was recovered from there, and you

15 can see -- I believe -- I have to go up and look.  It

16 looks like it's right here.

17         I'm sorry.  It's all the way in the back corner.

18 You barely see it, but it's laying across the back

19 here.  You can see the small little hollow points in

20 the corner.

21 Q.      In addition to that, let me show you what's been

22 marked as Government's Exhibit 9D.  Do you recognize

23 that exhibit?

24 A.      This is the 38 ammunition.  This box here is

25 right there.

1  Q.       And that is the same caliber as the gun you

2  recovered ?

3  A.       Yes, ma'am .

4  Q.       Next , let me show you what's been marked as the

5  larger of the two guns you recovered .

6  A.       Yes, ma'am .

7  Q.       Let me next show you what's been marked as 9E.

8  A.       Okay .  These bullet s are -- are they 22 caliber ?

9  What did you say?  These is 9E.

10  Q.       Nine  E, bullet s in a red case .

11  A.       I'm sure it's there .  I just have to find it.

12  Is it right here in this corner ?

13  A.       I'm sorry .  Bullet in case , yes, 9E.  I have

14  these bullet s.  These are the .22 caliber recovered

15  from the area -- from in there .  I think it's

16  underneath .  I don't see it depict ed here .  It could be

17  either underneath of the black bag , but all these item s

18  did come out of that lock ed box .

19  Q.       Now, they've been tape d up .  Is that for

20  security reason s we've wrapped them up?

21  A.       Yes, ma'am .

22  Q.       Finally , let me show you what's mark ed as

23  Government 's Exhibit 10 .  Can you tell us what's in

24  Government 's Exhibit Oglethorpe 10?

25  A.       There is four magazine s for weapon s.  Look s like

1 for smaller caliber, like a .22, and then the bigger

2 caliber bullets for the bigger magazines, and then

3 there are some bullets on the bottom.

4 Q.    Also recovered from the same?

5 A.    Everything --

6 Q.    From the same toolbox?

7 A.    Everything is recovered from the same toolbox.

8        MS. JOHNSTON:   Your Honor, if we could publish

9 -- or at least show these items to the jury.

10       THE COURT:   You may display them.

11       MS. JOHNSTON:   I know they're guns.   Thank you.

12       THE WITNESS:   Just show them?

13       MS. JOHNSTON:   Yes.

14       BY MS. JOHNSTON:

15 Q.    In addition to R-19, the red toolbox that we've

16 marked as Oglethorpe 9, were there other toolboxes

17 recovered from this location?

18 A.    I'm sorry, ma'am?

19 Q.    Were there other toolboxes recovered from this

20 location?

21 A.    Yes, there were.

22 Q.    Calling your attention to Government's Exhibit

23 P-157.  Do you recognize what's depicted in P-157, 158,

24 and 159?

25 A.    Yes, ma'am.  This is the -- another toolbox that

1  was recovered from the basement.  What number is that,

2  ma'am, for me?

3  Q.     You would have to -- let me show you what's been

4  marked as Government's Exhibit Oglethorpe 11 and ask

5  you if you recognize Oglethorpe 11.

6  A.     Yes, ma'am.  I do recognize it.  This toolbox

7  here was recovered right at this corner here, as you

8  walk down the steps and you look forward, that's this

9  little corner right here, and that's depicted in that

10 very first picture.

11 Q.     Referring to Government's Exhibit --

12 A.     Right there.

13 Q.     -- P-157.

14 A.     Yes, ma'am.

15 Q.     Do you recall if that particular toolbox was

16 locked or unlocked?

17 A.     This particular toolbox was locked.

18 Q.     How did you get into that toolbox?

19 A.     We had to pry it open.

20 Q.     What did you find inside Oglethorpe 11, or your

21 R-20?

22 A.     There was another toolbox inside of that, as

23 depicted right here in this next picture -- I can't

24 read the P number.

25 Q.     That would be P-158, for the record.

1  A.      And then once we pulled this one out, what we

2  recovered within this toolbox, there was some jewelry,

3  there was some cash in there, and there was an ID card.

4  Q.      In with the cash?

5  A.      Yes.  There was $5,940 inside this lockbox.

6  Q.      Let me show you what's been marked as Oglethorpe

7  5 and ask you if you recognize that identification

8  card.

9  A.      Yes, ma'am.  This is the identification card

10 that was recovered from within this toolbox with the

11 money.

12         MS. JOHNSTON:  Your Honor, may I publish the --

13         BY MS. JOHNSTON:

14 Q.      What is the name and expiration date on that?

15 A.      The name depicted on this driver's license is

16 Washington, D.C. driver's license of Gary G. Vessels,

17 the expiration date is 10/20/2007.

18         MS. JOHNSTON:  Your Honor, may we publish this

19 identity to the jury, please?

20         THE COURT:  Yes, you may.

21         MS. JOHNSTON:  Thank you.

22         BY MS. JOHNSTON:

23 Q.      Now, what do we see here in Government's Exhibit

24 P-159?

25 A.      That is the money that was recovered from this

1 inner toolbox and rubber bands that were recovered as

2 well.

3 Q.      Does that accurately reflect the way the money

4 was when you recovered it?

5 A.      Yes, ma'am.

6 Q.      So you didn't bundle it up in that manner and

7 form?

8 A.      No, ma'am.

9 Q.      Okay.  Now, was that the only two toolboxes you

10 recovered from that location?

11 A.      No, there were two other toolboxes.

12 Q.      Calling your attention to our next board.

13 Starting with P-160, can you tell us what we are

14 observing in photograph P-160?

15 A.      This is where the toolbox -- the other two

16 toolboxes that were recovered in this back room here of

17 -- in the Basement Area No. 3, back in this little

18 corner.

19 Q.      Is that area depicted on your chart?

20 A.      Yes, ma'am.

21 Q.      Could you --

22 A.      I did.

23 Q.      Thank you.

24         All right.  If I could then begin by showing you

25 the next exhibit, which is Oglethorpe 12.  Again, all

1  this black powder that we're seeing.  Was that on it

2  when you recovered these items?

3  A.      No.

4  Q.      There's a sticker on here saying R-21.  Is that

5  your sticker?

6  A.      Yes, ma'am.

7  Q.      What does that refer to?

8  A.      That refers to the lockbox -- the sticker refers

9  to?

10  Q.      Yes.

11  A.      Just identifies for me what lockbox that was.

12  It depicts what R number I gave to it during the

13  search.

14  Q.      In reference to R-21, is it depicted in any of

15  these photographs having been opened?

16  A.      It's going to depict this one here, the very

17  first one.

18  Q.      That would be P-161, for the record.

19  A.      Yes.

20  Q.      What did you discover in P-161?

21  A.      We had to break the lock off of this as well.

22  Once you open it, it was another little tray, and then

23  inside the tray, we recovered the Remington ammunition.

24  There's some baggies here, baggies -- they call them

25  jewel baggies, but we knew from experience that's how

1 you can package.

2          MR. HALL:   Objection.

3          MR. MARTIN:   Objection.

4          THE COURT:   Sustained.

5          BY MS. JOHNSTON:

6 Q.       What have you ever observed packaged in those

7 small plastic baggies?

8          MR. MARTIN:   Objection.

9          THE COURT:   Overruled.

10          THE WITNESS:   Drugs.  All sorts of drugs.   There

11 was .38 caliber ammunition there, and there's also .32

12 caliber ammunition as well as this little tiny black

13 bag right there.

14          BY MS. JOHNSTON:

15 Q.       And did you seize the -- did you seize the items

16 that were in the toolbox, your R-21 depicted on our

17 P-161, and identified as our Oglethorpe 12?

18 A.       Yes, ma'am.

19 Q.       We'll come back to that in a minute.   Now, you

20 mentioned there was also the fourth toolbox that was

21 recovered.

22 A.       That's correct.   There was two here.   The fourth

23 one is on the bottom and that is this toolbox here.

24 Q.       Referring to Picture P-162?

25 A.       Yes, ma'am.

1 Q.      Can you describe what was recovered in that

2 toolbox?

3 A.      Recovered in this toolbox, at the bottom of it,

4 there were test kits here.  These are cocaine test

5 kits, there were two of them.  There was also this

6 handgun here that was recovered and two magazines for

7 the handgun as well as ammunition.

8 Q.      Let me show you, first of all, what's been

9 marked as Government's Oglethorpe 13, which I believe

10 is your R-22; is that correct?

11 A.      Yes, ma'am.

12 Q.      And again, this box didn't have the black powder

13 on it when you recovered it; did it?

14 A.      No, ma'am.

15 Q.      There's a little card in here, maybe in some of

16 these toolboxes.  Who put those cards in there?

17 A.      Either the re -- this looks like Rodriguez did,

18 wrote down items that were found inside the toolbox.

19 Gives the time and date that it was found and by whom.

20 Q.      Let me show you what's been marked as

21 Government's Exhibit Oglethorpe 13B.  Do you recognize

22 this exhibit this time?

23 A.      Yes, ma'am.  This is the weapon, the Ruger here

24 that's depicted right here.  This is the same gun that

25 was found in the bottom portion of that toolbox.

1 Q.      Was it with loaded magazines when you recovered

2 it?

3 A.      What's written on my recovery thing, it says

4 with two magazines, and that he they were .45 caliber

5 magazines.

6 Q.      Are they depicted in the P-162?

7 A.      Yes, ma'am.  They're right there in the corner

8 right next to the handgun right here.

9 Q.      Next, let me show you what's been marked as

10 Government's Exhibit 13A.

11 A.      Yes, ma'am.  These are the two test kits that we

12 found that are right here in the picture right over

13 here.

14        MS. JOHNSTON:   Okay.  If we could publish that

15 exhibit to the jury, Your Honor.

16        THE COURT:   Yes, you may.

17        MS. JOHNSTON:   Thank you.

18        MS. JOHNSTON:   Court's indulgence one moment.

19        BY MS. JOHNSTON:

20 Q.      If we could go back to toolbox -- if we could go

21 back to P-161, which was your Toolbox No. 3.

22 A.      Yes, ma'am.

23 Q.      Our Oglethorpe 12 and your R-21.  Let me show

24 you what's been marked as Government's Exhibit 12A, and

25 it was our Toolbox 3, not your --

1 A.      They're baggies, the same as in the picture

2 here.

3 Q.      And Oglethorpe 12B?

4 A.      Again, the same baggies that were in this

5 picture here.

6 Q.      Referring to Government's Exhibit P-161?

7 A.      Yes, ma'am.

8        MS. JOHNSTON:   If we could publish those to the

9 jury, Your Honor.

10       THE COURT:   Yes, you may.

11       MS. JOHNSTON:   Thank you.

12       BY MS. JOHNSTON:

13 Q.      Finally, showing you what's been marked as

14 Oglethorpe 12C.

15 A.      Yes, ma'am.  This is the Winchester, the hollow

16 point bullets that are right here, the picture

17 underneath the black nylon bag.

18 Q.      Okay.  If you could open it so the jurors --

19       MS. JOHNSTON:   With the Court's permission may

20 we publish this by just showing it to them --

21       THE COURT:   You may.

22       MS. JOHNSTON:   -- as opposed to passing it

23 around?

24       THE WITNESS:   (Witness indicating she's

25 exhibiting the exhibit to the jury.)

1          JUROR:   May I see it, please.

2          THE WITNESS:   I'm sorry, sir.

3          MR. WARD:   Excuse me, Your Honor.

4          THE WITNESS:   He asked me the caliber.

5          MS. JOHNSTON:   You can just show the exhibit.

6          BY MS. JOHNSTON:

7 Q.       If you could identify Oglethorpe 12D.

8 A.       These are the Remington bullets in the box

9 there.

10 Q.      What caliber are those?

11 A.      These are .38 caliber.  (Witness indicating she

12 is exhibiting them to the jury.)

13 Q.      Corporal Muldoon, if you would.

14          THE WITNESS:   I can't answer any questions.

15          MR. WARD:   Your Honor, there's clearly some kind

16 of private conversation.

17          MS. JOHNSTON:   Your Honor, I think the juror has

18 a question.

19          MR. WARD:   If the juror wants to ask a question,

20 there's a way to do it.

21          THE COURT:   If the juror wants to ask a

22 question, you need to tell me you want to ask a

23 question.

24          JUROR:   I'd like to ask a question.

25          THE COURT:   Go ahead.

1          JUROR:   I want to know the caliber  and  whether

2  they're  hollow  points or not .

3          THE  COURT:   He wants to know the caliber and

4  whether they're hollow points or not.

5          BY  MS.  JOHNSTON:

6  Q.      Referring first to   12B.

7  A.      This is a .38, it is not hollow.

8  Q.      And going back, then, to the gun distributed at

9  Oglethorpe  12C.   Does it indicate on the box what the

10  caliber is?

11  A.      This is a .32 caliber , and it is a hollow point .

12  Q.      Now , continui ng with our picture s here ,

13  Photograph  P-164.   What  is depict ed  in that  photograph ?

14  A.      This  is the cabinet  right  here .   You can see a

15  the  corner  of it here .   The  cabinet  in the base ment .

16  Again , in the Base ment No. 3 .   It's going  to be  right

17  here , Room  No. 3 .

18  Q.      That  is the two -- the last two toolbox es , 3 and

19  4?

20  A.      Yes, ma'am .

21  Q.      Were  locate d immediate ly adjacent  to this

22  cabinet ?

23  A.      Yes, ma'am .

24  Q.      Now , could  you tell  us what  we're  look ing at in

25  P-165?

1  A.      Once you open up this door here --

2          JUROR:  We can't see it.

3          MS. JOHNSTON:    I'm sorry.

4          BY MS. JOHNSTON:

5  Q.      Calling your attention to P-165.

6  A.      When you opened up the doors to this cabinet,

7  you see inside here, and on the bottom, there in this

8  corner is a black duffel bag.  Further, once we opened

9  up the black duffel bag in P-165, we recovered

10 marijuana inside that bag.

11 Q.      Okay.  May I please have Government 's Exhibit

12 Drugs 25 and 25A?  Showing you what's -- you've already

13 discussed P-165.  What's depicted in P-165, for the

14 record?

15 A.      When we opened up the black duffel bag here, we

16 found marijuana.

17 Q.      If you could tell the jury what's, first of all,

18 in Drugs 25 -- 25A, what is --

19 A.      25A is the black nylon bag, as you can see in

20 this picture here and again in this picture.

21 Q.      Referring to P-165 and 166.

22 A.      Yes, ma'am.

23 A.      And then attached to the same item is the

24 marijuana that was recovered from the same bag.

25 Q.      That's evidence that's identified as Drugs 25;

1 is that correct?

2 A.      Yes, ma'am.

3 Q.      And these were previously admitted into

4 evidence?

5 A.      Yes, ma'am.

6        MS. JOHNSTON:   Your Honor, if we could publish

7 this item as well.

8        THE COURT:   You may.

9        BY MS. JOHNSTON:

10 Q.     Now, if I could show you what's been marked as

11 Government's Exhibit Drugs 27.

12       Court's indulgence one moment.

13       Calling your attention to Photograph P-167, 168,

14 and 169.  Can you tell us what's depicted in those

15 photographs?

16 A.     Getting back to my diagram, as you walk into

17 this back room, Room No. 3, it kind of circles around,

18 and in this area here, you can see this washer/dryer

19 set up, and then on top of it was this black suitcase

20 here.

21       In the second picture --

22 Q.     P-168, for the record.

23 A.     -- we unzipped the front area here, and you

24 could see marijuana in that area once we opened up the

25 rest of the suitcase.

1          In the third picture, P --

2 Q.       P-169, for the record.

3 A.       There was other marijuana recovered.

4 Q.       And showing you what's been marked as Drugs -- I

5 should say admitted as Drugs 27.  Do you recognize this

6 suitcase?

7 A.       Yes, ma'am.  That is the same suitcase that we

8 recovered from that basement area.

9 Q.       Does it contain what was previously admitted,

10 the drugs that were identified as Drugs 25?

11 A.       Yes, ma'am.  This is the marijuana that was

12 recovered from that same suitcase.

13 Q.       Drugs 27, for the record.  Is that the number

14 that's on here in Drugs 27?

15 A.       Yes, ma'am.

16 Q.       Okay.

17 A.       Yes, ma'am.

18 Q.       Does this accurately depict the way the

19 marijuana was when it was recovered?

20 A.       Yes, it is.  You can even tell in that last

21 picture there with the Ziplocs, a purple Ziploc baggy,

22 tops of the Hefty bag.

23          MS. JOHNSTON:  Your Honor, we won't move to

24 publish this at this time because I think was published

25 the other day with the chemist.

1          THE COURT:   You may.

2          BY MS. JOHNSTON :

3   Q.     Now, if we could go to our next set of pictures,

4   Government 's Exhibit P-170, P-171 and P -- let's go

5   with P-170 and P-171 first.   What is depicted on those

6   photograph s?

7   A.      The first picture here, this is the round table

8   in the corner, which on my diagram is right there.

9   It's the same round table.   This is a picture of what

10  is on top of that table, and you can see a razor blade

11  here, there's some documents, there is a lot of

12  different things on top of this desk that we went

13  through.

14  Q.      And are those items that you recorded as being

15  R-23?

16  A.      Yes.

17  Q.      Showing you first what's been marked as R-15.

18  A.      Yes, ma'am.   These are the zip tie bags.

19  Q.      Strike that.   That's Oglethorpe 15.

20  A.      You can see these baggies.   They're right there

21  on this picture.

22  Q.      That would be in P-170.   Why would you seize

23  this box of baggies?

24  A.      People use those to put drugs in.

25  Q.      Okay.   Now calling your attention  to the next

1 exhibit, Oglethorpe 16.  Can you tell us what that is?

2 A.      This is a Ourisman Parts receipt.  It's for $40.

3 Oh, this is an Ourisman Parts receipt.  I don't know  if

4 it has any other significance.

5 Q.      In reference to this receipt, does it say where

6 the items should be shipped to?

7 A.      I can't pronounce it.  Cirilo?  Which part?

8 Q.      Do you see where it says shipped to?  Who does

9 it say to ship to?

10 A.     I'm not very good at pronouncing this.  It's

11 Cirilo, C I R I L O, and the next initial is C.  And

12 the last is G U E R R E R O.

13 Q.     And does it say -- what does it say above that

14 name that you've just spelled?

15 A.     It's Lobo's Discount Car Center.

16 Q.     At what address?  Does it give an address?

17 A.     On the other side, there's a billing address.

18 Q.     Which is what?

19 A.     4400 Branch Avenue in Marlow Heights.

20 Q.     Is that the address of the Ourisman Parts

21 Center?

22 A.     Yes, ma'am.

23        MS. JOHNSTON:   Your Honor, if we could publish

24 Government's Exhibit Oglethorpe 15 and 16 to the jury.

25        THE COURT:   You may.

1           BY MS. JOHNSTON:

2 Q.       Let me show you next what's been marked as

3 Oglethorpe 19.

4 A.       Yes, ma'am.

5 Q.       Look at that and tell us that is.

6 A.       These were two calculators that we recovered,

7 all off of that same tabletop here.

8 Q.       Showing you what's been marked as Oglethorpe 17.

9 A.       These are playing cards.  Again, the cards as --

10 you can see some of the cards here in this box lid.

11 Again, it was recovered from on top of the table.

12 Q.        If I could have Drugs 22 and Drugs 23, please.

13 I have Drugs 23 here.  Let me show you what's been

14 marked as Government's Exhibit Drugs 23 and ask you if

15 you recognize that exhibit.

16 A.       These are baggies that have a residue inside,

17 and again, they were recovered from the same tabletop.

18 Q.       Showing you's been marked as Drugs 22 --

19 admitted as Drugs 22.  Do you recognize that exhibit as

20 well?

21 A.       Yes.  This is a marijuana pouch.  That bag of

22 marijuana that was also recovered from the same

23 tabletop.

24 Q.       In reference to Drugs 23, what kind of residue

25 did you say it was seized for?

1 A.        Cocaine .

2 Q.        Show  you  next  what 's  been  mark ed  as  Government 's

3 Exhibit  Oglethorpe   20 ,  still  part  of  your  R-23 .   Can

4 you  just  tell  us  what  that  is ?

5 A.        These  are  rubber  bands ,  assorted  different  size

6 rubber  bands  that  were  re covered  from  the  same

7 tabletop .

8 Q.        Were  there  also  some  document s  re covered  from

9 that  tabletop ?

10 A.        Yes .

11 Q.        Before  we  go  over  the   document s  on  the  tabletop ,

12 let 's  go  next  to  P-172 .   Can  you  tell  us  what  P-172  is ?

13 A.        This  is  a  box  of  document s  re covered  from  there .

14 There  was  a  scale ,  I  believe  --  let  me  double  check .

15 Cell  phone  item s  were  in  this  as  well .   There  were  a

16 lot  of  different   thing s  jumbled  up  inside  this  box .

17 Q.        Look  look ing  next  at  Government 's  Exhibit  P-173.

18 If  you  could  tell  us  what 's  depict ed  in  P-173.

19 A.        These  are  --  this  is  a  blue  duffel  bag  that  was

20 right  there  at  the  bottom  of  the  --  you  could  see ,

21 like ,  there 's  a  bike  area  in  the  bottom  portion  of  the

22 table  right  here ,  so  it 's  in  that  general  area  where

23 these  were .   Inside  there  were  packaging  materials .

24 Q.        Can  I  have  the  over all  --  one  of  the  other

25 chart s ,  please ?   Show ing  you  P-153 ,  do  you  see  that

1 first photograph?

2 A.     Yes, ma'am.  You can see the blue duffel bag

3 right there on the floor.

4 Q.     That gives us an idea?

5 A.     An idea of where it was, yes, ma'am.

6 Q.     Where the table was, where it was, and where the

7 first lockbox we discussed was; is that correct?

8 A.     Yes, ma'am.

9 Q.     That was the lockbox with the drugs in it; is

10 that correct?

11 A.     Yes, ma'am.

12 Q.     Let me show you next what's been marked as

13 Oglethorpe 33 and ask you if you recognize that

14 exhibit.

15 A.     That is the blue bag that was recovered, and

16 again, it's in these last two pictures here and here.

17 Q.     Referring to Photograph P-173 and 174 for the

18 record.  Could you describe for the ladies and

19 gentlemen of the jury  what was recovered in Oglethorpe

20 33?

21 A.     There was a scale that was recovered.

22 Q.     First of all, if we could just turn the bag --

23 allow the jury to see the contents.

24 A.     We have.

25 Q.     Starting with here, this is Oglethorpe  33C.

1  A.       Assorted baggies, differing sizes.

2  Q.       Do you how many baggies are in there?

3  A.       Several hundred.  There is a lot of baggies.

4          MS. JOHNSTON:   Could we publish this to the

5  jury, please?

6          THE COURT:   Yes, you may.

7          BY MS. JOHNSTON:

8  Q.       Showing you next Oglethorpe 33D, if you could

9  describe what those are.

10  A.      These are rubber gloves also recovered within

11  this bag.  Publish these?

12          BY MS. JOHNSTON:   If we could publish those as

13  well, Your Honor.

14          THE COURT:   Yes, you may.

15          BY MS. JOHNSTON:

16  Q.      Why did you seize the rubber gloves?

17  A.      People use gloves so that their hands don't get

18  contaminated with anything.

19          MR. MARTIN:   Objection.

20          THE COURT:   Overruled.

21          BY MS. JOHNSTON:

22  Q.      Let me next show you what's marked as Oglethorpe

23  33A.

24  A.      This is a scale that has cocaine residue on it.

25  Q.      Showing you Oglethorpe 33B.

1 A.      This, too, is a scale.  Both of them were

2 recovered from within this bag.

3        MS. JOHNSTON:   If we could publish Government's

4 Exhibit 33A and 33B.

5 Q.      And in regards to the contents of 33, are there

6 more bags, other than the ones we've individually

7 marked?

8 A.      Yes, ma'am.  And more gloves as well.

9 Q.      Could you hold some up so the jury can see them?

10 A.      (Witness indicating.)

11 Q.      What is this item here?

12 A.      That looks to be, like, a mask people might use

13 to not breathe in certain things.

14        MR. MARTIN:   Objection.

15        THE COURT:   Overruled.

16        BY MS. JOHNSTON:

17 Q.      And this little baggy here?

18 A.      Yes, ma'am.  It has some sort of substance

19 inside there.

20 Q.      A white powdery substance?

21 A.      Yes.

22 Q.      Let me show you what's been marked as and

23 introduced into evidence as Drugs 21.  Can you tell us

24 what these items are?

25 A.      The blue gym bag, this is cocaine powder residue

1 on the -- in baggies that were recovered.

2        MS. JOHNSTON:   If we could publish that to the

3 jury as well, Your Honor.

4        THE COURT:   Yes, you may.

5        MS. JOHNSTON:   Thank you.  Your Honor, I believe

6 that I can have the witness take the stand and finish

7 the remaining -- remainder of the exhibits.  We'll take

8 the photo board down and hopefully everyone -- if

9 somebody can't see her, let us know.  We'll move some

10 other items.

11        THE COURT:   Because we're going to be finishing

12 at 4:15 or so, why don't we take a 15-minute break now

13 and then you can get all set up.

14        MS. JOHNSTON:   Thank you, Your Honor.

15        MR. MARTIN:   Your Honor, sir, may I approach?

16        THE COURT:   Yes.

17             (At the bar of the   Court.)

18        MR. MARTIN:   Your Honor, if the jurors have a

19 question, I would like to request that first the

20 question be put in writing, submitted to you, and then

21 after the witness has finished testifying, the lawyers

22 have an opportunity to look at the question before they

23 put it to the witness.

24        THE COURT:   I'd prefer that, too, but this is

25 just one question.

1           MR. MARTIN:   I don't know  if it's going  to
2 happen  again .
3           THE  COURT:   I don't  want  this  to become  a habit .
4 Trust  me .
5           MR. MARTIN:   I know  in Virginia  they  do it ,  and
6 in the military  they  do it .
7           MS. JOHNSTON:   Perhaps  at the  end  of the  day ,
8 the Court  could  instruct  them ,  if you  have  any  more
9 question s .
10          MR. SUSSMAN :   Keep  them  to yourself .
11          THE  COURT:   No ,  I'm not  going  to encourage  it .
12                   (Back  in open  court .)
13          MS. GREENBERG:   Your  Honor ,  there  are  certain
14 item s the jury  wasn't  done  with .
15          THE  COURT:   Then  when  we come  back ,  they  can
16 look  at  them .
17                   (Jury  excused  at 3:10 p.m.)
18                   (Off  the record  at 3:10 p.m.)
19                   (On the  record  at 3:26 p.m.)
20          THE  COURT:   Have  changed  the courtroom  from  meat
21 locker  position  to sauna  position .   I've  told  Bea  to
22 communicate  with them  and ask ,  could  they  please
23 compromise  between  sauna   and  meat  locker ?
24          MR. MARTIN:   We will  all be asleep  in a half
25 hour .

1          THE COURT:   I have to do a sentencing at 4:30,

2 too, so I'm going to throw you out of here between 4:15

3 and 4:30.

4          Ready for the jury?

5          MS. GREENBERG:   Yes, sir.

6          THE COURT:   Bring them in.

7               (Witness resumes the stand.)

8          THE COURT:   I'm going to mention to the jury

9 about questions.

10          MS. JOHNSTON:   Your Honor, they will also get

11 the evidence back in the jury room.

12               (Jury returns at 3:29 p.m.)

13          MS. GREENBERG:   Judge, while you were up at the

14 bench, I did take the exhibits that were published to

15 the jury.

16          THE COURT:   You may publish the ones that were

17 in the process of being published.

18          MS. GREENBERG:   I don't know what they were, but

19 I trust the foreperson --

20          THE COURT:   Ladies and gentlemen, let me explain

21 one thing to you about questioning of witnesses.  The

22 role of questioning witnesses is assigned to the

23 attorneys in the cases.  On rare occasions, and I think

24 you've seen how rare it is, the judge asks questions,

25 this one doesn't, and even rarer occasions, jurors do,

1  but if you really do feel a need to ask a question, and

2  I don't want to discourage you from that, what you

3  should do is write it down on a piece of paper and then

4  I will evaluate it with the attorneys and then we'll

5  ask it, but you should put it in writing.

6          You may proceed.

7          MS. JOHNSTON:   Thank you, Your Honor.

8          BY MS. JOHNSTON:

9  Q.     If we could, Ms. Muldoon, go back to your R-23,

10 which I believe are the documents and other items that

11 were on top of the round table that were still on the

12 board; is that correct?

13 A.     Yes, ma'am.

14 Q.     I want to show you what's been marked as

15 Oglethorpe 23, and I'll just put them up here.  And

16 what do we see here in Oglethorpe 23?

17 A.     Those are four bullets that were recovered from

18 on top of the table and they were packaged in that same

19 manner.

20 Q.     So you didn't alter -- you didn't put them in

21 that plastic baggy?

22 A.     No, ma'am.

23         MS. JOHNSTON:   If we could publish Oglethorpe

24 23.

25         THE COURT:   You may.

1          BY MS. JOHNSTON:

2  Q.      Going back to Oglethorpe  18.  Again , is this

3  part of your R-23?

4  A.      Yes, ma'am , it says  Learley  Goodwin.

5  Q.      Do you recognize  the name on that  document ?

6  A.      This is a District  Court of Maryland  from Prince

7  George's  County .  I believe  it's a circuit  court --

8  district  court  case .

9  Q.      Okay .  Let me open  it up and see if there 's a

10  date on it.  Is there  a date  on it?

11  A.      The date  on that  document  says 12/23/03.

12  Q.      And also in that  envelope  -- or is there  some

13  notation s on the back  of that  envelope ?

14  A.      Yes, ma'am .  There are cell phone  number s or

15  telephone  number s on the back  of that  envelope .

16  Q.      The document s that  we saw from before  lunch ,

17  those  were  recovered  from the drawer in kitchen;   is

18  that  correct ?

19  A.      Yes, ma'am .

20  Q.      These  item s, again,  were  recovered  from where?

21  A.      On the top of the table in the  base ment .

22  Q.      The round table?

23  A.      The round  table.

24  Q.      And Oglethorpe  24.

25          MS. JOHNSTON:   Yes , Your  Honor , if we could

1 publish Oglethorpe 18.

2        THE COURT:  Yes, you may.

3        BY MS. JOHNSTON:

4 Q.     Do you see Oglethorpe 24?  What is that?

5 A.     That's a little tiny baggy with suspected

6 residue inside.  I can see that on there.

7        MS. JOHNSTON:  If we could publish Oglethorpe 24

8 to the jury as well.

9        BY MS. JOHNSTON:

10 Q.    And again, coming from the same place, that

11 round table in the basement?

12 A.     Yes, ma'am.

13 Q.     If one of these items I'm going through now

14 didn't come from there, will you please let us know?

15 A.     Yes, ma'am.

16 Q.     Showing you next Oglethorpe 25.  What is

17 Oglethorpe 25?

18 A.     It's a Tanita scales warranty.  We recovered

19 that scale in another location, but that warranty was

20 recovered from on top of the table.

21 Q.     And Oglethorpe 26, are these various slips of

22 papers with numbers on them?

23 A.     Yes, ma'am.  Again, those were recovered from on

24 top of the table in the basement.  Those are just

25 numbers.  Looks like telephone numbers.

1          MS.  JOHNSTON:    Your  Honor,  can  we  publish  like

2    wise  Oglethorpe  25  and  Oglethorpe  26?

3          THE  COURT:    You  may.

4          BY  MS.  JOHNSTON:

5    Q.      And  next  let  me  show  you  Oglethorpe  27.  Do  you

6    recognize  these  documents?

7    A.      Yes, ma'am.  Again,  that's  a  court  document  for

8    Mr.  Goodwin  for  a  district  court  case.  I'm  sorry,

9    circuit  court  case,  thank  you,  for  the  state  of

10   Maryland  in  Prince  George's  County.

11   Q.      And  is  there  a  date  on  it  in  terms  of  when  it

12   was  issued?

13   A.      January  --

14   Q.      When  it  was  issued?

15   A.      Date  of  return  is  January  9,  '04.

16   Q.      And  right  above  that,  is  the  issue  date  on

17   there?

18   A.      I'm  sorry,  thank  you,  ma'am.  The  issue  date  on

19   that  document  is  December,  2003.

20   Q.      If  we  were  to  compare  the  previous  court

21   document  with  this  document,  Page  1  of  Oglethorpe  27  --

22   are  there  case  numbers  on  the  top  in  reference  to  the

23   district  court  matter  that  would  allow  you  to  see  if

24   they  were  the  same  case?

25   A.      Yes.

1  Q.      And the district court number would be which
2  number?

3  A.      The district court number is that CR number,
4  that's CR4E00216458.

5  Q.      And the case number, is that a district court or
6  circuit court?

7  A.      The top one is a circuit court case.  It's
8  CT031730X.

9  Q.      And again in here, is there a -- do you
10 recognize that document?

11 A.      Again, these documents were recovered from the
12 top of that table in the basement.

13 Q.      And does this page have the same circuit court
14 number?

15 A.      Yes, ma'am, it does without the CT.

16 Q.      Looking at this page of the document, let me
17 zoom it out a little bit.  Can you tell who was
18 charged?

19 A.      Learley Reed Goodwin.

20 Q.      And the event he was charged with happened on or
21 about what date?

22 A.      On or about the 25th day of November, 2003.

23 Q.      And in what county?

24 A.      In Prince George's County, Maryland.

25         MS. JOHNSTON:   If we could publish Oglethorpe   27

1 as well.

2          THE COURT:   You may.

3          BY MS. JOHNSTON:

4 Q.       Oglethorpe 21, do you see that piece of paper?

5 A.       Yes, ma'am.

6 Q.       Was that, likewise, recovered from the tabletop?

7 A.       Yes, ma'am.  That was also recovered from the

8 tabletop in the basement.  It has names and phone

9 numbers and there's an address on there.

10 Q.      I want to bring you -- before I put it up on the

11 screen, Oglethorpe 22, when I put it up on the screen,

12 I'm going to ask you about the postmark, so if you want

13 to look at it a little bit closely.

14 A.      Yes, ma'am.

15 Q.      Okay.  Now, showing you Oglethorpe 22.  Was this

16 item likewise recovered from that same table?

17 A.      Yes, ma'am.

18 Q.      And who is that addressed to?

19 A.      Mr. Goodwin, Mr. Learley Goodwin, Sr.

20 Q.      What is the date of the postmark?

21 A.      May 22 -- is it '03?  I can't see it on mine.  I

22 didn't mean -- May 22 of 2003.

23 Q.      And again, were there numbers on the back of

24 that when you recovered it?

25 A.      Yes, ma'am.

1           MS.  JOHNSTON:    If  we  could  publish  these

2 exhibit s  as  well ,  Your  Honor .

3           THE  COURT:    You  may .

4           MS.  JOHNSTON:    Thank  you .

5           BY  MS.  JOHNSTON:

6 Q.     I  belie ve  when  we  were  look ing  at  the

7 photograph ,  there  was  a  photograph  of  a  box  next  to  the

8 table .   Do  you  recall  that ?

9 A.      Yes,  ma'am .

10 Q.      And  did  you  seize  item s  from  that  box ?

11 A.      Yes,  ma'am .

12 Q.      And  those  are  identifi ed  as  your  Exhibit  R-29?

13 A.      Yes,  ma'am .

14 Q.      Is  that  correct ?

15 A.      Yes,  ma'am ,  it  is .

16 Q.      Let 's  begin  with  Oglethorpe   32 .   Let  me  bring  it

17 over  to  you .   What  is  Government 's  Exhibit  Oglethorpe

18 32?

19 A.      That 's  going  to  be  a  --  it 's  a  memory  pocket

20 tone  dial er  from  Radio  Shack .

21           MR.  WARD:    I'm  sorry ,  memory  what ?

22           THE  WITNESS:    It  says  it 's  a  60  memory  pocket

23 tone  dia ler .

24           MR.  WARD:    Tone  dia ler .   I'm  sorry .

25           THE  WITNESS:    From  Radio  Shack .

1          BY MS. JOHNSTON:

2  Q.      Oglethorpe  29.

3  A.      Again, this is a document  that was recovered

4  from that box.  It has address es on there, a name and a

5  phone number.

6  Q.      And the name and the address  on that piece of

7  paper is where?

8  A.      It's for Steven Campbell  at 862 Marcolin  Street

9  in Houston, Texas.

10  Q.      The other individual?

11  A.      It's Tiffany Vessel, 5812 Herrington  Drive,

12  Orlando, Florida.

13  Q.      And in addition  to those two, there are some

14  other names and information  on the inside?

15  A.      Yes, ma'am.

16          MS. JOHNSTON:   If we could publish those two

17  exhibit s to the jury.

18          THE COURT:   You may.

19          BY MS. JOHNSTON:

20  Q.      Next let me show you what's been marked as

21  Oglethorpe  28.  Do you recognize  the content s of

22  Oglethorpe  28?

23  A.      Yes, ma'am.  These item s were recovered  from

24  within the box.  They are razor blades.

25  Q.      First calling your attention  to the Stanley box

1  that's in that exhibit.  Are those used or new razor

2  blades?

3  A.      Those are brand new razor blades.

4  Q.      Then there's a baggy with some items in it.

5  A.      Right, and then there are some new razor blades,

6  and then there are some razor blades that don't have a

7  protective covering on them.

8  Q.      And then there are a couple of little baggies in

9  there?

10 A.      Yes, ma'am.

11 Q.      And in the white box is what?

12 A.      More razor blades without the protective

13 covering on there.

14 Q.      Why did you seize the razor blades?

15 A.      One can use the razor blades to cut cocaine.

16 Q.      Would that be powder or crack cocaine or both?

17 A.      It could be used for both, yeah.

18         MS. JOHNSTON:   If we could publish Oglethorpe

19 28, please.

20         THE COURT:   You may.

21         BY MS. JOHNSTON:

22 Q.      Next let me show you what's been marked as

23 Oglethorpe 30.  Do you see that item?

24 A.      Yes, ma'am.  That was a scale that was recovered

25 from the box.

1  Q.      From the box in the basement?

2  A.      Yes, ma'am, the box in the basement.

3          MS. JOHNSTON:   Your Honor, if we could publish

4  Oglethorpe 30.

5          THE COURT:   You may.

6          BY MS. JOHNSTON:

7  Q.      And next, let me show you what's been marked as

8  Oglethorpe 31.  Do you recognize those documents?

9  A.      Yes, ma'am.  That was also recovered within the

10  box in the basement.

11  Q.      Okay.  First, let me call your attention to the

12  notice of District of Columbia Notice of Infraction,

13  and let me --

14  A.      Thank you.

15  Q.      -- zoom in on it.  And if you need to see it up

16  close, let me know.

17  A.      That's fine.

18  Q.      In whose name is that citation written?

19  A.      Learley Reed Goodwin.  It says September 3 --

20  September -- I don't know if that's '03.

21  Q.      I will bring it up to you.

22  A.      Thank you.

23          MR. MARTIN:   Which number is this, Counsel?

24          MS. JOHNSTON:   This is Oglethorpe 31.

25          MR. MARTIN:   Thank you, ma'am.

1           MS. JOHNSTON:   It's three pieces of paper.

2           THE WITNESS:   Tuesday, the 9th day of September,

3 2003, at 9:40 in the evening.

4           BY MS. JOHNSTON:

5 Q.      And what's the date on this infraction?

6 A.      That's the date on it.

7 Q.      And it's listed to whom?

8 A.      Mr. Learley Reed Goodwin.

9 Q.      Found again where?

10 A.     In the box in the basement.

11 Q.     Let me show you also the documents that are in

12 there.   What's the date on this document?

13 A.     August 18, 2003.

14 Q.     Okay.   And who is the insurance company?

15 A.     B I T U M I N O U S.

16 Q.     Where are they located?   In what state?

17 A.     They are in Louisiana, in New Orleans.

18 Q.     Who is that addressed to?

19 A.     That is to John D. Irby, care of Maurice

20 Alexander, Washington, D. C.

21 Q.     Does it indicate the date and the time of the

22 accident?   Or the DL, loss?

23 A.     It's going to be on 8/15/03.

24 Q.     Does it indicate the location of that accident?

25 A.     It's going to be in -- off of Highway 171 in

1  Deridder , Louisiana .

2  Q.      And in the attach ed letter , does that also

3  relate to the same accident ?

4  A.      Yes, ma'am .

5  Q.      And the date of that letter ?

6  A.      August 30 of 2003 .

7  Q.      Court 's indulgence .

8          MS . JOHNSTON:   I have no further question s of

9  this witness , Your Honor .

10         THE COURT:   Okay .   Cross-exami nation .

11         MS . JOHNSTON:   Your Honor , if we could publish

12 the last exhibit s.

13         THE COURT:   Okay .

14                   **CROSS-EXAMINATION**

15         BY MR . MONTEMARANO :

16 Q.      I have a little trouble keep ing up, so I'd like

17 your help , if I could .

18 A.      That 's fine .

19 Q.      This is Oglethorpe 9A.   This is a .22 Caliber

20 Dering er firearm ; correct ?

21 A.      Give me a sec ond.   Let me put my item s in order .

22 Yes, sir , that is.

23 Q.      And this is operable ?

24 A.      I did not test fire it, sir .

25 Q.      Okay .   This is Davis Industri es, .380 Caliber

1  semiautomatic ?

2  A.      I'm sorry, is it what ?

3  Q.      A Davis Industries, .380 Caliber semiautomatic ?

4  A.      Yes.

5  Q.      The second firearm ?

6  A.      I'm sorry ?

7  Q.      I said that's the second firearm ; right ?

8  A.      Yes, sir .

9  Q.      This is a Ruger, Sturm Ruger .45 caliber ?

10 A.      Yes, sir .

11 Q.      Semiautomatic ?

12 A.      Yes, sir .

13 Q.      And these .22 rounds fit the -- 9E fit the

14 Deringer ?

15 A.      I am not an expert on guns, so I just recovered

16 those items, sir.

17 Q.      These are .380 autos, Winchester.   That's 9D.

18 These probably fit the Davis Industry .380; right ?

19 A.      Sir, again, I'm not an expert on weapons.   I

20 know how to fire mine and what goes in my weapon, but I

21 don't know anything else about guns.

22 Q.      If I could ask you to look at these two sets of

23 .22s.  These are 9C for Charlie, and 9E for Echo.

24 These are both .22, right ?  As far as you can tell ?

25 A.      Yes, sir , they are .

1  Q.      They're not the same kind, are they?  They're

2  taken in different  firearms because you require a

3  different  size chamber  for them, do you not?

4        MS. JOHNSTON:   Your Honor, objection.  The

5  witness has said she doesn't know firearms.

6        THE COURT:  Mr. Montemarano, she's said she's

7  not an expert on firearms.

8        MR. MONTEMARANO:  I will let the jury look at

9  them and make their own -- may I publish these to the

10 jury, Your Honor?

11       THE COURT:  You may.

12       BY MR. MONTEMARANO:

13 Q.     Then is 12C for Charlie, these are .32 automatic

14 cartridges; correct?

15 A.     Well, my 12 -- your item numbers are different

16 than mine.  That's why I can't keep up with you, sir.

17 These are the Winchester  32s.  That's correct, sir.

18 Q.      These are not going to fit any of those

19 firearms over there; is that correct?

20 A.     Unless it's .32 caliber  weapon.

21 Q.     Which none of them are; correct?

22 A.     Right.

23 Q.     12D for Delta, which feels to be a pretty full

24 box of .38 special?

25 A.     Right.

1  Q.      Those are not going to fit into those weapons

2  either?

3  A.      Right.

4  Q.      Oh, yeah.  This is another .32 caliber bullet;

5  correct?  This single one here?

6  A.      Yes, sir.  I believe it is.  That's the one that

7  was recovered from on top of the -- yeah.

8  Q.      Three weapons, four kinds of ammunition -- oh

9  no, more ammunition here.  Oglethorpe 10, these are the

10 magazines for some of the weapons along with ammunition

11 from the magazines?

12 A.      Right.  They were recovered with the gun.

13 Q.      And these, it would appear from their dimension,

14 these are probably .45s?

15 A.      Yes.

16 Q.      So these would fit -- are going to fit the big

17 gun probably.

18        MS. JOHNSTON:   Objection, this witness has said

19 she doesn't know firearms.

20        THE COURT:   Yeah.  There's a limit on this, Mr.

21 Montemarano.  I don't know if she can tell you that.

22        BY MR. MONTEMARANO:

23 Q.      Based upon your 18 years as a Prince George's

24 County police officer, 15 years of which you spent in

25 narcotics, you would agree that fingerprinting evidence

1  seized in a drug seizure is discretionary on the

2  arresting or seizing officer; is that a fair statement?

3  A.      Yes.

4  Q.      You were not the case agent; correct?

5  A.      Correct.

6  Q.      So you did not make a decision whether or not to

7  print anything; is that a fair statement?

8  A.      Yes, sir.

9  Q.      Based upon your 18 years as a Prince George's

10 County police officer and a 15 years in narcotics, the

11 condition of -- this is Government 13 -- Oglethorpe 13.

12 This item appears to have been printed?

13 A.      Yes, sir.

14 Q.      Inside and out; correct?

15 A.      From where my vantage point is, yes.

16 Q.      I'll tell you what.

17 A.      Do you want me to --

18 Q.      Let us not guess.

19 A.      Top is.  I don't know if the bottom tray is.

20 Yes, everything --

21 Q.      My words exactly.  Everything.  Every surface

22 has been printed so somebody wanted this printed;

23 right?

24 A.      Yes.

25 Q.      Because this is not the shape or the condition

1  in which it was seized; correct?

2  A.      Right.

3  Q.      In fact, when seized -- well, the photograph's

4  in here somewhere.  Let's just say it kind of looks

5  more like this guy here who hasn't been printed?

6  A.      Right.

7          MR. MONTEMARANO:  Pass the witness, Your Honor.

8  Thank you.

9          MR. MARTIN:  Thank you.  With the Court's

10 permission.

11                     **CROSS-EXAMINATION**

12         BY MR. MARTIN:

13 Q.      Good afternoon, ma'am.

14 A.      Good afternoon, sir.

15 Q.      Corporal Muldoon, right?

16 A.      Yes, sir.

17 Q.      Colleen?

18 A.      Yes.

19 Q.      Corporal Muldoon, can you see that bottle?

20 A.      Yes.

21 Q.      And you saw me take a swig from it; right?

22 A.      Yes.

23 Q.      And you've been a police officer how long now?

24 A.      For almost 18 years.

25 Q.      Eighteen years.  And based on your experience as

1 a police officer , because you've testified to your

2 experience as a police officer , would it be fair to say

3 that there's a good chance you might get my

4 fingerprints off of that bottle ?

5 A.      Kind of depends .

6 Q.      Depends .  If I didn't smear it?

7 A.      Right .

8 Q.      If there's enough oil on my fingers , you might

9 be able to get prints; right ?

10 A.     I'm not very good at getting prints off of

11 anything .  I usually never get prints off of anything .

12 Q.     A fingerprint technician might be able to?

13 A.     Probably .

14 Q.     There's also a pretty good chance that my DNA

15 might be on that ?

16 A.     Yes, sir .  I've never taken a DNA swab from

17 anybody yet .

18 Q.      You might be inclined , as a police officer , to

19 send it to forensics to have a DNA sample taken if you

20 find a half bottle of water or something ?

21 A.     If I needed DNA or something, yes, sir,   I would

22 do that.

23 Q.     If you needed the DNA, right .  If you try to

24 link a certain item to certain people , those are the

25 things you try to use to link them; right ?

1  A.      Yes.  If I needed the a link, there are certain

2  things I would do to get that link.

3  Q.      If somebody were to come and take a photo of

4  that bottle from this angle with Ms. Johnston and Ms.

5  Greenberg sitting there, they might come to the

6  conclusion that because that bottle was sitting over

7  there, it might belong to them, right?

8  A.      But I don't think  I would take that picture  in

9  that direction because I knew I saw it coming from you.

10 Q.      You saw it.  But if you didn't see it?

11 A.      Right.

12 Q.      And you just saw the picture, you might come to

13 that conclusion; right?

14 A.      If I took that exact picture that you described,

15 yes.

16 Q.      Now getting back to the last thing Mr.

17 Montemarano  asked you about these boxes.  All of these

18 boxes were found at Oglethorpe; correct?

19 A.      Yes, sir, they were.

20 Q.      Some of them we've already established -- at

21 least three of them were dusted for fingerprints;

22 right?

23 A.      Right.  The ones that had the drugs and the guns

24 in.

25 Q.      And having been dusted for fingerprints, at no

1 time during your testimony today did you say whether

2 anyone's fingerprints were found on here; did you?

3 A.      That's because I don't know.

4 Q.      You don't know.  Because you didn't look at the

5 lab reports?

6 A.      Because the last time I saw these prior to trial

7 prep was when I dropped them off in Montgomery County

8 for Detective Eveler.

9 Q.      And so in all the documents that you've looked

10 at, you have not seen a single laboratory report

11 indicating whether results already came back?

12 A.      No, sir.

13 Q.      But you know for a fact that it was sent to the

14 forensic lab?

15 A.      All I know is from looking at that, that they

16 were fingerprinted.

17 Q.      So you have no indication that anyone sitting in

18 this courtroom or standing in this courtroom for that

19 matter have their prints on that toolbox, right?

20 A.      Right.

21 Q.      With respect to Oglethorpe Street, you had a

22 search warrant; correct?

23 A.      Yes, sir.

24 Q.      And the search warrant indicated not only the

25 address, but the person who lives at Oglethorpe; did it

1  not?

2  A.      The  search  warrant  was  for  the  address.

3  Q.      Do  you  have  it  in  front  of  you,  ma'am?

4  A.      I  don't  know  if  I  have  the  search  warrant  with

5  me.  Let  me  look.

6        MR.  MARTIN:   Court's  indulgence  for  a  moment.

7        THE  WITNESS:   I  don't  have  the  search  warrant

8  with  me.

9        BY  MR.  MARTIN:

10  Q.      You  do  or  you  don't  have?

11  A.      I  do  not  have  the  search  warrant  with  me.

12  Q.      Did  there  come  a  time  when  you  found  out  who

13  lived  at  Oglethorpe?

14        MS.  JOHNSTON:    Objection.

15        Basis  and  knowledge.

16        MR.  MARTIN:   I'm  asking  her  whether  or  not  she

17  found  out,  and  then  if  she  did.

18        THE  COURT:   Ask  her  if  she  found  out,  that's

19  fine.  Yes  or  no.

20        THE  WITNESS:   I  think  I  knew  that  Mr.  Lane  lived

21  there,  Larry  Lane  lived  there,  but  there  was  nobody  at

22  the  house,  and  we  were  finding  things  in  different

23  people's  names  at  the  house,  so  I  didn't  know  exactly

24  who  was  actually  living  there.

25        BY  MR.  MARTIN:

1  Q.      But you said you knew that there was Larry Lane?

2  A.      Yes.

3  Q.      When you went into the house, I presume that

4  there were a lot of documents that were found.  Would

5  that be a fair statement?

6  A.      There was a lot of documents, yes, that were

7  found, yes.

8  Q.      A lot of papers were found in the house; right?

9  A.      Right.

10 Q.      And some of those papers had Larry Lane's name

11 on it; did they not?

12 A.      I really don't recall.  I'd have to go through

13 some of the documents.  I'm sure there was things with

14 his name on there.

15 Q.      Well, take me back, ma'am, because I don't

16 remember.  I thought that I heard you say that you were

17 either the team leader or the seizing agent.  I don't

18 remember what your role was.

19 A.      My role after the -- after I gave everybody

20 their initial areas where they were supposed to be

21 searching, my role, once they recovered something, I

22 would go and photograph it and pack it up and then I

23 brought it back to Detective Eveler up in Montgomery

24 County.

25 Q.      So you packed it up, you took it back to

1 Detective Eveler, and how much did you pack up? Do you

2 remember in terms of boxes?

3 A.      There was a lot of things that we brought back.

4 Q.      A lot of those things included papers and

5 documents; didn't they?

6 A.      Yes.

7 Q.      And it included correspondence; didn't it?

8 A.      I really can't remember. I'd have to go through

9 the -- everything that we packaged up.

10 Q.      So of all the envelopes -- well, did you find

11 more than the three or four envelopes that you

12 testified about today?

13 A.      Yes. I'm sure we did. I would have to, again,

14 go through those documents to see exactly what we

15 found.

16 Q.      Out of all the many envelopes presumably that

17 were found, the only ones you've testified about today

18 are the ones that Mr. Goodwin's name is on it; right?

19 A.      Yes.

20 Q.      You didn't testify to any of the envelopes that

21 had Larry Lane's name on it; did you?

22 A.      No.

23 Q.      And you didn't testify to any of the envelopes

24 that had the address for Oglethorpe Street on it; did

25 you?

1  A.       Yes, that's correct.

2  Q.       When you went into the home at Oglethorpe, I

3  presume -- correct me if I'm wrong, because I don't

4  know, I wasn't there.  Did you and your other members

5  of your team wear latex gloves?

6  A.       Yes, sir.

7  Q.       If not latex, you wore something, and the reason

8  you did that is because you didn't want to contaminate

9  any potential evidence with your own prints; right?

10  A.       That, and to not get anything back on us.  To

11  protect us.

12  Q.       To protect you as well.  Now, with respect to

13  the ski mask, and I think this that were some other --

14  forgive me, because I don't recall.  I was taking

15  notes.  Did you testify to any ski mask that was found?

16  A.       Yes, sir, there was a ski mask and a bulletproof

17  vest.

18  Q.       And a bulletproof vest?

19  A.       Yes, sir, that was found in the brown suitcase.

20  Q.       And the ski mask and the bulletproof vest, did

21  you send that to forensics as well?

22  A.       I didn't do anything with that, sir.  I just

23  brought it up to Montgomery County where they were

24  collecting the evidence.

25  Q.       You have no way of telling the ladies and

1 gentlemen of the jury  today whether anyone else's DNA

2 was found on that ski mask?

3 A.       Right.  I didn't do that, right.

4 Q.       Again, based on your experience as an officer,

5 if you were trying to link somebody to those

6 identities, that would be one of the things you would

7 try to do to link them; wouldn't it?

8 A.       That would be one of the things I could do.

9 Q.       That would be good police work; wouldn't it?

10 A.      It kind of depends if I really needed it or not.

11 I might have it just -- if it was recovered in

12 somebody's house, I could link it to that person

13 because it was in that person's house.

14 Q.      Let me ask you this:  When you got the ski mask

15 and you got the vest, you put it in the plastic bag?

16 A.      I think I left everything in its box in the

17 suitcase when I brought it up to Montgomery County.

18 Q.      So you took it up to Montgomery County and you

19 gave it to?

20 A.      Detective Eveler, yes, sir.

21 Q.      Detective Eveler?

22 A.      Yeah.

23 Q.      After that, you never saw it again?

24 A.      Exactly.

25 Q.      Do you recall at the time that you went in for

1 the search warrant with the search warrant for

2 Oglethorpe?

3 A.      Yes, sir, I have that.

4 Q.      No, ma'am. If you would listen to me for a

5 second. Do you recall whether you had an arrest

6 warrant for Larry Lane?

7 A.      I don't believe I had an arrest warrant. I

8 don't remember, sir.

9 Q.      You don't remember? But you did say there was

10 no one in the house when you went in there; right?

11 A.      Right.

12 Q.      Let's go through some of this stuff here. You

13 testified regarding many items that were picked up.

14 One of the items you testified about was a Pyrex

15 measuring cup that contained residue, that was

16 Oglethorpe No. 2. Do you remember that?

17 A.      Yes, the Pyrex.

18 Q.      Do you remember whether that was sent to

19 forensic to determine whether or not there was

20 fingerprints on it?

21 A.      Sir, I don't know if they were or not.

22 Q.      I'm sorry, ma'am?

23 A.      I do not know if they were or not.

24 Q.      Oglethorpe 3. You found two boxes of baking

25 soda; one empty, one full. In your experience as a

1 police officer , would it be fair to say that the oil

2 from one's hands would sometimes leave finger prints on

3 paper or cardboard item s?

4 A.    You know , maybe a forensic person or an evidence

5 person might be able to get prints off of there .  I

6 don't know  if they could or not , but it could happen .

7 Q.    You don't know .

8 A.    Right .  I'm not an expert .

9 Q.    As a police officer , if you saw a piece of paper

10 or a magazine or something like that , based on your

11 train ing , aren't you aware --

12 A.    Right , you could get fingerprint s off of that ,

13 yes .

14 Q.    -- you could get finger prints off of that .  And

15 you don't know whether or not that was sent to any

16 forensic lab for fingerprint s; do you?

17 A.    I don't remember  if there was black powder on

18 there or not .  I don't know .  I don't think  there was .

19 Q.    As you sit here today , having review ed all of

20 the evidence that  was seize d by the government , you

21 can't say whether Mr. Goodwin 's fingerprint s were found

22 on that baking soda ; could you?

23 A.    I could not say that , right .

24 Q.    Oglethorpe  4, a Salter scale , you found that in

25 the kitchen with  the Pyrex measuring  cup , right ?

1  A.       Yes.

2  Q.       Same thing.  This scale, was it sent to

3  forensics to determine whether or not Mr. Goodwin's or

4  anybody else's fingerprints were on there?

5  A.       Sir, I didn't send anything to forensics.  None

6  of these things I sent to forensics.  The only thing I

7  did was package it up and bring everything to

8  Montgomery County.

9  Q.       When you were preparing for today's testimony,

10  as you went through the evidence, as you went through

11  the documents to refresh your recollection --

12  A.       Right.

13  Q.       -- do you recall seeing anything that suggested

14  that Mr. Goodwin's fingerprints were found on the

15  Salter scale?

16  A.       I did not see any kind of documents regarding

17  any kind of fingerprints.

18  Q.       Regarding any of these items that you testified

19  to today?

20  A.       That's correct.  I did not see any kind of

21  documents regarding any body's fingerprints on any of

22  the items that I testified to today.

23  Q.       You don't know how any of those envelopes that

24  have Mr. Goodwin's name and address on it arrived at

25  Oglethorpe; do you?

1 A.      No, sir, I do not know how they got there.

2 Q.      The weapons.  .22 caliber handgun, which is

3 Oglethorpe 9A, that particular weapon, where was that

4 found, ma'am?

5 A.      Can you -- in the top corner of your thing, you

6 might see an R number.  Can you tell me what that R

7 number is?

8 Q.      Unfortunately, ma'am, I don't have that.  Mine

9 has been sanitized.

10 A.      What is it again?

11 Q.      Oglethorpe 9A, it's a .22 caliber handgun.  Do

12 you recall where that was found?

13 A.      Yeah.  The 9A, that was going to be -- that was

14 found in the first toolbox that I testified to.  It was

15 recovered from the basement.

16 Q.      And Oglethorpe 9B, the .380 Caliber handgun,

17 where was that found?

18 A.      The .380 handgun, again, that was found in that

19 same toolbox.

20 Q.      When you say the same toolbox, was it one of the

21 larger toolboxes over here or the small one that was

22 not dusted?

23 A.      Right.  It was in one of the larger toolboxes.

24 Q.      The larger one.  So when we say the larger one,

25 just for the sake of making this clear to the jurors --

1 I don't want to hurt myself or anybody else, so I'm not

2 going to try to lift that. It's one of these three

3 that are here on the floor; right?

4 A.      Yes, sir.

5 Q.      We can distinguish those three on the floor from

6 this one from two ways, can we not? The first being

7 that the smaller one is not dusted.

8 A.      Right.

9 Q.      And the second is -- the size is different.

10 A.      Correct.

11 Q.      Okay. How many bedrooms did you say were in the

12 house?

13 A.      Three bedrooms.

14 Q.      You said of the three bedrooms, if I recall your

15 testimony correctly, two had furnishings that indicated

16 children would have been there?

17 A.      Correct.

18 Q.      Or sometimes might have stayed there; right?

19 A.      Correct.

20 Q.      One was a boy's room and one was a girl's room?

21 A.      Correct.

22 Q.      Do you remember whether there were any clothes

23 in the closet?

24 A.      Correct.

25 Q.      With respect to the clothes that were in the

1  closet, did the clothing square with the decor?  In

2  other words, was there an indication that a boy stayed

3  in one room and the a girl in the other?

4  A.     I really -- I can't say for sure.

5  Q.     You don't remember?

6  A.     No, because we didn't really want to touch those

7  rooms because those were the children's rooms, and we

8  just did a cursory search on those.  We did look

9  around, but we really didn't want to disturb the

10 children's items.

11 Q.     There was a third bedroom, you said, and that

12 room was used by an adult?

13 A.     Yes.

14 Q.     Do you recall whether or not the room indicated

15 that it was used by man or a woman?

16 A.     I -- you know, I don't remember.  My job in

17 this, after an officer would search something, they'd

18 call me and I'd take a picture and I'd bag it and we'd

19 tag it, in a sense, and then I'd get called some place

20 else.  I didn't look in everybody's room, look in

21 everybody's closet, look at every piece of document

22 right then and there.

23 Q.     Did you take a picture of that room?

24 A.     Yes.

25 Q.     As you prepared for your testimony today and you

1 looked over the various photos and documents, is there

2 anything that calls to mind whether or not a man was in

3 that room or used that room?

4 A.     I would say a man did use that room.  I'm not

5 100 percent sure if there's a woman that may have used

6 that room also.

7 Q.     We're not ruling out the fact that a mom might

8 have been using the room at all?

9 A.     I cannot recall any women's things in there, but

10 I cannot say for sure that there wasn't.

11 Q.     By the way, as you were preparing for today's

12 testimony and you were going through the evidence, did

13 you see the ski mask here?

14 A.     It might have been in that brown suitcase.  I

15 know it was in the picture.

16 Q.     And the bulletproof vest, is it here as well?

17 A.     I believe it's in the brown suitcase.

18        MR. MARTIN:   Court's indulgence.  And if I could

19 ask for your patience.

20        THE WITNESS:   That's fine, sir.

21        BY MR. MARTIN:

22 Q.     When you got to the house, Mr. Lane's house on

23 Oglethorpe, do you recall whether or not there was a

24 vehicle in the driveway?

25 A.     Yes.  I think there was three vehicles there

1  that we believed that belonged to the house.

2  Q.    You didn't search those vehicles, though; did

3  you?

4  A.    No, I did not search those vehicles.

5  Q.    You didn't search them because you didn't have a

6  warrant to do so?

7  A.    Correct.

8  Q.    Now, there were a number of phone numbers on

9  some papers that you found.  If I could just show them

10 to you.  I don't know if you have a memory of these.

11 MR. MARTIN:    Your Honor, may I approach the witness,

12 please?

13         THE COURT:    You may.

14         BY MR. MARTIN:

15 Q.    I'm showing you what's been marked as

16 Government's Exhibit 29 and Government's Exhibit 26,

17 just to refresh your recollection.

18 A.    Yes.

19 Q.    Do you remember these?

20 A.    Yes, sir.

21 Q.    Do you remember where you found those?

22 A.    I just want to double check and make sure I give

23 you the right answer.  Those were recovered from the

24 box -- this one, Item No. 29 was recovered from the box

25 -- the last box that we reviewed and this, Oglethorpe

1  26, was recovered at the -- on the round table they

2  discussed earlier.

3  Q.     You have no idea whose handwriting is that, do

4  you?

5  A.     No, sir.

6  Q.     And these documents, just like the other

7  documents that I asked you about, as far as you know,

8  they were never sent to forensics to get fingerprints

9  off of them?

10  A.     Correct.  I don't know if they were or not.  It

11  doesn't look like it.  Sometimes when you do that, it

12  might destroy --

13  Q.     Ma'am, if you just hold on.  When I have a

14  question --

15  A.     Okay.

16  Q.     -- you can answer.  Otherwise, Ms. Johnston here

17  will ask you to clarify later.

18         You also testified when Mr. Montemarano started

19  to ask you questions regarding caliber of guns and

20  things like that, you said you really didn't have much

21  experience or knowledge of weapons.

22  A.     Correct.

23  Q.     Do you remember that?

24  A.     Yes.

25  Q.     You are a police officer, though; right?

1  A.       Yes.

2  Q.       You use a weapon; right?

3  A.       I use one weapon.

4  Q.       You have to be certified on it every so often

5  for proficiency;   right?

6  A.       Yes.

7  Q.       So you have some familiarity?

8  A.       Yes.

9  Q.       You are not a pharmacologist,  are you?

10  A.       No.

11  Q.       And you're not a chemist, are you?

12  A.       No.

13  Q.       And you've never used crack cocaine, have you?

14  A.       No.

15  Q.       So you really don't know whether or not the

16  items that are in that bag are crack cocaine, do you?

17  A.       It says it on the paper.

18  Q.       It says it on the paper.  Just like the bottle

19  that I put over here appeared to be in front of Ms.

20  Johnston?

21  A.       What, that it appears to be water?

22  Q.       No, it appeared to be hers.

23  A.       I don't understand  what you're saying, sir.

24  Q.       Okay.

25  Q.       And you don't know the results of any of the

1 testing with respect to the drugs, what appears to be

2 drugs to you.  You don't know what the result of those

3 tests were either; do you?

4 A.     I'm sorry, do I know what the results of what

5 the drugs were, if they came back to be what drugs they

6 say they were?

7 Q.     Yeah.

8 A.     I read them on the papers.

9 Q.     You read those reports but you didn't read any

10 forensic reports?

11 A.     Yeah.  The US attorney Deborah Johnston handed

12 them to me, the documents written on there, what it is

13 that you could tell that it went to the lab and was

14 tested.

15 Q.     And it said that it was crack cocaine?

16 A.     I don't know if it said -- I think there was

17 something on there that said that it was.  I don't

18 know.  I thought I read that.

19 Q.     You thought you read that, but you're not sure;

20 are you?

21 A.     I'd have to look at it.

22 Q.     Would you want to look at it?

23 A.     Yes, please.

24 Q.     Which one would you want to look at?

25 A.     It doesn't matter.

1 Q.      And you said that you saw a lab report on this?

2 A.      Not a lab report, sir. I said I thought I saw

3 -- identified.

4 Q.      You just said where it was crack cocaine.

5 A.      No, I said I thought, excuse me, that I saw the

6 fact that it went to evidence and that it said that it

7 was hydrochloride or not, but I guess I was mistaken.

8 If it was analyzed.

9 Q.      Well, hydrochloride is just another word for

10 powder or sulfur; isn't it?

11 A.      Yes, right. It says here -- this one says -- on

12 the description I was reading, the description, sir,

13 when I was looking at it.

14 Q.      Oh, but that description isn't written by a lab

15 technician?

16 A.      No, that's not our evidence tag, but no, that is

17 not written by --

18 Q.      So you didn't use any of the items or the

19 substances in here?

20 A.      I've been working narcotics for a long period of

21 time --

22 Q.      You didn't use any of this?

23 A.      No.

24 Q.      You didn't test any of these substances?

25 A.      That is correct.

1 Q.     You are not a pharmacologist  and you are not a

2 chemist?

3 A.     Thank you.

4 Q.     And have no reason to believe that Learley Reed

5 Goodwin had any connection to that house other than the

6 envelopes with his name and address on there; right?

7 A.     That's correct.

8        MR. MARTIN:   No further questions, Your Honor.

9        MR. HALL:  No questions, Your Honor.

10       MR. MITCHELL:  No questions.

11       MR. WARD:  No questions.  Thank you, Your Honor.

12       THE WITNESS:   Thank you.

13       MR. MCKNETT:  No questions.

14       THE COURT:  Redirect?

15       MS. JOHNSTON:   Just a very few questions, Your

16 Honor, if I might.

17                 **REDIRECT  EXAMINATION**

18       BY MS. JOHNSTON:

19 Q.     You've been a narcotics officer for 18 years?

20 A.     No, I've been in narcotics for about 15 years.

21 Q.     During those 15 years, how many times have you

22 had occasion to see a substance that you believed was

23 crack cocaine and then send it to the lab?

24 A.     Several hundreds of thousands of times.  Almost

25 every other day.

1  Q.      And how -- are you familiar with what crack

2  cocaine looks like?

3  A.      Yes.

4  Q.      Have you made those observations and then sent

5  drugs to the lab and gotten the reports back?

6  A.      Yes.

7  Q.      Have those reports confirmed your evaluation?

8  A.      Yes.

9  Q.      And showing you just one, for example, 19 A.

10 What does that look to be to you?

11 A.      Looks to me to be crack cocaine.

12 Q.      The evidence tags indicate it was sent to the

13 lab?

14 A.      Yes.

15         MR. MARTIN:   Renewed objection as to 701.

16         THE COURT:   Overruled.

17         BY MS. JOHNSTON:

18 Q.      Similarly, that was your basis for saying the

19 powder looked like powder and the other crack looked

20 like crack; correct?

21 A.      And the marijuana looked like marijuana.

22 Q.      Indeed, that probably smelled like marijuana,

23 too; didn't it?

24 A.      Yes.

25         MR. MARTIN:   Objection.

1          THE COURT:   Overruled.

2          BY MS. JOHNSTON:

3 Q.        In terms of the items that were selected for

4 trial, did you make that selection or was that made by

5 the case agents and the prosecutor?

6 A.        That was made by the case agent and the

7 prosecutor.

8 Q.        The only item, in terms of bullets, guns or

9 drugs or drug paraphernalia was -- the bedroom, the

10 adult bedroom, did you recover any drug paraphernalia?

11 A.        We did find some marijuana in a shoe box under

12 the bed.

13 Q.        That was what we saw the picture of, that little

14 bit of residue?

15 A.        Yes.

16 Q.        That was the extent of it?

17 A.        And there was that one bullet that was found in

18 the closet.

19 Q.        Under a bunch of boxes and things?

20 A.        On the top shelf under everything, yes.

21 Q.        And other than that, where in the house did you

22 find items having coke, crack cocaine, or cocaine

23 powder residue?

24 A.        There was some residue in the kitchen that we

25 found, and then everything else was found in the

1  basement.

2  Q.      And the documents that we've introduced here

3  came from what locations in the house?

4  A.      The kitchen and then in the basement.

5          MS. JOHNSTON:   Court's indulgence.   Nothing

6  further.

7          THE COURT:   Any recross?

8          MR. MARTIN:   No recross, Your Honor.

9          THE COURT:   All right.   You may step down.

10         THE WITNESS:   Thank you, Your Honor.

11         THE COURT:   Ladies and gentlemen  we will recess

12  for the day.  I have a sentencing at 9:30 (sic), so I

13  will ask people to promptly evacuate their seats so I

14  can proceed to the 9:30 -- 4:30 sentencing.   Tomorrow,

15  we're doing our 9 clock to 2 o'clock drill, so I will

16  see you at 9 o'clock tomorrow morning.   You're excused.

17             (Off the record at 4:16 p.m.)

18

19

20

21

22

23

24

25

1                          **CERTIFICATE**

2

3        I, Tracy Rae Dunlap,   RPR , CRR , an Official Court

4    Reporter for the United States District Court of

5    Maryland, do hereby certify that I reported, by machine

6    shorthand, in my official capacity, the proceedings had

7    and testimony adduced upon the Jury Trial Proceedings

8    in the case of UNITED STATES OF AMERICA versus PAULETTE

9    MARTIN, et al, Criminal Action Number    RWT-04-0235 on

10   July 13, 2006.

11

12       I further certify that the foregoing    230 pages

13   constitute the official transcript of said proceedings,

14   as taken from my machine shorthand notes, of said

15   proceedings.

16

17       In witness whereof, I have hereto subscribed my

18   name, this  21st day of  April 2008.

19

20

21                            _____

22                            TRACY RAE DUNLAP, RPR , CRR
                              OFFICIAL COURT REPORTER
23

24

25