```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                       SOUTHERN DIVISION
 2
    -----------------------x
 3  UNITED STATES OF AMERICA  :
             Plaintiff        :
 4                            :
                              :
 5  vs                        :Criminal Action:    RWT-04-0235
                              :
 6                            :
    PAULETTE MARTIN, et al     :
 7           Defendants.       :
    -----------------------x
 8

 9                       Friday, July 14, 2006
                         Greenbelt, Maryland
10
         The above-entitled action came on for a Jury Trial
11  Proceeding before the HONORABLE ROGER W. TITUS, United
    States District Judge, in courtroom 4C, commencing at
12  9:00 a.m.

13       THIS TRANSCRIPT REPRESENTS THE PRODUCT
         OF AN OFFICIAL REPORTER, ENGAGED BY
14       THE COURT, WHO HAS PERSONALLY CERTIFIED
         THAT IT REPRESENTS THE PROCEEDINGS AS RECORDED AND
15       REQUESTED.

16       APPEARANCES:

17       On behalf of the Plaintiff:

18       DEBORAH JOHNSTON, Esquire
         BONNIE GREENBERG, Esquire
19
         On behalf of the Defendants:
20
         MICHAEL  MONTEMARANO , Esquire
21       ANTHONY MARTIN, Esquire
         MARC HALL, Esquire
22       TIMOTHY MITCHELL, Esquire
         PETER WARD, Esquire
23       EDWARD SUSSMAN , Esquire
         HARRY  MCKNETT , Esquire
24
    Tracy Rae Dunlap,   RPR , CRR              (301) 344-3912
25  Official Court Reporter
```

```
1                          I N D E X

2                       DIR       CROSS    REDIR      RECROSS

3   Karolyn Tontarski    8,13      12,56    90         96

4   Minh  Dang          101       110      118        119

5   David  Hearn        119       127      139

6   Vedoster  Ingram    155,170   175      178

7   Norma Horne         179       190      202

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                              Page

23  Reporter's Certificate                      208

24  Concordance                                 209

25
```

1        THE COURT:  Has anyone seen Mr. Martin?

2        Mr. Montemarano, do you know where Mr. Martin

3 is?  Do you know where Mr. Martin is?

4        MR. MONTEMARANO:  No, Your Honor.

5        THE COURT:  I know you're not your brother's

6 keeper.

7        MR. MONTEMARANO:  Your Honor, I'm more than

8 happy -- I have not seen him yet this morning, and I've

9 been here since before 8:30.  He wasn't downstairs in

10 the attorney lounge, and I have not seen him since I

11 came up.

12        Ms. Merez took a list of cell phone numbers from

13 us early in the trial.  I would be glad, if she has his

14 cell -- do you have Mr. Martin's cell phone number, Ms.

15 Merez?  I'll be glad to call him while you're taking

16 care of the jury.

17        THE COURT:  How's the jury?

18        THE CLERK:  Okay, judge.

19        THE COURT:  All here?

20        THE CLERK:  Yes.  He's on his way.  He thought

21 it was 9:30.  He's on his way.

22        THE COURT:  Okay.

23        MS. JOHNSTON:  Your Honor, while we're waiting

24 for Mr. Martin, may I step out into the alcove and

25 speak with one of our witnesses?  I will Not go any

1 further , Your Honor .  I promise .

2        MR. MARTIN:   Your Honor , I'm sorry .

3        THE COURT:   Mr. Martin , this cannot become a

4 regular thing .  Everyone else here understood 9 o'clock

5 and , you know , I was here early , as I told you I would

6 be , here 15 minute s ahead of preliminary matter s and I

7 want to take care of the jurors, so please       listen when

8 I announce  the time we're going to start      trial .

9 Everyone else heard.    I just want to state one minute

10 that listening is not waiting for your turn to talk.

11 So you have to listen to me.

12        Now, with regard to your preliminary matter , you

13 filed a Motion for Disclosure of Movement and asked to

14 have a defense -- a Form 129 provided to you for your

15 review because of concern that potential ly government

16 witness es had been talk ing to each other and had not

17 been candid about talk ing to each other , and that you

18 want ed to explore that for whatever it's worth .  Well ,

19 I didn't know what a Form 129 was .  I'm not sure anyone

20 else did , except Mr. Montemarano .

21        MR. MONTEMARANO :  And I may have been

22 mis inform ed .

23        THE COURT:   There actual ly is a Report 129 ,

24 which is a computer document .  It is not a form you

25 fill out .  It's a form that is a living document that

1  change s every  single  day .  I  have  personally  review ed

2  the  Report  No .  129  for  Michael  Joseph  Thurman  and  Larry

3  Delano  Lane .  I  will  tell  you  what  it  reveal s  that 's

4  pertinent  to  your  issue .

5       I  am  not  sure  you're  entitle d  to  anything  else .

6  If  you  can  convince  me  of  that  --  I'm  not  going  to  do

7  it  now .  This  jury  is  wait ing .  I  would  only  give  it  to

8  you  in  redact ed  form , but  what  is  pertinent  to  the

9  issue  that  you're  raising  is  were  they  in  the  same

10 place  at  the  same  time .

11      MR .  MARTIN:   Correct .

12      THE  COURT:   The  answer  is , yes , they  were  in  the

13 same  place  at  the  same  time .  According  to  the  report

14 -- take  note s  of  this .  This  is  important .  Michael

15 Joseph  Thurman  was  at  the  Maryland  Correctional

16 Ad justment  Center  from  September  28 , 2005 , to  the

17 present .  Larry  Delano  Lane  was  at  the  Maryland

18 Correction al  Adjustment  Center  from  April  26 , 2006 , to

19 the  present .

20      On  both  of  the  form s , there 's  a  list  of

21 separatees ; in  other  words , person s  with  whom  they  may

22 not  be  associate d  while  in  that  facility .  And  on  Larry

23 Delano  Lane 's  list  is  Michael  Thurman  and  on  Michael

24 Thurman 's  list  is  Larry  Lane .  So  if  the  directive s  of

25 the  U . S .  Mar shal 's  Service  was  follow ed , they  should

1  not have been talking to each other or seeing each

2  other in those facilities. There is nothing else in

3  this form that I think is pertinent the defense of the

4  case.

5       So if you want to press the issue of looking at

6  it, I have looked at it as an officer of the court. We

7  are all officers of this court, that's what it shows.

8  All of the other facilities listed are not in common at

9  all. The only place where there's any commonality

10 would be from the period of April 26, 2006, to the

11 present. They have been in the same facility with a

12 list that says they may not talk to each other. All

13 right?

14      MR. MONTEMARANO: Court's indulgence, please.

15 If I could consult with Mr. Martin briefly.

16      THE COURT: Yes.

17      MR. MARTIN: Much more experienced persons than

18 myself on this matter have raised two points that I'd

19 like to make for the record. The first is I don't know

20 if the report that Your Honor looked at referenced

21 transportation, whether they were ever transported at

22 the same time. The second is notwithstanding the

23 directives of the United States Marshal's Service,

24 whether or not these gentlemen at any point were in

25 adjoining cells, whether they at any point --

1          THE COURT:   I'm telling you what the record
2  shows.   The record does not show transportation
3  together -- it doesn't show transportation .  I mean ,
4  the form shows identification  data , name , address , date
5  of birth , place of -- you know sex , race , all that kind
6  of stuff , social  security  number .
7          It shows "separatees ," people  whom they may not
8  be associate d with , and prominent ly on each one's
9  listed is the other  one .   It shows detain ers, it shows
10  alias , it shows case information  in terms of what the
11  sentence  is and why they're  being  held .   And it has a
12  chronological  prisoner  history , which  is a fancy word
13  of saying where were they being  kept .
14          MS. JOHNSTON:   Your Honor , if I could  interrupt ,
15  please .   The jury has been waiting since nine o'clock .
16  We have a witness ready as well .
17          THE COURT:   I've given you plenty under the
18  circumstance s.   I will place these report s under  seal
19  in the court  file for appellate  review purpose , but I
20  think  I have communicate d to you everything  that the
21  form would  somehow show you if you had it in front of
22  you that 's pertinent  to the defense  of the  case .
23          There is nothing in here that says they were on
24  a bus together , it doesn't say what cell they were in.
25  It simply  list s their  status  and that they're

1  separatees   in  whatever   bureaucrat ic  parlance   that  may

2  mean .   Are  you  ready  for  the  jury ?

3          THE  CLERK:   Yes .

4          THE  COURT:   Go  get  them .

5              (Jury  return s  at  9:20  a.m. )

6  Thereupon,

7              **KAROLYN   TONTARSKI** ,

8  having  been  called  as  a  witness  on  behalf  of  the

9  Plaintiff , and  having  been  first  duly  sworn  by  the

10 Courtroom  Deputy,  was  examined  and  testified  as

11 follows:

12              **DIRECT   EXAMINATION**

13       BY  MS.  GREENBERG:

14 Q.      Could  you  state  your  name   and  spell  that  name

15 for  the  court  reporter  , please ?

16 A.      Karolyn  Tontarski , K A R O L Y N,

17 T O N T A R S K I.

18 Q.      How  are  you  employ ed  and  who  is  your  employer ?

19 A.      I'm  employed   as  a  forensic  scientist   by  the

20 Montgomery   County  Crime  Laboratory  in   Maryland.

21 Q.      How  long  have  you  been  employed  by  the

22 Montgomery   County  Crime  Laboratory?

23 A.      I've  work ed  for  them  for  five  year s  and  three

24 month s .

25 Q.      Prior  to  work ing  for  Montgomery   County , how  were

1  you employed and for how long?

2  A.      Before I worked for Montgomery County, I worked

3  for the Virginia Division of Forensic Science, which is

4  now the Virginia Department of Forensic Science Crime

5  Laboratory located in northern Virginia in Fairfax for

6  a little under six years.

7          Prior to that, I worked for the Massachusetts

8  Department of State Police Crime Laboratory for 11

9  years and three months.

10 Q.      What is a forensic scientist?  I mean, we've all

11 seen it on CSI, perhaps.  Can you give us the real live

12 version?

13 A.      A forensic scientist examines evidence in

14 connection with criminal investigations.  Working in

15 the forensic biology section of the laboratory, I

16 examine evidence for the presence of blood and other

17 body fluids, and also for other genetic material that

18 may be present, such as DNA from shed skin cells.  I

19 examine the evidence, perform DNA testing when needed,

20 prepare reports relative to my findings, and testify in

21 court when called upon to do so.

22 Q.      Could you give the jury an idea about your

23 educational background?

24 A.      I have a bachelor of arts degree in the field of

25 biochemistry from Mount Holy Oak College, which is

1  located in western Massachusetts .  I have a masters --

2  I --

3  Q.      I apologize .

4  A.      Keep going or?

5  Q.      Yes .

6  A.      I have a master of science degree in

7  biotechnology from Johns Hopkins University as well .

8  Q.      Besides your educational background , have you

9  had any specific training for your position ?

10 A.      Yes . Since I've been in the field for so long ,

11 my initial training was on-the-job training , but each

12 time you enter into a new laboratory system , you have

13 extensive on-the-job training to acclimate you to that

14 specific laboratory system .

15         In addition to my on-the-job training , I

16 participate in continuing education on a regular basis .

17 Initially, that was not required , now it is actually a

18 requirement to work in a DNA laboratory in the United

19 States . So we have continuing education requirements

20 that are required annually .

21 Q.      Are you a member of any professional

22 organizations?

23 A.      Yes , I am.

24 Q.      Could you tell the jury what those are ?

25 A.      I'm a fellow of the American Board of

1 Criminal istic s.   I am a member  of  the  Mid-Atlantic

2 Association  of  Forensic  Scientist s.   I am an associate

3 member  of  the  North eastern  Association  of  Forensic

4 Scientist s.   I'm a member  of Sigma  Chi , which  is a

5 scientific  research  society .

6 Q.      You mention ed that  you work  at  the  Montgomery

7 County  Crime  Laboratory .   How  many  analyst s are  there ?

8 A.      In  the  biology  section , there  are  three  of  us;

9 and  in  the  chemistry  section , there  are  three  full-time

10 examiner s and  one  part-time  examiner .

11 Q.      Is that  for  all  of Montgomery  County , Maryland ?

12 A.      Yes , it is .

13 Q.      Who  is  the  head  of  that  lab?

14 A.      Richard  Gervasoni .

15 Q.      Have  you  ever  testifi ed in  court  as  an  expert

16 witness ?

17 A.      Yes , I have .

18 Q.      How many  time s?

19 A.      I've  testifi ed over  200  time s at  this  point ;

20 with  regard  to  DNA  testing , I've  testifi ed

21 approximately  65  time s.

22      MS. GREENBERG:    Your  Honor , I submit  Ms.

23 Tontarski  as  an  expert  in  forensic  biology  and  ask  that

24 she  be  able  to  give  her  opinion  as  a  forensic

25 scientist .

1          THE COURT:   Is there cross on her

2 qualification s?

3          MR. WARD:   So do I assume that the proffer is as

4 to the DNA testing ?

5          MR. GREENBERG:   Yes, sir .

6          MR. WARD:   I have a couple of question s.

7          THE COURT:   All right .

8                    **CROSS- EXAMINATION**

9          BY MR. WARD:

10 Q.     How many time s have you been qualifi ed as an

11 expert in the field of DNA testing , ma'am ?

12 A.     Approximately 65 time s.

13 Q.     I'm sorry , I thought you said before you had

14 been qualifi ed as an expert 55 time s, but it was 65

15 time s?

16 A.     If I said 55, I meant to say 65.  I apologize .

17 Q.     I'm sorry .

18 A.     It is 65.  If I mis spoke , I apologize .

19 Q.     What specific train ing have you had in the field

20 of DNA analysis ?

21 A.     As I mention ed, I've had on-the-job training  .

22 I've also attend ed a number of specifically  related

23 course s for forensic biology since 1985.  I've attend ed

24 32 workshop s and course s that specifically  relate to

25 that particular  topic .

1          MR.  WARD:   I have no other question s.   Thank

2 you .

3          THE  COURT:   Any other  cross  on  qualifications?

4 All right .   She will  be  permitted  to  testify  as  a

5 forensic  scientist .

6          MS.  GREENBERG:    Thank  you , your  Honor .

7                    **FURTHER DIRECT EXAMINATION**

8          BY MS.  GREENBERG:

9 Q.     Could  you  briefly  explain  to  the  jury  what  is

10 DNA?

11 A.      DNA stands  for deoxyribonucleic acid.     It is  a

12 chemical  substance  that  is  found  in  each  one  of  our

13 bodies that  provides  the  information  that 's  necessary

14 for  each  one  of  us  to  look  the  way  that  we  look  and  for

15 our  bodies  to  function .   It  is  sometimes  referred  to  as

16 the  blueprint  of  life .

17          So  just  as  a  blueprint  for  a  house  contains  the

18 information  as  to  where  the  doors , the  windows , and  the

19 walls  are , for  example , the  DNA  in  our  bodies  provides

20 the  information  that  tells  us  how  tall  we're  going  to

21 be , what  color  our  hair  is , and  for  the  chemicals  that

22 are  necessary  for  our  hearts  to  beat  properly .

23 Q.     Where  is  DNA  found ?

24 A.      The  DNA  that  I  examine  is  found  in  cells  in  the

25 body  that  contain  a  nucleus .   A  way  of  thinking  of  the

1  nucleus is like a control center for the cell.

2  Example s of cell s that contain a nucleus are white

3  blood cell s.  Because we work in a regular crime

4  laboratory , we do a lot of sexual assault case s, so we

5  are interest ed in sperm cell s contain ing DNA, and also

6  skin cell s, cell s from the inside of your mouth , for

7  example , call ed buc cal cell s contain DNA, and the cell s

8  on the surface of your skin that are shed off also

9  contain DNA.

10 Q.     Is the DNA in your cell s in your body , are all

11 of them the same ?

12 A.     Yes .  The nuclear DNA in someone 's blood , for

13 example , is the same as the DNA in their skin .

14 Q.     What is DNA typing ?  You're going to be talk ing

15 about DNA typ ing .  Could you tell the jury what that is

16 before we get into the specific s of it?

17 A.     DNA typ ing is the process that we use from , in

18 the laboratory , to look at the DNA that is different

19 between people .  The question typically before us is

20 whether or not someone could be a source of a

21 particular stain or sample that we are examining in the

22 laboratory .

23     The DNA typ ing process allow s us to be able to

24 take sample s from evidence obtain ed what's call ed a DNA

25 profile and then compare that result to DNA profile s

1 obtained from known samples from individuals believed
2 to be associated with a particular investigation. Once
3 we make those comparisons, we can then say if someone
4 can be excluded as a source of evidence or if they
5 cannot be excluded.
6 Q.     What is the -- can you tell the jury what PCR
7 is? Does that relate to DNA testing?
8 A.     It is. PCR stands for Polymerase Chain
9 Reaction. It's the process that we use in the
10 laboratory to look at areas of DNA where there are
11 differences between people in the population.
12 Q.     What is a genetic system?
13 A.     A genetic system is actually one of those areas
14 where there are differences between people in the
15 population.
16 Q.     How many genetic systems do you use?
17 A.     In our laboratory, we look at 15 areas that are
18 called short tandem repeats, and we look at one area
19 that is a sex determination area, or locust, called
20 amelogenin. So together we look at 16 areas of DNA to
21 provide a DNA profile for each sample.
22 Q.     Is what you've just explained, the PCR method
23 and your use of the different genetic systems, is that
24 widely used in the scientific field of DNA testing?
25 A.     Yes. The PCR process, for example, is used

1 almost universally now in scientific research. It's

2 been around for over 20 years. It's used in hospital

3 laboratories to obtain diagnostic test results. And

4 here in Maryland, we have the National Institute of

5 Health, and they use that testing in their research

6 facilities routinely as well.

7 Q.     Now, with that background, if we can turn

8 specifically to your work in connection with this case

9 --

10     MS. GREENBERG:   Your Honor, may I approach?

11     THE COURT:   You may.

12     MS. GREENBERG:   I'd like to show you

13 Miscellaneous 25. Your Honor, the Court and the jury

14 will be happy to know that we've reached a stipulation

15 so we continue don't have to call Sergeant Sakala back

16 to the stand.

17     He took this swab from Ms. Lavon Dobie on or

18 about the date collected here at 12/23/2004, his name

19 is on here, and it was submitted to the crime

20 laboratory, so we don't have to call him to the witness

21 stand yet again.

22     MR. WARD:   That's correct. There is no issue as

23 to that. What is the exhibit number?

24     MS. GREENBERG:   Miscellaneous 25.

25     MR. WARD:   Thank you.

```
 1          BY MS. GREENBERG:
 2 Q.       Do you recognize  Miscellaneous   25?
 3 A.       I do.
 4 Q.       How do you recognize  it?
 5 A.       I recognize  it by the laboratory   number ,
 6 04-F-103 .  The item number , F-1, and the bar code --
 7 well , the bar code is not on here .  It's on the
 8 original  contain er, and my initial s.
 9 Q.       And Miscellaneous  25 is the known  sample  that
10 you used to compare  --
11 A.       Yes.
12 Q.       Do you recognize  Dobie  16A by your  Item No. 12
13 up on the top  left-hand  corner ?
14 A.       Yes , I do.
15 Q.       Could  you tell  us what  is contain ed in Item  12?
16 A.       Item 12 contains  a .40 Caliber  magazine  and the
17 associate d live ammunition  that  came  along  with  it.
18 Q.       I'm just going  to refer  to this  as Dobie  16A.
19 It's your  Item 12, and just  so the  jury  can follow
20 along , can you read  the seizing  officer  on this
21 pack age, what  that  name  is?
22 A.       It's D.
23 Q.       Is it P A P A L I A?
24 A.       Papalia , yes .  It's a little  hard  to read .
25 Q.       Did you compare  Miscellaneous  25 with  a sample
```

1  taken  from  16A?

2  A.       Yes,  I  did.

3  Q.       Where  is  the  sample  that  you  took  from  16A?

4  That  was  taken  from  16A?

5  A.       A  swabbing  was  taken  from  the  base  or  the  bottom

6  of  the  magazine  onto  a  cotton-tipped  swab.

7  Q.       If  I  can  just  stop  you  there.  When  you  say

8  bottom  of  the  magazine,  you  mean  right  here?

9  A.       Yes,  I  do.

10       MS.  GREENBERG:    Your  Honor,  may  I  show  the  jury

11  where  she's  talking  about?

12       THE  COURT:    Yes,  you  may.

13       BY  MS.  GREENBERG:

14  Q.       With  this  sampling  that  was  obtained  from  the

15  bottom  of  the  magazine  on  Dobie  16A,  could  you  explain

16  what  you  did  with  respect  to  Miscellaneous  --  what

17  happened  to  the  swab  from  Dobie  16A?

18  A.       The  swab  was  actually  cut  and  used  in  the  DNA

19  typing  process.    What  remains  at  this  point  is  what  we

20  call  the  extracted  material,  and  that  along  with  the

21  remainder  of  the  DNA  extract  is  in  the  freezer  section

22  of  our  laboratory  on  Research  Boulevard  in  Rockville.

23  Q.       Is  that  your  standard  operating  procedure  to

24  leave  it  there?

25  A.       Yes.    The  extracted  material,  the  DNA  extracts

1 and addition cuttings, or known samples, are retained

2 in the laboratory on a routine basis.  That is our

3 standard operating procedure.

4 Q.      Could you bring it here for the jury?

5 A.      We would only bring it here for the jury under

6 court order.  It is our goal to preserve that evidence

7 should additional testing ever be needed.  The best way

8 to do that is to maintain it in a pristine environment

9 in our laboratory.

10 Q.     Is this -- that's the typical practice to not

11 remove it from the pristine environment?

12 A.     That's correct.

13 Q.     Now, was this magazine, when you received it,

14 can you tell by looking at this exhibit whether it was

15 loaded or unloaded?

16 A.     When it was received at the laboratory, the live

17 ammunition was no longer within the magazine, but there

18 were items of live -- there were six live bullets, if

19 you will, that were submitted along with the magazine.

20 Q.     Did you -- did your lab swab the bullets to see

21 if there was a DNA sample?

22 A.     No, we did not.

23 Q.     Why not?

24 A.     We currently do not have the staffing to run the

25 bullets from firearms, so we are not doing that.  We

1 have done that on occasion.   The probability of

2 yielding a result is extremely low, so at this point,

3 we are not running them on a regular basis.

4 Q.      It's only in special circumstances?

5 A.      Yes.  For example, if that is the only item of

6 evidence that is available for examination.

7 Q.      How many items were you submitted for testing in

8 this case?

9 A.      We were submitted -- there were eight guns, ten

10 magazines, and eight known samples.

11 Q.      How long did it take you just to -- did it take

12 you to work on that one exhibit I showed you, Dobie 16,

13 with one question sample, one known question?

14 A.      The known sample?  That takes --

15 Q.      Just as to the two exhibits I showed you, how

16 long would that take?

17 A.       That would take about an hour and 15 minutes

18 just to work on each one of those samples.  Each sample

19 needs to have a pristine examination environment, so

20 the area has to be sterilized, a clean environment set

21 up, the item taken in its packaging, notations made,

22 opened up, additional notations made, a sample

23 collected, put into a prepared tube at that point, and

24 then the whole setup has to be cleaned and then we

25 start again for the next item.

1          MR. WARD:   How long -- I'm sorry, I didn't get

2 the length of time.

3          THE WITNESS:   Each item of evidence can take

4 about 45 minutes, and that would be for a small item of

5 evidence like that.  If we're examining, for example, a

6 pair of pants or slacks that have multiple bloodstains,

7 sometimes that can take over eight hours.  But for

8 something like a magazine, it takes roughly 30 to 45

9 minutes.

10         BY MS. GREENBERG:

11 Q.     How about taking you to the end of the process,

12 you're able to reach your conclusions as to whether or

13 not there's -- what the match is between the DNA on the

14 known sample and the DNA on the known sample?  From

15 beginning to end, how long would that take?

16 A.     In order to be time and cost effective, we do

17 what's called batching, which is the standard operating

18 procedure in forensic   DNA laboratories.  So we examine

19 evidence until we get enough samples to take through

20 for DNA testing, conduct the DNA testing, perform the

21 comparisons, write the reports, do the administrative

22 processing of, for example, drying down the DNA

23 extracts and preparing DNA packets.

24         Together, that time period is roughly four

25 weeks, so when we're talking to people about how long

1  it takes to do cases, we say it takes about a week to a

2  week and a half to process the evidence, about a week

3  to perform the DNA testing, roughly a week to get all

4  of those reports written.  So again, the single report

5  will take less time, and then about a half of a week to

6  do our administrative  cleanup, if you will, from that

7  DNA run, so it's about four weeks.

8  Q.      Was this submission  in this case for your

9  laboratory considered  to be a large or small

10 submission?

11 A.      This was considered to be a large  submission.

12 Q.      How many items were there?

13 A.      There were 18 items of evidence, and there were

14 eight known samples.

15 Q.      How many people in your lab do the work that you

16 do?

17 A.      There are three of us in the biology section.

18 Rough roughly half of my time is spent doing

19 administrative  and quality control measures.  A large

20 part of our process is our quality assurance  program to

21 insure that the quality of the results is appropriate

22 for release of reports and so that -- there are a lot

23 of steps to that, from anything as simple as taking

24 daily temperatures on items of equipment  through doing

25 quality  control checks that can take over four hours on

1 a single instrument.

2         So the majority of my time, or about half of my

3 time, is spent doing that. So to answer the question

4 simply would have been about 2.5 people.

5 Q.    If we had somebody who's working full time, how

6 long, approximately, would it take them to analyze the

7 exhibits that were submitted in this case?

8         MR. WARD:   Your Honor, I object to this. If she

9 wants to stipulate that the lab is under-funded and

10 understaffed, I'll stipulate to that.

11        THE COURT:   Okay. Overruled.

12        BY MS. GREENBERG:

13 Q.    Want me to repeat the  question?

14        If there were a full-time person, not taking

15 your time as half-time because a full-time person of

16 your training and caliber, how long would it have taken

17 them, approximately, to analyze the 18 -- is that what

18 you said -- exhibits in this case?

19 A.    Through the DNA typing process?

20 Q.    Yes.

21 A.    It takes approximately one and a half to two

22 months, and if we were to include the time for the

23 technical review process for a large case like this,

24 that's an additional two days or so.

25 Q.    You're an expert, so I'm going to give you a

1  hypothetical , and let me know if you need me to repeat

2  this or stop at any time .  The hypothetical is:

3  Suppose there were a number of search warrant s done in

4  the case and the agent s knew exact ly what the US

5  attorney s -- Assistant US attorney s were going to do in

6  court , so they were able to de lineate from this

7  voluminous evidence exact ly what exhibit s the AUSA

8  would elicit from you in court .  Follow me so far?

9  A.      I do.

10  Q.      Suppose they submitted to you approximately  300

11  exhibit s they were going to show to the jury because

12  they knew that .  Okay ?

13  A.      Okay .

14  Q.      Which I know it's a hypothetical .  It's not

15  meant to be in real life .  It's like that .

16  A.      Good .

17  Q.      Suppose they also guess ed right as to number of

18  known sample s to give you , and they said , okay , we only

19  need -- we only need seven known sample s and we got

20  those seven known sample s, we need you compare it to

21  these 300 exhibit s.  So we have 300 exhibit s not

22  count ing -- we're not going to ask you to examine every

23  little baggy , so that would only be count ed if there

24  were a whole bag full of baggi es.  We would n't ask you

25  to count every baggy , we would say that 's Exhibit 1 .

1 Do you follow me so far?

2 A.      Okay.

3 Q.      We have 300 of these, seven known sample s.  What
4 would you be able do that --

5       MR. WARD:  Objection, and I'd like to be heard
6 on that at the bench.

7             (At the bar of the Court.)

8       MR. WARD:  I don't know where these 300 example s
9 come in.  I thought we were talking about Lavon Dobie
10 here.  Lavon Dobie, there's two item s, I think, or
11 three item s that were tested with respect to her.

12       MS. GREENBERG:  Your Honor, she's a DNA expert.
13 She has examine d 18 item s here.  The defense counsel
14 have gone on and on and on with all the search agent s
15 and fingerprint and DNA testing, and I'm done after
16 this question.  I'm moving on to the individual
17 exhibit s she's observe d, but I think she's entitle d to
18 answer those question s.

19       MR. MONTEMARANO:  Will you proffer what the next
20 question is?

21       MR. WARD:  She's been asked about item s related
22 to Lavon Dobie.  Now the suggestion is the implicit
23 question that there were 300 item s that relate to Lavon
24 Dobie, which are ridiculous.  There aren't and the
25 government well know s that.

1          MS. GREENBERG:   No, no, no.  There's 300 as to
2 our exhibit list.
3          THE COURT:   Make it clear there's not 300 as to
4 Lavon Dobie.
5          MS. GREENBERG:   Okay.
6          THE COURT:   The objection is sustained to that
7 extent.  Redo your question.
8                    (Back in open court.)
9          BY MS. GREENBERG:
10 Q.    Ma'am, just to be clear, I am not talking about
11 300 exhibits as to Ms. Dobie.  I'm saying Exhibit 300,
12 that somebody like Detective Eveler would give you for
13 a whole case and would relate to seven people, what
14 would you say to Detective Eveler or Sergeant Sakala
15 submitting that to you?
16          MR. MONTEMARANO:   Objection.
17          THE COURT:   What's the basis?
18          MR. MONTEMARANO:   Relevance.
19          THE COURT:   Restate the question.
20          MS. GREENBERG:   Using my hypothetical, what
21 would be your response to receiving that --
22          MR. MONTEMARANO:   Objection as to relevance.
23          MR. WARD:   I object to that, Your Honor.
24 Probably her response is, oh my God, how am I going to
25 get that done?

1          THE COURT:   Overruled.

2          BY MS. GREENBERG:

3 Q.     Not adopting Mr. Ward's response, but what would

4 you say?

5 A.     I would say that's not a bad response.  I would

6 say that they would shut our laboratory down.  I was

7 trying to do a little math when you were at side bar.

8 Three hundred  exhibits would translate  into probably

9 double that number of DNA samples because we typically

10 -- depending on what you're talking about, but there's

11 usually  obviously at least  one DNA sample, typically

12 two or more.

13          So if we just average that out, we'd say we

14 would have about 700 samples to go through for DNA.

15 Your average DNA examiner can take about 30 samples

16 through per month.

17 Q.     I'm sorry, I didn't hear your average DNA

18 examiner can what?

19 A.     Can take through approximately  30 DNA samples

20 per month.

21 Q.     So it would take roughly a year and a half for a

22 single examiner to process that evidence?

23 A.     Because I'm thinking since they're not writing

24 the reports they'd be just going DNA run after DNA run

25 after DNA run.  So it may be slightly less than that,

1  but that would be a single examiner's work for about a

2  year and a half. Then we would have to have the

3  technical reviewer's time to review a case of that

4  magnitude, which I would imagine would be a very, very,

5  very, very large stack of paperwork, and I would

6  anticipate that would take about a month minimum.

7  Q.      Now turning our attention to Miscellaneous 26,

8  which I'll put this up on the screen and then I'll zoom

9  in if it were appropriate. Do you recognize that

10 exhibit?

11 A.      Yes, I do.

12 Q.      Is there a redacted copy of one of your reports?

13 A.      Yes. It's a redacted copy of a portion of my

14 report. Page 8.

15 Q.      What does this report reflect?

16 A.      This particular portion of the report reflects

17 the DNA typing results for two items in this case.

18 Q.      What does this mean, the summary of PowerPlex 16

19 typing results?

20 A.      That is a listing of the DNA profile results

21 that were obtained. So in this case, for two of the

22 items, we can see the DNA typing results.

23 Q.      And I'll zoom back out. We see up top here,

24 item, description and a list of letters and numbers.

25 Can you explain to the jury what that is?

1 A.     Yes.  The item number refers to the item number

2 that was designated for each item from the laboratory.

3 There is a brief description of the item.

4 Q.     Oh, I'm sorry.  I'm perhaps on the wrong page

5 from you.  Are you talking about the S-1 here and the

6 12 here?

7 A.     Yes, I am.

8 Q.     Those are the two exhibits I just showed you?

9 A.     They are.

10 Q.     The description of the two exhibits, S-1, which

11 matches with Miscellaneous 2 5 is what?

12 A.     The buccal, or cheek swab, sample from Lavon

13 Dobie.

14 Q.     And Item 12, which matches Dobie 16A, is what?

15 A.     That's the sample from the bottom, or the base,

16 of the magazine that was recovered from Ninth Street in

17 DC Northwest.

18 Q.     And now, if perhaps you can explain to us what

19 is not -- in as clear English as those two things

20 across the top of the chart.  What do those letters

21 and numbers reflective of?

22 A.     As you said, the title of this table is the

23 Summary of the PowerPlex 16 Typing Results.  PowerPlex

24 16 is the kit that we use in our laboratory to obtain

25 the results on those 16 areas of DNA, those genetic

1  marker s where  there  are  difference s  between  people  in

2  the  population  .   Each  one  of  those  genetic  system s  has

3  a  name  ,  and  so  that 's  what  those  flurry  of  letter s  and

4  number s  are .   So  for  example ,  in  the  first  column  of

5  result s ,  it  says  --

6  Q.      Where  my  pen  is?

7  A.      Yes ,  exact ly .   It  says  D3S1358 .   That  is  the

8  name  of  that  area  of  DNA  that  we  look  at  where  we  know

9  there  are  difference s  between  people  in  the  population .

10 For  that  system ,  just  look ing  at  that  one  alone ,  there

11 are  nine  common  variation s  that  are  found  in  the

12 population .   So  each  one  of  us  has  one  of  the  45

13 possible  type s  that  are  available  for  that  one  system

14 alone ,  and  then  each  one  of  the  system s  after  that ,  and

15 the  next  one  is  one .

16      Then  after  that  is  D21  for  short .   Each  one  of

17 those  system s  has  variation s  in  the  population .   The

18 more  system s  that  we  look  at ,  the  more  like ly  we  are  to

19 end  up  with  a  result  where  there  is  a  statistical

20 probability  that  no  one  else  will  have  that  DNA

21 profile .

22 Q.      So  do  these  number s  up  here ,  the  different  types

23 of  DNA  that  you  describe d  , such  as  THO1  and  D3S1358 ,

24 does  that  tell  you  whether  the  person  is  going  to  have

25 red  hair  or  brown  hair  or  short  or  is  tall  or  how  --

1 that's what we typically understand DNA to mean.  How

2 does this relate to those factors?

3 A.      What you just referred to with height and hair

4 color, those are determined through genes that are

5 found within our DNA.  These particular areas of DNA

6 that we look at are essentially spacer nonsensical

7 pieces of information.  So in order for our genes to be

8 read by our bodies to provide the information that's

9 needed, you need gaps between those.

10         So some scientists refer to this as junk DNA, if

11 you will, but it's DNA that for forensic scientists is

12 very valuable because there are these variations that

13 help us to distinguish between people.  It doesn't tell

14 us anything about how you look or what race you are or

15 anything.  It just provides these differences between

16 people.

17 Q.      That's through the space in the DNA?

18 A.      Exactly.  So you have a gene that's going to be

19 read and then you have spaces.  And actually, within

20 the genes there are spaces of nonsensical information.

21 That is not -- nonsensical information not is unique in

22 the actual reading and information that's used for our

23 bodies in terms of DNA that's needed for the genes.

24 Q.      And these spacers are different with each

25 person?

1 A.        They are.  We inherit half of our DNA from our

2 mothers and half from our fathers, and actually, if we

3 look for the result for D3 from that first sample, we

4 can see that there is a result that says 16, 17.  These

5 areas of DNA are actually repeats, and so in this

6 instance for D3, that 16 refers to 16 repeats of

7 information.  The 17 refers to 17 repeats of

8 information.

9        One way to think of this is to think of trains

10 on a track, and in the laboratory we have an engine and

11 a caboose and then we have our train's cars, and in

12 this instance,  for one of these trains, you'd have 16

13 cars, for the other you'd have 17.  If you think of

14 that again, if you were looking straight down on those

15 trains, on your separate tracks, the train that has the

16 17 boxcars is going to be longer than the train with

17 the 16 boxcars.

18        So it would be very easy to tell the difference

19 between them just by looking at their length.  And in

20 simple terms, that's all we're doing in the laboratory

21 is we're looking at length differences of pieces of DNA

22 for each of these very specific areas in our bodies

23 where there are differences between people.

24 Q.     Does 16 spacers come from one parent and 17

25 comes from the other?

1  A.      Yes.  And without looking at this individual's

2  parents, I don't know which parent they inherited the

3  16 from and which they inherited the 17 from, for

4  example, but they're inherited from each parent.

5  Q.      And you would need a DNA sample from each parent

6  to tell that or from one parent; is that correct?

7  A.      From each is preferable because your parents

8  may have different information.  For example, these

9  parents may both be 16, 17s.  Because we're only

10  looking at one area, you can have factors that are the

11  same.  People who are related to forensic biologists

12  are often asked to give their DNA samples.  So for

13  example, for each of my areas of DNA, I know which

14  parent I inherited my characteristics from, unless both

15  of my parents have the same marker in one area, and

16  then I don't know who gave me what.

17  Q.      These numbers up on top are the different ways

18  of typing in the DNA and differentiating the DNA for

19  analysis?

20  A.      Yes.  In the United States, we have 13 areas of

21  DNA that are referred to as the 13 core loci.  Loci are

22  multiple areas of DNA that are being looked at.  A

23  locus is a single area of DNA that is being looked at.

24  We have -- every laboratory looks at a minimum of 13

25  areas.  In some areas, we look at two additionals that

1  are called the pentas, Penta E and Penta D, and other

2  laboratories will be seeking different other extra

3  areas of DNA.  Those labs also use the amelogenin or

4  the sex-determining area as well  .

5  Q.     On this chart, Miscellaneous  26, there is the

6  Penta E; is that correct?

7  A.     Yes, it is.

8  Q.     If we slide it over, here we see the Penta D?

9  A.     Yes.  So essentially those are bonus areas of

10 DNA that we look at.

11 Q.     Extra credit?

12 A.     Extra credit.

13 Q.     And here is -- what did you call the XX here?

14 A.     It's amelogenin and if we think about back to

15 our basic biology, we will remember, hopefully, that we

16 inherit our sex characteristics from our parents as

17 well, so if we have two XX that means we're a female.

18 If we have a X and a Y, it means we're a male.

19 Q.     Other than that determination, is there anything

20 among the other characteristics that gives you any

21 personal information about the person other than the

22 spacers between their DNA?

23 A.     No.

24 Q.     Now, if I go specifically  -- you can start with

25 the beginning and give you some examples, this 16 and

1 17, and then you also have 16 and 17 written on the

2 bottom.  Do you see that?

3 A.      Yes, I do.

4 Q.      And you're consistent throughout with your

5 different results with the numbers.  Are they all the

6 same?

7 A.      Yes.  If you compare the results of the DNA

8 profiles all the way across, looking at all 16 areas of

9 DNA, the DNA profile from the known sample from Lavon

10 Dobie is the same as the DNA profile that was obtained

11 from the base of the magazine from Ninth Street.

12 Q.      What do you call in your practice this type of

13 profile?

14 A.      In terms of the fact that they match?

15 Q.      Yes.

16 A.      I would call those matching profiles.  In this

17 instance, what we can see on the evidence profile is

18 that we have a single contributor of DNA and we refer

19 to those as clean profiles.  In addition to having

20 something that's a single source of DNA, or a clean

21 profile, we oftentimes see mixture DNA profiles.

22       From what -- since we know that we inherit half

23 our DNA from our mother and half from our father, no

24 single person is going to have more than two

25 characteristics at any of these areas, so if we look at

1  D3, you can see we have a 16 and a 17.  If we were to

2  look at another factor as well, that would be an

3  instant indication to me that we most probably have a

4  mixture.

5  Q.      Just to back you up.  What do you mean by

6  "mixture" again?

7  A.      It means there's DNA from more than one person

8  present,

9  Q.      Is that common?  Uncommon?

10 A.      That's fairly common.  Even when we're looking

11 at swabs taken from someone's body, for example, we

12 oftentimes have mixtures.  But anything that's a

13 handled item of DNA, which we do a lot of now -- for

14 example, if I had a pen and I wanted to swab it and

15 determine who had been handling that pen, I would most

16 likely get a mixture DNA profile on that.

17         Sometimes we're lucky and we get a clean

18 profile, but oftentimes people set down pens and

19 someone else picks it up, so we're likely to see a

20 mixture, so we can interpret those profiles as well and

21 say if someone can be included in a group of people

22 that could have contributed to that mixture or if they

23 would be excluded as being a possible contributor into

24 that mixture.

25 Q.      Just to be clear, when you're talking about this

1  magazine, the bottom part of the magazine that I

2  recently showed to the jury, that was recovered from

3  7427 Ninth Street, Northwest.   Are you saying that

4  nobody ever, ever in their life ever touched the bottom

5  of that magazine --

6        MR. WARD:   Objection.

7        MS. GREENBERG:    -- and that only this person

8  with 16 and 17 touched the gun?

9        MR. WARD:   Objection, Your Honor.   I suggest

10 it's leading.

11       THE COURT:   Rephrase the question again.

12       BY MS. GREENBERG:

13 Q.     By seeing that there's two items there, 16 and

14 17, on the magazine that was recovered from 7427 Ninth

15 Street, Northwest, what you analyzed as Item No. 12,

16 are you able to tell who, if anyone else, might have

17 touched that weapon ever?

18       Are you able to tell whether this person with

19 the 16, 17, and the rest of the typing touched that

20 weapon, or is it a possibility that somebody else had

21 previously touched the weapon?

22 A.     Well, common sense actually tells us that

23 someone else has handled this weapon.   We have someone

24 that manufactured it, we have someone that sold it, so

25 we know that other people have handled this weapon, and

1 this magazine , for example .   The fact that I'm finding

2 a single DNA profile consistent  with a single

3 individual  just tells me that I have a clean profile at

4 this particular  point in time .  Could be if it were

5 examined or recovered  a day later , that there might

6 have been additional   DNA there as well .  But at this

7 point in time , I have  a single  DNA source  in the

8 profile .

9 Q.      What is the likelihood  that the person who

10 submitted that sample , Lavon Dobie , is the person  whose

11 DNA was recovered  from the bottom  of that magazine ?

12 What is the likelihood ?

13 A.      The DNA results can be interpreted into a

14 statistical  number , and by doing -- the way we do that

15 in the laboratory  is by looking at four population

16 categories.   The idea is to get a percent of the

17 extract at the high end and the low end of what the

18 significance of the finding is.     What you really want

19 to do, say a person walking down the street has the

20 same DNA profile as  does every other  person walking

21 down the street have this DNA profile , or is it

22 something  that we're unlikely to see again in the

23 population ?

24      So what I'm going to do is to provide you with

25 the most conservative  number from that statistical

1 analysis, so the probability of randomly selecting an

2 unrelated individual out of the population that has

3 this same DNA profile is one in 1.1 quintillion. Now,

4 quintillions are numbers that we don't typically deal

5 with, so sometimes it's helpful for us to try to put

6 that in people terms.

7          Right now, the approximate world population is

8 about six billion people. We can argue it a little

9 bit, but it's roughly six billion people. That has

10 nine zeros. A quintillion has 18 zeros. So what this

11 result is telling us is that, statistically speaking,

12 this is a result that we are not likely to see in the

13 population again. It is not a common finding, this

14 map, if you will.

15 Q.     Except for my initially writing in the wrong

16 spots; is that correct? This is a one in 11

17 quintillion chance it is the same person, and there's

18 18 zeros and approximately six billion people in the

19 world and that has --

20 A.     Yes, and that's the probability of randomly

21 selecting another individual with this DNA profile.

22 Q.     How about twins?

23 A.     That's a very good question. Identical twins

24 will have the same DNA profile. Fraternal twins,

25 however, such as even, you know, well, if we think of

1  that would be a brother and sister that are born

2  together, obviously would have different DNA profiles,

3  but the individuals in the population that would have

4  the same DNA profile would be identical twins, so that

5  does, indeed, happen.

6         MS. GREENBERG:   Your Honor, may I publish

7  Miscellaneous 26, please?

8         THE COURT:   Yes, you may.

9         BY MS. GREENBERG:

10  Q.     Just to be clear, Miscellaneous 26, all the

11  numbers are exactly the same on that chart as what you

12  based your decision?

13  A.     Yes, that is correct.

14  Q.     Now, I'd like to show you some other items that

15  you examined, if I could have --

16         MS. GREENBERG:   Court's indulgence.

17         BY MS. GREENBERG:

18  Q.     These are items submitted from 7427    Ninth

19  Street, Northwest.   If I could have Dobie 17A, which

20  for your purposes is Item 13; Dobie 16, which is Item

21  14; and Dobie 17 is Item 15.

22         Your Honor, may I approach with the exhibits?

23         THE COURT:   Yes, you may.

24         MS. GREENBERG:   It will make things go a little

25  quicker.

1          BY MS. GREENBERG:

2  Q.      Starting -- you've already testified about Item

3  12.  Handing you what is your Item 13 --

4          MR. WARD:  I'm sorry, what is the exhibit

5  number?

6          MS. GREENBERG:  This is Item 13 up in the

7  corner, and for our purposes it's Dobie 17A.

8          BY MS. GREENBERG:

9  Q.      Could you tell the jury what that is?

10 A.      Yes.  This is a nine millimeter magazine with

11 live ammunition that was received at    the laboratory in

12 connection with this investigation.

13 Q.      Was a sample obtained from that item?

14 A.      Yes, it was.

15 Q.      From where?

16 A.      Again, from the base of the magazine.

17         MR. WARD:  I'm sorry, I didn't hear.

18         THE WITNESS:  From the base, or the bottom, of

19 the magazine.

20         MS. GREENBERG:  Am I in your way, Judge.

21         THE COURT:  No.

22         BY MS. GREENBERG:

23 Q.      Is that the same location as before in the other

24 gun?

25 A.      Yes.  That's the standard location that we take

1  sample s from on magazine s because it's unlikely to have

2  latent fingerprints . If we can preserve the side for

3  the latent fingerprint examiner s, but still give us a

4  high probability of getting a DNA profile .

5  Q.     Why is that ?

6  A.     When someone puts the magazine into the gun ,

7  typically they tap it with the base of their hand and

8  they can transfer the DNA from their skin to the

9  magazine by doing that .

10 Q.     That's what we -- the jury had already seen when

11 I showed them Item 12; is that correct ?

12 A.     Yes , that bottom , or the base , of the magazine .

13 Q.     For Item 13, we were able to obtain -- you were

14 able to obtain a DNA sample from the bottom of the

15 magazine on that weapon -- on that magazine . I'm sorry

16 I keep saying weapon .

17 A.     Yes , a swabbing was recovered and the ability to

18 get a DNA profile is a different matter .

19 Q.     As to that exhibit , what was your conclusion as

20 to Ms. Dobie ?

21 A.     I was unable to obtain any DNA typing result s

22 from this particular sample , and so we have a long

23 phrase that we use , but essentially , it means that

24 we're unable to obtain a profile from the evidence , and

25 with touch or contact DNA sample s, that is -- that is

1 not uncommon, but it -- you know, it's nice when we get

2 a result, but we're not surprised when we don't.

3 Q.      In other words, it wasn't good enough to effect

4 whether or not match could be made?

5 A.      Exactly.  So we had a swab that was taken and no

6 DNA results were obtained.

7 Q.      If I could turn your attention to item -- what

8 is your Item 14 and for our purposes is Dobie 16.  For

9 the record, it is a firearm.  Again, a Llama Minimax

10 .40 Caliber handgun, and again, that's your Item 14 and

11 Dobie 16.  Can you tell the jury what your lab was able

12 to accomplish with that particular weapon?

13 A.      Yes.

14 Q.      Again, we're still on Ninth Street?

15 A.      Yes, we're still on Ninth Street.  A swabbing

16 was obtained -- typically with firearms, what we

17 attempt to do is take swabbings from ridged areas on

18 the weapon.  The reason for that is because you can

19 have skin cells that will collect in those little

20 ridges and nooks and crannies that we can then pull out

21 by the swabbing, and hopefully obtain a DNA profile

22 from.  So in this instance, we have a ridged area on

23 what's called -- we call the grip, and so we swab the

24 front -- well, both sides and any ridged portion of the

25 grip, and in this area, it's pretty much ridged all the

1  way around.  There's a hatching on the sides, and then

2  a straight up and down linear pattern on the front and

3  back of the grip.  So that is swabbed.

4        In this instance, the swab was taken through for

5  DNA testing.  There was a complex mixture that was

6  obtained from this DNA typing process and indicates a

7  mixture of at least three individuals.  Lavon Dobie

8  could not be excluded as a donor into this mixture

9  profile on the grip of this weapon.

10 Q.    What does that mean, could not be excluded?

11 A.    That means that her DNA profile is represented

12 in the typing results so that she cannot be excluded as

13 one of the people who left DNA on this particular area

14 of the weapon.

15 Q.    How does that differ from the probability that

16 you testified as to the other magazine?

17 A.    In our laboratory, if we have what's called a

18 clean DNA profile that we talked about on the base of

19 the magazine, we do not go on to obtain a statistical

20 number for mixture profiles.  The process of obtaining

21 a DNA statistical analysis for a mixture is completely

22 different.  We use what's called a likelihood ratio,

23 and you have to set up situations where you compare and

24 contrast the likelihood of one scenario versus another.

25 We do that when we need to, but if we have a clean

1 profile, that is the best statistical analysis, and so
2 we do not prepare the others.
3 Q.      What are you able to tell us, then, with Dobie
4 16 where you had a mixture profile and you couldn't
5 exclude Ms. Dobie?
6 A.      That's what I'm able to tell you, that her DNA,
7 she can't be excluded as a donor of DNA on the grip
8 area of this weapon, but I did not prepare a
9 statistical number. Samples were also taken from the
10 trigger on this item, as well as the slide, which you
11 would think of as the trigger. There's a rigid area,
12 and there's a rigid area on the slide.      The sticker is
13 over it on one side, but there are these grooves and
14 the slides typically work real well for DNA testing.
15 For both of those samples, I was unable to obtain any
16 DNA typing results. So again, there's nothing for
17 comparison there.
18 Q.      Dobie 17, which for your purposes is Item 15,
19 and again, we're still on Ninth Street Northwest; is
20 that correct?
21 A.      Yes.
22 Q.      Were any DNA samples able to be obtained from
23 that particular item?
24      MR. WARD:  Do you want to describe the item,
25 please?

1          MS. GREENBERG:    Certainly.

2          BY MS. GREENBERG:

3 Q.       That would be A Taurus Millennium handgun Serial

4 No. TWE 69738 recovered from 7427 Ninth Street

5 Northwest, Washington, DC as is on your report, ma'am;

6 is that correct?

7 A.       That's correct.  Again, this weapon swab was

8 taken from the ridged area of the grip or handle on the

9 weapon, obtained a DNA profile.  It was also consistent

10 to a mixture.  In this instance, a mixture of at least

11 two people, and Lavon Dobie could not be excluded as

12 one of the contributors of DNA into this mixture.

13         The sample was also prepared from the slide.

14 Again, that's that ridged or bumped area on the weapon

15 that is drawn back, so people typically handle that

16 area of on the weapon as well.  I obtained a partial

17 DNA profile on that portion of the weapon that was

18 handled from the slide.  Now, what that means is there

19 is very little DNA there.  If we do not obtain a full

20 DNA profile, there can be a number of reasons for that,

21 but typically it means we're working with a very small

22 amount of DNA that's recovered.

23         Again, we're talking about people touching

24 things and coming in contact with them, so that's an

25 expected result, if you will, and we see it frequently

1  with items like firearms.  In this instance, the

2  mixture was consistent with at least two people.  I

3  could not obtain a conclusive result in terms of

4  whether or not Ms. Dobie could be in that mixture

5  because it was so small or partial.

6  Q.     Before we get to the next set of exhibits, I

7  just touched this bench.  If this bench was taken into

8  your lab for DNA testing on that bench, would you be

9  able to get my DNA where I just touched?

10       MR. WARD:  Objection, Your Honor.

11       THE COURT:  Overruled.

12       THE WITNESS:  It depends, actually.  There are a

13  number of factors that would come into play there.

14       BY MS. GREENBERG:

15  Q.     Could you tell the jury some of the factors that

16  would come into play?

17       MR. WARD:  I'm sorry.  What was the question?

18       MS. GREENBERG:  Could you tell the jury some of

19  the factors that would come into play.

20       MR. WARD:  Objection.

21       THE COURT:  Overruled.

22       THE WITNESS:  The easiest factor to discuss is

23  the amount of time in which you would have had contact

24  with the bench when you touched it.  The longer the

25  contact, the more DNA you're going to leave, and in

1  reality , the more rigorous the contact , so if you're

2  slapping your hand up and down or rubbing it all over ,

3  you're going to leave more DNA.  This gets us into a

4  discussion of --

5       BY MS. GREENBERG:

6  Q.      I'm sorry .  If I could back you up.

7       Do you mean the amount of time I touched the

8  desk or the amount of time from when I touched the desk

9  to when you get it or both ?

10 A.      I was at that point talking about the amount of

11 time that you were touching it , okay?  But we can talk

12 about the amount of time since you touched it .  So for

13 example , if you touched it , left some DNA and then two

14 days went by before the bench was recovered and other

15 people touched that area , then that would affect my

16 ability to potential ly detect your DNA there .

17      Every time someone touches something , they leave

18 DNA, but they also take it away .  So, if someone

19 touches the area that you touched, they may leave their

20 DNA, and we'll get into that in a minute , but they will

21 also take away some of yours.

22 A.      What I was starting to talk about was that this

23 gets us into categories of people in the population .

24 You can be a heavy shedder of DNA or a weak shedder of

25 DNA.  So if you work in a DNA laboratory , like I do,

1  you want to be a weak shedder.  You don't want to be
2  leaving your DNA all over the place.
3        We take our gloves off and on, we go through all
4  sorts of special requirements to insure that we're not
5  leaving our DNA because that would be a bad thing, and
6  it's not a positive thing, but it does happen.  But
7  what I want to make sure of is that my DNA, for
8  example, isn't ending up in the evidence samples.  So
9  if you're a heavy shedder, you leave a lot of your DNA
10 behind, and if you're a weak shedder, you don't leave a
11 lot your DNA behind.
12        Complicated on -- compounded with that is how
13 often, for example, if you were talking about your
14 hands, you wash your hands.  So if you wash your hands
15 frequently, you're getting rid of a lot of the excess
16 cells that are on the surface of your skin that you
17 would leave behind.  If you don't wash your hands
18 frequently and you're a heavy shedder, you would tend
19 to leave a lot of your DNA behind.  So those are some
20 of the factors that come into play.  I'm sure there are
21 others, but if that gives you an idea.
22 Q.    Can I control whether I'm a heavy shedder, a
23 light shedder?
24 A.     No, you can't.  I can't look at someone and tell
25 you if they're a heavy shedder or weak shedder.  In

1 actuality, the only way to determine that is through

2 scientific experimentation, and that was one of the

3 ways that people actually found out that we do have

4 different people in the population, who we had

5 volunteers for laboratory experiments, and they were

6 leaving these massive amounts of DNA behind, and they

7 were overwhelming the very small amount of DNA that

8 someone else left behind, so you couldn't detect their

9 DNA profile.

10        In some instances, the person that was a weak

11 shedder whose DNA was being overwhelmed by the heavy

12 shedder had touched the item after the heavy shedder.

13 And something else that can affect things, too, is, for

14 example, if you have a cold and you cough into your

15 hand, you're going to be leaving DNA on your hand, and

16 then if you touch something, you will leave more of

17 your DNA behind. Not because you're a heavy shedder

18 but because you've deposited some of your DNA from your

19 oral cavity on your hand, which is then transferred.

20 Q.     So in your experience, we just looked at

21 different weapons. Is it unusual that you would

22 examine a weapon and find no DNA?

23 A.     No, it's not unusual at all. I mean, it's not

24 unusual to find DNA. It's not unusual -- I mean, just

25 about anything you can imagine, a single profile, a

1 mixture profile, no DNA we will find.

2 Q.     I'd next like to show you Oglethorpe 13B,

3 Oglethorpe 9B, Oglethorpe 9A, and Oglethorpe --

4        MR. WARD:   Excuse me.   Are we through with Ninth

5 Street?

6        MS. GREENBERG:   Yes.   May I approach?

7        THE COURT:   You may approach.

8        BY MS. GREENBERG:

9 Q.     With the other magazine at Ninth Street, I

10 apologize, Mr. Ward, you similarly didn't analyze the

11 bullets because of your standard operating procedure?

12 A.     That's correct.

13 Q.     In all of these exhibits where there were

14 bullets, just to shortcut it, you didn't analyze it; is

15 that correct?

16 A.     That's correct.

17 Q.     Showing you Oglethorpe 10, which for your

18 purposes is Item 9, could you tell the jury if you

19 analyzed those magazines in that bag?

20 A.     Yes, I did.

21 Q.     For the record, that is Oglethorpe 10.   Could

22 you tell the jury the results of your analysis, which

23 is two Davis industry magazines and two magazines with

24 ammunition recovered from 846 Oglethorpe Street,

25 Northeast?

1  A.       Yes.  I was unable to get DNA typing results

2  from the samples that were recovered from the base of

3  all four of those magazines.

4  Q.       Were any DNA results recovered from those

5  magazines?

6  A.       No.

7  Q.       Again, did you find that unusual?

8  A.       No, I did not.

9  Q.       Oglethorpe 13B, which for your purposes is Item

10  6, and for the record, Oglethorpe 13B is a Ruger 97 DC

11  handgun, Serial 66337394, recovered from 846 Oglethorpe

12  Street, Washington, D. C.

13  A.       Swabs were obtained from the ridged areas on the

14  grip and the slide of this weapon.  I was unable to

15  obtain any DNA typing results from either of those

16  areas on this weapon.

17  Q.       Again, was that unusual?

18  A.       No, it was not.

19  Q.       Oglethorpe 9B, for which -- for your purposes is

20  Item 7, and just to be clear for the record, that's a

21  Davis Industries, P-380 handgun, Serial No. AP171772,

22  recovered from 846 Oglethorpe Street, Northeast.

23          What were the results of your analysis on that?

24  A.       Swabs were obtained from the ridged areas on the

25  grip and the slide of this weapon, and again, I was

1 unable to obtain any DNA typing results on either of

2 those areas from this weapon.

3 Q.     Again, not unusual?

4 A.     No, it's not.

5 Q.     Oglethorpe 9A, which for your purposes is Item

6 8.  That is a Davis Industries DM .22 handgun, Serial

7 No. 1646492, recovered from 846 Oglethorpe Street,

8 Northeast.

9 A.     Yes.  The only ridged area on this weapon was

10 the hammer.  A swab was obtained from this portion of

11 the hammer, and I was unable to obtain any DNA typing

12 results from that sample.

13 Q.     And again, in your experience, is that unusual?

14 A.     No, it is not.

15 Q.     Next, I'd like to show you what's been marked as

16 Bynum 1 and Bynum 1A.  For your purposes, they're Item

17 13.

18       MS. GREENBERG:   Your Honor, may I approach?

19       THE COURT:   You may.

20       BY MS. GREENBERG:

21 Q.     Showing you what's been marked as Bynum 1 and

22 also 1 on your exhibit.  How about that?  For the

23 record, a Glock .26 handgun, Serial No. CAG959,

24 recovered from 1513 Ray Road, Apartment 102, in

25 Hyattsville, Maryland.

1         Did you test that particular item --

2 A.      Yes.

3 Q.      -- for DNA analysis?

4 A.      Yes.  Samples were recovered from four different

5 areas on this weapon.

6 Q.      What areas were they?

7 A.      They were the grip, the slide, the front of the

8 trigger, and the trigger guard.  And a DNA typing

9 results were obtained from all four of those areas.

10 There were partial DNA profiles obtained from the

11 trigger and -- trigger guard and the front of the

12 trigger guard.

13        There were -- there was a complex mixture DNA

14 profile comprised of at least three people obtained on

15 the grip, and a mixture profile of at least two people

16 obtained from the slide.  On all four of the samples,

17 all eight individuals from which I had received known

18 samples from in connection with this investigation were

19 excluded as being contributors into these DNA mixture

20 profiles.

21 Q.      So you didn't have one of those charts that you

22 typed and matched any of the known samples; is that

23 correct?

24 A.      That's correct.

25 Q.      Is that result atypical with respect to this

1  item where there would be a mixture of DNA sample s but

2  you're not able to compare it to any?

3  A.     We make the comparison but not include anyone

4  exact ly, so that 's not uncommon .

5  Q.     And Bynum 1A, which for purpose s of your report

6  is Item 3.  For the record , that 's a Glock magazine

7  with ammunition  recovered  from 1513 Ray Road , No. 102,

8  Hyattsville , Maryland .  Did you test that exhibit ?

9  A.     Yes .  I examine d the swab that was obtain ed from

10  the base of the magazine .  I was unable to obtain any

11  typing result s on that sample .

12  Q.     What does that mean again ?

13  A.     It means that there 's -- essentially , there 's no

14  more information  than when we start ed out .  We can't

15  obtain any result s for comparison  purpose s.

16  Q.     Could you describe , just so we're clear on it,

17  what do you mean by exclude someone ?  Could n't exclude

18  someone ?

19  A.     If we cannot exclude someone , that means that

20  their DNA could be present in that sample .  It 's more

21  of a way that the phrasing is current ly in forensic

22  biology laboratori es.  We use -- it's a term of art , if

23  you will .  It cannot be excluded or can be excluded .

24  So if someone cannot be excluded, for example , on the

25  -- as we did on the -- found on the base of the

1 magazine from Ninth Street, then a statistical number
2 can be applied to tell you if that's a common finding
3 or a rare finding where you have that match of the DNA
4 profiles.

5        If someone cannot be excluded from a mixture, it
6 certainly is possible to provide a statistical number,
7 but as I mentioned if we have a clean DNA profile, we
8 do not go forward and do that.  If someone is excluded,
9 that means that we can say that there is no indication
10 biologically that their DNA is present on that item.
11 Q.    Does that mean they never touched that item?
12 A.    No, it doesn't.  It means that we can't detect
13 their DNA.
14        MS. GREENBERG:   No further questions, Your
15 Honor.
16        THE COURT:   All right.  Cross-examination?
17                **CROSS-EXAMINATION**
18        BY MR. WARD:
19 Q.    Good morning.
20 A.    Good morning.
21 Q.    My name is Peter Ward.  I guess you gathered
22 from my objections that I represent Lavon Dobie.
23 A.    Yes, I did.
24 Q.    Let me see if I understand.  From Ninth Street,
25 we have four items.  Your Item 12, which was a No. 16A,

1  which  was  the  magazine   that  you  say  you  got  a  DNA

2  sample  from  the  bottom  of  the  magazine ; is  that  right ?

3  A.      Yes , that 's correct .

4  Q.      All right .  The  next  item  was  your  Item  13 ,

5  which  for  purpose s of  this  trial  is  Dobie  Exhibit  17 A.

6  You  got  a  sample  from  the  base  or  bottom  of  the

7  magazine ; is  that  correct ?

8  A.      Yes , but  I  was  unable  to  obtain  any  DNA  result s.

9  Q.      That 's what  I  was  going  to  ask  you  next .

10        So , you're  not  able  to  present  this  jury  with

11  any  evidence  that  she  actual ly held  that  magazine  at

12  any  time ?

13  A.      That 's correct .

14  Q.      The  next  item  was  Item  14 , also  referred  to  as

15  Dobie  Exhibit  16  for  the  benefit  of  this  trial .  This

16  was  a  .40  Caliber  firearm , and  I  understand  you  got

17  some  --  something  from  the  ridge d area  of  the  grip .

18  A.      Yes , that 's correct .

19  Q.      You  concluded  that  that  was  a  mixture  of  the  DNA

20  of  at least  three  people ?

21  A.      Yes .

22  Q.      Okay .  And  again , you  cannot  tell  this  jury  that

23  one  of  the  people  was  my  client , Lavon  Dobie .

24  A.      Ms.  Dobie  cannot  be  excluded  as  a  contributor  of

25  DNA  into  that  mixture , so  I  would  dis agree .

1  Q.      That's the best you can do?

2  A.      Yes, that's correct.

3  Q.      That she can't be excluded?

4  A.      That's correct.

5  Q.      You can't say that she did pick that item up?

6  A.      That's correct.

7  Q.      You can't say -- let me ask you this:  Can you

8  say beyond a reasonable doubt   that my client picked up

9  the .40 caliber firearm?

10 A.      I can't answer that as a yes or no question

11 without providing a full explanation.  So if you'd like

12 me to expound, I can.  I'll leave it up to you.

13 Q.      I think you already answered the question.

14         MS. GREENBERG:   Objection.

15         THE COURT:   Sustained.

16         She can explain her answer if she wants to.

17         MR. WARD:  If she wants to.

18         BY MR. WARD:

19 Q.      Let me ask you this:  On the same .40 caliber

20 firearm you also found some mixture of DNA on the

21 trigger; is that right?

22 A.      On that firearm, I was unable to obtain a DNA

23 profile from the trigger.

24 Q.      Okay.  Did you find the mixture on the trigger?

25 A.      No, I was unable to obtain a DNA profile from

1  the trigger, so I did not --

2  Q.      Can you say beyond a reasonable doubt    that Lavon

3  Dobie never touched that trigger?

4          MS. GREENBERG:    Objection.

5          THE COURT:    Overruled.

6          THE WITNESS:    I cannot say anything about the

7  trigger.  I don't have any information.  There is no

8  DNA profile, so there is no information about anyone

9  touching the trigger.

10          BY MR. WARD:

11  Q.      Let me try to put things in your terms.    You

12  didn't pick up any DNA off the trigger?

13  A.      That's correct.

14  Q.      That's correct.  Now, the judge said that you

15  could explain your answer with respect to the grip and

16  the mixture of three people that you found where you

17  said that Lavon Dobie could not be excluded.

18  A.      That's correct.

19  Q.      For the benefit, could you try to keep it

20  simple?

21  A.      The question you asked me was whether or not I

22  could say she had ever touched that weapon or handled

23  that weapon.  The fact that she can't be excluded as

24  one of the contributors into that mixture doesn't -- I

25  can't say, then, that she didn't handle the weapon

1 because there's an indication that her DNA is present,

2 but there are other things that can go on.

3        There can be a transfer of DNA without handling

4 the weapon, for example, or when you have a complex

5 mixture there -- it is helpful to apply a statistical

6 number because it tells you what that actually means.

7 However, as I said, I did not do that.  I could

8 certainly go back to the laboratory and use our

9 statistical analysis program and develop a statistical

10 number based on a comparison of scenarios.

11 In other words, her being in the mixture versus her not

12 being in the mixture.

13 Q.     Which brings me to a question I was going to ask

14 you down the road, but let me ask you it now, since you

15 talked about transference.  I'll give you a

16 hypothetical situation.  Okay?  A husband, let's say,

17 is caressing his wife's body, okay?

18 A.     Okay.

19 Q.     Then sometime after that, without washing his

20 hands, he picks up a handgun, okay?

21 A.     Okay.

22 Q.     Is it beyond the realm of possibility that he

23 might transfer some of her DNA, which he got on his

24 hands from caressing her, onto the handle of that gun?

25 A.     No, it is not.

1  Q.      So it could very well happen?

2  A.      Yes, it could.

3  Q.      Let's assume for the purpose of a hypothetical

4  that a son, a 17-year-old son held his mother's hand

5  for some reason, showing affection, perhaps, and that

6  the 17-year-old son then, without washing his hands,

7  touched a weapon or a magazine or something like that.

8          Isn't it quite likely also in that circumstance

9  or that situation that he might transfer some of his

10 mother's DNA to whatever he touched?

11 A.      Yes, that can happen.

12 Q.      I believe the next item was Dobie Exhibit 17,

13 and I am not sure what the exhibit number was.  Perhaps

14 Ms. Greenberg can help you.

15         MS. GREENBERG:   What are you looking for,

16 Counsel?

17         MR. WARD:   Dobie 17.

18         MS. GREENBERG:   Item 15.

19         MR. WARD:   Huh?

20         MS. GREENBERG:   Item 15.

21         BY MR. WARD:

22 Q.      I think the last thing you were shown was a

23 handgun and you said you got a mixture off the grip,

24 two people.

25 A.      This is from Ninth Street.  The last item I was

1 shown from Ninth Street -- yes, it was a Taurus

2 Millennium.

3 Q.      Do you have it in your possession?

4       MS. GREENBERG:   It's Item 15, Counsel.

5       MR. WARD:   Item 15 and Exhibit 17.

6       MS. GREENBERG:   Dobie 17, yes.

7       BY MR. WARD:

8 Q.      All right.  Again, with respect to that grip,

9 you found a mixture of two people's DNA, and you said

10 that the -- Ms. Dobie could not be excluded; is that

11 correct?

12 A.      That's correct.

13 Q.      All right.  On the ridges, you found only a

14 partial DNA profile, the amount was very small.  And

15 while it was consistent with two people, you could

16 reach no scientific conclusion as to the source of the

17 DNA; is that correct?

18 A.      From the slide, yes.

19 Q.      From the slide.  That is comparing it to the

20 known sample of Lavon Dobie?

21 A.      Yes.  The findings were inconclusive as to

22 whether or not she could be included in that mixture.

23 Q.      Let's go back to the first item you talked about

24 where you testified that you reached a positive result,

25 and that is the Item 12, the bottom of that magazine.

1  Is that right?

2  A.      Yes.

3  Q.      Now, we've already agreed that someone's DNA

4  could be -- have been transferred to the base of that

5  item by transference.

6         MS. GREENBERG:    Objection.

7         Misstating what the witness said, Your Honor.

8         THE COURT:   Is that consistent with what --

9         MS. GREENBERG:   I object to the question.   I

10  think he's misstating the evidence.

11        THE COURT:   Well, can you rephrase it so you

12  don't --

13        MR. WARD:   I will rephrase it.   I don't want to

14  upset Ms. Greenberg.

15        THE COURT:   All right.

16        BY MR. WARD:

17  Q.      You've already said that the DNA of one person

18  can be transferred by another person to an item.

19  Agreed?

20  A.      Agreed, yes.

21  Q.      It is quite conceivable, then, from a scientific

22  point of view, from your point of view, that the DNA of

23  Ms. Dobie could have been transferred by another person

24  using the hypotheticals I gave you, a husband or a son

25  to the base of that magazine.

1  A.      It's possible but much more unlikely to not see

2  a mixture in that situation. So if you have -- what

3  you're talking about is called a secondary transfer.

4  So you have a primary person who gets another person's

5  DNA on them and then transfers it, that's called a

6  secondary transfer. It's really unusual to not see

7  that primary person -- it's possible, but it's much

8  more unlikely.

9  Q.      But it's certainly possible?

10  A.      It certainly is possible.

11  Q.      I would assume, for example, if I had someone

12  else's DNA on my hand and I pressed it hard on a

13  surface, that would certainly transfer some of my DNA,

14  too, in addition to the DNA of the other person; is

15  that right?

16  A.      Again, some things come into play here that we

17  talked about with the heavy shedders and weak shedders

18  and hand washing and all of that, but for the most

19  part, you tend to see a mixture when you have a

20  secondary transfer.

21  Q.      If I were a weak shedder and I touched the heavy

22  shedder's head like this, and then lightly touched

23  something over here, it's quite conceivable that I

24  would put Mr. Montemarano's DNA on this item because

25  he's a heavy shedder and since I'm a light shedder and

1 only touched it lightly, not put my DNA on there.  It's

2 not possible?

3 A.      It's not impossible.

4       MR. WARD:  Okay.  Give me a second, please.

5             Thank you, ma'am.  I don't think  I have

6 any other question s, but I'm sure Mr. Montemarano  does.

7                     **CROSS-EXAMINATION**

8       BY MR. MONTEMARANO :

9 Q.      Good morning, Ms. Tontarski.  How are you?

10 A.      Good morning.  How are you?

11 Q.      Let me see if I get this straight.  You spent

12 about 22, 23 years in the business; correct?

13 A.      Yes.

14 Q.      Second half of the time, you've been down here

15 in Maryland  and Virginia; correct?

16 A.      Yes.

17 Q.      The first half of the time you were up in

18 Massachusetts  working for the state police lab?

19 A.      That's correct.

20 Q.      Massachusetts  is where you went to college;

21 right?

22 A.      Yes.

23 Q.      Mount Holy Oak, which is  in Holy Oak,

24 Massachusetts ; right?

25 A.      It's actually in South Hadley.  It's next  door

1 to Holy Oak.

2 Q.     I went to U-Mass, so I kind of know the area a

3 little.   Good school; right?

4 A.     Very good school.

5 Q.     And as a scientist, you would agree that science

6 is about precision and accuracy?

7 A.     Yes.

8 Q.     Science is about taking evidence and from the

9 evidence formulating a hypothesis; correct?

10 A.     Yes.

11 Q.     It's not taking hypothesis and trying to fit the

12 evidence into; correct?

13 A.     That's correct.

14 Q.     Take a look at the board over there.   Ms.

15 Greenberg wrote that while you were testifying.   Does

16 that accurately represent what you told us?

17 A.     It's a shortcut based on how she read it back

18 and my summarization of that.   I mean, it doesn't speak

19 for itself.   If someone were just to look at that, if

20 that's what you're asking me.

21 Q.     Well, but is it accurate?   Are the numbers right

22 and all that?

23 A.     Yes, they are.

24 Q.     Does that make it a little more accurate, ma'am?

25 A.     Yes.   When I was testifying, I talked about the

1  probability  of  selecting  an  unrelated  individual .

2  Q.      That's because  people  who  are  related  tend  to

3  have  similar  genetic  profiles; is that  fair  statement ?

4  A.      They  have  sharing of  DNA because  they  share  the

5  same  parents, but  they  have  different  DNA profiles

6  unless  they  are  identical  twins.

7  Q.      Different  DNA profiles, but  their  DNA profiles

8  would  tend  to  be  more  similar  based  upon  the  blood

9  relation ; correct ?

10  A.      They  would  have  a  sharing  of  what  are  called

11  alleles,  or  these  characteristics  the  numbers  that  are

12  typically  represented  in  the  profiles.

13  Q.      Take  your  time .

14  A.      So  for  example , in  my  family , there  are  seven

15  children  and  I  have , sadly  for  my  siblings , looked  at

16  all  of  us  and  we  have  some  sharing  of  characteristics.

17  For  example , we  talked  about  that  16, 17  result  at  D3

18  that  Ms. Dobie  has . We  may  have  more  of  those  areas

19  where  we  have  the  same  DNA profile , the  16, 17, for

20  example , between  siblings . And  we  will  always  have

21  some  sharing of  information  -- almost  always , I  should

22  say, sharing of  information  for  all  of  the  other  areas,

23  but  the  DNA profiles, of  course , are  different .

24  Q.      And  that  sharing of  information  is based  upon

25  the  fact  that  a  child  -- natural  child , not  adopted  or

1  anything  like  that ,  has  genetic  material  which  was

2  contributed  by  that  person 's  blood  parent ;  correct ?

3  A.      That 's  correct .

4  Q.      I'm  using  the  scientific  term  for  parent ,  not

5  adopt ed ,  foster  or  whatever .   That  person  or  individual

6  or  animal  that  contributed  along  with  the  hetero sexual

7  union  with  another  animal ,  person  of  the  opposite  sex

8  to  create  an  offspring ;  is  that  a  correct  statement ?

9  A.      Yes .

10  Q.      So  that 's  why  my  genetic  pro file ,  for  sake  of

11  discussion ,  would  probably  bear  a  great er  re semblance

12  to  my  son's  than  it  would  to  my  wife 's;  correct ?

13  A.      Yes .

14  Q.      In  fact ,  it's  unlike ly  to  bear  any  re semblance

15  to  my  wife 's,  assuming  we're  not  related ;  right ?

16  A.      That 's  correct .   I  mean ,  there  would  --  you

17  would  still  share  character istic s  because  it's  a  small

18  world ,  if  you  will .

19  Q.      It's  a  small  world .

20  A.      You're  going  to  --  it  would  be  unlike ly  --

21  actual ly  statistically  unlike ly  for  you  not  to  share  at

22  least  one  of  those  character istic s  or  alleles  at  one  of

23  those  15  short  tandem  repeat  areas  of  DNA .

24  Q.      It  would  be  statistically  like ly  for  me  to  share

25  common  traits  --  base  trait s  upon  the  analysis  you  do

1  with my offspring; correct?

2  A.      Yes, your offspring would have half of your

3  traits in these areas that we look at.

4  Q.      Would it be also fair to say that speaking in

5  terms of human populations, or groups, that we can see

6  this in the big picture, for example, Scandinavians

7  tend to be blond; correct?   It's the same kind of

8  thing; isn't it?

9  A.      Yes.   In terms of the genes that are inherited.

10  Q.      So looking at your 1.1 quintillion number, that

11  number is going to have to come down based upon

12  relation, blood relation, offspring, sibling, et

13  cetera; correct?

14  A.      Yes, there's actually a statistical algorithm

15  that can be used to account for relations when it's

16  necessary.

17  Q.      And for the sake of discussion, if all of the

18  known samples presented to you -- you said there were

19  eight?

20  A.      Yes.

21  Q.      If the eight known samples presented to you were

22  all African-Americans, checking the DNA against or in

23  terms of the statistical likelihood, there would be no

24  chance whatsoever they would resemble those of an

25  analysis from a population or a group of Norwegians,

1  for the sake of discussion ; correct ?

2  A.      You're talking about physical character istic s as

3  opposed to this nonsensical DNA, if you will . The

4  analysis on a DNA sample , with what we do, tells us

5  nothing about the race or the appearance of an

6  individual , so I talk ed about the fact that we look at

7  four population categori es when we're perform ing our

8  statistic s and they give us a high end and low end of ,

9  you know , what the relevance is of this match , if you

10  will .

11      Really , that's all that it does . It kind of

12  give s us a spread for these number s. It doesn't tell

13  us, for example , that if I -- if the lowest number is

14  from someone who is Caucasian -American that the sample

15  originate s from someone who is Caucasian . It doesn't

16  tell us that at all . As a matter of fact , there is no

17  correlation in that manner .

18      So , I don't know exact ly what you're look ing

19  for , but the statistical number has nothing to do with

20  race . It's a number that tells us whether or not this

21  is a common event or a rare event . Again , intend ed to

22  be an estimate , but does not bear on actual race or

23  appearance -- physical appearance of an individual .

24  Q.      You check ed eight known s; correct ? Not 38 ;

25  correct ?

1  A.       That's correct.

2  Q.       And the knowns were submitted to you by the

3  government; is that correct?

4  A.       Yes.

5  Q.       And the items against which you checked those

6  eight knowns were submitted to you by the government;

7  correct?

8  A.       That's correct.

9  Q.       You work for the government; right?

10  A.       Yes.

11         MR. MONTEMARANO:   Thank you, Your Honor.

12         Thank you, ma'am.

13         THE WITNESS:    Thank you.

14         THE COURT:    You may inquire.

15                    **CROSS-EXAMINATION**

16         BY MR. MARTIN:

17  Q.       Good morning, ma'am.  I forgot your name.  Was

18  it Tontarski?

19  A.       Tontarski, yes.  Good morning.

20  Q.       Good day to you, ma'am.  I have a few questions,

21  and if I can wake up my computer now that I've been

22  awakened.

23         Ma'am, you were also asked some questions about

24  some items taken from Oglethorpe.  I think you were

25  shown some weapons that were in a box, some magazines

1  perhaps.  I don't really remember.  Do you remember

2  that when Ms. Greenberg came --

3  A.      Yes.

4  Q.      -- and she showed you and you said you weren't

5  able to get any statistically significant or make any

6  conclusions regarding that?

7  A.      Exactly.  I was unable to obtain any DNA profile

8  from the three guns and the four magazines from

9  Oglethorpe.

10  Q.      Right.  You were also asked some questions by

11  Ms. Greenberg regarding factors that might affect the

12  results of your testing.  Do you remember that?

13  A.      Yes.

14  Q.      And she also asked you some questions regarding

15  the number of items that were submitted and how long it

16  might take you to look at 300-plus pieces of evidence.

17  Remember that, ma'am?

18  A.      I do.

19  Q.      Now, let me ask you this:  How long would it

20  have taken you to review two more items if it was a ski

21  mask and body armor?

22  A.      Body armor?

23  Q.      Yeah, a bulletproof vest.

24  A.      The ski mask would typically have at least two

25  DNA samples taken from it.  Body armor, I actually have

1  not examined before, but I would imagine it would take

2  at least two samples, possibly three. But in the

3  scheme of things, from the size of this case, it would

4  not add on that much more time, if that's what you're

5  asking.

6       The physical examination from the beginning of

7  each one of those items would probably take about an

8  hour. The body armor may take a little bit longer

9  because it's a good deal larger item, and then taking

10 five more DNA samples through would extend the process

11 by having them substituted in for other cases that

12 would not get examined because those items were being

13 examined.

14 Q.    So the answer is it wouldn't take much longer?

15 A.    It would probably -- well, it's -- I mean, it's

16 hard to say because it affects the productivity of

17 other cases, in other words. But if you want to look

18 at strict numbers, it would take probably on the

19 front-end processing about two additional hours and --

20 because they would have been from the same case, they

21 would have been wrapped into this same examination

22 process, if you will, the same extraction DNA typing

23 process.

24       So, as I said, it would have moved other samples

25 out, so it wouldn't have added anymore time on the DNA

1  end.  It would add a slightly much -- slightly larger

2  amount of time on the technical review process, but

3  five more profiles may not -- wouldn't provide that

4  much extra time.

5  Q.      Okay.  And getting back to these factors that

6  affect the results.  You would agree with me that if a

7  ski mask and a body armor that's covered in cloth was

8  kept in a cool, dry place, that the likelihood of you

9  getting a sample from a shedder would be greater than

10  if it was left out, let's say, in the sunlight exposed

11  to the elements, the rain, and so forth; correct?

12  A.      Yes.

13  Q.      And with respect to those other items that you

14  looked at, aside from the ski mask and the body armor,

15  you also had some toolboxes in your lab.  Do you

16  remember that?

17         Did you ever see the toolboxes?

18  A.      No.

19  Q.      If you didn't see the toolboxes, there's no need

20  to remember that.  Again, like the ski mask and the

21  body armor where you might snip pieces of cloth for

22  samples, assuming you did have the toolboxes there, the

23  four toolboxes, how difficult would it be to take DNA

24  samples from that?

25  A.      I guess it depends on what we're talking about.

1 Are we talking about having numerous tools within the

2 toolboxes?

3 Q.      No, ma'am.  We're just talking about the

4 exterior of the toolboxes.  Remember when earlier you

5 were talking about the transference and trying to

6 determine whether or not a particular individual had

7 touched a toolbox?  Let's assume those toolboxes were

8 in a cool, dry place, like a basement.  Let's assume

9 that that basement wasn't wet, that it wasn't flooded.

10 How much longer would it have taken you to examine,

11 let's say, one of those toolboxes to determine whether

12 or not there was DNA on it?  Just one.

13 A.      Well, again, we're talking about the front-end

14 processing.  It would depend -- it would probably be at

15 least an hour, but sometimes items like that become a

16 lot more complex to examine because there is a lot more

17 do to them.  It takes a lot more to document the

18 processing.

19      At this point, we're now starting to get into

20 samples where we would not be able to bump other

21 samples from a run, from another case, so we would

22 probably be starting to move into another month, if you

23 will, another four-week time period that would be added

24 onto the DNA testing process.

25 Q.      To test one additional toolbox to determine if

1  someone  had  touched  it?

2  A.      Yes, because  in order  for us to be  time  and cost

3  effective, we  have  to  run  samples  through  in  batches.

4  If we were  to  stop  everything  we  were  doing  and  run  one

5  item  and one  sample  through  the  DNA  typing  process, we

6  would  never  get  any  cases  out  the  door, including  this

7  one.

8  Q.      Suppose  your  lead  time  was  about  a  year  and  you

9  were  able  to  decide  when  you  wanted  to  do  it.  Would  it

10  still  result  in  the  same  kind  of  delay  that  you  just

11  suggested  to  the  jury?

12  A.      Yes, because  we  have  to  factor  it  in  with  all  of

13  the  other  cases  that  have  court  dates  that  are  moving

14  forward  through  the  criminal  justice  system.

15  Q.      We've  got  a  ski  mask, we've  got  one  bulletproof

16  vest.  You're  going  to  take  swatches  of  cloth  from

17  each, and  we've  got  one  toolbox, and  the  total  time  now

18  to  test  that  is  four  weeks  you're  saying?

19  A.      Yes.  Any  case  takes  approximately   four  weeks,

20  and  that  would  be  about  a  standard  size  case  that  we

21  would  take  through.  I'm  anticipating, as  I  said, we'd

22  probably  have  at  least  two  samples  from  the  ski  mask,

23  probably  three  samples  from  the  vest, and  maybe  just

24  one  sample  from  the  toolbox  but  probably  two, possibly

25  three, but  let's  just  count  it  as  one.  That  would  be

1  six additional sample s. They would get batch ed in with
2  other case s to reach that approximately 30 sample s that
3  are taken through for an examiner per month. So they'd
4  be part of that typing run.
5  Q.      You already had 18 sample s, right, to test;
6  didn't you?
7  A.      In this case?
8  Q.      Yeah.
9  A.      No, we had 38 sample s.
10  Q.      Thirty-eight?
11  A.      Yes. That's more than a month's worth of work
12  for a single individual.
13  Q.      So 38 took you a month, and you're say ing four
14  other item s would have taken you an additional four
15  week s -- another month?
16  A.      Thirty-eight goes into a two-month time period,
17  so if you -- if we didn't -- if we put those additional
18  six or seven sample s into the run, then yes, we'd still
19  be within two month s, But other case s would not be
20  process ed. So if you're talk ing about get ting a
21  supplemental submission in after we've complete d the
22  analysis on this case, then it would go into another
23  four -week time block because it would go into rotation
24  of standard analysis.
25  Q.      But the bottom line is you had another lead time

1  to have that accomplished before your testimony here

2  today; is that correct?  Assuming that you had the

3  other toolbox, ski mask, and body armor added to this,

4  you would have had enough time to testify to that

5  today; correct?

6  A.      Yes, if we had had a request for analysis in a

7  timely manner and there were not other cases that were

8  requiring analysis.  So in some instances, we have to

9  essentially bump cases from being analyzed if we do not

10 have enough time to get to everything.

11 Q.      All things being equal, all things being

12 constant, the same conditions that you face between the

13 time that samples were submitted to you and your

14 testimony here today, if those three other items were

15 added, you had enough time to come in today and testify

16 and test those and testify as to the results; correct?

17 A.      Yes, I would hope that we would have been able

18 to do that.

19         MR. MARTIN:  Thank you, ma'am.

20         MR. HALL:  I just have a couple of questions,

21 Your Honor.

22                  **CROSS-EXAMINATION**

23         BY MR. HALL:

24 Q.      Ms. Tontarski, you prepared a report; is that

25 correct?

1 A.      Yes, I did.

2 Q.      I believe it's a ten-page report dated September

3 8, 2005?

4 A.      Yes, it is.

5 Q.      Okay.  On the front of that report is a list of

6 eight individuals whose DNA was submitted in this case;

7 is that correct?

8 A.      That's correct.

9 Q.      Okay.  The name Reece Whiting is not listed as

10 an individual whose DNA was submitted; is that correct?

11 A.      That's correct.

12        MR. HALL:   Thank you.  That's all, Your Honor.

13                    **CROSS-EXAMINATION**

14        BY MR. MITCHELL:

15 Q.      Good morning.  Ms. Tontarski, my name is Timothy

16 Mitchell.  I have a few questions.

17        I need to look at Bynum 1 and 1A.

18        If I may approach the witness, Your Honor.

19        THE COURT:   You may.

20        BY MR. MITCHELL:

21 Q.      This exhibit Bynum 1A.  It is your Item 1;

22 correct?

23 A.      Okay.

24 Q.      And you examined this -- is it a Glock?

25 A.      Yes.  I'm not very good with weapons.

1  Q.      And you examine d what portion s of this aga in?

2  A.      Sample s were taken from the grip , the slide , the

3  trigger  guard , and the front of the trigger .

4  Q.      You were able to obtain sample s from each of

5  those location s, from one , or did you get sample s from

6  all?

7  A.      There were DNA profile s that were developed  from

8  all of those .  There are two partial s that were

9  obtain ed, two partial DNA profile s were obtain ed from

10  the front of the trigger and the trigger guard .  There

11  were mixture DNA profile s from all of them , but the

12  grip and the slide had full DNA profile s.

13  Q.      And these profile s that you developed , you're

14  profiling someone that would perhaps match that DNA

15  profile there ; correct ?  The profile would represent

16  somebody ; correct ?

17  A.      Yes .  On a full DNA profile , you expect that if

18  you do what's call ed a direct comparison to a person

19  whose DNA is there , that you will be able to say that

20  they cannot be excluded .

21  Q.      And you also received a sample from Mr. Derrick

22  Bynum ; correct ?

23  A.      Yes .

24  Q.      You did that similar profile ?

25  A.      Yes .

1 Q.      And you compared the two profiles of each of
2 those samples; is that correct?
3 A.      That's correct.
4 Q.      And your conclusion with Mr. Bynum's sample to
5 these four samples from the gun was what?
6 A.      That he is excluded as a contributor into any of
7 those mixture profiles.
8 Q.      Now, you gave a -- up here, resulted in a
9 calculation of probability.  Can you do opposite, a
10 calculation as an exclusion, or do you do that type of
11 calculation?
12 A.      When you have an exclusion, there is no need to
13 do a statistical number because you have definitively
14 said that this person's DNA is not represented in this
15 sample, so that is really concrete and the most
16 conclusive thing you can say essentially.
17 Q.      You can say without any doubt that Mr. Bynum's
18 sample does not match any DNA found on this gun?
19 A.      That's correct.
20 Q.      Without going through the same questions, I'm
21 going to ask you for the similar answers to Bynum 1A.
22 This was a magazine and some ammunition.  So the same
23 answers to this as well; correct?  Or actually, I'm
24 sorry.  I'm going to correct myself.  You did not find
25 any DNA on this; correct?

1 A.      That's correct .  I was unable to obtain DNA

2 profile from that item .

3 Q.      So you can't make any conclusion s one way or the

4 other ?

5 A.      That's correct .

6 Q.      All right .  Ms. Tontarski , with the sample s, the

7 eight sample s you've received , you tested each of the

8 item s.  I believe there were 15 item s that you received

9 to test for DNA?

10 A.      Yes.

11 Q.      And you compare d the DNA sample s from each of

12 the individuals with each of the item s submitted to

13 you ; correct ?

14 A.      That's correct .

15 Q.      And you did that pursuant to a request by the

16 government ?

17 A.      Yes.

18 Q.      When they submitted these thing s to you , did the

19 government explain to you who they thought own ed what

20 or who they believe d had this in their possession at

21 any time ?

22 A.      No , they did not .

23 Q.      So you just had blind sample s, you had all these

24 item s and you didn't know what was related ; where they

25 came from ?

1  A.      There was information  as to what location s they

2  were recovered from , but it didn't mean anything  to me .

3  For example , I don't know  who live s at Ninth Street ,

4  Northwest , for example .

5  Q.     I assume you didn't do any of your own

6  investigation  to find out who lived on Ray Road ?

7  A.      No , I don't .

8  Q.     So your whole examination  was simply item s, DNA

9  sample s, see if they fit ?

10 A.     Yes .

11 Q.     Now , with regard to Derrick  Bynum 's DNA sample,

12 without going into all the 15 item s, unless we need to

13 do that for your purpose s, but are you familiar  with

14 whether  or not his DNA sample match ed any of the 15

15 item s that were given to you for analysis ?

16 A.     Yes , I am .

17 Q.     I'm sorry ?

18 A.     Yes , I am .

19 Q.     You're aware of ?

20 A.     Yes .

21 Q.     Did his DNA sample match any of the 15 item s

22 that were submitted  to you for analysis ?

23 A.      The easy answer is no, and I just want to

24 clarify  that there were some item s that I did not

25 obtain  the DNA profile on, but for every DNA profile

1 that I obtained, Mr. Bynum was excluded as a

2 contributor or a source of the DNA.

3 Q.     I guess I should have clarified my own question

4 of the things you found DNA, his DNA sample did not

5 match any of those items.

6 A.     That's correct.

7 Q.     Now, you were asked some questions and I want to

8 follow up on the timing issue.  You received all these

9 15 items on June 1st, 2004; correct?

10     Let me clarify.  On June 1st, 2004, the

11 government submitted these 15 items to the crime lab?

12 A.     It's essentially that's when we received the

13 request for analysis for -- on those 15 items, so it's

14 a wordsmithing sort of situation, but it's a request

15 for analysis that we received on that date.

16 Q.     Right.  And I assume that you weren't sitting in

17 the crime lab waiting for them to hand it to you.  They

18 submit it to the crime lab and it's then taken through

19 the process to eventually get analyzed?

20 A.     Exactly.

21 Q.     And your report or conclusions were September 8,

22 2005; is that correct?

23 A.     That's correct.

24 Q.     If I'm doing my math correctly, that's about a

25 year and -- I'm sorry, about ten months.  See, I can't

1 do my math right.

2          So, about ten months?

3 A.      No.  It's more than that.

4 Q.      How long -- no, it took from June 1st, 2004, to

5 September 8, 2005 was a year --

6          MR. HALL:  And four months.

7          MR. MITCHELL:   Thank you.

8          BY MR. MITCHELL:

9 Q.      It was about a year and four months after these

10 items were submitted to the crime lab.

11 A.      That's correct.  A year and three months or four

12 months.

13 Q.      So during this period of time, and you were

14 asked questions about other items -- if items were

15 added in addition to the 15 items, it would have taken

16 a little bit longer; correct?

17 A.      Yes, it would have.

18 Q.      For example, you were asked about if a ski mask

19 was added to that list and you received 16 items

20 instead of 15 items, it would have taken slightly

21 longer, but it wouldn't -- you still wouldn't be

22 working on it today?

23 A.      I hope not.

24 Q.      For example, if a small -- a little scale --

25 someone had operated a small scale and touched the

1  scale, is it possible to receive DNA evidence to be

2  analyzed if you grab a little scale and work with it?

3  A.      Yes, it would be possible to obtain DNA from

4  that item.

5  Q.      If you added that one scale to these 15 items

6  you received, 16 items, how much additional time would

7  it have taken for that to be analyzed along with the 15

8  identities all together?

9  A.      It would be the same sort of discussion that we

10 had regarding the ski cap, the body armor, and the

11 toolboxes.

12 Q.      Not much additional time; correct?

13 A.      Yes.  But if you keep adding on items, and as I

14 said we have X amount of throughput that we can do in

15 our laboratory, so it means that other cases are not

16 being worked.  I realize that's not the be-all,

17 end-all, but ultimately if we get up to 300 items,

18 because we keep adding them and adding them and adding

19 them, it literally shuts our laboratory down.

20 Q.      Is it also possible, if the government submitted

21 many more items to you and indicated to you that trial

22 date and the importance of these items to be tested,

23 would that affect the timeline and the work amount that

24 you would put into analyzing these things?

25         Let me do it one at a time.  Is it possible for

1 the government  to tell you this is really  important , we

2 need to do it right  away?

3 A.     Yes .  Everyone  tell s us that  for  every  case .

4 Q.     What  if they  said  it was  more  important  than  the

5 last  guy?

6 A.     They  say that , too .  I know  what  you're  drivi ng

7 at, but  your  question  about  trial  date  and actua lly

8 that  does  affect  when  we get  to case s, and  so that 's

9 actua lly a factor  that 's very  much  into  the  15-month

10 time  period  between  when  we had  a request  for  analysis

11 in this  case  and when  the  report  was  complete d, because

12 we had  some  extra  time  there  because  there  was  a court

13 date  that  was  much  farther  out  than  we typically  see

14 for  the Montgomery  County  case s.

15     So this  was  fit  in because  of  the  large  number

16 of sample s over  many  month s to try  to get  the  work  done

17 to meet  the court  date , so that 's how  we do it.  We

18 work  to meet  the court  date s, and  when  people  say  we

19 have , you  know , 500  item s of evidence  that  need  to be

20 examine d, we work  with  them  to determine  what  is

21 possible  for us to do.

22     It's  always  possible  to do what's  call ed

23 outsourci ng and  ask  for  a private  laboratory  to assist

24 in testing .  We have  not  had  to do that  to date  because

25 it's  cost  prohibit ive , but  it could  be done .

1  Q.      But if the government  told you it was vitally

2  important  to test all these things to be conclusive  of

3  DNA on items and it was more than you could handle, you

4  would send it out and make sure it got done because

5  they have told you it was important?

6  A.      We probably would have actually  sent it out.  It

7  would have been beyond our capabilities.  We would do

8  what we can and it would be someone else's

9  responsibility  to find the funding.  I mean, you're

10 talking, at a minimum, of $500 per sample.  You're not

11 talking about items of evidence  and it funds on the

12 private  laboratory.  That, of course, does not include

13 testifying fees at all.

14      So, whether  we like it or not, it's a reality

15 and it has to be taken  into account.  But, you know, if

16 you have 300 items of evidence, which probably would

17 translate  into somewhere  around  700 samples to take

18 forward  for DNA testing, that is a lot of work.  It's

19 not like on TV where it takes two seconds  to do the

20 analysis.  There are a lot of quality control

21 procedures that have to be followed by any laboratory

22 that does the testing.

23      If the work is outsourced for the DNA process

24 and then we get the results back at our laboratory  to

25 review, we have to do 100 percent  review of every piece

1 of paper that comes back from that laboratory. So, in

2 essence, that doesn't really save us time, so we'd have

3 to have someone completely outsource the evidence. A

4 lot of private laboratories are not used to handling

5 the actual item of evidence.

6          They're used to handling only swabs, and so

7 there are some other factors that come into play, and

8 it's -- as I said, every item of evidence is important

9 to people in every case, you know whether you're the

10 defendant or whether you're the victim or a family

11 member. So everyone -- that never goes away. That's

12 always important and it's a balancing act, whether you

13 like it or not.

14 Q.    But the bottom line is, it is possible if they

15 gave you more items that you could handle and said it

16 was important. It is possible to have it done?

17          MS. GREENBERG:   Objection.

18          Asked and answered.

19          THE COURT:   Sustained.

20          MR. MITCHELL:   No further questions.

21          THE COURT:   Any further cross? You've already

22 had your bite at the apple.

23          MR. WARD:   No. I wonder if this is an

24 appropriate time.

25          MS. GREENBERG:   Your Honor, I can be very brief.

1          THE COURT:   Wait a minute.   Is there any other

2   cross-examination?

3          MR. MCKNETT:   No, Your Honor.

4          THE COURT:   Can you be one or two minutes brief?

5          MS. GREENBERG:   I will be very brief.

6                    **REDIRECT  EXAMINATION**

7          BY MS. GREENBERG:

8   Q.      Ms. Tontarski, the items that were submitted to

9   you, Counsel referred to the date on that report.

10          Were they swabbed before that date and put into

11  this pristine environment that you talked about?

12  A.      Yes.  All of the items were swabbed in August,

13  2004, on either August 2nd or 3rd of 2004.

14  Q.      Between the date they were submitted by the

15  agents and the date they were swabbed, were they kept

16  in an environment that is suitable for maintaining the

17  DNA?

18  A.      Yes, they were.

19  Q.      You mentioned in response to -- starting with

20  the end, with Mr. Bynum's counsel, Mr. Mitchell, you

21  mentioned the 15 exhibits and whether or not Mr.

22  Bynum's DNA was present on the exhibits.  Do you recall

23  that question he just talked to you about?

24  A.      Yes.

25  Q.      Were all 15 shown to you today?

1 A.       No, they were not.

2 Q.       Some of them don't relate to what we are talking

3 about here, they just weren't shown to you?

4 A.       That's correct.

5 Q.       Can you tell the jury, and if you need to look

6 at your report, how many of those 15 items contained

7 whether it's from the trigger or magazine or anything

8 DNA suitable for you to compare to something else?

9 A.       I'll need to a quick minute.

10 Q.       Sure.   Take your tame.

11 A.       Seven of those items contained DNA profiles that

12 were suitable for comparison, but on some of those

13 items, there were multiple DNA profiles that were

14 obtained.   For example, my Item 1, which was from 1513

15 Ray Road, and I apologize, I think it was Exhibit 1A,

16 but I don't remember.

17 Q.       That's fine.   It --

18 A.       That had four different DNA profiles, so it's --

19 Q.       Without the 15 exhibits submitted to you, there

20 were only seven where you got enough of a sample to be

21 able to type it?

22 A.       That's correct.   But it doesn't lengthen the

23 amount of time.   You still have to go through the

24 entire process.

25 Q.       Now, also with respect to your samples that are

1  kept in this pristine environment that you couldn't

2  bring to court today, are you able to give that access

3  so that a defense counsel's expert could have that

4  analyzed?

5  A.      Yes.

6  Q.      Referring your attention to -- just to finish up

7  with those last set of questions about how important a

8  case is and analyzing things.  What sorts of cases does

9  your lab do?

10  A.     My laboratory primarily analyzes evidence from

11  homicide cases, rapes and sexual assaults, what are

12  called aggravated assaults, which would be nonfatal

13  beating, stabbing, that sort of thing.  We do do some

14  burglary cases, although for the most part, the major

15  -- what are called major crimes are keeping us busy

16  getting those cases ready for court and meeting the

17  court dates.

18  Q.      Did you work on the sniper case also?

19  A.      Actually, the FBI did the majority of the work

20  on that case.  We worked on the serial arson

21  investigation that people may have heard of, so that

22  was one of the cases that we worked on as a member of

23  the task force team.

24  Q.      Did all those people think their cases were

25  important, too?

1          MR. MONTEMARANO : Objection , Your Honor .

2          THE COURT:   Overruled .

3          THE WITNESS:   Yes .

4          BY MS. GREENBERG:

5 Q.      Lastly , showing you Miscellaneous   26.

6          Mr. Ward asked, I think to some extent Mr.

7 Montemarano  asked you a little bit about transfer .

8          Do you recall those question s?

9 A.      I do .

10 Q.      What are we looking at here ?   This just relate s

11 to one known  sample  and one DNA sample ; is that

12 correct ?

13 A.      Yes , it is .

14 Q.      That 's from the magazine  that was -- one of the

15 magazine s that was recovered  from Ninth  Street ,

16 Northwest ; right ?

17 A.      Yes .

18 Q.      What type of comparison  is this in your

19 language ?

20 A.      That 's a direct comparison  between a known

21 sample received from an individual  to a clean or

22 non-mixture  DNA profile obtain ed from an item of

23 evidence .

24 Q.      Given your background , train ing and experience ,

25 how likely is it that you'd have a clean sample in a

1 transfer-type situation?

2 A.     It's actually -- it's really nice when we see it

3 on firearms and magazines which are associated with

4 firearms.  It is not.

5 Q.     See what?  I'm sorry, see what on firearms?

6 A.     When we see a clean profile or a non-mixture

7 profile.  Typically on firearms and magazines, we see

8 mixtures, so this is more of a -- it's not -- it's the

9 exception as opposed to the rule.  Typically we see

10 mixtures of at least two people or more.

11 Q.     How likely is that to transfer?

12 A.     I don't understand  the question.

13 Q.     When you talked about transfer, in other words,

14 somebody touching someone and getting it on an item,

15 how likely is this the result of a transfer from

16 someone else?

17        MR. MONTEMARANO:  Objection, basis for

18 knowledge.

19        THE COURT:  Overruled.

20        THE WITNESS:  In terms of being a primary

21 transfer, which would be a single person transferring

22 their DNA, the probability is extremely high.  In terms

23 of being secondary transfer, without seeing another

24 source of DNA mixed in with it, I would say the

25 probability is extremely low.

1          BY MS. GREENBERG:

2 Q.      When Mr. Ward was asking you a husband touching

3 a wife or a son holding his mother's hand, is that what

4 you mean by secondary transfer?

5 A.      Yes.  That male then touching the gun and

6 transferring the female's DNA would be a secondary

7 transfer.

8 Q.      I'm referring your attention, again, to these

9 XX, XY.  Can you tell the jury what that is?

10 A.      The amelogenin finding of an X, X tells us that

11 we have DNA from a female there.  If there was any

12 indication of male DNA, there would also be a Y

13 indicated in the typing result.

14 Q.      So how likely is this that instead of it being

15 the mother's DNA, it is her son's?

16 A.      Oh, this?

17          MR. WARD:   Objection, Your Honor.   That

18 certainly is not the question --

19          THE COURT:   Overruled.

20          MR. WARD:   -- I put to this witness.

21          BY MS. GREENBERG:

22 Q.      You may answer.  How likely is it, following up

23 on Mr. Montemarano's question, that it's the son's DNA

24 rather than the mother's being that they're related?

25 A.      This could not possibly be the son's DNA.  Not

1  only because there's no indication of a male factor

2  there, but it would not be biologically possible for

3  him to have the same DNA profile as his mother anyway.

4  It just wouldn't be possible.

5  Q.      Besides that fact, what does the XX tell you?

6  A.      The XX tells us that the DNA is from a female.

7  Q.      So it's not possible that could be the son's?

8  A.      That's correct.

9          MS. GREENBERG:   Nothing further, Your Honor.

10         MR. WARD:   I have one question, Your Honor.

11         THE COURT:   One?

12         MR. WARD:   One.

13         THE COURT:   One.

14                    **RECROSS-EXAMINATION**

15         BY MR. WARD:

16  Q.      In secondary transfer, you say the rate, the

17  likelihood of finding a clean DNA is extremely low.

18  A.      Yes.

19  Q.      But you are not able to say beyond a reasonable

20  doubt that it's not possible?

21         MS. GREENBERG:   Your Honor, I objected before.

22  This reasonable doubt standard is not --

23         THE COURT:   Mr. Ward that is not a proper

24  standard for her, so rephrase the question.

25         MR. WARD:   I was doing that because I thought

1 that was the standard in this case, but I will rephrase

2 the question.

3          BY MR. WARD:

4 Q.     You are not able to say to any degree of

5 scientific certainty that that's not possible?

6 A.     That's correct.

7 Q.     Thank you.

8          MR. WARD:   That's all, Your Honor.

9          THE COURT:   All right.

10         MR. MONTEMARANO:   Just a couple, Your Honor,

11 please.

12         THE COURT:   It's going to be a couple 20 minutes

13 from now.  We will take a recess until 11:35.

14         Counsel, stay behind for just one second.

15              (Jury excused at 11:15 a.m.)

16         THE COURT:   Counsel, don't disappear.  Counsel,

17 I just wanted to tell you, for the record -- and Mr.

18 Martin, you should listen to this -- that the -- I have

19 entered an order which is at Docket No. 876, which

20 refers to sealing of documents at 877, which is the U.

21 S. Marshals' form that was the subject of my ruling

22 earlier today.  So, for appellate review purposes, the

23 Fourth Circuit, if it wants to look inside the

24 envelope, the envelope is No. 877.

25         All right.  Thank you.

1                    (Off the record at 11:15 a.m.)

2                    (On the record at 11:39 a.m.)

3          MS. GREENBERG:   Your Honor, I'm informed by Mr.

4   Mitchell that we have preliminary matter.

5          THE COURT:   A preliminary matter?

6          MR. MITCHELL:   Yes, Your Honor.

7          THE COURT:   Okay.

8          MR. MITCHELL:   This witness doesn't have to

9   leave.

10         THE COURT:   Okay.   She can be comfortable.

11         MS. GREENBERG:   Your Honor, maybe we can finish

12  with -- I didn't realize she was here.   We can call

13  three other witnesses and then perhaps take another

14  break and then address Mr. Mitchell's --

15         THE COURT:   That's fine.

16         Mr. Montemarano, you were out of the room for

17  some reason when I announced the docket entries for the

18  order on that motion about the marshal's forms.   I

19  placed in the record what the docket entries are.

20         MR. MONTEMARANO:   Okay.

21         THE COURT:   So there will be no mystery as to

22  where it is.

23         THE COURT:   Ready for the jury?   Bring them in.

24                    (Witness resumes the stand.)

25                    (Jury returns at 11:41 a.m.)

1          THE COURT:   You may proceed.

2          MR. MONTEMARANO:   Thank you, Your Honor.

3                    **RECROSS-EXAMINATION**

4          BY MR. MONTEMARANO:

5 Q.       Good morning again, Ms. Tontarski.   How are you?

6 A.       Good morning.

7 Q.       A couple of questions.   Proceeding from the

8 questions asked to you since I last stood up and

9 looking at your report -- you have your report in front

10 of you; correct?

11 A.      I do.

12 Q.      It would be fair to say that your report says,

13 on Page 2 -- no, let me start from the beginning.

14         You performed tests on eight knowns; correct?

15 A.      That's correct.

16 Q.      And those in your report are demarcated or

17 denoted as items S-1 through and including S-8?

18 A.      Yes, that's correct.

19 Q.      That's S for Sierra; correct?   S for Steven?

20 A.      Yes.

21 Q.      And you received S-1 through and including S-6

22 in your lab on the 28th of December in the year 2004;

23 correct?

24 A.      They were submitted to what's called central

25 property in our building, so the request for analysis

1  tells us that the evidence is available in the

2  building, so the request comes to the laboratory, the

3  evidence goes to the property receipt area.

4  Q.     So would it be more correct, then, instead of

5  saying the samples were received in your lab,    the

6  samples were available for your lab, December 28, 2004.

7  A.     S-1 through S-6, that's correct.

8  Q.     And the other two, S-7 and 8, were available to

9  your lab to use in whatever way, shape or form about a

10 week later?

11 A.     Yes, on January 7, 2005.

12 Q.     And because you had a time lag before the trial,

13 you were able to complete all of this testing

14 comfortably within your schedule by September; correct?

15 A.     That's correct.

16 Q.     that's on 15 unknown items; correct?  16?

17 A.     There were 15 items, a total of 18 exhibits, if

18 you will.  There was one item that contained four

19 magazines.

20        MR. MONTEMARANO:  No further questions, Your

21 Honor.  Thank you.

22        THE COURT:  Any further we recross?

23        All right.  You may step down.

24        MS. GREENBERG:   Your Honor, may be the witness

25 be excused?

1          MR. MONTEMARANO : Yes, Your Honor.

2          THE COURT:   Yes, you may.

3          (Witness excused at 11:44 a.m.)

4          MS. JOHNSTON:   Your Honor, our next witness

5  would be Minh Dang.

6  Thereupon,

7                         **MINH DANG**,

8  having been called as a witness on behalf of      the

9  Plaintiff, and having been first duly sworn by the

10  Courtroom Deputy, was examined and testified as

11  follows:

12                 <u>**DIRECT  EXAMINATION**</u>

13          BY MS. JOHNSTON:

14  Q.     Sir, please state your full name  , spelling your

15  first and last name the record.

16  A.     My name is Minh Dang, first name spelled M I N

17  H, last name spelled D, as in David, A N G.

18  Q.     And where are you currently employed?

19  A.     I'm employed as a forensic chemist with the Drug

20  Enforcement  Administration , Mid-Atlantic  Laboratory .

21  Q.     How long have you been employed there ?

22  A.     Approximately  ten years.

23  Q.     Could you briefly describe  your educational

24  background  and training  in the area of forensic

25  chemistry ?

1  A.       Certainly.   I possess  a bachelor 's of science

2  degree in biochemistry , a master's  of science  degree  in

3  chemical  toxicology .   In addition to  my studi es, I've

4  also been employ ed as a drug technician  with the D.  C.

5  Pretrial Service s Agency and I've also complete d a

6  formal  train ing program for the  DEA.

7  Q.       During your  time with the DEA, the Drug

8  Enforcement  Administration , have you been employ ed

9  continuously  as a drug analyst ?

10 A.       Yes, I have .

11 Q.       Could  you describe  what your  day-to-day  duti es

12 are with DEA?

13 A.       My primary duti es are  to analyze  evidence  for

14 the presence  of controlled  substance s, in addition  to

15 provide  expert  witness  testimony  on my analyses .

16 Q.       Can you tell  us approximately  how many analys es

17 you have done  over your  ten year s with  the DEA?

18 A.       Approximately   4,000 .

19 Q.       Have you had occasion  to testify  concerning  the

20 result s of your  analys es in any  court s?

21 A.       Yes, I have .

22 Q.       What  court s are  those ?

23 A.       District  court , District  of Columbia  District

24 Court , Green belt , Maryland ; District  Court , Baltimore ,

25 Maryland;  District  Court , Tampa , Florida ; District

1  Court , Alexandria , and a number of state and local

2  court s .

3  Q.      When you say "district court ," you're refer ring

4  to the federal court s?

5  A.      That is correct .

6  Q.      Including this one here ?

7  A.      That is correct .

8  Q.      Was your testimony accept ed as an expert in the

9  area of drug analysis ?

10 A.      Yes , it was .

11         MS . JOHNSTON:   Your Honor , we would present  Mr.

12 Dang as an expert in the area of drug -- forensic  drug

13 analysis .

14         THE COURT:   Any cross-examination on

15 qualifications?

16         MR . MONTEMARANO :  No, Your Honor .  Thank you.

17         THE COURT:   He will be accept ed to give opinion s

18 in the field of forensic chemistry .

19         BY MS . JOHNSTON:

20 Q.      Mr . Dang , could you brief ly de scribe for us the

21 procedure that is follow ed in the lab in term s of the

22 process ing and analysis of samples submit ted by the FBI

23 or other agenci es for your analysis ?

24 A.      Certain ly .  The FBI agent submit s drug evidence

25 to our evidence technician at our    laboratory , and

1  subsequently, we are assigned to analyze the submitted

2  exhibits. Then the chemist will check out the evidence

3  from the evidence technician and proceed with the

4  analyses.

5  Q.      When you check out the evidence from your

6  evidence room, so to speak, is there a cover sheet

7  that's attached to that?

8  A.      I don't understand the question.

9  Q.      Let me show you what's been marked as

10 Government's Exhibit Miscellaneous 27 and 28, and ask

11 if you recognize those two-page documents.

12         Let me show you what's been marked as

13 Government's Exhibit Miscellaneous 27 and Miscellaneous

14 28. Do you recognize those documents?

15 A.      Yes, I do.

16 Q.      Do you have copies of those documents with you

17 here today?

18 A.      I do.

19 Q.      I'm going to take them back and put them on the

20 screen, so if you pull out your copies in case you need

21 to see it up close.

22         Calling your attention to the first page of that

23 two-page document in Miscellaneous 27. Does this -- on

24 this page, is this a page of the report that is

25 complete and attached to the exhibit when you first

1  receive it?

2  A.       Yes, it is.

3  Q.       With the portion that is completed, the portion

4  of this form that is completed before you receive the

5  exhibit, is that what we see on the first page?

6  A.       Yes, it is.

7  Q.       Do you use that information that's contained on

8  that first page in beginning your examination of the

9  item that's attached?

10 A.       Yes.  This report page is the DEA Form-7, which

11 is a report of drug property collected or seized, and

12 this is the standard form that is submitted with the

13 evidence.

14 Q.       In this case, this form was submitted, which --

15 this exhibit was submitted by the FBI; is that correct?

16 A.       That is correct.

17 Q.       For example, the form indicates they obtained on

18 October 17, 2002; is that correct?

19 A.       That is correct.

20 Q.       And the Case No. 245 DWF 21785; is that correct?

21 A.       That is correct.

22 Q.       And then there is a description given of the

23 object that is submitted; is that correct?

24 A.       That is correct.

25 Q.       Is that information important to you in the

1  course  of  your  examination ?

2  A.       Yes , that  is  correct .

3  Q.       What  do  you  do  with  that  --  what  do  you  compare

4  to  the  information  that 's  on  the  report ?

5  A.       The  information , this  is  compare d  and  reconcile d

6  with  the  drug  evidence , and  analysis  is  subsequent ly

7  per form ed .

8  Q.       Could  you  tell  us  what  was  submitted  to  the  lab

9  under  Exhibit  No.  259  and  what  you  did  with  it?

10  A.       Exhibit  No.  259  was  received  by  me  and  analyze d

11  on  November  7, 2002 .  Subsequent ly , a  report  was

12  prepared  and  attach ed  to  the  DEA-7.

13  Q.       Is  that  the  report  that's  attach ed  to

14  Miscellaneous  27?

15  A.       That  is  correct .

16  Q.       Of  course , is  that  your  signature  at  the  bottom

17  of  the  page ?

18  A.       That  is  correct .

19  Q.       Could  you  describe  for  us  very  brief ly  what

20  proced ure  you  follow ed  once  you  pull ed  the  exhibit  out

21  of  the  storage  area ?

22  A.       Certain ly .  Once  the  bag  is  received  from  the

23  FBI , the  seal s  are  examine d  to  determine  that  they  have

24  not  been  opened , and  then  I  subsequent ly  open  the

25  submitting  heat - seal ed  bag , weigh  the  content s ,

1  determine  the  net  weight  and proceed  with  analyses .

2  Q.      What  is  the  difference  between  the  gross  weight

3  and the  net  weight ?

4  A.      The  gross  weight , essentially , is  the  weight  of

5  the  FBI  bag  and  all  its  content s.   Essentially , the

6  weight  of the  entire ty and  the  net  weight  is  the  weight

7  of  the  drug s  minus  all  packaging , so essentially  the

8  weight  of the  rock  or  the  powder  which  was  submitted .

9  Q.      In  this  instance , what  was  the  net  weight  of the

10 actual  substance  itself ?

11 A.      For  Exhibit  No.  259 , the  net  weight  of  the

12 material  was  0.51  grams .

13 Q.      Okay .   And  what  --  what  did  you  do  with  it  after

14 you  weigh ed  it ?

15 A.      After  weighing  the  material , a  series  of

16 chemical  test s  were  perform ed  and  a  conclusion  was

17 derive d.

18 Q.      And  the  test s  you  perform ed, if  you  could  just

19 give  us  the  name  of  those  test s.   I  won't  ask  you  to

20 de scribe  them  each  individual ly.

21 A.      Certain ly.   Five  chemical  test s  were  perform ed:

22 color , infrared  spec trometry, gas  chrom atography , mass

23 spec trometry , gas  chromatography screen, and   also  a

24 chemical  quantif ication  using  gas  chromatography .

25 Q.      Are  all  the se  test s  that  you  routinely  perform

1 when a substance is submitted to you for drug analysis?

2 A.      That is correct, yes.

3 Q.      What was your conclusion concerning the drug

4 described in your report as Exhibit No. 259 and

5 Miscellaneous 27? What was your conclusion as to what

6 the substance was?

7 A.      Exhibit 259 was found to contain 0.51 grams

8 containing cocaine base at 87 percent purity.

9 Q.      You mentioned 87 percent purity. Could you

10 explain to us what you mean by that?

11 A.      87 percent of the material was found to be

12 cocaine base.

13 Q.      Do you have to have a certain percentage of

14 purity before you will conclude a substance is cocaine

15 base?

16 A.      No.

17 Q.      How low could that purity be and you would still

18 conclude it was cocaine base?

19 A.      The limits of our ability to identify it is

20 around one percent.

21 Q.      So as long as it had at least one percent in

22 that substance, you would conclude it was cocaine base?

23 A.      That is correct.

24 Q.      The percentage of purity ,does that have any

25 effect on whether or not there is cocaine base

1  available  in the  substance ?

2  A.      No , it  does  not  affect  that  application .

3  Q.      On the  same date  and  time ,  showing  you

4  Miscellaneous  28 , was  another  sample  submitted  by  the

5  FBI under  the  same  case  number  seize d  on  the  same  date

6  October  17  of  2002 ?

7  A.      Yes , that  is   correct .

8  Q.      Okay .   And  in reference   to  the  exhibit  that 's

9  identifi ed as  258 .  When  did  you  do  your  analysis ?

10  A.      The  analysis  was  perform ed  on  November  7, 2002 .

11  Q.      Did  you  follow  the  same  procedure s  you

12  previous ly  describe d?

13  A.      I  did .

14  Q.      Could  you  describe  what  Exhibit  No.  258

15  consisted  of ?

16  A.      Exhibit 258  consisted  of 56.2  grams  contain ing

17  cocaine  base  at  86  percent .

18  Q.      Is that  record ed  in Miscellaneous  28?

19  A.      Yes , it  is .

20  Q.      How  was  it  package d?

21  A.      It  was  package d  in  a  plastic  bag  contain ing

22  numerous  Ziploc s  contain ing  rock -like  material .

23  Q.      Do  you  recall  how  many  Ziploc s  were  in  there ?

24  A.      Ten .

25  Q.      And  again , the  gross  weight  is  what ?

1 A.      The gross weight the weight of the submitting

2 FBI bag and all its content s, and the net weight is the

3 weight of the material minus the packaging .

4 Q.      Could you describe for us how cocaine base look s

5 in comparison to cocaine powder ?

6 A.      In general , cocaine base is found as a rock-like

7 material ; however , if that rock-like material is

8 ground , then it can also appear as a powder .

9 Q.      And the cocaine powder ?

10 A.      Cocaine powder is general ly a white powdery

11 material .

12 Q.      Not a rock-like substance ?

13 A.      That is correct .

14 Q.      And the net weight was what ?

15 A.      The net weight was found to be 56.2 grams .

16 Q.      Again , did you do a purity test on this as well ?

17 A.      I did .

18 Q.      What was that concentration  level ?

19 A.      86 percent .

20       MS. JOHNSTON:  I have no further question s of

21 this witness .

22       THE COURT:   Cross- examination ?

23                 **CROSS-EXAMINATION**

24       BY MR. MARTIN .

25 Q.      Good afternoon , Mr. Dang . Well , it's very close

1  to noon , sir .

2  A.       Good afternoon .

3  Q.       My name is Anthony Martin , and I represent  Mr.

4  Learley  Reed Goodwin .  I have in my hand Miscellaneous

5  28, and if I understood  your testimony  correct ly, the

6  first page of Miscellaneous  28 was not fill ed in by

7  you .  That was submitted  by a special  agent ; right ?

8  A.       That is correct .

9  Q.       And let's put it up on the screen here so that

10  the juror s can follow with us.  On the first page of

11  Miscellaneous  28, there is a description  there of crack

12  cocaine , right ?

13  A.       That is correct .

14  Q.       You didn't put that description  in there , right ?

15  A.       I did not .

16  Q.       And you also testifi ed that you then did an

17  examination  of the exhibit that was attach ed to this .

18  And you concluded  on the second page that the

19  substance , in fact , contain ed cocaine  base ; right ?

20  A.       That is correct .

21  Q.       And I think if I slide this down here , we can

22  all this see .  That's your conclusion  there ; right ?

23  A.       That's correct .

24  Q.       I take it that this is your handwriting  -- let

25  me see if I could do this .  Is that your handwriting

1 down there?  Is that your signature sir?

2 A.      Yes, it is.

3 Q.      Mr. Dang, would you agree with me that there are

4 several types of cocaine base?

5 A.      I don't understand  the question.

6 Q.      Well, the base that's taken from the cocoa leaf,

7 that's cocaine base, too; isn't it?

8 A.      I don't understand  the question.

9 Q.      You don't understand whether or not cocaine base

10 exists in the form of cocoa base that's taken from the

11 cocoa leaf?

12 A.      Cocaine comes in primarily two forms:  Cocaine

13 hydrochloride  and cocaine base.  The material which was

14 received for analysis was determined to be cocaine

15 base.

16 Q.      Are you familiar with freebasing that was

17 sometimes used by people in the 1980s to smoke?

18 A.      That is outside my area of expertise.

19 Q.      So you're telling me that you've never heard of

20 the term freebasing?

21 A.      I have heard of the term.

22 Q.      And are you familiar with the fact that that is

23 another way of freeing cocaine so that you just have

24 the cocaine base available to you?

25 A.      Could you repeat the question?

1  Q.      Cocaine  sold  on  the  street  is  usual ly  --

2          MS.  JOHNSTON:    Objection .

3          MR.  MARTIN:   --  mixed  with  other  substance s;  is

4  that  correct ?

5          THE  COURT:   Is  there  an  objection ?

6          MS.  JOHNSTON:   The  witness  didn't  have  a  chance

7  to  answer  the  last  question .

8          THE  COURT:   Mr.  Martin ,  let  him  answer ,  if  he

9  could .

10         MR.  MARTIN:   I  thought  I  did.   I  thought  he  said

11  he  didn't  understand.

12         THE  COURT:   Sir ,  if  you  haven't  finish ed

13  answering  the  question ,  go  ahead  and  answer  it  now.

14         BY  MR.  MARTIN:

15  Q.      How  would  you  de scribe  the  presence  of  cocaine

16  in  the  cocoa  leaf ?

17  A.      It's  a  naturally  occurring  compound  which  is

18  found  in  cocoa  lea ves.

19  Q.      And  you  would  not  de scribe  that  as  cocaine  base ?

20  A.      If  it's  in  the  freebase  form ,  then  yes ,  but

21  there 's  also  a  variety  of  impuriti es  found  in  a  natural

22  product .

23  Q.      Understood .   And  when  the  coca  is  submitted  to

24  process ing  and  become s  a  paste ,  would  you  agree  that

25  when  it  is  separate d,  that  is  the  cocaine  from  the  coca

1  leaf , and the  a paste  is  made , that  the  cocaine  base

2  exist s  in  the  paste ?

3  A.       Cocaine  exist s  in  its  natural  form , that  is

4  correct .

5  Q.       Would  you  also  agree  that  if  you  took  sodium

6  hydrochloride   which  is  sometimes  referred  to  cocaine

7  powder  or  cocaine  salt ; correct ?

8  A.       I  don't  understand   the  question .

9  Q.       Well , we've  got  the  paste , and  now  we  have  to

10  convert  the  paste  to  sodium  hydrochloride ; right ?

11  A.       I  don't  --

12  Q.       You  don't  understand  the  question ?  Well ,

13  instead  of  me  try ing  to  do  it , because  I'm  not  a

14  chemist , how  does  one  go  from  coca  paste  to  cocaine

15  powder ?  Would  you  explain  that  to  the  ladies  and

16  gentlemen  of  the  jury  ?

17  A.       Certain ly .  Cocaine  is  general ly  found  in  a

18  natural  product  in  the  coca  leaf .  It's  subsequent ly

19  extract ed  and  refine d  in  clandestine  laboratori es , then

20  it  can  either  be  convert ed  to  cocaine  hydrochloride   or

21  cocaine  base.    Oftentimes , it's  converted  to  cocaine

22  hydrochloride , which  is    then  subsequent ly  later

23  convert ed  to  cocaine  base .

24  Q.       Now , the  cocaine  hydrochloride , which  is  the

25  powder  or  the  salt , how  exact ly  is  it  convert ed  from

1  the paste to the chloride itself? That was the

2  question. How does that happen? What ingredients are

3  added to make it powder? How does it go from a paste

4  to powder?

5  A.    Essentially, it's extracted by a variety of

6  different solvents and then hydrochloric acid may be

7  added to convert the cocaine to cocaine hydrochloride.

8  Q.    If we wanted to convert the cocaine

9  hydrochloride back to cocaine base, we could do that

10 several ways; would you agree?

11 A.    Yes, that is correct.

12 Q.    Okay. And one of the ways we could do that is,

13 I guess, by cooking it with sodium bicarbonate; right?

14 A.    That is correct.

15 Q.    And there are other ways of doing it, too.

16 Could you use either, for example, to free it from the

17 hydrochloride?

18 A.    That is a method. That is correct.

19 Q.    So now let's go back to your report here. I'm

20 looking at Miscellaneous 28. Nowhere on this report

21 does it indicate that you tested for anything other

22 than the presence of cocaine base; is that correct?

23 A.    No, that is incorrect.

24 Q.    Well, it says -- if I'm reading it correctly --

25 exhibit contains cocaine base and it says Exhibit No.

1  258; is that correct?

2  A.    I'm sorry.  I misunderstood  the question.

3  Essentially --

4  Q.    Well, let me ask you this:

5        MS. JOHNSTON:   Your Honor.

6        THE COURT:  Mr. Martin, please let him answer

7  question s before you propound another question.  All

8  right?

9        THE WITNESS:  In a series of -- in the process

10 of perform ing an examination  on this exhibit, gas

11 chromatography  screen was perform ed to determine  if

12 there were any other impuriti es found within the drug s

13 and that test was perform ed.

14       BY MR. MARTIN:

15 Q.    But that 's not indicated  here in that report, is

16 it?

17 A.    It was not report ed, that is correct.

18 Q.    That is the question, whether or not any other

19 substance s were tested for and you've said, yes, and

20 then I asked you whether or not it appear s here, and

21 you said no; is that correct?

22 A.    To answer the question, impuriti es were tested

23 and they were not report ed on your form.

24 Q.    Now, this particular  exhibit on Miscellaneous

25 28, do you know where that came from?  I mean, do you

1 know where the agents got it from?

2 A.      I do not.

3 Q.      And you don't know whether or not the particular

4 exhibit was tested for fingerprints; do you?

5 A.      Fingerprint examination was requested, original

6 packaging was separated and sent to the FBI lab for

7 examination.

8 Q.      But you don't know what the results were; do

9 you?

10 A.      That is correct.

11 Q.      Court's indulgence.

12        Mr. Dang, what did you do to prepare for today's

13 testimony?

14 A.      I reviewed my laboratory notes and appeared in

15 court.

16 Q.      Did you talk to anybody before testifying?

17 A.      My supervisor.

18 Q.      Did you talk to anybody other than the attorneys

19 for the government and your supervisor?

20 A.      Regarding this case?   No.

21        MR. MARTIN:   I have no further questions, Your

22 Honor.

23        THE COURT:   Any further cross?

24        MR. HALL:   No questions.

25        MR. MITCHELL:   No Y, our Honor.

1          MR. WARD:   No, thank you, sir.

2          THE COURT:   Any redirect?

3          MS. JOHNSTON:   Just a couple of questions.

4                    **REDIRECT EXAMINATION**

5          BY MS. JOHNSTON:

6    Q.     Mr. Dang, you indicated that you tested for

7    impurities.  Is that part of your routine process?

8    A.     Yes, I did.

9    Q.     Was anything else found that affected your

10   opinion that the materials contained cocaine base?

11   A.     No.

12   Q.     On the front of the report counsel referred to,

13   there was a notation made by the submitting officer

14   from the FBI, that it was -- the alleged drug was crack

15   cocaine; is that correct?

16   A.     That is correct.

17   Q.     And your finding of cocaine base, is that

18   consistent with the officer's allegation that it was

19   crack cocaine?

20   A.     I identified the drug as cocaine base.

21   Q.     Now, the cocaine base that you found in there,

22   was that the paste that Mr. Martin was questioning you

23   about?  Was it in the paste-like form?

24   A.     It was received as a rock-like material.

25   Q.     Based on your training and experience, is that

1 rock-like material commonly referred to as crack?

2 A.    Yes, it is.

3        MS. JOHNSTON:   I have nothing further.

4                    **RECROSS-EXAMINATION**

5        BY MR. MARTIN:

6 Q.    Did you specifically test for sodium

7 bicarbonate?

8 A.    Infrared spectrometry was performed on the

9 material, and I did not identify sodium bicarbonate.

10       MR. MARTIN:   No further questions, Your Honor.

11       THE COURT:   You may step down.  Thank you very

12 much.

13       (Witness excused at 12:06 p.m.)

14 Thereupon,

15                    **DAVID HEARN**,

16 having been called as a witness on behalf of     the

17 Plaintiff, and having been first duly sworn by the

18 Courtroom Deputy, was examined and testified as

19 follows:

20                    **DIRECT EXAMINATION**

21       BY MS. JOHNSTON:

22 Q.    Sir, please state your full name  and occupation.

23 A.    Corporal David Hearn.  I'm a Montgomery County

24 police officer assigned to the Forensic Services

25 Section of the county.

1  Q.      Could you spell your last name for the record?

2  A.      It's H E A R N.

3  Q.      How long have you been assigned to the Forensic

4  Services Section of the Montgomery County Police

5  Department?

6  A.      About 11 years

7  Q.      What is your current position there?

8  A.      I'm a firearms technician.

9  Q.      What do you do as a firearms technician?

10 A.      I test fire the firearms that come into the

11 county, serial numbers expiration, put the shell

12 casings into the system to try to match them.

13 Q.      How long have you been doing that kind of work

14 at the Forensic Services Center?

15 A.      Nine years.

16 Q.      Were you asked to examine some firearms in

17 connection with this investigation by Detective Sakala?

18 A.      Yes, I was.

19 Q.      Can you describe for us the procedure -- strike

20 that.

21         Did you follow the same procedure with all of

22 the weapons that were submitted by Detective Sakala?

23 A.      Yes.

24 Q.      Okay. Could you describe that process for us or

25 procedure?

1 A.      The firearm s, we have a property  room.   I pick

2 up the firearm s out of a gun cabinet  and take  them

3 along with the property  records , sign  them out , take

4 them to my desk .  I have a database  I log all the

5 firearm s in.  I fill out a test fire certificate  for

6 each firearm , and I transport  them over to our public

7 service  train ing academy  where we have a tank where I

8 fire the weapon s into to recover  bullet s and cartridge

9 case s.

10 Q.      You did that with the weapon s that I'm about  to

11 ask you about ; is that correct ?

12 A.      Yes, ma'am .

13      MS. JOHNSTON:   Your Honor , with the Court 's

14 permission , if I could approach  the witness .

15      THE COURT:   Yes, you may .

16      MS. JOHNSTON:   If you could please lean  in

17 closer  to the micro phone when you're answering  the

18 question s and speak  up please .

19      Let me show you first what 's been mark ed as our

20 Government 's Exhibit  Bynum  1.  Is that one of the

21 firearm s you examine d and test fire d?

22 A.      Yes.  It has my initial s and the date I close d

23 the box up.  The Glock Model 26 , nine millimeter

24 caliber , and the serial  number  is CAZ959US, which is

25 what I have here on my test fire certificate s.

1 Q.      Can you tell us where that gun was manufactured?

2 A.      It was manufactured in Australia.  I'm sorry,

3 Austria.

4 Q.      Where was it assembled?

5 A.      These guns come to the United States for

6 assembly in Georgia.

7 Q.      Describe what you did with it once you recorded

8 the information.

9 A.      After I recorded everything and filled out my

10 envelopes, I transport them over to the police academy

11 where we have our water tank.  I take two cartridges

12 for test firing.  When I get the weapon, I have to

13 digitally inspect it and make sure all the parts are

14 here, that it's safe to fire, do a dry fire without any

15 ammunition in the weapon.

16      Then I'm at the tank.  I'll put the ammunition

17 in the weapon and fire two rounds into the tank,

18 recover the cartridge casing and the bullets, and put

19 them into the envelope that I filled out for each gun.

20 Q.      Now, in regards to Bynum 1, did all of the parts

21 of it function properly?

22 A.      Yes, ma'am.

23 Q.      When you dry fired, were there any problems with

24 it?

25 A.      No, ma'am.

1  Q.      And when you test fired it, what was the result
2  of your test fire?
3  A.      It functioned.  I fired it twice in the tank,
4  recovered the cartridges and the rounds.
5  Q.      When you say fired it twice, were you using
6  standard ammunition?
7  A.      I was using ammunition from our ammunition file
8  for the nine millimeter.
9  Q.      Okay.  And when you say test fired properly, did
10 it cause a projectile to be shot out of the barrel as a
11 result of the use of an explosive powder?
12 A.      Yes, ma'am.
13 Q.      Showing you the next exhibit, Government's
14 Exhibit Dobie 17.  Do you recognize that exhibit?
15 A.      This also has initials and the date I closed the
16 box up after the test firing.  It's a Taurus nine
17 millimeter.  It's a PT 111 Millennium, and this is the
18 pistol and the serial number TWE 69738, and this is the
19 firearm that I test fired on August 10th of 2004.
20 Q.      What were the results of your test fire?
21 A.      It functioned, and I also fired two cartridges,
22 recovered the bullets out of the test fire tank, and
23 the two cartridges from --
24 Q.      Operated as a firearm was supposed to?
25 A.      Yes, ma'am.

1  Q.       Shooting  the  projectile s  as  a  result  of  using

2  explosive  powder ?

3  A.       Yes,  ma'am .

4  Q.       Any  irregular ities  about  that  weapon  --

5  A.       No,  ma'am .

6  Q.       -- in  terms  of  its  firing ?

7  A.       No.

8  Q.       Let  me  next  show  you  what 's  been  marked  as

9  Government 's  Exhibit  Dobie  16  and  ask  you  if  you

10 recognize  that  exhibit .

11 A.       That 's  my  initial s  and  the  date  I  seal ed  it.

12 It's  an  Llama  Minimax.   It's  a  .40  caliber,  and  the

13 serial  number  is  0704108598,  and  this  is  the  firearm

14 that  I  test  fired  in  August .

15 Q.       Follow  the  same  procedure ?

16 A.       Yes,  ma'am .

17 Q.       What  were  the  result s  of  the  test  fire  and

18 examination ?

19 A.       The  firearm  function ed  two  shot s  into  the  water

20 tank ,  recover ed  the  bullet s  and  cartridge  case s.

21 Q.       Any  difficulti es  in  terms  of  the  test  fire ?

22 A.       No,  ma'am .

23 Q.       And  again ,  that  would  be  a  firearm  that  operate s

24 by  shoot ing  a  projectile  through  the  use  of  an

25 explosive  powder ;  is  that  correct ?

1  A.       That's correct.

2  Q.       Did you make that same test fire when we

3  discussed firearms and you test fired?  Is that your

4  conclusion in regard to all the weapons that I'm going

5  to show you?

6  A.       Yes, it is.

7  Q.       Let me show you the next one, Government's

8  Exhibit Oglethorpe 9B.  If you could, look at that

9  exhibit and tell us whether or not you recognize that

10  exhibit.

11  A.       It has my initials and the date that I sealed it

12  after test firing.  It's a Davis Brand P380, .380

13  Caliber, and the Serial No. AP 171772.  It matches the

14  test fire envelope.

15  Q.       If you could, just hold it up so the jury can

16  see what weapon you're talking about.  Did you conduct

17  the same test on that weapon as well?

18  A.       Yes, ma'am.

19  Q.       What were the results of the test fire?

20  A.       It functioned as it should.

21  Q.       Let me show you the next exhibit, Government's

22  Exhibit Oglethorpe 11 -- Oglethorpe 13B, and ask you if

23  you recognize that exhibit.

24  A.       This is a Ruger P97 is the model.  It's a .45

25  caliber, and the Serial No. Is 66337394, and it also

1  has the initials and the date that I sealed it after

2  test firing.

3  Q.      If you could, just hold it up so everyone can

4  see which weapon you're talking about.  And during your

5  dry fire and your actual test fire, were there any

6  difficulties with that weapon?

7  A.      No, ma'am.

8  Q.      Did it operate as it was supposed to operate?

9  A.      Yes, it did.

10  Q.      Lastly, let me show you what's been marked and

11  introduced as Government's Exhibit Oglethorpe 9A and

12  ask you if you recognize that exhibit.

13  A.      This is also a Davis, the model is DM 22.  It's

14  a .22 long rifle -- excuse me .22 Magnum Deringer, and

15  the Serial No. Is 164692.

16  Q.      Okay.  If you could just show us and hold it up

17  and describe to the ladies and gentlemen of the jury  ,

18  did you test fire this weapon as well?

19  A.      Yes, I did.

20  Q.      Did it operate as it's manufactured to operate?

21  A.      Yes, it did.

22  Q.      Any difficulties at all with it?

23  A.      No.

24          MS. JOHNSTON:   Court's indulgence.  We have no

25  further questions.

1          THE COURT:   All right.  Cross-examination?

2          MR. MONTEMARANO:   Thank you, Your Honor.

3                    **CROSS-EXAMINATION**

4          BY MR. MONTEMARANO:

5   Q.     Good afternoon, Corporal Hearn.  How are you?

6   A.     Fine, thank you.

7   Q.     A little background for the ladies and gentlemen

8   of the jury, so we're all clear.  Would that be a fair

9   representation  of a cartridge?

10  A.     Yes, sir.

11  Q.     Not a bullet.

12  A.     No.  A bullet is the --

13  Q.     This guy?

14  A.     That's the bullet, yes, sir.

15  Q.     Also known as a slug?  It's what comes out when

16  you pull the trigger?

17  A.     Yes, sir.

18  Q.     This area is called the cartridge case?

19  A.     Yes, it is.

20  Q.     It's filled with propellant; is that correct?

21  A.     Yes, it is.

22  Q.     This is activated usually by a primer; correct,

23  sir?

24  A.     That is correct.

25  Q.     And a cartridge with a primer at the center,

1  what's called a center-fired cartridge; correct?

2  A.      That's correct.

3  Q.      Weapons have different calibers; correct?

4  A.      Yes, sir.

5  Q.      They're measured in -- well, I use the word,

6  sometimes caliber, like .45 caliber; correct?

7  A.      Yes, sir.

8  Q.      That would be written thusly?  That being a

9  decimal point; correct?

10 A.      It could be written at that point, yes, sir.

11 Q.      That would mean -- and what a .45 caliber means

12 is it's .45 inches; correct?

13 A.      Yes, sir.

14 Q.      There's also, you mentioned, for instance, a

15 nine millimeter, and that would just be a measurement

16 using millimeters, the metric system, instead of

17 inches; correct, sir?

18 A.      Yes, sir.

19 Q.      And the caliber, so we're all clear, is the

20 bored diameter, the size of the barrel; correct, sir?

21 A.      Yes, sir.

22 Q.      So caliber, that would be the width on this dark

23 red line, for all intents and purposes?

24 A.       Yes, sir.

25 Q.      Show you Government's 12D.

1          MS. JOHNSTON:   Counsel, could you get the
2  correct exhibit number, please?

3          MR. MONTEMARANO:  12D -- oh, I'm sorry.  My
4  apologies.

5          BY MR. MONTEMARANO:

6  Q.      It's Oglethorpe 12D; correct?

7  A.      Oglethorpe 12D, yes, sir.

8  Q.      That's a box of Remington .38 special
9  cartridges?

10 A.      That's what the box says, yes, sir.

11 Q.      And assuming that this contains .38 special
12 cartridges, these could only be fired from a gun that
13 takes .38 special ammunition; correct?

14 A.      It could be fired from a .38 special, or it
15 could be fired from a .357 Magnum.

16 Q.      Oglethorpe 12C is a box apparently of Winchester
17 .380 auto; correct?

18 A.      Yes, sir.

19 Q.      Could those be fired from a weapon chambered --

20 A.      I'm sorry, you said .380 auto?  The box says .32
21 auto.

22 Q.      I'm sorry, .32 auto fired from a weapon that
23 takes .32 caliber ammunition?

24 A.      Yes, sir.

25 Q.      Here's the .380 auto.  Winchester.  Oglethorpe 9D

1  could fired from a weapon that takes .38 auto, .380

2  auto ammunition?

3  A.      .380 auto, yes, sir.

4  Q.      Oglethorpe 9E.  What do they look like?

5  A.      These look like the .22 caliber.

6  Q.      .22 long rifle or .22 Magnum?

7  A.      These would be magnum, sir.

8  Q.      These would fit the Derringer you just showed

9  us?

10 A.      They should, yes, sir.

11 Q.      Okay.  And these are also .22s; correct, sir?

12 A.      Yes, they are.

13 Q.      They are not .22 Magnum; correct?

14 A.      No, they look like long rifle.

15 Q.      Could that they be usable in a Deringer?

16 A.      They may.

17 Q.      You didn't test the Derringer?

18 A.      I can check.  I can look through the envelope

19 and see if I did or didn't.

20 Q.      Sure.

21 A.      And I did.  I test fired the Remington magnum

22 round, the Derringer, and also a .22 long rifle round

23 to see if it would also work in there, which it did.

24 Q.      Okay.  So they are both compatible with the

25 Derringer?

1  A.      Yes, sir.  So this is only --

2  Q.      So this is the only fireable .32, these are

3  .32s; .38 special will only fire bullets of .38

4  specials and .357s.

5          Over here we have Oglethorpe 10.  This is

6  several magazines, and there's a bunch of loose rounds

7  floating around the bottom.  Do you see them?

8  A.      Yes, sir.

9  Q.      I'm not an expert, but this casual observation

10  suggests they're .45s.

11  A.      They're .45s.

12  Q.      I bet it probably says .45 ACP on the butt;

13  doesn't it?

14  A.      If I can get them out of the bag.  Wolf brand.

15  Q.      These were fireable in a .45; correct?

16  A.      Yes, sir.

17  Q.      .45 auto?

18  A.      Yes, sir.

19  Q.      Assuming these two can fit the same weapon,

20  these are all seized from the same location,

21  Oglethorpe.  One, two, three, four, five separate kinds

22  of ammunition -- or rather five separate weapons would

23  be needed to firearms examination; would that be a fair

24  statement?

25  A.      Yes, sir.

1  Q.      Actually, could be fired more than that because

2  you could have a weapon chamber for .22 long rifle that

3  requires these and not magnum?

4  A.      That's true.

5  Q.      And you could have a .357 Magnum floating around

6  that could fire the .38 specials; is that correct?

7  A.      Correct.

8  Q.      So potentially seven firearms; is that correct?

9  A.      It could be a lot of different weapon, yes, sir.

10 Q.      Not all the same though; correct?

11 A.      Well, those all will chamber in different

12 weapons, yes, sir.

13         MR. MONTEMARANO:  No further questions, Your

14 Honor.   Thank you.

15         MR. MARTIN:  Mr. Goodwin has no questions of

16 this witness, Your Honor.

17         MR. HALL:  No questions, Your Honor.

18         MR. MITCHELL:  Just a couple of questions.

19                    **CROSS-EXAMINATION**

20         BY MR. MITCHELL:

21 Q.      Your title is?

22 A.      I'm actually a detective corporal.

23 Q.      Detective corporal.  All right.  Detective --

24 Corporal Hearn, you did the test firing of two weapons,

25 they were identified to you as Bynum 1 and -- Bynum 1

1  and you identified that as a Glock; is that correct?

2  Do you need to see it?

3  A.      Yes, sir.  A Glock.

4  Q.      And you indicated that Glock originated from

5  Austria, but was actually assembled here in Georgia; is

6  that right?

7  A.      Yes, sir.  Based on what I've read about the

8  serial numbering of these weapons, that's what the

9  literature says.

10  Q.      And do you -- but do you know specifically from

11  this serial number whether it was actually originated

12  from Austria and actually assembled in Georgia?

13  A.      Well, I have ATF certificate that says it was

14  manufacture -- the manufacturer is Glock Austria and

15  that the importer was the Glock in Georgia.

16  Q.      Are you looking at the firearms trace summary?

17  A.      Yes, sir.

18  Q.      That was provided to you by who?

19  A.      That's ATF.  Alcohol, Tobacco, and Firearms.

20  Q.      And in this report the Department of Treasury

21  did, do you have the date of your summary when that was

22  actually provided to you?

23  A.      I can look it up.  I have it here with me.  This

24  was printed August 27, 2004.

25  Q.      Who requested that firearms trace summary?  Did

1 you or did someone else for you?

2 A.      Well, Detective Sakala filled out the trace

3 request form.  I sent the form to ATF through the mail.

4 Q.      On this report, does it indicate the purchaser

5 information anywhere on that form?

6 A.      Yes, sir.

7 Q.      According to this report, who is -- who actually

8 purchased this Glock that you identified and test

9 fired?

10 A.      On the form, it says it was purchased May 30,

11 1997, by a Victor Kelly, Jr.

12 Q.      And this Mr. Victor Kelly, Jr.  Did he have a --

13 I assume it's a he.  Did he have an address or location

14 of city and state where he resided or purchased this

15 weapon?

16 A.      In 1997, it says here Glenmont Circle, Silver

17 Spring, Maryland.

18 Q.      Does it indicate his race and sex?

19 A.      It says for race, it has Hispanic, and sex,

20 male.

21 Q.      Does it indicate where this firearm was

22 purchased initially.

23 A.      It says the dealer information on here, Maryland

24 Small Arms Range.

25 Q.      Where is that located?

1  A.        That's in Upper Marlboro, Maryland.

2  Q.        Okay.  I have no further questions.

3          One quick question.  You test fired this weapon

4  on what day?

5  A.        August 10.

6  Q.        Of what year?

7  A.        2004.

8  Q.        You've got speak into the microphone.

9  A.        I'm sorry.  August 10, 2004.

10  Q.        Prior to that, any time prior to August 10,

11  would you be able to conclusively state that the weapon

12  was actually functional prior to August 10?

13  A.        I didn't have the weapon.  I don't know what

14  condition it was in prior to my receiving it.

15          MR. MITCHELL:  Thank you very much.   No further

16  questions.

17          THE COURT:  Mr. Ward?

18          MR. WARD:  Just a couple, Your Honor.

19                    **CROSS-EXAMINATION**

20          BY MR. WARD:

21  Q.        Good afternoon.  Let me ask you about the two

22  Dobie exhibits.  Dobie Exhibit 17, I believe was a

23  Llama, L L A M A, Minimax .40 handgun; is that right,

24  sir?

25  A.        It's a Llama, yes, sir.

1 Q.      Huh?

2 A.      Yes, sir.

3 Q.      All right, sir.  So that means -- is it .40

4 caliber?

5 A.      .40 caliber, yes, sir.

6 Q.      Would that take a .22?

7 A.      No, sir.

8 Q.      Huh?

9 A.      No, sir.

10 Q.      And the other gun or handgun was a, as I

11 recollect this is, I think Dobie Exhibit 17, a Taurus

12 Millennium handgun; is that right, sir?

13 A.      I didn't say.

14 Q.      What caliber was the Taurus again?

15 A.      It's a nine millimeter.

16 Q.      Okay.  Would that take a .22 caliber projectile?

17 A.      No, sir.  Not without some type of insert.

18 Q.      I'm sorry?

19 A.      Not without some type of insert.

20 Q.      And you didn't find any inserts in these

21 weapons?

22 A.      No, sir.

23 Q.      Okay.  Now, you carry a service weapon?

24 A.      Yes, sir.

25 Q.      And it's an automatic; is that correct?

1  A.      It a semiautomatic , yes, sir .

2  Q.      Does it have the magazine that goes up into the

3  handle ?

4  A.      Yes , it does , sir .

5  Q.      All right .  These two weapon s that we just

6  talk ed about the , two Dobie exhibit s, the nine

7  millimeter and the .40 caliber , you understood from the

8  submission that they both were found with magazine s; is

9  that correct , sir?

10 A.      I don't know if they were or were not .  I wasn't

11 present when they were found .

12 Q.      Okay , sir .  And it does n't indicate on the --

13 they didn't come to you that way with magazine s either ?

14 A.      Well , with magazine s in them ?

15 Q.      Yeah .

16 A.      I don't believe they did .  I have picture s here

17 of how I received them .

18 Q.      Okay .

19 A.      And there was no magazine s in them .

20 Q.      I'm sure we can clear that up later .  Let me ask

21 you this :  How do you load a magazine ?  I'll give you

22 an empty magazine and I give you a hand ful of -- I'll

23 call them bullet s, but you probably call them

24 projectile s.  How do you load it?

25 A.      One at a time into the top of the magazine .

1  Q.      You take the magazine and you hold it and in one

2  of your hands, depending I guess whether you're

3  right-handed or left-handed; is that right?

4  A.      That's true.

5  Q.      Then you take the bullets and you push them in

6  the bottom one at a time.  There's a little spring in

7  there that sort of holds them in place, right?

8  A.      Right.  Oh, I put them in when I load a magazine

9  from the top down, but you could put them in upside

10 down.  You could put them in that way, if you felt like

11 it.  They should stay in there.

12 Q.      Whether you put them in from the top or the

13 bottom, you have to hold the magazine in your hand?

14 A.      Or between your knees or up against something to

15 support it.

16 Q.      Okay.  But it's likely to have your fingerprints

17 on it when you've finished filling the magazine, right?

18         MS. JOHNSTON:   Objection, basis of knowledge.

19         THE COURT:  Overruled.

20         THE WITNESS:   It's possible.

21         MR. WARD:  Okay, sir.  I don't have any other

22 questions.  Thank you.

23         THE COURT:  Any further cross?

24         Any redirect?

25         MS. JOHNSTON:   Just a couple of questions.

1                    **REDIRECT  EXAMINATION**

2          BY MS. JOHNSTON:

3 Q.      One of the lawyers was talking to you about

4 Bynum 1 and the information --

5          MS. GREENBERG:   Ms. Johnston, your microphone.

6          MS. JOHNSTON:   Thank you.

7          THE WITNESS:   The Glock.  Yes, ma'am.

8          BY MS. JOHNSTON:

9 Q.      And questions about the weapon and where it was  .

10 If you were to look at that exhibit, Bynum 1, are you

11 able to tell when it was put into property?

12 A.      I would look on my property record, not the box

13 itself.

14 Q.      What does your property record indicate in terms

15 of when the gun identified as Bynum 1 was checked into

16 your property section?

17 A.      Well, I have a -- there's the initials of Debbie

18 Greenwell are on the receipt part of the property

19 record and the date she put down was 6/1/04 at 12:30.

20 Q.      Was it then secured in the property locker until

21 you retrieved it and did your examination?

22 A.      Well, I can read through here, and it went to

23 various places before I received it, but yes, I

24 received it on August 10 and it was in the gun locker,

25 which is in the --

1  Q.      When you say other places, you mean other places

2  in the lab, for example, to the DNA section?

3  A.      Exactly.

4          MR. MITCHELL:    Objection.

5          THE COURT:   Overruled.

6          BY MS. JOHNSTON:

7  Q.      The DNA section, and also were there any other

8  places it went within the lab?

9  A.      It looks like it went to the DNA lab and it came

10 back to us where it was taken out by one of the

11 evidence technicians who did his exam on it, and then

12 it went into the forensics -- went back into storage

13 where it was put into the gun locker, and that's when I

14 picked it up.

15 Q.      Any indication that there was any mishandling of

16 this gun between the time it was received on June 1st,

17 2004, and when you did your --

18         MR. MITCHELL:    Objection.   Objection, Your

19 Honor.

20         MS. JOHNSTON:    -- when you did your test firing?

21         THE COURT:   Overruled.

22         BY MS. JOHNSTON:

23 Q.      You may answer.

24 A.      Based on my property record, I don't see any

25 indication, no.

1  Q.      When you examine d it, did you see any indication

2  that it had been tampered with in any way?

3  A.      When I received it, it was in the box, the box

4  was secured by tape.  When I opened the box -- when I

5  opened it, the firearm was in the box, secured, and

6  there was no indication of any that I could see.

7  Q.      You were reading from a report when Mr.

8  Mitchell was asking you question s about the ATF trace.

9  Do you have that report?

10  A.      Yes, I do.  Would you like to see it?

11  Q.      The one regard ing the Glock that Mr. Bynum asked

12  you about.  There's no indication on that report how it

13  got from Mr. Kelly to the address of 1513 Ray Road,

14  Apartment 102, where it was recovered    on June 1st,

15  2004; is there?

16  A.      No, there's no not.

17  Q.      And Mr. Montemarano, for whatever reason, asked

18  you about different kind s of bullet s.  Look ing at

19  Oglethorpe 10, can you look at that?  Do you see the

20  magazine s in there?

21  A.      Yes I do.

22  Q.      Can you tell us what caliber those magazine s are

23  for?

24  A.      One of the magazine s, I can tell, goes for the

25  .380 auto.

1          MR. WARD:   Excuse me, Your Honor.  I hate to

2  interrupt.

3          THE COURT:   Approach the bench.

4          MR. WARD:   Very briefly.

5          THE COURT:   Approach the bench.

6                   (At the bar of the Court.)

7          MR. WARD:   Judge, I've really got to go, and I

8  really can't hold it.   My client says it's okay.

9          THE COURT:   Well, if your client said it's okay.

10                  (Back in open court.)

11         MR. WARD:   Your Honor, Ms. Dobie is willing for

12 me to be excused for two or three minutes; is that

13 right, Ms. Dobie?

14         MS. DOBIE:   Yes, it is.

15         MR. WARD:   Thank you, Your Honor.

16         BY MS. JOHNSTON:

17 Q.     Are you able to examine those magazines?

18 A.     One of them I was looking at, it's a .380 auto.

19 It's even marked on here.  It says Davis Industries

20 P-380, five rounds, so that was easy.

21 Q.     How does that correspond to Government's Exhibit

22 Oglethorpe 9B, the .380 you told us about earlier?

23 A.      It should fit in this firearm.  It's a Davis

24 .380, P-380, and that's what's written on it.  It's

25 also written on the second one.  It says Davis

1 Industries P-380, five rounds.

2 Q.     So there are two magazines that would actually

3 fit into Oglethorpe 9B?

4 A.     Yes, ma'am.

5 Q.     Are you able to tell about the other magazines

6 or the bullets that are in there or that there are any

7 --

8 A.     This magazine is for a Ruger, and it appears to

9 be a larger caliber, probably if I had the ammunition,

10 I could tell you exactly what it was.  It's not written

11 on here.

12 Q.     A Ruger would be the same manufacturer as

13 Government's Exhibit Oglethorpe 13B, the gun that was

14 recovered at that location; is that correct?

15 A.     Yes, ma'am.

16 Q.     If we open that up, perhaps you could try to see

17 if that actually fit in this gun; is that correct?

18 A.     We can do that.

19 Q.     Why don't we do that?

20        (Mr. Ward is back in the courtroom.)

21        MR. WARD:   Thank you, Your Honor.

22        MR. MONTEMARANO:   Your Honor, may we approach?

23        THE COURT:   Approach the bench.

24             (At the bar of the Court.)

25        THE COURT:   Mr. Ward has returned, let the

1 record reflect.

2        MR. MONTEMARANO:  Thank you, Your Honor.  In my

3 experience, I've never seen live ammunition permitted

4 in proximity to a firearm, even a secured firearm like

5 these with the straps absent, it being surrounded by a

6 bag or something like that, and that's what Ms.

7 Johnston is asking for, and I just want the record to

8 reflect that.

9        MS. JOHNSTON:   I appreciate Mr. Montemarano's --

10 he's not using live ammunition.  He's taking the --

11 since Mr. Montemarano really didn't have any issues in

12 terms of these guns brought out about the various

13 calibers of bullets in that bag, I've asked him to see

14 if the magazine will fit into the Ruger gun, since it's

15 a Ruger magazine.  He has checked the magazine.  There

16 is nothing in it.  The gun is still secured in the

17 case.

18        MR. MONTEMARANO:  The bag with the magazine has

19 other magazines.  It has loose live rounds.  That's all

20 I'm saying.

21        MS. JOHNSTON:   Give me.

22        THE CLERK:  Excuse me, one second.  The marshals

23 said they are very uncomfortable with this situation

24 over there.

25        MR. MONTEMARANO:  I rest my case.

1           MS. JOHNSTON:   I will give him the magazine, and

2  I will take the live bullets away.

3           THE COURT:   Okay.

4                    (Back in open court.)

5           BY MS. JOHNSTON:

6  Q.      Could you take out just the --

7  A.      Yes, I took out the magazine.   The live

8  ammunition is over here.

9  Q.      Again, there's still -- you're going to take the

10 safety out so you can see if the clips fit?

11 A.      Yeah, I can't put it in there without this.   You

12 can check and see it's unloaded.

13 Q.      It's unloaded.   Okay.

14 A.      There's nothing in there.

15 Q.      The first clip fits that gun?

16 A.      Yes, ma'am.

17 Q.      Okay.   You want to try the second clip, too?

18 A.      (Witness indicating.)

19 Q.      They both fit as well?

20 A.      Yes, ma'am.

21 Q.      Now, if you could put the gun back in there and

22 secure it.

23          All of these weapons we looked at today were

24 also submitted for fingerprint examinations; is that

25 correct?

1  A.      Yes, ma'am .

2  Q.      Were any print s of value recovered  from any of

3  these  weapon s?

4  A.     I believe  that  I had  a sheet  that  said  that

5  there  was  nothing  of value  recovered .

6  Q.      Of value  mean s what ?

7  A.      A print  that  could  be use d to identify  where  the

8  source  came  from .

9          MS. JOHNSTON:    I have  no further  question s of

10  this  witness .

11          THE  COURT:   All right .  Any  recross ?

12          MR. MONTEMARANO :  No , Your  Honor .

13          MR. MARTIN:   No , Your  Honor .

14          THE  COURT:   All right .  You  may  step  down .

15  Thank  you very  much .

16          MR. MITCHELL:   Your  Honor , I'm  sorry .

17          THE  COURT:   You  do?

18          MR. MITCHELL:   Just  brief ly .  Brief ly .

19                  **RECROSS-EXAMINATION**

20          BY MR. MITCHELL:

21  Q.      You were  asked  on redirect  whether  the  gun

22  identifi ed  as Bynum  1, you  were  just  look ing  at  a

23  moment  ago , had  been  tampered  with .  Do  you  know  what

24  -- you  first  saw  the  gun  on August  10 , correct , 2004 ?

25  A.      Yes, sir .

1   Q.      You don't know what was happening  to that gun,

2   who was touching that gun, or the condition of the gun

3   until August 10; correct?

4   A.      I don't know who had the gun prior to June 1st,

5   but I do have a record here that tells me who had the

6   gun on June 1st until I received it on August 10.

7   Q.      Do you have a record of what they did with the

8   gun between June 1st and August 10?

9   A.      No, sir.

10  Q.      You only know from a list of people that

11  actually either took it from one locker to another or

12  handled the gun; correct?

13  A.      Correct, sir.

14  Q.      You don't know what they did with it?

15  A.      No, sir.

16  Q.      So you didn't know the condition of this gun or

17  what anyone did with it prior to August 10, only you

18  know what you saw on the 10th?

19  A.      Yes, sir.

20          MR. MITCHELL:   No further questions.

21          THE COURT:   All right.  You may step down.

22              (Witness excused at 12:43 p.m.)

23          THE COURT:   Counsel, we will take a recess now

24  until 1:05, and then we will be finished for the day.

25          MS. GREENBERG:   Do you want counsel back at 1

1  o'clock ?

2          THE  COURT:    Pardon ?

3          MS.  GREENBERG:    Do  you  want  counsel  back  at  1

4  o'clock ?

5          THE  COURT:    I can't  hear  you.

6          MS.  GREENBERG:    Your  Honor , do  you  want  counsel

7  back  at  1 o'clock  and  the  jury  back  at  1:05?

8          THE  COURT:    If  you  have  any  preliminary  matter s.

9          MS.  GREENBERG:    There  is  with  that  one  that  we

10 put  off  until  the  next  break .

11         THE  COURT:    Be  back  at  1 o'clock .

12                  (Off  at  12:43  p.m. )

13         MR.  MITCHELL:    Your  Honor , I  was  provided  with  a

14 letter  last  week , and  I  will  tell  the  Court  I  don't

15 have  this  letter  in  my  --  in  my  records .   I  don't  have

16 it  with  my  404(b)  evidence .   I'm  not  say ing  they  didn't

17 send  it.

18         THE  COURT:    What  letter  are  you  referring  to?

19         MR.  MITCHELL:    I  have  a  letter  dated  May  10,

20 which  attach es  the  lab  report  for  a  1996  arrest  of  Mr.

21 Bynum .

22         THE  COURT:    Right .

23         MR.  MITCHELL:    I  was  taken  by  surprise  when  I

24 was  asked  if  I  want ed  to  stipulate  to  the  chemical

25 analysis .   I  was  then  given  a  copy  of  the  letter  that

1   was sent to me, so I'm not saying they didn't send it.

2   I'm saying f or some reason , I just didn't have it,

3   so...

4        THE COURT:   Well, Mr.  Mitchell , the -- under

5   the circumstance s, I think it's appropriate  to permit

6   the gentleman  to testify .  If, however , after reviewing

7   the list of qualification s that you've gotten you

8   conclude  that there  is an issue that  you would like  to

9   explore  with him further  on his qualification s, we can

10  revisit  that .

11       MR. MITCHELL:   Well, I can  do a little  bit

12  better  than that .  I've already  learn ed a little  bit

13  about  him from fellow  counsel , which  give s me a lot  of

14  concern  that this  is a chemist  who is for hire to say

15  whatever  you want  him to say , that his opinion s are a

16  little  sketchy , and that fellow  counsel  may not

17  necessarily  use him -- use his opinion s because  they

18  don't  trust  him.

19        Furthermore , it was this -- not Ms. Greenberg  or

20  Ms. Johnston , but it was the government  in this

21  courthouse  that was argui ng against  his qualification s

22  and argui ng that he should n't be allow ed to testify .

23  So, there 's a lot of issue s that I've learn ed just in

24  the last hour that I think are appropriate , not after

25  they've  heard all of his conclusion s, but on

1  cross-examination , not -- later on.

2        THE COURT:   I'm assuming he's the next witness ;

3  is that correct ?

4        MS. GREENBERG:   Your Honor , there are two

5  witness es:   Normal Warren and Mr. Ingram .

6        THE COURT:   The one that he just described is

7  which one?

8        MS. GREENBERG:   Mr. Ingram analyzed the drugs

9  that were seized by Officer Warren .

10       THE COURT:   All right .

11       MS. GREENBERG:   Your Honor , during the time he

12 analyzed them , he was a forensic chemist for the   DEA

13 from 1971 to 1999 . He has a Ph.D from George

14 Washington University .   He has an MS in chemistry from

15 Howard University --

16       THE COURT:   I'm going to assume from what you're

17 proffering to me he is qualified.   The real question is

18 what weight is given to his testimony as to whether

19 he's a hired gun or the kinds of things that would go

20 to that , but not that he doesn't have the

21 qualification s?

22       MS. GREENBERG:   Your Honor , I'm paying him the

23 $40 witness fee that I pay every witness .  So, I

24 haven't hired him.

25       THE COURT:   No, I understand .  It sounds like

1  these  question s  goes  to  his  credibility  and the  weight

2  of  the  evidence , not  that he's not  qualified.      You

3  don't  doubt  that  he's  got  a  Ph.D, you  don't  doubt  that

4  he's got at least  some  degree  of  qualification s?

5        MR.  MITCHELL:   Well, he has a  Ph.M.   I'm don't

6  know what that is  .

7        THE  COURT:   Well, you will find  out .

8        MS.  GREENBERG:   Your  Honor , to  complete  my

9  proffer , I think  what  Mr.  Mitchell  is  referring  to,

10  current ly he is  a consultant with  Vingram  Enterprises,

11  Limited in  Washington,  D. C.  He provides  expert

12  service s for  those  request ed of  them .  He has  testifi ed

13  for defense  attorney s, he has  testifi ed for  public

14  defender s, he has  testifi ed for  other  individuals  who

15  have  request ed him .

16        We  have  simply  subpoena ed him  as a  witness ,

17  given  him  the  class ic -- the  standard  witness  fee based

18  on his  work  for  the  DEA  back  between  1971 and 1999,

19  which  is when  this  case  occurred .  So, there  is nothing

20  -- there  is no  payment .  We have  not  hired  him.  It's

21  just  the  standard  witness  fee , plus I think  his  Metro

22  fare.

23        THE  COURT:   What  was  the  last ?

24        MS.  GREENBERG:   His  Metro  fare.

25        MR.  MITCHELL:   Your  Honor , under  Rule  16, the

1  government  is required  to provide , under  rule  I think

2  it's 1(g) -- I'm sorry A1(g) . They're  required  to

3  provide  a summary  which  describe s his opinion s, the

4  basis  and reason s for those  opinion s, and his

5  qualification s.

6         THE  COURT:   All right .  You've got  the  opinion

7  and the  reason s for  the  opinion ; don't  you ?

8         MR. MITCHELL:   But --

9         THE  COURT:   I mean , do you have  that ?

10        MR. MITCHELL:   But I -- without  any opportunity

11  to now  investigate  his qualification s, determine  his

12  credibility  based  on those  qualification s, and I

13  certain ly can't  do it now .

14        MS. GREENBERG:   Your Honor , just  to shortcut

15  this , the  summary  was provide d.  He was  listed  as the

16  analyst  on Line  34.  The question  that  counsel  has is

17  whether  he was give n his qualification s, which  I

18  received  this  morn ing and gave  to him .  Given  the

19  circumstance s, give n the  complexity  of this case , given

20  the  nature  of the  case , give n Mr. Deson's role  only  as

21  the  supervisor  and we are only  going  to use  him if he

22  can  testify  about  multiple  exhibit s.

23        I don't think  the  rem edy in  this  case  should  be

24  the  exclusion  of evidence .  I think  what  the  government

25  has  proffer ed to  the  Court  is an appropriate  remedy  in

1  light  of  the  circumstance s.    If  Mr.  Mitchell  want s  him

2  brought  back ,  we  will  just  bring  him  back .    We  will

3  send  him  another  subpoena  and  bring  him  back  for  Mr.

4  Mitchell .

5        THE  COURT:   All right .   I agree .   Under  the

6  circumstance s that  we  have  here , that  while  there

7  has n't  been  perfect  compliance  with  Rule  16 , the

8  defense  will  be  permitted  to  inquire  into  his

9  qualification s that  they  are  able  today , and  if  the

10  defense  believe s that  additional  inquir y is

11  appropriate , we  will  have  him  brought  back .

12        And  if  it  turn s out  he  is  not  qualifi ed , and  it

13  does  not  sound  to  me  like  he 's  not  qualifi ed.    It

14  sound s to  me  that  there  might  be  some  question  as  to

15  his  credibility  or  the  weight  to  be  given  to  his

16  testimony .   I'll  entertain  his  a Motion  to  Strike  his

17  Testimony  after  you've  had  further  inquiry  on  his

18  qualification s.

19        MR. MITCHELL:    Unless  there 's  a  specific  reason

20  for  it , Your  Honor , they  have  not  yet  call ed the

21  officer  who  actual ly seize d these  drug s allegedly  --

22  who  seize d these  drug s from  Mr.  Bynum .

23        THE  COURT:   Well , they're  not  going  to  fin ish

24  the  trial  without  having  that  evidence .

25        MR. MITCHELL:    I  understand  that .

1          MS. GREENBERG:   She's next, Your Honor.

2          MR. MONTEMARANO:   Court's indulgence, please.

3          THE COURT:   Let me ask you this, counsel for the

4 government:   Why shouldn't we just call the seizing

5 agent today?

6          MS. GREENBERG:   We're calling her and then the

7 chemist.

8          THE COURT:   Well, the chemist, maybe we won't

9 reach the chemist today, and that gives them the whole

10 weekend --

11          MS. GREENBERG:   I really hope we will, Your

12 Honor.

13          THE COURT:   Excuse me?

14          MS. GREENBERG:   I think we will.

15          MR. MITCHELL:   One suggestion perhaps.   To

16 perhaps cut things short and not have to have him come

17 back.  If Your Honor would permit me to voir dire him

18 out of the presence of the jury on his qualifications,

19 perhaps that might avoid us having to bring him back

20 next week.

21          MS. GREENBERG:   That's fine, Your Honor.

22          THE COURT:   All right, fine.  We'll do that, but

23 do you want to do the seizing agent first or do you

24 want to do this first?

25          MS. GREENBERG:   Why don't we do him first and

1  then we don't have to bring the jury back and forth and

2  have them excused.

3        THE COURT:  Let's get the jury in.

4        MS. GREENBERG:  I thought you wanted to do it

5  outside of the presence of jury.

6        THE COURT:  Oh, you want to do the chemist

7  first?  That's fine.  Bring him in.  What's the name of

8  the witness?

9        MS. GREENBERG:  Your Honor, his name is Mr.

10 Ingram.  His first name is spelled  V E D O S T E R.

11                **VEDOSTER  INGRAM**,

12 having been called as a witness on behalf of the        _

13 Plaintiff, and having been first duly sworn by the

14 Courtroom Deputy, was examined and testified as

15 follows:

16                **VOIR  DIRE  EXAMINATION**

17        BY MS. GREENBERG:

18 Q.     Mr. Ingram, we're going to go through your

19 qualifications outside the presence of the jury.  Okay?

20 A.     Okay, sure.

21 Q.     Could you tell the judge what your background,

22 training, and experience is?

23 A.     Yes.  My background is in the area of chemistry,

24 in the academic area is bachelor's of science degree;

25 professional area, Howard University; master's of

1  science  degree  in chemistry  in bio-organic  chemistry ,
2  and a Ph.M, or master's of  philosophy  degree , at George
3  Washington  University  in the area  of  Organic  Synthesis
4  and Pyrrole  Chemistry  and Pyrrole  Chemistry  Reaction s,
5  Subunit of  Physiologically  Active  Compounds  or Body-
6  Active  Compounds .

7          My professional  background  is with  the Drug
8  Enforcement  Administration  for 28 year s.  Upon
9  retirement , I started my own company  Vingram
10 Enterprise s, LTD, which I am a consulting  chemist  and
11 also worked with  the National  Institute s of Health  as a
12 research  chemist  in the area  of colloid  physic s and
13 electro chemistry .

14         In the synthesis  of artificial  membrane s and
15 study  of ion  transport  in using  electro analytical
16 chemistry , and I also worked as an Instructor  of
17 Pharmaceutical  chemistry  for two year s at the College
18 of Pharmacy , Howard  University in  the area  of
19 pharmaceutical  analytical  chemistry .

20 Q.      Sir , is it correct  you were  a forensic  chemist
21 with  the DEA from  approximately  1971 to 1999?

22 A.      That  is correct .

23 Q.      Did you present  testimony  before  the Judiciary
24 Council  of the District of  Columbia  in 1999?

25 A.      Yes , I did .

1  Q.      Could you tell the Court about that?

2  A.      The testimony to the judiciary committee, on the

3  judiciary, was involving the classification of

4  controlled drugs.  They were interested in this

5  specific case for the classification of MDMA and its

6  derivative.  MDMA is a --

7  Q.      That's okay.

8  A.      Okay.

9  Q.      And between 1972 and 1999, when you were

10 employed by the DEA, can you tell the Court

11 approximately how many times you testified as an expert

12 witness?

13 A.      Three hundred times.

14 Q.      Is that before the federal court here in

15 Maryland, as well as D.C., Virginia, and West

16 Virginia?

17 A.      Yes.

18 Q.      And as well as Superior Court in Washington, D.

19 C.?

20 A.      Yes.

21 Q.      Currently, you're a consultant?

22 A.      Yes.

23 Q.      And you get paid for testifying?

24 A.      Yes, I do.

25 Q.      And you were subpoenaed to testify here about an

1  analysis you did while you worked for the DEA in 1996;

2  is that correct?

3  A.      Yes.

4  Q.      And for that, you're receiving just our standard

5  witness fee?

6  A.      Yes.

7        MS. GREENBERG:   No further questions.

8        THE COURT:   Mr. Mitchell?

9                    **VOIR DIRE EXAMINATION**

10       BY MR. MITCHELL:

11  Q.      Mr. Ingram, is it?

12  A.      Yes.

13  Q.      Is that proper --

14  A.      You can use that.

15  Q.      Okay.   You first started out your experience

16  after your college degree in 1964 as an instructor; is

17  that correct?

18  A.      That is correct.

19  Q.      At Howard University?

20  A.      That is correct.

21  Q.      And that's where, at the time you were an

22  instructor, you were obtaining your master's in science

23  in chemistry?

24  A.      That's correct.

25  Q.      From 1968 until 1983, you had a master's degree;

1 is that correct?

2 A.     That's correct.

3 Q.     And it wasn't until 1983 that you got a Ph.M.

4 What is that?

5 A.     That is a degree that recognizes the work

6 towards a doctorate of philosophy degree, and I had

7 completed all the research and everything and battery

8 of exams except the thesis.  I had to leave for family

9 medical reasons and I just -- they decided to give me

10 the degree in case I wanted to come back and finish my

11 doctorate.

12 Q.     Did you have to attend the classes for that

13 philosophy degree?

14 A.     Oh, yes.  As I mentioned before, all the courses

15 and battery of exams for doctor of philosophy were

16 completed.  The only thing I had to do was finish my

17 thesis, give the oral.

18 Q.     And from 1967 to 1971, you were a research

19 chemist for National Institute of Arthritis and

20 Metabolic Diseases; is that correct?

21 A.     Yes.  National institutes of Health, that's

22 correct.

23 Q.     And that was for four years.  Why did you leave

24 that job and go to DEA?

25 A.     It was an opportunity for me to explore an

1 alternative  area  of  chemistry .   I  was  asked  if  I  were

2 interest ed  in  pursui ng  a  Ph.D  at  Johns  Hopkins  by  Karl

3 Song er , who  was  the  head  of  the  section  that  you  had

4 mention ed , and  it  was  in  the  area  of  physic s  and

5 chemistry , but  I  had  an  interest  in  synthetic  organ ic

6 chemistry , which  would  have  dove tail ed  more  into  my

7 master 's  work , and  that 's  why  I  decide d  to  go  to  George

8 Washington .   I  went  on  my  own  because  of  my

9 professional  interest .

10 Q.    You  mean  in  2000  leavi ng  -- you  mean  --

11 A.     I  went  from  National  Institute s  of  Health  to  the

12 Drug  Enforcement  Administration  to  explore  the

13 opportunity  of  developing  approach es  for  alternative

14 drug  synthesis .

15 Q.    And  you  were  at  the  DEA  for  28  year s?

16 A.    That 's  correct .

17 Q.    And  your  final  title  was  forensic  chemist ?

18 A.    That 's  correct .

19 Q.    Is  that  right ?  And  during  those  28  ears, what

20 did  you  start  out  as?  When  you  first  join ed  them  in

21 1971, what  was  your  title  in  1971?

22 A.    It  was  as  chemist .  Forensic  chemist .   That  is

23 the  title  of  that  position .

24 Q.    Okay .  And  you  remain ed  a  forensic  chemist  for

25 those  28  year s?

1 A.      That is correct.

2 Q.      In 1999, you left the DEA?

3 A.      That is correct.

4 Q.      Under what circumstances did you leave the DEA?

5 A.      Under good standing as a retired person.

6 Q.      You're retired?

7 A.      I retired.

8 Q.      Then you ended up at Vingram Enterprises; is

9 that correct?

10 A.      In fact, it was opened up before that.

11 Q.      When was it opened?

12 A.      In 1999.

13 Q.      Okay.

14 A.      But it was --

15 Q.      Go ahead.  You can finish.

16 A.      It is a company established by me for the

17 setting up of business es in impoverished areas of the

18 world, and it -- as it turns out now, this is only one

19 arm of the company, and it came in after I came in,

20 after I had retired the matter of consulting and in the

21 area of chemistry.

22 Q.      Do you also -- it says here your professional

23 experience as a consultant, you will give chemist court

24 testimony; is that correct?

25 A.      That's correct.

1  Q.      Who will you give that court testimony for?

2  A.      For anyone who wishes the services.

3  Q.      And that would be for a fee?

4  A.      That's correct.

5  Q.      Would you testify for a fee now as in your

6  position as consultant for the government at any time?

7  A.      Yes, I would do that also.

8  Q.      So if they hired you and paid you their fee, you

9  would testify for them?

10 A.      That is correct.

11 Q.      Equally for the defense?

12 A.      That's correct.

13 Q.      Have you, since you left in 2000, opened your

14 own company, actually testified for the government at

15 your fee?

16 A.      Not at my fee.

17 Q.      Well, the $40 -- the fee you're getting today?

18         THE COURT:  He's not going to retire on the fee

19 he gets today.

20         BY MR. MITCHELL:

21 Q.      So, other than something for lunch money, you

22 haven't been hired and retained by the government to

23 testify on their behalf; is that correct?

24 A.      On the basis of my company status.

25 Q.      Correct.  Are you aware of whether the

1  government  has , at  any  point  in  time  since  2000 , since

2  you've  had  the  opportunity  to  testify  for  the  defense ,

3  have  you  ever  known  the  government  to  challenge  your

4  qualification s?

5  A.       Challenge  my  qualification s  as  what ?

6  Q.       Challenge  your  qualification s  as  an  expert , I'm

7  sorry .

8  A.       Oh , yes , I  have .

9  Q.       And  they've  challenge d  it  on  what  basis , if

10  you're  aware ?

11  A.       Whether  I  was  qualifi ed  as  an  expert  witness  as

12  a  chemist  -- as  forensic  chemist .

13  Q.       They  argue d  that  you  could n't  be  qualifi ed  as  an

14  expert ; is  that  right ?

15  A.       That 's  correct .

16  Q.       I  assume  that  under  your  testimony , you  would

17  testify  for  the  defense  as  to  whether  the  drug s  were

18  actual ly  proper ly  analyze d.   Would  that  be  one  of  the

19  thing s?

20  A.       That 's  one  the  aspect s.

21  Q.       What  about  chain  of  custody ?  Would  you  testify

22  as  to  whether  chain  of  custody  might  be  flaw ed  or  in

23  any  way  interrupt ed?

24  A.       Yes .

25  Q.       Now , in  your  -- in  being  hire d  as  an  expert  for

1  the defense, would you do your own testing of drugs,

2  for example?

3  A.      The testing would be -- would that also include

4  weighing?

5  Q.      Testing, weighing, analyzing?

6  A.      We do provide a service, a weighing service

7  only.  That's the only type of actual drug touching

8  that we do.

9  Q.      So if I give you a sample of drugs, you couldn't

10  tell me what the sample is?

11  A.      We're not going to chemically analyze it.  We

12  will physically analyze it through weights.

13  Q.      Would you then have someone else do the chemical

14  analysis?

15  A.      No.  That is not our approach.

16  Q.      But I could have someone else do it for me if I

17  wanted to and you could interpret.  Is that how it

18  would work?

19  A.      If you can find somebody to do that, yes.

20  Q.      If I could.  Okay.  Now, in your work as a

21  chemist with the DEA, you analyzed drugs from what

22  locations?

23  A.      Any locations that the drugs were confiscated

24  and submitted to the laboratory for analysis.  They

25  could be --

1  Q.      Where were you located?

2  A.      In the Washington, D.C. area.

3  Q.      Okay. So someone in the Washington, D.C. area

4  under the jurisdiction of your office gave samples of

5  drugs, you would be the one to test that?

6  A.      Yes. I would also include military samples.

7  Q.      And military as well?

8  A.      Yes. It could be from anywhere.

9  Q.      During the time that you were a chemist with the

10  DEA, did you receive any awards or accolades or

11  promotion?

12  A.      Oh, yes.

13  Q.      Do you list those anywhere in your CV?

14  A.      No, I don't. I have received citations on court

15  testimony. I remember one of them was in Harrison --

16  Burling, Virginia in district court on testimony on a

17  huge case.

18  Q.      At any time were you -- did you see any

19  sanctions or any other -- I'm losing the word

20         MR. MONTEMARANO: Adverse actions.

21         BY MR. MITCHELL:

22  Q.      Adverse actions --

23  A.      No.

24  Q.      -- as a result of any -- out of your work --

25  A.      No.

1  Q.        -- between 1971 and 1999?

2  A.        No.

3  Q.        You currently have a Web site with Vingram

4  Enterprises?

5  A.        Yes, I do.

6  Q.        That advertises your services?

7  A.        Yes, it does.

8            MR. MITCHELL:   I have no further questions.

9            MS. GREENBERG:   Your Honor, I submit at this

10  time that we not repeat this in front of the jury.  I

11  ask that the Court accept him as a forensic expert and

12  be allowed to offer his opinion, and I also move that

13  counsel not be allowed to ask him that the government

14  has asked to exclude him from his consulting work

15  because it appears he didn't that he didn't chemically

16  analyze the exhibits when he was a forensic chemist;

17  and therefore, it would not be relevant for the time

18  period we're talking about near 1996.

19            THE COURT:   All right.  Mr. Mitchell.

20            MR. MITCHELL:   I think it would be relevant,

21  Your Honor, if the government wants -- you can't have

22  it both ways.  They either trust him or they don't

23  trust him, and if they're argue today, I want the jury

24  to trust him, but then tomorrow he comes for the

25  defense and they argue they don't want to trust him, I

1  mean --

2          THE COURT:  What are the circumstance s under

3  which his qualification s were challenge d?

4          MS. GREENBERG:  Your Honor , Mr. Mitch ell is

5  say ing -- maybe he can correct me if I'm wrong , but

6  when he act s as a consultant  and he does n't chemically

7  analyze  the exhibit s, the government  has object ed to

8  him in other  case s.

9          In this case , we're call ing him in his role as a

10  forensic  chemist  with the DEA, U. S. Department  of

11  Justice , Washington , D. C. based on a chemical  analysis

12  he did of substance s.

13          THE COURT:  Was the government  success ful in

14  challeng ing his qualification s?

15          MS. GREENBERG:  I don't know , Your Honor .

16          THE WITNESS:  No.

17          MR. MITCHELL:  I d idn't hear the question , I'm

18  sorry .

19          THE COURT:  I asked was the government

20  success ful in challengi ng his qualification s.  The

21  witness has said no, he was able to testify .  If there

22  is a judicial  find ing that he was not qualif ied, I

23  would think that would be a ground for

24  cross-examination , but I'm not going to permit an

25  inquiry  into an unsuccess ful challenge  by some

1  prosecutor  somewhere  to his  qualification s in some

2  other  case  that  was un success ful .

3         MR.  MITCHELL:   I'm not  suggest ing  that  it be  a

4  --

5         THE  COURT:   You're  entitle d  to  impeach  the

6  witness , but  not  the  government .

7         MS.  GREENBERG:   I move  in limine  that  he not  be

8  allow ed to  ask  those  question s.

9         THE  COURT:   I grant  that  motion .   I see  no

10  reason to  go into  questions about  an unsuccessful

11  challenge  by  some  prosecutor  somewhere  to  his

12  qualification s.

13         Now,  how  do  you  want  to  hand le  the  physical

14  qualification  in  front  of  the  jury , because  they're

15  comi ng  back  here  in  just  a  moment ?  Do you  want  to

16  stipulate  to  his  qualification s, reserving , however ,

17  your right  to  challenge  it based  upon  the  voir dire  we

18  just  had ?

19         MR.  MITCHELL:   Court 's  indulgence .

20         MS.  GREENBERG:   Since  he's  here , Your  Honor , we

21  might  as  well  start  with  him .   I literal ly  have  five  or

22  ten  minute s  for  both  witness es.

23         MR.  MITCHELL :  Your  Honor , we  would  stipulate  to

24  his  qualification s.   I'm not  waivi ng  any  right  to

25  challenge  him , but  waive  --  stipulate  his

1 qualification s for the jury.

2        THE COURT:  All right .  We'll announce a

3 stipulation  that he's been -- that the parti es agree

4 that he's qualif ied to give opinion s in the field of

5 forensic chemistry .  You are re serving your right based

6 upon this voir dire  examination  for appellate purpose s

7 to challenge  his qualification s or the Court 's ruling

8 that he's qualifi ed.  I'm going to rule right now that

9 he's qualified  and you may then announce  the

10 stipulation  reserving unto yourself  all right as to

11 whether  I am properly --

12        MS.  GREENBERG:   Your Honor , may I just brief ly,

13 when  I'm introducing  the witness , state his education

14 and his work with DEA?

15        THE COURT:  You may do that  just very brief ly

16 because  they need to understand  it for weight purpose s

17 but that 's all.

18        All right .  Let's bring the jury in.

19              (Witness remain s on the stand .)

20              (Jury return s at 1:35 p.m. )

21        THE COURT:  Ladies and gentlemen  , while you're

22 getting settle d, I just want to remind you that we will

23 be resuming  on Tuesday , the 18th of July.  I have a

24 matter at 9 o'clock in another  case that won't take too

25 long , and I should be able to start prompt ly at 10:00.

1 So if you will be here at 10:00, and counsel, if you

2 will be here at quarter of 10:00, we will do that.

3        My apologies for the delay in bringing you back

4 in. We had a couple of other matters to handle, but I

5 think it will make it go a little faster.  You may

6 proceed.

7        MS. GREENBERG:   Your Honor, could the witness be

8 sworn?

9 Thereupon,

10               **VEDOSTER  INGRAM**,

11 having been called as a witness on behalf of the

12 Plaintiff, and having been first duly sworn by the

13 Courtroom Deputy, was examined and testified as

14 follows:

15               **DIRECT  EXAMINATION**

16        BY MS. GREENBERG:

17 Q.    Sir, could you state your name  and spell your

18 first and last name for the jury, please.

19 A.     Vedoster Ingram; Vedoster, V E D O S T E R,

20 Ingram, I N G R A M.

21 Q.     Sir, in the matter of shortcutting things, as

22 the judge suggested, did you receive your bachelor of

23 science in chemistry from Howard University in 1964;

24 your MS in chemistry from Howard University in 1968;

25 and your Ph.M in chemistry from George Washington

1 University in 1983?

2 A.      Yes.

3 Q.      And among other work experience , did you work

4 for 28 years as a forensic chemist with the Drug

5 Enforcement Administration , U. S. Department of

6 Justice , Washington DC, specifically from 1971 to 1999?

7 A.      Yes.

8 Q.      In connection with your work as a forensic

9 chemist , did you test a substance that was submitted to

10 you back in -- Court 's indulgence -- on September 3,

11 1996, that you have been asked to come testify about

12 here today ? Or I guess it was September 11, 1996. Do

13 you see that ?

14 A.      I have a date as --

15 Q.      Sir , when it was submitted -- if I may approach .

16 Showing you Miscellaneous 30 . Do you recognize that

17 exhibit ? Do you recognize this exhibit ?

18 A.      Yes , I do.

19 Q.      What is reflect ed there as the date it was

20 received at the lab ?

21 A.      9/11/96.

22 Q.      What is reflect ed here as the date that the item

23 was obtain ed?

24 A.      9/03/96.

25 Q.      Just to be clear , if you could state the file

1 number.

2 A.      500-610.

3 Q.      And the file title?

4 A.      Bynum.

5 Q.      Where does this document reflect that it was

6 obtained?

7 A.      6 Evart Street, Northeast.

8 Q.      Can you read at least the last name of the

9 special agent that submitted it to your laboratory?

10 A.      It appears to be Murphy, or something like that,

11 or Mayberry.

12 Q.      And this top half of this form, Miscellaneous

13 30, that's filled out before it gets to your lab, it's

14 maintained with the exhibit?

15 A.      Yes.

16 Q.      And it's below the line that it is from your

17 laboratory; is that correct?

18 A.      Correct.

19 Q.      In Paragraph 22, there is an indication to seal,

20 it says broken/unbroken.  Do you see that there?

21 A.      Yes.

22 Q.      And is that filled out by your technician who

23 receives the exhibit?

24 A.      Yes, it is.

25 Q.      Were you able to determine when it was submitted

1  to the laboratory whether the item was sealed or

2  unsealed?

3  A.      Yes.

4  Q.      How are you able to determine that?

5  A.      Upon receiving the evidence, I viewed it and

6  found it as being sealed and I recorded it in my

7  laboratory notes.

8  Q.      So even that's not reported on the front page of

9  the form, it's reported elsewhere in the file?

10  A.      Yes, it is.

11  Q.      And this exhibit that you received from File No.

12  500-610, File Title Derrick Bynum, relating to a

13  September 1996 seizure, can you tell the jury if you

14  performed tests on that item?

15  A.      Yes, I did.

16  Q.      Did you perform the standard tests that your

17  laboratory performed at that time?

18  A.      Yes, I did.

19  Q.      Generally, tell us, without telling what the

20  tests were, what tests you were performed?

21  A.      There was a screening test and there were

22  confirmation tests, and the screening tests indicated

23  that a cocaine base was present and that a confirmatory

24  test indicated that cocaine base was present at a 90

25  percent strength.

1 Q.     What was the weight of the exhibit that you

2 analyze d?

3 A.     The net weight , or weight received without the

4 wrapper s, was 5.686 grams .

5 Q.     What did you determine it to be?

6 A.     5.686 grams .

7 Q.     What drug did you determine it to be?

8 A.     The drug determine d was cocaine base .

9 Q.     How many package s were there ?  Was there one or

10 was there more than one ?

11 A.     There was one plastic bag .

12 Q.     What did it look like ?

13 A.     It was color less .

14 Q.     Was it hard or soft ?

15 A.     It had chunks of material that appear ed to have

16 been crush ed .

17 Q.     Is that reflect ed on your analysis on

18 Miscellaneous 30 , what your conclusion s were at the

19 bottom ?

20 A.     Yes .

21 Q.     Where it says Exhibit 1 ?

22 A.     Yes .

23 Q.     That would be 5.68 grams , one color less plastic

24 Ziploc bag with brown chunks found to contain cocaine

25 base ?

1 A.      Yes.

2 Q.      On the bottom of Miscellaneous  30, is that

3 Exhibit 1 , lab number , cocaine  base , strength  90

4 percent ?

5 A.      Yes.

6 Q.      And these two number s here, 5.117 G and 5.36 G,

7 what does that mean ?

8 A.      5.117 grams is the weight of a pure cocaine

9 base .  And the 5.366 grams is the weight  reserves  after

10 the analysis .

11 Q.      What is the common  term for cocaine  base ?

12 A.      The street  name is crack .

13        MS. JOHNSTON:   No further  question s, Your  Honor .

14                    **CROSS-EXAMINATION**

15        BY MR. MITCHELL:

16 Q.      Mr. Ingram , you were work ing for the DEA on

17 September  11, 1996 ?

18 A.      Yes.

19 Q.      And on September  11, 1996 , when this was

20 received , did you actual ly receive  the item on that

21 day?

22 A.      I received  it on September  13, 1996 .

23 Q.      When did you actual ly analyze  this substance ?

24 A.      The analysis  was begun on October  2nd.

25 Q.      So between  September  11 and October  2, what were

1 the drugs doing?

2 A.      Between that time, it was either in the central

3 laboratory vault or in my custody -- in my vault

4 custody prior to analysis and during analysis.

5 Q.      And when was your -- you opened this package

6 October 2, 1996?

7 A.      Yes.

8 Q.      And when did you complete your analysis?

9 A.      October 3.

10 Q.      The following day?

11 A.      That's correct.

12 Q.      Why was it it took 24 hours to complete your

13 analysis?

14 A.      It more than likely was begun in the afternoon

15 and completed the next day, including the paperwork.

16 Analysis is -- of a case is comprised of actually

17 receiving it, opening it, doing the test, and writing

18 up the paperwork and then sealing it, and the paperwork

19 turned in.  That is all.  This is comprised of

20 analytical time.

21 Q.      This substance that you analyzed, did you test

22 it for anything other than for cocaine?

23 A.      No, I didn't.

24 Q.      Showing you again what has been marked as

25 Miscellaneous 30.  Now, you received this document with

1 some printed language right here; did you not?

2 A.      Yes, I did.

3 Q.      You didn't type that word "cocaine" under

4 alleged drugs under No. 11; did you?

5 A.      No.

6 Q.      This was done by the police officer presumably?

7 A.      Yes.

8 Q.      So he already put down that this was cocaine;

9 correct?

10 A.      Yes, he did.

11 Q.      If I could go to your -- and your conclusion

12 was?

13 A.      Item 28, cocaine base.

14 Q.      During that period of time between the time you

15 received this September 11, 1996, until the time about

16 a month later when you actually tested it, did you have

17 any discussion or communication with an Officer Hearn,

18 I believe it is, or Murphy?

19 A.      No.

20 Q.      Do you have any notes to that effect?

21 A.      No.

22 Q.      I know this is sometime ago, it's about ten

23 years ago. Do you have any specific recollection of

24 that?

25 A.      Routinely, we do not hold discussions with

1 submitting  officer s' evidence .

2 Q.     Do you have any specific  recollection  from ten

3 year s ago what  happened  and who  spoke  to what ?

4 A.     No , I don't .

5      MR. MITCHELL:   No further  question s.

6      THE  COURT:   Any  redirect ?

7                **REDIRECT   EXAMINATION**

8      BY MS.  GREENBERG:

9 Q.     Have  you had  any  discussion s with  anyone  that

10 would  change  your  opinion  about  what  these  drug s are ?

11      MS . GREENBERG:   This  is  404(b), Your  Honor , and

12 only  goes  to this  one  defendant .  We can  approach  the

13 bench  if you  want .

14      MR. MARTIN:   No, no, no.   That  that 's not

15 necessary .

16      THE  COURT:   All right .

17      BY MS.  GREENBERG:

18 Q.     If you  had  opinion s with  any  of the  officers,

19 would  that  have  changed  your  conclusion  on this  report ?

20 A.     No .

21 Q.     Were  your  observation s of the  brown  chunks

22 consistent  with  crack  cocaine  versus  powder  cocaine ,

23 your  observation s of the  exhibit ?

24 A.     I hate  to use  the  term "crack ," but  cocaine

25 base .

1 Q.      Cocaine  base , yes?

2 A.      It's consistent  with that .

3        MS.  GREENBERG:   No  further  question s.

4        THE  COURT:  All right .  Any  question s of  this

5 witnes s?  Mr. McKnett ?

6        MR.  MCKNETT :  No , Your  Honor .

7        THE  COURT:  All right .  You  may  step  down .

8 Thank  you very  much .  Do  you  have  a question , Mr.

9 McKnett ?

10       MR.  MCKNETT :  Your  Honor , I want ed  to  ask  the

11 Court  if we could  give  an  instruction  at this  point  the

12 404 ?

13       MS.  GREENBERG:   Your  Honor , if we can  wait  until

14 the  next  witness .

15       THE  COURT:  I will  do it, attend  to both  of

16 them .

17            (Witness  excused  at 1:47  p.m. )

18 Thereupon,

19                     **NORMA  HORNE** ,

20 having  been  called  as a witness  on behalf  of the        _

21 Plaintiff , and having  been  first  duly  sworn  by the

22 Courtroom  Deputy, was  examined  and testified  as

23 follows:

24               **DIRECT  EXAMINATION**

25        BY MS.  GREENBERG:

1  Q.      Ma'am, could you state your name  and spell  your

2  last name, please?

3  A.      Norma Horne, H O R N E.

4  Q.      Where are you employed?

5  A.      With the  Metropolitan  Police  Department in

6  Washington,  D. C.

7  Q.      As what?

8  A.      Police  detective  now.

9  Q.      How long have  you been a police  detective  with

10 the Metropolitan  Police Department  in Washington,  D.

11 C.?

12 A.      A little  over 16 years.

13 Q.      As such, what are your duties and

14 responsibilities ?

15 A.      At this point  it covers  kind  of a gambit, but I

16 was just transferred  from the Safe Streets Task Force

17 with the FBI to Homeland  Security .

18 Q.      In the Safe Street  Task Force, did you work on

19 narcotics cases?

20 A.      Yes.

21 Q.      Was that the bulk of your work in that unit?

22 A.      Yes.

23 Q.      Back on September  3, 1996, were you a member  of

24 the -- were you part of the Fifth District?

25 A.      Yes, I was.

1   Q.        Working the vice unit?

2   A.        Yes, ma'am.

3   Q.        On that date on September 3, 1996, were you

4   working in the area of Edgewood Terrace, Northeast?

5   A.        Yes, ma'am.

6   Q.        And could you tell the jury if you had conducted

7   any law enforcement activity in the area of 535

8   Edgewood Street, Northeast, Washington, D.C.  On

9   September 3, 1996?

10  A.        Actually, prior to getting to that location, we

11  became involved in a traffic stop that subsequently led

12  to an arrest -- actually, it turned out to be two

13  arrests.

14  Q.        While you were going to that location?

15  A.        Yes, ma'am.

16  Q.        Can you tell the jury what happened that day?

17  A.        On that date, we were driving an unmarked

18  vehicle, and at that point believed that what we saw

19  might have been some type of transaction.  We pulled

20  over in front of the gray vehicle, at which point the

21  driver of the vehicle made a motion with his left hand

22  to the middle console.  At that point, we exited our

23  vehicle, approached --

24  Q.        Let me ask you this:  Before you approached the

25  vehicle, did you hear anybody in the vicinity say

1  something?

2  A.       Yes.  There was another gentleman that yelled

3  5-0, 5-0.

4  Q.       What does that mean to you as a police officer?

5  A.       Police.

6  Q.       Where was does that come from?  Do you know?

7  A.       That's just the street terminology back then.

8  Q.       When you saw this car and the driver was doing

9  what?

10  A.       Initially what happened was the -- there was a

11  young man that approached on the driver's side window

12  and had reached into the driver's side area and then

13  the whole --

14  Q.       Then you heard the 5-0?

15  A.       Right.

16  Q.       So then you approached the vehicle?

17  A.       Correct.

18  Q.       Tell the jury what observations you made of the

19  driver.

20          MR. MITCHELL:   Objection.

21          If we could approach.

22          THE COURT:  All right

23              (At the bar of the Court.)

24          MR. MITCHELL:   All I've heard so far is that a

25  police officer  saw a car and stopped it for a traffic

1  stop.  No violation of any law, no violation of any

2  traffic code, no idea that anyone was doing anything

3  illegal.

4        MS. GREENBERG:  Well, if he will let me

5  continue, I will get to that point.

6        MR. MITCHELL:  She's already had the officer

7  stop the vehicle, but no indication what the vehicle is

8  doing.  We --

9        MS. GREENBERG:  Your Honor, this would be the

10 basis of the Rule 12 pretrial, and we're not having an

11 audiotape suppression motion now.

12       THE COURT:  Did you file a motion?

13       MR. MITCHELL:  I didn't know about this until a

14 month ago -- a couple of months ago.

15       THE COURT:  The objection is overruled.  Let me

16 hear where this goes, and if she doesn't get there, we

17 will come back and revisit the question.

18            (Back in open court.)

19       BY MS. GREENBERG:

20 Q.    Detective Horne, take us back, just to be clear,

21 when you heard the witness screaming 5-0, what

22 observations did you make of that individual at the

23 vehicle?

24 A.    The gentleman on the outside of the vehicle?

25 Q.    The gentleman on the outside.

1 A.      He had reached into the vehicle, like a passing

2 motion.

3 Q.      And is that when you heard 5-0, 5-0?

4 A.      Yes.

5 Q.      And then what did that individual do?

6 A.      Had walked to the other side of the vehicle, and

7 at the same time, we actually had pulled up and

8 basically cut the vehicle off to conduct a traffic

9 stop.

10 Q.     What were your observations when you approached

11 the car?

12 A.      The driver with his left hand made a motion

13 towards the middle console area, at which time he was

14 told to show his hands, and then we approached, could

15 smell alcohol --

16 Q.     Was there any of your observations consistent

17 with the smell that you smelled about him?

18        MR. MONTEMARANO:   Objection, Your Honor, to the

19 leading.

20        THE COURT:   Sustained.   Ask it a different way.

21        BY MS. GREENBERG:

22 Q.      You just testified that you smelled alcohol.

23 A.      Yes.

24 Q.      What else did you observe?

25 A.      Once the gentleman's -- we asked the gentleman

1  to step out, there was an open bottle of rum in the --

2  right by the console area.

3  Q.     Do you recall what type?

4  A.     Citrus.

5  Q.     What did you do then?

6  A.     Actually placed him under arrest for possession

7  of an open container of alcohol.

8  Q.     Who was this person that you placed under

9  arrest?

10  A.     Derrick Bynum.

11  Q.     What happened next?

12  A.     Search incident of the vehicle to his arrest,

13  located by the console area where the same reaching

14  motion was a clear Ziploc, which contained an off-white

15  rock substance, of which a portion was field tested,

16  and yielded a positive color reaction for presence of

17  cocaine.

18  Q.     Where was that in relation to what you observed?

19  A.     That same area.

20  Q.     As what?

21  A.     As where he reached with his left hand toward

22  the middle console.

23  Q.     Approximately how much did that weigh?

24  A.     Approximately six grams.

25  Q.     And the field test that you did, is that

1 typically referred to as the color test? What kind of

2 test is it?

3 A.     It's a test for whether or not it contains

4 cocaine.

5 Q.     Do you have a further test on the field for

6 differentiating between cocaine and cocaine base?

7 A.     No. It's the same. I'm sorry. It's the same

8 test.

9 Q.     And you allowed the lab to do that for you?

10 A.     Yes.

11 Q.     Based on your training and experience, how did

12 it appear to you?

13 A.     We had a positive color reaction for presence of

14 cocaine.

15 Q.     Did the substance appear to be powder cocaine or

16 crack cocaine?

17 A.     Crack cocaine.

18 Q.     Did you search that same individual?

19 A.     Yes.

20 Q.     Did you continue to search the car?

21 A.     Yes.

22 Q.     What else did you receive from the console area

23 of the car to which you saw the person you identified

24 as Derrick Bynum reach?

25 A.     There was money recovered from that area, as

1 well as money recovered off of Mr. Bynum.

2 Q.    How much money in that area?

3 A.    The actual amount, I can't remember.

4 Q.    Is there anything that would refresh your

5 recollection?

6 A.    Yes, ma'am.

7 Q.    What is that?

8 A.    My 163.

9 Q.    Is that your report?

10 A.    Yes, ma'am.

11 Q.    I'm going to hand you what's been marked as

12 Miscellaneous 29 for identification purpose s only.  If

13 you could read this to yourself and tell me if that

14 refreshes your recollection as to the amount of

15 currency recovered from the console area of the

16 vehicle.

17 Q.    Let me direct your attention to that point down

18 there.

19 A.    Yes.

20 Q.    How much money was recovered from the console

21 area of the vehicle?

22 A.    $58.

23 Q.    Was there anything else?

24       THE COURT:   I couldn't hear the answer.

25       MS. GREENBERG:   I'm sorry.

1          BY MS. GREENBERG:

2 Q.      How much?

3 A.      $58.

4 Q.      Was there anything else recovered from the

5 console area of the defendant's vehicle?

6 A.      Mr. Bynum's ID.

7 Q.      Was it in his name?

8 A.      Yes.

9 Q.      What was recovered from his person in terms of

10 money?  And if you need your recollection refreshed,

11 your report is right here.

12 A.      His left, front pocket was $89 in   US currency.

13 Q.      And did you -- was there any statements as to

14 whose vehicle that was?

15 A.      The co-defendant, who was subsequently arrested,

16 made a statement that Mr. Bynum --

17          MR. MITCHELL:   Objection.

18          THE COURT:   Sustained.

19          BY MS. GREENBERG:

20 Q.      Let me back you up.  Did you record in your

21 report who said whose vehicle it was?

22 A.      Yes.

23 Q.      Whose vehicle was it?

24 A.      Mr. Bynum's.

25 Q.      Did you then place the individuals under arrest

1  who  you  encounter ed  at  that  scene ?

2  A.       Two  out  of  the  three ,  yes .

3  Q.       Who  was  place d  under  arrest ?

4  A.       Mr .  Bynum  and  a  Mr .  Gas ton .

5  Q.       Mr .  Gas ton ?

6  A.       Yes .

7  Q.       Were  there  any  spontaneous   statement s  made  at

8  the  time  that  you  place d  them  under  arrest ?

9  A.       Yes .   By  Mr .  Bynum ,  in  reference   to  something

10  Mr .  Gas ton  said .

11  Q.       What  did  Mr .  Bynum  say ?

12  A.       I  never  said  the  drug s  were  mine .

13  Q.       And  in  connection   with  your  report  in  this  case ,

14  did  you  give  it  a  --  did  you  give  a  report  number ?

15  A.       Yes .

16  Q.       If  I  could  direct  your  attention  to  --  again ,  to

17  Government 's  Exhibit  Miscellaneous   29 .   Your  CCN

18  number .   Is  that  your  report  number ?

19  A.       Correct .

20  Q.       What  is  that  number ?

21  A.       500610 .

22  Q.       Did  you  detail  someone  to  submit  the  item s  that

23  you  seized  to  the  laboratory  for  analysis ?

24  A.       Yes .

25  Q.       Who  did  you  detail  to  do  that ?

1 A.        Mike Murphy.

2 Q.        Under the same CCN number?

3 A.        Same CCN, and assigned a DEA lab number.

4 Q.        Did you take identifying information as to Mr.

5 Bynum?

6 A.        Yes, ma'am.

7 Q.        Could you read the identification number,

8 including his address and state, date of birth from

9 Miscellaneous 29 into the record?

10 A.        Sure.

11 Q.        And his full name, please.

12 A.        Derrick Louis Bynum, nickname Big D.  Address

13 11514 Lockwood Drive, A-2, with a birth date of 5/3/72,

14 a Social Security number of XXX-XX-4365.  He is -- at

15 that time, he was 5'9", approximately 225, black hair,

16 blown eyes, and medium complected.

17 Q.        After ten years, do you think you could identify

18 Mr. Bynum?

19 A.        No.

20          MS. GREENBERG:   No further questions, Your

21 Honor.

22          THE COURT:   Cross-examination?

23                    **CROSS-EXAMINATION**

24          BY MR. MITCHELL:

25 Q.        Detective Horne, you said you've been with been

1  with the Metropolitan police for how long?

2  A.      A little over six years.

3  Q.      So I assume you've been with them in that

4  position, you've been with them about six years, give

5  or take?

6  A.      Correct.

7  Q.      And you were with another officer in that

8  unmarked vehicle, were you not?

9  A.      Two other officers, but yes.

10  Q.      So there are three officers total in the

11  vehicle?

12  A.      Correct.

13  Q.      Were you driving the vehicle or was one of the

14  other officers; do you recall?

15  A.      I believe I was driving.

16  Q.      You observed something, and based on that

17  observation, you stopped a gray vehicle for a traffic

18  stop; is that correct?

19  A.      Correct.

20  Q.      What did you specifically stop the car for?

21  A.      Conducted a traffic stop after we believed we

22  saw what was a drug transaction.

23          THE CLERK:  I'm sorry, but she needs to speak

24  into the microphone.  They're having difficulty

25  hearing.

1          MR. MITCHELL:   I will walk over there.

2          MS. GREENBERG:   If you could repeat that again.

3 I'm sorry.

4          BY MR. MITCHELL:

5 Q.     Do you remember the question?

6 A.     Yes, what did we observe.  I'm sorry.

7 Q.     You stopped the vehicle for a traffic stop.

8 A.     Okay.

9 Q.     What specifically did you observe this gray

10 vehicle do that caused you to stop the vehicle?

11 A.     We conducted a traffic stop on the vehicle.

12 Q.     What?

13         MS. GREENBERG:   Your Honor, I think that Ms.

14 Merez asked her to repeat the answer, and we're --

15 perhaps she could just repeat her answer to the

16 previous question, just so the record is clear.

17         THE COURT:   Could you repeat that?

18         THE WITNESS:   We believe we saw what we thought

19 was a drug transaction.

20         BY MR. MITCHELL:

21 Q.     What specific traffic code violation of the

22 District of Columbia laws did this vehicle violate that

23 caused you to pull this car over?

24 A.     As I said before, sir, we believed we saw a drug

25 transaction and we conducted a stop of the vehicle.

1 Q.      Was this drug transaction occurring while the

2 car was moving?

3 A.      No, sir.

4 Q.      Then what specifically was the driver vile --

5 what law was the driver violating when you stopped this

6 vehicle?

7        Let me back up.  You saw a gray vehicle.  That

8 gray vehicle was actually moving when you stopped it?

9 A.      I'm sorry?

10 Q.      Was the gray vehicle actually moving when you

11 stopped it?

12 A.      That, I don't recall if he had actually put it

13 into drive at that point.

14 Q.      So when you say you conducted a traffic stop,

15 was the car moving that caused you to stop it?

16 A.      I don't believe it -- I don't remember that it

17 was.  What I -- as I said before, I pulled our vehicle

18 in front of it to conduct a stop.

19 Q.      When asked -- how many people were in this

20 vehicle?

21 A.      Two initially.

22 Q.      Two initially?

23 A.      Well, you had the -- I'm sorry, you had the

24 gentleman that walked over and then there was another

25 gentleman that was in the car.  So --

1  Q.      Right.   Let's take it from the time when you

2  stopped -- I'm going to use your term, stopped this

3  vehicle.   Whether it was moving or stopped, came up to

4  the vehicle, parked behind it?

5  A.      Correct.

6  Q.      How many people were inside the vehicle?

7  A.      Two.

8  Q.      When did another person all of a sudden appear?

9  A.      The other person was on the outside of the

10  vehicle prior to --

11  Q.      Prior to?

12  A.      -- the actual stop.

13  Q.      Okay.   Let's take it one step at a time.

14  A.      There were two people in the car.   There was a

15  gentleman --

16  Q.      Did you pull in front or in the rear of this

17  vehicle?

18  A.      I pulled up to the front of the vehicle, sir.

19  Q.      So you pulled in front of the vehicle so it

20  can't move?

21  A.      Correct.

22  Q.      How did you inform the driver that you were

23  stopping that vehicle?

24  A.      We exited in our police attire and approached

25  the vehicle.

1 Q.      Okay.  And there were two people inside the

2 vehicle?

3 A.      Correct.

4 Q.      And there's a third person?

5 A.      Another gentleman on the outside of the vehicle.

6 Q.      And then what happened?

7 A.      As I said before, as we approached the vehicle,

8 the driver took his left hand and made a motion to the

9 middle console, moved his hand toward the middle

10 console.

11 Q.      Where was the passenger?

12 A.      In the car.

13 Q.      Where in the car?

14 A.      I can't remember if he was in the backseat or

15 the front.

16 Q.      And this other individual, what did he do?  You

17 said there was a third individual.

18 A.      He had been on the outside of the vehicle.

19 Q.      And then what did he do when you approached the

20 car?  Did he run?  Did he get in the car?  What did he

21 do?

22 A.      He went around the vehicle.

23 Q.      Went around the vehicle?

24 A.      Yes.

25 Q.      To what part of the vehicle?

1  A.       To the front passenger side of the vehicle.

2  Q.       When he did that, where were you?

3  A.       In front of the vehicle pulling in front of the

4  vehicle.

5  Q.       Now, when you pulled in front of this vehicle --

6  because I'm a little confused -- did you -- why don't

7  we do it this way:  If you could -- we have this easel

8  here.  Would you be able to draw a schematic of where

9  cars were that -- you remember back that far?  That's

10 my first question.  Will you be able to remember?

11 A.       I can tell you I pulled in front of the vehicle,

12 so if you want me to put two boxes up here, I could do

13 that.

14 Q.       Would you remember the schematic of the street?

15 A.       No.

16 Q.       Okay.  We'll put that DB, that's Mr. Bynum's

17 car, the car of the individual you identified as Mr.

18 Bynum driving.  Where did you pull your car up to, if

19 you could -- here.  New color.

20 A.       (Witness indicating.)

21 Q.       What direction, if you could -- with arrows,

22 what direction was the car operated by the individual

23 identified by Mr. Bynum, where was he face and which

24 direction were you facing?

25 A.       It wasn't identified by Mr. Bynum.  The vehicle

1 that he was in, that would be the front end of his

2 vehicle.

3 Q.      Okay.  So it was facing that way.  Which

4 direction was your vehicle facing?

5 A.      At which point?

6 Q.      When you "stopped" this vehicle.

7 A.      Exactly as you see it right there.

8 Q.      If you could put an arrow, if you could point to

9 the front of the vehicle.

10 A.      (Witness indicating.)

11 Q.      So when you pulled your vehicle in front of the

12 vehicle that's the red one, was that red vehicle moving

13 at the time?

14 A.      As I said before, sir, I don't know  if he had

15 already put it in drive and was moving or not.

16 Q.      Did you give the driver a citation for a traffic

17 violation?

18 A.      No, sir, I did not.

19 Q.      So you approach the vehicle and ended up finding

20 a clear Ziploc baggy; is that correct?

21 A.      Subsequent to his arrest, yes, sir.

22 Q.      And you found that where?

23 A.      In the middle console area.

24 Q.      Was that middle console area accessible to

25 anyone else in the vehicle?

1 A.       Yes.

2 Q.       Including  this  other  second  individual  that  was

3 either  in  the  front  or  the  back?

4 A.       It  could  be  accessible , yes, sir .

5 Q.       And you  identif ied  that  other  individual ; did

6 you  not?

7 A.       Yes, sir .

8 Q.       Did  you  arrest  the  other  individual , the  second

9 passenger  of  that  vehicle ?

10 A.       Yes.

11 Q.       Did  you  arrest  him  as a  result  of  finding  this

12 clear  Ziploc  bag?

13 A.       No, sir .

14 Q.       You  arrested  him  for  another  reason ; did  you

15 not?

16 A.       Correct .

17 Q.       He  had  an  outstanding   warrant ?

18 A.       Yes, sir .

19 Q.       Now , this  third  individual , did  you  arrest  him?

20 A.       No, sir .

21 Q.       And  he  had  no  outstanding   warrant s?

22 A.       No, sir .

23 Q.       Now , you  --  were  you  the  one  that  actual ly

24 seize d  the  drugs  and  package d  them?

25 A.       I  didn't  package  them .  It  was  package d by  --

1   he's now Detective Murphy, but Michael Murphy.

2   Q.      Was Detective Murphy with you that night?

3   A.      Yes, sir.

4   Q.      Was he the one that also found this clear Ziploc

5   baggy?

6   A.      No, sir.

7   Q.      Now, were you ever called by the -- what would

8   have been corporation counsel or the US Attorney's

9   Office?

10  A.      It would have been US Attorney's Office.

11  Q.      Did the US Attorney's Office call you at any

12  point to testify about this case in the Superior Court?

13  Do you recall?

14  A.      That, actually, I don't remember.  I've done

15  quite a few cases, so I don't remember.

16  Q.      Do you know whether this case was actually

17  papered by the US Attorney's Office?

18          MS. GREENBERG:   Objection.

19          THE COURT:  Overruled.

20          THE WITNESS:   I'm not sure.

21          BY MR. MITCHELL:

22  Q.      Do you know what the result of the case was?

23  A.      No, sir, I don't.

24  Q.      Are you required to follow up on any of your

25  cases and find out what happened to them if -- do you

1 have open files where you are required to take notes of

2 the results of the case?

3 A.      Are we required to take --

4 Q.      Do you follow up on your cases to find out the

5 result of what happened?

6 A.      Not really. I mean, if you're going to court,

7 generally what will happen is you will be **cansed** to

8 court, but I've had so many cases I don't remember,

9 sir.

10 Q.     You don't remember going to court in this case

11 either?

12 A.     I don't remember if I did, sir.

13 Q.     Would you have made some note or report about

14 the result, if you had gone to court and there was some

15 result in court?

16 A.     No. Actually, I would have received

17 notification from the Metropolitan Police Department to

18 appear in court, and honestly, I don't recall. I've

19 done so many cases in between that time frame.

20      MR. MITCHELL:  Okay.  I have no further

21 questions.

22      MR. MONTEMARANO:  Court's indulgence, please.

23 Couple of questions, Your Honor, if I may.

24      MS. GREENBERG:  Your Honor, may we approach?

25           (At the bar of the Court.)

1          THE COURT:   Do we need to bring this witness

2 back next week?

3          MR. MONTEMARANO :   I know I've got five

4 question s, six.

5          MS. GREENBERG:   Your Honor , it's 404(b).  It has

6 nothing to do with his client .

7          MR. MITCHELL:   I don't think  we need any other

8 --

9          MR. MONTEMARANO :   Could I then have just a

10 moment to speak with Mr. Mitchell ?

11          THE COURT:   Sure .

12                    (Back in open court .)

13          MR. MITCHELL:   With the Court 's permission , just

14 a couple .

15          THE COURT:   A couple .

16          MR. MITCHELL:   That 's all .

17          THE COURT:   All right .

18                    **CROSS-EXAMINATION**

19          BY MR. MITCHELL:

20 Q.    The other individual that was arrested -- that

21 came up to the car , the third individual ?

22 A.    Yes, sir .

23 Q.    He was let go; correct ?

24 A.    Correct .

25 Q.    Did you ever search him before he left ?

1 A.       Yes, I believe he was searched.  I did not

2 search him.

3 Q.       Did you find anything on him?

4 A.       I don't remember, sir.

5 Q.       You weren't the one who searched him?

6 A.       Correct.

7        MR. MITCHELL:   No further questions.

8        THE COURT:   All right.  Any redirect?

9        MS. GREENBERG:   Briefly, Your Honor, and my

10 apologies for the hour.

11                **REDIRECT  EXAMINATION**

12        BY MS. GREENBERG:

13 Q.       Ma'am, when you talk about traffic stop, kind of

14 gets confusing.

15        Could you explain to the jury what that means

16 when you say traffic stop?

17 A.       What we did was conducted a stop.

18 Q.       Is the jargon sort of -- you say traffic stop?

19 Is that sort of a --

20 A.       Somewhat.  But it's basically a stop and

21 investigate, and at that time frame we approached the

22 vehicle.  At that time frame, we believed we saw a drug

23 transaction and we conducted a stop.  As we approached

24 and got closer to -- kind of escalated from there,

25 simply because of -- you could smell alcohol.  He had a

1  drink in his hand, and it just kind of -- it was a

2  chain of events.

3  Q.     When you say "stop," then you didn't necessarily

4  mean you stopped a moving car? It could have been

5  stationary, it could have been moving.

6       MR. MARTIN:   Objection.

7       Leading.

8       THE COURT:   Overruled.

9       THE WITNESS:   Correct.

10      BY MS. GREENBERG:

11 Q.     Were you able to tell if the suspected drug

12 transaction you saw had been finished? Were you able

13 to see if that had been completed, what you suspected

14 to be a drug transaction?

15 A.     I would say later on, based on the findings.

16 Q.     And what did you see before you approached --

17 we'll get away from the word stop -- you approached the

18 gray Oldsmobile?

19      MR. MITCHELL:   Asked and answered, Your Honor.

20      MS. GREENBERG:   I'll move on, Your Honor.

21      THE COURT:   Thank you.

22      BY MS. GREENBERG:

23 Q.     What observations did you make of the middle

24 console area?

25      MR. MITCHELL:   Asked and answered.

1          THE COURT:   Sustained.

2          BY MS. GREENBERG:

3 Q.       Were you able to see the middle console area

4 when you approached the car and saw the rum in the cup?

5          MR. MITCHELL:   Same.

6          THE COURT:   Overruled.

7          THE WITNESS:   The cup was actually in Mr.

8 Bynum's hand.

9          BY MS. GREENBERG:

10 Q.      Were you able to see the middle console area?

11         MR. MITCHELL:   Objection.

12         THE COURT:   Overruled.

13         THE WITNESS:   Yes.

14         BY MS. GREENBERG:

15 Q.      What did you see?

16 A.      There was a bottle of rum -- open bottle of rum,

17 citrus rum.

18 Q.      And what else did you see?

19         MR. MITCHELL:   Objection.

20         THE COURT:   Sustained.

21         BY MS. GREENBERG:

22 Q.      Were you able to see Mr. Bynum's hands?

23         MR. MITCHELL:   Objection.

24         THE COURT:   Sustained.

25         BY MS. GREENBERG:

1 Q.     Who recovered the clear    Ziploc baggies?

2        MR. MITCHELL:   Asked and answered.

3        THE COURT:   Sustained .

4        MS. GREENBERG:   Your Honor , I'm follow ing up on

5 counsel's  question s.

6        THE COURT:   They're already been asked.

7        MS. GREENBERG:

8 Q.     Ma'am , you talk ed about -- on cross-examination

9 about  arresting  Mr. Bynum . For what ?

10 A.     Possession  of an open contain er of alcohol  and

11 as well as possession  with intent  to distribute  crack

12 cocaine .

13        MS. GREENBERG:   No further  question s, Your

14 Honor .

15        THE COURT:   All right . Ladies and gentlemen  ,

16 we're going to send you home now , but before  I do, she

17 was going to remind me what I was already  doing . You

18 have just heard two witness es, the chemist  and this

19 officer , with regard  to matter s that happened  in 19 96,

20 which  is before  the period  of the charge d conspiracy .

21        I want to advise  you that this evidence  has been

22 received  very much along  the line s for the same reason s

23 I gave you some limiting  instructions  on some other

24 witness es, and let me repeat  what that is.  Our

25 evidence  rule s state , and I quote , that evidence  of

1  other crimes, wrongs, or acts is not admissible to

2  prove the character of a person in order to show action

3  in conformity therewith.

4         Simply put, this language of the rule means that

5  evidence of other crimes, wrongs or acts may not be

6  used to demonstrate that a person has a certain

7  character, and that because of that character, such

8  person is likely to have committed the offense charged

9  in this case.  The evidence rules provide, however,

10 that such evidence, and I quote, may be admissible for

11 other purposes such as proof of motive, opportunity,

12 intent, preparation, plan, knowledge, identity or

13 absence of mistake or accident.

14         I have ruled that the testimony of this police

15 officer, as well as the chemist testifying before her,

16 is admissible but only for those other limited

17 purposes.  Accordingly, I instruct you that you may

18 consider such evidence, but only for the limited

19 purposes that I have just described.

20         And with that, Happy Bastille Day, have a nice

21 weekend, and we will see you next Tuesday at 10:00.

22 Us counsel return at 9:45 on Tuesday.

23         MS. GREENBERG:   Your Honor, may the witness be

24 excused?

25         THE COURT:   Certainly.  She can go home.

1                    (Witness  excuse d.)

2                    (Jury  excused  at  2:17  p.m.)

3                    (Off  the  record  at  2:17  p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE**

2

3        I, Tracy Rae Dunlap,   RPR , CRR , an Official Court

4   Reporter for the United States District Court of

5   Maryland, do hereby certify that I reported, by machine

6   shorthand, in my official capacity, the proceedings had

7   and testimony adduced upon the Jury Trial Proceedings

8   in the case of UNITED STATES OF AMERICA versus PAULETTE

9   MARTIN, et al, Criminal Action Number    RWT-04-0235 on

10  July 14 , 2006.

11

12       I further certify that the foregoing 2    07 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17       In witness whereof, I have hereto subscribed my

18  name, this 24th day of April 2008.

19

20

21                       _____

22                       TRACY RAE DUNLAP , RPR , CRR
                          OFFICIAL  COURT REPORTER
23

24

25