```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                         SOUTHERN DIVISION
 2
    ------------------------x
 3  UNITED STATES OF AMERICA   :
              Plaintiff        :
 4                             :
                               :
 5  vs                         :Criminal Action:    RWT-04-0235
                               :
 6                             :
    PAULETTE MARTIN, et al     :
 7           Defendants.       :
    ------------------------x
 8

 9                        Wednesday, July 19, 2006
                          Greenbelt, Maryland
10
         The above-entitled action came on for a Jury Trial
11  Proceeding before the HONORABLE ROGER W. TITUS, United
    States District Judge, in courtroom 4C, commencing at
12  9:49 a.m.

13       THIS TRANSCRIPT REPRESENTS THE PRODUCT
         OF AN OFFICIAL REPORTER, ENGAGED BY
14       THE COURT, WHO HAS PERSONALLY CERTIFIED
         THAT IT REPRESENTS   TESTIMONY  AND PROCEEDINGS   AS
15       RECORDED AND REQUESTED BY COUNSEL.

16       APPEARANCES:

17       On behalf of the Plaintiff:

18       DEBORAH JOHNSTON, Esquire
         BONNIE GREENBERG, Esquire
19
         On behalf of the Defendants:
20
         MICHAEL  MONTEMARANO , Esquire
21       ANTHONY MARTIN, Esquire
         MARC HALL, Esquire
22       TIMOTHY MITCHELL, Esquire
         PETER WARD, Esquire
23       EDWARD SUSSMAN , Esquire
         HARRY  MCKNETT , Esquire
24
    Tracy Rae Dunlap,   RPR , CRR              (301) 344-3912
25  Official Court Reporter
```

Page   1

```
 1                         I N D E X

 2                   DIRECT      CROSS    REDIRECT   RECROSS
   Frederick Stacey   24          33        43         46
 3
   Nolan  Lockard     48          83       104        108
 4
   Timothy  Muldoon  110         134       195
 5
   Thomas  Eveler    226
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22                                               Page

23 Reporter's Certificate                         280

24 Concordance                                     281

25
```

1          THE  COURT:   Counsel , I  receive d  from  the

2  government  late  yesterday  a  motion  in  limine  concern ing

3  the  Title  3  intercept s.

4          What  is  the  ability  of  the  defense  to  give  me  a

5  response  to  this  so  I  can  start  look ing  at  it  and  be

6  able  to  resolve  this  before  the  defense  case  start s?

7  Any  issue , since  you  have  two  days  off ?

8          Any  reason  why  you  can't  get  me  something  on

9  Monday  so  I  can  look  at  it?

10          MR.  MONTEMARANO :   I  will  try  to  get  something  to

11  you  on  Monday , Your  Honor .

12          THE  COURT:   Okay .

13          MR.  MONTEMARANO :   Certain ly  by  Tuesday  morn ing .

14          THE  COURT:   Does  the  government  still  believe

15  they  can  finish  today ?

16          MS.  JOHNSTON:   Your  Honor , it  depends  on  the

17  length  of  cross-examination  .

18          THE  COURT:   Oh , I  understand .

19          MS.  JOHNSTON:   We  did  not  expect  yesterday  the

20  cross-examination   would  go  as  long  as  it  did .

21          THE  COURT:   I  know .

22          MS.  JOHNSTON:   We  have  four  witness es  for  today :

23  Special  Agent  Stacey , Detective  Lockard , and  Detective

24  Muldoon  --  the  other  Muldoon  --  and  then  the  case

25  agent , Thomas  Eveler .  I  think  that 's  going  to  be  it

1  for the government .

2         THE COURT:  Okay .  Well , we'll -- I'm going to

3  --

4         MS. JOHNSTON:  I doubt that we finish today .

5         THE COURT:  We'll see if we can get this done

6  today .  If I can get the opposition to the government 's

7  motion on Monday , I'll be able to address it on

8  Tuesday .

9         Mr. Ward .

10        MR. WARD:  There is another issue , Your Honor .

11 The government , in a fax sent out at 6:19 p.m. last

12 night , gave notice that they intend to call an

13 additional witness , a Fred Stacey, who is with the ICE

14 -- whatever that stands for -- who was part of the

15 entry team into the Dobie residence .  There has been a

16 -- is a sequestration rule in effect .  I think that I'm

17 entitle d to have a voir dire of this witness to show --

18 to find out if he has learn ed anything about this case

19 up to this date from any source , whether inside the

20 courtroom , including the government , before he take s

21 the stand .

22        MS. JOHNSTON:  Your Honor , I think that 's

23 inappropriate .  We are all officer s of the court , and a

24 sequestration rule has been in effect .

25        THE COURT:  Has he been present  in the

1  courtroom?

2        MS. JOHNSTON:   No, sir.  He was called yesterday

3  afternoon and asked to come in.  I spoke to him this

4  morning and showed him pictures that had been

5  introduced and asked him to explain where people were,

6  just as he's testified previously at the motions

7  hearing.  I don't think that it's necessary for the

8  court to ask him any questions.

9        MR. WARD:  I wasn't present at the motions

10  hearing because I wasn't in the case at that point, but

11  --

12        THE COURT:  I'm not going to make any --

13        MR. WARD:  The fact the government has spoken to

14  him and showed him photographs that were used in court

15  yesterday is, to me at least, a transmission to that

16  witness of what has taken place in court.

17        THE COURT:  I don't agree with that at all.

18  What's required under the sequestration rule is the

19  communication of the testimony of another witness so

20  that the witnesses are reinforcing each other.  To

21  simply say, here are some exhibits; I want to call you

22  to the stand to inquire about these matters is not a

23  violation of the sequestration rule.

24        MS. JOHNSTON:  I would further indicate to the

25  court that no witness testified, including Detective

1  Papalia , who testifi ed yesterday  testifi ed where  Ms.

2  Dobie  was  locate d  in  the  house  when  the  entry  team  made

3  entry .

4          At  Mr.  Ward 's  request ,  we  did  not  elicit  any

5  hearsay  from  the  detective .  So there 's nothing  that

6  could  have  been  dis closed  to  this  witness  related  to --

7          THE  COURT:   I'm  not  going  to  make  any  special

8  inquiry  of  the  witness .  You  may  inquire ,  Mr.  Ward ,  on

9  cross-examination   as  to  whether  it's  been  violate d.   If

10 so ,  I  can  take   correct ive  action .

11         MR.  WARD:   I  certain ly  will ,  Your  Honor .

12         THE  COURT:   Based  upon  the  proffer  the

13 prosecutor  has  made  to  me ,  I  see  no  base s  to  make  a

14 separate  inquiry  about  it .   You  can  certain ly  inquire

15 on  cross  and  see  if  there  has  been  a  violation .

16         Are  there  any  other  preliminary  matter s?

17         MR.  SUSSMAN :   Your  Honor ,  this  is  p robably

18 pre mature ,  but  I  think  through  Detective  Eveler  there 's

19 going  to  be  some  chart s  which  we've  talk ed  about  among

20 the  defense  attorney s.   I  think  we  have  some  objections

21 and  issue s  about  it , and  we  can  take  them  up  probably

22 --

23         THE  COURT:   These  are  new  chart s, or  the  chart s

24 that  we've  been  using ?

25         MR.  SUSSMAN :   These  will  be  new  chart s.

1          THE COURT:    New chart s?

2          MS. JOHNSTON:    Your Honor , I believe  maybe  a

3  week or week and a half ago we gave them some of the

4  chart s the government  intends to use .  Some  are summary

5  chart s in term s of summary  of evidence ; some are

6  summary  chart s that are in place  of voluminous

7  document s.  This is the first  time we're hear ing

8  there 's any objection .

9          MR. MONTEMARANO :   That 's not true .

10          THE COURT:    Mr. Montemarano , let her finish , and

11  then you can tell me it's not true .

12          MR. MONTEMARANO :   Thank you .

13          MS. JOHNSTON:    We have not heard anything  in

14  term s of what the objections  were .   That 's why we gave

15  them the chart s in advance  of his testimony .

16          There are a couple  of chart s that are being

17  draft ed now as a result  of some  of the testimony  that

18  we've heard that are summary  chart s that will be of

19  assistance  to the jury , not sum mary chart s of evidence

20  -- of records  that have not been  introduced .  So , there

21  are two different  kinds of chart s.  One is a summary

22  chart summarizi ng voluminous  records ; the other  summary

23  chart s are chart s that are going to be introduced  to

24  facilitate  the presentation  and comprehension  of the

25  evidence  that 's already  been present ed.

1          I would suggest to the court that perhaps -- I
2 don't know what the court -- how long the luncheon is
3 going to last. If the court would want to hear this
4 tomorrow afternoon later in the day after Mr.
5 Montemarano is finished with his medical treatment,
6 that would be an appropriate time so we don't lose
7 another trial day next Tuesday.
8          THE COURT:   Are the charts in existence and in
9 the courtroom now?
10         MS. JOHNSTON:   The charts are in -- most of the
11 charts are in existence. Some of -- they're not in the
12 courtroom at the present time.
13         MR. SUSSMAN:   The timing would be such that they
14 would be appropriate right before Detective Eveler's
15 testimony which I thought might be after the lunch
16 break.
17         MS. JOHNSTON:   I think it will begin today. I
18 don't know if we will finish it today.
19         MR. SUSSMAN:   I was giving the court a heads up.
20 I'm not arguing the issue, just pointing it out.
21         THE COURT:   Today I have a judge's meeting at
22 1:00. They are not matters that are of great, enormous
23 importance in my life and that I lust to be at them,
24 and they tend to be sometimes rather boring, but I'm
25 supposed to be there. I can absent myself if you give

1 me good and sufficient  reason  to do so.

2        MS. JOHNSTON:   Your Honor , let me correct  one

3 thing .  Mr. McKnett did tell me about  a problem  that he

4 had with the chart  in that there were -- the icon s that

5 were use d on the phone  telephone  frequency  chart .

6 There 's one that look s like a phone , and Mr. McKnett

7 believe s one of the number s may be a fax  number .  I had

8 a discussion  with Mr. McKnett  concerning  the icon s that

9 are on the chart .

10       THE COURT:  Can you fix that issue ?

11       MS. JOHNSTON:  I can't .  There are only two

12 options  in term s of the  icon s.  One a hard  phone  and

13 one is a cell  phone , and I think  the agent  use d which

14 phone  icon he thought  was representative  of most of the

15 number s listed  there .  I had that discussion  with Mr.

16 McKnett .

17       THE COURT:  We can deal with that .

18       Mr. Montemarano .

19       MR. MONTEMARANO :  Thank  you , Your  Honor .

20       THE COURT:  How are you feel ing today ?

21       MR. MONTEMARANO :  I'm alive , and I'm here .

22       THE COURT: You're  alive  and here .

23       I'm alive  and here , too.  I was up all night

24 with pain  in my shoulder .

25       MR. MONTEMARANO :  Much  the same  way .

1 Unfortunately, it's less the ankle.  It's what I have

2 to do to take care of the ankle, like supporting 215

3 pounds on crutches.  Great fun.

4        THE COURT:  Yes, yes.

5        MR. MONTEMARANO:  In any event, with regard to

6 Ms. Johnston's belief we have not informed her of

7 objections that Mr. Sussman referenced.  It is my

8 statement to the court that we have objected to every

9 chart provided to us by the government, in some cases

10 with specificity and in some cases not.

11        I know in particular that when we were handed

12 the two-part phone chart which shows a series of

13 numbers at the center allegedly relating to my client

14 and then in a penumbra around it phones relating to

15 other people and then reciting numbers of phone

16 contacts, I specifically told the government that we

17 would be objecting to that and that is, I believe, one

18 of the charts that Mr. Sussman is referring to.  That's

19 the first part.

20        As to the second part.  Ms. Johnston's continued

21 desire to dictate a time to the court's schedule --

22        THE COURT:  She is not dictating the court's

23 schedule.

24        MR. MONTEMARANO:  I said at "attempt."

25        THE COURT:  She's making suggestions.  You can

1  make  suggestion s, too.

2          MR.  MONTEMARANO :   I would  suggest  to the  court  I

3  have  a meet ing  set  up  tomorrow  in the  MS-13  case  with

4  prosecutor s and  with  my  co-counsel .   My  client  is one

5  of the  death -eligible  defendant s.

6          THE  COURT:    At  what  time ?

7          MR.  MONTEMARANO :   The  only  thing  that  keep  me

8  from  at tending  that  --

9          THE  COURT:    What  time  is  that ?

10          MR.  MONTEMARANO :   1 o'clock .   The  only  thing

11  that  would  keep  me  from  attending  that  is if  I'm  not  --

12  if  my  orthopedic  suggest s an  MRI  is  necessary  and  I'm

13  wait ing  somewhere  to  get  fancy  picture s taken  of  my

14  ankle .

15          THE  COURT:    Well ,  MRIs  are  pretty  easy  to

16  schedule  in  the  evening .   Mine  was  done  in  the  evening

17  and ,  you  know ,  so  --

18          MR.  MONTEMARANO :   I think  he'll  want  it post

19  haste  so  he  can  tell  me  if  I'm  --

20          THE  COURT:    I'm  sure  he  will .   But  I'm  say ing  is

21  when  I saw  my  orthopedic  surge on  and  he  said ,  get  an

22  MRI  right  away ,  it  could n't  be  done  right  away .   These

23  people  are  somewhat  prim a donnas  with  their  scheduling ,

24  but  I manage d to  get  an  evening  MRI ,  and  the  --  I can

25  even  tell  you  a place  to  go  near by  so  you  can  get  it

1 done if you need it.

2      Let me ask another question about the jury

3 instructions. If there are specific concerns about

4 what I have done or there are proposed additions or

5 deletions, it would be very helpful if you could get me

6 something in writing that says what you don't like or

7 what you do like or what you want added that I didn't

8 add and why by Monday so I can look at it and we can

9 start -- I can start reviewing those comments during

10 the trial week next week and be in a position on the

11 31st when we have our charge conference to go through

12 it and get it done rather quickly.

13      Depending upon the length of the defense case, I

14 may have to be in a position to give the instructions

15 pretty quickly after July 31, so I want to be ready to

16 go. What I don't want is to have a charge conference

17 where I'm getting a lot of contentions legal

18 contentions that I haven't had a chance to look at

19 before I took the bench. So I'd like to make sure you

20 tell me what are your hot button issues with this with

21 the instructions. I think if you've had a chance to

22 look at it, most of what I've been doing is stylistic

23 editing to make them not so stiff and get rid of some

24 redundancy, but I would be much appreciative if you

25 could give me something in writing -- you can be as

1  informal  as you want  -- by Monday  afternoon  so I can

2  look at it.

3         MR. HALL:   Your Honor, could I ask -- would it

4  be permissible  to E-mail that to your law clerk?

5         THE COURT:   Oh, certainly.   Any old way you

6  want.   You can use Pony Express, Fax, E-mail -- just

7  get something  to me so I can start looking at the

8  comments of the various  counsel  on it.   Same thing as I

9  said on responding to the motion  in limine.

10         I'm told we have a juror who had a family member

11  with an injury and had to tend to it and may be late,

12  but I don't know  if the juror has arrived.

13         Ms. Merez, do you want to see how that juror is

14  doing?

15         THE CLERK:   Yes.

16         THE COURT:   If the juror is okay, we can bring

17  them in.

18         On the chart issue.   You said some of these are

19  ready and some of these are not ready?

20         MS. JOHNSTON:   Yeah.   Your Honor, that would be

21  correct.   I gave counsel drafts of those charts.   I

22  don't think  there's been any really  substantive

23  changes.   I can get copies of those for the court.

24         THE COURT:   Can you make a copy for me?   Small

25  or big, I don't care.

1          MS. JOHNSTON:   We will get a copy made.

2          THE COURT:   Get that to me.

3          As far as tomorrow is concerned.  Mr.

4 Montemarano is tied up in the morning, as am I now

5 because I've agreed to go to this meeting.  I'm not

6 precisely sure what time I'm going to get back.  I

7 would guess I'll be back by 4:00.  I have a guilty plea

8 scheduled for 4:30, but I could move that to the

9 morning.

10         Mr. Montemarano, do you think your conference

11 with counsel in your death penalty case is going to be

12 all afternoon, or what?

13         MR. MONTEMARANO:   A significant portion of it,

14 Your Honor.  I would anticipate the best case I'd be

15 out by around 3:00 or so, but I can't go --

16         THE COURT:   What I could do, if you all are

17 prepared to do it, is to meet with you about objections

18 to these charts at 4 o'clock and move this guilty plea

19 to the morning, if it's movable.  I don't know if it's

20 movable.  We'll have to see.

21         MR. MONTEMARANO:   I'll make myself available

22 with regard to the court's schedule any time, Your

23 Honor.

24         THE COURT:   Let me, first of all, find out from

25 Bea --

1           MS. JOHNSTON:   Your Honor, we may get to that

2    testimony this afternoon, just so the court knows.

3           THE COURT:   Okay.

4           MS. JOHNSTON:   I don't know how fast we're going

5    to go today.

6           THE COURT:   I will get my bull whip out today and

7    see if we can go as quick as we can.

8           Bea?

9           THE CLERK:   You're missing one.

10           THE COURT:   Okay.   We'll get an update for you

11    on this juror.

12           Well, we're still without one juror.

13           MS. JOHNSTON:   Your Honor, I don't know if the

14    court wants to discuss one of the charts that we've

15    already discussed extensively,   which is CH-1.

16           THE COURT:   The organization chart?

17           MS. JOHNSTON:   The organization chart was

18    mentioned during testimony.   No one objected to it at

19    this time.   I know Mr. McKnett had raised an objection

20    before opening statement.   It would be the government's

21    position it is in evidence, but I'm sure there's going

22    to be objections made or disagreement with the

23    government's position that it is in evidence.   We could

24    discuss that at this time.

25           As the court will recall, that's the chart where

1  we had covered up names and individuals have -- many

2  witnesses had identified the different people and had

3  initialled and dated the chart. So, I don't know if

4  there's still an objection. An objection was not made

5  when we first used that. I think Mr. Thurman or Mr.

6  Encarnacion was the first witness we used it with, and

7  they made identifications, so there was -- and there

8  wasn't an objection at that time.

9       MR. MONTEMARANO: My recollection, Your Honor,

10 is there was a continuing objection to any use of it.

11 We complained about it including the use the headers

12 and that the photographs by themselves were acceptable,

13 even if organized per the government's view, but

14 they're given titles.

15       THE COURT: Well, this has been used fairly

16 extensively during the trial. Why would not a

17 cautionary instruction that the descriptive monikers  on

18 this chart are the government's position, and they

19 should not consider that as evidence, but they can

20 certainly look at the chart and the government's

21 position as to what these people are?

22       MS. SUSSMAN: May I speak to that?

23       THE COURT: Yes.

24       MR. SUSSMAN: I think the case law -- when the

25 charts come in, I think it's admitted conditionally

1 that this is what the government is going to prove.
2 The government can't prove a conspiracy by drawing a
3 chart. That's obvious. The proof has to demonstrate
4 they're in a conspiracy. If at the end of their case
5 they haven't proven that a conspiracy exists in the
6 manner that they've described, that's subject to all
7 kinds of legal motions.

8        THE COURT:   That's not the issue on this chart.
9        MR. SUSSMAN:   Well it would be, because then the
10 chart would be incorrect.

11        THE COURT:   That's an issue, I think, for your
12 motion at the end of the government's case, isn't it?

13        MR. SUSSMAN:   That's right.  If the court is
14 incorrect --

15        THE COURT:   If I rule in favor of one or more
16 defense motions at the end of the government's case,
17 obviously the chart has a problem.

18        MR. SUSSMAN:   That's right.  So I think that
19 some of the objections to the chart would be somewhat
20 premature, because I think they're --

21        THE COURT:   I agree it's premature.  If the
22 government survives a motion at the end of their case,
23 it would seem to me that the chart is appropriate for
24 remaining in evidence with an appropriate cautionary
25 instruction that I could give about that that the

1   monikers  that  are  attached  to  these  people  as  what

2   their  roles  were  are  the  government 's  view  and  that

3   they  are  the  ultimate  determiners  of  what  their  role

4   was , if  any .

5           MR.  SUSSMAN :   Or , conceivably , there  could  be

6   judgments  of  law .   That  law  that  would  knock  out  parts

7   of  the  chart  that  require  redaction .

8           THE  COURT:   I  agree  with  you .   I  think  it's

9   premature .   Let's  see  what  happens  at  the  end  of  the

10  government 's  case .

11          MR.  WARD:   Your  Honor , if  it's  the  government 's

12  view , may  we  add  ours  on  there ?   May  I  write  on  there

13  that  my  client  is  simply  an  addict  who  was  purchasing

14  for  personal  use ?   Fair  is  fair .

15          THE  COURT:   Get  your  pen  out .

16          No .   Wait  a  minute .   You  do  this  in  the  course

17  of  the  proceedings .   That's  what  you  really  want  to  do .

18          MS.  JOHNSTON:    Your  Honor , quite  frankly ,

19  counsel  can  prepare  his  own  chart .

20          MR.  WARD:   I  don't  have  an  army  of  ants  back  in

21  my  office  --

22          THE  COURT:   I'm  not  going  to  resolve  the  issue

23  now .   I  believe  the  chart , as  it's  been  used, is

24  appropriate , so  long  as  the  government 's  case  is  not

25  dismissed  in  any  significant  part .

1          MR. WARD:   I want to write on that chart,

2  whether it's before the jury, that my client is an

3  addict, for personal use.

4          MS. JOHNSTON:   I don't believe counsel is

5  permitted to do that.  If he can get a witness to

6  testify --

7          MR. WARD:   Please, Your Honor.  Counsel was the

8  one that put characterization on there.  If they can do

9  it, why can't I do it?

10          THE COURT:   We're not at that bridge yet.  Let's

11  see if the chart stays in evidence, and we'll see what

12  happens.

13          MR. WARD:   I feel, Your Honor, that the defense

14  is getting the short shrift in this case, frankly.  The

15  court seems to rule with the government invariably, and

16  --

17          THE COURT:   Mr. Ward, I make rulings the way I

18  see the ball come across the plate.  If it's a

19  "strike," it's a "strike," and if it's a "ball," it's a

20  "ball."  I don't care whose position it is.  I really

21  don't care.  I'm here to be fair to both sides.  So, I

22  don't agree with you at all.

23          I will check and see whether this re-arraignment

24  I've got tomorrow afternoon can move to the morning so

25  that I could clear up some time to deal with any other

1 chart issue s.  I don't know  and haven't  seen yet  a

2 chart , so I don't know  what  the issue  is.

3        Is that  the issue , Ms. Johnston , that 's going  to

4 potential ly rise  today ?

5        MS. JOHNSTON:   The sum chart s are  the issue s,

6 and there are  several  of them .  Some  of them , as  I

7 said , are  summary  chart s that are admissible  in place

8 of voluminous  records , records  that counsel  has  had

9 copies  of.  The telephone  frequency  chart is just  that .

10        THE COURT:   Can you get me copies  of those ?

11        MS. JOHNSTON:   Agent  Eveler  has gone  to make

12 copies .

13        THE COURT:   If they can be in reduced  form , I

14 can take  a look  at them  and deal  with them  on a break .

15        MS. JOHNSTON:   I can give  the court  my copy  of

16 the telephone  contact  chart which  is two page s instead

17 of one because  it was hard  to print  up, and I believe

18 it's going  to be CH-2 in term s of the exhibit  number,

19 but I'll have  to check  that .

20        MR. MCKNETT :  Your Honor , while  -- I can address

21 my problem  with the telephone  chart .

22        THE COURT:   The icon  problem ?

23        MR. MCKNETT :  Excuse  me?

24        THE COURT:   Is this  your  icon  problem ?

25        MR. MCKNETT :  Yes , Your Honor .

1           THE COURT:   All right.   Tell me what it is.

2           MR. MCKNETT:   If I can use the machine, I can --

3           THE COURT:   While you're coming up -- Bea, any

4  word on the jury?

5           THE CLERK:   He's here.

6           THE COURT:   All here?

7           Just tell me briefly what it is, because we're

8  ready to bring the jury in.

9           MR. MCKNETT:   Your Honor, if I can bring this

10 up, I can show the court.

11          THE COURT:   Where it says, "LaNora Ali?"

12          MR. MCKNETT:   If the court looks at the rest of

13 the chart, there's cell phone icons, land line

14 telephone icons, and the problem I have with this chart

15 is it has a telephone that's a land line icon on there

16 -- I've written on the -- my form here.   The second

17 number is a cell phone, the third number is a cell

18 phone, and the fourth number is a telephone land line

19 but it's connected to a computer.

20          THE COURT:   All right.   Well, let me ask you a

21 question.   Is there any reason why this chart doesn't

22 work just fine if you take all the icons off?

23          MR. MCKNETT:   That would be my suggestion.

24          THE COURT:   I know probably somebody stayed up

25 all night long putting icons on it.

1          MR. MCKNETT : The picture haves no evidentiary

2 value, and they are somewhat confusing with regard to

3 my client . My suggestion is take all the icons off.

4          THE COURT: Ms. Johnston .

5          MS. JOHNSTON: Your Honor , first of all , it is

6 not -- because , as the court sees, it's two pages, it

7 is a board . It is a big board . Counsel can certainly

8 cross -examine him -- the officer is not going to say

9 that it's just a land line . It's an icon that

10 represent s telephone contact over a telephone line .

11          THE COURT: Who is going to be your sponsoring

12 witness ?

13          MS. JOHNSTON: Detective Eveler .

14          THE COURT: If the court chart is already made

15 and you really can't change these icons, just make sure

16 you had Detective Eveler explain he put these icons in

17 for illustration and this is not to indicate the

18 number s are cell phone s or regular phone s, period .

19          MS. JOHNSTON: Just like it's not to indicate

20 actual conversations. It's contact over a telephone

21 line .

22          THE COURT: Why don't you also -- I don't think

23 this is a matter of great legal significance , but check

24 and see what difficulty would it be to simply cover up

25 the icon s.

1           MR. MCKNETT:   Your Honor, I was going to suggest

2 that as a back up and that as the   government  did on

3 their  first  chart, they  just  put  white  tape  over  the

4 icons if the chart  can't be redone.

5           THE COURT:   See if you can do that, Ms.

6 Johnston.  I think  this  is a pretty  minor  issue.

7           MR. MITCHELL:   Your Honor, I want to address one

8 thing with regard to this.

9           MR. SUSSMAN:   Judge, can we explore  this in more

10 depth later, or is this when we're doing it?

11           THE COURT:   Well, have you got other  issues

12 separate  from  this?

13           MR. SUSSMAN:   I think I do.  I think I have

14 substantive  issues.

15           THE COURT:   Let the last word be Mr. Mitchell's.

16           MR. MITCHELL:   Mine's a substantive  issue  as

17 well.

18           THE COURT:   Let's get the jury in and we'll  deal

19 with this when we get to that witness.

20                 (Jury returns at 10:14 a.m.)

21           THE COURT:   Good morning, ladies and gentlemen  .

22 We're  ready  to proceed.

23           MS. JOHNSTON:   The government  would  call  Special

24 Agent  Stacey.

25 Thereupon,

1            **FREDERICK J. STACEY** ,

2 having been called as a witness on behalf of the

3 Plaintiff , and having been first duly sworn by the

4 Courtroom Deputy, was examined and testified as

5 follows:

6                  **DIRECT EXAMINATION**

7      BY MS. JOHNSTON:

8 Q.      Sir , please state your full name   and occupation .

9 A.       Frederick  J. Stacey --  S T A C E Y --  I'm

10 Supervisory  Special  Agent  with  the  Department  of

11 Homeland  Security .

12 Q.      How long have  you been  employ ed with  the

13 Department  of Homeland  Security ?

14 A.      Since  its  inception :  Three  year s.  Prior  to

15 that  I was  with  United  States  Custom s Service  as  a

16 special  agent  since  1990.

17 Q.      What  are  your  duti es  and  responsibilities  , both

18 when  you  were  with  Custom s and  with  Homeland  Security ?

19 A.       Current ly, as a supervisory   special  agent , I

20 supervise  a drug  group , and  I'm also  the  tactical

21 supervisor  for  the  Special  Response  Team.

22 Q.      What  is a "Special  Response  Team ?"

23 A.       A Special  Response  Team , or  SRT, is a tactical

24 team  use d for  high  risk  search  warrant s and  arrest

25 warrant s.

1  Q.      Could you describe your training in that area?

2  A.      Over the course of the last 16 years, I've been

3  involved with SRT and SWAT.  I've gone to numerous

4  schools -- warrant entry and tactical training school

5  back in '91; special entry school and special response

6  training school.  So, numerous schools.

7  Q.      How long have you had one of the duties be

8  making entries during the -- for the execution of

9  search warrants?

10 A.      My entire career with Customs and Department of

11 Homeland Security.

12 Q.      Calling your attention to June 1st of 2004.

13         Were you asked to assist Special Agent Snyder

14 with the execution of search warrants in relation to

15 this investigation?

16 A.      I was.

17 Q.      In particular, are you familiar with a house

18 located on Ninth Street in Washington, D. C.?

19 A.      I am familiar, yes.

20 Q.      What were your responsibilities on the morning

21 of June 1st in relation to the single family home at

22 Ninth Street?

23 A.      Our responsibility, on that particular day, was

24 to make entry on the residence, secure the residence

25 and all occupants within the residence and then turn it

1 over to the Search Team.

2 Q.    Okay. Could you briefly describe for the ladies

3 and gentlemen of the jury what you do in terms of

4 securing the residence and making it safe for the

5 Search Team?

6 A.    Sure. Normally when a Special Response Team is

7 called in to assist with a warrant it's because there's

8 a higher risk.

9        MR. WARD:  Your Honor, can we object to what

10 normally happens and get to what happened in this case?

11        THE COURT:  Overruled.

12        BY MS. JOHNSTON:

13 Q.    You may continue.

14 A.    Our responsibilities are to secure the residence

15 because there's a higher risk factor that the agents

16 would normally encounter.

17        In this particular case we made entry and we

18 secured the residence and secured the occupants that

19 were there and then ultimately turned over the

20 residence to the Search Team.

21 Q.    Could you tell us approximately what time you

22 and the other members of your team made entry into the

23 residence?

24 A.    It was shortly after 6 a.m.

25 Q.    You were one of a team; is that correct?

1 A.      Correct.  I was part of the Entry Team.  Besides

2 being the team leader, I was part of the Entry Team.

3 Q.      Who was the first one who entered the house?

4 A.      It would be me.

5 Q.      Can you describe what occurred and what you

6 observed as you entered the house?

7 A.      Once we made entry through the front door, it

8 was still pretty early, so it was dark in the house,

9 and I had noticed a female at the top of the stairs.

10 It's a split-level home, the stairs going upstairs and

11 downstairs off the living room.  At the top of the

12 stairs, I noticed a female standing there.  I gave her

13 the command to get down and show me her hands, and I

14 proceeded up the stairs to secure.  The rest of the

15 team was hind me, and they had to continue searching

16 the residence.

17 Q.      Okay.  So you went up the stairs?

18 A.      I went up the stairs.  Since there were other

19 team members following me, I pushed her off to the

20 side, allowing the other team members to go past me and

21 continue to search.

22 Q.      As you went up the stairs, what observations did

23 you make with regards to the rooms that were on the

24 second floor?

25 A.      There were four doors at the top of the landing,

1   two of which were opened.  One was a bedroom door, and

2   directly opposite of the hallway there was an open

3   bathroom.  The other two doors were bedrooms, and those

4   doors were closed.

5   Q.      Did you determine whether those doors were also

6   locked or just closed?

7   A.      They were locked.  Other team members had to

8   make entry, and those doors had to be breached to make

9   entry.

10  Q.      Now, the -- where was -- strike that.

11          The woman whom you pushed aside.  Did you later

12  determine who that was?

13  A.      Yes.  That was Ms. Dobie.

14  Q.      What observations if any did you make concerning

15  the bedroom door that was open?

16  A.      Once I got to the landing and got Ms. Dobie off

17  to the side -- we consider an open door "hot," which

18  means it's a potentially dangerous area for other team

19  members to encounter.  I briefly stuck my head inside

20  that bedroom door and noticed there was another

21  individual in the bed laying there.  I gave the command

22  for that individual to get out of the bed and come to

23  me and lie prone on the floor until we had a chance to

24  secure the residence.

25  Q.      Did you subsequently identify that person?

1  A.      Yes, we did.   That was Mr. Dobie.

2  Q.      Goldie Dobie?

3  A.      Correct.

4  Q.      Approximately  how long did it take you and your

5  team members to locate all the individuals  in the house

6  and secure  them in one location?

7  A.      The primary  search  took less than several

8  minutes -- probably  two to three minutes, and then a

9  subsequent, secondary  search took another  few minutes.

10 We were probably  done and had all occupants secured

11 within five or six minutes.

12 Q.      How long were you actually in the residence,

13 then?

14 A.      No more than 15 minutes tops.

15 Q.      What do you do?  You notice  Ms. Dobie, push her

16 to the side; saw Mr. Dobie in the bed in the open door

17 bedroom.  Do you recall  how many other  people  were in

18 the house?

19 A.      I believe  there were two occupants, and one of

20 the closed -- behind one of the closed bedroom  doors,

21 and I'm not sure if there were one or two in the other

22 bedroom.  There were several  occupants in the house.

23 Q.      What did you do with the occupants?

24 A.      We handcuffed them and brought  them down to the

25 living room.

1  Q.      Is that your standard procedure?

2  A.      Yes.

3  Q.      Did you take any of them with you when you left?

4  A.      No.

5  Q.      What did you do with the individuals?

6  A.      Once we're done securing the residence, I brief

7  the team leader of the search team on what we found,

8  and we turn everything over including the detainees,

9  and then we leave.

10 Q.      So you were there in total no more than 15

11 minutes?

12 A.      That's correct.

13 Q.      I want to show you some photographs if I might.

14         Your Honor, may I have the witness step down,

15 please?

16         THE COURT:   You may.

17         MR. WARD:   Your Honor, may I get a better view?

18         THE COURT:   You may.

19         BY MS. JOHNSTON:

20 Q.      I'm going to give you a laser pointer.

21         First, asking you to look at photographs P-44

22 and P-45, and if you could stand to the side after

23 you've looked at it and use the laser so everyone can

24 see, and I'll ask you if you recognize the residence in

25 P-44 and P-45.

1 A.      Yes, I do recognize this.  This is the residence

2 we executed the warrant on June 1st.

3 Q.      Calling your attention to P-46, the picture

4 immediately next to you on the top row.

5        Do you recognize that photograph?

6 A.      Yes.  This is the landing -- the stairs from the

7 living room.  The door goes to the living room; the

8 stairs then go up and down from the living room.  This

9 is the stairs where I saw Ms. Dobie standing at the

10 top.

11 Q.      Could you use the laser to show where she was

12 standing?

13 A.      Right here.  (Witness indicating.)

14 Q.      Do you recall what she was wearing when you saw

15 her?

16 A.      Yes.  She was wearing a sleeveless T-shirt

17 probably down to her mid-thigh or thereabout.

18 Q.      Similar to a night shirt?

19 A.      Correct.  And that's it.

20 Q.      And her position.  How far was she from the open

21 bedroom door?

22 A.      I would say approximately 3' to 4' from the open

23 bedroom door, which was on the left.

24 Q.      And the bathroom.  How far was she from that?

25 A.      About the same distance, since they're adjacent

1 or directly across the hall from each other.

2 Q.      If we can take this one down.

3        Do you recognize what's depicted in P-48?

4 A.      I do.  This is the bedroom that I saw Mr. Dobie

5 lying in the bed.  This was the open door bedroom that

6 I saw.

7 Q.      The only one with the bedroom door open?

8 A.      Correct.

9 Q.      Where was he when you first observed him?

10 A.      He was on the -- facing the bed -- facing the

11 head of the bed.  He was on this side, so he would be

12 on the right side.  (Witness indicating.)

13        MR. WARD:  I'm sorry.  Which side, sir?

14        THE WITNESS:  The right side if you're facing

15 this side right here.  (Witness indicating.)

16        BY MS. JOHNSTON:

17 Q.      Did he follow your directions when you told him

18 to?

19 A.      He did.  I asked him to get out of the bed and

20 crawl to me on the floor.  Since I had Ms. Dobie and

21 was watching her at the same time, I wanted to make

22 sure that he wasn't in a position to grab a weapon.  I

23 had him crawl to me prone out on the floor at the head

24 of the bed.

25 Q.      You may resume the witness stand.

1          THE COURT:   Counsel  and ladies and gentlemen of

2  the jury , I want you to know that there  is a delegation

3  of Turk ish  law  student s who are comi ng  in  to observe

4  the proceed ings  for  a moment  with  my colleague , Judge

5  Messi tte.  Welcome .  Glad  to have  you  here .

6          BY MS.  JOHNSTON:

7  Q.     Just  for  clarification 's sake .  You  mention ed  a

8  primary  search  and then  a secondary  search .

9          Could  you explain  to  the  jury  what  the

10  difference  is between  the  two  and why  you  do  the

11  secondary  search ?

12  A.     Yes , of course .  The  primary  search  is those  --

13  we look  for  occupant s in  the  residence  that  are  in

14  plain  view , those  people  that  are  stand ing  or  sitting

15  or  lying  somewhere .  When  we  do  a secondary  search  to

16  look  in  those  area s, the  occupant s may  not  be

17  immediate ly  visible  -- for  instance , hiding  in  a

18  closet , under  a bed , those  type s of place s -- so  we  do

19  a secondary  search  to see  if there 's anyone  hidi ng.

20          MS.  JOHNSTON:  I have  no further  question s, Your

21  Honor .

22          THE  COURT:  All right .  Cross-examination  .

23          MR.  WARD:  I have  a couple  of  question s, Your

24  Honor .

25                    **CROSS-EXAMINATION**

1          BY MR. WARD:

2 Q.      Do I refer to you as "special agent? Is that

3 correct, sir?

4 A.      That's fine. Yes, sir.

5 Q.      Special agent, I assume you prepared a report of

6 your -- the events you've just described; is that

7 correct, sir?

8 A.      That's not correct. Normally when we're asked

9 to do -- we participate in a warrant like this, we

10 prepare an operations plan, and that's the only report

11 that we do prior to the enforcement action.

12 Q.      What about after the enforcement action?

13 A.      We normally don't do one unless something

14 unusual happens and we're required to prepare one --

15 for instance, if we use a diversionary device or

16 there's a shooting incident. Normally we don't prepare

17 an after action report.

18 Q.      You received a telephone call yesterday to come

19 here this morning to testify; is that correct, sir?

20 A.      That is correct.

21 Q.      You were not regularly summoned to come in and

22 testify.

23 A.      That's correct, counselor.

24 Q.      Who was that call from, sir?

25 A.      Detective Tom Eveler.

1 Q.      Detective --

2 A.      Tom Eveler.

3 Q.      Tom Eveler.

4         What did Detective Tom Eveler tell you you were

5 coming here to testify about?

6 A.      He said that I was probably going to be needed

7 to testify about the date that we executed the warrant,

8 the position of the defendant in relation to when we

9 found her and arrested her.

10 Q.     I'm sorry?

11 A.     The position of the defendant in the residence

12 when we found her and arrested her.

13 Q.     The position of what resident?

14 A.     Ms. Dobie and where we found her.

15        Detective Eveler said there were some questions

16 about where she might be in relationship to the --

17 Q.     So he told you the questions had been raised in

18 court yesterday about where Ms. Dobie was when the

19 entry was made and they needed you to come in and

20 clarify that?

21 A.     That's correct.

22 Q.     And you immediately, of course, went to your

23 file and looked at the documents relating to this

24 particular event of June 1, 2004, which is over two

25 years ago.

1 A.     No, I didn't go to my file.  When I got the
2 call, I wasn't even in the office.  So, no, I didn't
3 review any files or notes.
4 Q.     When he said -- first of all, let me ask you
5 this.  Since June 1 of '04, how many of these -- I
6 don't know what you call them -- "special entries" has
7 your team made, sir?
8 A.     I would say probably 25 or 30.
9 Q.     And when he -- when this gentleman called you
10 yesterday and told you this question had come up in
11 court, did you immediately remember and have a distinct
12 and clear recollection of the events of June 1 of '04?
13 A.     Absolutely.  It was a very distinctive warrant,
14 and I do remember very clearly what happened that day.
15 Q.     It was so distinctive, it was distinct from all
16 the other 25 that you have done?
17 A.     Absolutely.  Very much so.
18 Q.     You went in first and you saw Ms. Dobie at the
19 top of the stairs.
20 A.     That's correct.
21 Q.     And you said she was dressed in a sleeveless
22 T-shirt that came down to her thighs.
23 A.     That's correct.
24 Q.     I think the government then said, oh, you mean
25 like a nightdress.

1 A.      I think it was just a T-shirt, a sleeveless

2 T-shirt.

3 Q.      It wasn't a night dress?

4 A.      No.  It was a sleeveless T-shirt.

5 Q.      There were two doors open; is that right, sir?

6 A.      There was a bathroom door open on the right side

7 of the hallway and the master bedroom on the left-hand

8 side of the hallway.

9 Q.      All right.  Where did the name "master bedroom"

10 come from?  Is that what you called it, or is that what

11 Detective Eveler called it when he called you?

12 A.      I assumed it was the master bedroom, since Ms.

13 Dobie was there.  It doesn't necessarily have to be the

14 master bedroom.  It could be a bedroom.

15 Q.      A bedroom.

16 A.      Right.

17 Q.      All right, sir.  Detective Eveler didn't refer

18 to it as the master bedroom?

19        All right.  Did Detective Eveler tell you that

20 they believe that Ms. Dobie had come out of the "master

21 bedroom" or whatever you want to call it?

22 A.      I don't think he -- I don't recall  if he had

23 asked me about that.  He just said that there was a

24 question about Ms. Dobie's position in the hallway and

25 coming out of the bedroom.

1 Q.      You have a clear and distinct recollection of

2 something that happened two years and one month ago,

3 sir, but you can't tell me what Detective Eveler said

4 to you last night?

5 A.      The essence of the conversation I just recalled

6 to you, counselor.

7 Q.      What I asked you, sir, was did he say to you

8 that they believe -- that is Detective Eveler and

9 others who were on the raid -- that she had come out of

10 that bedroom?

11 A.      Yes.  And I would say that would probably be

12 correct.  That was the essence of what he asked me.

13 Q.      That's what he said to you; right, sir?

14 A.      Yes.

15 Q.      Right.  Now, you said the other two doors were

16 locked; is that right, sir?

17 A.      That's correct.

18 Q.      When you say "locked," do you mean locked with a

19 key?

20 A.      They were locked from the inside.  I don't know

21 if they were locked with a key, but my team -- the team

22 members on my team attempted to make entry and found

23 those doors locked.  They had to breach both doors.

24 Q.      Were you there?

25 A.      I was standing in the hallway, counselor.

1 Absolutely.

2 Q.     You don't know if it was because of all the

3 commotion out in the hall that somebody locked the

4 door.

5 A.     I don't know why it was locked, but it was

6 locked.

7 Q.     There were actually two doors that were opened

8 and one was to the bathroom; is that right, sir?

9 A.     That's correct.

10 Q.     You don't know from where Ms. Dobie was standing

11 whether she came out of the bathroom.

12 A.     Right. She either came out of the bathroom or

13 the bedroom.

14 Q.     Or one bedroom that had an open door?

15 A.     That's correct.

16 Q.     Or whether she came out of one of the other two

17 bedrooms when all the commotion started, whenever you

18 bashed in the door or whatever you did and somebody

19 locked the door. You don't know if she was left

20 standing out in the hall, having gone to the bathroom

21 and the doors were locked behind her, do you?

22 A.     No, I don't, counselor.

23 Q.     Goldie Dobie was lying on the right side of the

24 bed; is that right, sir?

25 A.     Yes.

1  Q.      In bed.

2  A.      Yes.

3  Q.      Covered up?

4  A.      Yes.

5  Q.      Was he asleep or awake?

6  A.      Oh, he was awake.

7  Q.      Were you there for any of the subsequent search?

8  A.      No, I was not.

9  Q.      All right.  (Cell phone rings.)  I apologize,

10 Your Honor for interrupting myself.  I stand chastised,

11 Your Honor.

12         THE COURT:  You're appropriately chastised.

13 Turn it off.

14         BY MR. WARD:

15 Q.      Were you shown photographs -- first of all,

16 after you had the telephone call and you came in here

17 this morning I suppose; is that right?

18 A.      That's correct.

19 Q.      You were told to get here early so you could

20 have a talking to?

21 A.      Yeah.  I was told to be ready to be in the

22 courtroom by 9:30.  That's correct.

23 Q.      But you did meet with somebody when you got down

24 here to the courthouse?

25 A.      Yes, I did.  I met with Detective Eveler and

1 Agent Snyder briefly.

2 Q.     And the lady sitting right here, Ms. Johnston?

3 A.     Correct.  Yes.

4 Q.     And the three of them met with you.

5 A.     Briefly, yes.

6 Q.     Where was that?

7 A.     In the U. S. Attorney's office.

8 Q.     U. S. Attorney's office.

9        What was said about what had happened in court

10 yesterday?

11 A.     I was just asked to recall what happened --

12 there was no discussion on what happened yesterday in

13 court, but they asked me to recall what happened the

14 day of the warrant and where I saw Ms. Dobie and --

15 Q.     At the meeting this morning, did Detective

16 Eveler or anyone else say the same thing that Detective

17 Eveler told you last night on the telephone, that Ms.

18 Dobie had come out of that open door bedroom?

19 A.     There might have been some mention of that.

20 They asked me if I knew if Ms. Dobie had come out of

21 the bedroom, and I said all I knew was that she was on

22 top of the landing -- very top, and I had no idea what

23 room she came out of because I didn't see her come out

24 of a room.  I saw her at the landing.

25 Q.     I'm sorry.  I didn't mean to cut you off.  I

1  thought  you  had  finish ed .

2        Of  course  you  have  been  shown  photograph s  of  all

3  the  people  that  have  been  arrested  or  at  least  detained

4  in  that  residence ;  is  that  correct ?

5  A.       This  morn ing ?

6  Q.       Yes .

7  A.       No , that 's  not  correct .   No , I  wasn't  shown  any

8  photograph s  of  anyone  who  was  arrested  that  day  or

9  detain ed .

10  Q.      Okay .   I  notice  that  counsel  didn't  ask  you  to

11  -- if  you  saw  Ms. Dobie  in  the  courtroom  -- anywhere  in

12  the  courtroom .

13        Do  you  see  Ms. Dobie  anywhere  in  the  courtroom ?

14  A.      Ms. Dobie 's  right  here  at  the  end  of  the  table .

15  Q.      You're  sure  about  that .

16  A.      Relatively  sure .

17  Q.      When  you  say  "relative ly ,"  can  you  give  us  a

18  percentage ?

19  A.      I  would  say  50  percent  sure .   I'm  not  that  sure .

20        When  I  saw  Ms. Dobie  that  morning ,  it  was  dark

21  and  she  was  in  that  T-shirt .

22  Q.      The  T-shirt ,  what ,  covered  her  up  so  you

23  could n't  see  her  face ?

24  A.      It  was  dark  that  morn ing ,  counselor .

25  Q.      I  see .

1       Do you usually go in in the dark?  Don't you

2  turn the lights on in view of the apparent danger you

3  believe you're facing?

4  A.    We have flashlights on our weapons systems.

5  Q.    Right.  But you're only 50 percent sure it was

6  her.  You're not sure that it was one of the ladies

7  sitting back on the back row, for example?

8  A.    No.

9  Q.    All right, sir.

10      And you were sure -- well, forget that.  I'll

11 withdraw that.

12      That's all I have sir.  Thank you.

13      THE COURT:   Any redirect?

14      MS. JOHNSTON:   Just a couple of questions.

15              **REDIRECT EXAMINATION**

16      BY MS. JOHNSTON:

17 Q.    When Detective Eveler called you yesterday to

18 see if -- was it to see if you would be available to

19 come in today?

20 A.    Yes.

21 Q.    During that conversation, did Detective Eveler

22 discuss with you any of the testimony that occurred in

23 court?

24 A.    No, not at all.

25 Q.    When you met with Detective Eveler, did he tell

1  you where Ms. Dobie was, or did he ask you questions

2  about what you recall that morning?

3  A.     No.  He just asked me what I recalled from the

4  warrant that day.

5  Q.     Indeed, was that in my presence?

6  A.     That's correct.

7  Q.     In addition to that, when you were shown the

8  photographs, were you given any instructions concerning

9  what doorways you should identify as being the open

10  doors or closed doors?

11  A.     No.  We just looked at the photograph and saw

12  which doors were identified and which doors were the

13  bedroom and the bathroom.

14  Q.     Who provided that information?

15  A.     I provided the information.  I was there.  I

16  knew exactly where the bedroom and the bathroom was.

17  Q.     At the end of your time in the residence, when

18  you turned Mr. and Mrs. Dobie and the other occupants

19  over to the Search Team, do you recall who the lead

20  agent was?

21  A.     Not offhand.  I'm sorry.

22  Q.     What did you advise the individual concerning

23  the location of Mr. and Mrs. Dobie, if you recall.

24         MR. WARD:   Objection, Your Honor.

25         THE COURT:   Restate the question.

1          BY MS. JOHNSTON:

2  Q.     What did you tell the team leader -- the search

3  team leader concerning the location of Mr. and Mrs.

4  Dobie when you entered the residence?

5          MR. WARD:   Objection.

6          THE COURT:   Overruled.

7          THE WITNESS:   I just advised the team leader

8  where I found Ms. Dobie that she was the first occupant

9  of the residence I had found and where she was and then

10 where I found Mr. Dobie in the bedroom, and then other

11 members of the team advised where they found their

12 occupants.

13         BY MS. JOHNSTON:

14 Q.     Now, in terms of -- you've had occasion to

15 testify about this incident at a previous hearing as

16 recently as January of 2006; is that correct?

17 A.     That is correct.

18 Q.     When you observed Ms. Dobie, what if anything

19 did she say to you while she was up there in that

20 hallway?

21         MR. WARD:   Objection.

22         THE COURT:   Overruled.

23         THE WITNESS:   Initially she wanted to know why

24 we were there and what was going on.   We told her we

25 were executing a search warrant and somebody would

1 explain to her what was going on.  Then she advise d me

2 she had to go to the bathroom , and it was urgent  and

3 she was going to have an accident if we didn't  allow

4 her to go to the bathroom .

5        BY MS. JOHNSTON:

6 Q.     That w as while you were up in the top hall way

7 area ?

8 A.     That 's correct .

9        MS. JOHNSTON:    I have nothing  further .

10       THE COURT:   Any re cross ?

11       MR. WARD:   One point .

12              **RECROSS EXAMINATION**

13       BY MR. WARD:

14 Q.     Ms. Johnston asked you if you were told any of

15 the testimony  from court yesterday , and you said no.

16 A.     That 's correct .

17 Q.     Let 's be clear .  In that call that was made to

18 you by detective Eveler yesterday , he said to you that

19 they , being the prosecution  team , believe d that Ms.

20 Dobie had come out of that bedroom , the one with the

21 open door .  That 's what you just testifi ed to; is that

22 right , sir ?

23 A.     It was something  to that effect .  They want ed to

24 know where she was in relation  to the bed room and the

25 bathroom .

                                                    Page 46

1 Q.     Not just where she was.

2       I want to make this clear.  He said something to

3 you -- if not in these exact words, something to the

4 effect that they all believed she had come out of that

5 bedroom with the open door?

6 A.     It could have been something to that effect.

7 Q.     That's pretty much the same thing that was said

8 to you this morning.

9 A.     Yeah.  I would say that's probably correct,

10 counselor.

11      MR. WARD:   Thank you.

12      THE COURT:  All right.  Anything further?

13      MS. JOHNSTON:   Nothing further.

14      THE COURT:   You may step down.  Thank you very

15 much.

16                (Witness excused at 10:38 a.m.)

17      MS. GREENBERG:    Your Honor, the government calls

18 Detective Nolan Lockard.

19 Thereupon,

20                     **NOLAN  LOCKARD**,

21 having been called as a witness on behalf of the

22 Plaintiff, and having been first duly sworn by the

23 Courtroom Deputy, was examined and testified as

24 follows:

25                     **DIRECT EXAMINATION**

1          BY MS. GREENBERG:

2  Q.      Would you state your name , sir , and spell your

3  last name please ?

4  A.      I am Detective Nolan Lockard .  Spelling on the

5  last name is L O C K A R D.   My ID is 1307 , currently

6  with the Prince George's County Police Department .

7  Q.      You're a detective with the Prince George's

8  County Police Department ?

9  A.      That 's correct .

10  Q.      Could you give the -- what area do you work in?

11  What subject area do you work in?

12  A.      I work in Prince George's County , Maryland .

13  Q.      What laws are you charged with enforcing?   What

14  group are you in?

15  A.      I'm with the Narcotics Enforcement Division .

16  Q.      Could you tell the jury some of your background ,

17  training and experience for your job as a narcotics

18  detective with the Prince George's County Police

19  Department ?

20  A.      Sure .

21  Q.      Starting back with when you started with the

22  M.P.D.C.

23  A.      Sure .  I worked with M.P.D.C. for a year, and

24  then I converted over to the Prince George 's County

25  Police Department , where I went to their academy .  From

1 there --

2 Q.     What year was that, sir?

3 A.     That was 1985.

4 Q.     You went to the police academy.   What was your

5 first assignment?

6 A.     My first assignment was working patrol at Oxon

7 Hill Police Station as a uniformed officer.

8 Q.     Did you come across narcotics offenses as a

9 patrol officer?

10 A.     Some.   Not much.

11 Q.     You were charged with enforcing it?

12 A.     Yes.

13 Q.     What was your next job after patrol officer?

14 A.     I went to the Street Narcotics Section.

15 Q.     What was the name of that division?

16 A.     That was called Street Narcotics Section.

17 Q.     What did you do there?

18 A.     That's where I worked as an undercover officer

19 and I purchased drugs from the street dealer.

20 Q.     What did you do after that?

21 A.     I went to Special Operations Division as a

22 tactical officer.

23 Q.     How long were you there?

24 A.     Over five years.

25 Q.     Where did you go next?

1 A.      I went back to narcotics as -- went to the Major

2 Narcotics Section.

3 Q.      How long have you been with the Major Narcotics

4 Section?

5 A.      Over seven years.

6 Q.      Have you conducted search warrants related to

7 narcotics activity?

8 A.      That's correct.  Yes, I have.

9 Q.      I'm sure you didn't keep specific count of them,

10 but can you give the jury an approximation about how

11 many search warrants you've been involved with in the

12 narcotics area?

13 A.      Over 200 or more.

14 Q.      In your work as a detective in the Special

15 Narcotics Section with Prince George's County Police

16 Department, were you asked by Detective Eveler to

17 assist with a search warrant of 36 Farragut Place,

18 Northwest, Washington D. C. on June 1st 2004?

19 A.      That's correct.

20 Q.      What was your role with respect to the search of

21 that residence?

22 A.      My role was to recover all the evidence --

23 pertinent evidence associated with the case, make sure

24 that I leave a search warrant at the residence, finish

25 up a search warrant return, and make sure the evidence

1 gets back to the Command Post.

2 Q.     Showing you what's been marked as P-84.

3       Do you recognize that picture?

4 A.     Yes, ma'am.

5 Q.     And you see the "36" on the front of it?

6 A.     Yes, ma'am.

7 Q.     Could you tell the jury what we're looking at

8 here in P-84?

9 A.     This is the house where we conducted the search

10 warrant on June 1st, 2004.

11 Q.     36 Farragut Place, Northwest, Washington, D.C.?

12 A.     That's correct.

13 Q.     Did you also execute any arrest warrants while

14 you were there?

15 A.     Yes, we did pick up a subject.

16 Q.     Who did you pick up?

17 A.     It was Learley Goodwin.

18 Q.     Was he at the house when you arrived?

19 A.     Yes, ma'am.

20 Q.     Did you also recover certain documents?

21 A.     Yes, ma'am.

22 Q.     I'd like to show you first what's been marked as

23 Goodwin 1.

24       If I may approach, Your Honor.

25       THE COURT:   You may.

1          MR. WARD:   I'm sorry.   What was that photo

2 number?

3          MS. GREENBERG:   When I get back there, I'll tell

4 you, counselor.

5          BY MS. GREENBERG:

6 Q.      Do you see that?   I'm going to put that up on

7 the screen.

8 A.      Yes, ma'am.

9          MS. GREENBERG:   Mr. Ward, the photo number is,

10 for the record, P-84.

11          MR. WARD:   I'm sorry.   PA-4?

12          MS. GREENBERG:   P-84.

13          MR. HALL:   P-84.

14          MR. WARD:   Oh, P-84.   Thank you.   I'm sorry.

15          BY MS. GREENBERG:

16 Q.      Can you see that on the screen in front of you?

17 A.      Yes, ma'am.

18 Q.      Is this a document, Goodwin 1, that you received

19 from the residence?

20 A.      Yes, ma'am, it is.

21 Q.      What area of the residence?

22 A.      That was located in the master bedroom of the

23 residence.

24 Q.      With respect to the documents that you seized,

25 did you note for each document where in the master

1 bedroom you obtained it or generally you put down

2 "master bedroom?"

3 A.      Generally, master bedroom.

4 Q.      What is the title of this document?

5 A.      This looks like an insurance form.

6 Q.      Could you read it on the screen into the record

7 for the jury what is contained on Goodwin 1?

8 A.      Says, "Paula's School of Performing Arts will

9 receive credit for all premium paid on behalf of

10 Learley Goodwin after July 1st of 2003."

11 Q.      And continue, please.

12 A.      "If you have any question, please contact me at

13 301-360-8703. Sincerely," -- looks like, "Gary A. -"

14 -- I cannot pronounce the last name.

15 Q.      Therkildsen or something like that?

16       MR. MARTIN:   Objection.

17       BY MS. GREENBERG:

18 Q.      Would you spell it if you can't pronounce it,

19 sir?

20 A.      Sure. T H E R K I L D S E N.

21 Q.      The gentleman's title?

22 A.      Director of Special Investigation Unit,    MAMSI

23 Life & Health Insurance Company  ; cc: Learley Goodwin.

24 Q.      This is a copy?

25 A.      Yes. It says, "copy."

1 Q.      And also contained as part of Goodwin 1 -- can

2 you tell the jury what we're looking at here?

3 A.      Yes. That is a MAMSI insurance card with

4 member's number of M57754973201.

5 Q.      In whose name?

6 A.      Member name is Goodwin -- last name Goodwin,

7 first name Learley.

8 Q.      Effective date?

9 A.      7/1/1996.

10 Q.      Can you read in the "group name" for this MAMSI

11 card?

12 A.      Group name is Paula's School of Performing --

13 Q.      Looks like an A?

14 A.      I can't see. It just stopped on the screen.

15 Q.      Referencing Goodwin 2. I'll put that up on the

16 screen.

17         Do you recognize what we're seeing here?

18 A.      It says Atlantic City, Tropicana Casino &

19 Resort.

20 Q.      Did you review this exhibit in connection with

21 your testimony here today?

22 A.      Yes, ma'am.

23 Q.      From where was it recovered?

24 A.      That was located also in the master bedroom.

25 Q.      What is the -- that's at the Farragut Place

1  address we're talking about here, 36 Farragut Place,

2  Northwest?

3  A.     That's correct.

4  Q.     What is the number and name referenced on the

5  top here?

6  A.     It has the name "Nod," then it's crossed out

7  with the spelling N O D, and then the spelling of

8  "Nard" again, N A R D, and the telephone number is

9  240-462-3965.

10 Q.     On the back of this, is there a name and some

11 numbers here?

12 A.     Yes.  With the name of Tiffany A. Vessels.

13 Looks like a date of birth of 6/15/75, then a number of

14 9-6-2755.

15 Q.     Can you read these two numbers here under the

16 scribbled out --

17        MR. MARTIN:   Your Honor, objection.

18        The document speaks for itself.   This is a waste

19 of time.

20        THE COURT:    If he can read it.

21        THE WITNESS:   No, ma'am, I cannot make out the

22 two numbers.

23        BY MS. GREENBERG:

24 Q.     Thank you.

25        Goodwin 3.  Can you tell us where you got this

1 document ?

2 A.      This is also a document that was located in the

3 master bedroom.

4 Q.      Could you read into the record the name here at

5 the bottom of that page?

6 A.      It says, "Raynard Dorsey."

7 Q.      Goodwin 4.  Do you recognize -- if I may

8 approach.

9        THE COURT:   Yes, you may.

10        BY MS. GREENBERG:

11 Q.      Do you recognize this exhibit?

12 A.      Yes, ma'am.  These are small baggies.

13 Q.      Where did you recover that?

14 A.      That was located in the master bedroom.

15 Q.      And we're talking about 36 Farragut Place?

16 A.      That's correct.

17 Q.      What caused you, as the person in charge of the

18 evidence seizure, to take the small baggies?

19 A.       In my experience we take small baggies because

20 we're used to finding drugs inside of small baggies.

21 That's where they place the drugs.

22        MS. GREENBERG:  Your  Honor, may I publish

23 Goodwin 4 to the jury, please?

24        THE COURT:   Yes, you may.

25        MS. GREENBERG:   I'll hand it to Detective Eveler

1  so I don't have  to go around  the table .

2          Goodwin 5 -- if I may approach  again , Your

3  Honor .

4          THE COURT:   Yes , you may .

5          BY MS. GREENBERG:

6  Q.      Do recognize  Goodwin  5?

7  A.      Yes, ma'am .

8  Q.      Where was Goodwin  5 obtain ed?

9  A.      From the master  bedroom .

10 Q.      Could you tell the jury what Goodwin  5 is?

11 A.       It looks like a check ing account  from Wachovia,

12 with the name of Tiffany A. Vessel s.

13 Q.      And the period for ?

14 A.      It has 3/18/2004  through  4/15/2004 .

15 Q.      Goodwin  6.  Can you tell the jury from where we

16 got -- where you got Goodwin  6?

17 A.      That was also another  document  that was locate d

18 inside the master  bedroom .

19 Q.      And what is Goodwin  6?

20 A.      Look s like a receipt  from Budget  Rent-A-Car .

21 Q.      In whose name ?

22          Let me zoom in on this .

23 A.      Look s like Maurice  Alexander .

24 Q.      And the date ?

25          Can you see the date here up top?

1  A.      I see a "0," "14", looks like, "05."

2  Q.      That says "valid driver's license?"

3  A.      Yes, ma'am.

4  Q.      Can you see the due date here?

5  A.      Due date is 2/27/03.

6  Q.      Goodwin 7. Can you tell us from where you got

7  that?

8  A.      It's another document that was located inside of

9  the master bedroom.

10 Q.      At the Farragut Place address?

11 A.      That's correct.

12 Q.      What is Goodwin 7?

13 A.      A Budget Rent-A-Car receipt.

14 Q.      Can you see the name of the person?

15 A.      Tiffany A. Vessels.

16 Q.      And the due date for the car due back?

17 A.      1/19/03.

18 Q.      On this one, what is the time out?

19 A.      Time out is 1/15/03. Time is 13:17.

20 Q.      Goodwin 8. Can you tell us from where you got

21 this document?

22 A.      Another document that was taken from the master

23 bedroom.

24 Q.      What is Goodwin 8?

25 A.      It looks like a Chevy Chase bank receipt.

1 Q.      Who is it for?

2 A.      Learley R. Goodwin.

3 Q.      What is the address?

4 A.      The address is 9002 Bexhill Court, Hyattsville,

5 Maryland, 20783.

6 Q.      What is this for Chevy Chase Bank?

7 A.      Statement of Account.

8 Q.      What is the statement date on this account?

9 A.      The statement date is February 8, 2002.

10 Q.     Goodwin 9. Can you tell us from where you got

11 Goodwin 9?

12 A.      It's another document that was located in the

13 master bedroom.

14 Q.     What is this relating to?

15         Can you read that there?

16 A.      It says, "HJA Hospitality Enterprises

17 Development, Incorporated, 1803 Rhode Island Avenue,

18 Northeast."

19 Q.     What city and state?

20 A.      "Washington, D. C., 20018."

21 Q.     Goodwin 10 contains two documents. Can you tell

22 us from where you got these two documents?

23 A.      One of the documents is upside down.

24 Q.     Oh, thank you very much.

25         Can you tell us from where you got these two

1  document s?

2  A.      From the master bedroom.

3  Q.      At Farragut Place?

4  A.      That's correct.

5  Q.      Starting with the top document.  Can you tell us

6  what this is?

7  A.      It's American Express -- it looks like it's a

8  receipt for --

9  Q.      For what?

10  A.      It's a receipt for --

11  Q.      For what company?

12  A.      United States Postal Service.

13  Q.      What's directly above "United States Postal

14  Service?"

15  A.      "Express Mail."

16  Q.      Who is it from?

17  A.      Lobo's Discount Car -- looks like it says,

18  "Center."

19  Q.      What's the address?

20  A.      1124 Florida Avenue, Northeast, Washington, D.

21  C., 20002.

22  Q.      Who is it to?

23  A.      It looks like it says the name of "Michael

24  Thurman."

25  Q.      And the city and state it's being sent to?

1  A.        North Houston, Texas.

2  Q.        Do you see this date in here?  Can you make that

3  out?

4  A.        Looks like the month is "4," and I can't make

5  out the date.  Looks like a "10," then looks like a "4"

6  on the year.

7  Q.        Showing you the second part of Goodwin 10.  Do

8  you see that there?

9  A.        Yes, ma'am.

10  Q.        There's two sides with writing on it; is that

11  correct?

12  A.        That's correct.

13  Q.        Could you read into the record, starting with

14  "Nathan," and continuing through "Mike" the names and

15  numbers?

16  A.        It has "Nathan," and looks like a telephone

17  number of "246-8520."  Then it has, "Mike Thurman," and

18  the telephone number is "837-8356."  Then there's

19  another one below that.  It's "301-213-4934."

20  Q.        Moving on to Goodwin 11.  It contains two

21  documents.  Where did you get these two documents?

22  A.        Inside the master bedroom.

23  Q.        The Farragut Place address?

24  A.        Yes, ma'am.

25  Q.        36 Farragut Place?

1 A.      That's correct.

2 Q.      Again, is this similar to a card we saw earlier

3 in your testimony?

4 A.      Yes, ma'am.

5 Q.      Starting with that.  Can you tell the jury what

6 we're looking at here?

7 A.      It's a MAMSI -- looks like an insurance card.

8 Q.      In whose name?

9 A.      Goodwin, Learley.  Last name Goodwin.

10 Q.      And the expiration date?

11 A.      Expiration date is 6/30/02.

12 Q.      And the effective date?

13 A.      Effective date is 7/1/96.

14 Q.      And the group name?

15 A.      Group name is Paula's School of Performing A.

16 Q.      And the other part of Goodwin 11 is a two-sided

17 document; is that correct?

18 A.      Yes, ma'am.

19 Q.      On the backside of this business card, could you

20 read in that information for the record, please?

21 A.      The name is "Steve," with a telephone number,

22 area code (281) 630-6498, and it has "Texas" on it.

23 Q.      Turning next to Goodwin 12.  Can you see that up

24 on your screen?

25 A.      Yes, ma'am.

1  Q.        Can you tell the jury from where you got this

2  document?

3  A.        Inside the master bedroom.

4  Q.        At the 36 Farragut Place, Northwest address?

5  A.        That's correct.

6  Q.        What is this document?

7  A.        It's a Nextel bill.

8  Q.        If we could zoom in for a second.

9            Who's the account name?

10 A.        Lobo's Discount Car Center.

11 Q.        And the statement date?

12 A.        The statement date is October 7, 2003.

13 Q.        Covering what billing period?

14 A.        The billing period is September '03 to October

15 2, 2003.

16 Q.        And the total amount due?

17 A.        $773.85.

18 Q.        On the bottom here does it have an address for

19 Lobo's?

20 A.        Yes, ma'am.

21 Q.        Could you read in the name and the address for

22 Lobo's?

23 A.        Lobo's Discount Car Center.  The address is 1124

24 Florida Avenue, Northeast, Washington, D. C.; ZIP code

25 is 20002.

1  Q.        And you found this at the Farragut Place in

2  Northwest Washington D. C. address you were searching?

3  A.        That's correct.

4  Q.        In what room?

5  A.        The master bedroom.

6  Q.        Showing you Goodwin 12A, previously introduced

7  into evidence. Is this a document that you seized --

8  is this a document that you seized on that date, June

9  1st 2004?

10 A.        That's correct.

11 Q.        From what room?

12 A.        The master bedroom.

13 Q.        What is Goodwin 12A?

14 A.        It's a Verizon bill.

15 Q.        Could you tell jury what telephone number this

16 is for?

17 A.        Telephone number is (202) 388-9033.

18 Q.        And the billing date?

19 A.        Billing date is 12/13 of '03.

20 Q.        Who is it sent to?

21 A.        Paul Sinclair.  The address is 1124 Florida

22 Avenue, Northeast, Washington,   D. C., 20002.

23 Q.        I neglected to ask you.  On the Nextel bill --

24 on Page 2 of the Nextel bill, which is Goodwin 's

25 Exhibit 12.  Is there a telephone number next to Lobo's

1  Discount Car C enter ?

2  A.      Yes, ma'am .  I see "dis count  car  center ," and

3  the  telephone   number  is (202) 409-3452 .

4  Q.      That 's in relation  to the  Nextel  bill  that 's

5  mark ed as  Goodwin  12?

6  A.      That 's correct .

7          MS. GREENBERG:    Your  Honor , may  I  approach ?

8          THE  COURT:   Yes , you  may .

9          BY  MS.  GREENBERG:

10  Q.      Show ing  you  what 's  been  mark ed as  Goodwin  13.

11          Do  you  recognize   these ?

12  A.      Yes, ma'am .

13  Q.      Where  did  you  re cover  these ?

14  A.      Those  are  money  strap s.   We  recovered  them  from

15  the  master  bedroom .

16  Q.      At  the  Farragut   Place  address  ?

17  A.      That 's correct .

18  Q.      Could  you  give  the  jury  some  idea  about  the

19  denomination s that  we're  see ing  here  for  the  money

20  wrapper s?

21  A.      The  money  wrapper  --  this  package  of money

22  wrapper  has $100 , $1,000 , $500 , $2,000 , $10,000  --

23  Q.      They're  all  --  those  are  just  example s, but

24  they're  all  contain ed within  this  exhibit , goodwin  13?

25  A.      That  is  correct .

1 Q.      From where did you find them?

2 A.      Master bedroom.

3        MS. GREENBERG:    Your Honor, may I publish to the

4 jury Goodwin 13?

5        THE COURT:   Yes, you may.

6        BY MS. GREENBERG:

7 Q.    Showing you what's been marked as Goodwin 14.

8        Do you recognize that exhibit?

9 A.      That's correct.

10 Q.     From where did you obtain Goodwin 14?

11 A.     It's another document that was recovered from

12 the master bedroom.

13 Q.     At the Farragut Place address?

14 A.     That's correct.

15 Q.     For the benefit of the jury, can you tell the

16 jury in whose name is Goodwin 14?

17 A.      Tiffany Vessels.

18 Q.     For what number?

19 A.     (202) 321-6685.

20 Q.     What kind of bill is this exhibit Goodwin 14?

21 A.     It looks like a Sprint telephone bill.

22        MS. GREENBERG:    Your Honor, may I approach?

23        THE COURT:   Yes, you may.

24        BY MS. GREENBERG:

25 Q.     Showing you two documents that are marked as

1  part of Goodwin 15.  I'll put them one at a time on the

2  screen.

3         Do you remember those?  They were previously

4  introduced into evidence.

5  A.      Yes, ma'am.

6  Q.      From where were these recovered?

7  A.      The master bedroom.

8  Q.      At the Farragut Place address?

9  A.      That's correct.

10 Q.      Starting with the first document out of Goodwin

11 15.  What is that?

12 A.      It's the Western Union telegram.

13 Q.      Who is indicated to be the sender?

14 A.      Richard Willis.

15 Q.      Who is the receiver?

16 A.      Rodney Green.

17 Q.      And the available end destination?

18 A.      Houston, Texas.

19 Q.      Can you see the date there?

20 A.      3/18/02.

21 Q.      And the time?

22 A.      The time is 4:58 p.m.

23 Q.      And this document attached to it -- that was

24 attached to it.  How did that come to be attached to

25 it?

1  A.      It's stapled to it.

2  Q.      Was this recovered like this?

3  A.      Yes, ma'am.

4  Q.      In the bedroom at Farragut Place?

5  A.      Master bedroom.

6  Q.      And the second part of Goodwin 15.  Do you

7  recognize what that is?

8  A.      That is also a Western Union Telegram.

9  Q.      And this, similarly, has a front and then a

10 customer receipt tape stapled to the larger Western

11 Union document.

12 A.      That's correct.

13 Q.      Is that how it was recovered by you and your

14 team?

15 A.      Yes, ma'am.

16 Q.      Who is the sender?

17 A.      The sender is Tiffany Vessels.

18 Q.      And the recipient?

19 A.      Steven Ross.

20 Q.      And available in?

21 A.      That's Houston, Texas.

22 Q.      And the date?

23 A.      3/18/02.  Time is 5:20 p.m.

24 Q.      Moving on to Goodwin 16.

25         Your Honor, I may approach?

1          THE COURT:    Yes, you may.

2          BY MS. GREENBERG:

3  Q.      Do you recognize Goodwin 16?

4  A.      Yes, ma'am.

5  Q.      What is Goodwin 16?

6  A.      It looks like an address book.  It has numbers

7  in it -- telephone numbers.

8  Q.      Are there also additional pieces of paper that

9  are made part of Goodwin 16?

10 A.      Yes.

11 Q.      Where did you recover that?

12 A.      In the master bedroom.

13 Q.      At the Farragut Place address?

14 A.      Yes, ma'am.

15 Q.      Were these little yellow stickies on it when you

16 recovered it?

17 A.      Yes, ma'am.

18 Q.      These stickies -- was the book like that?

19 A.      Are you talking about the yellow stickies?

20 Q.      Yes.

21 A.      No.  The book was without stickies.

22 Q.      So, as a book like that?  (Indicating.)

23 A.      It was just a plain book.

24 Q.      And from where was that recovered?

25 A.      Master bedroom.

1 Q.      Goodwin 17.  Do you recognize that exhibit?

2 A.      Those are some more money straps.

3 Q.      From where was that recovered?

4 A.      Master bedroom.

5 Q.      Were they in a different place than the other

6 money wrappers?  Is that why they're separate?

7 A.      Yes, ma'am.

8         MS. GREENBERG:   If I may approach again, Your

9 Honor.

10        THE COURT:  Yes, you may.

11        BY MS. GREENBERG:

12 Q.     Goodwin 18.  Could you tell the jury what we're

13 looking at here?

14 A.      Those are razor blades.

15 Q.      Were they packaged in a white container?

16 A.      Yes, ma'am.

17 Q.      Why did you seize razor blades?

18 A.      Through my training and experience, that's just

19 one of the tools that's used to cut drugs.

20        MS. GREENBERG:   Your Honor, what's the court's

21 pleasure on publishing razor blades?  What's the

22 court's practice?

23        THE COURT:  Just be careful.  We make no

24 representations, express or implied.  Be careful with

25 the razor blades.

1        MS. GREENBERG:   Your Honor, with that

2 admonition, I will publish Goodwin 18.

3        I didn't know  what the court's practice  was  on

4 that.

5        THE COURT:   All right.

6        BY MS. GREENBERG:

7 Q.      If I may approach  again  with Goodwin  19.

8        Could you tell  the  jury what we're  looking  at

9 here?

10 A.      Looks like  another  phone  book that was  located

11 at the address.   It's a calendar  with telephone  numbers

12 in it.

13 Q.      From what location?

14 A.      The master  bedroom.

15 Q.      And again, these  stickies  on it.   Is that

16 something  that was done for trial  practice, not by --

17 it wasn't  recovered like that?

18 A.      That's correct.   It was  trial  preparation, not

19 practice.

20 Q.      And just for the record, so we can keep track of

21 the telephone  books, what is on the front  of Goodwin  19

22 which you recovered  from the master  bedroom at Farragut

23 Place?

24 A.      "2004.   Teamwork.   Together  we achieve  the

25 extraordinary."

1  Q.      In the bedroom was there a night stand?

2  A.      Yes, ma'am.  Correct.

3  Q.      Did you also search the night stand?

4  A.      Yes, we did.

5  Q.      Did you recover any additional documents

6  specifically from the night stand?

7  A.      Yes, ma'am.

8          MS. GREENBERG:   If I may approach again, Your

9  Honor.

10         THE COURT:  Yes, you may.

11         BY MS. GREENBERG:

12  Q.      Showing you Government's Exhibit Goodwin 20.

13  That's a large number of exhibits, if you want to take

14  a second to look through those.

15  A.      (Witness indicating.)

16  Q.      Could you tell the jury if you know from where

17  in the master bedroom you recovered what's marked as

18  Goodwin 20?

19  A.      These documents came from the night stand in the

20  master bedroom, and it's a bunch of telephone numbers.

21  Q.      Were these little green stickies on them before,

22  or is that something that was done as part of trial

23  prep?

24  A.      Yes, it's for the trial prep.

25  Q.      Where was the night stand in relation to the

1 bed?

2 A.     I think it was on the left side, if I recall.

3 Q.     In what proximity to the bed?

4 A.     Real close.  It's kind of tight quarters in the

5 bedroom.

6 Q.     Let me show you certain of these numbers on

7 there.

8        Could you read what's on the screen for the jury

9 that's part of Goodwin 20?

10 A.     Gloria Thurman is the name.  Telephone number

11 (301) 516-1548, also a number (301) 43-77068.  It's a

12 cell phone.

13 Q.     And there are other numbers in this document, is

14 that correct, Goodwin 20?

15 A.     That's correct.

16 Q.     Goodwin 21.  Could you tell the jury from where

17 you got this document?

18 A.     21 was located in the master bedroom on the

19 night stand.

20 Q.     Looking to the top right portion of this

21 document.  Can you tell the jury the date of this

22 document?

23 A.     Yes.  It has 03 April 2003.

24 Q.     Who is it from?

25 A.     Embassy of the United States of America.

1  Q.      What country?

2  A.      Kingston, Jamaica, West Indies.

3  Q.      Who is it to?

4  A.      Mary Carter Wells, 1323 Anacostia Road,

5  Southeast, No. 2, Washington, D. C., 20019.

6  Q.      Could you read the number of that Anacostia Road

7  address again? I'm not sure if I heard you correctly.

8          MR. MARTIN:   Asked and answered.

9          THE COURT:   Overruled.

10         THE WITNESS:   1323 Anacostia Road, Southeast,

11 No. 2, Washington, D. C., 20019.

12         BY MS. GREENBERG:

13 Q.      Thank you.

14         This was recovered from where, sir?

15 A.      Master bedroom, on the night stand.

16 Q.      Showing you what's been marked as Goodwin 22.

17         Do you recognize this exhibit?

18 A.      Yes, ma'am.

19 Q.      What is that exhibit?

20 A.      That's a notebook with 80 sheets.

21 Q.      Where was that recovered from?

22 A.      Master bedroom on the night stand.

23 Q.      At the Farragut Place address?

24 A.      That's correct.

25 Q.      Your Honor, that's been previously introduced

1  into evidence .

2          Again , these yellow stickies .  This book like

3  that with the yellow stickies .

4  A.      No, ma'am .

5  Q.      Did you also search the kitchen area of this

6  residence ?

7  A.      Yes , we did .

8  Q.      Showing you what's been marked as P-85.  Do you

9  recognize that exhibit ?

10 A.      Yes, ma'am .

11 Q.      What's depicted there ?

12 A.      Yes, ma'am .  That 's the kitchen area of the

13 address .

14 Q.      Can you tell the jury what they're looking at

15 here ?

16 A.      On the right side of the microwave is a total of

17 three boxes of baking soda .

18 Q.      Did you seize that baking soda ?

19 A.      Yes, ma'am , we did .

20 Q.      Why did you seize that baking soda ?

21 A.      Thought that it was --

22         MR. MARTIN:   Objection .  Rule 701 .

23         THE COURT:   Overruled .

24         BY MS. GREENBERG:

25 Q.      Why did you seize that baking soda ?

1  A.      In my training and experience , that is used to

2  cut drugs.

3  Q.      Showing you what's been marked as Goodwin 23.

4          Can you tell the jury what this is and how that ,

5  if at all , relates to the picture ?

6  A.      Yes, ma'am . These are the three boxes of Arm &

7  Hammer baking soda that was recovered from the kitchen

8  area that's right beside the microwave .

9  Q.      Is that exhibit what we see in the picture

10 there ?

11 A.      That's correct .

12 Q.      Goodwin 23.

13 A.      Yes, ma'am .

14         MS. GREENBERG:   Your Honor , may I publish

15 Goodwin 23 to the jury , please ?

16         THE COURT:   Yes , you may .

17         BY MS. GREENBERG:

18 Q.      Did you locate other items from the kitchen ?

19 A.      Yes, ma'am , we did .

20 Q.      Showing you -- these are Arm & Hammer  baking

21 soda boxes; is that correct ?

22 A.      That's correct .

23 Q.      Did you locate additional  Arm & Hammer  baking

24 soda boxes that were different  in the appearance ?

25 A.      Yes, ma'am , we did .

1 Q.      Showing you P-86.  Can you tell the jury what
2 we're looking at here?

3 A.      That's three additional boxes of baking soda --
4 Arm & Hammer, and  says, "fridge and freezer" brand.

5         Also, there's a scale that is located right
6 behind one of the boxes of the baking soda that's
7 located in the bread box.

8 Q.      Is that where my finger is pointing?

9 A.      That's correct.

10 Q.     The three boxes are right here?

11 A.     Yes, ma'am.

12 Q.     And that's the scale you're talking about?

13 A.     Yes, ma'am.  That's the electronic scale.

14 Q.     Where is this picture, P-86?  Where was that
15 taken in the residence at farragut Place, Northwest?

16 A.     That's still the kitchen area.

17 Q.     How far from the microwave?

18 A.     Just a little ways off.  Not far.

19 Q.     Showing you what's been marked as P-24 and P-25.
20        Could you tell the jury how Goodwin 24 and
21 goodwin 25 relate to what they're seeing up on the
22 screen?

23 A.     24, the baking soda, which is located on the
24 screen at the bottom that we recovered from the address
25 in the kitchen.

1 Q.      And Goodwin 25?

2 A.      That is the electronic scale that was recovered

3 in the bread box in the kitchen area.

4 Q.      Immediately adjacent to the three baking soda

5 boxes?

6 A.      That's correct.

7       MS. GREENBERG:   Your Honor, may I publish

8 Goodwin 24 and Goodwin 25?

9       THE COURT:   Yes, you may.

10      BY MS. GREENBERG:

11 Q.      Did you also search the basement area of this

12 residence?

13 A.      Yes, ma'am, I did.

14 Q.      Showing you up on the screen what's been

15 pre-marked as P-87.

16      Could you tell the jury what we're looking at

17 here?

18 A.      That's the green file cabinet that I located in

19 the basement area.

20 Q.      Is that how it appeared when you approached it?

21 A.      Yes, ma'am.

22 Q.      Did you check the drawers of that file cabinet,

23 or did someone on your team check the drawers?

24 A.      I'm the one that checked the drawers.

25 Q.      Did you recover anything inside the drawers?

1  A.       Yes, I did.

2  Q.       Showing you what's been marked as P-88.

3          Does that depict how the drawer appeared when

4  you first opened it?

5  A.       Yes, ma'am.

6  Q.       Is this the part of the file cabinet that we saw

7  on P-87?

8  A.       That's correct.

9  Q.       And P-89.  Is that a close-up shot of that

10 particular drawer?

11 A.       Yes, ma'am, it is.

12 Q.       Showing you what's been marked as Goodwin 26

13 and Drugs 31.

14          Can you tell the jury how that relates to what

15 they're seeing in the picture?

16 A.       Sure.

17 Q.       Starting with Goodwin 26.  What is that?

18 A.       That is a black bowl that was located in the

19 third drawer of the file cabinet which has cocaine

20 residue in it.

21 Q.       Is that the black -- what we see inside what

22 appears to be a trash bag?

23 A.       Yes, ma'am, that's it.

24 Q.       How does Goodwin 26 appear now as opposed to

25 the picture that we're seeing?

1  A.      It's broken now.

2  Q.      I'll come back to that in a second.

3          Drugs 31.  What is Drugs 31 in relation to that

4  picture?

5  A.      That's a kilo of cocaine I located in the file

6  cabinet.

7  Q.      Does this picture depict how these items were

8  when you first located them?

9  A.      Yes, ma'am.

10 Q.      Could you tell the jury about your observations

11 -- what did you observe about the black bowl inside

12 that trash bag that we see on P-89?  What did you

13 observe about this?

14 A.      Yes.  I recovered the bowl, and I located or

15 found cocaine residue in the bottom of the bowl.

16 Q.      That was your observation of the bowl?

17 A.      Yes, ma'am.

18 Q.      And the proximity of the bowl to the

19 plastic-covered brick next to it.  Is that how it

20 appeared when you first opened the drawer?

21 A.      Yes, ma'am.  It was a little slight cut.  I did

22 that.

23 Q.      The cut on the left?

24 A.      Yes, ma'am.

25 Q.      Why did you do that?

1 A.      To give it a field test.

2       MS. GREENBERG:   Your Honor, at this time I would

3 like to publish Goodwin 26 and Drugs 31 to the jury.

4       THE COURT:   Yes, you may.

5       BY MS. GREENBERG:

6 Q.      Just to be clear.  This bowl broke since you

7 recovered it?

8 A.      That's correct.

9 Q.      What did you do with these items after you

10 seized them?

11 A.      After I seized them, we brought them back to a

12 central location and I turned them over to an agent.

13 Q.      Were the items that we see here subsequently

14 analyzed by the Montgomery County lab?

15 A.      Yes, ma'am.

16       MS. GREENBERG:   No further questions, Your

17 Honor.

18       Your Honor, I'm sorry.  I apologize.  I realize

19 that this hasn't been read in yet, Your Honor.

20       THE COURT:   All right.

21       MS. GREENBERG:   I'm sorry, Your Honor.  This is

22 related to Mr. Gervisone's testimony, so I'll leave it

23 at that.

24       THE COURT:   All right.  Before we begin

25 cross-examination, we will take a morning break and we

1 will resume at 25 minutes of 12.

2                         (Jury excused at 11:20 a.m.)

3                         (Off the record at 11:20 a.m.)

4                         (On the record at 11:38 a.m.)

5          THE COURT:   Counsel, are you ready for the jury?

6          MS. GREENBERG:   Yes, Your Honor.

7          MR. MCKNETT:   Your Honor, we're missing two

8 lawyers.

9          MS. GREENBERG:   Your Honor, I'm sure Ms.

10 Johnston would say we can proceed without here.  She

11 will be right here.  I'm sure she's getting things

12 ready for the court.

13         THE COURT:   See if you can rustle them up.

14         THE CLERK:   Ready, Judge?

15         THE COURT:   Everybody back now?

16         MR. WARD:   Mr. Sussman is in the bathroom.  He's

17 coming.

18         THE COURT:   Okay.  Well, wait one second.

19         MS. JOHNSTON:   Your Honor, I provided some of

20 the charts to your courtroom deputy to give you, and

21 there is another -- in addition to the one I gave you

22 this morning, there is one other one I was attempting

23 to get finalized that's a summary of the evidence.

24         THE COURT:   Are we ready now?

25         MR. WARD:   Your Honor, I see evidence over on

1  the jury box.

2         THE COURT:   The jurors requested that that be

3  provided to them.

4         MR. WARD:   Wasn't that what they viewed

5  yesterday?

6         THE COURT:   I'm sorry, Mr. Ward?

7         MR. WARD:   I thought they viewed that yesterday.

8         THE COURT:   They were not finished yesterday.

9  They want to finish looking at it.

10        MR. WARD:   Thank you.

11               (Witness resumes the stand.)

12               (Jury returns at 11:43 a.m.)

13        MR. WARD:   Your Honor, before we begin, it is my

14 understanding the jury has asked to see certain

15 evidence again.

16        THE COURT:   They hadn't had a chance to finish

17 reviewing it, nd they are now reviewing it.

18        MR. WARD:   Very well.   Thank you.

19        THE COURT:   Mr. Montemarano, you may proceed.

20        MR. MONTEMARANO:   Thank you.

21        Ms. Greenberg, you are complete?

22        MS. GREENBERG:   Yes, sir.

23                    **CROSS-EXAMINATION**

24        BY MR. MONTEMARANO:

25 Q.    Good morning, Detective Lockhard.   How are you?

1  A.        Fine, sir.

2  Q.        I invite your attention to Government Exhibit

3  Goodwin 20.

4  A.        That's correct.

5  Q.        These documents were part of what you were shown

6  by Ms. Greenberg; correct?

7  A.        That's correct.

8  Q.        Just to refresh your recollection, where were

9  these seized from again?  Do you recall?

10  A.        On the night stand.

11  Q.        These would be directly adjacent to the bed on

12  the night stand in the bedroom; correct?

13  A.        That's correct.

14  Q.        Ms. Greenberg didn't show these to you.  This is

15  part of -- this was also part of that; correct?

16  A.        Did you say you got that --

17  Q.        Part of Goodwin 20; correct?

18  A.        That's correct.

19  Q.        Okay.  That's 5561 South Dakota Avenue  address,

20  that would be in D. C. -- it doesn't say D. C. there,

21  but you see the "Northeast;" correct?

22  A.        It don't have D. C. but it has, "Northeast,

23  South Dakota."

24  Q.        202 area code?

25  A.        That's D. C.

1 Q.      This was also part of Goodwin 20, was it not,

2 sir?

3 A.      That's correct.

4 Q.      And that 5959 South Dakota Avenue.  That would

5 be right next to 5961 -- excuse me, 5559.  That would

6 be right next door to 5561, would it not, as far as  you

7 understand?

8 A.      Yes.

9 Q.      That's another  202 area  code?

10 A.      That's correct.

11 Q.      In fact, that does say, "Washington, D. C.,"

12 does it not?

13 A.      That's correct.

14 Q.      It says, "Paulette  Martin, Director?"

15 A.      Yes.

16 Q.      The person  in the photograph.  Do you see that

17 person  anywhere  in the courtroom?

18 A.      I'm not sure.

19 Q.      Thank you, detective.

20 A.      That's correct.

21        MR. MONTEMARANO:   Thank you very much.

22        Pass the witness, Your Honor.  Thank you.

23        THE COURT:   All right.   Thank you.

24                    **CROSS-EXAMINATION**

25        BY MR. MARTIN:

1 Q.      Is it "Detective  Lockhard ?"

2 A.      That's correct .

3 Q.      Good morning, sir.   Anthony  Martin  on behalf of

4 Mr. Learley  Goodwin .

5 A.      Good morning.

6 Q.      Good morning.   When you went to 36 Farragut  back

7 on June 1st -- it was June 1st, wasn't it, 2004?

8 A.      That's correct .

9 Q.      When you went there , Mr. Goodwin  wasn't  the only

10 one in the house that day was he?

11 A.      No.

12 Q.      There was at least  one other  person  there ;

13 correct ?

14 A.      That's correct .

15 Q.      It was a female ; is that correct ?

16 A.      That's correct .

17 Q.      During  the testimony  that you gave earlier

18 today , there were a number of items with different

19 people 's phone  numbers on it.   Do you remember  that?

20 A.      That's correct .

21 Q.      One of those names was Tiffany  Vessels.   Do you

22 recall  that?

23 A.      Yes.

24 Q.      How many bedrooms were in that house ?

25 A.      If I recall , I think  it was three  upstairs .

1  Q.      They were upstairs.

2          Were you the lead detective or law enforcement

3  personnel that day?

4  A.      No, sir.

5  Q.      How many individuals were there all together?

6  A.      I think it was six on the raid team, and maybe

7  five people from our squad.

8  Q.      I guess the place was divided up?  That is, the

9  house and each member of the team had a different area

10 of responsibility; would that be correct?

11 A.      That's correct.

12 Q.      What was your primary area of responsibility?

13 A.      The master bedroom, and to search the basement.

14 Q.      When you went upstairs to the master bedroom,

15 did you have occasion to look in the closet?

16 A.      Yes.

17 Q.      When you looked in the closet, did you note

18 whether or not there were men's clothes exclusively or

19 women's clothes exclusively, or a combination?

20 A.      I think it was a combination.

21 Q.      A combination of both?

22         And with respect to these phone numbers that you

23 had been shown earlier.  Well, let me show you some of

24 these items here, if I could.  Some of these are well

25 marked and some are not.

1         Let me show you what's been marked as

2 Government's Exhibit Goodwin 20.

3         May I approach, Your Honor?

4         THE COURT:   You may.

5         BY MR. MARTIN:

6 Q.     Do you remember being shown that by government

7 counsel, Ms. Greenberg?

8 A.     That's correct.

9 Q.     And you went through those, sir?

10 A.     Yes.

11 Q.     That's papers and business cards with different

12 phone numbers; right?

13 A.     That's correct.

14 Q.     With respect to these papers and other

15 documents.  There are different handwritings on those

16 documents, are there not?

17 A.     That's correct.

18 Q.     So there's not one single person's handwriting

19 on these.

20 A.     No, sir.

21 Q.     And you've been a police officer now since 1985?

22 A.     Yes.

23 Q.     And you've submitted items in the past for

24 fingerprint analysis; correct?

25 A.     Yes, I have.

1 Q.      And some of those items that you've submitted in

2 the past have included paper and cardboard and the

3 like; correct?

4 A.      No, sir.

5 Q.      You've never submitted any paper documents for

6 fingerprint analysis?

7 A.      No, sir, I haven't.

8 Q.      You were also shown Government's Exhibit 1 which

9 was a MAMSI correspondence.  Do you remember that?

10 A.      Yes.

11 Q.      Maybe instead of approaching you, if I can get

12 this to work I can show that to you and refresh your

13 recollection if you don't recall.

14        Do you remember that?

15 A.      Yes, sir.

16 Q.      And this was one of many documents that were

17 seized at 36 Farragut; right?

18 A.      That's correct.

19 Q.      I think you testified that this was also seized

20 out of the master bedroom; is that correct?

21 A.      That's correct.

22 Q.      Now, this document by itself -- nothing that you

23 see in that correspondence there or by virtue of that

24 letterhead suggests any drug activity to you, does it?

25 A.      No, sir, it don't.

1 Q.      You were shown Government 's Exhibit 2 --

2 Goodwin 's 2. Do you recall that?

3 A.      Yes.

4 Q.      Do you recall that, sir?

5 A.      Yes.

6 Q.      The name "Tiffany Vessels" is there?

7 A.      That 's correct.

8 Q.      Again, that 's the same young lady that you had

9 encountered at the house that day; right?

10 A.      That 's correct.

11 Q.      And if I didn't ask you before, let me ask you

12 now. You didn't arrest Ms. Vessels, did you?

13 A.      No, we didn't.

14 Q.      Again, showing you Goodwin Exhibit 3.

15         Do you see that document?

16 A.      Yes, I can.

17 Q.      There 's a name there of "Raynard Dorsey."

18        Do you see that name?

19 A.      Yes, I do.

20 Q.      Did you have occasion to speak at all with Ms.

21 Vessels?

22        Without telling me what she said, did you speak

23 to her at all?

24 A.      No, I didn't.

25 Q.      So you don't know who Raynard Dorsey is then?

1 A.      No, sir.

2 Q.      And he wasn't there that day.

3 A.      No, sir.

4 Q.      Again, with respect to this handwriting.  You

5 don't know whose handwriting this is, do you?

6 A.      No, I don't.

7 Q.      You don't know whether or not this document was

8 ever submitted for fingerprint analysis to try and

9 determine who had handled this page, do you?

10 A.      No, I don't.

11 Q.      Showing you now what's been marked as Goodwin

12 Exhibit 4.

13        Can you see that, sir?

14 A.      Yes.

15 Q.      Those are the plastic baggies that were

16 published to the ladies and gentlemen  earlier.

17        Where did you take this baggy from?

18 A.      Master bedroom.

19 Q.      Again, the master bedroom.  That was your area

20 of responsibility; right?

21 A.      Yes, sir, it was.

22 Q.      Would you agree with me that as a police officer

23 that plastic is a good repository for fingerprints?

24 A.      Yes, it is.

25 Q.      Did you submit these plastic baggies for

1 fingerprint analysis?

2 A.      No, I didn't.

3 Q.      So you don't know who handled that baggy, do

4 you?

5 A.      No, sir, I don't.

6 Q.      Did you have -- you didn't talk to Ms. Vessels

7 about those baggies?

8 A.      No, I didn't.

9 Q.      Showing you what's been marked as Goodwin 5.

10 Remember this?  Does that refresh your recollection if

11 I show you the letterhead there?

12 A.      That's correct.

13 Q.      Goodwin 5.  What is that, sir?

14 A.      It's a Wachovia -- looks like it's a checking

15 bank account statement.

16 Q.      It's an activity statement; right?

17 A.      Checking statement.

18 Q.      It's an activity statement.

19        On this particular activity statement -- well,

20 let's go back to this.  Let me not snatch it away from

21 you, because that wouldn't be fair.

22        At the top there, the name is Tiffany Vessels'

23 name, is it not?

24 A.      That's correct.

25 Q.      And there's no other name on this statement as

1 far as you can tell.

2          And if you'd like, I would be happy to walk over

3 to you and show you the document if you can't see.

4 A.     That's fine.

5 Q.     You can see it?

6          You don't see any other name there besides Ms.

7 Vessels, do you?

8 A.     No, sir.

9 Q.     So it would appear this is just her account and

10 no one else's; correct?

11 A.     That's correct.

12 Q.     You were also shown Goodwin 6.   This is the

13 Budget Rent-A-Car receipt.

14          Do you see that, sir?

15 A.     Yes, I see that.

16 Q.     I'm looking at this, and my eyes aren't very

17 good.   I think that's pretty obvious to anybody who's

18 been watching me the last few weeks.   Maybe if I

19 approach you, you could tell us who rented this

20 vehicle.

21          Your Honor, may I?

22          THE COURT:   Yes, you may.

23          BY MR. MARTIN:

24 Q.     Thank you, sir.

25          Goodwin 6.   Can you tell us who it was who

1 actually rented that vehicle?

2 A.      Maurice Alexander.

3 Q.      Do you see any other name there?

4 A.      No.  That's about it.

5 Q.      You don't see Mr. Goodwin's name on there

6 anywhere, do you?

7 A.      No, sir.

8 Q.      Thank you, officer.

9        Is there any indication whether or not this was

10 paid for by that checking account I showed you earlier,

11 Tiffany Vessels' account?

12 A.      I don't think so.

13 Q.      Is this another Budget receipt, Goodwin 7?  Do

14 you see that?

15 A.      Yes.

16 Q.      Do you recall looking at that, sir?

17 A.      Yes, I did.

18 Q.      The print is very light.  Can you see it?  Are

19 you able to read it from where you are?

20 A.      Most of it.

21 Q.      If you can read it, what's the name there

22 indicating where it says "credit identification" or

23 "billing instructions," the name of the renter.  Can

24 you see that name?

25 A.      Can you point at what you're trying to show me?

1  Q.      Right here, sir.  (Indicating.)

2  A.      "Tiffany A. Vessels."

3  Q.      Thank you.

4          Court's indulgence.

5          You were also shown some documents in Goodwin

6  11, and I'm going to try to put both of these up on the

7  screen as well.  Tell me if you can see those.

8          Can you see those, sir?

9  A.      Yes.

10 Q.      Okay.  Let's start with the one on the bottom.

11         Would you describe for the ladies and gentlemen

12 of the jury what that is?

13 A.      It's a MAMSI insurance card.

14 Q.      It's an insurance card.  And the member name is?

15 A.      "Goodwin, Learley."

16 Q.      And MAMSI by itself doesn't have any

17 significance in terms of drug activity as far as you

18 know as a narcotics officer, does it?

19 A.      That's correct.

20 Q.      And you've got here again a business card;

21 right?

22 A.      That's correct.

23 Q.      And you don't know who "Sam" is, do you?

24 A.      No, not at all.

25 Q.      And you didn't search Lobo's Discount Car Center

1 at 1124 Florida A venue , did you?

2 A.      You asked did I search it?

3 Q.      Yeah . Did you search it?

4 A.      No , I didn't .

5 Q.      You have no idea who Paul Sinclair is either , do

6 you?

7 A.      No, sir , I don't .

8 Q.      Remember these ? This is Government 's Exhibit

9 Goodwin 13.

10        Do you remember those ?

11 A.      Yes .

12 Q.      These are the money wrapper s; right ?

13 A.      Yes .

14 Q.      These were not submitted for fingerprint

15 analysis , were they ?

16 A.      Not by myself .

17 Q.      When you went into the master bedroom and you

18 found these document s, you said it was pretty tight in

19 the bedroom .

20        Do you remember exact ly where in the master

21 bedroom these were ?

22 A.      I think they was on the left side of the bed .

23 Q.      On the left side of the bed .

24        Was it under the bed ?

25 A.      No .

1 Q.      Was it on a night stand?

2 A.      It's like a night stand.  It's a combined area.

3 Q.      How many night stands were there?

4 A.      In that one bedroom?  I think there were three.

5 Q.      There were three night stands?

6 A.      Yes.

7 Q.      When you separated out the items, or when you

8 took the items out of the night stands, did you

9 separate them according to which night stand it was in?

10 A.      Some of them.

11 Q.      But not all.

12 A.      Not all.

13 Q.      We don't really know which night stand that

14 these wrappers came from, do we?

15 A.      They came from the left side of the bed.

16 Q.      The left side of the bed?

17 A.      Yes.

18 Q.      When you went into the house, you didn't find

19 the occupants --

20 A.      Beg your pardon?

21 Q.      When you went into the house, you didn't find

22 the occupants in bed, did you?

23 A.      They were in the bedroom.

24 Q.      They were in the bedroom, but they weren't

25 actually in the bed were they?

1  A.       I don't know .

2  Q.       If you recall .

3  A.       I don't know .

4  Q.       Here again , we have what's -- what I'm showing

5  you is Goodwin 14.

6           Remember  this , sir ?

7  A.       Yes, sir .

8  Q.       This is a Sprint activity statement , is it not ?

9  A.       That 's correct .

10  Q.      That 's in the name of Tiffany Vessel s, as well ?

11  A.      That 's correct .

12  Q.      You got this out of that same bedroom , didn't

13  you ?

14  A.      That 's correct .

15  Q.      Do you remember if you got this out of the same

16  night stand with the money wrapper s?

17  A.      No, sir , I don't .

18  Q.      Showing you what's been mark ed as Goodwin 15.

19  This appear s to be a Western Union receipt or bill .

20          Can you see that , sir ?

21  A.      Yes, sir .

22  Q.      Would you agree with me that it appear s to be

23  the customer copy of a receipt for a Western Union

24  transaction  or transfer ?

25  A.      Yes, it is .

1 Q.      Again, the name with respect to this activity

2 statement.  Can you see the name there?

3 A.      Yes.

4 Q.      If I can bring it over to you.

5 A.      I can see it.

6 Q.      Could you see it?

7 A.      Yes.

8 Q.      Whose name is on that?

9 A.      Tiffany Vessels.

10 Q.     Thank you.

11        You were also shown Goodwin 16.  I'm going to

12 hold it up because it might be easier if I held it up

13 for you to see.

14 A.     Okay.

15 Q.     Do you recognize that?

16 A.     Yes.

17 Q.     That's a duct-taped phone book; right?

18 A.     That's correct.

19 Q.     And you, I think earlier, had said that you

20 didn't speak to Ms. Vessels regarding any of these

21 items; right?

22 A.     That's correct.

23 Q.     Mr. Goodwin never told you that this was his,

24 did he?

25 A.     No, he didn't.

1 Q.      Same thing with respect to Goodwin 19.  Same

2 question.  Mr. Goodwin never said this was his, did he?

3 A.      That's correct.

4 Q.      Same question, sir, with respect to Goodwin 22.

5 Again, a spiral notebook.

6        Mr. Goodwin never said that was his, did he?

7 A.      No, he didn't.

8 Q.      Again, you didn't submit that to any lab for

9 analysis -- fingerprint analysis of any type.

10 A.     No, sir, I didn't.

11 Q.     You were also shown some photos of baking soda.

12 Remember that?

13 A.     Yes.

14 Q.     Ms. Greenberg had shown you that.

15        With respect to those boxes.  Again, they

16 weren't sent for fingerprint analysis were they?

17 A.     Not to my knowledge.

18 Q.     And you had found what appeared to be cocaine  in

19 a file cabinet.  Remember that in the photos you were

20 shown?

21 A.     That's correct.  Yes.

22 Q.     And you field tested that --

23 A.     Yes, I did.

24 Q.     -- for cocaine, but you didn't find any crack at

25 36 Farragut, did you?

1  A.      No, sir.

2  Q.      And you know what crack looks like; right?

3  A.      Oh, yes.

4  Q.      Drugs 31.  I believe that the cocaine that you

5  found in the file cabinet.  Was that in a plastic

6  wrapper?

7  A.      Yes, it was.

8  Q.      Again, the same question I've asked before.  Was

9  the wrapper sent for fingerprint analysis at any

10  forensic lab?

11  A.      Not to my knowledge.

12  Q.      So you have no clue as to who put that in that

13  file cabinet?

14  A.      No, sir.

15  Q.      Showing you what's been marked as Goodwin 25.

16  Remember this?

17  A.      Yes.

18  Q.      Maybe if I do this you could see it better.

19          Why don't I stop this nonsense?

20          May I approach, Your Honor?

21          THE COURT:  You may.

22          BY MR. MARTIN:

23  Q.      Thank you, sir.

24          Can you see that?

25  A.      Yes, I can.

1  Q.      And you know what that is; right?

2  A.      Yes.

3  Q.      This is what?  What is that?

4  A.      It's a scale.

5  Q.      And the reason you seized that is because it's

6  also commonly used in drug activity; right?

7  A.      Yes.

8  Q.      And it's also an item commonly found in a

9  kitchen; right?

10  A.      Not a Tanita scale.

11  Q.      With respect to this Tanita scale.  If it's not

12  commonly found in a kitchen, don't you think it would

13  be important to find out who was handling this scale?

14  A.      Yes, sir.

15  Q.      But this wasn't sent to a forensic lab for

16  fingerprint analysis, was it?

17  A.      Not to my knowledge.

18  Q.      And this scale is marked suspect defendant

19  Learley Goodwin, but at this point would it be safe to

20  say that Learley Goodwin wasn't the only person who was

21  residing at 36 Farragut?

22  A.      Sir, I don't know who was residing there.  Just

23  only Mr. Goodwin.

24  Q.      Let me ask you this.  Who wrote Learley

25  Goodwin's name on this evidence or property

1 description ?

2          Do you recognize the handwriting ?

3 A.      No, sir , I don't .

4 Q.      That 's not your handwriting ?

5 A.      No , not at all .

6 Q.      So you didn't make that determination , although

7 you were the person on the scene who was at 36 Farragut

8 that morning ; correct ?

9 A.      Yes , I did .

10 Q.      Your indulgence , sir , just a moment .

11 A.      Sure .

12          MR. MARTIN:   Detective Lockhard , thank you for

13 your patience .

14          Your Honor , I have no further question s for the

15 detective .

16          THE COURT:   Thank you .

17          Any addition al cross-examination ?

18          MR. HALL:   No question s , Your Honor .

19          MR. MITCHELL:   No question s , Your Honor .

20          MR. WARD:   Just a couple , Your Honor .

21                    **CROSS-EXAMINATION**

22          BY MR. WARD:

23 Q.      Detective , you talk ed about do ing a field test ?

24 A.      That 's correct .

25 Q.      Is that something you fair ly routine ly do in

1 your business?

2 A.      Yes, sir.

3 Q.      Using a reagent test?

4 A.      That's correct.

5 Q.      All right, sir.  They're usually pretty

6 accurate, aren't they?  Or a lot of them?

7 A.      Yes, that's correct.

8       MR. WARD:    Thank you.

9       THE COURT:   Any further cross?

10       MR. MCKNETT:   No, Your Honor.

11       THE COURT:   Any redirect?

12       MS. GREENBERG:   Briefly, Your Honor.

13                   **REDIRECT EXAMINATION**

14       BY MS. GREENBERG:

15 Q.      Following up on Mr. Ward's question.

16       Detective Lockhard, are your field tests as

17 reliable as the chemical analysis by the Montgomery

18 County Lab?

19 A.      No, ma'am.

20 Q.      That's why you submit suspected items for

21 analysis?

22 A.      Yes, ma'am.

23 Q.      Counsel asked you -- Mr. Martin asked you about

24 the scale, the Tanita scale.  Is that what you're

25 referring to, the name on the scale?

1  A.       That's correct.

2  Q.       Why were you -- you mentioned you wouldn't

3  expect to see one in a kitchen.  Could you tell the

4  jury why?

5  A.       I have never seen a Tanita scale or -- never

6  seen this type in the kitchen.

7  Q.       How about in the drug searches that you've done?

8  A.       Plenty.

9  Q.       Mr. Martin also asked you about not arresting

10  Ms. Vessels.

11         You arrested Mr. Goodwin?

12  A.       Yes.  He was indicted.

13  Q.       And you had authority to arrest him?

14  A.       That's correct.

15  Q.       What kind of authority?

16  A.       I think they had an arrest warrant for him that

17  day.

18  Q.       Did you have a similar authority for Ms.

19  Vessels?

20  A.       No, we didn't.

21  Q.       Is that why you didn't arrest her?

22  A.       That's correct.

23  Q.       You also testified -- Mr. Martin asked you about

24  your responsibility for searching the master bedroom.

25         Did you have additional responsibilities with

1  respect to the Farragut -- with respect to the Farragut

2  Place, Northwest address?

3  A.      That's correct.

4  Q.      What were your additional responsibilities?

5  A.      To recover all the evidence that we found that

6  was pertinent to the case and to take it to the Command

7  Post -- return it all to the Command Post, and turn it

8  over to an agent.

9  Q.      Mr. Martin asked if you were in charge of the

10  search and you said you weren't, but you were in charge

11  of the evidence?

12  A.      That's correct.

13  Q.      You were responsible for the evidence being

14  turned over from the search; is that correct?

15  A.      That's correct.

16  Q.      Were you responsible for determining what items

17  got analyzed for fingerprints and the like?

18  A.      No, ma'am, I wasn't.

19  Q.      That was somebody else's responsibility?

20  A.      That's correct.

21  Q.      Do you know who that was?

22  A.      That would be, I guess, the investigating

23  officer.

24  Q.      Who was that?

25  A.      The one that we was responsible for was

1 Detective  Eveler .

2 Q.      And if I could  approach  and show  you

3 Miscellaneous   37  just  for  identification .

4        Are  you  familiar  with  that  document ?

5 A.      Yes, ma'am , I am.

6 Q.      This  is  the  search  warrant  for  that  residence ?

7 A.      That 's correct .

8 Q.      What  is  Attachment  A to  that  warrant ?

9        I'm  sorry , Attachment  B.  Would  you  explain  to

10 the  jury  what  Attachment  B is  to  a search  warrant ?

11 A.      Attachment  B is  the  items  that  we  are  able  to

12 search  for  and  to  recover .

13 Q.      When  you  say  "able  to," who  gives  you  that

14 authority ?

15 A.      The  court .   The  judge .

16 Q.      Mr. Martin  showed  you  certain  MAMSI  cards  and

17 things  of  the  like  relating  to  Mr. Goodwin .  Do  you

18 recall  those ?

19 A.      That 's correct .

20 Q.      Direct ing  your  attention  to  Paragraph  9 of  that

21 warrant .  If  could  read , that  to  yourself  and  tell  me

22 if  you're  familiar  with  that .

23 A.      Yes, ma'am .

24 Q.      Does  the  seizure  of  items  with  Mr. Goodwin 's

25 name  on  it , is  that  covered  by  the  warrant ?  If  so,

1 how?

2 A.      By Paragraph  9.

3 Q.      How  is  that , sir ?

4 A.      It 's  a  residency  rental  and  ownership  of  the

5 premises  and  of  vehicle s  describe d  here , including  but

6 not  limited  to  utility  and  telephone  bill s, cancel led

7 envelope s, rental s, purchase s  or  agreement  --  lease

8 agreement s  and  key s.

9 Q.      Is  it  under  that  authority  that  you  seize d  the

10 MAMSI  card  with  Mr.  Goodwin 's  name  on  it ?

11 A.      That 's  correct .

12       MS. GREENBERG:    Court 's  indulgence .

13       Nothing  further , Your  Honor .

14       THE  COURT:   Any  recross ?

15       MR.  MARTIN:   Just  a  moment , Your  Honor .

16               **RECROSS  EXAMINATION**

17       BY  MR.  MARTIN:

18 Q.      Ms.  Green berg  just  show ed  you  attachment  B, and

19 she  specifically  direct ed  your  attention  to  Paragraph

20 9.

21       If  I  could  approach  the  witness , Your  Honor .

22       THE  COURT:    You  may.

23       BY  MR.  MARTIN:

24 Q.      I'd  ask  you  to  look  at  Paragraph s  7  through  9.

25 Just  read  it  to  yourself , sir .  When  you  finish  reading

1  it, look up, please.

2  A.      I'm ready.

3  Q.      Are you ready?

4        Okay.  Paragraphs 7 through 9 is telling you

5  generally to pick up papers and documents that you

6  find.  It doesn't say, "Learley Reed Goodwin's papers

7  and documents," does it?

8  A.      No, it don't.

9  Q.      That's why you picked up all the documents;

10  correct?

11  A.      That's correct.

12  Q.      Including those of Ms. Vessels; right?

13  A.      That's correct.

14      MR. MARTIN:   Nothing further, Your Honor.

15      MS. GREENBERG:   May the witness be excused?

16      THE COURT:   Yes.  You may step down.  Thank you

17  very much, officer.

18      MS. GREENBERG:   Your Honor, next we call

19  Sergeant Muldoon.

20  Thereupon,

21                **TIMOTHY MULDOON**,

22  having been called as a witness on behalf of the

23  Plaintiff, and having been first duly sworn by the

24  Courtroom Deputy, was examined and testified as

25  follows:

1                    **DIRECT EXAMINATION**

2        BY MS. GREENBERG:

3 Q.      Could you state your name and spell your last

4 name for the jury, please?

5 A.      My name is Sergeant Timothy    Muldoon  of the

6 Prince  George's  County Police Department.

7        My last name is spelled   M-U-L-D-O-O-N.

8 Q.       Sir, could you give the jury an idea of your

9 background, training and experience, please?

10 A.      I've been with the   Prince  George's  County Police

11 Department for over 16 years.     I'm currently assigned

12 as a supervisor in the Narcotics Intelligence Unit.

13 I've been doing narcotic work for just about ten years

14 now.  My primary training was the Basic Narcotic

15 Investigators School put on by the     Prince  George's

16 County Police Department.    I have gone through the

17 Basic Narcotics Investigator School sponsored by the

18 DEA; Advanced Narcotic Investigators School sponsored d

19 by DEA; training with the multi-jurisdictional task

20 force which is underwritten by the Department of

21 Defense, and that was a course in undercover

22 operations;  I've done undercover operation schools with

23 DEA; I've been through wiretap intercept training

24 through  DEA, and a number of other schools sponsored by

25 our department -- surveillance schools, and that's

1 about it.

2 Q.      The usual?

3 A.      Yeah, the usual.

4 Q.      You're currently a sergeant?

5 A.      I am.

6 Q.      Would the -- and you have your own squad that

7 works for you?

8 A.      I do.

9 Q.      You've been investigating narcotics activity for

10 how long?

11 A.      About ten years.

12 Q.      What was your position back in June of 2004?

13 A.      I was a --  I was a detective in a street

14 narcotics squad.    I did that for quite a few years.

15 Q.      On June 1st 2004 were you asked to assist in the

16 execution of a search warrant at 620      Sheridan Street,

17 Apartment 301 in   Hyattsville , Maryland?

18 A.      Yes, ma'am.

19 Q.      Who asked you to do that?

20 A.      Detective   Eveler .

21 Q.      Showing you what's marked as    P-1.

22         Do you recognize what's depicted in     P-1?

23 A.      Yes, ma'am.  This is the exterior of the

24 apartment that -- the apartment building that we

25 executed the search warrant at.

1  Q.      And P-1(A)?

2  A.      That's the front door -- the entryway to the

3  apartment building.

4  Q.      And the apartment was on the third floor; is

5  that correct?

6  A.      Yes, ma'am.

7  Q.      In Hyattsville,  Maryland?

8  A.      Yes, ma'am.

9  Q.      Could you give the jury an idea about what time

10 did you enter apartment 301 at 620    Sheridan  Street?

11 A.      I believe it was about 10   :45 in the afternoon --

12 in the morning.

13 Q.      How long did the search warrant take at that

14 residence, approximately?

15 A.      Two and a half hours, or maybe three hours.

16 Q.      When you first arrived at this apartment, who

17 was there?

18 A.      LaNora  Ali and a gentleman.    I believe it was

19 her husband.

20 Q.      Do you remember his first name?

21 A.      Not offhand.

22 Q.      And were you one of the first officers to

23 arrive?

24 A.      I was.

25 Q.      What happened when you arrived at the residence?

1 A.      We knocked on the door, announced our

2 intentions, and advised that we had an arrest warrant

3 for Ms. Ali, and we entered the apartment, asked both

4 of them to sit on the couch in the living room of the

5 apartment, at which time it was kind of strange.  The

6 gentleman was real eager to start cleaning up the

7 apartment, and  Ms. Ali the same.

8         They wanted -- we told them, you know, there's

9 no need to clean up the apartment; we're going to be

10 searching the apartment, and they were insistent on

11 cleaning up the apartment.  We asked them to sit down

12 and just cooperate with us.  We told them our

13 intentions and then proceeded with  the search.

14 Q.      Could you tell the jury -- showing you

15 Government's Exhibit   P-1(B) -- what they're looking at

16 here?

17 A.      As you come into the apartment, if you were to

18 look down the hallway, this is a walk-in closet

19 directly down the hallway.

20 Q.      Okay.  And from looking at that picture, where

21 is the doorway?

22         We're standing here --

23 A.      You're standing in the doorway looking down the

24 hallway, and the living room is to the left.

25 Q.      Just to clarify.  If   I was walking in, that's

1  what  I'd first see?

2  A.      Yes.

3  Q.      Did you search that closet?

4  A.      Yes, we did.

5  Q.      Showing you what's been marked as     P-1(C).

6          What is depicted here?

7  A.      That is the closet.  As you can see, it's pretty

8  full.  There's a lot of stuff in it.

9  Q.      Do you see this blue suitcase up here?

10  A.      Yes, ma'am.

11  Q.      Could you tell the jury -- that's marked for the

12  record as  Ali 1 -- what relationship, if any, this has

13  to what they're seeing on the picture there?

14  A.      That suitcase was in the -- that was in the

15  closet, in the back right-hand corner.  It was taken

16  out of the -- it was taken out of the closet and opened

17  up.

18  Q.      Sergeant, perhaps  I could ask you to step down,

19  and I'll ask for  Ms. Merez and the court reporter if

20  you can keep your voice.  If you can't keep your voice

21  up, we have a little lapel mic    for you if you can't

22  keep your voice up.

23  A.      I can keep it up.

24  Q.      If  I can borrow the lazer pointer.

25          Can you show the jury on the     TV screen there

1 where you got  Ali 1 from in that closet.

2          MR. MCKNETT :  Your  Honor, may  I relocate?

3          THE  COURT:  Certainly.

4          MR. MCKNETT :  We can't see where he's pointing

5 with that pointer on the screen.

6          THE  COURT:  By all means, come on over.

7          BY MS. GREENBERG:

8 Q.      Describe it for the record.

9 A.      By the time I had first seen it, it was actually

10 taken out.  Detective Hooper, she was the one who was

11 assigned to the closet.

12 Q.      You were the seizing agent?

13 A.      I was the seizing agent.

14 Q.      From where was it located?

15 A.      It was back in the back corner there, and it was

16 taken out.

17 Q.      For the record, you said that's the back,

18 right-hand corner?

19 A.      Back, right-hand corner.

20 Q.      Did you seize this suitcase marked as     Ali 1?

21 A.      I did.

22 Q.      If you could tell the jury, is this in

23 substantially the same condition as when you seized it?

24 A.      The stuff inside wasn't bagged up and marked as

25 evidence when we seized it.

1  Q.     But they were all inside the suitcase?

2  A.     Yes.  At first look what we thought were books

3  were actually -- they were safes to hold substantial

4  amount of money.

5  Q.     While you're holding the exhibit -- let me make

6  sure I'm saying  Ali 1( B).  If you could, hold that up

7  for the jury and describe what it is and describe how

8  it is when you first seized it.

9  A.     Ali 1( B) is a safe disguised as a book.  It was

10 laying down in the suitcase when we saw it.

11 Q.     If I could direct your attention up to the

12 screen.

13        Oh.  Could you tell us what's on the back, on

14 the binder of  Ali 1(B)?

15 A.     *Treasure  Island*.

16 Q.     And if you could look up on the screen while

17 still looking at  Ali 1(B).

18        What is the jury seeing up on the screen there?

19 A.     That is the three books, and it shows how one of

20 them -- one of them is opened and showing the money.

21 Q.     For the record, that's P-1(D).

22        Can you see on the screen there -- yes, please

23 keep your glasses on.  If you could stay with     Ali 1(B),

24 does that appear to be the same color --

25 A.     Yes.

1 Q.      -- as Ali 1(B)?

2 A.      That appears to be the second book.  That would

3 be the book right up next to the suitcase.

4 Q.      Open showing the money?

5 A.      That appears to be the closed one.  This appears

6 to be the closed one, and this is the one that's still

7 sitting in the suitcase.

8 Q.      Which is, for the record,   Ali 1(C).

9         It is still sitting in the suitcase?

10 A.      Yes.

11 Q.      And Ali 1(D)?

12 A.      That appears to be the one that is open, and

13 that's why you can see the sign on the open cover

14 underneath it, and it's sitting basically in that

15 fashion.

16         MR. WARD: Excuse me,   Your Honor.  If the

17 detective would keep his voice up.

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Keep your voice up.

20         BY MS. GREENBERG:

21 Q.      You have to wear the   mic if you don't.

22 A.      I don't want to wear a microphone.

23 Q.      We've got  Ali 1(D).

24         Does it appear the same now as it appeared in

25 the search warrant that the jury is seeing?

1  A.      Yes.

2  Q.      What is the binder on this?

3  A.      *The Bounty* .

4  Q.      Was it closed and locked?

5  A.      Yes, I believe so.  We opened them on the scene

6  using a --  I believe we used a screwdriver to open

7  them.

8  Q.      And Ali 1(C).  If you could describe the type of

9  book we're looking at here and how it was when you

10  recovered it.

11  A.      It's a green cover.  It's the same type of

12  thing.  It's a book safe.    *Imperial Lexicon Volume I* ,

13  and this same type of thing.  It's a book safe.  And

14  this one you can see is sitting in the -- that's the

15  one that is closed inside the suitcase.

16  Q.      And if you could talk about the third book safe,

17  please.

18  A.      Which is this one here.  (Witness indicating.)

19  that's the open one.    I think we went through them all.

20  Q.      And just to be clear, the three titles are?

21  A.      *Treasure Island, Imperial Lexicon*    and *The*

22  *Bounty.*

23  Q.      I'm going to put   P-1( E) on the screen for the

24  jury.

25          If you could, tell us how that compares to what

1  we're seeing now in P-1(D).

2  A.      It's just more of a -- it's a closer shot of the

3  money and the book safes inside the suitcase and

4  sitting outside the suitcase.

5  Q.      We could see the inside of one of the book

6  safes.

7          Did you recover anything from the inside of the

8  other book safes?

9  A.      Yes.  We first noticed it looked like a

10 substantial amount of money, and just looking at the

11 wrappers we estimated --   I believe  I estimated on the

12 scene at about $120,000  .

13 Q.      Did you do a money count and prepare a Customs

14 form relating to the count of what was seized from

15 these three items:    Ali 1(B), Ali 1(C) and   Ali 1(D),

16 the book safes marked   *Treasure  Island* , *The Bounty*  and

17 *Imperial Lexicon* ?

18 A.      I handed the money and all the evidence you see

19 here over to the case agent, and    I'm sure they did the

20 official count.

21 Q.      Is that contained in Ali 1(A)?

22 A.      Yes.  It appears to be.

23 Q.      What is the official count?

24 A.      $129,600.

25 Q.      And again, although we're only seeing one

1 picture, moneys were seized from each of these?

2 A.      Yes, ma'am.

3 Q.      How was it organized within the book safes?

4 A.      I don't recall.    I don't recall the amount in

5 each one.

6 Q.      Without stating the amount, how was it

7 organized?  Was it all thrown in there?

8 A.      No, no.  It was wrapped nicely in the money

9 wraps which are listed as Ali 1(G).

10 Q.      Now, these money wrappers that you've referenced

11 as Ali 1(G).  Where did these come from?

12 A.      They were wrapped around the bills.

13 Q.      Could you state for the record what type of

14 money wrappers those are?

15 A.      These are $10,000 wrappers.

16         MS. GREENBERG:    Your Honor, may  I publish  Ali

17 1(G) and --

18         THE  COURT:  Yes, you may.

19         MS. GREENBERG:  -- and   Ali 1(A) to the jury?

20         BY MS.  GREENBERG:

21 Q.      Could you tell the jury what Ali 1(F) is?

22 A.      These are documents that were in the suitcase as

23 well, and having been briefed with a couple of -- just

24 kind of briefed on the case,    I noticed that all

25 Paulette  Martin --

1          MR. MCKNETT :  Objection,  Your  Honor.  The

2  witness is testifying as to what he's been briefed on.

3          THE COURT:    Well, testify to what you have

4  personal knowledge of.

5          THE  WITNESS:  Okay.  This is -- these are papers

6  with the name " Paulette  Martin" on it, and they were

7  seized because  I knew the name " Paulette  Martin."

8          BY MS.  GREENBERG:

9  Q.      Is that from inside the suitcase?

10  A.      Yes, ma'am.

11         MS. GREENBERG:    Your  Honor, may  I publish  Ali

12  1(F) at this time?

13         THE  COURT:  Yes, you may.

14         BY MS.  GREENBERG:

15  Q.      And  Ali  1(E).  What is that?

16  A.      This is a --

17  Q.      Where was that recovered from?

18  A.      Out of here as well.  (Witness indicating.)

19  Q.      Out of the suitcase?

20         If  I can put it up on the  screen.

21         Can you read what the company is here?

22  A.      "California Security Cans."

23  Q.      Where is that located?

24  A.      In California.  Hermosa Beach.

25  Q.      Are there various items checked under here?

1  A.      Yes.  There's Lysol spray, a Dow bathroom

2  cleaner and spray starch stain remover.

3  Q.      Could you -- there's certain things that are

4  marked as "25 percent off" with checkmarks next to it

5  under "Automotive."

6  A.      I can't see that.

7  Q.      Yes, because  I haven't moved it up far enough.

8  A.      Okay.

9  Q.      Can you read that into the record?

10  A.     Yes, ma'am.  If you could slide it a little

11  more.  " WD-40 Brake Cleaner, Gunk Engine Cleaner,

12  Liquid Wrench, Puncture Seal, Marvel Mystery Fluid."

13  Q.     And under "Specialty Can Safe?"

14  A.     Under "Specialty Can Safe, 25 percent off AJAX"

15  and --

16  Q.     And they're checked off?

17  A.     Yes, ma'am.

18  Q.     There's another checkmark down here; is that

19  correct?

20  A.     Yes, for "Carpet Deodorant."  And then under

21  "Beer and Soda:  Heineken beer,    RC Cola, 7-Up, Diet

22  Rootbeer , Sunkist , Dr. Pepper, Ginger Ale and    Pepsi."

23  Q.     On the other side here?

24  A.     "Diet  Pepsi" and " Hawaii Punch."

25  Q.     And those are what?

1  A.       Beer cans or soda safes.

2  Q.       Under "Deluxe Safes?"

3  A.       Under "Deluxe Safes" it's "Fire Extinguisher

4  Safe, Fully Working," and then "Auto Battery Safe."

5  Q.       And, sir, lastly in that particular exhibit,     Ali

6  1, did you locate any other items within the suitcase?

7  A.       Yeah.  It struck our attention pretty quickly --

8  when we opened this up, we noticed all the digital

9  scales.  I made a note that there's 15 of the digital

10  scales in there.  At first glance they all appeared

11  unopened and unused at the time.

12  Q.       Could you read into the record -- are they all

13  the same type of scale?

14  A.       It appears we might have two different types.

15  Q.       Could you state for the record the two different

16  types?

17  A.       We have a  Tanita digital mini-slim scale, Model

18  Number 1475 T, and  Tanita  Professional Mini, Model

19  1479 BV, as in "Victor."

20  Q.       And you counted how many scales?

21  A.       Fifteen, ma'am.

22  Q.       That's marked as   Ali 1(D)?

23  A.       Yes, ma'am.  No,   H.

24  Q.       I'm sorry,  Ali 1( H).  Thank you.

25           MS. GREENBERG:  May   I publish a representative

1  from Ali 1(H)?

2           THE COURT:  Yes, you may.

3           MS. GREENBERG:   As well as one of the books?

4           Why don't we go with   *The Bounty* , which is  Ali

5  1(D)?

6           THE COURT:  You   may.

7           BY MS. GREENBERG:

8  Q.      You may resume the witness stand, sir.

9           Did you also search the living room area of this

10 residence?

11 A.      Yes, ma'am.

12 Q.      Showing you what's marked as P-1(F).

13          Can you tell the jury what we're looking at

14 here?

15 A.      This,  I believe -- this is the office area of

16 the home.

17 Q.      And were certain items taken from there?

18 A.      Yes.

19 Q.      What appears on this table right here?

20          Do you know what that is?

21 A.      Yeah.   I believe that's a cell phone that we

22 recovered.

23 Q.      Did you take a closer picture of that?

24 A.      I believe so.

25 Q.      Showing you P-1(G).

1          What is reflected there?

2 A.      That is a -- that's a cell phone that we

3 recovered.

4 Q.      Showing you what's been marked as    Ali 6.

5         If I may approach,   Your Honor?

6         THE COURT:    Yes, you may.

7         BY MS. GREENBERG:

8 Q.      Do you recognize   Ali 6?

9 A.      Yes.  This is the -- is this the cell phone

10 depicted in the picture and the one that is out of the

11 office of the apartment.

12 Q.     Did you seize any other cell phones that day?

13 A.     I believe we seized four.

14 Q.     Directing your attention to    Ali 5.

15        Do you recognize that exhibit?

16 A.     It is a cell phone that   I need photos to verify

17 which cell phone it was.

18        MR. MCKNETT :  Your Honor,  I'm sorry,  I couldn't

19 hear the witness's answer.

20        THE WITNESS:   I can't -- just looking at it like

21 this, I'm not sure which cell phone it is.  If     I had

22 the photographs or my notes,    I would be able to --

23        BY MS. GREENBERG:

24 Q.     Did you seize a cell phone out of a purse?

25 A.     Yes, I did.

1          MR. MCKNETT:  Objection.

2          Leading, Your Honor.

3          THE COURT:  Rephrase the question.

4          Sustained.

5          BY MS. GREENBERG:

6  Q.     Could you tell us, by looking at your notes to

7  refresh your recollection, if that relates to another

8  cell phone that you seized from the residence?

9  A.     There's --  I seized a -- of the four, there's a

10 Cingular  cell phone from the table in the center of the

11 office.

12 Q.     What is distinctive about this phone that you

13 can tell it's on the table that's depicted in the

14 picture before the jury?

15 A.     This one?

16 Q.     Yes.

17 A.     The case is similar -- the case is the same, and

18 you can see the antenna and the clip.  It's that phone.

19          This one is another  Cingular phone, and  I don't

20 know if my notes show which one it would be.       I believe

21 I have two  Cingular -- I have two  Cingular phones:  One

22 from the table, and then    I have this one here.

23 Q.     Where is that from?

24 A.     I believe it's from the purse.

25 Q.     Where was the purse located?

1 A.      In the living room on the dining room table,

2 which is the same place.

3 Q.      Drawing your attention to the bedroom area of

4 that residence.

5         Did you also cause that to be searched?

6 A.      Yes, ma'am.

7 Q.      How many bedrooms were there?

8 A.      Just the one.

9         MS. GREENBERG:    Your Honor, if  I may approach.

10        THE  COURT:  Yes, you may.

11        BY MS.  GREENBERG:

12 Q.     Handing you what's been marked as     Ali 2.

13        Do you recognize that?

14 A.      This is an address book, or a notebook, that was

15 recovered.

16 Q.      From where?

17 A.      From the bedroom.

18 Q.      And Ali 3?

19 A.      Documents recovered from the bedroom.

20 Q.      Ali 4?

21 A.      Another phone bill recovered from the bedroom.

22 Q.      Were these little   stickies on Ali 2 when you

23 recovered it, or that's been done since they were

24 recover ed?

25 A.      That's been done since.

1  Q.       Putting  Ali 3 up on the monitor.

2           Can you tell us in whose name this is in?

3  A.       It's under the name "  L. N.  Ali," and it's got

4  the phone number.

5  Q.       What is the phone number?

6  A.       (301) 270-5319.

7  Q.       And the date?

8  A.       February 2, 1998.

9  Q.       And  Ali 4.

10          What are we looking at here?

11 A.       It is a  Verizon phone bill for    Lanora  Ali Garner

12 at 620  Sheridan  Street, Apartment 301.

13 Q.       What city and town?

14 A.       Hyattsville,  Maryland.

15 Q.       City and state.

16          And this is a period --   I'm sorry.  Let's go to

17 the billing date.

18          What is the billing date here?

19 A.       The billing date is 9/28 of '03.

20 Q.       And the total due?

21 A.       $239 .63.

22 Q.       Directing your attention to P-1(H).

23          Can you tell the jury what we're looking at

24 there?

25 A.       If you can slide it up a little bit more.

1          There's a small amount of cocaine and a straw,

2 and the cocaine's in tinfoil.

3 Q.      What are we looking at here in P-1(H)?

4          Where is this?

5 A.      In the bedroom, on the top of the dresser.

6 Q.      And which bedroom is this?

7 A.      The only bedroom.

8 Q.      In what house?

9 A.      It's 620  Sheridan.

10 Q.     Showing you what's been marked -- if    I may

11 approach -- as Drugs 34.

12          THE COURT:  Y es, you may.

13          BY MS.  GREENBERG:

14 Q.     Can you tell the jury how that relates to what

15 they're seeing in the picture there, P-1(H)?

16 A.      These are the drugs that have been repackaged.

17 Q.     The drugs that they're seeing in the picture

18 there?

19 A.      Yes, ma'am.

20          MR.  MCKNETT :  What's the e xhibit number , please?

21          MS.  GREENBERG:  Drugs 34.

22          MR.  MCKNETT :  Thank you.

23          MS.  GREENBERG:   Your Honor, if  I may publish

24 this to the jury.

25          THE  COURT:  Yes, you may.

1              BY MS. GREENBERG:

2 Q.      Would you tell the jury what we're seeing here

3 in P-1(I)?

4 A.      In the dresser drawer there was a straw and some

5 cocaine -- cocaine baggy inside the jewelry box.  The

6 cocaine was in the top of the napkin that was inside of

7 the jewelry box -- next to that jewelry box.

8 Q.      Where is this -- where was this photo taken?

9 A.      In the bedroom one -- in the bedroom, in the

10 dresser drawer.

11 Q.      How does that relate to what we're -- what we

12 saw in P-1(H) with the jewelry box?

13 A.      I don't know what you mean, "how it relates."

14 Q.      Same place?  Same area?

15 A.      Same area.  It's the outer bedroom.

16 Q.      Showing you what's been marked as Drugs 33.

17          Can you tell the jury how this relates to what

18 they're seeing on the screen?

19 A.      Yes, ma'am.  These are all the items taken out

20 of the -- taken out of that drawer.  You can see the

21 napkin; you can see the jewelry box, the straw and the

22 small amount of cocaine.

23          MS. GREENBERG:   Your Honor, may  I publish Drugs

24 33 to the jury.

25          THE COURT:  Yes, you may.

1          BY MS. GREENBERG:

2  Q.      Sir, now we're looking at P-1(J).

3          What is depicted there?

4  A.      This is the bathroom inside the apartment.

5  Q.      And did you locate items in there?

6  A.      Yes.

7  Q.      What did you locate in --   I'm sorry.  If  I could

8  show you what's been previously marked as      Ali 7,  Ali 8

9  and Drugs 32.

10         Could you tell the jury how, if at all,     Ali 7

11 relates to what they're seeing on the screen before

12 them?

13 A.      There was a brown toiletry bag on the shelf

14 depicted on the picture right behind the toilet, and

15 inside the brown toilet tube bag there were empty

16 glassine baggies with trace amounts of cocaine in it

17 and a straw cut down.

18 Q.      Can you see the toiletry bag on the picture?

19 A.      You see it on that first -- it's hard to see.

20 It is hard to see on there.     I believe it's on that

21 first shelf.  That should be it right there what you

22 zoomed in on the first shelf there.

23 Q.      Could you describe where it is on the picture?

24 A.      It's on the first shelf, what you have zoomed in

25 on.

1  Q.       Where on the picture?  Towards the left?

2  Towards the right?  Towards the middle?

3  A.       Towards the right.

4  Q.       Perhaps if you could come up here again -- I

5  apologize -- and just point it out so the jury can see,

6  and also point out over here so counsel can see before

7  you go see the jury.

8           If you could point it out so counsel can see.

9  A.       This right here.  (Witness indicating.)

10 Q.       And then if you could go show the jury with the

11 laser.

12 A.       Right there.  (Witness indicating.)

13 Q.       Thank you.

14          And Drugs 32.  Do you recognize that exhibit?

15 A.       This would be the small amount of cocaine that

16 came out of the toiletry bag.

17 Q.       The same location and the same bag you pointed

18 out?

19 A.       Yes, ma'am.

20 Q.       And Ali 8?

21 A.       This is a crack pipe that came out of the same

22 location.

23 Q.       Out of that bag that you pointed out?

24 A.       Yes, ma'am.

25          MS. GREENBERG:  Your   Honor, may  I publish  Ali 8,

1  Ali 7, and Drugs 32 to the jury?

2        THE COURT:  Yes, you may.

3        MS. GREENBERG:   Your Honor, at this tie time   I

4  would like to read a stipulation that was agreed to by

5  the parties relating to 620   Sheridan  Street.

6        THE COURT:  O kay.

7        MS.  GREENBERG:  First of all, "Government

8  Exhibit Drugs 32, .60 grams of cocaine was recovered

9  from 620  Sheridan  Street, Apartment 301,   Hyattsville ,

10 Maryland, on or about   June 1st 2004;

11        Government Exhibit Drugs 33, a substance

12 containing a detectable amount of cocaine and       .14 grams

13 of cocaine base, commonly known as "Crack" was

14 recovered from 620   Sheridan  Street, Apartment 301,

15 Hyattsville , Maryland on or about   June 1st 2004;

16        Government Exhibit Drugs 34,    .08 grams of

17 cocaine base, commonly known as "Crack," was recovered

18 from 620  Sheridan  Street, Apartment 301,   Hyattsville ,

19 Maryland on or about   June 1st 2004;

20        And Government Exhibits   Ali 7 and  Ali 7, plastic

21 bags, straws and a plastic bottle pipe containing a

22 detectable amount of cocaine was recovered from 620

23 Sheridan Street, Apartment 301,   Hyattsville , Maryland

24 on or about  June 1st 2004."

25        No further questions,   Your Honor.

1          THE COURT: All right.  Cross-examination.

2          MR. MCKNETT: Yes,  Your Honor.

3          Your Honor, may  I ask when the court intends to

4 break for lunch?

5          THE COURT: Pardon me?

6          MR. MCKNETT: May  I ask when the court is going

7 to break for lunch?

8          THE COURT: When am  I going to take a break?

9          MR. MCKNETT: When would the court intend to

10 break  for lunch?

11         THE COURT: Right about 1:00, because there's a

12 judges meeting that I have to be at at 1:00, but close

13 to 1:00.  If you can't get finished before that, that's

14 fine.  We will come back.

15         MR. MCKNETT: I won't get finished.   I wanted to

16 find a good break.

17         THE COURT: No.  Pick an appropriate break point

18 and we'll break down.

19                    **CROSS-EXAMINATION**

20         BY MR. MCKNETT:

21 Q.     Detective, good afternoon.

22 A.     How are you sir?

23 Q.     I want to start by asking you some questions --

24 I'm taking this in reverse order, but     I want to start

25 with the photographs   Ms. Greenberg had showed you.

1            I want to start with photograph    P-1(J).  Do you

2 see that here?

3 A.        That helps.

4 Q.        If I understood correctly, you indicated that

5 this item here is the brown bag you were referring to?

6 A.        That appears to be in the photo.

7 Q.        Where is that brown bag now?  Do you know?

8 A.        I don't know.

9 Q.        Do you recognize this item back here, this blue

10 item?

11 A.        It appears to be a blue toiletry bag.

12 Q.        Let's take  P-I.  this is the photograph of a

13 dresser drawer?    I think you described it that way.

14 A.        Yes, sir.

15 Q.        This would be the top of the dresser here --

16 A.        Yes, sir.

17 Q.        -- items on it, and then this is the inside of

18 the drawer.

19            What was this item here?

20 A.        It looks like a watch box -- a box that would

21 contain a watch.

22 Q.        And this here is?

23 A.        An open napkin.

24 Q.        Was that napkin open in the drawer?

25 A.        Just as it appears there.

1 Q.      When you arrived to take a picture; correct?

2 A.      Yes, sir.

3 Q.      Who found this?

4 A.      I'm not sure who was assigned to the bedroom,

5 but as soon as it was found it was brought to my

6 attention.

7 Q.      You don't know who was assigned to search the

8 bedroom?

9 A.      Not offhand.

10 Q.      Is there anything that would refresh your

11 recollection as to who was assigned to search the

12 bedroom?

13 A.      It would be down to two people.  It would be

14 Detective Simms or Detective    Collandria .

15 Q.      How many people were on your team -- your search

16 team?

17 A.      I had three county officers and    I believe two

18 from federal agencies.

19 Q.      Can you give us their names, please?

20 A.      I had Detective   Collandria  and Detective Simms,

21 Detective Hooper, and   I'm not real familiar with the

22 federal guys.

23 Q.      Is there anything that would refresh your

24 recollection as to who was in that team?

25 A.      I don't have anything with me.

1          MR. MCKNETT :   Your Honor,  I need to retrieve a

2  document from the table, if    I may.

3          THE COURT:   That's fine.

4          MR. MCKNETT :   May I approach the witness,    Your

5  Honor?

6          THE COURT:    Yes, you may.

7          BY MR. MCKNETT :

8  Q.       Detective,  I want to show you a document.   It's

9  a report of investigation.     I just want to turn to the

10  second page and see if that would refresh your

11  recollection as to who was on your team.

12  A.       It has myself, Detective Simms, Detective

13  Collandria , Detective  Hooper and, from Customs, Brown

14  and Hornberger , along with   Davis from  Montgomery

15  County.

16  Q.       Can you look to see who prepared that report?

17          Just flip that page back over.

18  A.       Right here?

19  Q.       Yeah.

20  A.       "Phillip  Carch ."

21  Q.       "Carch ?"  "Card?"

22  A.       It appears.

23  Q.       Was he on your team?

24  A.       No, sir.

25  Q.       Why is it he would have prepared this report if

1  he was not on your team?

2  A.      Because  I hand over all evidence that we get

3  over to the case agent or people responsible for the

4  case, and they're responsible for preparing any kind of

5  report of investigation.

6  Q.      Who was the case agent to whom you turned over

7  all the evidence that was seized?

8  A.      The one  I was reporting to was Detective    Eveler.

9  Q.      Detective  Eveler?  Thank you.

10         Does looking at that list of individuals refresh

11 your recollection as to who was assigned to search the

12 bedroom?

13 A.      Not specifically, but it was either going to be

14 Simms or Collandria.

15 Q.      But just --  I want to be clear on the process.

16         When you come in -- when your team comes in, are

17 the areas to be searched already -- had they already

18 been assigned, or are they assigned upon entry?

19 A.      Upon entry, because   I don't know the layout of

20 the apartment to see what's most effective.

21 Q.      So your team would have entered the apartment

22 and you would have done a visual search     examination  and

23 then assigned various people to go to different areas

24 and search; is that the way it works?

25 A.      Pretty much, sir.

1  Q.      But you don't -- it would be physically

2  impossible for you to be with each person as they

3  conducted the search; correct?

4  A.      That's correct.

5  Q.      Then after they search their areas they come to

6  you and say, come see what    I found.

7  A.      Yeah.

8  Q.      And then you go -- in this case you would have

9  gone to the bedroom; correct?

10  A.      Yes.

11  Q.      I'm referring again to    P-1(I).

12          You would have gone to the bedroom and that

13  person would have already pulled the drawer out;

14  correct?

15  A.      Typically, yes.

16  Q.      And said, this is what    I found; correct?

17  A.      Yes.

18  Q.      So you don't know if this paper and this -- is

19  this the straw you're referring to here?

20  A.      Yes.

21  Q.      You don't know if they were actually in that box

22  when it was found or not, do you?

23  A.      Typically, it's left as they see it.  Or if

24  they're searching -- as soon as they determine it could

25  possibly be evidence, anything -- all things seized at

1  that point.

2  Q.      I didn't mean to cut you off.

3  A.      So when  I came there, that's what it looked

4  like.  Whether that seizing officer found it all

5  packaged nicely,  I don't know at this time.

6  Q.      Just to be clear, this item and these items

7  could have been in this item when first found.  You

8  don't know one way or the other; correct?

9  A.      It's possible.

10 Q.      I want to refer your attention now -- direct

11 your attention now to P-1(H).  This I think you

12 described as being on the dresser when you first saw

13 it.

14 A.      Yeah.  It's a little jewelry box.

15 Q.      This is the jewelry box here?

16 A.      That's the drawer of it.

17 Q.      Well, this object here is the drawer; right?

18 A.      Yes, sir.

19 Q.      And what's this item here?

20 A.      It appears to be a bracelet and a broach.

21 Q.      Okay.  When you say "jewelry box," you're

22 referring to this drawer.

23 A.      It appears that drawer is from a jewelry box.

24 Q.      Okay.  It appears, does it not, that this drawer

25 came out of here, doesn't it?

1  A.      If you pan out -- yeah.

2  Q.      It looks like it was removed from this?

3  A.      Yes, sir.

4  Q.      Whatever this is.

5  A.      Yes, sir.

6  Q.      The jewelry box on top of the dresser; correct?

7  A.      Yes, sir.

8  Q.      And when you arrived, this is the way it looked;

9  correct?

10  A.      Yes.

11  Q.      This drawer had been taken out by someone, put

12  on top of the dresser, and these items were on display;

13  correct?

14  A.      Yes, sir.

15  Q.      Again, you don't know who took this drawer out

16  of this chest, do you?

17  A.      Not offhand.

18  Q.      And it would be logical, would it not, that the

19  person who was searching that room would have walked

20  in, pulled the drawers out -- and there's another

21  drawer here it looks like, right? -- pulled the drawers

22  out and looked in them to see what's in them; correct?

23  A.      That's correct.

24  Q.      And then removed this drawer because it

25  contained what appeared to be contraband; correct?

1  A.       Yes, sir.

2  Q.       And then called you in to look at it?

3  A.       Yes, sir.

4  Q.       Detective,  I want to draw your attention now to

5  exhibit P-1(G), and   I think you referred to -- is this

6  the cell phone you referred to that was seized?

7  A.       Yes, sir.

8  Q.       And just to back up a little bit.  This is the

9  table that appears in the office area; correct?

10 A.       Yes.

11 Q.       Let me see if  I can find that.  Right there,

12 right?

13 A.       Yes, sir.

14 Q.       This is it here?

15 A.       Yeah.

16 Q.       There's the cell phone.  This a larger picture;

17 correct?

18 A.       Yes, sir.

19 Q.       Perhaps that wasn't the cell phone.  In any

20 event, it's hard to tell on this picture -- this is a

21 close-up; right?

22 A.       Yes, sir.

23 Q.       There's nothing -- what's the significance of

24 seizing the cell phone?

25 A.       In investigations, they're often valuable

1  evidence and who they're making contact with, who

2  they're making phone calls to and receiving phone calls

3  from.  A lot of evidence is stored in the cell phone.

4  Q.     It's not -- the significance is not the cell

5  phone itself, it's the information in the cell phone.

6  A.     It could be the cell phone itself.  It depends

7  on whose hands it's in.

8  Q.     Do you know whose hand that cell phone was in?

9  A.     It's sitting on a table.

10  Q.     Excuse me?

11  A.     It's sitting on a table.

12  Q.     So you seized it not because it was in

13  somebody's hand, but you seized it because you thought

14  there was other evidence you could develop from it;

15  correct?

16  A.     Yes.

17  Q.     Let's go back to when you first came in.

18         This is the parking lot as it appeared when you

19  arrived; correct?

20  A.     Yes, sir.

21  Q.     Can you see the apartment from here -- Ms.    Ali's

22  apartment?

23  A.     I don't believe so.

24  Q.     And this doorway here is here -- hidden behind

25  this car here?

1  A.       Yes, sir.

2  Q.       And you took this picture to further identify

3  the premises; correct?

4  A.       Actually,  I didn't take those pictures.

5  Q.       You didn't take any of these pictures?

6  A.       I didn't take the pictures of the exterior of

7  the building.

8  Q.       Okay.  You took them to identify the building;

9  correct --

10  A.       Yes, sir.

11  Q.       -- to make sure you're in the right place?

12  A.       Yes, sir.

13  Q.       Then as you entered the apartment you see this

14  is an entryway here?

15  A.       Yeah, a little hallway.

16  Q.       What's here to the left?

17  A.       That's the living room.

18  Q.       This is the walk-in closet you referred to;

19  correct?

20  A.       Yes, sir.

21  Q.       This is a close-up of the walk-in closet, right?

22  A.       Yes, sir.

23  Q.       Are you looking -- it appears that somebody --

24  if you look here -- these items here -- do you see them

25  on picture  P-1(B)?

```
 1          You can see where  I'm pointing; correct?

 2 A.      Yes.

 3 Q.      They appear to be these items here in picture

 4 P-1(C); right?

 5 A.      Yes.

 6 Q.      So the door to the closet would be over here.

 7 A.      You're basically standing in the doorway.

 8 Q.      But wouldn't you be standing --

 9 A.      You're looking directly at them that way, and

10 with that second picture you're looking directly at

11 them again.

12 Q.      You're looking directly at them?

13 A.      I can't see.

14 Q.      Are you saying this picture?

15 A.      You're standing almost over top of them.

16 Q.      Excuse me?

17 A.      You're standing almost over top them shooting to

18 the back right corner.

19 Q.      Are you saying that you're standing -- whoever

20 took this picture -- did you take this picture?

21 A.      I think Detective Hooper did.

22 Q.      Are you saying that Detective Cooper was?

23 A.      Actually,  I took those pictures prior to the

24 search.

25 Q.      Are you saying that you were standing directly
```

1  in the doorway when you took the picture?

2  A.      Pretty much at the doorway.

3  Q.      I'm sorry,  I didn't finish my question.

4  A.      Okay.

5  Q.      Are you saying that you were standing directly

6  in the doorway when you took this picture?

7  A.      Yeah, just about.  Just about in the doorway.

8  Q.      So you had the exact same angle on these two

9  pictures?  One's closer than the other.

10  A.      Yeah.  Might have had the camera maybe turned a

11  bit to the right on the second picture, on the

12  close-up, but basically the same vantage point.

13  Q.      On this picture, if you're looking straight in,

14  you see the sugar -- looks like sugar, right?  Sugar

15  bags?

16  A.      Yes, sir.

17  Q.      But directly behind them, on    P-1(B), are other

18  items.  But directly behind them on    P-1(C), they're

19  clothing.  So you couldn't have been standing directly

20  in the doorway when you took this picture, could you?

21  A.      Sure could.  The camera could have been tilted a

22  different way.

23          THE COURT:  Mr. McKnett,  I think we're at a --

24  we'll take a break now, ladies and gentlemen, and we

25  will resume at ten minutes after two.

1                    (Off the record at 1  :02 p.m.)

2                    (On the record at 2  :18 p.m.)

3          THE  COURT:  Ready for the jury?

4          All right, Bea.

5              (Witness resumes the stand.)

6              (Jury returns at 2  :19 p.m.)

7          THE  COURT:

8          THE  COURT:  All right.  You may proceed,    Mr.

9  McKnett .

10         MR.  MCKNETT :  Thank you,  Your  Honor.

11         BY MR.  MCKNETT :

12 Q.    Detective,  I want to come back to these two

13 photographs that   I was having trouble with before we

14 broke for lunch.

15         You took these photographs; right?

16 A.    Yes, sir.

17 Q.    This is coming in the front door; right?

18 A.    Yes, sir.

19 Q.    And if  I --

20         MS.  JOHNSTON:  Could we have an e   xhibit number,

21 please?

22         MR.  MCKNETT :  E xhibit  P-1(B).

23         BY MR.  MCKNETT :

24 Q.    Now I'm looking at   P-1(C).  If  I understand

25 correctly, you would have taken    P-1(C) when you were

1 standing about here?

2 A.      Maybe a little to the right, just inside the

3 doorway.

4 Q.      Looking more to the right than straight back?

5 A.      Yes.

6 Q.      Okay.  This would be the far right corner in

7 that walk-in closet; correct?

8 A.      Yes.

9 Q.      And it was back in this area, somewhere behind

10 these clothes, where you found that blue suitcase?

11 A.      Yes, sir.

12 Q.      You didn't find it, but somebody found it.

13 A.      Yes, sir.

14 Q.      Do you know who found it?

15 A.      Detective Hooper.

16 Q.      Detective Cooper.

17          Was it Detective Cooper's responsibility to

18 search the walk-in closet?

19 A.      It was.

20 Q.      Did he have any other responsibilities that day?

21 A.      She did.   I don't recall what other

22 responsibilities, but   I vividly remember her doing the

23 closet.

24 Q.      Did Detective  Cooper do the search of the

25 suitcase itself?

1  A.      She opened it up once she saw -- she pulled it

2  out into the living room.  She opened it up and she saw

3  the contents of it; she called me over and     I seized it.

4  Q.      Okay.  This --  I'm looking now at  P-1(D) and

5  P-1(E).  They're pictures of the same thing, but one's

6  a closer picture; correct?

7  A.      Yes, sir.

8  Q.      P-1(D) is further away;   P-1(E) is closer.

9          Now, when you came to inspect the items, this is

10 the way they were laid out when you got there; correct?

11 A.      No.   I believe everything was in the suitcase,

12 including the scales.

13 Q.      Okay.  The suitcase was opened.

14 A.      We couldn't see the money at first.

15 Q.      Right.  That was my next question.   The safe was

16 closed?

17 A.      The safes were closed.

18          What immediately brought our attention to the

19 contents of the suitcase were the bag of scales.

20 Q.      But everything was still in the suitcase when

21 you arrived at the closet.

22 A.      Yes.

23 Q.      Coming back to  P-1(C) and  P-1(B).

24          Did you take these photographs after you took

25 the picture of the safe -- the suitcase?

1 A.        No.   This is prior to searching the closet.

2 Q.        Was the closet door opened when you first

3 arrived as it is in this picture?

4 A.        Yes, I believe so.     I believe the coats hanging

5 on it would have made it impossible to close.

6 Q.        Since we last talked, have you been able to

7 remember who searched the bedroom?

8 A.        No.   I haven't given it any thought.

9 Q.        Do you recall who searched the bathroom, the

10 bathroom reflected in    P-1(J)?

11 A.        If I recall,  I did that myself.

12 Q.        You testified that you did not take photographs

13 P-1 P-1(A); correct?

14 A.        That's correct.

15 Q.        Do you know who did?

16 A.        I do not.

17 Q.        Was it a member of your team?

18 A.        No, sir.

19 Q.        Was it a member of the entry team?

20 A.        No, sir.   That was part of the briefing packet.

21 Q.        You had these beforehand?

22 A.        That's correct.

23 Q.        I mentioned the briefing team -- not the

24 briefing team; the entry team.

25          You say your team entered at about 10:45;

1 correct --

2 A.      That's correct.

3 Q.      -- in the morning?

4        Do you know what time the entry team entered

5 that apartment?

6 A.      We did not utilize them.

7 Q.      Excuse me?

8 A.      We did not utilize a SWAT team for the entry of

9 the --

10 Q.      At all?

11 A.      That's right.

12 Q.      What time did you arrive at the premises that

13 day?

14 A.      At that specific apartment?

15 Q.      Yes.

16 A.      About 10 :45.

17 Q.      Where had you been --

18        MS. GREENBERG:  Objection.

19        Relevance.

20        THE COURT:  Overruled.

21        MR. MCKNETT :  Where had you been --

22        MS. GREENBERG:  May we approach,    Your Honor?

23              (At the bar of the Court.)

24        MS. GREENBERG:    Your Honor, they -- it's not

25 that they were conducting another search warrant in

1  this case; they went to the wrong address.     I don't see

2  how that's relevant to this witness's testimony.

3         MR. MCKNETT:   Your Honor, it's sloppy police

4  work and  I'm entitled to show the officer's credibility

5  would be affected by the precision with which the

6  search is carried out, the sloppy police work -- they

7  went to the wrong apartment.

8         THE COURT:  Same building?

9         MR. MCKNETT:  Same building.

10        MS. GREENBERG:  It was not this officer's fault.

11        MR. MCKNETT:   I'm not saying it's his fault.

12  I'm not blaming anybody.

13        MS. GREENBERG:  He's impeaching him with

14  somebody else's mistake, and it's not relevant.

15        MR. MCKNETT:   I think it's fair for me to ask

16  him about circumstances about a search.  What happened

17  is they went into a wrong apartment about six o'clock

18  in the morning.  It was a previous apartment my client

19  lived in, 415, as opposed to 301 where she lived.  They

20  entered that apartment, realized their mistake,

21  apparently came back here and got a valid warrant for

22  the proper address, but   I'm entitled to --

23        MS. GREENBERG:  It was the information,     Your

24  Honor, made available through all the records and given

25  to the magistrate.  They were given permission to go to

1  that apartment.

2          THE COURT:   I know.

3          MR. MCKNETT :   Your Honor, it's important because

4  it's going to be part of my final argument that not

5  only were they sloppy in the beginning of the search;

6  they were sloppy in the search of the apartment itself.

7  I'm making an argument that some of the items --

8          THE COURT:  They had information on an old

9  apartment number, and that's where they went to and

10 found out it was the wrong one.  Then they went back to

11 the right one.

12         MR. MCKNETT :  In the affidavit itself it lists

13 the proper apartment number, but in the search warrant

14 it lists the wrong one.  They were prepared by the same

15 person, and one of the --

16         THE COURT:  Is he the affiant in support of the

17 search warrant?

18         MS. GREENBERG:  No,  Your Honor.

19         MR. MCKNETT :  Excuse me,  Your Honor?

20         THE COURT:  Is he the affiant in support of the

21 search warrant?

22         MR. MCKNETT :  I think  I'm entitled to ask him as

23 far as the precision --

24         THE COURT:  It has nothing to do with his

25 precision is the problem.  Whoever the affiant was may

1 very well --

2        MR. MCKNETT:   Your Honor, I'm not going to ask

3 him if it was his fault.    I'm going to ask him if he

4 was directed to the wrong apartment.

5        THE COURT:   I'm going to sustain the objection.

6        MR. MCKNETT:   Your Honor, this cuts to the heart

7 of my argument and the heart of my defense.

8        THE COURT:  Go after him for all the sloppiness

9 in the search he conducted all you want, but the fact

10 he went to the address on the warrant that he had in

11 his hands at six o'clock in the morning and it turned

12 out to be the wrong address does not show that he, this

13 officer, was sloppy.  It shows that somebody else was

14 sloppy.

15        MR. MCKNETT:   Your Honor, I don't think --  I'm

16 not comfortable revealing this initially because     I

17 don't think  I should have to do it, but    I will.

18        There is also a fundamental problem with what

19 this officer has already testified to as to the time

20 and place of my client at the time he entered the

21 apartment.  He testified that my client was in the

22 apartment at 10 :46 that morning and he saw her there

23 and he arrested her -- his team arrested her.  I can

24 show from other documentation that my client was in

25 fact arrested shortly after 6   :30 that morning and was

1  literally downstairs in this building being questioned

2  at 10:46 when this officer entered the apartment.

3          MS. GREENBERG:  That's a legitimate area of

4  cross-examination,   Your Honor, not --

5          THE COURT:   You may examine him about that.

6  That's fine.

7          What I'm saying is,  I don't think you can

8  impeach this witness as being a sloppy police officer

9  based upon what some other police officer did when he

10 swore out an application for a warrant.

11         MR. MCKNETT :  Your Honor, I am not saying he's a

12 sloppy police officer.    I am not going to say that.    I

13 am not going to ascribe the mistake to him.      I will ask

14 him, if the court would like, did you go to the address

15 on the warrant that you were given?  And he will say

16 yes.  And I'll say, did you -- subsequently, did you

17 find out that it was the wrong apartment?  That's not

18 his fault.

19         THE COURT:  Mr.  McKnett , we are not going to put

20 on trial the issue about the first search of the wrong

21 apartment based upon what some other officer did in an

22 application for a warrant.    I've sustained the

23 objection.

24         You may inquire as to whether he was arrested --

25 she was arrested at a different time than is testified

1 to.

2          MR. MCKNETT:  He's already testified to that,

3 and I don't intend to get into that with him,      Your

4 Honor, but  I do -- the purpose of me asking these

5 questions is to show that there are inconsistencies in

6 the testimony of these officers as to what happened

7 that morning.

8          THE COURT:   I don't think that going into what

9 happened at 6 :30 in the morning is going to impeach

10 what he's testified to from the stand thus far.

11          MR. MCKNETT:   Your Honor, I had intended to do

12 that.

13          MS. GREENBERG:   Your Honor has ruled.  We're

14 just revisiting the same arguments.

15          THE COURT:   I've already made my ruling,    Mr.

16 McKnett.   I wish  I could do it better, but that's the

17 best I can do.

18          MR. MCKNETT:  Just to complete the record, then.

19 What I had intended to do was address the incorrect

20 entry -- the entry to the incorrect apartment by

21 someone perhaps on the entry team, but he said there

22 was no entry team; he did it.  So, he went to the wrong

23 apartment and his people arrested    my client at about

24 6:30 in the morning.

25          THE COURT:  He went to the apartment that was

1 identified on the search warrant.

2          MR. MCKNETT:  Excuse me?

3          THE COURT:  He went to the apartment that was

4 identified on the warrant.

5          MR. MCKNETT:  Then they went immediately

6 downstairs to the correct apartment and arrested my

7 client at that time and then waited until a valid

8 warrant was delivered at 10  :30.  Then they went in and

9 did the search, but his team arrested my client at --

10         THE COURT:  You can ask him, what time of day

11 did you arrest her.

12         MR. MCKNETT:  He's already said 10  :46 -- 10 :45.

13         THE COURT:  You can challenge him.  This is your

14 right to cross-examine him on that.

15         MR. MCKNETT:  But his credibility is the issue,

16 Your Honor.

17         THE COURT:  His credibility is always an issue.

18 If you ask him, isn't it a fact, officer, that you

19 didn't arrest her at 10  :45 -- you arrested her at 6  :30,

20 isn't that a fact?  If he then says no, it's not the

21 case, then we may have to revisit the question.

22         MR. MCKNETT:  In order to accurately and fully

23 explore that issue, I have to be able to put it in

24 context, and the context is he arrested her shortly

25 after going to the wrong apartment.

1          THE  COURT:   I don't think it's proper
2   impeachment of this officer that he went to the wrong
3   place that was accurately described in the first search
4   warrant.   You may impeach him if he tried to deny that
5   he didn't arrest her at 6   :30.   If in fact she was
6   arrested at 6 :30 and he's now saying he arrested her at
7   10:45, you can challenge her.
8          MS.  GREENBERG:    Your  Honor,  I don't want him
9   challenging him by saying, you went to the wrong
10  apartment and then afterwards --     I don't want him
11  slipping it in and out.
12         THE  COURT:  Let's see what happens.
13         MR.  MCKNETT:   If   I can't address that he went to
14  the wrong apartment, how can     I challenge him when he
15  arrested my client?
16         THE  COURT:   If he denies he arrested her at
17  6:30, we may have to go back to this issue.
18         MR.  MCKNETT:  But if   I can't --  I understand.
19  I'm just trying to be clear on what questions      I can
20  ask.   If  I can't ask him where --
21         THE  COURT:   I can't tell you what you can ask
22  him until  I hear what his answer is to that question.
23  You're telling me, as an officer of the court, that she
24  was in fact arrested at 6   :30, and on cross-examination
25  you ask, isn't it a fact, officer, she wasn't arrested

1  at 10:45; she was arrested at 6  :30 in the morning?

2  Isn't that true?  And if he says no, it was 10     :45, then

3  we have to revisit the question of if he went there at

4  6:30 with the wrong warrant.

5          MR. MCKNETT :  Depending on his answer.

6          THE  COURT:  It depends on the answer.  We may

7  have to come back and talk about this.

8                    (Back in open court.)

9          MR.  MCKNETT :  Your  Honor, may  I consult  Mr.

10 Montemarano  for  a second?

11         THE COURT:    You may.

12         BY MR.  MCKNETT :

13 Q.      Detective,  I want to turn your attention right

14 now to the blue suitcase,    Ali 1, which  I will now, if   I

15 may Your  Honor, put up on the table here.

16         Detective, where was that suitcase when you

17 first saw it?

18 A.      On the living room floor.

19 Q.      Was it closed when you saw it?

20 A.      No, it was open.

21 Q.      Do you know who opened it?

22 A.      Detective Hooper.

23 Q.      Do you know how he opened it?

24 A.      She?  No,  I do not.

25 Q.      Did you ever see a key to the suitcase?

1  A.      I don't recall.

2  Q.      Well, is it a fact that   Detective  Cooper had to

3  pry it open, didn't he?

4  A.      I don't know.

5  Q.      You were in charge of the search; right?

6  A.      That's correct.

7  Q.      And you don't know who searched the bedroom;

8  correct?

9  A.      I don't recall at this time.

10  Q.      And you don't know how the agent opened this

11  suitcase; correct?

12  A.      No, sir.

13  Q.      Do you have any records that would refresh your

14  recollection?

15  A.      No, sir.

16  Q.      Did you make notes as you were carrying out this

17  search?

18  A.      Of how the suitcase was opened?  No, sir.

19  Q.      Did you make any notes at all?

20  A.      Notes on some locater cards.  That's about it.

21  Q.      The locater cards?  That's about it?

22          Did you make any notes as to certain times

23  things were discovered?

24  A.      I don't know if that was logged on the cards or

25  not.

1  Q.      Do you know if you made any records concerning

2  when the suitcase was open?

3  A.      No, I don't believe  I did.

4  Q.      Did you seize any keys from   Ms. Ali?

5  A.      I don't recall seizing any keys.

6  Q.      Did you seize any keys from -- well,    Ms.  Ali's

7  husband,  Mr. Garner?

8  A.      I don't recall recovering any keys -- seizing

9  any keys.

10 Q.      But you do recall seeing the suitcase?

11 A.      Yes, sir.

12 Q.      When you saw it, it was open.

13 A.      Yes, sir.  On the floor in the living room.

14 Q.      I think you said what first caught your eye were

15 the safes.

16 A.      The scales.

17 Q.      Excuse me, the scales -- bag of scales.  There

18 were 15 or so scales in here?

19 A.      Yes, sir.

20 Q.      Were these scales submitted for fingerprint

21 analysis?

22 A.      I don't know, sir.

23 Q.      There's no black powder on them, is there?

24 A.      I didn't open them up, but it didn't appear

25 there was.

1 Q.      There's no black powder on any of the boxes, is

2 there?

3 A.      There doesn't appear to be, sir.

4 Q.      That would indicate they were not submitted for

5 fingerprint analysis, wouldn't it?

6 A.      I don't know if they've been cleaned.  I can

7 only assume they were not.

8 Q.      Well, would it be your practice to do a

9 fingerprint analysis on an object and then clean it up

10 nicely afterwards?

11 A.      I typically do not.

12 Q.      Does anybody?

13 A.      I can't testify for everybody or anybody.

14 Q.      Have you ever seen anybody do that?

15 A.      I don't believe I have.

16 Q.      Then you noticed these book safes; correct?

17 A.      Yes, sir.

18 Q.      This is not the condition they were in when you

19 found them, is it?

20 A.      No, sir.  They were closed.

21 Q.      They were closed.

22        Do you know how these were opened?

23 A.      With a screwdriver.

24 Q.      So you didn't have the key for these either, did

25 you?

1 A.       No, sir.

2 Q.       These were in the suitcase.

3 A.       Yes, sir.

4 Q.       All three of them.

5 A.       Yep.

6 Q.       All three of them were locked.

7 A.       Yes, sir.

8 Q.       This is the bag the safes were in, isn't it?

9 A.       I don't know.

10 Q.      It's an empty bag.  It was not in the suitcase

11 when you found it; right?

12 A.      That's right.

13 Q.      This California Security Can receipt or list,

14 whatever you want to call it,   Ali 1(E) -- by the way,

15 the book safes are   Ali 1(B), (C) and (D); the scales

16 are Ali 1(H), and the suitcase is    Ali 1; is that

17 correct?

18 A.      I'll take your word for that over there.

19 Q.      The California Security Cans checklist,    Ali

20 1(E).

21       Do you see that here?

22 A.      Yes, sir.

23 Q.      Do you see up in the right-hand corner the date?

24 A.      "June 1996."

25 Q.      That's the date that's printed on the form;

1 correct?

2 A.      Yes, sir.

3 Q.      This was discovered when?

4 A.      June 1st of 2004.

5 Q.      Eight years later; correct?

6 A.      Yes, sir.

7 Q.      The Currency/Money/Instrument Seizure Inventory,

8 Ali 1(A).

9        Do you recognize that?

10 A.     It's a form that I looked at earlier today.

11 Q.     That was not the suitcase when you found it, was

12 it?

13 A.     No, sir.

14 Q.     Who filled that out?

15 A.     I'm sure the detective's name is on the bottom.

16 It's difficult to read.

17 Q.     Whose name is that?

18 A.     It's difficult -- "Lanf  ord," maybe?  It's

19 difficult to read from here.

20 Q.     It's zoomed in as far as I can go.  Oh, no it's

21 not.  I can do better than that.  Here we go.

22 A.     "Lamf ord."  " Lawford."  I can't make out the

23 signature on the bottom.

24 Q.     Do you know either of those two people?

25 A.     I do not.

1  Q.      This was something that was prepared and then

2  put in or within the suitcase; correct --

3  A.      Yes.

4  Q.      -- in lieu of the cash.

5  A.      Yes.

6  Q.      Where's the cash?

7  A.      I don't know.

8  Q.      Ali 1(G), the money wrappers.

9          You testified earlier that these were around the

10  money; correct?

11  A.      Yes, sir.

12  Q.      The money was bundled up in these wrappers.

13  They were not laying loose in the suitcase, were they?

14  A.      That's correct.

15  Q.      There's also in this bag, as part of    Ali 1(G)

16  these three envelopes.

17          Do you recognize them?

18  A.      Yes.

19          Those three envelopes would have been containing

20  what  I have listed as an approximate $9,600 of money.

21  Q.      And there's writing on the back of this one.

22          Do you see that?

23  A.      That says two thousand $100s and three $50s.

24  Q.      Do you know who put that on there?

25  A.      No,  I do not.

1  Q.      So the money was wrapped up in these money

2  wrappers.

3  A.      My estimate on the scene was $120,000 was

4  wrapped up in the wrappers, and the other money was in

5  the envelopes.

6  Q.      $120,000 was wrapped up in the wrappers, and

7  then there was how much in these envelopes?

8  A.      $9,600.

9  Q.      Detective,  I'm now showing you  Ali 1(F).

10         Let me hand those to you, if    I may,  Your  Honor.

11         Detective, what are they?

12  A.      These appear to be receipts for furniture with

13  the name " Paulette  Martin" on it, looking at the first

14  one.

15         How deep do you want me to go in the stack?

16  Q.      Excuse me?

17  A.      How deep do you want me to go in the stack?

18  Q.      I want to ask you about that.

19         Did you examine these?

20  A.      Not each individual one.    I looked at the -- saw

21  that they had names associated with the case, so      I

22  seized the whole bundle.

23  Q.      Detective,  I would like you to look at some of

24  these documents.  There is a -- is there a cash

25  register receipt, a yellow one, in there somewhere?

1  A.      Right in the front?

2  Q.      Yes.

3  A.      For Danker Furniture?

4  Q.      Yes.  What's the date on that?

5  A.      6/25 of '96.

6  Q.      '96?

7  A.      Yes, sir.

8  Q.      Look at some --  I don't want to sit here and

9  make you sit here and look at every receipt in there.

10         Do they all appear to be in the same of

11 "Paulette  Martin?"

12 A.      Yes, they do.

13 Q.      I want to draw you your attention -- let me look

14 at this first.  Look at some of the dates, if you

15 would.

16         Would you read off some of the dates at random?

17 A.      Let's see.  June of '02.  July '02.  April of

18 '02.  April of '99.  No date.  '96.  '02.  '97.  '99.

19 '99.

20         Would you like me to keep going?

21 Q.      You can stop whenever you want to.

22         Every document you looked at had    Paulette

23 Martin's name on it?

24 A.      It did.

25 Q.      I'll retrieve that, if you like.

1          So, the money was in these safe boxes.

2  A.      The majority of it was, yes.

3  Q.      What was not in the safe boxes was in these

4  envelopes; correct?

5  A.      That's correct.

6  Q.      The envelopes were closed?

7  A.      I don't recall.

8  Q.      You can't recall that?

9  A.      I don't recall if they were closed or not.

10 Q.      In any event, it was all in the suitcase, and

11 the suitcase was closed and locked; correct?

12 A.      I don't know if it was locked or if --    I don't

13 know if we needed to force it open or not.

14 Q.      Wouldn't that have been a significant fact to

15 make note of that entry had to be made by way of force

16 into the suitcase?

17 A.      Not really.

18 Q.      Wouldn't it have been a significant fact to make

19 note of that someone had the keys and you did not have

20 to force entry into the suitcase?

21 Q.      That would have been a significant fact,

22 wouldn't it, if the keys were in    Ms. Ali's possession?

23 A.      If they were.

24 Q.      But they weren't, were they?

25 A.      No.

1  Q.       They weren't in   Mr. Ali's possession, were they?

2  A.       I don't recall using a key to open it up.

3  Q.       Detective, let's look at some of the other

4  things that were seized at   Ms. Ali's residence.

5           There was a brown spiral notebook; correct?

6  A.       Yes, sir.

7  Q.       And you seized that because items of that sort

8  have information in them; correct?

9  A.       Typically, yes.

10 Q.       And you can use that in some cases to find lists

11 of ledger sheets, drug sales, that sort of stuff;

12 right?

13 A.       You can find a lot of things in them.

14 Q.       That's one of the things you can find; right?

15 A.       Sometimes.

16 Q.       You didn't find any of that in the brown

17 notebook, did you?

18 A.       I didn't look.

19 Q.       Did anybody tell you you found ledger sheets --

20 they found ledger sheets in that notebook?

21 A.       There's no need to tell me.

22 Q.       You found -- let me find the right e   xhibit

23 number here.  In picture P-1(G) -- no, excuse me,

24 P-1(G) was the drawer.

25           Let me put it this way.  You called it a

1  "jewelry box drawer;" correct?

2  A.      Yes, sir.

3  Q.      And it had -- again, what did it have in it?

4  What was this item?

5  A.      Tinfoil, with a little bit of coke in it.

6  Q.      What's this item?

7  A.      A straw.

8  Q.      That would indicate personal use, wouldn't it?

9  A.      Sometimes, yes.

10 Q.      Sometimes?

11 A.      Well, yes.

12 Q.      Always; right?

13 A.      There's actually legitimate purposes for straws

14 sometimes, but --

15 Q.      Well, seeing --

16 A.      In proximity, yes.

17 Q.      Found this way, that would indicate virtually

18 100 percent of the time personal use of cocaine;

19 correct?

20 A.      Yeah.

21 Q.      Showing you now picture 1(I).

22         Similar; correct?

23 A.      Yes, sir.

24 Q.      A straw?

25 A.      Yes, sir.

1  Q.      And a little -- you can just make it out here a

2  little baggy.

3          Do you see that?

4  A.      Yes.

5  Q.      That's a very small baggy, isn't it?

6          It's a very small baggy, isn't it?

7  A.      If it was filled with coke, it's actually a

8  pretty good size bag.

9  Q.      You find a baggy that size -- did that have

10 residue on it?

11 A.      Yes.

12 Q.      Which means it had drugs in it at one time but

13 doesn't now?

14 A.      That's correct.

15 Q.      It would indicate somebody used the drugs that

16 were in that baggy; correct?

17 A.      Perhaps.

18 Q.      Especially when you find a little straw next to

19 it; correct?

20 A.      Yes.

21 Q.      Indicates personal use, doesn't it?

22 A.      It often does.

23 Q.      Almost 100 percent of the time?

24 A.      It often does.

25 Q.      Let's go to the bathroom and P-1(J).  Not

1 literally, but --

2          THE COURT:  We'll do that at 3   :30.

3          BY MR. MCKNETT:

4 Q.     This is P-1(J); correct?

5 A.     Okay.

6 Q.     And you claim that -- you testified that this

7 right here is the brown toiletry bag that was seized --

8 A.     Yes, I believe that is --

9 Q.     -- correct?

10 A.    I don't think  I seized the toiletry bag.    I

11 believe it was just the contents.

12 Q.    The contents?

13 A.    Yes, sir.

14 Q.    The items that were in the bag were seized?

15 A.    Correct.

16 Q.    And those items,  I believe you testified to as

17 to -- were  Ali 7 and 8.   Ali 7 was a plastic baggy with

18 a straw and trace; right?

19 A.    Out of the bathroom  I have cocaine, baggies and

20 the crack pipe looking at my notes.     I don't know what

21 --

22 Q.    You didn't find a quantity of cocaine, did you?

23 You found the straw.

24 A.    No.  There was about a half a gram of coke.

25 Q.    Do we have that here?  Can   I see it, please?

1           Officer, when items of this sort -- drugs,

2  paraphernalia, suspected    CDS -- are seized, a report is

3  made; correct?

4  A.      Yes.

5  Q.      They're entered in a log of sorts -- a form;

6  right?

7  A.      Yes.

8  Q.      Do you --  I want to show you what's been marked

9  as a Number 1.

10          Do you recognize this form?

11          Let me zoom it in a little bit.     I can show it

12  to you, if it would be easier.

13  A.      They won't be able to see it.

14  Q.      I can show it to you and then put it back up.

15          Do you want to see it?

16  A.      Yes.

17          MR. MCKNETT :  May I approach,  Your  Honor?

18          THE COURT:   Yes, you may.

19          THE WITNESS:  This is a   Montgomery County Police

20  form that  I'm not familiar with it.  Looking at it,

21  it's a request for analysis of drugs and evidence

22  transmittal sheet.

23          BY MR. MCKNETT :

24  Q.      This has to do with the search on      Sheridan

25  Street; right?

1  A.      Let me look at it.  Yes, it appears to.

2  Q.      So this would -- this is the list of items that

3  were found during the search of     Ms. Ali's residence;

4  correct?

5  A.      Yes.

6          MS. GREENBERG:   Your Honor, I'm going to object

7  to it.  This witness says he's not familiar with that

8  form.

9          MR. MCKNETT:  He said he's familiar with the

10  contents of it.

11          THE COURT:   Well, he's not familiar with the

12  form.  He's just familiar with --

13          MR. MCKNETT:  He answered the question that he

14  knows this was the report that was filed concerning the

15  --

16          THE COURT:   I'll overrule the objection.  Stay

17  within his personal knowledge, if you can.

18          BY MR. MCKNETT:

19  Q.      To the best of your knowledge, all the drugs and

20  paraphernalia that would have been seized would have

21  been listed on this form or a form like this; correct?

22  A.      I don't know exactly what form they would have

23  been --  I merely hand them over to the case agent, and

24  where it goes from there    I'm not real sure.

25  Q.      There is a form -- if not this one -- somewhere

1 that lists all the drugs --

2 A.      In Prince George's County we have forms that

3 cover drugs and property; that's correct.

4 Q.      You say "we." You're talking about?

5 A.      We -- me being  Prince George's  County police.

6 Typically, yes.

7 Q.      There were members from Montgomery County on

8 your team, weren't they?  Your search team?

9 A.      Yeah.

10 Q.     It's possible that somebody from    Montgomery

11 County seized the drugs and forwarded them?

12 A.      I imagine that was filled out by a     Montgomery

13 County police officer.

14 Q.     Right.

15        You said there was about a half a gram of

16 cocaine that was seized?

17 A.      Yes, sir.

18 Q.     Powder?

19 A.      Excuse me?

20 Q.     Powder?

21 A.      I don't recall.

22        If I could see it,  I could tell you.

23 Q.     If you see --  I'm sorry,  I couldn't hear you.

24 A.      Hand me the exhibit, and typically you can tell.

25 Q.     Okay, you're right.  It's right here in front of

1 me.

2 A.      The drugs aren't in here.  You don't have the

3 drugs.  The drugs aren't there.

4 Q.      Okay.  Well, hold onto that for just a second.

5 A.      Okay.

6 Q.      Take a look at the other item in there.

7 A.      This?

8 Q.      Is there an e xhibit number on that?

9 A.      This is  Ali 8.

10 Q.      And the other -- the first one is Ali 7?

11 A.      This is  Ali 7.

12 Q.      Okay.  Have you had a chance to look at them?

13 A.      Yes.

14 Q.      Familiar with it?

15 A.      Yes.

16 Q.      Could  I have it back, please?

17 A.      Yes, sir.

18 Q.      Thank you.

19         MS.  GREENBERG:   Mr. McKnett, here is the other

20 exhibit.

21         MR.  MCKNETT:  Thank you.

22         Now, I'm going to show you Drugs 32.

23         MS.  GREENBERG:   I'm sorry.  Could you say the

24 number again?

25         BY MR.  MCKNETT:

1  Q.      Drugs 32.

2  A.      Okay.

3  Q.      Those are the drugs; correct?

4  A.      Actually,  I was wrong.  In that condition    I

5  can't tell if it's crack or if it's coke.  It got

6  smashed up.

7  Q.      Okay.  This is -- in any event, this is it;

8  right?

9          I'm not going to take it out of a sealed bag.

10 It's the small package here?

11 A.      Yes, the small package.

12 Q.      It's kind of hidden on reflection, but     I'll

13 publish that if   I may in just a moment.

14         Let's come back to   Ali 7 for just a second.  As

15 you pointed out, there are no drugs in there, but there

16 is an object in there; isn't there?

17 A.      There's a baggy with smaller baggies and a

18 straw.

19 Q.      A straw?

20 A.      Yes, sir.

21 Q.      Thank you.

22         It looks like there are three, perhaps, smaller

23 baggies.  Want to take a look again?

24 A.      Three or four.  There's a few.

25 Q.      It appears they also have -- at least two of

1  them -- it looks like all of them have residue in them.

2  A.      It does.

3  Q.      And you found these small baggies which are hard

4  to see on the screen, but    I'll publish them here.

5          There's a straw here; correct?

6  A.      Yes.

7  Q.      When the straw was recovered, it didn't have

8  this red tag on it, did it?

9  A.      No.

10 Q.      It was a clear plastic straw; correct?

11 A.      Yes.

12 Q.      It also had residue on it; correct?

13 A.      Yes.

14 Q.      Which would indicate that it had been used for

15 ingesting cocaine?

16 A.      Correct.

17 Q.      It would a fair assumption that the cocaine that

18 had come out of this through this straw would have come

19 out of these envelopes, wouldn't it?

20 A.      Sure.

21 Q.      And this item,  Ali 8.  You looked at that;

22 right?

23 A.      Yes.

24 Q.      What is that?

25 A.      It's a homemade crack pipe.

1 Q.      And it is used to smoke crack cocaine; correct?

2 A.      Correct.

3         MR. MCKNETT :  Your Honor, may  I publish these

4 items?

5         THE COURT:  Yes.

6         MR. MCKNETT :  Did you publish these?

7         MS. GREENBERG:  You can do it again.

8         BY MR. MCKNETT :

9 Q.      And that sort of homemade smoking pipe would

10 also indicate personal use, wouldn't it?

11 A.      Yes.

12 Q.      Not sale or distribution; correct?

13 A.      It indicates use.

14 Q.      But it does not indicate distribution, does it?

15 A.      No.

16 Q.      It indicates the person who used that was the

17 end user; correct?

18 A.      Correct.  It does not exclude the other, no.

19 Q.      Well, it doesn't exclude the possibility the

20 person who used it could have, at a different time,

21 distributed it; correct?

22 A.      It does not exclude that.

23 Q.      But it does indicate that at least when using

24 that pipe that was for personal use.

25 A.      It means to me that that pipe is used to smoke

1  crack cocaine.    I don't draw any other assumptions from

2  the person because of the crack pipe.

3  Q.     That pipe is not used to distribute or sale

4  cocaine.

5  A.     No, unless you share the pipe.

6        MR. MCKNETT:    Your Honor, may I get a glass of

7  water?

8        THE COURT:    Certainly.

9        BY MR. MCKNETT:

10 Q.     Detective, I want to take you back now again to

11 the time of your entry into the apartment.

12        You said -- you entered at what time?

13 A.     I think I might have erred on the exact time we

14 entered the apartment.    I believe we entered probably

15 an hour before, probably --    I'm going to say about

16 9:45.

17 Q.     Could it have been around -- well, let's start

18 from the beginning.

19        When did you receive the paperwork that

20 authorized the search of the apartment?

21 A.     The search of  Ms. Ali's apartment?  Apartment

22 301?  10 :45.

23 Q.     So why did you enter an hour earlier than that?

24 A.     Because we had to go up there -- prior to that,

25 we went to a different apartment and then learned that

1  we were at the wrong apartment, and then we went

2  upstairs, after consulting with Detective      Eveler --

3  conferred with him, and we went upstairs to apartment

4  301.

5  Q.      You went -- which apartment did you go to first?

6          MS. GREENBERG:  Objection.

7          THE COURT:  Overruled.

8          THE WITNESS:   I don't recall the apartment

9  number, but it was downstairs.

10         BY MR. MCKNETT :

11 Q.      It was below  Ms. Ali's apartment?

12 A.      I believe so.

13 Q.      Did you have a search warrant for that

14 apartment?

15         MS. GREENBERG:  Objection.

16         THE COURT:  Overruled.

17         THE WITNESS:  Yes, we did.

18         BY MR. MCKNETT :

19 Q.      Do you have that search warrant with you?

20 A.      I do not.

21 Q.      Before a search warrant is issued, legal

22 procedure requires that an affidavit be prepared;

23 correct?

24 A.      Correct.

25         MS. GREENBERG:   Your Honor, objection.

1          This is not the witness that prepared the

2 affidavit.

3          If we can approach the bench.

4          THE COURT:   You can't go much farther with this

5 witness.

6          MR. MCKNETT:   I'm asking about the process.

7          THE COURT:  You can go into the process.

8          BY MR. MCKNETT:

9 Q.    I was about to make clear that you did not fill

10 out the application, did you?

11 A.    Correct.

12 Q.    It was someone else?

13 A.    Correct.

14 Q.    And whoever filled out the application submitted

15 it to --

16          MS. GREENBERG:  Objection as to what some other

17 person did.

18          THE COURT: Yeah.   Mr. McKnett,  I think that's

19 far enough on that subject.

20          MR. MCKNETT:   I'll move on.

21          THE COURT:   Somebody else has to do it.

22          BY MR. MCKNETT:

23 Q.    Ultimately, a search warrant was issued; is that

24 correct?

25 A.    That's correct.

1  Q.      That is delivered to you?

2  A.      That is correct.

3  Q.      You assemble your team, or your team has already

4  been assembled; correct?

5  A.      Yes.

6  Q.      Your search team   I'm talking about.

7  A.      Yes.

8  Q.      And then you and your search team go to the

9  premises identified on the search warrant; correct?

10  A.      Yes.

11  Q.      And you carry out the search; correct?

12  A.      Correct.

13  Q.      But in this case there was a mistake made --

14         MS. GREENBERG:  Objection.

15         THE COURT:  Overruled.

16         BY MR. MCKNETT :

17  Q.      -- correct?

18  A.      Yes.

19  Q.      And the initial search warrant that you had was

20  for an address other than the address where    Ms. Ali

21  resided; correct?

22  A.      That's correct.

23  Q.      You recognized that mistake; correct?

24  A.      Yes.

25  Q.      You then contacted Agent   Eveler , is that what

1 you said?

2 A.      Yes.

3 Q.      You explained to him that a mistake had been

4 made; correct?

5 A.      Yes.

6 Q.      And eventually a correct and accurate search

7 warrant was delivered to you.

8 A.      Correct.

9 Q.      At that point you carried out the search.

10 A.      We carried out the search, yes.

11 Q.      You had been in the apartment for at least an

12 hour before.

13 A.      Yes.

14 Q.      Who was in the apartment during that hour?

15 A.      I believe it was Detective Logan who had to be

16 excused because of a medical condition.  Detective

17 Hooper and Detective Collandria,    I believe.

18 Q.      Where was the rest of your search team?

19 A.      I'm not sure.    I'm not 100 percent sure who was

20 in the apartment with us during the waiting period.

21 Q.      Did you make a report of this?

22 A.      Not -- no official report, no, sir.

23 Q.      Did you make any report of this?

24 A.      Just handing out evidence logs to the case

25 agent.

1  Q.      Did you make any report about the fact that you

2  had been a given faulty search warrant?

3          MS. GREENBERG:  Objection,   Your Honor.

4          THE COURT:  Sustained.

5          BY MR. MCKNETT :

6  Q.      You're sure that  Ms. Ali was in the apartment

7  when you went in at -- what time did you say it was?

8  A.      It was probably about an hour before.

9  Q.      You're sure she was in the apartment at that

10 time when you went in?

11 A.      Yes, ma'am -- yes, sir.

12 Q.      And you're sure that her husband was in there?

13 A.      If that was -- yeah.

14 Q.      The other gentleman?

15 A.      Yeah.

16 Q.      Mr. Garner.  He was there.

17         And you testified that they both attempted to

18 tidy up the apartment.

19 A.      Yes.

20 Q.      They weren't trying to hide things, were they?

21 A.      I don't know.   I don't know what their

22 intentions were.

23 Q.      Well, they were tidying up as people -- the way

24 people tidy up when they come into somebody's

25 apartment; correct?

1  A.       What they were -- they were trying to put things

2  into the closet, maybe to cover up a suitcase.  It's

3  hard to say.

4  Q.       But you don't know what they were doing, do you?

5  A.       That's what  I was trying to say earlier.

6  Q.       Okay.  Could it have -- what time -- is it

7  called "staging?"  Is that the right term?  You

8  "stage?"

9  A.       Yes.

10  Q.       When did you stage for the search of     Ms. Ali's

11  apartment?

12  A.       It was early.

13  Q.       What time?

14  A.       I don't recall.    I don't recall.  It was early.

15  6:00 or 7:00.

16  Q.       I'm sorry?

17  A.       6:00 or 7:00 in the morning.

18  Q.       Where did you stage?

19  A.       About a mile away.

20  Q.       What did you do between 6:00 or 7:00 and 9     :45?

21          MS. GREENBERG:  Objection.

22          THE COURT:  Overruled.

23          THE WITNESS:  We went to the other apartment,

24  and then there's some down time in between the staging

25  and the execution of the warrants; made entry into the

1  first apartment, consulted with Detective     Eveler  and

2  then went to the --   Ms. Ali's apartment.

3          BY MR.  MCKNETT :

4  Q.     It took you from 6:00 or 7:00 until 9    :45 to

5  realize that you were in the wrong apartment?

6  A.     Don't -- no.  Oh, no.  We realized instantly.

7  Once we were inside the first apartment we realized

8  that that was not the right apartment.     I mean, things

9  don't happen instantaneous, but as soon as possible we

10  went upstairs to -- went to   Ms. Ali's apartment.  The

11  exact amount of time,   I'm not sure of, but   I'm

12  estimating it was about an hour.

13  Q.     Were there -- were there people in the other

14  apartment?

15  A.     Yes.

16  Q.     Have the items that were before the jury -- did

17  they come back?   I want to make sure they've come back.

18          Detective, you mentioned several people who were

19  on your team; correct?

20  A.     Yes.

21  Q.     Could you name them again, please, and tell me

22  what the obligation as far as searching was with regard

23  to each of them?

24  A.     I mean, as  I stated earlier,  I didn't know

25  exactly -- the one   I remember was Detective Hooper, and

1 she had the -- she had the closet.  You couldn't fit

2 anymore than one person in that closet.  It was pretty

3 cramped.

4          As far as the bedroom and the office, it would

5 have been other people on the search team.     I'm not --

6 I don't have specifically who searched where.

7 Q.     There were how many people on the search team?

8 A.     It was three, and then the two outside agencies.

9 I don't think they did much of the search.  It was

10 primarily Hooper, Collandria and Simms.

11 Q.     You can't tell us what each of them was doing

12 during the search.

13          MS. GREENBERG:   Your Honor, asked and answered

14 about five times.

15          THE COURT:  Yeah.  Sustained.

16          MR. MCKNETT:  Can you tell us -- was that

17 sustained, Your Honor?

18          THE COURT:  Yes.  Sustained.

19          BY MR. MCKNETT:

20 Q.     Can you tell us what the members of the search

21 team that entered the apartment the first time were

22 doing while you were waiting for that valid warrant?

23          MS. GREENBERG:  Objection.

24          THE COURT:   Overruled.

25          THE WITNESS:  Same team.

```
 1            BY MR. MCKNETT :

 2 Q.       Same team?

 3 A.       Same team.

 4 Q.       All of them?

 5 A.       Yes.

 6 Q.       And you were all in the apartment.

 7          How much searching was done before the valid

 8 warrant arrived?

 9 A.       How much searching of what apartment?

10 Q.       Of Ms. Ali's apartment.

11 A.       None.

12 Q.       None at all?

13 A.       No.

14 Q.       Well, when you go to -- when you search a place,

15 you do a sweep, don't you?

16 A.       There was no searching done prior to that

17 warrant coming up.

18 Q.       When you go into an apartment -- any residence,

19 you do a sweep; correct?

20          MS. GREENBERG:   Objection.  Asked and answered.

21          THE COURT:   Overruled.

22          MR. MCKNETT :  It wasn't answered,   Your Honor.

23          BY MR.  MCKNETT :

24 Q.       What's the first thing a team does when it

25 enters an apartment?
```

1  A.      Look for people; make sure there's no other

2  people there, and just render the apartment safe.

3  Q.      You look in all the rooms; right?

4  A.      Yes.

5  Q.      You look in all the closets; right?

6  A.      Yes.

7  Q.      You look anywhere someone could be hiding;

8  correct?

9  A.      Yes.

10  Q.      So there is a search done.

11  A.      Yes.

12         MS. GREENBERG:  Objection.

13         THE COURT:  Sustained.

14         BY MR. MCKNETT:

15  Q.      Would you call that a search of the apartment?

16  A.      We're looking for people.  We're making the

17  apartment safe, just so no one sneaks up behind us.

18  Q.      You would call that a search?

19         You're searching for other people in the

20  apartment; correct?

21  A.      Yes.  We're looking for other people, yes.

22  Q.      You're looking in places that -- in closets that

23  are closed; correct?

24  A.      Yes.

25  Q.      And you're looking in bathrooms; correct?

1  A.      Yes.

2  Q.      And you're looking, if the situation calls for

3  it, behind the shower curtain; correct?

4  A.      Sure.

5  Q.      You're looking somewhere anyone could be; right?

6  A.      Sure.

7  Q.      And that's happening out of your presence, isn't

8  it?

9  A.      Excuse me?

10 Q.      Well, you can't see where everybody is at all

11 times in that apartment, can you?

12 A.      That's correct.

13 Q.      So when the -- if a person goes into a bedroom

14 and does a -- is it protective search?  Is that a good

15 phrase?

16 A.      I think the term that you're trying is

17 "protective sweep," maybe.

18 Q.      That's the one  I'm looking for.

19 A.      Okay.

20 Q.      Protective sweep.

21         When a protective sweep is being done, it's

22 being done by individual members of your team in

23 different rooms from each other; correct?

24 A.      Yes.

25 Q.      And you can't observe what each of them is doing

1  in each room, can you?

2  A.      No, sir.

3  Q.      How long did that take in the case of   Ms. Ali's

4  apartment?

5  A.      Less than a minute.

6  Q.      So, for the rest of that hour that you conceded

7  you were there waiting, what were you doing?

8  A.      Standing in the living room.  Didn't sit down

9  once.

10  Q.      Nobody sat down?  Nobody left the living room?

11  Everybody came back in?

12  A.      Everyone just -- we stayed in the living room.

13  The gentleman wanted to get dressed.  We let him call

14  work and let them know there was going to be a delay.

15  Basically, we knew we had to -- we knew we had time on

16  our hands, and we stood there and we talked.

17  Q.      Did you talk to  Ms. Ali?

18  A.      Casual conversation.

19  Q.      Did you talk to the gentleman who was there with

20  Ms. Ali?

21  A.      Just casual conversation.  Killing time.

22  Q.      Excuse me.   I didn't mean to cut you off.

23  A.      Just killing time.

24  Q.      Where was  Ms. Ali when you first came into the

25  apartment?

1  A.      I believe she answered the door.

2  Q.      Where was the other gentleman?

3  A.      Coming out of the shower.

4  Q.      Did you ever get his identification?

5  A.      I believe we did.

6  Q.      Do you recall what it was?

7  A.      I don't.

8  Q.      Does the name "Garner" come to mind?

9  A.      Yes.

10 Q.      Ulysses Garner, perhaps?

11 A.      Yeah.

12 Q.      After Ms. Ali answered the door, what did you

13 do?

14 A.      We told her -- we told her why we were there,

15 told her that we had an arrest warrant for her, and we

16 told her that we had a search warrant issued -- we were

17 going to have a search warrant issued for the house --

18 for the apartment, at which time we secured the

19 apartment and we had  Mr. Garner and  Ms. Ali sitting

20 after -- we let  Mr. Garner get dressed, and then

21 everyone sat in the living room.

22 Q.      Was Ms. Ali under arrest then?

23 A.      Yes.

24 Q.      When a person is arrested, is it your practice

25 to fill out a report of arrest?

1  A.      If it's my arrest, yes.

2  Q.      Whose arrest was it in this case?

3  A.      It was not mine.

4  Q.      Whose was it?

5  A.      I don't know.

6  Q.      You were in charge; right?

7  A.      I was in charge of that location.     I was not in

8  charge of the paperwork to fill out forms.

9  Q.      But you don't know who arrested    Ms. Ali?

10  A.      Who filled out the warrant -- the arrest warrant

11  and the indictment?  No,    I do not.

12  Q.      Who arrested her?

13          Which member of the team arrested    Ms. Ali?

14  A.      I don't recall.

15  Q.      Was it a member of your police department?

16  A.      I don't know.    I don't know.

17  Q.      When a person is arrested by a member of your

18  police department, is a report made that this person

19  has been arrested?

20  A.      Not necessarily.  If we're acting -- if we're

21  doing it for somebody else, no.

22  Q.      Were you doing -- were you arresting    Ms. Ali for

23  somebody else?

24  A.      Yes.

25  Q.      Who were you arresting her for?

1 A.      Whoever filled out the indictment or whoever

2 filled out the arrest warrant.

3 Q.      Did you have the arrest warrant?

4 A.      No.   I was advised that there was an arrest

5 warrant in my briefing package.   There might have been

6 a copy of the arrest warrant.      I don't recall seeing it

7 though.

8 Q.      So you arrested somebody without a copy of the

9 arrest warrant.

10 A.      Yes.

11 Q.      You don't know who you were arresting her for,

12 and you don't know who made out the report that she was

13 arrested, but you were in charge.

14 A.      Correct.

15 Q.      Thank you.

16         Thank you,  Your Honor.

17         THE COURT:  Any further cross?

18         Redirect.

19                    **REDIRECT EXAMINATION**

20         BY MS. GREENBERG:

21 Q.      Sir, if you would take us back to    June 1st 2004.

22         To follow up on some of   Mr. McKnett's  questions.

23         You testified you went to the wrong residence;

24 is that correct?

25 A.      That's correct.

1 Q.      Did you have a valid search warrant for that

2 residence ?

3 A.      I did.

4 Q.      How quickly did you realize you were at the

5 wrong residence?

6 A.      Immediately.

7 Q.      How did you know that?

8 A.      When the people inside did not fit the

9 description.   I asked the people's names.  None of the

10 people matched up, and you just kind of know.  They

11 were --  I don't know if they were Cambodian.

12 Q.      What caused you to know where the correct

13 apartment was?

14 A.      In my briefing packet there was some

15 documentation --   I think they were   MVA printouts -- and

16 they listed "apartment 301," at which point    I asked

17 Detective  Eveler, I said, would you like me to go

18 upstairs and knock on 301 to see if    Ms. Ali is up

19 there?

20 Q.      Staying with the wrong apartment.

21          Did you ever develop information that that had

22 been Ms. Ali's apartment at some time?

23 A.      Yes.  On some of the printouts there was that

24 apartment on it.

25 Q.      How about your discussions with the people in

1  that apartment?

2  A.     It was very limited.  It was -- they had just

3  moved there, and we just -- you just knew it right

4  away.

5  Q.     They had just moved into the apartment?

6  A.     It wasn't long before that.     I don't think it

7  was long after that that they left.

8  Q.     Because of your actions?

9  A.     I don't know.   I don't know.

10 Q.     But it was clear to you that   Ms. Ali had changed

11 apartments; is that correct?

12 A.     Yes.

13 Q.     So the probable cause presented to the

14 magistrate was no longer valid, although it had existed

15 at one time?

16 A.     That's correct.  For that apartment, yes.

17 Q.     Therefore you called Detective    Eveler , who was

18 giving you instructions?

19 A.     That's correct.

20 Q.     And was it Detective    Eveler who told you that he

21 had obtained an arrest warrant for     Ms. Ali?

22 A.     Yes.  I mean, it was in the briefing packet so

23 there was an arrest warrant for her.

24 Q.     Did you have any reason to doubt that there was

25 a legitimate arrest warrant for    Ms. Ali?

1 A.       Not at all.

2 Q.       Do you often go on the word of another law

3 enforcement officer when they give you that?

4 A.       All the time.

5 Q.       And then you went to the correct apartment.  Is

6 that where  Ms. Ali had moved to?

7 A.       Yes.

8 Q.       And you had a valid arrest warrant still for

9 her, based on your conversations with Detective       Eveler?

10 A.      Yes, I did.

11 Q.      What did you do at the apartment 301, the new

12 apartment?

13 A.      We knocked on the -- we kept it fairly low key.

14 She answered the door and, like     I said, we announced

15 our intention.  We told her we had an arrest warrant

16 for her, you know, step back inside.  At which time we

17 sat her down on the couch and the gentleman was walking

18 out of the shower.  We had him sit down on the couch

19 and get dressed and sit down on the couch as well.

20 Q.      The period of time   Mr. McKnett was asking you

21 about.  Why was it necessary for you to stand there and

22 wait for that period of time?

23 A.      Because Detective  Eveler or the other agents

24 were making contact with the judges and getting a new

25 warrant signed.

1 Q.      Based on the new information you developed?

2 A.      That's correct.

3 Q.      Now, sir, did you have any reason when you first

4 went to the original apartment that it was the wrong

5 apartment?

6 A.      Prior to going inside?  No,   I had no --  I

7 assumed it was going to be the right apartment.

8 Q.      Did you search that first apartment?

9 A.      No.

10 Q.      After you realized the mistake?

11 A.      No.

12 Q.      Did you at all times act courteously to the

13 people there?

14          MR. MONTEMARANO :  Objection.

15          THE COURT:  Overruled.

16          MS. GREENBERG:  Did you?

17 A.      Yes.

18 Q.      Sir, was there -- when you went up to    Ms. Ali's

19 apartment with the arrest warrant, was there any

20 difficulty in entering the residence?

21 A.      Not at all.

22 Q.      In fact, how did you get in?

23 A.      We were allowed in.  We knocked on the door and

24 were allowed in.

25 Q.      In connection with --   Mr. McKnett  didn't give

1  this an exhibit sticker, so    I'll just mark it as

2  miscellaneous 38.

3          If I may approach,   Your Honor.

4          THE COURT:  You may.

5          BY MS. GREENBERG:

6  Q.      You might recall he asked you about this exhibit

7  and asked you who this person was that filled out the

8  report relating to your search warrant that date on

9  miscellaneous 38.

10          Do you see that?

11 A.      Yes, sir.

12 Q.      Ma'am.

13 A.      Ma'am.  I'm used to saying "sir."    I'm sorry.

14 Q.      Who is the approving official on that?

15 A.      Steven Snyder.

16 Q.      And what role, if any, did you understand

17 Special Agent  Snyder to play in this investigation?

18 A.      I wasn't that familiar with the case.

19 Q.      I'm sorry?

20 A.      I don't know.

21 Q.      But he approved this report?

22 A.      Yes.  It appears so.

23 Q.      If I could have drug exhibits 32, 33 and 34,

24 please.

25          Mr. McKnett asked you a number of times about

1 the seizing agent -- your role as seizing agent and the

2 finding agent.

3       Could you explain to the jury quite simply what

4 your instructions were to the agents working with you

5 on this date when your role was the lead agent for the

6 search warrant?

7 A.      If I'm the seizing agent -- if   I'm the lead

8 agent on the search warrant,    I'll have a team that,

9 basically,  I'll assign to a room.  They'll search the

10 room.  When they find something that they believe might

11 be significant evidence, they'll come get me, at which

12 point  I determine whether it's going to be seized or

13 not.  If it's going to seized, we photograph it in

14 place as they found it or once they discovered that it

15 was possible evidence, and at which time    I seize it.

16 Q.     One what instructions, if any, did you give them

17 about moving the exhibits?

18 A.     Like  I said, you -- once you determine it's

19 possible evidence, you leave it and then    I come.

20 Q.     And certain of the items you were able to take

21 pictures of and certain you weren't?

22 A.     Yes.

23       MS. GREENBERG:   If I may approach,  Your Honor.

24       THE COURT:   You may.

25       BY MS. GREENBERG:

1  Q.       Showing you drug exhibits 32, 33 and 34, for

2  example.

3           Starting with 33.  When    Mr. McKnett showed you

4  this straw in the jewelry box, with the tissue in it or

5  -- and the gift wrapper, why were they all packaged in

6  the same box?

7  A.       It's hard to say.  Probably to keep it nice and

8  tidy.

9  Q.       Where were these in proximity to each other?

10 A.       Next to each other.

11 Q.       And you could see that on the picture?

12 A.       Yes.

13 Q.       On some occasions you put the picture in the

14 exhibit?

15 A.       Yes.

16 Q.       Similarly, the tinfoil and the drugs are in 34;

17 is that correct?  Drug   Exhibit 34?

18 A.       Yes.

19 Q.       Similarly, the cocaine or crack cocaine in an

20 envelope were in 32; is that correct?

21 A.       Yes.

22 Q.       Except for the picture that you took of it

23 which, just for the record -- well, we'll start with

24 that question.

25           The picture you took.  Except for that, this

1 exhibit is sealed with what was located in the

2 residence; correct?

3 A.      Yes.

4 Q.      And there's notations on the back of certain of

5 these pictures.  Did you review those?

6        Does that refresh your recollection as to who

7 recovered those particular exhibits?

8 A.      Yes.  Detective Brown.

9 Q.      What exhibit are you referring to there?

10 A.      This is my exhibit -- out of the jewelry box.

11 Detective Brown, who   I did not mention earlier.  He

12 wasn't on that report.

13 Q.      That's in Drug  Exhibit 34?

14 A.      Yes.

15 Q.      And similarly, Drug   Exhibit 33?

16 A.      Detective Brown. I.D. 22   456.

17 Q.      Is there any question in your mind that all of

18 these exhibits we showed you today were recovered from

19 the Sheridan  Street address at which you arrested     Ms.

20 Ali?

21 A.      No.  No doubt.

22 Q.      To finish up with the drug exhibit questions.

23        Mr. McKnett  asked you if you field tested

24 certain of the items.  Do you recall that question?

25        MR. MCKNETT :  Objection,  Your Honor.  I didn't

1   ask him about field testing.

2          THE WITNESS:  He didn't ask.

3          MS. GREENBERG:  Let me ask it this way.

4          Can a field test differentiate between cocaine

5   and cocaine base?

6          MR. MCKNETT:  Objection,  Your Honor.

7          THE COURT:  Wait a minute.  Wait a minute.  Was

8   this asked on cross?

9          MS. GREENBERG:  What?

10          THE COURT:  Was this asked on cross?

11          MS. GREENBERG:   I thought it was,  Your Honor,

12   but I can move on.

13          THE COURT:  Sustained.

14          Move on.

15          BY MS. GREENBERG:

16   Q.     You explained that you took certain things on

17   cross-examination by   Mr. McKnett, such as a cell phone,

18   address book, and he asked you what relevance that had

19   to the investigation.

20          Do you recall those questions?

21   A.     Yes.

22   Q.     Under what authority did you take these items?

23   A.     By search warrant.  The search warrant gave me

24   the authority to seize them.

25   Q.     And there's an attachment on the search warrant?

1  A.      Yes.

2  Q.      And it lists out "cell phones?"

3  A.      Yes.

4          MR. MCKNETT :  Objection.   I didn't challenge his

5  authority to seize these items.  It's outside the

6  scope.

7          THE COURT:  Overruled.

8          BY MS. GREENBERG:

9  Q.      Cell phones?

10  A.      Yes.

11  Q.      Address books?

12  A.      Yes.

13  Q.      Drugs?

14  A.      Yes.

15  Q.      Things of that sort?

16  A.      Yes.

17  Q.      Did you make an independent assessment as to

18  what relevance it would have to the investigation?

19  A.      Not my job.

20  Q.      You were following the search warrant authorized

21  by the judge?

22  A.      Yes.

23  Q.      You also talked about the money that was seized,

24  and on cross-examination you estimated $120,000 from

25  the book safes and approximately $9,600 from the

1 envelopes.

2          From where did you get that estimate?

3 A.     Just a preliminary count on the scene.

4 Q.     Who counted?

5 A.     Me.

6 Q.     And is that consistent with the final count,

7 approximately?

8          You said an estimate.  Is it consistent?

9 A.     Yeah, I believe so.

10 Q.    What is the procedure -- the money is not here.

11 You testified to that on cross-examination.

12         What is the procedure for your department after

13 you take seized money?

14 A.    Typically, it's to deposit it into a fund.  The

15 bills themselves aren't necessary for court.  Either a

16 receipt or, in our department's case, a property record

17 with serial numbers.

18 Q.    That's standard operating procedure?

19 A.    Yes.

20         MS. GREENBERG:  No further questions,     Your

21 Honor.

22         THE COURT:  Any recross?

23         No recross?

24         All right, you may step down.  Thank you very

25 much.

1                    (Witness excused at 3  :27 p.m.)

2          THE  COURT:   We will take a recess  until  20

3 minute s  of  four .

4                    (Jury excused at 3:28 p.m.)

5                    (Off  the record  at  3:28  p.m. )

6          THE COURT:   Counsel , with regard  to having  a

7 session  tomorrow .  That session  is not going  to be able

8 to happen .  The guilty  plea  that  I  have  in  the

9 afternoon  is an unmovable  feat , and  I don't think   we're

10 going  to be able  to accomplish   that  much , and  Mr.

11 Montemarano  pain  anyway .  So, we will  not  meet

12 tomorrow .

13          MR.  MONTEMARANO :   A pain , or in  pain ?

14          THE  COURT:   I said , "in  pain ."

15          MS.  GREENBERG:    Your  Honor  we'll  stipulate .

16          THE  COURT:   I want  you to know that with  regard

17 to next  week .  The  jury  had asked  if we were  going  to

18 have  long er session s  to start  at something  like 9:00  or

19 8:00 .  The one  day I absolute ly, positive ly cannot  do

20 that  is Tuesday , because  that 's when  I have  a followup

21 visit  with  the  surgeon .  So, we will  have  to start  at

22 10 o'clock  on Tuesday , and  I'm going  to explore  between

23 now  and next  Tuesday  the option  for start ing  early .

24 So, counsel  should  be contemplating   the possibility

25 that  we will  not  be doing  10 o'clock  starts  after

1  Tuesday of next week. So, I want to be able to get all
2  the testimony in that we can -- hopefully all of it
3  next week -- and then have a complete and successful
4  charge conference on Monday, the 31st.
5       MS. GREENBERG:  Sir, what time will we go to on
6  Tuesday? What time do you expect to stop on Tuesday?
7       THE COURT:  5:00.
8       MS. GREENBERG:  Thank you.
9       THE COURT:  Yeah. I have a status conference
10 that I can move to 5:30 to make sure I don't have any
11 problem with it, but -- no. If I'm starting at 10:00,
12 I'm going to go to five. I have some matters that are
13 in the morning on Wednesday and Thursday and Friday,
14 and I'm going to see what I can do to move some of them
15 around, but that's what I plan to do.
16      Yes, sir.
17      MR. MONTEMARANO:  When would Your Honor like to
18 deal with the question of the various charts?
19      MS. JOHNSTON:  Your Honor, if I could speak up
20 right now. Our next witness is Detective Eveler.
21      THE COURT:  The chart witness?
22      MS. JOHNSTON:  A short witness?
23      THE COURT:  No. The chart witness?
24      MS. JOHNSTON:  The chart witness.
25      THE COURT:  Will he short as well, but he's the

1  chart witness.

2          MS. JOHNSTON:   No.  Unfortunately, I don't think

3  he's going to be short in terms of his time on the

4  stand, given some of the previous cross-examination.

5          THE COURT:   All right.  Is there any chart I

6  haven't seen a copy of?

7          MS. JOHNSTON:   Yes.  There is one, Your Honor,

8  and that is the last one which is also the last one

9  that we're going to cover with him.

10          THE COURT:   All right.  Well, let me see it.

11          MR. HALL:   That is one, Your Honor, that most of

12  us do have an objection to.

13          MR. WARD:   I think all of us do.  I certainly

14  do.

15          MR. MONTEMARANO:   Your Honor, with regard to the

16  drug chart just provided you by Ms. Johnston.  I can

17  sort of -- we've reviewed it.  We don't believe there

18  are any factual errors in it that would deal with Page

19  1, 2 and most of Page 3.  However, at the bottom -- in

20  other words, the amounts are correct and the kinds of

21  drugs are correct, the locations are correct, the

22  exhibit numbers are correct -- we're all probably going

23  to have to double check that against our substantive

24  evidence that we have in our files -- but for the sake

25  of discussion, they're all correct.

1         There are minor errors that have been alleviate d
2    at the bottom of the chart . The court will note the
3    listing of the 404(b) evidence in the case . The
4    defense unanimously object s to the insertion of the
5    404(b) evidence in this sort of summary chart . The
6    Summary chart deal s with actual seizure s. It is the
7    amount s of drug s which the court is -- the jury will be
8    considering regard ing specific substantive offense s, as
9    well as the Count One conspiracy .

10        We believe there is a considerable risk of both
11   prejudice and confusion if the jury is considering
12   404(b) evidence and amount s with regard to those
13   count s. This should be direct ed sole ly to the seizure s
14   and not to 404(b) evidence which the court has already
15   instruct ed the jury is only admissible for limited
16   purpose s and it is purpose s which this chart does not
17   speak to

18        THE COURT: Tell me about the other exhibit s.
19        MR. MARTIN: Behalf of Mr. Goodwin and with
20   respect to the first exhibit , Drug s 1 --
21        THE COURT: Wait . I need to know which one
22   you're talk ing about .
23        MR. MARTIN: I'm look ing at Chart 14 .
24        MR. MONTEMARANO : Same chart , Your Honor .
25        MR. MARTIN: Same chart .

1           THE  COURT:   I've  got  it  in  front  of  me.

2           MR.  MARTIN:   Your  Honor,  it  says,  "recovered

3  from."  I  believe  the  stipulation  was  recovered  from

4  the  vehicle  driven  by  Learley  Goodwin,  and  with  that

5  change  we  don't  have  any  objections.

6           MS.  JOHNSTON:   Right.

7           THE  COURT:   The  first  entry  for  November  25,

8  2003?

9           MR.  MARTIN:   That's  correct.

10          THE  COURT:   All  right.

11          MS.  JOHNSTON:   How  would  you  like  it  to  read,

12  counsel?

13          MR.  MARTIN:   "Vehicle  driven  by  Learley

14  Goodwin."

15          THE  COURT:   Are  there  any  other  issues  with

16  regard  to  this  exhibit  that  I  haven't  heard  from  any

17  other  defense  counsel  on?

18          MR.  WARD:   I  would  like  to  add  something  to  what

19  Mr.  Montemarano  has  said,  Your  Honor.  I  think  it's

20  more  than  a  matter  of  simply  the  possibility  of

21  confusion  and  an  error.  I  think  --

22          THE  COURT:   On  what  issue,  Mr.  Ward?

23          MR.  WARD:   The  404(b)  evidence.

24          THE  COURT:   Stop.  Stop.  Don't  snatch  defeat

25  from  the  jaws  of  victory.

1          MR. WARD:   I wasn't repeating; I was adding to.

2          MR. MARTIN:   No.  Defeat.

3          THE COURT:   I said, don't snatch defeat from the

4  jaws of victory.

5          MR. MONTEMARANO:   When geese are flying your

6  way, Peter, sit down.

7          THE COURT:   I would like to have this chart --

8  if you're going to have this as an exhibit, take off

9  the 404(b) materials.  You can use that in argument.

10 In closing argument, you can stand up there and put it

11 on a Power Point and do anything you want and argue

12 about it, but I don't think  it should be on this

13 exhibit.

14         MS. JOHNSTON:   Your Honor, perhaps if I could

15 explain what the purpose of the exhibit is, because

16 counsel seems to be thinking that somehow we're arguing

17 drug quantity from this exhibit.

18         THE COURT:   No.  My concern -- Ms. Johnston, I

19 recognize what it's being used for and the limiting

20 instructions that I gave on it, but putting it on the

21 same chart with the direct evidence that is

22 attributable to these people as part of this conspiracy

23 I think creates a potential for confusion and

24 prejudice.  So, you can argue this -- you can put this

25 on a separate piece of paper for closing argument, but

1  I don't think  it should  go on an exhibit  that comes

2  into evidence  as a summary .  It's a simple  matter .  Go

3  back upstairs  in the word  process or and delete  these

4  last lines.

5       MS. JOHNSTON:  The purpose  of this exhibit  is

6  for the  jury in determin ing what exhibits go with what,

7  what testimony they heard went with what    because we had

8  to pull some chemists out of order    ; some thing s are

9  done by admission --

10      THE COURT:  I have  no problem  with this being  a

11  summary  exhibit  under  the Federal Rules of Evidence .

12  But as far as  the 404(b) part of it, it should be on a

13  separate  document .  Frankly , I think  it should  be used

14  during  closi ng argument  and not  as an exhibit .  They

15  can take notes  and write  the same  thing  down  and they

16  will get  the same  information , but I think  there 's a

17  potential  for confusion  and prejudice  by leavi ng this

18  exhibit  -- having  this exhibit  include  the 404(b)

19  materials  that  I believe , if I'm reading  it correct ly,

20  would  go from South Dakota  10n down ; is that  correct ?

21      MS. JOHNSTON:  No, Your Honor .  Mr. Bynum 's

22  seizure  on November  12 of 1999 is not  404(b).

23      THE COURT:  Which one do you mean ?

24      MS. JOHNSTON:  That is --

25      MR. WARD:  I didn't say it was .

1          THE COURT:   I'm sorry.  You're correct.  I'm

2 sorry.  The one that's -- the last four, I guess,

3 entries --

4          MR. WARD:   No, Your Honor.

5          MR. MITCHELL:   Your Honor, it's the -- it's part

6 of those last four entries.

7          THE COURT:   The four entries that say cocaine,

8 heroin, cocaine and 7,743  grams of cocaine.

9          MR. MITCHELL:   The only thing I would like to

10 clarify in this -- Your Honor, those drugs specifically

11 reference d on November 12, 1999 were actually not

12 admitted.  The drugs themselves were not admitted.  A

13 report was admitted.  So, if we could clarify they're

14 not -- if that's included in here that they're not

15 looking at drugs but they reference a report of a drug

16 seizure --

17          THE COURT:   Just put in the report of drug

18 seizure.

19          MR. MITCHELL:   Drug analysis.

20          MS. JOHNSTON:   Your Honor, that's what it says.

21 There is a blank here; the first column reference s the

22 exhibit number.  There is no exhibit for the 57.88

23 grams of crack and trace cocaine that was a drug

24 seizure from Derrek Bynum on November 12, 1999.  The

25 information comes from the testimony of Gervisone.

1           THE COURT:   I agree.  Take off the last four

2   items.

3           MS. JOHNSTON:   To be consistent with that, then

4   I think I need to take off Mr. Whiting's 404(b).

5           MR. HALL:   That's just what I was going to bring

6   up.

7           MR. WARD:   And Mr. Bynum.

8           THE COURT:   Where is it in the chart?

9           MR. HALL:   Starting after South Dakota 10, Your

10   Honor, at least as to my client, the 404(b) and the

11   74.36.

12           THE COURT:   That's what I said the first time,

13   that everything under South Dakota comes out.

14           MR. HALL:   I understand that, Your Honor.

15           MR. MITCHELL:   Right.  But the only thing that's

16   left within the conspiracy period is the drug seizure

17   from Derrek Bynum on November 12, 1999.  The reason

18   it's misleading is no drugs were actually admitted.  It

19   was simply testimony as to a report.  So, that could be

20   clarified that a report was admitted, not --

21           THE COURT:   All right.  I think the appropriate

22   wording can be put in here to make that clear you're

23   talking about simply a report.

24           MR. MITCHELL:   That's it.

25           THE COURT:   Take everything out except from the

1 -- below South Dakota  10, except for the seizure of

2 crack from Derrek Bynum on November 12, 1999, and

3 clarify it to indicate that this is an analysis of

4 drugs seized from Derrek Bynum on November 12.

5         MS. JOHNSTON:  Do you want me to write "analysis

6 of drugs" in the column that says "Exhibit No.," or

7 should I put "drugs destroyed analysis" only because

8 the drug --

9         THE COURT:  You can put down "analysis" only.

10 Make it simple.  I think that would be straightforward.

11        MS. JOHNSTON:  Where would you like me to put

12 that?  In the first column or in the second column?

13        THE COURT:  In the second column.

14        MR. MITCHELL:  In the second column.

15        THE COURT:  In the second column where it says,

16 "drug seizure from Derrek Bynum on November 12, 1999."

17 After that analysis only.

18        All right?  Does that clean this exhibit up?

19        MR. MITCHELL:  I would suggest in the second

20 column from the left.

21        THE COURT:  I thought you just agreed with what

22 I --

23        MR. MITCHELL:  Okay.  Maybe I misunderstood.

24        THE COURT:  In the column that has the words "

25 "drug seizure from Derrek Bynum on November 12, 1999,"

1  I was going to put down a "drug analysis only."

2        MR. MITCHELL:   What I was suggesting was not the

3  far left but the one where it lists the drug amount

4  report only.

5        THE COURT:   I think it's --

6        MR. MITCHELL:   I'm not going to fight on that

7  one.

8        THE COURT:   I think where I said to put it is

9  the right place, so that takes care of that summary

10 exhibit.

11       What's the next one where there's a problem?

12       MS. JOHNSTON:   Well, we could start at the

13 beginning in terms of what charts we're going to use.

14 We do have a jury waiting.

15       THE COURT:   I know.   I want to get moving on

16 this.

17       With regard to this telephone contacts chart.

18 I'm content to let it come in with -- I'll give them a

19 cautionary instruction that these little -- what do we

20 call them?

21       MS. JOHNSTON:   I took them off, Your Honor.

22 We've covered them up -- we've covered up the icons,

23 Your Honor.   Just so the record is clear, we are

24 introducing that chart as actual substantive evidence

25 based on a summary of records that are available to

1  counsel .

2       THE  COURT:   I  understand .   It  comes  in  under

3  Rule  106 .

4       MR.  MITCHELL:   Your  Honor ,  can  I  comment  on  that

5  one exhibit  with  the  telephone  contacts .

6       MS.  JOHNSTON:   For  the  record ,  it's  CH-2 ,  Your

7  Honor .

8       THE  COURT:   All  right .

9       MR.  MITCHELL:   CH-2 .   If  you're  looking  at  that ,

10  it lists  a  number  of  contacts .

11       THE  COURT:   Correct .

12       MR.  MITCHELL:   All  the  dates  are  different .

13  It's  very  misleading ,  because  you  may  have  a  longer

14  period  of  time .   The  government  doesn't  distinguish

15  between  dates ,  and  the  dates  are  very  small  and  hard  to

16  follow .   If  you  look  at  that  chart ,  it  appears  as

17  though  this  is  the  amount  of  calls  for  the  same  period .

18  You  have  to  look  very  carefully  at  that  and  really

19  analyze  it  before  you  understand  these  calls  may

20  involve  a  longer  period  of  time .   So ,  they  may  look

21  like  they  are  more  calls  for  one  person ,  as  opposed  to

22  another  person .   So  it  looks  like  one  person  has  more

23  contacts  than  another ,  which  is  not  true .   It's

24  misleading  because  they  have  longer  periods  of  time  or

25  shorter  periods  of  time .

1           THE  COURT:   I  think  you  can  bring  this  out  in
2  cross-examination   to  the  extent  you  need  to.   I  think
3  the  exhibit 's  a  proper   summary   exhibit .
4           MR.  MARTIN:   Your  Honor , if  I  may  be  heard  on
5  this  particular   exhibit .
6           THE  COURT:   Yeah .
7           MR.  MARTIN:   My  problem  with  this  is  856
8  contact s  with  respect  to  Mr.  Goodwin  is  mis lead ing  in
9  that  not  all  856  contact s  were  drug-related .   The
10  implication   here  is  that  these  were  all  conversation s
11  related   somehow  in  furtherance   of  this  conspiracy .
12           THE  COURT:   I  think  you  can  bring  that  out  on
13  cross-examination  .
14           MS.  JOHNSTON:   Just  so  the  record  is  clear , Your
15  Honor , Detective  Eveler  is  not  going  to  testify  that ,
16  first  of  all , all  of  these  contact s  were  conversations.
17  They  are  contact s  to  show  --
18           THE  COURT:   Right .  I  mean , the  evidence  so  far ,
19  as  far  as   contact s, has  been  very  clear .   It  could  be  a
20  one  second  ring ing  of  the  phone  and  nothing  happening .
21           MR.  MONTEMARANO :   Your  Honor , to  reflect  the
22  testimony  of  --
23           THE  COURT:   Excuse  me?
24           MR.  MONTEMARANO :   To  reflect  the  testimony  of
25  Sergeant  Sakala .   Should  it  not  say  "activation s,"

1  which is the phrase used in wiretap jurisprudence and

2  is -- was used by Sergeant Sakala? That means a time

3  that one number contacted the other. That was --

4       THE COURT: I think that can be made -- I will

5  request -- direct that that be made apparent as the

6  exhibit is presented to the witness, that "contact" for

7  purposes of this exhibit means an "activation," and an

8  "activation" could be anything from ringing and nothing

9  happening to a ten-minute conversation. I'll direct

10 the prosecutor to make that clear in her examination.

11      MS. JOHNSTON: Your Honor, indeed, using the

12 term that counsel suggested refers to activations and

13 refers to things that occurred during a wiretap. This

14 is Pin register data, which is much broader.

15      THE COURT: I will direct that the prosecutor

16 have the witness explain what these are -- if it's

17 activations, if it's Pin register listings, how these

18 were compiled. Just the methodology of the compilation

19 should be made apparent by the witness.

20      MR. MONTEMARANO: I am slightly at a loss to

21 argue this, Your Honor. We were provided this chart in

22 draft form about two weeks ago. My client and I went

23 through it, so I'm working from memory at this point.

24 My recollection from the conversation is Ms. Martin is

25 at least three of the numbers in the center of the

1 chart and these were not ones associate d with Ms.

2 Martin at any time .

3       There are , for the record , five on Page 1 and

4 another on Page 2, and I believe at least three of them

5 have no relationship to her or relation to other

6 people , and if it's another person 's number piling

7 those activation s in --

8       MS. JOHNSTON:   We are down , Mr. Montemarano , to

9 six number s. We've taken a couple off the final

10 version of the chart because they're -- when they ran

11 them through the system , there was no contact , so we

12 took the number s off .

13       THE COURT:   Counsel , let me tell you this . This

14 exhibit isn't coming in until a foundation is laid with

15 this witness .   It may very well be that some of these

16 matters can be resolved   as the foundation is being

17 laid. If it's not laid correct ly, it won't come in.

18 But as it stands right now, in general concept , I think

19 this is consistent with the case law and with Rule 106

20 and that it can come in.

21       MR. MARTIN:   One last comment . I adopt Mr.

22 Montemarano's last comment with respect to Learley

23 Goodwin . So, I join that objection .

24       MR. SUSSMAN :   The only question I would raise ,

25 Your Honor , with regard to the foundational question is

1  whether  different   provider s  count  thing s different ly --

2  different  phone  provider s.

3          THE  COURT:   I think  that 's a question  you can

4  ask  the witness .

5          MR.  SUSSMAN :  I think  that 's a foundation  --

6          THE  COURT:  Well , we'll --

7          MR.  SUSSMAN :  -- the chart  --

8          MR.  MCKNETT :  Your Honor , I just had a question .

9  I wasn't  sure  I heard  Ms. Johnston  right .  Has the

10 government  block ed out  the icons?

11         THE  COURT:   Yes , they have .

12         MS.  JOHNSTON:   We have  block ed out  the icons .

13         MR.  MCKNETT :  That was my concern , Your Honor .

14         THE  COURT:   That 's gone .

15         Any other  issue  on these  exhibit s?

16         I've got three  other  exhibit s here  that are

17 simply  listing s of telephone  act ivity, ship ment s, and

18 check  payment s.

19         Are these  all going  to come  in?

20         And one more .  That 's a Mangual  distribution .

21         MS.  JOHNSTON:   Yes, sir .

22         THE  COURT:  Are these  all going  to come  in

23 through  this witness ?

24         MS.  JOHNSTON:   Yes, sir .

25         MR.  SUSSMAN :  The Mangual  thing .  I might  not

1  have been paying close attention , but I don't remember

2  testimony about Mangual delivering drugs to Paulette

3  Martin on particular dates.

4          MS. JOHNSTON:   There certainly was , counsel .

5          THE COURT:   Look .   I think that I can't make

6  definitive final rulings on any of these exhibits

7  until the prosecutor attempts to lay a foundation for

8  them .   I've done what I think I should do with the drug

9  analysis evidence , and that's going to be fixed.

10         I'm not sure if we're going to get all these

11  charts into evidence today or not , but let's get the

12  jury in here and start going through this testimony and

13  get as far as we can go with the resumption being on

14  Tuesday at 10:00 .

15         MR. SUSSMAN :   With all due respect , Your Honor .

16  I understand the jury and I understand the need , but I

17  think when you're dealing with this kind of

18  demonstrative evidence that has a powerful effect --

19  and that's what all the case law says -- that it's

20  important to get it right before the jury sees it.

21         THE COURT:   I have gotten it about as right as I

22  can without a witness testifying about how the document

23  was prepared .

24         MR. SUSSMAN :   Respectfully , I would say that the

25  proper procedure is to do it out of the hearing of the

1  jury.  Generally, we don't publish anything until it's

2  admissible.  That's just how I would ask the court to

3  do it.

4        MS. JOHNSTON:  Your Honor, if counsel can point

5  to a case in the Fourth Circuit that says the court has

6  to hold a hearing out of the presence of the jury --

7        THE COURT:  Don't snatch defeat from the jaws of

8  victory.

9        Bring the jury in.

10        Ms. Johnston, is this the last government

11  witness?

12        MS. JOHNSTON:  I believe so.  With the proviso

13  we go back and check and make sure there's nothing

14  we've forgotten.

15        THE COURT:  Okay.

16                  (Jury returns at 4:06 p.m.)

17        MS. JOHNSTON:  Your Honor, our next witness

18  would be case agent Thomas Eveler.

19        THE COURT:  All right.  Let me tell the jury

20  where we are.

21        Ladies and gentlemen, we're going to have our

22  last session of testimony today and go to plus or minus

23  five, as I promised you.  I would like to start early

24  next Tuesday but I can't because that's when I have to

25  see my surgeon to see if I'm alive after surgery

1  tomorrow -- on Friday .  We will begin at 10 o'clock   on

2  Tuesday .  I have other matter s on other days that week

3  in the morn ing that I'm explori ng moving , and I will

4  give you an update on Tuesday as to whether we will be

5  start ing early on Wednesday , Thursday or Friday of next

6  week .  Plan on the possibility of that .  I can't tell

7  you for sure yet , because I have to talk to two sides

8  of three different  case s as to whether they can move

9  their proceed ings that are scheduled before me , but I

10  will do the best I can .

11        We'll go right straight through.      This is

12  probably , but nothing certain , until it's over with the

13  last government  witness .  I anticipate  we may have to

14  finish this witness on Tuesday  if we don't get him done

15  today .  At that point we'll then be shift ing to  the

16  defense  case and so the end , somewhere , is in sight .

17        All right , you may proceed Ms. Johnston.

18        MS. JOHNSTON:    Thank you.    Your Honor , we call

19  case agent Thomas Eveler .

20  Thereupon,

21                    **THOMAS  EVELER** ,

22  having been called as a witness on behalf of      the

23  Plaintiff , and having been first duly sworn by the

24  Courtroom Deputy, was examined and testified as

25  follows:

1                    **DIRECT EXAMINATION**

2          BY MS. JOHNSTON:

3  Q.      Detective Eveler, please state your full name

4  for the record.

5  A.      Thomas a Eveler.  E V E L E R.

6  Q.      Where are you currently employed?

7  A.      The Prince George's County Police Department.

8  Q.      How long have you been employed with the Prince

9  George's County Police Department?

10 A.      Over 17 years.

11 Q.      In what different assignments?

12 A.      I was assigned to Patrol upon completion of the

13 police academy, where I worked the Hyattsville district

14 station and patrol.  Then in 1991 I transferred to the

15 Street Narcotics Section where I worked for a year

16 purchasing street level narcotics and targeting street

17 level drug traffickers.  In 1992 I was transferred to

18 the Major Narcotics Section where I was assigned until

19 1999 when, as a member of the Major Narcotics Section,

20 I was detailed to the Customs Task Force which has now

21 been renamed the Immigration and Customs Enforcement

22 Task Force.

23 Q.      Let me back up a second.  I'm not going to try

24 to do the math.

25          How many years have you been involved     in

1 investigating narcotics cases at any level,     whether

2 it's street  level  or major  narcotic s?

3 A.     15 year s.

4 Q.     What is the difference  between  what  you were

5 doing at the street  level  and once you were  assigned  to

6 Major  Narcotic s?

7 A.     In Major  Narcotic s we target ed mid- and upper

8 level  drug  trafficker s and conduct ed joint

9 investigation s with  federal  agencies  like  DEA, FBI and

10 Custom s.

11 Q.     How much of your narcotic s experience  has been

12 investigati ng mid-level to upper -level  narcotic s

13 trafficker s?

14 A.     14 year s.

15 Q.     During  those  14 year s, for  the  last  six  year s,

16 seven  year s you've  been  on the  task  force ; is that

17 correct ?

18 A.     Yes, ma'am .

19 Q.     What is the difference  between  your  duti es as a

20 task  force  member  and as a member  of the  Major

21 Narcotic s Unit ?

22 A.     It changed  a little , except  that  I was deputized

23 as a federal  law enforcement   officer  so I could  then ,

24 as I had in the past  -- I've  been  detail ed to DEA and

25 FBI in the past . Once  you're  cross -designate d, you can

1 enforce the federal narcotics laws.

2 Q.     Does that give you a jurisdiction over a larger

3 area than just Prince George's County?

4 A.     Yes, it does.

5 Q.     What area do you have jurisdiction over in

6 relation to your assignment with the task forces?

7 A.     Anywhere the federal law has jurisdiction.

8 Q.     If you could, describe for us the investigative

9 techniques that you've used during your entire time as

10 a narcotics officer.

11 A.     I've made direct purchases myself of cocaine,

12 cocaine base, heroin, opium, LSD, PCP; and in the

13 laboratory environment I've manufactured cocaine base

14 as well as methamphetamine.

15 Q.     Once you moved to Major Narcotics, did the

16 investigative techniques that you used differ from

17 those that you used at the street level?

18 A.     Yes. At the street level we're either buying

19 ourselves or using an informant to buy, or we're

20 placing an order for drugs and the dealer shows up. If

21 it's too much to purchase or we believe there's some

22 other -- if there's an investigative purpose for it,

23 we'll make an arrest on the scene --

24 Q.     Is there a name for that, by the way?

25 A.     There's a slang term called a "rip."

1 Q.      Is that something  that  we heard  about  happening

2 in this  case  involving  one  of  the  defendant s?

3 A.      Yes .

4 Q.      Who  was  that ?

5 A.      Mr.  Goodwin .

6 Q.      That  event  happened  when , based  on  the

7 testimony ?

8 A.      On November  25 , 2003 .

9 Q.      If  you  could  explain  why , as  a  street  narcotic s

10 investigation , you  would  use  a  "rip "  or  set  up  a

11 transaction  and  arrest  the  person  when  they  arrive d

12 with  the  drug s.

13 A.      There  could  be  a  variety  of  reason s.   One  is

14 that  Prince  George's  County  does  not  have  an  abundance

15 of  money  to  be  able  to  just  purchase  kilos  or  multiple

16 kilo s, depend ing  on  the  amount  of  drug s  involve d.

17         Also , it  depends  on  the  relationship  with  the

18 informant  and  the  target .   If , as  in  this  case , the

19 informant  was  being  arrested  and  had  a  warrant  and

20 could  not  do  anything  beyond  that  date , they  would  just

21 conduct  a  "rip "  or  we  would  conduct  a  "rip "  because  we

22 weren't  going  to  have  access  to  that  informant  in  the

23 future .

24 Q.      Because  the  informant  was  already  going  to  be

25 lock ed  up ?

1 A.      Yes.  It's hard to make somebody deliver drugs

2 to the jail.

3 Q.      Is a "rip" or that kind of setting up of a deal,

4 as we heard about here from Detective Martini, a

5 standard practice of individuals who are conducting a

6 short term or an immediate investigation?

7 A.      Yes.  It's very common.

8 Q.      Do you also use those techniques of making

9 undercover buys or controlled buys and "rips," so to

10 speak, sometimes in your more complicated cases?

11 A.      Yes.  You just usually have access to maybe a

12 little bit more money, a little bit more time.  In

13 street narcotics we were not able to spend a great deal

14 of time on any one investigation.  They wanted us to

15 try to keep the street trafficking and impact to the

16 community at a minimum and try to get the street

17 dealers off the street.

18 Q.      Once you move into Major Narcotics, can you

19 describe for us some of the investigative techniques

20 that you have typically used in the course of your

21 investigations?

22 A.      You use the same techniques, but you -- then you

23 also use additional techniques.  You always use the

24 same basic techniques as in street narcotics.  But then

25 we started to add the addition of dialed number

1  record ers which record ed number s dialed in and out of

2  certain target telephones , and we would do more long -

3  term surveillance s.   We would still use search warrant s

4  just like in street narcotic s you use search warrant s,

5  and then if the case led that way, we would advance up

6  to possibly a Title 3.

7  Q.      In term s of your experience . Can you give us an

8  estimate of how many search warrant s you've been

9  involve d in?

10 A.      I stopped count ing at 80 -- involve d in -- I

11 personally have been the affiant on -- I quit count ing

12 at 80.   Hundreds .

13 Q.      In addition to a search warrant , you've

14 mention ed "dial number record ers."

15         Are those also known as Pin register s?

16 A.      Yes .

17 Q.      Is a court order required for those ?

18 A.      Yes , it is.

19 Q.      Can you give us an idea of how many case s you've

20 utilize d Pin register s or dialed number record ers in?

21 A.      I would say -- in my personal case , I'd say

22 probably six different -- six or seven different

23 investigation s, but I've assisted on more than -- many

24 other investigators' case s where I was also assisting

25 them .   I was look ing at their Pin register s, they were

1  bouncing ideas back and forth observing each other's

2  cases.

3  Q.     I'm sure you heard Sergeant Sakala testify here,

4  but a Title 3 or authorization to intercept actual

5  conversations.  Is it safe to say that that's the tool

6  of last resort in narcotics investigations?

7  A.     Yes.

8  Q.     How many investigations have you been involved

9  in that have utilized Title 3 intercepts?

10  A.     I've been the affiant or co-affiant on two

11  myself and participated in probably ten others.

12  Q.     When you say that on two of those you've been

13  the actual affiant, what does that mean?

14  A.     That I'm the one -- if I'm a co-affiant, there's

15  obviously more than one person preparing the affidavit.

16  Q.     And submitting it to the court?

17  A.     Yes.  To obtain court authorization to then

18  conduct the wiretap.

19  Q.     In this case were you the affiant on the Title 3

20  applications?

21  A.     Yes, I was.

22  Q.     In addition to that, in the other wiretap cases

23  have you fulfilled different roles?

24  A.     Yes.  Everywhere from monitoring, where you're

25  just listening to the lines and assisting the case

1  agent , to surveillance  team as part of the wiretap .
2  But we're still -- many time s I was minimize d and
3  participated  in some of the other investigative
4  function s .
5  Q.     In addition  to having the Pin register s up and
6  executing  search warrant s on occasion  and listening  to
7  the telephone  call s , did you also use other
8  investigative  technique s in try ing to determine  who was
9  involve d in a conspiracy ?
10  A.     Yes .
11  Q.     What do those other s include ?
12  A.     Surveillance , inter view s -- surveillance ,
13  inter view s , grand  jury , subpoena s , trash rip s --
14  Q.     You've mention ed grand  jury and subpoena s .
15       What role do subpoena s play in your
16  investigation ?
17  A.     Many of the document s , or many of the records we
18  utilize we obtain a subpoena  to compel the company or
19  an individual  to provide us with the records .  We use
20  grand  jury subpoena s to inter view people who we think
21  may have information  about the investigation  and also
22  to obtain certain records that we cannot obtain with an
23  administrative  subpoena .
24  Q.     The grand  jury subpoena  actual ly is a subpoena
25  for someone  to appear before the grand  jury ; is that

1 correct ?

2 A.      Yes .

3 Q.      In regard to your years of experience , have you

4 had occasion to testify in court and been qualified as

5 an expert in the area of drug trafficking activities ?

6 A.      Yes , I have .

7 Q.      In what different courts?

8 A.      The Circuit Court for Prince George's County and

9 the U. S. District Court for Maryland .

10 Q.     Calling your attention to this investigation .

11      In addition to being the affiant on the Title 3

12 application , what was your role in the investigation ?

13 A.      I was one of three participating case agents who

14 shared in the collective duties of the investigation .

15 I would conduct surveillance , I would interview people ,

16 I would review records , review the DNR activity ,

17 photographs, listen to telephone calls, listen to

18 intercepted calls, conduct informant interviews in the

19 rare occasion we had an informant in this case .

20 Q.     Who were the other two case agents?

21 A.      Special Agent Snyder and Detective -- now

22 Sergeant -- Sakala .

23 Q.     Now , this investigation .  How did it start ?

24 A.      Ms. Paulette Martin first came to our attention

25 in 2001 .  We were conducting an investigation of Juan

1  Encarnacion .   That  investigation   led  to  air  time  and

2  DNR  analysis  of  Mr.  Encarnacion 's  phone  as  well  as

3  surveillance  of  Mr.  Encarnacion , and  we  realized  that

4  there  was  a  connection  between  Mr.  Encarnacion   and  Ms.

5  Martin .

6  Q.      That  would  have  been  in  2001 ; is  that  correct ?

7  A.      Yes, ma'am .

8  Q.      In  2001 , who  were  the  primary  targets  of  that

9  investigation  that  was  going  on  in  2001 ?

10 A.      Initially  it  was  Mr.  Encarnacion , but  he  quickly

11 led , under  the  circumstances  , to  his  sources  of  supply ,

12 who  then  became  the  primary  targets  which  were  the

13 Hernandez/Nunez O  rganization .

14 Q.      Individuals  that  were  here  illegally  from  Mexico

15 in  large  part?

16 A.      Yes .

17 Q.      So  your  investigation  focused  upon  them ; is  that

18 correct ?

19 A.      Yes .

20 Q.      In  this  instance  you're  aware  that  the

21 indictment  charges  that  the  conspiracy  started  in  1997,

22 but  your  investigation  didn't  start  until  2001 .

23         Is  that  unusual?

24 A.      No .

25 Q.      I  shouldn't  say  your  investigation  didn't  start

1  until  2001.  Ms.  Martin  came  to  your  attention  in  2001

2  as  a  result  of  your  investigation   of  Mr.  Encarnacion;

3  is  that  correct?

4  A.      Yes.

5  Q.      When  did  you  actually  start  to  focus  on  Ms.

6  Martin?

7  A.      After  March  of  2003.

8  Q.      And  that  --  what  happened  in  March  of  2003  that

9  allowed  you  to   focus  on  Ms.  Martin?

10  A.      The  case  was  adjudicated.   The  prior

11  investigation   was  adjudicated  so  we  could  move  on  to  a

12  new  investigation.

13  Q.      In  that  first  case,  do  you  know  how  many

14  defendants  you  had  charged  and  prosecuted  or  ended  up

15  being  fugitives?

16  A.      We  had  26  who  were  processed  through  the  legal

17  system,  and  five  fugitives.

18  Q.      Going  back  to  my  other  question.

19         You  said  it  wasn't  unusual  for  your

20  investigation   to  start  at  one  point  in  time  but  then

21  ultimately  the  conspiracy  to  go  back  several  years

22  before  that.

23         Can  you  explain  to  us  why  that's  not  unusual?

24         MR.  MONTEMARANO:   Objection.

25         THE  COURT:   Overruled.

1        THE WITNESS:   You may develop information
2 currently, or oftentimes you develop current
3 information but then through interviews, documents,
4 records, other evidence that you gather shows that the
5 conspiracy was started prior to your investigation.
6 I've been involved in investigations that were purely
7 historical.
8        BY MS. JOHNSTON:
9 Q.     Meaning what?
10 A.     They're historical conspiracies that people were
11 not charged with an offense occurring.  Currently
12 they're charged with events that had happened in the
13 past.
14 Q.     Is it safe to say that just because your
15 investigation starts on 2002, it doesn't mean that your
16 target waited until that date to start their drug
17 dealing?
18 A.     Yes.
19 Q.     Let's talk a little bit here in terms of this
20 case.
21        There's been a lot of questions about the search
22 warrants and the procedures that were established.
23        MR. WARD:   I'm going to object to the leading
24 nature of the questions.  This is direct, after all.
25        THE COURT:   Sustained.

1          Do a little less leading.

2          BY MS. JOHNSTON:

3  Q.      Could you tell us what procedure you and the

4  other case agents established for the way the search

5  warrants were going to be executed on June 1st and

6  June 2nd of 2004?

7  A.      Yes. We held a briefing of as many team leaders

8  as we could assemble, given the variety of schedules.

9  We were executing approximately 26 search warrants and

10 a number of bank account seizures, so we had a large

11 number of people involved.

12         We briefed the team members on what we wanted

13 them to do, how they should process the evidence, and

14 we -- they were to follow the normal procedure, which

15 Prince George's County procedures and Montgomery County

16 search procedures are fairly similar. There's a few

17 differences, but you have one person recover the

18 evidence and the other team members search, and we

19 briefed them on those procedures.

20 Q.      Why do you have one person recover the evidence

21 instead of each of the five or six people who are at a

22 search location?

23 A.      So we don't have six officers coming to court

24 and sitting in the hallway not working; and it also

25 slows the court down to have six people testify about

1   the myriad of evidence recovered from one location.

2   Q.      Was there a system set up for where the team

3   leaders were to bring the evidence and what was to be

4   done with the evidence?

5   A.      Yes.

6   Q.      Could you describe that for us?

7   A.      All the evidence was to come to Montgomery

8   County, where it would be processed, separated as the

9   drugs have to go to the drug lab farm, the firearms

10  have to go to the -- I don't know what their unit is

11  called.   Ours is the Firearms Examination Unit in

12  Prince George's County.  You know, money has to be

13  processed differently than drugs, which has to be

14  processed differently than firearms.  So, all the

15  evidence would come back to one central location for

16  processing and completion of reports.

17  Q.      Could you describe for the ladies and gentlemen

18  of the jury how the cash was handled in this case from

19  the various locations where U. S. currency was

20  recovered?

21  A.      After it was counted, it was then converted to

22  -- it was then deposited in banks, pending forfeiture

23  or whatever other actions were to be taken.

24  Q.      Was that money put in an interest bearing

25  account?

1  A.      I don't know  if it's  interest  or non-interest

2  bearing, but  it's placed into  a bank  account  for

3  forfeiture.

4  Q.      To keep  it secure?

5  A.      Yes.

6  Q.      In that  regard.  Once  the evidence  was brought

7  to you and Agent  Snyder  and Sergeant  Sakala, what  was

8  done with some  the items  that  were  recovered?

9  A.      Some were  submitted  for a variety  of processing.

10 Some were  submitted  for DNA processing, some  were

11 submitted  for fingerprint  analysis, and  some were  just

12 processed in the normal, routine  manner.

13      MR. WARD:  Your  Honor, I have  a question.

14      Is the  witness  being offered  as an expert?   If

15 so, is he going  to be  qualified?

16      MS. JOHNSTON:   I've gone  over his  background  and

17 qualifications.  I haven't  asked  him a question  yet

18 that requires his  expert  testimony.  Right  now  he's

19 testifying concerning the procedures.  There may be a

20 point in time when we request --

21      THE COURT:  Let's see  if we get  there.

22      MR. WARD:  That's what  I wanted  to know.

23      THE COURT:  We're not  there  yet.

24      BY MS. JOHNSTON:

25 Q.      In addition  to firearms and money  and drugs,

1 were there also lots of documents recovered?

2 A.      Yes.  Many.

3 Q.      Could you give this jury an idea of how many

4 boxes of documents or pieces of paper and other items

5 were recovered from all of these search locations?

6 A.      Given that there were approximately 26 search

7 warrants executed, at some sites we had as many four,

8 five, six boxes of documents and some as little as one.

9 That will give you an idea that there's 30 to 40 boxes

10 of evidence -- of documentary evidence.

11 Q.      Have you had occasion to -- you or the other

12 case agents to go through that documentary evidence?

13 A.      Yes.

14 Q.      Indeed, under your direction, were copies of

15 everything that was seized during the execution of

16 those search warrants given or made available to the

17 defense attorneys in this case?

18 A.      Yes.

19      MR. MARTIN:   Your Honor, I'm going to object to

20 the leading nature of the questioning as well.

21      THE COURT:   All right.  Overruled, in the

22 interest of time.

23      BY MS. JOHNSTON:

24 Q.      Now, with regard to the evidence.

25      We've seen some items with black powder on it.

1  What  is  the  black  powder ?

2  A.      That  would  be  fingerprint   powder .

3  Q.      In  this  case , do  you  have  any  idea  of  how  many

4  item s  were  dusted  for  fingerprint s?

5  A.      Many  more  than  the  jury  saw .

6  Q.      In  your  role  as  a  case  agent , do  you  know  a  case

7  agent  -- strike  that .

8          In  your  role  as  case  agent , do  you  know  whether

9  or  not  any  print s  of  value  were  recovered  from  any  of

10  the  many , many  item s  that  were  dusted  for  fingerprint s?

11  A.      I  know  of  one .

12  Q.      What  was  the  one  item  that  had  a  print  of  value

13  on  it?

14  A.      I  don't  recall   the  exhibit  number , but  it  was

15  the  box  which  contain ed  the  quarter  of  a  million

16  dollar s  that  was  seize d  in  New  York  by  ICE  agent s.

17  Q.      Other  than  that  one  -- you  said  it  was  one   print

18  of  value ; is  that  correct ?

19  A.      Yes, ma'am .

20  Q.      When  you  say  "seize d  in  New  York ," where  was  it

21  seize d  from ?

22  A.      It  was  seize d  from  the  Furniture   Queen .

23  Q.      Who  was  the  person  who  took  it  to  the  Furniture

24  Queen ?

25  A.      Ms.  Gwendolyn   Levi .

1  Q.      And from whom -- whose custody was it recovered?

2  A.      Mr. Moises Uriarte.

3  Q.      That was the only print of value recovered?

4  A.      That's the only print that I'm aware of.

5  Q.      Certainly, as case agent, you would be aware if

6  there were other prints of value?

7  A.      I would hope so.

8  Q.      Is that unusual in a case with as many exhibits

9  -- with as many plastic bags and toolboxes as we've

10 seen here, is it unusual?

11         MR. MITCHELL:   Objection.

12         MR. WARD:  Objection, Your Honor.

13         That is an expert question.

14         MR. MONTEMARANO:  Basis for knowledge, Your

15 Honor.

16         THE COURT:  Well, lay a foundation for him.

17         BY MS. JOHNSTON:

18 Q.      All right.  Tell us how many times have you been

19 involved in cases where drugs were seized in plastic

20 bags.

21 A.      How many cases?

22 Q.      Sure.  How many cases?  I don't mean literally

23 cases in terms of boxes.

24 A.      More than I could count, easily.

25 Q.      Can you tell us in your -- have you been trained

1  to lift latent prints?

2  A.      Yes, I have.

3  Q.      Have you also received training concerning the

4  packaging of drugs for sale and distribution?

5  A.      Yes.

6  Q.      Have you had occasion to see drugs that were

7  packaged for sale and distribution?

8  A.      Yes, I have.

9  Q.      Have you also had -- during your experience,

10 have you had occasion to yourself purchase drugs?

11 A.      Yes, I have.

12 Q.      In quantities for distribution, as well as

13 smaller quantities -- quantities for personal use?

14 A.      Quantities for distribution?  You mean

15 redistribution after I've --

16 Q.      Yeah.  You've purchased it.  Was it in

17 quantities to be redistributed?

18 A.      Yes.

19 Q.      Have you also maybe had occasion to purchase

20 some in quantities that would be considered only for

21 personal use?

22 A.      Yes.

23 Q.      What kind of quantity would be considered --

24         MR. SUSSMAN:  Objection.

25         Relevance.

1          THE COURT:   Overruled.

2          BY MS. JOHNSTON:

3 Q.        What kind of quantity would be considered solely

4 for --

5          MR. SUSSMAN:   Your Honor, now he's giving

6 opinions.  The question started with fingerprints and

7 the ability to get fingerprints.

8          BY MS. JOHNSTON:

9 Q.        Let me rephrase the question.

10         You've said yes, you've purchased quantities

11 that could be considered for personal use.

12         What was that quantity?

13         MR. WARD:   Objection, Your Honor.

14         That is an expert question -- expert opinion

15 question.  That's not a fact question, and I'm

16 objecting to it.

17         MS. JOHNSTON:   I'm trying to lay a foundation

18 for his background and training, Your Honor.

19         MR. WARD:   Well, before you -- lay a foundation

20 before you ask the question.  That's the way it should

21 be.

22         THE COURT:   Continue laying the foundation.

23         BY MS. JOHNSTON:

24 Q.        That was my question.

25 A.        Have I purchased quantities of drugs in --

1 Q.      For distribution .

2 A.      Distribution ?  Yes .

3 Q.      Okay .  Are you -- did you familiar ize yourself

4 with the way drug s are package d?

5 A.      Yes, ma'am .

6 Q.      Have you also purchase d drug s in small er

7 quantiti es that would not be for redistribution ?

8         MR. MONTEMARANO :  Objection , Your Honor , unless

9 the detective intend ed to redistribute himself .

10        THE COURT:  Over ruled .

11        THE WITNESS:  Near ly every quantity I've

12 purchase d could be redistributed , even a $20 rock .

13        BY MS. JOHNSTON:

14 Q.      Have you also had occasion to use confidential

15 informant s to purchase drug s?

16 A.      Yes, ma'am .

17 Q.      Have you had occasion , in addition , to,

18 yourself , conduct surveillance  when other officer s were

19 engage d in purchasi ng drug s?

20 A.      Yes .

21 Q.      Have you on occasion had an opportunity  to

22 arrest individuals  with drug s or who were  in possession

23 of drug s?

24 A.      Yes .

25 Q.      Have you had occasion to process those drug s as

1 you took custody of them?

2 A.      Yes.

3 Q.      Did you receive training at the police academy

4 concerning how to process evidence for fingerprints?

5 A.      Yes.

6 Q.      Have you had occasion to testify in court

7 concerning whether or not you were able to obtain

8 fingerprints from some of the drug items or related

9 documents that you seized during the course of your

10 drug investigations?

11 A.      Yes.

12 Q.      This case --

13        MR. SUSSMAN:   I object, Your Honor.

14        If the question is how many times he's gotten

15 fingerprints off things or sent it for fingerprints,

16 then just ask it.

17        THE COURT:   Overruled.

18        BY MS. JOHNSTON:

19 Q.      Have you had occasion to attempt to lift

20 fingerprints off of packaging materials on drugs?

21 A.      Yes.

22 Q.      What has been your experience in doing that?

23 A.      It's not been a very good one as far as being

24 successful.

25 Q.      Explain to the jury what you mean by that.

1  A.      It's not a matter of being able to lift a print,

2  it's a matter of being able to lift a print of value.

3  It has to have a certain number of points for the

4  latent print examiner to be able to make.

5          MR. MARTIN:   Your Honor, I'm going to object

6  unless he's an expert on fingerprint examination.  I

7  don't remember  him being qualified as a forensic s

8  expert.

9          THE COURT:   Overruled.

10         BY MS. JOHNSTON:

11 Q.      Continue.

12 A.      From my training and experience, I know that a

13 certain number of points are required for a latent

14 print examiner to be able to make -- to give an opinion

15 to whether a fingerprint matches the latent lifted.

16 Q.      When you say you've been able to lift some

17 things, what do you mean?  What kind of prints were you

18 able to lift?

19 A.      Smudges.  Partial prints.  Smears.  I've also

20 observed our much more experienced forensic evidence

21 people when I've hand-carried evidence to them and

22 stood over their shoulder and watched them, and it's

23 very rare to lift a usable print off of drug packaging

24 or even off of what would appear to be, I'm taking you

25 there because I think there's a high likelihood of

1  being able to get a successful print and it's a

2  washout.  You don't get anything.

3  Q.      When you say -- does this -- has it been your

4  experience with just drug packaging, or does it apply

5  to other items as well?

6  A.      It applies to other items as well.

7  Q.      In this case you know of only the one print of

8  value; is that correct?

9  A.      Yes, ma'am.

10 Q.      And you haven't counted up how many items were

11 dusted with that black powder or with the purple ink

12 that we've seen on some items to be able to tell this

13 jury how many were actually submitted.

14 A.      No.

15 Q.      Are you able to, in Prince George's County, or

16 now it's Immigration and Customs Enforcement.  Do you

17 have the authority to submit every single piece of

18 paper in every single plastic bag that is seized during

19 the course of your investigation?

20         MR. MARTIN:   Objection, Your Honor.

21         THE COURT:   Sustained.

22         BY MS. JOHNSTON:

23 Q.      What is the procedure in terms of submitting

24 items for fingerprint analysis?

25         MR. MONTEMARANO:   Objection, Your Honor.   They

1 weren't submitted to Prince George's County. The

2 detective has already testified they were submitted in

3 Montgomery County.

4          THE COURT:   Overruled.

5          BY MS. JOHNSTON:

6 Q.       You may answer.

7 A.       What is the process for submitting items?

8 Q.       Yes.

9 A.       An investigator can attempt to lift the latents

10 himself, or you can have assistance from your forensic

11 section -- your crime scene people or your forensic

12 examiners are available to you -- or you can submit

13 things to the FBI for processing or other federal

14 agencies.

15 Q.       Is there a limit on -- strike that.

16          Do you have infinite resources in your

17 investigation?

18          MR. MONTEMARANO:   Objection.

19          THE COURT:   Sustained.

20          BY MS. JOHNSTON:

21 Q.       Detective, do you have an opinion as to what

22 would have happened if you had taken 30 boxes of

23 documents to your --

24          MR. MONTEMARANO:   Objection.

25          Basis.

1        MS. JOHNSTON:   -- forensic lab your forensic

2  evidence technician s, to have them examine each piece

3  of paper for fingerprint s?

4        MR. WARD:   Objection , Your Honor .

5        MR. MARTIN:   Objection .

6        Foundation.   Competency .   Lead ing .

7        THE COURT:   Over ruled .

8        BY MS. JOHNSTON:

9  Q.     You may answer .

10 A.     Do I have an opinion ?

11 Q.     Yes .

12 A.     Yes .

13 Q.     Tell the jury what your opinion is.

14 A.      I believe my Major would have received a call,

15 who would have called the Captain, who would have

16 called the Lieutenant, who would have called my

17 Sergeant, who  would have called me,  or I would have

18 been just turn ed away at the door .   There 's no way I

19 would have gotten 30 item s of evidence process ed.

20        MR. MARTIN:   Move to strike .   Speculation .

21        THE COURT:   Over ruled .

22        BY MS. JOHNSTON:

23 Q.     Does the same thing apply for all of those

24 plastic baggi es that we've seen here in court as well ?

25 A.      Yes .

1  Q.      Based  upon  your  training  and  experience , have

2  you  ever  had  a  fingerprint  lifted  off  of  a  plastic

3  baggy ?  A  fingerprint  of  value .

4  A.      No .

5  Q.      You  indicated  that  this  investigation  started

6  with  Mr.  Juan  Encarnacion .

7          Was  this  before  or  after  Mr.  Encarnacion 's

8  arrest  that  Ms.  Martin  came  to  your  attention ?

9  A.      It  was  prior  to  his  arrest .

10  Q.      Could  you  describe  for  us  what  occurred  in

11  relation  to  your  investigation  after  Juan  Encarnacion

12  that  brought  Ms.  Martin  to  your  attention ?

13          MR.  WARD:   Objection .

14          THE  COURT:   Overruled .

15          THE  WITNESS:   During  the  course  of  the

16  investigation , Mr.  Encarnacion , myself , and  members  of

17  the  group  to  which  I  was  assigned  -- the  Customs  Task

18  Force  -- at  the  time  conducted  surveillance  of  Mr.

19  Encarnacion .  He  was  observed  meeting  with  an

20  individual  later  identified  as  Salvador  Nunez, who  was

21  later  identified  as  Mr.  Encarnacion 's  source  of

22  cocaine .

23  Q.      What  date  -- was  there  a  particular  surveillance

24  that  you  recall ?

25  A.      Yes .

1  Q.     What was the date of that surveillance ?

2  A.     February 21, 2001.

3  Q.     If you could, describe for us where the

4  surveillance took place, what you observed, and how you

5  identified or associated Ms. Martin with that

6  surveillance.

7  A.     The surveillance started in Prince George's

8  County and ended up in -- on Veir's Mill Road in

9  Montgomery County, where Mr. Encarnacion met with

10  Salvador Nunez.

11         After meeting on Veir's Mill Road, there was a

12  restaurant, the Tijuana Mexican Cafe -- I don't know if

13  it's still there anymore, but they met there. They

14  were there approximately -- I remember it was quite a

15  bit of time, about 45 minutes probably, and then they

16  went their separate ways. We stayed with Mr. Nunez

17  because we thought the meeting was somewhat odd to just

18  sit in the car for 45 minutes and thought that he was

19  an interesting person. So, we followed Mr. Nunez to

20  another address in Rockville, Maryland, stayed at that

21  residence for a while, then followed him back where he

22  again met with Mr. Encarnacion, to the rear -- in a

23  residential neighborhood to the rear of the restaurant.

24  They met briefly and then separated.

25         The following day we obtained air time records

1  for Mr. Encarnacion 's cellular telephone and conducted

2  analysis of the telephone.

3  Q.      When you refer to Salvador Nunez -- is that the

4  individual who Mr. Encarnacion testified about here in

5  court?

6  A.      Yes, I believe he did.

7  Q.      How did Mr. Encarnacion identify him?

8  A.      He called him "Manual."

9  Q.      But his real name was Salvador Nunez?

10 A.      No. His real name was Fernando Andaya. He was

11 arrested as Salvador Nunez, and we found out later his

12 real name was Fernando Andaya, but his real name was

13 Manual.

14 Q.      Why is it that you ordered the records of Mr.

15 Encarnacion 's Sprint cellular phone?

16 A.      Primarily, at the time we wanted to find out who

17 he met with in an attempt to identify Mr. Nunez 's --

18 Mr. Andaya 's cellular telephone.

19 Q.      Let me show you what's been marked as CH-12 and

20 ask you if you can identify that piece of paper.

21 A.      Yes.

22 Q.      What is that?

23 A.      This is a page from Mr. Encarnacion 's Sprint PCS

24 air time records.

25 Q.      Is that the information that you requested?

1  A.       Yes, ma'am.

2  Q.       Did you recognize some of the phone numbers on

3  that item?

4  A.       Do I now?

5  Q.       Yeah.  Well, did you, at the time, recognize

6  some of them?

7  A.       No.  But subsequently we obtained subscriber

8  records for them, and yes.

9  Q.       Let me put it up on the screen so everyone can

10 see it.

11         First of all, the number at the top.  What's the

12 number under Sprint PCS?

13 A.       (301) 806-6756.

14 Q.       Whose telephone number was that?

15 A.       That was the cellular telephone used by Mr.

16 Encarnacion.

17 Q.       What is the time period covered by these

18 records?

19 A.       February 21 from 1:04 hours to 21:49 hours.

20 Q.       What telephone numbers did you recognize on this

21 exhibit?

22 A.       At 11:59, I recognized one that's a telephone

23 that was listed to Bexhill Court -- 9002 Bexhill Court.

24 Q.       What's that telephone number?

25 A.       (301) 439-3545.

1  Q.      Do you see any other numbers?

2         Let me start at the top.

3  A.      At the top, the first line is (301) 455-6152

4  that was the cellular telephone of Mr. Andaya, aka

5  Nunez.

6  Q.      Continuing down -- the columns.  By the way, the

7  "calling number" and "called number."  What does that

8  tell us?

9  A.      That on an outgoing call, the calling number is

10 the -- if you scroll farther to the -- if you pan out a

11 little bit, just a little bit -- yes.  See where it

12 says "roll" there's a zero?  That indicates that it's

13 an outgoing call.  So you get a repeat in the calling

14 number of the subscriber.  And then in the second

15 column is the dialed number.  That's the number that

16 Mr. Encarnacion or whomever was dialling from (301)

17 806-6756.  Well, the incoming call -- the second line

18 down where it says "roll one" indicates an incoming

19 call.  Calling number would be the incoming call

20 number.  The called number is Mr. Encarnacion's phone,

21 and that's the receiving number.

22 Q.      You mentioned it was February 21, 11:59:37  and

23 there was a call to 439-3545 which subscribed where?

24 A.      Bexhill Court.

25 Q.      Whose residence  on Bexhill  Court?

1  A.      Paulette  Martin.

2  Q.      What  was  the  duration  of  that  call?

3  A.      47  seconds.

4  Q.      When  was  that  in  relation  to  the  meeting  between

5  Mr.  Encarnacion  and  Mr.  Salvador  Nunez?

6  A.      That  was  well  before  the  meeting.  The  meeting

7  took  place  in  the  evening.  It  was  February.  It  was

8  dark  during  the  meeting.  I  can't  recall  the  exact

9  time,  but  it  was  --  it  started  out  with  a  little  bit  of

10  light  or  some  light  when  they  first  met,  and  then  it

11  was  dark  by  the  time  they  went  to  meet  the  second  time.

12  Q.      Then  are  there  further  significant  calls  on  this

13  record  in  relation  to  Ms.  Martin's  home?

14  A.      Yes,  at  15:34:28.

15  Q.      What's  the  number?

16  A.      439-8988.

17  Q.      What  number  is  that?

18  A.      That's  another  phone  number  associated  with

19  Paulette  Martin.

20  Q.      How  do  you  associate  that  with  Ms.  Martin?

21  A.      I  believe  it's  either  subscribed  to  Bexhill

22  Court  or  Paula's  School  of  Performing  Arts.

23  Q.      Any  other  numbers  that  you  associate  with  Ms.

24  Martin?

25  A.      Down  farther  there's  another  repeat  of  439-3545.

1  Q.       Where is that?

2  A.       At 17:42 and 17:49 there is an outgoing and an

3  incoming.

4  Q.       Any other numbers?

5  A.       Not that I can see.

6  Q.       Let me move it up.

7  A.       No more numbers associated with her directly.

8  Q.       It looks like there are some other numbers that

9  had been highlighted on a previous copy of this.

10         What number is that that was highlighted

11 previously?

12 A.       That's Mr. Nunez's phone.

13 Q.       You don't -- based upon these air time records,

14 do you know who was using the phone that was subscribed

15 to either the Bexhill Court or to Paula's School of

16 Performing Arts?

17 A.       No.

18 Q.       What can you tell us in terms of that contact,

19 based upon these records?

20 A.       That it was timely, and we believed at the time

21 that Mr. Encarnacion was obtaining drugs from Mr. Nunez

22 for Ms. Martin.

23 Q.       Was that corroborated subsequently after

24 arrested Mr. Encarnacion?

25 A.       Yes.

1 Q.      Also, were you able to tell how long the calls

2 took in terms of each one of them?

3 A.      Yes.  The duration is listed in seconds.

4 Q.      And this would have been in February of 2001; is

5 that correct?

6 A.      That's correct.

7 Q.      While we're talking about Bexhill Court.  During

8 the course of your investigation  -- let me show you

9 what's been marked as Bexhill 1.

10        Do you recognize these records?

11 A.      Yes.

12 Q.      What are those records for?

13 A.      The first stapled section is a deed for 9002

14 Bexhill Court, Adelphi, Maryland.

15 Q.      Take a look at and look at all the records

16 there, because I would like to ask you if you can tell

17 from those records when the property was purchased by

18 Ms. Martin and when it was sold.

19 A.      Yes.

20 Q.      If you could tell us, what was the date when Ms.

21 Martin purchased the property.

22 A.      September 23, 1996.

23 Q.      Are you able to tell when it was sold?

24 A.      Yes.  November 21, 2002.

25        MR. MCKNETT:  Ms. Johnston, could I have the

1 exhibit number?

2          MS. JOHNSTON:   The exhibit number is Bexhill 1.

3          MR. MCKNETT:   Thank you.

4          BY MS. JOHNSTON:

5 Q.       And the two dates you refer to.  The first date

6 is on the first stapled portion of the records; is that

7 correct?

8 A.       Yes, ma'am.

9 Q.       And then the date of sale is on the last stapled

10 portion; is that correct?

11 A.       Yes.

12 Q.       And the records -- those are the only two

13 transfers that are indicated in the record when Ms.

14 Martin purchased it and when she sold it?

15 A.       Yes.

16 Q.       There is nothing in between September 23 of 1996

17 and March of 2002 when she sold it, is there?

18 A.       Not in those records that I saw.

19 Q.       Were you familiar with Bexhill Court?

20 A.       Yes, ma'am.

21 Q.       Let me show you what's been marked as

22 Government's Exhibit P-2 and ask you if you recognize

23 that photograph.

24 A.       Yes, I do.

25 Q.       What is that?

1  A.      The residence on the left side with the white

2  SUV in the driveway is 9002 Bexhill Court.

3  Q.      You also heard testimony both from Task Force

4  Officer Cowan and Juan Encarnacion concerning Beverly

5  White.

6          Are you familiar with that testimony?

7  A.      Yes, ma'am, I am.

8  Q.      Were you familiar with Ms. White or have any

9  contact with Ms. White or her residence back in the

10 1996-97 time period?

11 A.      Yes, I did.

12 Q.      I'm going do show you what's been marked as P-

13 286.

14         Do you recognize that photograph?

15 A.      Yes, ma'am.

16 Q.      What is that a photograph of?

17 A.      8903 Royal Crest. I can't remember if it's

18 Drive, Place, Court, whatever, but I know it's 8903

19 Royal Crest.

20 Q.      Who resided at that location?

21 A.      Beverly White and, for a while, her husband, who

22 was McCarthy Plummer.

23 Q.      Did he go by a nickname?

24 A.      Yes.

25 Q.      What was that?

1  A.       Dobie.

2  Q.       You heard Task Force Officer Cowan's testimony

3  as well as Mr. Encarnacion.

4           Did you have any experience with search warrants

5  being executed at Ms. White's residence back in the

6  time period of '96, '97, '98?

7  A.       Yes.

8  Q.       Were you present during the execution of those

9  search warrants?

10  A.      I was present during two search warrants at that

11  residence.

12  Q.      Were any drugs recovered there?

13  A.      Yes, ma'am.

14  Q.      What kind of drugs were recovered from the

15  residence of Ms. White?

16  A.      On the first search warrant I believe it was

17  cocaine and heroin.

18          On the second search warrant I know there was

19  some heroin there, but I wasn't part of the search

20  team.  I observed some heroin, and I know they field

21  tested it positive and that -- I was there merely to

22  secure the residence until DEA could come there and do

23  their search.

24  Q.      Do you recall what kind of drugs Mr. Encarnacion

25  said he was getting from Ms. White?

1  A.      He did --

2  Q.      What he was giving to Ms. White?

3  A.      Yes.

4  Q.      What was that?

5  A.      E said he was supplying her with heroin.

6  Q.      In addition to the surveillance of Mr.

7  Encarnacion on February 21, 2001, when you've indicated

8  there was telephone contact with Ms. Martin, did you

9  also -- were you also conducting surveillance in June

10 of 2001?

11 A.      Yes, ma'am.

12 Q.      Where was your surveillance on June 6 of 2001?

13 A.      I was conducting surveillance in the 9200 block

14 of Willow Lane in a Adelphi, Maryland.

15 Q.      Who lived in the 9200 block of Willow Lane?

16 A.      It was either Francisco Martinez or -- there

17 were two individuals who were associates of Juan

18 Encarnacion who were associated with that address, and

19 for some reason I can't remember the other individual's

20 name.

21 Q.      Why did you happen to be there conducting the

22 surveillance on June 6 of 2001?

23 A.      I was surveilling Juan Encarnacion with the

24 assistance of the some members of the Prince George's

25 County Major Narcotics Section.

1  Q.      Did you make any observation s of Mr. Encarnacion

2  at that address ?

3  A.      Yes , I did .

4  Q.      Describe those observation s.

5  A.      He was at the residence to the right side of the

6  house . He was hang ing out with some guy s at the house ,

7  just talk ing and do ing whatever they were do ing , and he

8  spent some time there . After a while , I thought this

9  was a complete waste of my time and decide d to -- and

10 everybody else 's and decide d to end the surveillance .

11 Q.      You weren't there by yourself ?

12 A.      No.

13 Q.      Do you know about how many other people you had

14 with you to do the surveillance on Mr. Encarnacion ?

15 A.      It was at least three other s.

16 Q.      Why do you have more than one person to do the

17 surveillance ?

18 A.      That street was a court -- not what you would

19 typically call a "court ," but it was a dead end street .

20 If he left the area and one car follow ed him out of the

21 area and then stay ed on him the whole time , I think I

22 would have been burn ed.

23 Q.      So you decide d to call it off and send your

24 cohort s home or about their business .

25 A.      Yes . I left the residence , met with the

1  surveillance  team  who  was  outside  of  the  neighborhood ,

2  and  in  kind  of  a  strategic  point s,  you  know ,  at  cross

3  street s  in  the  area  and  told  them  that  we're  going  to

4  cancel  it .

5  Q.      What  did  you  do  at  that  time ?

6  A.      I  decide d  to  take  one  last  spin  past  the  house ,

7  and  his  vehicle  was  gone .

8  Q.      Okay .  When  say  you  took  one  last  spin  by  the

9  house .  Is  that  the  house  where  --

10  A.      The  Willow  Lane  address .

11  Q.      What  did  you  do  when  you  noticed  the  car  was

12  gone ?

13  A.      Said  something  probably  unrepeatable  in  court

14  and  then  decide d  to  --  I  had  to  get  on  the  belt way

15  anyway ,  so  I  went  past  Paulette  Martin 's  residence ,

16  which  was  on  my  way  to  the  belt way .

17  Q.      Her  residence  where ?

18  A.      9002  Bexhill  Court .

19  Q.      What  did  you  observe  when  you  got  there ?

20  A.      Mr.  Encarnacion 's  vehicle  at  her  residence .

21  Q.      Were  you  able  to  see  him  at  that  time ?

22  A.      No .

23  Q.      Was  his  vehicle  occupi ed?

24  A.      No .

25  Q.      What  did  you  do  upon  see ing  his  vehicle  at  Ms.

1 Martin 's house ?

2 A.      Called the surveillance team back , and we

3 established surveillance in the Bexhill Court area .

4 Q.      Did there come a time when Mr. Encarnacion left

5 -- strike that .

6       Did you subsequently observe Mr. Encarnacion in

7 the vicinity of Ms. Martin 's residence ?

8 A.      Yes . He left the residence , drove from the

9 residence but did not take the direct route out of the

10 neighborhood . He stopped -- there 's a little court off

11 of Royal Crest , and stopped on that court -- just

12 parked on that court for a minute , which I thought was

13 a counter -surveillance maneuver, and then he continued

14 on to Riverdale , where his -- to his residence .

15 Q.      Were you able to determine from the time you got

16 there how -- strike that .

17       Based upon the time you arrived and observed his

18 car there , how much time went by before he exited the

19 residence ?

20 A.      Somewhere around 15 minutes . Something like

21 that .

22 Q.      Okay . Now, during this time when you're making

23 these observations of Mr. Encarnacion at Bexhill Court

24 and the telephone contact , had you had any

25 conversations or gotten any information from Mr.

1  Encarnacion?

2  A.      Concerning the  surveillance?

3  Q.      Yes.

4  A.      No.

5  Q.      Had he been arrested at that point?

6  A.      No.

7  Q.      These are observations you made prior to his

8  arrest?

9  A.      Yes.

10  Q.      Okay.  Let me show you what's been marked as

11  CH-11.

12          Are you familiar with this exhibit?

13  A.      Yes.

14  Q.      Let me put it up on the screen.

15          First of all, disregard that fat green line

16  there, okay?  I want to ask you some other questions.

17          First of all, where did this come from, this

18  map?

19  A.      This is a Microsoft Streets & Trips rendition of

20  the streets.

21  Q.      Are you familiar with the streets and -- the

22  pertinent streets and locations in this area?

23  A.      Yes.

24  Q.      Does this map accurately depict the streets and

25  their layouts in the area that's depicted?

1  A.       Yes.

2  Q.       In looking at this map, are you able to show us

3  where Mr. Encarnacion was when you initially began your

4  surveillance?

5  A.       Yes.

6  Q.       Let me bring it up to you, and I'm going to have

7  you take a red marker -- let me use a blue marker since

8  that's not on the map yet, that color.  If you could

9  use the blue marker and show where Mr. Encarnacion was

10 when you first surveilled his vehicle.

11 A.       (Witness indicating.)

12 Q.       Can you make a bigger dot than that so we can

13 all see it?

14 A.       (Witness indicating.)

15 Q.       Why don't you draw a line out and put the street

16 name of where it was where Mr. Encarnacion was.

17 A.       (Witness indicating.)

18 Q.       Was that unnamed on the map?

19 A.       Yes.

20 Q.       Now, you didn't see what direction Mr.

21 Encarnacion traveled -- strike that.

22         You weren't there when he left Willow?

23 A.       No.

24 Q.       And the location of his car is the dot right

25 here?  (Indicating.)

1 A.      Yes.

2 Q.      So you don't know what route he took.

3         Can you tell us approximately how long it took

4 you to get from that area of Willow over to Bexhill

5 Court?

6 A.      It's only a couple of minutes.  It can't be more

7 than two or three miles apart, if that.

8 Q.      Is Bexhill Court accurately reflected on the

9 map?

10 A.     Yes.

11 Q.     Was that the only surveillance that you --

12 physical surveillance that you recall having of Mr.

13 Encarnacion at Ms. Martin's house on Bexhill during

14 your 2001 investigation?

15 A.     Yes.

16 Q.     And you were not part of Task Force Officer

17 Cowan's earlier investigation in '96-97; is that

18 correct?

19 A.     No, I was not.  We collided on those search

20 warrants, but that wasn't -- that was not part his

21 investigation.

22 Q.     When you say you "collided," what do you mean?

23 A.     I would -- there was a residential robbery at

24 Ms. White's home, and when detectives went there --

25 uniformed officers went there, it was kind of a strange

1  robbery.   One  individual  was  shot  and  killed  on  the

2  street  as  he  left  the  residence  --  an  apparent  suicide.

3  Q.     Was  that  related  to  one  of  the  heroin  search

4  warrants  you  told  us  about?

5  A.     Yes.  I  went  to  the  residence,  and  patrol

6  officers  had  seen  white  powder  on  some  of  the  --  there

7  was  some  furniture  upstairs  and  some  indications  that

8  these  people  were  involved  in  internal  body  carries  of

9  heroin,  and  I  was  there  merely  to  --  they  called

10  narcotics.  I  was  aware,  and  other  members  of  my

11  division  were  aware  of  Mr.  Cowan's  investigation,  so  we

12  merely  secured  the  premises  and  called  DEA  for  them  to

13  come  out  and  handle  the  scene.

14  Q.     Okay.  So  your  observations  in  2001  were

15  independent  of  Task  Force  Officer  Cowan  where  the

16  information  you  later  learned  from  Juan  Encarnacion;  is

17  that  correct?

18  A.     That's  correct.

19  Q.     Okay.

20      Your  honor,  it's  5  o'clock.  I  don't  know  if  the

21  court  wants  me  to  continue.

22      THE  COURT:   No.  I  think  we  should  adjourn  for

23  the  day.

24      Ladies  and  gentlemen,  we  have  a  pretty  big  gap

25  between  now  and  when  you  come  back.  Please  remember,

1  as I've told you before , do not discuss this case

2  among yourselves or with any other parties until you

3  begin your actual deliberation s at the end of the case ,

4  and I will see you next Tuesday , and I will hope that I

5  survive my little problem on Friday .  Thank you .

6                    (Jury excused at 5:03 p.m. )

7        MS. GREENBERG:   Judge , can you stay for a

8  minute ?

9        THE COURT:   Yes , yes .

10       Ms. Green berg , you had an issue ?

11       MS. GREENBERG:   A couple of housekeeping thing s,

12  Your Hono r -- a couple quick housekeeping thing s.   I

13  did check with the technical people .  If we're done

14  with the video s and you guy s don't want them for your

15  case , we can put the old system back up.  It would be

16  help ful to do it during the long break so they 'd have

17  more time to do it. So, I didn't know  if the defense

18  team -- anybody on the defense team want s these

19  monitor s or if we should put the old system back up,

20  since we're done with the video s.

21       THE COURT:   Any objection , counsel ?  We'll put

22  the old system back in.

23       MR. MCKNETT :   Your Honor , I may want to use the

24  pole camera .  I don't know what system --

25       MS. GREENBERG:   This is the only one that can

1  play video s.   The other other s are better  because  it's

2  right  on the table s.

3          MR. MCKNETT :  It's a video, not  DVD?

4          MS. GREENBERG:    The other  system .  This is the

5  U. S. Attorney's office system.   The court system's

6  broke and they haven't   gotten  it fixed  yet.

7          MR. MCKNETT :   To show the pole cam , you have to

8  use this system ?

9          MS. GREENBERG:    You have to use this system .

10         THE COURT:   Then we'll stay with this one.

11         MS. GREENBERG:   Your Honor , the second thing is,

12  if we're plan ning to  finish with Detective  Eveler  on

13  Tuesday , I want to remind  counsel  again  that we don't

14  have all the evidence  here .  So if they plan to call

15  somebody  and they need evidence , we'll need  to know

16  prior to Monday so that the agent can go out to the

17  facility and pick up the exhibit s that they want ; and

18  also , they do need  to let  us know what witness es

19  they're call ing on Monday  and how they're going to go

20  about do ing that .

21         THE COURT:   Counsel , please  remember --

22         MR. WARD:   Hold on.   I always thought once

23  exhibits  had been offered  into evidence  and became

24  evidence , they stay ed in the custody of the court until

25  such time as the  court  re lease d  them .

1            THE COURT:   No.   That's not the way it works.

2            If you need any additional  exhibits for your

3 case, please -- or any exhibit for your case, please be

4 sure to notify the U. S. Attorney's office so they can

5 be produced.

6            MR. SUSSMAN:   Your Honor, if I can make one

7 point.

8            If Detective Eveler is going to testify

9 intermittently  as an expert, I would renew my request

10 that the government  comply with Rule 16 and give what

11 his opinions are going to be and what the basis of his

12 opinions -- because I didn't think  he was going to be

13 an expert.   I thought he was going to be a summary

14 witness.

15            MS. JOHNSTON:   Your Honor, he was noticed as an

16 expert.   They were given copies --

17            MR. SUSSMAN:   I protested at that point in

18 regard to the specificity of --

19            THE COURT:   Your objection is noted.

20            MR. MARTIN:   Your Honor, I don't envy you, and I

21 know we don't always play well in the sand box, but --

22 and I always give you the benefit of the doubt, but

23 something happened yesterday and it repeated again

24 today, and that is with respect to the 611(c) and these

25 leading questions.   I notice near the end of the day

1 the government  is allowed to race  through  with  leading

2 questions, and  I don't think  it's fair  to these  people

3 who are  on  trial.  Let's be frank.  Given  their  ages,

4 they  face  life  sentences, and I think  that  the court

5 should  consider  the  time  constraint  -- I know  that, but

6 the --

7      THE  COURT:  I have restrained the government

8 from excessive leading.  Leading, sometimes, is a fact

9 of life.  When  it's pretty  easy to  ask  the  question  the

10 right  way with  a longer-winded version, I've  tried  to

11 be reasonably  lenient  with  it, but I agree.  I have

12 cracked the  whip  when  I've  had  to.

13      MR.  MARTIN:  Your  Honor, because  this  witness  is

14 not a witness  who is demented  or it's not  a sexual

15 assault  victim  who might  be hesitant  to testify  about

16 the facts -- he knows what  the facts are, and  trial

17 counsel  has more  experience  than  most  of us in  this

18 courtroom  regarding  this  matter.  So, I renew  my

19 objection.  I didn't  want  to do it  again  in  front  of

20 the  jury, but  it happened  yesterday.  Today  I talked  to

21 other  counsel  about  it, and  I just want  to make  a

22 record.

23      THE  COURT:  I have, where I have  thought  that

24 leading  questions  were  a problem, sustained  objections;

25 and  where  it  was  a matter  of  simply  expediting  the

1  exact same testimony , I have not sustain ed the

2  objection , but I note your concern and I've asked both

3  sides to try to refrain from unnecessary leading

4  question s. Not every single leading question is going

5  to be sustained as -- with an objection , as you well

6  know , but we're trying to have this trial be fair and

7  also efficient , and I'll continue to do so.

8         All right . Anything further , counsel ?

9         MR. WARD:  Yes.  I'm going to ask the government

10  to produce on Monday all of the evidence that has been

11  offered into evidence so far .

12         MS. JOHNSTON:   Your Honor , that is a ridiculous

13  request .

14         MR. WARD:  Well , it's my request . If you don't

15  like it , too bad.

16         THE COURT:  Mr. Ward , if you seriously intend to

17  have an examination made of each and every exhibit

18  during the defense case where you're maki ng your

19  presentation --

20         MR. WARD:  Your Honor , I don't --

21         THE COURT:  -- we'll be here for a long , long

22  time . I mean , if there are specific exhibit s that you

23  would like to have available for your use during your

24  case , you should let the government know .

25         MR. WARD:  Your Honor , it's --

1          THE COURT:   This is a case in which there are
2 literally truckloads of exhibits.
3          MR. WARD:   I understand, Your Honor.
4          THE COURT:   I am not going to require that the
5 government back a truck up to this courthouse every
6 single day on the possibility that you might want to
7 offer something.
8          MR. WARD:   Your Honor, they haven't backed a
9 truck up so far.
10          THE COURT:   It's not a difficult question for
11 you to identify who your witnesses are going to be and
12 tell them.   It's not a difficult problem for you to
13 say what exhibits you want to have available and tell
14 them so we can proceed efficiently, rather than have
15 trucks backed up to this courtroom.
16          MS. JOHNSTON:   Your Honor, we also note that
17 there's --
18          MR. WARD:   Just a minute.   I haven't finished
19 yet.
20          They haven't backed a truck up every day about
21 this trial, and we're in about the third or fourth day.
22 All they have done is roll these carts from their
23 office.   All I'm asking them to do is continue rolling
24 the carts from the office.   How do I know what
25 witnesses -- what evidence I'm going to need when a

1 witness is on the stand or their witness is on the

2 stand?  I don't.

3         THE COURT:   We're talking about your case, all

4 right?

5         MR. WARD:   My case is a different proposition to

6 take care of.

7         THE COURT:   That's what she's talking about.

8         MS. JOHNSTON:   Just so the court is aware.

9 We've only brought in the exhibits anticipated needing

10 for direct examination and cross-examination.  We have

11 not, by any stretch of the imagination, brought in

12 every exhibit every day.  Indeed, there are 15 kilos of

13 cocaine; there are lots of guns and cocaine, and that

14 is not kept here in the courthouse.  That is kept in a

15 storage facility -- a secured facility.  It presents

16 security issues for us to bring that sort of stuff in

17 here.

18         MR. WARD:   I'm not suggesting they bring 60

19 kilos or whatever it is in here.  They haven't brought

20 it so far all.  I said was what they brought so far and

21 put in evidence.

22         THE COURT:   Well, I've asked you to try to

23 cooperate each with the other side -- all sides in

24 giving reasonable notifications of the other of what it

25 is you need in the courtroom, because it's not possible

1  to have all of this evidence sitting in the courtroom
2  at all times.  I'm expecting you both to cooperate with
3  each other.  But to request that every single exhibit
4  that's been identified in these proceeding be present
5  in the courtroom at all times is simply not possible
6  with a case of this size.  So, do the best you can to
7  conclude what it is that you want to have here, and
8  I'll ask the government to have it here.  All right?
9           MS. JOHNSTON:   Your Honor, one other matter.  I
10 know the court is anxious to get going, but with --
11          THE COURT:   I'm here to serve.
12          MS. JOHNSTON:   We were given partial transcripts
13 of calls that the defense intends to use.  We have not
14 been given final transcripts.  We expect to be able to
15 start the defendants' case on Tuesday.  We filed the
16 motion, and we would like the rest of any exhibits that
17 they intend to use, including any transcripts.
18          THE COURT:   I have requested that there be an
19 opposition to the motion -- your motion in limine filed
20 by Monday.  I'm expecting if there's any updated or
21 redacted or corrected transcripts that they be
22 furnished on Monday as well.
23          MS. JOHNSTON:   Thank you, Your Honor.
24          MR. MCKNETT:   On that point, it is our
25 expectation that all the transcripts will be finalized

1  -- may  well  be  finalize d  now .

2         THE  COURT:    All  right .

3         MR.  MCKNETT :   As  soon  as  we  have  the  --

4         THE  COURT:    Don't  wait  until  Monday  afternoon .

5  As  soon  as  you  have  them  available ,  give  them  to  the

6  government .

7         MR.  MCKNETT :   As  soon  as  we  have  them ,  the

8  government  will  have  them .

9         MS.  JOHNSTON:    Thank  you ,  Mr.  McKnett .   I

10  appreciate  that .

11         THE  COURT:    Thank  you  very  much ,  counsel .)

12                  (Off  the  record  at  5:12   p.m. )

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **CERTIFICATE**

2

3       I, Tracy Rae Dunlap,   RPR, CRR, an Official Court

4  Reporter for the United States District Court of

5  Maryland, do hereby certify that I reported, by machine

6  shorthand, in my official capacity, the proceedings had

7  and testimony adduced upon the Jury Trial Proceedings

8  in the case of UNITED STATES OF AMERICA versus PAULETTE

9  MARTIN, et al, criminal Action Number    RWT-04-0235 on

10 July 19, 2006.

11

12      I further certify that the foregoing    279 pages

13 constitute the official transcript of said proceedings,

14 as taken from my machine shorthand notes, of said

15 proceedings.

16

17      In witness whereof, I have hereto subscribed my

18 name, this 22nd day of    March 2008 .

19

20

21                       _____

22                       TRACY RAE DUNLAP, RPR, CRR
                         OFFICIAL COURT REPORTER
23

24

25