```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                         SOUTHERN DIVISION
 2
   ------------------------x
 3 UNITED STATES OF AMERICA  :
            Plaintiff        :
 4                           :
                             :
 5 vs                        :Criminal Action:    RWT-04-0235
                             :
 6                           :
   PAULETTE MARTIN, et al    :
 7          Defendants.      :
   ------------------------x
 8

 9                         Tuesday , July 25, 2006
                           Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11 Proceeding before the HONORABLE ROGER W. TITUS, United
   States District Judge, in courtroom 4C, commencing at
12 9:57 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS THE PROCEEDINGS AS RECORDED AND
15      REQUESTED.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR          (301) 344-3912
25 Official Court Reporter
```

1                          I N D E X

2                          DIR    CROSS
   Thomas  Eveler         9      153
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                              <u>Page</u>

23  Reporter's Certificate                      227

24  Concordance                                 228

25

1          THE COURT:   Do we have any preliminary matter s
2  before we call the jury in today ?
3          MR. WARD:   I'm sorry . Before we proceed with
4  the witness , Your Honor .
5          THE COURT:   Yes .
6          MR. WARD:   Yes , we do. At least I do.
7          THE COURT:   You may proceed .
8          MR. WARD:   It's the same issue I raise d before
9  Your Honor . This witness has not been qualifi ed as an
10 expert and has been permitted to offer opinion s, and I
11 object . I have a continui ng objection to his being
12 offering opinion s in, unless he is qualifi ed, and I
13 would ask the court if he is qualifi ed to give the
14 appropriate  instruction since he is obvious ly a fact
15 opinion witness .
16         THE COURT:   Okay .
17         MR. SUSSMAN :   Just along that line . Judge , even
18 if the officer is qualifi ed, I think that we have to
19 avoid being cumulative . We had Sergeant Sakala on the
20 stand for about three or four month s giving opinion s
21 and I think that the notion that we need another expert
22 to give cumulative opinion s sun necessary  and I would
23 request that if Detective Eveler is to give any opinion
24 that it be something different than we've heard
25 already .

1          MR. MCKNETT:  Your Honor, on the same topic of
2  Detective Eveler.  I just want to be clear on the
3  record that we had originally made a joint objection to
4  Sergeant Sakala's testimony in and the nature of it
5  concerning his opinions and the foundation and so
6  forth.  I would just like to be clear that that
7  objection also would apply to Detective Eveler.
8          THE COURT:  All right.
9          MR. MCKNETT:  If we could have a continuing
10 objection with regard to him as well I'd appreciate
11 that.
12         THE COURT:  Okay.  Anything further from the
13 defense before I hear from the government?  How's your
14 ankle doing?
15         MR. MONTEMARANO:  Fine, thank you.  Your Honor,
16 I'd like to address that when we are done sorting out
17 the more serious matters.
18         THE COURT:  Okay.
19         MS. JOHNSTON:  Your Honor, our position is the
20 same as it was last week when we met.  There's nothing
21 different.  This officer -- we've gone through all of
22 his experience and training so if the court would like
23 we can ask the court to accept him as an expert
24 witness.  Two he is testifying as a summary agent which
25 is well within the scope of the law in the fourth

1 circuit and we can cite cases for the court if the

2 court needs them. He is going to be introducing

3 summary charts. His testimony in large part has

4 nothing to do with what Sergeant Sakala testified to.

5 Sergeant Sakala testified concerning calls. There is

6 one chart that he made may reference in his personal

7 opinion concerning -- his expert concerning Mr. Mangual

8 getting personal deliveries there is nothing new and

9 different from when the court made its ruling last week

10 counsel has not raised any new arguments it's if same

11 ole old organize argument mean file like we're standing

12 here beat ago dead horse until court changes its mind.

13 The court has ruled.

14      THE COURT:  Do you want me to have him qualified

15 as an expert.

16      MS. JOHNSTON:  If that would make defense

17 counsel feel better.

18      MR. WARD:  It's not a question of making defense

19 counsel feel better Your Honor it's a matter of

20 adhering to the dull t rules of evidence.  If he is

21 going to testify as an expert he has to be qualified if

22 he's not qualified he doesn't testify as an expert.

23 That's it.  Simple.  If the government doesn't want to

24 offer him as an expert I object to his testifying about

25 opinions.

1          THE COURT:   If such time as ever the government

2 asks him opinion testimony he will either be qualified

3 or he won't be able to --

4          MR. WARD:   I believe they already have.

5          MR. MARTIN:   They have.  Your Honor, I've made

6 objections under 701 repeatedly.

7          MR. WARD:   The same "old argument" is the same

8 argument we made before and I think it was a perfectly

9 valid and appropriate argument then and I think it's no

10 less now.

11          THE COURT:   Mr. Montemarano.

12          MR. MONTEMARANO:   Thank you, Your Honor.

13 Initially I'd like to thank the court for the

14 accommodations it permitted me last week.  I can advise

15 the court that my ankle is fine not in an objective

16 sent sense but subjectively for the purpose of our

17 trial.  I'm in a I guess they call an air cast, walking

18 booty bear weight so I will be able to cart myself I

19 won't be complaining about being on crutches so I'm a

20 perfectly adequate lawyer this way although I'd much

21 rather be shod on both feet.

22          THE COURT:   I will also thank all counsel for

23 their cooperation in my difficulties.  I had long,

24 awful surgery and I'm taking pain pills and putting ice

25 on my shoulder and everything else, but -- so if I look

1  like I'm in pain it's not because of your argument s.

2      Ms. Johnston , -- in order to address the defense

3  objection , why don't you just ask him a few more

4  question s about his background and experience and ask

5  if he can give opinion s in the field that you --

6      MS. JOHNSTON:  Your Honor I think I've gone

7  through all of those question s I don't want to be

8  repetitive .

9      THE COURT:  I think you've gone through it.

10  He's clear ly a witness who has extensive experience in

11  the drug business and police matter s pertain ing there

12  to and can bring to light his experience in giving

13  opinion s on certain subject s in that area , but.

14      MR. WARD:  I mean so is any expert Your Honor .

15  Any expert is clear ly, you know , an expert in his

16  field , but he still has to be qualifi ed and the court

17  still has to give appropriate instruction s with respect

18  to his testimony .  I mean , I'm not object ing to his

19  testify ing as a summary expert .  I recognize that the

20  fourth circuit has said that that 's appropriate .  It's

21  the approximately matter of expertise .

22      THE COURT:  Well , we'll get that clear ed up.

23      Bea, have we got all the juror s here ?

24      THE CLERK:  Yes .

25      THE COURT:  Ready for the jury ?

1        MS. JOHNSTON:   Yes, Your Honor.

2        THE COURT:  Bring them in.

3                (Jury returns at 10:04 a.m.)

4        MR. MONTEMARANO:  For the record Your Honor, the

5   defense filed a response to the government 's motion in

6   limine regarding the intercepted calls on Sunday.

7        THE COURT:  I'm starting to look at that and

8   I'll try to deal with that today at some point.

9        MS. JOHNSTON:   Your Honor, I for whatever reason

10  did not receive the E-mail over the weekend.  I checked

11  my E-mail as late as 10:30 last night and still hadn't

12  had it.

13       THE COURT:  Do you have it now.

14       MS. JOHNSTON:   I got it from Mr. Montemarano

15  this morning.  I understand Ms. Greenberg did get her

16  version of it but I don't know  if there was some

17  mess-up in the way it went through.

18       MR. MONTEMARANO:  My typo, Your Honor.

19       THE COURT:  I have special spies who told me

20  where you were this weekend.

21       MS. JOHNSTON:   I understand you probably do.

22       (Witness resumes the stand at 10:05 a.m.)

23       (Jury returns at 10:05 a.m.)

24       THE COURT:  Good morning, ladies and gentlemen  .

25  I hope you all had  a nice weekend.  I did not, but I'm

1  back, I'm here, I'm in a bit of pain, popping pills

2  here and there, and I look like I'm expecting a baby

3  because I've got a great big sling underneath here with

4  a balloon on it or something so I only have one arm in

5  this robe and I have an ice pack on my shoulder, so if

6  you bear with me, I'll get you through the end of this

7  trial.

8           Ms. Johnston, you may proceed.

9           MS. JOHNSTON:    Thank you, Your Honor.

10                  **FURTHER DIRECT EXAMINATION**

11          BY MS. JOHNSTON:

12  Q.       Detective Eveler, in terms of your testimony

13  here, would it be fair to say we could divide it into

14  several different categories; is that correct?

15  A.       Yes.

16  Q.       In preparation for your testimony here, have you

17  analyzed voluminous records that you intend to present

18  to this jury via some summary charts; is that correct?

19  A.       That's correct.

20  Q.       In addition to that, have you summarized on

21  charts some of the evidence as it relates to different

22  events; is that correct?

23  A.       That's correct.

24  Q.       In addition to that, have you formed an opinion

25  based upon your training and experience concerning drug

1 activities that occurred during the investigation

2 relative to these defendant s that are on trial ?

3 A.      Yes , I have .

4 Q.      In term s of those opinion s that you're going to

5 give , are those based on your train ing and experience ?

6 A.      Yes, ma'am .

7 Q.      Although we did this last week for the benefit

8 of defense counsel , would you brief ly summarize your

9 train ing and experience ?

10        MR. MCKNETT:    Objection .

11        MR. WARD:    Objection , Your Honor .

12        I think it's for the benefit of the jury , also .

13        THE COURT:   Pardon me?

14        MR. WARD:    I think this question is of benefit

15 for the jury , also .

16        THE COURT:   Sustained to the form of the

17 question .

18        MR. MONTEMARANO :   The Court did order it .

19        BY MS. JOHNSTON:

20 Q.      If you could please repeat for the ladies and

21 gentlemen of the jury , as well as everyone else in the

22 courtroom , what your train ing and experience has been

23 in the narcotic s area .

24 A.      Yes, ma'am .

25        I received basic narcotic s train ing as part of

1  the Prince George's County Police Academy. Upon

2  completion of the academy and my role as a patrol

3  officer at Hyattsville, I made numerous narcotics

4  arrests in patrols from Hyattsville's District 1

5  station.

6       I was then transferred to the Street Narcotics

7  Section in 1991, where I conducted controlled buys,

8  direct buys, numerous search warrants, assisted others

9  in numerous search warrants; also participated in

10 wiretaps.

11      After that, I was transferred to the Major

12 Narcotics Section in 1992, where I continued conducting

13 controlled buys, direct buys, search warrants, assisted

14 other agencies in wiretaps. We conducted our own

15 wiretaps as the Prince George's County Police Major

16 Narcotics Section, conducted joint investigations with

17 the DEA and the FBI, as well as Customs at the time.

18      I received training from the Drug Enforcement

19 Administration in identification and trends involving

20 narcotics. I received training from the Maryland State

21 Police and Finance in financial investigation, received

22 training from the Maryland State Police in conspiracy

23 investigation, received training from the Drug

24 Enforcement Administration in conspiracy

25 investigations, was -- received training in cocaine

1  synthesis  by  the  Prince  George's  County  Police  Drug

2  Laboratory , received  training  from  the  Drug  Enforcement

3  Administration   in clandestine   lab  investigation s and

4  synthesis  of methamphetamine   and  phencyclidine ,

5  conduct ed numerous  inter view s of drug  trafficker s and

6  cooperator s, who  would  then  provide  me  insight s into

7  trends  and  the  method s that  drug  trafficker s use  and

8  received  train ing  ongoing .

9         I've  been  to  many  seminars  and  school s --

10  Q.     Is it safe to say that since 1991 you have spent

11  your  law enforcement   time  extensively investigating

12  narcotic s trafficker s as well as their  money  laundering

13  activities ?

14  A.     Almost  exclusive ly except  that  as to where  it

15  would  --  the  drug  trafficking   would  impact  some  other

16  crime  as homicides , frauds , other  thing s like  that .

17  Q.     Would  those  be related  to your  drug

18  investigation s?

19  A.     Yes .

20  Q.      In addition  to that , is it important  to you when

21  you're  conduct ing under cover  purchase s or you're

22  cooperating  the  use  of informant s to purchase  drug s,

23  that  you become  familiar  with  the  language  and  the

24  term s that  are use d during  the  course  of those  drug

25  transactions ?

1  A.      Yes.

2  Q.      As well as becoming -- why is that important?

3  A.      When we're conducting an investigation, I need

4  -- if I'm making a direct buy, I need to understand the

5  language and the methods, or else I cannot make a

6  direct buy myself or I cannot -- sometimes you're with

7  a -- with an informant at the time, and you need to

8  understand what is going on, you need to be able to

9  participate if asked or spoken to by the target.  You

10 need to know what's going on and not blow the case, so.

11 Q.      Similarly, in regards to the prices of -- the

12 current prices of drugs, you need to be familiar with

13 that as well?

14 A.      Yes.

15 Q.      Now, have you had occasion to be qualified as an

16 expert in the area of drug trafficking in  any courts?

17 A.      Yes, ma'am.

18 Q.      And what courts are those?

19 A.      Numerous times in the Circuit Court for Prince

20 George's County, Maryland, and also in the US District

21 Court for Greenbelt.

22 Q.      Indeed, before this member of the bench; is that

23 correct?

24 A.      That's correct.

25         MS. JOHNSTON:    Your Honor, we would proffer this

1 witness as an expert in the area of drug trafficking,

2 including the methods and means used by drug

3 trafficker s, as well as the language s and price s used

4 during the course of their engaging in drug trafficking

5 or -- drug transactions, however --

6          MR. MONTEMARANO: Your Honor, objection.

7          THE COURT:   Do you wish to inquire?

8          MR. MONTEMARANO: May we be heard at the bench?

9          MR. MCKNETT: Your Honor, may I ask -- are we

10 coming to the bench?

11          THE COURT:   Yeah.

12                (At the bar of the Court.)

13          MS. JOHNSTON:   Your Honor, could we get on with

14 the objection here so we don't hold up the jury?

15          THE COURT:   What's the objection?

16          MR. WARD:   I was just inquiring as to the

17 judge 's health.

18          MR. MONTEMARANO: I was double checking with

19 counsel, because if I'm making an objection on behalf

20 of other counsel, I want to make sure we're on the same

21 page.

22          We would be objecting as to the lack of notice

23 of this person as an expert. We would object to the

24 lack of a summary of his expertise and opinion s and the

25 bases therefore provided in advance of his testimony.

1 The government apparently resolved to call this

2 individual as an expert only after the defense objected

3 last -- guess we're talking Wednesday of last week,

4 which would be the 19th.

5          THE COURT:  We were out of session on Thursday.

6          MR. MONTEMARANO:  No.  Wednesday, the 19th.

7 Thursday, I was getting fitted for my dancing shoe.  It

8 is the day before surgery, and you were --

9          THE COURT:  That's right.  We had medical week.

10         MR. MONTEMARANO:  And you were downtown with

11 Congress.

12         THE COURT:  Yes.

13         MR. MONTEMARANO:  I hope an enjoyable lunch.

14         THE COURT:  Oh, yes.

15         MR. MONTEMARANO:  It is what it is.  For that

16 reason, we would object to his being qualified as an

17 expert at this time.  If the Court is not persuaded by

18 counsel's argument, I then have a second argument

19 concerning the breadth and scope of his testimony, but

20 I'm not going to bore you with that until that becomes

21 an issue, because as a threshold issue, you would have

22 to rule him able to testify as an expert before I

23 complain about how he should or shouldn't testify.

24 That's the initial --

25         MS. JOHNSTON:  Your Honor, notice was given to

1  them  well  in  advance  of  the  trial .  They  received

2  copies  of  the  notice .  That  was  filed  in  the  very  first

3  trial  last  fall  designating  him  as  an  expert  witness .

4  Copies  of  that  correspondence  was  sent  to  them ,  I

5  believe  in  May  of  this  year ,  advising  them  that  he

6  would  be  called  as  an  expert  and  explaining  to  them

7  that  his  opinions  were  set  forth  in  the  affidavits  in

8  terms  of  the  wiretaps  in  the  ten-day  reports  that  were

9  provided  to  them  where  they  summarized  calls  and

10  interpreted  calls,  and  that  material  has  been  provided

11  to  them  well  in  advance  of  the  start  of  this  trial .

12          In  terms  of  the  opinions  that  he's  going  to

13  give .  That's  why  I  laid  --  sort  of  laid  it  out .  He  is

14  going  to  be  testifying  in  terms  of  evidence  in  place  of

15  voluminous  records .  He's  going  to  be  introducing

16  summary  charts;  those  are  not  a  question  of  real  expert

17  opinion .  He's  going  to  be  offering  some  expert  opinion

18  concerning  when  drug  transactions  took  place ,  but  by

19  and  large ,  he  is  going  to  be  testifying  to  summary

20  charts  of  items  already  in  evidence ,  summary  charts  of

21  voluminous  records  having  to  do  with ,  really ,  pin

22  register  data ,  and  then  some  minimal  opinions  that  he's

23  going  to  be  offering .          Counsel  has  gotten

24  notice  of  his  opinions,  we  couldn't  set  it  forth  any

25  more  clear  than  what's  set  out  in  the  ten-day  reports

1 and the affidavits .

2         THE COURT:   The objection  is over ruled .   I think

3 he's capable  of giving  opinion s.   I think  there 's been

4 notice  given , and a substantial  part  of his  testimony

5 won't  be expert  testimony , in any  event , on the  summary

6 matter s.

7         Do you  want  to give  me a second  opinion ?

8         MR.  MONTEMARANO :   I would  point  out  to the  Court

9 that  in the  view  of the  defense , notice  to other

10 counsel in  a separate  trial  was provided  to us as a

11 courtesy .   I do not  see how  it operate s as notice  to us

12 with  regard  to their  intention  to call  this person  in

13 this  trial .   Thing s change .   If we were  to hold  them  to

14 something  from  last  November  and the government  then

15 respond ed, well , Mr.  Montemarano , it's  been  seven

16 month s since  then --

17         THE  COURT:   Mr. Montemarano , they've  given  you

18 notice , both  prior  to the  earlier  trial , as well  as

19 prior  to this  trial , and he's  been  on the  witness  list .

20 You know  what  he's  going  to testify  about .

21         MR.  MONTEMARANO :   Not  as an expert .   Expert

22 versus  fact  is a complete ly separate  issue .   I'll  leave

23 that  alone .   Your  Honor  has ruled .

24         THE  COURT:   All right .

25         MR.  MONTEMARANO :   As to the  question  of the

1 breadth of his testimony . Once again , absent a preview

2 of what he will testify about and the conclusion s he

3 will draw , and going back to the -- I would simply

4 adopt all of the objections the defense has made at any

5 point during this trial concern ing Sergeant Sakala ,

6 concern ing over ly broad testimony based upon the fact s

7 of this matter versus the fact s in advance of the

8 matter , because once again I think what we run into is

9 a very , very dangerous slippery slope about which I may

10 have some expertise regard ing roll ing fact and opinion

11 witness es together , about over -- what's the right

12 word ? Over emphasizi ng the fact portion of a witness '

13 testimony because he is also able to provide opinion

14 testimony .

15       We hash ed this without Sergeant Sakala , and now

16 we are obligate d to raise the very same objections here

17 --

18       THE COURT:   Let me cut you off slight ly .

19       MR. MONTEMARANO :   I'm done .

20       THE COURT:   I will over rule your objection for

21 the same reason s I gave with respect to Sergeant

22 Sakala , and I will give all counsel a continui ng

23 objection on all those grounds to all the testimony of

24 this officer .

25       MR. MONTEMARANO :   That 's fine , Judge .   Thank you

1  very much.

2         MR. WARD:   Your Honor, with respect to notice.

3  I wasn't around when the first case went to trial.   I

4  got into the case late.   I honestly am not able to

5  recall --

6         THE COURT:   Do you want to get closer to the

7  mike?

8         MR. WARD:   -- whether or not I actually received

9  any written notice that he -- of his intent to be

10 called as an expert.   Perhaps, to make the record

11 complete, it would be advisable for the government to

12 put that document in the record so that it's clear,

13 because I frankly have no recollection of it.

14        THE COURT:   Well, the problem is, your client

15 has had several counsel.   I mean, the government did

16 give notice to her counsel at the time.

17        MR. WARD:   Your Honor, I'm not blaming that on

18 the government.   I'm saying, I got in late and I --

19        THE COURT:   Understood.

20        MR. WARD:   I just don't recollect seeing that.

21        MR. MCKNETT:   I rose to object on a somewhat

22 different ground, and I'd like to put it on the record.

23        Your Honor, it's my understanding there's a

24 difference between a case agent who's testifying as a

25 summary witness and a case agent who's testifying as an

1  expert witness.  Ms. Johnston, to paraphrase, said he

2  will testify as an expert on the interactions -- I may

3  not get the exact language that Ms. Johnston used, but

4  the interactions between the defendants in this case.

5       My concern there is that in a previous trial

6  before Your Honor, the John Martin trial, this witness

7  testified under oath that at least insofar as his

8  opinion concerning the content of the wiretapped

9  conversations was based on, among other things,

10 informant information and on interviews that he's done.

11 That brings us back to my original challenge as

12 hearsay.  What he's doing now is elevating information

13 received during the interview of informants and other

14 people involved in this case.

15      THE COURT:  That's why I've not heard any

16 questions that would call upon him to use that kind of

17 information.  If we get to that kind of a question,

18 raise the objection.

19      MR. MCKNETT:  Okay.  I will do that, Your Honor,

20 but I wanted to put the Court on notice that I will be,

21 if appropriate, raising that objection.

22      THE COURT:  All right.  Thank you.

23           (Back in open court.)

24      MS. JOHNSTON:  Your Honor, we had proffered the

25 witness as an expert -- we had proffered the witness as

1  an expert in the area of drug trafficking and codes and

2  language used by individuals.

3       THE COURT:   There was an objection.  Does

4  anybody wish to inquire on his qualifications in those

5  areas?

6       MR. WARD:   I have no questions, Your Honor.  I

7  would simply ask for a cautionary instruction that the

8  Court usually gives.

9       THE COURT:   All right.  He will be accepted as

10 an expert in those fields.

11      MS. JOHNSTON:   Thank you, Your Honor.

12      BY MS. JOHNSTON;

13 Q.     Detective Eveler, before I ask you any questions

14 of your opinion, let's go into some of the other areas

15 that you've been called to testify.  First of all, we

16 ended last Wednesday, I believe it was, looking at this

17 map.  Are you familiar with this map, Government's

18 Exhibit CH-11?

19 A.     Yes, ma'am, I am.

20 Q.     I believe you wrote on it here in reference to

21 where Mr. Encarnacion was when you did your

22 surveillance back in June of 2001; is that correct?

23 A.     That's correct.

24 Q.     In addition to that, are you familiar with the

25 testimony that took place here concerning the Takoma

1  Park police stop of John Martin, Jr. and the seizure of

2  approximately 25 empty kilogram wrappers?

3  A.      Yes, I am.

4  Q.      Can you tell us whether or not the location of

5  that stop is depicted on this map?

6  A.      Yes. The at the bottom of the map, there's a

7  red dot. I believe it may be -- it's hard for me to

8  see it, may be a push pin right there next to the red

9  square on the bottom of the map. That was the Takoma

10  Park stop.

11  Q.      Are you familiar with the roads in that area?

12  A.      Yes.

13  Q.      Does that accurately depict the location as was

14  testified to by the detectives?

15  A.      Yes, it does.

16  Q.      What is the approximate distance from Ms.

17  Martin's residence on Bexhill Court to the location of

18  that stop?

19  A.      Approximately two and a half miles.

20  Q.      You were present when Michael Thurman testified;

21  is that correct?

22  A.      That's correct.

23  Q.      When did you have your first contact with Mr.

24  Thurman, approximately?

25  A.      April of '05.

1 Q.      So we're talking about April of 2005?

2 A.      Yes, ma'am.

3 Q.      After the individuals in this case were

4 arrested?

5 A.      Yes.

6 Q.      Who were you looking for back around the spring

7 of 2005?

8 A.      I was trying to locate Tiffany Vessels.

9 Q.      Where did you go in an effort to locate her?

10 A.      1323 Anacostia Road, Southeast, Apartment 4.

11 Q.      Do you know who was the owner or principal of

12 that location, that building?

13 A.      Yes, Mr. Goodwin.

14 Q.      Who was that?

15 A.      Mr. Goodwin.

16 Q.      Prior to actually meeting with Mr. Thurman in

17 the spring of 2005, had you identified him during your

18 investigation?

19 A.      Mr. Thurman?

20 Q.      Yeah, Mr. Thurman.  I'm sorry.

21 A.      Yes.

22 Q.      If you could explain to the ladies and gentlemen

23 of the jury how it was that you had identified Mr.

24 Thurman before you met with him in the spring of 2005.

25 A.      Southwest Airline records that I had obtained

1  via subpoena showed that Mr. Goodwin and Mr. Thurman

2  traveled to Texas via Southwest Airlines together.

3  Q.      Are those the Southwest Airlines records that

4  were introduced to the custodian many weeks ago?

5  A.      Yes.

6  Q.      If you could, explain to the jury what led you

7  to get the Southwest Airlines records.

8  A.      Mr. Goodwin's -- I believe they're Chevy Chase

9  bank account records.

10  Q.      I want to show you what's been introduced

11  already as R-1 and ask you if you recognize that

12  exhibit.

13  A.      Yes, I do.

14  Q.      Do you recall how you obtained these records?

15  Was it by subpoena or something that was recovered

16  during a search warrant?

17  A.      No.  This would have been via subpoena.

18  Q.      Do you recall when you obtained these records,

19  whether it was before or after Mr. Goodwin had been

20  arrested in June of 2004?

21  A.      Oh, no.  This was before.

22  Q.      Okay.  As when you -- could you explain to the

23  ladies and gentlemen why it is that you would subpoena

24  one of your target's bank records?

25  A.      We subpoenaed bank records in an attempt to

1 understand what is going on with that defendant , if

2 they are -- what kind of bank activity they have . In

3 this case , the purchase of Southwest Airline ticket s

4 would indicate travel , and in other case s -- and in

5 this case , travel to certain location s such as the

6 southwest border of the United States and California

7 could be indicative of drug trafficking .

8 Q.     So that 's something based on your train ing and

9 experience you look for ?

10 A.     Yes .

11 Q.     As a result of get ting these bank records , you

12 obtain ed the Southwest Airline records ; is that

13 correct ?

14 A.     That 's correct .

15 Q.     Which reflect ed travel for both Mr. Goodwin and

16 Mr. Thurman ?

17 A.     Yes .

18 Q.     Prior to the spring of 2005 , had you had any

19 contact with Mr. Thurman ?

20 A.     No .

21 Q.     Had you obtain ed a warrant for him or anything

22 of that nature ?

23 A.     No , I didn't really know who he was .

24 Q.     You mention ed that you got Chevy Chase bank

25 records . Let me also show you what's been mark ed as

1 R-7.   Do you recognize  these  records ?

2 A.      Yes .

3 Q.      What  are these ?

4 A.      These  are Net Spend  account  records  that  I

5 obtain ed .

6 Q.      Those  are the  records  you've  subpoena ed during

7 the  investigation ?

8 A.      Yes, ma'am .

9 Q.      These  have to do with  what  individual ?

10 A.      Alton  McKenzie .

11 Q.      When did you receive  these  records ?

12 A.      April  21st  2005 .

13 Q.      Was that  as a result  of your reviewing various

14 document s that  had been seize d during  the different

15 search  warrant s --

16 A.      Yes .

17 Q.      -- in term s of Mr. Thurman .  You were looking

18 for Ms. Vessel s; is that  correct ?

19 A.      Yes .

20 Q.      Where  did you meet  with  Mr. Thurman ?

21 A.      I met with  him at his mother 's address  in Prince

22 George's  County , Maryland .

23 Q.      Prior  to going  to meet  with  him , had you done --

24 taken  any action  in term s of investigati ng him and his

25 present  status  at that  time ?

1 A.      Yes, I did.

2 Q.      What did you learn about Mr. Thurman before you

3 went to meet with him?

4 A.      That at the time that I was planning to meet

5 him, he had two open warrants.  One from Louisiana; one

6 from Texas.

7 Q.      Do you have a -- do you or Customs, who you were

8 working with at that time, have any policies that

9 govern what you have to do if you meet with somebody

10 who's got outstanding warrants?

11 A.      If it's extraditable, he is to be arrested.

12 Q.      When you went to meet with Mr. Thurman, did you

13 have a warrant to arrest him as a result of this

14 conspiracy?

15 A.      No, I did not.

16 Q.      Why not?

17 A.      At the time, I don't think  I had -- we were

18 still learning about Mr. Thurman at the time.  I had

19 not completed the investigation  enough to arrest him at

20 that moment.

21 Q.      When you met with Mr. Thurman, was it at his

22 mother's house?

23 A.      Yes.

24 Q.      Was another agent with you?

25 A.      Yes.

1  Q.      Prior to speaking to Mr. Thurman, what advice

2  did you give him?

3  A.      I advised him of his constitutional  rights, his

4  -- you know what's called his Miranda rights.

5  Q.      Did he waive those rights?

6  A.      Yes, he did.

7  Q.      At that time, did you conduct a preliminary

8  interview of Mr. Thurman?

9  A.      Yes.

10 Q.      Based upon the information he provided at that

11 time, what did you do with Mr. Thurman?

12 A.      He was placed under arrest and charged in this

13 court.

14 Q.      Once you placed him under arrest and charged him

15 in this court, did you take any investigative  steps in

16 relation to the information that he provided?

17 A.      Yes.

18 Q.      Describe the investigative  steps you took

19 generally.

20 A.      I obtained police reports from his arrests from

21 Louisiana and Texas; I then went back through the

22 evidence that we had seized during the search warrants

23 and in an attempt to corroborate  anything -- any

24 information I had received and also obtained other

25 records such as the Houston Police Department report

1 for his traffic accident and his carjacking in Texas,

2 and just subpoenaed and obtained -- police department

3 records do not need to be subpoenaed, but used a

4 subpoena for those records that I could not get that

5 were not public record and just obtained as many

6 records as I could regarding his trips to Texas.

7 Q.      Why is it important for you as an investigator,

8 once you've gotten a statement or a confession from

9 someone like Mr. Thurman, to go back in and obtain

10 documents and records?

11       MR. WARD:   Objection, Your Honor, to the leading

12 nature of the question.

13       THE COURT:   Rephrase the question.

14       BY MS. JOHNSTON:

15 Q.      What was your purpose in obtaining those

16 records?

17 A.      In particular, I didn't know the full scope of

18 Mr. Thurman's involvement, so this would show me what

19 the involvement was and what his relationship was with

20 Mr. Goodwin and others in the investigation.

21 Q.      As a result of that, is that how you obtained

22 these other records?

23 A.      Yes.

24 Q.      In addition to that -- strike that.

25       Have you prepared a chart for this jury

1  summarizing  the  records  that  you've  obtained  during  the

2  course  of  this  investigation  that  you  reviewed  from

3  search  warrants  that  relate  to  the  testimony  of  Mr.

4  Thurman?

5  A.      Yes.

6          MS. JOHNSTON:     If  I  could,  Your  Honor,  have  the

7  witness  step  down  to  the  chart  --

8          THE  COURT:    You  may.

9          MS.  JOHNSTON:    --  to  the  easel?   Thank  you.

10         MR.  HALL:   Your  Honor,  may  we  move  so  we  can  see

11 the  chart?

12         THE  COURT:    Certainly.   Yeah.

13         BY  MS.  JOHNSTON:

14 Q.      Let  me  show  you  what's  been  marked  as  CH-5.   How

15 many  boards  does  CH-5  consist  of?

16 A.      Three.

17 Q.      If  we  could  start  with  the  very  first  one  and  if

18 we  move  the  easel  over  in  front  of  the  jury  so  that

19 they  can  see  it.   I'm  going  to  give  you  this  laser

20 pointer  and  ask  if  you  if  you  could  describe  what  is

21 depicted  on  the  chart  beginning  with  the  caption  and

22 what  you've  summarized  here  for  the  jury.

23 A.      The  first  section,  December,  2001,  relates  to

24 the  trip  that  Mr.  Thurman  testified  about  that  he  and

25 Mr.  Goodwin  took  to  Texas  in  December  of  2001.

1 Q.      Let me interrupt you for a second.

2         Agent Snyder, may I have R-9 please, the records

3 from Southwest Airlines?

4         You may continue while he's looking for that.

5 A.      The first column just notes the date of the

6 event, second is a summary of the event, and the third

7 is the source where I obtained that information.  In

8 this case, R-9 are the records.

9 Q.      Court's indulgence one moment.

10        Showing you what's been marked as Government's

11 Exhibit R-9.  Is that the exhibit in question?

12 A.      Yes, ma'am.

13 Q.      How does that relate to the information on the

14 chart?

15 A.      This is the source for this information.

16 Q.      And then what do you have after that?

17 A.      This R-1 is the record that you just showed me a

18 few minutes ago, the check card transaction on Mr.

19 Goodwin's account where he purchased the tickets.

20 Q.      Continue.

21 A.      R-9 is, again, the Southwest Airline records,

22 which indicate the travel and the billing for that trip

23 which was covered by the custodian of records for

24 Southwest Airlines, as well as Miscellaneous 5, which

25 is the chart that the representative from Southwest

1  Airlines did on the easel right there.

2  Q.      Okay.  This chart here, showing you dates and

3  the times of the trips?

4  A.      Yes, ma'am.

5  Q.      Continue with what else is on the chart.

6  A.      Next, it shows the -- this is the departure from

7  BWI to Houston.  The next is Mr. Goodwin's return trip

8  from Houston to BWI -- I believe BNA is Nashville --

9  via Nashville, which is also indicated on R-9.

10  Then on December 31st, we have the check card

11  transaction, which was covered in R-1 which you saw

12  previously.  January 2 was the grand opening of a

13  restaurant which Mr. Goodwin was associated with, The

14  New DC's Finest, which Mr. Thurman spoke about.  That's

15  why he needed to return early from his trip.

16  Q.      This would be Goodwin 9, then, the document that

17  was recovered?

18  A.      Yes.  And this is -- this indicates -- this

19  document indicates that they opened the restaurant on

20  January 2nd, 2002.

21  Q.      Now, these documents that you're referring to,

22  did any of these documents come from Mr. Thurman?

23  A.      No.

24          Then on January 5th, Mr. Thurman returned from

25  Houston to BWI, which is also based on the Southwest

1 Airlines records.

2 Q.       What is the next category that you've listed on

3 the chart?

4 A.       The next is a billing charge to Mr. Goodwin's

5 Chevy Chase account for a Fed Ex shipment in February

6 of 2000.

7 Q.       Again, is that referenced in Government's

8 Exhibit R-1?

9 A.       Yes, ma'am, it is.

10 Q.       Continue.

11 A.       Then in January through March is a list of

12 events surrounding Mr. Thurman and Mr. Green's trip to

13 Texas in 2002.  The first, in the end of January 2002,

14 is a telephone record which is Government's Exhibit

15 Goodwin 31.  That shows that telephone contact with

16 this phone number, which was referenced in Goodwin 8, I

17 believe, and this telephone number in which we have --

18 and this telephone number, which has -- which we have

19 another document showing this telephone number linked

20 to Steve Campbell.

21 Q.       Court's indulgence one moment.

22         You've mentioned Hayward 8 there?

23 A.       I believe it was Hayward 8, not Goodwin 8.

24 Q.       Do you have notes that would refresh your

25 recollection?

1  A.       Yes, ma'am.

2  Q.       If you could obtain those please.

3  A.       Hayward 8 is the telephone number with the

4  notation Goody and this, the 281 telephone number was

5  reference d in Goodwin 11.

6  Q.       Showing you what's been mark ed as Goodwin 11, if

7  you could show the ladies and gentlemen of the jury

8  where that number is reference d in Goodwin 11.

9  A.       It is on the back of a business card.  It says

10 Steve with telephone number (281) 630-6498 and the

11 notation Texas next to that number.

12 Q.       Again, that item was not recovered from Mr.

13 Thurman; was it?

14 A.       No, it was not.

15 Q.       Continue with the next entry.

16 A.       The next entry is March 12, 2002.  The car that

17 Mr. Thurman took to Texas was rent ed by Julio Martinez,

18 which is reference d in R-4.

19 Q.       Showing you R-4.  Are those the Budget

20 Rent-A-Car records that were introduced?

21 A.       Yes, ma'am.

22 Q.       If you could go to the next entry.

23 A.       Based on -- on March 17, 2002, at 01:39 hour s,

24 Thurman was robbed in Houston, Texas, and that's based

25 on R-11, which is the Houston Police Department report.

1 Q.      The next entry.

2 A.      On March 18, 2002, at 16:58 hours, Richard

3 Willis, also known as Ricardo, wired money via Western

4 Union to Rodney Green, and that's Exhibit R-3, as well

5 as Goodwin 15.

6 Q.      Showing you R-3.  Those records came from where?

7 A.      These came from Western Union.

8 Q.      And then Goodwin 15.  What are those?

9 A.      These are the actual hard copy receipts that the

10 person wiring money would receive.

11 Q.      Do you recall where those were recovered from?

12 A.      I believe this was 36 Farragut.

13 Q.      Farragut Square?  Place?

14 A.      Place.

15 Q.      Farragut Place?  Is that the location where Mr.

16 Goodwin was arrested?

17 A.      Yes, ma'am.

18 Q.      Continue with the next entry.

19 A.      March 18, 2002, at 17:20 hours, Tiffany Vessels

20 wired the same amount of money to Steve Ross in

21 Houston, Texas, and that's also Exhibit R-3 -- the same

22 exhibits we --

23 Q.      The same exhibits we just showed the jury?

24         What is the next entry?

25 A.      On March 18, 2002, Thurman obtained a new key

1  for his rental car, which was lost in the robbery.

2  That's Exhibit R-6.

3          MR. MARTIN:  Your Honor, before he goes any

4  further, may I approach?

5          THE COURT:   You may.

6                    (At the bar of the Court.)

7          MR. MARTIN:  As you know, I'm hesitant to

8  approach on any issue, but it appears to me that this

9  chart was not prepared by this witness.  It appears

10  that this is a chronology of events that was prepared

11  by government trial counsel to summarize the documents

12  that have been admitted into evidence at this point and

13  the testimony from others.

14          I don't know what the Fourth Circuit's position

15  is on this, but there are other circuits that say that

16  with respect to this kind of summary chart, this is

17  really argument, and as a result, it should not be

18  brought in or admitted through a witness in this

19  fashion.  Now, if he prepared the chart himself, that's

20  a different matter.

21          In short, Your Honor, we object to the

22  introduction of this chart at this point.  It's clear

23  what it is.  It's summary argument.

24          THE COURT:  All right.

25          MS. JOHNSTON:  Your Honor, there is a Fourth

1 Circuit case on point in which they allowed the witness

2 to summarize testimony, and that would be *United States*

3 *v. Johnson* out of the --

4        MR. MARTIN:   What is the case, ma'am?

5        MS. JOHNSTON:   *United States v. Johnson* out of

6 the Fourth Circuit.  The witness did, in fact, prepare

7 the chart.  Government counsel did not prepare this

8 chart.  It was done by the witness to show the

9 correlation between the exhibits.

10       He is not summarizing any testimony of Mr.

11 Thurman.  He is merely showing what documents went with

12 what trip to assist the jury in putting those pieces of

13 evidence together in a trial that has been quite long

14 with voluminous evidence and documents.  I've been very

15 careful not to ask him what Mr. Thurman testified to,

16 rather having him just associate the documents with

17 particular time periods, and I think that is

18 permissible under *United States v. Johnson,* which is at

19 54, F.3d, 1150, Page 58; *United States v. Loaysa,* L O

20 A Y S A, at 107 F.3d, 257, at page **note the hear the**

21 **recording** this, and 130 exhibits.

22       We are well beyond that in this case, and I

23 think that what we've done is try to put a sort of

24 happy median not going to where the case -- the Court

25 allowed the prosecution to do in the Johnson case,

1  which was to actually summarize the testimony, but

2  rather just having him show the association of

3  documents with particular trips.  I think that's

4  proper.

5        MR. MARTIN:  Without knowing who actually

6  prepared the chart, Your Honor, I felt compelled to

7  come up and raise the issue and preserve it for appeal.

8        THE COURT:  I recognize that.  That's your role

9  to make that objection.

10        I think, based on what Ms. Johnston has said,

11  that the objection is not well taken, but your

12  objection is so noted, and it's overruled.

13        MR. SUSSMAN:  I want to make the point that I

14  don't think it matters who makes the chart.  I think

15  it's the use the chart is put to.  It's one thing to

16  summarize voluminous documents; it's another thing to

17  summarize voluminous testimony.  I don't think that's

18  the purpose of a chart.  I think that's the purpose of

19  what lawyers do in closing argument, and that's

20  argument and inference to come from things.  I think

21  what these charts are doing is taking a chronology of

22  events and trying to -- and in the form of summary.  I

23  mean, that's the lawyer's job, that's not the witness'

24  job.

25        MR. MARTIN:  To the extent that that's

1  happening , I maintain  my objection .

2          THE COURT:   I don't think  that's what's

3  happening , and the objection  is over ruled .

4                  (Back  in open  court .)

5          BY MS. JOHNSTON:

6  Q.      You may continue .

7  A.      I believe  we were up to March 21 , 2002 , and

8  Exhibit  R-11 and R-5  indicate  Mr. Thurman  was  in a

9  traffic  accident .

10  Q.      Here is R-5 . Is that one  of the  exhibit s that

11  corroborate d that  testimony ?

12  A.      Yes, ma'am . R-11 was the police  report  we

13  already  discuss ed .

14          On M arch 22 , 2002 , at 18:25 hour s -- E xhibit

15  R-10 are  the Southwest  Airlines  records  and indicate

16  that Mr. Thurman  and Rodney  Green  depart ed Houston  for

17  BWI.

18  Q.      Those were additional  Southwest  Airlines

19  records ; is that  correct ?

20  A.      Yes .

21  Q.      Once again , those document s you obtain ed

22  independent  of Mr. Thurman ; is that  correct ?

23  A.      That 's correct .

24  Q.      If you could  continue  with the September , 2003 ,

25  ship ment .

1 A.      On August 15, 2003, at 08:18 hours, there was a

2 traffic accident involving Mr. John Irby in DeRitter,

3 Louisiana, which is Exhibit Oglethorpe 31.

4 Q.      Showing you Oglethorpe 31.

5        If you could show that to the jury and describe

6 it for them, please.

7 A.      It's a letter from Bituminous Insurance Company,

8 addressed to Mr. John Irby, and they wish to discuss

9 with him his accident which occurred on Highway 171 in

10 DeRitter, Louisiana.

11 Q.      Where was that document recovered from?

12 A.      This was recovered from Oglethorpe.

13 Q.      Oglethorpe -- during the Oglethorpe search

14 warrant?

15 A.      That's right.

16 Q.      Would it be correct, then, that you had -- when

17 did you have this document in your custody?

18 A.      June 1st, 2004.

19 Q.      When did you speak to Mr. Thurman?

20 A.      April, 2005.

21 Q.      Did you mention the Louisiana car accident of

22 John Irby to Mr. Thurman?

23 A.      I didn't know what this meant in 2005 until

24 after Mr. Thurman spoke of it and he explained certain

25 things to us.  I didn't know anything about Mr. Irby

1  and a traffic accident.  This document was unknown to

2  us at the time.

3  Q.      If you can continue.

4  A.      August 16, 2003, at 19:09 hours, receipt from

5  Jack In The Box.  "O.C." indicates the Orange County

6  documents seized in Orange County during the arrest of

7  Thurman.  So all these documents were seized during

8  that arrest.

9          There's a receipt from Randal's in Houston,

10 Texas, August 19; August 22, another receipt from

11 Randal's.  September 3, 2003, a receipt from Ft.

12 Worth, from Capital Imation.  September 6, 2003, there

13 were tires purchased for a 1997 Conversion van at

14 Discount Tire in Houston, Texas.  September 9, Mr.

15 Thurman had a bill from the U-Haul center in Dallas --

16 Dallas Freeway -- of Dallas Freeway in Houston, Texas;

17 and September 11, 2003, at 21:13 hours, a receipt from

18 Denham Springs, Louisiana.

19 Q.      When you say, "O.C.," you're referring to?

20 A.      Orange County.

21 Q.      Texas?

22 A.      Texas.

23 Q.      Do you recall when the arrest of Mr. Thurman

24 took place in Orange County, Texas?

25 A.      That would be January of 2004.

1 Q.      When did you obtain these documents from the

2 Orange County law enforcement officers?

3 A.      I received a photo copy of them sometime -- May

4 -- it was after Mr. Thurman's arrest, because -- after

5 I was contacted by Mr. Thurman, I started making these

6 contacts with law enforcement agencies in Louisiana and

7 Texas, and at that time, I then started requesting

8 these documents.  I received a photo copy; later they

9 brought us the hard copy, the actual documents.

10 Q.      Were these documents seized by Orange County

11 from the van operated by Mr. Thurman before or after

12 Mr. Thurman made his statement to you?

13 A.      Oh, no.  These were seized at the time of his

14 arrest.

15 Q.      January of 2004?

16 A.      Yes.

17 Q.      If we could go to the second board of this

18 exhibit.  If you could tell the ladies and gentlemen of

19 the jury what we're looking at on this chart.

20 A.      This is the October, 2003, shipment.  There was

21 a discussion of -- on the way back, the van struck a

22 deer in Virginia on September 30, 2003.  Antwon Jones,

23 who was discussed in testimony, would go on trips with

24 Mr. Thurman and here's a receipt OC-5, which indicates

25 he had this van serviced in October in Houston, Texas.

1  Then on October 30, 2003, the van was towed from mile

2  marker 85, northbound 81 to Fox Mountain Inn in

3  Virginia.

4  Q.     Again, were these documents provided by Mr.

5  Thurman?

6  A.     No.  These were all seized by Orange County

7  sheriffs at the time of his arrest.

8  Q.     The next exhibit -- the next event that you have

9  on the chart is what?

10  A.     Mr. Thurman and Mr. Xavier Moore's arrest in

11  Orange County, Texas, January 21, 2004, the seizure of

12  money, marijuana, scale and guns, and those are

13  exhibits P-234 through P-237.

14  Q.     Referring to the photographs that were

15  introduced during the officer's testimony; is that

16  correct?

17  A.     Yes, ma'am.

18  Q.     Okay.  Now, if we could go to the next series of

19  events.

20  A.     The next series is the Tiffany Vessels and

21  McKenzie trip to El Paso, Texas, Las Cruces, New Mexico

22  in March, 2004.

23         On March 5th, there was a Riggs Bank transaction

24  receipt by Vessels from 800 H Street, Northeast.

25  That's Exhibit R-7, as well as Oglethorpe 8.

1 Q.      Let me show you, first of all, R-7 and ask you

2 how that relates to the information on your chart.

3 A.      These are the net spend account records --

4 Q.      Are those --

5 A.      -- that we discussed earlier.

6 Q.      Are those referred to on your chart?

7 A.      Yes.

8 Q.      Whose account is that?

9 A.      Whose account?

10 Q.      Yeah.  Whose name is that account?

11 A.      This is Alton McKenzie.

12 Q.      What does that reference in relation to this

13 trip?

14 A.      What does it reference?

15 Q.      Why is that relevant in terms of this trip?

16 A.      Because this is a prepaid MasterCard system, and

17 this card was then used to conduct other transactions

18 on this trip.  These are indicated on these records.

19 Q.      Okay.  Are they referenced again on the chart?

20 A.      Yes, ma'am.  R-7.  This is the opening of the

21 account.  And they should have been but they're not.

22 Q.      Okay.

23 A.      They're on the records indicating transactions

24 conducted in El Paso, Texas.

25 Q.      What are the dates of the transactions in El

1 Paso, Texas that are on R-7?

2 A.      March 11, March 12, March 14 of 2004.

3 Q.      Why don't you, next to R-7 on your chart up

4 there, indicate El Paso transactions and put the date

5 so that the chart is more complete.

6 A.      (Witness indicating.)

7 Q.      You could go to, then, the next item that you've

8 entered on the chart.

9 A.      The next item is the prepaid card, Oglethorpe 8,

10 Hayes Check Cashing. It's a receipt from March 5th,

11 2004.

12 Q.      Let me show you Oglethorpe 8.

13 A.      There are many receipts in here that are

14 reflected on this chart.

15 Q.      Based on your training and experience as a

16 narcotics investigator, what do you look for when

17 you're executing a search warrant?

18 A.      We're looking for financial records, ledgers,

19 documents associated with travel, documents associated

20 with other people in the conspiracy, phone records.

21 There so many different types of records that could be

22 useful. It's kind of as a -- as you go, you see

23 there's a hotel record from Texas. We have indication

24 these people have been traveling to Texas to obtain

25 cocaine. I want to seize that document.

1 Q.      Could you explain the document s that you've

2 listed that came from the Oglethorpe Street address ?

3 A.      This is receipt from Union Station , an Easy Buy

4 gas receipt from Georgia ; a Shell Mart gas receipt from

5 Athens , Alabama ; a gas purchase from Louisiana ; a

6 Wal-Mart card charge receipt from Louisiana ; a Jack In

7 The Box receipt from Texas . These show me, you know ,

8 the steady march southwest from the Maryland -DC area to

9 Texas . A gas receipt from Texas , and there's a few

10 more on the second page of this board also .

11 Q.      Just keep up there . You mention ed -- I think

12 you skip ped the hotel receipt s.

13 A.      Yes , that 's a different exhibit . The hotel

14 receipt s from the Red Roof Inn in El Paso under the

15 name of Tiffany Vessels . That 's Oglethorpe 8 -C. We

16 have records from March 7, March 8, March 11. They

17 switch to the Comfort Inn , which is also Oglethorpe

18 8-C, March 13, March 18, continui ng on . It ends -- the

19 last receipt we have is March 18.

20 Q.      Going back up the chart there . After you have

21 Ms. Vessels ' receipt from the Comfort Inn at El Paso on

22 March 11, 2004 , do you have any other records that

23 concern her activity or that trip to the southwest in

24 March of 2004 ?

25 A.      Yes . There 's -- Oglethorpe 8 -B is a tire

1 receipt from On Sale Tire Store in Las Cruces , New

2 Mexico , which was very close to El Paso , as well as

3 Goodwin 14 are telephone records .

4 Q.     What's the significance of the telephone

5 records , Goodwin 14, as it relate s to your summary

6 chart ?

7 A.     The telephone records show Ms. Vessels making

8 call s to telephone s in the El Paso area .

9 Q.     Were you able to listen to the conversation s

10 that took place over those phone s?

11 A.     No, ma'am . We didn't have authorization . We

12 weren't even aware of --

13 Q.     Aware of what ?

14 A.     Of what she was doing at that time .

15 Q.     Okay . Continue .

16 A.     We also have intercept ed Telephone Call B469 ,

17 which was intercept ed and I believe was play ed here , as

18 well as A258 .

19 Q.     So those are two call s from the wiretap that the

20 jury actual ly heard ?

21 A.     Yes, ma'am .

22 Q.     And they're reference d by their call number ?

23 A.     Yes, ma'am .

24 Q.     Okay .

25 A.     And then Goodwin 14 is the telephone record I

1  just reference d a minute ago with Ms. Vessels .

2  Q.      Using the phone ?

3  A.      Yes .

4  Q.      Okay .  Continue .

5  A.      That's it for this board .

6  Q.      Okay .

7  A.      Then March 18, we have the -- also on Oglethorpe

8  8, which we've discuss ed, is the numerous  receipt s

9  recovered from Oglethorpe are March 18, more gas

10  purchase s, as Ms. Vessels return ed, going through March

11  19.  March 20, we have a receipt from a Hess' Station

12  back here in DC-Maryland area , and then the car was

13  return ed, Oglethorpe 8 -A, to the Budget , Union Station .

14  Then on March 22, we had call B-1311, which was play ed

15  for the jury some week s ago.

16  Q.      Okay .  What's the last trip that you've

17  summarize d there ?

18  A.      This is Mr. Thurman 's return of the cocaine to

19  El Paso , Las Cruces area in April of 2004 .  He check ed

20  in the -- which is R-8 .  Check ed in the Road Runner RV

21  Park in El Paso on April 2nd.  April 2nd, that night at

22  22:06 hours, we have Call B2581, which was play ed for

23  the jury .

24  Q.      Who was involve d in that call ?

25  A.      That was Mr. Goodwin and Mr. Thurman .

1 Q.      Over whose telephone?

2 A.      Using Ms. Martin's telephone.

3        On April 8, 2004, Mr. Thurman checked out of the

4 RV park.

5 Q.      Those are these records, R-8?

6 A.      Yes, ma'am.  On April 14, Exhibit r-12 are State

7 Department Federal Credit Union records for Mr. Thurman

8 showing his ATM bank card transactions.  April 14,

9 April 15, April 21, he was in Richmond or Houston,

10 Texas conducting transactions with that card.  April

11 29, 2004, there is a call between Ms. Martin and Mr.

12 Irby, Call A1415 was played the jury on.

13        On April 29, April 30, on through May 6, Mr.

14 Thurman's still conducting bank card transactions in

15 Texas.  Then he conducted one -- there's one

16 transaction in Mississippi on April 28, and then on

17 June 16, Mr. Thurman and Mr. Weathersby were arrested

18 in Louisiana with cocaine, which are Exhibits P-233A

19 through E.

20 Q.      Okay.  And the records that you reference in

21 terms of his ATM card, are those the records R-12?

22 A.      Yes, they are.

23 Q.      How did you get those records?

24 A.      Those were subpoenaed.

25 Q.      Did Mr. Thurman provide you with any of these

1 records that relate to the travel that he discussed

2 with this jury in terms of trips to Texas?

3 A.     No.

4 Q.     So the record is clear, did you prepare this

5 chart -- this series of records?

6 A.     Yes, ma'am.

7 Q.     I want to show you -- while we're up here -- you

8 mentioned in your testimony initially about pin

9 registers and pin register data.

10     Could you explain again to the jury what that is

11 and how you utilize that information?

12 A.     A pin register is a device which records

13 incoming and outgoing calls made.  It does not record

14 the audio of the call.  It merely records the numbers

15 dialed in and numbers dialed out.

16 Q.     What is the significance of that to a narcotics

17 investigator?

18 A.     It allows you to identify parties and if they

19 associate with each other, how they associate with each

20 other.

21 Q.     Back in November of 2003, you heard testimony

22 about Mr. Goodwin's arrest by Detective Martini.  Do

23 you recall that testimony?

24 A.     Yes, I do.

25 Q.     At that time, were you wiretapping Ms. Martin's

1  phone or Mr. Goodwin 's phone s?

2  A.      No.

3  Q.      Did you, during that time period , have pin

4  register activity and air time records available for

5  phone s associate d with those individuals ?

6  A.      Yes .

7  Q.      Could you tell us what CH-4 is?

8  A.      This is a chart of pin register activity which

9  occurred after Mr. Goodwin 's arrest on November 25,

10 2003 .

11 Q.      If you could stand back a little bit.  And if

12 you could , de scribe for us what is in each column and

13 how you put together the information .

14 A.      This is just based on police report s that Mr.

15 Goodwin was arrested by Corporal Martini on November

16 25, 2003 .  The rest is based on register DNR activ ity

17 from November 26 through December 2, 2003 .

18 Q.      When you use the term "pin register DNR

19 activity," what 's the difference between a pin register

20 and DNR?

21 A.      It 's more or less the same thing .  It 's

22 inter changeable term s.

23 Q.      So it 's one and the same , pin register and dial

24 number record er ?

25 A.      Yes .

1  Q.      If you could tell us, then, what this chart

2  summarizes in terms of those records.

3  A.      In the first column, it's just the date of the

4  activity; second is the time of the contact; and the

5  third are the contacts between the telephones.  Such as

6  on November 26, 2003, at 00:46 there was a call

7  received on Ms. Martin's telephone, the hard line, from

8  the telephone subscribed to Constance Goodwin.

9  Q.      Who is Constance Goodwin?

10 A.      Mr. Learley Goodwin's wife.

11 Q.      That telephone, is that the telephone subscribed

12 to Constance Goodwin, (301) 559-5289, is that land line

13 or hard line?

14 A.      That's a land line.

15 Q.      Okay.  What address was that phone located?

16 A.      1302 Chillum Road.

17 Q.      Is that the same Chillum Road address that we

18 heard testimony from Ms. Featherstone-Buchanan last

19 week?

20 A.      Yes.

21 Q.      Continue with what's on the next line.

22 A.      November 26, 2003, at 00:51 hours, call from

23 Paulette Martin's hard line, the line we later

24 intercepted, to Mr. Goodwin's cell phone.

25 Q.      Continue.

1 A.      Then at 00:53 hours, a call from Paulette

2 Martin's phone to Ms. Goodwin's phone again.  At 00:06,

3 a call from Paulette Martin to a telephone utilized by

4 Reece Whiting.  At 00:59 hours, a call from Paulette

5 Martin's phone to Mr. Goodwin's cell phone again.  At

6 01:00 hours, a call from Paulette Martin to Constance

7 Goodwin's phone again.  At 01:47 hours, a call from

8 Paulette Martin to John Irby's phone.  At 07:36 hours,

9 a call from Paulette Martin to John Ford's telephone.

10 Star 67 indicating that she was blocking her number

11 from caller ID so the party could not see who was

12 calling.

13      At 07:37 hours, call from Paulette Martin's

14 phone to the telephone at Lobo's Discount Car Center

15 also blocked.  There's a series of those calls 07:37

16 through 07:38.  08:32, a call from Paulette Martin's

17 cell phone to Constance Goodwin's phone; 08:35, a call

18 from Constance Goodwin's telephone to Paulette Martin's

19 cell, and then again at 08:36, and at 08:40, Paulette

20 Martin's cell phone calling Constance Goodwin's

21 telephone.  09:07, a call from Paulette Martin's

22 telephone to Reece Whiting's telephone.  09:27, a call

23 from Paulette Martin's cell phone to Mr. Goodwin's cell

24 phone.

25      At 09:55 hours, a call from Paulette Martin's

1  cell phone to Mr. Larry Lane's cell phone.  At 10:45, a

2  return call from Mr. Larry Lane's cell phone to

3  Paulette Martin's cell phone.  Then at 11:11 hours a

4  call from Paulette Martin's cell phone, the Law Offices

5  of Victor Houlon and Berman; at 11:50 hours, a call

6  from Michael Thurman's telephone to Paulette Martin; at

7  13:10 hours, a call from Constance Goodwin's telephone

8  to Paulette Martin's cell phone; at 13:30 hours, a call

9  from Paulette Martin to the Law Offices of Houlon and

10 Berman; 13:31, a call from Martin's hard line to

11 Constance Goodwin's telephone.  13:43 hours, a call

12 from Paulette Martin to the Law Offices of Houlon and

13 Berman; 13:45 hours, a call from Paulette Martin to

14 Constance Goodwin; 14:31 hours, a call from Paulette

15 Martin to the Law Offices  of Houlon and Berman.  16:45

16 and 16:46, two calls from Michael Thurman.

17 Q.    Were those from Mr. Thurman's cell phone or from

18 a land line associated with Mr. Thurman?

19 A.    I believe this is a land line.  I'll have to

20 look.

21 Q.    If you could check your notes, please, before we

22 go any further.

23       The notes you're checking, are those a

24 computerized printout of the records that served as a

25 basis for this chart?

1 A.      Yes, ma'am .  That would be a cell phone , I

2 believe .

3        Then at 17:10 -- 17:01 hours , a call from -- two

4 calls from Paulette Martin 's cell phone to Constance

5 Goodwin 's telephone , and at 17:09 hours , a call from

6 Irby -- John Irby's phone to Martin 's cell .  17:10

7 hours , seven calls from Paulette Martin 's cell phone to

8 John Irby 's telephone .

9 Q.      During what time period did those seven calls

10 take place ?

11 A.      In a ten-minute time period from 17:10 to 17:20

12 hours .

13        At 11/26 , at 20:03 hours , a call from Paulette

14 Martin to Constance Goodwin 's phone .  23:07, two calls

15 from Paulette Martin to Reece Whiting's phone .  23:08,

16 a call from Paulette Martin to Constance Goodwin 's

17 phone ; 23:35, a call from Constance Goodwin 's telephone

18 to Paulette Martin .  23:38, a call from Paulette Martin

19 to Bail Bonds Ex press .  23:39, a call from Paulette

20 Martin to Constance Goodwin 's phone .  23:39, another

21 call from Paulette Martin to Bail Bonds Express .  23:41

22 a call from Paulette Martin to John Irby's phone .

23        Then on -- we then switch to November 27, 2003 ,

24 at 00:10 hours , call from Paulette Martin -- two calls ,

25 00:10 and 00:11 from Paulette Martin to Reece Whiting .

1  00:44 hours, call from Paulette Martin to John Irby.

2  At 10:41 hours, call from Constance Goodwin to Paulette

3  Martin, 13:59 to 14:02, two calls from Michael Thurman

4  to Paulette Martin.

5  Q.      Again, are those from Mr. Thurman's cell phone?

6  A.      I would need to look at my notes.

7  Q.      Please do that.

8  A.      Yes, that's the same telephone as before.

9  Q.      Continue.

10  A.      At 15:00 and 15:01 hours, two calls from

11  Paulette Martin's line to Michael Thurman. At 15:06,

12  call from Paulette Martin to John Irby. At 16:11, a

13  call from Paulette Martin to Constance Goodwin's phone.

14  November 28, 00:13 hours call from Paulette Martin to

15  Bail Bonds Express. 00:32 hours, call from Paulette

16  Martin to Constance Goodwin's phone.

17          On November 29 at 12:06 hours, call from John

18  Irby to Paulette Martin's cell. At 22:16 hours, a call

19  from Paulette Martin to Constance Goodwin. On November

20  30 at 17:10 hours, four calls from Michael Thurman to

21  Paulette Martin's cell phone between 17:10 and 18:07

22  hour.

23  Q.      Again, is that from Mr. Thurman's cell phone?

24  A.      Yeah. It's the same. It's a (301) 213-

25  telephone.

1  Q.      That's a cell phone?

2  A.      Yes, ma'am.

3  Q.      On December 1st, 2003, at 08:39 hours, 09:00, at

4  10:57 hours, there were three calls from Paulette

5  Martin's cell phone to Mr. Goodwin's cell.  On December

6  1st at 13:22 hours, there were 12 calls from Michael

7  Thurman's phone, at the same one we discussed earlier,

8  to Paulette Martin's cell from 13:22 hours to 15:29

9  hour.

10  Q.      Were you able to tell where Mr. Thurman's phone

11  was when he was making all these calls to Ms. Martin

12  between November 26 and December 1st of 2003?

13  A.      No, I was not.

14          On December 1st, at 20:44 hours and at 21:44,

15  there were two calls from John Irby to Paulette Martin,

16  and on December 2nd, 09:38 hours, a call from Mr.

17  Goodwin's telephone to Paulette Martin's cell.

18  Q.      Do you know what happened in terms of Mr.

19  Goodwin and where he was as of December 2nd, 2003?

20  A.      No, I do not.

21  Q.      Do you know whether or not he was released on

22  bond in terms of --

23          MR. MARTIN:    Objection.

24          Asked and answered.

25          THE COURT:    Overruled.

1          BY MS. JOHNSTON:

2  Q.      Do you know whether or not he was released on

3  bond on the charges that were filed as a result of

4  Corporal Martini's arrest?

5  A.      I do not know.

6  Q.      In regards to the telephone calls that we heard

7  here in court, did you prepare a chart that summarizes

8  those calls in relation to the opinion Sergeant Sakala

9  gave as well as your own opinion relating to Ms.

10 Martin's relationship with Mr. Mangual?

11 A.      Yes.

12         MR. MONTEMARANO: Objection.

13         Your Honor, can we approach?

14              (At the bar of the Court.)

15         MR. MONTEMARANO: I would reiterate the

16 objections we've already made regarding the use of

17 summary charts. This is not the summary chart. This

18 is a creation of evidence out of whole cloth. I show

19 the Court the cloth. I point the Court to the portion

20 highlighted by the government in bold and underlined.

21         For instance, 3/10/04 the very first line.

22 There has been no evidence during the trial there was

23 an actual delivery of cocaine. There is certainly

24 indicia that such took place. There is coded language.

25 There is the presence. There is the duration of the

1  visits, all those things, which I'm sure Ms. Johnston

2  and Ms. Greenberg will argue in closing that states

3  something that we don't know happened.  There is no

4  personal knowledge.

5       Mr. Mangual did not testify.  My client did not

6  testify.  This is far beyond the peal.  They want to

7  say, suspected delivery, fine.  That cannot stand.  If

8  the Court lets that in, please note my motion for a

9  mistrial.

10       MS. JOHNSTON:   Your Honor, that's based on the

11  testimony of -- Sergeant Sakala testified in terms of

12  his opinion that there were deliveries of cocaine made

13  by Mr. Mangual to Ms. Martin, and that these calls took

14  place in relation to those deliveries.  Detective

15  Eveler also has the same opinion in terms of having

16  reviewed those calls and the surveillance tapes and the

17  pole cameras, so it is also his opinion that those

18  deliveries took place based on the surveillances and

19  based on the content of the telephone calls surrounding

20  those dates.

21       So, he's going to testify like Sergeant Sakala.

22  I expect Detective Eveler to state that is also his

23  opinion that those deliveries took place on that date.

24       MR. HALL:   Your Honor, if I may.  The purpose of

25  a summary chart is to summarize facts, not opinions,

1  and by what counsel has just said, this is clearly an

2  opinion that the officer is expressing but it's not a

3  summary of factual evidence.  Each and every fact has

4  to, in and of itself, be admissible to go on a summary

5  chart.  This is an opinion.

6          MS. JOHNSTON:  Your Honor, there are two

7  different summary charts.  The chart we just did

8  summarizes evidence -- voluminous evidence.  It was

9  introduced in lieu of all those evidence; and second,

10 there is a summary chart that is introduced to the jury

11 for their evaluating and assessing.  That's what the

12 second chart does.

13         THE COURT:  That's the chart I have in front of

14 me?

15         MS. JOHNSTON:  That's the same chart the Court

16 had last week when we had this discussion last week.  I

17 can certainly recite the cases that I recited to the

18 Court before.  He is summarizing what is in evidence

19 before this jury.  The jury can choose to take that

20 evidence or not, and in this case, when you have a

21 trial this long, what that does is summarize the

22 evidence in terms of the different calls that relate to

23 the different dates and times.

24         MR. MONTEMARANO:  Your Honor, I'm trying to be

25 circumspect.  I'm an officer of the court, but this is

1   just  beyond  outrageous .   For  all  matter s, for  the  --

2   within  the  four  corners  of  Ms. Johnston 's argument , she

3   may  as  well  take  the  last  page  and  write  Paulette

4   Martin  is  guilty .   That 's what  that  says .   They  can't

5   do  that .   They  can  put  on  anything  --  I  don't  care  how

6   bad  the  evidence  is.   I  won't  like  it.   I  got  to  live

7   with  it .

8          That 's not  evidence .   That 's opinion .   There 's a

9   difference .   There 's no  fact s to  back  that  up .   If  they

10  had  Mr. Mangual 's testimony , if  they  had  seizure s

11  contemporaneous   with  as  opposed  to  month s later , there

12  is  just  no  way  of  know ing .   There 's way  of  know ing

13  beyond  a  reasonable  doubt  .   That 's their  call , the

14  folk s over  there , not  our s.  With  all  due  respect , Your

15  Honor , this  is  rid iculous .

16         MS. JOHNSTON:   Just  so  the  record  is  clear ,

17  these  are  the  same  chart s we  present ed to  the  Court

18  last  week  that  we  had  the  discussion  about .   The

19  government   has n't  add ed any  chart s.   They're  the  same

20  chart s we  discuss ed last  week .

21         THE  COURT:   Well , this  is  a  summary  exhibit  by

22  this  witness  --

23         MS. JOHNSTON:   That 's correct .

24         THE  COURT:   --  summarizi ng voluminous   testimony

25  that 's already  in  the  record .   The  dispute  here  is

1 whether it is correct for this to state Martin receives

2 cocaine from Mangual on several dates. I think their

3 objection is that that's because that was not a matter

4 in evidence but a matter of opinion from Detective

5 Sakala. Is that the basic nature of your objection?

6         MR. MONTEMARANO:   Yes, Your Honor.

7         MR. SUSSMAN:   It's an extrapolation of

8 voluminous evidence. It's not a summary of the

9 voluminous evidence. It's taking voluminous evidence

10 and taking particular items out of the voluminous

11 evidence and highlighting them.

12         MS. JOHNSTON:   Your Honor, we're not introducing

13 it as a summary chart under Rule 10. This is under

14 6-something, I'll get my notes and give the Court my

15 cite. I didn't know it was going be an issue now,

16 because quite frankly, I thought we had resolved these

17 issues last week when the Court asked me to remove the

18 little cell phones off the chart because Mr. McKnett

19 didn't like that, and the Court asked me to take things

20 off of the drug summary chart because the Court didn't

21 think it -- there were no objections raised at that

22 time to this language that was on this chart back then,

23 and now we're in the middle of the testimony. The

24 chart's here.

25         THE COURT:   I'm going to overrule the objection.

1  I believe that this can -- any question about this can

2  be addressed by a cautionary instruction, and I'm not

3  going to permit this to, in effect, say Paulette Martin

4  is guilty. It doesn't say that, but I can certainly

5  give a cautionary instruction as to the nature of this

6  type of exhibit and the purposes for which it can be

7  considered.

8        MR. MONTEMARANO: Ms. Martin would move for a

9  mistrial.

10       THE COURT: Your motion is denied.

11       MR. MONTEMARANO: Thank you, Your Honor.

12       MR. SUSSMAN: What instruction will the Court

13  propose.

14       THE COURT: I'll work on it.

15       MR. MONTEMARANO: Your Honor, it needs to be

16  reasonably contemporaneous of the introduction of the

17  chart. It needs to be in advance of the chart.

18       THE COURT: I'm not Superman.

19       MR. MONTEMARANO: Your Honor, I understand that.

20  Perhaps we could take a slightly longer morning break

21  and mull it over.

22       MS. JOHNSTON: Counsel had since last week to

23  present this Court with any objections they had with

24  the chart. They are raising this objection for the

25  first time. If they wanted an instruction, they

1 certainly had long enough time to prepare that.

2          THE COURT:   Mr. Montemarano, I'm doing the best

3 I can, but when you don't raise the objection until the

4 exhibit is before the jury already, it's a little late.

5 Let me ask you this:   I need a break.   They need a

6 break.   Why don't we take a break until 20 of 12:00 and

7 I'll take a look at this during the recess.   Okay?

8                    (Back in open court.)

9          THE COURT:   Ladies and gentlemen, this is an

10 appropriate time for a brief break.   We'll resume at 20

11 minutes of 12:00 by that clock.

12                    (Jury excused at 11:20 a.m.)

13                    (Off the record at 11:20 a.m.)

14                    (On the record at 11:49 a.m.)

15          THE COURT:   Counsel, during the recess, I took a

16 look at what I think is the applicable case that's most

17 directly in point unless somebody has a better case

18 which is *United States v. Roland Markeith Johnson*,

19 which is 54 F.3d 1150.   And in that case, the Court

20 considered this whole question of charts of this nature

21 being used in case the Fourth Circuit upheld the

22 prosecution's use of a chart similar to this.

23          I'm sure counsel will tell me it's not similar

24 to this, but at least it appears to be similar to this,

25 and in that case, the district judge gave a cautionary

1  instruction , which was upheld on appeal , which reads as

2  follow s:   Government   Exhibit   19 , the chart , is the

3  government 's analysis of the evidence . It is the case ,

4  as the government sees it , from the evidence which has

5  been adduced here in the courtroom , and of course it is

6  subject to such interpretation as you , as the jury ,

7  feel is to be given to it.   In other words , it is

8  presented to show what the government   contends has been

9  proven in the case .   It is -- the contention   is up to

10 you , as the jury , to resolve any issues that may be in

11 your mind concerning the chart .

12          Now , what would be the problem with that being a

13 limiting   instruction   that I give to the jury in

14 connection with this exhibit ?

15          MR. MITCHELL:   Could I ask a quick question ?

16          THE COURT:   If anybody has any cases or better

17 law than that , tell me what it is.

18          MR. MITCHELL:   I haven't read this chart , but

19 when was that chart presented to the jury ?   At what

20 point in the trial ?   Was it in closing argument   or was

21 it --

22          THE COURT:   No , it was during the -- through a

23 witness .   Let me double check , because I can only speed

24 read so fast .   I can't turn pages the way I normally

25 could turn pages , so I'm moving slowly.

1      MR. MONTEMARANO : One hand, one foot, it ain't
2 no fun.

3      THE COURT:   No. It was a detective who was a
4 sponsoring witness of an organization chart based upon
5 evidence adduced at the trial, and that was the
6 limiting instruction given by the district judge and it
7 -- the Court described it as an organizational chart,
8 but essentially a summary exhibit reflecting the
9 compilation of testimony already adduced at trial, and
10 that it -- they described the chart in more detail.

11      They discuss some of the rules applicable to
12 this and specifically refer to Rule 611A of the
13 evidence rules, which says the Court shall exercise
14 reasonable control over the mode and order of
15 interrogating witnesses and presenting evidence so as
16 to, one, make the interrogation and presentation
17 effective for the assessment of the truth; two, avoid
18 needless consumption of time; and three, protect
19 witnesses from harassment or undue embarrassment.

20      And then the Court went through a fairly
21 extensive analysis of Rule 611A and how it had been
22 interpreted, and then after stating what the principles
23 were, they said we find the district court did not ere
24 in admitting the summary chart. First, it is likely
25 that the summary chart served to aid the jury in

1 ascertain ing the truth .   The record  reflect s  in

2 present ing  its  case  over  a  seven -day  period ,  the

3 government   call ed  over  30  witness es  to  testify  about

4 the  work ings  of  the  drug  conspiracy ,  on  and  on  and  on.

5          Second ,  it  says  if  we  find  the  district  court

6 appropriately   employ ed  the  safe guards  discuss ed  above ,

7 and  then  they  gave  a  quotation   of  a  limiting

8 instruction   that  I  quoted  to  you  when  I  came  on  the

9 bench .

10         It  would  seem  to  me  that  it  is  well  within  the

11 scope  of  the  Fourth  Circuit  case  I've  mention ed  to

12 allow  that  kind  of  a  summary  chart  to  be  utilize d,  but

13 I'll  be  happy  to  give  a  cautionary   instruction   which  is

14 virtually  word  for  word  the  same  as  the  Fourth  Circuit

15 approve d  in  that  case .

16         MR.  MONTEMARANO :   Thank  you ,  Your  Honor .

17         THE  COURT:   I'll  take  this  opportunity   to  put

18 ice  on  my  shoulder   while  you're  talk ing .

19         MR.  MONTEMARANO :   Feel  free .

20         Wish  we  could  offer  you  something   strong er  than

21 ice .   Or  something   that  would  go  with  the  ice .

22         THE  COURT:   I  must  make  a  pretty  picture  up  here

23 with  all  this  stuff  under  this  robe .   You'd  think  I

24 have  my  lunch  under  here  and  a  few  other  thing s .   Go

25 ahead .

1          MR. MONTEMARANO :  Without  actually  reading  the

2 case  or  having  a  complete  understanding  of  what  that ,

3 chart  consisted ,  I'm  probably ,  at  least  to  some  degree

4 at  a  loss  to  address  the  propriety  of  the  Fourth

5 Circuit 's  ruling ,  but  nonetheless ,  it  would  appear  that

6 the  ruling  controls .   That 's  not  in  any  way ,  shape  or

7 form --

8          THE  COURT :   Let  me  suggest  this  to  you ,  Mr.

9 Montemarano ,  because  we've  got  a  jury  waiting ,  why

10 don't  we  finish  the  examination  of  this  witness .   I

11 don't  know  when  he's  going  to  be  finished  and  when

12 cross-examination  is  going  to  begin ,  but  it  seems  to  me

13 that  perhaps  it  would  be  better  to  get  the  jury  back  in

14 here ,  continue  to  hear  the  testimony  from  this  officer .

15          If  they  finish  before  lunch ,  that 's  fine ,  we'll

16 have  a  break ,  you  can  --  I'll  give  you  a  copy  of  the

17 case ,  you  can  read  it ,  we  can  discus  it ,  and  then

18 before  this  witness  disappears  from  the  witness  stand

19 and  the  memories  of  the  jury  are  fading  on  his

20 testimony ,  we  can  give  them  a  cautionary  instruction .

21 Would  that  be  a  fair  way  to  approach  it?

22          MR.  MONTEMARANO :   Well ,  I  would  say  that  in

23 light  of  the  language  of  the  instruction  that  would

24 seem  to  be  an  adequate  instruction  without  in  any  way ,

25 shape ,  or  form  suggesting  amending  my  objection .

1          THE COURT:   As I said, these things arise on the

2  fly.  We all have to take a look at these things on a

3  moment's notice.  I will ask my law clerk, if he's

4  still here, to make a few copies for both parties.  I

5  assume the government may have it as well.

6          MS. JOHNSTON:   Your Honor, we have a copy of the

7  case law.

8          THE COURT:   I'll make a copy of it for you all.

9  We're all professional colleagues to help each other,

10  and I think we can have an intelligent discussion about

11  whether you think that that instruction has probative

12  value or not.   In the absence of anything else, I'm

13  ready to bring the jury in.

14          MR. SUSSMAN:   I just have one thing.

15          MS. JOHNSTON:   Your Honor, I would note to the

16  Court there are several unreported Fourth Circuit

17  opinions since then that have allowed admission

18  likewise.

19          THE COURT:   You may want to give me citations.

20          MS. JOHNSTON:   I don't know if the Court needs

21  them at this point.

22          THE COURT:   No, I think this is the Seminole

23  case.

24          MR. MONTEMARANO:   Unreported opinions are not

25  binding authority in this circuit.  I seem to recall

1 seeing that language somewhere once before, Your Honor.

2        THE COURT:  Yes, I know.  I always hated that

3 rule when I was a practitioner, but there was no

4 lightning bolt going to hit you for citing this one.

5 This is a published decision.

6        MR. MONTEMARANO:   Fair enough, Your Honor.

7        THE COURT:  Look, my job is to follow the law,

8 not make it.  Unless there's any other reason -- Mr.

9 Sussman, I'm sorry.

10        MR. SUSSMAN:  One quick thing on the chart that

11 I think the government may get to during the testimony.

12        MS. JOHNSTON:   I would hope so.

13        MR. SUSSMAN:   Honestly, this is the first time

14 I've seen the chart.  That's not my problem.  My

15 problem is it's a chart of check payments, which I'm

16 not going to argue doesn't fall within the summary

17 exception.  I just -- there are memos, you know, check

18 memos that are -- when the checks came in, they were

19 fairly unreadable.

20        They've since been highlighted by the

21 government.  I don't think the memos have any real

22 relevance other than perhaps they list things as truck

23 detailing, chrome, and I think it creates some notion

24 of that other bad acts, and I would ask that since --

25 that the memo -- some of them are legitimate, and --

1          THE COURT:   It seems to me that all  this  is is
2 putting down what was the memo on the check.
3          MR. SUSSMAN:   I agree.
4          THE COURT:   Reporting what's said on the check.
5 So if the check said "Christmas  gift," maybe that's
6 what it said.
7          MR. SUSSMAN:   Maybe I fell asleep at the switch
8 the first time, but I think this should be redacted as
9 potentially other bad acts.
10          THE COURT:   Why is this other bad acts?
11          MR. SUSSMAN:   No one is going to argue that Ms.
12 Martin was doing truck detailing, and I don't believe
13 that in any inference concerning my client putting that
14 on the check has any probative value.
15          MR. MONTEMARANO:   We'll stipulate, Your Honor.
16          MR. SUSSMAN:   Well, that helps.   I believe that
17 it doesn't shed any light, and it perhaps prejudices my
18 client and it's a line thing.   If somebody says
19 Christmas  gift, that goes, too, so I'm being
20 even-handed about what I'm requesting.
21          MS. JOHNSTON:   That's what's written on the
22 check.   Quite frankly, one could infer from that that
23 Ms. Harden didn't want people to know why she was
24 paying Ms. Martin for drugs, so she wrote on there
25 chrome parts or truck detailing or whatever, but it's

1  what's on the check. This chart -- counsel is not
2  saying that this chart is inaccurate. He's -- and the
3  check s are in evidence with that information on it.
4      THE COURT:  It would seem to me if you have the
5  exhibit without what was on the memo, it would be more
6  harmful than the way it is.  It gives you a chance to
7  argue there were all these innocent reason s for these
8  check s that had nothing do with drug s.  Isn't this a
9  more fair summarization of what those check s show by
10 including what's on the memo?
11     MR. SUSSMAN :  Well, I believe if there was a
12 fair summarization in terms of -- I believe that
13 initial ly, like ly, it should have been redact ed.  I
14 don't think doing the wrong thing twice is the
15 appropriate action .  I think that these thing s connote
16 that they were being used for tax purpose s or something
17 other than -- there 's no requirement that you put a
18 memo on a check .
19     THE COURT :  Mr. Sussman , I considered your
20 objection , and it's over ruled .  I think that 's the
21 proper summary chart under the rule s and I'll permit it
22 and you're free , as Ms. Johnston is, to comment on the
23 significance of this evidence during closi ng argument .
24 Anything further , Counsel , before we get the jury in?
25     MR. MONTEMARANO :  We have not yet received the

1 Harden chart from the government. We'd like to get

2 copies.

3         MS. JOHNSTON:   It was handed out.

4         MR. MONTEMARANO: It was not. Seven of us

5 didn't get it. Ms. Johnston, maybe there was an

6 oversight.

7         THE COURT:   Counsel?

8         MS. JOHNSTON:   If you can't find it, I'll be

9 glad to get you another copy of it.

10         MR. WARD:   None of us got it.

11         MS. JOHNSTON:   If you had told me that -- I

12 don't know what happened with what, but I --

13         THE COURT:   Ms. Johnston, just have somebody

14 from your office make them copies and bring it to them.

15         MR. MONTEMARANO: That's all I ask, Your Honor.

16         MS. JOHNSTON:   I will. Had I been asked for

17 that at the beginning of the recess, I could have had

18 it done rather than have to do it now.

19         THE COURT:   Have someone from your office make

20 copies.

21         MR. MCKNETT: Ms. Johnston was told during the

22 recess that none of the defense counsel had a copy.

23         MS. JOHNSTON:   No. Mr. McKnett, you told me and

24 Mr. Sussman told me he didn't have a copy.

25         THE COURT:   Counsel, stop wrangling.

1          MR. MCKNETT:   That is not what I said.

2          THE COURT:   Enough, enough.  I'm in pain.

3 Enough of this.

4          MR. MONTEMARANO:   I'm not, neither can I.

5          MR. SUSSMAN:   I would make one request though.

6 I don't see any reason for the detective reading charts

7 line by line.  The chart is there, it can be shown to

8 the jury and move on.

9          THE COURT:   I've overruled the objection.

10          All right, bring the jury in.

11               (Witness resumes the stand.)

12               (Jury returns at 12:03 p.m.)

13          THE COURT:   Ladies and gentlemen, my apologies

14 for the delay.  I had to resolve a few legal matters

15 with the parties while you were out.  I'm also moving a

16 little slower than normal because I look like a

17 pregnant football player with his pads on, but we'll

18 plod right along.

19          Ms. Johnston, you may resume.

20          MS. JOHNSTON:   If I could.

21          BY MS. JOHNSTON:

22 Q.   Detective, before we have you come down here and

23 go over some more charts, we had completed your summary

24 of the telephone records that's contained on CH-4

25 concerning Mr. Goodwin's arrest on November 25 of 2003.

1  Do you recall that testimony?

2  A.      Yes, ma'am.

3  Q.      Let me show you what's been marked as

4  Miscellaneous 40 and ask you if that refreshes your

5  recollection concerning -- this is for identification

6  purposes only -- concerning the date upon which Mr.

7  Goodwin was released on bond as a result of that

8  November 25, 2003, arrest?

9  A.      It does.

10  Q.      What was the date of his release?

11  A.      December 1st, 2003.

12  Q.      Now, as a case agent, what was your

13  responsibility in reference to items that were seized

14  from various locations?

15  A.      To review them and make note of what may be of

16  interest to the government.

17  Q.      In regards to documents, did you review the

18  documents that were obtained from the various search

19  locations?

20  A.      Yes.

21  Q.      I want to show you what's been marked and

22  admitted as Goodwin 2, and ask you in looking at

23  Goodwin 2 and the back of Goodwin 2, do you recognize

24  any of the telephone numbers on there?

25  A.      I recognize the reference to Nard.

1 Q.        Who is Nard?

2 A.        Raynard Dorsey.

3 Q.        On the other side, did you recognize any of

4 those numbers or the information concerning Ms.

5 Vessels?

6 A.        I recognize her date of birth and what appears

7 to be a social security number.

8 Q.        Let me show you Goodwin 10.  Do you recognize

9 any of the information on there?

10 A.        Yes.  It's the Express Mail receipt from Lobo's

11 Discount Car Center to Michael Thurman in North

12 Houston, Texas.

13 Q.        Is that the same address that we heard testimony

14 from the FBI concerning a search warrant executed at

15 that?

16 A.        Yes, it is.

17 Q.        Let me next show you what's been marked as

18 Goodwin 16 and ask you if you're familiar with this

19 exhibit.

20 A.        Yes.

21 Q.        Did you examine that exhibit?

22 A.        Yes, I did.

23 Q.        Based on your examination, did you identify any

24 phone numbers that were familiar to you as a result of

25 this investigation?

1  A.      Phone numbers and individuals' names.

2  Q.      Showing you, first, the green card.  Do you

3  recognize any of the information on that card?

4  A.      Chico is a reference to Chico Williams, Tiffany

5  Vessels' father, and Tiffany is a reference to Tiffany

6  Vessels.

7  Q.      And the orange card, I'll show you the one side

8  first and then the reverse side and ask you if there's

9  anything on that side that's familiar.

10  A.      No, other than the Bro G. Goody was often

11  referred to as Bro G on many documents.

12  Q.      How about, first of all, on this card here?

13  Recognize anything on that?

14  A.      Yes.

15  Q.      What is that?

16  A.      Reference to Toby.

17  Q.      Who is Toby?

18  A.      Frederick Miller.

19  Q.      Do you know what his relationship with Mr.

20  Goodwin was?

21  A.      He.

22          MR. MONTEMARANO:  Objection.

23          Basis for knowledge.

24          MS. JOHNSTON:  I'll withdraw that question.

25          BY MS. JOHNSTON:

1  Q.      Let's move on to the next -- the inside cover.

2          Do you recognize Ms. Martin's name and Bexhill

3  Court address?

4  A.      Yes.

5  Q.      Is that an accurate address for her?

6  A.      That was her former address in Adelphi.

7  Q.      Calling your attention to this page, the

8  address.

9          Do you recognize that address and the name

10 Larry?

11 A.      Yes.

12 Q.      What does that refer to?

13 A.      Larry Lane and the address at 846 Oglethorpe

14 Street.

15 Q.      Are there any other numbers on there that are

16 familiar to you?

17 A.      No.

18 Q.      Calling your attention to this next page.

19 Recognize any of the names or numbers on this page?

20 A.      Reference to Gene Bird and a telephone number.

21 Q.      And on this page?

22 A.      A list of Paulette Martin's older telephone

23 numbers, (202) 276-1891 and the 8988, and then there's

24 -- looks like more continuing onto the second page,

25 which I can't see.  Yes, and then there's the 439-8988

1  and 3545 which were the same telephone number s that

2  were coming up on Juan Encarnacion 's air time records

3  from February 21st , 2001 .

4  Q.     Let me show you another series of exhibit s

5  marked as Goodwin 20 and ask you if you recognize any

6  of the number s that are set forth in there .  Do you

7  recognize any of those telephone number s?

8  A.     Yes .

9  Q.     Would you highlight the ones that you recognize

10 so I can put them up on the screen ?

11 A.     (Witness indicati ng.)

12 Q.     Just so the record is clear , Goodwin 20 was

13 recovered from what location ?

14 A.     The 36 Farragut Place in Washington , D. C.

15 Q.     Okay .  The first one you gave me was this card ;

16 is that correct ?

17 A.     Yes .

18 Q.     Did you recognize the number s on the front of

19 that card or on the reverse ?

20 A.     The front .

21 Q.     What number s are those ?

22 A.     The (202) 635-1400 .

23 Q.     What number is that ?

24 A.     That was a hard line at 5559 South Dakota

25 Avenue .

1  Q.      The next little card that came out of there,
2  what number do recognize there?
3  A.      That's the address of Estelle's Place, it's a
4  restaurant formerly owned by Estelle Brim.
5  Q.      Was that owned by Estelle Brim during the time
6  period -- at some portion of the time during the
7  conspiracy charged here between '97 and 2004?
8  A.      I'm not sure what -- when she was operating,
9  when that changed hands.  It's now a Dutch Pot Cafe or
10 something along those lines, last I know.
11 Q.      It's not currently Ms. Brim's place?
12 A.      No, it's not.
13 Q.      The next one?
14 A.      Goody's pager, Learley Goodwin.
15 Q.      (Indicating.)
16 A.      Gloria Thurman is Michael Thurman's mother.
17 Q.      Is that her home telephone number?
18 A.      I'm not certain if that -- I don't -- I don't
19 believe that's her home phone number.
20 Q.      Well, what's the significance of those numbers
21 to you?
22 A.      Mr. Thurman would obtain telephone numbers in
23 his mother's name and was also a point of contact.
24 Q.      What about this little card here?
25 A.      Mike T. is a reference to Michael Thurman.  His

1 pager code was 5000.  You will see that repeatedly.

2 Q.      (Indicating.)

3 A.      Reference to Cuba.

4 Q.      (Indicating.)

5 A.      Top line, Nard's girl.  Raynard Dorsey's girl.

6 Q.      (Indicating.)

7 A.      Louie is a -- (240) 353-8438 is a cellular

8 telephone number for Louis Mangual, which I believe he

9 shut off in about February of 2004.

10 Q.      Showing you Goodwin 19.  What information do we

11 have on that that is significant in your investigation?

12 A.      Michael Thurman's mother's address and an

13 address in Houston, Texas, which is the same address as

14 listed on the Express Mail receipt you showed me

15 earlier.

16 Q.      Any numbers familiar there?

17 A.      A telephone utilized by LaNora Ali and Dug,

18 misspelled, is Dug Alton McKenzie.

19 Q.      That would be the Alton McKenzie whose records

20 you discussed earlier today?

21 A.      Yes.

22 Q.      How about this on this page?

23 A.      A reference to Cuba, which is the same as the

24 previous paper that you showed me with his name.

25 Q.      How about that piece of paper?

1  A.       Big Mike.   A reference  to Michael  Thurman.

2  Q.       And inside of this, there are also some

3  identification  cards in this exhibit?

4  A.       Yes.

5  Q.       Whose picture is on that identification  card?

6  A.       Mr. Learley Goodwin's.

7  Q.       How about this one?

8  A.       The same.

9  Q.       And Goodwin 22, any number s on this exhibit --

10 let me zoom out -- that you recognize?

11 A.       At the bottom of the page, there's a reference

12 to John D., which is John -- his name is John D. Irby

13 but his nickname -- his common nickname is John D.,

14 just below the LSU Medical Center, Shreveport,

15 Louisiana reference.

16 Q.       How about on this page?

17 A.       Another reference to John D. below the Charity

18 Medical Center and a Louisiana area code.   And there

19 was a reference to Becky, I believe at the bottom of

20 that page.  As you flipped it, I saw Becky.   Yes.

21 Those are two telephone number s utilize d by Lavon

22 Dobie.

23          MR. WARD:   May I see that phone number again,

24 please?

25          MS. JOHNSTON:   Certain ly, Counsel.

1          For the record, it's 882-3738 or 39.

2          MR. WARD:   Thank you.

3          BY MS. JOHNSTON:

4  Q.     Any numbers you recognize on this page?

5  A.     No.  Not today.

6  Q.     The notation, the address on this page?

7  A.     Yes, that's the address of Michael Thurman's

8  mother.

9  Q.     Anything on this page here?

10  A.     A 889-6771 code 5000.  That's Michael Thurman's

11  code.  Reference to Tall Mike 202-409-3452, code 5000.

12  Q.     Referring to whom?

13  A.     Michael Thurman.

14  Q.     Next let me show you Goodwin 29, which is again

15  a group of little pieces of paper and a wallet.  Do you

16  recognize the driver's license that comes with this

17  exhibit?

18  A.     Yes.

19  Q.     Whose picture is on that driver's license?

20  A.     Learley Goodwin's.

21  Q.     Showing you another piece of paper that has some

22  telephone numbers on it and ask if you recognize any of

23  those numbers.

24  A.     Could you slide the paper up a little bit?

25  Q.     (Indicating.)

1  A.       No.

2  Q.       How about on the back?

3  A.       Reference to Anthony Hall.

4  Q.       Who Mr. Hall, if you know?

5  A.       Associate of Ms. Martin's and Mr. Goodwin's.

6  Q.       Do you recall whether or not he was discussed in

7  any of the telephone conversations that were played for

8  this jury?

9  A.       Yes.

10  Q.       Okay.  What was that in reference to?

11  A.       There was a call with -- I believe it was Ms.

12  Dobie discussing a gun and talking about Mr. Hall.

13  Q.       Do you recall the conversation that was played

14  having to do with somebody taking over Mr. Goodwin's

15  business and that that happened to put him into St.

16  Elizabeth's?

17  A.       Yes.

18  Q.       Who was that call between?

19  A.       That was between Ms. Martin and Mr. Goodwin.

20  Q.       Who were they talking about?

21  A.       They were talking about Tony Hall.

22  Q.       And here, I don't know if you can see any of the

23  numbers on these little pieces of paper, any of them

24  look familiar to you?

25  A.       Yes.  John D. is listed at the top of the left

1  side paper, and then partway down is Nard, and I

2  believe below that, for a second, I could see it is

3  Cuba is listed twice and on the --

4  Q.      The other little piece of paper?

5  A.      Yes, the right side paper, there's a reference

6  to Paula (301) 270-9007, which was the telephone

7  designated target Telephone B -- Line B.

8  Q.      And this card here, are you familiar with this

9  card?

10 A.      Yes.

11 Q.      Okay.  Whose name is that?

12 A.      That's a MAMSI life insurance card with the

13 member name of Learley Goodwin and group name of

14 Paula's School of Performing Arts.

15 Q.      Now, in your review of the documents that were

16 recovered from Paula's School of Performing Arts, do

17 you recall whether or not you found any employment

18 records indicating that Mr. Goodwin was employed at

19 Paulette's School of Performing Arts between July 1st

20 of 1996 and June 30 of 2004?

21 A.      I can't recall any at this time.

22 Q.      And you're familiar with that address; is that

23 correct?

24 A.      Yes.

25 Q.      Whose address is that?

1 A.      That's Paulette Martin's address in Adelphi, her

2 former residence.

3 Q.      She wasn't living there in 2004 when the search

4 warrant was executed or when Mr. Goodwin was arrested;

5 was she?

6 A.      No, she was not.

7 Q.      Here's another card like that, but it has some

8 numbers on it. Do you recognize the numbers?

9 A.      Just the upside down one, not the Lobo number.

10 Q.      How about on the reverse? Do you recognize any

11 of those numbers?

12 A.      Yes.

13 Q.      Okay. What numbers do you recognize there?

14 A.      The (202) 277-8177 is a cellular telephone of

15 Ms. Martin's. The 635-8093 was a hard line at Paula's

16 School of Performing Arts and (202) 526-8641 was a hard

17 line telephone at 804 Nicholson Street, Northeast where

18 Paulette Martin resided briefly between moving from

19 Bexhill and moving into Hayward.

20 Q.      Let me next show you what's been previously

21 introduced as Oglethorpe 5. Do you recall where this

22 item was recovered from?

23 A.      Oglethorpe Street.

24 Q.      What is it?

25 A.      It's a -- I'm not sure if it's a legitimate DC

1 driver 's license , but it's a -- what appear s to be a DC

2 driver 's license bear ing the name Gary G. Vessels but

3 Mr. Goodwin 's photo .

4 Q.      You recognize the picture on there ?

5 A.      Yes .

6 Q.      Who is that ?

7 A.      Learley Goodwin .

8 Q.      Show ing you Oglethorpe 7.  Do you recognize any

9 number s in this note pad ?

10 A.      Yes .  Mr. Thurman 's cellular telephone with the

11 code 5000 , the (301) 213-4934 , and Larry Lane 's number

12 at the bottom of the page .  It says Larry , new number .

13 Q.      How about on this page ?

14 A.      At the top is Mr. Thurman 's code 5000 again , and

15 half way down is John D., referring to John Irby .

16 Q.      Any number s on this page ?

17 A.      In blue is (240) 223-7729 with a code of 212 .

18 That's Luis Mangual 's telephone , which we were

19 intercept ing from April through June , 2004 . 212 , he's

20 from -- he was original ly -- he's called New York Louis

21 sometimes , and 212 would reference the New York area

22 code .

23 Q.      During the course of your investigation , what if

24 any , contact did you come across between Mr. Thurman

25 and Mr. Mangual ?

1  A.      None.

2  Q.      Or Mr. Mangual and Larry Lane?

3  A.      None.

4  Q.      How about this page?

5  A.      Big Mike at the top.

6  Q.      Is a reference to whom?

7  A.      Michael Thurman.

8  Q.      Looking at this page?  Recognize any of those

9  numbers?

10  A.      Could you slide it down a little bit?  Louis NY

11  is Luis Mangual.  That's the telephone number, (240)

12  353-8438, which we discussed a little while ago.  It

13  was a phone which he shut off in -- I believe it was

14  February, 2004.

15  Q.      And the one you just previously talked about,

16  was that the one that you had the wiretap up on?

17  A.      No.  This was a predecessor to that phone.

18  Q.      Again, on this page, any numbers you recognize?

19  A.      At the bottom, (301) 213-4934 is Thurman's phone

20  with code 5000 behind it.

21  Q.      And this number here, I think you had referenced

22  before.  Do you recognize that number?

23  A.      Yes.

24  Q.      Whose number is that?

25  A.      Luis Mangual's.

1 Q.      When did he have that number?  Do you recall?

2 A.      He had it from sometime in the spring of '04

3 until his arrest.

4 Q.      What would be -- you mentioned Mr. Thurman in a

5 lot of these notebooks had the code 5000 and now Mr.

6 Mangual had that code 212 after his number.  What,

7 based on your training and experience, is the purpose

8 of the role that codes play in the drug business?

9 A.      It's a way of identifying your number,

10 especially if you're using a pager, which is gradually

11 fading out.  Very few -- people are starting to use

12 pagers less and less as cell phones take over, but it's

13 a way of dialing a number and leaving a code so the

14 person knows who's calling, so they know whether or not

15 they want to pick it up, whether it's important, or it

16 identifies the page so they know who's calling if they

17 don't recognize the number, and they call it back.

18 Just like people in everyday life can use code with

19 family and friends.

20 Q.      Now, similarly, did you have occasion to review

21 items that were seized from the Hayward address, the

22 home residence of Ms. Martin back on June 4th of 2004?

23 A.      Yes.

24 Q.      Are you also familiar with Call B1311 on Page

25 162 of the transcript books?

1  A.       Yes.

2  Q.       Do you have that in front of you?

3  A.       No, I do not.

4  Q.       Here, let me give you a book, Page 162 and 3 is

5  that call.

6           Was that an incoming call to Ms. Martin's home

7  phone or an outgoing call?

8           MR. MONTEMARANO:    Objection, Your Honor.  We've

9  already had testimony about this call and it's been

10 played.  It's cumulative.

11          THE COURT:   Overruled.

12          THE WITNESS:    It's outgoing.

13          BY MS. JOHNSTON:

14 Q.       Do you recognize the number that it was outgoing

15 to?

16 A.       Yes.

17 Q.       What number is that?

18 A.       (240) 687-3172.

19 Q.       Let me show you a couple of exhibits, Hayward 2

20 and Hayward 9, and ask you to take a look at those

21 exhibits whether or not that telephone number is

22 referenced in either one of those exhibits.

23 A.       It is in Hayward 2, and in Hayward 9.

24 Q.       And the number referenced on Page 162, let me

25 show you first Hayward 2.  Where does that appear in

1 Hayward 2?

2 A.     That's the same number that was referenced in

3 Call B1311 and instead of Bob, it's Bop.

4 Q.     And you also mentioned that it's in Hayward 9;

5 is that correct?

6 A.     Yes, ma'am.

7 Q.     Showing you Hayward 9.

8 A.     Under the 13th, the second number down below

9 Deborah Darby.

10 Q.     There appear to be several different numbers

11 that have been crossed out; is that correct?

12 A.     One number is crossed out and then the number --

13 the call -- telephone number called in B1311 is written

14 above it, next to Bop, and then below that is another

15 -- is a repeat of more numbers with Bop.

16 Q.     Of the same number that was on the call that was

17 intercepted; is that correct?

18 A.     Yes.

19 Q.     Now, in addition, there are some other stickies

20 on here. Do you recognize some of the other -- for

21 example, in Hayward 9, some of the other telephone

22 numbers?

23 A.     That's a reference to Gwen Levi and a hard line

24 telephone at 5844 Digger's Lane.

25 Q.     How about here on this page, recognize any?

1  A.      Bolo, (202) 498-1051 is Derrick Bynum's

2  telephone.

3  Q.      Recognize any of the other numbers on that page?

4  A.      One that says Bro, but I'm not --

5  Q.      Was there -- in terms of Mr. Bynum, were those

6  numbers that you intercepted?  Do you recall?

7  A.      1051 we intercepted, and I believe the 853-6766

8  was also intercepted.

9  Q.      Then on this page?  Recognize any of the

10 numbers?

11 A.      Louis and Jade.  That's reference to Luis

12 Mangual and Jade Falu [ph.], (240) 353-8438 is that

13 same Sprint telephone that he got rid of in February of

14 '02 -- '04.

15 Q.      And the numbers underneath that one?

16 A.      The (301) 587-8298 is a hard line he had either

17 at Spring Street or Eisley Street.  He had an apartment

18 at both locations.

19 Q.      And the next page?

20 A.      John D., John Irby.

21 Q.      The next page?

22 A.      G-Bird.  It's Gene Bird's.

23 Q.      And again, in February of '03, do you recognize

24 that number?

25 A.      No.

1 Q.      How about on March 3rd of 03?  Recognize any of

2 those number s?

3 A.      Nathan and Liz.  That's a reference to Nathan

4 King and Elizabeth Evans and their telephone number in

5 Mississippi , and Black at the top is a reference to

6 Gerald Island.

7 Q.      And this page here, December of '03, do you

8 recognize any of that information ?

9 A.      That's Detective Mike Johnson is the arresting

10 officer of Nathan King when he was arrested in

11 Indian apolis in October of 2003, and beneath that is a

12 317 area code telephone number , which is Indian apolis

13 area in Indiana .

14 Q.      Are there similar number s in the other exhibit ,

15 for example , Hayward 2?

16      MR. MONTEMARANO :  Objection , lead ing .

17      THE COURT:  Rephrase the question .  You can do

18 that non-lead ing .

19      BY MS. JOHNSTON:

20 Q.      What did you do with Hayward 2 in term s of

21 telephone number s and the book ?

22 A.      Review ed it to see if any number s struck me as

23 being relevant to the case .

24 Q.      Okay .  On this page , are there any other number s

25 that are relevant to the case ?

1  A.       Luis and Jade, (240) 353-8438.

2  Q.       How about on this page?

3  A.       Bop, who we just spoke about a minute or so ago.

4  Q.       On this page, there's a reference to a Johnnie

5  Short.

6  A.       Yes.

7  Q.       Was Ms. Short intercepted during the course of

8  this trial?

9  A.       She was, during the intercept.

10  Q.       How about this page here?

11  A.       Yes.  Paula.  Paulette Martin had another

12  cellular telephone that was used very infrequently.

13  Q.       And that's the number for that one?

14  A.       Yes, ma'am.

15  Q.       That's not the one you were intercepting her on;

16  is that correct?

17  A.       That's correct.

18  Q.       And this reference here.  Do you recognize that?

19  A.       That's Luis Mangual's address in Washington, D.

20  C.  It's actually not his address.  It's -- 6213 is his

21  address, and Sheridan is a cross street.  He lived at

22  6213 14th Street.  Sheridan is the cross street right

23  next to his house.

24  Q.       Let me show you what's been previously

25  introduced as Hayward 28.  Do you recognize this page?

1  A.        Yes.

2  Q.        Can you tell us what's depicted on that page?

3  A.        The top of the page, it bears the initials RCW,

4  which is Reece Whiting's initials, and then there is a

5  ledger of activity.

6  Q.        What time period is covered by that activity?

7  A.        March of 2000 through April of 2002.

8  Q.        What's the balance owed?

9  A.        $11,530.

10 Q.        Find any indication in here where that was

11 continued on on another page or actually zeroed out to

12 nothing?

13 A.        No, not that I found.

14 Q.        Now, in terms of -- were you -- strike that.

15           On June 1st of 2004, were you working on that

16 date?

17 A.        I'm sorry?

18 Q.        Were you working on June 1st of 2004?

19 A.        Yes, I was.

20 Q.        Did you actually go to any of the search

21 locations?

22 A.        I went to two locations.

23 Q.        What were those locations?

24 A.        810 Hayward Avenue and 5559 South Dakota Avenue,

25 Northeast, Washington, D. C.

1  Q.      While you were at Hayward Avenue -- strike that.

2          Did you go to Hayward Avenue first?

3  A.      Yes.

4  Q.      What did you obtain at Hayward Avenue?

5  A.      I obtained the keys for the door at 5559 South

6  Dakota Avenue.

7  Q.      Where did you recover them from?

8  A.      From a purse in the basement. I believe it was

9  a Louis Vuitton.

10 Q.      Excuse me?

11 A.      I believe it was a Louis Vuitton purse.

12 Q.      How many women were in the basement?

13 A.      Pardon?

14 Q.      How many women were in the basement when you

15 recovered the keys from that purse?

16 A.      Just one.

17 Q.      Who was that?

18 A.      Paulette Martin.

19 Q.      What did you do with those keys?

20 A.      I took them to 5559 South Dakota Avenue and used

21 them to unlock the door so we would not have to breach

22 that door.

23 Q.      Now, we did talk a little bit about pin

24 registers. Did you prepare a summary chart showing pin

25 register contact between Ms. Martin and various members

1 of -- various defendants and other individuals involved

2 in this case?

3 A.     Yes.

4 Q.     If I could have you step down and we'll review

5 that chart with the jury.

6       THE COURT:   Ms. Johnston, you have a small

7 version of this one so I can follow along?

8       MS. JOHNSTON:   Court's indulgence.

9       This is CH-2, Your Honor.   I thought we had

10 provided them last week, but let me see if I have an

11 extra copy.   Detective Eveler has one that doesn't have

12 any notes on it.

13      THE COURT:   This is what he's reviewing now?

14      MS. JOHNSTON:   That's what he's reviewing now,

15 Your Honor.

16      THE COURT:   Okay.

17      BY MS. JOHNSTON:

18 Q.     Why don't we take this and mark this item as

19 CH-2A for identification only.   If you could look at

20 CH-2A and tell the jury what that stack of materials

21 is.

22 A.     These are the -- this is a printout of the

23 search I did in our database where we keep all the DNR

24 data, when the pin register DNR data is placed into a

25 computer system, so then we can then count it rapidly

1  and notice trends and relationship s that would be very

2  difficult to do look ing at one record and then look ing

3  at another and sitting there count ing them by hand .

4  Q.    Using that record , did you prepare a chart that

5  summarize d contact s between Ms. Martin 's known

6  telephone s and number s associate d that you identifi ed

7  as being associate d with individuals in this case ?

8  A.    I did.

9  Q.    If you could start , first of all , with the

10  center of that chart -- let me give you the laser

11  point er . If you could , back ing up and start ing in the

12  center , tell ing the ladies and gentlemen what those

13  number s are .

14  A.    The first three number s listed , the 271, 276,

15  and 277 number s were all cellular telephone s of Ms.

16  Martin 's.  The (202) 526-8641 is a hard line telephone

17  that was locate d at 804 Nicholson Street in D. C. where

18  she reside d for a period of time ; (202) 635-8093 is a

19  hard line for Paula 's School of Perform ing Arts and

20  (301) 270-9007 is the hard line we intercept ed during

21  the wiretap .

22  Q.    You don't have any of the number s, for example ,

23  the hard line at Bexhill Court included on this chart .

24  A.    No.  I did not have a pin register on that

25  telephone .

1  Q.      Why was that?

2  A.      We obtained a pin register for her cell phone a

3  very short time after she moved from Bexhill.

4  Q.      So although there were other investigations,

5  your investigation --

6          MR. MONTEMARANO:  Objection, leading.

7          BY MS. JOHNSTON:

8  Q.      Prior to -- when did you start your

9  investigation?

10 A.      October of 2002.

11 Q.      Do you recall, based on the land records you

12 testified to last week, when she moved to Bexhill

13 Court?

14 A.      I believe the sale was in November of '02.

15 Q.      If you could continue then.  How did you arrange

16 the names of these people on the chart around Ms.

17 Martin's numbers in the center?

18 A.      I just placed them in alphabetical order

19 starting with Ms. Ali and going around.

20          (Witness indicating.)

21 Q.      There's no particular significance to where

22 they're placed on the chart; is that correct?

23 A.      That's correct.

24 Q.      Why are some in red and others in black?

25 A.      The red merely indicates whether they are a

1 defendant  in court  today .

2 Q.     If you could  start  and explain  what  number s and

3 what  the contact  was between  Ms. Martin 's number s  in

4 the center  beginning  with Ms. Ali .

5 A.     Ms. Ali , we have  the telephone  contact s between

6 these  five  telephone  number s.   The 853 number s  are  hard

7 line  telephone s at her  residence  at Sheridan  Street .

8 The 219 and  the 646 are  both  cellular  telephone s --

9 Cingular  wire less  cell  phone s, and  this  telephone  --

10 I'm  sorry .   That  is the  -- her  work  telephone  number ,

11 the (202) 645-4439.

12 Q.     Could  you explain  to us what's  reflect ed on the

13 chart  in relation  to Ms. Ali's  telephone  number s and

14 contact  with  Ms. Martin ?

15 A.     DNR data , pin register  data , show ed between

16 April  8 of 2001  and May 31 of 2004 , there  were  2,441

17 contact s between  th ese  telephone s and Ms. Martin 's

18 telephone s.

19 Q.     Could  you explain  for  the  ladies  and gentlemen

20 of the jury  what  you mean  by "contact "?

21 A.     It mean s that  there  was enough  that  it was

22 enough  for the DNR to capture  that  the number  was

23 call ed.   So it could  be a -- as long as  you dialed  the

24 digits  complete  and the phone  company  actual ly

25 connect ed the call , enough  for your  phone  to be

1  activate d.  That 's a contact .

2  Q.      Okay .  Does that include calls that would not

3  actual ly be conversation s?

4  A.      Yes .

5          And hang -up s and voice mail s and stuff like

6  that .

7  Q.      Is there any way -- those include call s during

8  what time period again ?

9  A.      April of 2000 through May of 2004 .

10 Q.      So would there be call s includ ed in there that

11 were not intercept ed during the time that the wire was

12 up?

13 A.      Yes .

14         Those also include -- those do not include --

15 these contact s do not include , if you notice during

16 when you look ed at the transcript s, there were some

17 call s that mere ly show ed up as incoming .  Sometimes the

18 equipment does not cap ture the number .  It does not

19 mean there was not a contact , it just mean s that the

20 number was not captured , so it would go into the

21 account .

22 Q.      If you would go into the next one .

23 A.      These are four telephone number s for Mr. Bynum .

24 He was intercept ed over , I believe , over every one .

25 These are all telephone number s that he was intercept ed

1  utilizi ng.   The  853  is  a  hard  line  at  Ray  Road .   The

2  498-1051  is  his  cellular  telephone ,  and  then  there 's

3  two  other  cellular  tel ephones  sub scribe d  to  other

4  individuals  that  he  was  intercept ed  using ,  and  from

5  August  7, 2001 ,  through  May  27, 2004 ,  there  were  858

6  contact s  between  Mr.  Bynum 's  telephone s  and  Ms.

7  Martin 's  telephone s.

8  Q.       Is  that  a  Ms.  Dobie .

9  A.       These  three  telephone s,  the  882  and  --  the  two

10  882  number s  are  hard  line  telephone s  at  7427  9th

11  Street .   The  390-4805  is  a  cellular  telephone .   From

12  September ,  2003 ,  to  June  1,  2004 ,  there  were  1,268

13  contact s.

14  Q.       Mr.  Goodwin ?

15  A.       The  (282)  388-9033  is  the  hard  line  at  Lobo's

16  Discount  Car  Center .   The  726  number s  are  --  the  390  is

17  a  cell  phone ,  which  he  was  intercept ed  using .   The

18  9033 ,  he  was  also  intercept ed  using .   The  583-4389  is  a

19  hard  line  at  Anacostia  Road  --  1323  Anacostia  Road

20  Southeast .   The  726  and  --  both  726  number s  are  hard

21  line  phone s  at  36  Farragut  Place  where  Mr.  Goodwin  was

22  arrested ,  and  the  (202)  839-0259  is  a  hard  line  at  846

23  Oglethorpe  Street ,  which  is  intercept ed  using  also .

24  Q.       What's  the  total  number  of  contact s  over  what

25  time  period ?

1  A.       There were 856 contacts between November 12,

2  2002 and June 1st, 2004.

3  Q.       If you could go to Ms. Harden, the next name on

4  the list.

5  A.       Between December 15, 2002, and May 31, 2004,

6  there are 216 contacts between -- the (202) 321-5105  is

7  a -- is her cellular telephone and the (410) 285-4227

8  is the hard line at her residence.  She was intercepted

9  over both.

10 Q.       Mr. Harris, who is Mr. Harris?

11 A.       Mr. Harris is a customer of Ms. Martin's.  I

12 believe he played -- well, we played some of his calls.

13 The eight -- the (301) 843 numbers are hard line

14 telephone numbers at his residence in Waldorf,

15 Maryland, and the (301) 848 is his cellular telephone.

16 From February, '03, to June, '04, there were 267

17 contacts.

18 Q.       Continuing with Mr.  -- Ms. Gwen Levi.

19 A.       (202) 487-1373 was our Target Telephone No. 5 or

20 Line B, that was her cellular telephone.  The (410)

21 579-8565 and (410) 796-4622  were both hard lines at her

22 residence at 5844 Digger's Lane, that's the residence

23 where we executed the search warrant.  There were 395

24 contacts between June 16, '03, and April 25 of '04.

25 Q.       Continuing?

1 A.      Did I say June?  It's July.  I think I said

2 June.

3 Q.      What is it?

4 A.      It's July 16, '03, to April '04.  I may have

5 said June.

6 Q.      Okay.  The next one, Mr. Mangual.

7 A.      The next one is -- the first phone is (202)

8 498-1844.  That is a cellular telephone that was our

9 Line C, Target Telephone 3, utilized by Luis Mangual.

10 Q.      When you say "line," you mean it was

11 intercepted?

12 A.      Yes.  We had an authorization  for wiretap on

13 that phone.

14        (240) 223-7729 is a NexTel phone that was our

15 Line D that was utilized by Mr. Mangual, and he was

16 intercepted on both of these; (240) 353-8438 was the

17 predecessor phone.  That was the phone he got rid of in

18 February of '04.  And the (301) 537-9292 and 587-8298

19 were hard line telephones that had at the apartment at

20 Silver Spring that he used, and between October 31,

21 2002 and May 31, 2004, there were 498 contacts between

22 Mr. Mangual's phones and Ms. Martin's phones.

23 Q.      Continue with Mr. Nunn.

24 A.      Mr. Nunn in -- there were (202) 727-7705 was a

25 hard line at 423 Jefferson Street, which is his

1  parent's -- his mother's address .  He was staying there

2  sometimes , and in the process of moving to the **Mesrot**

3  Road address, and he also had a telephone (202)

4  299-7677 , which is a cellular telephone .  He was

5  intercepted on both , a conversation with Ms. Martin ,

6  and there were 514 contacts between October 17, 2003,

7  and May 29, 2004 .  The next phone is -- next person is

8  Pernell Philpot .

9  Q.     Who was Mr. Philpot ?

10 A.     He was the individual arrested in Wyoming in

11 March of 2004 on his way from California to Maryland .

12        These are all telephones utilized by Mr.

13 Philpot .  They're all hard lines except for the (202)

14 528-2928, which is a cell .  All the rest are hard lines

15 at his residence , and there were 216 contacts between

16 November 28, 2002 and May 18, 2004 .

17 Q.     If he was arrested in -- when was he arrested

18 Mr. Philpot in Wyoming ?

19 A.     Mid-March .

20 Q.     Of when ?

21 A.     2004 .

22 Q.     Why have you associated some calls going into

23 May 18 of 2004 with Mr. Philpot ?

24 A.     Calls were being three-wayed from the jail .  He

25 was in the Clark County Detention Center and there's

1 another detention center that alludes me at the moment

2 in Wyoming, through the hard lines of his residence to

3 Ms. Martin, so they were still speaking even after his

4 arrest, as well as Ms. Martin contacted his wife and we

5 played that call in court.

6 Q.      Okay. If you could go to the next one. William

7 Turner. First of all, who is Mr. Turner?

8 A.      Mr. Turner is William "Dog" Turner. That's Gwen

9 Levi's partner/boyfriend and he was in the house when

10 we executed the search warrant on Digger's Lane on

11 April 24, 2004.

12 Q.      Explain the contacts, please.

13 A.      This is his cellular telephone, and there were

14 25 contacts between July 15, 2003 and April 25, 2004.

15 Q.      Tiffany Vessels?

16 A.      Tiffany -- this is a cell phone subscribed to

17 Tiffany Vessels. There were 22 contacts between July

18 27, 2003, and May 26, 2004, and both Mr. Goodwin and

19 Ms. Vessels were intercepted over this line.

20 Q.      And Milburn Walker?

21 A.      Milburn Walker, this is his cellular telephone,

22 (202) 904-3414, and between November 1st, 2002, and

23 June 1st, 2004, there were 585 contacts, and I believe

24 we played some of those calls.

25 Q.      Who was Mr. Walker, based on the calls we

1  played?

2  A.      He's a customer of Ms. Martin's.

3  Q.      And to the last one, Reece Whiting.

4  A.      This is Mr. Whiting's cellular telephone, and

5  there were 351 contacts between April 12, 2001 and May

6  28, 2004.

7  Q.      This chart. Is it limited to telephone numbers

8  you've identified with these individual people?

9  A.      Yes.

10  Q.      Based only on the data that you got from Ms.

11  Martin's phone as opposed to data from the individual's

12  phones?

13  A.      It's based on her pin register data and air time

14  record data.

15  Q.      From Ms. Martin?

16  A.      Yes.

17  Q.      So you -- did you have pin registers on all of

18  these other individual's phones?

19  A.      No.

20  Q.      And why wouldn't you have pin registers on these

21  other people's phones when you had them on Ms. Martin's

22  phones?

23  A.      One, we were conducting a --

24  Q.      Other than, I guess, Mr. Mangual.

25  A.      Well, prior to the wiretap, we were trying to

1  identify who her associate s were , so we just did the --
2  they're very expensive and you have to have -- one , you
3  have to have a court order to obtain a pin register ,
4  and two , it's expensive .  You don't just run around
5  willy -nilly , slapping pin register s on people 's phone s.
6  You have to pick and choose where to expend your time
7  and assets .
8  Q.      In addition to Ms. Martin , did you run pin
9  register s on a couple of people 's phone s that are on
10  this list ?
11  A.      Yes .  We had pin register s on Gwen Levi 's
12  phone s, Louis Mangual , and I can't -- I can't recall if
13  we had one on William Turner's phone or not .
14  Q.      Why did you , based on your train ing and
15  experience , elect to go from Ms. Martin 's pin register s
16  to the pin register s on Ms. Levi and Mr. Mangual 's
17  phone and possibly Mr. Turner's ?
18  A.      Once they were identifi ed as her source s of
19  supply , and we want ed to obtain authorization  to
20  intercept their telephone conversation s with their
21  source s of supply , you have to have air time and DNR
22  records , that 's a requirement as part of your court
23  authorization to show these connection s.
24  Q.      Again , these -- does this chart show what they
25  were speak ing about ?

1  A.       No, it does not.

2  Q.       For the time -- the period of time here, during

3  what period were you able to intercept two of Ms.

4  Martin's phones?

5  A.       March 8 through June 2nd 2004.

6  Q.       Did you also have a pin register on the

7  telephone of Paulette's School of Performing Arts?

8  A.       Yes.

9  Q.       Do you recall when you had that pin register up?

10 Let my show you --

11 A.       Right here?

12 Q.       -- Miscellaneous 39 and ask you if you can

13 identify those records.

14 A.       Yes.

15 Q.       What are those?

16 A.       This is a printout of the pin register activity

17 for the hard line -- one of the hard line's of Paula's

18 School of Performing Arts.

19 Q.       If I can put it up on the chart so everyone can

20 see it, and you can use the laser and explain to the

21 ladies and gentlemen of the jury   what we're looking at

22 here, starting right at the top with the caption.

23 A.       At the top is -- this is just the type of report

24 I asked the computer to do.  All this is is

25 chronological  listing of the telephone numbers dialed

1  in and out of the business .

2  Q.      Starting with the first column , what's that

3  telephone  number  in there ?

4  A.      That 's the target  telephone .   That 's the

5  telephone  that  you have to get   the DNR.

6  Q.      Target  telephone,  and this  particular  target

7  telephone  was  locate d where ?

8  A.      This  was  locate d at  Paula 's  School  of  Perform ing

9  Arts at 5595  South  Dakota  Avenue .

10 Q.      When  did  this  start ?

11 A.      The  first  date  we  received  was  January  9, 2003 ,

12 at 12:44  hour s.

13 Q.      What 's  the  call  duration  would   tell  us  what?

14 A.      How  long  the  call  lasted .

15 Q.      How  long  did  the  first  call  last ?

16 A.      One  second .

17 Q.      Number  dialed ,  what  does  that  tell  us ?

18 A.      If  it  --  this  just  show ed  us  as  an  incomi ng

19 call .  It's  straight  incomi ng  call ,  and  we  did  not  --

20 the  cap  equipment  did  not  capture  the  dial  in  digits .

21 Q.      If  we  go  further  down  there ,  there 's  one  that

22 says  in  dash  and  there 's  a  number  (301)  972-3768.   Can

23 you  de scribe  to  the  ladies  and  gentlemen   of  the  jury

24 what  that  is ?

25 A.      That 's  an  incomi ng  call  from  (301)  972-3768,   and

1  the equipment  actually captured  it.

2  Q.      This data on this chart goes from October  29,

3  2003, until  what date?

4  A.      December  15, 2003.

5  Q.      And what happened on December  15 of 2003?

6  A.      We shut  it down.

7  Q.      Why did you shut  down the pin register?

8  A.      It was not -- the phone was the only -- it was

9  not only, but rarely receiving  anything  but incoming

10  calls with very little  duration  to show there  was no

11  meaningful activity  on that  phone.

12  Q.      If we could  look at some  of the numbers on

13  there, if we go down, there  is an indication  of four

14  minutes for a call.  That's on November  3 at eight --

15  is that 8:57 in the morning?  Eight o'clock  and 57

16  seconds  in the morning or during  the night?

17  A.      That's in the morning.

18  Q.      Okay.  And then what's the duration  of that

19  call?

20  A.      Four minutes.

21  Q.      Do you, by chance, recognize  the number next to

22  it?

23  A.      No.  It wasn't any one of significance .  It was

24  later identified -- it wasn't anyone we intercepted

25  later in the wiretap.  I do have a note somewhere  who

1  that is, but it alludes me.

2  Q.      Excuse me?

3  A.      I do have the note of who that is, but I don't

4  have it with me at the moment.

5  Q.      And then there is a -- looks like a 17-minute

6  call on November 3rd.

7  A.      Yes.

8  Q.      The same date.

9  A.      Yes.

10  Q.      Were you able to tell who that call was from?

11  A.      No.  The equipment did not capture the digits

12  dialed.  It dialed in.

13  Q.      And in reviewing this, do those appear to be the

14  only calls of any significant duration?

15  A.      There was one other call that day.  There's a

16  three-minute call right there.

17  Q.      Again, on what date was that?

18  A.      That's November 3rd also.

19  Q.      Of 2003?

20  A.      Yes.

21  Q.      Okay.  Again, that (202) 487-6517 number, do you

22  recognize that number?

23  A.      Not as being a significant number, no.

24  Q.      Would have been the business phone; is that

25  correct?

1  A.      Yes.

2  Q.      To your knowledge, were there any other business

3  lines at that school?

4  A.      Yes.

5  Q.      How did they relate to this line?

6  A.      You can have as many phone lines as you were

7  willing to pay for at a business.

8  Q.      Were they rollover lines?

9  A.      I don't know how they were engineered.   There

10 was 635-8093 at that same location.

11 Q.      Do you know whether or not that had more

12 activity than this one?

13 A.      I can't recall.

14         MS. JOHNSTON:   Your Honor, I don't know if the

15 Court wants to take a recess at this time.

16         THE COURT:   You're not almost finished, are you?

17         MS. JOHNSTON:   Not in five minutes, Your Honor.

18 I have two more charts to do.

19         THE COURT:   Ladies and gentlemen, we'll take a

20 recess until 2:15 by that clock.

21         Counsel, I'll return to the bench at 2:05 by

22 that clock.

23                 (Jury excused at 1:05 p.m.)

24                 (Off the record at 1:05 p.m.)

25                 (On the record at 2:13 p.m.)

1            THE COURT:   Counsel, have you had a chance to

2    look at the case that I brought to your attention

3    during the luncheon recess?

4            MR. MONTEMARANO:   Yes, Your Honor.

5            THE COURT:   Does anyone have some better ideas

6    than I did about how to treat this issue?  Go to it.

7            MR. MONTEMARANO:   Well, Your Honor, I am not

8    going to proceed precisely from the Court's phrasing

9    because then I'd sound sarcastic.

10           THE COURT:   I'm being facetious.  That's all

11   right.

12           MR. MONTEMARANO:   I would adhere to my initial

13   point of view that this chart, with those particular

14   entries, cannot be used.  The *Johnson* case makes

15   painfully clear that summary charts were summaries of

16   actual evidence.  At the very least, testimony of a

17   person who delivered or picked up CDS from the

18   defendants in question.

19           If that were based upon a delivery by Mangual or

20   a delivery to Mangual, which Mr. Mangual had testified

21   about, I would, like it or not, have to concede

22   honestly, if not for the record, because I do represent

23   Ms. Martin.  It's not my job to agree with the

24   government on anything that it fit within the rubric

25   defined by *Johnson*.  I submit, however, there is no

1  evidence  even  through  the  mouth  of  the  lie  on

2  cooperator  of  a  delivery  on  these  specific  dates  and

3  times  set  forth  on  the  summary  chart.

4         Those  dates,  so  the  record  is  clear,  are  the

5  reference  on  3/10  of  '04,  3/13  of  '04,  3/17  of  '04,

6  3/24  twice,  3/26,  4/29,  and  that  is  it.   It's  just

7  three  pages.   In  each  case,  not  only  did  it  talk  about

8  Martin  receives  cocaine  from  Luis  Mangual  over  and  over

9  again,  but  it  is  broken  into  sections.   Cocaine

10  delivery  one,  cocaine  delivery  two  --  the  fact  is

11  there's  no  evidence  of  delivery,  there's  evidence  of  a

12  meeting.   There  is  no  evidence  of  cocaine  or  any  other

13  drug  or  any  drug  --  cocaine  in  lieu  of  any  other  drug,

14  and  the  simple  fact  is  that  is  opinion  testimony  from

15  Sergeant  Sakala.

16         It  is  not  evidence  in  this  case  which  can  be

17  summarized.   In  essence,  an  opinion  is  summary.   I

18  summarize  what  is  given  to  me  and  I  draw  hypothesis

19  from  it.   This  is  a  summary  of  that  summary,  and  for

20  that  reason,  I  submit  cannot  be  permitted  to  come  in.

21         *Johnson*  is  painfully  clear.   It  does  not  stretch

22  this  far  and  the  dicta  in  *Johnson*  discussing  some  of

23  the  other  situations  where  it  does  and  doesn't  come  in,

24  and  the  bases  for  the  admission  of  this  particular

25  evidence  makes  clear  what  it  does  not  permit,  this  what

1  we have in this case is one --

2          THE COURT:  Show me where it says it does not

3  permit this if you have the opinion in front of you.

4          MR. MONTEMARANO:  It does not say it does not

5  permit this.  What it says is it permits other things

6  and it is very clear why it permits it.

7          Court's indulgence.

8          For example, approximately  -- if you look on

9  Page 1157 in the first column.

10          THE COURT:  I'm sorry, what page?

11          MR. MONTEMARANO:  1157, in the left-hand column.

12          THE COURT:  Wait a minute.  Which -- give me the

13  page number from the Lexus version, the upper

14  right-hand corner.  Are you looking at that version?

15          MR. MONTEMARANO:  I am looking at the reporter's

16  version, which I would glad to provide.  Mr. Krinsky is

17  going to provide it to you.

18          THE COURT:  Tell me what page.

19          MR. MONTEMARANO:  1157.

20          THE COURT:  Okay.

21          MR. MONTEMARANO:  Left-hand column.

22          THE COURT:  Wait a minute.  Let me get there.

23          MR. MONTEMARANO:  Head note six.  It's

24  subsection A for alpha within the opinion.  It's head

25  note six per the reporter.

1          THE COURT:   Okay.

2          MR. MONTEMARANO:  It says the organizational

3  chart was, in essence, a summary exhibit reflecting a

4  compilation of testimony already adduced at trial.  It

5  listed sources of crack and the principals, including

6  appellant, and the connections between them.  I'll

7  quote, names printed in black represent the persons

8  who, based upon the testimony, either bought crack from

9  or distributed crack for only one principal; names

10  printed in red represent the persons who worked for

11  more than one principal.

12          Both appellants stipulated that the columns of

13  names under their respective names accurately depicted

14  the testimony of other witnesses who had allegedly

15  received crack from them.  We have not stipulated that

16  there was a delivery that day of anything, let alone

17  cocaine.

18          The government makes two leaping leaps, (a) a

19  delivery, (b) that it's cocaine.  Indeed, there's

20  nothing from the evidence which Sergeant Sakala has

21  adduced his conclusions from that lets us know it's

22  cocaine.

23          Now, let's be entirely candid.  Not that long

24  thereafter, about a month and a half, two, two and a

25  half months, I'd be a fool to suggest otherwise, there

1  is the seizure of over a half a kilogram of cocaine in

2  various forms from my client's place of business.  That

3  does not mean it was cocaine two and a half months

4  before, it doesn't mean it was drugs two and half

5  months before.

6          There is no seizure at or near the day and time

7  in question.  It's not a controlled buy or purchase,

8  all of which could have been summarized.  This simply

9  cannot.  Going from 3/17 to 6/1 is just too great a

10  leap.  This is, I think -- this opinion is limited to

11  its facts to adduce more because it makes clear that

12  the admission under 611 under such a summary is a very

13  limited proposition.   The opinion, in its lengthy

14  explanation, makes that clear.    It goes to great

15  lengths to explain why this one was okay.

16          We cannot shoehorn the facts of this case within

17  this lengthy explanation as provided by Judge Williams

18  because, simply put, it doesn't fit within that

19  explanation.  Judge Williams' explanation is key to

20  facts of the *Johnson* case.

21          THE COURT:  What about an exhibit that said so

22  and so grams of cocaine received on X date and that is

23  based upon a laboratory analysis and the opinion of an

24  expert that it was, in fact, point so and so grams of

25  cocaine?  That is putting on a summary chart an

1 opinion ; isn't it?

2          MR. MONTEMARANO :  I submit that is not an

3 opinion of an expert . It is reducible to scientific

4 fact . It passes the Daubert test . Indeed , it would be

5 difficult for me , as an officer of the court , where a

6 person with 50 years in the face of God's green earth

7 to suggest I couldn't do that very same test given the

8 material and reagents .

9          THE COURT:  Doesn't Sergeant  Sakala 's testimony

10 have to pass the Daubert test as well ?

11          MR. MONTEMARANO :  Our argument is that it came

12 nowhere near .

13          THE COURT:  I recognize that , but I have

14 permitted him to testify , based upon his knowledge and

15 experience as a police officer , and specifically

16 knowledge and experience in the drug trafficking

17 business , to give opinions about what people meant when

18 they used certain language in conversations that are

19 recorded .

20          MR. MONTEMARANO :  The very language of Daubert

21 makes it clear  it is not merely scientific principles ,

22 it is not reproducible under controlled circumstances .

23 You know, it's sort of like cold fusion.      Oh, wow, what

24 a great idea, really cool.     Nobody's ever reproduced

25 that.  I submit that in a different situation , tickets

1 might well mean something else.

2         THE COURT:  All right.

3         MR. MITCHELL:  May I add one thing, Your Honor?

4 In my view of this opinion on Page 1157, 703 of the

5 Federal Rules of Evidence allows an expert witness to

6 base his opinion based on earlier trial testimony.  The

7 opinion continues to talk about testimony.  Nowhere in

8 this opinion does it say that opinion testimony may be

9 used in these charts and the Courts distinguish between

10 testimony and opinion testimony because they're vastly

11 different.

12        One is an opinion testimony.  In fact, they even

13 refer to this officer using his opinion based on prior

14 testimony.  So, if the Court meant for opinion

15 testimony to come in in these charts, they would have

16 said it all they're talking about is testimony.

17        THE COURT:  That issue wasn't necessarily before

18 them, but the core principle applied by the Fourth

19 Circuit in the *Johnson* case was to apply the language

20 of --

21        MR. MITCHELL:  Bitto [ph.] case.

22        THE COURT:  -- of Rule 611(a) as the basis for

23 permitting this because it would make the presentation

24 effective for the ascertainment of the truth.

25        MR. MITCHELL:  Agreed, but they only refer to it

1  --

2        THE COURT:   When you have a case that is as long

3  and as complex as this one, where we're now in the

4  middle of the 25th day of trial, and hopefully an end

5  in sight, with, you know I don't know the number of

6  witnesses, but a very large number of witnesses, and a

7  very complicated case that's already been cut into four

8  parts to fit, this is not a classic example of where

9  this type of summary testimony to assist the jury in

10 ascertainment of the truth, does that not make it

11 appropriate especially in this case?

12       MR. MITCHELL:   I think you have to distinguish

13 between opinion testimony and facts.  Facts, the jury

14 -- facts, the jury has heard that they need to put

15 together into some cohesive grouping so they understand

16 it.  That's a vastly -- from all the phone calls that

17 Sergeant Sakala used to form an opinion and that

18 opinion has already been expressed to the jury.   This

19 -- the *Johnson* case does not say that opinion testimony

20 can then go on charts to be explained to a jury.  I

21 just don't think that's -- you asked Mr. Montemarano,

22 does this case prohibit it.  I think by their own

23 language, their specific words they use, they didn't

24 include opinion testimony to go in these charts, but an

25 opinion --

1        THE COURT:   Why would it be -- this is my

2   question, Mr. Montemarano:   Why would it be

3   inconsistent with this decision in the *Johnson* case to

4   permit the use of opinion testimony being put up on

5   charts, especially where you've got a case where

6   somebody looked at some white powder and said that's

7   cocaine, and somebody else looked at another powder and

8   said that's heroin, and somebody else looked at some

9   hard stuff and said it's crack.   These are all opinions

10  reasons; aren't they?

11       MR. MITCHELL:   Here's the problem.   You have one

12  officer giving his opinion of another officer's

13  opinion.

14       THE COURT:   I don't think that's what this

15  exhibit is intended to do at all.

16       MR. MITCHELL:   In fact, what the government

17  accomplishes by that is they have one officer

18  corroborating and bolstering another officer's opinion.

19  So you've got two officers' opinions based on the same

20  evidence, and I don't think that's appropriate either.

21       THE COURT:   Well, I'll let the government speak

22  for itself, but it appears that this exhibit is

23  intended to show that on certain dates, there were

24  arrangements made for Mangual to deliver cocaine to

25  Martin, followed by an immediate series of phone calls

1  to various customers or co-conspirators to distribute

2  the cocaine. I assume that's what this is for.

3         MR. MARTIN: Let me answer the question.

4         THE COURT: Wait, let me finish with it.

5         MR. MARTIN: All right.

6         THE COURT: I'm saying, assuming that that's

7  what this is for, and I'll let the government tell me

8  whether my assumption is correct or not.

9         MR. MARTIN: Your Honor I have an objection, but

10  go ahead.

11        MR. MITCHELL: Of course that's what they intend

12  to prove.

13        THE COURT: All right. Well, let me hear what

14  Mr. Martin has to say.

15        MR. MARTIN: Briefly, Your Honor. You had asked

16  earlier about what's the difference between the *Johnson*

17  case and the case we now have before us. I think the

18  Court has to keep in mind that we didn't have 16 or 17

19  corroborating witnesses come in here and testify and

20  then have a summary of that, and the Court says

21  specifically now -- I draw your attention to Page 1162,

22  Paragraph 9. I'm not going to read the whole thing.

23  The bottom line there is --

24        THE COURT: 1162?

25        MR. MARTIN: Yeah, 1162, Paragraph 9. I'm not

1  going to read the whole thing, but the Court goes into

2  reading why there's danger in allowing this type of

3  testimony, and the bottom line is the Court says it

4  doesn't like it; however, due to the large number of

5  witnesses and extensive evidence -- I'm near the bottom

6  now -- as well as the curative instructions offered by

7  the district court, we conclude that the district court

8  acted within its discretion.

9        Well, there are differences here. We don't have

10  stipulations to any of these charts. We don't have 16

11  or 17 cooperating witnesses here, and I submit to the

12  Court, and I renew my earlier objections to these

13  summaries that this case is different from the *Johnson*

14  case and the *Johnson* case doesn't stand for the

15  principles, that the government said that this is

16  something that is the ordinary.

17        This case says that this is something that is

18  extraordinary. It's out of the usual. For that

19  reason, I think the Court should be hesitant to allow

20  this kind of testimony in, and again, I would ask that

21  it be stricken.

22        THE COURT:  I have to look at the record to see

23  the exact status of it, but has -- to two things:  One,

24  the defense was put on notice of the government's

25  intention to use this a number of days ago and it did

1  not raise any objection until today. Second question

2  is this document was referred to by the witness I don't

3  know how many question s before an objection was raised

4  to it.

5          MR. MARTIN:  That's true. That's correct.

6          THE COURT:  Under local rule, once it's referred

7  to without objection, --

8          MR. MARTIN:  The first part.

9          MR. MONTEMARANO:  About this chart, I was out of

10 my seat. I was waiting for it. This Martin/Mangual

11 chart, the very first time, referring to this chart

12 Martin/Mangual, objection, Your Honor. The record will

13 reflect that, with all due respect.

14         MR. MARTIN:  I think what His Honor was

15 referring to was the Chart 4 or Chart 5, it wasn't

16 until she was about -- Madam Counsel, three-quarter s of

17 the way down the chart, they stood up, and I think last

18 week there were objections.

19         THE COURT:  Let's make sure we're all on the

20 same page. The document that's in chart form that

21 you're all concerned about is the one entitle d

22 Martin/Mangual cocaine distribution during  --

23         MR. MONTEMARANO:  Yes, Your Honor.

24         THE COURT:  That's the one we're talk ing about?

25         MR. MONTEMARANO:  Yes, Your Honor.

1          MR.  MARTIN:   I'm talking about all the charts.

2          THE COURT:   We have to go one chart at a time

3 then.  The only chart I'm dealing with is this one, and

4 what is the exhibit number of this?

5          MS. JOHNSTON:   Your Honor, CH-3.

6          THE COURT:   CH-3.  So my question was:  Why was

7 not an objection raised when it was displayed by the

8 government previously, and secondly, why did you wait

9 all the way until the examination today?

10         MR. SUSSMAN:   I did raise an objection last

11 week.

12         MR. MONTEMARANO:   It was not displayed last

13 week.

14         MR. MITCHELL:   It's never been displayed.

15         MR. MONTEMARANO:   First came into court today.

16         MS. JOHNSTON:   It was presented to the Court

17 last week.  There was objections made to the summary

18 charts, and the Court asked us to make corrections to

19 two of these charts.  These charts were submitted to

20 the Court as a set last week, and in terms of what was

21 asked of the witness, I don't believe I got any further

22 with CH-3 than asking him to identify the chart when

23 Mr. Montemarano objected.

24         THE COURT:   Am I correct that this exhibit,

25 Chart No. 3, has been referred to by a witness, an

1  objection  was  made , and  nothing   further   happened  with

2  that  chart  with  this  witness ; is  that  correct ?

3          MR.  MONTEMARANO :   Today , Your  Honor .

4          THE  COURT:   Today .  All  right .

5          MR.  SUSSMAN :   I  think  it's  important  to  note  I

6  object ed  to  it  before  Detective  Eveler  took  the  stand ,

7  and  I  think  the  position  was , we'll  deal  with  it  when

8  we  get  to  it, not  --

9          THE  COURT:   All  right .  Well , we've  gotten  to

10  it.   Now , I  don't  see  any  problem  with  any  of  the  other

11  chart s.   I  thought  we  had  already  gone  through  that .

12  This  is  the  one  that  you're  focusing   your  attention  on

13  Mr.  Montemarano ; is  that  right ?

14          MR.  MONTEMARANO :   Yes, sir .

15          THE  COURT:   Well  --

16          MR.  MARTIN:   I  would  dis agree  with  the  Court ,

17  and  I  renew  my  objection  that  you  over ruled  earlier .

18          THE  COURT:   You  dis agree  what ?  I'm  sorry .

19          MR.  MARTIN:   You  said  you  didn't  think  there  was

20  a  problem  with  any  of  the  chart s.

21          THE  COURT:   They  didn't  address .  I've  had  some

22  repairs  and  adjustment s  made  to  them .

23          MR.  MARTIN:   No .  No, Your  Honor .  I  object ed  to

24  the  chart  that  listed  the  chronology  of  event s relating

25  to  Mr.  Goodwin , and  I  came  to  the  bench  and  the  Court

1   has said that I approached the bench late on that, and

2   I would submit to the Court that it's not late if

3   during the testimony I get up and I object to it, and

4   I'm not going to chase my tail on that, except to say I

5   think it was Chart 4.

6         MS. JOHNSTON:   Chart 4 was the telephone contact

7   chart around Mr. Goodwin's arrest, September 3, so that

8   is not a summary of evidence chart under Rule 611, I

9   believe it is, or 610.   That chart was a summary of

10  voluminous records that would come in.

11        THE COURT:   106?

12        MS. JOHNSTON:   110.06.   This other chart was

13  CH-5, which related to the various detectives and

14  referenced the various exhibit numbers.   That would be

15  the chart under the *Johnson* case.

16        MR. MARTIN:   That's the one I approached the

17  bench on, Your Honor.

18        THE COURT:   Which one?

19        MR. MARTIN:   Five.

20        THE COURT:   Five?   Can somebody show me 5?   When

21  you're showing these to the jury, I can't see them, so

22  I need to see.

23        MS. JOHNSTON:   Your Honor, I apologize I guess

24  between last Wednesday and this week, things have

25  gotten misplaced.

1          THE  COURT:   If  I  were  more  agile,  I  would  jump
2  up  and  go  look  at  it.
3          MS.  JOHNSTON:   It  is  three  different  boards,
4  Your  Honor,  which  just  --  I'll  put  the  date  of  the
5  exhibit  with  what  the  concerns  and  the  exhibit  number.
6          THE  COURT:   All  right.   Okay.
7          MS.  JOHNSTON:   Reference  to  time  frames  that  Mr.
8  Thurman  had  testified  about.
9          MR.  MARTIN:   Do  you  want  us  to  bring  that
10  closer?
11          THE  COURT:   I  can  see  it.   I  can  see  it.
12          MS.  JOHNSTON:   And  they  just  continue.   There's
13  just  three  of  them,  and  that's  what  it  does.
14          MR.  MARTIN:   This  is  the  one  that  I  approached
15  the  bench  on,  and  it  is  true  that  she,  that  is
16  government  counsel,  was  more  than  halfway  through  this
17  when  I  jumped  up  and  I  realized  exactly  what  was  taking
18  place,  and  I  think  you  overruled  my  objection.   I  just
19  wanted  to  renew  it.
20          THE  COURT:   I  overrule  it  again.
21          MR.  MARTIN:   All  right.
22          THE  COURT:   I  think  that's  a  proper  exhibit.
23          All  right.
24          MR.  WARD:   Your  Honor,  I  do  want  to  preserve  the
25  record  in  one  regard.   I  complained  earlier  that  we  had

1 not been notified that this witness was being called an

2 expert.  I've since consulted with all other counsel,

3 Mr. Martin has all of the letters in this case on his

4 computer and checked them all, and confirmed my view

5 that no written note was given in this case that this

6 witness would be called as an expert this in this case,

7 so.

8         THE COURT:   Let me hear what Ms. Johnston has to

9 say.

10         MS. JOHNSTON:   Your Honor, attached to the --

11 first of all, on May 3 -- defense counsel filed motions

12 in May objecting to our designation of experts.  Ms.

13 Harden filed a motion on May 11.  Mr. Montemarano filed

14 one in terms of Ms. Martin in May, and so did, I

15 believe, Ms. Ali, although that particular one escapes

16 me.  This was after we sent out the letter March 8 --

17 May 8.  Attached to our May 8 letter were copies of

18 letters that had been previously sent to defense

19 counsel.

20         Those were the letters that designated the

21 experts in the first two trials, the November trial and

22 the March 21 trial, that did not occur.  That letter

23 was dated February 22.  Both of those letters were

24 attached to the Government's May 8 correspondence.

25 More importantly, on May 30, the government filed a

1 response to -- let me get the right pleading, Your

2 Honor.

3         On May 30, the government filed a response to

4 the defendant's expert witness motions filed by Martin,

5 Ali, and Harden. In that response, the government set

6 forth, finally, on May 8, 2006, the government provided

7 notice of its intentions to use drug experts in the

8 June 6 trial and attached copies of the previous expert

9 drug designation letters. Attached to that were copies

10 of the October letter and the February 22 letter, both

11 of which designated the case agents as being expert

12 witnesses and referenced those.

13         When we filed this motion -- this responses on

14 May 30, the Court held a hearing in terms of expert

15 witnesses and what the case agents could say. This is

16 the first time yesterday that, other than the motions

17 that were filed where counsel said our notice was

18 inadequate, that now someone is saying they never got

19 any notice.

20         We litigated that with the Court pretrial, or at

21 the very beginning of the trial, and it is set forth in

22 our response. No one's ever said before they didn't

23 get those letters attached to the May 8 letter.

24         THE COURT: All right. Mr. Ward, your objection

25 is overruled. I believe that there's been adequate

1  notice and that the case agent is permitted to testify

2  and give the opinions.  Mr. McKnett, do you have

3  anything else?

4         MR. MCKNETT:   Yes, Your Honor.  I want to refer

5  back to Chart 3.  I wanted to respond to the question.

6         THE COURT:   Wait a minute.  This is the one

7  we've been talking about.

8         MR. MCKNETT:   Martin/Mangual cocaine.

9         THE COURT:   Let me steal your thunder.  Stop.

10 Don't snatch, okay?  I'm going to sustain the defense

11 objection to this.  I think this can be used during

12 closing argument, but I think this -- it's a close

13 call, perhaps, and perhaps could be admitted under

14 *Johnson* and I think all the other exhibits are

15 admissible under *Johnson*.  But this one, I think, goes

16 a little bit too far.

17        I think it's perfectly proper for the government

18 to use that as an argument document in closing

19 argument.  It will not be received as evidence, so I

20 sustain the defense objection.  All right?  Ready for

21 the jury?

22        MS. JOHNSTON:   Your Honor, could I redact some

23 things from that chart and have the Court reconsider?

24 We had this hearing last week, and now all of a sudden,

25 we're re-litigating things in the middle of testimony.

1          THE COURT:   My problem is, Ms. Johnston, I
2 didn't have  this in front of me when we were doing
3 this.  I'm trying to be fair to all sides.  If this is
4 going to come in, I share the concern of the defense
5 about these being receipts of cocaine, and perhaps you
6 can fix this by changing it to --
7          MS. JOHNSTON:   I could have made changes over
8 the five-day break that we've had, had that issue been
9 raised by defense counsel, and they had copies of it
10 last week.
11          THE COURT:   I'm not sure how to fix it, but it
12 would have to be along the lines of -- my problem is I
13 can't remember precisely everything that happened on
14 these specific dates, but I'm assuming that on March
15 10, 2004, for example there was a wiretap conversation
16 that Sergeant Sakala interpreted as meaning that
17 Mangual was about to deliver and did deliver cocaine to
18 Martin.
19          MS. JOHNSTON:   And there was surveillance on
20 that day.
21          THE COURT:   If you change this to simply be a
22 factual thing, Mangual says he is arriving to deliver
23 tickets, whatever -- you know, whatever it was on these
24 particular dates, then it's purely factual.
25          MS. JOHNSTON:   I could very well do that, but

1  here we are, you know --

2         THE COURT:   I understand.

3         MS. JOHNSTON:   -- at a quarter to 3:00.

4         THE COURT:   I share your pain.  I'm having some

5  other type of pain, but I share your pain.  The defense

6  should have brought this up earlier, but I think in my

7  gatekeeper function, this one is a little bit too far

8  into an argument exhibit, and I think that it's

9  perfectly fair game to use this exhibit in your closing

10 argument.

11        MS. JOHNSTON:   Your Honor, I appreciate we can

12 use pretty much almost anything in our closing

13 argument.

14        THE COURT:   Not everything.

15        MS. JOHNSTON:   In terms of summarizing evidence,

16 but the problem is that we're in a position now where

17 we're delaying the jury, we've now delayed them almost

18 20 minutes, and we're not -- we don't have an

19 opportunity to fix that chart because, quite frankly, I

20 can put in on there surveillance of Louis Mangual and

21 Paulette Martin's house.

22        THE COURT:   I will tell you this:  You can

23 conclude your examination of the pending witness on all

24 matters, and I'll allow you to recall him if this chart

25 can be refixed to my satisfaction, maybe not to the

1  defense 's satisfaction , but to take out the notion that

2  these are cocaine shipment s, which does appear to be a

3  little bit farther along the line than the *Johnson* case

4  might permit , or at least in my discretion , to not

5  permit . And I'll allow you to recall him.

6          MS. JOHNSTON:   Well , we will do that , then , Your

7  Honor , because it can be remedi ed very quick ly.  If we

8  had had notice , we would have done it before now .

9          THE COURT:   All right . Ready for the jury ?

10 Okay . Bring them in.

11                 (Witness resumes the stand .)

12                 (Jury return s at 2:41 p.m. )

13         THE COURT:   I have to see 12 or 15 heads up

14 before I can proceed . You may proceed . Sorry about

15 the delay , ladies and gentlemen . I apologize .

16         BY MS. JOHNSTON:

17 Q.     Detective Eveler , when we -- right before the

18 recess , you had talk ed about a second number at Paula 's

19 School of Perform ing Art s. Do you remember that

20 testimony ?

21 A.     Yes, ma'am .

22 Q.     Over the luncheon recess , did you have an

23 opportunity to check the pin register data for that

24 telephone ?

25 A.     Yes .

1  Q.      What did you conclude based upon that review?

2  A.      It's nearly the same type of activity as on the

3  1400 phone.

4  Q.      What time frame would that have been?

5  A.      I believe it was June through the fall of 2003.

6  Q.      Based on your training and experience, can you

7  explain to the jury why you did not request authority

8  in 2004 to intercept conversations occurring over

9  either the phones at the school?

10  A.      There was insufficient activity to establish

11  probable cause to obtain authorization for the wiretap.

12  Q.      Now, in reference to Mr. Bynum let me show you

13  what's been previously marked as Miscellaneous 19 and

14  introduced as Miscellaneous 19.  Are you familiar with

15  that document?

16  A.      Yes.

17  Q.      What is that a record of?

18  A.      It's a docket information for Mr. Bynum's case

19  in Montgomery County.

20  Q.      Was he convicted in that case based on the

21  records?

22  A.      Yes.

23  Q.      And based upon those records, do the records set

24  forth whether or not he received a sentence in excess

25  of one year?

1  A.      Yes.

2  Q.      Was it more than one year?

3  A.      Yes, it was.

4  Q.      Also, to your knowledge, has that conviction

5  ever been set aside or has Mr. Bynum ever been

6  pardoned?

7         MR. MITCHELL:   Objection.  Knowledge.

8         BY MS. JOHNSTON:

9  Q.      Well, look at the date of this record.  Do you

10 see the date on the top of that?

11 A.      Yes, ma'am.

12 Q.      What's the date on that?

13 A.      7/20/2000.

14 Q.      On the very date on the top indicating as of

15 what date was that record printed?

16 A.      October 19, 2004.

17 Q.      Going through that record, would you advise us

18 whether or not there's any indication at any time prior

19 to October 19, 2004, that that conviction was ever set

20 aside or reversed by any court?

21        MR. MITCHELL:   Renew the objection, Your Honor.

22        THE COURT:   Overruled.

23        THE WITNESS:   No, there's nothing to indicate

24 that.

25        BY MS. JOHNSTON:

1  Q.        Indeed, based on your training and experience,

2  if someone's conviction had been stricken or expunged,

3  would you be able to get a copy of the record?

4  A.        No.

5  Q.        Now, let me show you what's been marked as CH-14

6  and ask if you recognize this exhibit.

7  A.        Yes.

8  Q.        Did you prepare and view this exhibit for

9  presentation in court?

10 A.        Yes.

11 Q.        Could you tell the jury what CH-14 does?

12 A.        It's a summary of the narcotics evidence that

13 was either stipulated to or had drug laboratory

14 personnel testify to the results of the chemical

15 analysis.

16 Q.        During the weeks since this trial has commenced,

17 there have been many drug exhibits admitted; is that

18 correct?

19 A.        That's correct.

20 Q.        If we look at column one, what does that refer

21 to?

22 A.        That would be the exhibit number.

23 Q.        And column two?

24 A.        That is the drug.

25 Q.        And column three?

1  A.        Where  that  item  was  recovered .

2  Q.        And  column  four  under  witness .

3  A.        Either  the  witness '  name  or  the  stipulation

4  number .

5  Q.        Does  that  accurate ly  summarize  the  evidence  that

6  came  into  this  jury  concern ing  drug s  that  were  seized

7  in  relation  to  your  part  of  the  investigation  of  this

8  case ?

9  A.        Yes .

10 Q.        During  the  time  of  the  charge d  conspiracy ;  is

11 that  correct ?

12 A.        That 's  correct .

13 Q.        Now ,  finally ,  if  I  could  ask  you  to  step  down ,  I

14 think  we  have  two  more  chart s  to  review  with  the  jury .

15 Show ing  you  first  what 's  been  mark ed  as  CH-13 .   Do  you

16 recognize  that  chart ?

17 A.        Yes .

18 Q.        Let  me  next  show  you  Government 's  Exhibit s  R-14 ,

19 R-15 ,  R-16 ,  R-17 ,  R-18  and  R-19 .   Do  you  recognize

20 those  records ?

21 A.        Yes .

22 Q.        How  do  those  records  relate  to  the  chart ,  CH-13 ,

23 and  if  you  could  stand  back  to  the  side .

24          Do  you  have  the  laser ?   Thank  you .

25 A.        The  Exhibit s  R-14 ,  15 ,  16 ,  17 ,  18  and  19  are  all

1 bank records Sun Trust , Bank of America , Chevy Chase,

2 and this is a summary of certain activity that's

3 reflected in these bank records .

4 Q.     Does that include the checks that were reviewed

5 with the individual custodians when they were here in

6 court ?

7 A.     Yes .

8 Q.     If you could just describe for the ladies and

9 gentlemen of the jury  what you've depicted on this

10 chart .

11 A.     In the first column is the last four of the

12 account number .  Instead of putting the entire account

13 number , just the last four digits of the account number

14 are reflected in the first column .  The second column

15 is the date the check was posted .  The third column is

16 the date of the -- listed on the check .  The next is

17 the check number , the next column is the payor, which

18 account the check was titled in, the amount of the

19 check , if there was a reference to memo that I could

20 read , it's reflected in the memo section .

21 Q.     Were there some you were not able to read ?

22 A.     Some were illegible .

23 Q.     Were some blank ?

24 A.     Some were blank and some I just could not read .

25 Either the handwriting  -- I couldn't make it out .

1 Street address of the payor and city and state.

2 Q.    In reference to those, the memo portion, is that

3 your reading of what was on the check?

4 A.    Yes, it is.

5 Q.    Calling your attention, do you recall testimony

6 concerning March 29, the surveillance by officer on

7 that date?

8 A.    Yes.

9 Q.    And surveillance was of whom?

10 A.    Ruby Harden.

11 Q.    And who else?

12 A.    Paulette Martin.

13 Q.    Was there any checks written on that date?

14 A.    Yes. There was a check written on bank account

15 0609 on that date, Check No. 1519 for $125.

16 Q.    Based upon your training and experience, what is

17 $125 consistent with the purchase of?

18 A.    An eight ball.

19 Q.    An eight ball?

20 A.    An eighth of an ounce of cocaine.

21 Q.    In reference to your investigation, there are

22 some notations on here that the checks were written for

23 chrome deposit, truck lettering and truck parts and

24 truck detailing.

25       During the course of your review of all of the

1 documents recovered from Ms. Martin's house and her

2 school, what if any, evidence did you find that she was

3 involved in truck lettering or truck detailing or truck

4 parts?

5 A.     There's no evidence to indicate she was involved

6 in detailing, chrome sales, or truck parts.

7 Q.     Thank you.

8        Now let me go, finally, to the last chart unless

9 I've forgotten something, CH-1. Are you familiar with

10 CH-1?

11 A.     Yes.

12 Q.     Who prepared CH-1?

13 A.     I did.

14 Q.     Now, other than the handwritten notes that

15 individual witnesses have put on there in terms of

16 identifying people, did you select the photographs that

17 were to be put on there?

18 A.     Yes.

19 Q.     And the language describing the different boxes?

20 A.     Yes.

21 Q.     If you could, starting with the top, the first

22 box tell us why they're in a square together and why

23 you labeled it heroin.

24 A.     The investigation showed that Moises Uriarte,

25 who was -- who testified and was located in New York,

1  was the heroin source of supply for Gwendolyn Levi and

2  William Turner based on his testimony and ledgers and

3  our surveillances and wiretap.

4  Q.      That would be based upon the testimony that was

5  heard here in court?

6  A.      Yes.

7  Q.      And from what witnesses?

8  A.      Mr. Uriarte himself.

9  Q.      What other evidence that was presented here in

10  court?

11  A.      The wiretap calls as well as the ledger.

12  Q.      The -- anything else in terms of search

13  warrants?

14  A.      The evidence from 5844 Digger's Lane as well.

15  Q.      Who resided there?

16  A.      Gwendolyn Levi.

17  Q.      You have an arrow that goes down here in the

18  vicinity of the center box where Ms. Martin and Mr.

19  Goodwin are located.   Why is that arrow there?

20  A.      That's to indicate the distribution of heroin or

21  the supply of heroin from Ms. Levi, Mr. Turner, Mr.

22  Uriarte to all Paulette Martin.

23  Q.      Is that your opinion based upon the testimony

24  that the jurors heard here today -- here during the

25  trial, as well as the documents and the other items

1  that were seized and the calls that were played?

2        MR. MARTIN:   Objection, compound and leading.

3        THE COURT:   I couldn't hear the objection.

4        MR. MARTIN:   Objection. Compound question and

5  leading.

6        THE COURT:   All right. Sustained.

7        BY MS. JOHNSTON:

8  Q.      What is that based upon?

9  A.      It's based on the intercepted calls, the

10 testimony of Mr. Uriarte, the evidence seized from both

11 Digger's Lane, from the Furniture Queen in New York,

12 the surveillance, the traffic stop of Ms. Levi, the

13 intercepted calls with Mr. Turner after the arrest, as

14 well as the search warrant at Paulette Martin's

15 residence.

16 Q.      If we could go to the next box here, that says

17 California cocaine. Could you explain to the ladies

18 and gentlemen of the jury  what evidence they heard or

19 they saw that caused you to put those individuals

20 together and categorize them as California cocaine?

21 A.      Based on the testimony of Nathan King, as well

22 as the intercepted jail calls after Nathan King's

23 arrest, as well as the traffic stop of Nathan King in

24 Indianapolis and the testimony of the police officers

25 there and other intercepted calls, as well as evidence

1  recovered  from  Hayward  Avenue, Steve  Brim  was

2  identifi ed  as  the  California  source  of  supply  who  was

3  using  his  son  as  a  courier  to  transport  narcotic s  from

4  Compton  area  of  California  to  Maryland -DC  area.

5  Q.      And  in  addition  to  Nathan  King, did  another

6  individual  identify  Mr. Brim  as  being  a  source  of

7  cocaine ?

8  A.      Yes.

9  Q.      Who  was  that ?

10  A.      Emilio  Echarte.

11  Q.      What  about  Mr. Philpot ?  What  evidence  did  the

12  jury  hear  that  cause d  you  to  box  him  up  there  as  the

13  California  source  of  supply ?

14  A.      The  testimony  of  the  Wyoming  state  police

15  officer  intercept  telephone  call s  and  the  testimony  of

16  Mr. Echarte.

17  Q.      Now, again, there  are  arrows.  There 's  an  arrow

18  comi ng  down  this  way  from  Mr. Philpot  down  above  Ms.

19  Martin 's  rectangle.  Why  did  you  put  an  arrow  going

20  that  way ?

21  A.      That 's  to  indicate  the  flow  of  cocaine  from  Mr.

22  Philpot  to  Ms. Martin.

23  Q.      In  between  Mr. Brim  and  Mr. King  and  Ms. Martin,

24  the  arrow s  seem  to  go  both  way s.  Can  you  explain  that

25  to  the  ladies  and  gentlemen  of  the  jury   , based  upon  the

1 testimony they've heard and the evidence they've

2 received?

3 A.      The arrows two ways, one to indicate the flow of

4 cocaine from Steve Brim via Nathan to Ms. Martin, and

5 the arrow the other way to indicate the flow of money

6 back. Mr. King would transport the currency, the

7 payment for the cocaine received to California.

8 Q.      In terms of the relationship between Mr. Brim

9 and Ms. Martin, is there an arrow missing here?

10 A.      Mr. Brim and Ms. Martin?

11 Q.      Between Mr. Brim and Ms. Martin, had the arrow

12 going to Mr. --

13 A.      There should be a direct arrow going from Ms.

14 Martin to Mr. King.

15 Q.      What is that based upon?

16 A.      Based upon Mr. King's testimony.

17 Q.      Any other evidence in addition to Mr. King's

18 testimony?

19 A.      DNR contacts and --

20 Q.      Any other witnesses discuss Mr. Brim?

21 A.      Oh. Mr. Echarte.

22 Q.      What about intercepted calls? Were there any

23 calls relating to Mr. Brim and Ms. Martin without Mr.

24 King's involvement?

25 A.      There were calls referencing Mr. Brim, but all

1 intercepts occurred after his death.

2 Q.    If we could go to the next square or rectangle

3 across the top, it says Maryland cocaine. Could you

4 describe for us in reference to each of those three

5 individuals why you boxed them in there and what

6 evidence the jury heard or documents they've received

7 or calls they listened to that were on the base of your

8 blocking those people together as the Maryland cocaine

9 source?

10 A.    These were all more localized, more local

11 sources of supply for Ms. Martin. Luis Mangual saw

12 pole camera tapes of him arriving at the residence

13 after intercepted calls. After she was receiving a lot

14 of items from Mr. Mangual, he showed up either

15 photographed 35 millimeter photos, pole camera, other

16 surveillances.

17 Q.    Do you remember some of those items we heard

18 about?

19 A.    Ferragamo shoes, Versace sunglasses, books,

20 novels, oranges.

21 Q.    Mr. Encarnacion?

22 A.    Mr. Encarnacion testified about his involvement.

23 He was -- we also have air time records dating back to

24 2001 when he was involved with Ms. Martin and

25 surveillances of Mr. Encarnacion at the residence as

1  well as -- and we have his testimony.

2  Q.      And the next person is Cuba LNU?

3  A.      Cuba LNU. We have intercepted calls between

4  Cuba and Mr. Goodwin when Mr. Goodwin was utilizing Ms.

5  Martin's telephone, and we also have documentary

6  evidence. In Mr. Thurman's testimony, he documents

7  with Cuba's phone number on them as well as Thurman's

8  testimony regarding Cuba.

9  Q.      Is that in addition to the calls between Mr.

10 Goodwin and Ms. Martin discussing Cuba?

11 A.      Yes.

12 Q.      Then finally, way over on the end, we have the

13 Texas cocaine. If you could describe who is present in

14 that box and what evidence you used or the jury heard

15 that caused you to put those people together.

16 A.      Steve Campbell was identified as a Houston

17 cocaine source of supply. Kelly LNU was identified as

18 the El Paso Texas source of supply.

19 Q.      If you could summarize the evidence that

20 supports your conclusion that they were identified

21 during this trial as sources of cocaine in Texas.

22 A.      Mr. Thurman's testimony regarding both

23 individuals, as well as documentary evidence which

24 supported that, telephone numbers recovered from Mr.

25 Goodwin's residence, documentary -- other -- the

1 intercepted telephone calls regarding Ms. Vessels being
2 on a trip and then coming back, the bad cocaine
3 telephone call which Ms. Martin spoke to Bob LNU about
4 the bad cocaine. And the testimony of Mr. Thurman,
5 which was supported by those telephone calls.
6 Q.      What about any documents -- or were any
7 documents seized that supported your position of
8 Campbell as a Texas source of cocaine as well as Kelly
9 LNU?
10 A.      Yes.  On the earlier chart today, the one
11 detailing all of the trips by Mr. Thurman and then the
12 exhibit number that goes with each zero, one would
13 support that.
14 Q.      That would be CH-5?
15 A.      Yes, ma'am.
16 Q.      The three boards that were CH-5?  And then
17 underneath that, there is a box of individuals marked
18 as couriers.
19       Can you tell us who's in that box and what
20 evidence this jury has heard or seen that corroborates
21 your identifying those individuals as couriers?
22 A.      All the items on CH-5, which I just discussed a
23 second ago, all the documentary evidence, Tiffany
24 Vessels' hotel records from El Paso, Mr. Alton
25 McKenzie's NetSpin account records, as well as Mr.

1 Thurman's testimony, which touched on that the

2 intercepted phone calls which discussed the out-of-town

3 trips, which coincides with the document we have on

4 CH-5, which show that trip.

5         We also have the arrest of Mr. Thurman and Mr.

6 Moore, which -- on their trip back from -- one trip

7 down and then after the return of the -- Mr. Thurman's

8 return trip, which resulted in his arrest, documentary

9 evidence surrounding Mr. Irby and the intercepted calls

10 between Ms. Martin and Mr. Irby.

11 Q.      Now, again, there are lines going both ways in

12 between the box with Mr. Goodwin and the couriers and

13 the Texas source of cocaine. Can you explain why those

14 arrows go both ways?

15 A.      The couriers would return with payment to Texas,

16 so the drugs flowed from Texas to Maryland-DC, and the

17 money flowed from Maryland-DC to the southwest border.

18 Q.      In the center, there's a box with Mr. Goodwin

19 and Ms. Martin's pictures, and they were partners on

20 different drug deals. Can you explain for the ladies

21 and gentlemen of the jury  why it is you grouped them

22 together and called them partners based upon the

23 evidence that was presented here in court?

24 A.      Based upon testimony of Mr. Echarte, Mr.

25 Thurman, as well as the intercepted phone calls where

1 Mr. Goodwin, if he had cocaine from Cuba, would contact

2 Ms. Martin to see if she wanted any or they were going

3 to go in together, where if he wanted some cocaine, he

4 would contact Ms. Martin based on calls, and she would

5 contact Mr. Mangual to obtain cocaine for her brother,

6 Goody.

7 Q.      Then in the bottom, there is a group of people

8 marked distributors plus or minus facilitators.  Could

9 you explain to the ladies and gentlemen of the jury

10 what is meant by distributors plus or minus

11 facilitators in terms of the people in that box?

12 A.      These are people who obtained cocaine from Ms.

13 Martin and/or heroin and would distribute that and also

14 would facilitate the organization by providing support.

15 Q.      What evidence was there to support that

16 conclusion that they were supporting Ms. Martin's

17 activities in the drug conspiracy?

18 A.      Purchasing narcotics for resale, purchasing or

19 assisting in secreting contraband for Ms. Martin,

20 assisting her in moving contraband from one location to

21 another, providing support to the organization through

22 advice -- legal advice.

23 Q.      You've just highlighted Mr. Whiting.  Why did

24 you highlight him when you said that?

25 A.      The telephone intercepts where he would look --

1  he was going to look into certain -- surrounding the

2  arrest of certain individuals, he was going to conduct

3  an investigation to try to find out what was going on,

4  and also ask for papers as to -- so he could review

5  them and see -- look into the legal matter.

6  Q.      Now, is there a reason why some people are in

7  red and others are in black?

8  A.      Those were people who were scheduled for trial.

9  Q.      Should two of those people be in black instead

10 of red?

11 A.      Yes.

12 Q.      Who are the two that should be in black?

13 A.      Mr. Walker and Mr. Harris.

14 Q.      Other than those two, are the remaining people

15 in red the defendants who are on trial here?

16 A.      Yes.

17 Q.      Is there much more evidence describing those

18 roles than what you just here touched upon briefly?

19 A.      Yes.

20 Q.      The handwriting on here was done during the

21 course of the trial; is that correct?

22 A.      Yes.

23 Q.      Were you present as those people looked at these

24 photographs with the names covered and made their

25 identifications?

1  A.      Yes.

2  Q.      Are they accurately reflected on the board?

3  A.      Except this one.

4  Q.      Okay.  Which one is not accurate?

5  A.      The one -- I believe Nathan King said -- said

6  that Lavon Dobie looked a little bit like Bridget Brim.

7  Q.      That was his testimony; is that correct?

8  A.      Yes.

9  Q.      He mistakenly identified Ms. Dobie; is that

10 correct?

11 A.      Yes.

12        MS. JOHNSTON:   I have nothing further of this

13 witness, Your Honor.

14        THE COURT:  All right.  Cross-examination?

15                    **CROSS-EXAMINATION**

16        BY MR. MONTEMARANO:

17 Q.      Would you leave the Chart 1 up, please?  You can

18 stay there.  Just a few questions, if I could.  You're

19 the case agent; correct?

20 A.      Correct.

21 Q.      You've been involved with this investigation

22 from its very outset; correct?

23 A.      Correct.

24 Q.      As we stand here today, you don't know who Kelly

25 is; right?

1  A.       No, I don't.

2  Q.       And you don't know who Cuba is; right?

3  A.       No, I don't.

4  Q.       When you were sitting over there being shown

5  documents on the ELMO by Ms. Johnston before lunch, you

6  were shown a document, I think you -- it was before

7  Goodwin No. 20.  I think maybe 19.  There was a

8  business card, had Cuba's phone number on it; didn't

9  it?  Do you recall that?

10  A.       The business card or just the piece of paper?

11  Q.       The piece of paper.

12  A.       I recall seeing numbers with Cuba and a phone

13  number, yes.

14         MR. WARD:   Your Honor, I don't know  if anybody

15  else is having difficulty hearing, but I am.

16         MR. MONTEMARANO:  I'll try to speak up.

17         THE WITNESS:   I'll speak up.

18         MR. WARD:   Both of you.

19         BY MR. MONTEMARANO:

20  Q.       And that's Cuba here; correct?

21  A.       Yes.

22  Q.       You can go take the witness stand now, if you

23  would, please.

24         Now, this investigation  began when you -- at the

25  outset with Juan Encarnacion; correct?

1  A.      I'm sorry?

2  Q.      This investigation of Ms. Martin and these folks

3  began with Juan Encarnacion; is that correct?

4  A.      Ms. Martin was not a target of that

5  investigation, but she came up in the investigation.

6  Q.      And came up out of your interview with Mr.

7  Encarnacion; is that correct?

8  A.      No.

9  Q.      My correction -- my mistake.

10         Court's indulgence, please.

11         Eventually, you obtained a pin register; is that

12 correct?

13 A.      That's correct.

14 Q.      And that provided the information you showed to

15 us on the phone chart?

16 A.      Yes.

17 Q.      And at the center were numbers related to Ms.

18 Martin; correct?

19 A.      Correct.

20 Q.      And then surrounding it were the numbers of

21 actual calls; correct?  With -- from Ms. Martin's

22 numbers to the numbers relating to the other various

23 people; correct, sir?

24 A.      Yes.

25 Q.      Have you ever chosen to break down those numbers

1  by an average  number  of calls per month  during  any of

2  the periods  of time?

3  A.      No.

4  Q.      You testified that  in response  to one of Ms.

5  Johnston 's question s, were there any employ ment records

6  at Paula 's School  of Perform ing Arts; correct?

7  A.      I answered  a question  regard ing the  employ ment

8  records ; correct.

9  Q.      Correct.  You were asked that  question  by Ms.

10  Johnston ?

11  A.      Yes.

12  Q.      Your response  was you didn't  find  any employ ment

13  records  at the school; is that  correct?

14  A.      No, that's not  correct.  That's not what she

15  asked.

16  Q.      Why don't  you relate  the question  that you

17  understood.

18  A.      Were there  any records  related  to Mr. Goodwin 's

19  employ ment at Paula 's School  of Perform ing Arts, and I

20  could  not recall  any.

21  Q.      Were there  any other  employ ment records  that you

22  recall?

23  A.      There  were some, I guess -- I guess it depends

24  on what you would  call employ ment records , W-2s and

25  such.  There  may have been.  I really  don't  recall.

1  Q.      Did you look anywhere else for employment

2  records?

3  A.      I think we recovered records at various search

4  locations.  That's one thing we note -- tried to.

5  Q.      Nothing else that you recall?

6  A.      No.

7  Q.      Okay.  Now, there is the list of all the drug

8  seizures; correct?

9  A.      Yes.

10 Q.      And you had answered some questions posed by Ms.

11 Johnston last week relating to fingerprints; correct?

12 A.      Correct.

13 Q.      And you're qualified to at least check for

14 latents, maybe not do fingerprint comparisons, but to

15 lift those; is that correct?

16 A.      I'm sorry?  Could you -- there was a word in

17 there that --

18 Q.      You're qualified to lift latents?

19 A.      Yes.

20 Q.      Maybe not do comparisons like a fingerprint

21 expert says, like say this print and this print are the

22 same, but you can lift them and preserve them; is that

23 correct?

24 A.      Yes.

25 Q.      It's my understanding from the evidence in this

1  case that there's not a single fingerprint that law

2  enforcement was able to lift -- usable print from any

3  of the drug evidence in this case; is that a fair

4  statement?

5  A.      There's none that I'm aware of.  That's a fair

6  statement.

7  Q.      You're a case agent; right?

8  A.      Yes.

9  Q.      All those clear plastic bags, no prints;

10  correct?

11  A.      That's correct.

12  Q.      All that package material, no prints; correct?

13  A.      Correct.

14  Q.      Tape used to package cocaine, no prints;

15  correct?

16  A.      Correct.

17  Q.      That would even go back to as far as the seizure

18  from John Martin's car in -- heavens, 2002?  July 4,

19  give or take?  The 25 wrappers.  Let's forget the date.

20  You know the one we're talking about?

21  A.      No, I know the date.  I know the date.  If there

22  were any, I'm unaware of them.

23  Q.      That would be around July 4 of '02; is that

24  correct?

25  A.      It had occurred on July 4th, 2002, but that was

1  not done as part of this investigation . That evidence

2  was present ed, but I don't have  any -- any knowledge  of

3  latent  print s in that case .

4  Q.     All of the other  seizure s, all of the Pyrex and

5  glass  and thing s like that , no print s?

6  A.     Not that I'm aware  of, no.

7  Q.     And the toolbox es seize d from Larry Lane 's, no

8  print s?

9  A.     Not that I'm aware  of, no.

10  Q.     Was there  any Pyrex or  glassware  used for

11  cook ing cocaine  that you found when you search ed Ms.

12  Martin 's home ?

13  A.     Her home ?

14  Q.     810 Hayward .

15  A.     No, not that I know of .

16  Q.     She had been living  there for a while ; correct ?

17  Surveillance  made that pretty clear ; correct ?

18  A.     Yes .

19  Q.     She used the hard line -- land line , telephone

20  line there; correct ?

21  A.     Yes .

22  Q.     There 's a kitchen upstairs ; correct ?

23  A.     Yes .

24  Q.     So there 's a stove and you need a stove or you

25  can use a stove to make crack cocaine ; correct , sir ?

1 A.      Yes.

2 Q.      But the fact is, you don't even need a stove;

3 correct?

4 A.      That's correct.

5 Q.      All you really need is an electrical outlet;

6 correct?

7 A.      Well, you need a heat source.

8 Q.      Yeah.  Microwave?

9 A.      Yes.

10 Q.      You don't need a stove.  You could have a

11 microwave, or you need an electrical outlet; right?

12 A.      Yes.

13 Q.      It could have been done in the basement at 810

14 Hayward, couldn't it?

15 A.      Yes.

16 Q.      If there had been a microwave; correct?

17 A.      Sure.

18 Q.      Because there was certainly electricity down

19 there; right?

20 A.      Yes.

21 Q.      No microwave; correct?

22 A.      I don't know.

23 Q.      Weren't you the seizing agent at 810 Hayward?

24 A.      No.

25 Q.      Did you participate in the search of 810

1 Hayward?

2 A.     Other than recovering Ms. Martin's keys to open

3 South Dakota Avenue, no, I didn't participate in the

4 search.

5 Q.     So you don't recall if there was a microwave

6 there?

7 A.     No, I don't.

8 Q.     Baking soda?   Pyrex?

9      MS. JOHNSTON:   Objection, basis of knowledge.

10      MR. MONTEMARANO:  He is the case agent, Your

11 Honor.

12      THE COURT:   Overruled.

13      MR. MONTEMARANO:  He's welcome to say he doesn't

14 know it.

15      THE COURT:   Overruled.

16      MR. MONTEMARANO:  Okay.

17      THE WITNESS:   I don't recall.

18      BY MR. MONTEMARANO:

19 Q.     And then you were talking about the things you

20 do during a search and seizure.  Do you remember those

21 questions last week from Ms. Johnston about the things

22 you seized?

23      You were asked actually some questions earlier

24 today as well about searches and seizures, what you

25 look for.  Do you remember that question -- those

1 question s?

2 A.      There were several  question s.

3 Q.      It's fair to say, because you've been sitting

4 here during the trial, you've heard some of the other

5 search and seizure witness es who have testifi ed for a

6 search and seizure warrant for a particular  location

7 come s with something  attach ed to it call ed Schedule  A;

8 right ?

9 A.      Whatever  you label it.  It could be Schedule  A,

10 B?

11 Q.      Schedule 1 ?

12 A.      Whatever , yes.

13 Q.      Attachment  A.

14 A.      Yes, there 's usually  an attachment .

15 Q.      There 's something , and what it is, for lack of a

16 better  term , it's a shop ping list.  These  are the

17 thing s you can grab?

18 A.      I think  that 's kind of mis stati ng it.  It's not

19 a shop ping list.  It's a list of thing s you're

20 permitted  to seize under  the law.

21 Q.      Permitted  to seize based upon what you are

22 look ing for; correct ?

23 A.      Based  upon probable  cause articulate d in the

24 affidavit .

25 Q.      The simple  fact is, you're not going there

1 looking for evidence that will exculpate anybody; are

2 you, sir?

3 A.      I don't know we're allowed to seize exculpatory

4 evidence.

5 Q.      You go looking for evidence of a crime; correct,

6 sir?

7 A.      I'm going there searching for evidence on that

8 list.

9 Q.      Correct?

10 A.      That's all I'm permitted to -- I can't just

11 willy-nilly seize anything I feel like in the house.  I

12 have to seize items on the list.

13 Q.      The things that you -- you were the affiant with

14 regard to the search warrant as the person who creates

15 that list; correct?  It's not created by the judge who

16 signs off on it?

17 A.      I know the -- well the U. S. Attorney's office

18 has some input as to whether they agree with the scope

19 of the list.

20 Q.      So between you and the folks in U. S. Attorney's

21 office, you create a list of those things which you

22 believe there's probable cause to seize; is that a fair

23 statement?

24 A.      Yes.

25 Q.      Those things, for lack of a better term, are

1  evidence of the crime being investigate d; correct, sir?

2  A.      Yes.

3  Q.      Now, if you chose to put exculpatory evidence on

4  the list in your understand ing, could you?

5  A.      Not my understand ing, no.

6  Q.      Could you, while you were ther e, seizing those

7  item s on Schedule A -- we're going to call it Schedule

8  A, for lack of a better term, okay?

9          While you're seizing those thing s, if you seize

10 something that might contradict the theory of the case,

11 could you at least write down that it's there?

12 A.      Sure.

13 Q.      In fact, you do, in essence, write it down, for

14 lack of a better term, when you take photograph s;

15 correct, sir?

16 A.      It document s it, yes.

17 Q.      It document s it exact ly.  That was the next one.

18 Very good.  Now you could be a lawyer, too.

19         Maybe not.  What would your mother say, right?

20         The fact is, when you go into a house, there are

21 lot s of thing s there you don't take, but you at least

22 try to get an idea what was there by taking

23 photograph s; correct?

24 A.      That's one of the method s.

25 Q.      Okay.  You could also make list s of thing s that

1 are there; right?

2 A.      You could do many things while you're there.

3 Q.      And you could also make detailed lists of things

4 that might well deflate your theory of the case; is

5 that a fair statement?

6 A.      If those things were to exist, you could, but we

7 would be there all day if we made a list of every item

8 in the house that was, you know, 12 Ajax bottles under

9 the sink and three sponges, and you could be there

10 forever.  We're not -- that's not what we're there for.

11 We're there to conduct a search as part of a criminal

12 investigation.

13 Q.      That's not what you were there for; right?

14 A.      Right.

15 Q.      Writing down all the kinds of clothing in Ms.

16 Martin's basement, that would have taken time; right?

17 A.      Sure.

18 Q.      And writing down all the kinds of shoes in Ms.

19 Martin's basement, that would have taken time; right?

20 A.      Sure.

21 Q.      It would have taken yet more time to match sizes

22 to the kinds of garments; wouldn't that be a fair

23 statement?

24 A.      Yes.  Anything you do while in her house takes

25 time.

1  Q.      And all those things would be consistent  with

2  Ms. Martin selling clothing; right?

3  A.      All of what things would be?

4  Q.      Garment, sizes, shoe, those would be consistent

5  with the suggestion of perhaps Ms. Martin selling the

6  clothing; correct, sir?

7          MS. JOHNSTON:   Objection.

8          Assumes facts not in evidence.

9          THE COURT:   Overruled.

10         THE WITNESS:   Or that Ms. Martin wears clothes.

11         BY MR. MONTEMARANO:

12  Q.     Well, you don't know what size they were;

13  correct?

14  A.      No.

15  Q.      You don't know what size.  You don't know what

16  size Ms. Martin wears; correct?

17  A.      That's correct.

18  Q.      You didn't write them down, so you don't know if

19  they were men's clothes there?

20  A.      No, I do know there was men's clothing there.

21  Q.      There was?

22  A.      Yes.

23  Q.      Are you aware if Ms. Martin wears men's

24  clothing?

25  A.      I'm not aware of that, no.

1  Q.      As a trained investigato r with all this
2  experience,  would  it be  reasonable  to assume , at least
3  a point  of departure , that  perhaps  Ms. Martin  only
4  wear s female  clothi ng?
5  A.      I don't have  any basis  for an opinion  as to how
6  Ms. Martin  attire s herself  other  than  what  I've  seen .
7  Q.      You've  never  seen  her in men 's clothing ; is that
8  a fair  statement ?
9  A.      No.
10 Q.      In all that  surveillance ?
11 A.      Not  that  I've  seen .
12 Q.      And  certain ly you  participate d in some  portion
13 in listening  to and  monitoring  telephone  call s?
14 A.      Yes .
15 Q.      Those  would  include  the call s over  Ms. Martin 's
16 land  line ; correct ?
17 A.      Yes .
18 Q.      That 's the B line ; correct ?
19 A.      That 's correct .
20 Q.      And her cell  phone , which  is the A line ;
21 correct ?
22 A.      That 's correct .
23 Q.      And as part  of that , you therefore  had a hand  in
24 the composition  of the log s; correct , sir ?
25 A.      The person  monitoring  had a hand  in the

1 composition  of the logs.  I monitored  very  few  calls

2 myself .

3 Q.      Did  you  review  the  logs?

4        MS. JOHNSTON:   Objection .

5        Beyond  the  scope  of  direct .

6        THE  COURT:   Sustained .

7        MR. MONTEMARANO :  May  we  approach ?

8              (At the bar of the Court.)

9        THE  COURT:   Where  was  that  in  the  direct

10 examination ?

11        MR. MONTEMARANO :  Strictly speaking,  Your  Honor ,

12 there  was  no  question  regarding  the  logs  of  the  calls.

13 However ,  his  expertise  was  based  upon  his  knowledge  of

14 the  investigation  and  his  review  of  the  evidence .  The

15 logs  are  a  part  of  that .  I am  entitle d,  since  he  has

16 been  proffered  as  an  expert  by  Ms.  Johnston ,  to  talk

17 about  those  thing s he  did  and  did  not  consider  and  the

18 basis  or  the  weight  that  he  gave  to  those  thing s he  did

19 or  did  not  consider .  They  want ed  him  as  an  expert .

20 That 's  their  problem  now .

21        MS. JOHNSTON:   Your  Honor ,  we  called  him  for  and

22 he  gave  very  limited  expert  opinion s.

23        THE  COURT:   He  gave  very  limited  expert  opinion .

24        MS. JOHNSTON:   The  one  chart  that  had  call

25 number s on  it  that  we  were  going  to  reference  that

1  could  possibly  have  gotten  into  that  with  the  Court  is

2  not  allowing  us  to  use,  but  furthermore,  we  didn't  ask

3  him  about  the  calls,  not  any  questions  about  the  calls

4  that  were  intercepted,  not  any  questions  about  which

5  ones  were  pertinent  and  not.

6          We  covered  all  of  that  with  Agent  Sergeant

7  Sakala.  To  now  start  doing  that  with  cross-examination

8  with  this  witness  is  inappropriate.  When  I  asked  him

9  questions  about  his  opinions,  I  asked  him  very

10 specifically,  tell  the  ladies  and  gentlemen  of  the  jury

11 what  evidence  presented  here  in  court  supported  your

12 opinion  and  limited  it  in  that  fashion.  So  the  notion

13 to  get  into  logs  that  are  not  before  this  jury  is

14 inappropriate,  way  beyond  the  scope  of  our  direct

15 examination.

16          THE  COURT:   I  sustain  the  objection.

17          MR.  MONTEMARANO:   Thank  you,  Your  Honor.

18                  (Back  in  open  court.)

19          THE  COURT:   Mr.  Montemarano,  how  much  longer  do

20 you  expect  to  be  with  this  witness?

21          MR.  MONTEMARANO:   Ten,  fifteen  at  the  most.

22 Hard  to  say.

23          THE  COURT:   Let's  take  an  afternoon  recess  until

24 20  of  4:00.

25                  (Jury  excused  at  3:24  p.m.)

```
 1                    (Off the record  at 3:24 p.m)

 2                    (On the record at  3:49 p.m. )

 3          THE COURT:  Ms. Merez is checking on the  jury.

 4          I wanted to  talk about  scheduling  issues .  I

 5  believe  there was a juror who  had a doctor 's

 6  appointment tomorrow morning    that won't permit us to

 7  start until  10:00 .  I'll  give you an update  in a

 8  minute .

 9          I'm going  to go to 5:00 today and Wednesday .  I

10  have a guilty  plea , so we can only  start  at 10:00  on

11  Thursday .  Friday , I'm probably  going  to start at 10:00

12  because  I have  a sentencing  that was set for  8:00  that

13  I'm going  to have  to move  to 9:00 .  Takes me  longer to

14  get dressed , so -- takes me a little  longer to get in,

15  so -- what is the government 's -- I want to be able  to

16  tell the  jury where we are .  Government 's estimation  of

17  how long  they're  going  to go?

18          MS. JOHNSTON:   I think  this is our last  witness ,

19  Your Honor .

20          THE COURT:   Okay .

21          MS. JOHNSTON:   We have to check  on some  exhibit s

22  and thing s.

23          THE COURT:   I've given you leave  to recall  him

24  for that Exhibit 1 , if you want to change  that  exhibit .

25          MS. JOHNSTON:   Just in general , make  sure we've
```

1 got everything in.

2        THE COURT:  From the defense perspective , how

3 much time do you think you're going to need for this

4 witness ?

5        MR. MONTEMARANO :  Finish with him tomorrow

6 morning , at some time tomorrow morning , I think , Your

7 Honor .

8        THE COURT:  All right .  Well , I'm going to tell

9 the jury that we're not really on time , but we're close

10 and --

11        MR. MONTEMARANO :  I'm sorry ?

12        MS. JOHNSTON:  We do have the issue of the

13 government 's motion in limine , and in terms of those

14 400 pages of transcripts .  I think it's now --

15        THE COURT:  Why don't we do this ?  Bea, am I

16 correct the jury can't come in until 10:00  tomorrow ?

17        THE CLERK:  Exactly.  Yes.

18        THE COURT:  Why don't we do this ?  Why don't you

19 come in at 9:15, and we'll slug out the remaining

20 issues on that , or 9:30.  No, 9:30 will be enough time ,

21 don't you think , to get that wrapped up?

22        MR. WARD:  And we'll go to 5:00 tomorrow ?

23        THE COURT:  We'll go to 5:00 tomorrow .

24        MR. MONTEMARANO :  How late do you want to go on

25 Friday , Your Honor ?

1       THE  COURT:   Probably  to  3:00 .   I'll  talk  to  the

2  jury  during  the  week .   I  don't  want  to  make  that  final

3  decision  now ,  but  I  don't  want  to  go  until  5  o'clock  on

4  Friday .

5       MR.  MONTEMARANO :   Your  Honor ,  also,  could  you

6  give  them  the  possibility  of     Monday  or  not ?

7       THE  COURT:   Monday ,  we're  going  to  have  a  charge

8  conference  at  2:00,  and  in  absence  of  flowing  some

9  other  cases  off  of  my  calendar ,  that 's  the  best  I  can

10  do.   And  if  we  have  to  pick  up  a  Monday  to  make  this

11  case  finish  on  time ,  it  would  have  to  be  Monday  the

12  7th.

13       MS.  JOHNSTON:   I'm  scheduled  to  be  out  of  town

14  that  day ,  Your  Honor .

15       THE  COURT:   Well ,  then ,  we  will  just  push  this

16  along  and  we  will  get  it  done .

17       MS.  JOHNSTON:   Your  Honor ,  the  other  thing  is  we

18  would  like  a  list  of  witnesses  by  order ,  including

19  their  dates  of  birth,  so  we  can  run  a  criminal

20  histories  if  need  be  from  the  defense  this  evening ,  so

21  we  can  be  prepared  to  start  their  case  tomorrow ,  since

22  Mr.  Montemarano  is  done .

23       MR.  MARTIN:   I'll  do  what  I  can  to  get  dates  of

24  birth .   I  have  given  the  government  notice  as  to  who  I

25  expect  to  call  tomorrow ,  Your  Honor ,  so  I'll  make  some

1 phone calls tonight .

2         MS. JOHNSTON:   It would help us very much to

3 know what order we're going in , not going from one

4 witness for Mr. Goodwin to one witness from Mr.

5 Martin .

6         THE COURT:   Collectively , the defense is

7 required to tell the prosecution , just like she had to

8 tell you , who the anticipate d witness es are for

9 tomorrow .  So , do that .  I don't care who's call ing

10 them , just do it.

11         MR. MONTEMARANO :   I can tell the Court with

12 regard to Ms. Martin , Mr. McKnett and I plan to start

13 with Mr.  -- Sergeant Sakala and call s.  I have issue d

14 subpoena s and they were present ed to Your Honor on

15 Thursday , but unfortunate ly didn't go out until

16 yesterday , returnable Tuesday of next week .  Those

17 three people are Matthew Shannon, a member of the DC

18 Bar ; Gilbert Williams , with whom Ms. Johnston is

19 imminent ly familiar ; and Marcia Jean West, like wise .

20         MS. JOHNSTON:   That would not be correct , Mr.

21 Montemarano .  I'm not imminent ly familiar with Mr.

22 Williams.   He may have written a letter to me.   I'm not

23 imminently -- that bring s up other issue s.   My concern

24 is we were suppose d to be in the defense case this

25 week , if it hadn't been for losing last Thursday .

1 THE COURT:  Why can't they be here  this week , Mr.

2 Montemarano ?

3        MR.  MONTEMARANO :  I thought  it would  be

4 appropriate  to give  these  people  enough  time .

5        THE  COURT:  Call  them  up and  ask  them  if they

6 can come  in early .  I don't  want  any empty  space .

7        MR.  MONTEMARANO :  I will  do that .

8        THE  COURT:  Let's bring  the  jury  in.  I will  see

9 you tomorrow  morning at  9:30.

10        MR.  WARD:  9:30?  I thought  you said  9:15, your

11 Honor .

12        THE  COURT:  I'm sorry ?

13        MR.  WARD:  I thought  you said  9:15.

14        THE  COURT:  Is half  an hour  going  to be  enough

15 to slug  this  out ?  It sounds  like  it should  be .

16        MR.  WARD:  9:30 is fine .

17        THE  COURT:  Make  it 9:30  sharp , not  9:40.

18        MR.  MARTIN:  I'll get  up early , Your  Honor , so I

19 don't have  to speed  to get  here .

20        THE  COURT:  I'm re-enforced, ready  for another

21 hour.  I've  taken  two  Tylenol , extra  strength , and  I'm

22 ready to  go.

23        Well,  I'm going  to give  the  jury  what  the

24 schedule  is, as best  as I can  tell  them  right  now, but

25 it would  be 10:00  tomorrow , 10:00  Thursday , and  9:00 --

1  10:00 Friday.  I might be able to do 9:30, if you trail

2  a sentencing that's set for 9:00, if you want to try to

3  do 9:30.  We might have a slight delay with that, so we

4  can get more testimony in.  Well, I'll give them that

5  schedule for the week.

6                    (The witness resumes the stand.)

7                    (Jury returns at 3:56 p.m.)

8        THE COURT:  Let me review with you the schedule

9  for the rest of the week as best I can tell you what it

10 is right now.  We'll go to about 5 o'clock today.

11 Tomorrow, we'll start at 10:00 and go to about 5

12 o'clock.  I am advised that it appears that the

13 government's last witness will be the one that's on the

14 stand now, and he should be finished tomorrow morning,

15 so we will be going into the defense case tomorrow.

16        On Thursday, we'll begin at 10:00, and on

17 Friday, I'm not finally resolved on this, it might be

18 9:30, and I'll try to see if I can get out earlier than

19 normal on Friday, but depending on how slow we're

20 going, I may have to go a little longer, but I will

21 give you an update on that as the week wears on, but

22 you should assume that tomorrow, Wednesday the 26th and

23 Thursday the 27th, that we're going to be going both

24 days from 10:00 to 5:00.

25        All right.  You may proceed.

1          MR. MONTEMARANO :   Thank you, Your Honor.

2          BY MR. MONTEMARANO :

3  Q.      When we broke, Detective  Eveler, we were talking

4  about negative  fingerprint  results with regard  to the

5  tests run on the evidence  in this matter; is that a

6  fair statement?   Correct, sir?

7  A.      We discussed it, yes.

8  Q.      You also took a DNA sample  from my client;

9  correct?

10 A.      I didn't  take a DNA sample  from anyone.

11 Q.      Law enforcement   did?

12 A.      Yes.

13 Q.      Pursuant  to a court order; correct?

14 A.      I don't know   if it was consensual  or court

15 ordered.

16 Q.      As a result  of the DNA testing, there were no

17 positive  results regarding Ms. Martin; is that correct?

18 A.      I don't recall .

19 Q.      During  the time  of your  investigation , there

20 were no controlled  buys or purchases regarding Ms.

21 Martin; were there?

22 A.      By whom?

23 Q.      By law enforcement .

24 A.      No.

25 Q.      You know what  a controlled  buy is; right?   We've

1   heard  testimony ?

2   A.        , I'm  somewhat  familiar  with  them .

3   Q.        Somewhat  familiar  with  them .

4            And  there  were  --  there  was  no  --  there  were  no

5   controlled  purchase s  or  anything  like  that  regard ing

6   Mr. King ; correct ?

7   A.        I'm  sorry ?  Purchase s  for  Mr. King ?

8   Q.        No  controlled  purchase s  for  Mr. King ; correct ?

9   A.        That 's  correct .

10  Q.        In  fact , before  his  arrest  in  Indianapolis , he

11  had  never  been  surveil led  at  Ms. Martin 's  home  or

12  anything  like  that ; correct ?

13  A.        Not  by  me .

14  Q.        Like wise , Mr. Philpot  had  never  been  seen  at  Ms.

15  Martin 's  home , had  he ?  Correct ?

16  A.        Not  by  me .  By  other  witness es .

17  Q.        By  law  enforcement ?

18  A.        No .

19  Q.        Mr. Brim  hadn't  been  seen  at  Ms. Martin 's  home ;

20  correct ?

21  A.        By  whom ?

22  Q.        By  law  enforcement .

23  A.        No .

24  Q.        There  weren't  any  --  strike  that .

25            And  Mr. Thurman  hadn't  been  seen  at  Ms. Martin 's

1  home by law enforcement ; had he?

2  A.      No.

3  Q.      Certain ly not Mr. Encarnacion , because he was

4  pretty much in custody from the beginning of your

5  investigation ; correct ?

6  A.      He was seen during the previous investigation .

7  Q.      How many time s?

8  A.      Once that I recall .

9  Q.      Once .  And Mr. Uriarte ?  Was he ever seen at my

10 client 's by law enforcement ?

11 A.      He wasn't seen outside of New York that I know

12 of by law enforcement .

13 Q.      And Mr. Echarte ?  He wasn't seen at my client 's

14 home , correct , by law enforcement ?

15 A.      That 's correct .

16       MR. MONTEMARANO :  Court 's indulgence , please .

17       No further question s ,Your Honor .  Thank you .

18       THE COURT:  All right .  Further cross ?

19       MR. MARTIN:  Thank you , Your Honor , with the

20 Court 's permission .

21                   **CROSS-EXAMINATION**

22       BY MR. MARTIN:

23 Q.      Good afternoon , Detective .

24 A.      Good afternoon .

25 Q.      You're the case agent , and so you've summarize d

1  the evidence for the jury; correct?

2  A.      I've answered the questions put to me.

3  Q.      That was in an effort to summarize the evidence

4  that has been admitted; correct?

5  A.      I would presume so.

6  Q.      You would presume so.

7          You were sitting here through most of the trial;

8  right?

9  A.      Every day.

10  Q.     And you've been involved in this investigation

11  since what year?

12  A.     2002.

13  Q.     2002. So, it would be fair to say that you're

14  familiar with this case better than most people; would

15  that be an accurate statement?

16  A.     I would guess so.

17  Q.     Now with respect to Mr. Goodwin, there was no

18  surveillance of his home; is that correct?

19  A.     None that comes to mind.

20  Q.     And there was no Title 3 wiretap on his phone;

21  is that correct?

22  A.     That's correct.

23  Q.     And with respect to the organizational chart

24  that we're looking at -- you put that together; right?

25  A.     Yes.

1 Q.      Did you have any help doing that?

2 A.      Yes.

3 Q.      Who helped you?

4 A.      Our analyst did some of the work at my

5 direction.

6 Q.      And with respect to your testimony here today,

7 you've not had an opportunity, other than me seeing you

8 in the hallway and saying hi or good day, you and I

9 have never really spoken about this case; have we?

10 A.      Once or twice, you asked to have some titles

11 returned to Mr. Goodwin, and you asked about the --

12 some drug analysis.

13 Q.      That's correct.  But in terms of your testimony,

14 I haven't had an opportunity to prep you or prepare you

15 for the questions that I'm going to ask you, have I?

16 A.      You didn't ask.

17 Q.      Is it your testimony, Detective Eveler, that if

18 I had asked, you would have been more than willing to

19 sit down and talk to me about this case?

20 A.      I don't know.  I've never -- I don't know I've

21 ever been asked.  I think one time in my whole career a

22 defense attorney has spoken to me.

23 Q.      Now, with respect to the charts -- let's move

24 straight to this chart here, that I believe is the

25 telephone chart.  It's sort of a global -- I wish --

1  let's see.  Can you see that, sir?

2  A.      Yes.

3  Q.      Did you put that together?

4  A.      Yes.

5  Q.      This chart here has the contact frequencies on

6  it; correct?

7  A.      That's correct.

8  Q.      And when we talk about contact frequencies,

9  we're not talking about actual phone conversations; are

10  we?

11  A.      Just the ones that would have occurred -- the

12  telephone contacts that occurred during the wiretap.

13  During the course of the wiretap, those would be

14  included in there, along with DNR contacts that

15  occurred prior to the wiretap.

16  Q.      Understood.  But a contact would be a phone

17  message left on an answering machine?

18  A.      Could be.

19  Q.      A contact could also be a ring of three or four

20  times with no answer; couldn't it?

21  A.      Could be.

22  Q.      So when you -- what you have here on this chart,

23  for example, in the case of Learley Goodwin, 856

24  contacts between November, 2002, and June, 2004.

25  Wouldn't you agree that that's misleading?

1  A.      No.  We've -- I think I explained  it to the  jury

2  when we went  over that  that  it includes  -- all it shows

3  is telephone  contacts.  It does  not show the nature of

4  the call.  It does  not show the  duration  of the call,

5  and it does  not show the content  of the call.

6  Q.      Given that, wouldn't it have been more accurate

7  to say that  over that  period  of time, that  there were

8  43 phone  conversations  between  Paulette  Martin  and

9  Learley  Goodwin?  Wouldn't  that have been  a more

10 accurate  depiction  of what's  going on here?

11 A.      Well, that  gives  you a small  window.  We were

12 monitoring  her phone  lines  for approximately  85 days.

13 That's a very  small  window  given  that  this conspiracy

14 is charged  from  1997 to 2004.

15 Q.      I agree.  That's a small  window.  There were

16 10,000  contacts, right?  Over 10,000.  Isn't  that the

17 testimony  we heard?

18 A.      That's probably  a pretty  good  ballpark.

19 Q.      And out  of 10,000, 856 contacts  is a small

20 window  as well, to use your  own words; isn't  that

21 correct?

22 A.      I'm sorry, could  you repeat  that?

23 Q.      Out  of 10,000, wouldn't  you agree  that  856 is a

24 relatively  small  number?

25 A.      Those  are the numbers  that  I chose  to put on

1  there as I believe the -- your client used many more

2  phones than were included on that chart.

3  Q.     And 43 is a number that's even smaller than 856;

4  wouldn't you agree?

5  A.     I agree that 43 is less than 856.

6  Q.     You said that my client had several phones and

7  you've listed a number of phones here, and I've put

8  notes on this, and that's the only reason I'm not

9  showing this to the jurors.

10     MR. MARTIN:   But if I might approach, Your

11  Honor.

12     THE COURT:   You may.

13         MR. MARTIN:    Thank you, sir.

14         **CROSS-EXAMINATION**

15     BY MR. MARTIN:

16  Q.     Here where it says Learley Goodwin.  Would you

17  agree with me that there are seven phone numbers listed

18  there --

19  A.     Yes.

20  Q.     -- under his name?

21  A.     Yes.

22  Q.     Thank you, sir.  And this is the same chart

23  we've been talking about, Chart No. 2; right?

24  A.     Yes.  That's a smaller version of it, yes.

25  Q.     With respect to these seven phone numbers, you

1 didn't introduce any records of who these phone numbers
2 were listed to; did you?
3 A.     Some were stipulated to, I believe.  I can check
4 my list here and see if any were stipulated to.
5 Q.     Well, is it your testimony -- are you telling
6 the ladies and gentlemen of the jury  that all seven of
7 these phone numbers are in Mr. Goodwin's name?
8 A.     I didn't say that.
9 Q.     And you're also not able to tell the ladies and
10 gentlemen of the jury  that out of these 856 contacts
11 that you've listed here, all of those contacts were
12 made by Learley Reed Goodwin.
13 A.     No, I cannot, just like I cannot say that every
14 telephone call made utilizing Ms. Martin's hard line
15 were made by her.  Some were made by Mr. Goodwin and
16 others.
17 Q.     You've also listed here Tiffany Vessels at the
18 top of this chart.  And from the period, just so you
19 can see, sir -- can you see that?  I think this is Ms.
20 Vessels right here.  Can you see that, sir?
21 A.     Yes, I can see it.
22 Q.     You've listed here from July 27, 2003, to May
23 26, 2004, 22 contacts between Ms. Vessels and Ms.
24 Martin; correct?
25 A.     That's correct.

1  Q.      That's about one a month; correct?

2  A.      I don't know how it breaks down.  I didn't do a

3  monthly -- it may have been one in July and four two

4  months later.

5  Q.      I said about.  Approximately.  Would you agree?

6  A.      Approximately, sure.

7  Q.      Approximately.  Almost exactly -- I mean

8  assuming that it was one a month, if we make that

9  assumption.

10  A.      I don't even know how I'm supposed to answer

11  that.

12  Q.      All right.

13          But you've listed Tiffany Vessels here, and you

14  don't really know who used Ms. Vessels phone to make

15  those calls; do you?

16  A.      I do on a few occasions.  She was intercepted on

17  that phone.

18  Q.      She was intercepted?

19  A.      So was your client.

20  Q.      And the intercepts on that particular phone when

21  Ms. Vessels was talking to Ms. Martin, that was for

22  directions to Ms. Martin's house; right?

23  A.      I'd have to go back.

24  Q.      You'd have to go back and look at them.  That's

25  fair.  If you don't recall, that's --

1          Now, there were also some telephone  contacts
2 that you talked about in Chart No. 4 regarding Mr.
3 Goodwin's friends and associates making phone calls
4 after November 25, 2003. Do you remember that?
5 A.      Yes.
6 Q.      Would you agree that if somebody is arrested,
7 that one of the first things they're going to do is
8 call their family?
9 A.      Could be.
10 Q.      Would you agree that one of the first things
11 their family is going to do is call a lawyer?
12 A.      Possibly.
13 Q.      Would you agree that one of the first things
14 that the lawyer is going to do for a family member is
15 call a bondsman?
16 A.      Sure.
17 Q.      Based on your experience, the fact that somebody
18 is calling a lawyer or a bondsman, that in and of
19 itself doesn't mean that they're -- that there's
20 anything unusual about that; is there?
21 A.      Those calls weren't between Mr. Goodwin. They
22 were calls -- the calls were surrounding Paulette
23 Martin and her involvement, and I don't believe she's a
24 relative of Mr. Goodwin.
25 Q.      You believe that Ms. Martin is a relative of Mr.

1 Goodwin?

2 A.      I believe that she is not a relative of Mr.

3 Goodwin.

4 Q.      But she's a friend; is she not?

5 A.      Sure.

6 Q.      And from the different information that you

7 have, you've established that they're pretty close

8 friends; right?

9 A.      Sure.

10 Q.      Okay.  Now, you've also got this Chart 5 that

11 Madam Government had shown you earlier.  I'm not sure

12 which one that is.  I think that's the one that showed

13 the various activities of Mr. Thurman.  Do you remember

14 this?

15 A.      Yes.

16 Q.      And I don't know if you've had occasion to count

17 the number of times Mr. Goodwin's name appears on this

18 chart.  Have you?

19 A.      No.

20 Q.      Have you had occasion to count the number of

21 times that Mr. Thurman's name appears on this chart?

22 A.      No.

23 Q.      Did you know that Mr. Thurman worked for Mr.

24 Goodwin at Lobo's?

25 A.      Yes.

1   Q.      Did you check to see if he was a bona fide

2   employee there?

3   A.      As -- you said check to see if he's a bona fide

4   employee?  You mean with wage and records or?

5   Q.      Yeah.

6   A.      I think during one of the -- either he or one of

7   the other -- for some reason, I believe he may have had

8   a DC salesman's license or a card -- identification

9   card associating him with Lobo's.

10  Q.      Exactly.  A business card that you saw at some

11  point in your investigation; right?

12  A.      I -- that's what I'm thinking of.

13  Q.      And as such, he had reason to be at Lobo's;

14  correct?

15  A.      I think he had multiple reasons to be at Lobo's,

16  yes.

17  Q.      Well, assuming that you think he's there for

18  drug dealing and assuming that I think that he's there

19  for some legitimate purpose, we would agree that he has

20  a reason for being there; correct?

21  A.      He could be there for dual purposes.

22  Q.      He could be there for dual purposes, exactly.

23  With respect to that dual purpose analysis, would you

24  also agree that Mr. Thurman's going to Texas in Lobo's

25  vehicles could have been for dual purposes?

1  A.      I have nothing to support that.

2  Q.      Well, isn't it a fact that there were some

3  people who drove with Mr. Thurman to and from Texas,

4  who as far as you know, had nothing to do with drug

5  trafficking?

6  A.      Yes.  Some people went along for vacation -- for

7  the ride.

8  Q.      For the long drive; correct?

9  A.      Sure.

10  Q.      And when he went to Texas, you have absolutely

11  no way of knowing whether or not he engaged in any

12  legitimate business while he was there; do you?

13  A.      Who, Mr. Thurman?

14  Q.      Yes, Mr. Thurman.

15  A.      I have nothing to support that he did.  I don't

16  have any records or anything to support that.

17  Q.      And the reason you don't have any records to

18  support that is because Michael Thurman didn't tell you

19  that he was doing anything legitimate in Texas; is that

20  correct?

21  A.      I don't believe I recovered any documents or saw

22  any documents that coincided with those trips that

23  showed he engaged any legitimate business while in

24  Texas.

25  Q.      Please listen to the question, sir.  Michael

1 Thurman never told you that he was going to Texas to

2 conduct legitimate business; did he?

3 A.     I don't recall that, no.

4 Q.     And with respect to the Fed Ex packages that

5 came from Texas to Maryland, you had no way of knowing

6 what was in that Fed Ex package; do you?

7 A.     That's correct.

8 Q.     In fact, for all you know, that Fed Ex package

9 could have contained dealer license plates; correct?

10 A.     Could have contained many things.

11 Q.     Could have contained many things. Would you

12 concede that one of the many things it could have

13 contain were dealer license plates?

14 A.     Sure.

15 Q.     Would you also concede that the evidence showed

16 that at least one of the vehicles, if not more, that

17 Mr. Thurman used on his trips to and from Texas was

18 registered to Lobo's Discount?

19 A.     The tag was a Lobo's tag. I don't know where

20 the vehicle was technically registered.

21 Q.     Did Mr. Thurman ever mention to you that one of

22 the things that he did while in Texas was also -- was

23 meet with other auto discount dealers?

24 A.     Did he mention that?

25 Q.     Yeah, did he?

1  A.      Not that I recall.

2  Q.      Did he mention to you that one of the things

3  that he might have been doing in Texas was picking up

4  auto supplies?

5  A.      Drive to Texas to pick up auto supplies?

6  Q.      Yeah. Did he mention that to you?

7  A.      No.

8  Q.      Did he mention to you that one of the things

9  that he might have been doing was arranging for

10 meetings so that Mr. Goodwin would be able to ship back

11 auto supplies from Texas?

12 A.      No.

13 Q.      In fact, when Michael Thurman contacted you, he

14 contacted you through his mother; right?

15 A.      Yes.

16 Q.      And at that time, she indicated to you that

17 Michael Thurman was ready to turn himself in; right?

18 A.      She made some indication.

19        MS. JOHNSTON:   Objection.   Objection.

20        Calls for hearsay.

21        BY MR. MARTIN:

22 Q.      It was your understanding when you went there

23 that Michael Thurman was going to turn himself over to

24 you; right?

25 A.      He was making himself available for us to speak

1  to him.  I don't think  he wanted to be arrested.

2  Q.      He didn't want to be arrested, and when you said

3  that he made himself available  for you to  speak to him,

4  what you mean is he was going to tell you what he

5  thought  you wanted to  know; right?

6  A.      No.  I think he was going to tell us he was

7  going to answer the questions we asked him.

8  Q.      And you didn't ask him about any legitimate

9  business  purposes in Texas.  You asked him about drugs;

10  right?

11  A.      That's correct.

12  Q.      And Michael  Thurman never told you -- I withdraw

13  that.  Disregard that, please.

14        Did Michael  Thurman admit to you that he was

15  involved in drugs before he met Mr. Goodwin?

16  A.      Yes.

17  Q.      Did Michael  Thurman tell  you that he was selling

18  drugs out of Anacostia  Road?

19  A.      I don't remember  if we were speaking about  where

20  he was distributing, but I do believe  he mentioned drug

21  trafficking  prior.

22  Q.      Did Michael  Thurman tell  you that he was engaged

23  in the distribution  of drugs even after Mr. Goodwin was

24  arrested?

25  A.      I know he was arrested  with drugs after  Mr.

1 Goodwin was arrested.

2 Q.      Then he was still, as far as you know, still

3 involved in the drug trade after Mr. Goodwin was

4 incarcerated; right?

5 A.      He was still in Texas trying to arrange the

6 pickup of narcotics that Mr. Goodwin had sent back to

7 El Paso.

8 Q.      That he told you Mr. Goodwin had arranged for

9 the shipment back from El Paso?

10 A.     Well, I think we had some corroborative evidence

11 of that.

12 Q.     You don't know that yourself because you didn't

13 have any wires on him or anybody else at the time; did

14 you?

15 A.     No, I'm pretty certain of what happened.

16 Q.     You're certain because that's what Michael

17 Thurman told you; right?

18 A.     Certain because that's what we heard during the

19 wiretap, that's what Mr. Thurman told us, that's what

20 the documents show us, that's what the other evidence

21 shows us.

22 Q.     At that time, you didn't have any wiretaps on

23 him; did you?

24 A.     No, we didn't.

25 Q.     You didn't have any wires on Mr. Thurman; right?

1  A.      No, he was intercepted on Paulette Martin's

2  line, but we didn't have a wire on him specifically.

3  Q.      So again, the only reason you know that is

4  because Michael Thurman told you that; isn't that

5  correct?

6  A.      The only reason I know what?

7  Q.      The only reason you know that drugs were being

8  sent from Texas to Maryland for Mr. Goodwin is because

9  Michael Thurman told you that; right?

10  A.      No.  Other people told me that.

11  Q.      Well, the other people -- I withdraw it.

12          The other people who told you that, would it

13  have included his girlfriend who drove back with him?

14  A.      Whose girlfriend?

15  Q.      Michael Thurman.  He had two women who had

16  driven with him.  Do you remember that?

17  A.      Yes, I remember that.

18  Q.      Did those ladies tell you that he went down

19  there to collect drugs?

20  A.      I've only spoken to one of them very briefly.

21  That wasn't part of the conversation.

22  Q.      Michael Thurman told you that he knew Tiffany

23  Vessels; did he not?

24  A.      Yes.

25  Q.      Did he tell you whether he went to Texas with

1 Tiffany Vessels?

2 A.     I don't recall that. He did mention he made

3 several trips, and some were very specific and some he

4 had trouble recalling all the specific details.

5 Q.     Also, as an employee of Lobo's, did Mr. Thurman

6 tell you whether or not he had access to credit cards

7 or debit cards that might have been in Mr. Goodwin's

8 name that were issued through Lobo's?

9 A.     No.

10 Q.     Did you ask him?

11 A.     Not specifically, no.

12 Q.     So with respect to these packages that are sent

13 from Texas back here to Maryland, you don't really know

14 who paid for that; do you?

15 A.     No, I just know whose bank account it was

16 reflected in.

17 Q.     Now, Mr. Thurman, I think it was established,

18 rented a car with the help of a fellow by the name of

19 Julio Martinez.  Do you remember that?

20 A.     Yes.

21 Q.     There was nothing during your investigation that

22 indicated that Mr. Martinez rented that car to Mr.

23 Thurman at the insistence or request of Mr. Goodwin; is

24 there?

25 A.     No.

1 Q.      In fact, Mr. Thurman arranged for that by

2 himself, as far as you know; right?

3 A.      I really don't know.

4 Q.      Well, did Mr. Thurman tell you that Mr. Goodwin

5 had asked Julio Martinez to rent him a car?

6 A.      No, I don't think it came up.

7 Q.      Rodney Green.   Mr. Thurman and Rodney Green are

8 friends; correct?

9 A.      I don't know what their relationship is.   I

10 don't know if it's a business or a friendship.   I don't

11 know.

12 Q.      But you do know that they traveled from Houston

13 to BWI together; right?

14 A.      Yes.

15 Q.      And do you know that because Mr. Green told you

16 that or do you know that because Mr. Thurman told you

17 that?

18 A.      I know that based on the airline records and Mr.

19 Thurman.

20 Q.      But we've already established here that when

21 someone is boarding an aircraft, they have to show ID;

22 right?

23 A.      This post-September 11.

24 Q.      But they don't show ID all the time, if I recall

25 the testimony, that of one of the witnesses; correct?

1  Is that your recollection as well?

2  A.     Yes, but I don't know if he qualified that, if

3  they carry -- if they had -- I don't think he qualified

4  that in any way.  I think it was a -- he wasn't

5  specific about that.

6  Q.     Well, let's be a little more specific.  We've

7  seen here photos of people who have driver's licenses

8  with one photo and different names.  Do you recall

9  that?

10  A.     Yes.

11  Q.     So would it be fair to say that based on your

12  experience, it's not unusual for a person to present an

13  ID with somebody else's name on it?

14  A.     I don't think it's usual.

15  Q.     Based on your experience as a police officer,

16  it's not unusual; is it?

17  A.     You don't see it as much as you would think --

18  apparently as much as you would think.  I don't see it

19  that often.  I mean, I see it, but it's not an everyday

20  occurrence.

21  Q.     Let's talk about in the world of deception and

22  trafficking drugs.  Do you see it often in that

23  environment?

24  A.     You see it.  It's not -- you're asking for

25  generalization and sometimes you see it and sometimes

1 you don't.

2 Q.      Well, I'm asking for your opinion, based on your

3 status as an expert.

4 A.      Yes, I do see it.

5 Q.      So, we really don't know if Rodney Green was on

6 board that aircraft except for the fact that Michael

7 Thurman told you that; right?

8 A.      Yes.

9 Q.      And Michael Thurman had the use of different ATM

10 cards while he was in Texas; right?

11 A.      He had the use of his ATM card while he was in

12 Texas.

13 Q.      That's right.  His ATM card, and it was his

14 family members that he was visiting in Texas; right?

15 A.      He testified he had family in Houston.

16 Q.      And he had friends in Houston; right?

17 A.      I would guess so.

18 Q.      In fact, all the drug connections in Texas were

19 contacts that Michael Thurman had; correct?

20 A.      No.

21 Q.      Well, did you hear Michael Thurman testify that

22 he told Mr. Goodwin that he knew where to get the

23 cocaine cheap in Texas?

24 A.      From Houston, not from El Paso.  El Paso was Mr.

25 Goodwin's connection.

1  Q.      So it's your recollection that the El Paso

2  connection was Mr. Goodwin's connection even before he

3  met Michael Thurman?

4  A.      Yes.

5  Q.      Do you have any evidence, other than Michael

6  Thurman telling you, that Mr. Goodwin was transporting

7  goods from El Paso illegal or otherwise to Maryland

8  prior to meeting Michael Thurman?

9  A.      Do I have other evidence of that?

10  Q.      Yes.

11  A.      Yes.

12  Q.      Let's move on to November 25, 2003. Do you

13  remember that?

14  A.      Yes.

15  Q.      That's the incident where Mr. Goodwin was

16  arrested in Mr. Dorsey's car.

17  A.      That vehicle -- it was registered to a Mr. Dor

18  -- it wasn't registered to Raynard Dorsey.

19  Q.      That's correct. In fact, it was a female,

20  wasn't it, with a last name Dorsey; wasn't it?

21  A.      I'm not certain on the first name.

22  Q.      We'll agree that the last name was Dorsey;

23  right?

24  A.      I believe so.

25  Q.      It was a Cadillac; right?

1  A.      I believe so.

2  Q.      Did you have occasion to speak to Mr. Dorsey

3  subsequent to that arrest?

4  A.      Yes.

5  Q.      Did you have occasion to talk to Mr. Dorsey

6  prior to that arrest?

7  A.      No.

8  Q.      Do you know where Mr. Dorsey is now?

9  A.      He's in the Federal Bureau of Prisons in Terre

10  Haute, Indiana.

11  Q.      With respect to people being outside of the

12  jurisdiction, Park Smith wasn't in this immediate area,

13  was he, before coming here to testify?

14         MS. JOHNSTON:   Objection as to the relevance.

15         MR. MARTIN:   I withdraw the question, Your

16  Honor.

17         BY MR. MARTIN:

18  Q.      We will agree that the car was not registered to

19  Mr. Goodwin; correct.

20  A.      That's correct.

21  Q.      We'd also agree that the car was primarily used

22  by Mr. Dorsey prior to Mr. Goodwin having it; correct?

23  A.      No, I can't agree to that.  I don't have any

24  information to support that.

25  Q.      Well, you spoke to Mr. Dorsey; right?

1 A.      Yes.

2 Q.      Mr. Goodwin never told you that was his car; did

3 he?

4 A.      I didn't speak to Mr. Goodwin about that matter.

5 Q.      You've spoken to many people and nobody told you

6 that was Mr. Goodwin's car; did they?

7 A.      I don't know that I've asked anyone about that

8 car.

9 Q.      Now, with respect to the drugs that were seized

10 from that car on that particular date, my recollection

11 is that that was in a false bottom container.  Do you

12 recall that?

13 A.      It was in some sort of false container.  A

14 bottle.

15 Q.      Like a Pepsi bottle or something like that?

16 A.      I believe so.

17 Q.      And the Pepsi bottle would have been made out of

18 plastic; right?

19 A.      Yes.

20 Q.      Have you actually seen the bottle?

21 A.      I saw it here in court.

22 Q.      You saw it in court?  And I think also you had

23 testified earlier about fingerprints and how hard it

24 was to lift prints from plastic.  That was your

25 testimony; wasn't it?

1  A.      I believe we were talking about plastic bags at

2  the time.

3  Q.      Well, let's talk about plastic bottles now.   Is

4  it hard to get usable prints from a plastic bottle?

5  A.      Depends on the circumstances.

6  Q.      Actually, usable isn't the right term.   What is

7  the term that law enforcement uses with prints that --

8  A.      Latent of value.

9  Q.      Of value.   It depends on the circumstance.   If

10  somebody touches a bottle and places it in a particular

11  place and it's not wiped down, the oils from the ridges

12  on your fingers would leave prints; would they not?

13  A.      Not of value.   It would depend.   It depends on

14  how you place it, it depends on how touch it, it

15  depends on how oily your hands are.   It depends on the

16  weather conditions, it depends on many things.   You

17  have to -- if you have to set it down, if you smear it

18  as you set it down, if your fingers slide, you've

19  devalued that latent.

20  Q.      That's why we're not only talking about prints

21  when we're dusting.   We're also taking impressions, I

22  guess, of the thumb as well as the fingers and maybe

23  the sides of the fingers as well.   Would that be

24  accurate?

25  A.      The sides of fingers are not --

1 Q.      In other words, you would roll the finger when

2 you're taking a print; wouldn't you?

3 A.      Yes.

4 Q.      The reason you'd roll the finger is just for the

5 reasons you've stated.  Sometimes when somebody touches

6 a bottle, they don't touch it flat, they may touch it

7 at an angle; right?

8 A.      That's not my understanding as to why we roll a

9 print.

10 Q.      Do you roll the print?

11 A.      To get a good impression  of the pad of the

12 finger, the center portion where the rolls, loops are

13 in the center portion of the finger.

14 Q.      Aside from the central portion of the

15 fingertips, what other portions of the hand are rolled,

16 based on your experience?

17 A.      I routinely do the palm and the thumb.

18 Q.      The palm and the thumb?

19 A.      Yes.

20 Q.      If you grab the bottle, would those parts of the

21 hand be involved in picking up the bottle?

22 A.      If you use your entire hand and not your

23 fingertips.

24 Q.      If you use your fingertips, you would probably

25 leave prints; would you not?

1  A.       You could.

2  Q.       Okay.  Well, let's not quibble.  Can we agree

3  that if you were able to link that bottle to Learley

4  Reed Goodwin, that that would be compelling evidence?

5  A.       Sure.

6  Q.       But that wasn't done in this case; was it?

7  A.       No.  We don't have a latent of value from that

8  bottle.

9  Q.       Now, let's go to Drugs 31, which was at 36

10 Farragut Place, Northwest, Washington, D.C.; remember

11 that?  The bag that the officer testified was found in

12 the cabinet in the basement?  Were you here for that?

13 A.       I was here for that.  There was a lot of drug

14 exhibits.  I'm trying to differentiate between the

15 different drug exhibits.  The kilo in the basement in

16 the file cabinet?

17 Q.       Correct.

18 A.       Yes.

19 Q.       Remember that?

20 A.       Yes.

21 Q.       Again, that was also in a plastic container;

22 wasn't it?

23 A.       It was wrapped in plastic wrap, I believe.

24 Q.       Plastic wrap?  Can we agree that some mediums

25 are better than others for getting prints of usable --

1  of value, I think, as you put it?

2  A.      Sure.

3  Q.      Can we agree on that?

4  A.      Yes, we can.

5  Q.      For example, it might be harder to get prints

6  off of wood than it would be to, perhaps, paper?  Or

7  vice versa?

8  A.      It would depend on the finish of the wood.

9  Q.      That's true.  Or maybe it would be harder to get

10 prints, if not impossible, off cloth, but it would be

11 easier to get it off of paper.  Could we agree on that?

12 A.      Possibly.

13 Q.      Would we agree that plastic is one of the better

14 mediums for getting prints of value?

15 A.      It depends.  Plastic is a petroleum product and

16 fingerprints degrade when in contact with plastic over

17 a long period of time.

18 Q.      Agreed.

19         Can we also agree that, like the bottle in the

20 car, if prints could have been taken off of that

21 plastic wrapping that had Mr. Goodwin's fingerprints on

22 it, that that would have been compelling evidence?

23 A.      Sure.  There's a lot of things that would be

24 compelling evidence.

25 Q.      I'm just talking about that particular kilo.

1 Can we agree that if his fingerprint s were found on

2 that , that would be something that you would put

3 forward before the ladies and gentlemen of the jury ?

4 A.      Sure .

5 Q.      That wasn't done in this case ; was it ?

6 A.      There were no latent s of value .   The Saran wrap

7 was very wrinkle d, so there was no latent s of value .

8 Q.      Did you dust it ?

9 A.      No .

10 Q.      Did you send it to the lab ?

11 A.      I've seen the wrapper .

12 Q.      Did you send it to the lab for testing ?

13 A.      No , I did not .

14 Q.      So you really don't know that ; do you ?

15 A.      Don't know what ?

16 Q.      That there were no print s of value on the bag ?

17 A.      We have a report say ing there 's no latent s of

18 value .

19 Q.      So in other words , there are no print s of

20 Learley Reed Goodwin that you know of on that bag ;

21 right ?   On that wrap ping ?

22 A.      There are no late nts of value on any item s of

23 evidence in this case for Mr. Goodwin .

24 Q.      Let 's talk a little bit more about Farragut

25 Place , Northwest .   Did you actual ly go to 36 Farragut ?

1  A.       No.

2  Q.       At no time before or after, you've not been

3  there?

4  A.       No, I have been there afterwards.

5  Q.       Did you have occasion to go in any of the

6  bedrooms?

7  A.       No, I've never been inside the front door of

8  that address.

9  Q.       Do you know who was living there at the time?

10  A.       Do I know who was living there?

11  Q.       Yeah, who was living at 36 Farragut on the day

12  that the search warrant was executed?

13  A.       Mr. Goodwin.

14  Q.       Was anyone else living there?

15  A.       Tiffany Vessels, I believe.

16  Q.       Anyone besides Mr. Goodwin and Ms. Vessels?

17  A.       Couldn't tell you.

18  Q.       Don't know?

19  A.       Don't know.

20  Q.       What about Anacostia Road? We heard a lot about

21  the apartment, the multiple dwelling unit there. Did

22  you have occasion to go there?

23  A.       Yes.

24  Q.       And there were four units; right?

25  A.       Yes.

1  Q.     And I think we heard some testimony about

2  Apartment No. 4, which was on the second floor on the

3  right-hand side?

4  A.     That's correct.

5  Q.     And you've been in that apartment; right?

6  A.     No.

7  Q.     You've never been in there?

8  A.     No.

9  Q.     Did you have occasion to talk to Michael Thurman

10  about that apartment?

11  A.     Yes.

12  Q.     Did Michael Thurman tell you that he had access

13  to that apartment?

14  A.     He said he had stayed there before.

15  Q.     So he told you he had a key; right?

16  A.     I'm assuming he had some method of entry.

17  Q.     Did he tell you that Tiffany Vessels also had a

18  key to that apartment?

19  A.     As a matter of fact, I was there looking for

20  Tiffany Vessels at that apartment.

21  Q.     Did you have occasion to speak to anybody else

22  in that building?

23  A.     Yes.

24  Q.     Who was that?

25  A.     The resident of apartment -- I believe it was

1 three, directly across the hall.

2 Q.      Would that have been Margaret Battle?

3 A.      Could have been.

4 Q.      It was a female?

5 A.      Yes, it was a male and a female.

6 Q.      Was the other -- was the male a fellow by the

7 name of Pops?  Do you recall?

8 A.      Don't recall.

9 Q.      Don't recall?  Did you have occasion to go to

10 Lobo's Auto Discount over on Florida Avenue?

11 A.      Yes.

12 Q.      Did you have occasion to talk to any of the

13 people there?

14 A.      Yes.

15 Q.      When you went over to Lobo's Auto Discount, was

16 Mr. Goodwin there at the time?

17 A.      No, he had been arrested.

18 Q.      He had already been arrested.  Did you see any

19 drug activity taking place there at the time?

20 A.      No.  Mr. Goodwin had already been arrested.

21 Q.      Well, that's not what I asked you.  I asked you

22 whether or not you saw any drug activity, so I guess

23 the answer is no.  Is that your answer?

24 A.      No, I said no.

25 Q.      When you went to Lobo's, was Michael Thurman

1 arrested  yet?

2 A.      Yes.

3 Q.      Do you know Michael  Jackson?

4 A.      He's a singer.

5 Q.      No, not that Michael  Jackson.  Michael  Jackson

6 who worked for Lobo's.

7 A.      I'm familiar  with the name.

8 Q.      Was he there at the time?

9 A.      No, he was not.

10 Q.      He wasn't.  With respect  to the drugs that were

11 found -- well, let's not jump ahead.  Were there any

12 drugs found at Lobo's?

13 A.      Yes, in 2002.

14 Q.      And were those found in the same kind of hidden

15 containers?

16 A.      The drugs were recovered  in hidden  containers,

17 yes.

18 Q.      Do you recall  who was there at the time that

19 that search took place in 2002?

20 A.      There were a number of people there.

21 Q.      Mr. Goodwin wasn't there; was he?

22 A.      No, he was not.

23 Q.      And with respect  to those containers, they were

24 cans; right?

25 A.      Yes.

1  Q.      And you recall whether or not there were any

2  fingerprint s of value taken from any of those can s?

3  A.      The agent testifi ed -- I'm trying -- I can't

4  recall what his response was.  He did testify about the

5  process ing.

6  Q.      Based on your recollection , there was no

7  testimony that Learley Reed Goodwin 's fingerprint s were

8  found on any of those can s, were there ?

9  A.      As I said earlier , I do not have any latent s of

10 value in this case associate d with Mr. Goodwin on any

11 item s of evidence .

12 Q.      Would you agree with me that fingerprint s can

13 also be found or taken from paper ?

14 A.      Yes .

15 Q.      And these items that you pick ed up from

16 Farragut , that you've mark ed as Goodwin 1 through 33.

17 There was a glass bowl taken from Goodwin -- I'm sorry ,

18 from Farragut .  Do you remember that ?

19 A.      Yes , the one locate d next to the kilo .

20 Q.      Right .  And would you agree with me that glass

21 is a good medium also for taking fingerprint s or

22 lift ing fingerprint s?

23 A.      Sure , if it's smooth .

24 Q.      If it's smooth .  There was also a Tanita digital

25 scale ?

1  A.        A Tanita scale.

2  Q.        How do you say that?

3  A.        Tanita.

4  Q.        Digital scale, and what is that scale made from?

5  A.        Some sort of plastic, it appears.

6  Q.        Plastic again?

7  A.        Yes.

8  Q.        Like the plastic of the Pepsi bottles that we

9  talked about earlier?

10 A.        I'm not sure if it's the same chemical

11 composition of that plastic, but yes, it's some sort of

12 plastic.

13 Q.        And there was also baking soda, right, by the

14 bread box?

15 A.        Yes.

16 Q.        And cardboard, we've already -- well, we haven't

17 established, but cardboard being a wood product similar

18 to paper, would you agree that it, too, was a good

19 medium for taking fingerprints?

20 A.        Sometimes.

21 Q.        And no fingerprints were taken of any of those

22 boxes of baking soda; right?

23 A.        There are no latents of value associated with

24 your client on any items of evidence in this case.

25 Q.        Did you label these exhibits or was that done by

1 government  trial  counsel ?

2 A.     Did I label  them ?

3 Q.     Yeah .   In other words , these  exhibit s are

4 labeled  Goodwin  1 through  and 36, and they're  from

5 Farragut  Place .  Did you label  those  or was that done

6 by someone  else ?

7 A.     I didn't  participate  in the label ing process .

8 Q.     I'm just  try ing to get , you know , the role s

9 clear .  I know you made  the chart s.  I was wond ering if

10 you also  labeled  the exhibit s.

11 A.     No , I assisted .  I assisted  -- when we went

12 through  and mark ed the exhibit s, I assisted  with that .

13 Q.     When you say you assisted , did you actual ly say ,

14 well , this is from Farragut , this belong s to Goodwin ?

15 A.     No .  I said these  -- when you go through  the

16 evidence , there 's a sort ing process  on -- because  you

17 can't  cart  everything  in here , so we said , well , you

18 know , this piece  of paper  is so-and-so's phone  number ,

19 this is this , this is why we care  about  this .  This is

20 why we care  about  that .  That was my participation  in

21 that  process .

22 Q.     The reason  I ask is because  if we --

23     MS.  JOHNSTON :  Objection  to counsel 's giving  his

24 reason s for do ing it .

25     THE  COURT :  Over ruled .

1          BY MR. MARTIN:

2  Q.      Let's move to Oglethorpe .   The evidence  that was

3  seize d  from  Oglethorpe  -- well , before  we  get  to  that .

4          Oglethorpe  -- 846  Oglethorpe   Street , Northeast

5  was  the  home  of  Larry  Lane ; right ?

6  A.      That 's  correct .

7  Q.      And  there  were  several  items  taken  from

8  Oglethorpe   Street ; correct ?

9  A.      That 's  correct .

10 Q.      But  none  of  those  items  are  listed  as  Lane  1  or

11 Lane  2  or  Lane  3 .   They're  all  listed  as  Oglethorpe  1,

12 2,  3,  et  cetera ; correct ?

13 A.      That 's  correct .

14 Q.      So  my  question  is :   Did  you  decide  to  label

15 these  Oglethorpe   as  opposed  to  Lane , or  did  somebody

16 else  do  that ?

17 A.      Did  I  make  that  choice ?

18 Q.      Yes,  sir .

19 A.      No .

20 Q.      So  somebody  else  did  that ?

21 A.      Yes .

22 Q.      But  you  made  this  chart  here  put ting  Learley

23 Reed  Goodwin  and  Paulette  Mart in  in  the  center ?

24 A.      Yes .

25 Q.      With  respect  to  Oglethorpe , as  long  as  we're

1  summarizing the evidence for the jury, there were

2  toolboxes found there; weren't there?

3  A.       That's correct.

4  Q.       There were, what, four toolboxes; right?

5  A.       At least.

6  Q.       And three were dusted for fingerprints; right?

7  A.       At least -- at least three.

8  Q.       At least three, and the fourth one, the small

9  one, was not; right?

10 A.       I recall that one was not -- a smaller one was

11 not.

12 Q.       Again, Mr. Goodwin's fingerprints weren't found

13 on any of those toolboxes; were they?

14 A.       There were no latents --

15         MS. JOHNSTON:   Objection.

16         THE COURT:   Sustained.

17         MR. MARTIN:   Court's indulgence while I'm

18 looking at my notes.

19         BY MR. MARTIN:

20 Q.       You had said earlier that El Paso, Texas was Mr.

21 Goodwin's connection, if I heard you correctly.   Is

22 that an accurate statement of your testimony?

23 A.       Yes.

24 Q.       Do you have any surveillance of Mr. Goodwin in

25 El Paso, Texas?

1 A.      No, I do not.

2 Q.      Did you tell Michael Thurman that it would go

3 better for him if he cooperated?

4 A.      No.

5 Q.      You've testified, if I remember correctly, that

6 big Mike is Mike Thurman.

7 A.      Tall Mike is Mike Thurman, Cadillac Mike is Mike

8 Thurman, and I believe one of Michael Thurman's phone

9 numbers was listed next to Big Mike.

10 Q.     Are you certain of that, that Big Mike and Mike

11 Thurman are the same person?

12 A.     I'm not sure that there aren't two big Mikes.

13 Q.     Would you also agree that Mr. Goodwin had --

14 besides Lobo's, he had other legitimate businesses,

15 such as a restaurant?  Would you agree with that?

16 A.     No.

17 Q.     The restaurant was not a legitimate business?

18 A.     Whatever front business a drug trafficker uses,

19 I don't know that that makes it legitimate if you're

20 using it to launder your drug proceeds.  I would not

21 consider a business front a legitimate business,

22 although it may conduct some "legitimate" business.

23 Q.     Let's assume for a minute that Mr. Goodwin is

24 presumed innocent.  Would you indulge me in that?

25 A.     He is presumed innocent.

1  Q.       Is a restaurant  a legitimate  business ?

2  A.       It can be .

3  Q.       Again , with the same presumption  that Mr.

4  Goodwin  is innocent  as he sits here .

5          MS. JOHNSTON:    Objection , Your Honor .

6          MR. MARTIN:   Is an Auto Discount Store ?

7          THE COURT:   Overruled .

8          BY MR. MARTIN:

9  Q.       Is an auto discount store a legitimate  business ?

10  A.       It could be .

11  Q.       Are rental properti es a legitimate  business es?

12  A.       They can be .  They can also be fronts for money

13  laundering .

14  Q.       Well , do you know how Mr. Goodwin came into

15  possession  of his property ?

16  A.       Would you be more specific ?

17  Q.       Did you know that he inherited  property from his

18  father ?

19  A.       No .

20  Q.       And Lobo's being a business , irrespective  of

21  whether  you think it's legitimate  or not , I think

22  you 've already testifi ed that there were several people

23  there at the time that you went there ; is that correct ?

24  A.       That's correct .

25  Q.       Would it be safe to assume  that in running a

1  business, sometimes people have to use the telephone?

2  A.      Yes.  In many types of business, you have to use

3  a telephone.

4  Q.      Would it also be safe to assume that because Mr.

5  Goodwin is associated with that business, that people

6  might call him there looking for him at that number?

7  A.      Sure.

8  Q.      And that would include close friends; would it

9  not?

10  A.      Possibly.

11  Q.      Court's indulgence.

12          MR. MARTIN:  Your Honor, I think I'm finished

13  with this witness.

14          THE COURT:  All right.

15          MR. MARTIN:  Thank you for your attention.

16          MR. HALL:  Thank you, Your Honor.

17                    **CROSS-EXAMINATION**

18          BY MR. HALL:

19  Q.      Detective, I'm going to ask you to step down so

20  that we can look at Chart No. 1 for a few minutes.

21  Let's set this up in front of the jury for a few

22  minutes.  Why don't we put Chart No. 1 on there.

23          Do you still have your laser pointer?

24  A.      No.  I gave it back to the government.

25  Q.      That's okay.  We'll go without it.

1          MS. GREENBERG:    Here it is.

2          BY MR. HALL:

3   Q.     Let me ask you a couple of question s.   First of

4   all, the individuals that are on the top row across

5   this chart -- you have what is referred to a box called

6   the Texas cocaine; is that correct?

7   A.     That's correct.

8   Q.     Okay.   And then you have another box called the

9   Maryland cocaine; correct?

10  A.     That's correct.

11  Q.     And then one called California cocaine; right?

12  A.     Right.

13  Q.     And then one called heroin, which I guess we

14  could also call New York heroin; right?   Because this

15  gentleman up here came from New York; is that right?

16  A.     However, Gwen Levi and William Turner resided in

17  Maryland.

18  Q.     All right.

19  A.     That's the basis for that was --

20  Q.     My understand ing is you were the individual who

21  put this chart together; is that correct?

22  A.     Yes.

23  Q.     Now, would it be fair to say that this whole

24  group of people from all the way across here are people

25  who you allege supplied Ms. Martin and Mr. Goodwin; is

1  that correct ?

2  A.      Yes .

3  Q.      Okay .  And it would also be fair to say that

4  there are presumably people above them ; is that

5  correct ?

6  A.      Yes , some of them have been arrested , yes .

7  Q.      Okay .  Needless to say , none of these people are

8  the ones who grew the coca plants or the poppy plants ,

9  are they ?

10  A.      No .

11  Q.      To the best of your knowledge ; right ?

12  A.      No , Columbian  nationals .

13  Q.      So there 's -- presumably , there are people above

14  this level of suppliers ; correct ?  They supplied Mr .

15  Campbell  or supplied Mr . Encarnacion , et cetera ; is

16  that right ?

17  A.      Yes .

18  Q.      Okay .  And down here at the bottom of the chart ,

19  you have a box called distributors/facilitators ;

20  correct ?

21  A.      Yes .

22  Q.      In that box , we have a number of individuals  who

23  are on trial in this case , including my client ; is that

24  right ?

25  A.      Yes .

1  Q.      Okay.  Would you also agree, presumably, that

2  since you have been listed as distributors, that there

3  are, presumably, people who would be underneath this

4  chart; is that correct?

5  A.      Yes.

6  Q.      Okay.  Would you also agree with me that out of

7  the evidence that is presented to the jury, you cannot

8  give a name for anybody who Mr. Whiting allegedly

9  distributed to, can you?

10 A.      That's correct.

11 Q.      Okay.  Now, if you don't mind, if we could take

12 a look at another chart, Chart No. 4.

13 A.      Which one is that?

14 Q.      Chart No. 4 is the one of the phone calls that

15 were made after Mr. Goodwin's arrest.  I think it's the

16 -- I see it there.

17 Q.      All right.  Now, I want to ask you a couple of

18 questions about this.  First of all, this chart covers

19 approximately a seven-day time period from the date of

20 Goodwin's arrest up here on the 25th down to December

21 2nd; is that correct?

22 A.      Yes, from the date of his arrest to the date of

23 his -- he bonded according to court documents.

24 Q.      All right.  Now, let me ask you this:  Is --

25 these are all taken from the pin register; is that

1  correct?

2  A.      That's correct.

3  Q.      Okay.  And is -- let me ask you this:  Is this

4  every single phone call that Ms. Martin made during

5  that seven-day period, or just the ones that were

6  selected by the trial team?

7  A.      Just the ones that were selected.

8  Q.      Okay.  All right.  And let me ask you about a

9  couple of them.  The first one, which has Mr. Whiting's

10 name on it, is up here on 11/26, that's about four

11 minutes until 1:00 in the morning; is that right?

12 A.      That's right.

13 Q.      Okay.  And would it be fair to say that you

14 cannot tell from looking at the records that went into

15 making this chart, you do not know if Ms. Martin and

16 Mr. Whiting actually talked on that occasion; do you?

17 A.      I can look and see if there's a duration for

18 that call.

19 Q.      Okay.  That's not on this chart, the duration of

20 any of these calls; is that correct?

21 A.      That's correct.

22 Q.      And as to the next call involving -- and which

23 Mr. Whiting is listed, again, we have one the following

24 day at 9:07; correct?

25 A.      That's correct.

1 Q.     Then again, we do not have a duration to that

2 call; is that right?

3 A.     That's correct.

4 Q.     Then when we move on down further, we have the

5 following day, the 27th of November, we have a call at

6 -- is that ten minutes past midnight?

7 A.     Yes.  There's two other ones.

8 Q.     All right.  Let's back up to the other two

9 first.  11/26 at 23:07, that would be seven after

10 11:00 in the evening; is   that correct?

11 A.     That's correct.

12 Q.     Okay.  And while we don't know the duration of

13 that call, we do know that that call could not have

14 been for -- did not exceed a minute; did it?

15 A.     Correct.

16 Q.     Because there's another phone call placed

17 between Ms. Martin and Mr. Whiting's number in the same

18 minute; is that correct?

19 A.     Correct.

20 Q.     All right.  And when we move on down to the last

21 two phone calls to Mr. Whiting on the 27th, again, we

22 have a phone call at ten minutes past midnight, and

23 that one was for, we know, no more than a minute; is

24 that correct?

25 A.     The first one?

1  Q.      Yes.

2  A.      Yes.

3  Q.      Okay.  And then another phone call placed one

4  minute after that; is that correct?

5  A.      Correct.

6  Q.      Okay.  Now, let me ask you this:  I take it in

7  selecting the calls you were going to place on this

8  chart, you selected a number of calls that went to

9  people who you allege to be co-conspirators of Ms.

10 Martin; is that correct?

11 A.      Some are.

12 Q.      Some are.  Okay.  You also selected a number of

13 phone calls that went to a law firm; is that correct?

14 A.      That's correct.

15 Q.      There's nothing illegal about calling a law

16 firm; is there?

17 A.      I guess it depends on the advice given by that

18 law firm; but ostensibly, no.

19 Q.      And are you aware that that particular law firm

20 does more than just criminal law?  They also do

21 domestic law?

22 A.      I know they do civil and criminal.

23 Q.      Okay.

24 A.      I'm more familiar with their criminal.

25 Q.      That would make sense because you are a police

1 officer and you deal mostly in the criminal field; is

2 that right?

3 A.     That's correct.

4 Q.     And there's also phone calls to the bail

5 bondsman.  Again, there's nothing illegal about calling

6 a bail bondsman; is there?

7 A.     No.

8 Q.     Okay.  All right.  Now, let's take a look at

9 this chart, which is CH-2.  CH-2 would be the --

10      THE COURT:   Mr. Hall?

11      MR. HALL:   Yes, Your Honor.

12      THE COURT:   Are you going to be much longer with

13 him?

14      MR. HALL:   No, I'm not.

15      THE COURT:   I don't want to rush you.

16      MR. HALL:   No more than ten minutes, but I know

17 that --

18      THE COURT:   I have a conference call with

19 parties in another case at 5:00.

20      MR. HALL:   Okay.

21      THE COURT:   We will go to Chart 2 tomorrow

22 morning.

23      MR. HALL:   That will be fine.

24      THE COURT:   That's the one you wanted to go to,

25 Chart 2?

1          Ladies and gentlemen  , we'll  see  you  back  at  10

2  o'clock  tomorrow , and  counsel  and  the  parti es  should  be

3  here  at  9:30.

4                    (Jury excused at 5  :00 p.m. )

5                    (Off the record at 5:00 p   .m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **CERTIFICATE**

2

3       I, Tracy Rae Dunlap,   RPR , CRR , an Official Court

4  Reporter for the United States District Court of

5  Maryland, do hereby certify that I reported, by machine

6  shorthand, in my official capacity, the proceedings had

7  and testimony adduced upon the Jury Trial Proceedings

8  in the case of UNITED STATES OF AMERICA versus PAULETTE

9  MARTIN, et al, Criminal Action Number    RWT-04-0235 on

10  July 25, 2006.

11

12      I further certify that the foregoing 2    26 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17      In witness whereof, I have hereto subscribed my

18  name, this 24th day of April 2008.

19

20

21                    _____

22                    TRACY RAE DUNLAP, RPR, CRR
                      OFFICIAL COURT REPORTER
23

24

25