1          UNITED STATES DISTRICT COURT OF MARYLAND
                    SOUTHERN DIVISION

2
------------------------x
3  UNITED STATES OF AMERICA  :
            Plaintiff        :

4                            :
                             :
5  vs                        :Criminal Action:    RWT-04-0235
                             :
6                            :
   PAULETTE MARTIN, et al    :
7          Defendants.       :
------------------------x

8

9                      Wednesday, July 26, 2006
                       Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11 Proceeding before the HONORABLE ROGER W. TITUS, United
   States District Judge, in courtroom 4C, commencing at
12 9:40 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS   THE PROCEEDINGS AS RECORDED AND
15      REQUESTED .

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD  SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR           (301) 344-3912
25 Official Court Reporter

```
1                           I N D E X

2                         CROSS    REDIR      RECROSS

3  Thomas  Eveler          36      161        203

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                            Page

23 Reporter's Certificate                     251

24 Concordance                                252

25
```

```
 1          THE COURT:   Good morning.   Please be seated.
 2          MR. MITCHELL:   Your Honor, before you begin, if
 3  I could address Your Honor.   I know you don't need
 4  anymore headaches, but I'm going to give you another
 5  one.  Last week Mr. Park, from the U. S. Attorney's
 6  office, called me about trying to schedule a scheduling
 7  conference with Judge Messitte, and he wanted to do it
 8  at 10 o'clock this morning, and I told him I couldn't
 9  do that.  He said we'll get back to you.  He just
10  walked in this morning and said, we're having the
11  scheduling conference right now at 9:30.
12          THE COURT:   9:30?
13          MR. MITCHELL:   I don't know  -- I am comfortable
14  with Mr. Montemarano arguing on my behalf.
15          MR. MARTIN:   What about your client?
16          MR. MITCHELL:   I certainly think that Mr. Bynum
17  would have no problem, but I don't know what --
18          THE COURT:   How long is this going to take?
19          MR. MITCHELL:   I don't know.  Probably not long
20  at all.  I can probably be back before -- probably ten
21  minutes.
22          THE COURT:   Well, let me -- why don't you go
23  right through the back door and go quickly, and I'm not
24  going to -- we're not going to hear any evidence and
25  we're not going to bring the jury in or anything like
```

1 that.  All I want to do is address the government 's

2 motion in limine about the recordings, any other

3 preliminary matters people have, and some scheduling

4 issues.  I can do the scheduling issues first, which

5 don't have any legal significance whatsoever, while

6 you're out if you and your client are willing to have

7 that proceed on that basis.

8        Talk to your client.  I'll tell you this.  I

9 will not make a decision on the motion without hearing

10 from you.  What I wanted to tell you is I am not going

11 to make a decision on the motion in limine without you

12 being here.  I will make no decision on anything, and I

13 will be sure you can be heard.

14        Is your client willing to have you absent

15 yourself for a few minutes for that reason?

16        MR. MITCHELL:   Yes.

17        THE COURT:  All right.  Let me take up a

18 scheduling issue.  On Friday I have a sentencing

19 scheduled for 9:00 that I think is going to be

20 relatively straightforward and uncontroversial, and I

21 could start at 9:30 and do a 9:30 to 2:30 with no lunch

22 break -- just two breaks, if that would be preferable

23 for those who would like to not be here at 5 o'clock on

24 a Friday.

25        Any concerns about that?

1          MR. HALL:   That's fine.

2          MR. MARTIN:   That's great.

3          THE COURT:   Okay.   I apologize   for being a few

4 minutes late, but I got this little reply memo which I

5 wanted to peruse before I came on the bench.

6          Let me hear from Ms. Johnston on the motion in

7 limine.

8          MS. JOHNSTON:   Your Honor, quite frankly we have

9 received from defense counsel on Friday final

10 transcripts numbering approximately 410 pages for 88

11 telephone calls that they plan to play.   As a

12 preliminary matter, if they're going to use the CDs

13 that we provided them and play those calls, I don't

14 think we have any issue in terms of authenticating the

15 recordings.

16          There is, however, a problem in terms of the

17 transcripts.   We do not know who prepared those

18 transcripts.   We cannot agree to the accuracy of those

19 transcripts.   Two, we don't know who is going to be

20 identifying the voices in those calls, which also is a

21 prerequisite before those calls can be introduced.

22 Putting aside that -- those preliminary matters that I

23 think will have to be addressed by defense counsel,

24 Agent Sakala cannot get on the stand and authenticate

25 those transcripts or those voices, because he did not

1 prepare those transcript s, nor has he done -- as he

2 testifi ed in his direct examinatio n, he listened to the

3 calls we introduced four or five and some times a half

4 dozen time s or more before finalizi ng the transcript s

5 and making voice identification s. He also did any

6 number of other thing s, including listening to calls

7 before and after to get a sense for what was going on

8 at the time . So , that 's -- those are preliminary

9 issue s.

10       More important ly, the call s that defense counsel

11 intend to introduce are hearsay . Each and every one of

12 these call s constitute hearsay . They are not

13 admissible unless they fall within some exception to

14 the hearsay rule . The government was permitted to play

15 portion s of call s or call s under the coconspirator s

16 exception under the circumstance of where it was a

17 defendant that it was a statement by that defendant

18 against that defendant 's interest . The government

19 wasn't permitted to play those call s only to the ex tent

20 that we could articulate to the court that the call s

21 came in as admissible hearsay .

22       There was an objection made early on concern ing

23 some of the statement s made by non-coconspirator s in

24 those conversation s, and as we set forth in the case

25 law and as the court found , those non-coconspirator s'

1  statement s were admissible  to put in context either a

2  defendant 's statement , which would be an admission

3  against  interest , or a coconspirator 's statement  under

4  the exception  for coconspirator 's statement s.

5       What we have here is not the government  going

6  forward .  The defense have indicated , for example , that

7  they want to play the first eight call s.  Seven of the

8  first eight call s are conversation s between  Paulette

9  Martin and Martha Jean W est concern ing Ms. Martin

10 wanting  Ms. West to send her various  clothing  in

11 different  brands  and different  size s to her house .

12      THE COURT:  Wait a minute .  Ms. Johnston , first ,

13 Detective  Sakala has been permitted  to give opinion s as

14 to the mean ing of words used in the conversation s which

15 the government  had the right to select  and play ed, and

16 in a number  of those conversation s the terminology  used

17 in his opinion  to communicate  matter s pertain ing to a

18 drug transaction  were , among other s, ticket s, shirt s,

19 T- shirt s, dress es, and so forth .  He gave his opinion

20 as to the mean ing of those conversation s that you

21 play ed based not on an examination  in isolation  of a

22 particular  call but on his examination  of all the call s

23 from which he was able to, in his -- with his

24 experience  and expertise  make a judgment  of what were

25 the mean ing of the words used during this particular

1 conversation , and his opinion was that in these

2 particular conversation s select ed a T-shirt was n't a

3 T-shirt and so forth and so on.

4      If I understand correct ly, what the defense

5 want s to do is it want s to examine the expert 's opinion

6 by asking him did he take into account what -- did you

7 take into account this conversation which did in fact

8 involve the purchase of a T-shirt or a dress or ticket

9 to a ball or whatever .

10      Now , if -- just ignore that we're in a criminal

11 case . In any case involving an expert , an expert 's

12 opinion is not bind ing upon a jury . An expert 's

13 opinion is only as good or bad as the fact s under lying

14 it , and an expert 's opinion and the basis for it can be

15 challenge d by somebody say ing , did you take into

16 account this ? Or did you take into account that when

17 you gave an opinion that this is green , not red .

18      Why is it not appropriate in the context of the

19 defense theory , which is that these were legitimate

20 call s about ticket s and so forth , to show that there

21 indeed were conversation s?

22      MS. JOHNSTON:   Well , they cross -examine d Agent

23 Sakala , and they have no authority --

24      THE COURT:   They did the cross-examination  with

25 the benefit of the transcript s only of the ones that

1  the government  selected.

2        MS. JOHNSTON:   Your Honor, that's not the

3  government's fault.

4        THE COURT:   Understood.  I'm going to slap them

5  around.  Don't worry.

6        MS. JOHNSTON:   I'm not interested in the court

7  slapping them around, quite frankly.

8        THE COURT:   I'm being facetious.

9        MS. JOHNSTON:   I'm interested in making sure

10  that what is done here is what is, in the government's

11  opinion, appropriate.  On cross-examination they pulled

12  out the logs and they asked him questions about any

13  number of calls in those logs, and he admitted on

14  cross-examination that there were some call that is had

15  do with legitimate transactions  involving clothes.

16  Some calls that had to do with the entertainment

17  business.  Although he didn't say it was legitimate

18  entertainment, he said it wasn't, because in his

19  opinion they used drug proceeds.  So on

20  cross-examination, they asked him questions concerning

21  whether or not there were in fact calls that were

22  legitimate and whether or not those calls affected his

23  opinion, and he said they did not.

24        THE COURT:   Well, put it this way.  The jury has

25  not, however, had the benefit of seeing the recording

1 that he says was legitimate and that he disregarded it

2 for whatever reason he wanted to give in terms of it

3 being a legitimate versus an illegitimate transaction.

4         MS. JOHNSTON: They don't get them in -- these

5 conversations, what they want to introduce them for is

6 to say that there were engaged -- Ms. Martin was

7 engaged in a legitimate business of clothing sales.

8 That's why they want to get them in. It's not to

9 impeach Agent Sakala. Agent Sakala has said there are

10 these calls and I have listened to them and they

11 haven't changed my opinion. They cross-examined him

12 about that. Now, in their case to introduce calls that

13 Ms. Martin could testify -- Ms. Martin can get on the

14 stand and say, I was engaged in legitimate clothing

15 deals with Martha Jean West and that -- she has every

16 right to do that to refute our interpretation, but she

17 does not have the right to just put calls before this

18 jury which are hearsay calls.

19         There's no foundation for those calls, and they

20 wouldn't be coming in for the purpose of impeaching

21 Agent Sakala, because Agent Sakala has already said

22 that there were those calls but they did not affect his

23 opinion in this area. They could have played those

24 calls with him and asked him, well, did this call

25 affect you or not? And he says no, it didn't affect

1  him.  But now to introduce those calls in their case in

2  chief is their opportunity to present evidence not to

3  impeach a witness on the basis of those calls --

4      THE COURT:  Well, it seems to me that if

5  Sergeant Sakala is going to be further examined about

6  these calls, it's going to be in the nature of

7  additional cross-examination.

8      MS. JOHNSTON:  We would move to exclude it.

9  They're not entitled to call him back.  Can they now

10  call Michael Thurman and say, now we heard the

11  government's case, we want to ask for more questions.

12      Can they recall Agent Eveler after we've

13  finished our case and they put on some defense

14  witnesses and recall him?  That's what --

15      THE COURT:  I don't agree that's necessarily the

16  case, but let me ask you this.  Let's suppose that

17  Sergeant Sakala testified that call 10, referring to

18  tickets, was in his judgment a call involving the sale

19  of drugs -- Mr. Mitchell has.  Returned welcome back --

20  and that that's the only call in which tickets are

21  allegedly used as a proxy for the sale of drugs, but

22  there's ten other calls involving sales of tickets to a

23  Broadway show -- ten more.  His opinion is that this

24  one call was about the sale of drugs, but there's ten

25  other calls involving tickets to a legitimate Broadway

1  show .

2        Why is it not proper , on cross-examination , for

3  the government  to play those -- for the defense to play

4  those tapes and to test the strength of hi s opinion on

5  that ?

6        MS. JOHNSTON:   They could have done that in

7  cross-examination  and in fact did it in

8  cross-examination  and using the log s --

9        THE COURT:   I'm very unhappy that the transcript

10  wasn't prepare d a long time ago .  I'm not happy about

11  that .

12        MS. JOHNSTON:   The problem is , it's not comi ng

13  in now to attack his credibility  because they

14  question ed him on cross-examination  and he admitted

15  there were other call s.   Now , to let them play these

16  call s in their case , it will be received as the jury --

17  will mis lead the jury .  The jury is not going to be

18  able to differentiate  that the .3 week s now after Agent

19  Sakala 's finish ed day s of cross-examination , that what

20  they're day doing now is just recross ing him again .

21  They had an opportunity  then .  They in fact went into

22  those issue s using the log s, which was a choice they

23  made instead of play ing the call s which they could have

24  done .  And now to say , well , okay .

25        In your case , you can recall this expert and you

1  can cross-examine him but not to impeach him, mind you,

2  because he's already acknowledged those calls existed.

3  We take it out of the context of him giving -- looking

4  at it merely as impeachment.

5       If he had given a prior statement and they have

6  cross-examined him and he had admitted he made a prior

7  statement in the grand jury that this call means this,

8  they wouldn't be allowed to admit his grand jury

9  testimony, and that's what they're doing here is

10 seeking to introduce calls to impeach his testimony

11 when he has already -- they've asked him -- on

12 cross-examination they asked him about whether or not

13 there were other calls.  He said yes, there were other

14 calls but those other calls did not affect his opinion

15 about these calls.  They're not entitled then, in their

16 case, to introduce those calls.

17       It's the same as any other kind of impeachment.

18 You're not allowed to introduce that as impeachment.

19 It's not coming in for any other reason at this point.

20 But it's even beyond that.  The calls they're talking

21 about here are not calls in relation to when Agent

22 Sakala made that statement.  Many of these calls are

23 with people that Agent Sakala didn't testify about any

24 of those conversations, and there's no foundation for

25 them.  You can't just get the calls in without laying a

1  proper  foundation .  They're  replete  with  hearsay .

2  Somebody  has  to  lay  that  foundation ,  and  Agent  Sakala

3  is  not  the  person  to  do  it .

4       THE  COURT:   All  right .  Let  me  hear  from  the

5  defense .  Mr.  Montemarano ?  Mr.  Ward ,  you've  been

6  standing  there .  Do  you  want  to  go  first ?

7       MR.  WARD:   I  have  a  lot  to  say ,  Your  Honor ,

8  which  I'm  sure  comes  as  a  surprise .  Let  me  say  this ,

9  first  of  all .  I  was  prohibited  from  using  the  -- not

10 the  transcript s  but  the  log s  with  respect  to  a

11 telephone  call  -- a  particular  telephone  call  when  I

12 went  to  cross -examine  Mr.  Sakala  -- Detective  Sakala  --

13 Sergeant  Sakala .  I'm  sorry .

14       One  particular  call  that  I'm  concerned  about  is

15 the  call  in  which  he  opine d  that  when  Ms.  Martin  said

16 something  about  my  girl  having  -- my  client  having  a

17 hammer  that  she  was  going  to  cap  somebody  or  whatever

18 the  statement  was .  He  opine d  that  that  meant  she  was

19 carrying  a  gun .

20       The  call  that  I'm  referring  to  specifically  is  a

21 call  by  Ms.  Martin  at  a  later  time  saying  to  somebody ,

22 I  was  really  kidding .  I  was  joking  when  I  jokingly

23 said  that  she  was  carrying  a  gun .

24       MS.  JOHNSTON:   Your  Honor ,  I  don't  mean  to

25 interrupt  Mr.  Ward  --

1          MR. WARD:   I have not finished yet.

2          MS. JOHNSTON:    We have --

3          MR. WARD:   I have not finished yet.

4          THE COURT:   Ms. Johnston --

5          MS. JOHNSTON:   I would like to know the call

6 number.

7          THE COURT:   I can tell you right now we're not

8 going to play every single call unless I have some

9 understanding, call by call, as to how it's a proper

10 call to play.

11          MR. WARD:   Well, I think it's --

12          THE COURT:   You want to play a call that would

13 place in context the opinion that you say is wrong

14 about the firearm; correct?

15          MR. WARD:   Correct.

16          THE COURT:   That's one of these calls.

17          MR. WARD:   Now, I don't have a transcript, and I

18 don't intend to use a transcript, and in my opinion, my

19 view is I don't need a transcript.  The transcript is

20 only an aid to the jury and is not evidence of itself.

21          THE COURT:   Is the call you're referring to

22 transcribed or not?

23          MR. WARD:   I didn't transcribe it.

24          THE COURT:   I have a big transcript here that

25 Mr. McKnett --

1          MR. WARD:   I don't know .   If it is transcribe d

2   by the government , we will let them know , but it's call

3   2284 .

4          THE COURT:   All right .   Well , I think I

5   understand  your  position .

6          Let me get anybody else , because we've got to

7   get the jury going here .

8          MR. WARD:   That's all I want to do.

9          THE COURT:   I understand what your position is.

10          MS. JOHNSTON:   Your Honor , that's a call -- call

11   2284 is not in the 400 page s that have been submitted .

12          MR. WARD:   Okay .

13          THE COURT:   What was the call number ?   2284, you

14   said ?

15          MR. WARD:   Yes .   I think it's an A line but I 'm

16   not sure .

17          MR. MONTEMARANO :   Initial ly , Your Honor , I

18   speak , Detective -- Sergeant Sakala is in the

19   courtroom , and I would ask that he be excluded , at

20   least for my remark s.   I have no question that he may

21   well have been present and discuss ed what Ms.

22   Johnston 's view is, but I think it would be better if

23   he were to leave while the defense --

24          THE COURT:   All right .   Sergeant Sakala , you're

25   invite d to get a cup of coffee .

1          MR.  MONTEMARANO :   Thank  you , Your  Honor .

2          Ms.  Johnston  provides  the  court  a  heated

3  discussion  of  why  she  believes  these  calls  are  not

4  admissible , but  at  no  time  does  she  address  with

5  specificity  the  claims  made  by  the  defense  in  its

6  response  or  the  very  apt  analogy  the  court  used

7  regarding  one  call  taken  in  isolation  when  there  are

8  perhaps  ten  other  calls .

9          THE  COURT:   I  don't  know  what  it  is , but , yeah .

10          MR.  MONTEMARANO :   That 's  what  Your  Honor  used

11  for  an  analogy  or  for  a  descriptive  inquiry  is  exactly

12  what  we  have .   We  have  Sergeant  Sakala  repeatedly

13  talking  about  tickets  meaning  drugs , and  we  have  dozens

14  and  scores  of  calls  discussing  shows  and  a  list  of

15  entertainers  that  is  sort  of  a  who's  who  in  urban

16  American  Hip  Hop  music  and  with  a  small  mixture  of  Soul

17  and  Funk .

18          We  have  numerous  calls  about  clothing  that

19  Detective  Sakala  has  determined , and  all  kinds  of

20  clothing , not  just  one  particular  item  socks , socks ,

21  sock , socks .   Every  kind  of  clothing .   Your  Honor  has

22  already  spoken  to  that .   And  we  have  dozens  and  scores

23  of  additional  calls  discussing  the  clothing , discussing

24  sizes .

25          Let  me  speak  with  specificity  to  the  problems

1 with the government 's position .  Initial ly, the

2 government  claim s that we have problem s with

3 identification  of call er s.  Well , that would not be

4 true if we were to call a participant  in the call .

5 Marsha Jean West  is under subpoena .  Gilbert Williams

6 is under subpoena .  It is my understand ing, although

7 not I do not wish to speak for Mr. McKnett , but so we

8 can put all the argument s related to each other in one

9 easily discern ed and understood  area, it is my

10 understand ing that Ms. Ali intends to take the stand

11 and speak to the call s in which she participate s.  That

12 is the bulk of these call s.  There will be

13 authentication by a participant   from the stand .

14 Sergeant  Sakala is plain ly able to do so.

15      While the government  perhaps did not perceive it

16 as such when we were cross- examining the good sergeant ,

17 we nail ed him down and foreclose d his flight from the

18 position of , I know who these people are and I listened

19 to them repeat edly.  They cannot  stand up here now and

20 say he's all of a sudden  suffered  a sudden case of

21 amnesia and does n't know who these people are and

22 does n't know these call s which he 's listened to

23 repeat edly.  Not to put too fine a point of on it , but

24 the defense in this case -- not just the seven of us

25 but all of us, and I will speak to this with more

1  authority  than  anyone  else  because  I  was  discovery

2  counsel  and  I've  represent ed  the  lead  defendant  for

3  over  two  year s.

4         The  defense  counsel  has  been  made  aware

5  pain fully  aware  by  the  court  and  Ms.  Scherer  about

6  expense s  being  incurred  in  this  case ,  and  for  that

7  reason  we  have  limited  thing s  that  we  might  have  want ed

8  to  do .  This  matter ,  for  the  first  time  in  my

9  experience ,  which  goes  back  before  this  courthouse  was

10  opened ,  was  obligate d  to  budget  a  non- capitol  case .  As

11  a  result ,  we  did  not  prepare  transcript s  because  that

12  would  have  result ed  in  our  tran scribing  twice  as  many

13  call s  as  the  government  transcribe d.  They  provided  to

14  us  a  mass  of  transcribe d  call s,  one s  that  they  might

15  use .  These  we've  had  on  CD  --  I  burn ed  out  a  laser

16  printer  print ing  a  portion  of  those ,  A.  B,  then  we

17  received  the  great er  mass  of  the  ones  they  intend ed  to

18  call .  It  was  only  at  that  point  that  we  were  able  to

19  discern  which  ones  would  be  of  interest  to  us .

20         We  start ed  to  do  that,  and  then  narrow ed  that

21  analysis  to  the  specific  call s  which  we  had  transcribe d

22  which ,  un fortunate ly,  run  seven  dozen  and  400-some

23  page s.  We  could  have  will y-nill y  transcribe d

24  everything .  It  would  have  not  been  reasonable  or

25  appropriate  for  us  to  do  so ,  and  we  therefore  under took

1 to get the specific ones  transcribe d.  I can tell you

2 as an officer of the court -- I'm going to speak to Mr.

3 McKnett , because Harry and I have talk ed about this .

4 There are , I would say , in the mass of transcript s you

5 received , perhaps a quarter of the calls we could use .

6          THE COURT:  All right .  Let me say this , Mr.

7 Montemarano .  I do not intent to get --

8          MR. MARTIN:  Your Honor , may I say something

9 brief ly?  Your Honor , I'm nowhere near to being done .

10          THE COURT:  Let me say what I've said before

11 occasional ly like this :  Please don't snatch defeat

12 from the jaws of victory .

13          MR. MONTEMARANO :  Fair enough .

14          THE COURT:  I'm try ing to get this resolve d.

15          MR. MONTEMARANO :  I'll lea ve all of that alone .

16 Bottom line :  This is 703. He stood up here and said

17 -- and maybe he should n't have , and maybe Ms. Johnston

18 took him to the wood shed after he did , but he said , "I

19 KNOW WHAT THESE MEAN TO A MORAL CERTAINTY ."  Ms.

20 Dun lap, you can put that in capital s like in E-mail

21 shout , because I just raise d my voice .  I'm not yell ing

22 at Your Honor or Ms. Johnston or Detective Sakala .  He

23 had no question .  He has led with his chin , with all

24 due respect , Your Honor .  It is incumbent upon us to

25 attempt to demonstrate the error of his opinion .

1          THE  COURT:   All  right .

2          MR.  MCKNETT :   Your  Honor ?

3          THE  COURT:   Yes .

4          MR.  MCKNETT :   I'm  not  going  to  argue .   I  just

5    want  to  make  a  reference  to  the  rule , and  I  would  -- if

6    I  had  argue d  this  motion , I  would  have  referred  to  --

7    just  for  the  record , I'm  look ing  specifically  at  Rule

8    106  which  says  that  when  a  regular  or  court  statement ,

9    a  party  -- any  adverse  party  require  the  introduction

10   at  that  time  of  any  other  part  or  any  other  writing  or

11   record ed  statement  which  might  in  fairness  to  be

12   considered  contemporaneous  ly  with  it .

13         Now , I  then  look  at  the  advisory  committee  note s

14   from  1972  which  state  the  rule  does  not  in  any  way

15   circumscribe  the  right  of  the  adversary  to  develop  the

16   matter  on  cross-examination  or  as  part  of  his  own  case .

17   That 's  exact ly  what  we're  do ing .

18         THE  COURT:   All  right .

19         MR.  MARTIN:   Your  Honor , I  will  be  as  brief , if

20   not  brief er , than  Mr.  McKnett , please .   It's  an

21   important  point .   First , I'd  like  to  correct  the

22   reading .   It  does n't  say  "might ."   It  says , which  ought

23   in  fairness  to  be  considered  contemporaneous  ly , but

24   that 's  not  the  point  I  want  to  make .   The  point  is ,

25   when  they  first  start ed  play ing  these  tape s , I

1  approach ed  the  bench  and  I  asked  in  the  entire

2  conversation  --  I  don't  know  which  call  it  was  being

3  play ed ,  but  we  had  a  brief  conference  at  the  bench.

4  And  what  I  recall  was ,  Mr.  Martin ,  you  can  have  this

5  tape  play ed  in  your  case  in  chief .  I  belie ve  either

6  the  court  said  that  or  --

7       THE  COURT:   I  don't  recall  what  I  said .  It  was

8  either  that  or  on  cross .  In  other  words ,  I  was  not

9  going  to  require  the  government  to  play  it  during  its

10  case  --  I  mean  during  its  direct  examination .

11       MR.  MARTIN:   In  any  event ,  I  was  left  with  the

12  impression  we  would  be  allow ed  to  do  that  in  our  case

13  in  chief ,  and  that 's  where  we  are .

14       THE  COURT:   Let  me  tell  you  what  I'm  going  to

15  do .  We're  going  to  get  this  jury  in  here ,  and  I'm

16  going  to  tell  you  what  I'm  going  to  do  with  regard  to

17  the  government 's  motion .  I'm  going  to  grant  it  in  part

18  and  deny  it  in  part .  I  belie ve  that  the  defense  should

19  be  permitted  to  use  these  --  some  of  thes e  calls;  I

20  cannot  say  all  of  these ,  but  some  of  these  record ings

21  in  two  major  area s .  One  is  for  completeness .

22       There  are  a  number  of  case s ,  for  example ,  where

23  record ings  were  excerpt s  and  the  defense  has  contend ed

24  that  the  rest  of  the  call  was  pertinent  to  put ting  it

25  in  context  and  mak ing  it  complete .  I  don't  know  how

1  many case s there  are like  that  that  the defense  wish es

2  to use because  I have  not read  this huge  pile  of

3  transcript s and don't  know  what's  in  them .   All right ?

4       The second  thing  is that  the detective  has --

5  we're demoting  him .   Sergeant  Sakala  has  given

6  opinion s, and those  opinion s were  based  upon  his

7  reading  of all  of the record ings .  It is obvious ly fair

8  game  for the defense  to inquire  of this witness  about

9  other  circumstance s in which  language  which  he says  is

10  code d word  for drug  transactions   is not  in fact  code d

11  word  for drug  transactions   because  of A, B, C.

12       I don't  know  what's  in the record ings , but I do

13  think  it's fair  to have  the detective  -- the  sergeant

14  explain  his not -- reject ing as part  of his  opinion

15  what  is contain ed in  the  record ing that  contain s

16  information  which  is consistent  with  the defense 's

17  theory  that  this  isn't  a drug  transaction , that  it's a

18  sale  of ticket s to a show  or sale  of a dress  or T-shirt

19  or whatever  the case  may be .

20       Now , I do think  that  this  should  be part  of

21  further  cross-examination   of him  as part  of the

22  government 's case , so I will  permit  you  to have  him

23  recall ed during  the government 's case  for additional

24  cross-examination .   I'm not  say ing that  you  can play

25  every  single  one  of these  record ings  in this  entire

1 pile.

2        Now, with regard to the transcripts.  I think

3 the transcripts come before the jury the same way that

4 the government's transcripts come before the jury.

5 It's the defense's view of what was said in these

6 conversations.  The evidence is the recording itself.

7 This is an aid to the jury.  If the jury thinks it's

8 the wrong people that have been identified and that the

9 words are all wrong and that it wasn't typed up

10 correctly, it's the jury's understanding of what was

11 said.

12        If Sergeant Sakala cannot identify the persons

13 on the phone call, I think you're stuck with that.  So,

14 -- but I think we need to get moving.  So if you're

15 going to recall Sergeant Sakala to go through some of

16 these recordings, it's time to do it.

17        MS. JOHNSTON:  Your Honor, I think that what the

18 court needs to do is go through these -- I don't want

19 to have endless bench conferences in front of this jury

20 over what calls they can or cannot play.  Certainly,

21 it's very easy to see which calls that the court where

22 the government played excerpts and they want to play

23 the rest of the calls.  I don't know that the

24 government has a problem with that but, for example,

25 seven out of eight of the first calls are calls between

1 Paulette Martin and a Martha Jean West.  None of those

2 calls have anything -- first of all, Martha Jean West

3 is not a coconspirator.  It's Ms. Martin.  Those calls

4 are not around any of the calls that the government

5 played.

6        THE COURT:  But they are calls that Sergeant

7 Sakala considered in reaching his opinion.

8        MS. JOHNSTON:  Sergeant Sakala testified that he

9 listened to every call that was intercepted at least

10 once and that he formed his opinion based upon

11 everything that he had, but that -- and he's already

12 told them in cross that these calls did not change his

13 opinion about the calls that were played.

14        THE COURT:  That was a statement he made in the

15 abstract without an actual call being placed in front

16 of him.  I don't know what's in these calls, but I'll

17 tell you this.  I think -- so we can get this case

18 across the finish line in a reasonable and fair manner

19 for all concerned, I think you need to conclude the

20 examination of the pending witness.  I can let you rest

21 if you want to, subject to him being recalled for

22 further cross-examination, so we have a few days to

23 get ready for that additional cross-examination.

24        MS. JOHNSTON:  I'm just telling the court this,

25 that it will be much more efficient for the court to go

1  through these calls and decide which calls they can ask

2  than to have the government objecting every time.

3          THE COURT:  I can try to do that.  We can just

4  bring him back in here for additional cross-examination

5  next week.

6          MS. JOHNSTON:  I would indicate to the court, if

7  the court allows them to play these calls and the

8  government to play a whole lot more calls, too, to show

9  all the calls that we didn't play in our case in terms

10 of the calls where they -- Detective Sakala had the

11 opinion that they were discussing drugs and that

12 clothes did mean drugs, that tickets did mean drugs --

13 because we didn't play all of those calls in our direct

14 examination.  We tried to be conservative.  But if

15 that's the route we're going to go down, then we will

16 on redirect, after they do cross, play those calls as

17 well.

18         THE COURT:  Well, what would be helpful to me,

19 because I don't want to have endless bench conferences

20 on these things, is for the defense to give me, you

21 know, two or three sentences as to why each recording

22 you want to play is pertinent for the purposes that I

23 indicated.  I'll look at it, I'll give you a heads-up

24 in advance, and we can move this thing along.  I think

25 that's the easiest thing to do is let the government

1 rest its case in all respects, subject to the

2 understanding that Sergeant Sakala will be recalled for

3 further cross-examination with respect to these

4 recordings, after I've had a chance to look at it.

5       MR. MONTEMARANO: That's perfectly fine, Your

6 Honor. I would advise the court of one small thing

7 about the use of these transcripts. We prepared these.

8 We were intending not to use all of them, because we

9 also understood the court might not wish to have us use

10 all of them. Some may be repetitive and some may be

11 appropriately objectionable and excluded. We did not

12 undertake to create the 30 -- that's 3-0 -- copies of a

13 transcript book which would have been necessary to use

14 them whenever they're to be used. So, to that extent,

15 we will provide the court with our view of the calls so

16 the court can rule so we can then pull the ones which

17 are not appropriate and get them reproduced.

18       THE COURT: We will schedule that for Sergeant

19 Sakala sometime next week.

20       MS. JOHNSTON: Your Honor, can we maybe get to

21 him this week, if we don't run out of time?

22       THE COURT: If we can. I'm not ruling it out,

23 but I would like, for the sake of efficiency and

24 fairness to both sides, to have some two- or three-

25 sentence statement as to why each recording the defense

1  believe s comes within the view s I've express ed as to

2  how these can be use d as to either A, completeness , or

3  B, necessary to -- to challenge the grounds for his

4  opinion , because it's inconsistent with his opinion .

5         MR. MCKNETT :  Your Honor , I just ask the court

6  for clarification .  It's possible as Mr. Montemarano

7  indicated that my client might take the stand .  It's

8  also possible Mr. Montemarano will be call ing other

9  people who may have been participant s in these

10  conversation s.  It's my understand ing the court 's

11  ruling appli es only to the use of the conversation s and

12  transcript s in as far as they relate to Sergeant

13  Sakala .  What I'm refer ring to specific ally is the in

14  prohibition 18 U.S.C. 2517(3) which I referred to in a

15  letter I sent to the court which allow s a person who is

16  on -- who is intercept ed to testify about the content s

17  of the intercept ed conversation s.  I want to be sure

18  that the court has n't limited that --

19         THE COURT:   I took a look at that .

20         MS. JOHNSTON:   I think that statute only mean s

21  that it's not a violation of the wiretap law .  It has

22  nothing to do with the rule s of evidence .  We, of

23  course , Your Honor , will ask the court to give a

24  limiting instruction when  the court allow s these call s

25  to be play ed and that they're only to be introduced  --

1         THE COURT:   If you can help me out -- can you
2 give me a draft of the limiting instruction? I will be
3 glad to consider it.
4         MR. MCKNETT: The way I read that is that anyone
5 who has received information about the wiretap has
6 received the information legally which we received by
7 way of Sergeant Sakala and can then disclose the
8 contents of the communication or such derivative while
9 giving testimony under oath in any proceeding to the
10 court.
11        THE COURT:   Doesn't that simply mean your
12 client, if she takes the stand, can say, this is what I
13 meant when I talked to Ms. Martin on the phone call?
14        MR. MCKNETT: Exactly. I wanted to make sure
15 the court's ruling did not limit --
16        THE COURT:   No.  If she wants to get up there
17 and say the T-shirts were T-shirts, that's fine.
18        MR. MCKNETT: Your Honor, that would occur also
19 if Mr. Montemarano wanted to call Martha Jean West, who
20 is also in one of the transcripts.
21        THE COURT:   Yes.
22        MR. MARTIN:  All I'm asking is for five minutes
23 to call my investigator if it sounds like the
24 government is not going to rest today, because I've got
25 a bunch of people who I told to be here no later than

1  noon.

2        MS. GREENBERG:   Your Honor, we still have not

3  gotten Giglio on those witnesses.   We found out about

4  the witnesses yesterday and requested that.

5        MR. MARTIN:   That is partly correct.  I gave

6  them my witness list some time ago, Your Honor.   I

7  didn't have dates of birth and Social Security numbers,

8  and I still don't.  I only have it on one person.   I

9  guess what I could do then is have those people come in

10 and at the time they come in, you can get the dates of

11 birth.   But the other problem is, Your Honor, then

12 they'd have to be paid for having come here today.   As

13 long as the court doesn't have a problem with that, I

14 don't see why --

15        THE COURT:   Well, I believe that we're in the

16 home stretch on Detective Eveler; correct?

17        MR. MARTIN:   I think so.

18        THE COURT:   And the government would be able to

19 rest, subject to my ruling that Sakala can be called

20 back for further cross.  The defense should be ready to

21 roll with its witnesses.

22        MR. MARTIN:   All right.  Well, then they will be

23 here at noon, and they can get the 411 on them.

24        THE COURT:   Mr. Sussman.

25        MR. SUSSMAN:   I don't have a dog in this fight

1  or whatever the expression is, but I have a procedural

2  question.  If the government were to rest, then the

3  state of the record would be closed at that point and

4  whatever motions we have would be heard.  The procedure

5  that the court's suggesting is the government rests and

6  then we keep going in the government's case.  I would

7  suggest, since Detective Sakala -- Sergeant Sakala will

8  clearly be an adverse witness that we just do it as a

9  defense matter so that we do close the record at some

10 point, so we're not really shooting at a moving target

11 here for --

12      THE COURT:  I think -- to me, the mechanism

13 through which you get to ask these kinds of questions

14 of Sergeant Sakala is on cross-examination, testing the

15 opinions he's given.  I think that really is in the

16 nature of cross-examination, not calling him as your

17 own witness, because I think you then run headlong into

18 a bunch of other objections that may be more legitimate

19 if it's called as a direct witness by the defense.

20      Let me read to you a note I received from a

21 juror, because we really need to move along, folks.

22 This is to Judge Titus from Juror 6.  "I respectfully

23 submit this request for your consideration.  I have a

24 non-refundable reservation for a family vacation

25 starting on August 19 through August 26, 2006.  I did

1  not raise this issue on the  pretrial questionnaire  or

2  during the voir dire  question  since the case was

3  indicated  or projected to end a week before August 19.

4  However , it now appears likely that this case will --

5  trial will still be ongoing on August 19.  I am

6  therefore  requesting that I be excused as an alternate

7  juror if the trial continues past August 18, 2006."

8       Similarly, in order  to avoid this scheduling

9  conflict , I request that every effort be made to

10  maximize the jury's time in the courtroom hearing

11  testimony , including  sitting from 9:00 to 5:00  each day

12  and not working shortened Friday hours, shorter breaks

13  etcetera .  I understand  that many trial participants,

14  jury members,  counsel , and Your Honor  will be

15  inconvenienced by the  extended length .  However , in

16  light of the stated situation , I make the above request

17  and I hope you take into consideration my request at

18  the appropriate time.

19       Then there 's two footnotes.

20       Footnote 1.  The reservations were  made in

21  February this year , long before my knowledge  of this

22  trial .  Second footnote :  Also , my daughter  starts back

23  to school -- second grade -- on August 29.  So in

24  addition  to the loss of money consider  ation, the family

25  vacation cannot be rescheduled    later than August 29

1  through 26 due to school conversation consideration s.

2       Well , I think she 's -- he or she is too

3  pessimistic . I have already told the -- I thought I

4  told the jurors and the parti es that I have

5  non- refundable ticket s to fly out of here on Saturday ,

6  August 12, and there 's no way this trial can continue

7  during that period of time . If we don't finish this

8  trial by Friday , August 11, it's going to carry over

9  for two week s. That 's the only thing I can do.

10      MS. JOHNSTON:  Your Honor , can we -- I would

11  join that juror in asking the court to sit full day s

12  every day , including Friday .

13      THE COURT:  I'm going to do exact ly that , and

14  they're going to say, what is that judge do ing?  It's

15  10:15 and we're not in the courtroom . I want you to

16  know I'm going to tell the jury that as far as I can

17  tell , we still are in a reasonable likelihood of

18  concluding this case by August 11. If we're not going

19  to finish by August 11, we will not continue the

20  follow ing week , period .

21      MS. GREENBERG:  Judge , just to let you know .

22  We've got additional witness es from Mr. Martin today

23  and we've gotten a new list of from Mr. Ward , witness es

24  that have been in the courtroom . So, I share that

25  juror 's pessimism .

1      THE COURT:  Well, all I can tell you is we are

2 not going to sit the two weeks after Friday, august 11

3 under any circumstances.  We can't do it.

4      MR. MONTEMARANO:  Your Honor, unless the

5 government plans to put on two weeks of rebuttal, I

6 don't see any way we won't be done by the 11th.

7      THE COURT:  I believe you, but we're not going

8 to get there unless we get the jury in here.

9      MR. MONTEMARANO:  Ms. Johnston just mentioned

10 it, so to the question of forfeiture.  It is my

11 understanding that almost all of the defendants are

12 prepared to have the court, as opposed to the jury,

13 resolve the issue as to the forfeiture, and I will --

14 as lead counsel, it is incumbent upon me to perhaps

15 pass out things and be responsible for things like the

16 witness list for the next day and all that.  I will

17 assure the court that we will have that question

18 answered by the time we return from lunch today which

19 will, by itself, narrow things.

20      THE COURT:  This juror doesn't know about the

21 possibility of a second consideration of forfeiture,

22 and I wouldn't want to tell this juror that because

23 this juror would say, can we get out of here by

24 Halloween.  So, we're not going to tell this juror

25 this.

1          I'm going to bring the jury in now.  Let's get

2  moving.  I am going to continue to examine my calendar

3  about -- I'm going to tell the jury we're going to

4  start at 9:30 on Friday, although we may be a couple of

5  minutes late because of the sentencing that I have.

6          MR. HALL:   Your Honor, since we were in the

7  process of doing my cross-examination, can I get the

8  easel back and get set up where I was yesterday?

9          THE COURT:   Yes.

10                      (Witness resumes the stand.)

11                      (Jury returns at 10:22 a.m.)

12          THE COURT:   Good morning, ladies and gentlemen.

13  I wanted to give you a couple of scheduling updates.

14  I'm planning on starting on Friday at 9:30.  I have a

15  sentencing at 9:00 that should be a half hour and, you

16  know, plus or minus a few minutes I should be able to

17  start at 9:30.

18          I will make a decision later, depending on what

19  kind of progress we make today as to whether we do a

20  long day or short day that week.    As long as we have a

21  lunch break, that's when we cut that time off.

22          I have received a note from one of you

23  expressing concern, which I can see why you might be

24  expressing concern, that we might not be finished by

25  August 11.  I have every intention that this case will

1 be finished by August 11, but anybody looking at this

2 case is, you know, right to have concern about how are

3 we doing on the schedule.  I'm reasonably comfortable

4 we're on schedule and will finish, but I want to assure

5 whoever is concerned about sitting after August 11 that

6 there will be no judge here, so we will not be sitting

7 the week of August 14 or the week of August 21 because

8 I'm going to be out of town.  So, if we don't finish by

9 Friday, August 11, we'll be coming back two weeks

10 later.  I am praying that that will not be the case.

11 So, we will try to move things along as quick as I can

12         The problem that I have is that this is not my

13 only case, and I have stacks of other stuff to work on

14 and sentencings and guilty pleas and motions in civil

15 cases to hear.  So, I can't sit five days a week unless

16 I throw a bunch of things off my calendar.  I will

17 start throwing things off my calendar if I get

18 concerned we're not going to make it.  So, I am doing

19 everything I can to keep this battleship to its port on

20 time, and I will keep you posted as best I can.

21         All right, you may proceed.

22         MR. HALL:   Thank you, Your Honor.

23               **CONTINUED CROSS-EXAMINATION**

24         BY MR. HALL:

25 Q.      Detective Eveler, if we can go back up to the

1 chart and we'll pick up where we were yesterday.

2        I put CH-4 up here which is the contact chart;

3 is that correct?

4 A.     That's correct.

5 Q.     All right.  I wanted to ask you a couple of

6 question s about that.  The telephone contact s that are

7 contain ed on this chart.  Am I correct in my

8 understand ing that those come from pin register s?

9 A.     Pin register s.  Some could be air time, but the

10 majority are pin records.

11 Q.     The majority are pin register s, but some could

12 be air time records?

13 A.     Could be.

14 Q.     Now, I want to ask you -- the time periods for

15 each individual on this chart appear to vary; is that

16 correct?

17 A.     That's correct.

18 Q.     All right.  Specifically , in reference  to my

19 client, Reece Whiting, the contact s begin with the date

20 of 8/12-01; correct?

21 A.     Yes.

22 Q.     And on 5-28-04; right?

23 A.     Yes.

24 Q.     Okay.  That's about -- approximately , a 33-month

25 period , would that be correct?

1 A.        Approximately .

2 Q.        Approximately ?  Okay .   And during  that  time

3 period , that  would  be -- your  records  show  that  there

4 were  351  contact s; is  that  correct ?

5 A.        Yes .

6 Q.        All right .   And I'm not going  to ask  you  to do

7 the  math , but  that  would  be  about  ten  and  a half  per

8 month , would  it  not ?

9 A.        Yes .

10 Q.        All right .   Now , let  me ask  you  this .   When you

11 -- when  the  term  "contact " is  used  on  this  particular

12 chart , "contact " could  mean  a conversation ; correct ?

13 A.        Yes .

14 Q.        Okay .   It  could  also  mean  leavi ng  a message  on

15 an  answering  machine ; correct ?

16 A.        Correct .

17 Q.        It  could  mean  dial ling  a number  and  not

18 receiving  any  answer , just  hang ing  up  and  let ting  it

19 ring  a couple  of  time s and  then  hang ing  up; is  that

20 correct ?

21 A.        That 's correct .

22 Q.        So it  could  mean  a variety  of  thing s; is  that

23 right ?

24 A.        Yes .

25 Q.        All right .   Detective , you  can  go  back  to  the

1 witness stand for the rest of your cross, and I'll move

2 this out of the jury's way.

3          Detective, let me ask you this in reference

4 specifically to Mr. Whiting. During the time period of

5 this investigation which you were involved in, for

6 several years there was never any seizure of any drugs

7 from my client; is that correct?

8 A.      That's correct.

9 Q.      Okay. And there was never any type of

10 controlled buy done for my client was there?

11 A.      That's correct.

12 Q.      Okay. The wiretap of the telephone was not on

13 his telephone. He was simply picked up on calls he

14 made to Ms. Martin; is that right?

15 A.      Or calls that she made to him.

16 Q.      Correct. Okay. And his phone was never subject

17 of a DNR was it?

18 A.      Not by us.

19 Q.      Okay. All right. Now, let me ask you this,

20 sir. Your investigation for the most part came to an

21 end on June 1st 2004; is that correct?

22 A.      On the 2nd, actually. June 1st and 2nd -- it

23 was a two-day --

24 Q.      On June 1st and 2nd -- it was during that time

25 period, the 1st and the 2nd in which search warrants

1 were executed ; correct ?

2 A.      Correct .

3 Q.      And there were arrest s made , sometimes  of people

4 at the search warrant s, sometimes people that there

5 were arrest warrant s for ; is that right ?

6 A.      That 's correct .

7 Q.      And my client was arrested during that June

8 1st/ June 2nd time period ; is that correct ?

9 A.      That 's correct .

10 Q.      In executing the -- well , let me ask you this .

11 I believe you said in your direct testimony -- this

12 would be back on the 19th , last week , if you remember

13 back to your testimony that day , that there were 26

14 search warrant s done on the June 1st/June 2nd  time

15 period ; is that right ?

16 A.      Approximately .

17 Q.      In relation  to 3520 Essex Road in Baltimore , Mr.

18 Whiti n g 's address .   There was no search warrant

19 executed at his address , was there ?

20 A.      That 's correct .

21 Q.      There was just an arrest made ; correct ?

22 A.      That 's correct .

23      MR. HALL:   That 's all the question s I have of

24 this witness , Your Honor .   Thank you .

25      THE COURT:   All right .

1                    **CROSS-EXAMINATION**

2           BY MR. MITCHELL:

3  Q.       Agent Eveler, good morning.  Timothy Mitchell  on

4  behalf of Mr. Bynum.  I'm also going to need you to

5  look at a couple of charts.

6  A.       Sure.

7  Q.       Giving you a workout today.

8           What I want to ask you about -- you have already

9  testified about this chart.  I'm not going to ask you a

10 lot of the questions that have been asked before.  I

11 want to focus on this little box right here.  You have

12 characterized that as distributors/facilitators;

13 correct?

14 A.       Correct.

15 Q.       And you have put that on there because I believe

16 your testimony is that it's your opinion these

17 individuals  assisted  Mr. Goodwin  and Ms. Martin  in

18 either  the business  of the drugs or actually selling

19 the drugs; correct?

20 A.       Yes.

21 Q.       Directing you to Mr. Bynum, right here.  It's

22 your testimony, as I understand it, that Mr. Bynum was

23 receiving drugs from m Ms. Martin and then reselling

24 them; correct?

25 A.       Correct.

1  Q.       Do you have -- when did you start your

2  investigation  of Mr. Bynum, specifically ?  Do you

3  recall ?

4  A.       Probably around March 8 or March 9 of 2004.

5  Q.       Okay.  From March 8 or 9, give or take whenever

6  you started that investigation , did you have any

7  surveillance  of Mr. Bynum ?

8  A.       Yes,  we had surveillance  of Mr. Bynum.

9  Q.       Of his dealing of drugs, as you've character ized

10  him to do?

11  A.       No.  Just him receiving  drugs.

12  Q.       What specifically  did you -- what drugs

13  specifically  did you observe  him receiving ?

14  A.       We received  -- based  on the telephone  calls and

15  our surveillance,  we knew  he was receiving  drugs.

16  Q.       Isn't that much different  than he received

17  drugs?

18  A.       Not in my opinion .

19  Q.       Did you see him receive  any drugs?

20  A.       Yes , I believe  I saw him receive  drugs.

21  Q.       That's not my question .  There 's a big

22  difference  -- if I'm doing something  here , do you know

23  what I'm doing ?

24  A.       No.

25  Q.       Do you have an assumption  of what I'm doing?

1  A.      Not right now, no.

2  Q.      Would you try to guess at what I'm doing?

3  A.      No.

4  Q.      But you don't see what I'm doing, do you?

5  A.      I have nothing to bracket that to give an

6  opinion about what you were doing.  With Mr. Bynum, I

7  have events and telephone calls to bracket that to give

8  me an opinion about what he's doing.

9  Q.      If you hear this, you may want to make some

10 assumption as to what I'm doing; correct?

11         You don't know what I'm doing Behind this, do

12 you?  (indicating the easel board.)

13 A.      No.

14 Q.      It's safe to say that you have an assumption of

15 what Mr. Bynum was doing, rather than as your testimony

16 was that you know on chart that he was a distributor

17 and facilitator.

18 A.      It's not an assumption.  It's an opinion based

19 on fact.

20 Q.      It's an opinion based on theory, is it not?

21         MS. JOHNSTON:   Objection.

22         Asked and answered.

23         THE COURT:   Sustained.

24         MR. MITCHELL:   You did not see and actually

25 weigh or touch any drug that you allege in your theory

1  that Mr. Bynum received, did you?

2          MS. JOHNSTON:   Objection.

3          He's mischaracterized his testimony.

4          THE COURT:   Overruled.

5          THE WITNESS:   Could you repeat the question?

6          BY MR. MITCHELL:

7  Q.      You didn't feel or touch or weigh any drugs that

8  you in your theory and in your opinion say that he

9  received, did you?

10  A.      Wasn't there -- I believe there was a scale

11  recovered from his residence.   Am I correct?

12  Q.      There was a scale.   Correct.

13  A.      Okay.   It tested positive for residue, did it

14  not?

15  Q.      Did you weigh that?

16  A.      Did I weigh it?   No.

17  Q.      These things that you say he received is merely

18  your opinion.   You don't have any specific proof of any

19  weight or substance that he actually received, do you?

20  A.      Yes.   The telephone calls are very clear.

21  Q.      Let me make a distinction so we understand each

22  other.   There is one thing as a piece of evidence on

23  this table.

24  A.      Yes.

25  Q.      And then there is trying to understand what's

1 going on behind this chart.

2          MS. JOHNSTON:   Objection.

3          THE COURT:   Overruled.

4          BY MR. MITCHELL:

5 Q.      You can see what's on this table; correct?

6 A.      Yes.

7 Q.      You can't see this.  (Indicating behind the

8 easel.)

9 A.      No, I cannot.

10 Q.      You can only make an extrapolation  of, a theory

11 an assumption of what's going on behind here; correct?

12          MS. JOHNSTON:   Objection.

13          THE COURT:   Sustained.

14          BY MR. MITCHELL:

15 Q.      During this time that you were investigati ng Mr.

16 Bynum, did you at any time assign any officer s to

17 surveil his activities as a distributor and/or

18 facilitato r of the drug s that you theorize he received

19 from Ms. Martin?

20 A.      You mean upon --

21          MS. JOHNSTON:   Objection.

22          Counsel is mis character izing the witness '

23 testimony.  He hasn't theorize d anything.

24          THE COURT:   Sustained.

25          BY MR. MITCHELL:

1  Q.       Let me restate it.

2           In your terms.  In your opinion, during the time

3  that -- you investigate d between March and the time of

4  his arrest.  Did you assign any officer s to do

5  surveillance of any of his facilitati ng or distributing

6  these drug s?

7  A.       He left Ms. Martin 's residence.  No.  We did

8  surveillance at his residence on Ray Road brief ly.

9  Q.       Okay.  Is there any particular reason why you

10 didn't surveil his residence ?

11 A.       We did surveil his residence.  I just said that.

12 Q.       Any particular reason why you didn't assign an

13 officer to follow him and look at his activities as a

14 distributor/ facilitato r once he left Ms. Martin 's

15 residence ?

16 A.       Yes.

17 Q.       Why ?

18 A.       We were identify ing the heroin supply, Ms. Levi,

19 and her source of supply.  We were identify ing Ms.

20 Martin 's cocaine source of supply which was Mr. Mangual

21 and his source of supply in New York, and we were

22 identify ing all of these other participant s as well as

23 Mr. Goodwin and his associate s.

24 Q.       So was it not possible to assign someone to do a

25 surveillance of his activities selling these drug s you

1  -- in your opinion he's received from Ms. Martin?

2  A.      Possible?

3  Q.      Was it possible?

4  A.      It's possible. Probably wasn't -- our idea of

5  the investigation is to identify these people and

6  identify their source of supply and their source s of

7  supply and their source s of supply. To identify all of

8  Mr. Bynum 's customers would have been a drain on the

9  investigation.

10  Q.      So it was just mere ly inconvenient to have

11  someone do a surveil lance of him?

12  A.      Not convenient. Not a good use of our

13  resource s.

14  Q.      In essence, then, without that evidence, you're

15  just leavi ng the ladies and gentlemen of the jury    to

16  believe your opinion; is that correct?

17  A.      No. They have evidence to support my opinion:

18  The scale with residue at his residence, his prior

19  arrest which is in the scope of the conspiracy, and

20  narcotic s he had back in 1999 and the telephone call s

21  which are very specific -- more specific than some; the

22  surveillance s that were done of him leavi ng Ms.

23  Martin 's residence. I'm sure I've miss ed something in

24  that list.

25  Q.      Then in your opinion that all leads to him

1  selling drugs to other people out there that you don't

2  name.

3  A.      Yes.  The quantity of drugs he was purchasing

4  from Ms. Martin was well in excess of any personal use.

5  Q.      You're with the Prince George's County Police

6  Department; correct?  That's your employer?

7  A.      Yes.

8  Q.      Do you know how many police officers are

9  employed by the Prince George's County Police

10  Department?

11          MS. JOHNSTON:    Objection.

12          THE COURT:   Overruled.

13          BY MR. MITCHELL:

14  Q.      Approximately.

15  A.      We're supposed to have 1400.  We have less than

16  that.

17  Q.      How many police officers were assigned to do

18  surveillance and other activities in this

19  investigation, if you know?

20  A.      It varied on different days.  Sometimes we would

21  have two people available for surveillance, sometimes

22  five, and sometimes none.  It would -- we wouldn't have

23  -- we didn't have an entire division available to us.

24  We would call and say, can you break somebody loose

25  from what they're doing?  And we need you to go to

1 Hayward Avenue.  We need you to go here.  We need you

2 to go there.

3 Q.      From the course of the investigation,  from the

4 beginning to the  end, approximately  how many officers

5 were used over time?

6 A.      There were many.  When we executed the  search

7 warrants, we were at 26, approximately , different

8 locations.  So, we shut down our division for two days

9 to participate  in that.  Many of those people had no

10 knowledge  of this investigation  other than their

11 participation  that day.  So, for me to give you a

12 number  like that would be misleading.

13 Q.      Well, other than the search warrants --

14 obviously, that entailed a tremendous  amount of

15 manpower.  But other than that -- other than June 1st

16 of 2004, how many people would you say have been

17 involved in the investigation ?

18 A.      From the surveillance  portion?  15 to 20.

19 Q.      And one more.  Surveilling Mr. Bynum and

20 corroborating this activity, you opinioned that

21 wouldn't -- that would have shut down your department?

22 A.      That's not what I stated.  Those people were not

23 available all at one time.  We don't have a pool of 25

24 individuals  available  to conduct  surveillance  all at

25 one time.  Like I said before, there might be two

1  available  that  day.   It may be a Saturday.   People  may

2  be off; people  are  on  vacation ; there 's three  guys

3  working one  day  and  there 's two  the  next.   There may be

4  five  on a day , but  there  may  be  no  activity  that  day.

5  So, we have five people waiting around doing nothing ,

6  and there 's no  activity  and there 's nothing  to  indicate

7  any activity .   Maybe  there 's no  drugs  at  the  time.

8  Maybe we're waiting for  a supply .   So, there 's nothing

9  for those  guys  to  do, so they  pursue  their  other

10  investigation s until  we  need  them.   When  we  need  them ,

11  we call them.   We didn't  have  constant  access  to 25

12  bodies.

13  Q.      There 's approximately  1,400  officers  working  for

14  the department ; is that  correct ?

15  A.      They don't  work  for  me.   They  work  for  the

16  department .

17  Q.      I understand .

18  A.      People  in  Prince  George's  County  do  require

19  homicide  investigation s, patrol  officer s, tactical

20  squads , air -- we  have  the  helicopter  section .   We  have

21  all those  people , but  they  don't  answer  to  me.

22  Q.      Agent  Eveler , if  it  were  important , could  you

23  have gotten  that  extra  officer  to  do  surveillance  on

24  Mr.  Bynum ?

25  A.      If  it  were  important ?   If  I  had  an  indication

1  that he was going to engage in a transaction at a

2  certain time, yes, I would have broken somebody loose.

3  Q.      So the fact that you didn't do it, it wasn't

4  important to have anyone during doing surveillance on

5  Mr. Bynum.

6  A.      You have to realize that Ms. Martin was involved

7  in daily conversations and she required a great deal of

8  surveillance, and those other people required a great

9  deal of surveillance. But to pull surveillance off of

10  a target, off a trafficker -- a major trafficker and to

11  surveil Mr. Bynum -- it would have been great to

12  surveil all of these people and I would have loved the

13  assets, but we had to make a judgment call and we had

14  to work in the real world.

15  Q.      The bottom line is, it was your decision and

16  your choice not to have one surveilled; is that

17  correct?

18          MS. JOHNSTON:    Objection.

19          Asked and answered.

20          THE COURT:    Sustained.

21          BY MR. MITCHELL:

22  Q.      All right. Now let's go to Chart 4. I believe

23  that's the telephone contact; is that correct?

24          This chart here. Is it 2?

25          MS. JOHNSTON:    It's 2.

1           BY MR. MITCHELL:

2   Q.      I'm sorry.  Chart 2.

3           I want to focus -- this is Mr. Bynum right here.

4   Mr. Bynum's name, 858 contacts between August 7, 2001

5   and May 27, 2004.  I'm going to do a little math for

6   you.  I just want to make sure you don't have your

7   calculator here.  I didn't ask you to calculate it, did

8   I?

9   A.      No.

10  Q.      You do agree that's approximately  two years and

11  about nine months of pin registers --

12  A.      Sure.

13  Q.      -- Give or take a couple days.

14  A.      It's pretty close to Mr.  Hall's.

15  Q.      About.

16  A.      I think he used 33 months as his estimate.

17  Q.      You have four telephone numbers here; correct?

18  A.      Yes.

19  Q.      Are you familiar with the registered owners of

20  each of those telephone numbers, or do you need your

21  notes to refresh --

22  A.      Some of them I know and some I don't off the top

23  of my head, but I have my notes.

24  Q.      Probably, that might help.

25  A.      Okay.

1 Q.      The first number, 202-320-7342.  Do you know the

2 register ed owner to that number?

3 A.      Yes.

4 Q.      Who was that number registered to?

5 A.      Tony James, 1513 Ray Road.

6 Q.      Tony James.  Do you know who Tony James is?

7 A.      No.

8 Q.      Did you ever identify him?

9 A.      No.

10 Q.     Was that a land line, or was that a cell phone

11 number?

12 A.     It's a cellular telephone.  AT&T.

13 Q.     Okay.  Did you ever investigate why there was a

14 Tony James listing his cell phone number at the Ray

15 Road address?

16 A.     No.

17 Q.     Did you ever get any record ed telephone calls of

18 Mr. James?

19 A.     No.  Just Mr. Bynum using that phone.

20 Q.     Now, if we could -- I don't know if there's a

21 pen that we could use.  Could we write "Mr. Tony James"

22 right there so that we know that that was not Mr.

23 Bynum's registered number?

24        Do me a favor and just write "Tony James" right

25 there.

1  A.       (Witness  indicati ng.)

2  Q.       And  now  the  next  number ,  202-498-1051 .   Do  you

3  have  that  registration ?

4  A.       Yes .

5  Q.       Was  that  to  Mr.  Bynum ?

6  A.       Yes .

7  Q.       That  was  his  cell  phone  number ;  correct ?

8  A.       Yes .

9  Q.       The  next  number .

10  A.       Want  me  to  put  his  name ?

11  Q.       No .   We  already  have  his  name  right  here .

12  A.       Okay .

13  Q.       The  next  number ,  202-607-0394 .   Do  you  know  who

14  that  number  was  registered  to?

15  A.       Cindy  Lee .

16  Q.       Okay .   Did  she  have  an  addres s?

17  A.       Bright  Street ,  Washington ,  D.  C.

18  Q.       Was  that  a  cell  phone  number  or  a  land  line ?   Do

19  you  know ?

20  A.       That 's  a  cell  phone .

21  Q.       Okay .   If  you  could  do  me  a  favor  and  write

22  "Cindy  Lee"  just  next  to  that .

23  A.       (Witness  indicati ng.)

24  Q.       And  the  last  number ,  301-853-6766 .   Who  was

25  that ?   Was  that  register ed  to  Mr.  Bynum ?

1  A.      Yes.

2  Q.      Was that a land line?

3  A.      Yes.

4  Q.      And that was from the Ray Road address; is that

5  correct?

6  A.      Yes.

7  Q.      Now, you've listed 858 contacts.  Out of those

8  858 contacts, how many calls were made by Mr. James?

9  A.      I don't know that any were made by Mr. James,

10 since Mr. Bynum was intercepted using that phone.  I

11 couldn't tell you how many were made utilizing that

12 number.  They were on the same date, that one call that

13 we intercepted.

14 Q.      So there were two -- out of this 858, there were

15 two calls using this number?

16 A.      Yes.

17 Q.      Put it in parentheses, perhaps, next to Mr.

18 James, too, so we can differentiate.

19 A.      (Witness indicating.)

20 Q.      About Ms. Lee's phone number.  How many of these

21 858 were made by Ms. Lee?  Do you know?

22 A.      I will check.

23         MS. JOHNSTON:   Your Honor, objection to

24 counsel's question.  He said the calls were made by Ms.

25 Lee.  I think that's a misstatement.

1            MR. MITCHELL:   I'll rephrase, Your Honor.

2            THE COURT:   Rephrase.

3            BY MR. MITCHELL:

4  Q.     How many phone calls were made by the number

5  registered to Cindy Lee?

6  A.     Just the one that was intercepted.

7  Q.     The one phone call?

8  A.     Yes.

9  Q.     Out of these -- this is these 858 contacts.   One

10  call -- one call made with this number.

11  A.     Yes.

12  Q.     Okay.   Put a "1" there.

13  A.     (Witness indicating.)

14  Q.     And I know you've testified about this already,

15  but I want to ask you again.   I assume he's going to

16  say this about everyone on this chart, but you don't

17  know which of these 858 contacts were made, actually,

18  by Mr. Bynum; correct?

19  A.     Just the ones we intercepted.

20  Q.     Right.   Other than those, you don't know who

21  actually picked up the phone, dialed a number and

22  caused it to reach one of these numbers.

23  A.     That's correct.

24  Q.     Again, you don't know which of these 858 was a

25  hang-up, a missed call, a voice mail or other; correct?

1  A.       Correct.

2  Q.       Other than the ones that you've intercepted.

3  A.       Correct.

4  Q.       And would you also agree with me -- no, I know I

5  didn't ask you to do the math -- that over this period

6  of time, and it's about two years and nine months, that

7  would be about 25 calls per month.  Would you agree

8  with that?  Do you want to do the math first?

9  A.       Not particularly.

10  Q.       Does that sound about right?

11  A.       Sure.

12  Q.       It's about 850 over --

13  A.       I'll use your numbers, sir.

14  Q.       Over 33 months?

15  A.       Sure.

16  Q.       About.  Is it in your training and experience in

17  investigating drug activity that 25 calls in a month is

18  indicative of drug trafficking?

19  A.       I don't think I'd base an opinion solely on the

20  contacts.

21  Q.       Okay.  And you're aware that Mr. Bynum is the

22  father of Ms. Martin's grandchild; correct?

23  A.       That's what I've been told, yes.

24  Q.       All right.  You may have a seat.  I just have a

25  few more questions for you, Detective Eveler.

1         You were presented with, I believe it was

2  Miscellaneous 20.  That's the conviction -- certified

3  copy of a conviction of Mr. Bynum from 1999.  Do you

4  recall that?

5  A.     I don't recall the Miscellaneous number, but I

6  recall the document.

7  Q.     I'm doing that.  Am I correct --

8         MS. JOHNSTON:   I don't know counsel.

9         BY MR. MITCHELL:

10 Q.     Regardless of the name of the number of the

11 exhibit, it was his conviction from 1999.  You were

12 asked by government counsel whether or not this

13 conviction had been overturned or not.  Do you recall

14 that?

15 A.     Yes.

16 Q.     And you specifically referred to your training

17 and experience to reach an opinion on that.  Do you

18 recall that?

19 A.     Yes.

20 Q.     If I could inquire a little bit into your

21 experience and training in the Montgomery County

22 Clerk's office and their procedures.  How long -- how

23 much training did you receive from the clerk's office

24 in the Montgomery County courthouse -- Circuit Court?

25        MS. JOHNSTON:   Objection.

1          THE  COURT:    I think  he meant  --  you meant
2  something  else ,  didn't  you ?  You said  Montgomery .   Did
3  you  mean  Montgomery ?
4          MR. MITCHELL:    I believe  it  was  Montgomery  --
5  let  me  see .
6          THE  COURT:   Oh,  okay .   All right .
7          MR. MITCHELL:    I have  the Miscellaneous  19 , not
8  20 .
9          THE  COURT:    Now I understand .   Excuse  me .
10         BY MR. MITCHELL:
11  Q.     Look ing  at that , where  is  this  conviction
12  locate d?
13  A.     The Circuit  Court  for  Montgomery  County ,
14  Maryland .
15  Q.     Montgomery  County .  So if I could  direct  you to
16  your  train ing  experience  and knowledge  into  the
17  procedure s  of  this  Circuit  Court  for Montgomery  County ?
18  A.     I received  no train ing .  However , I've received
19  records  from  many  court s  in  the  state  of Maryland , and
20  I'm familiar  with  expungement  of  records .   These
21  records  are  not  expunge d.
22  Q.     They  were  not  expunge d.  If you could  explain  to
23  the  ladies  and gentlemen  of the  jury   .   How  does  a case
24  -- how  is  a case  eligible  for  expunge ment ?
25  A.     Upon  a pardon ,  somebody  could  have  their  case

1  expunged.  Upon certain actions of the court, a case

2  could be expunged.  After certain time periods, you can

3  ask for an expungement.  Based on an acquittal, based

4  on -- there's a variety of means to get an expungement.

5  I'm not familiar with all of the means.  I'm familiar

6  with more of the results of the expungement than the

7  methods of the expungement.

8  Q.      Are you aware of whether an expungement is

9  automatic?

10  A.      It is not, as far as I know.

11  Q.      Let me clarify it.  If someone were found "not

12  guilty" of a criminal charge, is their case

13  automatically expunged?

14  A.      You can request an expungement.

15  Q.      Correct.  So that person would actually have to

16  petition the court to have that done; correct?

17  A.      That's my understanding.

18  Q.      If they didn't petition the court to have that

19  done, that would still be in the records of the

20  Montgomery County Circuit Court; correct?

21  A.      That's my understanding, yes.

22  Q.      If that case were also overturned by the

23  appellate courts and you didn't request an expungement,

24  you would still be able to get access to that, would

25  you not?

1  A.       That's my understanding.

2  Q.       So when you -- the opinion that considering that

3  you were able to receive this, that it wasn't

4  overturned, you were mistaken, were you not?

5  A.       No.  I also contacted the governor's office to

6  see if --

7  Q.       Objection as to who said what to Agent Eveler.

8          MS. JOHNSTON:   Your Honor, he's just answering

9  the counsel's question.

10         THE COURT:   Overruled.

11         THE WITNESS:   I contacted the governor's office

12 to see if Mr. Bynum had received a pardon, and he had

13 not.

14         MR. MITCHELL:   Objection.

15         THE COURT:   Overruled.

16         BY MR. MITCHELL:

17 Q.       Do you have any records from the governor's

18 office to indicate whether or not he had applied or

19 received a pardon?

20 A.       They have no records to show that.  That's what

21 the result of my search was.

22 Q.       Okay.  But back to my question which you gave an

23 opinion that you could not have received this if his

24 case had been overturned or pardoned.

25         MS. JOHNSTON:   Objection.

1          That's not what the witness said.

2          THE COURT:   Sustained.

3          BY MR. MITCHELL:

4  Q.     On direct, did you not say that the only reason

5  why in your opinion this had not been overturned is

6  because you could still get this --

7          MS. JOHNSTON:   Objection.

8          THE COURT:   Sustained.

9          BY MR. MITCHELL:

10 Q.     What was your opinion as to why you were still

11 able to receive this document?

12 A.     It was based on the court papers, as well as my

13 contact with the governor's office.

14 Q.     All right.  Is it possible that he could have

15 appealed that case the appellate court could have made

16 some decision?

17         MS. JOHNSTON:   Objection.

18         THE COURT:   Sustained.

19         BY MR. MITCHELL:

20 Q.     You don't know that, do you, whether or not this

21 case was appealed.

22 A.     Let me see if it's -- if there's anything

23 included in this record.  There are docket entries in

24 here, and there's no docket entry in here after July

25 20, 2000, after the sentencing, so there's nothing to

1 indicate that.

2 Q.     What training and experience with the Montgomery

3 County Circuit Court would lead you to believe that if

4 it's not on this docket entry, it wasn't appealed?

5 A.     I don't.  It's based on my review of this

6 record.

7 Q.     Now, as the case agent --

8       THE COURT:  Counsel, can you approach the bench?

9             (At the bar of the Court.)

10       THE COURT:  Mr. Mitchell, I'm a little concerned

11 about what you're trying to get by way of an inference

12 from this line of questioning.  The witness has with

13 him a certified copy of the records.  If there had been

14 any appeal, it would have been noted.  You have to file

15 notice of appeal.  If there had been a reversal, it

16 would be on that document there.  That's a question of

17 law.  To suggest that there somehow could be an appeal

18 not reflected on a certified copy of the judgment

19 records of the Circuit Court for Montgomery County is

20 wrong.

21       MR. MITCHELL:  I was equally amazed that the

22 government would actually ask his opinion as to whether

23 or not the case was overturned.  I objected.  Your

24 Honor overruled my objection and allowed him to testify

25 as if he were a Clerk of the Court, and that was beyond

1 his expertise .

2         THE COURT:   Mr. Mitchell , I don't want the jury

3 mis led.   This is an official  court  document  showing the

4 status  of his  conviction  as of the date it indicated .

5 I forget  what  it was , but  it apparent ly indicate s no

6 appeal  was  taken .   If there  had  been  an appeal  take n,

7 you  would  have  seen  a notice  of appeal  and you  would

8 have  seen  an opinion  of the Court  of Special  Appeal s, a

9 mandate  of the C ourt  of Special  Appeal s, and  you would

10 have  seen  a record  from  the Court  of Appeal s say ing  the

11 petition  for Cert  denied  or grant ed, and  you would  have

12 seen -- I mean,  that  would  all be on there , unless  the

13 time  period  hadn't  run  yet and  this  was  a certification

14 of a judgment  quite  some  time  after  a judgment  and

15 there  was  no appeal .

16        MR. MITCHELL:   I would  have  absolute ly nothing

17 to ask  the Clerk  of the Circuit  Court  for Montgomery

18 County , because  they  would  have  the records  and  they

19 would  be the one s that  could  testify .   But, no, Agent

20 Eveler , who's  from  Prince  George's  County , and he's

21 testify ing as though  he's  a clerk  of the court .   What

22 they  did is they  had  him  on his  -- the words  were  his

23 train ing and  experience .   Now  he's  say ing  he didn't

24 have  any.   He didn't  have  any train ing and  experience .

25        THE  COURT:   I don't  want  this  jury  misled  into

1  thinking  there 's  an  appeal  out  there  that  was n't  pick ed

2  up  by  the  Circuit  Court  for  Montgomery  County .

3        MR.  MITCHELL:   I didn't  want  the  jury  to  be

4  mis led  that  this  officer  has  some  knowledge  --

5        THE COURT:   Let  me  have  the  docket  entry .  I

6  will  give  a  clarify ing  instruction .

7        MS.  JOHNSTON:   Yes, your  Honor .  The  records  are

8  in  evidence .  The  records  were  in  evidence  before .

9        THE  COURT:   Let  me  get  that  clarifi ed.

10                    (Back  in  open  court .)

11        THE  COURT:   Mr.  Mitchell ,  can  you  have  that

12  record  given  to  me?

13        MS.  JOHNSTON:   Your  Honor ,  it's  Miscellaneous

14  19 .

15        MR.  MITCHELL:   Do  you  want  me  to  continue  my

16  question ing ?

17        THE  COURT:   No .  I'm  going  to  --  before  you  go

18  on  to  that .  Ladies  and  gentlemen ,  there  has  already

19  been  received  in  evidence  as  Government 's  Exhibit  No.

20  Miscellaneous  19 ,  a  certifi ed  copy  of  the  records  of

21  the  Clerk  of  the  Circuit  Court  for  Montgomery  County

22  which  contain s  all  of  the  docket  entri es  of  the

23  criminal  conviction  that 's  been  reference d  in  the

24  examination  you've  just  heard .  The  final  entri es  in

25  this  case  are  July  20  and  July  21,  2000 .  The  most

1  significant  one  is  the  disposition , which  is  the

2  sentence  that  was  imposed  pursuant  to  a  plea  agreement .

3         The  final  entry  is  July 21, 2000  which  says ,

4  commitment :  Delivered  to  Sheriff .  Meaning , the

5  sheriff  was  taking  custody  of  the  defendant .  If  an

6  appeal  is  filed  in  the  state  of  Maryland , a  notice  of

7  appeal  must be  filed  on  the  docket  in  this  case .

8         If  an  appeal  had  been  filed , it  would  be

9  reflected  on  a  docket .  This  docket  was  --  this  docket

10  record  was  produced  by  the  Clerk  of  the  Circuit  Court

11  for  Montgomery  County  certifying  from  her  records  as  of

12  October  22, 2004 .

13         In  order  for  an  appeal  to  be  filed  in  Maryland ,

14  it  must  be  filed  within  30  days  of  the  sentence .  There

15  was  no  appeal  in  this  case  reflected  on  the  docket  of

16  the  Circuit  Court  for  Montgomery  County .

17         Thank  you .

18         MR. MITCHELL:   May  we  approach , Your  Honor ?

19         THE  COURT:   Yes , you  may .

20              (At  the  bar  of  the  Court.)

21         MR. MITCHELL:   I  want  to  note  an  objection  to

22  the  court 's  instruction , respectfully .  The  proper  way

23  for  that  to  have  been  done  was  for  the  government  to

24  have  subpoenaed  the  Clerk  of  the  Court  for  Montgomery

25  County  to  testify  to  that .  I'm  aware  --  Your  Honor  --

1          THE  COURT:    It's  in  evidence .

2          MR.  MITCHELL:    Absolute ly.

3          THE  COURT:    Nobody  object ed  to  it .

4          MR.  MITCHELL:    That  is  exact ly  what  the  jury

5  should  have  gotten .

6          THE  COURT:    That  is  before  the  jury .

7          MR.  MITCHELL:    Absolute ly.  And  that 's  all .

8  They  should  not  have  gotten  an  explanation .

9          THE  COURT:    Mr.  Mitchell , perhaps  because  it 's

10  of  some  unart ful  question ing  about  opinion s, you  were

11  able  to  enjoy ing  asking  some  interest ing  question s, but

12  the  bottom  line  is  it  would  not  be  proper  for  that

13  question ing  to  lead  the  jury  to  conclude  that  there 's  a

14  possible  appeal  out  there  that  somebody  does n't  know

15  about .  That 's  on  this  record , and  there  is  no  appeal .

16          MS.  JOHNSTON:    Quite  frankly , it  does n't  matter .

17  The  issue  that  the  government  want ed  to  bring  out  was

18  the  date  of  these  records  and  the  fact  that  he  had  been

19  sentence d  to  more  than  one  year  of  prison  to  meet  the

20  requirement s  of  922(g).  That  is  in  the  record .  That

21  is  what  I  had  him  read  into  the  record .  There  is

22  nothing  in  the  record  to  say  the  conviction  was n't

23  valid  as  of  June  4, 2004 .  That 's  a  negative .

24          MR.  MITCHELL:    They  also  have  to  prove  the  case

25  was  not  over turn ed  and  --

1          THE COURT:   Well, that's the -- that docket

2   under -- I practiced in that court for 37 years.   That

3   is where you would find a reversal.

4          MR. MITCHELL:   Absolutely.

5          THE COURT:   You don't find it in Annapolis.

6   They ship it back here and dump it in this file here.

7          MS. JOHNSTON:   There is no way we could prove a

8   negative, Your Honor.   There is nothing to be put in

9   other than the court record.

10          MR. MITCHELL:   I want to put in my objection.

11   You and I know that --

12          THE COURT:   I don't want the jury to be misled

13   about what this docket means or doesn't mean.

14          MR. MITCHELL:   I'm not the one that started

15   misleading.

16          THE COURT:   I understand that.   You had a good

17   time with that.

18          MR. MITCHELL:   They could have clarified by

19   bringing in the court of the clerk of the court.   It

20   should not be the court testifying as to the law.

21          THE COURT:   You've challenged his credibility by

22   putting in -- bringing in the opinions's, a public

23   record -- the public record shows no appeal and no

24   overturning of the case as of June 1, 2004.

25          MR. MITCHELL:   I wanted to note my objection.

1          THE COURT:   Your objection is noted.

2          MR. MITCHELL:   Now I will move on.

3                    (Back in open court.)

4          BY MR. MITCHELL:

5  Q.      Detective Eveler, moving on.  As the case agent,

6  you made a number of decisions of tactics and things to

7  do in the investigation; is that correct?

8  A.      Myself and others.

9  Q.      And Sergeant Sakala and --

10 A.      Special Agent Snyder.

11 Q.      Snyder.

12         Between you, you would make decisions on things

13 like fingerprints, DNA, and other investigative

14 techniques to tie evidence to specific individuals;

15 correct?

16 A.      I made very few decisions as far as what items

17 were submitted for forensic analysis.  I know I hand-

18 carried the box that was seized in New York.  I hand-

19 carried that for latent print examination.  The DNA

20 analysis decision was made by Sergeant Sakala.  That's

21 their lab and it's his decision.  Most of the

22 fingerprinting was made by someone else.  I did not

23 make those decisions.

24 Q.      I believe you testified about this before, but

25 you agree that none of the items of evidence that have

1  been  submitted  to  the  jury  placed  on  this  table  have

2  the  fingerprint  of  Mr.  Bynum.

3          MS.  JOHNSTON:    Your  Honor,  the  government  will

4  stipulate  that  the  only  latent  print  of  value  came  off

5  of  a  cardboard  box  was  recovered  in  New  York  and  it

6  didn't  belong  to  any  of  the  defendants  that  are  on

7  trial.

8          BY  MR.  MITCHELL:

9  Q.      So  I  assume  the  answer  is  yes.

10 A.      Yes.

11 Q.      There  was  one  found.

12 A.      Yes,  as  I  have  testified  before.

13 Q.      Equally  with  DNA  evidence,  I  assume  the  answer

14 is  the  same:   You  didn't  find  any  DNA  matching  Mr.

15 Bynum's  DNA.

16 A.      On  any  of  the  evidence  that  was  presented  to  the

17 jury.

18          MS.  JOHNSTON:    Objection.

19          That's  not  his  area  of  expertise.    There  was

20 testimony  about  the  DNA.

21          THE  COURT:    Sustained.

22          BY  MR.  MITCHELL:

23 Q.      Were  you  aware  of  any  results  given  to  you

24 matching  Mr.  Bynum's  DNA  to  any  of  the  evidence?

25 A.      I  really  can't  recall.

1          MR. MITCHELL:   I have no further question s.

2          THE COURT:   All right .

3          MR. WARD:   I guess I'm next .

4          THE COURT:   You're next .

5                    **CROSS-EXAMINATION**

6          BY MR. WARD:

7  Q.      Good morn ing , sir .

8  A.      Good morn ing .

9  Q.      "Case Agent " is a little cumbersome .   What is

10 your rank ?

11 A.      Corporal .

12 Q.      Corporal .  All right .  Well , Corporal Eveler ,

13 let me ask you a few question s, please .

14         You were respond ing to a question put to you by

15 Ms. Johnston and you said that near ly every purchase

16 could be sold , even a $20 rock , or words to that

17 effect ; is that right , sir ?

18 A.      That 's correct .

19 Q.      Do you recall  -- you were in the courtroom , by

20 the way .  Do you recall the testimony of Mr. Thurman ?

21 A.      Most of it .

22 Q.      Okay .  And Mr. Thurman told this jury that he

23 was a long time drug user ; is that correct , sir ?

24 A.      I don't believe he use d the term long time .

25 Q.      Do you recall him say ing that he start ed using

1 drugs when he was 16?

2 A.      I can't recall when said he started.

3 Q.      Okay.  Do you recall him saying that he started

4 around 199one?  I'll be glad to show you a transcript

5 of his testimony if you'd like to see that.

6       MS. JOHNSTON:   Objection.

7       Beyond the scope of direct.

8       THE COURT:  How is this within the scope?

9       MR. WARD:  How is it beyond the scope of direct?

10 She add asked him -- I'm trying to establish through

11 Mr. Thurman who, if anybody, is an expert is an expert

12 in drug use, that he is entirely consistent an eight

13 ball or -- an eight ball, yes, is highly consistent or

14 not inconsistent with personal use.

15       THE COURT:  Okay.  Overruled.

16       BY MR. WARD:

17 Q.      Do you want to look at the transcript of his

18 testimony in that regard?

19 A.      Sure.

20 Q.      Huh?

21 A.      Sure.

22       MS. JOHNSTON:   Your Honor, I would ask counsel

23 to provide him with all of Mr. Thurman's testimony and

24 not just an isolated portion.

25       MR. WARD:  Well, I'm only asking about an

1  isolate d portion , Your Honor .  If they want to ask him

2  about the whole thing , they can certain ly do that .

3         THE COURT:   Proceed .

4         BY MR. WARD:

5  Q.    Sir , this is a certifi ed copy by this court

6  reporter of partial cross-examination  and redirect

7  examination of Michael Thurman on June 20 .

8         MS. JOHNSTON:   Counsel , may I see what you're

9  referring to please ?

10        MR. WARD:   What ?

11        MS. JOHNSTON:   May I see what you're referring

12  to, please ?

13        MR. WARD:   I thought you had a copy .

14        MS. JOHNSTON:   I don't know  what you're look ing

15  at , and I have several copies of different thing s.

16        What page are you referring to?

17        MR. WARD:   Well , I'm going to start on Page 3 .

18        THE COURT:   Just give the page and line number

19  so she can follow along .

20        MR. WARD:   I'm going to start on Page 3, Line 8.

21        MS. JOHNSTON:   Thank you , sir .

22        BY MR. WARD:

23  Q.    Mr. Thurman was asked about his early

24  involve ment with drug s by Mr. McKnett ; is that correct ,

25  sir ?

1          Take a look at it.  I don't want to -- is that

2 correct, sir?

3 A.      Just a minute.  I'm sorry.  What was your

4 question again, please?

5 Q.      He was asked about his early drug use by Mr.

6 McKnett; is that correct, sir?

7 A.      That's correct.

8 Q.      And he said that he started using drugs when he

9 was 16 years old; is that correct, sir?

10 A.      That's correct.

11 Q.      And he's now, I guess -- I say "now." As of the

12 time he testified, he was 31; is that correct, sir?

13 A.      That's correct.

14 Q.      So he began around 1991; is that correct?

15 A.      That's -- yes.

16 Q.      And he stopped using about '04.

17 A.      That's what's reflected, yes.

18 Q.      All right, sir.  And on Page 4, beginning at

19 Line 14, Ms. Johnston and Corporal -- he said that when

20 he started using, he started out with marijuana, but

21 then he started using powder cocaine a year or two

22 later; is that correct, sir?

23 A.      Yes.

24 Q.      All right, sir.  And I'm simply asking your

25 opinion, sir.  Would you say that this gentleman was an

1 expert in the use of narcotic substance s, particular ly

2 cocaine powder ?

3          MS. JOHNSTON:   Objection .

4          THE COURT:   He didn't testify as an expert , Mr.

5 Ward.

6          MR. WARD:   I'm sorry ?

7          THE COURT:   He didn't testify as an expert .

8          MR. WARD:   I understand that , Your Honor .   I'm

9 asking his opinion , for what it 's worth .

10          MS. JOHNSTON:   Objection .

11          THE COURT:   Sustained .

12          MR. WARD:   All right .   Well , I'm sure the jury

13 will --

14          MS. JOHNSTON:   Objection to counsel 's comment s.

15          THE COURT:   Mr. Ward , go to your next question .

16          MR. WARD:   Do you remember -- this is the 16th

17 -- February 16th , another excerpt .

18          MS. JOHNSTON:   I don't have that excerpt ,

19 counsel .

20          BY MR. WARD:

21 Q.    I'll tell you what .   Why don't we share that ?

22 This is Page 4, beginning at Line 13.   I put the

23 question to Mr. Thurman .   I said , "The purchase of an

24 eight ball is not inconsistent with simply buying for

25 personal use ." And his answer was , "Correct ."

1          Do you remember that, sir?

2 A.     No, but I'm sure you could refresh my

3 recollection.

4 Q.     Well, I've showed it to Ms. Johnston.  Let me

5 show it to you, and you can tell me if I read it

6 correctly.

7          MS. JOHNSTON:   Your Honor, I'm going to object

8 to reading one or two questions and answers and not

9 reading the entire page.  He's taking it out of

10 context, and under Rule 106, it would be appropriate.

11         MR. WARD:   I'm sure he will put it in context.

12         THE COURT:   Provide the transcript to her so she

13 can put the context in on redirect.

14         BY MR. WARD:

15 Q.     I hate to run you through the mill and tire you

16 out, but I'm going to have to ask you to step over here

17 again, sir, so we can look at some of these charts that

18 have been put in evidence and shown to the jury.

19         I'm going to ask you to keep your voice up,

20 because everybody needs to hear you, including the

21 people back there and the gentlemen in the second row

22 over there.  Let me tell you which one we want to begin

23 with -- at least I want to begin with.

24         Before we actually turned to the charts, you

25 were shown a photograph which I think was P- -- let me

1 start again.   You were asked about a photograph, P-286,

2 which you identified as a photo of Royal Crest.   I

3 don't know  if you called it Road, Avenue or what.   Do

4 you remember  that?

5 A.      I remember  seeing a photograph.   I don't recall

6 the number.

7 Q.      Okay.   But you do remember  seeing a photograph

8 of Royal Crest?

9 A.      Yes.

10 Q.      I believe your answer was that it was the

11 residence of Beverly White and her husband, Dobie; is

12 that right, sir?

13 A.      I said his name was McCarthy Plummer.     His

14 nickname was "Dobie."

15 Q.      Dobie.   We're not talking about Lavon Dobie;

16 we're talking about a man?

17 A.      We're talking about McCarthy Plummer,  a male.

18 Q.      We're not talking about her husband, Goldie

19 Dobie?

20 A.      McCarthy Plummer  is deceased.   He is not in this

21 courtroom.

22 Q.      I just wanted to make clear that that was

23 somebody else.

24         All right.   Let's begin with the chart.   I

25 believe  it's Chart 5, and it's entitled Goodwin's Texas

1 Cocaine Shipment December -June 2004. All right , sir.
2 And this chart we have , this is Chart 5 -- CH-5, and it
3 begins December 20, 2001, to be precise , and runs down
4 through September 11 of 2003; is that correct , sir?
5 A.      On this first page .
6 Q.      On the first page , yes. We're just dealing one
7 page at a time .
8       This summarizes the government 's view of cocaine
9 shipments from Texas to Mr. Goodwin .
10 A.      Some , yes.
11 Q.      Some , yes. Do you see the name Lavon Dobie
12 anywhere on that , sir?
13 A.      No .
14 Q.      All right , sir. And let's look at the second
15 one then . This is for the --
16 A.      It's out of order .
17 Q.      Oh, I'm sorry .
18 Q.      This is -- it's not marked, but this is part of
19 CH-5, and this is, I don't know , Board 2 or whatever
20 you want to call it. This runs from September 20 of --
21 September 30, I beg your pardon , of '03 through March
22 18 of '04; is that correct , sir?
23 A.      That's correct .
24 Q.      Again , do you see the name of Lavon Dobie
25 anywhere on that chart ?

1 A.      No.

2 Q.      All right , sir.

3       MS. JOHNSTON:   Your Honor , the government  will

4 stipulate  that Ms. Dobie 's name does not appear on any

5 of that chart , CH-5.

6       MR. WARD:   Thank you , Ms. Johnston .  I

7 appreciate  the consideration .  I'm sure the jury does ,

8 too.

9       BY MR. WARD:

10 Q.     Let 's move to chart  CH-4 now , if you will .

11 This , I believe , is the chart of telephone  activity

12 follow ing the 11-25-03 arrest  of Mr. Goodwin .

13       MS. JOHNSTON:   Your Honor , the government  would

14 also stipulate  that Ms. Dobie 's telephone  number s are

15 not listed  on that chart  either .

16       MR. WARD:   That 's very kind of you .  Thank you .

17       BY MR. WARD:

18 Q.     Let me put a few preliminary  question s.

19       You prepared  this part because  the arrest  of Mr.

20 Goodwin  was , at least  in the government  's mind , a

21 signal  or important  event  in the life  of this allege d

22 conspiracy ; is that right , sir?

23 A.     It 's an event .

24 Q.     An event .  It was certain ly an important  event ,

25 since  it was one of the main suppliers  according  to the

1 government ; is that right , sir ?

2 A.      It's an event .

3 Q.      Huh ?

4 A.      It's an event .

5 Q.      It's an event .  All right .

6        And the purpose of putting the chart together is

7 to show that when Mr. Goodwin , who was allegedly the

8 partner of Ms. Martin , was arrested ; a lot of telephone

9 calms were made back and forth to other people who

10 might be interested in that arrest ; is that correct ,

11 sir ?

12 A.     To relationship s between parties after his

13 arrest .

14 Q.     And the fact that the news of his arrest was

15 transmitted  to certain people by Ms. Martin and others ,

16 allegedly .

17 A.     I don't know  if it's so much that there 's news .

18 It's the -- well , I think it's up to the jury to decide

19 what it is .

20 Q.     Of course it is eventually,  but the point is,

21 sir , why were they making these calls?  Why were all

22 these calls being made according  to the government's

23 theory of the case ?

24 A.     Are you asking my opinion ?

25 Q.     Yes .

1  A.      These are notification s from parti es close to

2  Mr. Goodwin to other parti es in order for them to make

3  arrangements and for some member s of that conspiracy to

4  decide what they're going to do and how they're going

5  to handle his arrest .

6  Q.      For example , call s made to people who might be

7  very concerned that if Mr. Goodwin had been arrested ,

8  he might turn on them and tell somebody about them --

9  is that right ? -- and their par ticipation.

10 A.      Or to let them know that law enforcement is --

11         MR. MARTIN:   Your Honor , I'm going to object to

12 the speculation call ed for in the question .

13         MR. WARD:   All right .   Well , I'm not going to

14 ask any further question s.   Why don't you finish that

15 one answer and we will move on.

16         MS. JOHNSTON:   Your Honor , the witness was

17 respond ing to the question pose d by defense counsel .

18         THE COURT:   Over ruled .

19         You may answer .

20         BY MR. WARD:

21 Q.      You were about to finish your answer .

22 A.      For parti es associate d with Mr. Goodwin , once

23 they found out law enforcement active ly involve d with a

24 member of that conspiracy , to figure out what step s

25 they were going to take --

1 Q.      In other words, for people -- according to the

2 government's theory of the case, people who were

3 involved in the conspiracy to protect their flanks, in

4 other words, and watch out; is that right?

5 A.      Yes.

6 Q.      All right, sir.  And we've already learned

7 actually, thanks  to the kind stipulation  from Ms.

8 Johnston that Ms. Dobie was not involved in any of

9 those telephone calls.

10        MS. JOHNSTON:   Objection.

11        Government stipulated that no calls were on this

12 chart involving Ms. Dobie.

13        MR. WARD:  Well, this is the chart we're talking

14 about.  The point is, there is nothing on this chart to

15 show that any of the people involved, according  to

16 government's view, contacted Ms. Dobie as a member of

17 the conspiracy to watch out.

18        MS. JOHNSTON:   Objection.

19        That's not what the government stipulated to.

20 The government stipulated to the fact that there are no

21 calls between Ms. Martin and Ms. Dobie listed on that

22 chart.  That's all the government stipulated to.

23        MR. WARD:  I understand that, but then I'm

24 taking that one step further.

25        THE COURT:  The objection is sustained.  You're

1 going to have to form it in a question.

2          BY MR. WARD:

3 Q.     All right. I will put it in the form of a

4 question, sir. Let me think about this. Let me come

5 back to this, okay? I want to think about it.

6          The point is, her name is not on here.

7 A.     Her name is not on there. That's correct.

8 Q.     If you did have evidence, sir, that calls had

9 been made to her following the arrest of Mr. Goodwin to

10 warn her or to tell her about the arrest of Mr.

11 Goodwin, you would have certainly made sure they were

12 on that chart so the jury can see them; is that

13 correct, sir?

14 A.     If I had a wiretap at the time to know what the

15 nature of the contacts were, yes, I would.

16 Q.     All right, sir. Let's go now to chart number

17 CH-2, I believe it is.

18          MR. MARTIN:   Your Honor, one of my witnesses is

19 sitting in the courtroom. I don't want him tainted in

20 any way.

21          THE COURT:   No. Ask him to excuse himself, if

22 you would.

23          MS. GREENBERG:   Your Honor, he's been here for

24 well over an hour; is that right, Agent Snyder?

25          MR. WARD:   I hope I haven't tainted him.

1          MR.  MARTIN:   I  just  noticed  him, Your  Honor.

2          THE  COURT:   If he  didn't  notice  him, then --

3          MR.  MARTIN:   It  was  just  pointed out  to me  by

4  Mr. Goodwin.

5          THE  COURT:   Counsel, please  be  sure  to turn

6  around  and  look  in  the  back  of  the  courtroom, because  I

7  don't know  who  the  potential  witnesses  are.

8          MS.  GREENBERG:   Neither  does  the  government,

9  Your  Honor.

10         THE  COURT:   I  understand.

11         MR.  MARTIN:   When  my  client  tries to  turn  around

12 sometimes  --  and  none  of  these  marshals  have  done  it  --

13 marshals  have  told  him  not  to.   So if  the  marshals

14 would  allow  him  to  do  that, it  would  be  helpful.

15         THE  COURT:   He  can  turn  around  and  look  behind

16 him, but  please  --  we  will  deal  with  any  issues  of

17 whether  he's  been  tainted  later.

18         You  may  proceed.

19         MR.  WARD:   Thank  you, Your  Honor.

20         BY  MR.  WARD:

21 Q.    I  want  to  make  sure  I  understand  this  chart.

22 First  of  all, people  whose  numbers  are  in  red  are

23 defendants  in  this  case; is  that  correct?

24 A.    Yes.

25 Q.    All  right, sir.   And  the  people  whose  numbers

1  are in black are the people who have been mentioned in

2  this case throughout, and in some cases I think

3  testified but are not defendants in this case; is that

4  correct, sir?

5  A.      None of the people in black testified.

6  Q.      Oh, okay.  Well, they didn't testify then, but

7  they're not defendants in this case; right, sir?

8  A.      Not in this case.

9  Q.      Do I understand, sir, that the calls that are

10 numbered there -- the numbers which calls are given are

11 a combination of the pin registers and the intercepted

12 calls some of which we've heard?

13 A.      During the intercepts, there is a pin register

14 running the entire time.

15 Q.      Okay.

16 A.      The pin register data includes the intercepted

17 contacts.

18 Q.      I see.  I'm glad you clarified that, because I

19 didn't fully understand that.

20         I think the point's been made before, and I

21 don't want to beat a dead horse to death, but the fact

22 that there were, let's say, 1,268 contacts with these

23 phones which you have identified with my client and

24 Paulette Martin between September 2, '03 and 6-1-04.

25 Some of those were recorded and some were not.

1  A.      Yes.

2  Q.      All right, sir.  Now, let's take the telephones

3  listed there to Ms. Dobie.  I think two of them -- are

4  two of them land lines, or that is they're like

5  permanent phones in the residence and one is a cell

6  phone?

7  A.      The 202-882-3738 and 3739 are hard lines at 7427

8  Ninth Street.

9  Q.      The other one is a cell phone.

10  A.      Yes.

11  Q.      This chart does not tell us who made the

12  "contact" as you call it, the 1,268 contacts.

13  A.      That's correct.

14  Q.      I think it's fair to assume that my client made

15  some of them, but this chart doesn't tell you how many

16  she made or whether some were made by her husband or

17  whether some were made by one of her two sons, for

18  example.

19  A.      That would be correct.

20  Q.      Or whether someone else used her cell phone to

21  make one of these calls; is that correct?

22  A.      That's correct.

23  Q.      All right, sir.

24          And this chart, likewise, does not tell us which

25  calls the government deems -- I don't want to say

1  "incriminating" and which calls may be are maybe

2  entirely innocent calls; is that right, sir?

3  A.     That's correct.

4  Q.     For example, if Ms. Dobie had called up Ms.

5  Martin and said, you know, I'm looking to buy a new

6  suit to, I don't know, go out to some special occasion,

7  that would not be distinguished from any other call on

8  there.

9  A.     That's correct.  This is just a chart of the

10  contacts.

11  Q.     All right, sir.  Now, when you say "contacts,"

12  this is calls both ways; is that right, sir?

13  A.     Yes.

14  Q.     So we don't know if this 1,268 calls -- I'm just

15  giving an example.  If 268 were from Lavon Dobie to

16  Paulette Martin, or at least one of the phones

17  identified with Paulette Martin, and the other 1,000

18  from one of these phones identified as Paulette Martin

19  to one of the phones presented by Lavon Dobie?

20  A.     The chart does not reflect that.

21  Q.     There's no way, looking at the chart, to know

22  that?

23  A.     That's correct.

24  Q.     All right, sir.  During the period that this

25  chart covers, specifically with respect to Mr. Dobie --

1   Ms. Dobie, rather, September 2, '03 to 6-1-04, and

2   based on the same information that you used to prepare

3   this chart, can you tell us if Lavon Dobie made any

4   calls to Ruby Harden or if Ruby Harden made any calls

5   to her?

6   A.      I cannot.

7   Q.      You certainly have no evidence that she did.

8   A.      That's correct.

9   Q.      Do you have any evidence that Lavon Dobie made

10  any calls to Learley Goodwin or that Learley Goodwin

11  made any calls to Lavon Dobie?

12  A.      All I have is her phone number in his documents.

13  Q.      In his documents?

14  A.      Yes.

15  Q.      Other calls we're talking about here.  You have

16  no evidence at all that there was any contact between

17  those two telephones.

18  A.      I did not have a dial number recorder, and I did

19  not receive air time records for Ms. Dobie.

20  Q.      All right.  Do you have any evidence that during

21  the same period of time, September-2-03 to 6-1-04, that

22  Lavon Dobie made any calls to Derrick Bynum or that

23  Derrick Bynum made any calls to Lavon Dobie?

24  A.      No.

25  Q.      Do you have any evidence that during the same

1 period of time, Lavon Dobie made any telephone calls to

2 LaNora Ali or LaNora Ali made any telephone calls to

3 Lavon Dobie?

4 A.      Not that I recall.

5 Q.      Well, let me ask the same question with respect

6 to Reece Whiting.  Do you have any evidence that Lavon

7 Dobie, during the time period concerned, made any calls

8 to Reece Whiting or that he made any calls to her?

9 A.      Not that I recall.

10 Q.      What about Milburn Walker?  Do you have any

11 evidence that he made calls to her or she made calls to

12 him?

13 A.      None that I recall.

14 Q.      Tiffany Vessels.  Same question.  Do you have

15 any evidence that Lavon Dobie called Tiffany Vessels or

16 Tiffany Vessels called Lavon Dobie during that time

17 period?

18 A.      None that I recall.

19 Q.      The same question with respect to William -- I

20 think this is Dog Turner.  William "Dog" Turner, that

21 during that same time period Lavon Dobie made any calls

22 to him or he made any calls to her?

23 A.      None that I recall.

24 Q.      What about Pernell Philpot?  Same question.

25 During the time period, do you have any evidence that

1 Lavon Dobie made any calls to him or he made any calls

2 to her?

3 A.     None that I recall.

4 Q.     The same question with respect to Larry Nunn.

5 Any evidence that she called him or he called her?

6 A.     None that I recall.

7 Q.     And with respect to Luis Mangual.  Any evidence

8 that she called him or he called her?

9 A.     None that I recall.

10 Q.     Gwen Levi.  Same question.  Do you have any

11 evidence that Dobie called her or she called Dobie --

12 Ms. Dobie?

13 A.     There were telephone intercepts indicating that

14 they knew each other, and she was attempting to get a

15 hold of Ms. Levi.

16 Q.     But that's it.

17 A.     That's all I recall.

18 Q.     You have no evidence of any discussions between

19 them.

20 A.     Not that I recall.

21 Q.     Specifically discussions where they're talking

22 about unlawful distribution or {TRAF} if I canning in

23 narcotic substances.

24 A.     Not that I recall.

25 Q.     Finally, the same question with respect to

1 George Harris. You have no evidence, is it correct, of

2 any telephone calls between Ms. Dobie and Mr. Harris

3 and vice versa, Mr. Harris to Ms. Dobie during that

4 same period of time.

5 A.      None that I recall.

6 Q.      All right, sir.

7         The final chart I want to discuss with you is

8 Chart 1, which is the one with the photographs on it.

9 Now, this chart -- first of all, whose language is this

10 distributors/facilitators?  Is that yours?

11 A.      That would be mine.

12 Q.      Huh?

13 A.      I put this together.

14 Q.      The question is, who put this

15 "distributors/facilitators" there?

16 A.      I did.

17 Q.      To reflect your view as to, for example, Lavon

18 Dobie's participation or alleged participation in this

19 enterprise?

20 A.      To reflect everyone in this box's participation.

21 Q.      I'm only interested in Lavon Dobie, you

22 understand.

23 A.      I understand.

24 Q.      So the answer is, with respect to Lavon Dobie,

25 this reflects your view that she was a distributor or

1 facilitato r.

2 A.       Yes .

3 Q.       All right , sir.

4        I believe  when  Ms.  Johnston  asked  you  --  you

5 said  that  by  facilitat or  or  distributor , you  meant , for

6 example , someone  who  would  purchase  for resale  or

7 someone  who  could  sell  contraband  for high er-ups  or

8 someone  who  provided  legal  advice . Can  we  say  safe ly

9 that  you  have  no  evidence  that  Lavon  Dobie  ever  offered

10 any  legal  advice  to  member s  of  this , as  you  say ,

11 "Goodwin -Martin  Organization ?"

12 A.       She  offered  advice  to  John  Martin  about

13 obtain ing  a  hoop die,  and  that  would  be  kind  of  street

14 legal  advice  I  would  --

15 Q.       A  hoop die  is  an  old  wreck  of  a  car ; right ?

16 A.       Yes .

17 Q.       Thing s  you  can  buy  cheap .

18 A.       Yes .

19 Q.       And  you  character ize  that  as  sort  of  street

20 legal  advice ?

21 A.       Yes . If  I'm  tell ing  you  how  to  avoid  the

22 forfeiture  law s  of  the  state  of  Maryland  or  the  federal

23 forfeiture  laws, I  would  see  that  as  being  kind  of

24 street  lawyer  advice .

25 Q.       We'll  accept  that .

1          Other  than  that ,  did  she  give  any  legal  advice
2  to  your  knowledge ?
3  A.        No .
4  Q.        With  respect  to  your  opinion  that  distributors
5  or  facilitato rs  purchase d  for  re sell .   Were  any
6  controlled  buy s  ever  made  from  Ms.  Dobie ?
7  A.        Not  by  member s  of  our  investigation .
8  Q.        Were  record ed  telephone  call s  where  you 'd ,  you
9  know ,  bring  an  informant  in  and  have  the  person  make  a
10  call  to  Lavon  Dobie  and  say ,  hey ,  I  want  a  cop  for  a
11  little  drug s  or  thing s  like  that  and  you  record  it  and
12  then  come  in  court  and  testify  about  that .   Do  you  have
13  anything  like  that ?
14  A.        Outside  of  the  wiretap ?
15  Q.        Yes .
16  A.        Not  by  us .
17  Q.        Did  you  ever  do  any  trash  pick ups  at  Lavon
18  Dobie 's  house  to  see  if  you  could  find  evidence  of  drug
19  distribution ?
20  A.        No .
21  Q.        I  don't  recall  --  I 'll  ask  you .   Do  you  recall
22  any  photograph  shown  in  this  court  to  this  jury  which
23  show s  Ms.  Dobie  show ing  up ,  for  example ,  at  somebody 's
24  house  or  leav ing  somebody 's  house  or  carry ing  a  bag  in
25  or  carry ing  a  bag  out  or  anything  like  that ?

1  A.        Were any shown in this cram?

2  Q.        Yes, to this jury.

3  A.        No.

4  Q.        Do you know if any -- I'll call it "live

5  surveillance."  That is police officers going out and

6  following somebody and watching what they did.

7          Any live surveillance done on Lavon Dobie that

8  led to evidence of her, you know, dealing drugs or

9  handing over bags or receiving bags or handing over

10  money or anything like that?

11  A.        Not that I recall.

12  Q.        All right, sir.

13          What about the pole cameras we've heard about.

14  There was a pole camera that looked over the front yard

15  of somebody's house.  I think it was Ms. Martin's

16  house.

17  A.        Yes.  810 Hayward Avenue.

18  Q.        She didn't appear on any of the views from that

19  pole camera, did she?

20  A.        At nighttime we would lose camera capabilities.

21  Q.        I understand that.  I guess that's why you

22  didn't show any nighttime pictures.

23          The pictures you showed to the jury.  She wasn't

24  on any of them, was she?

25  A.        Not that I recall.

1  Q.       All right, sir.

2          Now, I think you were present in the courtroom

3  when Nathan King testified.  He was the son of Steve

4  Brim out in California.  Do you remember that, sir?

5  A.       Yes.

6  Q.       And Nathan King was the guy who would ferry

7  drugs and money back and forth between here and the

8  west coast in his tractor trailer; is that right, sir?

9  A.       That's correct.

10 Q.       And his stepmother was a lady named Bridget

11 Brim, I believe; is that right, sir?

12 A.       That's my understanding, yes.

13 Q.       In fact, he was asked if he recognized anybody

14 on this chart, and he put, right next to my client's

15 picture, "Bridgett Brim, NK, 6-14-06."  You saw him do

16 that; right, sir?

17 A.       Yes.

18 Q.       You were in court when Mr. Echarte testified.  I

19 think it was a Cuban gentleman.

20 A.       Yes.

21 Q.       He was asked to look at this chart too and see

22 if he recognized anybody; is that right, sir?

23 A.       Yes.

24 Q.       At first he said, well, this -- pointing at

25 Lavon Dobie -- looks a little bit like Gwen Levi; is

1 that correct, sir?

2 A.    I don't recall.

3 Q.    Well, the jury I'm sure will recall whether or

4 not that happened.

5     You do remember later on when I pressed him

6 about being engaged in a, I don't know what you call

7 it, show up or whatever of stolen goods at some bar in

8 D. C.  Then he recognized Lavon Dobie as being the

9 woman who had the stolen goods.  Do you remember that?

10 A.    I remember some confusion about that, but he did

11 acknowledge meeting somebody in D. C. about some

12 jewelry.

13     MR. WARD:  All right, sir.  Agent, I don't think

14 I have any further questions.  I do thank you.

15     THE COURT:  All right.

16     MR. WARD:  I thank the government for the

17 stipulations.

18     THE COURT:  We will take a recess at this time

19 until high noon.

20                 (Jury excused at 11:40 a.m.)

21                 (Off the record at 11:40 a.m.)

22                 (On the record at 12:05 p.m.)

23     THE COURT:  Bring them in.

24     MS. GREENBERG:  Just a couple of housekeeping

25 matters.  One of the case agents requested that the

1  jurors have been smiling and saying good morning.

2  Could the court just remind them that the parties

3  aren't allowed to respond?

4          THE COURT:   I think I've done that, but I can do

5  it again.

6          MS. GREENBERG:   Thank you.

7                    (Witness resumes the stand.)

8                    (Jury returns at 12:06 p.m.)

9          MR. SUSSMAN:  If I might inquire.

10         THE COURT:   You may proceed.

11                    **CROSS-EXAMINATION**

12         BY MR. SUSSMAN:

13  Q.     Good afternoon.  In terms of what everyone else

14  has done, could you step on down?  We don't need to use

15  the easel.  We'll just do it by row here.

16         In terms of this chart and the organization.

17  It's fair to say that all of these entities -- these

18  little boxes here have other boxes who supplied them;

19  is that right?

20  A.     Yes.

21  Q.     In terms of -- I think you identified that Juan

22  Encarnacion and Luis Mangual had a group of people in

23  the Nunez Connection; right?

24  A.     Not Mr. Mangual.  Mr. Encarnacion was being

25  supplied by the Nunez Organization.  Mr. Mangual was

1 being supplied by his father and brother s.

2 Q.     Nunez was link ed with 26 people . That was

3 another conspiracy ; is that right ?

4 A.     Yes .

5 Q.     We can assume that all of these group s got their

6 drug s from some place ; is that right ?

7 A.     Yes . Cocaine is not grown in the United States .

8 Q.     Is it fair to say that in terms of your

9 investigation , this group was n't communicati ng

10 particular ly with this group ?

11     MS. JOHNSTON:   Your Honor , if we could perhaps

12 have counsel identify which group is "this group " and

13 "this group " so that the record is clear .

14     THE COURT:   Yeah . Could you do that , Mr.

15 Sussman ?

16     BY MR. SUSSMAN :

17 Q.     You can see the chart . Maybe that would help

18 you out . If I have to read , I'll read . Steve Campbell

19 and the Houston Group was n't talk ing to Juan

20 Encarnacion ; is that right ?

21 A.     Not that I know of .

22 Q.     Okay . Not that you know of .

23     And Juan Encarnacion was n't talk ing to Steve

24 Brim .

25 A.     Correct .

1  Q.      Steve Brim, when he was alive, he wasn't talking

2  to Moises Uriarte; is that right?

3  A.      I have no information that he was.

4  Q.      Okay.  Now, there was some discussion of that

5  guy Echarte testified; is that right?

6  A.      Yes.

7  Q.      Echarte.  His testimony was that at some point

8  he was living in Maryland and he was supplying cocaine

9  to Ms. Martin.  That was his testimony; correct?

10  A.      Yes.

11  Q.      So he's not on the chart there; is that right?

12  A.      That's right.

13  Q.      So if we were extending the chart, then there

14  would be another arrow and there would be Mr. Echarte

15  with cocaine going to Ms. Martin.  Wouldn't that be

16  consistent with the testimony you've heard?

17  A.      Yes.

18  Q.      And Echarte testified that he was getting his

19  cocaine from a bunch of people in Miami; isn't that

20  right?

21  A.      Yes.

22  Q.      And you had no information that the people in

23  Miami were talking to these people, the Uriarte group.

24  A.      That's correct.

25  Q.      Okay.  Or talking to any of these other groups,

1  just to make it easier.

2  A.      That's correct.

3  Q.      In terms of the -- if we were diagramming,

4  Echarte also said he had a heroin thing going; is that

5  right?

6  A.      Yes.

7  Q.      And a marijuana thing, also.

8  A.      (No response.)

9  Q.      Well, if you don't remember, you don't remember.

10 A.      I don't remember.

11 Q.      But heroin you do remember; right?

12 A.      Yes.

13 Q.      He was getting heroin, and he said he was just

14 selling it in D.C. to whoever he sold it to; right?

15 A.      And Mr. Whiting.

16 Q.      If this chart were correct, you would show

17 Echarte with cocaine and Echarte with his Miami sources

18 and Echarte selling heroin to whoever he sold it to

19 down here; right?

20 A.      I disagree with your statement, "if my chart was

21 correct." My chart is correct.

22 Q.      It may be correct as far as it goes, but you

23 could say there could be additions to the chart?

24 A.      Yes, but I couldn't have arrows going all over

25 the place.

1  Q.      And people added up on the chart?

2  A.      Yes.

3  Q.      In terms of the people down here in the bottom

4  box.  They're distributors +/-, and +/- we would take

5  it to mean "and/or?"

6  A.      Yes.

7  Q.      Some are distributors and some are facilitators.

8  A.      Some are both.  Some are both.  That's the end,

9  I guess.

10 A.      Yes.

11 Q.      In terms of Ms. Harden over here.  There was no

12 evidence that she was facilitating in the sense of

13 giving advice, hiding things, lookout, the kind of

14 things you might consider facilitating; right?

15 A.      Not that I recall.

16 Q.      So she's purely, in your schematic and your

17 system, she's a distributor; is that right?

18 A.      Yes.

19 Q.      I think you can take the stand again.  Thank you

20 very much.

21         In terms of the distribution.  There's been some

22 discussion about the eight ball and 3.5 grams; correct?

23 A.      Correct.

24 Q.      Okay.  Is it fair to say that the only -- well,

25 the principal way you would make money with an eight

1  ball is breaking it into very small amounts and selling

2  it as dimes or $20.

3  A.      That's your most profitable method.

4  Q.      Right.  And that's pretty much what people are

5  into selling drugs for.

6  A.      Or supporting their habit.

7  Q.      Okay.  And again, harkening back to Michael

8  Thurman.  He talked about selling $20 packets of

9  cocaine and running up and down whatever street it was

10  -- up and down the boulevard to find his customers;

11  isn't that right?

12  A.      I don't recall that.

13  Q.      But he mentioned that he was a dime, $10, $20

14  seller; isn't that right?

15  A.      I can't recall.

16  Q.      Okay.  You can't recall that, but you would

17  agree that that's the way you'd make money out of 3.5

18  grams.

19  A.      Not entirely, no.

20  Q.      Okay.  But that's the most profitable way to

21  sell it; isn't that right?

22  A.      Yes.

23  Q.      If you're selling it in the most profitable time

24  fashion, you need customers; right?

25  A.      To sell something, you need customers.  I agree.

1 Q.     Right.  And if you're selling dimes and $20s,
2 you need a group of customers; is that right?
3 A.     If that's what you're doing.
4 Q.     Okay.  Now, fair to say that Ms. Harden first
5 came to your attention in early March of 2004 with the
6 wiretap going up or down, whichever way the wiretap is?
7 A.     Yes.  I'm sorry.  It may not have been early.
8 It was in March of 2004.  I think you said "early."  I
9 just don't recall what portion of the month, but
10 sometime in March.
11 Q.     When did the wiretap start, if you remember?
12 A.     The wiretap started March 8, but I don't recall
13 which --
14 Q.     Which date, particularly?
15 A.     Right.
16 Q.     So between March and the arrest date for at
17 least for Ms. Harden, it was June 1st of 2004; is that
18 right?  Or June 2nd.  I'm not --
19 A.     The 1st or 2nd.
20 Q.     Right.  So that's a period of some three months
21 more or less; is that right?
22 A.     Yes.
23 Q.     So that was a period where you were aware who
24 she was and time you had to investigate her; isn't that
25 right?

1 A.       Yes.

2 Q.       As a matter of fact , you did some surveillance

3 in Baltimore at her residence in Dundalk; isn't that

4 right?

5 A.       An agent was sent to do surveillance there, yes.

6 Q.       Is it fair to say that agent didn't observe any

7 illegal conduct and didn't observe any narcotic s

8 activity and didn't observe anything of that sort?

9 A.       He just observe d her walk ing around the

10 building .

11 Q.       Did you ever send the agent back again?

12 A.       I did not.

13 Q.       And you're not aware of any other further

14 observation s.

15 A.       I am not.

16 Q.       Okay. Was a decision made that it just wasn't

17 worth it?

18 A.       You're going in many direction s.  I can't really

19 wall recall why we didn't go back , but we had these  --

20 one of the defendant's lines.    We had many iron s in the

21 fire .

22 Q.       In addition  to the three month s prior to the

23 arrest -- J une 2004 arrest -- we're in July now , 2006,

24 and the investigation  to some extent has been ongoing

25 throughout  the two-year period ; isn't that right ?

1  A.       Yes.

2  Q.       Okay.  In terms of the two years and three

3  months, how many of her alleged customers have you

4  located?

5  A.       None.

6  Q.       How many drug sales have you or any other police

7  officer observed her making?

8  A.       None that I'm aware of.

9  Q.       Okay.  And how many times in -- to your

10  knowledge has she been arrested in Baltimore or any

11  other place with a drug sale?

12  A.       None that I'm aware of.

13  Q.       Okay.  Now, it's fair to draw from your

14  experience, drugs are basically a cash and carry

15  business; isn't that right?

16  A.       No.

17  Q.       Well, most drug transactions are for cash paid

18  on the spot, wouldn't you say?

19  A.       It depends on what level.  At a certain level

20  they get -- you get them on the front.

21  Q.       Well, one thing's clear:  Drug sellers don't

22  take MasterCard or Visa, things like that; is that

23  right?

24  A.       I'm sure somebody has.  None that I've run

25  across.

1 Q.      Okay.  And it's not usual that in your

2 experience that people in the drug trade write checks

3 either, is it?

4 A.      I find it odd, but it happens.  I've seen it

5 happen in other investigations.

6 Q.      Right.  But you find it extremely unusual; is

7 that right?

8 A.      In the drug trade, there's not a lot of trust.

9 Usually, you don't accept a check from somebody.

10 You're afraid they're -- a user is going to bounce it

11 on you.  They're going to write you a bad check and run

12 away with your drugs.  Usually, you like to see the

13 green cash.

14 Q.      Well, when you sell drugs, you get cash as a

15 general rule, isn't that true?  Especially small

16 amounts.  Maybe I have to rephrase that to make that

17 clear.

18 A.      No, that's usual.

19 Q.      Yeah.  And then you take your cash and you go

20 out and buy more drugs; is that right?

21 A.      Sometimes.

22 Q.      Well, not all, but you take somebody out for

23 high living and whatever else you're selling drugs for.

24 A.      A lot of people that sell drugs don't live high

25 off the hog.

1  Q.      Generally speaking, you get paid in cash and you

2  have available cash when you sell drugs; is that right?

3  A.      Not if you get paid by check.

4  Q.      Well, we're talking about the general rule here.

5  The general rule is cash on the barrel head; correct?

6  A.      Generally, it's cash on the barrel head?

7  Q.      Right?

8  A.      Yes, unless it's fronted.

9  Q.      There's no evidence of any fronting in

10 connection with Ms. Harden; is that right?

11 A.      That's correct.

12 Q.      You never saw any ledgers indicating any debts

13 on her part or anything owed; is that right?

14 A.      I believe that's correct.

15 Q.      In fact, in terms of your familiarity with the

16 paperwork, it's fair to say there was no mention of Ms.

17 Harden in any of the searches that you did with the

18 exception of her own home; is that right?

19 A.      No.

20 Q.      You're agreeing with me or --

21 A.      I'm disagreeing with you. Her phone number -- I

22 believe her phone numbers are at Ms. Martin's

23 residence.

24 Q.      Obviously she knew Ms. Martin; right?

25 A.      You said at any of the locations.

1 Q.      Okay.  At any of the location s with the

2 exception of Ms. Martin .

3 A.      That would be correct .

4 Q.      And her name didn't appear  in any paperwork  of

5 any of the place s that were search ed and through  the

6 document s you inspect ed.

7 A.      Other than her residence .

8 Q.      Other than her residence .

9        Okay.  Now, let me just ask you about Chart 13.

10 I think it's 13.  I'm just going to show you this or --

11 not show it to you.  Depend ing on --

12        THE CLERK:   You need to change it over .  It's on

13 video .

14        MR. SUSSMAN :  There 's so many button s.  We seem

15 to have a technical  problem .  Maybe we'll use the real

16 -- the larger chart .

17        MS. GREENBERG:   It's right here , Mr. Suss man.

18 It's back here .

19        MR. SUSSMAN :  This board ?

20        MS. GREENBERG:   That one says 13.  Keep going .

21        BY MR. SUSSMAN :

22 Q.      Here we go.

23        All right .  Just brief ly, just to remind you of

24 the chart  and everyone  else .  It list s all the check s

25 over a period  of time ; isn't that right ?

1  A.      Yes.

2  Q.      And it starts the first check May 26, 2000, and

3  the last check is March 30, 2004; is that right?

4  A.      Those are the post dates, yes.

5  Q.      By my calculation, that's a period of about 46

6  months, if you want to just check me on that.

7  A.      That's accurate.

8  Q.      Just a couple months short of four years.

9  A.      Yes.

10 Q.      Okay.  And in terms of the amounts.  The amounts

11 vary.  $123.60.  I don't have to recall them all, but

12 did you ever add up the amounts?

13 A.      Yes.

14 Q.      Well, we can check our math together here.  Did

15 you get $2,363?

16 A.      Yes.

17 Q.      Okay.  And that's $2,363 over a period of four

18 years.  If you divide that by 46 months, did you do

19 that calculation?

20 A.      No.

21 Q.      Would you accept the fact that that's about $50

22 a month?

23 A.      Sure.

24 Q.      And about $10 or $12 a week?

25         Four weeks in a month.  That's what I used.

1  A.       Sure.   Sure.

2  Q.       Would you agree on that one?

3  A.       Sure.

4  Q.       Now, let me just turn to your general

5  familiarity with the paperwork in this case.   The

6  documents taken in the searches came to you; is that

7  accurate?  Or whatever came in the search.

8  A.       Right.   Eventually I reviewed the documents.

9  Q.       Okay.   And you said there were about 26 search

10 searches total.

11 A.       I believe it was approximately  26 search

12 warrants and then other events also.   Arrests.

13 Documents.   Right from -- arrests of individuals,

14 traffic stops, seizures and the like.

15 Q.       Okay.   So of that mass of documents we've

16 established, none of those documents, with the

17 exception of something in Ms. Martin's house that you

18 recall, had anything to do linked -- mentioned Ms.

19 Harden or any reference to her; is that right?

20 A.       Outside of Ms. Martin's and Ms. Harden's.

21 Q.       Right.   Exactly.

22 A.       Correct.

23 Q.       Okay.   In terms of your analysis of phone

24 records or pin registers, whatever, you were able to

25 turn up no phone traffic between Ms. Harden and any of

1  the people depicted in that chart with the exception of

2  Ms. Martin; is that right?

3  A.      Correct.   With the DNRs I had available.

4  Q.      Well, you also had phone records available;

5  isn't that right?

6  A.      Right.

7  Q.      Because you said the air time records were

8  outside the time periods of the pin register; isn't

9  that right?

10 A.      Yes, some.

11 Q.      Did you do a pin link register, if that's the

12 right term?

13 A.      Pin link --

14 Q.      I guess it's not the right term?

15 A.      I have a pin register DNR, and we utilize pin

16 link.

17 Q.      Well, the technology allows you to, when you do

18 pin register, to run a computer program to see if any

19 of the people on the pin register talked to any of the

20 people on the pin register.

21 A.      Yes.  If that data is in the system.  If we have

22 that data to -- you can't conduct a search of data you

23 do not have.

24 Q.      I'm not sure I understand the question -- the

25 answer.  Did you try to establish who would talk to

1 who, other than direct contact with one particular

2 person?

3 A.      Sure.

4 Q.      Were you able to turn up any contact between Ms.

5 Harden and of the other people who were mentioned in

6 the chart or on the other chart the phone register

7 chart?

8 A.      Not with the date I had.

9 Q.      Okay.  Now, you were not present when Ms.

10 Harden's home was searched; isn't that right?

11 A.      That's correct.

12 Q.      Okay.  But you were furnished with the report of

13 -- from the searching officers; isn't that right?

14 A.      Yes.

15 Q.      And you know exactly what was found and what was

16 not found; is that right?

17 A.      Loosely, yes.

18 Q.      We'll see how loose your recollection is.

19         Consistent with your recollection -- I haven't

20 done this in a while, so let me think.  Is it

21 consistent with your recollection that there were no

22 drugs trace amounts residues found in Ms. Harden's

23 apartment?

24 A.      There were none recovered.

25 Q.      If they had been found, they would have been

1  recovered ; isn't that right ?

2  A.     I would hope .

3  Q.     No packaging materials like plastic baggies ,

4  things of that nature ; is that correct ?

5  A.     That's my knowledge , yes .

6  Q.     No cutting agents .

7  A.     Correct .

8  Q.     No safes or vaults of any kind ?

9  A.     Correct .

10  Q.     No scales ?

11  A.     Correct .

12  Q.     No police scanners or surveillance cameras .

13  A.     Correct .

14  Q.     You weren't informed of any special security

15  devices ?

16  A.     No .

17  Q.     Okay . Now , in terms of the application for a

18  warrant . In fact -- for all of the warrants , one of

19  the things that you look for are drug ledgers ; isn't

20  that right ?

21  A.     Yes .

22  Q.     Do you recall specifically the application for

23  the warrant said that drug traffickers must maintain

24  records in order to show the current status of the

25  various illegal transactions , the amount of profits

1   from them, and the expenses incurred -- incidental to

2   the collection and distribution process?  Do you

3   remember that language in the affidavit?

4   A.      Not specifically.

5   Q.      Do you want to refresh your recollection?

6   A.      I didn't write the affidavit.

7   Q.      But you've seen it.

8   A.      In probably May of 2004 I saw it.

9   Q.      It would be fair to say the same affidavit was

10  used in connection with all of the Maryland searches

11  with some changes.

12  A.      I believe so, yes.

13  Q.      Okay.  And do you want to refresh your

14  recollection on that, or do you want to just accept

15  that I can read?

16  A.      I believe you can read, Mr. Sussman.

17  Q.      Okay.  Well, is it fair to say that the search

18  of Ms. Harden's apartment turned up no drug ledgers of

19  any kind?

20  A.      That's correct.

21  Q.      No addresses or phone numbers of any of the

22  alleged coconspirators?

23  A.      That's correct.

24  Q.      You're not aware of any items personal items of

25  high value?

1  A.      That's correct.

2  Q.      No jewelry?

3  A.      None that I'm aware of.

4  Q.      No expensive appliances, plasma TVs, things like

5  that?

6  A.      I'm not aware of that.

7  Q.      No razor blades or money wrappers?

8  A.      None that I'm aware of.

9  Q.      No evidence of safety deposit boxes?

10 A.      None that I'm aware of.

11 Q.      No false bottom Gunk containers or Pepsi bottles

12 or anything like that?

13 A.      None that were found.

14 Q.      Are you aware that she gave consent to search

15 her truck next to her apartment?

16 A.      I'm not certain of that.

17 Q.      Okay.  But if nothing was found, that might be

18 an event that didn't merit inclusion in the report;

19 right?

20 A.      Possibly.

21 Q.      Okay.  Now, you did seize her computer; isn't

22 that right?

23 A.      I don't know.

24 Q.      Well, that would be something you traditionally

25 would seize to take a look and see what kind of records

1  are on it; isn't that right?

2  A.      Possibly, yes.

3  Q.      Do you recall that nothing significant was found

4  on it?

5  A.      I don't know that we seized her computer.

6  Q.      Well?

7  A.      But if we did, and there was something

8  significant, I would know.

9  Q.      Then you have no recollection of returning it to

10 her; isn't that right?

11 A.      That's correct.

12 Q.      Okay.  The searching agents did seize a bunch of

13 paperwork; isn't that right?

14 A.      Yes, and a cell phone.

15 Q.      Okay.  Well, let me do the cell phones first.

16 They take the cell phones for a variety of reasons.

17 One of the reasons they take the cell phones is because

18 the cell phones have memories; isn't that right?

19 A.      Yes.

20 Q.      And you can see the last -- I don't know.  You

21 can see the last some period of time calls made and

22 received on a cell phone; right?

23 A.      Each cell phone is different but, yes, some have

24 that capability.

25 Q.      Right.  Some have address books in them and

1  things of that nature ; right ?

2  A.      That 's correct .

3  Q.      Are you aware of anything from an evidentiary

4  standpoint that was retrieved off of Ms. Harden's cell

5  phone ?

6  A.      If I could refer to my notes I could .

7  Q.      Sure .

8  A.      I didn't note what was done with that telephone .

9  Q.      Right .  We live by our notes ,

10  A.      We live by the notes we have with us , but I

11  don't have those notes with me .

12  Q.      You didn't bring all your weapons to war here

13  today ?

14  A.      No .

15  Q.      But you don't have anything in your notes that

16  you have here today that would indicate that anything

17  significant came off the cell phones .

18  A.      Correct .

19      MR. SUSSMAN :  If I could approach the witness .

20      THE COURT:   You may .

21      BY MR. SUSSMAN :

22  Q.      I'm going to show you what's been marked as

23  Harden Exhibit 1  and ask you to take a look at that .

24  Just in the interest --

25      MS. JOHNSTON:   Your Honor , ordinarily the

1 government would object because this is beyond the

2 scope of the government 's direct examination but , in

3 order to expedite matter s, we will not object .

4          THE COURT:  All right .

5          MR. SUSSMAN :  I don't know  what to say .

6          THE COURT:  There is no objection . Accept gift s

7 when they're given to you .

8          MS. JOHNSTON:  I would appreciate  some leeway ,

9 if necessary , on redirect .

10          THE COURT:  Yes .  I will rein you in if you go

11 too far .

12          MR. SUSSMAN:  I may need to sit down for a

13 second , Judge .

14          BY MR . SUSSMAN:

15 Q.      Take a look .

16 A.      Yes .

17 Q.      Is that -- basically , are those the document s

18 that were taken out of Ms. Hard en's home , to your

19 recollection ?

20 A.      I don't know .

21 Q.      Have you seen those document s before ?

22 A.      I don't recall  if I've seen these before .

23 Q.      In keep ing with your duti es , you said that part

24 of your duti es was to review the documentation  and the

25 evidence  that was seize d from a variety of search

1  location s.   Is  that  to  review  only  the  evidence  of  --

2  that  the  government  wants  to  put  on,  or  is  that  what

3  you  did  with  all  the  evidence ?

4  A.      No.   I  reviewed  all  of  the  evidence .

5  Q.      You  have  no  recollection  of  seeing  any  of  the

6  document s  seize d  from  Ms.  Harden 's  home .

7  A.      I'm  sure  I  did .   These  just  don't  --  I  can't  say

8  that  I  look ed  at  these  document s  that  --  that  I

9  remember  these  document s  in  particular .

10 Q.      Do  you  recall  that  there  were  a  variety  of

11 document s  seize d  from  Ms.  Harden 's  home  were  consistent

12 with  her  truck ing  business ,  thing s  of  that  nature ?

13 A.      I  believe  so.

14 Q.      And  you  don't  know  whether  these  are  those .

15 A.      Yes .   That 's  my  --  I  don't  know   if  these  are  the

16 exact  document s.

17 Q.      But  from  your  analysis  of  those  document s,  those

18 are  document s  having  to  do  with  the  truck ing  business

19 and  freight  haul ing  as  a  general  rule .

20 A.      Yes .   Exportation  to  Lagos ,  Nigeria .

21 Q.      Is  that  for  car s  or  something  like  that ?

22 A.      Yes .   It  appear s  to  be.

23      MR.  SUSSMAN :  A  moment 's  indulgence .

24      I  think  that 's  it  for  me .   Thank  you ,  Judge .

25      THE  COURT:   All  right .   Mr.  McKnett .

1          MR. MCKNETT:  Yes, Your Honor.  Thank you.

2                    **CROSS-EXAMINATION**

3          BY MR. MCKNETT:

4  Q       Good afternoon.

5  A.      Good afternoon.

6  Q.      I'll let you sit for a few minutes.

7  A.      I'm fine.

8  Q.      I want to start with some of the evidence you

9  identified.  Specifically, you identified or talked

10 about Government Exhibit   Goodwin 19, which was   Mr.

11 Goodwin's phone book.

12          Do you remember that?

13 A.      Possibly.

14 Q.      Let me just --

15 A.      If you could --

16 Q.      I apologize, Your Honor.  I left the exhibit

17 back here.  Actually,  I'm not sure where  I left it,

18 Your Honor.  I'll talk about it a little bit.

19          Detective, let me show this to you just to

20 refresh your recollection on this.

21          Do you remember that?

22 A.      Yes.

23 Q.      That's that little -- actually, it's a calendar

24 book, isn't it?

25 A.      Yes, a date -- a small day planner/calendar.

1 Q.      It appears to have been used to write down names

2 and phone numbers and such; correct?

3 A.      Yes.  It was used as a phone book rather than a

4 planner.

5 Q.      Okay.  And on one of the pages in there -- if

6 you want to look for it, that's fine, but one of those

7 pages has  Ms. Ali's name on it.

8 A.      Yes.

9 Q.      I think it's on the day for -- it is January 4

10 -- January 1st of '04.

11 A.      Yes.

12 Q.      I can't make this work.

13          MS. JOHNSTON:  It's not working.

14          MR. MCKNETT :  It's not working?

15          It doesn't seem to be working,    Your Honor -- the

16 projector.

17          THE CLERK:  May  I walk down,  Your Honor?  May  I

18 walk down?

19          THE COURT:  Oh, sure.  Yeah.

20          MR. MCKNETT :  Your Honor, that's all right.     I

21 can move on without the projector.  Thank you.

22          BY MR.  MCKNETT :

23 Q.      It's on the entry for   January 1st '04; correct?

24 It says, " LaNora Ali," and then a phone number?

25 A.      Yes.

1 Q.      "(301) 853-8035;" is that correct?

2 A.      That's correct.

3 Q.      There are no ledger sheets in this book, are

4 there?

5 A.      No.

6 Q.      There are no lists of dollar amounts.

7 A.      That's correct.

8 Q.      There are no lists of what might appear to be

9 quantities of some substance.

10 A.      Not that I recall.

11 Q.      In fact, all this book contains is a number --

12 perhaps dozens -- it appears to be dozens -- and maybe

13 hundreds -- of names and phone numbers; correct?

14 A.      Yes.

15 Q.      It's not your testimony -- is it your opinion

16 that everybody whose name is in this book is involved

17 in drug-related activity?

18 A.      No, that's not my testimony.

19         MR. MCKNETT:  May I retrieve the exhibit,   Your

20 Honor?

21         THE COURT:  You may.

22         BY MR. MCKNETT:

23 Q.      Thank you.

24 A.      Sure.

25 Q.      Now, I want you to come down into the well, if

1  you would please.

2          I'd like to start with Chart 4, the chart that's

3  captioned "Telephone Activity" following the November

4  25, 2003 arrest of   Goodwin; correct?

5  A.      Yes.

6  Q.      Just what is it that you wish the jury to draw

7  from this chart?

8  A.      This is a list of some contacts between      Paulette

9  Martin's phone and other members of the conspiracy.

10  Q.     And in your opinion, why are those contacts

11  important?

12  A.      After the arrest of   Mr. Goodwin, there was a

13  series of phone calls, starting with a call from

14  Constance  Goodwin.  And then   Ms. Martin is calling   Mr.

15  Goodwin's cellular phone, and what appears to be an

16  attempt to reach them; then another call to      Constance

17  Goodwin; then a call to Reece     Whiting, who we talked

18  about earlier -- he apparently had a legal background

19  -- and then a call again trying to reach       Mr. Goodwin;

20  then a call to  Constance  Goodwin; then a call to    John

21  Irby's  phone, an associate of    Mr. Goodwin; and a series

22  of calls to individuals associated with       Mr. Goodwin.

23          Then a call to Constance    Goodwin; two calls from

24  Constance  Goodwin; another call to    Constance  Goodwin; a

25  call to  Reece  Whiting; a call from    Paulette to

1  Goodwin's cell phone again; a call to    Larry  Lane's cell

2  phone; a call from    Larry  Lane's cell phone; a call to a

3  law office; a call from    Michael  Thurman to  Ms.

4  Martin; a call from    Constance  Goodwin to  Ms. Martin;

5  calls between   Constance  Goodwin and   Martin.

6        Interspersed with those are calls to the firm of

7  Houlan  and Berman, a law firm; more calls from      Mr.

8  Thurman to  Ms. Martin; more calls from     Ms. Martin to

9  Constance  Goodwin's phone; a call from    John Irby to  Ms.

10 Martin and we, in turn, intercepted calls with them.

11       Seven calls from   Ms. Martin to Mr. Irby's phone;

12 a call to  Ms. Constance Goodwin; two more calls to     Mr.

13 Whiting; another call to    Constance  Goodwin; a call from

14 Constance  Goodwin to  Ms. Martin; then calls between --

15 interspersed with these calls with    Constance  Goodwin

16 are calls to a bail bond company; calls to      Mr. Irby;

17 two calls to  Mr. Whiting and so on, up until the day

18 after his release.

19 Q.     Well, you've accurately told us what's on the

20 chart but, again, what is it about these calls that, in

21 your expert opinion, makes them significant enough to

22 select them out from all the other calls and put them

23 on this chart?

24 A.     These are calls, in my opinion, between the

25 post-arrest emergency calls between      Martin and other

1 members of the conspiracy that have close ties to     Mr.

2 Goodwin.  They are not all the calls.  They're the ones

3 reflected on the chart.

4 Q.     LaNora Ali's name is not on that chart, is it?

5 A.     No, it's not.

6 Q.     And you do know, do you not, that   Ms. Ali knew

7 this Mr. Goodwin?

8 A.     I believe so.

9 Q.     And that at least occasionally interacted with

10 him in one fashion or another; correct?

11 A.     Yes.

12 Q.     You knew that they would be at    Ms. Martin's

13 house at the same time on occasion; correct?

14 A.     Yes.

15 Q.     And they would talk on the phone.

16       Let me rephrase that.  There were conversations

17 you're aware of,  I believe, where  Ms. Ali's husband and

18 Mr. Goodwin talked on the phone.

19 A.     I can't specifically tell you but, yes,    I

20 believe there was contact between     Ms. Ali, or

21 indications on the phone that    Ms. Ali was in contact

22 with Mr. Goodwin.

23 Q.     Again,  Ms. Ali is not on that chart; is she?

24 A.     That's correct.

25 Q.     The chart,  CH-4 -- I don't have the --    I forget

1 the chart number, but the chart that has to do with      Ms.

2 Harden's checks.  You don't have to put that one up.      I

3 just wanted to refer your attention to it.

4          There's no similar chart with regard to      Ms. Ali,

5 is there?

6 A.      That's correct.

7 Q.      Can we go to Chart 1 now?

8          In that lower box, Chart 1, you have, as you've

9 been asked before, the box labeled "Distributors and/or

10 Facilitators;" correct?

11 A.      Yes.

12 Q.      And Ms. Ali is in that box; correct?

13          In fact, she is in the upper left coner of that

14 box.

15 A.      Yes.

16 Q.      You can return to the witness stand.  Thank you.

17          You described, in your direct testimony, that a

18 "facilitator"  is someone who provided advice -- legal

19 advice or helped move contraband from one place to

20 another or, as a distributor, would buy for resale;

21 correct?

22 A.      That's some of the -- that's some of the

23 possible definitions of "facilitator."

24 Q.      Those are the three that you identified

25 specifically,  I believe, in your direct examination.

1 A.       That's accurate,   I believe.

2 Q.       Is it your opinion that   Ms. Ali was providing

3 legal advice to  Ms. Martin?

4 A.       No.

5 Q.       Is it your opinion that   Ms. Ali helped move

6 contraband from one place to another during the course

7 of this conspiracy?

8 A.       Yes.

9 Q.       And it's your opinion that   Ms. Ali helped  Ms.

10 Martin move contraband?

11 A.       Yes.

12 Q.       When, in your expert opinion, did she do that?

13 A.       May 16 of 2004.

14 Q.       That was the occasion we saw on the pole cam

15 video; correct?

16 A.       Yes.

17 Q.       Part of it.  We saw the original stages on the

18 pole cam, and then there was --    I apologize.    I forget

19 the name of the officer who testified about his

20 surveillance at the dance studio; correct?

21 A.       Roger St . Louis.

22 Q.       Yes, thank you.

23          And the pole cam showed -- let's take -- back

24 that up a little bit.

25          There was a phone call before    Ms. Ali went to

1  Ms. Martin's house, wasn't there?

2  A.      Yes, there was.

3  Q.      Do you recall that phone call?

4  A.      I recall the essence of it, yes.

5  Q.      That was a phone call in which    Ms. Martin called

6  Ms. Ali and said, in sum, that    Ms. Martin wanted    Ms.

7  Ali to help her move something to the school; correct?

8  A.      My recollection is she said, leave your husband

9  at home, and she gave her a cover story when she told

10 her to come to the house and to tell    Ms. Terrell --

11 Q.      Well, let me show you a transcript of that, just

12 possibly to fully refresh your recollection.

13         It's call  A-1670.

14         MS. JOHNSTON:    Page number?

15         MR. MCKNETT : Page 525.    I'm not sure what book

16 that's in.  Book three.

17         May I approach,  Your Honor?

18         THE COURT: Yes, you may.

19         BY MR. MCKNETT :

20 Q.      Officer,  I'm going to show you my copy.  It's

21 marked up, highlighted and such.  You can ignore all

22 that stuff.

23         Ms. Martin says that she wants    Ms. Ali to leave

24 her husband and that she had something she wanted to

25 do; correct?

1          I'm paraphrasing.

2 A.      "I got to work on something" is,    I think, what

3 you're referring to.

4 Q.      "I got to work on something."

5          And then what does she say?

6 A.      Then, " I'm going past your house and take

7 something."

8 Q.      "And take something?"

9 A.      Yes.

10 Q.     Where?

11 A.     Ms. Ali's house.

12 Q.     Did she say where she wants to take something?

13 A.     To her house.

14 Q.     Excuse me?

15         I apologize.

16 A.     I believe she's referring to    Ms. Ali's house,

17 but --  Mr. McKnett , I can retrieve my copy of the

18 transcript book.

19 Q.     That would be helpful.

20         Do you have it there?

21 A.     Yes.

22 Q.     Thank you.

23         This doesn't transcribe the entire conversation,

24 does it?  It picks up about 43 seconds in; is that what

25 it says there?

1  A.      That's correct.

2  Q.      And it starts out with   Ms. Ali saying, "Yes."

3  And then  Ms. Martin says, "Yes,   I need you."   Ms. Ali

4  says, "Uh-huh" -- interrupts her to say, "Uh-huh," or

5  talks over what   Ms. Martin is saying.

6         And then  Ms. Martin says to, "leave your husband

7  home and come take me to the school.     I got to take

8  something there."

9         Ms. Ali again talks over, says, "Uh-huh."

10         Ms. Martin says, "  I got to work on something."

11  And then  Ms. Ali says, "Okay."

12         And then  Ms. Martin says, "Then   I'm going past

13  your house and take something."     Ms. Ali says, "Okay."

14         And then  Ms. Martin suggests the cover story;

15  correct?

16  A.      Yes.

17  Q.      And then the conversation effectively ends.

18         Ms. Martin says, "That's important.   "  Ms. Ali

19  says, "Give me about 15 minutes," and then the

20  conversation ends.

21         But Ms. Martin doesn't say, does she, that     I'm

22  going to take the drugs to the school, does she?

23  A.      I believe she does.

24  Q.      Well, she doesn't say,   I got to take the drugs

25  there, does she?

1  A.      Not in those words, no.

2  Q.      She doesn't say,  I got to take the tickets

3  there, does she?

4  A.      No.

5  Q.      She doesn't say anything -- well, let me take

6  that back.

7          Are you -- is it your opinion that the word

8  "something" is code language?

9  A.      That, combined with the "leave your husband at

10  home" instruction and the cover story would indicate

11  that that's her way of conferring that knowledge to      Ms.

12  Ali.

13  Q.      That's your opinion; right?

14  A.      That's correct.

15  Q.      And on  May 16 of 2004, it had become your firm

16  opinion that  Ms. Ali was involved in drug activity;

17  correct?

18  A.      By May 16?

19  Q.      Right.

20  A.      Yes.

21  Q.      So any opinion you draw from this conversation

22  is going to be based on at least, in part, your already

23  preconceived opinion that   Ms. Ali is involved in drug

24  activity; correct?

25  A.      No.  You still have to look at each call

1   individually.   There's some calls that occurred after

2   we came to the opinion that      Ms. Ali was involved in

3   drug trafficking that were still not drug trafficking

4   calls, and we managed to make that determination of

5   which calls were drugs and which were not.

6   Q.      But your opinions start from the premise that

7   Ms. Ali is involved in drug activity.

8   A.      No.   The premise was developed based on the

9   calls.   The premise didn't start out that way.   The

10  calls indicated that.

11  Q.      Are you saying that you interpreted this

12  conversation in a total vacuum, and the fact that you

13  had already determined in your mind that      Ms. Ali was a

14  drug trafficker did not affect your interpretation of

15  this conversation at all?

16  A.      We have to look at each call.   We have to look

17  at each call and listen to what it says and listen to

18  what the parties are saying, along with the other

19  activity that's going on, to base -- to form an

20  opinion.   You don't look at the call and say, this is a

21  drug trafficker, so what does this mean in regards to

22  drugs?   You listen to the call and see what the call

23  indicates, as well as the surveillance, as well as the

24  other activity and the other calls.

25  Q.      Part of your analysis of this conversation

1  involved your already formed opinion that     Ms. Ali was

2  involved in drug trafficking.

3  A.     Yes.

4  Q.     So what this conversation says is that     Ms.

5  Martin wants  Ms. Ali to help her do something without

6  Ms. Ali's husband's knowledge.

7  A.     That's part of it.  The second part is a cover

8  story for her roommate.

9  Q.     Okay.  And also, to help   Ms. Martin do something

10 without  Ms. Martin's roommate's knowledge.

11 A.     Yes.

12 Q.     That's what the conversation says.

13 A.     Yes.

14 Q.     And it's your opinion that what    Ms. Martin wants

15 Ms. Ali to help her with is to move drugs.

16 A.     It's my opinion that that's what the

17 conversation says.

18 Q.     Well, the conversation says what it says.  The

19 words are the words.  Your interpretation is your

20 interpretation.

21 A.     That's what listening is.  It's always an

22 interpretation.  The jury is interpreting my words

23 right now, and they're interpreting your questions.

24 I'm interpreting your questions.  You always make a --

25 you have to make an interpretation of what --

1  Q.      That's fine.

2  A.      -- what is said.

3  Q.      And what happened here on   May 16, at 5 :50 in the

4  afternoon, is that   Ms. Martin and   Ms. Ali had this

5  specific conversation using these specific words;

6  correct?

7  A.      Yes.

8  Q.      And you have interpreted that to mean that they

9  were discussing drug activity?

10  A.      That's my opinion, yes.

11  Q.      No one stopped   Ms. Ali's vehicle while traveling

12  from  Ms. Martin's house to the school, did they?

13  A.      No.

14  Q.      No one searched the vehicle, did they?

15  A.      No.

16  Q.      No one searched -- well, we saw bags being

17  carried from the house to the car; correct?

18  A.      That's correct.

19  Q.      We didn't see the bags being carried from the

20  car to the school, did we?

21  A.      That's correct.

22  Q.      It's your assumption that those bags were

23  actually carried into the school; correct?

24          That's your opinion.  "Assumption" is not a good

25  word.  It's your opinion; correct?

1  A.       Yes.  Based on the evidence, yes.

2  Q.       But no one saw any bags being carried into the

3  school, did they?

4  A.       No one from law enforcement saw anyone carry

5  bags into the school.

6  Q.       Point taken.

7           There could have been somebody on the sidewalk

8  watching.

9  A.       Or Ms. Ali and Ms. Martin.

10 Q.       No one other than  Ms. Ali and  Ms. Martin, to

11 your knowledge, saw bags being carried into the school

12 on that day, did they?

13 A.       That's correct.  No one from law enforcement.

14 Q.       And no one got a search warrant for this school

15 on May 16, did they?

16 A.       Not on  May 16, no.

17 Q.       In fact, the only search of the school -- the

18 only search -- subsequent search of the school was

19 performed how many days later?

20          MS.  JOHNSTON:   Your  Honor, we will stipulate

21 whatever the number of days is between     May 16 and  June

22 1st.

23          MR.  MONTEMARANO :  16.

24          THE  WITNESS:  It's approximately two weeks.

25          BY MR.  MCKNETT :

1 Q.      And drugs were found in bags in the school on

2 June 1st; correct?

3 A.      Yes.

4 Q.      And it's your opinion that at least one of those

5 bags was the same bag that was seen being carried out

6 of Ms. Martin's house on   May 16; correct?

7 A.      Yes.

8 Q.      But there's fingerprint evidence to support

9 that, isn't there?

10 A.     I think  I've answered this question with other

11 attorneys.   I know you haven't asked this, but there

12 was no  latents  of value recovered in this case for any

13 of the defendants in court today.

14 Q.     That's the last fingerprint question    I'll ask

15 you.

16        It's your opinion it's the same bag; correct?

17 A.     Yes.

18 Q.     It's your opinion that   Ms. Ali -- first of all,

19 it's your opinion that there were drugs in those bags

20 when they were being carried in the school, correct, on

21 May 16?

22 A.     Yes.

23 Q.     And it's your opinion that   Ms. Ali knew there

24 were drugs in those bags on   May 16 when she was helping

25 to carry them into the school; correct?

1  A.      That's correct.

2  Q.      But there's no conversation that's been recorded

3  in which  Ms. Ali acknowledges that there are drugs in

4  those bags; correct?

5  A.      That's correct.

6  Q.      There is no surveillance of anyone putting

7  whatever was in the bags into the bags; correct?

8  A.      We had no surveillance inside    Ms. Martin's

9  residence.

10 Q.      You have no surveillance of    Ms. Ali putting

11 anything in those bags, do you?

12 A.      That's correct.

13 Q.      You don't have any surveillance of    Ms. Ali

14 taking anything out of those bags, do you?

15 A.      That's correct.

16 Q.      You don't have any evidence at all other than

17 your opinions that   Ms. Ali knew what was in those bags.

18 A.      No.  We have the intercepted calls.

19 Q.      You have what?

20 A.      We have the intercepted telephone calls; we have

21 evidence recovered from a residence which shows her

22 involvement.  Based on that call,    I think it couldn't

23 be any clearer.

24 Q.      I'm not -- your opinion is that it couldn't be

25 any clearer; correct?

1 A.      That call is -- yes,   I'm using my opinion.

2 Q.      But it's your opinion "couldn't be any clearer;"

3 correct?

4 A.      As regarding that call?

5 Q.      Regarding --  I think  I started out asking the

6 question about your opinion being that    Ms. Ali knew

7 there were drugs in those bags.

8 A.      Yes.

9 Q.      And your opinion couldn't be any clearer that

10 she in fact knew what was in those bags.

11 A.      That's correct.

12 Q.      And your opinion is based on the totality of the

13 investigation; correct?

14 A.      Yes.

15 Q.      With regard to those bags, the totality of the

16 investigation is the phone call that we just went

17 through; correct?

18 A.      Yes.

19 Q.      The surveillance of the bags being carried from

20 Ms. Martin's house to the car; correct?

21 A.      Yes.

22 Q.      The surveillance of  Ms. Martin to  Ms. Ali

23 leaving the school later that evening.

24 A.      Yes.

25 Q.      And then two weeks later, drugs being found in

1  the bags at the school.

2  A.       No, that's not complete.

3  Q.       What happened in between    May 16 and   June 1st

4  with regard to those bags that supports your opinion

5  that Ms. Ali knew on  May 16 there were drugs in the

6  bags?

7  A.       We would also have the    John Martin call where he

8  said, "We'll be clean as rain" once those items were

9  removed from the residence, confirming the opinion; the

10  suitcase with the scales and the currency located at

11  Ms. Ali's residence, which --

12  Q.       They don't have anything to do with the bags, do

13  they?

14  A.       I'm sorry?

15  Q.       What was found at   Ms. Ali's residence had

16  nothing to do with the bags that were carried into and

17  then later found at the school, do they?

18  A.       I think it has everything to do with those bags.

19  Q.       How?

20  A.       Ms. Martin was cleaning out her residence of

21  contraband.  She didn't want cash at her house in case

22  law enforcement came.  She didn't want drugs at her

23  house in case law enforcement came.  She didn't want

24  drug scales at her house in case law enforcement came,

25  so she cleaned out the house and stored items at the

1 school.  However, that school is not in the greatest

2 neighborhood, so there was no currency of huge amounts

3 at the school, but there was a nice, safe place in

4 Hyattsville , meaning  Ms. Ali's.

5 Q.     Is it your -- first of all, are there any

6 reports of any burglaries at that school to your

7 knowledge?

8 A.     No, but  I've done a great deal of surveillance

9 there and  I'm familiar with -- there's a lot of drug

10 addicts walking up and down the street.

11 Q.     There's never been a burglary at that school to

12 your knowledge?

13 A.     Not that's been reported to the police.

14 Q.     Is it your testimony that those suitcases were

15 taken  into  Ms. Ali's house on or after    May 16, 2004?

16 A.     I don't know when the suitcase got there.       I

17 have an opinion on when -- the contents of the suitcase

18 --

19 Q.     Is it your opinion that the contents of the

20 suitcase were taken into    Ms. Ali's house on or after

21 May 16, 2004?

22 A.     That's my opinion, yes.

23 Q.     Excuse me just a second,   Your  Honor.

24       You examined the contents of the suitcase;

25 correct?

1  A.      Yes.

2  Q.      Okay.  Did you take photographs of the bills?

3  A.      Of the bills?

4  Q.      Yes.  The dollar bills.  The money bills.

5  A.      There were photographs shown in court.

6  Q.      Well, it's been my experience -- and perhaps

7  it's been yours -- that sometimes when money is seized

8  that it is sometimes laid out on a table top or

9  something and photographed so that the serial numbers

10  could be read, that sort of thing; dates.

11  A.      That's not the procedure used by the Immigration

12  Customs Enforcement.  They take a photograph when it's

13  recovered, and then there's a bill count which we had

14  in court.

15  Q.      We saw that.  That was the two-page document

16  that had the list -- the denominations and the number

17  of bills by denomination and then the total added up;

18  correct?

19  A.      Yes.

20  Q.      I forget the e xhibit number , but that was one of

21  the Ali exhibits.

22  A.      I believe so.

23  Q.      You also said that one of the things -- not a

24  facilitator, but someone was a facilitator and/or a

25  distributor of drugs is buy drugs for resale; correct?

1 A.      Yes.

2 Q.      That would be inherent in the definition of a

3 distributor; correct?

4 A.      You can distribute without selling.

5 Q.      Okay.  You can.  Again, point taken.  You can

6 give it away, and that's distribution.

7 A.      Yes.  Or in exchange for services other than

8 cash.

9 Q.      Did anybody, during your investigation, make any

10 observations of  Ms. Ali selling drugs?

11 A.      No.

12 Q.      Did anybody, during the course of your

13 investigation, intercept any telephone conversations in

14 which  Ms. Ali was arranging the sale of drugs?

15 A.      I believe there was the call between she and      Ms.

16 Martin where she's ordering a quantity of drugs and

17 then said,  I need to check with them and    I'll hit you

18 back, indicating she was going the check with her

19 customer.

20 Q.      Didn't she actually say,   I need to make a call?

21 A.      I'm doing the best   I can with my recollection.

22 Q.      I understand that.

23         Again, if  I may refer to my --

24         THE COURT:  You may.

25         MR. MCKNETT :  -- notes,  Your Honor.

1          BY MR. MCKNETT :

2  Q.      Do you have your book there?

3  A.      I have one of them.

4  Q.      It's B-2436, at Page 205.

5  A.      If I may --  I don't have that -- the proper

6  book.

7  Q.      265, excuse me.

8          While you're there, call A-1224 at page 348.

9          THE  COURT:  What was the page number again,     Mr.

10 McKnett ?

11         MR.  MCKNETT :  Excuse me,  Your  Honor?

12         THE  COURT:  The page number again.

13         MR.  MCKNETT :  The second one was at page 348;

14 the first one was on page 265.

15         THE  WITNESS:  I  'm sorry. 265?  And the other

16 call?

17         BY  MR.  MCKNETT :

18 Q.      348.

19         Do you have them there?

20 A.      Yes.

21 Q.      Let's look at page 265 first.  That's call

22 B-2436.  It was made on   April 1st of '04, about 6  :42 in

23 the evening.

24         Do you have that one there?

25 A.      Yes.

1  Q.      This is a very short one.  Again, it's an

2  excerpt.   Ms. Martin says, "Mm-hmm.  So just the one

3  magazine."   Ms. Ali says, "Mm.  That's what   I got to

4  make sure."

5          Is this the call you're referring to?

6  A.      Yes.

7  Q.      She doesn't say,  I've got to check with them,

8  does she?

9  A.      I may have been -- there was a call by another

10 party that's -- and she and   Ms. Ali have very similar

11 conversations, and sometimes   I confuse them.

12 Q.      That's fine.  But the point is she just said,

13 "That's what  I got to make sure;" right?

14 A.      Yes.

15 Q.      It doesn't make a reference to them or any other

16 person, does it?

17 A.      I believe it does in my opinion.

18 Q.      In your opinion it does?

19 A.      Yes.

20 Q.      But the words don't, do they?

21 A.      I believe the words do.

22 Q.      The words say, "That's what    I got to make sure."

23 Those are the words; right?

24 A.      We can agree to disagree, but that's my answer.

25 Q.      We can't agree to disagree on what the words are

1   on the tape.   The words on the tape are, "Mm.   That's

2   what I got to make sure."

3   A.       Those are the words on the tape.

4   Q.       It's your opinion that   Ms. Ali is saying

5   something to the effect that    I've got to check with my

6   customers?

7   A.       Yes, I thought I said that.  Maybe   I didn't

8   qualify it.

9   Q.       That's your opinion.

10  A.       Yes.

11  Q.       And again, your opinion on   May -- April 1st is

12  based at least in part on the fact that you have

13  already decided in your opinion that    Ms. Ali is

14  involved in drug trafficking.

15  A.       Mr. McKnett , I'm not sure what date we made that

16  determination that she was involved in drug

17  trafficking.  It was sometime before   June 1st 2004, but

18  I can't put my finger on the date that    Ms. Ali is a

19  drug trafficker.   I don't know if this was before or

20  after that determination.

21  Q.       Well, without the determination she was a drug

22  trafficker  there would have been no basis at all to

23  form an opinion that she was talking about calling

24  customers, would there?

25  A.       I'm sorry.  Could you repeat that?

1  Q.       Unless you already believed that she was

2  involved in drug trafficking, there would have been no

3  bases at all to draw the conclusion from this

4  conversation that she was talking about calling drug

5  customers.

6  A.       I don't agree with that.

7  Q.       Couldn't she have been saying,    I got to see how

8  much money I have in my wallet?

9  A.       No.

10 Q.       Couldn't she have been saying,    I got to make

11 sure what time my husband's coming home?

12 A.       No.  She's not going to check her wallet.  She

13 would get drugs; she would make partial payments or get

14 fronted drugs.  Also, there was a ledger, so that

15 doesn't carry over.

16 Q.       She couldn't possibly have been saying,    I got to

17 check to see how much money    I have.

18 A.       That's a possibility.  That's not what my

19 opinion is.

20 Q.       Let's go to the next call on page 348.  This,

21 again, is an excerpt.  In this one there are some

22 preliminary comments, and then    Ms. Martin interrupts

23 halfway down the page:  "You want...you just wanted one

24 ticket?" she asked.  And    Ms. Ali says, "That's...  I'm

25 going to make a phone call."  And    Ms. Martin says --

1 speaking simultaneously -- "Okay.  Let me know."        Ms.

2 Ali says, "To see.  Okay."  Right?

3        What was your opinion, if you have one, about

4 the content of this conversation?

5 A.      Basically, the same as the last.

6 Q.      This was on --  I didn't identify this.  Let me

7 interrupt for a second.  This is call A-1224 on        April

8 21st 2004 at about 7  :12, which makes it about 20 days

9 after the previous conversation; correct?

10 A.      Yes.

11 Q.      When Ms. Ali says, "That's...  I'm going to make a

12 phone call to see," it is your opinion that she's

13 saying she's going to check with customers?

14 A.      Yes.

15 Q.      Isn't it possible that she was going to call --

16 are you familiar with these bank services where you can

17 call the bank and see what the balance is on your

18 account?

19 A.      Yes.  Ms. Martin did that from her residence.

20 Q.      Isn't it possible that   Ms. Ali was saying the

21 phone call she was going to make was to her bank to see

22 how much money she had available?

23 A.      It's possible she was going to call a psychic,

24 but that's not my opinion.

25 Q.      It's not your opinion.  It's possible though

1  that she was going to make a call to her bank and check

2  the balance on her account.

3          MS. JOHNSTON:  Objection.

4          Asked and answered.

5          THE COURT:   Sustained.

6          BY MR. MCKNETT :

7  Q.      Are you aware of any other calls in which you

8  believe that  Ms. Ali is telling  Ms. Martin she's going

9  to check with her customers?

10  A.      Actually I only recalled the one, so now     I know

11  of two.  There may be more.  Off the top of my head,      I

12  couldn't tell you.

13  Q.      You can't recall any; right?

14  A.      No.

15          MS. JOHNSTON:  Objection.

16          Asked and answered.

17          THE  COURT:  Sustained.

18          BY MR. MCKNETT :

19  Q.      You talked about the search at     Ms. Ali's house a

20  couple of minutes ago.  Let me turn your attention to

21  that.

22          Now, there were --

23          THE COURT:   Mr. McKnett , how much longer do you

24  --

25          MR. MCKNETT :  This would be good place to break.

1 I've got  ten  minutes to go.

2        THE  COURT:   I've got a meeting   I'm late for now.

3 We will break until 2  :30, ladies and gentlemen.

4                      (Witness excused from the stand.)

5                      (Jury excused at 1:14 p.m.)

6                      (Off the record at 1  :14 p.m.)

7                      (On the record at 2  :35 p.m.)

8                      (Witness resumes the stand.)

9                      (Jury returns at 2  :36 p.m.)

10       THE  COURT:  You may proceed,   Mr. McKnett .

11       MR.  MCKNETT :  Thank you,  Your  Honor.

12       BY  MR.  MCKNETT :

13 Q.     I want to come back to something you said before

14 we broke for lunch.   I believe you said -- correct me

15 if I'm wrong -- that at least part of the -- one of the

16 reasons you suspected -- formed the opinion that      Ms.

17 Martin wanted to move the large quantity of money to my

18 client 's apartment was for safety reasons, that the

19 neighborhood around the school was a rough neighborhood

20 and there was an increased risk of burglary.

21       Is that a fair summary of your testimony?

22 A.     What  I was referring to is she wanted to put the

23 money in a secure location, and    Ms. Ali's apartment

24 would be a secure location.

25 Q.     Because the neighborhood around the school was

1  not a particularly safe neighborhood?  Is that part of

2  your opinion?

3  A.     In the --  I've done some interviews of

4  individuals in that area who are narcotics addicts.

5  There's quite a bit of drug trafficking going on around

6  there, and her place was a high profile location.

7  Q.     And you thought that -- in your opinion -- that

8  Ms.  Ali's apartment was a safer place?  A more secure

9  location?

10  A.     Well, somewhere there's somebody 24 hours a day

11  -- not 24 hours a day, but there's somebody residing

12  there, where the business didn't have anybody inside

13  the business on a regular basis.  As you know, an

14  apartment would at least have some residents there.

15  Q.     Are you familiar with the crime rate -- well     ,

16  Ms. Ali lives at 820 Sheridan; correct?

17  A.     620  Sheridan.

18  Q.     620.  You're right.  620     Sheridan, Apartment

19  301, on  June 1st; right?

20  A.     Yes.

21  Q.     Are you aware of the crime rate in the

22  neighborhood of 620   Sheridan Street?

23  A.     I'm familiar with the   Hyattsville  area in

24  general; not specifically her street.

25  Q.     Are you aware that there have been muggings

1  outside of that apartment building?

2  A.      Not specifically, no.

3  Q.      Are you aware that there have been robberies in

4  that apartment complex?

5  A.      No.

6  Q.      Are you aware of the apartment complex policy

7  that requires the rental office and maintenance staff

8  to have 24-hour access by key to every apartment in

9  that complex?

10  A.      That's common with many apartment complexes.      I

11  wasn't aware of that one specifically.

12  Q.      You think it's safer to have the money in     Ms.

13  Ali's apartment where at least the maintenance staff

14  could come in there at any time than it would be in the

15  school where only  Ms. Martin had keys?

16  A.      There's somebody at least at that apartment.

17  There was absolutely no reason to keep the money at the

18  school.  There was no advantage of keeping the money at

19  the school, where keeping the money in     Ms. Ali's would

20  be advantageous; at least there's somebody home in the

21  summertime.   Ms. Ali is not teaching.

22  Q.      That's assuming  Ms. Ali is not working in the

23  summertime; right?

24  A.      Yes.

25  Q.      It assumes that her husband is not working in

1  the summertime; correct?

2  A.      He may work all year round.     I don't know what

3  he does.

4  Q.      Let me come back to the search of    Ms. Ali's

5  apartment.

6          You were here during the testimony concerning

7  the search of her apartment, were you not?

8  A.      Yes.

9  Q.      Officer  Muldoon , I believe, testified about it.

10 A.      Yes.

11 Q.      And he testified about the suitcase that was

12 seized in the closet; correct?

13 A.      That's correct.

14 Q.      And about the items that were found in the

15 suitcase there was money, right?

16 A.      Yes.

17 Q.      A lot of money.  $129,000-some; right?

18 A.      I remember in excess of $120,000, yes.

19 Q.      That's the money you were talking about just a

20 minute ago; right?

21 A.      Yes.

22 Q.      There were papers in there -- in the suitcase;

23 correct?

24 A.      Yes.

25 Q.      There were a number of scales -- 12, 15 scales?

1 A.      Yes.

2 Q.      There were three book safes.

3 A.      Two or three, yes.

4 Q.      Okay.  Again, what you recall.

5         There were some book safes, and the money we

6 talked about was in the book safes.

7 A.      Yes.

8 Q.      There was some money outside of the book safes,

9 I think, in an envelope, perhaps?

10        Again, if you don't recall --

11 A.      That's what  I recall, yes.

12 Q.      Other than the items that were seized in the

13 suitcase -- excuse me.    Your Honor, can  I get a glass

14 of water?

15        Other than the items that were seized from the

16 suitcase -- except for those items, there were no

17 cutting materials found in    Ms. Ali's apartment, was

18 there?

19 A.      Not that  I recall.

20 Q.      There were no cutting materials in the suitcase;

21 correct?

22 A.      That's correct.

23 Q.      There were no razor blades; there was no

24 Mannitol or any other kind of a cutting agent anywhere

25 in the apartment; correct?

1  A.      That's correct.

2  Q.      There was no seizure of baking powder, was

3  there?

4  A.      That's correct.

5  Q.      There was no seizure of packages of small      Ziploc

6  bags; correct?

7  A.      Correct.

8  Q.      But there were some   ziploc  bags seized -- a

9  small number -- and they all appeared to have been

10 used, not new; correct?

11 A.      Not certain.

12 Q.      Okay.  Other than the scales and the suitcase,

13 there were no other scales found in the apartment, were

14 they?

15 A.      I believe so.    I believe that's correct.

16 Q.      There were no ledger books found, were there?

17 A.      No.

18 Q.      There were no lists of quantities of drugs or

19 what could have been lists of quantity of drugs, were

20 there?

21 A.      No.

22 Q.      There were no lists of dollar amounts with names

23 adjacent to them, were there?

24 A.      No.

25 Q.      There were no book safes, were there, other than

1  in the suitcase?

2  A.       Not that  I'm ware of, no.

3  Q.       There were no false bottom containers like Aqua

4  Velva  cans or things of that sort, were there?

5  A.       Not that were located.  Not that    I'm aware of.

6  Q.       Other than the money in the suitcase, there were

7  no large quantities of money found, were there?

8  A.       That's correct.

9  Q.       And there were no packages or quantities of

10  money wrappers, were there?

11  A.       That's correct.

12  Q.       In fact, all the drugs that were found and all

13  the paraphernalia that was found was indicative of

14  personal use of drugs, wasn't it?

15  A.       All of the drugs found were -- the paraphernalia

16  was indicative of personal use.     I don't recall the

17  amounts of the drugs located.

18  Q.       Fine.

19         Let me turn your attention to Chart 2.

20         Would you come down again?

21  A.       Sure.

22  Q.       Chart 2 is the telephone contact chart; correct?

23  A.       Yes.

24  Q.       I want to talk to you about the portion that

25  talks about  LaNora  Ali over on the side closest to me.

1  A.      Yes.

2  Q.      There are five phone numbers listed there;

3  correct?

4  A.      That's correct.

5  Q.      The first number is a 202 area code number?

6  A.      Yes.

7  Q.      Are you familiar with the physical location of

8  the phone that goes to that number?

9  A.      I have the subscriber.    I don't recall, off the

10 top of my head, the location.

11 Q.      Is it fair to say that's the phone where    Ms. Ali

12 worked?

13 A.      That's my belief, yes.

14 Q.      Then there are two cell phone numbers; correct?

15 A.      Yes.

16 Q.      Do you know who they were subscribed to?

17 A.      I can tell you if   I can refer to my notes.

18 Q.      Okay.

19 A.      Both were subscribed to    LaNora  Ali.

20 Q.      Both of them?

21 A.      Yes.

22 Q.      The next one, the (301) 853-3437.

23         Who was that subscribed to?

24 A.      LaNora  Ali.

25 Q.      And the last one, (301)853- --

1 A.        LaNora  Ali Garner.

2 Q.        Do you know if either one of those last two

3 phones was used for computer access?

4 A.        Don't know.

5 Q.        I'm going to ask you to go through some math

6 with me.

7          You can return to your seat now.

8 A.        Are we done?

9 Q.        Yeah.  Just take that down.

10          I've done some calculations.     I think  I did them

11 right, and  I'll -- if you need a calculator to follow

12 along,  I'll provide one.

13          What  I've done is  I've taken the information

14 from Chart 2, which showed 2,241 contacts between

15 phones used -- phones registered to     Ms.  Ali and phones

16 registered to  Ms. Martin.

17          That's the number off the chart; correct?  The

18 2,241?

19          Want to take a look?    I'll bring it over.

20 A.        Please.

21 Q.        I'll do the walking this time.

22 A.        Thank you.

23          Yes.

24 Q.        And then on this first line -- maybe I should

25 have held that chart up.  The time period --

1 A.      No, that's fine.

2 Q.      -- is between four -- that would be April 8, 01;

3 correct?

4 A.      Yes.

5 Q.      And May 31, '04; correct?

6 A.      Yes.

7 Q.      What I've done is gone the first year, April 8,

8 '01 to April 7, '02.  That's 365 days; correct?

9 A.      Yes.

10 Q.      April 8, '02 to April 7, '03, another 365; April

11 8, '03 to April 7, '04 is 366, because 2004 was a Leap

12 Year; correct?

13 A.      I will go with your numbers.

14 Q.      Thank you.

15         April 8, '04 to April 30, '04 is 22 days, and

16 then May 1st '04 to May 31, '04 is 31 days.  Add that

17 up and it's 1,149 days.

18         Trust my math on that?

19 A.      Sure.

20 Q.      And I divided --  I'm sorry, Your Honor.  Mr.

21 Montemarano  is --  I've divided the 2,241 contacts by

22 the number of days, 1,149, and it comes out to 1     .95 on

23 average --  I put "activations."  It should be

24 "contacts" -- per day.  Less than two contacts per day

25 during that time period.

1          Do my numbers look right to you?

2 A.       Sure.

3 Q.       In that average of less than two contacts per

4 day, that includes not just conversations; correct?

5 A.       That's correct.

6 Q.       That includes incomplete calls.

7 A.       That's correct.

8 Q.       Calls where someone may have dialed and then

9 hung up but they were on the line long enough for it to

10 register; correct?

11 A.      Yes.

12 Q.      Calls where an answering machine picked up and

13 no message is left; correct?

14 A.      Yes.

15 Q.      And that happened on these calls during this

16 time period, didn't it?

17 A.      Sure.  There's also calls that are incoming and

18 the digits are not captured.  Those would not be on

19 that chart also, or call waiting calls which occurred

20 between -- if  Ms. Martin was speaking to another party,

21 Ms. Ali called in and she flipped over on call waiting,

22 that call wouldn't be reflected either.  So, those

23 numbers are --

24 Q.      They're approximate?

25 A.      They're approximate numbers.  They're not --

1 Q.      I'm not looking for absolute specificity, but      I

2 want to make sure we understand what's included in

3 these contacts.

4 A.      Sure.

5 Q.      Calls in which the person calls and says,      I'm

6 busy; I'll call you back or words to that effect are

7 included; correct?

8 A.      Could be.  If we were not monitoring the wiretap

9 at the time,  I couldn't tell you what they discussed.

10 Q.      And calls of the type you described where

11 someone is on the line and a third party calls in, and

12 -- I forget the terminology, but they'll go over to the

13 other call?

14 A.      Call waiting.

15 Q.      A call waiting feature.

16 A.      Yes.

17 Q.      And that could be,  I'm on the other line; I'll

18 call you back.  That could happen.

19 A.      Possibly, yes.

20 Q.      Calls in which  Ms. Martin talks, perhaps, to      Ms.

21 Ali's husband are included; correct?

22 A.      Yes.

23 Q.      Calls in which  Ms. Martin talks to perhaps

24 someone else at  Ms. Ali's house; correct?

25 A.      Yes.

1 Q.      Calls in which  Ms. Ali talks to someone other

2 than Ms. Martin at her house?

3 A.      Probably.

4 Q.      Calls in which  Ms. Ali's husband talks to

5 someone else other than   Ms. Martin at Ms . Martin's

6 house; correct?

7 A.      Possibly.

8 Q.      Calls that don't involve   Ms. Martin and  Ms. Ali

9 at all; correct?

10 A.      Possibly.

11 Q.      It still evens out to approximately --    I'll even

12 round it up to two calls per day, two contacts per day,

13 between people who are good friends; correct?

14 A.      Yes.

15       MR. MCKNETT :  Thank you.

16       THE COURT:  All right .  Redirect .

17       MS. JOHNSTON:   Thank you , Your Honor .

18                **REDIRECT EXAMINATION**

19       BY MS. JOHNSTON:

20 Q.      Detective  Eveler , yesterday  Mr. Montemarano

21 start ed out  cross-examination   asking  you about  search

22 warrant s and the item s you look for .  Who tell s you

23 what it is you can look for?

24 A.      The magistrate , I guess , would be the final

25 authority .

1  Q.      The magistrate being a judge?

2  A.      Yes.

3  Q.      And he signs the search warrant; is that

4  correct?

5  A.      Yes.

6  Q.      And that includes an attachment that lists what

7  you can search for; is that correct?

8  A.      Yes.

9  Q.      Under that search warrant, how long are you

10  authorized to be in the premises?

11  A.      As long as is necessary to perform the function

12  that we're there to perform.

13  Q.      Which would mean to find items.

14          MR. MONTEMARANO:   Objection, Your Honor.

15          BY MS. JOHNSTON:

16  Q.      What is the function that you're there to

17  perform?

18  A.      To search for the items particularized in the

19  Schedule A or whatever the attachment is labeled.

20  Q.      Are you authorized under the search warrant to

21  take pictures of things that are not on Attachment A?

22  A.      We could take photos -- we could take overall

23  photos, but we don't make -- we don't search for items

24  not on the schedule.

25  Q.      Are you --

1           MR. MONTEMARANO:   Objection, Your Honor.

2           Non responsive.

3           THE COURT:   Overruled.

4           BY MS. JOHNSTON:

5  Q.       What is your understanding in terms of what

6  you're allowed to do in reviewing items or objects that

7  are not on Attachment A?

8  A.       We look at it to see if it fits the Attachment

9  A, and then we move on.

10 Q.       Are you allowed to take items that are not on

11 Attachment A?

12 A.       No.

13 Q.       Are you allowed to record what is in the items

14 that you're not allowed to take on Attachment A to

15 record the --

16          MR. MONTEMARANO:   Objection, Your Honor.

17          Basis for knowledge.

18          Can we approach?

19          THE COURT:   Rephrase the question.

20          BY MS. JOHNSTON:

21 Q.       What is your understanding -- when the judge

22 gives you an order -- a search warrant that says you

23 can look for the items on Attachment A, what is your

24 understanding of what you're authorized to do in

25 reference to items that are not on Attachment A?

1 A.      If it's not contraband , if it's not -- if we're

2 there to search for narcotic s but we find evidence of

3 child pornography , then we could go obtain another

4 warrant to then search for those item s, but we can't

5 seize those items.   We just have to look at them and

6 see if they fit what we're allow ed to search for and

7 move on .

8 Q.      And if it's not child pornography or on the

9 contraband , what are you able to do in term s of item s

10 that do not fall within the scope of the   attachment

11 signed by the judge?

12       MR. MARTIN:   Objection .

13       Asked and answered three time s.

14       THE COURT:   Over ruled .

15       THE WITNESS:   Nothing .

16       BY MS. JOHNSTON:

17 Q.    Are you permitted to take note s?

18       MR. MONTEMARANO :  Lead ing .

19       THE COURT:   Over ruled .

20       BY MS. JOHNSTON:

21 Q.    Are you permitted to take note s regard ing those

22 item s that you're not permitted to seize ?

23 A.     I would n't .  I'm not -- it's never come up .

24 I've never thought to take note s of item s that we were

25 not seizi ng .

1  Q.      And the reason for that is what?

2  A.      That's not what we're there for. We're there to

3  perform the function within the corners of the warrant.

4  Q.      In this instance, with regard to all of the

5  search warrants, including the search warrants that Mr.

6  Montemarano -- at Mr. Montemarano's client's residence

7  and business, did you leave behind all of the documents

8  and items that did not fit within Attachment A?

9          MR. MARTIN:   Objection.

10         Asked and answered four times.

11         THE COURT:   Overruled.

12         THE WITNESS:   Yes.

13         BY MS. JOHNSTON:

14 Q.      Indeed, do you have any knowledge what happened

15 to all of those documents and items that you left

16 behind?

17 A.      No.

18 Q.      In reference to the items that you did seize.

19 Were those made available to all defense counsel in

20 this case?

21         MR. MONTEMARANO:   Objection, Your Honor.

22         MR. MARTIN:   Objection.

23         MR. MONTEMARANO:   Basis for knowledge.

24         THE COURT:   If he knows.

25         BY MS. JOHNSTON:

1 Q.      Do you know?

2 A.      Yes.

3 Q.      How do you know that?

4 A.      I was -- we copied those items and provided them

5 to the government, and the government --

6        MR. MONTEMARANO: Objection.

7        Basis for knowledge. Unless he did the work.

8        THE COURT:  Just limit your response to what you

9 know personally.

10        BY MS. JOHNSTON:

11 Q.      What did you do or supervise in terms of all of

12 the items every piece of paper found at all these

13 search locations?

14 A.      Provided copies for force discovery.

15 Q.      In fact, today, this afternoon during

16 cross-examination, did Mr. Sussman show you copies of

17 some of those documents?

18 A.      That's what he said they were, yes.

19 Q.      Mr. Martin had asked you some questions about

20 your knowledge concerning Mr. Goodwin's contacts in El

21 Paso, Texas and your knowledge that Mr. Goodwin was

22 getting drugs from Texas. Do you recall those calls

23 from yesterday?

24 A.      The questions?

25 Q.      Those questions yesterday.

1  A.      Yes.

2  Q.      And he asked you what other people know, other

3  than Mr. Thurman, about those trips.  Do you recall

4  that?

5  A.      Yes.

6  Q.      And he asked you particularly what about the two

7  girls that Mr. Thurman said were with him.  Do you

8  recall that?

9  A.      Yes.

10  Q.      You indicated to him that there were other

11  persons who had told you Mr. Goodwin was getting drugs

12  from Texas.  Do you recall that?  Who were the other

13  people who described for you Mr. Goodwin getting drugs

14  from Texas?

15  A.      Larry Lane and Tiffany Vessels.

16  Q.      And you had also -- he had asked you about the

17  source in El Paso, Texas as being Mr. Goodwin's source.

18          How did you know that source in El Paso, Texas

19  was Mr. Goodwin's source?  Strike that.  Separate and

20  apart from Mr. Thurman's?

21  A.      Based on the statements by Mr. Lane and Ms.

22  Vessels.

23  Q.      That was separate and apart from Mr. Thurman?

24  A.      Yes.

25  Q.      When you spoke with Ms. Vessels and Mr. Lane,

1  was Mr. Thurman present   ?

2  A.      No.

3  Q.      In fact , had you had contact  with  Mr.  Thurman  at

4  the  time  of  your  inter view  with  Ms.  Vessel s?

5  A.      No.

6  Q.      Mr.  Lane .  At  the  time  of  your  initial  inter view

7  with  Mr.  Lane , when  he  provided  this  information , had

8  you  had  contact  with  Mr.  Thurman ?

9  A.      No.

10  Q.      Mr.  Martin  also  asked  you  about  a  restaurant  and

11  a  car  dealership , a  legitimate  business .  Could  you

12  de scribe  for  the  ladies and gentlemen of the  jury    how

13  you  use  the  term  "legitimate  business ?"

14  A.      A  legitimate  business  is  a  business  that  does

15  not  use  criminal  proceeds  and  does  not  act  as  a  front

16  for  a  criminal  enterprise .  It  is  pure ly  engage d  in

17  legitimate  business  with  no  tie s  to  criminal  activity .

18  Q.      What  do  you  mean  by  "tie s  to  criminal  activity ?"

19  A.      It's  not  use d  to  --  they  don't  --  you  don't  sell

20  drug s  from  a  legitimate  business .  You  do  not  take  drug

21  proceeds  and  invest  them  in  a  legitimate  business .  You

22  do  not  obtain  phone s  in  the  name  of  a  legitimate

23  business  to  then  use  in  the  conduct  of  narcotic s

24  trafficking  or  other  criminal  activities .  There 's  so

25  many  use s  of  --  there 's  so  many  way s  to  twist  a

1 legitimate business to illegitimate activity. I'm sure
2 I'm missing a couple.
3 Q.      Is it safe to say that those -- strike that.
4         I believe you testified yesterday they may have
5 some actual normal business; is that correct?
6 A.      Yes.
7 Q.      In regards to Mr. Goodwin's business, Lobo's car
8 dealership. Did you have an opinion as to whether or
9 not that was a legitimate business?
10 A.      Yes.
11 Q.      What is that opinion?
12 A.      It is not a legitimate business.
13 Q.      Why not?
14 A.      It was used as a distribution site, based on the
15 FBI's search warrant in 2002. It was used to obtain
16 dealer tags for courier vehicles to transport narcotics
17 from the southwest border to Maryland    and D. C. area
18 and to provide employment to conspirators and as a way
19 to legitimize and provide a front of having been
20 employed for participants in the drug trafficking.
21 Q.      There were also questions about controlled buys.
22 Were there any controlled buys made from any of the
23 defendants here in court or any of the associates that
24 were discussed here during the course of your
25 investigation?

1  A.      No.

2  Q.      Is that unusual?

3  A.      No.

4  Q.      Why not?

5  A.      To conduct a controlled buy, you need an

6  informant who is willing and able to make a controlled

7  buy from one of the participants.

8  Q.      Did you have -- during the course of your

9  investigation, were you able to do that?

10 A.      No.

11 Q.      There was also questions concerning undercover

12 buys. Were any undercover buys made for from any of

13 these individuals? From Ms. Levi or Mr. Thurman or Mr.

14 Mangual, the individuals that have been discussed

15 during the course of our trial?

16 A.      No.

17 Q.      And, why not?

18 A.      We didn't have anyone who was able to introduce

19 an undercover officer to any of the participants.

20 Q.      You were also asked questions about, couldn't

21 you use an informant to make a consensual call to my

22 client? One of the defendants asked you that question

23 this morning.

24         Why couldn't you make a consensual call to one

25 of the defendants in this case?

1  A.      We didn't have any informants that were in a
2  position or willing to do that.
3  Q.      What effect did that have to get a wiretap in
4  this case?
5  A.      This's one of the reasons -- you have to exhaust
6  other means.  That's what leads to a Title III.  If you
7  can do these things, you have to exhaust your other
8  methods of investigation to get authorization for a
9  wiretap.
10 Q.      There were some discussion by Mr. Bynum's
11 attorney.  He was doing something behind the board and
12 asking you about your not being able to see it.
13         Do you recall those questions?
14 A.      Yes.
15 Q.      Based on your training and experience, how often
16 do drug dealers engage in their drug business in front
17 of your face?
18 A.      In front of my face?
19 Q.      Yeah.  Or any other law enforcement officer for
20 that matter?
21 A.      Not knowingly.  Try not to knowingly.
22 Q.      Other than in an undercover capacity, did they
23 take it to the other guy in front of you?
24 A.      No.
25 Q.      Okay.  Why not?

1  A.       That would result in their arrest, which would

2  be counter-product ive to their goal s.

3  Q.       Based on your train ing and experience, do

4  individuals who are distributing drug s do it in front

5  of other individuals unknown to them?

6  A.       No.

7  Q.       Why not?

8  A.       Because they don't know if that 's a cooperator,

9  an informant, or someone involve d with law enforcement

10  or would have a time in the future where they may get

11  in trouble and give information to law enforcement .

12  Q.       In fact, in this case, were there call s voici ng

13  that type of concern?

14  A.       Yes.

15  Q.       Brief ly, what call s?  In general , were those --

16  A.       The call s -- the one s I recall in particular

17  were the call s involving Mr. Echarte and the charge s he

18  was facing in Florida and his sentence .

19  Q.       Who was involve d in those charge s with him from

20  this conspiracy ?  Do you recall ?

21  A.       Ms. Levi was not charge d in that case , but she

22  was mention ed in that case .

23  Q.       You on CH-1, that organizational chart .

24         Was Mr. Echarte inadvertent ly left off that

25  chart ?

1  A.      I don't think  he was  inadvertent ly  left off .   I

2  can't  include  everybody  on  the chart .

3  Q.      If we were  to put  Mr. Echarte  on the box , what

4  drug s  would  go  over  his  box  if we  put  him  on there ?

5  A.      Cocaine  and  heroin .

6  Q.      What  was his  role  in  this  organization  or

7  conspiracy ?

8  A.      Well , being  a distributor  himself , he was  also

9  -- I would  label  him a facilitato r  in that  he  assisted

10  Ms. Martin  in the  transportation  of money , the count ing

11  of money  and , while  not  legal  advice , did  provide

12  advice  to  Ms. Martin  how  she should  conduct  her

13  business .

14  Q.      Because  there  were  too  many  people  comi ng  in and

15  out  of the  house ?

16  A.      Yes .

17  Q.      Among  other  thing s.

18  A.      Yes .

19  Q.      The  drug s that  Mr.  Echarte  was  get ting  were

20  coming from  where?

21  A.      Florida .

22  Q.      The  ship ment s that  he  received .   Were  they  one

23  drug  or two different  kinds  of drugs?

24  A.      He received  two different  kinds  of drugs .

25  Q.      What  drug s were  comi ng  in his  ship ment s?

1        MR. HALL:   Objection.

2        Asked and answered.

3        THE COURT:   Overruled.

4        THE WITNESS:   Cocaine and heroin.

5        BY MS. JOHNSTON:

6 Q.      Who was getting some of that cocaine from him   ?

7 A.      Mr. Rice. Ms. Martin, I believe.  You may have

8 said Mr. Philpot, also.   There are several individuals .

9 I can't recall all of them.

10 Q.      Where was he taking those drugs when he got it

11 here in relation to Ms. Martin?

12 A.      To Bexhill Court.

13 Q.      In addition to that, he was also a facilitator ;

14 is that correct?

15 A.      Yes.

16 Q.      If I could ask you just to step down here to the

17 charts for a couple of moments real quickly.

18       Why don't we start with that very first chart,

19 CH-2. In regards to CH-2.  Mr. Bynum's attorney asked

20 you some questions and had you write something on the

21 chart here.   In particular, that the first telephone

22 number was Tony James, and it had two contacts, you

23 wrote.  And then this other number that it was Cindy

24 Lee, one time.  Why did you include those two numbers

25 on the chart?

1 A.      Because Mr. Bynum was intercepted using those

2 phones.

3 Q.      Could you write "Bynum intercepted" next to each

4 of those names so the jury knows why you included those

5 numbers on the chart?

6 A.      (Witness indicating.)

7 Q.      During cross-examination, I believe Mr. Ward

8 asked you about Ms. Dobie's contacts with other people

9 on the chart.  Do you recall that?

10 A.      Yes.

11 Q.      I believe you indicated you couldn't recall

12 whether she had contact with some of the people on the

13 chart; is that correct?

14 A.      Yes.

15 Q.      In addition to having pin registers up on Ms.

16 Martin's phones, did you have pin registers up on some

17 other individual's phones?

18 A.      Yes.  Mr. Mangual, Ms. Levi, and I can't recall

19 if we did on Mr. Turner or not.

20 Q.      Why would you have gotten pin registers on Ms.

21 Levi and Mr. Mangual and Mr. Turner's phone, as opposed

22 to the other people on the chart?

23 A.      They were suppliers, and we are attempting to

24 identify their suppliers, and we actually use the pin

25 registers to obtain -- as well as the intercepts -- to

1 obtain authorization to intercept the telephone calls

2 being made of one of Ms. Levi's two phones, and two of

3 Mr. Mangual's.

4 Q.     Your focus at that point was moving the

5 investigation where?

6 A.     Up.

7 Q.     What do you mean by "up?"

8 A.     Up the food chain.

9 Q.     Explain to us what you mean by "up the food

10 chain."

11 A.     Identifying the sources of supply and then

12 arresting the sources of supply.

13 Q.     You talk about sources of supply. Are you

14 talking about people dealing more and more larger

15 quantities of drugs?

16 A.     Yes.

17 Q.     I want to show you what's been marked as

18 Miscellaneous 41 and ask if you could identify that

19 document.

20 A.     Yes.

21 Q.     What is Miscellaneous 41?

22 A.     It's a printout of DNR contacts between Ms.

23 Levi's phone and Ms. Dobie's one telephone.

24 Q.     Just one of Ms. Dobie's telephones?

25 A.     Yes, one of the hard lines.

1  Q.     Is that telephone number reflected on this

2  chart?

3  A.     Yes.

4  Q.     Okay.  Which number is it that's reflected on

5  this chart that was also picked up in the pin register

6  of Ms. Levi's phone?

7  A.     This middle number, the 882-3738.

8  Q.     Do you recall if that's a cell phone or a hard

9  line?

10 A.     That's a hard line.

11 Q.     Can you tell from the miscellaneous document, I

12 think 41, that I just handed you what -- how many

13 contacts there were between Ms. Dobie and Ms. Levi?

14 A.     If I count them all?  Do you want me to count

15 them?

16 Q.     If you could count them, please.

17 A.     I believe it's 56.

18 Q.     If you could make a notation of 56 contacts with

19 Levi on the chart and then the time period.

20 A.     (Witness indicating.)

21        MR. WARD:   May the witness state the time

22 period?

23        THE WITNESS:   January 6, 2004 through March 25,

24 2004.

25        BY MS. JOHNSTON:

1  Q.      Could you put which phone of Ms. Levi's the

2  contact was with, just so it's clear?

3  A.      (Witness indicating.)

4  Q.      In reference to Mr. Bynum.  Counsel has asked

5  you questions like, what formed your opinion that he

6  was involved in the distribution of drugs.

7          I want to show you what we previously introduced

8  as Chart 14.

9          MR. MITCHELL:   Objection.

10          Mischaracterized the statement of the officer.

11          THE COURT:  Can you restate it?

12          BY MS. JOHNSTON:

13  Q.      Do you recall Mr. Bynum's counsel's question to

14  you about what evidence you relied upon to place him in

15  that box as a distributor/facilitator?

16  A.      Yes.

17  Q.      During the course of the conspiracy, what

18  quantity of drugs was seen -- seized from Mr. Bynum's

19  apartment?

20  A.      57.88 grams of crack.

21  Q.      Based upon your training and experience, do you

22  have an opinion as to whether that's a quantity for

23  personal use or distribution?

24  A.      I do.

25  Q.      What is that?

1  A.      That's the weight for distribution.

2  Q.      In fact, is that the charge that Mr. Bynum pled

3  guilty to?

4  A.      Yes, it is.

5  Q.      Now, if we could put that chart down, please,

6  and if you would give me CH-4.

7          Before I talk about CH-4.  I believe at some

8  point during Mr. Montemarano's testimony there was

9  questions about calls to the school and the school

10 business.  Do you recall those conversations?

11 A.      Yes.

12 Q.      And I believe you indicated there was a second

13 telephone at the school; is that correct?

14 A.      Yes.

15 Q.      Showing you Miscellaneous  42.

16         MR. MONTEMARANO:  Could I please see what you're

17 showing the witness?

18         MS. JOHNSTON:   Certainly, counsel.

19         MR. MONTEMARANO:  Thank you.

20         BY MS. JOHNSTON:

21 Q.      Showing you what's been marked as Miscellaneous

22 42.

23         Does that refresh your recollection concerning

24 the kind of telephone activity that was occurring over

25 the second line at Paula's School of Performing Arts?

1          MR. MONTEMARANO:    Objection, Your Honor.

2          There was no recollection needed to be

3  refreshed.  The detective answered my question.

4          THE COURT:  Can you restate the question?

5          BY MS. JOHNSTON:

6  Q.       Looking at Miscellaneous 42, could you describe

7  the nature of the telephone activity on the second line

8  at Paula's School of Performing Arts?

9  A.       Very, very low activity, with a vast majority

10 being incoming calls of no duration.

11 Q.       Over what period of time did you have the pin

12 register active on that second line?

13 A.       June 30, 2003 through October 3, 2003.

14 Q.       Why did you terminate your pin register over the

15 second line at the school?

16 A.       A lack of activity.

17 Q.       Consistent with the other line that we talked

18 about yesterday; is that correct?

19 A.       Yes.

20 Q.       Now, going to Chart 4.  One of the defense

21 counsel asked you what opinion did you believe this --

22 what information did you believe this chart provided to

23 the jury.  Do you recall questions of that nature?

24 A.       Yes.

25 Q.       Mr. Thurman is noted on this chart.  You recall

1  Mr. Thurman's testimony in reference to where he was

2  when Mr. Goodwin was arrested?

3  A.      Yes.  I believe he said he was in Texas.

4  Q.      Do you recall his testimony in terms of what he

5  did because he -- while in Texas, when he learned of

6  Mr. Goodwin's arrest?

7  A.      Yes.  He called Ms. Martin for instructions.

8  Q.      Did you know about Mr. Goodwin's arrest in

9  November of 2003 when it happened?

10  A.      No.

11  Q.      Did you know of Mr. Goodwin's arrest in March of

12  2000 --

13          MR. MARTIN:   Objection to leading.

14          MS. JOHNSTON:   I'll rephrase it.

15          BY MS. JOHNSTON:

16  Q.      Approximately when did you learn that Mr.

17  Goodwin had been arrested by someone else in the Prince

18  George's County Police Department with drugs?

19  A.      I believe it wasn't until after we had already

20  been up on the wiretap.

21  Q.      Was it sometime after March of 2004?

22  A.      Yes.

23  Q.      Now, in terms of this chart.  Could you explain

24  for the jury, in your own words -- give them your

25  opinion in terms of what this chart represents?

1 A.      This represents the contacts between members of

2 the conspiracy, one passing on word -- in the first

3 call, that would be Ms. Goodwin notifying Ms. Martin of

4 Mr. Goodwin's arrest, in my opinion.  Then after that,

5 Ms. Martin is attempting to ascertain what the problem

6 is and seeking advice and trying to organize things

7 until they can get him bonded out.

8 Q.      When you talk about organizing things.  What

9 calls in here relate to, in your opinion, Ms. Martin

10 trying to organize things or keep things going while

11 Mr. Goodwin was --

12 A.      The telephone contacts with Mr. Thurman would be

13 the running -- that and the contacts with Mr. Irby

14 would be the continuing in his stead.  Other than that,

15 the rest are making arrangements pursuant to his

16 arrest; the calls to the law office, the calls to

17 associates of his like Mr. Lane and calls with Mr.

18 Whiting.

19         MR. HALL:  Objection, Your Honor.

20         May we approach?

21              (At the bar of the Court.)

22         MR. HALL:  Your Honor, the reason I'm objecting

23 to that last comment about my client, Mr. Whiting is

24 there's absolutely no proof that a contact or a call

25 was ever completed.  It's simply the fact that there

1 was an activation of phone to phone, and I think it's

2 way past an opinion and to the level of speculation for

3 the officer to say that in his opinion that this call

4 was actually completed and that there was some

5 particular purpose to that call.

6         For all we know it was simply a call that he

7 wasn't there and hung up -- a call where he wasn't

8 there and hung up. In fact, two of the phone calls in

9 reference to my client show that the call was made and

10 obviously no connection occurred, because there's

11 another call made within a minute. That's why I object

12 to that opinion.

13         MS. JOHNSTON: Your Honor, other counsel asked

14 this witness repeatedly about the chart and what, in

15 his opinion, did it represent. I think I'm entitled to

16 let him bring out what his opinion is in terms of the

17 chart. That's what I'm doing.

18         In terms of Mr. Hall's other objection. I

19 intend to go into the length of some of those other

20 calls in my next few questions. So, they weren't just

21 hang-up calls.

22         THE COURT: Just make sure you finish up --

23         MR. MCKNETT: Just for clarification, Ms.

24 Johnston is talking about my question. My question to

25 this witness was, what do you want this jury to draw

1  from this court?  That was my precise words.  I want to

2  be clear.

3         MS. JOHNSTON:   I believe there were several

4  questions Mr. McKnett asked, changing the wording in

5  this area a little bit.

6         THE COURT:  Just make sure you stay within those

7  confines.

8                   (Back in open court.)

9         BY MS. JOHNSTON:

10 Q.     First of all, Detective Eveler, can you tell us

11 what Government's Exhibit CH-4A is?

12 A.     Yes.

13 Q.     What is CH-4A?

14 A.     It's a printout of DNR activity on Ms. Martin's

15 cell phone and her hard line from November 25 through

16 December 2, 2003.

17 Q.     Is that the printout of the data that you used

18 to compile chart CH-4?

19 A.     Yes.

20 Q.     Was CH-4 intended to include all of Ms. Martin's

21 contact with all of the coconspirators or codefendants

22 in this case, or was it directed towards particular

23 individuals?

24 A.     It was directed towards particular individuals.

25 Q.     What particular individuals did you direct the

1 preparation  of this chart towards?

2 A.      Ms. Martin and Mr. Goodwin primarily, along with

3 Mr. Whiting and then Mr. Thurman as he related to the

4 events.

5 Q.      And Mr. Irby as well?

6 A.      Yes.  He's not a defendant in this case.

7 Q.      Why is it that you used those individuals for

8 the preparation of this chart?

9 A.      I believe those were the ones pertinent to the

10 event that we were showing and tried to narrow it to

11 make it so as not to include every phone call in there.

12 It would be too voluminous.

13 Q.      Okay.  Now, in that regard, Mr. Whiting's

14 counsel asked you questions about his particular calls.

15         Are you able to ascertain from CH-4A the

16 duration of the calls that you've listed on this chart

17 between Ms. Martin and Mr. Whiting?

18 A.      Yes.

19 Q.      Okay.  And I hate to do this to you, but I'm

20 going to ask you, so that the record is clear, to write

21 in next to each of the calls involving Ms. Martin and

22 Mr. Whiting the duration of each call.  Or if you would

23 like to, read it off, and I'll write it on the chart.

24 A.      I've got it.

25 Q.      Have you got it?

1  A.       (Witness indicating.)  This is in minutes and

2  seconds is what I'll write.  It's not hours.

3  Q.       What did you write there?

4  A.       One minute and ten seconds.

5  Q.       If you could go to the next call which, I

6  believe, is November 26 at 9:07 in the morning.

7  A.       (Witness indicating.)

8  Q.       What did you write there?

9  A.       One minute and four seconds.

10  Q.       And if we can go down -- I think the next one

11  will be down here at 23:07 hours on the 26th.  There

12  are two in a row.

13  A.       (Witness indicating.)  It's 40 and 46 seconds.

14  Q.       And then I believe there are two more on the

15  27th.

16  A.       That would be 44 and 48 seconds.

17  Q.       I believe that's the last one; is that correct?

18  A.       Yeah, I believe so.  Yes.

19  Q.       Counsel for, I think, Ms. Dobie asked you about

20  whether that chart was supposed to depict people being

21  notified or receiving the news that Mr. Goodwin was

22  arrested.  Was that the purpose of this chart?

23  A.       Not -- no, not the general -- not the general

24  flow of information to everyone.  Just to say he was

25  arrested.  There was people who I thought would be

1 taking action.

2 Q.     What do you mean by "taking action?"

3 A.     Either assisting in trying to get him out of

4 jail or secreting evidence, possibly.

5 Q.     Okay. In looking at CH-4A, are you able to tell

6 whether or not during that November 26 -- the date of

7 the arrest, I believe, was November 25; is that

8 correct?

9 A.     Yes.

10 Q.     Between November 26 and Mr. Goodwin's arrest on

11 December 1, whether or not Ms. Martin had any telephone

12 contact with Ms. Dobie?

13       So the record is clear, I meant between the date

14 of his arrest, November 25, and his arrest on December

15 1st.

16 A.     Yes.

17 Q.     What was the date and time?

18 A.     November 25 at 20:13 hours.

19 Q.     I'm going to ask you to highlight those contacts

20 on that exhibit CH-4A, please.

21 A.     (Witness indicating.)

22 Q.     While you're doing that, are there any contacts

23 with Ms. Ali during the same time period of Mr.

24 Goodwin's being incarcerated between November 25 and

25 his release December 1st, if there were also contacts

1 between Martin and Ms. Ali?

2 A.      Yes.

3 Q.      How about Mr. Bynum?

4 A.      Yes.

5 Q.      And Ms. Harden?

6 A.      Yes, Ms. Harden.

7 Q.      Have you highlighted all of those other contacts

8 that happened between Ms. Martin and the other

9 codefendants not listed on Chart CH-4 on CH-4A?

10 A.      No.  I was just doing the ones with Ms. Dobie.

11         MS. JOHNSTON:   Your Honor, with the court's

12 permission, may he finish the highlighting during the

13 recess?

14         THE COURT:   Yes.

15         BY MS. JOHNSTON:

16 Q.      We'll let you do that then.  If you could resume

17 the witness stand for me, please.

18         Just for example, you've highlighted here some

19 contact; is that correct?

20 A.      That's correct.

21 Q.      And that would be with the Dobie number; is that

22 right?

23 A.      That's right.

24 Q.      Are the numbers that you're highlighting here

25 numbers that were on our CH-2 chart --

1  A.      Yes.

2  Q.      -- the summary telephone contact chart?

3  A.      Yes.

4  Q.      I'll leave this with you so you can finish that

5  during the break.

6          Now, there are also questions of you concerning

7  the distribution of drugs and distributor.  What do you

8  mean by a person who distributes drugs?

9  A.      Someone who passes drugs to another person.

10 Q.      What is encompassed within that definition?

11 A.      Sellers.  People who exchange drugs for favors.

12 I've had cases where people exchanged drugs for all

13 sorts of things, not cash.  There's oftentimes people

14 who will tax the drugs.  If you're buying a small

15 quantity of drugs, they'll chip off some and keep it

16 themselves and just pass it on to you and not even let

17 the customer know that they -- they pass it on as being

18 a full --

19         MR. WARD:   I object.  This is not responsive to

20 the question.

21         THE COURT:   Overruled.

22         by MS. JOHNSTON:

23 Q.      You may continue.

24 A.      I think I was finished.

25 Q.      Okay.  In this instance, Mr. Sussman asked you

1  question s about  not  finding  any  indicia  or
2  paraphernalia   associate d  with  distribution , like  those
3  many  bag s  plastic   glassine   bag s  that  were  recovered  at
4  several  different   location s .  Do  you  recall  that
5  testimony ?
6  A.      Yes .
7  Q.      Based  upon  your  train ing  and  experience , did  you
8  form  an  opinion  concern ing  whether  or  not  the  absence
9  of  those  materials   mean s  someone  was  not  involve d  in
10 distribution ?
11 A.      No .
12 Q.      Okay .  Explain  your  response .
13 A.      When  we  search ed , many  time s  we  do  not  find
14 packaging  material  at  drug  deal er s' house s .  I've
15 purchase d  drug s  direct ly  from  people  and  then  search ed
16 their  house  and  not  found  any  packaging  materials .  You
17 can  distribute  drug s  and  not  package  them .  Drug s  on
18 the  street  are  frequent ly  not  package d .
19 Q.      Explain  what  you  mean  by  that .
20 A.      They're  just  held  loose  in  your  hand .  If  it's
21 cocaine  base , it's  very  easy  to  hold  loose  in  your
22 hand .  Then  if  a  police  officer  approach es  you , you
23 toss  it .  It  look s  like  gravel  on  the  ground .  It's
24 very  hard  to  identify .  It's  a  very  efficient  way  of
25 avoid ing  arrest .  If  you  toss  it  on  the  ground , it

1 looks like gravel. And even if you find it, you may

2 only find a third of what's thrown, or none.

3 Q.      Based upon your training and experience, is

4 there any correlation between the quantity of drugs

5 someone is distributing and whether or not

6 paraphernalia, such as packaging or cutting agents,

7 would be present? Or scales, for that matter?

8       MR. MONTEMARANO: Relevance.

9       THE COURT: Overruled.

10      THE WITNESS: Is there a correlation?

11      BY MS. JOHNSTON:

12 Q.      Is there a correlation between the quantity of

13 drugs a person is distributing and the presence of

14 packaging materials or cutting agents or scales?

15 A.      Not necessarily. It depends on if you're

16 repackaging. Some people just buy the narcotics from

17 their supplier and pass it on and just tack on a higher

18 price and don't repackage it, don't cut it, don't do

19 anything with it.

20 Q.      In terms of ledgers. Based upon your training

21 and experience, are ledgers always present when

22 someone's involved in the distribution of drugs?

23 A.      No.

24 Q.      Under what circumstances, based on your training

25 and experience, would you expect to find ledgers or not

1 expect to find ledgers?

2 A.    If someone is running a debt, it would assist if

3 you kept the ledger maintaining that -- keeping track

4 of their debt so you know how much they owe you.  If

5 they are being paid on a cash and carry basis, then the

6 necessity of keeping a ledger is much less.

7 Q.    Is there any difference in terms of the quantity

8 of drugs someone might be involved in distributing in

9 terms of whether they keep a ledger or not?

10 A.    No.

11 Q.    Mr. Ward asked you some questions and brought

12 you a transcript of Mr.- -- part of a transcript of Mr.

13 Thurman's testimony.  Do you recall that?

14 A.    Yes.

15 Q.    I guess we'll mark this as the next -- Mr. Ward,

16 did you mark the June 20 transcript as an exhibit for

17 identification.

18        MR. WARD:  I don't think so.  I don't remember.

19        MS. JOHNSTON:  Just so the record is clear,

20 we'll mark our copy of the June 20, 2006 transcript as

21 the next miscellaneous number which, I believe, is

22 Miscellaneous 43 for identification purposes.

23        MR. WARD:  I'm sorry.  This is the 20th?

24        MS. JOHNSTON:  June 20.

25        MR. WARD:  Okay.

1          BY MS. JOHNSTON:

2  Q.      This is a transcript where counsel asked you

3  about when Mr. Thurman had begun using drugs on Page 3;

4  is that correct?

5  A.      Yes.

6  Q.      And that he had started in 1991 and stopped in

7  2004; is that correct?

8  A.      That's correct.

9  Q.      What else did Mr. Thurman say concerning how

10 whether his use was continuous, in response to Mr.

11 McKnett's question?

12 A.      His answer was, I'm not sure of the date but I

13 stopped on and off when I was locked up the first time.

14 So, on and off.  It wasn't straight until '04.

15 Q.      He then asked you questions about Mr. Thurman's

16 testimony concerning an eight ball, and again referring

17 to Mr. McKnett's cross-examination, the June 20

18 transcript, Miscellaneous 43.

19          MR. WARD:  What page, ma'am?

20          BY MS. JOHNSTON:

21 Q.      Starting on Page 6, could you read for the jury

22 what Mr.- -- starting on Page 6, Line 19.  If you

23 could, read the questions and answers in terms of what

24 Mr. Thurman said in response to Mr. McKnett's questions

25 about eight balls and what he did with them.

1 A.      Question :   How much  were you  buying  from  Tony

2 when  you  started  to  resell  crack  powder  cocaine , excuse

3 me ?

4        An  eight  ball .

5        Question :   An  eight ?

6        Answer :   Yes .

7        Question :   You  were  buying  one  eight  ball  to

8 use ; correct ?

9        Answer :   To  use  and  sell .

10 Q.      Continue  on  the  next  page .

11 A.      Question :   Maybe  I'm  confusing  you  and  myself

12 with  the  question  .  Let  me  rephrase  it .  When  you

13 bought  an  eight  ball  from  Tony -- strike  that .  Did  you

14 start  buying  eight  balls  from  Tony  for  your  own

15 personal  use  first ?

16        Answer :   No .

17        Question :   An  eight  ball  would  be  roughly  three

18 ounces  three  grams ; correct ?

19        Answer :   Give  or  take , yes .

20        Question :   When  did  you  start  buying  eight  balls

21 from  Tony ?

22        Answer :   I don't  remember   the  exact  date  or

23 time .

24        Question :   Do  you  remember  what  decade  it  was ?

25        Answer :   Probably   '01.

1 Q.      Okay.  And then he goes into about selling weed;

2 is that correct?  The next question?

3 A.      Yes.

4 Q.      Okay.  And then he gets back to the cocaine

5 again; is that correct?

6 A.      That's correct.

7 Q.      If we go to the next page, Page 8.  Are there

8 further questions from Mr. McKnett concerning the eight

9 ball and what Mr. Thurman did with it?

10 A.      Yes.

11 Q.      Starting on Line 5.  What's the question, and

12 what was Mr. Thurman's response?

13 A.      Question:  The first time you bought cocaine

14 from Tony to sell, how much did you buy?

15        Answer:  An eight ball.

16        Question:  And you used some of that eight ball?

17        Answer:  Yes.

18        Question:  And you sold some of the eight ball?

19        Answer:  Yes.

20        Question:  The part that you sold -- strike

21 that.  How much did you pay Tony for an eight ball?

22        Answer:  I'm not sure of the exact price.

23 Anywhere from $125 to $150.

24        Question:  When you stopped buying eight balls

25 -- when you stopped buying eight balls from Tony?

1        Answer:   A couple of weeks after I started

2 buying from him.

3        Question:   You only bought eight balls from Tony

4 for a couple of weeks?

5        Answer:   Yeah.  Maybe two to three weeks.

6        Question:   What portion of the eight ball that

7 you didn't use yourself did you repackage it?  How did

8 you repackage it?  In bags?  What size bags?

9        Answer:   I don't know the size.

10 Q.   If I could see it.  Okay.  And if you could

11 continue at the top of Page 9 with the further

12 discussion in response to Mr. McKnett's question about

13 the eight ball and his use of it.

14 A.    Question:   Well, how much of the eight ball did

15 you use?

16        Answer:   Maybe a gram.

17        Question:   So you would have about two grams

18 left; correct?

19        Answer:   Yes.

20        Question:   And then you would repackage that

21 into bags; correct?

22        Answer:   Correct.

23        Question:   How many bags would you repackage

24 that two grams into?

25        Answer:   $10 or more.

1          Question :   How much would  you sell  each  of  those

2  bags for ?

3          Answer : $10  or  more .

4  Q.      Okay .   Now , you  were  testify ing  before  about

5  sell ing  -- your  experience  is sometimes  the  dealer  will

6  just  hold  it  and  drop  it  if  the  police  come ;  is  that

7  correct ?

8  A.      Yes .

9  Q.      The  quantity  you're  dropping  and  hoping  it  looks

10  just  like  gavel  was  what  quantity ,  approximately ?

11  A.      It  would  be  multiple  $20  rocks  or  .1  grams .

12  Q.      Okay .   Is  that  the  same  quantity  that  Mr.

13  Thurman  was  discuss ing  that  he  was  resell ing  in  his

14  testimony  here ?

15  A.      Yes ,  yes .

16  Q.      Court 's  indulgence .

17          On  CH-1,  Mr.  Ward  asked  you  some  question s  about

18  Ms.  Dobie 's  role  as  distributor  or  facilitato r.   Could

19  you  describe  for  us  what  evidence  cause d  you  to  place

20  her  in  that  category  on  the  chart ?

21  A.      The  telephone  intercept s,  the  -- not  only  was

22  she  call ing  Ms.  Martin  and  asking  for  quantiti es  of

23  cocaine  -- crack  cocaine , but  she  was  also  offering  a

24  source  of  supply  to  Ms.  Martin .   She  and  her  husband

25  Goldie  were  attempt ing  to  identify  new  source s  of

1  supply , and she also -- there were calls referenci ng a

2  quantity of heroin which she had for sale , as well as

3  the evidence seized from her residence during the

4  search warrant .

5  Q.      There were some question s about surveillance on

6  different individuals . Is it safe to say that your

7  case was not the only case being handle d by the Prince

8  George's County narcotic s unit at the time ?

9  A.      That 's correct .

10 Q.      Just so the jury has an idea . Mr. Mitchell

11 asked you about how many police officers there are in

12 Prince George's County . How many officer s are assign ed

13 to the narcotic s unit , approximately ?

14 A.      Sworn officer s? I'd say 50 .

15 Q.      And of those 50, do they get -- do they only

16 work on one detective 's investigation s at a time ?

17 A.      No . We're divide d into several section s.

18 There 's a Vice /Intelligence section that we rare ly work

19 with . There 's diversion investigato rs who handle

20 prescriptions diversion --   it's diversion of legitimate

21 drug s for ill egitimate purpose s. We have a financial

22 investigative unit which support s the entire division .

23 We have a parcel interdiction unit , and we have a

24 street narcotic s section . So, my main contact was

25 with , at the time , about eight to ten major narcotic s

1  investigator s.

2  Q.      Some  of  those  investigator s  came  in  here  and

3  testifi ed  in  term s  of  surveil lances  and  the  search

4  warrant s  they  assisted  with ;  is  that  correct ?

5  A.      Yes .

6  Q.      On  any  given  day ,  in  term s  of  surveillance ,  did

7  you  --  strike  that .

8       Did  you  have  surveillance   officer s  available   to

9  you  24 /7  during  the  time  the  wiretap  was  up?

10  A.      No .

11  Q.      In  this  case  there  were  also  some  question s

12  about  see ing  people  going  in  and  see ing  Ms.  Ali  and  Ms.

13  Martin  also  leavi ng  with  the  pack ages  and  going  to  the

14  school .

15       Did  you  make  an  effort  to  stop  them  on  their  way

16  to  the  school  or  ask  other  officer s  to  stop  them  with

17  the  package s  on  the  way  to  the  school ?

18  A.      No .

19  Q.      Why  not ?

20  A.      Well ,  one ,  we  could n't  even  get  our  surveillance

21  agent  to  her  house  in  time  to  even  conduct  a

22  surveillance   at  the  residence .  We  could n't  even  get

23  him  to  the  school  in  time  to  observe  the  activity  from

24  the  vehicle  to  the  school .

25       Also ,  had  we  stopped  Ms.  Martin  and  Ms.  Ali  at

1 that time , we were not in a position to be able to

2 execute our search warrant s, and we would have lost

3 valuable evidence , I believe , if we had arrested Ms.

4 Martin and Ms. Ali that day or made a seizure from them

5 that day .

6 Q.      In fact , when Detective Roger St. Louis arrive d

7 at the school , do you recall where Ms. Mart in and Ms.

8 Ali were already ?

9 A.      They were already inside the school .

10 Q.      Could you have entered the school without a

11 search warrant at that time ?

12 A.      Not if we want ed to use the evidence for any

13 court purpose s.

14 Q.      Okay . How long does it take you to get a search

15 warrant ?

16 A.      A few hour s.

17 Q.      Court 's indulgence .

18      I had asked you some question s about

19 paraphernalia . In term s of the transaction like we

20 heard Mr. Thurman de scribe and how he -- what he did

21 with eight ball s, using some and sell ing some .

22      Based on your train ing and experience , does an

23 individual require a scale to engage in those kind of

24 transactions ?

25 A.      No .

1 Q.      Why not?

2 A.      You can eyeball a $20 rock.  Oftentimes when

3 you're buying them, the guy will hold out several to

4 you and you can see a bigger one and a smaller one, and

5 for some reason, even though I'm not a drug user or an

6 addict, I still want to buy the big one and you go for

7 the big rock because you will see different sizes.

8 It's not a scientific weight.  Oftentimes, they're

9 eyeballed.

10 Q.      Not only in terms of the buyer, but did Mr.

11 Thurman in fact describe how he would divvy it up into

12 a certain number of packages after he took some for

13 use?

14 A.      Yes.

15         MS. JOHNSTON:   I have nothing further.

16         THE COURT:   All right.  We'll take a recess

17 until five minutes after four, and then we will resume.

18                     (Jury excused at 3:47 p.m.)

19                     (Off the record at 3:47 p.m.)

20                     (On the record at 4:04 p.m.)

21         THE COURT:   Counsel, before we bring the jury

22 in, I want to say a couple of things.  There is now a

23 second sign on the door out there that I just put up

24 that says, if you're a witness, stay out of the

25 courtroom, because someone came in this afternoon and I

1   had my law clerk go say, are you a witness? And it was

2   just a lawyer watching the case. So, I'm doing the

3   best I can to make sure the rule is followed.

4           I have a guilty plea at 9:00 tomorrow, and what

5   I'm going to do is -- are we all here now? Counsel,

6   for those who came in. If you walked in, you saw I had

7   a sign put up that says, if you're a witness, stay out

8   of the courtroom. So that, hopefully, will help

9   self-administer the rule of sequestering witnesses.

10          I have a guilty plea at 9 o'clock tomorrow.

11   What I'm going to do is to request that all parties and

12   counsel be ready to go at 9:30. That doesn't mean you

13   might not have to wait a few minutes.

14          I'm not sure exactly where we're going to be,

15   but we are now on potential recross. I gave a lot of

16   latitude to a fairly redundant amount of

17   cross-examination. I'm going to be very careful not to

18   let that happen on a recross we want to get this

19   witness finished today, and I want to leave enough

20   time, if there's going to be motions at the end of the

21   government's case, to hear them or start to hear them

22   today and if not, hear them before the jury goes in the

23   box at 10 o'clock tomorrow. So, be forewarned, and we

24   will proceed.

25          Bring the jury in.

1                    (Witness  resume s  the  stand .)

2                    (Jury  returns  at  4:08  p.m. )

3          THE  COURT:   All right .  You  may  proceed , Mr.

4  Montemarano .

5                    **RECROSS  EXAMINATIO  N**

6          BY MR.  MONTEMARANO :

7  Q.      Thank  you , Your  Honor .

8          On  redirect , Ms.  Johnston  pose d a few  question s

9  to  you , Corporal  Eveler , regard ing  your  ability  to

10  seize  item s not  enumerate d in  the  attachment   to  the

11  search  warrant .

12          Do  you  remember  that  series  of  question s?

13  A.      Yes .

14  Q.      You  state d you  don't  take  thing s that  are  not  on

15  the A ttachment   because , "that 's not  what  we're  there

16  for ."  Do  you  recall  those  words ?

17  A.      Words  to  that  effect , yes .

18  Q.      Words  to  that  effect .  Maybe  I got  them  wrong .

19          You  did  a series  of  search es on  "Raid  D ay" of

20  June  1, 2004 ; correct ?

21  A.      And  Two , yes .   12.

22  Q.       12.  Talk ing  about  -- but  I'm  talk ing  about  June

23  1.  On  that  date , you  did  a number  of  search es in  the

24  state  of  Maryland ; correct ?

25  A.      Yes .

1 Q.       Including Ms. Martin's home at 810 Hayward ;

2 correct ?

3 A.       Correct .

4 Q.       Were the search and seizure warrant s the same

5 for all of the Maryland location s and the attachment s

6 all the same ?

7 A.       I can't recall .

8 Q.       I'm going to show you a document which we've had

9 mark ed for identification as D efendant Martin Exhibit

10 3 . I want you to take a look at that .

11       MS. JOHNSTON:    Excuse me . Mr. Montemarano , what

12 exhibit number ?

13       MR. MONTEMARANO:    Exhibit 3 .

14       MS. JOHNSTON:    Thank you .

15       BY MR. MONTEMARANO:

16 Q.       Does that look familiar ?

17 A.       Not particular ly.

18 Q.       Not particular ly?

19 A.       I've seen a lot of these . I'm not sure which

20 location this goes to .

21 Q.       I'm sorry ?

22 A.       I don't know which warrant this is attach ed to ,

23 if it was .

24 Q.       This was provided to me by Mr. McKnett . I'm

25 traveling a little light today . This is attach ed to

1 this.

2         MS. JOHNSTON:   Objection to counsel testifying

3 about where it came from.

4         THE COURT:   Let him finish the question.

5         BY MR. MONTEMARANO:

6 Q.      This would be the one attached to the search

7 warrant for Ms. Ali's home at 620 Sheridan.   Does that

8 sound reasonable to you, based upon your review?

9 A.      Could be.

10 Q.      Would you agree it's one of the ones from this

11 case?

12         You see Paulette Martin's name, do you not?

13 A.      Yes.   But if we had the warrant and the

14 attachment that it went to, then I could put it in

15 context.

16 Q.      Let's just work from this one, okay?

17 A.      Okay.

18 Q.      If you wouldn't mind.

19         Item 12.   That's --

20         MS. JOHNSTON:   Objection.

21         Your Honor, the witness has not identified this

22 exhibit.

23         THE COURT:   Is it not identified as an exhibit?

24         MS. JOHNSTON:   He said he can't say whether this

25 is an exhibit from a particular search location or not.

1  It's an attachment .

2        THE COURT:   Can you give him the real thing so

3  we don't have to speculate ?

4        MR. MCKNETT:    Your Honor , may I consult with Mr.

5  Montemarano  for a second on this ?

6        MR. MONTEMARANO:    I'm going to give Ms.

7  Forsberg,  our handy dandy clerk -- this will be Dobie

8  Exhibit  whatever  the next number  is.

9        MR. WARD:   Exhibit  for identification   only ?

10        THE CLERK:   It's a Dobie  exhibit ?

11        MS. JOHNSTON:    Mr. Montemarano , can I see it?

12  I'm going to walk to you.

13        MR. WARD:   What's  the number , Mr. Montemarano ?

14        BY MR. MONTEMARANO:

15  Q.     Since  the ladies and gentlemen of the jury    don't

16  do this for a living , let's educate  them brief ly.

17  There 's an affidavit   filed  request ing with -- with the

18  court ; correct ?

19  A.     Yes .

20  Q.     And the affidavit  request s the ability  to search

21  a location  or many location s; correct ?

22  A.     Yes .

23  Q.     And it's invariably  not eight affidavit s for

24  eight  location s, and there  were  26 location s here ;

25  correct ?

1          MS. JOHNSTON:   Objection on relevance.

2          THE COURT:   Where are we going with this, Mr.

3  Montemarano?

4          MS. JOHNSTON:   This is recross.

5          MR. MONTEMARANO:   Since the officer wants to be

6  clear with regard to this affidavit, I want to

7  establish so the jury understands what this document

8  embodies and what it does not embody, and I'm going to

9  be very brief.

10          THE COURT:   Be very brief.  This is recross, and

11  there's a very limited right of recross.

12          BY MR. MONTEMARANO:

13  Q.      Thank you.

14          In this case there were about 26 locations

15  searched on the 1st and the 2nd?

16  A.      Approximately.

17  Q.      There was one after affidavit, and's listed

18  serially, the addresses and why they were important in

19  the affidavit; correct, sir?

20  A.      I believe there were two affidavits.  There's

21  one in the District of Columbia and one in Maryland.

22  Q.      Sorry.  In Maryland -- one for the locations in

23  Maryland; correct?

24  A.      I believe so.

25  Q.      Okay.  And then there would have been a single

1 warrant and attachment for each of the separate

2 location s; correct, sir?

3 A.      I believe so.

4 Q.      That's based upon your knowledge and experience

5 and train ing, because you've been do ing this for a few

6 year s; correct, sir?

7 A.      Yes.

8 Q.      I'm show ing you Dobie 3 for identification   which

9 Mr. Ward provided me. This is the one for Ninth

10 Street. That's Ms. Dobie's address. That's the one -

11 page warrant; correct, sir? The application.

12 A.      Yes.

13 Q.      And then follow ing behind that is Attachment B;

14 correct, sir?

15 A.      Yes.

16 Q.      That would be the same Attachment B for all of

17 the location s; correct, sir?

18 A.      I believe so. I didn't do this affidavit.

19 Q.      Okay. Why don't you use that one? I'll take a

20 look at this one. I'd like you please to look at --

21 court's indulgence, please. Look at Item 16.

22 A.      Yes.

23 Q.      Any and all document s, records or

24 correspondence s pertain ing to Paulette Martin's

25 business es or residence s; correct, sir?

1  A.      Yes.

2  Q.      That would have covered all kinds of documents

3  relating to any business Ms. Martin would be involved

4  in; correct, sir?

5  A.      Yes.

6  Q.      Invoices, involving clothing; correct, sir?

7  A.      Yes.

8  Q.      Checkbook involving PTK Enterprises; correct,

9  sir?

10  A.      Yes.

11  Q.      All of these things that Ms. Johnston tried to

12  establish with you that you couldn't seize; correct,

13  sir.

14          MS. JOHNSTON:   Objection.

15          THE WITNESS:   No.

16          THE COURT:   Sustained.

17          BY MR. MONTEMARANO:

18  Q.      You could have seized anything relating to

19  clothing, because that involved the business; is that

20  correct?

21  A.      I believe when you spoke to me earlier about

22  this, you were speaking specifically to clothing and

23  whether I reviewed the clothing not records pertaining

24  to the clothing.

25  Q.      I recall asking about paperwork, too.  We'll go

1 on.

2          Before 16, we get to Item 15 on the preceding

3 page. Records, documents and invoice materials that

4 concern any transactions with the businesses,

5 individuals or properties associated with Paulette

6 Martin, Paulette Akufo, Paulette Murphy, or by

7 individuals associated with Martin, including but not

8 limited to escrow records, checks, checking accounts

9 and savings account, payment records, tax receipts,

10 dispersement journals, general ledgers, financial

11 statements, invoices, billing statements, and payroll

12 records; correct, sir?

13 A.      Yes.

14 Q.      So anything like that you could have seized when

15 you were in Ms. Martin's premises at 810 Hayward on

16 June 1st; correct, sir?

17 A.      It's my understanding we did.

18 Q.      Thank you.

19          So the answer would be yes?

20 A.      Yes.

21 Q.      Thank you.

22          Thank you very much, Mr. Ward.

23          MR. WARD:   You're welcome, Mr. Montemarano.

24          THE COURT:   Any further recross?

25          MR. MONTEMARANO:    That's it, Your Honor.   Thank

1 you very much.

2          MR. MARTIN:   Yes, Your Honor, briefly.

3          MR. WARD:   I'm sorry.  Go ahead, Mr. Martin.

4          MR. MARTIN:   Thank you, sir.

5                  **RECROSS EXAMINATION**

6          BY MR. MARTIN:

7 Q.        Getting back to Chart 4, briefly.

8 A.        Would you like me to step down?

9 Q.        I think it might be easier if you do.  I hate to

10 do that to you.  I know you've been up and down a

11 number of times.

12          Let's start from the line -- I guess this is the

13 second line here at 00:46 hours.  Constance Goodwin

14 telephones Martin.  Constance Goodwin is not on the

15 indictment, is she?

16 A.        No.

17 Q.        And then let's go to line 00:53.  That's

18 Constance Goodwin again; right?

19 A.        This's right.

20 Q.        And then we've got 00:56.  That's Mr. Whiting

21 who has legal training.

22 A.        Yes.

23 Q.        And now let's go to the next line down.  What is

24 that? 01:00 hours and Constance Goodwin again?

25 A.        Yes.

1  Q.      And Constance Goodwin is Mr. Goodwin's wife?

2  A.      Yes.

3  Q.      And then we go to 01:47 hours.  That's Mr. Irby,

4  who also is not on the indictment; right?

5  A.      That's correct.

6  Q.      And 07:36 hours.  Mr. John Ford.  He's not on

7  the indictment either, is he?

8  A.      No.

9  Q.      And we've got another call at 08:32 hours,

10 Constance Goodwin.    08:35, Constance Goodwin.  08:36,

11 Constance Goodwin.  08:40, Constance Goodwin, and 09:07

12 Mr. Whiting again.

13        We now go down to 13:30 hours.  Law Office of

14 Houlan and Berman.  It's not your testimony that

15 anybody at Houlan and Berman was involved in

16 distributing drugs, is it?

17 A.      No.

18 Q.      And no one from that firm was on the indictment.

19 A.      No.

20 Q.      We've got further calls from Constance, Mr. Irby

21 we've already talked about.  Then at 23:38 hours we've

22 got Bail Bond Express.  Was anybody at Bail Bond

23 Express, as far as you know, part of this conspiracy?

24 A.      No.

25 Q.      So, no one that I've mentioned so far was

1 secreting information  or involved in the conspiracy  as

2 far as you know; right?

3 A.     I don't think  there's any information  to

4 secreting information .  I think there's a reference  to

5 passing information .

6 Q.     Passing information .  I thought  I heard  the word

7 "secreting."

8        Would  you agree  with me that if we counted  all

9 of these up, the total  number  of calls is 64?

10 A.     I didn't  count .

11       MS. JOHNSTON:   Objection .  Objection .

12       Beyond  the scope  of redirect .

13       MR. MARTIN:   It is not, Your Honor .  If you want

14 us to approach , I will.

15       THE COURT:   You're  right  on the edge .

16       Overruled .

17       BY MR. MARTIN:

18 Q.     There  are a number  of calls here; right?

19 A.     Yes .

20 Q.     Would  it be fair  to say that the overwhelming

21 majority  of these  calls involve  Constance  Goodwin?  You

22 can count  them on the chart .

23 A.     The majority  involve  Ms. Martin .

24 Q.     Would  it be fair  to say that more than half of

25 these  calls involve  Constance  Goodwin ?

1          If you want to take a moment to count them and

2 after that, sir, you can go back to the witness stand.

3 A.     I believe I would agree with that.

4 Q.     How many calls did you count?

5 A.     20.

6 Q.     I counted 36.  Maybe we should go through each

7 one again.

8          MS. JOHNSTON:   Objection.

9          Beyond the scope of redirect.

10          MR. MARTIN:   It is not, Your Honor.

11          MS. JOHNSTON:   The document speaks for itself.

12          MR. MARTIN:   I made that same argument when it

13 was first introduced.

14          THE COURT:   Let him take a look at it.

15          BY MR. MARTIN:

16 Q.     Would you please count how many calls are there

17 and how many involve Constance Goodwin.  Or do you want

18 me to do it for you?

19 A.     Whatever you please is fine.

20 Q.     Why don't you count?

21 A.     Five plus six is 11 --  so, that would be 70-some

22 calls, and I think I counted 20 with Constance.

23 Q.     I counted 36 with Constance.  I'm not going to

24 bore the jurors with that.  They will have an

25 opportunity to go through that and count it up

1 themselves .

2          You also -- I'm sorry , sir .  If you would have a

3 seat , please .

4          You also made reference to Larry Lane and

5 Tiffany Vessels .  My recollection is neither one of

6 them testified in this case ; is that your recollection ?

7 A.       That 's correct .

8 Q.       And you said you had an opportunity to speak

9 with both of them ?

10 A.      Yes .

11 Q.       And I take it during that conversation with Mr.

12 Lane , you told -- you spoke to him about his possible

13 jail time ?

14 A.       No .  That 's not my function .

15 Q.       You also talked about the fact that some of the

16 business activities of Mr. Goodwin were not legitimate

17 in your estimation ?

18 A.       Yes .

19 Q.       Do you hold a degree in accounting ?

20 A.       No .

21 Q.       Did you audit the business to see where the

22 income was coming from ?

23 A.       No .

24 Q.       Did you audit the business to determine where

25 the income was going to ?

1 A.        No.

2          MR. MARTIN:    I have nothing further, Your Honor.

3 Thank you for your patience.

4          THE COURT:   Any further recross?

5          MR. HALL:   Just a couple of questions, Your

6 Honor.

7          Ms. Johnston, does he have the original CH up

8 there.

9          MS. JOHNSTON:   Yes, I think -- no, he does not.

10                    **RECROSS EXAMINATION**

11          BY MR. HALL:

12 Q.        Do you have CH-4A up there?  I was going to

13 refer to it, and I don't want -- I wanted to use the

14 actual court document.

15          Let me show you CH-4A.  Do you recall that

16 document, sir?

17 A.        Yes.

18 Q.        That's the -- just to make it clear, CH-4, the

19 large chart -- I'm not going to make you get down and

20 show it to the jury again, but the large chart.  Those

21 are the calls that you selected for that chart, and

22 they came from CH-4A; is that correct?

23 A.        Yes.

24 Q.        Okay.  So all of the information that's on that

25 chart is reflected in this document, CH-4A that I just

1  handed you; is that correct?

2  A.      Yes.

3  Q.      Let me just ask you a couple of questions.  If

4  you turn to Page 3 of that document, which has several

5  phone calls involving my client, Mr. Whiting.

6  A.      Yes.

7  Q.      Okay.  This document lists -- has a column the

8  third column over called "Date."  It gives you the date

9  that the call occurred; right?

10  A.      Correct.

11  Q.      And it has a column with the time of the call;

12  correct?

13  A.      That's correct.

14  Q.      And that's the actual time that the call

15  occurred; right?

16  A.      Yes.

17  Q.      Okay.  And then it has a column called

18  "Duration" which tells you how long the phone call was;

19  right?

20  A.      That's correct.

21  Q.      And then it has a column of the "Number Dialed;"

22  correct?

23  A.      That's correct.

24  Q.      And then the dialed -- the person who was the

25  subscriber or dialler name; is that correct?

1  A.      Yes.

2  Q.      All right.  You pointed out -- it's included  on

3  chart CH-4, several  phone  calls  that  were  made  to  Mr.

4  Whiting's phone  number; is  that  correct?

5  A.      That's correct.

6  Q.      I believe  the  first  one  is  on  11-26  at  56:39;  is

7  that correct?

8  A.      Yes.

9  Q.      That  was  the  one  for  one  minute  and  ten  seconds;

10  is that right?

11  A.      That's right.

12  Q.      Would  you  agree  with  me  that  that  is  not

13  inconsistent  with  leaving  a  message?

14  A.      It  could  be.   Possibly.

15  Q.      Okay.  Would  you  agree  that  one  minute  and  ten

16  seconds  is  not  a  very  long  phone  call, is  it?

17  A.      We  have  some  of  the  calls  that  were  transcribed

18  and played  in  court  which  were  less  than  a  minute.

19  Q.      All right.  Let  me  ask  you  this.   If  you  look  on

20  the  same  page, down  the  page  a  little  bit  -- let  me

21  just  show  you  -- for  example, you  have  a  call  to  the

22  phone  line  to  get  time  and  temperature.   How  long  was

23  that  phone  call?

24  A.      That's  a  minute  eight.

25  Q.      Not  too  far  off; right?

1 A.      From?

2 Q.      Length wise for the phone call, that's not --

3 it's only two seconds difference between that and the

4 phone call to Mr. Whiting; is that correct?

5 A.      That's right.

6 Q.      Just to make it absolutely clear.  These calls

7 only show that someone using the phone at Ms. Martin's

8 number called Mr. Whiting's phone number; is that

9 correct?

10 A.      That's correct.

11       MR. HALL:   Thank you.  That's all I have.

12       THE COURT:  All right.  Mr. Mitchell.

13       MR. MITCHELL:  No questions, Your Honor.

14       THE COURT:  Mr. Ward.

15       MR. WARD:  I think I'll -- if everybody can hear

16 me, I'll stand here.

17                **RECROSS EXAMINATION**

18       BY MR. WARD:

19 Q.    I think the first series of questions you were

20 asked by Ms. Johnston on redirect had to do with search

21 warrants.  I don't want to again beat this thing to

22 death, but you said that a magistrate said in the

23 warrant what you could look for and what you could

24 seize.  Is that my correct understanding of your

25 testimony?

1  A.      No.   What I was indicati ng was he's the final

2  authority .  If he saw something on that attachment  that

3  was outside  the scope  or outside  the probable  cause

4  articulate d in the affidavit , he would not approve  that

5  warrant .

6  Q.      Okay .  I mean , let's just think of  an example

7  here .  Look ing for drug s, and in the attachment  or the

8  warrant  authorizi ng what -- stati ng what you can seize ,

9  you list , you know , a bottle  of moon shine , okay ?

10 A.      Okay .

11 Q.      That 's clear ly not within  the scope  of the

12 warrant , is it?  I mean , look ing for drug s --

13 A.      If it was -- maybe  I didn't  follow  your

14 question .  If I was search ing -- if articulate d in the

15 affidavit  is a search  for narcotic s and I had probable

16 cause  to believe  the person  was involve d in moon shine ,

17 then  I could  seize  the moon shine , possibly .  But if I

18 didn't  articulate  that , no, I could  not .

19 Q.      If all you articulate d was drug s and drug

20 activity  and you saw the moon shine , you would n't be

21 able  to seize  that , I think  you said , but you would

22 recognize  it as being  an illicit  product ; right ?

23 A.      Right .

24 Q.      I thought  you said  you then  had to go back  to

25 the magistrate  and get another  warrant ; is that

1 correct?

2 A.      Or you could just choose not to seize that item.

3 Q.      Or choose not to seize it.  But if you wanted to

4 seize it, you would have to get a new warrant?

5 A.      It depends.  If it's contraband  -- if I'm there

6 searching for a firearms violation and I see narcotics,

7 I wouldn't have to go back and get a warrant for the

8 narcotics, because narcotics in and of themselves are

9 illegal.  If they're in plain view, I could seize them

10 under an exception.

11 Q.      Sawed off shotgun.  You wouldn't have to get a

12 search warrant for that, because that's something

13 that's illegal.

14 A.      Less than an 18" barrel?  Yes.

15 Q.      You recall the testimony of the detective, the

16 one with the ponytail.  What was his name?

17 A.      Detective Papalia.

18 Q.      Detective Papalia, that's correct.

19       Detective Papalia testified to all sorts of

20 credit card documents in different names, and I think

21 there were D.C. licenses with the same picture and

22 different names and addresses on them; is that correct,

23 sir?

24 A.      Yes.

25 Q.      Based on your experience  -- and I realize you

1  spent most of your time in narcotic s -- that sounds

2  like some kind of a credit card fraud scam, doesn't it?

3  That kind of stuff?

4  A.    It could. Oftentimes, if we find

5  identification, you will seize it to show there's a

6  term "indicia of occupancy." So, you will take

7  document s like that and try to determine if those --

8  later if those people have any tie s to that address.

9  Q.    Do you recollect that of the document s that were

10 shown on the screen by Ms. Johnston that any of them

11 related to that address? They had address es for that

12 address?

13 A.    Not after -- oftentimes, people will have an

14 I.D. and it list s the address where it's recovered.

15 That doesn't mean the person doesn't live there, but on

16 followup investigation of those credit cards and I.D. I

17 could tie none of the strange name s to occupant s of

18 that residence.

19 Q.    But it's fair to say that according to Detective

20 Papalia, nobody went back and got a second warrant.

21     MS. JOHNSTON:   Objection Your Honor.

22     May we approach the bench, please?

23     THE COURT:   You may.

24          (At the bar of the Court.)

25     MS. JOHNSTON:   Here 's the problem -- here 's the

1  government 's problem  is counsel  is now --

2       MR. WARD:  I'm not here yet.

3       MS. JOHNSTON:  Well, if you could move a little

4  more quickly.  I'm trying to move things along, Mr.

5  Ward.  I'm not trying to be rude.

6       Here is the problem.  He's trying to argue to

7  this jury, or leave an inference with the jury that the

8  officers did something  illegal in seizing the documents

9  from the residence.  The court has determined that

10  everything  seized is properly admissible.  I'm asking

11  the court to instruct  the jury at this time that the

12  court has determined the legality of the search

13  warrants that were executed  in this case and has

14  determined that those search warrants were legally

15  executed  and that they can receive  the evidence  and

16  give whatever weight they choose  to give to the

17  evidence  and that they are not to be concerned  with

18  whether  a search  warrant  was properly issued or not.

19  That 's a decision  the court makes.

20       MR. WARD:  Your Honor, that is not my intent,

21  and I'll be glad to make that clear in my question.  My

22  question -- my intent is to attack his expertise.  He

23  was qualified by the government  as being knowledgeable

24  with respect to search  warrants and what you can seize

25  and what you can't seize.

1       THE COURT:   Mr. Ward, why don't I make it very

2 simple?  Why didn't you make certain your next words

3 out of your mouth to this witness is, I'm not

4 suggesting there is any question to the legality of the

5 search warrants or the items seized?  Otherwise,  I will

6 give an instruction from the bench.

7       MR. WARD:   No problem.

8              (Back in open court.)

9       BY MR. WARD:

10 Q.    Corporal, let me make a point.  First of all,

11 I'm not suggesting in my question that there's anything

12 unlawful or illegal about this warrant or about the way

13 it was executed.  Understand, sir?  The court's already

14 ruled on that.

15 A.    I'm answering your questions as they're asked.

16 Q.    I understand.  I want to make clear to

17 everybody, including the members of the jury, I'm not

18 suggesting that.  What I am driving at is, I understood

19 you to say that with respect to something that was not

20 clearly contraband, if it was not described in the

21 authorization from the court, that you would need to go

22 back to the court to get a second warrant to seize it.

23 A.    Possibly.

24 Q.    Possibly.  And is it -- are we clear that in

25 this case you heard the testimony -- I think you were

1  in here when Detective Papalia testified that we were

2  clear he did not go back and get a second warrant. He

3  simply seized all of those documents.

4       MS. JOHNSTON:   Your Honor, the government is

5  asking the court to give the instruction based on that

6  question.

7       THE COURT:   Mr. Ward, the court has ruled that

8  the searches in this case are lawful.

9       MR. WARD:   Yes.   I'm not challenging that.   I

10 thought I made that clear.   What I'm asking is -- what

11 I'm challenging is the defendants -- the witness'

12 knowledge of what he's done in this situation, based on

13 what he testified to before.

14       MS. JOHNSTON:   Objection, because it's beyond

15 the scope.

16       THE COURT:   I think that's beyond the scope.

17       The objection is sustained.

18       BY MR. WARD:

19 Q.    All right.   Now, you talked about on redirect

20 that there was a call following Mr. Goodwin's arrest.

21       First of all, what was the date of Mr. Goodwin's

22 arrest?   I forget.

23 A.    November 25, 2003.

24 Q.    Okay.   I asked you whether Ms. Dobie's name

25 appeared on that chart; is that right, sir?

1  A.      That's right.

2  Q.      As I understood it, you had put -- you had made

3  up the charts about the calls following Mr. Goodwin's

4  arrest, and you had had a reason for selecting certain

5  names and putting them on the chart; is that right,

6  sir?

7  A.      Yes.

8  Q.      And your reason was what, sir?  Just to make

9  myself clear.

10  A.      I believe I've already discussed this earlier as

11  to why.

12  Q.      Yes, my -- I tend to forget.

13  A.      Okay.  I'll explain it again.  It's to show

14  connections between certain individuals and the arrest

15  of Mr. Goodwin.  That is all.

16  Q.      All right, sir.  So that we understand.  When

17  you made that determination that you wanted to show

18  connections between certain individuals who you say --

19  the government believed were involved in this

20  conspiracy, you chose -- you made the determination not

21  to put Ms. Dobie's name on there.

22  A.      I don't know if she was in one of the drafts of

23  that chart or not.  She did not make it to the final

24  cut.

25  Q.      It's before the jury, sir, and I suggest it is

1  not a draft.   My question to you is, again, you chose

2  not to put her name on that product that's been shown

3  to this jury; is that right, sir?

4  A.      Yes, that's right.

5  Q.      All right.   And then on recross you point to

6  CH-4A and you say that on the 25th, at 20:13 hours,

7  which is, what, 8:13 in the evening, sir?   Is that

8  right, sir?

9  A.      Yes.

10  Q.      There is a 58-minute call outgoing from Ms.

11  Martin's -- one of Ms. Martin's phones to 202-882-3738,

12  Dobie, G and L, which is Goldie and Lavon; is that

13  right, sir?

14  A.      58-minute?

15  Q.      Or 58 seconds.   I beg your pardon.   Let me show

16  it to you.   You tell me what it is.

17  A.      58 minutes would be a very long call.

18  Q.      It sure would.

19  A.      Yes, that would be.

20  Q.      That's my mistake.

21  A.      That would be 58 seconds.

22  Q.      58 seconds.

23          This was not a recorded call.   This was simply

24  something you picked up on the pin register; is that

25  right, sir?

1  A.      That's right.

2  Q.      And 58 seconds would seem to indicate, would it

3  not, sir, that the call didn't actually go through.

4  That nobody had any conversation.  That the phone rang,

5  and that's all.

6  A.      No.

7  Q.      All right, sir.  But you have no way of knowing

8  what was discussed in that telephone call.

9  A.      That's correct.

10 Q.      You have no way of knowing whether the telephone

11 call was directed to Ms. Dobie or it was directed to

12 her husband or it was directed to one of her sons;

13 isn't that correct, sir?

14 A.      That would be correct.

15 Q.      All right, sir.

16         Do you know, sir, from your investigation  in

17 this case -- and I'm directing us to the 56 calls that

18 you talked about that took place between January 6, '04

19 and March 25, '04 between a hard Line, 882-3738,

20 identified with Ms. Dobie and a line identified with

21 Ms. Levi.

22         Do you recall that testimony?

23 A.      Yes.

24 Q.      All right, sir.  Again, those 56 calls were in

25 fact not calls but contacts based on pin register

1  result s; is that right , sir?

2  A.      That's right .

3  Q.      Since  they  were  pin  register  result s, you don't

4  know how many of those 56 were from the phone

5  identifi ed with Ms. Levi to the phone  identifi ed with

6  Ms. Dobie or how they were  identifi ed from  the Dobie

7  phone to the Levi phone ; is that correct , sir?

8  A.      No, it's not correct .

9  Q.      It's not correct .  How many -- can you tell us?

10 A.      If I have that exhibit , I could tell you , yes.

11 Q.      What  exhibit ?

12 A.      The exhibit that the government  entered  in on

13 redirect .

14 Q.      I'm sorry .  I don't know  what it was.  I'm sure

15 that Ms. Johnston can get it.  CH-4 --

16         MS. JOHNSTON:   No.  I believe it was a

17 miscellaneous  number .  Miscellaneous  40, it looks like.

18         MR. WARD:   Thank you very much .  Here 's

19 Miscellaneous  4.

20         MS. JOHNSTON:    It's 40, counsel .  4-0.

21         BY MR. WARD:

22 Q.      I'm sorry .  Miscellaneous  41.  Is it 41?  It

23 looks like 41.  It's hard to tell .  There 's a stamp

24 over the top of it.

25         That's what you're talk ing about , sir?

1  A.        Yes.

2  Q.        All right.  Where it says in this "number

3  dialed," that means what, sir?

4  A.        That means those were calls from Ms. Levi's

5  residence to Ms. Dobie's residence.

6  Q.        All right, sir.  And it appears to me -- I'll

7  certainly be guided by your assessment that a great

8  bulk of those calls were from Ms. Levi's phone to Ms.

9  Dobie's phone; is that correct, sir?

10 A.        Yes.

11 Q.        All right, sir.  Again, since we're talking

12 about pin register.  You have no idea who made those

13 calls to Ms. Dobie's phone --

14 A.        That's correct.

15 Q.        -- from that number.

16 A.        That's correct.

17 Q.        Are you aware, sir, or did you become aware in

18 the course of your investigation that Ms. Dobie --

19 first off, Ms. Levi had a daughter named Bonetta?

20 A.        Some approximation of that name, yes.

21 Q.        Well, maybe I don't have the name quite correct.

22 But you learned that she had a daughter anyway; is that

23 correct, sir?

24 A.        Yes.

25 Q.        And you learned -- did you also learn that the

1  daughter  and  Ms.  Dobie ,  my  client ,  were  long  friends

2  going  back ,  perhaps ,  ten ,  12 ,  15  year s?

3  A.      Was  I  aware  that  they  were  friends ?   My

4  understand ing  was  that  Ms.  Dobie  had  some  sort  of

5  dis agreement  with  one  of  Ms.  Levi 's  children .

6  Q.      That  was  the  daughter ?

7  A.      Possibly .

8  Q.      Okay .   Were  you  aware ,  sir ,  that  my  client  and

9  Ms.  Dobie's  --  Ms.  Levi 's  daughter  Bonetta  or  her  exact

10  name  is  --

11      MS.  JOHNSTON:   Objection .   This  is  beyond  the

12  scope .

13      THE  COURT:   Mr.  Ward ,  I  think  you've  gone  over

14  the  line .   This  is  not  --

15      MR.  WARD:   I'm  sorry ?

16      THE  COURT:   This  is  not  within  the  scope  of  the

17  redirect ,  so  I'm  going  to  sustain  it .

18      MR.  WARD:   Well ,  I  --  Your  Honor ,  may  I  be

19  heard ?   I  would  be  glad  to  be  heard  at  bench ,  or  I

20  would  like  to  be  heard  anyway .

21      THE  COURT:   Come  up  to  the  bench .

22          (At  the  bar  of  the  Court.)

23      MR.  WARD:   It's  the  government 's  intent  of

24  show ing  this  number  of  call s  was  to  create  the

25  impression ,  if  not  the  belief  in  the  mind  of  this  jury ,

1  that these were drug calls.  I am explaining -- I am

2  trying to explain that they -- there was another

3  explanation for these calls, that Ms. Levi's daughter

4  and my client were long-time friends.  My next question

5  was, did you know that they were long-time buddies in

6  the "boosting" business -- going out and stealing stuff

7  -- which they were.

8         MS. JOHNSTON:  Your Honor, that clearly gets

9  into hearsay.  It's not in evidence.

10         THE COURT:  It's hearsay.  It's not within the

11  scope of the redirect, and I think you've already

12  gotten well-established that there's a lot of contacts

13  and that nobody knows precisely what they were for.  I

14  think you leave it at that.

15         MS. JOHNSTON:  This is hearsay.  Again, he's

16  trying to use this witness to get in substantive

17  evidence as an explanation for the calls.  He can't do

18  it through this witness.

19         THE COURT:  Your objection is sustained.

20         MR. WARD:  Your Honor, I'm simply trying to show

21  that there was an alternative explanation for the phone

22  calls.

23         THE COURT:  That evidence is before the jury

24  right now.

25         MR. WARD:  Thank you.

1                    (Back in open court.)

2          MR. WARD:   Thank you, Your Honor.  Let me see if

3   I have any additional  questions.

4          No, I think that covers it.  Thank you very

5   much, corporal.  I appreciate it.

6          THE COURT:   Any further recross?

7          MR. SUSSMAN:   No, not from me.

8                    **RECROSS EXAMINATION**

9          BY MR. MCKNETT:

10  Q.     Officer, I want to ask you some questions about

11  CH-4 and CH-4A.  They're the telephone activity we've

12  been discussing, and   CH-4A is the -- this document.

13  That is the background -- not the background but the

14  base information for which   CH-4 was drawn; correct?

15  A.     That's correct.

16  Q.     Okay.  Who prepared   CH-4A?

17  A.     I did

18  Q.     I want to ask you a couple of questions on this.

19  First of all, you testified that   CH-4 was prepared in

20  order to show connections between various individuals

21  who would be concerned about --   I don't think  I have

22  your exact words, but concerned about the arrest of      Mr.

23  Goodwin.

24         Is that an accurate description -- the purpose

25  for CH-4?

1  A.      It's to show call activity between certain

2  parties after the arrest of    Mr. Goodwin.

3  Q.      You chose not to put   Ms. Ali on that chart;

4  correct?

5  A.      At some point, yes.

6  Q.      Well she's not on there now; right?

7  A.      That's correct.

8  Q.      Let me ask you a couple of questions.  Let me

9  zoom in on  CH-4A .  I've highlighted here two calls, and

10 they show activity "In."  "In" means     Ms. Ali made that

11 call; right?

12 A.      Yes.

13 Q.      And it was in to this number --

14 A.      Yes.

15 Q.      -- which is  Ms. Martin's number.  It happened on

16 -- the first one that   I've highlighted is November 25th

17 '03; took place at 12  :06 :35.  Correct?

18 A.      Yes.

19 Q.      The second one, same thing from     Ms. Ali -- her

20 cell phone?

21 A.      Yes.

22 Q.      To  Ms. Martin's number here on the same day at

23 12:06 :51; right?

24         That's 16 seconds apart, right?

25 A.      Yes.

1  Q.      The next column is the "duration" column?

2  A.      Yes.

3  Q.      It says that the first call lasted for four

4  minutes and 17 seconds, and it says the next call

5  lasted for four minutes and 18 seconds.

6  A.      Yes.

7  Q.      Those two calls were only 16 seconds apart.

8          Can you explain that?

9  A.      One of those would be a data stream.

10  Q.      Excuse me?

11  A.      One of those calls would most likely be a data

12  stream which,  I believe, Detective   Sakala testified to

13  in the wiretap portion, that -- when he explained the

14  difference between activations and calls, particularly

15  with cellular telephones, you will get a data stream --

16  Q.      Okay.

17  A.      -- which is kept for billing purposes.  And we

18  get -- that's also given to us in the    DNR data from the

19  phone company.  They just give us the contacts.  We

20  can't differentiate.

21  Q.      So the duration of the call does not necessarily

22  reflect the length of any conversation.

23  A.      That's what the phone company gave us.  That's

24  what it's supposed to reflect.

25  Q.      But the phone company -- and there's other

1  examples -- let me turn back here to Page 5.        I

2  highlighted, again, calls from "   LaNora  Ali Garner," who

3  is a  LaNora  Ali; correct?  That's not a different

4  person.   Same person; right?

5  A.       That's correct.

6  Q.       Again, incoming calls from her phones on -- to

7  Ms. Martin on   November 26.  These highlighted --

8  they're all   November 26.  And if you look at them,

9  again the time of the first call is 18    :16:39.  The time

10  of the second call 18   :16:55, which is 16 seconds later,

11  but the "duration" column indicates that the first call

12  lasted for a minute and 20 seconds.

13  A.       That's correct.

14  Q.       I'm sorry.   I'm talking off the page.  That's

15  what it says, but is that the same thing -- the minute

16  and 20 seconds, is the data stream information?

17  A.       My opinion is that the second one would be the

18  data stream -- the second item registering.

19  Oftentimes, after a call is hung up, there is a data

20  stream.  That's what we found with the Title 3.  After

21  a call ended, there would be -- another entry would pop

22  up as a data stream.  We have no control over that.

23  That's something the phone company does, and they send

24  it to us.

25  Q.       So that would be after the first call ended, but

1  it still --

2  A.      It registers -- you would have to get a phone

3  company tech to explain all of their procedures.  This

4  is just the data that they send us and that we capture.

5  One of these is a call, and the other would appear to

6  be the data stream associated with that call.

7  Q.      There's no way to tell which is which; right?

8  A.      Not without having the wiretap up.

9  Q.      There's no way to tell how much of this minute

10 and 20 seconds or minute and 17 seconds was an actual

11 conversation and how much of it was just that data

12 stream information?

13 A.      No, because one -- for instance, if you listen

14 to the calls that we played with Detective      Sakala , you

15 will hear -- we even edited some of the ringing out so

16 the jury would haven't to incessantly hear ringing for,

17 you know, ten seconds, 20 seconds, four seconds

18 sometimes.  No.  Do you ever call somebody on the phone

19 and they pick up and you never heard it ring?  So, some

20 of that -- some of that is ringing; some of that is

21 somebody just picking up the phone.  So, the data

22 stream is a separate data stream.  It is not -- it is

23 not part of that call.  It doesn't take up any duration

24 of the telephone call.  That is a separate data stream

25 that the phone company uses for billing purposes and

1  the -- whatever other purposes they have.  That's for

2  their purposes.

3  Q.      It's fair to say, then, that you can't actually

4  tell from this information how long the actual

5  conversation took.

6  A.      No.  I don't believe  I testified that you could.

7  You never know how long a conversation is unless you

8  hear it.  Just like some of the calls are three

9  minutes, and it may be 10 seconds of ringing or it may

10 be one second of ringing.  You can't tell unless you

11 hear it.

12 Q.      Even though it says here, for instance, on this

13 call that it -- on   November 26, 2003 at 18   :16 :39, which

14 would be 6 :16 and 39 seconds in the evening, that      Ms.

15 Ali called on her cell phone    Ms. Martin, we don't know

16 if there was any conversation on that, do we?

17         That could all be data stream.  That could all

18 be --

19 A.      Both of them?

20 Q.      Yes.

21 A.      No.

22 Q.      You don't know which one, do you?

23 A.      No.  I don't know which one, no.

24 Q.      You can't really rely on this "duration" column

25 at all to determine how long someone actually talked to

1 somebody on these calls, can you?

2 A.      Well, a seven-minute call would definitely not

3 be indicative of a constant -- seven minutes of ringing

4 or seven minutes of data stream.  As a matter of fact,

5 the seven-minute call does not appear to have a data

6 stream attached to it.

7 Q.      You don't know that, do you?

8 A.      I testified before that these are merely

9 contacts.   I did not ever testify that these are

10 complete conversations.

11 Q.      So all they show us is that somebody using --

12 for these examples -- somebody who had access to      Ms.

13 Ali's cell phone used it to call this number; right?

14 A.      That, or somebody from    Ms. Martin's phone called

15 Ms. Ali.

16 Q.      These are incoming; right?

17 A.      That's incoming.

18 Q.      That would be  Ms. Ali calling  Ms. Martin; right?

19 A.      That's correct.   I got it backwards.   You're

20 right.

21 Q.      It is confusing.

22         But that's all it tells us, that somebody used

23 this phone -- the phone assigned to this number -- to

24 make a call to the phone assigned to this number, and

25 that's all it tells us.

1  A.      Yes.

2  Q.      Thank you.

3          Let me turn to  Mr. Thurman.  M s. Johnston had

4  you read extensively from  Mr. Thurman's testimony when

5  I was asking him questions on cross-examination.

6          Do you have his transcript up there?

7  A.      No, I do not.

8          MS. JOHNSTON:  Objection.  If we could approach

9  the bench, please.

10                (At the bar of the Court.)

11         MS. JOHNSTON:  Counsel now wants to question him

12 about an excerpt of  Mr. Ward's cross-examination which

13 I did not touch in my redirect.  In my redirect      I

14 referenced just the June 20 cross-examination by      Mr.

15 McKnett , so any reference to any other transcript would

16 be beyond the scope of the government's redirect.

17         MR. MCKNETT :  Completeness,  Your Honor.  Ms.

18 Johnston asked  Mr.- -- this detective to read

19 extensively from  Mr. Thurman's testimony about how he

20 would buy an 8-ball and then use part and sell part.

21         THE COURT:  What?

22         MR. MCKNETT :  Mr. Thurman would buy an 8-ball,

23 use part of it and sell part of it.      Mr. Ward followed

24 up with that in which  Mr. Thurman testified clearly

25 that he would -- at times he bought an 8-ball for his

1 own personal use, and that's all    I want to get in.

2 It's about ten lines long, and it's to complete      Mr.

3 Thurman's testimony about his purchases of 8-balls.

4         MS. JOHNSTON:   Your Honor, it's not --

5         THE COURT:  It's outside the scope.

6         MR. MCKNETT :  No it's not, because    Ms. Johnston

7 clearly asked those questions to lead the jury to reach

8 the conclusion that someone would only buy an 8-ball to

9 sell part of it.    Mr. Thurman said he bought 8-balls

10 for his own personal use.

11         THE  COURT:  How much cross-examination on this?

12         MR. MCKNETT :  It's about ten lines,    Your  Honor.

13         MS. JOHNSTON:   Your Honor, if I may be heard.

14 Here's the problem with it.    I relied on  Mr. McKnett's

15 cross-examination   June 20 and only that portion of it

16 that  Mr. Ward covered with Detective     Eveler  in his

17 cross-examination.    Mr. Ward's cross-examination was on

18 June 16, not June 20.    I didn't go into   Mr. Thurman's

19 direct examination when he discussed many, many times

20 over that he bought it and sold part of it.     I limited

21 my redirect very specifically to the date and       Mr.

22 McKnett's  cross-examination.  If there's something in

23 Mr. McKnett's  cross-examination on June 20 that     I

24 missed and he thinks should be covered,     I don't have

25 any objection to that.  But going to other portions of

1  Mr. Thurman's testimony, whether it be my direct

2  examination or another defense attorney's redirect, is

3  not necessary under any kind of verbal completeness,

4  and it is way beyond the scope of redirect examination.

5           MR. MCKNETT:  Your Honor, it completes the

6  picture of  Mr. Thurman's testimony about his purchases

7  and the reasons for his purchases of 8-balls.

8           THE COURT:  On this one   I agree with the

9  government.

10          Objection sustained.

11                    (Back in open court.)

12          BY MR. MCKNETT :

13  Q.      Let me ask you about your testimony concerning

14  the surveillance of   Ms. Martin -- at   Paula's School of

15  Performing Arts.

16          You testified,  I believe, that the reason you

17  didn't have  Ms. Ali's vehicle followed or stopped was

18  you didn't have time to do that.  It was -- you didn't

19  find out about that trip far enough in advance to set

20  up a surveillance or a stop; correct?

21  A.      We didn't find out about it far enough in

22  advance to get somebody there to conduct the

23  surveillance.

24  Q.      To be clear, we're talking about May 16; is that

25  correct?

1 A.      Yes.

2 Q.      And the question, in your opinion, to move

3 drugs, and the words used to move something from the

4 house to her school; is that correct?

5 A.      That's correct.

6 Q.      And Ms. Martin and  Ms. Ali are seen on the pole

7 camera carrying bags to  Ms. Ali's car and then driving

8 away; correct?

9 A.      Yes.

10 Q.      And the bags were coming from    Ms. Martin's

11 house?

12 A.      Yes.

13 Q.      You did have time to get an officer on the scene

14 at the school; correct?

15 A.      Yes.

16 Q.      That was officer   Roger  St. Louis.  He was a

17 member of the   Montgomery County Police Department;

18 correct?

19 A.      That's correct.

20 Q.      The distance from   Paula's School of Performing

21 Arts to my client's house is about  a mile or less;

22 correct?

23 A.      I would think it would be a little bit more than

24 a mile.

25 Q.      How far would you estimate?

1 A.      Just a guess?   I'd say more like two or more

2 miles.   It's not a terrible, terrible distance.

3 Q.      Not a great distance?

4 A.      No.

5 Q.      And Officer St . Louis was there; correct?

6 A.      Yes.

7 Q.      At the school?

8 A.      Yes.

9 Q.      We heard him testify that he saw     Ms. Martin and

10 Ms. Ali come out of the school and get in the vehicle

11 and drive away; correct?

12 A.      Correct.

13 Q.      But he didn't follow them, did he?

14 A.      No, he did not.

15 Q.      Because you didn't instruct them to; right?

16 A.      One agent testified for some reason --    I believe

17 it was him -- that he couldn't follow them because he

18 got stopped at the light.

19 Q.      I don't believe that was --    I don't believe that

20 was --

21         MS.  JOHNSTON:  Objection to counsel testifying.

22         THE  COURT:  Yeah.   Rephrase your question.

23         BY MR.  MCKNETT :

24 Q.      Did Officer St . Louis follow the vehicle my

25 client was driving after it left the school of

1 performing arts?

2 A.      Not -- did he follow --   I know he didn't follow

3 to your client's residence.

4 Q.      Did you instruct him to follow the vehicle?

5 A.      I don't recall what instructions he was given on

6 that day.

7 Q.      If he had been instructed to follow the vehicle,

8 that would have been helpful, wouldn't it?

9          MS. JOHNSTON:  Objection.

10          THE COURT:  Sustained.

11          BY MR. MCKNETT :

12 Q.      Did anybody follow the vehicle?

13 A.      No.  Officer St . Louis was by himself that day.

14 He was the only person we could get to go out there.

15 Q.      Did anyone set up a surveillance at my client's

16 house to see if she carried any bags or suitcases into

17 the house?

18 A.      We only had one officer available.

19 Q.      The answer is "no?"

20 A.      That would be no.

21 Q.      You said you didn't have time to get a search

22 warrant,  I believe, in answer to someone's question.

23          Do you remember that?

24 A.      I don't believe that's correct.     I don't believe

25 you're phrasing it correctly.

1  Q.      Well, there was a question where you were asked

2  about a search warrant; correct?

3  A.      Yes.  The government asked me how long it would

4  take to obtain a search warrant.  You said it would

5  have taken a few hours; correct?

6  A.      That's correct.

7  Q.      But this is a motor vehicle; right?

8          MS. JOHNSTON:  Objection.

9          THE WITNESS:  Paula's school --

10         THE COURT:  Wait a minute.

11         MS. JOHNSTON:  Objection.

12         Beyond the scope of redirect.

13         THE COURT:  Yes.

14         Sustained.

15         BY MR. MCKNETT :

16 Q.      You could have secured the premises at the

17 school, pending a search warrant; correct?

18 A.      If we wanted to end the investigation that day,

19 yes.

20 Q.      And you could have secured   Ms. Ali's vehicle,

21 pending a search warrant; correct?

22 A.      If we were prepared to end our investigation     on

23 that day, yes.

24 Q.      So you chose not to; correct?

25 A.      Yes.

1  Q.      But you could have.

2  A.      Yes.

3          MR. MCKNETT :  Thank you.

4          THE COURT:  Do you have any further questions?

5          MS. JOHNSTON:  No,  Your Honor.  At this time we

6  will put an end to the questioning of Detective      Eveler .

7                    (Witness excused at 5:04 p.m.)

8  THE COURT:  Perfect timing.  Ladies and gentlemen,      I

9  have a proceeding tomorrow morning at 9:00.      I will be

10  meeting with the attorneys on some other matters before

11  we start, so we will start at 10 o'clock sharp tomorrow

12  morning, and  I anticipate we will go the full day

13  tomorrow.   I'll give you an update on any changes each

14  day.  So, we will stand in recess until 10 o'clock

15  tomorrow morning, with the parties of this case and the

16  counsel being here at 9  :30.

17          Stay behind, counsel.

18                    (Jury excused at 5  :04 p.m.)

19          MS. JOHNSTON:   Your Honor, we need a list of

20  witnesses who are going to be called tomorrow.

21          THE COURT:   Counsel, you know my requirements.

22  You make sure she has a list.  She should have had it

23  before  now.

24          MS. JOHNSTON:  We don't have a list of who is

25  going to be called tomorrow.  In terms of all of the

1  witnesses that are expected to testify,    Mr. Montemarano

2  said Tony Martin's witnesses.  Well, we have some names

3  from Mr. Martin.  Some of them the government is going

4  to move to exclude, but --

5        THE COURT:  Counsel, you've got to give her the

6  information now.

7        MS. GREENBERG:   Your Honor, the second concern

8  is, if the court does exclude some of the witnesses

9  that there's enough communication among counsel to have

10 enough witnesses here to fill a day so we don't lose

11 time.

12       THE COURT:   I don't want to have any gaps.  So,

13 overload the day with witnesses.  Don't underload it.

14       MR. MARTIN:   Your Honor, I had my witnesses

15 outside in the hallway.    I've given the government --

16       THE COURT:   I can call the jury back in right

17 now if you want to hear them right now.

18       MS. JOHNSTON:   Mr. Martin has given us a list of

19 his witnesses.

20       THE COURT:  Counsel, let me just -- is that the

21 end of the government's case, subject to the issue that

22 arose about the recall of Sergeant    Sakala  for further

23 cross?

24       MS. JOHNSTON: Yes,  Your Honor.  I just want to

25 double check and make sure all of our exhibits are in.

1          THE COURT:  You can officially rest tomorrow

2    morning at 9 :30 and i will hear defense motions at 9      :30

3    and I will conclude the hearing of those motions and

4    any other preliminary matters so we can get the jury

5    back in the box and starting with the first defense

6    witness at 10 o'clock.

7          MS. GREENBERG:   Your Honor, there are six

8    witnesses that   Mr. Martin has outlined, a number of

9    them we think should be excluded, and those are the

10   only six witnesses we have.

11         MS. JOHNSTON:  For tomorrow.

12         MS. GREENBERG:  For tomorrow.  So,    I don't know

13   if any other counsel is going to step up to the plate

14   to fill up the day tomorrow.

15         THE COURT:  Please understand -- all counsel

16   should understand that if    Mr. Martin runs out of

17   witnesses, there had better be other witnesses ready to

18   go, and the government needs to know who those

19   witnesses are.

20         MR. WARD:   We will do what the government has,

21   frankly, done more than once in this case.  We will

22   caucus after we leave here, and then we will E-mail

23   them.

24         THE COURT:  You do your caucus and make sure      Ms.

25   Johnston and  Ms. Greenberg do not go home tonight

1  speculating about who the witnesses are.  They should

2  know within 20 minutes of now.  That's what     I want  you

3  to do.

4           MR.  MCKNETT :  I have provided a list of

5  witnesses.

6           MS.  JOHNSTON:  Are they going to be called

7  tomorrow?  We want to know who is going to be coming up

8  to bat tomorrow so we can prepare for that.

9           THE  COURT:  Counsel,   I have required the

10  government to do this and    I am requiring the same from

11  the defense.   I want you to be putting your witnesses

12  on.  If  Mr. Martin has run out of witnesses, the next

13  set of witnesses should be ready and they should be

14  ready tomorrow.  So, be ready to go.  All right?

15          Thank you.

16                   (Off the record at 5  :07 p.m.)

17

18

19

20

21

22

23

24

25

1                        **CERTIFICATE**

2

3       I, Tracy Rae Dunlap,   RPR, CRR, an Official Court

4   Reporter for the United States District Court of

5   Maryland, do hereby certify that I reported, by machine

6   shorthand, in my official capacity, the proceedings had

7   and testimony adduced upon the Jury Trial Proceedings

8   in the case of UNITED STATES OF AMERICA versus PAULETTE

9   MARTIN, et al, criminal Action Number    RWT-04-0235 on

10  July 26, 2006.

11

12      I further certify that the foregoing    251 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17      In witness whereof, I have hereto subscribed my

18  name, this  21st day of  April 2008 .

19

20

21                    _____

22                    TRACY RAE DUNLAP, RPR, CRR
                       OFFICIAL COURT REPORTER

23

24

25