```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                      SOUTHERN DIVISION
 2
   ------------------------x
 3 UNITED STATES OF AMERICA  :
           Plaintiff         :
 4                           :
                             :
 5 vs                        :Criminal Action:    RWT-04-0235
                             :
 6                           :
   PAULETTE MARTIN, et al    :
 7         Defendants.       :
   ------------------------x
 8

 9                      Friday, July 28  , 2006
                        Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11 Proceeding before the HONORABLE ROGER W. TITUS, United
   States District Judge, in courtroom 4C, commencing at
12 9:45 a.m.

13      THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
14      THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS TESTIMONY AND PROCEEDINGS     AS
15      RECORDED AND REQUESTED BY COUNSEL.

16      APPEARANCES:

17      On behalf of the Plaintiff:

18      DEBORAH JOHNSTON, Esquire
        BONNIE GREENBERG, Esquire
19
        On behalf of the Defendants:
20
        MICHAEL  MONTEMARANO , Esquire
21      ANTHONY MARTIN, Esquire
        MARC HALL, Esquire
22      TIMOTHY MITCHELL, Esquire
        PETER WARD, Esquire
23      EDWARD SUSSMAN , Esquire
        HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR              (301) 344-3912
25 Official Court Reporter
```

```
1                    I N D E X

2                   DIRECT    CROSS   REDIRECT   RECROSS

3  Reece  Whiting             16      103       109

4  Raquel  Whiting   115      117     135

5  Lavon  Dobie     179

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                    Page

24  Reporter's Certificate          282

25  Concordance                     283
```

1          THE COURT:  Counsel, a couple of matters.  I am
2  concerned about the pace of the case, and I want you to
3  know that I'm exploring options which would include
4  sitting next Monday -- not next Monday, but the
5  following Monday.
6          MS. JOHNSTON:  As I told the court, I will be
7  out of town that day.  I have child care
8  responsibilities that will put me in New Jersey, based
9  on the court's prior schedule.
10          THE COURT:  We may be going later than 5 o'clock
11  or starting at 9:00.  I can't sit this Monday.  We have
12  this Monday coming up for the charge conference.  I
13  want you to know to bring your toothbrush, because
14  we're going to start that charge conference at 2:00
15  with all counsel and parties present, and we're going
16  to get the instructions whipped into shape as long as
17  it takes.  I mean, I can't have, you know, endless
18  charge conferences.  I've made a lot of effort to go
19  through those instructions from beginning to end and
20  put in everything I thought was appropriate, leaving a
21  few issues for discussion.  It would certainly seem to
22  me that from 2:00 to 5 o'clock we should be able to get
23  those instructions whipped into shape.  If I run into a
24  large number of issues, I'm going to address and
25  resolve that large number of issues on Monday, because

1  I really have to get them done.

2         Mr. Sussman.

3         MR. SUSSMAN:   Two things I wanted to remind the

4  court.   I mentioned that I have a status in D.C. and

5  have somebody stand in for me.   I did submit stuff in

6  writing.   The second thing I wanted to ask the court is

7  the draft instructions that you've given, just to save

8  time.   They include all of the kind of housekeeping

9  kind of things you tell the jury.   I remember when I

10 read it there was nothing about note taking.   You know,

11 the kind of things that obviously.   --

12        THE COURT:   I gave them a preliminary

13 instruction on note taking.   That was covered in the

14 preliminary instructions.   What is not in the written

15 instructions, which I'm going to do in this case, is

16 that I'm going to give them the verdict form.   I'm also

17 going to give them the instructions in writing when I'm

18 finished, and I will probably spend a couple of minutes

19 -- not with a speech in front of me -- explaining the

20 verdict form to them and telling them it's arranged

21 defendant by defendant, offense by offense, and that

22 they need to complete this so that they have some -- I

23 want them to see the verdict form before they hear the

24 closing argument so that they can really understand

25 when they're listening to you and, you know, listening

1  to you in a meaningful way, knowing that once they've

2  listened to you and evaluated all the evidence, they

3  have to fill this form out.  It will be better to see

4  the form before that closing argument process begins.

5       MS. JOHNSTON:   Your Honor, can we perhaps

6  resolve the issue of which calls the court is going to

7  allow them to play through Sergeant Sakala?

8       THE COURT:   I've asked to be provided with the

9  reason for the calls.

10       Are counsel ready to give that to me?

11       MS. JOHNSTON:   Your Honor, my suggestion is,

12  could we do that Monday afternoon so that Tuesday

13  morning --

14       THE COURT:   On Monday?  If I haven't got it

15  before then.  I hope we can get it today, if not Monday

16  morning.  I want to have from the defense, with respect

17  to each call you want to play, you know, some precise

18  few words as to why that call is appropriate to be

19  played and we a can address that Monday as well.

20       MR. MONTEMARANO:   Mr. McKnett and I will

21  provide that, as well.  Your Honor has already ruled

22  that the calls -- we can authenticate the calls by

23  having a participant speak:  For example, Marsha Jean

24  West, LaNora Ali.   Your Honor has ruled those will be

25  admissible.  We have now reduced the body of calls in

1  contention  to a  bare  handful.   Most  of  them  are  exactly

2  what  the court  has  ruled  are  permissible , and  indeed  we

3  winnowed  calls --

4        THE COURT:   I've  made  some  rulings  on admissible

5  in  general .  I said  you  need  to  tell  me  how  the

6  specific  call  fits  the  parameter s  that  I've  indicated

7  are  appropriate .

8        MR.  MONTEMARANO :   Then  we  will  provide  the  court

9  an  explanation  as  to  each  call .   We'll  do  it  either  via

10  fax  or  via  E-mail  to  Mr.  Krinsky 's  E-mail  address .

11        THE COURT:   Let  me  remind -- maybe  my

12  recollection  is  not  perfect  on  this , but  I think  what  I

13  ruled  was  there  was  basically  two  categori es  that  I

14  thought  the play ing  of  further  calls  by  Sergeant  Sakala

15  would  be  appropriate .   One  was  when  there  was  an

16  excerpt  play ed  and  you  felt  in  fairness  and

17  completeness  the  balance  of  the  call s  should  be  play ed,

18  and  if  we're  in  that  territory  there 's -- just  tell  me

19  that 's  what  it  is.   The  other  would  be  in  the  nature  of

20  show ing  or  testing  Sergeant  Sakala 's  opinion  about

21  those  calls  in  which  he  did  give  an  opinion  and  testing

22  him  as  to  why  didn't  he  take  into  account  this  one

23  which  talk s  about  actual  ticket s  to  a  show  or  actual

24  dresses  being  sold , whatever  the  case  may  be .  Those

25  are  the  two  major  rulings  that  I  made .

1       I don't know  anything  about  these  calls, so  you

2  need  to  give  me, before  the  conference  on  Monday, the

3  reasons  for  each  call  being  appropriate  under  those

4  rulings.

5       MR. MONTEMARANO:  We will  be  happy  to  do  that.

6  We have  given  a  reasonably  final  version  of  the  mass  of

7  calls.  Because  a  few  of  the  calls  were  requested  by

8  Mr. Martin, he had  not  yet  seen  the  final  book, and  he

9  is going  to  double  check  those  and  get  back  to  us  and

10 make  sure  all  of  his  calls  are  there.

11      At this  point, from  Mr. McKnett  and  me, the  book

12 has been  assembled.  It was  produced.  I picked up  the

13 30 copies  this  morning.  The  government  is  provided  a

14 copy, Mr. Krinsky  has  one  in  on  the  bench  in  front  of

15 him --

16      THE  COURT:  We will  go  through  that  Monday  as

17 well.

18      MS. JOHNSTON:  In that  regard, we  did  prepare  a

19 limiting  instruction.

20      THE  COURT:  You've  got  to  give  it  to  me.

21      MS. JOHNSTON:  We had  drafted  one.  Let  me  pass

22 two copies  to  the  court  and  pass  out  to  counsel  copies

23 for defense.  I will  give  that  to  Mr. Krinsky.

24      MR. SUSSMAN:  Judge, probably  just  my  role  in

25 this case, I've  had  time  to  think  about  these  kinds  of

1  things.  One of the things that I think we've never

2  gotten, and Ms. Johnston -- some of the defendants got

3  dropped out of the indictment at the last minute

4  because of pleas.  So the numbers on the indictment --

5  I'm not sure the numbering on the current indictment,

6  the last, matches the numbers on the verdict form in

7  terms of the counts.  If they do, I'm wrong.  But I

8  think that --

9        THE COURT:   I believe that the verdict form is

10  appropriate.  It doesn't have the defendants who are no

11  longer on trial in it.

12        MR. SUSSMAN:  Well, I have not seen a copy of

13  the indictment that would be the final one.

14        MS. JOHNSTON:   I don't think the court sends a

15  copy of the indictment back.

16        THE COURT:   I'm not going to be sending the

17  indictment back to the jury.  The instructions that I'm

18  giving quote or paraphrase the charge as to each

19  defendant.  So, they're not going to be sitting there

20  with an indictment in front of them.

21        MR. SUSSMAN:   The verdict form is last -- in its

22  last lifetime and has the correct numbering of the

23  counts as they go.

24        THE COURT:   Yes.  I'll ask you, as officers of

25  the court, to make sure we have the numbering correct,

1  but I believe the last time we looked at the verdict

2  form that it was appropriate.

3       MS. GREENBERG:  Your Honor, there's been some --

4  counsel have highlighted some minor typos during the

5  course of this case and cleaning up the lines and

6  making sure they're exact.  We'll bring a clean, exact

7  copy to court on Monday and give everybody a copy and

8  give the court one on disk.

9       THE COURT:  We will walk through the verdict

10  form on Monday, too.

11       I don't want to prolong our delay for the jury,

12  but I will tell you this.  With regard to the issue we

13  were discussing at the end of the day yesterday, I

14  don't believe that the inquiry begins and ends with the

15  cases that you've given me in terms of bringing in a

16  conviction under 609(a).  I don't think that excludes

17  consideration of 404(b).

18       The matters that the prosecution has been

19  bringing out in its cross-examination are not merely

20  going into details of the crimes beyond the essential

21  matters which would arguably be not authorized by 609

22  but, rather, are matters that may be considered under

23  404(b).  I'm under 404(b).  I'm inclined, after the

24  conclusion of this witness, or wherever this happens,

25  to give a 404(b) instruction explaining to the jury the

1 fact of these convictions is before them and may be

2 considered under our evidence rules. The times of

3 these convictions that have been brought out in the

4 questions are before them. I will give them the 404(b)

5 instruction that limits it to say that they may

6 consider it for these other purposes.

7      MS. GREENBERG: Your Honor, just to complete the

8 record -- I appreciate the court's ruling, but one

9 thing that is quite clear from -- that adds to this

10 witness' testimony is he has testified that he didn't

11 need tickets in the phone calls and that he wasn't

12 dealing drugs with Paulette Martin. The jury can

13 assess his credibility as a long-term, large scale drug

14 trafficker since 1968. So, that is of course

15 independent of the 404(b) and 609 analysis. I just

16 wanted to make that on the record in this case.

17 There's an appeal issue on this --

18      MR. HALL: Just a couple of points, Your Honor,

19 and I don't want to belabor it since the court has made

20 the ruling after readding the government's memorandum

21 and the cases that I cited yesterday. However, first

22 of all, I appreciate the fact the court is going to

23 give the 404(b) limiting instruction after my client

24 has completed his testimony or whenever the court feels

25 is appropriate. Obviously, I disagree with the court

1 based upon what I cited yesterday .  I would poin out

2 that the government 's memorandum  actual ly is referring

3 to a case that is the conflict  between  608 and 404(b)

4 not 609 , which is impeachment .

5        Nevertheless , what I'm going to ask the court  to

6 do , so I don't have  to continue  to interrupt  counsel 's

7 cross , is to give me a continui ng objection  to any

8 further  detail s comi ng out regard ing the fact s which

9 under lie the prior  convictions .

10       THE COURT:   In the absence  of any objection  from

11 the government , I will give you that continui ng

12 objection .

13       MR.  HALL:   Thank you , Your  Honor .

14       MR.  MONTEMARANO :  Your Honor , I have  one thing  I

15 would  like to put on the record  in reviewing  the

16 government 's memorandum  and arguments made yesterday

17 relative to the cross-examination    by the other

18 defendant s of defense  witness es .  In particular ,

19 codefendant s.  I point the court  to the follow ing --

20 and I do not wish this to sound as confrontation al as

21 it does , but I am obligated  to make the record  in a

22 complete  fashion .

23       The Supreme  Court has spoken  to this issue

24 previously.   They did it in United States  versus

25 Dennis.  They admitted   either  487 or 488, in

1 Pennsylvania  v Ritchie .   Defense  counsel  is  the person

2 sole ly and  best  suit ed  to  determine  what  evidence  is of

3 utility  to  his  defense .

4       If  the  court  is  to  limit  my  cross  of  anybody ,

5 but  especially  any  defense  witness , including  Mr.

6 Whiting , the  court  cannot  begin  to  understand  where  I

7 am  going , because  maybe  even  I  don't .

8       THE  COURT:   I  haven't  complete ly  excluded  you

9 from  cross-examination  , Mr.  Montemarano .

10      MR.  MONTEMARANO :  I  didn't  suggest  that  for  a

11 second .  But  to  the  extent  you  limit  my  cross , Your

12 Honor , you  are  creat ing a Bruton  on  issue .  He  is

13 being  permitted  to  speak , and  I  am  not  being  allow ed  my

14 full  cross- examination  as  I, in  my  discretion  as

15 defense  counsel  am  indeed .  To  that  extent,    while  I  was

16 not  unhappy  with  what  I  was  able  to  get  from  Mr.

17 Whiting  -- but  we  had  a  long  discussion  about  that  at

18 the  bench , and  I  believe  the  court  understand s  my  point

19 of  view .  I'm  driving  this  bus , with  all  due  respect ,

20 to  the  court .

21      THE  COURT:   All  right .  You're  driv ing  the  bus ,

22 but  I'm  in  charge  of  the  signals at  the   inter section s.

23      MR.  MONTEMARANO :  I  understand  that , Judge , and

24 I'm  not  wish ing  to  be  --

25      THE  COURT:   When  I  say  stop , you  have  to  stop ,

1 even though --

2        MR. MONTEMARANO :  I don't question that.  I

3 understand that cross is vested in the court's

4 discretion .

5        THE COURT:  I don't think we have come to the

6 point where I have to put a red light in front of you .

7 I have put caution lights in front of you, and I think

8 there is a light that I may pull as red, but please

9 don't do go there.

10       MR. MONTEMARANO :  I simply wanted the court to

11 understand where I am coming from.  It is not just a

12 mad desire to hear my own voice.

13       THE COURT:  I have not shut you down yet.

14       MR. MONTEMARANO :  Thank you, Your Honor.

15       THE COURT:  Without anything further, I am going

16 to bring them in and I am going to tell the jury we're

17 not sitting next Monday because we are conferring on

18 other matters in this case; I am going to tell them I

19 will be constantly consulting with counsel for both

20 sides about our progress, and if I am concerned that we

21 are not making sufficient progress, I will have to

22 explore additional hours or additional days.     I already

23 told them we would go into a two-week recess and return

24 --

25       MS. JOHNSTON:  Your Honor, has the court made

1 arrangements , if they are in deliberation s, to have

2 another judge preside over the deliberation s while

3 you're gone so that this jury doesn't have to be --

4        THE COURT:  If that happen s, I'll make that

5 arrangement . I mean , if they're deliberati ng and I

6 have my non- refundable tickets -- I covered one for

7 Judge Williams once , and we got him on the speaker

8 phone so he could talk to his juror s.

9        MS. JOHNSTON:  It just would make more sense . I

10 know we have one college student who is going to have

11 to go back to school .

12        THE COURT:  I am will ing to do everything I can

13 to get this case over with my by then . If they're

14 deliberating, they can deliberate with another judge      .

15        MR. MONTEMARANO :  One last matter concern ing

16 scheduling . I have an appointment with my "orothopod  "

17 next Thursday , the third , at 7:30 in the morn ing. I

18 reasonably believe I will be here by 9:30. I'm

19 literal ly the first appointment . I made sure it was as

20 early as possible . I will be going to his office

21 dress ed for court and leavi ng direct ly from . I want ed

22 to advise the court there is at least the possibility ,

23 if we're start ing at 9:00, that I will be dragging a

24 little . I can't imagine I won't be here by 10:00 , but

25 it's not up to me .

1          THE COURT:   Ms. Johnston , what was the  day  you

2 said you could not be in court?

3          MS. JOHNSTON:    Monday , August  7.

4          THE COURT:   The whole  day?   Not at all?

5          MS. JOHNSTON:    I'm not suppose d to be here  that

6 whole  week , quite  frankly , and  I have  a commit ment  to

7 my ten  year -old  god son .

8          THE COURT:   I will  be explori ng , then , early  and

9 late  hour s , as long as  it take s to get it done .

10          Counsel , are  we ready ?  I'm going  to bring  them

11 in now .

12                    (Witness  resumes  the stand .)

13                    (Jury  return s at 10:01 a.m .)

14          THE COURT:   Good  morn ing , ladies and gentlemen  .

15 Sorry  for the delay .  I was resolving  some

16 administrative  matter s , and  the sentencing  took a

17 little  long er than  I thought .  We are going  to go today

18 until  plus or minus  4:15 and get  you out of here  so you

19 don't  have any problem s .  We will  not sit next  Monday .

20 I don't  want you to think  we're  not maki ng any progress

21 in this case .  I am meet ing with  the attorney s on some

22 legal  matter s that I have  to deal  with for a good  part

23 of Monday , and this is not my only  case , so I have  some

24 other  matter s to attend  to in some other  case s on

25 Monday .

1          The same thing applies to the following Monday.

2    We will not be sitting on that Monday.  That case --

3    that day is just jam packed because of the huge

4    problems caused by this case evaporating my calendar.

5    I am going to be exploring other options, if we're not

6    making enough progress, of going earlier or later, and

7    I'll keep you apprised of that, but we're going to try

8    to go as absolutely efficiently as we can, and I'm

9    pushing everybody, including myself, to get this thing

10   done in time.  With that, we will proceed.

11         Ms. Greenberg.

12         MS. GREENBERG:   Your Honor, may I approach the

13   witness?

14         THE COURT:    You may.

15                 **FURTHER CROSS-EXAMINATION**

16         BY MS. GREENBERG:

17   Q.    Sir, to get back to our chart which we left off

18   with yesterday.  Where we left off yesterday, sir, we

19   were talking about your 1994 arrest and conviction in

20   the Eastern District of Virginia, the Virginia U. S.

21   Attorney's office, a federal conviction, and we had

22   talked about the two trips, if you recall, that you

23   sent Ms. Withers on to Tokyo to get heroin; correct?

24   Multi-kilos of heroin; is that correct?

25   A.    Yes.

1 Q.      And we had gone on to Ms. Freeman when we

2 stopped.  Do you recall that?

3 A.      Do.

4 Q.      We're talking about Ms. Freeman, and I was

5 asking you about your role in picking her up at the

6 Washington  National  Airport.  This is referenced in

7 Miscellaneous  32, your Statement of Facts, and you

8 talked about your role of picking her up at the

9 Washington, D. C. National Airport, now named the

10 Ronald Reagan airport, on November 12, 1991.  You went

11 there to pick her up to get her and the heroin;

12 correct, sir?

13 A.      No.

14 Q.      She was coming back from San Francisco and she

15 was supposed to meet you there; is that correct?

16 A.      She was supposed to meet me there, yes.

17 Q.      But she didn't, because she had been arrested by

18 law enforcement  officials in San Francisco.

19       MR. HALL:   Objection.

20       Basis for knowledge.

21       THE COURT:   If he knows.

22       BY MS. GREENBERG:

23 Q.      You later learned she had been arrested by law

24 enforcement  authorities in San Francisco; correct?

25 A.      Yes.

1          MR. HALL:   Objection.

2          BY MS. GREENBERG:

3   Q.     In fact, you didn't meet her there that day to

4   pick up the heroin; is that correct?

5   A.     I did not.

6   Q.     You went there in order to meet her; correct?

7   A.     I did.

8   Q.     You parked your Jaguar in the vicinity of the U.

9   S. Air terminal that day, on November 12, 1991;

10  correct?

11  A.     No.

12  Q.     So, this Statement of Facts that's contained in

13  Miscellaneous  32 that says as follows, "On November 12,

14  1991, in Arlington, Virginia, within the Eastern

15  District of Virginia, Reece Coleman Whiting, Jr.

16  arrived at Washington National  Airport and parked his

17  burgundy-colored Jaguar in the vicinity of the U. S.

18  Air terminal."  You're saying that's not correct?

19  A.     No, that's not correct.

20  Q.     You signed this document  that said, "After

21  consulting with my attorney, and pursuant to the plea

22  agreement entered into this day between the defendant.

23  Reece Coleman Whiting and the United States, I hereby

24  stipulate the above Statements of Facts as true and

25  correct and that had the matter proceeded to trial, the

1  United States   would  have  prove n  the  same  beyond a

2  reasonable  doubt   ."   That 's your  signature ; correct ?

3  A.      That  is my  signature , yes .

4  Q.      In June  of  1994, you  stipulate d that  that  fact

5  was  correct .

6  A.      No.  What  I  stipulate d  in June  of  1994  was  that

7  I park ed my  car , I think , near  the  Hilton  hotel  in

8  Washington , D. C.   My accomplice , Mr.  Phillip s, was  at

9  National  Airport , and  he was  in contact  with  me by

10  telephone  let ting me know  what  the  situation  was .

11  Q.      Okay .  Let 's see  if we can  read  along .

12       Do you  see  Paragraph  10 in  front  of  you ?  Do you

13  see  that  on your  screen ?

14  A.      Yes .

15  Q.      Is it work ing okay ?

16  A.      Yes .

17  Q.      Are you able  to read  that ?

18  A.      Yes .

19  Q.      Could  you  read  that  first  sentence  under

20  Paragraph  10?

21       MR.  HALL:   Your  Honor , I'm going  to object .

22       This  has  now  been  asked  and answered .   It 's

23  going  back  over  the  same  --

24       MS.  GREENBERG:    Your  Honor , he 's say ing he

25  stipulate d to  something  different .   I want  to ask  the

1 witness what he stipulate d to.

2          MR. HALL:   Your Honor , counsel just read this
3 portion .

4          THE COURT:   You just read it to him.   He does n't
5 have to read it out loud .

6          BY MS. GREENBERG:

7 Q.       Sir , you're say ing you stipulate d to something
8 not contain ed in this document ?

9 A.       I'm say ing that Phillip s was at Washington
10 National Airport and I was in Washington , D. C. , and we
11 were in contact by phone .   There was no need for me --
12 for Phillip s and I both to be at Washington N ational
13 Airport .

14 Q.       Sir , just to be clear , and so the jury can see
15 it on their screen .   This is Mi scellaneous 32.   Is that
16 your signature right here ?

17 A.       That is my signature , yes .

18 Q.       In June 1994?

19 A.       Yes .

20 Q.       And to continue with your -- you admitted this
21 was all true and correct before the judge in Virginia ;
22 correct ?

23 A.       I did .

24 Q.       And just to continue with your stipulation .   Is
25 it correct , sir , at your direction a woman entered the

1 terminal and approached U. S. Air representatives,

2 identified herself as Ms. Freeman's sister and asked

3 the representative --

4        MR. HALL:   Your Honor, again, I'm going to

5 object for the same reason.

6        THE COURT:   Overruled.

7        BY MS. GREENBERG:

8 Q.      -- and ask that the representative to give

9 Freeman a message to go to the Washington Hilton in

10 Washington, D. C.?   Did you do that, sir?

11 A.      Yes.

12 Q.      Now, this jaguar we're talking about on this

13 subject.   Is this the Jaguar you purchased with Ms.

14 Martin's help?

15 A.      No.

16 Q.      It's a different one?

17 A.      Yes.

18 Q.      What color was the one that you purchased with

19 Ms. Martin's help?

20 A.      The Jaguar that I purchased with Ms. Martin's

21 help is a gray Jaguar that was a 1994.   I purchased it

22 in 2000.   This Jaguar I had in '91.

23 Q.      What were the tags?   Were the tags on the Jaguar

24 you purchased with Ms. Martin's help Maryland tags or

25 Illinois tags?

1  A.        The Jaguar that I purchased with Ms. Martin's

2  help had neither of those tags on it.  It had

3  Washington, D. C. tags -- still does have Washington,

4  D. C. tags.

5          This Jaguar has Illinois tags on it.  (Witness

6  indicating.)

7  Q.        Just to be clear.  In 1991, you had a burgundy

8  Jaguar with Illinois tags, and in 1992, 1993, 1994,

9  when you're dealing with Ms. Martin, you had a Jaguar

10 with D. C. tags that was gray.

11 A.        No.  You are wrong.

12          MR. HALL:   Objection.

13          Misstates the testimony, Your Honor.

14          BY MS. GREENBERG:

15 Q.        What color was your Jaguar in 1992, 1993 and

16 1994?

17 A.        It was red.  Burgundy.

18 Q.        In 2002, 2003, 2004, what color was your Jaguar?

19 A.        Burgundy.

20 Q.        Burgundy?

21 A.        Yes.  I didn't get the Jaguar that I got with

22 the help from Ms. Martin until the year 2000.

23 Q.        Okay.  The Jaguar that you got in the year 2000.

24 What color was it?

25 A.        It's gray.

1  Q.      What kind of tags did it have on it?

2  A.      Washington , D. C.

3  Q.      Thank you.

4          Getting back to the situation in 1991.  You

5  didn't approach Ms. Freeman at all, did you, that day?

6  A.      No.

7  Q.      Were you aware that law enforcement  had arrested

8  her prior to her coming back from Washington , D. C?

9          MR. HALL:   Objection .

10         It's been asked and answered , Your Honor .

11         THE COURT:   Overruled .

12         BY MS. GREENBERG:

13 Q.      Were you aware that law enforcement  arrested her

14 when she got back -- before she got back to Washington ,

15 D. C.?

16 A.      Yes.

17 Q.      In Arlington , Virginia ?

18 A.      Yes.

19 Q.      Is that why you didn't approach her?

20 A.      Yes.

21 Q.      How much was Ms. Freeman paid for this trip?

22 A.      I don't remember  the exact figure .  It was maybe

23 Ten, Fifteen, $20,000 .  I don't know  what the exact

24 figure was, because it's some time ago .

25 Q.      How about Ms. Withers?  Would she be about the

1 same amount? $10,000 -20,000?

2 A.      Yes, ma'am.

3 Q.      How many other couriers did you send over to

4 Japan or Thailand to pick up heroin for you?

5 A.      None.

6 Q.      Just those two ladies?

7 A.      That's correct.

8 Q.      At the time you were operating with -- who were

9 you operating with as a supplier?

10 A.      I don't know what you're talking about.

11 Q.      Who was the supplier of this heroin?  Phil

12 Phillips?

13 A.      Phil Phillips and I were in business together,

14 yes, but he wasn't a supplier of the heroin.

15 Q.      Is he the individual that -- this source of

16 heroin from Thailand and Japan?

17 A.      No.  We both had the source.

18 Q.      Who was the person over in Thailand and Japan

19 that you had heroin from?

20 A.      His name is a Achoochi.

21 Q.      Could you spell that for the record?

22 A.      I don't know how to pell it.

23 Q.      Phonetically, just to help the court reporter.

24 A.      A C H O O C H I.

25 Q.      But you're -- back in the time period we're

1  talking about here, the early nineties, your heroin

2  dealing didn't stop with these couriers going over to

3  pick up multi-kilogram quantities of heroin for you,

4  did it?

5  A.     It did not stop?

6  Q.     Did not stop with those two ladies going to pick

7  up -- couriers picking up heroin for you.  You

8  continued to deal heroin; is that correct?

9  A.     Yes.

10  Q.     In fact, on two occasions you provided heroin to

11  what turned out to be a confidential informant for law

12  enforcement; correct?

13  A.     Yes.

14  Q.     On December 17, 1993, specifically, you provided

15  personally one and a half ounces of heroin to what

16  turned out to be a confidential informant for $10,000

17  in official government funds; correct?

18  A.     That's correct.

19  Q.     On February 10, 1994, you distributed about a

20  half ounce of heroin to what turned out to be a

21  confidential informant for $3,500 in government funds;

22  correct?

23  A.     Yes.

24  Q.     You didn't know at the time that they were

25  confidential informants you were dealing drugs to.

1  A.      I did not know that she was a confidential

2  informant?

3  Q.      Correct, sir.

4  A.      No, I didn't know  at the time.

5  Q.      We're talking about November 1984 when you got

6  an eight-year and three month sentence.  When did you

7  get out of jail for that?  You said in approximately

8  when?

9  A.      '88.

10 Q.      And we talked about you sending couriers over to

11 Thailand and Japan in approximately 1990.  Between

12 1988 and 1990, were you dealing drugs?

13 A.      Yes.  But I didn't start couriers to Japan

14 until, I think it was '91.

15 Q.      Would you agree, sir, that in about August 1990

16 you started -- at least in August 1990 you started

17 dealing drugs again?

18 A.      Yes.

19 Q.      And that was in what sense, if you weren't

20 sending couriers over?

21 A.      What do you mean, "in what sense?"

22 Q.      What sense were you dealing drugs?

23 A.      I don't understand  the question.

24 Q.      How were you dealing drugs if you weren't

25 sending couriers over to Japan?

1  A.      We had drugs coming before I started sending

2  couriers to Japan.

3  Q.      In what quantities were you getting drugs?

4  A.      I don't know.  Kilos.

5  Q.      Kilograms of what?

6  A.      Of heroin.

7  Q.      Starting when?

8  A.      I don't remember  the date.

9  Q.      How long after your release from the Mexican

10  prison -- from prison after the Mexican conviction?

11  A.      I don't know.  A year or so.

12  Q.      And you were getting kilogram  quantities --

13  A.      Yes, ma'am.

14  Q.      -- of heroin.

15  A.      Yes, ma'am.

16  Q.      When you were caught with this pistol without a

17  license, were you dealing drugs during that period of

18  time, October 3rd 1992?

19  A.      Yes.

20  Q.      Were you also friends with Ms. Martin during

21  this period of time that we're talking about, 1988

22  through 1994?

23  A.      I've been friends with Ms. Martin since about

24  1981-82, somewhere around there.  I'd like to add that

25  Ms. Martin was not part of this project.

1 Q.      All right , sir .

2        Were you aware that there was a search warrant

3 at Ms. Martin 's school of perform ing art s on April 26 ,

4 1994?

5        MR. HALL:   Objection .

6        THE COURT:   Over ruled .

7        MR. HALL:   It's outside the scope , Your Honor .

8        THE COURT:   Over ruled .

9        THE WITNESS:   No .

10        BY MS. GREENBERG:

11 Q.     Were you aware that there was heroin seize d from

12 her school of perform ing art s during that search

13 warrant on April 26th of 1994?

14 A.      No .

15        MR. HALL:   Objection , Your Honor .

16        If he's not aware of the search warrant , he's

17 not aware of what was seize d.

18        THE COURT:   Over ruled .

19        BY MS. GREENBERG:

20 Q.     You were friends with Ms. Martin at this time ?

21 A.      Yes .   I've been friends of Ms. Martin since

22 '81-82.

23 Q.     Close friends ?

24 A.      Yes .   But I was not in contact with her during

25 this period .

1  Q.      Did she at any time tell you she was arrested as

2  a result of a search which recovered heroin at her

3  school of performing arts in 1994?

4  A.      No, she did not make me aware of that.

5  Q.      Between the time that you started dealing heroin

6  in kilogram quantities of heroin, one year later,

7  approximately 1999, until your arrest in March of 1994,

8  was your heroin dealing continuous during that period

9  of time?

10  A.      I did not deal heroin in 1999.

11  Q.      I'm sorry. From 1989 -- you said one year after

12  your release; is that correct --

13  A.      That's right.

14  Q.      -- from the jail, you started dealing heroin --

15  kilogram quantities of heroin until your arrest in

16  March of 1994. Was your heroin dealing continuous

17  during that period of time?

18  A.      During that period of time, yes.

19          MS. GREENBERG:   Your Honor, for the record, this

20  is Chart 15, and I believe I am done with that chart.

21          MR. WARD:  You don't mind if I move it so that I

22  can see the witness.

23          THE COURT:  Certainly.

24          MR. WARD:  Thank you.

25          BY MS. GREENBERG:

1  Q.      Sir, on the date of your arrest by law

2  enforcement authorities in Virginia on March 28 of

3  1994, they provided you with your Miranda rights, and

4  you agreed to cooperate with them; correct?

5  A.      I was not arrested in Virginia.

6  Q.      By the authorities in Virginia.

7  A.      Yes.

8  Q.      They arrested you and they gave you Miranda

9  rights, and you talked to them about corroborating;

10 correct?

11 A.      Yes.

12 Q.      And you said you wanted to help them get other

13 drug dealers; correct?

14 A.      No.

15 Q.      Did you specifically say to them that you could

16 provide information on the apprehension of three

17 international smuggling groups --

18 A.      Yes.

19 Q.      -- but first you wanted to talk with your legal

20 counsel?

21 A.      That's right.

22         MR. MONTEMARANO:  Objection.

23         Your Honor, may we approach?

24              (At the bar of the Court.)

25         MR. MONTEMARANO:  Any trial attorney with Ms.

Page 30

1  Greenberg 's experience  who brings up the ability  of a
2  criminal  defendant  or an arrestee  to access  counsel  is
3  only doing it deliberate ly .  I move for a mistrial  on
4  the part of Ms. Martin .

5        MR.  HALL:   I would  join in that , Your  Honor .
6        MS.  GREENBERG:   The proffer  is simply  that  he
7  wanted to help .  It was a week  later  that they met .
8  It's just to put it in context  why he didn't  give  them
9  all the information  that day .

10        MR. MONTEMARANO :  Bull .

11        THE  COURT:   All right .  I deny the motion  for
12  mistrial ; I will  sustain  the objection .  I will
13  instruct  the jury to disregard  the question .

14        MR. MONTEMARANO :  I will  further  request  the
15  jury be instruct ed that that was improper , and that
16  whether  or not a person  has access  to counsel  is an
17  absolute  right  guarantee d by the F ifth  Amendment  to all
18  of us.

19        Most  respect fully , Your  Honor , forgive  my tone .

20        MS.  GREENBERG:   Your  Honor , this is 404(b).
21  It's not in relation  to this case .  It's going  to put
22  his testimony  in context  with his talks with  the agent s
23  and not to mis lead  the jury as to what  he was do ing
24  during  that period  of time .  It is not meant  for  any
25  other  purpose , and it was not deliberate  in any regard .

1          MR.  HALL:   His  consultation   with  an  attorney

2  though  is  not  404(b).

3          THE  COURT:   All  right .

4          MR.  MONTEMARANO :   Thank  you ,  Your  Honor .

5          MR.  WARD:   You  forgot  to  ask  the  VIN  number s  of

6  the  two  Jaguar s.

7          THE  COURT:   Now ,  now .

8          MR.  WARD:   I  mean ,  you  know ,  the  rule  says  that

9  some  latitude  is  allow ed ,  but  my  God ,  when  we  go  --  I

10  mean ,  I  thought  she  was  going  to  ask  him  what  kind  of

11  tire s  he  had  on  the  cars .   It's  preposterous .

12          MR.  SUSSMAN :   Can  I  make  a  request ?   I  believe

13  my  client  is  implicate d  in  multiple  conspiraci es ,  and

14  now  she 's  sitting  in  a  case  where  she 's  accused ,  I

15  think ,  of  break ing  up  eight  ball s  and  sell ing  dime s.

16  Now  there 's  evidence  about  international  drug

17  smuggling .   I  think  she  can't  not  be  taint ed  by  this ,

18  and  I'm  going  to  request  that  she  be  severed  and  a

19  mistrial  be  grant ed.

20          THE  COURT:   Your  motion  is  deni ed.   Thank  you .

21              (Back  in  open  court .)

22          THE  COURT:   Ladies  and  gentlemen ,  I  sustained  an

23  objection  to  the  last  question .   A  person  has  an

24  absolute  constitutional  right  to  con sult  with  a  lawyer ,

25  and  I  therefore  instruct  you  to  disregard  the  question.

1           BY MS. GREENBERG:

2  Q.      Sir, it was about a week later that you met with

3  the agents in this case; is that correct?

4  A.      That's correct.

5  Q.      That was something you were willing to do all

6  along?

7  A.      What's this?

8  Q.      This is something you were willing to do all

9  along; is that correct?

10 A.      It was something that I did.

11 Q.      You didn't have any problems from day one in

12 talking to them about these three international

13 smuggling operations; correct?

14 A.      No, I didn't.

15 Q.      You met with Clyde Shelly, who testified before

16 the jury; is that correct?

17 A.      That's correct.

18 Q.      And you told Clyde Shelly about Phil Phillips

19 and about the heroin that we talked about here

20 originating from Thailand; correct?

21 A.      Yes.

22 Q.      You talked to him about what you guys had done

23 in the past two years and about Ms. Freeman getting

24 arrested, and that was connected with Mr. Phillips; is

25 that correct?

1  A.      That's correct.

2  Q.      You also told these agents -- again, I'm just --

3  you told them -- the first day you gave them some names

4  and you were being more specific at a later date;

5  correct?

6  A.      Okay.

7  Q.      I'm not trying to say that delay was anything

8  improper or bad on your part.

9  A.      I'm listening.

10  Q.      The second thing hat you talked to  Clyde Shelly

11  and his associates about was Mr. Riley, a source of

12  heroin operating in China; is that correct?

13  A.      From Hawaii.

14  Q.      Through Hawaii from China; correct?

15  A.      Yes.

16  Q.      And Mr. Riley lived in California; is that

17  correct?

18  A.      That's correct.

19  Q.      In fact, you gave the DEA, through Mr. Shelly,

20  information about Mr. Riley.  In fact, said one of the

21  sells to one of the confidential informants that you

22  sold heroin to was heroin that you had gotten from Mr.

23  Riley; is that correct?

24  A.      That's correct.

25  Q.      You didn't tell him about the  third

1 organization , did you?

2 A.      The third organization ?

3 Q.      No , the third organization .  You didn't tell

4 them about that , did you?

5 A.      There was no third organization .

6 Q.      You did tell them on the day of the arrest that

7 you had information on three international heroin --

8 international smuggling operation s; correct ?

9 A.      I did say that , yes .

10 Q.      That was the reason that your sentence got

11 reduced when you were talking to counsel on direct ,

12 because of your help with those two case s.

13 A.      That 's correct .

14 Q.      During all these time s that you're dealing drug s

15 -- and you've been a drug dealer since 1968 -- did you

16 talk to your coconspirator s on the phone ?

17 A.      My coconspirator s on the phone ?

18 Q.      People you were dealing cocaine with and heroin

19 with .  Mr. Phillip s and Mr. Riley .

20       MR. HALL:   Objection , Your Honor .

21       Your Honor , I'm going to object .  I really -- I

22 have to renew the objection I made before .  I realize

23 this court has given counsel some latitude as to going

24 into the details of the past , but I think there has to

25 be some end of that .

1          THE COURT:    Overruled.

2          Let's try to rein it in.

3          BY MS. GREENBERG:

4 Q.     Did you talk to people on the phone that you

5 were dealing drugs with?

6 A.     Yes.

7 Q.     When you talked on the phone, did you say the

8 words "heroin" and "courier" and "importing heroin from

9 Japan?"  Did you say those things on the phone?

10 A.    No, I did not.

11 Q.    You spoke in code words; correct?

12 A.    No, I did not.

13 Q.    You spoke in some language where the person

14 would understand, but you wouldn't have to say "heroin"

15 or "cocaine;" correct?

16 A.    I said to them that I needed to see them.

17 Nothing else.

18 Q.    Why wouldn't you say those words on the phone,

19 sir?

20 A.    Because it would be incriminating.

21 Q.    You talked about Paulette Martin and that you

22 didn't see her for most of 2003; correct?

23 A.    Right.

24 Q.    You talked to her over the phone; correct?

25 A.    Yes.

1  Q.      You didn't see her in 2003, but the first call

2  that we talked about in March of 2004 you were talking

3  to her about going to a concert; correct?

4  A.      Talking to her about tickets for a concert, yes.

5  Q.      What concert was that?

6  A.      Any concert that would be in Ms. Martin's -- she

7  would like to go ahead and take me to.  I was

8  petitioning, because I didn't have the money to pay for

9  the tickets to go to the concert  -- Ms. Martin did --

10  so I couldn't specify a specific concert to go to.

11  Q.      Did you go to a concert?

12  A.      No, we didn't, because I didn't see Ms. Martin.

13  Ms. Martin said no.

14  Q.      You were talking about going to Mary J. Blige

15  at Carter Baron Amphitheater?

16  A.      Those were concerts I was aware of, and I was

17  hoping she would want to go to some of those concerts,

18  but I couldn't specifically say to her, oh, Ms. Martin,

19  would you please buy tickets for Mary J. Blige or the

20  Four Tops or somebody like that.  No, I couldn't do

21  that, because I wasn't paying for them.

22  Q.      Correct me if I'm wrong.  I thought I heard your

23  testimony correct on direct examination.  You said

24  there was Mary J. Blige concert at the Carter Baron

25  Amphitheater.  I thought you were very specific in

1  that.

2  A.      No.  I said that -- Mr. Hall asked me what

3  concert s did I have in mind, or something  to that

4  effect, and I said Mary J. Blige.

5  Q.      Was that at the Carter Baron Amphitheater  ?

6  A.      No, it was not at the Carter Baron.  It was at

7  the Constitution   Hall.

8  Q.      When was that?

9  A.      Sometime  in '04.  I don't remember   exact ly when.

10  Q.      But you never  went.

11  A.      No, we didn't  go.  I didn't  see Ms. Mart in in

12  '04.

13  Q.      You weren't  work ing after February  6 of 2004,

14  were you?

15  A.      No.  I was work ing up until the time I was

16  arrested  on June 1st 2004.

17  Q.      You weren't  work ing at the Turk House after

18  February  6 of 2004, were you?

19  A.      I'm going to say this one more time, Ms.

20  Greenberg.  I was work ing until June 1st of 2004 at the

21  Turk House.

22  Q.      May I have the next miscellaneous   number,

23  please?

24          Sir, I'm show ing you up on the screen  what is

25  Miscellaneous   49.

1          MR. HALL:   Your Honor, I'm going to object to it

2 being shown to the jury before it's actually

3 introduced.

4          THE COURT:   Show it to him.

5          BY MS. GREENBERG:

6 Q.        May I approach the witness?

7          Showing you what's been marked as Miscellaneous

8 49.   Is this a document from the Turk house?

9 A.        Yes.

10 Q.        From Mr. Hickey, the Executive director?

11 A.        Yes.

12 Q.        And it's dated January 23, 2004; is that

13 correct?

14 A.        Yes.

15 Q.        It's to you?

16 A.        Mm-hmm.

17 Q.        It says, Dear Mr. Whiting, the last day we will

18 be able to employ you in this position is February 6,

19 2004?

20 A.        That's correct.

21 Q.        That's Miscellaneous 49?

22 A.        Yes, ma'am.   Now, I'd like to explain that if I

23 can.

24 Q.        Well, your counsel can ask you questions to

25 explain that, sir.

1          THE COURT:   I'll permit him to explain.

2          MR. WARD:   Your Honor, that --

3          THE COURT:   Mr. Ward, I just told him he can

4 explain his answer.

5          BY MS. GREENBERG:

6 Q.      The court is allowing you to explain it now,

7 sir.

8 A.      Thank you Judge.

9          I was terminated from the job of the privacy

10 officer on February 4, '04 -- February 6, '04 and was

11 continued as the monitor, another position at the Turk

12 House until June 1st 2004.   That can be verified by Dr.

13 Hickey when he testifies.

14          MS. GREENBERG:   Your Honor, at this time I'll

15 mark all of these exhibits as Miscellaneous 49.

16          If I may approach.

17          THE COURT:   You may.

18          BY MS. GREENBERG:

19 Q.      Looking through this packet.   Is there anything

20 in there to support that you continued to be employed

21 at the Turk House?

22 A.      No documentation here, but Dr. Hickey will be

23 able to confirm that.

24          MR. HALL:   Counsel, may I see the document?

25          BY MS. GREENBERG:

1  Q.      Your Honor, testimony on  direct, sir -- besides

2  going to concert s with Ms. Martin , your testimony  is

3  that she is not a drug deal er; is that correct ?

4  A.      Not to my knowledge .

5  Q.      And that she only gave you user quantiti es ; is

6  that correct?

7  A.      That's correct  .

8  Q.      Anything  you've heard during the  last couple

9  week s change  your mind ?

10        MR.  HALL:    Objection .

11        THE  COURT:    Sustained .

12        BY MS.  GREENBERG:

13  Q.     Did you know about  the drug s being kept at

14  Paula 's School  of Per form ing Arts when  you dealt  with

15  Ms.  Martin ?

16  A.      No.   No , I did not .

17  Q.      Ms.  Mart in is somebody  that you love ; is that

18  correct ?

19  A.      Yes , I do .

20  Q.      Is she your sister ?

21  A.      No, she 's not .

22  Q.      Did you sometimes  refer to her as "sister ?"

23  A.      Yes , I did .

24  Q.      But she is not actual ly your sister ; correct ?

25  A.      She 's my sister  in the context  of being  an

1  extended family member, yes.

2  Q.      But you're not actually brother and sister;

3  correct?

4  A.      Not by blood.

5  Q.      Did you live with her at any period of time?

6  A.      I lived at her house maybe for week.

7  Q.      When was that?

8  A.      I don't remember  exactly when it was.

9  Q.      In the time frame of what we're talking about

10 here, since you've known her for so long.

11 A.      No, no, no.

12 Q.      After you got out of jail in 1999?

13 A.      Yes.

14 Q.      Was it when Mr. Echarte was living there?

15 A.      No.

16 Q.      Was it after Mr. Echarte lived there?

17 A.      I'm not sure when it was.  I stayed there for a

18 week.  It may have been after.

19 Q.      Was it in -- before 2003-2004?

20 A.      Yes, ma'am.

21 Q.      But after 1999?

22 A.      It was -- I think it was the latter part of

23 2002.

24 Q.      For a week?

25 A.      Yes, ma'am.

1  Q.      You testified, in response to Mr. Montemarano 's

2  examination , that you know that Ms. Martin made money ;

3  correct ?

4  A.      Yes, ma'am .

5  Q.      Do you know if she made money any other way

6  besides the two individuals that you testified that

7  were elderly and left her money ?

8  A.      Yes, ma'am .  Ms. Martin was -- she sold clothes,

9  a lot of clothes.  She had racks of clothes in all

10 rooms of her house , plus the garage .  Before she had

11 the Benz, she had another kind of car , and she used to

12 park that outside of the garage ; and she stored clothes

13 in the garage , as well as at the school .

14 Q.      Any other ways?

15 A.      Any other way?  She played the lottery very

16 heavily .  I'm only talking about hundreds of dollars a

17 day.  That 's the only ways I know of .

18 Q.      Did you ever agree to assist Ms. Martin in her

19 making money by insuring yourself -- your life --

20 A.      No .

21 Q.      -- in case you died she would get money .

22         MR. MONTEMARANO :  Objection , Your Honor .

23         May we approach , please ?

24               (At the bar of the Court.)

25         MR. MONTEMARANO :  I'm waiting for other counsel .

1        May it please the court.  I thought  -- and

2  perhaps  it was a different  case , but I seem to recall a

3  specific  preclusion  issued by the court  regarding

4  insurance  and all that other  stuff which will be the

5  subject  of a rather  lengthy  trial in a month  or so from

6  now.

7        THE COURT:   Unless  it gets bumped by one.

8        MR. MONTEMARANO:   Actually, in terms of coming

9  back after vacation , it seems that coming back on the

10  fifth September  is looking good.  I thought  that was

11  out.  Mr. Hall went nowhere  near it.

12        I simply asked about his knowledge  about these

13  people  because  I was trying  to lay a foundation  for the

14  witnesses I'll be calling.  Mr. Shannon  has been

15  subpoenaed by the  defense , and he mentioned  Mr.

16  Shannon .  I didn't  prime him with that .  He knows about

17  it.  It's clearly the truth .

18        Going  to this insurance  stuff , I think , runs a

19  huge risk of spillover onto the other  codefendant s.  It

20  is beyond the scope of what the court  permitted  the

21  government  to do; it has nothing  to do with this case ,

22  and with all due respect  there is no way in the world

23  that this question  -- just like the one on Mr.

24  Whiting 's access  to counsel  -- should  have been asked .

25        MR. HALL:   May I also point out that my client

1  is not charged in the next case?

2      MS. GREENBERG:   Your Honor, there's -- it's very

3  limited, and there's two reasons.   Number 1. During the

4  time period we're talking about here, the time period

5  of the conspiracy, Mr. Whiting filled out an insurance

6  policy certifying that Paulette Martin was his sister

7  -- his signature there, or was done on his behalf, and

8  I'm entitled to inquire about that; and also, it lists

9  his address as Bexhill Court, further showing his

10 knowledge, and contains a false statement that it was

11 his sister and contains a false statement that he lived

12 at Bexhill Court.

13      There are only two insurance policies.   There's

14 about five that he filled out that are under his name

15 as the insured, and there's two, and I'm entitled to

16 explore that for both of those reasons -- both those go

17 to his character and his truthfulness in terms of Ms.

18 Martin being his sister and living at Bexhill Court.

19      Secondly, Mr. Martin -- Mr. Montemarano opened

20 the door about how she made money.

21      MR. MONTEMARANO:   May it please the court.   Ms.

22 Greenberg is entirely right that she's entitled to

23 explore that.   I would not have objected if she had

24 gone right to the question of, didn't you once tell an

25 insurance company that she was your sister, etcetera.

1   This is the very same thing Ms. Greenberg did with

2   regard to Mr. Whiting 's access to counsel . If she had

3   asked the question in the following form , at least , I

4   wouldn't have objected -- Mr. Hall might have because

5   it's his client . If she had said , you met with the

6   agents ; correct ? Yes . That was about a week later ;

7   correct ? Yes . And before then you had a chance to

8   meet with your attorney ; correct ?

9        That would have been perfectly fine . But the

10  first thing she did is try to pollute the well and

11  suggest , you wanted to talk to your attorney first .

12  She had a way to ask it which was not inflammatory , and

13  she chose the inflammatory fashion . For an attorney of

14  her experience , there is no question than she's doing

15  it deliberately .

16      MS. GREENBERG:   Your Honor , just so the record

17  is clear . I didn't intend this . My voice has not been

18  inflammatory . I have been very careful in my approach

19  of this witness . If Mr. Montemarano wants to

20  characterize the witness --

21      THE COURT:   Counsel , I will overrule the

22  objection because this goes to the main -- to the issue

23  of whether he listed this as his address and whether he

24  said she was his sister , and therefore it is

25  appropriate to inquire into those limited areas, and I

1  will permit that.  But I will caution counsel to not go

2  farther than that.

3           MS. GREENBERG:   Your Honor, there is a

4  certification he signed.  I am referring to the

5  certification underneath the signature.  If he admits

6  that's his signature --

7           THE COURT:   What, this?

8           MS. GREENBERG:   The certification.  Yes.

9           THE COURT:   You may ask him if that's his

10 signature.

11          MS. GREENBERG:   And the certification.

12          MR. MCKNETT:   Your Honor, may I be heard on

13 this?  I want to make the record clear that I join in

14 the previous motions for mistrial for the reasons

15 stated, and I am also concerned about the question

16 about insurance.  I suspect that my client may well

17 testify, and I'm afraid that by allowing the government

18 to ask questions about insurance with regard to Mr.

19 Goodwin, the court may be opening the door for the

20 government -- and Mr. Whiting, excuse me --

21          THE COURT:   If your client were to say something

22 that were to be impeachable by that - if there's

23 nothing -- if her testimony is consistent with this

24 kind of thing, I'm not going to permit it.  But in this

25 case, the witness has indicated he never referred to

1 her -- he's not in fact her sister -- her brother,

2 although he, you know --

3         MR. MCKNETT:   I understand.

4         THE COURT:   In the colloquial sense, perhaps,

5 and this is legitimate to challenge that.  But, you

6 know, I'm going to make these rulings document by

7 document.  I'm not opening a door that says all

8 insurance matters are in in this case --

9         MR. MCKNETT:   I wanted to be clear about that,

10 because that may affect a decision to testify or not.

11         THE COURT:   Thank you.

12         MR. MCKNETT:   Thank you.

13             (Back in open court.)

14         BY MS. GREENBERG:

15 Q.    Sir, let me show you what's been marked as

16 Miscellaneous 50 for the record.

17         MR. HALL:   Your Honor, I'm going to object.

18         MS. GREENBERG:   I'll approach the witness.

19         MR. HALL:   She can show it to the witness before

20 she shows it to the jury.

21         MR. WARD:   I'm sorry.  What is it?

22         MS. GREENBERG:   Miscellaneous 50, counsel.

23         MR. WARD:   50?

24         BY MS. GREENBERG:

25 Q.    Miscellaneous 50 is an application to Omaha Life

1 Insurance  Company  ;is that  correct , sir?

2 A.      That's what  that  says.

3 Q.      That's your  name  down  here  at  the  bottom , Reece

4 C. Whiting , Jr.?

5 A.      Yes , it  is.

6 Q.      Date  7/1/2002?

7 A.      That's what  it  says.

8 Q.      It  says , my  beneficiary  -- to  the  person  to  be

9 paid at my  death  is Paulette  Martin?

10 A.      Yes.

11 Q.      Sister?

12 A.      Yes.

13 Q.      It  says  this  person  is Reece  Whiting , Jr., 9002

14 Bexhill  Court , Hyattsville , Maryland,  20783-2038 ?

15 A.      That's what  that  says.

16 Q.      Okay.  Let's look  at  this.

17        Do  you  recognize  this  telephone  number , 301-439-

18 3545?

19 A.      I believe  it's Ms. Martin's phone  number.

20 Q.      And  your  age  in  2002  was  64; is  that  correct?

21 A.      No.  I was  62  in  2002.

22 Q.      Is that  your  correct  date  of  birth , sir?

23 A.      No, that's not  my  correct  date  of  birth.  My

24 correct  date  of  birth  is  6/13/40.

25 Q.      So  this  is  a  year  off?

1  A.       Yes, ma'am .

2  Q.       Is that your correct Social Security number ?

3  A.       No , it's not.

4  Q.       What is your correct Social Security  number ?

5  A.       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 .

6  Q.       Sir , this does say "Paulette  Martin ?"

7  A.       Yes , it does .

8  Q.       And "sister ?"

9  A.       Yes .

10  Q.      And this signature  here .  Is that your

11  signature ?

12  A.       No , it's not .

13  Q.      Do you recall  if you were associate d with Ms.

14  Martin  on July 1st of 2002 ?

15  A.       I knew Ms. Martin  then , of course .

16  Q.      This document  purport s -- and it's stamp ed here .

17  See that as "Received ?"  Do you see that there ?

18  A.       Yes , I see it .

19  Q.      It purport s to insure your life .  Do you

20  understand  that ?

21  A.       Yes .

22  Q.      Did you ever authorize  Ms. Martin to get this

23  policy  on your behalf ?

24         MR. MONTEMARANO:    Objection .

25         MR. MARTIN:   Your Honor , objection .

1          THE COURT:   Sustained.

2          MR. MONTEMARANO:  -- to be heard at the bench.

3          THE COURT:   Disregard the question.

4          MR. MARTIN:   Objection, Your Honor.

5          MR. MONTEMARANO:  Objection, Your Honor.

6          Move to strike all the evidence regarding this

7  document.

8          THE COURT:   Sustained.

9          Your motion is denied.

10          MS. GREENBERG:   Let's move on to the next one.

11          MR. MONTEMARANO:  Your Honor, may we be heard at

12  the bench?

13                    (At the bar of the court.)

14          MR. MONTEMARANO:  Mr. Hall avers to me.  I have

15  no reason to discredit his testimony, but the

16  government will now attempt to do the same thing again

17  and again and again with other documents.  I suggest

18  this is a functional equivalent of putting a witness on

19  the stand before the jury to deny, or to take the

20  Fifth, I should say.  All this does is if Mr. Whiting

21  denies this, and absent some sort of expertise or

22  witness to the signature or something like that, is to

23  attempt to blacken my client's name collaterally.

24          This has nothing to do, at the end of the day,

25  with Mr. Whiting.  It has everything to do with Ms.

1  Martin .  For that reason , I suggest this line of

2  inquiry should end here .  He has denied it .  If he

3  denies it once , he denies it five times .  The question

4  of his honesty has been placed at issue , and there's

5  enough other things the court -- the government has

6  been permitted to do that and will do that with regard

7  to Mr. Whiting , in my view , but he's not my client .

8        The confusion to the jury and the spill over of

9  this kind of evidence to my client -- what we are now

10 doing is trying a fraud case against my client .  There

11 was a suggestion at the last bench conference , but I

12 did not realize there were more of these same documents

13 that the government was going to go into .  There is

14 just no reason for this .  Mr. Whiting , I proffer to the

15 court , is going to deny , and that therefore turns this

16 full on Ms. Martin .

17       MS. GREENBERG:   Your Honor , I have no idea

18 whether he's going to admit or deny each one .  This one

19 has his correct date of birth .  I didn't check the

20 Social Security number .  I'm entitled to inquire when

21 his signature is on a document and his coconspirator's

22 name is on the document whether or not he had any

23 connection with this .

24       THE COURT:  Ms. Greenberg, if he is shown a

25 document and he says that is not his signature and he

1 has not seen the document before, I think you're stuck

2 with that.

3          MS. GREENBERG:   Okay.

4          THE COURT:   You can't go any farther.

5          MS. GREENBERG:   Okay.

6          THE COURT:   I think what Mr. Montemarano is

7 saying is correct. If he denies seeing the document

8 and doesn't recognize the signature, I think your

9 inquiry is at an end.

10          MS. GREENBERG:   Your Honor, to tie him to the

11 document, may I ask him about his date of birth and

12 Social Security number on this next one? If they're

13 correct, those are important facts to show that

14 somebody --

15          MR. MONTEMARANO:   If he denies it, Your Honor --

16          MS. GREENBERG:   If he denies it, I'm stuck with

17 it. I agree.

18          THE COURT:   You're stuck with it.

19          MR. MONTEMARANO:   If he denies it, it should not

20 come into evidence.

21          THE COURT:   You can say, is that your signature.

22          MR. MONTEMARANO:   Therefore, it should not be

23 put on the ELMO.

24          MR. HALL:   I was going to ask that.

25          MS. GREENBERG:   I will approach the witness.

1          THE COURT:   You may show him the document  and
2  say, is that your signature?  If he says it's not his
3  signature  and he doesn't recognize  the document  --
4          MR. HALL:   I suggest we start with the
5  signature.
6          MS. GREENBERG:   Your Honor, the identifying
7  information  is important  to tie it all --
8          MR. MONTEMARANO:   Paulette Martin's name on it
9  is not key.
10         THE COURT:   If it's not attributable  to him, I
11 don't see how you can use this to impeach him.  If this
12 is his own document  signed by him, you can use it for
13 the purposes indicated.  You may not use it if he does
14 not admit that that's his document  or his signature,
15 and that's the end of the inquiry.
16                   (Back in open court.)
17         MR. MONTEMARANO:   I renew my request, Your
18 Honor, that the evidence regarding the last document  be
19 stricken, based upon the court's ruling.
20         MS. GREENBERG:   Your Honor, I believe that what
21 we agreed to is that it will be marked for
22 identification  and not received into evidence.
23 Miscellaneous  50 will be for identification  only.
24         THE COURT:   It's identification  only, the last
25 exhibit  and this one.

Page 54

1          MS. GREENBERG:   Yes, sir.

2          MR. MONTEMARANO:   Your Honor, it has been put on

3 the ELMO.   I submit it should be stricken, therefore.

4 It should never have gone on the ELMO.

5          THE COURT:   Well, all right.

6          Ladies and gentlemen, the last document that you

7 had a series of questions asked about is a document

8 that this witness has indicated he did not sign and

9 he's not familiar with it.   Therefore, it should not be

10 used in evidence against him.   I therefore am directing

11 that his testimony concerning the last document is

12 stricken, and you should disregard it.

13          BY MS. GREENBERG:

14 Q.     Sir, I'd like to approach you and show you

15 miscellaneous 51.

16          Showing you Miscellaneous 51.   Take a second to

17 look at that document.

18 A.     Okay.

19 Q.     Sir, is that your signature on this document?

20 A.     No, it's not.

21 Q.     Do you have any knowledge of this document?

22          MR. HALL:   Objection, Your Honor.

23          No further questions.   He's denied it's his

24 signature.

25          THE COURT:   Sustained.

1          MS. GREENBERG:   If he has knowledge  of the

2 document , Your Honor --

3          MR. HALL:   Objection .

4          THE COURT:   Overruled .

5          You may ask if he has any knowledge .

6          BY MS. GREENBERG:

7 Q.      Do you have any knowledge  of this document ?

8 A.      No, ma'am .

9 Q.      Showing you Miscellaneous  52.

10         Take a second to look at that document .

11 A.      Okay .

12 Q.      Do you have any -- is that your signature  on

13 that document ?

14 A.      No, ma'am .

15 Q.      Do you have any knowledge  of that document ?

16         MR. HALL:   Objection .

17         THE COURT:   Overruled .

18         THE WITNESS:   No, ma'am .

19         BY MS. GREENBERG:

20 Q.      And except for one week in 2001-2002 , you didn't

21 live at Bexhill Court ?

22 A.      Pardon me?

23         MR. MONTEMARANO:   Objection , Your Honor .

24         MR. HALL:   Objection .

25         THE COURT:   Sustained .

1           BY MS. GREENBERG:

2   Q.      Now, you also testified on direct that in 2000

3   Ms. Martin lent you money for a car?

4   A.      Yes, ma'am.

5   Q.      Did she also lend you money to repair the car?

6   Was that your testimony?

7   A.      Yes, ma'am.

8   Q.      And that was in 2000 or 2001?

9   A.      I don't know when she -- she loaned me money on

10  several occasions for the repairs of the car.

11  Q.      Okay.  Mr. Ward showed you Hayward 28 in

12  relation to that testimony; is that correct?

13          MR. HALL:  I believe it was Mr. Hall.

14          MR. WARD:  I didn't show him anything.

15          MS. GREENBERG:  I'm sorry.  It was Mr. Hall.

16          MR. WARD:  Thank you.

17          BY MS. GREENBERG:

18  Q.      I must have Mr. Ward's conversation on my mind.

19  A.      That's correct.

20  Q.      He showed you Hayward 28, correct, which is what

21  we're seeing up here on the screen?

22  A.      Yes, ma'am.

23  Q.      You testified that those figures were in

24  relation to Ms. Martin loaning you money for this gray-

25  colored Jaguar that you got in 2000; is that correct?

1  A.        Yes, ma'am .

2  Q.        And these  continued  up until  April  2002;

3  correct ?

4  A.        That 's what  the date  is.   Yes, ma'am .

5  Q.        And the final  amount  with  $11,500 .

6  A.        I don't remember   exact ly what  I owe  her .   I know

7  I still  owe her  the  bulk .

8  Q.        That 's about  right; right ?

9  A.        It could  be.

10 Q.        And yet  your  testimony  is that  you  didn't  see

11 her  in 2003; correct ?

12 A.        I didn't  see her  but a couple  of time s in early

13 2003 .  I did  not see  her at all  in 2004 .   I did  not  see

14 her  in 2003  after  June .

15 Q.        But you  still  talk ed to her  on the  phone .

16 A.        Yes, ma'am .

17 Q.        In your  testimony  -- your  testimony  is that you

18 still  owe her  the  bulk  of this  money; correct ?

19 A.        Yes, ma'am .

20 Q.        The  first  contact  you have  with  her -- strike

21 that .

22         The  first  time  that  you're  try ing to see her  is

23 reflect ed in Page  8 of this  transcript  book  when  you're

24 try ing to get her  to go to a concert  with  you; correct ?

25 A.        I was  try ing to get her  to purchase  ticket s to

1 take me to the concert , and other people .

2 Q.     After not seeing her for most of 2003 --

3 A.     Yes, ma'am .

4 Q.     -- and owing her over $11,000 --

5 A.     Yes, ma'am .

6 Q.     -- she is going to take you to a concert ?

7 A.     Yes, ma'am .  Ms. Martin is very generous .

8 Q.     It happens to be just when our wiretap goes up;

9 correct ?

10 A.     Ma'am ?

11 Q.     That's just about when the wiretap went up;

12 correct ?

13       MR. HALL:   Objection .

14       Basis of knowledge .

15       THE WITNESS:   I don't know .

16       THE COURT:   If he knows.

17       BY MS. GREENBERG:

18 Q.     And your testimony is, when you talked about

19 "tickets" with Ms. Martin , you mean tickets; correct ?

20 A.     Yes, ma'am .

21 Q.     You mean actual tickets to actual events.

22 A.     Yes, ma'am .

23 Q.     With all this talk about tickets, you never went

24 to a concert with her .

25 A.     Not during that period of time .  I had gone with

1  her on other occasions.  We went to Carter Baron once.
2  There was a group of us.
3  Q.     When?
4  A.     I don't remember the exact date, but it was -- I
5  think it might have been in 2002.  Mr. Goodwin, myself,
6  Gene Bird, Ms. Martin, Ms. Martin's daughter, Tommy
7  Taylor.  It was a whole group of us that went.  That
8  was the last event I think we went to together.
9  Q.     So the last event you went to with Ms. Martin
10 was 2002, and on Page 8 of the transcript book, the
11 transcript that you reviewed -- we'll get to that in a
12 second -- you're talking about tickets and you're
13 talking about wanting to go to a concert with her
14 again; correct?
15 A.     Yes.  That was the way we did things.
16 Q.     And you're not offering -- you're not saying
17 what these other people talked to her about tickets.
18 You're not saying what that was about, are you?
19 A.     No, I'm not.  I'm talking about me.
20 Q.     Your testimony is that -- if I could have CH-1,
21 please.
22        Your testimony is quite clear that you had no
23 knowledge that Ms. Martin was a drug dealer; correct?
24 A.     That's correct.
25 Q.     Let me bring up to you CH-1.  Starting with the

1 first line here.  Do you know any of these people on

2 the top row?

3          MR. HALL:   Objection.

4          Outside the scope.

5          THE COURT:   Overruled.

6          THE WITNESS:   I know Ms. Gwen Levi.  Can I say

7 this, please?

8          BY MS. GREENBERG:

9 Q.       Sure.

10 A.      I have come to know who some of these people

11 were after my arrest on June 1st.

12 Q.      Let's talk about before your arrest.

13 A.      Okay.

14 Q.      Before your arrest on June 1st 2004.

15          Now, starting with the top row.

16 A.      You want me to start left to right or right to

17 left?

18 Q.      Let's make sure -- Steve Campbell.  Do you know

19 him?

20 A.      I don't know him.

21 Q.      Do you know a person named "Cuba?"

22 A.      No, I do not know him.

23 Q.      Juan Encarnacion?

24 A.      No, ma'am.

25 Q.      Luis Mangual, Jr.?

1  A.        No, I don't know  him.

2  Q.        Pernell Philpot ?

3  A.        Met him one time .

4  Q.        How did you meet Mr. Philpot?

5  A.        He was at Ms. Martin 's house .

6  Q.        What was he doing there ?

7  A.        Eating.

8  Q.        Do you know whether or not Mr. Philpot was a

9  drug dealer?

10 A.        No, I don't know  him.

11 Q.        Mr. Brim .  Steve Brim .

12 A.        Never met him.

13 Q.        Mr. Uriarte ?

14 A.        Never met him.

15 Q.        Mr. Turner , also known as "Dog?"

16 A.        Never met him.

17 Q.        Ms. Levi ?

18 A.        Know her from Baltimore .

19 Q.        How do you know her ?

20 A.        She 's the god-daughter of Eddie Tucker .

21 Q.        Was Ms. Levi , to your knowledge , involve d in

22 drug dealing?

23 A.        Not to my knowledge .

24 Q.        Mr. King .

25 A.        Met him when he was about seven years old.   He's

1 the son of Estelle Brim.

2 Q.      Was Mr. King involved in drug dealing?

3 A.      I don't know.  He wasn't when I met him.

4 Q.      Mr. Thurman?

5 A.      Don't know him.

6 Q.      Ms. Vessels?

7 A.      Don't know her.

8 Q.      Mr. McKenzie?

9 A.      I don't know him.

10 Q.      Mr. Irby?

11 A.      Don't know him.

12 Q.      Mr. Moore?

13 A.      Don't know him.

14 Q.      Mr. Goodwin?

15 A.      I know Mr. Goodwin.  Yes, I know Mr. Goodwin.

16 Q.      Is Mr. Goodwin involved in dealing drugs?

17 A.      Not to my knowledge.  I don't know what Mr.

18 Goodwin does.

19 Q.      Ms. Ali?

20 A.      Ms. Ali is a schoolteacher and has been for some

21 years.  I know Ms. Ali, because many years ago she was

22 a very good friend of a -- a very close fiend of mine,

23 a bail bondsman by the name of Mickey Lewis.   That's

24 how I know Ms. Ali.

25 Q.      Was Ms. Ali involved with drugs?

1  A.      Not that I know of.

2  Q.      Mr. Arnold?

3  A.      Do not know him.

4  Q.      Mr. Bynum?

5  A.      The only thing I know about Mr. Bynum is he is

6  the father of Ms. Martin's youngest daughter's baby.

7  Q.      Mr. Bird?

8  A.      Gene Bird I've been knowing for years.  Mr. Bird

9  owns several nightclubs in the Washington area, and

10 I've known Mr. Bird for years.

11 Q.      Does Mr. Bird have anything to do with drug

12 dealing?

13 A.      He did, yes.

14 Q.      What did Mr. Bird have to do with drug dealing?

15         MR. HALL:   Objection, Your Honor.

16         THE COURT:  Basis?.

17         MR. HALL:   Well, both relevance and scope.  I

18 don't -- Mr. Bird is not on trial here.  What his

19 involvement was and what time period is irrelevant to

20 any issue before this jury.

21         THE COURT:   Overruled.

22         BY MS. GREENBERG:

23 Q.      What did Mr. Bird have to do with drug dealing?

24 A.      Mr. Bird dealt drugs back in the '70s and '80s.

25 He used to have a club and I used to go to the club,

1 and he and I used to talk.

2 Q.      What kind of drugs?

3 A.      Cocaine, as far as I knew.

4 Q.      Did you ever see him with Ms. Martin?

5 A.      Yes. He was Ms. Martin's oldest daughter's

6 fiance at one time.

7 Q.      When did you see him with Ms. Martin?

8 A.      He went to the affair with us to the Carter

9 Baron, and he was -- he went to Ms. Martin's house with

10 her daughter.

11 Q.      This would be the Carter Baron event in 2001?

12 A.      Yes, ma'am.

13 Q.      Did you see Mr. Bird after that?

14 A.      I think it was 2002. It might have been 2001.

15 Q.      Did you see Mr. Bird after that?

16 A.      Yeah. I saw him at Ms. Martin's.

17 Q.      How frequently?

18 A.      I didn't go that frequently, but I went there on

19 an occasion and I saw Mr. Bird there.

20 Q.      Ms. Dobie?

21 A.      Didn't know Ms. Dobie.

22 Q.      Ms. Harden?

23 A.      Didn't know Ms. Harden.

24 Q.      Mr. Harris?

25 A.      Don't know Mr. Harris.

1 Q.      Mr. Lane?

2 A.      Don't know Mr. Lane.

3 Q.      Mr. Martin.  You've talked about him.

4 A.      Yeah.  Mr. Martin is the boyfriend of Ms.

5 Martin.

6 Q.      And your testimony is that Mr. Martin is a drug

7 dealer?

8 A.      That's right.

9 Q.      Did Mr. Martin deal drugs -- to your knowledge,

10 did Mr. Martin deal drugs after you got out of jail

11 from the conviction in 1999?

12 A.      After I got out of jail?

13 Q.      Yes.  Did you know him to deal drugs?

14 A.      I heard that.

15 Q.      Who did you hear that from?

16      MR. HALL:   Objection.

17      Your Honor, that would be hearsay.

18      THE COURT:   Sustained.

19      BY MS. GREENBERG:

20 Q.      Did you ever see Mr. Martin with drugs?

21 A.      No, I didn't see him.

22 Q.      Your testimony on direct examination was that

23 Mr. Martin was a drug dealer and was based on what

24 other people told you.

25 A.      No.  It was based on conversations I had with

1 Mr. Martin.

2 Q.      Based on those conversations with Mr. Martin, do

3 you know when he was dealing drugs?

4 A.      Mr. Martin was dealing drugs ever since I've

5 known Mr. Martin.

6 Q.      Until when?

7 A.      I don't know.

8 Q.      When is the last conversation you had with Mr.

9 Martin about dealing drugs?

10 A.      I didn't have a conversation with him about

11 that.  Mr. Martin would talk about, well, I got to go

12 and make a run to take care of some business.  I took

13 that to mean that he was dealing drugs.

14 Q.      When was the last time you had a conversation

15 with Mr. Martin when he said he was "taking care of

16 business," which you understood that to mean dealing

17 drugs?

18         MR. HALL:   Objection.

19         THE WITNESS:   I don't remember exactly.

20         THE COURT:   Overruled.

21         BY MS. GREENBERG:

22 Q.      2000?  2001?  2002?  2003?  2004?

23 A.      I don't remember.  I did not see him in 2003, so

24 it would have to be before that.

25 Q.      Was it after you got out of jail in Virginia in

1  1999?

2  A.      After I got out of jail?  Of course.

3  Q.      Mr. Walker?

4  A.      I saw Mr. Walker on occasion.

5  Q.      Where did you see Mr. Walker?

6  A.      I saw Mr. Walker driving down the street -- I

7  think it was Ninth Street -- on one occasion.  He had a

8  convertible Jaguar, I believe.

9  Q.      To your knowledge, did Mr. Walker have anything

10 to do with drugs?

11 A.      I don't know Mr. Walker.

12 Q.      I skipped over Mr. Nunn.

13 A.      Larry Nunn?  I did not know him before.

14 Q.      In front of you are transcript books so you can

15 follow along with the calls.  It will be up on the

16 screen.  If you can't see it on the screen, here are

17 some books.  Starting with Page 8 in Book 1.

18         MR. WARD:  I'm sorry.  These are the telephone

19 transcripts?

20         MS. GREENBERG:  Page 8, Book 1.

21         MR. WARD:  Do I need all three of them?

22         MS. GREENBERG:  You do, Mr. Ward.

23         BY MS. GREENBERG:

24 Q.      Do you have that in front of you, sir?

25 A.      Yes, ma'am.

1 Q.     This is the call where you said that you were

2 waiting to get tickets printed to go to a concert with

3 Ms. Martin?

4 A.     I said I was waiting to get tickets printed?

5 Q.     This is the call on direct examination.  Correct

6 me if I'm wrong.  These were relating to tickets that

7 you wanted to go to a concert and that you had to wait

8 for the tickets to get printed; correct?

9 A.     I never talked about having any tickets printed.

10 Q.     Sir, why don't you tell the jury what this call

11 means on Page 8.

12 A.     Do what, now?

13 Q.     What does this call mean?  What were you and Ms.

14 Martin talking about on Page 8?

15 A.     I spoke with Mr- -- I said, yeah.  She said, he

16 says he don't have any printed so I have to wait until

17 I get some printed tomorrow.  That's what she said.  I

18 said, okay.  And she said, okay, good-bye; and I said,

19 thank you.

20 Q.     Why don't you tell the jury, so I don't

21 mischaracterize what you said on direct, what were you

22 and Ms. Martin talking about here?

23 A.     Whenever I called Ms. Martin, I called her in

24 regards to tickets.  She's saying in this transcript

25 here she didn't have any printed.  I said, okay.

1  Q.      So your testimony is that she's in the business
2  of printing tickets for concerts?
3  A.      No.  I'm saying that's what she said, and I said
4  okay.
5  Q.      And your testimony is this is you calling for
6  concert tickets; correct?
7  A.      I'm calling Ms. Martin about going to a concert
8  at her expense whenever she wants to take me.  All of
9  my calls are in regards to that.
10 Q.      Your understanding when she said, he said he
11 don't have any printed, is that she had to wait for the
12 concert tickets to get printed?
13 A.      I didn't know what she meant.  I know what it
14 said was -- what she was saying to me was, no, she did
15 not have any intentions of going to a concert at that
16 time, and that's why I said okay.
17 Q.      You understood that she didn't have any printed
18 to mean that she didn't want to go to a concert.
19 A.      What I understood was that she did not have any
20 tickets to take me to a concert at that time.
21 Q.      Your testimony is this is not a call where you
22 were looking for drugs from Paulette Martin.
23 A.      Exactly.
24 Q.      Instead, she was waiting for some concert
25 tickets to get printed.

1          MR. HALL:   Objection.

2          Asked and answered.

3          THE COURT:   Sustained.

4          BY MS. GREENBERG:

5  Q.     What did you understand "printed" to mean?

6          MR. HALL:   Objection.

7          THE COURT:   Sustained.

8          BY MS. GREENBERG:

9  Q.     Turning to Page 56, still in Book 1.  This is

10 call B384 on March 12, 2004, and Ms. Martin called --

11 answers, hello.  You ask how you're doing.  You says,

12 you're trying to keep it together; and you asked her

13 whether she's heard anything.

14 A.     Right.

15 Q.     You said, huh?  You said, you heard anything?

16 And she said, no, not yet.  And you said, okay.  And

17 she said, hopefully they should be back here tonight or

18 tomorrow.  You said, oh, okay.  And she said, okay.  As

19 soon as I do, I'll call you.  You said, absolutely.

20 And she said that she thanks you for calling, and you

21 hung up.

22          Do you see that?

23 A.     Yes, ma'am.

24 Q.     Who were you referring to -- who did you

25 understand she was referring to when she said, they

1  should be back here tonight or tomorrow?

2  A.     I just took that to mean to call back later and

3  quite possibly we could get together later.

4  Q.     To be more specific, "hopefully, they." Who did

5  you understand "they" to mean?

6  A.     I didn't understand it to mean anything other

7  than the fact that she did not have -- was going to

8  take me to a concert at that particular time. That's

9  what I understood this to mean. No, I'm not going to

10  go ahead and hang out.

11  Q.     So your understanding -- your testimony is that

12  this call is relating to go to a concert also?

13  A.     What I'm saying to you is, I'm calling Ms.

14  Martin about the possibility of going to some sort of

15  affair, and Ms. Martin is saying to me, no, it's not

16  possible now. It's a thing called "jargon."

17  Q.     The phrase, "they should be back here tonight or

18  tomorrow." Did you have any knowledge at that time

19  that Pernell Philpot was making a trip out west?

20  A.     I don't know anything about Mr. Philpot. I

21  didn't know Mr. Philpot.

22  Q.     Turning to Page 72. Paulette Martin answers.

23  This is call B572, for the record, on March 14, 2004.

24        Paulette Martin says, hello. You say, hey,

25  baby, how you doing? You say, I'm all right. All

1 right .  Trying to keep it together .  She said , I

2 haven't heard anything yet .  You said , is that right ?

3 How you feeling ?  She says , I feel fine otherwise .  You

4 say , that's good .  I'm glad to hear that .  And she

5 says , so, hopefully any day .  They say any time now

6 it's due .  And you say , all right .  Right .  Right .

7 Okay , baby .

8        What are you two talking about there , sir ?

9 A.    It's the same thing , Miss.   My interest was to

10 get with Ms. Martin , and the overtures I was making

11 were overtures in that regard .  The way that I normally

12 got with Ms. Martin would be at concerts , to hang out .

13 Q.    So you're saying this call , B572 , "hopefully any

14 day;" "they said any time now it's due" is related to a

15 concert?

16 A.    That's the way I took it .

17 Q.    Did you have any knowledge at this time , on

18 March 14, 2004 , that Mr. Philpot was still out west

19 trying to get heroin ?

20 A.    Let me -- Ms. Greenberg , I did not know Mr.

21 Philpot at all .  I met him one time at Ms. Martin 's.   I

22 did not know anything about the man's activities .  He

23 was eating .  He was a young man .  We had nothing in

24 common .  I had no knowledge of Mr. Philpot 's doing

25 anything .

1 Q.     Just to be clear.  Through any conversation s or

2 any discussion s with anyone , did you have any knowledge

3 that on March 14, 2004 , Mr. Philpot was still out in --

4 on the west coast try ing to get drug s for the

5 organization ?

6        MR. HALL:   Objection .

7        Asked and answered .

8        THE COURT:   Over ruled .

9        THE WITNESS:   I did not know that Mr. Philpot

10 existed on 3/14/04.

11       BY MS. GREENBERG:

12 Q.     So your answer is no?

13 A.     I did not know he existed .

14 Q.     Did you have any knowledge -- I'll ask it again .

15 A.     No , I had no knowledge .

16 Q.     So your testimony is , when -- your understand ing

17 of what Ms. Martin meant by " so hope fully any day; they

18 said any time now it's due," that you were talk ing

19 about a concert ; correct ?

20 A.     No .  What I understood it to mean was that she

21 wasn't say ing , yes , I'm going to take you to see Alesha

22 Keys.  Come by on Friday so we can go .  Anything else

23 was irrelevant .

24 Q.     Just to be clear .  You hadn't gone to a concert

25 with her since 2002; correct ?

1  A.       That is correct .  It was probably more on my

2  part than on her s, because I hadn't been in contact

3  with her .

4  Q.       You hadn't seen her but a couple of time s in

5  early 2003 .

6  A.       That 's correct .

7  Q.       All of these call s we're going over so far all

8  relate d to a concert you want ed to go to.

9          MR. HALL:   Objection .

10          Asked and answered .

11          THE COURT:   Sustained .

12          BY MS. GREENBERG:

13  Q.       If we could turn to Page 137, still in Book 1 .

14  This is a call on March 19, 2004 .  Paulette Martin

15  says , hello .  You say , hey, Sis, how you do in'?  She

16  says , hey, okay .  I'm hanging in there , Bro.  You say ,

17  I can dig it .  You tell me you want to look at those

18  paper s.

19          Do you see that ?

20  A.       Yes, ma'am .

21  Q.       What did you mean by "paper s?"

22  A.       She had been talk ing to me on some -- several

23  occasion s about look ing at some paper s in regards to

24  some sort of project that she had , and that 's what I

25  was talk ing about .

1  Q.      What project was that?

2  A.      She said she had a project she wanted to talk to

3  me about.  I later found out that Ms. Martin was trying

4  to promote some shows.

5  Q.      And your testimony is --

6  A.      I didn't know that at the time.

7  Q.      Through March 19, 2004 to the date of your

8  arrest in June of 2004, you never met her to go get

9  those papers; correct?

10 A.      No, I didn't.

11 Q.      Okay.  And then she said, uh-huh.  And you said,

12 yeah, it was funny.  Try and get over there or

13 whatever, you know, was convenient for you.  And she

14 said, okay.  I have to get them together.   I still

15 haven't heard nothing about the ticket thing yet.

16         And your testimony is that, again, is tickets

17 for a concert?

18 A.      Yes, ma'am.

19 Q.      And you never went to the concert.

20 A.      I never saw her, as I indicated, in 2004.

21 Q.      And you say, oh, is that right?  And she said,

22 not a word.

23         Correct?

24 A.      Yes, ma'am.

25 Q.      And on Page 213 of the transcript book, still in

1 Book 1 -- this is March 26, 2004; correct?

2 A.      Yes, ma'am.

3 Q.      Call B1781, a call from Paulette Martin.  You

4 say, hey, Sis.  She says, hey, Bro, how you doing?  You

5 say, trying to make it.  Heard that.  Anything happen?

6 No, indeed.  And you said, goddamn.

7        Correct?

8 A.      Yes, ma'am.

9 Q.      Goody had something and they messed him up real

10 bad.

11        Do you see that there?

12 A.      Yes, ma'am.

13 Q.      What is your testimony -- what does that relate

14 to?

15 A.      I didn't really know.  That's why I asked the

16 question rhetorically, "is that right?"

17 Q.      And she said, yes.  And then you said, man, it's

18 a mother fucker.  I ain't gonna tell.  And she said, and

19 Philpot down.  And you said, wow.

20        Do you see that there?

21 A.      Yes, ma'am.

22 Q.      "Philpot" meaning Pernell Philpot?

23 A.      I guess that's who she meant, yes.

24 Q.      Well you didn't ask her is that who she meant.

25 You said, wow.

1 A.     I said, wow.  Yes.  I'm surprised at what

2 they're talking about and what's going on.

3 Q.     This relates to Mr. Philpot's arrest in Wyoming

4 by Officer David Chatfield in March of 2004; correct?

5 A.     I don't know what it related to.

6        MR. HALL:   Objection.

7        Basis for knowledge, Judge.

8        THE COURT:   See if he has a basis for it.

9        BY MS. GREENBERG:

10 Q.     Here she's saying, and Philpot down.  She's

11 reporting that to you; correct?

12 A.     She said that to me, yes.

13 Q.     You're acknowledging that; correct?

14 A.     No.  I just said, wow.

15 Q.     You don't ask, what do you mean by that?  Who

16 are you talking about?  You say, wow?

17 A.     No, I didn't ask who you're talking about

18 because I didn't care.

19 Q.      Because you know.

20 A.     Because I didn't care.

21        Mr. Martin:   Objection.

22        Argument.

23        THE COURT:   Overruled.

24        BY MS. GREENBERG:

25 Q.     Because you knew.

1  A.        Because I didn't care.

2  Q.        And then you move on and you're saying -- your

3  testimony is when she said, and Philpot down, you

4  didn't know that Mr. Philpot had been arrested out in

5  Wyoming by Officer Chatfield; correct?

6  A.        Yes, that's correct.

7  Q.        You didn't know he had been arrested at all?

8  A.        I didn't know he had been arrested at all.

9  Q.        And then here we get on, do you have anymore

10 from Julio.

11           Who is Julio?

12 A.        Julio is Emilio Echarte.

13 Q.        This is somebody you met on just a few occasions

14 back in 2001-2002; correct?

15 A.        That's correct.

16 Q.        And you're asking her whether or not she has

17 anymore from Julio; correct?

18 A.        That's right.

19           MR. HALL:   Objection.

20           Your Honor, that mischaracterizes what was

21 there.   I don't believe that was an exact quote.

22           THE COURT:   Rephrase your question.

23           BY MS. GREENBERG:

24 Q.        Mr. Whiting:   Do you have anymore from Julio?

25           Correct?   Is that what you say to her?

1  A.      That's what the transcript says.

2  Q.      So you're inquiring about Mr. Echarte.

3  A.      Yes.  She had complained constantly about Mr.

4  Echarte, and I said to her, have you heard anymore

5  about him?

6  Q.      He had been arrested in Florida; is that

7  correct?

8  A.      I didn't know what had happened to Mr. Echarte,

9  and I didn't really rare care.

10  Q.      You're inquiring about him here?

11  A.      I was inquiring to Ms. Martin in the context of,

12  has she been worried anymore.

13  Q.      And here she talks to you about him going to

14  court and getting 30 to life and they dropped it from

15  ten to life; correct?

16  A.      Yes.  Yes.

17  Q.      And you explain to her here about a quarter of

18  the way down that they charged him because the feds

19  don't have indeterminate sentences.

20         You told her about that; right?

21  A.      Yes, because she said to me -- it occurred to me

22  that this was an indeterminate sentence.  I said, oh,

23  wow.  It must be the state, because the feds don't have

24  indeterminate sentences.

25  Q.      Just to be clear.  In this call, B1781, you're

1 talking to Ms. Martin about Goody;    is that correct?

2 A.      No.

3 Q.      Right here, Goody --

4        MR. MONTEMARANO:    Objection.

5        THE COURT:   Sustained.

6        BY MS. GREENBERG:

7 Q.      And Julio means Mr. Echarte; is that correct?

8        MR. MONTEMARANO:   Asked and answered.

9        THE COURT:   Sustained.

10        BY MS. GREENBERG:

11 Q.      Turning to page 250.

12        Is that a conversation between you and Ms.

13 Martin?

14        Page 250.

15 A.      Yes, ma'am.

16 Q.      And you say, yeah, I'm over here.  I'm just

17 wondering, you know.  And she said, Mm-hmm.  And you

18 say, yeah.  And she says, I ain't forgot you.  As soon

19 as I hear something, you will be one of the first I

20 call.  It's like that, Brother.  It's rough.  And you

21 reply, I love you, babe.  And she said, okay.  If you

22 hear anything, you let me know.  You say, I most

23 certainly will.

24        What are you two talking about there?

25 A.      I'm just making conversation with the person

1 that I sincerely care about.

2 Q.     What are you talking about there?

3        MR. HALL:   Objection.

4        Asked and answered.

5        THE COURT:   Hasn't he already answered that?

6        MS. GREENBERG:   He said he was making

7 conversation, Your Honor.  I'm asking what he was

8 talking about in the conversation.

9        THE COURT:   All right.  Overruled.

10       THE WITNESS:   I'm saying to a person that I care

11 about, hey, how you doing?  What's happening?  That's

12 just the way I talk to Ms. Martin.

13       BY MS. GREENBERG:

14 Q.     Let me ask you specifically then.  Going to Ms.

15 Martin saying, I ain't forgot you.  As soon as I hear

16 something, you will be one of the first I call.

17       What did you understand that to mean?

18 A.     I understood her to mean that if she hangs out,

19 she would get in contact with me.

20 Q.     If she hangs out, she will get in contact with

21 you?

22 A.     Yes, ma'am.  If she goes some place, you know,

23 and she's going to hang out, she will get in contact

24 with me.

25 Q.     What did you understand her to mean when she

1 said , if I hear something ?  Hear what ?

2 A.      Hear about --

3        MR. MONTEMARANO :   Asked and answered , Your

4 Honor .

5        THE COURT:   Overruled .

6        THE WITNESS:   Hear about going to some affair .

7        BY MS. GREENBERG:

8 Q.      What affair ?

9 A.      Any affair that Ms. Martin wanted to choose , Ms.

10 Greenberg .

11 Q.      When she says , it's like that , Brother , it's

12 rough ; what does she mean by, "it's rough ?"

13        MR. HALL:   Objection .

14        Basis for knowledge .

15        BY MS. GREENBERG:

16 Q.      What did you understand it to mean when she said

17 to you it was rough ?

18 A.      She wasn't ready to go out and -- go hang out at

19 that particular time .

20 Q.      Sir , through your time in the drug business , you

21 knew a lot of dealer/suppliers ; correct ?

22 A.      I knew some .

23 Q.      What was the smallest amount that you ever

24 dealt ?

25 A.      Probably an ounce , and that was really just to

1  let somebody know what I had when I was really dealing.

2  Q.     An ounce of what?

3  A.     It doesn't -- cocaine. Heroin.

4  Q.     Did you deal both types of drugs?

5  A.     Pardon me?

6  Q.     Did you deal both types of drugs?

7  A.     At one time.

8  Q.     Did you use both types of drugs?

9  A.     At one time.

10  Q.     When is the last time you used drugs?

11  A.     Oh, my goodness. Sometime in '03.

12  Q.     What is the largest amount of drugs that you

13  got?

14         MR. HALL:   Objection.

15         Beyond the scope.

16         THE COURT:   Overruled.

17         THE WITNESS:    The largest amount that I've

18  gotten?

19         BY MS. GREENBERG:

20  Q.     Yes, sir.

21  A.     I don't know.  Multiple keys.

22  Q.     How many kilograms?

23  A.     I don't know.  Four or five, something like

24  that.

25  Q.     Four or five what?

1  A.       Four or five keys.

2  Q.       Of what?

3  A.       Of heroin.

4  Q.       When is the last time you got a shipment of

5  heroin or cocaine?

6  A.       It was probably in '91.

7  Q.       When is the last time you talked to one of your

8  sources of supply for cocaine?

9  A.       I haven't talked to one since about '90.

10  Q.       I'm sorry?

11  A.       '90.

12  Q.       How about heroin?  When is the last time you

13  talked to the last source of supply for heroin?

14  A.       '90-91.

15  Q.       And the individuals that you met that supplied

16  you for the situation in Virginia in 1994, Mr.

17  Phillips and Mr. Riley.  Where did you meet them?

18  A.       I met Mr. Phillips when I was in Mexico.

19  Q.       In what -- what context?

20  A.       He was at Santa Monica.

21  Q.       In the jail with you?

22  A.       Yes, ma'am.

23  Q.       And Mr. Riley?

24  A.       I met Mr. Riley in San Diego.

25  Q.       In what context?

1 A.      He was in the FCI.

2 Q.      In the jail with you?

3 A.      Yes, ma'am.

4 Q.      Did you meet any heroin suppliers when you were

5 in jail for your Eastern District of Virginia charge?

6         MR. HALL:   Objection, Your Honor.

7         THE COURT:   Sustained.

8         BY MS. GREENBERG:

9 Q.      Did you know any dealers -- heroin or cocaine

10 dealers when you got out of jail in 1999?

11        MR. HALL:   Objection.

12        THE COURT:   Overruled.

13        THE WITNESS:   No.

14        BY MS. GREENBERG:

15 Q.      But you were using drugs when you got out of

16 jail in 1999.

17 A.      No, not in 1999.

18 Q.      2000?

19 A.      Maybe the latter part of 2000.   Maybe.

20 Q.      Did you get drugs from anyone else besides Ms.

21 Martin?

22 A.      Yes.

23 Q.      Who did you get drugs from?

24 A.      I got drugs from over on the streets of

25 Baltimore City.

1  Q.       How often?

2  A.       Not that often.

3  Q.       How often?

4  A.       Every once in a while.

5  Q.       What do you mean by, "every once in a while?"

6  A.       Once every three or four months or something

7  like that when the urge hit me.

8  Q.       How much would you buy?

9  A.       I would buy a $10 thing of rock or $20 worth of

10 powder cocaine.

11 Q.       So you used crack?

12 A.       I've used a rock, yes.

13 Q.       Have you sold crack?

14 A.       No, ma'am.

15 Q.       In connection with people that you can name.

16 Besides picking drugs up on the street, and besides Ms.

17 Martin, did you get user quantities of drugs from

18 anyone else besides Ms. Martin or the people that you

19 met on the streets of Baltimore?

20 A.       No, ma'am.

21 Q.       Your testimony is that you didn't know the

22 source of supply after you got out of jail in 1999?

23 A.       I ceased and desisted from that -- all that

24 activity in that regard.

25 Q.       You're a drug dealer from 1968 until you went to

1  jail in 1994, but you stopped in 1999; is that correct?

2  A.      There is a thing called "change," Ms. Greenberg.

3  Q.      That's when you changed?  You stopped in 1999?

4  A.      Yes.  I had a "on the road to Damascus" type of

5  conversion.  I went from Saul to being Paul.

6  Q.      If I can ask you to turn to Page 386 of Book 2

7  of your transcript Book H.

8  A.      What page was that, Ms. Greenberg?

9  Q.      Page 386.  It's Call B4226.

10         Do have that in front of you, sir?

11 A.      Yes, ma'am.

12 Q.      Why don't we go ahead and play that call,

13 Detective Eveler?

14         (Recording begins playing at 11:22 a.m.)

15         (Recording stops playing at 11:23 a.m.)

16         BY MS. GREENBERG:

17 Q.      That's you and Ms. Martin talking on the phone?

18 A.      Yes, ma'am.

19 Q.      That's April 25, 2004?

20 A.      Yes, ma'am.

21 Q.      Just to be clear.  You were still driving the

22 Jaguar that she helped you purchase?

23 A.      Yes, ma'am.

24 Q.      The gray-colored Jaguar?

25 A.      Yes, ma'am.

1 Q.      With D. C. tags?

2 A.      Yes, ma'am.

3 Q.      You still owed her $11,000 for that car?

4 A.      Yes, ma'am.

5 Q.      She said to you, I don't have no tickets now?

6 A.      Yes, ma'am.

7 Q.      You're saying that's for a concert?

8 A.      Yes, ma'am.

9 Q.      And then you're going to help her resolve the

10 fact that she doesn't have tickets for a concert?

11 A.      That's correct.

12 Q.      And she said that she was waiting to hear about

13 that; correct?

14 A.      Yes, ma'am.

15         Can I explain what I meant?

16 Q.      Sure.

17 A.      Thank you.

18         I had been frustrated by the fact that Ms.

19 Martin had not purchased any tickets to take me and

20 others to concerts, so I had gotten in contact with a

21 friend of mine, a fellow named Mickey Craig, who's from

22 South Boston, Virginia, but he's been in Baltimore for

23 some time, to try to get in contact with Chris

24 Robinson, who was a promoter of videos. I thought he

25 might be able to get a couple of complementary tickets

1   so we might be able to go see Will Downing at the

2   Ronald Reagan building on May 9.    But Mickey was unable

3   to secure the tickets, and that's what I was talking

4   about.

5   Q.      Paulette Martin had the money to buy the

6   tickets, didn't she?

7   A.      Yeah, but I wanted to treat Ms. Martin on that

8   occasion.

9   Q.      That's what you were saying?  You were going to

10  resolve the problem that she couldn't get any tickets

11  by going and getting complimentary tickets?

12  A.      Yes, ma'am.

13  Q.      That's your testimony of what you guys meant by

14  "tickets?"

15  A.      Yes.

16  Q.      You didn't tell her what type of concert?

17  A.      No, I didn't.  I wanted to surprise her.

18  Q.      You didn't tell her where it was?

19  A.      No, ma'am.

20  Q.      You said you had to go over there to talk to her

21  about resolving it?

22  A.      Had to go where?

23  Q.      You had to come over -- you had to go over there

24  to talk to -- see here?   She says at the end, see you

25  here?

1  A.      Yeah.  I was going to surprise her if I got the

2  tickets, but I didn't get the tickets so I didn't go

3  over there.

4  Q.      This is when you haven't gone to a concert  in

5  about two years with Ms. Martin; is that correct?

6  A.      That's true.

7  Q.      Your testimony is that even though you talked

8  about how you were going to resolve the problem  when

9  she said she didn't have any ticket, on April 25, 2004,

10  that you didn't go over there that day; correct?

11  A.      That's correct.

12  Q.      And you specifically  said, on direct

13  examination, that Sergeant Sakala was mistaken when he

14  said that you went there; correct?

15  A.      He was wrong.

16  Q.      He was wrong.  The same way that Mr. Echarte  was

17  wrong?

18  A.      That's correct.

19  Q.      The way same way the Mexican police were wrong?

20  A.      Well, Ms. Greenberg, I think that it's common

21  knowledge  about the corruptibility  of the Mexican

22  police.

23  Q.      But you had a trial and an appeal  in that case;

24  correct, sir?

25  A.      Pardon  me?

1 Q.      You had a trial and an appeal ?

2 A.      Yes .

3 Q.      Your testimony today is the Mexican police were

4 wrong ?

5 A.      I'm saying the Mexican police are corrupt , and

6 that's a common knowledge .

7 Q.      I'm just trying to clear up what you said .   You

8 said Sergeant Sakala was incorrect ; you said Mr.

9 Echarte was incorrect , and you also said the Mexican

10 police were incorrect .   Is that your testimony ?

11        MR. MONTEMARANO:    Asked and answered , Your

12 Honor .

13        MR. HALL:   Objection .

14        THE COURT:   Sustained .

15        BY MS. GREENBERG:

16 Q.      Just to be clear .   The Mexican police were --

17        MR. MONTEMARANO:    Objection .

18        Asked and answered Your Honor .

19        MS. GREENBERG:    It's been asked a number of

20 times , Your Honor .   I don't think   it's been answered

21 yet .

22        THE COURT:    I sustained the objection .

23        BY MS. GREENBERG:

24 Q.      Sir , you testified that Sergeant Sakala was

25 mistaken .   Is that as to the fact that you went over to

1  Ms. Martin's and the facts that you were talking about

2  drugs in this call, both?

3          MR. HALL:   Objection.

4          I think that's been asked and answered, also.

5          THE COURT:   Overruled.

6          BY MS. GREENBERG:

7  Q.      Both aspects of that call?

8  A.      You know, Ms. Greenberg, the only thing I can

9  say is that, you know, the pole cameras were working.

10 If I had gone there, they could have seen me.

11         No, I was not talking about anything other than

12 tickets.

13 Q.      So you're saying Sergeant Sakala is wrong on

14 both facts?

15 A.      I'm saying --

16         MR. HALL:   Objection.

17         THE WITNESS:   -- the pole cameras can verify who

18 is right and who is wrong.

19         MS. GREENBERG:   Your Honor it's been asked a

20 number of times and it hasn't been answered.   I can

21 either ask the question again --

22         THE WITNESS:   He's wrong.

23         MS. GREENBERG:   -- or the court can --

24         THE COURT:   He answered the question.   That's

25 the best you can get.

1          MS. GREENBERG:   Thank you, Your Honor.

2          BY MS. GREENBERG:

3  Q.      Now, we just heard this call.  And just to be

4  clear for the record, this is April 25, 2004; correct?

5  A.      Yes, ma'am.

6  Q.      At 3:23 p.m; correct?

7  A.      Yes, ma'am.

8  Q.      If I could have the next miscellaneous  number,

9  please.

10         Video 23, Your Honor, relating to Tape 74 on

11 April 25, 2004.  I'd like to play it for the jury at

12 this time.

13         MR. WARD:   I'm sorry.  What was it again, Ms.

14 Greenberg?

15         MS. GREENBERG:   Video 23.

16         Ms. Holmes, if you could start   this tape at

17 7:35, please.

18               (Ms. Holmes indicating.)

19         BY MS. GREENBERG:

20 Q.      You mentioned the pole camera, sir; is that

21 correct?

22 A.      Yes, I did.

23 Q.      Watch this.  This is April 25 at 7:34 p.m.

24         Stop it right there, or pause it.   It doesn't

25 pause?  Play that.  If we could rewind it a little bit,

1 please.

2          Do you see that car, sir?

3 A.      Yes, I see the car.

4 Q.      This is at 7:35? And it's one of those fast

5 tapes, so it's going to go really fast, so watch very

6 carefully.

7          For the record, we're at 7:35?

8 A.      That's not me.

9 Q.      Your testimony is, that's not you?

10 A.      That's not me.  I don't know who that is.  I

11 didn't see Ms. Martin in '04.

12 Q.      Why don't we just go ahead and play that?

13          Going into the house.  Ms. Martin's house; is

14 that correct?

15 A.      I guess that's --

16 Q.      The person you say is not you is going into the

17 side door of Ms. Martin's house; is that correct?

18 A.      I'm saying it's not me.

19 Q.      The person that exited that car went into the

20 side door; is that correct, sir?

21 A.      That person did, yes.

22 Q.      I'm sorry.  I couldn't hear you over Mr.

23 Montemarano sneezing.

24 A.      That person did, yes.

25 Q.      If we could fast forward to about 8:10.  That's

1  about 35 minutes from when we saw this -- 8:10 is about

2  35 minutes from when we saw this camera come up.

3         MR. MONTEMARANO:   Is that a question, Your

4  Honor?

5         BY MS. GREENBERG:

6  Q.    If you could back it up.  The record is saying

7  8:10; is that correct, sir?

8  A.    The record is saying that, yes.

9  Q.    8:10.  And do you observe a person come out,

10 puts a bag in the passenger seat of the car and get

11 into the driver's side?

12        Do you see that there?

13 A.    I see the person doing something, yes.

14 Q.    Is that you?

15 A.    No, that's not me.

16 Q.    That's at 8:11:34, is that correct, on the

17 video?

18 A.    That's what it says, yes.

19 Q.    And then if we could continue.  The person

20 closes the passenger door and gets in the driver's

21 side; is that correct?

22 A.    Yes.

23 Q.    Now, the video stops at 11:31 a.m.

24        If you could turn your transcript book to Page

25 B389.  If could play call B4438.

1                    (Recording begins playing at 11:31 a.m.)

2                    (Recording stops playing   at 11:31 a.m.)

3          BY MS. GREENBERG:

4  Q.      For the record, on the transcript book, that's

5  April 25 of 2004 at 8:11 p.m; is that correct?

6  A.      What page is this on?

7  Q.      389.  It's call B4438.

8          And if we could play that brief call again.

9          (Recording starts playing at 11:32 a.m.)

10         (Recording stops playing   at 11:32 a.m.)

11         BY MS. GREENBERG:

12 Q.      Did you follow along with the transcript that

13 time, sir?

14 A.      Yes, ma'am, I did.

15 Q.      That's a call on April 25, 2004; correct --

16 A.      Yes.

17 Q.      -- at 8:11 p.m.?

18 A.      Yes.

19 Q.      And that's Mr. Martin and Ms. Martin -- Paulette

20 Martin; correct?

21 A.      Yes, ma'am.

22 Q.      She said, Reece just left?

23 A.      Yeah.

24         MS. GREENBERG:   No further questions, Your

25 Honor.

1        THE COURT:   All right.   Ladies and gentlemen,

2  we'll take a 15-minute recess and resume at quarter of

3  12.

4                   (Jury excused at  11:33 a.m.)

5                   (Off the record at 11:33 a.m.)

6                   (On the record at 11:50 a.m.)

7        THE COURT:   Counsel, before the jury is brought

8  in, I wanted to tell you, unless you have a better idea

9  and you want to talk me into it, that I intend to give

10  a limiting instruction to the jury now about the nature

11  of the materials brought out on cross-examination by

12  the government.

13        MR. HALL:   Your Honor, that's fine.   I just will

14  tell the court that I am going to have a brief redirect

15  of my client.

16        THE COURT:   If you want.   It's your call.   I can

17  wait until he's finished.

18        MS. GREENBERG:   Judge, what is the limiting

19  instruction?   Not all my cross was 404(b).

20        THE COURT:   No, no, no.   What I intend to tell

21  them --

22        MS. GREENBERG:   I think I went into the

23  transcript book a bit.

24        THE COURT:   No, no, no.   What I intend to do is

25  to tell them that the fact of these convictions was

1  admitted  under  a  rule  which  permit s  the  fact  of  those

2  convictions  to  be  introduced  -- the  fact  for  the

3  purpose  of  attacking  the  credibility  of  a  witness  and

4  that  I  have  ruled  and  concluded  that  that  examination

5  was  appropriate  to  be  before  the  jury  for  that  purpose .

6           Then  I  will  point  out  to  them  that  during

7  cross-examination  there  was  inquiry  made  in  certain

8  area s  with  regard  to  the  under lying  fact s  pertain ing  to

9  some  of  those  convictions, and  then  I  will  give  them  a

10 404(b)  limiting  instruction  on  what  those  additional

11 fact s  are .

12           MR.  HALL:   Fine , Your  Honor .

13           MR.  WARD:   Your  Honor , this  is  one  of  -- the

14 exhibition  that  I  just  witness ed  bring s  up  another

15 point  that  I  wish  to  raise  with  respect  to  my  client .

16 I  expect  that  she  will  be  testify ing , and  we  will

17 obvious ly  want  to  do  the  qualification  out  of  the

18 presence  of  the  jury .

19           Number  two , I'm  going  to  ask  the  court , under

20 Rule  609 , to  conduct  a  hear ing  out  of  the  jury 's

21 presence  and  make  a  determination  as  to  what  is

22 admissible  and  how  far  the  government  is  going  to  be

23 permitted  to  go  before  she  take s  the  stand  so  that  she

24 can  also  factor  that  into  her  consideration .  I  intend

25 to  bring  certain  -- I  intend  to  bring  her  aspect s  of

1 her witness -- her prior record out on direct.

2          THE COURT:   Mr. Ward, I don't want to cut you

3 off, but I can address that when the jury is not

4 waiting.

5          MR. WARD:   Sure.

6          THE COURT:   I will be glad to address that with

7 you.

8          MR. WARD:   I wanted to alert the court in case

9 we finish up.

10          THE COURT:   What I intend to do is take a one

11 hour lunch break today.   We can make it 45 minutes

12 while the jury is out for that one hour.

13          MS. GREENBERG:   Judge, it would be helpful to

14 know -- we still don't know who the next witness is.

15          MR. HALL:   I have my character witness next.

16          MS. GREENBERG:   Is Mr. Goodwin going to testify,

17 or Ms. Dobie?

18          THE COURT:   Is Mr. Goodwin ready to go?

19          MR. MARTIN:   I visited with the marshals last

20 night and I was told the earliest the dentist would

21 come to Prince George's County was Monday, and I'm

22 hopeful they will be able to move Mr. Goodwin to the

23 front of the line.

24          I asked Mr. Goodwin a few minutes ago as he came

25 back in if he thought he was going to be able to

1  testify today, and his response was no because his

2  mouth hurts too much and the bridge still has not been

3  replaced.  It's fitting in his mouth.  He just pushed

4  it up there, but it doesn't stay.

5       THE COURT:  Mr. Martin, all I will tell you is

6  the marshals have advised me that this is not a new

7  problem and that he's complained about it before and

8  it has never been interfered with his ability to speak

9  before, and he's not complained of pain, including

10 during lunch yesterday.

11      I will talk to the marshals' office about a

12 dental examination.  He needs to understand that if he

13 wants to testify, he needs to be prepared to testify.

14      MR. MARTIN:  I think he's heard the court, and

15 that's been relayed to him.

16      THE COURT:  Let's bring the jury in, and I will

17 give a cautionary instruction at your --

18      MR. HALL:  This would be an appropriate time,

19 Your Honor.

20      THE COURT:  Now?

21      MR. HALL:  Yes.

22      THE COURT:  Fine.

23          (Witness resumes the stand.)

24          (Jury returns at 11:56 a.m.)

25      THE COURT:  Ladies and gentlemen, before we

1  proceed with the redirect examination of this witness ,

2  I want to review a couple of matter s with you

3  pertain ing to the nature of the evidence that you've

4  been hear ing regard ing Mr. Whiting .

5         First of all , you have heard evidence brought

6  out about certain prior convictions of this witness of

7  crime s .  Such evidence is admissible for the purpose of

8  attack ing the credibility of a witness , and it has been

9  received and permitted as evidence for that purpose .

10        The under lying fact s of those convictions are

11  not admissible under that rule .  They are , however ,

12  matter s which may be considered under the rubric that I

13  have given you in some previous limiting instruction s.

14  By that I mean that when the prosecutor was permitted

15  to ask question s concern ing some of the under lying

16  fact s pertain ing to those convictions , those question s

17  were admitted by me but for a different and limited

18  purpose .

19        Our evidence rule s state , and I quote , that

20  evidence of other crime s, wrong s or act s is not

21  admissible to prove the character of a person in order

22  to show action and conformity there with .  As I've said

23  before , simply put : This language of the rule mean s

24  that evidence of other crime s, wrong s or act s may not

25  be use d to demonstrate that a person has a certain

1 character and that because of that character such

2 person is likely to have committed the offense charged

3 in this case.

4        The evidence rules provide, however, that such

5 evidence, and I quote, may be admissible for other

6 purposes such as proof of motive, opportunity, intent,

7 preparation, plan, knowledge, identity or absence of

8 mistake or accident.  I have ruled that the examination

9 of this witness concerning some of the underlying facts

10 pertaining to those convictions is admissible but only

11 for these other limited purposes.  Accordingly, I

12 instruct you that you may consider this evidence but

13 only for the limited purposes that I have just

14 described.

15        You may proceed, Mr. Hall.

16        MR. HALL:  Thank you, Your Honor.

17                **REDIRECT EXAMINATION**

18        BY MR. HALL:

19 Q.    Mr. Whiting, I'm going to ask you to view the

20 videotape again that you were shown a few minutes ago.

21        (Videotape begins playing at 11:58 a.m.)

22        BY MR. HALL:

23 Q.    Can you see it?

24 A.    Yes, sir.

25        MR. HALL:  Your Honor, the assistance of the

1  government -- I'm going to ask them to fast forward to

2  the point where the gentleman in question came out so

3  we don't have to watch all the silence.

4          Stop now.

5                (Video tape stops playing  at 12:00 p.m.)

6          BY MR. HALL:

7  Q.      Mr. Whiting, did you have an opportunity to look

8  at that video again?

9  A.      Yes, sir.

10 Q.      Let me ask you this.  Did you see the vehicle?

11 A.      Yes, sir, I saw it.

12 Q.      How would that vehicle compare to the vehicle

13 that you owned?

14 A.      I couldn't tell what type of vehicle that was,

15 to be truthful with you.

16 Q.      All right.  Could you see the tag number?

17 A.      I saw no tag number.

18 Q.      Did you see the individual  that walked in and

19 out of the house?

20 A.      I saw a person, but who it was I don't know.

21 Q.      Okay.  You indicated that person was not you; is

22 that correct?

23 A.      That's correct.

24 Q.      Let me ask you this.  To be blunt at the moment,

25 would it be fair to describe that you are either bald

1   or shaved your head; is that correct?

2   A.      At all times since the last 30-some years.

3   Q.      That's what I was going to ask you.

4           Has your physical appearance been the same for

5   the last -- for a lengthy period of time?

6   A.      Yes, sir.

7   Q.      What was your physical appearance during that

8   April 25-26 time period of 2004 when we saw that video?

9   A.      Bald.

10  Q.      Bald?

11  A.      All bald.

12  Q.      All right.  Sir, let me ask you this.  There was

13  a tape being played earlier concerning one of your

14  calls in which you asked about Mr. Echarte.

15          Do you recall that tape-recorded phone call?

16  A.      Yes, sir.

17  Q.      Okay.  Tell the ladies and gentlemen of the jury

18  why is it you would care about whether Mr. Echarte was

19  around?

20  A.      Because Ms. Martin cared.  That's the only

21  reason.

22  Q.      How would you describe your relationship with

23  Ms. Martin insofar as discussing her, shall we say,

24  love life?

25  A.      Ms. Martin constantly complained to me about the

1  fact that she couldn't find the man that she wanted to

2  find, and that was my function, I thought, to console

3  her in that regard.

4  Q.      Okay.  And during the time period that she had a

5  relationship with Mr. Martin, were there ever any times

6  in which she strayed from Mr. Martin to anyone else?

7  A.      Yes, sir.

8  Q.      How often?  That you knew of.

9  A.      I knew of at least twice.

10  Q.      Okay.  And one of those would be with Mr.

11  Echarte; right?

12  A.      Yes, sir.

13  Q.      The government asked you a number of questions

14  concerning your previous convictions, and I want to ask

15  you -- and the government created a chart back here.

16          MS. GREENBERG:  It's got a number, Mr. Hall, on

17  the top.

18          MR. HALL:  Excuse me, counsel.

19          MS. GREENBERG:  It's got a number, for the

20  record, up on top.

21          BY MR. HALL:

22  Q.      It has a number of CH-15.

23          I want to ask you about your 1968 conviction for

24  marijuana.

25  A.      Yes, sir.

1 Q.      That was in the state of Texas; is that right?

2 A.      Yes, sir.

3 Q.      What was your role in that case?

4 A.      I was a passenger in a car with Rudolph Cook.

5 Rudolph Cook had made the deal with this guy named

6 Willie Gardner.  Willie Gardner  knew Jose Palmer.  I

7 was riding with Mr. Cook, and we went across the bridge

8 and we got stopped.

9 Q.      The purpose of it was smuggling; is that right?

10 A.      Yes, sir.

11 Q.      In regard to that particular case.  Who, if

12 anyone from this case, did you ever see in Ms. Martin's

13 house?

14 A.      No one.

15 Q.      All right.  Now let me ask you -- in reference

16 to the 1973 conviction you had for heroin in Baltimore

17 -- in federal court in Baltimore.

18         Who in that case ever had any relationship  to

19 Ms. Martin that you knew of?

20 A.      Nobody.

21 Q.      All right.  How about your conviction in Mexico

22 in 1984? Was there anyone involved in that case that

23 had anything to do with Ms. Martin during the time

24 period of this matter?

25 A.      No, sir.

1  Q.      All right .   How about  the  1994  conviction   you

2  had  in  the  Eastern   District   of  Virginia ?   Anyone   in

3  that  case  involve d  with  Ms.  Martin   that  you  knew  of ?

4  A.      No, sir .

5  Q.      Let  me  ask  you  this .   Counsel   asked  you  a  number

6  of  question s  concern ing  the  phone  call s  that  were

7  play ed  during  the  course  of  this  trial .   The  occasion s

8  in  which  you  were  speak ing  to  Ms.  Martin   concern ing

9  ticket s.   You  testifi ed  you  were  actual ly  try ing  to  get

10  ticket s; is  that  correct ?

11  A.      I  was  hop ing  that  she  would  purchase   ticket s  for

12  us  to  go  to  something .

13  Q.      All right .   And  you  also  hope d  for  something

14  else , didn't  you ?

15  A.      Yes, sir .

16  Q.      What  did  you  hope  for ?

17  A.      I  hope d  that  when  we  went  on  these  affair s  she

18  would  probably   provide   some  sort  of  cocaine  so  we  could

19  enjoy  ourselves .

20  Q.      Were  you  hop ing  for  something   else ?

21  A.      Probably   some  sort  of  liaison  with  Ms.  Martin .

22  Q.      Okay .   By  that  you  mean  a  sexual   liaison ;

23  correct ?

24  A.      Yes .

25  Q.      Just  to  make  it  absolute ly  clear , because   we

1  can't have too much information about the -- your

2  jaguars.  The --

3          MS. GREENBERG:   Objection.

4          BY MR. HALL:

5  Q.     I'll withdraw that.

6          The Jaguar that you borrowed the money from Ms.

7  Martin.  For what model was it?

8  A.     It was an XJ-6 four-door.

9  Q.     An XJ-6 four-door?

10 A.     Yes, sir.

11 Q.     It was gray?

12 A.     Silver -- grayish blue.

13 Q.     Grayish blue?

14         And the one that you had during the time period

15 when you were arrested in 1994.  What model was that?

16 A.     That's an XJ-S two-door.  It was burgundy.

17         MR. HALL:   Okay.  No further questions.

18         THE COURT:   Anything further?

19         MR. MONTEMARANO:   If I may, Your Honor?

20         THE COURT:   All right.

21         MR. MONTEMARANO:   Thank you.

22         THE COURT:   With limits.

23                    **RECROSS EXAMINATION**

24         BY MR. MONTEMARANO:

25 Q.     I'd like to clarify a couple of things, Mr.

1 Whiting , if I could , please .

2          You were arrested in Virginia in 1994; correct ,

3 sir?

4 A.     Yes, sir .

5 Q.     As a result , you did dime time until about '99;

6 correct , sir?

7 A.     Yes .

8 Q.     You heard evidence here at the trial , and Ms.

9 Greenberg asked you some question s about Ms. Martin 's

10 arrest in 1994; correct , sir?

11 A.     Yes, sir .

12 Q.     And at that time , you were friends ; correct ,

13 sir?

14 A.     Yeah , we were friends .

15         MS. GREENBERG:   I'm going to object to the

16 continued leading .

17         THE COURT:   Over ruled .

18         BY MR. MONTEMARANO:

19 Q.     You heard the evidence . Was Ms. Martin

20 convict ed in 1994 of anything ?

21 A.     I don't have the slightest idea . I was not

22 really in contact with Ms. Martin in 1994. When I say

23 we're friends , we're friends because we have been

24 friends and our friendship continued , but I was moving

25 in other circle s at that time .

1          MR. MONTEMARANO:    Okay.   No further  questions.

2 Thank you.

3          MR. MARTIN:   Mr. Goodwin  has  no  questions, Your

4 Honor.

5          MR. HALL:   Obviously --

6          THE COURT:    Any recross?

7          MS. GREENBERG:    Briefly, Your Honor.

8                    **RECROSS EXAMINATION**

9          BY MS. GREENBERG:

10 Q.      Sir, Mr. Hall had asked you about Mr. Echarte

11 and Julio, the reference in the phone calls; correct?

12 A.      Yes, ma'am.

13 Q.      You said on redirect you were interested in  Mr.

14 Echarte being out of the picture because of your

15 interest in Ms. Martin; correct?

16 A.      No.  I said I was concerned  about her concerns

17 about Mr. Echarte.

18 Q.      But he had been gone from this area since about

19 2002; correct?

20 A.      Yes, I think so.

21 Q.      And living down in Florida?

22 A.      I think so.

23 Q.      And these conversations that you're having with

24 her are in 2004?

25 A.      Yes.

1 Q.      Relating to Julio, which is Mr. Echarte?

2 A.      Yes, ma'am.

3 Q.      And the call that we went over wasn't the only

4 call that you had with Ms. Martin about Julio; correct?

5 A.      What's this now?

6 Q.      The call that we went over on cross-examination

7 wasn't the only call that you had with Ms. Martin about

8 Julio; correct?

9 A.      I don't remember.

10 Q.      Why don't you turn to Page 84 of the transcript

11 book?

12 A.      Book 1?

13 Q.      Book 1.

14         Let me know when you have it.

15 A.      I've got it.

16 Q.      This is a call that you're having with Ms.

17 Martin on or about March 16 of 2004; correct?

18 A.      Yes, ma'am.

19 Q.      It's between you and Ms. Martin?

20 A.      Yes, ma'am.

21         MR. HALL:  Your Honor, I'm going to object.  I

22 didn't ask about this phone call.

23         MS. GREENBERG:   He asked about Julio, Your

24 Honor.

25         MR. HALL:  I asked about Julio in reference  to a

1 specific phone call.

2          THE COURT: Overruled.

3          BY MS. GREENBERG:

4 Q.      You're talking to Ms. Martin; correct?

5 A.      Yes, ma'am.

6 Q.      About somebody you haven't seen since 2002?

7 A.      Yes, ma'am.

8 Q.      And she tells you, about three quarters of the

9 way down, at the beginning of the phone call, that

10 Julio went to court yesterday; correct?

11 A.      Wait a minute. Oh, yes, ma'am.

12 Q.      And you say, oh, yeah? And she said, they were

13 going to give him 30 to life, but they broke it down to

14 ten to life.

15          Correct?

16 A.      Yes, ma'am.

17 Q.      And you say, over that nonsense?

18          Correct?

19 A.      Yes, ma'am.

20 Q.      What did you mean by that? What "nonsense?"

21 A.      I just was responding to what Ms. Martin said.

22 Q.      About the 30 to life?

23 A.      Yeah. I had talked -- she and I had talked, and

24 she was saying that it was something minor. Then I

25 said, some minor nonsense.

1 Q.      What was the minor thing?

2 A.      I don't know what it was.  She said something

3 about him being arrested for a, I think, PCP or

4 something to that nature.

5 Q.      So, the nonsense refers to PCP charges?

6 A.      Yeah.

7 Q.      And you say, that's tragic, man?

8 A.      Yeah, because I didn't realize that it carried

9 that kind of time.

10 Q.      And then you offer to her, if you talk to anyone

11 down there ask them to send the paperwork and I'll take

12 a look at it and we'll see.  I may be able to see

13 something I know.

14 A.      Right.

15 Q.      This's relating to Mr. Echarte who --

16 A.      No.  It's relating to Ms. Martin's concerns.

17 Q.      About Mr. Echarte, her former boyfriend;

18 correct?

19 A.      Right.

20 Q.      And your testimony on redirect was that every

21 time you talked to Ms. Martin about tickets, you talked

22 about tickets in order to meet with her and go to a

23 concert and perhaps become romantically involved with

24 her, and perhaps do cocaine with her; correct?

25 A.      Yes, ma'am.

1  Q.      But you hadn't seen her since 2002.

2  A.      That's correct.

3  Q.      You never did go to a concert with her during

4  the period of time between 2002 and the time of your

5  arrest in the June of 2004?

6  A.      No, I don't think I did.  Like I said, I can't

7  remember the last time we went.  But, no.  Right.

8          MS. GREENBERG:   Nothing further, Your Honor.

9          THE COURT:  All right.  In the absence of more

10 questions, you may step down.

11                  (Witness excused at 12:12 p.m.)

12         THE COURT:  Next witness.

13         MR. HALL:  The next witness would be Raquel

14 Whiting, who is out in the anteroom.  If I can --

15         THE COURT:  You may retrieve her.

16 Thereupon,

17                **RAQUEL BONITA WHITING,**

18 having been called as a witness on behalf of the

19 Defendant Whiting,  and having been first duly sworn by

20 the Courtroom Deputy, was examined and testified as

21 follows:

22                **<u>DIRECT EXAMINATION</u>**

23         BY MR. HALL:

24 Q.      Ma'am, please state your name.

25 A.      Raquel Bonita Whiting.

1  Q.      Ms. Whiting, what do you do for a living?

2  A.      I currently work for Educate, Inc.  I work for

3  Catapult Online.  We're a company that provides free

4  tutoring services and computers to low income and

5  disadvantaged families.

6  Q.      And you know Reece Whiting?

7  A.      Yes.  He's my father.

8  Q.      I won't ask you how long you've known him, but I

9  take it you've known him all of your life.

10  A.      Yes.

11  Q.      Ma'am, you're also an attorney; is that correct?

12  A.      Yes, sir.  I went to Virginia Law School.

13  Q.      And you are a member of the Maryland Bar; is

14  that correct?

15  A.      Yes, sir.

16  Q.      I take it that since you have known your father

17  all of your life, are you aware of his reputation

18  amongst friends, relatives, family members, associates

19  for being a truthful and honest person?

20  A.      Yes, sir.

21  Q.      What is his reputation?

22  A.      His reputation is being extremely honest and

23  truthful.

24  Q.      Okay.  And you base that upon your personal

25  experiences with him?

1  A.      I do.   Obvious ly, my dad has had some activities

2  in his life that have not been activities  that I

3  support , and my dad's always been extreme ly honest  with

4  me about every single thing that he's ever done and

5  I've always known that he was honest , even in light of

6  the activities  that he's been involve d in.

7          MR. HALL:   Okay .  I have no further  question s.

8          MS. JOHNSTON:   Just a couple of question s, Your

9  Honor , if I might .

10         THE COURT:   You may.

11                     **CROSS-EXAMINATION**

12         BY MS. JOHNSTON:

13  Q.      I was n't prepared  for counsel  to be finish ed so

14  quick ly, so bear with me just a minute .

15         I apologize , Ms. Whit ing.

16  A.      Oh, not a problem .

17  Q.      My voice tends to be too soft , unless I'm really

18  angry .

19         Good morn ing.

20  A.      Good morn ing.

21  Q.      We haven't met before , have we?

22  A.      No, we have not .

23  Q.      And you , yourself , are a member  of the Maryland

24  Bar; is that correct ?

25  A.      Yes, ma'am , I am.

1  Q.       When did you become a member of the Maryland

2  Bar?

3  A.       I graduated from law school in 1999, and then I

4  went and worked on the presidential campaign, and I

5  went and joined the Bar in 2001.  I'm sorry.  I had to

6  -- because I didn't take the Bar exam right after

7  graduating, since I worked on the presidential campaign

8  --

9  Q.       I won't ask you if it was a successful

10 presidential campaign.

11 A.       Unfortunately, no.

12 Q.       Okay.  So, since 19- -- you graduated in 1999;

13 is that fair to say?

14 A.       Yes, ma'am.

15 Q.       I take it that you maintained contact with your

16 father over the years while he was in prison; is that

17 correct?

18 A.       Not -- I mean, obviously, some contact through

19 letters and stuff.  Obviously, you know, I didn't get

20 to see him all the time.  But, yes, through letters and

21 phone calls.

22 Q.       Okay.  And during those times, did your father

23 ever have conversations with you concerning why it was

24 that he continued to support himself through engaging

25 in drug trafficking over those years?

1          MR. HALL:   Objection.

2          Beyond the scope.

3          THE COURT:   Overruled.

4          BY MS. JOHNSTON:

5  Q.     Did he ever explain to you why he continued to

6  engage in drug trafficking as a means of supporting

7  himself?

8  A.      You know, I have had conversations with my dad,

9  obviously, you know, asking him to change his life, and

10 he did, and that's what's exciting about.  I never

11 really asked that question about "why," because I can't

12 judge other people's actions.

13         Obviously, his actions had a really negative

14 impact on my life growing up and not having my dad

15 around a lot of times.  But the great thing about it is

16 that my mom worked really hard, and God was with, and I

17 was able to finish Princeton and U.VA.  And then, you

18 know, when my dad finally -- when I got out of school,

19 my dad was really intent on changing his life because

20 he knew how important it was to me because of the

21 things that I wanted to do, and he knew that it was a

22 reflection -- a negative reflection on me.

23         So, I guess -- I don't know if that answers your

24 question, but...

25 Q.      It does not.  I appreciate your insight into

1  your views of your relationship  with your dad, but my

2  question to you is this. Did he ever tell you how much

3  money he was making dealing drugs?

4  A.     No. I never -- my dad's never included me in

5  any of his criminal activity.

6  Q.     Ms. Whiting, I didn't mean to suggest that he

7  included you, but my question is, during these times

8  when you've had these conversations with him, did he

9  ever discuss with you the magnitude of his involvement

10 in drug trafficking over these different times when he

11 was arrested?

12 A.     Okay, ma'am.

13 Q.     Yes or no?

14 A.     Hold on one second. I just want to say I'm

15 sorry. I'm not being hostile to you, so please don't

16 towards me.

17       I guess I -- you know, I never really knew or

18 understood the magnitude. I know that my dad had

19 significant criminal behaviors when I was younger.

20 Obviously, it kept him in jail a significant amount of

21 time when I was growing up. I don't know the

22 magnitude. I've never talked to my dad about the

23 specifics of his business. What I did say was that I

24 was hoping that he would change his life, because that

25 was important to me. I prayed for that and my mother

1  prayed for that, and we felt like we had such an answer

2  to prayer because my dad needs such changes after the

3  last time he got out of jail.

4  Q.    So the answer to my question is that no, he

5  never discussed with you, even after he decided to turn

6  his life around, what the magnitude of his involvement

7  in drug trafficking was.

8  A.    Obviously, I know that it was significant

9  because it took a lot of time out of my life.  I do

10  know my dad's always been --

11         MS. JOHNSTON:   Your Honor, if I could ask the

12  witness to answer my question please.

13         MR. MARTIN:   Your Honor, the question has been

14  asked and answered several times, and she's answered

15  it.

16         THE COURT:   Try to answer the question.

17         Please let her finish the answers.

18         THE WITNESS:   I'm sorry, sir.  I'm trying to be

19  as helpful as I can.

20         I guess whatever questions I've ever asked my

21  dad, my dad's always been extremely honest with me

22  about it.  I've never asked a lot of questions about my

23  dad's old life because, you know what?  I want my dad

24  to change.  I wanted my dad to change, and so I wanted

25  to leave that in the past because that was important.

1  So, for me, like, talking to my dad was -- it was about

2  how do we get you a job? Dad what's happening in your

3  life right now? How can we support you so you don't go

4  back to that lifestyle? And we were doing everything

5  we could to make sure that happened and that he didn't

6  make those -- that he did make those changes. So, I

7  guess like maybe you would have conversations about the

8  magnitude.

9          For me, like, as a Christian, I want to move

10 forward with people and figure out how we work to,

11 like, make you the best person you can be, and that's

12 what we've been doing.

13         BY MS. JOHNSTON:

14 Q.     Did you have conversations with him -- he did

15 get a law degree; isn't that correct?

16 A.     Yes, ma'am. He got his law degree.

17 Q.     Do you know -- was it back in 1980-something?

18 Is that fair to say?

19 A.     I believe it was when I was in elementary

20 school. I don't know the exact date because,

21 obviously, I was younger.

22 Q.     He got his law degree. And while he -- after he

23 had his law degree, he still continued to be involved

24 in drugs; is that correct?

25 A.     Obviously, as ex-felon, my dad couldn't be a

1 member of the Bar, unfortunately, so he could never

2 have practiced law.

3 Q.     Okay.  Ma'am, my question to you is this.  After

4 he got a law degree from Howard University, he

5 continued to deal drugs as a way to support himself; is

6 that correct?

7        MR. HALL:  Objection, Your Honor.  Objection.

8        THE COURT:  Overruled.

9        BY MS. JOHNSTON:

10 Q.     Is that correct?  I believe you could answer

11 that question yes or no.

12 A.     Yes.  But like I said, I think that issue is

13 that you can't be a member of the Bar and practice law

14 as an attorney if you're a felon, and so that wasn't

15 even an option for him.  He went there for his own

16 edification, understanding the law and wanting to

17 better himself.  I mean, I don't think that he ever

18 thought that he would be able to practice.

19 Q.     And you know why he went to law school because

20 you were in elementary school at the time; is that

21 correct?

22 A.     Well, I know that when I was in elementary

23 school I always used to watch him study, and I would

24 look at his law books and talk to him about the law,

25 so...

1  Q.      And while he studied law, he was still dealing

2  drugs; is that correct?

3  A.      Obviously --

4        MR. HALL:   Objection.

5        THE WITNESS:   When I was in elementary school, I

6  had no idea.   I did not learn anything that my dad was

7  doing until I was in middle school.

8        BY MS. JOHNSTON:

9  Q.      You have a law degree; is that correct?

10  A.      Yes, ma'am, I do.

11  Q.      You're not practicing law at this time in your

12  current job; is that correct?

13  A.      I chose not to practice law.   I practiced law

14  for three years at Arent Fox, one of the most

15  prestigious law firms in D.C.   I chose to leave the

16  practice of law because I wanted to make a difference

17  every day in the lives of kids who     needed help.   Every

18  day I give kids whose parents have a lot of problems --

19  some of them drug addicts and some of them prostitutes.

20  I give these kids an opportunity to better their lives

21  and change their lives.   So, I left the practice of law

22  because I felt like I wanted to be hands-on in making

23  a difference in the community, because I believe in

24  public service.

25  Q.      Public service.

1 A.       Yes, ma'am .

2 Q.       Sort of what prosecutor s do as well , sever the

3 public .

4         MR. HALL:   Objection , Your Honor .

5         THE COURT:   Sustained .

6         MS. JOHNSTON:   You are to be commend ed indeed

7 for the work that you've chose n to do.

8         MR . MARTIN:   Objection .

9         BY MS. JOHNSTON:

10 Q.       Ms. Whiting , my question -- let me ask you

11 another question . You are familiar with the fact that

12 with a law degree there are any number of different

13 jobs you can get other than practici ng law; is that

14 correct ?

15 A.       Obvious ly , I know that there are other jobs you

16 can get . But , ma'am , obvious ly I was bless ed enough

17 and fortunate enough that I grew up in a household

18 where my mom work ed three jobs to pay for me to go to

19 Roane Park Country School . When I went to Princeton , I

20 left and I had amazi ng opportuniti es . So, you know

21 what ? The world is my oyster . I'm so bless ed and

22 lucky . I can d o anything I want .

23         My dad had a different life grow ing up, and he

24 made mis take s . Those mis take s follow ed him the rest of

25 his life , and he's been work ing really hard to turn

1   that around.  I  hear what you're saying, that  you  can

2   do other  jobs.   Obviously, I can do any job I want to

3   do but that's because  of Princeton, U.VA,  and the fact

4   I've worked for presidential  campaigns, I've worked for

5   U. S. Senate  campaigns, and I've worked for state

6   senators.

7        I'm really blessed.  I have an amazing resume,

8   but I didn't have the life.  I had a totally different

9   life than my dad did growing up.   It's a totally

10  different  world for me, and that's why I do  what I do

11  with the kids that I work with, because I don't want my

12  kids to make the same mistakes my dad made and have the

13  world close off to them.  If I don't do that work -- if

14  I don't help them, then they might be in this

15  courtroom, and I don't  want that.  His world was

16  different.

17  Q.    Are you through now?  Are you finished?

18        MR. HALL:  Your Honor, I'm going to object to

19  that comment from counsel.

20        MS. JOHNSTON:  Your Honor, the witness is not

21  being responsive  to the questions the government  has

22  asked her.

23        THE COURT:  She's finished, Ms. Johnston.

24        BY MS. JOHNSTON:

25  Q.    You indicated you think your father has turned

1  his life around; is that correct?

2  A.      Absolutely.

3  Q.      You would agree with me it would be a gross

4  misrepresentation -- strike that. Let me back up for a

5  second.

6          As a lawyer, in order to be a managing partner

7  of a law firm --

8          MR. HALL:   Objection, Your Honor.

9          She was never a managing partner in a law firm.

10 We're way beyond --

11         THE COURT:   Let's get the question out, counsel,

12 and then we will hear the objection.

13         BY MS. JOHNSTON:

14 Q.      As a lawyer and a member of the Maryland Bar --

15 you took ethics classes when you were in law school; is

16 that correct?

17 A.      Obviously, ma'am.  I have a law degree.

18 Q.      You worked out of one of the largest, most

19 reputable law firms in the District of Columbia; is

20 that correct?

21 A.      Yes, ma'am.

22 Q.      In order to be a partner in a law firm, you have

23 to have a law degree; correct?

24 A.      Yes.

25 Q.      You have to be licensed to practice law --

1  A.      Yes, ma'am .

2  Q.      -- in a particular  jurisdiction  --

3  A.      Yes .

4  Q.      -- or you can't be a partner .

5  A.      Right .

6  Q.      You can't hold yourself out as an attorney  at

7  law; is that correct ?

8  A.      Yes .

9  Q.      If your father were to have done that , he

10 certain ly would have been misrepresent ing his record ;

11 isn't that correct ?

12 A.      Yes .

13         MR. MONTEMARANO:    Objection .

14         Misrepresenting  the state of the evidence  in the

15 case .

16         MR. HALL:   Your Honor , I'm also going to object .

17         In addition  to that reason , the fact that we are

18 far beyond what this witness was call ed for .

19         THE COURT:   Connect  the dot s if you would , Ms.

20 Johnston .

21         MS. JOHNSTON:    I will indeed , Your Honor .

22         BY MS. JOHNSTON:

23 Q.      I want to show you what's been mark ed as

24 Government 's Exhibit  -- and introduced  in evidence  as

25 Miscellaneous  49 .

1          This item here is in reference to an application
2 for employment is that correct?
3 A.     Yes.  That's what it says.
4 Q.     And it's dated April 2nd of 2003?
5 A.     Yes, ma'am.
6 Q.     Your father.  Did he -- Mr. Whiting went to
7 Loyola college; is that correct?
8 A.     Yes, ma'am.
9 Q.     And he graduated from there at some point in the
10 '60s?
11 A.     Yes, ma'am.
12 Q.     And he also went and got a M.S. degree, I
13 believe, while he was incarcerated; is that correct?
14 From Takoma, Washington?
15 A.     Obviously, I know he has a masters degree.  I
16 didn't know when he got it.
17 Q.     Well he didn't live in Takoma, Washington.  When
18 he was outside of prison, he lived in this area didn't
19 he?
20 A.     Right.  But I'm just saying that, like, I didn't
21 know.  I mean, obviously, when I was growing up during
22 that time, my parents did not tell me that my dad was
23 incarcerated.
24 Q.     In terms of his resume.  That's attached to the
25 job application.  Do you see this document here?

1  A.      Mm-hmm.

2  Q.      Let me put it up on the screen so everyone can

3  see it.

4        It says, Reece  Whiting  at  the  top.

5  A.      Mm-hmm.

6  Q.      Reece C. Whiting.  Do you recognize  that

7  address?

8  A.      Yes.

9  Q.      Is that your mother's address?

10  A.      Yes, ma'am.

11  Q.      Okay.  And then we see the college  history; is

12  that  correct?

13  A.      Yes, ma'am.

14  Q.      Do you see there from 1988 to 1994, "Managing

15  Partner  of the J. Lincoln  Woodard, Attorneys at Law?"

16  A.      It actually doesn't say "managing partner."  It

17  says, "manager/partner," which I don't know  --

18  obviously, it can be an open interpretation.  But that

19  could be office manager  and a partner  in any other

20  business that was run of that business.  I don't see "E

21  S Q"  behind his name.

22  Q.      His name is not there at all.

23  A.      No.  I mean up at the top of it.  All of my

24  documents -- my resume says, "Raquel  Whiting, Esq."

25        I obviously don't know.  I've just seen this for

1 the first time.  It seems to me it could be open to --

2 you said "managing partner."  That's not what it says.

3 It says, "manager/partner."

4 Q.    It says "manager/partner" at a law firm; is that

5 correct?

6 A.    I mean, it says, "manager/partner."  Yes, it

7 says at J. Lincoln  Woodward L aw Firm.

8 Q.    Attorney s at law.

9 A.    Yes.  I'm just saying that, like, I don't know

10 -- I don't know  what the meaning behind that document

11 is, because I didn't write it and this is the first

12 time I've seen it.

13 Q.    You certainly would agree that if Mr. Whiting

14 represented to this company that he was a partner at

15 that law firm, that would be an inappropriate

16 representation.

17         MR. MONTEMARANO :  Objection.

18         Call s for speculation.

19         MR. HALL:  Objection.

20         THE COURT:  Overruled.

21         THE WITNESS:  I don't feel like I -- I don't

22 actually feel like I can answer that question.  I mean,

23 I don't know  -- because I don't know  what the mind-set

24 is behind writing that document.  If he was, yes,

25 holding himself as a partner at a law firm, yes, that

1  would be inappropriate .  I don't know  that that

2  document says that , and so I don't feel comfortable

3  answering  the question .  I'm just being honest with you

4  that I don't feel comfortable .

5       BY MS. JOHNSTON:

6  Q.      Court 's indulgence  one moment .

7       You don't know when the last time your father

8  used drugs was , do you?

9  A.      No , I do not.

10  Q.      You don't have those discussions with him; is

11  that correct ?

12  A.      Obviously , I hope my dad hasn't used drugs in a

13  long time .  Obviously , I pray that my dad hasn't used

14  drugs in a long time , but I've -- you know , I really

15  have worked on being extremely positive  and uplifting

16  and talking about changing lives, and so that doesn't

17  include  -- I know that , you know , my dad obviously has

18  struggled with drug addiction , but I know that he's

19  been working very hard on it .  I know that , you know ,

20  working at a recovery center , he's worked really hard

21  to really fight those demons.

22  Q.      Ms. Whiting , you pray and hope every day that

23  your father doesn't return to supporting himself with

24  drug trafficking ; is that correct ?

25  A.      Absolutely .  I feel pretty confident  that he

1  hasn't done that, as I've lent him a lot of money while

2  I was practicing law because I knew that he was

3  changing his life. And when you make big lifestyle

4  changes, it's not easy.

5  Q.      Okay. And you certainly have told him how much

6  you hope he doesn't get back involved in drugs; isn't

7  that correct?

8  A.      Absolutely.

9  Q.      In all candor, the last thing your father would

10 do would be to tell you now if he had been back

11 involved in drugs; isn't that correct?

12 A.      That's actually completely incorrect. You know

13 why? Because my dad knows that the most important

14 thing in our relationship is honesty. I mean, I've

15 told my dad that I can handle everything else but he

16 can't lie to me because it's too hard. Like, I've got

17 to be prepared for these big changes.

18       If my dad was doing anything illegal, he would

19 not live at my mother's house, because my mom made sure

20 that that lifestyle was kept far away from me. The

21 last thing my mom has ever deserved is for my dad to

22 come back into her home, when she allowed him to come

23 back in, to be helpful, so he would stay away from this

24 lifestyle and do what he did. I know my dad would not

25 do that to me; my dad would not do that to my mom. And

1  if he was doing that, he would have told me, because he

2  knows honesty for me and him in my relationship, that's

3  the most important thing.  He's always been honest with

4  me, like I said, even with the really tough stuff.

5  Because let me tell you, that lifestyle, that hurt me.

6           I mean, it hurt -- I lived in fear all my life

7  that people would find out what my dad did, because

8  then they would think something bad about me.  And

9  being here today is hard because it brings me into this

10 world that I've worked really hard not to ever get in.

11 But I'm here today because I want people to know my dad

12 changed his life.  I would not be here if I did not

13 believe that in the bottom of my soul.  I would not

14 risk -- I would not be here putting myself through this

15 unless I absolutely believed it, and he would tell me.

16 Q.      Okay.  Well in the past -- he let your mother

17 down in the past when he went back to drug dealing

18 after his arrests; isn't that right?

19          MR. HALL:   Objection, Your Honor.

20          THE COURT:   Overruled.

21          THE WITNESS:   Letting us down is different from

22 lying.  My dad's never lied to me.  I know he's never

23 lied to me.

24          MS. JOHNSTON:   All right.  I have nothing

25 further.

1          MR. HALL:   I just have a couple of question s.

2                  **REDIRECT EXAMINATION**

3          BY MR. HALL:

4  Q.     The document that the government 's counsel just

5  show ed you . Does that change your opinion of your

6  dad's credibility ?

7  A.     No , it does not .

8  Q.     One other question . Do you consider being a

9  defense counsel to be a public service ?

10  A.     Absolute ly .

11  Q.     Thank you .

12  A.     I feel like that's what we're taught in law

13  school , that everyone deserve s a fair defense .

14         MR. HALL:   Nothing further , Your Honor .

15         THE COURT:   All right . You may step down .

16  Thank you .

17                 (Witness excused at 12:33 p.m. )

18         THE COURT:   Who is the next witness ?

19         MR. HALL:   Your Honor , I don't have another

20  witness . I don't know whether any of my brother

21  counsel do or not.

22         MS. JOHNSTON:   Well , Your Honor , may we approach

23  the bench ?

24         THE COURT:   Yes

25                 (At the bar of the Court.)

1          MS. JOHNSTON:  Your Honor if Mr. Hall is --

2          MR. WARD:  Hold it.  We're not up here yet.

3          MS. JOHNSTON:  I'm sorry.  Some people were

4  moving more slowly than others.

5          THE COURT:  You're finished then, right?

6          MS. JOHNSTON:  Yes.  I would like Mr. Hall to

7  rest Mr. Whiting's case in front of the jury.  We don't

8  want to be in a position where next week we're coming

9  up next week with new witnesses from Mr. Whiting.

10          MR. HALL:  I'm not coming up with further

11  witnesses.  There may be other questions --

12          THE COURT:  You should put your case on and

13  rest.

14          MR. HALL:  Your Honor, what I'm saying is I

15  don't want to rest because I don't know who else may be

16  called that I may want to ask a question of.

17          THE COURT:  You can ask questions of other

18  witnesses, just like I let Mr. Montemarano ask

19  questions.

20          MS. JOHNSTON:  Your Honor, I think that's where

21  we get into the problem.  Mr. Hall's point is well

22  taken.  As Mr. Montemarano has done, he has used some

23  witnesses used and called by others as his own

24  witnesses, which is what Mr. Hall is suggesting that's

25  what he wants to do.  In those circumstances they

1  should be asking direct question s and not lead ing

2  question s.

3         I think he should rest at this point.  The court

4  could always give him leeway to ask some question s of a

5  witness if he think s that witness is favorable --

6         MR. HALL:  Can I make one more point?

7         THE COURT:  I will certain ly be liberal when

8  giv ing you two thing s.  One is your right to

9  participate in the examination  of other witness es; and

10 second ly, if there 's something unforeseen  that come s up

11 and you need to ask leave to reopen your case, I will

12 consider that at the time.

13        MR. HALL:  There is an issue that has already

14 come up.  It has come up during the course of Ms.

15 Greenberg 's cross, and that is the pole cam.  The log

16 that was given to us never listed Mr. Whiting as having

17 been observed on the pole cam, and I may want to try --

18 I have been told by other counsel who that individual

19 was that was seen get ting out of that vehicle, and I

20 may want to run an MVA check to see if I can find that

21 person.

22        THE COURT:  Do you have the tag number?

23        MR. HALL:  I could n't see the tag number, but at

24 least I could find out if they were driv ing a Jaguar.

25        MS. JOHNSTON:   Your Honor, the problem with that

1  is, counsel has had copies of these pole camera s for a

2  long time, and --

3       THE COURT:  I think you should rest.  I will

4  certain ly permit you to examine other witness es call ed

5  by other defendant s, and I will certain ly be

6  sympathetic for you to reopen your case if you need to

7  call other witness es.

8       MR. MCKNETT:  Your Honor, if I may, just on the

9  record, confirm what Mr. Hall said.  The pole camera

10 log that we have does not reflect any entry for Mr.

11 Whiting coming to Ms. Martin's house on that date and

12 time.

13      MS. JOHNSTON:  The pole cam log was note s that

14 was taken by officer s at different view time s when they

15 view ed the pole camera.  We did better than that.  We

16 provided them with copies of each and every pole cam

17 tape so they could look at them with their client s,

18 review them and see who they saw on the tape or didn't.

19 The pole cam log was, by no stretch of the imagination,

20 a complete review of the tape s.

21      MR. HALL:  The problem --

22      THE COURT:  You have a benefit of defer ring to

23 your colleague.

24      MR. HALL:  Yes, I am.  The problem is obvious ly

25 if I've review ed these thing s with my client, which I

1 have , my client  certain ly  has  never  identifi ed  himself ,

2 and  it  took  me  quite  by  surprise  that  the  government

3 purport s  that  this  individual  who  is  get ting  out  of  the

4 car --

5         THE  COURT:   I  can  understand  that .   That 's  why  I

6 said  I  would  be  reasonably  liberal  on  allow ing  you  to

7 reopen  if  you  can  give  me  a  reason  to  reopen .   I'm  not

8 going  to  have  you  sudden ly  call  another  character

9 witness .

10        MR.  HALL:   No, I'm  not .   At  this  point , I'm  not .

11        If  we  have  an  understand ing  with  what  the  court

12 is  say ing  is  that  if  I'm  able  to  develop  something  on

13 this  issue  of  the  pole  cam , you  will  let  me  reopen  my

14 case  after  I've --

15        THE  COURT:   I  will  be  very  sympathetic  with  that

16 if  you  can  give  me  something  specific .

17        MS.  GREENBERG:   Your  Honor , we  reserve  the  right

18 to  oppose  that  request .

19        THE  COURT:   You  can  have  the  right  to  oppose  it .

20 I  haven't  made  a  decision  in  this  case .   I  think  we're

21 in  the  same  position  as  Mr . Martin .

22        You're  not  call ing  anymore  witness es , are  you

23 Mr . Mart in?

24        MR.  MARTIN:   Yes, sir .

25        THE  COURT:   You  have  finish ed  with  all  of  your

1  witness es?

2          MR . MARTIN :  With  the  exception  of  Mr .  Goodwin ,

3  Your  Honor .

4          THE  COURT:   You're  in  the  same  posture , as  is  --

5  you  can't  rest  until  --  I'm  expect ing  there  will  be  no

6  more  defense  witness es  after  your  client  testifi es .

7          MR . MARTIN :  That's  correct ,  Your  Honor .

8          THE  COURT:   Who  is  the  next  witness ?

9          MS . JOHNSTON:   We  would  very  much  like  to  know

10  that .

11          THE  COURT:   Is  it  Mr .  Ward's  client ?

12          MS . JOHNSTON:   Yes .   That's  what  --

13          MR .  WARD:   I  don't  know   what  Mr .  Bynum  --

14          MS . JOHNSTON:    Mr .  Ward  had  indicated  his  client

15  would  be  next .

16          MR .  WARD:   Your  Honor ,  my  client  is  ready ,

17  willing  and  able  and  here ,  and  there  ain't  nothing

18  wrong  with  my  mouth  or  her s .   We're  ready  to  go .

19          MS .  GREENBERG:   Are  there   any  other  witness es

20  that  you  have ?

21          MS . JOHNSTON:   Could  we  have  the  name s ?

22          MR .  WARD:   Who  are  my  other  witness es  today ?   I

23  don't  have  any  other  witness es  to day .

24          THE  COURT:   Is  she  the  only  witness  you're  going

25  to  call ?

1          MS. JOHNSTON:   What about Mr. Bynum?

2          THE COURT:   Is she the only witness you're going

3 to call?

4          MR. WARD:   I don't expect so, Your Honor.

5          THE COURT:   We're not going to have cases

6 opening and closing and opening and closing.

7          MR. WARD:   I haven't closed my case.

8          THE COURT:   We're going to proceed defendant by

9 defendant, Mr. Ward.   All right?

10         MR. WARD:   Your Honor, do you want me to call

11 Officer Sakala out of order or -- I assume I'm not the

12 only one who is going to call Sakala.

13         THE COURT:   We will put Sakala in a separate

14 category by himself.

15         MS. GREENBERG:   Your Honor, our suggestion is

16 Mr. Ward get other witnesses here so we don't lose time

17 with the jury.

18         THE COURT:   Do you have other witnesses today?

19         MR. WARD:   No.

20         THE COURT:   I don't want to run out of gas with

21 no witnesses.

22         Are we able to continue with witnesses?   Is your

23 client going to take the stand?

24         MR. WARD:   If my client takes the stand, I'm

25 sure there will be other --

1          MS.  JOHNSTON:    Your  Honor , what  about  Mr.  Bynum ?

2  He  would  be  the  next  one  in  order   as  we  go  across  the

3  table .

4          THE  COURT:   Did  you  say  you  are  not  going  to  put

5  witness es  on?

6          MR .  MITCHELL:    Correct .   Your  Honor , what  I'm

7  going  to  do  is  I  have  every   right  to  cross -examine

8  Sergeant  Sakala  --

9          THE  COURT:   I  understand .

10          MR .  MITCHELL:   Depend ing  on  what  he  says , I  may

11  have  a  rebuttal  witness  but  not  a --

12          THE  COURT:    Mr .  Bynum  does  not  intend  to

13  testify , at  least  as  of  now ?

14          MR .  MITCHELL:    Correct .   I  would  like  to  voir

15  dire  him  and  qualify  him  and  make  sure  that  he  is

16  waivi ng  that  right .

17          THE  COURT:   And  y ou  do  not  intend  to  call  other

18  witness es?

19          MR .  MITCHELL:    Correct .   Except  in  rebuttal  to

20  Sergeant  Sakala .

21          THE  COURT:   Why  don't  I  do  this ?  Why  don't  I

22  tell  the  jury  to  come  back  at  20  minute s  of  two .  I'll

23  stay  here , and  you  can  do  that  voir  dire ; and  any  other

24  question s  that  Mr .  Ward  want ed  to  raise  about  his

25  client  testify ing  we  can  take  of  care  of  before  I  go .

1 It's 12:40 now.  I'll have them back at 1:40.

2       MS. JOHNSTON:   Does Mr. Hall rest in front of

3 the jury?

4       THE COURT:   Mr. Hall rested with the condition s

5 --

6       MR. HALL:   If the court said I rested, I guess I

7 have rested.

8       THE COURT:   You did say you rested, subject to

9 my telling you what my ground rule s were for your

10 reopening.

11      MR. HALL:   As long as we understand that.

12      MR. MCKNETT:   Your Honor, I have some question s

13 about the witness es, but we can do that after --

14             (Back in open court.)

15      THE COURT:   Ladies and gentlemen , I'm going to

16 excuse you for lunch.  Be back at 20 minute s of 2, and

17 we will continue then until we adjourn for the day.

18      Counsel and the parti es, stay behind.

19             (Jury excused at 12:41 p.m.)

20      MS. GREENBERG:   Judge, our concern is that it

21 appear s the only defense witness ready to go is Ms.

22 Dobie.  We might --

23      MR. WARD:   I'm sorry.  I can't hear you down at

24 this end, Ms. Greenberg .

25      MS. GREENBERG:   It appear s the only defense

1 witness is Ms. Dobie, and we might conclude before the

2 court's scheduled time today before 4:30.

3         THE COURT:   I intend to go to until 4:00-4:30,

4 so people better round up their witnesses.

5         MR. MCKNETT:   Your Honor, my impression is that

6 Mr. Mitchell said he would not put any witnesses on.

7 Is that correct, Mr. Mitchell?

8         I understand from Mr. Sussman that he will not

9 be calling any witnesses; is that correct?

10        MR. SUSSMAN:   That that's my thought.

11        MR. MCKNETT:   I would be coming up after Mr.

12 Ward.  I have -- there's two witnesses that the court

13 is aware of.  I haven't officially gotten a response

14 from the court as to whether or not it is a problem of

15 calling them.   They are on standby.

16        THE COURT:   Have them ready this afternoon.

17        MR. MCKNETT:   I can have them ready this

18 afternoon.  The second problem is that I have three

19 other witnesses.  One of them is a character witness

20 who is not available this afternoon.  The other two are

21 my client and her husband.  Both of their testimonies

22 will involve, in significant part, the transcripts that

23 we are proposing to bring.  Until we address those

24 issues, it would be inappropriate to put either one of

25 them on the stand.

1        THE COURT:   Well, do you need to have the

2   transcript before the jury to deal with that issue with

3   your client's testimony?

4        MR. MCKNETT:   The way I intended to present the

5   case, yes, Your Honor.   The transcripts are integral to

6   their testimony.

7        MS. JOHNSTON:   Your Honor, we've been in trial

8   now since June 6.

9        MR. MCKNETT:   Your Honor, I'm tired of the

10   government complaining about the defense slowing down

11   this trial.   Ms. Greenberg --

12        THE COURT:   Counsel.

13        MR. MCKNETT:   -- cross-examined for two and a

14   half hours on criminal records.

15        THE COURT:   All right.   How much of your

16   client's testimony, as well as her husband, is going to

17   require the playing of any recordings that you have in

18   these transcripts?

19        MR. MCKNETT:   I would say at least half, Your

20   Honor.   At least half.

21        THE COURT:   It seems to me that based upon the

22   fact we're not going to be resuming until 20 minutes of

23   two, and that Ms. Dobie is going to be taking the

24   stand, and that I anticipate that her examination would

25   be fairly comprehensive as well as her cross, we can

1 certainly get to your two witnesses that you've

2 referred to preliminarily . We could even start your

3 client and adjourn for the weekend before we get to the

4 question of the tapes.

5        MR. MCKNETT:    Your Honor , I walked out of here

6 last night with the firm impression that Mr. Goodwin --

7 based on comments made by Mr. Goodwin 's attorney and by

8 the court , I had the firm impression that Mr. Goodwin

9 would be testifying today . I therefore scheduled my

10 case with that in mind , knowing that I would come up ,

11 if at all , late today , and I had intended to call Mr.-

12 -- Ms. Ali 's husband first , which I think -- I think

13 I'm allowed to structure --

14        THE COURT:    If Mr. Goodwin is prepared to

15 testify today , we'll put him on today.

16        Is he prepared , Mr. Martin ?

17        MR. MARTIN :   He's prepared , but -- excuse me for

18 not standing . He's prepared , Your Honor . The question

19 is his physical ability . He's complaining to me about

20 being in pain . He asked me to ask the court earlier --

21 and I didn't -- if he could get Motrin or something

22 else . That , coupled with the fact that his bridge

23 continues to slip because it's not bonded, causes him

24 discomfort , and he's worried about the pain and also

25 the ability to articulate and be understood .

1        MR. MONTEMARANO:   Your Honor, something else I

2  would like to put on the record relative to Mr.

3  McKnett's posture.  I think Harry is too gracious not

4  to put it on, but I will.  We are under certain

5  limitations as CJA counsel.  We had a large number of

6  calls transcribed, Your Honor, signed off on the CJA

7  form, and now Mr. McKnett is being dunned for an

8  explanatory letter.  I thought Your Honor's signature

9  was all that was required.  We were, because of that,

10 limited in our desire or our ability to make copies --

11 to make 30 copies of the transcript book, because we

12 were trying to winnow the number of calls there with

13 issues regarding their admissibility which was ruled on

14 yesterday.

15       Harry and I were at a Kinko's last night at 9

16 o'clock finding out that all their machines -- a 24-

17 hour Kinko's, finding out all of their machines were

18 broken.  Harry then took them to another Kinko's which

19 produced them overnight, and I picked them up this

20 morning.  He called me at ten of ten, and he had not

21 yet been home to eat.

22       With all due respect, Mr. McKnett cannot be

23 faulted anymore than I can.

24       MS. JOHNSTON:   Your Honor, I don't mean --

25       THE COURT:   You're showing O'Brien's corollary

1  to Murphy's Rule, that Murphy was an optimist.  I

2  understand the problems you're having.  We can wrangle

3  about this all day, but the bottom line is we need to

4  get this testimony fully developed today to the best

5  extent we can.

6       Mr. Ward had an issue that I'd like to address;

7  Mr. Mitchell would like to voir dire his client; and

8  I'd like to get that done.  I'd like to make it so we

9  have enough chance to munch something before we come

10 back in here, because I really am going to start at 20

11 minutes of two.  Knowing the way we've all been

12 proceeding, I'm not too pessimistic that we will be

13 able to fill the testimony of today, but I think we

14 should be prepared to proceed with Ms. Dobie when we

15 resume at 20 minutes of two.

16      Do you have other witnesses that are available

17 today, Mr. Ward?

18      MR. WARD:  No, sir.

19      MR. MCKNETT:  Your Honor, may I just finish my

20 position?

21      THE COURT:  Yeah.

22      MR. MCKNETT:  I believe that as far as  my

23 client, we are coming to the most critical stage of the

24 case.  It is my obligation to somehow convince the jury

25 that she is not guilty.  I think I should be able to

1 structure  that  presentation   as I think  it best
2 structured .   I don't  see that  it's in my client 's best
3 interest  to have  to call  two witness es late  this
4 afternoon , perhaps , and which  is not  in the  sequence  I
5 would  prefer  to call  them in.  The sequence  I prefer  to
6 call  them in is my client 's husband  first .   I will call
7 my client's  husband  first, and then  my client , and then
8 those  two witness es that  I had describe d to the  court .
9 I think  that  is in my client 's best  interest  to do it
10 that way, and I don't think  we're going  to get -- if
11 the court  intends  to break  at 4:30  or thereabout s.
12        THE  COURT:   It's going  to be earlier  than that ,
13 I think .
14        MR. MCKNETT :  I don't  feel  that  I should  be
15 force d to disrupt  what  I think  is the best  way to
16 present  my case  in order  to save  an hour  or two of time
17 in the  courtroom .
18        THE  COURT:   Why don't  you put  your  client 's
19 husband  on first ?
20        MR. MCKNETT :  Because  my client 's testimony  --
21 my client 's husband , he is at work .  As I said , I
22 walk ed out of here  last  night  with the firm  impression
23 that  Mr. Goodwin  would  be testify ing, and if that  were
24 the case  we would n't get  to my case  at all  today .   My
25 client s's a work ing man and he can't  afford  to take

1 days off on the chance that he might be called.

2         MS. JOHNSTON:   Your Honor, we had witnesses

3 sitting here for two or three days who were missing

4 work.

5         MR. MCKNETT:   Government witnesses, Your Honor,

6 who are getting paid to be here.

7         THE COURT:   Right.   Right.

8         MR. MCKNETT:   I realize it may cost the court an

9 hour -- I think at most an hour.

10        THE COURT:   We're going to use up the time

11 today.   Trust me.   Based upon what I've seen, I'm not

12 optimistic that we're going to zip right through Ms.

13 Dobie's testimony.   Based upon what I've seen with

14 cross-examination of Mr. Whiting, it's going to take

15 some considerable period of time.   So, I don't know

16 that we're really talking about anything more than an

17 academic exercise for the most part.   What is to

18 prevent your client's husband from testifying today?

19        MR. MCKNETT:   First of all, he is at work in

20 Washington, D. C.   I had him on standby on Tuesday.

21 The government's comment about they have witnesses

22 waiting is completely inappropriate.

23        THE COURT:   I just don't even consider that.   I

24 don't want to have to --

25        MR. MCKNETT:   For me to call him now?   Well, the

1  other thing is, Your Honor, his testimony will be also

2  significantly revolving around the transcripts, because

3  he is in many of the transcripts.  The way I had

4  anticipated calling him involves the use of the

5  transcripts.  Now, if I call him in this afternoon, he

6  loses a half a day today, and then he'll lose another

7  full day of work next week.  I think that's unfair.

8  It's unfair to put me in a position to have to

9  restructure my presentation, and it's unfair to Mr.

10  Garner to have him lose most of a day's work and pay

11  because of -- I don't mean this in a pejorative sense,

12  but for the court's convenience.  I don't think that's

13  an appropriate thing to do.

14       THE COURT:  Well, I don't understand why you

15  can't call those two witnesses we talked about and get

16  that done today.  It's strictly out of order, but we

17  all do things out of order in our life.

18       MR. MCKNETT:  Yes, Your Honor, and we've done

19  that during the course of the trial.  But this is the

20  most critical stage of the trial for my client, and I

21  think I'm entitled to structure her defense in the way

22  that I think is the most effective way to do it, and

23  I've determined that the most effective way to do that

24  is to call them after my client testifies.

25       THE COURT:  The bottom line is this.  When we

1  return from lunch, after the matters I'm going to do

2  right now, Ms. Dobie will take the stand. When she's

3  finished, I either want to have Mr. Goodwin on the

4  stand -- and he can decide whether he's complaining

5  about pain in his teeth or not and put him on the

6  stand. But if not, and we're out of witnesses, then we

7  will go to those two individual witnesses. I can't

8  make a perfect world, and I think the jury could

9  certainly understand that if they're not in precise

10 sequence -- you want it, but by Tuesday we will be

11 right back on track. You're perfectly able to explain

12 to the jury in closing argument that that may not have

13 been the perfect order, but that's the way you're going

14 to do it. That's what we're going to do.

15        All I can tell you, Mr. Martin, is based on the

16 information I have from the marshals service, I am not

17 impressed that your client has any significant

18 impediment in being able to speak or his pain is as

19 significant as he is explaining, based on what the

20 marshals have told me.

21        MR. MARTIN: What I have proposed, Your Honor,

22 is he get a Motrin, and let's see how he feels during

23 the lunch hour.

24        THE COURT: Get him a Motrin.

25        I don't dispense drugs.

1          MR. MARTIN:  Neither do I, Your Honor.

2          MR. MONTEMARANO:  The marshals told me I had

3 some in my pocket yesterday.

4          MR. MCKNETT:  I have some aspirin in my pocket.

5          MR. MONTEMARANO:  I asked the courtroom

6 supervisor, whose last name I don't know, and he said,

7 we don't it.  We don't want you to do it because if

8 he's -- in our custody, he may have an allergic

9 reaction.  I said, that's fine.

10          I have a pocketful.  It's an anti-inflammatory,

11 because they tell me it's good for my bad wheel.  The

12 fact is, I left it all in the car.  But if the court

13 directs me, I can go get it, and I will --

14          THE COURT:  I will leave it to Mr. Martin about

15 the best way to get him some Motrin during the lunch

16 break.

17          Now, two matters.  First of all, Mr. Mitchell,

18 you wanted to do an on-the-record voir dire of your

19 client concerning his right to testify.

20          MR. MITCHELL:  Your Honor, unless the court

21 would prefer that.

22          THE COURT:  You may do it.

23          MR. MITCHELL:  Mr. Bynum, stand up.

24          MR. WARD:  Let me say that while we do that, why

25 don't we have Ms. Dobie stand up, too, and then we

1 don't have to repeat everything twice?

2          THE COURT:   You may proceed.

3          MR. MITCHELL:   Mr. Bynum, you understand the --
4 is there any way -- I don't know if the government is
5 connected to that.

6          MS. JOHNSTON:   It's the court system.

7          MR. MITCHELL:   Mr. Bynum, you understand the
8 United States constitution, the Fifth Amendment allows
9 you to go to trial and not be forced to compel -- not
10 be compelled or forced to incriminate yourself.   You
11 understand that?

12          DEFENDANT BYNUM:   (Unintelligible.)

13          COURT REPORTER:   You have to say yes or no,
14 please.

15          DEFENDANT BYNUM:   Yes.   Yes.

16          MR. MITCHELL:   You have the absolute right to
17 remain silent throughout the entire proceeding, and the
18 judge will instruct the jury that they cannot infer any
19 inference of guilt simply because you chose to remain
20 silent.   Do you understand that?

21          DEFENDANT BYNUM:   Yes.

22          MR. MITCHELL:   Equally, you have an absolute
23 right to testify.   You have a right to challenge any of
24 the evidence, provide your own evidence -- you have
25 that right, but you don't have to exercise that right,

1  because  it  will  not  be  held  against  you .

2          Do  you  understand  all  of  those  right s ?

3          DEFENDANT  BYNUM :   Yes .

4          MR.  MITCHELL:   Given  all  those  right s ,  do  you

5  elect  to  testify  in  your  behalf ,  or  do  you  elect  to

6  remain  silent ?

7          MR.  BYNUM :   I  would  like  to  remain  silent .

8          MR.  MITCHELL:    All  right .

9          THE  COURT:   All  right .

10          MR.  MITCHELL:    Any  other  question s  that  the

11  court  would  like  to  ask ?

12          MS.  JOHNSTON:   Your  Honor ,  if  the  court  would

13  just  mention  that  no  one  has  threaten ed  him  or  promise d

14  him  anything  to  get  him  to  make  that  decision .

15          THE  COURT:   Mr.  Bynum ,  has  anybody  threaten ed

16  you  or  made  any  promise s  to  you  if  you  decide  not  to

17  testify ?

18          DEFENDANT  BYNUM :   No ,  sir .

19          THE  COURT:   And  you're  doing  this  after

20  consultation  with  your  lawyer ?

21          DEFENDANT  BYNUM :   Yes ,  sir .

22          THE  COURT:   And  you're  satisf ied  with  the

23  service s  of  your  lawyer ?

24          DEFENDANT  BYNUM :   Yes ,  sir .

25          THE  COURT:   And  based  upon  your  advice  from  the

1 lawyer, you decided not to testify; is that correct?

2        DEFENDANT BYNUM:   Yes, sir.

3        THE COURT:   All right, you may be seated.

4        Mr. Ward, you may do the same thing.

5        MR. WARD:   Ms. Dobie, you heard what Mr.

6 Mitchell said to Mr. Bynum?

7        DEFENDANT DOBIE:   Yes.

8        MR. WARD:   You do understand that you have an

9 absolute right to remain silent.

10       DEFENDANT DOBIE:   I do.

11       MR. WARD:   And that if you choose to do that --

12 that is remain silent -- the drugs -- well, we will be

13 entitled to ask the jury that they may draw no adverse

14 inference from that.   Put that in plain English:   They

15 mustn't think that you're guilty or think anything else

16 but the fact that you exercised the constitutional

17 right to remain silent.

18       Do you understand?

19       DEFENDANT DOBIE:   I do.

20       MR. WARD:   If you do wish to testify, you

21 understand that you would be testifying under oath.

22       DEFENDANT DOBIE:   I do.

23       MR. WARD:   You understand that you may be

24 subject to cross-examination by the government.

25       DEFENDANT DOBIE:   I do.

1          MR. WARD:   And you understand  that because  I

2 asked -- I'm going to ask the court for a hearing on

3 your prior record , but you could be cross -examined  with

4 regard to your prior record of criminal  convictions .

5          Do you understand  that ?

6          DEFENDANT DOBIE:   I do.

7          MR. WARD:  Do you understand  that if you do

8 testify , and if you were to be convict ed in this case ,

9 the court may consider  whether  or not  it believe s you

10 have committed  perjury  in your  testimony  and take  that

11 into consideration  in making -- imposing  sentence.

12          Do you understand  that ?

13          DEFENDANT DOBIE:   I do.

14          MR. WARED:  Now, you do have some college

15 education , I understand ?

16          DEFENDANT DOBIE:   I do.

17          MR. WARD:  You graduate d from high school  and

18 have some college  education ?

19          DEFENDANT DOBIE:   I do.

20          MR. WARD:  You don't have any mental problem s of

21 any kind ; you haven't been under  any care or treatment

22 of a psychiatrist  or psychologist  or anything  like

23 that ?

24          DEFENDANT DOBIE:   Never .

25          MR. WARD:  Are you present ly under the influence

1  of any substance s, whether you got them by prescription

2  or otherwise , that affect your ability to understand

3  what's going on here today , right now , and the decision

4  you are honoring right now?

5           DEFENDANT DOBIE:    Nothing .  I haven't used

6  nothing .  Nothing is impedi ng my judgment .

7           MR. WARD:   All right .  Is it your desire to or

8  not to testify at this time ?

9           DEFENDANT DOBIE:    It's my desire .

10          MR. WARD:   To testify ?

11          DEFENDANT DOBIE:    Yes.

12          THE COURT:   I could n't hear your last reply .

13          It is your desire to testify ?

14          DEFENDANT DOBIE:    Yes, it is, Your Honor .

15          MR. WARD:   Has anybody made you any promises or

16  made any threat s to you of any kind or nature or

17  description whatsoever in order to affect the decision

18  that you've just made ?

19          DEFENDANT DOBIE:    To be honest , the government

20  has prompt ed me to testify .  Due to the fabrication of

21  a lot of their thing s, that's why I want to testify .

22          THE COURT:   Ms. Dobie , you say you are prompt ed

23  to testify because they fabricate d evidence against

24  you ?

25          DEFENDANT DOBIE:    Totally .

1          THE COURT:    They haven't directly talked to you

2  and demanded that you testify.

3          THE COURT:    No.  Not at all, sir.

4          THE COURT:    They have not threatened you with

5  anything if you don't testify, have they?

6          DEFENDANT DOBIE:    No.  Not about testifying, no.

7          THE COURT:    And you have discussed the pros and

8  cons of this decision with your counsel, Mr. Ward?

9          DEFENDANT DOBIE:    I understand what I'm doing,

10 Your Honor.

11         THE COURT:    All right.  You're satisfied that

12 he's fully explored the issue with you?

13         DEFENDANT DOBIE:    Yes, sir.

14         THE COURT:    Do you understand that there's risks

15 involved in taking the stand and testifying?

16         DEFENDANT DOBIE:    If I lie, and I'm not going to

17 do that.

18         THE COURT:    And you understand you will be

19 exposing yourself to what you can expect to be spirited

20 cross-examination by the government.

21         DEFENDANT DOBIE:    I do.

22         THE COURT:    You understand you have to tell the

23 truth and, if you didn't, that could result in adverse

24 consequences.  Do you understand that?

25         DEFENDANT DOBIE:    I plan to tell the whole

1 truth.

2          THE COURT:   All right.

3          MR. WARD:   Your Honor, tied in with this

4 determination or decision is the matter of prior

5 records, which I intend to bring out in direct

6 examination under Rule 609.  The latest conviction was

7 on July 26, 1996, in the Circuit Court for Prince

8 George's County.  My client was -- it doesn't say

9 whether she was found guilty or pled guilty to

10 attempted credit card impersonation in the District

11 Court of Prince George's County, which she was

12 sentenced to two years incarceration and one year and

13 11 months, and 30 days in jail, and two years

14 probation.  That's the first offense.

15          THE COURT:   That's in 1996 you say?

16          MR. WARD:   That's 1996, Your Honor.  July 26 is

17 the date of conviction.  She served 30 days, and that

18 would take us into August of '96, because it's a date

19 of last incarceration, the time under the rule that

20 counts.

21          THE COURT:   All right.

22          MR. WARD:   The next one, Your Honor --

23          MR. MCKNETT:   Mr. Ward, excuse me.  I apologize

24 for interrupting.

25          Your Honor, this since this applies only to Ms.

1 Dobie, could Ms. Ali and perhaps Ms. Harden excuse

2 themselves so they can go get a bite to eat?

3          THE COURT:   Any objection by anybody else?

4          MR. WARD:   I don't care.

5          THE COURT:   Both of you ladies understand you

6 have a right to be present?

7          DEFENDANT HARDEN:    Yes.  I waive that right.

8          THE COURT:   You waive your right?

9          DEFENDANT HARDEN:    Yes.

10         THE COURT:   You're hungry?

11         DEFENDANT HARDEN:    Yes.

12         THE COURT:   All right, you may be excused.

13         MR. MCKNETT:    Thank you, Your Honor.

14         MR. WARD:   Your Honor, also on July 26, 1996,

15 the -- my client was convicted of credit cards,

16 applying or false I.D. in Prince George's County.

17         THE COURT:    Is this the same case or a different

18 case?

19         MR. WARD:   It's a different case.   The

20 disposition took place on the same date.

21         THE COURT:   All right.

22         MR. WARD:   July 26, '96 she was sentenced to two

23 years incarceration, one year and 11 months suspended,

24 30 days in jail, credit given.  As I said, that was on

25 July 26, '96.

1          THE COURT:    Let me just ask her a question , if I
2 might .
3          MR. WARD:    The next , Your Honor , sentencing date
4 was September 4, 1997.   My client was convicted of
5 conspiracy having to do with fraud and credit cards and
6 so forth and was sentence d to one year of incarceration
7 to run concurrent with another case at the same date .
8          She was also convicted on September 4, '97 of
9 credit card theft and sentence d to two year s
10 incarceration  to run concurrent  with the previous
11 matter .
12         Case number three she was sentence d for grand
13 larceny , continuous  incarceration .
14         THE COURT:    What is the date , Mr. Ward ?
15         MR. WARD:    The second I'm --
16         THE COURT:    What's the date ?
17         MR. WARD:    The same date , your Honor , 9/4/97 .
18 These all took place at the same time .
19         THE COURT:    Grand larceny ?
20         MR. WARD:    Grand larceny :   Ten year s
21 incarceration  with five year s suspend ed, consecutive
22 with the two prior s.
23         The fourth case was a failure to appear .
24         These were all, I should have said , in the
25 Circuit Court for Arlington County , Virginia .

1          She was sentenced to one year to run concurrent
2 with one of the previous cases.  She was not released
3 from incarceration  in those cases until November 30 of
4 '98.
5          Your Honor, that takes us to the ten years under
6 Rule 609.
7          Oh.  That's it, sir.  There's one matter pending
8 in Henrico County, Virginia, but that has not gone to
9 trial at this point.
10          THE COURT:  All right.  What's the government's
11 position on these?
12          MS. GREENBERG:  Your Honor, I guess I'm
13 confused.  Is Mr. Ward saying these are the only
14 convictions he believes we are allowed to cross?  Or is
15 he objecting to cross on this?
16          MR. WARD:  I'm saying that under Rule 609, these
17 are the convictions that may be used for impeachment.
18          MS. GREENBERG:  Your Honor, we did give notice
19 of convictions outside the ten years.
20          MR. WARD:  You did for 404(b) purposes, as I
21 understood.
22          MS. GREENBERG:  We can gave notice for both,
23 counsel.
24          THE COURT:  Tell me what you believe come in
25 under 609?

1          MS. GREENBERG:   Your Honor, we didn't put in, in
2   our government 's case in chief, but we talked
3   incessantly  about it, but  the court  never ruled so we
4   left it alone for our chase in chief.
5          There is a situation  in 1998 where  Ms. Dobie was
6   convicted of  possessing firearms and she received  a
7   conviction  for that.  She had two handguns that were
8   recovered  from her next to her in the car where  she was
9   with her husband.
10          MR. WARD:   Pardon me.  She was convicted of
11   possession  of a handgun?
12          MS. GREENBERG:   That was in 1989.
13          Your Honor, she also has various  convictions
14   which go to truth and dishonesty or false statement.
15   There is also additional  ones that go to truth --
16   ability  to tell  the truth  that are appropriate  for
17   cross-examination .
18          MR. WARD:   Your Honor, I would ask the
19   government  -- not to interrupt  -- but to state what
20   they are --
21          MS. GREENBERG:   I'm trying to.
22          MR. WARD:   -- they relate to something,
23   something, something.
24          THE COURT:   I share your concerns.
25          What are the --

1          MS. GREENBERG:   There was a conviction  on

2 October  15, 1991 for  forgery  and uttering  out of

3 Alexandria,  Virginia , and there was -- Your Honor ,

4 there are other convictions,  just so the court  is

5 aware , that are felony convictions  but don't relate  to

6 truth  and falsity.   There  is a 1992 conviction  of Ms.

7 Dobie  for robbery  with a deadly weapon  out of

8 Montgomery  County , and a second  one for felony  theft --

9 actually, I take that back .  It's a 1989 felony  theft ,

10 and a violation  of probation  going along  with that , and

11 a felony  theft  would  go to ability  to tell the truth .

12 So, the 1989 conviction , the government   submit s, its

13 probative  value  outweigh s the prejudicial   effect .

14          THE COURT:   That 's the '89 one , you say ?

15          MR. WARD:   Yes .  November  13, '89.

16          MS. GREENBERG:   Your Honor , a robbery  out of --

17          THE COURT:   The robbery.   Was that  with a deadly

18 weapon ?

19          MR. WARD:   No .

20          MS. GREENBERG:   I stand  correct ed, Your  Honor .

21 She was charge d with robbery  with a deadly weapon ; the

22 conviction  was robbery ; she was sentence d on July 13,

23 1992.

24          THE COURT:   Okay .

25          MS. GREENBERG:   Sentence d to eight  year s,

1   suspended  four  years; three  years  probation .

2        THE  COURT:   All  right .

3        MS.  GREENBERG:   Those  were  the  additional

4   convictions  to  what  Mr.  Ward  state d.

5        THE  COURT:   What  is  the  government 's  position ?

6        MS.  GREENBERG:   Your  Honor , they're  appropriate .

7   We  didn't  seek  to  have  all  of  them  admitted  for  404(b).

8   All  of  them  are  appropriate   for  impeachment .   That  goes

9   to -- I  stand  correct ed.   Robbery  is  a  type  of  theft .

10  All  of  them  go  to  her  ability  to  tell  the  truth  and

11  her  honesty .   I  submit  that  the  probative  value

12  outweigh s  the  prejudicial   effect .

13       THE  COURT:   What  about  the  firearm -- the

14  firearm  conviction ?

15       MS.  GREENBERG:   The  firearm , Your  Honor , was

16  submitted -- sought  to  be  submitted  as  404(b).   The

17  government  didn't  introduce  it  in  its  case  in  chief ,

18  but  we  submit  it's  appropriate   on  cross-examination .

19       THE  COURT:   All  right .

20       MS.  GREENBERG:   It  was  a  conviction , Your  Honor .

21  So, it's  definite ly  reliable .

22       THE  COURT:   And  your  position , Mr.  Ward ?

23       MR.  WARD:   Your  Honor , under  609 -- and  I  think

24  Ms.  Greenberg  confuse s  the  admissibility   and  the  time

25  factor .   Under  Rule  609  there  are  two  type s  of

1  convictions  that  are  --  can  be  used  for  impeachment :

2  1.  Felony  conviction , certain ly; and  2. Crime s  that

3  involve  dishonesty  or  false  statement .

4        The  time  limitation  under  609(b) does  not

5  distinguish  between  friend liness  and  crime s  that  go  to

6  -- or convictions  that  go  to  the  question  of

7  truthfulness  or  honesty .  It  simply  says , ten  year s

8  have  elapse d  from  --  at a time  and  date  of  conviction

9  blah-blah-blah-blah,  which ever  occur s  later .

10       It's  ordinarily  not  usable  for  impeachment , and

11 I suggest  that  we're  in  --  I  don't  suggest .  I  think  it

12 is  required , where  the  government  intends  to  use

13 convictions  outside  the  ten -year  limitation , the  burden

14 is upon  the  government  to  show  why  they  may  be  use d.  I

15 thought  simply  enough  to  toss  out  this  amorphous , well ,

16 Your  Honor ,  they  relate  to  honesty  and , you  know , she 's

17 a  bad  person .  They 've  got  to  be  specific  and  give

18 specific  reason s  to  show  why  that  evidence  is  --  those

19 convictions  are  usable  for  impeachment  purpose s.

20       THE  COURT:  All  right .  Ms.  Greenberg , the  rule

21 does  require , in order  for  me  to  take  into  account  or

22 permit  consideration  of  a conviction  more  than  ten

23 year s  old , that  I  make  a finding  support ed  by  specific

24 fact s  and  circumstance s  that  evidence  of  that

25 conviction  substantially  outweigh s  the  prejudicial

1  effect what the specific fact s and circumstance s that

2  you believe would permit me to allow them to be use d.

3       MS. GREENBERG:   Start ing , Your Honor , with the

4  handgun conviction which , again , was -- there 's already

5  been filings as to the 404(b) aspect of that charge .

6  Specifically , Ms. Dobie was observe d by an officer ,

7  Officer Daniel , in Baltimore City . She was observe d to

8  be in possession of two handgun s; she was with her

9  husband in connection with that . I presume that her

10 testimony is going to be that the handgun s under her

11 bed were not her handgun s and that they were belong ing

12 to someone else . I have a basis for that belief , Your

13 Honor , because she testifi ed to that fact before

14 another member of this court up in Baltimore at her

15 husband 's supervised release hear ing in Baltimore .

16      One of it aspects of the charge that we have to

17 prove is Ms. Dobie possess ed a gun in furtherance of

18 drug trafficking , and I submit if she provides that

19 testimony it would be probative of whether or not she

20 possess ed the gun s to put in the fact that she has

21 previous ly been convict ed of possess ing weapon s in

22 connection with a prior incident in which she was with

23 her husband and that therefore it was more like ly than

24 not that she possess ed the weapon s on this occasion .

25      MR. WARD:   Your Honor , let me just respond .

1        MS. GREENBERG:    And knowledge , Your  Honor .

2  Knowledge  of  the  gun s.

3        MR. WARD:   The government  sort of hit the

4  proffer  -- the  nail  on the head .  Certain ly she

5  possess ed the  gun.  That is the charge in both

6  instance s.  Except , the charge  in the second  instance

7  is possess ing  of a gun  in furtherance  of drug

8  trafficking  activity .  There  is no suggestion  -- and

9  I've look ed at the  original  chargi ng document s in the

10  1998 case  -- that  have  anything  to do with  drug

11  activity , either  using , possess ing , or what's the

12  phrase  under  9(c) ?  Whatever  it  is, this  case  -- the

13  first  case  in 1988.  First  of all , it's almost  20 year s

14  old .   It has absolute ly nothing  to do with  drug s, and

15  the  sole  question  here  is whether  or not  -- not whether

16  she possess ed the  gun but  whether  she possess ed it  in

17  furtherance  of drug  activity  or trafficking  activity .

18        MS. GREENBERG:    Your  Honor , I will  shortcut

19  that .  I absolute ly agree  with  Mr. Ward .  It doesn't  go

20  to whether  she possess ed the  gun  in connection  with

21  drug  trafficking , but  one  of the  element s that  we have

22  to prove  is that  she possess ed a firearm .  And if she

23  admit s she  know ingly  possess ed a firearm , which  that's

24  why I want  to use  the  1988 conviction  is to show  that

25  she  know ingly  and  intentionally  possess ed the  firearm s

1   in that case, she was convicted of it, it has an

2   element of intent and it has an element of knowledge.

3   Every crime has a -- if not an intentional mens rea, a

4   general mens rea.   If she wants to stipulate that she

5   possessed those firearms, then we don't need to get

6   into it at all.

7           My understanding is that she is going to say

8   that with respect  -- she just moved those guns to

9   assist somebody else, and I think it would be probative

10  -- not character evidence, but probative of her

11  knowledge to show that she possessed guns on a prior

12  occasion.

13          MR. WARD:   Your Honor, I ain't letting any cat

14  out of the bag when I say because it's a matter of fact

15  and a matter of evidence that she gave testimony at her

16  husband's sentencing with regard to these guns.   She

17  took the guns away from her son, her 17 year-old son,

18  because as any mother would -- she didn't want him

19  having guns.   She took them away within hours,

20  allegedly, before the raid.   Again, there's no question

21  she possessed the gun.

22          If all the government wants to show is simple

23  possession, she's going to admit, I possessed the guns,

24  but I possessed them in terms of   taking it away from my

25  son and putting it away in what she thought was a safe

1  place .   The  only  question  then  become s  whether  or  not

2  it  was  possess ed  in  furtherance  of  drug  activity .   The

3  1998  conviction  is  not  going  to  shed  one  iota  of  light

4  on  that  question .

5         THE  COURT:   Well , what  are  the  specific  fact s

6  and  circumstance s  that  would  allow  this  to  come  in

7  under  the  1988  matter ?

8         MS.  GREENBERG:   Your  Honor , are  you  still

9  talk ing  about  the  gun s ?

10         THE  COURT:   Yes .

11         MS.  GREENBERG:   In  relation  to  the  924(c)  count ,

12  Your  Honor ?

13         THE  COURT:   Well , I  heard  what  you  said .    It

14  said  she  was n't --

15         MS.  GREENBERG:   Your  Honor , her  testimony , I

16  believe  --  and  I'm  just  bas ing  this  belief  on  her

17  testimony  before  another  judge  of  this  court  --  is  that

18  she  simply  move d  these  gun s  to  get  them   away  from  her

19  son .   In  connection  with  that , she  is  going  to  say  she

20  didn't  know ingly  and  intentionally   possess  these  guns ;

21  they  weren't  her  gun s .   She  simply  move d  them .   I  think

22  it's  probative  to  show  knowledge , intent , common

23  scheme , or  plan .

24         THE  COURT:   Knowledge  of  what ?

25         MS.  GREENBERG:   Of  guns , and  that  she  possess ed

1  them .

2        MR. WARD:   Your Honor , she is going  to admit  --

3  she already  admitted  under oath  she possess ed  the gun s.

4  She took  them from her son .  The single  issue is

5  whether  or not  she possess ed them  in furtherance  of

6  drug  trafficking  activity .   That 's the single  issue .

7  1988 does n't shed  any  light  on that at all.

8        MS. GREENBERG:   Your Honor , just so the court

9  understand s.  The charges  were that they were possess ed

10  in connection  with the burglary,  and she was with her

11  husband , Goldie Dobie , at the time .  Similar ly, she was

12  with her husband , Goldie Dobie , in 2004 when she was

13  arrested  with the gun s.

14       MR. WARD:   What does that show ?  She was with

15  her husband  on two occasion s.

16       MS. GREENBERG:   I'm answering  the court 's

17  question  about fact s and circumstance s, counsel .

18       THE COURT:   I don't think  I can permit  the '86

19  conviction  to come in.

20       MR. WARD:   I'm sorry ?

21       THE COURT:   I said , I decline  to permit  the use

22  of that conviction .

23       MR. WARD:   Thank you .

24       What about  the other s?

25       I'm sorry .  I'm asking  the government .

1          THE COURT:   '91, '92 and '89?  No.

2          Forgery in Virginia?  Robbery in Montgomery

3  County, and felony theft; is that correct?

4          MS. GREENBERG:   Yes, sir.

5          THE COURT:   What are the facts and circumstances

6  of those?

7          MR. WARD:   Let me deal with those from the

8  oldest first.  We just dealt with the '88 burglary.

9          On April 27, 1990, she was convicted of felony

10  theft in the Anne Arundel County Circuit Court and got

11  one year, with one year suspended and five years

12  probation.  That's it.  Everything else was nol

13  prossed, as I understand it.

14          THE COURT:   All right.

15          MR. WARD:   It appears from that, since

16  everything was suspended, that she would have been

17  released from custody on April 27, 1990.  So, that

18  conviction is a little over 17 years old -- 16 years

19  old, I beg your pardon.

20          MS. GREENBERG:   Your Honor, I do have

21  information that she was sentenced for a violation of

22  probation on that, which would extend the time to one

23  year, on August 20, 1992.  So, that would take us to

24  1993.

25          THE COURT:   That's still 13 years out.

1          MS. GREENBERG:   Yes, sir.

2          THE COURT:   I will not permit the use of that

3 conviction.

4          MR. WARD:   Your Honor, on October 15, 1991, in

5 Alexandria, Virginia, it appears she has a conviction

6 for forgery and uttering.  She received two years

7 incarceration on each, to run concurrent, with all but

8 60 days suspended.  It doesn't give a date of release.

9 But if we assume 60 days to October 91, I think we're

10 talking around Christmas '91 -- about December '91 that

11 she would be released from custody in that case.  That,

12 again, is 15 years old.

13          THE COURT:   Unless there's something that I

14 haven't been told, I don't see any basis for allowing

15 that to come in either, so I will not permit the

16 forgery in Virginia.

17          We've got one more to go and that is the

18 robbery in Montgomery County.

19          MR. WARD:   Yes, Your Honor, in the Circuit Court

20 for Montgomery County on March 17 of 1992, a common law

21 or simple robbery.  She received eight years

22 incarceration, with all but four years suspended, to

23 begin 17 -- I'm sorry, March 17, 1992.

24          THE COURT:   What was the date of release?

25          MR. WARD:   That was in relation to robbery -- a

1  robbery .  We're talking about July 13, 1992.

2       I don't have a release date on that, frankly .

3       THE COURT:  Does the government have a release

4  date on that?

5       MS. GREENBERG:  Your Honor , no, but I do have a

6  reference to a bench warrant that was issued for Ms.

7  Dobie in relation to that charge on January 25, 1994.

8  The bench warrant was served on August 1, 1996.

9       I don't know after August 1st 1996 when the

10 bench warrant was served how much time she served, but

11 I do have a reference within the last ten years that I

12 think she was arrested for something in connection with

13 that charge .

14      THE COURT:  All right .  She was subject to some

15 confinement on that conviction .

16      MR. WARD:  I'm sorry?

17      THE COURT:  I will permit that, because it

18 appears she did suffer some confinement with that

19 conviction during the ten-year period .

20      Any other issues before we all starve to death?

21      MR. MCKNETT :  Your Honor , can I ask the court

22 for a compromise with regard to my witnesses?

23      It sounds like we're going to get up to 3:30 or

24 so before it would be my turn to put witnesses on.  I

25 would propose , as a compromise , that court , to conserve

1 its resources, allow me to present my case as close as

2 possible to what I think is the ideal sequence by

3 calling just one of those witnesses, calling the first

4 one.

5          THE COURT:   You may not need both of them.

6          MR. MCKNETT:   I want to call them both.  But as

7 I said earlier, my -- the way I have structured this, I

8 would have to have -- was to have my client testify

9 after her husband testified first, and then have these

10 two witnesses testify.  If I could call one of them

11 this afternoon, that will satisfy to some extent the

12 court's concern about losing time.  And if I can call

13 the other one when I had intended to, it would satisfy

14 my concerns about --

15          THE COURT:   I think that will work, because I

16 don't think -- knowing how these things go, this it's

17 going to be a while with Ms. Dobie.

18          MR. MCKNETT:   Could I do it that way, Your

19 Honor?

20          THE COURT:   Yeah, you can do it that way.

21          MR. MCKNETT:   Just call the one?

22          MR. WARD:   Your Honor, I have a correction to

23 make.  I hate to do it.  But in the robbery case, the

24 record I have -- this was prepared by the -- it's a

25 pre-plea document prepared by the U. S. Probation

1  office.  It shows that on May 13 of '93 a hearing for

2  reconsideration was held and the court amended the

3  sentence and imposed, on July 13, 1992, to eight years

4  incarceration, with credit for time served.  The

5  remaining portion of the sentence was suspended under

6  the same terms and conditions.

7          My client tells me -- and I'm sure she would be

8  willing to go under oath and state this -- first of

9  all, she -- as of May 13, '93, she was released from

10 custody.  The probation violation was in connection

11 with another matter that she was involved in in Prince

12 George's County which didn't result, I understand, in a

13 conviction.  In any event, she was brought in on the

14 warrant.

15         THE COURT:  Is the government's information the

16 same or different than that?

17         MR. WARD:  Probation was terminated.

18         MS. GREENBERG:  Your Honor, I'm referring to the

19 Pretrial Services report.  I can show Mr. Ward and show

20 the court that they have under this robbery charge that

21 a bench warrant issued 8/1/89.  The bench warrant was

22 served.

23         MR. WARD:  No time was served on that.

24         THE COURT:  Why was the bench warrant issued?

25         MR. WARD:  The bench warrant was issued because

1 she got arrested in Prince George's County and she was

2 brought in. The probation was simply terminate d to let

3 her go to Prince George's County.

4        THE COURT: Let me see what you're talk ing

5 about.

6        COURT REPORTE R: You are going to have to speak

7 up if you want this on the record.

8        MS. GREENBERG: It appear s it was a probation

9 violation.

10        Thank you.

11        THE COURT: It says the bench warrant was issue d

12 for a violation of probation?

13        MS. GREENBERG: That 's what it appear s from the

14 Pretrial Service s record.

15        MR. WARD: It says she served no time. She was

16 simply brought into court.

17        THE COURT: She was n't a free woman if there was

18 a bench warrant. I mean, there 's some period of

19 confine ment.

20        Ladies and gentlemen , not with stand ing what I

21 told the jury, we'll resume at a quarter of two.

22                    (Off the record at 1:26 p.m.)

23                    (On the record at 1:55 p.m.)

24        THE COURT: Are you ready?

25        MR. HALL: I think we're all here now.

1         Your Honor, yesterday the court put a

2   sequestration order regarding my client because he was

3   in the middle of his testimony.  He has now finished

4   that.  As a result of that order, he was sent to Howard

5   County Detention Center.

6                        (Jury returns at 1:59 p.m.)

7         THE COURT:  Good afternoon, ladies and

8   gentlemen.  Sorry we didn't start precisely when I told

9   you we would.  We did take care of other matters while

10  you were out, and I think we only had 20 minutes for

11  our lunch.  So, we are back on track.

12        I wanted you to know that the case for Mr.

13  Whiting is essentially concluded, subject to a couple

14  of provisos that might cause there to be additional

15  testimony.

16        We're now going to hear the case for Lavon

17  Dobie.

18        Mr. Ward, you may proceed.

19        MR. WARD:  Thank you.

20        We call Lavon Dobie to the stand.

21        Ms. Dobie, if you would step over there, please,

22  remain standing, and raise your right hand and be

23  sworn.

24  Thereupon,

25                    **LAVON DE'NICE DOBIE**,

1 having been called as a witness on behalf of the

2 Defendant Lavon Dobie, and having been first duly sworn

3 by the Courtroom Deputy, was examined and testified as

4 follows:

5          THE CLERK:   I need you the state your name for

6 the record.

7          THE WITNESS:   Lavon De'Nice Dobie, D-O-B-I-E.

8          THE CLERK:  Spell " De'Nice " for me.

9          THE WITNESS:   D-E-'-N-I-C-E.

10                    **DIRECT EXAMINATION**

11          BY MR. WARD:

12 Q.    Mrs. Dobie, it's important that everyone be able

13 to hear what you say, and particularly important that

14 the jurors be able to hear what you say and, of course,

15 the judge.

16          Do you understand?

17 A.    Yes, I do.

18 Q.    I want you to sit forward and speak into the

19 microphone and keep your voice up.

20          Do you understand?

21 A.    Yes.

22 Q.    And it's not important that you look at me or

23 anybody else in the courtroom, except for the jury.        I

24 want you to look directly at the jury when you respond

25 to questions.

1        Do you understand?

2  A.     Yes, sir.

3  Q.     Unless somebody's showing you something or

4  asking you to look at something.  Got it?

5  A.     Yes, sir.

6  Q.     Now, Mrs. Dobie, you're how old presently?

7  A.     42.

8  Q.     And let me ask you a few questions about your

9  personal background.

10        You were born and raised in the    District of

11 Columbia, I understand.

12 A.     Yes, sir.

13 Q.     And that's where you were living at the time you

14 were arrested in this case, on June one of '04; is that

15 correct?

16 A.     Yes, sir.

17 Q.     Spent all your life there.  Raised --    I'm born

18 and raised in the   District of  Columbia.

19 Q.     All right.  Tell the jury a little bit about

20 your education.

21        Did you go to high school?

22 A.     I went to Woodrow   Wilson High School in the

23 District of  Columbia.  After high school,    I went to --

24 Q.     Did you graduate?

25 A.     Yes, I did.

1  Q.      When was that?

2  A.      1979.  I needed some extra credit, so    I think I

3  came out maybe a year later or something like that.

4  Q.      Following high school, did you pursue any other

5  education?

6  A.      I did.

7  Q.      Tell the jury about that, please.

8  A.      I went to Scanner's   Cosmetology school.    I've

9  taken several nursing aid and home health aid courses,

10  as well.

11  Q.      All right.  Are you familiar with Northern

12  Virginia Community College?

13  A.      I went back to school at age 38 at Northern

14  Virginia Community College to become a Certified

15  Addiction Counselor.

16  Q.      How long did you spend there, approximately?

17  A.      I stayed long enough to receive a 4    .0 grade

18  average and was intending to enroll the following

19  semester.

20  Q.      All right.  Did you become an addictions

21  counselor as a consequence of that education?

22  A.      I did.

23  Q.      Can you tell the jury when and where and for how

24  long you were an addictions counselor?

25  A.      I've worked at the majority of the group homes

1  and shelters in the   District of   Columbia.   Sasha  Bruce,

2  Bureau of Rehabilitation by Capitol   Cadillac and  IBR,

3  also,  and during my life it was Gap.  So,   I started out

4  of as off as a peer counselor.  My last job as a

5  counselor was at Charter Behavior Health Research

6  Center and I was an addiction counselor there, and    I

7  stayed there until 2001 or 2002.

8  Q.    Where was that located?

9  A.    I believe the correct mailing address is 1401

10 Broschartan [ph.] Lane.  It's in    Montgomery County.

11 Q.    I see.  Was that an adult institution for

12 teenagers or children, or what?

13 A.    It was for both children and adults and also

14 rendered services to the dually addicted, as well as

15 some that were mentally and emotionally challenged.

16 Q.    All right.  And of course you personally have

17 had experience with drugs; is that correct?

18 A.    Yes, I have.  Yes,  I have.

19 Q.    We'll come to that in a minute.

20      Did you ever follow up --   I think you said you

21 had some cosmetology school training.

22 A.    Yes.

23 Q.    Did you ever follow up on that?

24 A.    Yes.  Prior to this incarceration,   I was working

25 in a hair salon on   U Street -- Edges -- and   I also was

1  in the process of becoming a    CJA-certified

2  investigator.

3  Q.      All right.  Well, we'll come to the

4  investigation business.

5          You did work in the cosmetology business?

6  A.      Yes.  Actually, I'm utilizing those skills now

7  while  I'm incarcerated.

8  Q.      That was -- when you were working on the

9  business on the outside, was that women's hair or

10 makeup, or what?

11 A.      Actually, men and women's hair, coloring,

12 cutting, etcetera.    I went to cosmetology school, so    I

13 know the theory part of it as well as the practical.

14 Q.      All right.  Would you like a glass of water?

15 A.      Please.

16 Q.      Tell us about the investigator business you were

17 just talking about.

18 A.      I've had numerous of brushes with the law, and    I

19 have a son that's incarcerated.  Helping prepare for

20 his defense,  I was able to assist the investigator they

21 assigned to him.  Me being effective, it was suggested

22 why don't  I apply; my criminal history wouldn't affect

23 me getting the position.    I applied for an application.

24 While incarcerated on this charge,    I was notified

25 through mail that my application -- they were asking

1  for it to go to another step.    I never did it later.

2        Later some other things will be revealed, but

3  that's where my interest was going.

4  Q.    All right.  Now,  I seem to recall that one of

5  the calls or one or two of the telephone calls which

6  was played had to do with the arrest of    Gwen  Levi and

7  her location in some    Montgomery County facility and

8  your contacting someone to find out about her.

9        Do you recall that?

10 A.    I do.

11 Q.    I also seem to recall in that conversation you

12 said something about using your investigative license

13 or investigator I  .D. or something like that to get to

14 see  Ms. Levi; is that correct?

15 A.    I did.

16 Q.    Did you actually have any kind of I    .D. like

17 that ?

18 A.    I had a identification card bearing my picture

19 with the name " K. C. Johnson" on it.   I went to the

20 place where the   CJA Department send those employees.

21 Had I been hired legally,   I would have went to that

22 same place on 18th and   Columbia Road and they would

23 have done the identification.   I went there with a

24 gentleman who was a   CJA investigator, or he was an

25 investigator for the courts.  This is how    I became

1  aware of it.  At that time   I filled out two

2  applications.   I paid to have my picture put on with

3  the name " K. C. Johnson," at that time for fraudulent

4  purposes not relating to   Ms. Levi at all.

5          I also filled out an application that same day

6  in the name of " Lavon De'Nice  Dobie" as well, and the

7  government can verify that.

8  Q.     Did you ever use that document to go see    Ms.

9  Levi?

10         Did you ever see  Ms. Levi at all, first of all?

11 A.     I did indeed use the document.    I went to see

12 Goldie  Dobie, III, which is my son who was detained at

13 Prince  George's  County Detention Center where    I'm

14 detained, and  I presented myself as an investigator to

15 hug and kiss my son.   I never used it to go see    Ms.

16 Levi.

17         I did tell  Ms. Martin on the conversation --   I

18 even went as far as calling    Montgomery County because   I

19 had been arrested and detained there previously myself,

20 so I knew some of the correctional officers, and the

21 conversation confirms   I asked to speak to one

22 specifically who was a officer at that time, and     I

23 asked her did they have a    Gwen Levi, and  I told  Ms.

24 Martin on numerous occasions    I'm going to go. Once    I

25 was informed of  Ms. Levi's arrest --   I didn't know

1  about it;  I was informed about it.

2         I called the detention center, confirmed that

3  she was there while   Ms. Martin was on a three-way

4  conversation.   I stated  I would go.   I don't remember

5  the correct dates, but my   birth day was May 18 of  '04.

6  Evidently, when she was asking me to go see      Ms. Levi

7  was around that time.  The Last conversation      I had in

8  reference to going and seeing    Ms. Levi it was my

9  birthday.  It ain't that important to me.      I didn't go,

10  and that was the end of it.     I never went to see her.

11  Q.      Well, let me ask you this.  Why did you make

12  calls to -- for  Ms. Martin to find out where    Gwen  Levi

13  was and so forth?

14  A.     I knew  Ms. Levi way before I knew    Ms. Martin.    I

15  met  Ms. Levi through my stepfather, who's been with my

16  mother since 1971-72, and that's how     I met  Ms. Levi.

17  Ms. Levi -- at one point me and her daughter was very

18  close.  She considered me her goddaughter.  She's told

19  people on the street that    I was her niece.  Me going to

20  see her -- first of all, someone else -- the wiretap

21  revealed who called me and said, you know Gwen is

22  locked up.  I didn't know.  At that time    I called  Ms.

23  Martin and asked   Ms. Martin, did you hear that    Gwen was

24  locked up?  Ms. Martin denied knowing that     Gwen was

25  locked up.

1        The wiretaps that the government have also
2 confirms that she even stated to someone else -- the
3 through wiretap   I learned all of this after our arrest
4 -- I didn't tell   Becky that   Gwen was locked up.  She
5 said Tammy did.  Those wiretaps available.  It would --
6 I'm not denying where I've been, so it could have been
7 anybody.  It could have been "   Joe Blow."  And if they
8 would have said she was locked up or he was locked up,
9 they're supposed to be in   Montgomery County.  Well, if
10 they would have asked, do you know anybody work up
11 there?   I would have been honest:  Yeah,    I was locked
12 up there before;   I do know some officers that    I gained
13 a  rapport with.  So    I could have called to see if the
14 person was allowed to have visits or whatever.
15 Q.     But you also had some personal knowledge of --
16 with  Ms. Levi going way back?
17 A.     Yes.  Not prior to this.  But as a teenager     I
18 think  I met  Gwen Levi maybe when   I was 14 or 15 years
19 old, sometime around there.
20 Q.     We'll come back and explore that relationship.
21        Now, you said that you were married to Goldie
22 Dobie.
23 A.     Junior.
24 Q.     Junior?
25 A.     Yes.

1  Q.      When were you married to    Mr. Dobie?

2  A.      On April 17 of 1986,   I believe, or '85.

3  Q.      You don't let him hear you say '86 or '85.

4          MS. GREENBERG:  Objection.

5          THE COURT:  Overruled.

6          BY MR. WARD:

7  Q.      All right.

8          You've remained married since that time, is that

9  correct, to him?

10 A.      I'm married now; however,    I've filed for divorce

11 since being arrested on this case.

12 Q.      All right.  But you had some children together,

13 you and  Mr. Goldie   Dobie?

14 A.      Yes.

15 Q.      Who is the oldest child?

16 A.      Goldie Dobie, III.

17 Q.      He's the young man you said is incarcerated, or

18 was incarcerated?

19 A.      He is incarcerated.

20 Q.      How old is he?

21 A.      24 years old.

22 Q.      Your other child is?

23 A.      Ta'Vaughn  Dobie.

24 Q.      Can you spell that?

25 A.      T-A-'-V-A-U-G-H-N.

1  Q.      I'm sorry.  Did you say how old he is now?

2  A.      He's 20.  Born on June 20, '86.

3  Q.      Were either of your sons present in the house --

4  in your house on Ninth Street at the time it was raided

5  on June first, '04?

6  A.      Yes, sir, my youngest son,    Ta-Shawn.

7  Q.      All right.  And he was then how old?

8  A.      He was 17 years old.

9  Q.      Was he still living at home, or did he just

10 happen to be home at that time?

11 A.      He was still living at home.

12 Q.      All right.  Your husband, Goldie    Dobie.  Was he

13 a drug addict, too?

14 A.      Yes, he's used.

15 Q.      Has he ever had any other problems with the law?

16 A.      Numerous of problems.    I met him when  I was --

17 he's seven years older than me.  He's been incarcerated

18 numerous of times.  He was just returning to society in

19 2001 or 2002 after doing 12 years.

20 Q.      All right.  But you were back together,

21 obviously, at the time of the raid on your house;

22 correct?

23 A.      Yes.

24 Q.      All right.  Bear with me a moment.

25         Now, let me ask you in some more detail about

1 your substance abuse.  Let me ask you, when did you

2 start abusing drugs and what kind of drugs?

3 A.     I would say  I started abusing drugs around age

4 27 or 28.  Whenever  I caught -- whenever was first

5 arrested.   I would say at that point in my life    I had

6 began abusing drugs.  However,    I had experimented with

7 drugs far before  I started abusing drugs.

8 Q.     Around 27, or 28 is when you developed a habit?

9 Is that fair to say?

10 A.     Yes.

11 Q.     What were you using?  How were you using it?

12 A.     I started out snorting cocaine through my

13 husband and in  Baltimore, and being in   Baltimore  I then

14 started to experiment with heroin.    I've snorted both

15 of them, and  I became addicted.  By age 31    I would say

16 I was actually fully addicted.

17 Q.     Okay.  Now, it may be that everybody in the

18 courtroom knows what "snorted" means; it's been

19 referred to quite a few times.  Could you just -- in

20 case anybody doesn't, explain that.

21 A.     It's where -- whether it's cocaine or heroin,

22 either  I use a fingernail or a straw or something to

23 put it in my nose -- a matchbook or whatever.

24 Q.     Sniff it up?

25 A.     I'm inhaling it through my nostrils.

1 Q.      All right.  Were you ever in any programs to try

2 to cure your drug addiction?

3 A.      I was.

4 Q.      Can you tell the ladies and gentlemen of the

5 jury when and what programs you've been in?

6 A.      The last time -- the most recent time that      I've

7 addressed my addiction    I had relapsed at the end of

8 2003.  I was at  D. C. detox  center under the name

9 "Geneva Monroe" one of the identification cards that      I

10 had.  I used that and went into    detox .

11       On April 17 of '04, which was my wedding

12 anniversary,  I was in  detox  then under that name.

13 Prior to that,  I had an arrest stemming from      Montgomery

14 County .  I believe the arrest was      '91 or sometime in

15 the early nineties.    I was sentenced to eight years for

16 a robbery relating to some jewelry -- a jewelry store,

17 and  I was sentenced, and the judge suspended the

18 sentence.  He gave me eight years, all suspended but

19 four, and  I wrote for reconsideration asking to address

20 my addiction because    I had never been given the

21 opportunity.   I did that.  He allowed me to go into

22 Second Genesis.

23       While in Second Genesis,    I completed the

24 inpatient portion of the program.  A young lady and

25 myself got into a altercation, and      I was put out the

1 program.  However,   I didn't violate my probation.  They

2 terminated it successfully because    I had verification

3 from counselors and them that    I was approached about a

4 homosexual relationship or act and didn't choose to

5 indulge.  I felt like the girl violated me; we fought.

6 Q.     Any other programs that you've been in?

7 A.     No.  Just while incarcerated this time.  When     I

8 came into custody   I had a heroin addiction.    I was

9 treated for it in   Montgomery County.

10 Q.     This is on June 1, '04?

11 A.     June 1, '04.  June 1, '04 when    I came into

12 custody through Greenbelt.  Once    I got to  Montgomery

13 County from this courthouse,    I was ill.  If you all

14 don't know what "ill" is, at this point my body was

15 breaking down.   I began to vomit and have blue stool

16 and everything, and the nurse at that point diagnosed

17 me -- they looked up my nose to see that most of my

18 tissues in my nose had been deteriorated from drug use.

19 They treated me at that point with Methadone, which

20 they no longer -- they didn't give or whatever, but due

21 to my heroin addiction and the severity of my

22 withdrawals, they treated me -- they gave me a liquid

23 form for three or four days and some pills.

24        After leaving there, we were transfer today

25 Clarksburg.  Immediately while in the intake process,     I

1 signed up for the jail addiction services.  After

2 leaving  Montgomery County and being transferred to

3 Prince  George's  County I completed the relapse

4 prevention program.  By me having the therapeutic

5 knowledge because   I've obtained some information and

6 the personal knowledge from using,     I knew that there

7 was something that allowed me to relapse, and      I went

8 back into treatment while incarcerated at the relapse

9 prevention program, and    I completed it while   I've been

10 incarcerated.   I've had the opportunity to use while

11 incarcerated and chose not to.

12 Q.     You mean there were drugs in the institution?

13 A.     Sure.

14 Q.     You've been in custody since your arrest on June

15 1 of '04?

16 A.     I didn't hear you,   Mr. Ward.

17 Q.     You've been in custody since your arrest on June

18 1 of '04?

19 A.     Yes, I have.

20 Q.     Have you used drugs during that time?

21 A.     Nothing other than a    Tylenol when  I had my tooth

22 extracted.

23 Q.     Let me ask you this.  When would you say was the

24 height, if you will, of your addiction, when you were

25 using the most drugs that you ever used?

1  A.      Sometime around '89-'90.  Somewhere around that

2  time.

3  Q.      During that time, at the height of your

4  addiction, what were you using?  Both coke and heroin,

5  or alternately one or the other?  Or just one, or what?

6  A.      I apologize.  The height of my addiction would

7  have been in the nineties, around --    I don't know.  My

8  criminal history would verify it better for me.

9  Q.      We'll get into that.

10  A.      It was around the time that   I was in  Virginia.

11  I had got locked up, and at that time    I knew that that

12  arrest definitely was a direct result of my drug

13  control going bizarre at that point.

14  Q.      And what were you using and how much at that

15  time?

16  A.      I'm basically,  I would say, a heroin addict.    I

17  have a high tolerance.  So if    I'm using, just not to be

18  sick or whatever,   I can snort maybe a $50 bag.

19  However, if  I'm using just to be using, after the

20  illness part of it is over, if    I'm sick in the course

21  of a day,  I can snort $100 to $200 worth of stuff. $300

22  without exaggeration.

23  Q.      Well, let's talk about in terms of weight,

24  because there's been a lot of discussion of "grams" and

25  "eighths" and that sort of stuff.

1          How does a $50 bag of heroin relate to weight?

2  A.      The only way  I bought heroin was in the streets,

3  and what they sell are the way   I snort it.   I snort raw

4  dope.  There's a difference between dope that people

5  shoot and people snort.     I don't want anything that you

6  shoot, because it's cut with some other stuff.      I use

7  raw dope, and you're usually buying it in the street

8  anywhere between $35 -- back during the time when my

9  addiction was at its height, it was selling for $35 to

10 $40.  However, people started selling what are supposed

11 to be grams of dope or half a grams of dope, and they

12 go anywhere between $75 and $   150 for a bag of heroin --

13 raw heroin.

14        MS.  GREENBERG:  Judge, she's referenced back

15 when her drug addiction was at its height.  We've had

16 two different dates.  If counsel could clarify what

17 date we're talking about.

18        THE  COURT:  Could you clarify it,    Mr. Ward?

19 I've got two different dates in my notes.

20        THE  WITNESS:   I thought you all understood me.

21        BY MR.  WARD:

22 Q.      Restate it.

23 A.      Yeah.  He asked me when it was at the height of

24 my addiction.   I initially said in the late eighties,

25 and then  I recanted because   I remembered when  I had got

1  arrested in '90-something which    I believe was sometime

2  in '91 through '94 whenever --    I don't remember the

3  exact date because   I was using.  However,   I have an

4  arrest that comes out of    Arlington County.  At that

5  time my addiction was in full bloom.

6  Q.    Were you using any cocaine at that time?

7  A.    During that time   I wouldn't say that   I was using

8  it whereas though   I was addicted.  However, heroin

9  makes you nod.  So, all during my drug usage     I've

10 always snorted cocaine to -- like, for example, if     I

11 was in here, a member of this -- the audience.  If     I

12 was blowing dope at that point in my life,    I would have

13 some cocaine also.  Then that way    I wouldn't nod out.

14 The cocaine brings you back up more.  So, it mellows

15 you out.  So, it's a possibility that    I did have some,

16 or I would have had it, but it wasn't my drug of

17 choice.  It was something    I used in addition to my drug

18 of choice.

19 Q.    Just for clarification purposes.  When     you talk

20 about heroin and nodding out, you mean what?

21 A.    Heroin makes you appear to be sleepy, and you

22 actually go out for a moment.    I'm greedy.  If   I'm not

23 high -- at that point in my life, if wasn't nodding,    I

24 wasn't high.  The dope wasn't no good.  And that was my

25 telltale sign.    I could be talking to you on the phone

1  and I would go out.  If I said -- right now if    I was

2  high off of heroin and   I was sitting here, you all

3  would know it, because if you get too comfortable or

4  sit too long or too still and the dope is some good,

5  I'm going to close my eyes;   I'm going to be out and you

6  will be saying, Dobie,   Dobie.  You will know   I'm on

7  something.

8  Q.    Let's go to the period before you were arrested,

9  the period we talked about in this case -- in this

10 conspiracy.

11        How much were you using at that time?

12        Let's take this how much were you using up and

13 around the time your house was raided on June 1 of '04?

14        I don't mean that day;   I mean the weeks and a

15 couple of months before.

16 A.    Prior to June 1, '04,   I would say anywhere --

17 between  January and   June I was snorting numerous amount

18 of heroin and cocaine.  Basically,    I slept all day and

19 stayed up all night, basically.  The only time    I came

20 out during the day was basically to cop.

21 Q.    Where did you get the heroin that you were    using

22 back then?

23 A.    Basically, Seventh and   T, Northwest; Ninth

24 Street.  I frequent Chuck & Billy's.    I frequent after-

25 hour joints which had gambling joints.     I like to shoot

1  dice.   I know numerous of places to cop heroin from,

2  basically -- and cocaine.  Basically, I was doing most

3  of my copping at Chuck and Billy's right prior to this,

4  or even some of the people    I was gambling with sold

5  coke or dope easily.

6  Q.      When you say "gambling," do you mean a few bucks

7  here and a few bucks there?

8  A.      No.   I'm a jewel thief and a fur thief, and it

9  would be nothing for me to have taken some fur coats or

10  some jewelry, and    I go to illegal establishments where

11  what we call "hustlers" in the    District of   Columbia and

12  other places, and    I may have a fur coat that's $12,000,

13  for example, and I want $3,000 for it.      I would have

14  $3,000 and sometime s I may not make it out the crap

15  joint with the money, because    I'll stand there and

16  gamble.  Some days   I lose it all and some days    I might

17  turn three into fifteen.

18  Q.      You've used the word "hustler," and the jury has

19  been told that "hustler" means someone who deals

20  heroin.

21         MS.  GREENBERG:  Objection.

22         THE COURT:  Overruled.

23         BY MR.  WARD:

24  Q.      Is that correct?

25  A.      I totally disagree, and    I can state with moral

1  certainty that is not correct at all.

2  Q.      What do you understand a "hustler" to be?

3  A.      I'm considered one of the best jewel thieves and

4  fur thieves out of the District of Columbia, and one of

5  the government's cooperating witnesses confirmed that

6  for me.

7  Q.      All right.  You told us that you would go out to

8  whatever  the streets were in   D. C. to get your heroin.

9          Where were you getting your cocaine at that

10  time?

11  A.      I've purchased small amounts of cocaine from      Ms.

12  Martin;  I've purchased some from Chuck and Billy's;

13  seventh Street; ninth street.  The majority of the

14  cocaine or heroin   I use came out of the street.

15  Q.      When you purchased from   Ms. Martin, how much

16  would you purchase?

17  A.      I've purchased --

18  Q.      Or would it depend on how much money you had?

19  A.      No, it didn't.  Actually,   I first maybe first

20  purchased maybe something from   Ms. Martin, maybe

21  February of '04.   I met  Ms. Martin in '03 and didn't

22  have any knowledge of her -- none of this.  A lot of

23  this is a surprise to me.    Ms. Martin didn't have any

24  knowledge that   I was a heroin addict unless it was by

25  hearsay from someone else or me actually using until

1  maybe  February or something, and it started off,      I

2  believe, with maybe a 50 or a sixteenth of cocaine.

3  Either a 50 or a sixteenth.  A 50 is $50; a sixteenth

4  is $125.

5  Q.      All right.  That's a sixteenth of a what?

6  A.      Of a -- you get 1.75 if it's correctly given to

7  you.

8  Q.      Grams?

9  A.      Yes.

10  Q.      All right.  We've heard testimony about 8-balls

11  of cocaine; is that correct?

12  A.      Yes.  I've heard numerous of testimonies about a

13  8-ball.

14  Q.      At least as far as you were concerned -- and      I'm

15  confining you now to the time that you were dealing

16  with  Ms. Martin -- was it usual or unusual for you to

17  buy for your own personal use an eighth of cocaine?

18  A.      I've never  purchased a eighth of cocaine from

19  Ms. Martin.  My birthday was      May 18.  Ms. Martin

20  actually gave me some cocaine on my birthday.      I didn't

21  need to weigh it to find out how much it was.  It was a

22  gift.  I believe it may have been a 8-ball because      it

23  was more than the 1  .75 grams that  I normally got.

24  Q.      Have you ever, ever --   I'm not confining you to

25  this case -- ever sold drugs to other people yourself?

1 A.      I've never been a drug user -- a drug seller.

2 I've done a lot of things.    I've never sold drugs.  The

3 government knows that.    I've stole;  I used fraudulent

4 use of credit cards; forgery, robbery.     I've never been

5 a drug dealer.  Never.

6 Q.     Now, let's turn to these -- one of these charts

7 here.

8        MR. WARD:  Excuse me,  Your Honor.  May  I?

9 I was simply asking, since she's in custody,      Your

10 Honor, if she was allowed to come forward, closer to

11 the jury.

12       THE COURT:  You may.

13       MR. WARD:   I understand that's fine as long as

14 the marshals come.

15       THE COURT:   Just stay with her.

16       BY MR. WARD:

17 Q.     Would you step over here this way,    Ms. Dobie,

18 please?

19       Could we have the gadget that this goes on?

20       I'll be careful of the microphone this time.

21       As Your Honor can tell,  I'm not terribly

22 technically proficient.

23       Now, Ms. Dobie, this is   CH-1, and of course

24 you've seen this before during the course of the trial;

25 is that correct?

1 A.       I have.

2 Q.       All right.   I want to -- is that going to stay?

3          I want to --  I was looking for my papers.     I'm

4 sorry.

5          MS. GREENBERG:   Mr. Ward, can Agent   Eveler fix

6 that stand for you?

7          MR. WARD:   I will bow to his technical

8 expertise.

9          Thank you, Agent   Eveler.   I appreciate that.

10 Let me just get my pen.

11          I guess it doesn't matter if it's tilted, as

12 long as it stays there.

13          BY MR. WARD:

14 Q.     Now, Ms. Dobie, let's look at -- let's start at

15 the top.  Kelly Last Name Unknown of El Paso.  Before

16 seeing this board, had you ever heard of Kelly      LNU from

17 El Paso?

18 A.     No.

19 Q.     Did you ever have any drug dealings of any kind

20 with anybody at   El Paso?

21 A.     No, I have not.

22 Q.     Even copping for your own personal use?

23 A.     No, I have not.  Never been to    El Paso.  Don't

24 know anybody there to my knowledge.

25 Q.     What about   Steve  Campbell of   Houston?

1          Did you -- before seeing his picture up there in

2 this trial, did you know him?

3 A.      No, I have not.

4 Q.      You ever been to  Houston?

5 A.      If so, it was on,  I imagine, traveling a

6 airplane layover.  No, it was actually    Dallas where the

7 plain layed over at.  So,   I've never been to  Houston.

8 Q.      Let's go to what ICE termed "  Maryland Cocaine."

9          How about Cuba Last Name Unknown?

10 A.     No.

11 Q.     Is the name " Cuba" familiar to you at all?

12 A.     No, it's not.

13 Q.     You've never had any dealings with anybody named

14 "Cuba?"

15 A.     I have not.

16 Q.     What about Juan   Encarnacion?

17         You saw him in court, didn't you?

18 A.     That's when  I first seen him and first became

19 familiar with him or his name.

20 Q.     You never had any dealings with anybody by

21 telephone or E-mail or anything?

22 A.     I met him just like you ladies and gentlemen met

23 him:  On that stand.

24 Q.     What about Luis Mangual,   Jr.?

25         Have you ever seen him before?

1 A.      I have no knowledge of him except through here.

2 We've been locked up since June 1 of '04, and

3 downstairs in the holding area it's like cages, so of

4 course  I seen him under these circumstances.

5 Q.      All right.  Let's move over to the "  California

6 Cocaine," whatever it is.  Pernell      Philpot.

7        Do you know Pernell   Philpot?  Or did you know

8 him before this trial?

9 A.      We were familiar with each other.  We didn't

10 know each other.    I come out of the   District of

11 Columbia.   I've always lived in the Northwest sector of

12 Washington -- Upper Northwest.      I used to go with a

13 guy, and during my teenage years 17, 18, 19, 20 years

14 old off and on, and   Philpot comes from the Coolidge

15 High School area.  The IBEX during that time was a

16 place where we as young kids went to, or the Paragon on

17 Wisconsin Avenue.  Through two other people at that

18 time I met him, you know, at the Go-Go dancing,

19 whatever.  No personal contact.  Didn't come back in

20 contact with this man -- my kid -- my oldest kid -- son

21 is 24.  When  I had contact with him, my baby was just

22 born, which was in '82 or '83.     I had no contact with

23 this man up until maybe after meeting     Ms. Martin,

24 sometime --  I met Ms. Martin definitely in    August of

25 '03.  I came back in contact    and seen him there; had no

1  knowledge of none of this.  A lot of it is a surprise

2  to me, also.

3  Q.     When you say "seen him there" referring to     Mr.

4  Philpot, where is "there?"

5  A.     One time  I was over  Ms. Martin's house and

6  Philpot came in.  Or   I think it was actually a

7  situation he overheard, maybe, me and her talking on

8  the phone and they referred to me, as you all know by

9  now, " Becky."  When  I got there, it was the same

10  "Becky" that he had knew from years ago, as      I was

11  telling you all.  Hi, how you doing?  It was a clothing

12  situation.  It was a blue suit with maybe some, like,

13  light -- pail blue window pains, and     I was like, that's

14  a sharp coat or whatever.  That was it.  That was all.

15  Q.     Did you ever have any -- at any time, either

16  back when your oldest was a little tot, or more

17  recently when you met   Mr. Philpot at  Ms. Martin's, did

18  you ever have any drug transactions, drug

19  conversations, anything to do with drugs with      Mr.

20  Philpot?

21  A.     I can say in front of   God and his 12 Disciples

22  that I've never dealt drugs with     Philpot, any of these

23  people or anybody in my life.     I've used drugs;  I've

24  never dealt them.

25  Q.     Steve Brim, who I think we've heard is now

1 passed -- deceased.

2          Did you ever know him?

3 A.      The first time I ever even heard the name " Steve

4 Brim" was in this courthouse.     I was denied bond from

5 June of '04 up until   February of '05 due to the

6 government fabricating something --

7          MS. GREENBERG:   Your Honor, objection.  Move to

8 strike.

9          THE COURT:  Sustained.

10         BY MR. WARD:

11 Q.      Just tell us about   Steve Brim.

12 A.      No, I don't know him.

13         MS. GREENBERG:  Please tell the jury to

14 disregard that statement,   Your Honor.

15         THE COURT:  Please disregard the last statement.

16         BY MR. WARD:

17 Q.      Ms. Dobie, do you need a drink of water?

18 A.      No.

19 Q.      Just relax.

20         We've learned, though -- we heard from his son,

21 Nathan King -- had you ever seen   Nathan King before he

22 appeared in this courtroom?

23 A.      Never seen him.  Never even heard of him.

24 Q.      I see.  And  Nathan King is the gentleman who you

25 saw look at your photograph -- what is supposed to be

1  your photograph -- and say that it was his stepmother;

2  is that right?

3  A.      I remember him stating that.

4  Q.      Bridget Brim.

5          All right.  What about -- let's deal with      Mr.

6  Moises  Uriarte .  Ever see him before?

7  A.      No.  Except -- not prior to getting on the

8  stand.   I never seen him in my life.

9  Q.      Now,  Gwen  Levi.  How does she pronounce it?

10  "Levy" or " Levi?"

11  A.      Levi.

12  Q.      You told us that you had some prior knowledge of

13  her from when you were, what, a teenager?

14  A.      Yes.

15  Q.      Did that come about?  Tell me.  Tell the jury

16  about it.

17  A.      My mother and father -- stepfather, but      I call

18  him my father because he basically raised me --

19  evidently knew   Gwen  Levi and her husband from the

20  Boston area.  From the stories     I've heard, my father

21  knew  Gwen from the   Boston area.  A lot of people say

22  that we favor.    I've heard that for years.  Me and her

23  daughter met -- in 1985 or '86, me and her daughter

24  met.

25  Q.      Tell me her daughter's name.

1  A.      Her daughter's name is Bonita     Levi.

2  Q.      B-O-N-E-T-T-A?

3  A.      Yes.

4  Q.      Okay.

5  A.      At the time  I was working at D. J. Melon group

6  homes with kids.    Ms. Levi's daughter, Bonita, knew     Mr.

7  Daniel  J. Melon, who owned these group homes in the

8  District of  Columbia.  That's how   I met Bonita, and

9  Bonita and  I became close.

10        At that time  I was snorting cocaine;    Bonita was

11  snorting cocaine.  At that time     I didn't even know she

12  was snorting dope at that time.     I hadn't begun to use

13  heroin, and she was smoking.    Gwen Levi used to come

14  past 1506  Pennsylvania Avenue, Southeast which used to

15  be the office for  D. J. Melon & Associates, and    Gwen

16  came one time to get her daughter who, evidently,

17  hadn't been home or whatever, unbeknownst to me,

18  because  I had just come over.

19        Evidently,  Bonita had been there for a couple of

20  days or whatever getting high.    Gwen came hysterical,

21  like any mother would have, and was like, bring your

22  butt out of here, whatever, and at that time she

23  threatened to do something to everybody that was in

24  there.  At that point, when she seen me, she said, and

25  Becky,  I'm gonna call your mother and them and let them

1  know what you over here doing, or whatever.  And that's

2  how we came back in contact more so at that point, and

3  I would see her.

4         Gwen Levi.  She's a person that frequent after

5  hours.  In most after hour spots in the     District of

6  Columbia, downstairs you drink, you party, you snort,

7  you smoke, you do whatever, and upstairs you gamble.

8  So, a lot of times, as    I'm coming in the after hours

9  joint, I have to come past   that part of it to get

10 upstairs to get to the crap table or whatever, and      I

11 know  Gwen Levi from years ago.  She's given me

12 marijuana.  She gave me my first pound of marijuana,

13 actually, and --   I mean,  I know her to be a hustler.     I

14 know  Gwen to be a hustler.

15 Q.     Other than the -- well, first of all, when was

16 it she gave you the pound of marijuana, approximately?

17        I don't need an exact date.

18 A.     I don't know the exact date.  However --

19 Q.     How old would you have been, approximately?

20 A.     By this time in my 20s.

21 Q.     Okay.  Other than that, has she ever distributed

22 any kind of drug, marijuana, coke, heroin,      PCP,

23 whatever to you?

24 A.     The majority of the dope that    I would buy off of

25 Seventh Street or Ninth Street was from a few of her

1 workers, and they would say your, "Aunt" got it or

2 whatever because, like   I said, she often referred to me

3 as her goddaughter or her aunt, and     I've actually

4 gotten heroin from   Ms. Levi before.    I bought a few

5 grams from her before.  And this was in the later

6 years.  But when   I was snorting, like, from

7 thirty-something or whatever,    I knew that  Gwen was

8 selling.  If   I was to come through a after hour joint

9 or whatever, if   I didn't want her to know my personal

10 business -- that   I was snorting --   I would get it from

11 one of her workers during that time.

12          As  I got older,  I had no problem approaching her

13 about heroin, because it was evident if it was -- she

14 may have never seen me snort it, but by me being a

15 person in the street and moving around hustling and

16 selling my products and stuff, by that time she knew      I

17 was snorting cocaine and heroin.      I had no reason to

18 hide it.  Once my mother found out     I was using drugs,

19 it didn't matter.   I mean, if  I was hustling to pay for

20 it, it didn't matter if you knew.  So,     Gwen -- at this

21 time I could approach her:  Look,    I'm trying to get a

22 gram of dope;  I'm trying to get two grams of dope.

23 Q.     And you never sold any drugs with her, did you?

24 A.     Never .  First of all,  I'm a user.   Ms. Levi's

25 theory is that if   I wasn't using,   I would be a good

1  hustler.  She didn't give me any drugs.  The government

2  has her statement.

3  Q.     And William "Dog" Turner.  There's apparently a

4  time between  Mr. Turner and  Ms. Levi?

5  A.     I met  Mr. Turner in maybe 2002 or maybe 2001.

6  Q.     What circumstances?

7  A.     Actually,  I met them at what we call Daddy Grace

8  Church in the  District of  Columbia -- Paradise Kitchen,

9  where you go and buy soul food dinners or whatever.

10  They were sitting in there one day when    I happened to

11  come in there and buy something, which is off of Sixth

12  and N somewhere.   I've heard through the street that

13  Gwen Levi and "Dog" were an item or going together, and

14  it was confirmed that day when    I was introduced to him

15  that the place.

16  Q.     Do you have any knowledge -- any personal

17  knowledge other than what you've heard in this

18  courtroom as to whether or not    Mr. "Dog" Turner and

19  Gwen Levi had a business?  That is a drug business

20  relationship?

21  A.     I would say that  I would believe it.    I've never

22  seen Mr. Turner with any drugs.  However,    I know  Ms.

23  Levi's history.   Mr. Turner has a history in the

24  District of  Columbia of being a gambler and a dope

25  dealer.  So, yes.  I know for a fact he gave me some

1  tips on gambling.  So,   I wouldn't be surprised.  The

2  information  I heard here,  I would believe it.

3  Q.      Were they good tips?

4  A.      Yeah, he did.  He showed me the proper way to

5  bet the numbers and stuff.

6        MS.  GREENBERG:   Your Honor, objection.

7        MR.  WARD:  I'll withdraw that,  Your Honor.  I

8  was being facetious.

9        BY MR. WARD:

10 Q.     We'll skip over  Paulette  Martin for a minute and

11 go to  Mr. Leerily Goodwin, also known as "Goodie."

12       Before this case, did you know    Mr. Goodwin?

13 A.      I wouldn't say  I knew  Mr.  Goodwin.  I came in

14 contact with  Mr. Goodwin.

15 Q.     Tell us where and under what circumstances,

16 please.

17 A.     I came home from prison in '98,   I believe, and

18 my mother, at that time, had a grey    Mercedes Benz, a

19 older model, and it was a guy by the name of Johnny who

20 was a mechanic that used to work at Capitol      Cadillac,

21 who also was a dope fiend, a   IV drug user, so he

22 bounced from shop to shop.    I was going to pick up

23 mother's car is how   I came back in contact with the

24 guy, Johnny.  At that time   I believe it -- no, it

25 wasn't actually that time that I met    Mr. Goodwin.  I

1 started at that time and asked Johnny would he work on

2 my car if I needed some repairs done on it, and he said

3 yeah.  At a later date   I carried my own vehicle over

4 there to get service.

5 Q.    When you say "over there" --

6 A.    It was called  B & B.  Lobo's,  I learned now, is

7 the name of it.

8      When  I went to this shop that you all are

9 hearing about, it was called   B & B Auto.   I believe it

10 was in the 1100 block of    Florida Avenue.

11 Q.    Did you go there to cop from Johnny or from    B &

12 B or anybody at  B & B?

13 A.    At that point in my life   I was clean and sober.

14 I had been released from   Goochland  Penitentiary for

15 Women, and  I was not using at that point in my life

16 when I went over there.   I didn't know  Mr. Goodwin.  I

17 went over there to get my car fixed.  It was B &     B

18 Auto.  I went and brought the parts for the car and

19 carried them to him and he fixed    I. Johnny had been

20 knowing me since basically teenage years, because he

21 worked on Mount Pleasant Street where my mother and us

22 lived at prior to this.

23 Q.    Let's move down to somebody --    I guess it was

24 Agent  Eveler has designated as "Distributors" and

25 "Facilitators."

1         LaNora Ali, w ho is in the courtroom today, whose

2 photograph you see there?

3 A.      Can I say something?

4 Q.      Yeah.

5 A.      I didn't know if you wanted me to explain this.

6 Actually, like  I said, the way  I met  Mr.  Goodwin at --

7 through the auto supply place.     I didn't meet  Ms.

8 Martin until 2003.

9 Q.      Yeah.

10 A.     How  I met -- found out the connection there was

11 totally surprising, and it was -- it wasn't by

12 accident, but neither one of them,     I don't think, knew

13 that they knew me either.

14 Q.     All right.  Well, we'll come back to    Ms. Martin,

15 but let's go to LaNora Ali first.

16         How long have you known LaNora Ali?

17 A.     I met  Ms. Martin, like  I said, in  August of '03.

18 So, sometime after meeting    Ms. Martin  I met  Ms. Ali.

19 Q.     What were the circumstances under which you met

20 her?

21 A.      Ms. Ali is someone  I consider very sharp.  She

22 likes fashion.  Like   I told you.  The truth is,   I'm a

23 thief.   I steal jewelry and fur coats and nice items.

24 Ms. Ali -- if you've seen her one time, you would know,

25 if you were me, that this is a potential customer.      I

1  met her.  Anytime   I had some jewelry,   I always thought

2  of Ms. Ali.   Ms. Martin, for example, can you get rid

3  of this for me, or whatever.    Ms. Ali has purchased

4  some jewelry from me before.

5  Q.     Other than that, have you ever had any dealings

6  with Ms. Ali?

7  A.     Other than her purchasing some jewelry from me,

8  and I think one other time we were all in the basement

9  at 810  Hayward -- Ms.  Ali, her husband, me, my husband

10 -- and I went upstairs and ordered some food with the

11 lady whose house it was from the Chinese place.  We

12 were down there at that time drinking, and    I believe at

13 that time that's when   I tried some hydro-marijuana.   I

14 hadn't smoked weed since   I was more or less like a

15 young 'un.  It wasn't -- heroin became my drug of

16 choice.  That night   I smoked a joint of weed, or hit

17 the joint of weed that somebody else had, and more than

18 likely  I made a exit to go to the gambling joint.    I

19 like to gamble.

20 Q.     Okay.  Let me ask you specifically:  Have you

21 ever had any drug-related contacts with LaNora Ali    at

22 any time?

23 A.     I've never seen that woman with any drugs.  That

24 woman hasn't seen me do any drugs.  If she has any

25 knowledge about me snorting something, it was here

1  today by my own admission or    Ms. Martin or someone

2  telling her that   I did use.  That's the only knowledge

3  I have about her using is through hearsay.  We have

4  never done it together.    I've never seen her with

5  anything.

6  Q.     Derrick  Bynum, also known as "Bolo," who, of

7  course, is in court today.

8         Did you know  Mr. Bynum before this case?

9  A.     I wouldn't say  I knew him.   I knew he was

10 Adday's father, which is    Ms. Martin's granddaughter.

11 Q.     That's the child's mother is?

12 A.     Kim.

13 Q.     Oh, okay.

14        Any other contacts or business dealings or drug

15 dealings or any kind of dealings you have had with     Mr.

16 Bynum?

17 A.     He's my sitting-at-the-defense-table-candy-

18 eating-partner today.    I don't know him prior to that.

19 Maybe at one time or another may have seen me in

20 passing because   I was -- it could have even been at the

21 Hyatt Regency at the last fashion show that    I actually

22 put a face with Adday's father.  If anything, hi, how

23 you doing or whatever.  No other contact or anything.

24 Q.     Eugene Bird.  We've heard a lot about    Mr. Bird,

25 although we have not seen him.

1           Did you know  Mr. Bird before this case?

2 A.      I became aware of  Mr. Bird.  I used -- my

3 husband, I told you all, had did 12 years in prison.

4 Mr. Ward questioned the gentleman about the     Viagra

5 about knowing --

6 Q.      Mr. Echarte?

7 A.      Echarte.  Mr. Ward questioned him about knowing

8 me, and  Mr. Ward asked him about a Rudy Lawson or

9 whatever.  Rudy Lawson is a gentleman that    I dated

10 while my husband was incarcerated for 12 years.  Eugene

11 Bird had a club called Le Nice which is across the

12 street from the bus barn in the    District of  Columbia on

13 Fourteenth Street, Northwest, and Rudy initially had a

14 gambling joint in the back part of Le Nice, which is

15 now the mattress place.

16          Well, when  I left society -- it's been since

17 2004, but it was a gambling spot, and    Mr. Eugene Bird

18 had the front part of it, which was a legitimate bar

19 and stuff, and the back part -- you come out the bar

20 and go into the other half which was a gambling

21 establishment.   I knew that he was leasing the place or

22 renting it from  Mr. Bird who at some point after that

23 Rudy had taken over the spot because    Mr. Bird was

24 getting ready to go into custody.  Nobody told me Rudy,

25 the guy that  I'm messing with at the time,    Mr. Bird was

1  going in for some type of drug charge.      I've even asked

2  for Mr. Bird to be subpoenaed as a witness      in this

3  case.

4  Q.      Other than what you've related to the ladies and

5  gentlemen of the jury, have you ever had any contact

6  with him at all?

7  A.      No contact with him.

8  Q.      Specifically, any dealings -- specifically, any

9  drug dealings?

10 A.      No drug dealings.  Prior to this arrest,      Mr.

11 Bird met me at 810    Hayward street upstairs in Jaqueline

12 Terrell -- I thought her last name was Burgess, but

13 through this case   I've found out it was      Arnold --

14 Teresa Arnold who is the daughter of    Ms. Martin's.

15 They were interested -- it was told to me they were

16 interested  in looking at a ring or something for

17 Teresa .

18      MS. GREENBERG:   Your Honor, I'm going to have a

19 continuing objection to this hearsay answer about what

20 other people told her.

21      THE COURT:  See if you can confine it to a

22 non-hearsay response.

23      BY MR. WARD:

24 Q.      You understand the objection.  Try not to tell

25 us what other people have told you.

1  A.     Well, I actually went to 810   Hayward and met

2  with Gene Bird and   Teresa  Arnold at a dining room table

3  upstairs at 810   Hayward Street and   I displayed numerous

4  of range rings and new stones and unmounted diamonds

5  for them.  At that time,   Mr. Bird and  Ms.- --

6        MS.  GREENBERG:  Objection.

7        MR.  WARD:   I'm sorry.  Did I hear an objection?

8        MS.  GREENBERG:  Yes.  Objection.

9        THE  COURT:  To what?

10        MS.  GREENBERG:   To what  Mr. Bird or  Ms. Arnold

11  told her.

12        THE  COURT:  She didn't say anything.     Mr.  Bird

13  may have stood up or said something.  Don't tell me

14  that  Mr.  Bird said something.

15        MR.  WARD:  She didn't.

16        THE  COURT:  She did.

17        MR.  WARD:  Maybe   I misheard  I apologize.

18        THE  WITNESS:   I met them at 810   Hayward.  They

19  looked at the jewelry.    I displayed what goods I had

20  at that time.  Neither one of them selected.     Ms.

21  Arnold  decided  Mr. Bird couldn't afford any of those

22  pieces.  They were some extremely expensive pieces at

23  that time -- the unmounted diamonds were, and a caret

24  -- I think the cheapest one may have been $2,500 and

25  they went on up due to the clarity of the diamonds.

1 Q.      Ruby Harden, who is in the courtroom today and

2 appears on this chart here.  Prior to this case, did

3 you know  Ruby Harden?

4 A.      Never seen the woman.  She came into the case

5 after we were already arrested on 6/1.  I'm laying in

6 the bed.  Like  I said, I came in with a drug habit.

7 When she came in  Montgomery County Detention Center and

8 some other inmates that were there woke me up and said,

9 she on you all case.    I don't know that woman.

10       MS. GREENBERG:  Objection.

11       BY MR. WARD:

12 Q.      Hold on.  You were saying some other people told

13 me, and you can't say that.

14 A.      Okay.

15 Q.      Anyway, some other people said something to you

16 and it was then you saw   Ruby Harden; is that right?

17 A.      Yes.

18 Q.      Was that the first time you had ever seen her?

19 A.      First time  I had ever seen her in my life.

20 Q.      All right.  Let's go to   George  Harris, another

21 "distributor/facilitator."  Ever heard of him before

22 this case?

23 A.      No.

24 Q.      Have you ever met him at all?

25 A.      Never seen him at all.  Not even in passing.

1  Q.      How about  Larry  Lane?

2  A.      Larry  Lane I've seen before.

3  Q.      Where and under what circumstances?

4  A.      Larry  Lane selected a ring in the basement of

5  810 Hayward.   I allowed him to take the ring.   He

6  wanted to show it to his girlfriend or whatever, and at

7  that time  I said, well, you can either give the money

8  -- actually, he said he wanted the ring.

9  Q.      Whether or not he -- whoa, whoa.   You're not

10  supposed to tell us what he told you.

11  A.      Well, he purchased a ring or led me to believe

12  he was going to purchase a ring.   I gave him a ring

13  that --

14  Q.      A sort of layaway?

15  A.      No.   It's like,  I give you this and you go see

16  if it fit or whatever, and the money was supposed to be

17  given back to  Ms. Martin or whatever.   We didn't have

18  plans to get back together.    I thought it was a done

19  deal.

20  Q.      Other than that circumstance, did you ever know

21  Larry  Lane?

22  A.      I had no dealings with him.   Didn't know him or

23  anything like that.

24  Q.      Specifically, did you ever have any drug

25  dealings with him?

1  A.      No, not at all.

2  Q.      All right.  Now,  John Martin.  What about   John

3  Martin?   I mean, there are telephone calls where you

4  and John Martin are talking, and one    I can think of

5  specifically that we heard was about a whoop-dee or

6  something like that?

7  A.      A hoopdie?

8  Q.      A what?

9  A.      A hoopdie.

10  Q.      I'm sorry.  I got it wrong.

11          What's  a hoopdie?

12  A.      A hoopdie is a inexpensive car, and the

13  terminology came from even a generation younger than me

14  where you buy a old car and it's used to get around or

15  one that you don't mess up your own car or whatever.

16  Q.      All right.  I want to come back to   Mr. Nunn,

17  because  I want to ask you about -- in more detail about

18  that conversation.

19  A.      You mean  Mr. Martin.

20  Q.      I'm sorry.  Mr. Martin, yes.

21          Milburn Walker, also known as "   Bruce?"

22  A.      No.  You skipped one.

23  Q.      Oh, did  I?  I'm sorry.

24          Larry Nunn.  Yes,  I did skip one.  Thank you.

25          What about  Larry Nunn?  Did you ever know him

1  before this case?

2  A.       No, not at all.

3  Q.       All right.  Now let's go to    Milburn  Walker, also

4  known as " Bruce."  Did you know him before this case?

5  A.       No.

6  Q.       Finally,  Mr. Reece  Whiting, who is in the

7  courtroom here today.  Did you know him before this

8  case?

9  A.       I met him during this case.

10  Q.       Could you tell the ladies and gentlemen of the

11  jury when and under what circumstances please?

12  A.       I basically became familiar with him more so

13  during our arrest, but to my knowledge     I think  I met

14  Mr. Reece one time at 810    Hayward where   Paula

15  introduced me to me as her brother or something in

16  passing.  If I'm not mistaken, my husband was with me

17  at the time, because   I had a pink card -- the

18  government probably will produce it at some point.  It

19  was a pink card that said "   Turk House" or something on

20  the back of it.  It may have said Reece or something.

21  He told my husband he was a drug counselor.  Prior to

22  me and my husband -- when   I went into  detox in April of

23  '04, my husband also went into    detox .  I went in under

24  Genevieve  Monroe; he went in under Goldie    Dobie.

25          Prior to that  I contacted -- tried to contact

1  Mr. Whiting, because my husband needed to satisfy the

2  parole and probation office and go into treatment, and

3  I was seeing if he could help him get into treatment.

4  I never got in touch with him.

5  Q.     I think that except for   Ms. Martin that we're

6  going to come back to who is on the chart, but let me

7  go back to  Ms. Levi a minute and her daughter whose

8  name was Bonita,   I think you said?

9  A.     Bonita.

10  Q.     What was your relationship with the daughter --

11        MS. GREENBERG:  Objection.

12        Asked and answered.

13        THE COURT:  Overruled.

14        BY MR. WARD:

15  Q.     -- with Bonita?  You may answer.

16  A.     At one point we were close.  We even went to      New

17  York together and shopped with Mr. Melon.  I've been a

18  bad girl.  Him and   Bonita,  I found out, were smoking

19  crack cocaine in New York  .  I wanted to go shopping and

20  we had a verbal disagreement.     I took  Mr. Melon's car.

21  He later called my mother.

22  Q.     Excuse me.  Who is this   Mr. Melon?

23  A.     This is the man who owned the group homes in the

24  District of Columbia.  I left him to smoking and took

25  his car and came back to the    District of  Columbia.   I'm

1  not -- it's not funny, but    I was upset at that point,

2  you know.   I walked in or whatever.    I don't smoke, so

3  -- I mean, when   I got back, of course, my mother and

4  everybody was mad because    Mr. Melon was the boss of,

5  you know, the group homes and everything that we were

6  all working for at that time.

7  Q.     Was that the --

8         MS. GREENBERG:  Counsel, can we have a time

9  frame again on this?

10         BY MR. WARD:

11  Q.     I'm not sure it was stated.

12         Do you want to give us a time frame when you

13  were talking about?

14  A.     We went to  New York -- Bonita, Levi and I?  That

15  was during the time -- it had to be between '85-86,

16  because the group homes closed down shortly after that.

17  DHS was funding the group homes, so it can be confirmed

18  and verified.

19         MS. GREENBERG:   Your Honor, I don't see the

20  relevance.

21         THE WITNESS:  That's  Ms. Levi's daughter.

22         MR. WARD:  The relevance was,   I was asking the

23  witness to explain her relationship with the daughter,

24  and that blossomed into the trip to    New York, the

25  shopping trip.

1          MS. GREENBERG:  We're talking about events in

2  '85-86.

3          THE COURT:  Let's move on.

4          BY MR. WARD:

5  Q.      I'll move on.

6          Did Bonita Dorsey have any --

7  A.      Levi.

8  Q.      -- Levi have anything to do with your boosting

9  business?

10 A.      Yes.  She also had -- she's a convicted

11 shoplifter, also.   Bonita Levi, she has some criminal

12 cases, but it more or less me and     Bonita.

13         MS. GREENBERG:   Your Honor, objection again.

14         May we approach?

15             (At the bar of the Court.)

16         MS. GREENBERG:   Your Honor, I certainly

17 understand  Mr. Ward going through her relationship with

18 the conspirators on the chart, but now we're going back

19 to the boosting business that she had with one

20 codefendant's daughter back in 1985-86 in more and more

21 detail.  I don't see how that is at all relevant to the

22 charges in this case.

23         MR. WARD:  I will be glad to explain.  My

24 understanding is -- this is the next question    I was

25 going to ask --  I believe that  Bonita --

1        MS.  GREENBERG:    Your  Honor, perhaps  the  witness

2  --

3        MR.  WARD:  She can't hear.

4        MS.  GREENBERG:  Go back  to  the witness  stand.

5        MR.  WARD:  No.   I need her  there.

6        There were numerous  identification  documents

7  found during the raid at my client's house, which the

8  government made a big point of displaying to the jury

9  all the different licenses with the pictures on them.

10  I think one of those pictures -- she was on some of

11  those documents.

12        MS.  GREENBERG:  He can  show  the documents  to

13  her.   It has nothing do with this chart or what

14  happened.

15        THE  COURT:   I think you're getting to the outer

16  limits.

17        Let me ask you this.   How much more  examination

18  do you have of this witness?

19        MR.  WARD:   I've got to go into her prior record.

20        THE  COURT:   I was going to suggest, since we're

21  going to go until 4  :30, why don't we take a recess now

22  until 3 :20 and go the rest of the day and finish it?

23        MR.  WARD:  Can  I ask, with Bonnie present, if

24  the woman's picture was on those?  If it was,      I won't

25  go any further.

1          THE COURT:  All right.

2          MR. WARD:  If it's not -- can I do that, even

3   though she's on the stand?

4          THE COURT:  Ask her whether the pictures on the

5   chart --

6          MR. WARD:  No, no, no, whether    Bonita's picture

7   was on any of those documents found in her house.

8          THE COURT:  You can ask her that.

9          MR. WARD:   I won't go any further.  If she says

10  no, that's it.

11         THE COURT:  All right.

12                    (Back in open court.)

13         THE COURT:   You may proceed.

14         MR. WARD:  Oh,  I'm sorry.   I thought you were

15  going to break.

16         THE COURT:  No.  You can ask your one question,

17  and then we will break.

18         BY MR. WARD:

19  Q.    You were shown -- the jury was shown numerous

20  identification documents that were seized at your house

21  on Ninth Street on the -- during the raid on June 1.

22  Do you recall that?

23  A.    I do.

24  Q.    The faces shown on some of those identification

25  documents.  Was any one of them    Bonita Levi?

1  A.      No.  One of them was Cheryl    Levi.

2  Q.      Oh, okay.   I'm sorry, who is Cheryl    Levi?

3          MS.  GREENBERG:  Objection.

4          THE COURT:  Overruled.

5          BY MR.  WARD:

6  Q.      Who is Cheryl L evi?

7  A.      Cheryl Levi is the mother of one of    Gwen Levi's

8  son's,  Mitch  I believe his name is.  He's deceased.

9  She has a son named   Juwan  or  Jaquon  [ph.] or something

10 by Gwen Levi.

11 Q.      It would be a daughter-in-law?

12 A.      Right.  They were actually married.

13 Q.      Thank you.

14         Your Honor, that's as far as    I intend to go on

15 that particular issue.

16         THE COURT:  Ladies and gentlemen, we will take a

17 recess until precisely 3  :20, and then we will make a

18 sprint until 4 :15.

19                     (Jury excused at 3:07 p.m.)

20                     (Off the record at 3  :07 p.m.)

21                     (On the record at 3  :23 p.m.)

22         THE COURT:   Counsel, while we're waiting for the

23 jury to come in,  I wanted to tell you a couple of

24 scheduling matters.    I have a guilty plea on my

25 schedule on  Tuesday at 9 o'clock.    I am going to move

1  that, and  I would like to start us on     Tuesday at 9:00.

2          Is there any issue with that for any party?

3          MR. HALL:  Fine,  Your Honor.

4          THE COURT:  Depending on how we go that day,

5  Wednesday of next week  I have nothing scheduled in the

6  morning so  I can start at 8  :30 or 9:00 to see if we can

7  get this testimony in in time.

8          I have nothing on  Thursday early, so   I could

9  start at 9:00.

10         THE COURT:  Oh, that's your day.

11         MR. MONTEMARANO:  That's my day.

12         MR. WARD:  Tuesday starting at 9:00?

13         MR. MONTEMARANO:   I would suggest 9  :30, your

14  Honor, just to be sure.

15         THE COURT:  I'd like to tell the jury when they

16  come back in what the deal is   .  I'm going tell them on

17  Tuesday-Wednesday we will be doing 9:00; on     Thursday we

18  will be doing 9:30.

19         MS. JOHNSTON:  To 5:00,  Your Honor?

20         THE COURT:  Yes .  And on  Friday we'll start at

21  9:00.  Maybe, if depending on how much progress we're

22  making, we'll try to do a quick schedule so we end at

23  2:30 or 3:00.

24         MR. MCKNETT:  Your Honor, Ms. Bineko is here.

25  She is the witness that   I had come down.   Mr. Ward

1  tells me he's going to be another half an hour.

2          THE COURT:  Do you want to take her out of turn?

3          MR. MCKNETT:  Can I get her now?

4          THE COURT:   Do you want to take her out of turn

5  or let her go?

6          MR. MCKNETT:   I would prefer to get her go.

7          THE COURT:  Something tells me we're not going

8  to make it to her today.

9          Also, counsel, are you able to be here at 1    :30

10  instead of 2:00?

11          MS. JOHNSTON:  Yes.   I had grand jury which   I've

12  cancelled.

13          THE COURT:  Any problem for anybody?

14          MR. MONTEMARANO:   I am going to be interviewed

15  for an administrator about an audit interview.  They

16  set this up at 1:00.  If you want to go that way,      I

17  mean, you know.

18          THE COURT:   That's fine.  Let's get everybody

19  here at 1 :30, and if we have to wait for you for a few

20  minutes, we'll wait for you.

21          MR. MONTEMARANO:  I will be down in the clerk's

22  office.

23          THE COURT:  I have an 11  :30 hearing which   I

24  don't think will go one and a half hours.

25          MR. MONTEMARANO:  I'm hoping this audit

1 interview won't go very long.

2          MR. MARTIN:  I have an 11:00, as   Your Honor may

3 recall, down in  D. C.  I should be finished with that

4 by 12:00.  It shouldn't take me an hour and a half to

5 get from here.

6          THE  COURT:  Take the Green line.

7          MS.  JOHNSTON:  We will be in our office.

8          MR.  MONTEMARANO:  When   I'm done, I'll go by.

9          THE  COURT:  I'm going to try to start earlier

10 than 2:00.

11                    (Witness resumes the stand.)

12                    (Jury returns at 3  :24 p.m.)

13         THE  COURT:  Ladies and gentlemen, while you're

14 getting seated,  I wanted to give you some scheduling

15 information for next week.    I had a matter scheduled on

16 Tuesday,  the first, at 9:00.   I have just decided to

17 move that, so we're going to start on    Tuesday at 9:00.

18 On  Wednesday  I'm also going to start at 9:00.

19         On  Thursday there is one of the counsel who has

20 a matter that will preclude the person from being here

21 until 9 :30, so we will start at 9   :30 and I will

22 probably plan on starting at 9:00 or even earlier on

23 Friday.  I'm hopeful that we will get all the testimony

24 in next week.  We'll see, but these things are not an

25 exact science, as we know.

1         MS. GREENBERG:  Could you inform the jury how
2  long we're sitting each day?
3         THE COURT:  You can assume 5 o'clock.  It won't
4  be later than 5:00 each day.    I know some of you had
5  child care issues.  If any of you all can go later than
6  5:00 on a given day, we might do that.    I would very
7  much like to get this case finished on time and not
8  have to have you come back after a two-week break.  So,
9  I'm going to work with the counsel and the parties, who
10 are all working very well with me, to try to get this
11 done.  So  I will see you at 9 o'clock on    Tuesday after
12 we finish today.
13        Mr. Ward, you may continue.
14        BY MR. WARD:
15 Q.      Thank you, sir.
16        Ms. Dobie,  I said  I was going to ask you, when
17 you stepped back to the witness box, about the
18 conversation with   John Martin and the   hoopdie .
19 A.      Yes,  I recall.
20 Q.      You have to say "yes," you have to keep your
21 voice up, and you have to look at the jury.  Okay?
22        You heard,  I believe, the opinion of Sergeant
23 Sakala that, as   I understood it, your car had been
24 seized in a drug bust or something like that?
25 A.      I do.

1  Q.      All right.  First of all, tell us how the

2  conversation came about, if you would.

3          MS. GREENBERG:  Objection to hearsay,     Your

4  Honor.

5          THE COURT:  Overruled.

6          THE WITNESS:  Initially, before talking to     John

7  Martin, I was on the line with     Paulette  Martin.

8  Paulette was complaining about     John Martin needing to

9  get his self a car, because he would often use her car

10 to go to work or she would have to go pick him up,

11 things of that nature.  Basically, she was complaining

12 to me that  John needs to get his self a car.

13         I said, John should do like   I did.  I went the

14 auction and brought a few hoopdies.      I won some money

15 in a crap game, and    I went to the dealer's auction with

16 a friend and purchased three Cadillacs and a

17 convertible Sebring all in one day for less than

18 $8-9,000.  I was telling    John that they had nice

19 hoopdies at the auction.     I think one of them was a '94

20 prosecution-seized.  That was part of those documents,

21 the bill of sale.  Maybe it was one of them was a '94

22 or a '96 sedan DeVille Cadillac, and     I purchased it for

23 like $2,900-3,900 which was basically a nice car for

24 that type of money in 2004, and that's what     I was

25 suggesting to him when    I made the reference that    I

1 often, you know, for that reason keep a    hoopdie  was

2 because  I was arrested.

3          When  I was stating the dates --    I can't actually

4 remember the dates per se, but    I said, when I was

5 arrested at National Airport, which is now     Ronald

6 Reagan airport, and it was relating to a credit card

7 fraud charge, a   pickpocketting  that happened in the

8 airport, my car was seized.    Unbeknowing  to me how a

9 car pickpockets somebody, but they seized the car, and

10 that was just one of the tactics    I felt the government

11 did to go -- you know, as they do.  They have numerous

12 of tactics --

13          MS.  GREENBERG:  Objection,   Your  Honor.

14          THE  WITNESS:  -- for when you come  into custody.

15          MS.  GREENBERG:  Objection.

16          THE  COURT:  Please refrain from descriptions

17 like that, if you would,    Ms. Dobie, and just give the

18 facts.

19          BY  MR.  WARD:

20 Q.      Is it fair to say your car had not been seized

21 in relation to drug activity?

22 A.      It was seized because it had a computer in the

23 trunk of it that was purchased with a stolen credit

24 card,  I believe, to somebody named O'Brien, and when

25 they searched the car, under the mat of the driver's

1  steering wheel there was numerous of credit cards that

2  had been stolen or pickpocketed from people.  The case

3  basically came from a pickpocketting incident in Foggy

4  Bottom, and they seized the car because it had the

5  stolen credit cards in it and it had the stolen

6  computer that  I purchased from Staples fraudulently

7  using somebody's credit card.  It had nothing to do

8  with the drugs.  No drugs were in the car.     I had no

9  drugs.

10 Q.    All right.   I said  I wanted to come back to   Ms.

11 Martin -- Paulette   Martin, and  I think you told us that

12 you first met her --   I don't recall exactly what the

13 date was or under what circumstances, but if you would

14 tell the jury that please.  Look at the jury and speak

15 up.

16 A.    Can I clarify something else, please --

17      MS. GREENBERG:   Your Honor?

18      THE  WITNESS:  -- about   Mr. Martin?

19      MS. GREENBERG:   I don't think there's a pending

20 question.

21      THE  COURT:  Ask her a question,   Mr. Ward.

22      MR. WARD:  Would you clarify something else

23 about  Mr. Martin, please?

24      MS. GREENBERG:   Your Honor, we've gone from the

25 hoopdie  car back to an incident with a stolen computer,

1 and I would prefer if   Mr. Ward would ask questions.

2          MR. WARD:   Your Honor, for   Ms. Greenberg's

3 benefit, the question was obviously facetious.       I will

4 withdraw it.    I apologize.

5          THE COURT:   All right.

6          BY MR. WARD:

7 Q.     Had you completed your answer to the question     I

8 asked you about   Mr. Martin?

9          MS. GREENBERG:  Objection.

10          THE  COURT:  There's an answer to that:  Yes or

11 no.

12          BY MR.  WARD:

13 Q.     You can answer yes or no.

14 A.     No, I haven't.   I want to be completely honest.

15 I don't want to be impeached, so     I'm being honest with

16 you all.

17          I had a conversation, and    I don't know if it was

18 that same conversation.

19          MS.  GREENBERG:   Your Honor, objection.

20          THE  COURT:  Well, let me hear what she's --

21          MR.  WARD:  Well if they promise not to impeach

22 her,  Your Honor, we will cut it off at this point.

23          THE COURT:  Continue with your answer.     I will

24 cut you off if you go too far.

25          BY MR.  WARD:

1  Q.      Go ahead.  You may continue.

2  A.      I believe initially the question was about any

3  dealings with  Mr. Martin or any conversations.  The

4  hoopdie was relating to the conversation with       Paulette,

5  and I don't know the time, if it was the same day or

6  another day.   Mr. Martin -- when  I met Mr. Martin or

7  whatever, one user recognizes another user, so the

8  government will probably have a conversation about me

9  asking --

10          MS. GREENBERG:  Objection.

11          THE COURT:  Do not characterize the government.

12  Just give factual testimony, all right?

13          THE WITNESS:   I apologize.   I had a conversation

14  with Mr. Martin:  Do you know anybody that      I can do

15  what Howard used to do?  "  Howard" is someone that sells

16  heroin or cocaine on Ninth street and in after-hour

17  joints, and  I probably was looking, because     I was ill

18  or whatever, and he stated he didn't, and that was

19  that.  I just wanted to clear that up.

20          BY MR. WARD:

21  Q.      All right.  Well, let's go to   Ms. Martin now.

22  Tell us the circumstances under which you met her and

23  how your relationship developed and from that point.

24  A.      I met Ms. Martin in   August of '03.   I pause,

25  because if  I've never met her, I wouldn't be here

1  today.

2  Q.      There will be an objection, okay?

3  A.      Okay.

4  Q.      Let's not editorialize.  Just tell what

5  happened.

6  A.      In August of '03  I met  Ms. Martin through what    I

7  would consider an extended family member or brother or

8  something like that.  His name is    Anthony Hall.   I met

9  Ms. Martin through my stepfather -- I met    Mr. Hall

10 through my stepfather back before    I had my first child,

11 so it had to be anywhere between '80-82.    I had a pair

12 of platinum and diamond hoop earrings that had a retail

13 value of $12,000-something.   I was finding --  I had

14 difficulty locally selling these earrings.  They

15 weren't that pretty looking at them, but they were

16 expensive.   Mr. Hall stated that his girlfriend may be

17 interested in looking at the earrings.  Maybe a week or

18 two after that,  Mr. Hall called me and he said    Becky --

19      MS. GREENBERG:   I object to the continued

20 hearsay with regard to conversations with    Mr. Hall.

21      THE COURT:  Please don't describe what other

22 people told you.  Just describe what you say or what

23 people did.

24      MR. WARD:  Your Honor, if  I may.  I'm not

25 offering this for the truth of content; simply to put

1  in context what happened and explain why she did

2  certain things.

3          THE COURT:  Well, all right.  Proceed.

4          THE WITNESS:  At a later date and time,   Mr. Hall

5  called and said he was going to stop by and he was

6  going to bring --   I think he called her "  Paula," as

7  opposed to  Paulette.  He was going to bring      Paula by to

8  look at the earrings; they indeed showed up at my home

9  one evening, and   I think they were showing up from

10 Critchfield 's, because they brought me something from

11 Critch field's.

12          He looked at the earrings.  They had a

13 conversation sitting in my family area -- the picture

14 where you seen where the brown leather furniture --

15 while  I was in the kitchen area.  He said that he was

16 going to take the earrings.    I said  I wanted --  I

17 believe it was $3,000 or even $3,500.  I wanted $3,000

18 or even $3,500 for them.    I believe that night indeed

19 that he gave me,   I want to say, at least half.     I don't

20 remember exactly how much, but it was definitely over

21 $1,000.

22          MS. GREENBERG:  Objection.

23          Relevance.

24          THE COURT:  What's the relevance of this,     Mr.

25 Ward?

                                                      Page 241

1          MR. WARD:  Well, it was running on a little bit,

2 Your Honor.

3          THE COURT:   I think she's gone on a little bit.

4          BY MR. WARD:

5 Q.     Let me put the next question to you.

6          Was that when you met   Ms. Martin, and the

7 circumstances under which you met    Ms. Martin?

8 A.     That was the first meeting.   That was what that

9 was in reference to.

10 Q.     Tell us, please, as succinctly as you can, how

11 your relationship with   Ms. Martin developed.

12 A.     After having her in my home, it was like two

13 people that meet and it's like you been knowing

14 somebody all of your life.  We bonded.     Mr. Hall, I

15 considered, was dogging   Ms. Martin.  After   Ms.- -- I

16 mean, I got in it as far as if you don't want to leave

17 her alone or whatever and   I stated what   I had stated to

18 Mr. Hall to  Ms. Martin, me and -- actually, me and     Ms.

19 Martin became friends, and me and     Mr. Hall fell out

20 because he felt as though   I took sides and got into his

21 personal relationship.

22 Q.     All right.  And you continued to be friends with

23 Ms. Martin; is that correct?

24 A.     I indeed did.   I started calling her, referring

25 to her as my aunt, and she started referring to me as

1  "niecey ."

2  Q.     All right.  When you first met    Ms. Martin in the

3  first few meetings with her, were there ever any

4  discussions between the two of you, or was there any

5  activity between the two of you involving drugs?

6  A.     Not at all.  Like  I stated over there,   Ms.

7  Martin wasn't even aware of my drug use when she met

8  me, unless she had heard about it through hearsay.

9  Q.     All right.  Did there come a time when some drug

10  relationship did develop between you and    Ms. Martin?

11  A.     Yes, sir.

12  Q.     Tell us how that came about, please.

13  A.     Mr. Hall purchased those earrings, indeed, from

14  me, and he was -- he gave me an amount of money at my

15  home that night -- I don't remember.    I know it was

16  over $1,000.  One night   I was at a gambling joint and    I

17  got broke.  He brought me another $1,000.  He asked me

18  at that time would   I accept some cocaine for the

19  remaining portion of the money.  That night    I had been

20  gambling, and he brought me the $1,000.    I think that

21  morning  I accepted maybe 3 grams, 7 grams from     Mr.

22  Hall, and  Ms. Martin wasn't around.

23        Mr. Hall stated that  Ms. Martin was into

24  something else.   I approached  Ms. Martin at a later

25  date --  I'll say around   Christmastime -- and told her

1  exactly what  Mr. Hall stated, because at that time      I

2  wanted something.  And going back on that conversation.

3  Ms. Martin denied totally having any knowledge of what

4  Mr. Hall had told me.   I left it alone.  He was saying

5  that she did this.  When   I approached her personally,

6  she said she didn't.   I didn't know anything about her

7  drug business to any extent like this until now.

8           Sometime in 2004 --   I think it was   February --

9  another situation arose.  Someone else was around her,

10 and they actually sold me a Sixteen in her presence,

11 and that's how the door opened at that point for us to

12 discuss anything about drugs.

13 Q.      That was in approximately,    I think you said,

14 February of '04?

15 A.      It was sometime in '04 when we actually got

16 together face-to-face like -- there was no denying       I'm

17 buying drugs, and she's aware of it at this point.

18 Q.      From that point on -- that particular incident

19 you described involving the Sixteen -- did you continue

20 to buy drugs from  Ms. Martin?

21 A.      When you say "drugs" -- I've gotten marijuana.

22 I've often tried to kick my heroin addiction without

23 seeking professional treatment or     detox .  I've gotten

24 Percocets  from  Ms. Martin -- an abundance of them at

25 numerous of times, also.

1  Q.      And cocaine?

2  A.      Powder cocaine, yes.

3  Q.      Let me ask you this, if you can tell us.  From

4  February '4 on, how often or how frequently did you

5  obtain or buy any kind of controlled substance from      Ms.

6  Martin?

7  A.      I don't want to limit it to a number, but      I'll

8  say this.  Basically,    I was in the gambling joint or on

9  the road hustling and doing what    I do.  If  I was home

10 and  I woke up ill and   I had a little bit of dope and      I

11 needed something to energize me, to move around, and it

12 wasn't dope,  I would call  Ms. Martin.    I can say

13 honestly maybe   I can recall sure two Fifties and maybe

14 three or four Sixteens from her.

15 Q.      Is that over the period from     February of '04

16 through until the time you were bus    ted in  June of '04?

17 A.      That includes that.  My birthday gift, and also

18 I think one time, if   I'm not mistaken,   I asked her one

19 time that  I needed three and three or something.      I had

20 gotten 30 Percocets and    I had gotten something else

21 from her --  I can't recall the extent of it, but      I know

22 at one point  I purchased the cocaine from her and some

23 Percocets all in the same day.  Normally it would

24 either just be one or the other, but this particular

25 time maybe on one or two occasions     I've gotten

1  Percocets , marijuana and the powder cocaine, but the

2  majority of the times it would have been just the

3  powder cocaine or whatever.

4  Q.     What, if you can tell us, was the most powder

5  you ever bought at one time from    Ms. Martin?

6  A.     At one time it would have to be either a

7  sixteenth --  I can't -- the government -- well, excuse

8  me.  I apologize.   I don't recall buying an eight-ball

9  from her.  Like  I said,  I only use cocaine to keep me

10  up from the heroin.  Cocaine eats up dope, so     I wasn't

11  putting a whole lot of it in my system.

12  Q.     Did you ever, ever at all point sell or

13  otherwise distribute by giving away or whatever, or

14  sharing with anybody else any of the drugs that you got

15  from  Ms. Martin?

16  A.     I've never sold any drugs.  However, if me and

17  you are riding in my car together or we're sitting here

18  and you blow,  I'm the type that would say, you want a

19  blow?  Of course.  Are you talking for money?  No.      I

20  mean, if me and the person -- another individual were

21  together -- Cheryl   Levi, for example.  If Cheryl and    I

22  was together, we would share a bag of dope or coke if     I

23  had it.  Hon, you want to blow it?  Even if     I didn't

24  offer it.  Cheryl gets high, so she's gonna say, give

25  me a blow of that.  Let me try that.  We've had

1   different things, some she got from one of her sources

2   and some we may have copped --    I copped somewhere   else,

3   and we'll say, hon, give me a blow of that and you take

4   a blow of this.  But, no, not resell nothing.

5   Q.      Excuse me.  Let me regroup.

6           Did you ever, at any time, see any weight -- by

7   "weight " I'm talking about kilo quantities of any kind

8   of controlled substances in Ms.    Martin's house?

9   A.      The first kilo of cocaine   I've ever seen in my

10  life was right here in this courtroom.

11  Q.      So your answer is?

12  A.      Never.   I've never seen no kilo of cocaine in

13  Ms. Martin's house or nobody else's house.

14  Q.      Did you ever see any -- at least    I would call

15  them substantial quantities of money, like $400,000 or

16  $260,000, or even $10,000 in cash in    Ms. Martin's

17  house?

18  A.      No.  Ms. Martin did count out $3,000 that was

19  due me in her house at one time.

20  Q.      What was that for?

21  A.      A brown sable mink coat that Eugene Bird was

22  buying for  Teresa.  He asked   Ms. Martin to pay for it,

23  and she gave me the money right there.

24  Q.      Okay.  Did you ever receive any money from    Ms.

25  Martin for anything at all?

1 A.        When you say receive --

2 Q.        Or did she ever give to you or pay you any

3 moneys?

4 A.        She loaned me some money before.  Like      I said,

5 if I got broke, I could call her and ask her for money.

6 She knew  I was a thief.  She's held some of that

7 jewelry to sell to some other people.  Even though      I

8 was a user,  I could pay you back $1,000.  However,      I

9 got arrested in  Henrico  County, Virginia.  Right now if

10 my life depended on you,    I couldn't tell you the exact

11 date, but  I know it's pending about some fur coats out

12 of Alan Furs in  Henrico  County,  Virginia.

13        When  I was allowed a phone call,    I called back

14 to the  District of  Columbia and had someone on a

15 three-way phone call hook me up and ask     Ms. Martin

16 would she loan me my bail money.    I believe my bail was

17 $20,000, or maybe $2,500  was needed.  It was either

18 $20,000 or $2,500 and I needed ten percent cash, and      I

19 asked  Ms. Martin would -- as a matter of fact, the

20 phone call would have came through from a 487-3304

21 number to  Ms. Martin's line, because    I called from the

22 Henrico  County Jail and called that 202 number that      I

23 just stated, and  I asked her would she put up my bail

24 and that  I would pay her back.

25        Ms. Martin indeed gave    Mr. Dobie and the

1 gentleman that hooked me up with her the money.   Whose

2 hand she put it in,   I don't know, because   I was locked

3 up.  But because of my request to her, the $2,500 is

4 what she kicked out for me to be released.

5 Q.     All right.  Other than the money you paid her

6 for the drugs, as you've testified, did you ever give

7 her or invest with her any other moneys for any reason,

8 specifically in connection with any drug trafficking

9 business?

10 A.     No drug trafficking business.     I owed her $150

11 because she paid my Geico insurance for me through a

12 credit card over the phone.  Geico wanted an immediate

13 payment before terminating the insurance, and those

14 were -- it was for the vehicle that you all seen the

15 financial records for.  That was for a     Chrysler 300.

16 She put up the credit card.  She came by that same day

17 and picked up her $150-something or whatever the

18 payment was.

19 Q.     Did you ever knowingly receive from     Ms. Martin,

20 either directly or indirectly, any -- as     I say,

21 knowingly, any proceeds from any drug-related activity?

22  A.     Under no circumstances, with moral certainty,

23 did I have any proceeds from any drugs, or was involved

24 in any selling of any drugs with     Ms. Martin or any of

25 these people or anybody else.  Never.  Never.

1 Q.      All right.  Now, you've talked to some extent

2 about your prior record, and     I wanted to ask you

3 specifically about that.

4        You mentioned a robbery -- a simple robbery or

5 common law robbery.  Do you remember that?  You

6 mentioned it to the ladies and gentlemen of the jury.

7 A.      That would be the   Montgomery County robbery,

8 although they do consider pickpocket -- the court of

9 law considers   pickpocketting   a robbery, also.

10        MS. GREENBERG:  Objection,    Your  Honor.

11        MR.  WARD:  Let's not get into the law.

12        THE WITNESS:    That's what the initial charge

13 was.

14        MS.  GREENBERG:  Objection.

15        THE COURT:   Ms. Dobie, listen to your counsel,

16 and please do one question at a time.

17        BY MR. WARD:

18 Q.      On March 17, 1992, were you convicted of common

19 law robbery in the Circuit Court for     Montgomery County

20 when  you were 31 years of age?

21 A.      Yes.

22 Q.      All right.  And you were incarcerated for a

23 period of eight years with all but four years

24 suspended; is that correct?

25 A.      Yes, sir.

1  Q.      Did you come back to court on a reconsideration

2  in May of '93 and have the balance of the eight years

3  suspended?

4  A.      That's when  I went into the Second Genesis drug

5  treatment program.  Yes, that's correct.

6  Q.      That was a condition of your going into the

7  program, was it?

8  A.      They reconsidered --   I didn't do four years.    I

9  got eight years, all suspended but four.  The time from

10 the time  I was incarcerated, whatever length of time

11 that was --  I believe it was a year or something,

12 maybe, if that long.  I stayed lock locked up and the

13 judge brought me back and sentenced me to the Second

14 Genesis program.

15 Q.      In September of '97, were you sentenced on four

16 cases in the Circuit Court for    Arlington County,

17 Virginia?  First of all, let's ask that.

18 A.      When?

19 Q.      Let me put it this way.  On October 12 of 1994,

20 were you arrested in   Arlington County,   Virginia?

21 A.      Yes,  I was.

22 Q.      Did those cases come before the court, and were

23 you convicted on those cases on or about     September

24 1997?

25 A.      Your  Honor, may  I clarify something?

1 Q.      Yes.

2        I'm sorry, Judge.    I apologize,  Your Honor.

3        THE COURT:    If she's going to clarify something,

4 clarify something.

5        THE  WITNESS:  When  I was over there,  Mr. Ward

6 questioned  me about when was my addiction full-fledged.

7 I said,  I can't remember the exact date but it was

8 during the time when  I got arrested in  Virginia.  When

9 he just gave me the date,    I now indeed know that that

10 stemmed from that arrest, because that's the

11 pickpocketting  case where my car was seized or towed.

12        BY MR. WARD:

13 Q.      In any event, when you were sentenced on

14 September 4, 1997, were you sentenced on a conviction

15 for conspiracy to one year incarceration?

16 A.      I'm confusing something, because the      Arlington

17 County is where  I got that ten-year sentence, and the

18 judge later reconsidered it and gave me all suspended

19 but seven.  So,  I'm confusing something.

20 Q.      Why don't you let me finish?

21 A.      Okay.

22 Q.      Let me get this down to conspiracy and

23 sentencing.  Conspiracy, one year; credit card theft,

24 two years to run concurrent with that; grand larceny,

25 ten years incarceration to five years suspended,

1 consecutive to the other sentences; and failing to

2 appear, one year, to run concurrent with the earlier

3 sentences.  Does that sound right?

4 A.    Actually,  I'm assuming all that come from one

5 arrest as a inmate or the person that was charged with

6 --

7 Q.    Were you convicted of those offenses, whether it

8 all came out of one arrest or not?

9 A.    I'm being honest with you.  If that's what the

10 paper says -- I know if it's from that incident at the

11 airport, yes.

12        MR. WARD:  Let's just ask it.  Can    I ask what it

13 was?

14        MS. GREENBERG:  It's your witness, counselor.

15 It's your witness.  Just ask her the question.

16        THE  WITNESS:   I know it was numerous counts, but

17 me being the person --   I just summed it up.  It all

18 stemmed from that one arrest.  But, yes, it was -- it

19 was a bunch of credit cards under that mat, so they

20 gave me numerous of counts.

21        BY MR. WARD:

22 Q.    The conspiracy.  Did that have anything to do

23 with controlled substances?

24 A.    No.  It was a conspiracy to the credit card

25 theft with some other people.

1  Q.      All right.  In  July of 1996, were you sentenced

2  upon a finding of guilty in the    Prince George's  County,

3  Maryland District Court for credit card -- it reads

4  "credit cards; applied for false    I.D."

5  A.      I indeed was.

6  Q.      Huh?

7  A.      Yes, I was.

8  Q.      And you were sentenced in that case,    I think, to

9  two years incarceration, with one year and 11 months

10 suspended; is that correct?

11 A.      I pleaded guilty.    I really don't remember the

12 actual sentence.

13 Q.      But you do acknowledge that conviction.

14 A.      Yes.

15 Q.      Finally, on  July 26, 1996, which happens to be

16 the same date that  I referred to you for the one you

17 just admitted.  Were you also convicted of attempted

18 credit card/impersonation in the District Court for

19 Prince George's  County,  Maryland and sentenced to two

20 years' incarceration, with one year and 11 months

21 suspended?

22 A.      I remember the incident.    I pleaded guilty.

23 Q.      All right.  Have you ever, anywhere, in any

24 court at any time, been convicted of any kind of drug-

25 related criminal activity?

1  A.      If I'm guilty of something,   I plead guilty.

2  I've never been convicted of any drugs or anything like

3  that.

4  Q.      Okay.  Do you recall a telephone conversation

5  that was played when Detective   Sakala was on the stand

6  in which  Paulette  Martin said something about your

7  lowering the hammer on something?

8  A.      Yes,  I do.

9  Q.      Do you recall Sergeant   Sakala opining in his

10  expert opinion that that meant that you had a gun with

11  you?  Is that correct, ma'am?

12  A.      I recall his theory.

13  Q.      All right.  Did you ever, shortly after that

14  conversation -- recorded conversation have a

15  conversation with  Paulette  Martin yourself about the

16  cap on the gun or whatever it was?

17        MS. GREENBERG:  Objection.

18        Hearsay.

19        MR. WARD: Not hearsay,  Your Honor.   I will be

20  glad to proffer why.

21        THE COURT: All right.

22        MR. WARD: May we?

23        THE COURT:   You may.

24        MR. WARD: Thank you.

25              (At the bar of the Court.)

1        MR.  WARD:   Your  Honor,  under  Rule  806  .1,  or

2 806 .2, it talks about hearsay used for impeachment and

3 rehabilitation.    I'm sorry, it's 806.  Rule 806

4 specifies how a litigant against whom hearsay has been

5 admitted in evidence may challenge the credibility of

6 the declarant.  The impeaching party may use means that

7 he could have used if the declarant had testified to on

8 the witness stand.  It goes on to say, at the same

9 times statements are not defined as hearsay.

10       First of all, it is a coconspirator's statement

11 which is not the way it got in in the first place.       I

12 suggest that if  Ms. Martin had taken the stand, we

13 certainly could have questioned her about the later

14 conversation that she had.  The government knows about

15 this conversation because it's right there in the logs

16 and it says specifically that Paulette     Martin said, you

17 know,  I was just joking when    I told him about that.

18       MS.  GREENBERG:   Your  Honor, he could certainly

19 have -- he could certainly questioned Agent      Sakala

20 about whether there were conversations and what

21 conversations they had to show that was a joke or not

22 legitimate.  But to bring up this witness for an out of

23 court statement she had with another person when it's

24 not in furtherance of the conspiracy is clearly

25 hearsay.

1          MR.  WARD:   Your  Honor, I tried to bring it out.

2          MS.  GREENBERG:  It's opening up the door to this

3 gun stuff.  So, he's treading on thin ice.

4          MR.  WARD:  Thank you very much.  At my weight,      I

5 don't tread on any ice.

6          MS.  GREENBERG:  We know what might happen.

7          THE  COURT:  Now, now, now.

8          MR.  WARD:   Your  Honor,  I had intended to bring

9 it up.   I tried to bring it up and there was an

10 objection by the government and    Your  Honor ruled with

11 the government.  With all due respect,     I didn't agree

12 with the opinion but, as you say, you're the traffic

13 light.

14          This is what  I'm talking about,   Your  Honor, and

15 I'm quoting from --

16          MS.  GREENBERG:  This is not the declar    ant.   He's

17 saying Sergeant   Sakala was the declarant.

18          MR.  WARD:  No , no, no.  The declarant is the

19 woman.  It's  Paulette  Martin.

20          THE  COURT:  Repeat the question for me.      I

21 haven't got a perfect memory.

22          What was the question you asked?

23          MR.  WARD:  The question will be, did you,

24 shortly after the conversation in which the cap is

25 referred to, which he opined about --

1          THE COURT:  The gun.

2          MR. WARD:  -- did you yourself have a

3   conversation with   Paulette  Martin about the cap and the

4   gun, or the cap and the hammer or whatever it was.        I

5   proffer, and  I can show the court -- what do you call

6   it?

7          THE COURT:  A  transcription?

8          MR. WARD:  What?

9          THE COURT:  The transcription?

10         MS. GREENBERG:  The log,   Your Honor.

11         MS. JOHNSTON:  The log.  It has a short note

12  about the call.

13         MS. GREENBERG:  It's just a hammer.  There's no

14  note about what happen.

15         MR. WARD:  It's reported that   Ms. Martin says in

16  that conversation -- it was a conversation between the

17  two of them.   Ms. Martin says, oh,   I jokingly told him

18  that you had a gun.

19         MS. GREENBERG:   Your Honor, if he wanted to

20  impeach Sergeant   Sakala about it, he should have done

21  it when Sergeant   Sakala was on the stand.  If there

22  wasn't an objection made, it was because there was no

23  transcript or specific reference made.

24         This witness isn't going to be able to talk

25  about out of court statements she had with another

1 defendant when it's not part of the conspiracy, and

2 it's complete and rank hearsay.

3        THE  COURT:  Her statement?

4        MS.  GREENBERG:  Her discussion with    Ms. Martin.

5        THE  COURT:  What she said to    Ms. Martin?

6        MS.  GREENBERG:  She wants to talk about her

7 discussion with   Ms. Martin offered for the truth of the

8 matter.

9        THE  COURT:  Why can't she say what she said to

10 Ms. Martin?

11        MS.  GREENBERG:  It's hearsay.  It's between two

12 people out of court.  It's an out of court statement --

13 her talking to   Ms. Martin out of court.

14        THE  COURT:   She's here on the stand.

15        MS.  GREENBERG:   Your Honor, it's still hearsay.

16 It's an out of court statement when they have a

17 discussion.  It's self-serving.  She cannot get on the

18 stand and talk about conversations she had with other

19 people.  That is hearsay, unless it falls into some

20 other exception.

21        I do not appreciate counsel laughing at the

22 bench.

23        MR.  WARD:  I'm laughing, because if   I haven't

24 been practicing law as long as    I've been practicing    I

25 would think you were joking.

1          MS.  GREENBERG:   Your  Honor,  I will be glad to

2  find a case over the weekend, because this is basic --

3          MR.  WARD:   I'm sure you will.

4          Judge, I won't only want to bring in what my

5  client said to  Paulette Martin.  I want to bring in

6  that, by the way  I joked with so-and-so and told him

7  that you had a gun.    I think that that makes it clear.

8          THE COURT:  First of all, is that a recorded

9  call that you've transcribed?

10          MR. WARD: Yes.   I haven't transcribed it, but

11  the best evidence   Your Honor is the recording.   In

12  fact, the only evidence is the recording itself.       I

13  will be glad to have Sakala come in and play the

14  recording, if the government promises not to jump all

15  over me.

16          MS.  JOHNSTON:   Your  Honor, if the counsel   wants

17  to p lay recordings, they have can play copies of

18  recordings and they can play them themselves, but I

19  think  Ms. Greenberg's point is -- has nothing to do

20  with how they presented it.  It has to do with

21  questioning this witness.    I don't want to speak,

22  because  Ms. Greenberg --

23          THE COURT:  W ell, my question -- maybe   I'm being

24  slow today, on  Friday afternoon.

25          MR.  WARD:  Want some percocet here, Judge?

1          THE COURT:  No.  I have no Percocet.  Disregard

2   what I've said about     Percocet.   I'm take Extra-Strength

3   Tylenol and  I'm squeeze squeezing this little black

4   ball.  Maybe  I'm a little slow, but why is it not

5   proper form her to tell what she told    Ms. Martin?

6          MS. GREENBERG:   Your Honor, the witness can't

7   get on the stand and state what conversations she had

8   with people out of court.  If they want to introduce it

9   as coconspirator's statements and she says,    I had

10  discussions with her about dealing drugs and things

11  like that, not just that I had discussions with her

12  about how we're not going to, you know, use guns or

13  we're not going to, you know --

14         THE COURT:  I understand.

15         MS. GREENBERG:  -- we're going to go buy

16  clothes.  It's hearsay.

17         THE COURT:  My question is, if   I limit  Mr. Ward

18  at least today, absent there being something being

19  played of what she has said to    Ms. Martin, what is the

20  issue?

21         MR. WARD:  Your Honor, first of all, that's not

22  hearsay, because the declarant, i.e.,    my client, is on

23  the stand and subject to cross-examination.

24         THE COURT:  That's why  I'm asking you the

25  question.  If  I limit you in your examination of your

1 client at this time to asking her what if anything did

2 she say to  Ms. Martin in this conversation, on this

3 date about a gun --

4        MR. WARD:  What  I want to come in and what    I

5 firmly believe was permitted under the rule is the

6 statement by  Ms. Martin -- we're not talking about

7 Sakala being --

8        THE COURT:   I'm not privy to this call.  What

9 does Ms. Martin say?

10       MR. WARD:  Would you give me just a second,    Your

11 Honor?

12       Your  Honor, the call that was played was B289.

13 B289 was played, and it was an outgoing call to a

14 Robert  W. Warren, and  Paulette says -- there's actually

15 a transcript.

16       THE COURT:  That was a call from    Paulette  Martin

17 to who?

18       MR. WARD:  To a  Robert  Warren.   I don't know who

19 he is.   Paulette said he told    Tony it was probably to

20 avoid pulling the trigger on the hammer that she

21 carries with her.  Sakala opined that what that meant

22 was she carried a gun with her.  Now, that conversation

23 was on March 1 at 13:22, or 1   :22 p.m.

24       MS. GREENBERG:   Your  Honor, here's the relevant

25 portion of what's in evidence:  Trigger on the hammer.

1  Sergeant  Sakala said "hammer" referred to a gun.  That

2  was the extent --

3          THE COURT:  That's been done?

4          MS. GREENBERG:  Yes.

5          MR.  WARD:  Call 284 was an outgoing call to

6  Lavon and Goldie  Dobie.

7          MS.  GREENBERG:  That would be before this call?

8          MR.  WARD:  That's correct.    I didn't record

9  these calls.  That's what it is.     Paulette calls  Becky

10 telling her "blah-blah-blah," and she's talking about a

11 conversation and, "he said   Becky was shaking,"   Paulette

12 jokes, and she told him that    Becky was -- jokes that

13 she told him that  Becky was carrying a weapon.  In

14 other words, she's making this --   Paulette  Martin is

15 making this statement to Ms.   Dobie that she jokingly

16 said to the person that you're carrying a weapon.

17         MS.  GREENBERG:   Your  Honor, first of all, he's

18 saying what he proffered to the court is that this

19 conversation that was played,   B289, and that the reason

20 to introduce it was because he was going to impeach

21 Sergeant  Sakala and his definition of what a hammer was

22 and that the parties were joking.  Now the call he's

23 referencing to, without being clear who the identified

24 parties are, happened before in this call.  I don't see

25 how there could be a call before this call to impeach

1  it.

2           THE COURT:   I'll tell you what, counsel.  Why

3  don't you do this?  This is an esoteric issue.  For now

4  let's leave this esoteric issue until     Monday.  Why

5  don't you continue with other matters and we'll discuss

6  this matter on   Monday afternoon.

7           MR. WARD:  Thank you, Judge.

8                    (Back in open court.)

9           BY MR. WARD:

10  Q.     Ms. Dobie, you recall a telephone conversation

11  that was played for the jury when Sergeant      Sakala was

12  on the stand, where   Paulette  Martin was complaining

13  that you had gone over there in the middle of the night

14  banging on the door and banging on the windows and so

15  forth and making, generally, a nuisance of yourself?

16  Do you understand?

17  A.     I remember.

18  Q.     Was that or was that not one of the occasions

19  when you went over there to --

20           MS. GREENBERG:  Objection to the leading.

21           THE COURT:    Rephrase the question.

22           BY MR. WARD:

23  Q.     Can you tell us the purpose for which you went

24  over there and banged on the doors and windows in the

25  middle of the night?

1 A.      It could either have been to borrow some money

2 because the gambling --    I may have gotten broke at the

3 gambling joint, or it either could have been to get

4 some cocaine from her.

5        MS. GREENBERG:  Objection to what may have been,

6 Your Honor, and move to strike.

7        THE COURT:  Overruled.

8        BY MR. WARD:

9 Q.      All right.  Let's turn now to the June 1, '04

10 raid on your house.  Do you recall that?

11 A.      Yes, I do.

12 Q.      All right.  Among the items found under the bed

13 -- I believe on the right-hand side of the bed,

14 underneath, was a box.  It may have been a cracker box

15 or something like that -- two boxes.

16        In any event, there were two guns there; is that

17 right?

18 A.      Two guns in one box.

19 Q.      Can you put your hand out?  Two guns in one box?

20 A.      Yes.

21 Q.      I want you to tell the ladies and gentlemen of

22 the jury if you knew about those guns before the raid;

23 and if you did how you knew about them; and under what

24 circumstances you got to know about them.

25 A.      I did know about the guns prior to the police

1  coming into my home.     I was going to the bathroom or

2  doing something in my home, maybe --     I don't know for

3  sure --  I know for a fact that it wasn't more than 48

4  hours prior to the raid, and exactly what time     I don't

5  remember.  My bedroom --    I don't have the picture --

6  y'all seen the pictures of the house.  My bedroom sits

7  across from two bedrooms -- two bathrooms on the same

8  level in my home, and     I was going into the bathroom and

9  I heard my son's voice.  He's a teenager.  He wasn't

10 there when I had went to sleep or whatever.

11 Q.      Excuse me.  This was    Ta'Vaughn ?

12 A.      Ta'vaughn .  Goldie's locked up.

13 Q.      What time of the day or night was this?

14 A.      To be honest,  I really can't say, because     I was

15 awakened.   I woke up to use the restroom.  From my room

16 to the bathroom --   I couldn't tell what time of day it

17 was.  Only once  I went into my son's room.  That's when

18 I looked out, you know, and     I could see the window,

19 because where his bed is it's a window right there.

20 And  I'm coming in the door and I'm not --

21 Q.      Was it daytime or nighttime?

22 A.       I would say it was maybe evening-time.  It

23 wasn't 10 o'clock in the morning for sure.  It wasn't

24 bright like that outside, but it wasn't pitch black

25 either.   I entered the bedroom door -- went right in.

1  My son was standing -- he was actually at the end of

2  the bed sitting with a gun in his hand.  It was another

3  gun laying on the bed with a kid which is a friend of

4  my son's which  I call a "play little nephew" or

5  whatever.

6          Immediately, without thinking,    I went to grab

7  the gun.  My son said, wait a minute, Ma.  It's not --

8  you know,  I guess he was in the process of loading it

9  or whatever.  When  I seen that he had it in his hand

10 like this (Witness indicating) --    I've been shot before

11 -- I immediately went and reached for the gun.  He at

12 that point, more or less, like, grabbed my hand with

13 the gun and said, wait a minute, Ma.  Let me do this to

14 make sure.  At that point he said, let me do it.  He

15 said, well, push it all the way in.     I got the gun like

16 this and  I did like this and pushed the bottom of it

17 which, as  I learned in this courtroom, was the clip of

18 that gun.  That's where my    DNA test came up on that

19 gun. I beat him to reach --    I grabbed the gun like

20 this, and both of them tried to convince me -- my son

21 and his friend said, Ma, the gun belongs to somebody

22 else and they gonna get mad.  I said, tell them to come

23 see me.  I'm not giving you this gun.  At that point     I

24 asked my son, does this have anything to do with you

25 being afraid for your life?  Ma, it ain't like that.

1           MS. GREENBERG:  Objection.

2           THE WITNESS:  At that point --

3           MS. GREENBERG:  Objection.

4           THE COURT:  What's the basis?

5           MS. GREENBERG:  Hearsay.

6           THE COURT:  Please do not tell what someone else

7  told you.

8           THE WITNESS:  Well,  I questioned -- okay,  Your

9  Honor.  I questioned my son -- due to my other son's

10 case and incarceration  I questioned my 17 year-old to

11 make sure his life wasn't in jeopardy or he wasn't in

12 fear for his life.

13          BY MR. WARD:

14 Q.    Ms. Dobie, why on Earth would you take two

15 loaded guns out of the hands of two teenagers?

16 A.    Why?

17 Q.    Yes.  Why?  Tell the ladies and gentlemen of the

18 jury.

19 A.    I feel as though  I've lost one of my sons to the

20 system and to my own negative behavior and lacking in

21 parenting skills because of my past bad choices.       I

22 seen my son with a gun -- I've been shot myself in the

23 chest by a gun before and   I carry the bullet with me

24 today.  I would have done it for anybody's kid.

25          Even after being here today,  I would still do

1  it.  In them group homes   I worked at, every day   I tried
2  to save somebody else's child.     I was going to make
3  sure that my 17 year-old son didn't accidentally shoot
4  himself or that kid that was in that room at that time
5  and date or didn't go out there and shoot or kill
6  somebody else in society.
7          I took the guns from them that the moment     and
8  went back into my room, after    I assured them that it
9  was nothing neither one of them could have said to me
10 to get them guns back from me.
11 Q.      Ms. Dobie, did you think at the time that you
12 were a convicted felon and that your mere possession of
13 the gun was a federal crime?
14 A.      It didn't matter about my past.  It was about my
15 kid.   I even wrote the government a letter in this case
16 stating --
17         MS. GREENBERG:  Objection,   Your Honor.
18         THE WITNESS:  -- stating   I would take
19 responsibility for those guns.
20         MR. WARD:  That's all you can say about that.
21         THE COURT:  Sustained.
22         BY MR. WARD:
23 Q.      Did your having those guns and putting them in
24 the boxes under the bed have anything -- anything at
25 all to do with any drug trafficking activity by you?

1  A.      With a moral certainty in the name of      God and

2  his Disciples, the guns never left my home.  They never

3  left out that house after    I took them from my sons.

4        I went in my room,   I emptied the crackers out of

5  the box -- the crackers were prepackaged, like, Ritz

6  crackers, but they're not round.  They're the square

7  crackers.  I placed the remaining of the crackers at

8  the end of my bed, which was a hamper -- a nice wicker

9  hamper.  I took the guns and placed them in the box,

10  went under my bed and placed them under my bed, opened

11  the chest of drawers, slammed the chest of drawers,

12  slammed the closet door to throw my son off to where      I

13  may have been hiding the guns.      I never even removed

14  the guns.

15        The next time   I seen the guns was on June 1,

16  '04.  I never left my home after that incident with the

17  guns.  The police know    I didn't.  They were watching my

18  home --

19        MS.  GREENBERG:  Objection.

20        THE  WITNESS:  -- for this raid.

21        THE  COURT:  Sustained.

22        Disregard what the witness said.

23        BY MR.  WARD:

24  Q.    Did it ever occur to you,    Ms. Dobie, when you

25  found these young men with the guns and took them away,

1  to call the police and turn them in?

2  A.      No, it did not.   I wouldn't have called the

3  police and told the police that    I just took two guns

4  from my son.   I would be lying to you all to tell you

5  all that.   I'm not that confident with the police

6  through my own personal behavior and stuff.      I wouldn't

7  have picked up the phone and called the police.

8  Q.      Ms. Dobie, also in your house was -- aside from

9  some traces of cocaine and heroin, I believe there were

10 some empty bags with residue?

11 A.      Yes.

12 Q.      Do you know where they came from?

13 A.      Sure.   I would have had them in my home.

14 Q.      Was your husband using drugs at that time?

15 A.       found out my husband had relapsed through

16 parole and probation when they requested him to go into

17 treatment.   Prior to that, he had denied using to me.

18 I was the addict.

19 Q.      There was one box under the bed which had in it

20 -- I think it had a letter addressed to your husband as

21 "Julian  Dobie."  Do you recall that testimony?

22 A.      Yes,  I do.

23 Q.      In the same box, according to detective -- the

24 detective who testified -- the gentleman with the

25 ponytail?

1  A.      I recall it.

2  Q.      According to him, there was a bag with 11    .65

3  grams of --  I believe it was heroin; is that correct?

4  A.      Can you repeat that again?

5  Q.      11.65 grams of heroin.

6  A.      Let me make sure   I understand the question.

7          That's what it's alleged that was in my home?

8  Q.      I'm saying that as   I understood it -- certainly,

9  the jury's recollection controls -- Detective      Papalia

10 says -- showed it in court here that this was in a box

11 under the bed, together with a letter,     I think,

12 addressed to "Julian    Dobie." Do you recall that

13 testimony?

14 A.      I recall his testimony.

15 Q.      Did you have any prior knowledge of that

16 substance before the raid?

17 A.      I didn't see a box.

18         Can I explain fully?

19 Q.      Yes.   I'm sorry.  In the absence of an

20 objection?

21         THE WITNESS:   Your Honor, can  I explain fully?

22 He's mentioning a box   I never  seen.

23         THE COURT:  You may explain something, but you

24 may not do that in a manner that describes what

25 somebody else told.

1          THE WITNESS:  Okay.   I never seen the box.   I

2  didn't learn about the box until another the court

3  hearing which was April 6, '05.  That's when     I learned

4  about a box that had been pulled under my bed somewhere

5  -- that particular box, not the cracker box with the

6  guns.  On June 1, '04 the gentleman -- the Detective

7  Papalia  who testified here, he came down the steps and

8  he had us all placed in the living room of my home.  He

9  came down the steps with a baggy.  He said, "Got it."

10 I said, "Got what?"  And he showed that.       I said,

11 "That's not mine."  He at that point asked somebody for

12 a kit and did a test and shook his head.  If some drugs

13 were found in my home that day, Detective      Papalia

14 didn't find any drugs.

15         MS. GREENBERG:  Objection as to what Detective

16 Papalia  did, Your Honor.

17         THE COURT:  Overruled.

18         THE WITNESS:  That day he acknowledged in front

19 of me and the rest of those agents --

20         THE COURT:   Ms. Dobie, do not say what he said.

21 Say what he did.

22         THE WITNESS:  He tested --

23         BY MR. WARD:

24 Q.    Let me ask you this.  Did you hear him testify

25 in court about doing a test?

1   A.       Yes.

2   Q.       Did you hear him say that the test turned out to

3   be negative?

4   A.       Yes.

5   Q.       Okay.   There was a double-something scale found

6   in the basement.

7   A.       A triple beam.

8   Q.       A triple beam.   I'm sorry,   I was thinking double

9   beam, but triple beam.

10          Were you aware that that triple beam scale was

11  down there?

12  A.       Yes.   I placed it --   I believe they may have

13  found it on one of the upper shelves in the basement.

14  I placed it there in a green garbage bag.

15  Q.       Why had you had or possessed that triple beam

16  scale?

17  A.       Actually,   I had got the scale from someone.     I

18  had got an abundance of jewelry -- heavy jewelry --     I'm

19  not talking about diamonds or diamond rings.   It was

20  some pieces that actually had some brooches on them.

21  Later --   I mean, they were taken in this case.     I've

22  weighed some of the gold on them, and particularly     I

23  obtained that scale for this lot of jewelry     I had

24  recently obtained prior to this arrest.     I hadn't had

25  the scale that long.   I didn't purchase it brand new.

1 I wanted to sell the items that were seized as bulk

2 weight or whatever, and that's why that particular

3 scale was in my basement.

4 Q.      There were two other digital scales that were

5 found, as  I recall.   I think one was found in the box

6 with the substance that was tested by Detective      Papalia

7 and one was found somewhere else.

8        Can you tell the jury what you know about the

9 digital scales?

10 A.      I can tell you what   I know about the digital

11 scale that was found in the night stand drawer.      I had

12 never seen the box, and to this day     I haven't seen the

13 actual box how it was supposed to be found.      I seen

14 something and  I tried to --  I even asked  Mr. Ward,

15 could they unwrap something they set up here that said

16 was this white box before   I would know, too.    I had

17 never seen before either.  However, in the night stand

18 drawer -- I believe it would have been the left-hand

19 side, but it may have been the right.     I'm assuming it

20 would have been the left-hand side, maybe, that they

21 found a scale.

22 Q.      Excuse me.  Was that your side of the bed, the

23 left-hand side?

24 A.      Actually, either side.  A lot of times -- like     I

25 said, we were both gamblers and we were both hustlers.

1 He may have went out of town and     I might have slept on

2 either side.  The phone stayed on the right side of the

3 bed.  So if  I'm in the bed by myself,    I'm going to be

4 on the right side.  If he's out and prior to him coming

5 home, he will have to say, Stink, slide over.  But it's

6 no either side.  He didn't smoke cigarettes but I had

7 Kool  cigarettes on the right-hand side of the bed and I

8 had some on the left-hand side.  So, to be honest with

9 you, it wasn't a left side or right side that was his

10 or mine.  Whoever got in the bed first --

11 Q.     In any event, that digital scale in the night

12 stand or whatever it was on the left side.  What could

13 you tell the jury about that?

14 A.     I don't think it should have had any traces on

15 it, the one that was on the left side.     I'm not going

16 to sit here and lie to  y'all that I've never weighed

17 any cocaine or anything else on it.  If     I copped a

18 sixteenth,  I would snort some prior to getting home.

19 If  I copped two or three grams of heroin, prior to

20 getting home I'm going to take a blow of it because

21 it's not for resell.  It's for me.  So,     I'm going to

22 take a blow of it.   I may go home because   I have these

23 scales, and  I can put it on the scale and weigh it.  If

24 it's way off, common sense lets me know that if      I

25 purchased three grams, from time     I got home from 2600

1 block of  Georgia to the 7400 block of Ninth Street --

2 that's right past   Walter Reed -- I ain't snorting no

3 gram of dope and driving the car.    I'd be dead.  So   I

4 could put the stuff on the scale and know if the person

5 had cheated me or whatever.  Basically, even if     I'm

6 copping out of Chuck & Billy's,    I know the same person

7 I'm dealing with it may be two or three people and this

8 is where they sell their drugs at at this bar, that      I

9 could always go back and say, that wasn't right.  That

10 was a half a gram short or whatever.      I was a addict.

11 I used.   I never purchased less than a 50 or a gram of

12 it, so it wasn't like   I was a $5 or $10 customer.  The

13 person would have straightened it up or whatever.

14          THE  COURT:  Mr. Ward, unless you have, like --

15          MR.  WARD:   I have, really.

16          THE  COURT:  -- one more question on this

17 subject?

18          MR.  WARD:  Well, it's not -- it's one -- we're

19 going to carry over until Monday anyway.

20          THE  COURT:  We're going to carry over.  Unless

21 you're going to lose your train thought, let's adjourn

22 for the weekend.

23          MR.  WARD:  It's not going to interrupt my train

24 of thought.

25          THE  COURT:  Fine.  We will freeze that thought

1  right in mid-word, and we will resume on     Tuesday at 9

2  o'clock with the jury.

3          Counsel and the parties on    Monday at 2:00 or

4  earlier, if you can get here.  2:00 or 1    :30.

5                  (Jury excused at 4:27 p.m.)

6          THE COURT:  Counsel, stay behind.

7          Mr.  Martin.

8          MR.  MARTIN:  Yes, sir.

9          THE COURT:   I have been advised by the marshals'

10 office that the Prince    George's County Detention Center

11 is going to do their best to have your client seen by a

12 dentist on  Monday.  They will advise me and the marshal

13 of the results of that examination.     I have told them

14 that your client has advised me that he has some dental

15 device, whether it's bridge or a cap or --

16         MR.  MARTIN:  It's a bridge.

17         THE COURT:  -- or crown,   I don't know, that has

18 simply come loose.  So   I have simply said, in my

19 unsophisticated dental language, tell the dentist to

20 bring glue.

21         MR.  MARTIN:  A bonding agent.

22         THE  COURT:  They would probably call it an

23 adhesive.

24         MR.  SUSSMAN:  Judge, before you leave.  Since

25 we're doing the charge on the instruction thing, my

1  client would prefer not to be here and would waive her

2  presence.   I don't know about other people.      Mr.

3  Martin's has dental responsibilities.

4       Mr. Hall:  My client has no problem waiving.

5       THE COURT:  We're going to be discussing the

6  charge and we're going to be discussing the verdict

7  form, and we will be discussing the issue of the

8  recordings.  Those are all matters that are not

9  testimonial.  They're legal matters.  If they wish to

10 -- it might be arguable as to whether they can or

11 cannot be present if they wish to affirmatively waive

12 on the record their right to be present.

13      MR. MONTEMARANO:   Ms. Martin will waive her

14 presence and would request not to be transported on

15 Monday regarding that.

16      MR. HALL:  I do, too, with my client     Mr.

17 Whiting,  Your Honor.

18      THE COURT:  Let's do it one at a time.

19      Mr. Goodwin.

20      MR. MARTIN:   Mr. Goodwin also waives his

21 presence.

22      THE COURT:   Ms. Martin, you understand you had a

23 right -- you may have a right to be present during the

24 proceedings on  Monday, and you're willing to waive your

25 presence?

1          MR. MONTEMARANO:  She understands,    Your  Honor.

2 I've advised her.

3          THE  COURT:   Mr. Goodwin, do you understand you

4 have a right to be present on    Monday or may have a

5 right?  Do you wish to waive that right?

6          DEFENDANT GOODWIN:    I'm going to get my teeth

7 fixed.  Yes, sir.

8          THE  COURT:  Mr. Whiting?

9          DEFENDANT WHITING:  I waive my right.

10          MR. WARD:   Your  Honor,  I've just discussed in

11 front of the marshals with    Ms. Dobie her right to be

12 present.  She tells me she wishes to waive her

13 presence.

14          THE COURT:   Do you wish to waive your right as

15 well?

16          DEFENDANT DOBIE:    I decline to be here.

17          THE  COURT:   I'm giving you the right not to be

18 here.

19          DEFENDANT DOBIE:    Thank you.

20          THE  COURT:  Mr. Bynum.

21          MR. MITCHELL:   Your  Honor,  I've spoken to   Mr.

22 Bynum and he wishes to be here    Monday.

23          THE  COURT:  We will have him transported    Monday.

24          THE  COURT:  Ms. Harden  ?

25          DEFENDANT HARDEN:    I waive my presence.

1           THE COURT:  Do you wish to be present on      Monday,

2  Ms. Ali?

3           DEFENDANT ALI:    Yes,  I waive my presence.

4           THE COURT:  All right.  We will only have one

5  defendant here on   Monday, and that's   Mr. Bynum.

6           MS.  JOHNSTON:    Your Honor, can we get the list

7  or the order of witnesses for      Tuesday?

8           THE  COURT:  Counsel, be sure to give     Ms.- --

9           MS.  JOHNSTON:  There's been discussions     Ms.

10  Ali's going next.

11          THE COURT:  We don't want us running out of

12  witnesses.

13          MS.  JOHNSTON:  We would like to be prepared.

14          THE  COURT:  Could you please communicate that to

15  Ms. Johnston today, counsel?

16                   (Off the record at 4  :28 p.m.)

17

18

19

20

21

22

23

24

25

1                       **CERTIFICATE**

2

3       I, Tracy Rae Dunlap,   RPR, CRR, an Official Court

4  Reporter for the United States District Court of

5  Maryland, do hereby certify that I reported, by machine

6  shorthand, in my official capacity, the proceedings had

7  and testimony adduced upon the Jury Trial Proceedings

8  in the case of UNITED STATES OF AMERICA versus PAULETTE

9  MARTIN, et al,   Criminal Action Number   RWT-04-0235 on

10 July 28, 2006.

11

12      I further certify that the foregoing    281 pages

13 constitute the official transcript of said proceedings,

14 as taken from my machine shorthand notes, of said

15 proceedings.

16

17      In witness whereof, I have hereto subscribed my

18 name, this  31st  day of March 2008.

19

20

21                              _____

22                              TRACY RAE DUNLAP, RPR, CRR
                                OFFICIAL COURT REPORTER
23

24

25