```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                        SOUTHERN DIVISION
 2
    ------------------ ---------x
 3 UNITED STATES OF AMERICA     :
               Plaintiff        :
 4                              :
                                :
 5 vs                          :Criminal Action:  RWT-04-0235
                                :
 6                              :
   PAULETTE MARTIN, et al       :
 7               Defendants.    :
   ----------------------  ----x
 8
 9                        Wednesday , August 2 , 2006
                          Greenbelt, Maryland
10
          The above-entitled action came on for a Jury
11 Trial Proceeding before the HONORABLE ROGER W. TITUS,
   United States District Judge, in courtroom 4C,
12 commencing at 9: 02 a.m.

13            THIS TRANSCRIPT REPRESENTS THE PRODUCT
              OF AN OFFICIAL REPORTER, ENGAGED BY
14            THE COURT, WHO HAS PERSONALLY CERTIFIED
              THAT IT REPRESENTS THE PROCEEDINGS AS RECORDED
15            AND REQUESTED.

16            APPEARANCES:

17            On behalf of the Plaintiff:

18            DEBORAH JOHNSTON, Esquire
              BONNIE GREENBERG, Esquire
19
              On behalf of the Defendants:
20
              MICHAEL  MONTEMARANO , Esquire
21            ANTHONY MARTIN, Esquire
              MARC HALL, Esquire
22            TIMOTHY MITCHELL, Esquire
              PETER WARD, Esquire
23            EDWARD  SUSSMAN , Esquire
              HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR           (301) 344-3912
25 Official Court Reporter
```

```
 1                        I N D E X

 2                          DIR  CROSS     REDIR     RECROSS
     Learley  Goodwin             12
 3
     Matthew  Shannon     175  197       202       203
 4
     Chris  Sakala             220
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
                                            Page

23  Reporter's Certificate              298

24  Concordance                         299

25
```

1          THE COURT:  Counsel, before   I bring the jury in,

2  a couple of things.

3          Do we have an update,   Mr. Montemarano , on your

4  witness with the potential   Fifth Amendment problem ?

5          MR. MONTEMARANO :  Yes.  We are not going to use

6  her.

7          THE COURT:  You're not   going to use her?

8          MR. MONTEMARANO :   I spoke with her counsel

9  yesterday and we kicked some ideas around.  She is not

10 going to appear on behalf of the defense.

11         THE COURT:  What , if anything , does that do with

12 the collective wisdom of the defense with the length to

13 the balance of the case of the defense?

14         MR. MONTEMARANO :  The numbers  I quoted you

15 yesterday probably remain the same.    Mr. Shannon , my

16 attorney , will be here at 11  :00.  He had something but

17 rescheduled it -- death of a client -- and    I will speak

18 to him over the break and w  e'll be ready as soon as the

19 break is over.

20         THE COURT:  What I'd like to do is give the jury

21 my assessment of where we are so they can understand

22 where we are.  So it looks to me like everybody is

23 comfortable with the notion that we should be able to

24 finish testimony this week  ?

25         MS. JOHNSTON:  No.

1          THE COURT:   No?

2          MS. JOHNSTON:   Your Honor told the defense they

3 can play roughly 350 pages of calls.

4          THE COURT:   I understand.

5          MS. JOHNSTON:   It is going to take several days

6 to do that.

7          THE COURT:   I didn't say 300 calls  , if I remember

8 correctly.

9          MS. JOHNSTON:   Three hundred  pages of

10 transcripts.

11          MR. MONTEMARANO :  I don't think it's that many

12 pages after what's been removed.

13          THE COURT:   There's varying interpretations   , but

14 we should get the bulk of the testimony   , if not all of

15 the testimony , in this week is what my instincts tell

16 me.  Let me ask this question  :  Depending on where we

17 are -- I could make some schedule change   s if this would

18 help .  If we do , in fact , finish all the testimony this

19 week, would it be possible,   Ms. Johnston should listen

20 to this one , for me to charge the jury   Monday afternoon?

21          MS. JOHNSTON:   I will not be here on   Monday

22 afternoon.   I would prefer that the   Court not do

23 something without me.  We have accommodated other

24 people's schedules.  We have -- if we had not taken

25 three days to pick a jury and taken that      Friday off the

1 first week of trial, we would have been concluded in a

2 timely fashion.    I have made these plans; I have

3 cancelled a vacation.

4          THE COURT:  All  I'd be doing is reading something

5 where you can go to sleep.

6          MS. JOHNSTON:   I don't think it's appropriate for

7 the jury to hear anything without both government

8 counsel present.

9          THE COURT:  All right.  Well  , what I will tell

10 the jury is that  I'm fairly confident that all or

11 substantially all  the testimony will be completed this

12 week , and that we will be getting instructions and

13 argument next week  , and the only real question is

14 whether the amount of time required for deliberations

15 would extend beyond   Friday , and I would need to have --

16 I want them to understand that the length of their

17 deliberations is entirely up to them    .

18          They can take as long as they want, but that if

19 it goes beyond  Friday, they need to tell me whether they

20 have any issue internal to the jury in continuing their

21 deliberations into the following week.     I don't have a

22 problem because one of my colleagues can receive the

23 verdict, if they need to -- if they have vacation

24 problems, we'll have to see whether it's sufficiently

25 severe that they do need to take a recess    , or if it's

1 only one juror, we may have to evaluate a way to excuse

2 that juror.

3          MS. JOHNSTON:    Your Honor , I would not suggest --

4 I would not tell them we are   going to complete testimony

5 this week.   I think that sets false expectations.   If

6 the Court wants to tell the jury that you expect to

7 finish testimony early next week and    --

8          THE COURT:  It will be either late this week or

9 early next week, and   I'm very confident that my

10 instructions and the closing arguments will be

11 completed.

12          MS. JOHNSTON:    By the end of next week?

13          THE COURT:  The   question is whether or not the

14 deliberations are completed.

15          MR. MONTEMARANO :  The only thing  I would ask the

16 Court to advise the jury , if you are going to continue

17 deliberations into the week of the    14th, is advise them

18 they would be expect  ed to recommence their deliberations

19 on Monday s.  They have been missing Mondays.     I think

20 that needs to be made clear.

21          THE COURT:  Oh, yeah.

22          MR. MARTIN:   I wanted to echo what   Ms. Johnston

23 said.   I don't think  you should cause any   more anxiety

24 on their part if we don't finish the testimony by the

25 end of this week.

1          THE COURT:  Oh, no , I understand.    I think it
2  would be end of this week or early next week we will
3  finish the testimony.  My instructions     will be given ,
4  and  the closing arguments will be done with no problem
5  before next  Friday .  The real question is time to
6  deliberate .
7          If they don't have time to deliberate    , one of the
8  options , unless they have a problem   , is for them to come
9  back on  the  following  Monday, conclude their
10  deliberations in as many hours or days as     it takes , and
11  one of my colleagues can receive the verdict.
12          MR. MARTIN:   I don't want them to think that
13  there's some kind of deadline with respect to the
14  deliberations either.
15          THE COURT:   No.  I will make it very plain to
16  them , as I have all along  , that the length of the
17  deliberations is their decision and they should take as
18  much time as it takes to do a fair and thorough job.
19          MS. GREENBERG:   Your  Honor , before they start
20  deliberating , some of the jurors have given the     Court
21  notes about the one gentleman going to     Spain and things
22  like that.   I think it would make sense   , before they're
23  excused to deliberate  , to determine if somebody is going
24  to have a conflict in the next day or two to replace
25  them with an alternate.

1          THE COURT:   I'm going to tell them that  , and then

2 say , please confer yourselves and each other and through

3 your foreman let me know if there's any issues any of

4 you have , and I will acknowledge   I have received a note

5 from one juror indicating a problem with next        Friday

6 afternoon , and that the deliberation schedule they set

7 is up to them , and they are not precluded from coming

8 here to deliberate.  In fact  , I would encourage them to

9 come and deliberate the following     Monday if they can't

10 get it done.

11          MR. SUSSMAN :  May I suggest, sir, to allay the

12 anxiety , since we're just speculating when we're going

13 to finish the trial, we probably think we will finish

14 the active phase sometime next week.  At that point      ,

15 perhaps the  Court can tell them we will do a    -- kind of

16 a what's -what as to their personal status  , and then

17 decide who  our personnel are, where we go  , so at least

18 these folks won't think they're going to be caught in

19 this terrible time warp and lose all these personal

20 things and that's probably the way it will work out,      I

21 guess in terms of how you do it.

22          THE COURT:  All right.  Anything further?

23          Bring the jury in.

24          MR. MITCHELL:   Your Honor, while she's doing

25 that, I just want to test to make sure     I can get the

1  sound up.

2          THE  COURT:   All right.

3          MR.  MITCHELL:   Loud and clear.

4          THE  COURT:    Loud and clear.

5                    (Jury returns at 9  :11 a.m.)

6          THE  COURT:   Good morning, ladies and gentlemen.

7  While you're getting settled in,     I wanted to give you my

8  best update on what the rest of this case looks like.

9  It is quite likely based upon my assessment of

10 assessment of the status of the case that all of the

11 testimony will  be  concluded by either the end of this

12 week or early next, meaning    Tuesday, because we don't

13 sit Monday.

14         That being the case, the balance of the case

15 would consist of instructions to you from me on the law,

16 followed by the closing arguments of the attorneys.     I

17 am very confident that all of that will be done well

18 before  Friday , August 11.  The only issue is whether or

19 not you will have enough time to conscientiously

20 deliberate and reach a verdict.

21         I want to emphasize now   , and  I'll emphasize

22 again , that it is important that you take as much time

23 as it takes to be fair and thorough because this is a

24 large case with a large number of parties, a large

25 number of charges  , and you're required to make very

1  careful, individual assessments in each and every case.

2  So, the length of your deliberations is the only thing       I

3  see as being a problem bumping up against next        Friday.

4        I don't want you to have to consider that you

5  have to reach a verdict by    Friday afternoon.    I know

6  one of you sent me a note saying you have travel plans       ,

7  and I would like to get out of here early next        Friday

8  afternoon , and that may not be a problem.  If you have

9  not reached a verdict by the end of next week     , there are

10  a couple of options  .

11        The easiest option is for you to simply come back

12  the following  Monday, or as long as it takes to continue

13  with your deliberations without me here.        I am a

14  necessary party throughout the entirety of the trial.        I

15  am not necessary to receive a verdict.  One of my

16  colleagues can receive a verdict should you not be able

17  to reach a verdict by the end of next week.

18        What  I would like to know -- you can confer

19  amongst yourselves on your break -- is to what       , if any ,

20  issues it would present if you were to be a deliberating

21  jury the week after next   , if you can't reach a verdict

22  by the end of next week.    We then make a determination

23  of what to do if it means excusing somebody so you can

24  proceed,  I don't know.

25        I will cross that bridge when we get to it.  But

1  if you could let me know what your situation is      , if you

2  were to deliberate the following week, fine.        I'm

3  reluctant to have you start deliberations and then take

4  off for a couple of weeks and then come back.       I think

5  it's going to cause some serious problems for other

6  people on the jury , and it would be better if you just

7  had a continuous period of deliberations interrupted

8  only by weekends , but let me know , if you will , what

9  that situation is.

10       Now, today , we will be going until close to 6:00.

11  Tomorrow , we're going to start at 9   :30 and again go to

12  close to 6:00.   Friday , we'll start at  9:00,  and I won't

13  go -- I don't think  I'll go beyond 4:00 , so I can get

14  you out of here at a reasonable hour on      Friday

15  afternoon.  That's the best estimate     I can give you of

16  where we are.

17       I want to tell what  I've told you at  the

18  beginning of the trial and a couple of weeks ago.       I

19  thank you all for your participation and your service as

20  jurors in this case.    I recognize that this is a very

21  large sacrifice as part of your role as citizens.      I

22  appreciate it , the court appreciates it , all of the

23  parties in this courtroom appreciate it  , and I know

24  you're going to do a fair, thorough    , and conscientious

25  job , and I want to thank you again for all your help      .

1          All right.  You may proceed, counsel.

2          MS. JOHNSTON:    Your Honor, I believe I need a

3 witness.

4          THE COURT:  All right.

5                   (Witness resumes the stand.)

6                   **FURTHER CROSS-EXAMINATION**

7          BY MS. JOHNSTON:

8 Q.     Good morning , Mr. Goodwin.

9 A.     Good morning to you,   Ms. Johnston.

10 Q.     Mr. Goodwin, let me start out   -- first I want to

11 get something straight in terms of who was living at

12 which h ouse, because there are a number of    different

13 locations you discussed yesterday and we started to

14 speak about.  In terms of   Anacostia  Road --

15          You're familiar with   Tiffany  Vessels.  Did she

16 stay there at one point in time?

17 A.     Yes.

18 Q.     Calling your attention to October   , 2002 , when the

19 search warrant was executed there by the    FBI.  Was  Ms.

20 Vessels staying there then?

21 A.     No.

22 Q.     Okay.  It was your property back when the    FBI

23 execute d the  search warrant; is that correct?

24 A.     Yes.

25 Q.     And your friend,   Ms. Battle , was living there

1 then; is that correct?

2 A.     No.

3 Q.     She was not living there then?

4 A.     No.

5 Q.     Did you hear her testimony indicating that she

6 was living there during the time the search warrant was

7 executed?

8 A.     Okay.  So you're speaking about Apartment 4 or

9 the building itself?

10 Q.     I'm speaking about the building itself.     Ms.

11 Battle lived in the building back then when the search

12 warrant was executed; isn't that correct?

13 A.     Well,  I was under the assumption maybe she was    ,

14 that she was speaking about   Apartment  4.

15 Q.     I'm speaking about the building.  Was    Ms. Battle

16 living in the building in   October of 2002?

17 A.     I'm not sure ; she could have been.

18 Q.     She's a friend of yours; is that correct?

19 A.     She was a friend of   Mr. Davis.  He was living in

20 Apartment  3 also.

21 Q.     Was she a friend of yours?

22 A.     She was an associate.

23 Q.     Well , she testified that -- do you recall her

24 testifying that she was a friend of yours?

25 A.     Well, maybe  I'm a friend of hers.

1  Q.      Well, you don't consider her to be your friend?

2  A.      Well, she's an associate and a guest of a friend.

3  Q.      You knew she used crack; isn't that correct?

4  A.      Well, she had told me that  .

5  Q.      She used crack and her roommate, the gentleman

6  she lived with, he also used crack; isn't that correct?

7  A.      I heard that.

8  Q.      Who was living in your Apartment 4 when the

9  search warrant was executed by the    FBI back in 2002?

10 A.      Richard  Johnson.

11 Q.      Mr. Johnson.  Is he someone who you also had

12 working at  Lobo's for you?

13 A.      No.

14 Q.      Did he go to  Lobo's on occasion?

15 A.      I don't know.

16 Q.      Well, it was your business.  You don't recall

17 whether you or not you've seen him at    Lobo's?

18 A.      You see , I had three functions at    Lobo's , and it

19 kept me a lot on the road.    I had to do all of the --

20 most of the action running,    I had to run back and forth

21 to the  DMV Department , and I also had to make sure that

22 all the parts and things were secured.  So it was a lot

23 of times that's why there was a lot of things going on

24 at Lobo's that  I wasn't aware of at first.

25 Q.      You were aware of after    October , shortly after

1  the FBI executed a search warrant at    Lobo's in  October

2  of 2002 , that they recovered crack cocaine    ; weren't you?

3  A.      Oh, of course.

4  Q.      And you learned about that in 200   2; isn't that

5  correct?

6  A.      Yes.

7  Q.      And Ms. Battle , who used crack on a daily basis   ,

8  stayed at  Lobo's from time to time; isn't that correct?

9  A.      That was way before then.

10 Q.      You had the gentleman who came in and testified

11 for you who worked for you at    Lobo's.

12         Do you recall that gentleman last week?

13 A.      Yes.

14 Q.      And he used crack at    Lobo's, too; isn't that

15 correct?

16 A.      That's what he said.

17 Q.      He was an associate of yours; isn't that correct?

18 A.      He worked for  Lobo's, yes.

19 Q.      And he used crack and obtained crack right there

20 in the parking lot of    Lobo 's on daily basis.  Do you

21 recall that testimony   -- or an almost daily basis.

22 Do you recall his testimony?

23 A.      Well, his testimony was cut off at the pass, so,

24 I can't --

25         MS. JOHNSTON:  Your    Honor, if  I can -- the

1  witness is not responding to the government's question

2  which was, do you recall the testimony of the gentleman

3  last week that he purchased crack cocaine on an almost

4  daily basis in the parking lot.  It calls for a yes or

5  no answer.

6          THE WITNESS:  He was in the process of saying

7  that he --

8          MR. MARTIN:  Wait, wait, wait,  Mr. Goodwin.

9          THE COURT:  Mr. Goodwin, your counsel is making

10  an objection.

11          MR. MARTIN:  Your Honor, I don't think  Mr.

12  Goodwin had finished his response.  We don't know if it

13  was going to be responsive or not.

14          MS. JOHNSTON:  It called for a yes or no.

15          MR. MARTIN:  Your Honor, if he would be allow  ed

16  to answer the questions  , then we'll know  if it's

17  responsive ; and if it's not  , it can be asked again.

18          THE COURT:  Ask the question again.

19          BY MS. JOHNSTON:

20  Q.    Mr. Goodwin, do you recall hearing the testimony

21  of the gentleman , a witness you called last week    , that

22  he obtained crack cocaine on an almost daily basis in

23  the parking lot of   Lobo's?

24  A.    I heard his partial, and he started to say who he

25  was getting it from --

1  Q.      Objection.

2  A.      That's what happened.  Then you said, objection.

3  He was going to tell you he got it from Thurman, and you

4  said objection, and that cut his conversation off.

5  Q.      So it's your understanding that that witness said

6  that he got the drugs from    Thurman; is that correct?

7  A.      That's correct.

8  Q.      But he didn't testify as to where    Mr. Thurman got

9  his drugs ; did he?

10  A.      You didn't let him.

11  Q.      As much as  -- Mr. Goodwin , is it your belief that

12  the government controls what people are allowed to say

13  in the courtroom or that the judge does?

14  A.      You kept objecting and you stopped him.  You

15  stopped all of them.

16  Q.      Mr. Goodwin, in addition to that   , there were

17  other individuals who came by the service station --

18  Lobo's on a regular basis that were crack users; isn't

19  that correct?

20        In addition to  Ms. Battle and the gentleman who

21  testified, there were other people there getting crack

22  and selling crack; isn't that correct?

23  A.      That's what  I heard.

24  Q.      You continued to operate    Lobo's after that point

25  in time; isn't that correct?

1  A.      Yeah.  It was a changing of the guards though.

2  Q.      And in terms -- do you know   John  Irby ?

3  A.      Certainly.

4  Q.      John  Irby .  He worked for you at   Lobo's , too?

5  A.      Certainly.

6  Q.      And you know him by the name    John  D.?

7  A.      Certainly.

8  Q.      Mr.  Irby  is your right-hand man; is that fair to

9  say?

10 A.      You could say that.

11 Q.      Mr.  Irby .  Did he ever live at   Anacostia  Road?

12 A.      Momentarily.

13 Q.      When?

14 A.      I'd have to refer to my notes  .  If you would give

15 them to me , then  I could let you know.

16 Q.      Mr. G oodwin , what notes is it that you think we

17 have that you want to refer to?

18 A.      The ones when his house was on fire and he had to

19 move into the apartment because    I don't know exactly

20 what those dates because   I was being incarcerated  , so  I

21 don't know.

22 Q.      Where are those notes  , Mr. Goodwin?

23 A.      In my papers somewhere.

24 Q.      What papers?  From what location are those notes?

25 A.      Mr. Martin  --

1          MS. JOHNSTON:    Your Honor, I would ask the  Court

2 to direct the witness to answer the government's

3 question and not confer with his counsel.  He's on the

4 witness stand.

5          THE COURT:   Mr. Goodwin, are you able to answer

6 the question?

7          THE WITNESS:    I don't know where she has them

8 at.  I know he said he had seen some of the papers.       I

9 don't know where he saw them at.     I was going to ask him

10 where he saw them at.

11          BY MS. JOHNSTON:

12 Q.     Mr. Irby -- was it before or after the    FBI

13 executed the search warrant?

14 A.      It was after that.

15 Q.      After that, he stayed there for how long?  A

16 couple of days?  Two weeks?  A month?

17 A.      He stayed there for months while    his house  was

18 being repair ed.

19 Q.      So, Mr. Irby stayed at  Anacostia .

20          Mr. Irby was involved in the distribution of

21 drugs as well; is that correct?

22 A.      No.

23 Q.      He has a history of using drugs; is that correct?

24 A.      No.

25 Q.      You know he travel ed to  Louisiana; is that

1 correct?

2 A.      Yes.

3 Q.      And you sent him to  Louisiana; isn't that

4 correct?

5 A.      No , I sent him to  Texas.

6 Q.      You sent him to  Texas?  You sent him in one of

7 your vehicle s to Texas?

8 A.      No.  I think he was in  a rental car.

9 Q.      So you have this big dealership,    Lobo's, a car

10 dealership where you get cars at auctions and have any

11 number of cars, and you didn't give him one of your cars

12 to drive down to  Texas, isn't that correct?

13 A.      That's correct.

14 Q.      You didn't send him down in one of your cars    , and

15 he was on his way to  Texas when he had the car accident

16 in Louisiana; is that correct?

17 A.      That's correct.

18 Q.      Mr. Thurman had to go down after that car

19 accident; isn't that correct?

20 A.      No.

21 Q.      Mr. Thurman had to go meet him in    Louisiana

22 because there were problems; isn't that correct?

23 A.      No.

24 Q.      When Mr. Irby was injured in  Louisiana, he was on

25 his way to  Texas; correct?

1  A.        That's correct.

2  Q.        And that vehicle -- did you rent it for him?

3  A.        I think  Mr. Alexander.

4  Q.        Mr. Alexander?

5  A.        One that he had available and that's why we used

6  it because it still had rental time on it.

7  Q.        Let me understand this correctly.     Maurice

8  Alexander isn't involved in    Lobo's at all ; is he?

9  A.        No.

10  Q.        And  Mr. Irby --

11  A.        Not directly.

12  Q.        And  Mr. Irby wasn't on his way to    Texas to do

13  something with some disadvantaged children     ; was he?

14  A.        No, he wasn't.

15  Q.        He was there to conduct your business; isn't that

16  correct?

17  A.        Yes, that's correct.

18  Q.        So you sent him to    Texas in a   Rent-a-Wreck

19  vehicle that had been rented by     Maurice  Alexander ; isn't

20  that correct?

21  A.        That's correct.

22  Q.        So that your name and    Lobo's name wasn't on any

23  of the paperwork associated with the vehicle that you

24  sent  Mr. Irby to Texas in; isn't that correct?

25  A.        That's correct.

1 Q.      Maurice  Alexander never lived at    Anacostia   Road;

2 did he?

3 A.      No , he didn't.

4 Q.      Never stay ed there ; did  he?

5 A.      No.

6 Q.      And Mr.  Maurice   Alexander never stayed at

7 Oglethorpe  Street ; did he?

8 A.      Not that  I know of.

9 Q.      When  I talk about  Oglethorpe   Street,  I'm talking

10 about the house that  you used that your stepson      Larry

11 Lane lived in.  You know which house     I'm referring to ?

12 A.      Give me an address.    Oglethorpe   Street runs quite

13 a way.

14 Q.      Oglethorpe  Street, where  Larry  Lane lived.  How

15 many houses did  Larry  Lane live in on   Oglethorpe   Street

16 between  June of 2003 and   June of 2004,  Mr. Goodwin?

17 A.      Okay.  That brings it more in focus, because he

18 lived in two houses on   Oglethorpe  Street .  Between 2002

19 and 2004 , he lived in a particular one.

20 Q.      What was the particular one he lived in during

21 that time period?

22 A.      I think that was the one in the 800 block.

23 Q.      That would be the one where the search warrant

24 was executed on   June 1st of 2004; correct?

25 A.      I don't know ; I was arrested.

1  Q.      Where was  Mr. Lane living in   October of 2004?

2  A.      On Oglethorpe  Street.

3  Q.      In the 800 block?

4  A.      In the 800 block.

5  Q.      You would recognize a picture of it if you saw

6  it?

7  A.      Certainly.

8  Q.      I'm going to show you what's been marked as

9  Government's  Exhibit  B-3138.

10         Do you recognize the front of that house?

11         It's the very first picture,   Mr. Goodwin.

12 A.      Yes.

13 Q.      That's Mr. Lane's house; is that correct?

14 A.      That's correct.

15 Q.      Mr. Alexander didn't live on   Oglethorp e Street ;

16 did he?

17 A.      Not that  I know of.

18 Q.      And Mr. Larry  Lane had no business dealings with

19 Mr. Maurice  Alexander ; did he?

20 A.      Not that  I know of.

21 Q.      Mr. Alexander was your friend  ; is that correct?

22 Your associate, perhaps, is a better word.

23 A.      Friend, associate.  Either one.

24 Q.      He was your friend, not   Mr. Lane's associate;

25 correct?

1  A.       Friend, associate  , either one.

2  Q.       Mr. Maurice  Alexander didn't stay at    Farragut

3  Place at the   Farragut  Place location where you were

4  arrested ; did he?

5  A.       No.

6  Q.       And he never stayed at the    Constitution   Avenue ;

7  isn't that correct?

8  A.       No.

9  Q.       In addition to the car rental that you did

10 through Rent-a-Wreck for   John  Irby -- John  D., Mr.  Irby ,

11 Mr. Alexander rented other cars that you and your

12 associates use; isn't that correct?

13 A.       No, not me and my associates.

14 Q.       Well --

15 A.       He rented cars and he used them.  We used them.

16 Q.       You used them.   Mr. Alexander didn't go with   Mr.

17 John  D.  Irby to Texas and get in a car accident?

18 A.       No, not that particular time.  No, he    did  not.

19 Q.       And he didn't make --   Mr.  Maurice  Alexander

20 didn't make any other trips for you to    Texas ; did he?

21 A.       That was only the one trip intended.

22 Q.       Mr. Alexander didn't make any trips for you    ; did

23 he?

24 A.       What do you mean by    "trips?"  Because when he had

25 a lot of those kids, we had to move around a lot of

1 times.

2          So when you say  "trip," you know, where are you

3 going?  How far?  And for what purpose?

4 Q.     Mr. Goodwin, did  Mr. Alexander make any trips

5 related to any of your business dealings for you?

6 A.     As far as what?

7 Q.     Any business dealings.    I'm not talking about

8 kids that he took to summer camp   .  I'm talking about

9 business dealings for you?

10 A.     As far as  Lobo's?

11 Q.     Any business dealings for you.

12 A.     It covered a wide spectrum.

13 Q.     Mr. Goodwin, it's a very simple question.

14 A.     Not necessarily, you see, because    I ran more than

15 Lobo's.

16 Q.     We don't doubt that,  Mr. Goodwin.

17          MR. MARTIN:  Objection.

18          BY MS.  JOHNSTON:

19 Q.     My question is a very simple one   :  Mr. Alexander

20 was here and testified   last week.

21          Did you hear his testimony?

22 A.     Part of it.

23 Q.     Did you ever have him make any trips for you in

24 relation to any of your businesses?  Not his charity,

25 your businesses.

1  A.      My businesses ?

2  Q.      While you're thinking -- why don't we skip that

3  question and  move  on to something else  , since you're

4  having some difficulty recalling that.

5  A.      I assume -- when you say    "my businesses, " I also

6  did home renovation and he has gone and he's picked up

7  materials.    I want you to say what about this and what

8  about that.

9  Q.      Did he ever have to rent any cars for you for

10 your business other than the one car that     John  Irby  took

11 on the trip to   Texas?

12 A.      There was other times when he rented cars.

13 Q.      He rented cars for you?

14 A.      Not necessarily for me.  For when we were taking

15 the kids and things.  There was other thing     s that went

16 on.

17 Q.      I'm not talking about him and his children.     I'm

18 talking about you taking cars that he rented in his name

19 and using for your business.

20 A.      There was that one time that we used that.

21 Q.      That was the   Rent -a-Wreck?

22 A.      That's right.

23 Q.      You wouldn't have any other reason to have any

24 car rental receipts in your proper     under  the name of  Mr.

25 Alexander, would you?

1 A.      That's why  I'm saying , I'm not sure because there

2 was a lot of times there was car rentals     , but as you

3 said as far as my business     00

4 Q.      You didn't send  Mr. Alexander on trips to go pick

5 up your  Cuban cigars ; did you?

6 A.      See?  That's what I'm saying.  That goes into

7 another business.

8 Q.      Did you ever send   Mr. Alexander on trips to pick

9 up the Cuban cigars?

10 A.      No.

11 Q.      And  Mr. Alexander  -- you heard his testimony that

12 all of the cars he rented for his charity organization

13 were paid for through those funds.

14        Do you recall that?

15 A.      Most.

16 Q.      Well , you recall that testimony  ; is that correct?

17 A.      Somewhat.

18 Q.      Do you know an individual named    Xavier  Moore?

19 A.      Vaguely.

20 Q.      Well,  Mr. Moore -- did he stay at your apartment

21 building on  Anacostia  Street?

22 A.      No.

23 Q.      Do you know him through    Tiffany  Vessels; is that

24 correct?

25 A.      No.

1  Q.      How do you know  Mr. Moore?

2  A.      I think he was with  Mr. Thurman.

3  Q.      Where?

4  A.      He was arrested with him.

5  Q.      I'm not interested in  Mr. Moore being arrested.

6  You met  Mr. Moore; isn't that correct?

7  A.      And Mr. Thurman's apartment,  Apartment 3, yeah.

8  Q.      You met  Mr. Moore.  Mr. Moore was in the

9  apartment in  Anacostia  with Mr. Thurman; is that

10  correct?

11  A.      Right.

12  Q.      You knew him.  Do you know him by any nickname,

13  Mr. Moore?

14  A.      He called him his brother.

15  Q.      In addition to meeting him with  Mr. Thurman, he

16  since stayed at your building on  Anacostia  Road; isn't

17  that correct?

18  A.      No.

19  Q.      You don't know that because you  've been locked

20  up; is that fair to say.

21          MR. MARTIN:  Objection.

22          THE COURT:  Sustained.

23          THE WITNESS:  I'm saying  Thurman stayed in

24  Apartment  3.

25          BY MS. JOHNSTON:

1  Q.      You testified yesterday --

2  A.      I don't know who all he had living in there at

3  the time he was living there.

4          MR. MARTIN:   Your Honor, if the witness could be

5  allowed to respond.

6          THE COURT:  First of all,  Ms. Johnston , let him

7  answer the questions.  Also   , Mr. Goodwin , you need to

8  remember when somebody says objection and      I say

9  sustained , you don't go ahead an  d answer the question.

10 You just did that when your own counsel made an

11 objection and  I sustained it.  So please listen to me.

12         When somebody says objection, freeze.  Do not

13 answer until you hear the words come out of my mouth,

14 overruled, and then answer   , and if  I say sustained , you

15 don't answer the question.  Please also answer your

16 questions fully and promptly for    Ms. Johnston.

17         MS. JOHNSTON:   Your Honor , I'd ask the witness --

18 I'd ask the  Court to instruct the witness to listen to

19 the question and respond to the question asked.

20         THE COURT:  Just please listen to the question

21 and answer the question that's been asked of you.

22         BY MS. JOHNSTON:

23 Q.      Mr. Thurman lived in that apartment.  He moved

24 out in about October   , 2002, according to your direct

25 testimony yesterday.  Has that changed overnight?

1 A.       No.

2          MR. MARTIN:  Objection.

3          BY MS. JOHNSTON:

4 Q.       Do you also know an individual named Alton

5 McKenzie, or Dug?

6 A.       Yes.

7 Q.       Mr. McKenzie.  You know he was another individual

8 that used drugs; is that correct?

9 A.       I'm not sure.

10 Q.       Okay.  Mr. McKenzie.  Did he live in any of your

11 buildings?

12 A.       Yes.

13 Q.       What buildings did he live in?

14 A.       1351 Constitution.

15 Q.       Constitution?  Was he a friend of   Ms. Vessels'?

16 A.       Not that  I know of.

17 Q.       So, how did you -- you met   Mr. McKenzie separate

18 from Ms. Vessels; is that correct?

19 A.       Yes.

20 Q.       And you'd see him -- in addition to renting a

21 place from you on  Constitution , you also saw him on

22 Anacostia ; is that correct?

23 A.       What time period?

24 Q.       Between 2002 and -- the same time period your

25 attorney used , January 1st of 2002 to  June 1st of 2004  .

1 A.      When you say saw me at   Anacostia , no, I don't

2 think he saw me at   Anacostia .

3 Q.      I had asked you whether you saw him at       Anacostia .

4 A.      No.

5 Q.      You know him.  He's a relative of    Ms. Vessels;

6 isn't that correct?

7 A.      Dug is a relative?

8 Q.      That's what  I'm asking you, sir.

9 A.      I don't know.

10 Q.      Well, let's talk about   Ms. Vessels.   Ms. Vessels

11 uses drugs; isn't that correct?

12 A.      Yes, as far as   I know.

13 Q.      She uses crack; correct?

14 A.      No.

15 Q.      PCP?

16 A.      So I've heard.

17 Q.      Well , you've seen her under the influence of

18 those -- of that drug on occasion   ; haven't you , Mr.

19 Goodwin?

20 A.      I think so.

21 Q.      And Cynthia, who came in and testified last week

22 who you gave your power of attorney to.  She uses crack        ,

23 too; isn't that correct?

24 A.      She said she did.   I never  saw her.

25 Q.      You're familiar with what people look like when

1 they've used drugs ; aren't you , Mr. Goodwin?

2 A.      Not necessarily.  Because when they use crack    , if

3 you don't see them using it   , 15 minutes later you could

4 never tell.

5 Q.      Like Ms. Battle, who came in to testify last

6 week?

7 A.      She wasn't doing  no crack.

8 Q.      Well, let's go back  , then , to a couple of

9 documents.  This document recovered from -- first of

10 all, you recognize P-64 -- P-84,    I'm sorry ?

11 A.      Of course.

12 Q.      And that would be the house on     Farragut  Place;

13 isn't that correct?

14 A.      Yes.

15 Q.      Okay.  And that's where you were arrested;     isn't

16 that correct?

17 A.      Yes.

18 Q.      And that's where you were staying with     Ms.

19 Vessels at the time of your arrest; is that correct?

20 A.      That's where  I had just came in, yes.

21 Q.      My question is, is that where you were staying

22 with  Ms. Vessels at the time of your arrest?

23 A.      Periodically.

24 Q.      Indeed, you stored papers and property there;

25 isn't that correct?

1  A.      Yes.

2  Q.      And looking at  Goodwin  6, this would be a Budget

3  Rental car agreement.

4          Do you see that agreement?

5  A.      Yes.

6  Q.      That would have been in   Farragut  Square, because

7  you put it there; isn't that correct?

8  A.      Yes.

9  Q.      And that would be a rental agreement with total

10 amount due of over $1,000; isn't that correct?

11 A.      Wait a minute.  Put me back a little bit.     I

12 don't remember --

13 Q.      See the total due here?  Was the total due on

14 that rental over $1,000?

15 A.      Yeah.  I'm saying move it back a little bit.      I

16 want to see what the date is, yeah.

17 Q.      The due date on it , can you read it there  ,

18 February 27 of '03?

19 A.      Okay.

20 Q.      Okay.  And that was a car that you had       Mr.

21 Maurice  Alexander rent for you; isn't that correct?

22 A.      Is this the one  John  Irby was using?

23 Q.      Mr.  Goodwin,  I appreciate your asking me a

24 question , but  I don't -- it's not my respons   ibility  to

25 respond to questions.

1          This is a document that was rented by     Mr. Maurice

2 Alexander; isn't that correct?

3 A.      Yes.

4 Q.      The only way would have been at     Farragut  Square

5 is because you put it there; isn't that correct?

6 A.      Not necessarily.

7 Q.      Well , Mr. Alexander didn't live there.

8 A.      No.

9 Q.      Mr. Alexander wouldn't have any contact with     Ms.

10 Vessels; isn't that correct?

11 A.      I didn't say that either.

12 Q.      Well , Mr. Alexander was your friend; isn't that

13 right?

14 A.      Not necessarily.  Just my friend.

15 Q.      Well, who else did   Mr. Maurice Alexander rent

16 cars from in addition to you?

17 A.      You say rent cars from  ?

18 Q.      Rent cars for.

19 A.      You would have to ask    Mr. Alexander.   I did not

20 know.

21 Q.      Mr. Alexander was here, and he indicated that

22 this sheet would have been a car that he rented for

23 kids.

24          MR. MARTIN:  Objection,   Your Honor.

25          BY MS. JOHNSTON:

1 Q.      Do you recall that testimony?

2 A.      I don't know if this is the same car.  He      rented

3 a lot of cars.   I can't say he rented them for me.  No     ,

4 sir.

5 Q.      This receipt was in your house on      Farragut

6 Square.  Do you recognize that?

7 A.      Okay.  So it was in my house on      Farragut  Square.

8 That's a rental house.

9 Q.      You don't know how it got there?

10 A.      Alexander knew other people.

11 Q.      So now  Mr.  Alexander knew other people  in that

12 house ?

13 A.      Sure.  He associated with other people  in the

14 house.

15 Q.      Who?

16 A.      Like  I said , he associated with   Tiffany  Vessels.

17 Q.      Your girlfriend; correct?

18 A.      She wasn't only my girlfriend.

19 Q.      Mr.  Thurman didn't live at    Farragut  Place; isn't

20 that correct?

21 A.      Yeah.   I didn't even know   Mr.  Thurman had been to

22 Farragut  Place until later on when  I come to find out

23 about him and Ms.   Vessels.

24 Q.      Let's look at Goodwin 11.

25          Do you see those two cards    also recovered from

1 Farragut  Square .  Those are your cards, aren't they, out

2 of your property?

3 A.     One of them is my card.

4 Q.     The number for  Steve in  Texas.  Who's that?

5 A.     He don't have a last name.  It could be    Steve

6 Campbell.

7 Q.     And this  Lobo's that you had on -- in D  . C. on

8 Florida Avenue , do you recognize   Goodwin 12A?  I'll put

9 it up so you can see it.  It's a phone bill, is it not?

10 A.     It says  Verizon .

11 Q.     Okay.  And it carries the address of 1125     Florida

12 Avenue,  Northeast .  That would be the address of   Lobo's ;

13 would it not?

14 A.     That's  Lobo's address.

15 Q.     It has the name of   Paul  Sinclair on it ; doesn't

16 it?

17 A.     That's it.

18 Q.     The number at the top with the telephone number.

19 That is  Lobo's number, isn't it?

20 A.     Yes.

21 Q.     And Mr.  Sinclair isn't at all involved in your

22 business at   Lobo's ; is he?

23 A.     No.

24 Q.     Yet you maintain a telephone for the business

25 under  Mr. Sinclair; isn't that correct?

1  A.      Mr. Jackson is the one that put this phone in

2  there.

3  Q.      Mr. Jackson wasn't living at    Farragut  Place ; was

4  he?

5  A.      No, but  Mr. Jackson  was running the office at

6  Lobo's.

7  Q.      And the only person living at    Farragut  Place at

8  the time this search warrant was executed who was

9  running  Lobo's was you; isn't that correct?

10 A.      That's correct.

11 Q.      And this is a bill for over $1,300; isn't that

12 correct?

13 A.      That's correct.

14 Q.      In January , 2004 , you had to maintain a telephone

15 for your business in the name of a person unassociated

16 with the business; isn't that correct?

17 A.      I didn't put it in , Michael  Jackson  did .

18 Q.      Michael  Jackson did?

19 A.      Mm-hmm.

20 Q.      Another associate of yours; is that correct?

21 A.      No.  He was part of the corporation.

22 Q.      He was an associate of yours; isn't that correct?

23 A.      Certainly.

24 Q.      Absolutely.  And he didn't live at    Farragut  Place

25 either ; did he?

1  A.       No.

2  Q.       The only person who lived at    Farragut  Place

3  associated with   Lobo's was you; isn't that correct?

4  A.       That's correct.

5           Well, not necessarily.    Ms. Vessels worked at

6  Lobo's also for a while.

7  Q.       Excuse me?

8  A.       Ms. Vessels worked at    Lobo's also for a while.

9  Q.       Ms. Vessels , the drug user , worked at   Lobo's; is

10  that correct?

11  A.       Yes.

12  Q.       And she worked at   Lobo's because she was an

13  associate of yours; isn't that correct?

14  A.       Yes.

15  Q.       Also found there would be    Goodwin , this little

16  notebook here, your phone book; isn't that correct?

17  Would you like to look it up close?

18  A.       I would.  What happened to it?  It's an old book.

19  Q.       Excuse me.  Could you speak up so everyone can

20  hear?

21  A.       I said, this is an old book.

22  Q.       It is your book , though ; isn't it?

23  A.       There's a lot of things  , I guess.  This was in a

24  box that  I had taken up there and stored in     --

25  Q.       Stored in t he basement ?

1 A.        Mm-hmm.

2 Q.        Indeed, there's a number on there for      Maurice;

3 isn't that correct?

4 A.        Which Maurice?

5 Q.        Down at the bottom.     (301) 699-3397 ; isn't that

6 right?

7 A.        I was saying which   Maurice.   Which   Maurice  you

8 referring to?   I know three of them.

9 Q.        You tell me which   Maurice it refers to,    Mr.

10 Goodwin.

11 A.        I can't tell you whose number it is right at the

12 moment.

13 Q.        This is your phone book   .

14 A.        I don't think that's the same      Maurice, because

15 that looks like a 301 number.

16 Q.        This is your associate and your writing in this

17 phone number; is that correct?

18 A.        That book might be six or seven years old.        I

19 can't remember all those numbers now.

20 Q.        It is your book; isn't that correct?

21 A.        At one time , that was my book.

22 Q.        Again , found at   Farragut  Place; isn't that

23 correct?

24 A.        When you go in   Farragut  Place, in the basement   ,

25 you might find a whole lot of my stuff.

1 Q.      Let's talk about the basement.  We talked

2 yesterday about the file cabinets in the basement      ;

3 correct?

4 A.      Correct.

5 Q.      This is the file cabinet we were talking about;

6 is it not?

7 A.      Yes.

8 Q.      You kept lots of papers in that file cabinet      ;

9 didn't you?

10 A.      I kept a lot of papers in a lot of things.

11 Q.      Well, you told us yesterday you stored a lot of

12 your business papers down in that file cabinet.  Has

13 something changed since yesterday, or is that still your

14 testimony?

15 A.      No, it's still my testimony.  Like      I said,  I kept

16 papers in a lot of things.

17 Q.      In addition to storing papers in there, you also

18 stored cocaine in there   , showing you P-88 ; isn't that

19 correct?

20        Excuse me?  Let me show you what's been

21 introduced as Drugs 31  .   That came out from that file

22 cabinet.  Do you see that?

23 A.      Can I see it?

24 Q.      Yes, certainly you may.  It's all sealed up.

25 A.      I don't know how   I'm supposed to see it if it's

1 all sealed up.

2        MS. JOHNSTON:   Your Honor, just so the record is

3 clear , Mr. Goodwin is taking his thumbnail and pressing

4 it into the brick of cocaine, for the record.

5        MR. MONTEMARANO :   Your Honor, is  Ms. Johnston

6 testifying?

7        MS. JOHNSTON:   I'm just making it clear.

8        THE  WITNESS:   I'm trying to see it.

9        MS. JOHNSTON:   Well, stand up so everyone can see

10 what you're doing with that brick of cocaine,       Mr.

11 Goodwin.

12        MR. MARTIN:  Objection to counsel giving

13 directions to the witness.

14        THE  COURT:  She can request that the witness

15 stand up.

16        BY MS. JOHNSTON:

17 Q.    Stand up so -- and demonstrate for the jury what

18 you were doing with your thumbnail in the brick of

19 cocaine.

20 A.    I was trying to see if this    is  the one that was

21 supposed to have came out of this.

22 Q.     There was testimony   -- did you hear the witness'

23 testimony that this was a brick that was supposed to

24 that came out of the file cabinet    ?

25 A.    There's a lot of things that get turned around.

1  What's his name?  Mr.   Eveler .   Let him test that and see

2  if that's what it is that came out of there, and you

3  will find out --

4  Q.      This was a brick that you put in that file

5  cabinet; isn't that correct?

6  A.      No, I didn't put it in there.

7  Q.      You knew it was in there; isn't that correct?

8  A.      Smith told me it was in there, but he also told

9  me that it was something that    I could use , as I say ,

10 when we was -- it   can't -- it's not cocaine.  It can't

11 be use d.

12 Q.      This is the same brick  ; is it not?

13 A.      That's why  I was looking at it.     I'm not sure.

14 It's so wrapped up  , I can't see.

15 Q.      You see the picture here  ?  This is a brick of

16 cocaine in this cabinet  ; is it not?

17 A.      You see , you see a lot of plastic wrapping here.

18 Q.      There's a lot of plastic wrapping here    .

19 A.      The way it was  wrapped in  there , it wasn't in

20 there like that.  It was in a white wrapper and it had

21 the -- what was it?  Came from a -- what do you call it?

22 I can't think of the name of it.  A novelty shop.  It

23 had a novelty shop name on it.  It's different from

24 where it was .

25 Q.      Mr. Goodwin, you knew that this brick was in the

1  basement in a file cabinet.

2  A.      Don't know that brick.  It was a brick that came

3  from a novelty shop.

4  Q.      This was the brick that was in there; isn't that

5  correct?

6  A.      I can't say that.  That's why   I'm -- what I'm

7  saying.

8  Q.      Do you see the photograph here?  Are you saying

9  that the police officers fabricated the picture?

10  A.     I wasn't there.  This is what they say.      I'm

11  saying I'm not saying that.    I'm saying this is the one

12  that came out of there  , then it's not cocaine.

13  Q.     So you're telling us that you knew this brick was

14  in that file cabinet  ?

15  A.     No.  I knew that there was a brick in there    ,

16  supposedly looked like cocaine   , that came from the

17  novelty shop that   Smith had told me was in there   , but it

18  was not cocaine.

19  Q.     Well , you heard the agent testify that they

20  recovered this.  You heard the chemist    , Richard

21  Gervisoni , testified that this contained cocaine.  Do

22  you recall that testimony?

23  A.     No.

24  Q.     Are you now telling us that you don't recall

25  hearing the chemist come in and testify that this brick

1  contained cocaine , that it was a low quantity  , a low

2  purity of cocaine ?  Do you recall that testimony?

3  A.     I remember a lot of chemists coming in and     I

4  remember a chemist saying that there was certain thing    s

5  he didn't check for.

6  Q.     So you remember that  , but you don't recall

7  Richard  Gervisoni  saying that this brick that came out

8  of Farragut  Place where you were arrested contained

9  cocaine ?

10     MS.  JOHNSTON:   Your Honor, while he's thinking --

11     THE  WITNESS:   Describe him, because you had four

12  or five different chemists come in.

13     MS.  JOHNSTON:   Your Honor, if  I could maybe

14  publish this while the witness is trying to recall.

15     BY MS.  JOHNSTON:

16  Q.     So you recall  Mr.  Gervisoni ?

17  A.     Not necessarily.   I'm saying, describe which one

18  that was.  You had five or six of them.     I don't know

19  which one that might have been.  But like    I said,  Mr.

20  Eveler , he's supposed to be a specialist.  Let him test

21  it.  Prove that that's cocaine  , if that's the one that

22  came out .  Is that too much to ask?    I'll take his word

23  for it if that's the one that came out.

24  Q.     You heard Detective  Lockard  -- Detective Nolan

25  Lockard  from Prince George's  County , that he indeed

1  seized that package from your file cabinet in the

2  basement of  Farragut  Place.

3        Do you recall that testimony?

4  A.      He said he received something from the file

5  cabinet in  Farragut  Place.

6  Q.      And he identified that brick of cocaine as what

7  he recovered .  Do you recall that?

8  A.      How can he say it was that one?

9  Q.      He seized it from the file cabinet.

10 A.      What  I'm saying is , he didn't test it.

11 Q.      Mr.  Goodwin, you well know that the detectives

12 who seizes  the evidence aren't the chemists who finally

13 do the analysis  --

14        MR.  MARTIN:  Objection.

15        MS.  JOHNSTON:   -- d on't you ?

16        MR.  MARTIN:  Argumentative.

17        THE COURT:  Overruled.

18        BY MS.  JOHNSTON:

19 Q.      Don't you know that?

20 A.      I accept  Mr.  Eveler's  opinion .  If he said he

21 will test it  -- if he tests  it, then  I'll go with that.

22 Q.      Indeed,  Mr.  Goodwin , you fully knew that that

23 contained some cocaine  , but it was so weak and bad  , it

24 was one of those bricks that you had gotten from       Texas

25 that wasn't any good; isn't that correct?

1  A.      No, that's not correct.

2  Q.      There was one that came from    Cuba that wasn't so

3  good and that's why you and    Ms. Martin wanted    Cuba to

4  give them to you from in the original wrapping    ; isn't

5  that correct?

6  A.      That is not correct.

7  Q.      Because that one isn't in its original wrapping    ;

8  is it?

9  A.      No, that's not correct.

10  Q.      That one there was so weak you couldn't sell it

11  or get rid of it  ; isn't that correct?

12  A.      No, that's not correct.

13  Q.      After you got that kilo of cocaine from    Cuba or

14  whomever,  from that point on  , you wanted them in their

15  original wrappings as they're shipped with the duct tape

16  and everything else  , so you could be sure you were

17  getting good quality cocaine instead of bad quality

18  cocaine ; isn't that correct?

19  A.      No, that's not correct.  I have not heard of

20  cocaine being in a particular wrapper.  Like     I said, the

21  cigars was in a particular wrapper.

22  Q.      You're not telling the ladies and gentlemen of

23  the jury that you're unfamiliar with cocaine    ; are you ,

24  Mr. Goodwin?

25  A.      Unfamiliar with cocaine?

1 Q.     Are you telling the ladies and gentlemen of the

2 jury that you're unfamiliar with cocaine,     Mr. Goodwin?

3 A.     As far as when?

4 Q.     As far as any time,  Mr. Goodwin.  Your personal

5 knowledge.  Your person  al -- you have personal knowledge

6 of cocaine, don't you?

7 A.     I don't use cocaine.    I can't give no personal

8 knowledge.

9 Q.     So you're telling the ladies and gentlemen of the

10 jury you're unfamiliar with cocaine   ?

11 A.     Certainly.   I don't use it.

12 Q.     I didn't ask you if you used it.  You don't have

13 to use it to be familiar with it   ; do you?

14 A.     How else would you familiar with it    ?

15 Q.     You can make a lot of money selling cocaine     ;

16 can't you , Mr. Goodwin?

17 A.     Possibility.

18 Q.     Thousands and thousands of dollars selling

19 cocaine ; can't you?

20 A.     There's a good possibility.

21 Q.     Absolutely .  And you've sold cocaine in the past    ;

22 haven't you , Mr. Goodwin?

23 A.     Many, many years ago.

24 Q.     So you are familiar with cocaine?

25 A.     Back in the '80s  , I was familiar with cocaine.

1  Q.      Back in the '80s when you were -- first of the

2  all, let's go back to this cocaine.  The chemist     , Mr.

3  Gervisoni, who's worked at   Montgomery County and who was

4  the manager of their lab for 30 years -- maybe not quite

5  30 years, but for many, many years   , runs the  lab over

6  there, came in to court  .

7          Do you remember him now that    I've refreshed your

8  recollection with that information?

9  A.      If you describe him.  There was a lot of chemists

10 here.

11 Q.      He was a , I don't know , an elderly, white  ,

12 small-sized man who got on the stand and testified about

13 how he had been the manager of the lab for over 20-some

14 years, that he had done thousands and thousands of

15 examinations of materials sent in for drugs      , and that he

16 had tested this particular package and that he found

17 that it had contained cocaine   , although it was very weak

18 cocaine, but there was cocaine in it.

19         Does that refresh your recollection?

20 A.      I don't remember him speaking about where he

21 seized cocaine and    --

22 Q.      But you do remember --

23 A.      I especially didn't hear him say he got it from

24 Farragut .

25 Q.      Well, he would --

1 A.       Because you had so much stuff from other people.

2 Q.       Mr. Goodwin, do you recall   Nolan Lockard?  He was

3 a young, African-American detective from Prince      George's

4 County.  He had to put on his glasses,     I think, to see

5 something.  Rather short hair, big eyes.  Do you

6 remember him testifying about his search of      Farragut

7 Square --  Farragut  Place, rather?

8 A.       Mm-hmm.

9 Q.       Remember his testimony  , and he testified he

10 looked at that exhibit and he said he recovered it from

11 the file cabinet that's shown on P-89?  Do you recall

12 that testimony?

13 A.       Right.

14 Q.       Okay.  S o he recovered this item from that

15 location?  Do you recall that?

16          And then it was taken to    Montgomery  County where

17 it was packaged up and sent to the drug lab.  Do you

18 recall that?

19 A.       Supposedly.  That's the same drug lab that you

20 had told  Mr. Martin  that is supposed to have been 94

21 percent cocaine?  Is that the same drug lab?

22 Q.       It was -- they found --   Mr. Gervisoni  testified

23 that it contained cocaine; isn't that correct?

24 A.       I'm saying is that the same drug lab?  Because we

25 had to send it to another drug lab because it came back

1  -- suppos ed to  have been coated two percent    , something

2  like this.

3  Q.      So even the lab you sent it to    came back  as

4  having been coated with two percent of cocaine; isn't

5  that correct?

6          Isn't that correct?

7  A.      That's what it says.

8  Q.      So it does , in fact , contain cocaine.

9  A.      Well,  I'm not sure that it is usable cocaine.

10 That is another thing.

11 Q.      That was the problem because you got some cocaine

12 from somebody that wasn't usable.  You couldn't sell it

13 because they fooled you.  They coated it with cocaine       ,

14 to use your words ; isn't that correct?

15 A.      No.  That's what the lab said that it coated it.

16 Q.      Now, let's talk a little bit about your stepson,

17 Larry  Lane.  You lived with his mother    , Constance

18 Goodwin.

19          Is Constance  Goodwin  Larry's mother?

20 A.      Yes.

21 Q.      And you lived with   Ms. Goodwin  on  Chillum Road;

22 is that correct?

23 A.      Yes.

24 Q.      How long did you live at Chillum Road?

25 A.      Well , you have to go back to the years.  When?

1 Q.      I'm asking you when did you move into      Chillum

2 Road?  Maybe that's an easier way to do it.

3 A.      I think it was in the '70s.

4 Q.      Okay.  So you moved in there in the '70s    , and we

5 know you were living there in 1987; isn't that correct?

6 A.      Yes.

7 Q.      And in 1987 , you and your wife  , Constance , and

8 your stepson , Larry Lane , were involved in   a conspiracy

9 to distribute cocaine; isn't that correct?

10 A.      Yes.

11 Q.      In fact, you pled guilty to that; is that

12 correct?

13 A.      Yes.

14 Q.      And in 1987 , you engaged in drug transaction    s

15 right in your family home on     Chillum  Road; isn't that

16 correct?

17 A.      Yes.

18 Q.      You heard the officer    -- the under cover  officer

19 come in here , Fannie Johnson , or Fannie  Buchanan,  I

20 believe, or vice versa  , come in and testify how she

21 actually had the drug transaction with you.  Do you

22 recall that testimony?

23 A.      Well, I didn't go into the transaction    , but she

24 didn't have it with me.  She had it with her cousin     , but

25 it was in my house , so I took the weight for it.

1 Q.      So now you're telling us you d  idn't actually deal

2 the drugs to the undercover officer?

3 A.      No, because  I didn't know the undercover officer.

4 Q.      She was there and she  had somebody with her ?

5 A.      She had her cousin , Sheila , there.

6 Q.      Well , at least she represented it to be her

7 cousin , Sheila.   Sheila was somebody you knew  ; isn't

8 that correct?

9 A.      No.   Sheila was  Constance's cousin   -- her first

10 cousin.

11 Q.      Okay .

12 A.      Yes, my wife.  Her cousin.

13 Q.      It was something you were comfortable with    ?

14 A.      Yes.

15 Q.      So you were willing to deal drugs with     Sheila ,

16 and so you gave the drugs to    Sheila , who in turn gave

17 them to the undercover officer in your home; isn't that

18 correct?

19 A.      Yes.

20 Q.      That was just a one transaction that you did out

21 of your home; isn't that correct?

22 A.      And that was it.

23 Q.      Well, you then set up a second transaction    ; isn't

24 that correct?

25 A.      No.

1 Q.      When Officer   Featherstone   testified here that she

2 talked to you and you arranged a second delivery where

3 you had  Larry  Lane , your stepson , meet her at Capitol

4 Plaza, that's not true?

5 A.      That's not true.

6 Q.      Well , you recall you   pleading   guilty to that

7 offense , and  we read  the statement of charges that

8 include d that?  You pled guilty and acknowledged that

9 those facts were true.  Do you remember that?

10 A.      I pled guilty to eliminate the getting my wife

11 off the charge and my stepson.

12 Q.      Well , your  stepson  also pled guilty .

13 A.      Well , you see , because he continued  , and like  I

14 said , she couldn't call me on no second trip because       I

15 was already arrested on something else at the time     , and

16 if you go back through records   , you can verify that.  So

17 that second call  , I didn't go through the discrepancy of

18 it because it wasn't necessary.  That was a done deal.

19        But back then, huh-uh, she didn't talk to me a

20 second time.  She confronted my stepson the second time

21 because  I was already arrested on something unfamiliar

22 with that.

23 Q.      Now the two transactions occurred in     May of 1987 ?

24 A.      There was no two transactions.  One transaction     ,

25 and the next day   I was arrested on something unfamiliar

1  with that case.

2  Q.      Then in  August of 1987 , she had further contact

3  with your wife and your stepson    ?

4  A.      That might have been possible because    I was

5  arrested.   I can't say what's happening when    I'm

6  arrested.

7  Q.      Let me read to you what    I read back a couple of

8  weeks ago.  Miscellaneous 33   -A, which is admitted.    I'm

9  reading from Page 42 of that exhibit -- the page

10 numbered 42.  After that    May 4 purchase, a week later,

11 on May 11 , Detective  Johnson,  through  Sheila Hall , again

12 arranged for the purchase of another half an ounce of

13 cocaine  with Learley  Goodwin.

14       We were asked   at this time to meet at Big Boy

15 restaurant , which was at   Capitol  Plaza on Route 450 in

16 Hyattsville  near the  Baltimore/  Washington Parkway.

17 Again , Detective  Johnson set up surveillance on that

18 location, went with   Sheila Hall to the   Big Boy

19 restaurant.

20       After they arrived , Sheila  Hall , at the direction

21 of Detective  Johnson , and while she was standing there   ,

22 placed several calls to the beeper of    Learley  Goodwin

23 receiving no response to the calls of to the beeper      .

24 Sheila  Hall , at Detective  Johnson's direction , placed a

25 call to the residence.    Learley  Goodwin  was at the

1  residence , at that time said that he wasn't going to be

2  coming to Big Boy,   Larry Lane would , in fact , arrive at

3  the Big Boy and have the half ounce cocaine for

4  Detective  Johnson.

5         He indicated he -- that he, Larry    Lane , would be

6  driving a blue   Toyota described to him.   That

7  description was given to    Detective  Johnson , who in turn ,

8  gave it to surveillance  , and shortly after that  , Larry

9  Lane showed up.

10        Do you recall those statement of facts from your

11  guilty plea back in 1987?

12  A.     Those statements of facts  , I do not recall back

13  from  '87.  Those statement of facts are not true and

14  that can be proven because the date on there saying when

15  she called me , she couldn't call me because    I was

16  incarcerated.

17  Q.     So on that date  --

18  A.     Sheila said she called, right?  She said she

19  called me.  Sheila probably called him and said she

20  called me.

21  Q.     Mr. Goodwin, when you admitted under oath before

22  the judge back in 1987 that those facts were true, you

23  lied to the judge; is that correct?

24  A.     The judge didn't ask me about that.  He just

25  asked me, do you have a guilty plea?      I said yes, and

1  that was the end of it.  He didn't go through all about

2  did she call me, how many times.  He didn't ask me all

3  that.

4  Q.     They read those facts to you.

5  A.     No, they didn't read those facts to me   .  All he

6  asked me , was  I guilty , for no other than reason than

7  being guilty , and  I said , yes.

8  Q.     Then he said to you   -- why did you agree with the

9  prosecutor's statement   -- r esponse ?  Because  I believe

10 he would prove this   -- his statement .  Referring to the

11 statement  I just read.  Then the   Court said, yes , he

12 could prove his statement.

13        My question , again , and  I'm back to where we

14 started , are you telling the   Court that you did these

15 things ?  Your response was  , yes, sir.  Referring to the

16 statement  I just read.

17        So did you lie to the   Court back the n when you

18 said , yes, sir , that those statements were true?

19 A.     Are you waiting for me?

20 Q.     I'm waiting for you to answer the question.

21        Did you lie to the   Court back in 1987 when you

22 said those facts were true?

23 A.     No, I didn't lie to the   Court when  I said those

24 facts were true.

25 Q.     Okay.

1  A.       Because  I didn't say those facts was true because

2  he didn't go through how many times and where and who

3  called on the telephone.  He only asked me was       I guilty ,

4  and I said , yes , and that was the end of it.

5  Q.       Mr. Goodwin , I'm not going t o argue with you .

6  The document's in evidence.

7           You also heard  Ms. Featherstone's  testimony here

8  in court where he said that you arranged to meet       Larry

9  Lane to deliver the drugs  .  Do you recall her testimony  ?

10          MR. MARTIN:   Your Honor, this question has been

11  asked.

12          Objection.

13          THE COURT:  Overruled.

14          BY MS. JOHNSTON:

15  Q.       Do you recall her testimony?

16  A.       That happened in '87.    I'm going to go through a

17  discrepancy now?  What difference does it make?

18  Q.       You heard  Ms. Featherstone's  testimony here in

19  court that you arranged the second transaction and you

20  advised she and  Sheila that you were sending your

21  stepson instead of going yourself; isn't that correct?

22  A.       No.  I heard you telling her that and she said

23  all she ever said was, yes.    Yes.  Yes.  There's a

24  difference.

25  Q.       You heard her testify that after you got locked

1  up, she had further contact with your wife at the time

2  and your stepson; isn't that correct?

3  A.      That's a good possibility.

4  Q.      You heard her testify to that, didn't you?

5  A.      Certainly.  That's a good possibility.

6  Q.      And that your wife had -- you were giving your

7  wife instructions from jail how she should handle the

8  money and how your stepson should handle the drugs    .  You

9  heard her testify about that, didn't you?

10  A.      No, I didn't hear her testify about that.  How

11  could I do that?

12  Q.      Well, they had telephones in prison back then in

13  1987; didn't they , Mr. Goodwin?

14  A.      They might have had telephones   , but I wasn't in a

15  position to use them.

16  Q.      In fact, the  Chillum Road address is the same

17  address where  Mrs. Constance Goodwin was living when you

18  got arrested in  November of 2003; isn't that correct?

19  A.      Certainly.

20  Q.      Again, when you got arrested in 2003    , you called

21  -- in November , 2003, you called your wife,   Ms.

22  Constance  Goodwin; is that correct?

23  A.      That's correct.

24  Q.      Because you needed to get some assistance    ; isn't

25  that correct?

1  A.      That's correct.

2  Q.      In addition,  the  other people that were called

3  through  Ms. Constance   Goodwin were   Paulette  Martin and

4  John  D. Irby; isn't that correct?

5  A.      I called Constance, and   I assume she probably

6  called them.

7  Q.      And you called them because you had    Ms. Martin

8  assist you with getting an attorney    ?

9  A.      True.

10 Q.      Getting the money for an attorney   ?

11 A.      True.

12 Q.      And getting the money to get you out on bond;

13 isn't that correct?

14 A.      No.  I called my wife so that she could put my

15 property up and could get out on bond.

16 Q.      So there wouldn't be any reason for    Ms. Martin to

17 have call ed the bail bond for you?

18 A.      Well, at first, until we --

19         MR. MONTEMARANO : Objection,  Your  Honor.

20         Move to strike.

21         THE COURT:  What's the objection?

22         MR. MONTEMARANO : Right to an attorney and right

23 to bail bond -- right to bond are

24 constitutionally  -guaranteed rights.

25         MS. JOHNSTON:  Certainly it would be something a

1  co-conspirator would want to do under the circumstances

2  of this case.  It certainly is relevant,     Your Honor.

3           THE COURT:  Overruled.

4           BY MS. JOHNSTON:

5  Q.      In addition to that, were you aware of the fact

6  that Ms. Martin was in contact with   Mr. Thurman, who was

7  down in  Texas at the time?

8  A.      No.

9  Q.      Did you introduce   Ms. Martin to  Mr. Thurman?

10  A.      I'm not sure.   I think he seen her, but    I don't

11  think I ever introduced him to her.

12  Q.      And he's seen her because you -- he's been with

13  you when you saw her; isn't that correct?

14  A.      I think when she came by the shop one time    , he

15  was there.

16  Q.      Okay.  S o he would have seen her only when he was

17  with you; isn't that correct?

18  A.      Well, he was at the shop.  He wasn't with me    , but

19  he was at the shop.

20  Q.      And the only way he would have known     Ms. Martin

21  would have been through you; isn't that correct?

22  A.      That's correct.

23  Q.      Okay.  And he didn't have any dealings with      Ms.

24  Martin in relation to the shop at     Lobo's ; did he?

25  A.      Not that  I'm aware of at this moment.

1  Q.      She didn't bring her   Mercedes down to your shop,

2  Lobo's , to have it serviced  ; did she?

3  A.      She had more than one   Mercedes now, but she has

4  had cars that's been serviced.

5  Q.      Let's talk about the spring of 2004 -- March to

6  June 1st of 2004.

7          What other vehicles did   Ms. Martin have during

8  that time period other than the red      Mercedes?

9  A.      2004?

10 Q.      Yeah , the spring of 2004 when the wiretap was up.

11 Right before you got arrested on      June 1st of 2004 , when

12 Mr. Thurman was making his trips to      Texas , what other

13 vehicle did she have other than the red      Mercedes?

14 A.      That's probably the only one at that time.

15 Q.      And so between your arrest in      November of 2003

16 and  June of 2004 , or let's say before your arrest in

17 November , 2003, the months leading up to that arrest,

18 she wasn't taking her red    Mercedes down to your shop,

19 Lobo's, to be serviced so as to run into      Mr.  Thurman;

20 correct?

21 A.      She might have brought it one time for a

22 cleaning, but that's about it.

23 Q.      For what?

24 A.      For a cleaning.

25 Q.      During that time period, the only contact she

1  would have had with   Mr. Thurman was through you; isn't

2  that correct?

3  A.      More than likely , I assume.

4  Q.      I don't want you to assume anything.

5          As far as you know, the only way    Ms. Martin would

6  have known  Mr. Thurman was through you; isn't that

7  correct?

8          MR. MONTEMARANO : Objection.

9          Calls for an assumption.

10          THE WITNESS:   I assume.

11          THE COURT:  Overruled.

12          THE WITNESS:   I don't know how she knows    Mr.

13  Thurman.  They're two grown people.

14          BY MS. JOHNSTON:

15  Q.      Excuse me?

16  A.      I said, they're two grown people.     I don't know.

17  Q.      Larry Lane, your stepson.  Other than living at

18  Oglethorpe , he didn't live at    Anacostia  or Farragut  or

19  Constitution or any of your other properties    ; did he?

20  A.      No, but he had access.

21  Q.      And you had access to    Oglethorpe ; didn't you?

22  A.      Sure.  We all had access to other's place in case

23  of emergency.

24  Q.      Who else had access to    Larry's house , other than

25  you and  Larry , and  I guess if he had a wife or

1  girlfriend living with him.

2  A.      His mother had access.  His brother had access.

3  The Spanish guy that was working on the place, he had a

4  key, so he had access.  Quite a few people had access.

5  Q.      This little  Spanish guy , to use your phrase  , who

6  worked where?

7  A.      That was doing work on the place.      I can't

8  remember his name right now.

9  Q.      And during what time period did he have access to

10  the place?

11  A.      During those years you're speaking of.

12  Q.      2002?  Right up until when the search warrant was

13  executed on  June 1st of 2004?

14  A.      Before that.

15  Q.      Okay.  So during 2004, he didn't have access,

16  this person who was doing the home repair work?

17  A.      Yeah, before that search warrant, as you said, on

18  June 1st.

19  Q.      Yeah.  At that time?

20  A.      Yeah, before then he    had  access.

21  Q.      Before that.  Okay  .  And you had access to that  ?

22  A.      Certainly.

23  Q.      You kept thing s in  that house; isn't that

24  correct?

25  A.      Sure.

1 Q.      So your kept your papers there; is that correct?

2 A.      Papers could have been there.

3 Q.      Well, if papers of yours were there, they got

4 there because you put them there; isn't that correct?

5 A.      Not necessarily.

6 Q.      Well , you -- did you give your personal papers to

7 other people?

8 A.      Well, no.   I had left a lot of personal papers in

9 the car he had picked up from the lot.

10 Q.      And what?

11 A.      In the automobile that he was driving from the

12 car lot.

13 Q.      Okay.  What automobile was it that    Mr.  Lane  was

14 driving?

15 A.      I think at the time it was a    Honda.

16 Q.      And when was it that he was driving this     Honda?

17 A.      During that time.

18 Q.      Before or after your arrest in the     November of

19 2003?

20 A.      Before, during, and probably after because he

21 always had a car from the lot.  It didn't have to

22 necessarily be that car, but he always would pick up a

23 car from the lot.

24 Q.      What papers of yours were in any of the cars that

25 Mr.  Lane  drove?

1 A.      I'm saying it could have been a lot of papers.       I

2 used to leave a lot of things a lot of places.

3 Q.      I'm not interested in the possibility,      Mr.

4 Goodwin.   I'm interested in knowing what papers it was

5 that you left in any car  s that Mr. Lane drove.

6 A.      A lot of times.  It was bills, it was receipts.

7 That were a lot of papers.

8 Q.      Receipts?  Okay.  Receipts for what?

9 A.      Repairs.

10 Q.      Repairs for what?  For the car that was being

11 driven ?

12 A.      That car.  Other cars.

13 Q.      What else?

14 A.      Auction receipts.

15 Q.      Did you ever leave copies of your    --

16 A.      Could have been a lot of other papers.

17 Q.      What else?  Personal papers?

18 A.      Sure could have been there.

19 Q.      Mr. Goodwin , you got court papers in    November of

20 2003; is that correct?

21 A.      Yes.

22 Q.      Did you give anyone copies of your court papers?

23         Did you give anyone copies of your court papers

24 when you were charged in    November of 2003 , other than

25 your attorney ?  And I don't want to know anything about

1 that.

2        Did you give copies of your court papers to

3 anyone other than your attorney after your arrest

4 November of 2003?

5 A.     Give it to them for what?

6 Q.     My question is , did you give those papers to

7 anyone after your arrest in November    , 2003 , other than

8 your attorney?

9 A.     Not that  I recollect.

10 Q.    How often did you go t  o Oglethorpe ?

11       I believe you testified yesterday it was once or

12 twice a week ; is that correct?

13 A.    Sometimes.

14 Q.    Ever spend the night there?

15 A.    Maybe once when   I was feeling bad.

16 Q.    Excuse me?

17 A.    I said , once when  I wasn't feeling good.

18 Q.    Okay.  But you would go there -- when you went to

19 Oglethorpe , you spent a good deal of time in the

20 basement in the kitchen; isn't that correct?

21 A.    I used to do a lot of cooking in the kitchen for

22 the kids.

23 Q.    You did a lot of cooking with baking soda, too;

24 isn't that correct,  Mr. Goodwin?

25 A.    Not necessarily.

1  Q.      Your stepson,  Larry  Lane , he never had any reason

2  to go to Las Cruces, N  ew Mexico ; did he?

3  A.      I don't know.

4  Q.      Ms. Vessels , she never stayed at   Oglethorpe ; did

5  she?

6  A.      I'm not too sure about that either.    I'm  not too

7  sure what about where   Ms. Vessels might have stayed at.

8  Q.      Let me show you what's been marked as     Oglethorpe

9  8-B.  This would be your notebook; isn't that correct?

10         It looks like your handwriting here; isn't that

11  right?

12         You can flip through it  , if you need to.

13  A.      Yes, it looks like mine.  It looks like one of my

14  older books.

15  Q.      That's your handwriting.  That would be your

16  book; isn't that correct?

17  A.      Yes.

18  Q.      It's a list of telephone numbers for a lot of

19  different people; is that right?

20  A.      Mm-hmm.

21  Q.      That was re covere d in the kitchen drawer over at

22  Oglethorpe , along with a number of other documents    .  So

23  you would have left that in    Oglethorpe ; is that correct?

24  A.      No, not necessarily.    I can see that   Mr. Lane had

25  this book, also.

1 Q.      So Mr. Lane --

2 A.      Yeah.

3 Q.      Which writing --

4 A.      That's some of his writing.

5 Q.      Let's show the ladies and gentlemen of the jury

6 what you're saying is his writing.  Other than the --

7 see if there's any  more  of his writing other than that

8 one page you've marked.

9        Well, the rest of that appears to be the same

10 handwriting, your writing  ; isn't that correct?

11        Read off to the ladies and gentlemen of the jury

12 what is -- we'll put it up on the screen.

13 A.      It's -- that's probably his  , too , but it's mostly

14 my book.  More than likely --

15 Q.      How many did you find that were not your writing

16 that was  Larry's writing?  Why don't you tell us that?

17 I think that's probably easier than telling us what is

18 your writing.

19 A.      This is his writing also.  That's some of his

20 writing down here.  That's his handwriting up there.

21 That's his writing there.  That's his writing again

22 here.

23        (Witness indicating.)

24 Q.      Look at the first page that's open here.

25        Is that your writing?

1  A.      That's his writing there.

2  Q.      Let me put it up on the screen so everyone can

3  see what you're referring to,    Mr. Goodwin.

4  A.      That's his right writing there.

5  Q.      Okay.  Let me put it on the screen so that -- let

6  me put it up on the screen so everyone can see what

7  you're talking about  , so that we don't misrepresent

8  anything here.

9          If we look at this first page here, this writing

10 at the top  of the  page , that is your writing  ; isn't it?

11         That's your writing, isn't it?

12 A.      Some of it.

13 Q.      If we look at the next page here, this page here

14 with all these numbers and names on it, that's your

15 writing as well  ; isn't it?

16 A.      What's that you just went past?

17 Q.      My question to you  , Mr. Goodwin, this writing is

18 your writing ; isn't that correct?

19 A.      Some of it.

20 Q.      Well , which part of it is not your writing?

21 A.      The top part.

22 Q.      The  T & T Carryout is not your writing?

23 A.      That's not my writing.

24 Q.      But the rest of it is your writing; isn't that

25 correct?

1 A.      As you get down the page.  But when you go back

2 up, this Ms. Robinson  , that's not my writing.

3 Q.      So the  Ms. Robinson at the bottom,    Ms. Robinson,

4 Clinton Grove, that's not your writing?

5 A.      The red Sherrie, that's not my writing either.

6 Q.      The Sherrie is not your writing in the red?  But

7 the rest of it is your writing; isn't that right?

8 That's the way you write your B's and your C's.

9 A.      Not all of it.  Starting right here where it says

10 Jackie at work.  That's mine.

11 Q.      All the rest of that up there?

12 A.      When you get up here, some of this is not mine

13 either.

14 Q.      What isn't yours?

15 A.      Bring it back down again.

16 Q.      (Indicating.)

17 A.      Most of that there is mine.

18 Q.      Most of that is your writing; right?

19        We take out  Ms. Robinson and Sherrie in red and

20 the T & T Carryout; right?

21        If we look at this page here   , this would be your

22 writing as well; isn't that correct?

23 A.      Some of it.

24 Q.      Excuse me?

25 A.      Some of it.

1 Q.      Okay.  And this page here would be your writing     ,

2 too.  These numbers; isn't that right?

3 A.      That's mine.

4 Q.      And this here would be    -- some of this would be

5 your writing as well; is that correct?

6 A.      The bottom one.

7 Q.      The bottom?

8 A.      Well , right here.  The Big    John?  That's my

9 writing.

10 Q.      The Big  John.  This is your writing?

11 A.      Most of this is not mine.

12 Q.      Just so we get an idea of what your writing looks

13 like , and this would be your writing as well; isn't that

14 right?

15 A.      Yes.

16 Q.      Has a number for   Michael and for   Dog and for

17 'Nard; isn't that right?    Chico .   Cuba.   Those are all

18 things you wrote; isn't that right?

19 A.      Yes.

20 Q.      And  I think , just to give the jury an example    ,

21 here is a page that had your writing at the top      ; isn't

22 that correct?  The   Clark is your writing, but then the

23 --

24 A.      No, no.

25 Q.      The " Clark" is not your writing?

1  A.      No.

2  Q.      Okay.  And this writing right here?

3  A.      None of this here is mine.

4  Q.      This pencilled writing in through here is not

5  your writing ; right?

6  A.      No.  No.

7  Q.      Going on and looking at the numbers    , those , that

8  would be your writing  , so the jury can determine -- here

9  is another set of numbers   , those would be your writing   ?

10  A.      Yes, that's mine.

11  Q.      That w as found in the kitchen draw  er, so you left

12  a notebook  of your number s in the kitchen drawer ; is

13  that correct?

14  A.      No.  No, I didn't know the kitchen drawer --    I

15  don't know how it got in the kitchen drawer.  Somebody

16  put it in the kitchen drawer.

17  Q.      You don't know how it got in the kitchen drawer?

18  A.      No.

19  Q.      In the same drawer that was recovered these Riggs

20  receipts and these receipts from travel in       Texas?  You

21  don't know how any of those got in there in that drawer

22  with your book ; do you?

23          Do you know how any of those receipts got in the

24  drawer with your phone book?  Do you know how the

25  receipts got in the same drawer as your phone book?

1  A.      I can assume.

2  Q.      I don't want you to assume.  Do you know?

3  A.      No, I don't know, but I can assume.

4  Q.      How about the car rental receipt for Alton

5  McKenzie that was also recovered from that drawer with

6  your phone book?  Do you know how that got there?

7  A.      I can assume.

8  Q.      Do you know how it got there?

9  A.      I can assume.

10 Q.      Just happened to get in the same drawer as your

11 telephone book; is that correct?

12 A.      Not necessarily my telephone book  , but it has

13 some  writing in it , but  I can assume.

14 Q.      Those are numbers you wrote in that notepad    ; is

15 that correct?

16 A.      Yes.

17 Q.      The vast majority were written by you; is that

18 correct?

19 A.      Most of them.

20 Q.      The receipt from Las Cruces.  You don't know how

21 that got in the draw  er with y our telephone notebook   ?

22 A.      I can assume.

23 Q.      Do you know how all these hotel receipts in the

24 name of  Tiffany Vessels got in your notebook?

25 A.      I can assume that also.

1  Q.      Also, in addition to being in the kitchen    , there

2  were also Pyrex -- I think there were six or eight Pyrex

3  containers that tested positive for cocaine residue

4  recovered in that same kitchen   .  You don't know how

5  those got there , either ; do you?

6  A.      I got an idea.

7  Q.      You didn't put them there  ; did you?

8  A.      No I didn't put them there.  Why should    I?  They

9  were Larry's and  Mr. Thurman's.

10 Q.      They were  Larry's?

11 A.      And Mr. Thurman's.

12 Q.      And Mr. Thurman's?

13 A.      I found out him and   Larry had their own thing

14 going on.

15 Q.      That is why  Mr. Thurman called  Ms. Martin from

16 Texas when you were locked up in November    , 2003, because

17 Mr. Thurman had something going on with     Mr. Lane .  Is

18 that why?

19 A.      How do you know he didn't call    Mr. Lane ?

20 Q.      That's why he called   Ms. Martin from   Texas .

21 A.      That's what I'm saying.  How do you know he

22 didn't call  Mr. Lane or Mr. Lane didn't tell him to call

23 Ms. Martin?

24 Q.      Mr. Goodwin, you know who sent him to     Texas ; is

25 that correct?  You sent him to    Texas.

1 A.        I never sent him to   Texas.

2 Q.        You repeatedly sent him to    Texas.

3          In the basement there -- you were in the basement

4 many times; isn't that correct?

5 A.        When you say many times -- the basement of

6 Oglethorpe  Street.

7 Q.        When you went there once or twice a week --

8 A.        When you say  "many times, " what are you talking

9 about.

10 Q.        When you went there once or twice a week    , you

11 went to the basement of that residence on a regular

12 basis ?

13 A.        No.  Not necessarily, no.

14 Q.        Well, your paper  s are  in the basement; isn't that

15 correct?

16          Do you recognize this handwriting here?  Showing

17 you Government's Exhibit    Oglethorpe  18.        That would

18 be your handwriting as well; isn't that correct?

19 A.        That's my handwriting.

20 Q.        Okay.  And indeed  , this would be your notice of a

21 hearing in reference to your case; isn't that correct?

22 A.        That's my case.

23 Q.        And you recall -- that paper   , as you will recall  ,

24 was recovered from the table in the basement.  Do you

25 remember the testimony of that coming off of the table

1  in the basement?

2          Let's talk about the basement  , was  that your

3  paperwork recovered on the table in basement      ?  Do you

4  recall Detective Melon recovering th    at paper on the

5  basement table ?

6          Do you recall the testimony of having recovered

7  your court paper with your numbers written on the back

8  from the table in the basement    ?  Do you recall that

9  testimony?

10 A.      I recall the testimony saying that she got

11 papers.  Are you saying she got papers out of the house      ?

12 I didn't say exactly where she got it from      , but I

13 wouldn't know that  , either , because I had a whole

14 briefcase full of papers --

15 Q.      A whole briefcase?

16 A.      -- and  I couldn't tell you where they were when

17 they came.

18 Q.      You don't recall her testifying that those papers

19 came off of  -- and counsel , I apologize , but I don't

20 want the witness out of the witness box.

21         Do you r ecall her testimony about finding all of

22 those papers in the area that's shown on      P-170 and

23 P-171, the table in the basement?

24 A.      No, because , see , you had this over there   , and we

25 couldn't see it from over here.

1 Q.      Look at it now.

2 A.      That's what  I'm looking at now.

3 Q.      Right on the table in the basement, the round

4 table next to the toolboxes.

5         Let me show you another picture, a better one.

6 Although this one --

7 A.      Let me see that one.

8 Q.      Let me show you this one.  Which one would you

9 like to look at?    P-170 and  P-171.

10        Do you see those two pictures?  Those are

11 pictures of the table top.  Do you recognize that

12 tabletop in the basement?

13 A.      Not necessarily.

14 Q.      You don't recognize that table as being in the

15 basement?

16 A.      I should know  how the  papers got down there in

17 the basement ?

18 Q.      Yeah .  Could you tell the ladies and gentlemen of

19 the jury how your court papers ended up on this table in

20 the basement next to the toolboxes at     Oglethorpe   Street?

21 A.      I'd like to know  , too , because my court papers

22 and all those papers was in my briefcase the last time        I

23 saw them.

24 Q.      You didn't give them to anyone else    ?  You went to

25 this house twice a week; isn't that correct?

1 A.      No, not necessarily twice a week.

2 Q.      Can you explain --

3        MR. MARTIN:  Objection.

4        Your Honor, he's not being given a chance to

5 respond.

6        BY MS. JOHNSTON:

7 Q.      Excuse me?  Well, you finish.

8 A.      I said  I didn't necessarily go there twice a week

9 all the time.

10 Q.      I believe you said once or twice a week during

11 your direct examination.

12 A.      I said sometimes once or twice a week.

13 Q.      So now --

14 A.      My visits got much less once    I found out that him

15 and Mr. Thurman was doing something together.

16 Q.      And P-171.  This is your handwriting even

17 depicted on the --

18 A.      Certainly.

19 Q.      Okay.  Your handwriting  , your documents recovered

20 from this table; isn't that correct?

21 A.      I don't know they were recovered from that table.

22 I know they were in my briefcase.

23 Q.      You heard the detective testify that those

24 documents were recovered from that table.  Or did you

25 not hear that part of her testimony?

1 A.      No.   I heard her say she got them out of

2 Oglethorpe .

3 Q.      And the toolboxes that were there    , the locked

4 toolboxes , are you telling the ladies and gentlemen of

5 the jury that you didn't know anything about any of

6 these things in any of these toolboxes; is that correct?

7 A.      That's correct.

8 Q.      So you don't know anything about the drugs or the

9 guns or anything in these locked toolboxes?

10 A.      No.   Did you check where the guns came from?

11 Q.      You don't know anything about any of these things

12 in the locked toolboxes  ?

13 A.      Did you check to see where the guns came from?

14 Q.      Mr. Goodwin,  I'm not permitted to answer any

15 questions that you pose.

16 A.      Okay.

17 Q.      The question , again , are you telling the ladies

18 and gentlemen of the jury you didn't know anything about

19 anything in these toolboxes?  None     of the drugs ?  You

20 had -- you knew nothing about    none of the guns , you knew

21 nothing about  -- not the  bulletproof  vests or not the

22 ski mask or anything else recovered in that basement?

23 A.      What  I know or what   I heard?

24 Q.      What you know.

25 A.      I can say what   I heard.

1 Q.      Are you telling the ladies and gentlemen of the

2 jury that you had no knowledge that you had nothing to

3 do with those items in those?

4 A.      I said -- if I can speak on what I heard.  As far

5 as actual knowledge --

6 Q.      Did you have any contact with any of those items

7 in those safe boxes?

8        Are you telling this jury you had nothing do with

9 those items in those locked safe --

10 A.     I'm telling the jury   I had nothing to do with the

11 items in those boxes.

12 Q.     Let me show you what's been marked as      Oglethorpe

13 5.

14        Do you recognize this photograph?  Do you need me

15 to bring it up so you can see it real close?

16 A.     Nice looking guy.

17 Q.     I'm glad someone here finds humor,    Mr. Goodwin,

18 in this proceeding.

19        That is your picture, isn't it?

20 A.     Don't you think that's a nice looking guy?

21 Q.     It's not for me to judge,   Mr. Goodwin.

22        Do you recognize that picture?

23 A.     It looks a little familiar.  Beard is a little

24 dark.

25 Q.     Excuse me?

1 A.      His beard is a little darker than mine, but it

2 looks a little familiar.

3 Q.      It's you,  Mr. Goodwin; isn't that correct?  That

4 "nice looking guy" is you; correct?

5 A.      That's my picture.

6 Q.      That's your picture  , and that license was gotten

7 when -- can you read the date when it was issued, the

8 issue date?

9        Do you see the issue date of June 11 of 2003?

10 A.      Yes.

11 Q.      And the expiration date of October 20, 2007?

12 A.      Yes.

13 Q.      You had a driver's license  , did you not , in the

14 name of  Gary G. Vessels ; correct?

15 A.      Yes.

16 Q.      And you needed that driver's license and a false

17 name of  Gary D. Vessels to run your legitimate business

18 at Lobo's?

19 A.      No.

20 Q.      Or your legitimate concert business with     Ms.

21 Martin?

22 A.      No.

23 Q.      Could you tell the ladies and gentlemen of the

24 jury what your false identification was doing in one of

25 the locked red toolboxes that we saw before this jury

1  that contained money, drugs and guns?

2  A.      Looks like identity theft to me.

3  Q.      Excuse me?

4  A.      Looks like identity theft to me.

5  Q.      Can you tell the ladies and gentlemen of the jury

6  what your false identification was doing in one of those

7  red toolboxes which contained either money or guns or

8  drugs or both?

9  A.      That's a good question.  What was it do    ing in

10 there?

11 Q.      Excuse me?

12 A.      How did it get there?

13 Q.      Let's talk a little bit about    Ms. Martin and your

14 relationship with  Ms. Martin.  If  I understood

15 correctly, yesterday we played a call that had to do

16 with an  Aretha  Franklin concert; is that right?

17 A.      Yes.

18 Q.      And this  Aretha  Franklin concert was a venture

19 that you and  Ms. Martin had pooled your resources to

20 participate in as promoters;    is that correct?

21 A.      Yes.

22 Q.      And this was the very first concert that you and

23 Ms. Martin were going to do as promoters; is that

24 correct?

25 A.      Under the new corporation, yes.

1 Q.      This is the first concert that you two were going

2 to do; isn't that correct?

3 A.      Under the new corporation, yes.

4 Q.      What was the name of the corporation?

5 A.      PMI.

6 Q.      Have you got corporate documents for us?

7 A.      No.

8 Q.      How much money did you give to Ron Hood or Ron

9 Hayes to invest in that concert business?

10 A.      Ms. Martin handled the finances    , so I'm not sure.

11 Q.      You don't know how much money    you gave to Ms.

12 Martin to invest in this concert business?

13 A.      Well, the money kept changing.

14 Q.      How much money did you give for this       Aretha

15 Franklin concert?  Because this was the first and only

16 concert that you attempted to do with     Mr. Hood; isn't

17 that correct?

18 A.      Well, things got kind of confused.

19 Q.      Was this the first and only concert that you and

20 Ms. Martin attempted to invest in with     Ron hood?

21 A.      No.

22 Q.      So you invested more money with Ron Hood?

23 A.      No.

24 Q.      How much money did you in  vest --

25 A.      We were in the process of doing more than one

1 show.

2 Q.      But this was your initial first concert with      Mr.

3 Hood and you hoped --

4 A.      The Aretha  Franklin show?

5 Q.      Yes, and that you hoped there would be additional

6 concerts after that  ?

7 A.      It was the first one that had more or less been

8 consummated , but  there  was one supposedly that started

9 before them , but that didn't -- never materialized.

10 Q.      This was the first concert that was actually

11 supposed to go forward  , when your business dealings with

12 Mr. Hood; isn't that correct?

13 A.      True.

14 Q.      And you had hoped that you would do more concerts

15 with Mr.  Hood;  isn't that correct?

16 A.      Hopefully.

17 Q.      And  Mr.  Hood  talked to you and  Ms. Martin about

18 how he was going to be able to arrange concerts in

19 Kansas and in  Washington, D . C ., and all these different

20 venues of all these different stars; isn't that correct?

21 A.      That's true.

22 Q.      And he was asking you  -all to invest in that

23 concert; isn't that correct?

24 A.      Yes.

25 Q.      He was trying to get as much money as he could

1 out of the two of you; isn't that correct?

2 A.      That's true.

3 Q.      And he didn't have any concert -- he wasn't

4 getting -- hadn't signed any contract with you    -all, so

5 you weren't sure what kind of cut he was going to take

6 of the money or not  ; isn't that correct?

7 A.      Well, did  --

8 Q.      How much money did you give to    Ms. Martin to

9 give to  Mr. Hood ?  $100,000?  $200,000?  How much was

10 it, Mr. Goodwin?

11 A.      This was a separate investment entity.      I don't

12 know if I'm at liberty to expound or explain all that at

13 this time.

14        MS. JOHNSTON:   Your Honor?

15        THE WITNESS:   I may be subject to another tax

16 charge.   I'm not sure.

17        MS. JOHNSTON:   Your Honor, I would ask the  Court

18 to instruct the witness to answer the question    , which

19 was:  How much money did he invest with Ron Hood through

20 Ms. Martin for this concert business.

21        THE COURT:   Mr. Goodwin, if you can answer the

22 question, please .  Give her a dollar amount.  That's

23 what she's seeking.  What dollar amount did you invest?

24        THE WITNESS:  Does that exclude me from a tax

25 charge?

1          MS. JOHNSTON:    Your Honor, I would guess the

2     Court would have to advise him of his Fifth Amendment

3     rights, because he has no protection here against any

4     charges.

5          THE COURT:  You understand that if you answer --

6     if the answer would require that you incriminate

7     yourself, you have a   Fifth Amendment right to refuse to

8     answer.  Do you want to refuse to answer?  It's up to

9     you.

10         THE WITNESS:   I have a  Fifth Amendment right?

11         THE COURT:   Why don't we do this?

12         Ladies and gentlemen, we will take a morning

13    recess until 11 o'clock.

14         Remain on the stand, please.

15                    (Jury excused at 10  :42 a.m.)

16         MS. JOHNSTON:   I just wanted to let the   Court

17    know this is going a little more slowly -- my

18    cross-examination is going a little more slowly than       I

19    anticipated.   I think  I probably have another hour with

20    him.

21         THE COURT:  All right.

22         MS. JOHNSTON:   I just didn't think it would take

23    me so long to get his responses.

24         THE COURT:   Mr. Martin , do you want to confer

25    with your client --

1          MR. MARTIN:  Yes,  I do.

2          THE COURT:  -- concerning this issue while we

3 have a recess?

4          MR. MARTIN:  Yes, sir.

5          THE COURT:  I'll come back at five minutes of

6 11:00, and we can address the question then.

7                    (Off the record at 10  :43 a.m.)

8                    (On the record at 10:57 a.m.)

9          THE COURT:  Is everyone here now?

10         Mr. Martin, I've asked you to confer with your

11 client concerning this potential issue.  Have you done

12 that?

13         MR. MARTIN:   I have,  Your Honor, and he is going

14 to stand by his  Fifth Amendment right and he is not

15 going to give any testimony or information regarding the

16 amount of money that he invested in the entertainment

17 promotion.

18         I have conferred with government trial counsel,

19 and we agree that what we think the    Court might want to

20 consider is giving an instruction -- not right now,

21 because  I think we all need some time to think about it.

22 I invited the government to move to strike his

23 testimony, but they declined to do that.     I just think

24 that at the conclusion of   Mr. Goodwin's testimony , we

25 will get together and we'll try to come up with some

1  language that the   Court might want to consider.

2        THE COURT:  Ms. Johnston ?

3        MS. JOHNSTON:   Mr. Martin  correctly states our

4  discussions.  The government is not    , at this time ,

5  moving to strike his testimony.    I'd like to continue

6  with my cross-examination.  Perhaps at the end    , I might

7  move to strike it, but   I don't think so.

8        THE COURT:  The only thought that occurred to me

9  was to whether he has a Fifth Amendment privilege on

10  this issue, having already opened the subject of

11  investing with  Ms. Martin.  If the government doesn't

12  want to press the issue as to whether he has any

13  remaining  Fifth  Amendment right once he's opened the

14  door to discussing the fact that he had invested with

15  her concerts and then simply to decline to answer the

16  amount , he may have very well   open ed the  door , but if we

17  don't need to go there, we won't go there.

18        MS. JOHNSTON:   Your Honor , I would like

19  permission , because this was not anticipat   ed, to  look at

20  that and, if appropriate, to reopen my cross of      Mr.

21  Goodwin into that area.

22        THE COURT:  What's sauce for the goose is sauce

23  for the gander.  If they're going to get Sergeant      Sakala

24  back for further cross, you can have him back for

25  further cross.

1          MR. MARTIN:   I'm going to object, because they're

2  asking him to give a specific dollar amount, and I think

3  that that testimony would be self-incriminating.

4          THE COURT:  Look.  We're all dealing with an

5  issue that's come up that we didn't anticipate.       I just

6  gave you some thoughts as to whether or not he may have

7  passed the Fifth Amendment territory by discussing the

8  relationship with her.

9          I will simply bring the jury back in and we will

10  resume questioning on other matters   .   You can confer

11  which each other as to what   , if anything , you want to

12  do, may include doing nothing   , but in the absence of

13  pressing the issue and me ordering him to answer      , which

14  I won't do at this time, we'll go on to other matter     s.

15          MR. MONTEMARANO :   Your Honor, briefly.

16          THE COURT:   Yes.

17          MR. MONTEMARANO :  Two things.  First, I would    , on

18  behalf of  Ms. Martin , object to the characterization

19  that  Mr. Goodwin opened any door   .  He has only respond ed

20  to a question based by government counsel     , and for that

21  reason , I don't think   -- I don't believe this is a part

22  of direct.  It was probed by    Ms. Johnson, especially

23  with regard to his relationship to     Ms. Martin in the

24  investments.    I, therefore , submit that this is not any

25  sort of opening the door.

1         THE COURT:   I'm not going to resolve that issue

2    now.   I don't think door opening is a question of

3    whether he --   I think the door opening question is

4    whether he voluntarily addresses a subject and then

5    having voluntarily addressed it, changes his mind.   That

6    is what  I think is the potential of what he did.

7    Had he simply said,   I decline to answer any questions

8    concerning my business investments in concert with      Ms.

9    Martin, then that would have stopped it right there.

10   But having gone that far, he may have very well waived

11   it.   I don't need to address that issue.   I'll pass it

12   for now, we'll leave it alone, we'll bring the jury in,

13   and we'll resume on other matters.

14        MR. MONTEMARANO :  As to the government

15   representation that they will be another hour or so with

16   Mr. Goodwin , I have called my witness and told him we

17   probably wouldn't need him here until around a quarter

18   of 12.

19        THE COURT:  That would be fine.

20        MS. JOHNSTON:   Your Honor, I do intend to ask

21   more questions about this concert relationship with Ms.

22   Martin.

23        THE COURT:  He's been answering them all so far.

24   We're just going to pass on a question of the amount.

25        Bring them in.

1                    (Witness resumes the stand.)

2                    (Jury returns at 11  :03 a.m.)

3          THE COURT:  All right, you may proceed.

4          BY MS. JOHNSTON:

5  Q.      Mr. Goodwin, this investment that you made with

6  Ms. Martin -- the money that was given to    Ms. Martin ,

7  that was turned over to   Mr. Hood; is that correct?  The

8  money that you --

9  A.      No.  I don't know that.   Ms. Martin handled the

10 finances.

11 Q.      So you don't know what she did with whatever that

12 amount of money was that you gave to her?

13 A.      Right.

14 Q.      And this relationship with   Mr. Hood, fair to say ,

15 started in the spring of 2004; is that correct?

16 A.      Somewhere along there.

17 Q.      If I'm correct, although you had discussions with

18 them about other potential concerts, the first concert

19 that was to be held was   Aretha  Franklin; is that

20 correct?

21 A.      Correct.

22 Q.      And that concert was scheduled for    Kansas; is

23 that correct?

24 A.      Correct.

25 Q.      And you never received any tickets for that

1  concert because it was postponed due to     Ms. Franklin's

2  health; is that correct?

3  A.      Correct.

4  Q.      And Ms. Martin didn't get any tickets either

5  because the tickets were not printed because     Ms.

6  Franklin cancelled the whole tour; is that correct?

7  A.      The ticket s supposedly was printed  , but we never

8  issued them because she cancelled -- the tickets was

9  printed.  He said the tickets was printed.

10 Q.      That's what  Mr. Hood told you?

11 A.      Mr. Hood told me , yes , that the tickets was

12 printed , but they never issued them because the day they

13 were going to be issued is when she cancelled.

14 Q.      You and  Ms. Martin never got any of those

15 tickets?

16 A.      No, we was suppos  ed to, but we didn't.

17 Q.      You were supposed to, but you didn't get them     ?

18 A.      No.

19 Q.      Even though it was a concert, it's in     Kansas, and

20 you were supposed to get some tickets in case you want     ed

21 to go or try to sell them?

22 A.      We were going to issue some to our friends and so

23 forth.  Yes, we were supposed to get tickets, but they

24 were never issued.

25 Q.      Tickets for you and your friends to go because

1  you were funding or financing this production; is that

2  correct?

3  A.      That's true.

4  Q.      You weren't really involved in the production of

5  a concert in  Kansas; correct?

6  A.      If it hadn't been cancelled.

7  Q.      To that concert , there weren't any -- you weren't

8  involved in any other concerts or selling of tickets for

9  any concerts; isn't that correct?

10 A.      Not  PMI , no , but there was other concerts that we

11 were involved  in.

12 Q.      You were attempting to get involved in other

13 concert s; correct?

14 A.      No.   Beforehand there was other concerts   .   We

15 used to go to a lot of other concerts  , and it's like   Mr.

16 Harvey Star Washington,  she used to get ticket  s from  him

17 and we would help sell them.

18 Q.     Mr.  Harvey Star Washington had fashion shows;

19 right?

20 A.      Right.

21 Q.      Those were really fashion shows that were held

22 for women who need  ed to  raise their self-esteem.   He

23 would teach them how to wear clothes and how t     o carry

24 themselves in term  s of  walking on the runway and help

25 them raise their self-esteem; isn't that correct?

1            MR. MONTEMARANO : Objection.

2            Basis for knowledge.

3            BY MS. JOHNSTON:

4  Q.        If you know.

5  A.        I know it used to be a fashion show.      I don't

6  know if it was all about esteem.

7  Q.        The last fashion show would have been in

8  November , 2003 ; right ?   And the time you were arrested    ;

9  isn't that correct?

10 A.        That's true.

11 Q.        In fact , you didn't get to go to that concert

12 because you were incarcerated -- that fashion show

13 because you were arrested   ; isn't that correct?

14 A.        No , I went to the concert.

15 Q.        The fashion show in    November of 2003?

16 A.        Oh, November.

17 Q.        It might have been right before --

18 A.        Yeah.   I went to the concert.

19 Q.        Not the concert.   The fashion show that -- it was

20 a couple of days before you got arrested?

21 A.        Right.

22 Q.        November 23,  I think.

23 A.        Yes.

24 Q.        That was the last fashion show for    Mr.

25 Washington ; isn't that correct?

1 A.      No.

2 Q.      That you were -- that you attended     ?

3 A.      No.

4 Q.      You attended other fashion shows with     Mr.

5 Washington?

6 A.      Yeah.  We had just attended one that     May of 2004.

7 There was other shows   , but I think the last one was     May.

8 Wasn't it May of 2004?

9 Q.      Do you have a copy of the program from that show?

10 A.      Probably on my property.   There's a good

11 possibility.

12 Q.      As you look through your property at Constitution

13 Avenue?

14         Did you look at your property on Constitution

15 Avenue?  Was it in there?

16 A.      I haven't been back to Constitution, and     I can't

17 look through it anyway because it's no longer my

18 dwelling.

19 Q.      Let's move on from there.

20         You certainly didn't travel to or send people to

21 Texas in relation to any of    Mr. Washington's

22 productions, did you?

23 A.      No.

24 Q.      And neither did  Ms. Martin; is that correct?

25 A.      As far as  I know.

1 Q.      And Mr. Thurman wasn't involved in any of those

2 things ; was he?  Mr.   Thurman?

3 A.      I don't know.

4 Q.      As far as you know  , you never saw him at any of

5 these fashion shows  ; did you?

6        Harvey Star   Washington's fashion shows   , did you

7 ever see  Mr. Thurman there?

8 A.      Not that  I recollect.   I'm not sure if   he ever

9 went or not.

10 Q.      But you saw  Ms. Martin.

11 A.      Sure , I've seen  Ms. Martin.

12 Q.      Now, the concerts -- the   Aretha  Franklin concert  ,

13 you never got any tickets for that; isn't that correct?

14 A.      We never received the tickets for that.

15 Q.      And you never  did any other concerts with    Mr.

16 Hood  where you received tickets; isn't that correct?

17 A.      You mean what we produced or tickets that we went

18 to?

19 Q.      Any concert -- you didn't produce any other

20 contacts or promote any other concerts with     Mr. Hood ;

21 isn't that correct?

22 A.      Not with  Mr. Hood .

23 Q.      Okay.

24 A.      But he has gone to   concerts  with us.

25 Q.      So you have gone as guests to different concerts;

1 is that correct?

2 A.      Yes.

3 Q.      Those concerts didn't involve    Mr. Thurman ; did

4 they?

5 A.      Not that  I recollect.

6 Q.      And they didn't involve    Cuba ; did they?

7 A.      Not at this time.

8 Q.      And they didn't involve Tiffany    Vessels ; did

9 they?

10 A.      She's gone to some.

11 Q.      She went with you as your guest?

12 A.      Sometimes.

13 Q.      And so these were social    events that you went to;

14 is that correct?

15 A.      Sometimes.

16 Q.      And Cuba didn't go.  Do you know an individual

17 named Louie --   Louis?

18 A.      I know three  Louises .

19 Q.      Let me show you  CH-1.  Let's look at   CH-1.  Do

20 you know -- you don't know    Moises Uriarte , do you?

21 A.      No.

22 Q.      Do you know  Ms. Levi?  You've met    Ms. Levi ; isn't

23 that correct?

24 A.      Yeah, downstairs.

25 Q.      Excuse me?  Before you were arrested    , did you

1 meet Ms. Levi?

2 A.      I don't think so.

3 Q.      You ever meet her through   Ms. Martin at  Ms.

4 Martin's house?

5 A.      No.

6 Q.      How about Dog?  Do you know Dog Turner?

7 A.      No.

8 Q.      Never had any contacts with him?  How about     Steve

9 Brim?  You're familiar with   Mr. Brim; aren't you?

10 A.      About 15, 20 years ago.

11 Q.      Do you know  Mr. Brim?  He was married to    Estelle

12 Brim.  You know  Estelle  Brim, too; isn't that correct?

13 A.      I've seen  Estelle, but   I haven't seen him in

14 about 15 years.

15 Q.      He was involved in drugs.  Were you aware of

16 that?

17 A.      Who,  Steve?

18 Q.      Yeah.

19 A.      No,  I wasn't aware of that.

20 Q.      How about  Pernell  Philpot ?  Do you know him?

21 A.      No.

22 Q.      You don't know   Pernell  Philpot ?

23 A.      No.

24 Q.      You have no knowledge of Mr.    Philpot ?

25 A.      No more than when    I met him here when he was

1  here.

2  Q.     You never had a conversation --

3  A.     Are you talking about on the street before that?

4  Q.     I'm talking about before you got arrested on June

5  1st of 2004.

6  A.     No.

7  Q.     Never met him through   Ms. Martin.

8  A.     No.

9  Q.     Don't recall any conversations with    Ms. Martin

10 voicing your concern over    Mr. Philpot  and his arrest in

11 Wyoming ?

12 A.     We had a conversation.    I was inquiring because

13 -- yeah.   I didn't know him personally, but     I was

14 inquiring, because my stepson went with his niece or

15 something like that.

16 Q.     So you didn't --

17 A.     We discussed that.

18 Q.     You did know  Mr. Philpot ?

19 A.     No, I didn't know him personally.    I said  I was

20 inquiring because his stepson was going with his niece.

21 We were discussing him.    I never knew him personally.

22 Q.     You and  Ms. Martin were discussing    Mr. Philpot ;

23 isn't that correct?

24 A.     Right.

25 Q.     You had a conversation with her on the telephone    ?

1  A.       Right.

2  Q.       She didn't know anything about his drug dealing     ;

3  is that correct?

4  A.       I didn't know the man.

5  Q.       You didn't know he was dealing drugs?

6  A.       I didn't know the man.

7  Q.       Let's stop right there then.

8          You have in front of you three volumes there     .  If

9  you could turn to Page 203 of the first volume of the

10 transcripts on Page 203, please.  Now, your involvement

11 in the -- with  Mr. Hood, you were promoters and that was

12 the extent of it  ; isn't that correct?  Is that correct    ,

13 Mr. Goodwin?   I'll give you a chance to get to the page.

14         Could you please answer my question before you

15 worry about turning to that page,    Mr. Goodwin?

16         You and  Ms. Martin were strictly involved as

17 investing funds as promoters for that concert     ; isn't

18 that correct?

19 A.       I don't know.

20 Q.       The Aretha  Franklin concert  , you gave money to

21 Ms. Martin to give to   Mr. Hood; is that correct?

22 A.       Yes.

23 Q.       Okay .

24 A.       No.  No, sir .  I gave it to  Ms. Martin.

25 Q.       You gave money to   Ms. Martin to invest in the

1 concert?

2 A.      Right.

3 Q.      That was the extent of your involvement in that

4 concert ?  You didn't have any other responsibilities;

5 isn't that correct?

6 A.      I would have if the concert had revealed itself,

7 but it got cancelled.

8 Q.      Okay.  If we could please play    Call B1649 for  Mr.

9 Goodwin so he has a chance to hear it.

10              (Recording begins playing at 11   :15 a.m.)

11              (Record stops playing at 11   :16 a.m.)

12        BY MS. JOHNSTON:

13 Q.      Please stop it there.

14        You and  Ms. Martin were discussing in that call

15 the fact that  Mr. Philpot  had been stopped in   Wyoming

16 and had kilograms of cocaine with him; isn't that

17 correct?

18 A.      Yes.

19 Q.      You and  Ms. Martin were discussing    Mr. Philpot

20 getting stopped two vehicle -- thinking that he got

21 stopped with both of his vehicles with a total of ten

22 kilograms in them  ; isn't that correct?

23 A.      Repeat  that.

24 Q.      You and  Ms. Martin were discussing in this call

25 the fact that  Mr. Philpot  got stop ped in  Wyoming with

1  multiple kilograms of cocaine   ; isn't that correct?

2  A.      Yes.

3  Q.      And indeed , when  Ms. Martin says, ten of those

4  outfits for the   Aretha  Franklin show , she's refer ring to

5  ten kilograms of cocaine  ; isn't that correct?

6  A.      That was a discussion before this excerpt that

7  you have taken from this call   , and I was told that he

8  had been stopped before this conversation, yes    , that he

9  had gotten stopped in   Wyoming and --

10  Q.      The reference to ten of the outfits for the

11  Aretha  Franklin show refers to ten kilograms of cocaine;

12  isn't that correct?

13  A.      No.

14  Q.      Are you telling the ladies and gentlemen of the

15  jury that he actually got stopped with ten outfits that

16  someone was going to wear in the    Aretha  Franklin show?

17  A.      No.  I know he had gotten outfits made to go to

18  the show.  She had told me.    This was in an earlier

19  conversation , and my understanding is from looking at

20  the film , he didn't have ten in his car.  They said it

21  was fi ve.

22  Q.      And's  Ms. Martin told you he had two cars with

23  him in that conversation  ?  He had two things fixed  ?

24  A.      No, that's not what the video said.     It said he

25  had -- it didn't say there was fi   ve.  It didn't say

1  nothing about no two cars.

2  Q.      Mr. Goodwin , had you seen this conversation when

3  you -- had you seen the video when you had this

4  conversation with  Ms. Mar tin?

5  A.      No, but  I had  a conversation before that and she

6  had told me about it.

7  Q.      Okay.  And she had told you that he had gotten

8  stopped , as far as she knew  , with ten kilograms of

9  cocaine ; isn't that correct?

10 A.      No.

11 Q.      Are you telling the ladies and gentlemen of the

12 jury --

13 A.      She told me that he had gotten stopped with five.

14 Q.      The reference here  , he had gotten ten of those

15 outfit s for the  Aretha  Franklin show doesn't refer to

16 ten kilograms of cocaine  ?

17 A.      I wouldn't  assume  if he had gotten stop  ped with

18 five.

19 Q.      Are you telling us that that reference means

20 actual outfits for the   Aretha  Franklin show?

21 A.      What she had told me.  He had gotten outfits for

22 the show.

23 Q.      That's why he got stop  ped in  Wyoming ?

24 A.      No, that 's not why he got stop  ped in  Wyoming .

25 She said he got stop  ped in  Wyoming because of   -- what

1 did they call it when you see certain people out of

2 place?  What do they call that?  Race profiling?        She

3 said what was  -- they said what was he doing there?

4 Q.      Mr. Goodwin,  that may be what you want to refer

5 to it.  The truth of the matter is he had multiple

6 kilograms of cocaine in his vehicle; isn't that correct?

7 A.      Repeat that.

8 Q.      The truth  of the matter is  he did , in fact , have

9 multiple kil ograms of cocaine in his vehicle  ; isn't that

10 correct?

11 A.      He had five kilos  , I understand.

12 Q.      And so in this call  , you're telling us that you

13 understood ten of those outfits for the      Aretha  Franklin

14 show to refer to clothing; is that correct?

15 A.      As far as  I know, yes.

16 Q.      And then when you say at the bottom    , complain

17 about that transportation shit an    d then  you go on to

18 discuss that you went through $8,500 to get my new

19 machine made  , you're refer ring to  put ting hidden

20 compartments into vehicles  ; isn't that correct?

21 A.      Yes.

22 Q.      And you put hidden compartments in vehicles that

23 you had at  Lobo's ; isn't that correct?

24 A.      No.

25 Q.      And then -- well  , you put them in some vehicles.

1  You just admitted that you put hidden com    partments  in

2  some vehicles; isn't that correct?

3  A.      No, I didn't put them in there.

4  Q.      You paid to have them done; is that correct?

5  A.      I knew of them.   I didn't pay to have them done.

6  Q.      Just like  I went through the $8,500 to get my new

7  machine made.  What you told her was that you paid

8  $8,500 to have somebody put hidden compartments in a

9  vehicle for you ; isn't that correct?

10 A.      It don't say anything about hidden compartments.

11 It says new machine made.

12 Q.      And your men put a hidden compartment in your

13 vehicle , just like  Mr. Philpot  had hidden compartments

14 in his vehicle when he was stopped; isn't that correct?

15 A.      Not necessarily.

16 Q.      Why don't you tell the ladies and gentlemen of

17 the jury what new machine you had made that you were

18 referring to in this call   , after talking about    Mr.

19 Philpot  getting stopped with his hidden compartments

20 that contained cocaine.

21 A.      Well, it could have been the    Corvette .

22 Q.      I'm not asking you   what it  could have been  .   I

23 want you to tell the ladies and gentlemen of the jury

24 what new machine did you have made that you paid $8,500

25 for that wasn't a hidden compartment    ?

1 A.      Can I finish now?

2 Q.      You may certainly answer the question.

3 A.      Okay.  As I was about to say , I had just had a

4 Corvette  rebuilt , and it could have been that at the

5 time.

6 Q.      And then  Ms. Martin said that they had two of

7 them, referring to   Mr. Philpot  having two different

8 vehicles done with hidden compartments.   You understood

9 in this conversation that she was telling you about

10 hidden compartments in the vehicles; isn't that correct,

11 Mr. Goodwin?

12 A.      Mm-hmm.

13 Q.      There's a question pending  .  Could you please

14 answer it?

15 A.      I'm looking for it here now.   Where it says  -- I

16 don't see it in this conversation.  That's why      I'm

17 saying where is the one before that.

18 Q.      You referenced transportation shit.  What did you

19 mean by  "transportation shit " on the first page of that

20 call, Mr. Goodwin?   I'm not asking you about another

21 call .

22 A.      I see these two excerpts here from a

23 conversation , and I don't see the beginning of the

24 conversation and   I don't see the prior conversation    ,

25 like I said , to this so how   can I say exactly.

1 Q.      Well, on page -- let's m ove on , the n, to another

2 question if you can't answer that one.

3        Then you complain at the bottom of 204 that

4 people are telling and that's the problem.  You said

5 that at that time  when you said they're telling  , you

6 meant people getting stopped with these hidden

7 compartments and they're telling the police about them      ;

8 didn't you?

9 A.      More than likely  .

10 Q.      And that was a concern for you and     Ms. Martin

11 that people were telling about the hidden compartments      ;

12 isn't that correct?

13        MR. MONTEMARANO:  Objection  , Your  Honor .

14        THE  COURT :  O verruled.

15        MR. MONTEMARANO:  He can't begin to know what      Ms.

16 Martin  knows .

17        BY MS. JOHNSTON:

18 Q.      It was a concern you discussed with     Ms. Mart in in

19 that conversation; isn't that correct?

20 A.      Well, people are always telling.

21 Q.      That's always been a concern of yours    ; hasn't it ,

22 Mr. Goodwin?

23 A.      Not always.

24 Q.      But it was a concern of yours when     Raynard  Dorsey

25 told on you in  November of 2003; isn't that correct    ?

1 A.      Dorsey didn't tell on me ; Dorsey framed me.

2 Q.      It was a concern of yours when    Mr. Thurman came

3 in here and told on you  ; isn't that correct?

4 A.      Well , if he had told the truth --

5 Q.      It was a concern of yours when    Mr. Horace  Smith

6 had the gut s to  come in and tell this jury about you      ,

7 too.  That's a concern  of yours as well     ; isn't that

8 correct?

9 A.      Did  Mr. Horace  tell you about breaking  in my

10 house , him and  Mr. Thurman , because  I didn't  go along

11 with their little plan?  They didn't tell you about

12 that?  S ince he's going   to tell all these truths?  Did

13 Mr. Horace  tell you about that  ?

14 Q.      Mr. Goodwin , as I told you before , I am not

15 allowed to answer your questions.      I'm only allowed to

16 pose questions.

17         Let's go back to my chart   , now that we 've dealt

18 with  Mr. Philpot .

19 A.      You wouldn't let his cousin tell you either.  He

20 wanted to tell you.

21 Q.      Your  Honor  I would ask   --

22         THE  COURT:   Mr. Goodwin , do not argue with the

23 prosecutor.  Answer questions.  You do not have the

24 right to ask questions.  Your role is to answer

25 questions.  Do you   understand that ?

1         Do you understand that  , Mr. Goodwin?

2         THE WITNESS:  Yes, sir.

3         BY MS. JOHNSTON:

4  Q.     Let's go back over here.  Do you know     Luis

5  Mangual , Jr.?  Do you recognize him?

6  A.     Yeah , I see him.

7  Q.     Do you know him?

8  A.     Vaguely.

9  Q.     How do you know  Mr. Mangual ?

10  A.     I sold him a washing machine and a    dryer .

11  Q.     You sold him a washing machine and    dryer?   No

12  other dealings with him; correct    ?

13  A.     That was it.

14  Q.     You weren't involved in   any business with him?

15  A.     No.

16  Q.     You never bought any books from him, any or    anges

17  or apples or  apple sauce , or Versace  sunglasses from

18  him?

19  A.     No, no, no, no.  Never discussed anything like

20  that.  O nly a washing machine and a    dryer .

21  Q.     And he's not involved in drugs  , as far as you

22  know?

23  A.     I don't know what he's involved in.

24  Q.     What about  Juan Encarnacion ?  Do you know him?

25  Did you see him at   Ms. Martin's?

1  A.      I saw him here on the stand.

2  Q.      Did you ever see him at   Ms. Martin's?

3  A.      No, I don't think so.

4  Q.      And at her house on   Bexhill  Court -- you've been

5  to her house on   Bexhill  Court , I take it?

6  A.      A few times .

7  Q.      What about  Cuba? We don't know   Cuba.  We don't

8  have his picture here.     How m any  Cubas  do you know ?

9  A.      Three.

10 Q.      Three  Cubas ?  The first   Cuba is the one you got

11 the  Cuban cigars from, sec  ond Cuba is who ?

12 A.      His cousin.

13 Q.      And what does he do?

14 A.      More or less the same thing that his cousin does.

15 Q.      Sells  Cuban cigars?

16 A.      Mm-hmm.

17 Q.      Where did you meet these two     Cubas  that s ell

18 Cuban  cigars?

19 A.      Where  I met them at?

20 Q.      Where did you meet them?

21 A.      At Home  Depot.

22 Q.      At Home  Depot , just walked , saw them at   Home

23 Depot , introduced yourself,   and they said , hey,  you want

24 to by some   Cuban  cigars ?

25         MR. MARTIN:  Objection  .

1          THE WITNESS:  Well, you asked --

2          THE COURT:  Mr. Goodwin , there was an objection

3 made .  You have to s top answer ing the  question when an

4 objection is made.

5          MR. MARTIN:  Argumentative  .

6          THE COURT:  O verruled .  You may answer the

7 question.

8          BY MS. JOHNSTON:

9 Q.      That's where you met him,   Home Depot.  So you met

10 two Cubas there.  How about the third    Cuba?  Who is

11 that?

12 A.      One that  I saw up here on the stand.    I've seen

13 him a couple of time  s.

14 Q.      Excuse me?

15 A.      The one  I saw on the stand  , I saw hi m at  Ms.

16 Martin's house twice.

17 Q.      That would be  Emilio  Echarte  who testified?

18 A.      That they called him    Julio ?

19 Q.      Julio ?

20 A.      Yeah , I seen him there twice.

21 Q.      You referred to hi  m as Cuba?

22 A.      He's a  Cuban .

23 Q.      He's a  Cuban, but he didn't go by the name    Cuba ?

24 A.      Well , he had said he was    Cuban .

25 Q.      All right .  So you're referring to him -- he was

1 known to  Ms. Martin  as   Julio ; is that correct?

2 A.      From what  I gather.

3 Q.      Mr. Echarte .  He was selling drugs to   Ms. Martin .

4         Did you see him deliver the drugs to    Ms. Mart in?

5 A.      I only saw the man twice, a very short period of

6 time.

7 Q.      At Bexhill  Court?

8 A.      That's all.

9 Q.      And so you don't know that -- if he's a drug

10 dealer  or not.  How about   Steve  Campbell?  You met him  ,

11 didn't you ?

12 A.      He told you on  the  stand he didn't know me.

13 Q.      Did you know  Mr. Campbell ?

14 A.      Yes.

15 Q.      You met  Mr. Campbell  when you were in   Texas ;

16 isn't that correct  ?

17 A.      Right.

18 Q.      In fact , you had his telephone number   s in  your

19 papers over there; correct   ?

20 A.      Right.

21 Q.      You had conversations with him over the telephone

22 on numerous occasions; isn't that correct?  Is that

23 correct ?

24 A.      Yes.

25 Q.      Who is  Kelly  in  El Paso ?

1 A.      I don't know  Kelly.

2 Q.      You had no dealings with   Kelly?

3 A.      I don't know  Kelly.

4 Q.      You know  Mr. Thurman ; isn't that correct  ?

5 A.      Yeah.

6 Q.      He's a drug user  ; isn't that correct?

7 A.      I know him.

8 Q.      He uses drugs ; isn't that correct?  And still you

9 had him employed  , you gave him a salesman license for

10 your business ; isn't that correct?

11 A.      Yes.

12 Q.      And you gave him access to your shop    ; isn't that

13 correct?

14 A.      That's correct.

15 Q.      And you had his telephone number all throughout

16 your papers ; isn't that correct?

17 A.      That's correct.

18 Q.      And  Ms. Vessels , as well , she's a drug user;

19 correct?

20 A.      I found out later on also.

21 Q.      She's  a drug use r, and you sent her to   Texas on

22 occasion , too ; isn't that correct  ?

23 A.      No.

24 Q.      You don't know anything about    her trip s to  Texas?

25 A.      I found  out about her trips to    Texas .  She had

1 planned that trip to   Texas with  Mr. Thurman is the

2 thing .  They found out later on  , but I don't know  Mr.

3 Thurman at  first  was also a drug user.

4 Q.      When you get locked up in   November ,2003 , and Mr.

5 Thurman is in  Texas, he calls your associate,    Ms.

6 Martin; isn't that correct?

7 A.      I don't know.

8 Q.      Do you recall the testimony in court that that's

9 who he call ed?

10 A.      How can  I say who he called?

11 Q.      Do you remember   Detective  Eveler  going through

12 the phone chart showing who   Ms. Martin called?  Can you

13 tell us why  Mr. Thurman --

14 A.      You said he called or you said    Ms. Martin called

15 him?

16 Q.      Both ways .  It was both ways on that chart  .  You

17 give us any reason why   Mr. Thurman would   be talking  to

18 Ms. Martin when you're arrested   , other than  about  why

19 you're in jail ?

20          MR. MONTEMARANO : Objection , Your  Honor .

21          Argumentative; call  s for  speculation.

22          THE COURT: Sustained.

23          Ask another question.

24          BY MS. JOHNSTON:

25 Q.      Xavier  Moor e, another drug user  , a person who has

1  been o ver at Anacostia  Road; isn't that correct ?

2  A.      He said it was his brother.

3  Q.      Somebody who you've seen at your business,

4  Lobo' s; is that correct?

5  A.      He said he was his brother.  He went with him all

6  the time.

7  Q.      John  D.  Irby , the man who went to   Texas who got

8  in the  accident  in Louisiana.

9  A.      Yeah , he never got t o Texas .

10  Q.      And Alton  McKenzie,  Dug , you know him .  He's

11  another drug user  .

12  A.      I don't know that for sure.

13  Q.      He's somebody you know.

14  A.      Yes.

15  Q.      At Lobo's?  You saw him at   Lobo's and at

16  Anacostia ; isn't that correct  ?

17  A.      I saw him on  Constitution  Avenue , and he lived

18  there.

19  Q.      He used to live there?

20  A.      He had a second floor apartment.

21  Q.      So he still lived there?

22  A.      No.

23  Q.      He didn't live there?

24  A.      No , I said he lived in the second floor apartment

25  on Constitution  Avenue .

1  Q.      We know you know  Ms. Mar tin.  H ow about  Ms. Ali?

2  Do you know her?

3  A.      I met her before.

4  Q.      You met her through  Ms. Martin?

5  A.      Yeah , I met her before.

6  Q.      And she , like you , is not involved in drugs; is

7  that correct?

8  A.      No.   I haven't said  I was n't involved in drugs  .

9  I wasn't involved in no cocaine.

10  Q.      So you are involved in   drugs.  What drug s are you

11  involved in , Mr. Goodwin , but not cocaine.  Tell us what

12  drugs you're involved in   .

13  A.      With Mr.  Thurman , I was involved with marijuana.

14  Q.      Just marijuana ?

15  A.      That was it.

16  Q.      What other drugs?

17  A.      That was it.

18  Q.      Now you're telling the ladies and gentlemen of

19  the jury you were involved in marijuana with      Mr.

20  Thurman, marijuana that came from      Texas; is that

21  correct?

22  A.      That's where he said he got it from.

23  Q.      But it wasn't cocaine  ?

24  A.      No.   That's when our relationship got sour    , when

25  I found out that he was dealing with cocaine behind my

1  back with my son and my son -- he's a user and that's

2  why we fell out.

3  Q.     That's why your  false  ID was found in one of

4  those locked box  es in  the basement; is that correct?

5  A.     My what now?

6  Q.     My question was , that's why one of your false

7  identification was found in one of those locked box    es in

8  the basement where the drugs, the guns    , and everything

9  was found ; is that correct?

10 A.     Which box?

11 Q.     It doesn't matter , sir .  It was one of those

12 locked boxes.  Take your pick.

13 A.     It does matter because my son had my     ID and

14 everything because   I got the  ID when  I had  gotten two

15 tickets on my driver's license and     I needed another   ID

16 so I could keep functioning while mine was suspended.

17 Q.     Did you lie to --

18 A.     So he had  -- I had that in the briefcase with a

19 whole lot of other papers.

20 Q.     This is this phantom briefcase we haven't seen

21 here in court; isn't that correct?

22 A.     Hey, I haven't seen it  in a while either.  It's

23 been over two years.

24 Q.     That fake -- that false name    ID did you a lot of

25 good sitting down in one of those locked boxes     ; didn't

1 it?

2 A.      It wasn't neede d at the time.

3 Q.      Can you tell me   --

4 A.      It was needed when they was going to suspend me.

5 Q.      Can you tell me who   Dumb and  Dumber are?

6 A.      Who?

7 Q.      Dumb and  Dumber .  You and  Ms. Martin have a

8 conversation where you refer to "   Dumb and  Dumber ."  W ho

9 are you referring to there?

10 A.      That's a good question.

11 Q.      Well, isn't it correct that you refer    red to  Dumb

12 and Dumber as  Michael  Thurman and  Xavier  Moore?

13 A.      I don't know .  I would have to hear the

14 conversation.

15 Q.      Okay.  Well , we can play the conversations for

16 you.  There are two.  A  1415 on Page 415 , which I think

17 is in the third volume which is between     Ms. Martin and

18 John Irby .  Ms. Martin and   John Irby , through you , isn't

19 that correct?

20        And then there's a second call B6189 on      Page 479

21 and 480.  Why don't we go to     --

22 A.      479?

23 Q.      The call involving you is on    Page 479.   I wasn't

24 sure if  you needed to hear the   other call to put  it into

25 context.  But we can start -- we'll just play B6189 on

1  Page 479.

2          (Audio recording begins   playing  at 11:36 a.m. )

3          (Audio recording   stops  playing at 11:36 a.m.)

4          BY MS. JOHNSTON:

5  Q.      Of course , there , you weren't looking for a

6  ticket to go halfway to a show  ; were you?

7  A.        No, that , more than likely , was for the

8  marijuana.

9  Q.        That more than likely was for drugs; isn't that

10  correct?

11  A.        For the marijuana.

12  Q.        Oh, now you're telling us it was marijuana?      Ms.

13  Martin was involved with marijuana -- is that what

14  you're telling us? -- with you?

15          You do agree that it was drugs you were talking

16  about there ?

17  A.        I said it was marijuana.

18  Q.        You do  agree  that when you said -- when she said

19  any tickets , anything for the show, she was asking you

20  about drugs; correct?

21  A.        She was asking me about the marijuana because

22  that's the only thing   I was dealing with.

23  Q.        When you said , I need to go  , but  I can only go

24  halfway , you were telling her you could only buy half an

25  amount of drugs; isn't that correct?

1  A.      I was talking about the half of pound of

2  marijuana because we had already dis    cussed  that.

3  Q.      Half of a pound of marijuana?

4  A.      Yeah.

5  Q.      That would be why we didn't find any real bags of

6  marijuana at  Ms. Martin's school because you were

7  dealing marijuana with her  ?

8          MR. MARTIN:  Objection.

9          MS. JOHNSTON:  Is that correct?

10         THE WITNESS:  Well , we had a problem getting

11  some, so that's a good possibility.

12         BY MS. JOHNSTON:

13  Q.      But you do a gree that tickets for the show

14  referred to drugs; isn't that correct?

15  A.      I'd say if it was a show, it was tickets for the

16  show.

17  Q.      Well , did you just two minutes ago say that

18  tickets for the show meant you were looking for

19  marijuana and that you could only go halfway because you

20  could only buy half a pound?

21  A.      I said that's a good possibility.

22  Q.      Well , what was it , Mr. Goodwin?  You were a

23  participant in the conversation.  We weren't    --

24  A.      Do you expect me to remember everything    I talked

25  about three years ago?

1  Q.      Not everything,  Mr. Goodwin , just your drug

2  dealing.

3  A.      I just told you as far as   I can remember , it

4  could have been marijuana.

5  Q.      So Agent Sakala , when he interpreted that call to

6  be about drugs, his opinion was correct; isn't that

7  right?

8  A.      No his opinion wasn't correct, because he was

9  saying cocaine and   I wasn't dealing with no cocaine.     I

10  don't like cocaine.    I don't like to deal with cocaine

11  because my oldest son died from cocaine.      I hate for

12  cocaine.

13  Q.      Where was the marijuana at your house on      Farragut

14  Place?

15  A.      Repeat that again.

16  Q.      Where was the -- when your shop --    I'll change

17  the question .

18         When your store was   -- shop and  Lobo's was

19  searched in October  , 2002, they recovered amounts of

20  crack cocaine; isn't that correct?

21  A.      I wasn't there.    I don't know.

22  Q.      Well , you heard the testimony.  Have any   thing to

23  disagree with , what the  FBI agent disagreed to?

24  A.      I wasn't  there and  I don't know.

25  Q.      And in  Farragut  Place, that kilo of cocaine that

1  was recover ed from the bottom of your file cabinet   ,

2  there wasn't any marijuana in    there  with that ; was

3  there?

4  A.     Well , I told her there was some marijuana there.

5  Q.     It was n't a pound of marijuana  , it was a kilo of

6  cocaine; correct?

7  A.     As I stated before,  I don't think that was no key

8  of cocaine there.

9  Q.     I think you described it as something being

10 covered, coated with cocaine as to trick someone into

11 believing it was a kilo of cocaine   .

12 A.     No , I said the analysis came back that it was

13 coated with cocaine, but the analysis came back that it

14 was coffee and codeine  , but I'm saying the one that's

15 there was not cocaine  .  It was not usable as no cocaine.

16 Q.     No, because none of your buyers would take it

17 because it was so weak  ; isn't that correct?

18 A.     I didn't have any buyers for it.

19 Q.     You got hoodwinked on that kilo   ; isn't that

20 correct , Mr. Goodwin?

21 A.     I didn't have any buyers for it.

22 Q.     There was n't marijuana found in your file

23 cabinet , it was cocaine; isn't that correct?

24 A.     That's not what they said.

25 Q.     Okay .  Let's go on , then .

1          If I understood you correctly, the     Cubas that you
2 were intercepted with on the telephone     , do you recall
3 the  Cuba who was intercepted on the phone where we
4 played the calls through   Agent Sakala  sometime ago?
5          Which  Cuba were you talking to on the telephone
6 or which  Cuba were you discussing with    Ms. Martin during
7 the calls that were played with     Agent  Sakala ?
8          I'm not referring you to a particular call.  In
9 general , when you talk ed to  Ms. Martin , which  Cuba did
10 you  talk to her about?
11 A.     The  Cuba where  I got the marijuana and the cigars
12 from.
13 Q.     So now in addition to getting c    igars from this
14 Cuba , which you testified yesterday is what you got      from
15 him , now you've decided to say it's cigars and
16 marijuana ; is that correct?
17 A.     I said yesterday that    I got cigars and marijuana
18 from him .  I said he had cigars and marijuana.  You want
19 to look back through the record?  Maybe we can do that.
20 Q.     You can certainly   order a  transcript if you would
21 like to , Mr. Goodwin.  Your counsel can take care of
22 that.
23 A.     Okay.
24 Q.     Let's go into the calls   , then , please.  B35 on
25 Page  3 .

1 A.       On page what?

2 Q.       Page 3, the very first  volume , Page 3.  Hopefully

3 I will  go in order so you can go from book to book.  On

4 Page 3, you're having a conversation with    Ms. Martin;

5 isn't that correct?  You got Page      3 in front of you?

6 Page 3 in Volume 1.

7 A.       Yes.

8 Q.       Ms. Martin , you're  telling  her you're try ing to

9 check in with   Cuba ; isn't that correct?  And she asks

10 you if she could get half a sweet potato pie     , too , one

11 and -- and stops before she get   s to  finish what she's

12 saying there.  Do you see that?

13        Might be quicker to just play the call for      Mr.

14 Goodwin.  We're going to play this for you because it's

15 a very short call,  Mr. Goodwin.   If you will listen

16 because  it's the  recordings that are the evidence    , not

17 the transcript book .  Listen to the call and then    I'm

18 going  to ask you a question .

19 A.       Can you play the call from the beginning    ?

20 Q.       We're going  to play the call as it's excerpted   .

21 If your counsel want want   s to play the rest of the call  ,

22 he can do that on redirect   .

23 A.       See , excerpts , you only get a partial of an idea.

24 We could have been talking about two or three different

25 things in that conversation  .

1  Q.      Play the call , please.

2          (Audio r ecording begins   playing  at 11 :44 a.m. )

3          (Audio recording   stops  playing  at 11 :44 a.m. )

4          BY MS. JOHNSTON:

5  Q.      Cuba wasn't selling sweet potato pies to you, was

6  he?

7  A.      Like  I said , you didn't play the whole

8  conversation.    I don't know how that was discussed in

9  there.

10 Q.      Well , she asked you very clearly there if she

11 could get a half a sweet potato pie   , but you didn't get

12 sweet potato pies from   Cuba ; did you?

13 A.      Is it possible   to play the whole call?

14 Q.      Mr. Goodwin, my question to you is this   :

15 According to your testimony two minutes ago    , you got

16 cigars , which is what you said yesterday    , and now today

17 you're saying you also got marijuana from      Cuba.  You

18 didn't get sweet potato pies from    Cuba ; did you?

19 A.      No, I didn't get sweet potato pies from     Cuba.

20 Q.      That reference was to getting drugs from       Cuba for

21 Ms. Martin ; isn't that correct?

22 A.      Well , you see , it's partial here , so I can't

23 really  say that .

24 Q.      Well , you didn't say what -- you didn't ask her

25 what she meant there.  You said    , yeah.  Isn't that

1 correct?

2 A.     Because in the first part of the conversation    , it

3 could have been discussed   .  It also could have been

4 discussed a bout something else.    I'm not sure.

5 Q.     And then why don't we go on to    Call A258 on Page

6 103 in the same book   ?

7        THE COURT:  W hat was the number again   , Ms.

8 Johnston?

9        MS. JOHNSTON:  A258 , Page 103,  Your Honor.

10        BY MS. JOHNSTON:

11 Q.     Do you have that call in front    of you ?

12        Okay.  If we could play A258 for     Mr. Goodwin , so

13 he can hear it.

14        (Audio r ecording begins playing at 11   :46 a.m. )

15        (Audio recording   stops  playing  at 11 :47 a.m.)

16        BY MS. JOHNSTON:

17 Q.     Mr. Goodwin , when you mentioned tickets there and

18 them some being stuck in the middle    , you were talking

19 about drugs that were   -- you had coming into the area   ;

20 is that correct?

21 A.     Could have been talking about the marijuana     ,

22 that's a possibility.

23 Q.     I'm not asking you about possibilities.  This

24 call is the entire call.  When she asked you about

25 tickets, you understood that    Ms. Martin was talking

1 about drugs; isn't that correct?

2 A.      What did the first of them calls say    ?

3 Q.      This is the entire call here    .

4 A.      Is it the entire call?

5 Q.      Mr. Goodwin, if you look at the transcript     , you

6 see where it says , morning and  Ms. Martin , says hi,

7 Brother , and then at the end of that page     , it says let

8 me know.  Bye-bye.  This is the     entire call on this

9 page.  Do you see where it says excerpt anywhere?

10 A.      Okay.  That's a possibility that tickets could

11 have been there.

12 Q.      So it's a possibility that tickets -- tickets

13 certainly didn't refer to concert tickets or fashion

14 show tickets ; did it?

15 A.      Sometimes , most of the time.

16 Q.      I'm talking about this call.

17 A.      I'm saying it's a possibility.

18 Q.      Well , tell me what concert tickets are -- or

19 fashion show ticket  s that you know that get stuck in the

20 middle.

21 A.      Sometimes when they sold out and you can't find

22 any and you have to get a    scalper,  then you're stuck in

23 the middle , so that's possibility.

24 Q.      When you say   "they"?

25 A.      You never know the actual situation.

1  Q.      You had people that were transporting drugs for

2  you at that point   and that  were stuck .  They weren't

3  back yet; isn't that correct?

4  A.      I can't say that either,   because I don't know

5  when this was.

6  Q.      Can you say that's not true?

7  A.      Well, when you say   "transporting " for me.

8  Q.      You had people who were transporting drugs from

9  Texas  to Maryland , which were delivered to you; isn't

10 that correct?

11 A.      No.   That's not correct.

12 Q.      When you say they're stuck in the middle    , what do

13 you mean by that?

14 A.      I knew people that was transporting, yes    , but

15 they wasn't transporting for me.  You're saying for me

16 exclusively.  But there was people that     I knew that was

17 transporting marijuana that    I bought from them.

18 Q.      And this is what  Ms. Martin wanted from you,

19 marijuana , in this call ?

20 A.      More than likely.

21 Q.      So tickets in this call refers to drugs    , and in

22 your opinion , it refers to marijuana   , even though no

23 significant marijuana was ever found at     Ms. Martin's

24 business; is that correct?

25 A.      What did they say?  Didn't they say it was stuck

1  in the middle.

2  Q.      They said  stuck  in the middle .

3  A.      So how could it   be there if it was stuck in the

4  middle ?

5  Q.      This was on  March 17 of 2004  .  Do you see that?

6  So you were arranging to get drugs for    Ms. Martin or she

7  wanted to get some drugs from you; is that correct?

8  A.      Like  I said , it's a possibility  , but  I'm not

9  sure.

10  Q.      Let's go to the next call on    Page 18 3, B149 4.  Do

11  you have that call in front of you?      B1494 on Page 183.

12  It continues on  Page 18 4 into  Call  B149 6.

13         Do you have that call in front of you?

14  A.      183, yes.

15  Q.      Okay.  And  Ms. Martin is talking about    Loui

16  there .  She's talking about   Luis Mangual ; isn't that

17  correct?

18         MR.  MONTEMARANO :  Objection to what he

19  understood.

20         THE  COURT:  O verruled.

21         MS.  JOHNSTON:   Your  Honor , again , it may be

22  quicker to play the call for    Mr. Goodwin.

23         BY MS.  JOHNSTON:

24  Q.      Mr. Goodwin , we're going  to the play the call so

25  that you can listen to it an   d then  I'll ask you some

1    questions .  So please listen to the recording because

2    the recording is evidence.  Are you listening to me?

3    Please listen to the call.  We   'll play it for you.

4    B1494 .

5              (Audio r ecording begins  playing  at 11 :52 a.m. )

6              (Audio recording   stops playing  at 11 :52 a.m.)

7              MS. JOHNSTON:  You can stop it.

8              BY MS. JOHNSTON:

9    Q.      So when  Ms. Martin says she   got  a case of sweet

10   potatoes from  Mr.- -- from  Lui .  You understood "  Lui" to

11   be Luis Mangual ; is that correct?

12   A.      I don't know what she got from him    , but  I know

13   what he wanted.  He wanted the washer and     dryer  because

14   he said he had been hitting    Home Depot.   I know he had

15   discussed that with me.

16   Q.      And  I appreciate that  , but it was   -- Lui referred

17   to Luis Mangual ; is that correct?

18   A.      Like  I said , I know three   Loui s and  I can assume.

19   I can't be sure.

20   Q.      You just told us that you knew     it was  him because

21   he was wanting to get a washer and    dryer from you .

22   A.      I said  I assume that was him.  If he mentioned

23   Home Depot , I assumed that that could have been the same

24   Lui .

25   Q.      When she says , I got a case of sweet potatoes

1  from him, you understood her to be telling you she got

2  drugs from him ; isn't that correct?

3  A.      I understood she said she got    sweet  potatoes from

4  him.

5  Q.      A case  of sweet potatoes from him  ?

6  A.      Right.  How  do I know  what  she got from him ?

7  Q.      You believe  that was actual sweet    potatoes; is

8  that correct?

9  A.      I wasn't concerned with what she got from him.

10  All  I was concerned with was seeing him selling him the

11  washer and  dryer.   That's all we ever did.

12  Q.      So you didn't ask her what are you getting a case

13  of sweet potato --

14  A.      I know she used to cook  .  A lot of times she used

15  to bake pie s, so maybe she did.    I don't know.

16  Q.      You didn't cook a lot of times  ; did you ?

17  A.      Yeah , I used to do a lot of cooking  , too , for my

18  grandkids .

19  Q.      Now , if we could go to -- you don't know what

20  sweet potato pie is referred to there?

21  A.      I assume the sweet potato.

22  Q.      If we could go to  the next call, B1635 , please on

23  Page 19 6.  Do you have that in front of you  , Mr.

24  Goodwin?

25  A.      Where it says transcribed portion right here?

1  Q.      Yes, sir.  It was a three  -minute call , and we're

2  playing one minute of that call.

3          Do you see that?

4  A.      I see it.

5  Q.      Okay.  And in that call  , Ms. Martin asks you

6  about your tickets  , and you said you're making

7  arrangements now  , send them back the tickets  .

8          You're  referring to there were drugs   ; isn't that

9  correct?

10  A.      I doubt it.

11  Q.      Isn't that correct?

12  A.      I said  I doubt it.

13  Q.      You doubt it?  And you said   , so far so good  , but

14  positive or not  , I'm sending them back.  You    were

15  talking about drugs  ; weren't you?

16  A.      I doubt it.   I don't know what   I'm talking about.

17  It looks like it's an excerpt.

18  Q.      Let's play this excerpt so you can hear it and

19  maybe that will refresh your recollection.  Go ahead     .

20  A.      You don't have the whole conversation?

21  Q.      Mr.  Goodwin, your attorney has a copy of every

22  call we've played in its entirety.  If you and your

23  attorney want to play the rest of the call    s, you

24  certainly  are entitled to do that.

25          Do you understand that?  Do you understand that

1 fact?

2 A.      How can  I hear him , and there is no facility for

3 it over at the county jail.

4 Q.      Do you understand  what  I've  just said?

5 A.      I'm just saying there is no facility to hear it

6 at the county jail.  How could    I hear  it?

7 Q.      Let's play the call , please.

8           (Audio r ecording begins  playing  at 11 :56 a.m. )

9           (Audio recording   stops  playing  at 11 :57 a.m. )

10           BY MS.  JOHNSTON:

11 Q.      Okay.  Stop right there , please.  The tickets

12 there , what were the tickets?

13 A.      It could have been some tickets that    I didn't

14 want to use.   I don't know.

15 Q.      So you don't know what the tickets    were  there ?

16 A.      No.  Could have been tickets that   I didn't want

17 to use.

18 Q.      But you had good -- you said that    Ms. Martin --

19 you say to her , well, so far so good , that they're

20 talking positive.  Who are the    "they" that's talking

21 positive in reference to your sending the tickets back?

22 A.      That's a very good question.  Again,    I don't

23 know.  I don't see no names   on it.

24 Q.      Certainly you wouldn't have to give the name to

25 Ms. Martin.  She understood you, didn't she?

1          MR. MONTEMARANO : Objection , Your Honor .

2          MS. JOHNSTON:   I will withdraw that.

3          THE WITNESS:   I don't know if she did or not.

4          BY MS. JOHNSTON:

5 Q.      And you say here , well , so far so good , but

6 positive or not , I'm sending them back , but you know

7 good intentions.  If not  , then I'm going to follow

8 behind them , and in the other intention.

9          What did you mean by that  , that if they didn't

10 have good intentions , you were going to follow behind

11 them in the other intention?

12 A.      Follow behind getting my money  , be getting my

13 money back for the tickets  , who knows.

14 Q.      Get your money back.

15 A.      Yeah , if I had bought some tickets and   I didn't

16 want to use it.  Them.

17 Q.      So if they didn't have positive intentions, then

18 you were going to follow up with the other intention;

19 isn't that what you said?

20 A.      This says , you know , good intentions , and if not ,

21 then I'm going to follow behind them and, and it don't

22 say anymore.

23 Q.      With the other intention.  Do you see that?

24 A.      No, I don't see that.

25 Q.      Well, let me point it out to you   .

1 A.        Where is that at?

2 Q.        You know good -- well  , so far so good , but

3 positive or not , I'm sending them back  , but you know ,

4 good intentions and if not, then I'm    going  to follow

5 behind them and in the other intention.  Do     you see

6 that?

7 A.        Okay .  I see that .

8 Q.        Okay .  Do you want to tell the ladies and

9 gentlemen of the jury what your other intention was?

10 A.        I don't know what it was at that time.

11 Q.        So didn't get a positive reaction to whomever you

12 were sending whatever it was you were sending    , wherever

13 you were sending it  .

14         You were going to take care of it with a --

15 handle another intention; is that correct?

16 A.        I don't know what the intentions were at that

17 time.

18 Q.        Let's go to the next call on    Page 337.   That's in

19 the next volume, Volume   2, Mr. Goodwin.

20         Page 337,  Call B3609.  Ms. Martin asks you    Bro --

21 was that a nickname she had for you?       Bro?

22 A.        Pardon?

23 Q.        Bro, was that a nickname   Ms. Martin had for you?

24 A.        Well, if you notice, people that's over 50 years

25 old use brother and sister a lot.  You know    , it came

1 from the struggle back in the '   60s when we were trying

2 to obtain a little bit of equal rights.

3 Q.      Mr. Goodwin, the question is   --

4 A.      It was a cohesive answer.

5 Q.      It's a simple answer  , yes or no , Mr. Goodwin.

6 Did Ms. Goodwin  to you -- did  Ms. Martin refer to you as

7 Bro ?

8 A.      Older  people  refer to each other   a lot  as

9 brothers and sisters  .

10 Q.      I'm not asking  you about other people  .  I'm

11 asking  you about Ms. Martin and you,   Mr. Goodwin.  No

12 one else.  Did she refer to you as     Bro or brother?

13 A.      Well , I assume that   Bro is an ab breviation   for

14 brother .

15 Q.      Is that a common reference she used in talking

16 about you?

17 A.      As I stresses,  a lot of older black people use

18 that term brothers and sister   .

19 Q.      Did she use that term to refer to you?

20 A.      She used it for a lot of people.

21 Q.      Did she use it for you?

22 A.      She used it for a lot of people.

23 Q.      I'm not asking about a lot of people    , Mr.

24 Goodwin .  I'm simply asking about you  .

25 A.      Sure , it's been used towards me also.

1  Q.      With Ms. Martin?

2  A.      Certainly.

3  Q.      Okay.  Just like Mr. Thurman used it for his

4  young friend,  Mr. Moore ?

5  A.      Well , at the time , he made me believe it was his

6  brother.   I didn't know.

7  Q.      Now, going to the  Call B3609 on  Page 337.  She

8  says,  Bro , you don't know nobody with no tickets and you

9  say not a damn fool.  And then you say      --

10 A.      369?

11 Q.      On Page 337 , Call B3609.

12 A.      337.  Okay.  Okay .  And she asks you about

13 anybody having tickets; isn't that correct?

14 A.      Yes.

15 Q.      And then you say, my situation from down the way,

16 I finally got the transportation; isn't that correct?

17 Isn't that what you say?

18 A.      Okay.

19 Q.      Okay.  And the transportation, you were arranging

20 transportation to have drugs brought to you here in

21 Maryland or D . C.; isn't that correct?     Isn't that

22 correct , Mr. Goodwin?

23 A.      Not necessar ily.

24 Q.      Well,  I'm not asking you about -- but in this

25 call, you were arranging transportation; is that

1  correct?   You say  I finally got the transportation; is

2  that what you said?

3  A.      Well, it starts out  , I finally got the

4  transportation , and then it says  , I'm going to do the

5  call waiting or something here.

6  Q.      You said , I finally  got the transportation  , so

7  you were transporting something; is that correct    ?  Or

8  arranged for the transportation of something; isn't that

9  correct ?

10 A.      Transportation, yeah.

11 Q.      Because you , yourself , don't do the transporting;

12 isn't that correct?

13 A.      No, I don't do any transporting.

14 Q.      You don't do any transporting of any drugs; isn't

15 that correct?

16 A.      I don't do any transporting.

17 Q.      You don't do any transporting of any drugs; isn't

18 that correct?  You buy the drugs?

19 A.      I don't do any transporting.

20 Q.      Of drugs.

21 A.      I don't do any transporting of drugs.     Is that

22 what you want me to say?

23 Q.      That's my question to you.

24 A.      I don't do any transporting of drugs.

25 Q.      So you arrange for the transportation    ; isn't that

1 correct?

2 A.     I don't arrange for transportation.

3 Q.     Well, it says here, I finally got the

4 transportation.  Was it transportation for tickets?  For

5 a concert?  Tell us what transportation you have to

6 arrange for a concert ticket,    Mr. Goodwin.

7 A.     That's a good question.

8 Q.     How about my situation from down the way?  Down

9 the way referred to where?

10 A.     That's a good question.  Let me see what the rest

11 of it said.

12 Q.     Excuse me?

13 A.     It don't say down from where.

14 Q.     What did you mean when you said   , my situation

15 from down the way?

16 A.     Where is the rest of the conversation?  Then

17 maybe I will  know from down where.

18 Q.     So you don't know   from this part of the

19 conversation what   down the way  means?   It does say you

20 got the transportation  , though , doesn't it?    I'll

21 withdraw the last question.  Let's go to the next call

22 on Page 347, A1219.  Do you have that in front of you    ,

23 Mr. Goodwin?

24 A.     No.

25 Q.     Well, turn to   Page 347.  It's in that same

1  volume.  This is a short excerpt of this call.      Ms.

2  Martin asks you -- if w  e could just play this for    Mr.

3  Goodwin , it might be easier for him to put it in

4  context .

5           (Audio r ecording begins   playing  at 12 :07 p.m. )

6           (Audio recording   stops  playing  at 12 :07 p.m. )

7           BY MS. JOHNSTON:

8  Q.       The boy you had to get out of jail to give you

9  better insight into what you were doing about the

10  tickets wasn't a concert promoter     ; was he?

11  A.       Not only concert promoters getting    locked  up.

12  I'm trying to figure who was     I getting out of jail  .

13  Q.       There was somebody you need   ed to get out of jail

14  so you could respond to    Mrs. Martin's question about

15  tickets; isn't that right?

16  A.       It seems to be, but   I have to know   -- I'm try ing

17  to see exactly when this was.

18  Q.       It was on April 21 of 2004.  Do you see the date

19  on the transcript?

20           Certainly if these were legitimate concert

21  tickets , you wouldn't have to get anyone out of jail to

22  figure out what you were doing   , would you?

23  A.       Well, there's a possibility   , because at the time,

24  Mr. Hood  had gotten locked  up for something unrelated to

25  a concert.

1 Q.      But you never got any tickets from    Mr. Hood;

2 isn't that correct?

3 A.      But he was the o ne arranging the concerts and the

4 tickets.

5 Q.      And the concert you had to buy this time    , had it

6 been cancelled already?

7 A.      That's why  I was trying to see what the date was.

8 He was still in the process of arranging concerts.  Once

9 a concert got cancelled  , like I said , that didn't stop

10 the whole show.

11 Q.      Are you telling the ladies and gentlemen of the

12 jury that this call relates to getting some tickets from

13 Mr. Hood from some -- for some future concert date that

14 hadn't been scheduled and tickets hadn't even been

15 distributed yet?

16 A.      I don't know if it had been scheduled.    I don't

17 know if it had been distributed.  All    I know is  I had to

18 get him out of jail because -- on an unrelated charge at

19 one time.  That's why  I was trying to see what date it

20 was in 200 4.

21 Q.      Anything having to do with   Mr. Hood had nothing

22 to do with the tickets being asked about by     Ms. Mart in

23 in this call; is that   correct ?

24 A.      It could have been.    Mr. Hood was in jail on a

25 unrelated charge.

1 Q.     Well, let's go to the next call, B4312    , on Page

2 371.  Do you have that in front of you?

3 A.     What page?

4 Q.     Page 37 1, Call B4312.  We'll play this call

5 because this one is not excerpted   .  It's in its

6 entirety , so Mr. Goodwin can hear it.  Please play B4312

7 on Page 37 1.

8        MR. MARTIN:   Your Honor , before the government

9 does that , may I approach ?

10        THE COURT: You may.

11              (At the bar of the Court.)

12        MR. MARTIN:  This is some of the most damaging

13 cross-examination   I've ever seen , but I think the

14 government has well made   its point.  His credib ility has

15 been destroyed , whatever he might have  , and in the

16 interest of judicial economy   , I would suggest that we

17 move on from here.   I'm not going to redirect.    I think

18 the point's been made.

19        MS. JOHNSTON:   I appreciate  Mr. Martin 's comment.

20 Unfortunately, there are 12 jurors whom we have to

21 convince beyond a reasonable doubt of   Mr. Goodwin's

22 guilt , and therefore , I want to be allowed to continue

23 with my cross-examination.    I'm trying not to play all

24 of the calls.

25        THE COURT:   I think you get that point across.

1          MS. JOHNSTON:   Your Honor, there are any number

2   of calls.   It's a pattern of using the same code word in

3   different discussions about different people.   This next

4   call uses tickets in reference to    Cuba, so it's

5   important to establish the pattern with him and have him

6   deny that those calls relate to drugs.   It also goes to

7   Agent Sakala's  credibility.

8          THE COURT:  All  I'm saying is   --

9          MR. MARTIN:   It's cumulative, Your Honor.

10          THE COURT:  Not that  I completely agree with   Mr.

11   Martin, but  I think we're ge tting to  a point w here it

12   may be a cumulative problem.  If you would    , try to be as

13   efficient as you can.

14          MR. MITCHELL:  My client has asked if he could go

15   in the back and waive his presence during this

16   testimony.  He's tired.  Very sleepy.

17          THE COURT:  No , he can't do that.

18          MR. MITCHELL:   I'm relaying --  I know he's

19   listening to this.

20          THE COURT:  Request is denied.  He should sit

21   back where he's supposed to be.

22          MR. WARD:   He wants to go back and take a nap?

23          MR. MITCHELL:  Could  I go take a nap , Your Honor?

24          THE COURT:   I'd like to take a nap myself.

25          MR. MONTEMARANO :  Could we take a bathroom break

1 when Mr. Goodwin is done?

2          THE COURT:  M y problem is we're going t  o break

3 for lunch at  1:00, unless you're having bladder control

4 problems.

5          MR. MITCHELL:  Could  I just have you state why he

6 can't go back so that he understands.

7          THE COURT:  He is  -- a defendant has be seat  ed in

8 the seat that's assigned to him.

9              (Back in open court.)

10          BY MS. JOHNSTON:

11 Q.     If we could go to  Call B4112 on Page 671 , please ?

12          (Audio  recording begins playing at 12   :13 p.m. )

13          (Audio  recording stops  playing  at 12 :14 p.m.)

14          BY MS. JOHNSTON:

15 Q.     Mr. Goodwin,  you would agree , would you not , that

16 tickets in this call refers to drugs  ; isn't that

17 correct?

18 A.     I would say it referred to them cigars.

19 Q.     This refers to cigars?  Okay.  Now you're telling

20 the ladies and gentlemen of the jury that      Ms. Martin was

21 interested in buying cigars?

22 A.     Cuban cigars.

23 Q.     Excuse me , Cuban cigars?

24 A.     Yeah.

25 Q.     And indeed , the regular container we're talking

1 about is the wrapping that a kilogram comes in    ; isn't

2 that correct?

3 A.      Repeat that.

4 Q.      The container we're talking about here is a

5 container that a kilogram comes in   ; isn't that right?

6 A.      No.

7 Q.      How many cigars came in your container?

8 A.      Usually come in 20   blocks .

9 Q.      Twenty blocks?  Okay.  What does a container look

10 like?

11 A.      Looks like a regular container.

12 Q.      What kind of -- well  , what does a container look

13 like, Mr. Goodwin?  This container of   Cuban cigars , what

14 does it look like?

15 A.      You got a pencil and piece of paper?    I'll draw

16 it for you.

17 Q.      Describe it , please.

18 A.      Well, it's so wide -- they just came in a

19 container.

20 Q.      What is the container made out of?

21 A.      The way they was wrapped.

22 Q.      Describe  "wrapped ".  A cigar , when it's wrapped  ,

23 the wrapping of a cigar   , is it not the outer layer of

24 the tobacco  leaf that wrap s the cigar ; isn't that

25 correct?

1  A.      I don't know.  There's a certain way that it's

2  sealed in , like , the little glass container with a cap

3  on it that seals it in there.

4  Q.      So the individual -- you're talking now about an

5  individual con tainer , not the container that the whole

6  block is in ?

7  A.      Well , the block comes in an    individual

8  containers.

9  Q.      What does a regular wrapper look like?

10  A.      I'm saying it's , like , a little tube with a seal

11  on the end.

12  Q.      For an individual cigar  ?

13  A.      Yeah.

14  Q.      And  Ms. Martin was buying these cigars by the

15  block ?

16  A.      Yeah.  By the blocks.

17  Q.      And that would be   why the government found cigars

18  at Paula's  School of  Performing  Arts on  June 1st of

19  2004 , because you and she were buying    Cuban cigars; is

20  that correct?

21  A.      I don't know what they found in her school.

22  Q.      So this call was about   Cuban cigars, not

23  marijuana ?

24  A.      This call was.  This call was.

25  Q.      So  Ms. Martin was telling you all along when she

1 said tickets, she was asking you about cigars?

2          MR. MONTEMARANO: Objection, Your Honor.

3          THE COURT:  Overruled.

4          BY MS. JOHNSTON:

5 Q.     Your understanding was that   Ms. Martin, when she

6 was talking about tickets  , was she was asking you about

7 Cuban cigars?

8 A.     We had already discussed that and    I knew what she

9 was talking about.

10 Q.     Cuba was the  only person you got   Cuban cigars

11 from; isn't that right?

12 A.     Yeah.  Him and his cousin.

13 Q.     Let's go to the next call.  Let's skip a few

14 calls here.  Go to  Call B4842, on Page 421 , which is at

15 the back of Volume  2, which you have  in front of you,

16 Mr. Goodwin.

17          Do you have that call in front of you?

18 A.     Yes.  421?

19 Q.     Yes, 421.  If we could just play the beginning of

20 that call , please , for Mr. Goodwin.

21          (Audio r ecording begins  playing  at 12 :19 p.m. )

22          (Audio recording   stops playing  at 12 :19 p.m. )

23          BY MS.  JOHNSTON:

24 Q.     You can stop it there.  So the lunch -- you use

25 the term  "lunch " here to refer to what   it was you picked

1  up from  Cuba for  Ms. Martin ; is that correct?  The word

2  "lunch " here.

3          When you told  Ms. Martin , you know when  I went to

4  pick the  lunch up for you from  Cuba , I was supposed to

5  get one for myself the next day.  You used the term

6  "lunch " as a code word in talk   ing to  Ms. Martin ; isn't

7  that correct?

8  A.      Good possibility.

9  Q.      I'm not asking you if it's a possibility.  Did

10  you actually pick up lunch for     Ms. Martin from   Cuba?

11  A.      I doubt it.

12  Q.      You felt it necessary to use a code word     "lunch "

13  instead of cigars  , if it was cigars you picked up?

14  A.      Because they're illegal  , so I wasn't going to say

15  I'm going to pick up the illegal    Cuban cigars.  She knew

16  what  I was picking up.

17  Q.      And all of a sudden  , now Ms. Martin is involved

18  in the distribution of illegal    Cuban cigars; is that

19  your testimony?

20  A.      I could have been picking up marijuana    , but  I'm

21  not sure.  It's been a long time and     I'm not familiar

22  with the conversation to that extent.

23  Q.      So now if  I understand you correctly   , "tickets "

24  in reference to   Cuba , could  also refer to drugs  , but

25  marijuana; is that right?

1          And that  "lunch" here could refer to marijuana in

2 addition to  Cuban cigars ?

3 A.      It could have been marijuana or it could have

4 been Cuban cigars.

5 Q.      Then when we go to the end of this call on Page

6 423, after you have a lengthy discussion about      Estelle

7 Brim.  Do you see the end of the part that we played on

8 Page 423?

9          Ms. Martin tells you that   Louis got tickets  , but

10 she hasn't gotten any from him yet because she hasn't

11 quite finished with the tickets that she got the other

12 day, but I know he has tickets.  You understood her

13 there in terms of   "tickets" referring to drugs, didn't

14 you?

15 A.      Page 423 ?

16 Q.      Page 423.  I know -- where  Ms. Martin says  I know

17 Louis got drugs , but I ain't got any from him yet

18 because  I'm not quite finished with the tickets that      I

19 got the other day , but I know he has tickets.  You

20 understood  Ms. Martin to be telling you that      Luis has

21 drugs; isn't that correct?

22          Mr. Goodwin can you answer my question, please?

23 A.      I guess it's a possibility.

24 Q.      Well, certainly you don't have to finish a

25 concert ticket ; do you?

1 A.       Pardon?

2 Q.       You don't finish a concert ticket   ; do you?

3 A.       She was talking about her and    Loui .  How do  I

4 know what they're doing?

5 Q.       You don't know what they're doing   , but it's a

6 possibility that tickets refers to drugs.

7          Let's go to the next day and a conversation you

8 had with  Ms. Martin on Page 425,    B48 88, in reference to

9 Louis.

10          And if we could play this transcribed portion    ,

11 please , for the jury.

12          (Audio r ecording begins   playing  at 12 :23 p.m ).

13          (Audio recording s  tops  playing  at 12 :23 p.m. )

14          BY MS.  JOHNSTON:

15 Q.       You were asking her to get a kilo of cocaine from

16 Louis, weren't you?

17 A.       Like  I told you , there was three   Luises .

18 Q.       Excuse me ?

19 A.       There's three   Luises that  I know.

20 Q.       Were you asking --

21 A.       I'm saying there were three    Luises .

22          Which Luis  here are you talking about?

23 Q.       I'm not talking about Luis  .  You are , Mr.

24 Goodwin .

25          What Luis  were you talking about in this call?

1 A.      How do I know at this time?

2 Q.      You got in touch with Luis  , because  I can sure

3 use one.  What did  you want her to get from Luis   for

4 you?

5 A.      It's according to which   Luis it was.

6 Q.      I'm asking you what it was you wanted her to get

7 from Louis for you .

8 A.      I would have to know which   Louis it was.

9 Q.      What other Louis does   Ms. Martin deal  with?

10 A.      There's three Louis.

11 Q.      What other Louis does   Ms. Martin deal with,   Mr.

12 Goodwin ?

13      MR. MARTIN:  Objection  .

14      THE COURT:  O verruled.

15      MR. MARTIN:  Foundation?

16      BY MS. JOHNSTON:

17 Q.      You know three   Luises ; is that correct?

18 A.      Yes.

19 Q.      Okay.  Luis Mangual , you know through   Ms. Martin ;

20 isn't that correct?

21 A.      Vaguely.

22 Q.      Excuse me?

23 A.      I said vaguely.

24 Q.      And the other two   Luises are Luises  you know ;

25 isn't that right  ?

1  A.      Right.

2  Q.      Okay.  Well , I'm asking you what it was you asked

3  Ms. Martin to get from the Luis    she knew .

4  A.      Well, see , one Lui I know is a plumber, and a lot

5  of times  I used to get the big snake from him.

6  Q.      Okay.  And that  Louis did you contact  ?  That

7  Louis the plumber  , through  Ms. Martin , or did you call

8  him yourself when you wanted to --

9  A.      I'd have to know which Luis    it was.

10  Q.      Mr. Goodwin , let me finish my question.

11  A.      I had another  Lui that used to sell automobiles.

12  That could have been him.

13  Q.      Let me  ask you  the question again.  In order to

14  borrow t he big snake from   Lui , the plumber , did you have

15  to contact him through    Ms. Martin?

16  A.      She used to stay in touch with him a lot more

17  than  I did at the times.

18  Q.      But you had his number  , you would have   called Lui

19  the plum ber and  asked him to borrow his big snake    ; isn't

20  that true?

21  A.      I had tr ied to  reach him but sometimes    I

22  couldn't.

23  Q.      In this call , you didn't ask her to get in touch

24  with Louis to  borrow  his big snake ; did you?

25  A.      I said it could have been that    Lui , it could have

1 been the other  Lui  that sells automobile  s.

2 Q.     The  Lui  that s ells  automobile s  is a  Lui  you dealt

3 with through your car dealership   ; isn't that  correct ?

4 A.     No.  A lot of times   -- Ms. Mart in  had a lot of

5 good contacts.

6 Q.     You had that  Lui , too , isn't that right?

7 A.     Pardon ?

8 Q.     You had that  Lui's  number , too ; isn't that right?

9 The car dealing  Lui .

10 A.     I said I knew three  Luises .  I would have to know

11 which one  we're  talking about.

12 Q.     In this call, you said, because    I can sure use

13 one and see if -- you want her to see if she can bring

14 one that evening.  What was it you were asking for?

15 A.     I would have to know which    Lui .

16 Q.     Maybe if we listen ed to  the next call that

17 happens immediately after this call,    B4888 , on Page 425

18 at 1548 to 1550  .  If we go to  the next call,  B48 90 on

19 Page 426 , perhaps this call between    Ms. Martin and Luis

20 will refresh your recollection as to what you were

21 calling about.

22        Please play the next call.

23        (Audio r ecording begins  playing at 12 :27 p.m. )

24        (Audio recording   stops playing at 12 :27 p.m. )

25        BY MS.  JOHNSTON:

1  Q.      Does that refresh your recollection as to which

2  Luis it was?

3  A.      Not necessarily because she said my brother.

4  Q.      Your brother?

5  A.      She referred to quite a few of us as her brother.

6  Q.      Even though it happened immediately after the

7  call when you asked her to call    Lui and get one thing ,

8  it could have referred to any other people; is that

9  right , Mr. Goodwin ?

10          MR. MONTEMARANO : Objection , Your Honor .

11          Foundation.

12          THE COURT: Overruled.

13          MS. JOHNSTON:  You may answer.

14          MR. MONTEMARANO : May we be heard at the bench

15 please ?

16          MS. JOHNSTON:   I will withdraw the question to

17 save the problems.

18          MR. MONTEMARANO : Objection , Your Honor.

19          THE COURT: The question is withdrawn.

20          MR. MARTIN:   Your Honor , I renew the motion    I

21 made earlier when   I approached the bench.

22          THE COURT: Your motion is denied.

23          MS. JOHNSTON:   Your Honor , I am moving along in

24 terms of the calls.

25          BY MS. JOHNSTON:

1 Q.      If we could go the   next call , which happens at

2 15:52 minutes.  So it's within three minutes of the

3 first call we played when you asked her to get in touch

4 with Luis , and play this for   Mr. Goodwin and the jury on

5 Page 427.

6           (Audio r ecording begins at 12  :29 p.m. )

7           (Audio recording   stops at 12 :29 p.m. )

8           BY MS.  JOHNSTON:

9 Q.      When Ms. Martin said to you she just got     Lui and

10 he sold the last   Alicia Key's autobiography , you

11 understood her to be referring to drugs    ; isn't that

12 correct?

13 A.      It seems like she's talk   ing about the auto

14 biography.

15 Q.      When was it you asked her to get a book from      Lui

16 for you?  When was it you asked her to get a book from

17 any of the three   Luises for you?

18 A.      I don't recall at this time.     It's not

19 impossible.   Do you recall everything that happened

20 three year s ago?   I sure don't.

21 Q.      Let's go on , then , to another call,   Mr. Goodwin.

22 Why don't we go on to B5 530 and 5 531 on Page 450 in the

23 last book, please.  Going to    B -- call B5530 on Page

24 450.

25           Do you have that call in front of you?

1          Mr. Goodwin, do you have that front of you  ,

2   please, Page 450,   Call B5530?

3   A.     Yes.

4   Q.     Okay.  If we could play that very brief call for

5   Mr. Goodwin.

6          (Audio r ecording begins  playing  at 12:31 p.m. )

7          (Audio recording   stops  playing  at 12:31 p.m. )

8          BY MS. JOHNSTON:

9   Q.     So if I understand correctly   --

10         MR. SUSSMAN :  I apologize,  Ms. Johnston .

11         Judge, could  I approach the bench briefly on an

12   individual matter?

13                   (At the bar of the Court.)

14         MR. SUSSMAN :  I'm sorry .  My client  is very

15   uncomfortable  and needs a quick bathroom   brea k.  I will

16   waive her presence , if she can excuse herself for about

17   five minutes.   I know you're a federal judge  , but this

18   is what happens.

19         MS. JOHNSTON:   Whatever  the Court wants to do.   I

20   -- it's not relating to her  , so the government doesn't

21   have an objection .  She's allow ed to le ave and come

22   right back , if the Court --

23         THE COURT:  S he's hearing this .  I'm assuming

24   that she's voluntarily waiving her presence.

25         MR. SUSSMAN :  That's correct , sir , and I will

1  represent that.

2        THE COURT:  Please confirm that.

3        MR. SUSSMAN:  I will.

4        THE COURT:  Yeah.

5               (Back in open court.  )

6        BY MS. JOHNSTON:

7  Q.      In the call, you were asking her if she had any

8  tickets; is that correct?

9        On Page 450, 5530  , do you see that call?

10 A.      Okay.

11 Q.      And she says she is going to call    Lui, and you

12 say that  Cuba just called you; is that correct?

13 A.      Yes.

14 Q.      You weren't getting   Cuban cigars from  Lui through

15 Ms. Martin ; were you?

16 A.      No.

17 Q.      And then if we go to the next call, B5531.      Ms.

18 Martin , I think , calls you right back and she asks    -- do

19 you have  Call 5531 on Page 452 in front of you?

20        Do you have that?

21 A.      Yes.

22 Q.      On Page 452 , she asks you if  Cuba will fix up

23 half a sheet cake; is that right?

24 A.      Right.

25 Q.      Are you going to tell us that that means half an

1 order of  Cuban  cigars?

2 A.      No, it  probably  was marijuana.

3 Q.      So it was drugs?  You will agree with that?  A.

4 It could have referred to cigars.      How can  I be sure?

5 Q.      Okay.  Well , let me go to one -- skip several

6 calls .  Let me go to one final call, B2581   , which is on

7 Page 27 6, which is going to be in   Book  2.   I apologize ,

8 I did go out of order.

9        THE  COURT:  27 6, you said ?

10       MS.  JOHNSTON:  On   Page 27 6, Your  Honor , in Book

11 2.

12       BY MS.  JOHNSTON:

13 Q.     This call occurs on   April  2nd of 2004?  You were

14 in contact  with  Mr.  Thurman during this time period    ;

15 isn't that correct?

16       Mr.  Goodwin,  I'll give you a chance to get to the

17 call.  It's Page 27 6 in  Book  2, Call  B2581.  Do you have

18 it in front of you,   Mr.  Thurman (sic) ?

19       Do you have the call in front of you?

20 A.     Yes, yes.

21 Q.     I mean  Mr.  Goodwin.   I'm sorry .

22       It's a call between you and    Mr.  Thurman; isn't

23 that correct ?

24 A.      Right.

25 Q.     If we could play this call, please.

1          (Audio recording begins playing at 12   :36 p.m. )

2          (Audio recording   stops  playing  at 12 :37 p.m.)

3          BY MS.  JOHNSTON:

4  Q.      That was you calling   Mr. Thurman my man ; wasn't

5  it?

6  A.      Yes.

7  Q.      Okay.  And it was you who asked him about

8  exchanging  the clothes in   Mexico;  isn't that right?

9  A.      Yeah .  That's where he bought the marijuana from   .

10  Q.      And it was you who asked him if they were

11  exchanging the clothes  ; isn't that correct?

12  A.      That that's when he exchange   d the money for the

13  marijuana.

14  Q.      And now you're telling the ladies and gentlemen

15  of the jury that it's marijuana, not cocaine, as       Mr.

16  Thurman testified about;   is that correct ?

17  A.      That's Mr. Moore.  Mr. Moore was with him.  Why

18  didn't he bring  Mr. Moore?  Mr. Moore was with him.  He

19  could testify to that fact.  Why didn't they find it

20  when he was arrested?  That's all they found was

21  marijuana.  What was it marijuana, two guns, and what

22  was it, $2,000?   So, where was the cocaine?

23  Q.      Mr. Goodwin, the trip you're referring to was the

24  trip he was arrested on in   Orange  County , Texas in

25  January  of 2004 when he was a  rrested with  the guns and

1 marijuana.

2         Do you recall the testimony from that      Orange

3 County , Texas trooper who testified about that incident

4 in January of 2004?  Not after this call.

5         Do you recall the testimony of the      Orange  County

6 -- do you recall the testimony of the      Orange  County

7 Texas trooper who said that he arrested      Mr.  Thurman in

8 January of 2004 with the two guns and the marijuana in

9 the truck?

10 A.      Mm-hmm.  But when   did he get arrested with

11 cocaine other than after    I was already arrested  ?

12 Q.      When he was in   Texas -- you heard his testimony

13 that he was in   Texas and went to   El Paso  waiting  on Mr.

14 Kelly .  He took the bad cocaine back to him.

15         Do you recall his testimony about that    , Mr.

16 Thurman (sic) ?

17 A.      I'm saying  I didn't see where he was arrested

18 with no cocaine , just marijuana.

19 Q.      Mr. Thurman  (sic), do you recall the testimony of

20 the detective from    Louisiana -- strike that.

21         Do you recall the testimony of     Mr.  Thurman that

22 at the time of his call  , he was in   Texas awaiting to

23 exchange your bad cocaine for good cocaine in      El Paso,

24 Texas?  Do you recall that testimony?

25 A.      No.

1  Q.       You don't recall   Mr. Thurman saying that?

2  A.       No.

3  Q.       You do agree that he was in    Texas and that you

4  asked him about exchanging the clothes    ?

5  A.       Right.

6  Q.       And exchanging the clothes referred to the drug

7  transaction ; isn't that right?

8  A.       Referred to exchanging the money for the

9  marijuana.

10  Q.       So Mr. Thurman was wrong when he said it was

11  cocaine.  You agree it was marijuana because       Mr. Thurman

12  had gotten arrested with marijuana; is that correct?

13  A.       That's all  I dealt with with   Mr. Thurman was

14  marijuana.

15  Q.       So Mr. Thurman testified truthfully about the

16  fact that he was involved in drug dealings with you      , but

17  he was wrong about which drug it was.  Is that your

18  testimony?

19  A.       That's what  I'm saying .  He only dealt with me

20  with marijuana.

21  Q.       And it was you who asked him about exchanging the

22  clothing in  Mexico ; is that correct?

23  A.       That's right.  Changing the money for the

24  marijuana.  This is what he said    , where he said he use  d

25  to get it from.

1  Q.       Court's indulgence.

2          MS. JOHNSTON:    I don't have any other questions    ,

3  Your  Honor.

4          MR.  MARTIN:  No redirect.

5          THE COURT:  You may step down,    Mr. Goodwin.

6          (Witness excused at 12  :41 p.m. )

7          THE  COURT:   Are you ready to begin?

8          MR.  MONTEMARANO :  May  I approach,  Your  Honor ?

9          THE  COURT:  You  may approach .  Sure.

10              (At the bar of the Court.)

11         MR.  MONTEMARANO :   I would ask the jury be ex   cused

12 for five minutes and    I can go out and make a call to

13 make sure  Mr.  Shannon is here , and I'd like to use the

14 lavatory.

15         MS.  JOHNSTON:    I don't know if there are any

16 documents  that counsel is going to be using with     Mr.

17 Shannon .  We have received a copy of a few documents    , so

18 I don't know which ones he's planning to use with him     ,

19 so that we could get a copy to review so we can make

20 sure w e have a  chance.

21         THE  COURT:   Counsel,  let me tell you , my

22 situation is  I have a judge 's meeting at  1:00.  Because

23 we are going  to 6:00  today , I had  a telephone status

24 conference that was scheduled at      5:00 or 5 :30, and I

25 rescheduled it for 5  :45, so I would miss part of the

1  judge's meeting anyway.    Maybe it's a good solution to

2  take a five- minute break,  and then go until five or ten

3  minutes after  1:00,  then I will  make a cam eo appearance

4  in the  judge 's meeting , then to do a status conference

5  and then  come back.

6           MS. JOHNSTON:  W ell, your Honor , I would  ask  that

7  Mr. Goodwin rest and conclude his case at this time.

8           MR. MARTIN:   I was  going to do that.

9           MS. JOHNSTON:   I would ask that before    Agent

10  Sakala is called , that  Mr. Montemarano  rest his case ,

11  too, so it's a clear break that    Agent Sakala is not

12  being called as a witness in anyone's defense.

13          MR. MARTIN:  Yeah,  Mr. Goodwin rests.

14          THE  COURT:  Mr. Goodwin rests.  And you're re   ady

15  to proceed ?

16          MR. MONTEMARANO :  As soon as  I talk to  Mr.

17  Shannon.

18          THE  COURT:  We will take a five   -minute recess .

19  Do not  discharge the prisoners out of here    .  Let them

20  stay here , and  I'll be back in precisely five minutes.

21          MS. JOHNSTON:   Your Honor , the other thing is we

22  have not gotten a redacted book of the redacted calls     ,

23  and we will be getting to    the m after lunch.  We need

24  that to go through it.  Not that we believe anything

25  unsavory  would be done by defense counsel, b    ut we would

1 like to  go through it.

2        MR.  MONTEMARANO :  I have  been sitting there --

3 Ms. Johnston probably noticed -- pulling the dead pages

4 out of the books  .  I am just about done with that   , and

5 then we have my inter  weaving and  Mr. McKnett 's.  Or we

6 can hand them the interweaving pages and they can inse      rt

7 them themselves.    I have  no reason  to think they

8 wouldn't get them by lunchtime.

9        THE  COURT:   I'm going t o tell the jury what we're

10 doing.

11                  (Back in open court.  )

12        THE  COURT:  Ladies and gentlemen   , a little

13 scheduling update  .   I have a weekly judge  's meet ing that

14 begins at  1:00 .  In order to make this day go to    6:00, I

15 had a  status conference that    I was going to do at 5  :30

16 that  I'm going to do at 1  :45, so I'm going  to miss part

17 of the judge's meeting anyway.

18        So, we're going t o take a five -minute  break so

19 Mr. Montemarano  can get his next witness out in the

20 hallway.  We will then go until five or ten minutes

21 after  1:00,  and then we will break until about 2    :15.

22                  (Jury excused at 12:44 p.m.)

23                  (Off  the record  at 12 :44 p.m. )

24                  (On the  record at 12 :51 p.m. )

25        MR.  MONTEMARANO :  Ms. Merez , if you would wait a

1  moment, please.  He's not out there.

2         THE COURT:  Not out there ?

3         MR. MONTEMARANO :  I called his cell phone and got

4  voice mail.

5         THE COURT:  Do you have another witness?

6         MR. MONTEMARANO :  No, he's it.

7         MS. JOHNSTON:  Why don't we go to    Sergeant  Sakala

8  for his  cross- examination, and then   Mr. Montemarano   can

9  start his case after.

10         MR. MONTEMARANO :  I have my phone on vibrate in

11  my pocket , so if it goes off  , I will ask to break or we

12  can go until 1 :10 or 1 :15, whatever  Your  Honor wants to

13  do.

14         THE COURT:  I was having a mental lapse.  The

15  conference  I thought  was being mov ed to  1:45 has been

16  move d to  6:00 .  So,  I don't have that.

17         MS. JOHNSTON:   Your  Honor , I don't want to break

18  up Agent  Sakala's  recross -examination.

19         THE COURT:  Why don't we do this?  We'll break

20  until  2:00 .

21         MR. MONTEMARANO :  Fine , Your  Honor .  We will have

22  all the books ready  .

23         THE COURT:  You will get your acts straightened

24  out.  W e will find this guy.

25         MS. JOHNSTON:  We would like to take a book and

1  just go through it  .  We would like a book to review over

2  lunch that's been edited.

3      THE COURT:  Can you please provide that to the

4  prosecution ?

5      MR. MONTEMARANO :  Your Honor, five minutes ago  ,

6  before I went to the men  's room , I told  Ms. Johnston

7  that.  I don't know what my explanation    -- we're almost

8  done with that  .  We will deal wit h it .

9      THE COURT:  Give  it to her so she has it well in

10  advance of  2 o'clock.

11      MR. MONTEMARANO :  Absolutely.

12      MS. JOHNSTON:  That's all   I wanted was to get it

13  before lunch , before we come back at   2:00  so we can go

14  through it just a  s a second backup.

15      THE COURT:  Counsel , do you want to --   I'll do

16  2:00 .  I'm tired .  I've got to have five minutes in

17  chamber s.  Tell the jury  2 o'clock , Bea.

18      Counsel , why don't you be   back here  at 1 :55?

19  I'll be back on the bench   at 1:55.

20          (Off the record  at 12 :53 p.m. )

21          (On the record at 2  :05 p.m. )

22      MR. MCKNETT :  Your Honor, before the jury comes

23  in, I would like to make a motion for the record   .  I'd

24  like to make a  Motion for  Severance on behalf of my

25  client,  LaNora  Ali and  --

1          COURT  REPORTER:  Y ou're going   to  have to speak
2 up, Mr.  McKnett .
3          THE  COURT:  Just pick up the microphone.
4          MR.  MCKNETT :  I didn't  know it  was on.
5          THE  COURT:  You can pick it  up  , can't  you?
6          MR.  MCKNETT :  Your  Honor , I've been told that the
7 battery  may be dead  in this one   .  I will shout.
8          THE  COURT:  Project.
9          MR.  MCKNETT :  Your  Honor , I wish to make a   Motion
10 for Severance on behalf of my client,    LaNora  Ali,  and  I
11 will apo logize  in advance to   Mr.  Goodwin , but the basis
12 of the motion is that   I found that  Mr.  Goodwin's
13 testimony was inherently incredible    , and  I make the
14 motion based on spillover effect     that testimony will
15 have with regard to my client when she should testify       ,
16 that the jury will view her already with a jaundiced eye
17 because of what they  've heard yesterday and today.
18          MR.  HALL:  Your  Honor , I'd ask t o join in  Mr.
19 McKnett 's motion for the same reason   .  Although my
20 client has already testified   , I would suggest to the
21 Court that that doesn't change any client's position vis
22 a vis  Mr.  Goodwin's testimony.
23          MR.  SUSSMAN :  I would also join in that   , although
24 my reasoning is somewhat different.      I don't , at this
25 point , believe that   Ms. Harden  will testify, but her

1  lack of testimony may well be    -- despite what the   Court

2  instructs the jury , there may be a sense that her

3  testimony would echo testimony that they heard before      ,

4  which for the reasons   Mr. McKnett  articulated , I will

5  not --  I think compromises a fair trial   .

6        MR.  WARD:  A nd Your Honor , Ms. Dobie wishes to

7  join in the motion as well   .

8        THE  COURT :  Ms. Johnston ?

9        MS.  JOHNSTON:    Your  Honor , we oppose the motion.

10 First of all , the Court will give an instruction that    no

11 inference should be drawn because of    Ms. Harden's

12 decision not t o testify.  Secondly,    Mr. Goodwin did not

13 mention  Mr. Whit ing or Ms. Dobie or   Ms. Harden  and Ms.

14 Ali.  He just mentioned that he had seen her at    Ms.

15 Martin's house, so there's no possible spillover effect

16 concerning   Mr. Goodwin's testimony  .

17        Inasmuch as defense counsel may have ass   ess ed his

18 credibility that   Mr. Goodwin's testimony, in the way

19 that they have, that doesn't mean that's for the jury --

20 I think  the  Court will appropriately instruct the  jury.

21 It's not a bas is for  a mistrial .

22        THE  COURT:  C ounsel , I've considered your motions

23 and will deny them.    I don't believe that the

24 circumstances described compel or even would make it in

25 my sound discretion at this late date to sever      partie s

1  for separate trials.    If that were the law  , then every

2  time any defendant testifies in a multi    -defendant trial ,

3  there would be an in  effective  motion depending on

4  somebody's subjective assessment of how one defendant's

5  testimony went , and I don't think that's the standard    ,

6  and I accordingly deny the motion.

7       Now, let me make sure   I have the  --

8       MR. MCKNETT :  Your Honor , excuse me.   Mr.

9  Montemarano's  witness is in the courtroom.

10      THE COURT: We're going t  o call him now.

11      MR. MCKNETT :  I didn't know if the   Court's

12  comments would cause him to be outside of the courtroom.

13      THE COURT:  No, that's just a ruling on a legal

14  motion.  Now, if  I'm correct, as we stand here right

15  now, Mr. Goodwin has rested.

16      MS. JOHNSTON:   I don't know that he has rested   ,

17  Your Honor.

18      MR. MARTIN:   I did when we came  up to the bench  I

19  said.

20      THE COURT: When he came to the bench  , he rested.

21      THE COURT: We have --  Mr. Whit ing has rested;

22  correct?

23      MR. HALL: Correct , Your Honor , subject to the

24  proviso that we made  .

25      THE COURT:  Mr. Mitchell , you have rested ?

1          MR. MITCHELL:  Same.  Yeah, correct.  Subject to

2 crossing  Sergeant  Sakala .

3          THE  COURT:  A nd Ms. Dobie has rested  ?

4          MR.  WARD:  E xcept for  --

5          THE  COURT:  Subject to further cross, yes.  So

6 we're now down to the remaining three cases of       Ms.

7 Martin,  Ms. Harden  and  Ms. Ali ; correct?  Any reason why

8 I shouldn't tell the jury that so they know where we

9 are ?

10          MS. JOHNSTON:   Your Honor , just so the  Court

11 differentiates   Agent  Sakala  is not --

12          THE  COURT:  Oh,  I will.   I will.

13          MS.  JOHNSTON:  The other issue is    -- I have

14 another issue to raise with the    Court before   Mr.

15 Montemarano   calls his opinion witness.

16          THE  COURT:  All right.

17          MS.  JOHNSTON:   I don't know if he intends to use

18 it , but he included in some documents    , he gave us the

19 Last Will and  Testament  of Lucille  Christine  Lawson  and

20 the program.  So if he's not using them     , I don't have an

21 issue with them.    You didn't give  me any , and I would

22 like to get documents  , Your  Honor , before the witness is

23 due on the witness stand.

24          THE  COURT:  Give her the documents now    , Mr.

25 Montemarano .

1          MR.  MONTEMARANO :   I think  I took the government's

2  copy and moved them somewhere    I can't find.  If the

3  Court will give me just a moment, please.  Court's

4  indulgence, please.    I'm try ing to keep two balls in the

5  air at the same time.

6          THE  COURT:  All right.

7          MS.  JOHNSTON:   I'm going to object to a funeral

8  program for  Lucille  Lawson.   I am going to object to a

9  funeral program for   Alice  Payne .

10          MR.  MONTEMARANO :  Mary  Alice.

11          MS.  JOHNSTON:  Mary  Alice  Payne .  It has nothing

12  to do with  Ms. Martin.  Don't care if -- if there are

13  some financial documents counsel wants to get in    , but

14  the funeral are   --

15          THE  COURT:  What's  --

16          MR.  MONTEMARANO :  The attorney   -- Mr.  Shannon is

17  going to --

18          THE  COURT:  I f you're going to describe that, why

19  don't you have  Mr.  Shannon step out.

20          MR.  MONTEMARANO :  Mr.  Shannon,  will you step out

21  of the courtroom for  just a moment, please?

22          May it please the  Court.   Mr.  Shannon will

23  testify that the -- court's indulgence.

24          THE  COURT:  Let me ask you this  , Mr.  Montemarano :

25  If  I understand what your comments have been previously

1 is that he is an   attorney , has some connection to an

2 estate , the administration and distribution of which

3 resulted in the -- some substantial bequest to your

4 client ; is that correct  ?

5        MR.  MONTEMARANO :  That's correct  , Your  Honor.

6        THE  COURT:  Why do we need funeral    --

7        MR.  MONTEMARANO :  My client is referenced as    a

8 loving  Goddaughter   in one , as a close friend in the

9 other,  and I think  it is going to   establish this

10 relationship   is reasonable and appropriate.

11        THE  COURT:  It's pretty   close  if you get money

12 from their estate  , I mean , by definition.

13        MS.  JOHNSTON:   Your  Honor , a description of

14 someone as a loving friend or associate in a funeral

15 program is inadmissible hearsay    and  it's irrelevant

16 character evidence in this case.

17        Ms. Martin is not going to testify    , has no

18 business being put before the jury in terms --    I have no

19 objection if there is some estate documents    , although  I

20 haven't seen them.

21        THE  COURT:   I will sustain the government's

22 objection to the   two programs  -- or grant their   Motion

23 in Limine preclud ing the two funeral programs   .  You're

24 more than happy to put on substantial evidence through

25 this attorney , through the distribution of significant

1 monies to your client.

2        Ready to proceed?  This jury is    expecting to  be

3 in here ten minutes ago.

4        MS. JOHNSTON:   I appreciate that , Your Honor.  I

5 I'm just getting the documents from    Mr. --

6        MR. MONTEMARANO :  She is getting the norm  al

7 exhibit numbers .  I will tell the  Court what they are.

8 There are three  pages, three exhibits,   each of two

9 pages, front and back, of six checks written from    Mary

10 Payne Trust, to  Paulette  Martin --

11        MS. JOHNSTON:   I don't have no objection to

12 those.

13        THE COURT:  There is no objection.

14        MR. MONTEMARANO :  Thank you , Your Honor.

15        THE COURT: Ladies and gentlemen   , I have received

16 a chart  from the jurors as to their availability.    I am

17 interpreting it.   I will  let you know.

18        THE COURT:  Bring the jury in.

19        MS. JOHNSTON:   Your Honor , may we approach the

20 bench while the jury is coming in   ?

21        THE COURT:  Yes .

22           (At the bar of the Court.)

23        MS. JOHNSTON:   I'm objecting to this let  ter from

24 Mr. Shannon  to Mr. Biddle, who represented   Ms. Mart in in

25 regards to her forfeiture allegations in this case.     I

1  don't think this letter is at all relevant.  M    r. Shannon

2  can testify as to his business relationship.

3         THE COURT:  Why is  that?  I've looked at the

4  letter .  Why does that need to come in  ?

5         MR. MONTEMARANO :  This is a letter he wrote to

6  Mr. Biddle in an unrelated matter.  It was civil versus

7  criminal.  It lays out in outline form what he will

8  testify today on his letterhead.     I think this is

9  persuasive --

10        THE COURT:  L et's hear his testimony.

11        MR. MONTEMARANO :  That 's fair enough , Your  Honor.

12        THE COURT:  For the record  , what is that number  ?

13        MS. JOHNSTON:  That exhibit is    Paulette  Martin

14  Exhibit  No. 11.

15             (Jury returns at 2  :14 p.m. )

16        THE COURT:  Let me give you a little update,

17  ladies and gentlemen.  We had a     little change in plans.

18  As of right now, to give you an idea as to the progress

19  of this case,  subject to the recalling of    Sergeant

20  Sakala  for some additional   cross- examination , which you

21  shall consider to be part of the government's case      , the

22  defendants have rested as to the defendants        Goodwin,

23  Whiting,  Mitchell,  and Dobie , and the  remaining defenses

24  you have not yet heard and you are about to hear are

25  from  Ms. Martin , Ms. Hard en, and Ms. Ali, and we will

1 now hear the defense case presented by    Mr.  Montemarano

2 for  Ms. Martin , and we seem to be proceeding reasonably

3 close to on pace  .

4          So with that , you may proceed.

5          MR.  MONTEMARANO :  Thank  you, Your  Honor.   Ms.

6 Martin would  call    Matthew  Shannon,  Esquire.

7 Thereupon,

8                          **MATTHEW   SHANNON** ,

9 having been called as a witness on behalf of     the

10 Defendant,  Paulette  Martin , and having been first duly

11 sworn by the Courtroom Deputy, was examined and

12 testified as follows:

13                     <u>**DIRECT   EXAMINATION**</u>

14          BY MR.  MONTEMARANO :

15 Q.      Good afternoon , Mr. Shannon .  How are you ?

16 A.      Very well .

17 Q.      Could you please  give your name , spelling your

18 last name and your business add   ress to the court

19 reporter ?

20 A.      Matthew  Shannon , S H A N N O N.  Business add  ress

21 is 1420  N Street , Northwest , Suite 308 , Washington, D .

22 C.  ZIP Code is 20005.

23 Q.      Good afternoon,  Mr. Shannon .  How are you?

24 A.      Good afternoon.

25 Q.      Your business address you just gave to the ladies

1 and gentlemen of the jury.

2          Can you please tell us what sort of business

3 you're in?

4 A.      I'm an attorney.

5 Q.      How many people in your firm?

6 A.      It's just three of us.

7 Q.      What kind of work do you do?

8 A.      Probate and real estate.

9 Q.      How long have you been in practice?

10 A.      Thirty-one  years.

11 Q.      Where are you admitted to practice   ?

12 A.      In the state of   Connecticut and in the    District

13 of Columbia.

14 Q.      Can you give us a bit of your professional

15 qualifications , where you went to school, et    cetera?

16 A.      Yes.  I went to  Howard  University,  Tuskegee

17 Institute and  Advanced  Studies up at  Harvard  Law  School.

18          THE CLERK:  I'm sorry.  Could the witness move   up

19 to the mike a little closer , please ?

20          THE  WITNESS:  I can speak up .  I didn't  want to

21 say it too loud.   Can I speak up ?

22          BY MR.  MONTEMARANO :

23 Q.      When you go to  Harvard , you don't have to speak

24 up.

25 A.      Well , I did some further study  , but I did  not

1 take a degree from there, sir.

2 Q.      I would like to invite your attention to    ,

3 perhaps , a period of about  , let's say , up to and

4 including the year 2000.

5        During that time  , did you have calls from a woman

6 by the name of  Mary  Alice  Payne ?

7 A.      Yes , I did.

8 Q.      Can you describe the nature of your relationship

9 with Ms.  Payne  to the ladies and gentlemen of the jury?

10 A.      She was a  lady that  I met when  I was  in

11 undergraduate school  , and I subsequently represented her

12 in a few matters  .  Later in her life  , I did estate

13 planning for her.

14 Q.      Can you describe  , based upon your personal

15 knowledge , what sort of -- what was the nature of     Ms.

16 Payne 's life?  Was she in business?  Was she     married, et

17 cetera?

18 A.      I don't know personally whether or not she was

19 marrie d.  I never did ask her that question    , but she was

20 a business person who operated a clothing and fur

21 boutique.

22 Q.      Where would this boutique have been located?

23 A.      Originally , it was located in the old     Dumbarton

24 Hotel at  15th and  U Streets , Northwest .  Then it was

25 subsequently moved to her residence in the --     I believe

1  it was 1200 block of   Fairmont  Street,  Northwest ,

2  Washington, D. C.

3  Q.     What caused her to move from    Dumbarton  to

4  Fairmont ?

5  A.     To hear her tell it  , she said that the business

6  dried up because when   U street -- when integration came

7  in, U street businesses did not flourish any longer     , so

8  she had to find a new location.

9  Q.     Would  I be  correct in understanding that    Ms.

10  Payne  was an  African-American?

11  A.     Yes.

12  Q.     Did there come a time when she closed the shop on

13  Fairmont  Street?

14  A.     Yes.

15  Q.     Can you t ell us where she moved the contents --

16  okay.  Before   I get to the second   move .

17       What kind of things did she s   ell from this

18  business ?

19       MS. JOHNSTON:  O bjection.

20       Unless the witness has a basis and knowledge.

21       BY MR.  MONTEMARANO :

22  Q.     Do you have an  understanding of what she   sold

23  from the business  ?  Yes or no?

24  A.     Yes , I do.

25  Q.     Can you tell us what the basis of your knowledge

1  is from?

2  A.      There were clients of mine   , as well as even my

3  own wife purchased suits and hats and some accessories

4  and also a fur from   Mrs.  Payne .

5  Q.      So we're clear, this is based on your personal

6  knowledge; correct, sir?

7  A.      Oh, yes.

8  Q.      You visited the store  ?

9  A.      Oh, yes.

10 Q.      You visited the   Dumbarton  location?

11 A.      The  Dumbarton  location , I did not, no.  She told

12 me about the   Dumbarton  location.

13 Q.      Fairmont ?

14 A.      Fairmont , I did  visit there and did  make some

15 purchases for my wife.

16         MS.  JOHNSTON:   Your  Honor , could w e have  a time

17 frame ?

18         THE  COURT:  Y es, get a  set time frame.

19         BY MR.  MONTEMARANO :

20 Q.      Could you tell us   about  when she  move d from

21 Dumbarton  to Fairmont , roughly?

22 A.      No , I don't know.

23 Q.      Could you tell us when she closed     Fairmont ?

24 A.      Yes .  I believe  it was either 1999 or 2000.  It

25 was in the last 18 months of her life.

1  Q.      When she moved  from Fairmont , where did she  move ?

2  A.      To Ms. Martin 's residence on  Bexhill  Court.

3  Q.      Ms. Martin?  What's her full name   ?

4  A.      Paulette  Mart in.

5  Q.      Look around the courtroom.    Do you see Ms.

6  Martin?

7  A.      Yes , I do.

8  Q.      Can you describe what she's   wearing  and where she

9  is sitting in  locat ion to where  I'm sitting?

10  A.      She is  wearing a black top, and she's seated next

11  to where you're standing.

12          MR. MONTEMARANO :  For the record , indicate that

13  he's id entified  the defendant,   Paulette  Martin .

14          THE COURT:   The record will so indicate.

15          BY MR.  MONTEMARANO :

16  Q.      Did you visit -- you say she moved to     Paulette

17  Martin's home.   Can you tell us where that address was,

18  where the home was located?

19  A.      You mean the  Bexhill  Court address?    I don't know

20  the precise number  , but I know it was   Bexhill  Court , and

21  I've driven  there to visit  Ms. Payne .  It's off of

22  Adelphi  Road.

23  Q.      Okay .

24  A.      In Prince  George's  County, Maryland.

25  Q.      So outside the district?

1  A.      Yes, it is.

2  Q.      How many times  did you visit the  Bexhill  Court

3  address?

4  A.      Probably a half a dozen times.    Ms. Payne  became

5  ill and could not stay in her home because there were a

6  lot of step s in her home , and she subsequently move  d to

7  Ms. Martin's home.

8  Q.      Did there come a time when   Ms. Payne  ultimately

9  passed away?

10  A.      Yes.

11  Q.      Could you tell us about how old she was when she

12  passed?

13  A.      Eight-nine  years old.

14  Q.      Thank you.  Prior to her passing, did you have

15  cause to draft any documents relating to the transfer of

16  her property?

17  A.      I did.

18  Q.      Showing you what's marked as    Defense  Paulette

19  Martin  No. 7 .

20          Do you recognize this document   , sir?

21  A.      Yes, I do.

22  Q.      Can you tell the ladies and gentlemen of the jury

23  what it  is?

24  A.      It's a gift letter which   I prepared for  Ms.

25  Payne .

1  Q.      What would the substance of the gift letter be?

2  What would it mean in layman's terms?

3  A.      It conveys title to personal property from one

4  person to another.

5  Q.      And so the ladies and gentlemen of the jury

6  understand, can you define the difference between

7  personal property and real property  , which is a term

8  they may have heard before?

9  A.      Certainly.  Real property is property by which

10  title was transferred by deed.  Personal property is

11  usually transferred either by a bill of sale or a gift

12  letter , or if you have possession of it, it's presumed

13  that it's yours.

14  Q.      Okay.  And this was drafted on or about when    ?  Or

15  signed on or about when   , if you can tell us?

16  A.      Yes.  It was drafted and signed during the first

17  week of  April of 2000.

18  Q.      Okay.  Subsequent to that gift letter, did you

19  have cause  to draft another agreement relating to the

20  disposition or the ownership of    Ms. Payne 's assets?

21  A.      Yes, I did.

22  Q.      Showing you what's marked as    Defendant  Martin's

23  Exhibit 8 .  Do you recognize this document   , sir?

24  A.      Yes, I do.

25  Q.      Can you tell the ladies and gentlemen of the jury

1 what it is?

2 A.      It's a living trust agreement.

3 Q.      Again in layman's terms, that would help me   , too ,

4 because  I didn't like that kind of stuff in law school.

5 Explain a living trust to the ladies and gentlemen of

6 the jury in layman's terms.

7 A.      A living trust is an   alternative  distribution of

8 whatever assets a person owns as an alternative to a

9 will , which then has to be filed with the probate court

10 and subsequently authority granted to whomever is

11 nominated in order to convey that real property or

12 property personal  , mixed and real.

13 Q.      Based upon your personal knowledge, what property

14 was covered by this   living trust  agreement?

15 A.      Ms. Payne  intended to cover all of her property

16 by the  living trust.

17 Q.      This is based upon your discussions with her as

18 her attorney?

19 A.      Yes.

20 Q.      What kind of property -- you just said all.  Can

21 you tell the ladies and gentlemen of the jury what      "all"

22 subsumes in relation to   Mary Alice  Payne ?

23 A.      At this time , let's see.  On the -- let me look

24 at the date.  On the 27th of    July, it just involved

25 personal property.  There was some funds in the bank and

1   there were some residual funds in the estate of       Lucille

2   Austin , which needed to be dispersed to       Mary  Payne .

3   Q.        Who would  Lucille  Austin have been?

4   A.        Lucille  Austin was a friend of many years of       Mary

5   Payne  who bequeathed most of her       estate  to Mary  Payne .

6   Q.        Can you  give  us a rough  idea  , if you recall  ,

7   about -- of the approximate value of       Ms. Austin's

8   estate ?

9           MS.  JOHNSTON:   Objection  , relevance to the value

10  of  Ms. Austin's estate.

11          MR.  MONTEMARANO :  This goes to the amount of

12  funds  Ms.  Payne  may have had to distribute herself.

13          THE  COURT:   Overruled.

14          THE  WITNESS:   I believe the residual -- that is

15  the portion of the estate that went to       Ms.  Payne  was

16  about $39,000.

17          BY MR.  MONTEMARANO :

18  Q.        Okay.   Now, you say that at the point of this

19  living trust execution by   Ms.  Payne,  that there was some

20  personal property   and funds , including funds from the

21  Austin estate ; is that correct  , sir?

22  A.        That's correct.

23  Q.        You also describe that there was a fair amount of

24  merchandise being held at the       Bexhill  Road -- Bexhill

25  Court add ress , Ms. Martin's add ress at the same time; is

1  that correct , sir?

2  A.      That's correct .

3  Q.      Would I be  correct in understanding the gift

4  letter, Defense 7, would have disposed of the ownership

5  of that property?

6  A.      It would have disposed of the ownership -- well

7  --

8  Q.      Or transfer red the  ownership of the property?

9  A.      Can I --

10  Q.      Please.

11  A.      What happened,  Ms. Payne had a choice to make as

12  to whether or not she wanted to do a schedule and attach

13  it to the living trust  , or to do a gift letter to   Ms.

14  Martin , and she opted to do the gift letter so that the

15  property would be transferred inter    vivos; that is ,

16  while she was living rather than after she passed away.

17  Q.      How long had  Ms. Payne been in business , that

18  you're aware of , that led to this property that was

19  transferred to  Ms. Martin?

20  A.      It had to have been 30 years  , because  I was in

21  undergraduate school when    I met her , and she had dresses

22  and suits and hats and all of those things there at that

23  time in her  Fairmont  Street house at that time.

24  Q.      Based on your personal knowledge   , was she fairly

25  well known in the   Washington social circles?

1 A.      Extremely well known.  Extremely well known.

2 Q.      So the items that were at the   Bexhill  Road

3 address had been transfer   red to  Ms. Martin by   Ms. Payne

4 through the means of the gift?

5 A.      Yes.

6 Q.      Could you describe what that would have involved      ,

7 including numbers  , if you have any idea?

8 A.      I don't have any numbers   , but if you take a room

9 probably a third this size, it was pretty tightly packed

10 with racks of clothing and hats and accessories      , small

11 items of costume jewelry and accessory items that a

12 person would -- well,   a woman would wear.

13 Q.      Did I hear you say furs?

14 A.      Yes.

15 Q.      While the items were at the   Bexhill  Road --

16 Bexhill  Court address of  Ms. Martin's , did Ms.  Payne

17 continue her business selling them from that home      ?

18         MS. JOHNSTON:  Objection  , unless there's a bas   is

19 of knowledge.

20         THE COURT:  See if he has a bas   is to  know that.

21         BY MR. MONTEMARANO :

22 Q.      Do you have a bas   is to be able to answer that

23 question based on personal knowledge?

24 A.      Yes.

25 Q.      What would your description of    Ms.  Payne 's

1 continuing business be  , sir?

2 A.     I can just quickly describe a visit that     I made

3 there and which le  d to this gift letter  .  Ms.  Payne

4 asked me if  I was still in touch with a few of her

5 friends and former customers who were also     clients of

6 mine , and I said , yes.  She said  , well, let her know

7 that  I have a few  knits over here that she should come

8 over here and look at and maybe she can come and visit

9 me and she can buy those from me.

10     So in her mind --  I'm not say ing that,  you know ,

11 she was set  up to  do business , but certainly in her

12 mind , she wanted to continue to do business.

13 Q.     At this point  , she would have been 88-89 years

14 old?

15 A.     Yeah, between '88  and ' 89.

16 Q.     Still had her boots on  , as it were?

17 A.     She certainly did.

18 Q.     Based upon your personal knowledge    , would it be

19 fair to say that a large amount of -- a large portion of

20 Ms.  Payne 's clientele was generate   d in  a word -of-mouth

21 fashion?

22 A.     Yes.

23 Q.     She didn't advertise in the yellow pages

24 necessarily?

25 A.     Not th at  I  know of.

1  Q.        Turning your attention to the living trust.  Did

2  there come a time when you had cause to dispense funds

3  from that living trust?

4  A.        Yes.

5  Q.        I'd like to turn your attention  , first,  to

6  Defense  6.  That's two pages , fronts and  backs of checks

7  101, 102 , and  103 from the   Mary  Payne  Trust.

8            Do you recognize that handwriting   ?

9  A.        Yes.

10 Q.        Did you execute those checks?

11 A.        I did .

12 Q.        These are checks 101   and  103 from a bank account

13 you set up for the   Mary  Payne  Trust; correct, sir?

14 A.        That's correct.

15 Q.        There would have been a separate bank account for

16 the  Trust; is that correct  , sir?

17 A.        There was a separate bank account.

18 Q.        Check 101 , if this is correct  , would have been

19 executed on the   5th of  -- is that a  10?

20 A.        That's  October , yes.

21 Q.        Of 2000?

22 A.        Yes.

23 Q.        That would have been after    Ms.  Payne 's demise?

24 A.        Yes.

25 Q.        For $9,000 ?

1 A.      Yes.

2 Q.      To Paulette  Martin?

3 A.      Yes.

4 Q.      That's your signature, sir?

5 A.      That is my signature.

6 Q.      And this would be care for   Ms.  Payne  4/6 to 9/6

7 2000 ; correct?

8 A.      Yes.

9 Q.      The date , 9/6, does that have any significance to

10 you , sir?

11 A.      I don't have a n independent recollection of it    ,

12 but I think  I have  a cop y of Ms.  Payne 's death

13 certificate with me  , so that might help if   I look at it.

14        On with your questions.

15 Q.      Sure.  And then the next check to    Paulette

16 Martin , $25,000 ; again your signature, sir?

17 A.      Yes.

18 Q.      Dated 12 /12 --  December , 2000?

19 A.      Yes.

20 Q.      Distribute part?

21 A.      Partial.

22 Q.      Partial.  Now, these were not the only checks

23 that you wrote to   Ms. Martin out of the trust; correct,

24 sir?

25 A.      That's correct.

1  Q.       Turning your attention  , please , if I could , to

2  defense -- let's try  Defense 4 to  Ms. Martin , Checks N o.

3  104 and  105.  Is that the same bank account?  Can you

4  tell us , sir?

5  A.       Yes, it is.

6  Q.       Again with  Bank of  America?  Same checking

7  account number?

8  A.       Yes, it  is.

9  Q.       This is the only checking account you had for the

10  Mary  Payne  Trust; correct, sir?

11  A.       Yes , it is.

12  Q.       So -- not  putting words in your mouth   , this is

13  where all  the  assets are coming from relat   ing to  Mary

14  Payne  at this point  , all the liquid assets?

15  A.       Yes.

16  Q.       Check 104.  Is this also to -- it says to

17  Maryland  Motor  Vehicle  Administration .  Can you tell  us

18  what  that's for?

19  A.       Yes .  It's for the registration of a    Grand

20  Marquis  automobile , which  I sold to  Paulette  Martin.

21  Q.       Grand  Marquis,  that would be   Mercury?  A  Ford

22  Motor  Company product?

23  A.       Yes.

24  Q.       Why was it that -- let's go    to the next check .

25  The  next check , that would be the    Safford   Lincoln

1 Mercury .  They're located in --   I don't recall .

2 A.     They're located , I think , in Silver Spring.

3 Q.     It's a Lincoln Mercury dealership?

4 A.     Yes.

5 Q.     Auto purchase per  -- I can't read that  -- per

6 instruction?

7 A.     Per in struction .

8 Q.     P. Martin?

9 A.     Correct.

10 Q.    Can you explain to us the relation    of these

11 checks and what they had to do with    Ms. Martin?

12 A.     Yes.  I was driving a  Grand Marquis car and I

13 drove it to her house one day and she admired it     , and I

14 said , do y ou really like it ?  And she said , yes , and I

15 said , I'm thinking of buy ing a new one , and so she asked

16 me if she could purchase that particular car    .  She drove

17 it around and said she liked it.

18      I then found a car that   I liked at  Safford , and I

19 then asked  Paulette if she would sign a letter of

20 instruction so that she would understand that she was

21 purchasing my car with the funds from the trust    , and so

22 that's what she , in fact , did.  And  I have a letter of

23 instruction.

24 Q.    No problem, sir.  So for all intents and

25 purposes , the trust bought the car and    gave it to her ?

1 A.       The beneficiary bought the car   , and that's why

2 the beneficiary needed to instruct me to do that      .

3 Q.       I understand.

4 A.       Okay.

5 Q.       Now , there are two   Lincoln -- excuse me  , Mercury

6 Grand Marquis on the street ; your own old one , which Ms.

7 Martin is driving , and you're  driving  the new one ;

8 correct , sir?

9 A.       I don't know if they're still on    the  street.

10 Q.       No , I mean then.  After this transaction    , there

11 would have been two   Mercury Grand Marquis ?

12 A.       Oh, yes, yes.   I met Ms. Martin at the   Motor

13 Vehicles Administration over on   Route 1 in Beltsville

14 and gave her the car and the keys    , and the guy from

15 Safford  Lincoln  Mercury met  me with my car , so yes,

16 you're right.

17 Q.       Spend $30,000 , they deliver ; ain't it great?

18 A.       Well, they did.

19 Q.       Showing you  Defense  5, if I could.  Two more

20 checks from the   Mary Payne Living  Trust.  These would be

21 two checks later in the year 2001 to      Ms. Martin?

22 A.       Yes.

23 Q.       These are distributions of assets from the trust?

24 A.       Yes.

25 Q.       Would it be -- would these be the last two

1 distributions, sir?

2 A.     Yes.  There came a time when   I did an account

3 which had a residual distribution   , after all of what   I

4 was supposed to do  , making other payments to other

5 persons and for other purposes    , and these two checks

6 represented the residual distribution of the trust.

7 Q.     So would it be fair to say that you wrote two

8 checks each for half of the amount remaining?

9 A.     As per the instruction from    Ms. Martin.  She

10 wanted  these to be distributed in two checks instead of

11 one.

12 Q.     Based upon your understandings as you sit here

13 today , what was the total cash distribution or liquid

14 asset distribution to   Ms. Martin from the   Mary  Payne

15 Trust?

16 A.     I believe somewhere in the neighborhood of

17 $129,000.

18 Q.     That would have been at the    -- per the terms   of

19 the living trust agreement; correct, sir   ?

20 A.     Oh, yes.

21 Q.     That would have been the total distribution of

22 the assets in the   trust ?  I mean , at that point , the

23 trust was closed?

24 A.     No.  There was a $5,000 amount left in the trust

25 for  Ms. Payne 's grandson , whom  I could not locate at

1 that point, so that $5,000 remained in the trust.

2 Q.      One of the earlier checks  , I think on  Defense  6,

3 was talking about a care for    Ms.  Payne .

4        Can you describe your understanding of the

5 relationship , based upon your personal knowledge of     Ms.

6 Payne  and  Ms.  Martin?

7        Did they have an actual marital or filial

8 relationship, relationship by blood?

9 A.      I'm not sure about by blood, but     I was introduced

10 to Ms. Martin  , oh , probably 20 years ago at    Ms.  Payne 's

11 home as her   Goddaughter.

12 Q.      Okay.  Ms.  Payne  was very vigorous and active   , it

13 would be fair to say  , up until the time of her death?

14 A.      Yes.

15 Q.      There did come a time where she suffered

16 illnesses --

17 A.      Yes , and she was having falls and that sort of

18 thing in her home.

19 Q.      When we spoke  , you had mentioned renal failure.

20 Can you describe that  ?

21        MS.  JOHNSTON:  Objection to this lawyer giving

22 medical testimony.

23        THE  COURT:  Sustained.

24        MR.  MONTEMARANO :  May we approach   Your  Honor?

25                (At the bar of the Court.)

1          MR. MONTEMARANO : As her attorney , he certainly

2 has a basis for knowledge that she had renal failure      ,

3 and I would ask if it means her kidneys went     , that's all

4 I'm going to ask him.    I probably know her more --

5 ultimately , I'm going  to ask him if that was part   of her

6 final illness. Th at's the only we question   I'm going to

7 ask.

8          MS. JOHNSTON:   I'm objecting.

9          THE COURT:  Jus t say she assisted in her final.

10          MS. JOHNSTON:  What counsel is trying to get out

11 of this witness is that   Ms. Martin took care of this

12 woman and that's not appropriate.

13          THE COURT:  Simply the fact is she receive    d a

14 sufficient substantial amount of money from her.

15          MR. MONTEMARANO :  I was  trying  to establish a

16 transfer.

17          THE COURT:  She helped care for the woman in her

18 final illness.

19          MS. JOHNSTON:  That 's already been done  .  I would

20 object  to any further questioning.

21          THE COURT:   I will let you just --

22          MR. MONTEMARANO :  Three questions , and I would

23 have been done already.    I would point out to the    Court

24 my questions have been specific, narrow    , and precise.

25          THE COURT:   Precise.

1          MR. MONTEMARANO : Considering  I don't do direct,

2 I don't think the  Court should have any complaint about

3 what I've done , in all candor , after some of the lengthy

4 examinations we've seen during this trial.

5          MS. JOHNSTON: That very well   may be.  All the

6 government is asking   is that he be limit ed by the  Rules

7 of Evidence  and not introduce hearsay.

8          THE COURT: Stay within the   Rules of  Eviden ce and

9 move on .  I think we 've got the point.

10               (Back in open court.  )

11          BY MR.  MONTEMARANO :

12 Q.     Did there come a time when   Ms. Payne, because of

13 her final illness or illnesses  , take care of  herself

14 adequately?

15 A.     Yes.

16 Q.     Where did she  live when she was reduced to that

17 state , if you will ?  Forgive my stating it that way  .

18 A.     She lived  with Paulette  Martin in her home.

19 Q.     Did Ms. Martin take care of her?

20 A.     Yes.

21 Q.     Do you have personal knowledge of    this?

22 A.     I do.

23 Q.     You've seen this?

24 A.     I saw it.

25 Q.     Ms. Payne  discussed it with you?

1  A.      Yes, she did.  She discussed her desire to give

2  up her home and  move in with  Paulette .  She asked my

3  opinion about it , and I said , you know , if you feel

4  comfortable with doing that, that is as compared to

5  assisted  living, that as compared to a nursing home,

6  it's your personal choice  , and she said that's what she

7  wanted to do.

8  Q.     Do you recall about how long before her death she

9  moved in with  Ms. Martin?

10  A.     I don't recall exactly  , but I believe it's within

11  the 12 - to 18 -month range.

12  Q.     Okay.  Certainly it would be fair to assume from

13  this check in  Defense  6 that  it was  by April , because

14  that's the first period you covered there.

15       Does that seem reasonable?

16  A.     I would imagine that's correct   , but I'm not

17  certain.

18  Q.     Certainly  you have  no present recollection of    the

19  events?

20  A.     I do not have personal recollection.

21       MR. MONTEMARANO :  Thank you very much,   Mr.

22  Shannon.

23       Pass the witness , Your Honor.

24       THE COURT:  Cross-examination   ?

25       MS. JOHNSTON:  Jus t a few questions.

1                    **CROSS-EXAMINATION**

2            BY MS. JOHNSTON:

3  Q.        Mr. Shannon, just so the record is clear  , then ,

4  the gift letter that was written and signed by    Ms. Payne

5  here, Ms. Martin's Exhibit 7 , that would have been

6  executed by  Ms. Payne after she had gotten out of her

7  own home and went to live with    Ms. Martin; is that

8  correct?

9  A.        Yes, ma'am , that's correct.

10  Q.        And likewise, this living trust agreement was

11  executed by  Ms. Payne, looks like  July 27 of 2000  , when

12  she was already living with    Ms. Martin and under  Ms.

13  Martin's care and super  vision ; is that correct?

14  A.        Yes, that's correct.

15  Q.        And prior to her moving into the    Bexhill  Court ,

16  she didn't ask you to execute any of those kind of

17  document s; did she?

18  A.        Yes, I did.  I drafted a prior  Last Will prior to

19  Ms. Austin's death.  Prior to    Ms. Austin's death,  Ms.

20  Payne's estate went to  Ms. Austin,  and Ms. Austin's

21  estate went to  Ms. Payne.  So Ms. Austin died jus  t a few

22  months before  Ms. Payne moved into  Ms. Martin's home.

23  Q.        There was a relationship between    Ms. Payne and

24  Ms. Austin whereby if one died first, the other got the

25  estate?

1 A.       Yes.

2 Q.       In terms of any gifts to  Ms. Martin, those

3 occurred after  Ms. Payne moved into her residence  ; isn't

4 that correct?

5 A.       No.  Ms. Martin was mentioned as    a contingent

6 beneficiary in  Ms. Payne 's Will that went to  Ms. Martin .

7 Q.       Were t here any dis bursements?

8 A.       I'm sorry , went to  Ms. Austin.

9 Q.       The gift letter of any dis   bursements went to  Ms.

10 Martin after  Ms. Payne moved in?

11 A.       Please rephrase your question.  Or ask your

12 question again .  I want to make sure   I'm answering it

13 correctly.

14 Q.       I apologize,  because  I'm not  an estate and trust

15 lawyer.  Any dis burse ments  from Ms. Payne 's estate or

16 Ms. Payne's property went to   Ms. Martin, either under

17 the gift letter or the   Living  Trust?

18 A.       That's correct.

19 Q.       The dis bursements  under the gift letter and the

20 Living  Trust  all occurred after   Ms. Payne  moved into

21 Bexhill  Court with  Ms. Martin?

22 A.       That's correct.  Yes, you're correct.

23 Q.       Then Mr. Montemarano  threw out a  figure  of

24 $125,000.

25        MR. MONTEMARANO :  I did not , Your  Honor .  No

1 numbers came out of my   mouth .

2         MS.  JOHNSTON:  Let me correct myself.   In

3 response to  one  of Mr.  Montemarano's   questions  --

4         MR.  MONTEMARANO :  Objection withdrawn.

5         BY MS.  JOHNSTON:

6 Q.      Let me start over again.    I understand  I don't

7 have my like microphone on.    I apologize.    I was hop ing

8 I was  leaning over far enough  , but obviously  I'm not.

9         You gave a figure in terms of what the total

10 value of the estate was that went to    Ms. Martin.

11 A.      Yes.

12 Q.      That figure was?

13 A.      Approximately $129,000.

14 Q.      Okay.  But that did not go   to Ms. Martin in cash ,

15 that total amount  ; isn't that correct?

16 A.      Yes, that is -- that   is the  cash amount.

17 Q.      Didn't you use some of those checks to do this

18 Mercury  Marquis  exchange?

19 A.      The $129,000 fig ure  would be those funds which

20 went to benefit   Ms. Martin.   Those funds were requested

21 by the  beneficiary , Ms. Martin , in different  ways.

22 Q.      For example, the -- at least $1,000 -- $1,040,

23 Check 104 and  Check 105 , didn't actually  result in  the

24 money being placed in   Ms. Martin's hands; isn't that

25 correct?

1  A.      That's correct .  But she was entitled to that    ,

2  and as a beneficiary  , she could direct me   to expend

3  those funds on her behalf.

4  Q.      I have  no question or any dispute about     what

5  happened with those funds  .  I want to be clear in   terms

6  of the  amount of  money  that actually went into    Ms.

7  Martin's hands or bank account    .

8          She didn't actually   receive t hese funds ; rather,

9  she spent  them as she directed you to?

10 A.      That's correct .

11 Q.      The funds that went into her hands were the other

12 four remaining checks  , which  I think totals $97,754   .92 .

13 Does that sound right?

14 A.      That's probably  correct .

15 Q.      Indeed that money was not give   n to Ms. Mart in in

16 cash; correct?

17 A.      No, no, no.

18 Q.      It was given by you in checks?

19 A.      Yes.

20 Q.      For her to dispose of in terms of a check as

21 opposed to cash?

22 A.      Yes.

23 Q.      On the back of one of these checks    , it looks as

24 though it was placed into a    CD; is that correct?

25 A.      I'd have  to look.

1 Q.      Martin Exhibit No. 5.  I can't tell  you check it

2 is, either 106 or 107.  One of those $1,000 checks?

3 A.      Yes, it does have a  CDC number  on it.

4 Q.      Which reference s the CD it was placed into  , you

5 would  assume ?

6 A.      I would assume so, yes.

7 Q.      None of the  payments you made had to   her were in

8 cash; correct?

9 A.      The first part of what you said   , I didn't hear.

10 Q.      None of your disbursement   s was in cash ; is that

11 correct?

12 A.      That is correct .

13        MS. JOHNSTON:   I have no further questions.

14        THE COURT:  Redirect ?

15        MR. MONTEMARANO :  Yes , Your Honor .

16              **REDIRECT  EXAMINATION**

17      BY MR. MONTEMARANO :

18 Q.      I'm going  to ask a question  Ms. Johnston was

19 hedging around .

20        Were you able  to receive -- initially  , you

21 represented  Ms. Payne, not Ms. Martin?

22 A.      That is correct.

23 Q.      Were  you able to receive any   sort of  undue

24 influence  that  Ms. Martin attempted to impose upon   Ms.

25 Payne prior to   Ms. Payne living with her?

1  A.       No.

2  Q.       Were you able to perceive   any sort of  undue

3  influence by  Ms. Martin upon  Ms. Payne after  Ms. Payne

4  moved in?

5  A.       No.

6  Q.       What would your description be of the nature of

7  the relationship they had?

8  A.       Mutual  respect,  love and care , mutually .

9  Q.       As a member in good standing of the D    . C. Bar for

10  31 years, if you had seen anything e    ven remotely

11  resem bling  undue in fluence,  can you tell the   jury what

12  you would have done?

13  A.       Well, you'd have to  know  Ms.  Payne  to know  that

14  nobody could exert any undue influence over here     , that's

15  the  first thing .  Secondly , I would not have part   of any

16  kind of drafting of any   Testament or document if   I felt

17  there was any undue influence.

18  Q.       To reassure  Ms. Johnston  --

19        MS. JOHNSTON:  Objection.

20        THE  COURT:  Sustained.

21        MR.  MONTEMARANO :  N o further questions  , Your

22  Honor .

23        THE  COURT:  A ny recross ?

24        MS.  JOHNSTON:  Just one   question.

25                    **RECROSS-EXAMINATION**

1          BY MS. JOHNSTON:

2  Q.      Mr. Shannon , if I understand correctly , you

3  visited Ms. Payne at Ms. Martin's house about a half a

4  dozen times; is that correct?

5  A.      Oh, yes.  Over about a year to 18 months   , about

6  half a dozen times , yes.

7          MS. JOHNSTON:   I have nothing further.

8          THE COURT: You may step down.  Thank you   .

9              (Witness excused at 2 :48 p.m. )

10         MR. MONTEMARANO :  Thank you very much , Mr.

11  Shannon.

12         MR. MONTEMARANO :  Can we approach ?

13         THE COURT:  You may.

14              (At the bar of the Court.)

15         THE COURT:  Is that your case ?

16         MR. MONTEMARANO :  That would be my only defense

17  witness.

18         THE COURT:   Subject to the recross ?

19         MR. MONTEMARANO :  And any exhibits  I need to

20  introduce through  Sergeant Sakala .

21         THE COURT:  Subject to that , you rest , and we're

22  ready for who is going to go next   , Mr. Sussman or Mr.

23  McKnett ?

24         MR. MONTEMARANO :  I think we're going to start

25  with --

1          THE COURT:  Do you want to do    Sakala  now?

2          MR. MONTEMARANO :  Mr. Sussman may have something

3  to say.

4          MR. SUSSMAN :  Judge, I'm not going to offer any

5  testimony or evidence.  Obviously   , an appropriate time

6  --

7          THE COURT:  Subject to further questions   .

8          MR. SUSSMAN :  R ight.  But obviously   --

9          THE COURT:  Who wants to go next   , Mr. McKnett  or

10 Sergeant  Sakala ?

11         MR. MCKNETT :  Sergeant  Sakala .

12         MS. JOHNSTON:   Your Honor , there's a problem with

13 that.  A pparently there's a   Call  B3871 that's in the

14 book at  Page 178 that our notes reflect should have been

15 out.

16         THE COURT:  I can't hear you.

17         MS. JOHNSTON:  There is a problem with the

18 transcripts we were given.  Records -- our records could

19 be wrong -- indicate that    B3871 , which began on  Page

20 168 , was a call that was suppos   ed to be out.   I believe

21 it's a Gil William -- it's a   Gilbert Williams ; call and

22 the Court had excluded those calls.

23         There is also a 4134 call   , which goes  Pages 213

24 to 225 , which was supposed to have been redacted and it

25 hasn't been.  So   -- and also we had asked the    Court to

1 give the limiting   instruction that we proposed to the

2 jury.

3        MR. MONTEMARANO :  We've never dis  cussed  that

4 instruction , the defense  objects to  that .  I know  the

5 instruction,  and we have asked to be heard on it so the

6 record is clear.

7        THE  COURT:  My intention is to advise them and      I

8 have advised them and to re-advise them that      I made the

9 determination that   Sergeant  Sakala  should be subject to

10 being recalled for further cross-examination by the

11 defense with respect to record   ed conversations,

12 transcripts of which have only recently been prepared      ,

13 and that the recordings that will be played are going to

14 be played for one of two purposes   :  One is for

15 completeness in terms that the portions previously

16 played did not include these portions; two     , to go into

17 the question of the basis for the opinions that he's

18 previously given and to test the basis for that opinion.

19        MS. JOHNSTON:  And that they are not to be used

20 as substantive evidence.

21        THE COURT:  They are being received for those

22 purposes only.

23        MS. JOHNSTON:   I would ask the  Court to use the

24 instruction that we proposed in terms of the use of

25 those transcripts.

1          Your  Honor , also  I think we need to address these

2 issue s in  terms  of these two calls because the defense

3 counsel wanted to distribute books with these calls in

4 them.

5          MR.  MONTEMARANO :  Your  Honor , I can give you the

6 one that's on the witness stand.

7          THE  COURT:   I've got the one with my notes on it.

8 No.  No.

9          MR.  MONTEMARANO :  Which one ?

10          THE  COURT:  3871.

11          MS.  JOHNSTON:  I t says no on it.

12          MR.  MONTEMARANO :  Our  notes reflect  Mr.  McKnett

13 re-raised  that issue.   Your  Honor was  inclined to keep

14 it out because  of the  Gilbert  Williams aspect but was

15 incline d to  keep it  in because of the  portion that     Mr.

16 McKnett  direct s the  Court's and the  jury's attention to

17 concerning --

18          MS.  JOHNSTON:  That's not correct   .  There was

19 another call that the judge allowed to keep in     , B7757 ,

20 between  Ms.  Ali  and  Mr.  Williams over our objection

21 where  Ms.  Ali  is discussing ticket  s with  Mr.  Williams.

22          MR.  MONTEMARANO :  We can certainly pull it    .

23 That's why we have a loose leaf.

24          MR.  MCKNETT :  I was quite unprepared for this

25 challenge until   I got up here to this bench   , and since  I

1 don't know what is in that transcript   , I would like to

2 take a look at it before    I comment.

3        MS. JOHNSTON:  We have these issues with these

4 calls before we went over the book at lunchtime to make

5 sure the  calls were  pulled and edited as they should be.

6        MR. MCKNETT :  If the government was aware of this

7 at lunch , the government could have told me at     lunch .

8        MS. JOHNSTON:   Ms. Greenberg went through the

9 notebook during the testimony of    Mr. Shannon , and that's

10 when she found out  , so I could not have told you before

11 we started.   I apologize.

12        MR. MCKNETT :  That's fine.

13        MS. JOHNSTON:   I also am going to object to the

14 jurors being allow  ed to  keep these transcripts because

15 these transcripts are not being introduced a     s

16 substantive evidence  .  They are only being used to

17 impeach the opinion of    Sergeant  Sakala , so much like any

18 other impeachment document   , they wouldn't get a copy of

19 that as well.

20        I have no objection to them using them     while

21 they're playing the calls as a guide.

22        THE COURT:   I'm not going to limit it that way.

23 They're going  to get both sets of transcript  s with the

24 admonition tha t I gave that these are the version of the

25 offering party and the evidence is what they heard.

1           MS.  JOHNSTON:    B3871, on  Page 168.

2           MR.  MCKNETT :  I don't recognize this transcript

3 as one of mine.

4           MS.  JOHNSTON:  I t's a call between   Ms. Martin and

5 Mr. Williams about their concert business    , Your  Honor.

6           MR.  MONTEMARANO :  It is very possible we

7 overlooked it.

8           THE  COURT:   I have  no written on this one.    I

9 believe it ought to come out.    You've got other stuff in

10 here that's going   to get your point across.

11           MR.  MONTEMARANO :  I have  no argument .

12           MS.  GREENBERG:   The books are at the jury.

13           THE  COURT:  Fin d them , get them out.

14           MR.  MCKNETT :  They don't have them yet.    I don't

15 recognize this call and --

16           MR.  MONTEMARANO :  We argued about it   over the

17 break.  We said let's put them over here    , out of the  way

18 so people don't trip over them.

19           THE  COURT:  It's a very simple    task to  take out

20 that call and the other one is 3884    , which  I said to

21 redact.

22           MS.  JOHNSTON:  Page 213 to 225.

23           MR.  MCKNETT :  Again , this is a  Martha  Jean  West

24 call that  I don't think  I'm involved in.

25           MR.  MONTEMARANO :  Court's indulgence  , please.   I

1 might be able to answer this question then.

2        THE COURT: It may be that you conclude to      just

3 take it out.

4        MR. MONTEMARANO :  I Remember this call.     I

5 remember redacting it.    Your  Honor said   it was  usable if

6 redacted.

7        THE COURT:  Right.

8        MS. JOHNSTON:  Has it been redacted?

9        MR. MONTEMARANO :  I knocked off  --

10       MS. JOHNSTON:  It says bye  -bye on Page 225.

11       THE COURT:  The call goes from Page 213 to 230.

12       MR. MONTEMARANO :  I have it ending at 225.

13       MS. JOHNSTON:   It says bye -bye on that page.

14       MR. MONTEMARANO :  I believe it was redacted  , Your

15 Hono r.  B ut quite frankly , I've got too many ball  s in

16 the air.

17       THE COURT:  I've  got one arm and all this stuff

18 to move around.

19       MR. MONTEMARANO :  It starts at 223  , Your Honor.

20       MS. JOHNSTON:   Your  Honor , it went from 213 to

21 225. Page  226 is another call with   John Martin and

22 Michael  Martin that was not excluded.

23       MR. MONTEMARANO :  If that is the case  , then  I

24 would imagine that   I did not redact it because    I could

25 not redact it.  There is nothing that is not about

1 clothing.  While it's a lengthy call   , it talks about all

2 aspects of the clothing business, sizes, et      cetera.

3 That's the only --   I remember this call  , and it was

4 lengthy, but  I thought  I had redacted it  , but I guess I

5 didn't redact it.

6         THE  COURT:   Ms.  Johnston,   I've got the limiting

7 instruction.   I've already given this as something

8 that's similar but not precise    ly the  same as this , but

9 I'm not in total agreement with the government's

10 instruction.   I will just repeat the instruction     I gave

11 previously.

12        The calls are not being introduced for the truth

13 of the matter .  They are being introduce  d with regard to

14 two questions ; one is  for completeness .  In some

15 instances , there were calls played by the government

16 that were not the total call   , and in fairness , I'm

17 allowing them to play the fair balance     of the  call .  And

18 the second is the -- for the defense to be able to

19 question the bases for the opinion given by      Sergeant

20 Sakala  on those call  s that  he did opine about  , and I'll

21 tell them that they recall    -- they may base their

22 opinion on upon listening to all the calls     , and I'm

23 permitting the defense to play all the calls     , not for

24 truth of the calls but for the strength or weakness      , if

25 any , give n by Sergeant  Sakala .

1          MS.  JOHNSTON:    I would ask that the    Court remind
2 them that's the only purpose they could use      as to these
3 calls.
4          MR.  MONTEMARANO :  The de fense  would request that
5 jury be excuse d for five minutes while we remove the
6 pages.
7          THE  COURT:  Why don't we tell them what we're
8 about to do , I'll give them the in  struction,  tell them
9 we're about to put together the final version     of the
10 transcripts , and then we will be coming back.
11          MS.  JOHNSTON:  Will the   Court advise them that
12 Ms. Martin has concluded her case   ?
13          THE  COURT:  Y es.
14                    (Back in open court.  )
15          THE  COURT:  Ladies and gentlemen,   Ms. Mart in has
16 concluded her case, subject    -- as I indicated before  --
17 that all of the attorneys are reserving a right to
18 further cross-examination of    Sergeant  Sakala .
19          Now, let me tell you that the next person to
20 testify will be   Sergeant  Sakala , who will be called back
21 to the witness stand for additional cross-examination by
22 some, perhaps all , I don't know , of the defense
23 attorneys.   I want you to know the purposes for which
24 he's being called and precisely what consideration you
25 should give to some calls that may be played during the

1 course of his testimony.

2        When Sergeant Sakala testified, you will recall

3 that there were a number of recordings played and they

4 are before you as direct evidence and you may consider

5 it as any other evidence  .  Sergeant Sakala has given

6 opinions about the drug trafficking business in general      ,

7 and he's also given opinions about what was meant by

8 those who were parties to the conversations that you

9 previously  heard him play during the government's case.

10       I have decided to permit the defense to recall

11 him , and in the course of him being recalled     , to allow

12 certain addition  al recordings to be played.  The

13 context , however , in which you're listening to those

14 recordings is different than that which was the case

15 when the recordings were first -- when other recordings

16 were played during the course of his direct examination.

17       These recordings are being played during his

18 further cross-examination for one of two purposes and

19 these are limited purposes.  These are more limited than

20 purpose for which the recordings were originally play     ed

21 that he gave opinions about.

22       One is for the sake of completeness.  In some

23 cases , you may recall the government played some

24 recordings  that were excerpts.     The defense has

25 requested and   I have agreed that they may prepare

1  transcripts of the entirety of some conversations or

2  more of the conversations than was the case when the

3  excerpts were played.  So that yo   u may consider the

4  totality of that conversation and make a judgment about

5  what you did here during    Sergeant  Sakala's  earlier

6  testimony with the benefit of the additional

7  conversation -- additional portions of the conversation.

8          The second purpose for which    I am permitting

9  these additional excerpts to be played is this    :  You

10  will recall that   Sergeant  Sakala  gave opinions as to the

11  meaning of terms used by the parties to these

12  conversations and what they meant when they talked to

13  each other and he   gave  that opinion based not only on

14  his experience  in law enforcement  , but also on the fact

15  that he had listened to all of the recordings     , not just

16  the ones that were played  .  And he indicated that he was

17  not giving an opinion on a conversation in isolation     ,

18  but took into account the benefit of having listened to

19  all of the intercepted calls  .  And with the benefit of

20  his wisdom and experience in this area    , but also with

21  listening to all of the calls  , he was giving the

22  opinions that he gave.

23          I have permitted the defense to recall him for

24  additional cross-examination so that he may be tested on

25  his opinions by certain other conversations that were

1 not previously played for you so that you may make a

2 determination as to whether the opinions he gave were

3 strong or weak.  In other words    , to assess the strength

4 of the opinions that he gave.

5         The playing of these additional conversations     ,

6 though , is not to be considered by you as direct

7 evidence the way the other recordings were that you've

8 previously heard.    These  are for a limited purpose and

9 that is for you to make an assessment because it's up to

10 you to make an assessment of the strength or w     eakness of

11 an expert's opinions as to whether the opinions he      gave

12 were based upon a solid foundation or weak foundation.

13        So , you may listen to these calls and determine

14 at the end of the case as you will be hearing from me

15 with in structions  on judging credibility of regular

16 witnesses as well as expert witness what is strength or

17 weaknesses you should associate with the opinions that

18 Sergeant  Sakala  has given.

19        Now w e have  a few lo gistical  matters to attend to

20 before those recordings are played.  What will happen      ,

21 we're going t o take a very brief recess  , and when you

22 come back , we will have notebooks for you.  These

23 notebooks are , as I indicated to you yesterday    ,

24 notebooks of transcripts of these additional calls that

25 have been prepared by the defense     , just like the earlier

1  recordings that   you heard were prepare d by the

2  government.

3         As was the case with the recordings played by the

4  government in their transcripts,    I told you that the

5  evidence is what you heard  , not the transcripts.  The

6  transcripts  were prepared by each side as an aid to you.

7  In therein listen  ing to  these recordings , some of which

8  may be  difficult to hear , but it's  what you hear and

9  what your understanding of the recording is that counts.

10        So, you will be -- you will have the benefit of

11  the transcripts from both sides of the calls that you've

12  heard previously , and the calls you're about to hear to

13  assist you , but the evidence is the recording that you

14  will hear .  And in the case of the additional

15  cross-examination of   Sergeant  Sakala , the evidence that

16  you are hearing is being heard for the limited purposes

17  that  I just describ ed to you .

18        All right .  We will take about   -- how much time

19  do you need , Counsel ?

20        MR.  MONTEMARANO :  Ten minutes should be    plenty.

21        THE  COURT:   -- a  ten -minute re cess , and then we

22  will resume with   Sergeant  Sakala .

23               (Jury excused at 3:04 p.m.)

24               (Off the record  at 3:04 p.m. )

25               (On the record at   3:19 p.m. )

1          MS. JOHNSTON:   Your Honor, there was one more

2  issue with the book.  There is a calendar in the front

3  of this that has handwritten    March, 2004; April, 2004;

4  May, 2004.   I don't know whose it is, but it's not part

5  of the transcript.

6          MR. MCKNETT:   Your Honor, I prepare d the

7  calendar.   It's my handwriting .   It simply is a -- the

8  Court will have it   in the front of its binder.

9          THE COURT:  Do  I have it?

10          MR. MCKNETT:  It's simply  --

11          MR. MONTEMARANO:  Right behind the title page.

12          THE COURT:  In the binder we used    Monday ?

13          MR. MONTEMARANO:  Y es.  Either one of them  , in

14  reiteration .

15          MR. MCKNETT:  It's a calendar that covers the

16  three months that the wiretap was in place that     I had

17  intended , perhaps , to refer the calendar to point out

18  what day of the week it was , from time to time  , during

19  questioning.

20          THE COURT:  I don't have any problem with that.

21          MR. MONTEMARANO:  Thank you , Your Honor.

22          MR. MCKNETT:  Thank you , Your Honor

23          THE COURT:  N ot unless somebody says it's not a

24  correct calendar.

25          MS. JOHNSTON:   I haven't checked that yet.    I'm

1  sure Mr. McKnett made effort to make sure it was a

2  correct calendar .

3          MR. MARTIN:   Can I check that ?  I have a

4  perpetual calendar.

5          MR. MCKNETT : We didn't put in holidays  , Your

6  Honor.

7          THE COURT:  Are we ready for the jury?

8          Counsel , I understood there was a question while

9  I was out about this one call that    I had said no , unless

10 it's redacted , and I directed that it be taken out now

11 without prejudice to the notion it can be put back in

12 with approved redactions.

13         MR. MONTEMARANO : It is , as we speak , Your Honor.

14 The copies of it have been retained    . Mr. **Krinsky**

15 informed us that  Your Honor would like to address it

16 when we come close t o using it.  There is a stack next

17 to my client , next to the water jug  , which is  the stack

18 of transcripts .

19         THE COURT: A ll right. Let's  bring the  jury.

20              (Jury returns at 3 :22 p.m. )

21         THE COURT : S ergeant , if you want to come up  , you

22 can come up now.

23         (Sergeant Sakala resumes the stand  at 3:21 p.m. )

24         MR. MONTEMARANO :  Your Honor , if Ms. Johnston and

25 I and Mr. McKnett  could approach , please.

1                    (At the bar of the Court.)

2          MR. MONTEMARANO :  At the  Court's directive , we

3 have cut back our book.  Obviously   , it's in a much

4 larger binder than the actual contents require    , but the

5 there's reason  I'm saying this.  It is what it    is.

6 There are numerous   missing page s from the sequence.   I'd

7 like the  jury instructed that calls -- that calls have

8 been re moved  at the direction of the   Court.  I don't

9 want there to be some suggestion that we're doing

10 something wrong.

11        THE  COURT:   I didn't instruct you on    -- you can

12 tell them these are the call   s that  have been select ed to

13 be played.

14        MR.  MONTEMARANO :  Okay.

15        THE  COURT:   I don't  want to give the inference

16 about the amount of calls.

17        MR.  MONTEMARANO :  No, no.  Thank you.

18                    (Back in open court.  )

19        THE  COURT:  Ladies and gentlemen, we are about to

20 begin with the resumed cross-examination of       Sergeant

21 Sakala , and are about to get   , if you haven't got

22 already , some additional transcripts.  The transcripts

23 that you have are not in, you know, Page      1 through 100

24 order.  The transcripts that were prepared were of all

25 calls.  These are the ones that have been selected so

1  that -- don't  worry if you find that you have missing

2  pages.  There are indeed gaps, but the original

3  transcript from which the selection was made by counsel

4  to play are simply taken out of the larger transcript.

5  You may proceed.

6         MR. MONTEMARANO :  Thank you , Your  Honor.  If  I

7  may hand out the books while    Mr. Mitchell gets his

8  computer warm.

9         THE  COURT:  You may.

10         MR.  SUSSMAN :  Want  a hand?

11         MR.  MONTEMARANO :  No,  I'm good.

12         THE  COURT:  Counsel , when you play these

13  recordings, do the best you can to shove the microphone

14  down to the speaker so that they can hear them as well

15  as they could when the government played them.

16              **FURTHER  CROSS-EXAMINATION**

17         BY MR. MONTEMARANO :

18  Q.     Good afternoon,  Sergeant  Sakala .  How are you?

19  A.     Fine, thank you.

20  Q.     Picking up where we left off    --

21         MS. JOHNSTON:    Your  Honor, if  I could interrupt

22  for a minute.  If they want to    , perhaps they could plug

23  our speakers into their computer.    I know they don't

24  have the calls on a disk that we can play on our

25  computer , which is already loaded  .

1          THE COURT:  D o you want to borrow a speaker from

2 them ?

3          MR. MITCHELL:   I think we're fine.  Let's see how

4 it goes .  If we need it , we'll --

5          THE COURT:  I'd ask the jury to  give us a sign if

6 they can't hear  it, and if we will loan you a speaker

7 from the government.

8          MR. MITCHELL:   I think we're fine.

9          BY MR. MONTEMARANO :

10 Q.    Going back to when you were on   the stand last

11 month, let's fi rst establish some facts we can agree on.

12 You were one of the case agents  ; correct?

13 A.    Yes.

14          MS. JOHNSTON:  Objection , asked and answered a

15 dozen times on the first cross.

16          THE COURT:  Sustained .  Let's not go through

17 ground we 've tilled before.

18          MR. MONTEMARANO : Just a little background  , Your

19 Honor.

20          THE COURT:  Very , very brief.

21          BY MR. MONTEMARANO :

22 Q.    You've listened to all these calls  ; correct ,

23 Sergeant?

24 A.    I've listened to all the calls we intercepted at

25 least one time.

1 Q.       At least one time  .  And in some cases  , more than

2 one time?

3 A.       That is correct.

4 Q.       And you've also reviewed the logs that were

5 compiled regarding   the call s that  were intercepted?

6 A.       That's correct.

7 Q.       Actually , "calls" is not the right word  .  Every

8 time an act ivation  went up , you review ed the calls to

9 make sure the activation --

10 A.       All the calls  I listened to , yes.

11 Q.       Is there a white book in front of you    ?

12 A.       Yes.

13 Q.       That's the defense transcript boo   k.  I would ask

14 you to turn to Page   1, Call B26.

15         MR. WARD:  B  what?

16         MR. MONTEMARANO :  B26, Page  1.

17         BY MR. MONTEMARANO :

18 Q.       You listen ed to  this call; correct, sir?

19 A.       I listened to all the calls.

20 Q.       Okay.  And that would include this one    ; right?

21 A.       I listened to all the calls on the wire, yes.

22 Q.       And this one is on the    8th of  March of 2004;

23 correct, sir?

24 A.       That , I don't know.   I'd have to check the    logs.

25 If you have a copy of the    B logs , I could confirm the

1 date and time.

2 Q.      Why don't you turn to the back of the book.  See

3 a certification from a certified court reporter?

4 A.      Yes.

5 Q.      Can we work from these transcripts to save a

6 little time and agree that the dates are correct?

7 Perhaps Ms. Greenberg or  Ms. Johnston can check the logs

8 and make sure these are correct transcript    s.  D oes that

9 seem reasonable ?

10       MS. JOHNSTON: A s the Court knows , we didn't have

11 much advance notice of these transcripts    .  We are not in

12 a position to stipulate to the dates and times because

13 we did not prepare these and    Agent Sakala  has not had an

14 opportunity to review them with the logs.

15       THE COURT:  Have the log in front of him so he

16 can verify them.

17       MR. MONTEMARANO :  That's fine.

18       BY MR.  MONTEMARANO :

19 Q.      So we're all clear  , you played the actual   CDs

20 with the calls, sir?  You're aware of what they look

21 like?

22 A.      Excuse me ?

23 Q.      Have you ever looked at and played the    CDs with

24 the calls?

25 A.      Have I played  CDs with the calls?

1 Q.      CDs with the calls   recorded  on them.

2 A.      No.  They're actually -- the   CDs are actually

3 copies of a larger   CD.  I don't know that   I've played

4 those.

5 Q.      You play ed the calls off the larger   CDs?

6 A.      Yeah .  It's actually  -- I think  I described it as

7 a pin link system  .  It's actually part of a mainframe

8 computer and then   CDs are  created  from that system.

9 Q.      When it comes up on your screen    , there's a moving

10 bar across the bottom showing the progress     of the  call ;

11 is that correct?

12 A.      That's correct.

13 Q.      Right next to that, above the moving bar, there

14 is a date and time of the call; isn't there, sir?      Down

15 to the second ?

16 A.      Yeah , I don't know.   I don't recall.  There could

17 be.

18 Q.      Jus t trying to establish where these numbers

19 might have come from.  This is a call from      Martha  Jean

20 West  incoming to  Ms. Martin's home; correct, sir?

21 A.      That's what the transcript says.  If you would

22 give me a minute --   I haven't found the call yet.

23 Q.      I'm sorry.  Allow me to help.

24 A.      B is the second set?

25 Q.      Yes, sir.  This is just the    A and B logs.  We

1 will just be using the    Bs.   There are a few   A calls , but

2 nothing --

3 A.      Yeah, B26 is an incoming call from     Martha  Jean

4 West that was intercepted March 8, 2004    , at 5 :24 p.m.

5 Q.      Which is what the transcript says    ; right, sir?

6 A.      Yes, it does.

7 Q.      And so that t he ladies and gentlemen of the jury

8 remember , the B l ine , B for bra vo, is the phone number

9 ending in 9007.  That's    Ms. Martin's home  number;

10 correct?

11 A.      Yes, it is.

12 Q.      Locate d in the basement of 810    Hayward ; correct ,

13 sir?

14 A.      I believe so, yes.

15 Q.      Okay.  So this would be call   s to Ms. Mar tin at

16 her home; right?

17 A.      This is an incoming call to    Ms. Martin, yes.

18          MR. MONTEMARANO :  Mr. Mitchell,  if you could play

19 that call , please.

20          (Audio r ecording begins   playing at  3:31 p.m. )

21          (Audio recording stops playing at    3:31 p.m. )

22          BY MR. MONTEMARANO :

23 Q.      Stop there , now we've redacted a portion of the

24 call.  I ask you to turn the page   , the call  continues  on

25 Page  7.  Do you see that  , sir?

1  A.       Mine continues on Page   6.

2  Q.       Okay.  It should be on Page   7.  Why don't you

3  just pull that page out.    I don't think the jury has   --

4           MS. JOHNSTON:  Mine continues on Page   6 as well.

5           MR. MONTEMARANO :  Oh.  Well , mine's missing the

6  redacted page .  Why don't we continue with the section

7  on Page  6, then .

8           MS. JOHNSTON:  O urs is a redacted  to Page 6.

9           MR. MONTEMARANO :  That's correct.  My error.

10 Yeah , because  LaNora .  Is that where you  rs begin s?

11          THE  WITNESS:  Yes.

12          (Audio r ecord ing  begins  playing  at 3 :32 p.m. )

13          (Audio recording   stops  playing  at 3 :35 p.m. )

14          BY MR. MONTEMARANO :

15 Q.       Sergeant, let's talk about some of the language

16 that you previously testified to related to drug

17 conversations that we find in this call. We see the       No.

18 16; do we not , sir?

19 A.       What page?

20 Q.       How about Page  7?

21 A.       The No. 1 6 is on Page  7.

22 Q.       Near the top , there is also the word   "pieces, "

23 right, sir?  Correct, sir?

24 A.       I've got odds and ends.    I don't see --  I see six

25 pieces.  The word   "pieces " does appear on Page   7, yes.

1 Q.      And we have the  No. 16  again on Page  8; correct,

2 sir?

3 A.      Yes, No. 16  does appear on Page   8.

4 Q.      We also have some other words   .

5       MR.  MONTEMARANO :  Court's indulgence, please.

6 Never mind.

7       BY MR.  MONTEMARANO :

8 Q.      We won't go back through the list you compiled.

9 At least those two  , we're pretty clear -- oh, yes.

10 There's a description of something on Page     8, sir , the

11 color of sand; correct, sir?

12 A.      The word  "sand" appears on Page  8, yes.

13 Q.      Would  I be fair if  I understood that crack

14 cocaine is the color of sand   , too ; isn't it , sir?

15       MS. JOHNSTON: Objection  , relevance.   The

16 detective has not offered an opinion as to what sand

17 means in this telephone call.

18       THE  COURT:  Sustained.

19       BY MR.  MONTEMARANO :

20 Q.      What color is crack cocaine   ?

21 A.      It's usually an off -white, beige color.

22 Q.      Have you ever seen sand that color?

23 A.      I have seen sand that is off   -white and

24 beige -colored , yes.

25 Q.      Thank you.   I direct your attention   , please --

1 Court 's indulgence.    Oh, the talented attorneys at the

2 table asked me to have you look at    Page 8 , and I had

3 this noted , but I don't have it highlighted in this

4 copy.   Third line of Page    8.

5 Is there a number there, sir?

6 A.     If you're referring to "P.M."    she says in eight

7 something.

8 Q.     Eight.  We're not talking about    --

9 A.     I couldn't hear you.

10 Q.     I'm sorry.  I was facing away, and     I shouldn't

11 have been .  We're note  talking about an eighth of a

12 gram ; is that correct , sir?

13 A.     This call does not have nothing to do with drugs       ,

14 that's correct.

15 Q.     So we're not talking about an eighth of a gram?

16 A.     Call has nothing   to do with drugs.

17 Q.     We're not talk- --

18     MS. JOHNSTON:  O bjection.

19     Asked and answered, repeatedly.

20     MR. MONTEMARANO :  May we  --

21     THE COURT:  Sustained.

22     MR. MONTEMARANO :  May we approach , Your Honor ?

23     THE COURT:   No.  I've ruled .

24     Sustained.

25     MR. MONTEMARANO :  Invite your call to B240 on

1 Page 13 .

2          Could you play it  , Mr. Mitchell,  please?

3          (Audio r ecording begins playing at 3   :39 p.m. )

4          (Audio recording stops playing at    3:40 p.m. )

5          BY MR.  MONTEMARANO :

6 Q.      Going back to the beginning of the transcript     ,

7 this call takes place on the    10th of  March at about   8:00

8 in the evening, give or take.

9 A.      Call B240 was intercepted on March 10, 2004    , at

10 8:11 p.m.

11 Q.      Was it another incoming call to    Ms. Martin's home

12 address; correct, sir?  Home phone number?

13 A.       That's correct .

14 Q.      On Page --  Court's indulgence , please --  Page 16 ,

15 we see the N o. 4.

16 A.      The number "four" writ  ten o ut appears on  Page 16 ,

17 yes.

18 Q.      And on Page 14 , I'd like you to read through the

19 fourth entry , the fourth person speaking on that page

20 beginning with the word and.

21 A.      You want m e to read it out loud  ?  We just heard

22 it.

23 Q.      Sure.

24          MS. JOHNSTON:  Objection.

25          BY MR.  MONTEMARANO :

1 Q.      Why don't you just go ahead and look at    it.

2 A.      I see it.

3 Q.      I'm going  to keep it for myself , get it altered

4 for me for work .  That doesn't mean cooking cocaine into

5 crack ; does it?

6 A.      No.  This call has nothing to do with drugs.

7 Q.      Thank you.   I invite your attention to B241 at

8 Page 17.  While  Mr. Mitchell is booting it up  , this is a

9 call later in the same evening of March 10; correct,

10 sir?

11 A.      This was actually the very next call at 8     :19

12 p.m. on the same day.

13 Q.      There were no intervening calls    , for all intents

14 and purposes a continuation of the conversation;

15 perhaps?

16 A.      I have  no idea.

17 Q.      The same parties?

18 A.      The transcript reflect   s the  same parties.

19 Q.      The logs do , too.  The same phone numbers.

20 A.      The logs reflect the same parties    , yes.

21 Q.      And the  same phone numbers  ?

22 A.      The phone number is not reflected in the logs      ,

23 other than the  B line .  It doesn't show w  here it's

24 coming from.

25 Q.      Oh, okay.  That was one that    wasn't up.  My

1 apolog ies.

2          Can we listen to this one  , Mr. Mitchell  please ?

3          (Audio r ecording begins playing at 3   :46 p.m. )

4          (Audio recording   stops  playing  at 3 :47 p.m.)

5          BY MR.  MONTEMARANO :

6 Q.       Invite your attention to   Page 27 of the book.

7 This is call B322.   I want  you to  check  the  log and

8 confirm the date and time are correct.

9          THE  COURT:  What was the page number again    , Mr.

10 Montemarano ?

11          MR.  MONTEMARANO :  Page 27.   I'm sorry , Your

12 Honor.

13          THE  COURT:  All right.

14          MR.  MONTEMARANO :  My apologies.   I've got  to  get

15 Ms. Johnston's rhythm down.

16          THE  WITNESS:  Call B322 was intercepted on March

17 11, 2004 , at 6 :23 p.m.

18          BY MR.  MONTEMARANO :

19 Q.       And the  parties involved?

20 A.       The logs reflect that   Ms. Martin  and Ms. West  and

21 Ms.  Terrell .

22 Q.       That would be   Jacqueline  Terrell,  who lives

23 upstairs?

24 A.       Correct.

25          MR.  MONTEMARANO :  Could you play that  , Mr.

1  Mitchell,  please ?

2           (Audio r ecording begins playing at 3   :48 p.m. )

3           (Audio recording   stops  playing  at 3 :50 p.m. )

4           BY MR.  MONTEMARANO :

5  Q.     Based upon your listen  ing to  the other calls as

6  well as this one  , you heard that break in the recording     ;

7  correct , sir?

8  A.       Yes , I did.

9  Q.       It's reflect ed in  the last page of the transcript

10  in front of you on   Page 29?

11  A.       Yes.

12  Q.       Those are breaks in the actual master recordings;

13  correct , sir?

14  A.       Those are minimizations where the monitor

15  determined that the call    was not pertinent to the

16  investigation and minimize   d the  call.

17  Q.       Would it be fair to say that the calls as

18  pro vided to  the defense contained those breaks in them?

19  A.       Every call that is in   exis ten ce contains those

20  break s.  The  monitoring equipment is shut down    , the call

21  is not re corded.   It is not monitored  .   It is completely

22  minimized.

23  Q.       Therefore , what the defense received did not have

24  anything during that break that could be transcribed; is

25  that a fair statement?

1 A.      That's correct.

2 Q.      Okay.  That's all we want to be clear on.  By the

3 way, wh ile we're talking about this  , oh, yeah  Page 28.

4 See the word  "size" a couple different places?

5 A.      I see "size" in the , I guess , third line down.

6 Q.      Further down as well.

7 A.      I see the size in the fifth, sixth or     seven th

8 line down.  Those are the only two places     I see the word

9 "size" on Page 28.

10 Q.      You recall testifying when you were previously on

11 the stand that , in your opinion , certain times  when the

12 word "size" was used , it referred to drugs  ; correct ,

13 sir?  I think size eight --

14 A.      I don't think  I said anything  about the  word

15 "size".  I think  I said in specific calls  , they

16 identif ied the  quantity of drugs by using the term      "size

17 eight" in conversations  .  I think specifically   Milburn

18 Walker  did it,  George  Harris did it , and  I'm sure other

19 people did it , too.

20 Q.      So your testimony would have been that in prior

21 testimony , the word  "size" related to drugs in one case

22 or another; correct, sir?

23 A.      In connection with other words   , the word  "size,"

24 yes.

25 Q.      Absolutely.   I'm just try ing to get clear --  I'm

1 trying to make a list for you, sir .

2 A.      I don't need a list , Mr. Montemarano .

3 Q.      I'd like you to take a look at that and make sure

4 I'm not misrepresenting --

5        MS. JOHNSTON:   Your Honor , I object to the list .

6 I don't know what it represents.

7        MR. MONTEMARANO :  I'm trying to establish that

8 right before I was interrupted.

9        THE COURT:  Establish it.

10        MR. MONTEMARANO :  Thank you , Your Honor.

11        BY MR. MONTEMARANO :

12 Q.      These words that we've discussed that we find in

13 these transcripts; is that a fair statement, sir?

14 A.      Those are words that appear in these transcripts.

15 Q.      Okay.  Thank you.

16        Can we go onto the next call, B323 on Page 30?

17 That 's the same day a little bit later, March 11.

18 A.      323?

19 Q.      Yes, sir.  It's on Page 30 .

20 A.      Call B 323 was intercepted on March 11, 2004   , at

21 6:26 p.m.

22        MR. MONTEMARANO :  Mr. Mitchell .

23        (Audio r ecording begins playing   at 3:53 p.m. )

24        (Audio recording  stop s playing at  3:56 p.m. )

25        MR. MONTEMARANO :  We're going  to move right on to

1  call B324 on Page 35.

2          (Audio r cording begins playing at 3  :57 p.m. )

3          (Audio recording   stops  playing  at 3 :58 p.m.)

4          BY MR.  MONTEMARANO :

5  Q.      Going to the log,  Call B324 is also on the    11th;

6  correct,  sir?

7  A.      Yes.  Call B 324 is intercepted on March 11 at

8  6:34 p.m.

9  Q.      You heard near the end of the call    , as reflected

10  on Page 30 , right at the top of    Page 37 of the

11  transcript,  Ms. Martin , I believe -- no,  Ms. West,  the

12  other person on the phone with    Ms. Martin , refers to a

13  610, right?

14         Do you see that at the top    of the  transcript

15  page?

16  A.      I see the reference, yes.

17  Q.      You heard that ; right, sir?

18  A.      Yes.

19  Q.      Six and ten .  That would make 16  ; right , sir?

20  A.      Six and ten  add up to 16, yes, they do.

21  Q.      Okay.  Now, let's go back to the beginning    .  At

22  this point , the wire has been up for four days?  Eight,

23  nine, ten,  eleven ?

24  A.      Yeah.  The first call was intercepted on March 8.

25  Q.      Okay.  Based upon your listening to these calls

1 here today and having listened to them in the past, is

2 it fair to say you agree these are not calls relating to

3 drugs?  You already testif  ied to  that; right, sir?

4 A.      Yes.

5 Q.      These appear to be two women talking about

6 clothing; correct?

7 A.      Yes.

8 Q.      Appear.   You have  no personal knowledge  ; do you ,

9 sir?

10 A.      No.

11 Q.      Okay.  And there are things within these calls

12 that would lead one to that conclusion      -- t here is

13 reference s to  fabrics, to sizes, and to manufacturers;

14 correct, sir?

15 A.      Yes.

16 Q.      I mean , you probably don't wear    Vera  Want but

17 you're aware that   Vera  Wang is a women's designer,

18 right?

19 A.      No.

20 Q.      Okay.   I barely know.    I think my wife clues me

21 in on this kind of thing.  At this point    , it would be

22 fair to say we have a series of calls with someone

23 discussing clothing  , large amounts of money  ; right , sir?

24 $500?  $ 1,500?

25 A.      I guess that would depend on your perception of

1 large.

2 Q.    Question is fair enough.   I would ask you to turn

3 the Call B, for bra vo, 462, March 13 is when the call

4 takes place ; right, sir?

5 A.    Call B462.

6 Q.    Yes, sir.

7 A.    Was intercepted on March 13, 2004   , at 10:01 in

8 the morning .

9 Q.    Okay.  It appears to be a voice mail message    Ms.

10 Martin is leaving .  It's an outgoing call; correct, sir?

11 A.    Yes, it is.

12     MR. MONTEMARANO :  Could you play it , please , Mr.

13 Mitchell?

14     (Audio r ecording begins playing at 4  :01 p.m. )

15     (Audio recording   stops  playing  at 4:02 p.m. )

16     BY MR. MONTEMARANO :

17 Q.    See the word  "suit" in that message, sir?

18 A.    Yes.

19 Q.    That's a word you previously testified to having

20 to do with drug selling, drug conversation; correct,

21 sir?

22 A.    I believe so .  If you want to flip the list over   ,

23 but I believe that's accurate.

24 Q.    Let me see what's on this list.

25     MS. JOHNSTON:   Mr. Montemarano , it's not on

1  there.  It was marked as an exhibit    , and since that pad

2  was all used up , we'll get it for you.

3         MR. MONTEMARANO :  I'll tell you what   --

4         MS. JOHNSTON:   Here you go.

5         MR. MONTEMARANO :  Thank you.

6         BY MR. MONTEMARANO :

7  Q.     Let's see.  I tem No. 19; you would agree ?

8  A.     Yes.

9         MR. MONTEMARANO :  Why don't we leave this up

10 here , in case we need this again.  Thank you    , Ms.

11 Johnston .  I will  give this back when  I'm done with the

12 good sergeant.

13        MS. JOHNSTON:  That's fine  , Mr. Montemarano .

14        BY MR. MONTEMARANO :

15 Q.     Can I ask you to turn your attention now    to Call

16 B627 on Page 41?

17 A.     I'm sorry.  My next page is 39  , not that one?

18 Q.     That's correct .  I'm asking  you to go to  Page 41 .

19 Mr. McKnett  will have some call  s with  you he would like

20 to review with you.   I'm going through the ones that    I'm

21 reviewing so we will break   up the  book as oppose d to

22 breaking up the attorneys.

23        This call takes place on the   15th of  March, sir;

24 correct?

25 A.     Call  B627 was intercepted on March 15, 2004     , at

1 1:05 in the afternoon.

2 Q.      And again , that's to  Ms. Martin's land line, home

3 phone number?

4 A.      This is an outgoing call.

5 Q.      Or a call using her home phone  , I'm sorry .

6 A.      That is correct.

7 Q.      In fact , can we as sume  these will all be her home

8 phone unless one of us remembers to point out the other

9 the cell phone?  There are only a few     A calls .

10 A.      I don't know what calls you selected.

11       MR. MONTEMARANO :  Okay.  Mr. Mitchell,  if you

12 could.

13       (Audio r ecording begins playing at 4   :05 p.m. )

14       (Audio recording stops playing at 4    :11 p.m.)

15       BY MR.  MONTEMARANO :

16 Q.      Do you see the word "book" used in this call?

17 A.      I believe  the word book appears several time   s in

18 the transcript s.  Do you want me to go through and note

19 them?

20 Q.      No.  You do see the word "book   ;" correct, sir?

21 A.      Yes.

22 Q.      That's a word that you previously suggested would

23 be possibly drug   language ; correct , sir.

24       MS. JOHNSTON:  Objection  .  This witness has not

25 heard this call before  , so it's  not a book that he

1 previously testified about.

2        MR. MONTEMARANO :  I asked  about  the  word  "book."

3        THE  COURT:  Say again.

4        MR. MONTEMARANO :  I asked the sergeant    about the

5 word  "book."  I will re-ask the question    .

6        THE  COURT:  A ll right .  Re-ask the question.

7        BY MR.  MONTEMARANO :

8 Q.      Do you see the word   "book" in this conversation;

9 correct, sir?

10 A.      Yes.

11 Q.      The word  "book " is the one you previously

12 identified as relat  ing to  drug conversation during your

13 prior testimony ; is that correct , sir ?

14 A.      That's correct.

15 Q.      That's why we find it on    the list here; correct?

16 A.      Yes.

17 Q.      Thank  you .  And the word  "book " is used

18 interchangeably for catalog   s in this call ; is it not ,

19 sir?  It appears?

20 A.      It appears as if she's try   ing to  get some

21 catalog s.

22 Q.      She says catalog in one place and book in another

23 place , and I put catalog up here so we're on the same

24 page.

25 A.      I don't think   we're  on the page , but that's

1 fine.

2 Q.      Could we go to  Call B634 on Page 45 .  That's

3 another outgoing call the afternoon of March 15;

4 correct, sir?

5 A.      Call B634 was an outgoing call on March 15 at

6 1:39 in the -- 1 :39 in the afternoon .  Excuse me.

7         MR. MONTEMARANO :  Mr. Mitchell,  if you would

8 please.

9         (Audio r ecording begins  playing  at 4 :10 p.m. )

10        (Audio recording  stops playing at 4 :11 p.m. )

11        BY MR.  MONTEMARANO :

12 Q.      See the word  "sundresses " in the  middle of that

13 first page on Page 45?

14 A.      Yes.

15 Q.      We agree  "sundress es" is a word you previously

16 testified could have relation to drugs    ?

17 A.      I believe dresses.  Could you check the list and

18 see if  sundresses  is on there?

19 Q.      I would be delighted to, sir.  Did you      ever play

20 bingo?

21 A.      Yes.

22 Q.      Try the N o. 24.

23 A.      Yes, the word  sundresses  appears on that list.

24 Q.      Ask you to turn your attention    , then , to Call

25 B638 on  Page 47 , the very next call in the book.

1          MR. MONTEMARANO :  Mr. Mitchell, if you could ,

2 please.

3          (Audio r ecording begins playing at 4  :12 p.m. )

4          (Audio recording   stops playing at 4 :15 p.m. )

5          BY MR. MONTEMARANO :

6 Q.       This call was on the   15th again; correct, sir?

7 A.       Yes, it was on the   15th at 1 :46 in the afternoon.

8 Q.       That would be the eighth day the wiretap is up;

9 correct, sir?

10 A.       The wiretap went up March 8.

11 Q.       Right .  So the fifteenth would be day eight   ;

12 right?

13 A.       Around there, yes.

14 Q.       Okay.  And if my count is correct, that's ten

15 separate phone calls relating very clearly to clothing

16 and clothing sales , and clothing purchase s; is that

17 correct , sir?

18 A.       Are you asking me have we played ten calls about

19 clothing?  That sounds about a good approximation.

20 Q.       Thank you.

21          MR. MONTEMARANO :  Your Honor , if the  Court would

22 be interested in taking an afternoon break.

23          THE COURT:  All right.

24          MR. MONTEMARANO :  I can  stop now .  I'm a little

25 over halfway down done   .  I've got about six calls.

1         THE COURT: Why don't we take a break until 4    :30.

2              (Jury was  excused at 4 :16 p.m. )

3         THE COURT:  Counsel , stay behind.

4         MR. MONTEMARANO :  C an we be heard , Your  Honor ,

5   before  we resume or before you leave the bench    ?

6         THE COURT:  A bout what?   Counsel, two matters.    I

7   wanted to state for the record that the docket entry of

8   the draft jury in  structions  that were reviewed on   Monday

9   is Docket N o. 892.  So for appellate review purposes    , so

10  the appellate court will not go crazy trying to figure

11  out what we were talking about, it's on the docket as

12  No. 892.

13        Secondly , I have distributed to you the chart

14  given  to me by the jurors as to their availability     ,

15  should it be necessary for this case to continue --     I'm

16  distributing it to you -- beyond the end of next week.

17  I invite you to look at it, we can dis    cuss it later .  I

18  am also distributing to you the note they read into the

19  record yesterday from   Juror N o. 9, who really is   Juror

20  No. 8 if you count because we had a -- previously    , we

21  excused a juror.

22        But, I think the bottom line of this chart   , if

23  I'm reading it correctly  , and I don't think need to make

24  a decision now , but we will need to make a decision

25  depending on when this case does go to the jury    , is that

1  if the case goes to the jury next week and they do not

2  reach a verdict, every juror  , except N o. 9, could return

3  to deliberate and presum  ably conclude deliberations  ,

4  although you never want to say that on     August 16, 17 and

5  18.  There's problems with     Monday and  Tuesday the  14th

6  and 15th.

7         So, it would appear  , depending upon when the case

8  goes to the jury , that we will need to make an

9  assessment.  Now , the juror that's got a problem   , that

10  following week is the same juror who wrote the note to

11  me that  I read into the record yesterday who has grave

12  problems with airplane flight to     Spain , and then grave

13  problems about being able to go     back to college and so

14  forth.

15         So the one option may well be     to excuse him , but

16  I don't  want do that now.  Excuse him and then we would

17  then be down to only two alternates     , which doesn't make

18  me happy , but certainly that would make it so that the

19  jury , if it did not reach a verdict before the end of

20  next week, there would be three full additional days of

21  deliberation the following week that they could use.

22         I'm making no decision now  .  I simply wanted to

23  communicate this to you so you could se    e it and then you

24  can go through this chart and fig  ure it out , but I

25  believe that's the bottom line is that all the      jurors,

1 except N o. 9,  could continue to deliberations for three

2 full days of the following week after the end of the

3 week ending August 11.    Are there any other matters

4 before we recess?

5        MR. MONTEMARANO :  Your  Honor , we would like to

6 revisit or finally resolve the question of    Call B4134 ,

7 which was located between    Pages 213 and 225.

8        THE COURT:  Have you redacted it   ?

9        MR. MONTEMARANO :  We have pulled it out.  We have

10 pulled --  we moved all  the transcripts from   Mr.

11 Krinsky 's direction per the   Court.

12        THE COURT:  My direction   when we met  on that

13 Monday was that you couldn't use it unless you redacted

14 it , and it  doesn't  appear  that it was  redacted.

15        MR. MONTEMARANO :  The  Court will permit us to use

16 it if we redact it  ?

17        THE COURT:  Yes.

18        MR. MONTEMARANO :  I will use the last couple of

19 pages .

20        THE COURT:  That's fine.    I'll leave it to you.

21 Make the redactions  , and if it looks like an appropriate

22 thing , you may use it.

23        MS. JOHNSTON:   Your  Honor , I object.  It's

24 another call with   Martha  Jean  West that  concerns

25 clothing .  It's not going anywhere to impeach this

1 officer's testimony  .

2         THE  COURT:  I sn't it cumulative of the calls

3 you've  already played?    I'm not certain that it gets you

4 anything , Mr. Montemarano .

5         MR.  MONTEMARANO :  Your  Honor , I completely agree.

6 I tell you what  I'm going  to ask the sergeant  -- he's

7 sitting here , so I will tell  him up front.  T here are

8 lots of other calls  .  We haven't played them all.

9         THE  COURT:  I think  Sergeant  Sakala will concede

10 there are other calls about    -- legitimate call s

11 concerning clothing.

12        MR.  MONTEMARANO :  If he doesn't  , I have  the

13 transcript.

14        THE  COURT:  I think we don't need the cross the

15 bridge of that call  .  I think  Sergeant  Sakala  will give

16 you the answer you need  .

17                (Off the record  at 4 :21 p.m. )

18                (On the record at 4  :36 p.m. )

19        MR.  MONTEMARANO :  Ms. Merez  asked me to mark the

20 transcript book as redacted as a defense exhibit.  It's

21 been marked as  Defendant Martin N  o. 12.

22        Do you want me to tell the jury that    , too ?

23        THE  COURT:  Sure.

24        THE  CLERK:  Is that for just identification?  Am

25 I correct?

1          THE COURT:  It's the same way the government's

2 book is in evidence.

3          THE CLERK:  It goes -- okay.

4               (Witness resumes the stand  .)

5               (Jury returns at 4 :38 p.m. )

6          MR. WARD:  C an I just put something on the

7 record , Your Honor , about a correction ?

8          THE COURT:  Certainly .

9          MR. WARD:  Your Honor, I previously used an

10 exhibit for identification purposes only with one of the

11 witnesses on  July 26.

12          THE COURT: Speak up.   I don't know if they can

13 hear you .

14          MR. WARD:  Previously  I used an exhibit for

15 identification purposes only with a witness on      July 26

16 when the clerk was not here.  That was marked as     Exhibit

17 3 for identification  .

18          THE COURT:  Dobie exhibit?

19          MR. WARD:  I t should actually be   Exhibit 11 for

20 identification.  Just to straighten    the record out.

21          THE COURT:  All right  .  The record has now been

22 straightened out.

23          MR. WARD:  T hank you , Your Honor .

24          THE COURT:  Y ou may proceed .

25          BY MR. MONTEMARANO :

1 Q.      Sergeant , if you could please turn to Page 95 of

2 the transcript book.    I'm directing your attention to

3 Call A301.   I'm sure the ladies and gentlemen of the

4 jury remember the   A line would be my client's cell

5 phone; correct?

6 A.      That is correct.

7 Q.      Do you want to check the log and verify the day

8 and type at your convenience, please?

9        MR. HALL:  Mr. Montemarano , what page number was

10 that.

11        MR. MONTEMARANO :  Page 95,  Call A301.

12        THE WITNESS:  Call A301 was intercepted on    March

13 18, 2004, at 5:49 p.m.

14        MR. MONTEMARANO :  Okay.  Mr. Mitchell .

15        (Audio r ecording begins  playing  at 4 :40 p.m. )

16        (Audio recording  stops  playing  at 4 :41 p.m. )

17        MR. MONTEMARANO :  Thank you , Mr. Mitchell.

18        BY MR. MONTEMARANO :

19 Q.      This call doesn't have anything to do with drugs    ,

20 either ; does it , Sergeant  Sakala ?

21 A.      No.

22 Q.      It's referencing  Ms. Martin's seeking the

23 services of an entertainment lawyer and somebody

24 providing her a reference; correct, sir?

25 A.      Yeah , I believe that's  Juanita Newell .  That's my

1  recollection .   She had con versations   with  Ms.  Newell
2  about finding an attorney.
3  Q.      And then this is that response to that call?
4  A.      It could be.
5  Q.      And without wanting to put words in your mouth     ,
6  but you would agree there are numerous calls between     Ms.
7  Martin and  Mr. Boy er that were intercepted during the
8  time the wiretap was up; is that a fair statement?
9  A.      You know,  I don't know if there were numerous
10 calls with  Mr. Boyer, but it wouldn't surprise me.     I
11 wouldn't disagree with that.
12 Q.      Okay.  Would it also be fair to say    , going back
13 to your little discussion about 45 minutes ago     , about
14 subject minimization that when there's a call between a
15 person,  Ms. Martin , for example , and her attorney,
16 whatever that attorney represents her in, you're going
17 to minimize that call immediately; correct, sir?
18 A.      Yeah.  Unlike spot monitoring   , which we do with
19 other things , there's a  -- what's called an
20 attorney -client privilege , which is you minimize the
21 call completely , and the only time you can come back up
22 is just to make sure the parties of the conversation
23 have not changed.
24 Q.      Indeed, as far as you understand    , inasmuch as  I
25 don't represent  Ms. Martin in any entertainment    -related

1 matters , I couldn't listen to a call between her an    d Mr.

2 Boyer  without her permission; correct, sir?

3 A.      I don't know.

4 Q.      It's not part of my representation.     I mean, a

5 call between a lawyer --

6        MS. JOHNSTON:  Objection.  Relevance.

7        THE COURT:  Sustained.

8        BY MR. MONTEMARANO :

9 Q.      You would a gree that in the law , calls A and B,

10 that's all  I'm talking about , that book in front of you  ,

11 there were calls  where Spencer Boyer's name and number

12 and call minimized  , there is nothing there  ; is that

13 correct , sir?

14 A.      That may very well be  , yes.

15 Q.      If I could ask you , please , to turn to Page 101  .

16 This is a call on the   23rd Of March on the  B line,

17 B1441.

18 A.      Call B1441 was on the   23rd Of  March at 4 :44 in

19 the afternoon.

20        MR. MONTEMARANO : Mr. Mitchell , if you please.

21        (Audio r ecording begins  playing  at 4:44 p.m. )

22        (Audio recording  stops playing  at 4:45 p.m.)

23        THE WITNESS:   I don't have that call that he's

24 playing.

25        MR. MITCHELL:   I got a little dyslexic.

1           MR. MONTEMARANO : Oh.

2           MR. MITCHELL: Sorry.   Can we skip that call?

3           BY MR. MONTEMARANO : Sure.  We're going   to skip

4  that one for now and we will come back to that one,

5  Sergeant.  Maybe we can take a brief break and      Mr.

6  Mitchell  can find out what's wrong with his computer.

7           I would invite your attention to     Page 16 5,

8  please.  And   --

9  A.      I don't have a   Page 16 5 in my book.

10 Q.      Oh, okay.  Well,  I do , so I'll give you mine.

11          THE  COURT:  D o the jurors have that page?

12          MR. MONTEMARANO : Everybody got 16  5.

13          THE  COURT:  I just  wanted  to make sure everybody

14 had the page.

15          MR. MONTEMARANO : Thank you , Your  Honor.

16          THE  WITNESS:  Thank  you , sir.

17          BY MR.  MONTEMARANO :

18 Q.      I'll  look over my client's shoulder.  This is

19 probably a good call to talk about right after that last

20 call with  Mr. Boyer .  The date is April 13 on the      B

21 line,  B339 1.

22 A.      Call B 3391 was intercepted on April 13, 2004     , at

23 12:30 in the afternoon.

24          MR. MONTEMARANO :  Mr. Mitchell,  do we have this

25 one?

1          (Audio recording begins playing at 4  :47 p.m.)

2          (Audio recording  stops playing at 4:48 p.m.)

3          BY MR.  MONTEMARANO :

4  Q.      You would agree this probably is a call having to

5  do with drug s; right, sir?

6  A.      That is correct.

7  Q.      And by this point, April 13  , we've had a wiretap

8  that's been up for about five weeks?

9  A.      That's correct.

10 Q.      And during that five weeks  , we've heard

11 references to shows on other calls?

12 A.      Yes.  As  I think  I previously testified  , she

13 talked about shows a lot.

14 Q.      And about  Aretha  Franklin?

15 A.      Yes.

16 Q.      And about investing her money?

17 A.      Yes.

18 Q.      I would ask you please to turn to    Page 18 5.   This

19 is a call on the   A line, A1092.

20 A.      Yeah, Call A1092 was intercepted on    April 19,

21 2004 , at 11 :03 in the morning.

22         MR.  MONTEMARANO :  Mr. Mitchell,  if you could  ,

23 please.

24         (Audio recording begins  playing  at 4:49 p.m.)

25         (Audio recording  stops playing  at 4:50 p.m.)

1          BY MR.  MONTEMARANO :

2 Q.      You've heard these names    Gerald  Levert , Levert

3 before; correct, sir?

4 A.      Yes.

5 Q.      In fact , that would be the tour that    Ms. Martin

6 was seeking to sponsor or produce when she invested her

7 money with  Gilbert Williams ; correct,  sir?

8 A.      That , I don't know.    I know she told people a lot

9 about  Levert , and she told people about a lot of people      ,

10 so I don't know the exact arrangements she      had  with  Mr.

11 Williams.

12 Q.      Mr. Williams is the person the government sought

13 the return of $130,000 from   ; isn't he?

14 A.      Mr. Williams  is the  person we had tried to seize

15 and he had wire d the  money out  of the  account the day

16 before we were going to serve the ban    k with  the seizure

17 not ice.

18 Q.      The money you were try  ing to  seize had come from

19 Ms. Martin?

20 A.      Right .  That's  correct .  It had been  wired from

21 her account.

22 Q.      You were you were try  ing to  seize  Ms. Martin 's

23 money in his possession  ; is that a fair statement?

24 A.      That's a fair statement.

25 Q.      Around $100,000  , give  or take?

1  A.      It's probably around $100,000   .

2  Q.      Probably not over 150, probably not in double

3  digits ?

4  A.      I would agree with that  .

5  Q.      Invite your attention to Page 157    , please , next

6  call, call on the same day   , an incoming call from    Ms.

7  West again at 5 :56 in the evening,    B3946.

8  A.      I have it at 5 :55 , but that's all right.

9          MR. MONTEMARANO :   Okay.  Why don't we play this    ,

10 Mr. Mitchell,  please .

11         (Audio r ecording begins   playing  at 4 :52 p.m. )

12         (Audio r ecord ing  stops playing at 4  :54 p.m. )

13         MR. MONTEMARANO :   Mr. Mitchell , please stop the

14 tape.   Thank you.

15         BY MR.  MONTEMARANO :

16 Q.      Again , discussing clothing with    Ms. West ?

17 A.      Yes.

18 Q.      Sizes, manufacturers  , all that sort of stuff?

19 A.      Yes.

20 Q.      We see the word   "dresses ".  You agree   "dresses "

21 is a word you previously suggested has drug

22 connotations; correct, sir?

23 A.      The word  "dresses"  was previously used as a coded

24 word for drugs, yes.

25 Q.      That's on  Page 18 8?

1  A.      I do not believe    "dresses " is used as a code word

2  for drugs on   Page 18 8.

3  Q.      But it's used on    Page 18 8; is it not?

4  A.      The word  "dresses"  appears on  Page 18 8.  That is

5  correct.

6  Q.      Thank you.

7          I ask you to please turn to    Page 19 6.  If you

8  want to double   check  the date and time of that call in

9  the log, please.

10         MS. JOHNSTON:   Your Honor , I'm not sure we

11 finished playing the other call consistent with the

12 transcript that's in the book.

13         MR. MONTEMARANO :  My understanding was that call

14 was redacted further than that.     I'm a little confused

15 because  I didn't think  it was  necessary to play the

16 balance of the call.  The    Court asked that we redact the

17 call where is possible.

18         MS. JOHNSTON:   Your Honor , the book goes on with

19 Page 19 1, 19 2, 19 3, 194 -- not 19 3.  It's in  the

20 transcript book  , but it hasn't been played.

21         THE COURT:  We can redact the book if you want to

22 take out what has   not be  played ?

23         MS. JOHNSTON:  No , Your Honor .  I will deal with

24 it on redirect with the detective.

25         THE COURT:  Okay.

1          BY MR.  MONTEMARANO :

2 Q.      Mr. Mitchell  is having a little   trouble  with

3 3948 , so why don't we just skip that?

4          I'm going to ask you t  o turn your attention  ,

5 please , to -- almost done here,   Detective.  Give me a

6 moment, please.   I want to make sure we're not missing

7 anything.

8          Page 27 1, if you would be so kind.  Confirm the

9 day and time of that call  .

10 A.      Call  B4687 was intercepted on   April 28, 2004 , at

11 7:05 in the morning.

12         MR.  MONTEMARANO :  Mr. Mitchell, 468 7.

13         (Audio r ecording begins playing at 4   :56 p.m. )

14         (Audio recording stops playing at    5:03 p.m. )

15         BY MR.  MONTEMARANO :

16 Q.      I think the redacted tape and my redactions in

17 the transcript didn't quite match up.  You listened to

18 that call ; did you not , sir?

19 A.      Yes.

20 Q.      In that call, we hear discussions about things

21 being sent back; correct?    Right?  On the first page.

22 A.      Yes.

23 Q.      And a few pages on,   Ms. West  is offering to

24 credit  Ms. Martin; correct?

25 A.      Yes.

1 Q.      And we hear the numbers like 16 and all that;

2 correct, sir?

3 A.      What page are you   referencing?

4 Q.      Let's see.  Give me just a moment, please.  Oh      ,

5 about 27 1, at the bottom in the middle of the page.

6 A.      Yes.  Number 16 appears on     Page 27 7.

7 Q.      And will you concede on     Page 27 6, the  number

8 $1,300  is mentioned and that's a significant amount of

9 money?

10 A.      The number $1,300 is on  Page 27 6.  Again , your

11 perspective would be whether you consider $1,300

12 significant or not.

13 Q.      Fair enough.

14         We also have the color brown used; correct, sir?

15 A.      Again , what page are you referencing?

16 Q.      I think right at the end o   f Page 27 7, I believe .

17 A.      I s ee coffee on  Page 27 7.

18 Q.      The word --  I had found  "brown, " but I did not

19 note it.  Give me a moment   , if you would be so kind.

20 Right in the middle of    Page 278 , there was something

21 else, a  "brown."

22 A.      Yes, the word  "brown " appears on  Page 278.

23 Q.      Based upon your 17 years of experience in

24 narcotics , you would agree that    "brown " could have been

25 a reference to brown heroin   ; couldn't it , sir?

1  A.      No, it could not.

2  Q.      It could not under any circumstances be or it

3  could not be here?

4  A.      Here, could not be a reference to the heroin   , no.

5  Q.      Just so we're all clear  , taking  you back to the

6  beginning of this transcript, this is on     April 28;

7  correct, sir?

8  A.      I believe that's correct.    Yes.

9  Q.      Okay.  I'm going  to ask you  to turn finally to

10  page -- nope, not at all.    I'm going to ask you to --

11  Mr. Mitchell didn't play a couple of calls    I was going

12  to go into ; B1441 , which you will find in your book at

13  Page 101 , and B3946 at  Page 18 7.  Would you take a

14  moment and glance through those transcripts to yourself?

15  A.      I'm ready.

16  Q.      Okay.  The one on  Page 18 7, that's a call on the

17  19th of  April; correct, sir?

18  A.      Give me one minute.    Yes, Call B3936 was

19  intercepted  on the 19th of   April.

20  Q.      And B1441 in the transcript that we're not going

21  to play, is on the 23rd of    March;  correct , sir ?

22       MS. JOHNSTON:   Your  Honor , I'm going to object to

23  the reference to transcript   s if the calls are not being

24  played because those calls are not -- it is the

25  recordings that are evidence and not the transcripts     ,

1  and they should not have been given out to the jury or

2  anyone else if  counsel is  not introducing the calls.

3          MR. MONTEMARANO :  If  I could be permit ted to  tie

4  it up.  If the  Court doesn't believe it's appropriate    ,

5  I'm glad to play the cal  ls.   I thought  I would ask him a

6  few questions  and  dispense with a few calls  , like I was

7  going to dispense with B3134   , which you already

8  discussed , Your  Honor.

9          THE  COURT:  All  right.

10         BY MR.  MONTEMARANO :

11  Q.     Those are about a month apart   ; correct , sir ?

12  A.     Yes.  The B1441 was intercepted on    the 23rd of

13  March .

14  Q.     Interspersed between these    calls  and many other

15  calls were many calls between    Ms. Martin and  Ms.  West

16  discussing clothing; correct?

17  A.     I'm sure there was  , yes.

18  Q.     And other calls with other people discussing

19  clothing ; correct , sir?

20  A.     I remember  Ms. West.   I'm sure there was a couple

21  of other people.

22  Q.     They go all the way   to the end of the wiretap  ; is

23  that a fair statement, sir?

24  A.     The calls with  Ms. West or the call s with  other

25  people?

1 Q.      Calls with Ms. West , calls with other people

2 both.

3        MS. JOHNSTON:  Objection  , unless we know what

4 other people he's referring to.

5        THE COURT:  Clarify your question.

6        BY MR. MONTEMARANO :

7 Q.      Any other people concerning clothing, sizes,

8 colors, style s, the  sorts of things we've been listening

9 to since about three o'clock   ?

10 A.      Yeah.   I don't remember the last call we

11 intercepted with  Ms. West, but I remember there were a

12 lot of them through the wire  .  She also --  I think  I

13 testified previously   -- had a lot of call s with  Kevin

14 Scott.

15 Q.      You opine in your role as an expert witness for

16 the government that it was your opinion that the calls

17 about which you testified on direct that      Ms. Johnston

18 played through you were calls relating to drugs;

19 correct, sir?

20 A.      That is correct.

21 Q.      And it was your opinion that these demonstrated a

22 pattern of drug a  ctivity ; correct, sir?

23 A.      Yes , you could call it that.

24 Q.      Okay .  And in arriving at the conclusion that all

25 of those other calls related to drug activity      , you also

1 listened and considered these calls    ; did you not , sir?

2 A.      Yes, I listened to these calls.

3 Q.      Indeed , when you were asked by myself and other

4 defense attorneys,   seven of us here, you opined that

5 there was no legitimate business that     Ms. Martin was

6 engaged in; correct  , sir?

7 A.      This is not a legitimate business.

8 Q.      This is not a  legitimate  business ?

9 A.      That's correct.  If you're talking about the

10 Martha gene  West calls , that is correct.

11      MR. MONTEMARANO :  May we approach , Your Honor ?

12      THE COURT:  Okay .

13           (At the bar of the Court.)

14      MR. MONTEMARANO :  There ha s been no disclosure to

15 this defendant relative to any 404 or related or similar

16 issue, misconduct by my   client,  and now they're saying

17 this is not a legitimate business.    I am not about to

18 open the door and have him say something vaguely

19 tracking what  Ms. Johnston suggested regarding    Ms. West

20 and these being stolen clothing or anything like that     ,

21 so I don't want to open that door.

22      MS. JOHNSTON:   Your Honor , that door is.

23      THE COURT:  You just open  ed the door .

24      MS. JOHNSTON:  T hat door is way open playing all

25 of these calls , asking him these questions of what all

1  these calls were , and counsel had  notice of what we

2  believed  Ms. Martha  Jean  West  was  involved  in.

3           THE  COURT:   I don't want to go into a satellite

4  matter of whether she was engaged in the clothing -- the

5  stolen clothing business, but.

6           MR.  MONTEMARANO :  So we're clear.  If they

7  believe my client's involved,    I'm entitled to notice

8  under 404, other prior bad acts.

9           THE  COURT:  They have not sought to introduce --

10 you open ed thi s door up.

11          MR.  MONTEMARANO :  I would not have asked

12 questions of this sort --   I am entitled to knowledge of

13 it so as to frame my  cross , No. 1.

14          THE  COURT:  Mr. Montemarano , you have very

15 capably brought out through this witness of t   he fact

16 there were a number of calls involving the sale and

17 purchase of clothing.  In an effort to place before the

18 jury the  -- whether  or not  his conclusions about other

19 calls about clothing were characterize   d correctly ,

20 characterized as being about clothing and not drugs    , I

21 think that point has been amply and cap    ably made.

22          MR.  MONTEMARANO :  Thank you.

23          THE  COURT:  But when you asked him was he engaged

24 in a legitimate business , and he said no.

25          MR.  MONTEMARANO :  I didn't go any further.

1           THE COURT:  You may not want to go any further.

2           MR. MONTEMARANO :  I understand that.  Allow me to

3    explain my position.    I think I'm entitled to notice;

4    (b) I don't believe  I open ed the door because  I came up

5    here; (c) I think I'm entitle d to a proffer from the

6    government of what   I might say .

7           Are we talking legitimate because it was drug

8    money or are we talking legitimate because it's stolen?

9    I think I need to know where he   was going .

10          THE COURT:  I'm not sure we know where he's

11   going.

12          MR. MONTEMARANO :  For that record , I would ask

13   the opportunity to voir dire the sergeant out of the

14   presence  of the  jury. The fact is , if they are going to

15   sandbag me with this   sort of thing that   I have demanded

16   notice on  --

17          THE COURT:  T his is not something the government

18   has sought to introduce.  How can they be sandbagging

19   you?  Let's hear from  Ms. Johnston.

20          MS. JOHNSTON:   Your Honor , we didn't bring this

21   up.  We're not  entitled  to 404 (b) notice .  We stayed

22   away from the call s with Martha Jean West for  the very

23   reason when he advise d the Court that they intend ed to

24   call her as a witness , we told the  Court we believed she

25   had a Fifth  Amendment right involving selling stolen

1 clothing , and he now has open  ed the door by playing

2 these calls , by indicat ing to this jury that somehow   Ms.

3 West  and  Ms. Martin  had a legitimate business    , to use

4 his phrase.

5        The detective is going to tell that    -- I mean , in

6 his opinion , it was not a legitimate business   , that she

7 was selling  Ms. Martin stolen clothes  , and you can tell

8 by the prices.  She  gets one price and then she gets a

9 different price , and these prices -- she has a retail

10 catalog and who  lesale catalog.  He has open   ed thi s door .

11        We have not  -- we are entitled to have    Agent

12 Sakala  give his opinion why he didn't think this was a

13 legitimate business.   Counsel didn't have to ask him

14 that question if his point was to show -- to attack the

15 expert witness testimony of    Agent  Sakala  that these

16 words  don't relate to drug  s.  That 's what the court

17 allowed him to   do.

18        He went beyond that asking him what his opinion

19 was of the legitimacy of the business.  We are entitled

20 to get out why he has the opinion that it was not a

21 legitimate business.  He should not have gone there.

22 The  Court's instruction was to use these calls to attack

23 the basis of   Agent  Sakala's  opinion.

24        He's gone beyond that and has created this image

25 with this jury that these are all legitimate business

1  dealings and asked him what his opinion is.  This door

2  is wide open.  The horse is already out of the barn as

3  far as the government is concerned.  We have done

4  nothing wrong here and   Mr. Montemarano  is well aware

5  that this is where   it was going.

6          MR. MCKNETT :  Your Honor , may I consult  Mr.

7  Montemarano  for a second ?

8          THE  COURT:   I can't hear you.

9          MR. MCKNETT :  May  I consult with him for just a

10  second ?

11          THE  COURT:  Yeah.

12          MR. MONTEMARANO :  Your Honor , this was an

13  expertise offered based upon his expertise of       Ms.

14  Martin's expertise in drugs, about which he was an

15  exert .  He was not admitted as an expert for stolen

16  clothes or anything else.  As far as he's concerned      , Ms.

17  Martin  is responsible for the sinking of the       Titanic,

18  and she shot  President  Kennedy.  T here is little   Ms.

19  Martin can do right in this person's eye     , and he may

20  well be right .

21          And for sake of our discussions at      the bench ,

22  your Honor , I will  stip ulate every  stitch of clothing

23  sent by  Ms. West  -- Ms. Martin from  Ms. West from

24  Florida was stolen.  There is no way    .  So what?   This is

25  my client's trial, and it does not pass the 403 test if

1 they're going anywhere near it.

2        THE  COURT:  Why don't we just leave it the way it

3 is?

4        MS. JOHNSTON:   I intend to ask him why he

5 answer ed that question , because if counsel asked him you

6 don't -- was this a legitimate business, he said     , no, we

7 are entitl ed to have on the record why he said no.

8        MR. MONTEMARANO :  Based upon what  ?

9        MS. JOHNSTON:  It d idn't matter wh at it's  based

10 upon .  He is entitl ed to  a give an opinion.  We are

11 entitled  --

12        THE  COURT:  The government hasn't done any

13 redirect on this issue yet   , so we're not at the point

14 yet.

15        MR. MONTEMARANO :  Then  I will  go back and  I will

16 --

17        THE  COURT:  You've asked the question, you've

18 gotten the answer.

19        MR. MONTEMARANO :   I will  go back and ask him this

20 is his opinion as an expert   .

21        THE  COURT:   He'll answer yes .

22        MR. MONTEMARANO :  He will say yes or no.  At that

23 point , I think the government   , base d upon what  Your

24 Honor has just said  , the government's redirect will be

25 foreclosed.

1          THE COURT:  I don't know.   I'm not going to make

2  that ruling right now , but it certainly seems to me that

3  it's -- you've asked the question   , you've got an answer .

4  The government may be entitled to inquire    , but I'm not

5  ruling now.

6          MR. MONTEMARANO :  He's already provided this

7  opinion in the past , but we were entitled under    Rule 16

8  to a basis for the expertise   .  He has an expertise now

9  on stolen clothing ?

10         THE COURT:  This is not an opinion that the

11  government has sought to elicit in its case in chief.

12         MR. MONTEMARANO :  He said no legitimate business

13  on direct .  This is going back to his direct two weeks

14  ago , Your Honor .  That's why I said sandbag , with all

15  candor.

16         THE COURT:  I don't think that  you've been

17  sandbagged under the circumstances.

18         MS. JOHNSTON:   Your Honor , we have  a more

19  practical problem before   Mr. McKnett gets up , because  I

20  think Mr. Montemarano  is at the end of the   calls,  and

21  going through the book with those calls    , there is a

22  call, Call 3871 on  Page 168 that the   Court , according to

23  my notes , ruled should be excluded.

24         MR. MONTEMARANO :  We already pulled it out at

25  your request.

1          MS. JOHNSTON:  3871?

2          MS. GREENBERG:   Your Honor, I thought it was

3 pulled out.

4          MS. JOHNSTON:  It's in my book.

5          MR. MONTEMARANO:  You haven't pulled it out.  You

6 got your book -- we gave the book, you came up and made

7 the motion, we pulled them out.

8          MS. GREENBERG:   I thought it was pulled out  , but

9 then when I was --

10         MR. MONTEMARANO:  We didn't pull one out that was

11 suppose d to be pulled out.

12         THE COURT:  Conclude your cross.

13         MR. SUSSMAN:  I understand --  Mr. Montemarano was

14 trying to bring in these calls for the purpose of

15 showing that the jargon, the words could mean different

16 things.  Without weighing in on whether he opened a

17 door, I think that if you open a door  , you don't

18 necessarily open it all the way.

19         There are other people here  , and to the extent

20 that Sakala doesn't believe that this is a legitimate

21 business and the government wants to  elicit that, I

22 think if the Court is going to let him elicit it  , then

23 he can give his opinion and go on.  There doesn't have

24 to be any long exposition as to why or the wherefor  es of

25 the stolen clothing business.

1          THE COURT:  All I'm doing right now is  Mr.

2 Montemarano  should continue his cross-examination   .  I

3 haven't made a determination  , and I will think about it

4 whether the government on redirect can ask him whether

5 or not that was a legitimate business .  I have not

6 foreclose d the question .

7          MR. SUSSMAN :  I don't know where will be on time    ,

8 but I jus t did want to bring that up.

9                    (Back in open court.  )

10          BY MR. MONTEMARANO :

11 Q.      You're here,  Detective  Sakala , to testify as an

12 expert on drug transactions, drug jargon    , drug

13 economics; is that a fair statement    , sir?

14 A.      Whatever  I'm asked.

15          MR. MONTEMARANO :  No further questions  , Your

16 Honor.

17          THE COURT:  All right.  Further cross-

18 examination?

19          MR. MARTIN:  Mr. Goodwin has no questions for the

20 good sergeant.

21          MR. HALL:  Mr. Whiting has no questions   , Your

22 Honor.

23          THE COURT:  Mr. Mitchell?

24          MR. MITCHELL: Court's indulgence,   Your Honor.

25                    **CROSS-EXAMINATION**

1          BY MR. MITCHELL:

2 Q.        Sergeant Sakala, good afternoon.    Timothy

3 Mitchell.   I represent Mr. Bynum.

4          I want to direct your attention to    Page 136 in

5 the transcript book.  If you could confirm with the log,

6 this was  B2429.  This was an   incoming call; is that

7 correct?

8 A.       Call B2429 was intercepted on   April 1st, 2004, at

9 4:24 in the afternoon , and yes , it was an incoming call.

10 Q.       If I could take a  moment and just get a little

11 background.   I know Mr. Montemarano  asked you where you

12 derived your opinion from and how you derived your

13 opinion that these calls were of drug activity, but if      I

14 could further inquire on that.

15          You already stated that your opinions were based

16 on your training and experience as a police officer;

17 correct ?

18          MS. JOHNSTON:  Objection  , we've done this on

19 cross before several weeks ago   ?  Your Honor.

20          THE COURT:  Overruled.

21          BY MR. MITCHELL:

22 Q.       I won't go long on this.

23          Your opinion is also based on your personal

24 experiences and life experiences; correct?

25 A.       I would agree with that, yes.

1  Q.      Because you have to know what a real ticket is in

2  order to know  what a non-ticket is and what a suit is as

3  opposed to something that may be referenced to drugs;

4  correct?

5  A.      I would agree it help  s to  have real life

6  experience, yes.

7  Q.      And you would also need to know what's going on

8  in the community, knowing what's going on in local

9  areas , what jargon people are using; is that correct?

10  A.      Given those parameters  , I would not agree with

11  that, no.

12  Q.      Would it involve reading newspaper, listening to

13  radio, talking with people in neighborhoods, things like

14  that ?

15  A.      Are you asking me if that's important for

16  offering an opinion on these call    s?

17  Q.      to understand it's part of    your personal

18  experiences.

19  A.      I listen to the radio  , I read the newspaper  , I

20  meet people.

21  Q.      Getting to  Page 136 in  the transcript book.  You

22  used your training and experience    , knowledge as a police

23  officer and personal experience to interpret this phone

24  call; is that correct?

25  A.      I think th at's what we just said, yes.

1  Q.       As I understand on   Page 137 , if I understand your

2  testimony, you had indicated that you believed that on

3  that first line  , that  Mr. Bynum  had said , do you want to

4  try some  Peruvian- style tickets.

5          Was that your testimony?

6  A.       That is correct.

7  Q.       And that is based on your listening to the phone

8  call or someone else transcribing the phone call?

9  A.       The calls were transcribed initially by the

10  monitors as they would come in    , and  I think as  I

11  testified before  , they went through a refining process    .

12  So different people have worked on the transcripts     , and

13  ultimately , I listened to the transcripts    -- excuse me ,

14  listened  to the audio tapes while reading the

15  transcripts.

16  Q.       If you disagreed with whoever transcribed this     ,

17  would you change the words?

18  A.       I would then make corrections   .  It would then go

19  back to the secretary  , who would then fix the

20  transcript.  Sometimes they were fixed and sometimes

21  they weren't .  As we found out three weeks ago    , there

22  were still some that hadn't been fixed.

23  Q.       From looking at the original transcripts of this

24  --

25          MS. JOHNSTON:  Page 263 and 26   4, Mr. Mitchell .

1            BY MR. MITCHELL:

2 Q.      If I can have you look at Page 263 in Book 2.

3          Again, Book 2 of the Title 3 transcripts, Page

4 264. Looking at that and looking at that transcript    ,

5 are you able to tell who -- which person actually

6 transcribed that phone call initially?

7 A.      No.

8 Q.      Is there any one person that transcribed all

9 those phone calls ?

10          MS. JOHNSTON:  Objection.

11          Relevance to the purpose of this limited

12 cross-examination.

13          THE COURT:   Overruled.

14          THE WITNESS:  No.   I'm sorry.  Did you say , is

15 there any one person who transcribed all the calls?  And

16 the answer is no.    I believe  that was your question.

17          BY MR. MITCHELL:

18 Q.      You don't know who transcribed that particular

19 call?

20 A.      Not looking at the book, no,    I cannot tell you.

21 Q.      If I could direct your attention to the log.        I

22 know you have that in front of you.      I believe that's

23 Miscellaneous  9.  You're looking at Page 1506  ; is that

24 correct , of the log?

25 A.      I haven't  looked  up this call yet, have    I?

1  Q.      It should be 1506  , if my notes are correct.

2  A.      Yes.

3  Q.      Okay.  If you could review the log -- are you

4  able to determine who transcribed the notes for that

5  log?

6  A.      No.  I can tell you who monitored it.     I can't

7  tell you -- well  , the monitor would have been the one

8  typing the log, yes.

9  Q.      Who would that have been?

10 A.      I don't remember his last name   , but the initials

11 are T. A. L. A.; first initial,  I believe, is  J.

12 Q.      And in the log , what is the person who was

13 listening to that  ?  How did they interpret the word

14 chicken or tickets  ?

15         MS. JOHNSTON:  Objection.

16         Calls for hearsay; what somebody else

17 interpreted.

18         THE COURT:  Sustained.

19         BY MR. MITCHELL:

20 Q.      If I understand your testimony earlier, this     log

21 is based on reviewing the calls and listing the calls;

22 correct?

23 A.      The log is actually composed when the monitor

24 comes in and is actually monitoring the calls in

25 realtime , is actually typing in the computer and marking

1  different remarks  , and filling in different feeds all on

2  the computer as it comes in.

3  Q.      And you reviewed this log?

4  A.      That's correct.

5  Q.      And you made any changes that you felt were

6  appropriate, correct  , in the log?

7  A.      As I testified before  , if I saw a major

8  discrepancy , for example , if they had a person

9  misidentif ied in  a pertinent call or they had something

10  that was an unidentified male or unidentified female in

11  a call, I would make a  note in the log.

12  Q.      When you review ed thi s particular log , did you

13  call -- did you make any correction   s to that log?

14  A.      No, I did not.

15  Q.      When you review ed the notes on this log, were

16  they accurate?

17  A.      As I said, if they contain ed mistakes , if I

18  noticed the mistakes  , I would make the correction   , if it

19  was a major mistake  , but a lot of times if there was a

20  mistake that was in  consequential  or I didn't pick it up  ,

21  obviously  I would not make that change.

22  Q.      So the language in that log   , then , what does that

23  language state?

24          MS. JOHNSTON:  Objection.  It's hearsay.

25          THE COURT:  What the log says?

1          MS. JOHNSTON:  What the log says is hearsay    .

2          THE COURT:  O verruled.

3          THE WITNESS:  Do  you want me to read it to you    ?

4          MR. MITCHELL:  Please.

5          THE WITNESS:  Derrick   calls P.M.   Derrick

6  mentions that he ("Derrick")   is on the way  to P.M.'s

7  location .  Derrick  mentions  that she , P.M, that he,

8  ("Derrick" ) wanted because she  , P.M. has to pay for the

9  ticket when  P.M. gets them.   P.M. mentions --  Derrick

10  asks P.M. if she , ("P.M.") wants to try some

11  Peruvian- style chicken .   P.M. replies  -- mentions that

12  she ("P. M.") doesn't want something from     --

13          BY MR. MITCHELL:

14  Q.    After reviewing that, did -- strike that.

15          When you listened to this call and reviewed the

16  log , you didn't find any error to correct    ; is that

17  correct?

18  A.     I think  I, as I said before , previously testified

19  I did not make a correction on this log entry, that's

20  correct.

21  Q.     When  you looked at  the  transcript that was

22  provid ed to  the  jury , did you make a correct  ion to  the

23  actual language that was used?

24  A.     In the logbook?

25  Q.     Correct.  The interpretation that you got from

1  listening to the phone call and didn't correct the log?

2  A.      If you're asking me -- you cannot going back and

3  -- once the logs at the end of that day are done    , so to

4  speak, there is no going back and making any changes at

5  that point, no.  It physically cannot be done.

6  Q.      All right.  So when you said that you reviewed

7  the logs and made any changes, what exactly did you mean

8  then?

9  A.      Every morning , I would come in at    -- I think it

10 was six a.m.  I would review all the call   s that had come

11 in the previous night   for the time period   that I was  not

12 there .  I would make any additions or corrections again

13 that were of a -- to a pertinent call or a     momentous

14 correction.  Those logs are then    -- at th at point , they

15 are done .  They are sent to the   U. S. Attorney's   Office

16 and no further corrections at that point or change    s to

17 the logs are made.

18 Q.      Okay.  So initially when you looked at it    , you

19 didn't make any correction to it?

20 A.      For the third time , that's correct.

21 Q.      All right.  So then the call was transcribed?

22 A.      I have no idea when the first transcript was

23 done .  The normal practice was as a call    was coming in .

24 It was mark ed as pertinent .  It would go into what is

25 call ed a transcription log , which the monitors    would

1  work from  to decide -- again  , to determine what calls

2  would be transcribed  .  They would then work from that

3  log.  What day this was transcribed   , I could not tell

4  you.

5  Q.     I don't think you understand what    I'm asking.  At

6  some point , the decision was made to transcribe the

7  call; correct ?

8  A.     I'm sure this call was probably put in the

9  transcript log , probably right after   it was intercepted.

10 Q.     And it was transcribed  , put in  Book N o. 2 ;

11 correct?

12 A.     Yes.

13 Q.     Provid ed to  the jury.

14 A.     Yes.

15 Q.     And it had a different word in it than what was

16 in the log; isn't that correct   ?

17 A.     A lot of the words in the transcripts and the

18 log s are  different , that is correct.  This is one of

19 them.

20 Q.     Let's be specific then.  The word    Peruvian-style

21 chicken does not appear in the transcript provide     d to

22 the jury, does it?

23 A.     Peruvian- style chicken does not  , that's correct.

24 Q.     Whose decision was   it to make a change in the

25 word  "chicken " as opposed to ticket?

1 A.      There was no change to be made.      I'm not sure you

2 understand,  Mr. Mitchell, how those logs work.  The logs

3 are a work product based on what the monitor      is

4 listening to   realtime .  They are not meant to be a total

5 accurate representation of the call.  As the logs are

6 listened, there are certain legal requirements that are

7 necessary to keeping a log.  They are totally separate

8 and apart from the transcript.      The person working and

9 doing the transcript is not going to go back and refer

10 to the log to determine what goes into the transcript,

11 if I'm being clear.

12 Q.      I think you were clear the first time.      I don't

13 think you understand what    I'm asking.

14 A.      Could you please repeat it then   ?

15 Q.      I will  repeat this all over again   .

16 A.      Thank you.

17 Q.      We will do it until we get it straight.  You

18 reviewed the log; correct?

19 A.      Every morning.

20 Q.      Just --

21 A.      Yes, every morning  I would come in at six a.m.

22 and rev iew the log, yes.

23 Q.      And the word  Peruvian-s tyle chicken appear  ed in

24 that log and you didn't change it?

25 A.      Yes , that's correct  .  I already said that.

1  Q.      When the transcripts came in  , it was

2  Peruvian- style tickets , and you didn't change that   ; did

3  you?

4  A.      That is correct.

5  Q.      Why is it that you left the word ticket as

6  oppose d to chicken ?  When -- initially , when you

7  reviewed this call  , you didn't make that change?

8  A.      That is not an accurate representation.

9       MS. JOHNSTON:  Objection.

10       THE WITNESS:  When  I initially reviewed the call

11  with the logs, if  I noticed the  Peruvian- style chicken

12  tickets , I either  didn't make the change because    I

13  didn't notice it or   I didn't think there was any

14  significance  to note the log.  I f you look at  the note

15  where I made corrections  , which  is very few, probably

16  less than 2,000 in 10,000 calls,    you will find very few

17  notes.

18        At that time  -- that's the logs .  Now the

19  transcript process is a completely different process.

20  I'm not sure that --  I don't go back and look at the

21  transcript when comparing the --    excuse me , go back and

22  compar e the log .  When I look at the transcript  , there

23  is no -- it's either this  one or that one.   I'm not sure

24  the 460 -some transcript s, if you go back and look at

25  every log entry , you will find log entr  ies that  differ

1 from the transcripts.

2 Q.     I don't recall your answer to my question on

3 cross-examination , so let me ask it again.

4       MS. JOHNSTON:  Objection to asking a question

5 that was  previously  asked during cross-examination.

6       THE COURT:  Let him finish the question.

7       BY MR. MITCHELL:

8 Q.     Are you familiar with  Peruvian- still chicken, the

9 actual dish?

10 A.     No.

11 Q.     Now, not know ing that and not having that

12 personal experience of knowing what it is, wouldn't that

13 lack of experience affect this transcript that

14 eventually came through and provide    d to the jury ?

15 A.     Because I haven't eaten  Peruvian- style chicken ?

16 Q.     Correct .

17 A.     I would say no.

18 Q.     Have you  ever heard of the restaurant    Senior

19 Chicken?

20 A.     I think you asked me that before and the answer

21 was no.

22 Q.     Have you ever heard of  El Pollo Rico in Wheaton,

23 Maryland?

24 A.     No.

25 Q.     Are you familiar with any restaurant    s in the

1  District of  Columbia that ser  ve Peruvian  chicken ?

2          MS. JOHNSTON:  Objection  , relevance.

3          THE  COURT:  Sustained.

4          BY MR.  MITCHELL:

5 Q.      Would you know if they   exist?

6          MS. JOHNSTON:  Objection  , relevance.

7          THE  COURT:  Sustained.

8          BY MR.  MITCHELL:

9 Q.      Wouldn't you agree with me if you had broad

10 personal experience to know what this is    , that  perhaps

11 your opinion of this call would be different?

12 A.      No.

13 Q.      Do you agree with me  , looking at  Page 137 of the

14 transcript, the transcript that we have provided     --

15 A.      The defense transcript?

16 Q.      Correct , the defense transcript,   Page 137.

17 A.      Yes.

18 Q.      That it states , do you want to try some

19 Peruvian- style chicken?

20 A.      That is what's on this typed   , yes.

21 Q.      And would you -- is it your opinion that this

22 transcript is wrong?

23 A.      I would change this transcript, yes.

24 Q.      And you would change it to tickets?

25 A.      No , I would not.

1  Q.      What would you change it to?

2  A.      I would change it to unintelligible    , since our

3  last , I guess three weeks ago   , when you asked me about

4  this call,  I've listened to this call probably a hundred

5  times , maybe 200 times , and I think what  Mr. Bynum

6  actually says is "  chickets ," and that's the best   I could

7  do.  There is no such word   .  I would change it to

8  unintelligible if you were asking me today to change the

9  transcripts.   I would not   transcribe  it as ticket s or

10 chicken.

11 Q.      So when you testified before the ladies and

12 gentlemen of the jury about this call on

13 cross- examination and said that you were certain that

14 that's what it said, were you    giving an accurate opinion

15 to the jury?

16 A.      That's not what you asked me.  You play     ed the

17 call twice , I believe , and you asked me if   I heard the

18 word chicken over the courtroom loud speaker     .  I replied

19 I did not.

20 Q.      And I asked you if you would change your opinion

21 as to the word tickets , and as  I recall , your answer was

22 no.  Is that still your answer?

23 A.      You did not ask me that question    , but  I think  I

24 answered the question and    I would change it to

25 unintelligible.

1 Q.      When you testified initially and called it

2 tickets, you stated that you  , in your opinion , Bynum  was

3 trying to encourage   Ms. Martin  to seek a new supplier of

4 cocaine.  Do you recall that?

5 A.      Yes.

6 Q.      Is that still your opinion?

7 A.      If you change   the word to unintelligible  , then

8 the answer would be no.

9 Q.      So you're withdrawing that opinion then    ?

10 A.      If you change the word to agree with -- to give

11 Mr. Bynum the benefit of the doubt  , if you change the

12 word to unintelligible  , then I would withdraw that

13 opinion.  If the word is tickets    , and I think the jury

14 will decide what the word actually is, then my opinion

15 remains the same.

16 Q.      So it's your opinion  , then , that Mr. Bynum  was

17 not try ing to  get a new supplier of cocaine from     Ms.

18 Martin?

19 A.      That's not what   I said.

20       MR. MITCHELL:   I have no further questions.

21       MR. MARTIN:   Your Honor , may I approach the

22 witness before  Mr. Ward gets started?

23       THE COURT:  You may.

24       MR. MARTIN:   I just want to get the log.    I'll

25 put it right here.  If you need it,    I'll put it right

1  here.

2                    **CROSS-EXAMINATION**

3          BY MR. WARD:

4  Q.      Sergeant,  Ms. Johnston just reminded us it was

5  several weeks ago that you were last on the stand.

6          Do you remember   I was asking you some questions

7  at that time, sir?

8  A.      Yes, you asked me questions.

9  Q.      I see.

10          Before we get into that, let me ask you    :  Do you

11  know a  Beverly  Duncan or a  Beverly  Douglas?

12  A.      I have never heard the name before    , no.

13  Q.      You never ran across that in the course of your

14  investigation?

15  A.      To the best of my knowledge   , we intercepted no

16  one by that name, no.

17  Q.      I'm not asking if you intercepted anyone by that

18  name .  I'm asking you whether you came across the name

19  in the course of your total investigation      .

20  A.      That is correct , I have not come across that name

21  in the context of my total investigation.

22  Q.      Now, I think when  I left off last time several

23  weeks ago,  I was asking you about   Call B29 , which had

24  been transcribed and which the government played for the

25  jury , and on which -- with respect to which you offered

1 an opinion.

2        Do you recall that particular call or do you have

3 it there?

4 A.      Mr. Martin took the book , but let me look it up

5 in the logs.

6 Q.      I didn't bring my  --

7        MS. JOHNSTON:  Counsel , there is  not a Call B29

8 that was introduced  .

9        MR. WARD:  B289.

10        THE COURT:  Oh, 289.

11        THE WITNESS:  B289 ?

12        MR. WARD:  If I said B29, I'm sorry.

13        THE WITNESS:  Yes .  Do you have a page number for

14 that?

15        MS. JOHNSTON:  Page 31  .

16        MR. WARD:  Page 31?  Thank you  .

17        BY MR. WARD:

18 Q.      Have you found it  , sir ?

19 A.      Yes.

20 Q.      All right.  This is the telephone call in which

21 Paulette Martin tells an unidentified male that she,

22 Paulette Martin, had told Tony , whoever Tony is ,

23 something to the effect that if    Lavon Dobie -- if Becky

24 was shaking , it was because it was to stop her or

25 something from pulling the trigger on that hammer     .

1          Do you remember that  , sir?

2 A.      That's what the call says on Page 32, yes.

3 Q.      You opined to this jury to a degree of moral

4 certainty , I might add , which I understand covered all

5 of your testimony?

6 A.      I'm sorry , I can't hear you   Mr. Ward .  Could you

7 speak up ?

8 Q.      I said you opine d to a degree  of moral certainty ,

9 which you said covered all of your testimony    , that that

10 meant that  Lavon  Dobie w as in possession of a gun or

11 firearm; is that correct, sir?

12 A.      I think  I offered the opinion that the word

13 "hammer " refers to a gun, yes.

14 Q.      I'm sorry?

15 A.      The word  "hammer " refers to a gun.

16 Q.      I see .  And that that meant that   Lavon  Dobie had ,

17 in her possession at   the time that it was being

18 discussed , a gun, a  hand gun or a firearm ?

19 A.      I didn't say that.   I said that the sentence here

20 is where  Ms. Martin is referring to the call and the

21 word "hammer " refer s to a gun , and that she's relating a

22 story about  Ms. Dobie.

23 Q.      When she was shaking  , it was because she had a

24 hammer?

25 A.      Correct.

1 Q.      She had a gun?  All right  , sir.

2        There was another call, sir,   B284 , and I'll refer

3 you to -- let me hand you a copy.  This is just a page

4 out of the log , and for the record  , I've asked that it

5 be marked as   Dobie  Exhibit 13.

6        MS.  JOHNSTON:   I think that's for identification

7 only , Your  Honor.

8        THE  COURT:  All right  .

9        BY MR.  WARD:

10 Q.     Do  recognize that  , sir , as being a Xeroxed copy

11 of a page of the log that you apparently reviewed      every

12 morning at six o'clock  , which contains   Call 28 4 on Line

13 B?

14 A.      Yes.

15 Q.     All right, sir.  And since you told us that you

16 came in at six a.m. every morning to review these logs      ,

17 I assume that you saw this particular entry; is that

18 correct , sir?

19 A.      I'm sure  I probably did.   I don't recall it  , but

20 I'm sure  I probably did.

21 Q.     Now, this entry was an outgoing call   .  This log

22 entry from  Lavon  Dobie to --  I'm sorry , from  Paulette

23 Martin to  Dobie, G & L, which  I assume means   Goldie and

24 Lavon .  That's what it was  , it was an outgoing call?

25 A.      It was a call from   Paulette to  Lavon  Dobie .

1 Q.      It was on March 11, 2004   ; is that correct?

2 A.      That's correct.

3 Q.      And it was marked pertinent by a person who

4 prepare d the log , who appears to be   Chris Elser ; is that

5 right , sir?

6 A.      No.  Chris " ELSR " is the name of the report   ,

7 which stands for my   name, Chris , and Electronic

8 Surveillance  Log.  The call was monitored by    Jackie

9 Richardson.

10 Q.      I stand corrected.  In any event    , this is a

11 contemporaneous log that is a log made by whomever

12 contemporaneously to the call   .  As the person was

13 listen ing to  the call , they were making this log.

14 A.      That's correct.

15 Q.      You had said before that pertinent calls were

16 transcribed; is that right   , sir?

17 A.      Not always, no.   There were many reasons that

18 calls can be marked pertinent.  It then goes through

19 another review process   , usually by one of the case

20 agents , and then those calls are marked     for

21 transcript ion.

22 Q.      We do know , sir, that this call marked pertinent

23 was not , in fact , transcribed ; is that correct  , sir?

24 A.      I have no idea if it was or not.

25 Q.      You do know it certainly was not played for the

1 jury because you were   on the  stand and you were not

2 asked about it ; were you?

3 A.    This call was not played for the jury   .  I have no

4 idea whether it was transcribed or not.

5 Q.    Yes .  The point is you know because you were on

6 the stand when these calls were being discussed    , that

7 284 was not played for this jury   ?

8         MS. JOHNSTON:  Asked and answered   , Your  Honor .

9         THE WITNESS:   I think  I just said  that, yes.

10         THE COURT:  Sustained  .

11         MR. WARD:   Your answer is yes ?

12         THE WITNESS:   I think it was sustained   , the

13 objection.

14         MR. WARD:  Yes.  Thank you.

15         BY MR.  WARD:

16 Q.    Now, in this call, sir   --

17         MS. JOHNSTON:  Objection as to what's in the call

18 unless counsel is going to play it   .

19         MR. WARD:  Well, I will play it , but can't  I ask

20 the question first ?

21         MS. JOHNSTON:  He doesn't have a bas   is to  ask a

22 question about  a call that's not before this jury   .

23         MR. WARD:  The basis in his hand , Your Honor.

24         THE COURT:  Do you want to play the call now?

25 Play the call.

1          MS. JOHNSTON:   I'm objecting to refer  ring to  the

2  log because that's hearsay in terms of the substance of

3  the call.

4          THE  COURT:  O verruled .

5          BY MR.  WARD:

6  Q.      Sir, the log states, does it not, that     Paulette

7  said in this call , "E" said Becky was shaking.     Paulette

8  joked that she told   "M" that  Becky was carrying a

9  weapon .

10 A.      If that's what you're asking me   , that's written

11 in the log , that's  correct.

12 Q.      That's correct.  Now, is it your opinion, sir,

13 that that says what the sum and substance of what is

14 being said there is that when there was discussion of

15 carrying a weapon or carrying a hammer or whatever    , it

16 was that  Paulette  Martin was joking ?

17         MS. JOHNSTON:  Objection as to what his opinion

18 is of what somebody else wrote in a log.

19         THE  COURT:  Sustained  .

20         MR.  WARD:  He's done that all throughout his

21 testimony.

22         THE  COURT:  Sustain ed.

23         BY MR.  WARD:

24 Q.      Sir, did those words have any significance to you

25 when you read them in this log at six o'clock on

1 whatever morning it was  ?

2          MS.  JOHNSTON:  Objection  , it's irrelevant.

3          THE  COURT:  Sustained  .

4          MR.  WARD:   Your  Honor, well, let me approach the

5 bench , please.

6                    (At the bar of the Court.)

7          MR.  WARD:   Your  Honor , he's  given  an opinion on

8 what he thinks the words in the other call mean.  This

9 call -- this -- the words in this call pertain to the

10 words in the other call.    I'm simply  testing  his

11 credibility.

12          THE  COURT:  F irst of all , the log is not his

13 document.  The log is a document create    d by somebody

14 else .

15          MR.  WARD:   I understand that  , sir .  It's not

16 being admitted for the truth  .

17          THE  COURT :  He's listened to the recording  .  I

18 think you play the recording and    cross- examine on the

19 basis of the recording.

20          MR.  MONTEMARANO:  He's adopted it in some cases    ,

21 the --

22          MS.  JOHNSTON:    Your  Honor , he has not adopted the

23 monitor's summaries of the calls  .  He's reviewed those

24 call log s.  If he saw any  blatant  error in term s of

25 identifying the par  ties, he's made those corrections  .

1  He did not testify that he review   ed the lo gs for  the

2  accuracy of the summary of what they heard when think

3  they were listen ing to  it  in rea ltime .

4         MR.  WARD:   He testified several weeks ago when he

5  was on the stand  , and when  I asked him the specific

6  question , if he listened to the specific calls in

7  con junction w ith listen ing to  the calls , that he made

8  the necessary changes.     I don't believe there were any   ,

9  and I'm entitle d to  show hearsay or not.    I'm not

10  admitting it for the truth   , but if he saw that in there   ,

11  did that have any effect.

12         THE  COURT:  I don't have the log.  What    is it

13  say ing that  he saw ?

14         MR.  MITCHELL:  We have the call cued up    , Your

15  Honor.

16         THE  COURT:  Why don't you get him to play the

17  call.  The bottom line is this log is not a document

18  that he prepared .  As an investigator in this case    , he

19  looked at the log as part of the ongoing investigation

20  and he gave his opinion based on what was in all of the

21  calls an d he listened to all of the calls   , and you're

22  free , under my ruling , to inquire   into the details of

23  that call and why he didn't take into account what was

24  in that call when he give his opinion that in this other

25  call , the use of the word hammer meant a gun.   That's

1 the opinion he gave  .

2        MR.  WARD:   That's exactly what   I'm doing , Your

3 Honor.  The point is he did say that previously when he

4 was on the stand  , that he went through these logs, at

5 same time listening to the tapes to insure their

6 accuracy and that he --   whatever  changes he made were

7 noted on here , and there were very few -- less than 12    ,

8 I think , out of 10 ,000 calls.   If he did that , then it

9 seems to me he adopted --

10        THE  COURT:   I don't believe he adopt  ed the log.

11 He has given an opinion of what was meant in the

12 conversation that's previously been described     , which is

13 Call No.  B289 , and that the reference on Page 32 to a

14 hammer is making a reference to a gun in his

15 professional opinion.

16        You're entitled to ask him about other calls that

17 might indicate that hammer is referring to a      widget , is

18 referring to something else other than a gun     , you're

19 free to do that .

20        MR.  WARD:   No, sir.  His testimony was that she

21 had a gun , not simply that it meant a gun.  That she had

22 a gun.

23        MS.  JOHNSTON:   That's not the government's

24 recollection.  It was very specific about the word

25 "hammer."

1       THE COURT:  I recall him  making t he reference to

2 a hammer **was to  a gun**.

3       MR. MONTEMARANO : So the  Court is clear.  It

4 would be the position of the defense that    Mr.- --

5 Sergeant  Sakala has , indeed , adopted the logs because

6 we've asked him repeatedly an   d specifically , have you

7 reviewed these logs?  Have you -- he's said earlier     , I

8 reviewed them every morning when    I came in.  If there

9 were mistakes , I changed them.  He's adopted them

10 because  he indicated he fixed them.

11      THE COURT:  He indicated he didn't change the

12 logs.

13      MR. MONTEMARANO:  In some cases   , he did.  We can

14 show you examples  .

15      MR. WARD:   I pointed out a couple of examples

16 weeks ago , Your Honor.

17      MS. JOHNSTON:   Your Honor , he testified he made

18 corrections to  blatant  mistakes --

19      MR. MCKNETT : Yes, your  Honor .  He also said that

20 these are logs prepared by people who are working under

21 his direction and the caption of the log itself he just

22 described as  Chris's Electronic  Surveillance  Log.  It

23 has his  name on it.

24      THE COURT:  Counsel , I'll tell you what   I'm going

25 to do.  I have a  6 o'clock telephone status conference

1  in another case .  I need to get down there  .  I've got to

2  carry 5 ,000 pounds of junk down there with me.    I think

3  I'll jus t re cess for the day and we will take this up

4  tomorrow.

5       Now I'm going  to have the jury come in at 9  :30.

6  I have a doctor's appointment at 7   :30 .  I should be able

7  to get here so we can go and address this issue further

8  at 9 :15.

9       MR. MONTEMARANO:  Let's make sure we both go to

10  the right doctors .  I'd hate to have somebody look at

11  your shoulder  -- your ankle  and my shoulder.

12       MR. MCKNETT:  How late are we going tomorrow   ?

13       THE COURT:  6:00 or close to  6:00 .  I don't have

14  my Palm Pilot with me right now, but it will be close to

15  6:00 .

16             (Back in open court.  )

17       THE COURT:  All right.  Ladies and gentlemen,

18  because I have a status conference in another case at

19  6:00 and it's on another floor of the building   , we're

20  going t o recess for the day now.  We will return

21  tomorrow morning .  Be ready to  go at 9:30.  Friday will

22  be a 9 o'clock day.   I'll anticipate going to close to

23  6:00 tomorrow.

24       I am still hopeful we can get all the testimony

25  wrapped up this week  , but we will see.  Thank you for

1 your patience and please remember as    I've always told

2 you, please do not discuss the case among yourselves or

3 with any other persons until you begin your

4 deliberations.  Thank you  .

5                         (Jury excused at 5:35 p.m.)

6                         (Off the record at 5  :35 p.m. )

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3          I, Tracy Rae Dunlap,    RPR , CRR , an Official Court

4  Reporter for the United States District Court of

5  Maryland, do hereby certify that I reported, by machine

6  shorthand, in my official capacity, the proceedings had

7  and testimony adduced upon the Jury Trial Proceedings in

8  the case of UNITED STATES OF AMERICA versus PAULETTE

9  MARTIN, et al, Criminal Action Number    RWT-04-0235 on

10 August 2, 2006.

11

12         I further certify that the foregoing    297 pages

13 constitute the official transcript of said proceedings,

14 as taken from my machine shorthand notes, of said

15 proceedings.

16

17         In witness whereof, I have hereto subscribed my

18 name, this  28th day of April 2008.

19

20

21         _____

22                         TRACY RAE DUNLAP,  RPR , CRR
                           OFFICIAL COURT REPORTER
23

24

25