1          UNITED STATES DISTRICT COURT OF MARYLAND
                      SOUTHERN DIVISION
2
---------------------- -----x
3  UNITED STATES OF AMERICA    :
              Plaintiff        :
4                              :
                               :
5  vs                          :Criminal Action:  RWT-04-0235
                               :
6                              :
   PAULETTE MARTIN, et al      :
7              Defendants.     :
---------------------- ----x
8

9                          Thursday , July 27 , 2006
                           Greenbelt, Maryland
10

11        The above-entitled action came on for a Jury
   Trial Proceeding before the HONORABLE ROGER W. TITUS,
   United States District Judge, in courtroom 4C,
12  commencing at 9: 52 a.m.

13        THIS TRANSCRIPT REPRESENTS THE PRODUCT
          OF AN OFFICIAL REPORTER, ENGAGED BY
14        THE COURT, WHO HAS PERSONALLY CERTIFIED
          THAT IT REPRESENTS THE PROCEEDINGS AS RECORDED
15        AND REQUESTED.

16        APPEARANCES:

17        On behalf of the Plaintiff:

18        DEBORAH JOHNSTON, Esquire
          BONNIE GREENBERG, Esquire
19
          On behalf of the Defendants:
20
          MICHAEL  MONTEMARANO , Esquire
21        ANTHONY MARTIN, Esquire
          MARC HALL, Esquire
22        TIMOTHY MITCHELL, Esquire
          PETER WARD, Esquire
23        EDWARD  SUSSMAN , Esquire
          HARRY  MCKNETT , Esquire
24
   Tracy Rae Dunlap,   RPR , CRR              (301) 344-3912
25  Official Court Reporter

```
1                        I N D E X

2                        DIR  CROSS      REDIR     RECROSS

3  Romero  Brackett      55   59         65,69     68

4  Margaret Battle       70   78         90

5  Maurice Alexander     91   96

6  Maurice Bowman        113  121

7  Cynthia  Winestock    160  166        180

8  Reece  Whiting        196  229

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                                 Page

23  Reporter's Certificate                         277

24  Concordance                                    278

25
```

1          THE   COURT:   Ms.  Johnston   are  you  ready  to

2   proceed ?

3          MS.  JOHNSTON:   Yes , we  are  ready  to  proceed .

4   Your  Honor , we're  ready .

5          THE   COURT:   All  right .

6          MS.  JOHNSTON:   Other  than  check ing  with  the

7   clerk  to  make  sure  that  our  exhibit  list s  are

8   consistent  in  term s  of  the  evidence  being  admitted , we

9   -- in  term s  of  CH-1.   It's  the  government 's  position

10  that  that  chart , since  it's  been  used  with  many

11  witness es , that  it's  in  evidence .   I  think  that 's

12  probably  an  issue  defense  counsel  might  raise  with  the

13  court  we've  also  now  used  it  as  a  summary  chart  with

14  detective  Eveler  there  are  witness  who is  have  written

15  identification s  on  it  so  our  position  is  that 's  in

16  evidence .   At  this  point  the  government 's  prepared  to

17  rest .

18          THE   COURT:   All  right .   Mr.  Montemarano .

19          MR.  MONTEMARANO :   We  would  be  object ing  to

20  Chart  1.   I  think  I  speak  for  all  the  defendant s  here .

21  We  object  at  the  outset .   We  think  that  the  writing

22  upon  it  was  functional  the  equivalent  was  of  providi ng

23  answer s  to  reading  lead ing  question s  as  them  these

24  people  were  lump ed  together  place d  in  certain

25  juxtaposition.

1          I mean , if I'm asking a witness a series of

2    question s, and that person may not recognize my client

3    because of the time interveni ng and I say, you don't

4    even recognize my client ; I think he'd have to be a

5    fool not to perhaps look at the person sitting next to

6    me .  Again ,because of the lumping it together , and

7    there are conclusory allegation s, both within and

8    without the language of the statute .  I can understand

9    what cocaine is, because it's define d in the statute .

10   I can understand heroin .  I think we all know where

11   California is.  I'm not aware that being a

12   "facilitato r" -- their term, not mine -- is a crime

13   anywhere .

14          Now , there may be words like "aider" and

15   "abetter ," thing s like that .  Once again , those are

16   issue s of proof .  For the government to have put , for

17   lack of a better term, the other issue before the jury

18   on a chart make s it inadmissible in the view of the

19   defense .

20          I'm sure people have other things to say , but I

21   simply want ed to go on the record on that issue .

22          THE COURT:  All right .  Anyone else on that

23   issue ?

24          MR. SUSSMAN :  Your Honor , the only thing I would

25   say is , I join with Mr. Montemarano .  If the court is

1  going to receive the chart, I think it's acceptable to

2  give an appropriate limiting instruction in terms of at

3  the close of all the evidence.

4       THE COURT:  It's my conclusion that the chart

5  Number one is an appropriate exhibit under among other

6  things the Johnson case that we reviewed.  I will give

7  a limiting instruction explaining to the jury that it's

8  the government's view of the evidence, but -- I'll do

9  that.  All right.

10       MR. MONTEMARANO:  Your Honor, that then -- let

11  me be clear.  I don't have the number perhaps.  Ms.

12  Johnston or Ms. Greenberg can assist me.  The

13  Martin-Mangual chart.  That's not going to be used,

14  except as an exhibit to assist Ms.- -- excuse me.  A

15  demonstrative aid.

16       THE COURT:  That has not been received in

17  evidence.

18       MR. MONTEMARANO:  It's not an exhibit.  It's a

19  demonstrative aid.

20       THE COURT:  They can use it as a demonstrative

21  aid in closing argument.

22       MR. MONTEMARANO:  I was going to go to that but

23  I wanted to make sure I understood the rule, Your

24  Honor.

25       THE COURT:  Anything further?

1          MR. MCKNETT:   Your Honor, I don't have  any

2  comment on Mr. Montemarano 's objection , except  to adopt

3  it.  But I'm -- if I may ask the court for some

4  clarification  as to where we stand procedurally ?  The

5  government , as I understand  it, is closi ng but

6  reserving  the right to recall Sergeant Sakala .

7          THE  COURT:   No.

8          MR. MCKNETT:   I'm not sure where we are now.

9          THE  COURT:   I have said that I will permit  the

10  defense  to require  him to be recall ed for additional

11  cross-examination .   It's your call whether you call him

12  or not .

13          MR. MCKNETT:   He will be call ed as a defense

14  witness .

15          THE  COURT:   No.   It will be further  cross-

16  examination  of the prosecution  witness .

17          MR. MCKNETT:   Fine .   Thank you for clarify ing

18  that .

19          THE  COURT:   Any motion s?  Any other motion s?

20          MR. MARTIN:   If the government  rest s, clear ly --

21          THE  COURT:   I think I heard the magic word ,

22  "rest ?"

23          MR. MARTIN:   Mr. Goodwin move s for motion of

24  judgment  or acquittal  with respect to count one the

25  conspiracy  count .  There is insufficient  evidence , he

1  would maintain , specifically with respect to any

2  involvement with crack , heroin .

3         With respect to cocaine , there were a number of

4  phone calls -- specifically , in counts 18, 22, 51, 54,

5  there was no authentication   -- we believe no proper

6  authentication  that it was his voice , and for that

7  reason we would move that all of those counts be

8  dismissed, in addition to Count One.

9         There is questionable evidence about his coming

10  to Paulette Martin's house   to do anything other than

11  visit her socially . There is one video that was shown ,

12  and we don't know who is on that video . You may recall

13  that was -- I think that was Video 15, the Benny Hill

14  video , with a figure moving very quickly from the car

15  to the house and back .

16         There was no testimony that there was

17  surveillance on Mr. Goodwin either coming from or going

18  to the house after an alleged phone conversation that

19  would link him to that particular video , and for that

20  reason Your Honor and many others that we would put in

21  writing if the court would like , we would move for the

22  dismissal of Count One.

23         I've already talked about the telephone

24  communication  counts, and now let me move to Count Two.

25  The November 25, 2003 allegation where he supposed to

1   have been arrested with crack cocaine in Mr. Dorsey's

2   car. Whether the car was registered to Mr. Dorsey or

3   one of his family members is really the touchstone for

4   Mr. Goodwin's allegation and his belief that he was set

5   up by Mr. Raynard Dorsey.

6        There was a phone conversation by Mr. Dorsey to

7   bring Mr. Goodwin to the P. G. Plaza. We didn't hear

8   Mr. Dorsey testify of course. Everything we've heard

9   regarding this came from second and third hand

10  information and the police officer -- not the first

11  police officer but the second one. Officer Grant

12  testified that it was the daughter who actually told

13  him, after a lengthy search, where to find the drugs.

14       Your Honor, we submit that the entire

15  circumstance just is beyond belief. It's not his car.

16  It's Mr. Dorsey's vehicle. Other people had access to

17  the vehicle, and there's no way of showing that Mr.

18  Goodwin knew or intended -- didn't even know the drugs

19  were there or intended to distribute it.

20       What's more, with respect to his intention to

21  distribute crack cocaine. Not one expert witness not

22  one forensic chemist came in here and said that they

23  tested for the presence of sodium bicarbonate, and not

24  one forensic chemist came in here and said that the

25  substance tested was smokeable. For, that reason we

1   would also move for the dismissal of Count Two.  There

2   is absolutely no proof in this case that crack cocaine

3   was involved in that particular distribution or

4   anywhere else.

5        With respect to the drugs that were found in Mr.

6   Goodwin's house.  I don't know that there's any

7   specific allegation with respect to that.  There

8   doesn't appear to be -- I'm sorry, Count 55.  That is

9   the May 15, 2004 cocaine.

10        THE COURT:   Which count?

11        MR. MARTIN:   That's Count 55.

12        THE COURT:   Count 55?  Okay.

13        MR. MARTIN:   500 grams of cocaine hydrochloride.

14        Your Honor, the testimony I believe, from at

15   least the cross-examination, didn't conclusively show

16   that Mr. Goodwin was the only person who resided at the

17   house at 36 Farragut.  So, we would submit there were

18   other people in the house.  Again, the same argument

19   that we have with respect to Count Two we make with

20   respect to Count 55, and that is there was no

21   demonstration that Mr. Goodwin knew or intended to

22   distribute any drugs that might have been at 36

23   Farragut Road, where a number of people lived.

24        THE COURT:   Anyone else?

25        MR. MONTEMARANO:   Your Honor, if I could offer a

1   suggestion.  We have a lengthy indictment.  Many of the

2   counts deal with multiple individuals.  It might be

3   easier for the court if we were to go through the

4   indictment count by count and you to hear from

5   particular defendants relative to each count.

6        MS. JOHNSTON:  Your Honor, we have a jury

7   waiting.

8        THE COURT:  I'm not going to grind through this

9   one count at a time.  I mean, you need to tell me which

10  counts you feel the government's evidence is wanting,

11  such that a judgment of acquittal is appropriate at

12  this time.

13       MR. MONTEMARANO:  Okay.  Your Honor, as to Count

14  One, I respectfully submit on behalf of Ms. Martin that

15  there has not been adequate evidence to demonstrate a

16  conspiracy and a meeting of the minds.  While there is

17  some evidence of narcotics possession at the school and

18  I think Ms. Martin can be linked to it in one view, I

19  submit it is not adequate evidence with regard to the

20  demonstration of a conspiracy.  We have questionable

21  testimony that amounts, for lack of a better term, to a

22  gross overreaching on the part of Sergeant Sakala as to

23  the meaning of the various telephone calls, and I do

24  not believe that his testimony is in many ways the sole

25  evidence of a conspiracy can serve to establish my

1  client's participation  in a conspiracy  with the named

2  defendants.

3        Court  permit, I want to make sure I don't miss

4  any counts.

5        With regard to that, I would adopt that argument

6  with regard to each and all of the telephone counts.

7  If the court wishes, I will enumerate them as I go

8  through.  Count Three is a telephone count, and that

9  would be a Section 843(b) count.  There is no evidence

10 that on March 10, 2004, that my client possessed CDS at

11 any amount in any amount of any kind.  The classic bit

12 of evidence, I submit, from the government's case in

13 support of the defense regarding this is the repeated

14 testimony Sergeant Sakala that when a Milburn Walker or

15 a George Harris or many of the other people show up.

16 Well, they're here to buy an eighth of a gram -- an

17 eighth of an ounce or eighth of a kilo which the good

18 sergeant agreed would be a factor of about 41 in terms

19 of amount.  He can't even tell us what this is about.

20 For him, the number eight is somehow magical, and I

21 submit that the umber eight is magical only depending

22 on your point of view.  If you're a Yankees fan, you

23 think of Yogi Berra.  If you're an Orioles fan, you

24 think of Cal Ripken.  It doesn't mean the same thing to

25 all people.  And to consider the sergeant's testimony

1    as adequate to sustain a conspiracy, absent war, I

2    think it simply cannot be done.

3          Count Five is another telephone count. Once

4    again, we don't know what this is about.

5          Count Six -- excuse me. Not count six. Count

6    Seven is another telephone count.

7          Count Eight is identical to the earlier count,

8    court permit.

9          Count Four it's a possession count -- possession

10   with intent count, excuse me, regarding crack in this

11   case on March 12. Once again there is no evidence of

12   that. Then there's the telephone count concerning my

13   client, Count Nine, and Mr. Whiting on the same date

14   again. This is guesswork on a good day.

15         Count Ten is another substantive count on March

16   13.

17         Count 15 is -- Count 11 is a telephone count on

18   March 15.

19         Count 12 is a telephone count on March 15.

20         Count 13 is a telephone count, and it doesn't

21   specify that she spoke with anybody. It's just that

22   she used the phone once again. I think there has to be

23   more charged. I think there's a question of the

24   adequacy of the charge and certainly as to who she

25   spoke with. It's not been demonstrated by the

1  government .

2       Count 14 is another substantive count for March

3  16.  Once again , we have no evidence whatsoever .  We do

4  not have -- and I will not reiterate the failings of

5  the government 's case at this point for the court , but

6  just briefly:  No controlled buys.  No controlled

7  purchase s.  No marked money .  Just , nothing .  They

8  don't -- they're not on the premises until two and

9  one-half month s later .  We'll get to that issue in a

10 minute .

11      Count 15, as I said , is a telephone count

12 relating to March 16.

13      Count 16 is another substantive count on March

14 17.

15      Count 17 is a telephone count with Mr. Bynum for

16 March 17.

17      Count 18 is another telephone count with Mr.

18 Goodwin on March 17.

19      Count 19 is another telephone count for March

20 18.

21      Count 20 is another telephone count for 19.

22 Once again , these are all entire ly without evidence ,

23 absent what Sergeant Sakala tells us .  We s ubmit that

24 his testimony is simply not adequate enough even under

25 the very liberal standard which the court must judge

1   this motion here today at the close of the government 's

2   case .

3         Count 21 is a telephone count relating to March

4   19 .

5         Count 22 is a telephone count for March 20 .

6         Count 23 is a telephone count for March 21 .

7         Count 24 is a telephone count for March 22 .

8         Count 25 is a substantive offense on March 22 .

9   We again have nothing approach ing evidence .   March 24 ,

10  telephone -- yes , a telephone count with Mr. Goodwin .

11        Count 27 , telephone count for March 26 with Mr.

12  Whiti ng .

13        Count 28 , March 26 telephone count with Mr.

14  Harris .   March 26 , a substantive offense with regard to

15  Mr. Harris .   We do not hear from Mr. Harris .   The court

16  is aware it took Mr. Harris ' plea before this trial

17  began .   If there was evidence of narcotic s distribution

18  on that date , it could have come before that court .   It

19  didn't .

20        Count 40 , tel ephone count ; March 29 .

21        Count 31 , substantive offense on March 29 .   We ,

22  again , have no evidence of that sub stantive offense .

23        Count 32 , telephone count on M arch 29 with Ms.

24  Hard en .

25        Count 33 , substantive offense , March 29 , with

1   Ms. Harden.   I will recollect  to the court , though  I

2   know  the court  remember s and I would  hate  to steal  Mr.

3   Sussman 's thunder , but March  29, the famous  transfer  of

4   the Jolly Rancher  in the parking lot between  Ms. Harden

5   and my client , as observe d by Detective  --

6           MR. SUSSMAN :  Mussleman .

7           MR. MONTEMARANO :  Mussleman .  Thank you .  Should

8   have  remember  it had  name .

9           March  31, a telephone  count  is enumerate d -- I'm

10  sorry .  That 's Ms. Dobie 's count .  Count  34 does  not

11  apply  to my count .

12          Count  35 is a telephone  count  from March  31.

13          Count  36 is a substantive  offense  for March  31,

14  again , absent  evidence .

15          Count  37 is a telephone  count  on April  1.

16          Count  38 is a substantive  offense  relating ,

17  apparent ly, to that  telephone  count  on April  1.

18          Count  39 is a telephone  count  on April  3.

19          Count  40, possession  on a series  of date s

20  between  April  1 and April  7 of crack  charge d against  my

21  client  and Mr. Bynum .  A gain , there 's no specificity

22  with regard  to this .  There  is no evidence  in the

23  record  relating  to this .

24          Count  41 is a substantive  offense  on actual ly

25  April  7.  I would  argue  that  is duplicative  inasmuch as

1  the earlier count charge s during the period of time ,

2  and I think government should be obligate d to choose

3  which theory it's proceed ing . Did she possess at some

4  point during that time ? Because the jury could find

5  possession under count s 40 and 41, both on April 7, and

6  that would be duplicitous . My client cannot possess

7  enumerate d CDS twice . Since we have no actual seizure

8  of CDS, we cannot begin to understand how the court --

9  the jury -- how the government is present ing it and how

10  the jury could find it.

11      Count 43 is a sub stant ive count relating to

12  April 9 .

13      Count 44 is another telephone count on April 21.

14      Count 45 is a substantive offense relating to

15  that the tel ephone count , again on April 21 charge d

16  with Ms. Ali.

17      April 23 is a telephone count is -- there 's a

18  telephone count on April 23 enumerate d in Count 46.

19      We would adopt the same argument as to Count 47.

20  There is another telephone count for April 23 with my

21  client and Ms. Dobie .

22      Count 48 is an April 24 telephone count with Mr.

23  Goodwin . April 25, another telephone count with Mr.

24  Whiti ng .

25      Count 50 is a May 3 telephone count with Ms.

1   Dobie.

2         Count  51 is a telephone  count on -- excuse  me.

3   May 5 with Goodwin.

4         Count  52 is a telephone  count for May 7 with

5   Mr. Harris.

6         Count  53, telephone  count with Ms. Dobie  from

7   May 11.

8         Count  54, another  telephone  count with Mr.

9   Goodwin  on May 15.  To suggest, I think, that this is a

10  scatter  shot approach  is being gracious.  I mean no

11  insult to the government  in saying  that, but to charge

12  every time you're on the phone with coconspirator s as a

13  telephone  count which is, in essence, what the

14  government  has chose n to do is just perversion  of the

15  intent  of Section  843.

16        Count  56, May 16, a substantive  offense  charge d

17  against  my client  and Ms. Ali.   There  is absolute ly no

18  evidence  as Mr. McKnett 's care ful cross-examination   of

19  detective  -- excuse  me corporal  Eveler  laid out

20  yesterday.  That there  is any way of showing  that the

21  bag seize d my client 's place  of business  was the same

22  one that was brought  in.   It resemble d it the best.

23  There was no seizure.  There was no testing.  There was

24  no fingerprint s.   Indeed, this is the most  outrageous

25  of the count s, because  the government  has an

1    opportunity  in  this  case  to  demonstrate  the  evidence .

2          They  can  arrest  -- as  Mr.  McKnett  suggest ed,

3    they  can  print  the  bag s  or  have  materials  and  modes

4    from  which  absolute  certainty  by  comparison  can  be

5    drawn  fingerprint s  thing s  that  we  know  can  link  these

6    people .  The  government  simply  has  not  met  its  burden

7    on  this  case , and  this  one  is  perhaps  the  most

8    troubli ng  of  all .

9          Count  58  is  another  telephone  count  -- I  think  I

10   miss ed  Count  57.  I  apologize .  Count  57  is  a  May  18

11   telephone  count  with  Ms.  Dobie .  Count  58  is  a  May  28

12   telephone  count  with  Mr.  Whiti ng.

13         Court 's  indulgence , please .

14         And  then  the  last  count  deal ing  with  my  client

15   is  another  substantive  offense  numerate d  in  Count  62,

16   possession  with  intent  to  distribute  crack  on  June  1.

17   As  to  that .  Your  Honor , while  it  may  not  make  me

18   happy , the  seizure  of  actual  crack , which  has  been

19   stipulate d  to, was  crack  from  my  client 's  business  on

20   June  1st  at  the  raid  at  the  seizure .  I  submit  it  mean s

21   -- I  should  submit , and  I  don't  have  anything  else  to

22   say  with  regard  to  that .

23         As  to  the  forfeiture  count s.  I  will  put  on  the

24   record  now , because  we  are  at  that  -- at  the  point ,

25   since  that  come s  after  Count  62  -- and  if  anybody

1    disagree s with this , defense  counsel  are  welcome  to

2    stand  up  and  contradict  me .  The  defendant s  have

3    discuss ed  this  among  themselves   and  with  counsel , and  I

4    am  authorize d  to  inform  the  court  that  all  of  the

5    defendant s  will  submit  to  the  determination  of  the

6    forfeiture s  by  this  court , as  opposed  to  the  jury .

7         We  assume  with  the  agreement  of  the

8    governmental  , though  I'm  not  sure  that  that  is

9    necessarily  --  I  mean  as  to  the  actual  waiver  of  jury

10   trial , but  as  the  jury  trial  on  a  particular  issue , I'm

11   not  sure .  In  any  event , we  are  happy  to  have  Your

12   Honor  make  that  decision  if  and  when  the  jury  return s  a

13   guilty  verdict  on  the  necessary  predicate  offense s .

14        We  are  not  --  we  understand  the  court  only  make s

15   such  a  determination  with  a  find ing  of  guilt  as  to  a

16   particular  defendant  on  an  adequate  under lying

17   predicate  but , assuming  that  happen s , we  at  this  time

18   would  inform  the  court  and  the  government  that  we  are

19   perfect ly  happy  to  have  Your  Honor  to  make  those

20   decisions .   If  any  defense  counsel  disagree s  with

21   anything  I've  said , they  are  free  to  take  issue .

22        THE  COURT:   All  right .

23        MR.  MONTEMARANO :  Thank  you , Your  Honor .

24        THE  COURT:   Ms.  Johnston , with  respect  to  waiver

25   on  forfeiture .  Any  concern  the  government  would  have

1  --

2  MS. JOHNSTON:  No, Your Honor.  I think the

3  government would have the right to insist on a jury

4  trial, but, no.

5  THE COURT:  The jury is very happy to hear that.

6  MS. JOHNSTON:  The government would ask that the

7  court schedule that hearing at a later date.

8  THE COURT:  I will do that if there is a

9  necessary predicate of a guilty verdict.   We haven't

10  got that yet.

11  With respect to Mr. Montemarano 's motion.  Rule

12  29 authorize s the filing of such a motion and

13  authorize s it be grant ed that the evidence is

14  insufficient to support a conviction.  The standard

15  under which Rule 29 motion s are govern ed is view ing the

16  evidence in the light most favorable to the evidence,

17  whether any rational trier of fact s could find the

18  defendant guilty beyond a reasonable doubt   .

19  In considering such an motion, the government is

20  entitle d to the benefit of all reasonable inference s of

21  the fact s proven to those sought to be establish ed.  I

22  conclude, with respect to defendant Paulette Martin,

23  that the government has placed before this court and

24  the jury sufficient fact s that a rational trier of

25  fact s could find her guilty beyond a reasonable doubt   .

1    Accordingly, Paulette Martin's motion is denied.

2          MR. MONTEMARANO:  As to each count, Your Honor?

3          THE COURT:   As to every count -- all counts.

4          MR. MONTEMARANO:  I would like the record to be

5    clear.

6          THE COURT:   All the counts you enumerated in

7    your motion, including the ones you weren't even

8    indicted in.

9          MR. WARD:  We should try to cover all bases,

10   Your Honor.

11         THE COURT:   Yes.  Cover the waterfront.

12         Mr. Martin, you've already made your motion;

13   correct?

14         MR. MARTIN:   That's correct, Your Honor.  Just

15   to make it clear, the telephone communication counts I

16   believe were 18, 26, 48, 51 and 54.  I don't know if I

17   gave you the number for each one of those.

18         THE COURT:   Okay.  All right.  Well, for the

19   same reasons I just gave with respect to the motion

20   filed by counsel -- orally made by counsel for Paulette

21   Martin, your motion is also denied.

22         Any additional motions?

23         MR. HALL:  Yes, Your Honor.  I'm going to make a

24   motion under Rule 29 for a motion of acquittal for my

25   client, Reece Whiting.  I would suggest to the court

1    first, I think my client is charged -- I can state to

2    the court my client is charged under Count One, which

3    is the conspiracy count, and he is also charged with

4    several telephone counts.

5         Let me address the bulk of them and say to the

6    conspiracy count. I would suggest to the court that

7    the government's evidence in this case falls into

8    basically three areas. First is the conversations

9    that were captured on the wiretap, and the court had an

10   opportunity, as well as the jury, to hear those

11   conversations.

12        The court heard a number of conversations in

13   which my client was making reference to the word

14   tickets and asked Ms. Martin if there were any tickets

15   available, and the court will recall that each and

16   every time a request was made of Ms. Martin, my client

17   was rebuffed. I would suggest to the court that there

18   was simply no meeting of the minds, assuming that the

19   court believes that what my client is attempting to do

20   is to procure some type of illegal substance. I would

21   suggest to the court that no agreement was ever made

22   between these two individuals, and therefore the

23   government's count fails on that ground.

24        Secondly, Your Honor, there's a number of

25   telephone conversations in which my client is alleged

1  to have provided advice to Ms. Martin , and that is the

2  government 's second theory of why my client was

3  involve d in conspiracy . I would suggest to the court

4  that close examination of those phone call s show s that

5  while there were a number of conversation s, those

6  conversation s consisted of her asking him would he be

7  willing to look at something -- paper s, chargi ng

8  document s, whatever -- from another individual 's

9  arrest , and he indicati ng that he would , and that was

10  the end of the conversation . There was never -- no

11  evidence ever present ed in this court that my client

12  actual ly perform ed that task or ever look ed at any of

13  the document s.

14       There is also -- I would point out to the court

15  that even if there had been , as I would suggest to the

16  court , it's insufficient to show that my client was

17  part of any conspiracy . We're talk ing about public

18  document s and public records that anyone could look at

19  and anyone could offer an opinion about . I would

20  suggest to the court that as a conspiracy , that fail s.

21       The second area that the government 's evidence

22  fall s into would be the testimony of Mr. Echarte . Mr.

23  Echa rte testifi ed that on a number of occasion s he was

24  involve d in trafficking and bring ing up quantiti es of

25  heroin and cocaine from the Miami area to the

1   Washington , D. C. area , and he was very specifically

2   asked in regard to the heroin whether -- which he

3   allege s that Mr. Whiti ng assisted him in the pick ing up

4   of , he was asked specifically whether any of that went

5   to Ms. Martin and was she involve d in that operation .

6   He emphatically said no , that the heroin was sole ly his

7   business .

8        I would suggest to the court that therefore ,

9   even if you were to believe the testimony of Mr.  24

10  Echarte , that that would mean that Mr. Whiti ng was

11  involve d in the conspiracy with Mr. Echarte but not

12  with Ms. Martin , and therefore , since he is not charge d

13  in this case as being a coconspirator , that the

14  government 's evidence fail s and that what you're

15  actual ly deal ing with is a separate and distinct

16  conspiracy .

17       There is also evidence from Mr. Echarte ,

18  assuming that you believe it , that Mr. Whiti ng

19  purchase d very small amount s of cocaine from Ms.

20  Martin , and I would suggest to the court that the mere

21  purchase of a personal use amount of cocaine , even if

22  you do believe what Mr. Ehcarte said , does not make him

23  a coconspirator .  A purchaser for personal use is not a

24  coconspirator , and Mr. Ehcarte testifi ed a number of

25  time s in the course of this case that he -- that Mr.

1   Whiting was a -- someone with a habit who was a user

2   who came to Ms. Martin's house and a procured small

3   amounts of cocaine.

4        Again, I would suggest to the court that the

5   government's evidence fails in regard to being able to

6   involve Mr. Whiting in a conspiracy based upon the

7   testimony of Mr. Echarte.

8        Finally, the other area of evidence that the

9   government presents in regard to Mr. Whiting involves

10  404(b) evidence. Of course the court cannot properly

11  use that, just as the jury cannot properly use that

12  basic conviction. That is here solely for the distinct

13  purpose that was offered in the limiting instruction

14  that the court gave. Unless the -- some issue such as

15  his intent or motive is presented by other evidence,

16  then the 404(b) evidence is not sufficient to carry

17  this case across the threshold that the government must

18  reach at this point in time.

19       Finally, Your Honor, my client is charged with

20  several counts involving the use of a telephone or

21  communication device to facilitate drug trafficking,

22  and I would suggest to the court that based upon the

23  government's lack of evidence that my client was

24  actually involved in this conspiracy that those counts

25  are dependent upon that and would therefore fail also.

1           Thank you, Your Honor.

2           THE COURT:   All right.  With respect to the

3   motion made on behalf of Mr. Whiting, I will deny that

4   motion as well.  I believe that viewing the evidence in

5   the light most favorable to the government, as I must,

6   a rational fact finder could find this defendant guilty

7   beyond a reasonable doubt    .

8           With respect the question about 404(b) evidence.

9   Even if you were to disregard the 404(b) evidence, the

10  other evidence alone would be sufficient to permit a

11  rational fact finder to reach a verdict of guilt.  So,

12  I deny your motion.

13          Next counsel?

14          MR. MITCHELL:   Your Honor, I don't want to

15  repeat counsel and the benefit of their wisdom --

16  they're taking the wind out of my sails, but Ms. Martin

17  is charged in Count Seven, Eight, 17 and 39, along with

18  Mr. Bynum, and those were all the telephone counts.

19  I'll adopt Ms. Martin's argument as to those.

20          In Counts One and Seven,  Mr. Bynum is charged

21  with conspiracy involving crack, heroin and cocaine.

22  There has been no evidence that has been presented that

23  Mr. Bynum had anything to do with heroin at any time,

24  and I would move for judgment of acquittal as to that.

25          Ms. Martin also addressed Count 40, which is a

1   substantive   offense   between   April   1st   and   April   7th

2   which   contradict ed   Count   One , as   Ms.   Martin 's   counsel

3   has   already   add ressed   to   the   court , and   I'll   adopt   the

4   argument .

5        I   will   submit   on   59   and   60   and   make   the   motion

6   of   acquittal .

7        THE   COURT:   All   right .   The   court   will   deny   your

8   motion   for   the   same   reason s.   I   believe   that   a   rational

9   find er   of   fact , view ing   the   evidence   in   the   light   most

10  favorable   to   the   government , could   find   your   client

11  guilty .   Therefore , I   deny   your   motion .

12       Mr.   Ward .

13       MR.   WARD:   Yes , Your   Honor .

14       Ms.   Dobie   is   charge d   in   first   of   Count   One   with

15  the   conspiracy , as   the   court   well   know s.   Count s   34,

16  47,   50,   53   and   57   are   each   charge s   that   she   use d   a

17  communication   facility   to   commit   a   felony .   That   is   the

18  conspiracy   charge d   in   Count   One .   They   all   rest , I

19  suggest , on   Count   One .

20       Count   61   is   the   June   1, '04   possession   of   a

21  firearm   in   furtherance   of   a   drug   trafficking   crime ,

22  i.e., the   conspiracy   charge d   in   Count   One .   Now , the

23  court   may   recall   that   I   raise d   this   issue   orally --

24  that   is   the   firearm s   issue -- the   venue   aspect   at   the

25  outset   and   said   I   would   file   something   in   writing , and

1   I have done that.

2          THE COURT:  Yes, I have your papers.

3          MR. WARD:  It's short and sweet, Your Honor.

4   Nevertheless, what I'm saying is that it all -- the

5   Count 61 was the other telephone counts.  They all rest

6   on the conspiracy for the drug trafficking charge.

7          I recognize of course the very, very high burden

8   that we have to meet in order to have a motion for

9   judgment of acquittal and at this stage of the

10  proceedings.  Nevertheless, I would comment that I

11  think it's clear -- abundantly clear from the evidence

12  that my client is an addict who brought or bought drugs

13  for her personal use.  She is not charged with that if

14  she had been charged with that she would have certainly

15  pled to it, and we wouldn't have gone through this

16  trial.  But she was not charged with that.  The

17  government chose to tie her into this conspiracy.

18         I think the telephone calls all relate,

19  basically, to the ordering of drugs.  She was never

20  shown on any photographs or any pole cameras.  She was

21  not physically surveilled making any drug purchases,

22  let alone drug pickups, and there were no telephone

23  calls and there were no witnesses who said that yes,

24  indeed she did sell drugs.

25         With respect to the telephone counts.  As I

1  said, they all rest on the finding of Count One.  It

2  seems to me that if the jury decides she is not a

3  conspirator, then they would necessarily have to find

4  that she did not use a communications facility in

5  connection with that specific conspiracy.

6       With respect to count -- the firearm count.  The

7  venue statute, of course, or rather the venue rule,

8  Rule 18, says that prosecution must be brought in the

9  district where the offense is committed.  There is

10  evidence there were two guns in the house where my

11  client was found.  If they believe those guns were

12  possessed by her, then we have an offense in the

13  District of Columbia.  There is absolutely no evidence

14  whatsoever to show or even to suggest that those guns

15  or that gun -- those guns -- I say those guns or that

16  gun because although there were two found, she's only

17  charged with one, and I'm not sure which one she's

18  charged with.  In any event, that's another issue.

19       There is no evidence to suggest that she ever

20  possessed a firearm in this district.  Of course, the

21  government will say, well, the holding of United States

22  versus Rodriguez Marino at 26 U. S., 275, a 1999

23  opinion out of the Third Circuit, it's proper to look

24  at the jurisdiction where the underlying offense, that

25  is the trafficking crime, was committed.  And if it was

1  committed  in  Maryland , then  the  fact  that  she  possess ed

2  -- Maryland  and  elsewhere , the  fact  that  she  may  be --

3  if  she's  found  to  have  been  a  part  of  that  conspiracy ,

4  I  think  under  the  rationale  of  Rodriguez  Marino  , venue

5  could  be  in  the  state  of  Maryland .

6        As  I  say , we're  moving  for  judgment  of  acquittal

7  on  the  conspiracy  count .   We  don't  think  there  is

8  evidence  of  a  conspiracy .   We  think  --  without  the

9  evidence  of  the  conspiracy  and  without  the  proof  or

10  without  a  finding  of  the  conspiracy , other  count s  each

11  including  the  gun  count  all  necessarily  have  to  fail .

12  With  that , Your  Honor , I  would  submit .

13        THE  COURT:  All  right .   With  regard  to  the

14  motion  of  defendant  Lavon  Dobie  for  judgment  of

15  acquittal , the  court  will  deny  that  motion  on  the  basis

16  of  the  standard  that  I  have  previous ly  enunciate d.

17        With  regard  to  the  specific  issue  of  the

18  firearm , counsel  is  correct  and  candid  that  under

19  Rodriguez  Marino,  if  the  conspiracy  was  operational

20  within  the  district  of  Maryland  that  is  sufficient  to

21  allow  possession  of  this  firearm  at  another  location  to

22  serve  as  the  basis  of  a  prosecution  in  this  court .

23  Therefore , I  deny  the  defendant  Lavon  Dobie 's  motion

24  for  judgment  of  acquittal .

25        Mr . Suss man .

1           MR. SUSSMAN:   Sir.

2           I have somewhat different arguments, I think,

3     than some of my colleagues.  First, with regard to --

4     generally, Ms. Harden's charged with four counts in

5     the conspiracy and two telephone counts --

6     communications counts and the PWID cocaine that was

7     alluded to by Mr. Montemarano, the March 29 count.

8           First, with regard to the conspiracy.  As a

9     general matter, I think there is a fatal variance

10    between what the government has alleged in the

11    indictment -- a single unitary conspiracy -- and what

12    they have proven up.  If I could just use their chart

13    and, actually, working -- now I have to figure out how

14    to zoom it.

15          Basically, in the cross-examination, I believe

16    that the testimony and the opinion showed that there

17    were at least four groups and potentially five that

18    supplied Ms. Martin.  That's the allegation.  None of

19    these groups had anything to do or communicated with

20    either of the other groups.  This is what in conspiracy

21    parlance, I guess, is known as the wheel, where Ms.

22    Harden, Ms. Martin and Mr. Goodwin are allegedly the

23    hubs.  My understanding of conspiracy law is that to

24    turn this into a wheel conspiracy, you have to show

25    some interdependence between 1, 2, 3, 4, and you can go

1    as far as  Mr.  Echarte , fifth  conspire r.   None  of these

2    people  help ed  each  other  in  any  way  or  perhaps  even

3    knew  of  each  other 's  existence .

4         What  the  government 's  de scribe d  here  is  just  a

5    series  of  linear  conspiraci es  stem ming  from  Kelly  LNU

6    and  Campbell ,  going  down  through  courier s  to  Ms.

7    Martin  and  Mr.  Goodwin ,  Juan  Encarnacion  and  his  Nunez

8    connection  ,and  that  flow s  down  to  the  late  Steve  Brim

9    and  Phil pot  who  ship ped  drug s  from  California ,  and

10   Moises  Uriarte  who  has  his  heroin  source s  and  ship s  a

11   different  drug  through  --  apparent ly  through  Ms.  Levi

12   to  Ms.  Martin .

13        Echarte  perform s  the  same  function ,  albeit

14   closer  to  his  --  according  to  his   testimony ,  closer  at

15   hand .   But  he  has  his  own  group  of  suppliers ,  and  he

16   sends  his  --  sell s  his  stuff  to  Ms.  Martin ,  according

17   to  his  testimony .   So  you  have  at  the  top  end  a  bunch

18   of  un connect ed  people  who  have  no  inter dependence  among

19   them  or  between  them  --  among  them .   At  the  bottom  end ,

20   you  have  a  similar  thing .   Traditionally ,  what  I've

21   seen  in  term s  of  distributor s/facilitato rs  is  you  get  a

22   street  operation  at  the  lowest  end  of  the  conspiracy ;

23   you  get  a  bunch  of  people  who  have  some  connection ;

24   they  look  out  for  each  other ,  they  warn  each  other

25   about  the  police ,  they  do  thing s  of  that  nature .

1            In this case and talking about Ms. Harden

2    specifically, Ms. Harden is alleged to be in the box of

3    facilitators/distributors.  The evidence is pretty

4    clear she has no communication with any of the other

5    alleged facilitators/distributors, and to that extent

6    there is a lack of interdependence among that group as

7    well.

8            So what at best the government is charging here

9    is a group of distinct change conspiracies that have,

10   really, in terms of the proof, very little to do with

11   this organizational chart, and that's one of the

12   reasons why I had objections to the organizational

13   chart.  For purposes of this motion, I believe it's

14   instructional to the court.  That, by itself, I believe

15   should gain a motion for acquittal on behalf of my

16   client with regard to the conspiracy.  More

17   specifically, the evidence shows with regard to Ms.

18   Harden, she had absolutely no communication with any of

19   the people who are alleged to have been a part of this

20   conspiracy.  So at best, you have relationships of some

21   sort with Paulette Martin.

22           Now, you don't have to know everybody in the

23   conspiracy, but you do have to know something about the

24   general nature of the conspiracy.  You join a

25   conspiracy with a notion of furthering the interests of

1  that group.  There is absolute ly nothing  to show that

2  Ms. Hard en ever had any information  concern ing the

3  scope  of any group , that there  was a group  in existence

4  of any sort , or that she intend ed to further  the

5  purpose s of this unknown  group .

6       More  specifically , Ms. Hard en is also charge d in

7  the conspiracy  with entering  a conspiracy  to distribute

8  a kilogram , I believe , or more of heroin .  There 's

9  absolute ly no testimony  that links her to any heroin ,

10  any knowledge  of heroin , any discussion  of heroin or

11  anything  that would  indicate  that she knew anything

12  about heroin .  At the very least , the heroin aspect of

13  the conspiracy  charge  would  have to be dismiss ed.

14       Similar ly, with regard  to cocaine  base  -- and

15  I'm assuming  the government 's theory  here  is that Ms.

16  Hard en is a re-distributor  of cocaine .  The same

17  argument  would  apply  to the cocaine  base aspect of the

18  conspiracy .  There 's nothing  in the testimony  that I

19  can recall  that would  allow  even the vaguest  inference

20  that Ms. Hard en had anything  to do with cocaine  base or

21  knew that any of these people  were sell ing cocaine

22  base .  The cocaine  -- the aspect  that I would  ask for

23  dismissal  on the cocaine  aspect  of the conspiracy  first

24  as to quantity  of 5 kilogram s or more .  It would  be

25  mere speculation  if Ms. Hard en knew anything  about the

1   volume of that much cocaine. She was never at the

2   premises. She was never observed at the premises. At

3   best, the government's information and allegations are

4   that she bought small amounts of cocaine over a four-

5   year period. That hardly qualifies as a kilogram or

6   perhaps even a 500 gram inclusion in any conspiracy.

7   In essence, with the conspiracy counts there is

8   absolutely no inferences that Ms. Harden agreed to

9   enter a unit of this kind or agreed to further its

10  interest.

11          Everything -- with regard to the other counts,

12  what we have is they're all based on distributive

13  intent. Without distributive intent, the government

14  has -- doesn't have any telephone counts, because the

15  telephone counts are to further the conspiracy as

16  charged. My argument as to her lack of involvement in

17  the conspiracy would cause those counts to fall.

18          With regard to the -- I would submit that there

19  is nothing to indicate any distributive intent on Ms.

20  Harden's part at all. There is no evidence of sales.

21  There's no evidence of materials. There's no evidence

22  of packaging. There is no evidence of the life of this

23  conspiracy that Ms. Harden ever sold drugs to anyone or

24  engaged in sell activity. Specifically, also, with the

25  -- with regard to the March 29 incident, which is

1  indicted as a PWID.  I would argue that for record

2  purposes that the indictment was obtained through

3  inappropriate evidence, inasmuch as the testimony at

4  the trial was that at the grand jury, Sergeant Sakala

5  testified that a package was passed without stating

6  that it was his opinion that a package was passed.  I

7  think that given the grand jury indicted Ms. Harden on

8  that count, the impression that it was fact and not

9  just opinion was misleading and inappropriate to base

10  the indictment.

11      I think that's the argument, Judge.

12      THE COURT:  All right.  Thank you.  With regard

13  to the arguments made by counsel for the defendant

14  Harden, first, the argument with respect to her

15  participation in the alleged conspiracy and the notion

16  that she may not know any of the other members of the

17  conspiracy other than Paulette Martin and may not know

18  all of the objects of the conspiracy, that may very

19  well be the case, but that's simply not what the law

20  requires.  It is not required that the jury find that

21  the alleged members of the conspiracy met and

22  interviewed and entered into any express or formal

23  agreement.

24      They do not need to find that the conspirators

25  stated in words or writing what the scheme was or its

1    object  or  purpose  or  every  precise  detail.  What  they

2    must  prove  is  that  there  was  a  mutual  understanding,

3    either  spoken  or  unspoken, between  two  or  more  people

4    to  cooperate  with  each  other  to  accomplish  an  unlawful

5    act.  There  is  at  least  that  level  of  evidence  before

6    the  court  on  the  conspiracy  count, and  therefore  I  find

7    that  the  motion  would  be  appropriate  for  denial  under

8    Rule  29  of  the  forgiving  standard  of  the  Fourth  Circuit

9    where  I'm  to  consider  whether  any  rational  trier  of

10   facts  could  have  found  the  defendant  guilty  beyond  a

11   reasonable  doubt  .

12          With  respect  to  the  arguments  as  to  the  type  of

13   drug.  The  verdict  form  that's  been  agreed  to  in  this

14   case  does  require  the  jury  to  indicate  what  type  of

15   controlled  substance  she  was  involved  with, and  they

16   will  have  the  option  of  what  that  was, and  they  will

17   also  have  the  option  of  indicating  the  amount  that  they

18   attribute  to  her  as  being  in  furtherance  of  the

19   conspiracy.  Therefore, I  will  deny  the  defendant

20   Harden's  motion.

21       MR.  SUSSMAN:  Just  a  clarification  on  that,

22   Judge.  The  fact  that  it's  submitted  to  --  you're

23   denying  the  motion  as  to  the  particular  substances  and

24   amounts  and  that's  why  it's  going  to  the  jury.  It's

25   not  a  jury  question  unless  the  court  denies  the  motion.

1          I'm just clarifying.

2          THE COURT:   Your motion is denied.

3          MR. SUSSMAN:   Okay.

4          THE COURT:   Mr. McKnett.

5          MR. MCKNETT:   Your Honor, I first want to adopt

6    the arguments made by Mr. Sussman, particularly with

7    regard to the conspiracy and collateral drugs involved,

8    as well as the arguments made by other defense counsel.

9          Ms. Ali is charged in five separate counts, and

10   I'll deal with them sequentially.   Count One is the

11   base conspiracy count.   There has been absolutely no

12   evidence adduced at all during this trial at all that

13   Ms. Ali was involved in any way with heroin.   Now, I

14   know that's not a separate count, but as the verdict

15   sheet is now exists, that question will be presented to

16   the jury unless the court rules otherwise, because

17   there is absolutely no evidence involving Ms. Ali and

18   heroin.   I think it's totally inappropriate for that

19   question even to go to the jury, and I think that at

20   least as far as Count One addresses an accusation of

21   conspiracy to attribute heroin, that motion should be

22   granted.

23         As far as the overall conspiracy to possess with

24   intent and distribute the three substances, the powder

25   cocaine, the heroin and the cocaine base or crack.

1    There's really only four elements of evidence that

2    relate to that. Two of them are phone calls. One is

3    the phone call on A367; another is B1233. They relate

4    to Count Two, and I will address them in connection

5    with Count Two.

6        If the possession with intent charge should

7    fall, so will at least -- so will all of the other

8    counts, because they all relate to the underlying

9    charge of possession with intent to distribute. In

10   telephone call A367, March 20, the only thing in there

11   that talks about any sort of purchase of -- any sort of

12   transaction between Ms. Ali and Ms. Martin is Ms. Ali

13   asking if she could come by because, you know, all I

14   want, and then later on. So if you ain't there, is it

15   all right if I get some? And Ms. Martin says, yeah.

16   And then later the same day Ms. Martin says, in a

17   different call, I fixed your thing. I have it with me,

18   so you just call me. The only person who testified

19   that that is a drug conversation is Sergeant Sakala

20   whom, I submit by the very nature of his position, is

21   biased, and certainly his opinion is subjective. I

22   don't think the jury should be allowed to make

23   decisions based on subjective and biased information

24   without any other factual support with regard to those

25   two conversations.

1       There were no surveillance s no search es no

2  seizure s no evidence that Ms. Ali ever sold drug s to

3  anybody .   There's n o evidence  that anybody ever claim ed

4  they bought drug s from Ms. Ali ; no evidence  that

5  anybody  ever saw Ms. Ali make a sale ; no evidence  that

6  Ms. Ali was ever heard to arrange a sale of drug s.

7  There is evidence clear ly, at least adequate , to get to

8  the jury of a possible purchase of cocaine , but

9  absolute ly no other evidence  other than Detective

10  Sakala 's subject ive and biased  interpretation s to

11  support a find ing beyond a reasonable doubt  of

12  possession  with intent to distribute .

13       A jury simply should n't be allow ed to determine

14  the guilt of somebody based sole ly on the opinion of

15  somebody who , by his very nature , is biased and

16  subject ive.

17       I could make the same arg ument and will make the

18  same argument with regard to Count 44, which is another

19  -- I don't know if I specif ied this .  Count 22 is a

20  telephone use charge made on March 20 , '04, and Count

21  44 is a similar charge with regard to the 21st of

22  April , '04, and Count 45 is a charge of possession with

23  intent to distribute on April 21st, '04.  So, I will

24  deal with Count s 44 and 45 together .

25       For the same reason s that I proposed with regard

1    to Count 22:  Other than the bias and subjective

2    opinion of Officer Sakala -- Sergeant Sakala, there is

3    no evidence that Ms. Ali purchased any substance with

4    the intent to distribute it.  All she said was, in two

5    calls, A1224 and A1226, which took place on August 21,

6    the date of -- in 44 she said -- Ms. Martin says, you

7    just wanted one ticket?  Ms. Ali says, I've got to make

8    a call.  And then on the next conversation, which is --

9    I misplaced it, but it's a similar comment about having

10   to make a call or having to find out.

11           Now, Sergeant Sakala interprets that to mean

12   that Ms. Ali was checking with customers, but there is

13   absolutely no substantive evidence to support that

14   conclusion that it's purely his opinion -- purely a

15   subjective opinion, and purely a biased opinion if for

16   no other than reason than he is one of the case agents

17   who is investigating this case, and it was his goal to

18   convict Ms. Ali on this -- on these charges.

19           Again, a jury should simply not be allowed to

20   come to a conclusion about someone's future based

21   solely on subjective and biased opinion evidence,

22   without any other subject of support for that opinion.

23   No surveillances.  No searches.  No seizures.  No calls

24   in which Ms. Ali is discussing sales.  No other

25   evidence at all.

1          With regard to Count 56, which is the possession

2   with intent to distribute crack cocaine on the 16th of

3   May '04.  That involves, as the court will recall, the

4   transfer of items from Ms. Martin's house to her

5   school.  I will simply submit my argument on that and

6   adopt the argument made by Mr. Montemarano with regard

7   to that count.

8          THE COURT:  All right.  With regard to the

9   motion of acquittal for defendant LaNora Ali, I will

10  deny that motion.  Counsel for Ms. Ali correctly points

11  out that there is a large amount of circumstantial

12  evidence, and he claims, as is his right, about the

13  absence of direct evidence in certain respects.

14         However, under the very forgiving standard in

15  the Fourth Circuit of viewing the evidence in the light

16  most favorable to the government, whether a rational

17  trier of fact could find the defendant guilty, I am

18  required to take into account and do take into account

19  both the circumstantial as well as the direct evidence,

20  and the government is entitled to the benefit of all

21  reasonable inferences from facts proven to those sought

22  to be established.  And while in the case of Ms. Ali

23  there may be a number of matters that are proved by

24  reasonable inferences, that does not for that reason

25  alone mean that the government's evidence is

1  insufficient  at  this  stage .   According ly , I  will  deny

2  the  motion .

3          Now , are  with  we  ready  for  the  first  defense

4  witness ?

5          MR. MARTIN:  Can I   go  out  and  check , Your  Honor ?

6          MS. GREENBERG:    Your  Honor , I  did  alert  the

7  court  to  some  legal  issue s  that  may  relate  to  Mr.

8  Martin 's  witness es .

9          THE  COURT:   We'll  take  them  up  as  they  come  in .

10          MS. GREENBERG:   Yes .

11          THE  COURT:  I don't  know   what  they're  going  to

12  say .

13          MR. MARTIN:   Let  me  go  outside  and  check , Your

14  Honor .   When  I  look ed  just  before  comi ng  in  here , no

15  one  was  here  yet .

16          THE  COURT:   All  right .  Well , why  don't  we  take

17  a  five -minute  recess  while  you  do  that , and  I  will  ask

18  Ms. Merez  to  inquire  as  to  the  health  of  the  jury  and

19  bring  them  in  and  get  them  seat ed  so  we  can  commence .

20          I  will  tell  the  jury  that  I  apologize  for  the

21  delay ; it  was  occasion ed  by  my  plea  tak ing  a  little

22  long er  than  I  anticipate d .   I  will  tell  them  that  the

23  government  has  rested  and  we  are  now  moving  into  the

24  defense  case .

25          Counsel , do  I  understand  Mr. Martin  is  going  to

1  be the first to proceed with defense case?

2       MR. MARTIN:   Your Honor, I have three witnesses

3  here.

4       THE COURT:   I'm not going to go back and forth

5  between defendants.

6       MR. MONTEMARANO:   Your Honor, our understanding

7  was we were going to do exactly that, but we have

8  witnesses from out of state in my case, and our

9  intention -- --

10      THE COURT:   I want to have a complete flow of

11 witnesses.

12      MR. MONTEMARANO:   We're going to try to do that.

13      THE COURT:   Make sure you're flowing.

14      MR. MONTEMARANO:   For example, I have a witness

15 coming in on Tuesday from Florida.  To get her on and

16 off, we interrupt Mr. Martin's.

17      THE COURT:   I understand.  I don't mind

18 interruptions, but I like to have as much as I can to

19 have one set of witnesses and another set of witnesses.

20 There may be one or two out of turn, but so the jury

21 can focus and say, okay, this is the defense of this

22 defendant.  I don't think -- I think it's going to be

23 confusing people hopscotching back and forth, but so

24 that the jury can give individualized assessment that I

25 think you all want, I think they should know that the

1   witnesses being called are being called by Defendant X

2   and that they can attribute that testimony to the

3   Defendant X.

4        MR. MARTIN:   Right.  As a practical matter, Your

5   Honor, that makes sense, but there's another side to

6   that too.  Sometimes, scheduling -- you know people

7   have jobs and things like that, and we don't have --

8        THE COURT:   No, I understand.  I want to make

9   certain that the jury does not get confused if we

10  hopscotch back and forth too much.

11       MS. JOHNSTON:   Your Honor, I know we're late to

12  the jury, but there's something I need to mention to

13  the court.  I know the court was very generous with

14  defense counsel and permitted them to get partial

15  transcripts of Mr. Thurman's testimony; apparently his

16  transcripts have been dispensed out on the streets.

17  Mrs. Thurman contacted our office --

18       THE COURT:   On the street?

19       MS. JOHNSTON:   With individuals out on the

20  streets, which causes the government concern for the

21  safety and well-being of not only Mr. Thurman who, of

22  course, is incarcerated, but his mother, his

23  girlfriends, and I believe he has at least one child.

24       We don't know how it got out there, but clearly

25  the government didn't disclose it to anyone, and I know

1    that the court provided copies at court expense to

2    defense counsel. If anything happens in terms of any

3    -- Mr. Thurman or any of his family members, we're

4    going to have to conduct an investigation. I don't

5    know what the court can do, but there's no reason in

6    God's creation why that transcript should have gone

7    outside of the parties in this matter.

8         MR. MARTIN:  Your Honor, I'm going to state

9    right up front that I gave the transcript to one of Mr.

10   Goodwin's friends. I thought this was a public trial.

11   She asked for a copy of it. Mr. Goodwin authorized me

12   to give it to her, and I did.

13        MS. JOHNSTON:  Your Honor, could we get the name

14   of the individual who he gave it to?

15        MR. MARTIN:  I only know her name as Jackie. I

16   don't know her last name, but I thought it was a public

17   trial and anything that might have been said or heard

18   in this courtroom --

19        THE COURT:  While this is a public trial, I

20   don't want to have a situation where witnesses for

21   either side end up being subject to harassment for

22   intimidation because of their testimony. If I

23   authorize the preparation of a transcript, I think

24   people need to be very circumspect with that and use it

25   as vigorously as they can in the defense of the case,

1    but to distribute it to other people who might use it

2    for improper purpose s is something I think we should

3    watch out for . So, I'm going to be very care ful on

4    further transcript request s if I can't get a comfort

5    level that that 's not going to happen .

6         All right . Ready for the jury? All right ,

7    bring them in.

8         MS. JOHNSTON:   Your Honor , can we get an idea of

9    who the witness es are , and what order ?

10        MR. MARTIN:   Yes .

11        THE COURT:   First witness .

12        MR. MARTIN:   The first witness will be Mr.

13   Mario Bracke tt. The second witness will be Margaret

14   Battle . The third witness will be Mr. Maurice

15   Alexander .

16        THE COURT:   All right .

17        MS. GREENBERG:   Your Honor , not to leave the

18   jury sitting in the box while we have a bench

19   conference , but I think Mr. Bracket t is, as far as I

20   understand , being call ed to testify as to the

21   credibility of Mr. Smith , and that is the subject of

22   the government 's legal memoranda .

23        THE COURT:   I'll take that up before he

24   testifi es.

25        MR. MARTIN:   He's the first witness .

1          THE  COURT:   First  witness ?   What  is  he  going  to

2   testify  to?

3          MR.  MARTIN:   He  is  going  to  testify  to  a  number

4   of  thing s,  Your  Honor .   Not  only  the  credibility  of  Mr.

5   Mr.  Horace  Smith  who ,  by  taking  the  witness  stand ,  put

6   his  credibility  at  issue ,  but  Mr.  Bracket t  is  also

7   going  to  testify  regard ing  the  fact  that  he  has  seen

8   Horace   Smith  deal ing  in  drug s  long  before  he  met  Mr.

9   Goodwin   and  that ,  most  important ,  as  I  said ,  he  has  an

10  opinion   regard ing  his  credibility   and  know s  other

11  people  who  know s  Mr.  Smith  and  know s  what  his

12  reputation  is  in  that  community .   We  think  that  that 's

13  very  important ,  because  the  government   has  essentially

14  made  out  this  case  not  only  with  these  record ings  but

15  also  through  the  testimony  of  people  who  have  been

16  offered  leniency  by  the  government .

17         THE  COURT:   Well ,  are  you  contemplati ng  having

18  this  witness  offer  any  specific  instance s  of  conduct  a

19  witness ?

20         MR.  MARTIN:   Yes .   I've  asked  him  that ,  and  he

21  has  --

22         THE  COURT:   How  is  that  admissible ?

23         MR.  MARTIN:   How  is  that  admissible ?

24         THE  COURT:   Yes .

25         MR.  MARTIN:   Well ,  Your  Honor ,  to  begin  with ,

1  under Rule 60, the credibility of a witness may be

2  attacked by any party including the party calling the

3  witness.

4       THE COURT:  You can impeach him.  That's fine.

5       MR. MARTIN:  And then 608 --

6       THE COURT:  There's very specific limitations on

7  your ability to offer evidence of specific instances of

8  the conduct of a witness for the purpose of attacking

9  --

10      MR. MARTIN:  Well, 608(a), it seems to me, would

11 allow him to talk about --

12      THE COURT:  You may call a witness to the stand

13 and say what is the reputation of so forth, and what is

14 your opinion of the reputation of so-and-so for

15 truthfulness, and you can get an answer out of them.

16 But if you want to go into a specific instance about

17 conduct about the witness about whom he is testifying,

18 you have a pretty significant hurdle to overcome

19 because of 608(b).  All I can say is, don't go there

20 unless you think you've got a basis to go there that

21 satisfies Rule 608(b).

22      MR. MARTIN:  Wait a minute.  I want to

23 understand the court on this.  I thought that in

24 putting him on the stand, if he was going to give an

25 opinion regarding his own personal opinion regarding

1   this person's credibility, I would then have to ask

2   him, before asking him what his opinion was, what the

3   basis was for his opinion.  And in asking him what the

4   basis is, he would talk about specific instances where

5   this person proved to be dishonest or not truthful.

6   Now the court is telling me that that's not how they

7   want me to proceed?

8        THE COURT:  I think there's a significant issue

9   if you're going to call a witness to the stand and have

10  him give specific instances of conduct of that witness.

11       MS. GREENBERG:  Your Honor, I think it's even

12  further than that.  In the Garza case cited by the

13  government, which is a case from two months ago, Mr.

14  Martin hasn't provided the foundation upon which this

15  witness can form a reliable opinion.  He is going to

16  give his opinion as to Mr. Smith, and I have heard

17  nothing about his foundation:  About how he knows him,

18  what the background is, how he can offer this opinion.

19       And the second area of testimony -- I threw in

20  at the end of the memo the Bynum case, whereas the

21  court excluded cross-examination of an individual who

22  denied selling crack cocaine when the defense had some

23  evidence that he did sell crack cocaine.  The Fourth

24  Circuit specifically stated that extrinsic evidence is

25  inadmissible.  That was the second part of the

1  proffered  testimony  of  Mr.  Bracke tt,  that  he's  going  to

2  testify  that  Mr.  Smith  dealt  cocaine  at  a  time

3  different  than  he  testifi ed  on  his  direct  examination .

4  So,  I  think  both  area s  are  excluded .   I  don't  want  us

5  to  get  into  a  situation  where  there 's  a  trial  within

6  the  trial .   That 's  what  the  advisory  committee  note s

7  caution , and  I  think  that 's  what  we're  get ting  to  here .

8  I've  heard  nothing  from  Mr.  Martin  as  to  this  witness '

9  foundation   for  testify ing.

10        MR.  MARTIN:   Again  Your  Honor , as  I  told  the

11  court  previous ly:  Mr.  Bracke tt  know s  Mr.  Smith .  He

12  know s  people  who  also  know  Mr.  Smith .   With  respect  to

13  specific  instance s  of  mis conduct .   I  don't  know   that  I

14  have  to  tell  the  government  what  my  direct  examination

15  is  going  to  be.   I've  never  heard  of  that  before .   I've

16  call ed  witness es  in  other  case s  who  talk ed  about

17  credibility  of  people  and  --

18        THE  COURT:   You  may  call  him  and  ask  him , what

19  is  your  opinion  of  the  truthfulness  of  Mr.  X, and  he

20  can  say , yeah , he's  a  liar .   You  can  do  that .   What  you

21  can't  do  is  to  go  into  specific  instance s  of  conduct .

22        MR.  MARTIN:   All  right .   Fine .

23        THE  COURT:   If  he  says  he's  a  liar  because  he

24  deal s  drug s  or  he  deal s  drug s  on  different  date s  than

25  he  said  on  the  witness  stand , that  is  going  into

1    specific  conduct .   If  you're  going  to  tell  me  that  the

2    instance s  you  want  to  talk  about  is  he  lied  in  this

3    case ;  he  lied  in  that  case ;  he  lied  to  me  about  this ;

4    he  promised  to  do  thing s  he  never  did  it ;  he  lies  to  me

5    all  the  time ,  that 's  my  basis  for  an  opinion .

6             MR.  MARTIN:    Well ,  well .

7             THE  COURT:    That 's  one  thing .   But  to  say  that

8    he  is  an  untruthful   person  because  he  committed  some

9    crime  or  was  guilty  of  some  mis conduct  I  don't  think

10   you  can  do  under  608 (b).

11            MR.  MARTIN:    Well ,  let 's  assume  that  the  crime

12   involve d  an  act  of  dis honesty .

13            THE  COURT:    Like  perjury ?

14            MR.  MARTIN:    Sorry ?

15            THE  COURT:    Like  perjury ?

16            MR.  MARTIN:    No ,  like  robbery .

17            THE  COURT:    I  don't  think   that  you  can  have  the

18   person  come  in  and  give  testimony   concern ing  specific

19   instance s  of  conduct  --

20            MR.  MARTIN:    Well ,  well .

21            THE  COURT:    -- f or  the  purpose  of  attacking  the

22   witness 's  --  the  witness  who  previous ly  testifi ed's

23   character  for  truthfulness   other  than  conviction  of  a

24   crime  and  other  than  is  provided  in  Rule  609 .

25            MR.  MARTIN:    All  right .   Then  we  may  as  well

1   address the other witness es as well .  I understand the

2   court 's admonition , and I will stay clear of that with

3   respect to Ms. Battle and some of the other witness es

4   who are going to testify about Mr. Thurman too , but I'm

5   still going to ask them their opinion , as I understand

6   I can do, but I can't ask them about the specific

7   instance s that lay the basis for that opinion ; is that

8   correct ?

9        THE COURT:  Instance s involving conduct .  Yes ,

10  that 's right .  Conduct that does not meet the

11  requirement s of Rule 608 or 609 .

12        MR. MARTIN:  Court 's indulgence .

13        MS. JOHNSTON:  Your Honor , if I understand the

14  court 's -- as I understand the court 's ruling ,

15  preliminarily , counsel is going to have to establish a

16  basis for that opinion in term s of how long the witness

17  has known the -- how long , for example , Mr. Bracke tt or

18  Ms. Battle have known Mr. Smith or Mr. Thurman ; how

19  frequent ly they saw them ; what their relationship was

20  with each other so that there 's a basis for the

21  opinion .  He can't just put him on the stand and say ,

22  do you have an opinion --

23        THE COURT:  No .  You have to have some basis for

24  it .

25        MR. MARTIN:  Exact ly .

1          MS. JOHNSTON:   At the same time, he's not going

2   to be able to ask him, what do you know about their

3   drug dealing.

4          THE COURT:   It cannot be an opinion based upon

5   instances of conduct that are prohibited by 608, unless

6   authorized by 609.   You can certainly talk to the -- do

7   you know this person?   Have you dealt with them over a

8   long period of time?   Have you asked him to do things

9   and he's done them?   The kind of things you would go

10  into --

11          MR. MARTIN:   I understand that, Your Honor, and

12  I had a bunch of predicates here that I was going to

13  use to establish that he knew him.   I also understand

14  from the court that I'm not able to go into specific

15  instances of misconduct, but I will lay a foundation.

16          THE COURT:   All right.   Ready for the jury?

17          Okay.   Bring them in.

18                    (Jury returns at 11:10 a.m.)

19          THE COURT:   Good morning, ladies and gentlemen.

20  First of all, I want to apologize to you for the delay

21  in getting started today.   Every piece of bad news has

22  good news with it though.   I understand you're well

23  nourished that you weren't wasting your time not

24  eating, so -- but hopefully you're well fed and can

25  with stand a bit of a stretch of testimony now.   The

1  good news is we have passed an important milestone in

2  the case. The government has rested. When the

3  government rests, I have to handle some procedural

4  matters which I have disposed of and resolved, and we

5  are now ready for the defense case.

6          The first defense witness will be called by

7  counsel for Mr. Goodwin.

8          Mr. Martin, you may proceed.

9          MR. MARTIN:   Thank you, Your Honor.

10         Mr. Goodwin calls Mr. Mario Brackett to the

11  witness stand.

12  Thereupon,

13                   **ROMERO  ARNEZ  BRACKETT**,

14  having been called as a witness on behalf of the

15  Defendant Goodwin, and having been first duly sworn by

16  the Courtroom Deputy, was examined and testified as

17  follows:

18                   <u>**DIRECT EXAMINATION**</u>

19         BY MR. MARTIN:

20  Q.     Mr. Brackett, why don't you pull that microphone

21  closer to you so that the ladies and gentlemen of the

22  jury can hear you.

23          In a loud and clear voice, would you state your

24  full name for the jury, and spell your last name for

25  the court reporter, please?

1  A.      Romero  Arnez  Brackett ,  B R A  C K  E  T  T.

2  Q.      How  old  are  you  now ,  sir ?

3  A.      27 .

4  Q.      Mr.  Brackett ,  let  me  ask  you ,  have  you  ever

5  testifi ed  in  court  before ?

6  A.      Yes .

7  Q.      Are  you  a  little   nervous  today ?

8  A.      I'm  okay .

9  Q.      You're  okay ?

10         Mr.  Brackett ,  do  you  know  Mr.  Learley  Reed

11  Goodwin ?

12  A.      No .

13  Q.      Have  you  ever  met  him ?

14  A.      No .

15  Q.      Do  you  know  about  him ?

16  A.      No .

17  Q.      Do  you  know  other s  who  know  Mr.  Learley  Reed

18  Goodwin ?

19  A.      Yes .

20  Q.      Amongst  those  who  you  know  who  know  Learley  Reed

21  Goodwin ,  is  Horace  smith  one  of  them ?

22  A.      Yes .

23  Q.      How  do  you  know  Horace  Smith ?

24  A.      He's  my  wife 's  cousin .

25  Q.      Speak  up ,  sir .

1          THE COURT:   I couldn't hear that.

2          THE WITNESS:   He's my wife's cousin.

3          BY MR. MARTIN:

4    Q.    Who is your wife?

5    A.    Lakesha [ph.] Brackett.

6    Q.    Does she have any other relatives besides Mr.

7    Horace Smith that you know?

8    A.    Yes.

9    Q.    Who?

10   A.    Raynard Dorsey.

11   Q.    With respect to Mr. Horace Smith and Mr. Raynard

12   Dorsey. Have you seen them together at any time?

13   A.    Yes.

14   Q.    How long have you known Horace Smith?

15   A.    Three years -- three or four years.

16   Q.    During the three ore four years that you have

17   come to know Mr. Horace Smith, do you have an opinion

18   regarding his credibility? That is, his truthfulness,

19   his honesty in terms of telling you things -- the more

20   important things in life?

21          MS. GREENBERG:   Objection.

22          Foundation, Your Honor.

23          THE COURT:   Add a little more foundation, if you

24   would.

25          BY MR. MARTIN:

1  Q.      Have you ever had occasion  to talk to Mr. Smith

2  regard ing matter s that were important ?

3  A.      No .

4  Q.      Have you ever had occasion  to entrust  or -- this

5  is going to be hard to do with your admonition , Your

6  Honor .

7          Have you ever had occasion  -- have you ever had

8  occasion  to -- without  talk ing specifically  about any

9  conduct , have you ever had occasion  to -- court 's

10 indulgence .

11         You knew other s who also knew him ; is that

12 correct ?

13 A.      Yes .

14 Q.      And amongst  those other s who also know him , what

15 is his reputation  amongst  them for truthfulness ?

16         MS. GREENBERG:    Objection .

17         Hearsay .   Foundation .

18         THE COURT:    Over ruled .

19         BY MR. MARTIN:

20 Q.      What is his reputation  with respect  to

21 truthfulness  amongst  those in the community  who know

22 him ?

23 A.      He 's a liar .

24 Q.      Now , you 've come here today , and other  than the

25 compensation  that the court paid you for your travel

1  expense s, do you expect to get anything else for coming

2  here today?

3  A.      No.

4  Q.      Are you under subpoena to appear?

5  A.      Yes.

6          MR. MARTIN :  Your Honor, I have no further

7  question s of this witness.

8          THE COURT:   Cross-examination ?

9                  **CROSS-EXAMINATION**

10         BY MS. GREENBERG:

11  Q.      Good morning, sir.  My name is Bonnie Greenberg .

12  I'm with the United States -- the prosecution .

13  A.      Good morning.

14  Q.      How did you come to get here today, if you don't

15  know Mr. Goodwin ?  How did you come to be asked to be

16  here today?

17  A.      Somehow my name was brought up in something .  I

18  don't know .

19  Q.      Who do you know that know s Mr. Goodwin ?

20  A.      I know Mr. Smith and Mr. Dorsey .

21  Q.      Okay .  Do you know who Mr. Goodwin is?

22  A.      No, ma'am .

23  Q.      You keep looking over here .  Do you recognize

24  anybody at that table?

25  A.      No.

1    Q.      Who did you talk to before appearing here today?

2    A.      You said, who did I talk to?

3    Q.      Yes.

4    A.      The lawyer.

5    Q.      Did he tell you how he came to get your name to

6    come here today?

7    A.      He just said my name was brought up, and that

8    was it.

9    Q.      You've never met Mr. Goodwin; is that your

10   testimony?

11   A.      No.

12   Q.      Do you know anything about his reputation for

13   truthfulness?

14   A.      No.

15          MR. MARTIN:   Your Honor, I object.  Mr. Goodwin

16   hasn't taken the stand.

17          THE COURT:   Sustained.

18          BY MS. GREENBERG:

19   Q.      You have been involved in drug dealing in the

20   past; correct, sir?

21   A.      I have one time, yes, ma'am.

22   Q.      You have a charge in 2004 of distribution of

23   cocaine in Washington, D. C; is that correct?

24   A.      Yes.

25   Q.      You were convicted of that?

1   A.     Yes.

2   Q.     You also have another one, attempted

3   distribution of cocaine in D.C. in 2005.

4          Are you saying that's all one case?

5   A.     No.  I only have one case in D.C.  It was in

6   2005.

7   Q.     And you distributed cocaine?

8   A.     No, I didn't.

9   Q.     You pled guilty to that, didn't you?

10  A.     Yes, I did.

11  Q.     Okay.  You pled guilty to something you didn't

12  do?

13  A.     Yes.

14  Q.     So you went before the court -- a judge like

15  this -- in the District of Columbia, and they asked you

16  if you did something, and you said you did?

17  A.     Yes.

18  Q.     And you lied to the judge when you said you did

19  that?

20  A.     (No response.)

21  Q.     When you pled guilty, are you saying you lied to

22  the judge?

23         Let me take you back.  You're in the District of

24  Columbia, and you're charged with distributing cocaine;

25  right?  Is that right?

1  A.      I think it's attempted distribution  or something

2  like that.

3  Q.      Well, it involved cocaine; right?  A drug.

4  A.      Yes.

5  Q.      Either distribution, or attempted distribution;

6  correct?

7  A.      Yes.

8  Q.      It was in Washington, D.C., and you're charged

9  with that?

10 A.      Yes.

11 Q.      You went to court, and you could have chosen to

12 go to a trial or plead guilty; correct?

13 A.      Yes.

14 Q.      And you chose to plead guilty.

15 A.      Yes.

16 Q.      Is that a yes?

17 A.      Yes.

18 Q.      Okay.  You have to be loud so this young lady

19 over here can --

20 A.      Yes.

21 Q.      You got up before a judge, and the judge read to

22 you the charge; correct?

23 A.      Yes.

24 Q.      And you told the judge you did that charge.

25         MR. MONTEMARANO:  Foundation.

1          THE COURT:   Overruled.

2          MR. MONTEMARANO:   Can we be heard at the bench?

3          MS. GREENBERG:   Your Honor, I don't think Mr.

4   Montemarano has standing to object to this witness.

5          MR. MONTEMARANO:   Court's indulgence.   If I

6   could speak to Mr. Martin for a moment.

7          MS. GREENBERG:   I object to that, Your Honor.

8          THE COURT:   You can speak to him.

9          MR. MARTIN:   May we approach, Your Honor?

10              (At the bar of the court.)

11          MR. MARTIN:   Your Honor, learned counsel has

12   suggested to me that the government has to make a

13   foundation before asking questions regarding his plea

14   before the court.   That being the case, I would ask her

15   to do that before she goes into specific questions that

16   she intends to.

17          THE COURT:   She's asked him if he plead guilty

18   to a charge of attempted distribution of cocaine, and

19   he said yes.   She's simply inquiring about his decision

20   to plead guilty.   He says he didn't do it but he pled

21   guilty anyway.   I think it's fair cross-examination.

22          MR. MONTEMARANO:   Your Honor, may I?

23          MS. GREENBERG:   I would object to this.   If I

24   had a witness --

25          THE COURT:   We're not going to have every single

1   person -- you're all deemed to join in these --

2          MS. GREENBERG:   We don't double team them; they

3   shouldn't double team us.

4          THE COURT:   Okay.

5                    (Back in open court.)

6          BY MS. GREENBERG:

7   Q.     Sir, let me take you back here.  You're in

8   Washington, D.C. and you're charged with attempted

9   distribution of cocaine, a narcotic, a controlled

10  substance; correct?

11  A.     Yes.

12  Q.     You appear before a judge similar to the judge

13  here sitting up on a bench.  Do you recall that?

14  A.     Yes.

15  Q.     Pretty significant event, isn't it?

16         That's a pretty significant event in your life.

17  A.     Yes.

18  Q.     And the judge asks you if you're guilty or not

19  guilty, and you say you're guilty; correct?

20  A.     Yes.

21  Q.     And you tell the judge that.

22  A.     Yes.

23  Q.     But here before this jury, you're saying you're

24  not guilty of that; is that correct, sir?

25  A.     Yes.

1   Q.      You were also convicted just last month; is that

2   correct --

3   A.      No.

4   Q.      -- in Arlington, Virginia for failure to return

5   property, a theft conviction?

6   A.      Yes.

7   Q.      Okay. Just to be clear. You were just

8   convicted last month of a theft conviction of failure

9   to return property.

10  A.      Yes.

11  Q.      And you pled guilty to that, too?

12  A.      Yes.

13  Q.      Were you guilty of that one?

14  A.      Yes.

15          MS. GREENBERG:    Nothing further, Your Honor.

16          THE COURT:    Redirect?

17          MR. MARTIN:    Yes.   Thank you, Your Honor.

18                    **REDIRECT EXAMINATION**

19          BY MR. MARTIN:

20  Q.      Mr. Brackett, how much time were you facing in

21  that case where you pled? That drug case.

22          MS. GREENBERG:    Objection.

23          THE COURT:    Overruled.

24          BY MR. MARTIN:

25  Q.      How much time were you facing in that case?

1  A.      Six to 18 months.

2  Q.      Six to 18 months.  And when you pled, how much

3  time did you actually get?

4  A.      I got six months, and five years parole.

5  Q.      So you got sentenced at the low end of that

6  range.

7  A.      Yes.

8  Q.      With respect to your other testimony that you

9  made in front of the ladies and gentlemen of the jury

10 today.  Are you facing any charges here at this time?

11 A.      No.

12 Q.      Have you told them the truth regarding this

13 matter today?

14 A.      Yes.

15         MS. GREENBERG:   Objection.

16         THE COURT:   Overruled.

17         BY MR. MARTIN:

18 Q.      Are you threatened with imprisonment in this

19 case?

20 A.      No.

21         MS. GREENBERG:   Objection.

22         Leading.

23         THE COURT:   Overruled.

24         BY MR. MARTIN:

25 Q.      Were you offered a reduction in any jail time

1  that you might get in this case if you didn't testify

2  truthfully to my examination?

3  A.      No.

4          MS. GREENBERG:   Objection.

5          He's leading again, Your Honor.

6          THE COURT:   Sustained.

7          BY MR. MARTIN:

8  Q.      Have I offered you anything in exchange for your

9  testimony?

10 A.      No.

11 Q.      And the failure to return that Ms. Greenberg

12 just asked you about.  Whose car was that?

13 A.      It was a rental car, and the lady who -- the

14 company we rented it from, the lady called us and tried

15 to sell us the vehicle -- sell me and my wife the

16 vehicle.  I offered to buy it, but come to find out the

17 lady didn't work for the company.

18 Q.      Did you eventually return the vehicle?

19 A.      Yes.

20 Q.      What if any sentence did you receive in that

21 case?

22 A.      None.  I just had to pay a fine.

23         MR. MARTIN:  I have no further questions of Mr.

24 Brackett.

25         THE COURT:  All right, you may step down.

1        MS. GREENBERG:   Your Honor, may I briefly --

2        THE COURT:   Oh, I'm sorry.

3

4        BY MS. GREENBERG:

5   Q.    Just to be clear:  You pled guilty to theft; is

6   that correct?

7        For this case last month, you pled guilty to

8   theft; is that correct?

9   A.    Yes, I pled guilty.

10  Q.    I'd like to show you Miscellaneous  44.

11  Actually, let me get the page before that.

12        Sir, I'd like to show you this document.   Is

13  this the chart charge we're talking about, the failure

14  to return property?

15  A.    Yes.

16  Q.    That was relating to you -- you lived on Eastern

17  Avenue, Washington, D. C., and that's your Social

18  Security number?

19  A.    Yes.

20  Q.    And this is your Arlington County, June 20, 2006

21  guilty plea; is that correct?

22  A.    Yes.

23  Q.    What was the sentence imposed?

24  A.    It says 12 months.

25  Q.    That was the sentence that's reflected in the

1   records ?

2   A.      Yes .

3   Q.      And  the  judge  suspend ed  that  sentence ?

4   A.      Yes , that 's  what  it  says .

5   Q.      So  it's  correct  you  receive d  more  than  a  fine .

6   You  got  a  sentence  of  12  month s?

7   A.      No .  I  just  --  I  was  told  to  pay  $1,500 , which  I

8   did .

9   Q.      You  also  got  a  12-month  suspend ed  sentence ?

10  A.      Mm-hmm .

11  Q.      Maybe  you  should  check  your  records , don't  you

12  think ?

13          MR.  MARTIN:   Object ion .

14          THE  COURT:   Sustained .

15          MS.  GREENBERG:   For  the  record , Your  Honor ,

16  that 's  Miscellaneous  44 .

17          No  further  question s.

18                    **REDIRECT  EXAMINATION**

19          BY  MR.  MARTIN:

20  Q.      Mr.  Brackett , did  you  serve  any  jail  time ?

21  A.      No .

22          MR.  MARTIN:   Thank  you .

23          I  have  no  further  question s  of  Mr.  Brackett ,

24  Your  Honor .

25          THE  COURT:   You  may  step  down .  Thank  you  very

1    much , Mr. Brackett .

2              (Witness  excused  at  11:26  a.m. )

3          MR. MARTIN:    Your  Honor ,  if  I  may  just  go  to  the

4    witness  room  and  get  Ms.  Battle .

5          THE COURT:    Sure .   That 's  fine .

6    THEREUPON,

7                    **MARGARET BATTLE**

8    having  been  called  as  a  witness  on  behalf  of  the

9    Defendant  Learley  Goodwin,  and  having  been  first  duly

10   sworn  by  the  Courtroom  Deputy,  was  examined  and

11   testified  as  follows  :

12                 **DIRECT  EXAMINATION**

13        BY MR. MARTIN:

14   Q.     Ms.  Battle ,  there 's  a  micro phone  in  front  of

15   you ,  ma'am .   If  you  would  --  either  you  can  move  up

16   toward  that  or  pull  it  back  toward  you .

17          In  a  loud  and  clear  voice ,  I'd  like  you  to

18   state your  full  name   for  the  ladies  and  gentlemen  of

19   the  jury  and  spell  your  last  name  for  the  court

20   reporter .

21   A.     Margaret  Yvonne  B attle ,  B  A  T  T  L  E.

22   Q.     Ms.  Battle  where  do  you  live ?

23   A.     Northeast  Washington .

24   Q.     What  is  your  occupation ,  ma'am ?

25   A.     Self- employ ed .

1    Q.     Do you know Mr. Learley Reed Goodwin?

2    A.     Yes.

3    Q.     How long have you known him?

4    A.     About four or five years.

5    Q.     What is your relationship to Mr. Goodwin?

6    A.     Strictly friends.

7    Q.     Mr. Goodwin, you know, is incarcerated; right?

8    A.     Right.

9    Q.     Have you spoken with him since he's been

10   incarcerated?

11   A.     Yes.

12   Q.     When was that?

13   A.     About, oh, two weeks ago.

14   Q.     Where did you speak to Mr. Goodwin?

15   A.     Where they got him at in Marlboro.

16   Q.     In Upper Marlboro?

17   A.     Mm-hmm.

18   Q.     Ms. Battle, I'm going to ask you some delicate

19   questions here.

20          Do you have a drug habit?

21   A.     Yes.

22   Q.     How long have you had a drug habit?

23   A.     For some years.

24   Q.     What is your drug of choice or preference?

25   A.     Cocaine.

1  Q.      Was there a time when you lived at Anacostia

2  Road?

3  A.      Yes.

4  Q.      What was the address that you lived at?

5  A.      I forget the address.

6  Q.      All right.  Well, with respect to the building

7  that you lived in.  How many units were in that

8  building?

9  A.      Four.

10  Q.      Did you live on the first floor, the second

11  floor, the third floor?

12  A.      The second floor.

13  Q.      How many floors did the building have?

14  A.      Two.

15  Q.      How many apartments are on the second floor?

16  A.      Two.

17  Q.      Of those two, which did you live in?

18  A.      Apartment 3.

19  Q.      As you go up the steps, was that to the left or

20  to the right of the staircase?

21  A.      To the left.

22  Q.      With respect to the apartment on the right.  Who

23  lived in that apartment?

24  A.      On the right.

25          MS. JOHNSTON:   Objection.

1    Can we have a time frame, Your Honor?

2    BY MR. MARTIN:

3  Q.    When did you live there?

4  A.    About a year or two years ago.

5  Q.    Did you have occasion to either live there or

6  visit in the 2001-2002 time frame?

7  A.    Yes.

8  Q.    Getting back to my earlier question. With

9  respect to Apartment 3 and Apartment 4. When you were

10 living there, do you recall who lived in Apartment 4?

11 A.    Yes.

12 Q.    Who lived there?

13 A.    Richard and Tiffany, and who else was there?

14 Q.    You said Richard and you said Tiffany. Do you

15 know Tiffany's last name?

16 A.    Vessel.

17 Q.    Do you know a gentleman by the name of Michael

18 Thurman?

19 A.    Yes.

20 Q.    Tell the ladies and gentlemen of the jury   where

21 if any place you've ever seen Michael Thurman?

22 A.    At the shop, and at the apartment.

23 Q.    When you say "the apartment," are you talking

24 about the apartment on Anacostia Road?

25 A.    Yes.

1    Q.       Was he in your apartment?

2    A.       The one I was staying in.

3    Q.       In Apartment 3?

4    A.       Mm-hmm.

5    Q.       Did you ever have occasion to see Mr. Michael

6    Thurman in Apartment 4?

7    A.       Yes.

8    Q.       Ms. Battle, you told me that -- and you told the

9    ladies and gentlemen of the jury   that you have a drug

10   habit, and you've had one for some time; correct?

11   A.       Right.

12   Q.       Have you ever seen Michael Thurman with drugs in

13   Apartment 4?

14   A.       Yes.

15   Q.       On those occasions that you've seen him with

16   drugs, who else was there?

17   A.       Me, Tiffany, and I can't recollect who else was

18   there.

19   Q.       Do you have any idea how Mr. Thurman got those

20   drugs?

21   A.       No.

22   Q.       During the time when you had drugs in that

23   apartment, was Mr. Goodwin ever there?

24   A.       No.   I never seen him there.   He was always on

25   the road taking care of business.

1  Q.     What about -- you said you've also been down to

2  the shop.  Where is the shop?

3  A.     It's right there on Florida Avenue.

4  Q.     Why would you go down to the shop?

5  A.     Me?

6  Q.     Yes, you.

7  A.     I used to live there at the shop before I got

8  moved in that apartment.

9  Q.     Before you moved in the apartment, who would be

10 at the shop?

11 A.     Everybody was there that worked there, and

12 Michael Thurman was.  He was supposed to have been

13 working but he was working on other things.

14 Q.     You said he was supposed to be working.  What

15 was your understanding that Michael Thurman was

16 supposed to be doing at the shop?

17 A.     Detailing.

18        MS. JOHNSTON:   Objection.

19        THE COURT:   What's the --

20        MS. JOHNSTON:   Basis and knowledge.

21        THE COURT:   Lay a foundation for her knowledge

22 of that.

23        BY MR. MARTIN:

24 Q.     How often would you go to the shop?

25 A.     Are you talking about Michael Thurman?

1  Q.      No.  How often would you go to the shop?

2  A.      I used to stay there.

3  Q.      How do you know Michael Thurman worked there?

4  A.      I used to stay there.

5  Q.      Is it your testimony that you knew who the

6  employees were?

7  A.      Yes.

8  Q.      Who employed Mr. Thurman to work there?

9  A.      Mr. Goody.

10 Q.      Aside from Michael Thurman, who else worked

11 there?

12 A.      Robert Day, Maurice Lovell      --

13 Q.      Do know anybody else who worked there?

14 A.      No.  I don't know the Spanish boy.

15 Q.      The Spanish boy?  Now, let me ask you about

16 Michael Jackson.  Do you know him?

17 A.      Yeah.  He worked there.

18 Q.      What did Michael Jackson do at the shop?

19 A.      Paperwork, mainly.

20 Q.      While you were at the shop, did you see any drug

21 activity there?

22 A.      Yeah.

23 Q.      Who did you see engaged in drug activity at the

24 shop on Florida Avenue?

25 A.      People was coming to Michael.

1   Q.      Now, you said people were coming to see Michael.

2   The people who were coming to see Michael at the shop,

3   would that be at a time when Mr. Goodwin was there?

4   A.      Whether he was there or not they was coming to

5   see him.

6   Q.      I'm talking about Mr. Goodwin.  When Mr. Goodwin

7   was there, were people coming --

8   A.      Yeah.

9   Q.      -- to see Michael Thurman?

10          When those people would come to the shop to see

11  Michael Thurman, where would they get their drugs?

12  A.      From Michael.

13  Q.      No, but where?

14  A.      From the outside.  On the outside, in the yard.

15  Q.      When Mr. Goodwin would come to the shop, where

16  would he be?

17  A.      In the office.

18  Q.      I may have asked you before -- my memory isn't

19  what it used to be -- how long have you known Michael

20  Thurman?

21  A.      For about four or five years.  About the same.

22  Q.      During that four or five year period of time,

23  have you come to form an opinion as to his honesty?

24          In other words his credibility, his speaking the

25  truth about more important things?

1   A.      No.

2   Q.      You don't have an opinion regarding that?

3   A.      No.

4   Q.      Do you know other people who know Michael

5   Thurman?

6   A.      Yes, I do.

7   Q.      Do you know whether he has a reputation amongst

8   them for being truthful?

9   A.      No.

10  Q.      No, you don't know or no --

11  A.      I don't know.

12  Q.      You don't know?

13          Okay.  I have no further questions of Ms.

14  Battle.

15          THE COURT:   Cross-examination.

16          MS. JOHNSTON:   Just a few questions.

17                   **CROSS-EXAMINATION**

18          BY MS. JOHNSTON:

19  Q.      Ms. Battle you're self-employed?

20  A.      Yes.

21  Q.      What do you do?

22  A.      I sell antiques.

23  Q.      Antique furniture?  Antiques?

24  A.      Yes.

25  Q.      Have you made -- you've made a living doing

1  other things as well; isn't that correct?

2  A.      Yes.

3  Q.      How else have you made your living?

4  A.      I used to hustle back in the day, back in the

5  '80s.

6  Q.      When you say you used to hustle, do you mean

7  selling drugs or engaging in prostitution?

8  A.      Yes.

9  Q.      Selling drugs?

10  A.      Right.

11  Q.      Have you also engaged in prostitution as a means

12  to support yourself?

13  A.      Right.

14  Q.      When was the last -- prior to coming to court

15  here today, when was the last time you used cocaine?

16  A.      Last time I used it? Probably night before

17  last.

18  Q.      Excuse me?

19  A.      Probably the other night.

20  Q.      What night was that?

21  A.      What's today? Sunday.

22  Q.      Was that crack cocaine that you used?

23  A.      Yes, it was.

24  Q.      How often do you use crack cocaine?

25  A.      Whenever I feel like it.

1  Q.      Are you under the influence  of crack cocaine  now

2  as you sit here in court?

3  A.      Excuse me?

4  Q.      Are you under the influence  of crack here  in

5  court?

6  A.      No, I'm not.

7  Q.      No?  But you used it within the last few days;

8  is that correct?

9  A.      I haven't used it since Sunday.

10  Q.      And you use it whenever you feel like it; is

11  that correct?

12  A.      That's true.

13  Q.      And you're here today because you had a

14  conversation with Mr. Goodwin; is that correct?

15  A.      Yes.

16  Q.      You went to see him at the jail; is that right?

17  A.      Yes.  We're friends -- old-time friends.

18  Q.      You've been friends with Mr. Goodwin for?

19  A.      Four or five years.

20  Q.      Four or fife years?

21  A.      Right.

22  Q.      When you first -- how did you first meet him?

23  A.      I met him through Robert day.

24  Q.      Excuse my?  Through whom?

25  A.      I met him through Robert Day.

1  Q.      Robert Day is the individual whom you said was

2  living in one of Mr. Goody's apartments in the building

3  over on; is that correct?

4  A.      Yes.

5  Q.      And Robert Day was in the apartment with Ms.

6  Vessels; is that correct?

7  A.      Yes.

8  Q.      You stayed in another one of Mr. Goodwin's

9  apartments there; is that correct?

10  A.      Yes.

11  Q.      While you were living there living in Mr.

12  Goodwin's apartment, you were engaged in using crack

13  cocaine then, weren't you?

14  A.      Yes, I was.

15  Q.      You've used it fairly regularly for how many

16  years now?

17  A.      For about five -- five or six years.

18  Q.      And Mr. Goodwin would come to that apartment

19  building fairly frequently over on Anacostia while you

20  were living there; isn't that correct?

21  A.      Yes.

22  Q.      You would see him both in your apartment and in

23  the apartment that you said that Robert Day and Ms.

24  Vessels lived in; isn't that correct?

25  A.      No.  Robert Day stayed with me.

1  Q.      Robert Day stayed with you?

2  A.      In the apartment I was staying in, which was

3  Apartment 3 .

4  Q.      The other apartment Ms. Vessels stayed in?

5  A.      It's across the hall.

6  Q.      Across the hall on the second floor?

7  A.      Yes.

8  Q.      This building is owned by Mr. Goodwin ; isn't

9  that right?

10 A.      Yes.

11 Q.      Did you have to pay rent to Mr. Goodwin , or did

12 you provide services to him instead of paying rent ?

13 A.      I paid rent .

14 Q.      Did you also provide services to him?

15 A.      No , I didn't .

16 Q.      Ms. Vessels living across the hall from you.

17 Have you seen -- you saw Mr. Goodwin in that apartment

18 as well as your apartment ; isn't that correct ?

19 A.      That's right .

20 Q.      In both your -- in your apartment -- you would

21 smoke crack cocaine in your apartment; isn't that

22 correct?

23 A.      I smoked in my house , yeah .

24 Q.      And Ms. Vessels would . She smoke crack cocaine

25 in her apartment ?

1  A.      I don't even know if Ms. Vessels smoked cocaine.

2  I never said she did.

3  Q.      You don't know if she smoked crack?

4  A.      Right.

5  Q.      Have you ever been in that apartment where Ms.

6  Vessels was?

7  A.      Yes.

8  Q.      Have you seen crack cocaine in that apartment?

9  A.      Yes.

10  Q.      Have you seen containers that have false bottoms

11  in it where they kept the crack cocaine?

12  A.      No, I haven't.

13  Q.      You didn't seen any of those?

14  A.      No.

15  Q.      Have you purchased cocaine out of the apartment

16  where Ms. Vessels was living?

17  A.      Yes, I did.

18  Q.      When you purchased that crack cocaine, you would

19  purchase $10, $20 a rocks at the time; is that correct?

20  A.      Yes.

21  Q.      And sometimes when you went into that apartment,

22  would you buy a working $50 so that you could sell some

23  of the crack and use some of that?

24  A.      Mm-hmm.

25  Q.      You have to say yes or no.

1  A.      Yes, yes, yes.

2  Q.      Thank you.

3          So, you would use some and sell some of the

4  crack; is that correct?

5  A.      Right.

6  Q.      Was it before or after you lived at Anacostia

7  Road that you stayed at Lobo's, Mr. Goodwin's other

8  business?

9  A.      It was before.

10 Q.      So, you stayed at -- do you recall whether you

11 were living at Anacostia Road in 2002 when a search

12 warrant was executed at the other apartment on the

13 second floor?  Were you living there then?

14 A.      No.

15 Q.      Okay.

16 A.      Well, yeah.  I was there when they came there.

17 Q.      When the FBI came there --

18 A.      Yes.

19 Q.      -- and searched?

20 A.      Right.

21 Q.      And they seized drugs and paraphernalia.  You

22 remember that?

23 A.      Right.

24 Q.      And that was back when Mr. Goodwin owned that

25 apartment; is that right?

1  A.      Right.

2  Q.      And when he would come to see you sometimes; is

3  that right?

4  A.      Right.

5  Q.      Mr. Thurman wasn't there when the FBI came and

6  executed --

7  A.      He wasn't in the apartment.  All of them went to

8  the shop.  Thurman stayed in the apartment that I was

9  staying in.  It was me, him and Robert Day.  I was the

10 only one in the apartment when they came in there.

11 Q.      Mr. Thurman sometimes stayed in your apartment?

12 A.      No.  He stayed in the apartment.

13 Q.      In the apartment with you?

14 A.      Right.  Apartment 3.

15 Q.      Okay.  And the search warrant.  Was that at the

16 other apartment across the hall?

17 A.      Right.

18 Q.      Did you know Mr. Goodwin was Ms. Vessel's

19 boyfriend?

20 A.      Yes, I did.

21 Q.      Had you seen Mr. Goodwin with Ms. Vessels on a

22 number of occasions?

23 A.      Yes.

24 Q.      More recently, right before his arrest?

25 A.      Right.

1  Q.      Would you see Mr. Goodwin with Ms. Vessels over

2  at Anacostia Road right before he got arrested?

3  A.      Yes.

4  Q.      Were you getting drugs at that -- were you using

5  drugs back in 2004, right before Mr. Goodwin got

6  arrested?

7  A.      Right.

8  Q.      You were buying little tiny quantities; is that

9  correct?

10 A.      Right.

11 Q.      And back in 2004, when you were buying drugs,

12 were you buying some to sell at that time?

13 A.      Yes, I was.

14 Q.      What was the largest quantity you would buy when

15 you were buying drugs to use and to sell?

16         MR. MARTIN:    Objection.

17         Irrelevant.

18         THE COURT:    Overruled.

19         THE WITNESS:    Maybe a half.

20         BY MS. JOHNSTON:

21 Q.      Excuse me?

22 A.      Maybe a half, or maybe two ounce.

23 Q.      That would be the most you would buy?

24 A.      Yes.

25 Q.      What would you usually buy back in 2004, right

1  before Mr. Goodwin got arrested?

2  A.      I don't know.

3  Q.      You were buying some to sell and keeping some to

4  use out of what you bought?

5  A.      I was buying to sell and stuff for myself.

6  Q.      But you would buy one of quantity, am I correct?

7  A.      Mm-hmm.

8  Q.      You would take some of that and sell it; is that

9  right?

10  A.      Right.

11  Q.      And then you would keep the rest to use.

12  A.      Right.

13  Q.      And sometimes you would buy -- would it be safe

14  to say that sometimes you would buy an eight ball to do

15  that?

16  A.      Mm-hmm.

17  Q.      You have to say yes or no for the reporter.

18  A.      Yes.

19  Q.      And sometimes even less than an eight ball; is

20  that correct?

21  A.      Yes.

22  Q.      Tell the ladies and gentlemen  what a working 50

23  is.

24  A.      I really don't know.

25  Q.      Okay.  Well, did you ever spend $50 to buy some

1  crack?

2  A.      Yes, I did.

3  Q.      What would you do when you bought the $50 worth

4  of crack?

5  A.      I could show it to you so that you could see it.

6  Q.      You would show it to me?

7  A.      I would have to if you wanted to know.

8  Q.      Okay.  You bought $50 worth of crack.  What

9  would you do with the $50 worth of crack?

10  A.      I used it.

11  Q.      Did you sell some of the $50 that you bought?

12  A.      Maybe.  Depends.

13  Q.      So, sometimes you would buy $50 worth of crack,

14  keep some, use it and sell some of that; is that

15  correct?

16  A.      Mm-hmm.

17  Q.      You didn't need a scale to weigh that when you

18  were selling that, did you?

19  A.      No, I didn't.

20  Q.      You didn't need to plastic it up in plastic bags

21  when you were selling it.

22  A.      No.

23  Q.      You would just show it to the person and sell

24  them whatever pieces you broke off; right?

25  A.      Right.

1  Q.      Sometimes you would spend $100 to do the same

2  thing; is that correct?

3  A.      Yes.

4          What is the point, though?

5  Q.      Please be patient with me, Ms. Battle.  I won't

6  go too much longer with you.

7          Now, you also mentioned that you lived at

8  Lobo's; is that correct?

9  A.      Right.

10 Q.      And Mr. Goodwin owned Lobo's; is that right?

11 A.      Mm-hmm.

12 Q.      And Mr. Lobo would be there fairly regularly; is

13 that correct?

14 A.      Yes, he would.

15 Q.      Did you pay him rent to stay at Lobo's?

16 A.      No.

17 Q.      He let you stay there?

18 A.      Until I got a place.

19 Q.      Until you got a place?

20         While you were staying there, you were buying

21 crack cocaine and smoking it; correct?

22 A.      Yes, I was.

23 Q.      And buying crack and selling it; is that

24 correct?

25 A.      Right.

1  Q.      Mr.  Thurman  and  other  individuals  were  selling

2  crack  cocaine  right  there  on  the  garage  lot;  isn't  that

3  correct?

4  A.      Mm-hmm.

5  Q.      And  they  were  selling  $20  rocks,  $50  rocks;  is

6  that  correct?

7  A.      Yeah.

8  Q.      Okay.  So  you  would  see  them  out  there  selling

9  the  rocks,  and  sometimes  you  bought  from  them  as  well

10 isn't;  is  that  correct?

11 A.      Right.

12 Q.      You  could  tell  what  they  were  doing  when  you  saw

13 them  out  there,  couldn't  you?

14 A.      Yeah.

15         MS.  JOHNSTON:    Court's  indulgence.

16         I  have  nothing  further.

17         THE  COURT:    Any  redirect?

18                     **REDIRECT  EXAMINATION**

19         BY  MR.  MARTIN:

20 Q.      When  you  bought  drugs  at  Lobo's,  who  did  you  buy

21 it  from?

22 A.      From  Michael  Thurman.

23 Q.      When  you  bought  the  drugs  from  Michael  Thurman,

24 where  was  Mr.  Goodwin?

25 A.      I  don't  know.  He  wasn't  there.

```
 1          MR. MARTIN:   I have no further question s, Your

 2   Honor .

 3          THE COURT:   All right .  Any further recross ?

 4          MS. JOHNSTON:   No, sir .

 5          THE COURT:   All right .  You may step down .

 6   Thank you very much , ma'am .

 7                (Witness excused at 11:46  a.m. )

 8          MR. MARTIN:   The next witness , Your Honor , is

 9   Mr. Maurice Alexander  .

10   Thereupon,

11                     MAURICE ALEXANDER   ,

12   having been called as a witness on behalf of the

13   Defendant Learley Goodwin,  and having been first duly

14   sworn by the Courtroom Deputy, was examined and

15   testified as follows:

16                     DIRECT EXAMINATION

17          BY MR. MARTIN:

18   Q.     Good morning , Mr. Alexander .

19   A.     Good morning .  How are you?

20   Q.     I'm doing fine , thank you , sir .

21          In a loud and clear voice , would you state your

22   full name  for the ladies and gentlemen of the jury   , and

23   spell your last name  for the court reporter  please ?

24   A.     My name is Maurice August us Alexander .  The last

25   name is spelled A L E X A N D E R.
```

1   Q.      Where do you live, Mr. Alexander ?

2   A.      1353 Maryland Avenue , Northeast , Washington , D.

3   C., ZIP Code  20002 .

4   Q.      What is your occupation , sir?

5   A.      I work for the Agriculture  Department .

6   Q.      Mr. Alexander , do you know Mr. Goodwin ?

7   A.      Yes , I do.

8   Q.      Would you tell the ladies and gentlemen of the

9   jury how it is that you know Learley Reed Goodwin ?

10  A.      I think it was about two years ago I used to buy

11  cigars from Mr. Goodwin , and we also took neighborhood

12  kids out for extracurricular  activities .

13  Q.      You said that you used to buy cigars from Mr.

14  Goodwin .   You're a cigar smoker , I take it.

15  A.      Well , I managed to stop smoking about a year

16  ago .

17  Q.      These cigars that you would buy from Mr.

18  Goodwin .   Was it a particular  brand ?

19  A.      Yes .

20  Q.      What was the brand ?

21  A.      They were from Cuba .   Cuban cigars .

22  Q.      Cuban cigars? Do you know the brand name ?

23  A.      Not particularly .

24  Q.      Have you any idea where Mr. Goodwin used to get

25  these cigars from ?

1  A.      No.

2  Q.      When you would buy cigars from Mr. Goodwin, how

3  many would you buy at one time?

4  A.      Twelve and 24.

5  Q.      How much would you buy them for?

6  A.      $5 a piece.

7  Q.      What would you do with them?

8  A.      Resell them.

9  Q.      Did you make a profit?

10 A.      Yeah.

11 Q.      Now, the Cuban cigars that you would buy from

12 Mr. Goodwin -- let me ask you:  How were they wrapped?

13 A.      In bulk, as if they was maybe -- they could have

14 been rewrapped, but when I get them they would be a

15 package based on what I requested.  If I wanted 18,

16 there would be 18 wrapped in, like, Saran Wrap.  If it

17 was 24, it would be wrapped.

18 Q.      You don't know if they were in the original

19 wrappers or not?

20 A.      No, I do not.

21 Q.      Have you ever been over to Mr. Goodwin's place

22 on Florida Avenue?

23 A.      Yes.  It's a few blocks from where I live.

24 Q.      When you went over to Mr. Goodwin's place, would

25 you go there alone or would you go with someone else?

1  A.      I would go alone.

2  Q.      When you would go there, who would you be

3  looking for?

4  A.      Mr. Goodwin.

5  Q.      During the occasions that you came or went over

6  to Lobo's, would you see other people there?

7  A.      Yeah.

8  Q.      Did you socialize with them?

9  A.      No.   There was no one that I knew personally.

10 Q.      I'm sorry, sir?

11 A.      No.   There was no people that I knew personal.

12 Q.      Were they the type of people that you would

13 socialize with?

14 A.      No.   No, not really.

15 Q.      Did you see any illegal activity there when you

16 were there?

17 A.      What do you call illegal?   I mean, people would

18 be fixing cars and they would be dealing with clients

19 coming in to get their cars fixed, that sort of stuff.

20 Q.      When you would go over to Lobo's, would there

21 ever been an occasion when you would be there with Mr.

22 Goodwin?

23 A.      Yeah.

24 Q.      And when there with Mr. Goodwin, did you have

25 any occasion to see any illegal activity?

1   A.      No.   Never.

2   Q.      Now, you said you knew Mr. Goodwin.   Have you

3   had occasion to speak with Mr. Goodwin since June of

4   2004?

5   A.      No.  I think -- well, maybe -- yeah, I think I

6   visited him.   Yes, I did, about a year ago.

7   Q.      Where did you visit him?

8   A.      This was at the detention center in Upper

9   Marlboro.

10  Q.      How many times did you visit him there?

11  A.      I think it was twice.

12  Q.      Have you had occasion to talk to him on the

13  phone?

14  A.      Yes.

15  Q.      On those occasions when you've talked to him on

16  the phone, what did you talk about?

17  A.      Well, it was usually he --

18          MS. GREENBERG:   Objection.

19          Hearsay, Your Honor.

20          THE COURT:   Sustained.

21          MR. MARTIN:   I withdraw the question, Your

22  Honor.

23          I have no further questions for Mr. Alexander.

24          Your witness.

25          THE COURT:   All right.   Cross-examination.

**CROSS-EXAMINATION**

2        BY MS. GREENBERG:

Q.      Good morning, sir.

A.      Good morning.

Q.      How long have you known Mr. Goodwin?

A.      Maybe three to four years.

Q.      So if this is 2006, you're saying 2002-2003?

A.      Yeah.  That sounds --

Q.      How did you meet him?

A.      Well, I used to run a program that required us to take kids in our neighborhood, like, on picnics, to beaches, and give them some extracurricular activity. And because he was in charge of the auto mechanic place, he seemed always to have access to a minibus or bus, and he would actually help me drive these children, because we -- it was pretty difficult to get men.

Q.      Did you ever have any connection with car rental places yourself?

A.      Car rental places myself?

Q.      Did you ever work at one or anything like that?

A.      No.

Q.      What's your position with the Department of Agriculture?

A.      I do contract work.  Employment contract work.

1  Q.      How long have you worked at the Department of

2  Agriculture?

3  A.      About two years.

4  Q.      So, that was after you met Mr. Goody that you

5  started working there -- Mr. Goodwin?

6  A.      Yeah.  Before then I was with the Labor

7  Department.

8  Q.      You're a government employee?

9  A.      Yeah.  Let me just say, I'm a government

10  contractor.

11  Q.      Government contractor.

12  A.      Yeah.

13  Q.      Showing you Goodwin 6  If you could look up on

14  your screen there.

15          Do you see your name there, "Maurice Alexander?"

16  That's you; right?

17  A.      Where are you looking?

18  Q.      Right here.  (Indicating.)

19          Do you want me to come bring the document up to

20  you?

21  A.      Yeah, I can see.

22          MS. GREENBERG:   May I approach, Your Honor?

23          THE COURT:   Yes.

24          BY MS. GREENBERG:

25  Q.      It's Goodwin 6, Your Honor, previously

1    introduced   into   evidence .

2          Do  you  see  that  there ,  Goodwin  6?   That 's  you  as

3    the  rent er .

4    A.      Okay .   Okay ,  yes .

5    Q.      September   14 ,  2005 .

6    A.      Yeah .

7    Q.      This  is  from  Budget  Rent -A-Car  --

8    A.      Mm-hmm .

9    Q.      --  Massachusetts   Avenue ?

10   A.      Oh ,  yeah .   Union   Station .

11   Q.      This  is  a  car  that  you  rent ed?

12   A.      Yes .

13   Q.      And  this  was  for  Mr.  Goodwin ?

14   A.      It  could  have  been .   I  don't  know .   Yeah ,  but

15   that  could  --  yeah .   Again ,  like  I  said ,  he  would

16   always  be  responsible   for  get ting  us  vehicle s,

17   something   to  drive  people   around   --  the  kids   around .

18   That  was  the  other  part  of  our  relationship .

19   Q.      This  was  a  vehicle   rent ed  at  Union  Station ;  is

20   that  correct ?

21   A.      Yes .

22   Q.      It  was  $21.99  a day?

23          Here .   Let  me  put  it  up  on  the  screen .

24   A.      I'm  not  disputing   the  price  for  two  year s  ago .

25   Q.      Court 's  indulgence .

1           I referred you here to Union Station.  Do you

2    see that?  I'm going the try to zoom in as close as I

3    can.

4           If you can look on your little screen there.

5    "Union Station?"

6    A.      Yes.

7    Q.      And this due date is 2-27-93.  Do you see that?

8    I'm sorry.  It's 2-27-03.

9    A.      Okay.  Yeah, I see that.

10   Q.      Do you see that?

11   A.      Uh-huh.

12   Q.      That car was rented for $21.99 a day?

13   A.      Yeah, I see the figures.

14   Q.      And $8 for insurance?

15   A.      I see the figures.

16   Q.      And $7.99 tax for $87.98 a day?

17   A.      Yes.

18   Q.      To you; is that correct?

19   A.      Yes.

20   Q.      Did you pay for this car?

21   A.      Partially.

22   Q.      How much did you pay for this car?

23   A.      Maybe about half.

24   Q.      How long did you typically rent the car for the

25   kids around the neighborhood?

1   A.      We would usually try to -- we would end up

2   keeping the vehicle on average of a week.

3   Q.      One week?

4   A.      Yeah, on average.

5   Q.      Who paid the rest of the $1,098 due?

6   A.      I worked with a group called CURE, and --

7   Q.      I'm sorry, sir.

8   A.      I worked --

9   Q.      Answer my question.  Who did you --

10          MR. MONTEMARANO:  Objection, Your Honor.

11          MR. MARTIN:  He's trying to answer the question,

12  Your Honor.  Objection.

13          THE COURT:  Overruled.

14          BY MS. GREENBERG:

15  Q.      Who paid the rest of this money?

16  A.      The organization I worked for that sponsored it.

17  Q.      There were late charges as part of that, is that

18  correct, reflected on this?

19  A.      Yeah.

20  Q.      Do you know Mr. Irby?

21  A.      Mr. Irby?

22          MR. MARTIN:  Objection.

23          Beyond the scope.

24          THE COURT:  Sustained.

25          BY MS. GREENBERG:

1  Q.      Did you rent any other vehicles for anybody

2  associated with Mr. Goodwin besides the Budget

3  Rent-A-Car that we saw in Goodwin 6?

4         MR. MARTIN:   Again, objection.

5         Beyond the scope.

6         THE COURT:   Overruled.

7         THE WITNESS:   What was the question?

8         BY MS. GREENBERG:

9  Q.      Did you rent any other vehicles for anyone else

10 associated with Mr. Goodwin besides what we saw here in

11 the Budget Rent-A-Car?

12 A.      I'm not sure.

13 Q.      Do you know Mr. Irby?

14 A.      No.

15         MR. MARTIN:   Objection.

16         THE COURT:   Overruled.

17         MS. GREENBERG:   May I have the next

18 miscellaneous number, please?

19         Your Honor, with the court's indulgence - I

20 understand I might be duplicating something that's

21 already in evidence and I don't want to add to the

22 jury's paper load.  So, if we could --

23         MR. MARTIN:   Objection to the comments.

24         THE COURT:   All right.

25         MS. GREENBERG:   To get the absolute exhibit, and

1    I won't use Miscellaneous  45 if we can locate it.

2          I withdraw the M iscellaneous  number , Your Honor ,

3    and I'm going to draw counsel  and the witness to

4    Oglethorpe  31.

5          MR. MCKNETT :   What is that again ?

6          MS. GREENBERG:    Oglethorpe  31.

7          MR. MARTIN:   Can I see that ?

8          BY MS. GREENBERG:

9    Q.    Put ting Page 2 of that document  on the screen .

10   Again , this is Oglethorpe 31.

11         Sir , do you see that date August 30 , 2003 ?

12   A.    Yes .

13   Q.    That 's address ed to you ?

14   A.    Mm-hmm .

15   Q.    Is that your address ?

16   A.    Yes .

17   Q.    And this is -- this is from you ; is that

18   correct ?

19   A.    Yes .

20   Q.    To manage ment at Rental -A-W reck ?

21   A.    Yes .

22   Q.    Or what happens  it's a typo.   Rent -A-W reck , 1101

23   West Broad Street , Falls Church , Virginia ; is that

24   correct ?

25   A.    Yes .

1  Q.      This is a letter in which you indicate that you

2  got full coverage for the auto insurance for renting a

3  car from Rental-A-Wreck a few weeks ago.  So, that

4  would be in August 2003; is that correct?

5  A.      I'm not sure this letter is from me or not.  I

6  mean, I'm not -- it could be.  I'm not sure, because I

7  do a lot of paperwork -- a lot of paperwork.  So, if

8  you could produce one that bears my signature, then I

9  could --

10 Q.      You don't recall writing this letter, is that

11 what you're saying?  Huh?

12 A.      I don't recall.

13 Q.      You don't wall recall writing this letter?

14 A.      I don't recall writing that letter specifically.

15 I do a lot of paperwork.  If you can produce one with

16 my signature, then I can verify it.

17 Q.      Do you recall an auto accident on a car that you

18 rented from Rent-A-Wreck?

19 A.      I'm not sure.

20 Q.      Did you ever rent cars in which someone that was

21 driving a car that you rented had an accident?

22 A.      Yeah.

23 Q.      Who was that?

24 A.      I had an accident in one about two weeks ago.

25 Q.      Okay.  Did you rent a car back in 2003 in which

1  the car you rented for someone else that person had an

2  accident?

3  A.      2003?  I don't recall.

4  Q.      Showing you the first page of Oglethorpe 31.

5  See if this refreshes your recollection.  This is from

6  the insurance company.  Do you see there by Bituminous

7  Insurance Company?

8  A.      Yes, ma'am.

9  Q.      This is to you?

10 A.      Mm-hmm.

11 Q.      John Irby, C.O.U.  Is that your address?

12 A.      Yes, it is.

13 Q.      This is the claim number?

14 A.      Yes.

15 Q.      The insured?

16 A.      Mm-hmm.

17 Q.      The adverse driver, John Irby; the vehicle

18 owner, Rent-A-Wreck; and the renter is you.

19 A.      Mm-hmm.

20 Q.      The date of loss 8-15-03 at 8 a.m. and the

21 location at Highway 171, Derider, Louisiana.

22 A.      Yes.

23 Q.      Did you rent a car for John Irby that had an

24 accident in Louisiana?

25 A.      Okay.  First of all, I don't know a John Irby,

1  okay?  I rent many cars.  Again, I need something  in

2  order to verify it with my signature  that bears my

3  signature.

4          MR. MARTIN:   Your Honor, I'm going to renew my

5  objection.   This is well beyond the scope of my direct

6  examination.

7          THE COURT:   Overruled.

8          BY MS. GREENBERG:

9  Q.     Did you rent a car for Mr. Goodwin  in which

10 someone else drove the car in Louisiana  and they had an

11 accident?

12         MR. MARTIN:   Objection.

13         Calls for speculation.

14         THE COURT:   Overruled.

15         MR. MARTIN:   He said he doesn't know a John

16 Irby.

17         THE COURT:   Overruled.

18         BY MS. GREENBERG:

19 Q.     Did you rent a car from for Mr. Goodwin  in which

20 someone in a rental car that you rented under your name

21 as the renter had an accident?

22 A.     If I rent a car for Mr. Goodwin, he drove the

23 car.  If that in fact did happen, how can I say who he

24 lent the car to?

25 Q.     Sir, what you're looking at on the screen right

1  here says your name as the renter; correct?

2  A.      Yes, that's my name.

3  Q.      Did you rent cars for Mr. Goodwin under your

4  name?

5  A.      Yeah.  Amongst other people.  He's not the only

6  person I rented cars for.

7  Q.      And this car, apparently, that you rented, had

8  an accident in Louisiana; is that correct?

9  A.      I don't think so .  I don't recall .

10  Q.      Just to be clear.  The second part of Oglethorpe

11  31:  That is your name and address; correct?

12          MR. MARTIN:   Objection .

13          Your Honor, this has been asked and answered .

14  He said he doesn't know.  I don't know how many times

15  --

16          THE COURT:   That's not the question .  The

17  question is, is that his address .

18          Overruled .

19          THE WITNESS:   For the third time, yes, that is

20  my address .

21          BY MS. GREENBERG:

22  Q.      When you rented cars for Mr. Goodwin, would you

23  pay out of your pocket, or would you get paid for them?

24  A.      I had an expense account for the organization I

25  worked for at that time, and so I would pay for cars,

1  hotels or whatever that was in my budget.

2  Q.     This expense account would pay for the cars; is

3  that your testimony here today?

4  A.     Yeah.  Hotels, meals, expenses.

5  Q.     Did you reimburse Mr. Irby for any of these

6  expenses for this trip in August of 2003?

7  A.     Who is Mr. Irby?

8  Q.     Apparently, on this letter, he's somebody that

9  was a driver of a car that you rented.

10        Did you reimburse him from the extense account?

11 A.     I don't know a Mr. Irby.

12        MR. MARTIN:  Objection again.

13        MS. GREENBERG:  Is it your testimony --

14        THE COURT:  Overruled.

15        MS. GREENBERG:  -- the expense account did not

16 reimburse him?

17        MR. MARTIN:  Objection, Your Honor.  He doesn't

18 know Mr. Irby.  These questions -- objection.  These

19 questions are irrelevant.  This question has been asked

20 and asked over and over again.  He doesn't know John

21 Irby, and she keeps asking him about John Irby.

22        THE COURT:  The objection is sustained.

23        MS. GREENBERG:  Your Honor, I'm trying to figure

24 out who the money from the expense account went to.

25        THE COURT:  Ask him who it went to.  Ask him who

1    the money went to.

2          BY MS. GREENBERG:

3    Q.      Sir, where did the money of the expense account

4    go for the car that you rented on or about August of

5    2003?

6    A.      For any expenses I paid, I paid it to whoever

7    rented the service.  If it was a rental agent, they are

8    the ones who got the check or however they were paid.

9    If it was a hotel, the hotel got a check or however it

10   was paid.

11   Q.      How many times over the two to three year period

12   that you knew Mr. Goodwin did you rent cars for him?

13   A.      It wasn't actually Mr. Goodwin.  It was the

14   projects we was working on for taking our trips.

15   Q.      I'll ask you again, sir.  How many times did you

16   rent cars for Mr. Goodwin for his projects?

17   A.      At least three.  Three to four times.

18   Q.      Did any of these projects occur in Louisiana, to

19   your knowledge?

20   A.      No, not to my knowledge.

21   Q.      Now, you testified you got Cuban cigars from Mr.

22   Goodwin; is that correct?

23   A.      Yes.

24   Q.      Would he sell the Cuban cigars to you from

25   Lobo's or from a store out on the street?

1  A.      Oh, from Lobo's.   That's the reason for me going

2  to Lobo's.

3  Q.      I'm sorry?

4  A.      The reason for me to go to that shop was to get

5  the cigars.

6  Q.      Are you familiar, sir, with the Department of

7  Treasury regulations that Cuban cigars are illegal to

8  sell in the United States?

9  A.      Well --

10         MR. WARD:   Objection, Your Honor.

11         THE COURT:   Overruled.

12         BY MS. GREENBERG:

13  Q.      I'm sorry?

14  A.      I learned about a year ago.

15  Q.      That Cuban cigars are illegal to sell in the

16  United States?

17  A.      Yeah.

18  Q.      Is that when you stopped buying them?

19  A.      No.

20         MR. WARD:   Your Honor, I think the witness ought

21  to be advised of his Fifth Amendment privilege if he's

22  going to be questioned about criminal conduct, in all

23  fairness.

24         THE COURT:   Sir, do understand that if you admit

25  to a crime you could be prosecuted for that?   You need

1   to consider that when you answer these question s.

2         THE WITNESS:   Yes , I do .

3         THE COURT:   All right .

4         BY MS. GREENBERG:

5   Q.     So you said you learn ed it was illegal about a

6   year ago ?

7   A.     Yes .

8   Q.     Is that when you stopped buy ing them from Mr.

9   Goodwin ?

10  A.     It was before that , because I believe Mr.

11  Goodwin was detain ed at least a year ago .

12  Q.     You understand now that when you were buy ing

13  Cuban cigar s from Mr. Goodwin --

14  A.     Yes , I understand that now .

15  Q.     -- it was illegal for him to sell them ?

16  A.     Yes .

17  Q.     And it was illegal for you to buy them ?

18  A.     Yes .

19        MS. GREENBERG:   No further question s, Your

20  Honor .

21        MR. MARTIN:   I have no further question s for Mr.

22  Alexander .

23        THE COURT:   You may step down . Thank you very

24  much , sir .

25               (Witness excused at 12:09 p.m. )

1          MR. MARTIN:   Mr. Goodwin  calls Mr.   Maurice

2   Bowman  to the  stand.

3          MR. SUSSMAN:   Judge, just a scheduling  question.

4   Sir, are we going  to go to 1:00 now, or take a break

5   now?

6          THE COURT:   We can take a break now if you want.

7          MR. SUSSMAN:   Well, I'm not asking.   I just

8   thought --

9          THE COURT:   All right.   I'll take a break until

10  12:25 and then we'll go until, like, 1:15.

11                       (Jury excused at 12:09 p.m.)

12                       (Off the record  at 12:09 p.m.)

13                       (On the record  at 12:33 p.m.)

14          THE COURT:   Yes, sir.

15          MR. MARTIN:   Your Honor, I've got two more

16  witnesses, and then I believe Mr. Goodwin would like to

17  take the stand.   I just wanted the court to advise Mr.

18  Goodwin once again of his constitutional  rights, and I

19  have talked to him at length about this over several

20  days and even months and again, indeed, this morning we

21  spoke about it, and he still wants to proceed and take

22  the stand against counsel's advice.

23          THE COURT:   All right.   Mr. Goodwin, my

24  understanding is that you want to take the stand and

25  testify.   Do you understand  that I will be advising

1    this  jury  that  they  may  not  infer  anything  adverse  to

2    any  defendant  who  does  not  testify ?  Do  you  understand

3    that ?

4            DEFENDANT GOODWIN:     Yes .

5            THE COURT:    You  have  a  constitutional  right  to

6    remain  silent .   It's  the  government 's  problem  --  it's

7    their  burden  to  prove  you're  guilty .   You  don't  have  to

8    prove  you're  innocent .   By  taking  the  stand ,  you  expose

9    yourself  to  vigorous  examination  by  counsel  for  the

10   government  of  the  type  you've  just  seen  with  these

11   witness es.   Do  you  understand  that ?

12           DEFENDANT GOODWIN:     Yes .

13           THE COURT:    Your  counsel  has  recommend ed  that

14   you  not  take  the  stand .   I  can't  force  you  not  to  take

15   the  stand .   If  you  want  to  take  the  stand ,  that 's  your

16   right  to  do  that ,  but  you  may  want  to  further  consider

17   what  your  counsel  has  recommend ed.   It's  up  to  you ,

18   though .   It 's  your  personal  choice  to  make  after  you've

19   had  the  benefit  of  advice  of  counsel ,  and  I  want  to

20   just  reaffirm  for  you  that  you  have  no  obligation  to

21   take  the  stand ,  and  the  jury  will  be  advise d  that  they

22   may  not  infer  anything  adverse  to  you  because  of  your

23   decision  not  to  testify .

24           All  right .   Anything  further  before  we  bring  the

25   jury  in?

1        MR. MARTIN:   No, sir.  Our next witness is Mr.

2  Maurice Bowman.

3        THE COURT:   All right.  Bring the jury in.

4                  (Jury returns at 12:36 p.m.)

5  Thereupon,

6                      **MAURICE BOWMAN**,

7  having been called as a witness on behalf of the

8  Defendant Goodwin, and having been first duly sworn by

9  the Courtroom Deputy, was examined and testified as

10 follows:

11                 **DIRECT EXAMINATION**

12      BY MR. MARTIN:

13 Q.     Mr. Bowman, would you be so kind to sit closer

14 to that mike and bring it toward you, sir?  Very good.

15      In a loud and clear voice, state your full name

16 and spell your last.

17 A.     Maurice Bowman -- Maurice N. Bowman.

18 Q.     Spell your last name, please.

19 A.     B O W M A N.

20 Q.     Thank you, sir.

21      Mr. Bowman, where do you live?

22 A.     6421 North Capitol.

23 Q.     What is your occupation?

24 A.     I'm not working right now.

25 Q.     You're not working right now.

1          Do you know Mr. Learley Reed Goodwin?

2    A.    Yes.

3    Q.    How long have you known him?

4    A.    Oh, I'd say around -- about ten years.

5    Q.    About ten years? Is he a good friend of yours?

6    A.    Yes.

7    Q.    Mr. Bowman, you know that Mr. Goodwin's been

8    locked up since about June of 2004.

9    A.    Yes.

10   Q.    Have you had occasion to speak with him since

11   then?

12   A.    Once.

13   Q.    Where was that?

14   A.    I went to see him.

15   Q.    When did you go to see him?

16   A.    Last Sunday.

17   Q.    Last Sunday? What if anything did you discuss

18   with Mr. Goodwin last Sunday?

19         MS. JOHNSTON:   Objection.

20         Calls for hearsay.

21         THE COURT:   Sustained.

22         BY MR. MARTIN:

23   Q.    Do you know Michael Thurman?

24   A.    Michael Thurman?

25   Q.    Cadillac Mike?

1  A.      Yes.

2  Q.      How do you know him?

3  A.      From down the shop where I used to work.

4  Q.      What was the name of that shop?

5  A.      Lobo's Discount Auto Center.

6  Q.      Where was it located?

7  A.      Florida Avenue, Northeast.

8  Q.      When did you -- well, did you work at that shop?

9  A.      Yes.

10 Q.      When did you work there?

11 A.      I don't know  the exact dates, but it's been

12 about two years ago.

13 Q.      How long did you work at Lobo's?

14 A.      I think I stayed there about five years, I

15 think.

16 Q.      Who was the manager of Lobo's Discount Auto?

17 A.      Fellow's name was Lobo.

18 Q.      Who else worked at Lobo's?

19 A.      Well, we had a bunch of Spanish fellas working

20 there, and we had Lobo.  He was the manager of that

21 shop.

22 Q.      Did Michael Thurman work there?

23 A.      He was there.

24         MS. JOHNSTON:   Objection.

25         The witness has not said he knows Michael

1  Thurman .

2         THE  COURT:   He  said  he  didn't  know  him .

3         BY  MR.  MARTIN:

4  Q.     Did  Cadillac  Mike  work  there ?

5  A.     No ,  he  didn't  work  there .   He  was  there .

6         THE  COURT:   He  what ?   I  couldn't  hear  that .

7         MR.  MARTIN:   I  believe  the  witness  said  he

8  didn't  work  there ;  he  was  there .

9         THE  COURT:   He  was  there .

10         BY  MR.  MARTIN:

11  Q.     Sir ,  you  have  to  stay  as  close  to  that  mike  as

12  you  can .

13         Did  I  state  correctly  to  the  court  that  you  said

14  that  Cadillac  Mike  didn't  work  there ,  but  he  was  there ?

15  A.     He  did  little  odds  and  ends  there ,  yes .

16  Q.     What  did  you  do  at  Lobo 's ?

17  A.     I  was  a  mechanic .

18  Q.     When  you  saw  Michael  Thurman  at  Lobo 's ,  what  was

19  he  doing ?

20  A.     You  said  Michael  Thurman ?   Or  are  you  saying

21  Cadillac  --  are  you  referring  to  Cadillac ?

22  Q.     I'm  sorry  sir .   Cadillac  Mike .   When  you  saw

23  Cadillac  Mike  at  Thurman 's  (sic),  what  was  he  doing ?

24  A.     He  was  doing  little  --  mostly ,  he  was  selling

25  drugs ,  actually .

1  Q.      What kind of drugs was he selling?

2  A.      Cocaine.

3  Q.      Who was he getting his drugs from?

4  A.      I have no idea.

5  Q.      When you saw him selling cocaine during those

6  periods of time, would Mr. Goodwin be present?

7  A.      No.

8  Q.      How often would Mr. Goodwin come to Lobo's

9  discount?

10 A.      I used to see him about once a week. Once or

11 twice a week.

12 Q.      He came in once or twice a week? When he came,

13 what if anything would you see him doing?

14 A.      Well, we discussed the cars that he would be

15 getting from the auction and what wanted me to do --

16 what he wanted Lobo to do to them, check them out and

17 see.

18 Q.      Please, sir, if you would stay close to the

19 mike.

20 A.      Mostly, he would be -- he wanted us to check the

21 cars out he'd get from the auction. A lot of times I

22 would ride with him to bring cars back.

23 Q.      When he would talk to you about these cars,

24 where would you be?

25 A.      In the yard.

1    Q.      At the office?

2    A.      Right.

3    Q.      As opposed to the yard?

4    A.      Right.

5          MS. JOHNSTON:   Objection.

6          Counsel is misstating his answer.

7          Leading.

8          THE COURT:   Sustained.

9          BY MR. MARTIN:

10   Q.      Let me ask you again to make it perfectly clear:

11   Where would Mr. Goodwin discuss this with you?

12   A.      Sometimes we'd be in the office.   Most of the

13   time we would be in the yard.

14   Q.      When you were in the yard, would Michael Thurman

15   be there at the same time Mr. Goodwin was there?

16         MS. JOHNSTON:   Objection.

17         THE COURT:   Sustained.

18         BY MR. MARTIN:

19   Q.   When you were in the yard with Mr. Goodwin,   would

20   Cadillac Mike be around?

21   A.      Sometimes.   Most of the time he leaves.

22   Q.      When Mr. Goodwin came around, it's your

23   testimony that Cadillac Mike would leave?

24   A.      Right.

25         MS. JOHNSTON:   Objection to the leading.

1        THE COURT:   Sustained.

2        BY MR. MARTIN:

3   Q.      How long did you know Cadillac Mike?

4   A.      I'd say about a couple of years.

5   Q.      A couple of years?  During that period of time

6   that you've known Cadillac Mike, did you have an

7   opinion regarding his truthfulness?

8        MS. JOHNSTON:   Objection.

9        Foundation.

10        THE COURT:   Lay a foundation.

11        BY MR. MARTIN:

12   Q.      Have you ever had any dealings with Cadillac

13   Mike that led you to believe that he was truthful?

14        MS. JOHNSTON:   Objection.

15        THE COURT:   Sustained.

16        BY MR. MARTIN:

17   Q.      Do you know people who know Cadillac Mike?

18   A.      Yeah, I know people.

19   Q.      Do you know whether he has a reputation amongst

20   those people for truthfulness and honesty?

21   A.      As far as --

22        MS. JOHNSTON:   Objection.

23        THE COURT:   Well, let me hear what he says.

24        What?

25        BY MR. MARTIN:

1   Q.      Do you know people who know Cadillac Mike?

2   A.      Yes.

3   Q.      Do you know whether he has a reputation for

4   truthfulness and honesty amongst the people who know

5   him?

6           MS. JOHNSTON:   Objection.

7           THE COURT:   Overruled.

8           MS. JOHNSTON:   Foundation.

9           BY MR. MARTIN:

10  Q.      You may answer.

11  A.      Yeah, I know a whole -- lot of people that knew

12  him.

13  Q.      What --

14          THE COURT:   Sir, I can't hear the witness.   He's

15  going to have to get closer to that mike.   I can't hear

16  him, and the jury can't hear him.

17          THE WITNESS:   I know a lot of people that knows

18  Cadillac Mike.

19          BY MR. MARTIN:

20  Q.      What is his reputation amongst the people that

21  know him?

22  A.      It was terrible.   It was terrible.

23  Q.      It's terrible?

24  A.      Right.

25  Q.      Mr. Bowman, you've been in trouble before,

1  haven't you, sir?

2  A.      Right.

3  Q.      You've been convicted before; right?

4  A.      Right.

5  Q.      Have you ever been convicted for perjury?

6  A.      No.

7          MR. MARTIN:   I have no further questions for Mr.

8  Bowman.

9          THE COURT:   All right.  Cross-examination.

10                    **CROSS-EXAMINATION**

11         BY MS. JOHNSTON:

12 Q.      Just a few questions, Mr. Bowman.

13         You've been convicted of drug offenses before;

14 is that correct?

15 A.      Once.

16         MR. MARTIN:   Objection.

17         MS. JOHNSTON:   What kind of drugs?

18         MR. MARTIN:   Objection.

19         THE COURT:   Wait, wait, wait.

20         What's the basis of the objection?

21         MR. MARTIN:   It doesn't go to credibility.  And

22 also, I'd like to know what time frame she's talking

23 about.

24         THE COURT:   Let's get the time frame

25 established.

1            MS. JOHNSTON:   There's one from 1992.

2            MR. MARTIN:   Your Honor, if we could do this at

3    the bench.

4            THE COURT:   All right.

5                    (At the bar of the Court.)

6            MS. JOHNSTON:   In 1992 there was a conviction

7    for attempted distribution of cocaine.   He was placed

8    on three years probation for that.   He had a PWID on

9    6-20 of 2000 -- strike that.

10           On January 29 of 1999, he was sentenced to 180

11   days and three years probation, conditioned upon

12   completing a drug program.

13           MR. MARTIN:   I'm sorry, ma'am.   I was

14   distracted.

15           THE COURT:   What was the charge in that case?

16           MS. JOHNSTON:   Possession with intent to

17   distribute cocaine.   He was sentenced -- it looks like

18   180 days suspended, three years probation, with a

19   referral to drug program and conditioned upon

20   successful completion of that drug program.

21           He has a prior conviction for assault in 1997.

22   He has a prior conviction Counts 4 and 5.   Count 4

23   would be a CDS possession --

24           MR. MARTIN:   What was the year?

25           THE COURT:   What was the CDS possession?

1          MS.  JOHNSTON:    The  CDS  possession  would  be  --

2   let  me  find  the  year  here .   I'm  looking  for  the  year  on

3   this  one .   It's  not  coming  to  me  right  now .   1993  was

4   that  possession .

5          THE  COURT:   '93?   Okay .   And  what's  the  nature

6   of  the  drug  itself ?

7          MS.  JOHNSTON:    Your  Honor ,  it  does  not  --  the

8   records  don't  say  what  it  was .   I'm  trying  to  see  what

9   sentence .   It  just  says  as  to  possession .

10         MS.  GREENBERG:    Your  Honor ,  for  the  record ,  this

11  is  --  we  believe  that  we  had  to  --  counsel  gave  us  the

12  date  of  birth  but  did  not  give  us  the  rap  sheets ,  so  we

13  just  got  them  yesterday .

14         MR.  MARTIN:    I'm  not  going  to  make  a  notice

15  argument ,  Your  Honor .

16         MS.  JOHNSTON:    This  is  a  1989  --

17         THE  COURT:    What  is  it?

18         MS.  JOHNSTON:    A  1989  theft  conviction ,  which

19  would  go  to  his  credibility .

20         There  is  also  a  breaking  and  entering  conviction

21  in  1987.

22         I  think  there  may  also  be  an  obstruction  of

23  justice ,  but  let  me  --  that  would  be  it ,  Your  Honor .

24         THE  COURT:    You  said  obstruction  of  justice .

25         MS.  JOHNSTON:    No .   That  would  be  a  different

1    witness.

2           THE COURT:   Let me go back through the -- go

3    back to the ones you mentioned first.   I wasn't able to

4    take notes.

5           MS. JOHNSTON:   The first one that I mentioned

6    with the witness was an attempt distribution of

7    cocaine.   He was sentenced -- there are two dates here.

8    One is -- the most recent date is 5-14 of 1992.

9           MR. MARTIN:   I would argue that that's well

10   beyond ten years, Your Honor.

11          THE COURT:   Get to the next one.

12          MS. JOHNSTON:   The next one is a drug -- there's

13   another drug possession one -- well, he --

14          THE COURT:   I have a '93.

15          MS. JOHNSTON:   The '93?   That was one -- the

16   '93, yes, sir.

17          THE COURT:   That was possession with intent to

18   distribute?

19          MS. JOHNSTON:   That was attempt distribution of

20   cocaine.   Attempt distribution.

21          And then there was 1992 -- strike that.   A 1999

22   conviction of possession with intent to distribute

23   cane.

24          And then we have the assault that I mentioned to

25   the court in '97.

1        THE COURT:   Assault in '97?

2        MS. JOHNSTON:   In '97.

3        THE COURT:   Any details on the assault?

4        MS. JOHNSTON:   I don't have any details on the

5   assault.  As my co-counsel indicated, we just got this

6   information.  This printout was run on July 25 of 2006,

7   because that's when we received the information from

8   counsel concerning these people.

9        We also have the theft in '89.

10        THE COURT:   Are all of these more than one year?

11        MS. JOHNSTON:   All of these.

12        THE COURT:   Offenses.

13        MR. MARTIN:   Convictions.

14        THE COURT:   Convictions?

15        MS. JOHNSTON:   Yes, sir.  The exposure is more

16   than one year.

17        THE COURT:   What is --

18        MS. JOHNSTON:   The maximum penalty is more than

19   one year.

20        THE COURT:   All right.

21        MR. MARTIN:   Two objections on my part.  One on

22   the time limit, obviously, and the second one is these

23   don't go to false statements and they don't involve

24   dishonesty.  For that reason, I would ask the court not

25   to admit these -- to do a balancing under 403 and not

1   allow this to come in.

2        MS. JOHNSTON:   I believe someone convicted --

3   that an individual convicted of attempted distribution

4   and possession with intent to distribute, those crimes

5   certainly would be crimes that would be considered in

6   terms of whether this is a person that the jury wants

7   to believe.

8        In terms of the older convictions, the theft and

9   the breaking and entering, they clearly go to one's

10  truthfulness, one's honesty.

11       MR. MARTIN:   What was the date of the breaking

12  and entering?

13       MS. JOHNSTON:   One was '89 and one was '87.

14       MR. MARTIN:   They're too remote, Your Honor.

15  They're far too remote.

16       THE COURT:   I will not permit examination with

17  regard to the 1997 assault even though that's within

18  the ten years.   There's concern about the prejudicial

19  effect.

20       I do think that the -- this is a witness who's

21  professing not to know anything about drug activities

22  at Lobo's; is that correct?

23       MR. MARTIN:   No.   He didn't say there wasn't

24  drug activity.   He said there was, but Mr. Goodwin

25  wasn't present when there was drug activity.

1          THE COURT:   Well, there's a serious question of
2  his credibility in making those kind of statements if
3  he personally has these kind of convictions.  The '87
4  and '89 convictions go to credibility, and the
5  attempted distribution in '92, and the attempted
6  distribution of cocaine in '93, and the possession with
7  intent to distribute in '99 are all very probative; and
8  I think that the probative value of those convictions
9  substantially outweighs their prejudicial effect.  I
10  will, therefore, permit them to be used in his cross-
11  examination.

12          As you indicated, the notice question is not a
13  factor here because the government did not know of this
14  witness.

15          MR. MARTIN:   I'm not raising notice, but I
16  object to the government doing this, Your Honor, and I
17  want the record to so reflect.

18          THE COURT:   Well, I sustained it on the assault.

19          MS. JOHNSTON:   Thank you, Your Honor.

20                    (Back in open court.)

21          BY MS. JOHNSTON:
22  Q.     Mr. Bowman, you indicated that you had gone to
23  see Mr. Goodwin just last Sunday; is that correct?
24  A.     That's correct.
25  Q.     How is it that you happened to go last Sunday to

1  see him?

2  A.      Because I was overdue.  I should have been to

3  seen him.

4  Q.      Excuse me?

5  A.      I said I was overdue, and I should have been to

6  seen him.

7  Q.      Was that the only time you've seen him since

8  he's been incarcerated on June 1st of 2004?

9  A.      Yes.

10  Q.      Do you talk to him on the telephone?

11  A.      Once or twice.

12  Q.      Did he discuss with you an individual named

13  Cadillac Mike?

14  A.      No.

15  Q.      Have you used drugs yourself?

16  A.      Yes.

17  Q.      When was the last time you used drugs?

18  A.      It's been about a year ago.

19  Q.      A year ago?  So that would have been sometime in

20  2005?

21  A.      Pardon?

22  Q.      That would have been sometime in 2005; is that

23  correct?

24  A.      Yes.

25  Q.      During the -- were you working for Mr. Goodwin

1   at Lobo's until he got arrested on June 1st of 2004?

2   A.      No.

3   Q.      When did you stop working for him?

4   A.      About three months before that.

5   Q.      Okay.  In the spring of 2004, you stopped

6   working; is that correct?

7   A.      Yes.

8   Q.      And you had worked for him for about five years;

9   is that correct?

10  A.      Yes.

11  Q.      So, roughly, from 1999 until the spring of 2004?

12  A.      Yes.

13  Q.      Excuse me?

14  A.      Yes.

15  Q.      Can I ask you to lean forward into the

16  microphone, please?

17          And during that time, you were using drugs; is

18  that correct?

19  A.      Yes.

20  Q.      And the drug you used was cocaine; is that

21  correct?

22  A.      Yes.

23  Q.      Crack cocaine?

24  A.      Crack cocaine.

25  Q.      And powder cocaine?

1   A.       No.

2   Q.       Just crack cocaine?

3   A.       Yes.

4   Q.       How long have you used crack cocaine?

5   A.       I'd say about around seven or eight years.

6   Q.       Okay. Seven, eight years? Starting about when,

7   do you think?

8   A.       I can't remember exactly.

9   Q.       In fact, you have not only yourself used drugs;

10  you've distributed drugs, isn't that correct?

11  A.       No.

12  Q.       Have you been found guilty of attempt to

13  distribute drugs?

14  A.       No.

15  Q.       You don't recall being in court in the District

16  of Columbia?

17  A.       That's not for distributing drugs.

18  Q.       What was it for then, sir?

19  A.       Possession.

20  Q.       Possession of what drug?

21  A.       Crack cocaine.

22  Q.       When were you convicted of possession?

23  A.       I wasn't convicted. They dropped the charges.

24  Q.       You went to a drug program; is that correct?

25  A.       No.

1 Q.      What's your date of birth Mr. Bowman?

2 A.      12-7-41.

3        MS. JOHNSTON:   Your Honor, may we approach   the

4 bench just briefly, please?

5        THE COURT:   You may.

6              (At the bar of the Court.)

7        MS. JOHNSTON:   Court's indulgence one moment.

8        Here is one of the issues in terms of these

9 records.  We have a Nathan Bowman and a Maurice Nathan

10 Bowman, and it looks like the date of birth that he's

11 just given on the stand is not the date of birth that's

12 on these records.

13        MR. MARTIN:   Nathan is his brother.

14        MS. JOHNSTON:   It says here July '43.  I think

15 that's the birth date he just gave.

16        MR. MARTIN:   No.  He gave December 7, 1941.

17        THE COURT:   He gave Pearl Harbor Day.

18        MS. JOHNSTON:   Then it would appear that he is

19 not either one of these individuals.  The birth date we

20 have is 7-23-43 is a Nathan Bowman and a Maurice Nathan

21 Bowman.

22        THE COURT:   His birthday date is different.

23        MS. JOHNSTON:   I wanted to advise the court.

24              (Back in open court.)

25        BY MS. JOHNSTON:

1  Q.     Mr. Bowman, your drug use continued until the

2  spring of 2004; is that correct?

3  A.     Yes.

4  Q.     How regularly were you using crack cocaine

5  between 1999 and the spring of 2004?

6  A.     How regularly?

7  Q.     Yeah.

8  A.     Every day.

9  Q.     Every day. Where were you living during that

10 time period?

11 A.     I was living on Minnesota Avenue.

12 Q.     When did you meet Mr. Goodwin?

13 A.     Actually, we growed up together.

14 Q.     So you've known him for many, many years.

15 A.     And then he got away from me for a while, and

16 then we got back together.

17 Q.     When did you get back together with him?

18 A.     When he opened up Lobo's.

19 Q.     When he opened Lobo's? Do you remember when

20 that was?

21        And Lobo's was his shop; is that correct?

22 A.     Yes.

23 Q.     When you were working there back in that five-

24 year period, up through the spring of 2004, where were

25 you buying your crack?

1   A.      I was getting it from Cadillac Mike.

2   Q.      Who else did you get it from?

3   A.      I was getting it from Cadillac Mike.

4   Q.      I understand you got it from Cadillac Mike.

5           During the time Cadillac Mike wasn't there, who

6   did you get it from?

7   A.      There was other people in the area.

8   Q.      Who are some of the other people in the area

9   that you bought your crack from?

10  A.      I don't know names.

11  Q.      You don't know the names of anyone else you

12  bought crack from? Only Cadillac Mike? That's the

13  only name you remember?

14  A.      Because he was closer.

15  Q.      Who else did you buy drugs from at Lobo's?

16  A.      Nobody else.

17  Q.      You bought drugs from Cadillac Mike at Lobo's;

18  is that correct?

19          You have to say yes or no.

20  A.      Yes.

21  Q.      When you bought the drugs from Cadillac Mike,

22  you -- was it out in the yard at Lobo's?

23  A.      Well, it was anywhere in the shop.

24  Q.      In the shop or outside in the yard; is that

25  correct?

1  A.      Or outside the building.  Either one.  It made

2  no difference.

3  Q.      In that area?

4  A.      Yes.

5  Q.      And you bought it from him every day?

6  A.      Every day he was there.

7  Q.      How about the days when he wasn't there?  Who

8  did you get your crack from then?

9  A.      Oh.  He would show up sooner or later.

10  Q.      Excuse me?

11  A.      He would show up sooner or later.

12  Q.      You said there were days he wasn't there.

13  A.      Then I don't get it.

14  Q.      Who did you get your crack from?

15         MR. MONTEMARANO:  Asked and answered.

16         BY MS. JOHNSTON:

17  Q.      On the days Cadillac Mike wasn't there, who did

18  you get your drugs from?

19  A.      Somebody in the area.

20  Q.      What were the names of the "somebody" in the

21  area that you bought your crack from?

22  A.      I don't know any.

23  Q.      You don't know their names?

24  A.      No.  They have nicknames but, you know, I don't

25  know their real --

1  Q.      What were the nickname s of the other people you

2  bought the drug s from ?

3  A.      What do you call him ?  It's been so long .  I

4  just can't remember half of them .

5  Q.      In the spring of 2004 , while Cadillac Mike was

6  out of the area in Texas or elsewhere , on a daily basis

7  who did you get your drug s from up until you quit in

8  the spring of 2004 ?

9  A.      Oh .  He had somebody in the area sell ing .

10 Q.      Who were the people that you would buy from in

11 the spring of 2004 when Cadillac Mike wasn't in the

12 area ?

13 A.      I don't remember  the name s.

14 Q.      How about their nickname s?

15         MR. MARTIN:   Your Honor , asked and answered .

16         THE COURT:   Over ruled .

17         MR. MARTIN:   Objection .

18         THE COURT:   Over ruled .

19         BY MS. JOHNSTON:

20 Q.      How about their nickname s?

21 A.      I don't know .  Well , I can't remember half of

22 them .  This has been a while ago .

23 Q.      You do remember Cadillac Mike ; is that correct ?

24 A.      Yeah, because he was close .  Not real close .  He

25 was there all the time .  I know him .

1   Q.    And the quantities that you bought from Cadillac

2   Mike. That was a $20 rock? $50 rock? How much did

3   you buy from him on a daily base?

4   A.    20s and 50s.

5   Q.    So you would buy $20 from him? Would you use

6   all that 20 yourself?

7   A.    No.

8   Q.    So what would you do with it sometimes?

9   A.    I have friends I shared with.

10   Q.    You say you had friends you would share with.

11   So you would get a $20 rock, and in addition to you

12   using some of it, you would give it to your friends; is

13   that correct?

14   A.    Yes.

15   Q.    In fact, sometimes did some of your friends give

16   you money so that you could buy more than a $20 rock

17   for you all to share?

18   A.    No.

19   Q.    So you all just bought it yourselves?

20        Who were the friends that you all went and

21   shared it with?

22   A.    It was a young lady that lived in the

23   neighborhood.

24   Q.    Who was that?

25   A.    Her name was Rose.

1    Q.      Excuse me?

2    A.      Her name was Rose.

3    Q.      Rose?  So you would share it with Rose.

4            Who were the other friends you would share it

5    with?

6    A.      That's probably the only one I would share it

7    with.

8    Q.      You indicated to me initially that you shared it

9    with some friends.  So, who were some of the other

10   people in addition to this lady, Rose?

11   A.      Well, I had another friend, and his name was

12   Cedric.

13   Q.      Cedric?

14   A.      Right.

15   Q.      So you would share some of your drugs with

16   Cedric.  How much would you give Cedric?

17   A.      I couldn't tell you how much I would give him.

18   A $20 rock wasn't that much.

19   Q.      So, sometimes you would buy more than a $20

20   rock?

21   A.      A $50 rock wouldn't have much either.

22   Q.      You would get a $50 rock?

23   A.      I would give him a piece and share with him.

24   Q.      You would break off a piece and give it to

25   Cedric?  How often would you do that with a $50 rock?

1  A.      Not often.  Not every day, because I didn't have

2  it every day.

3  Q.      Well, you -- and with Rose, how often would you

4  share your $50 rock with her?

5  A.      Whenever I had it.

6  Q.      Okay.  How often -- did I understand you

7  correctly to say you used crack every day?

8  A.      Every day.  If I could get it every day.  A lot

9  of times I didn't have the money.

10  Q.      Did Cadillac Mike ever give it to you and let

11  you own him the 20 bucks?

12  A.      Yeah.

13  Q.      And you would pay him that?  And this would

14  happen at Lobo's?

15  A.      Yes.

16  Q.      Did you ever go to the Anacostia Road apartment

17  building that Mr. Goodwin owned?

18  A.      Yeah, I've been there.

19  Q.      You've been there?  All right.

20          Has Mr. Goodwin been there when you've been

21  there?

22  A.      Yeah, because I've done some work at the

23  apartments.

24  Q.      Excuse me?

25  A.      Yes.  I have done some work there.  Cut grass

1   and emptied the trash.

2   Q.      And he paid you? Mr. Goodwin paid you to do

3   that?

4   A.      Yes.

5   Q.      Did you use that money to then go buy crack?

6   A.      Wait a minute. Okay. Yeah, I used that money

7   to go buy crack.

8   Q.      And you would buy crack. Would you buy crack

9   from the people who were living at 1323 Anacostia Road,

10  Mr. Goodwin's building?

11  A.      Cadillac Mike was living there at one time.

12  Q.      Well, I didn't ask you if Cadillac Mike was

13  living there. Did you buy --

14  A.      You asked me -- say that again.

15  Q.      My question to you, Mr. Bowman, is this. Did

16  you buy crack with the money that Mr. Goodwin paid you

17  for with the services you did at Anacostia Road?

18  A.      Yeah. With the money he gave me, yes.

19  Q.      Did you buy it from people at his building on

20  Anacostia Road?

21  A.      No.

22  Q.      You never bought drugs -- did you ever buy drugs

23  from people inside at his apartment building?

24  A.      No.

25  Q.      You never bought drugs from people there. Did

1  you see drugs in that building?

2  A.      Cadillac Mike used to live there.

3  Q.      Okay.  What drugs did you see inside the

4  apartments?

5  A.      Crack cocaine.

6  Q.      Other than Cadillac Mike, who else did you see

7  at Anacostia Road?

8  A.      The tenants that lived there.

9  Q.      Who were they?

10  A.      I don't know.

11  Q.      You don't know their names?

12          Do you know Tiffany Vessels?

13  A.      Yeah, I know Tiffany.

14  Q.      Who was Tiffany?

15  A.      She's a friend of Mr. Goodwin.

16  Q.      She's Mr. Goodwin's girlfriend; isn't that

17  correct?

18  A.      Right.

19  Q.      You would see Tiffany with Mr. Goodwin; is that

20  correct?

21  A.      Yes.

22  Q.      She began with the shop sometimes?

23  A.      Yes.

24  Q.      Did you ever get drugs from Ms. Vessels  ?

25  A.      No.

1  Q.      Ever see her with crack cocaine?

2  A.      No.

3  Q.      In addition to Cadillac Mike, there were other

4  individuals who would sell out by Lobo's; isn't that

5  correct?

6  A.      You say around Lobo's?

7  Q.      Yes.

8  A.      Yes.

9  Q.      In the parking lot, in the yard area, there were

10 other people from whom you got crack from.

11 A.      Yard area outside the shop, yeah.

12 Q.      Outside the shop.

13         And in terms of cad Cadillac Mike. Did you ever

14 buy drugs from him -- crack from him in the apartments

15 over at Anacostia Road?

16 A.      No.

17 Q.      Did you know Mr. Goodwin's stepson, Larry Lane?

18 A.      Yes.

19 Q.      Where did you know him from?

20 A.      He comes down the shop every often.

21 Q.      Was he with Mr. Goodwin when he came to the

22 shop?

23 A.      Sometimes. Sometimes he would come down and

24 want his car fixed.

25 Q.      Were you working at the shop when the FBI

1  executed a search warrant there in October of 2002?

2  A.      No.

3  Q.      So you weren't working there in 2002?

4  A.      No.

5  Q.      If I understood you correctly, you said you were

6  working there about five years?

7  A.      I wasn't working there when they raided the

8  shop, if that's what you're saying.

9  Q.      You weren't present that day or --

10  A.      I wasn't working.

11  Q.      You weren't working at the shop then.

12          Did you hear about that?

13  A.      Yeah, I heard about it.

14  Q.      Who told you about that?

15  A.      I had just left there -- left out the back and

16  went around the front, and that's when I saw the police

17  going in.

18  Q.      So you were there that day.

19          Had you spoken to Mr. Goodwin that day?

20  A.      No.  I hadn't seen him.

21  Q.      You were there purchasing drugs that day.  Who

22  did you purchase drugs from that day?  Not Cadillac

23  Mike.  He wasn't there that day.

24  A.      He wasn't there that day.  He left ten minutes

25  before I did.

1  Q.      Okay.  And who else was there that day?

2  A.      A bunch of Spanish people and a fellow named

3  Pop.  He was there.  A whole lot of people was there.

4  Q.      Did you see Ms. Battle, who testified here this

5  morning?

6  A.      Was she there?  No.

7  Q.      Did you see her this morning?

8          Ms. Battle.  You know Ms. Battle, don't you?  Is

9  that correct?

10  A.      Yes.

11  Q.      You have to say yes or no for the record,

12  please.

13  A.      Yes.

14  Q.      You know Ms. Battle uses drugs; isn't that

15  right?

16  A.      Yes.

17  Q.      And that she used to live at Lobo's; is that

18  correct?

19  A.      She used to live at Lobo's?

20  Q.      She used to live at Lobo's.  Did you know that?

21  A.      No, I didn't know that.

22  Q.      You know she bought crack there; is that

23  correct?

24  A.      At the shop?  Yeah.

25  Q.      She would buy crack there at the shop, and other

1  people came to the shop and bought crack too isn't that
2  right?
3  A.    Yeah, a few of them.
4  Q.    Okay. Who were a few of the other people who
5  came to Lobo's and bought crack?
6  A.    I don't know their names. I didn't know
7  everybody that came in there.
8  Q.    Do you know their nicknames?
9  A.    No.
10 Q.    So, in addition to yourself and Ms. Battle,
11 there are a few other people who would come by Lobo's
12 and buy crack.
13 A.    I didn't know them. I didn't know everybody
14 that came in there. I knew the people who worked
15 there.
16 Q.    I appreciate you didn't know everybody who came,
17 but my question to you is that in addition to you and
18 Ms. Battle, there were other people who came to Lobo's
19 and bought crack; is that correct?
20 A.    Sure, there was other people that came.
21 Q.    Be fair to say that other people came by on a
22 daily basis to buy crack.
23 A.    Yeah, a daily basis.
24 Q.    And they weren't buying it from you, were they?
25 A.    No.

1  Q.     But you knew that that's what they were doing

2  there; isn't that right?

3  A.     Obviously, yeah.

4  Q.     Excuse me?

5  A.     Yes.

6  Q.     It was obvious to you?

7  A.     Right.

8         MS. JOHNSTON:   Court's indulgence.

9         Court's indulgence, one moment.

10        Nothing further Your Honor.

11        THE COURT:   Any redirect?

12        MR. MONTEMARANO:   Your Honor, I have a few

13  question s, if I could.

14        THE COURT:   All right.

15                     **CROSS-EXAMINATION**

16        BY MR. MONTEMARANO:

17  Q.     Good afternoon, Mr. Bowman.   How are you?

18  A.     Fine.

19  Q.     We've never met before, have we?

20  A.     No.

21  Q.     We've never spoken before?

22  A.     No.

23  Q.     I'd like to ask you a few question s.

24        MS. JOHNSTON:   Your Honor, may we approach the

25  bench, please?

1        THE COURT:   Yes.

2             (At the bar of the Court.)

3        THE COURT:   What's the basis for you to ask

4   these questions?

5        MR. MONTEMARANO:   These are based upon the

6   questions Ms. Johnston asked regarding his knowledge of

7   street sells and her attempting to elicit certain

8   information regarding street sells.   I'd like to clear

9   some things up.   The street sells have been issued with

10  regard to this case about knowledge, about the nature

11  and extent of them, and I would like to clarify it.   I

12  have ten, 15 questions tops.

13       MS. JOHNSTON:   No.   Your Honor, the government

14  is permitted to do its cross-examination  of a defense

15  witness after all defense counsel have finished.   There

16  is --

17       MR. MONTEMARANO:   We were asked if we had

18  questions.   My understanding is the government goes

19  first.   If Ms. Johnston has questions flowing from

20  mine, that's fine.

21       When Mr. Martin completed every witness, you

22  have turned to Ms. Johnston and never to us.   If you

23  wanted me to go first --

24       THE COURT:   We can't have all seven defense

25  attorneys doing that.

1          MR. MONTEMARANO:   Your Honor, if I have

2    misunderstood the procedure, that's my bad and I

3    apologize, but I would have been more than happy to ask

4    these before Ms. Johnston, except that they are -- they

5    stem directly from Ms. Johnston's questions.

6          THE COURT:   This is a witness called by Mr.

7    Martin for his client.

8          MR. MONTEMARANO:   I understand that.

9          THE COURT:   She is the principal proponent of

10   this witness.

11         MS. JOHNSTON:   Your Honor, Mr. Martin should now

12   be doing redirect.   If there is something he doesn't

13   cover on redirect, then I don't know how we'll possibly

14   then --

15         MR. MARTIN:   Mike, you can always call him.

16         MR. WARD:   This is a conspiracy case.   We're all

17   on the hook.   Why can't we cross-examine if we want to?

18         MS. JOHNSTON:   I don't have any problems of them

19   asking questions, but --

20         THE COURT:   I'm concerned about how redundant

21   this will be.

22         MR. MONTEMARANO:   I don't think it will be very

23   redundant at all.

24         THE COURT:   You will be very efficient?

25         MR. MONTEMARANO:   Absolutely, Your Honor.   My

1  hallmark .

2                    (Back  in  open  court .)

3         MR.  MONTEMARANO :   Thank  you , Your  Honor .

4         BY  MR.  MONTEMARANO :

5  Q.    Mr.  Bowman , I  don't  want  wish  to  embarrass  you ,

6  but  I'd  like  to  get  some  clarification  if  I  could .

7         When  Cadillac  Mike  --  Cadillac  Mike .  Would  it

8  be  fair  to  say  he's  a  tall  gentleman?

9  A.    Yes .

10        MS.  JOHNSTON:   Object  to  the  form  of  the

11  question .  This  is  a  defense  witness ; it's  a  leading

12  question .

13        MR.  MONTEMARANO :  I'm  entitled  to  cross -examine ,

14  Your  Honor .  He's  not  my  witness , Your  Honor .

15        THE  COURT:   Overruled .

16        BY  MR.  MONTEMARANO :

17  Q.    Tall  gentleman ?

18  A.    Who .

19  Q.    Cadillac  Mike  is  about  6'7"  maybe ?

20  A.    Yes .

21  Q.    Glasses ?

22  A.    No .  I  ain't  never  seen  him  with  glasses .

23  Q.    Okay .  Late  20s ?  Maybe  30 , tops ?

24  A.    He'd  probably  be  in  his  30s .

25  Q.    Okay .  Slender ?

1    A.      Slender.

2    Q.      Ms. Johnston had asked you questions about when

3    you would go looking for drugs when Cadillac Mike

4    wasn't available.  Do you remember that, sir?

5    A.      What?  Do what now?

6    Q.      Ms. Johnston, sitting here in the pail gray

7    suit, had asked you questions about where you would get

8    drugs when Cadillac Mike might not be available.  Do

9    you remember those questions?

10   A.      Yes.

11   Q.      You said you would try to get them from Cadillac

12   Mike regularly; correct, sir?

13   A.      Right.

14   Q.      You would establish a business relationship with

15   Cadillac Mike?

16   A.      Did I have a business relationship?

17   Q.      You would go to him routinely when you wanted

18   crack; right, sir?

19   A.      Right.

20   Q.      Occasionally, you would get crack on the street;

21   is that correct, sir?

22   A.      Right.

23   Q.      Would it be fair to say on the street there

24   would be different people selling at different times?

25   A.      Yes.

1  Q.      Would it be fair to say it would be different

2  people selling on different days; correct, sir?

3  A.      Yes.

4  Q.      It wasn't always the same people all the time;

5  is that a fair statement?

6  A.      No.

7  Q.      Also fair to say you wouldn't know the people on

8  the street selling drugs routinely?

9  A.      I didn't know them personally, no.

10  Q.      Since you didn't know them, would it be fair to

11  say you would have a fear of getting ripped off, sir?

12  A.      Yeah.

13         MS. JOHNSTON:   Objection.  Leading.

14         THE COURT:   Overruled.

15         BY MR. MONTEMARANO:

16  Q.      Would it be fair to say you had a fear of

17  getting a ripped off, sir?

18  A.      Yes.

19  Q.      That's by being sold what's called a "burn bag"

20  which is not drugs.

21         MS. JOHNSTON:   Objection.

22         Your Honor, may we approach the bench, please?

23         THE COURT:   Yes.

24                (At the bar of the Court.)

25         MS. JOHNSTON:   This witness has been called by

1    the defense in this case.  Mr. Montemarano  --

2         MR. MONTEMARANO:  Not by me.

3         MS. JOHNSTON:   The witness has not testified

4    concerning his client, but he does not have the right

5    to cross-examine this witness and ask leading questions

6    to get out his theory of what's going on.

7         MR. WARD:  Why not?

8         MR. MONTEMARANO:  I concur with Mr. Ward:  Why

9    not?  He's not my witness.  I will tell you, as an

10   officer of the court, there has been no kabala between

11   myself and Mr. Martin for me to make Mr. Martin's case

12   through questions.

13        THE COURT:  I don't know.  There's not much

14   more.

15        MR. MONTEMARANO:  Exactly.  There is not much

16   more, and I would be done by now --

17        MS. JOHNSTON:  Do I get to cross-examine when

18   Mr. Martin is finished?

19        THE COURT:  If we have seven people, and if

20   everybody does this, this is going to be a long ordeal.

21                  (Back in open court.)

22        BY MR. MONTEMARANO:

23   Q.    As I was asking you:  Part of that fear would be

24   getting what's called a "burn bag;" right, sir?

25   A.    Yes.

1    Q.      Which is getting sold something that looks like

2    crack but it's not.

3    A.      Right.

4    Q.      And it would be fair to say you don't have

5    enough money to be buying burn bags, so you want to be

6    sure you're getting crack if you're buying something;

7    is that a fair statement?

8    A.      That's true.

9    Q.      In addition, when you're out on the street,

10   would it be fair to say that buying drugs on the street

11   is dangerous?

12   A.      Really dangerous.

13   Q.      Really dangerous, because people are looking to

14   rob people who are looking   to buy?

15   A.      Yes.

16   Q.      And sometimes people rob the sellers?

17   A.      True.

18   Q.      And sometimes there's shootouts; correct, sir?

19   A.      True.

20           MS. JOHNSTON:    Objection.   Irrelevant.

21           BY MR. MONTEMARANO:

22   Q.      It would be fair to say you preferred to deal

23   with Cadillac Mike on every circumstance, instead of

24   going out and buying ton the street.   Is that fair,

25   sir?

1  A.      Yeah.  It would be a whole lot better than going

2  out on the street.

3        MR. **MONTEMARANO**:  That's all I wanted to be

4  clear on.  Thank you, sir.

5        MR. WARD:  May I, Your Honor?

6        THE COURT:  Okay.

7                    **CROSS-EXAMINATION**

8        BY MR. WARD:

9  Q.    Mr. Bowman, you've testified to your extensive

10  history of drug use and buying drugs, and you were

11  pressed by Ms. Johnston for the names of the people you

12  bought from when you went outside Lobo's.

13        You didn't know the names, the nicknames; is

14  that right, sir?

15  A.      Some of them.

16  Q.     In all of your experience, sir, have you ever

17  had a drug dealer come up to you on the street and say,

18  hello, sir.  Let me shake your hand.  My name is Fred

19  Smith, and let me show you the wonderful drugs I have

20  for sale.  Have you ever had anything like happen to

21  you?

22  A.      No, sir.

23        MR. WARD:  Thank you, sir.

24        THE COURT:  Any other cross?

25        MR. MARTIN:  No.

1        THE  COURT:   All right .

2        MR.  MARTIN:   No  redirect .

3        THE  COURT:   Does  the  government   wish  to  have

4  further  cross ?

5        MS.  JOHNSTON:   Your  Honor , I don't  believe  it's

6  necessary .   Thank  you .

7        THE  COURT:   You  may  step  down , sir .

8                    (Witness  excused  at  1:16  p.m. )

9        THE  COURT:   We  will  take  a  little  bit  shorter

10  luncheon  recess  so  we  can  get  more  testimony  in.   We

11  will  be  in  recess  un  til  2:20.

12                    (Jury  excused  at  1:16  p.m.)

13                    (Off  the  record  at  1:16  p.m.)

14                    (On  the  record  at  2:25  p.m.)

15        MS.  GREENBERG:   Your  Honor , if  I  could  raise  a

16  legal  matter  while  we  wait  for  the  defendant s  to

17  arrive .

18        MR.  MONTEMARANO :   Your  Honor , I  will  not  waive

19  my  client 's  presence  for  a  legal  argument .   She  is

20  entitle d  to  be  here .

21        THE  COURT:   I  just  want  to  sit  down .

22        MR.  MONTEMARANO :   I  know  the  feeling , Your

23  Honor .

24        THE  COURT:   I  hurt .

25                    (Defendants  arrive  at  2:27  p.m. )

1          MS. GREENBERG:   Your Honor, now if I could

2   address a legal matter for two minutes.

3          THE COURT:   Let's let them sit down.

4          THE COURT:   All right.  Ms. Greenberg.

5          MS. GREENBERG:   Your Honor, I've provided

6   counsel and the court with cases obtained over the

7   lunch hour.  Of course, the mode of interrogation of

8   witnesses is whatever the court practices.  We submit

9   it makes more sense to have the defense finish their

10  examination of their witnesses first before the

11  government goes; but, clearly, the Fourth Circuit law

12  and other circuits, as set forth in these cases, sets

13  forth that it is permissible for the court to not allow

14  a codefendant to cross-examine what is termed as a

15  "friendly codefendant."

16          In other words, if a defense witness does not

17  incriminate a codefendant in his or her testimony,

18  courts have historically not permitted other defense

19  attorneys to get up and cross-examine them.  I gave the

20  court United States versus Wimberly, a 1995 unpublished

21  case.  I've also attached the cases of Crockett and

22  Burke, upon with the   Fourth Circuit appropriately

23  relied.

24          Both Crockett and Burke are published opinions,

25  but the reason why I cited Wimberly is not only because

1   it is a briefer case but it correctly summarizes the

2   two published cases as follows:  In other words, we

3   find that the district court did not err in allowing a

4   codefendant to cross-examine two codefendants in an

5   effort to elicit friendly testimony from them when

6   neither codefendant incriminated that codefendant in

7   their direct testimony -- again, citing Crockett and

8   Burke.

9       Then there is a First Circuit case which is

10  attached.  Again, I've given copies to all counsel as

11  well as the court:  United States versus  [ph.], and it

12  was a landlord called by one defendant to come testify.

13  Did not incriminate the codefendant, and the First

14  Circuit found it was not error for the district court

15  to refuse to allow codefendants to examine    the

16  landlord, and the landlord did not incriminate the

17  other codefendants.

18      I would submit to the court that is the

19  appropriate way to proceed.  Again, everybody has

20  copies of all of these opinions.  Thank you.

21      THE COURT:  First of all, I recognize what my

22  discretion is.  I exercised it on the side of letting

23  Mr. Montemarano examine.  I've warned Mr. Montemarano

24  and all counsel that we have to provide for an orderly

25  ebb and flow of testimony and in fairness to all sides.

1   You know there's going to be a limit that's going to be

2   crossed, and I'm going to say, that's it.  So, be

3   forewarned.  If one defendant calls a witness who is

4   only dealing with that defendant and not any other

5   defendant, I'm going to be very, very conservative in

6   allowing every single defense attorney to cross-examine

7   that witness.  So, just --

8           MS. GREENBERG:  Your Honor, we --

9           THE COURT:  I'm trying to give everybody as free

10  a reign as I can.  Just don't take too much of the

11  reign and lose it.

12          MS. GREENBERG:  I further submit, if the court

13  does do that then they should go before we go, as it

14  should finish that side before we come over here.

15          THE COURT:  Yeah.  I think that's a reasonable

16  request.  If any defense attorney wants to cross-

17  examine a defense witness of another defendant, go

18  before the government so I don't have to bring the

19  government back.

20          MR. MONTEMARANO:  Your Honor, if I might.

21          THE COURT:  You may.

22          MR. MONTEMARANO:  I'd like to make two things

23  clear.  Number one, I certainly appreciate and

24  understand the court's point of view and understand the

25  court's discretion.  I would point out, so the record

1   is clear , in my view , I did not choose to cross -

2   examine any of Mr. Goodwin 's witness es because I have a

3   well -defined sense of -- well -understood sense of

4   propriety . I don't like to interfere in my

5   codefendant 's case s, and I would n't expect them to

6   interfere in mine . However , the cross I sought to

7   elicit I thought was appropriate and was evoke d only by

8   Ms. Johnston 's question s, which I thought would tend to

9   create a mis understand ing and mis apprehension on the

10  part of the jury . Whether or not that was her

11  intention , I am not suggest ing that in any way, shape

12  or form .

13          THE COURT:   I permitted you to do it.

14          MR. MONTEMARANO :   I only asked a few question s.

15  Frankly , I think my question s would have taken less

16  time than our hash ing it out at the bench .

17          THE COURT:   Counsel , who is the next witness ?

18          MR. MARTIN:   The next witness is Ms. Cynthia

19  Wine stock .

20          THE COURT:   Cynthia Wine stock ?

21          THE COURT:   Yes .

22          MR. SUSSMAN :   Judge , before the witness come s

23  in, just to speak to this issue . I think that the

24  notion that incriminati ng a defendant require s them to

25  name a defendant and talk specifically about them .

1        THE COURT:   I'm not necessarily going to be that

2   narrow.  Mr. Sussman, I'm not going to be that narrow.

3   All I'm saying is if you --

4        MS. GREENBERG:   We agree with you.

5        THE COURT:   If you believe something came out of

6   the words of a witness for a codefendant that you wish

7   to cross-examine on, then I want you to go before the

8   government.  Now, that's not to say that there might

9   not be something that comes out of the government's

10  cross-examination that does in fact come within the

11  grounds that we've discussed that I might permit you to

12  do cross-examination.

13       MR. SUSSMAN:   I object on relevance grounds.

14       THE COURT:   I'm just saying for the mercy of the

15  court and jurors:  I don't want to get into unnecessary

16  or redundant cross-examination of witnesses on either

17  side.

18       MR. SUSSMAN:   I don't think that's been my

19  style, but there may come some things from the

20  government that require a response and require somebody

21  out and --

22       THE COURT:   I'll deal with that when it happens.

23  I don't have a closed mind.  I'm just saying, you know,

24  please understand that I have some latitude.  I'm

25  trying to give you as much free latitude as I can in

1  fairness to all parties, but I've got some limits that

2  are going to be butted up against, and I'm going to say

3  no.

4          Bring the jury in.

5          Bring the next witness in.

6                    (Jury returns at 2:35 p.m.)

7  Thereupon,

8                    **CYNTHIA WINESTOCK**,

9  having been called as a witness on behalf of the

10  Defendant Goodwin, and having been first duly sworn by

11  the Courtroom Deputy, was examined and testified as

12  follows:

13                    **DIRECT EXAMINATION**

14          BY MR. MARTIN:

15  Q.      Good afternoon, Ms. Winestock.

16  A.      Good afternoon.

17  Q.      In a loud and clear voice, would you state your

18  full name for the ladies and gentlemen of the jury, and

19  spell your last name for the benefit of the court

20  reporter, please?

21  A.      Cynthia Denise Winestock

22  Q.      Where do you live, Ms. Winestock?

23  A.      6904 Verness Avenue, Oxon Hill, Maryland.

24  Q.      Do you know Mr. Learley Reed Goodwin?

25  A.      I do.

1  Q.      Would it be fair to say he's a good friend of

2  yours?

3  A.      Yes, sir.

4  Q.      How long have you known Mr. Goodwin?

5  A.      Quite a few years.  Maybe about -- I must have

6  been about in my 20s.

7  Q.      Was there a time that you lived over on Ayers

8  Road?

9  A.      Yes, Ayers Place.

10  Q.      Ayers Place?  Is that the residence of a Mr.

11  Williams?

12  A.      Yes, sir.

13  Q.      Do you know Mr. Williams' full name?

14  A.      James Williams.

15  Q.      Does he have a nickname?

16  A.      Chico.

17  Q.      Does Mr. Chico Williams have any relation to

18  Tiffany Vessels?

19  A.      Yes.

20  Q.      What is his relationship to Tiffany Vessels?

21  A.      Her father.

22  Q.      Does Mr. Williams have any relationship to a

23  Dorsey?

24  A.      Yes, sir.

25  Q.      Does he also have any relationship to a

1  gentleman by the name of Horace Smith?

2  A.      Yes.

3  Q.      Does Horace Smith have a nickname?

4  A.      I'm not sure.  I only knew him by Horace.

5  Q.      When did you first meet Horace Smith?

6  A.      Years ago when Mr. Williams was staying on

7  Wilmington Place.

8  Q.      Do you recall the circumstances under which you

9  met Mr. Smith?

10 A.      Yes, I do.

11 Q.      What was that?

12         MS. JOHNSTON:   Objection.  Relevance.

13         THE COURT:   What's the relevance?

14         MR. MARTIN:   I'll move on, Your Honor.

15         THE COURT:   All right.

16         BY MR. MARTIN:

17 Q.      Have you ever seen Mr. Horace Smith and Mr.

18 Raynard Dorsey in his place?

19 A.      Yes.

20 Q.      Are there any specific activities that you might

21 have seen them engaged in?

22         MS. JOHNSTON:   Objection.

23         THE COURT:   Overruled.

24         MS. JOHNSTON:   Your Honor, may we approach?

25         THE COURT:   All right.

1        MS. JOHNSTON:   I don't know  if we're getting

2  into some kind of specific bad conduct that he's trying

3  to use to impeach or attack Mr. Smith's credibility  as

4  a witness.  We were told that these witnesses were

5  going to be called as character  witnesses to attack the

6  character  with this witness and Mr. Thurman, but I

7  understand  now it's Mr. Smith.  Second, we don't have

8  any time frame.  So, the court couldn't even  accurately

9  determine  whether  information  is relevant.

10        MR. MARTIN:   I can get the time frame out.  With

11  respect to this, Your Honor, our theory of the defense

12  will be that Mr. Horace  Smith was involved in drug

13  dealing long before he met Learley Goodwin, and not

14  just in a small way but in a large way.

15        Mr. Smith came, took the stand and testified

16  before the ladies and gentlemen of the jury   that he was

17  a small time dealer and only became a big time dealer

18  after meeting Mr. Goodwin.  Ms. Winestock, it's

19  proffered, will be able to show that that's not the

20  case and that Mr. Smith was dealing in larger

21  quantities  before meeting Mr. Goodwin.

22        MS. JOHNSTON:   Your Honor, again, I think this

23  is directly under the Bynum case that Ms. Greenberg

24  cited to the court  and that we filed this morning under

25  608(b). It's not an admissible prior bad conduct of

1  the witness.  So, we would object to it coming in.

2  It's nothing -- he hasn't -- I'm not sure what time

3  frame it is, and I don't know -- I don't know that she

4  has a basis of knowledge for saying any of this.  And

5  more clearly, under Bynum, it is a specific attempt to

6  impeach the credibility of a witness by specific prior

7  acts of the witness being Mr. Smith.

8         MR. MARTIN:  Again, it goes to credibility.  I

9  think that the witness should be allowed to testify to

10  these --

11        THE COURT:  She can give an opinion about the

12  truthfulness of somebody.  I think we're running right

13  into 608(b) problems of specific instances of the

14  conduct of the witness by extrinsic evidence.  I'm

15  going to sustain the objection.

16        MR. MARTIN:  Very good, sir.

17        MS. JOHNSTON:   Thank you, Your Honor.

18                 (Back in open court.)

19        BY MR. MARTIN:

20  Q.    Ms. Winestock, you said you had occasion to meet

21  Horace Smith.  How long did you know him?

22  A.    Maybe about 15 or 20 years.

23  Q.    During that 15- to 20-year period, did you have

24  -- did you form an opinion regarding his credibility?

25  That is, his believability?

1   A.      Yes.

2   Q.      What is that opinion?

3   A.      Not good.

4   Q.      With respect to other people who might know Mr.

5   Horace Smith.  Do you know other people who know him?

6   A.      Yes, I do.

7   Q.      Within the community of people who know Mr.

8   Horace Smith, what is his reputation for truthfulness?

9   A.      Not honest at all.

10  Q.      Ms. Winestock, Mr. Goodwin's been locked up for

11  some time now.  You know that, right?

12  A.      Yes, sir.

13  Q.      Have you had occasion to speak with Mr. Goodwin

14  since he's been locked up?

15  A.      Of course.

16  Q.      Why have you had occasion to speak with Mr.

17  Goodwin?

18  A.      We're friends.

19  Q.      Are you handling any business matters for him?

20  A.      Yes, sir.

21  Q.      Would you tell the ladies and gentlemen of the

22  jury what kind of business matters you're handling for

23  him?

24  A.      Sure.  I take care of some property and -- well,

25  taking care of property, real estate, etcetera.

1  Q.      If you could be a little more specific with

2  respect to the real estate.  Exactly what are you doing

3  for him?

4         MS. JOHNSTON:   Objection.  Relevance.

5         THE COURT:   Overruled.

6         MR. MARTIN:   Ms. Winestock  -- Your Honor, I'm

7  going to stop.  I have no further questions of this

8  witness.

9         Madam government, your witness.

10        MS. JOHNSTON:   Thank you, Mr. Martin.

11        THE COURT:   All right.

12                    **CROSS-EXAMINATION**

13        BY MS. JOHNSTON:

14  Q.      Ms. Winestock, have you ever been employed by

15  Mr. Goodwin?

16  A.      No, ma'am.

17  Q.      Are you familiar with the property he owns on

18  Anacostia Road?

19  A.      Yes, ma'am.

20  Q.      Had you been there before his arrest?

21  A.      Yes, ma'am.

22  Q.      Who did you visit with when you went over to

23  Road?

24  A.      Tiffany and Mr. Goodwin as well.

25  Q.      When you visited with Tiffany and Mr. Goodwin

1   over at Anacostia Road, was that on the second level in

2   one of the two apartments occupied up there?

3   A.      Yes, ma'am.

4   Q.      What time period are we talking about here?

5   2000 to 2004?

6   A.      Yes.

7   Q.      Does that sound about right?

8   A.      Well, before then. I've been knowing him for

9   years.

10  Q.      Okay. So in terms of when you went to Road and

11  when you visited with Mr. Goodwin and Ms. Vessels in

12  one of those second floor apartments --

13          MR. MARTIN:   Your Honor, I'm going to object.

14          This is beyond the scope of my direct

15  examination.

16          THE COURT:   Overruled.

17          MR. MARTIN:   This is a very narrow scope.

18          BY MS. JOHNSTON:

19  Q.      It started back before even 2000; is that

20  correct?

21  A.      Yes.

22  Q.      Did it continue up until the time of his arrest

23  in 2004?

24  A.      Yes.

25  Q.      How often would you see Mr. Goodwin over at

1 Road during that time period?

2 A.     Not that often.  I mostly saw Tiffany Vessels.

3 Q.     What was the last time that you saw Mr. Goodwin

4 with Ms. Vessels before his arrest in June of 2004?

5 A.     I never said I saw them together, but I said

6 I've seen Mr. Goodwin and Ms. Vessels.

7 Q.     At Anacostia Road?

8 A.     Yes, ma'am.

9 Q.     But not together.

10 A.     Yes, ma'am.

11 Q.     And it was in one of those second story

12 apartments?

13 A.     Yes, it was.

14 Q.     Was it in the apartment that had the

15 surveillance cameras in it?

16 A.     I'm not sure.

17 Q.     In addition to seeing Mr. --- strike that.

18       So I'm clear.  You never saw Mr. Goodwin and Ms.

19 Vessels together anywhere?

20 A.     I've seen them together, but not at Anacostia

21 Road.

22 Q.     You've seen them together at other places?

23 A.     Out eating and, you know, things like that of

24 that nature.

25 Q.     How about at the residence over on Farragut

1   Place?

2   A.      No.

3   Q.      Have you ever been to the residence on Farragut

4   Place?

5   A.      Yes, I have.

6   Q.      Who have you been to see there on Farragut

7   Place?

8   A.      I lived there for a minute.

9   Q.      When was that that you lived there?

10  A.      Recently. Maybe about six months ago.

11  Q.      Was it after Mr. Goodwin got arrested that you

12  lived there --

13  A.      Yes, ma'am.

14  Q.      -- or before he got arrested?

15          Did you ever go there?

16  A.      No, ma'am.

17  Q.      So you weren't familiar with that location?

18  A.      Not at all.

19  Q.      Now, what about Oglethorpe Street? Are you

20  familiar with any residents on Oglethorpe Street?

21  A.      No, ma'am.

22  Q.      Have you ever met with Mr. Goodwin's stepson,

23  Larry Lane?

24          MR. MARTIN:   Your Honor, objection.

25          This is well beyond the scope of direct at this

1   point.

2         MS. JOHNSTON:   I'll rephrase the question.

3         BY MS. JOHNSTON:

4   Q.    In addition to knowing Ms. Vessels and her

5   father, Chico -- how did you meet Ms. Vessels?

6   A.    Ms. Vessels' brother and I grew up together.

7   Q.    So, you grew up with her brothers?

8   A.    Yes, ma'am.

9   Q.    Did Mr. Goodwin ever introduce you to, or were

10  you ever with Mr. Goodwin and Chico together?

11  A.    No, ma'am.

12  Q.    In terms of your relationship with Mr. Goodwin.

13  How often would you see or speak with him before he

14  went to jail in June of 2004?

15  A.    Quite often.  We're friends so, you know, we

16  kept in contact with each other and see how each other

17  was doing, you know.

18  Q.    Let me show you what's been marked as Oglethorpe

19  7, and let me just put it up here on the screen.

20        Can you see Government's Exhibit Oglethorpe 7?

21  A.    Mm-hmm.

22  Q.    Do you recognize the name Cynthia Winestock, W I

23  N E S T O C K?

24  A.    That would be me.

25  Q.    Is that your telephone number?

1  A.      Yes, ma'am , it is.

2  Q.      Who did you give your telephone number to?

3  A.      Mr. Goodwin .

4  Q.      That's not your handwriting , is it?

5  A.      No, ma'am .

6  Q.      Is that Mr. Goodwin 's handwriting ?

7  A.      Yes , it is.

8          MR. MARTIN:   Objection .  Objection .

9          THE COURT:   Basis ?

10         MR. MARTIN:   Scope .  Relevance .

11         THE COURT:   Overruled .

12         BY MS. JOHNSTON:

13 Q.      That's Mr. Goodwin 's writing ?

14 A.      Yes .

15 Q.      Let me show you another page from Goodwin 16.

16         Do you see that page , the reference to

17 Cynthia /Butch ?  Do you recognize those number s?

18 A.      No .

19 Q.      Do you know Butch ?

20 A.      No, ma'am , I don't .

21 Q.      In terms of Horace Smith . Did you work with Mr.

22 Smith ?

23 A.      No .  I purchase d drug s from Mr. Smith .

24 Q.      So you used drug s, too?

25 A.      I did at that time .

1  Q.      First of all, what kind of drugs did you use?

2  A.      I used cocaine.

3  Q.      Cocaine.  Would that be powder cocaine or crack?

4  A.      Crack.

5  Q.      How long have you used crack cocaine?

6  A.      Some years.

7  Q.      Well, give us an idea.

8          When was the last time you used crack cocaine?

9  A.      I haven't used crack cocaine in maybe about nine

10 or ten months.

11 Q.      Nine or ten months?

12 A.      Yes, ma'am.

13 Q.      So it would be safe to say that you quit maybe

14 last fall of 2005?

15 A.      Yes.  Smoking crack, yes.

16 Q.      Were you using any other drugs?

17 A.      Weed.  Marijuana.

18 Q.      So you used marijuana and you used crack.

19 A.      Yes, ma'am.

20 Q.      Before you quit using crack in the fall of 2005,

21 for what period of time had you been using it?

22 A.      Could you repeat the question?

23 Q.      For what period of time had you been using crack

24 cocaine?

25 A.      Before I quit?

1  Q.      Yes.

2  A.      Maybe about seven years.

3  Q.      Seven years?

4  A.      Eight.  Seven or eight years.

5  Q.      And you indicated that you obtained your crack

6  cocaine on occasion from Mr. Smith; is that correct?

7  A.      Yes, ma'am.  And Renaldo Dorsey.

8  Q.      And Renaldo Dorsey?

9  A.      Yes, ma'am.

10 Q.      Who else did you get crack from?

11 A.      That's it.  I used to go to Southwest and buy it

12 off the streets -- Southwest D.C. and buy it off the

13 street.

14 Q.      Have you ever been to Mr. Goodwin's business,

15 Lobo's?

16 A.      I've been there, yes, ma'am.

17 Q.      Ever buy crack from other people at Lobo's?

18 A.      No.  I went there to get my car fixed.  Parts

19 for my car.  That's why I attended Lobo's.

20 Q.      Ever see anyone there selling crack?

21 A.      No, ma'am.  I wasn't for that.  I was there to

22 get my car fixed.

23 Q.      When you went to Road, for what purpose did you

24 go to Road?

25 A.      To visit.  I didn't only have friends Mr. G. --

1   Mr. Goodwin and Tiffany were not my only friends. I
2   had other friends that lived in the building. I had a
3   cousin that lived in the building.
4   Q.      Were you using crack cocaine at the time you
5   were visiting?
6   A.      How often did I use it?
7   Q.      During the time period that you used it, the
8   seven years that you used it, how often did you use
9   crack?
10  A.      Occasionally.
11  Q.      Occasionally meaning, what, once a creek? Twice
12  a week? Three times a week?
13  A.      Maybe twice a week.
14          MR. MARTIN:   Your Honor, there's a continuing
15  objection to this entire line of questioning.
16          THE COURT:   So noted.
17          BY MS. JOHNSTON:
18  Q.      Did you discuss your use of crack cocaine with
19  Mr. Goodwin?
20  A.      No.
21  Q.      You never told him about it?
22  A.      No.
23  Q.      In terms of Mr. Smith. Mr. Smith you met
24  through whom?
25  A.      Renaldo Dorsey.

1   Q.     And Mr. Dorsey was related to Ms. Vessels; is

2   that correct?

3   A.     Yes, ma'am.

4   Q.     Did you ever see Mr. Goodwin at Ms. Vessels'

5   father's house?

6   A.     Yes, ma'am.

7   Q.     And that would be Chico's house; is that

8   correct?

9   A.     Yes, ma'am.

10   Q.     How often did you see Mr. Goodwin at Chico's

11   house?

12   A.     Not often.

13   Q.     Was Chico also involved in selling drugs?

14   A.     I'm not sure, ma'am.

15   Q.     Was Chico there when Mr. Goodwin --

16   A.     Sometimes.

17   Q.     Okay.  When Mr. Goodwin would be there,

18   sometimes was Mr. Dorsey also present?

19   A.     Mr. Goodwin would come sometimes to pick up Ms.

20   Vessels.

21   Q.     My question to you was this.  Was Mr. Dorsey

22   sometimes present at Chico's house when Mr. Goodwin

23   would come over to the house?

24   A.     I'm not sure.

25   Q.     What about Mr. Smith?  Was he there sometimes?

1  A.      Mr. Smith and Renaldo was there often.  I rented

2  a room from Mr. Williams, so that's how I know.

3  Q.      You rented a room from Chico -- Mr. Williams?

4  A.      Yes, ma'am.

5  Q.      So you were there a while.

6  A.      But I wasn't working, yes, I was.

7  Q.      So you stayed there?

8  A.      Yes, ma'am.

9  Q.      So, when Mr. Goodwin would come over to see Ms.

10 Vessels or to pick her up, were there occasions when

11 Mr. Smith was present?

12 A.      I'm not sure.  Not while I was there.

13 Q.      Are you not sure, or it didn't happen while you

14 were there?

15 A.      It didn't happen while I was there.

16 Q.      That you recall?

17 A.      That I recall.

18 Q.      Mr. Dorsey.  Was Mr. Dorsey there sometimes when

19 Mr. Goodwin would come by?

20 A.      Sometimes.

21 Q.      Did you ever hear any conversations between Mr.

22 Goodwin and Mr. Dorsey?

23 A.      No, ma'am.

24 Q.      So you didn't participate?

25 A.      Not that I recall, no.

1   Q.      You didn't participate  in their conversation s.

2   A.      No, ma'am .

3   Q.      And the quantity of drug s that you were buy ing

4   from Mr. Smith .  Was it just Mr. Smith you got drug s

5   from , or also Mr. Dorsey ?

6   A.      And Renaldo .

7   Q.      In t erm s of Mr. Smith and the quantity of drug s

8   that you got from him .  Are we talk ing about a $20 rock

9   of crack ?

10  A.      Yes, ma'am .

11  Q.      Sometimes would you get more than a $20 ?

12  A.      No.  No, ma'am .

13  Q.      Just got $20 ?

14  A.      Dime s and 20 s.  $10 bag s and $20 bag s.

15  Q.      That was crack ; correct ?

16  A.      Yes, ma'am .

17  Q.      And you got it from Mr. Dorsey and Mr. Smith ?

18  A.      Yes, ma'am .

19  Q.      They weren't offering you kilogram s of drug s,

20  were they ?

21  A.      Excuse me ?

22  Q.      They weren't sell ing you kilogram s of drug s,

23  were they ?

24  A.      No, ma'am .  But I've seen them fix up kilogram s,

25  because I was the tester .

1   Q.      You were the tester for them?

2   A.      Yes, ma'am.

3   Q.      And when they fixed up their crack cocaine from

4   the powder cocaine, did you observe them using alcohol,

5   like vodka, to mix it up with the crack cocaine so that

6   it would be better?

7   A.      I'm not sure what they use.

8   Q.      Well, do you recall seeing alcohol being used?

9   A.      No, ma'am.

10  Q.      This was done at Chico's house?

11  A.      Yes, ma'am.

12  Q.      Where Ms. Vessels was living?

13  A.      Yes, ma'am.

14  Q.      Where Mr. Goodwin would come to pick her up?

15  A.      Sometimes.

16  Q.      And it would be Mr. Dorsey that you saw?

17  A.      Yes, ma'am.  And Mr. Smith.

18  Q.      They would both cook it up there?

19  A.      Yes, ma'am.

20  Q.      You don't know where they got the powder cocaine

21  from, do you?

22  A.      I have no idea.

23  Q.      And they would sell you a $20 rock?

24  A.      They would first ask me to try it out and to

25  tell them how it was, and I would do so.  If I liked

1   it, I would buy it -- I would purchase some.

2   Q.      In addition to doing testing there at Ms.

3   Vessel's father's house, did you also do testing at --

4   test drugs at other locations for other people?

5   A.      No, ma'am.

6   Q.      Just there?

7   A.      Just there.

8   Q.      What about   Road.

9   A.      No, ma'am.  I knew them, and I felt like I could

10  trust them that they wouldn't sell me anything or give

11  me anything -- have me try anything.

12  Q.      In addition to buying from them, also over the

13  seven years you bought crack from other people; isn't

14  that correct?

15  A.      Yes, ma'am.  It was always someone I knew off

16  the street over Southwest, people I knew, you know.

17  Q.      So you trusted other people as well?

18  A.      The ones that I knew, yes, ma'am.

19  Q.      And this cocaine conversion was taking place in

20  the same residence where you saw Ms. Vessels and where

21  Ms. Vessels lived and where Mr. Goodwin would come by

22  and see her and pick her up?

23  A.      Yes, ma'am.

24  Q.      Did you know an individual named Vicki?

25  A.      Who?

1  Q.      Vicki?

2  A.      Vicki?

3  Q.      Yeah.

4  A.      Yes, ma'am.

5  Q.      Vicki is someone Mr. Goodwin knew; is that

6  correct?

7  A.      I'm not sure if Vicki and Mr. Goodwin knew each

8  other or not.

9  Q.      Are you aware of the fact that Vicki delivered

10  drugs to Mr. Goodwin -- to Mr. Smith at that residence?

11  A.      I have no knowledge of that, ma'am.

12  Q.      And the -- if I understood you correctly, the

13  reason you tested for Mr. Smith and Mr. Dorsey is

14  because you could trust them; is that correct?

15  A.      I thought so, yes, ma'am.

16         MS. JOHNSTON:  I have  nothing  further.

17         THE COURT:  All right.  Any redirect?

18         MR. MARTIN:  Yes.  Briefly, Your Honor.

19                    **REDIRECT EXAMINATION**

20         BY MR. MARTIN:

21  Q.      Ms. Winestock, you testified that you saw Mr.

22  Dorsey and Mr. Smith cooking up drugs at Ayers Place;

23  is that correct?

24  A.      Yes.

25  Q.      In addition to cooking it up, did you see them

1  package it?

2  A.      Yes, sir.

3  Q.      Did you see them distribute it?

4  A.      Yes, sir.

5  Q.      Is that before Mr. Horace Smith knew Mr.

6  Goodwin?

7  A.      Excuse me.  Could you repeat that, Mr. Martin?

8  Q.      Was that before Mr. Smith knew Mr. Goodwin?  The

9  distributing and packing.

10 A.      Yes, out of course.

11         MR. MARTIN:   Nothing further, Your honor.

12         THE COURT:   Thank you very much.  You may step

13 down.

14                  (Witness excused at 2:56 p.m.)

15         MR. MARTIN:   Your Honor, may I approach briefly?

16         THE COURT:   You may.

17                  (At the bar of the Court.)

18         MR. MARTIN:   Thank you for your patience, Your

19 Honor.  Mr. Goodwin has asked me to ask the court if he

20 can testify out of order Your Honor.  He says his cap

21 has fallen out in the front of his mouth, and he is

22 willing to come and show the court what the situation

23 is.

24         THE COURT:   Who wants to testify?

25         MR. MARTIN:   This is the defendant, Mr. Goodwin.

1        THE COURT:   He wants to testify?   Would this be
2   the right time?

3        MR. MARTIN:   Not now, because --

4        MS. JOHNSTON:   Your Honor, now is the right time
5   for Mr. Goodwin to testify.   We have many defendants in
6   this case.   The government has to be prepared.

7        THE COURT:   This is your case.   Unless there's
8   some extraordinary reason, I think he ought to testify.

9        MR. MARTIN:   He submits that that's the
10  extraordinary reason.

11       THE COURT:   What is the issue?

12       MR. MARTIN:   The issue is his bridge.
13  Apparently, it's fallen out during the lunch hour.

14       THE COURT:   I don't think a problem with
15  dentistry is going to be enough to --

16       MR. MARTIN:   Very good, Your Honor.

17       THE COURT:   I have  no idea when that can be
18  fixed or if it can be fixed.

19       MR. MARTIN:   I've brought it to the attention of
20  the court.   Mr. Goodwin has offered to come up and show
21  the court.

22       THE COURT:   I've urged him not to testify, as
23  I'm sure you have too, but I think if he wants to
24  testify, the time is now.

25       MR. MARTIN:   I'm sure he's hearing that on the

1   mike.

2        MS. JOHNSTON:   I don't know  if the court would

3   like to take five minutes and to question  him to make

4   the record clear and ask him if he's discussed it with

5   his attorney and if he's given consideration  to the

6   advice of his attorney and the court and if he's making

7   this decision to testify freely and voluntarily, just

8   so it is extra clear on the record down the road if

9   there are issues in terms effective  assistance  of

10  counsel.  I just would like the record to be very

11  clear.

12       MR. MARTIN:   Just for the record, I met with him

13  at lunchtime  and we discussed this again at length.

14       THE COURT:   Well, Ms. Johnston, I'm trying to

15  think of a way  to do this without  having to send the

16  jury out.

17       MS. JOHNSTON:   I understand  that, Your Honor.  I

18  don't suggest it lightly.  I just would like the record

19  very clear that it is his decision.

20       MR. MARTIN:   I didn't mean to inconvenience  the

21  court or the jury.  He told me this after  our meeting

22  downstairs.  This is when I came upstairs  here and he

23  was seated that he told me about the problem with his

24  mouth.

25       THE COURT:   I just don't think that's a

1  sufficient  reason  to  allow  him  to  go  on  to  another

2  defendant  and  suddenly  come  out  of  the  blue  and  do

3  this.   This  is  a  problem  that  may  or  may  not  be

4  resolved  that  I  simply  won't  testify  eloquently  with

5  bridge  work  that's  got  problems.   That's  not  going  to

6  prevent  him  from  talking.   Worried  about  his

7  appearance?

8        MS.  JOHNSTON:   Perhaps  the  court  should  inquire

9  of  Mr.  Goodwin  or  at  least  during  the  court's  inquiry

10  the  court  could  ascertain  if  he's  able  to  talk  with

11  that  problem.

12        THE  COURT:   We  will  send  the  jury  out  for  five

13  minutes.

14        MR.  MARTIN:   I'm  sorry  to  do  this  to  the  court,

15  believe  me.   I'm  really  sorry.

16                (Back  in  open  court.)

17        THE  COURT:   Ladies  and  gentlemen,  there's  a

18  minor  matter  I  need  to  attend  to  without  you  present,

19  so  I'm  going  to  send  you  back  to  the  jury  room  for

20  perhaps  five  minutes  and  bring  you  right  back  in.

21                (Jury  excused  at  2:59  p.m.)

22        THE  COURT:   All  right.   Mr.  Goodwin,  you  were

23  able  to  hear  the  conversation  I  had  at  the  bench;  is

24  that  correct?

25        MS.  JOHNSTON:   Your  Honor,  we  can't  hear  Mr.

1    Goodwin 's response s to the court .

2         THE COURT:   You're going to have to put the mike

3    in front of you , Mr. Goodwin .

4         MR. MARTIN:   Can he be seat ed , Your Honor ?   It

5    might be easier .

6         THE COURT:   You can be seat ed , sure ly , if we can

7    hear him better .  Put the mike right next to your

8    mouth , Mr. Goodwin , so I can hear you .

9         Mr. Goodwin , I have a conversation  with you

10   before we broke for lunch about your right not to

11   testify and about the fact that not testify ing would be

12   something I would advise the jury could not be used to

13   infer anything adverse to you .

14        Do you remember that conversation ?

15        DEFENDANT GOODWIN:   Yes .

16        THE COURT:   My understand ing is that you have

17   had a discussion with your attorney about the question

18   of whether to testify or not ; is that correct ?

19        DEFENDANT GOODWIN:   Yes .

20        THE COURT:   My understand ing is your attorney

21   has fully advise d you about your right to testify or

22   not testify , as the case may be ; is that right ?

23        DEFENDANT GOODWIN:   Yes .

24        THE COURT:   My understand ing is your attorney

25   has advise d you not to testify ; is that correct ?

1          DEFENDANT GOODWIN:    Yes.

2          THE COURT:   In spite of your attorney's advice,

3   you still wish to testify, knowing that if you testify,

4   you will be exposing yourself to cross-examination, as

5   is the right for any prosecutor to engage in with a

6   person testifying.

7          Do you understand that?

8          DEFENDANT GOODWIN:    Yes, sir.

9          THE COURT:   Do you understand that testifying in

10  some cases might make things worse, not better?  Do you

11  understand that?

12         DEFENDANT GOODWIN:    Yes, sir.

13         THE COURT:   In spite of those risks, you still

14  want to testify?

15         DEFENDANT GOODWIN:  Yes  , sir.

16         THE COURT:   You do.

17         Now, my understanding is you have some problem

18  with your dental work.   What is the problem you're

19  having?

20         DEFENDANT GOODWIN:    It came out.   My cap came

21  loose.

22         THE COURT:   I'm sorry.   I can't hear you.

23         DEFENDANT GOODWIN:    At lunchtime, my cap broke

24  loose.

25         THE COURT:   A cap broke loose on a tooth?

1          DEFENDANT GOODWIN:    Two of them.  It's a bridge

2   thing.

3          THE COURT:   All right.  What problem is that

4   causing for you, if any?

5          DEFENDANT GOODWIN:    It's aching.

6          THE COURT:   It's what?

7          DEFENDANT GOODWIN:  It 's aching.

8          THE COURT:   It's aching?  I can't hear what

9   you're saying, sir.

10          DEFENDANT GOODWIN?   I said, it's aching.

11          THE COURT:   I'm sorry.  I can't understand what

12   you're saying.

13          MR. MONTEMARANO:   I think he's trying to say

14   it's aching.

15          MS. JOHNSTON:   Your Honor, if Mr. Montemarano

16   would not interject and let the court conduct its voir

17   dire --

18          THE COURT:   You're saying it aches?

19          DEFENDANT GOODWIN:   It exposed the nerve, I

20   guess.

21          THE COURT:   Are you able to talk?

22          DEFENDANT GOODWIN:   As best I can.  I'm trying

23   to hold it up.  It came loose.  I was biting into a

24   hard sandwich, and it came loose.

25          THE COURT:   Well, you're able to converse with

1   me now, are you not?

2        DEFENDANT GOODWIN:    The best I can.  If you can

3   understand me.

4        THE COURT:    Well, Ms. Johnston, what's your

5   position?

6        MS. JOHNSTON:    Your Honor, I would only ask the

7   court to make sure that his decision to testify has

8   been made voluntarily and that no one has promised him

9   or threatened him anything.

10        THE COURT:  I can't hear you, Ms. Johnston.

11        MS. JOHNSTON:    I would just like to be sure --

12   I don't know if now is the right time to do it or not,

13   but to be sure that his decision to testify is one he's

14   made voluntarily and not subject to any threats or

15   promises from anyone in terms of that issue.

16        I don't know if the marshals could do something

17   in terms of fixing that crown overnight so that he

18   doesn't have a problem or if it could be removed so

19   that he could open his mouth more fully.  It looks like

20   he's not opening his mouth to speak because of -- his

21   crown is loose.  I don't know that it's a significant

22   injury.  I have crowns as well.  I don't know that it's

23   anything that's ever been an impairment to speaking

24   before, but if the court would want to have the

25   marshals attempt to get it fixed overnight, that may be

1  one thing. I understand that. We would prefer to have

2  his case finished in its entirety before we move to the

3  next defendant, for the sake of the jury.

4      We would defer to the court in terms of how the

5  court wants to handle it. He does not appear to be

6  under any significant pain.

7      THE COURT:  Where is your client being held?

8      MR. MARTIN:  He's being held in Prince George's

9  Detention Center, and this issue regarding his crown

10  has been brought up repeatedly and, to be quite frank,

11  Your Honor, ignored.

12      THE COURT:  I'm sorry. What?

13      MR. MARTIN:  It was ignored. The issue

14  regarding his loose crown has been brought up in the

15  past, and it's been ignored.

16      THE COURT:  He's had this problem before?

17      MR. MARTIN:  It was loose before, but now he

18  says -- Mr. Goodwin tells me that it's broken now.

19      THE COURT:  Well, did it fall off or what

20  happened?

21      MR. MARTIN:  I don't know, Your Honor. I'm

22  learning this as you are learning it when Mr. Goodwin

23  came in.

24      THE COURT:  Mr. Goodwin, tell me what is wrong

25  with your teeth.

1          DEFENDANT GOODWIN:     It came out today.

2          THE COURT:    What came out?

3          DEFENDANT GOODWIN:     Here.

4          MR. MARTIN:    The crown, apparently.

5          DEFENDANT GOODWIN:     Can you see it?  It broke

6  off.

7          THE COURT:    It fell off?  Are you able to speak?

8          MR. HALL:    He has it in his hand.

9          MR. MARTIN:    It broke off.  He has it in his

10  hand.

11          DEFENDANT GOODWIN:     The nerve, I guess, is

12  exposed.  It's real sensitive.  If they can get some

13  glue and put it back in there -- it's got the nerve

14  hanging down there.  You can come and see it.  I mean,

15  let me bring and show you, and you can see what I'm

16  talking about.

17          THE COURT:    Mr. Goodwin, you say you want to

18  testify.  Has anybody threatened you or tried to coerce

19  you into testifying?

20          DEFENDANT GOODWIN:     Hm-mm.

21          THE COURT:    No?  I can't hear you, sir.

22          DEFENDANT GOODWIN:     Hm-mm.

23          THE COURT:    No or yes?

24          DEFENDANT GOODWIN:  No.

25          THE COURT:    Did you say no?

1           DEFENDANT GOODWIN:  No .

2           THE COURT:   All right .  All right .  I'm going to

3  confer with the marshals and ask them to have his teeth

4  checked, and I'll permit you to be skipped over for

5  now, but you're going to have to be prepared to testify

6  tomorrow in the absence of there being some significant

7  dental issue that's brought to my attention by the

8  marshals service .

9           As I said , I have recommended you not testify ;

10  your counsel has.  It's up to you if you want to

11  testify , but I want to make sure it's clear :  Nobody

12  has threatened you or tried to force you to testify ; is

13  that right ?

14           DEFENDANT GOODWIN:  (Affirmative nod   .)  "Yes."

15           THE COURT:   You're shaking your head "yes?"

16           DEFENDANT GOODWIN:   No .  No.

17           THE COURT:   No, you're not shaking your head ?

18  Who's threatened you?

19           DEFENDANT GOODWIN:   No .  Nobody 's threatened me.

20           THE COURT:   Nobody 's threatened you.

21           Okay .  All right .  Ms. Johnston , I'm going to

22  ask the marshals service to give me a report on the

23  dental situation .

24           MS. JOHNSTON:   Your Honor might want to inquire

25  as to whether Mr. Goodwin has had any difficulty

1    speaking while down in lockup.

2           THE COURT:  I'm going to find out.  I'm going to

3    ask the marshals service to do a full inquiry with

4    speaking and problems with this issue and what if

5    anything needs to be done to correct it.  But if this

6    is a matter that's been going on for some time, it may

7    very well be something that I'm not going to simply

8    permit any further delay in this.  There's been enough

9    delays in this case, but I will permit you not to

10   testify today.  You should be prepared to testify

11   tomorrow morning, in the absence of the marshals

12   service telling me there's a serious problem and it

13   can't be fixed overnight.

14           Do you have any other witnesses, Mr. Martin?

15           MR. MARTIN:  No.  With the exception of Mr.

16   Goodwin -- I'm not saying I rest, but that would be the

17   end of the defense case for Mr. Goodwin.

18           THE COURT:  Mr. Hall, are you ready to go?

19           MR. HALL:  Yes, Your Honor, I'm ready to go.

20           My client is going to testify.  I believe it

21   would be appropriate to have him voir dire at this

22   time, before we bring the jury back in.  I can do it or

23   you can do it, if you prefer.

24           THE COURT:  You can do it.

25           MR. HALL:  Mr. Whiting, stand up for a moment.

1          Do you understand , sir , you have an absolute
2     right to testify in this case if you choose to?
3          DEFENDANT WHITING :  I do.
4          MR. HALL:  D o you understand also you have an
5     absolute constitution al right not to testify and remain
6     silent ?
7          DEFENDANT WHITING:    I do.
8          MR. HALL:   Do you understand that if you chose
9     to remain silent that the judge would instruct the jury
10    that they could not infer anything from your silence ?
11         DEFENDANT WHITING :  I understand .
12         MR. HALL:   And you understand that the
13    government could n't comment on your silence in their
14    closi ng statement .
15         DEFENDANT WHITING :  I do.
16         MR. HALL:   Okay .  Now , have you and I discuss ed
17    this before ?
18         DEFENDANT WHITING:    We have .
19         MR. HALL:   Did we have a fair ly lengthy meet ing
20    on Friday afternoon ?
21         DEFENDANT WHITING:    We did .
22         MR. HALL:   Did I point out to you that if you
23    testify that you're going to be subject to
24    cross-examination  by one of the government counsel ?
25         DEFENDANT WHITING :  I'm aware of that .

1          MR. HALL:   And that also that it is possible
2   that, should sentencing guidelines apply in your case,
3   that you could actually receive an enhancement in your
4   sentencing guidelines after you testify if you're found
5   guilty?
6          DEFENDANT WHITING :  I understand that.
7          MR. HALL:   Has anybody threatened you in any way
8   to choose one of your constitutional rights over the
9   other one?
10         DEFENDANT WHITING:   No.
11         MR. HALL:   Has anybody forced you?
12         DEFENDANT WHITING:   No.
13         MR. HALL:   Is this your voluntary decision that
14  you want to testify at this time, despite the warnings
15  I've given you about some of the issues that could
16  arise?
17         DEFENDANT WHITING:   It is my decision.
18         MR. HALL:   Okay.
19         THE COURT:  All right.  Mr. Whiting, did I
20  understand you have some legal training?
21         Do you have some legal training?
22         DEFENDANT WHITING:   I have a little.
23         THE COURT:   All right.  Do you really understand
24  that you have a right not to testify, and that --
25         DEFENDANT WHITING :  I do.

1          THE COURT:  --  there are some significant

2     downside s to testify ing?

3          DEFENDANT WHITING :  I understand  the risk s

4     involve d.

5          THE COURT:  All right .  I'll permit him to

6     testify .

7          Now , Mr. Martin --

8          MR. MARTIN:  Sir?

9          THE COURT:  What I will tell the jury is that

10    there is an additional  witness in the defense of Mr.

11    Goodwin who is not able to testify today -- I won't

12    tell them who it is -- and that we're now going to move

13    to the defense case of Mr. Whiti ng.

14         MR. MARTIN:  Okay .

15         THE COURT:  All right .  Bring the jury in.

16                    (Jury returns at 3: 12 p.m.)

17         THE COURT:  Ladies and gentlemen , while you're

18    get ting seat ed, I want to tell you that you've been

19    hear ing witness es call ed by the defendant Learley

20    Goodwin . There is one additional  witness for that part

21    of the case who is not able to testify today but will

22    possibly be call ed tomorrow . Therefore , we're going to

23    move from the defense case of Mr. Goodwin to the

24    defense case of Mr. Whiti ng.

25         Mr. Whiti ng is taking  the stand now as his first

1  witness in his defense .

2        You may proceed .

3        MR. HALL:   Thank you .

4  Thereupon,

5                    **REECE  COLEMAN  WHITING** ,

6  having been called as a witness on behalf of the

7  Defendant Whiting , and having been first duly sworn by

8  the Courtroom Deputy, was examined and testified as

9  follows :

10        BY MR. HALL:

11  Q.     Mr. Whiting, please state your full name .

12  A.     Reece Coleman W hiting, Jr.

13  Q.     What 's your date of birth ?

14  A.     6 - 13 - 40 .

15  Q.     That would make you 66 now ?

16  A.     That 's correct .

17  Q.     Okay . Make sure you keep your voice up , and

18  speak that micro phone so everybody can hear you .

19  A.     Certain ly .

20  Q.     Where were you born , sir ?

21  A.     Baltimore , Maryland .

22  Q.     Okay . Is that where you live d most of your

23  life ?

24  A.     Between Baltimore and Washington .

25  Q.     Okay . All right . Now , let me ask you this.

1    There have been a number of issues that have come up in

2    this case about you being a lawyer, so I'd like to ask

3    you a couple of questions about that.

4           First of all, do you have any degrees?

5    A.     Yes, I do.

6    Q.     What degrees do you have?

7    A.     I've got a B.S. in history.

8    Q.     Where is that from?

9    A.     Loyola.    Baltimore.

10   Q.     What other degrees do you have?

11   A.     M.S. in sociology from Pacific.

12   Q.     Where is that from?

13   A.     Pacific Lutheran in Tacoma, Washington.

14   Q.     Do you have a juris doctorate, commonly known as

15   a law degree?

16   A.     Yes, I do.

17   Q.     Where is that from?

18   A.     Howard University Law School.

19   Q.     What year did you get your juris doctorate?

20   A.     '83.

21   Q.     What about your bachelors degree?  What year was

22   that?

23   A.     '66.

24   Q.     And the masters?

25   A.     '78.

1    Q.      Now, sir, those degrees that you have are fairly

2    far apart, time-wise.  Can you tell the ladies and

3    gentlemen of the jury   what happened after that first

4    degree that you got from Loyola?   Were you convicted of

5    a crime?

6    A.      I was.

7    Q.      What was that?

8    A.      Smuggling  of marijuana  from Mexico  to the United

9    States.

10   Q.      Okay.  And that conviction  was in what

11   jurisdiction  , sir?

12   A.      The western  part  of Texas.

13   Q.      El Paso?

14   A.      El Paso.  Smuggled from Juarez  to El Paso.

15   Q.      What did you receive  for a sentence  in that

16   case?

17   A.      I think  it was  around  seven  and a half, eight

18   years.

19   Q.      Okay.  All right.  You got out of jail from that

20   offense, I guess, sometime  in the early 1970s?

21   A.      I did.

22   Q.      Did you receive  another  conviction  after you got

23   out of jail?

24   A.      I did.

25   Q.      Where  was that, first of all?

1  A.        In Baltimore.

2  Q.        Okay.   Which court was that?

3  A.        District Court of Maryland.   Distribution.

4  Q.        United States District Court?

5  A.        Yes, sir.

6  Q.        What was that conviction for?

7  A.        Distribution of drugs.

8  Q.        That was 1974?

9  A.        No, '73.

10  Q.        '73?

11  A.        Yes, sir.

12  Q.        Okay.   What did you receive for a sentence

13  there?

14  A.        I think it was about eight years.   Something

15  like that.

16  Q.        Eight years?

17  A.        Yes, sir.

18  Q.        When you -- did you have another conviction in

19  1986?

20  A.        It was the conviction was in '86.   My arrest was

21  in '84.

22  Q.        Okay.   What jurisdiction was that, sir?

23  A.        It was in Mexico City, Mexico.

24  Q.        That was for possession of cocaine?

25  A.        It was.

1  Q.      And you received how long  a sentence  in that

2  case?

3  A.      I think it was eight years.

4  Q.      And then finally you received a conviction  in

5  1994, is that correct , from the Eastern  District  of

6  Virginia?

7  A.      The conviction  was then.  The arrest was in '92.

8  Q.      That was in the Eastern  District  of Virginia?

9  A.      It was.

10  Q.      That was in federal  court; right?

11  A.      Yes, it was.

12  Q.      What did you receive  for a sentence  in that

13  case?

14  A.      Eight years, ultimate ly.

15  Q.      What was your original  sentence  when you first

16  were convict ed?

17  A.      I think it was 186 months.  I cooperate d and got

18  an eight -year  sentence .

19  Q.      Okay.  When you say you cooperate d, what do you

20  mean by that?

21  A.      I meant  that I cooperate d with  the government  in

22  reference  to that offense .

23  Q.      Okay.  And you received  a reduction  in your

24  sentence as a result  of cooperating ; is  that  correct ?

25  A.      I did .  I did .

1        I'd like to just add something, if I may, Mr.
2   Hall.
3   Q.     I'll ask you the questions, sir.  We'll get to
4   everything.
5        Now, did there come a time when you met someone
6   by the name of Paulette Martin?
7   A.     I did.
8   Q.     Okay.  And around when was that?
9   A.     It was in the '80s.  Around '81 or '82,
10  something like that.
11  Q.     Can you describe what the circumstances were in
12  which you met her?
13  A.     Ms. Martin has a dance studio, and there was
14  quite a few young ladies -- dance instructors at the
15  studio.  I met Ms. Martin through a friend, and I was
16  interested in some of the dance instructors.  That's
17  the way I met Ms. Martin.
18  Q.     Okay.  How would you describe your relationship
19  with Ms. Martin at that point in time?
20  A.     Ms. Martin and I, we hit it off immediately.
21  Very good friends.  I like Ms. Martin.  I like her a
22  lot.  And we did drugs together.
23  Q.     Okay.  And when you said you did drugs together,
24  what kind of drugs did you do?
25  A.     Powder cocaine.  Crack.

1  Q.      Okay.  And you used drugs with her?

2  A.      Yes.

3  Q.      Where were you living at that time?

4  A.      I was living on Connecticut Avenue.

5  Q.      Okay.  Were you working?

6  A.      I don't know.  I wasn't -- I was -- I think I

7  was self-employed.

8  Q.      Okay.  Doing what?

9  A.      I think I was selling drugs.

10 Q.      Okay.  All right.  Now, did there come a time

11 later on, prior to your arrest in this case, when you

12 were employed?

13 A.      You mean the '80s or --

14 Q.      No.  Prior to your arrest in this case.

15 A.      In '92?  Oh, yes.

16 Q.      What were you doing then?

17 A.      I was working for a drug program over in

18 Baltimore.  The Turk House Drug Program --

19 Rehabilitation Drug Program.

20 Q.      How did you end up working there?

21 A.      Most of the people who work at the drug program

22 are former drug users.  I went through a drug rehab

23 program in Buckner, North Carolina.  It's a 500-hour

24 program.  It's a two-year program.  And I had another

25 friend that I went through the program with by the name

1   of Thornton Armstead.   Thornton was employed at the

2   Turk House.   He told me that the Turk House needed

3   people who had drug abuse backgrounds to work at the

4   Turk House.   I put in an application, and I was hired.

5   Q.      Okay.  So as a result of your friendship with

6   this individual, you began to work at the Turk House;

7   is that correct?

8   A.      Yes, sir.

9   Q.      What year did you start working at the Turk

10  House?

11  A.      I started working at the Turk House around May

12  of '03.  I moved back to Baltimore the first of '03 and

13  lived in the -- lived in the back room of my first

14  ex-wife's house.

15  Q.      Why did you end up living in your -- well, first

16  of all, give me the address of where you were living.

17  A.      3520 Essex Road, Baltimore, Maryland.

18  Q.      Why were you living there in the back room of

19  your ex-wife's house?

20  A.      I was working at a law firm, a Mr. Randy

21  McCray's law firm in '02, and Mr. McCray closed his

22  office and I was no longer employed, so I had to give

23  up my apartment that I had, and my ex-wife told me that

24  I could reside in the back room of her house.

25  Q.      Okay.  Is that where you were residing at the

1  time you got arrested?

2  A.     I most certainly was.

3  Q.     Did you continue to -- during this time, after

4  you were released from prison the last time, did you

5  continue to have a relationship with Ms. Martin?

6  A.     I most certainly did.

7  Q.     Did she continue to be a friend of yours?

8  A.     A very good friend.

9  Q.     I wanted you to tell the ladies and gentlemen of

10  the jury. During that last time period, up until you

11  got arrested in this case, did you continue to see Ms.

12  Martin?

13  A.     I most certainly did.

14  Q.     Tell the jury about your use of drugs during

15  that period of time.

16  A.     My use of drugs after my release in '99 was more

17  in a relapse mode, rather than a drug abuse mode. I

18  used drugs from time to time but from, let's say, '99,

19  when I was released in November of '99, until my arrest

20  on June 1st of 2004, I might have used drugs 18 times

21  maximum. It was, like I said, a relapse mode, rather

22  than a drug abuse mode.

23  Q.     Okay. Now I want to direct your attention --

24  well, first of all, do you recall sitting here during

25  the course of this trial -- and you've had the

1   opportunity  to  hear  a  number  of  phone  calls that

2   occurred  between  you  and  Ms.  Martin.

3   A.      I most certainly did.

4   Q.      Okay.  I want to go through  some  of  those with

5   you.

6   A.      Yes, sir.

7   Q.      The  first  call  I  want  to  direct  your  attention

8   to was  one  on  March 9  of  2004,  and  in  that  phone  call

9   you spoke  to  Ms.  Martin --

10          MS. GREENBERG:   Could  we  have  a  page  number,

11  counsel?

12          BY MR. HALL:

13  Q.      Yes.   That  would  be  Page  8.

14          You said  hello  to  her -- I'll  skip  through  the

15  greetings.   You  said  hello  to  her,  and  Ms.  Martin  said,

16  he said he don't  have  any  printed,  so  you  just  have  to

17  wait  till  I  get  some  in,  probably  toward  the  end  of

18  next  week.

19          Could  you  tell  the  jury  what  was  being  discussed

20  in that  phone  call?

21  A.      Whenever  I  called  Ms.  Martin  in  reference  to

22  tickets, it  meant  tickets from  my -- in my -- from my

23  standpoint.   Ms.  Martin,  like  I  said,  had  been  very

24  kind  to  not  only  me  but  to  several  people,  and  from

25  time  to  time  Ms.  Martin  would  take  all  of  us  out  to

1  various  venues,  "oldie  but  goody"  shows,  to  Carter

2  Baron  during  the  summers  and  the  Blues  Alley  during  the

3  Valentine's  Day  to  see  Jerry  Butler,  because  most  of  us

4  was  around  the  same  age  grouping.

5          During  these  times  Ms.  Martin  would  take  us  out,

6  Ms.  Martin  would  provide  me  with  a  little  user  amount

7  of  drugs,  but  I  was  always  calling  for  tickets  --

8  tickets  for  one  of  these  venues,  with  the  expectations

9  that  I  would  have  a  good  time.  And  in  having  a  good

10  time,  I  would  have  some  user  amount  of  drugs  sometimes.

11  Q.    All  right.  Well,  let  me  ask  you  this.   In

12  reference  to  this  conversation  that  you  had  with  her  on

13  March  9  of  2004,  do  you  recall  what  show  it  was  you

14  were  hoping  to  go  to?

15  A.     I  think  it  was  Mary  J.   Blige.   I'm  not  sure.

16  Q.     When  you  indicated  that  you  expected  to  get  some

17  user  amount  of  drugs,  tell  the  ladies  and  gentlemen  of

18  the  jury  just  about  how  much  you  expected  you  were

19  going  to  get  as  far  as  drugs  go.

20  A.      It  was  nothing  more  than  something  for  the

21  evening,  because  I  had  a  high  state  of  paranoia  about

22  traveling  with  drugs.  After  my  conviction  in  '92,  I

23  knew  that  any  further  conviction  would  result  in  a  life

24  sentence.  So,  it  was  my  policy  not  to  carry  any  drugs.

25  What  I  would  do  --  Ms.  Martin  was  aware  of  my  paranoia,

1   and it would just be something for the evening.

2   Q.      When you say "something for the evening" --

3   first of all, what drug are you talking about?

4   A.      Could have been powder, or it could have been a

5   rock.

6   Q.      When you say a rock, what are you talking about?

7   A.      I'm talking about rack cocaine.

8   Q.      A rock of crack cocaine?

9   A.      Yes.

10  Q.      When you say a user amount, how much are you

11  talking about quantity-wise?  How much are you talking

12  about?

13  A.      A gram.  You know, something like that.

14  Something more than that.

15  Q.      Okay.  Did you continue to use drugs through the

16  spring of 2004?

17  A.      No.  I didn't use any drugs in 2004.

18  Q.      Would you have had them if you had gotten some?

19  A.      Not necessarily.  Like I said, my drug use was

20  in a relapse mode, as opposed to a drug abuse mode.  If

21  the urge had hit me, maybe, but it wasn't a thing where

22  I said, well, I'm going to get high every day, you

23  know, or something to that effect.  That was not the

24  case.

25  Q.      All right.  Now, you had a telephone

1  conversation  with  Ms.  Martin  on  March  14, 2004, and

2  that  would  be  Page 72  for  the  benefit  of  the  ladies and

3  gentlemen  of  the  jury .

4       In  that  conversation , again , after  the  opening

5  greetings, Ms.  Martin  said , so  hopefully  any  day  they

6  said  any  time  now  it's  due .  And  you  said , right ,

7  right .  Okay , baby .  And  she  says , as  soon  as  I  hear

8  something , I'll  call  you .

9       What  were  the  two  of  you  talking  about  in  that

10 phone  call ?

11 A.     Again , I'm  just  talking  about  tickets  and  the

12 anticipation  that  Ms.  Martin  would  take  us  out  some

13 place  so  that  we  can  enjoy  ourselves .

14 Q.     All  right .  If  you  had  gotten  tickets  to

15 something  on  that  occasion  and  Ms.  Martin  had  offered

16 you  a  rock  of  crack  cocaine , what  would  you  have  done ?

17 A.     I  probably  would  have  used  it .

18 Q.     Okay .  Let  me  ask  you  this .  On  any  of  the

19 occasions  where  you  got  a  rock  of  crack  cocaine  or  a

20 small  amount  of  cocaine  from  Ms.  Martin , did  you  ever

21 do  anything  else  with  it  other  than  use  it ?

22 A.     No .

23 Q.     Okay .  Now , let  me  direct  your  attention  to

24 another  phone  call  that  occurred  on  March  27, of  2004 .

25      You  had  a  conversation  with  Ms.  Martin  on  that

1  occasion; is that correct, sir?

2  A.      Yes, sir.

3  Q.      Okay.  After the greetings, you said, yeah, I

4  was gonna, you know, try to get over there whenever,

5  you know, was convenient for you.  And Ms. Martin says,

6  okay.  I have to get 'em together.  Still haven't heard

7  nothing.  I -- I still haven't heard nothing the ticket

8  thing yet.

9       Again, what were you referring to -- what was

10  being referred to in the realm of tickets in that

11  conversation?

12  A.      All of my phone calls were in reference to

13  tickets for various venues.  I assume that Ms. Martin

14  understood that and --

15       MS. GREENBERG:   Objection to the witness's

16  assumptions.

17       THE COURT:   Overruled.

18       BY MR. HALL:

19  Q.      Go ahead, sir.

20  A.      The reason that I take that posture is because,

21  as has been demonstrated by the telephone calls, Ms.

22  Martin never called me in regards to anything about

23  buying anything.  She always said to me that she would

24  get back to me, and I assumed that she would get back

25  to me when she had decided for all of us to get

1   together to some sort of venue, okay.

2   Q.    What was the largest amount of drugs you ever

3   got from Ms. Martin?

4   A.    A quarter of the gram, something like that.

5   Half a gram, maybe.   I'm not sure.

6   Q.    Okay.   Was it usually crack, or was it usually

7   powder?

8   A.    It could have been either or but, as I indicated

9   earlier, we were talking mainly during the periods of

10  '02 and '01, not '04 at all, and not '03, really,

11  because I had not seen Ms. Martin since June of '03.  I

12  saw her once or twice maybe in the first part of '03,

13  but none otherwise.

14  Q.    Okay.   Now, I want to direct your attention to

15  another phone call, sir.   It's on Page 390 of

16  Transcript Book 2, and it happened on April 25, 2004.

17       You had a conversation with Ms. Martin

18  concerning visiting an individual at the jail.   Do you

19  recall that conversation?

20  A.    Yes, I do.

21  Q.    Okay.   And Ms. Martin said to you, you know what

22  I forgot to ask you.   Kevin was saying on Sundays over

23  in Baltimore they can't go in the jail there.   A

24  lawyer.   And you said, they can't go in the jail?   And

25  Ms. Martin says, the attorney cannot.   You said, well.

1    And then Ms. Martin says, thought an attorney could

2    visit.   And then you said, he can visit there.   That's

3    bullshit.   Ms. Martin then says, that's what the

4    attorney told Kevin today.   And you said, interrupting,

5    that's bullshit, man.   That's bullshit.   And she says,

6    Mm-hmm.   And you said, that's bullshit.   That's

7    bullshit, pure, unadulterated bullshit.

8            What were you discussing with Ms. Martin on that

9    occasion concerning these jail visits?

10   A.     I was under the impression that, you know, an

11   attorney could go to the jail at any time.

12   Q.     Okay.

13   A.       That's what I was talking about.   I later found

14   out that was -- that the attorneys could not visit on

15   Sundays, but at that point in time I did not know that.

16   Q.     You subsequently learned that; is that correct?

17   A.     I most certainly did.

18   Q.     Was the answer that you were giving Ms. Martin

19   in any way based upon any -- anything other than your

20   experience?

21   A.     Nothing other than my experience.

22   Q.     I want to direct your attention to another phone

23   call on the same day which is located on Page 396.   You

24   speak to Ms. Martin and she says, hey Bro, I'm curious

25   about something.   Can you find out what the charges are

1   against  Gwen?   I'm just curious if -- curious if she's

2   hooked up with, you know.  And then you say, all right,

3   let me check with some people.  And then she says,

4   okay.  She's in Baltimore now.  And you said, okay.

5   And then she says, okay.  You know her last name?  And

6   you said, huh.  Guy knows it.  And then she says, Levi.

7   And you said, Levi.  That's right.  And then the call

8   ends.

9        What was being discussed in that phone call?

10  A.    Ms. Martin was -- I think Ms. Levi had been

11  arrested, and Ms. Martin was asking me to find out some

12  information.  What information, I don't know.  I told

13  her to get back to me, and she never did get back to

14  me.  I had tried to reach out to some people to say,

15  you know, what had happened to her, but nobody got back

16  to me in reference to that, so I let the matter drop.

17  Q.    Let me ask you this.  What was your relationship

18  with Ms. Martin vis a vis getting information or advice

19  or her asking you things?

20        What kind of things did she ask you during this

21  time period other than the one we just read?

22  A.    Well, you must understand that Ms. Martin and I

23  are very close.  I had always worked at law offices,

24  and so Ms. Martin would make the assumption that I knew

25  some attorneys or had some knowledge of some legal

1   information , and so she would call me about -- one time

2   she called me , she was having some problems with

3   getting the contractors to make the repairs on her

4   house .   I referred her to Joe Gibson , who is a licensed

5   attorney in Maryland practicing out of Riverdale who

6   resolved the problem for Ms. Martin .

7         Ms. Martin would call me in reference to

8   problems she had with Ms. Turrico, who was her landlord

9   at the school , for repairs on the school and any other

10  problems that she might have with Ms. Turrico, because

11  she and Ms. Turrico clashed. She felt as though I

12  could , you know, mediate that situation . So, it wasn't

13  anything beyond the fact of someone -- a friend asking

14  a friend for advice , basically .

15  Q.      Let me ask you this .   Through the testimony that

16  came out in court concerning these phone calls that

17  happened on April 25 to April 26 , 2004, the opinion of

18  Sergeant Jq*, was that you had actually been to Ms.

19  Martin 's house either that evening or the next morning.

20  Tell the ladies and gentlemen of the jury   about what if

21  anything you did in regard to going to Ms. Martin 's

22  house at that time .

23  A.      Never went .   Sergeant Sakala is mistaken .

24  Q.      Okay .

25  A.      I had not seen Ms. Martin in all of '04.   I had

1  not seen her since June or so of '03, and there is
2  nothing -- nothing to contradict that.
3  Q.    All right. And sir, why did you not see Ms.
4  Martin during that time period?
5  A.    I was working -- I was working not only the job
6  at the drug program; I was working two other jobs,
7  also. I was managing the property for a childhood
8  friend of mine, Robert Scott, at the Wellington --
9  Scott Wellington's real estate, and I also was taking
10 people's packages home in my Jeep from the Mount
11 Diamond Shopping Center for tips. So, the three jobs
12 at 64 years of age, which I was at that time, I was
13 exhausted at the end of night. Plus, I'm living in the
14 back room of my first ex-wife, and she was telling me
15 at to be in at 9 o'clock if I didn't have to work at
16 night. The reason I put on the alarm system, which
17 meant that I could not go out after 9 o'clock. So, it
18 was -- there was no space there to see Ms. Martin. The
19 only thing I did was speak to Ms. Martin on the phone.
20 Q.    Okay. All right, sir, let me ask you about
21 another phone call. Page 535, in Book 3. That
22 occurred on May 17 of 2004.
23        After the greeting, Ms. Martin says to you, I
24 heard they're talking about giving that girl 25 to
25 life. And your response is, is that right? And Ms.

1  Martin says, yeah.  Mr. Whiting says, oh, man, but you

2  know they've been -- they been saying she's, you know,

3  and Ms. Martin says, uh-huh.  And then you say, yeah,

4  but, well, man, uh, let me call you back.  Ms. Martin

5  says, okay.  You say, holler at you.  And then there's

6  a salutation.

7       What were you discussing with Ms. Martin on that

8  particular occasion?

9  A.    That's Ms. Gwen Levi that we're talking about.

10  Gwen Levi.  I met Ms. Levi through a fellow who is a

11  godfather named Eddie Tucker.  I know Mr. Tucker from

12  Lewisburg Federal Penitentiary, and I ran into Mr.

13  Tucker down to a place called Jigs.  It's a bar in

14  South Baltimore off of Baltimore Street, and he and I

15  was having a conversation, and he said --

16       MS. GREENBERG:   Objection.   Hearsay.

17       BY MR. HALL:

18  Q.    Don't say what someone else told you.  Just tell

19  us what you and Ms. Martin talked about.

20  A.    Right.  Well, Ms. Martin and I were talking

21  about the fact that Ms. Levi had -- she said that Ms.

22  Levi -- she thought Ms. Levi was going to receive 25

23  years.  And I said, oh?  I had not heard that, but I

24  thought that Ms. Levi would try to do whatever she

25  could do not to have the 25 years.

1    Q.      You had a conversation  with Ms. Martin  on May

2    28, 2004 -- Page 610 in the transcript  book  -- and you

3    say to her, hey, let me ask you, that girl.  If that's

4    March -- March.  I think it's March the 30th.  So, I

5    know it's March.  Yeah, I think it's the 30th.  And she

6    interrupts and says, yeah ,I know the date, but I

7    needed the Social  Security number and year.  You say,

8    oh.  Oh, okay.  Well, I have to look through my stuff

9    and see, because I've got that in my stuff somewheres.

10   What were you two talking about then?

11   A.      I think we were talking about -- I think we're

12   talking about Ms. Levi.

13   Q.      Okay.  And then later on in the conversation  you

14   said, speaking of that, did any of them tickets ever

15   come in.  What were you talking about on that occasion?

16   A.      I was talking about some sort of affair.

17   Q.      Okay.  And if you had gone out with Ms. Martin -

18   if she had gotten some tickets and you had gone out

19   with her and she had offered you some crack cocaine or

20   powder cocaine at the end of the evening, what would

21   you have done?

22   A.      I might have used it.  Probably used it.

23   Q.      Okay.  During the time period after you got out

24   of prison for the last time after that 1994 conviction,

25   how frequently do you think you did use drugs?

1   A.      As I indicated, from the '99 period -- first of

2   all, you should take into consideration in '99, when I

3   got out, I was in Second Genesis from '99 until the

4   first part of 2000.  I was also, you know, giving up

5   urine on a regular basis to the United States

6   Attorney's office and the District of  Columbia.

7   Q.      Do you mean because you were on supervised

8   release?

9   A.      I was on supervised release.  So, as indicated,

10  it was a relapse mode.  From '99 until my arrest, a

11  little over a dozen times maybe.  More than 18 if then.

12  Q.      And when you -- let me ask you this.  Did your

13  work requirement  at Turk House have any requirements

14  regarding drug testing?

15  A.      Yes, they did.

16  Q.      What was their requirement?

17  A.      Their requirement was it was a random drug test,

18  plus the fact that, you know, work at the Turk House

19  was a restrainer on me, because it kind of reminded me,

20  hey, Reece, you can't do this.

21  Q.      Now, let me ask you this.  You heard the

22  testimony of  Mr. Echarte say that when he was here in

23  court -- I want to ask you a couple of questions about

24  him.

25          When was the first time met Mr. Echarte?

1    A.      I met him at Ms. Martin's house.  He came up to

2   Ms. Martin's house and she says, my boyfriend, or

3   something maybe.  Not boyfriend.  Maybe she just said,

4   a guy -- I've got a new guy in my life and he's

5   upstairs.

6   Q.      Okay.  And had there been a guy previous in her

7   life?

8   A.      Yes.

9   Q.      Okay.  That was Mr. John Martin?

10  A.      That's correct.

11  Q.      So she and Mr. Martin had broke up for a while,

12  and she took up with Mr. Echarte?

13  A.      Well, yeah.  She was always, you know, breaking

14  off her relationship with Mr. Martin from time to time

15  for some reason.  And, yes.

16  Q.      Do you recall when was the first time,

17  approximately, that you met Mr. Echarte at Ms. Martin's

18  house?

19  A.      I can't really remember the first time.  And the

20  reason I say that is because I only met Mr. Echarte

21  around three times at Ms. Martin's house.  I met him

22  that one time and said, hey, how you doing, that type

23  of thing.  I think one other time I saw him and it was

24  as the guest of Ms. Martin, because Ms. Martin felt he

25  was being abusive, and I went up to speak to him about

1  that because, you know, she was talking about having

2  her younger son to speak to him, and I felt as though I

3  could do it more diplomatically than he could.  And

4  then I saw him one other time after that.

5  Q.     Okay.  Now, you heard him describe his heroin

6  operation during his direct testimony.  Tell the ladies

7  and gentlemen of the jury  , what was your relationship

8  to Mr. Echarte and any heroin operation that he had.

9  A.     We had none.  Mr. Echarte gave me nothing.  I

10  drove Mr. Echarte nowhere.  Mr. Echarte was penniless.

11  He was homeless.  Ms. Martin took him in because he had

12  no place to live.  Ms. Martin bought him clothes.  Ms.

13  Martin gave him money.  And to be truth truthful with

14  you, I didn't like it, because I like Ms. Marin in more

15  ways than one, and I felt as though she was being taken

16  advantage of.  And when I had to tell that guy, I let

17  him know in no uncertain terms.

18  Q.     In terms of his  testimony  concerning his

19  breaking up large quantities of cocaine  and

20  distributing  it.

21        Tell the ladies and gentlemen of the jury   what

22  you ever saw regarding that.

23  A.     I saw nothing.  As I indicated, this man was a

24  pauper.  Now, if we're dealing -- when I was dealing

25  large sums of cocaine, I lived like I was dealing large

1  sums of drugs.  Mr. Echarte -- Ms. Martin had to pay

2  his health insurance and everything else.  This man

3  didn't even have a driver's license.  So, I mean -- you

4  know, I think it was a figment of his imagination.  I

5  didn't see anything to indicate one way or the other.

6  But as I indicated, I only saw the man, like, three

7  times.

8       THE COURT:  Mr. Hall, how much longer do you

9  think you will be with this witness?

10      MR. HALL:  Probably at least another 20 minutes.

11      Did you want to take a break?

12      THE COURT:  We will take a 15-minute recess

13  until 4:00 p.m.

14                    (Jury excused at 3:46 p.m.)

15                    (Off the record at 3:46 p.m.)

16                    (On the record at 4:03 p.m.)

17      THE COURT:  Counsel, I'm going to tell the jury

18  we'll start at 9:30 tomorrow, trailing this sentencing

19  I have tomorrow.

20      MR. MONTEMARANO:  Until 2:30?

21      THE COURT:  I don't know.  We're dragging.  I

22  think we better go longer tomorrow.  I think we'll go a

23  normal day to 4:30, because we're dragging and I can't

24  let us drag much longer.  We'll have a regular lunch

25  break.

1          MR. MONTEMARANO:   Standard  lunch  and  all  that?

2          THE  COURT:   Yeah.

3          MR. MCKNETT:   Your Honor, I got  the  impression

4    that  some  of  the  jurors  may have  made  other  plans.

5          THE  COURT:   Well, I'll  check  and  see  if  there  is

6    a  problem.

7                        (Witness  resumes  the  stand.)

8                        (Jury  returns  at  4:04  p.m.)

9          THE  COURT:   Ladies and gentlemen , before  we

10   resume, I  have  a  sentencing tomorrow  at  9:00,  and  I  see

11   no  reason  why  I  shouldn't  be  able  to  start  this at  9:30

12   it's  a  relatively  simple  and  uncomplicated  sentencing.

13          We're  dragging a  little  bit.   What  I  would  like

14   to  know  --  if  you  could  just  pass  a  note  to  your

15   foreman  and  let  me  know  --  is, would  anybody  have  a

16   problem  if  we  did  a  pretty  normal  day  tomorrow  and  went

17   to  4:00?   I  don't  want  to  lose  too  much  time.   I  want

18   to  make  sure  that  my  prepaid  vacation  plans  don't  get

19   messed  up, so  I  might  go  as  late  as  4:00  or  4:30,  with

20   a  normal  lunch.   So, if  anybody  is  having  a

21   catastrophic  problem  because  of  that, please  let  your

22   foreman  know  and  he  can, in  turn, let  Ms. Merez  know,

23   and  I'll  make  a  final  decision  before  we  recess  today.

24          JURY FOREMAN:   Does  that  mean  you  want  to  start

25   at  9:30?

1           THE COURT:   Yes.   We'll go until 4:00 or 4:30,

2    and I we will stop before 5:00.   If there's any

3    problems, slip a little note to your foreman, and he

4    can tell Ms. Merez, but I will make a final

5    announcement before we recess for the day.

6           You may proceed.

7           BY MR. HALL:

8    Q.      Thank you, Your Honor.

9           Mr. Whiting, we were talking about Mr. Echarte a

10   few minutes ago before we took the break.   I want you

11   to tell ladies and gentlemen of the jury    -- you heard

12   him describe that there were occasions when there were

13   40 or 50 or 60 kilograms of cocaine in Ms. Martin's

14   kitchen.

15          Tell the jury what you saw in relation to that.

16   A.      I saw nothing in regards to any weight in Ms.

17   Martin's home, and I've been visiting Ms. Martin's home

18   since I came home in '99.   Ms. Martin had introduced me

19   to one of her girlfriends, Ms. Cathy Davis, and Ms.

20   Davis did accounting work for Ms. Martin, so I would go

21   up to Ms. Martin's home when I first got home 2000 for

22   sure, part of 2001, and I never saw anything of that

23   nature.   I sparingly went past there in 2002.   And, as

24   I indicated, in 2003 I was in Baltimore, so I wasn't

25   there at all.   But I never saw anything like it.

1  Nothing.

2  Q.     Okay.  What about the truckloads of marijuana

3  you talked about?

4  A.     I never saw that.  As I indicated --

5         MS. GREENBERG:   Objection.

6         Your Honor, I think counsel is misstating the

7  evidence.

8         MR. HALL:  Your Honor, my recollection is Mr.

9  Echarte said he brought marijuana up here and it was

10 brought up on trucks.

11        THE COURT:  I don't think he said "truckloads."

12        BY MR. HALL:

13 Q.     All right.  Well, what about the marijuana

14 coming off the trucks?

15 A.     I didn't see anything.

16        Let me say this, so that we are on the same

17 page.

18        MS. GREENBERG:   Objection.

19        The witness is supposed to answer the questions,

20 Your Honor.

21        MR. HALL:  He's still answering the question.

22        THE COURT:   He can explain his answer.

23        Go ahead.

24        BY MR. HALL:

25 Q.     Go ahead.

1  A.      I did not see any drugs, period.  I saw nothing

2  to indicate that Mr. Echarte had anything of value,

3  period, in relationship  to himself  or anybody  else.

4  Q.      Okay.  Now, let me ask you this, Mr. Whiting.

5  All together, how many years have you known Ms. Martin?

6  A.      I've known Ms. Martin more or less  25 -- 25+

7  years.

8  Q.      Okay.  And you would describe  her as a friend, I

9  take it?

10  A.      Yes.  We're good friends.  I have wanted more,

11  but we're good friends.  Yes.

12  Q.      Did there come a time when you borrowed some

13  money from her?

14  A.      I most certainly did.  Ms. Martin --

15  Q.      Let me ask you a question  about  that.

16  A.      Yes, sir.

17  Q.      First of all, what was the purpose  of you

18  borrowing money from her?

19  A.      Ms. Martin told me early on when my release --

20          MS. GREENBERG:   Objection  as to hearsay, Your

21  Honor.

22          THE COURT:   Sustained.

23          BY MR. HALL:

24  Q.      Just tell us, first of all, what was it that you

25  borrowed the money for.

1  A.      Okay.   I borrowed the money from Ms. Martin to

2  purchase an automobile.

3  Q.      Okay.   What type of automobile were you

4  purchasing?

5  A.      I was purchasing a 1994 XJ-6 Jaguar.

6  Q.      What year would this be that you were purchasing

7  it?

8  A.      This would have been in 2000.

9  Q.      So you were buying a used one?

10  A.      Yes, sir.

11  Q.      Did you have some money to put into the car?

12  A.      I did.   I had about $5,000.   The vehicle cost

13  $15,000.

14  Q.      Where did you buy the vehicle from?

15  A.      Manhattan Jaguar.

16  Q.      All right.   Where did you get the remaining

17  $10,000?

18  A.      Ms. Martin loaned me the $10,000.   She gave me a

19  check cut on a Wells Fargo bank account.   I endorsed

20  the check to a representative of Manhattan Jaguar, and

21  that was in March or so of 2000.

22  Q.      Okay.   Now I want to show you what has been

23  introduced as Hayward 28, or at least a page from

24  Hayward 28.   I'm putting it up here on the monitor.

25          First of all, do you see the initials up there?

1  A.      Yes, sir.

2  Q.      Whose initials are those?

3  A.      I think they're my initials.

4  Q.      Okay.   Your full name is Reece Coleman Whiting;

5  right?

6  A.      That's correct.

7  Q.      What was the amount that you borrowed?

8  A.      $10,000.

9  Q.      Did you ever make payments on that $10,000 that

10  you borrowed from Ms. Martin?

11  A.      From time to time I gave her small amounts of

12  payments on the money.

13  Q.      Okay.   Did you ever borrow more money on that

14  loan that you had secured for Ms. Martin?

15  A.      I most certainly did, because contrary to what I

16  had thought before, I couldn't keep the upkeep on the

17  car.   When I would put it in for servicing, I would

18  invariably run to Ms. Martin for loans to get the car

19  out, and I -- and she would say to me, Reece, you got

20  to stop doing this, and she would lend me the money

21  anyway.   She would browbeat me, but she would lend me

22  the money.

23  Q.      Do you see up on the screen there underneath the

24  initials R.C.W. a tabulation of some figures?

25  A.      Yes, sir.

1  Q.      Okay.  What do those figures have to do with

2  drugs?

3  A.      Nothing.

4  Q.      What are they for?

5  A.      They're for the repairs on my car.

6  Q.      Okay.  And the initial $10,000 is the amount you

7  borrowed from her?

8  A.      Yes, sir.

9  Q.      Did you ever finish paying off that loan?

10  A.      No, sir.

11  Q.      Okay.

12  A.      I still owe it to her today.

13  Q.      All right.  Now, in reference to any of the

14  drugs that you ever got from Ms. Martin during this

15  time period.  After you got out of prison this last

16  time, what if anything did you ever do with it?

17  A.      I used them in her bathroom as a rule, because I

18  didn't want to be driving with drugs, like I said,

19  because I have a -- let me say this.  I have a record

20  of DUI in the state of Maryland and I have lost my

21  privileges on occasions for driving on the roads of the

22  state of Maryland.  So, as soon as I get stopped,

23  automatically it's the toss and then if they do

24  something else to check the record.  So, paranoia would

25  not allow me to travel.  So, as soon as I would get

1  something, I would run to the bathroom and do it.

2  Q.     You said that during these latter -- the latter

3  time period in 2004 that you did not see Ms. Martin for

4  some period of time; is that right?

5  A.     I did not see her.

6  Q.     Where were you living at that time?

7  A.     I was living in my ex-wife's house.

8  Q.     Where was she -- what city is that?

9  A.     That's in Baltimore.

10 Q.     Where was Ms. Martin living?

11 A.     Ms. Martin is living in Washington or the

12 metropolitan area.

13 Q.     If you wanted to get some cocaine at that time,

14 where would you go?

15 A.     I would go to -- I'm from Baltimore; born and

16 bred in Baltimore.  I know a thousand open air drug

17 markets in Baltimore that I could go and get drugs.

18 And then with my budget, I couldn't afford the gas to

19 go to Washington to get some drugs.  When, hey, I can

20 go to Fulton and Lanvelle, or I go to Edmonson and

21 Winchester; I can go to Shirley Avenue and Park

22 Heights; I can go to Greenmont Avenue.  I mean, the

23 list goes on and on.  Baltimore has a plethora of open

24 air drug markets.  You just go up, and if you know how

25 to talk to people, you got it.

1  Q.      Okay.  Don't get good gas mileage on the Jaguar,

2  do you?

3  A.      No, sir.

4          MR. HALL:   No further questions.

5          THE COURT:   Any defense cross-examination?

6          MR. MONTEMARANO:   Thank you, Your Honor.

7                      **CROSS-EXAMINATION**

8          BY MR. MONTEMARANO:

9  Q.      Good afternoon, Mr. Whiting.  How are you?

10 A.      Good afternoon, Mr. Montemarano.

11 Q.      Now, you know my name, but we've never spoken

12 before have we, except maybe saying "hi" and "bye" in

13 the hallway.

14 A.      That's all.

15 Q.      That's because you understand, based upon your

16 law degree, that there's something called attorney/

17 client privilege?

18 A.      Yes, sir.

19 Q.      I haven't told you what questions I'm going to

20 ask you.

21 A.      No, sir.

22 Q.      Nor have I told you what answers.  You're going

23 to tell the truth; right, sir?

24 A.      Absolutely.

25 Q.      I want to talk about your relationship with Ms.

1   Martin.  You go back 25 years?

2   A.      Yes, sir.

3   Q.      During that time, is it fair to say she was

4   often involved romantically with other men?

5   A.      Yes, sir.

6   Q.      And that's sort of gotten in the way of you and

7   her; is that correct?

8   A.      In my mind, yes.

9   Q.      I'm not criticizing you in any way, sir, but

10  would it be fair to say that you would have liked your

11  friendship to blossom into something more?

12  A.      Yes.

13  Q.      It never did?

14  A.      Never did.

15  Q.      During the time you've known her, one of those

16  people would be John Martin; is that correct?

17  A.      Yes, sir.

18  Q.      Based upon what you were able to observe when

19  you saw them, Mr. Martin and Ms. Martin -- they're not

20  related; correct?

21  A.      No, they're not.

22  Q.      Based on what you were able to see when you saw

23  Mr. and Mrs. Martin together, is it fair to say Mr.

24  Martin was involved in the drug trade?

25          MS. GREENBERG:   Your Honor, can we approach the

1  bench at this time?

2        THE COURT:  Yes.

3              (At the bar of the Court.)

4        MS. GREENBERG:   Your Honor, based on the case

5  law we provided, and of course the court can, in its

6  discretion, permit counsel to examine this witness, but

7  it should be in a non-leading fashion.  It is not an

8  adverse witness.

9        THE COURT:  Where is the testimony of this

10 witness adverse to your client?

11       MR. MONTEMARANO:  He said he got cocaine from my

12 client repeatedly.

13       THE COURT:  You can inquire about that.

14       MS. GREENBERG:  He admitted she distributed

15 small amounts to him, so it's not adverse to him at

16 all.

17       THE COURT:  I don't think you should be leading

18 him on matters that aren't adverse to your client.

19       MR. MONTEMARANO:  He is not my witness, Your

20 Honor.

21       THE COURT:  I understand he's not your witness.

22 But if he is not testifying against your client --

23       MR. MONTEMARANO:  By the same token, if I'm not

24 going to not lead a witness, next week, when I'm

25 calling witnesses, they will be prepared and they will

1   understand  the  question s.

2          THE  COURT:   Mr.  Montemarano ,  you're  going  a

3   little  far .   I'm  going  to  have  to  reign  you  in .

4          MS.  GREENBERG:   Your  Honor ,  the  government 's

5   position  is  the  court  could  dis allow  his  exam ination  --

6          THE  COURT:   I'll  let  you  continue ,  but  please

7   don't  cross  the  limit ;  all  right ?   I'm  try ing  to  keep

8   you  reasonably  efficient .

9          MR.  MONTEMARANO :   I  understand  that ,  Your  Honor ,

10  so  allow  me  to  make  my  record .   I  am  asking  about

11  thing s  which  Mr.  Hall  inquired  about ,  number  one .

12  These  are  not  matter s  which  I  brief ed  Mr.  Whiti ng  on  in

13  any  way ,  shape  or  form .   I  establish ed  that  out  of  the

14  box .   Not  only  for  the  jury 's  satisfaction  but  for  the

15  court 's  satisfaction .   For  instance ,  John  Martin .   He

16  asked  about  him,  and  I  intend  to  ask  about  other

17  romantic  liaison s  Ms.  Martin  was  involve d  with  and  --

18  court 's  indulgence .   I  will  get  my  note s  and  --

19          MS.  GREENBERG:   I  don't  see  how  this  is

20  appropriate .

21          MR.  MONTEMARANO :   The  government 's  own  authority

22  says  you  cannot  --  raise s  question s  about  the  limit  to

23  cross -examine  a  codefendant  who  does  not  inculpate  you .

24  He  inculpate d  my  client  by  say ing  she  dealt  drug s.

25  Whether  or  not  my  client  made  a  small  admission  in

1  opening --

2        THE COURT:   I think you should stay within the

3  area in which he inculpate d your client .  I'm going to

4  give you a little more latitude to keep going .  You

5  haven't gotten there yet.

6        The objection is over ruled for now.

7        MR. MONTEMARANO :  Fair enough .  I will try to

8  retrench .

9        MS. GREENBERG:   Your Honor , it should be

10 non- lead ing.

11       THE COURT:   I don't think it should be lead ing

12 on matter s which have not been adverse to your client .

13 You can do it.   It's a challenge , I know , but you can

14 do it.

15       MR. MONTEMARANO :  Your Honor , if press ed for

16 honesty , I would concede that I have an expansive view

17 of my skill s and abiliti es, or at least my willingness

18 to pre tend that I have such .  But with all due respect

19 to Your Honor , you've got to be able to admit what you

20 can't do.  Right now I'm probably not danci ng in the

21 same way if I've not prepared a witness .  It is

22 difficult to have an understand ing of where the witness

23 is going to go.

24       THE COURT:   Just proceed .  We want to get out of

25 here at a reasonable hour .

1        MR. MONTEMARANO:   Thank you, Your Honor.

2                  (Back in open court.)

3        BY MR. MONTEMARANO:

4   Q.      Going back to John Martin.

5   A.      Yes, sir.

6   Q.      What if anything can you tell the ladies and

7   gentlemen of the jury  that you were able to observe

8   about Mr. Martin's involvement in the drug trade?

9   A.      Mr. Martin was a drug dealer of some note around

10  the Washington, D. C. area.  He also considered himself

11  to be a ladies' man.

12  Q.      Before Mr. Martin, was Ms. Martin involved with

13  another person for a lengthy period of time?

14  A.      Yes.

15  Q.      What was that person's name?

16  A.      The name escapes me.  When I met her, she was on

17  Jefferson Street, and this gentleman had been with her

18  for some years on Jefferson Street.  The name escapes

19  me, but there was two long-term relationships.  This

20  guy -- there was a -- on Jefferson Street with Ms.

21  Martin, and John Martin.

22  Q.      Okay.  If I were to prompt you to the first

23  name, would that possibly refresh your recollection?

24  A.      Possibly.

25  Q.      Robert?

1    A.      Yes.

2    Q.      Was that the gentleman's name?

3    A.      Yes.

4    Q.      Does the name Swissgood ring any bells?

5    A.      Right.

6    Q.      What did can you tell us about Mr. Swissgood's

7    involvement in the drug trade, if any?

8    A.      Drug dealer.

9            MS. GREENBERG:    Objection.

10           THE COURT:    What's the basis?

11           MR. MONTEMARANO:    I didn't about object.    I

12   asked him, what can you tell us about Mr. Swissgood's

13   involvement.

14           MS. GREENBERG:    I objected, Your Honor.

15           THE COURT:    What's the relevance to this case?

16           MR. MONTEMARANO:    I think I can tie it all in in

17   a moment.

18           THE COURT:    Well, tie it.

19           BY MR. MONTEMARANO:

20   Q.      What, if anything --

21   A.      He was a drug dealer.

22   Q.      Based upon what you were able to observe about

23   Mr. Swissgood's relationship with Ms. Martin and Mr.

24   Martin's relationship with Ms. Martin, what can you

25   tell us about her obtaining drugs from either of them?

1  A.      Quite  possibly,  she  was  receiving  the  drugs  from

2  them.

3           MS.  GREENBERG:    Objection,  Your  Honor.

4           THE  COURT:    Overruled.

5           THE  COURT:    Overruled.   Go  ahead.

6           MR.  MONTEMARANO:    Thank  you,  Your  Honor.

7           BY  MR.  MONTEMARANO:

8  Q.      Was  she  receiving  drugs,  as  far  as  you  were  able

9  to  observe,  to  deal  them  or  to  use  them?

10  A.     We  just  used  drugs.   I  never  seen  Ms.  Martin

11  deal  any  drugs.

12  Q.      What  was  her  drug  of  choice?

13  A.      Cocaine.

14  Q.      Did  she  have  a  term  she  would  use  for  her  use  of

15  cocaine?

16  A.      I  can't  think  of  anything  offhand.

17  Q.      Court's  indulgence,  please.

18          Let's  go  to  Mr.  Echarte.   You  said  that  Ms.

19  Martin  took  Mr.  Echarte  in;  correct?

20  A.      Yes,  she  did.

21  Q.      Although  you  only  encountered  him  perhaps  three

22  times  in  your  testimony;  correct,  sir?

23  A.      Yes,  sir.

24  Q.      Is  there  at  any  time  that  he  showed  any

25  independent  means  whatsoever?

1  A.      None.

2  Q.      At the same time, did Ms. Martin have any

3  independent means that you are aware of?

4  A.      Ms. Martin was very comfortably well off, and

5  she took care of everybody.

6  Q.      Do you have any knowledge as to where her wealth

7  may have come from?

8         MS. GREENBERG:   Objection.

9         THE COURT:   If he knows.   It was personal

10  knowledge.

11        BY MR. MONTEMARANO :

12  Q.      Of your personal knowledge.

13  A.      Yes, I do.

14  Q.      Stop right there.   I don't want to lead you.

15  A.      Yes, sir.

16  Q.      Let me ask some slightly more precise questions

17  Mr. Whiting, please.

18        Can you tell the ladies and gentlemen of the

19  jury who Mary Payne was?

20  A.      Marry Payne was like a godmother to Ms. Martin.

21  Ms. Martin took care of her in her later years, but in

22  earlier years she was like a mentor to Ms. Martin.   Ms.

23  Payne was a lady of some note in Washington, D.C. in

24  high fashion.   She had a lot of furs, clothing, and a

25  lot of generous male friends, and so she had property

1    and things of this nature, and she left the property to

2    Ms. Martin.

3         I happened to see Ms. Payne in the later years,

4    and but for Ms. Martin taking her in, bathing her,

5    wiping her and things of that nature, she would have

6    had no place to go. And not only Ms. Payne; it was a

7    lady who lived across the street from Ms. Martin,

8    Lucille. Ms. Martin also inherited property and moneys

9    from Lucille, and the reason that I'm aware of this is

10   because I tried to purchase Ms. Payne's house on

11   Fairmont Street through attorney Shannon, I think his

12   name is, with my G. I. Bill. I even went down and got

13   certified on my G. I. Bill to get it, but it was too

14   many repairs to be made on the property for me to go

15   forward with the project.

16   Q.    Okay. And so the ladies and gentlemen of the

17   jury are clear. I've never spoken to you before;

18   correct?

19   A.    No, sir.

20   Q.    I never told you about Mary Payne, have I?

21   A.    No.

22   Q.    Never told you about Lucille; correct?

23   A.    Yeah, Lucille.

24   Q.    Never told you about Mr. Shannon, did I?

25   A.    No.

1    Q.      And Mr. Hall didn't, did he?

2    A.      No.  Mr. Shannon knows me.

3    Q.      Going back to the beginning of your -- excuse

4    me.  Strike that.

5            If I could ask Mr. Hall a question, please.

6            THE COURT:  You may.

7            BY MR. MONTEMARANO:

8    Q.      The types of drugs that you received from or

9    shared with Ms. Martin were at all times small amounts?

10   A.      Yes, sir.

11           MS. GREENBERG:  Objection.  Leading.

12           THE COURT:  Sustained.

13           BY MR. MONTEMARANO:

14   Q.      Notwithstanding all of this, you still consider

15   Ms. Martin a friend, don't you?

16   A.      Absolutely.

17           MR. MONTEMARANO:  No further questions, Your

18   Honor.

19           THE COURT:  All right.  Any other cross by the

20   defendants?

21           All right.  Government.

22                        **CROSS-EXAMINATION**

23           BY MS. GREENBERG:

24   Q.      Mr. Whiting, let me start by outlining some

25   areas I think that we agree.  We agree that you've been

1  a drug dealer; correct?

2  A.      Yes, ma'am.

3  Q.      For most of your life.

4  A.      For a great part of my life.

5  Q.      We agree, don't sir, that Paulette Martin

6  distributed drugs to you; correct?

7  A.      She didn't distribute drugs to me.  We used

8  drugs together.

9  Q.      Okay.  She gave you the drugs that you used; is

10  that correct?

11  A.      On some occasions.

12  Q.      And you said it was a dozen to 18 occasions;

13  crack or powder in the last year or so; correct?

14  A.      No.  I said from the time that I was released

15  from prison.

16  Q.      In 1999?

17  A.      Yes, ma'am.

18  Q.      And it was either crack or powder?

19  A.      Yes, ma'am.

20  Q.      A dozen to 18 occasions.

21  A.      More or less.

22  Q.      And Ms. Martin knew you when you were a drug

23  dealer, because you've known her for 25 years; is that

24  correct?

25  A.      Yes.

1  Q.    So she knew about your times in jail, kept in

2  touch with you, things like that.

3  A.    Yes, ma'am.

4  Q.    In fact -- did you give us the notebook back Mr.

5  Hall?

6        MR. HALL:  Yes.  I placed it between you and Ms.

7  Johnston.

8        BY MS. GREENBERG:

9  Q.    I'll wait until Agent Snyder is finished.

10       In fact, during all those times that you --

11  strike that.  In fact, you testified that you graduated

12  from law school; correct?

13  A.    Yes, I did.

14  Q.    But you never practiced law.

15  A.    No.

16  Q.    And you never got a Bar license from the D. C.

17  Bar.

18  A.    No.  I took the Bar exam in the Virgin Islands;

19  I never took the Bar exam in D. C.

20  Q.    And you never practiced law.

21  A.    No, I didn't.

22  Q.    And here in the same notebook that Mr. Hall

23  showed you, Hayward 28, there is a reference to you

24  here, Reece C. Whiting, Jr. Is that your inmate number

25  where you were staying?

1   A.      That was where I was housed when I was arrested
2   in 1992.
3   Q.      And then, so that refers to you?
4   A.      Yes, ma'am.
5   Q.      And then underneath there, that federal inmate
6   number refers to you.
7   A.      Yes, it does.
8   Q.      Is this your handwriting?
9   A.      Is it my handwriting?  I don't know.  It's not
10  my handwriting.  I don't think so.
11  Q.      Do you recognize it as Ms. Martin's handwriting?
12  A.      I don't know whose handwriting it is.
13  Q.      Now, we talked about your -- talked a little
14  about criminal history with Mr. Hall.
15  A.      Yes, ma'am.
16          A JUROR:  Excuse me.  Could you move that board?
17          MS. GREENBERG:  Yes.  I'm going to go to the
18  board right now.  I'll move it back.
19          A JUROR:  We can't see the witness.
20          MS. GREENBERG:  Is that better?
21          MR. HALL:  Your Honor, may I move so I can see
22  what counsel is writing?
23          THE COURT:  Oh, sure.
24          MS. GREENBERG:  So, sir, first, I want to talk
25  to you about your first conviction when you were 28

1    years old, in 1968; is that correct?

2          MR. HALL:   Your Honor, I'm going to object if

3    counsel is going to write things on the board.  My

4    client can't see it from where he is.

5          MS. GREENBERG:   Sure.  I was just trying to give

6    the jury a better view, counsel, but if you want it

7    over here.

8          MR. HALL:   Write big.

9          BY MS. GREENBERG:

10   Q.    So, 1968; correct?

11   A.    That was when I was sentenced.

12   Q.    Okay.  That was for marijuana.

13   A.    Yes.  Smuggling.

14   Q.    Smuggling.  From Mexico?

15   A.    To the United States.

16   Q.    To El Paso, Texas; is that correct?

17   A.    Yes, ma'am.

18   Q.    If you could wait until I ask the question, and

19   then you can answer, okay?

20          And then, just to be clear, you got about three

21   and a half years with that sentence; correct?

22   A.    Yes.

23   Q.    Who was your supplier in Mexico?

24   A.    Jose Palmer.

25   Q.    How did you meet Mr. Palmer?

1  A.      I met --

2          MR. HALL:  Your Honor, I'm going to object.

3          May we approach?

4          THE COURT:   You may.

5                      (At the bar of the Court.)

6          MR. HALL:  Your Honor, I'm objecting because,

7  while I think it's perfectly proper for her to impeach,

8  and I certainly brought them out on my direct, I don't

9  think she can go into the details of the convictions as

10 far as factually what happened.  I think it's

11 sufficient that he's now impeached with these

12 convictions, but I don't think there's any provision

13 for her to go into anymore detail than that.

14         MS. GREENBERG:  It's a little bit more than

15 that, Your Honor.  One of the ways in which Mr. Whiting

16 assisted the conspiracy -- I'm going to get into a

17 phone call in the transcripts -- is by assisting Ms.

18 Martin and trying to obtain a supplier, and I want to

19 go through his background and show all the suppliers

20 that he was able to know, and connect those with the

21 convictions.   So, it goes to his -- the meaning of the

22 telephone calls and his ability to find suppliers.

23         MR. HALL:  Your Honor, that would be a supplier

24 from 1966.

25         MS. GREENBERG:   It's been his whole life, Your

1    Honor.

2         MR. HALL:  I know that.

3         MS. GREENBERG:  He started it, and I want to go

4    through --

5         MR. HALL:  I certainly am the one that brought

6    it out, but the fact is that I would suggest that who

7    his supplier was in 1966 has no relevance to whatever

8    it is --

9         THE COURT:  She's going to ask more than just

10   who the supplier was.

11        MR. HALL:  That's what she just argued.  That's

12   why I objected.

13        THE COURT:  I will overrule the objection.  She

14   intends to elicit the information with additional

15   questions.

16                    (Back in open court.)

17        THE COURT:  Ladies and gentlemen, while they're

18   going back to their tables, I have received your note

19   concerning availability for tomorrow.  I see everybody

20   is available.  One person will turn into a pumpkin at

21   4:30, and I will do everything I can to have minute

22   breaks and a one hour lunch and hopefully get us out of

23   here at 4:30 or else I will begin to turn orange with

24   you.  Thank you.

25        You may proceed.

1          BY MS. GREENBERG:

2     Q.        Thank you, Your Honor.

3          Mr. Whiting, your role back in 1968 -- and just

4     to be clear back.   Then, you were about 28 years old;

5     is that right?

6     A.        Yes, ma'am.

7     Q.        You were actually the one smuggling marijuana

8     into the country; correct?

9     A.        No.

10    Q.        You were assisting somebody in smuggling

11    marijuana?

12    A.        That's correct.

13    Q.        You got convicted of a felony --

14    A.        Yes.

15    Q.        -- in a federal court.

16    A.        Yes.

17    Q.        I've written on the board "federal felony

18    assisting importing marijuana; three and a half years;

19    Jose Palmer."   Is that right so far?

20    A.        Yes.

21    Q.        The second thing we have in the mid-1970s is you

22    were involved with Liddy Jones.

23    A.        That's correct.

24    Q.        What year were you convicted of that?

25    A.        '73, I think it was.

1  Q.      That, sir, just so the jury understands, was a

2  heroin conspiracy; correct?

3  A.      Yes.

4  Q.      The supplier was up in New York.

5  A.      Yes.

6  Q.      And you went to New York on behalf the Liddy

7  Jones organization.

8  A.      No.

9  Q.      You went on behalf -- you took over a gentleman

10 by the name of Deep Blue's role for Liddy Jones?

11 A.      You are correct, but I did not go New York.

12 Q.      You took Deep Blue's position, and Deep Blue's

13 position was to go up to New York; is that correct?

14 A.      That might have been Deep Blue's position, but

15 that was not my position.

16 Q.      Okay.  You took over his role in making

17 collections?

18 A.      That's correct.

19 Q.      And you collected about $20,000 to $30,000 in

20 drug proceeds per week?

21 A.      That's correct.

22 Q.      And then you got caught up in that drug

23 organization -- it was a heroin drug organization; is

24 that correct?

25 A.      Yes, ma'am.

1        MR. HALL:   Objection.

2        Asked and answered.

3        THE COURT:   Overruled.

4        BY MS. GREENBERG:

5   Q.    Just to be clear.  You moved up in the

6   organization before you were caught; is that correct?

7        MR. HALL:   Objection.

8        THE WITNESS:   That's the same position   I already

9   had.

10        MR. HALL:   Your Honor, I'm still objecting to

11   anything beyond the fact of conviction.

12        THE COURT:   Overruled.

13        BY MS. GREENBERG:

14   Q.    You took over Deep Blue's role; correct?

15   A.    That's correct.

16   Q.    The heroin came from New York?

17   A.    I don't know   the heroin came from.

18   Q.    And you collected $20,000 to $30,000 per week in

19   drug proceeds from Liddy Jones; is that correct?

20   A.    Yes.

21   Q.    We will write that part on here since we agree.

22   A.    Could I make a correction?

23   Q.    Sure.

24   A.    I did not collect the money for Liddy Jones.  I

25   collected the money   for Bobby Jones.

```
1   Q.      Bobby Jones was Liddy Jones' brother?

2   A.      That's correct.

3   Q.      And part of Liddy Jones' organization.

4   A.      I had collected for Bobby Jones.

5   Q.      He was part of Liddy Jones' organization?

6   A.      If you want to characterize it that way.

7   Q.      Was Mr. Jones convicted of this offense?

8   A.      And so was --

9           MR. HALL:  Objection, Your Honor.

10          MR. MONTEMARANO:  Objection.

11          Can we approach?

12          THE COURT:  Sustained.

13          MS. GREENBERG:  We'll put up Bobby Jones and the

14  Jones organization.  Is that fair?

15          MR. MONTEMARANO:  Objection, Your Honor.

16          MR. HALL:  Objection.

17          THE COURT:  What was the question?

18          MS. GREENBERG:  I'm writing on the board what he

19  told me, and I'm --

20          MR. MONTEMARANO:  Your Honor, I object and move

21  to strike.  Your Honor sustained the objection, and Ms.

22  Greenberg is going into the same material.

23          THE COURT:  I have already sustained the

24  objection on this, all right?

25          MS. GREENBERG:  Your Honor, I'm trying to
```

1    character ize the witness ' testimony .

2          MR. MONTEMARANO :   Objection .   Your Honor , this

3    is a speak ing objection .   We can do this at the bench .

4          THE COURT:    Come to the bench .

5                         (At the bar of the Court.)

6          MR. MONTEMARANO :   Your Honor , I in no way , shape

7    or form wish to steal Mr. Hall 's thunder -- this is Mr.

8    Hall 's client  -- but there is this issue -- we have now

9    spent  five minute s talk ing about a conviction  regarding

10   the Liddy Jones organization .   I don't know  anything

11   about  the Liddy Jones organization .   I didn't  represent

12   any of the codefendant s in the Liddy Jones

13   organization .   The most I know is that he was

14   represent ed by Mr. Ticknor , and Mr. Ticknor  is on

15   vacation,  in all candor , and going  into all this detail

16   might  be appropriate .   I don't mean to criticize  the

17   court, but it   might  be appropriate if Mr. Whiting  was

18   here on his own and was testify ing on his own , because

19   there is no spill over .   We have six other  defendant s

20   for whom  I think the spill over effect  is tremendous .

21         THE  COURT:   I have sustained  the objection .

22         MR.  MONTEMARANO :   Thank you , Your Honor .

23         THE  COURT:   We're not going to go into question s

24   about  other  people 's convictions .

25         MS.  GREENBERG:   Your Honor , the point we're at

1   is Mr. Whiting asked to make a correction.  He said, I

2   collected for Bobby Jones.  He had earlier said he

3   collected money for the Liddy Jones organization.

4          MR. WARD:  You said that.

5          MS. GREENBERG:   I corrected the chart, and he

6   said yes.  I corrected the chart, and I'm asking him if

7   that is now accurate because he asked to check his

8   answer, and I crossed it out and I wrote it up, and Mr.

9   Hall wanted him to see the chart and him to be able to

10  --

11         THE COURT:  Don't ask about someone else's

12  conviction.  Ask him whether you've written down

13  correctly --

14         MS. GREENBERG:   Your Honor, he's testified, and

15  we've given to counsel the court's opinion.   He

16  testified in this matter, so all of this has been

17  provided.  It's no surprise.  I'm trying to get the

18  chart --

19         MR. HALL:  However, can I point out that having

20  the appellate court opinion is not the same thing as

21  having read the transcript from those proceedings and

22  --

23         MS. GREENBERG:   Your Honor, I do have a good

24  faith basis to ask these questions.

25         MR. WARD:   What's the good faith basis?  The

1   rule says clearly that beyond the bare facts of the

2   conviction, there are only rare circumstances where you

3   are permitted to go further. She is offering no

4   rationale, just spreading all of this --

5          MS. GREENBERG:   Your Honor, we're revisiting

6   the issue we visited with Mr. Hall.

7          THE COURT:   What basis do we have too --

8          MS. GREENBERG:   We're done.

9          THE COURT:   If we're done, we're done.

10         MS. GREENBERG:   I'm trying to get the board back

11  so they don't object later.

12         MR. HALL:   If I could say one thing.  My

13  objection initially is, I'm objecting to any details

14  beyond the fact of the conviction, okay?  I think we

15  need to have a little bit of ground rules as to how far

16  the government is going to go with the two remaining

17  convictions or three -- two remaining convictions that

18  my client has, because I don't want to keep coming back

19  up here to the bench, either.

20         THE COURT:   If I understood Ms. Greenberg

21  correctly, she was asking questions beyond the

22  conviction because her contention is she was going to

23  get through questions that the person she was asking

24  about would be the persons he had introduced to Ms.

25  Martin.  Is that my understanding?

1    MS. GREENBERG:   Your Honor , one of the telephone
2  calls is where he talks to her about getting a
3  supplier . We've gone over this . Mr. Hall has gone
4  over his past criminal history . He has been involved
5  in the drug community for quite some time .
6       In connection with the Virginia organization , he
7  told the agents there were three suppliers he could
8  hook them up with . This was very close in time to the
9  conspiracy starting in this case in 1997 . In
10 connection with that , especially with the Virginia
11 conviction , it goes to show his ability to get a
12 supplier . It goes to explain those telephone calls
13 which are in evidence . I'm done with this . The
14 Mexican supplier is a large quantity of drugs . We've
15 already stipulated to most of that . I'm not going to
16 go into much more of that , but the Virginia conviction
17 I'm going to go into a lot of detail .
18      MR. HALL : Well , Your Honor , I'm going to have
19 to continue to object because , first of all , the
20 Virginia conviction he has is outside of the time
21 period of this conspiracy . What counsel is referring
22 to is a phone call that was played before this jury in
23 which my client inquires about a ticket and Ms. Martin
24 says there 's nothing . My client says , well there may
25 be something I can do about that , and that 's all .

1          There  is  no  specific  supplier  that  the

2   prosecution  is  going  to  show  that  my  client  knew  in  the

3   past  and  introduced  Ms.  Martin  to.

4          MS.  GREENBERG:   Judge,  he  can't  paint  the

5   picture  of,  I'm  a  poor  little  drug  quantity  and  got

6   drugs  from  Ms.  Martin,  when  he's  been  a  major  drug

7   supplier  all  his  life  --

8          THE  COURT:   I've  ruled  on  the  objection.

9   Proceed  to  the  next  question.

10                      (Back  in  open  court.)

11          BY  MS.  GREENBERG:

12   Q.      1973,  heroin,  $20,000  to  $30,000  for  how  long?

13   A.      I  don't  remember  the  duration  of  the  operation,

14   but  that's  what  we  did  every  week.

15   Q.      How  long  were  you  involved?

16   A.      How  long  I  was  involved  in  what?

17   Q.      Collecting  this.

18   A.      I  don't  remember  the  exact  length  of  time,  but

19   it  was  for  a  while.

20   Q.      A  week?   A  month?   A  year?   Years?

21   A.      It  was  more  than  a  month.

22          MR.  HALL:    Your  Honor,  I'm  going  to  object

23   again.

24          THE  COURT:   Overruled.

25          BY  MS.  GREENBERG:

1    Q.      Go ahead.   More than a month?

2    A.      It was more than a month.   I don't know  that it

3    was years.   It might have extended to a year, but it

4    was more than a month.

5    Q.      I'll put "approximately," okay?   So, is this

6    accurate so far?

7    A.      Yes, ma'am.

8    Q.      So we get to the third -- your third conviction

9    in 1984 regarding the Mexico conviction.   Sir, just to

10   be clear, what we're talking about here is stipulation

11   6.   So that was your arrest in November of 1984.   And

12   how long have you been out of prison for this -- this

13   Liddy Jones situation?

14   A.      Approximately  six years, I think.

15   Q.      How long was your conviction in '73?

16   A.      I think it was like about seven years, something

17   like that.

18   Q.      In Mexico that you were in possession of 7

19   kilograms, 743 grams of cocaine; correct?

20   A.      That's what I was convicted of.

21   Q.      The individual -- the stipulation  6 sets forth

22   that you got a sentence of eight years and three months

23   in custody and a fine of 400,000 pesos; correct?

24   A.      Yes, ma'am.

25   Q.      In connection  with the Mexican police coming to

1  the Hotel Century in Mexican City in response to an

2  anonymous complaint about you, they found you in Room

3  112 of the hotel in possession of the --

4         MR. MONTEMARANO: Objection, Your Honor.

5         THE COURT:  Wait a minute.  She hasn't finished

6  the question.

7         BY MS. GREENBERG:

8  Q.     In possession of a box marked "Rolling

9  Containers, Minneapolis, Minnesota;" is that correct?

10 A.     No, it's not correct.

11 Q.     That's the stipulation.

12 A.     I stipulated that.  Yes, that is the way it was

13 recorded there, but that is not what happened.

14 Q.     Okay.  So the stipulation where the Mexican

15 police testified, you say the Mexican police were

16 incorrect in their testimony?  Is that your testimony,

17 sir?

18 A.     Yes.

19 Q.     Further, that the Mexican police testified that

20 the box that you had contained cocaine and a scale.

21        Do you agree that that's what the box contained?

22 A.     I don't know what the box contained.  I did not

23 put the box in the room.

24 Q.     And do you disagree with the Mexican police that

25 you voluntarily gave the officers the box of cocaine?

1   A.       Yes.

2   Q.       This gentleman, Jorge Gonzalez.   The Mexican

3   police testified that you told them that Mr. Gonzalez

4   had sold you the cocaine.   Do you disagree with that?

5   A.       Yes, I do.

6   Q.       Mr. Gonzalez is somebody that you served jail

7   time with earlier; is that correct?

8   A.       That's correct.

9   Q.       So the Mexican police's testimony about Jorge

10  Gonzalez, you disagree with; correct?

11  A.       Yes.

12  Q.       You do agree that you served time with Mr.

13  Gonzalez; correct?

14  A.       Yes, I did.

15  Q.       You served time with him for which conviction?

16  A.       The '73 conviction.

17  Q.       In what jail?

18  A.       I think it was -- I think it was McNeil Island,

19  I think.

20  Q.       I'm sorry.   What?

21  A.       McNeil Island.

22  Q.       Where is that?

23  A.       Washington state.

24           MR. WARD:   This is waste of time.

25           BY MS. GREENBERG:

1    Q.      Washington   state?

2    A.      Yes, ma'am.

3    Q.      I forgot to put cocaine.  Your testimony is that

4    while you agree the Mexican police testified that Mr.

5    Gonzalez sold you the cocaine and Mr. Gonzalez was your

6    cell buddy back for this conviction, you said that

7    didn't happen?

8    A.      I'm saying this --

9           MR. HALL:  Objection, Your Honor.

10          THE COURT:   Overruled.

11          THE WITNESS:   I'm saying that Mr. Gonzalez was

12   not my cell buddy.  I'm saying that Mr. Gonzalez rented

13   the room at the Hotel Century.  My room was at the El

14   Presidential.   He invited me to that room to set me up.

15   Q.      And Mr. Gonzalez was not your cell buddy you

16   served time with.

17   A.      That's correct.   That's correct.

18   Q.      You are disagreeing with the stipulation   in

19   terms of that the Mexican  -- you're disagreeing with

20   the Mexican police.   You're saying they didn't tell the

21   truth when they said that you told them that Jorge

22   Gonzalez sold you cocaine.

23          MR. HALL:   Objection.

24          Asked and answered.

25          THE COURT:   Sustained.

1          BY MS. GREENBERG:

2  Q.      And the Mexican police also testified that you

3  had told them that you planned to transport the cocaine

4  back to North America.  And do you agree that you told

5  the Mexican police that?

6  A.      I did not tell the Mexican police that.

7  Q.      The Mexican police testified that you told them

8  that you had met Gonzalez in a United States prison,

9  and do you believe that that is what you told the

10 Mexican police?

11 A.      That is what I told the Mexican police.

12 Q.      So that part of what you told the Mexican

13 police, you agree with.

14 A.      I told the Mexican police that.

15 Q.      After you got out of jail from the Mexican

16 prison, you got transferred up to San Diego to finish

17 your sentence.  You got a prisoner transfer?

18 A.      Yes, ma'am.

19 Q.      And then you served approximately -- when did

20 you get out of jail from that conviction?

21 A.      I think '88.

22 Q.      An then your next conviction was in D. C. and

23 that was approximately September 30 of 1992.

24          MR. HALL: Objection, Your Honor.

25          May we approach?

1          THE COURT:   You may.

2                      (At the bar of the Court.)

3          MR. HALL:   I'm objecting to this conviction,

4   because I don't think it's an impeachable offense.   It

5   doesn't relate to honesty; it's a possession of a

6   pistol or something.

7          MS. GREENBERG:   Your Honor, it's a prior felony

8   conviction.   He was convicted of carrying a weapon in

9   1994.   It was a felony conviction of carrying a pistol

10  without a license in the District of Columbia.

11         THE COURT:   Carrying a pistol without a license

12  in D.C.?

13         MS. GREENBERG:   Yes.   It was a prior felony

14  conviction.

15         THE COURT:   What is your position?

16         MR. HALL:   My position is that this is not a

17  crime that reflects on his honesty and therefore is not

18  impeachable.

19         MS. GREENBERG:   Your Honor, it's a prior felony

20  conviction.

21         THE COURT:   Well, I conclude, under these

22  circumstances, that it should be admitted.   Its

23  probative value outweighs the prejudicial effect.   You

24  may proceed.

25          Overruled.

1                    (Back in open court.)

2           BY MS. GREENBERG:

3   Q.     Sir, we're getting to -- perhaps I should say

4   you have an eight-year sentence -- eight years and

5   three months.  When did you get out of jail from the

6   Mexican --

7   A.     I think it was '88.

8   Q.     You received a charge and subsequent conviction

9   based on your carrying a pistol without a license on --

10  on or about October 3, 1992 is when the offense

11  happened; is that correct?

12  A.     I think that was that date.

13  Q.     That was in Washington, D.C.

14  A.     Yes, ma'am.

15  Q.     And you were sentenced for that while you were

16  -- carrying the pistol in 1992.  You were sentenced for

17  that in approximately September 30 of 1994; is that

18  correct?

19  A.     I think so.

20  Q.     Would you like to see the judgment of conviction

21  to refresh your recollection?

22  A.     I accept your dates.

23  Q.     Now we're getting to the situation involving

24  your Eastern District of Virginia arrest.

25          Do you recall that?

1   A.      Yes, I do.

2   Q.      Specifically, that involved you recruiting

3   people to serve as couriers to go to Bangkok Thailand

4   and through Japan to bring back kilogram quantities of

5   heroin; is that correct?

6   A.      No, this's not correct.

7   Q.      You didn't recruit Rene Withers to import heroin

8   into the United States from Thailand?

9   A.      I recruited Rene Withers to go to Tokyo to pick

10  up heroin but not to Thailand.

11  Q.      So your testimony is that I'm just incorrect on

12  the place that she was going; is that correct?

13  A.      Yes.

14  Q.      Is it correct, sir, that on two occasions, Ms.

15  Withers, on your behalf, imported 8.4 kilograms of

16  heroin into the United States?

17  A.      Yes.

18  Q.      That's yes?

19  A.      Yes.

20  Q.      Is it also true, sir, that another person whom

21  you recruited was arrested in San Francisco, California

22  with a large quantity of cocaine -- of heroin?  We've

23  heard about that here through the chemist; correct?

24  A.      Yes, ma'am.

25  Q.      Her name was Bonita Freeman?

1   A.       That's correct.

2   Q.       She was arrested with heroin that you were

3   importing into the United States?

4   A.       Yes, ma'am.

5   Q.       Do you recall the amount of heroin?

6   A.       I do not.

7   Q.       We'll get that chemist's report in a second.

8           When you met with the -- you were arrested, is

9   it correct, in approximately March of 1994?

10  A.       No.  I thought the arrest was in '92.  I thought

11  the conviction was in '94.  I might be mistaken.

12  Q.       If you look at the -- when you were arrested,

13  did you meet with Special Agents Lacy Shelley Walker

14  and an AUSA by the name of John Ralig?

15  A.       Yes.

16  Q.       If I showed you the report of interview as to

17  that, would that refresh your recollection as to the

18  date?

19  A.       Yes, ma'am.

20  Q.       If I may have the next miscellaneous number.

21          MR. HALL:  May I see the exhibit?

22          BY MS. GREENBERG:

23  Q.       Showing you what's been marked as Miscellaneous

24  48 for identification purposes only.  Counsel, this is

25  just for refreshing his recollection.

1          Does that refresh the date and time that you
2    were arrested?
3    A.      Quite possibly, yes.
4    Q.      Is that the address you were living at?
5    A.      Yes, ma'am.
6    Q.      Does that refresh your recollection as to the
7    date that you were arrested?
8    A.      Yes, that's right.
9    Q.      That's March 28, 1994?
10   A.      Yes.
11   Q.      Is that correct?
12   A.      Yes, ma'am.
13   Q.      Sir, we're talking about the other individual,
14   Bonita Freeman, who brought in heroin and got caught in
15   San Francisco. Is it correct, sir, she was operating
16   on your behalf to bring heroin into the United States.
17          MR. HALL: Objection.
18          Asked and answered.
19          THE COURT: Overruled.
20          BY MS. GREENBERG:
21   Q.      This is in addition to the other individual who
22   we just talked about who went twice; correct?
23   A.      Yes, ma'am.
24   Q.      Now, Ms. Freeman. She's the one that you
25   testified went from Tokyo to San Francisco, and then

1    from San Francisco  to the Washington , D. C.  area ; is

2    that  correct ?

3           MR . HALL :   Objection , Your  Honor .   Basis  of

4    knowledge .

5           THE  COURT:   See  if  you --

6           BY MS.  GREENBERG:

7    Q.     Do  you  know  where  you  sent  her  to?

8    A.     Yes .

9    Q.     And  you  sent  her  to  Tokyo ?

10   A.     Yes, ma'am .

11   Q.     You're  aware  from  the  investigation   against  you

12   that  she  got  arrested  in  San  Francisco ;  correct ?

13   A.     Yes, ma'am .

14   Q.     And  you  were  suppose d  to  pick  her  up  at  the

15   Washington   National  Airport ;  isn't  that  correct ?

16          MR . HALL :   Objection .

17          Your  Honor , may  we  approach ?

18                      (At the bar of the Court.)

19          MR . HALL :   Your  Honor , I still  suggest  to  the

20   court  that  this  is  beyond  the  fact  of  the  conviction

21   and  the  specific  facts  that  came  in  as  404 (b)  that  any

22   further  level  of  detail  is  not  appropriate .

23          MS.  GREENBERG:   Your  Honor , I'm  reading  from  the

24   stipulation .

25          MR . HALL :   Okay .

1        MR. MONTEMARANO : Your Honor, while Mr. Hall is

2  reading, I would once again press the issue of

3  spillover effect from the parties. When Mr. Whiting's

4  attorney and the government first came to the bench,

5  the government claimed they were going to be

6  establishing his ability to obtain suppliers. I've

7  heard the word "supplier" not at all. We're talking

8  about couriers. We're talking about mules. We're

9  talking about whether or not he had a gun.

10        With all candor, Judge, all the government has

11  to say is, did you had a supplier in this one --

12        MS. GREENBERG:  I'm about there in three

13  questions, Your Honor, for this conviction. I did it

14  for every other conviction --

15        MR. HALL : Let me point out one other thing.

16  This comes in in other possible ways. It comes in as

17  the 404(B) -- well, it's already been introduced as

18  404(b). If what counsel is now trying to do is impeach

19  my client with this conviction, I would suggest to the

20  court that even though it may be here as 404(b), that

21  level of detail is not necessary for the impeachment,

22  and that if it is being used again as 404(b), then a

23  cautionary instruction should be given.

24        MS. GREENBERG:  Your Honor it's 609 and 404(b)

25  and there's tons of cases which talk about evidence

1  being admissible under both bases.  I'm reading from

2  the stipulation facts that's already been read to the

3  jury, and I'm about to go into the issue about the

4  suppliers that Mr. Montemarano mentioned.

5         MR. HALL:  The stipulated --

6         MR. MONTEMARANO:  Your Honor?

7         MR. HALL:  Let me finish.  The stipulated facts

8  came in for a very specific purpose under a very

9  specific set of rules.

10         MS. GREENBERG:  Again, we're getting back to the

11  same situation.  It was portrayed in the defense case

12  as this old man that bought drugs from Paulette Martin

13  and just used cocaine, and now we're talking about

14  somebody who has a major connection to drugs in Japan

15  and Thailand, a completely different picture, and the

16  government is entitled to go into this.

17         MR. HALL:  At a completely different time

18  period.

19         MR. MONTEMARANO:  Different century.

20         THE COURT:  Ladies and gentlemen, it's five

21  minutes of five.

22         MR. HALL:  I know.

23         THE COURT:  I think we can sleep on this one

24  overnight and resume tomorrow morning.  I'll send the

25  jury home.

1          Can you let me have a copy of the stipulation?

2          MS. GREENBERG:   Sure.   Your Honor, this has

3  already been admitted in evidence.

4          THE COURT:   Is it in the books?

5          MS. GREENBERG:   Yeah.   It should be, but we can

6  make you a copy.

7          THE COURT:   I've got so much stuff back here, I

8  don't know what I'm doing.

9          MS. GREENBERG:   Yeah.   If I say it's in the

10  book, it won't be in the book.

11          The other thing to think of, they went back 25

12  years with Ms. Martin.   This is the time period he said

13  he was very close with Ms. Martin.

14          MR. HALL:   Could I -- I wanted to give you two

15  cases, Your Honor, if I may.

16          THE COURT:   Okay.

17          MR. HALL:   U. S. versus Pandozzi.

18          THE COURT:   How do you spell it?

19          MR. HALL:   P A N D O Z Z I.

20          MS. JOHNSTON:   Perhaps we could do this in open

21  court.

22          THE COURT:   Yeah.   We could do that, too.

23                    (Back in open court.)

24          THE COURT:   Ladies and gentlemen, we're going to

25  recess for the day now; I have a few other matters I

1   can deal with once you've gone.  We will see you

2   tomorrow morning.  We should be starting at plus or

3   minus five minutes of 9:30, so we will see you then.

4   Thank you very much.

5                    (Jury excused at 4:59 p.m.)

6         THE COURT:  Counsel --

7         MS. GREENBERG:  Your Honor, I would --

8         THE COURT:  Wait.  Wait.

9         MS. GREENBERG:  Your Honor, I would appreciate

10  --

11        THE COURT:  Counsel --

12        MS. GREENBERG:  Your Honor, I would appreciate

13  Mr. Whiting not being present for the argument on my

14  cross-examination.

15        THE COURT:  I'm not going to argue about it now.

16        MR. MONTEMARANO:  He has a right to be here.

17        MR. HALL:  He has a right to be here, Your

18  Honor.

19        MR. MONTEMARANO:  It's his trial.

20        THE COURT:  I'm not arguing about it here.  I

21  want to have Mr. Hall simply give me the citations of

22  the cases he want me to review.

23        MR. HALL:  Fine, Your Honor.  Are you ready?

24        THE COURT:  Yes.  Mr. Krinsky is going to take

25  them down, because I'm having a hard time writing.  I'm

1  typing, but I'm not writing.  My law clerk is -- please

2  give the citations of the cases you would like me to

3  review.

4          MR. HALL:  United States versus , 878 F 2d, 526.

5  It's a 1989 case; and United States versus Albers, A L

6  B E R S, 93, F 3d, 1469.  That's a Tenth  Circuit case

7  in 1996.

8          MS. JOHNSTON:   The first case was from what

9  circuit?

10         MR. HALL:  The first one was from the First.

11         THE COURT:  I'll look at those authorities

12 overnight, and we can resume tomorrow morning.

13         Mr. McKnett, you have issued about some

14 subpoenas to some Pretrial Service s people who are both

15 unhappy.

16         MR. MCKNETT:  Actually, the supervisor is

17 unhappy.

18         THE COURT:  I don't know if Ms. Johnston knows

19 what the nature of this is all about, or Ms. Greenberg.

20         MS. JOHNSTON:  We don't.

21         THE COURT:  Is this something you can stipulate

22 to?  Can you talk to each other?

23         MR. MCKNETT:  Actually, no, Your Honor.

24         May I approach?  I would prefer to approach out

25 of the presence of the government, because it pertains

1    to testimony of my witness .

2         MR. MONTEMARANO :   17C.

3         THE COURT:   We will do that once I've recessed

4    for the day .  If there's something you can stipulate

5    to, fine .  If you can't , that's fine .  But I have

6    unhappy Pretrial Services people , and I need to take a

7    look at it.

8         MS. JOHNSTON:   Your Honor , we would like to be

9    heard in terms of those witnesses and what the issues

10   are .   I think we have a right to be heard .

11        THE COURT:   You will be heard .

12        MR. MCKNETT :   If I understand the contents of

13   the letter correctly -- I haven't seen it -- the

14   government has no role in the position of that agency .

15        THE COURT:   I understand .  I wanted to know  if

16   this is something that could be done by stipulation .

17        MR. MARTIN :  Your Honor , I have something  --

18        MS. JOHNSTON:   Your Honor , we also need to know

19   who are witnesses for tomorrow and what order , so we

20   can prepare .

21        THE COURT:   Counsel , please comply with my

22   directives .  I'm assuming Mr. Goodwin is going to be a

23   witness tomorrow in the absence of some issue

24   concerning his dental condition in the case he can't

25   speak .

1          MS. JOHNSTON:   Where do we go from there, Your

2  Honor?

3          MR. WARD:   I anticipate  I will be producing

4  testimony  tomorrow.

5          THE COURT:   And you please  provide --

6          MR. WARD:   What?

7          THE COURT:   Please  provide  the names to the

8  government.

9          MR. WARD:   I will, Your Honor.

10          MS. JOHNSTON:   Your Honor, we would  like those

11  before  we leave  the courthouse  today.

12          MR. WARD:   You will get them before  you leave

13  the courthouse.   You will get them before  you leave  the

14  courtroom, all right?

15          THE COURT:   That's been taken care of.

16          How about  Mr. Mitchell?   Have you provided

17  information?

18          MR. MITCHELL:   Your Honor, I don't have  any

19  witnesses except  regarding  Mr. -- Sergeant  Sakala.

20          THE COURT:   Okay.   All right.   So the next --

21          MR. MITCHELL:   But I may have  --

22          THE COURT:   The next batch of witnesses will be

23  from Ms. Dobie; right?

24          MR. MITCHELL:   Yes.

25          THE COURT:   Then tomorrow  we will continue  with

1  the testimony of Mr. Whiting, resolve and finish that

2  up. Are there any additional witnesses to be called?

3       MR. HALL: Your Honor, I have character

4  witnesses that I was going to call. My secretary was

5  trying to -- because they both work, she was going to

6  see if they would be available tomorrow morning.

7  They're under subpoena, but I haven't had a chance to

8  go out and check to see if --

9       THE COURT: Give those names to the government.

10       MR. HALL: They already have them. They've had

11  them.

12       THE COURT: So then the bottom line is, in the

13  absence of there being some scheduling snafu, we're

14  going to finish with Mr. Whiting; we will have two

15  character witnesses; we will then skip over to Mr.

16  Ward, who will be calling his client's witnesses.

17       MR. WARD: I, frankly, think that's going to

18  take us most of the day -- through most of the day.

19       THE COURT: Well, what will take most of the

20  day?

21       MR. WARD: I think with what we have so far,

22  that will be most of the day.

23       THE COURT: You don't think we will reach any of

24  your witnesses tomorrow?

25       MR. WARD: No. I think we will. But to quote

1    the government , it depends  on the  cross-examination  .

2         THE  COURT:   Yes .  It also  depends  on who  cross

3    examine s.

4         MR.  WARD:   I think  the  government  will  have

5    cross-examination  .

6         MR.  MONTEMARANO :  Your  Honor , that 's an issue

7    the defense  would  like  to  be  heard  on  through  Mr.

8    Martin .

9         MR . MARTIN :  Yes , Your  Honor .  My concern  here

10   is that  as  the  government  is  allow ed  to  get  into  this

11   extrinsic  evidence  on  not  only  the  prior  convictions

12   but  who  was  involve d, , what's  happening  now -- it's

13   already  stipulate d to .  The  sand  is  run ning  out  of the

14   glass , because  all we are  hear ing from  the  defense  side

15   of the  table  is , well  don't  worry .  We're  going  to be

16   finish ed by X date .  Don't  worry .  We  understand  that

17   you've  got  other  obligations .  Well , these  people  --

18   I've  said  this  repeat edly  --

19        THE  COURT:   Mr. Martin , we will  come  back  after

20   a two-week  gap .  That 's all .

21        MR . MARTIN :  I'm  concerned , Your  Honor , because

22   my examination  was  truncate d.   I want ed to  get  into

23   thing s that  I thought  was  important  to my examination .

24        THE  COURT:   I don't  want  any  counsel  to feel

25   inhibited  about  doing  a  thorough  job  for  their  client

1    on either side.   That does not mean I should not have

2    some concerns about the calendar, and I'll exercise

3    appropriate restraint on myself and on the counsel for

4    the parties, but I'm by no means saying people should

5    truncate things because of some objective to get done

6    by August 11.   I certainly believe, based upon what

7    I've seen, it's reasonable to get done by August 11.

8    But if we can't, we can't.   And if due process or

9    anything else requires more than that, we'll do that.

10           MS. GREENBERG:   Your Honor, just for the record,

11   I think I started my cross-examination between 4:20 and

12   4:30.   Half of that time was spent at the bench.

13           MR. WARD:   It was actually 4:23.   I made a note.

14           THE COURT:   Anything else, counsel?

15           MR. MONTEMARANO:   I hope you feel better.

16           THE COURT:   I'm going to go home now.   Thank

17   you.   See you tomorrow morning.

18           MS. JOHNSTON:   Your Honor, the government would

19   request that Mr. Whiting be housed separately from the

20   other defendants during the time while he's on the

21   stand on cross-examination, in particular.

22           MR. HALL:   Your Honor, my client is housed in La

23   Plata.   I'm not sure there's anybody else down there

24   with him.   I know a lot of these folks are housed in

25   Upper Marlboro.

1          MS. JOHNSTON:   I don't know where they're

2 housed.

3          THE COURT:   Is there anybody else in the same

4 place?

5          U.S. MARSHAL:   He is housed with another

6 defendant.

7          THE COURT:   Which one?

8          U.S. MARSHAL:   Mr. Bynum.

9          MR. HALL:   Considering my client doesn't know

10 Mr. Bynum --

11          THE COURT:   Can we keep them separated in La

12 Plata?

13          U.S. MARSHAL:   I'll see to it.

14          THE COURT:   All right.   We'll do that.

15          MS. JOHNSTON:   Thank you, Your Honor.

16                 (Off the record at 5:07 p.m.)

17

18

19

20

21

22

23

24

25

1                          **CERTIFICATE**

2

3          I, Tracy Rae Dunlap,   RPR, CRR, an Official Court

4   Reporter for the United States District Court of

5   Maryland, do hereby certify that I reported, by machine

6   shorthand, in my official capacity, the proceedings had

7   and testimony adduced upon the Jury Trial Proceedings

8   in the case of UNITED STATES OF AMERICA versus PAULETTE

9   MARTIN, et al, criminal Action Number     RWT-04-0235 on

10  July 27, 2006.

11

12         I further certify that the foregoing    276 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17         In witness whereof, I have hereto subscribed my

18  name, this 2 8th day of April 2008.

19

20

21                        _____

22                        TRACY RAE DUNLAP, RPR, CRR
                          OFFICIAL COURT REPORTER
23

24

25