```
1                UNITED STATES DISTRICT COURT OF MARYLAND
                           SOUTHERN DIVISION
2
        ------------------------------x
3       UNITED STATES OF AMERICA     :
                    Plaintiff        :
4                                    :
                                     :
5       vs                           :Criminal Action:RWT-04-0235
                                     :
6                                    :
        PAULETTE MARTIN, et al       :
7                   Defendants.      :
        ------------------------------x
8

9                                    Thursday, August 3, 2006
                                     Greenbelt, Maryland
10
                The above-entitled action came on for a Jury Trial
11      Proceeding before the HONORABLE ROGER W. TITUS, United States
        District Judge, in courtroom 4C, commencing at 9:34 a.m.
12
                THIS TRANSCRIPT REPRESENTS THE PRODUCT
13              OF AN OFFICIAL REPORTER, ENGAGED BY
                THE COURT, WHO HAS PERSONALLY CERTIFIED
14              THAT IT REPRESENTS THE PROCEEDINGS AS RECORDED
                AND REQUESTED.
15
                APPEARANCES:
16
                On behalf of the Plaintiff:
17
                DEBORAH JOHNSTON, Esquire
18              BONNIE GREENBERG, Esquire

19              On behalf of the Defendants:

20              MICHAEL MONTEMARANO, Esquire
                ANTHONY MARTIN, Esquire
21              MARC HALL, Esquire
                TIMOTHY MITCHELL, Esquire
22              PETER WARD, Esquire
                EDWARD SUSSMAN, Esquire
23              HARRY MCKNETT, Esquire

24
        Tracy Rae Dunlap, RPR, CRR              (301) 344-3912
25      Official Court Reporter
```

```
 1                    I N D E X

 2                    DIR  CROSS    REDIR      RECROSS

 3
      Chris Sakala         16       111        170
 4

 5    Lisa Spinnicchio    175  179  183

 6
      Nicki Snook         184  188  189
 7

 8    Ulysses Garner, Jr  192

 9

10

11

12

13

14

15

16

17

18

19

20

21

22                                        Page

23    Reporter's Certificate             241

24    Concordance                        242

25
```

1          MR. MONTEMARANO:  If I could approach, Your Honor, ex

2     parte on an administrative matter.

3          THE COURT:  What's that?

4          MR. MONTEMARANO:  This is a subpoena.  Harry, when he

5     speaks to the reporting service, will find out the name

6     precisely of the person who transcribed it, the subpoena you

7     wanted us to issue for the person who transcribed our calls.

8     We don't know precisely who it was.  We know the name of the

9     head of the company.  We will fill that in and make the

10    copies and all that stuff.  Is that acceptable?

11         THE COURT:  As long as you say you will fill in the

12    name.

13         MR. MONTEMARANO:  We will find out who it is.  I

14    don't want to put down Teresa Campopheles [ph.].  Why don't

15    you just put approved in the corner.

16              (Back in open court.)

17         THE COURT:  Counsel, first of all, have you had a

18    chance to look at the jury grid?  Unless I hear something

19    different, I'm not going to do anything about it now.  I want

20    to see where we are next week, but if it looks like there's a

21    very strong chance that the deliberations would have to carry

22    to the following week, we may want to excuse Juror 9, who has

23    all kinds of issues, but I don't want to do that yet because

24    we might have something else come up that's unforeseen that

25    might require that we keep him.

1           I anticipate being able to give to you revised draft

2     jury instructions by tomorrow morning.  I have them back, but

3     I'm reviewing them now.

4           MS. GREENBERG:  Judge, when you have a few minutes,

5     either during one of the breaks today, or if we can come back

6     early, I just have changing to as, an, or that I noticed in

7     reviewing the instructions.        THE COURT:  If you want to

8     let Mr. Krinsky if it's not substantive.

9           MS. GREENBERG:  Should I tell Mr. Montemarano also in

10    case he has an objection?

11          MR. SUSSMAN:  Along that line, Judge.  We've been

12    working on a memorandum on the 843, the communications count,

13    and we'll have that submitted either late today or first

14    thing tomorrow.

15          THE COURT:  I don't know if I'm going to do anything

16    to these instructions.  I really need to get them done to

17    make sure anything you need me to do I get done, too.

18          Now, what is the best guesstimate right now of

19    counsel as to where we are in terms of first naming

20    testimony?  It seemed to me things were going along pretty

21    quickly with Sergeant Sakala, and we -- it sounds to me like

22    we should finish him up this morning.  Am I unrealistic in

23    that?

24          MR. WARD:  That depends on redirect, Your Honor --

25    length of redirect, Your Honor.

1              THE COURT:  Right.  It seems to me we ought to be

2       able to get him done this morning and then we go to Mr.

3       McKnett's client's case.  Is that going to take the rest of

4       today and tomorrow morning?

5              MR. MCKNETT:  I think today would be optimistic, but

6       before the end of the day tomorrow.  We're leaving at 4:30

7       tomorrow; is that correct?

8              THE COURT:  If not earlier.

9              MR. MCKNETT:  I would think that tomorrow morning

10      before lunch, we should be finished.

11             THE COURT:  All right.  If that's the case, I don't

12      know if the government anticipates or has made a decision

13      about any rebuttal witnesses or not.  Do you have any

14      anticipation of rebuttal?

15             MS. JOHNSTON:  Your Honor, I think we will be calling

16      two witnesses, maybe three.

17             THE COURT:  Short?

18             MS. JOHNSTON:  We'd like to think that they're short,

19      but I can't speak to that.

20             THE COURT:  I'm still optimistic that we can get the

21      testimony done this week, or at the worst, Tuesday morning.

22      What I'm contemplating is that if we can get it done, then I

23      can start with the charge first thing Tuesday morning, and we

24      can have closing arguments all day and off the jury goes with

25      this case on Wednesday.

1           MS. JOHNSTON:  Your Honor, I don't think you're going

2     to finish closing arguments and instructions in one day.  I

3     think it would be a little bit much for the jury to listen to

4     eight lawyers argue the case after they listened to the

5     Court's instructions.

6           THE COURT:  What I'm thinking is that if we don't

7     finish up all testimony today, but we do finish it up Tuesday

8     morning, that I can instruct on Tuesday and the closing

9     arguments would be Wednesday.  And just Wednesday.  I don't

10    see any reason why it should be more than one day for this

11    case.  Mr. Montemarano?              MR. MONTEMARANO:  Inasmuch

12    as we may see government rebuttal witnesses by lunchtime

13    tomorrow, could we have identification of them per the

14    Court's --    THE COURT:  Oh, sure.

15          MS. JOHNSTON:  I haven't finally decided who I'm

16    going to be calling.  As soon as we make that decision -- we

17    have to hear the rest of the defense case before we make that

18    decision.

19          THE COURT:  I'm not going to require that if they

20    haven't heard the whole defense case.  Then we have the one

21    remaining issue was Mr. Ward's question about questioning on

22    the log and --

23          MR. WARD:  Your Honor --

24          THE COURT:  I think Sergeant Sakala should be excused

25    for this discussion.

```
 1              MR. WARD:  I think so.

 2              THE COURT:  Mr. Ward.

 3              MR. WARD:  Your Honor, what the -- what I am asking

 4    him about in the log is not admitted for the truth of

 5    content.  It's simply admitted to show why he took the action

 6    that he did, why he formulated the opinion that he has

 7    expressed in this courtroom and --

 8              THE COURT:  Now, let me make sure I'm clear.  The

 9    opinion you're referring to is his translation of the use of

10    the word "hammer" to mean gun.

11              MR. WARD:  Which results in the statement that my

12    client was carrying a gun.

13              THE COURT:  Right.

14              MR. WARD:  Yes.

15              THE COURT:  Let me just be a devil's advocate for you

16    for one second.  Is there anything inconsistent about his

17    opinion that when the word "hammer" was used to mean gun,

18    would the fact that some other conversation may indicate that

19    the reference to the word "hammer" was, in fact, about a gun

20    but they were joking?

21              I mean, isn't joking different than the question of

22    whether "hammer" really means the thing you put nails in

23    with?  I mean, that's the opinion you're testing.  The

24    opinion you're testing is was he correct when he said the

25    reference to a hammer was to a gun.
```

1          MR. WARD:  Yes, I understand that.  But what is
2     before the jury now is that the statement that my client was
3     shaking because she was something about pulling the trigger
4     on the gun she was carrying, it seems to me that, first of
5     all, he has testified that he, daily, starting at six a.m. in
6     the morning, went through all of these logs and went through
7     all of the incoming calls, and I suggest adopted what is in
8     the logs because he said I listened to the calls, I made sure
9     that the logs were correct, and I only made 12 corrections in
10    10,000 -- over 10,000 calls.

11         But in any event, it seems to me that if one were to
12    factor in his thought processes in reaching his opinion, the
13    fact that the reference was a joking reference, then that
14    certainly affects his opinion and ought to affect his
15    opinion.

16         THE COURT:  Well, what I'm assuming is there's no
17    question, even with the additional portion of the log you're
18    referring to, that the reference to hammer, in fact, meant a
19    gun.  What you're saying, though, is that while the
20    conversation did mention a hammer, that which was correctly
21    translated to mean a gun, that that reference to the gun was
22    a joking reference, but it nevertheless was to a gun.

23         MR. WARD:  Your Honor, we cannot take one word out of
24    context.  We cannot take the word "hammer" and say that that
25    means gun, and consider that simply out of context.  That was

1    not the way he offered his opinion.  His opinion was that

2    meant hammer -- meant gun in the context of the conversation.

3         It seems to me that if the context of the

4    conversation -- that is the balance of the conversation is in

5    question -- then is a factual question for the jury to decide

6    as to whether or not my client was, in fact, carrying a gun.

7    I mean, I don't think we can parse out just the one word.  If

8    he was put on the stand and asked what does the word "hammer"

9    mean to you, and he says, well, this is a -- since it's a

10   drug case, hammer means gun.  That's one thing.

11        THE COURT:  Did he opine that she was -- by that

12   statement, it meant she was, in fact, carrying a gun?

13        MR. WARD:  I'm not sure he exactly said that, Your

14   Honor, but we have to be realistic.  That was the import of

15   what he said, and that's certainly what the jury is going to

16   argue -- the government is going to argue to the jury, that

17   you heard that this woman was carrying a gun.

18        THE COURT:  All right.  Let me hear from Ms.

19   Johnston.

20        MS. JOHNSTON:  Your Honor, first of all, Agent

21   Sakala's testimony in court was not based on what was in the

22   logs.  It was based on his review of all of the calls.  He

23   said that he reviewed the log each day and he was

24   particularly looking to see whether they had misidentified

25   parties to the calls, because some of the monitors weren't

1     familiar with the calls, and that he would then review the

2     calls and pull those that he thought were pertinent and put

3     them in to begin the process of getting transcribed by

4     somebody.

5          He relied upon the recordings in making his opinions,

6     not only what is in the log.  He has never said he relied

7     upon what was in the logs to interpret the calls, but rather

8     he used the recordings.  In fact, he said that the people who

9     prepared the first round of transcripts did not have the logs

10    and didn't use the logs when they prepared the first round of

11    transcripts.

12         So this notion that somehow Detective Sakala adopted

13    the summary of the notes that the monitor makes in realtime

14    on that log to give a little synopsis of what the

15    conversation is about.

16         THE COURT:  Let me ask you this:  I assume one of the

17    things that Mr. Ward is trying to get before the jury is that

18    while the reference to a hammer in the context of the

19    conversation that he gave an opinion about correctly

20    identified it as meaning a gun, that when you take into

21    account the conversation, the log of which we're discussing,

22    the log maker indicated, if I recall -- I don't have it in

23    front of me right now, but the log maker indicated that they

24    had been joking about it.  Would not -- we have the call

25    available to play, and those who play it can opine as to

1      whether it was a joke or not.

2              MS. JOHNSTON:  Your Honor, the log cannot be used to

3      impeach Agent Sakala because what he interpreted that call,

4      all he said was the reference to hammer in that call refers

5      to a gun.  He did not opine an opinion about whether this was

6      a real incident or not.  He simply said that hammer means

7      gun.

8              Counsel through Ms. Dobie got out the fact that that

9      was a joke, that she had a conversation with Ms. Martin and

10     they joked about it.  There's nothing to cross-examine Agent

11     Sakala about in terms of his interpretation of the call.  It

12     was very simply put.  He has not given any opinions in this

13     courtroom based upon what is in the log.

14             His opinions have been based upon listening to the

15     actual recordings.  Quite simply, because what is in the log

16     in terms of the synopsis may or may not be accurate as he

17     testified yesterday, that that is a synopsis that somebody

18     makes in realtime as they're listening to the call, and it's

19     not Agent Sakala.

20     So, the log itself is not admissible.

21             THE COURT:  Okay.  Let me hear Mr. Ward.  Your reply?

22             MR. WARD:  Your Honor, I'm not saying the log itself

23     is admissible for truth of content otherwise.  It's not.  All

24     I'm saying is he has -- first of all, he listened to all the

25     logs -- I mean, all the telephone conversations and he read

1    the logs.  He's already said that and he conformed one with

2    the other to make sure that they were correct.

3              MS. JOHNSTON:  Objection.  That's not what he said.

4    He did not conform the logs to match the calls.

5              THE COURT:  I think when he was on the stand, he

6    insisted on looking at the log to verify the date and time of

7    the call and the speakers.

8              MS. JOHNSTON:  Absolutely, Your Honor.

9              MR. WARD:  And he made corrections, for example, when

10   he saw that there was an inaccurate name in the logs.  So he

11   did go through them and he did do them, but what I'm saying

12   is he has based his opinion on this one particular call, 289,

13   and the conversation that is the actual conversation that was

14   recorded.  What I'm saying is, Sergeant -- here there was

15   another piece of evidence out there that you should have

16   looked at because that would have affected your opinion or

17   should have affected your opinion.

18             THE COURT:  Isn't that other piece of evidence out

19   there the recording of the call that's referenced on the log

20   that you're going to play?

21             MR. WARD:  The recording and the log itself, because

22   the log itself was what would prompt him, I suggest, together

23   with the recording to consider that.

24             MS. JOHNSTON:  Your Honor, the problem with it is

25   Agent Sakala never offered an opinion as to whether this was

1    a serious conversation or joking conversation.  His only

2    opinion was that hammer is a term that is used to refer to

3    gun.  That was the extent of his opinion.

4           MR. WARD:  Your Honor, if the government would

5    stipulate or agree with me that we can tell the jury that

6    there were two conversations about a gun, one in which there

7    was joking and one that was apparently not joking, and not

8    argue had that, in fact, she was carrying a gun, I'd be

9    willing to enter into a stipulation to that effect.

10          MS. JOHNSTON:  Your Honor, the government is not

11   entering into any stipulations.

12          MR. WARD:  Of course not.

13          MS. JOHNSTON:  Because first of all, we don't

14   necessarily agree with what Mr. Ward has said.  Second, he

15   has already brought it out through his client, Ms. Dobie,

16   that -- the substantive evidence.  What he's trying to do

17   here is not attack Agent Sakala's opinion that he gave in

18   reference to the call that hammer is a gun.  Instead, he's

19   trying to introduce substantive evidence to establish that

20   that call was not -- that call does not demonstrate that Ms.

21   Dobie possessed a gun and the Court's not permitting them to

22   introduce these calls for that purpose at this time.  He had

23   an opportunity.

24          THE COURT:  All right.  I'm going to -- this is a

25   relatively close one, but I think I'm going to conclude that

 1      there should not be further examination about the log, if the
 2      recording is going to be played as I understand it is.
 3      Sergeant Sakala has based his opinion on all of the calls and
 4      the opinion that he's given that the reference in this call
 5      was to a gun can be tested by reference to this other
 6      conversation in which the reference to a gun was described as
 7      being a joke and he can be asked about that.
 8              If the entire recording were not available to be
 9      played, I might have a different view.  But the log is not
10      his document, he didn't prepare it, it was not purporting to
11      be a transcript.  It had some characterizations of the call
12      that aren't his, so I think that with the caveat that I am --
13      it's been represented to me that the entire call will be
14      played and that the jury itself can listen to that call and
15      decide whether it was a joking reference or not, that's going
16      to be my ruling.
17              MS. JOHNSTON:  Your Honor, I would ask preliminarily
18      that Mr. Ward in his questioning of Agent Sakala not
19      reference his opinion -- previous opinion improperly as the
20      government has indicated and think as the Court agrees, Agent
21      Sakala's opinion was limited to what the word "hammer" meant.
22      So Agent Sakala didn't give an opinion about whether it was a
23      real threat or whether she actually possessed a gun, and in
24      previous questions, Mr. Ward has referenced an improper
25      opinion that Agent Sakala --

1            THE COURT:  My recollection is the same as the
2       government's, that all he said was the reference to hammer
3       was that it was a gun.
4            MR. WARD:  Your Honor, is the Court telling me that I
5       cannot examine him about that word in context?
6            THE COURT:  You certainly can examine him about it.
7            MR. WARD:  Pardon?
8            THE COURT:  You certainly can examine him, but I'm
9       saying, what the prosecutor is saying, which I concur in, is
10      I don't think you should say, didn't you give an opinion of X
11      when he didn't give an opinion of X.  The opinion he gave was
12      the reference in that conversation to a hammer was a
13      reference to a gun, and you can test that and test that all
14      you want with this other recording or anything else you want
15      to test him with and that's fine.  You ready for the jury?
16      All right, bring them in.
17           MR. HALL:  I just wanted to tell the Court something
18      that -- while she's bringing the jury in.  It's not pertinent
19      to Sergeant Sakala's testimony, so we can do it at a break.
20           THE COURT:  All right.  We'll do it at a break.
21      MS. JOHNSTON:  Your Honor, we also have a matter to bring up
22      with the Court when we have an opportunity.      THE COURT:
23      I'll take a 20-minute recess and we'll take five minutes.
24           (Witness resumes the stand at 9:54 a.m.)
25           (Jury returns at 9:54 a.m.)

1    THE COURT:  I think I see 15 heads now.  You may

2    proceed.

3                    **CONTINUED CROSS-EXAMINATION**

4    BY MR. WARD:

5    Q.    Good morning, Sergeant Sakala.

6    A.    Good morning.

7    Q.    Yesterday we were discussing calls B284 and B289.

8    You recollect that?

9    A.    Yes.

10   Q.    And in particular, with respect to 289, I focused on

11   one statement, and this is at Page 0032.  It's a portion of

12   that long paragraph near the bottom.

13   A.    I don't have a book, Mr. Ward.

14   Q.    Oh, I'm sorry.  Do you mind sharing mine?  Actually,

15   it's not mine.  I'm borrowing it, too.  I'm talking about

16   this part here where Ms. Martin is talking to apparently

17   Learley Goodwin; right?

18   A.    Yes.

19   Q.    Oh, you've got your own set now.

20   A.    Thank you.

21   Q.    Let me know when you've reached that --

22   A.    Page 32, was it?

23   Q.    Page 32, yes, right near the bottom.

24   A.    I have it.

25   Q.    This was played for the jury, quote, he said -- I'm

1    beginning about the fourth line from the bottom of that

2    paragraph.  He said, last time he saw Becky, she was shaking

3    life a leaf.  I said -- this is Paulette Martin talking --

4    yeah, I guess so.  I said, she's probably shaking to keep

5    from pulling that trigger on that hammer she had with her.

6    He said, huh.  End quote overall.

7          Now, you gave the opinion that hammer in this context

8    meant -- was it firearm or gun?  I don't recall.

9    A.    I think I used the word gun.

10   Q.    Gun.  Okay.  So that context -- that statement would

11   read then she probably was shaking to keep her from pulling

12   that gun -- the trigger on that gun she had with her, end

13   quote.  That's the way it would read, right?

14   A.    That's correct.

15   Q.    Now, we discussed another conversation which was Call

16   284, and I'm going to ask Mr. Mitchell if he would kindly

17   play 284 so we can hear it.

18          MS. JOHNSTON:  Your Honor, could we have a transcript

19   of the call?

20          THE COURT:  What is the page number, Mr. Ward?

21          MR. WARD:  There is no transcript.  The government

22   didn't produce one and I certainly didn't produce one.

23          MS. JOHNSTON:  Objection to that comment.  Counsel

24   has had copies of these recordings for over a year.

25          THE COURT:  Sustained.

```
1              MR. WARD:  Your Honor, there was no transcript
2    prepared.  If the government can produce it, I will be happy
3    to use it.
4              THE COURT:  You can play the recording.
5              MR. WARD:  As the Court has pointed out, the best
6    evidence is the recording itself.
7              THE COURT:  You may play it.
8              (Audio recording begins playing at 9:57 a.m.)
9              Audio recording stops playing at 10:00 a.m.)
10             MR. WARD:  Thank you, Mr. Mitchell.
11             BY MR. WARD:
12   Q.        You heard the conversation, Sergeant?
13   A.        I heard the part you played.
14   Q.        Yeah, the part I played.
15   A.        Yes.
16   Q.        And you heard the context of that reference to
17   shaking and telling "Becky" that she, Paulette Martin, told
18   somebody else that Becky was carrying a weapon?
19   A.        She was, again $, telling the same story she told Mr.
20   Goodwin, yes.
21   Q.        In a joking context?
22   A.        I don't agree with that assessment, no.
23   Q.        Would you agree, sir, that others could construe that
24   to be said in a joking context?
25   A.        If you're asking my opinion on that, I would agree.
```

1    I'm sorry, are you asking my opinion on that?

2    Q.    You've already given that, that you didn't think it

3    is a joking context.

4    A.    I did not give that, no, I did not.  My only opinion

5    was that hammer was in reference to a gun.  I never offered

6    an opinion whether the comment was joking or not.  If you

7    want my opinion, I would be more than happy to share it with

8    you.

9    Q.    I'm sure you would, sir.

10         Let me put this hypothetical situation to you, sir.

11   Given the opinion that you've expressed with regard to 289,

12   that hammer in that context meant a gun.

13         MS. JOHNSTON:  Your Honor, just so the record is

14   correct, the call number was B29, I believe.

15         THE COURT:  B29?

16         MS. JOHNSTON:  Yes, sir.

17         MR. WARD:  B289.  Let me begin again.

18         BY MR. WARD:

19   Q.    This is a hypothetical situation.  Given to Call 289

20   and what you've said about Call 289 and the import of what

21   you said in the context of 289, that is that Becky was

22   carrying a gun --

23         MS. JOHNSTON:  Objection, that's not what the witness

24   testified to.

25         THE COURT:  Sustained.

1          MR. WARD:  I didn't say it was.

2          BY MR. WARD:

3     Q.        And given the joking, I suggest, and laughing context

4     in what you've just heard in Call 284, would that Call 284

5     have any affect on your opinion at all?

6          MS. JOHNSTON:  Objection.  Again, he's misstated

7     Agent Sakala's previous opinion.

8          MR. WARD:  I didn't misstate anything.  I simply

9     asked if it would have any effect on his opinion.

10         THE COURT:  Overruled.

11         THE WITNESS:  My opinion remains the same that hammer

12    means gun.

13         BY MR. WARD:

14    Q.        That's all you will say?

15    A.        That's all I've ever said, Mr. Ward.

16    Q.        I understand that.  I want to make sure the jury

17    understands that.  That's all you you're saying?

18    A.        I said it three weeks ago, I said it yesterday, and

19    I've said it this morning.  That's the opinion I offered

20    about this call, and that's the only opinion I've offered

21    about this call.

22    Q.        Thank you.  Your opinion is not for this jury that

23    Becky Dobie was, in fact, carrying a gun as related in the

24    conversation?

25    A.        I did not say that, no.

1     Q.      I just want to make it clear that that response never

2     came.

3             Let me just ask you one other thing in closing.  You

4     were asked yesterday about Peruvian chicken; is that right,

5     sir?

6             MS. JOHNSTON:  Objection.  Beyond the scope of --

7             MR. WARD:  Beyond what scope?

8             THE COURT:  Overruled.

9             BY MR. WARD:

10    Q.      Is that right, sir?

11    A.      Yes, there was some discussion about it.

12    Q.      Yes, there was.  And you interpreted initially, in

13    your opinion, that you told this jury that the reference was

14    to Peruvian tickets; is that correct, sir?

15    A.      Are you asking --

16            MS. JOHNSTON:  Objection.  This is repetitive

17    cross-examination.  We've covered this.

18            THE COURT:  I will let you go a little bit more.

19    Overruled.

20            MR. WARD:  This is it Your Honor.

21            BY MR. WARD:

22    Q.      Is that right, sir?

23    A.      If you're asking about my testimony yesterday or the

24    testimony three weeks ago?

25    Q.      I'm talking about your testimony original naturally

1    when you were first called, goodness knows when it was, but

2    several weeks ago, that the tape the jury heard said Peruvian

3    tickets.

4    A.      That's correct.

5    Q.      Is that right?

6    A.      That is correct.

7    Q.      You were questioned at that time if, in fact, what

8    was being said was not Peruvian chicken; is that right, sir?

9            MS. JOHNSTON:  Objection, asked and answered

10   yesterday with Mr. Mitchell.

11           THE COURT:  Sustained.

12           BY MR. WARD:

13   Q.      Sir, you said that since that particular testimony

14   and that particular opinion Peruvian chicken -- or Peruvian

15   tickets, you had listened to that recording up to 100 times?

16   A.      Could be 200.

17   Q.      Nevertheless, it was a lot of times; right?

18   A.      I listened to it with headphones.  I slowed it down.

19   I sped it up.  I changed the tone of the conversation.  I did

20   everything I could to try to hear that word as clearly as

21   possible.

22   Q.      As a consequence of this intensive evidence, you

23   concluded that the word was now -- it wasn't

24   incomprehensible, but you couldn't understand it.  Actually,

25   I think you said it was chickets.  Chickets, is that right,

1    which wasn't a word, so that you thought?

2    A.      Correct.   After listening to it, it could be tickets,

3    it could be chicken, but based on that, I left it -- I would

4    leave it as inaudible or excuse me --

5    Q.      All right, sir.   Did you intend to tell the jury that

6    you had changed your opinion on that, sir?   And when?

7    A.      If I was asked about it, yes, sir, yes, I was.

8    Q.      If you were asked.

9    A.      I can only answer the questions I'm asked, Mr. Ward.

10   Q.      I see.   You didn't feel any obligation, sir, to

11   correct your former testimony on what Mr. Mitchell deemed to

12   be a crucial point with regard to this point?

13   A.      I think we went over this --

14           MS. JOHNSTON:   Objection.

15           THE COURT:  Sustained.

16           BY MR. WARD:

17   Q.      So you're just following it basically?

18           MS. JOHNSTON:   Objection.

19           THE COURT:  Sustained.

20           MR. WARD:  Thank you.   I have no further questions.

21           THE COURT:  Anything further?

22           MR. MCKNETT:  I believe it's my turn, Your Honor.

23           THE COURT:  All right.

24           MR. WARD:  I'd just like to put one further question.

25           MR. MCKNETT:  I have no objection, Your Honor.

1              BY MR. WARD:

2      Q.     When you reached this conclusion, sir, that the word

3      was chickets or whatever it was, did you share that view or

4      that knowledge with the government?

5      A.     Mr. Ward, I believe I've been on cross-examination

6      for a month or two, and I'm not allowed to discuss my

7      testimony with any members of the government.

8      Q.     I see.  Thank you, sir.

9                        **CROSS-EXAMINATION**

10            BY MR. MCKNETT:

11     Q.     Good morning, Detective.

12     A.     Good morning Mr. McKnett.

13     Q.     Excuse me, Sergeant.  I did it again.  I apologize.

14           Sergeant, in light of your answers to Mr. Ward's

15     question, let me ask you, preliminarily, have you reviewed

16     any other transcripts since the trial started, and since your

17     previous testimony to determine whether or not there is

18     anything else you might want to change in the transcripts or

19     in your testimony or in your opinions?

20     A.     Have I reviewed other transcripts that I've testified

21     about or other transcripts for preparation for possibly

22     witnesses?

23     Q.     Let me rephrase this.  You testified previously with

24     regard to certain conversations that were played and certain

25     transcripts that matched up with the conversations that were

1    played; correct?

2    A.       Yes.

3    Q.       You testified in response to Mr. Mitchell's questions

4    that while you originally thought that the word that he

5    referred to was tickets, you now think that that is

6    inaudible; correct?

7    A.       That is correct.

8    Q.       And that change in opinion is based on your review of

9    that conversation; correct?

10   A.       That is correct.

11   Q.       Are there any other conversations that you previously

12   gave opinions about that you have since reviewed and feel a

13   need to change your opinion about?

14   A.       No.

15   Q.       Have you reviewed any other conversations?

16   A.       I don't want to say I didn't, because I may have.  I

17   just don't recall.  Certainly, none to the extent that I they

18   reviewed that one line or that one word.

19   Q.       Okay.  I want to just ask another preliminary couple

20   of questions.  You originally testified that I think it's

21   Government Exhibit CD-1, the CD that contains all the

22   conversations that were played; correct?

23   A.       If that's the number, yes.

24   Q.       I believe you testified that the Government Exhibit

25   CD-1A, CD-1B, and CD-1C are the actual transcript books that

1    relate to the conversations on CD-1?

2    A.      If that's their number, yes.

3    Q.      I want to have Mr. Mitchell play a series of

4    conversations and talk to you about them just a little bit,

5    if I may.

6            Can we turn to page, Mr. Mitchell, Conversation 463

7    in the defendant's logbook transcript book.  It's at Page 39.

8    Mr. Mitchell, if you would.

9            THE COURT:  Is this B463?

10           MR. MCKNETT:  Yes, Your Honor, that's right.  B463 at

11   Page 39.

12           MR. WARD:  35?

13           (Audio recording begins playing at 10:11 a.m.)

14   (Audio recording stops playing at 10:12 a.m.)

15           BY MR. MCKNETT:

16   Q.      Do you have your log there?

17   A.      I think I have Mr. Montemarano's logs.

18   Q.      Just to confirm that was a call that took place on

19   March 13, 2004, at about 10:24 in the morning and it was an

20   outgoing call from Ms. Martin to Ms. Ali.

21   A.      Call B463 was intercepted on March 13 at 10:24 in the

22   morning, and it was an outgoing call to Ms. Ali, yes.

23   Q.      Okay.  This is an outgoing call in which Ms. Martin

24   asked Ms. Ali to make travel arrangements for her; correct?

25   A.      Yes.

1    Q.      And travel arrangements in the context of this call

2    would necessarily involve tickets; right?

3    A.      I'm sorry, do travel arrangements involve tickets?

4    Q.      Yes.

5    A.      Ordinarily.  They don't mention it in here, but I

6    guess she would could have an E-ticket, but ordinarily, yes.

7    Q.      A ticket at some point?

8    A.      Yes.

9    Q.      Did you consider this conversation when forming your

10   opinion about the use of the word tickets?

11   A.      Did I consider this conversation?  I listened to this

12   conversation, so I guess in that context, I considered it.  I

13   don't believe it has anything to do with drugs though.

14   Q.      Okay.  Can we turn to Page 52, please?  That's call

15   B835.

16           THE COURT:  What was the page number again, Mr.

17   McKnett?

18           MR. MCKNETT:  Page 52, Your Honor, Call B835.

19           BY MR. MCKNETT:

20   Q.      Do you have that in front of you?

21   A.      Yes, I do.

22           MR. MCKNETT:  Mr. Mitchell, please.

23           (Audio recording begins playing at 10:14 a.m.)

24   (Audio recording stops playing at 10:18 a.m.)

25           BY MR. MCKNETT:

1      Q.      Sergeant, I want to address this conversation,

2      several different parts of it.  The first part, Ms. Ali is

3      talking about going to pick up a lipstick she left over here,

4      wherever this was, and -- it's on Page 52.

5      A.      52?

6      Q.      Yes.

7      A.      Okay.

8      Q.      That's not a drug reference, is it?

9      A.      I have not offered an opinion that it was, no.

10     Q.      And then they talk about Ms. Martin's acting classes;

11     correct?

12     A.      Yes.

13     Q.      Page 53 -- yes.  That's not a code language, is it?

14     A.      I do not believe so, no.

15     Q.      On Page 54, toward the bottom, there is two

16     paragraphs where Ms. Ali is talking.  Between those two

17     paragraphs, it's not indicated on the transcript, but did you

18     hear a male voice?

19     A.      Mr. McKnett, you would have to play the call again.

20     Q.      That's okay.  The jury can determine that.  And then

21     at Page 55 toward the top, Ms. Ali says, we'll stop by after,

22     if it's okay with you, and Ms. Martin says, okay.  No

23     problem.

24             It's not your opinion they were stopping by to pick

25     up drugs, is it?

1      A.     Based solely on that reference there, I would not

2      offer that opinion, not without doing a lot more looking at

3      it.

4      Q.     Was there anything in this conversation that would

5      lead you to believe that Ms. Ali was coming there to pick up

6      drugs?

7      A.     No.  Other than their relationship would make me

8      aware of their drug relationship, but limited to just this

9      conversation, the answer is no.

10     Q.     And then on the rest of that page, Ms. Martin is

11    expressing annoyance with someone named Jackie; correct?

12    Jackie is always asking her to run errands; correct?

13    A.     Yes.

14    Q.     Jackie, in your opinion, would be Jackie Terrell,

15    perhaps?

16    A.     Yes.

17    Q.     Jackie Terrell was Ms. Martin's landlord/house mate.

18    A.     Correct.

19    Q.     She's the woman who lived upstairs from Ms. Martin;

20    correct?

21    A.     Yes.

22    Q.     Can we go to Page 60, please?

23    A.     I have 58 we're not doing then?

24    Q.     We're skipping 58.

25    A.     Okay.

1    Q.      Sixty is a call on -- I don't know if we did this or

2    not with regard to Call 835.

3            Did we identify that one as to the date and time?

4    A.      If we didn't, Call B835 was intercepted on March 17

5    at 5:54 in the evening.

6    Q.      March 17, '04.

7    A.      I'm sorry?

8    Q.      March 17, '04?

9    A.      Yes.

10   Q.      Thank you.  Call B851 on Page 60 is a call on that

11   same day about three hours and a few minutes after Call 835;

12   correct?

13   A.      Call B851 was intercepted on March 17, 2004, at 9:06

14   p.m.

15   Q.      And that's about three hours after the -- yeah, about

16   three hours after the previous call; correct?

17   A.      Yes.

18           MR. MCKNETT:  Can we play that one please, Mr.

19   Mitchell?

20           (Audio recording begins playing at 10:22 a.m.)

21   (Audio recording stops playing at 10:24 a.m.)

22           BY MR. MCKNETT:

23   Q.      Detective, it would appear from this call that Ms.

24   Ali and her husband did, in fact, go to Ms. Martin's house

25   that evening, doesn't it?

1      A.      I would agree with that, yes.

2      Q.      And it would appear from this conversation that Mr.

3      Ulysses Garner is Ms. Ali's husband; correct?

4      A.      Yes.

5      Q.      It would appear from this conversation that he is

6      giving advice to Ms. Martin and Mr. Goodwin about a contract

7      of sorts that Ms. Martin may have with someone named Ron;

8      correct?  Ron Hood.

9      A.      That's correct.

10     Q.      And at the bottom of Page 61, Mr. Goodwin says, well,

11     I was going to scoop him up, which is a reference to picking

12     up Ron Hood; correct?

13     A.      I would agree with that, yes.

14     Q.      And let him come up there, which would be to Ms.

15     Martin's house; correct?

16     A.      He does not identify that, but I assume that's what

17     he's talking about.

18     Q.      Because, you know, I am not astute in this particular

19     area.  It would appear that Mr. Goodwin is expressing to Mr.

20     Garner, Mr. Goodwin is not that well versed in entertainment

21     law; is that correct?

22     A.      I'm sure he's not, yes.

23     Q.      And he is looking -- both he and Ms. Martin are

24     looking to Mr. Garner to advise them on entertainment law

25     matters; correct?

1          MS. JOHNSTON:   Objection, Your Honor.   May we

2     approach the bench?

3          THE COURT:   Yeah.

4                    (At the bar of the Court.)

5          MS. JOHNSTON:   Your Honor, in the last call and this

6     call as well, Counsel is not asking questions that go to

7     impeach the testimony that Sergeant Sakala gave previously.

8     What he's doing here is asking him what is the meaning of

9     these calls?   What is the relationship between Mr. Garner and

10    Ms. Martin.   That is beyond the scope of the recross that the

11    Court has allowed him into, and I think it's going to be very

12    confusing to this jury.

13         I thought they were permitted to play these calls and

14    ask them about whether or not these calls and the subject

15    matter therein changed his opinion or how did he take that

16    into consideration in forming his opinion, either concerning

17    code words or that certain instances for drug trafficking.

18    That's not what's being done in the last call or this call.

19         Instead, he's asking questions that are very similar

20    to what questions the government asked on direct, what do

21    these words mean?   What is the relationship between the

22    parties, and that is beyond the scope of cross-examination

23    regarding what the Court permitted.   These are not related to

24    the calls the government played in its direct examination,

25    and it is not being offered to attack his opinion at this

1    point.  There haven't been any questions asked about his

2    opinion.

3        MR. MCKNETT:  Up until these last two calls, I did

4    ask him specifically, did you consider this call in

5    formulating your opinion.  Some of these calls, they're

6    grouped together and need to be dealt with as a group.  These

7    are two of those calls.  I had intended to ask him if these

8    calls were considered by him in formulating his opinion about

9    whether or not there was any legitimate business relationship

10   between my client and Ms. Martin.

11       MS. JOHNSTON:  He was never asked -- he had never

12   offered any testimony concerning any legitimate business

13   relationship between Ms. Ali and Ms. Martin.  He testified on

14   cross-examination.  I don't know -- I don't recall on direct,

15   but on cross-examination, he testified that Ms. Ali and Ms.

16   Martin had a social relationship.  Ms. Ali isn't even a part

17   of this call.

18       This is about a relationship between Mr. Ulysses

19   Garner and Ms. Martin and Mr. Goodwin, not Mrs. Ali, and Mr.

20   Garner is not on trial here.  He's got nothing to do with

21   this conspiracy.  Agent Sakala didn't offer any opinions

22   concerning conversations with Mr. Ulysses Garner.

23       MR. MCKNETT:  Your Honor, government has alleged in

24   the indictment and through this and testimony of other

25   witnesses that my client was involved in a long-term,

1     drug-based relationship with Ms. Martin.  I believe that I am

2     entitled to inquire as to the government's expert as to

3     whether or not he has considered that there was a possibility

4     that my client was involved in a long-term, non-drug-related

5     relationship with Ms. Martin, and that's what I'm doing.  I'm

6     finished with these two calls, and I'm going to move on to a

7     different --

8             MR. MONTEMARANO:  Your Honor, may I speak with Mr.

9     McKnett for a moment?

10           MR. MCKNETT:  I would also point out before that,

11    yesterday the witness, in response to some questions about

12    the clothes business, indicated in his opinion, there was an

13    illegal foundation for that relationship, and in those calls,

14    my client is talked about as being one of the buyers of the

15    clothes.  That would also, I think, open up a door, somewhat,

16    to show that my client is not involved in some relationship

17    or a relationship with Ms. Martin that involved illegal

18    activities.

19           Mr. Montemarano, I think, stated more concisely than

20    I tried to earlier, without being able to lay these calls out

21    in front of this witness, I will not be able to question him

22    as to his ultimate opinion concerning a relationship between

23    my client and Ms. Martin and the other alleged

24    co-conspirators.

25           I have very selectively only picked out -- I could

1    have picked out two dozen calls of this nature, and I've

2    picked out two or three, just to show a different

3    relationship, different from the one the government's expert

4    has laid out to the jury.

5         THE COURT:  All right.  Well, I share Ms. Johnston's

6    concern you may be going a bit far afield.  I won't stop you

7    at this point, but I think you need to understand that I have

8    permitted him to be recalled for the purpose of eliciting

9    testimony from him as to calls that he did not play insofar

10   as that may affect his opinion on the calls that he did play,

11   and give opinion about -- or for the rule of completeness.

12        So, I think you need to stay within the confines

13   which, for the most part, is going to be the question of how

14   could you possibly have opined X when these calls show Y.

15        MS. JOHNSTON:  We haven't heard those questions, Your

16   Honor.

17        THE COURT:  Okay, thank you.

18        MR. MCKNETT:  Thank you.

19             (Back in open court.)

20        MR. MCKNETT:  Your Honor, we reproach?  I have a

21   procedural question.

22        THE COURT:  All right.

23             (At the bar of the Court.)

24        MR. MCKNETT:  Given the Court's concerns and our

25   recent visit to the bench, I'm going to skip the next call

1    and perhaps a couple of others, but they're already in the

2    jury book.

3         MS. JOHNSTON:  I'm objecting to allowing -- we've

4    already skipped one call that he didn't play, and I'm going

5    to ask the Court to remove that call from the transcript

6    book.  If there are other calls you're going to skip and not

7    play or reference with this witness --

8         THE COURT:  Put it this way.  If there's any calls

9    that you're not going to play, when we take a break, we will

10   remove those from the jury books.

11        MS. JOHNSTON:  My concern that the jurors may be

12   reading those calls now, and that's a major issue for this

13   government, for this jury, to be reading transcripts of calls

14   that now defense counsel has decided they are not going to

15   play.

16        MR. MCKNETT:  Let me rephrase that.  The Court can

17   instruct the jury to only look at the transcripts they're --

18        THE COURT:  I can handle that with an instruction,

19   but I could do that sooner rather than later.

20        MR. MCKNETT:  Some of these, also, I had wanted to

21   discuss that with the next witness.  So rather than take them

22   out and put them right back in, again, if we can just skip

23   them.

24        THE COURT:  Skip them for now.  That's fine.

25             (Back in open court.)

1          BY MR. MCKNETT:

2     Q.        Detective, can you turn your attention to Page 58,

3     Call B847.

4          MR. MCKNETT:  Mr. Mitchell, if you would please.

5          (Audio recording begins playing at 10:34 a.m.)

6          (Audio recording stops playing at 10:35 a.m.)

7          BY MR. MCKNETT:

8     Q.        Sergeant, that's a call that same day, March 17,

9     2004, and this call is at about -- it's a mistake there in

10    the time.  Could you tell us what the actual time was?

11    A.        B847 was intercepted on March 17, 2004, at 8:29  p.m.

12    Q.        8:29.  So it should be 20:29, and the "8" should not

13    be in there?

14    A.        It should just be military time, 20:29.

15    Q.        There's a conversation in here about tickets;

16    correct?  Ulysses was just throwing a figure?

17    A.        Yes.  This appears on Page 58.

18    Q.        These were tickets for $50 each; correct?

19    A.        The tickets sold for $50 each, yes.

20    Q.        Is this the use of the word "tickets" as a code for

21    drugs?

22    A.        No, I believe this conversation -- I believe this is

23    either Ron Hood or Ron Hayes.  I would have to go back and

24    compare the voices, but they're talking about, again, this --

25    one of the many calls we got about shows.

1    Q.      There's a legitimate use of the word "tickets", and a
2    legitimate use of the words "$50"?
3    A.      When she says tickets in this call, she means
4    tickets, if that's clear.
5    Q.      In reference to -- Aretha is a reference to Aretha
6    Franklin, as best as we can tell from this call?
7    A.      Yes.
8    Q.      And was a legitimate attempt on the part of some of
9    the defendants here to enter into the entertainment business;
10   correct?
11   A.      I would have a problem with the word "legitimate".   I
12   think we've been over that, but it is an attempt to enter
13   into a entertainment business, but I would not characterize
14   their attempt as legitimate.
15   Q.      Is it your opinion that Ulysses, who would be Ulysses
16   Garner, would be involved in an illegitimate attempt to get
17   into the entertainment business?
18   A.      I don't think he had any connection with the deal at
19   all.
20   Q.      So is it your opinion that -- you have expressed --
21   strike that.
22           You have expressed your opinion that you don't
23   believe that the efforts to enter into the entertainment
24   business was legitimate; correct?
25   A.      The money that was financing their efforts came from

1    illegal sources.  Therefore, that would be an illegitimate

2    endeavor, yes.

3    Q.      Have you formulated an opinion about whether --

4    strike that.

5            Was Mr. Garner, if you know, providing money to enter

6    into this attempted business enterprise?

7    A.      As I previously testified, I'm not aware of Mr.

8    Garner being involved in this enterprise at all.  I think

9    that I had said that last month, and not being clear, I'll

10   say it again today.  I'm not aware, not seeing any evidence

11   of him being involved in the business.

12   Q.      He's involved at least to the extent of providing

13   advice.

14   A.      Yes, I would say that.

15   Q.      Do you recall reading anywhere -- hearing anywhere in

16   the conversations comments by Ms. Martin to the effect that

17   Mr. Garner was going to play a particular role in her

18   entertainment business enterprise once it got off the ground?

19   A.      She may have told someone that.  I don't recall it,

20   but it's possible.

21   Q.      Perhaps he was going to be her spokesperson.  Does

22   that sound familiar?

23   A.      No, but it's possible.

24   Q.      So he would have been entering into the business

25   enterprise; correct?

1    A.      No .you asked me if I heard her tell people that.

2    Again, I will state my opinion is he had nothing to do with

3    these shows.  He was not part of the business, he did offer

4    advice as a friend.

5    Q.      Assume that Mr. Garner did intend at some point to

6    become a spokesperson for Ms. Martin's entertainment business

7    enterprise.

8           MS. JOHNSTON:  Objection.

9           Beyond the scope of direct examination.

10          MR. MCKNETT:  Goes to the basis of his opinion

11   concerning my client's behavior.

12          THE COURT:  Overruled.

13          You may ask.

14          MS. JOHNSTON:  Your Honor, he's not asking questions

15   about his client's behavior.  That's the problem.

16          THE COURT:  All right.  Overruled for this one.

17          MR. MCKNETT:  I forgot the question, Your Honor.  Let

18   me start again.

19          BY MR. MCKNETT:

20   Q.      I've asked you to assume that Mr. Garner intended at

21   some point to become a participant in Ms. Martin's business

22   enterprise efforts, okay?

23   A.      I understand the assumption, yes.

24   Q.      Would that mean that Mr. Garner was intending to join

25   an illegal enterprise?

1    A.      I would have no idea what Mr. Garner's intentions

2    would be.  However, if he joined in this enterprise and

3    taking drug money -- knowingly taking drug money to invest in

4    anything, yes, he would be entering an illegal enterprise.

5    Q.      The key to your opinion, is it not, is the word

6    "knowingly"?

7    A.      Yes.

8    Q.      Thank you.

9            Would you turn to Page 99, please?  There are about

10   five calls here that are going to be connected to each other,

11   so bear with me while we go through them, and I'll come back

12   and talk to you about your opinion concerning them, if you

13   have one.

14           MR. MCKNETT:   Mr. Mitchell.

15           (Audio recording begins playing at 10:40 a.m.)

16   (Audio recording stops playing at 10:41 a.m.)

17           BY MR. MCKNETT:

18   Q.      Detective, is the phrase "sweet potato pie" in that

19   conversation a reference to drugs?

20   A.      This call has nothing to do with drugs.

21   Q.      This call was made on March 20, 2004, at 10:59, which

22   would be in the morning; correct?

23   A.      Call B1139 was intercepted on March 20, 2004, at

24   10:59, and yes, 10:59 is in the morning.

25   Q.      Detective, during your previous testimony, you

1     referred to two calls -- you discussed two calls.  One is

2     Call 8367, one is call -- actually, there is three calls --

3     one is Call B1233, and the third is Call A3940.  Do you have

4     your government's transcription book up there?

5     A.      Yes.

6     Q.      I believe they would be in Book 1.  Would you look at

7     them, please?

8     A.      Page number?

9     Q.      A367, Call B1233, and Call A394.

10    A.      Can you give me page numbers, please?

11    Q.      Page 138, Page 140, and Page 158.

12    Q.      Do you have them there?

13    A.      I have Page 138 in front of me.

14    Q.      Let's start with that.  That's Call A367, which was

15    made on March 20, '04, at about 4:06 in the afternoon;

16    correct?

17    A.      Yes.

18    Q.      Which was on the same day and about five hours after

19    the call we just played, B1139; correct?

20    A.      Yes.

21    Q.      B1139, Ms. Martin is telling her son, **Corus**, that

22    LaNora and all them came over for dinner the night before;

23    correct?

24    A.      I don't know if she identifies when.  She says LaNora

25    and all them came for dinner.

1   Q.      And she says, I fixed a sweet potato pie and so

2   forth, so the conversation is with Corus Martin; right?  Her

3   son?

4   A.      Yeah, I guess his last name is Martin, yes.

5   Q.      In any event, her son, Corus?

6   A.      Yes.

7   Q.      So at about 11 o'clock on that morning, she calls her

8   son and says that Ms. Ali and all them came for dinner, she

9   talks about a sweet potato pie; correct?

10  A.      Yes.

11  Q.      Sweet potato pie, you said, is not drugs?

12  A.      The reference in Call B1139, that's correct.

13  Q.      And then in Call A367, about five hours later, Ms.

14  Ali calls Ms. Martin, and this is where you and I disagreed

15  somewhat, if you remember.  I disagreed with the way the

16  conversation is sectioned out by speaker.  I suggested to you

17  that with regard to the first three entries, what Ms. Martin

18  -- Ms. Ali said was, oh, but wait a minute.  I told her I was

19  coming by to get some pig's feet because that's all I could

20  think of, and she said, oh, call me before you come by,

21  because you know what I want, and that Ms. Martin spoke over

22  her while she was saying is that.  You disagree with that;

23  correct?

24  A.      I disagree with that's what was said.

25  Q.      You disagree when I suggested that what Ms. Ali was

1        doing was quoting her, telling Ms. Martin that her -- she --

2        and is it fair to assume that might have been Jackie Terrell?

3        A.       Probably, yes.

4        Q.       My interpretation was that you had disagreed with

5        that Ms. Ali was telling Ms. Martin that Ms. Terrell said,

6        when she found out that Ms. Ali was coming over, oh, call me

7        before you come by, because you know what I want, and you

8        disagreed.

9        A.       Correct.

10       Q.       You -- in your opinion, this transcript is a proper

11       representation of the conversation?

12       A.       I think I took out the quotes.  I think the

13       transcript's accurate.  We can play the call again and check

14       it, if you like.

15       Q.       It was my opinion that perhaps the quote should stay

16       in there because the way I heard it, Ms. Ali was quoting Ms.

17       Terrell.

18       A.       I don't know what your opinion is, Mr. McKnett.

19       Q.       If that is my opinion.

20               MS. JOHNSTON:  Objection as to counsel's opinion.

21       It's irrelevant.

22               THE COURT:  All right.  Sustained.

23               BY MR. MCKNETT:

24       Q.       If someone else should oppose the opinion that Ms.

25       Ali was actually quoting Ms. Terrell, would you agree or

1   disagree with that?

2   A.      I would disagree with that, I believe, if I

3   understand your question correctly.

4   Q.      But the conversation as on -- this controls; correct?

5   A.      Absolutely.  The jury should listen to the calls and

6   whatever they decide would be the controlling factor.  I

7   agree with that.

8   Q.      Later in that same call, A3681, Ms. Ali says if you

9   ain't there, is it all right if I get some, and Ms. Martin

10  agrees?

11  A.      A367, yes.

12  Q.      And your interpretation, your opinion, was Ms. Ali

13  was asking if she could come over and get some drugs from Ms.

14  Martin's house, even if Ms. Martin wasn't there; correct?

15  A.      That's correct.

16  Q.      Would you go to the next call, B1233, on Page 140?

17  A.      I'm sorry, which book?  In the government book or

18  your book?

19  Q.      Government book.  I apologize.  Government book.

20  That's Call B1233.  That's on the next day, March 21, '04, at

21  about 1:28, early afternoon; correct?

22  A.      That's correct.

23  Q.      And then the next call, A394, is also on -- it's on

24  Page 158.  That's also on March 21, '04, and it's now about

25  nine minutes to 6:00?

1    A.      I'm sorry, which call?

2    Q.      A394.

3    A.      What page number is that on?

4    Q.      158.

5    A.      I'm sorry, what was your question again?

6    Q.      Do you have that call?

7    A.      Yes, I do.

8    Q.      That was on the same day, March 21, at about nine

9    minutes to 6:00?

10   A.      The same day as the second call, the next day from

11   the first call.  Yes.

12   Q.      The very first call, the one I played, would you

13   describe on -- well, March 20, in which Ms. Martin tells her

14   son that she had cooked dinner for LaNora and all them the

15   night before; correct?

16   A.      Again, she doesn't say the night before, she just

17   says she made them dinner.

18   Q.      Well, she said, I fixed a sweet potato pie last

19   night.  LaNora and all them came for dinner.

20   A.      Correct.

21   Q.      Wouldn't that logically imply that she cooked dinner

22   for LaNora --

23   A.      I would agree with that implication.  I'm just --

24   Q.      That would be a fair reading of what she says;

25   correct?

1    A.      I would agree with that.

2    Q.      So on the 20th, at about 11 o'clock, Ms. Martin

3    describes fixing dinner, a fair interpretation, she describes

4    fixing dinner for Ms. Ali the night before, the 19th.  Later

5    on that day, on the 20th, Ms. Ali talks about, if you ain't

6    there, is it all right if I get some?

7            After having previously said, I told her, meaning

8    Jackie Terrell, I was coming by to get some pig's feet, and

9    then the next day, Ms. Martin says, I fixed your thing.  I

10   have it with me, so you can just call me.  So your

11   interpretation was when Ms. Martin said, I fixed your thing,

12   she was telling Ms. Ali that Ms. Martin had cooked crack for

13   Ms. Ali?

14   A.      I don't know if I said cooked crack or prepared the

15   package.

16   Q.      Okay.

17   A.      I'm not sure I said cooked crack.

18   Q.      In any event, Ms. Martin was telling Ms. Ali that she

19   had fixed some sort of a drug package for Ms. Ali to come

20   pick up.

21   A.      I would agree with that, yes.

22   Q.      And then on that same day, March 21, later on in the

23   evening, Ms. Ali and Ms. Martin talk again, and Ms. Martin

24   says, it's in the trunk of my car, just call me.  I'll come

25   outside and hand you the bag out of the trunk.  And then

1      there's other conversation about two juices, and I got to

2      help you bring them in, that sort -- that rest of that

3      conversation.  Your opinion is it is not drug related;

4      correct?

5      A.      I believe that's correct, yes.  But your opinion was

6      that when Ms. Martin said, it's in the trunk of my car, just

7      call me, I'll come outside and hand you the bag outside of my

8      trunk, that that was a drug reference; correct?

9      A.      That is correct, yes.

10     Q.      Having heard the first call -- first of all, did you

11     consider the first call, the Call B1139?  Did you consider

12     that in forming your opinion that the three calls played by

13     the government described a drug transaction between Ms.

14     Martin and Ms. Ali?

15     A.      I think I testified previously that I've listened to

16     all of the calls and my opinion is based on the totality of

17     all the calls, so that would include B1139.

18     Q.      Isn't it a fair inference, that if you listen to all

19     those calls together, that what happens is Ms. Ali is

20     arranging with Ms. Martin to come over and pick up some

21     leftovers from the dinner that she ate on the 19th?

22     A.      That she stored in the trunk of her car?

23     Q.      The bag.

24     A.      That she stored in the trunk of the car.

25     Q.      What is the largest quantity of drugs, in your

1    opinion, that Ms. Martin ever delivered or sold to Ms. Ali?

2    A.      I don't know.

3    Q.      It would be small, right?  You've never seen anything

4    larger than a 125; correct?

5    A.      I've never seen Ms. Martin deliver drugs to Ms. Ali.

6    Q.      What is your opinion about the largest quantity of

7    drugs that Ms. Martin ever sold?

8    A.      If you have -- Hayward 7 would be the indication

9    amounts.  I don't know if you want to pull it up.  I think

10   it's 125.  There might be something larger, but I don't

11   recall.

12   Q.      Let's assume for the conversation because Hayward --

13   is it Hayward 7?

14   A.      I believe it's Hayward 7.

15   Q.      That speaks for itself; correct?

16   A.      That's correct.

17   Q.      Let's assume that a 125 is the largest denomination

18   in Hayward 7, and Hayward -- a 125 would represent what?  In

19   your opinion?

20   A.      An eight ball, an eighth of an ounce.

21   Q.      That's small, that's the size of that piece of candy.

22   A.      Back to, again, large amounts of money or small

23   amounts of money.  The small or large would be relative to

24   the person getting it.

25   Q.      You said an eight ball?

1      A.      Eighth of an ounce, yes.

2      Q.      That's a specific quantity; right?

3      A.      That's correct.

4      Q.      Ms. Coles was kind enough to provide me with a

5      another Jolly Rancher.  This one is apple.  I think the first

6      one, I think, was watermelon.  Are you saying Ms. Martin had

7      to hide this in her trunk?

8      A.      Yes.  I'm saying she prepared and put the drugs in

9      the trunk of her car.

10     Q.      So it's your firm opinion that rather than a bag of

11     leftover food, Ms. Martin actually put the drugs this large

12     in her trunk in order to drive it over to Ms. Ali's house and

13     deliver it to her?

14     A.      I don't know if she drove it over there.  We would

15     have to continue the calls.  I don't remember if she made the

16     delivery on this one or Ms. Ali came over.  I can't recall.

17     Q.      Even if Ms. Ali actually drove over to Ms. Martin's

18     house, you're saying Ms. Martin went to the trouble of hiding

19     this quantity of drugs in the trunk of her car in order to

20     sell it to Ms. Ali?

21     A.      Yes.  I think we've heard many calls where she

22     prepared the amount of drugs ahead of time.  I don't think

23     that was unusual at all.

24     Q.      And when she says, I'll hand you the bag out of the

25     trunk, she was talking about having put a quantity of drugs

1    this size in a bag and then hiding that bag in the trunk?

2    A.      I don't know what quantity she put in there.  You're

3    asking me about two different things, we were talking about

4    Hayward 7, the amount of drugs in Hayward 7, and we're

5    talking about a separate transaction.  I don't know if this

6    transaction is listed in Hayward 7.

7    Q.      You did testify a moment ago that the largest

8    quantity of drugs indicated in Hayward 7 was a 125, which is

9    an eight ball; correct?

10            MS. JOHNSTON:  Objection, that's not what he

11   testified to.

12            THE COURT:  Sustained.

13            BY MR. MCKNETT:

14   Q.      You believe that that's what the largest quantity in

15   Hayward 7?

16   A.      I think we agreed that Hayward 7 speaks for itself.

17   I don't recall the particular amounts.

18   Q.      Isn't it possible that Ms. Martin was packaging a

19   meal or something like it, out of leftovers for the March 19

20   dinner, putting them in a bag, and then putting them in the

21   trunk of her car so they wouldn't spill on the way to Ms.

22   Ali's house?

23            MS. JOHNSTON:  Objection, asked and answered.

24            THE COURT:  Sustained.

25            BY MR. MCKNETT:

1    Q.      Turn to Page 101.

2    A.      In which book?

3    Q.      In my book, the defendants' book.  It's Call No.

4    1441.  And so you have it there?

5    A.      Yes, I do.

6    Q.      Check the log, if you would please, to confirm that

7    this call was made on March 23, '04, at 4:43 in the

8    afternoon.  It's between Ms. Martin and Martha Jean West.

9    A.      Call B1441 was intercepted on March 23, 2004, at 16

10   -- excuse me 4:44 in the evening, and the logs reflect that

11   it's an incoming call from Martha Jean West to Paulette

12   Martin.

13           MR. MCKNETT:  Mr. Mitchell, please.

14           (Audio recording begins playing at 10:57 a.m.)

15   (Audio recording stops playing at 11:00 a.m.)

16           BY MR. MCKNETT:

17   Q.      Detective, in this call, there is a reference at the

18   top to sundresses, size 10 and 12.  You have previously

19   expressed an opinion that sundresses, in some context, is a

20   drug reference; correct?

21   A.      Yeah, I believe that's on that chart, yes.

22   Q.      Do you have an opinion concerning the use of the word

23   "sundresses" in this conversation?

24   A.      Yes.

25   Q.      What is that opinion?

```
 1      A.        It means sundresses.
 2      Q.        What about the size 10 and size 12?  Do you have an
 3      opinion about the use of those --
 4      A.        Yes.
 5      Q.        You do?
 6      A.        Yes.
 7      Q.        What is your opinion?
 8      A.        One is a size 10; one is a size 12.
 9      Q.        There was a phrase about two-thirds of the way down
10      the page, Ms. Martin starts in the silver and Ms. West says
11      -- this is a call between Ms. Martin and Ms. Martha Jean
12      West; correct?
13      A.        Yes.
14      Q.        Ms. West says, yes, and Ms. Martin says, yeah, I
15      guess I can wear a medium, and then she asks is it running
16      true to size.  Do you have an opinion about the meaning of
17      that phrase?
18      A.        Yes.
19      Q.        What is the meaning, in your opinion, of that phrase?
20      A.        Ms. Martin wants to know if it's running true to the
21      size.
22      Q.        What does true to size mean?
23      A.        She wants to know if the clothes are actually -- if
24      it's a medium -- if it says medium, is it medium?  If it says
25      large, is it large?  Some clothes generally will fit small
```

1    and some will fit larger.  She's asking if the size is what

2    it says it is.

3    Q.      Will you turn to Page 110, please?  It's in the

4    defense book.

5    A.      I'm sorry?

6    Q.      Page 110 in the defense book.  It's Call B1568.  The

7    call was made on March 25, 2004, at 6:51, approximately, p.m;

8    correct?

9    A.      Call B1568 was intercepted on March 25, 2004, at 6:51

10   in the morning.

11   Q.      That's an outgoing call to Ms. Ali from Ms. Martin;

12   correct?

13   A.      That is correct.

14           MR. MCKNETT:  Mr. Mitchell, if you would, please.

15           (Audio recording begins playing at 11:02 a.m.)

16           (Audio recording stops playing at 11:03 a.m.)

17           BY MR. MCKNETT:

18   Q.      Detective, this is one of two calls that are related.

19   I'm afraid I've played them backwards, so I will ask Mr.

20   Martin to play the other one as well.  Mr. Mitchell, excuse

21   me.

22           Call B1567, and it's on Page 107 of the defendants'

23   transcript book.

24           (Audio recording begins playing at 11:04 a.m.)

25   (Audio recording stops playing at 11:06 a.m.)

1              BY MR. MCKNETT:

2    Q.      Detective, I have to ask.  A lot of these calls have

3    a very long annoying tone.  What is that?

4    A.      Either the beginning of the call or the end call.

5    Q.      Yes?

6    A.      You don't hear it on your phone.  It's just something

7    that comes with every wiretap.  I don't know what they are,

8    but I do agree they are annoying.

9    Q.      B1567, Page 107, and B1516 on Page 110, involves Ms.

10   Ali getting rid of two tickets; correct?

11   A.      Yes.

12   Q.      You have previously opined that tickets frequently is

13   a reference to drugs; correct?

14   A.      That is correct.

15   Q.      Do you have an opinion about the use of the word

16   "tickets" in these two conversations?

17   A.      Yes, I do.

18   Q.      What is that opinion?

19   A.      Tickets are tickets.

20   Q.      These are airline tickets apparently; correct?

21   A.      Some time ago, they were talking about going to

22   Vegas.  There are actually, I think, several calls about

23   this.  I don't remember exact specifically what ended up

24   happening, but Teresa Arnold is who they're talking about

25   giving the tickets to, and this is, I don't know, two of a

1    series of calls about the incident.

2    Q.     So it's your opinion, then, when Ms. Ali talks about

3    getting rid of two tickets because Ulysses and she can't use

4    them, she's not talking about drugs?

5    A.     No.  In fact, when you look at these calls, they talk

6    about where the tickets are going, who can use them, it's

7    normal conversation that you would have if you were really

8    talking about tickets.

9    Q.     Detective, I want to turn your attention now to Call

10   B2436 on Page 130 in the defendants' transcript book.  There

11   is also an extract of that in the government's transcript

12   book at Page 265.  Do you have that there?

13   A.     Yes.

14          MR. MCKNETT:  Mr. Mitchell, if you would, please.

15          (Audio recording begins playing at 11:09 a.m.)

16   (Audio recording stops playing at 11:10 a.m.)

17          BY MR. MCKNETT:

18   Q.     Sergeant, on Page 130, toward the bottom, LaNora Ali

19   says, I'm going to get my toes done.  I've got to have them

20   ready for the cruise.  I think we've heard several references

21   to a cruise.  Do you know what that's about?

22          MS. JOHNSTON:  Objection.

23          Beyond the scope of direct; relevance.

24          THE COURT:  What's the basis?

25          MR. MCKNETT:  Your Honor, I can proffer the

1    relevance, but I think it might be better to do it at the

2    bench.

3              THE COURT:  Come to the bench.

4                   (At the bar of the Court.)

5         MR. MCKNETT:  Your Honor, there are -- there's a

6    conversation that comes up, maybe the very last one, in which

7    this witness has opined that when my client talks about

8    getting a dress, the one with the ties, that she's talking

9    about buying drugs from Ms. Martin.

10        There is -- in these conversations, there has been a

11   series of conversations about sundresses that have ties in

12   the back, and Ms. Ali is preparing to go on a cruise.  They

13   intend to use those conversations at the end to question the

14   witness' opinion about dresses with ties, meaning drugs, and

15   specifically he said crack cocaine.

16        MS. JOHNSTON:  Your Honor, I don't understand what

17   the cruise has to do with that.  I understand now that he's

18   proffered he's going to tie it together, so we withdraw the

19   objection.

20             THE COURT:  I will overrule it for now.

21                  (Back in open court.)

22        MS. JOHNSTON:  Your Honor, based on the proffer, the

23   government would withdraw its objection.

24             THE COURT:  All right.  You may proceed.

25             BY MR. MCKNETT:

1    Q.      Detective -- Sergeant, you can answer the question,

2    if you remember.

3    A.      I don't remember.  Could you repeat it, please?

4    Q.      Sure.  At Page 130, toward the bottom, Ms. Ali says,

5    I'm going to get my toes done.  I got to have them ready for

6    the cruise, and my question was:  Do you have an opinion

7    about what she's referring to when she says the cruise?

8    A.      Yes.

9    Q.      What is your opinion?

10   A.      My recollection is that during the wire when we were

11   up, that her and her husband went on a cruise.  I believe it

12   was Ms. Ali and her husband.

13   Q.      An actual cruise on a boat somewhere?

14   A.      I would assume so, yes.

15   Q.      That was not drug related; correct?

16   A.      No.  Well, the cruise was drug related or the -- I

17   would have no way of knowing.

18   Q.      Both.  Neither the cruise nor the conversation are

19   drug related.

20   A.      I have no knowledge of that, no.

21   Q.      At the end on Page 132 --

22   A.      Page 132?

23   Q.      -- at the very top of Page 132, the first line is at

24   the end of the entire conversation, but it's the first line

25   that the government transcribed.  Do you see that?

1    A.      Yes, I do.

2    Q.      And there's a difference in terminology.  The

3    government's transcription says, Ms. Martin says, um-hum, so

4    just the one ticket, and Ms. Ali says, that, hum, that's what

5    I got to make sure.  Ms. Ali says, okay, I need to know that

6    because and so forth.  The important thing is in the middle

7    here.

8            MS. JOHNSTON:  Counsel, what page are you on?

9            MR. MCKNETT:  I'm on Page 265 of the government's

10   transcript.

11           THE COURT:  My transcript does not read that way.

12           MS. JOHNSTON:  Neither does mine.

13           THE WITNESS:  I have so just the one magazine.  It

14   doesn't say anything about tickets.

15           BY MR. MCKNETT:

16   Q.      Did I say tickets?  I apologize if I said tickets.

17   My mistake.  So just the one magazine.  Ms. Ali responds,

18   hum, that's what I got to make sure, and then a couple of

19   lines down, Ms. Martin says, hum, I may have some people in

20   here.  That's in the government's transcript; correct?

21   A.      That is correct.

22   Q.      But in the defendants' transcript, Ms. Martin says,

23   okay.  I need to know that cause I may have to keep it in

24   here.  That's a significant difference in the transcript,

25   isn't it?

1     A.       It is a difference.  I don't know that it would

2     impact on the meaning of the conversation but it is a

3     difference.

4     Q.       Well, if the defendants' transcript is correct and

5     the jury will decide -- if Ms. Martin is telling Ms. Ali that

6     she may have to keep it in here, that wouldn't make sense if

7     Ms. Martin was selling drugs to Ms. Ali, would it?

8              Ms. Martin wouldn't be saying, I'll sell you drugs,

9     but I have to keep them in here.

10    A.       I don't know what she's referring to.  I know she did

11    not sell magazines, so I don't know if it would affect my

12    opinion one way or the other.

13    Q.       There is nothing in here that says Ms. Martin is

14    selling magazines; is there?

15    A.       That's what she's asking Ms. Ali.  She just wants the

16    one magazine, and that's the same in both transcripts.

17    Q.       But you said that Ms. Martin wasn't selling

18    magazines.

19    A.       That's correct.

20    Q.       There's nothing in here that says Ms. Martin was

21    selling magazines; was there?

22    A.       She's asking if she just wants the one -- Ms. Ali if

23    she just wants the one magazine.

24    Q.       Now, there's nothing -- let me strike that.

25             Ms. Ali and Ms. Martin are friends; correct?

1      A.      Yes.

2      Q.      Isn't it reasonable to assume that one friend might

3      want to borrow a magazine from another friend?

4      A.      That is a possibility in a friendship but not in this

5      call, no.

6      Q.      You've made the assumption that Ms. Martin is selling

7      the magazine.  Or talking about selling the magazine.

8      A.      Okay.  Transferring a magazine from her to Ms. Ali.

9      The assumption they're selling is because they're not talking

10     about magazines, they're talking about drugs.

11     Q.      But you have assumed that Ms. Martin is selling

12     something on the strength of this conversation.

13     A.      I think I've based my opinion on all the

14     conversations and what was recovered during search warrants.

15     I think I've testified what my opinion is based on.  It is

16     not based on just this conversation, no.

17     Q.      Can you direct us to any other conversation in which

18     Ms. Martin and Ms. Ali talk about magazines?

19     A.      We've listened to them.  I don't recall all off the

20     top of my head.  There is a listing of code words.  We can

21     certainly go back.  I think magazines is on there.

22     Q.      You your answer is you cannot point us to any other

23     conversation in which Ms. Martin and Ms. Ali talk about

24     magazines?

25             MS. JOHNSTON:  Objection.

1          That's not what the witness responded.

2          THE COURT:  Overruled.

3          THE WITNESS:  That is not my answer, no.

4          BY MR. MCKNETT:

5     Q.     What was your answer then?

6     A.     We can pull out the list of words on that sheet, and

7     I believe the word magazine is on there.  We could then go

8     back through the transcript books and compare that list to

9     the transcripts to see if those calls involve Ms. Ali.  As I

10    sit here, I don't recall.

11    Q.     Do you recall previous conversations between Ms.

12    Martin, and I don't recall the other person offhand, but

13    there was a conversation about catalogs.  More than one

14    conversation about catalogs?

15    A.     The 800 number?  Is that the one you're referring to?

16    It's a defense.

17    Q.     I keep talking over you.  I apologize.

18    A.     A defense call yesterday, she called an 800 number.

19    Q.     She was discussing catalogs with Ms. West, I believe.

20    A.     I do not believe it was with Ms. West.

21    Q.     Not on the 800 call, but on other calls.

22    A.     The call that was played in court, and my

23    recollection, we can go back through the book, the call was

24    an 800 number where she was talking to a female by the name

25    of Genina or Jenny or Genita, and she asked for catalogs.

1    Q.      I'm sorry.  I didn't hear the beginning part of your

2    answer.

3    A.      The call -- if you're referencing the call where she

4    was asking for catalogs, it was a call to an 800 number where

5    she spoke to a female.  She complained she had only received

6    one catalog and she wanted eight or ten, and she wanted a

7    price list.  If that's the call you're referencing.  I don't

8    recall a call with Ms. West about a catalog, but it's

9    certainly possible, I guess.

10   Q.      Okay.  Now, assume that Ms. Martin was selling

11   clothes.  And assume that Ms. Martin had catalogs out of

12   which she was selling clothes.  Okay?  Can you make that

13   assumption?

14   A.      Yes.

15   Q.      Wouldn't it make sense to form the opinion in this

16   conversation, Ms. Ali is talking about borrowing a catalog,

17   and Ms. Martin is saying she needs to know how many catalogs

18   Ms. Ali wants to look at because she has to keep them in the

19   place where she's doing the clothes business.  Is that not a

20   reasonable assumption?

21   A.      That is not my opinion, no.

22   Q.      Is that not a reasonable assumption?

23   A.      No.

24           MS. JOHNSTON:  Objection.  He's answered.

25           Objection.  Asked and answered.

1          THE COURT:  Overruled.

2          BY MR. MCKNETT:

3     Q.      Given the basis for my question, is the assumptions I

4     asked you to make, isn't it reasonable to assume that Ms.

5     Martin did not want to give away the catalogs out of which

6     she was taking -- selling clothes?

7     A.      Give away the free catalogs?  No, I don't agree with

8     that opinion.

9          THE COURT:  Mr. McKnett, how much longer do you have

10    with this witness?

11         MR. MCKNETT:  Your Honor, if I could do one more

12    call, it would be a good place for a break.

13         THE COURT:  All right.

14         BY MR. MCKNETT:

15    Q.      Sergeant, I'm not sure we identified that call.  I

16    know we identified it by number.  It's call B2436.

17    A.      That's correct.  If you're talking about the one with

18    the magazine we just discussed, that was intercepted on April

19    1st at 6:42 p.m.

20    Q.      That's the one in which the defense has a longer

21    transcription and the government has a shorter transcription?

22    A.      Correct, yes.

23    Q.      If we could turn to Call B3956 on Page 201.

24    A.      In your book?

25    Q.      In the defense book.  This is very short.

1                MR. MCKNETT:  Mr. Mitchell, if you would, please.

2                (Audio recording begins playing at 11:21 a.m.)

3      (Audio recording stops playing at 11:22 a.m.)

4                BY MR. MCKNETT:

5      Q.      Sergeant, this call took place on March 19, '04, at

6      about 8:38 p.m; correct?

7      A.      Call B3956 was intercepted on April 19, 2004, at 8:38

8      p.m.

9      Q.      Detective, the end of -- this is a call in which Ms.

10     Ali leaves a message on Ms. Martin's answering machine;

11     correct?

12     A.      Yes.

13     Q.      And Ms. Ali's message is, in part, that she was

14     wondering -- Janice was wondering if you had any fat people

15     clothes, like a 16; correct?

16     A.      Yes.

17     Q.      In other conversations, you've opined that the word

18     16 was a drug reference; correct?  It's on the chart behind

19     you there, if you need to refresh your recollection.

20               MS. JOHNSTON:  Objection, that is not the chart that

21     the agent prepared.

22               MR. MCKNETT:  He testified.

23               THE COURT:  He can look at the chart.  Overruled.

24               THE WITNESS:  I don't think that chart was what we're

25     talking about.  I'm trying to think if -- I know Mr.

1    Montemarano put that up, and I remember the number eight

2    being mentioned.  I'm not -- we've talked about sixteenths.

3    I don't know that we've had a call with sixteenths.  I may be

4    not remembering one, but I'm not sure we've had a call with

5    sixteenths.  If you can point me to one, but I'm not sure

6    we've had one.

7                 BY MR. MCKNETT:

8    Q.      I didn't mean to imply that that specific 16 on that

9    chart was a reference to drugs.  I wanted you to look at that

10   and see if it would refresh your recollection.

11   A.      Yeah.  We've had calls note eighths.  I don't recall

12   if we've played any calls with sixteenths.  We probably

13   intercepted them, but we maybe didn't play them.

14   Q.      I may be making more of this than I should have.

15           In this conversation, the reference to the word 16 is

16   not a reference to drugs in your opinion, is it?

17   A.      I'm not offering an opinion on this call.  I have not

18   offered one.

19   Q.      Do you have an opinion?

20   A.      I do not have an opinion.

21   Q.      Do you know -- do you have  an opinion about whether

22   fat people clothes is a reference to drugs?

23   A.      I do not have an opinion.

24                 MR. MCKNETT:  Your Honor, this would be a good time

25   for a break.

1          THE COURT:  All right.  Ladies and gentlemen, we will

2     take a recess until quarter of 12:00.  Counsel, stay behind.

3               (Jury excused at 11:24 a.m.)

4          THE COURT:  Counsel, what were the matters that we

5     needed to take up that were preliminary matters?

6          MR. HALL:  I had one, if I can.

7          THE COURT:  You may proceed.

8          MR. HALL:  Your Honor, again, let me -- as the Court

9     will recall yesterday, a Motion for Severance was made by

10    both Mr. McKnett and by myself in regard -- as an aftermath

11    of Mr. Goodwin's testimony.  My client feels very strongly

12    concerning the fact that Mr. Goodwin's testimony -- again,

13    let me say I'm not trying to show my disrespect for Mr.

14    Goodwin.

15         I want to say that to him, but my client feels very

16    strongly that his testimony tainted the credibility of anyone

17    who had testified in this trial, and as a result of that, my

18    client has asked me to ask the Court if his case can be

19    reopened for want -- in order to introduce one fact, and that

20    fact is the following:  In June of 2004, after his arrest, he

21    was inadvertently released by the Charles County Detention

22    Center, and he returned home to Baltimore, and later that

23    day, after learning that a warrant had been issued for him by

24    the federal marshals, since it was an inadvertent release, he

25    turned himself in on that warrant.

1          That could either be done through stipulation that he

2     turned himself in on the warrant, it could be done through

3     him answering about three or four questions based upon that

4     fact, or it could be done by getting a record from the

5     marshals' office, but he feels very strongly that by virtue

6     of the fact that Mr. Goodwin's testimony wasn't the opinion

7     of a number of people quite incredible on some issues, that

8     he needs that in order to show that his degree of honesty

9     that he would return under those circumstances, knowing what

10    he was facing.

11         THE COURT:  All right.  Ms. Johnston.

12         MS. JOHNSTON:  Your Honor, that's totally irrelevant

13    whether or not he turned himself in afterwards.  He could be

14    motivated for any number of factors.  One, he might not have

15    wanted police to come in and break down his front door and

16    disrupt whoever's house he was staying at.  It has nothing to

17    do with his credibility in this case and his testimony.

18         Furthermore, Mr. Goodwin didn't mention Mr. Whiting

19    during his testimony, as far as I can recall.  I don't even

20    know if he said he knew him in terms of his testimony or had

21    said he knew him.  So we would object to the Court granting

22    that kind of extreme remedy.

23         MR. HALL:  Your Honor, I will agree that he did not

24    mention Mr. Whiting by name, but there certainly was

25    extensive testimony by Mr. Goodwin concerning the subject of

1    tickets, which was also a subject of my client's testimony,

2    and he feels that -- I have to agree with him -- that Mr. --

3    there's a spillover effect from Mr. Goodwin's testimony on

4    other defendants.

5        THE COURT:  All right.  I've considered your request

6    to reopen your case for the purpose of that testimony, and I

7    decline to permit you to reopen it for that purpose.  If

8    there's some other purpose or some other basis for doing so,

9    I would entertain that, but the mere fact that he turned

10   himself in when he was inadvertently released is not

11   something I would permit you to rope your case at this time.

12       MR. HALL:  Thank you.

13       THE COURT:  Is there another preliminary matter?

14       MS. JOHNSTON:  We believe there is a woman -- Ms. Ali

15   has had these two friends with her on an almost daily basis,

16   and we believe one of those women was engaged in a

17   conversation on Tuesday with one of our jurors here as they

18   were walking down the hall approaching the escalator, so that

19   raises concerns with us whether it was just chitchat, doesn't

20   matter.  The notion befriending or being nice to a juror

21   could certainly influence the way that juror looks at your

22   friend, Ms. Ali, because of Ms. Ali and her associates sit at

23   the top of the escalators every day during every break, so

24   all of the jurors see them, and now we've been told about a

25   conversation -- I know it may not be intentional that they're

1    sitting there for that purpose, but they see them there and

2    they've been present throughout the time.

3          I don't know what the nature of the conversation was,

4    but clearly it gives the government great concern that an

5    associate -- an obvious associate of one of these defendants

6    has had communication with a juror.

7          MR. MCKNETT:  Which juror?

8          MS. JOHNSTON:  I believe it was Juror 5.

9          MR. MCKNETT:  Five?

10         MS. JOHNSTON:  I believe it was --

11         LADY IN THE AUDIENCE:  That's not so.

12         MS. JOHNSTON:  Obviously, I think that's the woman

13   who had the conversation.

14         MR. MCKNETT:  First of all, I'm not sure.

15         MS. JOHNSTON:  Juror No. 5.

16         MR. MCKNETT:  The fifth seat or?

17         MS. JOHNSTON:  The fifth seat.

18         MR. MCKNETT:  Just a quick response.  I would point

19   out that the only place to sit outside is in the bench in

20   front of the US Attorney's Office.

21         THE COURT:  I recognize that.

22         MS. JOHNSTON:  Mr. McKnett, I wasn't making a point

23   about that.

24         MR. MCKNETT:  I just want that in the record.

25         MS. JOHNSTON:  It doesn't matter to me what kind of

1    conversation it was.  It's just if the notion that someone

2    who is obviously very much associated with a defendant here,

3    and as I said before, I'm not saying they intentionally sit

4    there.

5         THE COURT:  Well, let me just say this for those who

6    are present in the courtroom and for the parties who may have

7    friends that may come in.  I want to tell you in the

8    strongest possible terms exactly the same thing I told to the

9    jury yesterday.

10        There is to be no conversation of any nature

11   whatsoever with any juror in this case.  Period.  No, not to

12   say good morning, not to say it's raining, not to say the

13   sun's out, not to say the case is taking a long time,

14   nothing.  They are off limits.  They should not be talked to

15   nor should they initiate conversation with you, and I have

16   told them that, so please make certain that communications

17   with these jurors only takes place in this courtroom in my

18   presence with me and there should be no communications

19   whatsoever.

20   If I hear any further concerns about this, I may have to take

21   further actions.

22        MR. WARD:  Your Honor, the concerns, it seems to me,

23   are totally spurious and unfounded.

24        THE COURT:  Whether spurious or not ,if there's been

25   conversation inadvertent, casual or otherwise, even if

1    initiated by the juror, that is a concern for me.  I have

2    communicated that concern to the jurors.  I'm now

3    communicating it to all the parties and spectators in the

4    courtroom.  I am not going to try the question of was there a

5    contact or not.

6          I want to make it very plain for everybody in this

7    courtroom that that is something that I would view with great

8    disfavor.  I do not want this to happen.  Period.  All right?

9    I will be back at a quarter of 12:00.

10                     (Off the record at 11:32 a.m.)

11                     (On the record at 11:52 a.m.)

12          MS. GREENBERG:  Your Honor, I have a very brief

13    preliminary matter.  I understood from talking to Mr. McKnett

14    earlier this week that I got some materials relating to Ms.

15    Spinnicchio.  I understand Mr. McKnett doesn't want to

16    stipulate either Ms. Spinniccio's portion of her testimony.

17    Gina Snook from Pretrial Services is here.  Ms. Snook

18    prepared a Pretrial Services report.  It's the government's

19    opinion that that is Jenks.

20          Ms. Snook is agreeable to giving Mr. McKnett and

21    myself a copy of the Pretrial Services report as to Ms. Ali,

22    which Ms. Snook prepared to use in court.  Similar as we do

23    in detention hearings, the parties use it in court then

24    provide it back to the Pretrial Services officer, and she was

25    willing to do that, and Mr. McKnett has objected, and I seek

1     to raise it with the Court so she can provide us copies of

2     the witness' Pretrial Service report as to Ms. Ali for use

3     during Ms. Snook's testimony, and then provide it back to

4     Pretrial Services for their records.

5          MR. MCKNETT:  Your Honor, I oppose that.  I don't

6     consider it to be Jenks material.  The purpose of calling

7     these two witnesses, as I've said in court before on the

8     record, is simply to say what they did and when they did it

9     with regard to the arrest of Ms. Ali.

10         THE COURT:  You don't want the content of the report?

11         MR. MCKNETT:  The content of the report is

12     irrelevant.  The only aspect of that report that may possibly

13     be relevant is that Ms. Greenberg tells me it may indicate

14     when the report was prepared.  That's on one little box on

15     the lower right-hand corner of the last page.  If that's

16     Jenks, then everything else should be blanked out.  Why can't

17     the government stipulate that that's what it says?

18         MS. GREENBERG:  Then, Your Honor, Ms. Snook can go

19     about her business.

20         MR. MCKNETT:  No, on that issue, not on all that she

21     did.  Her report and when she prepared it is only part of

22     what I intend to ask her.

23         THE COURT:  I understand that.

24         MS. GREENBERG:  If it's only part of what he intends

25     to ask her, I don't know what the rest of the report might

1    reflect.

2         THE COURT:  My understanding, based upon what I

3    received from Probation and Pretrial Services is that Mr.

4    McKnett intends to elicit from these witnesses not anything

5    that's contained in that report, except perhaps if there's a

6    reference to the date and time, that he intends to elicit

7    information from these witnesses as to the date and time that

8    they did their work.

9         MS. GREENBERG:  That is on the Pretrial Services

10   report.  If that's all Mr. McKnett is going to ask Ms. Snook,

11   I suggest we stipulate that Ms. Snook prepared her report at

12   a date and time and let her know, then he's got Ms.

13   Spinnicchio.  If he intends to ask her other questions about

14   her work that day, then, I think her report may become

15   relevant.

16        MR. MCKNETT:  That the report is inadmissible.  What

17   I intend to ask Ms. Snook and Ms. Spinnicchio is what they

18   did that day with regard to Ms. Ali and the times that they

19   did it.  That's it.

20        THE COURT:  That's it.  All right.  I will permit

21   that testimony.

22        MS. GREENBERG:  Your Honor, I'm not saying --

23        THE COURT:  Limit it to that without the report at

24   all.

25        MS. GREENBERG:  Your Honor, I'm not seeking to admit

1    the report.  I'm just seeking it at Jenks.  At the very

2    latest, I should have the date and time, but if that is what

3    we're willing to do --

4              THE COURT:  You had the report before, but you don't

5    have it now.  Is that the problem?

6              MS. GREENBERG:  Yes, Your Honor.  That was about two

7    years ago.

8              THE COURT:  You don't remember it?

9              MS. GREENBERG:  No, I don't remember it and Ms. Snook

10   doesn't have any problem using it in court like we did at the

11   detention hearing.

12             THE COURT:  Then I think that's appropriate.

13             MR. MCKNETT:  I'm not objecting to Ms. Greenberg

14   reviewing the report.

15             THE COURT:  Fine.

16             MR. MCKNETT:  I object to any questions about the

17   content of the report.

18             THE COURT:  I am not going to permit content of the

19   report.  I understand the purpose for which you want to call

20   them.  It's a very limited purpose with respect to a temporal

21   question only, because I'm not going to permit exploration

22   into Pretrial Services procedures or the content of the

23   report or anything else.

24             MS. GREENBERG:  I'm just seeking it as Jenks, Your

25   Honor.

1           THE COURT:  The only thing we're going to get is date

2      and time.

3           MS. GREENBERG:  Your Honor, may Ms. Snook provide

4      copies to both court and counsel?

5           THE COURT:  Yes, I think that's appropriate.  Mr.

6      McKnett, are you ready for the jury to come back in?

7           MR. MCKNETT:  Yes, Your Honor, I'm ready.

8           (Witness resumes the stand.)

9                (Jury returns at 12:00 p.m.)

10          THE COURT:  All right.  You may proceed, Mr. McKnett.

11          MR. MCKNETT:  Thank you, Your Honor.

12          BY MR. MCKNETT:

13     Q.      Sergeant, I want to just catch back up.  I want to

14     just refer you back to Call B2436, Page 130, and specifically

15     at Page 132.

16          This is a call we played just before the break.  Do

17     you have it there?

18     A.      Yes.

19     Q.      Page 132?  And it was your opinion that at the top of

20     Page 132, Ms. Martin -- when Ms. Martin says, so just the one

21     magazine, she is referring to a quantity and type of drugs;

22     correct?

23     A.      She's trying to confirm the quantity of the drugs,

24     yes.

25     Q.      Okay.  And the word "magazine" is the reference to

1    drugs in your opinion; correct?

2    A.      I think I've testified to that, yes.

3    Q.      It's your opinion that that word could not be a

4    reference to catalogs; correct?

5    A.      I believe I've testified that opinion is -- that word

6    "magazine" is a code word for drugs, yes.

7    Q.      Turn to Page 213, please.  Call B414 in the

8    defendants' book.

9           MR. MCKNETT:  And Your Honor, this is a rather

10   lengthy conversation.  I've asked Mr. Mitchell to --

11          THE WITNESS:  I do not have that call.

12          MR. MCKNETT:  Oh.  Your Honor, this is a call -- may

13   we approach?

14          THE COURT:  You may.

15               (At the bar of the Court.)

16          MR. MCKNETT:  This is a call that we had taken out of

17   the book because we thought it was repetitive.  However, in

18   this conversation, Ms. Martin and Ms. West are talking about

19   clothes, and they are using the words catalog and magazine

20   interchangeably beginning and end of the call.

21          MR. MONTEMARANO:  Which is the very reason I was

22   intending to use it, and Your Honor indicated it was

23   cumulative, and I didn't.

24          THE COURT:  How long does it take?

25          MR. MONTEMARANO:  The call itself, I think, is about

1    seven minutes.  It goes from 2:13 to and including 2:25.

2          MR. MCKNETT:  Mr. Mitchell has set it up to play two

3    small sections.

4          MS. JOHNSTON:  Your Honor, they weren't going to play

5    this call, they've not redacted this call as the Court had

6    instructed them to do in advance.  Now to come up here in the

7    middle of this recross and now say, oops, Judge, we've

8    decided that for strategical reasons, we now want to play

9    part of the call -- now they want to hand out a full

10   transcript?

11         THE COURT:  The jury don't have this transcript;

12   correct?

13         MR. MCKNETT:  We can provide it.

14         THE COURT:  Are you capable for preparing insertions

15   in that book, the portion you intend to play?

16         MR. MONTEMARANO:  We can pull the middle out of the

17   transcript.

18         THE COURT:  I'll permit you to play it, but you're

19   going to have to promptly remove from --

20         MS. JOHNSTON:  Yes, your Honor.  If the Court is

21   going to permit them to play it, then I want them to play the

22   whole call with all of the conversation and to put it into

23   context.  I think I have a right to do that.

24         THE COURT:  All right.  We can could spend less time

25   talking, arguing about it, and they can sit back and close

1    their eyes and listen to this conversation.

2                    (Back in open court.)

3            THE COURT:  Ladies and gentlemen, the witness is

4    about to be questioned about a call that is not presently in

5    your books.  Your books will be updated to include this call.

6    Perhaps we can do it on a break, but you will have it -- do

7    you want to give it to them now and then we can insert it?

8            MR. MCKNETT:  Your Honor, I believe the transcripts

9    are being passed out.

10           THE COURT:  Oh, they're being passed out.  If you're

11   very good multi-taskers, you can insert it into your book at

12   the right place.

13           MR. MCKNETT:  Which would be right after Page 212,

14   Your Honor.

15           THE COURT:  That's good.  All right.

16           BY MR. MCKNETT:

17   Q.     Detective, do you have a copy of it?

18   A.     Yes.

19           MR. MCKNETT:  Does the court have a copy?

20           THE COURT:  What's the page number?

21           MR. MONTEMARANO:  213.

22           MR. MCKNETT:  213, Your Honor.

23           MR. MONTEMARANO:  Should be in the book we gave Your

24   Honor.

25           THE COURT:  Yes, I have it.

1               MR. MCKNETT:  May I begin, Your Honor?

2               THE COURT:  Yes, you may proceed.

3               MR. MCKNETT:  Mr. Mitchell, would you play Call

4     B4134, please?

5               (Audio recording begins playing at 12:04 p.m.)

6               (Audio recording stops playing at 12:11 p.m.)

7               BY MR. MCKNETT:

8     Q.        Detective, this is a call that took place on March

9     22, 2004; correct?

10    A.        That is correct.

11    Q.        April.  Excuse me, April 22, 2004?

12    A.        I'm sorry, you are correct the second time.

13    Q.        And it's at 9:56 in the evening; correct?

14    A.        It's actually 9:55.

15    Q.        Okay.  The conversation's between Ms. Martin and

16    Martha Jean West; correct?

17    A.        And Gwen Levi.

18    Q.        Yes, ultimately Gwen Levi gets in for a little while

19    then Ms. Martin gets back on the phone with Ms. West;

20    correct?

21    A.        Yes.

22    Q.        They're talking about clothes; right?

23    A.        Yes.

24    Q.        Talking about ordering clothes?

25    A.        They're talking about obtaining clothes from Ms.

1    Martha Jean West.

2    Q.      On Page 216, toward the bottom, Martha Jean West

3    says, okay.  Ms. Martin, says, she, which is a reference,

4    apparently, to Gwen; correct?

5    A.      I'm assuming so, yes.

6    Q.      She looking in the Neiman Marcus catalog right now as

7    we speak.  That's what it says; correct?

8    A.      That's what it says, yes.

9    Q.      At the top of Page 217, Ms. West says, why don't you,

10   when she -- why don't you give her, and again, it appears to

11   be Gwen; correct?

12   A.      I'm assuming.  I don't know, but I'm assuming,

13   because Gwen then gets on the phone later on.

14   Q.      Why don't you give her one of those books, have her

15   check off what she likes, and then send it down to me;

16   correct?

17   A.      That's what the transcript reads, yes.

18   Q.      So now Ms. West apparently is using the word "book"

19   interchangeably with the word "catalog;" correct?

20   A.      The book -- the word "book" and "catalog" appear in

21   this transcript.

22   Q.      Ms. Martin says on Page 216, she's looking in the

23   Neiman Marcus catalog right now as we speak, and then Ms.

24   West says, why don't you give her one of those books, have

25   her check off what she likes, and then send it down to me.

1    So they're using the word "catalog" and "book"

2    interchangeably; correct?

3    A.      They appear they're using what appear to be the same

4    item, yes.

5    Q.      And then on Page 218 in the middle, Ms. West says,

6    just have her bend the page and mark; correct?

7    A.      Yes, that's what it reads.

8    Q.      And then at the top of Page 224, Martha Jean West

9    says, and just ask her to mark the magazine; correct?

10   A.      That is what it says, yes.

11   Q.      So they're using the words catalog, book and magazine

12   interchangeably; correct?

13   A.      I do not know that.

14   Q.      Doesn't -- isn't it reasonable to assume -- to form

15   the opinion from this conversation that they're using all

16   three of those words interchangeably?

17   A.      No.  There could be a magazine, there could be a book

18   and catalog in the first reference there.  Since they were

19   close in time, I would agree that they're referring to the

20   same item.  Whether they're now referring to a magazine, I

21   don't know.

22   Q.      Well, they're close in time as far as the

23   conversation between Ms. Martin and Ms. West; correct?

24          Because on Page 218, Ms. West says, just have her

25   bend the page and mark and then Ms. Martin says on the second

1    page is a Prada bag, so they're talking about a catalog;

2    correct?

3    A.      They're talking about -- I don't know if it's

4    catalog, book, or magazine.  They're talking about Ms. Levi

5    is supposed to mark up whatever they're talking about and

6    they're going to send it to Ms. West.  She is going to go

7    shopping for those items.

8    Q.      You said you couldn't opine about the use of the word

9    "magazine" on Page 224 because it wasn't close in time.

10   A.      No, you asked me -- excuse me, Mr. McKnett.  You

11   asked me whether that was referring to the same item as the

12   previous references to book and catalog, and I said I can't

13   say that.  It may be.  I have no idea.

14   Q.      Well, let me finish my question on this.  On Page

15   218, Ms. West says to Ms. Martin, just have her bend the page

16   and mark.  You see that; correct?

17   A.      Yes.

18   Q.      And then just very shortly thereafter on the next

19   page, Ms. Whoever Gwen is, gets on the phone with Ms. Martin

20   -- with Ms. West; correct?

21   A.      She gets on in the middle of Page 219, it looks like.

22   Q.      And she stays on until Page 223, the middle of the

23   page; correct?

24   A.      I would agree with that.

25   Q.      And then as soon as Ms. Martin picks the phone back

1 up, Ms. West says yeah, let her, and then Ms. West interrupts

2 herself and tells Ms. Martin what Gwen said to Ms. West;

3 correct?

4 A. I'm sorry, repeat that question.

5 Q. As soon as Ms. Martin gets back on the phone, she

6 says, okey dokey.  Ms. West says, yeah, let her, referring to

7 Gwen, and then Ms. Martin -- Ms. West interrupts herself and

8 tells Ms. Martin what Gwen said to Ms. West; correct?

9 A. She says, let her -- well, the transcript reads let

10 her, then dot, dot, she just told me she'd like some light

11 summer leathers, and then that's a possibility.

12 Q. And toward the end, Ms. West says, I know which one

13 she's talking about.  Ms. Martin says, okay, and Ms. West

14 says, and just ask her to mark the magazine.  So as far as

15 the conversation between Ms. West and Ms. Martin is

16 concerned, the use of the word "catalog," which is also used

17 in the top of Page 218, and the phrase "bend the page" and

18 "mark" and then the phrase, "just ask her to mark the

19 magazine," that's all within a very short part of the

20 conversation between Ms. West and Ms. Martin; isn't it?

21 A. It's all contained in this conversation, yes.

22 Q. So, it would then be reasonable to form the opinion,

23 would it not, that they are using the word "catalog," "book"

24 and "magazine" interchangeably to refer to the same item?

25 A. Are you asking me if that's my opinion?  And I think

1    I've already said no.  I don't know.  I have no idea.

2    Q.      Actually, that wasn't my question.

3    A.      Okay.  What is the question, I guess.

4    Q.      Wouldn't it be reasonable to assume that they are

5    using the terms "magazine," "book" and catalog

6    interchangeably to refer to the same item?

7            MS. JOHNSTON:  Objection.  It calls for an

8    assumption.

9            THE COURT:  Overruled.

10           MR. MCKNETT:  He's an expert.

11           THE WITNESS:  It could be reasonable that it refers

12   to other things.  I have no idea.

13           BY MR. MCKNETT:

14   Q.      Turn back to Page 132, if you would, please.  So if

15   Ms. West and Ms. Martin are using the word "magazine" on Page

16   224 to refer to a Neiman Marcus catalog, wouldn't it also be

17   reasonable to assume that when Ms. Martin uses the word

18   "magazine" when she's talking to Ms. Ali on Page 132, that

19   she is also referring to a catalog?

20   A.      No.  These conversations are diametrically different.

21   One is about clothes.  It goes into great detail about

22   different types of clothes, different styles, different

23   sizes.  The other call talks about clothes -- excuse me,

24   about a cruise that they're going on, and then right at the

25   very end, she just asks for one magazine, doesn't identify

1    what it's for or anything else.

2           Given that, and the context of all the other calls

3    what was found in the search warrants, the surveillance, the

4    documentation, I do not think that's a reasonable assumption,

5    no.

6    Q.      On Page 130, you're right, Ms. Ali talks about

7    getting ready for the cruise; correct?

8    A.      Yes.

9    Q.      And on Page 132, Ms. Martin asks if Ms. Ali just

10   wants just the one magazine; correct?

11   A.      I think I've said that that's what's on the

12   transcript.  I don't know how many times, but yes, again,

13   that is what is on the transcript.  That's what she says.

14   Q.      And we heard several conversations yesterday, did we

15   not, in which Ms. Martin is discussing buying clothes for Ms.

16   Ali because Ms. Ali is getting ready to go on a cruise;

17   correct?

18           MS. JOHNSTON:  Objection.

19           THE COURT:  Overruled.

20           THE WITNESS:  I don't believe we heard any calls like

21   that, no.  If we did, I don't recall them.  If you can point

22   me to one.

23           BY MR. MCKNETT:

24   Q.      How about Call B323 on Page 30.  Do you have that

25   there?

1    A.       Yes, I do.  I'm just looking through it.  At the

2    bottom of Page 31, there is a reference to the cruise.

3    Q.       At the top, after the break in the recording, it says

4    in the transcript, you know, I ain't gonna spend that kind of

5    money for it.

6    A.       What page are you on, sir?

7    Q.       Page 31.

8    A.       Yes, it does say that.

9    Q.       When you listen to that conversation on the tape, did

10   you hear Ms. Martin actually say, you know, LaNora ain't

11   gonna spend that kind of money for it?

12   A.       I did not compare the transcript to the tape.  If you

13   want to play the call again, we can listen to her name, but

14   no, I don't recall.

15   Q.       I don't know if Mr. Mitchell is that technically

16   skilled.

17           MR. MCKNETT:  Mr. Mitchell, would you play just the

18   first portion of Call 31 -- Call B323, please?

19           (Audio recording begins playing at 12:22 p.m.)

20   (Audio recording stops playing at 12:23 p.m.)

21           MR. MCKNETT:  Thank you, Mr. Mitchell.

22           BY MR. MCKNETT:

23   Q.       Later in that conversation -- do you have a pencil

24   there?  I would ask you to correct your copy of the

25   transcript.

1    A.    Do you want me to make other corrections as we go

2    along or just that one?

3    Q.    Just that one.

4          Then later on that same page, Ms. Martin says, I'm

5    pretty sure she's not going to take it because she's getting

6    ready to go on a cruise; right?

7    A.    Yes, I think I said that.

8    Q.    Then Page 35, if you would, please.  Call B324, on

9    the bottom of Page 36, Ms. Martin says, yeah, uh-huh cause

10   LaNora and them going on a cruise and all.  They want casual

11   stuff.  See that there?

12   A.    Yes.  Both of those calls would refresh my

13   recollection that we played calls yesterday about LaNora

14   getting clothes for a cruise.

15   Q.    These are calls between Ms. Martin and Martha Jean

16   West; correct?

17   A.    Which call?  Just these two here?

18   Q.    These two here.

19   A.    Yes.

20   Q.    And Ms. Martin is talking to Ms. West about getting

21   clothes for Ms. Ali to take on her cruise; correct?

22   A.    I would agree with that, yes.

23   Q.    Would you turn to Page 47, please, Call B638.

24   A.    Is this one from yesterday or a new one?

25   Q.    This is from yesterday.  This is another call between

1       Ms. Martin and Martha Jean West; correct?

2       A.      Yes.

3       Q.      And at the bottom of Page 48, Ms. Martin says, and

4       I'll abridge it, she's right here now.  She says, Gwen, she

5       told me to call you.  She said she also wants some -- if you

6       get any sundresses, she wants them; correct?

7       A.      That's what the transcript says, yes.

8       Q.      And then at Page 49, Ms. Martin says -- starts out

9       inaudible and they call me back if they see inaudible if they

10      had sundresses.  But I refused.  I just called them back, but

11      they said they got rid of them.  Ms. West says, yeah, she

12      probably -- I'll check at Margarita's.  I can let Ralph

13      Lauren as designer, like they tie around the neck.

14              Do you see that?

15      A.      That's what the transcript says, yes.

16      Q.      Do you have any reason to say that the transcript is

17      inaccurate?

18      A.      We just went over one that was inaccurate, this

19      transcript.  I did not compare this transcript to the call.

20      Q.      You heard the call yesterday; correct?

21      A.      Yes.

22      Q.      You did not point out any inaccuracies; correct?

23      A.      I was not asked to, no, I did not.

24      Q.      Finally on this topic, Page 45 if you would, Call

25      B634.

1      A.      Page 45?

2      Q.      Yes.

3      A.      Okay.

4      Q.      Another call.  This is between Ms. Martin and someone

5      named Kathy; correct?

6      A.      I don't know who it's between.  It's just listed as

7      Kathy.  I don't know how they did the identification.  I did

8      recognize Ms. Martin.  Did we play this one yesterday?

9      Q.      I believe we did, yes.

10     A.      I don't recall.  The transcript reflects that it's

11     with Paulette Martin and Kathy, but I just don't remember

12     this call yesterday, if we played it.

13     Q.      In this call, Ms. Martin is asking Kathy, did you get

14     rid of those sundresses, and Kathy says, yes; correct?

15     A.      That's what the transcript says, yes.

16     Q.      Then later on, Ms. Martin says, okay, because someone

17     was here and I was telling her about them and she was

18     interested.  Okay, no problem.  When you get some more small

19     sizes, like 2 or 4, and a 12 or 14, let me know; correct?

20     A.      That's what the transcript says, yes.

21     Q.      And Ms. Martin is inquiring into sundresses; correct?

22     A.      I have no idea.  I have no opinion about this call.

23     Q.      She says she's inquiring about the sundresses?

24     A.      That's what the transcript says, yes.

25     Q.      Do you believe this is a coded call of any sort?

1    A.      Ms. Martin is a drug dealer, but I have no opinion

2    about this call.

3    Q.      Do you have any reason, other than your opinion is

4    that Ms. Martin is a drug dealer, that this call is about

5    drugs?

6    A.      I have many reasons to suspect calls, communications

7    with Ms. Martin.  Without knowing who Kathy is or Kathy LNU,

8    I have no opinion about this call.

9    Q.      On this call, Ms. Martin is calling somebody and

10   asking -- using the word sundress and asking about, did you

11   get rid of those sundresses; correct?

12   A.      That's what the transcript says, yes.

13   Q.      Then on Page 49, Ms. Martin says to Ms. West in the

14   middle of the page, I just called them back, but they said

15   they got rid of them.  The first call Ms. Martin says, did

16   you get rid of those sundresses, took place on March 15 of

17   2004 at 1:39 p.m; correct?

18   A.      Yes.

19   Q.      And the call between Ms. Martin and Ms. West took

20   place six minutes later; right?

21   A.      That's correct.

22   Q.      And Ms. Martin and Ms. West are talking about

23   clothes, right?

24   A.      Yes, I believe that is true.

25   Q.      And Ms. Martin is telling Ms. West, I just called

1    them back, but they said they got rid of them, and Ms. Martin

2    is talking about sundresses; correct?

3    A.      That's what's reflected in the transcript, yes.

4    Q.      So it would be reasonable to form the opinion that

5    when Ms. Martin was talking to Kathy, she was actually

6    talking about sundresses, right?

7    A.      That may be her opinion.  I have not offered an

8    opinion and do not have an opinion about that call.

9    Q.      Turn your attention, please, to Page 231 in the

10   defendants' book, Call B44.

11           MR. MCKNETT:  Mr. Mitchell, if you would, please.

12           (Audio recording begins playing at 12:31 p.m.)

13   (Audio recording stops playing at 12:31 p.m.)

14           BY MR. MCKNETT:

15   Q.      Sergeant, the reference to size 10 or 12, do you have

16   an opinion about the meaning of that?

17   A.      Yes, I do.

18   Q.      What is that?

19   A.      Talking about size 10, 12.

20   Q.      Dinner dress, or a dance for a dinner dress (sic),

21   right?

22   A.      They're talking about clothing.

23   Q.      Excuse me, a dance for a dinner?

24   A.      I'd have to hear the whole call, but I don't see

25   anything untoward there.

1    Q.      Have you ever been on a cruise?

2    A.      No.

3    Q.      Detective, I'm just going to ask you about a rather

4    lengthy series of calls, and what I will do is ask Mr.

5    Mitchell to play them all, and then I'll ask you about them.

6            MR. MCKNETT:  Mr. Mitchell, I'm starting with Call

7    4662 on Page 254.

8            THE WITNESS:  I'm sorry, what page number was that

9    again?

10           MR. MCKNETT:  254.

11           (Audio recording begins playing at 12:32 p.m.)

12   (Audio recording stops playing at 12:33 p.m.)

13           MR. MCKNETT:  I'm sorry, Your Honor.  I had edited

14   down this transcript, and apparently it didn't get properly

15   communicated to Mr. Mitchell.

16           MR. MITCHELL:  It did.

17           MR. MCKNETT:  It did?

18           MR. MITCHELL:  Yes.

19           MR. MCKNETT:  Okay.  I'm sorry, you're right.  I

20   apologize.  Can you continue, Mr. Mitchell?

21           (Audio recording begins playing at 12:34 p.m.)

22   (Audio recording stops playing at 12:35 p.m.)          MR.

23   MCKNETT:  Would you play Call B4663, please Mr. Mitchell?

24           (Audio recording begins playing at 12:35 p.m.)

25   (Audio recording stops playing at 12:36 p.m.)          MR.

1     MCKNETT:  Mr. Mitchell, please play B4670 on Page 267.

2               (Audio recording begins playing at 12:36 p.m.)

3     (Audio recording stops playing at 12:38 p.m.)     MR.

4     MCKNETT:  Page 270, Call B4671, Mr. Mitchell.

5               On Page 281, Call B4722.

6               (Audio recording begins playing at 12:39 p.m.)

7               (Audio recording stops playing at 12:39 p.m.)

8     MR. MCKNETT:  Call B4739 on Page 281.

9               MS. JOHNSTON:  Your Honor, we will stipulate that

10    that's a fax tone to save the problem of everyone listening

11    to a fax beeping.

12              MR. MCKNETT:  Thank you, Ms. Johnston.

13              And the next call A1389 on Page 283.

14              (Audio recording begins playing at 12:39 p.m.)

15              (Audio recording stops playing at 12:40 p.m.)

16              MR. MCKNETT:  Ms. Johnston, the next two?

17    MS. JOHNSTON:  Absolutely.  We will stipulate to any fax

18    tones.

19              MR. MCKNETT:  That would be B4740 and B4741.  We will

20    stipulate, Your Honor, that those are fax tones.  Call B4766,

21    Mr. Mitchell.

22              (Audio recording begins playing at 12:41 p.m.)

23    (Audio recording stops playing at 12:43 p.m.)

24              MR. MCKNETT:  Page 303, Mr. Mitchell Call B4906.

25              (Audio recording begins playing at 12:44 p.m.)

1      (Audio recording stops playing at 12:44 p.m.)

2              MR. MCKNETT:  And finally in this series, Call B4907,

3      Page 305.

4              (Audio recording begins playing at 12:44 p.m.)

5      (Audio recording stops playing at 12:44 p.m.)

6              MR. MCKNETT:  Thank you, Mr. Mitchell.

7              BY MR. MCKNETT:

8      Q.      Sergeant, is it fair to say that these calls are all

9      related to the same subject matter?

10     A.      I believe that's accurate.

11     Q.      They're all, are they not, calls in which Ms. Martin

12     and Ms. Ali are talking about Ms. Ali preparing a letterhead

13     for Ms. Martin; correct?

14     A.      I believe so, yes.

15     Q.      And the letterhead -- this whole series of

16     conversations was kicked off when Ms. Martin talked to Mr.

17     Williams, Gilbert Williams in Call B4662 on Page 254 in which

18     Mr. Williams tells Ms. Martin to fax him a letterhead with

19     your stuff on it; correct?

20     A.      That's one of two possibilities.  There were also

21     other things going on in the investigation that might have

22     prompted this need.

23     Q.      Well, that's what Mr. Williams says, isn't it, in the

24     conversation?

25     A.      That is what he says.

1    Q.      Mr. Williams says on the bottom of Page 259, you are

2    going to send me a letterhead, you're going to fax me a

3    letterhead with your stuff on it.  Those are his words;

4    correct?

5    A.      I believe so, yes.

6    Q.      And at the end of that call, it appears to be the

7    very next call, the call between Ms. Martin and Mr. Williams

8    is Call B4626.  The next call is B4663 and that's the call in

9    which Ms. Martin says she needs Ms. Ali to do some type of

10   letterhead with PTK Associates on it, cause Gilly's saying I

11   need.  You know, he's going to need me to fax him a letter as

12   to what I want him to say or something; correct?

13   A.      Yes, I heard the call.  That's what the transcript

14   reads.

15   Q.      So in the first call, Mr. Williams is telling Ms.

16   Martin to fax him something on her letterhead about an

17   announcement that's going to be made; correct?

18   A.      Yes, I believe that's accurate.

19   Q.      The very next call, Ms. Martin asked Ms. Ali to

20   prepare the letterhead for her; correct?

21   A.      I believe that's accurate.

22   Q.      And then the rest of the calls have to do in one way

23   or another with Ms. Ali getting the right street address,

24   getting the right phone number, faxing another sample to Ms.

25   Martin for her review, Ms. Martin and Ms. Ali talking about

1     it, Ms. Ali making some changes and then faxing the changed

2     letterhead over and so forth; correct?

3     A.      I believe that's an accurate summary, yes.

4     Q.      The last conversation in that series, B4907 on Page

5     305, Ms. Martin asks Ms. Ali to prepare a similar letterhead

6     but with a different identification in it, PM-1

7     Entertainment; correct?

8     A.      Yes.

9     Q.      Now, when you testified several weeks ago, you

10    referred to calls -- let me see if I can find them here --

11    call -- in the government's book, if you would.  I turn to

12    that, though, let me -- this whole series of calls between

13    Ms. Martin and Ms. Ali and the one call between Ms. Martin

14    and Mr. Williams started on April 27, '04 at about 9:48 in

15    the evening and ended with Call 4907 two days later about

16    5:20 in the evening; correct?

17    A.      That sounds about right.

18    Q.      When you testified, first you referred to Call A16 --

19    excuse me A1363 on Page 402 in the government's book.

20    A.      Is that in Book 3?

21    Q.      I think it's Book 2.  Thank you, Ms. Johnston.  Do

22    you have that there?

23    A.      Yes.

24    Q.      That's a call on April 28, '04, which is in that same

25    period of days; correct?

1    A.        I actually forgot the date range, but it sounds about

2    right.

3    Q.        27th to 29th?

4    A.        Sounds about right.

5    Q.        The dates on the transcripts; correct?

6    A.        Correct.

7    Q.        So on April 28, '04, about 9:53 in the morning, Ms.

8    Martin and Ms. Ali talk about -- actually, it looks like Ms.

9    Ali does most of the talking in this conversation and she's

10   talking about an answering service for the place, a fax

11   machine, everything will just look official when you're doing

12   this business because everything's coming from the same

13   address; correct?

14   A.        Yes.

15   Q.        It would appear, would it not, that they're still

16   talking about the same event, the preparation of the

17   letterhead for Ms. Martin to use in connection with her

18   entertainment business efforts with Mr. Williams.

19   A.        This went on, for my recollection, is maybe even two

20   or three days.  It went on for a period of time.

21   Q.        That's what this conversation is about; correct?

22   A.        Yes.

23   Q.        If you would turn, please, to a call in the

24   government book again on Page 404, B4758.

25   A.        I'm sorry, the page number again?

1    Q.      404.

2    Q.      Do you have that there?

3    A.      This is the same one we just talked about; isn't it?

4    Q.      No, I think it's the next one.  I think the one we

5    just talked about was Ms. Ali talking to Ms. Martin.

6    A.      Oh, okay, yeah.  Yes, I have it in front of me.

7    Q.      This is a conversation between Ms. Martin and Larry

8    Nunn; correct?

9    A.      Yes.

10   Q.      And they're talking about Mr. Nunn bouncing right out

11   there, which is Office Depot or Staples to get time sheets;

12   correct?

13   A.      Yes.

14   Q.      And then he asks, do I still need her to fill it in;

15   correct?

16   A.      Yes.

17   Q.      There was not a reference to Ms. Ali, was it?

18   A.      I think you asked me that before, and I think my

19   answer was, I have no idea who he's referring to.

20   Q.      Didn't you say it was not a reference to Ms. Ali?

21   A.      If that's your recollection, I'll go with that

22   answer, too.  I have no idea who he's referring to.

23   Q.      I don't want to go with my recollection.  Do you have

24   an opinion who Mr. Nunn is referring to?

25           MS. JOHNSTON:  Objection.  Asked and answered.  He

1      doesn't know.

2                THE COURT:  Sustained.

3                MR. MCKNETT:  He didn't say he doesn't know, Your

4      Honor.  He said, if it's my recollection, he'll go with that.

5      I want to know what his recollection is.

6                THE COURT:  All right.  You answer.

7                THE WITNESS:  I have no idea.

8                BY MR. MCKNETT:

9      Q.     You have no reason -- well, strike that.

10             Let's go to Page 406.  That's a call on April 28,

11     Call No. A1407, again, between Ms. Martin and Mr. Nunn, and

12     at the bottom, Ms. Martin says, I put the fax machine on when

13     I left.  Do you see that there?

14     A.     Yes.

15     Q.     And then at the top of the next page, Ms. Martin

16     tells Mr. Nunn that he can fax it on to the house and then

17     fax it to that number in California.  Do you see that?

18     A.     Yes.

19     Q.     These calls are between Ms. Martin and Mr. Nunn.  Do

20     you have an opinion about those calls?

21     A.     Specifically Call A1407 and which one?

22     Q.     The two I just referred.

23     A.     B4758?  Those two?

24     Q.     Those two.

25     A.     Yes, I have an opinion about those calls.

1    Q.      Do you have an opinion as to whether those two calls

2    are related to the series of calls that we had played for you

3    between Ms. Martin and Ms. Ali?

4    A.      Yes, they are related.

5    Q.      They are related.

6    A.      Yes.

7    Q.      What in these two calls tells you that they are

8    related to the other series of calls between Ms. Ali and Ms.

9    Martin?

10   A.      There was a -- I think it's already in evidence, but

11   we actually introduced the fax letterhead that Ms. Ali

12   prepared for Ms. Martin that are discussed here in the two

13   calls, B4758 and A1407.

14   Q.      What you prepared, if I recall correctly, was a time

15   sheet; correct?

16   A.      That was what was faxed.  That's correct.  But the

17   cover sheet is what they're talking about here that Ms. Ali

18   prepared.

19   Q.      Ms. Ali prepared the cover sheet that was attached to

20   the time sheet; is that correct?

21   A.      She prepared the fax cover sheet, which I think we've

22   heard however many calls about that, Ms. Ali -- excuse me,

23   that Ms. Martin used in her discussing here in A1407 and

24   B4758.

25   Q.      I want to be -- I'm not sure I understand you.  Are

1    you saying that Ms. Ali prepared the cover sheet that Ms.

2    Martin used with regard to the time sheet that Ms. Martin and

3    Mr. Nunn were talking about?

4    A.      Yes.

5    Q.      Ms. Ali had nothing to do with the preparation of the

6    time sheet; did she?

7    A.      No.  I don't believe -- I think the calls are pretty

8    clear that Mr. Nunn prepared the time sheets.

9    Q.      The conversation between Ms. Martin and Mr. Nunn took

10   place on April 28 about 7:22; correct?

11   A.      The telephone conversation took place at that date

12   and time.

13   Q.      That's the one I'm referring to, Call A1407; correct?

14   A.      The telephone conversation took place at that time,

15   yes.

16   Q.      That's the one I'm referring to, Call A1407; right?

17   A.      Yes.

18   Q.      And in this conversation, Ms. Martin is telling Mr.

19   Nunn to fax something to her; correct?

20   A.      Yes.

21   Q.      Did Mr. Nunn -- is it your testimony that Mr. Nunn

22   used the fax cover sheet that Ms. Ali prepared?

23   A.      That's not my testimony, no.

24   Q.      What is your testimony?

25   A.      Regarding the fax cover sheet?  If you want a whole

1    rundown of this is Mr. Nunn prepared fraudulent time sheets,

2    she sent them over to Ms. Martin, Ms. Martin then took the

3    fax cover sheet with the fraudulent time sheets and faxed

4    them to another party for another purpose.

5    Q.      That's your opinion.

6    A.      That's what happened.

7    Q.      That's your opinion about what happened; correct?

8    A.      That's my opinion about what happened.

9    Q.      It would appear, though, wouldn't it, that as late as

10   April, Ms. Martin hadn't yet reviewed the fax cover sheet

11   that you say Ms. Martin and Ms. Ali prepared.  If you look at

12   the conversation, B4906, on April 29 at 5:18 in the evening,

13   which is the day after the conversation between Mr. Nunn and

14   Ms. Martin, Ms. Martin is telling Ms. Ali that she's just now

15   reading over the fax cover sheet.

16   A.      I believe that's accurate.  I believe she faxed that

17   to the third party after.  I'd have to look at the actual fax

18   to recover the exact date, but I believe that's accurate.

19   Q.      So the sequence is that starting with the

20   conversation with Mr. Williams --

21   A.      No, I disagree with that.

22   Q.      Well, can I finish my question?

23   A.      Okay, but I disagree with the starting.  You said the

24   sequence.

25   Q.      I haven't finished the question.

1    A.      I apologize, Mr. McKnett.  Please ask your question.

2    Q.      The series of conversations started with the

3    conversation between Ms. Martin and Mr. Williams in which Mr.

4    Williams asked Ms. Martin to fax him a letterhead; correct?

5    A.      I disagree with that.

6    Q.      When did the conversations between Ms. Martin and Ms.

7    Ali concerning a letterhead begin, in your opinion?

8    A.      There was a -- well, that's a different question now.

9    Q.      No, it's not.

10   A.      All right.  There were two events that were going on

11   during this time period that prompted Ms. Martin to need a

12   fax machine.  One was the one we discussed; one was another

13   issue that came up as a result of an interview she had and as

14   a result of that interview, that necessitated her needing the

15   fax.

16           My recollection, and I may be wrong, was that the

17   interview took place before the conversation with Mr.

18   Williams.  I believe that's accurate.

19   Q.      I think you just answered the question I may have

20   been unartfully trying to ask.  There were two separate

21   events going on here; is that correct?

22   A.      That is correct.  That's what I said.

23   Q.      The only event that Ms. Ali was involved in was the

24   preparation of the letterhead; correct?

25   A.      Yes, I believe I've testified to that.

1    Q.       She was not involved in the preparation of any time

2    sheets; correct?

3    A.       My opinion is she is not involved in preparation of

4    any time sheets.  I believe Mr. Nunn did that with Ms.

5    Martin.

6    Q.       And she was not involved in the transmission by fax

7    or otherwise of any time sheets; correct?

8    A.       I believe that's accurate, yes.

9    Q.       If you would turn now to Page 389 -- strike that.

10            Let me turn your attention to a conversation you

11   talked about earlier, if can lay my hands on it here.  It's

12   in the government book at Page 599.

13            MR. MCKNETT:  Your Honor, I know we were right up at

14   lunch, but I'm just about finished.

15            THE COURT:  All right, finish him up.  That's fine.

16            BY MR. MCKNETT:

17   Q.       Do you see that call there, B7815?

18   A.       Yes.

19   Q.       It was made on May 26 of '04 at 12:19, and the

20   beginning part is what I want to focus your attention on.  It

21   starts out with Ms. Martin and Ms. Ali just saying hello.

22   Then Ms. Ali says, good.  Good.  Did -- were you able to get

23   -- and then Ms. Martin simultaneously speaks yeah, I have it,

24   unintelligible, yeah, I have it.  Do you have an opinion

25   about what they were talking about there?

1    A.      I think I've already voiced it, but yes, I do.

2    Q.      What is that opinion?

3    A.      Ms. Ali is asking her whether she was able to prepare

4    the package of drugs and Ms. Martin says, yes.

5    Q.      Would you turn your attention to Page 387 in the

6    defendants' book?  This conversation took place on May 25,

7    the day before the conversation that the government played

8    and we just talked about, okay?

9    A.      Are you asking me what time this call was

10   intercepted?

11   Q.      It was the day before the one we just talked about;

12   correct?

13   A.      Call was intercepted on May 25 at 4:23 in the

14   afternoon.

15   Q.      And Call 7815 was intercepted on May 26, the next

16   day; correct?

17   A.      Is that the one we played in the government's book?

18   Q.      Yes.

19           MR. MCKNETT:  Mr. Mitchell, if you would play that.

20           (Audio recording begins playing at 1:03 p.m.)

21           (Audio recording stops playing at 1:05 p.m.)

22           BY MR. MCKNETT:

23   Q.      Sergeant, this is a call on the evening of May 25,

24   2004; correct?

25   A.      As I said, yes.

1    Q.      And Ms. Ali is asking Ms. Martin if she can go to the

2    post office tomorrow, which would be May 26, and pick up a

3    certified letter from the IRS addressed to her husband;

4    correct?

5    A.      It's possible about that.  I'd like to hear it again.

6    Q.      That's fine.  If you want to hear it again, we can

7    hear it again.

8    A.      Please.

9    Q.      Do you want to hear the entire conversation?

10   A.      If you're asking me to offer an opinion, I'd like to

11   hear the entire conversation.

12   Q.      Fine.

13           (Audio recording begins playing at 1:06 p.m.)

14           (Audio recording stops playing at 1:07 p.m.)

15           THE WITNESS:  I would agree that's what she's asking,

16   yes.

17           BY MR. MCKNETT:

18   Q.      And then the next day, Ms. Ali asks Ms. Martin, were

19   you able to get, and Ms. Martin says, yeah, I have it,

20   unintelligible, yeah, I have it.

21           Having heard Call B7733, does that affect your

22   opinion about the conversation that Ms. Ali and Ms. Martin

23   had the next day on May 26?

24   A.      No.

25   Q.      And finally, I want to refer you to the government's

1     book, B8110, Page 612.  Do have it there?

2     A.     Yes.

3     Q.     In this conversation, Ms. Martin and Ms. Ali

4     initially talk about Corus, jerk chicken, food in the

5     refrigerator and stuff; correct?

6     A.     Yes.

7     Q.     And the top of the next page, Ms. Ali says, but I

8     need another dress.  And if you remember, I asked you if it

9     sounded to you like Ms. Ali hadn't quite finished her

10    statement before Ms. Martin interrupted with okay.  And you

11    disagreed with me.  Do you recall that?

12    A.     Actually, I don't, Mr. McKnett.  I'm sure it did

13    happen.  I just don't recall it.

14    Q.     Then Ms. Martin said, okay.  And Ms. Ali said, okay,

15    yeah.  So with the ties for, and then Ms. Martin interrupted

16    again; correct?

17         Having heard this series of conversations in which

18    Ms. Martin is talking to Ms. West about buying clothes for

19    Ms. Ali, specifically sundresses, specifically Ralph Lauren

20    sundresses that tie around the back.

21         MS. JOHNSTON:  Objection, there is no reference to

22    Ms. Ali in conjunction with the Ralph Lauren sundresses in

23    the call that he's played.

24         THE COURT:  Sustained.  Rephrase.

25         BY MR. MCKNETT:

1      Q.     Having heard a series of conversations in which Ms.

2   Martin talks with Ms. West about buying clothes for Ms. Ali

3   for Ms. Ali to wear on a cruise, and conversation -- at least

4   one conversation in which Ms. West and Ms. Martin talk about

5   Ralph Lauren sundresses that tie in the back, and at least

6   some conversations in which Ms. Ali -- Ms. Martin is talking

7   to Ms. West about Ms. Ali being interested in sundresses.

8       Do you have -- you feel that you need to change your

9   opinion about this being a drug-related conversation?

10      MS. JOHNSTON:  Objection.  Misstates the calls that

11  were played.

12      THE COURT:  Overruled.

13      THE WITNESS:  No.  In fact, I think this distribution

14  is even detailed in Hayward 7.  My opinion has not changed,

15  no.

16      MR. MCKNETT:  Thank you, Sergeant.

17      I'm finished, Your Honor.

18      THE COURT:  Does the government wish to have any

19  redirect?

20      MS. JOHNSTON:  Absolutely, Your Honor.

21      THE COURT:  How long will that be?

22      MS. JOHNSTON:  Oh, probably an hour and a half.

23      THE COURT:  All right.  Well, we will take a break

24  now until 2:15.

25            (Jury excused at 1:11 p.m.)

1                    (Off the record at 1:11 p.m.)

2                    (On the record at 2:25 p.m.)

3            THE COURT:  Ready for the jury?

4        Ms. Johnston, do you really have an hour and a half

5   worth?

6            MS. JOHNSTON:  I may, Your Honor.  It depends on how

7   many objections and bench conferences we have as we go along

8   the way.

9            MR. MONTEMARANO:  Depends what kinds of questions she

10  asks.

11           THE COURT:  I'm praying for brevity, Ms. Johnston.

12           MR. MITCHELL:  Your Honor, may we approach?

13           THE COURT:  What for?  The jury is not here.

14                    (At the bar of the Court.)

15           COURT REPORTER:  Judge, if you could turn on the

16  husher.  I can't hear without it.

17           MR. MITCHELL:  We need to produce a CD for the jury

18  of the calls we played.  I just wanted to make sure there is

19  not going to be a government objection to us producing a CD

20  with all the calls that have already been --

21           THE COURT:  Produce it and verify that it's okay.

22           MS. JOHNSTON:  We would like to review it before it

23  is admitted into evidence.

24           MR. MITCHELL:  That's fine.

25           MS. JOHNSTON:  Make sure there isn't any accidental

1     slipups.

2          THE COURT:  Make sure it's not a rap song or

3     something like that.

4                    (Back in open court.)

5                    (Jury returns at 2:28 p.m.)

6          THE COURT:  I see 15 heads.  You may proceed.

7          MS. JOHNSTON:  Thank you, your Honor.

8                    **REDIRECT EXAMINATION**

9          BY MS. JOHNSTON:

10    Q.     Let me start in a little bit of a reverse order.  Mr.

11    McKnett asked you questions about the call that he had in his

12    transcript book on Page 132, but the government had on Page

13    265.  And why don't you turn to the government's version

14    only, because I'm going to reference you another call in that

15    book, please.

16          On Page 265 -- that's in Volume 2, the one magazine.

17    A.     Yes.

18    Q.     Mr. McKnett referenced you to, and also we had

19    played, I believe it was Call B4134, but let me check in his

20    book.  4134.  Let me just check and make sure that's the call

21    I want to reference on Page 213, and in that call on Page

22    213, do you have that one in front of you from their book?

23    A.     I believe it's in front of Mr. Montemarano there.

24          MS. JOHNSTON:  Mr. Montemarano, may I give him the --

25          MR. MONTEMARANO:  Please.

1              MS. JOHNSTON:  Thank you.

2              BY MS. JOHNSTON:

3    Q.      Do you have that in front of you?

4    A.      What page number?

5    Q.      This started on Page 213.  It was a rather lengthy

6    call.

7    A.      I believe that's a call still on Mr. Montemarano.  I

8    believe that was the call that was handed to me.

9    Q.      I apologize.

10   A.      I do now have it, yes.

11   Q.      Why don't you put it in, if Mr. Mr. Montemarano

12   doesn't have an objection, into that book that is marked as a

13   defendant's exhibit.

14             MR. MONTEMARANO:  Feel free, Sergeant.

15             MS. JOHNSTON:  So that it will be in the appropriate

16   place.

17             BY MS. JOHNSTON:

18   Q.      Now, in this call -- this was a call where there was

19   a discussion about the word catalog showing up on Page 216.

20   Is that -- looking on Page 216 at the bottom of the page, how

21   did Ms. Martin describe the catalog?

22   A.      She said she's looking in the Neiman Marcus catalog

23   right now as we speak.

24   Q.      And then on the next page, is there a further

25   discussion as to which Neiman Marcus catalog it was?

1    A.       Ms. West identifies it as the -- asks is it the

2    Neiman Marcus catalog for spring?  They talk about what's on

3    the front, what color it is, they talk about several things

4    to identify which particular catalog they're talking about.

5    Q.       And it continues on to the next page; is that

6    correct?

7    A.       Yes.

8    Q.       And then there is a lengthy discussion about

9    different brand or different designer clothes; is that

10   correct?

11   A.       Yes.

12   Q.       And that discussion, does it include not only the

13   names of the different individuals but fabrics; is that

14   correct?

15   A.       Yeah, I think they talk about the colors, fabrics,

16   sizes, all the stuff you expect in a catalog of clothes.

17   Q.       Just so the record is clear, did you, based on your

18   investigation, form an opinion as to whether or not Martha

19   Jean West was engaged in distributing drugs or receiving

20   drugs from Ms. Paulette Martin?

21   A.       Yes.

22   Q.       What is that opinion?

23   A.       She was not involved in the sale or distribution of

24   drugs with Ms. Martin.

25   Q.       Is that, in fact, what you testified to originally

1    when you testified a month or so ago?

2    A.      Yes.

3    Q.      Now, when we look at the other call, B2436 on Page

4    265.  Counsel had you introduce the entire transcript where

5    the beginning of it talks about -- discusses Ms. Martin --

6    discusses Ms. Martin getting the -- discussing the call on

7    Page 265 in the government's exhibit is also the same on Page

8    224 in the defense book.

9           Is that -- he included the entire call; is that

10   correct?

11   A.      Yes, I believe we played the entire call.

12   Q.      And the beginning of that call had to do with where

13   Ms. Ali was going to get her toes done before her cruise; is

14   that correct?

15   A.      Yeah, I believe so.  They talked about assorted

16   things.

17   Q.      Did it have anything at all to do with a magazine or

18   clothing?

19   A.      No.  The call abruptly changed at the end, but the

20   first part had nothing to do with magazines or clothes.

21   Q.      Anything to do with catalogs?

22   A.      No.

23   Q.      Anything to do with sundresses or dresses, dinner

24   dresses?

25   A.      I don't believe so, no.

1    Q.      Well, take a moment and look at their version, if you

2    don't mind, on Page 224 so that we can be certain.  It's not

3    Page 224 in their book.  Hold on.

4            MR. MONTEMARANO:  213.

5            MS. JOHNSTON:  No, sir.

6            BY MS. JOHNSTON:

7    Q.      It would be on Page 130 in their book.

8    A.      Yes, it is on Page 130.

9    Q.      Are you looking at the first portion of that, before

10   we get to magazines?  Describe what, if any, discussion is in

11   there relating to clothing.

12   A.      I don't see any.  They're primarily talking about

13   having her toes done and then she goes to have them done.

14   Q.      In fact, there's a typo on there; is there not?  Is

15   the reference to the street is Ridge Road?

16   A.      Yes.

17   Q.      That should be what?  If you remember.

18   A.      It should be what now?  I'm sorry.

19   Q.      Strike that.  It's not important.

20           So in that call, is there any discussion of clothes?

21   A.      No.

22   Q.      Any discussion of a Neiman Marcus catalog?

23   A.      No.

24   Q.      Any discussion of Saint John's?

25   A.      No.

1      Q.      Any discussion about the color of clothes?

2      A.      No.

3      Q.      Or the size of clothes?

4      A.      No.

5      Q.      And the reference to just magazine, is there any

6 description of what kind of magazine?

7      A.      No.

8      Q.      Okay.  And your opinion is that one magazine refers

9 to what?

10     A.      A quantity of -- she's trying to confirm the quantity

11 of drugs, and Ms. Ali says that she has to check on it.

12     Q.      In fact, that was not the only time that the word

13 "magazine" was used in the calls that you played for the

14 Court, was it?

15     A.      I believe there are other calls.

16     Q.      Let me call your attention to Page 274 of the

17 government's exhibit, B2531.  Do you have that in front of

18 you?

19     A.      Yes.

20     Q.      Who were the parties to that call?

21     A.      Paulette Martin and Larry Nunn.

22     Q.      What was the -- did you form an opinion or give an

23 opinion the last time you testified on direct as to what

24 magazine meant in that call?

25     A.      Yes.

1    Q.      What did "magazine" mean in that call?

2    A.      This referred to cocaine, and if -- New York City,

3    excuse me, heroin, and this would have been heroin that Ms.

4    Martin obtained from Ms. Levi for Mr. Nunn.

5    Q.      Any indication in any of the -- as far as you can

6    recall -- in the Martha Jean West calls that you heard as to

7    Larry Nunn obtaining clothing from Martha Jean West?

8    A.      If it is, I certainly don't recall it.

9            MR. MCKNETT:  What was that call number, please?

10           MS. JOHNSTON:  That call number would be B2531 o Page

11   274.

12           BY MS. JOHNSTON:

13   Q.      In addition to that, Mr. McKnett asked you about

14   another call, one of the very last calls in the book.  Do you

15   recall those questions right before we broke?

16   A.      Yes.

17   Q.      In particular was a call in Book 3 on Page 612.  Do

18   you have that call in front of you?

19   A.      Yes, I do.

20   Q.      And 613?

21   A.      Yes.

22   Q.      Just as we're going to sort of put that in context --

23   strike that.

24           To put it in context, what date did this call take

25   place?

1    A.        This took place on the 29th, two days -- two and a

2    half days before the search warrants were executed.

3    Q.        And in that call on Page 612 and 613, you testified

4    concerning the meaning of another dress; is that correct?

5    A.        Yes.

6    Q.        What was your opinion?

7    A.        She's ordering another quantity of cocaine from Ms.

8    Martin, and Ms. Martin says that she had already been to the

9    school where she kept her cocaine stored this morning at 6

10   o'clock.  She was ordering a quantity of cocaine from Ms.

11   Martin.

12   Q.        Is there any description in that call anywhere in

13   that call that further describes that dress?

14   A.        No.

15   Q.        Counsel asked you a lot of questions about Ms. Ali

16   and her planned cruise.  You familiar with those questions?

17   A.        Yes.

18   Q.        What was the date and time of this call?

19   A.        I don't recall the specific dates and times.

20             MS. JOHNSTON:  If I may have the next Sheridan Ali

21   exhibit number for Sheridan Street?  Is it Sheridan Street,

22   please?

23             BY MS. JOHNSTON:

24   Q.        You've reviewed the photographs taken of Paula's

25   School of Performing Arts taken on June 1st, 2004; is that

1    correct?

2    A.      Yes.

3    Q.      Do you recall seeing a rack of clothing found  at

4    Paula's School of Performing Arts?

5    A.      There were not.

6    Q.      Let me show you what we've marked as Ali 9.

7            MS. JOHNSTON:  Mr. McKnett?

8            MR. MCKNETT:  What's in it?

9            MS. JOHNSTON:  Documents from a cruise.

10           MR. MCKNETT:  May I see it?

11           MS. JOHNSTON:  You certainly may.

12           BY MS. JOHNSTON:

13   Q.      While Mr. McKnett is looking at that item, he also

14   asked you some questions about that sundress call.  Let me

15   call your attention, if we could look at Call B634 beginning

16   on Page 45 of the defense exhibit in terms of who was

17   discussing the sundresses with Ms. West.  Do you have that

18   call?

19   A.      Yeah.  This was a person the defense identified as

20   Kathy, last name unknown.

21   Q.      Going then to Call B638 on Page 47.  Do you have that

22   call in front of you?

23   A.      Yes.

24   Q.      Is there a discussion of sundresses in this call with

25   Martha Jean White -- Martha Jean West?  I'm sorry.

1    A.      Yes.

2    Q.      Calling you attention to Page 48 at the bottom of the

3    page.  Does Ms. Martin indicate who it is who's interested in

4    the sundresses?

5    A.      She says Gwen's interested in them.

6    Q.      And indeed, it continues on to the next page; isn't

7    that correct?

8    A.      Yes, they go ahead and identify it can be by Ralph

9    Lauren and they talk about they -- she goes on to describe

10   them.

11   Q.      Including the fact that they're designer stuff and

12   super expensive; is that correct?

13   A.      Yes.

14   Q.      And Ms. Martin responds it doesn't matter.  Gwen wear

15   that kind of stuff?

16   A.      That's correct.

17   Q.      The person who was discussing the sundresses with Ms.

18   West was Ms. Martin for whom?

19   A.      Gwen Levi.

20   Q.      If I could return to the issue about the cruise and

21   Mr. McKnett's questioning that that last call on 28

22   concerned getting a sundress for the cruise, let me show you

23   what's been marked as Ali 9.  I want you to look at some of

24   those documents.  In particular, there's an envelope marked

25   Carnival?

1    A.      Yes.

2    Q.      And welcome aboard?

3    A.      Yes.

4    Q.      Does it reflect the dates of that trip in that

5    document?

6    A.      Yes.

7    Q.      What are the dates of that trip?

8    A.      The sailing date is April 4 of 2004.

9    Q.      And who was the pass -- who were the passengers on

10   that trip?

11   A.      Ms. Ali and her husband, Mr. Garner.

12   Q.      Were there receipts that, in fact, reflect they were

13   on the Carnival cruise?

14   A.      Yes.

15   Q.      What are the dates on those receipts?

16   A.      They would be in the same time period as the tickets,

17   and I think as I testified, she went on a cruise in April.

18   Q.      During your direct testimony, did you ever say --

19   what, if anything, did you say in reference to whether or not

20   there were calls relating to actual tickets for the cruise?

21   A.      I said there were.  Just because a word is used as a

22   code word in one conversation doesn't mean the person can

23   never use it as a legitimate or legal conversation.  There

24   are plenty of examples of that through the wire.

25   Q.      So the cruise documents reflect that the trip

1    occurred before or after that last call asking for another

2    dress?

3    A.      It occurred a month before.

4    Q.      If we could just --

5            MS. JOHNSTON:  Your Honor, if I could publish Ali 9

6    to the jury?

7            THE COURT:  Yes, you may.

8            MR. MCKNETT:  Yes, your Honor.  Your Honor, we will

9    stipulate to the date of the cruise.

10           MS. JOHNSTON:  That's fine.  We've admitted -- we're

11   moving the evidence -- the item into evidence.

12           BY MS. JOHNSTON:

13   Q.      Now, if we could back up here for a moment and talk,

14   first of all, with you generally.

15           You have the logs for lines A and B; is that correct?

16   A.      I'm sorry.  No, I do not have them up here with me.

17   Q.      You had them yesterday.  Can I have logs A and B,

18   please?  Miscellaneous 9 and Miscellaneous 10.  Are these the

19   logbooks for both of those lines?

20   A.      Yes.

21   Q.      Can you tell us how many activations there were on

22   each of those lines?

23   A.      On the B line, there were 8,381 calls or activations;

24   and on the A line, there are 1,771.

25   Q.      You previously testified not all activations are

1    conversations; is that correct?

2    A.       Not all.  There are -- some are not conversations.

3    Q.       There's been much conversation about these log

4    sheets.  What information on that log sheet is generated by

5    the computer?

6    A.       The computer generates a date, time of the call.  It

7    also assigns the call a call number, and there are certain

8    fields that the computer will fill in.  The remaining major

9    fields are filled in by the monitor.

10   Q.       If you can describe which fields the computer fills

11   in by itself and which field the monitors fill in.

12   A.       Besides the date and time, the computer will also

13   fill in when the call was minimized.  You heard breaks in the

14   call, whether there's any of those.  It will fill in the

15   duration of the call and a telephone number for to or from

16   that's available.

17           The monitor then will fill in the synopsis, will also

18   make a determination as to whether the call is pertinent or

19   not to the conversation, which is usually just a checkmark in

20   a drop down menu, and they will also fill their name in.

21   Q.       Who identifies the parties to the call?

22   A.       The monitor will identify the parties to the call as

23   best as possible.  The computer does not.  The monitor will

24   put the names of the persons intercepted.  It usually should

25   be the thing in the synopsis, but they will put the names of

1        the people intercepted, if known.

2        Q.        The names would go right into the synopsis section?

3        A.        Correct.

4        Q.        Is this done in realtime as the monitor is listening?

5        A.        It's done in realtime.  They are actually typing and

6        writing as they are listening to the call.

7        Q.        And your review of those monitors' logs was primarily

8        for what purpose?

9        A.        I think as I testified before, the main purpose to

10       review a call is just to know what's going on.  You can't be

11       there 24 hours a day, so you need to know what's going on in

12       the investigation.  Then you check and make sure -- you go

13       out check and make sure there are no major errors in there.

14       If there is, you put a note in the log saying unknown female

15       is Jane Doe, or whatever the error is.

16       Q.        You've used the example of unknown female as Jane

17       Doe.  Why is that significant?

18       A.        Because especially, as you change monitors for a

19       wire, if someone comes in in the third week of the wire and

20       they're monitoring, everything is going to be unknown to

21       them.  They're not going to know the voices and who belongs

22       to what phone numbers.  It doesn't do you a lot of good to go

23       back and search through all the phone calls and say Paulette

24       Martin, if half her calls are marked as unknown female.  That

25       way, if you're going back and searching for particular calls,

1    you need the person's name so that you can identify that

2    person with that call.

3    Q.       When you say, if you go back in and search --

4    A.       Yes.

5    Q.       -- search the logs after the wiretap is over?

6    A.       Well, at any point in time, you know, you're

7    conducting an investigation, and you may want to look up for

8    a call that was Jane Doe two weeks ago.  Well, if that call

9    has not been identified -- is identified as unknown female,

10   it's going to be very, very difficult to find that call

11   amongst 10,000, 15,000 other calls.  Versus if you can

12   identify by female, you do it by the name in the computer

13   search.

14   Q.       That was the kind of significant mistakes you were

15   looking for in reviewing the logs?

16   A.       That was the main thing were misidentification of the

17   voices, yes.

18   Q.       In terms of the synopsis of the call, what is that

19   used for?

20   A.       That's a legal requirement.  Obviously good for

21   investigation, but the monitor is required to keep a realtime

22   synopsis as best he or she can of a log as it's going on so

23   they can make a determination whether the call is pertinent

24   or not.

25           You can't just sit there on your own accord and not

1          -- excuse me, record the conversation and not synopsize the

2          call as it's being -- taking place.  The  law requires they

3          make a determination whether the call is normal or not.

4          Q.      What roles did those calls play in the preparation of

5          the transcripts that's composed the day after or shortly

6          after the call is intercepted?

7          A.      They would have no role whatsoever.  The only thing

8          they would have, conceivably, you could get the date and time

9          off the logs, but this is -- it's not necessary.  When you

10         pull the calls up to transcribe it in the computer, it's

11         already there, so there would be no need to go to a  logbook

12         to do a transcript.

13         Q.      Could you describe for the ladies and gentlemen of

14         the jury the procedure that was followed and the preparation

15         of the transcripts that eventually ended up here in court?

16         A.      As I testified to, there was a determination made

17         whether they were pertinent or not.  That pertinent

18         determination to transcribe the calls by case agents, they

19         were put in a transcript log.  Contract employees, contract

20         people that were hired by the investigating team were then

21         paid to do the transcript.

22              They were then reviewed several times by agents,

23         officers, myself, secretaries trying to work out and make

24         sure the transcripts get to a final form.  As we saw on both

25         sides of the defense and the government transcripts, it's

1    still a work-in-progress.  As I was listening to calls on the

2    government and defense calls, there's still mistakes made in

3    transcripts.

4    Q.    You made an effort to recorrect them when we played

5    the calls a month ago in front of the jury?

6    A.    Yes.

7    Q.    In terms of the recordings, have all of the

8    recordings been made available to the defendants in this the

9    case?

10          MR. MONTEMARANO:  Objection, Your Honor.

11          Can we be heard at the bench?

12          THE COURT:  Sustained.

13          BY MS. JOHNSTON:

14    Q.    The recordings that the defense played, were those

15    recordings that came from the original ones that you

16    intercepted?

17    A.    Yes.  They got an exact copy.

18    Q.    Were any calls redacted or edited in any fashion

19    before --

20          MR. MONTEMARANO:  Objection.

21          Asked and answered.

22          BY MS. JOHNSTON:

23    Q.    -- before they were turned over to defense counsel?

24          THE COURT:  Overruled.

25          THE WITNESS:  No, they were not.  They had exactly

1          what we had.

2                    BY MS. JOHNSTON:

3          Q.        Now, in terms of Mr. Mitchell questioned you

4          concerning Mr. Bynum and a single call.  Do you recall those

5          questions?  Concerning Call B2429, which is on Page 263 and

6          64 of the government's exhibit.

7          A.        Is that the chicken call?

8          Q.        That would be the Peruvian chicken call.  You're

9          familiar with that?

10         A.        Yes, I am.

11         Q.        What would cause you to go back after you finished

12         your direct testimony and listen to that call over and over

13         again?

14         A.        Mr. Mitchell asked me about it and wanted to hear it

15         with headphones and see if I could hear chicken, as he

16         suggested.

17         Q.        Did you, in fact, hear chicken?

18         A.        No.  I would keep it, as I said, it literally I would

19         listen to it one time, and I then I would think I would hear

20         chickets, and the next time, I would think I would hear

21         chicken.  Based on that, I would put unintelligible and let a

22         jury decide what they think.

23         Q.        If we could have the court exhibit of transcript book

24         number, I think it's one.

25                    MS. GREENBERG:  Two.

1                MS. JOHNSTON:   Two.

2                BY MS. JOHNSTON:

3       Q.       Transcript Book No. 2, please.  I'm going to give to

4       you court's exhibit, government's exhibit CD-1B and ask you

5       to turn to that page.

6       A.       I have it.

7       Q.       No, this is the original exhibit.  I'd like you the

8       turn to that page, please.

9       A.       I'm sorry, what page is it?

10      Q.       Page 263.  Do you have that?

11      A.       Yes, I have it, yes.

12      Q.       If you could, turn to the word "chicken".

13      A.       Yes.

14      Q.       "Tickets," rather.

15      A.       Yes.

16      Q.       I'm going to give you a marker, if you could please

17      cross that out.

18               MR. MONTEMARANO:  Objection, Your Honor.

19               THE COURT:  Overruled.

20               MR. MONTEMARANO:  May we be heard at the bench?

21               THE COURT:  Come on up to the bench.

22                       (At the bar of the Court.)

23               MR. MONTEMARANO:  This book was admitted a month ago

24      in this form.  I submit that it's inappropriate for an

25      exhibit to be altered in any way.  They could admit another

1    one, they could admit another copy of that page as opposed to

2    an entire book.  This is how it came in a month ago.  That's

3    what he testified to.  That supported his testimony at that

4    time.

5           THE COURT:  Mr. Montemarano, the witness has candidly

6    indicated that he has gone out and listened to this

7    particular tape over and over and over again, especially in

8    light of the cross-examination he got about whether he was

9    hearing a word correctly, and he's indicated upon reflection,

10   he thinks the best he can make out of it is "chickets," and

11   therefore, he thinks it is unintelligible.  Obviously, he

12   came in saying tickets --

13          MR. MONTEMARANO:  For the record, Your Honor is

14   extraordinarily kind in calling the detective's admission

15   candid inasmuch as it had to be extracted from him with a

16   pair of pliers.

17          THE COURT:  Candid or not --

18          MR. MONTEMARANO:  I don't wish the Court to think I'm

19   arguing with him.  I wanted our point of view to be on the

20   record.

21          THE COURT:  Okay.

22          MR. MITCHELL:  Your Honor, I assume you will allow me

23   additional cross-examination now that we've changed an

24   exhibit?  He didn't change any exhibits when I was

25   cross-examining him.

```
 1              THE COURT:  Mr. Mitchell, there will be -- it will be
 2      very little, if any, recross.
 3              MS. JOHNSTON:  Your Honor, we will object to any
 4      recross.
 5              THE COURT:  My inclination is none.  You're going to
 6      have to tell me what you want to do.  If you wish, you can
 7      recall him.  There is a limit.
 8              MR. MITCHELL:  I would have no more than three -- two
 9      or three questions.
10              THE COURT:  You're going to have to proffer to me
11      what they are before I permit it.
12              MS. JOHNSTON:  I would like to put on the record, Mr.
13      Mitchell has done the exact same cross twice.
14                  (Back in open court.)
15              BY MS. JOHNSTON:
16      Q.      Do you have that page in front of you?
17      A.      Yes.
18      Q.      If you would, cross out the word tickets and write in
19      unintelligible.
20      A.      (Witness indicating.)
21      Q.      You can put in brackets next to unintelligible,
22      tickets or chicken.
23      A.      (Witness indicating.)  Tickets/chicken; is that fine?
24      Q.      That's fine.
25      A.      Okay.
```

1    Q.      With that change made, could you tell us whether or

2    not you have an opinion as to whether or not that call was

3    drug related?

4    A.      Yeah.  That has nothing to do with the call being

5    drug related.  The discussion at the beginning of the call

6    about her getting the kilo from Mr. Bynum is not affected by

7    that.

8    Q.      Could you describe for us what words are used in the

9    beginning of that call?

10   A.      I guess the middle of the page, Ms. Martin says, did

11   you get the other ticket you wanted?  Yeah, no, no I told you

12   I have to pay for those tickets when I have to get them in.

13   I just have to wait a minute until the show.  That has

14   nothing do with the second part of the conversation.

15   Q.      Therefore, does it have any change in your opinion?

16   A.      No, not at all.

17   Q.      Indeed, if we were to look at some other calls with

18   Mr. Bynum

19           MR. MITCHELL:  Objection, Your Honor.

20           MS. JOHNSTON:  If we could.

21           THE COURT:  To what?

22           MR. MITCHELL:  She's asked to look at other calls for

23   Mr. Bynum.  We didn't look at any other calls for Mr. Bynum.

24   Far beyond.

25           MS. JOHNSTON:  This is redirect.  I'm perfectly

1    permissible to ask him questions about --

2              THE COURT:  Overruled.

3              BY MS. JOHNSTON:

4    Q.      If we could look at some other calls with Mr. Bynum,

5    in particular if we could look at Call B838 on Page 123 in

6    Volume 1.  Do you have that call in front of you?  B838 on

7    Page 123?

8    A.      Yes.

9    Q.      And that is a short call, if I could ask that we play

10   Call B838 on Page 123, please.

11             MR. MITCHELL:  Objection again, Your Honor.

12             THE COURT:  Overruled.

13             MR. MITCHELL:  Same basis.

14             THE COURT:  Overruled.

15             (Audio recording begins playing at 2:58 p.m.)

16             (Audio recording stops playing at 2:59 p.m.)

17             BY MS. JOHNSTON:

18   Q.      What was the drug code used in that call?

19   A.      Ticket.

20   Q.      Okay.  Did that sound at all like chicken to you?

21   A.      No, that sounded clearly like ticket.

22   Q.      If we could go to call A406 on Page 1060, please.

23   And again, this is a brief call, if we could please play it.

24             MR. MITCHELL:  Objection, Your Honor.

25             THE COURT:  Overruled.

1          (Audio recording begins playing at 2:59 p.m.)

2          (Audio recording stops playing at 3:00 p.m.)

3          BY MS. JOHNSTON:

4    Q.    Do you have an opinion as to what code word was used

5    in that call for drugs?

6          MR. MITCHELL:  Objection.

7          THE COURT:  Overruled.

8          THE WITNESS:  At the bottom of the page, Mr. Bynum is

9    talking in a fairly loud and clear voice, and then he drops

10   his voice and says, I need I need another one of those

11   tickets I just got from you, almost whispering, and the code

12   word is tickets.

13         BY MS. JOHNSTON:

14   Q.    Likewise, is Ms. Martin's response is tickets used in

15   the same manner?

16   A.    Yeah, she had no trouble hearing.

17   Q.    In your previous direct examination was -- did you

18   testify that you did not include every call between these

19   parties in the calls that were played before the jury; is

20   that correct?

21   A.    That's correct.

22         MS. JOHNSTON:  If I could, Your Honor, I have an

23   additional call, B58, that I'd like to play for you, if we

24   could pass out the transcripts.  It's a half a page

25   transcript, Your Honor.

```
1              MR. MITCHELL:  Objection.

2              THE COURT:  Overruled.

3              MS. JOHNSTON:  If we could play Call B58 --

4    BY MS. JOHNSTON:

5    Q.      Before we do that, Agent Sakala, would you please

6    check your logs to make sure the date and time is accurate on

7    the transcript?

8    A.      Call B58 was intercepted on March 9, 2004, at 6:26 in

9    the morning.

10             MS. JOHNSTON:  If we could please play Call B58.

11             (Audio recording begins playing at 3:03 p.m.)

12   (Audio recording stops playing at 3:03 p.m.)

13             BY MS. JOHNSTON:

14   Q.      Based upon your training and experience, what was Ms.

15   Martin advising Mr. Bynum in this call?

16   A.      If he wanted to come over and pick up the drugs from

17   her, he better get moving because she was heading out of

18   there.

19   Q.      What code word for drugs was used in that call?

20   A.      Ticket.

21   Q.      And in this call, was there any reference to a show,

22   a concert, a movie, a ball game?

23   A.      There was no identifying things that you would

24   normally associate with a ticket, like for example, the

25   cruise calls that we played.  It clearly identified that what
```

1    they were doing, the tickets to Las Vegas, they talked about

2    staying in a hotel, other normal things you would see in

3    normal conversation.

4    Q.    Now, if we could move on to the clothing calls that

5    were played in terms of the calls with Martha Jean West.  Do

6    you recall those series of calls generally?

7    A.    Yes.

8    Q.    Could you explain, you didn't include any of those

9    calls in the calls that were played during your direct

10   testimony.

11   A.    Ms. West was not involved in the drug business with

12   Ms. Martin or anybody else at the defense table.

13   Q.    Now, were there occasions when you had calls that

14   included references to drugs and clothing?

15   A.    Yes.

16   Q.    And if I could play -- did we play all of those calls

17   before the jury?

18   A.    No.

19   Q.    If I could, Your Honor, I have three additional calls

20   I would like to play.  We've put them on a disk marked as

21   CD-7.

22          MR. MONTEMARANO:  Do we have numbers?

23          MS. JOHNSTON:  Yeah, the call numbers will be A271,

24   A431, and B2825.

25          MR. SUSSMAN:  I'm sorry, you said previously unplayed

1    calls?

2         MS. JOHNSTON:  These are previously unplayed calls.

3         MR. MONTEMARANO:  Your Honor, the defense objects and

4    request to be heard at the bench.

5         THE COURT:  You may.

6              (At the bar of the Court.)

7         MR. MONTEMARANO:  As the Court will note, these were

8    three calls between Ms. Martin and Ms. Levi.  My calls

9    involved Ms. Martin and Ms. West, or Ms. Levi and Ms. West,

10   never Ms. Martin and Ms. Levi.  There may have been other

11   coded language relating to clothing.

12        THE COURT:  Your objection is overruled.  I permitted

13   the defense to recall the expert to challenge his opinion on

14   the basis of recordings that he had considered but had not

15   mentioned in his testimony.  These are other recordings that

16   they can call and your objection is overruled.

17              (Back in open court.)

18        BY MS. JOHNSTON:

19   Q.    If could begin with Call A271.  First of all, agent

20   -- Sergeant Sakala, could you please check the log to make

21   sure the dates and times are correct?

22   A.    271 was intercepted on March 17 at 11:23 in the

23   morning.

24        MS. JOHNSTON:  If we could please play call A271.

25              (Audio recording begins playing at 3:09 p.m.)  (Audio

1    recording stops playing at 3:09 p.m.)    BY MS. JOHNSTON:

2    Q.      Sergeant Sakala, who were the parties to that call?

3    A.      Paulette Martin and Gwen Levi.

4    Q.      The same Paulette Martin and Gwen Levi that were on

5    the telephone call that we heard with Ms. West?

6    A.      Yes.

7    Q.      In this call, did you form an opinion as to -- do you

8    have an opinion as to whether any part of this call is drug

9    related?

10   A.      Yes.

11   Q.      What is that opinion?

12   A.      The bottom third of the call is where Ms. Martin

13   says, you know that $4.50 I gave you, was for six tickets for

14   the show.  That's $450 for six grams of heroin, $75 a gram.

15   Q.      Now, in terms of the part about the beginning of the

16   call about money for Kevin's shoes, do you have any opinion

17   as to what that relates to?

18   A.      That's referencing Kevin Scott.  She bought clothes

19   from Kevin Scott.

20   Q.      Does shoes refer to actual shoes?

21   A.      Yes.

22   Q.      Now, if we could go to the next call, A431, please.

23   And again, if you could check the log to see if the dates and

24   times are correct.

25   A.      A431 was intercepted on March 22, 2004, at 1:17  in

1    the afternoon.

2    Q.       If we could please play A431.

3             (Audio recording begins playing at 3:11 p.m.)

4             (Audio recording stops playing at 3:12 p.m.)   BY MS.

5    JOHNSTON:

6    Q.       Based on your training and experience -- strike that.

7             Can you identify the parties to the call?

8    A.       That's Paulette Martin and Gwen Levi again.

9    Q.       Based on your training and experience, do you have an

10   opinion as to whether any of that call is drug related?

11   A.       Yes.

12   Q.       What portion of the call is drug related?

13   A.       The 30 tickets for Harvey's show refers to Ms. Martin

14   ordering 30 grams of heroin from Ms. Levi.

15   Q.       Any part of that call that is related to actual

16   clothing as opposed to clothing being used as a drug code?

17   A.       Yes.

18   Q.       What is that?

19   A.       The second part where she's talking about the suit

20   with Kevin, that's reference to Kevin Scott again, and that's

21   actual clothes.

22   Q.       On Page 2 of that call where it refers to a rust

23   suit?

24   A.       Yeah.  He wanted -- they further identify the suit by

25   color, and then they talk over each other, but that's about

1      clothes.

2      Q.      If we could go to the next call, B2825.  If you would

3      check your log and make sure the date and time is correct on

4      that call.

5      A.      2825 was intercepted on April 5, 2004, at 6:13 in the

6      evening.

7              MS. JOHNSTON:  If we could play this call, please.

8              (Audio recording begins playing at 3:13 p.m.)  (Audio

9      recording stops playing at 3:15 p.m.)

10             BY MS. JOHNSTON:

11     Q.      Now, Sergeant Sakala, who are the parties to that

12     call?

13     A.      Paulette Martin and Gwen Levi.

14     Q.      Do you have any opinion as to whether or not any of

15     that call is drug related?

16     A.      Yes.

17     Q.      What portion of that call would be drug related?

18     A.      Well, the fact that Gwen Levi is in New York is drug

19     related, but the call --

20     Q.      Why is the fact that Gwen Levi is in New York

21     statement make it drug related?

22     A.      She was up there during this time to purchase from

23     Mr. Uriarte heroin and the part of the conversation with

24     Paulette Martin, she says she's got 30 tickets to the show,

25     she's talking about 30 grams of heroin.

1    Q.      That she's sold?

2    A.      Yes.

3    Q.      Now, there's a discussion here about Gucci and Louis

4    Vuitton and Saint John's and a catalog.  Do you have an

5    opinion as to what was being discussed in that portion of the

6    call by Ms. Martin --

7    A.      Yes.

8    Q.      -- and Ms. Levi?

9    A.      They're talking about clothes.  They actually

10   identify clothes.  And Ms. Martin asked her to pick up --

11   asked her to ask the salespeople do they have a catalog.

12   Q.      Could you explain to us what the term "catalog" in

13   this call means?  Does that refer to drugs?

14   A.      No, nothing to do with drugs.

15   Q.      Could you describe for us what is the difference

16   between the "catalog" used in this call and the term

17   "magazine" as it was used in the Ali call and the Nunn call

18   that we heard earlier this afternoon?

19   A.      In this call, they talk -- they have a general

20   conversation about clothes.  It flows perfectly fine with the

21   conversation.  In the other calls, it makes no sense

22   whatsoever in the terms of the conversation.  It's just stuck

23   in there.

24   Q.      Indeed, in terms of your interpretation that Ms. Ali

25   had picked up drugs there, let me show you what's been

1        admitted as Government's Exhibit NY-1.

2                 MR. MCKNETT:  Excuse me.  Who did you say?

3                 MS. JOHNSTON:  I'm sorry, Ms. Levi.  I apologize, Mr.

4        McKnett.

5                 MR. MCKNETT:  Thank you.

6                 BY MS. JOHNSTON:

7        Q.       That Ms. Levi had picked up heroin in New York, is

8        that corroborated by the chart or log on Mr. Uriarte?

9        A.       Yes.  They have dates 4/6 -- 4/5, 4/6, which

10       correspond to the call on 4/5 and shows a distribution of 2.6

11       kilograms of heroin to Ms. Levi on the 6th.

12       Q.       Similarly, were there -- there were some calls that

13       we played originally that referenced dresses that you had

14       formed an opinion of.  If we could look briefly at Call

15       B7782, I believe on Page 595.  Do you have that call in front

16       of you?  It would be in Book 3.

17       A.       Yes.

18       Q.       And who are the parties to that call?

19       A.       Paulette Martin and George Harris.

20       Q.       And is there a reference in that call to clothes?

21       A.       Yes.

22       Q.       What does that reference?

23       A.       Mr. Harris says I need -- I only need two size eight

24       dresses.

25       Q.       Is there any significance to his hesitation in your

1    opinion?

2    A.     Yes.

3    Q.     What is that?

4    A.     Quite frequently, when people talk in codes, they're

5    searching for the words, and I think we've seen dozens and

6    dozens of examples throughout this case, but they're

7    searching for how to relay what they want to mean the message

8    they want to get to the other person.

9          Like I'm doing now, stretching for the words to get

10   that meaning across.  So quite frequently, you will see

11   hammering -- the stammering, hesitation, a drop in the voice.

12   Not always, but quite frequently.

13   Q.     In that call, does Ms. Martin advise Mr. Harris where

14   he should meet her?

15   A.     Not in this call, but this would have been after she

16   moved the drugs to the school, so they make arrangements to

17   meet at the school, which is what they had to do.

18   Q.     And she says in here, I'll be in there by 8:00; is

19   that correct?

20   A.     That's correct.

21   Q.     And that she is only going to be there an hour?

22   A.     Yes.

23   Q.     Is there any discussion about whether it's a St. John

24   dress or Ralph Lauren dress?

25   A.     No.  There's no other indication than -- the word

1    "dress" is meaningless in this call.  It's the two sizes that

2    relay what he wants.

3    Q.      Are there other similar calls that we played some

4    weeks ago during your direct testimony?

5    A.      Yeah.  I think we compiled quite a list.

6    Q.      Is that one way that you distinguish between whether

7    it's a drug code or it is actual clothing?

8    A.      You know, you look at it, you're going to see an

9    entire pattern of calls with individuals, so if you only have

10   one call, say if this is the only call you had with Mr.

11   Harris, it would be very difficult to make an assessment

12   based on this.

13           But if you have 30 calls with Mr. Harris of the

14   similar nature or changing code words, one day he orders a

15   dress, next day it's tickets, next day it's a sundress, next

16   day it's a book, you start establishing a pattern of

17   involvement, as we call it, when you're doing a wire as

18   opposed to a pattern of innocence or not involvement.

19   Q.      In terms of pattern of innocence or no drug

20   involvement, was that something that was demonstrated by the

21   calls with Martha West?

22   A.      Yes, it was clear.  I don't want to say very early

23   on, but at some point, it was clear she was involved in the

24   acquiring of clothes in Florida and shipping them to Ms.

25   Martin.

1      Q.      In addition, before I leave that subject matter, the

2      calls that we had played, counsel for Ms. Ali referred to

3      call A367, I believe on Page 138, which referenced pig's

4      feet.

5      A.      Which book?

6      Q.      It's the government's book, but let me check because

7      I didn't write that down.  Yes, the government's book, Volume

8      1 on Page 138.

9              Do you recall this morning, Mr. McKnett played for

10     you a call with Corus Martin and Paulette Martin where they

11     discussed her making a sweet potato pie last night and having

12     Mr. and Mrs. Ali Garner over for dinner?

13     A.      Yes.

14     Q.      And discussions about maybe it would have been

15     leftover food left in the trunk?

16     A.      Yes.

17     Q.      In reference to this call, did you form an opinion as

18     to -- strike that.

19             MS. JOHNSTON:  If we could play this call, A367 on

20     Page 138, and then I will ask you a question because it is a

21     very short call.

22             (Audio recording begins playing at 3:22 p.m.)

23             (Audio recording stops playing at 3:22 p.m.)

24             BY MS. JOHNSTON:

25     Q.      Based upon your training and experience, you gave an

1    opinion during your previous testimony.  Is your opinion

2    still the same?

3    A.      Yes.

4    Q.      Could you describe what your opinion is in terms of

5    that telephone call?

6    A.      Ms. Ali is asking Ms. Martin for permission to come

7    over and get some drugs, if she's not there, and she uses the

8    cover story they talk about the cover story with Ms. Terrell

9    about her telling her she's coming to get pig's feet.

10   Q.      What is the significance of Ms. Ali's statement, I

11   told her I was coming by to get some pig's feet, because

12   that's all I could think of?

13   A.      She's making up a story for a reasonable -- for a

14   reason for her to visit Ms. Martin, and she doesn't want to

15   tell Ms. Terrell she is coming over to pick up drugs.

16   Q.      In terms of Ms. Martin, there were questions asked to

17   you about the -- her relationship with Martha Jean West.  Do

18   you recall those calls by Mr. Montemarano, I think earlier

19   yesterday?

20   A.      Yes.

21   Q.      In reference to those calls, I believe I have a very

22   disjointed portion of Call 4936 was played.

23            MS. JOHNSTON:  Your Honor, with the Court's

24   permission, I would like to distribute the complete

25   transcript that was provided by defense counsel and play the

1      complete call that we now have on a disk.

2              MR. MCKNETT:  Objection, Your Honor.  May we

3      approach?

4              THE COURT:  All right.

5                      (At the bar of the Court.)

6              MR. MCKNETT:  I'm not even sure what the content of

7      this call is, but the reason the defense redacted these

8      conversations was not to leave anything out particularly, but

9      because the Court wanted us to keep it as short as possible

10     and so that we would not waste unnecessary time playing

11     calls.

12             THE COURT:  Why do we need to play the whole call?

13             MS. JOHNSTON:  Your Honor, we need to play the whole

14     call.  Part of the call was played that was redacted.  There

15     is another part that was redacted that is drug related and

16     the government would like to play that portion of the call.

17             THE COURT:  All right.

18             MR. MCKNETT:  Your Honor, if this is drug related, it

19     should have been brought up during his direct.  It is unfair

20     to raise the inference now that the defense has tried to hide

21     things.

22             THE COURT:  I have given very wide latitude to the

23     defense to be able to develop inconsistencies in this

24     expert's opinions by probing into other conversations and you

25     play one to challenge of him to him and it's only to

1     challenge it, he is entitled to play the rest of it.

2           MR. MONTEMARANO:  Except for one thing, Judge.  This

3     call was redacted at the specific request of the government.

4     They've sandbagged us.  They've turned around and

5     cross-examined us on it.

6           MS. JOHNSTON:  Your Honor, if the Court goes back

7     when we reviewed these calls, this is one call in particular

8     that the government advised the Court the government wanted

9     the whole call played.

10           THE COURT:  Overruled.

11              (Back in open court.)

12           MS. JOHNSTON:  Your Honor, just so the record is

13     clear, I believe yesterday, a part of the call was played

14     that wasn't in part of the transcript, and so we're asking to

15     play the whole call.

16           THE COURT:  Play the whole call.

17           BY MS. JOHNSTON:

18     Q.     And if in listening to -- before we play -- well,

19     I'll wait a moment until I make sure everyone has a copy.

20           First of al, l if you could look at the transcript

21     B3946.  Do you have that in front of you?

22     A.     Yes.

23     Q.     It starts on Page 187, which corresponds to the

24     defendants' exhibit book.  Do you understand that?

25     A.     Yes.

1    Q.      And I believe yesterday you verified the date and
2    time of the call; is that correct?
3    A.      Yeah.  The times are slightly off, it's 5:55.
4    Q.      It's what?
5    A.      The time is slightly off.  The call actually starts
6    at 5:55.
7    Q.      I would ask while you're listening to this call,
8    Sergeant Sakala, if you find any errors in the transcript, to
9    note them on the copy you have in front of you.  Do you have
10   a pen?
11   A.      Yes.
12   Q.      Okay.
13           MS. JOHNSTON:  If we could then now play the call,
14   please.
15           (Audio recording begins playing at 3:27 p.m.)  (Audio
16   recording stops playing at 3:34 p.m.)
17           BY MS. JOHNSTON:
18   Q.      Sergeant Sakala, did you make any corrections to the
19   transcript?
20   A.      I would make -- I would have to listen to the call
21   again, but I would make numerous corrections.  They were all
22   minor, nothing substantive.
23   Q.      Nothing that changes the substance of the
24   conversation?
25   A.      No.

1    Q.      Mr. Montemarano asked you questions yesterday about

2    whether you thought the business that Ms. Martin was

3    conducting with Ms. West was legitimate.  Do you recall that

4    question?

5    A.      I do.

6            MR. MONTEMARANO:  Objection, Your Honor.

7            THE COURT:  Approach the bench

8                        (At the bar of the Court.)

9            MS. JOHNSTON:  Your Honor, Mr. Montemarano asked that

10   precise question yesterday.  The witness gave an answer of no

11   and allowed him to state his reason.  One of the reasons is,

12   quite frankly, is on Page 188 where Ms. West explains to Ms.

13   Martin that her co-worker, the person who she's going out

14   doing things with is too busy because she's out running

15   around shopping, legitimately shopping.

16           So, he is permitted to explain the reason why he's

17   saying no, he doesn't think it's legitimate shopping or

18   legitimate business.  Counsel asked him that question.  Do

19   you have an opinion as to whether or not Ms. Martin's

20   relationship with Ms. West -- whether that was a legitimate

21   business?  The officer said no.  I want to ask him why he

22   said no, that he didn't think it was a legitimate business.

23           I expect he is going to say that in his opinion, Ms.

24   West was selling Ms. Martin stolen goods, and one of the

25   basis for that opinion is on Page 188 of the conversation

1    where she distinguishes what she does from what her

2    co-worker's too busy doing, which is legitimately shopping.

3    In addition to that, he would also base it upon Ms. West --

4         THE COURT:  Show me the page, please.

5         MS. JOHNSTON:  It's on Page 188, Your Honor, right at

6    the top here.  I would expect he would also base his opinion

7    on the pricing in the calls.  I don't know that for sure

8    because I haven't discussed his testimony with him.  I also

9    believe that he would also -- well, it would be improper, Mr.

10   Montemarano, for me to have discussed his redirect.

11        MR. MONTEMARANO:  No, I was laughing at the notion

12   that this detective has any knowledge about prices of women's

13   clothing, but we will leave that one alone for now.

14        MS. JOHNSTON:  That may very well be, that's why I

15   hesitated.  He would also base it on the fact of Ms. West's

16   criminal history, and she has a lengthy criminal history,

17   including shoplifting.  I think the fact retail merchandise

18   is the way it is phrased, so I think it is an appropriate

19   question in light of what's in the call and in light of the

20   fact that Mr. Montemarano asked him.

21        As it stands now, this jury thinks that this officer

22   thinks the calls are about clothing but doesn't think it's a

23   legitimate business and he should be entitled to explain

24   that.

25        MR. MONTEMARANO:  Thank you, Your Honor.  I think we

1    have now crossed the line from guess work to sheer

2    supposition.  For starters, he is not an expert.  He cannot

3    offer any sort of opinion on fraud and theft offenses.  He's

4    not been qualified there; his training is in narcotics.  He's

5    spent all his life in narcotics, although he is now back in

6    patrol, Number 1.

7         Number 2, Ms. West did not testify as to what -- this

8    is the equivalent of convicting somebody based on the fact

9    they have a criminal propensity.  It is not admissible

10   without Ms. West taking the stand because which the defense

11   chose not to because of the government's claim and Ms. West's

12   consultation with her attorney.

13        THE COURT:  What about your response to her position

14   that you opened the door by asking the question.

15        MS. JOHNSTON:  Your Honor, if he hadn't asked that,

16   we wouldn't be here.  If he had stuck with what clothes are

17   real clothes and what clothes are code, we wouldn't be in

18   this position.

19        MR. MONTEMARANO:  That was a question to me, right?

20        THE COURT:  Any question was --

21        MR. MONTEMARANO:  Ms. Johnston answered it.  If you

22   would like my answer, my answer is I would have objected when

23   Ms. Johnston started going down this road.  We had a lengthy

24   discussion at the bench, Your Honor.  He did not go any

25   further.  He offered an opinion.

1          MS. JOHNSTON:  No.

2          THE COURT:  My question is, why have you not already

3    opened the door?  The jury has in front of them the question

4    -- the opinion that she was not engaged in a legitimate

5    business.

6          MR. MONTEMARANO:  I would therefore -- he's being

7    asked an opinion.  He is not entitled to give an opinion

8    unless he is an expert witness.  If he is an expert, the

9    basis for his expert has to be filed with the defense, not

10   the -- they cannot now provide it without permitting us an

11   opportunity to investigate it, which is what we would have

12   done.

13         THE COURT:  Ms. Johnston, how is going to --

14         MR. MONTEMARANO:  If I can proffer, Your Honor.

15         THE COURT:  -- base his opinion that the business was

16   not legitimate?

17         MS. JOHNSTON:  Based upon this call that -- based

18   upon -- let me back up for a minute.

19         Mr. Montemarano asked the question about whether he

20   believed that Ms. Martin's dealings with Martha West were

21   legitimate business.  He said, no.  We didn't go down that

22   road.  He did.  He should be allowed to explain why he

23   answered that question, no.  We're not asking him for an

24   expert opinion.  We're asking why he responded no to that

25   question.  He should be able to explain that response.

1              THE COURT:  Based upon your knowledge of the case,
2      what is his answer going to be?
3              MS. JOHNSTON:  His answer is going to be that Ms.
4      West was involved in the selling of stolen clothing.
5              MR. MONTEMARANO:  Hearsay.
6              THE COURT:  How does he come to that conclusion?
7              MS. JOHNSTON:  This call in particular.
8              THE COURT:  Is it from calls?
9              MS. JOHNSTON:  It's from calls.
10             THE COURT:  Is it from other evidence?  What is it
11     from?
12             MS. JOHNSTON:  It is from calls.  It would be from
13     the nature of these calls.  This call makes a very, I
14     believe, very clear, and this call would also be with the
15     knowledge of Ms. West's prior criminal history.  It would be
16     a lot of things that it would be based upon.  I'm not saying
17     that we have to necessarily get into Ms. West's prior
18     history, but Mr. Martin asked -- Mr. Montemarano asked the
19     question, and now the jury is left with the notion that this
20     officer, who has said these calls are all about clothing --
21     real clothing, but that the officer thinks it is not a
22     legitimate business.
23             If counsel hadn't asked that question, we wouldn't be
24     here.  The problem is the jury is left to test this officer's
25     credibility.  Mind you, that's the veracity of his opinions.

1      We're left with the notion that this officer has said these

2      calls also relate to clothing, but yet it's my opinion that

3      it was not a legitimate business, and he should be allowed to

4      explain that answer so that they can assess his opinion in

5      other matters.

6            It's not fair to give them one side without the full

7      side as to why he has that opinion.  If he hadn't asked the

8      question about the legitimacy of the business, we wouldn't be

9      here, and I raised this earlier in terms of Martha Jean West.

10     It's nothing to defense counsel where she all along said that

11     she was engaged in selling stolen goods.

12           MR. MONTEMARANO:  For the last two days.

13           MS. JOHNSTON:  Well, since Ms. West's name has come

14     up, and I think it's been more than two days, but at any

15     rate, we -- so everyone knows what our position has been:

16     She was selling stolen goods.  If the question hadn't been

17     asked, we wouldn't be here.  It's been asked.

18           And because they're going to be evaluating Agnet

19     Sakala -- Sergeant Sakala's testimony as an expert witness,

20     the fact to allow it to stand is inconsistent where he says

21     this is real clothes, but at the same time, he says this is

22     not a legitimate business is unfair and it leads to drawing

23     an improper inference without giving them the full scope.

24           MR. MONTEMARANO:  Ms. Johnston has just identified

25     the problem.  The problem is not with any question.  The

1    problem is with the answer.  He should have said, I have no

2    bases.

3         THE COURT:  You asked the question.

4         MR. MONTEMARANO:  He should have said it's not my

5    area of expertise.  I could ask him distance from the sun to

6    the moon, he would could say I'm not an astronomer.

7         THE COURT:  I believe because the question is asked,

8    that it's appropriate for a very limited fashion for the

9    prosecutor to explore why he said that.  I don't want to go

10   on into a one hour of testimony debating about whether the

11   woman is a shoplifter.

12        MR. MONTEMARANO:  They have to show that my client,

13   not Ms. West, was involved in criminal conduct and knew --

14        MS. JOHNSTON:  Your Honor, we're not arguing that --

15   the question was whether or not.

16        THE COURT:  The objection is overruled, but I am not

17   going to permit too much on this.

18        MS. JOHNSTON:  Your Honor, it's not going to be maybe

19   two or three questions.

20        MR. SUSSMAN:  I'm a little concerned that there

21   becomes a spillover.  Other people are potentially buying

22   clothes from Ms. Martin.  Now the question is if you put her

23   in the hot clothes business, you put --

24        THE COURT:  I understand.  Under the circumstances,

25   limited questioning about why he said that is appropriate.

1      The objection is overruled.

2                          (Back in open court.)

3             BY MS. JOHNSTON:

4      Q.      Agent Sakala, do you recall the question from Mr.

5      Montemarano in regards to whether or not you thought it was a

6      legitimate business, the clothes business between Ms. West

7      and Ms. Martin?

8      A.      Yes.

9      Q.      And your response was what?

10     A.      It is an illegitimate business.

11     Q.      Could you describe for the ladies and gentlemen of

12     the jury why you believe it is an illegitimate business?

13     A.      There were two illegal things about it.  As you saw

14     on this conversation, it became obvious that Ms. West was not

15     involved with Ms. Martin in the drug business.  She had

16     knowledge that was what Ms. Martin did for a living.  So by

17     engaging in a transaction; i.e. selling Ms. Martin clothes,

18     that became an illegal act on the part of Ms. West.

19     Q.      Why?

20     A.      It's called money laundering, engaging in a financial

21     transaction with the proceeds of a specified unlawful

22     activity, in this case drug dealing.  It's against federal

23     and state law.  That was the first basis that would be

24     illegitimate or illegal.

25             The second, it became obvious through the numerous

1     calls with Ms. West that she was not obtaining the clothes in

2     a lawful manner and that the clothes --

3             MR. MONTEMARANO:  Objection, Your Honor.        THE

4     COURT:  Overruled.

5             MR. MONTEMARANO:  Basis for knowledge.

6             MS. JOHNSTON:  I believe he's testified through the

7     calls, Your Honor.

8             MR. MONTEMARANO:  Obvious?

9             THE COURT:  That's the basis he's going to rely upon.

10    You may answer.

11            BY MS. JOHNSTON:

12    Q.      Continue.

13    A.      It became obvious that Ms. West was stealing the

14    clothes in Florida or having them stolen for her.

15    Q.      If we look at the call that we've just played at the

16    bottom of Page 187, even where Ms. West is complaining about

17    Lourdes, continuing to the top of the next page.

18            MR. MONTEMARANO:  Objection, Your Honor.

19            BY MS. JOHNSTON:

20    Q.      Is there anything in those paragraphs that supports

21    the opinion that you've just given to the jury?

22            MR. MONTEMARANO:  Beyond his area of expertise.  He

23    cannot begin to interpret this call.

24            THE COURT:  All right.  Overruled.

25            THE WITNESS:  Yes, she's talking about -- that's one

1       of the mistakes, it's not Lloyd, it's Lourdes, referring to a

2       female, and top of Page 188, Ms. West makes it clear that

3       this person is actually legitimately shopping as opposed to

4       boosting or shoplifting.

5               BY MS. JOHNSTON:

6       Q.      Now, you indicated that there was a reference in this

7       call that had to do with drug trafficking; is that correct?

8       A.      Yes.

9       Q.      Could you call our attention to what page that is?

10      A.      On Page 194, the third large paragraph down, Ms.

11      Martin is telling Ms. West, she's relating to a story about

12      her boyfriend, John Martin.  She says, but I told him he

13      can't go in the neighborhood, you know, with those tickets

14      and doing stuff like that, because I don't know, you know,

15      I'm getting all completely away from the ticket business and

16      all.  I want to go in another direction.  She's complaining

17      about Mr. Martin, John Martin, carrying drugs in her car.

18      Q.      Again, does that subject matter start above that

19      paragraph with the --

20              MR. MONTEMARANO:  Objection, leading.

21              BY MS. JOHNSTON:

22      Q.      Calling your attention to the paragraph that starts,

23      but I had to get John straight, too.  What John does that

24      refer to?

25      A.      That's John Martin, her boyfriend.

1    Q.       In that paragraph, what does she advise Ms. West she
2    has allowed John to do with her car?

3    A.       She says he's working, let him take my car to let him
4    drive it to work referring to taking it to and from the Metro
5    is what she is letting him do, but he's doing the drug
6    business in her car, which is what she has a problem with.

7    Q.       The reference to the drug business would be where?

8    A.       Ticket business.

9    Q.       And what car was it that Ms. Martin had at that time?

10   A.       A red Mercedes.

11   Q.       Now, there were also some questions of you concerning
12   -- strike that.

13           You've mentioned money laundering here.  In regards
14   to drug traffickers, based on your training and experience,
15   what do they frequently do with their drug proceeds?

16   A.       Buy things like all of us do.  Their only problems
17   that they have that we don't have is they have to show a
18   source for the income.  Otherwise, they are likely to come
19   under the scrutiny of law enforcement.  Thereby, they set up
20   or establish some ruse or method to explain their
21   unexplainable wealth.

22   Q.       How is that done in relation to businesses commonly?

23   A.       How is it --

24   Q.       How do you do it in terms of businesses?

25   A.       Oh, you can establish a business of and name it

1    anything.  Frequently, you will see cash businesses or

2    businesses that generate a lot of cash will be used as fronts

3    for money laundering operations.  That way, the cash that

4    they get from drug dealing is easily explained by the other

5    legal cash business.

6    Q.       Mr. McKnett played some calls for you relating to, I

7    think, Mr. Gil Williams down in North Carolina.  Do you

8    recall that call?

9    A.       That's correct.

10   Q.       There may have been one or two that were played with

11   Mr. Montemarano as well.

12   A.       Yes.

13   Q.       I don't recall whether those were played or not, but

14   in reference to the first call, there was a discussion about

15   possible ticket prices.  Do you remember that?

16   A.       Yes.

17   Q.       Whether it would be 50 or 75 or $100.  Do you recall

18   that?

19   A.       Yeah, I don't remember which call, but I remember

20   that discussion, yes.

21   Q.       And based upon your investigation, was that concert

22   ever held?

23   A.       No, it was not.

24   Q.       Or tickets ever dispensed?

25   A.       As far as we know, they never existed.

1    Q.      And in terms of the faxed letterhead that was

2    discussed, was there any indication that -- strike that.

3            That in terms of that faxed letterhead or letterhead

4    that was to be prepared and then faxed, and I believe Mr.

5    McKnett asked you if that was something that was done partial

6    -- at least partially because of the call with Gil Williams

7    where he needed some letterhead; is that correct?

8            MR. MCKNETT:  Objection, Your Honor, that's not my

9    question.

10           MS. JOHNSTON:  Let me rephrase it.

11           BY MS. JOHNSTON:

12   Q.      Do you recall answering questions concerning whether

13   or not Mr. Williams had requested letterhead from Ms. Martin?

14   A.      Yes.

15   Q.      Do you recall hearing that call this morning?

16   A.      Yes.

17   Q.      Was, based upon your training and experience, the

18   transaction between Ms. Martin and Mr. Williams involved what

19   kind of money?

20   A.      Drug proceeds.

21   Q.      And indeed, Mr. Montemarano -- letterhead then would

22   be required by Ms. Martin for what purpose?

23   A.      She needs Mr. Williams or Guilty Productions, he

24   wanted something with her business name on it, which she

25   didn't have.  So the fax letterhead was to show -- purported

1      to show that this was her legitimate business that was going

2      to be putting up this promotion or concert.

3      Q.      In regards to that business, Mr. Montemarano asked

4      you questions, likewise, about a seizure warrant.  Do you

5      recall those questions yesterday?

6      A.      Yes.

7      Q.      What did you obtain a seizure warrant for?

8      A.      The funds that had been wired from Ms. Martin down to

9      Guilty Productions.  We prepared an affidavit outlining the

10     probable cause that those proceeds -- funds were proceeds of

11     a money -- drug operation, presented it to a judge, the judge

12     signed it, and when we served it on the bank, Mr. Williams

13     had wired the money out, I believe the day before we served

14     it on the bank.

15     Q.      Were you -- why were you authorized to seize those

16     funds?

17     A.      We established probable cause in the affidavit that

18     the funds were tied to drug proceeds, or were direct drug

19     proceeds.

20     Q.      And the fax letterhead.  Was that in -- did you form

21     an opinion as to whether or not the sending letterhead to Mr.

22     Gil Williams was in furtherance of laundering her drug

23     proceeds?

24     A.      Sure.  That helped her.

25     Q.      How did it help her?

1    A.      It gave her the appearance of a legitimate company in

2    dealing with Mr. Williams that put on these concert tours.

3    Q.      To your knowledge, were any concerts ever held either

4    through Ron Hood, Ron Hayes or Mr. Williams?

5    A.      No concerts were ever held.

6    Q.      Court's indulgence.

7            I have nothing further.

8            THE COURT:  All right.  We'll take a recess until ten

9    minutes after 4:00, and counsel stay behind.

10                      (Jury excused at 3:53 p.m.)

11           THE COURT:  Do any counsel wish to recross this

12   witness?

13                      (Mr. Montemarano and Mr. Mitchell indicating.)

14           MS. JOHNSTON:  Your Honor, the government would ask

15   Your Honor to exercise its discretion.

16           THE COURT:  Tell me specifically.

17           MR. MONTEMARANO:  Your Honor, new calls that have

18   never been played before.

19           THE COURT:  Mr. Montemarano, tell me specifically

20   because I've been giving the defense wide latitude for

21   bringing him back.  What specific areas do you need to

22   inquire into?  And Sergeant Sakala, you should step out, if

23   you would.

24                      (Witness excused at 3:54 p.m.)

25           THE COURT:  You need to make a proffer to me

1    specifically of what you need to inquire into.

2              MR. MONTEMARANO:  I have three questions.

3              THE COURT:  All right.

4              MS. JOHNSTON:  Your Honor, could we hear the subject

5    matter?

6              THE COURT:  Can you tell me the three questions?  You

7    don't have to frame them perfectly.

8              MR. MONTEMARANO:  I will frame them exactly as I

9    intend to -- maybe Ms. Dunlap can do me a quick printout and

10   I will ask them in the very same language.  The first

11   question would be inviting his attention to the bottom of

12   Page 187, asking who Lourdes is.

13             THE COURT:  Who what?

14             MR. MONTEMARANO:  Lourdes.  It's at the bottom of

15   Page 187, the person that our transcriber wrote down as

16   Lloyd.  He said it should be Lourdes.  It's a, I guess,

17   Hispanic name for a female, L O U R D E S.

18             THE COURT:  It sounds French to me, but.

19             MR. MONTEMARANO:  Okay.  And I would ask him to

20   describe in that same -- I would ask him, is it not true that

21   Ms. West states she's working on that day.

22             THE COURT:  All right.

23             MR. MONTEMARANO:  I was going to ask him if he had

24   done any investigation -- no, excuse me, I'm not going to do

25   that.  Gosh, there was one other question.  I think actually

1        just those two.

2                THE COURT:  All right.  And Mr. Mitchell?

3                MR. MITCHELL:  Your Honor, they played B58, which was

4        not played before.

5                THE COURT:  B what?

6                MR. MITCHELL:  B58.

7                THE COURT:  Okay.

8                MR. MITCHELL:  I feel like I'm playing bingo.  They

9        played B58, which is transcribed, had never been heard before

10       or transcribed before.  This is a call that Sergeant Sakala

11       himself listened to when it was intercepted, and I want to

12       question him on the log in which the word tickets, he put as

13       "unintelligible." The word tickets in the call is listed in

14       the log as unintelligible.  This is the same log he said he

15       went through to correct as he stated on his redirect any

16       major errors.

17              Well, I think that's a very significant issue to go

18       into.  Not only that, he's now saying that these calls and

19       these transcripts is a work in progress and that he's still

20       making changes to them.  So I want to inquire as to why that

21       now is his position that these transcripts aren't final.  So

22       those are the calls, those are the -- let me see if there's

23       something else.     Oh, and he also stated that he was going

24       to let the jury decide whether the word heard is either

25       chicken or --

1          THE COURT:  That's what I've told them.

2          MR. MITCHELL:  I understand, but I want to ask him

3     one question regarding that and --

4          THE COURT:  No.  We have taken the Peruvian chicken

5     and fried it and filleted it and diced it and sliced it and

6     we are not going back to the -- we're not going to go back to

7     the Peruvian chicken.  Enough is enough.  Basta.

8          MR. MITCHELL:  Let me tell you what's different.  Now

9     there is a new bit of evidence that has been introduced that

10    wasn't there before that I didn't have the opportunity to ask

11    him before.

12         THE COURT:  What's that?

13         MR. MITCHELL:  New evidence, and because he's now

14    altered the evidence, I think I have a right to cross examine

15    him on that.

16         THE COURT:  No.  We have gone through the Peruvian

17    chicken.

18         MR. MITCHELL:  I will leave the chicken --

19         THE COURT:  Nomas.

20         MR. MITCHELL:  But I'll ask him why it's still a work

21    in progress, and when is the progress going to end.

22         THE COURT:  No.  No.  That, I think, is argument.

23    He's obviously indicated what he's doing to try to make

24    certain the transcript is correct.  I am not going to permit

25    any inquiry.  This row has been plowed and replowed and

1    replowed.

2         Mr. Montemarano, if you want to ask him who was

3    Lourdes, you ask that.  You can ask about what West says

4    she's working.  Mr. Mitchell, you can ask him about whether

5    the log said it's unintelligible.

6         MS. JOHNSTON:  Your Honor, I'm going to object to

7    asking him about the log.  What is written is a summary, it's

8    hearsay, he didn't write it.

9         THE COURT:  I understand he didn't write it.   MR.

10   MITCHELL:  Your Honor, whenever the government asks him about

11   that log, he is free to talk and he talks freely about it.

12   Then when we ask him about it, all of a sudden it's hearsay.

13        THE COURT:  You may have a very limited question

14   about the fact that the log says unintelligible.  That's it.

15   Because this is -- we're going to finish him very quickly,

16   because I tried to give the defense a very significant, you

17   know, assistance in making certain that his opinions were

18   tested thoroughly, adequately, and fully by letting him be

19   brought back with these transcripts to cross him further, but

20   I think there's a limit and I think we've reached the limit,

21   and those are the limits I'm going to impose on any further

22   recross.

23        MR. MITCHELL:  Last word, Your Honor.  One of the

24   problems that we have had, and the reason why this trial has

25   taken so long, is when we do ask Sergeant Sakala a question,

```
1    it takes three questions to get it out of him.  So, I don't
2    want to be limited.  Now they ask him one question, he gives
3    a full, complete answer.  I don't want to be limited to one
4    question if he doesn't answer.
5         THE COURT:  Of all the witnesses, he's been pretty
6    straightforward.
7         MR. MITCHELL:  Not to me.
8         MR. MONTEMARANO:  Your Honor, with all due respect,
9    the question is straightforwardly what --
10        MR. MITCHELL:  I'll give you one example.  I asked
11   him how these transcripts were prepared and who prepared
12   them.  He wouldn't answer my question.  When Ms. --
13        THE COURT:  Mr. Mitchell, I've ruled that's what I'm
14   going to permit.  No more.
15        MS. JOHNSTON:  Your Honor, could I ask him one more
16   question.
17        THE COURT:  One more.
18        MR. WARD:  May I be excused, Your Honor?
19        THE COURT:  Yes, you may.  Ms. Johnston, you said you
20   had one question?
21        MS. JOHNSTON:  Just one question.
22        THE COURT:  Ask it.
23        MS. JOHNSTON:  I'm going to ask Sergeant Sakala one
24   question.
25        THE COURT:  Oh, one more?
```

1          MS. JOHNSTON:  Just one more.

2          MR. MONTEMARANO:  Before he finishes?  Sure.  We have

3     no objection to Ms. Johnston completing her redirect.

4          MS. JOHNSTON:  I just want to ask him whether or not

5     he had any discussion about any of the calls or the questions

6     that I asked him prior to his testimony.

7          MR. MONTEMARANO:  No.

8          MR. MITCHELL:  He's already answered that.

9          THE COURT:  He's already answered that question, the

10    answer is no.  That's it.  And Mr. McKnett, I better be ready

11    to start going because we're ready to go to 6:00.

12               (Off the record at 4:01 p.m.)

13               (On the record at 4:18 p.m.)

14         THE CLERK:  Are you ready for the jury, Judge?

15         THE COURT:  Yes.  Bring them in.

16               (Witness resumes the stand.)

17               (Jury returns at 4:20 p.m.)

18         THE COURT:  Mr. Montemarano.

19         MR. MONTEMARANO:  Thank you, Your Honor.

20                    **RECROSS-EXAMINATION**

21         BY MR. MONTEMARANO:

22    Q.    Sergeant Sakala, I invite your attention to the

23    bottom of Page 187, please.

24    A.    Which book?

25    Q.    The defense book, please.  I'm sorry.  This is the

1    call Ms. Johnston just asked you questions about, B3946.

2    A.    Okay.  It's kind of messed up in my book, but I think

3    I've got part of a transcript.

4    Q.    I'll bring you a copy.  How does that sound?  This is

5    the one Ms. Johnston gave to you.

6         MS. GREENBERG:  Mr. Montemarano, it's one that we

7    passed out.  It's not one that's in your book.

8         MR. MONTEMARANO:  I'm sorry.  Okay.

9                    **RECROSS EXAMINATION**

10        BY MR. MONTEMARANO:

11   Q.    The bottom of Page 187 refers to where Ms. Martha

12   Jean West is talking, she refers to Lloyd.  You've identified

13   that as Lourdes, right?

14   A.    yeah, she says the name Lourdes.

15   Q.    Who is Lourdes?

16   A.    I have no idea.

17   Q.    Okay.  Ms. West also refers to going to work; correct

18   --

19   A.    Yes.

20   Q.    -- in that same section?

21   A.    Yes.

22   Q.    Okay.  And you were qualified back in June as an

23   expert in narcotics; correct?

24   A.    Yes.

25        MR. MONTEMARANO:  No further questions, Your Honor.

1        THE COURT:  All right.

2                    **RECROSS-EXAMINATION**

3        BY MR. MITCHELL:

4    Q.      God afternoon, Sergeant Sakala.  I want to ask you

5    about the call that you passed out, B58.  Do you have the log

6    in front of you?

7        MS. JOHNSTON:  Your Honor, just so the record is

8    correct, Sergeant Sakala didn't pass out any calls, the

9    government did.

10       THE COURT:  The government did.

11       THE WITNESS:  Is that in the books?  If it's not in

12   the books, I don't have it.

13       BY MR. MITCHELL:

14   Q.      Did the government give you a copy of B58

15   transcribed?

16   A.      I take that back.  I stand corrected, Mr. Mitchell.

17   I do have it.

18   Q.      Do you have the logs?

19   A.      No, I do not.  I turned them back in.

20   Q.      You will now.

21           If you could look in the log for B58.  All right.

22   This is the same log that you had the opportunity to make

23   corrections, if you needed to make any corrections; is that

24   correct?

25   A.      As I reviewed the logs, I think I've testified about

1          that, yes.

2          Q.       Now, looking at this log, are you not the one that

3          intercepted this call -- monitored this call?

4          A.       Yes.

5          Q.       And you're the one who wrote the notes in the log?

6          A.       I wrote the synopsis and monitored the call.

7          Q.       I think that's a yes to my question then.

8          A.       Yes.

9          Q.       Okay.  Now, in that -- isn't it true that you stated

10         in response to what Paulette Martin said, if he needs I/U --

11         you look at the log.  If he needs I/U -- I'm sorry U/I, she

12         is going out soon.  U/I, is that unintelligible?

13         A.       Probably, yes.

14         Q.       Is it or is it not?

15         A.       Probably, yes.

16         Q.       You wrote it, did you not?

17         A.       I wrote this two years ago and that's probably what I

18         meant, yes.

19         Q.       Well, what would you -- what would you say U/I stands

20         for?

21         A.       Probably unintelligible, yes.

22         Q.       You don't know?

23         A.       No, I do not know.  I have no recollection of

24         monitoring this call.

25         Q.       Are those your notes?

1    A.        It is my synopsis.  I was the monitor on that call,

2    yes.

3    Q.        When this was given to the jury, Call B58, did you

4    write in here, instead of ticket, U/I?

5    A.        That would have nothing to do with the logs.  No, I

6    did not.

7    Q.        Did you not review this call -- this transcript?

8    A.        I reviewed it as it was played here in court.

9    Q.        You've never reviewed this call -- you've never

10   reviewed this transcript before it was handed to the jury?

11   A.        That's correct.

12   Q.        How would you know this is accurate?

13   A.        I listened to the call when it was played.

14   Q.        You think you might want to listen to it a couple

15   more times and maybe you might come to a different opinion?

16   A.        No.

17   Q.        Such as the last call regarding the Peruvian chicken?

18             MS. JOHNSTON:  Objection, argumentative.

19             THE COURT:  Sustained.

20             MR. MITCHELL:  No further questions.

21             THE COURT:  All right.  You may step down, Sergeant.

22             THE WITNESS:  Thank you, Your Honor.

23             THE COURT:  You may return to Rockville.

24                  (Witness excused at 4:25 p.m.)

25             THE COURT:  Ladies and gentlemen, this concludes the

1      portion of the testimony that I told you was in the form of

2      additional cross-examination of a government witness.  We're

3      now returning to the defense case, and the defense case being

4      presented now is Mr. McKnett on behalf of --

5              MR. SUSSMAN:  May I approach briefly, Your Honor?

6              THE COURT:  Yes, you may.

7                      (At the bar of the Court.)

8              MR. SUSSMAN:  I'm not sure of the protocol here, but

9      to the extent it's necessary, I will renew my Motion for

10     Judgment of Acquittal.  We've had additional

11     cross-examination and we're in some addition posture.

12             THE COURT:  No, it's done.

13                      (Back in open court.)

14             MR. MCKNETT:  Your Honor, Ms. Ali will call Lisa

15     Spinnicchio.

16     Thereupon,

17                      **LISA SPINNICCHIO**,

18     having been called as a witness on behalf of the _____

19     Defendant LaNora Ali, and having been first duly sworn by the

20     Courtroom Deputy, was examined and testified as follows:

21                      **DIRECT EXAMINATION**

22             BY MR. MCKNETT:

23     Q.      Good afternoon, Ms. Spinnicchio?

24     A.      Good afternoon.

25     Q.      Where are you employed?

1          A.        U. S. Probation.

2                    THE CLERK:  Could I just get her to state her name

3          for the record and for the recorder?

4                    THE WITNESS:  Sure.  Lisa Spinnicchio, S P I N N I C

5          C H I O.

6                    BY MR. MCKNETT:

7          Q.        Ms. Spinnicchio, where were you employed on June 1st

8          in the year 2004?

9          A.        US Probation.

10         Q.        Where was your office located?

11         A.        In Baltimore.

12         Q.        Was there -- did there come a time when you came to

13         work in this courthouse on June 1st, 2004?

14         A.        Yes.

15         Q.        Do you know when you arrived here on that day?

16         A.        I've been told by human resources department it was

17         7:05 a.m.

18         Q.        Human resources is a department of your office?

19         A.        Yes.

20         Q.        That keeps time sheets?

21         A.        Keeps time sheets and things, yes.

22         Q.        What were your duties that morning?

23         A.        That morning, I was assigned to work in Greenbelt,

24         and I was going to interview defendants as they came into the

25         lockup and type reports.

1    Q.       Was LaNora Ali one of the people you interviewed on

2    the morning of June 1st, 2004?

3    A.       Yes.

4    Q.       Where did you interview her?

5    A.       In the marshals' lockup.

6    Q.       Where is that located?

7    A.       It's located on the first floor of this courthouse.

8    Q.       Do you remember what time it was when you began your

9    interview of Ms. Ali on June 1st?

10   A.       No, I do not.

11   Q.       Is there anything I could show you that would refresh

12   your recollection?

13            MS. GREENBERG:  Your Honor, we will stipulate -- as

14   I've mentioned, we will stipulate that she left arrived her

15   at 7:40 a.m. and that she left at 8:10 a.m.

16            THE COURT:  Who is the "she" you're referring to?

17            MS. GREENBERG:  Ms. Spinnicchio arrived in the lockup

18   at 7:40 and left at 8:10.

19            MR. MCKNETT:  I appreciate the offer, Your Honor, but

20   I would prefer to have Ms. Spinnicchio identify the log, if I

21   may?

22            THE COURT:  You may.

23            MS. GREENBERG:  Your Honor, I am going to object to

24   the whole thing coming into evidence.

25            THE COURT:  It will not come in evidence.  She may

1       look at it to refresh her recollection.

2               BY MR. MCKNETT:

3       Q.      Ms. Spinnicchio, I'm showing you a document that's

4       marked as Ali Exhibit --

5       A.      Three.

6       Q.      Three.

7               MS. GREENBERG:  For identification.

8               MR. MCKNETT:  For identification only.

9               BY MR. MCKNETT:

10      Q.      Does that refresh your recollection?

11      A.      Yes, it does.

12      Q.      What do you now recall the time you began your

13      interview of Ms. Ali?

14      A.      7:40 a.m.

15      Q.      What time does it indicate you finished your

16      interview of Ms. Ali?

17      A.      8:10 a.m.

18      Q.      Was Ms. Ali a prisoner when you interviewed her

19      shortly after 8 a.m. on the morning of June 1st, 2004?

20      A.      Yes, she was.

21      Q.      Was she being detained by the United States Marshal's

22      Service after having been arrested before you interviewed

23      her?

24      A.      Yes.

25      Q.      Did you take notes while interviewing Ms. Ali?

1    A.      Yes.

2    Q.      What did you do with those notes?

3    A.      They're contained in the pretrial services file.

4    Q.      Do you know what happened to that file after you put

5    your notes in it?

6    A.      After I put my notes in it, it was, I believe, given

7    to Nicki Snook to type the report.

8    Q.      Did you have any contact with Ms. Ali after you

9    finished your interview with her?

10   A.      No, not that I can recall.

11   Q.      Thank you, Ms. Spinnicchio.

12           MR. MCKNETT:  May I approach and retrieve the

13   exhibit?

14           THE COURT:  Yes, you may.  Are you finished?

15           MR. MCKNETT:  I am finished.

16           THE COURT:  Any other counsel have questions of this

17   witness?

18           MR. HALL:  No, Your Honor.

19           MR. MARTIN:  None, Your Honor.

20           MR. WARD:  Nothing else, Your Honor.

21           THE COURT:  Government, any cross?

22           MS. GREENBERG:  Yes, Your Honor.

23                           **CROSS-EXAMINATION**

24           BY MS. GREENBERG:

25   Q.      Ms. Spinnicchio, good afternoon.

1    A.       Good afternoon.

2    Q.       Just so the jury understands, you testified that you

3    work in Baltimore for probation that encompasses pretrial

4    services.

5    A.       Yes, it does.

6    Q.       The purpose of you going to the cellblock was to

7    interview Ms. Ali that day to give a report to the court at

8    the eventual hearing before the judge?

9    A.       Yes.

10   Q.       Could you give them some background on how this all

11   works, just so they can put into context, you go to the

12   cellblock, how that all happens?

13   A.       When you go into the cellblock, we interview the

14   defendant, take their background information, and we prepare

15   a report making a recommendation as to whether they should be

16   detained or released, and if released, under what conditions.

17   Q.       That's for everyone that's arrested by every law

18   enforcement agency in this whole district?

19   A.       Yes, federal.

20   Q.       Pretrial services, you work for the court.

21   A.       Yes, we work for court.

22   Q.       So you're responsible for reporting to the Court and

23   not the defense counsel, me or anybody else?

24   A.       That's correct.

25   Q.       You testified you were down in Greenbelt on June 1st;

1      is that correct?

2      A.      Yes.

3      Q.      And that was -- you were coming down to Greenbelt

4      because of what that particular day?

5      A.      I was assigned to Greenbelt that day for staffing

6      purposes.  My recollection, it was because of the defendants

7      that were coming in that day, they needed extra staff.

8      Q.      Just to be clear, there was a large indictment and

9      the United States Attorney's Office had warned your

10     supervisors, so they gave extra manpower to Greenbelt?

11             MR. MCKNETT:  Objection.

12             THE COURT:  Sustained.

13             BY MS. GREENBERG:

14     Q.      Ms. Ali, do you understand she was arrested on an

15     indictment?

16             MR. MCKNETT:  Objection.

17             THE WITNESS:  To the best of my recollection, it was

18     an indictment.

19             BY MS. GREENBERG:

20     Q.      You were coming down here specially to assist with

21     the people on that indictment?

22     A.      Yes.

23             MR. WARD:  Asked and answered, objection.

24             THE COURT:  Overruled.

25             THE WITNESS:  Yes I was.

```
 1              BY MS. GREENBERG:
 2      Q.      That is why you were here at the early morning hour
 3      of 7 a.m.
 4      A.      Yes.
 5      Q.      Do you know what was happening with the rest of the
 6      case besides your limited role of reporting to the court with
 7      respect to this person?
 8              MR. MCKNETT:  Objection, Your Honor, relevance.
 9              THE WITNESS:  No, I do not.
10              THE COURT:  Overruled.
11              BY MS. GREENBERG:
12      Q.      You don't know what was going on with the search
13      warrant, the --
14              MR. MONTEMARANO:  Objection, Your Honor, relevance.
15              THE COURT:  Sustained.
16              BY MS. GREENBERG:
17      Q.      Just to be clear, Ms. Spinnicchio, you interviewed
18      Ms. Ali, and that was it, that was your the extent of your
19      involvement with this particular case?
20              MR. MONTEMARANO:  Asked and answered.
21              THE COURT:  Sustained.
22              BY MS. GREENBERG:
23      Q.      Ms. Spinnicchio, after you left the Marshal's service
24      at 8:10 a.m., what did you do with respect to Ms. Ali?
25      A.      I'd like to answer that, but to the best of my
```

1    recollection, personally, is that the file was handed off.

2    Q.      Who was it handed off to?

3    A.      I believe Nicki Snook, it was handed off to.

4            MS. GREENBERG:  No further questions, Your Honor.

5            THE COURT:  Any redirect?

6            MR. MCKNETT:  Yes, Your Honor.

7                    **REDIRECT EXAMINATION**

8            BY MR. MCKNETT:

9    Q.      Ms. Spinnicchio, it's clear in your mind that Ms. Ali

10   was in custody at the time you interviewed her in this

11   building on the morning of June 1st, 2004; correct?

12   A.      Yes, it's clear.

13   Q.      So if a police officer came into this court and

14   testified under oath that on June 1st, '04, at about 10:45

15   a.m., or perhaps an hour earlier, he met Ms. Ali at her

16   apartment at 620 Sheridan Street, Hyattsville, Maryland, and

17   had a casual conversation with her while they were both in

18   her apartment, he would be mistaken?

19           MS. GREENBERG:  Objection, Your Honor, misstates the

20   evidence and basis of knowledge for this witness' testimony.

21           THE COURT:  Sustained, that's argument.

22           MR. MCKNETT:  Nothing further, Your Honor.  Thank

23   you, Ms. Spinnicchio.

24           THE COURT:  You may step down.  Thank you.

25           (Witness excused at 4:35 p.m.)

1          MR. MCKNETT:  Ms. Ali will now call Nicki Snook.

2     Thereupon,

3                          **NICKI SNOOK**,

4     having been called as a witness on behalf of the _____

5     Defendant Lanora Ali, and having been first duly sworn by the

6     Courtroom Deputy, was examined and testified as follows:

7          THE CLERK:  I'd like you to state your name for the

8     record and spell your last name, please.

9          THE WITNESS:  Nicki Snook, S N O O K.

10                    **DIRECT EXAMINATION**

11         BY MR. MCKNETT:

12    Q.    Good afternoon, Ms. Snook.

13    A.    Good afternoon.

14    Q.    Ms. Snook, where were you employed -- are you

15    employed now?

16    A.    I'm a US probation officer.

17    Q.    Where were you employed on the 1st of June, 2004?

18    A.    I was employed in Greenbelt, Maryland.

19    Q.    Doing what?

20    A.    As a US probation officer.

21    Q.    Is that the same agency for which Ms. Spinnicchio

22    works?

23    A.    Yes.

24    Q.    Different office, same agency?

25    A.    Yes.

1    Q.      Thank you.  Do you recall when you arrived in your

2    office that morning?

3    A.      I believe it was 8 o'clock a.m.

4    Q.      What were your duties that morning?

5    A.      My duties were to interview defendants and prepare

6    reports for the Court.

7    Q.      Ms. Snook, can you pull that microphone just a little

8    bit closer to you?

9    A.      Sure.

10   Q.      Or maybe slide up a little bit?  Thank you.

11   A.      Mm-hmm.

12   Q.      Was LaNora Ali one of the people you were involved

13   with on that morning?

14   A.      Yes.

15   Q.      What was your -- what involvement did you have with

16   Ms. Ali on the morning of June 1st, 2004?

17   A.      I prepared a report for the Court.

18   Q.      What information did you use to prepare that report?

19   A.      I used the information obtained during the interview

20   in the Marshal's service lockup.

21   Q.      The interview by whom?

22   A.      Ms. Spinnicchio.

23   Q.      When did you write your report?

24   A.      I believe the report was completed at 11 a.m. on the

25   morning of June 1st.

1    Q.       At the time you wrote your report, had you yet met

2    Ms. Ali?

3    A.       No.

4    Q.       Did there come a time that morning when you did meet

5    Ms. Ali?

6    A.       I believe I was present for the initial appearance.

7    Q.       Do you recall when that was?

8    A.       I do not.

9    Q.       Was it on the morning of June 1st of 2004?

10   A.       I believe so.

11   Q.       Where was that hearing held?

12   A.       In the federal courthouse in Greenbelt in this

13   building.

14   Q.       What kind of hearing was it?

15   A.       An initial appearance.

16   Q.       What's the purpose of an initial appearance?

17            MS. GREENBERG:  Your Honor, I'm going to object at

18   this point.

19            THE COURT:  Overruled.

20            BY MR. MCKNETT:

21   Q.       You can answer.

22   A.       The purpose of an initial appearance is when the

23   judge notifies the defendant what they're charged with,

24   explains the maximum amounts for those charges and rights

25   that they have, their rights.

1    Q.      Did you attend the initial appearance?

2    A.      I believe I did.

3    Q.      Was Ms. Ali in custody at the time of the initial

4    appearance?

5    A.      I believe so.

6    Q.      Did there come a time when Ms. Ali was released from

7    the custody of the United States Marshal Service?

8    A.      Yes.

9    Q.      Do you recall when that was?

10   A.      I do not.

11   Q.      Was it that day?

12   A.      No.

13   Q.      Was it at some time after June 1st, 2004?

14   A.      I believe so, yes.

15   Q.      To the best of your knowledge, was Ms. Ali in the

16   custody of the United States government continuously without

17   interruption from the time of her arrest, before your arrival

18   in the courthouse that morning, until after her release at

19   sometime after June 1st, '04?

20   A.      Yes.

21   Q.      Was she released into your custody, your supervision?

22   A.      Yeah, she was released on bond to pretrial services

23   supervision.

24   Q.      And were you her supervisor -- her pretrial

25   supervisor?

1    A.      I was.

2    Q.      Thank you, Ms. Snook.

3                       **CROSS-EXAMINATION**

4            BY MS. GREENBERG:

5    Q.      Good afternoon, Ms. Snook.  How are you?

6    A.      Good afternoon.

7    Q.      Is this procedure that you just described to the jury

8    anything different than the typical procedure that you've

9    seen as a pretrial services officer?

10   A.      No.

11   Q.      It's the usual procedure?

12   A.      Yes, the usual procedure.

13   Q.      And you were responsible at one point in time for

14   supervising people in this area; correct?

15   A.      Yes.

16   Q.      Can you give the jury some idea about how far it is

17   from Sheridan Street to the courthouse here?

18   A.      Sheridan Street?

19   Q.      In Hyattsville.

20   A.      How far?

21   Q.      Yes.

22   A.      Mileage?  I would say it's between 10 to 15 miles.

23   Q.      How long in terms of time?

24   A.      I guess around 15 minutes.

25   Q.      Thank you.

1            MS. GREENBERG:  No further questions.

2            MR. MCKNETT:  Very briefly, Your Honor.

3                    **REDIRECT EXAMINATION**

4            BY MR. MCKNETT:

5    Q.      Ms. Snook, you don't know what time it was that Ms.

6    Ali was arrested, do you?

7    A.      I do not.

8    Q.      That was on June 1st.  You do know she was arrested

9    on June 1st, '04; correct?

10   A.      I would assume, yes.

11   Q.      You also know she was arrested before you arrived in

12   the building; correct?

13   A.      Yes.

14   Q.      You arrived inside the building at what time?

15   A.      Eight a.m.

16   Q.      Thank you.

17           THE COURT:  All right.  You may step down.  Thank you

18   very much.

19                 (Witness excused at 4:41 p.m.)

20           MR. MCKNETT:  Your Honor, may I release Ms. Snook and

21   Ms. Spinnicchio?

22           THE COURT:  You may.

23           MR. MCKNETT:  Thank you.

24           MR. MCKNETT:  Your Honor, may I approach?

25   THE COURT:  You may.

1              (At the bar of the Court.)

2          MR. MCKNETT:  Your Honor, the only witness who

3    testified as to tangible evidence concerning Ms. Ali and

4    whether or not she was guilty of the charges in this case was

5    presented by and through officer --

6          THE COURT:  What?

7          MR. MCKNETT:  By and through Officer Muldoon.

8    THE COURT:  Right.

9          MR. MCKNETT:  Officer Muldoon testified clearly that

10   he met Ms. Ali in her apartment on Sheridan Street on the

11   morning of June 1st, 2004, at either 10:45 or 9:45,

12   approximately, he wasn't sure.  He said he met her there.  He

13   said she answered the door.  He said that he talked to her.

14   He said that he was present when she was arrested.  That is

15   flatly untrue.  I think that his testimony is so completely

16   unreliable that it taints the entire case against Ms. Ali,

17   and I'm going to ask at this point for a mistrial.

18         MS. JOHNSTON:  Your Honor, as the Court may recall,

19   and Ms. Greenberg can speak -- I'm sort of handling his

20   defense witnesses, but at the same time, Ms. Greenberg

21   handled Officer Muldoon.  Officer Muldoon testified

22   originally, they went to the wrong apartment, then located

23   the right apartment and had contact with Ms. Ali, that they

24   had to order another search warrant.   He may be wrong about

25   the time in terms of what time it was that he saw Ms. Ali,

1    but that goes to the weight to be given to his testimony.  It

2    certainly is not a basis.

3           MS. GREENBERG:  Your Honor, for the record, I think

4    if I may add to the record, he corrected his testimony.  He

5    said, you know what?  I think it was a little bit earlier.

6           MR. MCKNETT:  Yes.

7           MS. GREENBERG:  They waited around for the search

8    warrant.  What obviously happened here, and what is a

9    reasonable conclusion for the jury to reach, is they got to

10   the right apartment, they took the prisoner to the

11   courthouse, and they waited for the search warrant to be

12   done.  This is two years, and I don't think that --

13          THE COURT:  There are obviously inconsistencies, and

14   Mr. McKnett, will have some fun in closing argument, but I

15   don't think this is a basis for a mistrial.  You did as

16   capably as I expected you to do.  Who is your next witness?

17          MR. MCKNETT:  I'm going to call Ulysses Garner, who

18   is Ms. Ali's husband.

19          THE COURT:  All right.

20          MR. MCKNETT:  And we will go to as close to 6:00 as I

21   can get.

22          THE COURT:  Have your client ready to go, and she can

23   go today, too.

24          MR. MCKNETT:  He will go longer than that, but I will

25   go as to as close to 6:00 as I can.

```
1              THE COURT:  All right.

2                     (Back in open court.)

3   Thereupon,

4                    ULYSSES GARNER,

5   having been called as a witness on behalf of the

6   Defendant Lanora Ali, and having been first duly sworn by the

7   Courtroom Deputy, was examined and testified as follows:

8              THE CLERK:  I need you to state your name for the

9   record, please.

10             THE WITNESS:  My name is Ulysses Garner, Jr.

11             THE CLERK:  G A R D E R?

12             THE WITNESS:  G A R N E R.

13                   DIRECT EXAMINATION

14             BY MR. MCKNETT:

15   Q.     Good afternoon, Mr. Garner.

16   A.     Good afternoon.

17   Q.     Mr. Garner, I want to start by asking you some

18   questions about your background.  Can you tell me where you

19   -- where did you grow up?

20   A.     I'm a native of Washington.  I grew up in Washington,

21   DC, the northeast section of Washington.

22   Q.     You graduated from high school there?

23   A.     Yes.  I went to St. John High School, played football

24   and baseball there, was student counsel president, led a

25   debate team, had a very, very interesting and varied
```

1    experience at St. John.

2    Q.      Did there come a time when you went to college?

3    A.      Yes.  I went to Howard University undergraduate

4    school, graduated Phi Theta Kappa and Magna Cum Laude.  Also

5    went to law school for a while.  I was in the School of

6    Religion, and also went and worked on a Ph.D at the School of

7    Education.

8    Q.      Did you obtain a degree from Howard University?

9    A.      Yes.  I retained a BS in philosophy, economics and

10   history.

11   Q.      Did you pursue education beyond your bachelors

12   degree?

13   A.      Well, it was a -- I was in a Ph.D program, so you

14   went to the -- through and up to a dissertation.  I didn't

15   complete the dissertation.

16   Q.      So if you completed your dissertation, you would be

17   eligible for a Ph.D?

18   A.      Yes.  Also, once -- I'm teaching presently, and once

19   I became a teacher, I took some graduate courses at Trinity

20   and finished the certification program at Trinity about four

21   years ago.

22   Q.      Trinity is?

23   A.      Trinity University.

24   Q.      Where is that located?

25   A.      That is located in Washington, D. C. also.

1    Q.      Tell me a little about your employment background.

2    A.      Primarily over the, I guess, for the last -- within

3    the last 20 years, I was a program manager, assistant

4    director, and director of DC Art Works, which became the

5    largest employment and training program for young people in

6    the arts in America.

7    Q.      Is that affiliated with the government in Washington?

8    A.      Well, essentially, it was a program that was

9    sponsored in part as a nonprofit organization by the DC

10   Department of Labor.  That was our primary source of funding.

11   We also received funding from the D. C.  Commission on Arts

12   and Humanities.

13   Q.      How long did you work in that position?

14   A.      As director and deputy director for approximately 11

15   years.

16   Q.      When did you start in that position?

17   A.      I started at DC Art Works in, let's see, '81, as a

18   program manager, and then I moved up to deputy director

19   around '86, and became director, I think, 79-1990, I mean

20   89-1990.

21   Q.      You said I believe that it was programs that were set

22   up to assist young people.

23   A.      Initially, it was a program designed to assist young

24   people.  When I got there, we had a budget that was

25   approximately $179,000.  When I left the program, it was

1    approximately $4.6 million.  What took place during that

2    period is we began to expand.  I began to incorporate a

3    professional element to the program in which we created a

4    dance unit, theatrical unit, musical theater unit, visual

5    arts unit, a media unit.

6         So what we began to do, as many of our young people

7    grew and developed certain skills and talents, we felt it was

8    necessary to continue that and provide opportunities for them

9    as they continued their development.  And as a result, we

10   created a professional wing in which we've had a number of

11   really, really fine graduates in jazz, for example, the

12   Harper Brothers came through it, and also Wallace and Antwon

13   Rooney, Miles Davis passed his trumpet to Wallace, and

14   Wallace is considered one of the foremost trumpet players.

15        We had tremendous opera singers that have come

16   through, dancers that dance with Alvin Ailey, Arthur

17   Mitchell, Dane Contemporary.  So we were very proud of the

18   graduates that moved through our program and gained their

19   training with us.

20   Q.    You said you left that program at some point?

21   A.    Well, I essentially -- what happened -- well, there

22   was a lot of things going on.  The Labor Department changed

23   its emphasis.  When we began in the program, the senior

24   program was our primary funder.  ASEDA was spending about

25   $9.3 million with the city.

1      Q.        Excuse me just a second.   ASEDA?

2      A.        Yeah, it was a comprehensive employment training

3      program that was a favorite program of the federal government

4      in terms of addressing employment needs of inner-city people

5      back in the '70s and early 80s.  As the government began to

6      change its emphasis in terms of employment programs, that

7      program became radically cut back, so it went from 53.- -- I

8      think it was $53.4 million to $20 million to $13 million to

9      $5 million and, consequently, that had a profound impact on

10     the funding of our program.

11             So essentially, it became financially untenable to

12     finance, say, the program that we had established because our

13     program was running more than the city was getting in terms

14     of its entire grant.

15     Q.        What did you --

16     A.        And also as an adjunct to that, the city was also

17     going through a difficult time in terms of its own funding.

18     It was running huge deficits.  It went into receivership, and

19     as a result, the type of funding that our profit

20     organizations were receiving were cut back significantly.

21     Q         What did you do when you moved on from that position?

22     A.        Essentially, I did a little consulting work, I like

23     to write, so I spent time writing.  From there, I had a son

24     that was born during that period, and people saw the

25     relationship that I had him and indicated that they thought

1        that I might want to consider expanding my relationship with

2        my son, with other kids, and so I began to concentrate on

3        possibly re-entering education.  I hadn't used my education

4        degree, and so I decided to sign up with the public school

5        system.

6    Q.        When did you do that?

7    A.        I did that in August of 1999.

8    Q.        Did you become a teacher?

9    A.        Yes, I was a teacher.

10   Q.        What school did you teach at?

11   A.        Initially, I went to Shadd Elementary School.  I was

12   there for approximately, I think, three months, and then I

13   went to another elementary school.  During the time I was at

14   Shadd, I met my wife.

15   Q.        When was that?

16   A.        That was in -- I guess I met her -- really, it was

17   the first day, so I would say August of 1999.

18   Q.        Before I forget, I wanted to ask you specifically

19   with reference to your career before you became a teacher.

20   A.        Sure.

21   Q.        Did you acquire any expertise in show business

22   production?

23   A.        Well, we produced -- we became the largest producer

24   of black theater in the city at that time.  We were nominated

25   for the Helen Hayes Award, which is a very prestigious award

1     for excellence in musical theater.  We also sponsored

2     concerts -- jazz concerts, classical concerts, and we

3     produced singing groups that traveled throughout the city

4     putting on productions not only here, but we've had

5     productions at the Kennedy Center, we had productions at

6     Lisner Auditorium, productions at Galludet, productions at

7     the Lincoln Theater, productions at Cramden Auditorium.

8     Q.     Since you've been a teacher, what grades have you

9     taught?

10    A.     I've taught third grade through sixth grade and

11    special education.

12    Q.     Are you still teaching?

13    A.     Yes, I am.

14    Q.     Where are you teaching today?

15    A.     I'm teaching -- well, currently this summer, I taught

16    summer school.  Summer school ended yesterday.  I taught

17    summer school at Friendship Edison, and I also have a summer

18    camp in the afternoon at Smothers Elementary School, so I'm

19    working two jobs.

20    Q.     Please describe the summer camp.

21    A.     The summer camp?

22     MS. JOHNSTON:  Objection, Your Honor, as to the

23    relevance of the summer camp.

24     THE COURT:  Well, wrap it up.

25     MR. MCKNETT:  I'm just about finished with this, Your

1    Honor.

2              THE COURT:   Overruled.

3              BY  MR. MCKNETT:

4    Q.      You can continue.

5    A.      The summer camp is designed for young kids that are

6    interested in just simply having a good time.  We have games;

7    basketball, badminton, volleyball.  The girls jump rope.  We

8    take them on a lot of field trips, so we have field trips

9    that were lined up where they go to the Smithsonian Museum,

10   the Supreme Court, we take them down to the Capitol.  So they

11   get an opportunity to experience what Washington really is.

12   Q.      When you -- this is just during the summer, right?

13   A.      Right.  Just during the summer.

14   Q.      During the normal school year, what hours do you

15   work?

16   A.      We work -- well, I work two jobs.  I work the morning

17   program, which is the regular teaching program, and that's

18   from 8:30 -- 8:30 is our beginning work time to 3:30, and

19   then I participate as a facilitator in the after-care

20   program, which is from 3:30 to 6:30.  So I'm at school at

21   8:30, and I don't leave until 6:30, and that's five days a

22   week.

23   Q.      You mentioned that when you were teaching, was it at

24   Shadd?

25   A.      Shadd, yes.

1   Q.      That you met your wife.

2   A.      Right.

3   Q.      Who is your wife?

4   A.      LaNora Ali.

5   Q.      Do you see her in the courtroom today?

6   A.      Yes.

7   Q.      That's her sitting back there in a white shawl.  A.

8   Yes, it is.

9   Q.      When did you meet her?

10  A.      The first day of school.  As I was getting situated

11  in my classroom, she entered the classroom and indicated that

12  she was there to be of assistance, and if there were any

13  materials or supplies I needed to get the classroom ready for

14  students, that she would be there.  And essentially, I needed

15  to compile a list and submit it to her by the end of the day.

16          This was approximately around -- the early part of

17  the morning, and I complied with that and got my list to her

18  and I received my supplies the next morning.  So I was

19  surprised that things worked that fast.

20  Q.      Obviously, over time, a relationship developed?

21  A.      Yes.

22  Q.      Outside the co-teacher relationship?

23  A.      Yes, it did.

24  Q.      It culminated in your marriage?

25  A.      Yes.

1      Q.      When did that occur?

2      A.      We were married June -- yeah, July of 2000.  July of

3      2000.

4      Q.      Were you working at Shadd Elementary from then --

5      from the day you started until you got married?

6      A.      No, no.  I was the last teacher that was hired at

7      Shadd.  At the end of October, they do a -- they check the

8      enrollment, and if the enrollment isn't what was projected,

9      then they realign the staffing pattern, and so I went from

10     Shadd to Aiton Elementary School.  Which was in the middle

11     part of November.  So, once our relationship began to

12     develop, I was at another school.

13     Q.      Was Ms. Ali working at Shadd from the time you met

14     her until the time of her arrest on June 1st?

15     A.      Yes, she was.

16     Q.      What hours was she working?

17     A.      She worked on two programs.  She was a technology

18     teacher, so she dealt with kids from first grade through

19     fifth.  I don't know if they had sixth.  I think first grade

20     through fifth, and she also was the coordinator of the

21     after-care program, so she would work from 3:30 to 7:00.  So

22     essentially, and we would leave in the morning together,

23     since my school was only five minutes from hers, so she would

24     leave, we would leave at quarter to 8:00 and she would pick

25     me up 7:00 to 7:15 from my school and then we would come

1    home.

2    Q.      Did the come a time when you met Paula Martin?

3    A.      Yes.

4    Q.      When was that?

5    A.      I met Ms. Martin, I would say, probably sometime

6    either late September of 1999 or early October of 1999.  Ms.

7    Ali said she had a friend that she thought that I would like,

8    and she took me by to meet her.  At that time, I have a young

9    son and I was looking to purchase some clothes for him, and

10   Ms. Martin had a kid's boutique shop, and she Ms. Ali

11   indicated that she thought that I might be able to find some

12   interesting garments through Ms. Martin.

13   Q.      Did you actually go to the boutique shop?

14   A.      Yes.  Well, her boutique shop was actually in her

15   basement in her house, so I was able to go there and locate a

16   number of really interesting and unique pieces that I

17   purchased for my son.

18   Q.      Do you remember the address or the location where Ms.

19   Martin was living at the time?

20   A.      I don't drive, so addresses are very, very difficult

21   for me, but I -- it was a fairly new house that Ms. Martin

22   had owned and that was the location that we went to.

23   Q.      If you can, can you describe for me a little bit

24   about the layout of the boutique in Ms. Martin's basement?

25   A.      At that time, the basement was, like, unfinished, and

1    so -- but she had it cornered off where there were, you know,

2    children's clothes, women's clothes, men's clothes, and such.

3    So, you know, you would go downstairs, and she took me right

4    to the area that she had children's clothes, and I was able

5    to buy a couple of suits, I think a winter coat, a couple

6    pair of slacks and some sweaters.

7    Q.       Were the clothes on display?

8    A.       Some were on display, and then what you would then do

9    is go to boxes and then pull out the sizes that met what the

10   particular size your child was.

11   Q.       Did there come a time when you started to buy clothes

12   for yourself from Ms. Martin?

13   A.       Yes.  I think over the years, she began to expand her

14   clothing operation, and as a result, I would buy slacks,

15   suits if -- you know, if she were able to get them in my

16   size, and that was -- and sweaters.

17   Q.       Do you recall any of the prices you paid for the

18   items of clothing you bought?

19   A.       They would range anywhere, I think, from $50 to $400.

20   Q.       $50 for what?

21   A.       You could get ties, you could get shirts that would

22   be in the $50 to $75 range.  Slacks generally ran from $75 to

23   $150.  Suits ran from $300 to $450.  Sweaters $150 to $300.

24   Q.       So these were high-end items.

25   A.       High-end items, right.  Very fine fabric.  One of the

1      things that drew me to Paula was that we could discuss

2      fashion.  We had friends that were in the fashion industry

3      that put on fashion shows so we could sit there and discuss

4      the quality of fabrics, the new designs and such.  So that

5      became a focal point for discussion.

6      Q.      Do you remember any of the names of any of the people

7      who were putting on the shows you just mentioned?

8      A.      Well, one good friend of ours, Star Washington, is --

9      actually, in some ways, world-renowned, especially if you

10     listen to him in terms of the type of shows that he puts on.

11     He does it for full-figured women and he travels around the

12     country putting on those shows, and he would come over to the

13     house, ask for Ms. Martin's input.

14             He knew me from my days at DC Art Works, so we would

15     also communicate in terms of ideas that I might have in terms

16     of the types of shows that he put on.  Mr. Martin also was

17     the type of person who put on the fashion show for the black

18     caucus event that was held in Washington by the Congressional

19     black caucus in September.  So Mr. Martin -- I mean, Star

20     Washington has a sterling reputation as a fashion producer.

21             MS. JOHNSTON:  Your Honor, can we have a time frame

22     for while this witness is testifying?

23             THE COURT:  Yeah.  If you would, Mr. McKnett, try to

24     make the time clear -- make the time clear.

25             BY MR. MCKNETT:

1    Q.      Did you know Mr. Washington before you met Ms.
2    Martin?
3    A.      Yes, I did.
4    Q.      When did you meet him?
5    A.      That was probably in the early '90s.  We had
6    discussed the possibility of doing some projects together.
7    He heard about what we were doing at DC Art Works.  One of
8    the things that we did is that we funded young artists,
9    people that had demonstrated a certain type of able to
10   produce excellent production, and we were looking to team
11   with those people, and it was my job to develop funding
12   sources for them, and we discussed the possibility of funding
13   a project that he might have control of.
14   Q.      Did you attend any of Mr. Washington's shows before
15   you met Ms. Martin?
16   A.      Yes.  I mean, I attended his fashion show at the
17   caucus, and I had seen some of the things that he was working
18   with with other people -- local fashion shows during the
19   early '90s.
20   Q.      Did you attend any of Mr. Washington's shows after
21   you met Ms. Martin?
22   A.      Yes.  Two or three fashion shows.  Ms. Martin acted
23   as a Godmother to Mr. Washington, and so she would buy blocks
24   of tickets to --
25   Q.      I'm sorry, I didn't catch the word.  She would --

1    A.     Buy blocks of tickets to the fashion show and

2    distribute it to her friends.  So we would -- I think we went

3    to, like, three fashion shows where she actually purchased

4    the tickets herself and distributed to her friends.

5    Q.     So is it fair to say that your relationship with Ms.

6    Martin developed from just a seller of clothes to more of a

7    friend?

8    A.     Well, I think what happened is, also, I'm a gourmet

9    cook, and Ms. Martin is an excellent cook.  I tend to cook on

10   the heavy, rich side, and she tends to be a little lighter

11   with her hand, but I guess the first couple of months that

12   Ms. Ali would take me past Ms. Martin's home, Ms. Martin

13   would always be in the kitchen cooking.  So she would produce

14   these orange date nut muffins, which were just simply

15   excellent.  She would cook Teriyaki chicken wings.

16          MS. JOHNSTON:  Your Honor, can we have a time frame

17   if this witness is talking about a few months after he met

18   her in 1999 or --

19          THE COURT:  See if you can clarify the time.

20          MR. MCKNETT:  When did you start to develop -- when

21   did you first find out that Ms. Martin liked to cook?

22   A.     Well, one thing, we were over at her house and she

23   had --

24   Q.     Excuse me.  Could you narrow it down as to when it

25   was?

1    A.       This was early in the relationship.  This was before

2    Christmas of '99.  I had taken some sweet potato pies over to

3    Ms. Washington -- Ms. Martin's house, and Ms. Martin said

4    that she also cooked sweet potato pies, and what she would

5    do, like, with the muffins, she would actually make, like,

6    six dozen, sometimes eight, nine dozen muffins s.he would

7    cook six, 12, 18 sweet potato pies.

8         She would have just huge bowls of turkey wings and

9    sometimes we could go and actually get enough food where we

10   didn't have to worry about buying food during the week.  We

11   could just get the food, and that was our lunch during the

12   course of a week.  So I mean, it was nothing to go over to

13   her house when she was living at the house to have plenty of

14   food all over where she would just allow people who came in

15   just to take a pie, take some turkey wings, and what have

16   you, and leave.

17        That's -- that was the foundation for the

18   relationship.  And that continued up until, I think, 2003

19   when she moved out of her -- out of her house.

20   Q.       Do you know where she moved to?

21   A.       Once again, I'm bad with addresses.  She moved to a

22   location with a friend of hers, and once she was at the

23   friend's house, she had some misgivings and then she left

24   there and moved to --

25   Q.       Before you go -- do you remember the name of the

1       friend that she moved to first?

2       A.      No, I don't.  I don't remember the name of the first

3       friend, but it was a female that wasn't too -- I can't even

4       say what the street was, even though I know the general area.

5       But she left there and then she moved into a person that she

6       called Granny's, and then from there, she moved to another

7       friend's house, Jackie's house, and that's where she was

8       until this incident occurred.

9       Q.      Let me see if I can narrow it down for the times.

10      A.      Okay.

11      Q.      When she first moved, she moved in with a friend --

12      A.      Right.

13      Q.      -- that she had misgivings about you said?

14      A.      Well, yeah, she had misgivings.  She didn't think

15      that that would really work.

16      Q.      Do you know how long she stayed there?

17      A.      No more than a month or two.  It was a very short

18      period of time.

19      Q.      And then you said, I think, she moved to Granny's?

20      A.      Right.  The lady that she called Granny that she said

21      was her, you know, play grandmother.

22      Q.      I'm sorry?

23      A.      So she was there for about a year or so, and then

24      from there, she moved to Jackie's house.

25      Q.      Is that where she was living, Jackie's house, when

1    your wife was arrested?

2    A.      Yes.  Yes, it was.

3    Q.      You've indicated that your relationship with Ms.

4    Martin started out as one involving clothes and it developed

5    into one involving cooking and food?

6    A.      Right.

7    Q.      Were there other aspects with regard to your

8    relationship with Ms. Martin?

9    A.      That was primarily it.  Once in the -- I guess it was

10   the end of 2003, 2004, where she began to want to move into

11   the promotion and production, music promotion and production

12   business, and there I began to listen to things that she was

13   saying regarding that, and dreams that she had about that,

14   and I just offered her some advice.

15   Q.      I'll come back to that, but when Ms. Martin was

16   living at the location where she resided when you first met

17   her --

18   A.      Right.

19   Q.      -- how often, on average, did you visit her at her

20   house?

21   A.      Primarily, we would go maybe two times a week,

22   sometimes three times a week, and generally it was only for,

23   like, 15 minutes, 20 minutes, 30 minutes.  Generally when we

24   went, you know, I would go and I would visit her grandchild.

25   Her grandchild and I were very close and I spent a lot of

```
 1        time with her.              Periodically, people would come in

 2        and we would discuss politics, history.  Actually, a couple

 3        of the people that would come in, we would discuss

 4        metaphysics.  Some people were esthete in Conte, Decar,

 5        Aristotle...so, it was really interesting to be able to

 6        discuss, you know, metaphysics and philosophical issues with

 7        certain individuals.

 8        Q.      Do you recall her grandchild's name?

 9        A.      Whose name?

10        Q.      Her grandchild's name?

11        A.      Yeah, Adai.

12        Q.      You say initially the visits just lasted for a

13        relatively short period of time?

14        A.      Right.

15        Q.      Did that change?

16        A.      Primarily when we would go, I mean, if there was

17        food, we would stay for an hour or so, but because we put in

18        such long hours, if we went during the workweek, essentially,

19        we were there for just a short period of time.  We had to get

20        home and work on lesson plans and prepare for the next day.

21              Subsequently, we might go on weekends, which would be

22        a Friday night or Saturday night, in which -- once she moved

23        out of the house, sometimes she would order out food and we

24        would sit and eat and discuss just daily vents i, f we went

25        over and we were trying on clothes or something like that,
```

1      that would be for -- that would extend the period of time

2      because we were looking, and then we would try to decide

3      whether or not we would purchase anything based on what our

4      financial situation was.

5      Q.      Mr. Garner, you've been using the word "we" a lot.

6      Who are you referring to?

7      A.      My wife.

8      Q.      Your wife?

9      A.      My wife, yes.

10     Q.      Did you ever visit Ms. Martin without your wife being

11     present?

12     A.      No.  Never did.

13     Q.      Why is that?

14     A.      I don't drive, so wherever -- yeah.  Wherever and

15     whenever we would go there to wherever she was situated, I

16     would always be with her.

17     Q.      Did you maintain that frequency of contact with Ms.

18     Martin after she moved from her first residence?

19     A.      Yes.

20     Q.      Did that frequency of contact continue all the way up

21     until the time your wife was arrested?

22     A.      Yes, it did.

23     Q.      Can you describe for us the nature of your

24     conversations, if any, with Ms. Martin about the

25     entertainment business?

1    A.       Essentially --

2             MS. JOHNSTON:  Objection, Your Honor.

3             THE COURT:  Overruled.

4             MS. JOHNSTON:  Your Honor, can we have a time frame

5    for these?  We're talking about 1999 --

6             MR. MCKNETT:  Your Honor, he's testified he didn't

7    meet her until 1999.

8             THE COURT:  See if you can tighten the time frame up

9    a bit.

10            BY MR. MCKNETT:

11   Q.       When did you first start to have conversations with

12   Ms. Martin about the entertainment business?

13   A.       2003-2004.

14   Q.       Can you describe for us the nature of your

15   discussions with Ms. Martin?

16   A.       She had indicated --

17            MS. JOHNSTON:  Objection as to what Ms. Martin

18   indicated.

19            THE COURT:  Sustained.

20            BY MR. MCKNETT:

21   Q.       Mr. Garner, don't tell us what Ms. Martin said.  If

22   you can describe the nature of your conversations, that would

23   be helpful.

24   A.       Essentially, it centered on what would be the most

25   feasible way of establishing a production company that could

1    promote national artists in local venues, and essentially, I

2    used the experience that I had in terms of bringing national

3    dance figures and people that had performed on Broadway and

4    off Broadway in productions that I held and presented that

5    information to Ms. Martin.

6            I would indicate to her the need to get a

7    entertainment lawyer.  I indicated the need for her to get

8    stationery that would have her name on top of the stationery.

9    We discussed people that I knew that were actively involved

10   in promotions, and so that information was relayed to Ms.

11   Martin.  Ms. Martin thought that I made sense and she was

12   communicating ideas that I had to her business partners.

13   Q.      How many times did you have conversations of that

14   nature with Ms. Martin?

15   A.      Once I saw that she was serious, almost every time

16   that I came over.  You know, there was some discussion in

17   terms of her desire to make this work and she asked me to

18   provide as much support as I could to that particular

19   project.

20   Q.      Can you remember some of the other people, if any,

21   you may have talked to in connection with Ms. Martin's

22   attempts to get into the entertainment business?

23   A.      Also just as an adjunct to that --

24           MS. JOHNSTON:  Objection, Your Honor.

25           THE COURT:  Overruled.

1          THE WITNESS:  Ms. Martin also had a dance studio and

2     she was concerned it was being underutilized and she wanted

3     me to see if I could do something to get it utilized and

4     bring it up to code and I made some phone calls and --

5          BY MR. MCKNETT:

6     Q.     Excuse me.  You said "bring it up to code." What do

7     you mean by that?

8     A.     In terms of making sure there were bars, that the

9     floor itself was suitable for kids dancing on.  Sometimes if

10    the floors are too hard and there's not enough give in the

11    floors, the kids could get shin splints and that kind of

12    thing, so there's a thing called molly floors that you lay

13    slightly above, say, a concrete floor, so when they are

14    dancing on it, the shins themselves are not splint or hurt.

15    So we discussed things like that, having the place repainted

16    and I even made some phone calls to dancers that could

17    possibly lead her into finance and negotiations, but it

18    didn't work out that way.

19    Q.     Do you remember any of the names of any of the

20    dancers you contacted?

21         MS. JOHNSTON:  Objection.  Relevance.

22         THE COURT:  Sustained.

23         BY MR. MCKNETT:

24    Q.     Do you remember when it was that you made those

25    contacts?

1      A.      This was early 2004.

2      Q.      Did there come a time when you discussed business

3      contracts with Ms. Martin?

4      A.      Yes.  She would get contracts that would come in.

5      Evidently she was working with a guy named Ron Hood, I think,

6      and then she was working with another guy named Ron Hayes, I

7      think, and there were contracts being bandied around, and she

8      would show it to me in which they had projected costs for

9      putting on an Aretha Franklin concert.

10             Subsequently, there were contracts that were

11     established for LeVert and Eddie and Joe LeVert shows, and

12     then there were talks about R. Kelly concerts, and so I would

13     see those, and as a program man on this and I was an

14     accountant also for my organization, I would look at those,

15     and I was troubled by what I saw because there were a lot of

16     hidden costs, and if you're not familiar with putting on

17     shows and producing shows, you can actually lose your shirt,

18     even though you might have a sold-out house, even though how

19     the contracts were structured and how the profits were

20     divided, so I would look at those and offer suggestions to

21     her.

22             At the same time, I still suggested that she hire a

23     entertainment attorney and an accountant to be sure that

24     every penny that she invested was tracked properly.

25     Q.      Do you know if she took your advice in that regard?

1    A.        I know she had begun discussions with a couple of

2    entertainment attorneys.   I think one entertainment attorney

3    worked at Howard University as a law professor, and I know

4    there was some talk about securing an accountant that would

5    over -- you know, look at the financing and such.   So until

6    that was dually put in motion, I acted as a advisor to her.

7    Q.        Was there ever any discussion about you becoming a

8    participant in the production business or the show business

9    that Ms. Martin was trying to establish?

10   A.        It never really got beyond the initial discussions

11   that we had.   Ms. Martin was gracious enough to suggest that

12   if I wanted any position and if it would work financially for

13   the project, that she would consider it, but it never reached

14   a point of any serious discussion.

15   Q.        Did you ever contribute any money toward Ms. Martin's

16   entertainment business efforts?

17   A.        Not with my salary, no.   I was not able to do that.

18   Q.        Did your wife contribute any money toward that?

19   A.        No.

20   Q.        Mr. Garner, I want to play a couple of conversations

21   for you, if I may.

22             MR. MCKNETT:  Mr. Mitchell, would you cue up Call

23   B851 on Page 60, and if I may, Your Honor, I will present a

24   transcript book to Mr. Garner.  Mr. Mitchell, are you ready?

25             MR. MITCHELL:  Just one moment.

1          MS. JOHNSTON:  Your Honor, may we approach the bench?

2                       (At the bar of the Court.)

3          MS. JOHNSTON:  I'm going to object to this call being

4     played on the basis of hearsay at this point in time.  It's

5     Call B851 on Page 60.  It has to do with Paulette Martin

6     speaking to Learley Goodwin speaking to Mr. Garner speaking

7     -- they are discussing a meeting with Mr. Hood concerning the

8     percentage of profits from the Aretha Franklin concert.  The

9     calls that we played relate to their drug conspiracy.

10         I don't know of any hearsay basis to allow this call

11    to be played at this stage of the proceedings, and I would

12    notice in the book, and it's probably too late because the

13    jurors are probably reading it because they now have it in

14    front of them and know what page it's on, and the next call

15    is a similar call, and we're going to object to this call as

16    well.

17         MR. MCKNETT:  Your Honor, I have three calls that are

18    similar in nature.  As far as Mr. Garner is concerned, they

19    will not be hearsay because they are his words and that he

20    had here available for cross-examination, if appropriate.  I

21    would not be offering the words of the other participants for

22    the truth, but simply to support Mr. Garner's present sense

23    impression and his -- and context for his comments and also

24    18 U.S.C. 2517(3) allows for a person who is -- has been

25    electronically surveilled to testify under oath concerning

1        the contents of the conversation, which has been recorded.

2              MS. JOHNSTON:  Your Honor, if I might.  In terms of

3        the code section that counsel just testified to, that code

4        section has to do with the disclosure of wiretapped

5        communications.  What it does is it protects somebody from

6        liability.  It's not an evidentiary rule.  It merely says

7        that somebody, if they're called to testify, can testify

8        during the proceeding about those calls without violating the

9        disclosure limitations set forth in the wiretap statute.

10              In terms of what Mr. Garner says in this call being

11       his present-sense impression, Mr. Garner's present-sense

12       impression is irrelevant to this case.  He is not on trial

13       here.  The fact that he had a meeting discussing the Hood

14       percentage of profit relating to the Aretha Franklin concert

15       is totally irrelevant.  There is no evidence here that that

16       has anything at all to do with drugs.  Nobody has said

17       anything like that.

18              What Mr. Garner's intent was and his impression was

19       irrelevant to this jury's deliberations and the issues before

20       them.

21              MR. MCKNETT:  Your Honor, the words of 2517(3) do not

22       limit the testimony to proceedings concerning a wiretap.  It

23       says in any proceeding, I believe under oath.

24              THE COURT:  Let me -- I'm inclined to agree with the

25       government's view of what 2517(3) means, but with regard to

1    your ability to play -- how many recordings are you going to

2    play?

3              MR. MCKNETT:  There's three.

4              THE COURT:  With regard to your ability to play

5    recordings in which this witness has been recorded, in light

6    of the testimony that's been received, I'm going to permit

7    it, but I'm going to give the cautionary instruction to the

8    jury that they're about to hear -- these are all calls with

9    him.

10             MR. MCKNETT:  With him?

11             THE COURT:  That they may consider these calls but

12   insofar as any other speaker is being heard on these calls,

13   they may not consider what the speakers are saying and the

14   truth of what they are saying.  But only of the fact that it

15   was said during the conversation.

16             MR. MCKNETT:  I only intend to ask him about he said

17   anyway.

18             THE COURT:  I'll permit it.

19             MR. MCKNETT:  Thank you.

20                     (Back in open court.)

21             THE COURT:  Ladies and gentlemen, through this

22   witness, you are about to here a few recordings in which he

23   is one of the participants to the call.  There are other

24   participants on these calls.  The permission that I'm giving

25   to the defense to play this recording is authorizing it to be

1    played and considered by you but for limited purposes.

2    Remember I gave you instructions about limited purposes?

3          You may consider what this witness said on these

4    recordings in any and all respects as evidence, but insofar

5    as statements that are made by other speakers on these

6    conversations, you may not consider the statements made by

7    other speakers on these conversations for the truth of what

8    they are saying but simply for the fact that they said what

9    they said.

10          All right?  You may proceed.

11          MR. MCKNETT:  Mr. Mitchell, would you play that call,

12   please?

13          (Audio recording begins playing at 5:28 p.m.)

14          (Audio recording stops playing at 5:30 p.m.)

15          BY MR. MCKNETT:

16   Q.    Mr. Garner, did you recognize the voices in that

17   conversation?

18   A.    Yes, I do.

19   Q.    Who is speaking?

20   A.    That was Paula Martin, Goody -- well, Mr. Goodwin and

21   myself.

22   Q.    Goody, you mean by -- who do you mean by Goody and

23   Mr. Goodwin?

24   A.    Mr. Goodwin.  Learley Goodwin.

25   Q.    Do you recognize him in the courtroom?

1      A.      Yes, right here.

2              MR. MCKNETT:  May the record reflect that Mr. Garner

3      has identified Mr. Goodwin, Your Honor.

4              THE COURT:  It will so indicate.

5              BY MR. MCKNETT:

6      Q.      What are you -- when I say you specifically, what are

7      you talking about in this conversation?

8      A.      Essentially, Ms. Martin had shown me a work sheet

9      which had the proposed expenses for the Aretha Franklin show,

10     and after tabulating the preliminary costs, I could see that

11     there would be at max no more than $50,000 after expenses

12     that were to then be divvied up among the promoters and the

13     other investigators, the finders fees and such, and generally

14     what you try to do is get people to lock into a percentage so

15     you know exactly what money is going to be involved and how

16     it's going to be divided.

17             Also, there are riders in contracts in which they say

18     a star like Aretha, for example.  After you have established

19     what the promoter's fee would be, which is generally 15

20     percent, it's a rider to the contract, which would then say

21     that, say, $50,000 Goody got 15 percent.  That would be

22     $7,500 that they would make off the top.

23             Then Aretha's people would have a stipulation that

24     the profits would then be divided up 60/40, 80/20, so they

25     would get, say, 60 percent of 50,000 minus 7,500, which would

1      then leave the difference to be divided up among everyone

2      else involved, after which if Ron Hood was getting a certain

3      percentage, Ron Hayes was getting a certain percentage, their

4      take on this could have been less than -- I think I had

5      tabulated it to be less than 12 or $13,000.

6          And for the aggravation that really goes into

7      producing as against -- the euphoria that comes from, say,

8      the production night where, you know, you're backstage with

9      the artist, and you know, you're playing a certain type of

10     role, the financial end is very, very very, very dangerous.

11     That's why so few people actually last in this business

12     because they end up losing money in the long run and people

13     don't understand that, but it's because of the way the

14     contracts are detailed.

15         So I was cautioning her that it was terribly

16     important for her and Mr. Goodwin to look at the people they

17     were dealing with and how important it was for them to seek

18     legal assistance so that everything was firmed up so there

19     were no surprises other than how many people showed up for

20     the performance.

21     Q.    Would you turn, please, to Page 68.

22         MR. MCKNETT:  Mr. Mitchell, it's Call B853.  Would

23     you play that, please, Mr. Mitchell?

24         THE WITNESS:  Page what, sir?

25         MR. MCKNETT:  Page 68.  It should be the next

1      conversation.

2              (Audio recording begins playing at 5:34 p.m.)

3      (Audio recording stops playing at 5:38 p.m.)

4              BY MR. MCKNETT:

5      Q.      Mr. Garner, who were the participants in this

6      conversation?

7      A.      That was Ron Hood.  That was Mr. Goodwin's partner

8      and Paulette Martin.

9      Q.      And yourself?

10     A.      And myself, yes.

11     Q.      Is this an example of what you were describing in a

12     previous conversation about how the money wasn't working?

13     A.      Yes.  And this was essentially the nature of most of

14     the conversations I had with Ms. Martin during this period.

15     She was in contact with people every day, and if my wife and

16     I went over, she would, you know, show me papers and just ask

17     me to look at it.  As you can tell, I had certain

18     trepidations about entering into these type of arrangements,

19     just given what the dollar figures are.  And to my knowledge,

20     Ms. Martin was operating on very limited resources, and so we

21     were trying to maximize whatever the investment was.

22     Q.      You mentioned two individuals here on Page 71.  You

23     mentioned Ron Hayes.  Who is Ron Hayes?

24     A.      I never met Ron Hayes.  I talked to him, I think,

25     briefly on one phone conversation.  He was a gentleman in

1        Kansas City that was promoting the Aretha Franklin concert,

2        and he was the person who was essentially making contact with

3        Ms. Franklin's people, and he was to set up the venue in

4        which -- or secure a contract for the venue in which Ms.

5        Franklin was to perform.

6        Q.       And you mentioned on Page 71, Burke Pardell.  Who is

7        Burke Pardell.

8        A.       My understanding is he is a New York lawyer promoter

9        that participates doing the legal work for Mr. Hayes, but I

10       didn't have any contact with him at all.

11       Q.       These two calls, B851 and B853, take place on March

12       17, 2004, shortly after 9 o'clock at night.  Where were you

13       when you were having these conversations?

14       A.       It appears that I was at Ms. Martin's place of abode,

15       which I think, at that time, was Jackie's home.  She was

16       living in the basement.

17       Q.       She was?

18       A.       Ms. Martin was living in the basement.

19       Q.       Where was your wife during these conversations?

20       A.       She would be upstairs with Jackie.

21       Q.       Was your wife ever present when these conversations

22       about her were taking place?

23       A.       Yes, she was.

24       Q.       The last call is on Page 97.  Mr. Garner would you

25       turn to Page 97?  Call No. B1078, and this call takes place

1    on March 19, 2004, at about just a couple of minutes before 8

2    o'clock at night.

3              MR. MCKNETT:  Mr. Mitchell, would you play that

4    please?

5              MR. MITCHELL:  Which call again?

6              MR. MCKNETT:  B1078.

7              (Audio recording begins playing at 5:42 p.m.)

8    (Audio recording stops playing at 5:43 p.m.)

9              BY MR. MCKNETT:

10   Q.      Mr. Garner, do you know what day of the week this

11   call took place on, March 19?

12   A.      No.  No.

13   Q.      If I showed you a calendar, would it refresh your

14   recollection?

15   A.      Possibly.

16   Q.      If you would turn to the second sheet in that binder.

17   Do you see it there?

18   A.      Right.  March 19, which is a Friday.

19   Q.      So this would have been one of the Friday nights you

20   described you were at Ms. Martin's house for dinner?

21   A.      Yes, it would.

22   Q.      Do you know who you were calling or talking to during

23   this conversation?

24   A.      It sounded like Kevin.  Kevin was a gentleman who

25   sold fine fashion -- upscale fashion from Baltimore, and he

1    was working with Ms. Martin in terms of trying to expand the

2    boutique that he had in Baltimore, very exclusive Italian

3    clothes, and I had certain ideas about promoting such a fine

4    line of clothing.  And we were talking in terms of setting up

5    fashion shows, making contacts with athletes in the area in

6    which he could demonstrate his clothes.  It's just an

7    exceptional array of clothes that he had.

8    Q.    I think it goes without saying, but I will ask the

9    question.  Were you doing this with the hope of making a

10    profit?

11    A.    No.  Actually, you know, I -- working with the arts

12    program and the tremendous weight that had befallen me in

13    operating the program, some nights toward the end of the

14    program, I would have a payroll of $350,000, the night before

15    have $64,000 in the bank.  Believe me, that is a tremendous

16    amount of responsibility, and had to pray that the city

17    government would walk the payroll check through so I could

18    get it in the bank to pay people.

19         Those were considerations that I really wasn't

20    interested in revisiting, but I did have enough knowledge and

21    enough ideas, since one of my strengths was being an idea man

22    that I could produce ideas for people and it was up to them

23    to essentially carry forward.

24    Q.    On the first page of this conversation, Page 97, you

25    make the comment you were scheduling the conference call if

1    that worked out for you.  What was that in reference to?

2    A.      If --

3    Q.      If you remember.

4    A.      Honestly, I don't remember.

5            MR. MCKNETT:  I have nothing further on transcript

6    book, Your Honor.

7            THE COURT:  All right.

8            MR. MCKNETT:  Mr. Garner, I'm going to show you a

9    chart of pictures.  Could I ask the witness to come down to

10   the well, Your Honor?

11           THE COURT:  You may.

12           BY MR. MCKNETT:

13   Q.      Mr. Garner, I'm going to ask you, why don't you stand

14   over on that end, and I want to ask you if you know any of

15   these people.  I'll start up there in the upper right-hand

16   corner.  There's a box and the top picture is Moises Uriarte.

17   Do you recognize him?

18   A.      No.  I don't recall ever seeing him.

19   Q.      You will have to speak a little louder.

20   A.      I don't recall having met him or seen him.

21   Q.      There's a picture of a woman.  It's labeled Gwen

22   Levi.  Do you recognize that picture?

23   A.      She came to Paula's maybe two or three times.  I do

24   remember her.  At that time, she was very tall, a model-like

25   figure, always wore very fashionable clothes so she stood

1    out, but I just saw her a couple of times.

2    Q.       On what kind of an occasion would she come to Ms.

3    Martin's house?

4    A.       She would come with Kevin, who we just talked in

5    terms of having a boutique shop in Baltimore.  That was the

6    extent of the conversation.  She would come, I think she

7    would stay 10, 15 minutes and then would generally leave.

8    Q.       There's a picture next to him, a gentleman named

9    William Turner, a/k/a Dog.  Do you recognize him?

10   A.       No, I don't.

11   Q.       I'm going to move to my left on the chart.  The next

12   picture is labeled Steve Brimm.  Do you recognize him?

13   A.       Never -- I don't recall having met him, no.

14   Q.       How about Pernell Philpot?

15   A.       I do know Mr. Philpot.

16   Q.       How do you know him?

17   A.       He would come past Paula's, would sit down and eat.

18   He was one of the regulars that would simply come and eat,

19   you know, gregarious guy.  We would talk sports and that kind

20   of thing, and he had a love for food.

21   Q.       The next box over toward me is the first person is

22   Luis Mangual, Jr.  Do you recognize him?

23   A.       I don't recall having met him.

24   Q.       How about Juan Encarnacion?

25   A.       Same.  Don't recall having met him.

1    Q.      Have you ever met a picture -- who doesn't look like

2    that, but whose name is Cuba?

3    A.      No.

4    Q.      How about Steve Campbell, Houston?  Steve Campbell

5    from Houston?

6    A.      I don't recall ever having met him.

7    Q.      Have you ever been to Houston?

8    A.      Oh, I may have been in Houston -- I was elected the

9    national student representative, the national honors counsel

10   back in the late '60s.

11   Q.      Keep your voice up.

12   A.      Late '60s.  I did a lot of traveling then, and I did

13   pass through Houston back in the '60s, early '70s, but not

14   since then.

15   Q.      Back when you were in school?

16   A.      Yes.  I did -- the organization dealt with colleges

17   and universities that have honors programs, and I would

18   travel a lot to the various universities and assess the type

19   of programs they have for students.

20   Q.      You haven't been back to Houston since?

21   A.      No.

22   Q.      Do you know anybody from El Paso, Texas named Kelly?

23   A.      No.

24   Q.      How about Nathan King?  Do you know Nathan King?

25   A.      The face doesn't look familiar.

1      Q.      How about this young lady, Tiffany Vessels?

2      A.      The face looks familiar.  It's difficult for me to

3      place exactly in what context.

4      Q.      Would it have been in connection with anything to do

5      with Ms. Martin, if you recall?

6      A.      Well, there would be some people that would come in.

7      They would sit in one portion of the kitchen or living room,

8      like I said, when -- generally, I was over there.  I was

9      preoccupied with Ms. Martin's granddaughter, so we would

10     essentially be playing games and this kind of thing, or we

11     would be involved in some intellectual discussion.

12             Some of the people, maybe we would get to on the

13     board that, you know, intellectual discussions, but other

14     than that, there would not be -- I never really paid

15     attention who was coming in and out because there was no

16     interaction there.

17     Q.      You used the phrase coming in, coming out over there.

18     What are you referring to?

19     A.      Essentially, once again, there was always a lot of

20     food at Ms. Martin's house, and I always, you know, looked at

21     the people coming in.  They would come in, they would sit

22     down, they would eat, they would talk.  Really in

23     non-sequiturs in many cases.  I mean, you know, it wasn't

24     real profound types of conversation, and in some cases, I

25     would enjoy interacting with Paula's granddaughter more than

1    I would, you know, having discussions with some of the

2    people.

3    Q.     Where would your wife be on these occasions?

4    A.     At the -- there was a -- an aisle and counter and

5    general --

6           MS. JOHNSTON:  Your Honor, again, could we have an

7    idea of what location the witness is describing this counter

8    in?

9           THE COURT:  Yeah, could you --

10          BY MR. MCKNETT:

11   Q.     Could you describe this?

12   A.     Ms. Martin's house, this is 2002-2003.  She would be

13   sitting at the aisle and we had chairs and would be

14   essentially there eating.  If Paula's daughters would come

15   in, my wife would have -- interacted with them, but very

16   seldom did I see her interact with anyone else that came in

17   to the -- came into the house.

18          That was on rare occasions.  It wasn't like every

19   night these people were coming in.  I mean, there were many a

20   nights where it was just Ms. Ali and myself and Ms. Martin

21   where -- and one or two other people that we grew to know.

22   Only on rare occasions would there be more than that.

23   Eventually, it was her family members there when we would go.

24   Q.     Is it fair to say that on these rare occasions, Ms.

25   Martin would simply invite a lot of people into the house

1        just like party or something?

2        A.      I really couldn't speak to that because I'm not

3        really sure the nature of the relationships that she had, but

4        Ms. Martin didn't -- did not like to have huge gatherings,

5        and so at no time were there any more than four or five

6        people.  There were never huge amounts of people.  There was

7        never a lot of traffic coming in and out of the house while I

8        was there, so I mean, I didn't see that.

9        Q.      Did you ever meet a man named Michael Thurman?

10       A.      I don't recall.

11       Q.      How about Xavier Moore?

12       A.      I don't recall.

13       Q.      John Irby?

14       A.      No.  None of these people look familiar to me.

15       Q.      Alton McKenzie is also known as Dug?

16       A.      No.

17       Q.      You know this person?

18       A.      Yes.

19       Q.      Who is that?

20       A.      That's my wife.

21       Q.      Can you speak up a little bit?

22       A.      That's my wife.

23       Q.      Do you know Claude Arnold, also known as Skip?

24       A.      No.

25       Q.      How about Derrek Bynum?

1   A.      Yes, I know Mr. Bynum.  Addae, Paula's granddaughter,

2   is his daughter.

3   Q.      How about Eugene Bird?

4   A.      Yes, I know Mr. Bird.

5   Q.      How do you know him?

6   A.      I met Mr. Bird at Paula's, and Mr. Bird is an

7   extraordinarily intelligent man, and we would discuss

8   politics, we would discuss finances, and we would discuss

9   sports.

10  Q.      How about a young lady named Lavon Dobie, also known

11  as Becky?

12  A.      Yes, I know Ms. Dobie.

13  Q.      How do you know Ms. Dobie?

14  A.      Ms. Dobie, toward the -- I think I met Ms. Dobie

15  probably early 2004, and she would be one of the regulars

16  that would come over to Ms. Martin's home.

17  Q.      To eat?

18  A.      To eat primarily, yeah.

19  Q.      How about Ruby Harden?

20  A.      I don't know her, but I've seen -- you know, I've

21  seen her, but you know, I don't --

22  Q.      You've never interacted with her?

23  A.      Never really interacted with her.

24  Q.      Where would you have seen her?

25  A.      It may have been in the courthouse here.  I mean, you

1      know, I mean, the face looks familiar, but I could not

2      identify exactly the circumstances under which I met her.

3      Q.      How about a gentleman named George Harris?

4      A.      No.

5      Q.      How about a gentleman named Larry Lane?

6      A.      The face doesn't look familiar.  I may have met him,

7      but I mean, I couldn't swear to that.

8      Q.      Okay.  How about John Martin?

9      A.      I know Mr. Martin because that was one of Ms.

10     Martin's ex-boyfriends.

11     Q.      And Larry Nunn?

12     A.      Don't know Mr. Nunn.

13     Q.      How about Milburn Walker, known as Bruce?

14     A.      I don't know him.

15     Q.      And how about Reece Whiting?

16     A.      Mr. Whiting is another gentleman who is extremely

17     intelligent, the nature of his visits to the house and when

18     Ms. Martin had her home, Mr. Whiting would come by.  He's an

19     avid Ravens fan.  We would talk football, but he's also a

20     historian, has great understanding of sociological issues,

21     and we would discuss that and we would discus philosophical

22     issues.

23             So, my conversation I used to like it when Mr.

24     Whiting was there, because I could have a decent intellectual

25     discussion with him.

1    Q.      I meant to ask earlier, have you seen Mr. Bynum

2    today?

3    A.      Yes, I do see Mr. Bynum.

4    Q.      Where do you see him?

5    A.      Right next to Mr. Whiting.

6    Q.      At the trial table?

7    A.      Right.

8    Q.      How about Ms. Dobie?

9    A.      Ms. Dobie is at the end.

10   Q.      Ms. Harden?

11   A.      Yes, right there.

12   Q.      Where do you see her?

13   A.      In the back.

14   Q.      At the second table?

15   A.      Right.

16   Q.      And Mr. Whiting?  Do you recognize him?

17   A.      Yes.  Mr. Whiting is right there.

18   Q.      He's also at trial table?

19   A.      Right.

20   Q.      You do know Mr. Learley Goodwin; correct?

21   A.      Right.

22   Q.      Also known as Goody.  Do you see him today?

23   A.      Yes.  He's right there.

24   Q.      At trial table?

25   A.      Right.

1    Q.      And of course, Ms. Martin.  Do you see her today?

2    A.      Right.

3    Q.      Now, you can return.

4            THE COURT:  Mr. McKnett, if we're finished with the

5    chart, I think we can finish up for the day.

6            MR. MCKNETT:  Just one more question, I think, on the

7    chart.

8            THE COURT:  One more question on the chart?

9            BY MR. MCKNETT:

10   Q.      Mr. Garner.

11   A.      Yes, sir.

12   Q.      Of all the people you've identified on this chart, as

13   well as all the people you've identified in the

14   conversations, do you have any knowledge -- prior to June

15   1st, '04, did you have any knowledge that any of these people

16   may have been involved in drug activity?

17   A.      No, sir.  I mean, one thing, and if anybody knows me

18   and my history, they know that I have difficult problems with

19   the influx of drugs into our community.  I even have family

20   members that have fallen prey to drugs, and so no, I would

21   not have participated or even allowed my wife to participate

22   if we were to be together.  So, no, I had no knowledge that

23   anything, and there was nothing there, the number of times

24   that I was in Ms. Martin's home and environment that led me

25   to believe that any illegal activities were taking place.

1              MR. MCKNETT:  Thank you, Mr. Garner.  We can pick up

2        again tomorrow.

3              THE COURT:  We will recess for the day, ladies and

4        gentlemen.  We will resume tomorrow morning at 9:00, and I'm

5        going to do my level best to get you out of here before 4:00.

6              Counsel remain behind.  Where is Mr. Garner?

7              MR. MCKNETT:  Mr. Garner has just stepped out.

8              THE COURT:  Will you make sure he doesn't talk to

9        anybody while he's on the stand?

10             MR. MCKNETT:  I told him that ten seconds ago.

11       THE COURT:  Mr. McKnett, after this witness, is the next

12       witness your client?

13             MR. MCKNETT:  I believe so.

14             THE COURT:  Would that be the conclusion of your

15       case?

16             MR. MCKNETT:  There's a possibility I would have one

17       more very short witness.

18             THE COURT:  All right.

19             MS. GREENBERG:  Your Honor, can we know who that is?

20             MR. MCKNETT:  I've already provided the name.  It's

21       the pastor.

22             THE COURT:  If I understand correctly, the government

23       might have as many as three rebuttal witnesses.

24             MS. GREENBERG:  Yes, sir.

25             THE COURT:  Have them ready tomorrow, just in case.

1            MS. GREENBERG:  Yes, sir.

2            THE COURT:  I'm very anxious to try to wrap up

3      testimony tomorrow, if we can.

4            MS. JOHNSTON:  Can we have the witnesses here at

5      lunchtime tomorrow?

6            THE COURT:  Oh, yes.  Now, next thing I wanted to

7      read you a note I got from a juror.

8            Dear Judge Titus, I wish to express my intense

9      interest in serving as a juror for the deliberative phase of

10     the trial and hope that you will select me for that important

11     role.  That role is a critically important aspect of the

12     trial process, and I believe that I can bring strategic value

13     to the decision-making process.  Thank you in advance for

14     your consideration of my request.  Sincerely, Juror No. 197,

15     which is the last alternate.

16           MR. MONTEMARANO:  Got to love those engineers and

17     scientists.

18           MR. SUSSMAN:  Many are called, but few are  chosen.

19           THE COURT:  I read that to you for your information.

20     Is there any likelihood of any preliminary matters to take up

21     tomorrow morning?

22           MR. MONTEMARANO:  I have one matter now, Your Honor.

23     We had requested the name of government's witnesses.  Your

24     Honor indicated you wouldn't obligate the government to make

25     the final decision until Mr. McKnett is done inasmuch as the

1    other defendants are complete.

2         THE COURT:  I will ask the government to let all

3    defendants, other than Mr. McKnett, know who they might call

4    to rebut.

5         MS. JOHNSTON:  Your Honor, it depends upon how this

6    goes in terms of who we're going to --

7         THE COURT:  I understand.  Do the best you can.  I

8    don't want them guessing at all, so --

9         MS. JOHNSTON:  We may recall Thomas Eveler.  We may

10   call Sergeant Sakala.

11        THE COURT:  I thought we sent him back to Rockville.

12        MS. JOHNSTON:  We have -- in all likelihood, we will

13   call IRS Special Agent Ken Olin.

14        MR. MCKNETT:  Your Honor, I apologize for

15   interrupting Ms. Johnston, but Ms. Ali would like to leave

16   the courtroom in a matter of some urgency.  She needs to get

17   to the ladies' room.

18        THE COURT:  That's fine.  No, I'm -- this is the end

19   of the proceedings for today.

20        MS. JOHNSTON:  Your Honor, I expect we will call Ken

21   Olin form the IRS to testify about some bank records.  We may

22   call those agents and we may also call another witness that I

23   haven't made up, but I haven't made up my mind yet.

24        THE COURT:  All right.

25        MR. MCKNETT:  Your Honor, there may be a matter

```
 1    preliminarily.  It has to do with my asking Ms. Ali questions
 2    about transcripts, all of which have been played.
 3              THE COURT:  All right.  Well, look, Counsel, be here
 4    at ten minutes of 9:00.
 5              MR. MCKNETT:  Your Honor, the reason --
 6              THE COURT:  If there's anything I need to deal with
 7    tomorrow morning, I can deal with it.
 8              MR. MCKNETT:  I can tell the Court very quickly the
 9    basis for that would be the same basis that both Mr. Garner
10    and also --
11              THE COURT:  I understand.
12              MR. MCKNETT:  -- has to challenge the agent's bases
13    for his opinions.
14              THE COURT:  Counsel, I want to have the jury sitting
15    in the box at 9 o'clock, so I'll be on the bench at ten
16    minutes of 9:00 and have the defendants all present and we'll
17    see you then.
18                        (Off the record at 6:03 p.m.)
19
20
21
22
23
24
25
```

1                          **<u>CERTIFICATE</u>**

2

3          I, Tracy Rae Dunlap, RPR, CRR, an Official Court

4     Reporter for the United States District Court of Maryland, do

5     hereby certify that I reported, by machine shorthand, in my

6     official capacity, the proceedings had and testimony adduced

7     upon the Jury Trial Proceedings in the case of UNITED STATES

8     OF AMERICA versus PAULETTE MARTIN, et al, Criminal Action

9     Number RWT-04-0235 on August 3, 2006.

10

11         I further certify that the foregoing 240 pages

12    constitute the official transcript of said proceedings, as

13    taken from my machine shorthand notes, of said proceedings.

14

15         In witness whereof, I have hereto subscribed my name,

16    this 28th day of April 2008.

17

18

19                          _____

20                          TRACY RAE DUNLAP, RPR, CRR
                            OFFICIAL COURT REPORTER
21

22

23

24

25