UNITED STATES DISTRICT COURT OF MARYLAND
SOUTHERN DIVISION

```
--------------------------x
UNITED STATES OF AMERICA    :
          Plaintiff         :
                            :
                            :
vs                          :Criminal Action:RWT-04-0235
                            :
                            :
PAULETTE MARTIN, et al      :
          Defendants.       :
--------------------------x
```

Friday, August 4, 2006
Greenbelt, Maryland

The above-entitled action came on for a Jury
Trial Proceeding before the HONORABLE ROGER W. TITUS,
United States District Judge, in courtroom 4C,
commencing at 8:53 a.m.

THIS TRANSCRIPT REPRESENTS THE PRODUCT
OF AN OFFICIAL REPORTER, ENGAGED BY
THE COURT, WHO HAS PERSONALLY CERTIFIED
THAT IT REPRESENTS THE PROCEEDINGS AS RECORDED
AND REQUESTED.

APPEARANCES:

On behalf of the Plaintiff:

DEBORAH JOHNSTON, Esquire
BONNIE GREENBERG, Esquire

On behalf of the Defendants:

MICHAEL MONTEMARANO, Esquire
ANTHONY MARTIN, Esquire
MARC HALL, Esquire
TIMOTHY MITCHELL, Esquire
PETER WARD, Esquire
EDWARD SUSSMAN, Esquire
HARRY MCKNETT, Esquire

Tracy Rae Dunlap, RPR, CRR          (301) 344-3912
Official Court Reporter

I N D E X

|                | DIR | CROSS | REDIR | RECROSS |
|----------------|-----|-------|-------|---------|
| Ulysses Garner | 13  | 65    | 116   | 127     |
| LaNora Ali     | 136 |       |       |         |

|                        | Page |
|------------------------|------|
| Reporter's Certificate | 285  |
| Concordance            | 286  |

MR. WARD:  Your Honor?

THE COURT:  Mr. Ward.

MR. WARD:  I was also going to say, I am going to prepare over the weekend and submit a multiple -- I mean a lesser-included offense.

THE COURT:  A what?

MR. WARD:  Lesser-included instruction.

THE COURT:  Mr. Ward, I've been asking for that for days and days and days.  I've got to give my instructions next week.

MR. WARD:  I will e-mail that to Mr. Krinsky on Saturday.

THE COURT:  All right.  I mean, the train is, you know, pretty much leaving the station, but I'll do the best I can.

Now, are there preliminary matters we need to address this morning before we begin this morning at 9:00?

MR. MCKNETT:  Your Honor, one matter would be the presence of my client.  I haven't seen her this morning.

THE COURT:  Oh, I didn't notice that.  Okay.

MR. MCKNETT:  And my witness as well.  I assume they're together.

THE COURT:  Oh, all right.  I didn't know she's

not here.  Well, we won't do anything until gets here, will we?  Are there any preliminary matters other than those relating to Ms. Ali.

MR. MONTEMARANO:  Yes, Your Honor.  Mr. Martin and I was wondering was the Court's pleasure to actually break for lunch or just take a couple of extended breaks?

THE COURT:  If I'm going to go all the way to 4:00, I think I'm going to have to take a 45-minute lunch in there.  I don't want to starve them to death. I'm going to take breaks that really are 15 minutes and lunch that really is 45 minutes, and have people really out of here at four.

MR. MONTEMARANO:  This is the first day we were going to stop at 4:00.

THE COURT:  I think for the sake of humanity, people need to have sustenance and so forth.  As of right now, my anticipation remains that at the very minimum, all testimony and my instructions will be concluded by the close of business Tuesday.  So that Wednesday would be argument day.

MS. JOHNSTON:  Your Honor, I don't think we can finish arguments in one day.

THE COURT:  Ms. Johnston, we're going to finish arguments in one day.  This case is not one that I

think merits more than one day of argument.  I think,
frankly, this jury is going to get completely
befuddled if they have more than one day of argument.
I think we're going to have to figure out how to make
it work in one day.

          MR. MCKNETT:  Your Honor, I understand the
Court's concern, but being the last guy.

          MS. JOHNSTON:  I would be the last person.

          MS. GREENBERG:  The last gal.

          THE COURT:  Well, you're the last guy.

          MR. SUSSMAN:  I'll go last, Ms. Johnston, just
to help you out.

          THE COURT:  Look, I've done a lot of closing
arguments in my lifetime in cases just as long and
ugly as this one.  I really think that it's in
everybody's best interest to try to figure out how to
be succinct, very adequate and thorough, but
efficient, and get it done.  I don't see how it should
take more than one day.

          MR. SUSSMAN:  The only thing, if I can weigh in
on that.  Given the number of talking heads that the
jury is going to have to face, if we can get a ground
rule in terms of how much time before we get a break,
because if there's no breaks, you know you can only
listen to a bunch of lawyers --

THE COURT:  I'm usually going to take a break
between each speaker, and it may not be a long break.
It will be a brief break.  I think Ms. Ali and her
husband are now entering the courtroom.  It will be a
brief break, but you know we will have the government
give its initial argument, have a break, and then one
of the defense attorneys.  So -- but, you know, talk
amongst yourselves.

I really want to fit this into a budget of one
full day, and then the jury comes back the next
morning and begins their deliberations.  I think
that's a reasonable approach.  I don't think there's
any need to burden these jurors with more than one
full day of argument.  I think we're going to lose
them if you spend much more than that.

MR. MARTIN:  You don't think they're lost
already?

MR. MONTEMARANO:  Court's indulgence.  Can I
have a moment to speak with Ms. Johnston?

THE COURT:  Yes, certainly.

MR. MCKNETT:  Your Honor, Ms. Ali would like to
use the restroom before we get started.

THE COURT:  Okay.

MS. GREENBERG:  Judge, as a housekeeping matter,
one thing I thought might be helpful with closing

arguments, if the Court won't mind, because there's so many questions on the verdict form, so that the jurors can follow along, if each of them could have a copy.

THE COURT:  I intend to distribute to the jurors every single one a copy of the verdict form.  As a matter of fact, I'm going to give it to them during my instructions so they can look at it.

MS. GREENBERG:  If Your Honor could also give them a clean copy, so they can take notes on theirs and a clean one.

THE COURT:  There will be one in pristine condition that the foreman will have and keep and every single one will have one to play with as they see fit, including the foreman, because I really think with a verdict form as long and complex as this one, they really want to start looking at it while I'm talking.

I intend to also give them -- I don't want to give them one set for every one.  I will give them several sets of the instructions clean.  They won't get them until the next day because until I've actually delivered them, I don't know what they look like, and there may be things I fix as I go, and I will give them to them as read.

I'm also going to warn them that, please, don't

ask me for transcripts.  Tracy asked me to ask that.
We just can't do it.

        MR. SUSSMAN:  Judge, since we got a minute here.
Do you have any thought, once the jury goes out, what
we're -- where we're supposed to be or what we're
supposed to do?  I mean, it gets a little --

        THE COURT:  Well, you know, everybody in this
room has probably got a different viewpoint of how
long it's going to take to reach a verdict and we're
probably all wrong, but what I usually do is ask that
you be within a half hour of the courthouse, if you
can.  I know some of -- many of you are from more than
a half an hour away.  I'll think about it.  Maybe for
the first day, you could go back to your office, but I
need to know exactly how to get a hold of you.

        Nobody should disappear on me.  You should be
reachable by phone -- cell phone, but you know, if we
get a note, I don't want to have to wait hours to be
able to do a note.  If we have a verdict, I want to
have you here promptly, and remember, this verdict is
going to take a long time to receive.  Just to read
that -- I mean, Bea is probably going to die going
through that verdict form.

        MR. SUSSMAN:  With regard to administerial
things, one thing that might work, and I don't know if

                                                              8

we could have a designated hitter to be here and sort
of be the point man to sort of disseminate something
about a note or to gather the kind of the community's
sentiment as to what -- how to respond.

THE COURT:  Well, if I get a note, I'm going to
make copies of the note for every counsel and provide
it to them and we will discuss how to respond.  I
don't think I can operate on less than all attorneys
when dealing with a note.

MR. SUSSMAN:  I didn't mean that, but in terms
of one person actually being here and other people
putting their input through phone.

THE COURT:  Well, if persons are here or near
the courthouse and they get here, they will get a copy
of the note upon arrival.

Bea, is the jury ready?

THE CLERK:  Yes.

MR. MCKNETT:  Your Honor, before we start that.
I realize I think to say it's Mr. **Krinsky's** last day.

THE COURT:  It is indeed -- no, no, a week from
today is his last day.

MR. MCKNETT:  Oh, okay.

THE COURT:  We haven't got rid of him yet.

MR. MCKNETT:  I don't think we could do without
him at that stage.

THE COURT:  He's been extraordinary.  This is one of my interns' last days, but not David's last day.

MR. MCKNETT:  Impose upon the Court one last request.  Well, maybe not one last request.  One more request.  When Mr. Garner is finished, could I have a very brief break, two or three minutes, just to reorganize myself.

THE COURT:  It will be really two or three minutes.  I don't want to have the defendants taken out.

MR. MCKNETT:  It might be an appropriate time for a break anyway, but if not, at least a couple of minutes to shuffle things around.

THE COURT:  Any other preliminary matters?

MS. GREENBERG:  Your Honor, could we get a copy of that note from yesterday?

THE COURT:  Yes.  We'll file that note and we'll deal with that note next week.  The note is probably moot.  I don't know that we're going to need to get to the third alternate to have three remaining alternates.  So I don't intend to leapfrog him over the others unless circumstances compel that.

Ready for the jury?  Bring him them in.  Nine sharp.

Counsel, on Tuesday, I have followup with the surgeon at 8:00t.  I don't see why we can't start at 9:30.

(Jury returns at 9:05 a.m.)

THE COURT:  Good morning, ladies and gentlemen. While you're getting settled into your chairs, I wanted to review with you some scheduling matters.  As I said yesterday, I'm going to try to get you out of here by 4:00 today, if not earlier, depending on the suitable breaks and the testimony.  I'm going to try to get as much testimony as I can by having one break this morning, maybe a 45-minute lunch rather than an hour and 15 minute lunch, and another 15 minute break, and we will get you out of here so you don't have to get killed on the roads at 5 p.m. around here.

We won't be sitting on Monday.  On Tuesday, I have a brief followup visit to my surgeon, who will tell me I'm doing fine, at 8 o'clock, but we should be able to start at 9:30 on Tuesday.  You will know more later in the day about how we're doing on completing all the testimony, but I anticipate that all defense witnesses also be finished today.  There may be some prosecution rebuttal witnesses.  I don't know that until the defense has concluded its case.

If we don't finish the entirety of the testimony

today, we will finish it on Tuesday.  I'm very comfortable.  I will be giving you my instructions. I'm very comfortable I will be able to get that done on Tuesday.  They are reasonably lengthy, so it will take some time to do that.  I have to have about five glasses of water up here to get through it, but we'll get that done.

I'm anticipating that there will be fairly lengthy closing arguments because this has been a long trial and the attorneys need to talk to you and tell you what they think about the evidence and each one of them needs to talk to you individually because you have to make very careful, individual assessments in this case, and that is going to be the better part of a day to do that.

So my best prediction now -- I can't guarantee anything, as you know, because highways can get jammed up and other things can happen, is that you will start deliberating probably about Thursday.  That's my best estimate I can give you right now.

So with that, Mr. McKnett, you may resume.

MR. MCKNETT:  Thank you, Your Honor.

(Witness resumes the stand.)

### FURTHER DIRECT EXAMINATION

BY MR. MCKNETT:

Q.     Good morning, Mr. Garner.

A.     Good morning.

Q.     Mr. Garner, I want to direct your attention to the early morning hours of June 1st, the year 2004. Do you recall where you were at that time?

A.     Yes.  I was in my apartment, 620 Sheridan Street, Apartment 301.

Q.     Had you slept there the night before?

A.     Yes, I slept there the night before.

Q.     Your wife was there with you?

A.     She was.

Q.     What time did you arrive that morning?

A.     Essentially, we have a phone alarm.  The phone rings, so it rang at 6:30.  My normal morning protocol is to get up, survey the dresser because I have my cologne and certain other items that I use to go in and shave, I got up around 6:35, went into the bathroom, took a shower, and I had -- I began to put shaving cream on my head and face, which was about 6:45.             Approximately around that time, I was startled to hear what I felt was a very tremendous clanging sound in the hallway.  It almost sounded as though an anchor had dropped from a battleship up against the elevator.  Approximately 10, 15 seconds afterwards --

Q.    Excuse me a second.  The elevator?  Where is the elevator --

A.    The elevator is about five feet away from the end of the apartment.  My apartment was stationed here.  The elevator was right here.  So I heard the sound, couldn't figure out what it was.  And then I would say about ten seconds later, I heard what sounded like some type of solid cylindrical object intrude upon the sanctity of my door.  And once the door had been intruded upon, there was a certain reverberation that was taking place, and I couldn't figure out what had transpired.  I went to the door --

Q.    You say intruded upon?  Do you mean it came through door?

A.    No.  It hit the door, and for me, at that time of morning, it's almost as though your privacy was being attacked.

      I went to the door, looked out and said, who is it?  And the gentleman says, the police.

Q.    Did you look out by opening the door?

A.    I looked through the keyhole -- I mean the eyehole, and I looked through the eyehole and they said the police.  So, I opened the door.  I had a towel wrapped around me and shaving cream on my head and my face.  I shave my head and my face every

morning, and the gentleman said may I speak to LaNora?

So when he said that, I assumed that somebody must have been hurt or what have you, and I said just a moment and I closed the door.  As I started to walk away, the gentleman put his arm in the door, knocked the door open.  He and, I think, two to three other police officers walked into the apartment.  I went back to get my wife.  I said the police are here.

When I got there, the -- when I got her, she came out and they indicated to her that she was under arrest, and so we said why is she under arrest?  She was in her pajamas.  One officer said -- she said, well, can I change?  One officer said no, you're going to have to go the way you are.  There was a female officer there that said no, let her change.

So, she walked her back, changed clothes, and they took her out.  It had to be before 7 o'clock.  In the meantime, I kept asking the officer, but before she went, the officer asked her, may we search your apartment?  And she said, no.  Then he turned to me and said, may we search your apartment?  Your wife said, no.  May we search your apartment?  I said, no.  I said, do you are have a search warrant?  He said, no.   There are certain technicalities, and I didn't understand that.  I mean, either you have a search

warrant or you don't have a search warrant.  So, she
-- they took her out.

Q.     Excuse me.  Do you know any of the names of the
officers?

A.     I didn't know -- I don't know any of the names.
This gentleman appeared to be the lead officer because
the others were responding to him.

Q.     The woman -- the person who took your wife out,
was it a man or a woman?

A.     It was a female.  They handcuffed her and they
took her out.  This is around seven o'clock.  About --
I kept asking questions, exactly what are you looking
for?  He says, I can't give you that information.  So
I said well, I have to go to work.  I'm due at work at
8:30.  I'm leaving.  He said no, wait a minute.  I
have to make a phone call.

       So he said he was making a phone call to the US
Attorney's Office to get some clarification.  He gets
the call back.  He says, no, you cannot leave.  You
have to stay here.  I said, am I under arrest?  No,
but you cannot leave.  Then, you know, I asked the
officer, well can I contact my lawyer?  No, you cannot
contact your lawyer.  So, I'm saying I don't
understand exactly what is transpiring here.  I'm not
under arrest, you won't tell me exactly what you're

looking for, you're in my house without a search
warrant.  What is going on?

        MS. JOHNSTON:  Your Honor, objection.  May we
approach the bench, please?

              (At the bar of the Court.)

        MS. JOHNSTON:  All of this is irrelevant.  It
goes to the search of the apartment.  I would ask the
Court to limit his testimony at this time.  His
conversation with the police officers is hearsay.
It's not relevant to anything here.

        I would also ask the Court to instruct the jury
now at the end of this portion of his testimony that
the Court has determined that the search of that
apartment was lawful.

        MR. MCKNETT:  Your Honor, if Ms. Johnston would
be a little more patient, my witness will testify that
the police did eventually come with a valid search
warrant.

        THE COURT:  Well, get to that point.

        MR. MCKNETT:  I will.

        MS. JOHNSTON:  All of this testimony here is
doing nothing but --

        THE COURT:  I understand.

        MS. JOHNSTON:  -- reflecting negativity on the
police department.

THE COURT:  I'm not going to put up with much
more of this.  They did eventually come back with a
warrant.  Because this is a valid search.

MR. MCKNETT:  I'm not challenging the search
warrant.  I'm explaining what happened that morning.
It's relevant.  It's critically relevant the time
involved because of the issues I raised yesterday.

THE COURT:  I will give you that latitude.

MS. JOHNSTON:  I would ask that the Court
instruct the jury --

THE COURT:  Let's get to the point.

MS. JOHNSTON:  I think it's necessary now,
because of the detail he's gone into about how they
banged on his door and how he was this and that, and
how his wife had to be allowed to get clothes on, all
of that is irrelevant.

THE COURT:  I will tell the jury this testimony
is being admitted for background testimony, but the
search question has been ruled on by the Court.

MR. MCKNETT:  Again, for the record, I object to
any such instruction because he will testify --

THE COURT:  I think to avoid confusion, that I
will instruct.

MR. MONTEMARANO:  With all due respect, the
Court is only compounding the two because, if the

defense had been aware, Mr. McKnett had been aware of
the nature of the testimony that Officer Corporal
Sergeant Muldoon, the male, provided, I think it would
have forced this Court to give Mr. McKnett to request
a Franks hearing because the officer claimed he lied.

There is no other way around it.  We've
got documentation either that he can or he can't tell
time.  It's your choice, Your Honor.  So with all due
respect, if you're going to have to instruct that,
which you're going to have to add things, and I
therefore would submit no instruction.

**THE COURT:**  What with -- like what**?**

MR. MONTEMARANO:  If you're going to instruct
that this search was okay at this point, as opposed to
in the closing of the evidence, I think, then, we
should be permitted to craft some sort of addendum to
that relating to the dissembling by Officer Muldoon.

MR. MCKNETT:  Your Honor, I also intend to ask
him, what did the officers do while they were in the
apartment waiting for the valid search warrant?  I
think that's relevant to Officer Muldoon's testimony
to his credibility.

THE COURT:  All right.  I will give an
instruction.

(Back in open court.)

THE COURT:  Ladies and gentlemen, the testimony that you've been hearing, and maybe a few more questions you may hear, is being admitted for your information to -- for your assessment of the credibility of the testimony of Officer Muldoon.  It is not, however, testimony that goes to the question of the lawfulness of the search that was conducted at this apartment.

It was conducted pursuant to a search warrant and the Court has ruled that the search was a valid search and that the evidence obtained during the search may be admitted.  This information may be considered by you in assessing the credibility of the testimony of Officer Muldoon.

You may resume, Mr. McKnett.

BY MR. MCKNETT:

Q.    Mr. Garner, after your wife was taken out of the apartment, you said that was at or slightly before 7 o'clock?

A.    About 7 o'clock.

Q.    Then who then remained in the apartment?

A.    There was were approximately -- I think there were four officers that came in.  The lead officer indicated there was a technicality with the search warrant and was sending one of the officers back to

this courthouse to get a valid search warrant.  So
that gentleman left.  About 15, 20 minutes later --

Q.     Excuse me.  The question was how many -- who was
in the apartment after your wife was taken out?

A.     Three police officers.

Q.     And yourself?

A.     And myself, yes.

Q.     Thank you.  Continue that.

A.     About 15 minutes later, another team came in.  I
think approximately three people, and they were ready
to begin the search, and the lead officer said no, we
cannot begin the search because we -- there's a
technicality.  So they left and went to another
location.

       Approximately -- during the meantime, two of the
officers went into the back where I could not see them
in the bedroom and in the computer room and TV room
and stayed there for about a half an hour.  They came
back around 7:30, and I was discussing with an officer
that was seated in the living room with me making sure
that I could not move around the apartment unless I
had approval.

       The gentleman -- I indicated to the gentleman
that I needed to call work and to notify my school
that I would not be in.  So, he used his cell phone.

I could not use my cell phone nor could I use the
house phones to make the call.  He used his phone -- I
gave him the telephone number of my school, and he
called the school.  I indicated if the assistant
principal or principal was in so I could notify them
that I simply -- I had a family emergency and I
wouldn't be in.

Q.     Excuse me, Mr. Garner, let me interrupt for a
second.

A.     Right.

Q.     When you were having the conversation with the
officer about calling the school, in what room of the
apartment were you in?

A.     I was in the living room.  That's pretty much
where I stayed the entire time.

Q.     You say officers went to the back of the
apartment?

A.     Went to the back of the apartment.

Q.     what rooms are in the back of the apartment?

A.     There's the bedroom where we sleep, and then
there's a room -- a computer room/TV room --
entertainment room, which is really a bedroom that's
been changed or transitioned into where we do our
work.  The computers are there, the computers were set
up for us to primarily do our school work and that

kind of thing.  I was -- I write, and I also was
taking graduate classes and my graduate papers and
everything were on those computers.

Q.    Mr. Garner, I want to show you a picture.  It's
been marked as Government Exhibit P-1B.  I have a
black and white version.  The color version has been
presented previously.

A.    Okay.  That's the entrance into the hallway.

Q.    There appears to be a doorway here.  Is that a
doorway?

A.     There's a doorway where you see the African
items.  That's the doorway to a walk-in closet.

Q.    Here?

A.    Right.

Q.    Now, is this a doorway over here where my pencil
is pointing?

A.    Where your pencil is pointing is the area
leading to the hallway walking down to the bathroom
and the two bedrooms.

Q.    The two bedrooms being the one that you and your
wife slept in?

A.    Yes the living/bedroom and then the bedroom that
housed the TV and computers.

Q.    I'm showing you what's been marked as P-1F.  Do
you recognize this?

A.    Yes.   That's the computer room/TV room.

Q.    Mr. Garner, I want to show you a hand-drawn sketch and ask you --

      MR. MCKNETT:  I haven't marked this, Your Honor. I'll mark it as Ali Exhibit whatever number I have. Whenever Ms. Merez returns, she can tell me what number that is, I believe.  Ms. Johnston is reviewing it.

      THE WITNESS:  Sure.

      BY MR. MCKNETT:

Q.    You recognize this sketch?

A.    Yes, that's one that I made an attempt at to give the layout of the apartment.

Q.    It doesn't quite fit on the screen.  Let me turn it this way.  What does this represent down here in the lower left-hand corner?

A.    Let's see.  I think you need to turn it around.

Q.    Tell me where to stop.

A.    Okay.  Turn it around again.  That's pretty good.  As you see the hallway --

Q.    Here?

A.    Hallway with that indicating seven feet, and then where the upper right-hand corner has wall, that's the entrance into the apartment.

Q.    This area here?

A.     Right.   That's the entrance into the apartment.
There's a narrow, maybe three-feet-wide hallway that
as you enter the door, you walk down.  As you walk
down, there's a walk-in closet.  If you make a left,
you walk into the dining area.

Q.     Can you hold on just a second?

A.     Sure.

Q.     I'm showing you what's been marked as P-1B.

A.     Right.  This is the hallway as you walk in.

Q.     So this would be this door?

A.     Right.

Q.     It would be like this?

A.     Switch it around.  Right.  Rotate it.  Okay.
Right.  This is the wall.

Q.     You're pointing on the screen we can't see.

A.     Okay.

Q.     This is the wall here?

A.     Right.

Q.     You would come in the door?

A.     Right.

Q.     And then you would hit the walk-in closet?

A.     You would hit the walk-in closet, yes, sir.

Q.     And this doorway here you identified as what?

A.     That's not a doorway.  This is a wall -- section
of a wall.  As you pass this particular wall --

Q.    This wall?

A.    Right.  And make a left, you're walking into the dining area.  And if you make a sharp right, then you're walking down the hallway to the bathroom and the two bedrooms.

Q.    And just to orient us a little bit, you had indicated here was a living room?

A.    Right.  The living room was to the right of the dining area.

Q.    And then you identified this room, which is marked at about 17x9.  Am I reading that?

A.    Yes, that's not 17.  That's 12x9.

Q.    12x9?

A.    Right.

Q.    That was the bedroom that was converted into the office area?

A.    The office area, yes, sir.

Q.    And then back here is the bedroom?

A.    Bedroom, yes, sir.

Q.    Where and your wife slept?

A.    Right.

Q.    Over in this corner would be the dining area?

A.    Dining area.

Q.    Is this the kitchen, this area?

A.    Yes.  If you see the little doorway between the

-- see, I have the door to the kitchen.

Q.    Right here?

A.    Right there.

Q.    And then there's this area here?

A.    Right.  It's very narrow.  It's, like, 4x10 in terms of the kitchen.

Q.    That's the kitchen area?

A.    That's kitchen area, yes, sir.

     MR. MCKNETT:  Ms. Merez, what was my next exhibit number, if you recall?

     THE CLERK:  Four.

     BY MR. MCKNETT:

Q.    Back to the narrative, Mr. Garner.  You were in the living room area here?

A.    Yes.

Q.    Being detained in this area?

A.    Detained in the area.  I contacted -- I --

Q.    Then the other two officers went back way?

A.    Right.  They used a hallway, the ten-foot hallway, and they walked back to the bedroom.

Q.    You don't know where they went, do you?

A.    Well, no, no.  There the gentleman said he was going back to the bedroom, and then one went into the -- also, they went into the second room.

Q.    Mr. Garner, try not to tell us what other people

told you.

A.     Okay.

Q.     This area over here, what area is this?

A.     That's the closet.  There was a metal pullout
closet that housed my clothes, yes.

Q.     And back here?

A.     Back there was also a closet -- well, it's a
pantry room.  There's a closet and also a linen closet
and then the bathroom.

Q.     And then all the way in the back is the
bathroom?

A.     Bathroom, yes.

Q.     So you were out here and the other two officers
went back in this area?

A.     Back in that area, yes.

Q.     Then what happened?

A.     Like I said, approximately 7:30, I asked the
officer if I could call the school.  The principal and
vice principal had not arrived, and I indicated I
needed to call them later.  So approximately 7:45, I
called.  The principal had not arrived -- the vice
principal had, and I left word with the vice principal
that I was going to be -- I wouldn't be coming in,
that I had a family emergency.  So she said try to
call back after, like, eight o'clock to see if you can

contact the principal.

Q.    How long were you detained in this area?

MS. JOHNSTON:  Objection, relevance.

THE COURT:  Sustained.

MR. MCKNETT:  Your Honor, I'll move on.

BY MR. MCKNETT:

Q.    Do you recall the time when officers arrived with the valid search warrant?

A.    Oh, the valid search warrant did not get there until close to 12 o'clock.  They had received the call, I think, somewhere after 11:00, and the reason I can be fairly specific with the time --

MS. JOHNSTON:  Objection as to his reasons for.

MR. MCKNETT:  It goes to his credibility, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  There was a clock -- I was sitting in the living room.  They kept me in the living room pretty much for this entire period.  I was able to look on the wall unit and there was a clock that we had, so I could tell the time that was taking place. The search warrant did not come into the apartment with an officer until after 12 o'clock.  I think he received a call sometime between 11:00 and 11:30, in which he said I have the search warrant; I'm on my

way.

Q.    Before that call, how many officers were in your apartment?

        MS. JOHNSTON:  Objection, relevance

        THE COURT:  Sustained.

        BY MR. MCKNETT:

Q.    How many officers went down this -- before the call about the search warrant, how many officers proceeded down the hallway toward the bedroom and the office?

        MS. JOHNSTON:  Objection.  Relevance.

        THE COURT:  Sustained.

        BY MR. MCKNETT:

Q.    You testified that officers did go toward that back area.

A.    Yes, they did.

        MS. JOHNSTON:  Objection.  Asked and answered

        THE COURT:  Sustained.

        BY MR. MCKNETT:

Q.    Were you able to see what those officers did while they were back there?

        MS. JOHNSTON:  Objection, relevance.

        THE COURT:  Overruled.

        BY MR. MCKNETT:

Q.    You can answer.

A.    I walked down.  I asked the one officer if I
could go to the restroom.  I went to the restroom and
as I was walking down the hall, the door to both rooms
were closed.

Q.    Had they been closed when you answered the door?

A.    No.  All doors were open, but they were closed
when I went down to the restroom.  I went to the
restroom, I came back and asked the officer why are
those doors closed.

Q.    Do not tell us what he said.  Did he respond?

      MS. JOHNSTON:  Objection.  Relevance.

      THE COURT:  Sustained.

      BY MR. MCKNETT:

Q.    Did you do anything after the officer responded
to your question?

      MS. JOHNSTON:  Objection.

      Relevance as to what this man did.

      THE COURT:  Overruled.

      THE WITNESS:  I continually asked the officer --
went back and talked to one officer.  The officer came
out for approximately five minutes and then went back.
He stayed back there, oh, I would say until about 10
o'clock, and then he came out and he told me your wife
has a drug problem.

      MS. JOHNSTON:  Objection.

THE COURT:  Sustained.

BY MR. MCKNETT:

Q.    You cannot say what anybody told you.

A.    Oh, okay.

Q.    What happened after the officer arrived with the valid search warrant?

A.    Well, they began -- well, prior to that, officers were -- approximately nine officers had been in and out of the apartment.  They had gone in the kitchen; they had gone into the closet.

MS. JOHNSTON:  Objection.  Nonresponsive to the question.

THE COURT:  Sustained.

THE WITNESS:  Would you repeat the question, please?

BY MR. MCKNETT:

Q.    What happened after the officer arrived with the valid search warrant?

A.    They began a search, but --

MS. JOHNSTON:  Objection.

THE COURT:  Overruled.

THE WITNESS:  But a search had already begun prior to the search warrant coming into the apartment.

MS. JOHNSTON:  Objection.

THE COURT:  Sustained.

MS. JOHNSTON:  Move to strike.

THE COURT:  Disregard the last.

MR. MCKNETT:  May we approach on that?

THE COURT:  Yes.

(At the bar of the Court.)

MR. MCKNETT:  Your Honor, it can just go to the credibility of Officer Muldoon.  He testified that no search was carried out prior to the arrival of the valid search warrant.  This witness contradicts that and he was present in the apartment at the time.

MS. JOHNSTON:  It's immaterial as to when the search warrant happened, Your Honor.  It was a lawful search conducted at the residence.

MR. MARTIN:  It goes to credibility.

MS. JOHNSTON:  Not only that, Your Honor, but he's already testified that they received a call before the search warrant.  They would have gotten a call saying that the search warrant had been signed, to commence the search so he's adding confusion to the jury, misleading the jury in terms of something that's irrelevant.

THE COURT:  Do you know the time of the issuance of the valid warrant?

MR. MCKNETT:  10:21.

MS. JOHNSTON:  I'm sure it's on the search

warrant.

MR. MCKNETT:  It is.  I can check, Your Honor.
I visit back there.

THE COURT:  A search in the **search** of this case
has already been ruled to be lawful.  The evidence is
before the jury already, and I don't want to turn this
into -- incorrectly into a suppression.

MR. MCKNETT:  I'm not going to do that, Your
Honor, but the officer testified very clearly that no
search was carried out.  No effort to search was
carried out before the search warrant arrived.

THE COURT:  I will let you have one more
question.  You can ask him what, if anything, did they
do before the search warrant arrived physically in the
apartment.  I don't want a long speech from him.

MS. JOHNSTON:  The problem with that question,
Your Honor, is it's not a question of when the search
warrant arrived, because they were authorized to
search once the search warrant arrives and it doesn't
have to arrive and counsel has indicated it arrived
sometime after 10:00, and the --

MR. MCKNETT:  The issue is to the credibility,
and he testified that no search was met.

MR. MONTEMARANO:  An officer who attempted to
implicate this witness and Ms. Ali, trying to tidy up

an apartment when she wasn't there, and he was sitting
still and told not to move.

MR. MARTIN:  I might add, Your Honor, even if he
didn't specifically see the officers searching the
bedrooms, the fact that they closed the door, a
reasonable inference can be drawn that that's exactly
what they were doing.  They were searching.

THE COURT:  So what?

MR. MARTIN:  It goes to credibility, that's so
what.

MS. JOHNSTON:  Credibility about what?

MR. MARTIN:  All of the officer's testimony.  If
he's lying about one aspect that's important, he could
be held to have lied about everything.

MR. MCKNETT:  I moved past that part.  I'm only
asking this gentleman what he personally saw.

THE COURT:  If you know the search warrant was
issued as 10:21 and that as of 10:21, a search would
be properly conducted, even if the owner wasn't
physically present, you ought to focus your question
on at or after 1:21.

MR. MCKNETT:  That isn't the issue.  The issue
is the credibility of the officer who testified that
no search warrant started until the search warrant
arrived.  They could have started before that, but

this officer denied it.  It's a credibility issue.

THE COURT:  I will let you ask him what happened before the warrant arrived.  I don't want to use wrong speech because we're not going to have this jury confused.

MS. JOHNSTON:  Your Honor, could we phrase it in terms of after the call he got?

THE COURT:  Ask it both ways.  Make sure that your question -- if you're all in agreement, that the search warrant was issued as of 10:21 a.m.

MR. MCKNETT:  I think it was 10:20 something.

THE COURT:  Take a look at it, if you've got it. Take a look at it.  Make sure your questions are grouped into two categories; one is what happened at or after 10:21, and at or after they arrived.  I want to make sure they don't get confused, if there was an invalid search.

MR. MCKNETT:  I'll ask what did they do between the time the officers got the call and between the time the warrant arrived.  Would that --

THE COURT:  Depends what time that call was, if he got the call at 10:22.

MR. MCKNETT:  If he knows.

MS. JOHNSTON:  The issue would be what they did before they got the call that the warrant was issued,

not after.

                    (Back in open court.)

        BY MR. MCKNETT:

Q.    Mr. Garner, I think you said there came a time
-- you're talking about the lead officer?

A.    The lead officer, right.

Q.    Every time you say "the officer"?

A.    Primarily, I'm talking about the lead officer.
There were a couple of officers that sat in the living
room with me and we had -- you know, we had light
banter.  One officer knew my former wife.  He had
attended her retirement --

Q.    Mr. Garner, you say there came a time when the
lead officer received a call about the valid search
warrant?

A.    Yes, sir.

Q.    Do you recall what time that was?

A.    That was somewhere between 11:00 and 11:30.

Q.    Did the officers do anything after that call was
received?

A.    Yes.  They began searching the apartment.

Q.    When did the valid warrant actually arrive?

A.    After 12 o'clock.

Q.    What parts of the apartment were you able to
observe while the search was being conducted?

A.     Well, prior to the initial search, I heard the closets.  Because they were metal closets, you could hear them opening.  I had a number of papers and things in one room.  You could hear people actually going through the papers, so I heard that prior to ten o'clock.

Once they got a call that they had the search warrant in hand and they were beginning, people were in the hallway, they were throwing my clothes out of the closet into the floor, people went into the closet area.

Q.     Which closet are you referring to?

A.     This is the walk-in closet.

Q.     That would be the closet perhaps?

A.     Right.  As you can see --

Q.     I'm showing the witness what is marked previously as --

A.     Right.  That was a walk-in closet.

Q.     Mr. Garner, slow down a little bit.

A.     Okay.

Q.     Let me finish the question before you start.

A.     Sure.

Q.     It's hard for the stenographer to write down when we're both talking.  This is the walk-in closet you said?

A.    Yes, it is.

Q.    What did you observe the officers doing in the walk-in closet?

A.    I couldn't observe.  I was sitting on the sofa. You could just see clothes flying out of the closet into the dining room area.

Q.    This is the sofa here?

A.    Yes, that was the sofa.

Q.    And the walk-in closet is over here?

A.    Yes, sir.

Q.    Okay.  Continue, please.

        MS. JOHNSTON:  Objection.

        MR. MCKNETT:  I interrupted his answer, Your Honor.

        THE COURT:  Objection to what?

        MS. JOHNSTON:  I'm objecting the witness said he couldn't observe what they were doing.

        MR. MCKNETT:  No, he said he couldn't observe the closet.

        BY MR. MCKNETT:

Q.    What did you observe in the area of the closet?

A.    I saw clothes flying out of the closet into the dining room area.  They were throwing it up in the air.  They took all the clothes, just threw it haphazardly.  Comments were made, think of it as early

spring cleaning.

Q.     Are these the clothes you're referring to?

A.     Yes.

Q.     Picture B-1C?

A.     Yes.

Q.     What, if anything else, did they remove from the closet?

A.     They found a suitcase, and the lady officer started yelling and screaming, I found it.  I found it.

Q.     Hold on just a second.

A.     Sure.

Q.     Showing you what's been previously marked as Ali No. 1.  I'll set it out here on the floor.  Do you recognize this?

A.     Yes.  That's one of the suitcases that they found.

Q.     You say one of the suitcases?

A.     Well, that's the suitcase that they said they found.

Q.     Could you see the suitcase?

A.     No.  No.  They brought the suitcase out and laid it on the floor.

Q.     Could you see what they were doing with the suitcase?

A.     No.   They asked if I had a key, and I said no,
that wasn't my suitcase.  I didn't have a key.  Then
they looked on the suitcase and they found -- they
found that the suitcase owner's name was Paulette
Martin.

Q.     I want to interrupt your narrative, just for a
second, and talk about this suitcase.  When had that
suitcase been brought into your apartment?

A.     Approximately when Paula moved from her house.
She went to --

Q.     Which house are you referring to?

A.     This is the -- see, I don't know what the
address was, but the house that she owned and she sold
the house, I guess, in 2002, early 2003.

Q.     Is this the house that she lived in when you
first met her?

A.     Yes, that's the house that she lived in when I
first met her.

Q.     When, again, did she sell that house, to the
best of your recollection?

A.     It was either the end of 2002 or early part of
2003.

Q.     What happened at this time with regard to this
suitcase?

A.     She had moved to or was staying at another

friend's house, and we got a call one evening saying that she had some important papers and valuables in suitcases and wanted to know if we would hold them until she moved into her new house.  She was purchasing a new house and my wife asked me if it was okay and I said, fine.

And we rolled over, she handed me the suitcases saying she did not feel comfortable in the location where she was staying, and we simply took the suitcases to the house, put them in the closet underneath the clothes that you saw.

Q.    Where were the suitcase -- where did you put the suitcase with regard to these clothes?

A.    Well, straight ahead, there was one suitcase and on the side there was one suitcase.

Q.    They were behind the clothes?

A.    Yes, sir.

Q.    You mentioned two suitcases.  Did they both look like this?

A.    As I recall, I think so.

Q.    After you put the suitcases in the closet, what if anything, did you do with them?

A.    They just stayed there.  They were there for two years.  Every now and then, Ms. Martin would say could she come by and say she needed to get some papers or

something like that.  That was over a two- or
three-year period, I had even forgotten that they were
there.

Q.    Did your wife do anything with these suitcases
while they were in there?

A.    No.  Ms. Martin had the keys.  They were Ms.
Martin's property.  There was no issue for us in terms
of looking at the suitcase.

Q.    Did you ever see what was in the suitcases?

A.    No, I did not.

Q.    When Ms. Martin came over to take things out of
the suitcases that you describe, did you have an
opportunity to observe?

A.    No.  Ms. Martin would come into the living room.
I would bring the suitcases out to her and I would go
back into my TV room.

Q.    What would happen with the suitcases then?

A.    Whatever papers and that she was looking for,
she would get them, and you know, say she's finished
and she would leave.

Q.    Did you ever see her carry things out after
visiting the suitcases?

A.    You know, she may have had an attache case or a
small kettle thing, but no, you know, I didn't pay any
attention to what she was carrying out.

Q.    When she finished with the suitcases, who closed
them up?

A.    She closed them up.

Q.    Who locked them?

A.    She locked them.

      MS. JOHNSTON:  Objection.

      How would he know if he were in the TV room?

      BY MR. MCKNETT:

Q.    Did you close them up?

A.    No, I did not.

Q.    Did you lock them?

A.    No.  I had to assume that she locked them.

Q.    Can't assume.

A.    Okay.

Q.    After Ms. Martin was finished with the
suitcases, did you see them again?

A.    Did I see them again?  I think the last time I
--

Q.    Let me rephrase that question.  On these
occasions when Ms. Martin came to your apartment in
which you brought the suitcases out to her and then
left and went back to do whatever you were doing, when
she was finished with the suitcases on that occasion
-- on those occasions, what did you do next?

A.    I would pick the suitcases up and take them and

put them back underneath the clothes.

Q.    When you picked them up and put them back underneath the clothes, were the suitcases already closed?

A.    I mean, the suitcases were closed, right.  I can't assume that they were locked because I never tried to see if they were locked.

Q.    That happened maybe two or three times?

A.    Approximately two or three times, yes, sir.

Q.    Let's come back now June 1st, 2004.  Describe how the officer -- a female officer, you said, found the suitcase in the closet?

A.    Right.

Q.    Or found the suitcases in the closet.  Did this officer bring both suitcases out?

A.    I don't know.  I couldn't see what she did.  She just yelled, I found it.  The next thing I know, they were asking me did I have a key.  I said, no.  Someone had something that they could pry the suitcases open, they pried the suitcases open.  Someone indicated to me, look at all of these digital scales.  Why would anyone need this many digital scales.

    Well, I remember -- I can't say what they said, but would they need all those digital scales.  Then they found, I think, some book safes and they pried

that open with a screwdriver, or something popped it up open and said, look. That's when they raised, I think a freezer bag that was full of money and raised that up in the air, and that's the only reason I could tell what they saw.

Q.    You just called it a freezer bag. What did it look like?

A.    It's a large freezer bag.

Q.    Ziploc bag?

A.    Ziploc bag.

Q.    Clear plastic.

A.    Clear plastic.

Q.    At this time, could you see what was in the bag?

A.    Well, they raised it high so they could see, and the officer indicated -- evidently they had located some IRS problems that I was having and the officer said if I had this amount of money --

        MS. JOHNSTON:  Objection.

        THE WITNESS:  I would take care of my --

        MR. MCKNETT:  You can't tell what you say the officer said.

        BY MR. MCKNETT:

Q.    What kind of problem?

        MS. JOHNSTON:  Objection.  Relevance.

        MR. MCKNETT:  He described --

BY MR. MCKNETT:

Q.    He said -- I couldn't quite make out what you said.

A.    I had a Internal Revenue Service problem.

MS. JOHNSTON:  Objection and move to strike.

THE COURT:  Sustained.

Disregard the last comment.

MR. MCKNETT:  Your Honor, I can establish relevance at the bench, if the Court would prefer.

THE COURT:  Come to the bench.

(At the bar of the Court.)

MR. MCKNETT:  Your Honor, yesterday and also when he first testified, Sergeant Sakala opined that a particular call on -- I can't think of the exact date -- a call in which Ms. Ali said to Ms. Martin, did you get, and Ms. Martin responded yes, I got it.  He opined that that was a drug-related conversation.

I played the conversation for him in testing his opinion in which Ms. Ali, the day before that conversation, asked Ms. Martin to go pick up a certified letter from the IRS, the Internal Revenue Service, that had been addressed to Mr. Garner but was returned by the mailman because no one was there to sign for it.  This is a reference to that IRS problem.

MS. JOHNSTON:  I don't know what his comments on

June 1st, 2004, or what paperwork he had in his office June 1st, 2004, relevant to that.

THE COURT:  What does it have to do in terms of --

MR. MCKNETT:  It establishes that he, in fact, did have a problem with the IRS, that the conversation preceding the one that the detective was a drug-related conversation actually related to Mr. Garner's problems with the IRS.

THE COURT:  Why don't you ask him about his problems with the IRS?

MS. JOHNSTON:  Separate and apart of the search.

THE COURT:  Not as part of the search.

MR. MCKNETT:  He got there before I did, Your Honor.  I still think it's a relative comment.

THE COURT:  I think we're going into a long, you know, description of how unhappy he was about the search.

MR. MCKNETT:  As the Court may be able to tell, Mr. Garner is hard to reign in from time to time.

THE COURT:  Yes.  Reign him in.  I think the problems about with the IRS should be in a separate part of his testimony, which would be consistent with what you've described, but move on in this subject.

MR. MCKNETT:  I'll do that, Your Honor.

(Back in open court.)

BY MR. MCKNETT:

Q.    Mr. Garner, let's go back to the suitcase for just a second.  After the officer held up the bag, the freezer bag, what then happened with regard to the suitcase?

A.    There were a number of officers that came running from the back.  They all gathered around the suitcase and they seemed to be very pleased.  They were smiling.  They were patting one another on the shoulders.

MS. JOHNSTON:  Objection.  Relevance.

THE COURT:  Sustained.

THE WITNESS:  And they seemed satisfied.

BY MR. MCKNETT:

Q.    These were the officers you described as coming from the back.  These were the officers who had gone back into the bedroom and the office?

A.    Right.

MS. JOHNSTON:  Objection.  Relevance.

THE COURT:  Sustained.

MS. JOHNSTON:  Move the strike.

MR. MCKNETT:  Your Honor, the relevance would be my next question.

THE COURT:  Do your last question.  I'll decide
whether to strike or not.

BY MR. MCKNETT:

Q.    Did you observe them as they came from the back
of the apartment?

A.    Yes.  They came, they had things in their hands
and that kind of thing.

Q.    The question was just did you observe them?

A.    Yes, I did.

Q.    When you observed them, did you observe anything
in their hands?

A.    Yes.  They had papers, they had pouches and
whatever they were going through and searching for
evidence, whatever was in their hands at the time they
just came running out.

Q.    What -- after that, after the suitcase incident,
what happened next?

A.    They went back and continued their search.

MR. MCKNETT:  Your Honor, can I retrieve the
suitcase?

THE COURT:  You may.

BY MR. MCKNETT:

Q.    Did there come a time when the officers left
your apartment?

A.    Yes.  They left sometime after 1 o'clock, about

1:23, something like that.

Q.    Did they take things with them when they left
the apartment?

A.    Well, the problem is they took things with them.
I couldn't see what they were taking or if they were
bringing something in.  I couldn't see any of that.

Q.    I'm sorry, Mr. Garner.  I'm not sure what you
meant by that answer.

A.    Well, people were coming in and out, coming in
and out of the closet, going in and out of the
bedrooms, coming in and out of the kitchen.  They went
through the freezer, they left the food out on the
counter, they went through the refrigerators, they
left the food in the sink.  Nobody even attempted to
put it back.  Clothes in the bedroom were lined up
from the floor to the ceiling.

        MS. JOHNSTON:  Objection, Your Honor.
Relevance.

        THE COURT:  Sustained.  Just stay within the
scope of the question you're asked, please.

        THE WITNESS:  Sure.

        BY MR. MCKNETT:

Q.    Did you see anyone removing items from your
apartment at the conclusion of the search?

A.    I didn't see anything leave the apartment.  What

happened was the lead officer came --

       MS. JOHNSTON:  Objection.

       MR. MCKNETT:  He's explaining his answer.

       THE COURT:  Oh.

       BY MR. MCKNETT:

Q.    Is there a reason why you didn't see anything
leave the apartment?

A.    They forced me to sit on the sofa.  If you can
tell by the schematic of the apartment, you come down
the hall and turn and go down the hallway, you cannot
see people leaving with any objects in their hand.  So
I cannot swear that they took anything out the
apartment.  I did not see it.

       What I did -- what did occur is the gentleman,
the lead officer, had a sheet which he itemized the
things that he said he was taking out of the
apartment.  They never showed me all of the things
that they were taking out of the apartment.  So I have
no way of verifying what they took or didn't take.

Q.    Mr. Garner, after the search was completed and
the officers left the apartment, did you have occasion
to inspect your apartment?

       MS. JOHNSTON:  Objection, relevance.

       THE COURT:  What's the relevance?

       MR. MCKNETT:  The location of certain items,

Your Honor, after the search compared to where they
were before the search.

THE COURT:  Overruled, but don't go much
farther.

MS. JOHNSTON:  Objection.

THE WITNESS:  Essentially, I inspected the
apartment.  The apartment looked like a hurricane had
hit it.

MR. MCKNETT:  Mr. Garner.

MS. JOHNSTON:  Objection.

THE COURT:  Sustained.

Disregard the last comment.

BY MR. MCKNETT:

Q.    Did you have an opportunity to inspect your
apartment after the search was completed?

MS. JOHNSTON:  Objection.  Relevance.

THE WITNESS:  I inspected the apartment, yes.

BY MR. MCKNETT:

Q.    I want to draw your attention to your bedroom
area --

A.    Yes.

Q.    -- after the search.  That was the bedroom in
which you slept the night before?

A.    Yes.

Q.    And it was the bedroom in which your wife was

sleeping before the officers arrived at the apartment;
correct?

A.     Yes, sir.

Q.     Mr. Garner, I want to show you -- did that
bedroom have a -- you've indicated on the sketch that
there were a bed, I believe.

A.     Yes, there was a king-size bed, a long dresser,
and two end tables and a lounge chair.

Q.     This is the sketch again, and back here is the
bedroom.  You've indicated the bed.

A.     Yeah, the bed.  You see the long drawer they
were -- by the bed, there were two end tables.

Q.     Excuse me.  This is the dresser, right?

A.     Right.

Q.     And were there end tables or bedside tables?

A.     Bedside tables, right.

Q.     Were there one on each side?

A.     One on each side.

Q.     If I draw one --

A.     Right.

Q.     -- approximately there?

A.     Right.

Q.     And then another over here?

A.     Right.

Q.     Approximately here?

A.      Right.

Q.      Which side of the bed did you sleep on?

A.      I slept on -- if you're looking at the --

Q.      Was it the side where my pencil is?

A.      Yes, the side where your pencil is.

Q.      I will put an H here for husband, and your wife slept on this side?

A.      Yes, sir.

Q.      What, if anything, was on the top of the night stand on her side of the bed?

A.      There were some books and a -- books and a night light.  There was a lamp, a night lamp.

Q.      Was there anywhere in your bedroom a jewelry chest, two drawer?

A.       Yes, a jewelry chest was alongside of a wall, which would have been perpendicular to the night table.  There was a -- if you look at the night stand on her side, there was a long closet.

Q.      A closet here?

A.      Right about there.  You can draw a closet that would come down past the night stand.  Okay.  Come on down some more.  Okay.  Down some more.  Okay.  And then you can draw a little entrance area into the bedroom.

Q.      Here?

A.     Okay.  And then the night table was right here
along the entrance --

Q.     Here?

A.     -- I mean the jewelry chest.

Q.     That was here?

A.     Yes, sir.

Q.     Excuse me drawing.  I want to put jewelry chest,
JC for jewelry chest here.

       When you arose that morning, was the jewelry
chest open or closed?

A.     It was closed.

Q.     I'm going to show you a picture that's been
marked as Government Exhibit P-1H.  Can you recognize
what's in this picture?  Focus your attention up on
this area up here.

A.     Sure.

Q.     Does this look familiar to you?

A.     The -- I mean, the chest looks familiar.

Q.     What does the chest look like to you?

A.     It looks like there's some foreign substances in
it.

Q.     No, the chest.

A.     The chest is a wood, a red cherry wood chest.

Q.     Where was this chest?  Was this chest in your
bedroom?

A.    Yes, the chest is in the bedroom.

Q.    Where in the bedroom?

A.    Just where you just drew the jewelry chest.

Q.    Is that it?  Is this the jewelry chest?

A.    Yes.

Q.    Ms. Johnston has been kind enough to provide me
with the color picture, perhaps it would help.  Ignore
these portions for now.  I'm focusing right on this
chest.  Is this the jewelry chest you're talking
about?

A.    Yes, it is.

Q.    Was this the condition -- this looks -- appears
to be the drawer that was taken out of this space in
the jewelry chest.  Does it look like that to you?

A.    Yes, it does.

Q.    Is that the way the door was when you woke up on
the morning of June 1st, 2004?

A.    No, it was not.

Q.    Where was the drawer?

A.    The drawer was inside of the jewelry chest.

Q.    How do you know that?

A.    Getting up, and you walk past the -- I had to
walk past the jewelry chest to go into the hallway and
then to go into the bathroom to take my shower.

Q.    Again, Ms. Johnston has been kind enough to give

me the color photos, so I will show you them.  I will
show you what's been marked Government's Exhibit P-1.
Do you recognize that piece of furniture?

A.    Yes.  That seems to be one of the night tables
next to the bed.

Q.    Were they identical night tables?

A.    Yes, they were.

Q.    Do you recognize the items that are in the night
table?

A.    Yes, I do recognize.

Q.    How do you recognize them?

A.    Well, the items in the night table or just the
night table?

Q.    Well, let me start with the night table.  Do you
recognize that?

A.    Yes, I recognize the night table.

Q.    Can you tell from this picture on whose side of
the bed this night table was located?

A.    It looks like my wife's.  I mean, I have a lot
of papers and cuff links and things on the top drawer
of my night table.  She generally had some papers or
books or things in her night table, phone books and
such.  And from time to time, she would have me go and
retrieve phone books and things from the night stand.

Q.    From the top of the night stand?

A.     From -- from the top drawer.

Q.     Do you recognize the items that are in this drawer?

A.     It looks like a straw that's bent.  It looks like a -- some type of decorative napkin, and it looks like a -- some type of jewelry box or something. Well, a watch or a bracelet or something may have been.

Q.     You said you had occasion to go into this drawer?

A.     Yes.  I mean there was nothing --

Q.     Excuse me, yes or no.

A.     Yes.

Q.     The last time you looked in this drawer, when was that?

A.     Oh, a day or two prior.

Q.     Was this the way the drawer looked the last time?

A.     No.  There was books and things in the drawer.

Q.     Do you recognize this jewelry box as something that had been in the drawer the last time you looked in it?

A.     Yes.

Q.     Was the jewelry box opened or closed the last time you saw it?

A.     I think it was open.  There wasn't anything in it, so I just assumed it may have been a bracelet or something that she had purchased.

Q.     Mr. Garner, I'm showing you now what's been marked as Government's Exhibit P-1, and I think it's a J; P-1J.  Do you see that?

A.     Okay.

Q.     Do you recognize what's in this picture?

A.     Yes, that's the bathroom.  Can see it's a very small bathroom.

Q.     I want to see if I can zoom in on this and ask you about some of the items in the bathroom.  Do you see this shelf?

A.     Yes.

Q.     That appears that there's two shelves here, maybe three.

A.     Yeah.  As I recall, there were three shelves.  Generally, there's the lower shelf.

Q.     Excuse me.  Let me ask you about the shelves one at a time.

A.     Okay.

Q.     There were items on this shelf.  There's a blue case of some sort, and then some other items in an open case.  Do you see that?

A.     Yes, I do.

Q.    What are those items?

A.    Primarily they were bath items that you get at
bath and whatever the bath stores are.  Lotions, bath
oil, that kind of thing.

Q.    Whose items were they?

A.    Those were primarily my wife's.

Q.    On this shelf above that, there were other
items.  Do you see them?

A.    Yes.  That appears to be my brown shaving bag,
which I kept my shaving things in.

Q.    This here?

A.    Yes.

Q.    Is this the bag you're talking about?

A.    Yes.

Q.    And these are your shaving items in there?

A.    Yes.

Q.    Mr. Garner, do you use drugs?

A.    No, I do not.

Q.    Does anybody store drugs in your brown shaving
bag?

A.    No.

Q.    Mr. Garner, I want to show you just a couple of
pictures real quick.  This is Government's Exhibit
P-1.  Do you recognize the building there in that
picture?

A.      Yes, that's the outside of the apartment
building that we were living, 620 Sheridan Street.

Q.    Can you see your apartment?

A.    No.  It's on the other side.

Q.    And then one more, if I may, Ms. Johnston.  This
is P-1A.  Recognize that?

A.    Yes.  That's the entranceway into the apartment
complex.

Q.    Mr. Garner, what time was it, if you recall,
when the officers left your apartment?

A.    They left after -- about 1:00, 1:30, quarter of
2:00.  I was then able to get phone calls once they
left.  Sam Williams, who's like a brother to me,
called and --

        MS. JOHNSTON:  Objection, Your Honor.

        BY MR. MCKNETT:

Q.    Don't say what was said.

A.    Sure.

Q.    Mr. Garner, did there come a time when you
discovered that your wife, LaNora, was using drugs?

A.    Only after she was arrested.

Q.    Did you have any occasion or reason to believe
prior to her arrest that she was using drugs?

A.    None.  None whatsoever.  We would get up in the
morning, we would go to work every day, we were

working two jobs, sometimes three.  I was with her
essentially all the time.  I began to backtrack and
try to figure out when she could possibly be using any
drugs, and the only time that I could come up with was
when I went to sleep.

     I worked, you know, 12, 14, 16 hours almost
every day, was working on a novel, was also taking
classes and such.  So when I went to sleep, I slept
very soundly for three, four, five hours.  During that
time, I can't speak to what was taking place, but
never in my presence did I see her use drugs or
purchase drugs in any way, and no one that came to our
house participated in anything like that.

Q.    Did you have any -- when you were present at
your apartment, did any people come to your apartment,
stay five minutes, talk to your wife and leave?

A.    No.  No.  Anyone that came to the apartment was
always welcome.  Generally, when they would come over,
because I loved to cook, we would sit around, have
dinner, discuss whatever the topics were for the day
were, looked at sporting events.  So when people came
over, they generally stayed for a while.

Q.    Other than the contents of that blue suitcase
that we talked about a few minutes ago --

A.    Yes.

Q.     -- did you have any scales in your apartment?

A.     No.  Well, there was a scale -- there was a -- a weight scale.  I mean, we were conscious of our weight, so that was the only scale that was in the apartment.

Q.     No small electronic scales?

A.     No small electronic scales, no.

Q.     Did you have any triple beam balance scales?

A.     No.

Q.     Are you familiar with those?

A.     I'm not familiar with them, but I'm aware of them.

Q.     Did you even have a kitchen scale for measuring ingredients?

A.     No.  I did that really more by cup and such.

Q.     Did you have any large quantities of baggies in your apartment?  Plastic baggies, Ziploc baggies?

A.     No.

Q.     Did you have any quantities of very small, maybe 1" by 1" square plastic baggies?

A.     No.

Q.     Did you have any -- do you know what Manite is?

A.     No, I don't.

Q.     Didn't have any Manite; did you?

A.     No.  No.

MR. MCKNETT:  I have no further questions, Your
Honor.  Thank you, Mr. Garner.

THE WITNESS:  Thank you.

MR. MCKNETT:  I think Ms. Johnston may have a
few questions for you.

MS. JOHNSTON:  I don't know if any other counsel
have questions before we start.

THE COURT:  Any defense counsel have questions?

MR. HALL:  I do, Your Honor.  Very briefly.

THE COURT:  All right.

### CROSS-EXAMINATION

BY MR. HALL:

Q.   Mr. Garner, yesterday you were shown a chart
that had photographs of a number of people on it; do
you recall that?

A.   Sure.  Yes, I do.

Q.   You identified as one of the individuals that
you knew on that chart my client, Reece Whiting.

A.   Yes.

Q.   Do you recall that?  You indicated you had seen
him at Ms. Martin's house on a number of occasions; is
that correct?

A.   Correct.

Q.   And on those occasions you saw him, did you ever
see him with any quantity of drugs?

A.     No, I did not.

          MR. HALL:   Thank you.

          MR. WARD:   I have a few questions.

### CROSS-EXAMINATION

          BY MR. WARD:

Q.     Mr. Garner, you said you had seen my client,
Lavon Dobie, at the house --

A.     Yes.

Q.     -- on a number of occasions.

A.     Yes.

Q.     Did you ever see her with jewelry she was
showing to people for sale?

A.     Yes.

Q.     Did you ever see her buy any drugs from anybody
in the apartment?

A.     No, I did not.

          MR. WARD:   I have nothing else.   Thank you, sir.

### CROSS-EXAMINATION

          BY MR. MONTEMARANO:

Q.     Good morning, Mr. Garner.   How are you?

A.     Okay.

Q.     We've never spoken before with; have we?

A.     No, we have not.

Q.     And at no time did Mr. McKnett ever tell you
what kind of questions I might ask you?

A.      No.

Q.      Or suggest how you should answer them?

A.      No.

Q.      My name is Michael Montemarano.  I represent
Paulette Martin.

A.      Okay.

Q.      You mentioned having bought some clothing from
Ms. Martin.

A.      Yes.

Q.      Cash and carry business?

A.      Pretty much cash and carry, but we had a running
account with Ms. Martin.  Ms. Martin had a number of
catalogs that I could browse through in terms of
shoes, belts, that type of thing.  And she early on
she showed me her license to sell clothes, her
business ID, so anything that I saw, she could order
at wholesale prices and essentially the prices that we
were getting in terms of clothes were wholesale, but
because of the very tight budget that we were
operating on and pretty much my wife and I were using
our second job to purchase clothes and to travel, so
Ms. Martin would have a running account and every
payday we would take X number of dollars by and pay on
the account.

Q.      You mentioned at some point Ms. Martin became

interested in concert promotion; do you remember that?

A.    Yes.

Q.    You had mentioned there was somebody in North Carolina?

A.    Yes, which is like brother to me, Gilbert Williams.  I had contacted Mr. Williams and indicated that Ms. Martin was looking for someone to represent her in terms of promoting and assisting in the production of concerts.  She was dissatisfied with the people that she was currently working with and we were able to set up a dialogue that took place between Ms. Martin and Mr. Williams.

Q.    Were you aware if that dialogue involved any particular act or acts?

A.    Yes.  Three concerts took place.  There were father and son, Eddie and Gerald Levert.

Q.    That's L E V E R T; right?

A.    L E V E R T, right.  Eddie is one of the primary singers for the O'Jays.  His son, Gerald, has a tremendous reputation following, and the concerts did take place.

Q.    You had mentioned at some point Ms. Martin had discussed the need for an entertainment attorney with you?

A.    I had indicated to her that I thought it was

important that she get an entertainment attorney, that they were much more well versed to dotting the Is and crossing the Ts than I was, that I would assist her in any way that I could, but she needed to put her own team in place.

Q.     You had mentioned one who taught at Howard?

A.     Right.  She -- as far as I can recall, she did make contact with that person and they began to discuss the possibility of him representing her and began to set out what costs would be and et cetera, et cetera.

Q.     Do you recall the name of that attorney?

A.     Not offhand.  Not offhand.

Q.     If I suggested a name to you, might that refresh your recollection?

A.     It would.

Q.     Spencer Boyer?

A.     Yes, that's the name.

        MR. MONTEMARANO:  No other questions, Your Honor.  Thank you.

        THE COURT:  Any other defense counsel?

        All right.  Government, you may proceed.

### CROSS-EXAMINATION

        BY MS. JOHNSTON:

Q.     Good morning, Mr. Garner.  How are you?

A.      Good morning.  I'm fine.

Q.      As Mr. Montemarano had asked you, we haven't had
an opportunity to converse or discuss your testimony;
is that correct?

A.      That's correct.

Q.      We have seen each other in the hall, I think,
and exchanged pleasantries at one point; is that fair
to say?

A.      That's true.

Q.      Mr. Garner, you talked quite a bit yesterday
about Ms. Martin's concert business.  Do you recall
that or her promotion business?

A.      Yes, I do.

Q.      You indicated, I think at one point, that you
were interested in helping Ms. Martin meet some of her
goals; is that correct?

A.      That's correct.

Q.      And that these calls occurred, it would be fair
to say, during 2004, prior to her arrest.

A.      Right.  As I recall there was a two- or
three-month period prior to that there wasn't, you
know, discussions about the concert business per se.
She had indicated a love of fashion, and productions
with fashion, and she has always had, since I've known
her, a love of music, so you know, that grew out of

that.

Q.    All right.  Mr. Garner, if you could try to
stick with the questions that I've asked you.  It
might help us speed things a along a little bit.

A.    Okay.  I thought it was.

Q.    The two to three months, that would have been
during the time that we intercepted some of your
conversations; is that correct?

A.     Evidently.  Right.  I'm not sure when you
started the phone surveillance.

Q.    Assuming it was in early March of 2004, and
continued through May of 2004, that would have been
the time period when you were trying to assist Ms.
Martin with making sure she was getting in touch with
the right people and wasn't getting conned in some of
those contacts --

A.    Based on what I read yesterday, the dates were
in March and April, so that would appear to be
correct.

Q.    In fact, it was your opinion that Ms. Martin and
Mr. Goodwin had -- were possibly being conned or
getting --

A.    Well, it was apparent to me that she was serious
about this endeavor, and when she gave me the
paperwork, I thought that people were taking

advantage, yes.

Q.    And indeed, at that point in time, were you
aware of how much money she had invested with Ron Hood
and the others?

A.    I had heard figures that she had -- she and
Goodwin had invested X number of dollars.

Q.    What was that X number of dollars that you heard
that they had invested with Ron Hood?

A.    I think it was $50,000, but I never saw a
cashier's check.  I never saw money wired, so that
would be hearsay.

Q.    Okay.  Well, I appreciate now that you
recognized hearsay, sir, but --

A.    I'm a fast learner.

Q.    I'm glad to hear that.  It would have been Ms.
Martin who told you that she invested $50,000; is that
correct?

A.    My concern is that it's hearsay.  If I can't
indicate what an officer tells me, I don't understand
how I can say what Ms. Martin is telling me.

Q.    Mr. Garner, I think the attorneys will object if
they believe the question I'm asking you is improper.

A.    Okay, sure.

Q.    And the judge will rule.

A.    Okay.

Q.    Let me ask you the question again.  It was Ms.
Martin who had told you that she had invested $50,000;
is that correct?

A.    Yes, she did.

Q.    Did Mr. Goodwin also put in $50,000?

A.    Not to my knowledge.  I understand that it was a
joint venture.

Q.    Okay.  So it was a joint venture, but the total
amount was just Ms. Martin's $50,000; is that correct?

A.    If it was a joint venture, my understanding is
that they both put money up.

Q.    But the total amount was $50,000?

A.    That's my understanding.

Q.    That was put up with Mr. Hood to do that Aretha
Franklin concert; isn't that correct?

A.    That's my understanding.

Q.    That concert was never held; is that correct?

A.    My understanding was that Ms. Franklin became
ill, could not carry on, and there was negotiation
with Ms. Franklin's agent in terms of returning the
money that was put up.  I don't know how that was
resolved.

Q.    You don't know if that money ever came back?

A.    No, I do not.

Q.    And then you were trying to put Ms. Martin in

touch or did, in fact, put her in touch with Gil
Williams?

A.      Yes, I did.

Q.      That would have been subsequent to the problems
with the Aretha Franklin concert?

A.      Yes, it was.

Q.      So sometime either in April or May certainly
before June 1st of 2004?

A.      Right.  My understanding was April, early May,
right.

Q.      When you put her in contact with Mr. Williams --

A.      Right.

Q.      -- are you aware the fact that she invested with
him approximately $120,000 or thereabouts?

A.      Yes.  I thought it was $125,000 that was
invested, yes.

Q.      That would have been invested in late April,
early May; is that correct?

A.      I'm not sure when the money was wired.  I'm not
sure then, but I know there was discussions before
that in order to get Gerald and Eddie Levert, money
had to be sent to Mr. Williams, put in an account.  My
understanding was that it did take place, and
evidently it did because the concerts did take place.

Q.      And those concerts took place after June 1st of

2004; is that correct?

A.     Yes, it took place in 2005.

Q.     In 2005?

A.     Right.

Q.     So those concerts that she invested that money
in in April or May of 2004 didn't occur until 2005; is
that correct?

A.     That's my understanding.

Q.     In fact, dates hadn't even been set during April
or May for the holding of those concerts; isn't that
correct?

A.      My understanding, once again, and at that time,
I was on the periphery.  Clearly the arrest of Ms.
Martin on June 1st cut off all communication, so I was
left out of the loop, so I'm not sure exactly what the
issues were, but my understanding was that once he was
able to get additional backers to put the concert on,
the concerts took place.

Q.     So it was in its very preliminary stages in
April and May of 2004; correct?

A.     Right.  Preliminary stages where investments had
to be made, where money had to be put up-front in
order to secure the artist; correct, yes.

Q.     At that point in time, there hadn't been any
dates set for those concerts; is that correct?

A.     That is my understanding.

Q.     If there hadn't been any dates set, there wouldn't have been any tickets available during April and May for those concerts; correct?

A.     Well, I don't know how you determine the tickets.  The only tickets that I had knowledge of was the Aretha Franklin tickets.

Q.     That that concert was cancelled?

A.     That concert was cancelled, yes.

Q.     That concert was scheduled in Kansas City?

A.     Kansas City, yes.  I think that was scheduled for June -- June or July of 2004.

Q.     So it was cancelled well in advance of those dates?

A.     Well, people buy tickets well in advance to shows now.

Q.     Mr. Garner, did I ask you any questions about tickets for the Aretha Franklin show?

A.     You asked me about tickets, and I was just trying to clarify what I thought you were leading to.

Q.     All right.  No, my question to you was in terms of the concerts Gil Williams was working on that occurred in 2005.  My question to you was --

A.     In 2004, there were no tickets to my knowledge.

Q.     There were no tickets, there were no dates?

A.     No dates, right.

Q.     And indeed, were you aware of the fact that a seizure warrant was executed to attach the 120-some-odd thousand dollars that Ms. Martin paid because that money was drug proceeds?

        MR. MCKNETT:  Objection, Your Honor, scope.

        THE COURT:  Overrule.

        THE WITNESS:  My understanding was that Mr. Williams had discussions with federal agents.

        MS. JOHNSTON:  Objection as to Mr. Williams' discussion.

        BY MS. JOHNSTON:

Q.     My question simply is --

A.     No, I cannot answer that then.  I have no knowledge.

Q.     You had no knowledge -- did Ms. Martin ever tell you that the money she was giving to Gil Williams came from her drug activities?

A.     No.  I didn't know Ms. Martin was involved in drug activity.  That's --

Q.     You also indicated yesterday that Ms. Martin was -- I believe you described her as a woman of limited means.  Do you recall that testimony?

A.     I don't think I ever said limited means.  I don't think -- I think if you played my testimony

back, you would never hear me say limited means.  Not
in regards to Ms. Martin.  I don't think you heard
that.  I did?  Please play it back for me.

Q.    Mr. Garner, there's no recordings in this
courtroom.  There's a --

        MR. MONTEMARANO:  Objection, Your Honor, she's
arguing with the witness.

        MS. JOHNSTON:  Well, Your Honor, I would ask,
then, during the recess, for the court reporter to go
back over Mr. Garner's testimony yesterday afternoon
and determine what he said in terms of Ms. Martin's
resources.

        MR. MARTIN:  Your Honor, I would object to that.
I think that's a waste of time.  The jury's
recollection rules.

        THE COURT:  Overruled.

        BY MS. JOHNSTON:

Q.    You also indicated you had been to Paulette's
School of Performing Arts; is that correct?

A.    Yes, I went there a couple of times, looked at
the facility, saw that it had possibilities and
indicated to her that I saw no reason why her dance
studio could not work -- her dance program could not
work in her studio.

Q.    There were problems with it working because it

wasn't up to standards for a dance studio; is that
correct?

A.    I didn't think so.  I made certain
recommendations, gave her an indication of
approximately how much it would cost to bring it up to
what my standards were.

Q.    Did you see the lawn mowers and appliances that
were being stored in on the dance floor?

A.    When I was there, I didn't see any such thing.

Q.    Did you see the boxes and crates full of
crackers that were being stored there as well?

A.    I didn't see that, no.

Q.    Didn't see any clothing in the store -- strike
that.

       She didn't follow through on your
recommendations and turn it into a functioning dance
studio; is that correct?

A.    Essentially, we made contact with three or four
dancers that I had recommended.  They had indicated
what the cost would be for supervising or directing or
operating a dance program out of that.  Ms. Martin did
not think that the costs was -- that the cost was
prohibitive.  Now, I may have said prohibitive, but
not limited.  So as a result of prohibitive costs, she
decided not to go in that direction.

Q.    Now, if I could --

A.    Excuse me.  May I get some water, please?

Q.    Absolutely.

      MR. WARD:  I got it.

      MS. JOHNSTON:  Thank you, Mr. Ward.

      MR. WARD:  Absolutely.  Want some?

      MS. JOHNSTON:  No, I have some.  Thank you.

      THE WITNESS:  Yes.

      BY MS. JOHNSTON:

Q.    So, Ms. Martin had decided that it wasn't worth
--

A.    She said it was prohibitive, and I accepted
that.

Q.    In terms of making it a functioning studio?

A.    Yeah, at that time, right.

Q.    At that time, would have been when, Mr. Garner?

A.    I'm sorry, I didn't hear you.

Q.    You said at that time would have referred to
when?

A.    This was taking place around the same time.  It
appeared that Ms. Martin had a creative streak and she
wanted to expand the facility and interest that she
had in, and the dance studio was one of the things
that came up in discussion.

Q.    When you say at the same time, you're talking

about March-April 2004?

A.     Yeah, I think the dance studio even came up a little earlier, I think sometime in January.  January or February.

Q.     Late '99 or early --

A.     No, this is 2003-2004.

Q.     Late 2003, early 2004, would that be a fair time frame for when she discussed making the dance studio functional?

A.     Yes.

Q.     Now, so that I'm clear, you testified yesterday that Ms. Martin was a woman of limited resources and you're saying that's not what you said; is that correct.

        MR. MONTEMARANO:  Objection, asked and answered.

        THE WITNESS:  I answered that.  I simply don't recall saying anything, and in terms of Ms. Martin, I would not say that she was a woman of limited resources, especially at that particular time.  She had sold her house, she had sold it and made a profit of two, $300,000.  So I mean, there was liquid capital.

        BY MS. JOHNSTON:

Q.     But I used -- earlier when I asked that question, I used the words limited means.  I want to

make sure you're telling us that you didn't say
yesterday that Ms. Martin was a woman of limited
resources.

A.    I had no way of knowing.  I never looked at her
checkbook, never asked her what her net worth was,
never asked her what she was financially capable of
undertaking.  She would come and say this is something
that she wanted to explore.  I would work out a
financial sheet for her, cost analysis, present it to
her, and she decided up or down.

Q.    That would have been about the dance studio and
about the concerts?

A.    Yes.

Q.    In 2004; correct?

A.    Right.

Q.    You also mentioned Harvey Starr Washington.

A.    Yes, Mr. Washington.

Q.    You've known him since the early 90s; is that
correct?

A.    Yes.

Q.    Indeed, I think yesterday you testified Ms.
Martin had been involved in three of his shows; is
that correct?

A.    Yes.

Q.    And that the -- do you recall the dates of those

shows?

A.    I just know that it was, you know -- I went to three shows that Ms. Martin provided the tickets for, and that was 2000 -- I would say 2001, 2002, 2003.

Q.    Would it be safe to say -- do you recall the last show being a tribute to Ms. Martin?

A.    It was a lavish tribute to Ms. Martin, yes.

Q.    That would have been the last one that you attended?

A.    That would have been the last one that I went to.

Q.    And the last one that you got tickets from Ms. Martin to; is that correct?

A.    Yes.

Q.    Now, Mr. Garner, if I understand your testimony, you don't have any involvement with drugs; is that correct?

A.    N, o I don't.

Q.    In fact, you have a strong dislike for people involved with drugs, users or sellers of drugs; is that correct?

A.    Well, I understand people have weaknesses in terms of using, and if it's considered a medical illness, then I don't have any aversion to that. People need to be helped.  In terms of selling drugs,

I do have an aversion to it.

Q.    Do you recall testifying yesterday that you had
a family experience that really made you strongly
opposed to --

A.    Yes.

Q.    -- drugs?

A.    Right.

Q.    Those drugs would include, marijuana -- any
drug, cocaine, heroin?

A.    Any drug that has an adverse effect on the
development of an individual, yes.

Q.    Certainly, Ms. Ali would not then -- was aware
of your feelings; isn't that correct?

A.    That's true.

Q.    And Ms. Ali certainly then would have done
everything in her means to hide from you her
involvement with drugs; is that correct?

A.    Yes.

Q.    You weren't working in her school during 1999 or
-- was it 1999 when you started in the school system?

A.    I started in the school system, but I also --
that's not true.  I did work with Ms. Ali for three
years in the after-care program, so I did work with
her extensively while she was in school.

Q.    But you didn't work with her during normal

business hours?

A.     Not after 1999, no.

Q.     In fact, as you told us, she would drop you off
to your school, go to her school, and then pick you up
at your after-care location?

       MR. MCKNETT:  Objection, Your Honor.  May we
approach?

       MS. JOHNSTON:  Is that correct?

       THE WITNESS:  That's correct

               (At the bar of the Court.)

       MR. MCKNETT:  Your Honor, I object to this
entire line of questioning.  Ms. Johnston, without any
factual basis at all, is trying to raise an inference
in the mind of this jury that my client was involved
in drug activity at the school where she worked.
There was absolutely no basis for that, even that line
of questioning, let alone that assumption.

       MS. JOHNSTON:  Mr. Garner said she didn't get
any drugs in front of him.  He never saw her use drugs
or buy drugs.  I need to show she had an opportunity
to do it at other places at other times without him
being present.

       THE COURT:  That's the purpose of the question.

       MR. MCKNETT:  Your Honor, it's simply unfair.
It's -- it would incite the jury.

THE COURT:  I will permit it for the purpose that she just indicated.

MR. MCKNETT:  What was the purpose?

MS. JOHNSTON:  The purpose is to show she had other opportunities to sell and to buy drugs.

MR. MCKNETT:  Your Honor, the entire line of questioning is improper because there is no basis for it.  All the evidence shows is that in the evenings, my client, from time to time, bought drugs from Ms. Martin.  In the evenings, not during school days, no drugs involving a school at all.  There is not an iota to support any inference or any line of questioning that my client was involved in any drug activity.

MS. JOHNSTON:  Your Honor, I have a few more questions.  I'm not going to focus in on the school. The fact that it was a school, I want to show that there were students at other times to use drugs and --

THE COURT:  I think you should move on from the school.

MR. MCKNETT:  Not the school, Your Honor.

MS. JOHNSTON:  She may have been doing drugs with other teachers.  There is at least one other person who worked in the school system whom I believe she knew who purchased drugs at Ms. Martin's house.

MR. MCKNETT:  There is absolutely no evidence of

that.  I would like a proffer.

MS. JOHNSTON:  I don't know that I need to give a proffer in terms of that.  I think I am entitled to ask this witness.

THE COURT:  The objection is overruled.  I cautioned counsel.

MS. JOHNSTON:  Absolutely.

(Back in open court.)

BY MS. JOHNSTON:

Q.    Mr. Garner, I believe you testified yesterday that generally you would leave the house at 7:45, Ms. Ali would drop you off at school, go to her school and her after-care, and not pick you up until about 7:00.

A.    Seven o'clock, yes.

Q.    Then you would return home with her?

A.    Right.

Q.    You don't know what she was doing throughout that time?

A.    We would talk throughout the day.  We have cell phones.  Lunchtime.  If I had any issues -- she's a computer technology teacher.  If I needed answers, since I integrated technology in my classroom, I could call her.  I could get software, she resolved a lot of my software problems over the telephone, computer problems, so I was in contact with her three, four,

five times every day.

Q.    The last thing she was going to tell you that she just picked up drugs from somebody or that she just gave drugs to someone or that she just used drugs?

A.    You're making a comment.  I can't respond to that.

Q.    My question is, the last thing she would tell you, who is so strongly against drugs, is that she was using, purchasing, or distributing cocaine; is that correct?

        THE WITNESS:  I simply can't answer that.

        MR. MCKNETT:  Overruled.

        BY MS. JOHNSTON:

Q.    You testified a lot about that search warrant being executed; is that correct?

A.    Yes.  I was being detained.  He didn't have a valid search warrant.  He said there was technicalities with the search warrant.  He sent someone out to get a search warrant.  So, how else was I to take that?

Q.    Mr. Garner, the agents did recover this suitcase in your residence; isn't that correct?

A.    That's my understanding.

Q.    And this suitcase that was loaded with $127,000

of United States currency came out of your residence
in the closet where your clothes were, hidden in the
back; isn't that correct?

A.    Ma'am, that suitcase was given to me to hold for
another person.  I did not know what the contents were
of that suitcase.  I'm not in the habit -- I had no
reason to suspect that there was $127,000 in that
suitcase.

     I think all of us have had experiences where
friends say, could you hold something?  I'm moving.
They don't go rummaging through the other people's
personal effects.  I did not do that.  I was as
surprised as the agents were when they popped open the
suitcase and found money in the suitcase.

Q.    In fact, this is a suitcase that was found in
your residence in the closet that Ms. Martin had
stored there; is that correct?

A.    That's correct.

Q.    And it's a suitcase that the agents didn't come
bring into your house, it was in your house when they
got there?

A.    Yes, it was.

Q.    It's not a question of the agents, during that
time, they were there bringing this suitcase in and
planting it in your house?

A.    Correct.

Q.    And it's your testimony that this suitcase was there for two years?

A.    Two years.

Q.    And in addition to that, the agents also recovered other items from your house; isn't that correct?

A.    They took things out.  Once again, there was a list that they left.  I cannot swear to what they -- I cannot swear to what they took out.

Q.    If I can have the next miscellaneous number.

      When the search warrant arrived at the scene, you saw a copy of the search warrant; is that correct?

A.     After 12 o'clock, yes.

      MR. MCKNETT:  May I see the exhibit, please?

      MS. JOHNSTON:  Certainly, Mr. McKnett.

      MR. MCKNETT:  No objection, Your Honor.

      BY MS. JOHNSTON:

Q.    Let me show you what's been mark as Miscellaneous Exhibit 56.

      Do you recognize that as being the search warrant that they gave you a copy of?

A.    They didn't give me a copy.  They showed it to me.

      MR. MONTEMARANO:  Objection.

Your Honor, could we be heard at the bench?

THE WITNESS:  They did not give me a copy.

THE COURT:  Come to the bench.

(At the bar of the Court.)

MR. MONTEMARANO:  Pursuant to the local rule, it would seem that Ms. Johnston is seeking to admit this. If she wants to show it to the witness for purposes of identification, that's one thing.  I don't think there's any reason to have the search warrant and the appended affidavit admitted.  Perhaps the Return, but I am concerned because I've not seen this  that there may be inadmissible hearsay contained in it, and for that reason I think it would be --

MS. JOHNSTON:  If I could interrupt.  I don't have the affidavit attached here, Mr. Montemarano.  It is the search warrant with the attachment that is referenced in here, and the Return.  I am more than happy to take out the attachment and just use the search warrant.

MR. MONTEMARANO:  The attachment is already in evidence, isn't it?

MS. JOHNSTON:  Not that I know of.  At any rate --

THE COURT:  Well, if it does not have the affidavits --

MR. MONTEMARANO:  I just want to be clear.

THE COURT:  -- your objections are well articulated but they are not well-founded.

MR. MONTEMARANO:  That is the thing.  With all due respect to Mr. McKnett whom I trust implicitly, it's not his responsibility to protect Ms. Martin.

Thank you, Your Honor.

MS. JOHNSTON:  The objection is?

THE COURT:  Overruled.

(Back in open court.)

MR. MONTEMARANO:  For the record, Your Honor, Ms. Martin would withdraw this objection after that clarification.

MR. WARD:  Ms. Dobie would concur, Your Honor.

BY MS. JOHNSTON:

Q.    This appears to be the search warrant that he showed you while you were there?

Referencing your correct apartment number?

A.     Correct apartment number, yes.

Q.    And the date and time it was signed is on there?

A.    I mean, it's reflected on there.  Right.

Q.    It has Judge Connelly's signature; is that correct?

A.    I assume that's his signature.

Q.    And then the last page there has a copy of

what's known -- called the Return at the top.

Is that the document you received copies of?

A.     Yeah, they did leave this.  Right.

Q.     It lists the items that were taken.

A.     That's two personal computers.  One laptop.
Documents, that's generic.  I don't know what that
was.  Suspected cocaine.  Once again, I don't know
what that was.  I didn't see any cocaine.

Q.     This was the document where they gave you a list
-- listed the items that they had taken; isn't that
correct?

A.     Well, you know --

Q.     Is that --

A.     -- the U. S. government -- excuse me, ma'am.
I'm looking at this.  U. S. currency on the document I
have, it said approximately $129,000.  I don't see
that.  The document he left me specifically stated how
much they approximated.  So, this is not the document
that they left with me, okay?  That is not the
document.

Q.     Okay.  In terms of the apartment.  You lived  at
620 Sheridan Street, that apartment building for how
many years?

A.     Four years, I think.

Q.     And on June 1st, you were living in Apartment

301; is that correct?

A.     That's correct.

Q.     How long had you been living in Apartment 301?

A.     Living -- let's see.  What year was that?

Q.     This was June 1st of 2000.

A.     Since 2000.  The year 2000.  May of 2000.

Q.     Okay.  Where had you lived before -- what apartment had you lived in before that?

A.     I had lived in 415, I think.

Q.     Do you know whether or not your wife continued to maintain her driver's license with the old apartment number on it?

A.     No.  She made that change.

Q.     Apartment 415 is in the same building; is that correct?

A.     That is in the same building.

Q.     One floor up; is that correct?

A.     One floor up, yes.

Q.     So there's no disagreement whatsoever that that suitcase came out of your apartment.

A.     No.

Q.     And that it was being stored there before the police got there.

A.     Right.

Q.     Can I have Ali 7 and Ali 8 and the drug exhibits

that go with them, please?

Now I want to show you what's been marked and introduced into evidence as Drugs 32 and stipulated to as being cocaine.  Do you see that exhibit there?

A.    I do see an exhibit, yes.

Q.    That was not your cocaine from your house; is that correct?

A.    I have no way of knowing.  I did not see any cocaine in my house.  I had not discovered any cocaine.  If there was cocaine there, I cannot vouch where the cocaine came from.

Q.    Is this your cocaine, Mr. Garner?

A.    No, it is not.

Q.    Okay.  That was my question.

A.    Okay.

Q.    Let me show you Ali 7, these plastic baggies. Okay.  Were these your plastic baggies?

A.    No, they were not.

Q.    Other than you and your wife, did anyone else live or stay in your apartment for any period of time?

A.    We had people that would come in and spend weekends and that.

Q.    In your discussions with your wife, she admitted to you that these were her drugs; isn't that correct?

A.    No, she did not.  We never discussed that.

Q.     You never asked her?

A.     No, I did not.

Q.     It was after her arrest she told you she used cocaine; is that correct?

          MR. MCKNETT:  Objection, Your Honor.

          THE WITNESS:  That's husband and wife --

          MR. MCKNETT:  Objection.

          MR. MARTIN:  Objection.

          THE COURT:  Approach the bench.

               (At the bar of the Court.)

          THE COURT:  What's the basis for your objection?

          MR. MCKNETT:  Your Honor, first of all, it's post-arrest.  Second of all, it's a conversation with the husband.

          THE COURT:  I can't hear you.

          MR. MCKNETT:  First of all, it was post-arrest which was, I think, significant.  The second thing is there is a husband-wife spousal privilege that my client can invoke, and I would do that at this point.

          THE COURT:  You elicited from him on direct examination drug use after -- that  he learned of drug use after her arrest.

          MR. MCKNETT:  But not from her.

          THE COURT:  You elicited in that question --

          MR. MCKNETT:  No.  She's accused of it.  I

specifically didn't ask anything that she told him.  I
asked, did you learn after her arrest about drug
involvement and he said yes, but I didn't ask -- he
can find out from anybody.  He could find out from
reading the documents.

        MR. MONTEMARANO:  If I can consult with Mr.
McKnett for a moment.

        THE COURT:  Yeah.

        MR. MCKNETT:  In any event, Your Honor, I think
more importantly these are admissions that may or may
not have been made after the arrest and the
investigation was over.  They're not part of this
case.  What a wife may have told her husband is not
relevant to the government's case.

        MS. JOHNSTON:  First of all, I think it would be
highly relevant if Ms. Ali made statements to him
concerning her drug use.  I'm not sure if Mr. Garner
said, in response to Mr. McKnett's question, whether
or not he found out from his wife, so I can back up
and ask him if that's how he learned about her drug
use.  If so, then I think I'm entitled to ask him what
she said.  That would be an admission of her
involvement in the crime.  I don't think now that is
privileged information.

        MR. MCKNETT:  Your Honor, that would not be

enough to waive the privilege.

THE COURT:  Why is this not covered by the spousal privilege?

MS. JOHNSTON:  If he testified on direct, I learned after my wife's arrest she used drugs.  If I ask him the question, how did you learn that and he says, from his wife, then I think it's waived, because he testified on direct examination, I learned about her drug use.  If it came from his wife, then his testimony on -- his direct testimony would have been a waiver of that privilege because he said, I learned about her drug use.  If it's from his wife in that statement "I learned about the drug use" would be a waiver of the privilege in terms of that conversation about her drug use.

MR. MCKNETT:  Ms. Johnston overlooks the fact that it's my client's privilege to invoke, not this client's privilege to waive.  My client -- my questions did not waive any privilege, and I do not now waive any privilege that my client has.

MS. JOHNSTON:  She called him -- she called him to the stand to testify, so if he says, in response to Mr. McKnett's question, did there come a time when you learned your wife had a drug problem and he said, I learned -- I did learn my wife had a drug problem,

then by his question -- by Mr. McKnett's question, the
wife has waived the privilege, if that answer was
something he learned from a statement she made.

MR. MCKNETT:  Ms. Johnston, because -- should
have objected to my question at that point if she had
a problem with the question.

THE COURT:  Why would she have an objection to
that?

MR. MCKNETT:  That's not the main issue.  The
main issue is, Your Honor, anything my client may have
told her husband is covered by the spousal privilege.
The privilege exists for my client.

THE COURT:  I want to take a look at some law on
this.  Why don't you move on to other areas?

MR. MCKNETT:  Well, Ms. Johnston has to.  It's
her witness right now.

THE COURT:  I understand.

MS. JOHNSTON:  Your Honor, may I at least lay
the foundation for the argument I've just made in
terms of you testified on --

THE COURT:  Why don't you ask him -

MS. JOHNSTON:  -- how did he know.

THE COURT:  Do you recall -- did you testify at
the end of your direct examination that after the
arrest, with regard to that, your wife had, I guess,

some problem with drugs?  Are you now telling me what
the information was that led you to that conclusion?
I want to know where the information came from.  Was
it from your spouse?  Was it from the police?  Where
did you get that?  And then we stop.

          MS. JOHNSTON:  Right.

          MR. MCKNETT:  Your Honor, if I had asked that
question and he says it's my spouse, then the
privilege has been violated.

          THE COURT:  We will ask that question out of the
presence of the jury --

          MR. MCKNETT:  That's fine.

          THE COURT:  -- when we take the recess.

          MS. JOHNSTON:  What question?

          THE COURT:  Why don't we do this?  We will take
the morning recess.  We will tell the jury to come
back at five minutes after 11.  They will march out,
you can ask the question, and then I will take a look
at the law.

                    (Back in open court.)

          THE COURT:  Ladies and gentlemen of the jury, we
will take a recess until five minutes after 11.

          Counsel, remain behind.

                    (Jury excused at 10:49 a.m.)

          THE COURT:  Ms. Johnston, you may proceed.

Mr. Garner, please be seated.

BY MS. JOHNSTON:

Q.    Mr. Garner, you testified at the end of your direct examination that after your wife was arrested, you learned that she had a drug problem; is that correct?

A.    No.  What I said was, the police officer came into the room approximately 10 o'clock and said, your wife appears to have a drug problem.  Didn't you see the cocaine on the top of the dresser?  There was no cocaine on top of the dresser in the bedroom when I got up that morning.  That's what I said.

MS. JOHNSTON:  Your Honor, I think we have a problem here, because Mr. McKnett asked him at the end of his direct examination whether he, subsequent to her arrest, learned she had a drug problem and his response was yes.

MR. MONTEMARANO:  He's started to give the very same answer the officer said, and Ms. Johnston objected.

MR. MCKNETT:  That's true.

THE COURT:  Well, ask another followup question or two, Ms. Johnston.

BY MS. JOHNSTON:

Q.    After your wife was arrested, have you had

discussions with her concerning her having a cocaine problem?

A.    My understanding is that any conversations I had with my wife is a very privileged conversation.

THE COURT:  All you have to answer is yes or no. You did or didn't have a conversation.  I don't want -- you do not need to, at this time, give any testimony about what your wife may have told you.

THE WITNESS:  Yes.

THE COURT:  The answer was?

THE WITNESS:  Yes.

THE COURT:  Did you have a conversation with her?  And the answer is yes; is that right?

THE WITNESS:  Yes.

MS. JOHNSTON:  Those were after her arrest.

THE WITNESS:  Not right after her arrest.

THE COURT:  Sometime after her arrest.

THE WITNESS:  Sometime after the arrest.

MS. JOHNSTON:  Sometime after her arrest, you had conversations with her?

THE WITNESS:  Right.

MS. JOHNSTON:  I think we're going to need to know what that question was.

THE COURT:  Why don't you follow up on the question of has he learned about a problem that his

wife may have with drugs from any other sources.

        BY MS. JOHNSTON:

Q.    Have you received information from any other
sources concerning her having a problem with drugs,
cocaine in particular?

A.    Well, how are you defining "problem?"  How are
you defining "problem?"

Q.    Did you learn -- from what sources did you learn
that your wife used cocaine?

A.    Pretty much from the fact that she was arrested.

Q.    In addition to knowing she was arrested for
cocaine, were there other sources that you received
information about her use of cocaine?

A.    No.  No one came to me and told me that they saw
her using cocaine.  So, no, there weren't other course
sources that I could say indicated that other than
conversations that I had with my wife, and that
remains privilege.

        THE COURT:  All right.  We will recess now until
five minutes after 11.  In the meantime, I would ask
the court reporter to locate the portion of the
transcript of the earlier testimony.

        You may also want to look for the question that
you alluded to earlier, if that's possible.  I don't
know if that's possible.

MS. JOHNSTON:  I would ask our court reporter to research yesterday afternoon's testimony --

THE COURT:  That's what I mentioned.

MS. JOHNSTON:  -- for the phrase "limited resources."  I think that will help her in terms of trying to locate --

THE COURT:  The first request I think she may be able to take care of quickly.  The latter one I'm not sure.

(Off the record at 10:52 a.m.)

(On the record at 11:13 a.m.)

THE COURT:  What is the status of things?  I understand you've had some discussions about this matter.

MR. MCKNETT:  Your Honor, I have had occasion to discuss this matter with my client, and we have elected to withdraw my objection.

MS. JOHNSTON:  I am not going to ask that question.

THE COURT:  You just sent me on an exciting foray into the Maryland statutory privilege of husband and wife, and I was reading an article on Judge Walters' endless decision in *Brown versus State of Maryland* and I was ready to rule on this exciting issue, and you just took it away from me.

MR. WARD:  Your Honor, you can save it.  You might use it in another case.

MR. MONTEMARANO:  Maybe you could just tell us how you would have ruled.

THE COURT:  Reassert the objection and you will find out.

All right, bring them back in.

(Witness resumes the stand.)

(Jury returns at 11:15 a.m.)

BY MS. JOHNSTON:

Q.   Mr. Garner, let me go back to the items that were seized from your residence.

A.   Okay.

Q.   Showing you what's been marked into evidence as Drugs 33, and showing you P-1I.  That dresser drawer there.  Was that your wife's dresser drawer?

A.   Yes.

Q.   I mean, night table drawer.  On the photograph there.

A.   Right.

Q.   That was her night table drawer?

A.   Yes.

Q.   And these items were not your items; is that correct?

A.   Correct.

Q.    And they were -- at least according to that
picture, they appear to be in the drawer that was your
wife's night table; is that correct?

A.    Right.

Q.    And in there, there are two little rocks.  Do
you see those?  Two little white chunks of something?

A.    I do see that.

Q.    You don't know what that is?

A.    I do not know.

Q.    And that certainly was not yours.

A.    Right.  That's not mine.

Q.    I want to show you Ali 7.  Again, these baggies.
Are those -- were those your baggies?

A.    No.

Q.    Okay.  Drugs 32 I showed you before.  That was
not cocaine.

A.    No, it was not.

Q.    Likewise, showing you Ali 8.  Do you see Ali 8,
this item here?

A.    I do.

Q.    It was recovered in your bathroom.

A.    Okay.  I was unaware.  Where was that located?

Q.    Okay.  Have you seen this before?

A.    No, I have not.

Q.    Okay.  And so it was not yours.

A.     Right.

Q.     Drugs 34 is also something recovered from your
bathroom.  Ever see that item before?

A.     No, I have not.

Q.     So it wasn't yours.

A.     Right.

Q.     So, none of these items which were found to
contain cocaine were your items; is that correct?

A.     That's correct.

Q.     And you had no knowledge of them being in your
house; is that correct?

A.     I have no knowledge that those items were in my
house.  Right.

Q.     Okay.  And this jewelry case here, where some of
those items were recovered.  There's a jewelry box --
jewelry chest, I think you referred to it as.  That
was your wife's jewelry chest; is that correct?

A.     That's correct.

Q.     Now, you mentioned that what you and your wife
had purchase -- that you and your wife had purchased
clothes from Ms. Martin?

A.     Yes.

Q.     And the men's clothes came from Kevin Scott?

A.     Some clothes came from Mr. Scott, if that's his
last name.  I remember Kevin.  I wasn't sure what his

last name was.  Others, Ms. Martin had a catalog, and
if I saw something, I could put in an order.  She
would purchase it at wholesale prices.  So, I was
gaining maybe 60 percent or 70 percent from what it
would cost in a regular store.

Q.    Would you and your wife pay for those clothes
when you -- shoes and items when you got them, or did
you run a tab with her?

A.    No, we ran a tab.  If it wasn't too much, we
paid for it outright.  If not, we ran a tab and we
would pay on it as we got paid.

Q.    Did you have a joint tab, or did you each have a
separate tab?

A.    My understanding was we had a separate tab.  I
never asked Ms. Martin how she was tabulating it
because, essentially, my wife and I had a joint --
well, she had a checking account and all of my funds
went into the checking account, and she paid all the
bills.  So, a check would be written to Ms. Martin,
and I assumed that it would include both of our tabs.

Q.    So you paid Ms. Martin generally by check for
those items?

A.    Well, check and cash.  Check and cash.  It
depends on if we could get to the bank, but it's check
and cash.

Q.    You don't know of any other tab your wife was
running with Ms. Martin during that time, do you?

A.    No.

Q.    In fact, if you had learned that your wife was
getting cocaine or crack cocaine from Ms. Martin, you
would have stopped going to Ms. Martin's house; isn't
that correct?

A.    If that was true, I would have.  Right.

Q.    So it was important that you not learn of that
kind of a relationship, isn't that correct?

A.    Correct.

Q.    Indeed, if any exchanges were to take place and
you observed anything suspicious, you would have
questioned what was going on; is that correct?

A.    Correct.

Q.    You mentioned that you saw Ms. Lavon Dobie at
Ms. Martin's house on occasion.

A.    Yes.

Q.    Did you ever smoke any marijuana with Ms. Dobie?

A.    No.

Q.    Have you ever been present in the house when Ms.
Dobie got -- smoked marijuana with your wife and Ms.
Martin and other people who were there?

A.    No.  No drugs were ever used in my presence.

Q.    So if Ms. Dobie testified that she shared a

marijuana cigarette or a joint with you and your wife,
that statement would be --

  MR. WARD:  Objection, Your Honor.

  MR. MCKNETT:  Objection.

  Your Honor, that's not the testimony.

  MR. WARD:  That's not the testimony, and if she
wants it written up and played back we will be glad to
do that.

  THE COURT:  Yeah.  I'm not sure I recall it
either way.

  MS. JOHNSTON:  Your Honor, it's the government's
recollection that Ms. Dobie testified she shared
joints with people at the house, including Ms. Ali and
her husband.

  MR. WARD:  Your Honor, if --

  THE WITNESS:  That's not true.

  MR. MCKNETT:  If we can state our recollection
now.

  MR. WARD:  I will state my recollection, which
it is, and it is not that.  If the government states
that that is its recollection, I ask that it be found
and typed up and prepared.

  MS. JOHNSTON:  I will leave that question and go
on to another area.

  THE COURT:  Yeah.  Leave that and go on.

BY MS. JOHNSTON:

Q.    Certainly, you weren't going to be a participant in the use of any illegal drugs.

A.    No.  If I saw that, I would have said, let's get up and let's go.  That never took place in my presence.

Q.    Likewise, any use of cocaine by Ms. Ali would not have done in your presence, because you were opposed to drugs; is that correct?

A.    I never saw my wife use drugs.

Q.    And you never saw her with drugs.

A.    I never saw her with drugs.

Q.    And you never saw her give drugs to anyone.

A.    Never saw her give drugs to anyone.

Q.    If you had, it would have caused issues for you with your wife; is that correct?

A.     We would have dealt with that immediately.

Q.    All right.  So in fact, it was very important that any of those activities be kept secret from you.

        MR. MCKNETT:  Objection, Your Honor.

        THE WITNESS:  I can't answer that.  You're asking me to speak for my wife.  You know, I just --

        MR. MCKNETT:  Mr. Garner.

        THE COURT:  Mr. Garner, please understand something.  I have a role to play here.

THE WITNESS:  Okay.

THE COURT:  When somebody says the magic word "objection," freeze.

THE WITNESS:  Fine.

THE COURT:  You have to wait until I say the magic words "overruled" and then you can answer.  If I don't say that, stop --

THE WITNESS:  Right.

THE COURT:  -- because when you blurt something out, it's out.

THE WITNESS:  I understand.  Thank you.

THE COURT:  You've got to stop doing that.

MR. MCKNETT:  Your Honor, I have objected to the question.

THE COURT:  Sustained.  Disregard the answer.

Now let's start with another question.

BY MS. JOHNSTON:

Q.   We had a conversation before the break about your testimony yesterday concerning Ms. Martin being a person of limited resources.  Do you recall that?

A.   I recall you asking me the question.  Upon further reflection, I recall a question that the attorney asked me, if I had the resources would I have invested in the entertainment project and I said not with my limited resources.  Not with my limited

resources.

Q.     So you never said that Ms. Martin was a woman of limited resources?

A.     I don't recall having said that, no.

MS. JOHNSTON:  Madam Reporter, would you please read back the question and Mr. Garner's response?

COURT REPORTER:  Question:  "Is this an example of what you were describing in a previous conversation about how the money wasn't working?"

Answer:  "Yes.  And this was essentially the nature of most of the conversations I had with Ms. Martin during this period.  She was in contact with people every day, and if my wife and I went over, she would, you know, show me papers and just ask me to look at it.  As you can tell, I had certain trepidations about entering into these type of arrangements, just given what the dollar figures are. And to my knowledge, Ms. Martin was operating on very limited resources, and so we were trying to maximize whatever the investment was."

THE WITNESS:  Within the context.

THE COURT:  Wait until she asks you a question.

THE WITNESS:  Okay.

MS. JOHNSTON:  In fact, yesterday, you referenced Ms. Martin as being a woman of "limited

resources."

    MR. MONTEMARANO:  Objection.

    Mischaracterizes the answer.

    THE WITNESS:  No, I'm not characterizing her.
I'm characterizing the project themselves.  I mean,
there's projects that even Bill Gates won't spend
money on.

    MS. JOHNSTON:  You believe a woman of -- is a
woman of limited resources who stores almost --

    MR. MCKNETT:  Objection, Your Honor.

    It misstates the testimony.

    THE COURT:  Overruled.

    MS. JOHNSTON:  You believe a person is of
limited resources, when they store roughly $129,000 in
cash in your apartment; is that correct?

    MR. MCKNETT:  Objection.

    MR. MONTEMARANO:  Objection.

    Basis for knowledge.  He had no knowledge of the
money.  Therefore, he could not begin to formulate
such an answer.

    THE COURT:  If he had no knowledge, he can so
state.

    THE WITNESS:  I had no knowledge.

    BY MS. JOHNSTON:

Q.   You had no knowledge of that yesterday when you

testified that that's what was in that suitcase; isn't that correct?

A.    No.  No.  The amount of money just came to bear today.  I had no knowledge.  I had knowledge of what the agent told me when he was leaving the house on a document that's not the same document that you presented to me.

Q.    Okay.  So you had knowledge, when you testified yesterday, that roughly -- I'll use the figure you gave us before the break -- that there were approximately $120,000 of currency that Ms. Martin was storing in your residence when you testified yesterday.

A.    The officer blurted out something to me.  I understand that's hearsay evidence.  He didn't sit there and count it in front of me, ma'am.

Q.    Well, you saw the money.

A.    No.  I saw one package.  I doubt if $129,000 was in that package.

       MS. JOHNSTON:  Court's indulgence.  I have nothing further with this witness.

       THE COURT:  Any redirect?

       MR. MCKNETT:  Yes, Your Honor.

                    **REDIRECT EXAMINATION**

       BY MR. MCKNETT:

Q.    Mr. Garner, when is the first time that you discovered that there was money in the blue suitcase that you had stored in your closet at Ms. Martin's request?

A.    When the agents opened the suitcase.  Prior to opening the suitcase and yelling out, look what we found, that was the first time.  I was as surprised as anyone.  I mean, I was surprised that it was that amount of money in the suitcase, given the fact that there are keys, you know, three or four different people having keys to the apartment.  It wasn't secure.  Someone could have easily come in -- I mean, we had problems with a couple of mice, I mean, so people were coming in.  The maintenance people had keys.  They could come in at any time during the day.  If I had known, I would have returned it or it would have been some place far more secure than just in the closet and in my apartment.

Q.    Mr. Garner, did you ever consider Ms. Martin to be a person of limited means?

A.    No.  I mean that -- you know, that never entered my mind.  In fact, I never think of anyone as having limited means.  I used that term solely in terms of how much capitol was available to invest in a project. I mean Dan Snyder goes to the bank and gets a loan to

buy the Redskins.  He didn't put up $800 million.
Technically, you could say he has limited means,
because he didn't buy the team and pay cash for it.
There are issues in terms of cash liquidity, and I
think all of us understand that.

Q.    So your testimony was that the project you
described had a budge and a limited amount of money
was available.

A.    For that particular budget.

      MS. JOHNSTON:  Objection.

      Counsel is leading the witness.

      THE COURT:  Overruled.

      BY MR. MCKNETT:

Q.    Ms. Johnston asked you a question about
Apartment 415 in your building.  Do you remember the
question?

A.    Yes.

Q.    With reference to June 1st 2004, do you know
where the officers were that morning before they
entered your apartment?

      MS. JOHNSTON:  Objection.

      THE WITNESS:  They broke into 415.

      MS. JOHNSTON:  Objection.

      THE COURT:  Basis?

      MS. JOHNSTON:  It's withdrawn, Your Honor.

THE COURT:  All right.

MR. MCKNETT:  You can answer.

THE COURT:  You may answer.

THE WITNESS:  They broke into Apartment 415.

BY MR. MCKNETT:

Q.    Mr. Garner, I'm going to show you what's been
marked as Government's Exhibit Miscellaneous Exhibit
56.

A.    Sure.

Q.    I'm going to direct your attention to the last
page.

A.    Okay.

Q.    I will put it on the top, but it's the last
page.  Do you recognize that document?

A.    This is not the document that the people left
with me, no.

Q.    How do you know it's not the document that the
people left with you?

A.    They stipulated other things that are not on
here in terms of U. S. currency.  They clearly stated
how much money they approximately felt was there.

Q.    If you look toward the -- let me put this on the
screen here.  It says at the top "two personal
computers."  Did they show you two personal computers
when they were taking them out of the apartment?

A.    No.  They took things out.  They did not stop
and have me check off the list that they gave me in
terms of what was departing the apartment.

Q.    So they didn't show you a laptop, either.

A.    They did not show me a laptop, no.

Q.    Did they show what documents they were taking?

A.    They put documents in a transparent cellophane
bag and just said "documents."  I had no idea what
they took out.

Q.    They didn't let you examine the documents?

A.    No.  No.  In fact, I'm still looking for certain
documents.  So, I really don't know what documents
they took out.

Q.    Did they show you what they've labeled here as
"suspected cocaine?"

A.    Well, they came out with one package and said,
-- well around 10 o'clock, they came out with one
package and said, we found cocaine on the dresser.
And I said, no, it wasn't on the dresser.  They came
out around 12 o'clock with two brown bags -- I mean
two transparent bags saying there was hashish, heroin,
and some other suspected capsules which were health
pills that were mine.  I mean, the two capsules and
unknown brown substance.

Q.    You're referring here?  (Indicating.)

A.    Yeah.  Right at the bottom was in two capsules
which came from a health store.

They had another bag that was a brown substance.
They said it was hashish or some other kind of drug
which, I mean, you know, none of that was presented in
the evidence that she presented to me.

Q.    I want to come back up to this suspected
cocaine.  You just testified that they told you it was
on the dresser.

A.    At 10 o'clock the gentleman came in, the lead
officer, and that's when he said, your wife has a
severe drug problem.  Did you see the cocaine on the
dresser?  And I just looked at him, because there was
cocaine on the dresser, and if it was cocaine on the
dresser, someone put it there.

Q.    Was there cocaine on the dresser when you awoke
that morning and walked --

A.    There was no cocaine --

Q.    -- excuse me, when you walked past the dresser
on the way to the bathroom?

A.    There was no cocaine on the dresser as I walked
past the dresser on my way to the bathroom.

Q.    There is a line item here for paraphernalia,
baggies, pipes, scales.  Did they show you the
baggies, pipe and scales?

A.     None of that was ever mentioned to me.  I never saw anything that had a -- was a baggy.  I never saw anything that was a pipe.  I never saw any scales.

     And that was not on the document that they left with me.

Q.     Mr. Garner, I'm going to -- Your Honor, may I approach and show him some of these exhibits?

     THE COURT:  You may.

     THE WITNESS:  Sure.

     BY MR. MCKNETT:

Q.     First, let me put this exhibit back in the envelope.

A.     Oh, okay.

q.     I'm returning Exhibit 7 -- miscellaneous Exhibit 7 to the envelope, Your Honor.

     Mr. Garner, I want to draw your attention to some of the items that were shown to you earlier.  This is Drugs 32.  These were shown to you by Ms. Johnston; right?

A.     Correct.

Q.     And Drugs 32 is a large plastic bag, and in  the bottom is a very small plastic bag about 1" or less by 1" or less.  Do you see that?

A.     Right, right.

Q.     It's got a red bag on it, but just ignore the

tag for now.

Have you ever seen bags like this?  The small bag.  Not the big evidence bag, but the small bag. Have you ever seen baggies like that around your apartment?

A.    No, I have not.

Q.    I'm not sure if Ms. Johnston showed you this or not, but I will.  It's been marked as Government Exhibit --

A.    She did show me that.

Q.    Have you ever seen this item before today?

A.    No, I have not.

Q.    I'm showing you what's marked as Drugs 34 which appears to be again a large evidence bag with a photograph -- Polaroid photograph in it and then a crumbled up piece of tinfoil -- aluminum foil.  Do you see that?

A.    Yes, I see it.

Q.    Have you ever seen that before today?

A.    No.  No.

Q.    Have you ever seen any items that resembled that before today?

A.    Not around the house.  No, I have not.  Nor the apartment at the time.

Q.    I'm showing you what's marked as Exhibit

Government Drugs 33, which is a large evidence bag
with what appears to be a jewelry box of some sort.

A.     Right.  Some type of, yeah, jewelry.

Q.     Is this -- does this appear to be the jewelry
box that was in the photograph of the dresser drawer
that I showed you earlier today?

A.     Yes, it does appear to be.

Q.     There are two straws in here.

A.     Right.

Q.     Do they resemble, in your opinion, anything
other than ordinary drinking straws?

A.     They're just -- yeah.  It appears to be ordinary
drinking straws, but as I indicated to the --

Q.     Have you seen ordinary drinking straws around
your apartment?

A.     I think in the kitchen we had -- because we
would have kids -- my son would come over, my
grandkids, so we would have straws for them.

Q.     I'm showing you, if I can get them to separate
in this bag -- I'm not having much success, but there
is -- appears to be a napkin in here.  Do you
recognize that?

A.     Yeah.  It appears to be a holiday napkin -- one
of the holidays we had napkins similar to that.

Q.     Does that appear to be the napkin that was also

in the photograph of the dresser drawer, along with
the jewelry box?

A.    Yes.

Q.    And then also in this exhibit Drugs 33, there
are other smaller plastic baggies Ziploc baggies.  Do
you see them?

A.    I see those.

Q.    There appears to be at least one the same size
as the baggy that was in Exhibit 32 and then a
somewhat larger -- two somewhat larger Ziploc baggies.
Do you see them?

A.    I do see those.

Q.    Have you ever seen these baggies before today?

A.    No, I have not.

Q.    Have you ever seen baggies similar to this
around your apartment?

A.    No, I have not.

Q.    Finally, I'm showing you what's marked as Ali
Exhibit 7 which contains -- appears to be two items,
one of which is hard to see in the bag, but it appears
to be a short piece of straw there?

A.    Right.

Q.    Does that appear to be anything other than an
ordinary drinking straw that's been cut to a smaller
size?

A.     That's what it appears to be.

Q.     And we also have in here small Ziploc baggies somewhat larger than Exhibit 32, somewhat smaller than the larger bags in exhibit Drugs 33.  Do you see them?

A.     Yes, I do.

Q.     Have you ever seen baggies of this sort around your apartment?

A.     No, I have not.

Q.     Have you ever seen baggies like this before today?

A.     No.  Today is the first time.

Q.     Mr. Garner, again, with reference to this suitcase.  There are three book safes here.

A.     Mm-hmm.

Q.     Have you seen these before?

A.     No, I have not.

Q.     There is a piece of paper that indicates there's $129,600 in this suitcase.  Did you know there was $129,600 in this suitcase when it was in your closet?

A.     No, I did not.

Q.     There are money wrappers and money envelopes from Sun Trust Bank.  Did you know that the money in this suitcase was wrapped in these wrappers that came in these envelopes?

A.     No, I did not.

Q.     There is a list from California Security Cans
Company in California dated June 1996.  Have you ever
seen this list before?

       Let me bring it over to you and show it to you.
It's marked as Ali 1E.  Have you ever seen this list
before today?

A.     No, I haven't.

Q.     There are a number of small boxes.  Let me show
these to you.  They appear to be Tanita mini slim
scales and Tanita digital scale professional mini.

       Do you see them in here?

A.     This is the first time I'm seeing those.

Q.     Have you ever seen anything like this -- like
these scales around your apartment?

A.     No, I have not.

Q.     And here is a stack of papers.  It's marked as
Ali 1F.  Are you familiar with these papers?

A.     No.  The only thing I knew is what Ms.- --

Q.     Are you familiar with these papers?

A.     No, I'm not familiar with them.

Q.     Have you ever seen them before today?

A.     No, I have not.

Q.     This is the suitcase that was closed and locked,
and you didn't have a key; correct?

A.     I did not have a key, no.

Q.     And this suitcase was in your closet because Ms.
Martin, a person you trusted, asked you to hold onto
it for her.

A.     Correct.

        MR. MCKNETT:  Thank you, Mr. Garner.

        THE COURT:  All right.  Any recross?

                    **RECROSS-EXAMINATION**

        BY MR. MONTEMARANO:

Q.     You visited Ms. Martin's home and you said you
didn't remember the street address because you don't
drive; is that a fair statement, sir?

        MS. JOHNSTON:  Objection.

        Beyond the scope of cross.

        THE COURT:  This is not within the scope of the
cross.

        MR. MONTEMARANO:  He was asked about limited
resources by Mr. McKnett.

        THE COURT:  Sustained.

        MR. MONTEMARANO:  May I approach?

        THE COURT:  You may.

                (At the bar of the Court.)

        MR. MONTEMARANO:  I have, perhaps, five
questions relating to his having seen this house and
being aware what kind of car she drove, and then I was
going to ask, in terms of the limited resource phrase,

if he used -- if he considers 50 or 100 or $100,000 a
large amount of money.  They're based on Ms.
Johnston's cross.  She's trying to discredit this man
and make it seem like he's a liar on Ms. Martin's
limited resources.

THE COURT:  She's not trying to do that.  The
question about the house, he said he had been there
but didn't know the address.

MR. MONTEMARANO:  His awareness of what the
property looked like and limited resources.

THE COURT:  She didn't own that house.

MR. MONTEMARANO:  She did.

THE COURT:  That one?

MR. MONTEMARANO:  This is where she lived, the
one she told for the $300,000 profit.

MS. JOHNSTON:  He testified to that, Your Honor.
This is way beyond my cross-examination.

THE COURT:  This is beyond the cross.

MR. MCKNETT:  If I may be heard on this.  The
witness did testify he visited Ms. Martin at this
address several times a week the first couple of years
that he knew her.  I also asked questions about
limited resources, in response to Ms. Johnston's
question.

THE COURT:  I'll give you five questions; you

count them out any way you want.

      MR. MONTEMARANO:  Fair enough.

              (Back in open court.)

      BY MR. MONTEMARANO:

Q.    Just a very few question, Mr. Garner.

A.    Sure.

Q.    I'd like to show you these photographs.  Look at all of them, if you would be so kind.

      This is P-4 -- Government's P-4.  I'm going to get this a little wider.

      This is Government's P-3.

      And last but not least, Government's P-2.

A.    Yes, that appeared.

Q.    That would be Ms. Martin's home that you visited her at --

A.    Yes.

Q.    -- when you met her?

A.    Yes.

Q.    This is the one that she sold for the large profit?

A.    Yes.

Q.    When she lived here, she drove a red Mercedes, did she not?

A.    Yes, she did.

Q.    Would it be fair to say that in your view, 50 or

100 or $150,000 isn't a lot of money in the concert
promotion business?

A.     No.  No.  Generally, in the projects that we
were discussing, you would need a minimum of 225, 250,
and the bigger the acts up to a million, million and a
half, money up front.  So the idea was that you had to
begin small, making limited profits, build on that so
that you could get the big acts.  At the smaller
venues, really, the promoters don't make that much
money.  The big money comes from being able to be at
MCI Center or Verizon or something like that with
20,000, 30,000 people at $60, $70.  Then you start
looking at gross revenue of $2.1, $3 million, $4
million.  That's where the promoter's money comes
from, not from a 2,000, 3,000 seat place selling
tickets for $40.  The money just isn't there.

Q.     So an investment -- Number five, Your Honor.  An
investment of $150,000 -- no more -- would be in your
view a limited application of resources to a project
such as that?

A.     Really in a small market.  I mean, you can go --
and that was the reason for the father/son, Eddie and
Gerald Levert being in Charlotte or Birmingham and
places like that, because it was a small market area,
and therefore you could at least recoup what you had

invested.

      MR. MONTEMARANO:  Thank you very much.

      THE COURT:  Any other recross?

      MS. JOHNSTON:  Yes, sir.

### RECROSS EXAMINATION

      BY MS. JOHNSTON:

Q.    Mr. Garner, was your wife home when Ms. Martin
came over and got things out of her suitcase?

A.    Yes, she was.

Q.    It was always the blue suitcase that she got
things out of?

A.    Yes.

Q.    You don't have a copy of that sheet of paper --

      MR. MCKNETT:  Objection, Your Honor.

      I don't think this is within the scope of my
redirect.

      THE COURT:  Overruled.

      BY MS. JOHNSTON:

Q.    I didn't finish the question.

      You don't have a copy of the sheet that the
officers left you, do you?

A.    No, I don't.

Q.    Finally.  During your discussions with Ms.
Martin about investing the money in the concerts in
2004, did Ms. Martin ever say to you, hey, why don't

you bring me that $100,000 I have in the closet?

A.     Ma'am --

Q.     Did Ms. Martin ever ask you?

A.     No, she did not.  No.

Q.     In terms of these concerts and starting out small and moving up until you make millions of dollars.  None of the concerts that were planned with Ms. Martin were actually held at any time in 2004; isn't that correct?

A.     Correct.

        MS. JOHNSTON:  I have nothing further.

        THE COURT:  All right.  Anything further?

        All right, you may step down.  Thank you.

                (Witness excused at 11:48 a.m.)

        MR. MCKNETT:  Your Honor, is Mr. Garner excused now?  Can he remain in the courtroom?

        THE COURT:  Any objection from the government?

        MS. JOHNSTON:  No, sir.

        THE COURT:  He may be excused.  He may remain in the courtroom.

        MR. MCKNETT:  Thank you, Your Honor.

        Your Honor, the defense would now call Ms. Ali, but there is one preliminary matter I would like to address with the court before she takes the stand.

        THE COURT:  All right.  We'll recess -- jury, I

will excuse you for about five minutes and have you
come right back.

                (Jury excused at 11:49 a.m.)

     THE COURT:  Mr. McKnett.

     MR. MCKNETT:  Yes, Your Honor.  What is the
court's preference with regard to the lunch break is
concerned?

     THE COURT:  Well, you know, I'd like to break at
or before 1:00.

     MR. MCKNETT:  Okay.

     THE COURT:  Perhaps a little earlier than 1:00.

     MR. MCKNETT:  I'll find an appropriate breaking
point.  Your Honor, the main matter I wanted to ask
the court about is the transcript.  The government
made a transcript B5728.  That's the only purpose I
want to put it in so I can argue that Ms. Ali was
coming over for a legitimate reason, as opposed to a
drug reason, which was the interpretation of their
expert.

     THE COURT:  What is the government's position on
playing that recording?

     MS. JOHNSTON:  Your Honor, I was looking at my
copy of the un-redacted calls.  I think the court was
going to allow them to play it, originally.

     THE COURT:  I wasn't going to allow them to play

it originally, but I'm convinced unless you tell me
otherwise that -- to put that call into context that I
will tell the jury it's being received for the limited
purpose to allow them to get a context of this  other
call three minutes later.

          MR. MCKNETT:  Your Honor, we do have something
of an administrative problem.

          MR. MONTEMARANO:  It's my fault, Your Honor.

          MR. MCKNETT:  It's not his fault at all.  I
didn't make the decision until last night I wanted to
play this call.  Apparently, Mr. Montemarano has
removed from the building the transcripts that were
extracted.

          MR. MONTEMARANO:  It's a big box.  I thought I
would tidy the courtroom.  It's my mother, the
Registered Nurse in me.

          MR. MCKNETT:  What I thought I would do is play
it for the jury and then let them know we were
providing --

          THE COURT:  Do you need to play it now?

          MR. MONTEMARANO:  It's three-page call.  If Mr.
Krinsky can make us 20 or 30 copies.

          THE COURT:  It can be done in a heartbeat.

          MR. MCKNETT:  I'm sure I can fill the next hour.

          THE COURT:  I'm sure you can.

Are we ready to bring the jury in?

MR. MONTEMARANO:  Your Honor, I was going to give my copy to Mr. Krinsky, and I will take care of stapling while Mr. McKnett is finishing.

THE COURT:  Is he here?

MR. MONTEMARANO:  He's vanished.  Maybe when he comes back we can ask him to make 30 copies of this three-page transcript.

THE COURT:  You call him.

MR. MONTEMARANO:  Thank you, Your Honor.  I apologize for being too -- I'm sorry, Judge.

THE COURT:  All right.  Let's bring the jury in.

(Jury returns at 11:57 a.m.)

THE COURT:  You may proceed, Mr. McKnett.

MR. MCKNETT:  Thank you, Your Honor.  The defense would call LaNora Ali to the stand. Thereupon,

**LaNORA ALI**,

having been called as a witness on behalf of the defendant, LaNora Ali, and having been first duly sworn by the Courtroom Deputy, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. MCKNETT:

Q.    Good morning, Ms. Ali.

A.    Good morning.

      COURT REPORTER:  Could I get your name, please,
for the record?

      THE WITNESS:  LaNora Ali Garner.

      BY MR. MCKNETT:

Q.    Ms. Ali, I want to ask you some questions about
your background.  Where were you born?

A.    I was born in Newark, New Jersey.

Q.    How long did you live in Newark?

A.    Until 1971.

Q.    When were you born?

A.    1953 until 1971.

Q.    Did you go to school -- high school in Trenton?

A.    I went to high school in Newark, New Jersey.

Q.    Excuse me.  Newark, New Jersey?

A.    Yes.

Q.    Did you graduate from high school in Newark?

A.    Yes, I did.

Q.    What high school was that?

A.    Weekwake High School in Newark, New Jersey.

Q.    Did you continue your education after high
school?

A.    Yes, I did.

Q.    Where did you go to college?

A.     I attended American University in Washington,

D. C.

Q.    Did you graduate from American University?

A.    Yes, I did.

Q.    Did you obtain a degree?

A.    Yes.

Q.    In what field was your degree?

A.    A bachelor of arts and science in elementary education.

Q.    Did you continue your education?

A.    Yes.

Q.    What did you pursue after your got your bachelors?

A.    I have attended Trinity University, Catholic University.  In order to teach, I had to get recertified.  They were not hiring teachers at that time, so I had to go back to school and take additional classes, and so I have what you call a equivalency to a masters degree, and that was from taking courses at several different universities in Washington, D. C.

Q.    Were you working while you were approaching that master equivalency?

A.    Yes.

Q.    Where were you working?

A.    Started out at the National Institutes of

Health.  I worked there from 1972 until 1977 -- '75.
I worked with the D. C. Public School System.  I
started out --

Q.    Excuse me, Ms. Ali.  Let me interrupt for a
second.

      What did you do for the National Institutes of
Health?

A.    I worked with Dr. Brinzinki [ph.], and we were
one of the first people to start dealing with
cholesterol.  So, I went around to different sites
setting up cholesterol screening in the Washington
metropolitan area.

Q.    How long did you have that occupation?

A.    From 1972 until 1975.

Q.    Was it in 1972 when you graduated from college?

A.    No.  I graduated from 1975, but I had a -- I
worked on a work study program there during my summer
vacations and semester breaks.

Q.    What did you do as far as employment is
concerned after you graduated in 1975?

A.     I entered the D. C. Public School System, where
I subbed for two years, and then I started working as
a temporary teacher in 1977.

Q.    What schools were you teaching in?

A.    I taught at Trusedale Elementary, Takoma Park

Elementary, Brookland Elementary, Clark Elementary,

Barnard Elementary, Shad Elementary, Louis Elementary

--

Q.     These were all --

A.     Gage-Eckington in Washington D. C, yes.

Q.     These were all substitute teaching positions?

A.     Oh, no.  I'm sorry.  I substituted in Trusedale

-- I substituted all over Washington, D. C., yes.

Q.     Did there come a time when you obtained a

permanent position teaching?

A.     Yes.

Q.     What school was that in?

A.     That was Louis Elementary School, located in

Washington, D. C.

Q.     What grades were you teaching?

A.     Pre-K.

Q.     Did there come -- how long did you have that

position?

A.     From 1980.  The school closed in 1995.  I went

to Gage-Eckington from 1995 to 1998, and then I went

to Shad Elementary in 1998 as a technology teacher.

Q.     Were you still working at Shad Elementary as of

June 1st 2004?

A.     Yes.

Q.     Did there come a time when you met a gentleman

named Ulysses Garner?

A.     Yes, I did.

Q.     Where did you meet him?

A.     I met him at Shad Elementary School.  I was
known as the hospitality person.  The school had just
been reconstituted and reopened the year prior to
that, and I was the one that kind of pulled things
together with my principal, and I noticed we had a new
male gentleman, and I went to him and asked him if he
needed any supplies and I said I was the person he
could contact if he needed anything.

Q.     It was there that your relationship developed
with Mr. Garner?

A.     Yes.

Q.     Ultimately, you wound up getting married to him?

A.     Yes.

Q.     When did that happen?

A.     We got married on July 29, 2000.

Q.     And then you began living together?

A.     Oh, no.  We started living together in October
of '99.

Q.     Okay.  Where were you living -- let me break
this down into periods.  Where were you living when
you met Mr. Garner?

A.     I was living at 620 Sheridan Street, Apartment

415, Hyattsville, Maryland.

Q.    When you and Mr. Garner began to live together, where did you reside?

A.    Apartment 415, Hyattsville, Maryland.

Q.    Where did you live after you were married?

A.    Apartment 307.  We moved in 2000.  Apartment 301, Building 620, Hyattsville, Maryland.

Q.    That's one floor down from where you had been living in 415?

A.    Yes.

Q.    You were living there at the time of your arrest on June 1st of 2004?

A.    Yes.

Q.    Where was Mr. Garner working -- strike that.

      Did Mr. Garner continue to work at Shad during the entire time you've known him?

A.    No.  Because of the enrollment change, Mr. Garner was the last one to come in, so the first one to leave.  He left Shad and went to Alton Elementary School about three months after he arrived at Shad.

Q.    When you say he left, do you mean he was transferred?

A.    Yes.

Q.    He maintained his position as a teacher?

A.    Yes.

Q.     Ms. Ali, let me finish my question before you
answer so that the stenographer can get it down
quickly, if you would.

       Can you describe an average day as a teacher
during the time you were married to Mr. Garner?
A.     Yes.  We would arrive at work around -- I would
drop Mr. Garner off.  He worked, like, five minutes
away from me, so I would arrive at my school about
8:30.  I would work from 8:30 until 12 o'clock.
Teachers would get a half an hour lunch, sometimes an
hour lunch.  It was according to the weather, what
schedule you were on, how many teachers were
available for recess duty.
Q.     Excuse me.  Recess duty?  What does that entail?
A.     Indoor duty with the children in the cafeteria
or outside duty with the children.  You did duty every
week.  It was according to how large your staff was or
how small your staff was if you received an hour or an
hour and a half, I mean, or an hour.  Most of the
times it was just a half an hour.

       The school ended for teachers at 3:30.  From
3:30 I would leave my classroom and attend the after-
school program.  I was the coordinator for the after-
school program.  From 3:30 to something to seven --  7
o'clock, according to how many children were left, I

would be at Shad Elementary school.  Prior to -- I
didn't do that the first year of our marriage.  I
worked six days a week.  We didn't have after-care.
We had Saturday school.  So I was there every
Saturday.

Q.    What hours did you work on Saturday?

A.    From 8 o'clock to 1 o'clock.

Q.    Back to when you were working at Shad.

      During the normal school days Monday through
Friday, what were your hours again?

A.    From 8:30 to 3:30.

Q.    Did you have classroom assignments during that
entire period?

A.    Yes.

Q.    Was there ever a time -- strike that.

      Were you accountable to anyone at the school to
insure you were present at the school?

A.    Yes.  My principal.

Q.    Was there ever an opportunity for you to leave
the school during the class time?

A.    No.  Lunchtime.  If you had enough time to go
somewhere within a half an hour.

Q.    You had to be back within that half hour because
classes started again; is that correct?

A.    Yes.

Q.    On those days when you had recess assignment,
you couldn't leave at all; correct?

A.    That was when we had the half an hour break,
yes.

Q.    Were you ever reprimanded or corrected in any
way for unauthorized absences from school while you
were working?

A.    No.

Q.    You mentioned your after school obligations.
What did they entail?

A.    I was in charge of anywhere from eight to ten
facilitators an aids, and anywhere from 80 to 110
children.  It started out as 50, 60, and the
enrollment increased gradually.  We had a program that
consisted of sports activities, community service,
academic pieces, a technology piece, and an arts
program.  The children would go from class to class,
whichever way the schedule was set up, and they would
participate in the activities.

Q.    Where was Mr. Garner while you were
participating in these after-school activities?

      MS. JOHNSTON:  Objection.

      THE COURT:  Overruled.

      THE WITNESS:  For two -- two or three years, Mr.
Garner worked in my after-school program.  We would

have someone pick him up and bring him to my school so
he could be there at least by a quarter of four.
After that, he was employed in the after-school
program at his school.

Q.    You said you would have someone pick up Mr.
Garner.  Why was that?

A.    Because Mr. Garner does not drive.

Q.    At the end of the day, when you were finished
both your daytime teaching and your after-care
efforts, what did you do then?

A.    Can I back up?  Someone picked Mr. Garner up,
because I could not leave the facility because of the
children -- the aids -- I could leave my classroom to
go down and receive the classroom.  There was no one
there to receive the children, because they didn't
report until 3:30 so I would be there, and then I
would have someone go pick Mr. Garner up.

       Can you repeat your question again, please?

Q.    At the conclusion of the after-care sessions,
what would you do then?

A.    A lot of times I would drop children off,
because parents did not show up to pick them up prior
to dropping them off because the neighborhood wasn't a
very safe neighborhood.  At times I would go get Mr.
Garner first, and we would take the children home, and

then we would go home.

Q.     So you went to get Mr. Garner.   Where was he?

A.     Alton Elementary School, about five minutes away
from Shad.

Q.     So this was after he had been --

A.     Yes.

Q.     -- detained at his after-care program at Shad?

A.     Yes.

Q.     And he participated in an after-care program at
his new school?

A.     Yes.

Q.     What time would it be when you picked him up?

A.     It varied.   It could be 6:30, quarter to seven,
7 o'clock, 7:15, according to if children were left
there unattended and I had to stay.   I had to stay at
least until 7 o'clock.

Q.     After you were finished dropping the kids off,
what would you do then?

A.     When he was with me, or if he was at Alton?

Q.     First, when he was with you.

A.     He was with me -- if we had to take children, we
would take children home.   If we didn't, we would
sometimes go to Ms. Martin's home after I picked him
up.

Q.     What would you do when Mr. Garner was at Alton?

A.     I would go and pick him up, and then if we had children to take home, I would take -- we would take the children home.  If not, we would go home to do our errands, or we would go to Ms. Martin's home.

Q.     Ms. Ali, I want to turn your attention now to Ms. Martin.  You mentioned that you would sometimes go to Ms. Martin's home.

       Who was Ms. Martin?

A.     Paulette Martin.

Q.     Do you see her today in the courtroom?

A.     Yes, I do.

Q.     How did you know Ms. Martin?

       First of all, how did you meet Ms. Martin?

A.     I met Ms. Martin for the first time -- maybe for the second time in 1997 or '96.  I'm not certain, but it's somewhere in that time frame.

Q.     Where was she living at that time?

A.     She was living in her studio.  She had a bed and a couch and a lot of Christmas gifts in her studio. The studio, Paula's School of Performing Arts on South Dakota Avenue.

Q.     When was that that you met her?

A.     It was either 1996 or 1997, I'm not certain.

Q.     After you met Ms. Martin, did you develop a relationship with her?

A.    I didn't see Ms. Martin again until she moved
into her home, and I don't know what year I gauge it,
because we had a very close relationship with her
granddaughter, and I know her granddaughter was born
in 1998, if I'm correct, and I started a relationship
with Ms. Martin that year.   I also know, because I
moved to a new school, Shad Elementary, and I had
never seen anything like that before in my life, and I
used to go by Ms. Martin's house.

Q.    What do you mean?

A.    The school was very different.   It's very
stressful.   I had never seen children like that
before.

Q.    Could you be more specific as to what you mean?

        MS. JOHNSTON:   Objection.

        Relevance.

        THE COURT:   Overruled.

        THE WITNESS:   The children were out of hand.
The school had been closed down and reconstituted.
Everyone in the school had been let go.   No one that
worked there could come back.   They started a new --
started up with a new principal, faculty, the entire
staff, the maintenance and the cafeteria staff, and I
voluntarily transferred with my principal who came out
of retirement to take the school over.   It was a very

-- we would stay up late at night trying to go out and buy supplies for the school.  I mean, the school was just in a wreck.  The children were just off the hook. I had never seen anything like that on TV or anything. They were out of control.  I would often leave there, and I had started a relationship with Ms. Martin and go to Ms. Martin's house and sit and talk to her about the school and actually sit down and cry.

BY MR. MCKNETT:

Q.    What time period was this again?

A.    1998.

Q.    Would Mr. Garner be with you when you went to Ms. Martin's house?

A.    No.

Q.    Did your relationship with Ms. Martin continue to develop socially after that?

A.    Yes, it did.  We became very close.  I talked to her, and she would talk to me.  I was a single person. I did not get married until I was 47.  My friends were married and had children and they had young families, so I didn't have a lot of time that I spent with them. Ms. Martin became a person that I sat down and started talking to a lot.

Q.    You mentioned Ms. Martin was originally living at her studio; correct?

A.      Yes.

Q.      Do you know when she moved out of the studio and
went to her home?

A.      I don't recall, no.

Q.      Do you recall the address of the home she moved
into?

A.      Not the exact address, but I know it's Bexhill
Court.  It was on Bexhill Court.

Q.      Did you ever visit Ms. Martin at Bexhill Court?

A.      Numerous of times.  Yes.

Q.      Can you describe to us the appearance of the
residence at Bexhill Court?

A.      It was a very lovely home.  You walked into the
foyer, and to the right was a library room; to the
left, a living room.  In front of you was the kitchen,
and the family room to the right.

Q.      Can you describe the furnishings?

A.      I can't describe it, but it was a custom-made
kitchen.  She had a lot of Danker's furniture in her
home.

Q.      A lot of what?

A.      Danker's furniture, Louis XIV, things like that.
Very elegant furniture.

Q.      Did you ever have occasion to form any opinions
about Ms. Martin's sources of income during that time

period?

A.    No.  No, I didn't.  I just -- I knew she said
she worked -- well, I knew she worked with Danker's at
times was an interior decorator assisting people in
decorating their homes.  I knew she wrapped gifts, and
she would charge -- she wrapped beautiful gifts, not
just during the holidays but for special occasions,
for people.

    I would often travel with her to Annapolis,
Maryland.  She would -- had a license to buy clothing,
and she would purchase clothing for children -- for a
children's line, and they would have their line out in
the spring, and we would go there and she would let me
purchase some of the children's clothing.

    She used to do a lot of catalogs.  She would
have catalogs around the house where you could
purchase things from the catalogs and you could get
them for discount prices or wholesale prices.  I know
Ms. Martin was a hard person to buy something for.
When you would buy something for her, she -- I know
she had these large books in the home and she would
look up the manufacturer that produced the product,
and the next day she would have a box of something.
For instance, I was in Vegas, and I purchased some
money toilet tissue paper for her.  The next thing,

Ms. Martin found out the company and she was buying
the paper and she was selling the paper to us.

Q.    Do you know anything about Ms. Martin's
inheritances?

A.    Yes, I do.

Q.    What do you know about that?

A.    I was there quite often when Ms. Payne was in
her home.  I was also there when she talked about, you
know, Ms. Martin inheriting Lucille's money and --

Q.    Excuse me?

A.    Lucille was a very close friend of Ms. Payne's,
and Ms. Martin was -- the money went to Ms.- --

       MS. JOHNSTON:  Objection.

       She's giving us hearsay testimony.

       MR. MCKNETT:  I don't think she is.

       THE COURT:  Well, just make sure she testifies
from her personal knowledge.

       THE WITNESS:  It's personal knowledge.  I've
been in the apartment.  Mr. Shannon probably didn't
remember, but --

       BY MR. MCKNETT:

Q.    Mr. Shannon?

A.    Is the attorney who was here the other day, yes,
and how the money -- it went from Lucille to Ms. Payne
to Ms. Martin.  Ms. Martin kept Ms. Payne, even -- we

would often -- my husband and I would also go see Ms. Payne in the nursing home when she was placed in the nursing home, and we also attended her funeral, and Lucille's.

Q.    You said Ms. Martin kept Lucille.  What did you mean by that?

A.    She took care of her.

Q.    Did Ms. Payne live with Ms. Martin?

A.    Yes, she did.

Q.    For how long?

A.     I really don't -- maybe a year or so.  Ms. Payne was supposed to attend our wedding, but she could not attend our wedding --

Q.    You got married when?

A.    2000.

Q.    Do you know how much money Ms. Martin inherited from Ms. Payne and Lucille?

        MS. JOHNSTON:  Objection.

        THE COURT:  If she has personal knowledge.

        BY MR. MCKNETT:

Q.    If you know from your own personal knowledge.

A.    No, I don't.  I just know about the car that she got.  I don't know how much money.  I just know that the car was a part of it.

Q.    What do you know about the car?

A.    I was there when Mr. Shannon brought the car over to her.

Q.    That's the car he talked about that had been his car --

A.    Yes.

Q.    -- and he transferred it to Ms. Martin?

       During this time period -- let me narrow down the time period.  You were married in 2000; correct?

A.    Yes.

Q.    And Ms. Payne was supposed to attend your wedding but was unable to; correct?

A.    Yes.

Q.    Was she still alive at the time of your wedding?

A.    Yes, she was, because I think she was -- I know she died around Thanksgiving, because my mother also attended the funeral.

Q.    When was your anniversary again?

A.    July 29.

Q.    July 29.

       You heard testimony from Mr. Garner about a boutique that Ms. Martin had.  Do you remember that?

A.    Yes.

Q.    Can you describe that boutique for us, please?

       First of all, when did the boutique exist?

A.    Well, when I met her -- she had clothing in the

studio when I met her between 1996 and 1997; and the
home on Bexhill Court she would receive the children's
clothing, and it was so much that she did not display
it all.  A lot of the things were kept in boxes, and
she had things on hangers, and so she didn't pull out
every size.  She would have it on the box or on a
hanger to represent what was in the box.  She also had
female clothing down there, also.

Q.    Did you buy clothing from her?

A.    Yes, I did.

Q.    How often did you buy clothing from Ms. Martin?

A.    Whenever she had something available that was in
my size or something that I admired.  I couldn't say
how often.

Q.    What would your size have been?  I'm talking
when you first met Ms. Martin.

A.    At that time?  A size 6.

Q.    As happens to all of us, that changed over time;
is that correct?

A.    My husband and I -- you heard my husband
testify.  He's a gourmet cook.  Ms. Martin was more of
a soul cooker, and so I -- between the two homes, I
gained numerous pounds.  I'm now -- I went from a 6,
to a 8, to a 10, to a 12.

Q.    When you bought clothes from Ms. Martin, did you

pay cash?

A.     Sometimes.  It was according to my funds.  You know, my mother used to say that -- well, I can't repeat hearsay, but I didn't have as much money to -- teachers don't make that much money, so I would often have a tab, and she would allow me to purchase things on a tab.  Sometimes I paid her cash and sometimes I would just -- she would just place it on the tab.

Q.     You've talked about a teacher's salary.  When you first began teaching, how much money were you making?

A.     Oh, gosh.  I don't recall.  Maybe $25,000, if that much.

Q.     By the time of your arrest in this case, how much were you making?

A.     Two years ago?  Sixty-something-thousand, not including my after-care.  I don't recall.  I would have to see my income tax papers.

Q.     Was it roughly $60,000?

A.     Sixty to sixty-five, yes.

Q.     That was exclusive of income from after-care?

A.     That was with the after-care.

Q.     I want to be clear.  Mr. Garner was working similar jobs.

A.     Yes.

Q.     Do you know what he was making?

MS. JOHNSTON:  Objection.

Relevance.

THE COURT:  What's the relevance of this?

MR. MCKNETT:  Should I approach, Your Honor?

THE COURT:  Yeah, approach.

(At the bar of the Court.)

MR. MCKNETT:  Your Honor, my client's been accused of selling drugs.  I want to introduce to the jury the total household income to show that she had no need to make money by selling drugs, particularly in the quantities that she's been accused of selling, which is buying eight balls and selling smaller quantities than eight balls for $10, $20 and $50 bags. I can show that the household income was such that that was not -- it's not logical to assume she would be selling drugs at that level when making over $100,000 a year.

THE COURT:  All right.

MS. JOHNSTON:  Your Honor, that's fine.  It's just opening the doors to other things that I don't know that Mr. McKnett is fully aware of.

THE COURT:  All right.  Move on.  Thank you.

(Back in open court.)

BY MR. MCKNETT:

Q.     You can answer that question, Ms. Ali, if you can remember it.

A.     Could you repeat the question, please?

Q.     Do you know how much Mr. Garner was making as a teacher?

A.     Yes.  It was in the fifties.  $55,000, maybe?

Q.     So the total household income was in excess of $100,000 a year?

A.     Yes.  During that time, yes.

Q.     It was just the two of you?

A.     Yes.

Q.     With no children?

A.     Well, my husband has children -- a child that we pay child support to.

Q.     You don't have any other dependents that are -- that you have to pay money for?

A.     No.

Q.     When you first met Ms. Martin, from that time until you met Mr. Garner, how often were you visiting Ms. Martin?

A.     Sometimes in the -- in 1998, the first part of 19- -- the last part of 1998, September, it might have been three times, four times a week after work.

Q.     Once your relationship with Mr. Garner developed, how often would you visit Ms. Martin?

A.    Maybe two or three times a week.  Mr. Garner
became very attached -- we both did -- to her
granddaughter, and we would just stop by to see her.
And because we worked such late hours, Ms. Martin used
to cook for us, and we would stop by just to pick up
food so we would have it for lunch the next day at
work and to eat that night so we wouldn't have to
cook.  She just loved to do that for people, not just
us.

Q.    Can you tell us what kinds of things Ms. Martin
would cook for you?

A.    Teriyaki turkey wings, pig's feet, sweet potato
pie, orange muffins.  She used to make a cake, it was
a green cake, a pistachio cake, that she just loved to
make.  Vegetables.  She used to make homemade ice
cream.  She fried fish.  She just cooked numerous
numbers of things.

Q.    When Ms. Martin cooked, what quantities of food
would she cook?

A.    A lot.

Q.    I'm talking when she lived at Bexhill.

A.    When she lived at Bexhill, she cooked a lot of
food.  We would take food home in containers this
tall.  Beans and --

Q.    We can't see what you're --

A.    Containers, I guess, of half gallons or pints
and stuff.  We would -- she just cooked a lot of food.
She cooked a lot of food.  She even cooked crab cakes.
Anything you wanted or requested, she cooked.

Q.    It was all good?

A.    It was all good.

Q.    Now, this was when she was at Bexhill?

A.    Yes.

Q.    Do you remember when it was that she moved out
of Bexhill?

A.    She moved out of Bexhill in 2002.

Q.    Where did she move to?

A.    She moved to Annette's house on Sargent Road.

Q.    Where is Sargent Road?

A.    Northeast Washington, D. C.

Q.    How long did she stay there at Annette's?

A.    Not very long.  I don't recall how long, but not
very long.

Q.    Was she renting a room there?

A.    I have no idea if she was renting.  I just know
she was staying there.

Q.    Did you visit her there?

A.    I don't recall if we visited or if the one time
we did go was when we helped her move out.  I don't
recall.

Q.    Do you recall when it was that she moved out of
the Sargent Road address?

A.    No, I don't.

Q.    Do you know where she moved to from the Sargent
Road address?

A.    Yeah.  She moved to Granny's.

Q.    Who is Granny?

A.    I can't recall the name right now.  If you would
give me the name, I'd probably remember, but I can't
recall her real name right now.

Q.    Was she an older woman?

A.    Yes, she was.

Q.    Do you know where she lived?

A.    Nicholson Street, Northeast.  I think that's the
address.

Q.    Do you know how long Ms. Martin lived on
Nicholson Street?

A.    Maybe a year.  I'm not certain, but maybe a
year.

Q.    When Ms. Martin lived on Sargent Road and then
on Nicholson Street, was she able to maintain the same
lifestyle that she had at Bexhill?

A.    I don't know about Sargent Road, but at
Nicholson she had a room at Granny's and she was --
she utilized the basement where she had some of her

clothing there.   She didn't cook as often, but she did

cook.   She would cook during the holidays and maybe on

Sundays, but she didn't cook as much as she did.

Q.     If you know, was she still selling clothes?

A.     Yes.

Q.     Was she still wrapping packages for people for a

price?

A.     I don't know about the packaging, because it

wasn't that much room there.   I don't know if she was

still doing the gift wrapping.

Q.     Coming back to clothing business.   Can you tell

us some of the prices that she was charging for the

clothes?

        MS. JOHNSTON:   Objection.

        Can we have a time frame?

        THE COURT:   Give a time frame, if you would.

        BY MR. MCKNETT:

Q.     During the time that Ms. Martin was selling

clothes which, I believe, you said had started by the

time you met her; correct?

A.     Yes.

Q.     And it continued until the time she was

arrested; is that correct?

A.     Yes.

Q.     During that time period, what kind of prices was

she charging for clothes?

A.    They were very high end clothing.  Maybe the cheapest thing would be a tie or a wallet, and that would be $50, and it would escalate, $100, $150, $200, $300 according to what you were purchasing.  She had St. John's which were very expensive, and the prices ranged.  They varied.

Q.    What kind of prices did you pay?

A.    Anywhere from $50 up to -- I purchased a fur coat from her that she got from Jonathan's in New York, and that was like $2,000 or $3,000.

Q.    When did you buy that?

A.    2003.

Q.    That was after you were married?

A.    Yes.

Q.    And you were making about $65,000 a year yourself?

A.    Yes.

Q.    How often did you buy clothes from Ms. Martin?

A.    It was according to what she had, what time of year it was, or what my needs were.  I purchased things for different reasons and different occasions.

Q.    Did you buy things as gifts for other people?

A.    Yes, I did.

Q.    Did Mr. Garner buy clothing and other items from

Ms. Martin?

A.     Yes, he did.

Q.     How often did he buy items from Ms. Martin?

A.     Again, it's according to what she had and what
our funds were like.  You know, even though she put
pus on a tab, you didn't want to take advantage of
things and not give -- you know, not paying someone
their money.  So, it was according to what was
available at that time.

Q.     You said that she would put you on a tab.  What
do you mean by that?

A.     Sometimes I would purchase items with Ms. Martin
and didn't have all the funds, and she would -- I
would give her part of funds and we would pay her when
we got paid.

Q.     Ms. Ali, I want to show you a chart that's been
marked as CH-1.

       If I may, Your Honor, I will set it up and ask
Ms. Ali to come down.

       THE COURT:  Yes, you may.

       BY MR. MCKNETT:

Q.     Ms. Ali, can you come on over, please?

       Ms. Ali, if you could stand over there where
your husband was standing yesterday.  Careful of the
ledge there.  As I did yesterday with your husband,

I'm going to ask you about these people and whether or not you know them, and I may ask you now a couple of questions about how you know them.

A.    Okay.

Q.    Do you know Moises Uriarte?

A.    No.

Q.    Do you know William Turner --

A.    No.

Q.    -- also known as Dog?

      Let me ask first, then answer, please.

      Do you know Gwen Levi?

A.    Yes.

Q.    How do you know Gwen Levi?

A.    I met Gwen Levi at Harvey S's fashion show in November of 2003, and I've been at Ms. Martin's house where she's been maybe once or twice.

Q.    When you were at the fashion show that you referred to -- Harvey Star Washington's fashion show, were there any drugs involved with the show?

A.    No, not that I know of.

Q.    I'm only asking you what you know of your own personal knowledge.

      When Ms. Levi came to Ms. Martin's house on those couple of occasions and you met her there, to the best of your knowledge was there any drug activity

going on?

A.    No.  She was always with Kevin.  No drugs that I know of.

Q.    You mentioned Kevin.  And can you speak up a little bit?

A.    Kevin was someone that had men's clothing that my husband purchased clothing from.  I learned here in court that that was her son or stepson.  We had no knowledge of that prior to being in court.

Q.    Maybe I should ask you to use your "recess" voice when you're talking here.

A.    Okay.

Q.    Do you know Steve Brim?

A.    I met Steve Brim one time.  I was entering Paula's house, and she introduced me to him as Estelle's wife.  Estelle was with him.

Q.    Who is Estelle?

A.    Estelle was a very good friend of Ms. Martin's. She lives in Washington, D. C.

Q.    Other than their friendship, do you know anything about their relationship between Ms. Martin, Mr. Brim and Estelle Brim?

A.    No, I don't.

Q.    Do you know Pernell Philpot?

A.    Yes.  Pernell Philpot used to be at Ms.

Martin's, and my husband and I would sit down and talk
to him and eat with him.  As my husband said, he loved
to eat.

Q.    Did you talk about drugs with Mr. Philpot?

A.    No.  I haven't seen Mr. Philpot since Ms. Martin
moved out of her house.

Q.    Out of the Bexhill Court?

A.    The Bexhill Court house, yes.

Q.    What did you talk about with Mr. Philpot?

      MS. JOHNSTON:  Objection.

      Relevance.  Hearsay.

      MR. MCKNETT:  I didn't ask what he said.  I
asked what they talked about, the topics.

      THE COURT:  Just the subject matter.  That's
all.

      MR. MCKNETT:  Subject matter.

      THE COURT:  Overruled.

      THE WITNESS:  I'm known as the motherly person.
Mr. Philpot had a lot of girlfriends, and I was
advising him, since he was --

      BY MR. MCKNETT:

Q.    Keep your voice up.

A.    I was advising him, since he wasn't married,
that that was something that he needed to consider and
to stop doing, and that's what my conversations with

Mr. Philpot would always be about.

Q.     Have you ever met Luis Mangual, Jr., this gentleman here?

A.     No.

Q.     Have you ever met Juan Encarnacion?

A.     I met him in Ms. Martin's kitchen.  My husband, during the holidays, cooks these bourbon balls, and Ms. Martin gave him a bourbon ball, and he was kind of -- it has liquor in it, so it was something that I don't think he really liked.

Q.     Is that the only time you've met him?

A.     Yes.

Q.     And this gentleman.  He goes by the name of Cuba.  Do you know anybody named Cuba?

A.     No.

Q.     Do you know a gentleman named Steve Campbell from Houston, Texas?

A.     No, I don't.

Q.     Have you ever been to Houston, Texas?

A.     Yes.

Q.     When was that?

A.     Maybe 1998-1999.  I visited Houston, Texas with a friend of mine.

Q.     Vacation?

A.     Weekend vacation, yes.

Q.     Do you know anybody named Kelly from El Paso,
Texas?

A.     No, I don't.

Q.     Do you know Michael Thurman?

A.     No, I don't.

Q.     Do you know Tiffany Vessels?

A.     No, I don't.

Q.     Do you know Xavier Moore?

A.     No, I don't.

Q.     Do you know John Irby?

A.     Mr. Irby, I think, was at a concert that we went
to at Carter Baron.  I'm not sure if that's him.  I
don't know him by name.  I don't know if that's him or
not.

Q.     Does he look familiar?

A.     Yes, he does.

Q.     Who was at the concert?

A.     Ms. Martin, Teresa --

Q.     Who's Teresa?

A.     Ms. Martin's daughter.  Gene Bird, Mr. Goodwin,
myself, my husband, and other people I can't recall at
this time.

Q.     Do you know anyone named Alton McKenzie, also
known as Doug?

A.     No.

Q.     You do know Ms. Martin.  We will get back to
that again.

A.     Yes.

Q.     Do you know Mr. Goodwin?  I think you just said
you did.

A.     Yes.

Q.     How do you know Mr. Goodwin?

A.     I was introduced to Mr. Goodwin as Ms. Martin's
"play brother."  We've been to concerts together,
fashion shows together, celebrated his birthday at a
seafood restaurant, and he's been over Ms. Martin's
house.

Q.     And then you, of course.

       Claude Arnold, aka Skip.  Do you know him?

A.     I know a Skip.  That doesn't look like him, but
I know a Skip.

Q.     Do you know Derrick Bynum?

A.     Yes.  Derrick is a great cook, and he's also the
father of Adaye Bynum.

Q.     Who is Adaye Bynum?

A.     Ms. Martin's granddaughter.

Q.     Have you met Mr. Bynum?

A.     Yes.

Q.     Where have you met him?

A.     At Paula's house.

Q.    Eugene Bird.  Is this the Gene Bird you
mentioned you saw at a concert?

A.    Yes.

Q.    And you may have seen Mr. Irby there?

A.    Yes.

Q.    Do you know Mr. Bird from circumstances other
than that one concert?

A.    Yes.  I met Mr. Bird back in 1985, and I was a
friend of his wife.

Q.    What's his wife's name?

A.    Michele Bird.

Q.    You knew Mr. Bird socially?

A.    Yes.

Q.    And you knew his wife socially?

A.    Yes.

Q.    Do you know Lavon Dobie, also known as Becky?

A.    Yes.  I met Becky in about 2003 at Jackie
Terrell's, where Paula resided in the basement.  Ms.
Martin resided in the basement.

Q.    How often have you seen Ms. Dobie since you
first met her?

A.    Maybe three, four times.

Q.    When did you meet her?  What year was that?

A.    2003.

Q.    Okay.  Before this trial started, did you know

Ruby Hardin?

A.    No, I didn't.

Q.    Do you know George Harris?

A.    I've seen George Harris.  I don't know him.

Q.    Where have you seen him?

A.    At Ms. Martin's.

Q.    What was he doing there?

A.    He would just stop by.  She would give him food, too.  I've seen her give him food.

Q.    Do you know Larry Lane?

A.    Yes.  I met Larry celebrating -- he was Mr. Goodwin's stepson, and I met him at dinner, Mr. Goodwin's birthday dinner.

Q.    Where was that?

A.    A seafood restaurant on Georgia Avenue in Silver Spring, Maryland.

Q.    Other than that dinner, have you met Larry Lane?

A.    No.

Q.    John Martin.  Do you know John Martin?

A.    He was a boyfriend of Ms. Martin.

Q.    When did you first meet John Martin?

A.    It's hard to say.  Ms. Martin and John were off and on, so I don't recall the year that I met him.

Q.    You mean off and on in the sense of --

A.    The relationship was off and on, yes.

Q.    Where would he be when you would meet him?

A.    At the house.

      Yes, I do recall the first time I did meet him.
It was at the studio.

Q.    When was that?

A.    Either 1996 or 1997.

Q.    How often have you seen Mr. Martin?

A.    A lot of times.  Numerous of times.

Q.    Always at Ms. Martin's residence?

A.    Yes.

Q.    Larry Nunn.  Do you know Larry Nunn?

A.    No, I don't.

Q.    Do you know Milburn Walker, aka Bruce?

A.    Yes.

Q.    How do you know Mr. Walker?

A.    I dated Mr. Walker.

Q.    When was that?

A.    1997, maybe.  I met him prior to 1997.  199- --
I can't remember the date, the year.

Q.    Mr. Walker played a part in you meeting Ms.
Martin; right?

A.    Yes.

Q.    And Reece Whiting.  Prior to this trial, did you
know Mr. Whiting?

A.    Yes, I did.

Q.    How you know him?

A.    I met him in 1999 at Paula's house, and I had

prior -- I don't recall, but -- we had mutual friends,

and I don't know if I met him at that mutual friend,

but we had mutual friends.

Q.    How often had you seen Mr. Whiting after you met

him?

A.    I used to see him quite often when I would first

go to the house on Bexhill Court.  After she moved in

2002, I hadn't seen Mr. Whiting since then.

Q.    Of the people on this chart, whom do you see in

the courtroom today?

        MS. JOHNSTON:  Your Honor, we will stipulate

that she's seen the defendants and that she's

identified on the chart that they're the same people

who are in the courtroom.

        MR. MCKNETT:  Thank you, Ms. Johnston.

        Ms. Ali, you can return to the stand if you

would, please.

        Your Honor, I know it's a little bit early, but

this would be a logical place.

        THE COURT:  Keep going, because I've got a thing

that will mess me up if you break now.

        BY MR. MCKNETT:

Q.    Ms. Ali, have you ever met a woman named Martha

Jean West?

A.      Yes.

Q.      How do you know Ms. West?

A.      She was a friend of Ms. Martin's.

Q.      Do you know anything about the nature of the relationship of their friendship?

A.      I know that Ms. Martin used to talk to Martha Jean -- Ms. Martin used to talk to Martha Jean West on the phone lot, and Ms. West would send her catalogs and magazines with clothes in it, and Ms. Martin would receive clothes from Ms. West.

Q.      By "received," you mean buy?

A.      I don't know.  I've never seen them exchange money.

Q.      Okay.  Ms. Ali, I mentioned to you -- you identified Milburn Walker on the chart, and I asked you if he played a part in your meeting Ms. Martin, and I think you said he did.

A.      Yes.

Q.      Would you explain to us please when -- did Mr. Walker introduce you to Ms. Martin?

A.      I had met Ms. Martin prior to that.  I think -- it was at one of Harvey Star Washington's shows.  I also taught Harvey Star Washington, so I was in contact with him prior to meeting Ms. Martin, but I

didn't come in contact again with her until I met her through Bruce walker.

Q.    Harvey Star Washington is the producer of the shows?

A.    Yes.

Q.    Did you say he was a student of yours?

A.    Yes.  When I first started subbing, I subbed working at Trusedale Elementary School.

Q.    Was he as entertaining then?

A.    He was the same as he is now.  He hasn't changed.

Q.    There came a time -- after you met Ms. Martin at that show, when is the next time you saw her?

A.    The year -- if I'm correct, like, 1996-1997, at her studio.

Q.    How is it that Mr.  Walker introduced you again to Ms. Martin?

A.    We went to her studio and he purchased some sunglasses from her.

Q.    When was that again?

A.    1996-1997.

Q.    When you renewed your -- did you recognize Ms. Martin as someone you had met before?

A.     We couldn't -- we couldn't put it together. Finally, after we started talking, we realized where

it had been, after we started talking, where she used
to live and what school I taught at and things like
that.

Q.    When did you next meet Ms. Martin?

A.    I didn't see Ms. Martin again until she moved
into her home.

Q.    The home on Bexhill?

A.    Yes.

Q.    Do you remember when it was that you met her for
the first time at her home on Bexhill?

A.    I'm again going to say maybe 1998 -- the early
part of 1998 or middle part.

Q.    What was it that caused you to meet her at her
house on Bexhill?

A.    I remember -- she had given me her card when I
was at the studio, and I remember she said she's
selling clothes, so I called her up to see what she
had for purchase.

Q.    Did you visit her at that point?

A.    Yes, I did.

Q.    Did you buy anything from her at that point?

A.    I don't recall.

Q.    When did -- did the relationship between
yourself and Ms. Martin develop beyond that of simply
customer-seller of clothing?

A.      Like I said, I was single, and I don't like to
cook -- I don't cook, and she would always have food
available, and I would sit there and we would just sit
and talk and I would eat, and I would also take food
home.

Q.      How often would you visit her in that context?

        MS. JOHNSTON:  Objection.

        Asked and answered.

        THE COURT:  Sustained.

        BY MR. MCKNETT:

Q.      So you continued to visit with Ms. Martin, not
just to buy clothes but also to eat and to visit.

A.      Yes.

Q.      As friends.

A.      Yes.

Q.      And the friendship developed over time; is that
correct?

A.      Yes.

Q.      To the point --

        MS. JOHNSTON:  Objection.

        Your Honor, we've been over this now three
times.

        THE COURT:  Overruled.

        Let him finish the question.

        BY MR. MCKNETT:

Q.    Did there come a time -- was this the time when
you were dating Mr. Walker?

A.    No, I don't think so.  My relationship with Mr.
Walker was off and on, and I don't think it was.  It
might have been.  It might have been, but I can't give
for certain what year it was or what time it was.

Q.    Did there -- I want to ask you a little bit
about your relationship with Mr. Walker.

        MS. JOHNSTON:  Objection to relevance.

        MR. MCKNETT:  Mr. Walker is on the chart, Your
Honor.

        THE COURT:  Overruled.

        BY MR. MCKNETT:

Q.    It was a romantic relationship, I take it.

        MS. JOHNSTON:  Objection.  Leading.

        BY MR. MCKNETT:

Q.    Is it accurate to say that you had a romantic
relationship with Mr. Walker?

        MS. JOHNSTON:  Objection.  Still leading.

        BY MR. MCKNETT:

Q.    Please describe the nature of your relationship.

        THE COURT:  Now you got it right.

        BY MR. MCKNETT:

Q.    Please describe the nature of your relationship
with Mr. Walker.

A.     I don't know what kind of relationship you would
call the relationship I had with Mr. Walker.  It
wasn't a romantic relationship.  I think that's one
reason why I was going by Ms. Martin's house a lot to
talk about that too, because it wasn't the type of
relationship I was looking for, but for some reason I
couldn't seem to get away from it.  I don't know if it
came out of being alone, the loneliness, but it wasn't
a healthy relationship, let's put it that way.

Q.     You were dating Mr. Walker?

A.     Yes.

       MR. MCKNETT:  Your Honor, I'll ask again, would
this be an appropriate time?  I'm about to make a --

       THE COURT:  Still too early.

       MS. JOHNSTON:  Your Honor, can we -- I'll
withdraw my comment.

       BY MR. MCKNETT:

Q.     Ms. Ali, there came a time in your life -- did
there come a time in your life when you were exposed
to drugs?

A.     Yes.

Q.     Did there come a time in your life where you
made a decision to use drugs?

A.     Yes.

Q.     When did that happen?

A.    I started using drugs in about -- when I --
after my late 30s.  It wasn't a continuous thing.  I'd
stop and I'd start, and I'd stop and I'd start.

Q.    What drug did you first use?  I'm talking about
illegal drugs, not prescription drugs.

      What illegal drug was the first illegal drug you
started to use?

A.    Marijuana.

Q.    Did there come a time when you began using other
drugs?

A.    Yes.

Q.    What other drugs?

A.    Cocaine.

Q.    Other than marijuana and cocaine, have you used
any other illegal drugs?

A.    No.

Q.    With regard to cocaine, did you use powder
cocaine or crack cocaine?

A.    I used powder cocaine.  I never used the term
crack cocaine, because I always thought crack cocaine
was something that you purchased on the street.  I
learned --

Q.    We'll get there.

      MS. JOHNSTON:  Objection to counsel interrupting
his witness's answer.

MR. MCKNETT:  I was trying to --

MS. JOHNSTON:  She was explaining her answer.

THE COURT:  Keep her on track.  You may proceed.

BY MR. MCKNETT:

Q.    So, the first form of cocaine you used was powder cocaine?

A.    Yes.

Q.    Was your use of powder cocaine a factor in your relationship with Mr. Walker?

MS. JOHNSTON:  Objection.

He's leading the witness.

THE COURT:  Ask it in a non-leading way.  You can do it.

BY MR. MCKNETT:

Q.    Did Mr. Walker use drugs?

A.    Yes.

Q.    Did Mr. Walker use drugs when you were dating him?

A.    Yes.

Q.    Did you use drugs when you were dating Mr. Walker?

A.    Yes.

Q.    Did you and Mr. Walker use drugs together?

A.    Yes.

Q.    Was that part of the problem with your

relationship with Mr. Walker?

MS. JOHNSTON:  Objection.

Again, counsel is leading the witness, Your
Honor.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. MCKNETT:

Q.    What time period was it you started using powder
cocaine?

A.    Like, when I was 35 -- 35.  After my late 30s.
Like I said, it wasn't often, you know.  It wasn't
often at all, and it was a stop and go period.  Stop.
Go.  Stop.

Q.    Under what circumstances would you use powder
cocaine?

MS. JOHNSTON:  Can we have a time frame, Your
Honor?  Late 30s, or 50?  What?

THE COURT:  What period are you talking about?

THE WITNESS:  Late 30s.  Same as always.
Weekends.  Holidays.  Stressful moments or time,
periods of my life.

BY MR. MCKNETT:

Q.    Did your usage of powder cocaine -- the
regularity, the frequency of your usage of powder
cocaine.  Did it change over time, or did it stay

relatively constant?

A.    It stayed constant for a long period of time.
And powder -- it could stay constant, you know.  It
was on the weekends, holidays, and it wasn't every
weekend.  It was when I felt like it, or if I had the
time.

Q.    How much -- were you buying any particular
quantities of cocaine -- powder cocaine when you
started it?

A.     I wasn't buying it at that time; it was given
to me.

Q.    Who was it given to you by?

A.    From a friend.

Q.    Do you know the quantities?

A.    Well, sometimes it wasn't a quantity.  It was
just, you know, maybe something that they would give
me out of their package or something.  But what I -- I
don't know.  You know, it might sound ignorant to you
-- to some people after hearing a lot of statements in
this courtroom, but I would always see a small bag and
I would know that to be as half a gram or $50 worth.

Q.    You were about to continue.

A.    I'm sorry.  No.

Q.    Did you ever actually weigh the cocaine?

A.    No.  I don't know how to weigh cocaine.  No.

Q.    When did you start to buy cocaine?

A.    1998.

Q.    Let me back up just a bit.  You mentioned that you were first getting cocaine -- powder cocaine from someone -- a friend who was giving it to you?

A.    Yes.

Q.    Did that friend have anything to do with this trial?

A.    No.

Q.    Did it have anything to do with any of the people who were on trial?

A.    No.

Q.    In 1998, when you started buying powder cocaine, for what purpose were you buying it?

A.    To use.

Q.    To use?

A.    Yes.

Q.    Did you ever in your life buy cocaine in any form to sell?

A.    No.

Q.    Did you ever in your entire life buy cocaine in any form to give away to anyone else?

A.    No.

Q.    Did you always -- all the cocaine that you've bought in your life, did you use it yourself?

A.     Yes.

Q.     Did you ever in your entire life buy crack
cocaine?

A.     No.

Q.     Did you ever in your life use crack cocaine?

A.     Well, you used the term again "crack cocaine."
Freebase?  Yes, I freebased.  I consider freebasing
not crack cocaine.

Q.     What do you mean by the term "freebasing?"

A.     I learned how to cook it.  I learned that you
use baking soda -- cocaine was my private drug.  My
company.  It was a secret that I kept amongst myself.
My friends, my family -- my friends and my family, my
husband, no one knew about it but me and the person
that I got it from or purchased it from.

Q.     Do you need a napkin, Ms. Ali?

       Did you ever tell anyone -- well, obviously, the
person from whom you were buying or getting the
cocaine knew.

A.      Yes.

Q.     Did you ever tell anyone else --

A.     No.

Q.     -- that you were using cocaine?

A.     No.

Q.     How were you able to keep other people from

finding out?

A.    Because I didn't purchase it on the street.  I
didn't deal with anyone except maybe the person that I
was dating.  It was something I did in the privacy of
my home.

Q.    That was before you were married, and you were
living alone.

A.    Yes.

Q.    So it would be easy the keep it private.

A.    Yes.

      And with my husband -- my husband worked two
jobs, and he also had to go back -- he went back to
school to take some classes, and he would -- was a
very hard sleeper.  Once I learned that, and I guess
maybe, too, he wasn't paying a lot of attention to me
because he was working so hard and, you know, he was
in school, and I picked the habit back up again.  Our
apartment was very large -- extremely large.  It was a
two bedroom apartment, and our bedrooms were in the
back.

      My husband, as you heard in the courtroom, was a
great cook, but a sloppy person in the kitchen.  So
when he would go to sleep, you know, I would go into
the kitchen and clean up and do other things around
the house, and then I would go to bed and get ready

for the next morning.

Q.    How is it -- I don't think you precisely answered my question, or I didn't even ask the question.  Let me ask it now.

After you were married, how were you able to keep your cocaine usage a secret from your husband?

A.    I didn't do it around my husband.  I didn't do it in the daytime.  It was always in the evening.  I didn't leave anything around the house for him to discover.  So, I was -- I concealed it.

Q.    How did you conceal it?

A.    By hiding it.  Hiding it in my house, in drawers in my bedroom.

Q.    Did you ever have any large quantities of cocaine in your house?

A.    No.

Q.    Did you ever buy more cocaine than you intended to use on a particular occasion?

A.    No.  I've never purchased more than three bags. And sitting in this courtroom, again, I've learned that three bags -- to me they were $50 a piece.  Ms. Dobie made it clear that it was a sixteenth.  I didn't know it was a sixteenth, but I knew it was three bags, and --

MS. JOHNSTON:  Objection as to what Ms. Dobie

said and what Ms. Dobie made clear.

      THE COURT:   Yes.

      BY MR. MCKNETT:

Q.    You were talking about three bags.  You were here when I was showing the exhibits to your husband. Actually, could I have the Ali exhibits?

      I think they're in here somewhere, Ms. Ali. I'll be right with you.

      Ms. Ali, I want to show you what's been marked as Drugs 32 -- Government Exhibit Drugs 32 which there has been testimony about concerning this exhibit being recovered from your apartment on June 1st of 2004.

      Do you see that there?

A.    Yes.

Q.    In this large envelope is a very small 1" or less square envelope.  Do you see that?

A.    Yes.

Q.    This one has a red tag on it.  Do you see that?

A.    Yes.

Q.    Without reference to the red tag, is that the size of the bag that you're talking about?

A.    That's a 50, yes.

Q.    What you were buying was not -- didn't have a red tag on it.

A.    No.

Q.    So this was what you would buy for $50?

A.    Yes.

Q.    And you would get three of these for how much?

A.    For $125.

      MR. MCKNETT:  May I publish this, Your Honor?

      THE COURT:  You may.

      BY MR. MCKNETT:

Q.    When did you -- strike that.

      I'm going to ask you, while I have it here,
about the other exhibits, the exhibits that were --
the drug exhibits that were seized at your apartment.

      I'm showing you what's marked as Ali 7, which
appears to be a section of a plastic straw with one of
those red tags on it.

A.    Yes.

Q.    Do you recognize that?

A.    It is a straw.  It could be mine.  It's a straw.

Q.    Assuming that it was recovered from your
apartment, what purpose would this straw have served
if any with regard to you using drugs?

A.    I snorted drugs, too.  It was cocaine.

Q.    When you say you snorted drugs, what do you mean
by that?

A.    I put it up my nostrils.

      MR. MCKNETT:  May I publish, Your Honor?

THE COURT:  You may.

BY MR. MCKNETT:

Q.    I forgot to ask you something, Ms. Ali.

Also in Ali 7, there appears to be -- there appears to be some smaller envelopes.  Do you see them?  They're behind the sticker here, and I can't seem to get them to slide out in plain view.

Do you see them up here?  They have a red strip across the top, and they're attached to what appears to be envelopes.

A.    Yes.

Q.    Do these look familiar to you?

A.    It could be bags that I've used that were left in my home in a drawer or something, bags that had cocaine in it at one time.

Q.    Bags that contained cocaine that you used?

A.    Yes.

Q.    Not cocaine that you intended to sell.

A.    Yes.

MR. MCKNETT:  May I publish, Your Honor?

THE COURT:  You may.

BY MR. MCKNETT:

Q.    Ms. Ali, I want to show you Drugs 34, which is a small piece of crumbled up aluminum foil -- tinfoil with one of those red tags on it.

Do you recognize the aluminum foil?

A.    No, but it's not -- it could be mine, but I'm not saying it is.  But, no.

Q.    What -- let's assume that it is yours, for the sake of questioning.  What use would that aluminum foil have been put to?

A.    Once I cooked the cocaine, I could have placed it in there.

Q.    I'm showing you now Drugs 33.  Do you recognize the contents of this evidence bag?

A.    Yes.  That's a jewelry box from Nordstrom's.

Q.    You've heard testimony that this jewelry box was recovered from a drawer in your bedroom.

A.    No, it was not recovered from a drawer.  It was on top of a dresser.

Q.    The jewelry box was?

A.    Yes.

Q.    Now, there's also -- well, let me show you a photograph.  I want to show you Photograph P-1.  Do you see that?

A.    Yes.

Q.    I want to put it on the viewer.  Are you familiar with it?

A.    Yes.

Q.    There appears to be a jewelry box in this

photograph, P-1.  Do you see that?

A.    Yes.

Q.    Is that the same jewelry box that you identified in Drugs 33?

A.    Yes.

Q.    Was this jewelry box in the same location in that drawer when you last saw it?

A.    No.

Q.    Where was it?

A.    On my dresser drawer, with the rest of my jewelry.

Q.    Was there jewelry in this box?

A.    It could have been.  Not necessarily.

Q.    With regard to that drawer.  Is that how the drawer looked the last time you saw it?

A.    No.  In that drawer -- that's a bed -- night stand, and I don't -- well, I never kept a neat drawer like that.  That drawer had books, paper, a phone book, pencils, junk, buttons, everything you can think of that you would shove -- money -- everything that you can shove into a drawer that's next to your bed.

Q.    When is the last time you looked in that drawer before your arrest?

A.    I don't recall.

Q.    Would it have been the day before?  The week

before?   The month?

A.     It could have been any time, because I kept pencils in there.  I would write, you know, if I wrote anything down or did a puzzle or took a phone number down, but I have never kept a neat drawer like that.

Q.     I'm sorry?

A.     If you see that closet, like the officer -- well, if you see the closet where we had all of those coats, you know -- you know my drawer did not look like that, if you saw that closet.

Q.     In exhibit Drugs 33, there is also a folded up napkin here.  Do you see that in the exhibit bag?

A.     Yes.

Q.     Do you see a similar looking napkin in that picture?

A.     Yes.

Q.     Was that napkin in your drawer the last time you looked in the drawer?

A.     I don't recall that napkin being in my drawer, no.

Q.     In Exhibit 33 there appears to be some drinking straws.  Do you see that?

A.     Yes.  The straws might have been there.

Q.     Excuse me?

A.     The straws might have been there.

Q.    And also in Exhibit 33 are a little grouping of empty plastic bags the same size we saw before, about 1" by 1"?

A.    Yes.  The bags might have been there, yes.

Q.    They may have been in the drawer?

A.    Yes.

Q.    Where was this drawer located?

A.    On the left-hand side -- on my side of the bed the left-hand side.

Q.    Your husband had a similar dresser -- bed stand --

A.    Yes.

Q.    -- to the bed on his side --

A.    Yes.

Q.    -- where he kept his things?

A.    Yes.

Q.    Ms. Ali, finally, I want to show you for now Ali 8.  Do you recognize that?

A.    Yes.

Q.    What is that?

A.    That's a homemade pipe that I made out of a water bottle.

Q.    All of these exhibits have little red tags on them.  You didn't put them there, did you?

A.    No.

MR. MCKNETT:  May I publish, Your Honor?

THE COURT:  You may.

BY MR. MCKNETT:

Q.    Ms. Ali, is it fair to say that you did not keep drugs and drug paraphernalia displayed in a drawer like this?

A.    Could you repeat the question, please?

Q.    Is it fair to say you did not keep drugs and drug paraphernalia displayed in a drawer like this?

A.    No, I did not keep it neatly displayed like that.

Q.    Ms. Ali, before I forget.  On this picture, if you look right down here, ask -- you see there?

A.    Yes.

Q.    It's very hard to see.  There appears to be a little envelope there.  Do you see that?

A.    Yes.

Q.    Do you recognize it?

A.    I don't recognize that particular one but, like I said, in that drawer there was a lot of different things in there, so it was a lot of things shoved up in that drawer.

Q.    This envelope -- envelopes of this size?

A.    Yes.

Q.    Is that the size of a package -- strike that.

I'll come back.

Did you ever -- when you were buying drugs --
when you were buying powder cocaine, did you ask for a
specific weight?

A.    No.

Q.    Did you ever ask for a specific quantity?

A.    I would say I want $125 worth, maybe, but never,
like, a size.

Q.    So you would order by dollar amount?

A.    Yes.

Q.    And you would get consistently the same amount
of drugs for the -- for instance, you would order $125
worth, and you would get about the same quantity every
time?

A.    Yes.

Q.    If you ordered a dollar amount, you would get
about the same quantity every time?

A.    By looking at it, yes.

Q.    You never weighed it?

A.    No.

Q.    And you never asked for it by volume or by
weight?

A.    No.

Q.    If you ordered a 50, you would get one of those
little packages?

A.      Yes.

Q.      When you bought a 125, you would get three of
them?

A.      Yes.

        MR. MCKNETT:  I guess I should recover the
exhibits, Your Honor.

        THE COURT:  If you would.

        Now would be a good time.

        MR. MCKNETT:  I saw people looking at the clock.

        THE COURT:  All right.  Why don't we take a
break until 2:00?

        MS. GREENBERG:  Your Honor, the jury is not
done.  We will just republish them after the break, if
that's all right.

        THE COURT:  You may, if you like, unless they're
finished.

        MR. MCKNETT:  I thought they had finished, Your
Honor.

                    (Jury excused at 1:12 p.m.)

                    (Off the record at 1:12 p.m.)

                    (On the record at 2:06 p.m.)

        THE COURT:  On Page 45, I made some minor
corrections to the instructions.  The "ands" that were
are now "ors."

        On Page 94, the "ands" in four different places

there were changed to "ors."

MR. SUSSMAN:  Are you talking about Instruction 69 or generally in the page?

THE COURT:  Pardon me?

MR. SUSSMAN:  Instruction 69, or the page?

THE COURT:  No.  I'm giving you page numbers.

The last one I mentioned to you was in jury instruction 69, Page 94.  There's four "ands" in there that were changed to "ors" where it gives the alternatives to drug quantities.

If you weren't following me, the other changes were Instruction 42 on Page 41.  Again, it's "ands" being changed to "ors."

On Instruction 45, on Page 59, in the first paragraph, again "ands" are being changed to "ors."

Other than that, I have reviewed all the changes with you and I will have this set docketed so that we can use this the next time we talk about the instructions as the "revised set of draft jury instructions," and I have before me and I'm reviewing the defendants' motion with regard to a Section 843 instruction.

Can the government give me something on this on Monday?  Is that possible?

MS. GREENBERG:  Your Honor, we did give the

court a summary of cases with the initial submission
back in mid-July of the cases that supported it, but I
can redo that.

        THE COURT:  If you can tell me why they're
wrong, and I can look at it and decide who's right.

        MS. GREENBERG:  The instruction with the second
element, there were a whole list of Fourth Circuit
cases, and we will we redo that.

        THE COURT:  Anything further?  We will bring the
jury in.

        MR. MONTEMARANO:  One other thing.  Did Mr.
Krinsky manage to make those 30 copies of that
transcript?

        THE COURT:  Yes, I believe so.  Yes.  There you
go.

        MR. MONTEMARANO:  Thank you, Your Honor.

        THE COURT:  Ready for the jury?

        We'll give you the docket number of these as
they go on.

            (Jury returns at 2:11 p.m.)

        MS. GREENBERG:  Your Honor, at this time may we
continue publishing the exhibits to the jury?

        THE COURT:  Does the jury wish to see them
anymore?

        THE CLERK:  They hadn't finished seeing them.

THE COURT:  Unless the jury wants to see them.
If the jury wants to see them, we will recirculate
them.

A JUROR:  (Indicating.)

THE COURT:  Yes, he would like to see them.

All right.  You may proceed, Mr. McKnett.

MR. MCKNETT:  Thank you, Your Honor.

BY MR. MCKNETT:

Q.    Ms. Ali, we had left off with a discussion of
your personal drug usage.  I want to ask you now, did
there come a time -- well, you described your
relationship with Ms. Martin as one involving food and
clothes, and you were friends.

A.    Yes.

Q.    Did there come a time when that relationship
between yourself and Ms. Martin began to involve
drugs, as well?

A.    Yes.

Q.    When did that happen?

A.    Maybe the latter part of 1998.

Q.    How did that happen?

A.    I approached Ms. Martin.

Q.    What led you to approach Ms. Martin?

A.    You know -- well, we were just talking, and I
just gradually -- I wasn't getting it from the friend

that I told you that was giving it to me no longer,
and we were just talking and I asked her if she knew
anyone that she can -- I can get some cocaine from.

Q.    Was there some reason that you thought she might
be able to answer that question the way you hoped?

A.    After talking to her, we knew -- found out that
we knew similar people -- not that we had been in
their presence at the same time together -- and I had
knowledge, you know, that they knew something about
it, so I -- -- that's why I approached her.

Q.    Do you remember her response?

A.    She told me that -- to just, you know, wait, and
she can see if that could be possible.

Q.    Did there come a time when it actually did
become possible?

A.    Yes.  Yes.

Q.    When was that?

A.    Sometime the latter part of 1998.

Q.    What kind of drugs were you obtaining from Ms.
Martin beginning in the latter part of 1998?

A.    Cocaine.

Q.    Powder cocaine?

A.    Yes.

Q.    Did you ever obtain any crack cocaine from Ms.
Martin?

A.     No.

Q.     Were you paying Ms. Martin for the cocaine?

A.     Yes.

Q.     How much money your paying her?

A.     $50.

Q.     How much cocaine were you getting for that $50?

A.     A half a gram.

Q.     Do you know for a fact it was a half a gram?

A.     No, I don't.

Q.     What kind of package was it?

A.     A small package that was shown to me in this courtroom.

Q.     Do you know -- 1" by 1"?  The plastic envelope? In fact, we saw one that had a white substance -- powder substance in it.  Do you remember that?

A.     Yes.

Q.     Did that look similar to the package you would receive from time to time from Ms. Martin?

A.     Yes.

Q.     In fact, was that a package you obtained from Ms. Martin?

A.     Yes.

Q.     There were other envelopes in the exhibits we discussed, just before the lunch break.  There were empty envelopes that you indicated had previously

contained cocaine.  Do you remember them?

A.    Yes.

Q.    Were they other examples of packages of cocaine that you obtained from Ms. Martin?

A.    Yes.

Q.    Did you ever obtain packages of powder cocaine from Ms. Martin larger than the ones I showed you today?

A.    No.

Q.    There were envelopes of a larger size, plastic Ziplocs of a larger size.  Do you recall them?

A.    I don't recall that in the exhibit, but if Ms. Martin -- if I got three, sometimes they would be put in that larger packet so they would be -- when you bought the larger quantity, you would buy just multiples of the same size; correct?

A.    Yes.

Q.    And she would put them sometimes in a larger envelope?

A.    Yes.

Q.    What's the largest amount of money you ever paid Ms. Martin for powder of cocaine?

A.    $125.

Q.    Can you estimate for us how often you were buying powder cocaine from Ms. Martin?

A.     No.   It varied.   It could have been once a week,
twice week.   It varied according to if it was a
holiday, if it was -- it just varied.

Q.     Ms. Ali, I want to show you an exhibit, Hayward
7.  I'm going to turn to a couple of pages in Hayward
7.  If you recall -- and I will put it on the screen
here.

       Do you recall Hayward 7?  It was a notebook
seized at the Hayward Avenue address.  I'm going to
put up a page here.  Do you see it?

A.     Yes, I can.

Q.     I've highlighted part of it.   These highlights
were not there on the original exhibit.

       At the top, do you see a name written there?

A.     Yes, I do.

Q.     That's Ulysses?

A.     Yes.

Q.     That would be your husband?

A.     Yes.

Q.     And there are some numbers in here below that.
There's what appears to be a date entry of 8/22.  Do
you see that?

A.     That's correct.

Q.     An then there are some numbers, 175, 150, 225,
and then what looks like a total of 570.  Do you see

that?

A.     Yes.

Q.     And then there's another number over here, 228.
       Do you have any idea what that 228 might be?

A.     No, I don't.

Q.     Do you have any idea what these three numbers
and this total represent?

A.     Purchases that Ulysses and I made from Paula.

Q.     Purchases for what?

A.     Clothing.

Q.     Now, let me see if I can do this logically.
       Below that is another name here, "LaNora."  That
would appear to be you, would it not?

A.     Yes.

Q.     And then there are some other number entries
with 1,481, 228, a total, and then the 8/29 entry
appears to be a calendar entry for August 29.  We
don't know what year this is, do we?

A.     No, I don't.

Q.     You've had what appears to be a payment of $200.
Addition is made, another $200.  Not addition.
Subtraction was done.  More subtraction.  Another
$200.  More subtraction.  Then 10-312.  Then down
here, more subtraction.  Then there's -- I think
that's a 10-31.  Can you see that down here?

A.    Yes, I can.

Q.    Does that look like 10-31?

A.    Yes, it does.

Q.    And it says, if I read it correctly, "sweater."

A.    Yes.

Q.    Does that help to refresh your recollection at all as to what year this may have been?

A.    Well, if you keep going I can tell you exactly what years.  I see some other figures.  That sweater doesn't -- I don recognize the year by that sweater. By other figures in the other column, I know.

Q.    The 110 for the sweater adds back in and makes the total 719.  Then 11-13, a $100 payment.  There's an entry up here, Ulysses:  Pant.

A.    I can't see that.

Q.    I'm sorry.  It's off the page, that's why you can't see it.

      Is that better?

A.    Yes.

Q.    And then below that is 11/20 and 619, which would be the same total at the bottom of this column; correct?

A.    That's correct.

Q.    So it appears that whoever was keeping this ledger just carried that total up to here and started

the next column.

A.     Yes.

Q.     A payment of 244.  Not a payment, but a charge
of 244; correct?

A.     Correct.

Q.     That would indicate that you bought something
for $244; correct?

A.     Yes.

Q.     And that continues down in similar fashion.
There is a large item here for $3,200.

A.     That's correct.  I told you earlier that we -- I
purchased a fur coat -- a mink coat from Ms. Martin.

Q.     That would reflect the purchase of the mink
coat?

A.     Yes.

Q.     And then a payment of $500.  Would that refresh
your recollection as to what year?

A.     Yes.  It was year 2003.

Q.     2003?  Thank you.

       Now, this column continues in a similar fashion
with payments and charges and other channels through a
total of 4,608, and then we turn the page and that
total is carried up to the top here:  4,608.  See
that?

A.     Correct.

Q.    It still says "LaNora," so the indication is
that all of these entries on this page relate to you;
is that correct?

A.    That's correct.

Q.    And does this -- do these columns -- do these
sheets of paper in these columns conform to your
recollection of at least this aspect of your
relationship with Ms. Martin?

A.    Yes.

Q.    And this list continues more of the same; right?
A payment of $400, a purchase of $400, a payment, a
purchase of a ring for $150; is that correct?  Am I
reading that right?

A.     Yes.  That's the ring that I spoke about -- was
spoken about in the courtroom, yes.

Q.    Then we come down here, we're now 3-6, which
would be March 6.  So what year would that indicate
that we're in now?

A.    Excuse me.  March 6?  2004.

Q.    Do you see that down here?

A.    Yes.

Q.    And then the total here is 2,558, and it doesn't
seem to carry over.  I skipped a column here.  The
2,558 carries over to this column, and we have more
purchases and more payments and so forth.  1,343 which

carries over here, and then on 5-28 there is a payment
of $80, a balance of $1,353; correct?

A.     Correct.

Q.     That would indicate that as of the 28th of May
of what year?

A.     2004.

Q.     You owed Ms. Martin $1,353 for clothes.

A.     Correct.

Q.     Now, there is another column on this.  There are
other entries.  Let me look at them.  8-22.  Do you
see that there?

A.     Yes.

Q.     That's the same as the entry here; right?  Do
you see that?

A.     Yes.

Q.     At least as far as this book is concerned, these
are the starting entries -- these columns started on
August 22 of 2003?

A.     Yes.

Q.     It starts out with $50; right?

A.     Yes.

Q.     And then another $50 and a total of $100.  The
next day, $50; total is $150.  Six days later, $50.
I'm not quite sure if that's the same day or not.  It
looks like a payment, because the total here is 100.

Do you see that?

A.    Yes, I do.

Q.    It looks like there was a purchase of $50, making a balance due of $200, and then a payment on the same day of $100, leaving a balance of $100; correct?

A.    Correct.

Q.    That carries over to here.  The next entry is 9-15, which would be September 15; correct?

A.    Correct.

Q.    Is that $100 total a purchase of $50 for 150. On March 19 the purchase of $50, for a total of 200.

      On another date, a purchase of $50 for 250 and a payment of 90, a balance of 160.  Do you see that?

A.    Yes.

Q.    In the middle here there is a Ulysses, 186.  Do you have any idea what that's about?

A.    Reference to clothing.

Q.    It does not relate to the numbers in this column over here; correct?

A.    No, it doesn't.

Q.    Or in this column down here; correct?

A.    No, it doesn't.

Q.    Then the 160 total carries over to here and this ledger continues in like fashion with, it looks like

purchases on 10-22, and then there's another date
here.  I can't make it out.  Another date here.  Might
be 10-29, and so forth.  There's purchases of $50,
$50, 125, payment of 30, payment of 30, purchase of
125 and so forth, to a total of 405.

     Do you see that?

A.    Correct.

Q.    Then that carries over to this page and then
these same entries.  I won't go through this whole
column.  It goes down this column, with the total of
325 up to the top here, 325.  Down to the bottom here,
275.  The next page, 275, a purchase on a date which
may be 5-28.  It's not here, but it's on the same
line.  A total of 400.  5-28, a payment of 300.  So,
on May 28 you owed Ms. Martin $100.

A.    Correct.

Q.    Now, you've established that the first column --
the columns on the left down here and here were for
clothes.

A.    Correct.

Q.    What is reflected in these columns down this
side, down here and down here?

A.    Cocaine.

Q.    Powder or crack?

A.    Powder.

Q.    It would appear that at least from the period covered by this ledger, which appears to be August 22 of 2003 through May 28 of 2004, which would be three days before your arrest; correct?

A.    That's correct.

Q.    That the largest quantity that you ever purchased with dollars.

      MS. JOHNSTON:  Objection.

      Counsel is leading the witness.

      THE COURT:  Overruled.

      BY MR. MCKNETT:

Q.    Does it appear that that's correct?

A.    That's correct.

Q.    And it would appear that the smallest quantity you bought was $50; is that correct?

A.    That's correct.

Q.    It appears that the most you ever owed Ms. Martin on this drug ledger was -- let me just check to make sure -- $465.

A.    That's correct.

Q.    Were you buying cocaine in any form from anyone else once you started obtaining cocaine from Ms. Martin?

A.    No.

Q.    Does this ledger accurately reflect the

frequency with which you were buying cocaine from Ms. Martin?

A.     Correct.

Q.     Does it reflect the frequency with which you were buying cocaine from Ms. Martin prior to August 22 of 2003?

A.     I don't -- the 125s might not.  The frequency, are you saying?  Or the cost?

Q.     The frequency.

A.     Yes.

Q.     When did you start buying the 125s from Ms. Martin?

A.     I don't recall the date, but within that last year or so I had a little more money in the bank.  I didn't realize that you could get 125 and get three packets and that you save money that way.  So, maybe within the last year or two when I had more funds to spend and the knowledge that I can purchase more for -- I could purchase more for $125.

Q.     When you bought a 125 from Ms. Martin, did you always obtain the entire 125 from her?

A.     No.  Sometimes I would get the 125 and -- let me go back.  Maybe it was more than a year.  Let me correct myself.  Maybe it was more than a year.  Maybe I purchased 125 when she was in the house.  I don't

recall.

Q.     Excuse me.  When you say "the house," which house?

A.     Bexhill Court.  I'm not certain, but -- I'm not sure, but I would purchase it but give it to Ms. Martin because I didn't want it all on me at one time. So she would hold it for me, and I would make phone calls or come back to the house and, you know, tell her to keep half of it or the majority of it, and I would come back and pick it up.  I found out it was cheaper to buy three for $125 than to buy three for $150, so I would let her hold it, and she would hold it and I would go back from time to time and pick it up.

Q.     When you started buying 125s, did you ever sell any portion of the 125?

A.     No.

Q.     Did you ever sell any cocaine in your life?

A.     No.

Q.     In your entire life?

A.     My entire life.

Q.     Did you ever buy crack cocaine?

A.     No.

Q.     In your entire life?

A.     My entire life.

Q.    I asked you questions -- I asked you to identify people on this chart, CH-1.

A.    Yes.

Q.    Other than Ms. Martin, were you involved in any drug activity -- any drug purchasing activity at all with any of these other people?

A.    No.

Q.    Were you involved in any drug-related activity at all with any of those people?

A.    What do you mean by "drug-related activity?"

Q.    Did you ever use drugs with any of those people?

A.    Yes.

Q.    Who was that?

A.    Bruce Walker.

Q.    Milburn Walker?

A.    Yes.

Q.    Was the drug usage a part of the problem you described with your relationship with Mr. Walker?

      MS. JOHNSTON:  Objection.

      Asked and answered before lunch.

      THE COURT:  Sustained.

      BY MR. MCKNETT:

Q.    Did you ever know any -- other than Mr. Walker, did you ever know any of those people on that chart -- with the exception of Mr. Walker and Ms. Martin, did

you ever know any of the people on that chart to buy
or sell drugs?

A.    No.  Just reading in the newspaper about
persons.  But, no.

Q.    Don't tell me what you read in the paper.

A.    No.

Q.    Prior to June 1st, did you have any knowledge
that any of those people other than Mr. Walker and Ms.
Martin were involved in the distribution at any level
of drugs?

A.    No.

Q.    Ms. Ali, I want to ask you some questions about
the transcripts that we've had played in this court.
Do you have a transcript book up there?

      I ask the jurors to refer to theirs.

      With one exception, they've all been played, so
I won't be asking that any except that one be played,
but I do want to ask you some questions.

      You've heard Sergeant Sakala testify about them,
and I want to talk to you about some of these same
conversations.  I'd ask you to turn first to Page 30.

Q.    Do you have it there?

A.    Yes, I do.

Q.    I'm going to ask you to turn your attention
specifically to Page 31.

Now, this is a conversation between Ms. Martin and Martha Jean West, and it involves clothing as to when the detective testified.  Do you recall that?

A.    Yes, I do.

Q.    At the top in the transcript it says -- the third "P.M." down in the transcript, it says, you know I ain't gonna spend that kind of money for it, but the officer -- the sergeant agreed that actually what was said was, you know LaNora ain't gonna spend that kind of money for it.

Do you recall that?

A.    Yes, I do.

Q.    Then later, at the bottom, Ms. Martin says, I'm pretty sure she's not going to take it, because she's getting ready to go on a cruise.

A.    That's correct.

Q.    Were you getting ready to go on a cruise?

A.    Yes.

Q.    Was that the cruise that we heard about that -- was it April?

A.    It was the early part of April 2004.

Q.    Were you -- what were you doing to prepare to go on this cruise?

MS. JOHNSTON:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Getting my wardrobe ready.  You
know, on a cruise you can dress, and you can take as
many items as you like.  You can change three, four
times a day, or you don't have to change at all.  So,
I was trying to get my wardrobe together, and I was
calling Ms. Martin because, gaining the weight, I
could no longer fit some of my evening attire or
casual attire that we went for dinner.  So I was
trying to locate evening attire and sundresses which I
had outgrown or any -- not just sundresses but any
type of summer clothing items, casual sport items.

        BY MR. MCKNETT:

Q.    Who were you going on the cruise with?

A.    My husband and friends, and my mother.

Q.    Where was the cruise going to be?  What
geographic area?

        MS. JOHNSTON:  Objection.  Relevance.

        THE COURT:  Overruled.

        THE WITNESS:  I think it was the western or the
eastern Caribbean.

        BY MR. MCKNETT:

Q.    Did you actually go on that cruise?

A.    Yes, I did.

Q.    Ms. Martin says toward the bottom, and her money
is funny.  Do you see that?

A.    Yes.

Q.    Bottom of Page 31.  Do you know what she was talking about there?

A.    Well, Ms. Martin knew certain high end clothing I would admire but I didn't purchase, but she also knew we were going on a cruise.  Basically, when we went on the cruise, we didn't try to spend a lot of money beforehand, because we wanted to purchase items in the Caribbean.

Q.    Let's turn to Page -- call B324 -- excuse me. Before we do that, let's turn to Page 36, at the bottom.

      Ms. Martin says, yeah, uh-huh, because LaNora and them going on the cruise, and all they want casual stuff.  And Ms. West, at the top of Page 37, says 610; right?

A.    Correct.

Q.    Do you know who Ms. West was referring to when she said 610?

A.    The six no longer was me, so -- the ten was, but not the six.  So, I don't know who the six was in reference to.

Q.    Go to Page 39, call B463.  This is a call on March 13, '04 between yourself and Ms. Martin.  In the middle of Page 39, Ms. Martin says, I need you to go

ahead and look on the Internet and book my flight to
Kansas City for the 12th of May, me and Goody.

First of all, who was she referring to when she
said "Goody?"

A.   Learley Good win, her "play brother."

Q.   Mr. Goodwin who is sitting here in the
courtroom?

A.   Correct.

Q.   You've used that phrase twice now.  Her what
brother?

A.   Play brother.

Q.   Her play brother?

A.   Yes.

Q.   What do you mean by that?

A.   A person that you've been knowing so long, and
you don't -- and you consider him as somewhat of a
brother to you.  Someone who is very close to you.

Q.   She's asking you -- it appears to book a flight
to Kansas City.  Do you know what that was for?

A.   Yes.  Ms. Martin was trying to promote some
shows.  If I'm not mistaken, this was the Aretha
Franklin show that -- the show didn't go off, but she
knew that I was -- she wasn't that familiar with the
Internet, and so she asked me to book the flight for
her and Goody to go there.

Q.     Did you ever do that?

A.     No, I didn't.

Q.     It fell through?

A.     Yes.

Q.     Now, there's four calls in a row I want to turn
your attention to, and they're in the government
transcript book.

       I'm not sure I placed one of them up there.
Have I?

A.     No, you didn't.

       MR. MCKNETT:  If I may do that, Your Honor.

       THE COURT:  You may.

       BY MR. MCKNETT:

Q.     There should be one as an exhibit, Your Honor.

       I'm just going to sit these here on the side,
Ms. Ali.  I want you to take Book 1 and turn to Page
70.  Are you there?

A.     Yes.

Q.     Okay.  Call B566, on Page 70; call B567 on Page
71; call B669 on Page 76, and call a231 on Page 77.  I
want to address them as a related sequence of calls.

       Call B 566, on Page 70, took place on March 14,
'04 at about 10:11 in the morning, and it appears that
you're calling Ms. Martin.  There's a number at the
top --

A.     That's my home number.

Q.     Do you know what day of the week March 14 was?

A.     No, I don't.

Q.     If you look in the front of the defendants'
transcript book, you will see a calendar.

A.     On Sunday.

Q.     March 14 was a Sunday?

A.     Yes.

Q.     You're asking Ms. Martin if she's going to go --
if she's going back home when you leave there.  You
must have been calling -- is it fair to assume you
were calling Ms. Martin on her cell phone?

A.     Yes, it's fair to say that.

Q.     Do you know?

A.     No, I don't.

Q.     And then she says she's not sure yet; she may go
walking.  You say, 'cause you know, cause, no,  just
one.

       Then the next call, which is one minute later,
Ms. Martin is calling you; correct?

A.     That's correct.

Q.     You can tell that from the heading.  She asks
you, you know, I forgot -- the other day you got the
other day you want me to put that on the, on the books
right?  And you say, no.  I'm gonna, I'm going to the

bank now; correct?

A.     Correct.

Q.     Do you know what she meant when she said, do you
want me to put that on the books?

A.     Yes.

Q.     What did she mean?

A.     I probably didn't pay her, so she wanted to know
if I wanted her to put it on the books.

Q.     Then you say, I'm going to, I'm goin' to the
bank now.  How were you going to go to the bank on a
Sunday?

A.     Bank card.

Q.     ATM machine?

A.     Correct.

Q.     And then the next day, on March 15.  Now, this
call is at 19:14 -- 7:14 at night; correct?

A.     What page is that, sir?

Q.     On Page 76, excuse me, call B 669.

A.     Correct.

Q.     And you say, yeah, one.  All right, call me.
I'll bring it downstairs so don't have to come up.

       And then the next call is on Page 77, call A231
at 7:23, which is nine minutes or so after the
previous call.  Ms. Martin is telling your husband he
can come down to the door.  Do you see that?

A.     That's correct.

Q.     On call B669, Page 76, what was it that you were going to bring downstairs so Ms. Martin didn't have to come up?

A.     I'm assuming money.

Q.     These calls, call B566, call B567, call B569 and call A231.  What were they about?

A.     Purchasing cocaine.

Q.     When you say "just one," what were you referring to?

A.     The $50 package.

Q.     Ms. Ali, would you turn to -- in the defendants' book, would you turn to Page 45, please?  I want you to look at call B634 on Page 45 and then call B638 on Page 47.  I want to address them together as a unit.

       In call B634, at 1:39 on the 15th of March, '04, Ms. Martin is talking to someone named Cathy.  Do you see that?

A.     That's correct.

Q.     She asks, did you get rid of those sundresses?

       MS. JOHNSTON:  Objection.

       This witness is not a party to this call.

       THE COURT:  He's reading what it says.

       MR. MCKNETT:  Excuse me, Your Honor?

       THE COURT:  Overruled.

BY MR. MCKNETT:

Q.    That's what it says; correct?

A.    That's correct.

Q.    At the bottom of the page, Ms. Martin says,
someone was here and I was telling her about them, and
she was interested.

        Do you have a basis for knowing who Ms. Martin
was talking about?

A.    Yes.

        MS. JOHNSTON:  Objection.

        THE COURT:  See if you can establish that she
has a basis for knowing.

        MR. MCKNETT:  I asked her if she had a basis for
knowing.

        THE COURT:  All right.  Ask her what it is.

        BY MR. MCKNETT:

Q.    What is the basis for knowing who Ms. Martin was
talking about?

A.    I know she could have been talking about me,
because I inquired about sundresses.

Q.    In the next sentence, Ms. Martin says, when you
get some more small sizes like 2 or 4, and a 12 or 14,
let me know.

        Do you know -- do you have a basis for knowing
what Ms. Martin was referring to then?

MS. JOHNSTON:  Objection.

THE COURT:  What is her basis?

BY MR. MCKNETT:

Q.    What is your basis?

A.    I inquired about sundresses with Ms. Martin, and she also -- she knew that my bottom was much larger than my top so I would take anywhere from a 10 to a 12 in a sundress.

Q.    Ms. Ali, I'm just going to skip past the -- let me ask you -- let me look at one thing here, if you'll bear with me, Your Honor.

On Page 49, which is part of call B638, which is a call made six minutes after the one we just discussed in the middle of Page 49, Ms. Martin refers to sundresses.  I just called them back, but they said they got rid of them.  And then Ms. West says, yeah, she probably, I'll check.  I can let -- Ralph Lauren has designer like they tie around the neck.

Are you familiar with anything that ties around the neck made by Ralph Lauren?

A.    Yes, but not just Ralph Lauren.  Other designers, too.

Q.    What is it that you're familiar with that are made by Ralph Lauren and other designers?

A.    Ms. Martin and I both like sundresses, and we

like the ones with the halters and the ones that tie
and fasten around the neck, and we were interested in
those because they fit both of us better and I think
they had an A-line shape more to them.

Q.    Are sundresses dresses that you would purchase
and use on a cruise?

A.    Correct.

Q.    Ms. Ali, turn to Page 52 in the defendants'
book, if you would, please, call 835.  It's a call
made at -- on 3 September -- excuse me, March 17,
2004, at about six minutes before six.  This is a call
between you and Ms. Martin; correct?

A.    That's correct.

Q.    Turn to Page 54, if you would, please.  Toward
the bottom of the second paragraph, where you're
speaking, you start out, spring and summer.  Then
there's a second paragraph.  Do you see that?

A.    That's correct.

Q.    Did you -- when we played this transcript
yesterday, did you hear anyone else talking in the
background in that conversation?

        MS. JOHNSTON:  Objection.  The recording speaks
for itself.

        THE COURT:  Overruled.

        THE WITNESS:  Yes, I did, but I don't recall

right now.  Yes, I did.

     BY MR. MCKNETT:

Q.    Okay.

A.    It was Ulysses in the background talking about Kevin.

Q.    Kevin was who?

A.    Kevin was the young man that had a clothing boutique in Baltimore, and Ulysses was purchasing clothing from him.

Q.    On Page 53, toward the bottom, you say yes, he talked to Kevin last night.

     Who was it that talked to Kevin?

A.    Ulysses.

Q.    And Kevin was the gentleman who, on Page 54, you say wants to do a fashion show?

A.    Correct.  He was trying to get his spring line out there.

Q.    On Page 55, toward the top, you say well, we'll stop by after it, if it's okay with you.  Ms. Martin says, okay.  No problem.

     Do you see that there?

A.    Yes, I do.

Q.    Why were you going to stop by?

A.    Just to be stopping by.

Q.    To pick up drugs?

A.     No.

Q.     Just to visit?

A.     It could have been, yes.

       Or Ulysses might have wanted to go by to discuss
-- Kevin had spoke to her on the telephone.  It could
have been to pick up -- to look at new clothing that
she had, and to eat.

Q.     To socialize?

A.     To socialize; correct.

Q.     In the beginning of this conversation, on Page
52, there was conversation about, Ulysses said you
could take that chocolate Godiva cheesecake.

       What was that a reference to?

A.     Page 52?

Q.     Page 52.

A.     Ms. Martin loved to please her friends, and she
knew that Ulysses loved cheesecake, so she would often
go to The Cheesecake Factory and buy a new cheesecake.
So when Ulysses came over, you know, he can indulge
cheesecake.

Q.     And it says, he will come by and give it to you.
       What was that a reference to?

A.     Sometimes Ulysses would buy cheesecake and they
would share cheesecake, sweet potato pies with each
other.

Q.    And so it was a reference to chocolate Godiva cheesecake and nothing else?

A.    Right.

Q.    There's a reference in here to you say on the same page, 52, we got to go pick this lipstick I left over here.  He said he'll cut his.  What does that mean?

A.    I know that I was at a shopping center, and I don't recall which one right at the moment, and I left -- I had purchased some lipstick and they didn't place it in the bag, so I had to go back and pick it up.  And he said he'll cut his.  That's why I'm kind of confused.  I don't know if she had the chocolate cheesecake or he had the chocolate cheesecake.  I know whatever it was, Ulysses was getting ready to get some chocolate cheesecake or had chocolate cheesecake.

Q.    During the end this conversation --

A.    Excuse me.  I'll go back.  It couldn't have been Ulysses, because it said we were not at work that evening, so we wouldn't have had chocolate cheesecake in the car.  So I'm sure Ms. Martin had it and we were going to go over there and get a piece.

Q.    Okay.  In the middle of Page 55, the conversation starts between yourself and Ms. Ali, and it continues on down to about the middle of Page 56,

and you're talking about, she ain't going to work

today.  I swear.  She had me, I was going to go to the

store and get me some bubbles and a pack of

cigarettes.  I said, Jackie, I had just come in here

and so forth.

        Who was Jackie?

A.    Jackie Terrell was the owner of the house at

Hayward Avenue in Takoma Park, and Ms. Martin lived in

her basement.

Q.    It appeared -- is it fair to say that in the

conversation, Ms. Martin appeared to be annoyed with

Jackie?

        MS. JOHNSTON:  Objection.  Leading.

        THE COURT:  Sustained.

        Ask another question.

        BY MR. MCKNETT:

Q.    Did you have occasion to observe the

interactions between Ms. Martin and Ms. Terrell --

Jackie Terrell?

A.    Yes.

Q.    Did you have occasion to form an opinion about

the relationship between Ms. Martin and Ms. Terrell?

A.    Yes.

        MS. JOHNSTON:  Objection.  Relevance.

        THE COURT:  Overruled.

THE WITNESS:  Yes.  Ms. Martin and Jackie
Terrell had a very good relationship, except Jackie
was annoying to some of us because she didn't like to
leave home once she got there.  So if we called, or
Ms. Martin was going out, or John was going out,
Jackie would constantly ask us to stop at the store
and pick up some bubbles -- champagne -- and
cigarettes for her.  So, sometimes we would tell her
different reasons that we weren't going to stay or we
weren't going in that direction, or we would make up
an excuse because we didn't want to stop at the store.
It got quite annoying, especially if she wanted you to
go back out.

Q.    There's a reference to "bubbles."  Did you say a
reference to bubbles was champagne?

A.    Well, yes.  My bubbles is champagne.  Correct.

Q.    Ms. Ali, please turn to Page 99 in the
defendants' transcript book.

A.    In whose book?

Q.    Defendants.  I'm going to ask you to juggle
books a little bit.  I want you to look in the
defendants' book --

A.    Defendants or government?

Q.    Did I say defendants?  I meant government.  The
first one is in the defendants book at Page 99; the

second, third and fourth will be in the government's
transcript book at Pages 138, 140, 158.

      I apologize.  I think they're in Book 1, but I
can't swear to it.

      MR. MARTIN:  Yes.

      BY MR. MCKNETT:

Q.    Do you have them there?

A.    138, 140, and what was the other one?

Q.    And 158.

A.    Yes.

Q.    Turn your attention first to the defendants'
book, Page 99, call, B1139.  Do you see that?

A.    Yes.

Q.    Ms. Martin says -- she's talking to her son,
Corus?

A.    Cyrus.

Q.    I'm sorry.  I'm trying to say it right.  I don't
think I've done it right yet, but I'll keep trying.

      Ms. Martin says to her son, I fixed a sweet
potato pie last night.  LaNora and all them came for
dinner.

      Was that correct?

A.    I know we went.  I don't remember who all were
there.  It could have been someone else, and it could
have been someone else before me or after me.

Q.    Do you remember what day of the week March --
well, the night would have been March 19; correct?

A.    Yes.

Q.    Do you remember what day of the week March 19
was?

A.    No, I don't.

Q.    Would you look at that calendar, please?

      MS. JOHNSTON:  Your Honor, we'll stipulate it
was the same day of the week as it was yesterday when
these questions were asked.

      MR. MCKNETT:  I didn't ask this question of Ms.
Ali yesterday.

      MS. JOHNSTON:  Of the detective, Sergeant
Sakala.

      THE WITNESS:  It's on a Saturday.

      BY MR. MCKNETT:

Q.    March 19?

A.    March 19 was a Friday.

Q.    Do you remember if Ms. Martin fixed a sweet
potato pie on March 19?

A.    Yes, I do.

Q.    Did she?

A.    Yes.  She fixed a complete dinner.

Q.    Turn your attention to the government's
transcript book, please, Book 1, and the first call

there I mentioned was A 367.

Do you have that there?

A.     Yes, I do.

Q.     It says at the top -- this is an excerpt.   It gives the excerpt information and then you say, wait a minute.   I told her I was coming by to get some pig's feet because that's all I could think of.   And she said, oh.   Call me before you come by.

The government's transcript has you stopping there.   And then Ms. Martin interrupts and says, Mm-hmm.   Then the government's book has you starting again, with quotes, saying, because you know what I want.

Do you remember Sergeant Sakala testifying that first you were making two separate comments, and that if he were to edit this page now he would take out the quotation marks because, you know what I want.   Do you remember that testimony?

A.     Yes, I do.

Q.     Does that fit your recollection of this conversation?

A.     No, it doesn't.

Q.     What is your recollection of this conversation?

A.     I was calling, talking -- I was talking with Jackie, and I'm saying that I'm coming by to get some

pig's feet.  I couldn't think of anything else to tell her, because that's what I was coming by for, and she said well, call me before you come by, because you know what I want.  And that's what she wanted was always champagne and cigarettes.

Q.    Then later on you say, so if you ain't there, is it all right if I get some?  Ms. Martin says yeah. You say, okay.  She says, okay.  And you say, all right, hon.  And she says, okay.  Then you both say good-bye.

When you said, so if you ain't there, is it all right if I get some, what were you referring to?

A.    The dinner from last night.  The pig's feet by dinner.  The dinner that we had the night before.

Q.    Leftovers?

A.    Yes.

Q.    At any time in your relationship with Ms. Martin, did she ever leave a package of drugs with Ms. Terrell for you to pick up later?

A.    No.

Q.    Was it the nature of the relationship between Ms. Martin, yourself and Ms. Terrell that either you or Ms. Martin would trust Ms. Terrell with drugs for you to pick up later?

A.    That's correct.  We would not trust Ms. Terrell

with drugs.

Q.    Is it fair to say that these four conversations related to nothing but you coming over to pick up some leftovers?

A.    That's correct.

Q.    And then the next -- the third part of this series, B1233 in the government's book at Page 140, a call that was placed on March 21 at 1:28 in the afternoon.  Ms. Martin says, okay.  I fixed your thing.  I have it with me, so you just call me.

       What was Ms. Martin referring to when she says, I fixed your thing.  I have it with me, so you just call me?

A.    That could have been food; could have been anything.

       MS. JOHNSTON:  Objection as what it could have been.

       THE COURT:  Sustained.

       BY MR. MCKNETT:

Q.    Do you have a recollection as to what Ms. Martin was talking about when she said that?

A.    Food.

Q.    Is this the food you were referring to in call A367 the previous evening?

A.    Correct.

Q.    Did you in fact go to Ms. Martin's house on the
evening of March 20, if you recall?

A.    I don't recall.

Q.    And then the last call in this set, call A394 in
the government's book, at Page 158 at 5:51 on March
21, which is the same day as the call on which Ms.
Martin says, I fixed your thing.  I have it with me.
Ms. Martin says, I can't wait, LaNora, till I get my
house.  I'm so sick of that.  I don't know what to do,
which appears to be a reference again to Jackie asking
Ms. Martin to run errands for her.

      Is that what it appears to be to you?

A.    Yes.

Q.    Then Ms. Martin says, when you get near, when
you get near the house, it's in the trunk of my car.
Just call me.  I'll come outside and hand you the bag
out of the trunk.  What was she referring to?

A.    In the trunk, I distinctly remember Ms. Martin
did have some sundresses and she knew that there was
one that I admired, and in the bag she was giving me
one of my early birthday dresses and it was a
sundress, a black, white and pink sundress, along with
some food.  That was in the bag in the trunk of her
car.  One bag had food in it, and one bag had a dress
in it.

Q.     In your relationship with Ms. Martin, when you were buying drugs from her, did she ever store eight ball quantities of drugs the size of a Jolly Rancher candy in the trunk of her car to your knowledge?

A.     I don't know what an eight ball looks like, except for you described it here in the courtroom here.  I never purchased anything from her from the inside of her car or received any drugs from the inside of the trunk of her car.

Q.     How would you receive drugs from Ms. Martin?

A.     In her home or in the basement.

Q.     She would hand them to you?

A.     Yes.

Q.     The very last part of this conversation -- the very bottom of Page 158, in any event, you say, that's okay.  I'll bring your necklace to you.  I got to help you bring them in too, okay.

       What are you talking about there?

A.     That's the incorrect word.  It's not "necklace," it was Nantuckets.

Q.     What are Nantuckets?

A.     They're nectar juices that were sold at Costco's, and we would go to Costco's and Ms. Martin -- they were one of Ms. Martin's favorite drink, and we would pick up those and take them to her house

after we purchased them.

Q.    Before you get to the last part of that
sentence.  Is that -- further up in that conversation
you say, okay.  Well, I got two juices -- two things
of juices for you, too.

A.    Yes.

Q.    Those are the Nantuckets?

A.    Correct.

Q.    And then at the bottom of Page 158 you say, I
got to help you bring them in, too, okay?

A.    Yes.

Q.    What are you referring to there?

A.    Two cases of Nantuckets.

Q.    How many bottles are in a case?

A.    Well, at Costco's they usually oversize.  So,
maybe 36 or 24.

Q.    They're heavy?

A.    Yes.

Q.    Big?

A.    Yes.

Q.    Ms. Ali, I want to turn your attention now in
the defendant's book to Page 101, call B141.  That's a
call between yourself and -- excuse me, between Ms.
Martin and Martha Jean West on March 23, '04 at 4:43
in the afternoon.  If you look at Page 102, Ms. Martin

says, I guess I can wear a medium.  Is it running true

to size?  Sergeant Sakala opined yesterday that was a

reference to, if I can paraphrase, different

manufacturers sizes may not -- there is no standards

that sizes may vary from manufacturer to manufacturer.

Remember that testimony?

A.     Yes.

Q.     Has that been your experience?

A.     Basically, a medium is a size 10 to 12.

Q.     Do you know what she was referring to when she

says, is it running true to size?

A.      If it was a medium, it was true to size.  So if

it was a medium, it was a 10-12.  Or if it was a -- it

could have been pus -- maybe it wasn't true to size.

Sizes vary.

Q.     Would you turn to Page 107, please, in the

defendants' book?  There are two calls, one at 1107

and one at 110.  You recall on 1107, it's call B1567,

which was made on March 5th '04 at about 6:37, and the

call B1568 was made on the same day about 14 minutes

later.  The first one, call B1567 you say to Ms.

Martin, nothing.  Listen.  I've got these two tickets

that I got to get rid of and "inaudible" because

Ulysses and I can't use them.  Then you continue about

D. C. and Tina going to Vegas and so forth.

Then on Page 110, call B1568, as I said, about 14 minutes later, you say you called Teresa earlier but she wouldn't answer the phone.  I told both of them, and then Ms. Martin says she's at Gene's.  You say no "inaudible" came home last night.  Oh, good. Then you say, so she -- they said they would take them.  Nobody else would seem like they wanted, but Teresa jumped on them.

What are you talking about there?  Are you're talking about tickets that you have to get rid of? What tickets?

A.    The year prior to that, I also went on a cruise, and we got bumped off a flight, and we received eight Air Tran tickets for being bumped off the flight.

Q.    I'm sorry.  Eight what?

A.    Eight Air Tran tickets, airline tickets for being bumped off the flight.  In total we received 16, but they were split with another couple, and we had to use them within a certain time period.  We had two left.  We were using the ones to go on the cruise prior, but we had two sets of tickets left.  I offered them to a friend, Tina, in D. C. and they refused them for other plans, and I was calling Ms. Martin to find out if she thought if it would be all right to ask her daughters if they would like to use the tickets.

Q.     What ultimately happened?

A.     Her daughter, Teresa, decided that they wanted
the tickets.

Q.     This didn't have anything --

A.     Excuse me.   These tickets were transferable.
Air Tran allows you to transfer tickets.

Q.     So this conversation had nothing to do with
drugs, did it?

A.     That's correct.

Q.     Turn if you would to Page 130 in the defendants'
transcript book, and at the same time to Page 265 in
the government's transcripts.   These relate to the
same call, call B2436, a call made on April 1st 2004
at about 6:42 in the evening.   It's between yourself
and Ms. Martin.   The government's transcript is just
the very end.   They've excerpted that out, so I'd like
you to look first at the defendants' book.

       MR. MARTIN:   What page, Mr. McKnett?

       BY MR. MCKNETT:

Q.     Page 130 in the transcript of the entire call in
the defendants' book.   Ms. Martin says, trying on some
things I had taken up.   You say, oh, the ladies
"inaudible."

       Do you know what that was a reference to?

A.     She had a seamstress that was taking clothes up

for her.

Q.    Is that the lady?  "The lady" is the seamstress?

A.    Yes.

Q.    Then you say, I'm going to get my toes done.  I got to have them ready for the cruise.

     Do you see that?

A.    Yes.

Q.    Is this the same cruise you were talking about before?

A.    Correct.

Q.    The cruise you were buying sundresses and casual clothes for?

A.    That's correct.

Q.    Then you say, but "inaudible" to call me, I'm still trying to stop by there.

     What did you mean by that?

A.    That I was going to stop by.

Q.    I stopped too soon.

     But I'm, you know, so I was getting ready to go get my nails, then I'll be by there later after that.

     Where were you going to stop by?

A.    To Ms. Martin's.

Q.    Were you going to stop by there to get drugs?

A.    Not necessarily, no.

Q.    Let's go down to the top of Page 132 which is

the section that was transcribed by the government.
You say -- she says, uh-huh.  So just the one
magazine.

     Well, let me put this in better context.  After
you say you were going to get your nails done and then
you will be by there after that, you talk about where
you're going to get them done it appears; is that
correct?

A.    That's correct.

Q.    And then you go back to you're going to stop by
after you get them done?

A.    That's correct.

Q.    So the conversation returns to that.

A.    Yes.

Q.    And then Ms. Martin says, so just the one
magazine?  And that's where the conversation returns
to you going to Ms. Martin's house; is that correct?

A.    That's correct.

Q.    And you say, that's all.  I got to make sure.
And then Ms. Martin says -- in the government's
transcript, Ms. Martin says, I need to know that
'cause I may have some people in here.  But in the
defendants' transcripts, Ms. Martin says, okay.  I
need to know that because I may have to keep it in
here.

Which of those two versions most accurately
reflects Ms. Martin's actual words as best you recall?

MS. JOHNSTON:  Objection.

THE COURT:  Overruled.

THE WITNESS:  In the defendants' book?  Okay.  I
need to know that, 'cause I may have to keep it in
here.

BY MR. MCKNETT:

Q.    She says, just the one magazine.  You say that's
all I got to make sure.

What are you and Ms. Martin talking about in
that portion of the conversation?

A.    Ms. Martin had a lot of magazines in reference
to clothing, shoes and cosmetic surgery, and I would
often share some of the magazines with her.  She was
in the process of getting cellulite taken care of, and
a lot of times when you came over there, especially
with me, I don't know if she did with other people,
she was always, girl, you need to get this done or
taken care of.  And she would show, you know, written
documentation that was about this, that her plastic
surgeon had given her, and I would share this with
other people, and I would read it myself and magazines
-- she had other magazines.  We also would share Jets
together.  I used to go and get Ms. Martin's Jet

magazines and read those and take them home.

Q.    If you know, why would she need -- why would she say, I need to know that 'cause I may have to keep it in here?

A.    Well, if it's in reference to the cellulite information, she shared that with everyone.  She didn't have a lot of pamphlets, and -- if there was a reference to the Jet magazines, Ms. Martin liked to talk a lot, and so she would get information to Jets and share them with other people.

Q.    Let me turn your attention to Page 187 in the defendants' transcript book.  It's call B3946.

A.    What page is that?

Q.    It starts on Page 187.  It's call B 3946, and it took place on April 19, '04 at about 5:56, and I want to turn your attention to specifically Page 191 and 192.  Do you see that?

A.    192 and 193?  Yes.

Q.    At the bottom of 191, Ms. Martin says, I need something to go work on.  LaNora's not home, her --

a.    I'm sorry.  Is that the defendants' book?

Q.    Yes.

A.    I'm sorry.  I have the wrong book.

Q.    This is a call between Ms. Martin and Martha Jean West again.

A.     Okay.

Q.     Ms. Martin says -- at the bottom of Page 191,
she makes a reference to working on LaNora some.  Your
birthday comes up in June.  Was Ms. Martin accurate on
that?

A.     Yes.

Q.     And then she says -- Ms. West says, what size?
Ms. Martin says, LaNora a 10 now?

A.     Correct.

Q.     That was a reference to your clothes size?

A.     Yes.

Q.     If you would, turn to Page 201, please, call
B3956.  This is a call that same day, April 19, about
8:38, and you're calling Ms. Martin and her answering
machine picks up.  Do you see that?

A.     Yes, I do.

Q.     Who is Janice?

A.     A friend.

Q.     You say, Janice on the other end.  What do you
mean by that?

A.     It was a two-way conversation.

Q.     She was wondering if you had any fat people
clothes, like a 16.  What did you mean by that?

A.     Janet asked me to ask Ms. Martin if she had any
fat people clothes.  That's how Janet described it,

size 16.

Q.     Is Janice a large woman?

A.     Yes, she is.

Q.     Turn to page -- in the defense book -- excuse me, in the government book, Page 346.  I'm not sure if we're still in Book 1 now.

       MR. MARTIN:  No.  You're in Book 2 now.

       BY MR. MCKNETT:

Q.     We're in Book 2 now.  Do you have it there?

A.     Yes.

Q.     Page 348.  Then the next call on page 348, they're calls A1224 and call A1226.  They both took place on April 21st '04.  The first one took place at 7:12; the second one took place at 9:01.

       In the first one, in the extract, Ms. Martin asks, you want -- you just wanted one ticket?  And then you say, that's, you pause, I'm going to make a phone call.  Ms. Martin speaks simultaneously and says, okay.  Let me know.  Then you complete the previous comment, to see.

       Is that what you're saying?  I'm going to make a phone call to see, okay, and Ms. Martin talks over you and says, okay.  Let me know.  And then -- what were you referring to "them?"

A.     You mean the ticket, or the phone calls?

Q.    The first, with reference to one ticket.

A.    Probably a 50.  One ticket would be a 50.

Q.    And then you say, I'm going to make a phone call
to see.

      What were you referring to then?

A.    Sometimes I would make a phone call to call to
see what my funds were like.  Even though Ms. Martin
made a tab and it was okay, that wasn't the business
that I always wanted to do.  So if I would -- if I had
the money to pay, if it was convenient for me to go
get the money or -- I would do that.

Q.    When you say make a phone call?

A.    Make a phone call or get on the computer either
one to check my account, my bank account.

Q.    Who would you be calling?

A.    The bank.

Q.    To talk to a person?

A.    No.  Automated services.

Q.    Did you do that often?

A.    Yes.

Q.    So you were checking to see how much cash you
had available?

A.    Yes.

Q.    You were going to let Ms. Martin know you wanted
one ticket which would be a 50 or a 125, depending how

much cash you had available?

A.     That's correct.

Q.     Were you going to call another person to see if that person wanted to buy something from you?

A.     No.

Q.     Did you ask anybody else to see if they wanted to buy drugs from you?

A.     No.

Q.     Did anybody ever call you asking to buy drugs from you?

A.     No.

Q.     Did you ever sell drugs to anyone?

A.     No, I did not sell drugs, Mr. McKnett.

Q.     Turn to Page 350, if you would, in the government's book.  That's the second call I referenced, call A1226 about --

A.     Page 350?

Q.     The call starts at 3:49.  It's almost two hours after that previous call, and starting on Page 350 it looks like you're calling Ms. Martin back and you say to her, I just realized.  Remember I told you I wanted the whole thing, but I only wanted part of it today?  And then there's a conversation about you put the wrong price in the book.  You put the wrong price in the book, $1.25.  Oh, you did.  I thought you put 50

in the book.  Ms. Martin says, you told me you wanted one of them today.  You say, yeah, yeah.  You say, but I thought you put the wrong price in the book.  And it goes on ,I'm just trying to look out for you, and so forth.

What was that conversation about?

A.    That was one of the times that I had purchased $125 worth, which would be three packages of -- three fifties, and I left it with Ms. Martin, and I would only -- I went back to get one.

Q.    And the thing about you put the wrong price in the book, 125, what was that about?

A.    I thought she put a 50 in the book, and she said she didn't; she put 125 in the book.  So I was trying to make sure that she wasn't being cheated.

Q.    Is that the book we talked about earlier that had the columns of numbers and dollar amounts and such in it?

A.    Yes.

Q.    Would you turn in the defendants' book to Page -- excuse me, in the governments's book to call B430?  And I have -- it's page 378.  Do you have that there?

A.    The defendants' book?

Q.    No.  I'm sorry, I misstated that.  Government's book.  Book 2, I believe, Page 378.

A.      Yes.

Q.      Again, it's an extract of the larger
conversation.  You say, I think we might go get some
crabs.  You want some?  Ms. Martin says, I'm waiting
on -- I'm waiting for my brother to take, take care of
some business.

        First of all, do you know who Ms. Martin was
referring to when she said "my brother?"

A.      Goody.

Q.      Mr. Goodwin?

A.      Mr. Goodwin.

Q.      Do you know what she was referring to when she
said, "to take care of some business?"  I'm waiting
for my brother Goody to take care of some business?

A.      No, I don't.

Q.      Do you know of any -- strike that.  I'll come
back to that issue.

        If you would turn now to the page in the
government's book, Page 382.  No, excuse me.  I made a
mistake here.  Yes, page 382 in the government's book.
This is a call on April 25, '04, about 10:17 in the
morning.

        Do you know what day of the week April 25 was?

A.      A Sunday.

Q.      This is a call between yourself and Ms. Martin,

and she says at the very beginning of the extract, I
think something went down Friday with them.  And then
you say, Peterson.  And she says, no.  Huh.  Huh.
Gwen.  And you say oh, oh.

        Who was Peterson?

A.    I don't know.  I don't recall.

Q.    And then she says Gwen, and you say, oh, oh.
You say, you ain't talked to her?  She says, I can't
get her.  You say zero.  Then there's a lot of talk
about Kevin and Gwen and Skip.  You ask, who's that?
Who's Skip?  A friend of Gwen, you know, Skip who used
to live with Granny and so forth.  Smack, they call
him Skip.  Smack, whatever.  You ask if he knows her,
Gwen.

        What was this conversation about?  Do you
recall?

A.    No, I don't.

Q.    Let me address your attention to the next call,
Page 0387 in the government's book, call B4430 which
is a call on the same day but about six and a half
hours later, again between you and Ms. Martin.

        You asked, you heard from Gwen?  Ms. Martin
says, she locked up.  You say, really?  Mm-hmm.  You
ask, what happened?  She says, I think she's involved
with that Julio thing.  And the conversation continues

to the next page where the excerpt ends.

Does that refresh your recollection about what the previous call was about?

A.    Yes.

Q.    What was that previous call about?

A.    Listening to this, what you're saying now, I didn't get a chance to turn to the pages in the book. Ms. Martin was telling me that Gwen Levi was locked up, and I listened to her.

Q.    Tell me again how you met Ms. Levi.

A.    I met her at the last fashion show that I went to, Harvey Star Washington's fashion show.  She was there.  Then I met her two to three times or -- at Paula's house with Kevin.

Q.    In the next call -- in that first call, B4393, is it fair to say that Ms. Martin is telling you something went down Friday night with them, and when she says "them" she's referring to Gwen?

A.    Yes.

Q.    Did you have any knowledge of why something would have gone down with Gwen on Friday night?

A.    No.  I just knew she was concerned.  She hadn't heard from Gwen, so I knew she was concerned about it.

Q.    Do you recall the next call, I think she's involved with that Julio thing?

A.     No, I don't.

Q.     And you said, really?  Then Ms. Martin says, I think Julio's told on her, I really do.

       Do you know what Ms. Martin was talking about when she said that Julio told on Gwen?

A.     No, I don't.  I didn't even know that they -- Julio knew Ms. -- knew Gwen.

Q.     Did you know Julio?

A.     Yes.

Q.     Who was Julio?

A.     He was a friend of Ms. Martin that lived with her at Bexhill Court.

Q.     Then you asked, did you tell Gwen that?  Ms. Martin says, huh?  I told Gwen a long time ago.  And you say, did you?  And then, did you know what Gwen was involved in that could have gotten her locked up?

A.     No, I didn't.

Q.     On Page 383 you say, I liked her too.  Seems like she's an up front person.  Ms. Martin says, she wasn't involved in that.

       What was Ms. Martin talking about that Gwen wasn't involved in?

A.     I have no idea.

Q.     Why were you continuing with the conversation?

A.     I was listening to her, and I was concerned,

too, about Gwen.   I met Gwen.   She seemed like she was

a okay person.   I didn't know her personally.   So,

after Ms. Martin -- if you know me, I am a very

concerned person.   I explained I'm the mother type of

my family and friends' circle, and Ms. Martin was

talking about her, so I was concerned about her.   I

asked had she heard from her?   And I just listened to

her and asked questions.

Q.    Ms. Martin continues on to say, she just

introduced him to the people that wanted the recipe to

the sweet potato pie.

       Did you know what Ms. Martin was talking about

there?

A.    No.

Q.    Were you curious?

A.    I don't think so.   I was just listening to her.

You know, Ms. Martin did a lot of talking, and so I

just listened.

Q.    B4480, on Page 231.

A.    In the government's book?

Q.    In the defendants' book, excuse me.

       Do you have it there?

A.    Yes.

Q.    This took place on April 26 at 2:58 in the

afternoon.   You're calling Ms. Martin.   You asked, do

you have anything that I can wear to a dinner dance,
black tie optional, size 10-12 -- excuse me, size 12,
10 or 12.

     What are you referring to there?

A.    Either I'm calling about myself or someone else
in reference to a black tie/after 5:00 dinner dress.

Q.    Are those your sizes?

A.    Yes.

Q.    Then at the bottom, Ms. Martin says, here.  You
asked, I didn't think so.  What you up to?  She says,
not a thing.  Here sewing some buttons on, tightening
up some buttons on a suit.

     What was she referring to there?

A.    That she was sewing buttons on a suit.

Q.    Did you know Ms. Martin to sew things?

A.    Yes.  Buttons.  And she might tack a hem back or
something.

Q.    Ms. Ali, I'm not going to ask you to look at all
these, but there is a series of calls that have to do
with letterhead.  Do you remember that?

A.    Yes, I do.

Q.    They start -- the series starts at B4662, on
Page 264.  I will read off the numbers and the page
numbers; that's in the defendants' book.  The first
one is B4662, on April 26, '04 at 7:23 in the evening.

The next one is -- excuse me, I misstated that.  B4662 is April 27, 2004 at 9:48 in the evening.  That's a call between Ms. Martin and Gill Williams.  The next one is a call on April 27, '04 at 9:59, a minute later that evening between you and Ms. Martin.  The third one is call B4670, the same day -- the next day -- excuse me, the same day, later that evening, later in the day between you and an unidentified male.

A.    What page is it?

Q.    It's on Page 267.

A.    Yes.

Q.    Do you remember hearing that call?

A.    Yes.

Q.    It says in here, "unidentified male."  Do you know who that actually was?

A.    Yes.  John Martin.

Q.    Then the next one is call B4671 on Page 270, the same evening, two minutes after the previous call.  It consists of, all right, bye.  Bye.

      Do you know why that happened that way?

A.    It was a continuation of the call, I guess.

Q.    Continuation of the previous call?

A.    Yes.

Q.    You're just saying good-bye to Mr. Martin?

A.    Yes.

Q.     The next call is B4687, the next day, April 28, at 7:05 in the morning.  You're calling -- excuse me, that's not in the sequence.  You can skip that one.

The next one is in the government's book, call A1363.  That's the one in which you're talking about an answering service to be placed.  Do you remember that?  It's on Page 402.

A.     Yes.

Q.     What were you and Ms. Martin talking about?

A.     Ms. Martin was trying to get the promotion business off the ground, and she really wasn't into technology.  She had one fax machine at her home, and I was trying to get her to purchase a second fax to place on South Dakota Avenue so when she sent her faxes out that represented the promotion business, that the numbers and the fax would come off the same machine instead of because the fax was on -- the fax letterhead was the same number that was at the studio.

Q.     Back to the defendants' book, if you would please, Page 281, call B4722.  That's also on April 28.  It's about an hour and a half after the call in which you discussed the fax machine.  Ms. Martin says, you going to fax it?  'Cause ain't gonna be in here that long.

Do you see that?

A.     Yes, I do.

Q.     What is it that you were gonna fax?

A.     The letterhead that I was creating for her.

Q.     You said, that man's at the school doing that thing.

       Do you know who "that man" was?

A.     Yes.  She often had a piano man go to the school to tune her two pianos there.

Q.     There's a reference later to the piano man.  Is that who that meant?

A.     Yes.

Q.     On Page 282, call B4739, which is at 139 in the afternoon, again on April 28.  That's just a fax tone.

A.     Correct.

Q.     That was from you to Ms. Martin?

A.     Yes.

Q.     What were you faxing?

A.     The letterhead.

Q.     The first draft?

A.     Yes.

Q.     The next call in the defendants' book, call A1389, again on April 28, and it's about three minutes after you faxed over the draft letterhead.

       What are you and Ms. Martin talking about there?

A.     I was talking about if there are any faxes need

to be done, if the letter -- if the letter was too --
letterhead type was too small, or if she wanted to
make -- wanted me to make it larger, and I was
confused about the name, if it was PT -- PMT or PM-1,
and she corrected me on that which was PM-1, same as
her license plate tags.

Q.    About six minutes after that, there's another
fax tone, Page 285.  And then several minutes after
that, there's another fax tone on the same day.  Do
you -- what were you faxing -- these were from you to
Ms. Martin; is that correct?

A.    That's correct.

Q.    What were you faxing to Ms. Martin?

A.    Completed letterhead.

Q.    Call B4766, again on April 28, it's about 6:07
in the evening.  What were you and Ms. Martin talking
about there?

A.    I don't have that one.  Is that in the
defendants' book or in --

Q.    In the defendants' book, Page 287.

A.    I don't have that.  Oh, I see.  I'm sorry.
Asking if she received the fax copies.

Q.    Then on -- in that same call, on Page 289, Ms.
Martin says, I got to go back to the school, let that
man out of the school.  You say, the piano person?

Is that the man you were talking about in the previous conversation?

A.     Yes.

Q.     Page 303 in the defendants' book, call B4906.

A.     343, you say?

Q.     303.  Do you see that there?

A.     Yes.

Q.     Is this more conversation about the letterhead that you were faxing?

A.     That's correct.

Q.     And then finally in this series of calls, B4907 on Page 305.  Do you see that there?

A.     That's correct.

Q.     What is Ms. Martin asking you to do in the middle of that page?

A.     She says, do me one saying PM-1 Entertainment and that black box at the top, too.

Q.     What did she mean by, do me one saying PM-1 Entertainment?

A.     She wanted me to place it at the top -- in the black box at the top.

MR. MCKNETT:  May I approach the witness, Your Honor?

THE COURT:  You may.

BY MR. MCKNETT:

Q.    Ms. Ali, I'm presenting to you what's been
marked as Defense Exhibit Ali 5?

        THE CLERK:  Yes.

        BY MR. MCKNETT:

Q.    Do you recognize that?

A.    Yes.  That's the fax sheet that I completed for
Ms. Martin.

Q.    Is this the second one that she asked you to do
--

A.    Yes, it is.

Q.    -- in that last conversation?

A.    Yes.

        MR. MCKNETT:  May I publish, Your Honor?

        THE COURT:  Yes, you may.

        BY MR. MCKNETT:

Q.    Ms. Ali, did you have anything to do with
preparing time sheets for Ms. Martin's business?

A.    No.

Q.    Did you ever participate in preparing time
sheets?

A.    No, I did not.

Q.    Did you ever have any telephone conversations
with Larry Nunn about preparing time sheets?

A.    No, I did not.

Q.    Did you ever have any conversations with Larry

Nunn?

A.     No.

Q.     Telephone conversations?

A.     No.

Q.     Your Honor, are we going to keep going?  I want to turn back a little bit in the defendants' book, turn Ms. Ali to page -- excuse me, I'm looking at the -- I'm looking in the government's book.  It's at Page 408, call B4706.

       Do have that there?

A.     Yes.

Q.     This is a fairly lengthy call.  It's from Ms. Martin to you.  Your husband answers first; correct?  They have him identified as "Ulysses Ali," but that's not accurate; is it?

A.     No, it's not.

Q.     Your husband never went by the name "Ulysses Ali," did he?

A.     No.

Q.     So it should be "Ulysses Garner?"

A.     Yes.

Q.     He picks up the phone, and then you get the phone from him; is that correct?

A.     That's correct.

Q.     Take a look, if you would, and review this

conversation and tell me if you know what this conversation is about, specifically what Ms. Martin is talking about.

A.    Yes.

Q.    What was Ms. Martin talking about there?

A.    She was talking about some people from California -- I don't know if they were detectives or what -- who had come around questioning her about Steve Brim.

Q.    What were they questioning her about with regard to Mr. Brim?

        MS. JOHNSTON:  Objection.

        BY MR. MCKNETT:

Q.    If you know.

A.    About his death.

Q.    Why would Ms. Martin say, at the top of Page 409, they here, uh-huh.  I got the card and all.  I show you -- if you know why she said this, Ms. Martin said, they here, uh-huh.  I got the card and all.  I show you when I see you.  I just didn't want to say anything in front of your husband.

        MS. JOHNSTON:  Objection, as to why Ms. Martin would say something.

        MR. MCKNETT:  I asked if she knew.

        THE COURT:  Sustained.

BY MR. MCKNETT:

Q.    Do you have a reason to form an opinion as to
Ms. Martin would say that to you?

        MS. JOHNSTON:  Objection.

        Her opinion is irrelevant.

        THE COURT:  Sustained.

        BY MR. MCKNETT:

Q.    At the bottom of Page 411, Ms. Martin says, she
-- that's why I called Gene.  I called Lou and them.
I said, you all better beware because, you know, you
never know.  And she continues on a little bit.  What
was Ms- -- if you know, what was Ms. Martin
communicating to you?

A.    That she's given up different people's names to
the detectives that had come to see her.  And when I
eventually arrived over there with my husband, she
explained.

        MS. JOHNSTON:  Objection as to what Ms. Martin
told her.

        THE COURT:  Sustained.

        MR. MCKNETT:  Your Honor, the government has
proposed this conversation as being in furtherance of
the conspiracy.  I think my client should be able to
explain --

        THE COURT:  Not with hearsay statements, no.

BY MR. MCKNETT:

Q.    We'll move on, Ms. Ali.

Ms. Ali, please turn to Page 365 in the
defendants' book.

MR. MONTEMARANO:  Your Honor?

MR. MCKNETT:  Thank you, Mr. Montemarano.

MR. MCKNETT:  This was the one that we talked
about earlier today, and I need to pass these out to
the jury.

MR. MARTIN:  Your Honor, in light of that, my
client wants to know if we can take a break.  He needs
to --

THE COURT:  We're only going to go to 4:00,
another 15 minutes.

MR. MONTEMARANO:  When Mr. McKnett is done with
this, can we be heard at the bench, please?

MR. MCKNETT:  Finished passing these out?

(At the bar of the court.)

THE COURT:  Yes, sir.

MR. MONTEMARANO:  With regard to that last
conversation, Mr. McKnett was seeking to have his
client explain, and the government sought to admit it,
and the court has admitted it as a statement between
two coconspirators.  We have one of the coconspirators
on the stand.  That person can testify as to what she

said but not as to what she understood the alleged
coconspirator to be saying.  They cannot seek to
introduce a statement, propose a meaning for it, and
when the defendant then takes the stand preclude,
under the same idea, the explanation of it by that
person.  She is entitled to explain what she
understood this to mean as much as my client could
explain what she understood Ms. Ali to mean if she
were to take the stand.

MS. JOHNSTON:  The government's objection was as
to what Ms. Martin told her when she went over to the
house.

THE COURT:  That's what I was sustaining the
objection to, not the conversation but what she said
when she went over to her house.

MS. JOHNSTON:  To be admissible under the
coconspirators' exception, it has to come in as a
statement against interest, and it comes in as
coconspirators because it's being part of a conspiracy
admission of one is an admission of all, so that
doesn't come in under these circumstances.

THE COURT:  I think you misunderstood what I
sustained the objection to.

MR. MONTEMARANO:  That's entirely possible, Your
Honor.

THE COURT:  Mr. McKnett, how much more have you got to do?

MR. MCKNETT:  I think I can finish up the transcripts by 4 o'clock, Your Honor.

THE COURT:  I mean her direct.

MR. MCKNETT:  Just the transcripts.  There's more to go.

THE COURT:  How much more do you have to go?

MR. MCKNETT:  I have to go into her arrest, and I have to go into some of the incidents that the government says was --

MS. JOHNSTON:  We are going to object to any questions concerning her arrest.  We have not taken any testimony regarding her arrest, and so the circumstances of her arrest are irrelevant here.

THE COURT:  The only thing you can get out about her arrest is the time.

MR. MCKNETT:  That's what I intend to get  into, where she was, when she was there, and what happened.

THE COURT:  You've got to move it along.  You're really dragging.

MR. MCKNETT:  Your Honor, the government spent a month on transcripts, and I've spent an hour and a half.

MS. JOHNSTON:  Not only that, Your Honor --

THE COURT:  You're dragging it out.

MS. JOHNSTON:  He's gone over calls where
Sergeant Sakala agreed they were clothing calls and
agreed the calls were about the Las Vegas trip.  I
don't understand why we're going through it.

MR. MONTEMARANO:  The fax calls were about
faxes.

MR. MCKNETT:  There is a few more calls, and I
will be done about the calls, but the government spent
a month on this.

THE COURT:  Can Mr. Goodwin wait until 4
o'clock?

MR. MONTEMARANO:  I think so.

THE COURT:  All right.  Well, I'm not going to
go much beyond 4:00.

MR. MONTEMARANO:  I hope.

MR. MCKNETT:  I hope not to do that myself, Your
Honor.

(Back in open court.)

MS. JOHNSTON:  Your Honor, may we inquire if Mr.
McKnett is finished with those drug exhibits that were
here?

MR. MCKNETT:  Yes.

THE COURT:  Okay.

MR. MCKNETT:  Your Honor, if I may continue.

THE COURT:  You may.

BY MR. MCKNETT:

Q.    Ms. Ali, we've just passed out call B5726, Page 365 in the defendants' book.  It's a conversation between yourself and Ms. Martin on May 6, 2004 at about 3:35 in the afternoon.

Do you recall where you were at the time you made this call to Ms. Martin?

A.    Yes.  I was at my girlfriend Renee's house.

Q.    There's a reference to Joyce.  Who was Joyce?

A.    A friend of mine.  No.  In reference to this, it could either be a friend of mine or the person that I was at her house.  Renee, her mother's name was Joyce.

Q.    Could you pull the mike a little closer?

A.    Yes.  It could have been Renee's mother who passed on, her name was Joyce, or it either could have been a friend of mine named Joyce.

Q.    Then you asked Ms- -- toward the end, you asked Ms. Martin if she talked to Gillie today and she says, no.

MR. MARTIN:  Where are you, counsel?

BY MR. MCKNETT:

Q.    I'm at Page 366.

Just before that, you say, I'm going to stop by before I leave -- after I leave here.  Are you going

to be there?

       Right?  Do you see all that?

A.     Yes.

Q.     And then the government played a two-line
excerpt, call B5728, on Page 455 in the government's
book.

A.     Say that again?  I'm sorry.

Q.     Page 455 in the government's book, Book 3.  That
call was about three minutes after the one where you
said you were at Joyce's house --

A.     Yes.

Q.     -- and you said you were going to stop by.  The
excerpt reads that you say hello.  I guess Ms. Martin
is calling you.  She says, uh-huh.  Did you want
tickets when you came out here?

       Do you remember that?

A.     I don't remember.  I see what's in the
transcript.

Q.     Do you remember what you said?

A.     No.  I didn't say anything.  I don't remember
saying anything.  I was just stopping by to see Ms.
Martin.  It was on the way home.

Q.     Do you remember if you actually stopped by there
and picked up any drugs that day?

A.     I don't recall.

Q.    Government book Page 497, call B603, a May 11, call from you to Ms. Martin at about 4:35.  You say on Page 497, I'm going to come by see you this evening. Ms. Martin says, okay.  Then there's some more talk about food and such, Ms. Martin's son.  Then you say -- on Page 498, you say, all right.  Well, one this time.  What he got good over there?  He still bringing clothes?  Ms. Martin asks who, Kevin?

      Do you recall what you were communicating to Ms. Martin in that conversation?

A.    If I said "one," I was probably speaking of a purchase of a 50, a half a gram, which is $50 from Ms. Martin.

Q.    Call A1670 in the government book, on Page 525. This is the May 16 call at about 5:50 in the evening.

      Do you recall what day of the week May 16 was?

A.    Yes, I do.  I'll just make sure.  Sunday.

Q.    This is a call in which Ms. Martin says she wants you to assist her in taking something to the school; correct?

A.    That's correct.

Q.    I'll come back to this incident.

      In the government book, Page 563, call B7224, at the bottom of the page.

A.    What page is that?

Q.     563.  At the bottom, Ms. Martin says, I don't
even want to stress that issue with girlfriend
upstairs.

       Do you know what Ms. Martin was communicating to
you?

A.     Yeah.  She was concerned about people talking in
the neighborhood.  And here again, I was asking
questions, did you say anything to Jackie?  And she
says no, she didn't want to stress with her because --
well, I know she didn't want to bring problems -- more
problems go into Jackie's home.

Q.     You're talking about the neighborhood.  Is that
in reference in the middle of the page, you haven't
heard anything about the lady next door or anything?

A.     That's correct.

Q.     And later you say, they didn't have -- you don't
know about the meeting or anything?

A.     That's correct.  They were supposed to have a
neighborhood meeting.

Q.     That was about -- from previous testimony, that
was about concerns about foot traffic in and out of
Ms. Martin's house?

A.     That's correct.

Q.     Page 578 in the government's book, May 21 call,
B7385.  Ms. Martin says to Ms. Dobie, LaNora is

picking me up.  We going out to Ruth's and eat crabs.
I'm not gonna be here now.

Then the next call, Page 579, call B7396, same
day, at 5:30, about an hour and a half after the
previous call.  Ms. Martin says to Ms. Dobie, I been
out of here.  LaNora just brought me back, because we
getting crabs to eat this evening.

Do you know what day of the week May 21st is?

A.    Friday.

Q.    Where would you have been around 4:06 in the
afternoon on a Friday, May 21st?

A.    Either at a meeting, or at the after-care
program.

Q.    So you would not have been going out with Ms.
Martin to eat crabs.

A.    Not during that time.

Q.    In defense book, call B733, on Page 387, do you
see that?

A.    Yes.

Q.    This is a call on May 25 at 4:23 in the
afternoon.  There's a reference -- you say to Ms.
Martin about 2/3 of the way down the page, Ulysses has
something from the -- you say, that's good tonight if
I can get you to do it for me.  Ulysses has something
from the IRS at the post office that's certified.

What were you telling Ms. Martin?

A.   That there was a certified letter at the post office on Holbrook or started at Langley Park, and because after hours -- late hours that I was not able to pick it up, and I was asking Ms. Martin if I left Ulysses' ID and a letter, would she pick the certified letter from the IRS up for us.

Q.   Did Ms. Martin agree to do that?

A.   Yes, she did.

Q.   You say later in this conversation, I'll probably drop that by tonight.  What -- that's on Page 389.

What are you referring to there?

A.   Dropping by the identification and the letter signed by Ulysses.

Q.   Why couldn't Mr. Garner go get the letter?

A.   Because we both were at work, and the post office closed, like, between the hours of 5:00 and 5:30, and we weren't able to get it, and we wanted to get it to see what this certified letter was in reference to.  We knew it was from the IRS but wanted to make sure we had the contents of the letter.

Q.   If you turn to the government's book, Page 599, please.  That's a call the next day, May 26, B7815. It's at 12:19 in the afternoon.  Do you see that?

278

A.     Yes, I do.

Q.     At the top of that conversation, the government's extracted portion, you say, good.  Good.  Did -- were you able to get -- Ms. Martin interrupts, says, yeah, I have it "unintelligible" yeah I have it.

A.     I'm sorry, I'm on the wrong page.

Q.     Page 599.

A.     In the government's book or defendants'?

Q.     Government's book.

A.     599?  Call B7815?

Q.     Yes.

A.     Oh, good, good, good.  Yes.  I'm sorry.

Q.     Do you see that?

A.     Uh-huh.

Q.     What were you and Ms. Martin talking about when you said, were you able to get it and she says, yeah, I have it.  Yeah, I have it.

A.     I was speaking in reference to the IRS certified letter at the post office, and she was letting me know that she had it.

Q.     Were you talking about drugs?

A.     No, I wasn't.

Q.     Were you asking Ms. Martin if she had just gotten a new supply of drugs?

A.     No.

Q.    Were you indicating to Ms. Martin that you
wanted to get drugs?

A.    No.

Q.    At the bottom of that page, Ms. Martin says,
okay, now, look.  I may not be here, but I'm going to
leave it.  If I leave if, I leave out for y'all get
here, I'll leave it with Jackie.

      What was Ms. Martin telling you?

A.    That she was going to leave the letter --
certified letter with Jackie.

Q.    Was she saying that she was going to leave drugs
with Jackie for you?

A.    No.  That wasn't the arrangement we made.

Q.    Did you -- did Ms. Martin ever leave drugs with
Jackie for you to pick up?

A.    No, she did not.

Q.    Did she ever leave drugs with anyone else?

A.    No, she did not.

Q.    Ms. Martin, we're almost there.  Ms. Ali, we're
almost there.  Ms. Martin, too, we're almost there.

      Call B7757 in the defendants' book, at Page 391.
This is a call in which you're talking to Gill
Williams on May 25, '04 at 7:57 in the evening.  Do
you see that?

A.    Yes.

Q.    You're talking about $75.  Tickets.  You say you got tickets.  He says he was going to call and get you some.  You said, you get me some 75 top of the line, I'll sell my tickets at the door.  You say, I got tickets, and so forth.  It goes on for a while.

Were you talking about drugs?

A.    No, I wasn't.

Q.    What kind of tickets were you talking about?

A.    Tickets to the Essence Music Festival in New Orleans, held at the Super Dome.

Q.    Did you attend that festival?

A.    Yes, I did.

Q.    When was that?

A.    July 2004.  July 4th weekend, 2004.

Q.    That was after you were released from custody, as we heard yesterday?

A.    Yes.

Q.    In the government's book, Page 610.  This is call B8064.  It took place on May 28, which is three days before you were arrested, at 9 o'clock at night.  The call is primarily between Mr. Whiting and Ms. Martin, but you answered the phone.

Do you remember that?

A.    Yes.

Q.    After you handed the phone to Mr. Whiting, did

you overhear any of the conversation -- excuse me,
handed the phone over to Ms. Martin, did you hear any
of the conversation?

A.    No.

Q.    What did you do?

A.    I gave the phone to Ms. Martin.

Q.    Then where did you go?

A.    Could have been talking to my husband if there's
anybody else there, or gone upstairs and speak to
Jackie.

Q.    Finally -- I'm sure we're all glad to hear that
word -- B8110 in the government's book, at Page 612.
This is a call on May 29, 2004 at 11:05 in the
morning.  Do you remember what day of the week that
was?

A.    Call B8110?

Q.    Yes.  Page 612 of the government's book.

A.    On a Saturday.

Q.    So on a Saturday morning, you're calling Ms.
Martin; there's some talk about jerk chicken and food
and food in the refrigerator and Mr. Martin eating the
food that Ms. Martin was looking for.  At the top of
Page 613, you say to Ms. Martin, but I need to another
dress.  Okay.  Ms. Martin says, okay.  You say, okay,
yeah.  So, with the ties for, and then you're

interrupted and Ms. Martin interrupts you by saying,
hey, I've been to school this morning already.  I've
been to school this morning at 6o'clock.  And you say,
were you?

      When I talked to Sergeant Sakala about it, I
asked him if it was possible that you had not finished
your comment when you said, but I need to another
dress, before Ms. Martin said, okay.  It's clear that
when you say so with the ties for her that she
interrupted you.

      What were you telling Ms. Martin in that
conversation?

A.      That I needed another sundress, another dress.
As I told you, she had already given me one dress, a
early birthday gift, and I wanted another dress with
the ties that tied around the neck.

Q.      How do they tie?

A.      Around the neck.

Q.      Similar to the dresses that you were talking
about before you went on your cruise?

A.      That's correct.

Q.      Were you telling Ms. Martin that you needed more
drugs when you said "another dress?"

A.      No.

Q.      When you said, so with the ties for, were you

telling Ms. Martin that you wanted her to cook you some crack?

A.     No.

Q.     Did this conversation have anything to do with drugs?

A.     No, it did not.

       MR. MCKNETT:  Ms. Ali, I think this would be a good place.

       THE COURT:  That is perfect.

       All right.  Ladies and gentlemen, we'll be in recess until Tuesday morning at 9:30.  Please remember, as we get near the end of the trial, it's especially important that you not begin to talk about this with anybody or amongst yourselves until the deliberations actually begin.  We will see you Tuesday morning.

                  (Jury excused at 4:06 p.m.)

## CERTIFICATE

I, Tracy Rae Dunlap, RPR, CRR, an Official Court Reporter for the United States District Court of Maryland, do hereby certify that I reported, by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the Jury Trial Proceedings in the case of UNITED STATES OF AMERICA versus PAULETTE MARTIN, et al, Criminal Action Number RWT-04-0235 on August 4, 2006.

I further certify that the foregoing 284 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, of said proceedings.

In witness whereof, I have hereto subscribed my name, this 24th day of April 2008.

_____

TRACY RAE DUNLAP, RPR, CRR
OFFICIAL COURT REPORTER