UNITED STATES DISTRICT COURT OF MARYLAND
SOUTHERN DIVISION

```
--------------------------x
UNITED STATES OF AMERICA   :
          Plaintiff        :
                           :
                           :
vs                         :Criminal Action:RWT-04-0235
                           :
                           :
PAULETTE MARTIN, et al     :
          Defendants.      :
--------------------------x
```

Tuesday, August 8, 2006
Greenbelt, Maryland

The above-entitled action came on for a Jury
Trial Proceeding before the HONORABLE ROGER W. TITUS,
United States District Judge, in courtroom 4C,
commencing at 9:28 a.m.

THIS TRANSCRIPT REPRESENTS THE PRODUCT
OF AN OFFICIAL REPORTER, ENGAGED BY
THE COURT, WHO HAS PERSONALLY CERTIFIED
THAT IT REPRESENTS THE PROCEEDINGS, AS RECORDED
AND REQUESTED.

APPEARANCES:

On behalf of the Plaintiff:

DEBORAH JOHNSTON, Esquire
BONNIE GREENBERG, Esquire

On behalf of the Defendants:

MICHAEL MONTEMARANO, Esquire
ANTHONY MARTIN, Esquire
MARC HALL, Esquire
TIMOTHY MITCHELL, Esquire
PETER WARD, Esquire
EDWARD SUSSMAN, Esquire
HARRY MCKNETT, Esquire

Tracy Rae Dunlap, RPR, CRR            (301) 344-3912
Official Court Reporter

I N D E X

|                    | DIR | CROSS | REDIR | RECROSS |
|--------------------|-----|-------|-------|---------|
| LaNora Ali         | 28  | 49    | 211   | 228     |
| Harvey Washington  | 240 | 246   | 255   |         |
| Det. Thomas Eveler | 256 | 264   | 291   |         |

|                        | Page |
|------------------------|------|
| Reporter's Certificate | 314  |
| Concordance            | 315  |

THE COURT:  Counsel, before we bring in the jury, I had a couple of issues I wanted to discuss with you.  We're getting near the point where we're going to have to select our final jurors and decide who stays on and who doesn't.  We have been advised by juror Number six that his mother-in-law is about to die of breast cancer and that his wife is going to some out-of-state location where the mother-in-law lives and he wants to go with her, and that trip is Thursday.

The other matter you've already been told about which was the younger student in the back who has a trip to Spain  and he's leaving on a Friday and has to be out of here by two to go to the airport and in addition he can't be here the next two weeks.  I'm inclined to do the following, which is to not excuse them and keep them as alternates who are subject to recall.  In other words, have them here all the way to the end of the closing argument, but at the end of that process tell these two that they are discharged as alternates and that they will be subject to recall in the highly unlikely event that one of the deliberating jurors for some reason of health or otherwise has to be replaced, in which case this person could be recalled. We wouldn't waste a juror and the jury would be instructed, as would be the case if that were to happen

that they would begin the  deliberations in the case

anew.  That's my inclination on that.  You don't have

to voice your opinions on that, but think about that.

There has also been various concerns expressed

about the juror in the back row who had been in the

wrong place at the wrong time in the lawyers' lounge

and then had heard a conversation about people arriving

late.  I haven't heard any motions on her, but if we

have one more alternate to go -- if we let her go or at

least re-designate her as an alternate, so think about

that and we can talk about that on a break.

Now, if I understand correctly we're about to

wrap up the direct of Ms. Ali this morning.

MR. MCKNETT:  That's correct, Your Honor.

THE COURT:  We will have cross-examination by

other counsel and government with any redirect, and my

understanding at that point is that's the last defense

witness.  Is that right?

MR. MCKNETT:  Your Honor, there is one

administrative issue we need to address.  I believe

it's the court's -- at one point it was the court's

understanding that we were going to bring in the people

who prepared our transcripts.

THE COURT:  Right.

MR. MCKNETT:  If the court still wants to do

that, they will be here about 10:30 this morning.

THE COURT:  You know, I think those transcripts are going to be viewed the same way the government's transcripts are, and Ms. Johnston just waved her head "no", so I'm not going to require that.

MR. MCKNETT:  Can I have just a short break to call them and tell them they don't have to come down, Your Honor?

THE COURT:  Yeah, you can do that.

Now what I did want to find out -- my understanding, Ms. Johnston, is there may be some rebuttal witnesses.

MS. JOHNSTON:  Yes, Your Honor.  Yes, sir.

THE COURT:  Short rebuttal witnesses?

MS. JOHNSTON:  I would like to think they're short, but I can't vouch for cross-examination.

THE COURT:  I have reviewed over the break some requests for additional or modifications to instructions, and I wanted to tell you where I am on that and also where I am on the verdict form.  I have considered the request I instruct the way the original Sand & Siffert instruction is on the original instruction -- what is it?  843, I think it is.  I'm not as well organized with one arm as I usually am. Yes, the 843 instruction.  I have reviewed the

authorities on that, and at least as of the moment --
I'm not going to debate about this now, but I'm
inclined to stay with it the way it is and not change
it.

I have also considered the instruction request
made by counsel for LaVon Dobie that I give a lesser
included offense instruction.  I have considered that
and I've considered the cases cited that have been
brought to my attention on that which include an
unpublished decision of the Fourth Circuit that applies
to some of these cases in the specific context of a
conspiracy, and I'm inclined to believe that she is
entitled to a lesser included offense instruction.  If
the government has other authority it would like to
designate, I will listen to it, but my concern is if
Ms. Dobie is entitled to a lesser included offense
instruction on conspiracy, which is the only thing
she's asked for, why would not a lesser included
instruction be appropriate on the possess with intent
to distribute count, and why would it also not be
appropriate as to the defendants Ali and Harden?  So,
those are my questions for you.

MR. MCKNETT:  Your Honor, if I may very briefly
respond first on behalf of Ms. Ali.  Ms. Ali and I will
discuss -- we have discussed that issue and we have not

come to a firm decision yet; but we will do so before
the end of business today.

THE COURT:  All right.  Let me just tell you
what my quandary is.  I don't want to be looking
hopelessly inconsistent in giving a lesser included
instruction as to some but not all to whom it might be
entitled.  If my understanding on the law on the lesser
included offense instruction is correct, it is if there
is evidence before the court that would permit that
verdict that it may be appropriate to give that
instruction, not otherwise.  Based upon my view of the
so far, incomplete record, but I'm not sure this is
going to change, it would appear that if a lesser
included offense instruction is appropriate, it would
be appropriate at least insofar as what's been placed
before me now is concerned, certainly as to Ali, who is
alleging that her possession was solely for possession
purposes and put on forceful testimony to that extent.

The same effect with Ms. Dobie, who said the
same thing, and at least inferentially by Ms. Harden.
I don't see evidence that would support a lesser
included offense instruction as to any other defendant.
My concern is if I give it as to one on the possession
with intent to distribute count or the conspiracy count
and not as to others, that is going to be very

confusing to the jury.  Those are my thoughts on those
issues.

     The next thing I wanted to tell you about is I
have a lot of concerns about the verdict form.  The
first concern I have about the verdict form is that the
charge in this case in the indictment that we're
operating under is -- for example, jury verdict
question number 36 asks, how do you find the defendant,
Learley Goodwin, as to Count Two, distribution of
cocaine base?  The actual charge is possession with
intent to distribute.  So, for openers, the whole
verdict form has to be reviewed to change all of these
descriptions of the counts as being distribution, to
change them to possession with intent to distribute.

     MS. GREENBERG:  We can do that, Your Honor.

     THE COURT:  The second thing is, I really think
that for ease of reference by the jury that the verdict
form, especially with so many defendants, should be
arranged by defendant so that they first go through a
series of questions as to defendant one, then defendant
two, and defendant three.  I know this has been put in
the order in which they appear in the indictment, but
it goes all over the place hopscotching back and forth
between defendants, and I think it's just a word
processing question to switch it around so we go by

defendant.

I mean, they're going to be listening to defenses that have been put on by defendants individually; they're going to be listening to argument by defendants, and then to have a verdict form that does it in counts of an indictment that they're not going to get a copy of makes it confusing.

MS. GREENBERG:  Your Honor, I think the other way would be more confusing, because some of the defendants are charged with being in a phone conversation.  For example, a telephone count.  If we have, you know, Paulette Martin in the beginning of the indictment and we're talking about that telephone count, and then three pages later where she has Ruby Harden on that same telephone count, it's going to be even more confusing.  My summary is by count because that's -- goes first of all by date.  It's the earliest to the end of the conspiracy.  It follows the book.

THE COURT:  Let me hear what the other side says.  Also, if I resolve this so that a lesser included offense instruction is appropriate, it will magnify this verdict form even more.

Mr. Montemarano.

MR. MONTEMARANO:  Your Honor, I think in terms of the actual return of the verdict, what's handed in

and goes in the court file, probably the one in the current format makes sense for the sake of them understanding it and working on it, it seems that  Your Honor's idea makes sense.  In other words, they should have the other verdict to work through and then fill in the actual verdict form and then turn in the one that's in the current form.  I almost think they need be both, because -- I mean, with all due respect, Your Honor, there's 62 counts.  If you conceivably count defendants, we're up to 100, because many of the defendant counts have multiple persons, and it's 100 separate decisions they have to make, and anything that makes it easier.  Otherwise, we will spend several days while they do --

          THE COURT:  I'm not sure how I can give them a real verdict form and hypothetical verdict form.  I have to give it to them one way or the other.

          MR. MONTEMARANO:  A worksheet.  That is what I'm suggesting is they need a worksheet, as Your Honor as noted, because they will spend hours.  By delivering the verdict, they will be delivering it Count One, each defendant, "yes" or "no"; Count Two, the named defendant; Count Three...

          THE COURT:  Your view is leave it the way it is, the way the government suggests, but also prepare a

cheat sheet as it were?

          MR. MONTEMARANO:  Otherwise, with all due
respect, the government gets to go back to their
office.  They can do a lot offer things while they're
waiting for the verdict.

          THE COURT:  Why don't my law clerk and I put
together a chart, as it were, that goes by defendant,
by charge, and then as to those charges reference it to
the verdict form number -- the question number on the
verdict form?

          MR. MONTEMARANO:  That would be fine.  I think
something like that would be of assistance, and it
didn't even occur to me until Your Honor brought up the
verdict form.  We're so used to it because we're so
used to looking at the indictment --

          THE COURT:  When they look at it as they go
through their deliberations, they can then transfer it
on to the verdict form in the right place.  That's the
way they're going to hear the arguments.

          Yes, Mr. McKnett.

          MR. MCKNETT:  Your Honor, on behalf of Ms. Ali,
I think Ms. Greenberg is correct that there is the
possibility of confusion with regard to the telephone
counts, but I think Mr. Montemarano's suggestion of a
"cheat sheet", for lack of a better term, is an

appropriate --

THE COURT:  What I want to do is this.  I want to get Ms. Ali on the stand and get her off the stand and do that promptly.  I just wanted to highlight the issues for you.  We will need to talk about them as soon as possible.

What I'm hopeful is that I can instruct today.  But in order to instruct today, I've got to get final resolution of a the lesser included offense issue.  I'm prepared to rule that I'm not going to give the instruction requested on Section 843, but I'd like to know what the position of the parties are on the lesser included offense so I can start acting on it.

MR. MCKNETT:  Your Honor, just for the sake of completeness on the lesser included, I'm not suggesting that the court should, but there is ample authority that the court can on its own motion give that instruction if the court thinks it's appropriate.

THE COURT:  I'd like to hear what everybody thinks before I make my own mind up about it.

MR. MONTEMARANO:  Your Honor?

THE COURT:  Yes, sir.

MR. MONTEMARANO:  I would like to be heard briefly.  I understand you want to get the jury in here, but with regard to 2843 and rebuttal evidence --

THE COURT:  Very briefly.

MR. MONTEMARANO:  With regard to 2843.  I was kicking around this topic in my office yesterday with Mr. Ticknor, my office mate, and he, because he is not as close to the case as many of us, has put it in what I think is an easy to understand nutshell that I think the court's instruction is likely to create a problem about.

Let us assume a defendant in this case, "Fred", who is a cab driver and who is called by one of the defendants here at trial for the purpose of going to the airport or the train station to pick up drugs. Fred's not a member of the conspiracy and he has no knowledge of it, but under the construction as currently constituted regarding 843, Fred could be convicted of using a telephone to further the intent of the conspiracy without having any knowledge of it or anything else.  Clearly, his conduct is not an illegal wire offense, whereas the conduct charging the defendant is illegal, but the instruction as you will give, if you give it in the current form, would permit a person -- in the current form would permit a person who is entirely innocent of the conspiracy and of 2843 to be convicted, because I don't think 843 should apply to Fred, and I think that's what the appellate courts

have said, although the Fourth Circuit has not spoken
to it directly, and I think that's a problem.

THE COURT:  I thought the opinion of District
Judge Freedman was pretty compelling on where the
Fourth Circuit is likely to come out on that subject,
but I recognize they haven't squarely addressed the
issue

MR. MONTEMARANO:  With regard to the question of
rebuttal.  Ms. Johnston provided me, at my request on
Friday afternoon, a list of the bank accounts that
they're -- one of their rebuttal witnesses, an IRS
witness, would testify concerning.  I questioned her as
to what his testimony would constitute.  He has not
been announced to the defense as an expert and we have
not received any Rule 16 concerning any expertise.  She
said he has prepared summary charts and will be
testifying about them, so it is my understanding he
will not be testifying as an expert, that's number one.

In light of the fact these are summary charts, I
think the defense needs to be provided them as soon as
possible so that we can review them, because if he is
going to testify about charts, we are able to object to
them regarding their contents, which I cannot in good
faith do until I review them; and I would therefore
request any and all information regarding that as soon

as possible.

THE COURT:  What's the status of that, Ms. Johnston?

MS. JOHNSTON:  Your Honor, I gave Mr. Montemarano the exhibit numbers for the records, and I also told him if he had difficulty going through them we had the two boxes of the records the agent has summarized available in our office for review.

THE COURT:  Is there a summary chart?

MS. JOHNSTON:  Is there a summary chart?  I do not want to disclose it at this time.  There is a defendant who is testifying, and it's rebuttal evidence.  There is no notice required that they be given rebuttal evidence, and it is extremely critical that one of the defendants is on the direct examination --

THE COURT:  I'm not suggesting that.

MS. JOHNSTON:  -- and maybe have an opportunity to discuss some of the issues that are contained in that.  I will make them available once the defense rests.

MR. MONTEMARANO:  I wanted the record to be clear that I wanted to review them carefully.  I have the bank records with me courtesy of the identification of the records by Ms. Johnston.  I spent much of Sunday

afternoon in the office going through the 24 boxes of discovery in this matter to make sure I had all those bank records, and it will  take some time to vet the bank records against the summary charts.  I simply want the court to be aware of that.

THE COURT:  What do you want to say about lesser included offense?

MR. MONTEMARANO:  No, sir.

MS. JOHNSTON:  I want the record to be clear that the records we're using have been pulled and they have been available, and I told Mr. Montemarano what they were.

MR. MONTEMARANO:  What does that have to do with anything, Your Honor?  I've had them since 2005.

THE COURT:  Mr. Sussman.

MR. SUSSMAN:  After the defense rests, I think the government should be asked for some brief proffer about what the rebuttal is.  I'm always concerned when I don't put on anything that I may be placed in the rebuttal.  I'm kidding.  As I said, just trust and verify --

THE COURT:  They've told you who the witnesses are.

MR. SUSSMAN:  I don't know who these witnesses are.

THE COURT:  Mr. McKnett.

MR. MCKNETT:  Can I go out and call the two transcribers?

THE COURT:  Call them up.

Mr. Ward, did you have an issue?

MR. WARD:  I'm sorry, I missed something.  The summary charts that the government proposes to use in rebuttal is bank records?

THE COURT:  Of bank records.

MR. WARD:  So I don't have to worry about that.

MS. JOHNSTON:  The portions that have been pulled have been sitting in my office, as I told Mr. Montemarano on Friday.

MR. MONTEMARANO:  With all due respect, Your Honor, it's not the bank records, it's the charts.  The charts I'm asking about.  Ms. Johnston keeps yammering about "the bank records are available."  With all due respect, they're not going in.  I've got them.  It's the evidence in the summary chart.  I know about all the defendants, but we objected to the use of their photographs and the names on the chart.

THE COURT:  You will have the chart before he takes the stand, but I can't guarantee it's going to be days or hours before.

MR. MONTEMARANO:  Before the chart is used and

marked --

THE COURT:  You will have a chance to look at it.

MR. MONTEMARANO:  That's all I want to be clear on.

THE COURT:  I'm not sure precisely when I'm going to be instructing this jury today but, as I look at the schedule, I see no reason why all arguments can't be done in one day.  I really don't like breaking it up.

MS. JOHNSTON:  We'll be starting at 9 o'clock tomorrow, Your Honor?

THE COURT:  Yes.  I've moved a sentencing so we can do it.

MS. GREENBERG:  Judge, while Mr. McKnett is calling, I thought we were making changes to the jury instructions, and I wanted to give Mr. Mitchell a correction on the gun count, and we can talk about it on the next break and see if he agrees or disagrees.

THE COURT:  I want to have counsel advise me by the break we take today what their position is on lesser included offense.  I mean, based upon my preliminary review of the cases on this subject, the defendants as to whom there is a sufficient issue raised as to potentially entitle them are the ones I

indicated.  My inclination is if I give an instruction, I would give it across the board for those three defendants, and it would be as to the conspiracy count and the possession with intent to distribute count as to those defendants only.

        MS. GREENBERG:  Your Honor, may we have a time to consult with each other after Ms. Ali is finished?

        THE COURT:  Yeah, talk to each other.

        We have one juror who has a heart monitor or something that they were given to wear because of a visit to the doctor that needs to take it off at 11:30, so we will definitely be in recess at 11:30.  I just wanted to let you know that.

        MR. SUSSMAN:  Judge, do you have any idea how long your instructions will take?

        THE COURT:  Well, I don't know what the answer is unless we decide on the lesser included offense, which is going to add to them.  I would assume an hour and a quarter.  That's a rough estimate when I look at this pile of paper.

        MR. MONTEMARANO:  Without a break?  I'm sorry, Your Honor.  Without a break?

        THE COURT:  Without a break.  Five glasses of water, but I'll grind my way through it.

        MR. MONTEMARANO:  I'm not asking either way.

We're sitting here twiddling our thumbs and listening,
but Your Honor has to talk.  If Your Honor has to take
a break, that's all.

          THE COURT:  No.  Once I start, I'm going to
rumble right through, and I will put a bunch of glasses
of water here in front of me and take a deep breath
here and there and keep going.

          MR. MONTEMARANO:  You're a better man than I am.

          THE COURT:  And my surgeon says I'm okay for
another 50,000 miles.

          MR. MONTEMARANO:  Congratulations.

          THE COURT:  Mr. McKnett is back.

          Are we ready for the jury now?

          Ladies and gentlemen, I'm going to tell the jury
that tomorrow we will begin at 9:00, that Thursday we
will begin at 9:00, and depending upon when they get
this case we'll deal with the particular issues they
may have in terms of their ability to deliberate on
given days, but I will make a final decision on who the
deliberating jurors are after consulting with the
parties.  I won't tell them that now.  We're taking
into account all of that to decide who the deliberating
jurors will be, and I recognize that there are problems
with Monday and Tuesday of next week.  If a verdict is
not reached by close of business on Friday, they will

come back the following Wednesday.

MR. MONTEMARANO:  Your Honor, with regard -- you suggested Thursday at 9:00.  If I understand the court's proposed schedule and we close tomorrow, Thursday would just be deliberation?

THE COURT:  Yes.

Bea, was there a problem with time on one of those days?  One juror has a doctor's appointment and would like to leave at like 2:30 on Thursday, so I may ask them if they would like to come in on Thursday that day.

Bring them in.  I'll give them an update on this when they come in.

MR. WARD:  Your Honor, I couched a lesser included request on Ms. Dobie, and I know there are differing views of counsel, and I raised the issue on Ms. Dobie.

THE COURT:  You also raised it with conspiracy.

MR. WARD:  Yes.

THE COURT:  Do you also want it on the possession with intent to distribute?

MR. WARD:  I don't have a possession with intent to distribute.

THE COURT:  I thought you did.

MR. WARD:  We have several telephone counts.

THE COURT:  I'll have to take a look.  I thought there was one.

MR. MONTEMARANO:  Your Honor, if I could step in the hall briefly?

THE COURT:  You may.

                (Mr. Montemarano returns.)

                (Witness resumes the stand.)

                (Jury returns at 9:53 a.m.)

THE COURT:  Counsel, can you approach the bench?

                (At the bar of the Court.)

THE COURT:  The juror that has the mother-in-law who's dying gave me a note.  I'll read it into the record.  It says, My mother-in-law, who lives in Missouri, has become very ill and is dying.  She has been fighting breast cancer for several years and she is presently bedridden and under hospice care.  My wife called the doctor yesterday and he said she should come out sooner rather than later.  My wife and daughter are flying to Missouri this Thursday, August 10.  I need to travel to Missouri to visit my mother-in-law and to support my wife.  Accordingly, I request that I be excused.  Thank you for your consideration.

I didn't realize they were asking to have a decision made now.  What I would propose is to tell this juror right now that you are -- does anybody

object to this?

        MR. MONTEMARANO:  No, not at all.

        THE COURT:  You are designated as an alternate.
I'm going to have you stay through as much as you can
stay for, including closing argument, so that you could
deliberate if for some reason the jurors could not
deliberate because of death or illness or something so
that they should stay, you know, pristine.

        MS. JOHNSTON:  I'm not so sure the propriety of
doing that, Your Honor.  I know that the court, under
the rules, can allow this jury to do it with just 11
once they start deliberating.

        THE COURT:  I understand that.

        MS. JOHNSTON:  I don't know whether or not
there's authority for the court to put a juror back
into the deliberations.  I know it's possible.

        THE COURT:  If nobody objects, I can do that.

        MS. JOHNSTON:  It's possible in a death penalty
case.

        THE COURT:  You're not objecting, are you, Ms.
Johnston?

        MS. JOHNSTON:  What I'm saying is it would be
ripe for plain error on appeal, so -- but I just --

        THE COURT:  You're really talking about an
academic question, because in all likelihood this juror

will not ever deliberate.  I want to make certain that
this juror is excused and that the juror stays clean
and does not discuss it, so that if there were a
situation we could all confer about this and we would
bring the juror back in and start from -- they could
start from scratch.  I'm going to tell the jury now.

      MR. MARTIN:  What if he doesn't want them to
know?

      THE COURT:  I could ask the juror to come up
here.

      MR. MONTEMARANO:  Him alone?  Counsel can go
back to their tables and you can wish him Godspeed and
go from there.

      MS. JOHNSTON:  Your Honor, the government would
ask that the court exercise discretion and excuse him
or dismiss him for cause.  Quite frankly, he is a juror
that the government would like to keep here, but I
don't think it is fair to him when his wife is losing
her mother and his wife and daughter are in Missouri
that he should have to sit through this testimony for
the next two days and not be there at the time his
mother-in-law passes.

      THE COURT:  I understand.  I'm going to try to
keep an insurance policy for an unforeseen disaster.
What I will do, Counsel, is ask juror 6 to come up to

the bench, and I will tell him what I've done.

(Back in open court.)

THE COURT:  Juror 6?

(At the bar of the court.)

THE COURT:  Good morning.  I'm sorry to hear about your mother-in-law.

JUROR 6:  Thank you

THE COURT:  I have conferred with counsel in regard to your situation.  You need to leave by Thursday?

JUROR 6:  That's when my wife has a flight, Thursday morning.

THE COURT:  Here's what I'm trying to do to make sure we don't have a problem if other people would get ill or sick.  I will tell you now that I want to have you stay here.  We hope we will be done tomorrow; we may go into Friday.  You would be excused on Thursday. What I intend to do is have an alternate take your place.  What I do want to have to is an insurance policy and make sure you've heard all the evidence and the closing arguments so that if the jury were to begin deliberations and then another juror became ill or died or something like that, there is a possibility you could be called back at some later point to start deliberations anew with the jury.  It's very, very

unlikely that would happen, but I want to put you at
rest and you can count on going to the -- with your
wife on Thursday.

JUROR 6:  Okay.  But, I mean, if the case is not
concluded by Wednesday evening --

THE COURT:  If closing argument is not over
Wednesday evening, I'm still letting you go.  I'm
anticipating that we will get it done so that then you
would be a juror who, if necessary, could be recalled
at a later time after you've taken care of your family
business and you could be called back.  I don't think
it's going to happen, but it gives me insurance.  Thank
you very much.

(Back in open court.)

THE COURT:  Good morning, ladies and gentlemen.
Let me give you some scheduling information.  I've
gotten various communications from the jurors, and I've
also conferred with counsel for the parties, and I'm
anticipating -- I should say praying or hoping that we
will finish all the testimony by early afternoon, and
that if things go smoothly -- things might not go
smoothly -- I'll be able to give you my instructions
today.

What I'm hoping for is that tomorrow would be
consumed in its entirety with closing arguments.  This

is a long case, and they need to talk to you, and it's a very important part of a trial.  While I've told you before that arguments are not evidence, arguments are perhaps the highest art form of the legal profession, and so I'm not discounting the importance of closing argument.  It's their chance to tell you what they think this evidence shows or doesn't show.  So, if things go smoothly, you would be hearing arguments tomorrow.  At the worst case scenario, you will be hearing instructions and then arguments and maybe spillover arguments the next day, but I am anticipating you will get this case on Thursday.

I believe one of you, unless excused, has a doctor's appointment on Thursday afternoon, so you wouldn't be able to deliberate all day, so you may want to ask yourselves during the break or discuss it amongst yourselves at a break whether, if you're deliberating on Thursday, you could come in early to offset the fact that you wouldn't be coming back.  We would have to adjourn at 2:30.

On Friday -- if you haven't reached a verdict, then you have all day Friday.  I'll put your mind at rest on one thing.  The fact that I'm going to be out of town next week does not mean that you can't deliberate.  Another judge can receive your verdict, so

that if you did not reach a verdict this week, you're
under no pressure to get it done while I'm here.  I
mean, you do the right job, the thorough job, and the
proper job.  If you get done this week, fine.  If you
can't, so be it.  I understand because of conflicts and
whatever, you cannot be here Monday and Tuesday.  So,
if you can't reach a verdict this week, by the end of
the day on Friday, then you would return Wednesday,
Thursday and Friday the following week, if necessary,
to reach your verdict.

      That's the best schedule I can lay out for you.
If you have any questions, make sure you tell your
foreman so he can communicate that to me.

      With that, we're ready to proceed with the
further direct examination of Ms. Ali.

      Mr. McKnett, you may proceed.

**FURTHER DIRECT EXAMINATION**

      BY MR. MCKNETT:

Q.     Thank you, Your Honor.

      Good morning again, Ms. Ali.

A.     Good morning.

Q.     Ms. Ali, on Friday, toward the end of the
afternoon, we had been playing a number of recordings
and following along in the defense and government's
transcript books.  I asked you questions about one of

the transcripts on Page 365 in the defendants' book, B5726.

At the end of the day, as I was leaving the courthouse, I realized I hadn't actually played that conversation, so I would like to play that now, if I may.

Mr. Mitchell.

THE COURT:  What was the number again?

MR. MCKNETT:  B5726.  It's on Page 365 of the defendants' transcript book.

MR. MCKNETT:  Mr. Mitchell.

It was the one that was handed to you toward the -- in the afternoon.

Mr.  Mitchell.

(Recording begins playing at 10:04 a.m.)

(Recording stops playing at 10:04 a.m.)

BY MR. MCKNETT:

Q.     Ms. Ali, on Page 366 you say, I'm going to stop before I leave -- after I leave here.

Do you remember if you were going to stop by there at Ms. Martin's house for any particular reason?

A.     Yes.  It was on my way home, and I was just stopping by after I left my girlfriend's house.

Q.     Was there any drug involvement --

A.     No.

Q.      -- in your intent to stop by?

A.      No.

Q.      Ms. Ali, I want to turn your attention now to May 16, 2004.  Do you recall that day?

A.      Yes, I do.

Q.      Do you recall what you did that day insofar as your friendship with Ms. Martin is concerned?

A.      Yes.

Q.      What did you do?

A.      May?

Q.      Yes.

A.      Ms. Martin called me up and asked me to come by and help her take some things to the studio, and she said to me that I didn't have to bring my husband because, as you know, my husband doesn't drive, and usually he rides with me when she needs something done or if Jackie needs something done.  On that particular day, she asked me to come by and help her take some things to the studio.  I did tell my husband where I was going -- I was going over to Paula's -- and if he wanted to go with us, and he declined because it was a big time for basketball, and he's an avid basketball and sports fan.  I went over to Ms. Martin's.  We were in the house for maybe one or two minutes, if that long.  She gave me a bag, and we took the bags to the

studio.

Q.      Do you remember what day of the week May 16
was?  You don't remember --

A.      It was a Sunday.  Sunday.

Q.      You mentioned a call from Ms. Martin.  Would you
turn to Page 525 in the government's book, please?  I
apologize.  I'm not sure which volume of the
government's -- Volume III.  Do you see that call
there?

A.      Yes, I do.

Q.      Is that the call you were referring to?

A.      Yes.

Q.      A call in which Ms. Martin says, leave your
husband at home and come take me to the school; I've
got to take something there?

A.      Yes.

Q.      And then later on she says, then I'm coming past
your house and take something.

        What did she mean when she said that, then I'm
going past your house and take something?

A.      I have no idea.

Q.      Did she come by your house that day?

A.      Yes, she did.

Q.      Did she take anything?

A.      Not that I recall.  No, she just checked the

suitcases that were there, and my husband and I were in the back -- I was in the kitchen, went to the back, and she left.

Q.     How did she leave?

A.     With her pocketbook and out the front door.  She drove.

Q.     What vehicle did she drive?

A.     The red Mercedes.  No, I drove.  I'm sorry.  I'm sorry.  No, no, no.  I took her back to her place, because I picked her up.  I'm sorry.

Q.     When you went in the house at Ms. Martin's residence, did she tell you anything about what she wanted to take to the studio?

A.     No.  We had been talking, and she was concerned about the police coming in because she had been warned through the neighborhood group that people had been coming in and out of the house, and she thought that they would come in; and she said she wanted to take some things out because she didn't want them to be destroyed or ruined, that she wanted to take them to the studio if they were to come in and check the clothing.  She thought it was about the clothing -- that's what I was told, that it was about the clothing that Kevin had been bringing in there.

Q.     Did you see what was in -- well, did you see any

-- did Ms. Martin direct your attention to any items
that she wanted you to take to the studio?

A.     No, she didn't.  She just gave me the bags, and
we walked directly out the house.

Q.     Did you put anything in the bags?

A.     No, I did not.

Q.     Did you see what was in the bags?

A.     No, I did not.

Q.     What did it appear to you was in the bags?

       MS. JOHNSTON:  Objection.  She said she didn't
see what was in the bags.

       BY MR. MCKNETT:

Q.     Let me rephrase.  Were the bags empty?

A.     No.

Q.     Were there items in the bags?

A.     Yes.

Q.     Could you see the items in the bags?

A.     No, I could not.

Q.     When you -- how many bags did you carry?  Do you
remember?

A.     I don't recall.  I know it was one, possibly
two, but I don't recall.

Q.     We saw a pole cam --

A.     Yes.

Q.     -- that was played at Ms. Martin's house.  The

pole cam tape that was made on May 16, do you remember
seeing that?

A.      Yes.

Q.      Was that the pole cam -- did the pole cam tape
accurately reflect what happened when you were helping
Ms. Martin move things to the studio?

A.      Yes, sir.

Q.      Once you got to the studio, what did you do with
the bags?

A.      I gave them to Ms. Martin.

Q.      What did she do?

A.      I have no idea.  It's two parts to the studio.
It's a office part that's in front, and then there's
another small office to the right, then there's a huge
room.  I sat in the front of the office and sat in the
chair.

Q.      Did you help carry the bags into the studio?

A.      Yes, I did.

Q.      When you got in the studio, what did you do with
them?

A.      I gave them to Ms. Martin.

Q.      What happened after that?

A.      We stayed there for a bit; I made some phone
calls, and we left and we went by my house.

Q.      Did Ms. Martin ever tell you what was in the

bags?

A.      No, she did not.

Q.      Did you ever ask her what was in the bags?

A.      No, I didn't.

Q.      Ms. Ali, I want to turn your attention now to your apartment.

        Ms. Ali, do you recognize this suitcase?

A.      Yes, I do.

Q.      How do you recognize it?

A.      It was a suitcase that Ms. Martin gave my husband and I in 2002 when she moved out of her house on Bexhill Court.

Q.      Where did you keep that suitcase in your apartment?

A.      In the closet, on the right-hand side, in back of a rack of clothing.

Q.      Did you ever look into the suitcase?

A.      No, I did not.

Q.      Did you ever have a key to the suitcase?

A.      No, I did not.

Q.      Did Ms. Martin ever tell you what was in the suitcase?

A.      No, she did not.  Yes, she did.  I'm sorry.  She just said there was some important papers and things that she did not feel comfortable carrying around -- I

did not get out the suitcase when she first moved out
the house.  When she moved into Annette's house, she
gave us the suitcase and she felt that she didn't want
certain things to be traveling with her, you know, so
she asked us to keep it until she moved into her house.

Q.     How long was that suitcase in your apartment?

A.     The suitcase has been in my apartment since
2002.

Q.     Ms. Ali, I want to show you some photographs.
These are the photographs that were marked as Ali
Exhibits P-1, and then there were A, B, C and so forth.

       Are they available?  I have the black and
whites.

       MS. JOHNSTON:  Yes.  We're pulling for them, Mr.
McKnett.

       BY MR. MCKNETT:

Q.     Bear with me just one second.  Agent Snyder is
kind enough to get them for me.

       Ms. Ali, I'm showing you what's been marked as
Government's Exhibit P-1B.  Do you see that?

A.     Yes, I do.

Q.     What is -- what's reflected in that photograph?

A.     That's the walk-in closet at our apartment.

Q.     This area back here?

A.     Yes.

Q.      I'm showing you what's been marked as Government
Exhibit P-1C.  Do you recognize that?

A.      Yes, I do.

Q.      What is that?

A.      It's a very full walk-in closet.

Q.      Is this the closet in which the suitcase was
kept?

A.      Yes.

Q.      Am I -- you described it in the back right-hand
corner; is that correct?

A.      No.  If you go to the right, the right wall,
there's a rack of clothing right there.  The suitcase
was back there.

Q.      So, the suitcase was behind and underneath
clothing?

A.      Yes.

Q.      Ms. Ali, I'm showing you what's been marked as
Government P-1H.  Do you recognize that item, the
contents of this photograph?

A.      Yes, I do.

Q.      What is that?

A.      That's a drawer out of a small jewelry box that
was on my dresser.

Q.      This is the drawer here?

A.      That's correct.

Q.      Is this the jewelry box?

A.      That's correct.

Q.      Is this the space where this drawer was?

A.      Yes.

Q.      Where was this drawer the last time you saw it before your arrest on June 1st 2004?

A.      Inside the jewelry box.  In the slot.

Q.      Right here?

A.      That's correct.

Q.      There are contents of this drawer.  Do you recognize them?

A.      Yes.

Q.      What's this, if you can make it out.

A.      I can't tell.

        MR. MCKNETT:  May I approach, Your Honor?

        THE COURT:  You may.

        THE WITNESS:  It's a piece of foil with some cocaine that I cooked.

        BY MR. MCKNETT:

Q.      Do you recognize the other items in that drawer?

A.      Yes, I do.

Q.      Let me put it back on the screen.

        You said this was a piece of foil that contained cocaine that you cooked?

A.      Yes, sir.

Q.      Where did you get the cocaine that you cooked?

A.      From Ms. Martin.

Q.      How much did you get?

A.      125 -- three bags for $125.

Q.      There's three little --

A.      Three 50s.

Q.      Three little 1" x 1" bags?

A.      Yes.

Q.      Do you recognize this item here?

A.      That's a straw.

Q.      What did you use the straw for?

A.      Sometimes I did snort it, too.  I put it in my nostrils.  And sometimes it was used for the homemade pipe that I made.

Q.      This item here, is that a bracelet?

A.      It's a bracelet, yes.

Q.      What's in this plastic bag?

A.      I can't tell from here.

        MR. MCKNETT:  Can I approach again, Your Honor?

        THE COURT:  You may.

        THE WITNESS:  That looks like the large bag that the three came in.

        BY MR. MCKNETT:

Q.      When you say "the three", you mean the 125, those three small bags?

A.      Yes.

Q.      You said this is cocaine that you cooked.   How
did you learn to cook cocaine?

A.      Asking questions.   Asking questions from friends
-- people that I knew that smoked.

Q.      How did you do it?

A.      I had a pot -- I placed the pot on the stove --
and I had a spice jar, and I would place the -- a
little bit of baking soda into a piece of paper and mix
it up and put it into the spice jar.   The water was in
the pan, and I would cook it.

Q.      Did you ever buy already prepared crack cocaine?

A.      No, I did not.   I never bought crack cocaine
already prepared.

Q.      When you last saw this drawer before your arrest
on June 1st, is this the way it looked?

A.      You mean before -- out of the drawer?   Yes.
That's probably how it looked inside the jewelry box,
yes.

Q.      Okay.   Now, let me ask you about another
picture, P-1I.   Do you recognize this -- the contents
of this photograph?

A.      Yes.

Q.      What do you recognize in this photograph?

A.      That's my jewelry box -- empty in Nordstrom's

jewelry box that was not inside that drawer.

Q.      Excuse me.  Right here?

A.      Yes, sir.

Q.      I'm sorry I interrupted you.  What were you
about to say?

A.      It was not inside that drawer; it was on top of
my dresser with the rest of my jewelry.

Q.      And this item?

A.      A napkin.  A Costco's napkin.

Q.      Was that in the drawer?

A.      No.

Q.      And this item over here?

A.      That might have been in the drawer.  A straw
might have been there.

Q.      If you can see it, there's a small baggy down
here.  Do you see that?

A.      Yes.  That might have been in there along with
phone books and books and pencils and papers.

Q.      So this is not the condition of the drawer --

A.      That's correct.

Q.      -- the last time you saw it before you were
arrested on June 1st 2004

A.      That's correct.

Q.      I want to come back to the cooking of the
cocaine.  How were you able to cook the cocaine without

your husband knowing?

A.      It's a very large apartment.  The kitchen was all the way to the front of the apartment.  My bedroom was in the back.  My husband was a hard sleeper. There's nothing to cooking it, except the bottle might rattle in the pan a little bit.

Q.      How long does it take to cook cocaine?

A.      Well, I wasn't a expert, so sometimes it took me longer because I messed up a lot.  I don't know.  Three minutes?  Five minutes?  It's according to how hot the water was, the temperature of the water or --

Q.      Why would you cook cocaine into crack?

A.      Because when I snorted it, I was afraid that it was going to mess my nostrils up.  It caused me to have a lot of sinus problems, and I didn't want people to know, so it was a way that I was able to hide it by not -- when I smoked it, my nostrils didn't drain.

Q.      I want to show you one more photograph that's been marked as exhibit -- Government Exhibit P-1, and I believe it's a "J."  Let just confirm that.  Yes, I believe it is a J.

        Do you recognize the contents of this photograph?

A.      Yes.

Q.      What is that?

A.       That's our bathroom.

Q.       There are some items on a shelf here above the
toilet.  Do you see them?

A.       Yes, I do.

Q.       What are these items here?

A.       The brown piece where your pen is is a basket
with toiletries.

Q.       The blue?

A.       Cosmetic bag.

Q.       There appears to be something yellowish or
orangeish here?

A.       I don't recall what that is.

Q.       And up here?

A.       That's my husband's shaving -- brown shaving kit
bag.

Q.       Did you ever store cocaine in your husband's
shaving kit bag?

A.       No, I did not.  He used that bag every day.  I
was hiding it from him, so I wouldn't store cocaine in
that bag.

Q.       Is this the way these items on these shelves
appeared the last time you saw them prior to your
arrest on June 1st of '04?

A.       Yes.

Q.       Ms. Ali, I want to show you a document that's

been marked as -- Ali Exhibit 6, Ms. Merez?

       THE CLERK:  Yes.

       MS. JOHNSTON:  Your Honor, may we approach the

bench please?

       THE COURT:  You may.

              (At the bar of the Court.)

       MS. JOHNSTON:  I don't know what this document

is.  I appreciate counsel said it came out of

discovery, but we took many boxes of documents.  I'm

objecting on a Rule 16  basis because it wasn't

provided to us as a document they intended to use in

their case in chief.  This is the first time I'm seeing

it.  I didn't even see it before Ms. Ali started her

direct, nor during the time lapse between last Friday

and today.  I don't know how these items are relevant,

and it appears to be --

       THE COURT:  Was it your understand the

government was going to use this?

       MR. MCKNETT:  That was my impression.  I could

be wrong.

       THE COURT:  What is this document?

       MR. MCKNETT:  It's a receipt.  It's dated May 30

of 2004, two days before my client got arrested.  It's

a receipt for the two computers that she picked up from

the repair shop.  If the government is not intending to

reference this document in any way, then I won't even
bother with it.

        MS. JOHNSTON:  I don't know why it's being
introduced.  It's irrelevant.

        THE COURT:  What is the relevance?

        MR. MCKNETT:  Your Honor, my impression was that
the government would make an argument that this somehow
was connected with the suitcase.  If I'm wrong on that,
then I don't need this document.

        MS. JOHNSTON:  I don't know what he's talking
about, Your Honor.

        MR. MCKNETT:  Then I'm wrong and --

        MS. JOHNSTON:  No.  The court's ruling should
not be based on what the government intends to do in
argument.

        THE COURT:  I'm trying to understand its
relevance.  It may be relevant because he's going to
make an argument that this has something to do with the
suitcase.

        MR. MCKNETT:  As long as the government is not
going to make that argument --

        MS. JOHNSTON:  I don't think the government
should have to disclose what it is going to argue or
not argue.  1.  It violates Rule 16 and 2. He's failed
to establish the relevancy of this document.

MR. MCKNETT:  Your Honor, if it's not in
evidence, then the government can't make any argument
about it so I won't put it in evidence.

THE COURT:  All right.  The objection is
sustained.

MR. MCKNETT:  Your Honor, can I withdraw my
objection after you rule?

THE COURT:  Sure.  That's fine.

(Back in own open court.)

BY MR. MCKNETT:

Q.    Mr. Ali, based on the discussion we had at the
bench, I will not be using this exhibit, so I'm going
to move on.

Now I want to come down to the circumstances of
your arrest on June 1st of 2004.  I'm sure you remember
that morning.

A.    Yes, I do.

Q.    Where were you that morning?

A.    I was asleep in my bedroom.

Q.    What's the first thing you remember that
morning?

A.    I remember my husband --

MS. JOHNSTON:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I remember my husband coming into

the bedroom and telling me that the police were at the
door.

       BY MR. MCKNETT:

Q.    What time was that, if you remember?

A.    It had to be between 6:30 and a quarter to
seven, because my husband was already up.

Q.    Do you remember what day of the week June 1st
was?

       MS. JOHNSTON:  Objection, Your Honor.

       THE COURT:  Overruled.

       THE WITNESS:  A Tuesday.

       BY MR. MCKNETT:

Q.    Was that a workday?

A.    No.  The day prior to that was the holiday
weekend, Memorial Day weekend, and that was a workday,
yes.

Q.    June 1st was a workday?

A.    Yes.  I'm sorry.

Q.    So what's the next thing you remember after
being told that the police were at the door?

       MS. JOHNSTON:  Objection.  Relevance.

       THE COURT:  What's the relevance?

       MR. MCKNETT:  Officer Muldoon, Your Honor.

       THE COURT:  All right.  Overruled.

       THE WITNESS:  I put my robe on and I went to the

door.  The police officers -- several of them, I
couldn't tell you how many were in the foyer, they
asked me was I LaNora Ali, and I told them yes and they
told me I was under arrest.  I asked them for what, and
they told me they couldn't tell me because they didn't
know.  I asked them could I get dressed, and the
officer said that they didn't have to allow me to get
dressed but they would, so she went to the back room
with me and I got dressed, and they brought me here to
the federal courthouse around -- it was after 7
o'clock.

Q.    Did they have you sit on your couch at any time
that day?

A.    No, I did not.  I went directly to the bedroom.
I didn't have any conversations except for the fact
what was I being arrested for and could I get dressed.

Q.    Did you attempt to tidy up your apartment before
you were arrested?

A.    No, I did not.

Q.    Do you remember having any conversations -- any
casual conversations with any of the officers in your
apartment that morning?

A.    No.

Q.    How much time elapsed between the time you came
to the door and the time you were taken out of your

apartment?

A.      Maybe about seven minutes, or ten minutes or

five to seven minutes.  It didn't take me long, because

I just went right to the back and I didn't have

anything to zip up or button up.  I just threw a pair

of pants on and a top and a jacket, and she escorted me

right out of the apartment.  It probably wasn't even

ten minutes.

Q.      And then she brought you to this courthouse?

A.      Yes, sir.

        MR. MCKNETT:  I have nothing further, Your

Honor.

        THE COURT:  Cross-examination by defense?

        MR. MCKNETT:  I think there might be some.

        MR. HALL:  I have a few questions, unless Mr.

Montemarano wants to go first.  I'll be brief.

                    **CROSS-EXAMINATION**

        MR. HALL:

Q.      Good morning, Ms. Ali.

A.      Good morning.

Q.      Let me ask you a couple of questions.  How long

have you known my client, Reece Whiting?

A.      Since 1999.

Q.      During that time, have you ever known Mr.

Whiting to have his hair, or lack of hair, shall we

say, any different than it is?

A.      He's always had a bald head.

Q.      He's always had a bald or shaved head; is that correct?

A.      Yes.

Q.      Let me ask you one other thing.  Do I understand correctly that when you talked about the purchases of drugs that you made that you always purchased around -- you always purchased by a dollar amount and not by a quantity, like grams?  You always purchased, like, 125 or some lesser amount; is that right?

A.      Yes.  I always purchased a 50 or 125, yes.

Q.      Okay.  All right.  That's what I -- that's what I was getting at.  You didn't understand or know what the quantity was, you just knew the dollar amount that you got; right?

A.      That's correct.

Q.      And whatever you received for that dollar amount you assumed was correct; is that right?

A.      That's correct.

        MR. HALL:  Thank you.

        MR. MONTEMARANO:  Actually, Your Honor, I think I have a couple of questions.

        THE COURT:  All right.

        MR. MONTEMARANO:  Thank you.

## CROSS-EXAMINATION

BY MR. MONTEMARANO:

Q.      Good morning, Ms. Ali.  How are you?

A.      Good morning.

Q.      Just a couple of questions.  You had mentioned purchasing a fur coat from Ms. Martin?

A.      Yes.

Q.      Do you have any knowledge of where that coat came from?

A.      Yes.  They came from Jonathan's, a fur salon in New York City.

Q.      Was that the only fur coat which you knew Ms. Martin to have?

A.      No.  She had several fur coats.

Q.      Did she have others that she sold?

A.      Yes, sir.

Q.      Did she ever have clothing in her dining room at Bexhill as Mr. Shannon described?

A.      Yes, she did.

Q.      Did you know Mary Payne?

A.      Yes, I did.

Q.      Did she live with Ms. Martin, as Mr. Shannon described?

A.      Yes, she did.

Q.      Prior to Ms. Martin's purchase of the Mercedes,

did she drive a Mercury, as Mr. Shannon described?

A.      Yes, she did.

Q.      You bought clothes from Ms. Martin that came from Ms. West?

A.      I bought clothes from Ms. Martin not knowing if it came from Ms. West, not all of them.  I can't say that all of the clothing came from Ms. West.

          MR. MONTEMARANO:  Thank you.

          THE COURT:  Any further cross?

          MR. MARTIN:  Briefly, Your Honor.

### CROSS-EXAMINATION

          BY MR. MARTIN:

Q.      You mentioned, Ms. Ali, that you knew Mr. Goodwin.

A.      Yes.

Q.      Did you ever purchase drugs from Mr. Goodwin?

A.      No, I've never purchased drugs from Mr. Goodwin.

Q.      Did Mr. Goodwin ever advise you how to cook cocaine?

A.      Mr. Goodwin has never advised me how to cook cocaine.

          MR. MARTIN:  No further questions, Your Honor.

          MR. WARD:  A couple of questions, Your Honor.

### CROSS-EXAMINATION

          BY MR. WARD:

Q.      Good morning, Ms. Ali.

A.      Good morning.

Q.      When did you first get to know my client, Ms. Dobie?

A.      I met Ms. Dobie in the year 2003 in Jackie Terrell's house where Ms. Martin lived with Jackie.

Q.      Did you ever see her, other than in Ms. Martin's house or Jackie Terrell's place?  My client.

A.      No.

Q.      Did she ever sell drugs to you?

A.      No, she did not.

Q.      Did you ever see her buying drugs from anybody?

A.      No, I did not.  I have never seen her buy drugs from anyone.

Q.      Were you ever in Ms. Terrell's portion of the house when my client was there showing some jewelry that she had for sale?

A.      Yes.

Q.      How many occasions?

A.      Once.

Q.      Can you tell us generally what kind of jewelry it was?

A.      She had rings, watches, bracelets, different types of jewelry.  It was in a bag.

        MR. WARD:  All right.  Just give me a moment,

please.

I don't have any other questions.  Thank you, Ms. Ali.

THE COURT:  All right.  Any other defense counsel?

All right.  Government.

MS. JOHNSTON:  Thank you, Your Honor.

### CROSS-EXAMINATION

BY MS. JOHNSTON:

Q.    Ms. Ali, did Ms. Dobie tell you the jewels were stolen?

A.    No, she did not.

Q.    She didn't discuss that with you?

A.    No.

Q.    Did you buy some things from her?

A.    I purchased a ring.

Q.    You didn't ask her where she got them?

A.    They showed me a sales receipt with the ring, when I purchased the ring.

Q.    You didn't have any discussion with her where she got all these jewels?

A.    No, I did not.

Q.    And she sold it to you at a discounted price; is that correct?

MR. MCKNETT:  Objection, Your Honor.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't know.  I don't recall.

BY MS. JOHNSTON:

Q.     In terms of Ms. Martin.  Would you describe your relationship with Ms. Martin as being very close friends?

A.     Yes.

Q.     And Ms. Martin and you discussed your problems at school; is that correct?

A.     That's correct.

Q.     And Ms. Martin discussed how she made her living with you; is that correct?

A.     No.  She didn't sit down and just discuss how she made a living, but we talked about things like that, yes.

Q.     You talked about things like that and you talked about her family and how she didn't get along with different people in her family; is that correct?

A.     That's correct.

Q.     Through Ms. Martin, you met any number of people who are on CH-1; isn't that correct?

A.     Excuse me, could you rephrase that?

Q.     You talked with Ms. Martin, and it was through Ms. Martin that you met any number of the people who are on CH-1; isn't that correct?

A.      Yes.  I didn't understand you at first, Ms.
Johnston.

Q.      So you didn't -- you met any number of these
people through Ms. Martin; isn't that correct?

A.      Yes, I have.

Q.      Ms. Martin told you about Estelle Brim; isn't
that correct?

A.      I met Estelle Brim through Ms. Martin.

Q.      You met her.  And she told you about Steven
Brim; isn't that correct?

A.      I met Steve Brim briefly, through Ms. Martin.

Q.      Okay.  What year did you meet Ms. Martin?

A.      I told you I didn't recall.  1996-1997?

Q.      And when you met Mr. Brim, Steve Brim, that was
several years before his death; is that correct?

A.      Yes, that's correct.

Q.      Did you meet Estelle Brim around the same time
that you met Steven Brim?

A.      I met Estelle before Steve.

Q.      Okay.  And according -- Ms. Martin advised you
that she had some business dealings with Mr. Brim; is
that correct?

A.      She said she sold clothes to Mr. Brim.

Q.      Indeed, you know Pernell Philpot, as well; isn't
that correct?

A.       Yes.  I met him at Ms. Martin's house.

Q.       And you saw him at Ms. Martin's house.  Did she discuss with you when Mr. Philpot got arrested in Wyoming with 5 kilograms of cocaine on him?

A.       She didn't discuss about 5 kilos of cocaine. No, she did not.

Q.       She discussed with you the arrest of his in Wyoming.

A.       Yes.

Q.       Did she tell you that arrest was because he had Aretha Franklin outfits with him?

A.       Not that I recall, no.

Q.       She told you he was arrested for drugs; is that correct?

A.       No, she did not.

Q.       She just told you he was arrested?

A.       Yes.

Q.       You didn't ask her why he was arrested or what he was doing in Wyoming; is that correct?

A.       No, I did not have any conversations with her about that.

Q.       During that time frame, however, you were getting cocaine from her on a regular basis; isn't that correct?

A.       I did purchase cocaine from her.

Q.      On a regular basis; correct?

A.      I did purchase cocaine from her.

Q.      On a regular basis, correct, Ms. Ali?

A.      I don't know what you mean by a "regular basis."

        MR. MCKNETT:  Objection, Your Honor.
Argumentative.

        THE COURT:  Overruled.

        BY MS. JOHNSTON:

Q.      Once?  Twice?  Three times a week?

A.      Could have been once, twice or three times.

A.      A week?

A.      Yes, it could.

Q.      That would have occurred during 2003-2004; is
that correct?

A.      This's correct.

Q.      Those transactions would have occurred at Ms.
Martin's house; is that correct?

A.      That's recollect.

Q.      Or at the school; is that correct?

A.      Not at the school.

Q.      She would come to your house and deliver the
drugs to you sometimes; isn't that correct?

A.      Maybe once, yes.

Q.      Just once?

A.      Yes.

Q.      And when was that one time that she delivered
the drugs to you at your apartment?

A.      I don't recall.

Q.      You do recall it was just one time she came to
your apartment?

A.      I said maybe one time, but I don't remember the
exact time or day.

Q.      Luis Mangual, Jr.  You've met him at Ms.
Martin's house or at one of the fashion shows she
sponsored?

A.      I don't remember meeting Luis Mangual, Jr.

Q.      You don't remember seeing him, but you do
remember seeing Juan Encarnacion?  You would have seen
him at her house on Bexhill Court?

A.      Yes, just once.

Q.      Just once that you saw him at the house on
Bexhill Court.  Did Ms. Martin introduce you to Mr.
Encarnacion?

A.      Is that "Juan?"

Q.      Yes.  Juan Encarnacion, did she introduce him to
you?

A.      Yes.

Q.      Did she introduce him to you as a business
associate of hers or as a friend?

A.      We shared holiday treats with him.

Q.      Okay.  And of course you don't know any of the
people over here:  Steven Campbell, Michael Thurman,
Tiffany Vessels.  Do you remember seeing Tiffany at Ms.
Martin's?

A.      I don't know Ms. Vessels.

Q.      John Irby?

A.      I think I saw Mr. Irby at Carter Barron.

Q.      When was that concert at Carter Barron?

A.      Well, we went to several concerts at Carter
Barron since I met Ms. Martin, so I couldn't tell you
which exact one.  From 1998 on we went to concerts.

Q.      When was the last concert you went to with Ms.
Martin at Carter Barron?

A.      In 2003.

Q.      You didn't go to any concerts with her in 2004;
correct?

A.      Not at Carter Barron.

Q.      In 2004, that's when you were getting drugs from
her one, two, three times a week; isn't that correct?

A.      That's correct.

Q.      Were you getting drugs from her one, two, three
times a week during 2003 as well?

        MR. MONTEMARANO:  Asked and answered.

        THE COURT:  Overruled.

        THE WITNESS:  It varied.  Sometimes I would

stop; sometimes I didn't get drugs one, two or three times a week.

           BY MS. JOHNSTON:

Q.      When was the last time that you stopped using drugs before 2004?

A.      In 2003.  Several times.  I would go different times without using it.

Q.      And of course Ms. Martin and Mr. Goodwin you know.

A.      That's correct.

Q.      And you know Mr. Goodwin from being Ms. Martin's "play brother"; is that correct?

A.      That's correct.

Q.      And being over at her house, her house at Bexhill, the granny's house on Nicholson Street and also at the Haywood address; is that correct?

A.      That's correct.

Q.      Did you know Claude Arnold, who is known as "Skip?"

A.      I know a Skip.  I don't know if that's him from looking at the picture.

Q.      But was this a Skip that you knew from Ms. Martin?

A.      A Skip that I met at Granny's.

Q.      At Granny's, as a friend of Ms. Martin; correct?

A.      As a friend, no, of Granny's.

Q.      And Mr. Bynum.  Of course you've seen him at all of those locations, is that fair to say?

A.      No.  I've only seen Mr. Bynum at Bexhill Court. I have not seen him at Granny's or Haywood.

Q.      So you haven't seen Mr. Bynum pretty much in 2003 or 2004?

A.      That's correct.

Q.      And Mr. Bird.  You knew him, too?

A.      Yes.

Q.      Did you know Mr. Bird was getting drugs from Ms. Martin?

A.      No.  I don't know anything about that.

Q.      And Ms. Dobie you met through Ms. Martin; is that correct?

A.      Yes, that's correct.

Q.      And Ms. Harden you don't know at all?

A.      No, I don't.

Q.      Did you know Ms. Dobie was getting drugs from Ms. Martin?

A.      No, I did not.

Q.      Did you know Ms. Dobie was trying to arrange to supply Ms. Martin with drugs --

A.      No, I did not.

Q.      You don't recall that.

Mr. Harris, do you remember seeing him at Ms. Martin's?

A.      I've seen George Harris before.

Q.      At Ms. Martin's house?

A.      I think I have, yes.

Q.      Well, which house do you think you saw him at?

A.      At Bexhill.

Q.      So, Mr. Harris was at Ms. Martin's house at Bexhill?

A.      I have no idea how long she's been knowing him.

Q.      You've known Ms. Martin since back at Bexhill.

        Do you recall seeing him at Bexhill?

A.      Yes.

Q.      Do you recall seeing him at Haywood?

A.      No.

Q.      How about at Paulette's School of Performing Arts?

A.      No.  I've never gone to Paula's School of Performing Art.

Q.      You went there one time.

A.      Yes.

Q.      And that's the only time you were ever there?

A.      Once when we helped to clean it up.  To help clean it out for her and to try to get new people to come in to rent it to dance, and we used to go to the

Dutch Pot next door and eat and bring the food over there.  That's the only time.

Q.     You would go in there and eat food in there?

A.     There was only several of us would be there, yes.

Q.     Several of you?

A.     My husband.

Q.     Your husband, Ms. Martin, and who else?

A.     Her daughters, her family.

Q.     Well, her daughters -- now, that last call that you played with Mr. McKnett apparently was Mother's Day of 2004, and Ms. Martin didn't want to have anything to do with her two daughters; isn't that correct?

A.     That's correct, but that was prior to that.  Her and her family would get together often for family affairs prior to 2003, which was Christmastime, Ms. Johnston.

Q.     Those would be held sometimes at the school, and you would take your food back to the school and eat it; is that correct?

A.     The restaurant was next door to the office.  It was in the summer, and we would go next door to the studio, Ms. Johnston, and eat the food.

Q.     Okay.  And you would go into the school, and you didn't stay just in the reception area?

A.      We stayed in the reception area because that's
where the tables were, and we would eat in the front
office in the reception area.

Q.      There's a little desk area in the reception
area?

A.      That's correct.

Q.      And all, however many of you -- let me see, it
would be her two daughters?

A.      It would be her daughter, granddaughter,
friends.  It could be, like, ten of us.  It was a room
large enough for ten people to sit in.

Q.      Ten of you sitting in that little reception area
out front, as opposed to in the big dance hall; is that
correct?

A.      It was dark in the dance hall.  There were
windows in the front of the studio.

Q.      So there was no electricity working in the
studio during this time period; is that correct?

A.      It was more pleasant to eat in the --

Q.      Ms. Ali, if you would --

        MR. MCKNETT:  Your Honor, I object.  I would
ask Ms. Johnston to let Ms. Ali answer the questions.

        THE COURT:  If you would both let each other
answer the questions, the court reporter would thank
you too.

BY MS. JOHNSTON:

Q.      I pause sometimes.

A.      We would come in and go out, yes.

Q.      You wouldn't go back in the dance studio part?
You would just sit in the reception area?

A.      Just sit in the front, that's correct.

Q.      Was there electricity or no electricity?

A.      There was electricity.

Q.      And John Martin; you know him as well?

A.      Yes, I do.

Q.      You've known him from Bexhill Court?

A.      Yes.

Q.      You've known him from during the time period
when Ms. Martin was living at Granny's?  Did you see
him around then?

A.      He was not at Granny's, no.

Q.      No, he didn't stay at Granny's?

A.      No, I didn't see him around at Granny's.

Q.      You also saw him at Haywood; is that correct?

A.      That's correct.

Q.      You're aware John Martin used and distributed
cocaine and heroin; is that correct?

A.      Only through court here.

Q.      So you didn't know that back then?

A.      No, I did not.

Q.      Ms. Martin didn't discuss with you her
relationship with Mr. Martin?

A.      John and Ms. Martin was off and on, so...

Q.      Did she discuss it with you?

A.      Unhappiness with John at times.

Q.      And the problem with him in terms of him taking
her red Mercedes and having tickets in the red Mercedes
when he would go down into different neighborhoods, and
she was concerned that he might get arrested while he
was in her car and she might lose her car; is that
correct?

A.      I don't recall about the tickets.  I know she
wanted her car.

Q.      When we mention "tickets", tickets was used
between you and Ms. Martin as term for drugs at time;
isn't that correct?

A.      I never used the word "tickets", Ms. Johnston.

Q.      Well, Ms. Martin used the word "ticket" with
you, and you understood her to be referring to drugs
that you were getting from her on occasion; isn't that
correct?

A.      I never used the word ticket, Ms. Johnston.

Q.      Well, in the call where Ms. Martin used the term
"ticket", you understood her to be referring to drugs.

A.      I never answered her when she said the word

tickets, Ms. Johnston.

Q.      Okay.  We'll get back to that in a minute, Ms. Ali.

        Mr. Walker.  You knew Mr. Walker?

A.      Yes, I do.

Q.      Were you aware he was distributing crack and cocaine and heroin that he got from Ms. Martin?

A.      I don't know anything about him distributing drugs.

Q.      He gave you drugs; isn't that right?

A.      Yes, he did.

Q.      And he gave you crack; is that right?

A.      Not correct.

Q.      Just powder cocaine.

A.      That's correct.

Q.      Powder cocaine that you took maybe half a gram and put into a bowl and somehow cooked it on the stove and converted it into crack yourself; is that correct?

        MR. MCKNETT:  Objection.  Argumentative, Your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  No, that is not correct.

        BY MS. JOHNSTON:

Q.      That's not correct?

A.      Not from Mr. Walker.

Q.      When you met Mr. Walker, did you know he knew Ms. Martin?

A.      Yes.  No.  When I first met Mr. Walker?  No.

Q.      After a period of time you found out that he knew Ms. Martin; isn't that correct?

A.      That's correct.

Q.      In fact, you saw him on occasion at Ms. Martin's; isn't that correct?

A.      Once.  Twice, twice,

Q.      Two times you saw him there.  When you first started using cocaine with Mr.- -- strike that.

        Was Mr. Walker the first person you started using cocaine with?

A.      No.

Q.      Okay.  Well, when -- who was the first person you started using cocaine with?

A.      I used it by myself.

Q.      Where did you get the cocaine that you used by yourself the first time that you used it?

A.      From a friend.

Q.      Who was that friend?

A.      Mr. Fondell McKeithan.

Q.      Who?

A.      Fondell McKeithan.

Q.      Okay.  Where does Fondell McKeithan live?

A.      He's deceased.

Q.      Where did he live at the time you were getting
drugs from him?

A.      Northeast, off of South Dakota Avenue.

Q.      Off of South Dakota Avenue, in the vicinity of
Paula's School of Performing Arts?

A.      No, further down.

Q.      What hundred block, do you recall?

A.      No, I don't.

Q.      About what year was it that you started getting
cocaine from this gentleman?

A.      I don't recall the year.  It was around my late
30s.  I don't recall the year.

Q.      Late 30s?  And you are?

A.      53 years old.

Q.      You're 53 now.  So, in your late 30s, how is it
that you went to this gentleman and asked him, can you
have some cocaine to get high on?

A.      I didn't ask him.  I didn't purchase anything
from him.

Q.      How was it that you came to get high with him?

A.      We just became friends, and people talk, and
that's what happened, Ms. Johnston.

Q.      So, you talked with him about drugs, about
cocaine; is that correct?

A.      No.  He also sold clothing.

Q.      Okay.  He sold clothing and cocaine?

A.      That's correct.  He didn't sell cocaine, though.
You're putting words in my mouth.  I did not say he
sold cocaine.

Q.      He distributed cocaine.

A.      He gave me cocaine.

Q.      And so -- were you involved in a romantic
relationship with him?

A.      No, I wasn't.

Q.      Just a social relationship?

A.      Yes.

Q.      Out of the blue, this gentleman says to you, do
you want to get high?

A.      I don't recall, Ms. Johnston.

Q.      But you continued your friendship with him; is
that fair to say?

A.      Yes.

Q.      And then you started getting cocaine from him to
use; is that correct?

A.      When I used it.  I didn't use it that often.

Q.      But back then you didn't say, I'm a
schoolteacher and I shouldn't use cocaine; is that
correct?

A.      To myself, yes, I did.

Q.      But you didn't --

A.      Until this day, I said, yes, I'm a schoolteacher
and I should not use cocaine.

Q.      When he offered cocaine to you, you didn't say
no you didn't want it.

A.      Sometimes I did.

Q.      But sometimes you didn't.

A.      And sometimes I didn't.

Q.      Now, after you got the drugs from him, who was
the next person you got cocaine from?

A.      Mr. Walker.

Q.      Okay.  And when -- what year or how old were you
when you started getting cocaine from Mr. Walker?

A.      In my 40s, late 40s.

Q.      Late 40s?  So in between your late 30s and your
late 40s, the only person you got cocaine from was this
gentleman?

A.      That's the truth, yes.  I was not a street
person.  I did not purchase drugs off the street.  Back
then I didn't purchase drugs.  Yes, that's the only
person I got my drugs from.

Q.      So you received them from -- who else did you
get high with, in addition to --

A.      No one.  I was a closet.  Like you have closet
queens, I got high by myself.  That was my private

thing.  It was my company.  Just like you said, I was a

schoolteacher and it was very embarrassing to me, and I

did it alone.

Q.      Well, you had to get the drugs somewhere to do

it alone; isn't that correct?

A.      I told you where I received the drugs from.

Q.      So, this gentleman before you met Mr. Walker

would give them to you but you wouldn't get high with

him?

A.      He did not get high.

Q.      So, he gave you the drugs --

A.      Yes.

Q.      -- for free?

A.      Yes.

Q.      And then you came upon Mr. Walker in the late --

in your late 40s; is that correct?

A.      That's correct.

Q.      Was that after you knew Ms. Martin?

A.      It was before I knew Ms. Martin.

Q.      How often did you get drugs from Mr. Walker?

A.      I can't say how often it was.

Q.      Was it just --

A.      More than once.

Q.      Okay.  Was it powder cocaine?

A.      It was always powder cocaine.

Q.      When was it that you decided that you would start converting your powder to crack cocaine?

A.      Maybe around 50.

Q.      After you knew Ms. Martin?

A.      Yes.

Q.      After you started buying cocaine from Ms. Martin; is that correct?

A.      Yes.

Q.      Now, when you were going with Mr. Walker, I believe I understood you to say that you had some sort of relationship with him; is that fair?

A.      That's correct.

Q.      Not necessarily romantic, but some kind of --

A.      That's correct.

Q.      More than just a friends relationship.

A.      That's correct.

Q.      During that time period, did you buy drugs from Mr. Walker?

A.      No, I did not.

Q.      He just gave it to you?

A.      That's correct.

Q.      And the only person, then, you ever bought drugs from is Ms. Martin; is that correct?

A.      That's correct.

Q.      And you've never bought drugs from anyone else

but Ms. Martin?

A.      That's correct.

Q.      When you started to deal with Ms. Martin, that was how many years ago?

A.      Around 1996-97.

Q.      Okay.  So, shortly after --

A.      You mean dealing with as far as buying drugs?

Q.       Buying drugs, ma'am.

A.      1998.

Q.      I apologize.  I wasn't clear.

So, since 1998, continuing until your arrest on June 1st 2004, you were engaged purchasing drugs from Ms. Martin; is that correct?

A.      That's correct.

Q.      And sometimes as frequently as one to three times a week; is that correct?

A.      Sometimes, yes.

THE COURT:  Ms. Johnston, could I interrupt for just one second?  I wanted to let you and the attorneys and the jurors know that we are -- we have a delegation of visitors in our courtroom today who are being escorted by my colleagues, Judge Connelly and Judge Chasanow.  We have ten law students from Japan who are watching us, so we've got to be on our good behavior.

You may continue.

MS. JOHNSTON:  I apologize, Your Honor, if I wasn't on good behavior before.

BY MS. JOHNSTON:

Q.    so you were getting cocaine from Ms. Martin starting in about 1999 and continuing until the time of your arrest on June 1st of 2004; is that correct?

A.    1998.

Q.    I apologize, 1998.  And she was the only person you were dealing with; is that correct?

A.    That's correct.

Q.    During this time period, you learned how to cook crack -- cook cocaine into crack cocaine; is that correct?

A.    I had heard about how to cook it prior to that, yes.

Q.    Who told you how to cook cocaine into crack, Ms. Ali?

A.    I asked questions.  I asked lot of questions about it.

Q.    Who did you ask questions about how to convert cocaine into crack?

A.    A friend.

Q.    Who was the friend that you asked the questions of?

A.    Deborah.

Q.      Deborah who?

A.      Terry.

Q.      Where does Ms. Terry live?

A.      She's deceased.

Q.      Okay.  What does she do -- what did she do for a living when she was alive?

A.      She was a homemaker.

Q.      Where did she live when she was alive?

A.      In Takoma Park, Maryland.

Q.      And she was a cocaine or crack user; is that correct?

A.      Yes.  She smoked.

Q.      She smoked crack?

        And who else did you discuss it with?

A.      That's it.

Q.      Tell us exactly what it is -- strike that.

        How did you meet Ms. Terry, who was using crack?

A.      She was a long-time friend.  At an apartment building I lived in.

Q.      She was in the apartment building you lived in?

A.      No, another apartment building.

Q.      Did you know her for years?

A.      Yes.

Q.      Did you and Ms. Terry ever share crack cocaine together?

A.      No.

Q.      How was it you came to discuss this with her?

A.      Because I allowed her to smoke it in my apartment.

Q.      You allowed her to smoke crack in your apartment?

A.      Yes.

Q.      You didn't smoke crack with her?

A.      No, I did not.

Q.      And you didn't smoke cocaine with her?

A.      No, I did not.

Q.      You had to, at some point, tell her that you were also a cocaine and crack user; is that correct?

A.      No.  I didn't tell anybody I was a crack user.

Q.      Well, you were a crack user; isn't that correct?

A.      I freebased.  You prefer the term "crack."  I never used crack.

Q.      What we've seen here in court that the chemist has discussed as crack is something that you used.

A.      Ms. Johnston, I never used the word "crack."

Q.      I appreciate you don't use the word "crack."

        You recall hearing the -- not the testimony, but you do recall stipulating that in Government's Exhibit Drugs 33, these two little rocks were cocaine base, commonly known as crack.

A.      I called it "cocaine base."  I never called it "crack."

Q.      Do you understand that you and your attorney stipulated that this was cocaine base, commonly referred to as crack?  Do you understand that?

A.      Yes.

Q.      And this was something that you prepared and you smoked; is that correct?

A.      That's correct.

Q.      Although this little bit here you hadn't smoked yet; is that correct?

A.      That's correct.

Q.      You do admit you were a user of cocaine base, then I'll use your term instead of crack.

A.      Thank you.  Yes, that's correct.

Q.      In addition to the people on this chart here, you also met Julio, or Mr. Echarte; isn't that correct?

A.      Yes.

Q.      You met him at Bexhill Court; isn't that correct?

A.      That's correct.

Q.      And Ms. Martin, at some point in time, advised you that he was in jail for drug offenses; isn't that correct?

A.      No.  She never told me what he was in jail for.

Q.      And you never asked?

A.      I never asked.

Q.      There wasn't a concern of yours why he was in jail?

A.      No.

Q.      We'll get back to that when we go through some of the calls.

        You also met Beverly White at her house; isn't that correct?

A.      I don't know a Beverly white.

Q.      You didn't meet Beverly White at her house on Bexhill Court?

A.      I don't know.

Q.      Her neighbor who lived down at Royal Crest?

A.      No.  I don't recall a Beverly White.

Q.      How about an individual who went by the name of Dobie?  Other than LaVon Dobie, did you meet a gentleman who went by the nickname "Dobie?"

A.      No.

Q.      You don't recall meeting him?

A.      No.

Q.      Let's get back to the crack cocaine.  Describe for us how it is that you took powder cocaine, such as that shown in Drugs Exhibit 32, and converted it into crack or, strike that, cocaine base?  I'll stick with

your term, I'm sorry.  How did you convert it into --
from powder into cocaine base?

A.      I put it in a piece of paper, the cocaine
powder, and I put baking soda in it, put a little water
in a spice jar -- empty spice jar, put it in some
boiling water in a pan, and I cooked it.

Q.      And then what did you do with it?

A.      I smoked it.

Q.      Were there processes that you had to go through
before you could smoke what you put in the pan?

A.      Yeah.  You take it out the bottle and it dries,
it's hard, and then you smoke it.

Q.      During this time, you never had it -- while you
were converting tiny portions of cocaine powder to
base, you never had a discussion with Ms. Martin
concerning whether or not you could just buy it as
crack at the same price?

A.      Ms. Martin did not even know until I was in this
courtroom that I smoked cocaine base.

Q.      Now, in terms of the converting of the powder
into cocaine base, what kind of paper did you use?

A.      What do you mean what kind of paper did I use?
In reference to what?

Q.      In reference to converting the powder cocaine to
crack.  You are aware of the fact that powder cocaine

will stick to paper?

A.      You just used a normal piece of paper.  It could
be whatever piece of paper was available in the area of
the kitchen.  It could be a piece of notebook paper or
a sticky pad.

Q.      Even though cocaine powder will stick to that
kind of stuff?

A.      It doesn't stick.  You poor the baking soda and
cocaine in the paper, and you pour that into the water.
Why would it stick?

Q.      You cooked this in your kitchen?

A.      Yes, I did.

Q.      Your husband never knew anything about it; is
that correct?

A.      That's correct.

Q.      You never used a microwave to do it; is that
correct?

A.      No.  I did use the microwave, but my way was
cooking it on top of the stove.

Q.      Well, describe for us how you did it in a
microwave then, Ms. Ali.

A.      The same exact way, except no boiling water, and
the same type of jar in the microwave.

Q.      And who is it -- again, who described this for
you?

A.      I learned that process myself.

Q.      No.  You never discussed it with anyone?

A.      No.

Q.      You just figured out how to do that on your own?

A.      Correct.  If you can boil something in water, you do something in the microwave, and I wasn't good at that because it used to pop all over the place.

Q.      It would pop all over the place?

A.      In the microwave, yes.

Q.      And we're talking about half a gram at a time; is that correct?

A.      That's correct.

Q.      So you would waste it, then; is that correct?

A.      You're exactly right.  I would waste a lot of it.

Q.      You never thought to ask Ms. Martin to get it as cocaine base, rather than powder; is that correct?

A.      No, I never asked Ms. Martin to get it as crack.

Q.      Let's talk about Ms. Martin a little bit.  You testified in direct examination that Ms. Martin made money selling clothes; is that correct?

A.      That's correct.

Q.      And that she made money from her inheritances.

A.      That's correct.

Q.      And that she made money by gift wrapping

packages; is that correct?

A.      That's correct.

Q.      At Christmastime and also for other special occasions; is that correct?

A.      That's correct.

Q.      And if I understood your testimony, as well as your husband's testimony, Ms. Martin sought to become a concert promoter; is that correct?

A.      That's correct.

Q.      But she never actually promoted any concerts or made any income from them; isn't that correct?

A.      Do you mean the concerts with Aretha Franklin in them?  No, she did not.

Q.      Yeah, the concerts she tried to invest in as the promoter.  Is that correct?

A.      She never made any money, no, she did not.

Q.      So she never made any money from the concerts?

A.      No.

Q.      That was something she was trying to do at the time of her arrest in 2004; is that correct?

A.      She was into it.  It just didn't happen because of the arrest.

Q.      She had invested money is what you're saying?

A.      Yes, and she had gotten dates.

Q.      But none of the concerts happened before she

went to jail; isn't that correct?

A.      Yes, that's correct.

Q.      So you did omit one way that Ms. Martin made money, in telling this jury how she made money; isn't that correct?

A.      Excuse me?

Q.      You forgot to tell the jury about one of the other ways Ms. Martin --

        MR. MCKNETT:  Objection.

        MS. JOHNSTON:  -- Ms. Martin made money in the spring of 2004, haven't you?

        MR. MCKNETT:  Objection.  Argument.

        THE WITNESS:  No.

        THE COURT:  Overruled.

        BY MS. JOHNSTON:

Q.      Indeed, you assisted Ms. Martin in that other way of making money; isn't that correct?

A.      I don't know what you're referring to, Ms. Johnston.

Q.      Perhaps I could play some calls for you.  You're familiar with a life insurance policy with Canseco Insurance Company, are you not?

        MR. MCKNETT:  Objection, Your Honor.

        MR. WARD:  Objection, Your Honor.

        MR. MONTEMARANO:  Objection, Your Honor.  Could

we be heard at the bench, please?

THE COURT:  Come to the bench.

(At the bar of the Court.)

THE COURT:  Who is going to make the objection?

MR. MONTEMARANO:  Allow me to start.  Far beyond the scope of direct.  There was no discussion of making money with Ms. Martin or anything like that that I recall from this week or last, A.  B, the court has already ruled as to the bifurcation of any questions of insurance fraud which we then went through again at the bench last week and Ms. Johnston averred she wouldn't be going there.  So, of course 17, 18 minutes into her cross, here we are.

THE COURT:  Let me ask you this, Mr. Montemarano.  The testimony of this witness is to the effect that she was unaware of anything illegal going on whatsoever at Ms. Martin's household; she wasn't aware of any drug sales, she wasn't aware of -- on and on and on.  Why is this not fair game, if she is aware of some of the illegal activities?

MR. MONTEMARANO:  Because there are six other defendants sitting down there, and if the government wanted to go that way, they should have severed her and tried her separately or severed Ms. Martin and tried her separately.  The spillover effect of these

defendants when this hasn't been alluded to in any way, shape or form by any client's witnesses, by my client -- by my client's attorney on cross, I submit, creates a huge problem.

Ms. Ali, I submit, has been on the stand for approximately three hours and has provided more than enough fertile ground for Ms. Johnston to cross-examine to her heart's content without going anywhere near this.

THE COURT:  Let me hear from Mr. McKnett.

MR. MCKNETT:  Your Honor, if Ms. Johnston is allowed to pursue this line of questioning, we will have a trial on the insurance fraud case, because on redirect I will be required to go through, chapter and verse, all the evidence.  My client has pled not guilty to that.  There is going to be a separate trial, and we don't want to have one here and now as part of this drug case.

I think the purpose of the court's separating out the trials -- and my client did not -- I don't recall the exact words, but I don't think my client ever said that she obviously -- she obviously knew there was something going on because she was buying drugs from Ms. Martin at Ms. Martin's house.  She has never claimed that Ms. Martin was an angel.  She's

buying drugs from her.  And to open up the insurance
fraud case opens up, as I said, a whole new trial.

      MR. MONTEMARANO:  Not only that, Your Honor, but
if this were a question of Ms. Martin having been
convicted of insurance fraud or something, perhaps Ms.
Johnston should go this way.  It might make some sense.
This is, at best, a theory of the defense.  Unless I'm
very wrong, my client remains not guilty until such
time as the government chooses to take her to trial or
dismisses the charges.  The government cannot have its
cake and eat it too.

      THE COURT:  Let me hear --

      MR. WARD:  Your Honor, if I may just say --

      MR. MCKNETT:  May I follow up?

      MR. WARD:  If I may just say, in light of prior
rulings of this court and in light of prior
representations made by the government, I suggest that
if the government wanted to go into this area, it would
have been appropriate to raise that with the court
first, out of the jury's presence.  What the government
has done, I suggest, is slick at best and slimy at
worst.

      THE COURT:  Now let me hear from Ms. Johnston.

      MR. MCKNETT:  Your Honor, if I may just finish
that.  I want to echo Mr. Montemarano's argument.

There has been no conviction of anybody on the
insurance fraud.  The evidence regarding my client's
alleged involvement in that is --

THE COURT:  There has been no convictions of
anybody on trial.

MR. MCKNETT:  It is also, again, circumstantial.
There is no direct evidence that my client participated
in any insurance fraud.  There is circumstantial
evidence that she made a trip to a bank to help Ms.
Martin -- not to help her but to take Ms. Martin to the
bank where Ms. Martin cashed a check, and there was
some documents with my client's name on it.  There has
been handwriting exemplars taken.  I have not gotten
any results back that show that my client put her own
name on those forms.  It's purely circumstantial case.

THE COURT:  Let me hear from the government.
I've heard from you over and over again, and now I'll
hear from Ms. Johnston.

MS. JOHNSTON:  Your Honor, the government did
not intend to raise any issue about life insurance --
the life insurance fraud until first we have Mr.
Montemarano putting one evidence about how she's
getting her money from this estate, leaving the
impression with this jury that she had a legitimate
source of income.  We have taken care of the concert

business by showing that she never made any money from doing that, and we will take care of the fashion show evidence in our rebuttal case.

Then Ms. Ali gets on the stand and Ms. Ali says, well, I knew her, and this is how she got her money. She got her money from selling clothes, and some she got from Kevin Scott, and some I guess she got from Martha Jean West, although Ms. Ali's backed off from that a little bit, and she got her money from inheritances from these two little old ladies' estates, and she also got her money from gift wrapping packages for Christmas and other special occasions.

I didn't go there.  Mr. McKnett went there with her.  All she reiterates is this image that "all I got was small quantities of cocaine from this woman who wasn't involved in the drug business and she was just making money doing these things."  I am allowed to bring out the fact that Ms. Ali assisted Ms. Martin in obtaining money from fraudulent insurance claims and I intend to do that.

There are three or four calls that I am -- there's probably 40 or 50 calls, but there is probably half a dozen calls that I intend to play that will show that Ms. Ali assisted her with cashing in on one insurance policy, and also that she allowed Ms. Martin

to use her name on another insurance policy.  That is
highly relevant in this case where Mr. McKnett has gone
on about trying to show that their only relationship
was buying small quantities of cocaine and that Ms.
Martin only had legitimate business that she was
engaged in and that's all Ms. Ali knew about was her
legitimate business.

I think it's perfectly admissible for those
reasons.  I'm not getting into the impeachment
arguments that we could have made, because it's highly
relevant, given what his testimony was on direct, and I
intend to be very circumspect in how I'm going to
present that by limiting it to two occasions.

THE COURT:  Is there an allegation that Ms. Ali
financially benefited from the insurance fraud?

MR. MCKNETT:  No.

MS. JOHNSTON:  I don't know that she did, which
is not relevant here.  What is relevant here is Ms.
Martin had this source of income and Ms. Ali was aware
of it and assisted her in getting money through these
illegal means, and that is very clear from the calls,
as well as both on the policy that was cashed, as well
as her name was being used on another insurance policy.
I think it's relevant for that reason.

MR. MARTIN:  Even if it's relevant, Your Honor

--

MS. JOHNSTON:  I didn't go there.

MR. MARTIN:  Even if it's relevant, it's
cumulative, and the spillover effect is such that I
don't think the court should allow the government to go
into it.  We're spending too much time up here and
we're spending too  much time going over stuff that the
government really doesn't need to prove in this case.

MR. MONTEMARANO:  Your Honor, here again it is a
trial within a trial.  Ms. Johnston has just proffered
that my client used Ms. Ali's name.  Of course Ms.
Martin's point of view would be, I didn't use it; Ms.
Ali did it.

MS. JOHNSTON:  The calls show their relationship
and their knowledge, and Your Honor can give a limiting
instruction as to the other defendants that it is not
relevant as to them and they should not -- Your Honor,
it is fair for this jury to think that she only made
her money these ways and that's all Ms. Ali knew about
it.  It certainly is highly relevant.  They opened this
door.  We didn't open it.

MR. MONTEMARANO:  To the extent that Ms.
Johnston's arguments about my client's sources of funds
would be "well taken", they had the opportunity to
subpoena Ms. West.  She sat in the courtroom during the

testimony of Mr. Shannon.  She sat in the courtroom
during some of the testimony, I believe, of one of the
other government witnesses.  They did not place her
under subpoena and they've never even talked to her.  I
know that because I've talked to her lawyer.  With all
due respect, they don't have the guts to call the
witness, and they're trying to -- no, and they're
trying to backdoor it.

        If they had the faith in their theory, they'd
have put Ms. West on.  Let her take the Fifth, or maybe
she wouldn't have, and maybe she would have deflated
their theory.  I decided not to put the woman through
it.  I got what I needed out of the government's own
witnesses, but the government had a way of doing this:
Put up or shut up.  They could have put the witness on.
We've had ten weeks, and they spent three hours with
"Mr. Southwest Airlines" explaining to us what these
forms mean which, I think, average chimpanzee could
have figured out in about 35 seconds.

        THE COURT:  Mr. Montemarano, that doesn't help
me.

        MR. MONTEMARANO:  Your Honor, I submit.

        THE COURT:  It's been a long tile trial, but
let's lighten up on those comments.  They don't help me
and they don't help you, and the same goes for Ms.

Johnston.

       MR. MONTEMARANO:  Yes, sir.

       THE COURT:  Let's keep the personal comments down.

       I'm going to sustain the objection.  I think that this is relevant, and I think the danger of unfair prejudice is too much.

       MR. MCKNETT:  Thank you, Your Honor.

       THE COURT:  We're not going to a trial on --

       MS. JOHNSTON:  Your Honor, how is the government supposed to refute that she just had a legitimate income?  How do I cross-examine on that when I'm not allowed to establish that she had sources --

       THE COURT:  I think you can ask in the abstract, aren't there other means by which she was supporting herself.  If she says no, I think you're going to have to take it at face value.

       MS. JOHNSTON:  I'm not introducing it to impeach --

       THE COURT:  I understand.

       MS. JOHNSTON:  I'm introducing it to --

       MR. MONTEMARANO:  Your Honor, we would ask for a limiting instruction.

       THE COURT:  There was just -- the question was so vague, if I give them a cautionary instruction I

think it would make it worse.

MR. MONTEMARANO:  At least to strike the question and disregard it.

THE COURT:  The question is not evidence.  I'm not going -- I don't want to unduly emphasize the question.

MR. MONTEMARANO:  I would point out to the court that this is a request that was whispered in my ear by several of the other attorneys, so it's not just me. I'm not saying that Your Honor wouldn't consider it, but --

THE COURT:  Sustained.

MS. JOHNSTON:  Your Honor, I would ask the court then to allow me to question her about being under indictment and that she's been charged with insurance fraud, as impeachment.

THE COURT:  No.  You're not going to impeach her with an accusation, no.

Objection sustained.

(Back in open court.)

BY MS. JOHNSTON:

Q.    Ms. Martin had other sources of income other than what you've discussed here in court, isn't that correct, that you were aware of?

A.    If you have something to give me, some reference

to --

Q.      She had business dealing with her daughter
Kimberly; is that correct?

A.      In reference to what, Ms. Johnston?

Q.      In reference to going to the bank and cashing
checks.  You're familiar with that, aren't you?

A.      Yes.

Q.      And those checks were not checks that she should
have had properly, isn't that correct?

        MR. MONTEMARANO:  Objection.

        MR. MCKNETT:  Objection, Your Honor.

        MR. MONTEMARANO:  Basis for knowledge.

        THE COURT:  Overruled.

        BY MS. JOHNSTON:

Q.      Isn't that correct?

A.      I can't say that.  That Kimberly shouldn't have
the checks?

Q.      That Ms. Martin should not have gotten the money
from those checks; isn't that correct?

A.      I don't know.

Q.      Well you do know that the check came to your
house; isn't that correct?

A.      Yes, it did.

Q.      And you went with them to the bank to cash it;
isn't that correct?

A.      I went to the bank as a witness, not to cash the check.

Q.      Well, the check was cashed while you were at the bank; isn't that correct?

A.      That's correct.

Q.      And the money didn't go to Ms. Kimberly Rice, it went to her mother; isn't that correct?

        MR. MCKNETT:  Objection, Your Honor.

        THE WITNESS:  I didn't see any money being transferred.

        BY MS. JOHNSTON:

Q.      So you closed your eyes to that; is that correct?

        MR. MCKNETT:  Objection, Your Honor.

        MR. MONTEMARANO:  Objection.

        THE COURT:  Overruled.

        THE WITNESS:  I was sitting in the back, at the office wall, and they were sitting at the desk with the person behind the desk, and I was sitting away from both of them.

        BY MS. JOHNSTON:

Q.      You saw the check because it came to your house; isn't that correct?

A.      Yes, it did.

Q.      You called Ms. Martin when it came to your

house?

A.      Yes, I did.

Q.      You didn't call Ms. Martin to tell her a check came in her daughter's name.

A.      I was dealing with Ms. Martin.  Yes, I called Ms. Martin.

Q.      You were anxiously awaiting the arrival of that check; isn't that correct?

A.      No.

Q.      Ms. Martin was anxiously awaiting the arrival of that check to get to the house; isn't that correct?

A.      No.  We were waiting for the check, not that we were anxiously awaiting for the check.

Q.      You were concerned that Ms. Rice had had the check diverted to her address; isn't that correct?

        MR. MCKNETT:  Objection, Your Honor.

        THE COURT:  Overruled.

        BY MS. JOHNSTON:

Q.      Isn't that correct?

A.      It was a concern as to where the check was, yes.

Q.      That maybe Ms. Rice had called and gotten the check sent to her address, not your address.

        MR. MONTEMARANO:  Objection, basis of knowledge.

        THE WITNESS:  No, that is not correct.

        BY MS. JOHNSTON:

Q.      And you and Ms. Martin didn't discuss that on
the telephone?

A.      We discussed what had happened to the check and
whether it was sent out or not, whether Kim had picked
the check up.

Q.      Or whether Ms. Rice had called the company and
had it sent to her.

A.      I don't remember that part of the conversation.

Q.      If I play a call for you, perhaps it would
refresh your recollection.

A.      It probably would.

        MR. MCKNETT:  Objection, Your Honor.

        THE COURT:  Overruled.

        BY MS. JOHNSTON:

Q.      If we could play Call B-428, which occurred on
March 12.  We have copies of the transcript for
everyone.

        MR. MARTIN:  What page, ma'am?

        MS. JOHNSTON:  Your Honor, we will need a few
moments here to pull out just the one call.

        THE COURT:  Why don't we do this?  We have to be
in recess at 11:30 in any event, so let's take a recess
until 20 minutes of 12.

        Counsel, please return at 11:30 so we can
discuss other matters before the jury is brought in.

(Jury excused at 11:18 a.m.)

(At the bar of the Court.)

THE COURT:  How is your ankle doing?

MR. MONTEMARANO:  I think better than your shoulder.  I may be out of my boot by Thursday.

I wanted to apologize to the court and Ms. Johnston for my ill-considered choice of imagery.  I wasn't calling anybody a chimpanzee.  I was simply suggesting it was easily understood.

THE COURT:  It's been a long trial.

MS. JOHNSTON:  I didn't take anything personal.

MR. MONTEMARANO:  Well, I hope Ms. Johnston --

THE COURT:  It just rolled right off her back. She's a professional and you are, too.

MS. JOHNSTON:  I'm used to being called lots of things.

MR. MONTEMARANO:  I didn't call you that, and that's the point.  Whether or not I was calling her that, Your Honor, I apologize.

THE COURT:  Will you please make sure you confer with each other about the matters that I raised at the beginning of the day on instructions?  I would like to address those at 11:30.

MR. MONTEMARANO:  Oh, 11:30?

THE COURT:  Yeah, 11:30.

(Off the record at 11:19 a.m.)

(On the record at 11:34 a.m.)

MR. MCKNETT:  Your Honor, Ms. Ali asked me if she should be in the courtroom or should she step out.

THE COURT:  No, she can be here.

MR. MCKNETT:  I knew there were discussions you wanted to have.

MR. MONTEMARANO:  Your Honor, on behalf of the defendants, we renew our objection to the objected to question made by Ms. Johnston.  We further move for immediate cessation of cross-examination on this topic. Ms. Johnston has not used the word "insurance" yet but is simply asking all the same questions that I submit the court has made clear should not be gone into and now, on top of that, we now have --

THE COURT:  I think she's pretty much gone as far as I'm going to let her go without going into all the details of the insurance scheme.

MR. MARTIN:  That's not true, Your Honor.

THE COURT:  I can only hear one person at a time.

MR. MONTEMARANO:  The transcript we've been provided talks about insurance, exactly what Your Honor has said not to do, and here is Ms. Johnston intending to go into it.  With all due respect, Your Honor, the

ruling was, as I understood, we weren't going to get into another trial on insurance.

THE COURT:  No, we're not going to get into that, but clearly the witness was pressed and legitimately so concerning her knowledge of the other income.

MS. JOHNSTON:  It was her response that precipitated me having to play this one call.

THE COURT:  I'm not going to revisit this record.

MR. MONTEMARANO:  May I read into the record for Ms. Dunlap the objection I find in this transcript?  On Page 2 of it, there is LaNora saying, "Right.  But how would she get it, though, you see what I'm saying?  It's no way.  It's like she didn't know the insurance company, right?"  And Ms. Martin, my client, saying, "Yeah, she knew the insurance company.  She might have called and told them something."

MS. JOHNSTON:  That's a response of Ms. Ali's response to the question.

THE COURT:  This is not going into the details of what that insurance check was and how it came to be issued.  It may very be that they had somebody else's insurance check.  It has nothing to do with this case until I hear the insurance fraud part of this case.

MR. MCKNETT:  Judge, it invites speculation on the part of the jury, at minimum.

MS. JOHNSTON:  No, it doesn't.

MR. MCKNETT:  It's got going to do with this case, absolutely nothing to do with this case.

MS. JOHNSTON:  It establishes Ms. Ali knew Ms. Martin was getting funds from another source, which is contrary to her direct examination.

THE COURT:  I've already ruled on this and I'm not going to revisit this ruling.

MR. MARTIN:  That's the whole point, Your Honor. You have ruled on it, and the government has ignored it.

THE COURT:  I have permitted the additional question, which was limited, and I don't believe there is going to be anymore questioning on the subject.

MR. MCKNETT:  There is.  They're going to play this tape and then read the transcript, and I object to that.

THE COURT:  I haven't seen the tape.  I mean, I haven't seen the transcript so I need to see what the transcript is.

MR. MCKNETT:  I can hand one up.

THE COURT:  If you will give me a transcript, I will take a look at it.

MS. JOHNSTON:  Your Honor, this is in response to her question about not discussing the change of address.  It's very limited.  It is directly in response to Ms. Ali's response to my questions.  I think she may have asked if I had something that would help her remember.

THE COURT:  Why should I permit you to play this call, Ms. Johnston?

MS. JOHNSTON:  Your Honor, it was as a result of my questions of Ms. Ali right before the break where she said she couldn't remember whether asking anything about whether Ms. Rice had changed the address on this.  This call goes directly to that point, because she advises she is the one who mentions to Ms. Martin that the address was -- that she could have called and changed the address, and that's how it came up with her was in response to her questions, not anything -- her answers in response to the government's general questions about getting some money by another means.

MR. MCKNETT:  Your Honor, if I may respond.

THE COURT:  What's the status of this transcript?  You haven't distributed it yet, have you?

MS. JOHNSTON:  No, Your Honor.  We asked to play the call and distribute the transcript.

THE COURT:  But you haven't done that yet.

MS. JOHNSTON:  We have not done that yet.

THE COURT:  Okay.

MR. MCKNETT:  First of all, if this is to refresh recollection, it should merely be shown to my client and not played for the jury.  If it refreshes her recollection, fine; if it doesn't, that's the end of the issue.  The second part is, we are now much further down the road toward insurance fraud than we were before this.

THE COURT:  Let me cut to the chase.  I think there's been enough inquiry that goes to this question of other sources of income, and I'm going to sustain the objection and will not permit this recording to be played nor the transcript to be circulated.

MS. JOHNSTON:  May I use it to refresh her recollection in terms of the address and her discussions with Ms. Martin relative to that check, Your Honor?

MR. MCKNETT:  Your Honor, I object to that because that's not --

THE COURT:  I'm not going to permit this transcript to be read to the jury nor a tape of it to be played.  You can certainly show it to her to refresh her recollection, and that's about the end of the inquiry.  All right?

MS. JOHNSTON:  Thank you, Your Honor.

MR. MONTEMARANO:  For the record --

THE COURT:  Counsel --

MR. MONTEMARANO:  I'm sorry?

THE COURT:  I've got to get instructions done, and I'm not going to get them done unless I get some decisions made.  I've asked you, Mr. Montemarano, if there is a collective decision of the defense attorneys with respect to lesser included offense instructions, because if I do that I'm going to have to do some brain surgery not only to the instructions but also to the verdict form.

MR. MONTEMARANO:  Your Honor, I think that's a matter for the people who are involved.  Ms. Martin does haven't a dog in this fight and doesn't have anything to do --

THE COURT:  What I need to know, defendant by defendant, is what is your position with respect to a lesser included offense instruction.

Mr. Ward, you've given me that in writing, I understand, what you want.

MR. WARD:  Obviously, we've asked for it.

THE COURT:  I need to check the indictment.  Your client is not charged with possession.

MR. WARD:  That's correct.  I think under the

law --

THE COURT:  Her only charge is conspiracy?

MR. WARD:  Several telephone call counts and the
firearm in furtherance of, yes.

THE COURT:  All right.

Mr. Sussman?

MR. SUSSMAN:  We're not requesting any.  We
believe that we're entitled to separate trials, and the
court's concerns about uniformity really pale in
comparison to our right to a separate trial.

THE COURT:  I've already ruled on that, I
believe, in the case of your client -- I mean, you  did
not make that in opening statement so I don't know what
your contention is.  If I recall correctly from the
testimony, there's two incidences of Ms. Martin and
your client meeting.

MR. SUSSMAN:  One.

THE COURT:  One?  Is it one or two?

MR. SUSSMAN:  I believe one that was an observed
meeting and another one that was probably referenced as
supposed to have happened.

THE COURT:  Mr. McKnett, what's your position?

MR. MCKNETT:  Your Honor, I've consulted with my
client and I believe it's our position now that we will
join in Mr. Ward's request and request the court to

make the instruction with regard to the conspiracy
count and the other counts, accordingly.

THE COURT:  Ms. Johnston.

MS. JOHNSTON:  Your Honor, I would defer to Ms.
Greenberg since she was the one who was able to do the
research on it.

THE COURT:  Ms. Greenberg.

MS. JOHNSTON:  I think there's a little bit of
changes to what Mr.- --

MR. WARD:  I can't hear.

MS. JOHNSTON:  There may be some minor changes
to what Mr. Ward proposed, in terms of the language he
used.

THE COURT:  Oh.  I'll do the language myself.
What I want to know is, what is the government's
position?  I mean, I've looked at the law.  It appears,
at least with respect to Lavon Dobie and LaNora Ali,
that they have put affirmative testimony before me and
before this jury that, if believed, would support the
lesser included offense on the conspiracy, and I
believe they're both charged with possession with
intent to distribute.

MS. JOHNSTON:  I am not sure Ms. Dobie is
charged with possession with intent to distribute.

THE COURT:  She's not, but Ms. Ali is.

Is that correct, Mr. McKnett?  I've got to take a look at the indictment.  It's such a long monster, but is your client charged with possession with intent to distribute?

MS. SUSSMAN:  Are you asking me, sir?

THE COURT:  No.  Mr. McKnett.

MR. MCKNETT:  I believe so, Your Honor.  I can't think of the count number.

THE COURT:  I'll have to get it out.  Clearly, if I give a lesser included offense, it would go both in your case, at least both in conspiracy count and to the possession count, and you prefer that there be such an instruction, as does your client.

MR. MCKNETT:  Yes.

THE COURT:  All right.

MS. JOHNSTON:  We're not going to oppose the court giving that instruction.

THE COURT:  I would be giving it, as I said, on the conspiracy as to both of them and on the possession with intent to distribute only as to Ms. Ali.

MS. JOHNSTON:  I don't know if there was some other language --

MS. GREENBERG:  Your Honor, I was just going to mention that it's not based on the cases cited and defense memo of the court, the case that addresses it

is an unpublished case is *U. S. versus Amos*.

THE COURT:  I believe I have the case.

MS. GREENBERG:  The Fourth Circuit seems to indicate where the facts support it.

THE COURT:  Where the facts support it.  I do believe that both of these defendants have forcefully put forth not just an argument but in testimony that they are mere users and they have nothing to do with distributing.  So, the issue is joined fairly by the evidence, and there have -- I will give it as to those two defendants in the case of Mr. Ward's client just the conspiracy, and in the case of Mr. McKnett's client on the conspiracy and the possession with intent to distribute.

Ms. Greenberg, are you -- have you -- you understood the concern I had about the verdict form in terms of saying "distribute."

MS. GREENBERG:  Yes, Your Honor.  I just didn't want us to be looking on two different versions at the same time.  So, over lunch -- I haven't had a chance to --

THE COURT:  I believe there's a consensus that we shouldn't mess with the verdict form other than as I indicated we that should correctly describe what the charge is, which is possession with intent to

distribute which is also what the instructions describe.  So, if you will undertake to take care of the verdict form -- we are preparing a chart, and I will distribute the chart at the earliest possible time so they can see what are the charges against the defendants defendant by defendant.

MS. GREENBERG:  Your Honor, I will be happy to take care of the verdict form changing distribution to possession with into to distribute.  I just worry there is not enough time for me to do it over the lunch hour, and I have to be in the court --

THE COURT:  No.  The verdict form is something I'm going to give to them.  I don't know if I can do it today or not.  If I don't get it done to them today, I will explain the verdict form to them, perhaps at the beginning of the closing argument, because I would like to have them have the verdict form in front of them as the closing arguments come in.

MS. GREENBERG:  Did Your Honor want us to put the lesser includeds in?

THE COURT:  If you've got them, put the lesser includeds in.

MS. GREENBERG:  Your Honor, I also have to prepare my closing tonight.  It is their request to change the verdict form.  It was not our request.

THE COURT:  Then we'll take a shot at it.

Have you done the other part?

MS. GREENBERG:  No.  Your Honor mentioned it
this morning.

THE COURT:  We'll undertake to do it ourselves.
We'll do it all.  We'll do it all.

Now, I will undertake, during the lunch recess,
to do the additional materials to go to the
instructions on lesser included offenses that I've just
indicated.  Anything further, counsel?

MR. MCKNETT:  Your Honor, just that I've
identified two possession with intent to distribute
counts with my client, Counts 45 and 56  -- Paragraphs
45 and 56.

THE COURT:  What were the numbers again?

MR. MCKNETT:  Paragraphs 45 and 56.

THE COURT:  Those are the possession with intent
to contribute?  The three counts that she gets an
alternative one are 1, 45, and 56.

MR. MCKNETT:  That's correct.

THE COURT:  Then Mr. Ward's client is just one
only.  All right.  We'll take care of that.

MR. MONTEMARANO:  One last thing.

THE COURT:  What we will do, by the way, on the
lesser includeds, is to -- the drug quantity question

will still come in.  They will still be asked to
identify drug quantity.

　　　　　Okay.  Proceed.

　　　　　MR. MONTEMARANO:  One thing.  We can do it now,
as opposed to in the presence of the jury.  This
transcript that was just the source of some contention
is B-428.  It's Government's Exhibit B-428.

　　　　　THE COURT:  Right.  Well --

　　　　　MR. MONTEMARANO:  It will be marked for
identification only.

　　　　　THE COURT:  This has been received for
identification only as Government's Exhibit No. B-428.

　　　　　MR. MONTEMARANO:  Thank you, Your Honor.

　　　　　THE COURT:  It will not be received in evidence.
Courtroom Deputy, you may file that.  That's the one
we're not going to let them use.

　　　　　Anything further?  We'll bring the jury in.

　　　　　MR. SUSSMAN:  I don't want to stop the jury
coming in, but maybe at the lunch break could I get
three minutes on that 843?  I did some work on that.

　　　　　THE COURT:  Sure, I will be glad to.

　　　　　Bring the jury in.

　　　　　How much more do you think you have on the
witness, Ms. Johnston?

　　　　　MS. JOHNSTON:  I don't know, Your Honor.

Certainly not as long as direct was, which I think was
bordering on five hours.

               (Witness resumes the stand.)

               (Jury returns at 11:52 a.m.)

      THE COURT:  All right.  You may proceed.

      BY MS. JOHNSTON:

Q.     Thank you, Your Honor.

      Ms. Ali, when we recessed I had referenced you
to Call B-428 which we've identified for identification
purposes only as Miscellaneous 57.

      Have you had a chance to review that transcript?

A.     Yes.

Q.     Does that refresh your recollection concerning
conversations that you had with Ms. Martin concerning
whether or not her daughter, Kimberly Rice, had changed
the address on the check?

A.     Changed the address?  Yes.

Q.     And there was concerns on the part of you and
Ms. Martin about whether Ms. Rice had had the check
diverted to her, rather than to your address; isn't
that correct?

A.     We talked about that, yes.

Q.     And there were concerns about whether she had
done that.

A.     It wasn't so much concern but, yes, we talked

about that, yes.

Q.     You and Ms. Martin wanted that check to come to
your house, not to Ms. Rice's house; isn't that
correct?

          MR. MCKNETT:  Objection, Your Honor.

          THE COURT:  Overruled.

          THE WITNESS:  Ms. Martin wanted the check to
come to my house, yes.

          BY MS. JOHNSTON:

Q.     You certainly didn't disagree with her, did you?

A.     No.  My husband and I allowed that to happen,
yes.

Q.     In terms of Ms. Martin, you two were best
friends; is that safe to say?

A.     I won't say we were "best friends."  We were
good friends.

Q.     Very close?

A.     Yes.

Q.     You would see her or talk to her on an almost
daily basis; is that correct?

A.     Yes.

Q.     You pretty much knew -- strike that.

          You discussed each other's lives and issues that
came up in your life as well as her life; isn't that
correct?

A.      At times.  We would talk about what friends talk about, yes.

Q.      Right.  And in this instance about her difficulties with Ms. Rice; isn't that correct?

A.      No, there wasn't difficulties with Ms. Rice.  It was difficulties that she was having with her family during that time, it was not just with Ms. Rice.

Q.      And including what we just talked about with Ms. Rice; is that correct?

A.      No.  That wasn't a daily discussion, no.

Q.      Well, you had discussions over the course of time with her about problems with Ms. Rice and about problems with her other daughter, Teresa.

A.      I discussed with Ms. Martin about her family because I was not happy with that situation, yes.

Q.      And do you know an individual -- a friend of yours named Pat?

A.      Do I know a friend of mine named Pat?

Q.      Yes.  Was there a friend of yours named Pat whom you put in contact with Ms. Martin?

A.      I have a friend named Pat, yes.

Q.      Did you arrange for her to have a dealing with Ms. Martin?

A.      As far as what?

Q.      I'm asking you, did you make an arrangement for

your friend Pat -- what was Pat's last name?

A.      I have a friend named Patricia Swain.

Q.      Okay.  Is she a teacher?

A.      Yes.

Q.      Did you make arrangements for Ms. Martin to have
contact with your friend, Pat?

        MR. MONTEMARANO:  Objection.  Relevance; beyond
the scope.

        THE WITNESS:  A lot of my friends --

        MR. MONTEMARANO:  Beyond the scope.

        THE COURT:  Overruled.

        THE WITNESS:  A lot of my friends met with Ms.
Martin, and my family too, not just Ms. Pat.

        BY MS. JOHNSTON:

Q.      And Pat had some health issues; is that correct?
She was suffering from a lot of stress; is that
correct?

A.      No.

Q.      And you made arguments -- you didn't make
arrangements for Ms. Martin and Ms.- -- this individual
named Pat to do a transaction?

A.      No.

Q.      Well, I want to show you what's -- what we'll
mark as B-424, another call, Your Honor.  This time
I'll mark it for identification purposes only.

MR. MCKNETT:  May we see that?

MS. JOHNSTON:  Sure, Mr. McKnett.

THE COURT:  Counsel, do you have a copy to take a look at?

MS. JOHNSTON:  I will get a copy, Your Honor.

MR. MONTEMARANO:  Me, too.

BY MS. JOHNSTON:

Q.    Again, Call B-424 for identification only.  Ms. Ali, if you could read through the first two pages, and I think you will see at the top of the third page it goes into a different subject matter.  If you could, read through the first two pages.

Have you read through that, Ms. Ali?

A.    Yes.

Q.    Okay.  Is that your friend, Pat Swayne.

MR. MONTEMARANO:  Objection, Your Honor.  At this point the only proper question is whether this refreshes Ms. Ali's recollection.

THE COURT:  All right.  Sustained.

BY MS. JOHNSTON:

Q.    Does that refresh your recollection?

A.    Yes, it does.

Q.    And that was your friend, Patricia Swain?

A.    Correct.

Q.    And you had arranged for her to engage in a

transaction with Ms. Martin; is that correct?

A.      No.

Q.      Why don't you tell us what you say that call's

about, where you --

        MR. MCKNETT:  Objection.

        MR. MONTEMARANO:  Objection, Your Honor.

        THE COURT:  What's the basis?

        MR. MCKNETT:  Ms. Ali has answered the question:

No, this is not about a transaction that she set up

between Patricia and Ms. Martin.

        MR. MONTEMARANO:  The call has already been

ruled inadmissible.  Therefore, asking what the call is

about --

        MS. JOHNSTON:  Your Honor, I'm referencing the

first two pages of this call.

        THE COURT:  Approach the bench.

                (At the bar of the Court.)

        MR. MCKNETT:  Your Honor, Ms. Johnston asked if

this transcript refreshed my client's recollection

about interactions between Patricia and Ms. Martin.  My

client said it did.  When Ms. Johnston asked what did

it have to do with the transaction between Ms. Martin

and Patricia, my client said no, and that's the end of

it.

        THE COURT:  Well, it does refresh her

recollection as to how she hooked the two of them up, didn't it?

MR. MONTEMARANO:  No, that she discussed her with Ms. Martin:  Do you recall discussing pat with Ms. Martin?  Yes.

MR. MCKNETT:  Did it have anything to do with setting up a transaction?  No.  And that's the end of it.

MS. JOHNSTON:  I think I can have her explain what the transaction is.  I don't think it has anything to do with insurance fraud.  That's why I want to reference the first two pages.  The remaining pages have to do with the insurance fraud.

THE COURT:  What is the finder of fact to infer from --

MS. JOHNSTON:  The finder of fact can infer whether it was a drug transaction or what kind of transaction it is.  She said she recalls it.  I didn't ask her specifically what kind of transaction it is.

MR. MONTEMARANO:  Your Honor, there is no reference to tickets and there is nothing except some generalized language, which is entirely collateral to this matter.  The simple fact is the court has ruled this conversation and the prior conversation inadmissible because they are collateral.

THE COURT:  I ruled the prior conversation was inadmissible.

MR. MONTEMARANO:  If she has --

MS. JOHNSTON:  Your Honor, we can move on.  It's not worth arguing over.

THE COURT:  Okay.

(Back in open court.)

BY MS. JOHNSTON:

Q.     Ms. Ali, you and Ms. Martin were very close; isn't that correct?

A.     That's correct.

Q.     Okay.  And Ms. Martin -- according to you, she brought suitcases and left them in your house back in 2002 or 2003.  When was it?

A.     She didn't bring the suitcases to my house.  My husband and I picked the suitcases up, and they were there in 2002.

Q.     There were two suitcases then?

A.     Yes.

Q.     And one of those suitcases is this blue suitcase we see in front of the jury; is that correct?

A.     That's correct.

Q.     All right.  That stayed in your residence; is that correct?

A.     That's correct.

Q.      Ms. Martin came over to your residence during
2003 and 2004 and asked to have her suitcase and go
through her suitcases; is that correct?

A.      She checked it maybe two to three times, yes.

Q.      Is that what your husband testified to last
week, two to three times?

A.      I don't recall what he testified to.

Q.      So when she came and she asked to see her
suitcase, did you get it out of the closet and give it
to her?

A.      My husband did.

Q.      And you're home on those two to three occasions?

A.      Yes.

Q.      When she asked to see them -- the suitcase, it
was in the living room; is that correct?

A.      Living room/dining room -- the dining room area,
yes.

Q.      On the coffee table?

A.      No, it was not on a table.  It was on the floor,
the living room/dining room area; correct.

Q.      And she opens the suitcase?

A.      That's correct.

Q.      You weren't in there with her when she opened
the suitcase?

A.      No.

Q.      You just left the room?

A.      Yes.

Q.      You went back in the back bedroom?

A.      Yes.

Q.      She didn't have a key for your house -- your
apartment, did she?

A.      No.

Q.      She had to have your permission to come in the
house?

A.      Yes.

Q.      You didn't sit in the living room with her and
socialize with her while she went through her
belongings?

A.      No.  That was her personal belongings.

Q.      You didn't sit with her and chat?

A.      No, I did not.

Q.      You didn't see what was in there?

A.      No, I did not.

Q.      Now, if you could look at the suitcase and tell
me where you see the pry marks.

A.      Where I see what?

Q.      The pry marks.

        MR. MCKNETT:  Objection, Your Honor.

        THE WITNESS:  I wasn't there.

        MR. MCKNETT:  Objection, Your Honor.  Scope.  My

client didn't testify as to how the suitcase was
opened.

THE COURT:  Sustained.

BY MS. JOHNSTON:

Q.    Can you look at the suitcase for me?

A.    Yes.

Q.    Do you see any pry marks on the suitcase?

MR. MCKNETT:  Objection, Your Honor.  That's the
exact same question.

THE COURT:  Sustained.  The jury can look at the
exhibit themselves.

MR. WARD:  The agents said they pried it open.

MS. JOHNSTON:  Objection to Mr. Ward's comments.

MR. WARD:  On the basis it's improper or
incorrect, Your Honor?

MS. JOHNSTON:  Both, Your Honor.

BY MS. JOHNSTON:

Q.    That suitcase was in your house when the police
executed the search warrant; is that correct?

A.    Yes.

Q.    We looked at a lot of pictures here, Picture
P-1B.  That accurately depicts your house the way it
was on the day the search was executed; isn't that
right?

A.    That depicts the closet.

Q.      And the hallway.

A.      And the hallway.

Q.      And the way to get to the living room and the
dining room.

A.      I don't see that.  The picture's too far up, but
it does to the left, yes.

Q.      Let me put it wide.  I don't want to -- okay.
This area here goes to your kitchen and dining room; is
that correct?

A.      To the left is the dining room.  Further to the
left is to the kitchen.

Q.      All right.  So, it accurately depicts the way
your house was on June 1st; isn't that correct?

A.      That's correct.

Q.      So does P-1C; isn't that correct?

A.      That's correct.

Q.      When the officer testified that this picture was
taken, he was correct that that's the way your closet
looked on that date; is that correct?

A.      That's correct.

Q.      And the blue suitcase that we just heard all
about, that suitcase was in fact in that closet; is
that correct?

A.      That's correct.

Q.      And then we heard a lot about this drawer, P-1H.

Do you see that?

A.      Yes.

Q.      The items that were in that drawer, they were
your items weren't they?

A.      That's correct.

Q.      And they did belong to you; is that correct?

A.      Yes.

Q.      And they were kept in that drawer; isn't that
correct?

A.      Yes.

Q.      And that was the top drawer -- was the drawer
inside your jewelry chest on top of the dresser; isn't
that correct?

A.      Yes.

Q.      It would have been a little hard to take a
picture of those items if the drawer were still in the
jewelry chest, wouldn't you agree?

A.      Yes.

Q.      So it had been -- it was removed to take the
picture; is that correct?

A.      That's correct.

Q.      All of those items were in that drawer when that
search warrant was executed; isn't that right?

A.      Yes.

Q.      Similarly, P-1I.  Now, I understand you had some

telephone books and other things in there; is that

correct?

A.      I had a lot of things in there.

Q.      You had a lot of papers in there?  Do you see

this little baggy here down in the corner?

A.      Yes.

Q.      It would have been a little hard to take a

picture of that baggy in the drawer if all of your

telephone books were in there; is that correct?

        MR. MONTEMARANO:  Objection, Your Honor.  Basis

for knowledge.

        THE COURT:  Overruled.

        THE WITNESS:  No.  I've seen other pictures in

here where things were just taken on top of stuff.

They could have left the stuff in the drawer and taken

pictures.

        BY MS. JOHNSTON:

Q.      If it was on the bottom of the drawer, they

could have taken a picture of that in its position with

the telephone books and the address books and your

other papers in that; is that correct?

        MR. MONTEMARANO:  Assumes facts not in evidence,

Your Honor.  There's been no evidence where the bag

was.  The officer testified that's what the drawer

looked like.

THE COURT:  Sustained.  Rephrase the question.

BY MS. JOHNSTON:

Q.      You heard the officer testify that this is where they found the baggy; isn't that correct?

A.      That's correct.

Q.      Okay.  And is it not correct that if they had left all of your books and your papers and things in there, you could not have seen that baggy on the bottom of the drawer?  Isn't that correct?

A.      If it was on the top of the drawer.  It could have been on the top of the drawer.

Q.      So it's your position that the officer is misplacing the item in the drawer; is that correct?

MR. MCKNETT:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I know that drawer did not look like that.  I know that box was not in that -- that's a jewelry box.  It was kept on top of my dresser with a bag in it on top of my dresser.  That is my night stand. (Witness indicating.)

BY MS. JOHNSTON:

Q.      Opened, and in that condition; is that correct?

A.      It was a top on it.  That is not the condition. It was a top on it.

Q.      You hid your drugs and your baggies from your

husband, yet you had it in a jewelry box sitting on the
top of your dresser; is that correct?

A.      Why would my husband go in my jewelry box?

Q.      Is that correct?

A.      Yes.

Q.      And you don't disagree that that bag came from
your bedroom, and that was your bag that had cocaine in
it?

A.      In my bedroom.  I disagree where it might have
been but, yes, it was my bag and my bedroom.

Q.      You didn't disagree about a little baggy here
that was found in that dresser drawer, that it was your
bag and it contained cocaine.

A.      It did not contain cocaine.  I think it was
cocaine residue.

Q.      At one point it contained cocaine.

A.      That's correct.

Q.      And you put it in this drawer.

A.      I'm not going to say I placed it in that drawer,
ma'am.  I told you I know I had something in that box
with the top on it.

Q.      Are you telling us you didn't -- contrary to
your direct examination, you didn't put that baggy in
there?

A.      I said a bag could have been in there.

Q.      Is it your bag?

A.      I agreed to it that that was my bag.

Q.      So, that bag was found in your house.

A.      Yes, it was.

Q.      You don't disagree with that.

A.      I don't disagree with that.

Q.      So we've spent hours discussing whether it was
in this drawer or somewhere else; is that correct?

        MR. MCKNETT:  Objection, Your Honor.
Argumentative.

        THE COURT:  Overruled.

        THE WITNESS:  Yes, we've spent hours on that.

        BY MS. JOHNSTON:

Q.      Though you admit that is your bag of cocaine.

        MR. MCKNETT:  Objection, Your Honor.  Ms. Ali
never denied that, Your Honor.

        THE COURT:  Sustained.

        BY MS. JOHNSTON:

Q.      In addition to that, all of these other items
that the detective testified that he found in your
house, these are all your items aren't they?

A.      All of those items, yes, are my items.

Q.      And I'm referring to Drugs 34 and Drugs 32.
Those are your items.

A.      If that's the number on them, yes, they are my

items.

Q.      And you recovered them; they were from your
house, is that correct?

A.      They were from my apartment.

Q.      You don't dispute that they were in your house?

A.      No, I don't.

        MR. MONTEMARANO:  Objection, Your Honor.  Asked
and answered for the third time.

        THE COURT:  Sustained.

        BY MS. JOHNSTON:

Q.      You're not arguing that the detective planted
these things in your house, are you?

        MR. MONTEMARANO:  Objection.

        THE COURT:  Overruled.

        THE WITNESS:  No, I'm not.

        BY MS. JOHNSTON:

Q.      And this crack pipe here, this is something that
you made; isn't that correct?

A.      That's my freebase pipe, yes.

Q.      And it was in your -- excuse me, your freebase
pipe.

A.      Thank you.

Q.      Your cocaine base -- why don't use that term,
"cocaine base pipe" was your pipe; is that correct?

A.      That's correct.

Q.      Found in your house.

A.      Found in my house.

Q.      The officers didn't plant that item, either.

A.      No, they did not.

Q.      Likewise, these baggies that had this residue in them in Ali 7.  They didn't plant those either, did they?

A.      No, they did not.

Q.      All of these items were in this house when they were there on June 1st 2004; isn't that correct?

A.      Somewhere in the house.

Q.      Well, where else did you hide your empty baggies?

A.      Somewhere in the house.

Q.      Where?  Where else did you hide them, other than in your jewelry box?  Where else did you hide your cocaine base pipe?  Where did you hide that in the house?

A.      Wherever I found a place for it.

Q.      Give us some example of where you hid those items.

        Over the course of how many years have you been married?  Since 1999 or 2000?  How long have you been married?

A.      2000.

Q.      Since 2000 to June 1st of 2004, where did you hide these items in your apartment?

A.      Could have been a number of places.  Shoe box, jewelry boxes; like you said, dresser drawer.

Q.      And on the dresser top in a jewelry box?

A.      On the dresser top?  No, it was not on the dresser top.  I never had drugs on top of the dresser.

Q.      In the jewelry box.

A.      They were always inside.

Q.      What about in that Nordstrom's box?

A.      Yes.

Q.      Where did you keep the baking soda and the little spice jar that you would use to cook your cocaine into cocaine base?

A.      I kept it in a small baking soda box.

Q.      Where would you keep the spice jar?

A.      I don't recall right now, I really don't.

Q.      Certainly you didn't keep that in the kitchen where your husband was cooking -- doing all the cooking.

A.      I said I didn't recall where I kept it.

Q.      In terms of your dealing with Ms. Martin.  You do agree, do you not, that you kept a running tab with her; is that correct?

A.      That's correct.

Q.      That tab was for clothing on one side of the
book; is that correct?

A.      That's correct.

Q.      And you had permission from Ms. Martin for
yourself to help yourself to her drugs; is that
correct?

A.      That is not correct.

Q.      You would go in her house and get some for
yourself.

A.      That is not correct.

Q.      Do you recall the telephone call we played here
in court?

A.      Yes, I do.

Q.      Did you write it in the book yourself?

A.      No.

Q.      You've never written in that book.  Are you
telling us that she didn't tell you that you could go
get your own?

A.      No.  She has never told me to go get my own.

Q.      Okay.  But you would agree that in that book
where it says "tickets" that refers to drugs; isn't
that correct?

A.      On the right-hand side, yes.

Q.      Where it says "tickets?"

A.      Yes.

Q.      It wasn't for any real tickets, was it?  Those
were all calculations for drugs; isn't that correct?

A.      Yes.

Q.      Your clothing tab with her was separate; isn't
that correct?

A.      That's correct.

Q.      Some of those clothes did come from Martha Jean
West; isn't that correct?

A.      I'm assuming some of them did, yes.

Q.      You're familiar with St. John and some of those
other designers?

A.      Yes, I am.

Q.      She was giving you a very, very good price on
those clothes; isn't that correct?

A.      We didn't have any St. Johns in the last couple
of years.  No, we didn't have any St. Johns.

Q.      You didn't have any St. Johns?

A.      Yes, earlier, but not in 2003-2004.

Q.      That wasn't my question, Ms. Ali.  My question
was, you were getting a very good price for the clothes
you were getting through Ms. Martin from Ms. West;
isn't that correct?

A.      That's correct.

Q.      Better price than you could get any sale in any
store; isn't that correct?

A.      That's correct, Ms. Johnston.

Q.      You never questioned Ms. Martin about where those clothes were coming from?

A.      I never questioned her about it.

Q.      You never asked her how it was that Ms. West could sell those clothes at such reduced prices, did you?

A.      I never asked her.

Q.      You didn't want to know the answer to that question, did you?

A.      Yes, you're right.

Q.      Because you had a feeling that it was wrong, didn't you?

A.      I knew that I got them for a good price.

Q.      You had a feeling that maybe it was too good to be true; isn't that correct?

        MR. MONTEMARANO:  Objection, Your Honor.  Can we be heard at the bench?

        THE COURT:  Overruled.

        THE WITNESS:  I don't know if it was too good to be true; I purchased them.

        BY MS. JOHNSTON:

Q.      You didn't want to ask Ms. Martin any questions about why the price was so good; right?

A.      A lot of times you choose not to ask a question,

yes.

Q.    You didn't want to know what the answer was;
isn't that correct?

A.    Probably so.

Q.    Because you, in your heart of hearts, suspected
that maybe there was something wrong with those clothes
being sold so low.

A.    Maybe so.

Q.    But you continued to buy the clothes without
asking questions; is that correct?

A.    That's correct.

Q.    Now, if we could, I'd like to discuss a few of
the calls with you.  Do you have a copy of the
government's transcripts in front of you?

A.    Yes, I do.

Q.    You heard Sergeant Sakala testify during his
direct examination that some of the calls that you had
concerned an actual cruise.  Do you recall that?

A.    Yes.

Q.    So he was correct about that; is that correct?

A.    Yes.

Q.    And he also said that there were some calls that
were -- that those calls were about legitimate tickets
when you discussed your cruise.  Do you recall that?

A.    That's correct.

Q.      And he then also testified that there were some
calls that were actually about clothing, whether they
were legitimate clothes or illegitimate clothes he did
say that the calls were actually about clothing.  Do
you remember that direct examination back in June?

A.      Yes, I do.

Q.      So, Agent Sakala was correct when he said that
there were some calls where clothing was actually
discussed; is that correct?

A.      That's correct.

Q.      Then he differentiated those calls involving
tickets that were, in his opinion, drug-related.  Do
you recall that?

A.      That's correct.

Q.      Certainly other than discussing your cruise with
Ms. Martin and her request that you check on flights
from Kansas City, you discussed the tickets in Las
Vegas; those were the three areas where Sergeant Sakala
acknowledged those were about actual airplane tickets;
correct?

A.      Correct.

Q.      And they were also about the trip to Las Vegas
where you sold the tickets to Teresa; is that correct?

A.      That's correct.  I didn't sell them to Teresa.

Q.      I apologize.  You gave them to Teresa because

you had to use them within so much time.  So, Sergeant
Sakala was correct about that; is that right?

A.      That's correct.

Q.      And he was also correct about the clothing
conversations with Ms. West, where the clothing was
actually discussed, different sizes and different
designers; isn't that correct?

A.      Yes.  I mean -- excuse me, what do you mean he
was correct in reference to --

Q.      He was correct when he was called back here on
recross examination.  Do you recall that just last week
or the week before when they played calls from him, and
Sergeant Sakala said they're discussing actual clothes
in these calls?

A.      Yes.

Q.      Those were calls between Ms. Martin and Ms.
West, and sometimes Ms. Levi was on the phone.

A.      That's correct.

Q.      So he gave -- his opinion was correct, then;
isn't that right?

A.      Yes.

Q.      And he also gave testimony that when he looked
at Haywood 7 -- let's just pick a page here -- this
reference to LaNora up here, it was a reference to you;
isn't that correct?

A.      Yes.

Q.      And he referenced that the column on the left
had to do with clothing, because it was a carryover
from the previous pages; correct?

A.      That's correct.

Q.      And so the left side was clothing, and the right
side, he opined, was drugs; isn't that correct?

A.      That's correct.

Q.      He was right about that, wasn't he?

A.      That's correct.

Q.      Then when he said the tickets on this next page
referred to drugs; he was right about that, wasn't he?

A.      That's correct.

Q.      And "tickets" was a term that Ms. Martin used
frequently to refer to drugs; isn't that correct?

A.      That's correct.

Q.      So if we look at Calls 1224 and 1226, on Page
348 and 349, which should be in Book II -- do you have
that in front of you?

A.      No, I don't yet.

        MR. MCKNETT:  What were the pages again, Ms.
Johnston?

        MS. JOHNSTON:  Page 348 and Page 349.

        BY MS. JOHNSTON:

Q.      On Call A-1224, Page 348 -- do you have that in

front of you now, Ms. Ali?

A.      Yes, I do.

Q.      That was on April 21, 2004; isn't that correct?

A.      That's correct.

Q.      And Ms. Martin asked you if you just want one ticket, and you said you had to make a phone call; isn't that correct?

A.      That's correct.

Q.      And that one ticket she was referring to was to a quantity of drugs; isn't that correct?

A.      A 50, yes.

Q.      That was a reference to drugs; isn't that correct?

A.      Yes.

Q.      It would have been cocaine; is that correct?

A.      That's correct.

Q.      You say it's 50?

A.      $50 worth, yes.

Q.      Because it says "1?"

A.      Yes.

Q.      Okay.  But then if we look at the next page, Page 350, at the next call, again on April 21st, about two hours later -- do you have that call in front of you?

A.      A-1226?

Q.      A-1226.   Looking at Page 2, because on the first page you talked to John Martin; isn't that right?

A.      That's right.

Q.      On the second page, though, you talk to Ms. Martin; isn't that right?

A.      Yes.

Q.      And the price for "1" was a $1.25; isn't that correct?

A.      No.

Q.      Well, read it for me.   Calling your attention to Page 350.   You say to her, "You put the wrong price in the book," don't you?

A.      "You put the wrong price in the book."

Q.      And you repeat it:   "You put the wrong price in the book."

A.      Yes.

Q.      And Ms. Martin says, "$1.25."

A.      Yes.

Q.      Meaning $125; right?

A.      That's what Ms. Martin said.

Q.      When she said $1.25 meaning a $1.25, you knew that what she was saying was $125 dollars; isn't that right?

A.      Yes.

Q.      So she wasn't -- she didn't want to say $125.

Instead, she said $1.25; is that right?

A.      Yes.

Q.      And then you said, "Oh, I thought you put 50 in the book;" isn't that right?

A.      Yes.

Q.      And then Ms. Martin says, "You told me you wanted one of them today;" isn't that right?

A.      Yes.

Q.      And so the price for one of them was a $1.25; isn't that right?

A.      No, that's not right.

Q.      Wasn't $50, according to this?  Isn't that correct?

A.      That might have been a prior purchase.

Q.      So when she says, "You told me you wanted one of them today" --

A.      Yes.

Q.      -- and that she put $125 in the book, you're telling us that was a prior purchase that she just  now recorded?

A.      Yes.  Sometimes it happened like that.

Q.      At the bottom, you told her you just wanted to look out for her to make sure she recorded it accurately; isn't that correct?

A.      That's correct.

Q.      So you got drugs on that day from her, and you disagree with whether you got $50 or $125; is that right?

A.      Yes, I do.

Q.      You're saying you got $50; is that correct?

A.      That $125, if I asked her if she put it on the book, that was something prior because we had a conversation about it.  I had already been over there, so that's something prior, because I'm having a conversation with her on the phone about it.

Q.      Prior to that day, you had already picked up the drugs; isn't that right?

A.      I can't say that I did.

Q.      Well, I thought that's just what you said now, that you picked up the drugs.

A.      I didn't say that, Ms. Johnston, you did.  If I did say that, I was incorrect.  I don't know whether I did.  I just know what I purchased from Ms. Martin and if they're that particular there, I don't think this 125 was on that particular day.  That's all I'm saying.

Q.      "You told me you wanted one of them today." Which part of that word today is not clear?

A.      What page?

Q.      On Page 350.

A.      Yes, but I wanted one today.  That 125 could

have been something that I got prior and she put the wrong price down.  I'm not certain about it.  I do admit to you that I did buy -- when I got one, one was a 50, and 125 was not a 50.  However, you're trying to interpret this phone call, and I'm being very honest with you about that.

Q.    So Ms. Martin, when she said one of them was 125, is not being -- wasn't being clear with you on the phone.

A.    If I had a prior discussion with her with that. You never heard me on the phone saying, I want 125. Maybe it was when I got there, maybe I changed my mind, I don't recall.  What I purchased from Ms. Martin was a 50, which is a half a gram, which is $50, which was always "one."  If I purchased $125 worth, it was three in a package.

Q.    Why would you have to be clear with her?

A.    Because I never wanted to treat --

Q.    You thought she made a mistake in her book when she put 50, and when you actually got one, that was 125?

A.    Because sometimes I left my stuff with Ms. Martin.  Sometimes I would ask her, and I would always sometimes confuse her.  I didn't always pick up the whole $125 worth.  I would leave it with her.  So,

maybe I was trying to say to her that, hey, did you

know that that's what I wanted 50?  And maybe I changed

it and got 125.  I'm not disputing that.  My one was

always a half a gram, which is $50 worth.

Q.     Did you ever order three?  Can you show us a

call in there where you ordered three from her?

A.     No, I don't recall you playing a phone call

saying I ordered three.  You don't have a phone call, I

think, where I ordered 125 from her.

Q.     Can you show us any call where you told her you

wanted three tickets instead of one ticket?

       MR. MONTEMARANO:  Objection.  Basis for

knowledge.

       THE COURT:  Rephrase the question.

       BY MS. JOHNSTON:

Q.     You had access -- you and your attorney have had

access to all of these calls; isn't that correct?

A.     That's correct.

Q.     And you've had a chance to go through all of

those logs as well; isn't that correct?

A.     That's correct.

Q.     Can you point to us any place, in any of those

calls, where you told Ms. Martin that you wanted three

tickets or you wanted three of them?

       MR. MONTEMARANO:  Objection, Your Honor.  How

can she be expected to remember something out of 10,000

phone calls?

THE COURT:  Overruled.

THE WITNESS:  I never said three.  I never used

the word tickets that I recall -- I never used the word

tickets, I do know that, and I would say one meant 50.

Maybe when I got over there I might have changed my

mind, but one was always a 50.  I'm very clear, and I'm

being very honest with that.  One was 50.  I might have

changed mind when I got there and I confused Ms.

Martin, and that's why in the conversation about 125

maybe I've gotten three.  I don't recall what I did

that day, but I know one is always $50 worth.

BY MS. JOHNSTON:

Q.      And you never ordered three over the phone; is

that right?

A.      No.

Q.      You say you never used the tickets.  Ms. Martin

used the word ticket in talking to you; isn't that

right?

A.      Yes, she did.

Q.      You understood that to refer to a quantity of

cocaine; isn't that correct?

A.      With the word ticket, yes.

Q.      Now, you mentioned Ms. Levi.  You were familiar

with Ms. Levi from Ms. Martin's house; is that correct?

A.      That's correct.

Q.      You had conversations with Ms. Martin about Ms. Levi; is that correct?

A.      Yes.

Q.      And about her problems being in jail; isn't that correct?

A.      Only because Ms. Martin, yes, talked about that with me, yes.

Q.      Ms. Martin told you she was in jail for drugs; isn't that correct?

A.      I don't remember her saying drugs.  I don't remember why she told me she was in jail.  I don't remember that.  I don't recall.

Q.      Do you remember having a discussion with Ms. Martin about whether it was an old charge from Montgomery County or whether it was something new and different?

A.      Ms. Martin might have said that, but I didn't say that, because I don't know anything about Ms. Levi.

Q.      Do you remember Ms. Martin having those kinds of conversations about Ms. Levi?

A.      I remember reading them, yes, and they recollect my memory, yes that she did have conversations about that.

Q.      Have you ever had any discussions with Ms.
Martin about whether it was an old drug charge or
whether it was something new and different?  Do you
remember that?

A.      I don't recall.  I don't recall her saying drug
charges at all.

Q.      Having other -- do you recall her telling you
that she didn't know whether it was an old drug charge
or something new that had happened?

A.      I don't recall the word "drugs" being used at
all.

Q.      You're telling the ladies and gentlemen of the
jury Ms. Martin told you Ms. Levi was arrested but
never told you what it was for?

A.      That's correct.

Q.      And you didn't ask her what it was for.

A.      That's correct.

Q.      Were you familiar with Ms. Mr. Echarte; is
that's correct?

A.      Is that Julio?

Q.      You knew Mr. Echarte had been arrested in
Florida.

A.      I never knew he was arrested in Florida.

Q.      She never discussed that with you either.

A.      She never discussed him being in Florida.  I

knew he was in Florida.

Q.      You knew he was in jail in Florida.

A.      I knew he was in Florida.

Q.      She never told you he was in jail in Florida?

A.      No.

Q.      You had a conversation with Ms. Martin about Ms. Levi and Mr. Echarte; isn't that correct?

A.      That's correct.

Q.      That had to do with both of them being involved in drugs; isn't that correct?

A.      I don't recall seeing drugs in the conversation. I just know that she said that Julio  thing, and I was just as shocked.  So, no, I don't know if it was a reference to drugs.

Q.      I'm not asking about what you recall seeing in the conversations, I'm asking about your conversations with Ms. Martin.

        Ms. Martin did in fact discuss with you the fact that Mr. Echarte was in jail and had been arrested in Florida and that she thought maybe that's why Ms. Levi was in trouble; isn't that correct?

A.      I don't remember saying -- her telling me that he was arrested and in jail.  I don't remember that conversation at all.  I know that she had a -- what I saw here, I don't remember that.  That's what I

remember is what I saw on paper.

Q.     I'm not interested in on what you saw on paper here, I'm interested in your conversations with Ms. Martin about Ms. Levi being incarcerated.  Did she or did she not tell you that she thought Ms. Levi might be arrested because of her dealings with Mr. Echarte in regards to his arrest for drugs in Florida?

A.     I didn't know anything about Gwen dealing with Mr. Echarte, with her dealings with him.  I had no prior knowledge of that.

Q.     So Ms. Martin didn't discuss that with you during those daily calls you had with her?

A.     No, she did not.

Q.     Or during the daily visits you paid to her house?

A.     No, she did not.

Q.     Now, if I could then -- let's turn to call -- Page 387 of Volume II, which is Call B-4430.  We're going to play this call, please.

       Do you have a transcript in front of you now?  Page 387.  Do you have it in front of you, Ms. Ali?

A.     Yes, I do.

Q.     Then we'll play the call.  Please play it.

                  (Recording begins playing at 12:29 p.m.)

                  (Recording stops playing at 12:29 p.m.)

BY MS. JOHNSTON:

Q.     When you said, "Did you tell Gwen that?", what were you asking Ms. Martin, Ms. Ali?

A.     Did she tell Gwen what she just said in a prior conversation to me.

Q.     What?  What was that?

A.     I don't know.  It's what Ms. Martin says.  I think Julio told her, I really do, because every time I talk to Julio's sister, I told -- she would ask me what I had told the lady.  I haven't.  I don't even  know. It was brand new, too.  I have seen her, and I didn't know her.

Q.     And you said, "Did you tell Gwen that?"  Tell Gwen what?

A.     I don't know.  Tell Gwen what she just said.

Q.     So you asked Ms. Martin if she told Gwen something you don't know.

A.     Yes.  I'm responding to Ms. Martin's conversation.

Q.     You felt it was important to find out if Ms. Martin told Gwen that Julio told on her; is that correct?

A.     Whatever Ms. Martin did say, I bet you that's what I asked her and she tells me.

Q.     Did you ask Ms. Martin, would Julio tell on her

about?

A.     No.   The conversation is right here; no, I did not.

Q.     You weren't interested in knowing why?   You weren't curious?

A.     No, I was not interested.

Q.     You didn't want to know what Mr. Julio was involved in?

A.     Ms. Martin talked, and I listened.

Q.     So you didn't ask her about the Julio thing?

A.     No, I did not.

Q.     Well, Ms. Martin said on Page 387, "I think she's involved in that Julio thing."  You didn't say, what Julio thing?

A.     No, I did not.

Q.     And you knew Ms. Martin was dealing drugs at the time; is that correct?

A.     I knew she was dealing drugs with me, yes.

Q.     Well, you knew Ms. Martin -- you knew Ms. Levi had a history of being involved with drugs; is that correct?

A.     I had just met Ms. Levi.   I had no idea what Ms. Levi did.

Q.     You knew Mr. Echarte was involved with drugs with Ms. Martin previously, didn't you?

A.      No, I did not know that.

Q.      She never discussed her relationship with Julio
with you?

A.      She didn't --

Q.      So she did discuss Julio with you, just not in
front of --

A.      Her relationship with Julio as a boyfriend
girlfriend relationship.

Q.      Not the drug dealings?

A.      I don't know anything about the drugs with Mr.
Julio and Ms. Martin.

Q.      When she said "that Julio thing", you didn't
know what that was about?

A.      I'm just listening to her.  I'm having a
conversation, and I'm just listening.

        MS. JOHNSTON:  Please play the rest of it.

        (Recording begins playing at 12:32 p.m.)

        (Recording stops playing at 12:32 p.m.)

        BY MS. JOHNSTON:

Q.      Your question, "Where was she when they got
her?"  What was your question about?

A.      Ms. Martin said she was arrested; I asked where
was she when they got her.

Q.      And then when Ms. Martin said, "She just
introduced them to the people that wanted the recipe to

the sweet potato pie."

A.      I said, "Mm-hmm."  I mean, I just listened.  I had no idea what Ms. Martin was talking about.

Q.      You didn't say, what do you mean the sweet potato pie recipe?

A.      I wasn't concerned.

Q.      You didn't want to know; isn't that right?

A.      I wasn't concerned.  I was just listening.  She was talking, and I was not concerned about it.  I just listened to her.

Q.      So you didn't want to know what the sweet potato --

A.      I was not concerned.

Q.      You didn't want to know what the sweet potato pie had to do with anything.

        MR. MONTEMARANO:  Asked and answered.

        MR. MCKNETT:  Asked and answered three times.

        THE COURT:  Sustained.

        BY MS. JOHNSTON:

Q.      All you said in response to that is, "Mm-hmm"; is that right?

A.      That's correct.

Q.      You didn't ask her to explain conspiracy; is that correct?

A.      No, I did not.

Q.      This was not the only call where you discussed
Ms. Levi's arrest; isn't that correct?

A.      I'm not certain.

Q.      If we could go to Call B-5728 on Page 455,
please, which should be in the last book, Book III.

        Do you have that in front of you, Page 455,
ma'am?

A.      Yes, I do.

Q.      That is you and Ms. Martin; isn't that correct?

A.      That's correct.

Q.      Her question was, "Did you want a ticket when
you came out here?"  Is that correct?

A.      That's correct.

Q.      You understood "tickets" there to refer to
drugs; isn't that right?

A.      Yes, but I never answered Ms. Martin.

Q.      The call ended; is that correct?

A.      That's what it says here, yes.

Q.      You don't have any reason to disagree with that,
do you?

A.      Disagree with what?

Q.      With the fact that the call ended.

A.      It ended, yes.

Q.      You understood when she asked you if you wanted
tickets what she was referring to.

A.      I don't recall where I'm asking Ms. Martin for tickets here or want anything.

Q.      Ms. Ali, you understood when she said, "Do you want tickets when you come out here?", that she was referring to drugs; correct?

A.      On this particular day?  I don't know.

Q.      So you don't know whether that refers to tickets -- drugs.

A.      No.  I don't know what we discussed prior to that, no, I didn't.  I don't know what the conversation was prior to this.

Q.      Court's indulgence.

        I believe, if you look at your counsel's book, Page 370 of the defense version of the transcripts, Call B-5728 is in there.

A.      Is that the call where I was just stopping by?

Q.      Page 370.

A.      What page?

Q.      Page 370.  That would be Call B-5728; is that correct?  Let me get the right page here.  Call B-5728; is that correct?

A.      I don't have the page.  I'm confused right at this moment.

Q.      The defense book, Call B-5728, on Page 370.  Do you have that in front of you?

A.      I don't have a 370.

Q.      Page --

A.      Oh, that's the insert?  I don't have a 370.

        MR. MONTEMARANO:  I believe that was not played,
and it was not in the book.

        THE COURT:  All right.  Then skip over that.

        BY MS. JOHNSTON:

Q.      We'll mark this as the next miscellaneous
exhibit.

        I want to show you what's been marked as the
Government's Miscellaneous Exhibit No. 58.  Is that the
same call number as --

        MR. MCKNETT:  May we approach, Your Honor?

        THE COURT:  You may.

                (At the bar of the Court.)

        MS. JOHNSTON:  This is a transcript that I was
given by defense counsel in the packet of transcripts
that they prepared.  All it does is show that there was
a beep over and that was the --

        THE COURT:  It was a what?  I can't hear.

        MS. JOHNSTON:  There was a beep that flipped
over into this conversation with Ms. Ali where there
wasn't any additional conversation between the two of
them, and that's the purpose of what I'm doing here.

        MR. MONTEMARANO:  Your Honor, I believe Your

Honor ruled this inadmissible, and I thought that
couldn't take place.  We wanted it and it couldn't be
played.  We wanted to use it and Your Honor said we
couldn't.

MS. JOHNSTON:  I don't believe that -- it was on
Page 370 of the original set that they gave to the
court.

MR. MONTEMARANO:  It would be in the big book
right there, Your Honor.

MR. MCKNETT:  I don't have a copy of it, and I
don't recall the call.

MS. JOHNSTON:  It's the copy that counsel gave
to us that I have.

MR. MCKNETT:  Before they were ruled
inadmissible.

MS. JOHNSTON:  I don't believe it was
inadmissible.  I think it's a call that counsel decided
not to play.

MR. MCKNETT:  Your Honor, I have no specific
recollection of this call.

MS. JOHNSTON:  That would be the government's
version, Your Honor.

THE COURT:  This one?

MS. JOHNSTON:  That's the government's version.
They have their own version.

THE COURT:  I'm sorry.

MR. MCKNETT:  It should be just before that.

MR. MONTEMARANO:  Your Honor, I think that may
have been provided to the government in the original
vision of draft transcripts way back when, not in the
full book, nor in the redacted book.  So, this wasn't
even ruled on by the court.  We never sought to admit
it.  We've never had this checked through.

MS. JOHNSTON:  It should be Page 370, Your
Honor.

MR. MONTEMARANO:  It's not in that book.  It
wasn't provided to Your Honor, unless Mr. Krinsky has
the original set of loose transcripts.

MS. JOHNSTON:  The court should have the
original set.

MR. MCKNETT:  Your Honor, it was probably in the
original packet --

THE COURT:  Oh, the one that --

MR. MONTEMARANO:  The draft transcripts.

MR. MCKNETT:  When we had all the possible
transcripts.

MS. JOHNSTON:  No.  It was in the set we got on
July 21st.  It was July 21st that we received it.

THE COURT:  This?

MS. JOHNSTON:  Is that dated July 21st, Your

Honor?

THE COURT:  I've made no ruling on this one.

MS. JOHNSTON:  Right.

MR. MCKNETT:  I stand corrected.  I have no specific recollection to that call at all.

MS. JOHNSTON:  There is nothing of substance. In the beginning of it, it shows there's a beep over, and that's the conversation.

THE COURT:  What's the purpose in playing this call?

MS. JOHNSTON:  She has said we only gave her part of the call.  That's the only thing she has to look at, so I want her to look at the entire call to see that that was the only portion she's referenced and that that was the extent of her call with Ms. Martin on that day.

THE COURT:  This is -- maybe I'm on a different page here, but this is Call B-5728 and she is not a party to the conversation.

MS. JOHNSTON:  Your Honor, she is at the end. What happens here on Page 3 is there is a beep, so it goes over from call waiting and she says, hello, and Ms. Martin says this.  This is the part we included. The rest of the call shows that she wasn't a party to that.  She has said she doesn't know what "tickets"

means because she doesn't know what the rest of the
conversation is.  I think I'm entitled to show that she
was not part of the --

THE COURT:  You want to let her see the rest of
the conversation --

MS. JOHNSTON:  Exactly.

THE COURT:  -- but not to admit it.

MS. JOHNSTON:  It doesn't have to be admitted.
I don't care one way or the other.

MR. MCKNETT:  My client is not on the rest of
the conversation.

THE COURT:  What?

MR. MCKNETT:  I'm confused as to the purpose of
why this is being offered.

THE COURT:  She's been asked about that
conversation and says that it did say that it was not a
full call and she didn't understand the context of it;
is that right?

MS. JOHNSTON:  That's what she said, she didn't
know what else was said on the conversation because we
only played an excerpt of it.

MR. MCKNETT:  Apparently nothing was said.

MS. JOHNSTON:  That's what I'm trying to
establish.

THE COURT:  I understand your reason for not

having it read.  Why not look at it to read the balance
of the conversation so she can answer the question?

MR. MCKNETT:  My client -- there was no
conversation between my client and Ms. Martin.

THE COURT:  Wait a minute.  How much more do you
have of this witness?

MS. JOHNSTON:  I don't know.  Ten minutes, 15
minutes, 20 minutes.

THE COURT:  All right.  Then we will finish her
cross-examination.

(Back in open court.)

BY MS. JOHNSTON:

Q.    During that discussion, did you have an occasion
to look at what I've given you as Miscellaneous 58?

A.    Yes.

Q.    And you see there that the -- it's still the
same call, B-5728, as was in the government's exhibit;
isn't that correct?

A.    Yes.

Q.    And the same date and time; is that correct?

A.    Yes.

Q.    And the reference -- no, you're on the wrong
page there.  In the government's book it's B-5728.  If
you need the page number, let me get it for you.  It's
on Page 455.

A.      Yes.

Q.      In looking at B-5728, it's the same date and time as the government's; isn't that correct?

A.      Yes.  A minute off, yes.

Q.      The parties to that conversation was going on was somebody from Nationwide and Ms. Martin; isn't that correct?

A.      That's correct.

Q.      And then it just beeped over; isn't that right? There was a beep, and it beeped over; isn't that correct?

A.      Yes.

Q.      That's where the conversation between you and Ms. Martin takes place; isn't that correct?

A.      That's correct.

Q.      And the extent of that conversation between you and Ms. Martin is shown on that page; isn't that correct?

A.      That's correct.

Q.      So there wasn't any additional conversation that took place in terms of you and Ms. Martin in  Call B-5728 that's shown on Page 455; is that correct?

A.      That's correct.

Q.      Again, when she said, "Did you want tickets when you came out here," you're telling us now you don't

know whether that was cocaine or not?

A.      I didn't ask her for anything.  I went to Ms. Martin plenty of times just to go see her.  She was my friend.

Q.      When she asked you did you want tickets when you came out here, was it your understanding she was asking if you wanted cocaine?

A.      I can't recall that.  I can't say that's what it's making reference to.

Q.      Now, if we look at Call B-6306 on Page 497 -- do you have that one in front of you?  It's, again, in Volume III now.

Q.      Do you have that in front of you?

A.      B-6306?

Q.      B-6306, on Page 497.

A.      Yes.

Q.      In that call you initially talked to her about Kevin having shoes and about Mother's Day; is that correct?

A.      That's correct.

Q.      And how her son fixed dinner for her; is that correct?

A.      That's correct.

Q.      So Ms. Martin was on good terms with her son at this time, but not with her two daughters; is that fair

to say?

A.      Yes.

Q.      And then as we get on to the next page, Page
498, in the middle of the conversation you say, "All
right.  Well, one this time," and then you say, "What
have you got good over there?  Is he still bringing
clothes?", and this time you referred to cocaine; is
that correct?

A.      Yes.  Probably so, yes.

Q.      Is that yes?

A.      Yes.

Q.      And you didn't explain what it was that you
wanted, "just one this time;" is that correct?

A.      Yes.

Q.      So Detective Sakala was correct when he said
that you were ordering a quantity of drugs from Ms.
Martin when you said "one this time;" is that correct?

A.      What do you mean when you say, "a quantity of
drugs?"

Q.      I said when -- Sergeant Sakala said, all right,
well, one this time --

A.      Are you referring to a quantity as one?

Q.      When, he said that referred to drugs.

A.      Okay, just --

Q.      He was correct?

A.      That's correct.

Q.      And then if we look at Call B-8040, which was a loose call, so if I could have that exhibit please, B-8040 which is not in the book but one that was handed out.  I want you to look at that as well.

A.      I don't have that.

Q.      No.  I'm asking them to get the exhibit for us. Just bear with me a minute and I'll get it for you.

Q.      While he's looking for that, let us go back to Book II on Page 265, Call B-2436.  That would be in Book II.  Do you have that in front of you?

A.      Yes.

Q.      Okay.  If I understood you correctly, Ms. Martin collected lots of magazines; is that right?

A.      That's correct.

Q.      She had *Jet* magazine?

A.      She had *Jets*.  She had a lot of magazines.

Q.      What other magazines did she have?  *People* magazine?  I don't know.

A.      No.  If it was a interesting article in there about somebody she wanted to know about, she would have had a *People*.

Q.      She had *Jet*; she may have had *People*; she may also have had some magazines about plastic surgery?

A.      Yes.

Q.      What other magazines did she have?

A.      She had magazines with clothing items in it:
*Vogue*.

Q.      Fashion magazines?  *Vogue*?

A.      Catalogs with clothing in it.

Q.      And so she had *Vogue* magazine, she had some
other fashion magazines, and she had some fashion
clothing?

A.      Yes.

Q.      Some catalogs that would tell you the price, and
it was wholesale prices and the retail prices of
clothes?

A.      Basically.  When you have magazines, they just
tell you where you can purchase them.

Q.      So, it was magazines that showed different
fashions.  And she had magazines about plastic surgery?

A.      Right.  And she had magazines with prices.  I'm
sorry, it was a Neiman-Marcus or Nordstrom's catalog.

Q.      She wasn't buying those from Neiman-Marcus.

A.      She purchased a lot of things from
Neiman-Marcus.  She did a lot of catalog shopping
herself.

Q.      In addition to getting those items from Ms.
West?

A.      Yes.

Q.      She would use those catalogues in telling Ms.
West what she wanted; is that correct?

A.      No.  She would purchase them herself.

Q.      I appreciate Ms. Martin may have sometimes
purchased things, but she also used those catalogs when
she was telling Ms. West what she wanted Ms. West to
get for her.

        MR. MONTEMARANO:  Objection, Your Honor.  Basis
for knowledge.  She's already testified she had no
knowledge of which clothing might have come from Ms.
West.

        THE COURT:  Rephrase the question.

        BY MS. JOHNSTON:

Q.      Are you aware of whether or not Ms. Martin used
those catalogs to pick out things that you might want
from Ms. West or Ms. Levi?

A.      I don't know.  I wasn't there.  I don't know.

Q.      Did Ms. Martin ever discuss with you the
catalogs and tell you that she could get those items
from Ms. West?

A.      No, she did not.

Q.      Let's get back to the magazine, okay?  Do you
have that call in front of you?

A.      Yes, I do.

Q.      So, Ms. Martin had fashion magazines like *Vogue*;

she had *People*; she had *Jet*; she had plastic surgery
magazines and some catalogs from different stores.
What other kinds of magazines did she have?

A.      She might have had -- I don't recall.

Q.      In that call on Page 265 --

A.      Shoe catalogs and shoe magazines.

Q.      We have six, seven different kinds of magazines;
isn't that correct?

A.      That's correct.

Q.      And so she said, "So, just the one magazine?"
Did you ask her which magazine she was referring to?

A.      No, I did not, but --

Q.      Then you said, what I got --

        MR. MCKNETT:  Objection, Your Honor.  She wasn't
finished with her answer.

        THE COURT:  Let her finish.

        MS. JOHNSTON:  I thought she was finished.

        THE WITNESS:  No, I did not, because prior to
that I would go over there and get magazines, the shoe
catalog magazines, the magazines on plastic surgery,
and I would share them with my friends.

        BY MS. JOHNSTON:

Q.      Okay.  And in this conversation, all she said to
you was, "Just the one magazine?"  And you, before
responding, said, "That's what you got to make sure;"

is that correct?

A.     Yes.

Q.     And you told us yesterday that -- Friday that
you had to make sure you had money in the bank; isn't
that correct?

A.     That wasn't in reference to this call.

Q.     We'll let the jury's recollection recall.

       So you didn't tell her which magazine you
wanted, did you?

A.     No, I didn't.  She didn't ask.

Q.     And your response to her was, "I got to make a
call and make sure;" isn't that correct?

A.     Yes.  Because if I was taking the magazines and
sharing them with other people in reference to the
men's shoes, she was selling and the magazines in
reference to the cellulite information, I would need
maybe one or more.  A lot of times she would like to
keep them at the house, so it may be so I couldn't take
all the catalogs or whatever she had available.

Q.     So now your testimony is not that you had to
call the bank and check on how much money you had but,
rather, you had to call someone else to see what -- how
many magazines you needed; is that correct?

A.     This was not in the call in reference to calling
the bank.

Q.      Is that what you're telling us now, that you --

A.      Yes, I am.

Q.      -- had to call someone to see what magazines they wanted?

A.      I didn't say I had call someone to see what magazines they wanted.

Q.      You had to call someone to check on something.

A.      Yes.

Q.      And now it's not the bank, it's to find out --

        MR. MONTEMARANO:  Objection, Your Honor.  Asked and answered.

        THE COURT:  Overruled.

        BY MS. JOHNSTON:

Q.      To find out something about a magazine?

A.      Yes.

Q.      Without any other reference to a magazine in this call; isn't that correct?

A.      That's correct.

Q.      If we look at Call B-8040 which, I believe, I now have, if I haven't misplaced it.  I'll give you the original exhibit.  Take a moment and look at that.

        THE COURT:  What was the call number?

        MS. JOHNSTON:  B-8040, Your Honor.  It's not the book.  It was a call that we added during Sergeant Sakala's original testimony.

BY MS. JOHNSTON:

Q.      I'm going to put it up on the screen in case
counsel don't have their copy available.  Now, this
call took place, did it not, on May 28; is that right?

A.      That's correct.

Q.      Okay.  And roughly 5:30 in the evening; is that
correct?

A.      That's correct.

Q.      Here on the first page you're talking about jerk
chicken; isn't that correct?

A.      That's correct.

Q.      And then you're talking about some people who
got pink slips at work; is that correct?

A.      Yes.

Q.      However, at the top of that page, she -- you
asked her if you're going to be home this evening, and
she tells you she's going to be there; isn't that
right?

A.      Correct.

Q.      And then you tell her that, something about my
thing, and that you're going to bring her your money
for your clothes; is that correct?

A.      That's correct.

Q.      The money you were taking for -- to her was for
the clothes, as opposed to the drug tab you ran with

her; isn't that correct?

A.     Well, now, sometimes I could have -- I brought
money for clothes but gave her money for the tab, too.
So, I can't say that that's all I gave her money for.

Q.     When you say "my thing", you're telling her you
want to get drugs from her; isn't that right?

A.     That's probably correct.

Q.     When Sergeant Sakala testified that "my thing"
referred to drugs, he was correct.

A.     That's probably correct.

Q.     And the money you were taking to her was for
your running clothes tab; is that correct?

A.     It could have been clothes or both.

Q.     And you did have a tab with her for clothing and
drugs in May of 2004; isn't that correct?

A.     Say that again.

Q.     You did have a tab for her for drugs and clothes
during May of 2004; isn't that correct?

A.     That's correct.

Q.     And she was your only source of cocaine at that
time; is that correct?

A.     Yes.

Q.     And Mr. Walker, who's a friend of hers.  Did you
see Mr. Walker at her house from time to time?

A.     No.  I hadn't seen Mr. Walker in her house since

she lived at Bexhill Court.

Q.      But you saw him there in -- when she lived at Bexhill Court?

A.      Once or twice.

Q.      You knew he was getting drugs from her?

A.      I assumed that, yes.

Q.      So, you knew that.  You knew she had more than one person she was selling drugs to; is that correct?

A.      I assumed that she did.

Q.      I think in one of our exhibits at your house, the drugs actually came in a white bank envelope; is that correct?

A.      From my house?

Q.      Yes, from your house.  We saw a white bank envelope.

A.      I wasn't shown that from my house.

Q.      Well, let me --

A.      I go to the bank quite often.

Q.      Did you sometimes get the drugs from her in the white bank envelope --

A.      No.

Q.      -- folded up so no one would see what you were getting?

A.      No.

Q.      Would she just hand this to you so Jackie

wouldn't see or so your husband wouldn't see what she
was giving to you?

A.      Yes.

Q.      Once she handed it to you, they went in a little
baggy?

A.      Yes.

Q.      And would she sometimes put them in a white bank
envelope?  Here we go.  Let me see show you Drugs 32.

A.      I might have placed this -- is that a bank
envelope?

Q.      It looks like a white bank envelope to me.

A.      I might have placed it in there.  I don't recall
-- Ms. Martin has never given me a white bank envelope.

Q.      You don't recall getting that from her, even
though that's where the drugs were when the police
recovered it?

A.      I don't recall it being at my house.  Is that
one of my exhibits?

Q.      That's one of the exhibits.

A.      And drugs were in it?

Q.      Yes.  It says, "LaNora Ali, 620 Sheridan Street,
Apartment 415," and here's the little bag of drugs.

A.      I don't recall drugs being in there.  If there
was drugs in there, I placed them in there.  Ms. Martin
did not give me a white bag.

Q.      So this white bank-type envelope could hold any number of baggies of drugs; is that correct?

A.      It could hold lot of things.

Q.      You knew Mr. Walker was getting drugs.  Did you make that assumption about Ms. Dobie as well when you saw her at the house, that she was getting drugs from Ms. Martin?

A.      No.

Q.      You did recognize that she was under the influence of heroin from time to time when you saw her there, didn't you?

A.      No.

Q.      She didn't appear to you to be high on any drugs when you saw her?

A.      No.  She made reference -- can I make -- being nodded out.  I never saw her nod out at Ms- -- at Ms. Martin's.

Q.      That's what she testified to here, but --

A.      Yes.

Q.      -- do you recall having discussions with Ms. Martin about Ms. Dobie being strung out on drugs --

A.      No.

Q.      -- and talking too much?

A.      I never had discussions with Ms. Martin about Ms. Dobie being strung out on drugs.

Q.      And coming over -- about her coming over to the house and making a nuisance of herself?

A.      About her coming over to the house?

Q.      You knew about her dealings with Mr. Walker, or you assumed that she was dealing drugs.

A.      I assumed that, yes.

Q.      Did you make that assumption about anyone else? Ms. Levi?  Mr. Echarte?

A.      No.

Q.      You didn't want to know what other people were doing; is that correct?

A.      I didn't make that assumption.

Q.      Is it a fair statement that when you saw other people coming in the house and meeting with Ms. Martin, that you did not want to know what they were doing with Ms. Martin?  Isn't that correct?

A.      We would -- we would be there together.  You know, we would be eating, drinking, and we would -- we stay there for a period of time.  No, I didn't make that assumption.

Q.      In addition to your eating and drinking there, you got drugs from her one, two, three times a week; isn't that correct?

A.      Not always.  Sometimes one, sometimes twice, maybe three, according to my mood or the time of year,

but, yes.

Q.      And you did that regularly; correct?

A.      At time, yes.

Q.      And you didn't want to know what the other
people were doing with her in addition.

A.      No.  I wasn't concerned about the other people.

Q.      In addition to them coming there and eating with
her; is that correct?

A.      I was not concerned with what they did.  We
socialized there.

Q.      But you assumed Mr. Walker was getting drugs; is
that correct?

A.      From the past, yes.

Q.      And what about John Martin?  Did you see him
high on drugs?

A.      I've never seen Mr. Martin high.

Q.      So you didn't question why Ms. Martin was upset
about him driving her car with tickets in it?

A.      I don't recall her telling me he drove her car
with tickets.  She was upset that he couldn't have
transportation.

Q.      That he didn't have transportation?

A.      That he didn't have transportation.  She didn't
have transportation, because he had the car.

Q.      Of course, you didn't want to know anymore about

their relationship; is that fair to say?

A.      Excuse me?

Q.      You didn't want to know anything about their relationship; is that fair to say?

A.      I knew that it was not a great relationship between the two of them at times.

Q.      So it was sort of like Mr. Echarte?  They didn't have a relationship, either; is that correct?

A.      It started out with a good relationship.

Q.      I thought you told us a little while ago it wasn't a good relationship.

A.      I didn't say it wasn't always a good relationship.

Q.      You didn't question her about how Mr. Echarte could have gotten Ms. Levi in trouble over the sweet potato pie recipe.

A.      I didn't know that he knew Ms. Levi.

Q.      Well, you knew that after the telephone call; isn't that correct?

A.      Yes.  I never questioned it.

Q.      After the telephone call, did you ever question Ms. Martin about how it was that Mr. Echarte could get Ms. Levi into trouble over a sweet potato pie recipe?

A.      I never questioned her about it.

Q.      Because you didn't want to know the answer;

isn't that correct?

A.      It wasn't my concern.

Q.      It wasn't your concern, even though Ms. Martin
was supplying you with drugs; is that correct?

A.      That was Ms. Martin's and my business, yes.

Q.      When she told you about the sweet potato pie
recipe causing Ms. Levi problems, you didn't ask
anymore questions about that; is that correct?

        MR. MCKNETT:  Objection.  Asked and answered
Your Honor,

        THE COURT:  Overruled.

        THE WITNESS:  I'm not a police officer, so I
just didn't ask.  It was no need for me to ask.

        BY MS. JOHNSTON:

Q.      So, while you're getting drugs from Ms. Martin
in May of 2004, Ms. Martin calls you on the phone on
May 16; isn't that correct?

A.      That's correct.

Q.      And Ms. Martin told you she had to move things
to the school; isn't that correct?

A.      She told me she wanted to take something to the
school.

Q.      Take something to the school.  Something to the
school in bags that contained drugs; isn't that
correct.

MR. MONTEMARANO:  Objection, Your Honor.  We've been over this.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  That's what you're saying, Ms. Johnston.  That's not what I'm saying.

BY MS. JOHNSTON:

Q.    Well, when she said, "I need to take things to the school," did you ask her what things.

MR. MCKNETT:  Objection, Your Honor.  It's not what Martin said.

MS. JOHNSTON:  Let me get to the call on May 16, and we can play the call so we're all on the same page.

Court's indulgence one moment.  That would be Call A-1670, on Page 525; that's in Volume III.

Do you have that in front of you?

A.    No, I don't.

Q.    It's Page 525 in Volume III of the government's book.  If we could cue that up, because I want to play that.  If we could please play this call.

(Recording begins playing at 1:01 p.m.)

(Recording stops playing at 1:01 p.m.)

BY MS. JOHNSTON:

Q.    Mr. Martin told you that you had to leave your husband at home; isn't that correct?

A     She said to leave my husband at home.

Q.      And you didn't ask her why you had to leave your
husband at home, did you?

A.      No.  No, I did not.

Q.      You didn't think it was unusual, when your
husband would go with you over to Ms. Martin's house,
that she would tell you to leave your husband at home?

A.      No.

Q.      And it didn't cause you to say, well, what are
we doing that I can't -- my husband can't find out
about it, did you?

A.      No, I didn't.  Ms. Martin never -- really never
asked, though, to do a lot of things for her.  So, when
she asked me this, I just assumed, you know, she didn't
need my husband.  My husband was involved in sports and
watched a lot of sports, and it was a Sunday, and that
was his time.

Q.      Well, she didn't say, well, your husband doesn't
have to come with you.  She told you to leave  him at
home; is that correct?

A.      Yes, she did.

Q.      You never questioned why he had to stay at home?

A.      No, I did not.

Q.      When she hesitated and said she had to take
something there, you didn't ask her what is that;
correct?

A.      This's correct.

Q.      But you went over to her house immediately; isn't that right?

A.      Yes, I did.

Q.      Dropped everything and went to her house; correct?

A.      Yes, because she's a friend.  She said she wanted me to do something for her and I did.

Q.      And in this call -- this a friend who was selling you cocaine; isn't that right?

A.      That's correct.

Q.      And in this call she tells you basically to lie to Ms. Terrell; isn't that correct?

A.      Yes.

Q.      Okay.  And she tells you, just tell her -- just say so something when you walk in, not even tell her but just say something.  Paula, you got those that we were gonna go show our girlfriend.

A.      That's correct.

Q.      You didn't ask her, why do I have to say anything?

A.      I didn't say anything to Ms. Terrell.  I didn't lie to Ms. Terrell; I didn't say anything to her.

Q.      My question to you is this:  When Ms. Martin told you to come up -- to make this false statement

when you walked in the house, you didn't ask Ms. Martin
why, did you?

A.      We had a conversation when I got to the house in
the truck.

Q.      Did you ask her why --

A.      I didn't ask her why in the phone call, because
I felt what she was asking me -- she wanted me to do
her a favor, and I dropped things and I did her a
favor.

Q.      Because you owed her money for your drugs; isn't
that right?

A.      No.

Q.      Well, you didn't ask her why you had to lie in
front of Ms. Terrell, did you?

A.      No, I did not.

Q.      When you got to the house, she had some bags and
you helped her carry the bags out and these were two of
the bags that you all took out of the house that day;
is that correct?

A.      You say there were two bags.  I don't recall
those two bags, and I don't recall those being the
bags, but that's what you say.  I don't recall those as
being the bags.

Q.      Describe the bags that you recall.

A.      I don't recall the bags.  I knew I had a bag and

I had it in one hand, but I cannot say that those are
the bags that I brought out of the house.

Q.      How many trips did you make with bags to the
school with Ms. Martin on may 20, 2004?

A.      One day on this day.

Q.      Well you describe the bags that you recall,
then.

A.      I just told you, Ms. Johnston, I don't recall
the bags.  I cannot say those were the bags.  I do
admit that I had a bag, but I cannot say that those
were the bags.

Q.      And you can't say that those are not the bags,
can you?

A.      I can't say -- if I'm not mistaken, I thought it
was -- I thought I carried a zippered bag, if I'm not
mistaken.  Not a colorful bag -- a dark-colored bag,
not a bag like that time.  I might be mistaken, but
that's not the bags I recall.

Q.      A big black duffel bag kind of bag?

A.      No.  Maybe a bag about this big (Witness
indicating).  The size of the green one maybe, but not
a duffel bag.

Q.      Ms. Martin carried bags out with you as well.

A.      I think she did.  I think she had a bag and I
had a bag.

Q.      And you put them in the car?

A.      That's correct.

Q.      And you took them down to the school?

A.      Yes.

Q.      And you never asked her why you were moving
things down to the school?

A.      We had already had prior discussions about that.
She was concerned about someone coming into the house
in reference to the clothing that Kevin had -- was
bringing in.

Q.      The clothing was still in her house, isn't that
correct, in her basement?

A.      No.  Most of it -- a lot of it was gone.
Kevin's clothing was gone.

Q.      There were racks of clothes in her basement.

A.      Yes.  She was concerned about people, if they
came in there, that she didn't want certain things
destroyed or misplaced or torn up, and that's what I
assumed was in the bags, things that she just did not
want misplaced.

Q.      She didn't tell you she was moving the ticket
business to the school?

A.      No, she did not.

Q.      And you are her very close friend who saw her on
a day-to-day basis, and she never mentioned that she

had to move the tickets to the school.

A.      No, she did not.

Q.      She told Ms. Harden that, she told Ms. Dobie
that, she told Mr. Walker that and Mr. Harris that, and
you heard all of those calls.

A.      Like I said, she kept things from me.  She told
them, but she not tell me, and that's very obvious in
the transcripts.

Q.      That was -- you heard those calls here --

A.      Yes.

Q.      -- where she told all of those people?  And you,
whom she met with on a daily basis, she didn't tell?

A.      Do friends tell people everything, Ms. Johnston?
She was my friend.  Certain things she discussed with
me and certain things she did not.  You can tell by the
conversations, she had different conversations with me,
other than what she had with  other people.

Q.      What was the thing that she took to your house
that day?

A.      I don't know what she took to my house that day.
I didn't see her come out of the studio with anything.
Neither one of us had bags.

Q.      Well, when she told you in that call on A-1670,
on Page 525, then I'm gonna pass your house and take
something.

A.      She said that, but I didn't see her bring anything.

Q.      And she didn't take anything into your house. Is this the black bag?

A.      I can't say that's the bag, either.

Q.      So you don't know what the bag was?

A.      No, I don't.

Q.      You didn't bother looking in it, and you didn't bother asking her --

A.      It was not my bag.

Q.      You weren't worried about what was in the bag.

A.      No, I wasn't.

Q.      When she said she was going to take something past your house, you didn't ask her what it was.

A.      No.  I assumed she came --

        MR. MCKNETT:  Objection, Your Honor.  It's not in the transcript.

        THE COURT:  Rephrase the question.

        BY MS. JOHNSTON:

Q.      When she said she's going to come past your house and take something, she didn't take anything.

A.      I didn't see anything in her hands.

Q.      You didn't see her bring anything in or take anything out.

A.      I didn't see her bring anything in or take

anything out.

Q.      Then when she tells everyone else about moving the ticket business to the school, she didn't tell you that?

A.      She told everyone, again, but she did not tell me.

Q.      Okay.  Well, do you recall, Call B-7224 on Page 563 of the calls?

A.      Page 563?

Q.      Yeah, on Page 563 of that last book, the one you have in front of you.  You were curious, were you not, about that meeting and what happened?

A.      Yes.

Q.      And you asked her about the meeting.

A.      Yes.

Q.      And she told you that it really had to do with Kevin's business and people coming in and out of the house frequently for that; is that correct?

A.      That's correct.

Q.      And that she wasn't going to question Jackie upstairs, because she didn't want to stress her out about it; is that correct?

A.      That's correct.

Q.      She didn't want Jackie knowing about her drug business; is that correct?

A.      It doesn't say that, no.

Q.      I'm asking you that question.  In your
conversations with Ms. Martin, after you moved the
stuff to the school, when you went over to her house
and conversed with her --

A.      I did not know -- I did not move drugs to the
school.

Q.      After you moved the things to the school, did
you have a conversation with her at the house about the
meetings that were going on?

A.      Yes.

Q.      Okay.  And she -- but she never told you that it
was the ticket business you moved to the school.

A.      She never told me.

Q.      And you never asked her that question?

A.      I never asked her that question.

Q.      When she told you in one of the very last calls
that we played that she had already been to the school
when you wanted dresses, you didn't understand that she
had already been there to give drugs to Ms. Dobie; is
that correct?

A.      That's correct.

Q.      So you didn't know why she went to the school;
is that correct?

A.      That's correct.

Q.      And you didn't ask her what did the school have
to do with Ms. Dobie.

A.      Why was that my business?  That was not my
business.  I did not ask her that.

Q.      That would be on Call B-7365 on Page 577.

A.      I didn't hear the number.

Q.      Call B-7365, on Page 577.  Do you have that call
in front of you, or could you please get it in front of
you?

        When she tells you that she's waiting on Becky
to pick it up and that she's got to go past the school
for something, you didn't ask her what she had to go
past the school for.

A.      No, I did not.

Q.      You knew she had her drugs there; isn't that
correct?

A.      No, I did not know that.

Q.      Or you didn't want to know.

A.      I did not know that.

Q.      You didn't want to -- okay.  Did you ask her why
she had to go past the school?

A.      No, I did not ask her.

Q.      Because you didn't want to know why.

A.      It wasn't my concern.

Q.      It wasn't your concern why she went by the

school -- why she had to go by the school with Becky.

       MR. MCKNETT:  Objection.  Asked and answered.

       THE COURT:  Overruled.

       BY MS. JOHNSTON:

Q.     Is that correct?

A.     That's correct.  I know.  What am I saying
that's correct?  You keep repeating the same thing over
again.  It was not my concern why she was going  to the
school.

Q.     Your only concern was to make sure that Ms.
Martin had cocaine to continue to give you on a tab; is
that right?

A.     No, it's not right.

Q.     Well, you did have a tab with her then; isn't
that right?

A.     Yes, I did have a tab.

Q.     And you continued to get drugs from her until
the time she was arrested; isn't that right?

A.     That's correct.

Q.     You would have continued to get drugs after that
if she hadn't been arrested; isn't that right?

       MR. MCKNETT:  Objection, Your Honor.

       THE COURT:  Sustained.

       BY MS. JOHNSTON:

Q.     You didn't take any dresses to the school when

you took those bags down there, did you?

A.      I don't know what was in the bags, Ms. Johnston.

Q.      And you didn't ask what was in the bags;
correct?

A.      No, I did not.

Q.      Well, then on Call B-8110 on May 29 on Page 612.
When you told her you needed another dress, Ms. Martin
told you she had already been to the school; isn't that
right?

A.      But you keep leaving it out.  It's another part
to that.  "I need another dress, the one with the
ties."  You keep saying that it made reference to I
needed another dress:  Another sundress.  I needed
another dress.

Q.      Just so we're clear here, what it says is,
"Okay.  Yeah.  So with the ties for --", and you didn't
finish what the ties were for, did you?

A.      The ties were -- they tied around.  The
sundresses tied around the neck.

Q.      What did that have to do with her being in the
school?

A.      I have no idea.  She said that.  She's telling
me what her day was like.  People have conversations.
You talk to people about what their day was like.  She
says, I've been to the school already.  I didn't ask

her if she had been to the school.

Q.      She interrupted you.

A.      Yes, she did.  She interrupted a lot of people on conversations when we weren't able to follow the conversation, because she interrupted and said something, not just this conversation.

Q.      And you didn't continue with any further description; isn't that correct?

A.      No, I did not.  After that, okay, yeah, so with the ties, and it was an interruption there.

Q.      You can't explain to us why she would have to go to the school to get you a sundress with ties, can you?

        MR. MCKNETT:  Objection, Your Honor.

        THE COURT:  Sustained.

        BY MS. JOHNSTON:

Q.      She wasn't storing dresses at the school, was she?

        MR. MCKNETT:  Objection, Your Honor.

        MR. MONTEMARANO:  Basis for knowledge.

        THE COURT:  If she knows.

        THE WITNESS:  I don't know.

        BY MS. JOHNSTON:

Q.      You didn't carry any dresses to the school on May 16, did you?

        MR. MONTEMARANO:  Asked and answered.

THE COURT:  Sustained.

BY MS. JOHNSTON:

Q.      Court's indulgence.

You didn't have to go to the school on prior occasions when you bought the black dinner dress from Ms. Martin, did you?

A.      I didn't buy a black dinner dress.

Q.      You discussed with her --

A.      I asked about that.  I didn't purchase it.

Q.      You never had to go to the school whenever you purchased clothes from Ms. Martin; isn't that correct?

A.      No, that's not correct.  You mean clothes on -- were there clothes on display at the school?

Q.      No.  My question to you is, I believe you testified this morning before the break that you went to the school once with her to take something there on May 16, and other than that you would get food at the carryout and bring it over there and eat it in the reception area.  Do you recall that testimony this morning?

A.      Yes, I do.  There was a carryout next door to the school.

Q.      Are you now telling us that in addition to taking food from the carryout and then eating it in the reception area, you also went to her school to pick up

clothing?

A.     No, I'm not telling you that.  No.

Q.     Or to look at clothing?

A.     I'm not telling you that, no.  I'm not telling you I looked at clothing at the school, no.

Q.     So you never had to go to the school to buy clothing from her; isn't that right?

A.     No.

Q.     It was only after May 16 when she had moved her business down there -- her tickets down there that you ended up having to go there; isn't that right?

A.     That's the only day that I recall being at that studio in the last two years or so -- a year or so.

Q.     So you never had to go to the school before May 16 to get clothes; is that correct?

       MR. MARTIN:  Objection.  Asked and answered. Asked and answered.

       THE COURT:  Sustained.

       BY MS. JOHNSTON:

Q.     And you didn't ask her any questions when she told you about the sweet potato pie recipe; is that correct?

A.     The sweet potato pie recipe in reference to?

Q.     Mr. Echarte.

A.     No, I did not.

Q.      You didn't ask her any questions concerning Mr.
Philpot's arrest; is that correct?

A.      It was not my concern.  I wasn't concerned about
Mr. Philpot and his arrest.

Q.      You didn't ask her any questions when she asked
you to hold that suitcase full of over $100,000 in
cash; is that correct?

        MR. MONTEMARANO:  Objection, Your Honor.
Assuming facts not evidence.  She had no knowledge of
the money.

        THE COURT:  Sustained.

        BY MS. JOHNSTON:

Q.      You didn't ask her any questions when she asked
you to hold that suitcase; is that correct?

        MR. MONTEMARANO:  Objection, Your Honor.  You
just sustained that question.

        MS. JOHNSTON:  I didn't ask what was inside.  I
changed the question.

        THE COURT:  Overruled.

        THE WITNESS:  She asked my husband and if we
would hold the suitcase, and we agreed.

        BY MS. JOHNSTON:

Q.      You didn't ask her any questions about why she
had had to keep coming back and going through that
suitcase, did you?

A.      She was moving back and forth.  She was
unsettled, and she asked us to hold it until her house
was built.

Q.      And when she offered to put you on a tab for
your cocaine sells, you didn't ask her any questions
about that.

A.      If she offered to put me on a tab?

Q.      When she offered to run a tab for your cocaine
purchases, you didn't ask her any questions about why
she was doing that.

A.      I don't recall asking her any questions.  Maybe
I did in reference to, are you certain this is what you
want to do, but I don't recall.

Q.      You didn't ask any questions what about dealings
she was having with Ms. Dobie; is that correct?

A.      That's correct.

Q.      You didn't ask her any questions about what her
dealings were with Mr. Harris; is that correct?

A.      That's correct.

Q.      You didn't ask her what her dealings were with
Mr. Walker; is that correct?

A.      That's correct.

Q.      Even though you assumed at he was getting drugs
from her.

A.      Yes.

Q.      You didn't ask her any questions about Steven
Brim's son, Nathan King, when he got arrested; is that
correct?

A.      That's correct.

Q.      She did tell you he had been arrested, though;
isn't that correct?

A.      Yes.

Q.      Okay.  So you knew Mr. King had gotten arrested,
but you didn't ask any questions about why he had
gotten arrested; is that correct?

A.      That's correct.

Q.      Because you didn't want to know; isn't that
correct?

A.      It was none of my business.

Q.      Then when she asked you on May 16 to come
without your husband and move bags of things down to
the school, you don't ask her any questions about why,
do you?

        MR. MONTEMARANO:  Objection.  Asked and
answered.

        THE COURT:  Overruled.

        THE WITNESS:  No, I did not.  Being a friend, I
didn't think I was doing anything wrong.  She asked me
to take something, and that's what I did.

        BY MS. JOHNSTON:

Q.      Even though at that time you were getting
cocaine from her.

A.      I did not know that there were drugs in that
bag.  If that's what you're saying, no, I did not.

Q.      My question to you is:  At that time, you were
getting cocaine from her.

A.      Say that again.

Q.      You were getting cocaine from her at that time;
is that correct?

A.      Yes, I was.

Q.      And you also ran a tab with her at that time; is
that correct?

A.      That's correct.

Q.      And yet you didn't see fit to ask her any
questions about what it was she had to move to the
store and lie to Ms. Terrell about; is that correct?

        MR. MCKNETT:  Objection.  Asked and answered,
Your Honor.

        MR. WARD:  At least five times, Your Honor.

        THE COURT:  Sustained.

        MS. JOHNSTON:  I have nothing further.

        THE COURT:  All right.  Ladies and gentlemen,
we'll take a recess until 2:30.

        Counsel, please remain behind.

             (Jury excused at 1:18 p.m.)

THE COURT:  Counsel, please return here at 2:15, and we can discuss at that time any remaining questions on the instructions.  We'll be working on the verdict form and the instructions during the lunch break, and I want to be able to discuss them with you at that time.

(Off the record at 1:19 p.m.)

(On the record at 2:21 p.m.)

THE COURT:  Counsel, let me review a couple of things with you that I've done during the lunch break. First of all, within a matter of half an hour or so at the most, I will hand out a revised verdict form.  The verdict form has been revised to take into account the matters I discussed earlier with you so that we include the lesser included offense instruction on conspiracy as to the defendants Dobie and Ali only, and a lesser included offense instruction for the defendant Ali only on the possession with intent to distribute count.  The changes are otherwise not remarkable.

We are also working on a chart of the counts that we'll have available to you sometime.  I can't promise on that one.  I didn't work on that at lunch, but a copy of that will probably be given to me to look at this afternoon.  I'll give that to you, as well.

With regard to the instructions.  I have -- if you've got your copy of the instructions in front of

you.  Now, the copy that I handed out to you last
Friday, I believe, for appellate review purposes, has
been docketed as Paper 893.  For record purposes, what
I'm talking about is the version of the instructions
that are in the docket as proposed instructions at 893.
If you will turn to Page 60, at the end of instruction
45, and right before instruction 46, is appropriate
placement, I believe, for the instruction requested by
Ms. Dobie and which I have expanded to include Ms. Ali.
I'll read it to you, but I'm going to give it to you in
clean form before it's read.  Mr. Ward is following
along on his copy and will be able to see the changes
that I've made as I go.

In some cases, the law a defendant is charged
with breaking actually covers two separate crimes.  One
is more serious than the second, and the second is
generally called a "lesser included offense."  As I
have previously advised you, Count One charges the
defendants Lavon Dobie and LaNora Ali with conspiracy
to distribute and possess with intent to distribute
controlled substances, and I have explained to you the
elements which the government must prove beyond a
reasonable doubt before you may convict either of them
of that crime.

If you find that the government has not

satisfied its burden of proof on any of those elements,
then you should render a verdict of not guilty.
However, you must then proceed to determine whether Ms.
Dobie or Ms. Ali has committed the lesser crime of
conspiring to possess a controlled substance.  In order
for Ms. Dobie or Ali to be found guilty of the lesser
crime of conspiring to possess a controlled substance,
the government must still prove, et cetera.  It's the
same to the end that Mr. Ward submitted.

With regard to the lesser included offense
instruction on the charge of possession with intent to
distribute, I believe that the appropriate place to put
that would be on Page 71, at the end of instruction 53
and before instruction 54.  The way that instruction
would read as modified would be as follows:  As I
mentioned earlier, in some cases the law a defendant is
charged with breaking actually covers two separate
crimes.  One is more serious than the second, and the
second is generally called a "lesser included offense."

Counts 45 and 56 of the indictment charges the
defendant LaNora Ali with possessing with intent to
distribute certain controlled -- controlled substances,
and I have explained to you the elements which the
government  must prove beyond a reasonable doubt before
you may convict her of that crime.  If you find that

the government has not satisfied its burden of proof on any of those elements, then you should render a verdict of not guilty.  However, you must then proceed to determine whether Miss Ali has committed the lesser crime of possessing a controlled substance.

In order for Ms. Ali to be found guilty of the lesser crime of possessing a controlled substance, the government must still prove beyond a reasonable doubt, in accordance with my earlier instructions to you defining possession that she (1) possessed a controlled substance and (2) that she knew that she possessed a controlled substance.

That would be how I would do the lesser included on Ms. Ali.

MS. JOHNSTON:  Your Honor, I don't believe the lesser included offense instruction applies to Count 56, which is a count that charges her with possession with intent to distribute the drugs which were moved on May 16 from the home to the school.  Ms. Ali has claimed no knowledge whatsoever of those drugs.  There is no evidence from which this jury could conclude simple possession.

We don't have any objection to the instruction as it applies to the earlier possession with intent to distribute count, but in terms of Count 56, there

simply is no evidence from which this jury could find that she simply possessed the drugs that were moved to the school.  They were packaged for distribution, there were scales included in those boxes, there was crack cocaine, cocaine and heroin, and Ms. Ali specifically has denied any knowledge of those drugs.

So, it's not a question of there being evidence to support simple possession when it comes to Count 56, so we would ask the court not to confuse the jury by giving them an instruction of simple possession in terms of Count 56.  I think that it is appropriate with reference to the earlier count, because she has said she's merely possessed the drugs for use.  But as to that date, she makes no claim whatsoever.

THE COURT:  Let me hear from Mr. McKnett.

MR. MCKNETT:  Your Honor, could I have just a second?

MR. WARD:  Excuse me.  I'm sorry, what page would that second instruction go?

THE COURT:  The one that doesn't apply to your client?

MR. WARD:  No, the one relating to the others, the possession of intent and possession.

THE COURT:  That would go on Page -- it would go on Page 71, Mr. Ward, after 53 and before Count --

instruction 53.

     MR. WARD:  Thank you.

     THE COURT:  Mr. McKnett.

     MR. MCKNETT:  Your Honor, with regard to the May 16 count.

     THE COURT:  Count 56.

     MR. MCKNETT:  Count 56.  The problem I have there is that there was a specific quantity of drugs alleged in that count.  I'm having trouble thinking this through logically, but I think the lesser included instruction should apply there because there is no evidence as to how much drugs, if any, were in those two bags, whatever it was.

     THE COURT:  If you accept the government's theory, though, there was a lot.

     MS. JOHNSTON:  I believe the verdict form says, if you find her guilty of that count what is the quantity of crack cocaine.

     THE COURT:  Correct.  I know.  They have to find that based on the evidence and the inference from the evidence.  My question to you is, what is the position -- the government is saying that, granted, there may be a basis for a lesser included offense instruction on Count 45 in light of her testimony and her defense that she was a mere user and was not involved in and never

intended to possess with intent to distribute, but they don't believe that that -- that the testimony that's been generated so far has been sufficient to raise a basis for me to give a lesser included offense on Count 56.

MR. MCKNETT:  Your Honor, I hadn't anticipated this argument.  I apologize for talking while I think; it's dangerous.

THE COURT:  We all do that.

MR. MCKNETT:  My concern is the allegation in Count 56 is a gram or more quantity of crack cocaine. I think the lesser offense with regard to Count 56 would be powder cocaine.  To that extent, I think I have a valid basis for requesting that the lesser included offense instruction be given with regard to --

THE COURT:  Let me do this.  I left my copy of the indictment downstairs, so I will have to take a look at it to see what the answer is.  I don't want to delay the jury at all.  I want to have them in here at 2:30, because I want to get the testimony wrapped up, because we will have to take a break again at the end of testimony if I'm going to instruct today.

Let me explain what the timetable is.  I am advised today, assuming I get off and running with my instructions, that the jury can stay as late as 5:30 to

a quarter to six but not later, because one of the
jurors has an appointment they have to be at.  I am
advised the jury is capable of coming in as early as
8:30 tomorrow and going until 6:00.

I'm not going to make a decision today whether
I'm going to instruct today or not.  I am prepared to
instruct, and I will have another conference before I
do so, but I'm not sure how much more examination there
is going to above Ms. Ali, and I don't know how long
the government's rebuttal witness is going to take, so
I don't want to make a decision until the government
says they rest their rebuttal case and see where we
are.  I would very much like to instruct today.  If I
can't, then I will be instructing at 8:30 in the
morning.

The other thing -- no, I think that covers
everything.

Any other preliminary matters before we bring in
jury in?  I intend to give the jury orally an
explanation of the verdict form, and if something has
to be held over today and if I'm running late on the
instructions, I'll do the explanation of the verdict
form tomorrow.

I also intend to tell them that it is not our
practice or our capability to provide them with

transcripts, that they should consider the testimony as
a whole and not focus on any one particular witness, in
any event, but they should not anticipate receiving
transcripts.

I will tell them that, because I think they were
concerned about what happens if there's any questions
that the questions would be answered by the  judge who
is assisting in my absence and might involve input from
me.  Still, any questions that happen while I'm here,
I'll dispose of any questions.  If I'm not here, that
will be done by a substitute judge in consultation with
me.

I also intend to have available for you to look
at today the chart of the charges, and I would give
that to them simply as an aid to understanding your
closing argument.  I'll make certain you're all
satisfied that it is accurate before I give it to them.

Anything further?  We'll bring in the jury.

MR. SUSSMAN:  Just housekeeping.  Do you have
like a drop dead time where you wouldn't start
instructions today?

THE COURT:  No, because I don't want to
encourage there being a drop dead time.  We're just
going to move you all right along.

Count 41 is still in the jury instructions.  I'm

going to do a word search and delete "Count 41" and
that will be deleted.  On Page 60 it's still in here,
I'm told.

        I was told counsel was looking at an
instruction.

        MS. GREENBERG:  I gave that to Mr. Mitchell, and
I was told he was going to look at it today.

        MR. MITCHELL:  I am looking at it right this
minute.  At the break --

        THE COURT:  Be prepared to tell me what you want
to do when we take the next break.

                (Witness resumes the stand.)

                (Jury returns at 2:37 p.m.)

        THE COURT:  Ladies and gentlemen, while you're
getting seated, I wanted to tell you that I am going to
try to give you my instructions today.  It depends on
the pace of the testimony, but win, lose or draw I
would like to take you up on your ability to be here
from 8:30 to 6:00 tomorrow so we can get everything
before you, hopefully, by the close of business
tomorrow.

        All right.  You may proceed, Mr. McKnett.

                    **REDIRECT EXAMINATION**

        BY MR. MCKNETT:

Q.      Thank you, Your Honor.

Good afternoons, Ms. Ali.

A.      Good afternoon.

Q.      Ms. Ali, Ms. Johnston asked you questions about
people on this chart, CH-1.  Let me ask you questions
about them as well.  The people you -- did you tell  us
you knew Juan Encarnacion?

A.      I met him at Ms. Martin's house during the
holidays.

Q.      How many times did you see him?

A.      Once.

Q.      Did you ever associate with him other than that
one time you saw him at Ms. Martin's house?

A.      It might have been once or twice, but I think
it's once.  No, I haven't.

Q.      What about Luis Mangual, Jr.?  Did you ever
associate with him?

A.      No.

Q.      Pernell Philpot?

A.      He was at Ms. Martin's house a couple of times
at Bexhill Court, and we sat down and talked and ate.

Q.      Did you ever socialize or associate with him
outside of those occasions at Ms. Martin's house?

A.      No.

Q.      Steve Brim?

A.      Mr. Brim I saw going out - he was coming in and

I was going out and I was introduced to him at Bexhill
Court.

Q.      Did you ever associate with him other than that
one occasion?

A.      No.

Q.      How about Moises Uriarte?

A.      No.

Q.      William Turner?

A.      No.

Q.      Gwen Levi?

A.      Yes.  I met her at Ms. Martin's when Ms. Martin
lived on Haywood.

Q.      How many times did you associate or see Ms.
Levi?

A.      A couple of times.  Maybe two to three times.
Maybe two or three times at Ms. Martin's house, if that
many, but I went to a fashion show.  She was at Harvey
Star Washington's fashion show, and we were at a talent
show at the Hard Rock Cafe.

Q.      Other than those occasions, did you ever
associate with Ms. Levi?

A.      No.

Q.      How about Nathan King?

A.      No.

Q.      Tiffany Vessels?

A.      No.

Q.      Michael Thurman?

A.      No.

Q.      Xavier Moore?

A.      No.

Q.      You've mentioned John Irby; you said you think you saw him once at Carter Barron.  Did you ever see him or associate with him other than that one occasion?

A.      If he's Goody's friend, I might have met him at the diner for his birthday, if that's his friend.  I can't tell by the picture or the name.

Q.      What about Alton McKenzie?

A.      No.

Q.      Claude Arnold?

A.      I know a Skip, but I don't know if that's him or not.

Q.      Derrick Bynum?

A.      Yes.

Q.      How many times did you associate with Mr. Bynum?

A.      The last time I saw Mr. Bynum was on Bexhill Court.  He used to be by there often with his daughter or eating, and during the holidays.

Q.      Other than when you saw him at Bexhill Court and other places with Ms. Martin, did you associate with

Mr. Bynum?

A.      No.

Q.      How about Eugene Byrd?

A.      Yes, I associated with -- I knew him, I think, back in the '80s -- 1985 -- and I would socialize with him and his wife.

Q.      LaVon Dobie?

A.      I met her at Ms. Martin's in 2003, and we socialized at Ms. Martin's house at Haywood.

Q.      How many times, if you recall?

A.      It could have been more than two or three.  It might not have been.  You know, we used to meet up on Friday evenings sometimes, and I don't know how often that was.

Q.      Other than those occasions at Ms. Martin's house, did you associate with Ms. Dobie?

A.      No.

Q.      Ruby Harden?

A.      I've never met Ruby Harden before until the court.

Q.      George Harris?

A.      I've seen him at Ms. Martin's house on Bexhill.

Q.      What were the circumstances under which you saw him at Ms. Martin's house on Bexhill?

A.      I don't remember if I was coming in there or

leaving; I just saw him there.

Q.     Just social events?

A.     No, he just was there.  It wasn't a social event.  I was sitting in the kitchen.

Q.     Larry Lane?

A.     I met him at Mr. Goodwin's birthday party.

Q.     Other than that, did you associate with Mr. Lane?

A.     No.

Q.     John Martin?

A.     We would go out to dinner sometimes with Mr. Martin, and I've seen him at the house on Bexhill -- very little at the house on Bexhill, but also at Haywood.

Q.     Did you ever see John Martin at times other than when he was with Ms. Martin?

A.     No.

Q.     Larry Nunn?

A.     No.

Q.     Milburn Walker?  You described your relationship with Mr. Walker.

A.     Yes.

Q.     Reece Whiting.

A.     The last time I saw Mr. Whiting was at Ms. Martin's house on Bexhill Court.

Q.      Did you ever associate with Mr. Whiting outside
of Ms. Martin's house?

A.      At my wedding.

Q.      At your wedding?

A.      Yes.

Q.      He came to your wedding?

A.      Yes.

Q.      And Mr. Goodwin?

A.      For dinner, fashion shows, concerts.

Q.      And, of course, Ms. Martin.

A.      Yes.

Q.      You described your relationship with her.   Thank
you.

        Ms. Ali, you mentioned something called "Dutch
Pot."   What is that?

A.      A Caribbean restaurant that was located next to
South Dakota -- Paula's School of Performing Arts.

Q.      Is that the place where you would go get dinner
and then take it into the front part of the studio and
eat dinner?

A.      Yes, jerk chicken.

Q.      In response to one of Ms. Johnston's questions,
you mentioned that cocaine was your company and it was
embarrassing.   Do you remember that?

A.      Yes.

Q.      Did you make efforts to stop using cocaine?

A.      Yes, I did.

Q.      When did you do that?

A.      Several times.  I've never gone into a program on my own, but when I got arrested I went into a program and completed it.

Q.      Ms. Johnston showed you that suitcase, that blue suitcase, and even held it up in front of you.  Do you remember that?

A.      Yes.

Q.      Were you present when the suitcase was seized at your apartment?

A.      No, I wasn't.

Q.      Where were you at the time the suitcase was being seized?

A.      Here being detained at the federal court building in Greenbelt.

Q.      Ms. Johnston asked you questions about a plastic surgery magazine.  Do you remember those questions?

A.      Yes.

Q.      Is there such a thing as a plastic surgery magazine?

A.      Not that I know of.  I know Ms. Martin had magazines with articles in reference to plastic surgery.

Q.      Are those the magazines you were referring to?

A.      Yes.

Q.      There was a call, B-2436, when you were talking about one magazine.  Are the magazines with the articles about plastic surgery amongst the magazines you were referring to?

A.      Yes.

        MS. JOHNSTON:  Objection.  It wasn't a reference to magazines in the plural.  It was single.  It misstates the evidence.

        THE COURT:  Sustained.  Rephrase the question.

        BY MR. MCKNETT:

Q.      I'll skip past that right now, Ms. Ali, and I'll come back to it.

        Ms. Johnston asked you if you were helping Paula Martin move things from her house to her studio because you had a drug debt with her.  Do you remember that?

A.      Yes, I do.

Q.      Let me show you Haywood 7.  Now, you moved the items on May 16; correct?

A.      That's correct.

Q.      And this is the ledger, Haywood 7; correct?

A.      Correct.

Q.      Do you see an entry down here that looks like 5-14?

A.      That's correct.

Q.      What does -- it shows that the balance you owed
Ms. Martin for drugs on the 14th of May, two days
before the move, was $150; correct?

A       That's correct.

Q.      It also shows, if I can find it, on the 14th of
May, in the clothing column ledger, that you owed Ms.
Martin $1,233; correct?

A.      That's correct.

Q.      Were you knowingly and willfully helping Ms.
Martin move drugs on the 16th of May because you owed
her $125?

A.      No, that is not correct.

Q.      If I may turn your attention to the transcript
books.  If you would look at the government's book,
Page -- I'll tell you what.  Let's skip that and we'll
come to that in a second.  Let's start with Page 138
in the government book.  Do you have it there?

A.      Yes, I do.

Q.      Ms. Johnston asked you a series of questions
about the transcripts in which she asked you whether
Sergeant Sakala was correct in his interpretation of
the conversations.  Remember that?

A.      Yes.

Q.      And you agreed with her on many of those

occasions; correct?

A.      Yes.

Q.      I want to ask you some questions about where Sergeant Sakala was wrong about his interpretation.

        MS. JOHNSTON:  Objection.  Beyond the scope of cross.

        THE COURT:  Overruled.

        BY MR. MCKNETT:

Q.      Page 138.  It's call A-367, on the 20th of March, '04.  Sergeant Sakala opined that you were telling Ms. Martin that you were going to come by when you said you were going to come by because, you know what I want, that you were telling her you were coming by to get drugs.  Is he right or wrong?

A.      He's incorrect.

Q.      He opined that later in that conversation when you said, "So if you ain't there, is it all right if I get some?", that you were asking Ms. Martin if you could go into her private supply of drugs and help yourself.  Was he right or wrong?

A.      That's incorrect.  He was wrong.

Q.      On Page 140 in the government's book, Sergeant Sakala opined that when Ms. Martin said -- this is Call B-1233, on the 21st of March, when Ms. Martin said, "I fixed your thing.  I have it with me, so you just call

me."  It was his opinion that Ms. Martin was telling

you that she had fixed your package of drugs.  Is that

right or wrong?

A.     That's wrong.

Q.     What had she fixed for you?

A.     The dinner.  The leftover dinner.

Q.     Call A-394, on Page 158.  Do you see that?

A.     Excuse me.  The call -- I didn't hear the

number.

Q.     It's on Page 158, Call A-394.

A.     Yes, I have it.

Q.     Sergeant Sakala opined that when Ms. Martin

said, "It's in the trunk of my car.  Just call me, I'll

come outside and hand you the bag out of the trunk,"

that Ms. Martin was saying that she had placed the

package of drugs that she had fixed for you in the

trunk of her car and that you should come downstairs or

she'll come outside and give it to you out of her trunk

when you came to her house.  Was he right or wrong?

A.     That was wrong.  He was wrong.

Q.     What was Ms. Martin saying to you?

A.     What I got out of Ms. Martin's trunk was a bag

with some food, and another bag with a sundress in it,

a red, white and black and pink sundress.

Q.     Please turn to Page 265 in the government's

book.  This is call B-2436, it's on April 1st of '04.
The government prepared an excerpt of it.  In the
defendants' book at Page 130 is a transcript of the
full conversation.  In that conversation Ms. Martin
says, "So just the one magazine?"  Sergeant Sakala
opined that you were -- Ms. Martin was referring to a
quantity of drugs.  Was he right or wrong?

A.      That's wrong.

Q.      You then say, "That's what I got to make sure."
The sergeant opined that you were telling Ms. Martin
that you had to check with your customers to see how
much you should buy.  Is that right or wrong?

A.      That's wrong.

Q.      Did you ever have any drug customers?

A.      I've never had any drug customers.

Q.      Would you turn to Page 348, please, in the
government's book?  It's call A-1224, on the 21st of
April 2004.  When Ms. Martin -- the sergeant opined
that when Ms. Martin says, "You just wanted one
ticket?", she was asking you if you wanted a quantity
of drugs.  Was he right or wrong?

A.      It could have been that I wanted some drugs that
day.

Q.      The sergeant opined that when you responded,
"That's -- I'm gonna make a phone call," that you were

telling Ms. Martin again that you had to check with
your customers to see how much he should get.  Is that
right or wrong?

A.      No, that's wrong.  If you would turn the Page
378 in the government's book, please.  You say -- this
is call B-4330 on April 24, '04.  You say, "I think we
might go get some crabs.  You want some?"  Martin says,
"I'm waiting for my brother to take care of some
business."  The sergeant opined that the business Ms.
Martin's brother was going to take care of was drug
business.  Is that right or wrong?

A.      I have no idea.

Q.      On Page 525 of the government's book -- this is
the May 16 call, it's Call A-1670 -- Ms. Martin says,
"I need you to leave your husband home and come take me
to the school.  I need to go take something there." You
say, "Uh-huh."  Ms. Martin says, "I got to work on
something."  Did you know what it was -- the sergeant
opined that Ms. Martin was telling you that she was
taking her drugs to the school and wanted you to help
her.  Is that right or wrong?

A.      That is incorrect, Mr. McKnett.  That is
incorrect.

Q.      Did you know what it was that Ms. Martin was
going to take to the school?

A.      No, I did not know what she was taking to the
school or what she was going to take to the school, no.

Q.      When she said something she used the words, "I
got to take something" -- the word "something."  Did
you know what she was referring to when she said
"something?"

A.      No, I did not.

Q.      If the officer opined that you knew that meant
drugs, would he be right or wrong?

A.      He's wrong.

Q.      Then Ms. Martin says, "Then I'm going past your
house and take something."  The sergeant opined that
that was Ms. Martin telling you that she was going to
bring something to your house.  Was he right or wrong?

A.      I have no idea.  I didn't see Ms. Martin bring
anything to my house.

Q.      So she did not bring anything to your house?

A.      No, she did not.

Q.      Did  Ms. Martin come to your house?

A.      Yes, she did.

Q.      Did she have access -- make access to her
suitcase?

A.      Yes, she did.

Q.      Did she take something out of the suitcase?

A.      I have no idea.

Q.      If she had taken something out of the suitcase
and put it in her pocket or her bag, would you have
seen that?

A.      I was not in the same room with Ms. Martin.

Q.      Page 599, please, in the government's book.
It's call B-7815.  It was on May 26, '04.  You asked,
"Good.  Good.  Were you able to get --", and Ms. Martin
simultaneously says, "Yeah, I have it (unintelligible),
yeah, I have it."  The sergeant opined that Ms.- -- you
were asking Ms. Martin if she had any drugs and Ms.
Martin was telling you, yeah, she had drugs.  Was he
right or wrong?

A.      That was wrong.

Q.      What were you talking about?

A.      I was talking about the IRS papers that Ms.
Martin picked up from the post office.

Q.      Would that be the IRS papers that were
referenced in Call B-7733, on Page 387 of the
defendants' transcript book?

A.      Oh, 378?

Q.      Page 387.

A.      I don't have 387 in this book, but it is the
call -- I see 388.  Yes, it's the same call.

Q.      It's the call?

A.      Yes.  Oh, I have it.  Yes, I'm sorry.  It's the

same call.

Q.      So in Call B-7815 you are referring to the IRS

letter that you describe in Call B-7733 the previous

evening.

A.      That's correct.

Q.      You were not referring to drugs.

A.      That's correct.

Q.      Ms. Martin was not telling you that she had just

gotten drugs.

A.      That's correct.

Q.      Toward the bottom of Page 599, Ms. Martin says,

"Okay.  Now, look, I may not be here but I'm going to

leave it.  If I leave out before you-all get here, I'll

leave it with Jackie."  The sergeant opined that Ms.

Martin was telling you that she would leave a quantity

of drugs for you to pick up with Jackie Terrell.  Is he

right or wrong?

A.      He was wrong.  I was picking up the certified

IRS letter from Ms. Terrell.  Ms. Martin was going to

leave it with her.

Q.      And on Call B-8110, on Page 612.  In the

government's book at the top of Page 613, you say to

Ms. Martin, "But, um, I need to another dress."  She

says, "Okay."  You say, "Okay.  Yeah.  So, with the

ties for --", and then Ms. Martin interrupts you and

starts talking about having been to school.  The
sergeant opined that you were telling Ms. Martin, and
when you said "another dress" that you were referring
to more drugs.  Was he right or wrong?

A.      That's incorrect.  He's wrong.

Q.      The sergeant opined that when you said, "with
the ties for", it was his opinion that you were again
referring to drugs.  Was he right or wrong?

A.      That's wrong.

Q.      What were you referring to?

A.      Ms. Martin had given me a pre-birthday gift.  It
was the sundress, and I wanted another dress, the one
with the ties.

        MR. MCKNETT:  Thank you, Ms. Ali.

        THE COURT:  Any recross?

        MR. MONTEMARANO:  No, Your Honor, thank you.

        MR. HALL:  I have one question, Your Honor.

### RECROSS EXAMINATION

        BY MR. HALL

Q.      Ms. Ali, you indicated that you had seen Mr.
Whiting at Ms. Martin's house.  Was that the house on
Bexhill, or was it the house on Haywood?

A.      I've only seen him at the house on Bexhill.

        MR. HALL:  Okay, thank you.

        MR. MITCHELL:  Just a couple of questions, Your

Honor.

## RECROSS EXAMINATION

BY MR. MITCHELL:

Q.     Ms. Ali, you were asked a question on direct,
and then also on recross -- I mean redirect -- direct,
redirect, and also cross about Mr. Bynum.  You said you
had seen him a couple of times at the Bexhill Court
address; is that correct?

A.     That's correct.

Q.     You haven't seen him after that.

A.     I haven't seen him after that, no.

Q.     At the time when you did see him, did you see
him involved in any drug activity at the Bexhill Court
address?

A.     No, I have not seen him involved in any drug
activity.

        MR. MITCHELL:  I have no further questions.

        THE COURT:  Anyone else?  Government?

        MS. JOHNSTON:  Just a couple of questions.

## RECROSS EXAMINATION

BY MS. JOHNSTON:

Q.     How did you pay for that sundress that you
bought?

A.     It was a gift.  You mean the second one?

Q.     The second one.  How did you pay for that?

A.      I don't even know if I got that other dress.  I
don't know if it fit or not.  I don't even recall
getting another dress.

Q.      Okay.  So this was a call about the dress then
--

        MR. MCKNETT:  I'm sorry, I can't hear Ms.
Johnston.

        BY MS. JOHNSTON:

Q.      This was a call allegedly about a dress that you
never got, then; is that correct?

A.      If I went over there and tried the dress on and
it didn't fit, I did not get the dress.

Q.      I'm not asking you if you went and tried it on.

A.      I did not get another dress - another sundress.

Q.      Did you go try it on?

A.      Yes, I did.

Q.      Where was that?  At the school or at her house?

A.      At her house.

Q.      So there would be no reason for her to reference
the school when you asked her about a dress, is there?

A.      She made reference to the school.

Q.      She interrupted you to tell you?

A.      She always interrupts people.  She was telling
me where she had gone, Ms. Johnston.

Q.      She had already told you that she had been to

the school that day; isn't that correct?

A.      Yes, she did.

Q.      Okay.  Now, during this time period, Ms. Ali,
Ms. Martin, from -- I think you said 1998 up until your
arrest on June 1st of 2004, Ms. Martin was your only
source of cocaine; is that correct?

A.      That's correct.

Q.      Counsel asked you about Call A-367, on Page 138,
where you told her that you had to tell -- you told Ms.
Terrell that you were there for the pigs feet, because
you had to make something up; is that correct?

A.      It wasn't a reference.  I had to make a lie up,
and it was just that I couldn't think of anything else
to tell her except what I was coming there for, and
that was the pigs feet.

Q.      Let's turn to Page 138 and look at what you said
in the call.  "Oh, but wait a minute.  I told her I was
coming by to get some pigs feet, because that's all
could think of."

A.      Page 138 in the defendants' book?

Q.      No, in the government's book.  Volume I.

A.      Well, you didn't say that.  Thank you.

Q.      I apologize if I didn't tell you that.  You
said, "But wait a minute.  I told her I was coming by
to get some pigs feet, because that's all I could think

of."

A.      Yes, that's all I can think of.  That's what I
was coming by for.  That's all I can think of.

Q.      So you didn't -- you felt you had to tell her
pigs feet because you couldn't tell her you were coming
up to pick up any leftovers, could you?

A.      That's what was for dinner.  I was coming by to
pick up some pigs feet.

Q.      Where in the transcripts were you discussing the
dinner, the turkey wings?  We heard Ms. Martin's call
with Clarice.  She discussed the turkey wings and the
sweet potato pie.  Where in that conversation was there
any reference to pigs feet?

A.      Ms. Terrell cooked the pigs feet.  Ms. Martin
didn't cook the pigs feet.  Ms. Terrell cooked the pigs
feet.

Q.      So you could have told Ms. Terrell, then, that
you were -- you did pick up some of Ms. Terrell's pigs
feet, didn't you?

A.      Picked up pigs feet -- I picked up a little bit
of everything.

Q.      "So if you ain't there, is it all right if I get
some."  "Some" what?

A.      Excuse me?

Q.      I'm sorry.  Apparently someone's telephone is

going off in the courtroom.

So, you left her with, "Can I get some," without explaining what you wanted some of; is that correct?

A.    I'm not certain.  I'm not certain where you are right now.

Q.    On Page 138.

A.    I know that, but I don't know the line, Ms. Johnston.

Q.    Let me get there with you, okay?  On Page 138 -- I want to make sure you have the right page -- you say, "So if you ain't there, is it all right if I get some?".

A.    Yes.

Q.    You didn't tell her some of what you wanted, did you?

A.    She knew what I wanted.  It was the dinner.

Q.    In that regard, if we go to Page 265 and Call B-2436, Page 265, which I think is in the second book. Do you have that in front of you?

MR. MCKNETT:  What page, please?

MS. JOHNSTON:  Page 265.

BY MS. JOHNSTON:

Q.    Ms. Martin asked you in a call where she was talking to Nationwide -- do you remember that this morning? -- and the call beeped over to you, and she

said, "So, just the one magazine?"  And you said,

"That's what I got to make sure;" is that correct?

A.      That's correct.

Q.      What one magazine was she referring to?

A.      It could have been a number of magazines.  It

could have been the ones with the articles for the

plastic surgery; it could have been the catalog

magazines with reference to the mens shoes that she was

selling; it could have been a number of magazines.

Q.      But she says, "just the one magazine."  What one

magazine did you -- was she referring to?

A.      It could have been either one of the magazines.

Q.      Did you ask her which magazine?

A.      No, I did not.

Q.      Then if I'm correct, Ms. Martin was your only

source of cocaine; is that correct?

A.      That's correct.

Q.      And when Ms. Martin asked you -- Ms. Martin

being a drug dealer, there's no doubt about that in

your mind; isn't that correct?

A.      She sold me drugs, yes.

Q.      She was selling drugs; is that correct?

A.      She sold me drugs, yes.

Q.      You believe she sold drugs to Mr. Walker; is

that correct.

A.      I guess -- I assumed that.

Q.      You knew she had friends, Mr. Philpot, who was arrested?

A.      I didn't know what Mr. Philpot did.

Q.      Because you didn't ask.

A.      I did not ask.

Q.      And Mr. Echarte had been arrested, and you didn't ask what he was involved in.

A.      No, I did not.

Q.      You didn't ask her what sweet potato pie recipe was illegal, did you?

A.      Did I ask her was it illegal?  I had no reason to assume that it was illegal.

Q.      In the call where she discussed Ms. Levi getting arrested, you didn't ask her what Ms. Levi was arrested for, did you?

A.      No, I did not.

Q.      When she told you in that call that Levi gave Mr. Echarte the recipe for sweet potato pie, you didn't ask her what was illegal about the sweet potato pie.

A.      Once again, it was none of my business.  I did not ask her anything about that.

Q.      And when this drug dealer then brought you -- had you and your husband pick up suitcases to store in your house, you didn't ask her what was in the

suitcases, did you?

A.      Who was the drug dealer?  Who are you referring to?

Q.      Ms. Martin, who sold drugs during the time period she gave you the suitcase.

A.      Did I ask her what?  Did my husband and I ask her what?

Q.      Let me back up for a minute.  Ms. Martin was selling you cocaine during the time that she asked you and your husband to store this suitcase or suitcases in your apartment; is that correct?

A.      That's correct.

Q.      And at that time, did you ask Ms. Martin, the drug dealer, what was in the suitcases?

A.      I didn't think I need to.  I didn't think Ms. Martin would give me any drugs to store in my home.

Q.      So you're running a tab with her for drugs, and you didn't think she would give you anything to store -- drugs to store at your house?

A.      Friendship.  People have friendships, and that was part of our friendship.  That is something that she allowed me to do, and I paid.  I paid for what I purchased from her when it came to my clothing.

Q.      You purchased by cash and by check with her --

A.      Yes.

Q.      -- in addition to being fronted drugs by her on the tab.

A.      Yes.

Q.      My question to you is this.  When Ms. Martin, the person -- the only person whom you knew at the time who was dealing drugs gave you a suitcase to take to your apartment and store, you didn't think it was necessary or important to ask her what was in the suitcase.

A.      Not when my husband was involved and I was involved.  I didn't think Ms. Martin would give me drugs to put in a suitcase.

Q.      And you didn't know where the money or whatever else came from in that suitcase?

A.      Excuse me, could you repeat that last part?

Q.      You didn't think to ask her if there was money or any other valuables in the suitcase?

A.      No, I did not.

Q.      You didn't think it was necessary.

A.      I didn't think it was necessary.

Q.      Likewise, when your friend Ms. Martin, from whom you were getting drugs as recent as May 11 -- do you see this date down here, 5-11, where you got a 125 and it adds up to 350?  Do you see that?

A.      I see that.

Q.      When she, five days later, asked you to help her
move some things to the school, you didn't ask her what
was in those bags.

A.      No, I did not.

Q.      You didn't think it was important to find out
what your friend Ms. Martin, the drug dealer, was
moving to the school.

A.      No.  I didn't think Ms. Martin would have drugs
in a bag to give me to take to a school or any place
else.

Q.      You knew she was worried about the police coming
into her house; isn't that correct?

A.      That's correct.

Q.      You didn't think to ask her, because you didn't
want to know; isn't that correct?

A.      I didn't think Ms. Martin would give me drugs to
take to a school or any place else.

Q.      After you moved the drugs to the school, you
continued to receive drugs from her as recent as May
23, when you got another 125 from her; isn't that
correct?

A.      I did not move any drugs to the school but, yes,
I did purchase something from her and it was not at the
school.

Q.      So you didn't ask her what was in the bags you

moved to the school.

A.      No, I did not.

Q.      Because it wasn't important enough for you to
find out what she was moving to the school.

A.      It was not important.  Ms. Martin did not tell
me, and I -- didn't tell me there was drugs in the bags
and I did not ask her.

Q.      All you were concerned about was making sure Ms.
Martin continued to have cocaine to sell to you; isn't
that right?

        MR. MCKNETT:  Objection.  Argumentative.

        THE COURT:  Overruled.

        THE WITNESS:  That's not correct.

        BY MS. JOHNSTON:

Q.      You were concerned about that, weren't you?

A.      No, I wasn't.

        MS. JOHNSTON:  I have nothing further.

        THE COURT:  All right.  You may step down.

        Mr.  McKnett.

        MR. MCKNETT:  Ms. Ali has no further witnesses,
Your Honor.

        THE COURT:  All right.  That concludes the last
defense case.  Is the government ready for the
rebuttal?

        MS. JOHNSTON:  Yes, Your Honor.  The first

witness we would call would be Harvey Star Washington.

        MR. WARD:  Your Honor, I think all counsel wish
to make certain motions.  Your Honor, should they be
heard now or after rebuttal?

        THE COURT:  Do it after rebuttal.

Thereupon,

                    **HARVEY STAR WASHINGTON**,

having been called as a witness on behalf of the
Plaintiff, and having been first duly sworn by the
Courtroom Deputy, was examined and testified as
follows:

                    <u>**DIRECT EXAMINATION**</u>

        BY MS. JOHNSTON:

Q.      Mr. Washington, please state your full name for
the record.

A.      My name is Harvey Washington.  My stage name is
"Harvey Star Washington."

Q.      How old are you, Mr. Washington?

A.      I'm 42.  Yeah, 42.

Q.      Approximately 42?

A.      Yes.

Q.      And where do you -- what area do you live in?

A.      Washington, D. C.

Q.      Were you born and raised in this area?

A.      Yes, I was.

Q.      Who do you reside with at this time?

A.      I'm sorry?

Q.      Who do you reside with at this time?

A.      My mom.

Q.      And her name?

A.      Estelle Washington.

Q.      If you could, tell us what you do for a living.

A.      I'm a fashion producer, and I'm now on television with Monique.  I'm the Image Producer and Costume Designer for Monique's Fat Chance on Oxygen.

Q.      When did you start doing that?

A.      About two years ago.

Q.      That would have been about 2004?

A.      Yes.

Q.      The latter part of 2004?

A.      Yes.

Q.      Could you describe for us what you mean by "fashion producer?"

A.      Well, I do fashion shows and I specialize in plus-size women, where I take women and I make them over and make them beautiful.  A lot of women sometimes suffer from self-esteem problems, and I take them and I make them over, and it's a makeover kind of show.

Q.      And you did that locally with your fashion shows?

A.      Yes.  Locally and around the United States, as well.

Q.      In terms of those shows, did the people who participated in them pay to be in the shows?

A.      Well, what they do is they pay a registration fee.  Then, after they pay a registration fee, because it's a show with full exposure and experience, they are then required to sell tickets for the fashion show as a participant.

Q.      Do you know the defendant, Paulette Martin, in this case?

A.      Yes.

Q.      Do you see her in court?

A.      Yes.

Q.      Would you identify where she's sitting to my left?

A.      Right there, the second.  (Witness indicating.)

        MS. JOHNSTON:  We would ask the record reflect he's identified Paulette Martin.

        THE COURT:  The record will so indicate.

        BY MS. JOHNSTON:

Q.      Do you know approximately when you first met Ms. Martin?

A.      I met Paula back in the late '80s, because her granddaughter, Melanie, was in my fashion show.

Q.      You said the late '80s.  Did you lose contact
with her for a while?

A.      Yes.

Q.      Do you know where she was during that time
period?

A.      Not really.

Q.      When did you meet her again after that?

A.      I met her back -- she came back in '93, because
I was having a fashion show and we were rehearsing at
the Fourth District Police Department, and she walked
in and surprised me.

Q.      Okay.  Were you having a model call there?

A.      I was having a model call.

Q.      What's a "model call?"

A.      A model call is where the women come out for the
first time to audition to actually be in the fashion
show.

Q.      Between 1993 and 2004, was Ms. Martin involved
in any fashion show?

A.      Yes, she was.

Q.      How many fashions did she model?

A.      She did -- she modelled in three fashion shows,
but she helped me sell tickets for about, maybe six of
them.

Q.      When was the last fashion show that she assisted

you with anything, either modelling or selling tickets?

A.      In 2003.  That was the fashion show, "The
Evolution of Fashion Silhouettes of Glamour."

Q.      Do you know approximately what day that show
was?

A.      It was November of 2003.

Q.      For that show in November 2003, had Ms. Martin
sold tickets for you?

A.      No.

Q.      For the November 23, 2003 show, did she sell
tickets to that show?

A.      Yes, she did.

Q.      What was her role in the show in November of
2003?

A.      In the 2003 show, she sold tickets.  That was
the fashion show that we actually honored her for.

Q.      Why did you honor Ms. Martin?

A.      I honored her because I always thought that she
was a woman of courage.  She was always nice to me, and
she always wanted to help me with my fashion shows.

Q.      Was your honoring her in that fashion show in
November 2003 at all related to the number of tickets
she was able to sell for you?

A.      Well, she told me -- she said if I honored her
for that particular show, she would get a lot of people

to come.  I needed a lot of tickets sold, so I was like, girl, I'm gonna honor you.

Q.     As a result of that, was there a contract that she signed for you?

A.     Well, all the models and the people that take tickets from me sign an agreement, so if they lose them or if the tickets are stolen or anything, they're held responsible for them.

Q.     And you make your income based on the number of tickets that the models sell or the honorees sell on behalf of your show?

A.     Yeah, that's how I make my money.

Q.     Was that show held on or about November 23, 2003?

A.     I'm sorry?

Q.     Was that show held on or about Sunday, November 23, 2003?

A.     Yes, it was.

Q.     After that show on November 23 of 2003, what if any involvement did Ms. Martin have in selling tickets for any of your fashion shows?

A.     I didn't have any other shows that she sold tickets for after that.

Q.     Did you have any shows after that that she gave away tickets for?

A.      No.

Q.      Was that the end of your contact with Ms. Martin as it relates to your fashion shows and selling tickets?

A.      Yes, in terms of the fashion show.

        MS. JOHNSTON:  Court's indulgence.

        I have nothing further of this witness.

        THE COURT:  Mr. Montemarano.

        MR. MONTEMARANO:  Thank you, Your Honor.

        Can I have the Dobie exhibits please, Ms. Merez?

                      **CROSS-EXAMINATION**

        BY MR. MONTEMARANO:

Q.      Good afternoon, Mr. Washington, how are you?

A.      Fine.

Q.      I'm going to show you what's been marked as Dobie Exhibit 12.  Does that look familiar to you?

A.      Yes.

Q.      That would be a Xeroxed copy of the program from the November 23, 2004 show; correct, sir?

A.      Yes, it is.

Q.      That would be your picture inside?

A.      Yes.

Q.      And Ms. Martin's picture?

A.      Yes.

Q.      In addition, there's advertising in there that

was sold; correct, sir?

A.      Yes, it was.

Q.      Various businesses in the District?

A.      Yes.

Q.      In the surrounding suburbs, as well?

A.      I'm sorry?

Q.      And businesses from the surrounding suburbs, as
well?

A.      Yes.

Q.      Was the show a success?

A.      It was very successful.

Q.      Good.  I'd like to ask some other questions
relating to your relationship with Ms. Martin.

A.      Okay.

Q.      Are you aware of her involvement in the sale of
clothing?

A.      I can't hear you.

Q.      I'm sorry.  Are you aware of Ms. Martin being
involved in the sale of clothing?

        MS. JOHNSTON:  Objection.  May we have a time
frame, please?

        THE COURT:  Ask about a time frame.

        MR. MONTEMARANO:  During the time you knew her
--

        MS. JOHNSTON:  Objection.  Is that the '80s or

'90s?

THE COURT:  Sustained.

BY MR. MONTEMARANO:

Q.     Since 1997 --

A.     Yes.

Q.     -- you have been aware of Ms. Martin being involve in the sale of clothing.  What kind of clothing?

A.     She specialized in children's clothes.

Q.     Did she sell any other kind of clothing?

A.     I have purchased, like, a couple of suits from her, because she told me that she was a buyer.

Q.     Suits for your mom?

A.     Yes.

Q.     Did your mom like the suits?

MS. JOHNSTON:  Objection.

THE COURT:  Sustained.

BY MR. MONTEMARANO:

Q.     Court's indulgence for a moment, please.

Did you ever visit Ms. Martin's home at any time?

A.     Yes.

Q.     Did you ever see clothing for sale in her home?

A.     I did.

MS. JOHNSTON:  Objection.  If we can have a time

frame?

       BY MR. MONTEMARANO:

Q.     During the same time frame, Mr. Washington?

A.     I'm sorry?

Q.     During the same time frame, 1997, did you ever
visit Ms. Martin's home?

A.     Yes, I did.

Q.     During that time when you visited her home, did
you ever see clothing for sale by Ms. Martin that was
being kept in her home?

A.     Yes, I did.

Q.     Just children's clothing, or adult clothing as
well?

A.     Basically, it was children's clothes; and she
did have some other items, some other clothing as well.

Q.     Did you ever see any furs there?

A.     I did see furs that had belonged to her
godmother, Mary Payne, because Mary Payne was a
furrier.

Q.     Did you know Ms. Payne?

A.     Yes.

Q.     What was Ms. Payne's relationship to Ms. Martin,
if you know?

A.     Marry Payne was kind of like Paula's backbone.
Mary was very fashionable, and we kind of looked up to

Mary, because she was like the Diva.

Q.     Did there come a time when Ms. Martin received

some clothing and other items from Ms. Payne?

A.     Yes.

       MS. JOHNSTON:  Objection.  Basis -- I'll

withdraw it.

       THE COURT:  All right.

       MR. MONTEMARANO:  Court's indulgence, please.

I think that's about it, Your Honor.

       THE COURT:  All right.

       MR. MONTEMARANO:  Thank you.

       THE COURT:  Any further cross of this witness?

       MR. MARTIN:  Yes, just a few questions.

                    **CROSS-EXAMINATION**

       BY MR. MARTIN:

Q.     Good afternoon, Mr. Washington, how are you?

A.     Hello, how are you?

Q.     I'm doing fine, thank you, sir.

       You said the last contact you had with Ms.

Martin was in November of 2003; right?

A.     The last contact that I had with Ms. Martin in

terms of selling tickets for my fashion show was 2003,

but I kept in contact with her until she was arrested.

Q.     Very good, sir.  And with respect to you and

your particular profession.

A.      Yes.

Q.      How is it that you learned that?

A.      I learned it because I was talented.  Most of it
was from God, and once you are born with talent, you
can create and you can do what you do because you are
talented and you're good at what you do, and I'm very
good at making women fabulous and teaching them how to
walk and teaching them about glamour.

Q.      No doubt.  And with respect to the talent that
you have, sir, do you have any competition in that
regard?

        MS. JOHNSTON:  Objection, Your Honor.
Relevance.

        THE COURT:  Sustained.

        MR. MARTIN:  Your Honor, if I might approach
very quickly.  If counsel would give me some leeway, I
would haven't to approach.

                (At the bar of the Court.)

        MR. MARTIN:  I'll tell you why.  The question is
whether or not there were any tickets sold after
November 23, 2003 and if he has competition.  If Ms.
Martin has engaged in selling tickets promoting tickets
for competitors, then that would be something that the
jury could consider.  We don't know that because
nobody's explored that, and I think it's fair -- you

know, it's fair grounds for cross-examination.

MS. JOHNSTON:  He does haven't a good faith
basis for arguing that there was some competitor that
Ms. Martin dealt with.  This is purely speculation on
his part.

THE COURT:  It's speculation, and I don't think
it's within the scope anyway.

MR. MARTIN:  Your Honor, it is within the scope,
because I think what the government has to  show here
is that after November 23, 2003, no more tickets were
sold by Paulette Marin, and she didn't have anymore
tickets to give to anybody else, and it goes to the
heart of this whole business of coded language and
whether or not Paula Martin had tickets to other shows.
So, I ask the court to reconsider its decision to let
me go into this.

THE COURT:  You can ask him if he has any
personal knowledge of her selling tickets for other
shows.

MR. MARTIN:  Can I ask --

THE COURT:  If the answer is no, then you stop.

(Back in open court.)

BY MR. MARTIN:

Q.    Mr. Washington, with respect to other fashion
shows that may have been held after November 23, 2003

-- not by you, but by other people -- do you know whether Ms. Martin was engaged in promoting or selling tickets for other shows?

A.      Repeat that again please.

Q.      Do you know whether Ms. Martin was selling tickets for other shows after November 23, 2003, and not necessarily yours?

A.      The only thing I remember Ms. Martin telling me is that --

        THE COURT:  Wait, wait.  Wait a minute.  Of his personal knowledge.  Please limit it to that.

        BY MR. MARTIN:

Q.      Only tell the ladies and gentlemen of the jury what you know.  Don't tell us what she said.

A.      Oh, okay.  Okay.  Okay, so repeat it again.

Q.      So the question is, do you know whether Ms. Martin was selling tickets for any other fashion shows after November 23, 2003?

A.      I don't know.

Q.      You don't know.  Thank you, Mr. Washington.

A.      You're welcome.

        MR. HALL:  I have no questions, Your Honor.

        THE COURT:  Anything further?  All right.

        MR. MCKNETT:  Your Honor, if I may very briefly, I hope --

THE COURT:  Briefly.

**CROSS-EXAMINATION**

BY MR. MCKNETT:

Q.     Good afternoon, Mr. Washington.

A.     Hello, how are you?

Q.     Well, thank you.  Mr. Washington, you looked around and you saw -- you recognized Ms. Martin in  the courtroom.  Do you recognize anybody else in the courtroom?

A.     Yes.

Q.     Who might that be?

A.     My uncle, Goody, and her brother who I know she told me was her attorney.

Q.     Do you see anybody in the back row you might recognize?

A.     Yeah, my schoolteacher.

Q.     Who is that?

A.     Ms. Ali.

Q.     What grade were you in?

A.     I was in the third or the fourth grade?  Yes.

Q.     Did you ever meet Ms. Ali at Ms. Martin's house?

A.     Yes.

Q.     What were the circumstances?

A.     Basically, she was just over there because her and Paula were good friends.

Q.      Did you ever see Ms. Ali at any of your fashion
shows?

A.      Yes.  She would always patronize my fashion
shows.  All of them would.

Q.      Thank, Mr. Washington.  I appreciate it.

A.      You're welcome.

        THE COURT:  Any redirect?

                    **REDIRECT EXAMINATION**

        BY MS. JOHNSTON:

Q.      Just one question.  Those fashion shows they
patronized, the last one was November of 2003; is that
correct?

A.      Yes, it was.

        MS. JOHNSTON:  I have nothing further.

        THE COURT:  You may step down.  Thank you, Mr.
Washington.

        THE WITNESS:  Thank you.

                    (Witness excused at 3:26 p.m.)

        MS. JOHNSTON:  Your Honor, I would like to very
briefly recall Detective Thomas Eveler.

                (Witness Eveler resumes the stand.)

        THE CLERK:  He's still under oath.

        Would you just state your name again for the
record, please?

        THE WITNESS:  Thomas Eveler, E V E L E R.

## REBUTTAL - DIRECT EXAMINATION

BY MS. JOHNSTON:

Q.     Detective Eveler, you heard testimony here that
Ms. Dobie, who has testified she was a drug user, used
Mannitol to cut her heroin before she used it.  Do you
recall that testimony?

A.     I recall her testifying that she used a cut.  I
don't remember on which type of drug.

Q.     Based upon your training and experience, do drug
users cut the drugs before they ingest them?

A.     Not that I've --

       MR. WARD:  Objection, Your Honor.

       THE COURT:  Pardon me?

       MR. WARD:  Under what circumstances are we
talking about?  It seems to me a little broad.

       THE COURT:  Overruled.

       MR. WARD:  It's about, like, saying if I put
sugar in my tea every time I drink it.

       THE COURT:  Overruled.

       BY MS. JOHNSTON:

Q.     Can you explain the basis of your opinion?

A.     In my experience, I have never heard of anyone
weakening the narcotics that they are taking.  The only
time I would have heard of that is -- I've never heard
of a heroin addict buying the high grade heroin and

then weakening it.  They usually buy on the level of
their ingestion, whether it's for snorting or
injecting.  I've never heard of anyone buying drugs and
then weakening the narcotic.

Q.      Based on your training and experience, would
there be any reason for someone who was using heroin or
cocaine to have cut in their house?

A.      To add it to the narcotics for resell to expand
their profit.

Q.      In terms of just using it, would there be any
purpose for having Mannitol in your residence if you
were purely using the drugs?

A.      I have no experience in that.  I have never
heard of that.  I have never seen it.  I have no
experience involving that.

Q.      In terms of drug users or drug addicts.  They
want to get -- would it be fair to say they're
interested in getting the most they can out of their
drugs?

A.      Yes.

Q.      Getting as high as they can get; is that
correct?

A.      That's correct.

Q.      In terms of crack.  You heard Ms. Ali describe
converting a half a gram of crack using a microwave or

using boiling water.  Based --

MR. WARD:  Excuse me, Your Honor.

MS. JOHNSTON:  Based on your training and experience, are there any difficulties with the process as she described it?

THE COURT:  There's an objection.

MR. WARD:  Your Honor, I know it's been a long trial and maybe I've forgotten, but was this witness qualified as an expert?

MS. JOHNSTON:  Absolutely.  Your Honor, we went through that.

THE COURT:  He has been.

MR. WARD:  He has been.  It has been a long trial and I have forgotten, so I will sit down and shut up.

THE COURT:  You don't have to shut up; just sit down.

BY MS. JOHNSTON:

Q.    Based upon your training and experience, would there be any difficulties in cooking up half a gram of cocaine or converting it from cocaine powder to crack cocaine or cocaine base?

A.    Yes.

Q.    Could you describe for us what those difficulties would be, based upon the way Ms. Ali

describes she did it?

A.      There's a very small amount to convert in the
method that Ms. Ali described.  The surface area, if
you think about it, is adding a small amount of powder
to water and adding baking soda to it and then cooking
it.  And how that would -- how you get a -- it's not
really a precipitate in the true chemical definition,
but you would end up with a thin layer that you would
then have to scrape, and you would lose some of that
with sticking to the container.  You wouldn't get a --
you would lose some of the product doing it that way.

Q.      When you say sticking to the container, are you
familiar with spice jars generally?

A.      Yes.

Q.      In terms of cooking up half a gram of crack,
where would that end up, or taking half a gram of
cocaine and converting it to crack or cocaine base,
where would it end up in terms of that bottle?

A.      All over the bottom of the bottle, and you would
have to somehow scrape that base off of the jar or off
the bottle.

Q.      During the course of this trial, did we see how
some of that is left on in the Pyrex bowls that we saw
from another search location?

A.      Yes.  The residue is maintained and is difficult

to -- you could wash it out and scrape it out, but you
don't want to -- that would defeat the purpose of
cooking it.

Q.     If you washed it out because it was stuck on the
sides or the bottom of it, what would happen to the
cocaine base?

A.     It would go down the drain.  It wouldn't serve
the purpose of ingesting it.

Q.     Based upon your training and experience, are you
familiar with the prices for both cocaine and cocaine
base or crack during the 2000 to 2004 time period of
this investigation?

A.     Yes.

Q.     What was the price of an eight ball of cocaine
or cocaine base?

A.     Anywhere from $125 to $150, depending on your
relationship with your supplier.

Q.     What do you mean "your relationship?"

A.     It's like if you know a car dealer, you're going
to get a better deal from the car dealer if you know
him than if you just walk in off the street.

Q.     In terms of those prices, would $125 be a good
price for an eight ball?

A.     Yes.

Q.     Would $150 be approaching the higher end?

A.      Yes.

Q.      And an eight ball, again, is how much?

A.      3.5 grams.

Q.      Is there a difference between the price for --
was there, based on your training and experience during
this time period, a difference between the price for
cocaine powder and cocaine base?

A.      Not at that level.

Q.      What do you mean by that?

A.      Not at the eighth of an ounce level, the 3.5
grams, eight ball.

Q.      Where would you see a difference between the
price -- what quantities would you see a difference
between cocaine powder and cocaine base?

A.      Once the weight starts to increase, you'd see a
price difference.

Q.      At what approximate level would you see a
difference in the price?

A.      Usually somewhere around 62 grams, the 62 level
and up to a kilo.

Q.      Why do you see a difference there?

A.      Because if it is cooked and it's a true cook and
the guy is not ripping you off, the crack is a better
construct product.  It doesn't have the cut in it if
it's cooked properly.

Q.      So if I -- based on your training and experience
then, at an eight ball or $125, could you get the same
amount of crack as you would coke -- cocaine powder?

A.      You'd get the same amount in weight.  You
wouldn't get the same amount in product.

Q.      Okay.  Explain what you mean.

A.      The powder would generally be a cut product
because powder is usually snorted, and the cocaine base
is smoked.  So the cocaine base, when it's cooked
properly, will be a purer, better product.

Q.      For a user, you would get more for your money in
terms of the high you would get off of the cocaine --

        MR. MCKNETT:  Objection to the leading question,
Your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  That you would get off of the
cocaine base, as opposed to the powder cocaine part of
that is based on the way the cocaine is ingested.  The
cocaine base, when you ingest it, is carried directly
from your lungs to the brain, rather than being diluted
in your bloodstream so the --

        MR. MARTIN:  Objection, Your Honor.

        MR. MCKNETT:  Objection.

        MR. MARTIN:  This is beyond the scope of his
expertise.

THE COURT:  Overruled.

THE WITNESS:  Based on basic physiology, knowing that the oxygenated blood or the blood is oxygenated by the lungs, and that's how the smoke --

MR. MCKNETT:  Objection, Your Honor, he's talking about body chemistry.  I don't believe he's  an expert --

THE COURT:  Overruled.

BY MS. JOHNSTON:

Q.      Continue.

A.      Based on my knowledge of the human body, that is my understanding, and the cocaine powder would -- is usually a weaker product when you're comparing the two.

Q.      Based on your training and experience, an eight ball would be in the same price range whether it was cocaine powder or cocaine base, $125 to $150?

A.      Yes.

Q.      When you convert, especially half gram quantities, do you have an opinion as to whether or not you would lose some of it in the conversion process as Ms. Ali described she did?

A.      If it is a cut -- if the powder had been cut, you would lose some weight.

Q.      That's in addition to losing some inside the container that she described she would use?

A.      Yes.

        MS. JOHNSTON:  Court's indulgence.

        I have nothing further.

        THE COURT:  Cross-examination.

                        **CROSS-EXAMINATION**

        BY MR. MONTEMARANO:

Q.      Is your statement you have no knowledge of
addicts ever cutting their drugs prior to using them?
Is that a fair statement, sir?  Is that what you just
said?  Right?

A.      Yes.

Q.      You're an expert; right, sir?

A.      Yes.

Q.      What's Fentanyl?

A.      It is a synthetic -- it's a --

Q.      Synthetic opiate; right?

A.      Yes.

Q.      About ten times as strong as heroin; right?

A.      Yes.

Q.      Remember a case called "China White?"  Ever hear
the name?

        MS. JOHNSTON:  Objection, Your Honor.

        MR. MONTEMARANO:  He's an expert, Your Honor.
We're going to probe that.  I think it's appropriate.

        MS. JOHNSTON:  Objection.  Beyond the scope of

the government's limited direct.

THE COURT:  What does this have to do with his direct?

MR. MONTEMARANO:  A little bit of latitude, Your Honor, and I can explain.

THE COURT:  Very little.

THE WITNESS:  I'm familiar with a street name "China White."  I'm unfamiliar with a case "China White."

BY MR. MONTEMARANO:

Q.     You've been a narcotics officer since 1991; correct, sir?

A.     Yes.

Q.     So you would have been a narcotics officer in 1992; correct, sir?

MS. JOHNSTON:  Objection.  Relevance.

THE COURT:  We've already gone through when he was a narcotics officer.  Sustained.

MR. MONTEMARANO:  Fine.  Thank you, Your Honor.

BY MR. MONTEMARANO:

Q.     So you have no recollection or familiarity within the construct of your expertise, Detective Eveler, about a situation in the city of Baltimore --

MS. JOHNSTON:  Objection.  Relevance.

THE COURT:  Well, finish the question.

MR. MONTEMARANO:  Where Fentanyl was being sold under the street name "China White" and 28 addicts died from overdoses because of the strength of what they were buying on the street; correct, sir?

MS. JOHNSTON:  Objection.  Relevance.

THE COURT:  Sustained.

MR. MONTEMARANO:  Can we approach, Your Honor?

THE COURT:  Yes.

(At the bar of the Court.)

MR. MONTEMARANO:  The broad brush notion that addicts never cut drugs is nonsense.  There is no other word for it, Your Honor.

THE COURT:  Cross-examine him all you want that that's nonsense.  What does that have to do with somebody dying of a completely different substance, when his only examination on direct was concerning cocaine?

MR. MONTEMARANO:  He said drugs, he didn't say cocaine.  The question about Dobie was about heroin, which is why I went to Fentanyl, because it's a --

MS. JOHNSTON:  Fentanyl is not heroin, it's an artificial drug.  Two, that case had nothing to do with whether or not they cut their drugs.  Three, he's denied any knowledge of that case, so any further cross-examination about it is inappropriate.

THE COURT:  I don't think this is proper cross-examination.  I think it's improper, so I'll sustain the objection.

(Back in open court.)

BY MR. MONTEMARANO:

Q.    Let me offer a hypothetical.  Addict buys drugs, addict ingests drugs, the drugs being sold are stronger than what the addict is used to.  What would happen to the addict?

A.    The addict would have an overdose if it's beyond their capacity to handle that narcotic.

Q.    Okay.  And what are the possible results of an overdose?

MS. JOHNSTON:  Objection.

THE COURT:  Overruled.

THE WITNESS:  There's a scope of them, leading up to death.

BY MR. MONTEMARANO:

Q.    Through and including death.  Unconsciousness, heart racing, the whole nine yards through and including death?

A.    It depends on if it's a stimulant or depressant.

Q.    Absolutely.  So using heroin for an example.  If you overdose on heroin, it will possibly kill you; correct, sir?

A.      Possibly.

        MR. MONTEMARANO:  No further questions Your
Honor.

        THE COURT:  All right.  Any additional cross?

        MR. HALL:  Actually, I had one or two questions,
Your Honor.

        THE COURT:  All right.

### CROSS-EXAMINATION

        BY MR. HALL:

Q.      Detective, you indicated that for an eighth of
an ounce or an eight ball, which is what it is commonly
referred to, there is a price range of $125 to maybe
$150; right?

A.      Yes.

Q.      I think your example was it depends on how well
you know the person you're buying from.

A.      That's one of the factors.

Q.      Another factor may be the availability of the
drug at that time; correct?

A.      Correct.

Q.      And it's possible for people to also buy an
amount smaller than an eight ball, for example half of
that, a sixteenth.

A.      Is it possible for people to buy less than an
eight ball?  That's correct, people can buy less.

Q.      You can buy a sixteenth; you can buy a single
gram; correct?

A.      Yes.

Q.      They would also have price ranges; correct?

A.      Yes.

Q.      Therefore, $125 could very well be a sixteenth,
rather than an eighth, couldn't it?

A.      A 125 would be a sixteenth?  You could also pay
half a million dollars for a Chevy, but most people
wouldn't.

Q.      You could get a bad deal; right?

A.      You could get a very bad deal, yes.

Q.      But it is possible; right?

A.      Many things are possible, yes.

        MR. HALL:  Thank you.

                    **CROSS-EXAMINATION**

        BY MR. MITCHELL:

Q.      Agent Eveler, a couple of questions about your
testimony about cut or things you add to drugs.  As I
understand your testimony, someone who is in the
business of selling drugs would add this before they
resell it to others.  If they already had a quantity of
drugs, they would add cut, increase the amount, and
then sell it; right?

A.      It depends on what they're selling.

Q.     Let's talk about cocaine.

A.     Cocaine they can.  You don't have to.  It's just
a way to increase your profit.  It's not a necessity to
redistribute by adding cut.

Q.     All right.

A.     If you're selling crack, you'd have to convert
it.  You'd have to break it down to add cut to it.
Again, it's in a hard form.  You can't just readily rub
cut on the outside of a hard substance like crack.

Q.     So typically, someone with cocaine could
increase it to crack or cocaine base by adding cut.

A.     I'm sorry?

Q.     They could increase the amount by adding cut.

A.     Yes.  You increase the volume there by
increasing your profit.

Q.     And someone -- you said if they possessed 62
grams or more that would be more likely of an amount to
use cut in order to expand the profit.  Did I
understand your testimony?

A.     No, that's not my testimony.  I believe Ms.
Johnston asked me what -- I'm trying to remember the
exact phrasing of the question.  At what point would
you start to see a variance in the price of between
crack and powder, I believe was her question.

Q.     And that would be 62 grams and up; correct?

A.      That's where I started to see a disparity.

Q.      And that's where they would -- at that point, at
that level they would start to cook it up.  Do I
understand your testimony correctly?

A.      No.  That's when you would start to see a price
-- the price difference would become more apparent at
that level.

Q.      And at that level, you would expect to find cut,
if you were to do a search warrant, for example, you
would expect to find at least some cut somewhere in the
house, wouldn't that be your experience?

A.      No.  There is many times -- as a matter of fact,
in the previous -- the investigation that led to Mr.
Encarnacion's arrest, many of the traffickers in that
case didn't cut the drugs at all.  They took a kilo and
they added a couple of grand to it and they passed it
on and they never even opened the kilo wrappers.  They
just passed it on untouched.

Q.      I see.  But if someone were actually increasing
the amount for profit -- for resell for profit, you
would expect to find some residue somewhere in the
location where they were doing that, wouldn't you
agree, in your training and experience?

A.      Some residue of what?

Q.      Cut.

A.     No.  It depends on how much money they are trying to make.  It depends on how much profit they are trying to make.

Q.     So then it's your training and experience you wouldn't find cut in a location where this is being increased for profit?

A.     I wouldn't find cut in a place where they --

Q.     Let's say you did a search warrant in your. Training and experience in serving search warrants on individuals who are increasing the amount of drugs with this substance you're referring to as cut, is it your training and experience that you would find residue or residual amounts of cut in someone's house?

A.     You may find anything -- if they are using cut to increase the volume, yes, generally you will find some sort of either residue, or in the case of Gwendolyn Levi's residence you will find huge quantities of cut.

          MR. MITCHELL:  No further questions.

          THE COURT:  Any other cross?

          MR. WARD:  Yes.

### CROSS-EXAMINATION

          BY MR. WARD:

Q.     Good afternoon, Corporal Eveler.

A.     Good afternoon.

Q.      Drawing on your vast experience in the field,
what type of cut is used with heroin?

A.      You can use Quinine, you can use Mannitol --
those are the two probably most popular.  You can use
any white powdery substance that you could mix into it.
People use brick dust if they can, just anything that
can add --

Q.      Brick dust?  How about baby talcum powder?

A.      You can use anything you can.  You're selling
it.  You can use toxic chemicals, anything that's a
powder that adds volume if you're selling it.  It
wouldn't have to be any of those two objects.  You
could use Strychnine.

Q.      Typically, in the case of heroin, you said
Quinine and Mannitol?

A.      Those are two, I think, which would be most
popular.

Q.      What about cocaine?  What would be the typical
cutting agents, again drawing on your long experience?

A.      Usually Inositol or Mannitol.

Q.      So, Mannitol could be used on both heroin and
coke; is that correct, sir?

A.      You can pretty much use any white powdery
substance.

Q.      Brick dust or -- right?  As you said, brick

dust?

A.      Yeah.  I know of instances where people took a razor blade and scraped the side of a brick wall into a bag of heroin to cut it to increase the volume.  It may not go through a needle very well, but you can increase the volume.

Q.      Yes, I'm sure you can.

        Again, drawing on your long experience, what effect does one standing use or snorting of cocaine have on the tissues in the nose?

A.      I understand it's destructive to the tissues on the inside of the nose.

Q.      It eats away at the tissues; is that correct, sir?

A.      That's my understanding.

Q.      You've dealt with addicts who are always sniffing like that because their nose is running from damage to their noses; is that right, sir?

A.      I've seen it on very rare occasions.  The majority of people I run into are crack users but, yes, I have seen people with sinus problems.

Q.      So the majority of people you run into are crack users, which is a different situation as they don't snort crack up their nose; is that right, sir?

A.      That's correct.

Q.      All right.  As I understood it, you did not know
what the product was that was found in the house where
Ms. Dobie lived.

A.      Can we be more specific?

Q.      The cut.  I thought you said you didn't know
what was found there.

A.      When did I say this?

Q.      Well, you said it during your direct
examination.  You were asked about using Inositol to
cut heroin, and you said something about -- I don't
recall what kind, or at least that's what I wrote down.
Maybe I misunderstood you.

        MS. JOHNSTON:  Objection, Your Honor, that
misstates the question.  The question had to do with
what Ms. Dobie's testified to.

        THE COURT:  Sustained.

        BY MR. WARD:

Q.      Well, instead of having the government testify,
let me ask the witness, please, to explain the cut that
was found in the house.  Do you know what it was?

A.      I believe it was Inositol.

Q.      You believe it was Inositol?

A.      Yes.

Q.      Okay.  And that can be used to cut cocaine; is
that correct, sir?

A.      That's correct.

Q.      All right.  You said that you had never heard of addicts cutting -- I know you said heroin, is that right, unless they were going to resell it?

A.      That's correct.

Q.      Is that just that you've never heard of it or that you can't say that that's not sometimes a fact that people will cut it without wanting to sell it.

A.      I cannot testify, based on my training and experience, that anyone I've ever interviewed -- that's not something in my experience that somebody has done.

Q.      It's not something in your experience.

        MS. JOHNSTON:  Objection, Your Honor, the witness wasn't finished with the answer.

        THE COURT:  Please let him finish the answer.

        BY MR. WARD:

Q.      Go ahead, sir, and please finish your answer.

A.      That pretty much sums it up.

Q.      That's what I thought.  But you cannot say, sir, can you, that an addict cutting heroin not for resell is something that never happens or doesn't -- cannot possibly happen.

A.      No, I cannot say it's not possible.

Q.      Simply that it's outside your experience.

A.      Yes, it is outside my experience.

Q.      All right.  What about people -- an addict
cutting cocaine powder for use not for resell?  Is that
something that you've never heard of?

A.      That's correct.

Q.      Is that something that's outside your
experience?

A.      That's correct.

Q.      Is that something that you've said you can say
positively does not happen?

A.      I have done many cases involving cocaine powder
and people who are using and distributing that powder,
and I have never heard of anyone cutting the powder
prior to their use.

Q.      All right.  What about someone who has a great
deal of destruction of the nasal tissues?  I think you
were in the court when Ms. Dobie testified to that,
that that is her problem.

A.      I don't know if I was or was not.  I do not
recall that testimony.

Q.      All right.  Sir, would you say that it was
outside the realm of possibility that someone who had a
substantial amount of destruction of the nasal tissues
might cut the heroin before using it in order to lessen
whatever further damage it might do to their nasal
tissues?

A.      Is it possible?

Q.      Yes.

A.      Yes.  Many things are possible, yes.

Q.      What about someone -- an addict who was short of
drugs and wanted to stretch what they have out as long
as possible?  I see you smiling, sir.  I think you know
what's coming.  Would you say that that's not a
possibility?

A.      I don't find it to be very likely at all.

Q.      No?  But you're not saying that it's not
possible.

A.      Some people believe in UFOs.

Q.      I beg your pardon?

A.      Some people believe in UFOs.

Q.      UFOs?  Well, I don't believe in UFOs, sir, and
I'm not asking you to speculate or to believe in UFOs
or the Tooth Fairy or anything else.  All I'm asking
you, sir, is, drawing on your vast experience that
you've testified to and told this jury about, are you
saying that that's not possible that an addict might do
that?

A.      I believe it's highly unlikely.

Q.      But not impossible.

A.      Not impossible.

Q.      All right.  Now, do you -- were you here when

the testimony was ongoing about the search of Ms.

Dobie's house?

A.      Yes.

Q.      Do you recall, sir, the testimony that the

bottle of what you call "cutting agent", whatever it

was, was in fact empty?

A.      I really can't recall.

Q.      I'm sure the jury will be able to draw on their

collective recollections in that regard.

        Do you recall, sir, that the bottle -- the empty

bottle, if it was empty, the bottle of cut was found in

a box that contained an envelope addressed to Goldie

Julian Dobie, Jr., my client's husband?

        MS. JOHNSTON:  Objection.  Beyond the scope of

direct examination.

        THE COURT:  Sustained.

        MR. WARD:  May I approach the bench, Your Honor?

        THE COURT:  Yes.

                (At the bar of the Court.)

        MR. WARD:  Your Honor, the government has sought

to show that my client had this bottle of Inositol or

whatever it was and was using it for cutting whatever

substances she had and that the only purpose she would

do this, of course, would be to make it weaker for

resell.  It seems to me that anything that is within

the general scope of that question to show that, well, is fair game.  Whether or not she did use it simply for resell, which I've asked about, or whether or not it could have belonged to somebody else, which I'm about to ask him about.

I mean, she's going to get up and argue to this jury that the only reason she had that Inositol in the house or that it was there is she was using it to cut the drugs she got from Ms. Martin to sell to other people.

MS. JOHNSTON:  Your Honor, I think this goes beyond the scope of direct.  We brought him in for a very specific purpose in our rebuttal case, which was to contradict Ms. Dobie's testimony that she used the cut to weaken the drugs she was taking because of damage to her nose.  That is the extent of it.  We didn't ask him whose drugs it was.  Ms. Dobie admitted that's what the cut was there for.  So, the notion of now of trying to cross-examine him about whose drugs goes beyond the scope of the very limited area we called him for on rebuttal.

THE COURT:  I sustain the objection.

(Back in open court.)

MR. WARD:  Corporal, I don't think I have any questions for you about dope or UFOs or tooth fairies.

Thank you.

THE COURT:  Any further cross?

MR. SUSSMAN:  Just briefly, judge.

**CROSS-EXAMINATION**

BY MR. SUSSMAN:

Q.     Corporal, I take it from your answer that you've never been the subject of an alien abduction or anything like that?

A.     Not that I recall.

Q.     But you are familiar with the concepts of wholesale and retail; right?

A.     Yes.

Q.     They apply to the drug trade just as they apply to any business; is that correct?

A.     It depends on who you're dealing with.

Q.     Right.

Q.     Would it be fair to say that people who are buying for resell are trying to buy wholesale, trying to buy it at a lower price?

A.     You would hope.

Q.     And they are more concerned about their profit margin; isn't that right?  What they can mark it up for and what they are reselling it for?

A.     That's a goal, yes.

Q.     And people buying retail may not be concerned

about price if they're, say, an ultimate user?

A.      I don't believe that for a second.

Q.      Let me ask you this.  You likened it to the car business; isn't that right?

A.      Sure.

Q.      And it's fair to say if you're a smart buyer you do your homework, you do -- as the dealer, you understand pricing, and you might get a good deal?

A.      Yes.

Q.      If you walk in off the street and you've never bought a car before or don't have much experience, you might just get the shaft; right?

A.      That's correct.

        MR. SUSSMAN:  Thank you.

                    **CROSS-EXAMINATION**

        BY MR. MCKNETT:  Good afternoon, corporal.

A.      Good afternoon.

Q.      Corporal, you mentioned -- you talked about 125s, $125 as a relatively standard price for a quantity of drugs; right?

A.      Yes.

Q.      And you said it was the same price for a quantity of -- for an eight ball; right?

A.      That's a standard price for an eight ball.

Q.      Standard price for an eight ball.  And the eight

ball could be either powder or crack -- powder or
crack; right?

A.      Yes.  I have most commonly heard that term with
crack, but --

Q.      But it could also be powder; right?

A.      It could be.  It applies to a weight.

Q.      So if somebody says, I want to buy a 125, you
can't tell whether they're talking about powder or
crack, can you?

A.      Not based solely on those words, no.

Q.      Did you ever use cocaine?

A.      No.

Q.      Wouldn't you agree that a drug user, someone who
used cocaine, would be the best expert on drug usage?

A.      I have been coached by some pretty good drug
experts over the years.  As a matter of fact, they told
me how to buy drugs.  I have interviewed many drug
dealers, and they told me what mistakes I can make when
buying drugs, what happens and what doesn't happen; and
I've been to training.  So, I've had many conversations
with many drug users and they have explained how the
world works.

        I have had dealings where I've been standing
there watching people buy drugs, standing in line
buying drugs, watching people cut drugs, watching

people package drugs; so I have, without using drugs --
you can gain a lot of experience without having used
the drugs yourself.

Q.    That's all very interesting.  Wouldn't you agree
that a drug user would be the best exert on drug usage?

A.    It depends on their experience.  If they're only
buying from one person, they may not have a, you know,
as much information as they would buying from three,
four different people.

Q.    Again, that's interesting, but wouldn't you
agree that a drug user would be the best expert on drug
usage?

        MS. JOHNSTON:  Objection.

        THE COURT:  Sustained.

        MR. MCKNETT:  I haven't gotten an answer yet,
Your Honor.  It's a "yes" or "no" question.

        THE WITNESS:  I don't agree it's a yes or no.

        MS. JOHNSTON:  Objection.

        THE COURT:  Sustained.

        BY MR. MCKNETT:

Q.    Did you ever cook crack?

A.    Yes.

Q.    How many times?

A.    I did it a couple of times in the lab, a handful
of times.

Q.      When was that?

A.      Sometime in the '90s.

Q.      Wouldn't you agree that a person who cooked powder cocaine into crack cocaine on a regular basis would be the best expert on how to cook powder cocaine into crack cocaine?

A.      How many times -- it depends how many times they cooked it.

Q.      More than you.

        MS. JOHNSTON:  Objection.

        THE COURT:  Sustained.  I think you're just arguing with the witness, Mr. McKnett, so I'm not going to permit that.

        BY MR. MCKNETT:

Q.      Were you present when Ms. Ali used drugs?

A.      No.

        MS. JOHNSTON:  Objection.

        MR. MCKNETT:  Were you present --

        THE COURT:  Overruled.

        BY MR. MCKNETT:

Q.      Were you present when Ms. Ali testified about using drugs?

A.      Yes.

Q.      You're not saying are you that Ms. Ali couldn't have cooked powder the way she described, are you?

A.      I found it to be not very believable.

Q.      Corporal, if the question calls for a "yes" or "no", could you tell us "yes" or "no", please?

        MS. JOHNSTON:  Objection.  He's answered the question.

        THE COURT:  Sustained.

        MR. MCKNETT:  Actually, he hasn't, Your Honor.

        THE COURT:  He answered the question.

        BY MR. MCKNETT:

Q.      You found it what?

A.      Unbelievable.

Q.      In your expert opinion.

A.      Yes.

Q.      And you find it unbelievable, because it would be too difficult to cook it that way?

A.      I've seen it cooked in smaller amounts, and it does not coincide with what Ms. Ali testified to --

Q.      In what?

A.      -- generally it is used.

Q.      I'm sorry, I didn't mean to interrupt.

        MS. JOHNSTON:  Objection.

        THE COURT:  Sustained.  Let him finish his answer.

        BY MR. MCKNETT:

Q.      Please finish.

A.      If someone is cooking a small amount, which
happens on rare occasions, it is usually done by using
some very narrow item like a test tube, not a spice can
or spice container as described by Ms. Ali.

Q.      But Ms. Ali said she used a spice jar, if I
remember correctly.

A.      Yes, that's correct.

Q.      Haven't you ever seen spice jars that sit in
spice racks that are about this tall and maybe an inch,
inch and a quarter in diameter?

A.      I see a great deal of difference in the diameter
of a test tube and the diameter of a spice jar.

Q.      I didn't ask you that question.  I asked you if
you have ever seen spice jars that are maybe this tall
and about an inch to an inch and a half in diameter.
Have you ever seen them?

A.      Yes.

Q.      Wouldn't the degree of difficulty in cooking
powder into crack depend, at least in part, on the
purity of the powder?

A.      Degree of difficulty?  No.

Q.      Well, you said that when -- if I remember
correctly, you said that someone who tried to cook a
half a gram would wind up only with a thin layer in the
bottom of the container, because it would -- because of

the process the cooking process; correct?

A.     Yes, that's what I said.  But I disagree with --
I think that was a compound, but I disagree.  Go ahead.
Go ahead.

Q.     Are you saying that the quality -- the purity of
the powder cocaine has no affect on the end result of
cooking the powder?

A.     It affects how much cocaine base you will have
left as your finished product.

Q.     So if you have had a half a gram of relatively
high purity, you could actually have crack cocaine in a
usable form at the end of the process; right?

A.     Yes.  I don't think I said it wouldn't be a
usable form.  I think what I was referring to is
logistically it would be difficult to function with
that equipment.

Q.     So when you cooked even a half a gram of powder,
you could wind up with a usable quantity of crack;
correct?

A.     Yes, you could, but you would be wasting a
portion of it using that equipment.

Q.     But that would be your opinion that you're
wasting it; correct?

A.     Sure.

Q.     And if you had a reason to run the risk of

wasting it such as not wanting to suffer the nasal

passage problems that Mr. Ward talked about, you might

just do it; right?

A.      I'm sure it's possible.

Q.      And you did hear Ms. Ali testify, did you not,

that she wasn't very good at cooking crack?

A.      My recollection was she wasn't very good at

cooking it with the microwave, that it splattered

around.  That's my recollection.

Q.      She said when she tried to cook it in the

microwave it didn't go very well for her; right?

A.      Yes, but I didn't recall her saying she had

difficulty with the other method.

Q.      But you cannot say, can you, that she didn't

cook powder into crack, can you?

A.      I'm sorry, could repeat that?

Q.      I think I did repeat it.  You can't say that Ms.

Ali never cooked powder into crack, can you?

A.      That's correct.  I cannot say she never did it.

Q.      And the process she described is a valid process

for cooking powder into crack, isn't it?

A.      I thought she was a little vague on the details

but, generally, yes.

Q.      She seemed to know what she was talking about,

didn't she?

A.      I had a problem with some of her description.
In general she had it right, but she could have --

Q.      I'm not sure I got your answer.  Your answer was
that she seemed to know what she was talking about,
even though you would quibble a bit on some of the
details; correct?

A.      I have a few questions I would like to ask her
about that, but generally she was in the ballpark.

Q.      And those questions weren't asked by Ms.
Johnston, were they?

A.      That's correct.

        MR. MCKNETT:  Thank you.

        MR. MARTIN:  Your Honor, I didn't ask him any
questions.

        THE COURT:  No, you've already had your
opportunity, Mr. Martin.

        MR. MARTIN:  Oh, my opportunity has passed?
Okay, sir.

        THE COURT:  You've already had your opportunity.

        Counsel, we're going to take a ten minute recess
and then -- do you have any redirect, Ms. Johnston?

        MS. JOHNSTON:  Your Honor, maybe two questions.

        THE COURT:  Well, take your two then.

        MS. JOHNSTON:  Thank you, Your Honor.

        THE COURT:  Go for it.

## REDIRECT EXAMINATION

BY MS. JOHNSTON:

Q.      Based upon your -- Mr. Ward asked you a lot of questions about what is possible.  Is it correct that you indicated UFOs are possible?  Is that the standard you have used in terms of saying whether something is possible?

MR. MONTEMARANO:  Objection.  Leading.

THE COURT:  Overruled.

BY MS. JOHNSTON:

Q.      Maybe three questions.

Is that your understanding of possibilities?

A.      Yes.  That's why I said many things are possible.

Q.      Based upon your training and experience, do cocaine or heroin users use cut to dilute drugs they're using?

A.      No.

Q.      Do you -- based on your training and experience, do you have to cut cocaine or heroin to sell it for a profit?

A.      No.

Q.      And the third question, Your Honor, could you explain to the ladies and gentlemen of the jury why you found it -- why you found Ms. Ali's description of

cooking half a gram of cocaine powder in a spice jar

unbelievable?

A.      If you think about how small a half a gram of

powder is mixed with a half a gram of baking soda,

mixed with fluid, and then when you cook it -- when

it's completed you will only have half a gram of --

        MR. MCKNETT:  Objection.  Your Honor, that is

not my client's testimony.

        THE COURT:  Let him finish his answer.  I

haven't heard his answer.

        THE WITNESS:  The end result is if you have high

quality powder, there would be approximately half a

gram of cocaine base left in the bottom of that jar

which you would then have to extract from the jar to

smoke it.

        MS. JOHNSTON:  What form does that --

        MR. MCKNETT:  Your Honor, I object because the

answer assumes facts that are not in evidence through

my client's testimony.

        THE COURT:  Overruled.

        BY MS. JOHNSTON:

Q.      In what form is it in the spice jar?

A.      It would be -- when it's completed, it would be

cocaine base on the bottom of the jar.

Q.      Hard or soft?

A.      Hard.

Q.      Sticking to any part of the jar?

A.      It would be sticking to the bottom of the jar.

        MS. JOHNSTON:  I have nothing further.

        THE COURT:  Okay.

        MS. JOHNSTON:  Thank you, Your Honor, for the
court's indulgence.  It was more than three questions.

        THE COURT:  Pardon me?

        MS. JOHNSTON:  I went more than three questions.

        THE COURT:  We will take a recess until 4:17.

                    (Off the record at 4:09 p.m.)

                    (Jury excused at 4:09 p.m.)

                    (On the record at 4:19 p.m.)

        THE COURT:  All right.  Are we ready for the
jury?

        MR. MONTEMARANO:  No, Your Honor.

        MR. MCKNETT:  Your Honor, I have a preliminary
motion and objection to one of these exhibits.  It's
Government's Exhibit Chart 17.

        THE COURT:  17?  Wait a minute.

        MR. MCKNETT:  17.  It's a two-page chart --

        THE COURT:  I have it.

        MR. MCKNETT:  -- reflecting checks of my client.
I have no idea what this is intended to rebut, and I
would like a proffer before the government refers to

it.

THE COURT:  Ms. Johnston.

MS. JOHNSTON:  Your Honor, it's intended to show the full picture of Ms. Ali's dealings with Ms. Martin. She indicated she agreed with what was in the Haywood book, but this shows additional checks that she had written in addition to a running tab, and it gives a full scope of the extent of her transactions with Ms. Martin, and for those reasons we think it's proper rebuttal.

MR. MCKNETT:  Your Honor, that doesn't rebut anything.  My client never tried to minimize her relationship with Ms. Martin.  There is 96 checks itemized on here, and if the government introduces this I will have to go through each check and question the proffer about the purpose of the check and the basis of knowledge.  My client never -- in fact, my client, in answer to a question of Ms. Johnston, said she paid Ms. Martin for drugs --

THE COURT:  Are these banking records in evidence that serve as the basis for this exhibit?

MR. MONTEMARANO:  No.

THE COURT:  The answer is no.

MR. MCKNETT:  I don't believe they are, Your Honor.

THE COURT:  The banking records have been provided to defense counsel prior to trial; correct?

MS. JOHNSTON:  Absolutely, Your Honor.

THE COURT:  This is an exhibit that is intended to summarize the voluminous records.

MR. MCKNETT:  This isn't rebuttal, Your Honor.

THE COURT:  I want to make sure I understand what this exhibit is.

Ms. Johnston, why is this not an exhibit that should have been offered in the government's case in chief?

MS. JOHNSTON:  Your Honor, it wasn't relative in the government's case in chief because Ms. Ali hadn't testified concerning her relationship with Ms. Martin. This gives a fuller picture of her relationship with Ms. Martin.

MR. MCKNETT:  Your Honor, it could have been used in cross-examination of Ms. Ali, at which point I would have had a chance to respond to it.

THE COURT:  All right.  What are the concerns as to the other exhibits?

MR. MCKNETT:  The other two don't relate to my client, Your Honor.

THE COURT:  All right.

MR. MONTEMARANO:  They relate to mine.

THE COURT:  Okay.  Mr. Montemarano.

MR. MONTEMARANO:  We received, before the break,
approximately 30 or 40 pages of bank records which
purport to summarize cash deposits by year, deposits
from January '99 through 2004.  They are identical but
different.  One is by time, and the other is by account
showing subtotals by month and by year and by account,
depending on which of the documents -- these are 16 and
16A, Chart CH-16 and 16A.  I have not had an
opportunity to go through these to vet them, to insure
they their accuracy.

When I brought this matter to the court's
attention earlier today, Ms. Johnston kept referring to
the bank records.  Just so the court is clear, this is
some but not all of the bank records that we're talking
about.  I have an 18" stack sitting in front of me.

THE COURT:  Let me ask you the same question I
asked Mr. McKnett.  If I understand correctly, these
two exhibits are based upon an analysis that's been
made by the next witness of the bank account records
that defense counsel has had prior to trial; is that
correct?

MR. MONTEMARANO:  That is correct.

THE COURT:  This is intended to be a summary of
voluminous records offered by the government in its

case in rebuttal.  My question, Ms. Johnston, is why is
this not evidence that could or should have been
offered in the government's case in chief?

MS. JOHNSTON:  Because evidence shows cash
deposits into the account.  Mr. Montemarano called Mr.
Shannon to testify about how she got money from
different estates.  He put in evidence the Martha Jean
West calls to say she was making money selling clothes.
He questioned Ms. Ali about those transactions as well.

This shows her the scope of her business that is
not accounted for by the testimony of Mr. Shannon and
by the testimony or the calls related to Martha Jean
West.  It is absolutely rebuttal of his case that she
had legitimate sources of income, be it the concert
business, be it the clothing business, or be it getting
inheritances from old women who passed away.  So, this
directly refutes that.  It shows cash deposits going
into her accounts.

MR. MONTEMARANO:  Your Honor, that evidence was
a direct rebuttal to Detective Sakala's statement
beyond a moral certainty that there were no legitimate
businesses.  Now the government is going to say well,
you know we meant legitimate because it was drug money
involved.  Anybody sitting in this courtroom knew what
Detective Sakala intended -- Sergeant Sakala intended

by that statement and that there is nothing legitimate
involved in anything Ms. Martin's doing, which is
simply not true.  That's what he intended for the jury
to believe, and for that reason I undertook to put on
this evidence.  This could have been part of the
government's case in chief and quite frankly might have
persuaded me not to put on that evidence because of the
difference in quantity.

          The simple fact is, Your Honor, at this point
being provided these documents on the 8th of August as
opposed to the 5th of June, there is no way I can get a
forensic accountant to go through and verify that the
numbers are accurate.  I have pounds of bank records
that these would need to be checked against.

          MS. JOHNSTON:  Your Honor, Agent Sakala
testified in his direct examination and in response to
cross-examination that it wasn't legitimate money
because it was drug proceeds, and that was the extent
of that.  We didn't go down the road of how she got her
income, counsel did.  We are certainly entitled to show
this jury that in addition to those moneys that she got
from the inheritances, she had a lot of cash going
through her account, and that directly rebuts the
defense that's been put on in this case.  It is
absolutely rebuttal.

In terms of the charts.  Your Honor, I would just call the court's attention to the fact that Chart 16A should actually be Chart 18, because 16A is pages 1 through 24 which shows the bank account number and the date the cash deposit was made and the amount of the cash deposit, in addition to the cover sheet that summarizes the cash deposits by account.  Similarly, in the other set, which is the same summary Page 1 which shows the total amount, it just brakes it down by year. Again, each deposit is listed individually, each by cash deposit from those records.

It is absolutely appropriate for the government to show that in spite of the defendants' argument and their presentation of a defense that she had legitimate sources of income to show that she had these cash deposits going through her account.  The government would not have gone here if we hadn't had that defense put on.  It wasn't necessary for the government's case in chief to put this on.  We could have, albeit if we wanted to continue the case ad infinitum, but we chose not to do that and we waited to see what defense Mr. Montemarano has put on, and he has gone down this road.

THE COURT:  Didn't Mr. Montemarano, in his opening statement, indicate that she had legitimate sources of income?

MR. MONTEMARANO:  Yes, Your Honor.

THE COURT:  Didn't he place that before the jury in his opening statement?

MS. JOHNSTON:  He may have placed it before, but there's no evidence of it until he puts on his case, Your Honor, and now we're rushed and --

THE COURT:  You did call the expert to the stand to indicate that he found no legitimate business.  That was part of your case chief, was it not?

MS. JOHNSTON:  Your Honor, no.  On cross-examination, counsel asked him whether or not it was a legitimate business, and he said it was not legitimate because it was drug proceeds.  This shows the source of the money.  Counsel argued the source of the money was these inheritances she received and the clothing she received.  This shows cash going into her accounts separate and apart from any wire transfers, separate and apart from the money she got from the estates in terms of those checks that we listened to here.  If those checks hadn't been introduced and if we hadn't heard the testimony about her supposedly legitimate clothing business and her legitimate concert business through the calls with Ulysses Gardner and his testimony, we wouldn't be here at this point in time, but we are here because they introduced that evidence

trying to say she was a legitimate businesswoman.

THE COURT:  Anything further?

MS. JOHNSTON:  No, sir.

MR. MCKNETT:  Your Honor, if I may respond to Ms. Johnston's response to my request for a proffer as to what this chart is supposed to rebut.

Ms. Johnston didn't point out anything that it is supposed to rebut.  She said it's supposed to show the full picture of the relationship between my client and Ms. Martin.  Well, that's what the government was supposed to do in its case in chief.  My client did not minimize, deny, or in any other way refute the government's theory that my client was related with Ms. Martin.  This is stuff that should have come in, if not in their case in chief at least certainly through cross-examination of Ms. Ali.  The government shouldn't be allowed to just sit back and sandbag us, which is exactly what this is.

MS. JOHNSTON:  Your Honor, counsel has had these records, and I think Mr. McKnett's objection as to CH-17, which summarizes his client's checks, is the --

MR. MCKNETT:  I cannot hear Ms. Johnston.

THE COURT:  There is nothing terribly remarkable about Chart 17.  The jury has already heard that there was a large number of payments made, and they've seen

legers, they've seen there were payments made for both clothing and drugs.  They have already seen this.

MR. MCKNETT:  They've seen Haywood 7 at least a dozen times during this trial in which there is a leger that lays out a portion of the relationship between my client and Ms. Martin, and I specifically asked Ms. Ali if that ledger accurately reflects the nature of their relationship and she said yes.

THE COURT:  All right.  I'm going to sustain the defense objection.  I do not think these are proper rebuttal, and I will not permit them to be used.

MS. JOHNSTON:  Your Honor, we would ask permission to use the charts concerning Ms. Martin.  It's a different objection than the objection with Ms. Ali.

THE COURT:  The charts what?

MS. JOHNSTON:  The charts concerning Ms. Martin.  That certainly refutes her argument that she had a legitimate source of income.

MR. MONTEMARANO:  Your Honor, what it does not refute is the suggestion she had a legitimate source of income.  There are many kinds of income where people traffic in cash.

THE COURT:  My problem is, number one, I don't think this is proper rebuttal; and number two, if we're

going to get into this, then we're going to  have to go

into what are the possible sources of these cash

deposits other than drugs, and then I can see the

defense asking to have a parade of students come in and

claim that they paid her cash for lessons and we're

going to go on and on and on into satellite matters in

rebuttal, and that's not where we should be doing this.

The jury, I think, has got plenty of evidence

before it from which it can reach the conclusions it

needs to reach to conclude this case.  I just think

this is not proper rebuttal and could and should have

been brought in the government's case in chief.  So,

that's my ruling.

MR. MONTEMARANO:  With regard to that, Your

Honor, the government intended to put this material on

through an IRS agent.  Will the court be excluding the

testimony of the IRS agent?

THE COURT:  If the IRS agent is going to simply

get up and be the sponsor of these exhibits, then the

IRS agent is not going to have much to say.

MR. MONTEMARANO:  It seems to me if he said,

these are the numbers I added up and came up with, in

essence he is oralizing --

THE COURT:  I don't think that would be proper.

MR. MONTEMARANO:  Thank you.

THE COURT:  Are you going to call a witness or
--

MS. JOHNSTON:  Your Honor, I will need a few
minutes to see whether or not we're going to call him,
in light of the court's ruling.

THE COURT:  Okay.  While Ms. Johnston is
conferring with her colleague, there is a question
still left open, Mr. McKnett, on whether there was a
basis for a lesser included offense instruction on the
second of the two counts.  Did you have a chance to
reflect on that more?

MR. MCKNETT:  Not very much, Your Honor.  I've
been kind of busy this afternoon.  I still think the
lesser included offense would be with regard to the
quantities if not the substance of the charge itself.

THE COURT:  Let me tell you what I intend to do,
depending on what happens now with this potential
additional witness.  If there are no additional
witnesses, I intend to take every last minute I can
with this jury today and start these instructions.  I
don't think I'm going to get to that one because, as I
indicated, one juror has to be out of here between 5:30
and a quarter of six.  So, it would be very pleasant
for me to break the instructions, unlike breaking up
closing arguments, which I don't like to break up.  I

don't mind breaking me up, and I can stop at a suitable breaking point in these instructions between 5:30 and a quarter of six and then finish up tomorrow morning at 8:30.

So what I need to do is to have resolved the question of this -- of whether it's a one count or two count lesser included offense instructions appropriate, and I'll need to hear more from the government and from you about that to the extent that we don't get it done today.  I can do it today after the jury leaves, or I can do it tomorrow morning early, but what I would propose to do is to go through these instructions to about a halfway point or maybe a little beyond, depending on what the government does now.

MR. MCKNETT:  Your Honor, I would prefer if the court would allow me to be able to think that through more fully after we finish today.

THE COURT:  All right.  Well, let me see what the government is going to do.

MS. GREENBERG:  Your Honor, the government's position remains the same, that count 56 there is no basis for lesser included instruction, both in terms of the quantities that were transported and in terms of Ms. Ali's defense in this case, and --

THE COURT:  I'll think it over night, too.

Page 305

MS. GREENBERG:  If I may finish, Your Honor, just before I forget to tell you this.  There's lots of typos with cutting and pasting, and at the top of Page 23, Ms. Dobie and Ms.- --

THE COURT:  Page 23 of what?

MS. GREENBERG:  It says, if you find -- what page and what?

THE COURT:  Of what document?

MS. GREENBERG:  If you find the defendant, LaNora Ali, guilty of Count 56, please skip to Question 31.  If you find the defendant, LaVon Dobie, not guilty of Count 56 --

THE COURT:  I wasn't talking about the verdict sheet yet.  My intention with regard to the verdict sheet is to try to get that -- you need to get all your comments that you can to each other and to me or my law clerk.  I'm not going to give it to them today.  What I'd like to do is to give it to them at the end of my instructions.  So, what you all should do is to look at these carefully.  We can convene tomorrow morning early and make sure there's no additional corrections to make.  We can get the corrections made while I'm finishing my instructions and distribute it at that time.

MS. GREENBERG:  Your Honor, if you have a few

minutes after the jury is excused, Mr. Mitchell and I
wanted to discuss the restoration of civil rights
issues with the court.

MR. MITCHELL:  I can do it now, Your Honor.

THE COURT:  No, we've got a jury waiting.  What
I'm going to do is after the jury leaves today or
tomorrow morning at 8 o'clock.  I don't want to keep
them waiting any longer.

MS. JOHNSTON:  Your Honor, the government is
going to rest.  We can't call the accountant to
testify.

THE COURT:  The government now rests its
rebuttal case.

Do I here a motion?

MR. MARTIN:  Mr. Goodwin renews his motion of
for judgment of acquittal that was made earlier under
Rule 29.  I am not going to chase my tail any further.

THE COURT:  Does anybody have any new arguments
that were not previously made at the end of the
government's case in chief?

MR. MONTEMARANO:  Very briefly.  I would submit
that while the standard the court applies, and
rightfully so, at the end of the government's case is
that of any rational finder of fact, I believe the
standard of the court should and is obligated to apply

at this point is a more stringent one and it must not
be so forgiving of the government's case or the
deficiencies thereof if my client -- and I assume the
codefendants -- are to receive due process, and for
that reason I submit that the court must apply a more
careful and more stringent standard other than they do
adopt the same factual arguments.  It took me about ten
minutes to go through all 55 of my counts.

      THE COURT:  I remember it well.

      MR. MONTEMARANO:  Thank you, Your Honor.

      THE COURT:  Anyone else?

      MR. HALL:  Your Honor, adopting Mr.
Montemarano's argument concerning the standard at this
point, I would suggest to the court that in reviewing
the evidence against Mr. Whiting that there still has
been no showing of the government -- by the government
of an agreement between Mr. Whiting and Ms. Martin
relative to the sale or possession with intent to
distribute drugs, and I'm renewing my motion for all
the reasons I may have made before.

      THE COURT:  By all means.

      MR. MITCHELL:  Your Honor, I obviously come into
the process of adopting and adopting and adopting, but
the one argument I do wish to make in addition on -- I
believe it's Count 56 -- court's indulgence.  The gun

charge, I believe, is Count 60.  The government has not
proven that Mr. Bynum's civil rights to possess a
firearm were not restored, and other than that I adopt
all the other arguments made before by and co-counsel.

THE COURT:  Mr.  Ward.

MR. WARD:  I will adopt the arguments I made
previously and the additional arguments made by other
counsel here today, Your Honor, on the part of Ms.
Dobie.

THE COURT:  Mr. Sussman.

MR. SUSSMAN:  I move for judgment of acquittal
on all counts and submit.  I still want to point out we
still haven't got to that communications thing.  We can
do that -- the telephone thing.  We can do that after.

THE COURT:  That's probably going to be
tomorrow.  That's pretty far into the instructions.

MR. SUSSMAN:  We can do that.

THE COURT:  I'm going to be able to get through
the general instructions and maybe the conspiracy
instruction and quit for today.

MR. SUSSMAN:  Okay.  That's fine.

THE COURT:  Mr. McKnett.

MR. MCKNETT:  Your Honor, I will renew any
previously made motion and adopt the argument of
co-counsel, and I want to focus specifically on Count

1, the conspiracy count, and Count 56, which is the
distribution -- possession with intent to distribute on
May 16, '04.  Excuse me, Count 45.  I take it back,
count 56.  I was right the first time.  Insofar as
those two counts were lined to heroin, there is simply
no evidence at all that my client was involved in
heroin.  While they are not stated specifically as
separate counts, I believe that the fact that the
verdict sheet contains those words should justify
granting the motion insofar as it relates to heroin.

THE COURT:  All right.  Ms. Johnston.  Ms.
Greenberg.

MS. JOHNSTON:  Your Honor, in terms of Mr.
McKnett's last argument.  Certainly the court's got a
willful blindness instruction.  She transported bags
that contained heroin, cocaine and cocaine base, all of
which were quantities and with packaging that indicated
an intent to distribute.  We would submit on the
others, unless the court has a particular concern.

THE COURT:  All right.  I've considered the
motions, and I will deny them for the grounds I
previously stated.  I am not sure that there is a
difference between now and the end of the government's
case, but to the extent that there is, I don't think in
this case that the government's case is sufficiently

wanting so as to take it away from the jury.  I believe
there is evidence upon which the jury could find a
verdict in favor of the government and therefore deny
the motion.

All right.  Counsel, are we ready?  I'm going to
bring the jury in, and I'm going to tell them what I'm
going to do, which is to read about half of these
instructions, resuming with the other half tomorrow
morning at 8:30.  I would ask that all counsel and the
parties be present at 8:00 tomorrow so we can deal with
any remaining issues and the balance of the
instructions and the verdict sheet.

I've also handed out to you a verdict form index
which I invite your comments on, but not now..

MR. MONTEMARANO:  I've got a couple of minor
problems.

THE COURT:  What I would ask you to do, because
you will be bored silly listening to my instructions
for the next hour, is to take a look at the verdict
sheet, and when I discharge the jury between 5:30 and a
quarter of six, please let me know what errors or
corrections you would like the court to make.  I want
to make sure this is something that everybody is
reasonably happy with.

Anything further?  I'll bring the jury in and

begin the instructions.

MR. MITCHELL:  Your Honor, one last issue we're still resolving.  The recorded phone calls the defense played.  I'm in the process of sorting that out with the government to make sure all of those calls are in. We have not submitted the CD actually or identified it. So, if we could have, Your Honor, until tomorrow morning to sort that out --

MS. JOHNSTON:  We indicated to Mr. Mitchell -- I believe we gave him a list of calls.  Some calls are not on the CD that were played, and some transcripts are included that --

MR. MITCHELL:  As I said, we're working that out.  I'm not disputing -- so in other words --

THE COURT:  Work harder so we can get this resolved by tomorrow morning.

MR. MITCHELL:  While you're doing these instructions --

THE COURT:  I intend to take the next, approximately, one hour to instruct or less, and then for my sanity I will enjoy the break.

All right, bring the jury in.

Counsel, you should be taking a look at your calendars and figuring out how you can divide up one day.

MS. JOHNSTON:  Your Honor, the government will need an hour for closing and 30 minutes for rebuttal.

THE COURT:  Counsel for defense, that should leave you plenty of time.  I will talk about it with you when the jury leaves today.

MR. MONTEMARANO:  Fifty-five counts, Judge.

THE COURT:  I know.

MR. MONTEMARANO:  I didn't indict it.

MS. GREENBERG:  Your Honor, it's the same on our end.  I'm wondering how I'm going to get done in an hour.

THE COURT:  We're all under the same disability.  I'll talk to you about it when the jury is discharged, but it seems to me some of the defense arguments would be probably less than others.  I would prefer to let you all work that out amongst yourselves and give me a budget, but I can give you my visceral reaction when the jury is back in -- when the jury is gone.

(Jury returns at 4:45 p.m.)

(Jury instructions read to the jury.)

(Off the record at 6:02 p.m.)

## <u>CERTIFICATE</u>

I, Tracy Rae Dunlap, RPR, CRR, an Official Court Reporter for the United States District Court of Maryland, do hereby certify that I reported, by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the Jury Trial Proceedings in the case of UNITED STATES OF AMERICA versus PAULETTE MARTIN, et al, Criminal Action Number RWT-04-0235 on August 8, 2006.

I further certify that the foregoing 313 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, of said proceedings.

In witness whereof, I have hereto subscribed my name, this 2nd day of September 2008.

```
            _____
            TRACY RAE DUNLAP, RPR, CRR
            OFFICIAL COURT REPORTER
```