1                      UNITED STATES DISTRICT COURT
                           DISTRICT OF MARYLAND
2                           SOUTHERN DIVISION

3    UNITED STATES OF AMERICA      .
                                   .
4         vs.                      .   RWT-04-0235
                                   .
5    PAULETTE MARTIN, ET AL        .   GREENBELT, MARYLAND
          DEFENDANTS               .   JULY 11, 2006
6

7                         TRANSCRIPT OF TRIAL
               BEFORE THE HONORABLE ROGER W. TITUS
8              UNITED STATES DISTRICT JUDGE AND A JURY

9

10   A P P E A R A N C E S:

11   FOR THE GOVERNMENT:            DEBORAH A. JOHNSTON, ESQ.
                                    BONNIE GREENBERG, ESQ.
12                                  ASSISTANT U.S. ATTORNEYS

13

14   FOR THE DEFENDANT MARTIN:   MICHAEL MONTEMARANO, ESQ.
     FOR THE DEFENDANT GOODWIN:  ANTHONY MARTIN, ESQ.
     FOR THE DEFENDANT WHITING:  MARC HALL, ESQ.
15   FOR THE DEFENDANT BYNUM:    TIMOTHY MITCHELL, ESQ.
     FOR THE DEFENDANT DOBIE:    PETER WARD, ESQ.
16   FOR THE DEFENDANT ALI:      HARRY McKNETT, ESQ.
     FOR THE DEFENDANT HARDEN:   EDWARD SUSSMAN, ESQ.
17

18   Court Reporter:              Sharon O'Neill, RMR
                                  Official Court Reporter
19                                United States District Court
                                  6500 Cherrywood Lane - RM 200
20                                Greenbelt, Maryland 20770
                                  Tel.  301-344-3227
21

22

23

24

25

1                              I N D E X

2  GOVERNMENT'S WITNESSES        DIRECT   CROSS   REDIRECT   RECROSS

3  Cotina King                     5       23        28
                                           25
4                                          26
                                           27
5
   Kenyatta Williams              29       44
6                                          46
                                           52
7                                          58

8  Scott Burger                   59       66
                                           67
9
   Det. Ronald Humble             68       89
10                                         94

11 Emilio Echarte                 96      158
                                          198
12                                        213

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Ready for the jury, counsel?

2          I have received an inquiry that my clerk had from

3     Mr. Montemarano about next Thursday.  I will try to give you

4     more information about that today.  That's the day that all

5     the judges are meeting with all the members of Congress, and

6     I have to ...

7          MS. JOHNSTON:  We're not sitting next Friday.

8          THE COURT:  Next Friday, no.  I'm -- I had my

9     preoperative physical and lab test today.  I'm on target.

10          MR. McKNETT:  Your Honor, I have a -- Thursday

11     morning I have a 9:15 sentencing with Judge Williams, but I

12     should be out by about 10:00.

13          THE COURT:  This Thursday?  I think I'm -- I have

14     a hearing on motions in a case at 9:00 anyway.  We're not

15     going to start 'til 10:00.

16          MR. McKNETT:  I shouldn't be late, but if I am,

17     that's where I'll be.

18          THE COURT:  I'll know where to find you.

19          MR. McKNETT:  Yes.

20          THE COURT:  Okay.  Ready for the jury?

21          MR. WARD:  Just one thing, Your Honor, if I may,

22     and I discussed this with Ms. Greenberg.  Your Honor has a

23     404(b) motion pending.  Counsel for both sides made

24     reference to the documents of the Circuit Court for

25     Baltimore City, and I want to put those in the record as

1    Dobie Motion Exhibit 1 --

2              THE COURT:  All right.

3              MR. WARD:  -- just to make the record complete.

4              THE COURT:  Is this what I've already ruled on, or

5    is this what's pending?

6              MS. GREENBERG:  Your Honor has one --

7              MR. WARD:  It has not been ruled on, Your Honor.

8              MS. GREENBERG:  Your Honor has one 404(b) motion

9    pending.

10             THE COURT:  This one.

11             MS. GREENBERG:  That relates to Ms. Dobie's prior

12   possession of firearms.  It was a 1988 conviction where she

13   was found in possession of two firearms, and that was in

14   connection with the 924(c) count in the indictment, and the

15   Court took that under advisement because it was different

16   than the other ones.

17             THE COURT:  Okay.  All right.  When are we going

18   to reach that issue, or when do we have to reach that issue?

19   Today?

20             MS. GREENBERG:  Your Honor, I told the officer to

21   be ready to come down Wednesday or Thursday --

22             THE COURT:  Okay.

23             MS. GREENBERG:  -- so if we could reach it

24   tomorrow, then I could let them know when to come down.

25             THE COURT:  We'll get it sorted out.

1                  All right.  If we're ready, we'll bring the jury

2       in.

3                  (Jury present.)

4                  MS. JOHNSTON:  Your Honor, our next witness would

5       be Cotina King.

6                  Ms. King.

7                  (The oath was administered.)

8                  THE CLERK:  Please be seated.

9                  Speak into that microphone.  State your name for

10      the record.

11                 THE WITNESS:  Cotina King.

12                 THE CLERK:  What is it?

13                 THE WITNESS:  Cotina King.

14                 THE CLERK:  Spell your first name, please.

15                 THE WITNESS:  C-O-T-I-N-A.

16                          DIRECT EXAMINATION

17      BY MS. JOHNSTON:

18      Q.   Good morning, Ms. King.

19      A.   Good morning.

20      Q.   Where are you employed?

21      A.   Chevy Chase Bank.

22      Q.   And how long have you been employed there?

23      A.   Six years.

24      Q.   And in what capacity?

25      A.   I'm the custodian of records.

1   Q.   And have you been in that position for those six years?

2   A.   I was the assistant to the custodian of records for

3   about a year.

4   Q.   As the custodian of records, are you familiar with the

5   records that are created and maintained by Chevy Chase Bank?

6   A.   Yes, I am.

7   Q.   And the bank provides banking services to both

8   individuals as well as businesses, is that correct?

9   A.   Yes, they do.

10  Q.   I want to show you a series of records, the first set

11  marked R1, R17 and R19.  Have you had occasion to review

12  these records this morning in preparation for your

13  testimony?

14  A.   Yes, I did.

15  Q.   And are all three of those exhibits accurate copies of

16  bank records of Chevy Chase Bank?

17  A.   Yes, they are.

18  Q.   And are these records maintained and used in the

19  ordinary course of the business of Chevy Chase Bank?

20  A.   Yes, they are.

21  Q.   I'm going to put them up on the screen.  If you need to

22  see one up close, let me know and I'll bring you a copy.

23  A.   Okay.

24  Q.   Starting with R1, can you tell us the account number

25  for this account?

1    A.   I think I need to see it up in person.

2    Q.   Let me see if I can zoom it in so you can see the

3    number.

4              Do you see the account number?

5    A.   Yes, I do.

6    Q.   And what is that?

7    A.   1083254286.

8    Q.   And who is the account holder?

9    A.   Learly R. Goodwin.

10   Q.   And at what address?

11   A.   9002 Bexhill Court, Hyattsville, Maryland, 20783.

12   Q.   And what kind of account is this?

13   A.   It's a no minimum checking account.

14   Q.   And the statement is for what time period?

15   A.   December the 11th, 2001 to January 9th, 2002.

16   Q.   If we go down to the next section, account activity,

17   what does that tell us?

18   A.   It shows the activity of deposits and withdrawals

19   during that time period.

20   Q.   And is there a withdrawal on December 24th and -- two

21   on December 24th and two on December 31st?  Do you see those

22   two withdrawals?

23   A.   Yes, I do.

24   Q.   And does the statement reflect how those withdrawals

25   were made, whether by check or ...

1    A.    They were done by check card.

2    Q.    And those withdrawals, the two on December 24th and the

3    two on December 31st, who was the payment made to?

4    A.    Southwest Airlines.  Southwest Air.

5    Q.    That would be in Dallas?

6    A.    Yes.

7    Q.    I'll show you the second page of Government's Exhibit

8    R1.

9              Going back up to the top, is it the same account

10   holder?

11   A.    Yes, it is.

12   Q.    And, again, the same account number?

13   A.    Yes, it is.

14   Q.    And what's the date of this statement?

15   A.    March the 8th, 2002.

16   Q.    And the time period covered by this statement is what?

17   A.    February the 9th, 2002 to March the 8th, 2002.

18   Q.    And then on the activity on the account, is there

19   activity dated February 14th?

20   A.    Yes, there is.

21   Q.    And what is the amount of that withdrawal?

22   A.    $25.66.

23   Q.    And can we see how that was paid and to whom it was

24   paid and on what date?

25   A.    It's a check card, and it's for a Fed Ex ship,

1    February the 1st, 2002.

2    Q.   Now, going to the next set of records, Government's

3    Exhibit R17, we'll go back up to the top, and, again, can

4    you see the account number there?

5    A.   Yes, I can.

6    Q.   And what is the account number?

7    A.   1083202294.

8    Q.   And what's the date of this statement?

9    A.   July the 9th, 2002.

10   Q.   Okay.  And who is this account holder?

11   A.   Paulette Martin, trading as Paula's School of

12   Performance -- Performing Arts.

13   Q.   And at what address?

14   A.   9002 Bexhill Court, Hyattsville, Maryland.

15   Q.   Is that the same address that was on the preceding

16   account -- previous account that was listed to Learly

17   Goodwin?

18   A.   Yes, it is.

19   Q.   And can you tell us what kind of account this is?

20   A.   Yes, I can.

21   Q.   And what is that?

22   A.   It's a sole proprietor, no interest checking account.

23   Q.   Now, on this statement, does it reflect whether any

24   deposits were made?

25   A.   I can't see the transaction part.

1    Q.   Oh, I'm sorry.  Let me move it up a little bit.

2              Were there any deposits made?

3    A.   Yes, there was.

4    Q.   And on what date was the deposit made?

5    A.   July the 9th, 2002.

6    Q.   Showing you the third page.  Let me back up.

7              What are we looking at on this page?

8    A.   Those are copies of a deposit, a check, a cash-in

9    ticket and a deposit slip.

10   Q.   Okay.  The bottom one is what?

11   A.   The deposit slip.

12   Q.   Does that correspond with the July 9th deposit that was

13   shown on the statement?

14             Let me see if I can zoom it in for you.

15   A.   Yes, it does.

16   Q.   And what does it indicate was deposited on that date?

17   A.   $500 in cash, and $125, check.

18   Q.   And if we turn it back the other way, can you tell us

19   what the cash-in ticket shows us?

20   A.   $500.

21   Q.   And then above that is what?

22   A.   A check for $125.

23   Q.   And on what account was the check drawn?

24   A.   Harrison, Harden & Best Transportation.

25   Q.   And the date of that check?

1    A.   7/9/2002.

2    Q.   Now, going to the next exhibit, R19, once again, are

3    these records for another account at Chevy Chase Bank?

4    A.   Yes.

5    Q.   Showing you the first page of these records, let me --

6    do you see the account number?

7    A.   Yes.

8    Q.   And what is the account number?

9    A.   0942000609.

10   Q.   And the date of the statement?

11   A.   June the 19th, 2001.

12   Q.   And who is the account holder?

13   A.   Paulette Martin.

14   Q.   Okay.  And at what address?

15   A.   9002 Bexhill Court, Adelphi, Maryland  20783.

16   Q.   And does the account activity reflect any deposits made

17   into that account?

18   A.   Yes, it does.

19   Q.   Okay.  And what deposit was made?

20   A.   Excuse me?

21   Q.   What was the date and the amount of the deposit?

22   A.   June the 18th, 2001 for $2,200 even.

23   Q.   Now, if we go to the next page, what do we have here?

24   A.   A copy of a deposit slip.

25   Q.   Okay.  And does that correspond to the deposit that you

1    just mentioned?

2    A.    Yes, it does.

3    Q.    And what was -- how was the deposit broken down?

4    A.    $2000 in cash, and then a check for $150 and a check

5    for $50.

6    Q.    And the next page shows us what in relation to that

7    deposit?

8    A.    It was $150.

9    Q.    Is that one of the checks that was listed?

10   A.    Yes, it is.

11   Q.    And the next item?

12   A.    $50, which was on the deposit slip.

13   Q.    Okay.  And does that also correspond with the deposit

14   slip we just looked at?

15   A.    Yes.

16   Q.    Now, going to the next statement for that account, is

17   that the same account number?

18   A.    Yes, it is.

19   Q.    And who's the holder of that account?

20   A.    Paulette Martin.

21   Q.    Is there anything different in terms of the address on

22   this statement than the previous one?

23   A.    Yes.

24   Q.    What's the new address on the account?

25   A.    804 Nicholson Street, N.E., Washington, D.C.

1    Q.   And the date of the statement?

2    A.   December the 17th, 2003.

3    Q.   And what time period is covered by this statement?

4    A.   September the 18th, 2003 to December the 17th, 2003.

5    Q.   So is this a checking account or a savings account?

6    A.   It's a statement savings account.

7    Q.   And is that why the statements only come out quarterly?

8    A.   Correct.

9    Q.   And, again, on this statement, are there a number of

10   deposits that are made?

11   A.   Yes, there is.

12   Q.   Calling your attention to this next page in the

13   exhibit, and what is this?

14   A.   A copy of a deposit slip.

15   Q.   And for what date?

16   A.   For October the 23rd, 2003.

17   Q.   And what was the amount of that deposit?

18   A.   The total deposit is $143 even.

19   Q.   And does that correspond with the October 23rd entry on

20   the statement?

21   A.   Yes, it does.

22   Q.   And how was this deposit made, cash or check?

23   A.   Two checks.

24   Q.   And what do we see here in relation to that deposit?

25   A.   A copy of the check that was deposited.

1   Q.   Is that the $118 check?

2   A.   Yes, it is.

3   Q.   And the second one, what is this?

4   A.   The other check that was deposited.

5   Q.   And on what account is that check drawn?

6   A.   Harrison, Harden & Best Transportation.

7   Q.   Going back to our statement, was there also a deposit

8   made on November 26th?

9   A.   Yes, there was.

10  Q.   Okay.  And what was the amount of that deposit?

11  A.   $130 even.

12  Q.   Showing you the next page in this exhibit, what are we

13  looking at here?

14  A.   A copy of a deposit slip.

15  Q.   That corresponds with the November 26th note on the

16  statement?

17  A.   Yes, it does.

18  Q.   And how was that deposit made?  In cash or check?

19  A.   It's a check for $130 even.

20  Q.   Showing you the next page, what do we have here?

21  A.   The copy of the check that was deposited.

22  Q.   In relation to the deposit slip we just saw?

23  A.   Yes.

24  Q.   And who -- on what account is this check drawn?

25  A.   Harrison, Harden & Best Transportation.

1    Q.    Now, calling your attention to December 5th of '03,

2    again looking at the statement, was there a deposit made on

3    that date?

4    A.    Yes, there was.

5    Q.    Okay.  And what was the amount of that deposit?

6    A.    $576 even.

7    Q.    Looking at the next exhibit, what do we have here?

8    A.    A copy of a deposit slip, showing a deposit.

9    Q.    Corresponding with that entry on the statement?

10   A.    Yes, it does.

11   Q.    And how was this deposit made?

12   A.    Three checks.

13   Q.    What were the amounts of the checks?

14   A.    One for $151 even, $125 dollar even and $300 even.

15   Q.    And our next page, do you recognize this page?

16   A.    Yes.

17   Q.    Okay.  And is that one of the checks that was

18   deposited?

19   A.    Yes, it was.

20   Q.    Showing you the next page in the exhibit, again, do you

21   recognize that item?

22   A.    Yes.

23   Q.    Okay.  And does that correspond with one of the checks

24   that was deposited on December 5th?

25   A.    Yes, it does.  They do.

1    Q.   There are two checks on that page, is that correct?

2    A.   Yes, there is.

3    Q.   And the first check is drawn on whose -- the account in

4    the name of who?

5    A.   Joanne A. Johnson.

6    Q.   And the amount of that check is what?

7    A.   Three hundred dollars.

8    Q.   And then the second check is drawn on what account?

9    A.   Harrison, Harden & Best Transportation.

10   Q.   And in what amount?

11   A.   $125 even.

12   Q.   All corresponding with the December 5th, 2003 deposit,

13   is that correct?

14   A.   Yes.

15   Q.   Now, let's go to --

16           MS. JOHNSTON:  Court's indulgence one minute.

17   Q.   Let's go to the next statement, first page, referencing

18   the account number.  Is that the same account number?

19   A.   Yes, it is.

20   Q.   And the date of this statement is what?

21   A.   March the 17th, 2004.

22   Q.   And has the holder of the account or the title on the

23   account changed?

24   A.   Yes, it did.

25   Q.   And how is it held now?

1  A.    Paulette Martin, Trust for Carise Ann Martin and

2  Burgess L. Arnold.

3  Q.    And is it the same address as on the previous statement

4  we looked at?

5  A.    Yes, it is.

6  Q.    And, again, what time period is covered by this

7  statement?

8  A.    December the 17th, 2003 to March the 17th, 2004.

9  Q.    And are there a series of deposits listed for this

10 account?

11 A.    Yes, there is.

12 Q.    Showing you the next page, what are we looking at here?

13 A.    The copy of a deposit slip.

14 Q.    And does that correspond with the February 17th entry

15 on the statement?

16 A.    What was the total of that deposit slip?

17 Q.    Okay.  And on what date is that reflected on the

18 statement?

19 A.    January the 17th.

20 Q.    Let me bring it up to you so you can see it up close.

21 A.    Yes.  January the 17th, 2004.

22 Q.    What month is it?

23 A.    Oh.  February the 17th.  Sorry.

24 Q.    Is there a deposit for January 17th listed there?

25 A.    No, there isn't.

1   Q.   And does that -- are they both dated February 17th of

2   '04?

3   A.   Yes, it is.

4   Q.   And in the same amount reflected on both?

5   A.   Yes, it is.

6   Q.   And what is that amount?

7   A.   $2,045 even.

8   Q.   Just put it back up on the screen so everyone can see.

9        Again, there is no entry for January 17th, is

10  there?

11  A.   No, there isn't.

12  Q.   And the entry you were referring to is the

13  February 17th entry?

14  A.   Yes, I was.

15  Q.   Looking at the February 17th deposit slip, can you tell

16  us how the deposit was made?

17  A.   Yes.  Four checks.

18  Q.   The records contain copies of those checks, is that

19  correct?

20  A.   Yes.

21  Q.   Showing you the next page, looking at the first check,

22  on what account is that drawn?

23  A.   Harrison, Harden & Best Transportation.

24  Q.   And the amount of that check?

25  A.   For $25.

1   Q.   And the next check, are you able to read that?

2   A.   Andre Hart Elard.

3   Q.   And the amount of the check?

4   A.   $220 even.

5   Q.   And the third item on that page?

6   A.   The first name looks like John, but I can't read the

7   second -- the last name.

8   Q.   And is that payable to Paula Martin?

9   A.   Yes, it is.

10  Q.   And what was the amount?

11  A.   I need to see that.

12           For $600 even.

13  Q.   And so that we all know where you got the 600 from

14  since it's a bad copy, can you -- is that the typewritten

15  number on the bottom?

16  A.   Yes, the encoding.

17  Q.   And I believe there was one more item on that deposit,

18  is that correct?

19  A.   Yes.

20  Q.   Okay.  And what was that?

21  A.   For $1,200 even.

22  Q.   Now, again, staying with that statement, was there a

23  deposit made on March 12th?

24  A.   Yes, there was.

25  Q.   And in what amount was that deposit?

1   A.   $125 even.

2   Q.   Showing you the next page, is this the deposit slip

3   that corresponds with that deposit?

4   A.   Yes, it is.

5   Q.   And what did it consist of?

6   A.   One check.

7   Q.   Showing you the next page, do you see that item?

8   A.   Yes, I do.

9   Q.   Okay.  And what is that?

10  A.   One check in that deposit.

11  Q.   And, again, the account that the check is written on?

12  A.   Harrison, Harden & Best Transportation.

13  Q.   Now, going to the next statement, what is the date on

14  this statement?

15  A.   June the 17th, 2004.

16  Q.   Same account number?

17  A.   Yes, it is.

18  Q.   And the same account holder, same address?

19  A.   Yes, it is.

20  Q.   And what time period is covered by this statement?

21  A.   March the 17th, 2004 to June the 17th, 2004.

22  Q.   And were there a number of deposits made during that

23  quarter?

24  A.   Yes.

25  Q.   Now, calling your attention in particular to

1  March 22nd, was there a deposit made on March 22nd?

2  A.   Yes, there was.

3  Q.   And what was the amount?

4  A.   $735 even.

5  Q.   Showing you the next page, do you recognize that

6  deposit slip?

7  A.   Yes.

8  Q.   And is that the deposit slip that corresponds to the

9  March 22nd entry on the statement?

10  A.   Yes, it does.

11  Q.   And what was -- how was this deposit made and what was

12  the total amount?

13  A.   There's three checks made in that deposit.

14  Q.   Okay.  And the amounts of the check are 125, 150 and

15  460, is that correct?

16  A.   Yes.

17  Q.   So the total deposit was?

18  A.   $735 even.

19  Q.   Continuing on the next page, what are we looking at

20  here?

21  A.   A check for $460.

22  Q.   The next page?

23  A.   It's a check for $150.00.

24  Q.   Again on Ms. Joan Johnson's account, is that correct?

25  A.   Yes.

1   Q.   And then the third check, what was the amount of that

2   check?

3   A.   $125 even.

4   Q.   So those are the three checks that correspond to the

5   March 22nd, '04 deposit?

6   A.   Yes.

7   Q.   And on what account was this check drawn?

8   A.   Harrison, Harden & Best Transportation.

9   Q.   Now, in regards to that same statement of June 17th of

10  '04, was there also a deposit made on March 30th?

11  A.   Yes, there was.

12  Q.   And what was the amount of that deposit?

13  A.   $125 even.

14  Q.   And how was that -- let me show you the next exhibit.

15  What is this?

16  A.   The deposit slip.

17  Q.   That corresponds with that deposit?

18  A.   Yes, it does.

19  Q.   How was that $125 deposited?

20  A.   It was a check.

21  Q.   Showing you the next page, what is this?

22  A.   The copy of the check that was deposited.

23           MS. JOHNSTON:   Court's indulgence.

24           I have nothing further of this witness.

25           THE COURT:   Cross-examination.

1              MR. MONTEMARANO:  Thank you, Your Honor.

2                          CROSS-EXAMINATION

3   BY MR. MONTEMARANO:

4   Q.   Good morning, Ms. King.  How are you?

5   A.   I'm fine.

6   Q.   And you've been with Chevy Chase for how long?

7   A.   Six years.

8   Q.   And during that time you served as custodian of records

9   or assistant custodian of records?

10  A.   Yes.  For about the first year, I was the assistant.

11  Q.   Do you have an assistant now?

12  A.   Yes.

13  Q.   And correct me if I'm wrong, Chevy Chase is a

14  reasonably large regional bank, correct?

15  A.   Yes.

16  Q.   It's not a national or international bank like Bank of

17  America?

18  A.   Not that I know of.

19  Q.   Not that you know of.

20           And your job is to maintain these records so they

21  can be provided when there is a need for them.  Is that a

22  fair statement?

23  A.   Correct.

24  Q.   In this case, you provided those records in response to

25  a subpoena from the U.S. Attorney's Office?

1    A.    Yes.

2    Q.    And the records you maintain are, if I understand

3    correctly, on microfilm, microfiche?

4    A.    Microfilm and microfiche.

5    Q.    And nothing on paper?

6    A.    No.

7    Q.    And that's because of the voluminous amounts of these

8    records?

9    A.    Yes.  Probably so.

10   Q.    And when you need them, you then take the microfiche,

11   print out and provide the hard copies that we've seen today?

12   A.    Yes.

13   Q.    And so even in a not especially huge bank like Chevy

14   Chase, you have an elaborate detailed system to maintain

15   records of deposits, checks written, et cetera on all the

16   accounts maintained by Chevy Chase.  Is that a fair

17   statement?

18   A.    Yes.

19   Q.    So if somebody wants to track down a deposit, they can

20   do it.

21   A.    Yes.

22   Q.    Want to track down a check, they can do it.

23   A.    Yes.

24   Q.    Want to track down an electronic funds transfer, they

25   can do it.

1    A.    Yes.

2                MR. MONTEMARANO:  No further questions.

3                         CROSS-EXAMINATION

4    BY MR. MARTIN:

5    Q.    Good morning, Ms. King.

6    A.    Good morning.

7    Q.    I'm Anthony Martin, and I represent Mr. Goodwin.

8                You were shown R1, and I'm going to put it back up

9    on the screen.  Hopefully the screen is still functioning.

10   Remember that?  Remember seeing that?

11   A.    Yes.

12   Q.    And the address there, I believe, on Exhibit R1 was

13   9002 Bexhill Court?

14   A.    Can you scoot it down?

15   Q.    Do you want me to bring it to you?

16   A.    No, I just couldn't see it on the screen.  It wasn't on

17   the screen.

18   Q.    Can you see it now?

19   A.    Yes, I see it.

20   Q.    Now, Mr. Montemarano asked you questions about the

21   various records that you have.  Would it be fair to say that

22   you also have records of the signature card at the time that

23   a person opens the account?

24   A.    Yes.

25   Q.    And would it also be fair to say that Xerox copies are

1   made of some photo identification?

2   A.   That, I don't know what the procedures are on that as

3   far as giving signature cards.

4   Q.   So you don't know how the account is actually opened

5   up?

6   A.   Correct.

7   Q.   So you couldn't testify as to whether somebody opened

8   up an account in someone else's name?

9   A.   That would be in our operations department or the

10  branch that the account was opened up at.

11          MR. MARTIN:   I have no further questions of this

12  witness.   Thank you.

13          MR. HALL:   No questions, Your Honor.

14          MR. MITCHELL:   No, Your Honor.

15          MR. WARD:   No questions.

16          THE COURT:   Anyone else?

17                      CROSS-EXAMINATION

18  BY MR. SUSSMAN:

19  Q.   Good morning, ma'am.

20  A.   Good morning.

21  Q.   You identified a number of banking transactions for a

22  period of time in Ms. Martin's account, is that correct?

23  A.   Yes.

24  Q.   What was the period of time exactly?

25  A.   I can't recall right now.   I'd have to look at the

1   statement.

2   Q.   Well, did it start some time in 2001 or earlier?

3   A.   I think it was 2001.

4   Q.   And it ran to June of 2004?  Is that the last one you

5   looked at?

6   A.   I would have to look at a statement to verify the exact

7   date.

8   Q.   So would your recollection be you're talking about a

9   three-year or three-and-a-half-year period, is that right?

10  A.   Yeah.

11  Q.   Okay.  And let me ask this question.  Do you have any

12  idea how many checks were deposited into Ms. Martin's

13  account during that period of time?

14  A.   Not right now.

15  Q.   The checks that you identified certainly were not the

16  totality of all the checks that went into Ms. Martin's

17  account?

18  A.   No, it was not.

19            MR. SUSSMAN:  I have nothing further.

20                      CROSS-EXAMINATION

21  BY MR. McKNETT:

22  Q.   All you know about these checks and these accounts is

23  what's in the records, correct?

24  A.   I don't understand the question.

25  Q.   The only knowledge you have about these accounts or

1    these checks is what's in the records that you have,

2    correct?

3    A.   Yes.

4    Q.   And you don't know why somebody would have written any

5    of the particular checks, do you?

6    A.   No, I wouldn't.

7            MR. McKNETT:  Thank you.

8            THE COURT:  Any redirect?

9            MS. JOHNSTON:  Just one question.

10                       REDIRECT EXAMINATION

11   BY MS. JOHNSTON:

12   Q.   Ms. King, the bank responds to all subpoenas, whether

13   they're from the Government or from defense counsel, is that

14   correct?

15   A.   Correct.

16   Q.   And provides the same records if they're requested, is

17   that correct?

18   A.   Yes.

19           MS. JOHNSTON:  I have nothing further.

20           THE COURT:  All right.

21           MS. JOHNSTON:  May she be excused, Your Honor?

22           THE COURT:  Yes, you may.  You may step down.

23   Thank you very much.

24           MS. JOHNSTON:  Ms. Williams, please.

25           (The oath was administered.)

1          THE CLERK:  Please be seated.

2          State your name for the record.

3          THE WITNESS:  Kenyatta Williams.

4                      DIRECT EXAMINATION

5   BY MS. JOHNSTON:

6   Q.    And could you spell your first name for the record.

7   A.    K-E-N-Y-A-T-T-A.

8   Q.    Good morning, Ms. Williams.  Where are you employed?

9   A.    Bank of America.

10  Q.    And how long have you been employed there?

11  A.    Five and a half years.

12  Q.    And what is your current position there?

13  A.    I'm a banking center manager.

14  Q.    And what are your -- where are you a banking zone

15  manager?

16  A.    Cipriano Square, Greenbelt, Maryland.

17  Q.    And could you describe what your duties and

18  responsibilities are as the banking zone manager?

19  A.    Sure.  I lead a sales force of nine people.  We focus

20  on selling and service and operations for our customers.

21  Q.    And as a result, are you familiar with the records that

22  are generated and maintained and created by Bank of America

23  in the course of their business of handling customers'

24  accounts?

25  A.    I am.

1    Q.   And, as such, Bank of America is a national bank, is

2    that correct?

3    A.   That's correct.

4    Q.   And were you requested by your headquarters to appear

5    here to authenticate records for Bank of America?

6    A.   I am.

7    Q.   I want to show you what's been marked as Government's

8    Exhibit R16 and R15.

9              Do you recognize those records?

10   A.   Yes.  That's a bank statement.

11   Q.   And are those records generated and maintained by Bank

12   of America in the ordinary course of their banking business?

13   A.   Yes, it is.

14   Q.   Now, you didn't personally handle the setting up of

15   these accounts, did you?

16   A.   Did I set them up?  No, ma'am.

17   Q.   I'm going to show you what's been marked -- first we'll

18   go with R16 since that's the thinner of the two exhibits,

19   and if you could tell us what the account name is for this

20   account?

21   A.   Paulette Martin is the owner, with Theresa and Burgess

22   Arnold as beneficiaries.  Carise Martin is a beneficiary,

23   and Kimberly L. Rice is a beneficiary.

24   Q.   And what is the address for the account?

25   A.   9002 Bexhill Court, Hyattsville, Maryland  20783.

1    Q.   And are we able to see what the account number is?

2    A.   Sure.  That's 000091274292.

3    Q.   And what is the date of this statement?

4    A.   This is August 27th, 2002 through September 24th, 2002.

5    Q.   Now, in regard to -- call your attention to the next

6    statement.  What is the date of the next statement?

7    A.   September 25th, 2002 through October 25th, 2002.

8    Q.   The same account name?

9    A.   Yes.  Same account name.

10   Q.   Okay.  Is the address now different on the account?

11   A.   Yes, it is.

12   Q.   And what is the new address?

13   A.   804 Nicholson Street, N.E.  That's Washington, D.C.,

14   20011.

15   Q.   And does the statement reflect the beginning balance as

16   well as whether or not any deposits were made?

17   A.   Yes, it does.

18   Q.   And what deposits does it reflect were the total

19   deposits for this month?

20   A.   The deposits, other additions to the account,

21   $15,728.64.

22   Q.   Those other additions would include interest on the

23   account, is that correct?

24   A.   Yes.

25   Q.   Now let me show you this page here.  Do you recognize

1    these two documents?

2    A.    Yes.   That's the front and back of a deposit slip.

3    Q.    What's the date of this deposit?

4    A.    August 27th, 2002.

5    Q.    And what was the amount and the breakdown of the

6    deposits?

7    A.    We had $1,550 in cash, 300 in check, 50 in a check, so

8    a total of 1900.

9    Q.    And the next page that we're looking at shows us what?

10   Let me widen the screen.

11   A.    That cash was taken out.

12   Q.    That cash was?

13   A.    Taken out of the account, right.

14   Q.    Let me bring this up to you and ask you to look at it

15   closer.

16   A.    Okay.  Actually, I'm sorry.  That's a deposit ticket

17   and the cash in, cash that was put in for the $1500, 1550.

18   Q.    Does that correspond with the deposit slip?

19   A.    Yes, it does.

20   Q.    And just so we're all clear about it, the cash-in

21   notation is where?

22   A.    Right at the top, cash in.

23   Q.    Right here?

24   A.    Um hum.

25   Q.    And, again, that corresponds to the original deposit

1   slip?

2   A.   Yes, it does.

3   Q.   Looking at the other two items, what are we looking at

4   here?

5   A.   That's a check made payable to Paulette Martin.

6   Q.   And does that check correspond with the $300 listed on

7   the deposit slip?

8   A.   Yes, it does.

9   Q.   And finally, the next check?

10  A.   For $50.

11  Q.   Drawn on what account?

12  A.   Harrison, Harden & Best Transportation.

13  Q.   And, again, does that correspond with the $50

14  deposit --

15  A.   Yes, it does.

16  Q.   -- on August 27th?

17       Now if we could go to R15.

18       Now, in terms of R15, who is the account holder on

19  this account?

20  A.   Paulette Martin, in Trust for Carise Martin.

21  Q.   And what is the account number?

22  A.   000009617233.

23  Q.   And the date or period covered by this statement?

24  A.   That's June 11th, 2000 through June 12th, 2000.

25  Q.   And if we look down at the activity on the account, is

1   there any deposits noted for May 16th of 2003?  Of 2000.

2   I'm sorry.

3   A.    Yes.  A deposit for $123.

4   Q.    Looking at the next page, what do we see on this page?

5   A.    That's a deposit slip.

6   Q.    Corresponding the May 16th deposit on the statement?

7   A.    Yes, ma'am.

8   Q.    And the next item, what is this?

9   A.    That's the check written to Paulette Martin.

10  Q.    For that deposit?

11  A.    Right, for the 123.

12  Q.    Now going to the next statement, going first to the

13  top, is that the same account number as the previous

14  statement?

15  A.    Yes, it is.

16  Q.    Has the name on the account changed somewhat?

17  A.    Yes.  It's another name added.

18  Q.    Okay.  And what's the name on the account now?

19  A.    So we have Paulette Martin in trust for Carise Martin

20  and Learly Goodwin.

21  Q.    And the time period covered by this statement?

22  A.    November 10th, 2000 through December 6th, 2000.

23  Q.    Calling your attention to the next page of the

24  statement, does that list -- on the bottom of the first page

25  and then continuing over on the second page, does that list

1    deposits and transactions during the time period?

2    A.    Yes, it does.

3    Q.    Calling your attention to the next page, what are we

4    looking at here?

5    A.    That's a deposit slip.

6    Q.    Now, that says Nations Bank on it.

7    A.    Bank of America acquired Nations Bank back in 1997, and

8    so we still honor any of the bank slips for Nations Bank.

9    Q.    Even though it's a couple of years later?

10   A.    Yes.

11   Q.    So what's the deposit on December 4th of 2000?

12   A.    So the total deposit is $80.

13   Q.    Could you describe what happened with this transaction?

14   A.    Yes.  There was $461 check, $60 check, $20 check, and

15   then it subtotaled up to 541.  They got less cash back 461,

16   and so that left a deposit of $80.

17   Q.    The next slip, what does that reflect?

18   A.    So that's cash taken out of the account.

19   Q.    In reference to the deposit slip we just looked at?

20   A.    Correct.

21   Q.    And then the next exhibit?

22   A.    It's a check written to Paulette Martin.

23   Q.    And is that one of the deposit items?

24   A.    Yes.

25   Q.    From December 4th?

1   A.   Um hum.

2   Q.   And the next item?

3   A.   Another check to Paulette Martin.

4   Q.   Part of that same deposit?

5   A.   Yes.

6   Q.   And the next one?

7   A.   Another check written to Paulette Martin.  It's part of

8   that same deposit.

9   Q.   Now going to the next statement, first let's zoom in to

10  the top and tell me if that's the same account number.

11  A.   That is the same account number.

12  Q.   And what's the time period covered by this statement?

13  A.   December 9, 2000 through January 10, 2001.

14  Q.   And the same people named on the account as the

15  previous statement?

16  A.   Yes.

17  Q.   What is the address listed on this statement?

18  A.   9002 Bexhill Court, Hyattsville, Maryland  20783.

19  Q.   Now, again with this statement, were there -- during

20  this time period, were there numerous deposits made, based

21  on looking at the -- part of the statement?

22  A.   Yes.  There are several deposits made.

23  Q.   Calling your attention to the next sheet, what are we

24  looking at here?

25  A.   Another deposit ticket, Nations Bank.

1   Q.   And so it was deposited into the account?

2   A.   Yes, for Bank of America.  Um hum.

3   Q.   And what was the total amount of that deposit?

4   A.   $275.

5   Q.   Showing you the next page, what do we see here?

6   A.   Check for $50 written to Paulette Martin.

7   Q.   And was that part of the deposit that was made on

8   December 26th?

9   A.   Yes.

10  Q.   And the next check?

11  A.   Check for 125 to Paulette Martin.

12  Q.   Again, is that part of the deposit we just discussed?

13  A.   Yes.

14  Q.   And the third check?

15  A.   A hundred dollar check to Paulette Martin.

16  Q.   Again, part of that same deposit on December 26th, is

17  that correct?

18  A.   That's correct.

19  Q.   Now showing you the next deposit slip, what is the date

20  on this deposit slip?

21  A.   January -- January 27th, '01.

22       January the 2nd, '01.

23  Q.   And, again, if we go back to the statement, is there a

24  deposit on January 2nd?  There looks to be two deposits, is

25  that correct, on January 2nd?

1   A.    On January 2nd, yes, that's correct.

2   Q.    In what amount?

3   A.    400 and 175.

4   Q.    And this deposit here is which of those two deposits?

5   A.    The 175.

6   Q.    Showing you the next exhibit, what are we looking at --

7   let me get us wide again.

8             And what is this item?

9   A.    A check to Paulette Martin.

10  Q.    And was that part of the deposit of the 175?

11  A.    Yes.

12  Q.    And show you the next exhibit.

13  A.    A check to Paulette Martin for 125.

14  Q.    And were those the two checks in reference to the 135

15  deposit?

16  A.    Yes.

17  Q.    Now going to another statement.  Getting us back into

18  the account number, is this the same account number?

19  A.    Yes, it is.

20  Q.    And what time period is covered by this account?

21  A.    June 14th, 2001 to September 10th, 2001.

22  Q.    Okay.  Let me strike the word covered by this account.

23  A.    That must be 814.

24  Q.    Okay.  And that would be the statement for this account

25  number?

1    A.    Yes.

2    Q.    The same as the one we've looked at before, is that

3    correct?

4    A.    That's correct.

5    Q.    And, again, are there a series of deposits listed for

6    this account?

7    A.    Yes.

8    Q.    Continuing over to the next page, is that right?

9    A.    Yes.

10   Q.    Now, showing you the next page.

11   A.    That's another deposit ticket.

12   Q.    And for what date is that deposit?

13   A.    August 21st, 2001.

14   Q.    And what was the total amount of the deposit?

15   A.    $800.

16   Q.    And how was it broken down?

17   A.    We have 500 in cash, 250 and a $50 check.

18   Q.    Again corresponding to the deposit listed on the

19   statement, is that correct?

20   A.    That's correct.

21   Q.    And the next sheet we have, is this in relation to that

22   deposit?

23   A.    Yes, it is.

24   Q.    And what does this relate to?

25   A.    Bringing cash into the account.

1    Q.   That would be the $500 cash?

2    A.   That's correct.

3    Q.   And to the next page?

4    A.   Another check for $250.

5    Q.   Also part of that August 21st deposit?

6    A.   Yes.

7    Q.   And the next page?

8    A.   A check for $50.

9    Q.   Again part of that August 21st deposit?

10   A.   Yes.

11   Q.   Go to the next statement.  Again, is this the same

12   account number?

13   A.   Yes, it is.

14   Q.   And what time period is covered by this statement?

15   A.   September 11, 2001.

16   Q.   And did this -- September 11, 2001 to when?

17   A.   October 11, 2001.

18   Q.   And were there also deposits made into this account

19   during this time period?

20   A.   Yes, there are.

21   Q.   Calling your attention to the next exhibit, and what is

22   this exhibit?

23   A.   Deposit slip.

24   Q.   For the time period of the statement, is that correct?

25   A.   That's correct.

1    Q.   And what was the total deposit?

2    A.   $250.

3    Q.   And how was that $250 deposited?

4    A.   Two checks, each for $125.

5    Q.   Showing you the next page, is that one of those two

6    checks?

7    A.   Yes, it is.

8    Q.   And the next page?

9    A.   That's part of that deposit as well.

10   Q.   Now going to the next statement we have here, first

11   let's go into the account number.  Is that the same account

12   number?

13   A.   Same account.

14   Q.   All right.  Now, has the names on this account changed?

15   A.   Yes.

16   Q.   In terms of the beneficiary?

17   A.   Um hum, in terms of the beneficiary.

18   Q.   Other than that, is it the same account?

19   A.   The same account, um hum.

20   Q.   And what is the time period covered?

21   A.   May 11, 2002 to June 10th, 2002.

22   Q.   And, again, does the bank statement reflect deposits

23   made during that time period?

24   A.   Yes, it does.

25   Q.   Calling your attention to the next exhibit, and what is

1   this exhibit?

2   A.   Deposit ticket for $125.

3   Q.   For what date?

4   A.   June 8th, 2002.

5   Q.   And how has that $125 deposited?

6   A.   A check for 125.

7   Q.   Now, that's the date that's actually handwritten in on

8   the deposit slip, is that correct?

9   A.   That's correct.

10  Q.   And looking at the back of the deposit slip, are you

11  able to see when it was actually -- when the transaction

12  actually occurred and when it was credited to the account?

13  A.   Yes.   June 9th, 2002 and credited June 10th, 2002.

14  Q.   And that corresponds with the bank statement entry for

15  June 10th, is that correct?

16  A.   That's correct.

17  Q.   Now, are we able to see the June 10th entry?

18  A.   Yes.

19  Q.   Now let me show you the next page in the records, and

20  what is that?

21  A.   A check for $125.

22  Q.   Does that correspond to the handwritten -- the bank

23  deposit slip with the handwritten date of June 8th, 2002?

24  A.   It does.

25  Q.   And go to the next statement.   Again, what's the

1    date -- is this the same account number?

2    A.    Yes, it is.

3    Q.    Okay.  And what's the time period of this statement?

4    A.    July 12th, 2002, August 12th, 2002.

5    Q.    And the beneficiaries appear to be the same as on the

6    previous one?

7    A.    Yes, they do.

8    Q.    And the address on the account?

9    A.    It's the Hyattsville, Maryland address.

10   Q.    Now, again, does this account reflect deposits being

11   made into the account as well as withdrawals?

12   A.    It does.

13   Q.    Calling your attention to the next exhibit, whats

14   the -- what is this?

15   A.    A deposit ticket depositing $550 in cash, $125 check,

16   $50 check, total of $725 deposit.

17   Q.    And what was the date of that deposit?

18   A.    June 12th, 2002.

19   Q.    Again --

20   A.    I'm sorry.  July.

21   Q.    And, again, is that reflected on the statement?

22   A.    Yes, it is.

23   Q.    In relation to that deposit slip, what's the next page?

24   A.    Where the cash is taken in.

25   Q.    Okay.  And that would be the 550 that's reflected on

1    the deposit slip?

2    A.   That's correct.

3    Q.   And what are we looking at here on this page?

4    A.   A check written to Paulette Martin for $125.

5    Q.   Again part of that July 12th deposit?

6    A.   Yes.

7    Q.   And then the next check?

8    A.   Check for $50, part of that deposit.

9    Q.   And on what account was this check written?

10    A.   Harrison, Harden & Best Transportation.

11    Q.   And the previous check, on what account was that

12    written?

13    A.   R Enterprises, Incorporated.

14          MS. JOHNSTON:  Court's indulgence.

15          I have no other questions for this witness.

16                 CROSS-EXAMINATION

17    BY MR. MONTEMARANO:

18    Q.   Good morning, Ms. Williams.  How are you?

19    A.   Doing well, sir.

20    Q.   You've been with Bank of America for five and a half

21    years?

22    A.   I have.

23    Q.   And do you often come to court to testify on behalf of

24    the bank?

25    A.   I do not.

1    Q.    Is this your first time?

2    A.    Yes, sir.

3    Q.    Fair to say that Bank of America is one of the handful

4    of the largest American banks?

5    A.    Yes.

6    Q.    International bank, right?

7    A.    Somewhat.

8    Q.    Thousands of branches?

9    A.    Sure.

10   Q.    Hundreds of thousands of accounts?

11   A.    Sure.

12   Q.    And accounts such as the ones -- the statements you've

13   gone through with Ms. Johnston, balances 5, 15, $75,000, in

14   terms of the total assets of the bank, a drop in the bucket?

15   A.    Yes, sir.

16   Q.    Nonetheless, you maintain careful detailed records, the

17   bank does, of all the accounts?

18   A.    We do.

19   Q.    All the deposits?

20   A.    We do.

21   Q.    All the electronic transfers?

22   A.    Yes, sir.

23   Q.    All the checks?

24   A.    Yes, sir.  To the best of our ability.

25             MR. MONTEMARANO:  Thank you very much.  No further

1    questions.

2                      CROSS-EXAMINATION

3    BY MR. MARTIN:

4    Q.    Good morning, Ms. Williams.  My name is Anthony Martin.

5    I represent Mr. Goodwin.

6              Ms. Williams, take a look at the screen there.  If

7    you can't see that, I'll bring it over to you.

8              Can you see that, ma'am?

9    A.    I can see it.

10   Q.    You can see it?

11   A.    Um hum.

12   Q.    I want to go through some of these activity statements

13   that Madam Government went through.  On the first one here,

14   can you see the names there?

15   A.    I can't.  Can you zoom it in just a little bit?

16   Q.    You want me to zoom it in?

17   A.    Just a little bit.

18   Q.    I have bad eyes, too, so I understand.  Is that better?

19   A.    Yes.

20   Q.    And behind the first name, do you see where it says

21   Paulette Martin?

22   A.    Sure.

23   Q.    Behind that, there are the letters ITF.

24   A.    Yes.

25   Q.    What does that stand for, ma'am?

1   A.   In trust for.

2   Q.   In trust for?  And how does one go about -- well, what

3   does that mean, in trust for?

4   A.   That we have a custodian of an account and a

5   beneficiary.

6   Q.   And who would be the custodian in this particular

7   incident?

8   A.   Paulette.

9   Q.   And what would be the status of the name underneath her

10  name?

11  A.   That is the person that the account is in trust for, so

12  they -- they're not the owner, but they're in trust for that

13  account.

14  Q.   Okay.  And the person whose name appears underneath the

15  trustee's name?

16  A.   Um hum.

17  Q.   Did that person have to come to the bank to open this

18  account?

19  A.   No, they do not.

20  Q.   Let's go to the next page.  Well, let's go a few pages

21  down actually.  Can you see the names there, ma'am?

22  A.   Yes.

23  Q.   And at this point we have a second name added under

24  Ms. Martin's name, is that correct?

25  A.   That's correct.

1    Q.    And what is the date on this particular activity

2    statement, if you can see it?  Can you see it there?

3    A.    November 2000.

4    Q.    November 2000?

5    A.    December 2000.  Um hum.

6    Q.    That, again, we have two names, and we again have the

7    initials ITF, is that correct?

8    A.    That's correct.

9    Q.    And the same thing that you just said earlier when we

10   had one name would also be true, that is, that the second

11   person would not have to show up to have their name added to

12   the trust account?

13   A.    Right.

14   Q.    Is that correct?

15   A.    That's correct.

16   Q.    I'm going to move a little further down -- and I should

17   have asked you earlier.  Let's go back to the beginning.

18   What's the account number here that we're looking at, just

19   to make sure that the ladies and gentlemen of the jury are

20   able to follow us.  Can you see the account number here in

21   the corner, ma'am?

22   A.    Yes.

23   Q.    And would you read the last four numbers of that

24   account number?

25   A.    7233.

1    Q.   Okay.  Let's go back to this again then.

2              And I showed you, I believe, this page here, and

3    what was the date on that particular page?  Can you see

4    that?

5    A.   No, I can't.

6    Q.   You can't?  I'm going to have to do what Madam

7    Government told me to do then and see if we can't -- I'm

8    going to move this down a little bit like that.  Can you see

9    the date now?

10   A.   Yes.

11   Q.   And what is the date there, ma'am?

12   A.   November 10, 2000, December 8th, 2000.

13   Q.   Okay.  And this is the activity statement that has two

14   names on it?

15   A.   That's correct.

16   Q.   Here we have two names again.  And, again, if you could

17   give us the date there?

18   A.   November 10, 2000, December 8th, 2000.

19   Q.   And it's the same account number?

20   A.   Yes.

21   Q.   And continuing to move along with this particular

22   account, at some point we come now to a point in this

23   activity statement or these accounts where a name is now

24   missing.  Can you see that?

25   A.   Yes, sir.

1    Q.   And which name is it that's missing, if you recall?

2    A.   Larry Martin, I think was the last name.

3    Q.   Close enough.

4    A.   Okay .

5    Q.   Close enough.  Up here in the corner, can you see the

6    date?

7    A.   Yes.

8    Q.   Is it the same account number?

9    A.   Yes.

10   Q.   And let's go back.  You thought it might have been

11   Larry Martin, but let's go back and show you those documents

12   so you can see the name.

13        Can you see the name there?

14   A.   Yes.

15   Q.   What's the name?

16   A.   Goodwin.

17   Q.   Okay.  And it's not here now, right?

18   A.   Right.

19   Q.   All right.  And so Mr. Goodwin wouldn't have had to

20   come in to remove his name from the trust account, would he?

21   A.   No.

22   Q.   And he wouldn't have had to go in to put his name on

23   the trust account I think you said earlier, right?

24   A.   Right.

25   Q.   And what was the address that this particular account

1   was registered at?  Is there any way of telling that from

2   this statement, from any of these statements?

3   A.   I don't understand the question.

4   Q.   Well, sometimes bank statements have to be mailed to

5   people, right?

6   A.   Right.

7   Q.   And we're seeing a bunch of activity statements here,

8   but what I was wondering was -- well, let's look at this

9   one.  This is a different account, is it not?  That's a

10  little different from the other account I was just showing

11  you.  I think before I was showing you 7233?

12  A.   Right.

13  Q.   Now I'm showing you a different account.  Well, no,

14  this is the same one, isn't it?  Isn't that 7233?

15  A.   It is.

16  Q.   But now the format of the activity statement is a

17  little different, is it not?

18  A.   It is.

19  Q.   Now we have the Bank of America logo up in the upper

20  left-hand corner?  See it?

21  A.   Yes, sir.

22  Q.   And, ma'am, we also have an address there, do we not?

23  A.   Yes, sir.

24  Q.   And would you just read into the record what that

25  address is?

1    A.    9002 Bexhill Court, Hyattsville, Maryland  20783.

2    Q.    And there are a number of names on this particular

3    account at this point, are there not?

4    A.    Yes, sir.

5    Q.    And we have -- behind Ms. Martin's name, it looks like

6    we have Theresa and Burgess Arnold?

7    A.    As beneficiaries, correct.

8    Q.    As beneficiaries.  Is that different from the status of

9    the others we saw as trust members on the account?  Is that

10   the same thing?

11   A.    Yes, sir.

12   Q.    Okay.  And do we have any way of knowing whether these

13   people live at 9002 Bexhill Court?

14   A.    No, sir.

15              MR. MARTIN:  I have no further questions.  Thank

16   you, ma'am.

17              THE COURT:  Any further cross?

18              MR. HALL:  Yes, Your Honor.

19                        CROSS-EXAMINATION

20   BY MR. HALL:

21   Q.    Good morning, ma'am.

22   A.    Good morning.

23   Q.    Let me ask you a couple questions again about these

24   bank statements.  This is my copy -- I'll show you so you

25   can see this is my copy of Government's Exhibit R15.

1      Do you see that at the bottom of the page?

2   A.   Yes, sir.

3   Q.   Okay.  And do you want me to zoom in a little bit?

4   Would that make it easier?

5   A.   Yes, sir.

6   Q.   Okay.  I want to direct your attention first to the

7   upper corner of the page.  There's a certain amount of

8   information that's on every statement in that position on

9   the first page of each bank statement, is that right?

10  A.   That's correct.

11  Q.   Okay.  And one of the things it indicates to you is a

12  statement period, is that correct?

13  A.   Yes, sir.

14  Q.   Okay.  And in this particular case, the statement

15  period runs from June 11th, 2000 to -- excuse me, May 11,

16  2000 to June 12 of 2000, is that right?

17  A.   That's correct.

18  Q.   Okay.  And this is, I believe you testified, a regular

19  checking account, is that correct?

20  A.   Bank statement, right, for a checking account.

21  Q.   For a checking account.

22  A.   Um hum.

23  Q.   So you have deposits that come in, and you have checks

24  written on the account, is that correct?

25  A.   That's correct.

1    Q.   Okay.  And would it be fair to say, or is it accurate

2    to say, that on a regular checking account Bank of America

3    sends out a statement to its customer once a month?  Is that

4    right?

5    A.   That's correct.

6    Q.   Okay.  Now, as the custodian of records in this case,

7    is it accurate that you brought only those specific monthly

8    statements that the Government asked you to bring?

9    A.   I wasn't asked to bring.

10   Q.   Okay.  You were only asked to interpret, is that

11   correct?

12   A.   That's correct.

13   Q.   Okay.  Well, let me show you -- the very next statement

14   in this particular exhibit is November 10th, 2000 through

15   December 8th of 2000, is that right?

16   A.   That's correct.

17   Q.   And would it be accurate to -- there would have been a

18   statement for that time period of July to August, August to

19   September, September to October, October to November?

20   They're just not here in this record, is that right?

21   A.   That's correct.

22   Q.   Okay.  And I assume that those statements would have

23   looked much like these insofar as their format, is that

24   correct?

25   A.   That's correct.

1   Q.   Okay.  And Bank of America sends out a statement

2   regardless of whether there's any activity that particular

3   month.  You still get a statement every month, is that

4   right?

5   A.   That's correct.  Um hum.

6   Q.   And so this entire exhibit, R15, would consist of a

7   number of bank statements, correct?

8   A.   Correct.

9   Q.   A number of deposit slips of deposits into that

10  account, right?

11  A.   That's correct.

12  Q.   And copies of checks that were part of those deposit

13  slips, is that correct?

14  A.   That's correct.

15  Q.   Okay.  All right.  Now, let me direct your attention

16  then to the last bank statement that is part of R15 and let

17  me ask you if you can -- do you see the time period listed

18  here?

19  A.   Yes, sir.

20  Q.   And what would that be?

21  A.   July 12th, 2002, August 12th, 2002.

22  Q.   Okay.  And in this particular bank statement, on the

23  first page of the bank statement, you get sort of a summary

24  of activity, is that correct?

25  A.   That's correct.

1    Q.    And you get a line item that says this much was

2    deposited into the account during this time period?

3    A.    That's correct.

4    Q.    And you get a line item this much was subtracted?

5    A.    That's correct.

6    Q.    And maybe either bank fees or interest or something

7    like that?

8    A.    Yes, sir.

9    Q.    Correct?  Okay.

10          Well, let me direct your attention to that

11   particular portion of it.  It says, I believe, your account

12   at a glance.  Is that the summary I was just describing?

13   A.    Yes, sir.

14   Q.    Okay.  And that indicates that a certain -- a

15   particular -- let me zoom out a little bit just so you can

16   see the whole thing.  That would indicate that there was a

17   certain amount of deposits that went into the account that

18   month, is that right?

19   A.    That's correct.

20   Q.    And a certain amount of withdrawals or checks posted,

21   is that correct?

22   A.    Yes, sir.

23   Q.    Okay.  And then another area called other subtractions,

24   I guess that would be direct debits or maybe ATM cards or

25   whatever?

1   A.    Yes, sir.

2   Q.    Okay.  All right.  And then that gives you a total

3   amount that you have at the end of the month, is that right?

4   A.    That's correct.

5   Q.    Okay.  And attached to this for deposit, we have one

6   deposit slip, is that correct?

7   A.    Yes, sir.

8   Q.    Okay.  And that indicates that there was 550 in cash

9   deposited, right?

10  A.    That's correct.

11  Q.    A check for 125?

12  A.    Yes.

13  Q.    A check for, I believe that's 50?

14  A.    Yes.

15  Q.    And a total of 725, is that right?

16  A.    That's correct.

17  Q.    Okay.  And then attached to that we have the checks

18  that comprise those two checks that were deposited to the

19  account, right?

20  A.    Yes, sir.

21  Q.    Okay.  But let me just ask you this.  Looking at the

22  summary at the beginning of the account that we looked at a

23  little bit earlier, that's not the total number of deposits

24  that went into that account during that month, is that

25  correct?

Case 8:04-cr-00235-DKC   Document 1242   Filed 09/26/08   Page 58 of 223

```
 1    A.    That's correct.

 2                MR. HALL:  Okay.  Thank you very much.

 3                THE COURT:  Any further cross?

 4                MR. McKNETT:  May I approach the Government?

 5                THE COURT:  You may.

 6                MR. McKNETT:  I apologize for this, Your Honor.

 7                Thank you, Your Honor.

 8                          CROSS-EXAMINATION

 9    BY MR. McKNETT:

10    Q.    Ms. Williams, you don't know why any of those checks

11    were written, do you?

12    A.    I do not.

13                MR. McKNETT:  Thank you.

14                THE COURT:  Any redirect?

15                MS. JOHNSTON:  No, sir.

16                THE COURT:  All right.  You may step down.  Thank

17    you.

18                Let me take a break now until 25 minutes of 12.

19                (Recess.)

20                (Jury present.)

21                THE COURT:  Next witness.

22                MS. JOHNSTON:  Your Honor, our next witness is

23    Mr. Scott Burger.

24                (The oath was administered.)

25                THE CLERK:  Please be seated.
```

1                    DIRECT EXAMINATION

2    BY MS. JOHNSTON:

3    Q.    Please state your full name and occupation.

4    A.    Scott Burger.  I'm an assistant vice president for Sun

5    Trust Bank.

6    Q.    And how long have you been employed by Sun Trust Bank?

7    A.    Fifteen years.

8    Q.    And what are some of your duties with Sun Trust Bank?

9    A.    I go into the branches and make sure policies and

10   procedures are followed.  I am the custodian of record.  I

11   do a lot of training with the branches, things like that.

12   Q.    As -- part of your duties include being the custodian

13   of record, is that correct?

14   A.    Correct.

15   Q.    And as such, are you familiar with the records that are

16   created and maintained during the ordinary course of the

17   business of Sun Trust?

18   A.    Yes, I am.

19   Q.    Let me show you two sets of records marked R14 and R18.

20   Do you recognize those as being records maintained by Sun

21   Trust in the ordinary course of their business?

22   A.    Yes, I do.

23   Q.    I'm going to put them up on the screen.  If you need to

24   see them a little close up, let me know.

25              Starting first with R14, can you tell us the name

1   on this account?

2   A.   Paulette Martin, also known as Paulette Akuffo, Akuffo,

3   and Mary Alice Payne.

4   Q.   And at what address?

5   A.   9002 Bexhill Court, Hyattsville, Maryland  20783.

6   Q.   And if you go down further, do we have the account

7   number?

8   A.   It's 891788786.

9   Q.   Could I ask you to please keep your voice up so we can

10  all hear you, or lean into the microphone.

11          What is the time period covered by this statement?

12  A.   This statement is from 8/14/2001 to 9/14/2001.

13  Q.   Going to the next page, can you tell us what we're

14  looking at on this page?

15  A.   This would be the information from a deposit ticket

16  dated September 11th, 2001.

17  Q.   And is this the way the records are maintained in

18  reference to deposit tickets?

19  A.   Yes, they are.

20  Q.   In the computer system at Sun Trust Bank?

21  A.   Yes.

22  Q.   And can you tell us what the date of this deposit is?

23  A.   It's September 11, 2001.

24  Q.   And what was the amount of the deposit?

25  A.   The deposit was $125.

1   Q.   And how was that deposited?

2   A.   The full amount was in a check.

3   Q.   And the next page, if you can tell us what we're

4   looking at here?

5   A.   This is a check that's made payable to Paulette Martin

6   for $125.

7   Q.   Corresponding with the deposit information on the

8   previous page?

9   A.   Yes.

10  Q.   Going to the next page, going to the account number, is

11  this the same account number as the preceding statement?

12  A.   Yes.

13  Q.   And what's the time period covered by this?

14  A.   This is June 15, 2002 to July 16, 2002.

15  Q.   Still carrying the same names on the account and the

16  same address?

17  A.   Yes.

18  Q.   Calling your attention to the next page, what are we

19  looking at here?

20  A.   That is the deposit information for July 15, 2002.

21  Q.   Okay.  And what was the total amount of the deposit?

22  A.   $2,821.

23  Q.   And how was it broken down?

24  A.   $2,000 in cash, a $300 check, a check for $396 and a

25  check for $125.

1  Q.   What does the next page reflect?

2  A.   That is the record for the cash amount for the 2,000

3  for a deposit of July 15, 2002.

4  Q.   So this corresponds to the cash portion of the deposit

5  you just explained?

6  A.   Correct.

7  Q.   And the next page?

8  A.   It's a check for $300.

9  Q.   Again, part of that same deposit on July 15th?

10  A.   Correct.

11  Q.   And the next page?

12  A.   That's the check for 396 for the corresponding deposit.

13  Q.   And the last page?

14  A.   That's a check for $125 for the same deposit.

15  Q.   Going to the next set of records, R18, what is the name

16  on this account?

17  A.   Paulette M. Murphy Martin.

18  Q.   And the same address as the --

19  A.   Same address as the previous.

20  Q.   A different account number?

21  A.   Yes.  This is 807343099.

22  Q.   And the time period covered by this statement?

23  A.   It's November 14th of 2000 through December 13th of

24  2000.

25  Q.   Now going to the next document, what are we looking at

1   here?

2   A.   This is the deposit information for December 11th of

3   2000.

4   Q.   And what was the amount of the deposit?

5   A.   $325.

6   Q.   And how was that broken down?

7   A.   It was a check for $125 and a check for $200.

8   Q.   And the next page, what is this?

9   A.   That is a check for $125 with the corresponding

10  deposit.

11  Q.   And the next item?

12  A.   Is a check for $200 for the corresponding deposit.

13  Q.   Going to the next statement, the same name on the

14  account as the previous one?

15  A.   It's Paulette Martin, aka Paulette Akuffo.

16  Q.   At the same address?

17  A.   Correct.

18  Q.   And, again, is the account number the same --

19  A.   807343099.

20  Q.   And what time period is covered by this statement?

21  A.   October 17, 2001 to November 16, 2001.

22  Q.   And then this page, what does this refer to?

23  A.   This is deposit information for November 13th, 2001.

24  Q.   For the same account within the same time period as

25  this statement?

1    A.    Correct.

2    Q.    And what is the amount of this deposit?

3    A.    $610.

4    Q.    And how was it made?

5    A.    A check for 125 and a check for 485.

6    Q.    Going to the next page, is this related to that

7    deposit?

8    A.    Yes.   That's the check for 125.

9    Q.    And the next page?

10   A.    That's the check for 485.

11   Q.    For the corresponding deposit?

12   A.    Yes.

13   Q.    Going to the next page in this record, again, is this

14   for the same account number?

15   A.    Yes.

16   Q.    And the same name on the account, same address?

17   A.    Correct.

18   Q.    And what's the time period covered by this statement?

19   A.    October -- I'm sorry, December 15, 2001 to January 16,

20   2002.

21   Q.    Now, are there more than one deposit made in these

22   various statements?

23   A.    Yes, there are.

24   Q.    But the records we're covering relate to specific

25   deposits, is that correct?

1   A.   Yes.

2   Q.   Now going to the next page, what are we looking at

3   here?

4   A.   This is the deposit information for December 28, 2001.

5   Q.   And what was the nature of the deposit?

6   A.   The deposit was for $355.  There was $250 in cash, $75

7   check and a $30 check.

8   Q.   And what is this?

9   A.   That is the cash-in information for the $250 for that

10  same deposit.

11  Q.   And the next page?

12  A.   That is a check for $75 for the corresponding deposit.

13  Q.   And the next page?

14  A.   That's the check for $30 for the corresponding deposit.

15  Q.   Going to the next page, again, is this a statement for

16  the same account number?

17  A.   Yes, it is.

18  Q.   In the same name and address?

19  A.   Correct.

20  Q.   And what's the time period covered by this statement?

21  A.   January 17, 2002 to February 14, 2002.

22  Q.   And, again, are there multiple deposits made?

23  A.   Yes, there are.

24  Q.   What are we looking at here?

25  A.   The deposit information for January 28th, 2002.

1   Q.   And how much was the deposit?

2   A.   $5,893.   5500 of it was in cash, a check for $343 and a

3   $50 check.

4   Q.   And the next page?

5   A.   This is the cash-in information for 5500 for that same

6   deposit.

7   Q.   On January 28th of 2002?

8   A.   Correct.

9   Q.   And what is this?

10  A.   This is a check for $343 for the corresponding deposit.

11  Q.   And the next item?

12  A.   A check for $50 for the corresponding deposit.

13  Q.   All for that deposit made on January 28th --

14  A.   28th.

15  Q.   -- of '02?

16          MS. JOHNSTON:  Court's indulgence.

17          I have no other questions.

18          THE COURT:  Cross-examination?

19          MR. MONTEMARANO:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21  BY MR. MONTEMARANO:

22  Q.   The records you've just gone through with Ms. Johnston,

23  are they routine records maintained by your bank?

24  A.   Yes, they are.

25  Q.   In the course of doing business?

1    A.   Yes, they are.

2    Q.   Done for all accounts?

3    A.   Yes.

4         MR. MONTEMARANO:  No further questions, Your

5    Honor.  Thank you.

6         MR. MARTIN:  Mr. Goodwin has no questions.

7         MR. HALL:  No questions, Your Honor.

8         MR. WARD:  No questions.

9                    CROSS-EXAMINATION

10   BY MR. McKNETT:

11   Q.   Mr. Burger, Ms. Johnston has showed you several checks.

12   You don't know why those checks were written, do you?

13   A.   No idea.

14        MR. McKNETT:  Thank you.

15        THE COURT:  You may step down.  Thank you very

16   much.

17        MS. JOHNSTON:  Your Honor, our next witness would

18   be Detective Ron Humble.

19        (The oath was administered.)

20        THE CLERK:  Please be seated.

21                   DIRECT EXAMINATION

22   BY MS. JOHNSTON:

23   Q.   Detective, please state your full name for the record.

24   A.   Ronald S. Humble.

25   Q.   Where are you employed?

1    A.    With the Prince George's County Police Department.

2    Q.    And how long have you been employed there?

3    A.    For -- it will be 17 years in November.

4    Q.    Could you describe for us the various assignments that

5    you've had during your 17 years with the police department.

6    A.    Initially out of the Academy, I was on regular patrol.

7    After a four-year period, I went to the Narcotic Enforcement

8    Division, where I have been since, so a period of over 12

9    years, which I have supervised and also executed search

10   warrants, made undercover drug buys from dealers.

11   Q.    Is it safe to say that you're familiar with the process

12   and procedures followed during the execution of search

13   warrants by members of your department?

14   A.    Yes, ma'am.

15   Q.    And have you also worked in conjunction with other

16   federal agencies?

17   A.    Yes, ma'am.

18   Q.    Now, calling your attention to June 1st of 2004, were

19   you asked to assist Detective Evler and others with the

20   execution of search warrants in reference to this case?

21   A.    Yes, ma'am.

22   Q.    And what assignment were you given?

23   A.    I was given the collection -- evidence collection

24   assignment for 1513, Apartment 102, Ray Road in Hyattsville,

25   Prince George's County, Maryland.

1    Q.    And could you describe the procedure that was followed

2    that day in the execution of the warrant at 1513 Ray Road,

3    Apartment 102?

4    A.    We meet prior to the execution to go over

5    responsibilities as far -- prior to the execution for the

6    team that will actually enter the apartment and others who

7    will stand outside and guard the perimeter, which I was one

8    of those members.

9         After the execution by the entry team is made,

10   then we come inside, and any individuals who are in the

11   apartment are located in one area for us, and we begin to

12   search then those premises for evidence.

13   Q.    Could you describe the procedure that's followed for

14   the location and then collection of the evidence?

15   A.    Yes.  The two -- there were two individuals located in

16   the apartment.  They were both seated in the living room

17   area.  The first -- there were different items collected

18   inside, which it was collected by me.  The rest of the team,

19   they look, identify an item, call me and I collect it.

20        The first item -- did you want me to go through

21   the different items?

22   Q.    No, I just wanted you to describe the procedure that

23   was followed.

24   A.    Okay.  And pictures of those items are taken.  We take

25   a picture of the living area, the apartment prior to the

1    search, and then, as items are located and recovered, a

2    picture of where they're recovered, and we document that and

3    I take possession of those items.

4    Q.   And you followed that procedure in regards to the Ray

5    Road address?

6    A.   Yes, ma'am.

7    Q.   Now, you indicated that there were two people in the

8    premises in the apartment when you executed the search

9    warrant on June 1st of 2004?

10   A.   Yes.

11   Q.   Do you recall who those two people were?

12   A.   One was a female.  I believe her first name might have

13   been Cindy.  The other was a male, a Derrek Bynum, and

14   appears to be the gentleman right there with the beard, bald

15   head.

16   Q.   Okay.  And what color shirt is he wearing?

17   A.   Maroon.  Maroon shirt.

18           MS. JOHNSTON:  We'd ask the record to reflect that

19   he's identified the defendant, Derrek Bynum.

20           THE COURT:  The record will so indicate.

21   Q.   And what was done with Mr. Bynum on that day?

22   A.   He was arrested and transported to be interviewed from

23   that scene.

24   Q.   Now, before we go any further, if I could, let me begin

25   by showing you Government's Exhibit P6.  Do you recognize

1   that photograph?

2   A.   Yes.   That's the front entrance of 1513 Ray Road.

3   Q.   And P7?

4   A.   That's a close-up of the numbers of the entrance to

5   that apartment building.

6   Q.   And then P8?

7   A.   That's the front door, the door to Apartment 102 of

8   Apartment Building 1513.

9   Q.   And why do you take pictures of -- close-ups of the

10  numbers on the outside of the building and then inside on

11  the apartment?

12  A.   If there's any discrepancy as far as in the search

13  warrant, all those numbers are located in your search

14  warrant so you can prove that yes, we were in the correct

15  apartment.

16  Q.   And looking at P9?

17  A.   That's the living room area within that apartment, and

18  that's a subject that was in the apartment by the name of

19  Derrek Bynum.  You see the back of that individual and then

20  the female across from him.

21  Q.   Can you describe the layout of the apartment?

22  A.   From this vantage point, if you walk into my right, the

23  subjects are seated.  The apartment door would be to my

24  rear.  And as you enter, the living area is to your right.

25  Then you go further in the apartment.  There's a dining room

1    table on your left, the kitchen on your right, and you would

2    go straight down a hallway and come to a bedroom and a

3    bathroom.

4    Q.    Just a one-bedroom apartment?

5    A.    Yes, ma'am.

6    Q.    And P10, what are we looking at here?

7    A.    That's another picture of the couch in the living area,

8    in the living room.

9    Q.    So is that the opposite end of the couch from where

10   Mr. Bynum is seated?

11   A.    Correct.

12   Q.    And P11, if you can tell us what we're looking at here.

13   A.    That's another picture from the front entrance, the

14   front door of the apartment, looking into the apartment,

15   where that couch that you just saw would be to your right,

16   and then you see catercorner to your right the entrance to

17   the kitchen, the dining room table that I had described

18   earlier basically directly in front of you, kind of to the

19   left, and you can peer down the hallway to what leads you to

20   the bedroom and to the bathroom.

21   Q.    Let me take it out of this plastic.  It looks like

22   we're getting some glare.

23           Now, again, this sofa here, is that the sofa where

24   Mr. Bynum was seated on it?

25   A.    Yes, ma'am.

1    Q.    And you mentioned the kitchen.  Can we see the kitchen

2    opening on this?

3    A.    Yes.  As I said, it's catercorner to the right, located

4    right next to that large bookcase, wooden bookcase.

5    Q.    This area here?

6    A.    Yes, ma'am.

7    Q.    And you mentioned an entrance to the bedroom or the

8    hallway leading to the bedroom?

9    A.    If you look to the left on that picture, you can see

10   the hallway, which is on the other side of the table that

11   you can see directly in front of you, and that hallway leads

12   down to the bedroom and to the bathroom.

13   Q.    And that would be this area here behind this green

14   bottle?

15   A.    Yes, ma'am.

16   Q.    Now showing you the next photograph, P12, do you

17   recognize this photograph?

18   A.    Yes, ma'am.

19   Q.    What is this a photograph of?

20   A.    It's of a bookshelf containing two false books, which

21   are book safes, which are directly in front of you that are

22   brown in color.

23   Q.    And does this show their location when you recovered

24   them?

25   A.    Yes, ma'am.

1    Q.    And where is that bookcase in relation to the pictures

2    that we've just seen?

3    A.    As you enter the front door, they would be directly to

4    your right, against the wall.

5    Q.    Okay.  Are we able to see where that wall is on either

6    of the preceding pictures?

7    A.    No.  The picture's taken with that back -- with the

8    wall to the rear of the picture taker.

9    Q.    And does this depict their location as well as the

10   other books' location at the time that those two items were

11   noticed?

12   A.    Yes, ma'am.

13   Q.    Let me next show you what have been marked as

14   Government's Exhibit Bynum 7 and Bynum 8.  Do you recognize

15   these two exhibits?

16   A.    Yes, ma'am.  These are the two that are in that picture

17   on the bookcase.

18   Q.    Now, are they in the same condition as they were when

19   you saw them on the bookcase?

20   A.    Yes, ma'am.

21   Q.    When you recovered them, were they empty or was there

22   anything inside?

23   A.    There was U.S. currency located in both.

24          MS. JOHNSTON:  Your Honor, if I could publish

25   these items to the jury?

1          THE COURT:  Yes, you may.

2    Q.   And what were the names on the two books?

3    A.   The Bounty and Treasure Island maybe?  It might have

4    been Treasure Island.  I'm not sure.

5    Q.   Well, looking at the picture, does that refresh your

6    recollection of the names on the two books?

7    A.   The Bounty and Treasure Island.  I didn't think to look

8    at the picture.

9    Q.   If we could go to the next photograph, P13, can you

10   tell us what we're seeing in this photograph?

11   A.   Those are the two book safes with the U.S. currency

12   that was inside.

13   Q.   And does that accurately depict the currency the way it

14   was bundled and observed inside the bookcases?

15   A.   Yes, ma'am.

16   Q.   And Government's Exhibit P14, another picture of the

17   same book?

18   A.   Yes, ma'am.

19   Q.   And the currency?

20   A.   Yes.

21   Q.   And can you tell us -- in addition to this currency,

22   was there some currency recovered from another area in the

23   residence?

24   A.   Yes, ma'am.  There was currency located from inside one

25   of the large water -- like Deer Park water jug that people

1   commonly use to put change in, and that was on the floor of

2   the bedroom.  During closer examination, I saw that instead

3   of change, there were a lot of $20 bills, so that was also

4   seized.

5   Q.   Showing you P21, jumping ahead a little bit, is that

6   the water jug you're referring to?

7   A.   Yes.

8   Q.   And that was recovered from what area?

9   A.   The bedroom.

10   Q.   And what was the total amount of money recovered from

11   the book safes and the water jug?

12   A.   $14,905.

13   Q.   Now, in reference to those book safes, I want to show

14   you a couple other exhibits, Government's Exhibit Ali 1B and

15   Ali 1D.

16          They appear to be similar to the book safes that

17   you recovered at Mr. Bynum's residence?

18   A.   Yes, they do.

19   Q.   The titles on both of these book safes are what?

20   A.   Treasure Island and The Bounty.

21   Q.   Let me show you one more exhibit, Government's Exhibit

22   South Dakota 2.  Again, what does that appear to be?

23   A.   It's a book safe.  It appears to be similar to the

24   others that you showed me, and the name on that one is The

25   Bounty.

1   Q.   If we could move along to Government's Exhibit P15.   If

2   you can tell us what we're observing in P15.

3   A.   These are documents that were located on the book shelf

4   in the living area, the living room area.

5   Q.   Now, there's a piece of paper there that says F on it?

6   A.   Correct.

7   Q.   And whose piece of paper is that?

8   A.   That's mine.

9   Q.   And why do you put that there?

10  A.   To keep track of the different pieces of evidence that

11  are located -- different evidences can be located from

12  different parts of the apartment, similar types of evidence,

13  so that way you can differentiate.

14  Q.   Now, did you have occasion to go through these

15  documents and pull out some of those for exhibits in this

16  case?

17  A.   Yes.

18  Q.   I want to show you what's been marked as Government's

19  Exhibit P4.  Not P4, Bynum 4.  I'm sorry.

20           What is that?

21  A.   It's a passport for Derrek Bynum.

22  Q.   And is that one of the items found in the location

23  that's depicted in P15, your Number F?

24  A.   Yes, ma'am.

25  Q.   And Bynum 6, do you recognize that item?

1   A.   Yes, ma'am.  That was also located on the bookshelf.

2   Q.   Okay.  And what is that?

3   A.   A bill from a -- or a piece of mail from the Department

4   of Motor Vehicles from D.C.

5   Q.   Appears to be a parking ticket or a ticket --

6   A.   It's a -- yeah, a ticket.  Upper left reads ticket

7   number.

8   Q.   And who is that addressed to?

9   A.   Derrek Lewis Bynum.

10  Q.   And what's the date of that?

11  A.   12/19/2003.

12  Q.   And then showing you Government's Exhibit Bynum 5.

13  Again let me -- and what is Bynum 5?

14  A.   That is another piece of evidence with Derrek Bynum's

15  name on it.  It looks to be a paystub.

16            MR. MITCHELL:  Objection.  I withdraw it.

17  Q.   And in that regard, is there a notation at the bottom

18  in terms of who was --

19  A.   It reads payroll account to the order of Derrek Lewis

20  Bynum.

21  Q.   At the same address that you were searching?

22  A.   Correct.

23  Q.   Okay.  And does it also indicate who the payor was on

24  that check?

25  A.   PTK Associates, Incorporated, Washington, D.C.

1    Q.    And is there a date on that?

2    A.    August 15th of the year 2000.

3    Q.    Now, again, how many bedrooms was there in the

4    residence?

5    A.    I'm sorry?

6    Q.    How many bedrooms was there?

7    A.    One.

8    Q.    If we could go to P16, what are we looking at here in

9    P16?  What's that a photograph of?

10   A.    A picture of the bedroom prior to search.

11   Q.    And that's before you searched the bedroom?

12   A.    Yes, ma'am.

13   Q.    And what position are you in when you took this

14   photograph?

15   A.    Standing basically in the doorway, looking in.

16   Q.    And P17?

17   A.    Another picture of the other side of the bedroom as

18   you're looking here.

19   Q.    So it's the opposite side of the picture we saw?

20   A.    Correct.

21   Q.    If we go back to P16, the chest in that photograph?

22   A.    I'm sorry?

23   Q.    The chest that we see here in the back of that

24   photograph?

25   A.    Yes.

1    Q.    Is that also reflected in P17?

2    A.    Yeah.  I think if you scan to the right, you'll see the

3    corner of it there on the right side of the picture.

4    Q.    Now showing you Government's Exhibit P20, what do we

5    observe in Government's Exhibit P20?

6    A.    This is a drawer inside the bedroom of the nightstand.

7    Q.    And, again, is there a piece of paper in there?

8    A.    Yes.  With the letter D on that that I placed.

9    Q.    And what does that refer to again?

10   A.    That's items so that I can keep track of where they're

11   located within the apartment.

12   Q.    And when you gathered those items out of that box, what

13   did you do with them?

14   A.    Put them in a bag to give to the investigating

15   detective.

16   Q.    Okay.  And what happened to that piece of paper that

17   said D?

18   A.    It was contained in the bag.

19   Q.    And did you go through that bag of documents with us

20   prior to testimony to pull out an item to be used here in

21   court?

22   A.    Yes, ma'am.

23   Q.    I want to show you what's been marked as Bynum Exhibit

24   3.  Do you recognize those two photographs?  First, this

25   one?

1    A.   I see one.  Yeah, that was one of -- I believe it was a

2    total of five pictures.

3              MR. MITCHELL:  Objection.  Can we approach?

4              (Counsel approached the bench and the following

5    ensued:)

6              MS. JOHNSTON:  He's going to say he believes there

7    was a total of five pictures, some of which were duplicates.

8    These are two of those pictures.  He's not mentioning the

9    pig, as the Court asked him not to.  I don't even have the

10   pig picture here.

11             MR. MITCHELL:  If the Government wants to then

12   instruct the jury that the other two photographs were

13   insignificant and --

14             THE COURT:  I'm sorry.  I can't --

15             MS. JOHNSTON:  No.

16             MR. MITCHELL:  If the Government wants to agree

17   now that these other two -- that an instruction be given to

18   the jury that the other pictures that are not going to be

19   introduced are favorable to Mr. Bynum, then I'll withdraw

20   the objection.

21             THE COURT:  Why does --

22             MR. MITCHELL:  The Government got him to say there

23   are five pictures.  They're going to introduce two.  Now

24   what is the jury going to think?  They obviously did this --

25   if they didn't talk to the witness in advance and explain to

1    them the problem with the pictures, then they should have.

2    Now they've opened the door to the jury asking where are

3    these other pictures.

4              MS. JOHNSTON:  I did exactly what the Court --

5    that I understood the Court told me.  I could bring out the

6    fact that there were five pictures, but some of them were

7    duplicates, so we're only introducing them.  That's what I

8    was doing.  Nothing more than that.

9              THE COURT:  She's only introducing two pictures.

10             MR. MITCHELL:  I don't ever remember Your Honor

11   instructing the Government to say there were five pictures

12   and then let these other phantom pictures kind of be out

13   there as a question.  I think there has to be some

14   instruction or all the pictures come in.

15             THE COURT:  I will inform the jury that the

16   Government's only going to introduce two pictures, the other

17   three pictures are irrelevant and have nothing to do with

18   this case.

19             MS. JOHNSTON:  I don't know that that's

20   necessarily the truth.  Two of those pictures are

21   duplicates.  That's what he's going to say.  Some of the

22   pictures are duplicates.  These are two out of those five

23   pictures.  That's it.  There's nothing else --

24             THE COURT:  I'll just say that the Government has

25   offered and that the Court has received in evidence two

1    pictures.  The other three are not being offered and are not

2    going to be received.

3                (Counsel returned to the trial tables and the

4    following ensued:)

5                THE COURT:  Ladies and gentlemen, let me clarify

6    one thing for you.  The Government is offering two of those

7    pictures into evidence.  They will be received as evidence.

8    The other three are not being offered, will not be received

9    and will not be considered by you.

10   Q.   Is that one of the pictures that were recovered in that

11   drawer?

12   A.   Yes, ma'am.

13   Q.   Do you recognize the person in that photograph?

14   A.   Yes.  It appears to be the subject who was in the

15   apartment that morning, Derrek Bynum.

16   Q.   What does he appear to be holding?

17   A.   Appears to be holding a black handgun.

18   Q.   And can you tell whether that gun is a revolver or a

19   semiautomatic?

20               MR. MITCHELL:  Objection.

21               THE COURT:  Overruled.

22   A.   It appears to be a semiautomatic handgun.

23   Q.   Showing you the second picture in Bynum.

24   A.   Yes.  That's the second picture.

25   Q.   And those were recovered from P20, is that correct?

1    A.    Yes, ma'am.

2    Q.    Now let me show you what's been marked as Government's

3    Exhibit P19.  Do you recognize that photograph?

4    A.    Yes.  That's a photograph from within the dresser, one

5    of the dresser drawers.  I believe the third one down.

6    Q.    What's depicted there?

7    A.    Semiautomatic black handgun with -- lying next to a box

8    of ammunition.

9    Q.    Does this accurately depict the location of the gun and

10   its condition when you recovered it?

11   A.    Yes, ma'am.

12   Q.    Was that gun loaded or unloaded?

13   A.    It was loaded, ma'am.

14   Q.    Show you what's been marked as Government's Exhibit

15   Bynum 1 and Bynum 1A.  Do you recognize those two exhibits?

16   A.    Yes, ma'am.  This is the semiautomatic handgun in the

17   picture, and this is the magazine, what other people call a

18   clip, that was inside the handgun at the time.

19   Q.    Are you able to tell from looking at that firearm what

20   company manufactured it?  What kind of gun it is?

21   A.    I believe it's a Glock.

22          I'm looking for the name, but I believe it's a

23   Glock by looking at it.

24          Yes, ma'am.  It's a Glock.  The name was on the

25   other side.

1    Q.   And could you hold that gun and let's look again at the

2    photograph of Mr. Bynum and the pig if you have that in

3    front of you.

4    A.   Yes, ma'am.

5    Q.   Okay.  And is there any similarity between the gun you

6    seized and the gun in the picture?

7              MR. MITCHELL:  Objection.

8              THE COURT:  Overruled.

9    A.   Yes, ma'am.  They're both black handguns, and they both

10   appear to be a Glock handgun.

11   Q.   Both using a clip in the base of it?

12   A.   Yes, ma'am.

13   Q.   Okay.  Do you know the serial number that's on that

14   firearm?  Did you report the serial number?

15   A.   Yes.

16   Q.   Okay.  What is it?

17   A.   It's C as in Charlie, A as in Adam, Z as in zebra, 959,

18   U as in union, S as in Sam.

19             MS. JOHNSTON:  Your Honor, if I could publish the

20   photograph, Government's Exhibit Bynum 3, to the jury.

21             THE COURT:  You may.

22             MS. JOHNSTON:  Thank you.

23             And if I could at least show them the gun.  I know

24   the Court's policy --

25             THE COURT:  You can show it.

1          MS. JOHNSTON:   -- on publishing it.

2          Thank you, Your Honor.

3   Q.   Now, of course our Government's exhibit sticker wasn't

4   on it, and it wasn't in this case when you recovered it?

5   A.   Right.   Correct.

6   Q.   And, again, when you recovered it, the clip was loaded

7   inside it, is that correct?

8   A.   Yes, ma'am.

9   Q.   Calling your attention to P18, can you tell us what's

10  depicted in Government's Exhibit P18?

11  A.   Yes, ma'am.   If you look to the right of the picture,

12  there's a plastic bag of what appear to be pills, and

13  they're lying on top of a digital scale.   Where you would

14  read the numbers on the scale are kind of covered by that

15  bag.   To the left of that is where you would place an item,

16  the gray area, so it's an electronic scale.

17  Q.   Okay.   This would be this side on here?

18  A.   Yes, ma'am.

19  Q.   And did you make any observations about the condition

20  of that scale?

21  A.   It appeared to be have a white powdery substance on the

22  area in which you would weigh an item on that scale.

23  Q.   And why was that significant to you?

24  A.   In my line of work, typically those scales are used to

25  weigh narcotic substances, such as cocaine or heroin or even

1   marijuana, but there was a white substance, which is

2   indicative of cocaine or heroin.

3   Q.   Let me show you what's been marked as Government's

4   Exhibit Bynum 10.  Do you recognize that item?

5   A.   Yes, ma'am.  It's the same scale as in the picture.

6   Q.   And there's some color Polaroids in there with it and

7   another piece of paper.  What are those items?

8   A.   The pictures are Polaroid pictures that I took of that

9   item while in the drawer, and the white piece of paper are

10  notations that I made in my writing, in my handwriting, of

11  where it was located.

12          MS. JOHNSTON:  Your Honor, if I could publish

13  Government's Exhibit Bynum 10?

14          THE COURT:  You may.

15          MS. JOHNSTON:  Thank you.

16  Q.   And, finally, when we looked at Government's Exhibit --

17          MS. JOHNSTON:  Court's -- if I can approach the

18  witness, please.

19  Q.   I want to show you what's been marked as Government's

20  Exhibit and introduced as Stipulation 4.  Can you read

21  paragraph 30 in reference to Bynum 10, what the parties have

22  stipulated to?

23          MR. MITCHELL:  Objection.

24          THE COURT:  Approach the bench.

25          MR. MITCHELL:  The document speaks for itself.

1           THE COURT:  Overruled.  All right.

2    Q.    You may continue.

3    A.    Item 30, Government Exhibit Bynum 10, a scale

4    containing a detectable amount of cocaine, recovered from

5    1513 Ray Road, Apartment 102, Hyattsville, Maryland, on or

6    about June 1st, 2004.

7    Q.    And that is part of Stipulation 4, is that correct?

8    A.    Yes.

9    Q.    Now, in returning back to our picture, P19, do you

10   see -- in addition to the gun, is there another exhibit

11   there as well?

12   A.    Yes.  There's a box, a yellow box, of Remington

13   ammunition.

14   Q.    And did you seize that?

15   A.    Yes, ma'am.

16   Q.    I'm going to show you Bynum 2 and ask you if you

17   recognize that exhibit.  You can take it out.

18   A.    Yes, ma'am.  This is the box that is in the picture

19   there.

20   Q.    And was it -- is it in the same condition as it was in

21   when you recovered it?

22   A.    Yes, ma'am.

23   Q.    And in terms -- is this ammunition compatible with the

24   firearm you recovered at Mr. Bynum's?

25   A.    Yes.

1    Q.    And are these live rounds of ammunition?

2    A.    Yes.

3    Q.    Let me take my bag from you.

4    A.    Yes.

5          MS. JOHNSTON:  Again, Your Honor, if I could

6    display this to the jury as opposed to publishing it.

7          THE COURT:  Yes, you may.

8          MS. JOHNSTON:  Court's indulgence one moment.

9          I have nothing further, Your Honor.

10         THE COURT:  All right.  Cross-examination.

11                   CROSS-EXAMINATION

12   BY MR. MITCHELL:

13   Q.    Is it Detective?

14   A.    Yes, sir.  Detective is fine.

15   Q.    Detective, the search warrant that you searched, you

16   were not the one that actually did the search correct?

17   A.    That's correct, sir.

18   Q.    You were just asked to execute it once it was -- once

19   it was executed by the Court, correct?  It was your job to

20   go in?

21   A.    Yes, sir.  That's correct.

22   Q.    And your job was, pursuant to the search warrant, to

23   look for various items relating to controlled dangerous

24   substances, correct?

25   A.    Well, that being one, yes.

1    Q.    Okay.  And other items related to that?

2    A.    To -- yeah, to the crime, yes.

3    Q.    Such as things that you mentioned here, documents,

4    paraphernalia, drugs, things like that?

5    A.    Yes, sir.  That's correct.

6    Q.    And you're looking for documents because those

7    documents might reference other people involved in a

8    conspiracy, correct?

9    A.    That, in addition to the subject that's located in that

10   apartment, any kind of bank records to show that they have

11   residency in that apartment, yes.

12   Q.    You're also looking for, perhaps, ledgers that would

13   show any transactions, correct?

14   A.    Correct.  Yes, sir.

15   Q.    Numbers of -- telephone numbers of people so you can

16   identify others that might be related to this activity?

17   A.    Correct.

18   Q.    And your job was once an officer found something, you

19   would then go and then physically take these items, correct?

20   A.    That's correct, sir.

21   Q.    There were what, about six -- six officers, seven

22   officers total that went into --

23   A.    An approximation, yes.

24   Q.    Now, in your search of the house, you found a number of

25   documents, you found some money, and as I understand, you

1    found a little bit of marijuana, correct?

2    A.    Correct.

3    Q.    Now, did you find any large amount of cocaine anywhere

4    scattered around the house?

5    A.    No, sir.

6    Q.    The only reference that you could find to cocaine was

7    this little powdery substance on a scale, is that correct?

8    A.    Right.

9    Q.    And did you field test that powdery substance?

10   A.    No, I didn't field test it at the time.

11   Q.    You just seized it, put it in an envelope, and then

12   gave it on, is that correct?

13   A.    Yes, sir.

14   Q.    And the -- of the other items that you found, did you

15   find any other items, such as kilo wrappers or other

16   packaging materials anywhere in the house?

17   A.    No, sir.

18   Q.    What about, as we talked about just a minute ago,

19   ledgers or telephone numbers of people?  Did you find any of

20   that in the house?

21   A.    None that I could see were pertinent.

22   Q.    And I assume that you and the other officers were doing

23   a very meticulous job, looking all throughout the apartment,

24   were you not?

25   A.    Yes, sir.

1  Q.   You also found some small book safes?  Is that a proper

2  term for it?

3  A.   Well, yeah.  It was actually kind of large book safes,

4  but yes.

5  Q.   Okay.  These are -- the safes by themselves aren't

6  illegal, correct?

7  A.   That's correct.

8  Q.   And the currency itself is not -- possessing the

9  currency is not illegal either, is it?

10 A.   No, it's not.

11 Q.   And if you're trying to hide it, if you don't want

12 people to steal it, a book safe is a perfectly

13 understandable way to keep cash out of the eye of others?

14 A.   Sure.  Yes.

15             MR. MITCHELL:  If I can have P9 through 11.

16 Q.   Take a look at these again.  I'll show what you've

17 already identified, P9 through 11.  This is the living room

18 of the apartment, is that correct?

19 A.   That's correct.

20 Q.   And looking at this picture, and looking around the

21 living room itself, did it appear to you when you walked in

22 that it was fairly orderly and neat?

23 A.   Not really.  I mean if you look at the dining room

24 table, there was a bunch of stuff on the dining room table.

25 And if you looked in the bedroom, there was kind of clothes

1   strewn about.

2   Q.   Okay.  But it wasn't things scattered everywhere, all

3   over the floor.  I mean, you know, looks like here there's a

4   nice lamp.  There's pictures up there on the -- what does

5   that appear to be, a television?

6   A.   Yeah.  I mean according to, I guess, this picture, if

7   you just look at what you see right there.

8   Q.   There's a glare here.  There we go.  How about that?

9            And there's a bookshelf here that appears to have

10  books on the bookshelf?

11  A.   Yes, sir.

12  Q.   Right here?  Looking at P10, would you also agree that

13  it's not terribly -- I think --

14  A.   No, not terribly.  No.

15  Q.   -- orderly --

16  A.   I guess.  Yeah, I guess.

17  Q.   It's not -- it's not totally messy, if I may?

18  A.   Yeah, not totally -- yeah, not totally messy.

19  Q.   And, again, this picture, yes, there are some things on

20  the --

21  A.   Well, yeah.  My -- yeah, my definition of that would be

22  totally messy though.  My house doesn't look like that.

23  Q.   You didn't find drugs scattered throughout this room,

24  did you?

25  A.   No, sir.

1    Q.   Or drug paraphernalia all over?

2    A.   No.  No, sir.

3    Q.   What about items to ingest drugs?  Did you find that

4    scattered throughout the house?

5    A.   No, sir.

6    Q.   As well as no items of cocaine, like cocaine wrappers,

7    other things --

8    A.   No.  I had answered no.  We didn't recover that.

9             MR. MITCHELL:  Court's indulgence.

10            No further questions.

11            THE COURT:  Any further cross?

12            MR. WARD:  No, Your Honor.

13            MR. HALL:  No, Your Honor.

14            THE COURT:  Any redirect?

15            MS. JOHNSTON:  No, sir, Your Honor.

16            THE COURT:  Oh.  Okay.

17                      CROSS-EXAMINATION

18   BY MR. McKNETT:

19   Q.   Detective Humble, Ms. Johnston showed you two exhibits

20   that I believe she referred to as Ali 1B and Ali 1D.  Do you

21   remember them?

22   A.   No.

23   Q.   These were two book safes.  Do you remember them?

24   A.   Yeah, one of the, I guess, five that she showed me or

25   so.

1    Q.   You want to look at them?

2    A.   Sure, I can take a look.

3            MR. McKNETT:  May I approach, Your Honor?

4            THE COURT:  Sure.

5    Q.   Do you recall them?

6    A.   Yeah.  She brought them up to me a little while ago.

7    Q.   Do you know where they were obtained?

8    A.   No.  No, I don't.

9    Q.   Did you take part in a search at an address on Cherry

10   Street in Hyattsville?

11   A.   No, I did not.

12           MR. McKNETT:  Thank you.  No further questions.

13           MS. JOHNSTON:  No redirect, Your Honor.

14           THE COURT:  All right.  You may step down.  Thank

15   you.

16           THE WITNESS:  Thank you, sir.

17           MS. GREENBERG:  Your Honor, the marshals are

18   getting the next witness for us, so perhaps if we could just

19   take a five-minute break and start with that witness.

20           THE COURT:  Okay.  We'll do five.

21           MS. GREENBERG:  Yes, Your Honor.  They're on their

22   way.

23           (Recess.)

24           (Jury present.)

25           THE COURT:  You may proceed.

1          MS. GREENBERG:  Your Honor, the Government calls

2    Emilio Echarte, and if we could swear the interpreter.

3               (Interpreter sworn.)

4               THE CLERK:  Please state your name for the record.

5               THE INTERPRETER:  Shelly Blumberg Lorenzana,

6    federally certified court interpreter.

7               THE CLERK:  Thank you very much.

8               Would you ask the witness to please stand and

9    raise his right hand.

10              (The oath was administered.)

11              THE CLERK:  Thank you.  Please be seated.

12                        DIRECT EXAMINATION

13   BY MS. GREENBERG:

14   Q.   Sir, could you state your name and spell your last name

15   for the court reporter, please.

16              THE INTERPRETER:  Emilio Echarte, E-M-I-L-I-O,

17   E-C-H-A-R-T-E.

18   Q.   Mr. Echarte, do you speak English?

19   A.   Little bit.

20   Q.   But you asked for the assistance of an interpreter

21   because this is a legal proceeding?

22   A.   Yes, ma'am.

23   Q.   To better understand questions?

24   A.   Yes, ma'am.

25   Q.   And if you can move that microphone closer to you.

1          As long as you understand my question, then you

2    don't need her, but if you don't understand something or if

3    I ask her -- if you don't understand how to answer, she is

4    available to interpret for you.  Okay?

5    A.   Yes, ma'am.

6    Q.   Do you have a nickname?

7    A.   Say it again.

8    Q.   Do you have a nickname?

9    A.   Julio.

10   Q.   And did you ever use other names besides Emilio Echarte

11   or Julio?

12          MS. GREENBERG:  Okay.  Maybe if you could

13   interpret that for us, please.

14          THE INTERPRETER:  Luis Alberto Marero Beles.

15   Q.   And are you currently serving a sentence?

16   A.   Yes, ma'am.

17   Q.   For what?

18   A.   For drugs.

19   Q.   What kind of drugs?

20   A.   PCP.

21   Q.   Where did you get the sentence?

22   A.   Tampa, Florida.

23   Q.   Tampa, Florida?

24   A.   Yes.

25   Q.   And how long is your sentence?

1   A.   Fourteen years.

2   Q.   Fourteen years?

3   A.   Yes.

4   Q.   How did you come to be a witness in this case?

5   A.   They -- they call me for this case and ask me

6   questions.

7   Q.   Did you call the agents or did the agents call you?

8   A.   Agents call me.

9   Q.   And are there any promises made to you as a result of

10  your testimony in this case?

11  A.   No, ma'am.

12  Q.   Do you have any expectation about what would happen as

13  a result of your testimony in this case?

14  A.   Yes.  Some consideration about my case.

15         MS. GREENBERG:  And could you interpret that for

16  us, please, ma'am?

17         THE INTERPRETER:  Some consideration with regard

18  to my sentence.

19  Q.   And what consideration would that be?

20         THE INTERPRETER:  That would depend on them.

21  Q.   On who?

22         THE INTERPRETER:  On the Court.

23  Q.   What Court?

24         THE INTERPRETER:  This Court.

25  Q.   Who is the one that sentenced you?

 1              THE INTERPRETER:  Tampa.

 2   Q.   Can this Court do anything with your sentence?

 3              THE INTERPRETER:  No, ma'am.

 4   Q.   And have any promises been made to you by myself,

 5   Ms. Johnston or the agents in this case?

 6              THE INTERPRETER:  No, none.

 7   Q.   But it is your hope that you will get some

 8   consideration?

 9   A.   Yes, ma'am.

10   Q.   Did we -- did you enter into an agreement here to

11   cooperate with the United States?

12   A.   Yes, ma'am.

13   Q.   And did you ask for some protection from being

14   prosecuted here as a result of your cooperation?

15              THE INTERPRETER:  No.

16   Q.   Do you think you're going to be prosecuted here for

17   activities you did in Maryland?

18              THE INTERPRETER:  No.

19   Q.   Did you talk to your lawyer about this?

20   A.   Yes.

21   Q.   And did you reach an understanding that we wouldn't

22   prosecute you for your truthful statements to us?

23   A.   Yes.

24   Q.   And have you met me before?

25   A.   Yes, ma'am.

1  Q.   And met with the agents before?

2  A.   Yes, ma'am.

3  Q.   And did we ask you questions relating to the people in

4  this case?

5          THE INTERPRETER:  Yes, ma'am.

6  Q.   And it was in relation to all the people you knew here

7  in the Maryland area?

8  A.   Yes, ma'am.

9  Q.   Now, have you -- besides your PCP conviction, have you

10  been convicted of other crimes?

11  A.   Yes, ma'am.

12  Q.   Have you been convicted of cocaine in 1994?

13  A.   Yes, ma'am.

14  Q.   And were you convicted of telephone use involving a

15  half a kilogram of cocaine in 1990?

16  A.   Yes, ma'am.

17  Q.   And then you had your conviction for PCP in Tampa?

18  A.   In Tampa.

19  Q.   And what year was that?

20  A.   '94.

21  Q.   What year was your PCP conviction?

22  A.   In 2000 -- in 2003.

23  Q.   And are you currently serving your sentence for that?

24  A.   Yes, ma'am.

25  Q.   And you're in jail?

1   A.   Yes, ma'am.

2   Q.   Now, do you know an individual by the name of Paulette

3   Martin?

4   A.   Yes, ma'am.

5   Q.   Do you see her here in the courtroom?

6   A.   Yes, ma'am.

7   Q.   Could you identify her by where she is seated and what

8   she is wearing?

9         THE INTERPRETER:  That's the woman right there.

10  Q.   What is she wearing?

11  A.   A black jacket.

12  Q.   I'm sorry?

13  A.   She wearing a black jacket.

14        MS. GREENBERG:  Your Honor, let the record reflect

15  that the witness has identified Paulette Martin.

16        THE COURT:  The record will so indicate.

17  Q.   And how do you know Paulette Martin?

18  A.   I met her through Gene Byrd.

19  Q.   Met her through Gene Byrd?

20  A.   Gene Byrd.

21  Q.   And how long were you out of jail for your 1994 cocaine

22  conviction when you met Paulette Martin?

23  A.   I met her 2001.

24  Q.   And how long were you out of jail for your 1994 cocaine

25  conviction when you met Paulette Martin?

1    A.   About a year or something like that.

2    Q.   Approximately one year?

3    A.   Approximately one year.

4    Q.   And you said you met her through Gene Byrd?

5    A.   Yes, ma'am.

6    Q.   How did you know Gene Byrd?

7    A.   I know him for a long time.

8    Q.   And how did you know him?

9    A.   He owned a nightclub and bar.

10   Q.   And did you have any business relationship with Gene

11   Byrd?

12   A.   Yes, ma'am.

13   Q.   And what was that business relationship?

14            MS. GREENBERG:  Could you interpret that for us,

15   please?

16            THE INTERPRETER:  He spoke English.

17   Q.   Okay.  If you could repeat that, please.

18            (Everyone talking at once.)

19            MS. GREENBERG:  I didn't understand his answer.

20   A.   I met Gene Byrd in the nightclub many years ago.

21   Q.   How many years ago?

22   A.   Many years ago.

23   Q.   Ten years ago?

24   A.   I used to gamble in his nightclub and sell drugs to

25   him.

1   Q.   And sell drugs to him?

2   A.   Yes.

3   Q.   Thank you.

4          Now, how -- when did you meet Paulette Martin?

5   A.   2001.

6   Q.   And how did you come to meet her?

7   A.   Gene Byrd introduced me to her.

8   Q.   For what purpose?

9   A.   The purpose is to be a friend, keep me company,

10  something like that.

11  Q.   Did you develop a business relationship with her?

12  A.   Yes, ma'am.

13  Q.   And could you tell the jury what that was?

14  A.   Drugs.

15  Q.   And what was the first drug transaction you had with

16  Ms. Martin?

17  A.   Cocaine.

18  Q.   How much?

19  A.   Two kilo, one kilo, something like that.

20  Q.   One or two kilograms?

21  A.   Yes.

22  Q.   Of cocaine?

23         What was the price that you were dealing

24  cocaine -- were you selling or buying from Ms. Martin?

25  A.   I would sell it.

1    Q.    You sold to Ms. Martin?

2    A.    Yes.

3    Q.    And what was the price that you were selling per

4    kilogram?

5    A.    $20,000.

6    Q.    How much?

7    A.    20,000.

8    Q.    $20,000?

9    A.    $20,000.

10   Q.    And did you form a personal relationship with

11   Ms. Martin?

12   A.    Yes, ma'am.

13   Q.    Did you end up staying with her?

14   A.    What?

15   Q.    Did you end up living with her?

16   A.    I live in the house.  We don't have no sexual relation.

17   Q.    You had a personal relationship?

18   A.    Personal relationship, but we were not having sexual

19   relations.

20   Q.    So you had a business relationship and a personal

21   relationship?

22   A.    Something like that.

23   Q.    And you lived at her house?

24   A.    Yes, ma'am.

25   Q.    How long did you live at her house?

1    A.    About a year.

2    Q.    Showing you what's been marked as P2, do you recognize

3    that?

4    A.    Yeah.  That's the house.

5    Q.    And could you describe where you're talking about.

6    There's two houses on this picture.  Could you describe

7    where it was.  Which house?

8    A.    The house facing the picture right here.

9    Q.    Is it the house, if you're looking at it, on the left

10   or the right?

11   A.    It's just in front of me.

12   Q.    Perhaps I could -- is it this house where my pen is or

13   is it this other house?

14             MR. MARTIN:  Your Honor, please.  With respect to

15   the leading nature of the questions, I'm going to object.  I

16   understand about background, et cetera --

17             THE COURT:  Overruled.  She's asked him which

18   house.

19             MR. MARTIN:  Well, prior to my objection, Your

20   Honor, I'm waiving --

21             THE COURT:  Okay.

22             MR. MARTIN:  -- and it was very suggestive, I

23   believe, of where he should go.  And I'm sorry for arguing

24   in front of the jury.

25             THE COURT:  No, I understand, but she's asked him

1    in this picture which house, the left one or the right one.

2              MS. GREENBERG:  Your Honor, perhaps I could ask it

3    this way.

4    Q.   Is it the house with the truck in the driveway or the

5    house that you don't see the driveway?

6    A.   The house that I see directly to me in this screen in

7    the alarm.  It's right here, where I'm pointing the finger.

8    Q.   Okay.  We can't tell where you're pointing the finger.

9    A.   The alarm.

10   Q.   I'm sorry?

11   A.   The alarm, or the combination alarm when you open the

12   door.

13   Q.   You're saying there's an alarm on the door?

14   A.   Yes.  On the garage door.

15   Q.   On the garage door.  Okay.  So where is -- is the truck

16   in the driveway in the house -- is it the house with the

17   truck in the driveway or the house where the truck isn't in

18   the driveway?

19             THE INTERPRETER:  The house with the truck.  Yes,

20   it's this one.

21   Q.   Showing you what's been marked as P3, is that the house

22   you're talking about?

23   A.   Yes, ma'am.

24   Q.   And P4?

25   A.   This is the house.

1    Q.   Is that the same house?

2              And P5.  Is that the same house?

3    A.   That's the same house.

4    Q.   And you were mentioning an alarm.  Do you see that in

5    that picture?

6              THE INTERPRETER:  Not in this photo.

7    Q.   Was it in P4?  Is it in P4?

8              THE INTERPRETER:  In this photo.

9    Q.   And could you describe where the alarm is?

10   A.   It's right here.  (Indicating.)

11   Q.   Sir, we can't see where you're pointing.

12   A.   To the left, the inside of the garage door.

13   Q.   Thank you.

14             Now, you lived in the house for approximately one

15   year?

16   A.   Yes, ma'am.

17   Q.   Could you describe to the jury what daily life was like

18   in the house that they saw up on the screen where you lived

19   with Paulette Martin?

20             THE INTERPRETER:  It was coming and going of

21   drugs.

22   Q.   What do you mean by that?

23             THE INTERPRETER:  People were coming in and out to

24   buy drugs.

25   Q.   How often?

1    A.    Very often.

2    Q.    How much drugs were being sold to these people?

3    A.    They can buy lots amount, and they can buy small

4    amount.

5    Q.    Depend on the person?

6    A.    Depend on the person.

7    Q.    Did you discuss this with Ms. Martin?

8    A.    Yes, ma'am.

9    Q.    And could you tell the jury your discussions with her

10   about that.

11         THE INTERPRETER:  I asked her why she didn't have

12   the small sales of drugs in some other place and the large

13   sales of drugs in some other place.

14   Q.    And what did she say?

15         THE INTERPRETER:  She wasn't able to trust anyone.

16   Q.    And did she continue to -- did activity continue as it

17   did before that conversation?

18         MR. MONTEMARANO:  Objection, Your Honor.  Leading.

19         THE COURT:  Sustained.  Ask it again.

20   Q.    After you had that conversation, did anything change

21   with respect to the drug activity in and out of the house?

22         THE INTERPRETER:  No, ma'am.  Absolutely not.

23   Q.    Did you ever help Ms. Martin in connection with her

24   drug activity?

25   A.    Yes, ma'am.

1    Q.   Did you ever assist her in paying for drugs?

2    A.   Yes, ma'am.

3              MR. MARTIN:  Objection to leading questions.

4              THE COURT:  Try not to lead him, if you would.

5    Sustained.

6    Q.   Could you tell us when that was?

7              THE INTERPRETER:  After she had an operation, I

8    saw her with a car -- the interpreter requests repetition.

9              When she had an operation, plastic surgery, I took

10   her to pay for the drugs.

11   Q.   Could you explain to the jury how you took her to pay

12   for drugs?

13             THE INTERPRETER:  She was in the back of the car.

14   I was in the front driving, and the money was in the trunk.

15   Q.   Whose car was it?

16             THE INTERPRETER:  It was her car.  I don't have

17   one.

18   Q.   Do you remember what kind of car?

19             THE INTERPRETER:  Oldsmobile.

20   Q.   And what year are we talking about here?

21   A.   2001.

22   Q.   2001?

23   A.   Yeah.

24   Q.   Is that the year that you lived with Ms. Martin?

25   A.   Yes.

1    Q.    And when during that year did you go to assist her with

2    taking money?

3              THE INTERPRETER:   In the beginning of the year,

4    the first two or three months.

5    Q.    And how much money was involved in this transaction?

6              THE INTERPRETER:   $450,000.

7    Q.    And how do you know that?

8    A.    Because I count the money.

9    Q.    And where did you count the money?

10   A.    In the house.

11   Q.    Whose house?

12   A.    Ms. Martin house.

13   Q.    And how did you package the money?

14   A.    I count the money, and she put the wrapper in the

15   packet.  I count the money, she put the wrapper.  If she

16   count the money, she put the wrapper.

17   Q.    Showing you what's been marked for identification as

18   Hayward 22.

19              MS. GREENBERG:   If I may approach, Your Honor?

20              THE COURT:   You may.

21   Q.    Do you recognize what's contained in this box?

22   A.    That's wrappers.

23   Q.    How do they compare with the money wrappers that you

24   used back in 2001?

25   A.    Same ones.

1    Q.   Please tell the jury, when you're in the car with

2    Ms. Martin, what happened next with respect to the $450,000

3    that you counted.

4    A.   We take the money to there and parking behind a trailer

5    truck.

6    Q.   And where was the trailer truck?

7            THE INTERPRETER:  It was at an address that is

8    near the entryway to Silver Spring.  Crossing the street is

9    where Estelle lives?

10           THE WITNESS:  Yes.

11           THE INTERPRETER:  Yes.

12   Q.   And who did you meet there?

13   A.   Steven.

14   Q.   And how did you know his name was Stevie?

15   A.   Because she said hi, Steven.

16   Q.   Who said hi, Steven?

17   A.   Paulette.

18   Q.   Ms. Martin?

19   A.   Ms. Martin.

20   Q.   And could you describe what Steven looked like?

21   A.   Steven is a tall man.  They had a little difficulty to

22   walk.

23   Q.   And what connection, if any, does Steven have with the

24   tractor-trailer?

25           THE INTERPRETER:  He told me that I had to take it

1  in the back and help him to load the money on the truck.

2  Q.   Whose truck was it?

3  A.   Steven's truck.

4       MR. MONTEMARANO:  Objection.  Basis of knowledge.

5  A.   Got to be Steven's truck.

6       THE COURT:  If he can answer the question.  If he

7  doesn't know, he won't answer the question.

8  Q.   How did you know it was Steven's truck?

9       THE INTERPRETER:  He's the one who opened the rear

10 part of the truck.

11 Q.   And what, if anything, did you do with the money, the

12 $450,000 you counted?

13      THE INTERPRETER:  They were put in the trunk of

14 the car, and it was locked.  The trailer.  In the trailer.

15 Q.   And where was the money before you put it in the trunk?

16      THE INTERPRETER:  In the trunk of the car that I

17 drove.

18 Q.   And who directed you to put the money into Steve's

19 truck?

20 A.   Steven and Ms. Martin.

21      MS. GREENBERG:  Your Honor, this is apparently a

22 good time to break.

23      THE COURT:  How much more do you have of this

24 witness?

25      MS. GREENBERG:  I probably have about another half

1  hour, 45 minutes.

2           THE COURT:  All right.  We'll take a break then

3  until 2:10 p.m.

4           (Luncheon recess.)

5           THE COURT:  Counsel, a couple of scheduling

6  matters.  Now, who was it that had something on Thursday?

7           MR. McKNETT:  I do, Your Honor.  Thursday morning.

8           THE COURT:  How long is that supposed to be?

9           MR. McKNETT:  It's a sentencing with a statutory

10 sentence.  There's no real argument.  It shouldn't take very

11 long.

12          THE COURT:  Well, what I'd like to do -- I just

13 found out that my 9:00 matter is canceled so I'm a free

14 spirit at 9:00.  You want to have a -- why don't we schedule

15 that day at 9:30, and we won't start until you get here,

16 though.

17          MR. McKNETT:  That's fine with me, Your Honor.

18          THE COURT:  Okay.

19          MR. HALL:  Is that this Thursday, Your Honor?

20          THE COURT:  That's this Thursday.

21          MR. HALL:  Okay.

22          THE COURT:  Now, the following Thursday, which is

23 the day before I get knifed up, I'm going to ask the jury

24 whether they could start at 8:00 and go to noon and quit.

25 Then you'd be off all the way 'til the next week.

1          So unless I hear any complaints, I'm going to

2     check with -- have Bea check with the jury to see if they

3     could do an 8:00 to noon on Thursday, the 20th, and then off

4     Friday.

5          MR. McKNETT:  Your Honor, with regard to my

6     appearance on Thursday, it's with Judge Williams, and if

7     Judge Williams could move it up to 9:00, I could do that.

8          THE COURT:  Oh, fine.  Yeah.

9          MR. McKNETT:  I think if you ask for that

10    consideration --

11         THE COURT:  Oh, you mean if I were to ask him.

12    Okay.  Yeah.  We'll take care of that.  I'll send him an

13    email.  If you think I'm busily taking notes, I'm sending an

14    email to Judge Williams.  All right.

15         Tomorrow morning we're starting at 10:00, because

16    I have a sentencing at 9:00.  The sentencing, however,

17    should not be long, so if there's any preliminary matters or

18    anything like that, let's -- counsel should be here with the

19    clients at 9:45, so the marshal should have them up here at

20    9:45.  I'll tell the jury 10:00, but I do have a sentencing,

21    ironically in this case, at 9:00.

22              (Jury present.)

23              (Interpreter sworn.)

24         THE INTERPRETER:  Ron Earnest, E A R N E S T,

25    federally certified interpreter.

Case 8:04-cr-00235-DKC   Document 1242   Filed 09/26/08   Page 115 of 223

1    BY MS. GREENBERG:

2    Q.   Mr. Echarte, we're going to continue the same way, and

3    you now have somebody to give your current interpreter a

4    break if she needs a break from interpreting.  All right?

5    A.   Okay.

6    Q.   So as long as you understand me and are comfortable

7    with the question or understand whatever counsel's asking

8    the question and are comfortable answering, then we'll

9    proceed in English, and I will try my best to understand

10   your English.

11   A.   I will do so.

12   Q.   And if you need any assistance, you can turn to them.

13   Okay?

14   A.   Thank you, ma'am.

15   Q.   Now, where we ended was the delivery of $450,000 to an

16   individual that you knew as Steve at the direction of

17   Ms. Martin.  I want to now turn to -- you spoke about living

18   at Ms. Martin's residence, which we saw depicted on the

19   screen, and could you tell the jury, besides seeing the drug

20   customers coming in and out of the house, would you ever see

21   quantities of drugs in the house?

22   A.   Yes, ma'am.

23   Q.   And could you tell the jury about how many times you

24   saw large quantities of drugs in the house?

25   A.   Two times.

1   Q.   And what do you mean by large quantities of drugs?

2   What quantities are we talking about here?

3   A.   About 30, 40 kilos.

4   Q.   How much?

5   A.   Thirty and forty kilos of drugs.

6   Q.   Thirty and forty kilograms of drugs?

7   A.   Yes.

8   Q.   And what kind of drugs?

9   A.   Cocaine.

10  Q.   Would you be there when they arrived?

11  A.   Yes, ma'am.

12  Q.   And who would deliver them?

13  A.   Steven.

14  Q.   Did you say Steven?

15  A.   Steven.

16  Q.   Were they all for her, for Ms. Martin?

17  A.   Say it again?

18  Q.   When Steven delivered --

19  A.   No.  He not -- he delivered by him because we pick it

20  up from that truck, from the driver.

21            MR. MARTIN:  Again, Your Honor, I'm going to

22  object to the leading nature of the question that he did not

23  respond to, but it's leading.

24            THE COURT:  I think some leading because of

25  language barriers may be appropriate, but I'll stop her if

1   she goes too far.

2            MR. MARTIN:  Well, Your Honor, we have two

3   certified interpreters here.

4            MR. MONTEMARANO:  Your Honor, may we approach?

5            (Counsel approached the bench and the following

6   ensued:)

7            MR. MONTEMARANO:  I fear I will be disclosing my

8   advancing years.  I have two words for the Court regarding

9   Mr. Echarte's ostensible lack of English.  Lawrence Welk.

10  This gentleman has been in the U.S. for 40 years.  I would

11  represent to the Court his English is perfectly fine, even

12  if accented.  He's trying to make the most out of it.

13           THE COURT:  I'm having a hard time understanding

14  him.

15           MS. GREENBERG:  I am, too, Your Honor.  It's

16  difficult.

17           MR. MONTEMARANO:  I don't question that.  That has

18  nothing to do with his inability to understand plain English

19  and to respond in understandable English without leading

20  questions, and that's our objection.

21           MS. GREENBERG:  Your Honor, this is --

22           THE COURT:  I know that --

23           MR. MONTEMARANO:  Your Honor, the court reporter's

24  having trouble hearing.

25           THE COURT:  When we English speakers deliver

 1   convoluted sentences, that's not easy --

 2           MS. GREENBERG:  I think it's the legal part that

 3   he's getting confused.

 4           THE COURT:  I think you need to speak --

 5           MS. GREENBERG:  He's much better with con --

 6           THE COURT:  -- in much more basic --

 7           MR. MARTIN:  Let's do this, Your Honor.  Why don't

 8   we just have the interpreters translate what he's saying,

 9   and then we can avoid this whole legal business.

10           MS. GREENBERG:  Well, Mr. Martin, you can do that

11   on your examination.  I think I can direct him from the last

12   question to this question.  I am simply repeating what --

13           THE COURT:  I'm only saying this because I've had

14   the --

15           MS. GREENBERG:  Fine.

16           THE COURT:  -- same experience myself.  Try to

17   make your sentences simple.

18           MS. GREENBERG:  I will certainly do that.

19           THE COURT:  Without two or three subjects and four

20   verbs.  Make them very simple.  I think it will be less of a

21   problem.  If you're going to -- if you want to get into

22   convoluted sentences that have legal terms in them, have

23   them translated.

24           MS. GREENBERG:  Thank you, Your Honor.

25           MR. McKNETT:  I've been listening on this device

1    at the table.  I'm picking up conversations from the jury

2    box.

3               THE COURT:  You are?

4               MR. McKNETT:  Yes.

5               MS. GREENBERG:  That's not good.

6               THE COURT:  Call Bea up here.

7               MR. McKNETT:  She says it's supposed to be doing

8    that, but I was concerned that if I'm hearing this, then

9    perhaps other people are hearing it.

10              THE COURT:  That's a revelation to me because I

11   did not know we could hear them.  You have no secrets.

12   That's all.

13              MR. McKNETT:  Thank you, Your Honor.

14              THE COURT:  Thank you.

15              (Counsel returned to the trial tables and the

16   following ensued:)

17   BY MS. GREENBERG:

18   Q.   Mr. Echarte, we may be repeating ourselves, but let me

19   ask you again.  Who would deliver the cocaine that you

20   observed at Paulette Martin's house?

21   A.   She pick him up, and I pick him up with her.  One time

22   we pick him up together.

23   Q.   Where.

24   A.   To -- from the trailer.

25   Q.   Where was the trailer?

1  A.   In the same position that I described before.  In the

2  Estelle house.

3  Q.   And who was at the trailer?

4  A.   Stevens.

5  Q.   And how much cocaine did you pick up?

6  A.   Approximately -- I not count exactly how many was in

7  there, but it was about 45 kilo.

8  Q.   And how many times besides that did you see large

9  quantities of cocaine at --

10  A.   Twices.

11  Q.   I'm sorry?

12  A.   Twices.

13  Q.   In addition to that?

14  A.   Approximately one more time or twices more.

15  Q.   And how did that cocaine get to Ms. Martin's house on

16  the other two occasions?

17  A.   In her car.

18  Q.   From who?

19  A.   I not see when he give it to her, but I see the time

20  that we deliver the money and one time that we pick it up

21  from there.  So I assume --

22          MR. MONTEMARANO:  Objection.

23  Q.   Okay.  Don't assume.  Don't assume --

24          THE COURT:  Don't assume.

25  Q.   -- Mr. Echarte.

1              Did you have any conversations with Ms. Martin

2   about the drugs, the large quantities of drugs?

3   A.   Conversation that she not sell small amount from there

4   and large amount from there.

5   Q.   Were all of the drugs at her house, the 30, 40, 50

6   kilograms, for her?

7              MR. MONTEMARANO:  Objection.  Leading.

8              THE COURT:  Don't ask it in a leading way.

9   Sustained.

10             MS. GREENBERG:  Your Honor --

11  Q.   You just testified about large quantities of drugs at

12  Ms. Martin's house.

13  A.   Yes, ma'am.

14  Q.   Who were the drugs for?

15  A.   For her and for Mr. Goodie.

16  Q.   How do you know that?

17  A.   Because she said so.

18  Q.   What did she tell you?

19  A.   She said half of these are for Mr. Goodie.

20  Q.   And what did she call Mr. Goodie?

21  A.   His brother.

22  Q.   And did you ever see Mr. Goodie at the house?

23  A.   Yes, ma'am.

24  Q.   Did you ever see him at the house when the cocaine was

25  there?

1    A.    Yes, ma'am.

2    Q.    Did you ever see him with the cocaine?

3    A.    He look at it, and he got people that doing the moving

4    for him.

5    Q.    And how do you know that?

6    A.    Because they was there.

7    Q.    Who was there?

8    A.    The people that come in with him.

9    Q.    And what was done, if anything, with the cocaine at

10   that time?

11   A.    Cook some.

12   Q.    Do you see Mr. Goodie in the room?

13   A.    Yes.

14   Q.    Could you identify him?

15   A.    The man right there in the middle with the glasses

16   looking at me.

17   Q.    How many people over from me?

18   A.    How many people?

19   Q.    Yes.  How many people over from me?

20   A.    Three this side and about six this side.  Exactly six

21   this side.

22         MR. MARTIN:  We'll stipulate that he's identified

23   Mr. Goodwin.

24         THE COURT:  All right.  The record will so

25   indicate.

1    MS. GREENBERG:  Thank you, Your Honor.

2    Q.   You said cooking.  Could you explain to the jury what

3    you mean by cooking.

4    A.   Cooking, convert cocaine into rock.

5    Q.   And did you observe that?

6    A.   Yes, ma'am.

7    Q.   Where?

8    A.   In the house.

9    Q.   Which house?

10   A.   The Paulette Martin house.

11   Q.   And how is the cocaine converted into crack cocaine?

12   A.   By putting baking soda in the cocaine.

13   Q.   And who did that?

14   A.   Mrs. Paulette Martin.

15   Q.   And was anything else besides baking soda put with

16   the --

17   A.   Well, when the coke was for Mr. Goodie, they put liquor

18   in the coke.

19   Q.   Did you see what kind of liquor?

20   A.   Liquor.  Drinking liquor.  Crystal drinking liquor.

21   Q.   Could you repeat that?  I'm sorry.

22   A.   Crystal drink liquor, drinking liquor.

23   Q.   Drinking liquor?

24   A.   Like rum, white rum.

25   Q.   And whose cocaine was that for?

1    A.    For Mr. Goodie.

2    Q.    And who did you see cooking the cocaine?

3    A.    Mrs. Paulette Martin.  I help her to do that.

4    Q.    And who put the one with the liquor in it?

5    A.    That was for Mr. Goodie.

6    Q.    And how do you know that?

7    A.    Because she said so.

8    Q.    Who said so?

9    A.    Mrs. Paula Martin.

10   Q.    And with these large quantities of cocaine, where

11   did -- where were they kept?  The 30, 40, 50 kilograms --

12   A.    Right there in the kitchen or upstair in her room.

13   Q.    And in connection with the time that you took $450,000

14   to Steve, was that before or after a shipment of drugs?

15   A.    The drug wasn't there when I arrived to her house,

16   little bit of drugs.  Come in there among the drugs, and

17   after that she had surgery, and that's when we delivered the

18   money.  She cannot drive.

19         And the next time we both went to pick them up,

20   the drugs.  It was an amount about 45 or -- I never count

21   them.  I cannot question nobody.

22   Q.    I'm sorry?

23   A.    I'm not questioning how many was there or how many not.

24   But she, and I said approximately, and she said about 40,

25   45, but the rest was for him.

1    Q.    But the rest was for him.

2    A.    For Mr. Goodie.

3    Q.    Was there any other business going on from the house?

4    A.    Clothes, shoes, dresses.

5    Q.    Could you tell the jury what type of customers came for

6    the shoes and dresses versus the drugs.

7    A.    Ninety-eight percent would be using drugs, for drug

8    business.

9    Q.    Did any of the drug customers buy clothes and shoes?

10   A.    Yes.  Possibility.

11   Q.    Do you know that?

12   A.    Yes, I know.

13   Q.    What about the paraphernalia, the bags and things used

14   to convert the cocaine into crack cocaine?  What did

15   Paulette Martin do with those?

16   A.    We throw it away in the garbage.

17   Q.    What garbage?

18   A.    In the 7-Eleven or supermarket garbage.

19   Q.    Why?

20   A.    Because not supposed to put it in the back of your

21   house.  I wouldn't do it in mine.

22   Q.    Why not?

23   A.    Because the garbage people can look and make assumption

24   that this coming from drugs.

25   Q.    And how did you know to take the garbage to the

1    7-Eleven?

2    A.   Because I was there.

3    Q.   You were there?

4    A.   I was driving to those place.

5    Q.   And why were you driving to those places?

6    A.   To throw away the garbage.

7    Q.   And did anybody -- did you receive any instructions to

8    do that?  Or did you do it on your own?

9    A.   No.  We do it together.  That's the proper way to do

10   it.  Do not dispose of that in your house.

11   Q.   And whose garbage were you throwing away at the

12   7-Eleven?

13   A.   Mrs. Martin garbage.

14   Q.   Did you ever hear that anybody got caught with the

15   garbage?

16             MR. MONTEMARANO:  Objection.  Leading.

17             THE COURT:  Sustained.

18   Q.   Did you have a conversation with Ms. Martin after you

19   left her house?

20   A.   I was in Florida and I call, or she called me, either

21   way, but I call her most of the time.  And she said that

22   John had been caught with 10 or 15 bags, empty bags of coke.

23   Q.   Who is John?

24   A.   I think it was her last boyfriend or --

25             MR. MONTEMARANO:  Objection.

1    Q.   Okay.  Please don't think or guess or assume.

2            Had you met John?

3    A.   Yes.

4    Q.   Do you know who she meant when she said John?

5    A.   Yeah.  Her last boyfriend.

6    Q.   And what happened to John according to what Ms. Martin

7    told you?

8    A.   He insisted taking a package around the house when

9    he --

10   Q.   What package?

11   A.   The package from the cocaine rock.  And she said no,

12   and he insisted yes, and he took, and he got arrested with

13   the package.  I tell her that going to be a problem.

14   Q.   What packages?

15   A.   The rock and the cocaine.

16   Q.   And who told you about this?

17   A.   Mrs. Paula Martin.

18   Q.   What, if anything, did John Martin -- strike that.

19           Who was in charge of the business, as far as you

20   know, the drug business that you observed at Ms. Martin's

21   house?

22   A.   She's in charge of this.

23   Q.   Were Paulette Martin and John Martin married?

24   A.   They both.

25   Q.   Now, when did you leave -- approximately when did you

1    leave Paulette Martin's house here in Maryland?

2    A.    Part of 2002, I want to Miami for the pace making.

3    Q.    Did you continue to talk to Ms. Martin on the phone?

4    A.    Yes, occasionally, and occasionally I travel, myself

5    with the drug, my drug.

6    Q.    Did you hear her talk to others on the phone while you

7    were at the house?

8    A.    Say that again?

9    Q.    Did you hear her talk to other people on the telephone?

10   A.    When I was in the house?

11   Q.    Yes.

12   A.    Many people.

13   Q.    Did you ever talk to her and use the word cocaine on

14   the phone?

15   A.    No.

16   Q.    Did you ever talk to her and say the word heroin on the

17   phone?

18   A.    No.

19   Q.    Did you ever hear her use these words on the phone to

20   anyone else?

21   A.    No.

22   Q.    Why not?

23   A.    Because it's --

24             THE COURT:  Wait -- hold -- come to the bench.

25             (Counsel returned to the trial tables and the

1   following ensued:)

2           MR. MONTEMARANO:  The question posed by

3   Ms. Greenberg was did you hear Ms. Martin use certain words

4   over the telephone.  He said no.  Her question then was why

5   not.

6           The Government is not seriously going to suggest

7   on the record that that's an appropriate question, why my

8   client did something, that this man could read her mind.

9           THE COURT:  I think you can phrase the question

10  better.  I think you can rephrase the question and get the

11  question without having to lead.

12          MS. GREENBERG:  Okay.

13          THE COURT:  So I'll sustain the objection.

14          MR. MONTEMARANO:  Thank you, Your Honor.

15          (Counsel returned to the trial tables and the

16  following ensued:)

17  BY MS. GREENBERG:

18  Q.  Were you involved with Ms. Martin in the drug business?

19  A.  Yes.

20  Q.  Did you ever directly discuss the drug business on the

21  phone?

22  A.  I talk two different way.  I have something.  I might

23  be there.  That's all.

24  Q.  Could you explain to the jury the different ways that

25  you talked on the phone.

1    A.    I might be there next week.  I have something.  I'm

2    passing by.  That's all.

3    Q.    Were those in the conversations with Ms. Martin that

4    you used those different ways of speaking?

5    A.    No.

6    Q.    How did you speak with Ms. Martin on the phone when you

7    were talking about drug business?

8    A.    I'll be there.  I have something.  I'm passing by.  I

9    will see you.

10   Q.    Did you ever use code words?

11   A.    Cocaine word?

12   Q.    Code words.

13   A.    Not necessarily.

14   Q.    Did you ever hear her use code words?

15              MR. MONTEMARANO:  Objection.

16              THE COURT:  Overruled.

17              MR. MONTEMARANO:  May we approach, Your Honor?

18              THE COURT:  Come on up.

19              (Counsel approached the bench and the following

20   ensued:)

21              MR. MONTEMARANO:  The last defense objection,

22   simply put, he said he didn't use code words.  How could he

23   possibly know when she's speaking using code words to

24   someone else on the telephone, she doesn't know who that --

25   he doesn't know who the person is.

1          THE COURT:  The question is what Ms. Martin using

2    code words.

3          MR. MONTEMARANO:  How can he possibly know if

4    there's a coded conversation going on if he's hearing only

5    one side --

6          MS. GREENBERG:  I can make it easier.  I can say

7    "Do you know what code words are?"

8          THE COURT:  Well, Ms. Greenberg, I think you need

9    to understand, even though he's been here for a long time

10   and he knows how to speak English, I think you need to do

11   more basic questions that are not leading that will also be

12   more understandable.  Okay?

13         MR. MONTEMARANO:  Your Honor, if we could, I'd

14   like it to be clear the defense's point of view is that this

15   witness cannot possibly know when Ms. Martin is using code

16   words with another person unless she told him I said tickets

17   but I meant drugs.  Because the Government has agreed

18   through its own witnesses that these code words often are

19   being used for other purpose, i.e., non-code words, to mean

20   that which they are.

21         THE COURT:  She can ask him whether she ever used

22   words during conversations that were not appropriate to the

23   conversation and what those words were.

24         MR. MONTEMARANO:  But if he's not participatory in

25   the conversation -- he's already denied the use with her.

1    THE COURT:  Right.

2    MR. MONTEMARANO:  And if he doesn't know who's on

3 the other end of the phone -- you don't know if he's talking

4 to a dead receiver, Judge.  That's my problem.

5    THE COURT:  Well, I don't know how much you're

6 going to be able to get out of him on this.

7    MS. GREENBERG:  I'll just do a couple questions,

8 Your Honor.

9    THE COURT:  Okay.  Thank you.

10    (Counsel returned to the trial tables and the

11 following ensued:)

12 BY MS. GREENBERG:

13 Q.  Mr. Echarte, let me see if I can simplify this.

14    When you were part of this drug business, if you

15 were talking on the phone to Ms. Martin, how would you

16 describe the difference between crack cocaine and cocaine?

17 A.  I don't use those word.  I hid it if people refer to

18 that, her or any of the other people in the house, soft and

19 hard.

20 Q.  And did you understand that to be code words?

21 A.  Yes.  I understand soft and hard.

22 Q.  And what does soft mean and what does hard mean?

23 A.  Soft mean cocaine regular in the package.  Hard be the

24 rock cocaine.

25 Q.  Do you remember any of the code words that you used

1   from being a part of this conspiracy back when you were

2   living with Paulette Martin or when you talked to her from

3   Florida?

4           MR. MONTEMARANO:  Objection, Your Honor.  He said

5   he had no -- he did not use code words with Ms. Martin.

6           THE COURT:  All right.  Sustained.

7           MS. GREENBERG:  Your Honor, he just said hard

8   versus soft is coke.

9   Q.   How did you understand hard versus soft?

10          MR. MARTIN:  Asked and answered.  Objection.

11          THE COURT:  Sustained.  Sustained.

12  Q.   What other -- did you use other code words with

13  Ms. Martin?

14          MR. MONTEMARANO:  Objection.  Asked and answered.

15          THE COURT:  Sustained.

16  Q.   Any other words -- did you hear any other words being

17  used to describe drugs while you were living with

18  Ms. Martin?

19          MR. MONTEMARANO:  Objection.  Asked and answered.

20          THE COURT:  Overruled.

21  A.   Soft and hard.

22  Q.   Any other words?

23          MR. MONTEMARANO:  Objection.

24          MR. MARTIN:  Objection.  Asked and answered.

25          THE COURT:  Overruled.

1   A.   They referred to the word crack cocaine, hard.

2   Q.   Okay.  We're off crack cocaine and cocaine.  Any other

3   words used to describe drugs in general while you lived with

4   Ms. Martin?

5   A.   Okay.  You can say I have three pair of shoes --

6             MR. MONTEMARANO:  Objection, Your Honor.

7   A.   -- or I want four dresses.

8             THE COURT:  Overruled.

9   Q.   Okay.  I didn't hear you since I overheard the

10  objection.  Could you repeat your answer?

11  A.   I needed three pair of shoes or I needed four dresses,

12  could be exactly those word.

13            MR. MONTEMARANO:  Objection, Your Honor.  Move to

14  strike.

15  Q.   What could be exactly those words?

16  A.   Three dresses.  Give me four pair of shoes is -- is you

17  needed four kilo or you needed four ounce or you needed four

18  whatever.

19  Q.   Now, directing your attention to Paula's School of

20  Performing Arts, are you familiar with that business?

21  A.   I been there a few times.

22  Q.   Did you ever see students there?

23  A.   No.

24  Q.   When you lived with Ms. Martin, did you ever see her

25  work there?

1    A.    I see her in there.  I don't know what she do in there.

2    But I never seen no children there when I was there.

3    Q.    Did you meet an individual named Reese Whiting?

4    A.    Yes, I did.

5    Q.    And how did you meet him?

6    A.    Through Paulette Martin.

7    Q.    Do you see him here in the courtroom?

8    A.    Yes, it is.  Right here.

9    Q.    Could you identify him?

10   A.    Yes.  The man right next to me.

11             MS. GREENBERG:  Your Honor, may the record reflect

12   that the witness identified Reese Whiting?

13             THE COURT:  The record will so indicate.

14   Q.    How did you come to meet him?

15   A.    Through Paula Martin.

16   Q.    What, if anything, did he have to do with drugs?

17   A.    He was, he get a little bit of coke from Paula Martin.

18   Q.    And do you know what, if anything, he did with them,

19   with the drugs?

20             MR. HALL:  Objection.  He wasn't there.  He can't

21   say what he did --

22             THE COURT:  If he knows of his own personal

23   knowledge.

24             You may answer.

25   Q.    Do you know what he did with the drugs that he bought?

1    A.    Smoke it.

2    Q.    And what do you call little?

3    A.    Half a gram.

4    Q.    What would he do with the drugs after he smoked it?

5    A.    If he have a little bit, he might go and bring the

6    little money.

7    Q.    And how did he get -- how did you understand that he

8    got the little money?

9    A.    By selling it to somebody.

10            MR. HALL:  Your Honor, objection.  He isn't saying

11   that he was present when this occurred.  Speculation.

12            THE COURT:  Unless he knows from his own personal

13   knowledge, it's sustained.  If he can answer of his own

14   personal knowledge, he may answer it.

15   Q.    Explain to the jury, Mr. Echarte, what you observed

16   Mr. Whiting do on the occasions when you lived at Paulette

17   Martin's house.  What you saw, what you observed him do.

18   A.    He buy little amounts of the drugs.  Little bit, he go

19   into the bathroom and smoking.  And a little more, he going

20   out with the drugs, and he return the money the next day

21   with a little piece of money and buy some more.

22   Q.    And what kind of quantities were you dealing in at that

23   time?

24   A.    Me?

25   Q.    Yes.

1    A.    I sell heroin.

2    Q.    Did you sell heroin when you lived at Paulette Martin's

3    house --

4    A.    Yes, ma'am.

5    Q.    Who did you sell heroin to?

6    A.    I sell heroin to Luis, to a lady, to him.

7    Q.    Who do you mean by him?

8    A.    Mr. Reese.

9    Q.    How did you come to sell heroin to Mr. Reese,

10   Mr. Whiting?

11   A.    He tell me he have somebody that can move something.  I

12   never want to give nobody nothing because they -- he no have

13   cash money.  So I loan to him about 50 or hundred grams of

14   coke -- heroin.  He took and he returned it back to me later

15   on.

16   Q.    How much heroin did you give him?

17   A.    About a hundred grams, and he return them back and a

18   little money, no coke.

19   Q.    How much heroin did he return back to you?

20   A.    The amount that he don't pay was about $2300.  The

21   rest, he returned it to me, that he cannot move.

22            So actually he wanted consuming that drug.  I

23   don't -- I don't know.  But he returned it back to me.  And

24   he owed me the money that I make him driver for me to pay

25   the money.

1    Q.   Okay.  Let's just make sure we get this straight.

2              How much money did he give back to you?  How much

3    money bid did he pay you for the hundred grams of heroin?

4    A.   He supposed to give me $10,000.

5    Q.   How much?

6    A.   $10,000.  A hundred dollars a gram.

7    Q.   Okay.  So a hundred grams of heroin you sold for

8    a hundred dollars a gram.  That's $10,000?

9    A.   He not -- he not pay for that.

10   Q.   How much did he pay you?

11   A.   Only $2300, something like that.

12   Q.   He paid you $2300?

13   A.   That's all.

14   Q.   And did he return any of the heroin to you?

15   A.   Yes, the rest of the heroin.

16   Q.   How much heroin did he return to you?

17   A.   It could be around 75 gram, something like that, and

18   the rest was going.

19   Q.   Did he pay you any money up front, or did you front him

20   all the drugs?

21   A.   I front all of the drugs.

22              (Objection by counsel.)

23              THE COURT:  Overruled.

24   Q.   And how long did it take him from when you gave him the

25   heroin until he returned the money and the rest of the

1   heroin to you?

2   A.   About 15 day or something like that.  There was a lot

3   of argument about that.

4   Q.   So what did you do about the money that was owed to

5   you?

6   A.   He started driving for me in order to deduct the money

7   that he owe me.

8   Q.   Where did Mr. Whiting drive you to.

9   A.   He drive me to Virginia.

10  Q.   What was in Virginia?

11  A.   A restaurant in Virginia, Cecilia.

12  Q.   I'm sorry?

13  A.   A restaurant in Virginia, Cecilia.

14  Q.   And what did you do with Mr. Whiting in Virginia?

15  A.   Pick out the drug that delivered to me.

16  Q.   And how were the drugs delivered to you?

17  A.   To the bus, drive back.

18  Q.   What bus?

19  A.   It's a bus company, the Lackawanna.  They chauffeur

20  from there, deliver the drug to me.

21  Q.   And how did the drugs get on the bus?

22  A.   Somebody put it in Miami or I put it in Miami.

23  Q.   And what kind of drugs were you getting delivered to

24  you?

25  A.   Cocaine and heroin.

1    Q.   Did you discuss the purpose of you driving to Virginia

2    with Mr. Whiting?

3    A.   Yeah.  He know he coming to drive me to pick up some

4    drugs.

5    Q.   What were your discussions with him?

6    A.   To drive carefully.  The drug going to come in -- we

7    going to pick it up at 6:00 in the morning.

8    Q.   We're going to pick what up?

9    A.   The drugs.

10   Q.   Did you pay him for the trips?

11   A.   Most of the occasion I pay even though he owe me the

12   money.

13   Q.   And how did you pay him?

14   A.   By giving couple hundred dollar plus a gram free, or 2,

15   $300 with a gram free.

16   Q.   A gram or -- gram or two of what?

17   A.   Gram, the heroin.

18   Q.   And where would you get the gram or two of heroin to

19   give to Mr. Whiting after these trips?

20   A.   From the package that coming from Miami in the bus.

21   Q.   And how would you get it from the packet?

22   A.   I'd open the package in the Paula house, and he take me

23   to there.

24   Q.   Where was Mr. Whiting when you opened the packet?

25   A.   Right there with me.

1    Q.    And how many times did Mr. Whiting drive you to

2    Virginia?

3    A.    About three times.

4    Q.    And did he have another job, as far as you know?

5    A.    Yes.  He was a janitor from a large building or a

6    corporation to real estate.  He work in there.

7    Q.    Did you understand that he had a former job, what his

8    former employment was?

9    A.    What?

10   Q.    What his job was before a janitor?

11   A.    A lawyer.

12   Q.    And how do you know that?

13   A.    Because he explained to me that he was a lawyer, and

14   Mrs. Martin told me he was a lawyer.

15   Q.    Why did he stop driving for you?

16   A.    Well, his condition wasn't good for me, the way he

17   drive.

18   Q.    What do you mean?

19   A.    Because he was a little high.

20   Q.    And why is that a problem?

21   A.    Because we can create accident and I could be locked

22   up.  So I stopped him to drive for me.

23   Q.    Could you repeat that?

24          MS. GREENBERG:  Your Honor, just

25   understandability.

Case 8:04-cr-00235-DKC  Document 1242  Filed 09/26/08  Page 142 of 223

1          THE COURT:  I couldn't understand either, so

2    repeat that.

3    Q.   Why didn't he continue -- why was that a problem if he

4    was using drugs while he was driving?

5          It's just we didn't under -- it's not -- we just

6    didn't understand what you said.  If you could repeat it.

7    A.   It's not sound security for me that he be high and

8    driving for me, so I change it to somebody else.

9    Q.   Who did you change it to?

10   A.   Philpot.

11   Q.   And how did you meet Philpot?

12   A.   Through Paula Martin.

13   Q.   Now, did you know Ms. Martin's daughter, Kimberly Rice?

14   A.   Yes, ma'am.

15   Q.   How did you know Ms. Martin's daughter, Kimberly Rice?

16   A.   Her daughter be at the house.

17   Q.   Did you have any drug dealings with Kimberly Rice?

18   A.   Yes, I did.

19   Q.   Did I ask you about that when we first met?

20   A.   Yes, you did.

21          MR. MONTEMARANO:  Objection, Your Honor.

22          THE COURT:  Sustained.

23          MS. GREENBERG:  Your Honor, impeachment.  I'm

24   entitled to lead.

25          THE COURT:  You're -- come to the bench.

1     (Counsel approached the bench and the following

2     ensued:)

3          THE COURT:  You're telling me that the witness is

4     going to say something different?

5          MS. GREENBERG:  He lied in the Grand Jury, Your

6     Honor.  I'm going to bring that out, that he said he didn't

7     have any drug dealings with Kimberly Rice but then he ended

8     up stating --

9          THE COURT:  What?

10         MS. GREENBERG:  Your Honor, my proffer is that the

11    witness, when he met with me, said -- and when he met with

12    the Grand Jury -- said that he didn't have any drug dealings

13    with Kimberly Rice.  On a later date, he admitted that he

14    did have drug dealings with Kimberly Rice, and I'm

15    impeaching my own witness as to an inconsistent plea --

16    prior inconsistent statement.

17         MR. MONTEMARANO:  Your Honor, she hasn't put in

18    that he said X, which she then wants to impeach with a

19    subsequent statement of Y.  She went right to Y because that

20    benefits her case.

21         THE COURT:  Why don't you ask him whether he said

22    something different in the Grand Jury.

23         MS. GREENBERG:  Okay.

24         THE COURT:  All right?

25         MR. SUSSMAN:  I'm just a little puzzled on

1   foundation.  I don't remember him saying that Kimberly Rice

2   had denied this or that -- it's the inconsistent statement.

3   This is not a foundation for an inconsistent statement.  I

4   think that was Mr. Montemarano's objection.

5           MS. GREENBERG:  Your Honor, the --

6           THE COURT:  The objection is that he did tell

7   Kimberly Rice.

8           MS. GREENBERG:  Right.

9           THE COURT:  And you're telling me that he said the

10  opposite to the Grand Jury.

11          MS. GREENBERG:  Yes.

12          THE COURT:  Okay.

13          (Counsel returned to the trial tables and the

14  following ensued:)

15  BY MS. GREENBERG:

16  Q.   Sir, had I asked you about your dealings with Ms. Rice

17  on an earlier occasion?

18  A.   Yes, you did.

19  Q.   And did you talk to the Grand Jury about your dealings

20  with Ms. Rice while you're under oath?

21  A.   Yes, I did.

22  Q.   Did you lie to me and did you lie to the Grand Jury?

23  A.   Yes, I did.

24  Q.   What is the -- what is the truth about your drug

25  dealings with Kimberly Rice?

1    A.   I did it with her, but at that time, I would feel sorry

2    for the kids, and that's why I said no.

3    Q.   What drug dealings did you have with her?

4    A.   Heroin and cocaine.

5    Q.   And you lied under oath in the Grand Jury about that?

6    A.   Yes, I did.

7    Q.   And why did you lie under oath?

8    A.   I lied because I don't want the kids being raised by no

9    mother, that was moving me and torture me and I said no --

10   Q.   I'm sorry.

11            THE COURT:  I couldn't understand his answer.

12            MS. GREENBERG:  I couldn't either.

13            THE COURT:  Could you speak a little more slowly,

14   sir.

15   Q.   Perhaps you could tell the interpreter, sir, why did

16   you lie under oath?

17   A.   I lied to the Grand Jury --

18            THE INTERPRETER:  I lied to the Grand Jury because

19   I didn't want her daughter to wind up without her mother.

20   Q.   Whose daughter?

21            THE INTERPRETER:  Her daughter.  Kim.

22   Q.   Whose daughter is Kim?

23   A.   Kim had a daughter.  Her name is Aday.

24            THE INTERPRETER:  Aday is her -- Kim has a

25   daughter.  Her name is Aday.

1   A.   And I lie because I don't want it -- the daughter

2   raised without her mother.

3            MS. GREENBERG:  Okay.  If you could just repeat

4   that.  I know it's --

5            THE INTERPRETER:  And I lied because I didn't want

6   her daughter to be raised without her mother.

7   Q.   And who is Kimberly Rice?

8   A.   Daughter from Mrs. Martin.

9   Q.   Did you end up admitting that you lied?

10  A.   Yes, I did.

11  Q.   And how did that come about?

12  A.   Advice through my lawyer.  My lawyer said that he no

13  would represent me anymore if --

14           MR. MITCHELL:  Objection.  Objection.

15           THE COURT:  Approach the bench.

16           (Counsel approached the bench and the following

17  ensued:)

18           MR. MITCHELL:  Do we have any other communication

19  from this lawyer?

20           MS. GREENBERG:  Your Honor, I can shortcut and say

21  your lawyer advised you?  Yes.  And we can just be done with

22  it.  We don't really need to go any further.

23           MR. MITCHELL:  How about confidential

24  communication between the lawyer?  Open up whatever else the

25  lawyer told him.

1           MS. GREENBERG:  I don't think he does, Your Honor.

2    I think I can shortcut that, and we can leave the bench and

3    finish up with this witness.

4           THE COURT:  Well, just say you did it as a result

5    of advice you got from your lawyer.

6           (Counsel returned to the trial tables and the

7    following ensued:)

8    BY MS. GREENBERG:

9    Q.  Sir, without getting into confidential communications

10   between yourself and your lawyer, you told us about your

11   drug dealings with Kim Rice based on your lawyer's advice,

12   is that correct?

13   A.   Absolutely.

14          MS. GREENBERG:  Now -- I'd like to approach the

15   witness if that's okay, Your Honor?

16          THE COURT:  You may.

17   Q.  Showing you what's been previously marked as CH1.  Is

18   this a chart that you have previously seen in preparation

19   for your testimony?

20   A.   Yes.

21   Q.  Can you identify, starting with the upper right-hand

22   corner and going across the top and then to the next line,

23   can you tell us who you recognize and who that person is?

24   A.   Levi.

25   Q.   Okay.  I'm going to --

1   A.   Gwen Levi.

2   Q.   L-E-V-I?

3   A.   Yes.

4   Q.   And I'm going to put the date on here, and if you could

5   initial that.

6        And please tell the jury how you know Gwen Levi.

7   A.   A long time ago in the nightclub through Gene Byrd.

8   Q.   Through Gene Byrd?

9   A.   Through Gene Byrd.

10  Q.   Did you have any dealings with her when you lived with

11  Ms. Martin?

12  A.   Yes, I did.

13  Q.   Could you tell the jury about that.

14  A.   I sell her some heroin.

15  Q.   Did you observe her at Ms. Martin's house?

16  A.   Yes.

17  Q.   How often?

18  A.   One time.

19  Q.   Continuing across the top line, do you recognize

20  anybody else?

21  A.   Steven, Philpot.

22  Q.   This is Steven?

23  A.   No, this is Steven.

24  Q.   This is Steven, and this is Philpot.

25       If you can initial both of those, please.

1        You already talked about Steven and a little bit

2   about Mr. Philpot.  Besides Mr. Philpot driving you, could

3   you tell the jury how you came to know him and what your

4   relationship was with Mr. Philpot?

5   A.   My relation with Philpot was that I sold to him heroin

6   on different occasion, two, three occasion, and he decided

7   not to get it anymore because he going to get a better

8   price.  And he get a better price, and he driving for me.

9   Q.   To where?

10  A.   To Cecilia Restaurant to pick up the coke.

11  Q.   Is that in Virginia?

12  A.   In Virginia.

13  Q.   Sir, if you can continue along this top line, do you

14  know anyone else along the top line?

15  A.   Luis.

16  Q.   If you can initial that, please.

17       Please tell the jury how you know Luis.

18  A.   I know Luis through Ms. Martin, Paula Martin.

19  Q.   And how do you know him through Ms. Martin, in what

20  context?

21  A.   That they are very good friends, and he just coming

22  from jail.

23  Q.   And what, if any, drug dealings did you have with Luis?

24  A.   Heroin.

25  Q.   How much heroin?

1   A.   Hundred grams.

2   Q.   And how long had he been out of jail when you saw him?

3   A.   I don't know.  Could be approximately a month or two

4   months.

5   Q.   And Mr. Byrd, was he recently released from jail when

6   you saw him at Ms. Martin's?

7   A.   Yeah, recently released from jail.

8   Q.   And how long had Mr. Byrd been out of jail when you

9   were living with Ms. Martin?

10  A.   Could be about a month or something.  Month or two

11  months.

12  Q.   Anything else about Luis that you remember from your

13  time living with Ms. Martin?

14  A.   Yeah, sold him the heroin.

15  Q.   How many times?

16  A.   Was one time.

17  Q.   How much?

18  A.   Hundred grams of heroin.

19  Q.   Did he pay you for it or did you front it to him?

20  A.   No.  Mrs. -- Paula told me that she back the money.

21  Q.   What -- she said she backed the money?  What did you

22  understand that to mean?

23  A.   Yeah, she -- that she would pay if he not pay.

24  Q.   Did you get paid for that heroin?

25  A.   Yes, I did.

1    Q.    Now, continuing along this top line, if you can get

2    back to the chart, do you know any of these other people?

3          How about these people in the box marked couriers?

4    The answer is no?

5    A.    No.

6    Q.    How about the box marked couriers here?

7    A.    No.

8    Q.    How about these two people here where it says partners?

9    A.    Yeah.  This is Goodie.

10   Q.    And did you know Goode's full name?

11   A.    No.

12   Q.    If you can initial both those, please.

13         And getting down to the box --

14         MS. GREENBERG:  Judge, I'm sorry.  That's the best

15   place to start.

16   Q.    Getting to the top row under distributors plus/minus

17   facilitators, starting with the left, do you recognize this

18   person?

19   A.    Yes.

20   Q.    And who is that?

21   A.    Lanora.

22   Q.    Could you tell the jury how you knew Lanora?

23   A.    The best -- her best friend.

24   Q.    Whose best friend?

25   A.    Mrs. Martin best friend.

1    Q.   And did you see her when you lived at the house with

2    Ms. Martin?

3    A.   Yes.  Many times.

4    Q.   And in connection with the drug business, to your

5    knowledge?

6    A.   No.

7    Q.   If you can initial that, please.

8             And the next person over?  The next person over?

9    A.   The father from the daughter, from Kimmy.

10   Q.   Kimberly Rice's --

11   A.   Husband.

12   Q.   -- her child's father?

13   A.   Yes.

14   Q.   And do you know his name?

15   A.   No.  Only Polo.  Polo.  Bolo.  I remembered it was

16   Tolo.  Polo.  Bolo.

17   Q.   Polo or Bolo?

18   A.   Tolo, Bolo, Polo, something like that.

19   Q.   And did you observe him buying or selling any drugs?

20   A.   Absolutely not.

21   Q.   Did you sell him any drugs?

22   A.   No.

23   Q.   So the answer to both those questions is no?

24   A.   No.

25   Q.   I'm writing Bolo, dating it July 11th, and if you can

1    initial that.

2              The next gentleman?

3    A.   Gene Byrd.

4              MR. WARD:  I'm sorry.  Who was that?

5              THE WITNESS:  Gene Byrd.

6    Q.   And if you could initial that.

7              The next person over?

8    A.   Looks like Levi, looks like her, but I don't know.

9    Q.   Looks to you like Ms. Levi, but it's not?

10             The next person over?

11             MR. WARD:  I didn't hear his answer.

12   Q.   Could you say what your answer was?

13   A.   Looking like her, but I don't know if it is or not.

14   This is a picture.  The development and condition that you

15   got to be -- to me, her, but I don't know.

16   Q.   And the next person over?

17   A.   I don't know.

18   Q.   This person?

19   A.   I don't know.  I don't know.  I don't know.  I don't

20   know.  I don't know.  Reese.

21             MR. SUSSMAN:  Could we get the names of the

22   non-ID, for the record.

23             MS. GREENBERG:  When I finish with this, we can

24   discuss it up at the bench.

25             MR. SUSSMAN:  You want to do it now?

1        THE COURT:  I can't hear you.

2        MS. GREENBERG:  Your Honor, if we could approach

3   at this time?

4        THE COURT:  All right.

5        (Counsel approached the bench and the following

6   ensued:)

7        MS. GREENBERG:  Your Honor, the chart's in

8   evidence.  The taped-over other witnesses that I have

9   identified these people, and their names are underneath the

10  tape, but I don't think it's appropriate to announce each

11  and every person with the witness in the room.  The chart is

12  the evidence, and each person's name is on there.

13       THE COURT:  Well --

14       MR. SUSSMAN:  Well, there's two things.  First,

15  the chart may not eventually be in evidence if the chart --

16       MS. GREENBERG:  It is.

17       MR. SUSSMAN:  It could be stricken.  If the

18  evidence doesn't accurately reflect what the chart shows,

19  the chart loses its evidentiary value.  But the big thing is

20  the record doesn't reflect who he's not identifying, and I

21  think it -- if he's making it --

22       THE COURT:  How do we get the record to indicate

23  who he hasn't identified?

24       MS. GREENBERG:  Your Honor, we'd have to remove

25  the tape from each person who hasn't been identified.  I

1    mean, there's no way I can testify who --

2                THE COURT:  Well, my problem is --

3                MS. GREENBERG:  He initialed next to each person

4    who he could identify, and his initials aren't next to the

5    persons that he couldn't identify.

6                MR. SUSSMAN:  We'll get a stipulation on the

7    non-IDs later.

8                THE COURT:  Well, why don't you just do a

9    stipulation on it --

10               MS. GREENBERG:  Yeah.  That's fine.  That's fine.

11   If you want to write it up, we'll sign it.

12               MR. SUSSMAN:  Well, I want to do it --

13               MR. WARD:  Why can't it be done now while his

14   testimony is fresh in their minds?

15               MR. SUSSMAN:  It should be done now with the

16   witness on the stand.

17               THE COURT:  What?

18               MR. SUSSMAN:  We could just write down the names

19   --

20               MS. GREENBERG:  He has not identified your client.

21   He has not identified Ms. Dobie.  He has not identified --

22               MR. WARD:  But that's the point.

23               MR. SUSSMAN:  We'll get the names --

24               THE COURT:  Why don't you do that so that this is

25   not so far away from the witness -- the testimony of the

1    witness before the jury forgets it.  Talk to counsel and

2    have a stipulation, and we can announce it today or tomorrow

3    morning.

4              MS. GREENBERG:  Sure.  Fine.

5              THE COURT:  This is a list of the witnesses he

6    didn't identify --

7              MS. GREENBERG:  If they want to prepare a list,

8    Your Honor.

9              MR. SUSSMAN:  I would have no problem.  She knows

10   who these people are.

11             MS. GREENBERG:  Prepare a list.  That's fine.

12             THE COURT:  Do a stipulation.  We'll announce it

13   tomorrow morning.

14             MS. GREENBERG:  That's fine.  Your Honor, just so

15   they prepare the stipulation.  I've got enough homework for

16   tonight.

17             THE COURT:  The jury has approved starting at 8:00

18   on Thursday, the 20th, so we will go from 8:00 to noon.

19             MR. MONTEMARANO:  For the record, Your Honor, I

20   have another objection.  That regards Ms. Greenberg's

21   writing the names on the board, which then Mr. Echarte is

22   agreeing with and initialing.  If he thinks somebody's name

23   is Bolo, he needs to write what he thinks Bolo is spelled

24   like.  Likewise Gene Byrd.  I think that's -- I'm sure

25   Ms. Greenberg wrote Byrd B-Y-R-D, and in the Grand Jury, he

1    --

2              THE COURT:  You can do that on cross-examination.

3    Okay?

4              (Counsel returned to the trial tables and the

5    following ensued:)

6              MS. GREENBERG:  Your Honor, I have no further

7    questions of this witness.

8              THE COURT:  All right.  Cross-examination.

9              MR. HALL:  Your Honor, I'm going to begin.

10                        CROSS-EXAMINATION

11   BY MR. HALL:

12   Q.   Good afternoon, Mr. Echarte.

13   A.   Good afternoon.

14   Q.   Let me begin by asking you, you have -- you have gone

15   by several names in the past, have you not?

16   A.   Yes, sir.

17   Q.   Your name is Emilio Echarte, correct?

18   A.   Yes, sir.

19   Q.   And you have also gone by the name of Julio Echarte?

20   A.   No.  Julio alone.

21   Q.   Julio?

22   A.   Alone.

23   Q.   Cologne?

24   A.   No, no.

25              THE COURT:  No.

1    A.    Julio by itself.

2    Q.    Okay.

3          THE COURT:  No last name.

4    Q.    I gotcha.  Okay.

5          Any other names that you've gone by?

6    A.    Luis Alberto Marero Beles.

7    Q.    Okay.

8    A.    Long time ago.

9    Q.    A long time ago.  When would that have been?

10   A.    1967.

11   Q.    1967.  Okay.

12         Any other names that you've gone by?

13   A.    Absolutely not.

14   Q.    Absolutely not?

15   A.    Not.

16   Q.    Okay.  Now, you testified that you have a conviction

17   and you're serving a sentence for manufacturing PCP, is that

18   correct?

19   A.    Yes, sir.

20   Q.    And that is in Federal Court or State Court in --

21   A.    Federal Court.

22   Q.    Federal Court in Florida.  And what year did you

23   receive that conviction?

24   A.    2003.

25   Q.    2003.  And you're serving a 14-year sentence?

Case 8:04-cr-00235-DKC   Document 1242   Filed 09/26/08   Page 159 of 223

1    A.    Fourteen-year sentence.

2    Q.    Okay.  And, sir, that's not your first conviction for a

3    drug case, is it?

4    A.    For drug case, no.  For PCP, yes.

5    Q.    Okay.  For PCP.  Okay.

6              Your first conviction was in -- what year was your

7    first conviction?

8              MS. GREENBERG:  Objection.  May we approach?

9              (Counsel approached the bench and the following

10   ensued:)

11             MS. GREENBERG:  Your Honor, he has two

12   convictions, one in 1967 and one in 1968.  We received no

13   notice that counsel was going to use these convictions.

14   They're well outside the ten-year limitation, and the

15   probative value does not exceed the prejudicial effect.

16   We're talking about 40-year-old convictions.

17             MR. MARTIN:  My recollection is that I filed a

18   motion on behalf of all defense counsel giving notice that

19   not only would we be introducing the record of, I think it

20   was Horace Smith, but any and all Government witnesses that

21   might follow.

22             MS. GREENBERG:  Your Honor, that's not specific

23   enough for notice outside the ten-year limitation.  1967 and

24   1968 convictions are ridiculously far outside the 10-year

25   limit.

1          MR. HALL:  Well, the Government informed me they

2     were going to use a 404(b) involving my client from 1968,

3     so.

4          MS. GREENBERG:  And we withdrew it.

5          MR. HALL:  Yes, and I'm sure if my client

6     testifies, we'll cross-examine him about it.

7          MR. MONTEMARANO:  In addition, Your Honor, we

8     only -- we were only made aware of the existence of such a

9     conviction a week before trial, less than a week before

10    trial, as part of the 3,000 pages of Jencks, whereas the

11    404(b) the Government knew about for quite awhile, and,

12    indeed, Mr. Hall could have learned from his client.  We had

13    no way of learning from Mr. Echarte, who we didn't know is a

14    witness until Tuesday afternoon, a week before trial.

15         MS. GREENBERG:  Your Honor, they got the Jencks

16    for well over a month.  We've been in trial for well over a

17    month.

18         MR. HALL:  Yes.  And I relied upon Mr. Martin's

19    notice.  I felt that that was specific enough.

20         MS. GREENBERG:  Your Honor, then it's excluded.

21    We're talking about a 1967 and 1968 conviction, almost 40

22    years ago.

23         THE COURT:  Let me tell you what.  Let me think

24    about this.  Go on --

25         MR. HALL:  All right.  Let me -- what I'm going to

1  do is I'm going to -- until the Court makes a ruling on

2  that, I will go to the two convictions that you brought out,

3  and then we'll come back to it whenever --

4           THE COURT:  And what we'll do is I'm going to take

5  a recess at some point.  I'll give you a ruling when we come

6  back from the recess.

7           MR. HALL:  We'll probably take a recess --

8           THE COURT:  Shortly.

9           MR. HALL:  -- within the next 10 or 15 minutes?

10          (Counsel returned to the trial tables and the

11  following ensued:)

12  BY MR. HALL:

13  Q.   Mr. Echarte, let me rephrase my question to you.  You

14  testified earlier today that you were convicted on a cocaine

15  charge in 1992, is that correct?

16  A.   Yes, sir.

17  Q.   Okay.  And was that in Federal Court or State Court?

18  A.   Federal Court.

19  Q.   Okay.  And that was a felony also, is that correct?

20  A.   I pled guilty.

21  Q.   Okay.  And what was your sentence in that case, sir?

22  A.   Seven years.

23  Q.   Seven years?  And did you have a period after your

24  seven years of incarceration of being on supervision with

25  the Court, probation?

1    A.    In those seven years?

2    Q.    After that conviction that you received the seven-year

3    sentence, did you -- when you came out, did you have a

4    probation officer?

5    A.    Yes.

6    Q.    Okay.  And at the time that you received that sentence,

7    did you tell -- did you go to court?

8    A.    I received the sentence in court.

9    Q.    Yes.  You were before a judge when you were sentenced?

10   A.    I received a sentence in court.

11   Q.    Okay.  And did you tell the judge that you were not

12   going to engage in this kind of behavior again, that you

13   were not going to sell drugs again?

14   A.    No, I pled guilty.

15   Q.    You pled guilty?

16   A.    I didn't say anything.  I pled guilty.

17   Q.    You didn't say anything.  You just pled guilty.  Is

18   that right?

19   A.    Yes, sir.

20   Q.    Okay.  And let me ask you this, sir.  You testified

21   earlier today in response to a question from --

22         MR. HALL:  Court's indulgence just a moment, Your

23   Honor.

24   Q.    You testified earlier this afternoon about another

25   conviction that you had, did you not, sir?

1              In response to a question from the Government?

2              Sir, did you tell the Government you had another

3    cocaine conviction prior to the PCP conviction?

4    A.   It was illegal use of the phone related to a cocaine

5    charge, which I pled guilty to.

6    Q.   Okay.  And, sir, that was in 1990, is that right, or

7    1994?  Which --

8    A.   Around that.  I do not remember the time, but I pled

9    guilty to that charge.

10   Q.   Okay.  And that was in Federal Court also, is that

11   right, sir?

12   A.   Yes, sir.

13   Q.   Okay.  Now, you indicated that you had met Ms. Martin

14   through an individual by the name of Gene Byrd, is that

15   right?

16   A.   Absolutely.

17   Q.   And Mr. Byrd is somebody you sold cocaine to, is that

18   correct?

19   A.   Absolutely.

20   Q.   And when would you have met Mr. Byrd?

21   A.   Thirty-five years ago.

22   Q.   Okay.  And when did you start selling him cocaine?

23   A.   Thirty-five years ago.

24   Q.   So you've been selling Mr. Byrd cocaine for the entire

25   time that you've known him, is that right?

1    A.   You don't do that every day.

2    Q.   Excuse me, sir?

3    A.   You don't do that every day.  I say look, this year,

4    next year, whatever come into my hand.

5    Q.   Okay.  All right.  So during the past 35 years up until

6    the time you were incarcerated on this case, you dealt with

7    Mr. Byrd and sold him cocaine, is that right?

8    A.   I spent 17 years of my life behind bars.

9    Q.   Except for the times when you've been incarcerated, you

10   sold drugs to Mr. Byrd, is that right?

11   A.   When I been in the street, may be to Mrs. Byrd, might

12   be to somebody else.

13   Q.   Okay.  In fact, it would be fair to say that selling

14   drugs has been -- at least since 1990 or so, has been your

15   primary occupation?

16   A.   Absolutely.  I worked as a plumber before in the

17   Washington Gas Light Company.

18   Q.   Okay.  You made more money as a drug dealer than you

19   did as a plumber, right?

20   A.   Absolutely in the drug business.

21   Q.   Okay.  All right.  Now, you indicated that the first

22   deal that you had with Ms. Martin, you sold her one or

23   two kilos, is that right?

24   A.   Yes, sir.

25   Q.   And did you testify that -- earlier today that when you

1    sold her that one or two kilos, that it was for $20,000 a

2    kilo, is that right?

3    A.    Twenty, I might have even said twenty-two.

4    Q.    Oh, you think it might be 22?

5    A.    Price is -- is there.

6    Q.    Okay.

7    A.    $20,000.

8    Q.    All right.  Now, that one or two kilograms of cocaine

9    that you sold Ms. Martin, did you -- you got that from

10   Miami, is that right?

11   A.    Absolutely from Florida.

12   Q.    Okay.  Miami, Florida?

13   A.    Miami, Florida.

14   Q.    Okay.  And you've been interviewed by the Government on

15   a number of times in relation to this case, have you not?

16   A.    Absolutely.

17   Q.    Been interviewed by some of the special agents?

18   A.    Yes, sir.

19   Q.    Okay.  Interviewed by the prosecutors?

20   A.    Yes, sir.

21   Q.    One of the Assistant U.S. Attorneys?

22   A.    Yes, sir.

23   Q.    How many times all together do you think you were

24   interviewed by either the agents or the prosecutor or some

25   combination of the two?

1    A.    About three times, something like that.

2    Q.    Okay.  And did you tell them who your source was in

3    Miami?

4    A.    Yes, sir.

5    Q.    You did?  Okay.

6          Now, you indicated that at some point in time --

7    well, let's see.  Let me ask you this.  When did you move

8    into Ms. Martin's house?

9    A.    2001.

10   Q.    When in 2001?

11   A.    Approximately the beginning of 2001.

12   Q.    The beginning of 2001, and you stayed there for

13   approximately a year, is that right?

14   A.    In and out, almost.

15   Q.    Okay.  In and out?

16   A.    Yes.  I be in Miami and coming right back.

17   Q.    Okay.  So you were there for a period of time, and then

18   you went to Miami, and then maybe you came back, and then

19   maybe you went to Miami again?

20   A.    Bring the drugs.  Going to Miami to pick up the drugs.

21   Q.    Okay.  Did you go pick up the drugs yourself?

22   A.    Yes.

23   Q.    Okay.

24   A.    And put it in the bus.

25   Q.    And you put them on the bus?

1    A.    Yes, sir.

2    Q.    Okay.  And did you have somebody going on the bus with

3    the drugs?

4    A.    No.  The driver of the bus cover for me.

5    Q.    How did you get back?

6    A.    In the buses.

7    Q.    You came back in the bus?

8    A.    Yes.

9    Q.    And how many times did you make this trip to Miami?

10   A.    Six, seven times.

11   Q.    Six?

12   A.    Seven.

13   Q.    Six, seven times.  Okay.

14          Now, you also indicated in your testimony that you

15   went with Ms. Martin one time when she was picking up some

16   drugs from a man named Steven, is that right?

17   A.    Yes, sir.

18   Q.    And Steven was the gentleman who was driving a truck,

19   is that correct?

20   A.    Yes, sir.

21   Q.    Big tractor-trailer, right?

22   A.    Yes, sir.

23   Q.    And you indicated that on one occasion that you had

24   taken $450,000 and Ms. Martin to this person named Steven,

25   is that right?

1   A.   Yes, sir.  I count the money.

2   Q.   And you counted the money yourself.  Is that right?

3   A.   Yes, sir.  Not all of it.  I would say 175 be count by

4   me.  The rest would be count by her.

5   Q.   Okay.  But the two of you together counted $450,000?

6   A.   That's what we delivered.

7   Q.   And that's what was delivered to this person named

8   Steven, is that right?

9   A.   Yes, sir.

10  Q.   Okay.  Now, do you remember that there was a time that

11  you came up here to the courthouse and you testified in

12  front of the Grand Jury?

13  A.   Yes, sir.

14  Q.   Okay.  And do you remember when that was, sir?

15  A.   Absolutely not.

16  Q.   Okay.  If I told you it was November 3rd, 2004, would

17  that sound correct?

18  A.   I would say to that if you got it in the record, sir.

19            MR. HALL:  Okay.  Counsel, I'm going to refer to

20  page -- Court's indulgence for a moment.

21            THE COURT:  Why don't I give you about 20 minutes

22  worth of indulgence.  So we'll be back at 25 minutes of 4.

23            (Recess.)

24            THE COURT:  Are we all present and accounted for

25  now?  All right.

1        Counsel, I told you I would take a look at this

2   issue that you've raised about impeachment of this witness

3   by convictions, which, if I heard correctly, these are

4   convictions from the mid '60s?

5        MS. GREENBERG:  It's 1967 and 1968 convictions,

6   Your Honor.

7        THE COURT:  Because I don't have the documents in

8   front of me.  You all are -- you all do, and I don't, so I'm

9   at somewhat of a disadvantage.

10        MR. HALL:  There's also, Your Honor, from I think

11   1969, there's what appears to be a conviction for false

12   claim of citizenship.

13        MS. GREENBERG:  That's what I had as 1968, Your

14   Honor.

15        THE COURT:  Now, as I understand it, the

16   Government has objected, complaining first that it has not

17   received the notification required by Rule 609(b) -- because

18   it's more than ten years old and because they haven't been

19   given sufficient written notice.  That's the Government's

20   position.  Am I correct?

21        MS. GREENBERG:  Yes, Your Honor, but, secondly,

22   that it -- the probative value --

23        THE COURT:  No, I understand, but I'm saying

24   you're throwing up procedurally the bar that it's not only

25   too old but, more importantly, they did not give you notice.

1    Is that --

2            MS. GREENBERG:  Yes, Your Honor.  I don't think

3    Mr. Martin's overall notice that any conviction more than

4    ten years old for any witness is sufficient notice under the

5    rule.

6            THE COURT:  Well, first of all, I believe that the

7    purpose of this rule is to avoid surprise being sprung on

8    opposing counsel who's got a witness and has this sprung on

9    them.  If I understand correctly, the source of the

10   information about these old convictions is the Government

11   itself, is that right?

12           MS. GREENBERG:  Yes, Your Honor.

13           MR. HALL:  That's correct, Your Honor.  I'm

14   relying solely on documents that were provided to me as part

15   of the Jencks material.

16           THE COURT:  Well --

17           MS. GREENBERG:  Yes.  But, Your Honor, the

18   surprise is if I had had notice, it would have been

19   something I could have addressed with the witness.  I didn't

20   think there was any possibility of a 40-year-old conviction

21   under Rule 609.

22           THE COURT:  Well, all right.  The second question

23   then is whether or not the document filed by Mr. Martin --

24   and I assume this is what you're referring to, Mr. Martin,

25   is your notice you gave with respect to any and all

1   Government witnesses, including but not limited to Horace T.

2   Smith.

3           MR. MARTIN:  Filed on June 16th.

4           THE COURT:  Is that right?  And I have it here

5   filed -- well, earlier than that.  June 14th.  Give you an

6   extra two days.

7           And the question is whether that is sufficient to

8   comply with the notice requirement.

9           MR. MARTIN:  To give the Government an opportunity

10  to contest.

11          THE COURT:  Right.  Well, under the circumstances

12  of the case where I have -- first of all, I've made it so

13  that an objection by one or a motion by one is taken as to

14  all, I would interpret this as being a document filed on

15  behalf of all counsel.  And while it's relatively broad by

16  saying all witnesses, under the circumstances in which large

17  quantities of materials are provided to you shortly before

18  trial, which included this information, I will not conclude

19  that it is inadmissible because of the failure of the --

20  alleged failure of the proponent to give sufficient advance

21  written notice of intent to use it and will deem this to be

22  sufficient.

23          The second question then is whether it meets the

24  balancing test of probative value outweighing prejudicial

25  effect, and what is the Government's position on that?

1          MS. GREENBERG:  Your Honor, this is -- these two

2     are approximately -- well, 35- and 40-year-old conviction,

3     one for heroin, one for false impersonation regarding a

4     false claim of citizenship, as Mr. Hall just said.

5          We already had this person admitting to three

6     separate drug distribution convictions, three separate

7     Federal Court convictions.  To drag out something from 40

8     years ago as impeachment in this case is not probative in

9     light of those three convictions, and the prejudicial effect

10    is plain on its face, and I don't think that -- it's the

11    defendant's burden to prove under Rule 609 that the

12    probative value outweighs the prejudicial effect.  Given

13    the --

14         THE COURT:  What is the prejudicial effect to the

15    Government?

16         MS. GREENBERG:  Your Honor, the prejudicial effect

17    of any conviction.  That's that -- you know, a conviction as

18    impeachment.  That's the nature of the rule.  When something

19    is 40 years old, it's well outside what we consider a

20    reasonable time limit.

21         THE COURT:  All right.  Mr. Hall?

22         MR. HALL:  Your Honor, my position is -- I don't

23    really care so much about the conviction for the heroin, but

24    the false claim of citizenship is what's commonly referred

25    to, at least in the Court of Maryland, as a crime of

1    falsity.  Therefore, it goes to the very credibility and

2    honesty of someone to have a conviction for making a false

3    statement, and that's the very crux of that crime, that he

4    had made a false statement under oath.  And I think,

5    therefore, it's highly probative of his truthfulness here.

6              THE COURT:  All right.  I conclude under the

7    totality of the circumstances of this case that the

8    probative value of these convictions is significant and that

9    the circumstances, I think, substantially outweigh any

10   prejudicial effect.  Whether this person is a short-term

11   drug dealer or a long-term drug dealer or whether he's told

12   untruths in the midst of this business, I think is -- goes

13   to the question of credibility, and I think the probative

14   value under the circumstances of this case does outweigh the

15   prejudicial effect.

16             I'll overrule the objection.

17             Ready for the jury?

18   MR. HALL:  Your Honor, we were about to -- or I

19   was about to attempt to impeach the witness with a statement

20   from the Grand Jury.  Rather than bring the jury in, I can

21   go ahead and resolve that because the Government's going to

22   object to the --

23             THE COURT:  All right.  Well, I don't know what

24   you're talking about so you need to tell me.

25             MR. HALL:  Yes, Your Honor, and I'll -- let me

1   explain.  The witness had testified very specifically in

2   direct testimony that he had counted -- in reference to the

3   transaction that occurred after Ms. Martin had --

4              THE COURT:  Right.

5              MR. HALL:  -- plastic surgery, he drove her to the

6   location where the tractor-trailer was, and they turned over

7   $450,000 to a gentleman by the name of Steven.  He testified

8   very specifically as to the amount of -- that the amount was

9   $450,000.

10             What I was going to impeach him with was in his

11  Grand Jury testimony, and it was, for the record, on page

12  11.  Specifically that he says -- he says on line -- well,

13  the question is on line 15.  How much money was it?  And the

14  answer is:  I would say 400,000, maybe a half a million.

15  And then he says pero, which is a word he uses quite often

16  in this transcript.  I think that probably is perhaps.

17             MR. MARTIN:  No, that means but.

18             MR. HALL:  Oh, but.  Okay.  But it was closer to a

19  half a million.

20             My position is that that's a direct contradiction

21  of what he testified to earlier today when he said that he

22  was involved in the counting of the money and that it was

23  specifically $450,000.  And the Government objects.

24             THE COURT:  All right.  What's the Government's

25  objection?

1          MS. GREENBERG:  Your Honor, I don't think it's a

2     direct contradiction.  Four hundred to a half a million

3     dollars is the four hundred fifty thousand.  We're exactly

4     at the same spot.  So I don't think it's impeachment.

5          MR. McKNETT:  Your Honor, I would also point out

6     that at least three times in his Grand Jury testimony he

7     said he counted the money.  He doesn't say he counted part

8     of the money and Ms. Martin counted part of the money.  He

9     said he counted it.  And today he said that he counted it

10    and Ms. Martin counted part of it.  So I think that would

11    also be --

12         THE COURT:  All right.  I'll overrule the

13    objection in advance.  Your motion in limine by the

14    Government is denied.

15              Ready for the jury?

16         MR. HALL:  Now we're ready, Your Honor.

17         THE COURT:  Okay.

18         (Counsel returned to the trial tables and the

19    following ensued:)

20         THE COURT:  Ladies and gentlemen, while you're

21    getting your papers together and notes together, I wanted to

22    give you a couple of scheduling updates.

23              Tomorrow, the 12th of July, we'll start at 10

24    because I have a sentencing at 9 in another case, and we

25    should be going to the same 4:30, quarter of 5 tomorrow.

1            On Thursday, I'm going to try to have us start at

2    9:30, try to pick up some time because of elevator disasters

3    and other things, to see if we can get this train back on

4    track.

5            On Friday, I intend to do the 9:00 to 2:00 drill

6    that we've done before.

7            Next week, and this is subject to change since

8    we're this far out, Tuesday, the 18th, would be 10:00 to

9    4:30 or 5 unless -- I have a 9:00 matter.  If the 9:00

10   matter moves, I'll let you know, but as of right now, it

11   will be 10:00 on the 18th.

12            On the 19th, we'll start at 10.

13            On the 20th -- I have reviewed this with you, and

14   what we're going to do on that day is we'll start at 8 and

15   go to noon and stop.

16            And that will be it for the whole week because,

17   unfortunately, I have an appointment with a surgeon on

18   Friday, the 21st, so I will be in the hospital and not able

19   to preside over a trial, but I'll be back in action the

20   following week in a sling.

21            So that's the schedule that I can tell you right

22   now.  If there's any updates, I'll let you know.

23            All right.  You may proceed, Mr. Hall.

24        MR. HALL:  Thank you, Your Honor.

25   BY MR. HALL:

1   Q.   Mr. Echarte, I want to pick up where I left off.  I had

2   asked you if you remembered testifying in front of the Grand

3   Jury here in this courthouse.

4   A.   I don't remember if it was in this courtroom or not.

5   Q.   Okay.  In this building?

6   A.   Yes.

7   Q.   Okay.  And that would have been November 3rd, 2004, is

8   that right?

9   A.   You got it in record.

10  Q.   Okay.  Let me ask you this, sir.  When you testified in

11  the Grand Jury, one or two of the Assistant U.S. Attorneys

12  was present, is that right?

13  A.   Yes, sir.

14  Q.   Okay.  And there was a group of people sitting there

15  that you testified in front of, right?

16  A.   Yes, sir.

17  Q.   And one of these two individuals asked you questions,

18  correct?

19  A.   Yes, sir.

20  Q.   And when you went in, you put your hand up, and you

21  took an oath to tell the truth, right?

22  A.   Yes, sir.

23  Q.   Now, sir, would you agree with me that you did not tell

24  the Grand Jury that the amount of drugs on this transaction

25  that we just talked about was $450,000?

1    A.   You said if I agree with you?

2    Q.   Yes.  Did you tell the Grand Jury that the amount of

3    money that you delivered with this transaction that we just

4    talked about was $450,000?

5    A.   450 or 475.  Was over $400,000.

6    Q.   Okay.  So what you're telling me is that -- in your

7    direct testimony this morning, or earlier today, you said

8    that you helped count it, and it was $450,000, correct?

9    A.   Yes, sir.

10   Q.   Okay.  And now you're telling me it was over 400, maybe

11   475, whatever.  Is that what you're saying?

12   A.   No, I'm not saying whatever.

13   Q.   Okay.  You were saying that it was over $400,000.  It

14   might have been 475.  Is that what you're saying?

15   A.   Exactly.

16   Q.   Okay.  So were you -- when you told the jury here

17   earlier today that it was exactly $450,000, that wasn't

18   completely the truth, was it?

19   A.   Absolutely, like I take today the record that you said,

20   because that's the record.

21   Q.   Now, sir, let me ask you -- let me ask you this.  You

22   testified in your direct testimony earlier that you had seen

23   my client, Mr. Whiting, on a number of times, is that right?

24   A.   Absolutely.

25   Q.   Okay.  And this would have been during that year that

1    you lived in Ms. Martin's house, is that correct?

2    A.   Yes, sir.

3    Q.   And you testified that, if I understand correctly, that

4    my client, Mr. Whiting, was a drug user, is that right?

5    A.   I said so.

6    Q.   He would come there to the house, right?

7    A.   Yes, sir.

8    Q.   And he'd buy cocaine sometimes, right?

9    A.   Most of the time.

10   Q.   Okay.  He bought heroin sometimes, right?

11   A.   From me.

12   Q.   From you?

13   A.   From me.

14   Q.   Okay.  The only person there at the house -- you were

15   the person at the house dealing heroin, is that right?

16   A.   I dealing --

17   Q.   Okay.

18   A.   -- not from the house.  I deal the heroin myself in

19   that house with the customer that come into the house.  It

20   was Mr. William.

21   Q.   Okay.

22   A.   Alone.

23   Q.   You'd go someplace else.

24   A.   I'd sell to her for Washington, D.C.

25   Q.   Now, let me ask you this.  You indicated that when my

1   client, Mr. Whiting, bought cocaine, that he bought that to

2   use himself, is that right?

3   A.    From me?

4   Q.    Yeah.  Or from Mrs. Martin.

5   A.    Yes.

6   Q.    Small amounts, right?

7   A.    Small amount.  Some take it to the street and some he

8   using it.

9   Q.    Okay.  You don't know what he did with the drugs after

10  he left the residence, though, do you?  You never saw him?

11  A.    Absolutely I not saw him, but he said he going to sell

12  it.

13  Q.    But you -- the point is you did not see him sell it?

14  A.    I not follow him.  I don't see what he did.  Even stand

15  there with money.

16  Q.    Okay.  Now, you testified that there came a time when

17  Mr. Whiting purchased a hundred grams of heroin, is that

18  correct?

19  A.    Yes, sir.

20  Q.    And that was $10,000 worth, is that right?

21  A.    Hundred dollars a gram.

22  Q.    And would you agree that that was -- compared to what

23  he had bought from you in the past, that was a lot, wasn't

24  it?

25  A.    Because he said he going to sell it to somebody else

1   that was his customer before.

2   Q.   Listen to my question, sir.

3   A.   The question was yes.

4   Q.   Okay.  Now, when he bought that, it's your testimony

5   that it was a hundred grams, right?

6   A.   Yes, sir.

7   Q.   Okay.  Now, do you recall telling the Grand Jury that

8   the most heroin he ever bought from you was 50 grams?

9   A.   Could be.  I don't remember -- I don't remember exactly

10  how much money he paid from the heroin.

11  Q.   Let me show you, sir.  It's page 62.

12          MR. HALL:  May I approach the witness, Your Honor?

13          THE COURT:  You may.

14  Q.   Sir, let me ask you this first.  Do you read English?

15  A.   A little bit.

16          MR. HALL:  Okay.  Could I ask that one of the

17  interpreters step forward just in case.

18  Q.   Sir, I'm going to show you the first page of your Grand

19  Jury testimony.  Can you read your name on that page and see

20  that it's yours?

21  A.   Yes, sir.

22  Q.   Okay.  So you see that that is your testimony, right?

23  A.   Yes.

24  Q.   Okay.  Now let me show you the specific page, sir.

25          MS. GREENBERG:  What page, counsel?

1          MR. HALL:  62.

2          And I'm going to direct counsel to -- I'm going to

3     direct first to the question which begins at line 20, and

4     then his answer begins at line 23.

5     Q.   Sir, you were asked the question:  Can you estimate the

6     amount of drugs that he bought from either you or Paula

7     during the time period you lived with Ms. Martin?

8          Now, sir, I want you to read -- can you read

9     your -- first tell me -- look at line 23.  Tell me if you

10    can read that, and if you can't, ask the interpreter --

11    A.   Absolutely.  He bought it from me, 50 grams.

12    Q.   Fifty grams.  So which is it, sir?  Was it a hundred

13    grams or 50 grams?

14    A.   It could be both of them -- both of them.  I could be

15    giving to him 10 grams free.

16    Q.   Okay.  So what you're telling the jury today is that it

17    could be a hundred grams, it could be 50 grams or it could

18    be both, is that right?

19    A.   Absolutely.

20    Q.   Okay.  Would it be fair to say you don't remember how

21    many grams --

22    A.   No, no.  I remember that we dealing with drugs.

23    Q.   Okay.  So --

24    A.   We're not dealing with maybe.  Was with drugs.

25    Q.   Okay.  So, sir, let me ask you this.  You testified

1    earlier today that Mr. Whiting couldn't pay you back the

2    money?

3    A.   He cannot pay me the money.

4    Q.   And I believe, and you correct me if I'm wrong, that

5    you testified that he only gave you $2300, is that right?

6    A.   Exactly.

7    Q.   Okay.  And it's your testimony that he gave you the

8    rest of the heroin back, is that right?

9    A.   Yes, sir.

10   Q.   Okay.  Now, sir, let me ask you this.  You knew

11   Mr. Whiting was an addict, didn't you?  He had a drug

12   problem?

13   A.   I believe so.

14   Q.   Okay.  And it's your testimony that knowing that he had

15   a drug problem, that you gave him $10,000 worth of heroin to

16   walk out with, with only paying $2300?

17   A.   Yes, I did.

18   Q.   Okay.  You fronted him the rest of it, is that right?

19   A.   Yes, I did.

20   Q.   And it's also your testimony that when -- he still owed

21   you money, is that right?

22   A.   Yes.

23   Q.   Well, let me ask you this, sir.  You indicated he paid

24   you 2300, right?

25   A.   Yes.

1   Q.   And that he returned about 75 grams, is that right?

2   A.   Something like that.  I not remember exactly how many

3   grams were returned.

4   Q.   Well, then didn't you have your whole $10,000?  You had

5   your --

6   A.   No.

7   Q.   -- the rest of the stuff back and you had your 2300.

8   A.   No.  Absolutely not.  Some money was owed in that

9   transaction.  I don't care about money.

10  Q.   What was owing?  What did he owe you?  How much?

11  A.   About 1500, something like that.  But I don't care

12  about money when I'm in the street.

13  Q.   You said that you don't care about money?

14  A.   I don't care about money.  You make a lot of money when

15  you sell drugs, so 1,500, 2,000 doesn't make no difference.

16  Q.   Okay.  So 1,500 or $2,000 was not enough money for you

17  to care about?  Is that what you testified to?

18  A.   Yes, sir.

19  Q.   Okay.  And -- however, you also testified that because

20  he owed you $1,500, we'll say --

21  A.   Yes.

22  Q.   -- that you had him drive for you, is that right?

23  A.   Yes, sir.

24  Q.   So it did matter to you, didn't it?

25  A.   He didn't know how to express it himself, was a good

1   lawyer and know the street.

2   Q.   He was also a drug user, wasn't he?

3   A.   Absolutely.

4   Q.   And that's why you stopped having him drive for you,

5   was because you couldn't trust him?

6   A.   Absolutely.

7   Q.   Now, sir, let me ask you this.  The -- this part of

8   your testimony where you talked about him driving to this

9   particular restaurant in Virginia, do you remember that?

10  A.   Cecilia Restaurant in Virginia.

11  Q.   Where is that in Virginia?

12  A.   It's in Alexandria, Virginia.

13  Q.   It's in Alexandria.  Okay.

14  A.   Alexandria, something like that.  I don't know the

15  streets in here.

16  Q.   Okay.  Now, you told the Grand Jury about 50 grams.

17  You didn't tell them about the -- him driving you to this

18  restaurant to pick up drugs, did you?

19  A.   Tell him that he driving to -- to pick up drugs with

20  me.  I don't have to tell him it's exactly 5 kilos and 20

21  grams, nothing like that.  It's my drug.  I'm going to pay

22  you for driving.  That's all.

23  Q.   My question to you is did you tell the Grand Jury about

24  that?

25  A.   Yes, sir.  I think so.

1   Q.   You think so.  All right.  Let me show you your Grand

2   Jury testimony.

3           MR. HALL:  Counsel, again, I'm going to refer

4   to -- starting at page 62.

5           MS. GREENBERG:  Unless counsel can point us to

6   something, I don't think this is appropriate impeachment.

7           MR. HALL:  Let's approach the bench.

8           (Counsel approached the bench and the following

9   ensued:)

10          MR. HALL:  Your Honor, the problem is that he

11  never told this story to the Grand Jury before.  He told

12  them about the 50 grams, but he never said anything about

13  driving to the restaurant or assisting in picking up drugs,

14  the heroin, from -- or drugs, I should say, from the bus or

15  any of the -- or terminating Mr. Whiting's services because

16  of him being high.

17          So the only way to impeach him is going to be to

18  have him read to himself that portion of the testimony and

19  then have him answer my questions again, did --

20          MS. GREENBERG:  Your Honor --

21          MR. HALL:  -- he tell the Grand Jury or did he

22  not.

23          MS. GREENBERG:  I don't see how that's

24  impeachment.  I never asked him.

25          MR. HALL:  Well, he testified about 50 grams, and

1  he's asked a number of questions about his contacts with

2  Mr. Whiting, and this is the first that I ever hear about

3  this, is today in court.

4          MS. GREENBERG:  Your Honor, in addition to that,

5  there's no questions -- there's no question posed to him.

6  Is there anything else, Mr. Whiting.  But at the end of

7  it -- where's the last page?  I usually put a catch -- the

8  catch-all provision on the end, is there other information.

9  We didn't discuss it today as a result of time.  You know,

10 it's not a situation where he can point to -- there's no

11 particular question that counsel has pointed to him.  He's

12 asked him to read a whole section.

13         THE COURT:  We're going to be here for hours if we

14 have him read the whole transcript trying to find something

15 that's not there.

16         MR. HALL:  It's pages 62 to --

17         MS. GREENBERG:  Your Honor --

18         MR. HALL:  What I'm telling the Court is that it's

19 pages 62 to 66.  It's a very short part of his Grand Jury

20 testimony that has to deal with my client.  I mean he

21 testified about a lot of things in the Grand Jury, but this

22 is the section that deals with Mr. Whiting, and he never

23 tells the Grand Jury this story about my client --

24         THE COURT:  Well, was he asked to tell the story?

25         MR. HALL:  Well, he's asked about his dealings

1    with my client.  Otherwise --

2                THE COURT:  Let me take a look at the pages.

3                MS. GREENBERG:  Your Honor, and just to -- at the

4    end of his testimony, I asked him:  So what you've given is

5    the best summary based on the questions Laura asked, and he

6    goes through a little -- sure.  Now I've done the best job

7    you can based on the questions that I've asked, and he said

8    yes.

9                And there might be other details that, if we had

10   to talk again, that you would remember.  It's not to mean

11   that you're lying.  It just means there are other details.

12   And he said:  This could be possible.

13               Obviously, Your Honor, we didn't cover everything

14   with this witness that would occur in a trial, and I didn't

15   ask him the question about this.  It doesn't mean that he's

16   lying.

17               THE COURT:  Let me see.  What are the pages that

18   you believe --

19               MR. HALL:  62 to 66.  And I --

20               THE COURT:  You were asking him, if I recall,

21   before we came up here, about not letting your client drive

22   him anymore and things like that --

23               MR. HALL:  Yes, because he never told the Grand

24   Jury that.  It's not in any report.

25               THE COURT:  How is it impeachment if it's not in

1    here and he wasn't asked about it?

2              MR. HALL:  Because in here it specifically refers

3    to this transaction for the 50 grams, and it's because of

4    that alleged debt that this gentleman says my client was

5    driving him in the first place.

6              THE COURT:  I'm not sure how it's impeachment.

7              MR. HALL:  Your Honor, he said that he thought he

8    told the Grand Jury that.  That was in response to one of

9    the last questions I just asked.  He just testified to it.

10             THE COURT:  I don't recall him saying he had told

11   the Grand Jury about your client not being trusted to drive

12   anymore.

13             MR. HALL:  My recollection, that was the last

14   thing before I pulled out the Grand Jury transcript that he

15   said.

16             MR. MONTEMARANO:  I believe -- my understanding is

17   that he said I thought I told the Grand Jury that.  That's

18   now placed in issue whether or not he told the Grand Jury.

19             MR. McKNETT:  My recollection is Mr. Hall asked

20   the question did you tell the Grand Jury that, and his

21   answer was I think I did.  So then it would go to --

22             MS. GREENBERG:  He can do that with every single

23   question.  Did you tell the Grand Jury that, you know, you

24   met Bolo?  Let's look through to see he was never asked if

25   he met Bolo.

1          THE COURT:  What I'll permit you to do is show him

2    this transcript, tell him to take a look between here and

3    here.  You may represent to him that this is his Grand Jury

4    testimony insofar as it relates to your client.

5          MR. HALL:  Right.

6          THE COURT:  Can you tell me, having looked at it,

7    does he believe that he told that story.  Yes or no.

8          MS. GREENBERG:  Your Honor, that's not true

9    because, as I was pointing out to the Court, at the end I

10   said there are other details that might be relevant and

11   there are other --

12         THE COURT:  I understand that, but they're

13   representing to me, and I think they may be correct --

14         MS. GREENBERG:  -- that I never asked him a

15   question should not blame it on this witness.

16         THE COURT:  I believe he just testified -- if

17   their recollection is correct, it may be -- that he

18   testified that he had told this story to the Grand Jury, and

19   if he didn't, then he's permitted to ask that question.

20         So I'll permit you to show him this transcript

21   from that point to the point you've indicated, which was

22   from Grand Jury --

23         MR. HALL:  I understand that.

24         THE COURT:  -- page 62, line 13, to page 66, line

25   8.  Let him look at it and tell me where in here did you

1  tell them the story about not trusting my client to drive

2  the car.

3           MR. HALL:  Do it just that way, Your Honor.

4           (Counsel returned to the trial tables and the

5  following ensued:)

6           MR. HALL:  May I approach the witness, Your Honor?

7           THE COURT:  You may.

8  BY MR. HALL:

9  Q.   I showed you your Grand Jury testimony a little earlier

10  today.  Do you recall that?

11  A.   Yes, sir.

12  Q.   Okay.  I want to show you a portion of it, page 62,

13  from line 13, to page 66, line 8, and I want you to read

14  that to yourself.

15           THE COURT:  If he needs any assistance, he can

16  have the assistance.

17           (Pause.)

18  Q.   Let me repeat my question to you.  Did you ever tell

19  the Grand Jury the story about my client driving you to

20  Virginia to pick up drugs?

21  A.   Yes, sir, I did.

22  Q.   Did you see it in here?

23  A.   I not see it in there.  It might be not listed in

24  there.  It maybe not be writed in there.

25  Q.   So you did not see it in what was just read to you, did

1   you?

2   A.   I not seen it.  Can you ask your client if he met me

3   through that situation or not.

4   Q.   So the answer to my question is you did not see it, did

5   you?

6   A.   I not see it in there.  Maybe the question not being

7   asked to me.

8   Q.   Okay.

9   A.   How I agree with everything that's in the paper?  We

10  talking about drug in that paper.  We not talking about

11  something else.  Nothing but the drugs.

12  Q.   Okay.  So let me ask you this.  I want to ask you

13  about -- a couple more questions about your prior

14  convictions.

15          You were convicted -- well, let me ask you this.

16  Your involvement in heroin goes back to the 1960s, doesn't

17  it?

18  A.   Yes, I did.

19  Q.   And you have a conviction in 1967 for heroin, don't

20  you?

21  A.   Yes, I did.

22  Q.   Okay.  You also have a 1969 conviction for making a

23  false claim of citizenship, is that not correct?

24  A.   Absolutely.

25  Q.   You did.  Okay.  That means you lied about being a U.S.

1   citizen, doesn't it?

2   A.   I have a paper that said that my name was Beles.

3   Q.   Okay.  Now, sir, let me ask you this.  You testified

4   that there were a lot of people that went in and out of

5   Ms. Martin's house, and some of them bought small amounts of

6   drugs, is that right?

7   A.   Yes, I did.

8   Q.   Okay.  And sometimes somebody might -- these are people

9   who you'd call junkies, wouldn't you?

10  A.   Not actually call junky.  It's more amount of drug buy.

11  Q.   Okay.  All right.  We'll -- there are people who

12  have -- you're talking about people who have a drug habit,

13  who buy it and use it?

14  A.   Or don't have enough money to deal in large amount.

15  Q.   But sometimes these people would come in and they'd buy

16  maybe a gram, maybe two grams, is that right?

17  A.   Could be that.

18  Q.   And you testified that that happened a number of times,

19  is that right?

20  A.   Yes.

21  Q.   In fact, that was one of the reasons you didn't like

22  the way Ms. Martin ran her business, because you didn't like

23  all these people coming in, right?

24  A.   Yes, I did.

25  Q.   Okay.  Now, let me ask you a couple of questions about

1    Kimberly Rice.  You testified in your direct testimony that

2    you had previously lied under oath about Ms. Rice's

3    involvement in drugs, is that right?

4    A.   I did.

5    Q.   Okay.  And you admit you lied about that, right?

6    A.   Say it again?

7    Q.   You admit that you lied about that?

8    A.   I admitted that I lied to Grand Jury basically.  I

9    don't want the baby raised alone.

10   Q.   Okay.  And you were under oath that day also, right?

11   A.   Yes, I did.

12   Q.   Okay.  Now, correct me if I'm wrong, but when you

13   testified in your direct about your relationship with

14   Ms. Martin, did you testify that you did or did not have a

15   personal relationship with her?

16   A.   I said that physically we not terminate a physical

17   relation.

18   Q.   Okay.

19   A.   Clearly.

20   Q.   How about with Ms. Rice?

21   A.   With who?

22   Q.   With Ms. Rice.  Her daughter.

23   A.   Absolutely not.

24   Q.   You did not have a relationship with her?

25   A.   Absolutely not.

1    Q.    Did -- there came a time when you were asked to leave

2    the house, though, weren't you?

3    A.    Say it again?

4    Q.    There came a time when you were asked by Ms. Martin to

5    leave the house, weren't you?

6    A.    Me?

7    Q.    Yeah, you.

8    A.    Yeah, she going to moving.

9    Q.    She moved?  Is that what you said?

10   A.    She moving out of the house.

11   Q.    Okay.  And you were not invited to come live in --

12   where she moved to, were you?

13   A.    Because she move in with somebody else, and I be in

14   Florida anyway.  I was close.

15   Q.    Okay.  All right.  Now, let me ask you this.  Your

16   conviction in Florida that you're currently serving a

17   sentence for, I believe you testified earlier that's a

18   14-year sentence, correct?

19   A.    Yes.

20   Q.    Okay.  How old are you now?

21   A.    Sixty-eight years old.

22   Q.    Sixty-eight.  So how old will you be in 14 years?

23   A.    Eighty-two.

24   Q.    Eighty-two.

25   A.    My mother live at 99.

1    Q.    Where are you imprisoned?

2    A.    Butler, North Carolina.

3    Q.    Butner, North Carolina?

4    A.    Yes, sir.

5    Q.    It would be fair to say you don't like it there, do

6    you?

7    A.    I no like no prison at all, but if I can be in Florida,

8    closer to my family would be better off.  And if I be on the

9    street would be better.  I no like prison.

10   Q.    I would agree with you.  It would be better to be in

11   the street than to be in prison, right?

12   A.    Everybody, I think, assume that situation.

13   Q.    Okay.  And in order -- you testified in your direct

14   testimony that you're hoping to get some help --

15   A.    That's --

16   Q.    -- to be back on the street?

17   A.    -- recommendation.  Sure I did.

18   Q.    And the reason for that is that -- just so you can

19   accomplish that, to get out of prison before you're 82,

20   right?

21   A.    It doesn't matter anyway if it is coming to disagree.

22   I was -- did my time without being -- trying to call on me.

23   I never call nobody.  They call me.

24   Q.    Oh, I understand they called -- they called you, but

25   you agreed to testify in this case because you want to help

Case 8:04-cr-00235-DKC   Document 1242   Filed 09/26/08   Page 197 of 223

1    yourself get out of prison, don't you?

2    A.   I want to tell the truth and clean myself out.

3    Q.   And you understand, don't you, that the only way that

4    you're going to get out of prison is for you to get your

5    sentence reconsidered in Florida, is that right?

6    A.   No, no.  Absolutely I know I will get out of prison if

7    I reach 82.

8    Q.   You don't think you're going to get out before you're

9    82?

10   A.   If he coming, I appreciate that, but I will get out in

11   82.  I live until 82.

12   Q.   But you testified earlier today you're hoping for some

13   consideration on your sentence?

14   A.   Yes, sir.  I said that.

15   Q.   You did say that?

16   A.   I said that.

17          MR. HALL:  Okay.  That's all the questions I have,

18   Your Honor.

19          THE COURT:  All right.  Any further

20   cross-examination?

21          MR. MONTEMARANO:  Just a few questions, Your

22   Honor.

23                      CROSS-EXAMINATION

24   Q.   Good afternoon, Mr. Echarte.  How are you?

25   A.   Fine.

1   Q.   I'd like to ask you a few questions departing from

2   where Mr. Hall left off.

3            Mr. Hall asked you earlier about your having gone

4   to court to plead guilty in 1994, your cocaine charge,

5   right, sir?

6   A.   Yes, I did.

7   Q.   And he asked you if you promised the judge to stay out

8   of trouble.  Do you remember that question, sir?

9   A.   Everybody said the same thing, but I not remember

10  saying that I'm going to be out of trouble.

11  Q.   You said you were just there to plead --

12  A.   I said guilty.

13  Q.   It would be also fair to say you didn't tell the judge

14  you were going to go right back into drug dealing as soon as

15  you got out, did you?

16  A.   Nobody said that.

17  Q.   You didn't tell that to the judge?

18  A.   I not said that.  Nobody said that.

19  Q.   You didn't tell that to the judge, did you?

20  A.   I not said that.

21  Q.   No, you didn't.  And when you pled guilty this last

22  time, you didn't tell the judge you were going to go back

23  into drug dealing as soon as you get out, did you?

24  A.   I not said that.  I pled guilty.

25  Q.   The fact is you were released from jail when, on the

1   1994 charge?

2   A.   2000.

3   Q.   In October, right?

4   A.   No.  I don't remember.

5   Q.   You don't --

6   A.   January 2000.  November 2000.

7   Q.   And by your testimony, you were dealing drugs almost as

8   soon as you got out.  Is that a fair statement, sir?

9   A.   Almost very close to the day that I get out.

10  Q.   Almost very close to the day you got out?

11  A.   Absolutely I said that.

12  Q.   And in repayment --

13  A.   Repayment?

14  Q.   -- in repayment for your testimony here today, you've

15  not been charged with dealing drugs here in Maryland,

16  correct, sir?

17  A.   No.  No.

18  Q.   And by your testimony --

19  A.   I have a --

20       MS. GREENBERG:  Objection, Your Honor.

21  A.   -- paper that I cannot be --

22       THE COURT:  Overruled.

23  A.   -- I cannot be indicted in Maryland for nothing.

24  Q.   Right.  You're not going to be charged --

25  A.   No --

1   Q.   -- in any way.

2   A.   Better not because they said that.  It's because I have

3   a paper, but they can plead guilty in Tampa.  I never can be

4   brought to Maryland or Baltimore, Maryland to -- in no case.

5   I said I pled guilty.  When they come to me, I take it.

6   Q.   So you're not going to be charged in Maryland, right?

7   A.   They no pressure me with that.  They cannot do that.

8   Q.   Mr. Echarte, that's a simple question.  The ladies and

9   gentlemen of the jury aren't lawyers.  I want them to

10  understand.  You're not going to be charged in Maryland for

11  dealing drugs, right?

12  A.   Because they cannot do so.  It was voluntarily what I

13  said, yeah.

14  Q.   Do you have a law degree, sir.

15  A.   Agree to what?

16  Q.   Do you have a law degree?

17  A.   No.  But I read the book like anybody else.

18  Q.   That's the cocaine that you dealt in Maryland, you're

19  not getting charged for, right?  Nor the heroin, right?

20  A.   No.

21  Q.   Nor the perjury, right, sir?

22  A.   No.  And I said that.  No, no.  Perjury, yes.

23  Q.   You're not going to be charged with perjury.  You

24  haven't been charged yet, right, sir?

25  A.   Not yet.

1    Q.    You lied, right?

2    A.    I said I lie.

3    Q.    You came in front of the Grand Jury.  You took an oath.

4    A.    Yes, I did.

5    Q.    To swear to tell the truth.

6    A.    Yes, I did.  Not being touched, not being touched now.

7    Q.    And they have not said they're going to charge you with

8    it, right, sir?

9    A.    No.

10   Q.    You've got a pretty lousy criminal record.  Is that a

11   fair statement, sir?

12   A.    What?

13   Q.    You have a pretty lousy criminal record, a bad criminal

14   record?

15   A.    Absolutely a bad record.

16   Q.    Absolutely a bad record.  And it's absolutely true that

17   when you took your plea in the case in 2003 in Tampa, that's

18   for manufacturing PCP, right?

19   A.    Yes, I did.

20   Q.    You talked to your lawyer about what kind of sentence

21   you could be looking at.  Is that a fair statement?

22   A.    Yes.

23   Q.    And he told you about the possible sentence you could

24   get, right, sir?

25   A.    Yes.

1              MS. GREENBERG:  Objection.

2              THE COURT:  That's far enough on this subject, I

3     think.

4              MR. MONTEMARANO:  Your Honor, may we approach?

5              THE COURT:  Well, all right.

6              (Counsel approached the bench and the following

7     ensued:)

8              MR. MONTEMARANO:  I was going to ask him if his

9     attorney informed him that he was eligible for a mandatory

10    life sentence based upon his two prior felonies --

11             MS. GREENBERG:  Your Honor --

12             MR. MONTEMARANO:  -- eligible.  Section 851,

13    discretionary with the Government.  I think the jury

14    deserves to know this gentleman was a goner.  Let's leave

15    aside --

16             THE COURT:  Was what?

17             MR. MONTEMARANO:  Was a goner.  Leaving aside mom

18    living to 99 and all that, the fact is it doesn't matter how

19    long you live, they're going to keep you in.

20             MS. GREENBERG:  Your Honor, that case was done and

21    over with, that plea agreement was done and over with before

22    we even get involved.  It's not at all relevant to his

23    cooperation in this case.  What his sentence was there, what

24    he worked out with his attorney, what his attorney told him,

25    it's not like one of the cooperators here in this case.

1            THE COURT:  Well, I assume it wasn't an 851 that

2    was given in Florida, right?

3            MR. MONTEMARANO:  I assume there wasn't because it

4    would be mandatory upon the Court if filed --  I'm not going

5    to -- I don't need to use the word Section 851.  I think

6    we're going to the witness's state of mind that he

7    understands.  He understands the way to get around this is

8    to take a plea --

9            THE COURT:  How do we get what the lawyer told him

10   in evidence?

11           MR. MONTEMARANO:  I think it goes to the witness's

12   state of mind.  I think I can ask that question.  If he

13   denies it, then, you know, I'm stuck, Judge, and I know

14   that.

15           MS. GREENBERG:  Your Honor, one, it's privileged.

16   Two, it has no relevance at all --

17           THE COURT:  I mean there's a privilege issue, and

18   I'm not sure I want to, you know, walk this witness through

19   the rights and liabilities of waiving the privilege.

20           He obviously made a decision to make the plea that

21   he did after conversing with his lawyer.  I think you've

22   already gotten some information out of him.  I'm not sure

23   going much farther is going to be appropriate.

24           MR. MONTEMARANO:  Well, I proffer to the Court, as

25   an officer of the Court with 15 years of experience

1   defending cases in federal criminal court, that the

2   Government, rightly or wrongly, tends to use substantially

3   the same language in its plea agreements, and one of the

4   things that it requires is that you be willing to speak with

5   the Government without the presence of your attorney.  I

6   submit that attorney/client privilege at that point is

7   waived.

8          MS. GREENBERG:  Your Honor, this is a completely

9   different plea agreement.

10          THE COURT:  This is -- yeah, this is a

11   different issue.

12          MS. GREENBERG:  This is not a cooperation plea

13   agreement.

14          THE COURT:  That's not the issue.  It's not his

15   cooperation here.  It's the plea agreement that he entered

16   somewhere in Florida.

17          MR. MONTEMARANO:  He's speaking with the

18   Government here without the presence of an attorney.  They

19   get him to waive privilege and then come in here and say,

20   oh, well, this is privileged, Judge.  I just -- this is a

21   very simple thing --

22          THE COURT:  All right.  I've given you the liberty

23   to ask him, I think, two different questions about what his

24   lawyer told him, and I think that you've gone far enough

25   without having to go through a painful, exhaustive waiver

Case 8:04-cr-00235-DKC   Document 1242   Filed 09/26/08   Page 205 of 223

1    discussion with him.

2              MR. MONTEMARANO:  I don't want to go into an

3    exhaustive waiver discussion.  I'd like the Court -- because

4    I don't want to go beyond the grounds the Court laid down.

5    What would you prefer or what would the Court believe is

6    appropriate for me to ask at this point?  Was he --

7              THE COURT:  What is it you wish to elicit from him

8    with this line of questioning?

9              MR. MONTEMARANO:  Did he realize he was looking at

10   a mandatory life sentence as a possibility at that point in

11   time in 2003.

12             THE COURT:  No, I think -- I think that's not

13   appropriate for the circumstances of an old conviction that

14   he served with another lawyer under another circumstances

15   with another U.S. Attorney's Office.  I don't think you

16   should go there.

17             Objection sustained.

18             MR. MONTEMARANO:  Thank you.

19             (Counsel returned to the trial tables and the

20   following ensued:)

21   BY MR. MONTEMARANO:

22   Q.   And so we're clear, Mr. Echarte, you're not going to be

23   prosecuted by the Maryland State authorities for your drug

24   dealing, correct, sir?

25   A.   Federal authority.

1   Q.    State.  You understand that you can be prosecuted in

2   the state system, correct, sir?

3   A.    It could be possible.  I know --

4   Q.    You could be prosecuted in the state system in Florida

5   if you weren't, sir?

6   A.    For what?

7   Q.    You could have been prosecuted in Florida by the state

8   authorities, correct, sir?

9   A.    You could?

10  Q.    You could have been?

11  A.    Not been.

12         THE INTERPRETER:  But they did not prosecute me.

13  They didn't.

14         MR. MONTEMARANO:  I'm asking did he understand

15  that he could have been prosecuted?

16         THE INTERPRETER:  Yes.

17  A.    Yes.

18  Q.    And, likewise, the Maryland state authorities could

19  prosecute you for your drug dealing in Maryland?

20  A.    They -- I have a paper that said no, you not be

21  prosecuted for any activity in Maryland.

22  Q.    You have an agreement with the Maryland state

23  authorities?  Is that what you're telling us?

24  A.    I got a paper that said that when I received my

25  sentencing in Tampa.  The district attorney in -- send to me

1    the paper in order for me to plead guilty in Florida, and I

2    did it.

3    Q.   You were telling us about the drug deals -- thank you,

4    ma'am.

5              You were telling us about the drug deal when

6    you -- right after Ms. Martin's surgery and you drove over

7    there in her car, correct, sir?

8    A.   Yes.

9    Q.   And you moved all the cocaine, correct, sir?

10             You moved the cocaine into her car and you moved

11   the money out of her trunk?

12   A.   Yes, sir, I did.

13   Q.   That was her car, correct, sir?

14   A.   Yes, sir.

15   Q.   And when you left her home, you were the only two

16   people there, is that correct, sir?

17   A.   Yes, sir.

18   Q.   And you took her car, correct, sir?

19   A.   Yes, I drove her car.

20   Q.   And you drove it, in fact.

21   A.   Yes.

22   Q.   It was an Oldsmobile, correct, sir?

23   A.   Yes.

24   Q.   In fact, Ms. Martin, unless I'm very wrong, handed you

25   the keys, right?

1   A.   Yes.

2   Q.   That was her Oldsmobile, right, sir?

3   A.   Yes, sir.

4   Q.   Okay.  And that would have been in 2002?

5   A.   2001.  2002 I be in Florida.  In 2002 I be in Florida

6   having surgery all day and almost a night.

7   Q.   This would be in 2001 that this happened, correct, sir?

8   A.   Yes.

9   Q.   Okay.  Now, you moved in with Ms. Martin because you

10  became her friend.  Is that a fair statement?

11  A.   That I become -- say that again?

12  Q.   You moved in with Ms. Martin at her home --

13  A.   Yes.

14  Q.   -- correct, sir, on Bexhill?  That's the photograph we

15  saw?

16  A.   Yes.

17  Q.   That was her home, right?

18  A.   Yes.

19  Q.   You moved in there with her permission, correct?

20  A.   Yes.

21  Q.   That's because you became friends, is that a fair

22  statement?

23  A.   Yes.

24  Q.   And would it be fair to say that friendship -- well,

25  there's a measure of attraction there between the two of

1   you, is that a fair statement?

2   A.   Could be some attraction.

3   Q.   Well, if I understood your statement correctly, it did

4   or did not develop into a personal --

5   A.   Exactly.  That's what I said.

6   Q.   It did or did not?  I --

7   A.   Did not.

8   Q.   It did not.

9   A.   We're still good friend.  We still be friends and

10  everything.  This situation don't change anything.

11  Q.   She was your close friend, wasn't she?

12  A.   At that moment, yes.

13  Q.   And there came a time in 2001, I believe?

14  A.   Yes.

15  Q.   Where you overdosed on drugs, right, sir?

16  A.   What?

17  Q.   Did there come a time when you overdosed on drugs in

18  early 2002?

19  A.   I take a Viagra, Viagra --

20  Q.   Viagra?

21  A.   -- Viagra, and I have a pacemaker problem.  And

22  occasionally I have been using drugs.  Occasionally through

23  my lifetime, I be related to drug dealers, and I'm selling

24  drugs.  And occasionally I taste it, and occasionally I

25  like.

1   Q.    Okay.  But you weren't dealing Viagra, were you?

2   A.    Huh?  No.  Viagra, my doctor said that it -- whoever

3   had a problem with the heart have trouble.  I don't know

4   nothing about that.

5   Q.    You just took it anyway?

6   A.    What?

7   Q.    You just took it anyway?

8   A.    I took the Viagra because I wanted some, some reaction

9   with me.  By me not responding sexually to her, I took

10  anything.  And that's clear.  I be dysfunctional.  Simple.

11  Q.    What I was trying to ask you, sir, did you want to have

12  personal physical relations with Ms. Martin?

13  A.    Exactly, because I appreciate the house and the

14  attention.  And I take Viagra, and I would take anything to

15  appreciate what she do for me.  No work, and I went to the

16  hospital.  I almost kill myself with it.

17          MR. MONTEMARANO:  Your Honor, how much longer are

18  we going to go?

19          THE COURT:  Are you finished with this subject?

20          MR. MONTEMARANO:  I think so.

21  Q.    Would it be fair to say that at some point you and

22  Ms. Martin parted company, went your separate ways?

23  A.    When what?

24  Q.    You and Ms. Martin went your separate ways?

25  A.    Yes, yes, yes.  Not because there was no -- no fight or

1    no nothing.  Just I went away.

2    Q.   You said you didn't move in with her because she moved

3    in with someone else, correct?

4    A.   No, no, no, no.  She told me on few occasion that she

5    have a new boyfriend.

6    Q.   Oh, so she had someone else?

7    A.   Yes.  But we still be -- I coming to Washington and I

8    giving the drugs that I have.

9    Q.   You wanted to continue the relationship, didn't you?

10   A.   Oh, absolutely.

11   Q.   You were angry with Ms. Martin for not continuing the

12   relationship, weren't you?

13   A.   Say that again?

14   Q.   You were angry with Ms. Martin for not continuing the

15   relationship?

16   A.   Oh, no.  I could be angry with me, not with her.  She

17   not done nothing to me.

18   Q.   Not done anything to you at all?

19   A.   Nothing to make me angry.  Not that I be here because

20   I'm angry about anything.

21   Q.   Of course not.

22   A.   I'm not jealous.

23           MR. MONTEMARANO:  No further questions, Your

24   Honor.

25           THE COURT:  Additional cross?

1          MR. MARTIN:  Yes, Your Honor.

2                        CROSS-EXAMINATION

3    BY MR. MARTIN:

4    Q.   Buenos tarde.  Good afternoon.

5    A.   Buenos tarde.

6    Q.   Let me make sure I heard this correctly.  You've used

7    different names, correct?

8    A.   Yes, sir.

9    Q.   And you've lied to the Grand Jury?

10   A.   Yes, sir.

11   Q.   And you've lied about your citizenship status?

12   A.   Yes, sir.

13   Q.   And you lied to the Grand Jury after taking an oath

14   just like the oath you took here today, right?

15   A.   Not today.

16   Q.   No, no, no.  You took an oath today, right?

17   A.   Yes, sir.

18   Q.   And it was the same oath you took when you lied to the

19   Grand Jury, right?

20   A.   Yes, sir.

21   Q.   And I've never had a chance to talk to you before, have

22   I?

23   A.   Absolutely you cannot.  You're the lawyer for the

24   defendant.

25   Q.   That's right.  I'm a lawyer for the defense.  And as

1    such, I didn't have access to you, did I?

2    A.    Absolutely not.

3    Q.    And you were brought here what, last week?

4    A.    Yes.

5    Q.    And from last week to today, you had an opportunity to

6    meet with the Government and talk about your testimony,

7    right?

8    A.    I talked to them last week, you said.  I've been

9    brought here and stay sitting down here, but I not talk to

10   nobody.

11   Q.    You haven't spoken to anyone prior to testifying today?

12   A.    Prior to testifying right now, no.

13   Q.    So the last time you spoke to Ms. Greenberg was when?

14   A.    It would be two weeks ago or something like that.  I

15   not remember the time.  Pero not previous to this situation

16   right now in here.

17   Q.    Did you talk to Ms. Greenberg in Florida?

18   A.    No.  In here, in Baltimore.

19   Q.    So they brought you up to Greenbelt to meet with her,

20   right?

21   A.    Yes.

22   Q.    And she showed you that chart back there, right?

23   A.    Yes.

24   Q.    And you went over the different people on that chart,

25   right?

1   A.   Yes.

2   Q.   And she specifically showed you Mr. Goodwin and asked

3   you if you remembered him, right?

4   A.   Specifically she showed me everybody.

5   Q.   Everybody.  But certainly she showed you Mr. Goodwin,

6   right?

7   A.   Everybody that was there that I can recognize, and I

8   recognize the name.

9   Q.   Let's go back a little bit to your testimony.  I think

10  you had said that at one point you remember seeing 30, 40,

11  maybe 45 kilos delivered at one time, is that correct?

12  A.   Yes, it is.

13  Q.   And you also testified that you counted out some

14  $450,000, right?

15  A.   Yes, sir.

16  Q.   And that $450,000 was related to which delivery of

17  drugs?

18  A.   The first $450,000, I don't see the whole drugs.  Was

19  selling drugs before I came into the house.  So the money

20  was count, and we recount the money and the drug I was

21  selling, did not possess.

22  Q.   So it's not your testimony that the 45 kilos was

23  related to the 450,000?

24  A.   Was related to the -- to that one and to the next one.

25  Four hundred this time.  Four hundred the next time.  We not

1    count only $400,000.  I count more than three times

2    $450,000.

3    Q.    No, sir, my question was it is not your testimony that

4    the 450,000 was related to the 45 kilos that you saw,

5    correct?

6    A.    No.  Possibility no.

7    Q.    Possibility no?

8    A.    We talking about maybe million and a half dollar.  I

9    get sick and tired about counting money.

10   Q.    Now, you were asked some questions earlier.  I don't

11   want to go through this --

12   A.    You can go through anything you want.

13   Q.    Thank you.  That's kind of you.  But you've got a

14   birthday coming up very shortly, on July 28th, don't you?

15   A.    Sixty-eight.

16   Q.    You're 68 now --

17   A.    Yes.

18   Q.    -- but you're going to be 69 in just a couple of weeks,

19   right?

20   A.    Yes.

21   Q.    And you hope to live a lot longer, right?

22   A.    Absolutely, I will live a lot longer.

23   Q.    And you're also hoping, as you've already pointed out,

24   to have your sentence reduced here, right?

25   A.    Some consideration, yes.

1    Q.    You want some consideration.  But you don't know what

2    that's going to be, right?

3    A.    Absolutely not.

4    Q.    But you do know that the only way you can get your

5    sentence reduced is if the Government is happy with your

6    testimony, right?

7              MS. GREENBERG:  Objection.

8              THE COURT:  Repeat the question.

9    Q.    You do know the only way you can get your sentence

10   reduced is if the Government is satisfied with your

11   testimony, right?

12             THE COURT:  Overruled.

13   A.    I say so.

14   Q.    If Mr. Goodwin is not satisfied or made unhappy with

15   your testimony, it really doesn't make any difference to

16   you, does it?

17   A.    Well, I take the chance with Mr. Goodie that he can do

18   anything.  And you got your money already in front for -- if

19   you close the case or not, so I don't know.

20   Q.    Interesting response, but could you answer my question?

21   You really don't care if Mr. Goodwin is satisfied or made

22   unhappy by your testimony, do you?

23   A.    I know I'm making him very unhappy.

24   Q.    You know you're making him unhappy.  But you don't

25   care, right?

1   A.   I care, but there is no other way to go now.

2   Q.   You don't care because it's not in your interest to

3   care about --

4   A.   No.  No.  I care about everything, but it's not nothing

5   that I can do now.

6   Q.   But the thing you care about most is your freedom,

7   isn't that correct?

8   A.   I wouldn't -- I care.  I do.  I care about my freedom

9   if that's what you want to say.

10  Q.   But that's the most important thing to you right now,

11  your freedom.  Isn't that a fact?

12  A.   Absolutely.

13  Q.   Okay.  Thank you, sir.

14          Now, you know a lot of people, would it be fair to

15  say?  You've been in the United States now since the 1960s,

16  right?

17  A.   '64.

18  Q.   Since 1964.  So you know a lot of people, right?

19  A.   A lot of drug dealers.

20  Q.   A lot -- and that's exactly what I was getting at.  You

21  know a lot of --

22  A.   That's what I'm telling you.

23  Q.   And you know a lot of drug dealers here in the

24  Washington metropolitan area, right?

25  A.   Yes, sir.

1   Q.   And you've got a chart behind you.  If you look over

2   your left shoulder, that chart behind you, remember that

3   chart?

4   A.   Yes.

5   Q.   And you were shown a number of pictures, but all the

6   drug dealers you know are not on that picture, right?

7   A.   Oh, no.  Absolutely not.

8   Q.   There are a lot of others that you could tell the

9   Government about that are not there, right?

10  A.   Maybe a thousand.

11  Q.   Thousand?  And so the people that are on that picture

12  there that you've been asked to identify were people that

13  the Government pointed out to you, right?

14  A.   No.  No.  There's people there that I said I don't know

15  them.

16  Q.   You didn't put that chart together, right?

17  A.   Absolutely not.

18  Q.   The Government put it together, right?

19  A.   Yes, with the help of the --

20  Q.   And they asked you to identify the people on the

21  chart --

22  A.   That you know.  That's what they asking.  Identify the

23  people that you know.

24  Q.   Exactly.  Identify the people that you --

25  A.   That I know.

1    Q.   And that's what you've done, right?

2    A.   And that's what I've done.

3    Q.   Now, you've already testified, I think, that you're not

4    going to be prosecuted for any of the drug dealing you did

5    here in Maryland?

6    A.   Absolutely.

7    Q.   In other words, you don't believe you're going to be

8    prosecuted in Federal Court, right?

9    A.   I believe so.

10   Q.   And you also testified, if I heard you correctly, that

11   you got a piece of paper from the State's Attorney that says

12   you're not going to be prosecuted in Maryland in the State

13   Court, right?

14   A.   Yes.  In 19 -- in 2003.

15   Q.   And was that the State's Attorney's Office for Prince

16   George's or Montgomery County?

17   A.   I don't know what it is.  It says the State of Maryland

18   not going to prosecute you if you accept -- you plead in

19   Tampa.  I don't know nothing about this case before, and I

20   take that plea in Tampa.  I pled guilty to 14 year.  I can

21   show you the paper.

22   Q.   Do you have it with you?

23   A.   No, but I can ask in Florida to deliver me the paper

24   and it will be.

25   Q.   Well, I think there may be some time constraints.

1    A.    Well, time is life to me.

2                MR. MARTIN:  Your Honor, I think that many of my

3    questions may have been covered already.  Court's

4    indulgence.

5                Thank you very much, Your Honor.

6                THE COURT:  Any additional cross?

7                MR. MITCHELL:  Your Honor, the rest of us, I

8    think, have maybe five, ten minutes each.

9                THE COURT:  All right.  If you have five or ten

10   minutes each, then we're going to come back tomorrow.  I

11   didn't know if we were close to the end of him or not, but

12   if --

13               MS. GREENBERG:  Your Honor, may we approach on

14   that?

15               THE COURT:  You may.

16               (Counsel approached the bench and the following

17   ensued:)

18               MS. GREENBERG:  Your Honor, I'd like to get this

19   done if possible.

20               THE COURT:  You'd like to what?

21               MS. GREENBERG:  I'd like to get this done if

22   possible.  I'd like to get this done if possible, and he

23   didn't mention any of their clients as being involved in the

24   drug business.  Five- to ten-minute estimate --

25               THE COURT:  Everybody have ten minutes to go?

1              MR. WARD:  I've got some questions, but --

2              MS. GREENBERG:  He didn't mention any of their

3     clients.

4              MR. MITCHELL:  I don't know why she's questioning

5     why we're asking questions.

6              THE COURT:  Yeah.

7              MS. GREENBERG:  No, I just wondered if that was a

8     reasonable estimate.  If they need the interpreters or just

9     the marshals.  If they need it, they need it, but they

10    didn't mention any of their clients as being involved in the

11    drug --

12             MR. MITCHELL:  He mentioned Mr. Bynum.

13             THE COURT:  You have redirect?

14             MS. GREENBERG:  Maybe two minutes.

15             MR. WARD:  Well, I do have some questions.  I'm

16    almost tempted to ask what is the effect of an overdose of

17    Viagra, but I think I'll pass on that one.  But I do have

18    some serious questions.

19             MR. McKNETT:  He did mention my client.

20             MS. GREENBERG:  As not -- as not involved in the

21    drug business.

22             THE COURT:  I think we'd better bring the witness

23    back.

24             MS. GREENBERG:  Your Honor, will these counsel

25    need the interpreters?  We have the two of them here because

1   it was requested --

2              THE COURT:  We'll have the two interpreters here.

3              MS. GREENBERG:  -- but they're not available.  We

4   don't have any interpreters.

5              THE COURT:  They're not available?  When?

6              MR. MONTEMARANO:  Mr. Earnest may be in the

7   courthouse.

8              MS. GREENBERG:  I'll consult with them, Judge,

9   after the break.

10             THE COURT:  Mr. McKnett, your case is off the

11  calendar.

12             MR. McKNETT:  Excuse me, Your Honor?

13             THE COURT:  Your case is off the calendar.  Your

14  sentencing.

15             MR. McKNETT:  It's off the calendar?

16             MR. MARTIN:  Your Honor, it may be that we don't

17  need two interpreters if the testimony is not going to be

18  longer than another hour.  I think they rotate on the hour.

19             (Pause.)

20             MS. GREENBERG:  He's okay proceeding with one.

21  They're fine with one interpreter coming in tomorrow.  I

22  just wanted to make sure that --

23             THE COURT:  All right.  Well, I will tell them

24  we'll resume tomorrow at 10:00.

25             (Counsel returned to the trial tables and the

1    following ensued:)

2              THE COURT:  Ladies and gentlemen, we're going to

3    take a break for the day.  I will resume at 10:00 tomorrow.

4    Counsel and parties should be here at 9:45, and we

5    anticipate this witness will just finish up tomorrow

6    morning.  I didn't want to keep you too late today.  So

7    we'll see you tomorrow morning.

8              (Proceedings adjourned.)

9

10

11              COURT REPORTER'S CERTIFICATE

12              I certify that the foregoing is a correct

13    transcript from the record of proceedings in the above

14    matter.

15

16    Date:

17                        /s/Sharon O'Neill

18

19

20

21

22

23

24

25