1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MARYLAND
2                         SOUTHERN DIVISION

3    UNITED STATES OF AMERICA      .
                                   .
4          vs.                     .   RWT-04-0235
                                   .
5    PAULETTE MARTIN, ET AL        .   GREENBELT, MARYLAND
          DEFENDANTS               .   JULY 12, 2006
6

7                       TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE ROGER W. TITUS
8            UNITED STATES DISTRICT JUDGE AND A JURY

9

10   A P P E A R A N C E S:

11   FOR THE GOVERNMENT:          DEBORAH A. JOHNSTON, ESQ.
                                  BONNIE GREENBERG, ESQ.
12                                ASSISTANT U.S. ATTORNEYS

13
     FOR THE DEFENDANT MARTIN:    MICHAEL MONTEMARANO, ESQ.
14   FOR THE DEFENDANT GOODWIN:   ANTHONY MARTIN, ESQ.
     FOR THE DEFENDANT WHITING:   MARC HALL, ESQ.
15   FOR THE DEFENDANT BYNUM:     TIMOTHY MITCHELL, ESQ.
     FOR THE DEFENDANT DOBIE:     PETER WARD, ESQ.
16   FOR THE DEFENDANT ALI:       HARRY McKNETT, ESQ.
     FOR THE DEFENDANT HARDEN:    EDWARD SUSSMAN, ESQ.
17
     Court Reporter:             Sharon O'Neill, RMR
18                               Official Court Reporter
                                 United States District Court
19                               6500 Cherrywood Lane - RM 200
                                 Greenbelt, Maryland 20770
20                               Tel.  301-344-3227

21

22

23

24

25

1    I N D E X

2    GOVERNMENT'S WITNESSES        DIRECT   CROSS   REDIRECT   RECROSS

3    Emilio Echarte                          3       16          37
                                             6                   48
4                                           13                   50
                                                                 55
5                                                                56

6    Horace Lindsay              60         65      66

7    Marsha Lee                  67         77      83

8    Detective Randy Kucsan      91        138      167         175
                                          165                  178
9
     Detective Jacques Cowan    182        196      203
10                                         197
                                           200
11                                         201

12   Detective John Shea        204

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  I want to tell you that one of the
 2   jurors, Juror Number 11, has a father-in-law who was rushed
 3   to the hospital yesterday and is in intensive care and may
 4   be getting a health bulletin during the day.  I'll keep you
 5   advised if that necessitates consideration of replacement of
 6   the juror or not, but I've been apprised of that, and the
 7   juror has been given the phone number in the courtroom so
 8   that if there's an urgent need to reach that juror, that
 9   juror will be reached.
10              Oh, are you drinking coffee again?
11              MR. WARD:  I was, Your Honor.
12              THE COURT:  You're not supposed to do that.
13              MR. WARD:  Well, that's what they tell me, but
14   today is Day 19 of the trial and nobody --
15              THE COURT:  Well, I didn't notice you doing it.
16   For security reasons, we don't want people with hot liquids
17   sitting next to them during a trial.
18              (Jury present.)
19              THE COURT:  Before we proceed, Mr. Echarte, I've
20   been having a little bit of trouble hearing you sometimes
21   and understanding you, so could you try to speak up and
22   speak a little slower.
23                       CROSS-EXAMINATION
24   BY MR. MITCHELL:
25   Q.   Good morning, Mr. Echarte.
```

1    A.    Good morning.

2    Q.    My name is Timothy Mitchell.  I represent Derrek Bynum.

3          I believe you identified him on the picture as

4    Bolo or Tolo, something like that.  Do you recall?

5    A.    Yes, sir.

6    Q.    And you were asked if you knew him.  You've seen him

7    before?

8    A.    Yes, sir.

9    Q.    And where have you seen him at?  Paulette Martin's

10   house?

11   A.    Yes, sir.

12   Q.    Now, are you aware of whether or not he was involved in

13   drugs?

14   A.    I think he not was, but.

15   Q.    Say it again?

16   A.    I think he not was.

17   Q.    He was not or was?

18   A.    Was not.

19   Q.    Was not.  Would you describe him as a working man?

20   A.    I don't -- I don't know if he working or not.

21   Q.    You never sold him any drugs, did you?

22   A.    No.

23   Q.    He never drove for you?

24   A.    No.

25   Q.    Delivered money for you?

1    A.    No.

2    Q.    And I assume that you never consumed drugs with him

3    either?

4    A.    Absolutely not.

5    Q.    Okay.  And you know him to be the father of

6    Ms. Martin's grandchild, correct?

7    A.    Yes, sir.

8    Q.    Now, you were asked a question about Ms. Kimberly Rice.

9    You know her, correct?

10   A.    Yes, sir.

11   Q.    And she is the granddaughter of Ms. Martin, correct?

12   A.    Say it again?

13   Q.    The daughter.  She's the daughter of Ms. Martin,

14   correct?

15   A.    Yes, sir.

16   Q.    Initially when you gave testimony before the Grand

17   Jury, you indicated that Ms. Rice had nothing to do with the

18   drug trade.

19   A.    I lying that time.

20   Q.    And you did that to protect her, correct?

21   A.    Absolutely.

22   Q.    Now --

23   A.    Not her.  The child.

24   Q.    The child.  Now, I want to make sure, be very  careful,

25   now, you know that Mr. Bynum is the father of that

1    grandchild, correct?

2    A.    Absolutely.

3    Q.    Now, are you saying that he's not involved in drugs

4    because you're trying to protect the grandchild?

5    A.    No.  He's a man.  He's not living with her.

6            MR. MITCHELL:  Okay.  I have no further questions,

7    Your Honor.

8            THE COURT:  Any further cross-examination?

9            MR. WARD:  Yes, I have a few questions.

10                        CROSS-EXAMINATION

11   BY MR. WARD:

12   Q.    Good morning, sir.

13   A.    Good morning.

14   Q.    Would you pronounce your name for me so that I get it

15   right?

16   A.    Emilio Echarte.

17   Q.    Echarte.  Echarte?

18   A.    Echarte.

19   Q.    Mr. Echarte, my name is Peter Ward, and I represent a

20   woman named Lavon Dobie.  Does that name ring a bell?

21   A.    Who you represent?

22   Q.    Lavon Dobie.

23   A.    I don't know who that is.

24   Q.    Becky Dobie?  Does that ring a bell?

25   A.    Becky.  She's here.

1    Q.   Yeah.

2    A.   I don't know her.

3    Q.   Well, let me ask you this.  Maybe it will put things in

4    context.

5            Do you know -- do you know Al Mundy and his wife,

6    Lauren?

7    A.   Yes, sir.

8    Q.   Okay.  And they've been friends of yours for some time?

9    A.   Long time.

10   Q.   And Al Mundy is what is known on the streets as a

11   booster, is that right, sir?  He goes around stealing

12   clothes, particularly, and other things?

13           MS. GREENBERG:  Your Honor, objection.

14   Q.   Absolutely.

15           MS. GREENBERG:  Relevance.

16           MR. WARD:  I'll establish the relevance.

17           THE COURT:  All right.  Establish that connection,

18   if you would.

19   Q.   Is that correct, sir?

20   A.   Say it again?

21   Q.   He's a booster.  He goes around stealing --

22   A.   I never see him boost.  I'd see him with the clothes.

23   Q.   With the clothes, right.

24           Do you recall a meeting that he set up with you

25   and a woman at Chuck and Billy's Bar on Georgia Avenue in

1  the summer of 2002 to look at stolen jewelry?

2              MS. GREENBERG:  Objection.  Relevance.

3              MR. WARD:  I'll establish it.

4              THE COURT:  Overruled.

5  A.   I don't remember exactly.  What --

6  Q.   Well, let me ask you.

7              MR. WARD:  Ms. Dobie, would you stand up, please.

8  Q.   Take a look at that lady now.  I know you've seen a

9  photograph of her before, but do you recognize her as --

10 A.   Absolutely not.

11 Q.   Absolutely not.

12 A.   I not recognize her right now.  Could be change.  In

13 this pictures over here, it's a lady looking like her.  It's

14 a lady with picture taking, look like a lady, but I cannot

15 sure be -- like I said to the other people.

16 Q.   Well, do you recall meeting with a lady who looked like

17 this lady who just stood up with Mr. Mundy and his wife at

18 Chuck and Billy's Bar to look at stolen jewelry,

19 particularly loose diamonds, gold and platinum rings,

20 bracelets, earrings, that sort of stuff?

21 A.   Jewelry, absolutely not, but it could be.

22 Q.   It could be, but you have no recollection?

23 A.   I don't have a recollection of that taking place.

24 Q.   All right.  The lady who stood up, you've never seen

25 her at Ms. Martin's house?  To your knowledge, she was never

1    involved in drugs?

2    A.   I have no knowledge if she be involved in drug or not

3    in any of the location, but I not see her.  I no have a

4    knowledge.  What was the question?

5    Q.   My question is do you know whether or not that lady

6    down there was ever involved in the drug business?

7    A.   No.

8    Q.   No.  You don't know, or she was not?

9    A.   I -- I don't know if she was or not.

10   Q.   Okay.  All right.  But you never seen her at

11   Ms. Martin's house?

12   A.   I said I no have a recollection to be seeing her, but I

13   said I don't know what she does with her life.

14          MR. WARD:  Okay.  That's all.  Thank you, sir,

15   very much.

16                    CROSS-EXAMINATION

17   BY MR. SUSSMAN:

18   Q.   Good morning, Mr. Echarte.

19   A.   Good morning.

20   Q.   During the year you lived at Ms. Martin's house, you

21   pretty much saw what was going on in the house, isn't that

22   right?

23   A.   About 95 percent.

24   Q.   You saw people coming and going throughout the day, is

25   that right?

1   A.   Yes, sir.

2   Q.   Okay.  And you participated in the affairs of the

3   house, is that right?

4   A.   Yes, sir.

5   Q.   Okay.  You even went to a fashion show that Ms. Martin

6   put on, is that right?

7   A.   Yes.

8   Q.   Okay.  It was an old people show.  Is that what you

9   call it?  A lot of older people at that show?

10  A.   It can be oldies and young.  I was drunk.  I don't know

11  if they older or not.

12  Q.   Were you one of the younger ones?

13  A.   Absolutely not if it was past two years.

14  Q.   Now, during that time period, you testified that you

15  were selling heroin, is that right?

16  A.   Yes.

17  Q.   You made a lot of money selling heroin, is that

18  correct?

19  A.   I was at beginning.

20  Q.   At the beginning.  Okay.  Well -- and you were getting

21  your heroin from a source -- sources in Florida?

22  A.   In Florida.  If you want to know the name, I got it.

23  Q.   Well, I'm not actually interested, but I am

24  interested -- your sources weren't on -- pictures of your

25  sources weren't on that chart, were they, that you looked

1    at?

2    A.   No.

3    Q.   Okay.  And was anyone telling you how to sell your

4    heroin?

5    A.   Say it again?

6    Q.   Was anyone telling you how to sell your heroin out

7    there in Washington or Baltimore or wherever?

8    A.   No, because I sell in 1990 -- '67.

9    Q.   Okay.  And you weren't splitting the profits with

10   anybody, were you?

11   A.   No.

12   Q.   Okay.  Now -- so you basically had your own thing going

13   on during that period of time.  Would that be accurate?

14   A.   Yes.

15   Q.   Okay.  Now, let me ask you this.  You mentioned that

16   one of your objections was that you didn't like the way

17   things were operating at Ms. Martin's house, right?

18   A.   Absolutely not.

19   Q.   I think you used the word there's a proper way to do

20   things?

21   A.   Well, yes.

22   Q.   And that's based on the fact that you've been selling

23   drugs off and on, with a few interruptions, for about 40

24   years, right?

25   A.   Everybody got his way to do something, and I disagree

1    with the way they'll be done.

2    Q.   And specifically the thing you don't like, or one of

3    the things you didn't like, was the fact that there was too

4    much traffic, people coming in and out, is that right?

5    A.   Yes.

6    Q.   And Ms. Martin was also selling, you believed, to

7    people who were drug users, is that right?

8    A.   Everybody uses.  They buy, sell, use.

9    Q.   Some people just buy and use, right?

10   A.   Yes.

11   Q.   And drug users are unreliable, can be problems, isn't

12   that right?

13   A.   In the drug business, though, everybody is a big

14   problem.

15   Q.   Okay.  And the more people who know your business, the

16   worse it is, right?

17   A.   Well, you need a lot of people in order to make it your

18   business.

19   Q.   Now, was Ms. Martin, to your knowledge, was she selling

20   like $10 -- $10 bags to --

21   A.   No.  No.  Not $10 baggies.

22   Q.   So it wasn't a stream of what they call pipeheads

23   coming through buying $10 bags?

24   A.   No.  No.

25   Q.   So -- there were junkies coming through, isn't that

1    right?

2    A.   Well, people walking down the street, they are a junky

3    and you don't know.

4    Q.   But there were people you could tell were junkies,

5    right?

6    A.   Not that way.

7    Q.   Okay.  Now, the drug -- but you knew that there were

8    drug users coming through the place.  That was your problem

9    with the place, right?

10   A.   No.  The amount of people that come, not if they drug

11   use.

12   Q.   Okay.  But you indicated that Ms. Martin would sell a

13   gram or two to people when they came through, is that right?

14   A.   Yes.

15   Q.   And those are basically 75, $100 transactions, right?

16   A.   Could be.

17        MR. SUSSMAN:  Yeah.  Thank you very much, sir.

18                      CROSS-EXAMINATION

19   BY MR. McKNETT:

20   Q.   Good morning.

21   A.   Good morning.

22   Q.   Mr. Echarte, is that correct?

23   A.   Echarte.

24   Q.   Echarte.  You got out of jail in 1990, yes?

25   A.   2000.

1    Q.    I'm sorry.  2000.  You met Ms. Martin in 2000?

2    A.    2001.

3    Q.    You moved into her house early in 2001, correct?

4    A.    Yes, sir.

5    Q.    And you lived in Ms. Martin's house for about one year,

6    yes?

7    A.    Approximately.

8    Q.    While you were living in Ms. Martin's house, you met

9    Lanora, yes?

10   A.    Yes, sir.

11   Q.    And you've identified Lanora on the chart.  Do you see

12   her in the courtroom today?

13   A.    Yes, sir.  The lady dressed in white.

14   Q.    Is it the lady standing?  The lady --

15   A.    Yes.

16   Q.    -- standing, correct?

17             Thank you.  Thank you, Ms. Ali.

18             You also met her husband, yes?

19   A.    Yes, sir.

20   Q.    And you found Lanora to be a very nice lady, yes?

21   A.    Everybody is nice --

22   Q.    Well, when you testified to the Grand Jury, you

23   described her as a very nice lady, correct?

24   A.    Everybody is nice when you met her.

25   Q.    You knew that she was a schoolteacher, yes?

1    A.    Yes, sir.

2    Q.    And you knew that she was a friend of Ms. Martin's,

3    yes?

4    A.    Yes, sir.

5    Q.    In fact, I think you described her as a very close

6    friend of Ms. Martin's?

7    A.    Yes, sir.

8    Q.    You knew that she bought clothes from Ms. Martin, yes?

9    A.    Yes, sir.

10   Q.    A lot of clothes, yes?

11   A.    Well, she bought some clothes once a little while.

12   Q.    Well, didn't you tell the Grand Jury that she bought

13   clothes from Ms. Martin a whole lot?

14   A.    Yes.  You come and you buy.  You come and you buy.  I

15   buy a lot, used to buy a lot of clothes.

16   Q.    She liked to dress nicely, correct?

17   A.    Yes.

18   Q.    You saw Lanora at Ms. Martin's house many times,

19   correct?

20   A.    Yes.

21   Q.    And to the best of your knowledge, Lanora had no

22   connection with the drug business, yes?

23   A.    Best of my knowledge, she don't have no connection.

24            MR. McKNETT:  Thank you.

25            THE COURT:  Redirect?

1                          REDIRECT EXAMINATION

2    BY MS. GREENBERG:

3    Q.   Good morning, Mr. Echarte.

4    A.   Good morning.

5    Q.   Could you explain this bus service to the jury.  You

6    talked about it on cross-examination a little bit.  What was

7    this bus service?  How did it work?

8    A.   What was what?

9    Q.   When Mr. Hall was asking you questions about the

10   Spanish bus service, he asked if you took the drugs back and

11   forth each time on the bus?  Do you remember the Spanish bus

12   that you --

13   A.   Yes.

14   Q.   -- talked about?  Could you explain that to the jury,

15   what the Spanish bus service is?

16   A.   It's a bus like Greyhound, but they -- this one, they

17   call it Lackawanna.

18   Q.   They call it what?

19   A.   Lackawanna.

20   Q.   But it's --

21   A.   The Cuban bus.

22   Q.   A Cuban bus.

23   A.   It's a regular bus, like any little transportation.

24   Q.   And how did it work that you got drugs through that bus

25   service?

1    A.   Well, I know the chauffeur.

2    Q.   You know the driver?

3    A.   And I give it to him and he bring it to me.

4    Q.   Were you on the bus when it was brought to you?

5    A.   Sometime I be on the bus, but I not carry.  He carry.

6    Q.   How would it get on the bus?

7    A.   I give it to him.

8    Q.   And how would it get off the bus?

9    A.   He give it to me.

10   Q.   And were you always on the bus?

11   A.   Yes.

12   Q.   You were always on the bus when it came up?

13   A.   Yes.

14   Q.   How did you come to meet the bus then with Mr. Whiting

15   or Mr. Philpot?  I'm confused.

16   A.   No, I take them to drive for me.  That's all.  I pick

17   up the drugs.

18   Q.   Okay.  The question is -- I'm trying to be clear, and I

19   apologize.  When you had the cocaine delivered through the

20   bus service, the Cuban bus service, were you traveling on

21   the bus from Florida to Maryland?

22   A.   I done it many times that way.  One time I did it

23   different way, and he drive it for me by hisself.  He

24   delivered it to somebody.

25   Q.   And how many times did you go with Mr. Whiting to pick

1    up drugs from the bus?

2    A.    Three or four times.

3    Q.    On those three or four occasions, did you travel with

4    the cocaine on the bus?

5    A.    No.

6    Q.    So there is more than one occasion that you weren't on

7    the bus?

8    A.    Yes, and I was on the bus.

9             MR. HALL:  Objection.

10            THE COURT:  Overruled.

11   A.    Because I know the coke coming on the bus.  I just have

12   to go and pick them up.

13   Q.    And how many --

14            MR. HALL:  Your Honor, I didn't hear the Court's

15   ruling.

16            THE COURT:  Overruled.

17   Q.    How many kilograms did you transport from Florida to

18   Maryland using the Cuban bus service?

19   A.    Three, four at a time.

20   Q.    And how many times, approximately?

21   A.    Possibility 15 days.  Sometime take about a month.

22   It's not a processity (phonetic), exactly the date.

23   Q.    Okay.  And let me ask the question trying to be more

24   clear.

25            How many times did you use the bus service to

1    transport kilograms of cocaine from Florida to Maryland?

2    A.    I would say 10 to 15 time.

3    Q.    And what did you do with the drugs that you transported

4    from Florida to Maryland?

5    A.    Sell them in Washington, D.C. to some people that I

6    know.  Some people, I be introduced by Gene Byrd, and

7    something that I giving to Mrs. Martin, and something I

8    giving to Kimmy.

9    Q.    How much did you give to Kimmy?

10   A.    On different occasion, I giving two kilos, three.

11   Q.    And what kind of drugs did you give to Kimmy?

12   A.    Cocaine, heroin.

13   Q.    What was your role with respect to Paulette Martin's

14   drug business?  What did you do with Ms. Martin with her

15   business?

16   A.    Her business, what I did was to help her do the

17   transportation.  Pero her business, her business.

18   Q.    Did you help her at all with customers or deliveries?

19              MR. MONTEMARANO:  Objection.  Leading.

20   A.    No.

21              THE COURT:  Okay.  Don't ask in a leading way.

22              MS. GREENBERG:  Your Honor, should I rephrase that

23   or --

24              THE COURT:  You can rephrase the question.

25              MR. MONTEMARANO:  Move to strike the witness's

1    answer.

2              THE COURT:  Did he answer it?

3              MS. GREENBERG:  He answered no, Your Honor.

4              THE COURT:  Disregard the answer.  Rephrase the

5    question.

6    Q.    Sir, what role, if any, did you have with respect to

7    Ms. Martin's drug business?

8    A.    Bolo be in the house.  If I see something wrong, some

9    drug be left over here, a lot of people's around, I say how

10   did this drug be there?  And nobody tell me what to do, but

11   if anybody make a wrong move and they are trying to --

12   stealing anything or stick them up at the house, I would be

13   there.

14   Q.    Did you assist her in any other way?

15   A.    No.  The other way would be open the package.

16   Q.    And did you provide her narcotics?  Did you provide her

17   drugs?

18   A.    Provide drugs to her?

19   Q.    Ms. Martin?

20   A.    Yes.

21   Q.    How much cocaine?

22   A.    Two kilo.  Three kilo.  One time, I think it was about

23   four kilo.

24   Q.    How much heroin?

25   A.    Heroin, never.

1    Q.    And Mr. Goodie?

2    A.    Never.  I give over to Mr. Goodie.

3    Q.    How much did you give to Mr. Goodie?

4    A.    Never I give drug to him myself.

5    Q.    And did you observe him get drugs from anyone?

6    A.    Say that again?

7    Q.    Did you observe Mr. Goodie get drugs --

8             MR. MARTIN:  Objection.  Leading.

9    Q.    -- from anyone?

10            MR. MARTIN:  Leading.

11            THE COURT:  Rephrase the question.  You can do it

12   in a non-leading way.

13   Q.    Did you have any observations as to Mr. Goodie at the

14   residence?

15   A.    The drug for Mr. Goodie come from Mrs. Paula Martin,

16   not from me.

17   Q.    And what quantity?

18   A.    According to what she said, half of the drug was belong

19   to him.

20   Q.    And how much drugs did you observe at that time?

21   A.    They doing about five, ten kilo in one moment.

22   Q.    And what kind of drugs?

23   A.    Coke and crack.

24   Q.    And how about Mr. Whiting?  Were there any observations

25   of him with drugs?

1    A.    Mr. Whiting coming to the same time.  The amount of

2    drug that I see in his transaction was a small amount of

3    drug.

4    Q.    And what do you call a small amount?

5    A.    $30.  Three or four grams.  That's what I considered.

6    If it was that much.

7    Q.    What's the smallest amount you've ever distributed?

8    A.    Me?

9    Q.    You.

10            MR. HALL:  Objection, Your Honor, unless there's a

11   time frame.

12   A.    Distributed to who?

13   Q.    From 2001 until the present, what is the smallest

14   amount that you've ever sold?

15   A.    In that house, hundred grams they have.

16   Q.    And do you consider -- do you consider a hundred grams

17   a small amount or a large amount?

18   A.    It's -- it's a good amount of drug.  Some of the people

19   that came in over there, I think that I give a couple a gram

20   to taste it, and -- with the idea they're going to buy some

21   more.  Pero I'm not going to dedicate myself to one gram of

22   heroin.

23   Q.    And what type of drugs did you observe Mr. Whiting get

24   from Ms. Martin?

25   A.    Coke, crack.

1    Q.    And what did you hear him say while he was in the house

2    about drug activity?

3    A.    He gets -- taste the drug, and the little bit that he

4    got it, he went to sell it.

5    Q.    And what dealings did you have with Mr. Whiting

6    personally?  How much did you distribute to him?

7    A.    I give it to him like I explained to you before.

8    Hundred grams, he cannot pay, owe me some money, and that

9    time was amount of money, and our relation was very close

10   relation.  Talking conversation was nice.

11              So I really, for principle, I make him to drive me

12   for what he owed me.  For money, did I need the money?  Not

13   with that situation.  But I like him.  But go ahead and

14   drive and try to destroy your life.  That was my ideal to do

15   this is all.

16   Q.    And what kind of drugs was it that you're talking about

17   when you say a hundred grams?

18   A.    Heroin.

19   Q.    Now, did you make -- have any observations as to

20   Mr. Whiting and Ms. Martin having any other business

21   activity while you lived at the house?

22              MR. HALL:  Objection.  Leading.

23              THE COURT:  Rephrase the question.  Sustained.

24   Q.    Did you have any other observations as to Ms. Martin's

25   and Mr. Whiting's relationship?

1    A.    Friendship.  My brother, brother, my brother, brother.

2    Q.    Any other business relationship?

3              MR. HALL:  Objection.  Still leading, Your Honor.

4              MS. GREENBERG:  Your Honor, I don't think that was

5    leading.

6              THE COURT:  Sustained.  Rephrase it.

7    Q.    Any other relationship?

8    A.    No.

9    Q.    I'd like to show --

10             MR. HALL:  Objection, Your Honor.  I think it's

11   still leading.  I'd ask that it be stricken.

12             THE COURT:  Overruled.

13   Q.    I'd like to show you what's marked as part of R15.

14   A.    Part of what?

15   Q.    I just want to show you something on the screen.  Let

16   me show it to you first.  It's already in evidence.

17             It's one of the checks from R15.

18             MR. HALL:  Your Honor, I'm going to object and ask

19   to approach.

20             (Counsel approached the bench and the following

21   ensued:)

22             MR. HALL:  Your Honor, this is part of the bank

23   record exhibits that was introduced yesterday.  Unless

24   there's some proffer from the Government that they saw him

25   sign this check, then I would suggest to the Court this is

1    totally inappropriate to show him, show Mr. Echarte.

2              THE COURT:  The document in question is a check --

3              MR. HALL:  That was part of Exhibit R15.

4              THE COURT:  -- on the account of R. Enterprises,

5    Inc., made out to Paulette Martin, signed by Reese Whiting

6    and endorsed by Paulette Martin.  This is from a deposit

7    record?

8              MS. GREENBERG:  Yes, Your Honor, and the date is

9    July 12th, 2002.  I'm going to ask Mr. Echarte if he still

10   was involved in conversations with Ms. Martin and if there

11   were any conversations about any other business with

12   Mr. Whiting at that time and if he was aware of any

13   consulting business.  That's on the reference.

14             THE COURT:  Because it says at the bottom

15   consultation?

16             MR. HALL:  Your Honor, well, first of all, it is

17   beyond the scope of the cross, but, secondly, you know,

18   unless this witness can say that he saw that check before, I

19   don't think he can testify to anything involving this check.

20   He can't say that's Mr. Whiting's handwriting.

21             MS. GREENBERG:  Your Honor, the exhibit's already

22   in evidence.  It's not a question of introducing it.

23             THE COURT:  You can ask the witness -- tell the

24   witness it is an exhibit in evidence in the form of a check

25   signed by Reese Whiting, addressed to Paulette Martin,

1    reference to consultation.  What, if any, knowledge do you

2    have concerning any consultation business of Ms. Martin.

3    That's about the best you can do for this word.

4                MS. GREENBERG:  That's all I plan to do.

5                THE COURT:  It's in evidence, and I think she can

6    do that.

7                (Counsel returned to the trial tables and the

8    following ensued:)

9    BY MS. GREENBERG:

10   Q.   Mr. Echarte, I'm going to show you a check that's

11   already part of R15, and I'm showing this to you here now,

12   and I'll put it up on the screen.  If you need some

13   interpretation, this gentleman will be here to interpret for

14   you.  Okay?

15   A.   What is it?

16   Q.   I'm going to ask you some questions about the data

17   that's on this check.

18   A.   Okay.

19   Q.   Showing you part of what is R15 on the screen, do you

20   see that in front of you, sir?

21                Do you see that, Mr. Echarte?

22                THE INTERPRETER:  The monitor is not on.

23                MS. GREENBERG:  Oh, lovely.

24   Q.   Do you see that date here, July 12, 2002?

25   A.   Yes.

1    Q.    And where were you physically located at that time?

2    Where were you living in 2002?

3    A.    Florida.

4    Q.    And were you still conversing with Ms. Martin?

5    A.    Yeah.  I still related to her in some kind of way.

6    Q.    Are you aware of any consulting business --

7              MR. HALL:  Your Honor, I'm going to object.  He

8    testified that he was living in Florida at that time.

9              THE COURT:  Well --

10             MR. HALL:  Different than the proffer we just

11   had --

12             MS. GREENBERG:  Your Honor, he was still talking

13   with her.

14             THE COURT:  Well, wait a minute.  He's testified

15   that he was there on and off all of 2002.

16             MR. MONTEMARANO:  He said he was back in Florida

17   then.

18             THE COURT:  I'm sorry.  What?

19             MR. MONTEMARANO:  He just testified he was back in

20   Florida at the date of the check.

21             MS. GREENBERG:  Your Honor, the witness testified

22   he still had conversations with Ms. Martin.

23             THE COURT:  All right.  Overruled.  He was in and

24   out the whole year, so I think it's a fair basis.  You can

25   ask the question.

1    Q.   Sir, are you aware of any consulting business that

2    Mr. Whiting had with Ms. Martin?

3    A.   Consulting business?

4    Q.   Yes.  Any other business besides the drug business are

5    you aware of between Mr. Whiting and Ms. Martin?

6    A.   He tried to sell some property, was immense property

7    that he's been dealing with, but this check is for only $25,

8    right?

9    Q.   Yes.

10   A.   Property that I --

11           MR. HALL:  Objection, Your Honor.

12   Q.   Sir, I'm going to just ask you again.  Did you have any

13   conversations, just yes or no, with Ms. Martin about any

14   other business that she was involved with with Mr. Whiting?

15           MR. HALL:  Your Honor, it has now been asked and

16   answered several times --

17           THE COURT:  Overruled.  I think we're having a

18   language difficulty --

19           MR. WARD:  Any conversation not related to the

20   conspiracy is not admissible.

21           THE COURT:  Overruled.

22   Q.   Sir, did you have any -- just yes or no.  I understand

23   you're trying to explain, but are you aware of any other

24   business that Ms. Martin had with Mr. Whiting other than the

25   drug business?

1    A.    No.

2    Q.    Now, you also talked about a piece of paper that you

3    got.

4                MS. GREENBERG:  Your Honor, may I approach?

5                THE COURT:  Yes you may.

6    Q.    Showing you what's been marked as Miscellaneous 20.

7                MR. WARD:  Your Honor, I'm objecting.  I don't

8    believe this was discussed in direct or cross.

9                THE COURT:  Let me see the document.

10               MS. GREENBERG:  Your Honor, if we could approach?

11               THE COURT:  You may.

12               (Counsel approached the bench and the following

13   ensued:)

14               MS. GREENBERG:  Your Honor, he said over and over

15   again the piece of paper that he got, and I just want to

16   clarify what piece of paper we're talking about here, what

17   was brought up on cross-examination.  And he talked about a

18   piece of paper from us and a piece of paper from Maryland,

19   and just so the jury's not confused, I want to clarify what

20   piece of paper we're talking about.

21               THE COURT:  Why is this not within the scope of

22   redirect?

23               MR. WARD:  Your Honor, he was talking about, as I

24   recollect, a piece of paper in the context of any immunity

25   he may have gotten from state authorities, but regardless --

1          THE COURT:  Regarding the PCP charge.

2          MR. WARD:   Regarding the PCP charge.

3          MS. GREENBERG:  He talked about a lot of pieces of

4    paper.  I just want to clarify.

5          MR. WARD:  Well, you had a chance to clean it up

6    then, and you didn't, and I think it's --

7          MR. MONTEMARANO:  Actually, for the record, Your

8    Honor, Mr. Echarte cleaned it up by making clear that he got

9    a paper relative to his pleading guilty in Tampa that

10   prevented him from being prosecuted if he pled in Tampa, and

11   that was finally dragged out of him near the end of the day

12   yesterday.

13         I'm not suggesting he was dissembling.  I am

14   suggesting that there was a language difficulty and a lack

15   of legal expertise on behalf of Mr. Echarte.

16         This relates in no way to the Tampa PCP

17   prosecution or any state immunity flowing therefrom.  This

18   is purely with regard to his --

19         THE COURT:  Based on what I've heard, I'm not so

20   certain he's correct when he said he was assured that he

21   wouldn't have any state prosecution.  I expect if I read

22   this document -- is there a document signed by --

23         MS. GREENBERG:  I think --

24         THE COURT:  -- all the prosecutors and the State's

25   Attorney's Office throughout Maryland?

1              MS. GREENBERG:  No, I think there is some --

2              THE COURT:  I kind of doubt that.

3              MS. GREENBERG:  -- I think there is some confusion

4    between two different times, and he mixed it up, and I just

5    want to clear it up.

6              THE COURT:  I think it's proper --

7              MR. MONTEMARANO:  Your Honor, I withdraw my

8    objection.

9              THE COURT:  I think it's proper redirect.

10             (Counsel returned to the trial tables and the

11   following ensued:)

12   BY MS. GREENBERG:

13   Q.   Sir, showing you Miscellaneous 20, do you recognize

14   this document?  Let me refer to the last page, the second

15   page.

16             It's addressed to Mr. Kaplan --

17   A.   Yes.

18   Q.   -- dated November 3rd, 2004, and is that your

19   signature?

20   A.   Yes, ma'am.

21   Q.   Do you recognize this document?

22   A.   Yes, ma'am.

23   Q.   What is this document?

24   A.   It's about there is no promise about anything.

25   Q.   And who is this document from?

1   A.   From this -- this city or this court to my lawyer, Joe

2   Kaplan, in Miami, Florida.  See if he accept the situation

3   for what it was.  And he was the one advising me to follow

4   this instruction and tell the truth.

5            It's one thing that I have to make clear for a

6   minute.  By me forcing my mind back, I recognize that lady.

7   I don't want to -- they said that I'm trying to lie.  I

8   remember now that I recognize her.

9            (Objections by various counsel.)

10            MR. MONTEMARANO:  Objection, Your Honor.  There's

11   no question.

12            MS. GREENBERG:  Your Honor, the witness is just

13   attempting to correct his testimony.

14            MR. SUSSMAN:  Nonresponsive, Your Honor.

15   A.   I remember --

16   Q.   Let me ask a question.

17            THE COURT:  Mr. Echarte.

18   Q.   Could you tell the jury what you remember about

19   Mr. Ward's client.

20   A.   Yeah.

21            MR. WARD:  I'm sorry.  I didn't hear the answer.

22   We'll clear that up.

23            (The reporter read the record as requested.)

24   Q.   Tell the jury how your recollection has been refreshed

25   by Mr. Ward as to his client.

1   A.    When he keeping said that it -- it was jewelry, was Al

2   Mundy, and she keep looking at me, I know now I never bought

3   any jewelry, but I know she was in the car trying to sell

4   jewelry and trying to show the way that I really believe

5   that was -- something was funny.  And I no buy the jewelry.

6            But I met her.  I remember that I met her.  But

7   all the people that I see here, you got to accept it, that

8   they have a different look in the street.

9   Q.    And how many times did you meet her?

10  A.    Only one time.  Was a moment.  But I don't want it

11  later said that I trying to -- I said something and that

12  wasn't true and maybe Al Mundy come in and said yes, it's

13  true.

14  Q.    Sir, that's fine.

15  A.    She tried to be there, but I never did business with

16  her.

17  Q.    Just answer the questions.  You met her once?

18  A.    Once.

19  Q.    Okay.  So now to get to Miscellaneous 20, this is the

20  piece of paper that you got from whom?

21  A.    From -- from this court.  From this place, there is no

22  agreement at all.

23  Q.    Now, there is a place here for your attorney to sign.

24  Do you see that?

25  A.    Yes.

1    Q.   Was he physically in Maryland?

2    A.   No.  You people fax to him.  We waiting for few, maybe

3    10, 15 minute.  He read the document.  He faxed back the

4    document where he sign and tell me on the phone.

5    Q.   Don't tell the jury what he said to you.  That's --

6    that's privileged.  But you consulted with your attorney?

7    A.   Yes.  Absolutely.

8    Q.   Now, you talked about another piece of paper that you

9    got.  Was that different from that?

10   A.   Yes.

11   Q.   Could you explain to the jury what the different piece

12   of paper was.

13   A.   The piece of paper that I receive, I know nothing about

14   this case.

15   Q.   Okay.

16   A.   When I receive that paper was in Tampa.

17   Q.   In connection with what case?

18   A.   In connection with my PCP case.

19   Q.   Now --

20   A.   And in order for me to plead guilty in Tampa, I

21   accepted in Tampa.

22   Q.   And when was that?  What year was that?

23   A.   '93.

24   Q.   Was that all done before you met with us with this

25   piece of paper?

1   A.   Absolutely.

2   Q.   Now, on cross-examination, you talked about 1.5 million

3   drugs.  Could you explain to the jury what you were talking

4   about when you talked about $1.5 million worth of drugs.

5   A.   Well, three times a half a million dollar, half a

6   million dollar, is million and a half.

7   Q.   And what drugs were you talking about?

8   A.   Say it again?

9   Q.   What drugs were you talking about?

10  A.   Cocaine.

11  Q.   Whose drugs?

12  A.   Mrs. Paula Martin.

13  Q.   Now, you got -- you testified on cross-examination that

14  you went to the Cuban bus service and picked up cocaine, and

15  we followed up a little bit here.  Who did you give that

16  cocaine to?

17  A.   Some given to her.

18  Q.   To who?

19  A.   To Mrs. Paula Martin.  On couple occasion.  The rest, I

20  sold it myself in the street or to Ms. Kimmy.

21  Q.   And what drugs -- when you drove with Mr. Whiting, what

22  drugs did you pick up?

23  A.   Coke and heroin sometime.

24  Q.   How much?

25  A.   Two, three kilos of heroin -- coke and 500 grams of

1    heroin.

2    Q.    Okay.   500 grams of what?

3    A.    Heroin.

4    Q.    And how much cocaine?

5    A.    Three kilos.

6    Q.    Each time or all together?

7    A.    No.   One time was the heroin.   The rest was only coke.

8    Q.    And how many -- you said two to three kilograms of

9    cocaine.   Each time or all together?

10   A.    Sometime be four kilo.   Sometime be five kilo.

11         I want you people to understand that I did this

12   for a period of time.

13   Q.    What's the smallest amount of cocaine that you had

14   transported on the Spanish bus service?

15   A.    Four kilo, three kilos.

16   Q.    What's the most amount of cocaine that you had

17   transported on the --

18   A.    Five.

19   Q.    And getting back to this -- to your understanding with

20   the United States, what has the United States asked you to

21   do with respect to your testimony?   What do you have to do

22   when you testify?

23   A.    Tell the truth.   That's what they told me.

24              MS. GREENBERG:   Nothing further, Your Honor.

25              THE COURT:   Any recross?

1          MR. MONTEMARANO:  Thank you, Your Honor.

2          Mr. Earnest, if I could trouble you, please --

3          THE WITNESS:  Say that again?

4          MR. MONTEMARANO:  Mr. Earnest, if I could trouble

5    you, please, to translate my questions, I want to make sure

6    Mr. Echarte is not misunderstanding anything.

7          Thank you, sir.

8                    RECROSS-EXAMINATION

9    BY MR. MONTEMARANO:

10   Q.   You just told Ms. Greenberg, Mr. Echarte, that the

11   Government expects you to tell the truth, is that correct?

12         THE INTERPRETER:  Yes, sir.

13   Q.   And they told you that before you testified before the

14   Grand Jury, correct, sir?

15         THE INTERPRETER:  Yes, sir.

16   Q.   And that didn't prevent you from lying to the Grand

17   Jury, correct, sir?

18         THE INTERPRETER:  Yes, sir.

19   Q.   Your lawyer explained this letter to you, did he not,

20   sir?

21         THE INTERPRETER:  My lawyer explained that letter

22   to me.  He came to see me.  He was with me when he explained

23   that letter to me.

24   Q.   He showed the letter to you?

25         THE INTERPRETER:  Yes, sir.

 1    Q.   Die he explain it to you in English or in Spanish?

 2              THE INTERPRETER:  In English.  And I understood

 3    perfectly what he told me.

 4    Q.   You understood perfectly?

 5              THE INTERPRETER:  We clarified this situation,

 6    that I had lied.

 7    Q.   You were absolutely clear on what it meant?

 8              THE INTERPRETER:  Yes, sir.

 9              MR. MONTEMARANO:  Will you please read paragraph

10    3, the first part of it, to Mr. Echarte, please, sir.

11    Q.   Do you understand that, Mr. Echarte?

12              THE INTERPRETER:  No.  You have to explain that to

13    me.

14    Q.   It says your client's complete truthfulness and candor

15    are express material conditions to the undertaking of the

16    Government set forth in this letter.  Therefore, the

17    Government may use statements made or other information

18    provided by you or your client during the proffer under the

19    following circumstances.

20              Do you understand that, sir?

21              THE INTERPRETER:  If I could have that again.

22              (Interpreter reading in Spanish.)

23              THE INTERPRETER:  What circumstances?

24    Q.   Why don't you let me ask the questions, Mr. Echarte.

25    I'd like to simply talk about this.  We'll talk about the

1   circumstances in a moment.

2                  Mr. Kaplan came and spoke with you, correct?

3                  THE INTERPRETER:  Yes, sir.

4   Q.   He explained to you that what you said to the

5   Government would not hurt you in any way, correct, sir?

6                  THE INTERPRETER:  That's right.

7   Q.   That your admissions about dealing heroin would not be

8   used against you, correct, sir?

9   A.   Yes.

10                 THE INTERPRETER:  Yes, sir.

11  Q.   And that your admissions about dealing cocaine would

12  not be used against you, correct, sir?

13  A.   Yes.

14  Q.   You understand that, correct, sir?

15  A.   Yes.

16  Q.   If you tell the truth.

17  A.   I did tell the truth, and the moment that that taking

18  place in there, everything was clarified that I lie about

19  Mrs. Kimmy.

20  Q.   When you testified before the Grand Jury, you lied.

21  A.   I lied when I testify in the Grand Jury.

22  Q.   So you weren't truthful.

23  A.   Not in the Grand Jury, and I correct that situation.

24  Q.   You're not going to be prosecuted even though you lied,

25  correct, sir?

1    A.   I not -- my lawyer not --

2    Q.   Your lawyer can't be in the Grand Jury.  You were told

3    that, weren't you?

4    A.   No.  I was advised by my lawyer, and what my lawyer

5    advised me, I explained to everything.  And the reason that

6    I lied, I said before that I was touched about the baby and

7    raised by itself, and that was the reason.

8              When it come to the point that my lawyer advise me

9    that he not be -- he continue to be my lawyer if I not tell

10   the whole truth, I accepted that I lie, and I accepted that

11   I lie and I accepted my responsibility that I lie.  When I

12   will be receiving any -- any negative recommendation or

13   anything, I accept the lie.

14             I lie in that moment.  I'm not lying now.

15   Q.   So you lied.

16   A.   I did lie.

17   Q.   And you're not going to be prosecuted for your heroin,

18   right?

19   A.   I said I never can be prosecuted in this court before.

20   Q.   That's not what this says, is it?  It says you won't be

21   prosecuted if you tell the truth.  That's what Mr. Kaplan

22   explained to you --

23   A.   I accept the whole responsibility in front of this

24   court even if to get prosecuted if it is necessary.

25   Q.   Mr. Kaplan told you it was okay to lie if you thought

1    it was important to lie?

2            MS. GREENBERG:  Objection --

3    A.   He wanted -- he told me don't lie, I don't lie.

4    Q.   He told you don't lie, and you did lie.

5            MS. GREENBERG:  Objection.

6            THE COURT:  Mr. Montemarano, sustained.  You're

7    arguing with him.

8            MR. MONTEMARANO:  Fair enough, Your Honor.

9            THE COURT:  No more.

10   Q.   Now, this is not the same paper you told us about from

11   the State of Maryland.

12   A.   Absolutely not.

13   Q.   And that piece of paper related to your drug dealing --

14   that's the PCP charge, correct?

15   A.   Yes.

16   Q.   And that was the case in Tampa?

17   A.   Yes.

18   Q.   And you just told Ms. Greenberg a few moments ago it

19   was 1993, but that was really in 2003, right, sir?

20   A.   Say what?

21   Q.   You just told Ms. Greenberg a few moments ago it was in

22   1993, correct?

23   A.   It's impossible to be in 1993.  I was in jail.

24   Q.   Right.  It happened in 2003, right?

25   A.   In 2003.  In 1993, I was in jail in Lexington,

Case 8:04-cr-00235-DKC   Document 1243   Filed 09/26/08   Page 42 of 230

1   Kentucky.

2   Q.    That's what I thought.

3   A.    That's what you thought, so the question be obvious.

4   Q.    But you told Ms. Greenberg --

5   A.    I not say that to Ms. Green.  It should be in record if

6   you answered that.

7   Q.    Well, we assume the record -- we have no question about

8   that.

9   A.    Just bring the record.

10          MS. GREENBERG:  Objection.  Argumentative, Your

11  Honor.

12          THE COURT:  Sustained.

13  Q.    With all your drug dealing, it's a little difficult to

14  keep them all straight, isn't it?

15          MS. GREENBERG:  Objection.

16  A.    Absolutely.  I don't deal with nobody buy drugs.

17  Everybody that dealing with me is about drugs.

18          THE COURT:  Mr. Echarte --

19          THE WITNESS:  Yes, sir.

20          THE COURT:  -- when you hear someone say the word

21  objection --

22          THE WITNESS:  I'm sorry, sir.

23          THE COURT:  -- do not answer until I've said

24  whether the objection is well taken.  All right?

25          THE WITNESS:  I'm sorry, sir.

1          THE COURT:  Mr. Montemarano, I think you're

2   arguing with the witness.  The objection is sustained.  I

3   instruct the jury --

4          MR. MONTEMARANO:  No problem, Your Honor.

5          THE COURT:  -- to disregard the answer.

6   Q.  I have two other questions, if I could, Mr. Echarte.

7   Let me see if I get -- if I understand your testimony

8   because I don't want there to be any confusion as part of

9   the jury.

10          You're a drug dealer of long, long standing.

11   You've been doing it for a very long time, correct?

12   A.  Since 1967.

13   Q.  And you moved in with Ms. Martin approximately 35 years

14   later, in about 2001?

15   A.  Yes.

16   Q.  Thirty-four years later?

17   A.  More.

18   Q.  Okay.  And at this point, you have been dealing --

19   providing her with heroin and cocaine for a period of time,

20   correct?

21   A.  Is not correct because I not provide her with heroin.

22   Q.  Excuse me.  Just cocaine.

23   A.  You're making mistake.  Not me.

24   Q.  Absolutely.  I make them all the time.

25          And you moved in with her and you lived with her

1   for about a year, right?  Correct?

2   A.   Yes, sir.

3   Q.   But during that time, if I understood your answer to

4   Ms. Greenberg correctly, you had no part of her extensive

5   drug dealing, is that correct?

6   A.   Yes, sir.

7   Q.   So in spite of all of your experience and all of your

8   knowledge, she never asked you for advice.  She never asked

9   you for help.  You just were sort of sitting there while all

10  this drug dealing went on around you, correct, sir?

11  A.   Sir, I not going to interfere to her dealing drug, and

12  she not interfere in my heroin business.  That was the deal.

13  I cannot walk into there and be interfering with her

14  business.  Her business, she have it already.  Was the

15  people that going over there.  I'm not going to cut their

16  throat and be in her house and sell no drug to the people

17  that she selling drug.

18  Q.   You weren't going to be involved because she didn't

19  wanted you involved.  Is that what --

20  A.   Say that again?

21         MS. GREENBERG:  Objection.  Asked and answered.

22  Q.   You weren't --

23         THE COURT:  Sustained.

24         MR. MONTEMARANO:  I'm trying to clarify the

25  witness's answer.  I didn't quite understand.

1          THE COURT:  Ask a new question.

2          MR. MONTEMARANO:  Thank you, Your Honor.

3  Q.   So you were not involved during this time, correct?

4          MS. GREENBERG:  Objection.  Asked and answered.

5          THE COURT:  Overruled.

6  A.   Say that again?

7  Q.   You were not involved in any way at this time, correct?

8  A.   As to what?

9  Q.   While you lived there.

10 A.   Involved with what?

11 Q.   Ms. Martin's drug business.

12 A.   I did business with her daughter.  Due to the

13 circumstances that she come to me and said that she don't

14 have the right pricing with her mother.  The mother would

15 not give to her the right price.  And that she been selling

16 drugs for a long time in her life for her mother.  That

17 was -- that was what she coming to me.

18          She needed money to pay her rent because she no

19 have a husband.  Then I give to her the drugs.

20          And she introduce it to me through her boyfriend.

21 Pero it's not that I interfere with his people.

22 Q.   So in not being involved in Ms. Martin's drug business,

23 you were following her desires, correct?

24 A.   I respected her house.  She was very mad because I

25 dealing drug with her daughter, and Philpot can testify over

1    that.

2    Q.   And she also didn't want to have personal relations

3    with you, correct, sir?

4    A.   She no wanted what?

5    Q.   She also didn't want to have personal relations with

6    you, correct, sir?

7    A.   Well, I said that before.  It's not --

8              MS. GREENBERG:  Objection, Your Honor.  Outside

9    the scope of redirect.

10             THE COURT:  How is this inside the scope of

11   redirect?

12             MR. MONTEMARANO:  Does Your Honor want to hear

13   from me here, or should we approach?

14             THE COURT:  Approach the bench.

15             (Counsel approached the bench and the following

16   ensued:)

17             MR. MONTEMARANO:  It's not a place I wanted to go.

18             MS. GREENBERG:  Judge, do we have to go through

19   the whole Viagra thing again?  I didn't address their

20   personal relationship at all during my redirect.

21             MR. MONTEMARANO:  If I could, Your Honor, I laid a

22   foundation for this question.  He had stated that he would

23   not involve himself in her drug business based upon her

24   expressed desires.  I now intend to ask him, however, that

25   notwithstanding her expressed desires, he conceived of and

1    desired to have a personal relation with her, which is what

2    he said yesterday, and it's the juxtaposition of I'll follow

3    her desires with regard to this but I won't follow them with

4    regard to this.

5                   THE COURT:  I think we've already said this.

6                   MR. MONTEMARANO:  I think I'm entitled to --

7                   THE COURT:  Thoroughly and comically.

8                   MR. MONTEMARANO:  Your Honor, I'm not looking

9    to -- for a second career as a stand-up comic.  Okay?  I

10   don't want to go near the Viagra again.  But he has, for

11   lack of a better term, opened the door by claiming one

12   thing, that, you know, his conduct is conditioned in one way

13   based upon her desires, and I, therefore, would like to

14   juxtapose that his conduct --

15                   THE COURT:  I sustain the objection.

16                   MR. MONTEMARANO:  I don't intend to go any

17   further, but I think I'm entitled to ask this question.

18                   MS. GREENBERG:  Your Honor, it was not at all

19   touched in redirect and it's far beyond the scope.

20                   THE COURT:  It wasn't in the scope of the redirect

21   at all.

22                   (Counsel returned to the trial tables and the

23   following ensued:)

24   BY MR. MONTEMARANO:

25   Q.   You respected Ms. Martin's wishes, correct, because it

1    was her house?  Is that what you said?

2    A.   Yes, sir.

3    Q.   It wasn't her idea for you to take Viagra, was it, sir?

4            MS. GREENBERG:  Objection, Your Honor.

5            THE COURT:  Sustained.

6            MR. MONTEMARANO:  No further questions, Your

7    Honor.

8            THE COURT:  Any further recross?

9                    RECROSS-EXAMINATION

10   BY MR. MARTIN:

11   Q.   Mr. Echarte, if at any time you don't understand

12   anything that I say, please stop me, and I'll have

13   Mr. Ernest assist us.  Okay?

14   A.   I will.

15   Q.   Very good.

16           Now, you were shown this letter that your lawyer

17   brought to you.  Remember the letter that --

18   A.   Yes, sir.

19   Q.   Okay.  And isn't it a fact, Mr. Echarte, that even

20   before you testified before the Grand Jury, you met with the

21   Government's lawyers, isn't that correct?

22   A.   Yes.

23   Q.   And when you met with the Government's lawyers, you

24   also lied when they asked you questions about Kim, isn't

25   that correct?

1    A.    Yes, sir.

2    Q.    Okay.  Now, you also testified, as I recall, that in

3    the drug business, there are a lot of unreliable people,

4    correct?

5    A.    All day.

6    Q.    Sorry?

7    A.    Everybody.

8    Q.    Everybody is unreliable.  And as a result of everybody

9    being unreliable, you have to be careful about who you deal

10   with.  Would you agree with that?

11   A.    Yes.

12   Q.    Okay.  And would it be safe to say that Mr. Goodwin

13   seated here is not your friend?

14   A.    No.

15   Q.    And is that no, he's -- I want to make sure we got this

16   clear.  He's not your friend, correct?

17   A.    Absolutely not my friend.

18   Q.    He's not your friend.  You don't -- you never

19   socialized with him, did you?

20   A.    I not socialize.

21   Q.    And you didn't drive anywhere with him, did you?

22   A.    Absolutely not.

23   Q.    And you didn't deal drugs with him, did you?

24   A.    Absolutely not.

25   Q.    And you've only seen him maybe two or three times at

1   Ms. Martin's house, correct?

2   A.   About three or four times.  Could be five.  Could be

3   three.

4   Q.   And other than just a passing conversation, you and he

5   really didn't have anything to talk about, right?

6   A.   We don't have nothing to talk about.

7   Q.   And notwithstanding that, you would have the ladies and

8   gentlemen of the jury believe that Mr. Goodwin would deal

9   drugs with Ms. Martin in front of you?

10            MS. GREENBERG:  Objection.  Argumentative.

11            MR. MARTIN:  I withdraw the question.  Nothing

12   further.

13            MR. HALL:  Just a couple of questions, Your Honor.

14                       RECROSS-EXAMINATION

15   BY MR. HALL:

16   Q.   Mr. Echarte, Ms. Greenberg showed you a check earlier

17   this morning.  Do you recall that?

18   A.   Yes, sir.

19   Q.   Okay.  And just to make sure that I understand

20   correctly, you stated that you were in Florida at that time

21   that was dated on that check, right?

22   A.   No, no.  I cannot be specific and say that I wasn't

23   here or I wasn't there.  I'm traveling many times from Miami

24   to Washington, D.C.

25   Q.   Okay.  But did you -- this morning you said you were in

1    Florida at that time.

2    A.    Yes.  Yes.  I be in Florida because I don't --

3    almost -- A, I have a pacemaker.

4    Q.    Okay.  And you had to go to Florida at some point

5    because you had to have that pacemaker put in, right?

6    A.    I been going to Florida, then coming back.  My parole,

7    all the time, if I late in my parole all the time, and I'm

8    coming up and down to Washington to Florida.

9    Q.    Okay.

10   A.    And the --

11   Q.    Let me ask you another question.  Okay?  You answered

12   my question.

13          Now, you would agree, however, that you were not

14   there when Mr. Whiting gave Ms. Martin that check, right?

15   A.    I never see the check.

16   Q.    You never saw it before.  Thank you, sir.  That's all I

17   need to know.

18          Now, sir, let me ask you this.  You talked earlier

19   about the bus service that went back and forth --

20   A.    Yes.

21   Q.    -- between Miami and someplace in Virginia.  Where did

22   it stop?  Let me ask you where it stopped.

23   A.    Virginia.

24   Q.    Virginia.  Okay.  All right.  Now, you rode that many

25   times, correct?

1    A.    Many times.

2    Q.    And just so I understand the -- you would buy the

3    drugs, either the cocaine or the heroin, in Miami, correct?

4    A.    Yes.

5    Q.    And you would, I guess, put it in some type of luggage?

6    A.    Yes.

7    Q.    You'd give it to the driver, who put it underneath

8    the --

9    A.    Somewhere.  I not ask.

10    Q.    Somewhere inside -- somewhere inside --

11    A.    Exactly.

12    Q.    -- inside the bus.  And then you would ride in the bus?

13    A.    Yes.

14    Q.    And come back up here, right?

15    A.    Yes.

16    Q.    And is it my understanding of your testimony that you

17    always rode on the bus when your drugs were coming back?

18    A.    Not always.  Sometimes the drug coming and I go and

19    pick them up.

20    Q.    Okay.  All right.  So you did not always ride on the

21    bus, is that right?

22    A.    No.

23    Q.    Sometimes you rode on the bus, sometimes you didn't,

24    right?

25    A.    Because sometimes somebody else put the drug on the bus

1    and I pick them up.

2    Q.   So you would have people who would do that for you down

3    in Florida?

4    A.   Yes.

5    Q.   Right?  Now, yesterday, when you talked about the bus,

6    you testified that it was heroin that was being transported,

7    but do I understand correctly it was both heroin and

8    cocaine?  Is that right?

9    A.   Except for marijuana, everything coming on the bus.

10   Q.   Except for marijuana?

11   A.   Yes.

12   Q.   You dealt marijuana, too?

13   A.   Long time ago.

14   Q.   Okay.  All right.  Now, did the marijuana ever come on

15   the bus?

16   A.   No.

17   Q.   All right.

18   A.   Coming in the big trailer.

19   Q.   Excuse me?

20   A.   In the trailer.

21   Q.   It came in the trailer?

22   A.   Yes.

23   Q.   Oh, okay.  So you had a different way of getting --

24   A.   Absolutely.

25   Q.   -- marijuana up here.

1    A.    Yes.

2    Q.    Is that because it's bigger and bulkier?

3    A.    Not in Baltimore.  D.C.

4    Q.    No.  I said it's bigger.

5    A.    Yes.

6    Q.    Amounts of marijuana are bigger than amounts of

7    cocaine, right?

8    A.    Yes.  Yes.

9    Q.    So you had to use a tractor-trailer for that?

10   A.    Yes, sir.

11   Q.    Okay.  Just want to make sure.

12              Now, do I understand that when you were living in

13   Ms. Martin's household, that the heroin business was all

14   your business, is that right?

15   A.    Yes, sir.  Yes, sir.

16   Q.    Okay.  You did not share the profits from that business

17   with anybody, is that right?

18   A.    No.

19   Q.    And that's how you made your money, right?

20   A.    Yes.

21              MR. HALL:  Thank you.  That's all.

22              THE WITNESS:  I make my money through that and

23   through cocaine.

24              MR. MITCHELL:  A few questions, Your Honor.

25                        RECROSS-EXAMINATION

1    BY MR. MITCHELL:

2    Q.    Mr. Echarte, you were asked a couple questions about

3    Kimmy, that is, Paulette Martin's daughter, and that you

4    were dealing directly with her, providing her with drugs,

5    correct?  Do you recall that?

6    A.    Yes.

7    Q.    And you also made reference to meeting with her

8    boyfriend?

9    A.    Yes.

10   Q.    Now, I just want to clarify.  You're not referring to

11   Mr. Bynum, are you?

12   A.    That is a husband.

13   Q.    Correct.

14   A.    Boyfriend was somebody else.

15   Q.    Correct.  She had a boyfriend at this time?

16   A.    Yes.

17   Q.    And you met with him?

18   A.    Yes.

19   Q.    And dealt with him?

20   A.    Yes.

21   Q.    Not with Mr. Bynum?

22   A.    Absolutely not.

23            MR. MITCHELL:  Okay.  Thank you.

24            THE WITNESS:  Can I make clear something else?

25            MR. MONTEMARANO:  Objection.  No question pending,

1   Your Honor.

2          THE COURT:  Only answer questions.

3                    RECROSS-EXAMINATION

4   BY MR. WARD:

5   Q.   You're what, 68, Mr. Echarte?

6   A.   Say it again, sir?

7   Q.   You're 68, right?

8   A.   Sixty-eight years old.

9   Q.   Yeah.  Well, we share something, and I realize that

10  every once in awhile the memory is not what it used to be.

11  A.   You should be familiar with that.

12  Q.   Believe me, I am.  All too well.  At least that's what

13  my wife says.

14          Now, you do now recognize the young lady at the

15  end, the lady that I had stand up?

16  A.   It coming back to my memory.

17  Q.   Yeah.  And that's Lavonne Dobie, also known as Becky

18  Dobie?

19  A.   I don't know the names.

20  Q.   Do you know her as Becky?

21  A.   Sound familiar, that Becky, but I don't know.

22  Q.   Did you know her as the guy who used to go

23  with Budie -- the woman who used to go with Budie Lawson?

24  A.   Yes.

25  Q.   And Budie Lawson was a friend of yours, too?

1    A.    Yes.

2    Q.    Okay.

3    A.    About a year, 40 years ago.

4    Q.    Now, you do remember a meeting that was set up by Al

5    Mundy and his wife Lauren at Chucky and Billy's Bar at

6    Georgia Avenue where --

7    A.    That's the wife of --

8    Q.    That's the lady who was present.

9    A.    That's the lady from Budie Lawson?

10   Q.    Yeah.

11   A.    I don't know her to be the wife of Rudy Lawson.

12   Q.    But you know that lady as being a --

13   A.    Now, to bring my recollection, the jewelry and the car,

14   and show me something.  The makeup is different.

15   Q.    Okay.

16   A.    All these people got different makeup, but I don't even

17   know that she was the wife of Rabuby Lax (phonetic.)

18   Q.    Well, I'm not saying she was the wife of --

19   A.    Or woman or mystery.

20   Q.    But anyway, that's sort of beside the point.

21          The point is when you met with her at Chucky and

22   Billy's Bar, it was for the purpose of looking at stolen

23   jewelry and stuff that she had?

24   A.    Exactly.

25   Q.    Okay.  And she had loose diamonds, right?

1   A.   Possibility have a diamond watch or anything, and

2   this is what --

3   Q.   Watches?

4   A.   -- this is what I'm trying to bring to you.

5   Q.   Yeah.

6   A.   When she meet me and she is a delinquent and trying to

7   sell the jewelry, she never met me before, and she going to

8   discuss that jewelry sale with me.  It's the same like

9   happen with Mr. Goodie.  He don't know me, pero he can

10   discuss his business affair, because everybody know me.

11   Q.   But she was introduced to you by Al, Al Mundy, and his

12   wife?

13   A.   Yes, sir.

14   Q.   Okay.  And you know Al and his wife?

15   A.   Absolutely for 30 or 40 year.

16   Q.   But they -- they knew her, right?

17   A.   They might know each other because they boosted each

18   other.

19   Q.   And she was trying to sell you stolen jewelry.

20   A.   Stolen property.

21   Q.   And you were suspicious.

22   A.   No.  I guess maybe could be counterfeit.

23   Q.   So you didn't buy any.

24   A.   I not boughted anything.

25   Q.   Okay.  And that's -- I mean she didn't buy drugs from

1    you or --

2    A.    No, no, no.  She don't buy nothing from me.

3    Q.    She didn't try to sell drugs to you?

4    A.    No.

5    Q.    And you have no knowledge of her ever being involved

6    with Paulette Martin or any of the other people that you

7    talked about?

8    A.    No.  Hardly for me to recognize her.

9              MR. WARD:  Yeah.  Okay.  Thanks.

10             THE COURT:  Any further recross?

11             MR. McKNETT:  No, Your Honor.

12             THE COURT:  Okay.  All right.

13             Thank you very much.  You may step down.

14             MS. GREENBERG:  May the witness be excused?

15             THE COURT:  You may be excused.

16             Do you have a five- or ten-minute witness?

17             MS. JOHNSTON:  Maybe 15 minutes, Your Honor.  I

18   don't think this witness will be subject to extensive

19   cross-examination.

20             THE COURT:  Okay.

21             MS. JOHNSTON:  We would call Horace Lindsay.

22             (The oath was administered.)

23             THE CLERK:  Please be seated.

24             Please speak loudly and clearly into the

25   microphone.  State your name for the record and spell your

1    last name.

2              THE WITNESS:  Horace Lindsay, L-I-N-D-S-A-Y.

3                        DIRECT EXAMINATION

4    BY MS. JOHNSTON:

5    Q.   Good morning, Mr. Lindsay.  Are you currently employed?

6    A.   No, I'm not.

7    Q.   Where are you retired from?

8    A.   Metropolitan Police Department.

9    Q.   In Washington, D.C.?

10   A.   Yes.

11   Q.   And how long did you work for the Metropolitan Police

12   Department?

13   A.   Twenty-seven years.

14   Q.   Could you give us an idea of what time period that was?

15   A.   I joined the department in June of '71.  I retired June

16   of '98.

17   Q.   And what different positions did you hold with the

18   Metropolitan Police Department?

19   A.   I was a police officer, and in the '90s, I made

20   detective.

21   Q.   And where were you assigned as a detective?

22   A.   Fourth District.

23   Q.   Could you describe what your duties and

24   responsibilities were as a detective.

25   A.   When I was working in the Narcotic Section of the

1    Fourth District Police Department, we conducted different

2    vice investigations.  And later I left the Vice Department

3    and went into the regular detectives office, where I

4    progressed different crime reports.

5    Q.    Different types of crimes you investigated when you

6    were in just the Detective Bureau?

7    A.    Yes.

8    Q.    Now --

9    A.    That's -- go ahead.

10   Q.    When you were in the vice portion of the Detective

11   Bureau at the Fourth District, what did the vice

12   investigations include?

13   A.    We did warrants for narcotics.  We did different vice

14   operations as far as solicitations.  Anything that primarily

15   fell under vice and the complaints that passed through our

16   office.

17   Q.    Now, were you assigned to that section on or about

18   April 29th of 1994?

19   A.    Yes, I was.

20   Q.    I want to show you for identification purposes only

21   Miscellaneous 21.

22           Do you recognize that report?

23   A.    This is a Metropolitan Police Department Form PD 163, a

24   prosecution report.

25   Q.    And does -- have you had an opportunity to review that

1    report before coming to court?

2    A.   Yes, I did.

3    Q.   Could you tell us what you did on Tuesday, April 29th

4    of 1994?

5    A.   On that particular date, we conducted -- my office

6    conducted a narcotics search warrant for 5559 South Dakota

7    Avenue, N.E.  During the process of serving the warrant, a

8    person was located inside that premises, and upon searching

9    that person, a white substance was found in the person's

10   pocket.  It was field tested positive for heroin.

11   Q.   Just so the record is clear, do you recall who that

12   person was, the name of that person?

13   A.   Jeffrey Miles.

14   Q.   In addition to finding white powder that field tested

15   positive for heroin on Mr. Miles, was a further search

16   conducted of the premises?

17   A.   Yes.  Within the premises, a portfolio was located.

18   Within that portfolio, another quantity of white substance

19   was found there and field tested positive for heroin also.

20   Q.   And in that folio, were there any other documents or

21   pictures?

22   A.   There were -- there were photographs.  There were

23   personal papers.  There was a scale with a residue of green

24   weed and ziplock plastic bags.

25   Q.   Now, in regards to the people who were present, other

1    than the police officers and Mr. Miles, was there another

2    person present?

3    A.    Yes.

4    Q.    And who was that?

5    A.    Paulette Martin.

6    Q.    And was -- in the portfolio or folio where the heroin

7    powder was recovered, were there any items associated with

8    Ms. Martin recovered from that folio?

9    A.    There were photographs and personal papers of

10   Ms. Martin.

11   Q.    Now, as a result of that, what was done with

12   Ms. Martin?

13   A.    Both Ms. Martin and Mr. Miles were placed under arrest

14   for narcotics violations.

15   Q.    And at the time Ms. -- approximately what time of the

16   day was this?

17   A.    Around 2100 hours.

18   Q.    Which is 9:00?

19   A.    Which is 9:00 civilian time.

20   Q.    In the evening?

21   A.    Yes.

22   Q.    Now, at the time Ms. Martin was arrested, did she

23   provide an address, a home address?

24   A.    Yes.

25   Q.    What was the home address Ms. Martin provided?

1   A.   804 Nicholson Street.

2   Q.   In Northeast?  Northwest?

3   A.   Northeast section of the city.

4   Q.   Did she also provide a date of birth and a social

5   security number?

6   A.   Yes.

7   Q.   And looking at Miscellaneous 21, can you tell us what

8   the date of birth and social security number was that she

9   provided?

10  A.   Date of birth is 10/22/46.  Social security number,

11  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.

12  Q.   And did Ms. Martin also provide employment information

13  to you at that time?

14  A.   Yes.

15  Q.   And what was the employment information she provided?

16  A.   She stated she worked at a dance school which is

17  located at 5559 South Dakota Avenue, Northeast.

18  Q.   And was that the same address where you executed the

19  search warrant and recovered the white powder substance that

20  tested positive for heroin?

21  A.   Yes.

22  Q.   Now, do you have any recollection in terms of what the

23  exact quantity was of the heroin that was seized?

24  A.   No, I do not.

25  Q.   All right.  And do you have any knowledge in terms of

1    what happened with -- ultimately happened with the charges

2    that were filed against Ms. Martin?

3    A.    No, I do not.

4    Q.    Okay.  And are you able to identify Ms. Martin here in

5    court?

6    A.    No, I don't recognize her.

7    Q.    All right.  And that would be because this happened how

8    many years ago?

9              MR. MONTEMARANO:  Objection, Your Honor.

10             THE COURT:  Sustained.

11             MS. JOHNSTON:  I have no further questions.

12             THE COURT:  Any cross?

13                      CROSS-EXAMINATION

14   BY MR. MONTEMARANO:

15   Q.    Did you make any pre-raid observations?

16   A.    I'm sorry, sir?

17   Q.    Did you undertake any pre-raid observations?

18   A.    I don't recall a lot of circumstances on this case,

19   sir.  I don't know if it was my particular warrant.  So no,

20   I don't have any information.

21             MR. MONTEMARANO:  No further questions, Your

22   Honor.

23             MR. MARTIN:  Mr. Goodwin has no questions, Your

24   Honor.

25             MR. HALL:  No questions.

1              THE COURT:  Anyone?

2              All right.  In light of that, there's --

3              MS. JOHNSTON:  Just one question.

4                        REDIRECT EXAMINATION

5    BY MS. JOHNSTON:

6    Q.   Detective Lindsay, did you prepare the report that

7    you've used to refresh your recollection?

8    A.   Yes, I did.

9              MS. JOHNSTON:  Nothing further.

10             THE COURT:  All right.  You may step down.  Thank

11   you very much.

12             All right.  We'll take a recess now until 20

13   minutes of 12:00.  Twenty-five minutes of 12.00.

14             (Recess.)

15             THE COURT:  Ready for the jury?

16             Bring them in.

17             (Jury present.)

18             (The oath was administered.)

19             THE CLERK:  Please be seated.

20                        DIRECT EXAMINATION

21   BY MS. GREENBERG:

22   Q.   If you'd state your name and spell your last name for

23   the court reporter, please.

24   A.   My name is Marsha Lee.  Last name is spelled L-E-E.

25   Q.   And where are you employed, ma'am?

1   A.   I'm employed at the Western Laboratory Drug Enforcement

2   Administration in San Francisco, California.

3   Q.   And what is your position there?

4   A.   I'm -- at the laboratory, I am a senior forensic

5   chemist.

6   Q.   And how long have you been a senior forensic chemist at

7   the laboratory, in the DEA lab in San Francisco, California?

8   A.   I have been with the Western Laboratory since November

9   1992.

10  Q.   And could you give the jury some idea of your

11  background, training and experience as a chemist.

12  A.   First of all, I received my bachelor's degree in

13  chemistry from Swartmore College in 1979.  I also received

14  my master's and doctor's degree in chemistry from the Johns

15  Hopkins University in 1983 and doctorate in 1985.

16        I have been a chemist for the Environmental

17  Protection Agency for approximately five years, and I worked

18  for a private British company for approximately two years

19  and then spent the next roughly fourteen years with the Drug

20  Enforcement Administration as a forensic chemist.

21  Q.   And, Dr. Lee, in your position as a forensic chemist,

22  have you been called to testify as to narcotics analyses and

23  identifications as an expert witness in Federal Court?

24  A.   Yes, I have.

25  Q.   And have you been certified as an expert in that area?

1    A.    Yes, I have.

2    Q.    Approximately how many times?

3    A.    Over 43 times.

4              MS. GREENBERG:  Your Honor, I submit Dr. Lee as an

5    expert, a forensic chemist entitled to give her opinion as

6    to narcotics identification and analysis.

7              THE COURT:  Any cross?

8              MR. MONTEMARANO:  No.

9              MR. HALL:  No, Your Honor.

10             THE COURT:  All right.  She'll be permitted to

11   express opinions in those fields.

12   Q.    Now, Dr. Lee, did you analyze some white powder

13   substance that was submitted to your lab on November 11th,

14   1991?

15   A.    No, I did not.

16   Q.    Did you do a subsequent analysis from another person in

17   your lab that had some analyses of drugs done, Mr. Joseph

18   Power?

19   A.    No, and I would like to provide a short clarification?

20   Q.    Sure.

21   A.    The evidence that I did analyze for this particular

22   case was submitted to the laboratory in April of 1995, and

23   this is the evidence I analyzed.

24   Q.    Had it been previously analyzed by another DEA chemist?

25   A.    Yes, it was.

1   Q.   And who was that chemist?

2   A.   The previous chemist was Forensic Chemist Joseph A.

3   Power.

4   Q.   And has Mr. Power since passed away?

5   A.   Yes, he has.

6   Q.   And could you tell by looking at the file when

7   Mr. Power first received the exhibits that were analyzed and

8   then subsequently analyzed by you?  Can you tell from

9   looking at this file in your office when Mr. Power first

10  received the drugs that you looked at?

11  A.   Yes.  There was his case file and his notes, but more

12  importantly, the evidence had his seal and his initials.

13  Q.   And for the jury, so they can tie the two exhibits

14  together, can you look and see when Mr. Power first got the

15  drugs which you subsequently reanalyzed?

16          And if you need to look at the DEA-7, which is the

17  lab report, go ahead and do that.

18  A.   Forensic Chemist Joseph Power completed his analysis on

19  December 30th, 1991.

20  Q.   And can you tell from looking at the DEA-7 when the

21  exhibit was first submitted to the DEA lab?

22          MS. GREENBERG:  Your Honor, may I have the exhibit

23  marked and approach the witness?

24          THE COURT:  You may.

25  Q.   Showing you what's been marked as Government's

1   Miscellaneous Number 22 just for identification, Mr. Power's
2   DEA-7.
3           Showing you a series of DEA-7s, which are marked
4   as Miscellaneous 22, the initial section of this, is this
5   filled out by the person submitting the exhibit?
6   A.   Yes.
7   Q.   And can you tell from looking at the submission when it
8   was received by the DEA lab?
9   A.   The Western Laboratory received the evidence initially
10  on November 12th, 1991.
11  Q.   And this was from U.S. Customs?
12  A.   It was submitted by an Agent Michael Baxter.
13  Q.   And looking at Miscellaneous 22, was it a submission by
14  U.S. Customs Service?
15          MR. HALL:  Your Honor, I'm going to object.  She's
16  answered the question.  If she didn't know beyond that, I
17  would suggest that showing her the correct answer on the
18  document is inappropriate.
19          THE COURT:  Overruled.
20  Q.   Was it submitted by U.S. Customs?
21  A.   It was submitted by the United States Customs Service
22  under a DEA case number.
23  Q.   And was that numbering subsequently corrected by your
24  office?
25  A.   When I received the evidence to analyze, it was

1    submitted as a U.S. Customs case number.

2    Q.    And who caused that numbering to be corrected?

3    A.    U.S. Customs.

4    Q.    Who in your lab caused the numbering to be corrected so

5    it correctly reflected a Customs number?

6    A.    When the DEA-7 was submitted, it has a Customs case

7    number.

8    Q.    So you're able to tell from your lab number that it was

9    a Customs case?

10   A.    Yes.

11   Q.    And based on the submission by U.S. Customs on

12   November 12th, 1991, did you analyze the drugs that were

13   submitted to the DEA lab?

14   A.    Eventually, when the evidence was submitted back in

15   April of 1995 under the Customs case number, I did have the

16   opportunity to analyze it.

17   Q.    And were you able to tell from looking at your internal

18   file if it was in the same condition and remained in a

19   sealed condition except for Mr. Power's analysis?

20   A.    That is correct.  I was able to compare the gross

21   weight and the description and the number of packaging, as

22   well as the seals affixed by Mr. Power.

23   Q.    And could you tell the jury, please, what did you do

24   with those packages that you received for subsequent

25   identification?

1    A.   The first thing I did was to take a weight of each of

2    the packages and thereby obtain a net, a new net weight of

3    the exhibit.  Subsequent to that --

4    Q.   Okay.  If I could stop you for a second, I just wanted

5    to show you a picture up on the screen.  Do you recognize

6    what's depicted in P211?

7    A.   Yes, I do.

8    Q.   And what is that?

9    A.   This was a photograph taken by Mr. Power when he first

10   received the evidence.

11           MR. HALL:  Your Honor, I'm going to object.  I

12   don't think she would know whether Mr. Power took the

13   photograph.

14           MS. GREENBERG:  Your Honor, I can follow up.

15   Q.   Is this part of the official case file from your

16   office?

17   A.   Yes, it is.

18   Q.   And it was provided to our office as part of our

19   request?

20   A.   Yes.

21   Q.   Okay.  Now if you could tell the jury what's depicted

22   in P211.

23           I think there's a little TV next to you if it's

24   working.

25   A.   No, it's not.

1   Q.   That's the second time today.  Sorry, Dr. Lee.  See if

2   we can fix that.

3   A.   The photograph he took, we have a sign that denotes the

4   case number and the date the photograph was taken and that

5   it was at the Western Laboratory.  This picture is of the

6   bulk portion.

7   Q.   Let me just walk up and show you P212, and then I'll

8   put it up on the screen.

9         Do you recognize what's depicted in P212?

10  A.   Yes, I do.

11  Q.   And could you tell the jury what they're seeing here?

12  A.   This is a standard protocol by the DEA laboratories to

13  photograph the -- these large seizures, also known as bulk

14  seizures, and that is to take a picture with a sign, as well

15  as what the material looked like upon being received in the

16  laboratory since after our chemical analysis, it generally

17  does not retain its original form.  Mr. Power was taking

18  core samples.

19  Q.   And is the core samples taken by this black rod with

20  the red top on it?

21  A.   Yes.

22  Q.   And why is that done?

23  A.   He was attempting to sample from each of the packages

24  and to form a chemist composite that is representative of

25  the entire seizure.

1    Q.   And P213, what is -- well, let me walk it up there.

2    Let me first show you P213.

3              Do you recognize what's depicted on P213?

4    A.   Yes, I do.

5    Q.   And could you tell the jury what they're seeing here?

6    A.   What is being shown in this photograph is just to the

7    right is what the material is in its original form, as a --

8    as a thin white brick, compressed powder.

9    Q.   And is that what we see with the Customs green label on

10   it?

11   A.   That is correct.

12   Q.   Can you see it on your screen now?

13   A.   Yes, I do.

14             And the -- and the brick just below the sign is of

15   the sample that he's ready to take another core sample from.

16   Q.   And what are we seeing in P214?

17   A.   In this photograph, it shows the packages just prior to

18   him opening them up for his sampling.  This is the -- what

19   should be the original form of the packages.

20   Q.   And, Dr. Lee, did you -- you were getting to the point

21   before I showed you these pictures where you said the first

22   thing you do is weigh the exhibit.  How did the weight of

23   your analysis compare to what Mr. Power did?

24   A.   It agreed very well.

25   Q.   Was there a slight difference?

1  A.   The slight difference is only due to some of the powder

2  adhering to the wrappers, but this is consistent, and it was

3  just a few grams less than his.

4  Q.   And what was the total weight of the package that was

5  submitted to your laboratory back in November of 1991 by

6  United States Customs?

7  A.   Do you mean the gross weight or the net weight?

8  Q.   Why don't you give us both.

9  A.   When I analyzed the exhibits in April of 1995, the

10  gross weight of the submission was 9,417 grams.

11  Q.   And the net weight?

12  A.   And the net weight for this exhibit was 7,989 grams.

13  Q.   So the net weight, is this correct, is just under

14  eight kilograms?

15  A.   That is correct.

16  Q.   Now, Dr. Lee, after you weighed the sample and compared

17  your weight with Mr. Power's, what did you do with the

18  exhibit next?

19  A.   I proceeded to do a number of screening tests to make

20  sure that the contents from each of the bags were all

21  chemically equivalent, and this included doing some chemical

22  tests, instrumental tests, and then after I was satisfied

23  that they were all of the same type of material, I also

24  formed my own chemist composite, and from there I did a

25  quantitative analysis and obtained the purity.

1    Q.   Well, first, before you get to the purity, could you

2    tell us the results of your initial analyses on these -- on

3    these samples?

4    A.   When I did several chemical tests, they were consistent

5    with heroin.  I did an instrumental test on all the

6    packaging material and found it to be of high purity heroin

7    hydrochloride, and then I performed my composite.

8    Q.   Now, did you test each and every one of these what

9    we're seeing here as bricks?

10   A.   When I received the exhibit, in addition to 23

11   packages, I also received in the evidence two additional

12   bags that Forensic Chemist Joe Power had prepared as his

13   chemist composite.

14   Q.   And what is a chemist composite?

15   A.   The chemist composite is when he takes little core

16   samplings from each of the originally submitted packages,

17   and he also screens each package to make sure that they are

18   chemically equivalent.  And the chemist composite is a

19   representative sampling of all the packages, and it's

20   generally on the order of 50 grams.

21   Q.   Did you redo the composite, or did you go back to the

22   original packages?

23   A.   I went back to the original packages, and I also

24   rescreened the chemist composites prepared by Joe Power.

25   Q.   And were the results of your testing of all those

1   packages consistent?

2   A.   Yes, they were.

3   Q.   And consistent with what drug?

4   A.   This was consistent with very high purity heroin

5   hydrochloride.

6   Q.   And what was the purity?

7   A.   The purity for the heroin hydrochloride was 88 percent.

8             MS. GREENBERG:  No further questions, Your Honor.

9             THE COURT:  Any cross?

10            MR. HALL:  Yes, Your Honor.  I have a few

11  questions.

12                      CROSS-EXAMINATION

13  BY MR. HALL:

14  Q.   Let me ask you this -- Dr. Lee?  Correct?

15            You indicated that this originally came in under a

16  DEA lab number, is that correct?

17  A.   Originally when Joseph A. Power, did the analysis, the

18  paperwork showed that it had a DEA case number.

19  Q.   Okay.  And then it was renumbered at some point with a

20  Customs case number, is that correct?

21  A.   When it was resubmitted for my analysis, the paperwork

22  had a Customs identification number.

23  Q.   Okay.  And when was it renumbered?

24  A.   I have no idea.

25  Q.   You have no idea where it -- when it was renumbered.

1    Okay.

2              Now, you indicated that there was a slight

3    difference in the weight of the drugs between Mr. Power's

4    examination and your examination?

5    A.   That is correct.

6    Q.   Okay.  And how many grams difference in weight was

7    there?

8    A.   It would be roughly 24 grams.

9    Q.   Okay.  And you would agree with me that's more than a

10   couple of grams, wouldn't you?

11   A.   Considering that there were a total of 23 original

12   packages, two chemist composites provided by Mr. Power, this

13   is not unusual in the sense that there is powder that often

14   adheres to plastic bags, and it wasn't possible to

15   completely empty the plastic bags.

16             So yes, this was more than a couple grams, but in

17   light of the circumstances concerning this evidence, this is

18   not at all inconsistent.

19   Q.   Okay.  Now, you did your analysis approximately four

20   years after he did, is that correct?

21   A.   That is correct.

22   Q.   Okay.  And let me ask you, how did the bags of heroin

23   come into your possession there at the crime lab?

24   A.   All the packaging and the evidence, they were submitted

25   in a sealed cardboard box.

1    Q.    Okay.  And who submitted them?

2    A.    It was submitted by an agent.

3    Q.    Okay.  And do you receive on the paperwork that you are

4    given where this item would have been stored during the

5    previous four years?  Did you receive that information?

6    A.    Because this is a Customs case, the DEA Western

7    Laboratory does not store U.S. Customs evidence.  It is

8    returned back to that agency.  I have no idea.

9    Q.    Okay.  Now -- well, let me ask you this.  Since the

10   drugs were originally submitted under a DEA case number,

11   wouldn't it have remained at the DEA facility?

12   A.    No, it would not.

13   Q.    Even though it has a DEA case number?

14   A.    What happened was it was probably requested back.

15   There are times when DEA evidence can be permanently

16   transferred out of the laboratory system.

17   Q.    Okay.  And do you know where it goes?

18   A.    At the time I was a forensic chemist, and I was not an

19   evidence technician, so I have no idea where it went.

20   Q.    Okay.  Fair enough.

21           Now, you indicated that a composite was made of

22   the substance in these bags from a core sample, is that

23   correct?

24   A.    That is what I assume that the previous --

25   Q.    I'm not asking you what you assumed.  I'm asking you

1    what you know.  Do you know that the composite was made?

2    A.    Yes, I do know.

3    Q.    Okay.  And was that done by you or by Mr. Power?

4    A.    Mr. Power made his composite, and I also made my own.

5    Q.    Okay.  All right.  That's what I was getting at.

6            So you each made a composite of the substance in

7    each of these bags, is that correct?

8    A.    That is correct.

9    Q.    Okay.  When you made your composite, you made your

10   composite using a sampling from each of those packages or

11   just a select number of packages?

12   A.    I had made my chemist composite from a sampling of the

13   packages, but I screened every single bag.

14   Q.    Okay.  And is it the DEA Lab's or the Western Lab's

15   practice to use a sample of the packaging rather than using

16   each package for the composite?

17   A.    That is correct.

18   Q.    Okay.  So it would have been the procedure at the time

19   Mr. Power did his examination that he would have taken

20   samples from a similar selection of packages, is that

21   correct?

22   A.    That is correct.

23   Q.    Okay.  And when you make that selection of what's going

24   to go into your composite, is there a set number of bags or

25   a percentage of the bags that you sample?

1    A.   For myself, I generally sample every single bag.

2    Q.   Okay.  But for your composite, you don't sample every

3    bag, is that correct?

4    A.   For the composite, no.  I only sampled a portion of the

5    bags.  However, every single bag that was submitted, I did

6    test.

7    Q.   I understand that.  Okay.

8            Now let me ask you this.  Once the analysis is

9    completed, is it the DEA's practice or your lab's practice

10   to set a certain number of these bags to be destroyed?

11   A.   What the DEA does for DEA and other federal agencies is

12   to separate the evidence into two portions.  One is what we

13   call the threshold portion, which is generally, depending on

14   the drug, on the order of two kilograms, and the remaining

15   is what we call the bulk portion.  Generally, the bulk

16   portion is destroyed but not necessarily destroyed.

17   Q.   Do you know in this particular case whether the drugs

18   were destroyed?

19   A.   I do not know that.

20   Q.   Okay.  All right.  So if I understand correctly, you

21   don't know whether or not the drugs were destroyed, and you

22   do not know where the drugs were kept during that time

23   period between Mr. Power's examination and your examination,

24   is that correct?

25   A.   That is correct.

1    Q.    Okay.  And it would also be fair to say that other than

2    the use of composites and the fact that some of the drugs

3    adhere to the bags, you can't really account for the

4    24 grams that were missing, can you?

5    A.    No, but as I stated, it is as if I had taken a plastic

6    bag and if I had put flour in it to, say, dredge some

7    chicken and then emptied it out, there would be some powder

8    adhering to the bag.  Do I make an attempt to scrape every

9    single portion off?  No.

10          And because you have reminded me that it has

11   been -- it had been about four years since I did the

12   analysis, it is possible that the material might have lost

13   some moisture.

14   Q.    All right.  Would you agree with me that that's a

15   lot -- 24 grams would be a lot to have adhere to the bags?

16   A.    For this number of bags, no.

17   Q.    You believe that in emptying these bags, you might have

18   24 grams adhere to these bags?  Is that your testimony?

19   A.    I'm saying that it is not a lot.  I am just simply

20   stating, as I stated earlier, that it would be consistent

21   with this number of bags.

22   Q.    So if I understand correctly, you do not consider a

23   24-gram loss of this particular drug to be a particularly

24   significant amount, is that correct?

25   A.    That is correct.

1          MR. HALL:  Thank you, Your Honor.

2          THE COURT:  Any further cross?

3          Any redirect?

4          MS. GREENBERG:  Briefly, Your Honor.

5                    REDIRECT EXAMINATION

6    BY MS. GREENBERG:

7    Q.   Dr. Lee, could you, by looking at the exhibit and

8    looking through your file, tell if the item was in the same

9    condition as from when Dr. Lee tested it?  I'm sorry.

10   Mr. Power tested it.

11   A.   Yes.  And I have in my notes that I had noted that

12   several of the contents were initialed by Joseph A. Power.

13   Q.   And in what condition were the items?

14   A.   The items look similar to what he had noted in his --

15   in his reports.  That is, the weights were all very much

16   consistent.

17   Q.   And how were the bags maintained?

18   A.   The bags were all in a sealed condition.

19   Q.   Now, counsel asked you some questions about the 24-gram

20   difference.  How do you explain that difference between the

21   testing by Mr. Power and the testing by you?

22          MR. HALL:  Objection, Your Honor.  I think it's

23   been asked and answered.

24          THE COURT:  Overruled.

25   Q.   How do you explain the difference of 24 grams?

1    A.    Twenty-four grams, as I had commented, could be, in

2    part, due to some moisture loss that -- with the elapse of

3    four years, that -- as I mentioned, the purity of the heroin

4    was 88 percent.  Some of that could have been moisture.  And

5    by losing some water in the samples, that could account for

6    some of the weight loss, as well as some adhering to the

7    plastic bags.

8    Q.    Did it concern you at all?

9    A.    Not at all.

10   Q.    And how did your findings compare with the findings of

11   Mr. Power?

12         MR. HALL:  Objection.  Again I believe that was

13   asked and answered.

14         THE COURT:  Sustained.

15   Q.    Were there any differences?

16   A.    No.

17         MS. GREENBERG:  No further questions, Your Honor.

18         THE COURT:  Any recross?

19         MR. HALL:  No further questions, Your Honor.

20         THE COURT:  All right.  You may step down.  Thank

21   you very much.

22         MS. GREENBERG:  Your Honor, the next witness is

23   Detective Kucsan.

24         THE COURT:  All right.

25         MR. HALL:  Your Honor, may we approach briefly?

1          THE COURT:  Okay.

2               (Counsel approached the bench and the following

3     ensued:)

4               MR. HALL:  Your Honor, Your Honor, this particular

5     exhibit was introduced pursuant to the 404(b) ruling

6     earlier, and I think it would be an appropriate time for the

7     Court to give that instruction again, the fact that what

8     they just heard relates to 404(b) evidence, not --

9               THE COURT:  What they just heard?

10              MR. HALL:  Yes.

11              MS. GREENBERG:  Your Honor, just to make sure that

12    they're not confused, could you let them know it relates to

13    two witnesses they will hear later this week or early next

14    week, Clyde Shelly and Edgar Lacy?

15              MR. HALL:  Yeah.  I have no problem with that.

16              MS. GREENBERG:  Just so that they can put it

17    together.

18              THE COURT:  Clyde?

19              MS. GREENBERG:  Shelly.

20              THE COURT:  S-H-E --

21              MS. GREENBERG:  L-L-Y, and I'll double-check that.

22    And Edgar Lacy.

23              THE COURT:  Edgar?

24              MS. GREENBERG:  Edgar.

25              THE COURT:  Edgar Lacy?

```
 1              MS. GREENBERG:  Yeah.

 2              THE COURT:  And the witness they previously heard

 3   was --

 4              MR. HALL:  Dr. Lee.  The one we just had was

 5   Dr. Lee.

 6              THE COURT:  No, the earlier one that had a 404(b)

 7   instruction was Officer Shelton Roberts.

 8              MR. HALL:  Right.

 9              THE COURT:  So I'm just going to say --

10              MR. HALL:  You might want to relate that fact.

11              THE COURT:  Are there any other cases in which a

12   cautionary instruction can be focused?

13              MS. GREENBERG:  No, but do you want him to say as

14   to Mr. Whiting for these two and as to Ms. Martin for

15   Mr. Roberts now that we're doing them all together?

16   Mr. Shelly and Mr. Lacy and Dr. Lee are as to Mr. Whiting,

17   and Shelton Roberts is as to Ms. Martin.

18              THE COURT:  Marsha Lee.

19              MS. GREENBERG:  Oh.  Shelton Roberts, Your

20   Honor --

21              THE COURT:  Shelton Roberts was as to --

22              MR. HALL:  Was as to Ms. Martin.

23              THE COURT:  And Lacy is to who?  Lacy is to who?

24              MS. GREENBERG:  Mr. Whiting.

25              THE COURT:  Whiting?
```

1         MS. GREENBERG:  Your Honor, the witness --

2         THE COURT:  And Shelly is as to who?

3         MS. GREENBERG:  Mr. Whiting.  It's the same case.

4         THE COURT:  Okay.  And Lee is who?

5         MS. GREENBERG:  Dr. Lee is the one that just

6    testified.

7         THE COURT:  But what is --

8         MS. GREENBERG:  She's as to --

9         MR. HALL:  As to my client, Mr. Whiting.

10        MS. GREENBERG:  She's as to -- she's as to

11   Mr. Shelly.  She analyzed the drugs --

12        THE COURT:  Whiting?

13        MS. GREENBERG:  -- relating to the case with

14   Mr. Shelly and Mr. Lacy, and so it would be as to

15   Mr. Whiting.

16        THE COURT:  It's a Whiting instruction.  Okay.

17        MS. GREENBERG:  But, Your Honor, Ms. Johnston

18   advised that the Court already gave a limiting instruction

19   as to Mr. Roberts.

20        THE COURT:  I know I did.

21        MS. GREENBERG:  Okay.  So it would be as to Mr. --

22        THE COURT:  I was just going to remind them.

23   You'll recall that when I -- at the conclusion of

24   Mr. Roberts' testimony, I gave them an instruction

25   concerning the limited purpose for his testimony.  I want to

1    repeat that same instruction as to this witness and tell you

2    that the same instruction will apply to two more witnesses

3    to be called later.

4              MS. JOHNSTON:  Your Honor, the Court should also

5    include Horace Lindsay's testimony about the 1994 search at

6    Paula's School of Performing Arts this morning.

7              THE COURT:  Testified this morning.

8              MS. JOHNSTON:  Right.  Um hum.

9              THE COURT:  And that's against Martin.

10             MR. MONTEMARANO:  Yes.

11             MS. JOHNSTON:  Paula's School of Performing Acts

12   of technically against all of those people who had anything

13   to do with Paula's School.

14             THE COURT:  Right.  Okay.

15             MR. MONTEMARANO:  Your Honor, I'm not sure if it

16   applies to anybody else because it's --

17             MS. JOHNSTON:  No, it does not apply to anyone

18   else.

19             MR. MONTEMARANO:  -- because it's pre -- it's

20   pre-conspiracy.

21             THE COURT:  All right.  I'll do it.

22             MS. JOHNSTON:  404(b).

23             THE COURT:  Thank you.

24             (Counsel returned to the trial tables and the

25   following ensued:)

89

1          THE COURT:  Ladies and gentlemen, you will recall

2     a few days ago you heard testimony from Officer Shelton

3     Roberts, and I gave you an instruction that that testimony

4     was being received for a limited purpose.  I want to repeat

5     for you the same admonition with respect to the testimony

6     that you just heard from Dr. Marsha Lee, the chemist, and

7     what you will also be hearing shortly, and I will probably

8     remind you of this again, with two other witnesses you will

9     hear, Clyde Shelly and Edward Lacy.

10          The testimony is being received by me with the

11     following -- or I'm receiving into evidence, and you may

12     consider it, with the following cautionary instruction:  The

13     evidence that was just testified to by Dr. Marsha Lee and

14     which was also recently testified to by Horace Lindsay and

15     which will be testified to by Clyde Shelly and Edgar Lacy is

16     being admitted under one of our evidence rules that governs

17     evidence of this nature, and let me repeat for you the

18     limited basis upon which such testimony is before you.

19          Our evidence rules state, and I told you this

20     before, and I quote:  Evidence of other crimes, wrongs or

21     acts is not admissible to prove the character of a person in

22     order to show action in conformity therewith.  That's what

23     the evidence rule says.

24          Simply put, this language of the rule means that

25     evidence of other crimes, wrongs or acts may not be used to

1    demonstrate that a person has a certain character and that

2    because of that character such person is likely to have

3    committed the offense charged in this case.

4          The evidence rules, however, provide that such

5    evidence, and I quote, may be admissible for other purposes,

6    such as proof of motive, opportunity, intent, preparation,

7    plan, knowledge, identity or absence of mistake or accident.

8          I have ruled that the testimony of Dr. Marsha Lee,

9    as well as the testimony of Horace Lindsay you've heard

10   today, and the testimony you will be hearing of Clyde Shelly

11   and Edgar Lacy, is admissible, but only for these other

12   limited purposes.

13         Accordingly, I instruct you that you may consider

14   this evidence but only for the limited purposes that I have

15   just described.

16         All right.  You may proceed.

17         MS. GREENBERG:  Your Honor, at this time we call

18   Detective Kucsan, please.

19         THE COURT:  Is he being recalled?

20         MS. GREENBERG:  Yes, Your Honor.

21         THE COURT:  Okay.

22         (Detective Kucsan took the stand.)

23         THE COURT:  Detective Kucsan, you remain under

24   oath.  You don't need to be sworn again.  You are already

25   under oath.

DIRECT EXAMINATION

BY MS. GREENBERG:

Q.   Detective Kucsan, it's been some time since you appeared before this jury.  Can you remind them of your employment, please.

A.   I'm a narcotics detective with Montgomery County Police.

Q.   And in connection with your work as a Narcotics County Police -- as a Montgomery County police detective, did you participate in a search of 810 Hayward Lane --

A.   Yes, I --

Q.   -- Takoma Park, Maryland?

A.   Yes, I did.

Q.   And what was the date that you participated on the search warrant?

A.   June 6, 2004.

Q.   What date was it?

A.   June 6, 2004.

Q.   Now, in connection with the search warrant on that date, whose residence did you understand it was?

A.   Paulette Martin.

Q.   And who was present when you entered?

A.   Paulette Martin, John Martin and Jacqueline Terrell.

Q.   Did you seize certain items?

A.   Yes.

1    Q.    And were pictures taken?

2    A.    Yes.

3    Q.    Could you describe to the jury how you took the

4    pictures.  How that's done, in your experience.

5    A.    First pictures of -- the first pictures are of the

6    exterior of the residence.  And then, as we make our way

7    through the residence, I take overall photos before anything

8    is touched or seized.  And then, as individual items are

9    seized, I take individual photos of those items.

10   Q.    And did you maintain those photos as part of the case

11   file?

12   A.    Yes.

13   Q.    Now, did you work in connection with Detective Evler,

14   Sakala and Special Agent Snyder in connection with this case

15   before you conducted the search warrant?

16   A.    Yes.

17   Q.    And was this search warrant conducted along with other

18   search warrants on this case?

19   A.    Yes.

20   Q.    And did you conduct search warrants on one day totally

21   or two separate days?

22   A.    Two days.

23   Q.    And was the search warrant at 810 Hayward Lane on the

24   first day or the second day?

25   A.    It was on the first day.

1    Q.   And do you recall specifically the date?

2    A.   Yes.

3    Q.   And that date was when?

4            MR. MONTEMARANO:  Objection, Your Honor.  Asked

5    and answered.

6            THE COURT:  Overruled.

7    A.   June 6, 2004.

8    Q.   And did you make a record of that?

9    A.   Yes.

10   Q.   And that is so that a couple years later you can

11   remember it?

12   A.   Yes.

13           MS. GREENBERG:  Your Honor, Court's indulgence.

14           While Ms. Johnston is finding that, I'll move on.

15   Q.   Now, could you describe the residence that you entered

16   on that date?

17   A.   Yes.  It's a single-family residence.  It's a

18   ranch-style house with two bedrooms and a basement.

19   Q.   And if I could direct your attention to what's

20   previously been marked as P103, and I tried to find a spot

21   where everybody could see this.

22           MS. GREENBERG:  Can everyone see that?

23   Q.   If you could step down and describe to the jury what

24   we're seeing on P103.

25           What are we seeing in P103?

1    A.    This is a photograph of the exterior of the residence.

2    Q.    And that's 810 Hayward lane?

3    A.    Yes.

4    Q.    And when you walk inside the house, what do you see?

5    A.    When you walk inside this front door, there is a dining

6    area to the left, and to the right is a living room.

7    Q.    And describe what's in P103, this picture right here,

8    when you walk in the front door.

9    A.    When you walk in the front door, there's a dining room

10   to your left and a living room to your right.

11   Q.    And what are we seeing here, what's depicted in P105?

12   A.    That's a photograph of the basement.

13   Q.    And did you review certain items for -- review for

14   trial in this case to be shown to the jury?

15   A.    Yes.

16   Q.    And were all the items that you reviewed from the

17   basement area of this residence?

18   A.    Yes.

19   Q.    And showing you what's marked as P104, which is right

20   there to the right, and P105 -- it's a little bit out of

21   order -- these two top pictures on this photo board, could

22   you describe to the jury, using those pictures, what you see

23   when you enter the basement area.

24   A.    If I would come down the basement stairs, this is what

25   I would be looking at from the stairway.  These are two

1   photographs of the basement, and if they would just be

2   pushed together, that would be like an overall view.

3   Q.    Is it a total picture or is there a gap between those

4   two pictures?

5   A.    There could be a slight gap, but that's generally the

6   way it looks.

7   Q.    And this door that's depicted in P105, could you tell

8   us what that is.

9   A.    That's an exterior door that leads directly out of the

10  residence from the basement.

11  Q.    Is it different than the door we're seeing at the

12  front?

13  A.    Yes.

14  Q.    And where in P103 is the door that we see in P105 in

15  relation to that?

16  A.    It would be on the right side of the -- right and back

17  side of the residence here.

18  Q.    Now, directing your attention to P106, is that a piano

19  bench there?

20  A.    Yes.

21  Q.    Could you show us in P104 where is that piano bench?

22  A.    Right here.

23  Q.    Am I hitting where your finger was?

24  A.    Yes.

25  Q.    The bottom right corner of that picture?

1    A.    Yes.

2    Q.    And directing your attention back again to P106, did

3    you seize certain items from that piano bench?

4    A.    Yes.

5           MS. GREENBERG:  And if I could have D8, D9 and

6    D9B, please.

7    Q.    Showing you what's been premarked as Drugs 8, Drugs 9A

8    and Drugs 9B, can you tell the jury what we're looking at

9    there.

10   A.    Yes.  These are individual packages of crack cocaine

11   and powder cocaine that were located in that piano bench.

12   Q.    And how did you come to seize them?  How did you come

13   to -- what was your role in seizing those exhibits?

14   A.    Well, there was a designated search member for that

15   area.  That person initially found that evidence and then

16   put the note card on the evidence with his or her initials.

17   After all the evidence was located, I then went around and

18   photographed and seized the evidence myself.

19   Q.    And how were the drug exhibits packaged in that piano

20   bench?

21   A.    The crack cocaine and the powder cocaine were each

22   individually wrapped inside of small clear ziplock baggies.

23   Both of those ziplock baggies were inside of banking

24   envelopes.

25   Q.    And is the banking envelope part of that exhibit?

1    A.   Yes.

2              MS. GREENBERG:  Your Honor, if I could ask the

3    witness to publish the banking exhibit -- the envelope that

4    he's talking about to the jury just simply by walking it

5    across?

6              THE COURT:  Yes, you may.

7    Q.   And if I could ask you, based on your observations of

8    the drugs contained in 9A and 9B, what were your

9    observations of those two items?  What did they appear to

10   you?

11   A.   One baggy is crack cocaine, and the other baggy is

12   powder cocaine.

13             MS. GREENBERG:  If I may have the stipulation,

14   please.

15   Q.   And how are they both packaged?

16   A.   In clear ziplock baggies.

17   Q.   And in what?

18   A.   In a banking envelope.

19   Q.   Now, were all -- we're seeing it in bigger plastic

20   baggies.  When it was in the banking envelope, did it all

21   fit in there?

22   A.   Yes.

23             MS. GREENBERG:  Your Honor, for the record, we

24   have in front of us Drugs 8A.  Before I publish it to the

25   jury, we have a stipulation that Drugs 9A is 19.06 grams of

1    cocaine, and Drugs 9B is 6.02 grams of cocaine base, both of

2    which were recovered from 810 Hayward Avenue, Takoma Park,

3    Maryland, on or about June 1st, 2004.

4    Q.   And what are we seeing here, Detective, with these

5    little tiny bags?

6    A.   These --

7    Q.   Or this exhibit?

8    A.   Yeah.  These were the baggies that the cocaine and the

9    crack cocaine were in when we seized them.

10           MR. MONTEMARANO:  Objection, Your Honor.  Move to

11   strike and be heard at the bench.

12           (Counsel approached the bench and the following

13   ensued:)

14           MR. MONTEMARANO:  The detective stated three times

15   on direct that he undertook the search on June 6th.  He's

16   now stating he seized these drugs.  These drugs, we

17   stipulated, were seized on June 1st.

18           MS. GREENBERG:  Your Honor, it's on or about in

19   the indictment.  We're talking about the same here.  I just

20   read the stipulation.

21           THE COURT:  Overruled.

22           (Counsel returned to the trial tables and the

23   following ensued:)

24           MS. GREENBERG:  May I have the next miscellaneous

25   number, please.  Miscellaneous 23.

1          If I may approach the witness, please?

2          THE COURT:  Yes, you may.

3   BY MS. GREENBERG:

4   Q.   Showing you what's been marked as Miscellaneous 23, if

5   you could read that to yourself and tell me if you recognize

6   that exhibit.

7   A.   This is the search warrant return.

8   Q.   And whose signature is at the bottom there?

9   A.   Judge Connelly.

10  Q.   And whose signature is right above it?

11  A.   Mine.

12  Q.   And does that contain your certification?

13  A.   Yes.

14  Q.   Does it relate to the search warrant you're currently

15  testifying about?

16  A.   Yes.

17  Q.   And does that refresh your recollection as to the exact

18  date that that was done?

19  A.   June --

20         MR. MITCHELL:  Objection.  I don't recall the

21  witness ever stating he didn't recall anything.

22         THE COURT:  Ask it a different way.

23  Q.   Were these -- was this return done at or about the time

24  of the search warrant that we're talking about here, 810

25  Hayward Avenue?

1   A.    Yes.

2   Q.    And did you accurately and thoroughly record the

3   circumstances for submission to Judge Connelly?

4   A.    Yes.

5   Q.    And what was the date reflected as the date of this

6   warrant?

7   A.    June 1st, 2004.

8   Q.    And is that the date that the search warrant was

9   conducted?

10  A.    Yes.

11  Q.    Thank you.

12              Now if you could approach the exhibit again.

13              Handing you what's been marked as Drugs 10 -- let

14  me just clear up something else for a moment.

15              To clear up what's found in this piano bench, we

16  just read a stipulation that it was 6.02 grams of cocaine

17  base.  What is the common term for cocaine base, if you

18  know?

19  A.    Crack cocaine.

20  Q.    And we also stated that there was 19.06 grams of

21  cocaine recovered from this location.  Given that, did that

22  all fit in that bank envelope?

23  A.    Yes.

24  Q.    Any problem with that bank envelope containing all

25  that?

1   A.   No.

2   Q.   Now, directing your attention to the money contained in

3   that cocaine bench -- that piano bench, did you seize that?

4   A.   Yes, I did.

5   Q.   Did you seize money from other locations throughout the

6   house?

7   A.   Yes, I did.

8   Q.   Did you -- without going -- we'll see that depicted in

9   other pictures that you caused to be taken?

10  A.   Yes.

11  Q.   Can you give the jury a total amount of money that was

12  seized from your search of 810 Hayward Avenue on June 1st,

13  2004?

14  A.   $7,865.

15  Q.   And was that all from this basement area that we're

16  seeing depicted on P104 and P105?

17  A.   Yes.

18  Q.   And directing your attention to P107, is that the

19  exhibit with the 20 number on it?

20  A.   Yes.

21  Q.   And what does that 20 number mean?

22  A.   That's Exhibit or Evidence Number 20.

23  Q.   And what does that mean to you?  Why is that number

24  there?  Is that something that was there, or is that

25  something you placed there?

1    A.    No.  We placed there -- we placed it there.  Each

2    exhibit is given a number.

3    Q.    And is that what we see here on the 9, the 18 and the

4    12?

5    A.    Yes.

6    Q.    And why is that done?

7    A.    Just to keep track of the items.

8    Q.    And what is depicted in P107?

9    A.    This is a wallet and a couple day planners, some

10   currency, identification and documents.

11   Q.    Can you point out to the jury where in P105 the overall

12   basement shot is reflective to what is a more close-up shot

13   of P107?

14   A.    Right here.

15   Q.    And just so we're clear, in P105, it's about the middle

16   of the picture, and you can see the red box, the Magnavox?

17   A.    Yes.

18   Q.    Is that correct?

19   A.    That's right.

20         MS. GREENBERG:  Now, Special Agent Snyder, if you

21   could then provide me with Items Hayward 2, 9, 14, 15 and

22   16.

23   Q.    I'd like to go through these with you one at a time.

24         Can you tell the jury what is Hayward 2?

25   A.    This is one of the day planners or telephone address

1    books located in this photo.

2    Q.    Hayward 9?

3    A.    Same thing.  It's a day planner or telephone address

4    book located in this photo.

5    Q.    Now, it has little tags on that.  Was it in that

6    condition when you seized it?

7    A.    No.

8    Q.    Is it in the condition that we see depicted on P107?

9    A.    That's the way it was found right there.

10   Q.    And showing you what's been marked as Hayward 14, do

11   you recognize that?

12   A.    It's a photograph.

13   Q.    And from where was that located?

14   A.    From the brown wallet.

15   Q.    Hayward 15?

16   A.    These are a business card to a jeweler, Silver Spring

17   Jewelry, and an accompanying invoice to Silver Spring

18   Jewelry.

19   Q.    And from where was that located?

20   A.    From this pile of documents here.

21   Q.    And just to give up for the record a little more

22   information on this, within Hayward 15, you mentioned a

23   jewelry store.  What jewelry store is it?

24   A.    Silver Spring Jewelry.

25   Q.    And who is the receipt made out to?

1   A.    Paulette Martin.

2   Q.    And what is the amount of the purchase?

3   A.    $30,500.

4   Q.    And Hayward 16?

5   A.    These are two Maryland insurance cards.

6   Q.    In whose name?

7   A.    One is Paulette Martin.  One is Paulette Akuffo.

8          MS. GREENBERG:  Your Honor, if I may publish these

9   and the two drug exhibits that we admitted shortly after the

10  bench conference to the jury.

11         THE COURT:  You may.

12  Q.   Now, directing your attention to what is labeled here

13  as P108, and for your purposes it's Search Warrant Number

14  18.  Can you tell the jury what we're seeing now.

15  A.   A plastic bin with documents.

16  Q.   And where is that in the overall basement shot?

17  A.   Right here.

18  Q.   For your reference, you're pointing to the left of the

19  door?

20  A.   Yes.

21         MS. GREENBERG:  And if I could have Hayward 4, 5,

22  6 and Hayward 35.

23  Q.   Could you tell the jury where you found Hayward 4?

24  A.   From the plastic bin.

25  Q.   The one depicted on P108?

1    A.    Yes.

2    Q.    If I could put it up on the screen.

3          Perhaps what I should do is this, let me have you

4    talk about all these exhibits and then take the witness

5    stand so you can see the screen.

6          Hayward 4 is from that plastic bin?

7    A.    Yes.

8    Q.    Hayward 5?

9    A.    Yes.

10   Q.    Hayward 6?

11   A.    Yes.

12   Q.    And Hayward 35?

13   A.    Yes.

14   Q.    Now, if I could ask you to resume your -- were they all

15   from what is depicted in P108?

16   A.    Yes, the plastic bin.

17   Q.    And that is located on P105?

18   A.    Actually, it's right here on top of the washer or

19   dryer.

20   Q.    And do we see the washer/dryer in P108?

21   A.    Yes.  Yes.

22   Q.    And see the plastic bin there?

23   A.    Yes.

24   Q.    And just to be clear, P105 and P104, were they taken

25   initially as you walked down to the basement?

1    A.    Yes, they were.

2    Q.    If you could resume the witness stand for a moment.

3          I don't know if that screen next to you is

4    working.  You'll be able to tell in one second.

5          Is that working?

6    A.    Yeah.

7    Q.    Oh, good.

8          Could you tell the jury what is depicted in P104,

9    Hayward 104?

10   A.    It's an -- it's a letter.

11   Q.    And the date?

12   A.    April 24, 2004.

13   Q.    And can you read it into the record, please.

14   A.    Please call me in reference to my godson Pernell

15   Philpot.  My name is Paulette Martin.  Number is

16   301-270-9007.  He's trying to touch base with you.  Thank

17   you.  Yours truly, Paulette Martin.

18   Q.    And the next exhibit from that plastic bin, could you

19   tell the jury the date on that.

20         MR. MONTEMARANO:  Could we have a number on it,

21   please?

22         MS. GREENBERG:  Hayward 5.

23   A.    Friday, May 14th, 2004.

24   Q.    And who is it from?

25   A.    Paulette Martin.

1    Q.    Who is referenced up here in the right-hand corner?

2    A.    Mr. Pernell Philpot.

3    Q.    And where is he sending it from?

4              MR. MONTEMARANO:  Objection, Your Honor.  Assuming

5    facts not in evidence.

6    Q.    What is reflected on this document?

7    A.    I believe it's --

8    Q.    Could you read this into the record?

9    A.    I believe it's Platte County Detention Center.

10   Q.    And where is that?

11   A.    Wheatland, Wyoming.

12   Q.    And turning to page 2 of that letter, can you read the

13   sentence starting with the second line down.

14   A.    I can't stand tall, but at 250 pounds and a heart as

15   big as Texas, I can sure stand up, and that I will do until

16   death comes upon me.  Once again, I love and appreciate you

17   for all you've done.  So long for now.

18   Q.    And who is it signed by?

19   A.    Philpot.

20   Q.    And who is it to?

21   A.    Paula.

22   Q.    And showing you Government's Exhibit Hayward 6, who is

23   this letter from?

24   A.    Pernell Philpot.

25   Q.    Who is the return address?  And how does that relate to

1  the previous letter we've seen as to the address listed?

2  A.   It also is from Platte County Detention Center in

3  Wheatland, Wyoming.

4  Q.   And who is it to?

5  A.   Paulette Martin.

6  Q.   What address?

7  A.   810 Hayward Avenue, Takoma Park, Maryland.

8         MS. GREENBERG:  Your Honor, if I may approach the

9  witness.

10         THE COURT:  You may.

11  Q.   Can you tell by looking at this document where the

12  postmark was and what date?

13  A.   The postmark is from Wheatland, Wyoming, and the date

14  is May 20th, 2004.

15  Q.   How does that relate to the time period of your search

16  warrant?

17  A.   It was a month before the search warrant.

18  Q.   Meaning May versus June?

19  A.   Yes.

20         MR. MONTEMARANO:  Objection, Your Honor.  He

21  answered the question.

22         THE COURT:  Sustained.

23  Q.   And Hayward 35, if you could tell the jury what you see

24  there in terms of the cover fax?

25  A.   It's a fax transmission from Embassy Suites Hotel.

1    Q.    And who is it to?

2          Can you read the to line there?

3    A.    Not really.  Jeffrey --

4          MS. GREENBERG:  Should I come up and -- if I may

5    approach, Your Honor?

6          THE COURT:  You may.

7    A.    Jeffrey S. Leslie.

8    Q.    And who is it from?

9    A.    Paulette Martin.

10   Q.    And can you tell us what the document is attached, what

11   the title of it is?

12   A.    Yes.  It's a weekly timesheet.

13   Q.    Can you read the name of employee?

14   A.    Larry D. Nun.

15   Q.    For what time period?

16   A.    For the week ending 11/30/03.

17   Q.    And whose signature?

18   A.    Paulette Martin.

19         MR. MONTEMARANO:  Objection, Your Honor.  Assuming

20   facts not in evidence.  He wasn't there when it was signed.

21         THE COURT:  Sustained.

22   Q.    Whose signature is reflected on this document?

23   A.    Paulette Martin.

24   Q.    And can you read what -- if you can't, I'll bring it up

25   to you.

1    Can you read what is typed in underneath there?

2    A.    Mr. Nun's official start of employment with TIK

3    Associates was 01/05/04.

4    Q.    That was all seized from that purple bin reflected on

5    the pictures?

6    A.    Yes.

7    Q.    If I could have you get back up and approach the board

8    and ask you to look at P109.

9          At the bottom right-hand corner of this exhibit,

10   what is reflected there?

11   A.    Identification and documents.

12         MS. GREENBERG:  And if I could have Hayward 13,

13   please.

14   Q.    First of all, could you tell the jury what we're seeing

15   on P109.  What area of the basement was that in?

16   A.    I'm not sure.

17   Q.    And is it a circular object?

18   A.    Yes, it is.

19   Q.    And was this in the basement area?

20   A.    Yes.

21   Q.    Showing you what's been marked as Hayward 13, from

22   where did that come from?

23   A.    From the circular bin.

24   Q.    And what is part of Hayward 13?

25   A.    It's a Washington, D.C. driver's license.

1   Q.   In whose name?

2   A.   Can I open this?

3   Q.   Certainly.

4   A.   Paulette Martin.

5   Q.   And what else is contained as part of Hayward 13?

6   A.   A piece of paper and also another document.

7   Q.   When you said the other document, could you read into

8   the record what is reflected there?

9   A.   Has the name Paula, two phone numbers, (202) 271-0991

10  and (240) 498-0283.

11  Q.   And the other piece of paper in there is what?

12  A.   It's an advertisement for can safes.

13  Q.   Could you read into the record what is reflected on the

14  advertisement?

15  A.   Yes.  The perfect place to conceal your valuables.

16  Plain sight.  A great gift for home, office, travel, school,

17  camping, RVs and boats.  Southwest Specialty Products.  To

18  open, unscrew bottom.

19  Q.   And these three documents are part of Hayward 13?

20  A.   Yes.

21  Q.   And the can safes refer to different types of cans?

22  A.   Yes.

23  Q.   Now, if we could move on to the next chart, directing

24  your attention to P110, what is depicted there?

25  A.   Two cellular telephones.

1    Q.    And where were the cellular telephones located in the

2    house?

3    A.    In the basement.

4    Q.    And did you seize both phones?

5    A.    Yes.

6          MS. GREENBERG:  Your Honor, if I could publish

7    Hayward 13 and ask the agent to get me Hayward 20, please.

8          THE COURT:  You may.

9          MS. GREENBERG:  And Hayward 21.

10   Q.    How does Howard 20 relate to what we see on P110?

11   A.    This phone is the cellular telephone depicted in the

12   picture on the left.

13   Q.    And just to be clear, you seized both phones?

14   A.    Yes.

15   Q.    But one is marked for this trial?

16   A.    Yes.

17   Q.    And as part of this investigation, were the numbers

18   taken off of that phone?

19   A.    Yes.

20   Q.    And that's reflected in Hayward 21?

21   A.    Yes, it is.

22   Q.    Okay.  Moving on to --

23          MR. MONTEMARANO:  Objection, Your Honor.  Be heard

24   at the bench?

25          (Counsel approached the bench and the following

1    ensued:)

2              THE COURT:  She said she was moving on to.  What's

3    the matter with moving on to?

4              MR. MONTEMARANO:  Hayward 21, Your Honor, he

5    testified the phone numbers were taken off the phone.  He

6    didn't do it, or the question wasn't asked if he did it, if

7    he saw it being done, if he knows who did it.  You know, no

8    basis for knowledge the numbers were taken off, that these

9    are the numbers taken off.

10             I, therefore, move to strike Hayward 21 unless the

11   Government is going to proffer here at the bench that

12   they're going to tie it up, and then I would simply ask for

13   a continuing objection.  I would withdraw it for the jury's

14   purposes, but I ask for a continuing objection subject to

15   their tying it up.

16             I'm not -- I don't wish to be obstreperous.  I'm

17   assuming that the Government will, indeed, at some point be

18   able to tie it up and all that, but those questions are

19   simply not an adequate foundation.

20             MS. GREENBERG:  Your Honor, it's a very minor

21   point.  We're trying to save time here for the Court.

22   Special Agent Snyder can testify as to these numbers.  If

23   Mr. Montemarano has an objection, we'll call him simply for

24   a two-minute examination to talk about these numbers.  His

25   initials are right down here.  I was just trying to --

1          THE COURT:  She'll be glad to call that agent.

2          MS. GREENBERG:  I'll be glad to call that agent.

3          MR. MONTEMARANO:  If Ms. Greenberg is proffering

4     that Special Agent Snyder will be able to testify to the

5     proper chain of custody and foundation for this agent's

6     testimony, then I would simply wait for Special Agent

7     Snyder's testimony.

8          I'm not asking them to call anybody now.  I'm

9     simply asking for a proffer in lieu of the adequate

10    foundation, and I think the Court understands my objection.

11         THE COURT:  She just made that proffer.

12         MS. GREENBERG:  Your Honor, I was hoping not to.

13         MR. MONTEMARANO:  Not now.  I didn't say now.  I'm

14    assuming she's going to do it later in her case.

15         But at this point, there's been no representation

16    made to the defense as to a basis for this.  She put it on.

17    I'm asking her if it's going to be done.

18         THE COURT:  The witness made the proffer.

19         MR. MONTEMARANO:  Well, she can do it later.

20    That's fine.  I'm not asking her to stop and do it now.

21         MS. GREENBERG:  But perhaps Mr. Montemarano is not

22    listening.  I'd rather not call Special Agent Snyder.  His

23    initials are here.  But if he's requiring it, I will call

24    him.

25         MR. MONTEMARANO:  I'm expecting it at some point.

1    Absolutely.

2              THE COURT:  Would you stipulate to it?

3              MR. MONTEMARANO:  Oh, no.  I expect that this

4    witness be called at some point.  Absolutely.

5              MS. GREENBERG:  Okay.

6              THE COURT:  Then you won't stipulate.  Then you're

7    going to call that witness.  Your objection is overruled

8    subject to the Government tying it up.

9              MR. MONTEMARANO:  Thank you.

10             (Counsel returned to the trial tables and the

11   following ensued:)

12   BY MS. GREENBERG:

13   Q.   Detective, moving on to the next picture, what we're

14   dealing with is P111.

15             MS. GREENBERG:  The jury can see that still.  Can

16   you all see that exhibit?

17   Q.   What's depicted in P111?

18   A.   This is a shaving kit containing documents and cocaine

19   and heroin.

20             MS. GREENBERG:  And if I could have Hayward 19,

21   please.

22   Q.   How does what we see in P111 compare with Hayward 19?

23   A.   This is the shaving kit depicted right here.

24   Q.   And to take us one step further, how -- where is the

25   shaving kit which is depicted in P111 on the overall

1    basement shot?

2    A.    Right here.

3    Q.    You're referring, for the record, to P104, near the

4    clothes that are hanging on a rod, is that correct?

5    A.    Yes.

6    Q.    Okay.  And could you take the exhibit, Hayward 19, and

7    explain to the jury what they're seeing in terms of the sort

8    of animal skins and everything in P11, how that was

9    photographed?

10   A.    The background is this chair.

11   Q.    The chair that's depicted in P104?

12   A.    Yes.  The black bag is right here.  It's opened and --

13   Q.    Perhaps we could just walk up to the jury.

14   A.    This is the black bag.  It's opened.  Some of the

15   contents have been removed for the photograph, such as the

16   document right there and the bag -- the banking envelope

17   containing the drugs.  That's our note card.

18   Q.    And to the right of the number 17, we see some brown

19   thing with writing on it.  How does that compare to Hayward

20   19, the exhibit in your hand?

21   A.    It's one of the documents inside the shaving kit.

22   Q.    And could you show the jury, please?

23   A.    Sure.

24   Q.    And showing -- if you could give me the shaving kit bag

25   and show the jury 10 and 11, could you explain how these

1    items, Drugs 10 and Drugs 11, relate to the shaving kit

2    which is in my hand, and I'll take those envelopes from you.

3    A.    This is a ziplock baggy of cocaine, and the way it was

4    found, it was packaged in these ziplock baggies, and those

5    ziplock baggies were then inside of that banking envelope.

6    Q.    And the banking envelope is contained as part of Drugs

7    10?

8    A.    Yes.

9    Q.    And is that Drugs 11 in your hand?

10   A.    Yes, it is.

11   Q.    And could you explain to the jury what they're seeing

12   in Drugs 11.

13   A.    This is heroin.  Again, the way it was packaged was it

14   was in clear ziplock baggy, and the ziplocks baggy was

15   inside the banking envelope.

16   Q.    And directing your attention to the shape of the drugs

17   in Drugs 11, has that changed somewhat in appearance since

18   the day you first seized it?

19   A.    Somewhat.  It's broken apart a bit.

20   Q.    How did that drug exhibit appear when you seized it?

21   A.    Pretty much like it is.  It's a solid form in the shape

22   of a disk.

23   Q.    And what, if anything, did this disk shape mean to you?

24   A.    The disk --

25   Q.    If you can hold that up to the jury and explain that to

1    them, please.

2    A.    The disk shape was similar to the way heroin was being

3    processed at -- the name is escaping me of the other

4    residence right now.

5    Q.    And what do you mean by that's the way it was

6    processed?

7    A.    The heroin was -- at that location was being processed

8    by placing it in cylindrical tubes as a mold.

9    Q.    And how did it get out of the cylindrical tubes?

10   A.    By using a hammer and screwdriver.

11   Q.    The previous testimony provided to this jury?

12   A.    Yes.

13   Q.    And is that consistent with your previous testimony?

14   A.    Yes.

15            MS. GREENBERG:   Now, Your Honor, for the record,

16   Drugs 11 are 7.85 grams of heroin recovered from 810 Hayward

17   Avenue, Takoma Park, Maryland on or about June 1st, 2004,

18   and Drugs 10 is 19.06 grams of cocaine recovered from 810

19   Hayward Avenue, Takoma Park, Maryland on or about June 1st,

20   2004.

21            May I publish at this time, Your Honor, Hayward 19

22   and Drugs 10 and 11?

23            THE COURT:   Yes, you may.

24   Q.    And is it correct, sir, both of these were in these

25   banking envelopes?

1    A.    Yes.

2    Q.    Any problem with the drugs fitting in those banking

3    envelopes?

4    A.    No.

5    Q.    And inside that shaving kit, were there documents

6    relating to an individual?

7    A.    Yes.

8    Q.    And who was that?

9    A.    John Martin.

10   Q.    And is that what we see depicted on P111?

11   A.    That's one of them, yes.

12   Q.    And now if I could move on to P113, what are we seeing

13   there?

14   A.    Those are two spiral notebooks.

15   Q.    And where were they seized from?

16   A.    In the basement.

17   Q.    And can we see where those spiral notebooks are on the

18   bigger picture?

19   A.    I don't believe so.

20   Q.    But those were from the basement area?

21   A.    Yes.

22         MS. GREENBERG:  And if I could have Hayward 8,

23   please.

24   Q.    How does what's reflected on Hayward 8 relate to --

25   reflected on P113 relate to Hayward 8?

1   A.   That's one of the notebooks depicted in the photograph.

2   Q.   And turning your attention now to P114.

3        MS. GREENBERG:  And if I could have Special Agent

4   Snyder give me Hayward 22.

5   Q.   Again, for the record, that's P114, and we're looking

6   at Hayward 22.  What is depicted in P114?

7   A.   It's a clear plastic storage bin.

8   Q.   And how does that relate to Hayward 22?

9   A.   That's the storage bin in the photographs.

10  Q.   And from where did you get Hayward 22?

11  A.   The basement.

12  Q.   The basement we're talking about here depicted in P104

13  and P105?

14  A.   Yes.

15       MS. GREENBERG:  Your Honor, if I could publish

16  Hayward 22?

17       THE COURT:  You may.

18  Q.   And if I could now draw your attention to what's

19  depicted in P116.  It's U-Haul boxes, is that correct?

20  A.   Yes.

21  Q.   Was that how the U-Haul boxes were when you entered the

22  residence?

23  A.   I don't believe they were stacked in that fashion.

24  Q.   Can you see them on your overall picture, P104 and

25  P105?

1    A.    Right here.

2    Q.    And you're pointing to, for the record, the bottom

3    left-hand corner of P104?

4    A.    Yes.

5    Q.    And can you see that metal object that's sort of the

6    frame of a couch or daybed in P116?

7    A.    Yes.

8    Q.    And that is what is reflected in P104?

9    A.    Yes.

10   Q.    And the U-Haul boxes are immediately next to it?

11   A.    Yes, they are.

12   Q.    Did you recover items from those U-Haul boxes that

13   reflected on P116?

14   A.    Yes.

15         MS. GREENBERG:  Special Agent Snyder, if I could

16   have Hayward 11, 12, 24, 25, 26, 27, 28, 29 and 34.

17         And, Your Honor, do you want me to start with

18   these or do you want to break a few minutes early?

19         THE COURT:  We can go for four more minutes.

20   Q.    Starting -- perhaps you can take your seat again.

21         Starting with Hayward 11, is this a document that

22   you recovered from those U-Haul boxes at 810 Hayward Lane?

23   A.    Yes.

24   Q.    And what is this item, Hayward 11?

25   A.    It's an envelope from Garden State Life Insurance

DIRECT - DET. KUCSAN                                        122

1    Company.

2    Q.   And can you see the --

3            MS. GREENBERG:  If I can approach, Your Honor?

4            THE COURT:  You may.

5    Q.   Can you read the postmark on this exhibit?

6    A.   Yes.  October 13th, 1995.

7    Q.   And can you read the number on the back of this exhibit

8    and the name and number on the back of this exhibit?

9    A.   Reese, 3323660.

10   Q.   And Hayward 12, can you tell us what that is?

11   A.   An address book.

12   Q.   And from where was this located?

13   A.   U-Haul boxes.

14   Q.   At what location?

15   A.   In the basement.

16   Q.   810 Hayward Avenue?

17   A.   Yes.

18   Q.   Could you tell the jury what we're seeing in Hayward

19   24?

20   A.   An envelope.

21   Q.   And who's the return address from?

22   A.   I can't see it.

23           MS. GREENBERG:  If I may approach the witness,

24   Your Honor?

25           THE COURT:  You may.

1    Q.   If you could read into the record who the return

2    address is on that letter and the date of that postmark?

3    A.   The return address is Luis Angel Baptista, and the

4    postmark is January 28th, 2002.

5    Q.   And from where did Mr. Baptista address what is

6    reflected on there?

7    A.   Federal Medical Center.  It's a P.O. Box.

8    Q.   And who is the letter to?

9    A.   Mr. Emilio Echarte.

10   Q.   And the address?

11   A.   113 P Street, N.W., Washington, D.C.

12   Q.   And that's Hayward 24, is that correct?

13   A.   Yes.

14   Q.   And from where did that come?

15   A.   The U-Haul boxes.

16   Q.   Showing you next a two-page exhibit marked Hayward 25.

17   Can you tell us what we're seeing here?

18   A.   I can't read it on the screen.

19   Q.   Let me see if I could -- who is listed as the party,

20   the responsible party?

21   A.   Paulette Martin.

22   Q.   Address?

23   A.   804 Nicholson Street, N.E., Washington, D.C.

24   Q.   And who is it from?

25   A.   Center for Ambulatory Surgery.

1   Q.   Where is that located?

2   A.   Baltimore, Maryland.

3   Q.   And what is the date on this document for the date of

4   the procedure?

5   A.   10/1/02.

6   Q.   And what is the description?

7   A.   Cosmetic procedure.

8   Q.   For who?

9   A.   Paulette.

10   Q.   Turning now to Hayward 26, could you tell the jury what

11   we're seeing here?

12   A.   Piece of paper with the name Elizabeth Evans on it.

13   Q.   And from where was that piece of paper obtained?

14   A.   The U-Haul boxes.

15   Q.   And could you read into the record the address for --

16   that's listed for Ms. Evans.

17   A.   P.O. Box 86, Metcalfe, Mississippi.

18   Q.   And the zip code?

19   A.   38760.

20   Q.   And showing you what's been marked as Hayward 27, what

21   are we seeing here?

22   A.   Piece of paper with the name Bolo.

23   Q.   And from where was that obtained?

24   A.   U-Haul boxes.

25   Q.   At this location, 810 Hayward Avenue?

1    A.    Yes.

2    Q.    And could you read in the record what's reflected on

3    this piece of paper.

4    A.    Yes.  SSN 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 and DOB 05/03/72.

5              THE COURT:  All right, Ms. Greenberg, I think this

6    is an appropriate time to break for lunch.

7              MS. GREENBERG:  Thank you, Your Honor.

8              THE COURT:  Ladies and gentlemen, we'll resume at

9    2:10 p.m.

10             (Luncheon recess.)

11             (Jury present.)

12             MS. GREENBERG:  Your Honor, I was informed that

13   Hayward 22 and Hayward 19 didn't make its way around the

14   jury.  I don't know how far it got, but may I republish it

15   to the first row over here?

16             THE COURT:  Submit it so it may finish its

17   journey.

18             MS. GREENBERG:  Thank you, Your Honor.

19   Q.    Detective Kucsan, before we go to this location that we

20   were dealing with, I was looking at the drug exhibits over

21   the break.

22             MS. GREENBERG:  Your Honor, may I approach the

23   witness?

24             THE COURT:  Yes.

25   Q.    I wanted to ask you, concerning these exhibits, such as

1    Drugs 11 and Drugs 8, for example, the envelopes have --

2    what color do they have on them right now?

3    A.    The paper envelope?

4    Q.    Yes.

5    A.    Purple.  Purple powder.

6    Q.    And how was the envelope -- when you seized it, did it

7    appear to have this on it or was it a different appearance?

8    A.    It was white.  It did not have the purple powder on it.

9    Q.    Can you explain the purple powder?

10   A.    It's fingerprint powder.

11   Q.    And were all the envelopes you seized from Hayward

12   Avenue white?

13   A.    I believe so, yes.

14   Q.    And these exhibits are sealed, so if you can explain to

15   the jury, what are these envelopes made of?

16   A.    Paper.

17   Q.    And were all of these exhibits that you seized from

18   Hayward, the drug exhibits that were in bank envelopes, were

19   the bank envelopes paper?

20   A.    Yes.  They were all the same type.

21   Q.    Thank you.

22         And just for the record, I think I left out one.

23   Is Drugs 10 similarly the same type of envelope?

24   A.    Yes.

25   Q.    Now, if I can direct your attention back to where we

1    stopped at the break and direct your attention to Hayward

2    28.

3                MS. GREENBERG:  If I may approach the witness,

4    Your Honor?

5                THE COURT:  Yes, you may.

6    Q.    Could you tell the jury what that is?

7    A.    A spiral notebook.

8    Q.    Put that up on the screen.

9                Just take us back to where we were.  From where

10   was this recovered?

11   A.    From the basement.

12   Q.    Of what residence?

13   A.    810 Hayward Avenue.

14   Q.    And from what location, depicted on what picture?

15   A.    I'm not sure without --

16   Q.    What -- from where was it taken?

17   A.    Oh, in the basement.

18   Q.    Do we see on this chart we were previously looking at

19   from what location was it seized, the notebook?

20   A.    23.  Right next to the plastic crate.

21   Q.    And where is that located in the basement?

22   A.    In the basement against a wall.

23   Q.    And Hayward 29, tell the jury -- can you see that on

24   your screen?

25   A.    Yes.

1    Q.   -- what we're looking at here?

2    A.   Bag of money clips or money wrappers.

3    Q.   And where was that recovered?

4    A.   I'm not sure without looking at the card number.

5              MS. GREENBERG:  If I may approach the witness,

6    Your Honor?

7              THE COURT:  Yes, you may.

8    Q.   On certain of these exhibits, could you explain to the

9    jury what the card number is and how that helps you

10   recollect where the item was located.

11   A.   Yes.  We -- each item that's going to be seized as

12   evidence is assigned a note card with a number and the

13   person who found its initials.

14   Q.   And was this an item that was seized from the basement

15   of Hayward?

16   A.   Yes.

17   Q.   And can you tell from looking at the -- exactly where

18   it was seized from the basement at the overall findings?

19   A.   I'm not sure without the note card.

20   Q.   But you're certain that it came from the basement at

21   Hayward?

22   A.   Yes.

23   Q.   And Government's Exhibit 34, can you tell the jury what

24   we're looking at here.  Hayward Exhibit 34.

25   A.   I can't see it.

1          MS. GREENBERG:  May I approach the witness again,

2     Your Honor?

3          THE COURT:  Yes.

4     Q.    Could you tell the jury what this is?

5     A.    Looks like a paystub.

6     Q.    In whose name?

7     A.    Nicholas Diaz.

8     Q.    What time period?  Does it have a period ending on

9     there?

10    A.    Pay period 10/31/2000.

11    Q.    And from where was this located?

12    A.    I don't know without the note card.

13    Q.    Did you recover this as a result of your search at 810

14    Hayward Avenue, Takoma Park, Maryland?

15    A.    Yes.

16    Q.    And were all the items recovered from the basement

17    area?

18    A.    Yes, they were.

19    Q.    And directing your attention to the bottom part of

20    that, can you read what's on the screen there?

21    A.    PTK Associates, Incorporated, Washington, D.C.

22    Q.    Thank you.

23          Are you wearing your little clip?

24    A.    Yes.

25    Q.    If you could approach the exhibit, please.

1          Could you tell the jury what's depicted in this

2    bottom right-hand picture, the picture that appears to be a

3    dryer.  What is depicted there in P119?

4    A.   Yes.  It's a picture of a dryer.  On top of the dryer

5    is assorted documents that we seized.

6    Q.   And you have the number 19 there.  What does that mean?

7    A.   It was Exhibit or Number 19.

8    Q.   And using P104 and P105, can you show the jury where

9    what's depicted in P119 was in the downstairs basement area?

10   A.   Yes.  Right here.

11   Q.   Is that the machine with the yellow bottle on top of

12   it?

13   A.   Yes.

14   Q.   And did you recover items from that location?

15   A.   Yes.

16   Q.   Showing you what's marked as Hayward 7, do you

17   recognize that?

18   A.   Yes.  It's a spiral notebook.

19   Q.   And from where was that recovered?

20   A.   Right here.

21   Q.   And can you actually see the spiral part of the

22   notebook on the picture, P119?

23   A.   Yes.

24   Q.   And turning to the next board.

25          Are these additional pictures of the basement area

1    at 810 Hayward Avenue?

2              MR. MONTEMARANO:  Objection.  Leading.

3    Q.    What are we seeing here on the poster board?

4    A.    Photographs of items that were seized from Hayward

5    Avenue.

6    Q.    And directing your attention to P118, can you tell me

7    where that is in relation to the basement area?

8    A.    It's a separate room also in the basement.  I described

9    it as a utility room primarily used for what appeared to be

10   storage.

11   Q.    And directing your attention to P112, right here, what

12   is depicted there?

13   A.    That's a suitcase that was located in the utility room.

14   Q.    Do you see that suitcase in the utility room part

15   that's described on P118?

16   A.    No.

17   Q.    But you recorded it as coming from that particular

18   room?

19   A.    Yes.

20   Q.    Now showing you what's been marked as Hayward 17 and

21   Hayward 18, can you tell the jury what these are?

22   A.    Those are two digital scales that were located inside

23   of the suitcase.

24   Q.    And can you see them on the picture on P112 --

25   A.    Yes.

1    Q.    -- where my laser is pointing?

2    A.    Yes.

3    Q.    Inside the suitcase?

4    A.    Yes.

5    Q.    And what is inside that black trash bag?

6    A.    U.S. currency.

7    Q.    Is that part of the overall count that you previously

8    testified to?

9    A.    Yes, it is.

10          MS. GREENBERG:  Your Honor, at this time I'd like

11   to publish Hayward 17 and Hayward 18.

12          THE COURT:  You may.

13   Q.    Directing your attention to P115, would you tell the

14   jury what's depicted there.

15   A.    Those are two metal lockboxes.

16   Q.    And where were those metal lockboxes located?

17   A.    In the utility room.

18   Q.    And do we see them on the picture here, P118?

19   A.    No.

20   Q.    But you recorded that they were coming from the utility

21   room?

22   A.    Yes.

23   Q.    Showing you, for example, Hayward 30, how did that

24   relate to what's in the picture?

25   A.    That is one of the lockboxes in the photograph.

1    Q.   Can you see in the photograph, do they contain similar

2    items?

3    A.   Yes.

4    Q.   And what are those similar items?

5    A.   Money wrappers.

6    Q.   Is this sealed shut?

7    A.   Yeah.

8    Q.   If I could ask Special Agent Snyder to open this so you

9    can publish it to the jury.

10          And while he's doing that, P117, what is depicted

11   there?

12   A.   Assorted documents.

13          MS. GREENBERG:   Your Honor, without passing this

14   around -- it's kind of heavy -- can I just open and publish

15   it to the jury?

16          THE COURT:   Yes, you may.

17   Q.   Okay.   Getting back to P117, where was that picture

18   taken?

19   A.   Also in the utility room.

20   Q.   The same utility room that's on the bottom right-hand

21   corner of that exhibit?

22   A.   Yes.

23   Q.   And showing you what's marked as Hayward 10, Howard 31,

24   and Hayward 32, starting with Hayward 10, could you tell the

25   jury, where did you get those documents.

1    A.    These documents were among the documents in this pile

2    right here.

3    Q.    Hayward 31?

4    A.    Also recovered from the pile of documents right here.

5    Q.    And Hayward 32?

6    A.    Same thing.  From this pile right here.

7    Q.    Okay.  If you could resume the witness stand, I'll show

8    you these up on the screen.

9          Starting with Hayward 10, what are we looking at

10   here?

11   A.    A personal check.

12   Q.    To who?

13   A.    Murtha Echarte.

14   Q.    From whom?

15   A.    Paulette Martin.

16   Q.    Dated what?

17   A.    3/21/03.

18   Q.    What amount?

19   A.    $3,000.

20   Q.    Second item in that exhibit?

21   A.    It's also a personal check.

22   Q.    To who?

23   A.    Emilio Echarte.

24   Q.    From who?

25   A.    Paulette Martin.

1    Q.   What amount?

2    A.   $3,000.

3    Q.   What's the date?

4    A.   5/3/02.

5    Q.   Third item in that exhibit?

6    A.   Also a personal check.

7    Q.   To who?

8    A.   Murtha Echarte.

9    Q.   From who?

10   A.   Paulette Martin.

11   Q.   What's the date?

12   A.   4/11/03.

13   Q.   And the last check in that exhibit?

14   A.   It's also a personal check made out to Murtha Echarte.

15   Q.   What amount?

16   A.   $3,000.

17   Q.   To who?

18   A.   Murtha Echarte.

19   Q.   From who?

20   A.   Paulette Martin.

21   Q.   That would be Exhibit Hayward 10.

22        Hayward 32, could you tell the jury what that

23   is -- what this document purports to be, looking at the top

24   left-hand side and the top right-hand side of that exhibit.

25   A.   An AARP life insurance program premium.

1    Q.   Premium notice?

2    A.   Notice, yes.

3    Q.   And what's the date that it was prepared?

4    A.   9/3/02.

5    Q.   And who is it to?

6    A.   Mr. Emilio Echarte.

7    Q.   What address?

8    A.   9002 Bexhill Court in Hyattsville, Maryland.

9    Q.   And the coverage period?

10   A.   9/5/02 to 12/25/02.

11   Q.   Would you look at that start date again?

12   A.   9/25/02.

13   Q.   And Hayward 31, is a series of documents, and could you

14   relate to -- read to what this relates to on the top

15   right-hand --

16   A.   Yeah.  Mamzi Insurance Company.

17   Q.   And who are the names associated with this document?

18   A.   Debra Darby, Emilio Echarte, Learly Goodwin and

19   Paulette Martin.

20   Q.   And is the correspondence contained as part of this

21   exhibit?

22   A.   I'm sorry?

23   Q.   Is the correspondence contained as part of this exhibit

24   from Mamzi?

25           Is there correspondence contained as part of this

1   exhibit from Mamzi?

2   A.   Yes.

3   Q.   And who was it sent to?

4   A.   Paula's School of Performing A.

5   Q.   What address?  To whose attention?

6   A.   Paula Martin.

7   Q.   And what address?

8   A.   9002 Bexhill Court, Adelphi, Maryland.

9   Q.   Just to clarify, with all these items that you've

10  testified about today, as well as previously, at the end of

11  when you seized them, what do you do with the documents that

12  you seize from the location after you've tagged, identified

13  them and put them into bags?  What did you do with them?

14  A.   The items from this location, I turned them --

15  following the search warrant, I turned all of the evidence

16  over to Special Agent Evler.

17  Q.   And when you were reviewing the items, did you review

18  the items with him along with Government counsel?

19  A.   Yes.

20  Q.   And are you confident that all these items came from

21  810 Hayward Avenue?

22           MR. MONTEMARANO:  Objection.

23           THE COURT:  Sustained.

24  Q.   Let me ask you this.  You specifically reviewed each

25  and every item you testified about to this jury?

1     A.    Yes.

2     Q.    And where did those items come from?

3     A.    Hayward Avenue.

4     Q.    What address?

5     A.    810 Hayward Avenue.

6     Q.    How sure are you of that?

7              MR. MONTEMARANO:  Objection.

8              THE COURT:  Sustained.

9     Q.    Any question about that?

10    A.    No.

11             MS. GREENBERG:  Court's indulgence.

12             No further questions, Your Honor.

13             THE COURT:  Cross-examination.

14                      CROSS-EXAMINATION

15    BY MR. MONTEMARANO:

16    Q.    Good morning.  How are you?

17    A.    Good afternoon.

18    Q.    Refresh the jury's recollection for a moment, if you

19    could be so kind, how long have you been a police officer?

20    A.    Seventeen years.

21    Q.    How long a part of that have you been in narcotics?

22    A.    Twelve years.

23    Q.    So during that time you have done a fair number of

24    search and seizures?

25    A.    Yes.

1   Q.   During your time in the academy, which lasted how long?

2   A.   Approximately six months.

3   Q.   So during that 180 days, you learned about police

4   procedures?

5   A.   Yes.

6   Q.   And learned about the law?

7   A.   Yes.

8   Q.   Learned about doing things like, for instance, writing

9   reports, correct?

10  A.   Yes.

11  Q.   And it's important to make sure your report is true and

12  complete and accurate, correct?

13  A.   Correct.

14  Q.   God forbid you might not be available to testify and

15  someone else might need to use that report?

16  A.   Yes.

17  Q.   You may have moved out of the state or something?

18  A.   Yes.

19  Q.   So, therefore, it's important that you be complete and

20  accurate.  Is that a fair statement?

21  A.   Yes, it is.

22  Q.   And then if I recall from your testimony the last time

23  you visited with us, you were talking about seizing items

24  pursuant to a search warrant, correct?

25  A.   Yes.

1   Q.   And we talked about Schedule A, which would be attached

2   to the search warrant affidavit?

3   A.   Yes.

4   Q.   Schedule A would be the listing of things that you're

5   looking to seize?

6   A.   Yes.

7   Q.   These would be the fruit and instrumentality of the

8   crime which are you investigating, correct?

9   A.   Yes.

10  Q.   Things like drugs, correct?

11  A.   Yes.

12  Q.   Money?

13  A.   Yes.

14  Q.   Weapons?

15  A.   Yes.

16  Q.   Packaging material?

17  A.   Yes.

18  Q.   Other tools of the drug trade?

19  A.   Yes.

20  Q.   Wrapping material?

21  A.   Yes.

22  Q.   And you, as the seizing agent -- you were the seizing

23  agent in the search of Hayward, were you not?

24  A.   Yes, I was.

25  Q.   And as the seizing agent, it is your job to accurately

1  record all of the items which are brought to your attention

2  by the searching agent, correct?

3  A.   Yes.

4  Q.   And each searching agent gets responsibility for a

5  certain section of the search location, correct?

6  A.   Yes.

7  Q.   Sort of like a Congressman that represents a District?

8  A.   Yes.

9  Q.   So it would be fair to say that none of the things you

10  testified to you saw with your own eyes first, correct?

11  A.   I may have seized or located a couple items myself

12  first, yes.

13  Q.   Did you put the tags on any of the items?

14  A.   I may have, yes.

15  Q.   You're not sure which ones?

16  A.   I could double-check right now.

17  Q.   I'm just curious if you recall now.

18  A.   I would have to double-check.

19  Q.   Okay.  Well, let's go on.

20        Seizing agents go through and they search inside

21  of containers, is that a fair statement?  The seizing agents

22  -- the searching agents go through and search the area they

23  are responsible for?

24  A.   Yes.

25  Q.   They look --

1    A.    Yes.

2    Q.    -- look on top of things?

3    A.    Yes.

4    Q.    And if they find something, they take out one of those

5    handy dandy index cards with a number on it, correct?

6    A.    That's right.

7    Q.    Put it next to the item?

8    A.    Yes.

9    Q.    And say, hey, Randy, come over here.  Take a look at

10   this.

11   A.    Yes.

12   Q.    And you will shoot a photograph?

13   A.    That's correct.

14   Q.    And it's the job of the searching agent, unless I

15   misunderstand the protocol, not to move anything before it

16   gets photographed, correct?

17   A.    Yes.

18   Q.    So it's supposed to be photographed exactly where it

19   was when it was seized?

20   A.    Yes.

21   Q.    And going back to the importance of protocol and

22   records, when you put things in Schedule A, these are things

23   you're looking to grab up, things that you need, correct?

24   A.    Yes.

25   Q.    Would it be fair to say that you're not authorized to

1    seize or take away from the location things that are not

2    specified in Schedule A?

3    A.    Yes.

4    Q.    And that would include items which might tend not to

5    suggest criminal involvement on the part of people located

6    in the premises you're searching?

7              MS. GREENBERG:  At this point I would object.

8    L 12 motion.  May we approach?

9              THE COURT:  Okay.

10             (Counsel approached the bench and the following

11   ensued:)

12             MS. GREENBERG:  For Mr. Montemarano to suggest

13   that this witness makes an independent determination of what

14   we deem important this conspiracy is inappropriate.  If he

15   had items that were outside of Schedule A that he wanted to

16   move to suppress, he should have done so before.  We're

17   sitting before the jury in this case, and I wanted to stop

18   him before he got there.

19             MR. MONTEMARANO:  Did I use the word suppress?

20             THE COURT:  Where are you going, Mr. Montemarano?

21             MR. MONTEMARANO:  I was going to point out --

22             THE COURT:  What?

23             MR. MONTEMARANO:  -- that he -- excuse me, Your

24   Honor.  That the agent did not -- or detective did not seize

25   certain items.  He did not look for certain kinds of items.

1    I was going to walk him through some of the things he didn't

2    take that were there, using the exhibits that the Government

3    used.

4              MS. GREENBERG:  Then he's going to have to

5    introduce Attachment A with the search warrant.  He's

6    talking about the dresses and the clothes and things like

7    that.  That wasn't listed in the attachment.

8              THE COURT:  I think you can go to the fact that

9    the agent didn't take any clothes with him.  Overruled.

10             MR. MONTEMARANO:  Thank you, Your Honor.

11             (Counsel returned to the trial tables and the

12   following ensued:)

13   BY MR. MONTEMARANO:

14   Q.   Let's talk a little further about some of the things

15   you didn't take.  The stuff you testified to, all the

16   Hayward exhibits that Ms. Greenberg showed you, those are

17   all things you did take, correct?

18   A.   Yes.

19   Q.   I'd like to direct your attention to P104, one of the

20   photographs on the biggest of the boards here.

21             Tell the ladies and gentlemen of the jury what you

22   see in this photograph right here where my finger is.  Over

23   here on the left side.

24   A.   Where you're pointing?

25   Q.   Yes.

1    A.    Clothing.

2    Q.    Clothing on racks, correct?

3    A.    Yes.

4    Q.    And here on the floor?

5    A.    Shoes.

6    Q.    Any of those shoes look like they're matched pairs in

7    your point of view as you sit here today?

8    A.    It's hard to tell.

9    Q.    Didn't take any of those with you, correct?

10    A.    Shoes?  No.

11    Q.    Clothing?

12    A.    No.

13    Q.    Did you check the clothing?  Did you check the

14    clothing?

15    A.    Did I check it?

16    Q.    Yeah.

17    A.    Personally did I check the clothing?

18    Q.    Or did somebody.  Maybe I should not use the pronoun

19    you.  Let's say did a seizing agent check the clothing?  Was

20    there one responsible for that part of the room?

21    A.    I believe so, yes.

22    Q.    And none of it was seized?

23    A.    No.

24    Q.    So you would have no idea if any of the clothing had

25    its original tags on it?

1    A.    No.

2    Q.    Likewise, the shoes.  Nobody seized those?  Nobody

3    brought those to your attention?

4    A.    No.

5    Q.    So, once again, you'd not have any idea if there were

6    matched pairs or boxes for those shoes or anything like

7    that, correct, sir?

8    A.    Not exactly.

9    Q.    Would there or would there not be any information that

10   you have for us today regarding those shoes being seized?

11   A.    Oh, I didn't seize any shoes, no.

12   Q.    Were any of the shoes brought to your attention?

13   A.    No.

14   Q.    Did you inspect the shoes?

15   A.    No.

16   Q.    Were the shoes in any way, shape or form shown to you

17   by any of the agents?

18   A.    Not that I recall.

19   Q.    You can't tell if they were worn, correct?

20   A.    No.

21   Q.    I mean like my shoe looks like I've been wearing it for

22   awhile, right?

23   A.    Yes.

24   Q.    There's wear on the sole.

25   A.    Yes.

1   Q.   And you know what a new shoe looks like?

2   A.   Yes, I do.

3   Q.   And there weren't any boxes maybe with the -- the

4   matched pair for any of these shoes?  The matching -- other

5   guy, the left hand versus the right, left foot versus the

6   right?

7   A.   I don't recall.

8   Q.   Okay.  Now, you have suggested that it was important as

9   part of your actions as the seizing agent to be careful and

10  accurate in the materials that you compile, correct?

11  A.   Yes.

12  Q.   And you're certainly not here to mislead or confuse the

13  jury, are you?

14  A.   No.

15  Q.   But it would be fair to say that during the course of a

16  search, mistakes sometimes get made?

17  A.   Yes.

18  Q.   Like, for example, the fact that this search didn't

19  take place on the 1st -- no, it did take place on the 1st of

20  June, didn't it?

21  A.   Yes, it did.

22  Q.   And you were asked three different times by

23  Ms. Greenberg the date, and each time you said June 6th,

24  correct?

25  A.   Yes.

1   Q.   You would agree with me June 1st isn't June 6th?

2   A.   Yes, I would.

3   Q.   And that five-day difference is very significant, isn't

4   it?

5   A.   Yes.

6   Q.   Indeed, when you get a search warrant, there's a --

7   sort of a drop dead date on it?  You can search up until a

8   certain day, isn't that correct?

9   A.   Yes.

10   Q.   And it could be -- as you sit here today, you may not

11   recall -- that the search warrant may not even have been

12   good on the 6th of June?

13   A.   That's possible.

14   Q.   But you weren't trying to confuse it.  That was a

15   mistake, right?

16   A.   Yes.

17   Q.   And that was a mistake like when you pointed out where

18   the ground -- I think that first bin Ms. Greenberg showed

19   you -- there have been so many, it's hard to keep them

20   all -- I'm trying to find the photograph.  Bear with me if

21   you would, please, Detective.

22        Calling your attention, please, to P105, remember

23   how you were telling Ms. Greenberg that when you first

24   looked at this photo, the bin was in one place, over here on

25   the left, and then you said, oh, no, actually it was back

1   here by the door?

2   A.    Yes.

3   Q.    And that was just another mistake, correct?

4   A.    Yes.

5   Q.    Because you'd agree that over here on the left where

6   you first pointed is certainly not back here by the door,

7   correct?

8   A.    That's right.

9   Q.    And then you told us about the fingerprint powder,

10  correct?

11  A.    Yes.

12  Q.    That's the powder that's on all those bags of -- paper

13  bags.  Those are bank envelopes, I believe, is how you

14  described it?

15  A.    Yes.

16  Q.    And those are within the drug evidence seized?

17  A.    Yes, they are.

18  Q.    And those bags were fingerprinted?

19  A.    Yes.

20  Q.    And you fingerprint bags routinely as part of a drug

21  seizure, correct?

22  A.    I do not.

23  Q.    Isn't there a general protocol in the Montgomery County

24  Police Department concerning fingerprinting drug evidence?

25  A.    Yes.

1    Q.   And the answer is you're supposed to do it, correct?

2    A.   No.

3    Q.   You're not?

4    A.   No.

5    Q.   Never?

6    A.   Not never.  Officer discretion.

7    Q.   Officer discretion.  You'd agree that fingerprints

8    would be valuable and important evidence?

9    A.   Yes, I do.

10   Q.   And fingerprints, as far as we understand, are unique

11   to individuals?  My fingerprints aren't going to be like

12   anybody else's?

13   A.   Yes.

14   Q.   Maybe my twin brother if I have one?  Right?

15   A.   I don't know.

16   Q.   Well --

17   A.   I don't know about twins.  I don't know.

18   Q.   Okay.  But certainly, leaving twins out of the

19   equation, as far as you know, they wouldn't be the same as

20   someone else's?

21   A.   Yes.

22   Q.   Now, you fingerprinted the paper bags.  Did you

23   fingerprint any of the small plastic bags the drugs were in?

24   A.   Just to clarify, I didn't fingerprint anything.

25   Q.   Did you request that?

1    A.   I did not.

2    Q.   But you did request that the paper bags be

3    fingerprinted?

4    A.   I did not.

5    Q.   Who made the request?

6    A.   I'm not sure.

7    Q.   You didn't make any sort of request?

8    A.   No.

9    Q.   Well, based upon your training and experience as a

10   narcotics officer for 12 years and a police officer for 17

11   years, you would agree that it's entirely reasonable to

12   expect to get prints off of a paper bag?

13           MS. GREENBERG:  Objection.

14   Q.   If you know.

15           THE COURT:  Overruled.

16   A.   Can you just ask the question again?

17   Q.   Is it possible to get paper bags --

18   A.   Is it possible to?

19   Q.   Get prints off a paper bag.

20   A.   Yes.

21   Q.   And, therefore, printing it would be a valuable

22   investigative tool?

23   A.   Yes.

24   Q.   And, likewise, off of a plastic bag, you could get

25   prints, correct?

1   A.   Yes.

2   Q.   And that would make it a -- printing that would be a

3   valuable investigative effort, correct?

4   A.   Yes, it would.

5           MR. MONTEMARANO:  Court's indulgence, please.

6           Could I please see -- I don't have the number for

7   the lockbox.

8   Q.   While we're talking about fingerprinting bags and

9   plastic bags, would it be fair to say that you could

10  probably get a fingerprint off a flat metal container like

11  this?

12  A.   Yes.

13  Q.   This wasn't printed.  There's no purple powder on this

14  lockbox, is there?

15  A.   No.

16  Q.   Nothing at all, correct?

17  A.   Correct.

18  Q.   Outside or inside, correct?

19  A.   Correct.

20  Q.   But a print on this would be a valuable investigative

21  effort?  Or searching for a print on this would be a

22  valuable investigative effort, would it not, sir?

23  A.   Yes.

24  Q.   And when you came in the home, about what time of day

25  was it on the 1st of June?

1   A.   6:00 a.m.

2   Q.   6:00 a.m.  Early.

3   A.   Yes.

4   Q.   Jacqueline Terrell was present?

5   A.   Yes.

6   Q.   She was upstairs on the phone, you think?

7   A.   She was upstairs, yes.

8   Q.   John Martin was present?

9   A.   Yes.

10  Q.   Where?

11  A.   In the basement.

12  Q.   My client, Paulette Martin, was present?

13  A.   Yes.

14  Q.   You'd never met Ms. Martin before, is that a fair

15  statement?

16  A.   I've never met her before.

17  Q.   You'd met John Martin before, hadn't you?

18  A.   Yes.

19  Q.   You'd interviewed John Martin before?

20  A.   Yes.

21  Q.   And not wishing to steal your thunder, that was part of

22  an investigation back in 2002?

23  A.   Yes.

24  Q.   July of 2002?

25  A.   Yes.

1   Q.   Part of an investigation of Mr. Martin, correct?

2   A.   Yes.

3   Q.   And the federal prosecution of Mr. Martin?

4   A.   Yes.

5   Q.   And that was for possession with intent to distribute

6   cocaine?

7   A.   Yes.

8   Q.   That was the time when he was arrested with 25 kilo

9   wrappers of cocaine in the backseat of his car, correct?

10  A.   Yes.

11  Q.   So it would be fair to say that the moment you walked

12  through the door with a search warrant in hand on the

13  morning of June 1, 2004, you knew for sure and certain that

14  at least one known drug dealer was in that residence,

15  correct?

16  A.   Yes.

17  Q.   John Martin, right?

18  A.   Yes.

19  Q.   You knew personally because Mr. Martin was convicted,

20  right?

21  A.   Yes, he was.

22  Q.   And while we're talking about fingerprinting, I

23  neglected to ask.  That shaving kit, based upon your

24  training and experience as an American male, does that look

25  like a guy's shaving kit to you?

1   A.   I believe so, yes.

2   Q.   Did you fingerprint it?

3   A.   No.

4   Q.   Or request?

5   A.   No.

6   Q.   Thank you.

7          And the digital scales?  There were digital

8   scales, scales seized?

9   A.   Yes.

10  Q.   Were they printed?

11  A.   No.

12         MR. MONTEMARANO:  Court's indulgence, please.

13  Q.   Now, there was drugs seized from inside the shaving

14  kit, correct?

15  A.   Yes, there were.

16  Q.   And there was drugs outside the shaving kit elsewhere?

17  A.   Yes.

18  Q.   And the packaging materials for the drugs in and out

19  were substantially the same, were they not?

20  A.   Yes.

21  Q.   So we know there are drugs in John Martin's shaving

22  kit, and we have other drugs that look just like them

23  elsewhere in the place where he's found when you execute the

24  search warrant.  Is that a fair statement?

25  A.   Yes, it is.

1    Q.   And, indeed, inside that shaving kit, those are

2    documents related to who, if you recall?  There were

3    documents in the shaving kit, correct?

4    A.   Yes.

5    Q.   And those documents related to what person, if you

6    recall?

7    A.   John Martin.

8    Q.   And as far as you understand today, let alone back on

9    the 1st of June, 2004, John and Paulette Martin have no

10   legal relationship.  They're not related by blood?  They

11   just happen to have the same last name?

12   A.   I don't know.

13   Q.   Oh, you don't?  Thank you.

14            MR. MONTEMARANO:  Court's indulgence for a moment,

15   please.

16   Q.   And you were asked a few times about signatures or

17   names on documents.  There are places where you saw Paulette

18   Martin's name written, correct?

19   A.   Yes.

20   Q.   And at this point in time, let alone the 1st of June,

21   you had no way of knowing what Ms. Martin's signature looked

22   like, correct?

23   A.   No.

24   Q.   Now, that photograph I showed you earlier, 104, this

25   guy up in the corner?

CROSS - DET. KUCASN

1    A.    Yes.

2    Q.    That wasn't the only rack of clothing in that basement,

3    was it not?

4    A.    No.

5    Q.    In fact, you already testified that P118 -- that's this

6    guy down in the corner --

7    A.    Yes.

8    Q.    -- is another photograph of what you said was probably

9    the utility room?

10   A.    Yes.

11   Q.    That was the word you used for it.  Fair statement,

12   right?

13   A.    Yeah, that's how I described that room.  Yes.

14   Q.    And there was more clothing back there?

15   A.    Yes.

16   Q.    And would it be fair to say that with regard to that

17   clothing back there, it was not checked either in the way I

18   asked you earlier about it being checked, like for tags or

19   anything like that?  Or sizes or anything like that?

20   A.    I don't believe so.

21   Q.    Now, at some point at the end of the search, you

22   collected together all the stuff you seized, correct?

23   A.    Yes.

24   Q.    Each separate item went into an evidence bag?

25   A.    Yes.

1   Q.   Okay.  With that tag?

2   A.   Yes.

3   Q.   So, for example, the items here that are demarcated as

4   Item Number 6 -- Item Number 6. that's in Photograph P117,

5   this one here?

6   A.   Yes.

7   Q.   Okay.  There would be a bag that would have all of that

8   stuff inside of it?

9   A.   A bag or a box, yes.

10  Q.   A bag or a box.  Or maybe more than one bag, 6A and 6B.

11  This was stuff that was found in Location 6, correct?

12  A.   Yes.

13  Q.   And the things you didn't take would have still been

14  there when you left the premises?

15  A.   Yeah.

16  Q.   And that would have been about what time on the

17  morning -- was it the morning of June 1st or afternoon?  How

18  long did the search take?

19  A.   We secured that residence at 9:10 a.m.

20  Q.   9:10.  About three hours and ten minutes?

21  A.   Yes.

22  Q.   During that 190 minutes, you went through this entire

23  area.  What was the dimension of the basement, if you

24  recall?  Ballpark.  I'm not going to hold your feet to the

25  fire.  Twenty by thirty maybe?  Bigger?

1    A.    I'm not sure exactly.  It was -- including the utility

2    and laundry rooms, it was probably the exact size of the

3    residence above it.

4    Q.    The footprints of the house?

5    A.    Pretty much, yeah.

6    Q.    Okay.  So 40 by 50 -- not as big as this courtroom?

7    A.    No.

8    Q.    No.  And there were how many of you there?

9    A.    I believe there were eight members of the search team.

10   Q.    So it would be seven searching agents rooting through

11   stuff, and you as the seizing agent writing stuff down.

12   Fair statement?

13   A.    Yes.

14   Q.    So when the seven searching agents got done and given

15   you a -- it had all been done and written down and carefully

16   bagged up so there's no mistakes made and all that.  You

17   then put it all together and march it out to your vehicles,

18   correct?

19   A.    Yes.

20   Q.    Put it in the vehicles, correct?  Under lock and key,

21   correct?

22   A.    That's not exactly how it happened.

23   Q.    Well, you tell me.

24   A.    Well, when I exited the residence with the evidence, at

25   that time I turned it over to Agent Evler.

CROSS - DET. KUCASN                                    160

Case 8:04-cr-00235-DKC   Document 1243   Filed 09/26/08   Page 160 of 230

1    Q.   Oh, so you turned it over to Agent Evler on the scene?

2    A.   On the street.

3    Q.   On the street in front of Hayward?

4    A.   Yes.

5    Q.   But not actually on the property line?

6    A.   No.  We were actually on the street.

7    Q.   Okay.  So when I'm saying not on the property, you

8    would be off of that area for which 810 Hayward is taxed,

9    the property, demarcation of the deed.  You were actually

10   out on the public highway where your vehicles were parked,

11   right?

12   A.   Yes.

13   Q.   I'm not trying to confuse you, Detective.  I'm trying

14   to clear it.

15           So you're out on the street behind your car and

16   you're putting stuff in -- well, or your SUV.  Putting your

17   stuff in the backseat or trunk.  Is that a fair statement?

18   A.   Yes.

19   Q.   Okay.  But you didn't put it in yours.  You gave it to

20   Detective Evler and he put it in his?

21   A.   Yes.

22   Q.   He took custody from you, correct?

23   A.   Yes, he did.

24   Q.   And at that time, for lack of a better term, you washed

25   your hands of it.  It's now someone else's concern and

1  responsibility.  Is that a fair statement?

2  A.   Yes.

3         MR. MONTEMARANO:  Court's indulgence, please.

4  Q.   And after that point, you don't know what happened to

5  it until you reviewed it for purposes of our trial?  Is that

6  a fair statement?

7  A.   Yes.

8  Q.   All right.  And that's the stuff that was seized, and

9  there was a fair amount of it.  Is that a fair statement?

10  A.   Yes, there was.

11  Q.   Well, you left behind a lot more stuff than you seized.

12  Is that a fair statement?

13  A.   Yes.

14  Q.   Like all the clothing?

15  A.   Yes.

16  Q.   And there's paperwork that you left behind.  Fair

17  statement?

18  A.   A copy of the warrant and the return, yes.

19  Q.   But paperwork that was there when you arrived that you

20  left behind and decided not to take.  Is that a fair

21  statement?  Any kind of paperwork.

22  A.   Documents?

23  Q.   Yeah.

24  A.   Yes.

25  Q.   You didn't take every document.  You took those which

1   you thought were important.

2   A.    Yes.

3   Q.    Or which the searching agent thought was important?

4   A.    Yes.

5   Q.    But those that weren't important in your view as the

6   searching agents or the seizing agents were not taken,

7   correct?

8   A.    Yes.

9   Q.    And they were left behind, correct?

10  A.    Yes.

11  Q.    Along with lots of personal items, correct?

12  A.    Yes.

13  Q.    And so effective 9:11 a.m. on the 1st of June, 2004,

14  they were no longer in -- they were no longer in your

15  custody, in police custody or of access to the police

16  because you guys had left the scene, correct?

17  A.    Who would not?

18  Q.    Come 9:11 in the morning, correct, on the 1st of June,

19  2004, you guys were off the premises.  You'd left.

20  A.    Yes.

21  Q.    And all the stuff you left behind is still there,

22  correct?

23  A.    Yes.

24  Q.    You no longer have access to it, correct?

25  A.    Yes.

1  Q.   And you don't know what's happened to it or what's

2  still there or what's not there from that point forward,

3  correct?

4  A.   Yes.

5  Q.   As part of preparing for today, did you happen to

6  review any reports other than the one you prepared?

7  A.   I don't believe so.

8  Q.   Have you ever seen this document before?

9          MS. GREENBERG:  Can I see it, counsel?

10         MR. MONTEMARANO:  Oh, I'm sorry.

11 Q.   This is ROI 106.

12         Would you look at this?

13 A.   Actually, I have a copy of it right here.

14 Q.   You have a copy right there.  And that was prepared by

15 whom?

16 A.   Tom Evler.

17 Q.   That would be Detective Evler over here in the yellow

18 tie?

19 A.   Yes.

20 Q.   He's the case agent, right?

21 A.   Yes.

22 Q.   Can you look at the second paragraph.  It's a narrative

23 in the Report of Investigation 106.

24         MS. GREENBERG:  I'm going to object to him

25 crossing this witness on Detective Evler's report.

1    Detective Evler will be available.

2              MR. MONTEMARANO:  Simply going to establish the

3    basis for his testimony.  He said he has a copy.  He

4    reviewed it, Your Honor.  I have one more question.

5              THE COURT:  Try it out.

6              MR. MONTEMARANO:  Thank you.

7    Q.   Can you tell us what date the search was described

8    having taken place by Detective Evler, the case agent?

9    A.   June 6, 2004.

10             MR. MONTEMARANO:  Thank you.  No further

11   questions.

12             MR. MARTIN:  With the Court's permission.

13                     CROSS-EXAMINATION

14   BY MR. MARTIN:

15   Q.   Good afternoon.  Detective?

16   A.   Yes, sir.

17   Q.   I'm Tony Martin, and I represent Mr. Goodwin.

18             How long were you a detective or are you or have

19   you been?

20   A.   About 12 years.

21   Q.   Twelve years?  And what's your total time as a police

22   officer?

23   A.   Seventeen years.

24   Q.   And how many of those years have you been involved in

25   narcotics investigations?

1   A.   Twelve years.

2   Q.   And would it be safe to say that during that period of

3   time you've had many occasions to execute search warrants?

4   A.   Yes.

5   Q.   And when we say many occasions, would it be fair to say

6   more than a hundred?

7   A.   Yes.

8   Q.   And would it also be fair to say that there have been

9   many occasions where you have filled out applications for

10  search warrants?

11  A.   Yes.

12  Q.   Like the one that you had looked at earlier that was

13  signed by Judge Connelly?

14  A.   Yes.

15  Q.   And typically those applications for search warrants

16  will have some boilerplate language that refers to the

17  things that you might be looking for at the time you execute

18  it, right?

19  A.   Yes.

20  Q.   And those things might be books, ledgers, documents,

21  maybe photographs of the people that you think might be

22  involved in drug dealing and that sort of thing?

23  A.   Yes.

24  Q.   And I think during the course of your testimony you

25  were shown some documents by Ms. Greenberg.  One of them was

1  Hayward Exhibit 31.  Do you remember that?

2  A.   No.

3        MR. MARTIN:  May I, Your Honor?

4        THE COURT:  Um hum.

5  Q.   Do you remember looking over this package?  Just review

6  it, and after you finish, look up.

7  A.   Yeah.  The Mamzi health insurance document.

8  Q.   Right.  The health insurance.

9        And would you agree with me that health insurance

10 is not something that typically is listed on an application

11 for a search warrant?

12        MS. GREENBERG:  Objection.

13        THE COURT:  Overruled.

14 A.   I'm sorry?

15 Q.   I said would you agree with me that health insurance

16 documents are not something that are typically looked for at

17 the time you're executing a search warrant?

18 A.   Specifically health insurance documents?

19 Q.   Yes.

20 A.   Yes.

21 Q.   That's yes, you would agree with me?

22 A.   I would agree with that, yes.

23 Q.   And these health insurance documents by themselves

24 don't suggest anything about drug dealing, do they?

25 A.   No.

1          MR. MARTIN:  I have no further questions.  Thank

2    you.

3          MR. HALL:  I have no questions for Detective

4    Kucsan.

5          MR. WARD:  None, Your Honor.  Thank you.

6          MR. SUSSMAN:  None, Your Honor.  Thank you.

7          THE COURT:  Mr. McKnett?

8          MR. McKNETT:  Nothing, Your Honor.  Thank you.

9          THE COURT:  Redirect?

10          MS. GREENBERG:  Your Honor, just a few questions.

11                    REDIRECT EXAMINATION

12   BY MS. GREENBERG:

13   Q.   Detective Kucsan, whose job was it to make the call

14   regarding what should be fingerprinted?

15   A.   The case agent's.

16   Q.   And who would that be?

17   A.   Sergeant Sakala, Detective Evler and Agent Snyder.

18   Q.   And where was Ms. Martin when you entered the

19   residence?

20   A.   In the basement.

21   Q.   Just to be clear, when we're looking at 104, the

22   basement area, what is depicted here in the middle of the

23   basement area?

24   A.   It's a makeshift bed.

25   Q.   And in what area of the basement were Mr. and Mrs. --

1  Mr. Martin and Ms. Martin located?

2  A.   Right there.

3  Q.   As depicted in P104?

4  A.   Yes.

5  Q.   And that's the far right picture on this exhibit?

6  A.   Yes.

7  Q.   Going back to the date question, did you prepare that

8  report that Mr. Montemarano asked you about?

9  A.   No.

10 Q.   Showing you Miscellaneous 23, the return that you made

11 to Judge Connelly, did you sign that report?

12 A.   I did.  Yes.

13 Q.   And what date is on that report?

14 A.   6/1/2004.

15 Q.   And when did Judge Connelly acknowledge that he

16 certified that he had gotten your report?

17 A.   June 3rd, 2004.

18 Q.   And could you explain to the jury what this document

19 is, Miscellaneous 23.

20 A.   It's --

21         MR. MONTEMARANO:  Objection.  Beyond the scope,

22 Your Honor.

23         THE COURT:  Overruled.

24 Q.   What is Miscellaneous 23, Detective Kucsan?

25 A.   This is the cover sheet of the search warrant return.

1  Q.    And when was that done?

2  A.    Following the search warrant ultimately, I'd have to

3  return the search warrant return to the judge, issuing

4  judge.

5  Q.    And do you sign that document?

6  A.    Yes, I do.

7  Q.    And the judge signs and dates that document?

8  A.    Yes.

9  Q.    And it's reflected on that document, the date of the

10 search warrant?

11 A.    Yes.

12 Q.    And Judge Connelly signed that on what date?

13 A.    June 3rd, 2004.

14 Q.    And what date did you reflect the search warrant was

15 conducted?

16 A.    June 1st, 2004.

17 Q.    And that's your signature and your certification on

18 that document?

19 A.    Yes, it is.

20 Q.    You testified on cross-examination that you did the

21 warrant at 6 a.m., correct?

22 A.    Yes.

23 Q.    Would you tell the jury why you did the search warrant

24 at 6 a.m.

25            MR. MONTEMARANO:  Objection, Your Honor.

1                MR. WARD:  Objection, Your Honor.  Beyond the

2       scope.

3                MS. GREENBERG:  He asked it, Your Honor.

4                THE COURT:  Overruled.

5       Q.   Why do you do a search warrant at 6 a.m.?

6                MR. MONTEMARANO:  Your Honor, may we be heard at

7       the bench?

8                (Counsel approached the bench and the following

9       ensued:)

10               MR. MONTEMARANO:  Thank you, sir.  I fail to

11      understand how this is within the scope of my cross.  I

12      asked about the time the search commenced because I needed

13      to have a starting time, which I then followed by asking

14      about an ending time so as to establish the time they were

15      on the premises, and I think I used that as a part of my

16      cross.  The length of the search and the number of people

17      was important.

18               I do not believe that the time of the search in

19      terms of a rationale for a time or why they routinely do

20      this at these hours, we all know they execute search

21      warrants invariably before 7 a.m., almost invariably before

22      7 a.m.  Why this has anything to do with my cross or any

23      relevance.

24               MS. GREENBERG:  He opened by saying she was an

25      African-American businesswoman that felt she was being

1   targeted for drug activity.  He's leaving with the jury that

2   they show up and knocked on her door at 6 a.m. while

3   everybody was sleeping, and I want him to explain that's a

4   usual practice and why they do that.

5            THE COURT:  All right.  Objection's overruled.

6            MR. MONTEMARANO:  Thank you, Your Honor.

7            (Counsel returned to the trial tables and the

8   following ensued:)

9   BY MS. GREENBERG:

10  Q.   Detective Kucsan, why did you do the search warrant at

11  6 a.m.?

12  A.   Well, the case agents made the decision as to when the

13  search warrant would be executed, but for obvious reasons,

14  law enforcement likes --

15            MR. WARD:  Objection, Your Honor.

16            MR. MONTEMARANO:  Objection, Your Honor.

17            THE COURT:  Overruled.

18  Q.   Please continue.

19  A.   Law enforcement often likes to serve search warrants in

20  the early morning hours so there's an element of surprise to

21  the execution of the warrant.

22  Q.   Now, sir, you've mentioned a search warrant.  You were

23  authorized to go into that residence by a search warrant?

24  A.   Yes.

25  Q.   And what delineates what can be seized?

1   A.    The attachment to the search warrant.

2   Q.    Showing you what's been marked just for identification

3   as Miscellaneous 24.

4              MS. GREENBERG:  If I may approach, Your Honor?

5              THE COURT:  You may.

6              MR. WARD:  I'm objecting.  This has already been

7   gone into at least once, perhaps several times.

8              THE COURT:  Overruled.

9   Q.    Showing you what's been marked as Miscellaneous 24,

10  does that appear to be the Attachment A for your search

11  warrant which gives the authority for what to search for in

12  that house?

13  A.    Yes.

14  Q.    Could you look through that and tell the jury if you

15  see anywhere in that attachment a reference to dresses that

16  you can seize?

17             MR. MONTEMARANO:  We'll stipulate, Your Honor.

18  There are none.

19             THE COURT:  All right.  He's stipulated that

20  there's no reference to dresses in the --

21  Q.    There's no reference to dresses in there, is there?

22  A.    There's not.

23  Q.    How about to shoes?

24             MR. MONTEMARANO:  Stipulated.

25             MS. GREENBERG:  Following up on his cross.

1   Q.   So there's no reference to shoes in there, is there?

2   A.   No.

3   Q.   And directing your attention to --

4           MS. GREENBERG:   Court's indulgence.

5   Q.   -- paragraph 10, do you see that paragraph there?

6   A.   Yes.

7   Q.   Is that a standard paragraph in your warrant?

8   A.   Yes, it is.

9   Q.   And how does that relate to the document Mr. Martin

10  asked you about regarding health insurance?

11  A.   Indicia of occupancy.

12  Q.   And whose name was on that particular document?

13  A.   Paulette Martin.

14  Q.   And to what paragraph did you attribute seizing that

15  document?

16  A.   Number 10.

17  Q.   So it's your testimony you were allowed to seize that

18  document?

19  A.   Yes.

20  Q.   Now, in reviewing these documents with myself and

21  Detective Evler, did you bring before the jury everything

22  you seized from the house?

23  A.   No, not at all.

24  Q.   But certain selected items?

25  A.   Yes.

1   Q.   Is it all available?

2   A.   Yes, it is.

3           MS. GREENBERG:  Nothing --

4   Q.   Oh, one other thing.  Mr. Montemarano asked you about

5   the drugs from the shaving kit.  Drugs Number 11, do you

6   recall seeing that?

7   A.   From the shaving kit?

8   Q.   Yes.

9   A.   Yes.

10  Q.   And he asked you if it related to Item 10, the shaving

11  kit, relating to Mr. Martin, is that correct?

12  A.   Yes.

13  Q.   Did you relate this particular exhibit to anything else

14  in your investigation?

15  A.   That particular exhibit of heroin, I related to heroin

16  that we seized at another location, yes.

17  Q.   Which location was that?

18  A.   Diggers Lane.

19  Q.   And how did you relate that?

20  A.   The consistency and the shape was how it was processed

21  at that location, how the heroin was processed at that

22  location.

23          MS. GREENBERG:  Nothing further, Your Honor.

24          THE COURT:  Any recross?

25          MR. MONTEMARANO:  Yes, Your Honor.  Thank you.

RECROSS-EXAMINATION

BY MR. MONTEMARANO:

Q.   There's no dresses or shoes, clothing items or any of

that kind of stuff set out in the Schedule A, correct, sir?

A.   Yes.

Q.   But in your 12 years as a narcotics agent, I suspect

that there have been times that clothing has been seized in

a search in which you participated.  Is that a fair

statement?

A.   No.

Q.   Never?

A.   Never.

Q.   So if for the sake of discussion you find a jacket

hanging in a closet, and in the jacket you find drugs, you

wouldn't seize --

        MS. GREENBERG:  For the record, that doesn't

appear to be drugs.

        MR. MONTEMARANO:  Actually, it's Tylenol

Allergy/Sinus, for the record.  Day-time, non-drowsy.

        THE COURT:  You have a prescription in your back

pocket, too, for it.

        MR. WARD:  May I have one?

Q.   You wouldn't seize the jacket?

A.   Possibly, yes.

Q.   Possibly.  Because the size of the jacket might be

1    important?

2    A.   Yes.

3    Q.   Because, for instance, if it's a 43 long, it might not

4    fit somebody.  Let's assume there are two people on the

5    premises.  One guy is about 6-1, and we're not going to say

6    how much -- okay, Mr. Ward.

7           MR. WARD:  I will stipulate that it probably

8    wouldn't fit me, Your Honor.

9    Q.   Perhaps it might be important to know that it's this

10    jacket and this jacket as to who it might fit, correct?

11           MS. GREENBERG:  Your Honor, I'm going to object to

12    the relevance.  There were no drugs seized from any clothing

13    at this location.

14           MR. MONTEMARANO:  That's the point.

15           THE COURT:  Overruled.

16    Q.   In fact, there were no drugs seized from any of the

17    clothing, right?

18    A.   Yes.

19    Q.   And those seizing agents went through the clothing, or

20    they -- excuse me, searching agents went through the

21    clothing?

22    A.   Yes.

23    Q.   Or should have?

24    A.   I believe so, yes.

25    Q.   You believe so.  You didn't watch them for the entire

1    190 minutes you were on the scene.

2    A.   I did not.

3    Q.   But if they're doing their job, they would have.

4    A.   Yes.

5    Q.   And if you're doing your job, you're going through it

6    if you were not the seizing but the searching agent

7    responsible for that portion of the basement, correct, sir?

8    A.   Yes.

9    Q.   And would it be fair to say that if you had written up

10   the report investigation on this search, you would have put

11   down June 1 because that's the date it took place, right?

12   A.   I would have liked to think that, yes.

13   Q.   You testified June 6th because that's what's on the

14   sheet in front of you and it's been two years and you made a

15   mistake, right?

16   A.   Yes.

17   Q.   You weren't trying to deceive me or anybody else here,

18   were you?

19   A.   I wasn't.

20        MR. MONTEMARANO:  I didn't say you were.  Thank

21   you very much, Detective.

22        MR. MARTIN:  With the Court's permission.

23                    RECROSS-EXAMINATION

24   BY MR. MARTIN:

25   Q.   Getting back to Exhibit 31, Hayward 31, remember you

1    were asked why you took that particular document?  It was

2    the Mamzi document?

3    A.   Yes.

4    Q.   And it was suggested, I think, in the question that you

5    took it to show occupancy.  Remember that?

6    A.   Yes.

7    Q.   And there, if you will recall, were a number of names

8    on that particular policy or statement for that month.  Do

9    you remember that?

10   A.   Yes.

11   Q.   And of the various names that you saw on that policy or

12   that statement, as far as you know, the only person listed

13   there who lived there was Ms. Martin, is that correct?

14   A.   I believe so, yes.

15           MR. MARTIN:  I have no further questions.  Thank

16   you, Your Honor.

17           THE COURT:  Any further recross?

18           MS. GREENBERG:  Your Honor, may the witness be

19   excused?

20           THE COURT:  Yes, you may.  You may step down.

21   Thank you very much.

22           Why don't we take an afternoon recess until 3:35.

23           (Recess.)

24           THE COURT:  Counsel, the foreman of the jury has

25   asked if when an attorney is publishing material to the jury

1    and it's wandering around among the jury that we slow the

2    questioning down a little bit so they can look at it and not

3    have to -- I'm going to tell them when they come in I've

4    communicated that concern, but also going to tell them that

5    they should remember, so that they don't fail to pay

6    attention to testimony, that all exhibits are going to be

7    available to them during deliberation so that if there's

8    something they missed when it was published, they can look

9    at it in deliberations.

10            MS. JOHNSTON:  Your Honor, we don't traditionally

11   send drugs back into deliberations or firearms and bullets.

12            THE COURT:  I think they were talking about not

13   just the drugs.  Keep the drugs to ourselves.

14            You had a matter?

15            MR. MONTEMARANO:  Well, just I advised

16   Ms. Greenberg before the Government whenever the Government

17   in its routine chooses to seek to produce Hayward 21, the

18   list of phone numbers allegedly from one of the cell phones

19   seized from Hayward --

20            THE COURT:  Right.

21            MR. MONTEMARANO:  -- we'd like to be heard out of

22   the presence of the jury before that happens.

23            MS. GREENBERG:  Your Honor, perhaps we can do that

24   with the 15 minutes the Court gives us in the morning.

25            MR. MONTEMARANO:  Whenever.

1          THE COURT:  All right.  Well, tomorrow we start at

2     9:30 because I don't have any matter at 9.  If you have any

3     preliminary matters tomorrow, I'll see you at 9:15.  So plan

4     on being here at 9:15.

5          Now, I have received -- I don't have the title of

6     it in front of me, but I received a -- from counsel for

7     Mr. Goodwin a motion for disclosure of movement.  A copy has

8     been provided to the Government.

9          Will the Government let me know what their

10    position is on that?

11         MS. JOHNSTON:  We just received that.

12         THE COURT:  Oh, I know.  I understand.  Maybe you

13    can let me know tomorrow morning.  Or I don't know how -- I

14    have not studied it, so I -- I've been trying to study the

15    evidence, so.

16         MS. JOHNSTON:  I haven't either.  I don't think

17    there's any legal authority cited in it.

18         MR. MARTIN:  No, I didn't cite any authority.

19    We'll take care of it tomorrow.  We can argue tomorrow.

20         THE COURT:  We'll talk about it tomorrow.  I don't

21    want to keep the jury waiting.

22         By the way, can counsel for the Government tell me

23    where you think you are on your timetable?

24         MS. JOHNSTON:  I think that we lost quite a bit of

25    time last week, and we're losing time next week.  I would

1    like -- the Government was hoping to rest by this Friday.

2    Probably it will be next Tuesday.

3              THE COURT:  Next Tuesday?

4              MS. JOHNSTON:  Yes, sir.  I would like us to

5    proceed then with the defense case on Wednesday.  Wednesday

6    probably.

7              THE COURT:  Okay.  All right.  Bring the jury in.

8              (Jury present.)

9              THE COURT:  While you're getting seated, I want to

10   tell you that I have communicated with counsel for both

11   sides, and if they publish exhibits to the jury, they'll

12   sort of pause a little bit so you can get a chance to look

13   at them.

14             I do want to remind you, however, that with the

15   understandable exception of drugs and guns, the exhibits

16   will be available to you during deliberations, so that if

17   there's an exhibit that you didn't have a chance to really

18   study very carefully other than drugs and guns, you will

19   have a chance to look at it during your deliberations.

20             MS. JOHNSTON:  Your Honor, with the Court's --

21             THE COURT:  Oh, one other thing.  I have gotten an

22   update.  These things are always subject to change, but it

23   appears that the Government case will end about next

24   Tuesday, and we'll get into defense case next week.

25             All right.  You may proceed.

1          MS. JOHNSTON:  Your Honor, with the Court's

2     permission, we're going to call Detective Jacques Cowan a

3     little bit out of turn to accommodate schedules, another

4     court appearance.

5               (The oath was administered.)

6               THE CLERK:  Please be seated.

7               Please speak loudly and clearly into the

8     microphone.  State your name for the record and spell your

9     first and last names.

10               THE WITNESS:  Detective Jacques Cowan.  The first

11    name is J-A-C-Q-U-E-S.  Last name, C-O-W-A-N.

12                         DIRECT EXAMINATION

13    BY MS. JOHNSTON:

14    Q.    Detective Cowan, where are you employed?

15    A.    Montgomery County Police.

16    Q.    And how long have you been employed with the Montgomery

17    County Police?

18    A.    A little over 23 years.

19    Q.    In what different capacities?

20    A.    Currently, I'm a detective with the Career Criminal

21    Section, Firearms Investigation.

22    Q.    Now, have you ever been assigned to do narcotics work

23    there?

24    A.    For several years.

25    Q.    Approximately how many years did you do narcotics work?

1    A.    Ten years.

2    Q.    And during those ten years in narcotics, were you ever

3    assigned to any task force?

4    A.    Yes.  I was assigned to HIDTA Group 34.

5    Q.    And is that a DEA task force?

6    A.    DEA temporary task force.

7    Q.    And were you federally deputized at that time?

8    A.    Yes, I was.

9    Q.    Calling your attention to 1996 and early '97, were you

10   assigned to that task force?

11   A.    Yes, I was.

12   Q.    And in particular in 1997, were you involved in any

13   investigations in the Adelphi, Maryland area?

14   A.    Yes, I was.

15   Q.    And approximately -- strike that.

16          Who were the initial targets of your investigation

17   in 1996?

18   A.    I created the case in 1996.  The original target was

19   McCarthy Plumber and Beverly White.

20   Q.    And McCarthy Plumber, is he known by any nickname?

21   A.    He was known by nicknames of Dobie and Mack.

22   Q.    And were they husband and wife, to your knowledge?

23   A.    They lived together.

24   Q.    And where did they --

25          THE COURT:  Could you get a little closer to the

1    mike.

2            THE WITNESS:  Yes, sir.

3            THE COURT:  It's a little hard to hear you.  Thank

4    you.

5    Q.   Where were they living together back during the course

6    of your investigation in '96, '97?

7    A.   At 8903 Royal Crest Court in Adelphi.

8    Q.   And can you give us an idea of where in Adelphi that's

9    located?

10   A.   It's near the intersection of -- I think it's Metzerott

11   and New Hampshire Avenue.

12   Q.   Now, if I could show you what's been marked as

13   Government's Exhibit P285, do you recognize the residence

14   depicted on that photograph?

15   A.   Yes.  That's 8903.

16   Q.   The residence of Mr. McCarthy and Ms. Beverly White?

17   A.   Yes, ma'am.

18   Q.   And P286?

19   A.   Same house.

20   Q.   Now, during the course of your -- let me back up for a

21   second.

22            You said Mr. McCarthy Plumber went by the nickname

23   of Dobie, is that correct?

24   A.   Correct.

25   Q.   Okay.  In the course of your investigation, you didn't

1   come across anyone named Lavon Dobie?

2   A.   No, I did not.

3   Q.   Now, in terms of that residence, did there come a time

4   while you were investigating Mr. Plumber and Ms. White when

5   you identified another location in that neighborhood

6   associated with Mr. Plumber and Ms. White?

7   A.   Yes.  About a block and a half away at 9000 -- 9002

8   Bexhill Court, there's another location.

9   Q.   And who resided at that location during your

10  investigation?

11  A.   John White and Paulette --

12  Q.   Excuse me?

13  A.   Excuse me.  John Martin and Paulette Martin.

14  Q.   Now, you indicated it was about a block and a half

15  away.  Can you describe the condition of that area back in

16  '96 and '97 when you were doing your investigation?

17  A.   In '96, it was a pretty new area.  Not all the homes

18  were built back there yet.

19  Q.   And in terms of the location 9002 Bexhill Court, what

20  was that particular area of the development like?

21  A.   That was a court off of the main street going into the

22  development, and I think at that point it had either two or

23  three developed homes on it.

24  Q.   When you say developed, you mean occupied homes?

25  A.   Well, actually two or three homes that were up, and two

1   of those homes were occupied.

2   Q.   And were there other homes being built in that area at

3   that time?

4   A.   Yes, there was.

5   Q.   Let me show you what's been marked as P2, and putting

6   aside perhaps the grass and the growth there, do you

7   recognize the houses depicted in that photograph?

8   A.   The home on the left is 9002 Bexhill Court.

9   Q.   And is that the home with the truck in the driveway?

10   A.   Yes, it is.

11   Q.   And the other home, was that home also there back in

12   1996?

13   A.   That home was there and occupied.

14   Q.   Just so the record is clear, let me also show you P3.

15           What are we looking at here in P3?

16   A.   A closeup of 9000 -- 9002 Bexhill.

17   Q.   Now, in regards to your investigation back in 1996, did

18   there come a time when you conducted surveillance and used

19   investigative techniques such as trash, collecting the trash

20   from 9002 Bexhill Court?

21   A.   Yes, I did.  On 11/21, I conducted a trash, what we

22   called rip or pull.

23   Q.   And what did you -- what do you do when you take the

24   trash?

25   A.   We take it from in front of the residence, and we go

1    through it to find out any identification of who might be in

2    the residence.

3    Q.    And in this instance, do you recall whether or not you

4    recovered any documents associated with the residence or

5    with Mr. John Martin or Paulette?

6    A.    On that occasion, out of the trash, we found a --

7    letters addressed to the Christian Praying Center with an

8    address of 5559 South Dakota Avenue, N.E., Washington.

9    Q.    And was it put to someone's -- anyone's attention?

10   A.    Yes.  Special attention, Mother Martin.  There were

11   also letters addressed to Paulette Akuffo at 9002 Bexhill

12   Court.

13   Q.    Now, calling your attention to January 14th of 1997,

14   did you have occasion to do surveillance on that date?

15   A.    Yes, I did.

16   Q.    Okay.  And where was that surveillance done, at the

17   Bexhill Court address or at the Royal Crest address?

18   A.    At the Bexhill Court address.

19   Q.    Can you describe for us what observations you made on

20   January 14th of 1997?

21   A.    Could you repeat the question, please.

22   Q.    Could you describe for us what observations you made on

23   January 14th of 1997?

24   A.    At that point, I saw a beige Ford four-door sedan with

25   Maryland plate Yankee Paul Tom 306 pull into the driveway.

1    Q.    And was it -- do you recall how many people were in the

2    vehicle and where their positions were?

3    A.    It was occupied twice, and I don't recall the positions

4    of the people.

5    Q.    Okay.  And do you have in front of you -- or strike

6    that.

7             Did you prepare a report of investigation close in

8    time to when that occurred?

9    A.    Yes, I did.

10   Q.    Do you have a copy of that report with you?

11   A.    Yes, I do.

12   Q.    Will reviewing that report refresh your recollection

13   concerning the sex and the positions of the individuals who

14   were in the beige Ford?

15   A.    Yes, ma'am.  According to the report, it says a

16   medium-skinned female was the driver of the vehicle and a

17   tall light-skinned male was a passenger.

18   Q.    And did you determine who the car was registered to?

19   A.    Yes, ma'am.  It was registered to Lanora Ali.

20   Q.    At what address?

21   A.    620 Sheridan Street, Number 415, Hyattsville, Maryland.

22   Q.    Were there other vehicles that you also noticed at that

23   location on January 14th of 1997?

24   A.    A 1993 Infiniti four-door, green in color, with

25   Maryland plate David King Tom 047.

1    Q.    And did you observe either Mr. and Mrs. Martin arrive

2    at that location on January 14th of 1997?

3    A.    When we first initiated surveillance on that location,

4    a female was seen inside the residence, but no vehicles were

5    seen outside parked.  And as we continued our surveillance,

6    the brown Cadillac occupied by Mr. Martin came to the

7    residence.

8    Q.    Okay.  Now, that brown Cadillac, did that arrive before

9    or after you saw the vehicle registered to Ms. Ali?

10   A.    After.

11   Q.    And did Mr. John Martin arrive in the brown Cadillac

12   before or after the car registered to Ms. Ali left the area?

13   A.    Mr. Martin arrived after Ms. Ali left.

14   Q.    Do you know approximately how long Ms. Ali was -- that

15   the vehicle registered to Ms. Ali was present at the

16   location?

17   A.    It says at 1719, the vehicle arrived.

18   Q.    And at what time --

19   A.    And at 1725, it left.

20   Q.    Now, calling your attention to January 22nd, 1997, did

21   you have occasion again to be in the vicinity of 9002

22   Bexhill Court?

23   A.    Yes, ma'am, I was.

24   Q.    And did you observe any vehicles parked near -- in the

25   driveway or in front of the residence at 9002 Bexhill Court?

1    A.    Yes, ma'am.  There were several vehicles in the

2    driveway at 9002.  An older model blue Cadillac with D.C.

3    plates U-N-C-M-I-C-K.  A white Lincoln with D.C. plates

4    784890.  A brown Cadillac with Maryland plates, Tom Mary

5    Lincoln 953.  And an unidentified red vehicle.

6    Q.    And had you associated any of those vehicles with

7    people in your investigation?

8    A.    Yes, ma'am.  Before, on several other surveillances, I

9    had seen the blue Cadillac being driven by Beverly White's

10   mother and Beverly White.  The Lincoln had been driven by

11   Beverly White and McCarthy Plumber.  And the brown Cadillac

12   was seen driven by John Martin.

13   Q.    That's the same one you described seeing him arrive in

14   on January 14th --

15   A.    Yes.

16   Q.    -- of '97?

17          Now, calling your attention to January 23rd of

18   1997, did you perform another trash rip at 9002 Bexhill

19   Court?

20   A.    Yes, ma'am, I did.

21   Q.    Can you describe what items you recovered from the

22   trash on January 23rd of 1997.

23   A.    On that particular trash rip, we found an invoice from

24   a health and life insurance company, Mamzi, and it was

25   invoiced from Paula's School of Performing Arts with several

1   names as recipients.

2   Q.   Okay.  And who were the names on that Mamzi

3   correspondence?

4   A.   Debra Darby, Learley Goodwin, Ian Gordon, John Martin,

5   Jr., Melba May, McCarthy Plumber, Martha West and Beverly

6   White.

7   Q.   Was there -- during the course of your investigation,

8   did you develop any evidence that McCarthy Plumber or

9   Ms. Beverly White ever worked for Ms. Martin?

10  A.   I have never seen a working relationship.

11  Q.   And, again, those names, McCarthy Plumber and Beverly

12  White, those were the same names of the people you were

13  investigating who lived on Royal Crest?

14  A.   They're the same names, yes.

15  Q.   Now, calling your attention to January 31st of 1997,

16  did you conduct a brief surveillance in the vicinity of 9002

17  Bexhill Court, Adelphi, Maryland?

18  A.   Yes, I did.

19  Q.   And what, if any, vehicles or individuals did you

20  observe at that time?

21  A.   Parked in the driveway was Maryland plate David Yankee

22  Charlie 142.  A listing was performed on that, and it came

23  back to Derrek Bynum of 11514 Lockwood Drive, A2, Silver

24  Spring, Maryland.

25  Q.   Were you there long enough to see anyone exit that

1   vehicle or enter that vehicle on that date?

2   A.   No, ma'am.

3   Q.   Now calling your attention to February 7th of 1997,

4   were you -- did you conduct more extensive surveillance on

5   that date?

6   A.   Yes, ma'am.  We began our surveillance that day at 8903

7   Royal Crest Drive.

8   Q.   And did your investigation leave 8903 Royal Crest and

9   go to Bexhill Court?

10  A.   Yes, it did.

11  Q.   Could you describe for us what you saw on that date in

12  relation to both of those locations?

13  A.   We found a red Honda and a blue Cadillac in front of

14  the Royal Crest address.

15  Q.   Is that the same blue Cadillac that you described?

16  A.   Yes, ma'am.  U-N-C -- white U-N-C-M-I-C-K.

17  Q.   That you saw previously at the Bexhill Court address?

18  A.   Yes, ma'am.  And we also saw a white Lincoln pull up in

19  front, occupied by several females at the time when it

20  pulled up.  The driver at that point was identified as

21  Beverly White.

22  Q.   Now, did there come a time when anyone left the

23  residence at 8903 Royal Crest Drive and proceeded to a

24  different address?

25  A.   Yes, ma'am.  After a few minutes of our surveillance,

1    we saw the red/maroon pickup truck being driven by a black

2    male leave.

3    Q.   Okay.  And did you continue with your surveillance at

4    that time?

5    A.   Yes, we did.

6    Q.   And while still conducting your surveillance at the

7    Royal Crest address, did you observe any other people exit

8    the premises and leave that location and go to another

9    residence?

10   A.   Yeah.  A pickup truck left the 8903 Royal Crest and

11   went over to 9002 Bexhill Court and went inside.

12   Q.   After the pickup truck arrived at 9002 Bexhill Court,

13   did the occupant of that pickup truck remain in his truck,

14   or did he enter the residence?

15   A.   No.  The occupant got out of the truck, entered the

16   residence.

17   Q.   And what occurred shortly after he entered the

18   residence?

19   A.   The garage door opened up.  A female that we identified

20   as Paulette Martin opened the garage door, got into a

21   Subaru, and both the Subaru and the red truck left.

22   Q.   And the Subaru, were you able to identify its

23   registration?

24   A.   The Subaru had temporary plates on at that point.

25   Q.   And where did the -- was Ms. Martin the only person you

1    observed in the Subaru?

2    A.    Yes, it was.

3    Q.    And where did the Subaru and the pickup truck go at

4    that time?

5    A.    Back to Royal Crest.

6    Q.    That would be 8903 Royal Crest?

7    A.    Yes, ma'am.

8    Q.    And while those -- did the occupants of those vehicles

9    remain -- Ms. Martin and the occupant of the pickup truck

10   remain in their vehicles, or did they exit and enter?

11   A.    They exited and went into Royal Crest, and at that

12   point Mr. Martin pulled up in the brown Cadillac and went

13   into Royal Crest also.

14   Q.    And do you know how long Ms. Martin and the Subaru were

15   at the Royal Crest address?

16   A.    It says at 1440 hours the Subaru left the area.

17   Q.    And does your report also reflect what time it arrived?

18   A.    1430 is when she left the garage.

19   Q.    How far is it from 9002 Bexhill Court to Mr. Plumber

20   and Ms. White's residence on Royal Court?

21   A.    A block and a half.

22   Q.    And could you drive directly from one to the other?

23   A.    Yes.

24   Q.    Now, did there come a time when you left the HIDTA Task

25   Force?

1   A.   Yes, I left in '97.

2   Q.   And do you know whether or not Ms. Martin, or

3   Mr. Martin, for that matter, were arrested in relation to

4   this investigation?

5   A.   I know that a search warrant was done at 8903 Royal

6   Crest.  I don't know the result of that search warrant

7   except for there were drugs found at that location, and I

8   know that Mr. Martin was arrested at another location.

9   Q.   But to your knowledge, Ms. Martin wasn't charged back

10  in '96 or '97 in relation to your investigation?

11  A.   Not by me.

12  Q.   And do you know -- were you involved in the

13  investigation once you left HIDTA?

14  A.   No, I was not.

15           MS. JOHNSTON:  Court's indulgence.

16           I have nothing further.

17           THE COURT:  Cross-examination?

18           MR. MONTEMARANO:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20  BY MR. MONTEMARANO:

21  Q.   Good afternoon --

22  A.   Good afternoon.

23  Q.   -- Detective Cowan.  How are you?

24  A.   Good.

25  Q.   Detective?

1    A.    Yes.

2    Q.    John Martin was arrested in April of '97, correct?

3    A.    I'm not sure when Mr. Martin was arrested.

4    Q.    Some time after this surveillance you described?

5    A.    Correct.

6    Q.    And, in fact, it was Mr. Martin who was the subject,

7    along with Mr. Plumber, of your investigation.  Is that a

8    fair statement?

9    A.    He became a subject after the initial investigation.

10   Q.    Because you saw him with Mr. Plumber and Mr. Plumber

11   was known to you to be a drug dealer?  Is that a fair

12   statement?

13   A.    That's a fair statement.

14   Q.    And then he was -- Mr. Martin was arrested -- you say

15   you don't know exactly when it was.  He was arrested for a

16   narcotics felony, wasn't he?

17   A.    Yes, sir.

18         MR. MONTEMARANO:  No further questions, Your

19   Honor.  Thank you.

20         MR. MARTIN:  Mr. Goodwin has no questions, Your

21   Honor.

22         MR. HALL:  I have no questions, Your Honor.

23                         CROSS-EXAMINATION

24   BY MR. MITCHELL:

25   Q.    Detective Cowan, you began this investigation in 1996?

1    A.   Correct.

2    Q.   And it lasted how long?

3    A.   I left in '97, and I don't know when it actually came

4    to an end.

5    Q.   So about a year long investigation, that's all you were

6    involved in?

7    A.   Correct.

8    Q.   And did you leave before you determined that your

9    investigation was completed?

10   A.   Yes, I did.

11   Q.   All right.  Now, during this period of a year, you did

12   some surveillance?

13   A.   Correct.

14   Q.   How many days total did you do surveillance?

15   A.   I guess at least twice a week for a year.

16   Q.   For a year?

17   A.   Um hum.

18   Q.   All right.  And if I understand your testimony, on one

19   of those days you observed a vehicle that was registered to

20   a Derrek Bynum?

21   A.   Correct.

22   Q.   Now, did you ever identify Mr. Bynum?

23   A.   Just ran the NADIS checks and ran the vehicle listing

24   checks.

25   Q.   And you don't know who drove that car to that location?

1   A.   No, sir.

2   Q.   Was there anyone in the vehicle when you saw the

3   vehicle?

4   A.   No, sir.

5   Q.   You don't know how the car got there or what the

6   circumstances were, nothing -- the car was not illegally

7   parked or anything?

8   A.   No violations.

9   Q.   Nothing unusual about the car itself?

10  A.   No, sir.

11  Q.   And you didn't see anyone get in or outside the

12  vehicle?

13  A.   Can I refer to my notes?

14  Q.   Sure.

15  A.   No, sir.

16  Q.   So you wouldn't know if anyone from that car actually

17  went into that residence?

18  A.   Correct.

19  Q.   During the period of time that you were doing this

20  investigation, did you also do any of telephone numbers?

21  A.   I don't -- I'm sure that we did.  I don't recall which

22  numbers we checked.

23  Q.   I'm asking if you recall if you issued subpoenas for

24  telephone numbers to identify --

25  A.   I -- that's not -- we didn't do that.  We had other

1    people that would do that in our unit.

2    Q.   Maybe I can cut it a little short.

3         Other than just observing a vehicle registered to

4    a Derrek Bynum, did you find any other reference to him in

5    any manner?

6    A.   No, sir.

7    Q.   During the period of your investigation?

8    A.   No, sir.

9    Q.   None in the trash runs or any other investigative

10   technique that you used?

11   A.   No, sir.

12   Q.   This was for a period of about a year from what, 1996?

13   When in 1996?

14   A.   I don't recall when the initial case started.  Early

15   1996.  And I think the last report was February of '97 that

16   I wrote.

17        MR. MITCHELL:   Thank you.  I have no further

18   questions.

19                    CROSS-EXAMINATION

20   BY MR. WARD:

21   Q.   Just to clarify a point, Detective.  McCarthy Plumber,

22   McCarthy Plumber was a felony drug dealer who was a target

23   or the target in the beginning?

24   A.   A suspected drug dealer, yes.

25   Q.   Now, Dobie was his nickname?

1    A.    One of his nicknames.

2    Q.    One of his nicknames.  And just to make clear, I think

3    you've already been asked by Ms. Johnston, you did not run

4    across a Lavonne Dobie in that investigation?

5    A.    No, I did not.

6    Q.    Or a Becky Dobie?

7    A.    No, I did not.

8    Q.    Or a Goldy Dobie?

9    A.    No, sir.

10            MR. WARD:  Thank you very much.

11            MR. McKNETT:  May I, Your Honor?

12            THE COURT:  You may.

13                      CROSS-EXAMINATION

14   BY MR. McKNETT:

15   Q.    Good afternoon, Detective.

16   A.    Good afternoon.

17   Q.    Detective, I want to focus your attention on the

18   January 14th, 1997 surveillance at 9002 Bexhill Court, and I

19   believe you had a report that you had done concerning that.

20   Do you have that there?

21   A.    January 14?

22   Q.    Yes.

23   A.    Yes, sir.

24            MR. McKNETT:  May I approach, Your Honor?

25   Q.    Could I see that report for a second?

1    A.    Yes, sir.

2    Q.    Make sure that we're on the same page here.

3    A.    Yes, sir.

4    Q.    Okay.  Good.

5          Detective, did you make the observations that are

6    contained in your report?

7    A.    At the beginning of the report, it says members of the

8    HIDTA DEA task force, so myself and the rest of the unit

9    that were with me.

10   Q.    Well, let me be a little more precise.

11         The report was written -- it was written over your

12   signature, correct?

13   A.    Correct.

14   Q.    It's your report?

15   A.    Correct.

16   Q.    I just want to be sure.  Did you make all the

17   observations that are contained in the report?

18   A.    No, sir.  We work in a team.  Some of the other members

19   of the team could have made -- could have made notes and

20   given them to me to prepare the report.

21   Q.    So it's a compilation.

22   A.    Yes, sir.

23   Q.    Okay.  You said that -- I think you said that you saw a

24   vehicle registered to Lanora Ali arrive at the premises, is

25   that correct?

1   A.    In the report, it says at 1719 a beige Ford, and it

2   doesn't say that I actually saw it.

3   Q.    Okay.  So somebody on the team saw the vehicle?

4   A.    Correct.

5   Q.    And you said it was occupied twice, and that's police

6   talk for two people in the vehicle?

7   A.    Correct.

8   Q.    There was a male and a female, correct?

9   A.    Correct.

10  Q.    And the female was driving, correct?

11  A.    Correct.

12  Q.    At a later time, it was determined that the vehicle was

13  registered to Lanora Ali at 620 Sheridan Drive, Number 415,

14  Hyattsville, correct?

15  A.    Correct.

16  Q.    And the report says that when the vehicle arrived, the

17  female was driving the vehicle, correct?

18  A.    Yes, sir.

19  Q.    The male passenger got out of the vehicle, correct?

20  A.    Yes, sir.

21  Q.    He entered the residence, 9002 Bexhill Court, correct?

22  A.    Correct.

23  Q.    And about six minutes later, the male exited the

24  residence, correct?

25  A.    Correct.

1    Q.    Got back into the vehicle, correct?

2    A.    Yes, sir.

3    Q.    And the vehicle left the scene.

4    A.    Correct.

5    Q.    So the female stayed in the vehicle the entire time.

6    A.    Correct.

7              MR. McKNETT:  Okay.  Thank you.

8              THE WITNESS:  You're welcome.

9              MR. McKNETT:  Nothing further.

10             THE COURT:  Any redirect?

11             MS. JOHNSTON:  Just one question.

12                    REDIRECT EXAMINATION

13   BY MS. JOHNSTON:

14   Q.    Detective Cowan, the drugs, do you recall what kind of

15   drugs Mr. Plumber and Ms. White were distributing out of

16   their house at Royal Crest?

17   A.    Heroin and cocaine.

18             MS. JOHNSTON:  I have nothing further.

19             THE COURT:  Any recross?

20             MR. MONTEMARANO:  No thank you, Your Honor.

21             THE COURT:  You may step.  Thank you.

22             THE WITNESS:  Thank you.

23             MS. JOHNSTON:  Your Honor, our next witness would

24   be Detective John Shea.

25             (The oath was administered.)

 1                    THE CLERK:  Please be seated.

 2                    Please speak loudly and clearly into the

 3    microphone.  State your name for the record and spell your

 4    last name.

 5                    THE WITNESS:  John -- Detective John Shea,

 6    S-H-E-A.

 7                         DIRECT EXAMINATION

 8    BY MS. JOHNSTON:

 9    Q.   Good afternoon, Detective Shea.  Where are you

10    employed?

11    A.   I'm employed with the Prince George's County police,

12    currently assigned to the Narcotics Enforcement Division.

13    Q.   And how long have you been employed as a Prince

14    George's County police officer?

15    A.   Twenty-two years.

16    Q.   What different assignments have you had during those 22

17    years?

18    A.   Approximately 17 years I've been assigned to the

19    Narcotics Enforcement Division and Patrol.

20    Q.   During your assignment to the Narcotics Unit, have you

21    had occasion to obtain and execute search warrants?

22    A.   Yes.

23    Q.   Any idea of how many search warrants you've

24    participated in over those years?

25    A.   Search warrants, probably around 300.

1    Q.    Now, calling your attention to June 1st of 2004, were

2    you asked to assist Detective Evler and Detective Sakala and

3    Agent Snyder with the execution of search warrants in this

4    case?

5    A.    Yes, ma'am.

6    Q.    And what assignment were you given on June 1st of 2004?

7    A.    That particular day, I was a team leader, the search

8    team leader, for 5559 South Dakota Avenue, N.E., Washington,

9    D.C.

10   Q.    Now, could you describe for us -- you said you were a

11   team leader -- what your responsibilities are as a team

12   leader?

13   A.    The team leader is the main point of contact between

14   the case agent and the location, and as a team leader, you

15   assign people search areas, areas to search.  And if they

16   locate what they believe to be evidence, then you go and you

17   determine whether it's evidence, and if it is evidence, you

18   seize it.  If you have a question about it, you contact the

19   case agent.

20   Q.    Approximately what time was the warrant executed?

21   A.    We made entry at approximately 6:45 in the morning.

22   Q.    Was anyone present in the school when you made

23   entrance?

24   A.    No, ma'am.

25   Q.    How did you make entrance?

1   A.   Detective Evler responded to the location with a key to

2   the front door for us.

3   Q.   And were you expecting Detective Evler to arrive with

4   the key?

5   A.   Yes, ma'am.   That was the plan, that we would stage in

6   the area and wait for Detective Evler to bring us a key to

7   gain entry.

8   Q.   Now, let me show you first what's been marked as

9   Government's Exhibit P184.   Do you recognize this

10  photograph?

11  A.   Yes, ma'am.   That's the location, 5559 South Dakota

12  Avenue, N.E.

13  Q.   And does that accurately depict the way it appeared on

14  the date that you made the entry?

15  A.   Yes, ma'am.

16  Q.   Could you just -- once you go inside, could you just

17  briefly describe the general layout of the school for us?

18  Then we'll look at some photographs after that.

19  A.   Sure.   As you see, the door is to the left of the photo

20  there.   Once you go through that door, to the right is a

21  reception area.   It's a little room that the reception is

22  kind of open.   And then you take about five feet and you go

23  through a little threshold or a doorway, and then

24  immediately to the right of that, on the other side of the

25  wall is an office, small office.

1          And if you continue straight, there's a large

2   area, a large open area that you can see all the way to the

3   back of the ...

4   Q.   Let me show you what's been marked as P185.  Can you

5   tell us what's depicted on that photograph.

6   A.   That's the reception area that once you walk -- once

7   you go through the first door to get into the building or

8   the store there, that's what you see, the desk and the

9   picture on the wall there.

10  Q.   And P186, if you could tell us whether that gives us an

11  overview of the remainder of the school, so to speak.

12  A.   Yes, ma'am.  That -- if -- this picture, you'd be

13  standing in the very back of the dance hall, or what is

14  supposed to be a dance hall.  And if you look toward that

15  doorway, that corner to the left, there's a little picture,

16  that's actually the office.

17  Q.   Is this the picture?

18  A.   Yes, ma'am.  That one that you just had there.  Just to

19  the right of the little symbol there.  Keep going to the

20  right.  Over a little more.

21          That's the actual edge there.  There's -- there's

22  a doorway into that office right there.

23  Q.   That we can't see?

24  A.   You can't see that doorway, but the doorway that we can

25  see leads out into the reception area.

1   Q.   Okay.  And that's this one back there that I'm pointing

2   to?

3   A.   Yes, ma'am.

4   Q.   So the office area that you're talking about, is that

5   behind this wall with the music note on it?

6   A.   Behind that wall.  Yes, ma'am.  Behind that wall.

7   Q.   Now, in terms -- could you describe for us how you as a

8   team leader directed the other individuals to search the

9   premises.

10  A.   Yes.  When we made entry, we kind of huddled up and

11  everybody said, okay.  I assigned some of the team members

12  certain areas to search, a couple to search the office, some

13  to search the back, the dance hall, and some to search the

14  reception area.

15  Q.   And what instructions did you give them if they located

16  anything?

17  A.   I told them if they located something, to call me, let

18  me know, and I would come take a picture of it and then

19  recover it and document it.

20  Q.   In regards to these pictures that we've looked at so

21  far, were those pictures taken before the search had been

22  conducted, referring to P186?

23  A.   Yes.

24  Q.   And P185?

25  A.   Yes.

1          MS. JOHNSTON:  Now, Your Honor, with the Court's

2    permission, if I can have the witness step down to the

3    easel?

4          THE COURT:  You may.

5          MS. JOHNSTON:  Thank you.  And ask him to keep his

6    voice up because I think we only have one microphone in

7    here.

8    Q.   I'm going to give you a laser pointer.

9          MS. JOHNSTON:  Your Honor, if counsel wants to

10   move, I'm just going to put it up here so the jury has a

11   better view of the picture.  In fact, we'll move it a little

12   bit closer.

13   Q.   Detective, if you could, starting with Photograph P187,

14   tell the ladies and gentlemen of the jury what we're looking

15   at in P187.

16   A.   This is the office that I told you about.  You're

17   standing in the doorway.  That's the chair.  It's a

18   bookshelf that was at the back, so you're standing at the

19   front looking in.  And that's pretty much what you see

20   there.  There's an office and a desk there.

21   Q.   And does that accurately depict that location as it was

22   on the date that you executed the search warrant?

23   A.   Yes.

24   Q.   And then P188, what are we looking at there?

25   A.   P188, the focus is on this box, this box here, and that

1    box is in this photo.

2    Q.   And did you have occasion to seize that box?

3    A.   Yes, I did.  It was -- drugs were recovered in that

4    location.

5    Q.   Let me show you what's been marked as Government's

6    Exhibit DE -- Drugs 15.  Do you recognize that exhibit?

7    A.   Yes.  This is a box -- this is the box that is depicted

8    in that picture, and that's the contents, the crack that was

9    recovered from inside the box.

10   Q.   Okay.  Now, was that crack inside of the box when you

11   recovered the box?

12   A.   Yes.

13   Q.   Was it subsequently packaged up and sent to the lab?

14   A.   Yes.

15   Q.   And do you know what kind of drugs was recovered in

16   there?

17   A.   Crack cocaine.

18   Q.   And how was it packaged when you recovered it?

19   A.   It was packaged pretty much the same way it is here now

20   in a chunk form.

21   Q.   Was there just one big chunk or several chunks?

22   A.   No, it's several chunks.  Pretty much the way that you

23   see it in this package, little chunks of it inside the box.

24   Q.   Okay.  And based on your training and experience, how

25   is that crack cocaine packaged when it's prepared to be

1   sold?

2   A.   It depends on the amount that they would sell it or who

3   was purchasing it, whether they would purchase the whole

4   individual packs here, it was in the two bags, or if you

5   weigh these, these are probably similar.  Each little chunk

6   is close to the same weight, so that they just take one out

7   and sell it.  Depending on who's the customer and how much

8   they want to purchase.

9           MS. JOHNSTON:  Your Honor, if we could publish

10  Government's Exhibit Drugs 15, and while we're doing that,

11  I'd like to read paragraph 14 from Stipulation 4 to the

12  jury.

13          THE COURT:  And just remember the jury wants you

14  to go a little slower now.

15          MS. JOHNSTON:  I -- we will do that.  If we could

16  pass that to the first juror over here, please.  Thank you,

17  Detective Shea.

18          The parties have agreed and stipulated that

19  Government's Exhibit Drugs 14A, which we'll show you

20  shortly, and Drugs 15 contain a total amount of 243.96 grams

21  of cocaine base, commonly known as crack, which was

22  recovered from Paula's School of Performing Arts at 5559

23  South Dakota Avenue, Washington, D.C. on or about June 1st,

24  2004.

25  Q.   Now, did you continue your search of the office area?

1    A.    Yes, ma'am.

2    Q.    First of all, have we brought in here to court

3    everything that was seized from the school?

4    A.    Yes.

5    Q.    Everything you picked up and seized, is that all here

6    in the courtroom to be shown to the jury?  Are there are

7    some documents and items that we chose not to select?

8    A.    Okay.  Some documents that were seized, various

9    documents, are not here.

10   Q.    Now, in reference to the pictures, if you could go back

11   to Government's Exhibit P189 and 190 and tell the jury what

12   you're looking at there.

13   A.    That is a book safe.  It's -- The Bounty is the name

14   that was on the back strap here, but that's the -- that's

15   how we found it, and that was my arm holding it, trying to

16   take a picture of the back strap.

17   Q.    And then P191?

18   A.    That was the contents there.

19   Q.    And what was inside the book safe?

20   A.    It was envelopes, these envelopes that are stretched

21   out here with the money.

22   Q.    That would be the envelopes in P192, is that correct?

23   A.    Yes, ma'am, 192.

24   Q.    Do you know approximately how many -- how much money

25   was recovered from the book safe?

1   A.   15,600.

2   Q.   And was it bundled and packaged in those envelopes as

3   it's shown in the photograph?

4   A.   Yes.  I believe six of them had money in it and

5   three -- three of the envelopes were empty.

6   Q.   And the envelopes, can you tell us what color they

7   were.

8   A.   They were white.

9   Q.   And what kind of envelopes were they?

10  A.   I believe they were Bank of America envelopes.  I have

11  my notes.

12  Q.   Okay.  If you want to get your notes and bring them

13  over here and refresh your recollection to be more specific.

14  A.   Thank you.

15  Q.   The notes you're referring to, were those notes made at

16  the time that the search warrant was being executed?

17  A.   Yes, ma'am.  It's my inventory list.

18       I have nine -- yeah, I have nine envelopes, six

19  with currency, three without.

20  Q.   Does it refresh your memory in terms of what bank the

21  envelopes were from?

22  A.   Yeah, I didn't write down in my notes the bank, but for

23  some reason I believe they're Bank of America.

24  Q.   Now, if I could show you what's been marked as

25  Government's Exhibit South Dakota 2, tell us what that is.

1   A.   This is the book that's on the shelf in P198.  Or 189.

2   189.  I'm sorry.

3   Q.   And if you could, take it out of the bag and open it so

4   the jury can see it.

5   A.   Appears to be a book, but it's actually a safe.

6   Q.   What's inside?

7   A.   There's envelopes inside.  There's Sun Trust and

8   there's Bank of America, Bank of America envelopes that were

9   inside.

10          MS. JOHNSTON:  And with the Court's permission,

11  may we publish this exhibit with the envelopes to the jury?

12          THE COURT:  You may.

13  Q.   And there's another piece of paper there.  What is that

14  piece of paper?

15  A.   This piece of paper is filled out by members of the

16  search team or by myself, and it just shows the location of

17  where we found it and what it is, and the officer who

18  actually located the item also put the name.  This was

19  located by Officer Black, but then he calls me and then I

20  come to it and then I take custody of it, take pictures of

21  it and seize it.

22  Q.   And why is it that we have one -- why you have one

23  officer who is what's known as a seizing agent who responds

24  and photographs and takes custody of items?

25  A.   That way it's uniform and you have one officer who

1  makes one master list of -- an evidence log of where

2  everything was found and who found it, and it just makes it

3  easy and it's not confusing.

4  Q.  Otherwise, how many officers would you have to have

5  come to court and testify about the search at Paula's School

6  of Performing Arts?

7  A.  You would probably have about four or five.

8  Q.  At a minimum?

9  A.  At a minimum.

10  Q.  Now, if you could publish that by giving that to the

11  foreperson.  You don't need to put it in the bag.  It can

12  remain out of the bag.  So long as we get all of the

13  envelopes back and none of them fall on the floor.

14         What happened to the money, Detective Shea?

15  A.  The money was seized by the case agents and hopefully

16  forfeited or will be forfeited.

17  Q.  Is the money kept as evidence or is it usually put into

18  a bank account?

19  A.  It's actually put into a bank account after a property

20  record is done of it.

21  Q.  Now, in addition to the book safe and the drugs you

22  described, calling your attention to photograph P193, which

23  is the last photograph on this board, can you describe for

24  the ladies and gentlemen of the jury what we're observing in

25  P193?

1    A.    P193, this is a two-drawer file cabinet that is located

2    next to the desk, and right in that location in the drawer

3    there are two safes -- sorry, not safes.  Two little

4    electronic scales that are commonly used to weigh out the

5    different sizes of the drugs so that you're getting the same

6    amount.

7    Q.    Let me show you what's been marked as Government's

8    Exhibit South Dakota 10 and ask you if you recognize the two

9    items that are in that bag.

10   A.    Yes.  These are the scales that are in that picture.

11   They're sitting on top of each other.  One's on top of the

12   other one, pretty much like they are in this bag.

13   Q.    Now, there's a CDS evidence sticker on the outside of

14   that envelope.  Do you see that?

15   A.    Yes, ma'am.

16   Q.    Did you complete that?

17   A.    That was done by Tatalia.

18   Q.    And there's a reference on there to somebody named

19   Milburn Walker.  Do you see that?

20   A.    Yes.

21   Q.    Who was Mr. Walker?

22   A.    Mr. Walker showed up while we were conducting our

23   search.  He showed up about 7:50.  He came up to Paula's

24   School and actually came to the door and gave a tug on the

25   door.

1    Q.    He had a key for the school?

2    A.    No.

3    Q.    And what happened to Mr. Walker when he came up and

4    tugged on the door?

5    A.    We arrested Mr. Walker because he had an arrest

6    warrant.

7    Q.    In relation to this case?

8    A.    In relation to this case.

9    Q.    Other than him appearing there, you didn't know of any

10   association of him with either owning or managing that

11   school, did you?

12   A.    No.  To my knowledge, he didn't.

13   Q.    Now, in reference to Government's Exhibit South Dakota

14   10, you may publish that to the jury at this time.

15           MS. JOHNSTON:  With the Court's permission?

16           THE COURT:  You may.

17           MS. JOHNSTON:  And while we do that, I would like

18   to read to the jury Stipulation 4.  All of the parties have

19   agreed to the following, which is set forth in paragraph 18,

20   that Government Exhibit South Dakota 10 is two digital

21   scales with -- let me back up.

22           Stipulation 4 sets forth that the parties have

23   stipulated that the following exhibits were analyzed by

24   forensic chemists and were determined to contain the

25   controlled substance as identified below.  In particular,

1  paragraph 18 states that Exhibit South Dakota 10, two

2  digital scales, contains detectable amounts of cocaine and

3  heroin.

4  Q.   Was that the extent of the items that we selected for

5  presentation that came from the office?

6  A.   Yes.

7          MS. JOHNSTON:  Your Honor, at this point we're

8  going to move into the dance hall, so I don't know if the

9  Court wants us to continue?

10          THE COURT:  How long is that going to take?

11          MS. JOHNSTON:  Oh, we're going to be probably 20

12  minutes, 30 minutes.

13          THE COURT:  See how fast you can go.

14          MS. JOHNSTON:  I'm trying not to go too fast

15  because we're publishing items to the jury, but we'll move

16  ahead.

17          Counsel, I'm going to keep him down here, so you

18  may want to stay over there.

19  Q.   Now, beginning with P194, if you could describe the

20  viewpoint perspective of that photograph.

21  A.   This is just past the office, kind of standing to the

22  door -- if you were to make a hard right, you'd go into the

23  office, but if you went straight and looked, this is what

24  you would see.

25          This is the back door, and then those are two

1    little bathrooms or a bathroom.  And this area here, it's

2    like storage.  It had lawnmowers, appliances, even an air

3    conditioning unit.  Just a litany of stuff there.

4    Q.   Okay.  And if you could, I put P186 up on the

5    television monitor.  If you could use P186 and describe how

6    that relates to P195.

7    A.   If you were standing right where this red dot is in

8    that doorway, this would be what -- the view you would see.

9    The mirror which is right here is actually right in this

10   area over here.

11   Q.   Referring to --

12   A.   To the left of this photo here.

13   Q.   That would be P194 for the record?

14   A.   Yes.  And then this group of stuff, appliances and

15   heating and air conditioning, is actually right here.  It's

16   to the left.

17          So you're actually standing right next to that.  I

18   believe that's like an organ or an old piano.

19   Q.   Now, you mentioned lawnmowers and air conditioners.

20   Can you describe for the ladies and gentlemen of the jury

21   what you observed inside this dance hall area of Paula's

22   School of Performing Arts?

23   A.   In my opinion, it was more of a storage area.

24          MR. MONTEMARANO:  Objection.

25   Q.   If you could, without giving your opinion, describe the

1  items and things that you saw in there.

2  A.    It was a lawnmower.  There was maybe a refrigerator

3  still in the box or in a box.  Heating -- inside heating and

4  air conditioning.  An outside unit.  There was just a box --

5  a bunch of crackers, oyster crackers.  There were loads -- I

6  mean that right there, all those boxes are just full of

7  those crackers, oyster crackers, soup crackers.  There's

8  more here.

9            And in this area, it just was as if someone was

10  building a house and they just stored a lot of their stuff

11  right there.

12  Q.    Now calling your attention to P195, are we able to see

13  some of those crackers that you referred to?

14  A.    Yes, ma'am.  Right there.  Those are the crackers.  And

15  this little blue mat was more or less used as a divider, you

16  can see here.  This table had piles of stuff on it.

17  Q.    And what are we looking at in P196?

18  A.    This is the actual -- right in this corner of this

19  photo, it's the stuff on top of this table, and this kind of

20  closet.  And this pan here is right here in this picture.

21            So this was like another little organ that just

22  basically had stuff piled on top of it.

23  Q.    A what?

24  A.    It was like an organ.  One was an organ.  Up next to

25  the -- that was an old piano, and this was like an organ

1    area, like an organ.  But it had so much stuff piled on top

2    of it, books, papers and just documents.

3    Q.   Okay.  Now, calling your attention to P196, what is the

4    piece of furniture there?

5    A.   That's a china cabinet.

6    Q.   All right.  And is that again depicted in Photograph

7    P197?

8    A.   Yes, ma'am.

9    Q.   And was the contents of P197 searched?

10   A.   Yes.

11   Q.   And did you recover any items from P197?

12   A.   Yes.  There was that heater box, that Palonius box

13   there, heater box.  That had 127 grams of crack in the

14   plastic bag with small ziplocks.  And also that box of Arm

15   and Hammer was seized from there.

16   Q.   Okay.  Now, calling your attention to P198, what do we

17   see in P198?

18   A.   That's the actual -- the contents of that box.

19   Q.   The heater -- what box?

20   A.   The Palonius box.

21   Q.   Okay.  Could you use the laser and show us where the --

22   the box depicted in P198.

23   A.   Yes, ma'am.  It's the bottom on the right there.  It

24   says Palonius there and has a little black and white label

25   there.

1   Q.   And what was recovered from inside the heater box, the

2   Palonius heater box.

3   A.   That was 127 grams of crack cocaine.

4   Q.   Calling your attention -- you mentioned the baking soda

5   box?

6   A.   Yes, ma'am.

7   Q.   Okay.  Showing you what's been marked as South Dakota

8   5, do you recognize that exhibit?

9   A.   Yes.

10  Q.   And what is that?

11  A.   That's the Arm and Hammer baking soda box that was

12  inside the china cabinet.

13  Q.   And based on your training and experience, why did you

14  seize the baking soda box?

15  A.   Baking soda is used in the making of crack.  You use

16  the hydrochloride, which is the powder, and an equal amount

17  of baking soda and it separates.

18  Q.   And you indicated drugs were recovered from the heating

19  box as well, is that correct?

20  A.   Yes, ma'am.

21  Q.   Let me show you what's been marked as Drugs Exhibit 14A

22  and 14B and ask you if you recognize those items.

23  A.   This is the contents that was inside the Palonius box.

24  These are the ziplock baggies that was located in there, and

25  this is the green stripe.  And then you have the contents

1   that were individually packaged.

2   Q.   Do you recall how many bags were found?

3   A.   I didn't mark them, I didn't count them, but they

4   were -- I remember they were individually -- you can see --

5   I don't have it individually on my notes, but you can see

6   how it's separated here into individual baggies.

7   Q.   And that exhibit now is in two pieces.  When you

8   recovered it, how was it recovered?

9   A.   It was recovered all in one bag in two ziplock bags.

10   You have a red and green.  Two bags.

11   Q.   Now -- and were those subsequently separated after you

12   seized them?

13   A.   Yes.

14         MS. JOHNSTON:  Okay.  For the -- if we could

15   publish this exhibit to the jury, please.

16         And for the record, again, the parties have

17   stipulated that these materials were analyzed by a chemist

18   and they were found to be -- Drugs 14A, coupled with Drugs

19   15, contained a total amount of 243.96 grams of cocaine base

20   and that Drugs 14B, in combination with Drugs 16, contained

21   301.71 grams of cocaine, both, of course, recovered from the

22   School for Performing Arts.

23   Q.   Now, in addition to those items from the bookcase, did

24   you also seize other items in the dance hall?

25   A.   From the china cabinet area.

1    Q.   Let's go to the next picture there, P199.  If you could

2    tell us what we're looking at there.

3    A.   That's a Honeywell heater box.  Yeah, that's -- that's

4    the Honeywell heater box that was located underneath of a --

5    underneath of a table.

6    Q.   And are we able to see that table in any of the

7    photographs that are up here now?

8    A.   Actually, this is the top of the table.  It was located

9    underneath of that table that is right here.  See this

10   table?  It was located underneath that table.

11   Q.   Referring to P196 for the record.

12            Now, that's separate from the Palonius heater box

13   you found on the china cabinet?

14   A.   Yes.  The boxes look similar, but this one says

15   Honeywell, and the other one is a Palonius.

16   Q.   Now, in regards to P199, could you describe -- going to

17   the next photograph, P200, what do we see in P200?

18   A.   That's the contents that were located inside of that

19   black bag, which was inside of that box, 212 grams of

20   cocaine.

21   Q.   And what kind of black bag was it?

22   A.   It's just like a little plastic black bag.

23   Q.   Let me show you South Dakota 14.  Is that the plastic

24   bag you're referring to?

25   A.   Yes.  You can see -- you can see the black bag in Photo

1   199.  And then 200, I have it where I have it open, and the

2   contents are still in the bag.  So it's basically how it

3   came out -- came out of the box, the black bag, and then the

4   drugs were inside the black bag.

5   Q.   Let me show you what's been marked as Drugs 16 and ask

6   you if you can identify that exhibit.

7   A.   That's the contents of the bag.  It's still in what we

8   call brick form.

9   Q.   So the record is clear, South Dakota 14 is not the

10  black bag that came out of the heater.

11  A.   No.  This is attached to it, so this -- the black bags

12  are similar, but this is the actual one that came with it.

13  Q.   And that's the one that's depicted in Government's

14  Exhibit P200 here?

15  A.   Yes, ma'am.

16  Q.   Okay.  And what do we see in P201?

17  A.   P201 is -- that's pretty much the cocaine that came out

18  of the box, and there's the ziplock bags that are also

19  attached in here, too.  Ziplock bag.

20  Q.   Are the drugs still in the ziplock bag?

21  A.   Yes.  In one of the ziplock bags.

22  Q.   And does Government's Exhibit P201 demonstrate how the

23  drugs were packaged when you originally recovered them?

24  A.   Yes.  They're packaged for sale, individual packages

25  again.

1    Q.    And are they in smaller individual bags inside the big

2    ziplock bag?

3    A.    Yes.

4            MS. JOHNSTON:   If we could publish that exhibit to

5    the jury.

6    Q.    Now, if we could go to the third board that we have

7    over there.  If you could pick it up, Detective Shea, and

8    bring it over.

9            MS. JOHNSTON:   And while you're doing that, the

10   parties have reached an agreement, as I previously read,

11   that Government's Exhibit Drugs 14B, which has been shown to

12   the jury, and Drugs 16, which is now being published,

13   contained a total of 301.71 grams of cocaine.

14   Q.    Now, in addition to recovering those items, did you

15   also locate a box that's depicted in Government's Exhibit

16   P202?

17   A.    Yes.

18   Q.    And could you tell us where that was recovered?

19   A.    That was a -- that's a Cook champagne box that's

20   located on top of the table in the back left corner of the

21   dance hall.

22   Q.    And what was contained inside the Cook's box?

23   A.    Had a green, red and white bag containing several

24   ziplock baggies.

25   Q.    And were there other items found in there as well?

1   A.   There was also a Hallmark bag located inside of there,

2   purple Hallmark bag.

3   Q.   Showing you first what's been marked as Government's

4   Exhibit South Dakota 1, can you tell us what that is.

5   A.   This is -- this is one of the bags that was located

6   inside of that Cook's champagne box.  You can see it in that

7   picture there.  Right next to it is a Hallmark bag.

8   Q.   And what did you discover inside of South Dakota 1?

9   A.   This bag was several ziplock baggies, just unused

10  ziplock baggies.

11  Q.   What was in the smaller bag inside there?

12  A.   The smaller bag contained more ziplock baggies.

13  Q.   If you could just pass some of those ziplock baggies to

14  the jury so that they could see.

15           Are they all similar in nature?

16  A.   Yes, ma'am.

17  Q.   Why don't we just -- while you're publishing those,

18  we'll just dump some of the other ones out here so the jury

19  can see them.

20           Do you have any idea how many of these ziplock

21  baggies were in here?

22  A.   No, ma'am.  I didn't count every one individual.  New.

23  There was different sizes.

24  Q.   And based on your training and experience, what's the

25  significance of the different sizes of the baggies, whether

1    they be the small ones or --

2    A.   Different weights, and you can package more, depending

3    on quantity, for the amount of sale.  If you wanted a small

4    amount or you were bringing it down to a small size to sell

5    smaller quantities, you'd use a smaller bag.  Middle size or

6    larger size, you would put more into these bags.

7            If you looked at it, you would know that the --

8    approximate weight, depending on who you are, if you're the

9    drug dealer, you would know that you'd put a certain amount

10   in this size bag, in the smaller bag.  That way you don't

11   have to keep weighing it.  It's already weighed out and

12   organized.

13   Q.   Now, based on your training and experience, do you know

14   what kind of quantity would go in one of these smaller bags

15   as opposed to the medium-size bags that you were just

16   holding up?

17   A.   What I purchased on the street, you can fit anywhere

18   from a $20 rock in here to a hundred dollar rock in here of

19   cocaine, crack cocaine, rock.

20   Q.   And how about these middle size bags?

21   A.   These can go ounces, eightballs.  There's different

22   denominations and different sizes, but, you know, these are

23   ounce, eightball size.

24   Q.   And these that I'm just now holding up, do they appear

25   to be used bags?

1   A.   This -- this one does, yeah.  There's a whitish, like a

2   powdery tint to it.

3   Q.   And these being more of a in between the little bag and

4   the --

5   A.   In between.  It all depends on the person that's

6   selling and how they break it down.  Most of them -- there's

7   no set conformity, but a lot of them use the same materials

8   to package their stuff.

9   Q.   And why do they do that?

10  A.   To package it makes things quicker, easier.  You don't

11  have to sit and break out a scale and weigh it on the

12  street.  You weigh it at a safe location, put it into the

13  bags, and you know how much you have and you know if I have

14  ten of these, I know that I have ten $100 bags, and you can

15  keep track of it a lot faster so it expedites a lot of, you

16  know, their business.

17  Q.   And you mentioned an eightball.  How many grams is

18  that?

19  A.   An eightball is 1.5 grams, is what you use on the

20  street.

21  Q.   Okay.  And would those fit inside one of these bags?

22  A.   Yes.

23  Q.   An eightball is -- how did it get its name, an

24  eightball?

25  A.   I'm not really sure how it actually got its name.  Ever

1   since -- for 22 years, I've always known it as an eightball.

2   You know, depends -- $150, $125, you can pick up an

3   eightball.

4   Q.   Okay.  Now --

5          THE COURT:  Ms. Johnston, would this be an

6   appropriate --

7          MS. JOHNSTON:  We can stop now if the Court would

8   like.

9          THE COURT:  I'm going to release the jury until

10  9:30 tomorrow morning, and, counsel, you should be here with

11  your clients at 9:15.

12          (Proceedings adjourned.)

13

14

15

16              COURT REPORTER'S CERTIFICATE

17          I certify that the foregoing is a correct

18  transcript from the record of proceedings in the above

19  matter.

20

21  Date:

22                           /s/ _____

23                                Sharon O'Neill

24

25