<pre>
 1                   UNITED STATES DISTRICT COURT
                         DISTRICT OF MARYLAND
 2                         SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA     .
                                  .
 4        vs.                     .  RWT-04-0235
                                  .
 5   PAULETTE MARTIN, ET AL       .  GREENBELT, MARYLAND
          DEFENDANTS              .  NOVEMBER 21, 2006
 6

 7                  TRANSCRIPT OF MOTIONS HEARING
                BEFORE THE HONORABLE ROGER W. TITUS
 8                  UNITED STATES DISTRICT JUDGE

 9

10   A P P E A R A N C E S:

11   FOR THE GOVERNMENT:          DEBORAH A. JOHNSTON, ESQ.
                                  BONNIE GREENBERG, ESQ.
12                                ASSISTANT U.S. ATTORNEYS

13

     FOR THE DEFENDANT MARTIN:    MICHAEL MONTEMARANO, ESQ.
14   FOR THE DEFENDANT GOODWIN:   ANTHONY MARTIN, ESQ.
     FOR THE DEFENDANT WHITING:   MARC HALL, ESQ.
15   FOR THE DEFENDANT BYNUM:     TIMOTHY MITCHELL, ESQ.
     FOR THE DEFENDANT DOBIE:     PETER WARD, ESQ.
16   FOR THE DEFENDANT ALI:       HARRY McKNETT, ESQ.

17

18   Court Reporter:             Sharon O'Neill, RMR
                                 Official Court Reporter
19                               United States District Court
                                 6500 Cherrywood Lane - RM 200
20                               Greenbelt, Maryland 20770
                                 Tel.  301-344-3227
21

22

23

24

25
</pre>

1                        I N D E X

2    GOVERNMENT'S WITNESSES      DIRECT   CROSS   REDIRECT   RECROSS

3    Det. Thomas Eveler              70      95      131
                                            108
4                                           111
                                            114
5
     Kenneth Oland, Jr.            135      140
6                                           144
                                            146
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                THE COURT:  Good morning.  Please be seated.

 2                MS. JOHNSTON:  Good morning, Your Honor.  We're

 3    here in the matter of United States of America vs. Paulette

 4    Martin, et al., Case Number RWT 04-0235.  I'm Deborah

 5    Johnston representing the Government.  I will be joined at

 6    some point by Ms. Greenberg, who had a matter in Baltimore

 7    and is supposed to be arriving late.

 8                Seated with me at counsel table are case agents

 9    Thomas Eveler and Chris Sakala and Genevive Holmes, our

10    paralegal, sitting in the well.

11                THE COURT:  All right.

12                MR. MONTEMARANO:  Good morning, Your Honor.

13    Michael Montemarano on behalf of defendant Paulette Martin,

14    who sits behind me.  Good morning.

15                MR. MARTIN:  Good morning, Your Honor.  Anthony

16    Martin on behalf of --

17                THE COURT:  Good morning.

18                MR. MARTIN:  -- Learley Goodwin, defendant.

19                MR. HALL:  Good morning, Your Honor.  Marc Hall

20    representing Reece Whiting.

21                MR. MITCHELL:  Good morning, Your Honor.  Timothy

22    Mitchell representing Mr. Bynum.

23                THE COURT:  Good morning.

24                MR. WARD:  Good morning, Your Honor.  Peter Ward

25    representing Lavon Dobie.
```

1              THE COURT:  Good morning.

2              MR. McKNETT:  Good morning, Your Honor.  Harry

3    McKnett representing Lanora Ali.

4              THE COURT:  Good morning.

5              All right, counsel, we are here today, I believe,

6    for two matters.  One is all pending post-trial motions, and

7    the second is the Court's non-jury determination of the

8    forfeiture allegation.  Am I missing anything, or is that

9    what we all are here for?

10             MS. JOHNSTON:  I believe that's what we're all

11   here for.  I don't know that there are motions for new trial

12   as to all defendants.

13             THE COURT:  No, I know.  What I'm going to do now

14   is review what I think are all outstanding motions because I

15   looked on CMECF to see what the list was, and let me tell

16   you what my notes show are still outstanding and to be

17   disposed of.

18             Ms. Martin has filed pro se some matters that I

19   believe have been forwarded to Mr. Montemarano, so he's

20   aware of them.  Correct, Mr. Montemarano?

21             MR. MONTEMARANO:  Yes, sir.

22             THE COURT:  Your client's pro se filings?  All

23   right.

24             And you may not have it reflected in your notes

25   these ways, but I'll tell you what I have on the docket.

1   776 is Ms. Martin's motion filed in March of this

2   year to dismiss on speedy trial grounds, and 930 and 934 are

3   additional filings relating to the same subject matter of

4   speedy trial.

5   And then I have the document filed by

6   Mr. Montemarano on behalf of Ms. Martin, which is the

7   consolidated post-trial motions.  That's Docket Entry 953.

8   And then there was a supplement to that which fleshed out in

9   greater detail the grounds for that motion.  That's 995.

10   That was filed on November 1.

11   That's what I have for Ms. Martin.  Are there any

12   other matters, Mr. Montemarano, that you're aware of?

13   MR. MONTEMARANO:  No, sir, not with regard to

14   defense motions nor with regard to forfeiture.

15   THE COURT:  All right.  Let me then go down -- let

16   me go down defendant by defendant and say what I have, and

17   you -- and anybody correct me if I'm missing anything.

18   The defendant Learley Goodwin, I have a motion for

19   return of property, which is filed on September 27th.

20   That's Number 963.  I have no other pending motions for

21   Learley Goodwin.

22   MR. MARTIN:  That's correct, Your Honor.

23   THE COURT:  Okay.  Then I have a -- for the

24   defendant Reece Whiting, I have no post-trial motions.  I do

25   have a pro se motion for downward departure, Number 960,

1  which I will not hear today.  I will hear that at the time

2  of sentencing.

3  MR. HALL:  Yes.  That's what I anticipated, Your

4  Honor.  My client did file that pro se, and I will be filing

5  a sentencing memorandum, but as far as today's proceedings,

6  I have filed no additional motions.

7  THE COURT:  Okay.  On the defendant Derrek Bynum,

8  I have no motions.

9  MR. MITCHELL:  That's correct, Your Honor.

10  THE COURT:  Is that correct?  All right.

11  On the defendant Lavonne Dobie, I have a motion to

12  adopt the motions of the other defendants filed on

13  September 14th.  Is that correct?

14  MR. WARD:  That's correct, Your Honor.

15  THE COURT:  All right.  And on Lanora Ali, I have

16  no motions other than Number 952, which is the motion to

17  adopt the motions of other defendants, but I have a

18  supplement to that that was filed last week.

19  MR. McKNETT:  That's correct, Your Honor.

20  THE COURT:  Now, is that everything for all

21  defendants?  Anything else?  Okay.

22  All right.  Well, then let's take them from the

23  top.  Start with Ms. Martin's motions.

24  Ms. Johnston, you had --

25  MS. JOHNSTON:  Your Honor, I had prepared and --

1    I'm prepared to handle Ms. Martin's motion for a new trial.

2    In terms of her pro se motions, I think Ms. Greenberg had

3    filed something with the Court.  I didn't know the Court was

4    planning to address those today.

5              THE COURT:  Mr. Montemarano, do you wish to be

6    heard on her pro se motions on speedy trial?

7              MR. MONTEMARANO:  No, Your Honor.  While in no

8    way, shape or form would I like the Court to understand that

9    I don't agree with them or believe that they are

10   meritorious, the issue of speedy trial was addressed at the

11   motions hearing in the spring of 2005.

12             THE COURT:  Correct.

13             MR. MONTEMARANO:  I filed specifically a speedy

14   trial motion at that point because of the delay even until

15   motions with trial not yet set at that point.

16             THE COURT:  Right.

17             MR. MONTEMARANO:  But I believe the motion is

18   adequately preserved for appellate review, and I don't think

19   it's necessary to waste the Court and counsel's time to go

20   yet further.

21             THE COURT:  All right.  Well, then with regard to

22   the defendant Paulette Martin's pro se motions, and I'll

23   address each one of them, the -- Number 776, filed on

24   March 31, 2006, and then she filed -- let me put them in

25   front of me here.

1          On August 30, she filed a document that had two

2     captions to it so it was filed two different ways.  One is a

3     motion in request of transcript of the Court's denial of my

4     motion to dismiss based on lack of a speedy trial.  Second

5     caption on it was motion for dismissal based on improper

6     jury recess for an extended period.  And those are the

7     matters that I have in front of me that I believe

8     Ms. Greenberg has filed a responsive memorandum by the

9     Government.

10          I will deny that motion.  The Government has filed

11     a memorandum that I think adequately sets forth the

12     standards on this question.  There's two questions.  One is

13     the speedy trial, and the second is the question of the jury

14     recess.

15          And the -- first, I have already addressed the

16     question of the alleged denial of rights under the Speedy

17     Trial Act and under the Sixth Amendment in a previous

18     hearing in this matter.  Nothing has changed.  I believe

19     that the delay in this case is fully justifiable under the

20     factors set forth in the Speedy Trial Act and that there's

21     not been a denial of the right to a speedy trial.

22          Taking into account the factors under Barker vs.

23     Wingo and looking at the Fourth Circuit cases that address

24     the question, the length of the delay in this case has not

25     been sufficient to trigger a denial of rights under the

1  statute or under the Constitution.

2          With regard to the recess of the case, this was a

3  relatively brief recess in deliberations of a very long

4  trial.  The case went longer than it should have gone.  It

5  was very difficult to impanel this jury with summer vacation

6  plans, and the break that the jury took in its deliberations

7  was essential for being able to have these jurors serve.

8  They served substantially longer than they were

9  anticipating.  The case should have been concluded before

10  this break, and I consider that the break was proper.

11          In addition, no objection was made at the time

12  that the decision was made to allow the jury to have a break

13  in its deliberations.

14          The request for documents and productions, I don't

15  see any need for doing that.  All these matters will be

16  fully preserved for appellate review and are available for

17  review by the Fourth Circuit should Ms. Martin pursue an

18  appeal from the ultimate disposition of this case.

19          So those motions will be denied.

20          Now I'll hear Mr. Montemarano on your motion

21  that -- as you supplemented as well.

22          MR. MONTEMARANO:  Thank you, Your Honor.

23          THE COURT:  Let me say one other thing before I go

24  further.  One of the counsel in this case has a situation

25  which may require departing earlier, so I wanted to clear up

1    one scheduling matter.

2         On December 19th, I have got the sentencings in

3    this case scheduled.  If I remember correctly, Mr. Martin,

4    your client was scheduled later in the day because you had

5    some problem early in the day.

6         MR. MARTIN:  That's correct, Your Honor.

7         THE COURT:  Okay.  Is that still a problem?

8         MR. MARTIN:  If the Court would give me about two

9    minutes -- once Mr. Montemarano finishes, I could tell you

10   because I have to look at my calendar.

11        THE COURT:  Okay.  Well, the reason why I want to

12   look for it, I received a letter dated November 17th from

13   Ms. Johnston indicating that she would like to call or may

14   call Case Agents Eveler and Sakala to testify about the

15   scope of the conspiracy, the role of each defendant, drug

16   quantity and so forth.  I received that letter.  I assume

17   all counsel have received that letter.

18        If we're going to have six sentencings in one day

19   and each and every one of them, we're going to hear from

20   these officers, it's going to be a very long day.  And we

21   did discuss the length of the time for the sentencings at

22   the time of the verdicts.  I asked whether one hour for each

23   sentencing would be sufficient.  I was told yes.

24        What I am going to suggest, if the Government

25   really does want to call these persons to the stand, is that

1    that be done first thing in the day and that all counsel

2    have an opportunity to cross-examine them on any and every

3    thing they may say, and then I will then proceed into the

4    separate sentencings and dispositions of each case.

5            That's why I want you to check your calendar, Mr.

6    Martin.

7            MR. MARTIN:  And I just did, Your Honor, and it

8    appears that the conflict is a trial that I have before

9    Judge Williams, and I think that's why you put it off to the

10   end of the day, because we knew that I'd be in trial all

11   day.

12           However, yesterday a most generous offer was made

13   by the Government, and my client -- my client's in the

14   hospital in Laurel.  I haven't had a chance to communicate

15   that to him, so I have to run to Laurel to communicate to

16   him the new offer that's been made by the Government, and if

17   he accepts that, then I would be able to be here earlier.

18           THE COURT:  Well, let me tell you this.  What I

19   intend to do then is, if it turns out that you're not

20   available until late in the day, I will hear everything and

21   everything these agents have to say about all of the

22   defendants other than your client in the morning, and then

23   when you come in, we'll put them back on the stand, and

24   anything they want to say about your client can be heard.

25           MS. JOHNSTON:  Your Honor, just so the Court

1    understands that, we had a deadline of November 20th to

2    notify the Court of our intent, and our filing that notice

3    was based on what we saw -- some of the objections that are

4    being raised and what we anticipate may be raised in

5    sentencing memos.

6              It may be that, especially in terms of

7    Mr. Goodwin, we would rely on the testimony that the Court

8    has already heard and don't have a need to put on one of

9    the --

10             THE COURT:  Well, that's a judgment call you'll

11   have to make --

12             MS. JOHNSTON:  Right.

13             THE COURT:  -- but if in your judgment you need a

14   witness with regard to Learley Goodwin and Mr. Martin's not

15   available until 4:30, you put him on at 4:30.  All right?

16             MS. JOHNSTON:  Thank you, Your Honor.  I just

17   wanted to let the Court know it may not be necessary.

18             THE COURT:  Mr. Ward.

19             MR. WARD:  I just wanted to comment.  I just got

20   that letter, I think it was yesterday, and have not had the

21   opportunity to respond, but I'm certainly going to.  I,

22   frankly, don't see why the same witnesses who testified at

23   trial have got to be called again in a sentencing hearing.

24   Your Honor has already heard what they had to say.

25             THE COURT:  I don't know.  I mean it's the

1    prosecutor's decision if they want to call someone, and I

2    have not studied the presentence reports, as some of you may

3    have already done, so I don't know what issues there may be

4    that are not fully encompassed within the trial testimony.

5            So I agree there may be no need for one or both of

6    these witnesses to testify, but I'm not going to preempt the

7    Government from making that decision.  That's their decision

8    to make.

9            They've notified me in accordance with my order of

10   their intention to call these witnesses.  All I'm saying is

11   that if they're going to call them, assuming Mr. Martin's

12   available first thing of the day, I want to hear all the

13   testimony from them and all the cross of those witnesses

14   first off at 9:00 on December 19th.

15           MR. WARD:  I appreciate what the Court is saying.

16           THE COURT:  But I share your concern that we may

17   not need to hear from anybody.  Because this was a long

18   trial, and I heard a lot of testimony from both of these

19   officers, and there may not be a need, but we'll see.

20           MR. WARD:  Thank you, Your Honor.

21           MR. MONTEMARANO:  Your Honor, I would join

22   Mr. Ward's objections for the reasons he noted.  I was here

23   for ten weeks or so.  I seem to recall Your Honor being up

24   there for most of the time and paying attention, so I'm

25   going to assume that Your Honor heard what I heard.  That's

1    number one.

2              Number two, in all candor, I'm not sure what these

3    witnesses are going to contribute in the sense that they are

4    not going to be testifying based upon personal knowledge.

5              THE COURT:  Understood.  All of your objections

6    you can make at the time they call them, but they perfectly

7    have the right to call -- notify me.  They've notified me.

8    All I'm telling you is if their testimony is germane and if

9    they decide to call them, we're going to hear all of their

10   testimony all at once, with all counsel present to

11   cross-examine, and then they can be excused, and then we

12   deal with sentencing issues individual to each defendant

13   rather than to have them called potentially as many as six

14   times, which I don't want to do that.

15             MR. MONTEMARANO:  And we're going to begin at

16   0900?

17             THE COURT:  Yeah.  What did my -- did I say?

18             MR. MONTEMARANO:  That's what you said.

19             THE COURT:  Let me make sure I'm not telling you

20   something that's wrong.  9:30.

21             MR. MONTEMARANO:  Okay.  Just wanted to be clear.

22   Whatever -- whatever the Court's pleasure.  I just wanted --

23             THE COURT:  At the present time, just for your

24   information, Paulette Martin is set for 9:30; Reece Whiting,

25   10:30; Derrek Bynum, 11:30; Lavonne Dobie, 1:00; Lanora Ali,

1    2:00; and Learley Goodwin, 4:30.  And what I'm telling you

2    is everybody is going to be in this courtroom at 9:30, and

3    we'll do them seriatim.  So that -- to the extent that you

4    need to be notified of a schedule change, consider yourself

5    notified.

6              MR. MONTEMARANO:  And to the extent that it saves

7    time with regard to the proceedings on that day, I will be

8    filing a sentencing memorandum addressing issues in the PSR,

9    and I'll probably do that no later than the 1st of the

10   month, which will give the Government more than enough time

11   to respond and for chambers to have considered the issues

12   which will be raised in advance of the hearing.

13             THE COURT:  Right.  Well, all of you should be

14   doing that.  I mean I want to be able to be prepared and not

15   get a memorandum handed to me the day before on any of these

16   issues.  I do read these things, and I do want to be able to

17   pass a quiz on what they said, so.

18             MS. JOHNSTON:  I'm sure that the Court will wait

19   until it hears all of the testimony then.  As the Court well

20   knows, hearsay is admissible at sentencing.  We operate

21   under different standards than trial, so there is plenty of

22   evidence that this Court has not heard in the course of the

23   trial that may be relevant to particular defendants'

24   sentencing issues.

25             THE COURT:  Okay.  We're all on the same page then

1    on how I'm going to proceed on December 19th.

2                Okay.  You may proceed, Mr. Montemarano.

3                MR. MONTEMARANO:  Thank you, Your Honor.  I'm

4    going to try to avoid repeating what I've already put in

5    writing for the Court to consider, in particular the

6    citations to authorities in support of the propositions I

7    advanced for the Court's consideration.

8                That being said, I think I need to sort of give

9    the Court a global perspective.  Our contention is that the

10   verdicts are unsupported by adequate evidence to rise to the

11   level of beyond a reasonable doubt, number one, or, in some

12   instances, are specifically against the weight of the

13   evidence regarding participation by my client in possession

14   with intent to distribute.

15               What I am not addressing because I -- and I am

16   submitting on behalf of Ms. Martin is the Count 1 charge,

17   the overarching conspiracy, and the Count 62, possession

18   with intent to distribute which charges conduct on June 1,

19   which, as the Court -- June 1, 2004, which, as the Court

20   will recall, was raid day, at which time there was

21   approximately 300 grams each of cocaine and crack cocaine

22   seized from what we will term the school, Paula's School of

23   Performing Arts.  And being aware of that evidence, I

24   understand the posture in which the defense stands today,

25   and I think arguing over those two counts would be

1    substantially a waste of time.  I am not submitting in the

2    sense of conceding, but I am submitting in the sense of

3    argument.

4          I do, however, invite the Court's attention to the

5    possession with intent to distribute charges in the

6    indictment lodged against Ms. Martin.  For the record, they

7    are Counts 4, 8, 10, 14, 16, 25, 29, 31, 33, 36, 38, 40, 43,

8    45, 55 and 56.  These are the other 15 possessions with

9    intent.

10         These, I submit, merit the closest of scrutiny by

11   this Court with regard to defenses' motions post trial.

12   These charges involve a serious felony, possession with

13   intent to distribute of a drug, heroin, cocaine, crack

14   cocaine.  In half of the charges, they refer to specific

15   amounts of drugs, 500 grams of cocaine, 50 grams of crack,

16   whatever.  There is not a scintilla of evidence regarding

17   type of drug or amount of drug with regard to any of these

18   counts.

19         There is -- and the matter has been litigated and

20   I'm not going to go back into it, but I do have to present a

21   full argument to the Court, to invite the Court's attention

22   once again to the affray we had in this courtroom over the

23   question of expert testimony, specifically that from

24   Sergeant Sakala.  In all candor, that from Sergeant Eveler

25   was icing on the cake.  I think the Government's case or our

1    argument relative to the Government's case is focused upon

2    and relevant to Sergeant Sakala's testimony.

3         There are telephone calls.  They involved what is

4    ostensibly coded language, so the sergeant has testified.

5    Fine.  For the sake of discussion, they can be considered to

6    be revolving around drug dealing.

7         The fact that they may be dealing about --

8    revolving around dug dealing, that there is some sort of

9    questionable conduct, that this language is, indeed, code

10   for something other than what it purports to be, shirts,

11   tickets, books, whatever, does not permit a finder of fact

12   to proceed from that across the great divide, keeping it

13   from reaching the goal, in the Government's view, of proof

14   beyond a reasonable doubt.

15        It is the most egregious of assumptions to be able

16   to determine, and I put quotes around that word, that a

17   particular count involves a particular kind of drug, absent

18   more.  It is, likewise, simply beyond comprehension, in my

19   view, that the jury could find, with regard to a specific

20   count, an amount of drug when there is no observation and

21   there is no seizure regarding any of these counts.  And most

22   importantly, and this is something that was absolutely

23   hammered home by all of the defense attorneys during cross

24   and during argument, that Sergeant Sakala freely admitted,

25   repeatedly, quote, I don't know, close quote, regarding the

1    amounts of certain transactions.

2           The most classic example of that is the famous

3    size eight where Sergeant Sakala could not testify with

4    regard to specific calls if they were eighths of kilograms,

5    125 grams, four ounces and change, an amount indicating,

6    under all circumstances, an intent to distribute, and an

7    eighth of an ounce, three to three and a half grams, an

8    amount possibly distributable, but if you are profoundly

9    addicted, as many of these purchasers were, including

10   codefendants here in the courtroom, not enough to indicate

11   an intent to distribute.

12          For lack of a better term, Your Honor, even Dom

13   Deluise driving a Dunkin' Donuts truck can be understood to

14   be intending to distribute those donuts because he couldn't

15   eat the whole truck.  With a dozen under his arm, we don't

16   know if that's for a coffee breakfast at the office or if

17   that's just a morning snack, and there is no way to

18   determine that to that standard which the jury was obligated

19   to reach, beyond a reasonable doubt.

20          That this conduct subsumed some form of drug

21   dealing based upon other conduct, seizures, et cetera, the

22   people with whom Ms. Martin was dealing, I can understand

23   the jury believing that, but we are not at the point of

24   belief by a preponderance of the evidence.  We are not at

25   the point of firm conviction by clear and convincing

1    evidence.  We are at the point of beyond a reasonable doubt.

2              THE COURT:  Well, look, Mr. Montemarano, let me

3    ask you this.

4              MR. MONTEMARANO:  Yes, sir.

5              THE COURT:  You would agree with me, would you

6    not, that --

7              MR. MONTEMARANO:  I'm always scared when a judge

8    says that.

9              THE COURT:  I hope you would agree.  I'm trying to

10   bring you something that's bulletproof.  But would you agree

11   with me that there -- I should sustain their convictions if

12   any rational trier of fact, viewing the evidence in the

13   light most favorable to the Government, could find the

14   essential elements of the crime beyond a reasonable doubt?

15   That's the standard, is it not?

16             MR. MONTEMARANO:  Yes, sir.

17             THE COURT:  All right.  Now, your focus right now

18   is on the counts other than the conspiracy count, correct?

19             MR. MONTEMARANO:  Yes.  Those enumerated

20   possessions with intent that I set out, absent Counts 1 and

21   62.

22             THE COURT:  Right.  So insofar as the argument

23   that you're making is concerned, you're dealing with

24   specific counts that dealt with possession with intent to

25   distribute on date X, Y or Z, correct?

1           MR. MONTEMARANO:  And often in Amounts A, B or C.

2           THE COURT:  Correct.  Now, in determining whether

3     a rational trier of fact could have reached the conclusions

4     reflected in these verdicts, does not the jury have the

5     right to take into account the totality of all the evidence

6     before them, not just evidence on a specific day, so that

7     what we're dealing with here is on these various dates that

8     are pertinent to the counts that you've enumerated in your

9     argument, we do know that large amounts of heroin were

10    intercepted coming from New York.  We do know repeated sales

11    of large quantities of cocaine from Mr. Mangual, Jr.,

12    correct?

13          MR. MONTEMARANO:  No, we do not.  Mr. Mangual

14    didn't testify.

15          THE COURT:  Didn't have to testify.

16          MR. MONTEMARANO:  He was not seized with large

17    amounts of cocaine.

18          THE COURT:  Well, were there not purchases made by

19    your client from Luis Mangual, Jr.?

20          MR. MONTEMARANO:  Were there?  So he says.

21          As I pointed out, Your Honor, there are no

22    seizures.  There is no cooperator testimony who

23    participated --

24          THE COURT:  Why is all of that necessary in the

25    face of the amount of other evidence in this case that's

1   already before the jury?

2          MR. MONTEMARANO:  Because, Judge, we are not

3   talking about a conspiracy where -- this is not the

4   standard, but perhaps framing it this way will --

5          THE COURT:  Well, doesn't the conspiracy --

6   doesn't the existence of this conspiracy that's been proven

7   beyond a reasonable doubt to the jury help in determining

8   the question of whether the possession was with intent to

9   distribute or whether it was just a bunch of donuts that I'm

10  going to go back and eat at my office?

11         MR. MONTEMARANO:  Only insofar as we know that

12  there are donuts actually possessed, and on these dates,

13  what we have is questionable conversation that may underlie

14  the findings on the phone counts at best.  We do not know

15  what was discussed, we do not know which drugs, and we

16  certainly do not know amounts.

17         I don't want to -- Your Honor, it is not fitting

18  for counsel to play gotcha with the Court, but what Your

19  Honor has said is what I anticipated the Government's

20  argument to be, and I submit it is an argument that is

21  effective on Count 1 because, in a manner of speaking, the

22  rules of evidence are different on a conspiracy.  They are

23  more relaxed.  We bring in 801(D)(2)(E) evidence.  We bring

24  in implication.  We bring in something extending over time,

25  and roping all that together is a much easier job for the

Government than it is proving a specific conduct on a specific date.  I mean it's no different than saying John Smith is a serial killer.

THE COURT:  But do I take all these dates in a vacuum?  Was the jury required to take these dates in a vacuum and ignore all the other evidence they had in front of them?

MR. MONTEMARANO:  With respect, Your Honor, I reject the notion that considering the evidence arrayed against a defendant on a date with regard to specific conduct and a specific drug in a specific amount is in a vacuum because what we have then is guilt by association, guilt by implication.  Oh, well, gee, she's dealt before. She must be dealing now.

THE COURT:  That's -- we're not just dealing with prior bad acts.  We're dealing with evidence presented in this courtroom.

MR. MONTEMARANO:  And that's all they're left with.  Because what Your Honor is then suggesting is -- let us take, for example, the first of the enumerated counts, Count 4.  What Your Honor is suggesting is, well, we have all this other conspiracy conduct, and, gee, all these other counts, Count 8, 10, 14, 16, ad nauseam, well, because she's done all this kind of similar stuff on other times, this must be the same stuff, you know, the proverbial same stuff,

1    different day.

2              I respectfully submit that's not beyond a

3    reasonable doubt.  I respectfully submit that is not a way

4    for any finder of fact to reach a question of guilt on a

5    certain date.  That is what due process is all about.

6              Even if you concede that a person is a terrible

7    person, a serial killer, for example, you're still obligated

8    to prove that a particular victim was killed by that serial

9    killer and that person is actually dead, that this person

10   had the ability, was present or in the same area, the same

11   zip code, the same time zone, et cetera, having the ability

12   to do so.  The Government cannot do that by supposition and

13   guesswork, and that is exactly what Sergeant Sakala

14   presented to this Court, and that's the reason we so

15   ardently opposed it from the very outset.

16             Let us look at Count 4.  It charges 500 grams of

17   cocaine.  Now, last time I looked, that's about 18 ounces,

18   give or take a little.  We are not talking about an

19   insignificant amount.  It does not fit in your pocket.  It

20   is thousands of dollars of product even at the wholesale

21   level.  A half a kilogram on the 10th of March, 2004.

22             If you look at the Government's own evidence,

23   because evidence is what this analysis is supposed to be

24   about, I invite the Court's attention to our transcript

25   book.  Book 1.  Calls relative to March 10 begin on page

1    0015.  There will be 15.  Call A111.  They extend through

2    and including B248, which is on page 26.  My math suggests

3    there are 10 calls covering 12 pages.  That was the evidence

4    regarding March 10th.  Correct, Your Honor?

5            There was no cooperator concerning March 10th.

6    There was no controlled buy concerning March 10th.  There

7    was no seizure concerning March 10th.  March 10th was this.

8    That's all the Government adduced into evidence.

9            On top of that, they adduced Sergeant Sakala's

10   testimony based upon his analysis of all these calls.  Fine.

11   Based upon other calls on March 10th.  Fine.  No seizures,

12   no personal knowledge, and quite honestly, it is because of

13   this that we screamed and ranted and raved months ago about

14   Daubert relating to Sergeant Sakala because his supposition

15   cannot be tested.  You could test his supposition if, based

16   upon these calls at 11:59 p.m., 2300 -- 2359 hours, the

17   Government had executed a search warrant on Hayward.

18           THE COURT:  Well, you're essentially saying that

19   the Government's required to present testimony from a

20   participant in the transaction or introduce the actual

21   drugs, right?

22           MR. MONTEMARANO:  By and large, I can't imagine

23   what other evidence there would be.

24           THE COURT:  Well, hasn't the Fourth Circuit in

25   U.S. vs. Campbell pretty soundly rejected that contention?

1          MR. MONTEMARANO:  I respectfully submit that in

2    light of the need for an element of the offense to be proved

3    beyond a reasonable doubt, as the Supreme Court guises in

4    Booker, I respectfully submit that is simply not enough.

5          I mean if we again look at the evidence on page 17

6    of the book, we have a discussion of -- I believe by John

7    Martin needing one starched and one downy T-shirt.  Sergeant

8    Sakala, pretty clearly drug conversation.  Starch and downy

9    are, you know, soft and hard cocaine, crack cocaine, but we

10   know they are soft and hard.  That's one possible meaning.

11   Fine.

12         Oh, then, on page 21 --

13         THE COURT:  Isn't that all that's necessary to

14   support the jury's verdict?

15         MR. MONTEMARANO:  It's all that's necessary --

16         THE COURT:  Under the applicable standard?

17         MR. MONTEMARANO:  I respectfully submit the

18   standard then permits mere supposition because that's all it

19   is.  There's not even consistent testimony or consistent

20   evidence, if you want to call that evidence, which I quail

21   at dignifying this with, but if you call that evidence, then

22   how is it -- it's a T-shirt on page 17, and three or four

23   calls later, on page 21 -- and, for the record, the call on

24   page 17 would be B197, and the call on page 21, B243, and

25   these are both on March 10 again -- there is a discussion

1    about a ticket.  And based upon exactly what?  It's a

2    T-shirt here.  It's a ticket there.  I'm guessing.

3            Judge, this isn't odds making.  This isn't

4    somebody on ESPN talking about who's going to win the game

5    on Saturday or on Sunday and how many points you should be

6    giving.  Your Honor, this is something a bit more serious,

7    and, quite honestly, unlike odds making or whatever, this is

8    something you have to be reducing to cold hard facts to

9    reach the standard of beyond a reasonable doubt.

10            It is for that reason that we sought at the

11   beginning of trial -- I don't wish to steal the thunder of

12   co-counsel.  I forgot who filed the motion, in all honesty.

13   We sought to have the jury instructed on the reasonable

14   doubt standard, and it is for this reason that the Fourth

15   Circuit instruction denies these defendants due process.

16            I hearken the Court --

17            THE COURT:  What Fourth Circuit instruction?

18            MR. MONTEMARANO:  Excuse me.  The Fourth Circuit

19   prohibition --

20            THE COURT:  Oh, oh, okay.  All right.

21            MR. MONTEMARANO:  The Fourth Circuit standard on

22   the instruction is what I should have said --

23            THE COURT:  Well --

24            MR. MONTEMARANO:  -- which is to say none.

25            Your Honor, I'm making a record here.  Your Honor

1    may agree or disagree.

2              THE COURT:  I understand.  I understand.

3              MR. MONTEMARANO:  Okay.  But if there --

4              THE COURT:  This may be the case that causes them

5    to revisit the question of whether they should give an

6    instruction on reasonable doubt when requested by defense,

7    but as of right now, I am told I should not give a

8    definition of reasonable doubt unless and until the jury

9    asks me for one.

10             MR. MONTEMARANO:  And I submit that given that

11   instruction by the Fourth Circuit, this Court is obligated,

12   perhaps not a felicitous word for counsel to address to an

13   Article 3, Judge, but I submit that in the interest of due

14   process, this Court is obligated to consider the Fourth

15   Circuit's admonition to consider the facts of the case, to

16   consider the nature, the evanescent nature, the tenuous

17   nature of the evidence, and I'll put quotes around that

18   again, when considering why the reasonable doubt instruction

19   was required, why it would have been felicitous to give it.

20             I hearken the Court to the Maryland standard.  I

21   know Your Honor in private practice did not handle very many

22   criminal cases.

23             THE COURT:  Oh, I had my fair share.

24             MR. MONTEMARANO:  Okay.  In Maryland, the standard

25   is proof of a certainty to permit you to make an

1    important --

2              THE COURT:  Important decision in life.  I am very

3    familiar.

4              MR. MONTEMARANO:  -- decision in your life without

5    reservation, and a failure to add those two words is an

6    automatic fast bus back from Annapolis, Your Honor.  I can

7    speak from personal experience, without reservation.

8              If you don't have reservation based upon the

9    guesswork provided by Sergeant Sakala, you're not doing your

10   job as a juror.  And these jurors, God bless them for

11   sitting here as patiently as they did and putting up with

12   all the ranting and raving and listening to me, not to

13   mention poor Mr. McKnett at the tail end of the caboose, let

14   alone Ms. Johnston, who was after all of us.

15             (Foghorn type noise.)

16             THE COURT:  That was a very good argument you just

17   made.

18             MR. MONTEMARANO:  It's not quite like the entrails

19   of the lamb, but it will do.

20             I submit that this is simply not enough.  And

21   before the Court or Ms. Johnston -- the fact that there is

22   one of these or that there is -- can somebody lend me a

23   hand -- 15 of them is absolutely immaterial because one

24   guess, 15 guesses, it's still that.  It's still supposition.

25   It's no more than.

1            I am not hooked by the argument relative to the

2     conspiracy into this.  I do not hook the argument relative

3     to the seizure at a school to which my client had dominion

4     and control, even if not sole dominion and control, on

5     June 1.  With the rest of these, it is the most egregious

6     form of nonsense to suggest that, based upon these calls, a

7     starched shirt, a downy T-shirt and a ticket, that language,

8     they found not only that it was cocaine, but that it was

9     500 grams.

10            Where did this number come from?  Your Honor, I'm

11    a pretty practical guy.  I understand my limitations.  It

12    sort of is what it is.  If I had any question about my

13    limitations, I'll observe to the Court that that sprained

14    ankle that I troubled the Court with for part of the trial

15    was no more serious than one I did playing football in

16    Chicago in 1974.  There's a little difference, of course,

17    and that's 32 years.  And I understand that being 50 ain't

18    all it's cracked up to be, or 49 when I did it, compared to

19    being 18.  So maybe I'm not --

20            THE COURT:  Wait 'til you get to the Beatles'

21    level of when I'm 64 --

22            MR. MONTEMARANO:  That's fair enough, Judge.

23            THE COURT:  -- which is where I am -- where I am

24    now.  You've got a long way to go, baby.

25            MR. MONTEMARANO:  But I'm going to submit to the

1    Court --

2         THE COURT:  You will be suffering far more then

3    than you do now.

4         MR. MONTEMARANO:  Perhaps, Your Honor, but it will

5    all be my fault.

6         And what I'd like to observe to the Court is, just

7    regarding Count 4 -- you know, Your Honor, I've been on

8    panel for a long time, and I've been told by more than one

9    judge and more than one prosecutor I don't do a bad job.

10   Maybe I'm just not smart enough to do this because I can't

11   abstract 500 grams from this evidence.  Not even close.

12   Even if Your Honor's point is well taken, which it is not

13   for this defense attorney, but even if Your Honor's point is

14   well taken, oh, well, you know, they're dealing drugs,

15   that's what the conversation is about, where do you get what

16   kind of drugs?  Where do you get the math?

17        We are not talking where they're talking about 15,

18   16, 17 -- excuse me -- where we're talking 8 or 10 or 12,

19   and that could have been testified to by our expert sitting

20   at the end of the table.  That's the kind of price you pay,

21   in thousands of dollars, for a half a key of coke.

22        You know, we can abstract amounts from prices or

23   the size of a container.  I remember some testimony during

24   the trial where, you know, we seized wrappers and these are

25   all about the same size of what a kilogram wrapper is.  You

1  know, what would go inside of this would be about a key of

2  cocaine, and, therefore, we know that these 25 wrappers in

3  John Martin's backseat are 25 kilogram wrappers.  Okay.

4  Fine.  There's no seizure amounts, Mr. Montemarano.  I

5  understand that.  I'm no fool.  The wrappers test positive.

6  They were wrapped around cocaine.  From the size of the

7  wrapper, you can figure out what the contents were, the

8  volume.  I mean, you know, that's like what, physics or

9  maybe math.  What, eighth grade or something?  I remember

10  that.  It's been a long time, but I do remember it.

11       But where on Count 4 can you give me 500 grams?

12  I'm clueless.

13       And I'm not going to belabor this because I'm sure

14  all my brother counsel, who have been very patient with my

15  ranting and raving for the ten weeks of trial, would love to

16  hear me go on and on and on.  You could apply this analysis

17  to every one of the enumerated specified counts.

18       In Count 8, there's no language that's coded, yet

19  they find 50 grams of crack.

20       Count 14, we talk about a hundred tickets, 106

21  envelopes, 75, not a hundred, 75 plus 6, between pages 81

22  and 87.  Based upon that, there is an amount of heroin.  How

23  do we know it's heroin?  I don't know.  Oh, okay, Ms. Levi

24  dealt heroin most of the time, but there was not just heroin

25  seized from her home.  Once again, beyond a reasonable

1    doubt?

2              And it goes on and on.  Many of these calls,

3    there's just no coded language relative thereto.  I mean

4    they deliberated, as I recall, about nine days?  Or parts of

5    nine days?  What were they talking about?  I mean do they

6    spend eight and a half days talking about Ms. Martin, I

7    guess?  Because they obviously gave no consideration to the

8    actual evidence adduced.

9              And I submit that under the -- in the cold light

10   of a post-trial motion, what the jury did and didn't do in

11   meeting its obligations is for this Court to determine, and

12   I respectfully submit that in analyzing that, the whole

13   question of if they understood what a reasonable doubt was,

14   which I don't think they did because they weren't

15   instructed, notwithstanding our request, but even if they

16   understood it, they sure didn't apply it.

17             And I submit for that reason -- if it's going to

18   happen, Judge, this is as good a case as any.  I submit that

19   these defendants, mine in particular, were denied a fair

20   trial in a finding beyond a reasonable doubt that a certain

21   amount of drugs was possessed with the intent to distribute

22   on a certain day in a certain amount on half the charges.

23   And if the Court would like, I will address each one of

24   these one by one, but I don't think the Court wants to hear

25   all that.  The Court was here during the evidence.

1      If you look at -- on Count 29 -- Court's

2  indulgence -- no cocaine.  It is a charge on the 26th of

3  March.  There is no amount of cocaine found.  It's a

4  substance with a detectable amount of cocaine, possession

5  with intent.  But it's what I, in my notes, refer to as a

6  zero amount.  It's less than the 500 grams under B(1)(B) or

7  the five kilograms -- one kilogram under B(1)(B) versus five

8  kilograms under (B)(1)(A).  So it's less than a kilogram.

9      We have at one point on page 215, in the three

10  calls on that date, covering four pages -- okay.  215,

11  there's a reference to some size eights.  How do we abstract

12  an amount?  How do we abstract -- remember, size eights,

13  Sergeant Sakala's already said he doesn't know whether an

14  eights an eighth or what.  How do we abstract that in three

15  calls?  That's all you got under 26.

16      In some cases, we have many, many calls.  Count

17  16, March 17th, St Patrick's Days.  It's 500 grams of

18  cocaine.  There are 12 calls covering 21 pages.  And do you

19  know what you get for language on page -- Court's

20  indulgence.  I can't read my handwriting.

21      Page 116, there's a reference to $62.  By the

22  testimony of Sergeant Sakala, 62, a curious number, could be

23  referring to a 16th of a key, half of 125.  Okay.  So it's a

24  16th of a key.

25      Well, on that date we have a conviction for a half

1      a key.  Exactly how?  I don't understand.

2              And it goes on and on.  Count 45, there are three

3      calls covering a total of five pages.  I mean there's just

4      not enough evidence with regard to specific charged

5      instances because there would be as much evidence of these

6      as there is evidence of all of the other dates which were

7      not charged, and had the Government charged each and every

8      day of the conspiracy, arguably, because of the overarching

9      conspiracy, the jury could have found certain conduct,

10     certain dates involved.

11              It reduces the overt acts of the conspiracy to a

12     nullity.  The Government is obligated to prove actual overt

13     acts in support of convictions on those specific overt acts.

14              As to the balance of my argument, Your Honor, I

15     think I've laid it out.  I think the Government has agreed

16     that there is a need to merge certain of the phone counts

17     where there -- a phone count is charged regarding Ms. Martin

18     on a certain date and then another phone count is charged on

19     a certain date.  The jury instruction is not clear as to

20     what specific conduct.  There are numerous phone calls on a

21     date.

22              I don't believe, under the language of the statute

23     and the instructions, that it is possible to convict a

24     person of that offense more than one time on a specific date

25     in the way that the indictment came to --

1          THE COURT:  Yeah.  The Government agrees with you

2   they should be merged for sentencing purposes, so I will

3   proceed on that basis of agreement between the parties.

4          MR. MONTEMARANO:  And as to the balance of my

5   argument, Your Honor, I think I've laid it out adequately in

6   writing.  If the Court has any questions, I'll be glad to

7   answer them, but I think that I've said all I need to say.

8          THE COURT:  Okay.

9          MR. MONTEMARANO:  Thank you, Your Honor.

10         THE COURT:  All right.  Any other counsel wish to

11  be heard?

12         MR. MARTIN:  Just briefly with respect to the --

13         MS. JOHNSTON:  Your Honor, I'm going to object to

14  Mr. Goodwin being heard on this motion for new trial because

15  he did not file a motion for new trial so there's nothing

16  pending as to his client, and the Court has nothing to

17  decide.  There are very strict rules when it comes to motion

18  for new trial.  He hasn't filed one --

19         THE COURT:  Well, let me hear very briefly from

20  him.

21         MR. MARTIN:  I just want to say that with respect

22  to the argument regarding failure to give the instruction on

23  reasonable doubt, at the conclusion of trial or when we were

24  discussing the jury instruction, Mr. Goodwin did request an

25  instruction on reasonable doubt.  Your Honor declined, and

1    we renew again our objection to the Court not having given

2    that.  That's all.

3              THE COURT:  Okay.  All right.

4              MR. HALL:  Other than to join in what Mr. Martin

5    just said during the reasonable doubt instruction, I have

6    nothing else.

7              THE COURT:  All right.  Thank you.  Mr. Mitchell?

8              MR. MITCHELL:  The same, Your Honor.  I have

9    nothing to add.

10             THE COURT:  All right.  Mr. Ward?

11             MR. WARD:  Nothing to add, Your Honor.  Thank you.

12             THE COURT:  Mr. McKnett.

13             MR. McKNETT:  Your Honor, I have in writing

14   adopted Mr. Montemarano's motion, and then I'll just renew

15   that and will not be arguing.

16             THE COURT:  You also filed some additional --

17             MR. McKNETT:  I did, Your Honor.

18             THE COURT:  -- materials.  Do you want to be heard

19   on that now?  I mean I think it would be most efficient just

20   to have Ms. Johnston respond to all of them, all the

21   arguments, so you may proceed with your arguments.

22             MR. McKNETT:  Thank you.  Your Honor, I'll be very

23   brief.  I think I have in my written submission laid out the

24   basis for my argument concerning Counts 1, 44 and 56.

25   Again, I will adopt Mr. Montemarano's arguments, especially,

1    but not limited to, Count 56.

2            I would like to make one change in terminology in

3    the written memorandum I submitted.  Page 6, at -- the last

4    sentence in the first full paragraph --

5            THE COURT:  Wait a minute.  Wait a minute.  Let me

6    get it in front of me.

7            This is the latest filing?

8            MR. McKNETT:  Yes, Your Honor.

9            THE COURT:  What page?

10           MR. McKNETT:  Page 6.

11           THE COURT:  Okay.

12           MR. McKNETT:  First full paragraph, the last

13   sentence, beginning, "She was seen going to the school."  I

14   used the word, "Person.  She was seen going to the school

15   from time to time," comma, "was the only person who had

16   access to the premises," and I'll give Mr. Montemarano

17   credit for this, he pointed out that she was not the only

18   person who had access to the school because John Martin also

19   had access.  So I'd like to change the word "person" to

20   "defendant."  She was the only defendant in this case who

21   had access to the premises.

22           THE COURT:  Defendant on trial or defendant?

23           MR. McKNETT:  Defendant on trial would be the

24   better terminology.

25           THE COURT:  I think he is a defendant.

1           MR. McKNETT:  He had been at one point.  He was a

2    defendant that didn't go to trial.

3           THE COURT:  All right.  Okay.

4           MR. McKNETT:  With regard to Count 1 and Count 56,

5    specifically with reference to quantities, I did address

6    that in my written submission, but Mr. Montemarano used a

7    phrase that I wish I had thought of, that the jury's verdict

8    with regard to quantities, particularly with Count 56, which

9    I believe is a finding which underlied the quantities they

10   found with regard to Count 1, was superstition -- not

11   superstition -- supposition and guesswork because the jury

12   had to suppose that the drugs found in the school on

13   June 1st were taken there on May 16th.  It's a more than

14   two-week time frame.

15          There were no surveillances at the school during

16   that time frame.  There were surveillances of Ms. Martin, I

17   believe, but there was no surveillance at the school.  There

18   was no search of the school before May 16 to see whether or

19   not, in fact, there were already drugs in the school.  The

20   jury's verdict, particularly with regard to quantities, is

21   based on supposition stacked on top of supposition.

22          THE COURT:  Well, didn't the jury have before it,

23   and my memory will probably fade quicker than most on this,

24   but didn't the jury have before it information that at the

25   particular time in question there had been concerns raised

1  by neighbors in Takoma Park, things were getting hot, police

2  activity, and testimony was before me indicating that

3  Ms. Martin needed to move things to the school, get them

4  away from there and get them to the school?  And there's a

5  pretty significant record developed of the nature and scope

6  of the drug transactions taking place up until the time --

7  the relocation of the business and its inventory to

8  Paulette's school.

9          Isn't that all before this jury?

10          MR. McKNETT:  It is before the jury, Your Honor,

11  and I addressed that in my written submission.  I think it's

12  important for the Court to take note that when Ms. Martin

13  was telling people that she was moving her business to the

14  school, she did not tell Ms. Ali that.

15          THE COURT:  Why does she need to tell Ms. Ali

16  that?

17          MR. McKNETT:  It goes to the basis of what Ms. Ali

18  knew she was doing on May 16th.  If Ms. Ali did not know on

19  May 16th that Ms. Martin was recruiting her to help move

20  drugs to the school, then there is no basis to find her

21  guilty.  As the Court instructed the jury, even if you do

22  something that furthers the conspiracy, if you don't know

23  what is an otherwise legal act is, in fact, furthering the

24  conspiracy, then you can't be found guilty of it because you

25  have no knowledge.  You have no guilty knowledge.

1          And that's my argument with regard to Count 1 and

2   Count 56, which I believe -- more accurately, Count 56,

3   which is the count that focuses specifically on May 16th.

4          On May 16th, Ms. Martin, in the conversations that

5   I've outlined in my memorandum told, for instance, John

6   Martin she was going to move those tickets and everything to

7   the school.  Tickets, as we heard from the Government's

8   witnesses, was a code word for drugs.  Not necessarily a

9   specific drug, but a code word for drugs generally.

10         She told Ms. Harden that she closed the shop down

11  because of the neighbor meeting and the neighbor concern

12  about traffic in and out of the house and that the traffic

13  had nothing to do with the tickets.  She would be having her

14  shows at the school.

15         She told Ms. Dobie what little tickets I did have,

16  I took them to my business, meaning the school.

17         She told George Harris, I stopped everybody from

18  coming here, so people just have to catch me at the school.

19         Clearly, if the jury accepts the Government's

20  versions of what those words mean, the business, the

21  tickets, the shows, as drug references, then it's extremely

22  important to look at what Ms. Martin told Ms. Ali on May

23  16th.  She said that she wanted Ms. Ali to help her take

24  something to the school.  Something is not any word that

25  would raise a suspicion that it was drugs.  Something could

1    be boxes of clothing.  Something could be bags of anything.

2          When Ms. Ali arrived at Ms. Martin's house, the

3    Court will recall she was in and out of Ms. Martin's house

4    within minutes because the bags were already packaged up.

5    Whatever was in them was in the bags.  Ms. Ali did not help

6    load the bags.  All she did was carry them to her vehicle,

7    drive Ms. Martin and the bags to the school and help her

8    carry them in.  And even carrying them in is an assumption

9    because there was no surveillance at the school at that

10   point.

11         But that -- even assuming that Ms. Ali knew there

12   were drugs in the bags, and there is no evidence to support

13   that supposition, there is no evidence to support a finding

14   of quantities of drugs at all.

15         Ms. Martin herself, in those conversations, talks

16   about what little tickets I did have.  In the school,

17   significant quantities of drugs were found.  Heroin, powder

18   cocaine, crack cocaine.  There was no evidence refuting a

19   reasonable argument that Ms. Martin, John Martin, someone

20   else could have taken quantities of drugs into the school

21   after May 16th.  There was no evidence that would refute the

22   reasonable assumption that there were drugs in the school

23   before May 16th.  The only connection the Government made

24   was a shopping bag, a department store shopping bag, that

25   was found in the school on June 1st that resembled a

1   shopping bag that was taken out of Ms. Martin's house on

2   May 16th.

3            The mere presence of a department store shopping

4   bag, which I think it's fair to state are probably produced

5   in the hundreds of thousands, is simply insufficient, not

6   just to find somebody guilty beyond a reasonable doubt of

7   participating in the movement of drugs from one location to

8   another, it's certainly not a sufficient basis for a finding

9   of a specific quantity of drugs, and that's what the jury

10  did.

11           The jury said that because specific quantities

12  were found on May 16th, they, beyond a reasonable doubt,

13  were taken there by Ms. Ali on May 16th, and there is simply

14  no basis for the jury to make that finding beyond a

15  reasonable doubt.

16           At worst, the jury could -- and I don't think

17  beyond a reasonable doubt, but at worst the jury could make

18  a finding that Ms. Ali helped take Ms. -- helped Ms. Martin

19  take some quantity of drugs to the school, and even that's a

20  stretch because there's no evidence from which the jury

21  could find beyond a reasonable doubt that Ms. Ali knew --

22  first of all, that Ms. Ali had any reason to suspect that

23  there were drugs in those bags, let alone know it.

24           Because of that, the jury's findings about

25  quantities must be set aside at minimum, and I would argue

1    that because of the speculative and -- the speculative

2    nature, the supposition and guesswork involved in reaching

3    the conclusions the jury did, the verdicts themselves cannot

4    stand.

5              THE COURT:  All right.  Ms. Johnston.

6              MS. JOHNSTON:  Your Honor, I don't -- I know that

7    the Court noted that Mr. Ward had filed a motion to adopt

8    the motion for new trial filed by Mr. Martin.  That, I

9    believe the Court referenced, was filed on September 14th.

10   The Government would argue that that motion is out of time

11   under Rule 33.  A motion for new trial must be filed within

12   seven days of the verdict, setting forth the grounds.  That

13   motion was not filed within that time period, so I'd ask the

14   Court to deny that motion on that basis, in addition to the

15   fact that if the Court wants to reach the substance,

16   certainly there was sufficient evidence to support

17   Ms. Dobie's convictions on the counts on which she was

18   convicted.

19             But Rule 33 is a strict time limit requirement.

20   Counsel did not seek grounds to get the time extended within

21   the seven days, so I'd ask the Court to dismiss Ms. Dobie's

22   motion to adopt the motion for new trial as it not being

23   timely filed, having been filed on September 14th.

24             In terms of Ms. Ali, again, people like to use the

25   word supposition.  There was more than abundant evidence in

1    this case to establish Ms. Ali's involvement in the drug

2    conspiracy.  Ms. Ali admitted her involvement with

3    Ms. Martin over a period of years, of buying drugs from her,

4    of being a frequent visitor at her house, of meeting other

5    individuals.

6           In reference to the two counts surrounding

7    May 16th or the count surrounding May 16th, counsel doesn't

8    mention the call to Ms. Ali saying leave your husband at

9    home.  Doesn't mention the fact that if Jackie asks you what

10   you're doing here, to give her a story about why you're

11   here.  The surveillance observed, and, in fact, there's a

12   videotape that was introduced showing her assisting

13   Ms. Martin, putting those bags in the vehicle, and then a

14   photograph of them leaving the store, taken by the

15   surveillance agent who arrived after they had already

16   entered the store.

17          In addition to that, there was evidence before the

18   jury that Ms. Martin stopped getting heroin, couldn't get

19   any more heroin once Ms. Levi was arrested the end of April,

20   that Mr. Mangual didn't have any drugs, any cocaine, that

21   there was difficulty getting cocaine during May of 2004.

22   So, if anything, the drugs recovered at the school on

23   June 1st were less than what was taken there, so it was fair

24   for the jury, given the similarity and description of the

25   package, given the nature of those calls and the drugs

1    recovered, to reach the drug quantity conclusions that they

2    did and certainly to support their finding of involvement by

3    Ms. Ali.

4            There was one comment -- counsel made a big to-do

5    to change his motion to say that John Martin, Jr. had access

6    to the school.  There was absolutely no evidence before this

7    jury that John Martin, Jr. had access to the school without

8    going through Ms. Martin.  I think it's immaterial, but I'd

9    just like to note that for the record.

10           In terms of Ms. Martin's motion, Your Honor, one

11   doesn't look at evidence of a particular count in isolation

12   of the other evidence.  Certainly you consider the counts

13   individually, and this jury did just that.

14           If the Court will recall with certain counts -- in

15   fact, Ms. Martin, they found not guilty of a count of

16   telephone use, so this jury very much distinguished

17   defendants.  They found varying drug quantities involved in

18   the conspiracy for different defendants based on their

19   consideration of the evidence.

20           They found the defendant Ms. Martin guilty of

21   possession with intent to distribute for her distribution to

22   Ruby Harden but were hung in terms of being able to reach a

23   verdict as to Ms. Harden.  That verdict of guilty, based

24   upon the telephone calls, the ledger, the checks that showed

25   checks being paid in the amount of $125, which Agent Sakala

1    testified, as well as, I think, other agents, that 125 was a

2    typical price paid for an eightball, and the observations of

3    the actual distribution, sufficient to support her

4    conviction for possession with intent to distribute that

5    quantity.

6            Counsel mentioned the quantity of 500 grams or

7    more.  That was based on Agent Sakala's testimony that

8    Ms. Martin was getting a kilo from Mr. Mangual.  The one box

9    of envelopes, certainly if you look at that in isolation,

10   maybe she just was asking him for a box of envelopes because

11   she ran out of envelopes.  But when you look at that call in

12   conjunction with all of the other calls, it is very clear

13   that she wasn't getting envelopes, she wasn't getting boxes

14   of oranges, she wasn't getting autobiographies, she wasn't

15   getting Versace sunglasses, she was getting cocaine, and the

16   officer testified to that fact.

17           And, indeed, Ms. Ali admitted, you know, she was

18   getting cocaine, so there's no doubt Ms. Martin was dealing

19   cocaine during those time periods.

20           I don't belabor the point.  It is clear that this

21   jury understood the evidence.  It is circumstantial

22   evidence.  Counsel uses the example of a serial killer.

23   Well, you don't have to have the body or even the cause of

24   death to convict someone of homicide, and that is what this

25   case -- in terms of each one of those counts, there was

1    evidence, there are actual conversations, the surveillance,

2    the drugs that were recovered, all sufficient for this jury

3    to conclude that Ms. Martin was guilty of each one of those

4    substantive counts in the quantity -- in a quantity above

5    the quantity charged in the indictment as they found.

6             We would ask the Court to deny the motion for new

7    trial.

8             THE COURT:  Any reply?

9             MR. MONTEMARANO:  Very briefly, Your Honor.

10            Ms. Johnston, Ms. Greenberg and their team of

11   investigators did what I believe is an admirable job of

12   assembling evidence and presenting it to the jury.  It is

13   sad, therefore, at this late date that the Government's

14   arguments reduce themselves to the parcel.

15            Ms. Johnston argues that we had this conversation

16   about a box of envelopes.  Gee, maybe she was dealing with

17   Mr. Mangual and wanting a box of envelopes from him.  I'm

18   not aware there was any evidence or any suggestion by the

19   defense that Mr. Mangual owned a Barnes and Nobel or Staples

20   franchise, and there has been no suggestion by me that that

21   specific call or that kind of call was not drug related.  We

22   have not presented evidence to the contrary.  There is doubt

23   about that, but because of the massive number of calls of

24   similar nature over time, the jury made a decision

25   concerning the conspiracy.  That's their decision, whether

1    or not I agree with it.  I can understand it, and I've not

2    made an argument concerning the conspiracy, but the fact

3    that a particular call on a particular date raises Chris

4    Sakala's hackles does not permit him to say that's a drug

5    deal of this kind of drug in this amount.  That's nonsense.

6              And I would like to turn the argument around, if I

7    might.  What the Government's argument is, in essence, is

8    because we know Ms. Martin is involved in a drug conspiracy

9    over time based upon this huge arc of calls, we, therefore,

10   can say that a specific call is drug related.  That is as

11   ridiculous, I submit, as the course of conduct for between

12   10 and 50 years where there were allegations made by young

13   man after young man after young man that he was being

14   sexually abused as a minor by a priest, and nobody wanted to

15   believe it was possibly true until we found out it was so

16   true that it shocks the conscience.  And not only is it true

17   for numerous individual priests but numerous dioceses --

18              MS. JOHNSTON:  Your Honor, I must object to this

19   argument.

20              MR. MONTEMARANO:  -- across this country were

21   involved in covering it up.

22              THE COURT:  Well, bring it back --

23              MR. MONTEMARANO:  Nobody wanted to believe it

24   because --

25              THE COURT:  Let's go back to talking about this

1  case.

2       MR. MONTEMARANO:  Well, Your Honor, the point is

3  nobody wanted to believe it because of the nature of the

4  person being accused.

5       And this is the exact opposite.  We have someone

6  we're very sure is involved with a conspiracy.  Therefore,

7  we can adduce from that, we can -- excuse me.  We can

8  abstract from that that she's guilty of specific conduct on

9  a specific date.  It does not work.  It does not work

10  anymore than because of the person charged, we can't believe

11  that plain evidence which is before us in huge amounts.

12       I submit that you cannot convict Paulette Martin

13  of specific conduct because of what you believe she has been

14  doing over a period of time, that there must be specific

15  seizures, which we have in Count 62, or specific conduct

16  supported by specific facts.  If there were repeated calls

17  using only a certain kind of language, talking about only

18  certain amounts, we could, therefore, abstract what kind of

19  drug.  I mean the classic example, of course, in Baltimore,

20  the Court may not -- may or may not be aware, is boy and

21  girl for heroin and cocaine.  Routinely, that's the language

22  used.  And if boy and girl is used and a police officer

23  comes in and testifies a guy's out there yelling boy, boy,

24  well, I know what he's -- what he's talking about.  That's a

25  different kind of story.

1      Likewise, if they're discussing certain amounts

2  and they're within the realm of numerical probability that

3  this is what you pay for this kind of drug -- and, of

4  course, there is some fluctuation in, you know, the free

5  market, but if we're talking -- case in point, Your Honor.

6  I had a client in another case in this court who took a plea

7  not long before this case began, and he was on the phone

8  with another participant in the conspiracy.  And he said,

9  well, I'm like on 47th Street.  And the person responded and

10  I'm on 44th Street, and the person responded no, you're on

11  47th Street.  And then just a stunning bit of evidence, in

12  my view.  The response is no, you're on 45th and a half

13  street.

14      You know, Judge, I don't know of any 45 and a half

15  street anywhere.  That was negotiating about two kilograms

16  of cocaine, and for a price between 44 and $47,000, with a

17  final agreement of 45 and a half thousand dollars.

18      With that, and an experienced police officer

19  coming in and testifying about it, I could understand where

20  the jury is coming from.  But words like supposition and

21  guesswork just scratch the surface here.  I mean what kind

22  of drug and what kind of amount on a specific date is just

23  not before us, and for that reason I submit all 15 of those

24  counts fall of their own weight.

25      Thank you, Your Honor.

1            THE COURT:  All right.

2            MR. WARD:  Your Honor, I simply wanted to respond

3    to Ms. Johnston's comment about the supposed late filing.

4    It's my -- has been my understanding and was my

5    understanding throughout this trial, and I think it was

6    discussed on the record many times, that a motion filed by

7    one is deemed to be filed a motion by all unless the others

8    opt out.  So the letter I sent on September 13 is simply an

9    embodiment of what I understood to be the, if you will, rule

10   in this case with regard to filing of motions.

11           THE COURT:  All right.  Mr. McKnett.

12           MR. McKNETT:  Your Honor, Ms. Johnston said that I

13   didn't mention the call in which Ms. Martin told Ms. Ali to

14   leave your husband at home and then told her further to give

15   a cover story to Jackie.  Well, I did mention that call.

16   That's the call in which Ms. Martin told Ms. Ali that she

17   wanted help moving something to the school.

18           And I think it's important to note not only did

19   she use the word something instead of tickets, business,

20   other stuff, other words that she used with regard to other

21   mentioned in the conspiracy, the only reason she called

22   Ms. Ali at all that day is she didn't have a car.  John

23   Martin had her vehicle, and the transcripts and the records

24   show that.

25           THE COURT:  But wasn't the jury entitled to infer

something was up in the sense that she says don't tell your

husband and let's do a nice cover story for Jackie?  I need

to move something?  The something she was going to move, if

it was an innocent thing to move, why wouldn't she tell her

husband or why wouldn't she come clean and tell Jackie

what's going on if it was an innocent help to move some

clothing?

        MR. McKNETT:  It might have been a reasonable

assumption for the jury to make with regard to what

Ms. Martin was saying, that Ms. Martin may have been trying

to hide something, but for one -- Your Honor --

        THE COURT:  The conversations -- I mean the

statements made by Ms. Martin to Ms. Ali obviously were her

statements, not your client's, but it does indicate that

there was specifically communicated to your client the

notion that what Ms. Martin wanted her to help her with was

something she was doing surreptitiously, right?

        MR. McKNETT:  Not necessarily, Your Honor.

        THE COURT:  Well --

        MR. McKNETT:  I'm married, and I have been told by

my wife more than once that a friend of hers is coming over

and I'm staying home.  There's nothing suspicious in one

friend telling another friend I want you to do something

with me and don't bring your husband.  That's -- there's

nothing suspicious in that at all.

1        And as far as telling -- tell Jackie some story,

2   well, the evidence was clear that Jackie was nosy.  Jackie

3   was always trying to find out what was going on, and there

4   was evidence in the transcripts that Ms. Martin and Ms. Ali

5   talked about that and complained about Jackie trying to find

6   out what was going on, just sticking her nose into other

7   people's business.

8        That doesn't -- those two statements, standing

9   alone, as they do, combined with the phrase help me take

10  something to the school, and in the background of Ms. Martin

11  not having her own car and needing somebody to drive, does

12  not -- cannot under any circumstances allow a jury to find

13  beyond a reasonable doubt that Ms. Ali knew she was being

14  recruited to move drugs.  Those statements and those

15  circumstances simply continue allow that.

16       The jury might be suspicious.  The jury might

17  think that something was up.  But there's no basis for the

18  jury to find beyond a reasonable doubt that Ms. Ali knew or

19  should have known that Ms. Martin was up to something

20  involving drugs.

21       And the fact that this took place -- this event on

22  May 16th took place against a background of other drug deals

23  between Ms. Ali -- drug purchases by Ms. Ali from Ms. Martin

24  doesn't lend any weight at all to that supposition, that

25  suspicion.

1          That is simply, as Mr. -- the phrase

2    Mr. Montemarano used, she did it before.  She must doing it

3    now.

4          The jury is not allowed to make that kind of a

5    broad assumption.  There must be a factual basis beyond a

6    reasonable doubt for every guilty verdict, and there simply

7    isn't any.

8          Even if the Court -- even if I were to assume --

9    and I'm not admitting this.  Even if I were to agree that

10   Ms. Ali knew or should have suspected that Ms. Martin was

11   doing something illegal, there is absolutely no facts, no

12   evidence in the record to support a finding with regard to

13   specific drugs, such as heroin, powder and crack, and

14   certainly no -- no evidence, no facts in the record to

15   support a finding that on May 16th specific quantities of

16   drugs were being moved.  It's simply not there.

17         At worst, and I don't -- I wouldn't -- I don't

18   admit this, but at worst, the jury could make a finding that

19   Ms. Ali should have asked more questions, and, therefore,

20   was involved in moving drugs, but not as to specific drugs

21   and not as to specific quantities.

22         Ms. Johnston says, well, there must have been more

23   drugs than were found on May 16th, as if she's giving

24   Ms. Ali some sort of a break.  There isn't any evidence of

25   specific quantities in those bags on that day.

1          Ms. Johnston points out that because the

2     Government didn't find any other sources, there couldn't

3     have been any other sources, that Ms. Martin was complaining

4     about the sources drying up.  Well, that's -- Ms. Johnston

5     is saying that Ms. Martin is telling the truth in those

6     conversations, and, therefore, the Government can rely on

7     the truth of what Ms. Martin was telling other people.  And

8     that -- and by the Government relying on the truth of what

9     Ms. Martin was saying, Ms. Ali is guilty.

10          It doesn't work that way, Your Honor, because the

11     record shows that Ms. Martin repeatedly told people things

12     that were not true, and the Government's witnesses testified

13     to that.  Ms. Martin talked in the transcripts about going

14     to Philadelphia.  Never happened.  She talked about several

15     things as if they were facts, and they didn't happen.

16          She said that major R&B performers were stopping

17     by her house.  There is no evidence to support that.  But

18     the Government wants to pick out one conversation and vouch

19     for that one conversation and make that the basis for the

20     conviction of Ms. Ali.

21          The Government did not address my argument that

22     there could have been drugs in the school before May 16th

23     because there is no way to establish what was in that school

24     before or what was taken into that school after May 16th.

25     There is no evidence upon which any reasonable jury, any

1   rational jury, could find beyond a reasonable doubt that

2   Ms. Ali on May 16th moved specific drugs in specific

3   quantities to the school.

4              THE COURT:  All right.

5              MR. HALL:  Your Honor, if I may interrupt for a

6   moment, my client needs an opportunity to use the bathroom.

7   This particular part of the argument does not involve him.

8   He'll waive his presence if it's possible to have him taken

9   back.  I apologize, Your Honor, but ...

10             THE COURT:  All right.  Mr. Whiting?

11             DEFENDANT WHITING:  Yes, sir.

12             THE COURT:  You understand you have a right to

13  remain present in the courtroom?

14             DEFENDANT WHITING:  I do.

15             THE COURT:  And you desire to absent yourself?

16             DEFENDANT WHITING:  Yes, sir.

17             THE COURT:  And you're waiving your right to be

18  present?

19             DEFENDANT WHITING:  Yes, sir.

20             THE COURT:  All right.  You may take him out,

21  marshal.

22             (Defendant Whiting left the courtroom.)

23             THE COURT:  The verdict in this case was received

24  by the Court on September 5th, and under the federal rules

25  of criminal procedure, post-trial motions in the nature in

1    this case were required to have been filed within seven

2    days, and the Government argues that the post-trial motion

3    filed on behalf of Lavonne Dobie was filed outside the

4    seven-day period.

5            MS. JOHNSTON:  Your Honor, if I might correct the

6    Court, the verdict was returned by the jury on

7    August 31st --

8            THE COURT:  I'm sorry.  August 31st.  Excuse me.

9    Excuse me.  I'm --

10           MS. JOHNSTON:  It was entered onto the docket --

11           THE COURT:  I'm not looking at the right -- that

12   date.  Excuse me.  The date was what?

13           MS. JOHNSTON:  August 31st, 2006.

14           THE COURT:  August 31st.  Excuse me.  You're

15   right.

16           MR. MONTEMARANO:  We'd agree with that, Your

17   Honor.

18           THE COURT:  All right.  Now, your argument was

19   that it should have been filed by what date?

20           MS. JOHNSTON:  Within seven business days of that

21   date, which would have been, I think, September 12th, if my

22   math is correct.

23           Of course, Mr. Montemarano, who's the math genius

24   here, can correct me if I --

25           THE COURT:  Well, let me put my calendar in front

1    of me.

2              MR. MONTEMARANO:  The Government keeps holding me

3    to such a high standard that I cannot meet every one.

4              THE COURT:  I have a calendar.

5              MR. MONTEMARANO:  I would have seven as being the

6    12th as well, the Court being closed on Monday, the 4th.

7    That would be Friday, the 1st, Tuesday through Friday, the

8    5th through 8th.  That would be five days.  Day 6 would be

9    Monday, the 11th.  Day 7 would be Tuesday, the 12th.

10   Ms. Johnston is correct.

11             THE COURT:  Yes.  Okay.  I misspoke when I said

12   the 15th.  I meant August 31 was the verdict day.

13             So seven business days, counting the method that

14   you use when this limitation is that short of a duration,

15   would require that the motion on behalf of Ms. Dobie be

16   filed by September 12th, and the motion filed by counsel for

17   Ms. Dobie was filed on September 14, which makes it out of

18   turn.

19             I have heard Mr. Ward's argument that he believed

20   that we were proceeding under the rule that I had adopted at

21   the beginning of the trial, that a motion by one is a motion

22   by all and an objection by one is an objection by all.  I

23   believe that my ruling in that regard was relating to the

24   filing of -- or making of motions during the course of the

25   trial and not with respect to a motion of this nature, and I

1    don't believe there was really any ambiguity in that regard.

2         So I will, with respect to Ms. Dobie's motion,

3    conclude that it is out of turn.  I will not, however, rest

4    my decision with respect to Ms. Dobie on that ground alone

5    because I will address the merits alternatively with respect

6    to Ms. Dobie, and let me do that now with respect to all of

7    the defendants who have raised motions, post-trial motions.

8         The two defendants have been the principal -- or

9    three.  Three.  Excuse me.  Three defendants have

10   specifically addressed arguments to me, or have joined, that

11   is, in the post-trial motions, Ms. Martin, Ms. Ali, and I

12   just mentioned Ms. Dobie.

13        There are no other defendants who have joined in

14   the post-trial motion filed by Mr. Montemarano.  I have had

15   specific arguments made to me with regard to the factual

16   circumstances by Ms. Martin and by Ms. Ali.  There were no

17   specific circumstances brought to my attention by counsel

18   for Ms. Dobie, but I will assume that essentially the same

19   arguments have been made, which go to the sufficiency of the

20   evidence.

21        Under the applicable standard, a verdict, or

22   series, in this case, of verdicts reached by the jury in

23   this case should be sustained if any rational trier of fact,

24   viewing the evidence in the light most favorable to the

25   Government, could find the essential elements of the crime

1   beyond a reasonable doubt.

2          I occupied this courtroom for almost the entire

3   summer and listened to extensive testimony presented by the

4   Government, as well as the evidence presented by the

5   defense.  The jury in this case took a fairly substantial

6   amount of time to go through a very extensive verdict sheet

7   and did not simply come in with across-the-board guilty

8   verdicts.  There were some not guilty verdicts.  There was

9   an inability to reach a verdict on one defendant.  There

10  were very specific verdicts on the various charges against

11  the various defendants, and the jury obviously proceeded in

12  a thoughtful, careful and thorough basis, sifting through

13  the massive amount of evidence that was before it.

14         I conclude, on the basis of the evidence that was

15  presented to this jury, that it's had more than an adequate

16  amount of evidence on the basis of which, as a finder of

17  fact, it could rationally reach the verdicts that it did,

18  and I do so viewing the evidence, as I must, in the light

19  most favorable to the Government.

20         It appears to me that the argument of the defense

21  is that I should view evidence with regard to specific dates

22  in isolation, and I decline to do so.  This jury had before

23  it a very substantial amount of evidence, some of it

24  circumstantial, some of it direct, but evidence from which

25  they rationally could and did conclude, based upon the

1    evidence, that the verdicts of guilty that they returned

2    were appropriate, and I do not believe that the arguments

3    raised by the defense is sufficient to overcome, or meet,

4    that is, the standard that I'm required to follow in

5    examining and deciding a post-trial motion of this nature.

6            Ms. Ali, for example, contends that the evidence

7    was insufficient to support her conviction under Count 56,

8    and yet the fact is that the testimony and evidence before

9    this Court indicated that the surreptitious and clandestine

10   nature of the activity on that date was communicated to her

11   specifically by Ms. Martin, including making certain that

12   her husband was not home and deceiving Jackie Terrell, the

13   other occupant of Ms. Martin's house, and I conclude that

14   this is more than sufficient evidence from which a jury

15   could infer the nature of the activity being engaged in and

16   that there were significant quantities of drugs being moved

17   from Maryland to the District of Columbia.

18           I have already indicated, but I'll repeat it, that

19   Ms. Martin's arguments with respect to the merger of counts

20   for sentencing is one that the Government agrees with, and,

21   accordingly, I will merge the counts at issue for purposes

22   of sentencing.  And I believe that would mean that the

23   counts that are merged for sentencing purposes are Counts 5

24   and 7, 11 and 12, 13 and 15, 17 and 18, 20 and 21, 27 and

25   28, 30 and 32 and 46 and 47.  If I've missed something,

1    please let me know, but I will enter an order that says that

2    for sentencing purposes, those counts shall be considered

3    merged.

4           By the way, I don't think I mentioned this when I

5    reviewed the counts at the beginning, but, Mr. Goodwin -- I

6    think I did -- filed a motion for return of property, and I

7    consider that motion to be premature, and I will deny it

8    without prejudice.  To the extent that it is addressing the

9    forfeiture matter that we'll address shortly, I'll consider

10   it in connection with that.

11          So for those reasons, I will deny the motion of

12   Ms. Martin, which is -- are docketed at 953 and 995.  That's

13   the original motion and then the supplemental motion.

14          With regard to Reece Whiting, I already indicated

15   I'm going to hold the motion for downward departure and

16   decide that at the time of sentencing.

17          Mr. Bynum has filed no post-trial motions.

18          Ms. Dobie has filed at 955 the motion to adopt

19   motions of other defendants.  I am going to deny that for

20   the two reasons that it's out of turn, and, secondly, that

21   the -- to the extent that it is timely, that the motion is

22   without merit for the same reasons I just indicated with

23   respect to Ms. Martin.

24          With respect to Lanora Ali, I will deny her motion

25   at Tab Number 952 for reasons that I've just indicated.

1          I believe that disposes of all post-trial motions.

2   Have I missed any?

3          MS. JOHNSTON:  No, sir.

4          THE COURT:  All right.  Counsel, let me ask you

5   this.  What amount of time does the Government anticipate

6   will be required to deal with the forfeiture allegation?

7          MS. JOHNSTON:  Your Honor, the Government intends

8   to call Task Force Officer Thomas Eveler to testify

9   concerning the value of the drugs that were testified to by

10  various witnesses during the course of this trial and also

11  to call IRS Agent Ken Oland to testify as to the matters

12  that the Court didn't allow us to introduce in rebuttal,

13  which is a summary chart of the bank records showing the

14  amount of cash that went into Ms. Martin's various accounts.

15         So direct examination of Mr. Oland maybe will take

16  30 minutes.  Mr. Eveler may take 45.

17         THE COURT:  All right.  First of all, do counsel

18  for the defense intend to call witnesses on this issue?

19         MR. MONTEMARANO:  No, Your Honor, on behalf of

20  Ms. Martin, but I have two preliminary matters -- actually,

21  three preliminary matters.

22         THE COURT:  Well, let me just get the scheduling

23  question out of the way.

24         No defendant intends to call a witness on the

25  forfeiture allegations of the Government, is that correct?

1              MR. MARTIN:  Mr. Goodwin does not.

2              MR. HALL:  No, Your Honor.

3              MR. WARD:  No, Your Honor.

4              MR. MITCHELL:  That's correct, Your Honor.

5              MR. McKNETT:  No, Your Honor.

6              THE COURT:  I anticipate there will be spirited

7    cross-examination, so you can take that into account.

8              Now, what were your three preliminary matters?

9              MR. MONTEMARANO:  Well, Your Honor, the spirited

10   cross-examination presupposes that the Court will permit the

11   other agent, Mr. Oland, to testify.  There's been no notice

12   to the defense in any way, shape or form in the time since

13   the verdict was returned that the Government intended to

14   adduce evidence regarding this, nor has there been any

15   filing by the Government establishing to the Court or to the

16   defense what its theory for the seizure of these assets is.

17             So we are at this time clueless.  I mean is this a

18   suggestion that these are proceeds of narcotics activity?

19   Certainly Mr. Eveler -- excuse me, Sergeant Eveler could

20   testify regarding that.

21             Is this -- are these assets that were used to

22   facilitate?  Once again, perhaps Sergeant Eveler could

23   testify to that, and he has testified about related matters

24   already in this trial.

25             Or is the Government now proceeding, at this 11th

1    hour, 59th minute, on the theory of substitute assets?  We

2    have not had any of that established to us.  I was

3    anticipating at some point in advance of this hearing today

4    that the Government would make some sort of case relating to

5    this and establish, or identify, I should say, witnesses to

6    support this.

7              THE COURT:  Well, isn't there time to do that now?

8    I mean if -- we went to trial, and at the beginning of the

9    trial, which was set to hear everything by agreement of all

10   parties, we bifurcated it into two parts, and the defendants

11   waived a jury, and we're here today to now do the second

12   half of the trial, correct?

13             MR. MONTEMARANO:  Correct.

14             THE COURT:  All right.  Have you not previously

15   been provided with whatever information you believe you're

16   entitled to with respect to the forfeiture when we began

17   this trial?

18             MR. MONTEMARANO:  I don't believe so in terms of

19   identifying the nature of the assets -- the nature of the

20   assets, not the specific assets.  We received a vast amount

21   of bank information and deposit information.

22             THE COURT:  All right.  Any other --

23             MR. MONTEMARANO:  A theory under which the

24   Government chooses to proceed.  It's not identified in the

25   indictment, I submit.

1          THE COURT:  Any other preliminary matters?

2          MR. MONTEMARANO:  No, Your Honor.

3          THE COURT:  Okay.  Ms. Johnston, any response?

4          MS. JOHNSTON:  Only that the forfeiture

5  allegations in the indictment specifically say that we want

6  to forfeit the property, obtain directly or indirectly any

7  property used or intended to be used in any manner or part

8  to submit or facilitate the commission of the conspiracy.

9          And then we've asked for $10,200,000 in U.S.

10 currency and then specific personal real property, listing

11 each one of the accounts, and finally indicate that we wish

12 to seize things as substitute assets as well.

13         I don't know that substitute assets is something

14 for this Court to decide at this time.  The Court's to

15 determine whether it -- what is the amount to be forfeited

16 in terms of the amount of currency we've asked be forfeited,

17 $10 million, and then, as to the specific items, as to

18 whether or not they can be forfeited criminally.  In the

19 event that they were -- they contain any part of proceeds

20 that were used in any manner to facilitate this offense,

21 then they would be subject to criminal forfeiture.

22         Alternatively, once the Court enters the judgment

23 for the currency amount representing the $10 million, then

24 if we are unable to satisfy it, we may ask the Court to

25 forfeit items as substitute assets, but right now we've

1    asked for the items listed here to be forfeited under the

2    criminal forfeiture statute as set forth in the indictment.

3            The charts that I'm going to use with Mr. Oland

4    are summary charts from bank records.  We have provided

5    those to defense counsel.  The two primary ones are CH16 and

6    16A and CH17.  We've remarked them as forfeiture exhibits

7    for purposes of this hearing.

8            And we have some other calls that we may be

9    playing, all matters that were disclosed during discovery,

10   and didn't know that there was -- there was no request made

11   of the Government for any specifics prior to this hearing.

12           THE COURT:  Okay.

13           MR. MONTEMARANO:  Actually, Your Honor ruled a

14   long, long time ago, I think back in the spring, June 5th,

15   give or take, witnesses will be identified at least 24 hours

16   before their appearance.  I didn't get anything yesterday.

17   I didn't get anything Friday.

18           THE COURT:  Well, that's --

19           MR. MONTEMARANO:  With all due respect, Your

20   Honor, if they're going to call witnesses today, I think

21   it's incumbent upon them to identify them to us so we can

22   prepare.  I brought those specific banking records because

23   I'm not an idiot, but as observed by some of the other

24   defense counsel here, none of us brought our entire file.

25   If I had brought just those banking records, I'd have

1    doubled what I was carrying, all of the paperwork on all of

2    the various --

3          THE COURT:  If there's any specific thing that you

4    feel you're concerned about when a witness gets called, let

5    me know.  We'll address it.

6          All right.  Counsel, let me tell you what I'm

7    going to need to do.  I have a very important meeting at

8    3:00 that I cannot avoid going to.  What I'm going to do is

9    take a break for lunch now.  We'll return.  We will grind

10   along until just before 3.  If we are not finished at 3, I'm

11   going to either have to carry over to another day --

12   hopefully I won't have to -- or we will resume after my

13   meeting finishes.  But I have a -- as you recall from this

14   summer's surgery, I have a physical therapy appointment at

15   5:30, which means I have to be out of here by like 4:30.  So

16   we will have to deal with it.

17         We did get off to a slow start today for long and

18   complicated reasons that I won't go into, but -- so we're

19   running a little bit behind where I'd like to be to get this

20   done.  So I would like to take a shorter than normal recess

21   for lunch so hopefully we can get this thing done by 3.

22         So it's 5 minutes after 12 from the clock that I'm

23   looking at in the back of the courtroom, so synchronize your

24   watches on that one.  Can we tolerate a half hour lunch

25   since we got off to a late start?

1             All right.  Be back at 12:35.

2             (Luncheon recess.)

3             THE COURT:  You may proceed.

4             MS. JOHNSTON:  Thank you, Your Honor.  The

5    Government would call Case Agent Thomas Eveler to the

6    witness stand.

7             (The oath was administered.)

8             THE CLERK:  State your name for the record.

9             THE WITNESS:  Thomas Eveler, E-V-E-L-E-R.

10                        DIRECT EXAMINATION

11   BY MS. JOHNSTON:

12   Q.   Detective Eveler, are you one of the case agents in

13   this case?

14   A.   Yes, ma'am.

15   Q.   Were you present throughout the jury trial of this

16   matter for the testimony of all the witnesses?

17   A.   Yes.

18   Q.   And based upon that testimony, as well as the documents

19   and evidence that was introduced during that trial, did you

20   summarize the number of kilograms of cocaine that were part

21   of the drug conspiracy as based on that testimony?

22   A.   Yes.

23   Q.   If we could -- and I'm going to ask you to bring that

24   easel over so you can add up the ...

25             And do you have a marker up there?

1    Beginning with Pernell Philpot, were there

2  telephone calls introduced between Mr. Goodwin and

3  Ms. Martin and perhaps others discussing Mr. Philpot?

4  A.   Yes, there were.

5  Q.   And who else was intercepted discussing Mr. Philpot in

6  addition to Mr. Goodwin and Ms. Martin?

7  A.   Mr. Whiting.  Mr. Mangual.

8  Q.   In terms of the defendants here, it would be

9  Mr. Whiting?

10 A.   Yes.

11 Q.   And Mr. Goodwin and Ms. Martin, is that correct?

12 A.   Yes.

13 Q.   Okay.  And was there also testimony from the Wyoming

14 officers concerning the seizure?

15 A.   Yes, ma'am.

16 Q.   Okay.  And based upon that, how many kilograms of

17 cocaine did you associate with this conspiracy from

18 Mr. Philpot?

19 A.   Ten kilograms.

20 Q.   Okay.  If you'd write Philpot and 10 kilograms next to

21 that.

22    Was there also testimony concerning John Martin

23 and a number of kilograms?

24 A.   Yes, ma'am.

25 Q.   Okay.  And what was -- what were the number of

1   kilograms there?

2   A.   Twenty-five.

3   Q.   And that is based upon what?

4   A.   The kilo wrappers recovered from his vehicle on

5   July 4th, 2002.

6   Q.   If you'd write 25.  John Martin and 25 kilograms.

7            Now, we also heard testimony from Juan

8   Encarnacion.  Do you recall how many kilograms of cocaine he

9   acknowledged distributing to Ms. Martin?

10  A.   Yes.

11  Q.   Again, how many kilograms was that?

12  A.   Nine.

13  Q.   If you'd write Mr. Encarnacion.

14           You heard testimony -- there was also testimony

15  concerning Nathan King and his father, Steve Brim?

16  A.   Yes.

17  Q.   Did you determine how many kilograms they -- there was

18  testimony about them distributing to Ms. Martin and

19  Mr. Goodwin?

20  A.   Yes.

21  Q.   Approximately how many?

22  A.   Approximately 100 kilos.

23  Q.   Okay.  And how did you reach that conclusion?

24  A.   Based on the number of trips, the range of trips that

25  he estimated and the range of kilos that he estimated they

1    transported per trip.

2    Q.    And do you recall what those were?

3    A.    If I could refer to my notes.

4    Q.    Certainly.  Go ahead.

5    A.    Yes.  That refreshed my recollection.

6    Q.    Okay.  What was the range of trips, and how did you

7    reach a hundred kilograms?

8    A.    He estimated that he transported 15 to 25 kilos per

9    trip.  He made several trips himself, and he also -- his

10   father had also made trips based on his testimony and the

11   testimony of Mr. Echarte.

12   Q.    And based upon the testimony of Nathan King and

13   Mr. Echarte, what is the total number of kilograms that you

14   attribute -- what was the -- you said the range was 15 to

15   how many?

16   A.    Fifteen to twenty-five per trip.

17   Q.    And how many trips did Mr. King, as you can recall,

18   testify that he had made?

19   A.    I believe it was at least four.

20   Q.    And his father, Mr. Echarte had testified about trips

21   made by Steve Brim in addition to Mr. King's testimony, is

22   that correct?

23   A.    That's correct.

24   Q.    Okay.  If you could write Brim/King and a hundred

25   kilograms next to that.

1    Now, you mentioned that Mr. Echarte had testified

2    concerning the deliveries of drugs from Mr. Brim that were

3    shared between Mr. Goodwin and Ms. Martin.  How many

4    kilograms did Mr. Echarte testify to having delivered to Ms.

5    Martin?

6    A.   My recollection was three to four.

7    Q.   If you could write that up there as well.

8    Pick three kilograms just so we're on the lower

9    range.

10   Was there also testimony concerning -- and

11   evidence concerning Tiffany Vessels delivering -- or

12   obtaining cocaine and transporting it for Mr. Goodwin?

13   A.   Yes, there was.

14   Q.   And what was the source of that information?

15   A.   Telephone intercepts, the testimony of Mr. Thurman, and

16   the documentary evidence seized during the search warrant.

17   Q.   The telephone intercepts were between whom, if you

18   recall?

19   A.   Paulette Martin and an unknown male, Paulette Martin

20   and Learley Goodwin, and Mr. Goodwin and Mr. Thurman.

21   Mr. Thurman was returning the bad cocaine.

22   Q.   And how many kilograms was that that Ms. Vessels had

23   delivered?

24   A.   Approximately 15.

25   Q.   Okay.  If you'd write Vessels and 15 up there.

1          Now, in reference to Mr. Thurman, did you

2   calculate the number of kilograms that he testified about?

3   A.   Yes.   That was based on a range and a range of trips

4   and a range of kilos.

5   Q.   What was the range of trips and the range of kilos that

6   you used that he testified about?

7   A.   If I could refer to my notes?

8   Q.   Certainly.

9          Okay.   And what was the range that he gave in

10  terms of trips and quantities?

11  A.   Five to ten trips at eight to ten kilos was a low-end

12  estimate.

13  Q.   What was a low-end estimate?

14  A.   That would be 40 kilos.

15  Q.   Okay.   If you could write Thurman and 40 kilos up

16  there.

17          And Luis Mangual, did you make a calculation based

18  upon the intercepted calls that were introduced, and the

19  other evidence, in terms of the number of kilograms that

20  Ms. Martin was receiving from Mr. Mangual during the

21  conspiracy?

22  A.   Yes.

23  Q.   Again, could you describe for the Court what figure you

24  calculated and how you reached it.

25  A.   During the course of the wiretap, we estimated that

1   Mr. Mangual -- or during the course of 2004, Mr. Mangual

2   supplied Ms. Martin with approximately seven kilograms of

3   cocaine.  He had been in touch with her for a number of

4   years prior to that, so we gave an estimate of 21 kilograms

5   of cocaine supplied by Mr. Mangual to Ms. Martin.

6   Q.   Do you recall when their contact started?

7   A.   March of 2002.

8   Q.   So you added another 14 kilograms for that period of

9   time, is that correct?

10  A.   Yes, ma'am.

11  Q.   And during that time period, was a pen register contact

12  or the air time record contact consistent with the kind of

13  contact you saw during the wiretap?

14  A.   Yes, ma'am.

15  Q.   Did you find any evidence of any other relationship

16  between Ms. Martin and Mr. Mangual?

17  A.   She had contact with him regarding a crib.

18  Q.   A baby crib?

19  A.   Yes.

20  Q.   Any other business relations other than the calls --

21  A.   No, ma'am.

22  Q.   -- that have been testified to as being drug related?

23  A.   No, ma'am.

24  Q.   If you could add Mr. Mangual and 21 kilograms.

25          Now, finally, there was an individual named Cuba.

1  Who were the conversations about Cuba between?

2  A.   Ms. Martin and Mr. Goodwin.

3  Q.   And based upon those conversations, how many kilos of

4  cocaine did they receive from Cuba?

5  A.   Five kilograms because during the telephone contacts

6  there was evidence of prior distributions from Cuba to

7  Ms. Martin through Mr. Goodwin.

8  Q.   If you could write Cuba and five kilos.

9           And then I'm going to ask you to total up the

10  total number of kilograms that are listed there.  If you

11  have a calculator, you can use that if you think that will

12  be quicker.

13  A.   That would be faster.

14  Q.   What's the total number of kilograms?

15  A.   228.

16  Q.   Excuse me?

17  A.   228.

18  Q.   Okay.  If you would write -- total them up there.  Draw

19  a line with the total.

20           Now, in terms of the amount of money paid by

21  Ms. Martin and/or Mr. Goodwin when they were purchasing

22  these kilos, do you have a range of prices?

23  A.   Yes, ma'am.

24  Q.   Okay.  And do you recall what the price was that was

25  being paid to Mr. Mangual?

1  A.    Mr. Mangual was receiving the cocaine for approximately

2  23,000 a kilo, and we know he was selling it for

3  approximately 24,500 a kilo.

4  Q.    And do you know what Mr. Thurman was -- or what

5  Mr. Goodwin was obtaining through Mr. Thurman, what price he

6  was paying for a kilo in Texas?

7  A.    Somewhere around 15,500 per kilo.

8  Q.    How much?

9  A.    15,500.

10 Q.    And that would be the price that was paid, is that

11 correct?

12 A.    Yes.

13 Q.    And then it would be sold from there?

14 A.    Yes.

15 Q.    And did you use that -- an average price to make

16 calculations of the amount of money that was involved in the

17 cocaine aspect of this case?

18 A.    Yes.

19 Q.    And what anything did you use?

20 A.    20,000.

21 Q.    And why did you select 20,000?

22 A.    That is a common average but low conservative average

23 for this area for the price of a kilo of cocaine.

24 Q.    For the wholesale price?

25 A.    Yes.  It's a very low average.  Average would be closer

1    to 23,000.

2    Q.    In terms of what one would pay to buy a kilo, is that

3    correct?

4    A.    That's correct.

5    Q.    Not the profits one would make, is that correct?

6    A.    That's correct.

7    Q.    Could you multiply 228 by $20,000 per kilogram.

8          And what is that figure?

9    A.    456.

10   Q.    228 by $20,000?

11         MR. MONTEMARANO:  We'll stipulate it's

12   4.56 million, Your Honor.

13         MS. JOHNSTON:  Thank you.

14         THE COURT:  My calculator agrees with you.

15   Q.    Now, in terms of Mr. -- strike that.

16         That would be for powder cocaine, is that correct?

17   A.    That's correct.

18   Q.    And you didn't include in there the calculation for the

19   crack cocaine that was seized throughout this case?

20   A.    Correct.

21   Q.    Or include the crack transactions that were testified

22   to involving Ms. Martin, Mr. Bynum and other people in the

23   conspiracy?

24   A.    That's correct.

25   Q.    Now, did also do calculations for the heroin?

1    A.    Yes, ma'am.

2    Q.    Okay.  Why don't you mark cocaine at the top of that,

3    and we'll have that chart marked as Forfeiture 9 for

4    purposes of this hearing.

5              MR. MONTEMARANO:  Subject to cross, Your Honor.

6              THE COURT:  What?

7              MR. MONTEMARANO:  Ms. Johnston's moved the

8    admission of this.

9              THE COURT:  Oh, oh.  Okay.  All right.  Yes.

10   Q.    Write heroin on the top of the chart.

11             And did you, based upon the evidence that was

12   heard before this jury in this case back over the course of

13   the summer, determine an amount of heroin that was

14   reasonably foreseeable within the scope of the agreement as

15   it involved Ms. Martin?

16   A.    Yes.

17   Q.    And what was that quantity?

18   A.    Between 60 and 80 kilograms of heroin.

19   Q.    And what was the price of that?

20   A.    Ms. Levi was paying $60 per gram to Mr. Eriarte for the

21   heroin.

22   Q.    And what was Ms. Martin paying for it?

23   A.    Something more than $60 per gram.

24   Q.    Do you recall what she was selling it to Mr. Nun for?

25   A.    No, I do not.

1    Q.    And if you could just make the calculation using the

2    amount that was paid by her coconspirator, Ms. Levi, for the

3    heroin.

4              And do the calculation using the low figure of

5    60 kilograms --

6              MR. WARD:  Excuse me, Your Honor.  I don't mean to

7    interrupt, but we can't see the board.  Could you step on

8    the other side of the board, Agent, please.  Thank you.

9              MS. JOHNSTON:  I don't know that the Court can see

10   it, but that's --

11             THE COURT:  I'm writing it down.  That's all

12   right.

13             MS. JOHNSTON:  Okay.

14   Q.    If you could give us the total amount of money used to

15   purchase that heroin.

16             Now, in regards to the heroin, did Ms. Martin

17   receive all of those, 60 kilograms of heroin?

18   A.    No.

19   Q.    Did she assist Ms. Levi in addition to taking drugs and

20   distributing heroin for Ms. Levi?

21   A.    Yes.

22   Q.    If you could sit down for a moment, we'll get back to

23   the chart in a second.

24             If you could describe to the Court how else

25   Ms. Martin assisted Ms. Levi.

1    A.   Ms. Martin also assisted Ms. Levi by converting cash --

2    lower denomination bills to larger denomination bills and

3    also writing checks for Ms. Levi in order for her to

4    purchase real property.

5    Q.   Ms. Levi, did she have any legitimate means of income?

6    A.   No, she did not.

7    Q.   And the checks that were written, were they written on

8    Ms. Martin's accounts?

9    A.   Yes, ma'am.

10   Q.   And they were used for what purpose?

11   A.   Ms. Levi was purchasing property through her sister.

12   Ms. Levi was a fugitive at the time and could not convert --

13   could not have a bank account and also had no legal income,

14   so she could not purchase -- easily purchase property.

15   Q.   She didn't have a bank account in her real name to

16   purchase the property with?

17   A.   No, she did not.

18   Q.   Now, in addition to the calls that the Court heard,

19   were there a few other calls that relate specifically to the

20   laundering of Ms. Levi's proceeds by Ms. Martin?

21   A.   Yes.

22           MS. JOHNSTON:  And, Your Honor, we'd like to admit

23   as Forfeiture 8 the transcript of those calls.  We have a CD

24   so we can mark that as two.

25   Q.   Do you have a copy of the transcript?

1    A.    Yes, ma'am.

2    Q.    Who are the parties in this conversation?

3    A.    In E108, it is Gwendolyn Levi and her sister, Magretta

4    Terry, or Magretta Jean is her other name.

5          MS. JOHNSTON:   Okay.  And, Your Honor, I don't

6    know if you had the original --

7          THE COURT:   Hand me up the exhibit, if you would.

8          MS. JOHNSTON:   If we could play E108, please.

9          (Tape being played.)

10   Q.    What time did that call take place on April 8th of

11   2004?

12   A.    10:05 a.m.

13   Q.    Will you go to the next call, E124/B3044.  What time

14   did this call take place?

15   A.    At 10:51 a.m.

16   Q.    And who are the parties?

17   A.    Gwendolyn Levi and Paulette Martin.

18         MS. JOHNSTON:   Would you play that call, please.

19         (Tape being played.)

20   Q.    And was there a follow-up call to that call on

21   April 8th?

22   A.    Yes, ma'am.

23   Q.    What time was this call?

24   A.    11:45 a.m.

25   Q.    And that would be Call B3046 and E134?

1    A.    Yes.

2    Q.    And who were the parties to that call?

3    A.    Again, Gwendolyn Levi and Paulette Martin.

4            MS. JOHNSTON:  If you could play that call,

5    please.

6            (Tape being played.)

7    Q.    And do you know what -- based upon that call, did you

8    also review bank records?

9    A.    Yes, ma'am.

10   Q.    And when Ms. Martin in that call refers to writing one

11   for 905 and one for 1405, what is she referring to?

12   A.    The amounts of the checks that she wrote on that day.

13   Q.    Let me show you Government's Exhibits Forfeiture 6 and

14   7.

15            Do you recognize those two items?

16   A.    Yes, ma'am.

17   Q.    What are those?

18   A.    These are copies of the checks written on Ms. Martin's

19   account, Bank of America account.

20   Q.    On that same day, April 8th?

21   A.    On that same date, to Stephane Jean and Magretta Jean.

22   Q.    And on what account were those checks written?

23   A.    Bank of America account 9517233.

24   Q.    And the other one?

25   A.    91274292.

1  Q.   And what is the name on the account?

2  A.   On the one ending 7233, it is in the name of Paulette

3  Martin, 9002 Bexhill Court.

4  Q.   Okay.  And is that the account that is listed on our

5  indictment at the forfeiture allegation under Roman Numeral

6  10?

7  A.   Yes.

8  Q.   And the preceding check, Forfeiture Number 7, written

9  to Marguerite, is that from an account that's also listed on

10  our forfeiture allegation, this time as Roman Numeral 8?

11  A.   Yes.  It's Magretta.

12  Q.   And were those accounts listed as Ms. Martin being the

13  owner with beneficiaries in different people's name?

14  A.   One was in -- one was -- they both were actually, yes.

15  Q.   Okay.  And who were the beneficiaries on the -- listed

16  on those accounts?

17  A.   On the one ending in 4292, it was Theresa and Burgess

18  Arnold, Carise Martin and Kimberly Rice.

19          And the one ending 7233 is Theresa and Burgess

20  Arnold, Carise Martin and Kimberly Rice.

21  Q.   Now, if we could turn to the allegations that are set

22  forth in the forfeiture allegations of the indictment, do

23  you have a copy of that in front of you?

24  A.   Yes, ma'am, I do.

25  Q.   In regard to the first item listed under personal and

1   real property, Item I, who was the owner of that account?

2   A.   That is Paulette Martin.

3   Q.   And during the course of your investigation, did you

4   find -- did you identify any legitimate source of income for

5   Ms. Martin?

6   A.   No.

7   Q.   And Roman Numeral Number 2, in whose name is -- does

8   that -- does the indictment accurately reflect the account

9   numbers and the amount of money that was seized?

10  A.   Yes.

11  Q.   And, again, in terms of Item Number 2, in whose name is

12  that money or that account owned?

13  A.   Paulette Martin.

14  Q.   Did you find any source of legitimate income that would

15  support that advisor investment account?

16  A.   No, ma'am.

17  Q.   If we could go to Roman Numeral Number 3, what was that

18  account number?

19  A.   It's a Chevy Chase Bank account, 0942000609.

20  Q.   And, again, who was listed as the owner of that

21  account?

22  A.   Paulette Martin, with -- looks like it's in trust for

23  Carise Martin and Burgess Arnold.

24  Q.   And who are -- do you know who Carise Martin and

25  Burgess Arnold are?

1    A.    Those are her sons.

2    Q.    And was that the amount of money seized from that

3    account?

4    A.    Yes, ma'am.

5    Q.    Did you determine whether or not any checks were

6    deposited in that account from either Ms. Ali or Ms. Harden?

7    A.    Yes.  There were checks from Ms. Ali and Ms. Harden

8    both to that account.

9    Q.    Let me show you what's been marked as Government's

10   Exhibit Forfeiture 3 and Forfeiture 4 and 5 at this time.

11        Do those charts reflect checks that were deposited

12   from Ms. Harden, Ms. Ali and Mr. George Harris into various

13   Paulette Martin accounts?

14   A.    Yes, they do.

15   Q.    And are some of those checks checks that were testified

16   about during the course of the trial?

17   A.    Some of them, yes.

18   Q.    Now, Mr. Harris, for the record -- based upon the

19   testimony and the calls that were placed, who was Mr. Harris

20   in relation to Ms. Martin?

21   A.    He is a drug customer of Ms. Martin's.

22   Q.    If we could then go to the next item on the list, which

23   would be Item 4.

24        Does Item 4 reflect the amount of money that was

25   seized from the Chevy Chase account listed there?

1    A.    It does.

2    Q.    And in what name was that account?

3    A.    That's in PTK Associates.

4    Q.    Did you find any legitimate source of income for that

5    business?

6    A.    No, ma'am.

7    Q.    If you go to the next item, Number 5, again, does that

8    accurately reflect the amount of money recovered from that

9    Chevy Chase bank account?

10   A.    Yes, it does.

11   Q.    And that amount is 15,479, is that correct?

12   A.    That's correct.

13   Q.    And that account was held in the name as reflected

14   there?

15   A.    I'm sorry?

16   Q.    Does the forfeiture allegation contain the correct name

17   on the account?

18   A.    Yes, it does.

19   Q.    That was arguably the Paulette's School for Performing

20   Arts business account, is that correct?

21   A.    Yes.

22   Q.    Do you find any evidence that there was actually

23   ongoing activity at the -- ongoing legitimate activity at

24   the school during the course of the conspiracy?

25   A.    No, ma'am.

1   Q.   Now, if we could go to the next item, V6 -- V6, Roman

2   Numeral 6, that account was in the name of what individuals?

3   A.   Learley Goodwin and Paulette Martin Akuffo.

4   Q.   And what was the amount of money in that account?

5   A.   $30,951.

6   Q.   And in regards to that account, were Ms. Goodwin and

7   Mr. Martin, based on your review and your investigation,

8   ever involved in a legitimate business together?

9   A.   No, ma'am.

10   Q.   And why do you say no?  We heard testimony concerning a

11   concert business.  Why do you say that was not legitimate?

12   A.   Because their investment in the concert business

13   stemmed from their involvement in the drug trafficking

14   business.  That money was drug proceeds which was being

15   invested in the concert business.

16   Q.   If you could go to the next item, Roman Numeral 7,

17   again, does that accurately -- the forfeiture allegation set

18   forth in the indictment accurately reflect the amount of

19   money seized and the individual in whose name the account

20   was held?

21   A.   Yes, ma'am.

22   Q.   Now, in regards to the Sun Trust Bank account listed

23   under Roman Numeral 7, were funds or checks received from

24   Ms. Ali and Ms. Harden deposited into those accounts?

25   A.   Yes.

1  Q.   Now, if we could go to the next item, which I think we

2  covered, Roman Numeral 8, again, does that accurately

3  reflect the name on the account and the amount of money

4  seized?

5  A.   Yes, ma'am, it does.

6  Q.   Okay.  And is this one of the accounts you mentioned

7  that Ms. Martin wrote a check for Mr. -- Ms. Levi from?

8  A.   Yes.

9  Q.   If we go to the next number, Roman Numeral 9, and that

10 account is in the name of Paulette Martin and Mary Alice

11 Payne, is that correct?

12 A.   That's correct.

13 Q.   Now, Ms. Payne wasn't alive at the time this account

14 was seized, is that correct?

15 A.   No, ma'am, she was not.

16 Q.   And, indeed, was she alive when the -- strike that.

17        Were any checks deposited in that account from

18 Ms. Martin's drug customers?

19 A.   Yes, ma'am, they were.

20 Q.   From what customers?

21 A.   Lanora Ali and Ruby Harden.

22 Q.   And at the time those checks were deposited, was

23 Ms. Payne alive?

24 A.   No, ma'am, she was not.

25 Q.   If we could go to the next account number, Roman

1   Numeral 10 on the asset for forfeiture list, does that

2   accurately reflect the account number and the amount of

3   money seized from that account as well as the owner and the

4   beneficiaries?

5   A.   Yes, it does.

6   Q.   In relation to that count, were any moneys or checks

7   from drug customers deposited in that account?

8   A.   Yes.   There were checks received from Ms. Ali,

9   Ms. Harden and Mr. Harris.

10   Q.   Now, if we could go to Roman Numeral Number 11, and if

11   you could explain to the Court that -- the $126,000 in the

12   escrow account for Norbeck Road, L.C.

13   A.   This was money placed in an escrow account for the

14   purchase of land and the construction of a home for

15   Ms. Martin.   This money came from Bank of America account

16   9517233, which is listed as Number 10, just prior to this,

17   and there were checks from Ms. Martin's drug customers, Ali,

18   Harden and Harris, that were deposited into that account.

19   Q.   Now, if we could go to the next one, Roman Numeral 12,

20   is that the accurate count of the currency that was seized

21   from Paulette's School for Performing Arts on June 1st of

22   2004?

23   A.   Yes, ma'am.

24   Q.   And, again, was there any evidence of an ongoing

25   performing arts school at that school at the time the money

1  was received?

2  A.   No, there was not.

3  Q.   And, indeed, do you recall the testimony of Ms. Ali's

4  husband concerning his efforts to try to get Ms. Martin

5  started in a performing arts school?

6  A.   Yes.

7  Q.   Now, if we could go to the next number, Roman Numeral

8  Number 13, does that list a Mercedes SLK?  Is that correct?

9  A.   That's correct.

10  Q.   And is that the Mercedes SLK that we observed on the

11  various videotapes during the course of the trial?

12  A.   Yes, ma'am, it is.

13  Q.   And based on that testimony, do you recall whether or

14  not Ms. Martin used that car to drive to the school when she

15  was meeting different drug customers there?

16  A.   She used it to deliver to customers.  She used it to

17  meet Ms. Harden at the Shoppers Food Warehouse parking lot.

18  She used it to deliver money to Mr. Lane for Mr. Goodwin to

19  purchase cocaine.

20  Q.   If we could go to the next number, Roman Numeral 14,

21  does that allegation accurately reflect the amount of

22  currency recovered from Ms. Martin's residence at Hayward

23  Drive on June 1st?

24  A.   It does.

25        MS. JOHNSTON:  And, Your Honor, we're going to

1   skip Number 15 for purposes of this hearing because Guilty

2   Productions moved that money out of the account so we don't

3   have the derivative proceeds that resulted from Ms. Martin

4   sending $150,000 check to that account.

5           THE COURT:  So --

6           MS. JOHNSTON:  So there's --

7           THE COURT:  Okay.

8           MS. JOHNSTON:  -- there's -- we're unable to seize

9   it from --

10          THE COURT:  All right.

11          MS. JOHNSTON:  -- Guilty Productions.  They --

12          THE COURT:  Okay.

13          MS. JOHNSTON:  -- transferred it, I think the day

14   before we got the seizure warrant.

15          THE COURT:  Right.

16  Q.   So we'll go to Roman Numeral 16, and what is reflected

17  in the allegation of Roman Numeral 16?

18  A.   The $129,700 in currency seized from Ms. Ali's

19  apartment.

20  Q.   And Number 17?

21  A.   $14,905 in currency seized from the apartment of Derrek

22  Bynum.

23  Q.   Let's talk for a minute about Mr. Bynum.  Did you

24  perform a calculation concerning the number of kilograms of

25  cocaine that Mr. Bynum was involved in based upon the calls

1   that were played here in the courtroom and his relationship

2   with Ms. Martin?

3   A.   No, I did not.  I based it on what the jury found.

4   Q.   Okay.  And the jury in this case found five kilograms

5   or more of cocaine, is that correct?

6   A.   That's correct.

7   Q.   And did you do a calculation based on their attributing

8   a minimum of five kilos to Mr. Bynum?

9   A.   Yes.

10   Q.   Okay.  And what was -- what price did you use for the

11   kilograms of cocaine?

12   A.   I used the price that Ms. Martin would have paid

13   Mr. Mangual, which was $24,500, which will give you a total

14   of 122,500.

15   Q.   Okay.  If you could write that up on the board under

16   Bynum.

17         You can put it right under the heroin.  That's

18   fine.

19         And why did you use the 24,500 that Mr. Mangual

20   was selling the cocaine to Ms. Martin for rather than the

21   20,000 that you used for the overall cocaine total?

22   A.   Because Mr. Bynum wasn't getting the reduced price that

23   Ms. Martin would have received, and the other prices were

24   based over cocaine over a period of time, over a number of

25   years.  The prices vary.

1   Q.   And this five kilograms was based on what period of

2   time?

3   A.   March through June of 2004.

4           MS. JOHNSTON:  I have no other questions, Your

5   Honor.

6           THE COURT:  Cross?

7           MR. MONTEMARANO:  Thank you.

8                      CROSS-EXAMINATION

9   BY MR. MONTEMARANO:

10  Q.   Good afternoon, Sergeant Eveler.  How have you been?

11  A.   I'm fine.  I'm corporal, but thanks for the promotion.

12  I would be happy to have the pay.

13          MR. MONTEMARANO:  You know, Your Honor, for ten

14  weeks you'd think I would be able to get it straight.

15  Q.   My apologies, Corporal, Detective Eveler.

16          Let's start with the board right behind you.  You

17  put down 60 to 80 kilograms of heroin, correct?

18  A.   Yes, sir.

19  Q.   And that's what your testimony would be, you believe,

20  Ms. Levi -- Levi transferred to Ms. Martin?

21  A.   No, that's what she received from her source of supply,

22  Mr. Eriarte, who testified in the summer.

23  Q.   And if I understand correctly, what was seized from

24  Ms. Levi was approximately 2.3 kilograms, correct?

25  A.   That's correct.

1    Q.    So less than five percent of the amount up there.   Is

2    that a fair statement?

3    A.    Yes.

4    Q.    Any other seizures -- other than that seizure from

5    Ms. Levi, any other seizures from Mr. Eriarte?

6    A.    Yes.

7    Q.    How much?

8    A.    A kilogram of heroin from his store in New York.

9    Q.    Okay.  So now we're up to about three, three and a half

10   kilograms, give or take?

11   A.    Yes.

12   Q.    So maybe we're just over five percent of that amount

13   behind you?

14   A.    Yes.

15   Q.    Any other seizures from Ms. Levi?

16   A.    There was a seizure of heroin from her residence.

17   Q.    How much was that?

18   A.    Can't recall.

19   Q.    So we're still in the three and a half kilogram range?

20   A.    Less than -- we're less than four.

21   Q.    Okay.  Less than four.

22          And no other seizures other than that one kilogram

23   in New York from Mr. Eriarte, correct?

24   A.    That's correct.

25   Q.    So the other 95 percent of the amount on the board

1  behind you would be based upon Mr. Eriarte's claims,

2  correct?

3  A.   And his ledger, which we had.

4  Q.   And those are transfers to whom?

5  A.   To William Turner and Ms. Levi, who were partners.

6  Q.   And those ledgers demonstrated a transfer from

7  Mr. Turner to Ms. Martin?

8  A.   No.  They showed -- they did not --

9  Q.   That's an easy question, yes or no.  They did or did

10  not demonstrate a transfer from Mr. Turner to Ms. Martin?

11  A.   That was solely based on his relationship with Ms. Levi

12  and Mr. Turner.  No transactions beyond that.

13  Q.   Okay.  So his ledger demonstrates a transfer to

14  Ms. Levi and his ledger demonstrates a transfer to Mr.

15  Turner, but his ledger does not demonstrate a transfer to

16  Ms. Martin.  Is that a fair statement?

17  A.   That's correct.

18  Q.   If I could invite your attention, please, to this

19  board, and this is the list you prepared based upon

20  Ms. Johnston's questions regarding the amounts of drugs

21  testified to during the trial, correct?

22  A.   Yes.

23  Q.   Now, I'd like to clarify a few things.

24       Twenty-one kilos regarding Mr. Mangual, that was

25  based upon your estimate from what you believe was

1   transferred during the period of the wiretap and then

2   extending that during the time you believe Mr. Mangual and

3   Ms. Martin did business together?

4   A.   Yes.

5   Q.   Okay.  So it would be fair to say that the only amounts

6   within that 21 that you have actual evidence of would be the

7   7 kilograms that you believe were transferred between

8   Mr. Mangual and Ms. Martin.  Is that a fair statement?

9   A.   I would disagree with that.

10  Q.   Well, during the trial we heard testimony from the wire

11  taps, and it's based upon that that you extrapolated seven

12  kilograms, correct?

13  A.   That and the DNR contacts and the surveillances prior

14  to the wiretap, I think, show more than that.

15  Q.   Show contacts, correct?  The DNRs, the surveillances,

16  that shows contact between Ms. Martin and Mr. Mangual.

17  Correct, sir?

18  A.   Yes, and I believe that's evidence.

19  Q.   Okay.  And there were seizures related to those DNRs?

20  A.   No.

21  Q.   There were seizures related to those surveillances?

22  A.   No.

23  Q.   And you were here when Sergeant Sakala testified that

24  with regard to certain phone calls he could not tell us what

25  the amounts were.  Do you remember that testimony?

1   A.   Not with regard to Mr. Mangual.  With regard to some

2   other individuals, yes.

3   Q.   With regard to some other individuals.  No way of

4   knowing, when Mr. Mangual came over with the bag in his

5   hand, if that was a delivery of an ounce, a kilogram, five

6   kilograms, correct?

7   A.   There's no way of knowing?

8   Q.   Based upon the evidence at this trial.

9   A.   I -- I believe it's a kilogram, yes.

10  Q.   You believe it's a kilogram.  My question was there is

11  no way of knowing.  You didn't seize a kilogram with regards

12  to --

13          MS. JOHNSTON:  Objection.  The question was asked

14  and answered.

15          THE COURT:  Overruled.

16          MR. MONTEMARANO:  Thank you, Your Honor.

17  A.   I'm sorry.  Could you repeat that?

18  Q.   There were no seizures of that particular kilogram with

19  regard to a certain visit by Mr. Mangual, correct?  You

20  could be wrong, correct?

21  A.   It's possible.

22  Q.   Possible.  Twenty-five kilograms, that's 25 kilogram

23  wrappers in Mr. Martin's vehicle, correct, sir?

24  A.   That's correct.

25  Q.   And that was seized in 2004?

1   A.   2002.

2   Q.   2002.  I'm sorry.  And those wrappers had been in

3   Mr. Martin's vehicle for how long?  Fair to say you don't

4   know?

5   A.   Don't know.

6   Q.   And you don't know if -- there's no surveillance or DNR

7   or wiretap ongoing during the time of that seizure for

8   Mr. Martin in 2002, correct, sir?

9   A.   Not that I'm aware of.

10  Q.   Okay.  So, therefore, you don't know if Ms. Martin,

11  that's Paulette Martin, had any knowledge of John Martin's

12  trafficking in cocaine at that point in time based on the

13  evidence at our trial, correct, sir?

14       Take your time.

15  A.   Would you repeat the question?

16  Q.   Based upon the evidence at our trial, which did not

17  involve DNR, surveillance, wiretap or anything like that

18  during that period of time, 2002, July of 2002, the July 4th

19  weekend, as I recall --

20  A.   Correct.

21  Q.   -- you have no way of knowing if John Martin and/or

22  Paulette Martin were involved together in cocaine

23  trafficking at the time he's seized with these wrappers,

24  correct?

25  A.   I believe Mr. Echarte testified that they were in

1   contact during that time.

2   Q.   We'll get to Mr. Echarte.

3         Other than Mr. Echarte, there would be no

4   evidence.  Is that a fair statement?

5   A.   And the contacts linking Mr. Martin to other

6   conspirators with Ms. Martin, such as having Mr. Goodwin's

7   telephone number on him, Mr. Whiting's telephone number on

8   him, Mr. Encarnacion's telephone -- or Mr. Mangual's

9   telephone number on his person at the time of his arrest.

10   Q.   In 2002.

11   A.   Correct.

12   Q.   Mr. Encarnacion, were there any seizures from

13   Mr. Encarnacion?

14   A.   No.

15   Q.   So if he said 9 kilograms, it could be that.  It could

16   be .9.  It could be 19.  Couldn't it?

17         You don't know, do you?

18   A.   Could be more, yes.

19   Q.   Could be less?

20   A.   I don't believe so.

21   Q.   Do you trust Mr. Encarnacion?

22   A.   Yes, I do.

23   Q.   We're not going to go into Mr. Encarnacion's record,

24   but it would be fair to say that he's not the kind of person

25   you'd necessarily want to trust, would you?

1   A.   I have corroboration for Mr. Encarnacion.

2   Q.   Brim and King, you have a hundred kilos.  How many

3   kilograms of cocaine were seized from Mr. King, if you

4   recall, based on the evidence at trial?

5   A.   Twenty-one, I believe.

6   Q.   That was in Indianapolis, correct?

7   A.   Correct.

8   Q.   Let's be honest.  There was also a seizure in

9   Mississippi, right?

10  A.   Correct.

11  Q.   Wasn't that like 16 or 17 or something like that?

12       Very well.  For the sake of rough numbers.

13  A.   That's close.

14  Q.   Let's say 40.  Will you agree with that?  No more than

15  40 between the two?

16  A.   Maybe a little less, but close.

17  Q.   But no more than 40, right?  I wouldn't want you to

18  bend too far.  Forty, you can live with that, right?

19  A.   I can live with that.

20  Q.   Okay.  Fifteen kilograms Tiffany Vessels testified to?

21  Any seizures related to this 15 kilograms?

22  A.   Yes.  A small portion of the cocaine that Mr. Thurman

23  returned to El Paso was seized in Louisiana.

24  Q.   So --

25  A.   That was the -- that was the rebate on the bad cocaine.

1   Q.   So is this 15 separate and apart from the 40 for

2   Thurman?

3   A.   Yes.

4   Q.   So my question is -- let's leave Mr. Thurman out of it.

5   A.   I can't separate the two on that incident.  Those

6   15 kilos came from Kelly LNU in El Paso, Texas.  Mr. Thurman

7   returned the bad cocaine, a portion of the bad cocaine, to

8   El Paso and Mr. Goodwin.

9   Q.   Now, LNU, that's law enforcement shorthand for Last

10  Name Unknown, right?

11  A.   Correct.

12  Q.   Because we don't know who Kelly is or if he even

13  exists, right?

14  A.   We're trying very hard to find that out.

15  Q.   You're trying very hard to find that out.  Unless I'm

16  wrong, my math isn't as good as Ms. Johnston would like to

17  suggest, we're 27 months now since raid day, right?

18  A.   Yes.

19  Q.   Give or take?

20  A.   Yes.

21  Q.   So we're 30 some months, more since all these events

22  took place?  Forty some months?  Fair to say you're not

23  going to find him any time soon?  You haven't yet, right?

24  A.   Not yet.  I've been busy.

25  Q.   Haven't we all?

1              Speaking of LNUs, Cuba's not related to Kelly, is

2     he?

3     A.    No.

4     Q.    But he's another LNU, right?

5     A.    That's correct.

6     Q.    Because they're like sort of ubiquitous in this

7     business, right?

8     A.    Yes.

9     Q.    So we don't know who Cuba is?

10    A.    I have his voice on tape.

11    Q.    You have his voice on tape.  But for all you know, it's

12    someone claiming to be him.  You know, you've heard of like

13    voice impersonators and things like that, right?  So you

14    don't know who Cuba is, right?

15    A.    Not yet.

16    Q.    You've never located him, correct?

17    A.    Correct.

18    Q.    So we don't know who Cuba is, correct?  We know of, in

19    your testimony, the evidence shows seven kilograms.

20              Let's talk about Mr. Thurman.  Where's all this --

21    all these drugs come from?  There's the 15 seized in

22    Louisiana, correct?

23    A.    Steven Campbell in Houston, Texas.

24    Q.    Oh.  And those were seized?

25    A.    No.

1    Q.   You've never seen them, correct?

2            Let's face it.  The evidence we've got is like

3    Mr. Goodwin paying for a tire in Arizona, correct?

4    A.   Right.  I don't --

5    Q.   A trip to Houston, correct?  No cocaine, right?

6    A.   That's correct.

7    Q.   And Ms. Vessels, that was the 15 -- that's the same as

8    the 15 seized in Louisiana?

9    A.   That's a few ounces seized in Louisiana.

10   Q.   It was nine ounces, right?

11   A.   I think.

12   Q.   Let's just, for the sake of discussion --

13           And then Mr. Echarte?  The three kilograms?  You

14   never seized those?

15   A.   No.

16   Q.   In fact, actually, if you were to be accurate,

17   Mr. Echarte talked about dozens and dozens of kilograms

18   sitting on the counter in Ms. Martin's kitchen, right?  And

19   that's not here.  That's more than three kilograms, right?

20   A.   That's included in the 100 kilograms from Brim/King.

21   Q.   Oh, that's what the hundred kilograms is.  Oh, okay.

22           We agree we seized 40, if that.

23           MS. JOHNSTON:  Your Honor, I'm going to object to

24   counsel marking that.  We've marked that as an exhibit.  He

25   shouldn't be writing on it.

1          MR. MONTEMARANO:  May it please the Court, we

2     don't have a jury here.  I'm going to ask that it be marked

3     with the blue as a defense exhibit when I'm done.

4          THE COURT:  All right.  You can mark it.  Just

5     don't cross over anything the Government --

6          MR. MONTEMARANO:  I'm using a different color so

7     the Court has no trouble --

8          THE COURT:  Just don't cross out anything the

9     Government put on there.

10          MR. MONTEMARANO:  Fair enough.  Thank you.

11    Q.   The Encarnacion, we never seized that?

12    A.   That's correct.

13    Q.   And the John Martin, we don't know where that comes

14    from?  And then the Philpot, the ten kilograms, that's the

15    Wyoming seized during the pendency of the wiretap, correct?

16    A.   That's correct.

17    Q.   You came up with 228, correct, sir?

18    A.   That's correct.

19    Q.   When we take up all of this guesswork, 228 minus 166

20    comes to 62, correct?

21    A.   I don't know what you're adding with the cross-outs and

22    the others.  I don't know what totals --

23    Q.   The amounts in blue either that are not altered or the

24    blue amounts.  10 and 40 would be 50.  Three, four, 61.  Oh,

25    61.  Whoops.

1          Not 228, right, sir?  That's what we got evidence

2  of, 61.  Is that a fair statement?

3  A.   No.

4  Q.   Just went through the math.  That's what you actually

5  seized in this case.

6  A.   You -- you said that's what we have evidence to.  I

7  disagree with your characterization.

8  Q.   That's what we have seizures of?

9  A.   No.  That's not true.  We don't have three kilograms

10 seized from Mr. Echarte.

11 Q.   What was that seized from Mr. Echarte?

12 A.   It wasn't.  I believe you totaled that in with the

13 other number.

14 Q.   Oh, okay.  That should be even less, 58 maybe?

15 A.   Your numbers, not mine.

16 Q.   But if -- you wouldn't disagree with -- even if you

17 don't like the numbers I've created, you're not going to

18 argue with my math, right?

19 A.   That is the number you totaled, yes.  That's correct.

20 Q.   Just so we're clear again, this was less than four

21 kilograms, we agree, right?

22 A.   Your number, yes.

23 Q.   But you helped me with the math, right?

24 A.   That was your number.  Yes.

25          MR. MONTEMARANO:  Thank you, Your Honor.

1          THE COURT:  Mr. Martin?

2          MR. MARTIN:  Thank you.

3                    CROSS-EXAMINATION

4    BY MR. MARTIN:

5    Q.    Corporal Eveler, you are a special agent of the task

6    force, right?

7    A.    I'm a task force officer.

8    Q.    So it wouldn't be inaccurate to refer to you as Agent

9    Evler, would it?

10   A.    I answer to many titles.

11   Q.    Okay.  I'm just trying to --

12   A.    I'm flexible.

13   Q.    I'm just trying to make it easy on everybody else.

14   A.    That's fine.

15   Q.    With respect to Mr. Goodwin in the indictment, I guess

16   it's the fifth superseding indictment, that's the one I've

17   been looking at anyway, on page 65, I believe it's Roman

18   Numeral 6, if you have it in front of you in front of you,

19   there's a number there like $30,951.  Do you see that?

20   A.    Yes.

21   Q.    Now, during the trial you heard testimony that

22   Mr. Goodwin had rental property, right?

23   A.    Correct.

24   Q.    And you also heard testimony that he had an auto

25   dealership called Lobo's?

1   A.   Yes.

2   Q.   Okay.  And you were not involved in the search of

3   Lobo's in the District of Columbia, were you?

4   A.   No, I was not.

5   Q.   And you didn't audit Lobo's books, did you?

6   A.   No.

7   Q.   And you didn't go through the bank records for Lobo's

8   Discount Auto, did you?

9   A.   I did not, no.

10  Q.   And so with respect to the activity statements, you

11  couldn't say where any of the income from Lobo's came from,

12  could you?

13  A.   From Lobo's.

14  Q.   That's right.

15  A.   Are we speaking -- I'm sorry.  I don't understand your

16  question.

17       Are we speaking to this account or --

18  Q.   We're speaking to the account for Lobo's.  Not that

19  account.  We're talking about Lobo's Discount Auto.

20       You did not look at any of the bank activity

21  statements for Lobo's, did you?

22  A.   I did not, no.

23  Q.   All right.  So you couldn't say to His Honor today

24  whether any of the moneys from Lobo's bank accounts was

25  transferred into the account referenced on page 65, Item 6,

1   of the indictment, is that correct?

2   A.   That's correct.

3   Q.   Now let's move to the rental property on Anacostia

4   Road.  With respect to that property, you didn't do an

5   inventory or a search of that apartment, did you?

6   A.   No, that was conducted by the FBI.

7   Q.   Okay.  And at the time that the FBI finished doing

8   their inventory and search, did they give you any papers

9   from Anacostia Road?

10  A.   That was done -- that was a separate investigation that

11  they did.  I received them later, but I was not part of that

12  investigation.

13  Q.   All right.  Well, when you received the papers later,

14  did you go through any of the bank statements that might

15  have been seized from Anacostia Road?

16  A.   I don't recall.

17  Q.   Did you go through any of Mr. Learley Goodwin's bank

18  accounts?  And I'm not talking about bank accounts with

19  Paulette Martin.  Did you go through any of his bank

20  accounts during the course of this investigation?

21  A.   I personally did not.

22  Q.   Okay.  So you can't say to His Honor today whether any

23  moneys that came from Anacostia in the way of rental

24  property was deposited into the account that's listed on

25  page 65, Item 6, of the indictment, can you?

1   A.   I cannot, no.

2             MR. MARTIN:  I have no further questions, Your

3   Honor.  Thank you, sir.

4             MR. MONTEMARANO:  Your Honor, before Mr. Hall

5   begins, I'd move this, if I failed to do it, as a defense

6   exhibit as well with the turquoise amendments.

7             THE COURT:  Hearing no objection, it will be

8   received.

9                         CROSS-EXAMINATION

10  BY MR. HALL:

11  Q.   Detective Eveler, let me ask you a couple questions

12  about the forfeiture.

13            First of all, in reference to the list of accounts

14  that were seized in this case, you went over them earlier

15  with Ms. Johnston, correct?

16  A.   That's correct.

17  Q.   Okay.  And would you agree with me that none of those

18  accounts has the name of Reece Whiting on them?

19  A.   I agree with you.

20  Q.   Okay.  And during the course of your investigation, you

21  didn't seize or find any accounts with the name of Reece

22  Whiting, did you?

23  A.   I did not seize any.

24  Q.   Okay.  Did you find one?

25  A.   I don't recall.

1    Q.    You don't recall.   Okay.

2          And as part of your investigation, you're not

3    aware of any large amounts of real estate or anything that

4    were owned by Mr. Whiting, are you?

5    A.    I'm not aware of any.

6    Q.    Okay.   In fact, do we have the same understanding at

7    the time that Mr. Whiting was arrested, he was renting a

8    room from his ex-wife?   Do you recall that?

9    A.    I don't know what the financial arrangement was, but he

10   was residing with his ex-wife.

11   Q.    Okay.   All right.   You do recall that part of the

12   testimony then, that he was residing with his ex-wife,

13   right?

14   A.    Correct.

15   Q.    Okay.   And did you ever seize the vehicle he was

16   driving at the time, the 1980 something Jaguar?

17   A.    No.

18   Q.    Now, let me ask you a couple questions about the chart.

19   I'm not sure what number the Government marked it as, but

20   the exhibit that's present here in front of the jury.

21          At the top of the list, you have Philpot and 10

22   kilos, referring to cocaine, is that correct?

23   A.    That's correct.

24   Q.    Okay.   And I think Mr. Montemarano asked you, that's in

25   reference to the cocaine that was seized when Mr. Philpot

1    was stopped in Wyoming, is that right?

2    A.   Yes.  Half was seized and half had made it through with

3    the previous driver.

4    Q.   Okay.  So five -- just to be clear, approximately five

5    kilograms was actually seized, is that right?

6    A.   Correct.

7    Q.   And it's your belief that five kilograms had made it

8    through to their destination, is that correct?

9    A.   That's correct.

10   Q.   And in your direct testimony a few minutes ago, you

11   referred to conversations among parties in this case in

12   reference to Mr. Philpot and that seizure, is that correct?

13   A.   Correct.

14   Q.   And I believe the individuals that you said were

15   involved in those conversations was my client, Mr. Whiting,

16   correct?

17   A.   Correct.

18   Q.   Ms. Martin, correct?

19   A.   Correct.

20   Q.   And Mr. Goodwin?

21   A.   Correct.

22   Q.   Okay.  And when you referred to a conversation

23   involving my client, you referred -- can you tell me

24   specifically what conversation you're referring to?

25   A.   I don't recall the call number, but Ms. Martin told

1    Mr. Whiting Philpot is down or Philpot is in, and

2    Mr. Whiting said, oh, no, or oh -- you know, expressed

3    dismay.

4    Q.   Okay.  So it would be fair to say the -- the

5    conversation you're referring to, whatever the date was,

6    whatever the time was, is one that was heard in front of the

7    jury, correct?

8    A.   Yes.

9    Q.   Okay.  And that was a conversation in which Ms. Martin

10   provided information to Mr. Whiting.  In other words,

11   Philpot is down.  I think you can probably agree that that's

12   the quote.

13   A.   Words to that effect.

14   Q.   Words to that effect.  And Mr. Whiting made some kind

15   of exclamation response to it?

16   A.   I believe that's an accurate characterization.

17            MR. HALL:  Okay.  That's all the questions I have.

18                      CROSS-EXAMINATION

19   BY MR. MITCHELL:

20   Q.   I can also call you Sergeant Eveler if you want, if you

21   like that title.

22   A.   Colonel would be fine also.

23   Q.   Corporal, correct?

24   A.   Correct.

25   Q.   On June 1st, 2004, when the search warrant was served

1    on Mr. Bynum at his residence on Ray Road, what was the

2    amount, the quantity of drugs that were found in his

3    apartment?  Do you recall?

4    A.    I believe there was residue on a strainer and possibly

5    on the scale.

6    Q.    And what would be the value of that amount of drugs

7    found on that scale, the residue, street value?

8    A.    Negligible.

9    Q.    Is it of any value really?

10   A.    I'm sure some people would find it of value.

11   Q.    For Mr. Bynum, the total amount of drugs seized from

12   him during the amount of the conspiracy was how much?

13   A.    I can't remember the quantity seized in 1999, but that

14   was within the conspiracy, so that was -- that was ounces of

15   crack.

16   Q.    A couple ounces, correct?

17   A.    I can't remember the exact number.

18   Q.    Would you have any -- could you estimate what the value

19   of that amount was?

20   A.    Not without some specifics.

21   Q.    Okay.  If you could turn to the -- I'm not sure what

22   the chart number is.

23   A.    This one?

24   Q.    Yes.  It's kind of a dual chart, one for heroin, one

25   for Mr. Bynum, and you quantify the amount of money that is

1    attributable to Mr. Bynum as 122,500, correct?

2    A.    That's correct.

3    Q.    If we are to attribute the amount that was actually

4    seized on him, trace, on 6/1/04 and in 1999, two ounces,

5    three ounces, thereabouts?

6    A.    A more substantial quantity, yes.  I don't remember the

7    amount.

8    Q.    And the value, approximately, if it were a couple

9    ounces of crack cocaine?

10   A.    Wholesale or street value?

11   Q.    Well, let's use this value here.

12   A.    If it's two ounces, at the time it could be somewhere

13   around $2500, $2400.

14   Q.    All right.  Use $2500.

15         Would you agree that's the amount attributed to

16   him that was actually seized from him, $2500?

17   A.    Not the street value.  That's how much he would have

18   paid for it at the time.  Give or take.

19   Q.    Now, would you agree or disagree that Mr. Bynum was

20   selling these drugs during the time of this conspiracy?

21   A.    I believe he was selling the drugs during the time of

22   this conspiracy.

23   Q.    Do you know the quantity of drugs that he sold during

24   the time of this conspiracy?

25   A.    It's my belief he sold all the drugs he purchased.

1    Q.    That's not my question, though.  Do you know how

2    many -- in quantity, how much drugs in quantity Mr. Bynum

3    sold during the time of this conspiracy?

4    A.    Several kilos.

5    Q.    And you know that from -- what observations did you

6    make of Mr. Bynum selling any quantities of drugs?

7    A.    That he would purchase the cocaine from Ms. Martin and

8    then resell it.

9    Q.    That's -- my question --

10   A.    That's based on the scale, the strainer and the other

11   evidence.

12   Q.    But I don't think you understand my question.

13           What -- do you have any surveillance of any kind

14   of Mr. Bynum selling drugs to any person, either involved in

15   the conspiracy or otherwise?

16   A.    No.

17   Q.    Any photographs of him selling drugs to anybody?

18   A.    No.

19   Q.    Do you have any electronic means, any electronic

20   surveillance means, indicating that Mr. Bynum was selling

21   drugs to any person, involved in this conspiracy or

22   otherwise?

23   A.    No.

24   Q.    So simply, would you agree with me then you're based

25   on -- you're basing your amount -- you're basing your

1    assumption simply on guesswork?

2    A.    No.  Actually, he did distribute a quantity of drugs we

3    know about when he returned, the substandard cocaine, to

4    Ms. Martin, which she then gave to Claude Arnold for resell.

5    Q.    And he sold -- he sold that money -- he sold those

6    drugs to someone else?

7    A.    No.  It was a distribution.  It wasn't a sale.

8    Q.    But do you know how much money he received or bought

9    these drugs for?

10   A.    That was a return.  He was unhappy with his -- with the

11   product.

12   Q.    Do you know what types of drugs Mr. Bynum was selling

13   to any person, involved in this conspiracy or otherwise?

14   A.    He was involved in the sale of cocaine.

15   Q.    That's not my question.  I'm asking you specifically,

16   not to guess.  I want you to base your answers on specific

17   information that you have in your possession or the

18   Government's possession which would indicate that Mr. Bynum

19   was, in fact, selling drugs to persons involved in this

20   conspiracy or otherwise.

21   A.    It's not a guess.  It is a reasonable inference based

22   on the strainer in the house, the scale and the intercepts

23   that this was distribution.

24         As I testified earlier, no, I did not see him

25   distribute to somebody.  No, I did not take a photograph of

1   him distributing to others.  But that is a reasonable

2   inference based on the evidence seized, both in 1999 and in

3   2004.

4   Q.   Okay.  Fine.  And that's what Judge Titus can draw.

5   I'm asking you what specific evidence do you have, specific,

6   meaning actual concrete evidence, whether it's surveillance,

7   whether it's other cooperators, something that you can

8   direct us to which would indicate that you know Mr. Bynum

9   was, in fact, selling drugs?

10          MS. JOHNSTON:  Objection.  Asked and answered.  He

11  just answered it.

12          THE COURT:  Sustained.

13  Q.   Are you aware of any other means that Mr. Bynum used to

14  get the money seized on June 1st, the $14,500 that was

15  seized from him?

16  A.   Am I aware of any other sources of income?

17  Q.   Correct.

18  A.   I know he was conspiring to engage in insurance fraud,

19  but I don't know if he had received any payment as far as

20  the fraud goes.

21          MR. MITCHELL:  Your Honor, I thought we were not

22  going to be discussing insurance frauds.  I don't think

23  that's part of --

24          THE COURT:  You asked the question.

25  Q.   What means did you use to indicate whether or not he

1    had any other means to obtain this money?

2    A.   The review of evidence from his -- from the search

3    warrant did not reveal any that I'm aware of.

4    Q.   What means did you take upon yourself investigating to

5    determine whether or not Mr. Bynum was receiving income from

6    any other sources?

7    A.   There was many means.  We used interviews of

8    codefendants.  We used review of documents from the search

9    warrants.  We used subpoenas.  We used so many different

10   methods of investigation in this case, I can't go through

11   them all.

12   Q.   Okay.  Great.

13   A.   That's the best I can do.

14   Q.   I'm sure that those are means that you used in the

15   purpose of your investigation, but I'm speaking with regard

16   to specifically Derrek Bynum.  What means did you use

17   specifically for him to determine whether or not there were

18   other means of income that he was receiving which would give

19   him legitimate income?

20   A.   Interviews of codefendants who were familiar with

21   Mr. Bynum, searches, the search of his residence and a

22   review of the documentary evidence seized from his property.

23   Those are two that I know of specifically.

24   Q.   And what specific witnesses or cooperators did you

25   interview to determine whether or not Mr. Bynum was

1   receiving legitimate income?

2   A.   Do you want me to name every person I interviewed in

3   this case?

4   Q.   No.  Every person you interviewed and you asked them

5   about Mr. Bynum.

6   A.   Every person I interviewed, I asked about Mr. Bynum.

7   Every person in this case that was interviewed was asked

8   about every codefendant in the case.

9   Q.   Did you do any search of the social security records of

10  the United States Government?

11  A.   I cannot recall.

12  Q.   Did you do any credit checks to determine whether or

13  not he had employment or had employment at or before the

14  time of this conspiracy?

15  A.   I believe we did a wage and record check.  I cannot

16  recall the results of the wage and record check.

17  Q.   Do you have it with you today?

18  A.   Not in front of me, no.

19  Q.   Certainly if it were helpful, that evidence was helpful

20  to Government, you would have brought that here to make sure

21  that Judge Titus was aware that he had no other legitimate

22  source of income, wouldn't you?

23  A.   It probably is helpful to the Government, and I

24  probably overlooked it.

25  Q.   If you could turn the chart back, the first -- turn the

1    page back to the first chart, if you could.

2            Just looking at that list, would you agree that

3    Mr. Bynum had no direct participation with any of these

4    transfers of those drugs listed on that chart?

5    A.   Between whom?

6    Q.   He had no direct participation in any of transfers of

7    any of those drugs listed on that chart?

8    A.   Between whom?

9    Q.   Transfers between anybody.  Did Mr. Bynum have any

10   direct participation -- I'll go through it -- Mr. Philpot,

11   did he have any direct participation in Mr. Philpot's

12   transfer of 10 kilos of cocaine to whomever?

13   A.   No.  Not that I'm aware of.

14   Q.   What about Mr. Martin and 25 kilos?

15   A.   I don't know.

16   Q.   Okay.  Now that you understand my question, going down

17   the list, was there anyone on that list where he had any

18   direct participation in any transfer of any kilograms of

19   cocaine to any other person?

20   A.   Yes.

21   Q.   Who?

22   A.   Mr. Mangual.

23   Q.   He directly dealt with Mr. Mangual?

24   A.   No, he directly dealt with Ms. Martin immediately after

25   she dealt with Mr. Mangual.

1    Q.    That's not my question.

2           MS. JOHNSTON:  Objection to counsel arguing with

3    the witness over whether it's the question or not.

4           THE COURT:  Overruled.

5           MR. MITCHELL:  I'm not arguing with anyone.  I

6    just wanted to clarify.

7    Q.    Did Mr. Bynum deal with Mr. Mangual directly?

8    A.    No.  He went through Ms. Martin.

9    Q.    Okay.  So again I'll ask the question.  Did he have any

10   direct participation in Mr. Mangual's transfer of 7 or

11   21 kilograms, depending on which side you believe?  Did he

12   have any direct participation in the transfer of those

13   kilograms to any other person?

14   A.    He contacted Ms. Martin and ordered the drugs, and then

15   she would call Mr. Mangual and order more, so I consider

16   that direct participation.  If she is -- he is causing her

17   to take an action to transfer cocaine, that is direct

18   participation.

19   Q.    All right.  So if I take this water right here and I

20   give it to lead counsel here, did anyone else here have any

21   direct participation in what I just did?

22   A.    If Mr. Montemarano asked Mr. Martin for some water and

23   then he asked you to get some water, I'd consider that

24   direct participation.  He's causing someone else to take an

25   action based on his request.

1   Q.   Direct -- if that's direct participation, what --

2   A.   It may not be a very good analogy.

3   Q.   I haven't finished my question.  What communication did

4   I give to Mr. Martin?

5   A.   I probably used a poor analogy, but that was the best I

6   could come up with at a moment's notice.  You handing the

7   water to Mr. Martin, there was no direct participation by

8   anyone else at the table when you handed him that water.

9   Q.   Okay.  Now, using that same analogy, did Mr. Bynum have

10  any -- Mr. Bynum, standing here --

11          MS. JOHNSTON:  Your Honor, we'll stipulate that

12  Mr. Bynum didn't deal directly with Mr. Mangual, that he

13  acted through Ms. Martin.  I think that's been crystal clear

14  throughout the trial.

15          THE COURT:  Right.

16          MR. MONTEMARANO:  I thought it was, too, but for

17  some reason, Corporal Eveler is not.

18          THE COURT:  All right.  Move on to the next

19  subject.

20  Q.   Similarly, on the next chart, if you could turn that

21  over, please.  Looking at the top part of that, in the

22  amount of heroin, what direct participation did Mr. Bynum

23  have in the purchase or sale of heroin from Ms. Levi?

24  A.   He had no participation that I know of.

25  Q.   Now, you used the amount -- as you stated in your

1   earlier testimony, you used the amount of five kilograms to

2   come up with an amount attributable to Mr. Bynum for

3   forfeiture.  Why did you use the amount of kilograms that

4   the jury found?

5   A.   That's what we chose based -- that's what I chose based

6   on -- I based it on what the jury found rather than

7   extrapolating back a number of years and including a much

8   higher number.  This was a conservative estimate, to use

9   what the jury found.

10   Q.   Is that because it was just simpler to do?

11   A.   No.  It's more conservative, and I stuck with what the

12   jury found rather than -- the number would have been much

13   higher had I used the cocaine that he actually received.

14   Q.   So do you consider that five kilograms an inaccurate

15   amount?

16   A.   No.  I consider it a low-ball estimate.

17   Q.   Is it an accurate or is it an inaccurate amount?

18           MS. JOHNSTON:  Objection.  He just asked that

19   question.  He said he considered it a low-ball number.

20           THE COURT:  Sustained.

21           MR. MITCHELL:  Your Honor, I simply want to -- he

22   hasn't answered the question.

23           THE COURT:  He answered you that it was a low-ball

24   estimate.

25   Q.   Do you have any specific instances when these

1    five kilograms, the five kilograms that you're referring to

2    in this chart, were actually transferred or purchased from

3    Ms. Martin to Mr. Bynum?

4    A.   Yes.  A number of them were transferred between March

5    and June of 2004.  I can give you specific dates and times

6    if I could refer to the transcript book or our surveillance

7    notes, which we had surveillance of him going to

8    Ms. Martin's to receive cocaine.

9    Q.   And you could go back in your notes and find an exact

10   amount of five kilograms that were transferred?

11   A.   Not at one -- it wasn't transferred at one time.  It

12   was transferred over a period.

13   Q.   And you could --

14   A.   It was either 62s or kilogram quantities he received

15   the cocaine.

16   Q.   And you could go back and find an exact quantity of

17   five kilograms?

18          MS. JOHNSTON:  Objection.  Asked and answered.

19   It's the same question again.

20          THE COURT:  Sustained.

21   Q.   Do you have any -- the $14,500, do you have any idea

22   where Mr. Bynum received that money from?

23   A.   Sales of narcotics.

24   Q.   Do you know that?

25   A.   Allegedly Mr. Bynum was involved in photography.  There

1    were no cameras or any photography equipment located at the

2    residence.  That was what he was purported to be involved in

3    as his legitimate income.

4            Based on that and other evidence recovered from

5    the house, we had no evidence of legitimate income for

6    Mr. Bynum.

7    Q.   And did you look at any evidence in his apartment to

8    indicate that he had in his apartment at any one time

9    five kilograms of cocaine?

10    A.   Yes.  The scale and the strainer.

11    Q.   And there was something you could extrapolate from a

12    strainer and a scale to indicate that he had at one point

13    five kilograms of cocaine in his apartment?

14    A.   That was based on the totality of the evidence we

15    received that we came up with this number.

16    Q.   And would that be -- would it be safe to say that's

17    simply a guess of yours?

18    A.   No.  I don't believe that's accurate.  The word guess,

19    I believe, would be inaccurate.

20    Q.   All right.  Well, let me ask you this question.  Here,

21    stand here.

22            Can you tell me how much I weigh?

23            MS. JOHNSTON:  Objection, Your Honor.  Relevance.

24            THE COURT:  Where are we going with this?

25            I mean that's always a dangerous question to ask

1    somebody how much do I weigh.  He may be sorry about the

2    answer.

3            MR. MONTEMARANO:  Your Honor, the dangerous

4    question is does it make you look fat.

5            MS. JOHNSTON:  Your Honor, can we move on here?

6            MR. MITCHELL:  I will as soon as he answers the

7    question.

8    A.    Would I estimate it?

9    Q.    Yeah.  The question is do you have any idea how much I

10   weigh?

11           MS. JOHNSTON:  And I'm objecting.  It's not

12   relevant.  What, is counsel going to take the stand and

13   testify?

14           THE COURT:  Sustained.  Sustained.

15   Q.    Would you be afraid to guess how much I weigh?

16           MS. JOHNSTON:  Objection.

17           THE COURT:  Sustained.

18           MR. MITCHELL:  There's a reason why I'm asking

19   these questions, Your Honor, and the reason is --

20           MS. JOHNSTON:  Objection.

21           THE COURT:  I understand the reasons, and I

22   sustain the objection.

23   Q.    For the same reason that you would hesitate guessing

24   how much I weigh, isn't it -- isn't it possible --

25           THE COURT:  He didn't say he would hesitate to

1  guess how much you weigh.  I sustained an objection.  He's

2  never said whether he could estimate how much you weigh.

3         MR. MITCHELL:  Well, he didn't answer my question

4  initially, and then eventually there was a . . .

5  Q.  It's fair to say that you're simply guessing about all

6  the amounts that are attributable to Mr. Bynum and nothing

7  more?

8  A.  The jury has -- the jury made a determination.  I'm

9  following that determination.  If the jury had made a

10 determination as to your weight, I'd probably just go with

11 their determination as to your weight.

12 Q.  And if they were wrong?

13 A.  I believe they're presented certain facts that would

14 support an estimate of your weight and they reached that

15 conclusion based on those facts and that evidence that I --

16 I believe that would be a fair determination.

17        MR. MITCHELL:  Now may I ask him questions about

18 my weight, Your Honor, now that he --

19        THE COURT:  No, you may not.

20        MR. MITCHELL:  No further questions.

21        MR. WARD:  I don't have any questions, Your Honor.

22 Thank you.

23        THE COURT:  Mr. McKnett?

24        MR. McKNETT:  I have no questions.

25        THE COURT:  All right.  Before we do redirect, I

1    will do a five-minute recess, count them, five, because I

2    want to see if I can keep close to that.

3              (Recess.)

4              THE COURT:  All right, counsel, ready to proceed?

5              MS. JOHNSTON:  Well, I'm in a -- I'm waiting for a

6    document to come in.

7              THE COURT:  Okay.

8              MS. JOHNSTON:  Well, I can do some questions, Your

9    Honor.  It must might get --

10             THE COURT:  Well, if you're waiting for a

11   document, let me just ask counsel, if we're not able to get

12   this finished by 5 minutes of 3, I am going to break at 5

13   minutes of 3.  I don't know how long the meeting I'm going

14   to go to is, perhaps an hour, and then I have to be out of

15   here by 4:30.

16             If we don't finish today, can we carry over to

17   tomorrow morning?  Do you have any problem with that?

18             MR. HALL:  I have another court commitment

19   tomorrow morning.

20             THE COURT:  Well, the other option, knowing that I

21   own December 19th on your calendars, is to finish this up,

22   if I don't finish it up earlier in the morning, on

23   December 19th, which I may have to do.

24             MR. MONTEMARANO:  Fine.

25             THE COURT:  At least we'll be able to wrap up all

1   the testimony today, it seems to me, unless we really get

2   stuck with endless cross-examination.

3            Are you ready with the exhibit now, Ms. Johnston?

4            MS. JOHNSTON:  I think I am, Your Honor.

5            THE COURT:  Okay.

6            MS. JOHNSTON:  If I could have the Court's

7   indulgence for a moment.

8            THE COURT:  You may.

9                    REDIRECT EXAMINATION

10  BY MS. JOHNSTON:

11  Q.   Detective Eveler, in regards to Mr. Goodwin, was there

12  evidence that Lobo's was used to distribute drugs?

13  A.   Yes, ma'am.

14  Q.   And was that introduced in this trial before this jury?

15  A.   Yes, it was.

16  Q.   And in addition to that, was Ms. Martin ever a business

17  partner in the Lobo's automobile rehab garage, whatever it

18  was at Lobo's that was arguably legitimate business?

19  A.   No.

20  Q.   And the account that's listed in our asset forfeiture

21  allegations, was that an account in both Mr. Goodwin and

22  Ms. Martin's name?

23  A.   Yes.

24  Q.   Now, in regards to Mr. Bynum, who -- what was the

25  information that you had had that Mr. Bynum was allegedly a

1    photographer?

2    A.   I believe there was a business card that I saw

3    somewhere, or I believe even a witness who was interviewed

4    said that Mr. Bynum said he was a photographer.

5    Q.   Now, when the search warrant was executed, was any

6    evidence -- the search warrant on June 1st, 2004, was there

7    any evidence of a photography business recovered from his

8    residence?

9    A.   No.

10   Q.   And similarly, back in -- when Takoma Park executed

11   their search warrants, was there any evidence recovered then

12   of Mr. Bynum being involved in the photography business?

13   A.   No.

14   Q.   Now, counsel also asked you about -- Mr. Bynum's

15   counsel -- about the amount of cocaine, crack cocaine that

16   was recovered by the Takoma Park police officers during the

17   course of this conspiracy, specifically November 12th of

18   1999.

19        Reviewing these lab reports, does that refresh

20   your recollection concerning the actual amount of crack

21   cocaine that was seized from his house and from his vehicle?

22   A.   Yes.

23   Q.   And what was the total amount of crack cocaine that was

24   seized from his residence?

25   A.   Approximately -- I'm sorry.  From his residence,

1    147.12 grams.

2    Q.   And from the vehicle?

3    A.   57.88 grams.

4    Q.   So the total was approximately?

5    A.   204 and change.

6    Q.   Now, Mr. Montemarano asked you -- and he got down to --

7    is it 61 kilograms?  And then you corrected and said it was

8    actually 62 of them, and his should be in this aquamarine --

9              MR. MONTEMARANO:  It's 58.

10   A.   58.

11   Q.   58.  Okay.  58 --

12             MR. MONTEMARANO:  If you'd like --

13             MS. JOHNSTON:  No.  No.  That's all right.

14   Q.   Fifty-eight times the 20,000, which was your low-ball

15   price that she was paying for a kilogram comes out to what?

16             MR. MONTEMARANO:  It's stipulated 1.16 million.

17   A.   Correct.

18   Q.   1.16 million?

19   A.   Yes.

20   Q.   Okay.  Now, I want you -- was there evidence at the

21   trial that she was selling that cocaine as eightballs?

22   A.   Yes.

23   Q.   Okay.  And what was the price she was charging for an

24   eightball?

25   A.   Somewhere between 125 and $135.

1    Q.    Using that 120 -- how many eightballs in a kilogram?

2    A.    Over 285.  285.7 plus.

3    Q.    Well, take that 285 eightballs per kilogram, multiply

4    258 by 285, and tell us how many eightballs were in his

5    50 -- in Ms. Martin's 58 kilograms that counsel concedes she

6    was involved with.

7    A.    16,530.

8    Q.    And what -- using the low-ball price of 125, how much

9    money would be the proceeds of those 58 kilograms, selling

10   it as eightballs?

11   A.    The gross would be 2,066,250.

12   Q.    And that would be without cutting the cocaine once she

13   purchased it?

14   A.    That's correct.

15          MS. JOHNSTON:  And could you write that figure up

16   there for us.  And why don't you write it in.  Just write it

17   in black.  That's fine.

18          And that's all I have -- the questions I have of

19   this witness, Your Honor.

20          THE COURT:  All right.  After he writes the number

21   down, he may step down.

22          All right.  Next witness?

23          MS. JOHNSTON:  Our next witness would be IRS

24   Special Agent Ken Oland.

25          (The oath was administered.)

1          THE CLERK:  Please be seated.

2          State your name for the record.

3          THE WITNESS:  Kenneth W. Oland, Jr.  Last name is

4    spelled O-L-A-N-D.

5          THE COURT:  I couldn't hear you, sir.  Say that

6    again.

7          THE WITNESS:  My last name is spelled O-L-A-N-D.

8          THE COURT:  All right.  Thank you.

9                     DIRECT EXAMINATION

10   BY MS. JOHNSTON:

11   Q.   Where are you employed?

12   A.   Internal Revenue Service.

13   Q.   And what do you do there?

14   A.   I'm a special agent with the Criminal Investigation

15   Division.

16   Q.   And how long have you been employed with the Internal

17   Revenue Service?

18   A.   Since January of 1995.

19   Q.   Could you describe for the Court the various duties

20   that you've had there?

21   A.   I was a revenue officer for a short time, which is

22   basically the person that goes into the field and does

23   collection work.  I was a revenue agent for a few years,

24   which does examinations.  And then I was a special agent,

25   which is the position that I currently hold.

1    Q.    And could you describe your educational background?

2    A.    I attended Salisbury State University and received a

3    bachelor of science in accounting.

4    Q.    Do you use your accounting experience in your -- did

5    you in your various positions at the IRS?

6    A.    Yes, I did.  I'm also a CPA.

7    Q.    And calling your attention to this investigation, were

8    you asked to assist the Immigrations and Customs Enforcement

9    Agency with analyzing Ms. Martin's bank records?

10   A.    Yes, I was.

11   Q.    Did you prepare a summary chart of her bank accounts?

12   A.    Yes, I did.

13   Q.    I'm going to show you what's been marked as Forfeiture

14   1 and Forfeiture 2.  Do you recognize those charts?

15   A.    Yes, I do.

16   Q.    What are those charts?

17   A.    Those are an extract of the cash deposits to the

18   miscellaneous accounts belonging to Paulette Martin or her

19   businesses.

20   Q.    And there are two, one is Forfeiture 1 and Forfeiture

21   2.  Do they contain the same data?

22   A.    They contain the same data.  It's just in the way that

23   they are organized that change.

24   Q.    Do they accurately summarize the information that you

25   reviewed in her bank account records?

1    A.    Yes, they do.

2          MR. MONTEMARANO:  Subject to cross, Your Honor.

3    Q.    If we could begin with --

4          THE COURT:  They'll be received subject to cross.

5    Q.    If we could begin with Forfeiture 1, and if you could

6    explain to the Court what's on the very first page of

7    Forfeiture 1.

8    A.    That is essentially the nine bank accounts that I

9    analyzed associated with Paulette Martin and a summary of

10   the cash deposits that were made to those accounts.

11   Q.    Okay.  Did you include in these exhibits, Forfeiture 1

12   and Forfeiture 2, any of the checks or wire transfers that

13   were deposited in these accounts?

14   A.    No.  These reference cash deposits only.

15   Q.    And if you could, what time period is covered by these

16   records?

17   A.    From January of 1999 to May of 2004.

18   Q.    And when you look at these, does page one accurately

19   reflect the bank name, the account number and the account

20   holder?

21   A.    Yes, it does.

22   Q.    And the amount at the end, is that the total amount of

23   cash in each account during the time period January '99 to

24   May of 2004?

25   A.    That's correct.

1    Q.    What was the total amount of cash only deposited in

2    these accounts of Paulette Martin?

3    A.    $1,122,319.50.

4    Q.    And, again, there was some testimony at trial

5    concerning Ms. Martin inheriting some money from an estate.

6    Are you familiar with those estate checks?

7    A.    Yes.

8    Q.    Were those included in any way in this $1.1 million?

9    A.    No.   This is cash only.

10   Q.    Now, the pages behind the summary sheet, if you could

11   tell the Court how they're organized.

12   A.    They are organized by account and then by date.

13   Q.    And were all of these amounts kept under $10,000?

14   A.    I believe so.

15   Q.    And what is the significance of that?

16   A.    If a deposit was made over 10,000, a currency

17   transaction report would be filed.

18   Q.    And now as we -- when we go through these pages, for

19   example, on page 4 of 24, have you broken down and given the

20   dates of each deposit for each account and then totaled up

21   the individual accounts on the pages as you've gone through

22   the deposits?

23   A.    That's correct, and that's the total you will see

24   carried forward to the first page.

25   Q.    Now, looking at Government's Exhibit Forfeiture 2, if

1    you could tell the Court again, is this the same data that's

2    contained in Forfeiture 1?

3    A.    This is the same data.  It's just organized by the year

4    of deposit with no differentiation depending on the account.

5    Q.    So if we were to look at January of 2002 to December of

6    2002, the amount, 524,593.04 would be the total cash only

7    deposited in her accounts during that year, is that correct?

8    A.    That's correct.

9    Q.    Now, in terms of reviewing Ms. Martin's bank account

10   records, did you find any source of legitimate income with

11   the exception of the checks from the estate?

12              MR. MONTEMARANO:  Objection.

13              THE COURT:  Overruled.

14   A.    No, I did not.

15              MR. MONTEMARANO:  Objection, Your Honor.  Basis

16   for knowledge.  How can he possibly know where this cash

17   came from?  The question posed by Government counsel was

18   with regard to legitimate sources of income.

19              THE COURT:  You may inquire on cross-examination.

20   Q.    Putting this aside, the cash, did you find any evidence

21   that Ms. Martin was engaged in any legitimate business?

22   A.    No.

23   Q.    In regards to the cash, did you find any evidence in

24   reviewing those documents to indicate that she was involved

25   in a business that would have generated this kind of cash

1    deposit, a legitimate business?

2    A.    No.

3         MS. JOHNSTON:  Government's going to move

4    Government Forfeiture 1 and 2 into evidence.

5         THE COURT:  All right.  They'll be received.

6         MS. JOHNSTON:  I have no other questions of this

7    witness.

8         THE COURT:  Cross?

9                      CROSS-EXAMINATION

10   BY MR. MONTEMARANO:

11   Q.    Special Agent Oland, good afternoon.  How are you?

12   A.    I'm fine.  Thank you.

13   Q.    Ms. Johnston was just asking you about legitimate

14   business, correct?

15   A.    Correct.

16   Q.    Would I be correct in understanding your testimony that

17   you would believe a business involving legal merchandise

18   that was not recording its income and paying taxes to the

19   IRS to be illegitimate, in your view?

20   A.    The business itself would not be illegitimate, but

21   certainly a crime would be committed if that was the

22   purpose.

23   Q.    Okay.  So Ms. Johnston asked you if you had managed to

24   locate any evidence concerning legitimate business, correct?

25   A.    That's correct.

1    Q.    And if I understand your testimony correctly, if

2    Ms. Martin were involved in selling cantaloupes, correct?

3    Cantaloupes are legal as far as you understand, correct,

4    sir?

5    A.    As far as I know, yes.

6    Q.    And if she is not reporting her income to the IRS, she

7    is not keeping any records, she's paying for her cantaloupes

8    with cash and she's putting the money from the cantaloupe

9    sales into her bank account, your testimony would be the

10   very same, would it not, sir?  You have no evidence of her

11   being involved in a legitimate business.  Is that a fair

12   statement?

13   A.    I'm assuming that there would be a line of people for

14   cantaloupes if she's selling $1.1 million worth.

15   Q.    But you would have no evidence of her being involved in

16   a legitimate business, correct?

17   A.    It would be apparent if someone who was conducting a

18   business of $1.1 million in gross receipts that a business

19   was being conducted.

20   Q.    Let me ask the question now again for the third time.

21   Your testimony would not be any different than it was just

22   in response to counsel -- the question posed by Government

23   counsel.  You located no evidence of Ms. Martin being

24   involved in a legitimate business.  Your answer to that

25   question was no, you didn't.

1  A.    No, I did not.  That's correct.

2  Q.    But if she had been involved in what you agree is a

3  legitimate business, selling cantaloupes, and had not been

4  making any records or paying taxes or anything else, you

5  still would have located no evidence of her being involved

6  in a legitimate business.  Correct, sir?

7  A.    No.  I think I would see a lot of purchases of

8  cantaloupes, for one.  You would see a line outside of the

9  door selling cantaloupes.

10  Q.    Were you involved in this investigation?  Were you

11  involved in a surveillance role?

12  A.    No, I was not.

13  Q.    So you'd have no knowledge if she was selling

14  cantaloupes out of her house, right?

15  A.    There is no checks to anyone indicating the purchase of

16  cantaloupes.  Those things would be apparent from the bank

17  records that I looked at.

18  Q.    Except that I posed the question to you earlier if she

19  was paying cash for the cantaloupes, there would be no

20  record, would there?  Pure cash business, not reported to

21  the IRS involving and quantity would be a legitimate

22  business involved in tax fraud, correct?

23  A.    That's correct.

24  Q.    But that would not make the business itself

25  illegitimate or illegal, correct?

1    A.    No.   Assuming that she paid every expense of the

2    business in cash and received all of her items in cash,

3    there would not be a record on the bank records.

4    Q.    And if, for the sake of discussion, the items she's

5    selling she inherited as opposed to having to buy from her

6    cantaloupe supplier, likewise there would be no record of

7    her having paid for those items, correct, sir?  And when she

8    sold them for cash, there would be no record of them.

9    Correct, sir?

10   A.    There would be record of an inheritance of this size,

11   yes.

12   Q.    Where would that record be?

13   A.    It would be an estate filing.  There would be a trustee

14   that would be paying out money.

15   Q.    As a part of --

16   A.    There would be records associated with a $1 million

17   estate.

18   Q.    As part of your investigation, did you interview or

19   have contact with an attorney in Washington, D.C. by the

20   name of Matthew Shannon?

21   A.    No, I did not.  I did see the checks from him.

22   Q.    So you're aware of his existence but you didn't talk to

23   him?

24   A.    I did not talk to him.

25   Q.    So you wouldn't know anything about dozens and dozens

1   of furs and other items inherited by Ms. Martin from her

2   godmother, Mary Alice Payne, about which Mr. Shannon

3   testified at this trial.  Right, sir?

4   A.   No, I do not.

5   Q.   And that wasn't shared with you by Government counsel,

6   was it?

7   A.   No, I did not know about furs being donated, or

8   inherited.

9           MR. MONTEMARANO:  Thank you very much, Special

10  Agent Oland.  Appreciate your job.

11                  CROSS-EXAMINATION

12  BY MR. MARTIN:

13  Q.   Special Agent Oland, good afternoon.  My name is

14  Anthony Martin.  I represent Mr. Goodwin.

15          Let me ask you a few questions about your role as

16  an accountant.  You do audits, right?

17  A.   No, I do not.  I did when I was a revenue agent.  That

18  is their role.

19  Q.   But you're familiar with the auditing process, right?

20  A.   Yes, I am.

21  Q.   And I guess one of your jobs with the FBI is to look at

22  businesses and determine whether or not the proceeds are

23  from legitimate sources, is that correct?

24  A.   I'm with the Internal Revenue Service, but yes, that

25  would be part of my job if I was working a tax case or,

1  depending on the type of case, whether or not a judge had

2  issued an order allowing me to look at those tax records.

3  Q.   And then the question is have you actually done that

4  before?

5  A.   Yes, I have.

6  Q.   Okay.  And when you're doing that, would it be fair to

7  say that what you do is you look at bank activity

8  statements?

9  A.   Yes.

10 Q.   And you would also look at checks that correspond with

11 that bank activity statement?

12 A.   During the course of the investigation, yes.  Um hum.

13 Q.   And you do that to determine whether or not the money

14 is coming from legitimate as opposed to illegitimate

15 sources, right?

16 A.   That's one of the ways, yes.

17 Q.   And you were not asked to do that with respect to

18 Mr. Learley Reed Goodwin, were you?

19 A.   No, I did not look at records of Mr. Goodwin.

20 Q.   So you're not familiar with a business known as Lobo's

21 Auto Discount, are you?

22 A.   No.

23 Q.   And you're not familiar with any rental properties with

24 addresses on Anacostia Road in southeast Washington, D.C.,

25 are you?

1    A.    No, I'm not.

2    Q.    But in order to determine whether or not -- well,

3    strike that.

4           MR. MARTIN:  Court's indulgence.

5    Q.    Sir, without those records, if someone were to ask you

6    to give an opinion as to whether or not -- now, remember,

7    you don't have the bank records, you don't have any checks,

8    and they ask you to give an opinion as to whether or not the

9    funds were legitimate that were coming from either rental

10   property or a discount store, you wouldn't be able to tell

11   them, would you?

12   A.    No.

13          MR. MARTIN:  Nothing further.

14          MR. HALL:  No questions, Your Honor.

15          MR. MITCHELL:  Just a couple, Your Honor.

16                      CROSS-EXAMINATION

17   BY MR. MITCHELL:

18   Q.    Looking at Exhibit Forfeiture 1 and Forfeiture 2, these

19   are a number of cash deposits, and also -- you understand

20   there's also a listing of -- these are all cash deposits,

21   correct?

22   A.    That's correct.

23   Q.    Do you have any idea if any of these cash deposits came

24   from any one of the people sitting behind me?

25   A.    No, I don't.

1   Q.   According to these two charts?

2   A.   I don't know that, no.

3              MR. MITCHELL:  No further questions.

4              THE COURT:  Mr. Ward.

5              MR. WARD:  I have no questions, Your Honor.  Thank

6   you.

7              THE COURT:  Mr. McKnett.

8              MR. McKNETT:  No questions, Your Honor.

9              THE COURT:  Redirect?

10             MS. JOHNSTON:  No, sir.

11             THE COURT:  All right.  You may step down.  Thank

12   you.

13             MS. JOHNSTON:  Your Honor, that's the Government's

14   evidence as it applies to forfeiture.

15             THE COURT:  All right.  I'll be glad to hear

16   argument.

17             MS. JOHNSTON:  Your Honor, as we indicated, as

18   we've alleged in the asset forfeiture allegations in the

19   indictment, we are requesting the Court to -- I don't know

20   what the problem is with the . . .

21             The Government is asking the Court to order assets

22   forfeited in the amount of currency as to the cocaine

23   conspiracy in the amount of $4,550,000 in terms of the

24   foreseeable amount of money expanded for and, therefore,

25   also constituting proceeds of drug trafficking activities,

1    and we're asking the Court to award that amount of money as

2    to Mr. Goodwin and Ms. Martin because they -- two

3    individuals, as was evident throughout the trial, were

4    partners in this drug conspiracy, that they were partners in

5    investing their drug proceeds, they were partners in sharing

6    sources for cocaine, they discussed multiple sources amongst

7    each other.

8            Mr. Thurman testified as to how Ms. Martin got

9    drugs from the shipments he was bringing back for

10   Mr. Goodwin.  Mr. Echarte testified as to the fact that

11   Mr. Goodwin was getting portions of the drugs that

12   Ms. Martin received, including the huge quantity of drugs

13   that came from Mr. Brim and Mr. King.

14           So for that reason, we ask the Court to assess the

15   amount of $4,550,000.  I believe that that's been

16   established from the evidence at trial as presented here in

17   this court by a preponderance of the evidence, which is the

18   standard that the Court applies at this juncture.

19           In regards to the heroin amount, we are asking the

20   Court to hold Ms. Martin accountable for $3.6 million based

21   on her relationship with Ms. Levi.  We certainly do not

22   alleged that she received 60 kilograms, which is what that

23   is based upon, but, rather, that that is reasonably

24   foreseeable to her and within the scope of the agreement,

25   given her various roles with Ms. Levi, in that she not only

1    took drugs from Ms. Levi and distributed them to people such

2    as Mr. Nun and, I believe, Ms. Martin -- Mr. John Martin,

3    she also took her large amounts of small denomination bills,

4    converted them to larger amounts, making it easier for

5    Ms. Levi to handle the money and transport some, such as the

6    $250,000 she took up to New York when she was stopped with

7    those 2.3 kilograms on her return trip.  But also

8    Ms. Martin's involvement in the laundering of Ms. Levi's

9    proceeds in assisting her with transferring money to her

10   sister and brother-in-law in Massachusetts or Connecticut to

11   purchase property on her behalf.

12           So for that reason, we'd ask the Court to assess

13   that amount of money against Ms. Levi for her involvement --

14   Ms. Martin for her involvement in the heroin conspiracy.

15           As to -- and I'm just going to go down the row

16   here.  As to Mr. Goodwin, we would ask the Court -- and the

17   jury found that that he was involved in more than

18   10 kilograms of -- five or more kilograms of cocaine, and we

19   would ask the Court to attribute to him the 10 kilograms

20   involving Mr. Philpot.  He discussed Mr. Philpot with

21   Ms. Martin, showing that his, Mr. Philpot's, involvement was

22   foreseeable and within the scope of Mr. Whiting's agreement,

23   as well as the three kilograms from Mr. Echarte.

24           There was specific testimony from Mr. Echarte that

25   Mr. Whiting helped him transport cocaine and heroin from his

1    courier in Virginia back to Maryland on several occasions,

2    so the three kilograms is actually a small quantity or an

3    underestimate there.  And take that 13 kilograms and

4    multiply it by, again, that low figure of $20,000, to give

5    the Court the amount of proceeds and money used to purchase

6    cocaine that could be reasonably foreseeable and

7    attributable to Mr. Whiting.

8            And I apologize.  I didn't do the calculations.

9    But 13 kilos times 20,000 is what we're asking.

10           We're also asking the Court to --

11           THE COURT:  You're going a little fast.  It's

12   22,000 times the 13 is what you're asking?

13           MS. JOHNSTON:  20,000, Your Honor, was the figure

14   that Agent Eveler used in terms of all these --

15           THE COURT:  20,000 times 13.

16           MS. JOHNSTON:  Times 13 kilograms in terms of

17   Mr. Whiting.  And, again --

18           THE COURT:  That would be $260,000.

19           MS. JOHNSTON:  That would be it, Your Honor.

20           THE COURT:  And that's what you're seeking as to

21   Mr. Whiting?

22           MS. JOHNSTON:  Right.

23           And as to the heroin, Your Honor, I believe

24   Mr. Whiting was found guilty of -- the jury found beyond a

25   reasonable doubt that he was involved in -- and let me check

1    to make sure what that finding was.  Court's indulgence.  I

2    don't want to misspeak.

3         Found him involved -- found beyond a reasonable

4    doubt that one kilogram or more was reasonably foreseeable

5    and within the scope of Mr. Whiting's participation in the

6    heroin aspect of the conspiracy.

7         So the Government is asking the Court to order the

8    forfeiture in the amount of one kilogram times $60 a gram,

9    which is $60,000, Your Honor.

10        THE COURT:  As to Mr. --

11        MS. JOHNSTON:  That's as to Mr. Whiting, in

12   addition to the cocaine.

13        Now, as to Derrek Bynum, Your Honor, the jury

14   found both cocaine and cocaine base, and the jury found five

15   kilograms or more of cocaine and 50 grams or more of cocaine

16   base, and they made those findings beyond a reasonable

17   doubt.  And the Government could, indeed, argue and could

18   present evidence to establish more than five kilograms, but

19   rather than do that, we're asking the Court, again, to use

20   only the jury's findings for purposes of asset forfeiture

21   and order that proceeds and currency in the amount of

22   $122,500 be forfeited by Mr. Bynum and in particular that

23   the proceeds recovered in his residence, which are

24   identified in the indictment as Roman Numeral 17, 14,905, be

25   ordered forfeited as proceeds of drug trafficking or, in the

1   alternative, as substitute assets for a portion of that

2   $122,500 that we're asking the Court to order forfeited by

3   Mr. Bynum.

4           THE COURT:  Okay.

5           MS. JOHNSTON:  Your Honor, in terms of Ms. Dobie,

6   we have not requested any specific amount of assets be

7   forfeited as to her, and, quite frankly, we have not located

8   any assets that can be forfeited, so I think to request a

9   judgment at this time would be, in essence, nothing that

10  would be enforceable, so we're not asking the Court to make

11  a specific finding as to Ms. Dobie.

12          As to Ms. Ali, the Government is seeking the

13  forfeiture, as set forth in Roman Numeral 16, of $129,700

14  based upon the evidence in court and, in particular,

15  Ms. Ali's testimony that she did not own that money, that it

16  was Ms. Martin's money, that the Court forfeit that money as

17  drug proceeds of Ms. Martin or, in the alternative, as a

18  substitute asset for that larger --

19          THE COURT:  You said 129,500 and the indictment

20  says --

21          MS. JOHNSTON:  700, Your Honor.

22          THE COURT:  -- 129,7.

23          MS. JOHNSTON:  I misspoke.  129,700.

24          THE COURT:  All right.

25          MS. JOHNSTON:  So we're not asking for an

1    additional amount in terms of Ms. Ali, only that specific

2    fund that was recovered from her residence.

3         I think that clarifies what the Government's

4    requesting in this case.

5         In terms of the specific assets that are listed

6    here, as Agent Eveler testified, with regards to Roman

7    Numeral 3 and Roman Numeral 5 and Roman Numeral 7, 8, 9, 10

8    and 11, all of those accounts, moneys were either deposited

9    from -- received from Ms. Ali or Ms. Harden or Mr. Harris,

10   or checks were drawn out from Ms. Levi's property, so we

11   believe that all those accounts were utilized to further the

12   drug conspiracy and to process direct drug purchases.

13        In addition to that, the other items we would ask

14   the Court to forfeit on the basis --

15        THE COURT:  Give me the paragraph numbers again.

16        MS. JOHNSTON:  The paragraph numbers that were

17   directly used to process payments received from Ms. Ali,

18   Ms. Harden or Mr. Harris and/or to write the checks for

19   Ms. Levi's property are Roman Numerals 3, 5, 6, 7, 8, 9, 10,

20   11, and those are the ones where we have checks actually

21   deposited or withdrawn, so we would ask the Court to forfeit

22   those accounts on that basis.

23        In addition, we would ask the Court to forfeit all

24   of the accounts on the basis that they constitute -- some

25   portion of them constitute drug proceeds as there's been no

1  evidence that either Ms. Martin or Mr. Goodwin had any -- in

2  reference to the one account, had any legitimate source of

3  the moneys in those accounts given the large number of cash

4  deposits and the testimony that the Court heard during the

5  trial.

6           Alternatively, we ask the Court to order all of

7  those accounts, including the currency that was seized at

8  the various locations, that it be forfeited as substantive

9  assets, as these are the only assets agents have been able

10 to identify as associated with Ms. Martin.

11          And, again, this goes to the cash currency and the

12 Mercedes.  The Mercedes, which is listed as Number 13,

13 certainly there was abundant evidence that it was used

14 throughout the conspiracy to further the conspiracy.

15          I think that I've addressed all of the particular

16 items listed, as well as the overall amount, which is a

17 little bit less than set forth in the indictment but is what

18 we're seeking.

19          THE COURT:  All right.  Well, I'll tell you what

20 I'm going to do.  Because we had a very late start this

21 morning, I'm not going to be able to hear anything further

22 today.  What I'm going to do is to request that the

23 Government submit to me a proposed order that contains the

24 findings and the orders on forfeiture that you would request

25 that I have entered.

1          MS. JOHNSTON:  Certainly, Your Honor.

2          THE COURT:  That you provide a copy to opposing

3    counsel.  And how long will it take you to do that?

4          MS. JOHNSTON:  When does the Court want us to have

5    it done?

6          THE COURT:  Well, not by Thursday afternoon.

7          MS. JOHNSTON:  As the Court knows, we're preparing

8    for the trial that starts next Tuesday.

9          THE COURT:  Yes, I know.

10         MS. JOHNSTON:  And then my -- the other trial I

11   have January 3rd.  But I would think by the end of the week

12   after this, so I think December 2nd?  Is that --

13   December 1st.  By December 1st.

14         MR. MONTEMARANO:  That's fine with the defense,

15   Your Honor.  I would just observe that with regard to the

16   proposed order, because they'll be separate -- will it be

17   one order with regard to all defendants or separate orders

18   with regard to each defendant?

19         THE COURT:  That's up to the Government.  Just

20   give me what the Government wants.  That's what I'd like to

21   see.

22         MR. MONTEMARANO:  I asked for a reason, because I

23   would like to see copies of the orders relating to the other

24   defendants as well as that relating to my defendant.  If

25   it's a joint order --

1          THE COURT:  Any and all orders that Ms. Johnston

2    prepares should be served on any -- all counsel.

3          MR. MONTEMARANO:  Thank you.

4          THE COURT:  And be done by the close of business

5    on December 1.  That's a Friday.

6          How much time do the defense wish to have to tell

7    me what they think's wrong with what she gave me.

8          MR. MONTEMARANO:  I could probably get something

9    to the Court by a week from the following Monday, the 11th.

10         MR. MITCHELL:  Your Honor, since those of us on

11   the defense side didn't get to really argue --

12         THE COURT:  Well, you're going to argue.

13         MR. MITCHELL:  Okay.

14         THE COURT:  You're going to argue.

15         MR. MITCHELL:  I was going to say if you want it

16   in writing, I have no problem with including it in -- or at

17   least, from my point of view, in my response to what

18   Ms. Johnston submits.

19         THE COURT:  Right.  I want to have in writing a

20   memorandum, whatever you -- whatever you want to communicate

21   it to me.  A letter will do, but a memorandum would be fine.

22   Get it docketed.  Your objections to her proposed order,

23   which can include your argument as to why the order is all

24   wet.  All right?

25         MR. MITCHELL:  That's fine.

1          THE COURT:  And if I get you to do that by Monday,

2     the 11th, is that enough time for everybody?  All right.

3     And then I'd like to have the Government give me any reply

4     by Friday, the 15th.  Will that work?

5          MS. JOHNSTON:  I don't know that that will work,

6     Your Honor, because we're going to be in court.  If they're

7     filing it on Monday, December 11th, we're going to be in

8     court Tuesday, Wednesday, Thursday and Friday with the --

9          THE COURT:  We'll be finished early.  You're going

10    to go very fast with that case.

11         MR. MONTEMARANO:  Your Honor, understanding that

12    Ms. Johnston has other obligations because she's in trial,

13    I'll do my very best to at least give you my filing, which

14    would --

15         THE COURT:  Can you all do better than

16    December 11th?

17         MS. JOHNSTON:  It would be nice if we could just

18    get it the Friday before so --

19         THE COURT:  All right.  Make it Friday, the 8th.

20    All right?  Friday, the 8th.  Submit your opposition

21    memorandum, why you don't like her findings, and that way

22    she'll have the weekend to look it over.

23         You'll have a jury deliberating.  You're not going

24    to have anything to do that week, you know.

25         MS. JOHNSTON:  I believe I have a trial starting

1   January 3rd involving four homicides.

2          THE COURT:  I remember that, too.  Can you give me

3   something by the 14th?  That's a Thursday?

4          MS. JOHNSTON:  Sure.

5          THE COURT:  All right.

6          MS. JOHNSTON:  The weekend will help.

7          THE COURT:  Now, the next thing is on the 19th,

8   which is the day we have set for sentencing.

9          I'm going to move a couple of things around, and

10  I'll start at 8:30, and at 8:30 I will hear the defense

11  response to Ms. Johnston's closing argument, anything else

12  you want to add based upon your memoranda, your reply from

13  Ms. Johnston, and I will decide right then and there the

14  forfeiture question.

15         Then we'll go into the first witness that's going

16  to be called by the Government, which will be applicable to

17  such defendants as you call that witness for, with everybody

18  entitled to cross.  And then I will go into the sentencings

19  one at a time, in the order in which I originally scheduled.

20  They will not be at the times.  They will simply be

21  seriatim.

22         MS. JOHNSTON:  Your Honor, I would propose asking

23  the Court to consider the testimony that the Court has heard

24  today as part of the sentencing presentation so that we

25  don't have to reproduce that.

1          THE COURT:  Yeah.  You don't need to repeat the

2    testimony we heard today all over again.  We've all been

3    here, and we've all been subject to cross-examination, so

4    all the testimony heard at trial, all the testimony heard

5    today, if that means you don't have to add anything

6    additional, that's not a problem with me.  But we'll see.

7          MS. JOHNSTON:  We may because we didn't go above

8    the quantities for some of the defendants.

9          THE COURT:  All right.  So let me just recap for

10   everybody's pleasure.  I'm going to have the Government

11   submit to me its proposed findings and order on or before

12   December 1, close of business, with a copy to opposing

13   counsel.  Defense objections and memorandum on the whole

14   question of forfeiture December 8th.  The Government reply

15   December 14.

16         I will hear the remaining argument on forfeiture

17   and resolve it beginning at 8:30 on the 19th, followed by

18   the witnesses for the -- witness or witnesses for the

19   Government on the sentencing issues, followed by the

20   sentencings in the order originally scheduled.

21         Mr. Montemarano.

22         MR. MONTEMARANO:  Because of the time frame

23   involved, I assume we'll be faxing these to each other to

24   make sure that they are received on the date --

25         THE COURT:  Whatever way works.  Don't put them in

1    the U.S. mail.

2                MR. MONTEMARANO:  Right.

3                THE COURT:  Either by hand, fax or email.  And as

4    far as my chambers is concerned, you know, get it to us the

5    fastest way you can.

6                MR. MONTEMARANO:  Absolutely.  No, I want to be

7    clear on that, Your Honor.

8                THE COURT:  Yeah.  No, I want to be able to, as

9    does my law clerk, start looking at the information as soon

10   as it comes in.

11               Yes, sir.

12               MR. MITCHELL:  Your Honor, I just wanted to ask --

13   I was going to be filing a sentencing memorandum.  I don't

14   have your sentencing order in front of me.  Did you

15   establish a date that you wanted that filed?

16               THE COURT:  I don't have the sentencing order

17   here, but memoranda should be submitted promptly.

18               MR. MITCHELL:  Well, I'll do it.  I just wanted to

19   know if there was a date certain.

20               THE COURT:  I don't have the date certain to give

21   you because I don't have it with me.

22               MR. MITCHELL:  Okay.

23               MR. MONTEMARANO:  Mr. Hall and I were discussing

24   having ours in chambers by the 1st.  We propose to have them

25   in chambers by the 1st, a week from this coming Friday.

1          THE COURT:  Yeah, I'd like to have them as soon as

2  I can so I can go through them.

3          MR. MONTEMARANO:  Certainly.

4          THE COURT:  All right.  Anything further, counsel?

5          All right.  See you then.

6          (Proceedings adjourned.)

7

8                    COURT REPORTER'S CERTIFICATE

9          I certify that the foregoing is a correct

10  transcript from the record of proceedings in the above

11  matter.

12

13  DATE:

14                              /s/ _____

15

16

17

18

19

20

21

22

23

24

25