```
 1            UNITED STATES DISTRICT COURT OF MARYLAND
                       SOUTHERN DIVISION
 2
   --------------------------x
 3 UNITED STATES OF AMERICA      :
              Plaintiff          :
 4                               :
                                 :
 5 vs                            :Criminal Action:RWT-04-0235
                                 :
 6                               :
   LAVON  DOBIE, e t al       :
 7                Defendants.    :
   --------------------------x
 8

 9                        Monday , January 23 , 2006
                          Greenbelt, Maryland
10
           The above-entitled action came on for a      Motions
11 Hearing  Proceeding before the HONORABLE ROGER W. TITUS,
   United States District Judge, in courtroom     2A,
12 commencing at   10:10 a.m.

13         THIS TRANSCRIPT REPRESENTS THE PRODUCT
           OF AN OFFICIAL REPORTER, ENGAGED BY
14         THE COURT, WHO HAS PERSONALLY CERTIFIED
           THAT IT REPRESENTS THE PROCEEDINGS    , AS RECORDED
15         AND REQUESTED.

16

17         APPEARANCES:

18         On behalf of the Plaintiff:

19         DEBORAH JOHNSTON, Esquire
           BONNIE GREENBERG, Esquire
20

21         On behalf of the Defendant   :

22
           JOHN  PIERCE,  Esquire
23         PETER WARD, Esquire

24
   Tracy Rae Dunlap, RPR, CRR             (301) 344-3912
25 Official Court Reporter
```

1                         I N D E X

2                          DIR   CROSS      REDIR      RECROSS

3  Frederick  Stacey       4    22          62          67

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                             Page

24  Reporter's Certificate                      90

25

1          MS. GREENBERG:   Your Honor, we are here in the

2  matter of United States of America versus LaVon Dobie.

3  It's criminal number RWT-04-0235.  Bonnie Greenberg and

4  Donna Johnston for the  United States.   We're here on a

5  motion to suppress evidence   based on knock and announce  .

6          THE COURT:  All right.

7          MR. PIERCE:  Good morning, Your Honor.  John

8  Pierce and Peter Ward on behalf of Ms. Dobie.  As the

9  court may know, I represented Ms. Dobie at the time this

10 reply in this motion was filed; I've been since

11 relieved, and Mr. Ward has taken over the

12 representation.  I agreed to assist with this hearing.

13         THE COURT:  All right.  Glad to have Mr. Ward

14 with us.

15         MR. WARD:  Good morning, Your Honor.

16         THE COURT:  You may proceed.

17         MS. GREENBERG:   Your Honor, at this time we would

18 call supervisory  special  agent Fred Stacey to the

19 witness stand.

20 Thereupon,

21                **FREDERICK  J.  STACEY**,

22 having been called as a witness on behalf of the

23 Plaintiff, and having been first duly sworn by the

24 Courtroom Deputy, was examined and testified as follows:

25         THE CLERK:  I need you to state your name  for the

Direct - Stacey

1   record .

2        THE  WITNESS:   Frederick  J Stacey,  S  T  A  C  E  Y.

3                    **DIRECT  EXAMINATION**

4        BY MS.  GREENBERG:

5   Q.    Good  morning .  Could  you  tell  Judge  Titus how you

6   are employed  and  your  position , please ?

7   A.    I'm  currently  employed  with  the  Bureau  of

8   Immigration  and Customs Enforcement , the  Washington

9   field  office  in  Sterling , Virginia .

10  Q.    If  you  could  move  that  microphone ?

11  A.    I'm  sorry .

12  Q.    I  think  it's mostly  for  us  over  here , because

13  this machine  ends  up taking  a  lot  of  the hearing  space .

14  A.    Sure .  Is  that  better?

15  Q.    That's much  better .   Thank  you .

16        What  is  your  position ?

17  A.    I'm a supervisory   special  agent , currently  acting

18  assistant  special  agent  in  charge  of  the  Washington

19  office .

20  Q.    What  is  your  background , training  and  experience ?

21  A.    I've  been  with  ICE,  previously  Customs  -- United

22  States  Customs  Service  since  1990  as  a  special  agent .

23  I've  been  a supervisory  special  agent  since  1999, and

24  I've  been  involved  in  Special  Response  Team , either  as  a

25  team  leader , now  as  a  tactical  supervisor  for  almost  ten

Direct - Stacey

1  years now.

2  Q.     And that team that you described, what is the

3  name of that?

4  A.     Special Response Team.

5  Q.     What is that?

6  A.     A special response team is a team of highly

7  trained agents that execute high risk warrants, either

8  search warrants or arrest warrants.

9  Q.     Is that what we typically think of as a SWAT

10 team?

11 A.     That's correct.  It's normally referred to as a

12 SWAT team.

13 Q.     How long have you been supervisor of the Special

14 Response Team?

15 A.     Almost two and a half years now as a supervisor.

16 Q.     And were you in that position on June 1st 2004?

17 A.     I was.

18 Q.     And could you give the judge an idea,

19 approximately -- if you can approximate how many high

20 risk entries you've done in terms of --

21 A.     In my career?

22 Q.     -- search warrants.  Yes.

23 A.     In my career, I would say over a hundred easily.

24 Maybe 120.  I have no idea.  Quite a few.

25 Q.     Would it be fair to say that it's been over a

Direct - Stacey

1  hundred  as  of  the  date  of  this  search  warrant ,  June  1st

2  2004 ?

3  A.      I've  done  over  a  hundred  warrant s  since  that  --

4  Q.      No .

5  A.      Oh ,  prior  to  June  1st?

6  Q.      Prior  to  June  1st .

7  A.      Prior  to  June  1st ,  that 's  correct .

8  Q.      Of  2004 ?

9  A.      That 's  correct .

10 Q.      Now ,  you  were  in  your  position  as  leader  of  the

11 Special  Response  Team  on  June  1st  2004  at  approximately

12 6:30  a.m. ?

13 A.      I  was .

14 Q.      And  did  you  go  to  a  location ,  7427  Ninth  Street

15 in  Washington ,  D. C.?

16 A.      Yes .

17 Q.      And  do  you  recognize  what  is  depict ed  in  the

18 picture  next  to  you ,  the  one  that 's  mark ed  as  Dobie  1

19 for  purpose s  of  this  suppression  hear ing ?

20 A.      I do .   That  is  the  front  of  7427  Northwest  Ninth

21 Street ,  Washington .

22 Q.      Did  you  go  to  that  residence ?

23 A.      We  did .

24 Q.      Why d id  you  go  to  that  residence ?

25 A.      To  execute  a  warrant  --  search  warrant  on  that

Direct - Stacey

1   residence .

2   Q.      And how did you come to execute a search warrant

3   at that residence ?

4   A.      I was contacted by supervisory special agent Ron

5   Selerbsha in Baltimore . Ron had -- Special Agent

6   Selerbsha had requested our help from Special Response

7   Team . They were executing approximately 25 warrants

8   that day and of which five they considered high risk or

9   higher than normal risk , and they requested the services

10  of the Special Response Team . This address was one of

11  the ones considered higher risk .

12  Q.      So your testimony is it's one of the five out of

13  the 25 that were considered high risk ?

14  A.      That 's correct .

15  Q.      Is that why you were specially requested ?

16  A.      That 's correct .

17  Q.      Now , could you tell Judge Titus what the special

18  agent in Baltimore told you to give you background about

19  this particular residence ? Is that something you

20  typically get ?

21  A.      We do , because we make a determination whether

22  the Special Response Team should be used or not . And

23  based on the information that was given to me by Special

24  Agent Selerbsha and other agents of the task force ,

25  primarily the criminal history of the occupants of the

Direct - Stacey

1 residence and information that was obtained from the

2 Title 3 wire intercept indicating the amount of crimes

3 that Mrs. Dobie had claimed to have committed, we felt

4 that it was necessary for the Special Response Team to

5 be utilized in this warrant.

6 Q.     Please tell Judge Titus specifically what

7 information you were given by the other special agents

8 connected with the underlying investigation that led you

9 to believe that Special Response Team would be utilized

10 and factored into how you entered this residence.

11 A.     Well, there are two components, the first of

12 which is the criminal history of the occupants of the

13 house.  Both Mr. and Mrs. Dobie had a long history of

14 violent crimes; also, a significant drug history

15 selling, distributing drug.

16 Q.     Could you tell us in your mind as a law

17 enforcement officer, are drugs connected to violence and

18 if so how?

19 A.     Normally so, and that's for a couple of reasons.

20 One is primarily as protection against people that would

21 try to steal drugs from the owners of the drugs.  So,

22 normally people that distribute or deal in drugs are

23 armed to protect themselves.

24 Q.     That's been your experience, sort of guns and

25 drugs go together?

Direct - Stacey

1  A.       Absolutely.

2  Q.       What other criminal history, specifically, did

3  you have as to Ms. Dobie?

4  A.       Best of my recollection, I think there were some

5  crimes of violence.  I want to say armed -- either armed

6  robbery or some sort of assault.  I can't remember

7  offhand but something to that effect.

8  Q.       Did the special agent relay to you any

9  conversations from the wiretap as to Ms. Dobie?

10  A.       He did, and he said that Ms. Dobie was quoted as

11  saying that she had committed so many crimes that she

12  couldn't remember how many crimes she committed.

13  Q.       What information was provided to you as to Mr.

14  Dobie?

15  A.       Again, there was background, his criminal

16  history, and then prior to execution of the warrants on

17  June 1st we had been informed that Mr. Dobie had been

18  incarcerated on a drug offense in Washington, D. C.

19  Q.       Without -- did you know a lot about the

20  underlying offense?

21  A.       Not really.  I think it was possession with

22  intent to distribute, if I remember correctly.

23  Q.       But your information was that he had just been

24  released from jail?

25  A.       That's correct.

Direct - Stacey

1 Q.      Did that factor into your decision as to what to

2 do at this residence ?

3 A.      Absolute ly.  Again , now we've had relative ly

4 current  information  on the status of one of the

5 occupant s relating  to a drug offense .

6 Q.      Even with that information , was there a

7 determination  made to knock  and announce ?

8 A.      Absolute ly.  That 's a requirement  for all our

9 warrant s that we do:  Knock  and announce .

10 Q.      Could  you de scribe  specifically  for Judge Titus

11 -- and if you need to use the exhibit , go right  ahead .

12 You can step off the  witness  stand if you need to.

13 Could  you de scribe  for him exact ly what you did that

14 morn ing of June 1st 2004 at approximately  6 :30 a.m. at

15 7427 Ninth  Street , Washington , D. C.

16 A.      Absolute ly.

17 Q.      If you don't keep your voice  up, that nice  lady

18 there will throw  a portable m ike at you .

19 A.      Our approach  was this direction .  We went down

20 the sidewalk .

21 Q.      If you're fac ing the picture  from  the right ?

22 A.      From  the right .

23      THE COURT:  Officer , could  you move the picture

24 over a little  bit so I can see the bottom  of it?  I

25 don't know  if there 's anything  of interest  on the bottom

Direct - Stacey

1 but I'd like to see.

2          MR. WARD:  Does this have a number?

3          THE WITNESS:  Your Honor, can you see that?

4          THE COURT:  Yes, I can see it now.

5          BY MS. GREENBERG:

6 Q.     It has been previously marked, and I mentioned

7 prior to that that it has been marked as LD Search 1.

8 A.     Facing the picture, we approached the stage

9 approximately two houses away from the front of the

10 house facing to the right, went down the sidewalk up the

11 steps and stopped just short on the landing here to the

12 front door.

13 Q.     Special Agent Stacey, when you say "we", who do

14 you mean as "we", and how many of there were you?

15 A.     Including myself, there were seven of us on the

16 entry team for this particular warrant.

17 Q.     If you could describe to Judge Titus how you were

18 dressed.

19 A.     Sure.  Our typical attire is black battle dress

20 uniform, BDUs for short, blue or black bullet proof

21 vests with "POLICE" predominantly displayed on the front

22 of the vest in three-inch letters, balaclavas and

23 googles.  The balaclavas are to protect us from

24 shattering glass.

25 Q.     Is the "Police" on the front and the back?

Direct - Stacey

1  A.      It is on the front and the back.

2  Q.      I'm sorry, continue.

3  A.      We had long arms as well as our side arms,

4  sub-machine guns or shotguns.

5  Q.      Did somebody bring a battering ram with them?

6  A.      We did.  We have one person we designate as a

7  breacher on the team, and a breacher carries a battering

8  ram, what's called a hooligan tool  which is basically a

9  large pry bar and a sledge hammer.  Those are the three

10 basic components for our breacher's tool kit.

11        The team then approached here.  I sent the

12 breacher to open up the front door.  We had done a

13 prereconnaissance  surveillance  of the residence.  We

14 knew that there was a screen door and then an inward

15 opening door behind the screen door.  I had told the

16 breacher to open the door, pin the door, put his back

17 against the  door, and then I designated Special  Agent

18 Muldown to do the knock and announce.

19        MR. WARD:  What was the name?

20        THE WITNESS:   Craig  Muldown.  Special  Agent Craig

21 --

22        MR. WARD:  Thank you.

23        BY MS. GREENBERG:

24 Q.      When you said you designated him -- so he was

25 acting at your direction?

Direct - Stacey

1  A.      That's correct.  That's to allow me to watch the

2  team and give direction s to the rest of the team while

3  someone else is doing the knock and announce.

4  Q.      Were you also listen ing to what h appened in  the

5  house?

6  A.      Absolute ly.

7  Q.      Why is that?

8  A.      Because if I hear someone speak ing or say ing

9  they're comi ng to the door or identify ing or asking what

10 we're doing there, I can start communicati ng

11 instruction s to the person in the house.  So that's

12 really why I designate someone to do the knock and

13 announce, so I can listen.

14 Q.      And if you would, put your initial s on Dobie

15 Search 1 where you were and where the person who was the

16 breach er -- put "breach er" there.

17 A.      I don't know  if it's going to show up here, but

18 against the wall was the breach er.  Adjacent  to this

19 corner was Special Agent Muldown.  Then right next to

20 him was me.  So, I was actual ly sort of right beside

21 him.

22 Q.      You all were pretty close up there on the porch?

23 A.      Right.  And then the rest of the team is stack ed

24 behind us on the  sidewalk  here.

25 Q.      Where was the chair?

Direct - Stacey

1  A.      The chair was there, and then it was thrown over.

2  Q.      To give you --

3  A.      -- into the shrubs to give, under the

4  circumstances, more room to maneuver so we could hold

5  the door up.  So, the chair was basically picked up and

6  thrown on the grass.

7  Q.      A simple plastic chair?

8  A.      Yes.

9  Q.      Were you in a position where you could hear what

10 was going on in the house?

11 A.      I could.  I would say I was close enough to the

12 door and the window so I could hear any kind of noise or

13 someone responding that they could hear our commands.

14 Q.      You are all up at the porch and you gave a

15 command to the person who was knocking?

16 A.      Right.

17 Q.      What command did you give?

18 A.      I told Special Agent Muldown to do the knock and

19 announce.

20 Q.      Did you observe him do the knock and announce?

21 A.      I did.  He knocked three times and identified

22 that we were the police and we were executing a search

23 warrant.

24 Q.      Could you describe to the court how he knocked?

25 A.      I could actually demonstrate if that would be

Direct - Stacey

1 easier, Judge.  Special Agent Muldown used the back of

2 his fist and pounded against the door three times

3 (Witness indicating):  Police officers with a search;

4 warrant open up.

5 Q.     Now, how you just said that here, is that how it

6 was said at the scene?

7 A.     Much louder but the same.

8 Q.     How loud was it?

9 A.     Pretty loud.  Very loud, as a matter of fact.

10 Q.     How about the knock?

11 A.     The knock was very loud.  It was against the

12 door.  We have done enough of these warrants that we

13 know to be sure that the people -- the occupants inside

14 know that we're executing a warrant.  So, it is pretty

15 loud.

16 Q.     Would you describe it as a knock or a pound?

17 A.     A pound would probably be more accurate.

18 Q.     Could he have hit the door any harder with his

19 fist?

20 A.     I doubt it.

21 Q.     And is he a small guy or big guy?

22 A.     He's roughly my side.

23 Q.     How tall are you?

24 A.     Six feet.

25 Q.     How -- weight?

Direct - Stacey

1 A.        195.

2 Q.        You can't ask that to a woman but I guess you can

3 ask it to a guy.   What happened next?

4 A.        We paused for a brief moment and then I gave him

5 the command to knock and announce again.

6 Q.        And again, how did he knock and announce?

7 A.        The same way.   Three loud raps on the door,

8 followed by "police with a search warrant; open the

9 door."   Then there was a brief pause.   Again, I was

10 trying to hear some sort of motion or activity inside

11 the residence and I did not.   I then gave the breacher

12 the command -- Special Agent Duffy the command to breach

13 the door and utilize the battering ram to utilize the

14 knocking mechanism on the door.

15 Q.        In your experience in a house this size, is that

16 a sufficient amount of notice for someone to either open

17 the door or to yell, I'm coming?

18 A.        Absolutely.   It's a relatively small home, I

19 would say less than 2,000 square feet, so any of the

20 occupants in the house would have heard our commands to

21 open the door.

22 Q.        In your search warrants that you've done, that's

23 happened before?

24 A.        Absolutely.

25 Q.        Are your search warrants typically during this

Direct - Stacey

1 period of time, 6 a.m. to 7 a.m.?

2 A.     Absolutely. We try to do it as early as

3 possible. Sometimes there are those circumstances that

4 preclude us from doing it early, but generally it's

5 first thing in the morning, six o'clock.

6 Q.     Why is that?

7 A.     Usually most occupants are in bed and it just

8 gives us the opportunity to insure that the residents

9 are home when we get there.

10 Q.     Were arrest warrants also being executed at this

11 time or at least one arrest warrant?

12 A.     Yes.

13 Q.     Is this deemed a double knock and announce what

14 you did?

15 A.     No, it's a standard protocol. I'm sure you could

16 call it that because there's two distinct knocks and

17 announces, but that's our standard protocol is that we

18 knock and announce twice before making entry.

19 Q.     In preparation for this hearing, did you

20 independently determine how much time there was from the

21 time that the officer under your direction gave the

22 first knock until the time that you first hit the door

23 with the battering ram, given a conservative period of

24 time?

25 A.     I would say, conservatively, 15 seconds.

Direct - Stacey

1  Q.      Could it have been any less than that?

2  A.      I doubt it.

3  Q.      Could it have been  more than that?

4  A.      Absolutely.

5  Q.      What, conservatively,  is the longest period of

6  time that could happen?

7  A.      I would say at the outside 25 seconds, 30 at

8  tops, but no more than that.

9  Q.      So your testimony is it couldn't have been less

10  than 15 and it wouldn't have been more than 30?

11  A.      Correct.

12  Q.      And that was from the first knock until you hit

13  the door with the ram?

14  A.      Until the door was actually breached, correct.

15  Q.      And what happened after you entered the

16  residence?

17  A.      Our standard protocol is that the team starts to

18  go into several directions in the house to cover

19  possible what we call "hot spots", and I started going

20  to the top of the stairs.  I made entry.  I was -- I

21  believe I was first or second through the door, and as

22  soon as -- my area of responsibility for the stairs

23  going up to the bedroom, and I saw Mrs. Dobie at the top

24  of the stairs.

25  Q.      And would you by the -- strike this.

Direct - Stacey

1          By how the house was set up, could you -- did you

2 reach a conclusion about from where Ms. Dobie had come?

3 A.     Not immediately, but once I reached the top of

4 the stairs I could see that there were several bedrooms

5 and a bathroom at the top of the stairs.  The one

6 bedroom door was open and the other bedroom doors were

7 closed, and it appeared that Mrs. Dobie came out of that

8 one open bedroom door.

9 Q.     Did she make a statement that she had to go to

10 the bathroom?

11 A.     She did.  She first asked me what we were doing,

12 and I told her we were executing a search warrant; and

13 then she indicated she had to go to the bathroom, that

14 it was an emergency.

15 Q.     Was the bathroom in between the bedroom and the

16 stairwell in which you saw her?

17 A.     The bathroom was directly opposite of the

18 bedroom door that was open and perhaps five to six feet

19 from the top of the stairs, the landing.

20 Q.     So, just to be clear, if she had left her

21 bedroom, she would have passed the bathroom at the point

22 you saw her?

23 A.     Right.  And I think -- I believe there was

24 another closed door between that open door and the top

25 of the stairs.

Direct - Stacey

1 Q.      Describe to the court what Ms.- -- if you want to

2 take your seat again.

3 A.      Okay.   Thank.

4 Q.      Describe to the court what happened when you

5 encountered Ms. Dobie.

6 A.      First I gave her instruction s to raise her hands

7 and get on the ground, which is standard protocol for

8 our entries for high risk entri es.  She then indicated

9 to me that she had to go to the bathroom after she asked

10 me what we were doing there.  She said it was an

11 emergency.  I gave her an opportunity to go to the

12 bathroom.

13      I quick ly look ed into the open door because,

14 again, that was considered a hot area for us.  I look ed

15 in that open room and I saw Mr. Dobie in bed, and I

16 start ed giving him commands to get out of the bed and

17 come to me on the ground.

18 Q.      From your observation s of the bed, did it appear

19 that somebody had also been on the other side of the bed

20 along --

21 A.      It did.  It did.

22 Q.      -- next to Mr. Dobie?

23 A.      Adjacent to Mr. Dobie, that side of the bed was

24 -- it look ed like it had been occup ied.

25 Q.      Now, could you give the court an estimate of the

Direct - Stacey

1 size of this house based on your observation s of it,

2 just a general estimate of the size of it?

3 A.      Relative ly small .  Probably less than 2,000

4 square feet .

5 Q.      One of the point s raise d by defense counsel that

6 I mention ed to you they would ask you is if you knew was

7 there any evidence that you knew about support ing the

8 guilt of the defendant s in this case .  Did you have any

9 idea about the under lying investigation ?

10 A.      I did .  We were extensively brief ed by the

11 investigating group about the developments in their

12 investigation so far , primarily intelligence collect ed

13 from the Title 3 wire intercept and surveillance

14 observation s.  So, we had a pretty good understand ing of

15 the nature of the investigation and the different

16 component s of the organization that was being

17 investigate d.

18 Q.      And your understand ing is it was a wiretap

19 investigation ?

20 A.      It was very clear to us that it was a wiretap

21 investigation.

22 Q.      From your discussion s with the agent s, you

23 understand that the case was strong ?  Weak ?  Medium ?

24 A.      According to what we heard from the agent s, it

25 was a very strong case and there was a lot of

Recross -   Stacey

1  incriminating  information   that  had  been  developed .

2          MS.  GREENBERG :   Court 's  indulgence .

3          No  further  question s, Your  Honor .

4          THE  COURT:    Counsel .

5                          **CROSS-EXAMINATION**

6          BY  MR.  PIERCE:

7  Q.      Good  morning , Agent  Stacey.

8  A.      Good  morning .

9  Q.      My  name  is  John  Pierce .   Agent  Stacey , do  I

10  understand  then  that  you  were  not  part  of  the

11  investigative   team  for  the  under lying  investigation ?   Is

12  that  correct ?

13  A.      That 's  correct .

14  Q.      You  were  called  in  at  some  point  before  the

15  execution  of  the  warrant  that  you've  testified  about  to

16  under take  that  warrant  execution ; is  that  right ?

17  A.      That 's  correct .

18  Q.      Were  you  inform ed  how  long  this  investigation   had

19  been  ongoing ?

20  A.      Yes .   In  fact , we  had  gone  to  several  meetings

21  prior  to  the  execution  of  warrant s and  it  had  -- from  my

22  understand ing , it  had  been  going  on  for  several  month s.

23  Q.      When  you  say  several  meetings , over  what  period

24  of  time ?

25  A.      I  think  I  went  to  either  two , possibly  three

Recross - Stacey

1  meetings.  It's hard to recall -- it's been over a year

2  and a half -- but I would say at least two meetings.

3  Q.      When were those meetings?

4  A.      Sometime during May of 2004.

5  Q.      I believe your testimony was this warrant was

6  executed on June 4?

7  A.      June 1st.

8  Q.      June 1st?

9  A.      Correct.

10  Q.      And you believe you went to two or three meetings

11  in May?

12  A.      Correct.

13  Q.      How long before the execution of the warrant do

14  you believe those meetings were?

15  A.      The last one probably within two weeks of the

16  warrant execution.  So, sometime mid-May I would think.

17  Q.      And then the one before that was earlier in May?

18  A.      Probably a week before that.

19  Q.      I take it by your testimony then that those

20  meetings where you were educated about this

21  investigation preceded the May 24 request to Judge Day

22  for the search warrant; is that right?

23  A.      That's correct.

24  Q.      I take it at these debriefings you were educated

25  about the ongoing investigation; right?

Recross - Stacey

1  A.      To some extent, yes.

2  Q.      And I believe your testimony was you believed the

3  investigation had been on going for several months.

4  A.      Right.

5  Q.      It had included a title 3 intercept; right?

6  A.      That's correct.

7  Q.      Many phone calls intercepted; is that right?

8  A.      Yes, that's right.

9  Q.      You were informed of the contents of intercepted

10 communications as it related to execution of the warrant

11 on Ninth Street that you executed; correct?

12 A.      Right.  The risks involved; correct.

13 Q.      Right.  I believe your testimony was that during

14 the intercepted communications you testified you

15 believed that it was represented to you that Ms. Dobie

16 had claimed to have committed crimes.

17 A.      Right.  That was -- that information was provided

18 to me by one of the agents in the task force, that's

19 correct.

20 Q.      Did I understand your testimony to be that that

21 representation is that she had committed violent crimes?

22 A.      I don't know if it was violent crimes.  It was

23 just stated to me that she had committed so many crimes

24 she didn't know how many she had committed.

25 Q.      Whatever that representation, it was made prior

Recross - Stacey

1  to going to Judge Day for the warrant ; correct ?

2  A.    I would assume so.  I didn't apply for the

3  warrant , but I would assume so.

4  Q.    But you know that the warrant was issued on May

5  24?

6  A.    I do know that .

7  Q.    You know in your debriefings prior to that time

8  that's when you were educated about claims that agents

9  say that she made on these intercepted communications ;

10 correct ?

11 A.    Right .  I would say that's correct .

12 Q.    All right .  And I believe you also testified

13 about -- had done a records check of Ms. Dobie ; correct ?

14 A.    One of the agents in the Baltimore office had

15 done a records check and provided us the information

16 from Mr. and Mrs. Dobie .

17 Q.    That was another factor that was provided to you

18 in part to help you make assessments during execution of

19 the warrant ; correct ?

20 A.    That's correct .

21 Q.    And again , that would have been something

22 communicated to you prior to the application to Judge

23 Day on May 24 .

24 A.    Yes , that's correct .

25 Q.    And also I believe you testified on direct that

Recross - Stacey

1  her husband, Mr. Dobie, had been recently released from

2  custody; is that right?

3  A.      That was the information that was provided to us

4  just prior to that warrant, that Mr. Dobie had been

5  arrested and released prior to June 1st.

6  Q.      This would have been at one of the debriefings in

7  May?

8  A.      It would have been probably one of the many

9  conversations I had with the case agents prior to the

10 execution of the warrant.

11 Q.      But during the debriefings in May --

12         MS. GREENBERG:   Objection.   Asked and answered.

13         MR. PIERCE:   Your Honor, I don't believe he said

14 when it was over.

15         THE COURT:   Overruled.

16         BY MR. PIERCE:

17 Q.      During one of the debriefings in May?

18 A.      Either through a debriefing or through a

19 subsequent phone conversation with the agents prior to

20 execution of the warrant.

21 Q.      Was there any other information about danger or

22 prior criminal history that was not provided to you

23 during the debriefings?

24 A.      Not that I know of.

25 Q.      And again, you had mentioned this was an

Recross - Stacey

1 extensive  and  ongoing  investigation ; correct ?

2 A.      Correct .

3 Q.      Any  information  not  in  the  custody  of  law

4 enforcement  at  the  time  they  went  to  the  judge  on  May  24

5 for  the  warrant ?

6      MS. GREENBERG:    Objection .  Your  Honor , this  is

7 not  somebody  who  was  an  affiant  on  the  warrant .  He

8 didn't  go  to  the  judge .  He  is  not  part  of  that .  He  was

9 just  brought  in  for  the  entry .  I don't  think   that  he

10 has  any  knowledge  about  what  was  said .

11      THE  COURT:   Ask  him  a  question  that  he  would  have

12 some  basis  for  answering .

13      BY  MR. PIERCE:

14 Q.      Were  you  provided  with  any  additional   information

15 about  danger  for  instance  or  past  criminal  history  prior

16 to  execution  of  the  warrant  that  was  not  part  of  your

17 debrief ings ?

18 A.      Other  than  conversation s with  agent s that  were

19 part  of  the  investigation , no .  It  was  either  covered  in

20 brief ings  or  subsequent   conversation .

21 Q.      That 's what  I'm  try ing to  understand .  I'm  try ing

22 to  understand  if  there  were  was  any  additional

23 information  you  were  provided  prior  to  the  execution  of

24 the  warrant  that  was  not  part  of  the  debrief ings  and

25 made  prior  to  application  for  the  warrant .

Recross - Stacey

1  A.      We were given constant intelligence  update s on

2  the nature of the investigation  and the status of the

3  application  for the warrant up to the day of the

4  execution of the warrant .

5  Q.      What were the factor s?  What was the information

6  that you learn ed after application  of the warrant until

7  execution of the warrant about danger or criminal

8  history .

9        MS. GREENBERG:    Again , this -- for the court 's

10  reference , the application  was made on May 27, but this

11  witness had no part of that .  I don't know that he can

12  answer .

13        THE COURT:   He was asked what additional

14  information  he got after the application  for the warrant

15  was filed .  If he know s what that information  is, he can

16  answer it.

17        MS. GREENBERG:   I don't even think -- maybe if

18  counsel use s the date of the application  for the warrant

19  was made , on May 27.  Again , he wasn't part of that

20  process  so there 's no reason he had to know .

21        THE COURT:   The objection  is over ruled .  I

22  believe the question  was what information  about the

23  nature of the person s and the activities  at that

24  premises  was he given subsequent  to the time the warrant

25  was applied for .  Is that the question ?

Recross - Stacey

1          MR. PIERCE:   Yes, sir.

2          THE COURT:   All right.   You can answer that

3 question.

4          THE WITNESS:   The only information that we

5 obtained, substantive information, was that Mr. Dobie

6 had been arrested and subsequently released.

7          BY MR. PIERCE:

8 Q.      That's the only additional information?

9 A.      That I can recall.   Again, that was over a year

10 ago.

11 Q.      All right.   You have testified that you

12 understood Ms. Dobie To have been a target of both your

13 search and an arrest responsibilities; correct?

14 A.      Our -- right.   Our responsibility was to execute

15 the warrant and secure the premises for the search and

16 arrest team to go in and do what they had to do.   Our

17 mission was only just to secure the residence.

18 Q.      All right.   But you understood Ms. Dobie was a

19 target of an arrest warrant?

20 A.      Yes, I did understand that.

21 Q.      To be executed at that time?

22 A.      I did.

23 Q.      Can you tell me who the seven members of the

24 entry team were?

25 A.      Yes.   Myself, Special Agent Craig Muldown,

Recross - Stacey

1 Special Agent Craig Ko on, Special Agent Mark Duffy,

2 Special Agent Tony Rodriguez, and I'm sure I'm missing

3 someone here. I think that's five. There were two

4 other members, and I can't recall offhand now.

5 Q.      Do you recall whether they were all members of

6 your agency?

7 A.      They are. They're all members of ICE. They're

8 all member of the Washington field office.

9 Q.      Were each of these seven persons also former

10 Customs agents who then became under the gambit of ICE?

11 A.      Yes, that's correct, they were all former Customs

12 agents.

13 Q.      Were any of them women?

14 A.      No, none were women. All males.

15 Q.      Was there another team of officers that you

16 expected to enter after you had secured the residence?

17 A.      There was. There was a team of officers from the

18 Baltimore field office of ICE, along with task force

19 members from Montgomery County Sheriff's office that

20 once we secured the residence we were going to turn over

21 any prisoners to those -- to that team.

22 Q.      They were actually the search team, so your team

23 did not conduct a search.

24 A.      Our team did not conduct a search.

25 Q.      All right. Just securing the residence.

Recross - Stacey

1  A.       That's correct.

2  Q.       How long after securing the residence did the

3  search team come in?

4  A.       I called the all clear probably 10 to 12 minutes,

5  maybe 15 minutes tops after we conducted our primary and

6  secondary sweeps.  We then escorted all the occupants of

7  the residence to the living room, and then I sought out

8  Dave Papalia from Montgomery County.

9  Q.       I'm sorry?

10 A.       Dave Papalia from Montgomery County Sheriff's

11 office who was the team leader of that search team to

12 tell them that the residence was all secure and that all

13 the occupants of the residence were in the living room,

14 and then that was it.  We left and his team came in.

15 Q.       How many members of that search and arrest team

16 there were?

17 A.       Offhand?  I'd say five, maybe six.

18 Q.       Where were they positioned when your team came to

19 the front of the residence prior to the execution of the

20 warrant?

21 A.       We had some of their team staged in the back of

22 the residence in the alleyway to insure if there were

23 anyone fleeing that they could apprehend fleeing

24 suspects from the back, and then the rest of the team

25 was in the front of the residence on the street.

Recross - Stacey

1  A.       On Ninth Street.

2  Q.       Literally, in the street?

3  A.       I don't know.  I was -- I was in the residence,

4  so I don't know if they were in their vehicles or on the

5  sidewalk.  I have no idea.

6  Q.       Okay.  But somewhere on the street or back and

7  either in or outside of vehicles?

8  A.       That's correct.

9  Q.       It's a little bit difficult to see from this

10 exhibit, Dobie Search 1, I believe it is, how far it was

11 from the front door to the street.

12 A.       I would say no more than 30 feet.

13 Q.       Is that the street -- we see -- it appears

14 vehicles in the forefront of that picture.  Are they

15 parked on the curb next to the lawn that goes up to  the

16 house?

17 A.       I think that's the -- there's a driveway to the

18 left of the residence, and then I think this is actually

19 a photo from the inside of the vehicle, a surveillance

20 photo.  So I don't know what -- I don't think  this is a

21 vehicle, actually.  I think this is -- in fact, if you

22 look closely, I think this is the edge of the sidewalk

23 right here.

24 Q.       You're pointing to something right at the bottom

25 of the photo?

Recross - Stacey

1  A.       Bottom  right  corner.   Looks like  the  edge  of  the

2  sidewalk.

3  Q.       Agent, it looks like that lawn sort of drops

4  precipitously straight  down  from  the  sidewalk  in  front

5  of  the  house; is  that  correct?

6  A.       That's  correct.

7  Q.       And  it  looks from  this  photograph  as  though  it's

8  going  straight  from  the  doorway  to  what  might  be  the

9  curb  as  if  it  might  be  only  perhaps  ten  feet.   Would

10 that  more  accurately  describe, you  think, the  distance?

11 A.       No.   I  think  it's  actually  further  than  that.

12 Would  you  say -- I  think  the  question  was  how  far  to  the

13 street.   The  sidewalk  is  probably  three  feet  wide, and

14 then  the  curtilage  between  the  sidewalk  and  the  curb  is

15 probably  another  two  feet.  So  I  would  say  maybe  25, 30

16 feet.   It's  hard  to  say  from  this  photo.

17 Q.       You  think  then, from  your  testimony, that  it

18 would  be  perhaps  15  to  20  feet  from  the  front  door  to

19 the  public  sidewalk?

20 A.       That's  probably  a  fair  assessment.

21 Q.       Were  there  any  of  your  team  members  parked  right

22 in  front  of  the  house?

23 A.       No.   My  team  members  were  all  inside  the  house --

24 were  all  inside  the  residence.

25 Q.       Prior  to  the  execution  of  the  warrant?

Recross - Stacey

1 A.        Prior to executing the warrant, my team members

2 were all stacked in front of the picture window of the

3 house.

4 Q.        Were their vehicles down the street?

5 A.        Vehicles were -- yeah.  Yes, two houses down.

6 Q.        Were there vehicles for the search and arrest

7 team right in front of the house?

8 A.        I would say that would be correct.

9 Q.        So, any members of that team that were in their

10 vehicles were probably right in front of the house.

11 A.        That's correct.

12 Q.        It's June?

13 A.        Yes, June 1st.

14 Q.        Windows down?

15 A.        Windows down in the vehicles or?

16 Q.        Yes.

17 A.        I have no idea.  I don't recall whether the

18 search team's vehicles were parked there and whether

19 their windows were up or down.

20 Q.        Were you communicating with any members of the

21 search or arrest team as you approached the house?

22 A.        No.  Just to let them know we were getting ready

23 to execute the warrant.

24 Q.        Did you do that in person or by radio?

25 A.        We did it by radio, and then we -- once the

Recross -  Stacey

1  residence  was  secure ,  we  communicate d  by  radio  to  let

2  the  team  leader  know  that  it  was  safe  for  his  team  to

3  come  in .

4  Q.     What  about  the  house ?   Window s  open  or  shut ?

5  A.     I  can't  recall .   I  think  the  front  window s  were

6  shut .   If  I  remember  correct ly,  they  were  shut .

7  Q.     You  had  mention ed  that  there  were  search  team

8  member s  in  the  back  of  the  house ;  correct ?

9  A.     I  believe  two .   Two  member s .

10  Q.     The  house  had  been  under  surveillance  for  some

11  time  in  preparation  for  your  entry .

12  A.     That 's  correct .

13  Q.     How  long ?

14  A.     Through  the  night ,  I  believe .

15  Q.     At  least  midnight  and  after ,  you  think ?

16  A.     Yes .

17  Q.     And  what  did  they  communicate  to  you  about

18  window s  open  or  shut  during  the  course  of  their

19  surveillance ?

20  A.     It  d idn't  communicate  anything .   We  were  asking

21  primarily  if  there  was  any  activity  just  prior  to  us

22  maki ng  entry .   That  was  my  primary  concern ,  to  see  if

23  light s  were  on  or  had  come  on ,  whether  there  was  anyone

24  leavi ng  or  enter ing  the  residence  prior  to  us  executing

25  the  warrant .

Recross - Stacey

1  Q.      What do you remember about the weather condition s

2  before you made entry ?

3  A.      Warm and no rain .

4  Q.      Was it a hot summer night or a cool summer night ?

5  A.      I can't recall .

6  Q.      Do you recall air conditioner units in the

7  neighborhood running ?

8  A.      I can't recall .

9  Q.      Do you recall air conditioner units for this

10 house running , if any ?

11 A.      I can't recall .

12 Q.      There wasn't any noise that sticks out in your

13 mind as you approach ed?

14 A.      It was quiet ?

15 A.      It was -- the area was very quiet , yes , so I

16 can't recall whether there was an air conditioner on or

17 not .

18 Q.      There was no ambient noise , if you will , that

19 affect ed your instruction s to knock and announce and how

20 long to wait ?

21 A.      No , none at all .  It was pretty quiet .

22 Q.      On the search and arrest team , you mention ed it

23 was Dave Papalia -- is that P A P A L I A?

24 A.      I believe ; I don't recall .

25 Q.      Montgomery County ?

Recross - Stacey

1  A.      Montgomery  County  Sheriff's  office.

2  Q.      There  was  another  agency  you  mentioned.

3  A.      It  was  our  --  the  office  of  Immigration  Customs

4  Enforcement  out  of  Baltimore.

5  Q.      Baltimore  ICE?

6  A.      Yes.

7  Q.      Any  other  agencies  involved?

8  A.      I  believe  Metropolitan  P.D.  had  representatives

9  there  as  well.

10 Q.      Why?

11 A.      Because  the  warrant  was  being  executed  inside

12 Washington,  D.  C.

13 Q.      That's  standard  protocol;  correct?

14 A.      It  is.

15 Q.      You  want  representatives  of  law  enforcement   from

16 the  jurisdiction  where  the  warrant's  being  executed?

17 A.      If  possible.   That's  not  always  the  case.

18 Generally  though  we  have  representatives  from  that  local

19 agency  with  us.   Since  this  is  a  federal  warrant  it's

20 not  necessary.

21 Q.      In  this  case  you  do  remember  Metropolitan  Police

22 Department  members  being  present.

23 A.      I  do.

24 Q.      How  many?

25 A.      Don't  remember.   I  just  remember  seeing  the

Recross - Stacey

1  roster of the search teams for each location of the 25

2  locations, and there were representatives from ICE,

3  Montgomery County and M.P.D. on virtually every team.

4  Q.      Were these 25 locations all in Washington, D.C.?

5  A.      No.  Some were in Maryland.

6  Q.      For those locations that included Maryland, were

7  there Metropolitan Police Department members of that

8  team?

9  A.      I can't recall.

10  Q.      Do you know if Metropolitan Police Department was

11  part of the underlying investigation?  Was it part of

12  the task force?

13  A.      I can't recall if they were or not.  I know it

14  was an ICE-led investigation.

15  Q.      What members of M.P.D. or Montgomery County were

16  involved?

17  A.      I'm not sure.

18  Q.      I believe your testimony was you don't recall the

19  identity of the Metropolitan Police Department officers

20  who were part of the search and arrest team?

21  A.      No.

22  Q.      At your location?

23  A.      That's correct.  And since we did five locations

24  that day, I was dealing with a lot of different people

25  over the course of the day.

Recross - Stacey

1  Q.      You mentioned that all of the special agents that

2  were part of your entry team were men; correct?

3  A.      That's correct.

4  Q.      Do you recall names or do you recall having seen

5  women assigned to the search and arrest team to follow

6  you?

7  A.      On this particular location?

8  Q.      At this location.

9  A.      Not to my recollection.  I can't remember if

10 there were or not.

11 Q.      If Ms. Dobie was a target of an arrest, a warrant

12 that you were going to execute, would there not have

13 been a woman assigned to the team to process a female

14 target?

15 A.      That's a decision that the search and arrest team

16 would make, not the entry -- the tactical team.  That's

17 not our decision.

18 Q.      That's not something that you remember then is it

19 a particular --

20 A.      Not.

21 Q.      -- 5hat a woman was assigned?

22 A.      No, not that I can recall.

23 Q.      Any other agencies that you recall being part of

24 the search and arrest team?

25 A.      No, just those ones that I've noted.

Recross - Stacey

1  Q.      So, all of the members of the search and arrest

2  team should be comprised of Baltimore ICE, M.P.D. or

3  Montgomery County detectives; correct?

4  A.      That's correct.  To the best of my knowledge,

5  that's correct.

6  Q.      You mentioned in your testimony that the entry

7  was approximately 6:30 in the morning; right?

8  A.      Yes.

9  Q.      I believe your testimony was that you try to

10  execute all of your warrants between 6 and 7 in the

11  morning; right?

12  A.      Generally, that's a correct.

13  Q.      A big, big part of that is because you expect

14  people to be in bed?

15  A.      That's right.

16  Q.      You expect them to be home, one; right?

17  A.      Right.

18  Q.      You expect them to be in bed, two; correct?

19  A.      Correct.

20  Q.      I take it a big part of the reason that you want

21  them in bed is that it helps you gain control of the

22  situation, perhaps better than if they were up late the

23  night before or if it's in the evening; correct?

24  A.      That's correct.

25  Q.      This is June 1st, if I recall; correct?

Recross - Stacey

1  A.      Yes.

2  Q.      By 6:30, had light broken?

3  A.      Just starting to, right.   It was just -- just now

4  starting to get a little light.

5  Q.      Was there anything about your timing of the entry

6  that had to do with daybreak?

7  A.      No.   Other than that we had already executed two

8  warrants prior to the Dobie residence.

9  Q.      That day?

10  A.      That morning.   We had gone -- one -- excuse me,

11  one -- we executed two simultaneously at two different

12  locations at the same time at 6 a.m., and then we went

13  to the Dobie location.

14  Q.      When you say you executed two, your team?

15  A.      My team.

16  Q.      Executed two at 6 o'clock?

17  A.      That's correct.

18  Q.      So your team broke up into two, is that what

19  you're saying?

20  A.      Two elements.

21  Q.      I'm sorry?

22  A.      Two elements.

23  Q.      That's correct.   And then they rejoined for this

24  6:30 warrant?

25  A.      Correct.

Recross - Stacey

1  Q.      So your seven member s were three and four?

2  A.      Well , no .  We had one team of seven on this

3  location .  The other team that was on the simultaneous

4  warrant hadn't reach ed this location by the time we

5  executed it , so they weren't part of this warrant .  So

6  it would have been a dozen member s total , of which seven

7  had been on this location .

8  Q.      Did you have any warrant s to execute after this

9  one?

10  A.      We did .

11  Q.      What time did you execute that one?

12  A.      I think the one after this was probably around 7

13  o'clock .  7:00 a.m.

14  Q.      Each in D. C.?

15  A.      Yes .

16  Q.      Did you execute any after the 7 o'clock warrant ?

17  A.      No.  That was it for the day .

18  Q.      But you knew that you were going to execute each

19  of those warrant s sequentially;  correct ?

20  A.      Correct .

21  Q.      And you knew that another team was going to come

22  in behind you after execution of each of those warrant s?

23  A.      Yes .  There was a search team that we would hand

24  off the residence to .

25  Q.      In the debrief ings in May , were you told that

Recross - Stacey

1  this location on Ninth Street was to be one of your

2  warrants?

3  A.      Yes.

4  Q.      So you knew for two weeks, probably more, you

5  were going to execute a warrant at that particular

6  location.

7  A.      That's correct.

8  Q.      Did you know at what time you were going to

9  execute that particular warrant?

10 A.      We had a rough idea. We had -- we tried to

11 execute the warrants in the most efficient manner going

12 from one location to the next instead of bouncing across

13 town. We tried to do it so it was a little more orderly

14 and sequential. So, yes, we did roughly know exactly --

15 roughly what time we were going to execute the warrant.

16 Q.      During your debriefings, were you advised of the

17 date of the warrant executions?

18 A.      It was contingent upon the warrants being signed,

19 but we knew a window -- approximate window of when those

20 warrants, and that our team would be on standby.

21 Q.      And I take it you were educated as much as

22 possible by the investigative team about this particular

23 residence and its layout, etcetera; correct?

24 A.      That's correct.

25 Q.      Did they provide you a diagram?

Recross -  Stacey

1 A.      I don't remember  seeing a diagram  but we did  have

2 photo s from  the  front  and  the  back  of  the  residence .

3 Q.      This  particular  location  had  been  subject  of  the

4 investigation  for  several  month s; is  that  right ?

5 A.      That 's correct .

6 Q.      Did  the  investigator s indicate  to  you  whether  any

7 under cover  operative s had  been  inside  the  residence ?

8 A.      Not  that  I  can  recall .

9 Q.      Any  informant s?

10 A.      Not  that  I  can  recall .

11 Q.      Were  you  provided  a  schematic  at  all  for  the

12 inside  of  the  residence ?

13 A.      None  that  I  would  remember .  My  answer  would

14 probably  be  no .  I  don't  remember  any  schematic .

15 Q.      You've  testifi ed  that  you  target ed  your  entry  for

16 a  time  when  you  expect ed  people  to  be  in  bed ; correct ?

17 A.      Correct .

18 Q.      In  part  to  make  thing s better  under  control  from

19 your  perspective ; correct ?

20 A.      That 's correct .

21 Q.      Where  were  the  bedroom s, from  your  understand ing ,

22 prior  to  entry ?

23 A.      The  bedroom s would  be  on  the  second  floor .  Since

24 this  was  a  split  level ,  it  would  be  at  the  top  of  the

25 stair s.

Recross - Stacey

1  Q.      You knew it was a split level?

2  A.      We did.  And based on our own personal

3  surveillance that we conducted, we'd try to do

4  surveillance of every location prior to our entry and we

5  were down the alleyway and in front of the house, and I

6  noticed it was a split level.

7  Q.      You've mentioned a couple of times you think it

8  was a smallish house, 2,000 square feet and less;

9  correct?

10 A.      Correct.

11 Q.      What was your estimate or understanding of the

12 distance from the door to the bedrooms upstairs?

13 A.      Prior to the warrant, or after making entry?

14 Q.      Prior to the warrant.

15 A.      Since it was a small house, I would say just by

16 guessing maybe 20 feet, 25 feet.

17 Q.      Straight shot?

18 A.      Straight shot.  I mean, it's going upstairs, so.

19 Q.      Did you know how the stairs were laid out --

20 A.      No.

21 Q.      -- prior to entry?

22 A.      No, not exactly.

23 Q.      How many bedrooms did you understand there to be?

24 A.      At least three.

25 Q.      I take it that your team was split up and

Recross - Stacey

1 assigned to go first to separate bedroom s?

2 A.     Not necessarily . That 's not general ly how we

3 operate . We don't try to choreograph the entry . We

4 just pick up hot spot s as they -- as they're approach ed

5 by team member s.

6 Q.     What were your hot spot s as designate d prior to

7 entry ?

8 A.     The hot spot prior to entry would be -- well ,

9 again , it's not choreographed . As we encounter a hot

10 spot , whether it be an open room , a stairwell , are

11 considered hot spot s. So the first hot that we

12 encounter ed was the stairwell going up to the bedroom s.

13 Q.     But you certain ly expect ed in your measure of

14 entry for a response from a bedroom to your knock and

15 announce ; is that fair to say?

16 A.     Either someone would come from a bedroom ,

17 correct , or be at the door by the time we made entry .

18 Q.     You expect ed them to be asleep ; is that right ?

19 A.     Correct .

20 Q.     So you expect ed there to be some period of time

21 for them to awake n from your knock and respond ; correct ?

22 A.     That 's correct .

23 Q.     All right . And then you expect ed there to be

24 some period of time for them to make their way

25 downstairs to the door ; correct ?

Recross  -  Stacey

1 A.      Or to either  announce  that  they  heard  our  knock .

2 Q.      One  or  the  other .

3 A.      Correct .

4 Q.      So  if  they  made  their  way  to  the  door , it  would

5 be  whatever  period  of  time  it  took  for  them  to  awaken

6 and  get  to  the  door .

7 A.      Correct .

8 Q.      And  that's  standard  for  entry  -- knock  and

9 announce  and  entry  for  a  warrant  at  this  time  of  the

10 morning; correct ?

11 A.      Do  you  want  to  make  a  distinction  between  a  high

12 risk  warrant  and  a  standard  search  warrant  or  --

13 Q.      Well , you've  testified  that  you  considered  this  a

14 high  risk  warrant  --

15 A.      Correct .

16 Q.      -- under  the  factors  of  a  high  risk  warrant ;

17 correct ?

18 A.      This  would  be  a  standard  protocol  for  a  high  risk

19 warrant ; correct .

20 Q.      Just  so  I  make  sure  I  understand  you . You're  not

21 aware  of  any  high  risk  elements  after  going  to  the  judge

22 for  a  warrant  and  the  time  that  you  executed  the

23 warrant , except  for  Mr. Dobie's  release  from  custody ;

24 correct ?

25 A.      That's  the  only  ones  that  I  can  recall , correct .

Recross - Stacey

1 Q.      It was already a high risk warrant on your

2 analysis from the debriefings that you got in May;

3 correct?

4 A.      That's correct, yes.

5 Q.      All right.  You also testified, if I'm not

6 mistaken, that you dispatched to the site of the entry a

7 person with a battering ram; correct?

8 A.      Correct.

9 Q.      Another person with a hooligan bar; is that

10 right?

11 A.      Right.  Generally, the breacher would have the

12 battering ram -- the person designated the breacher

13 would have the battering ram.  Another person would have

14 the supporting tools, which would include the hooligan

15 and the sledge hammer.

16 Q.      So of the seven-member team, two of them had

17 breaching equipment.

18 A.      Correct.

19 Q.      Not three but two?

20 A.      Correct.

21 Q.      All right.  You debriefed about the fact that a

22 warrant was going to be applied for; correct?

23 A.      Yes.

24 Q.      And you were ultimately advised that a warrant

25 had been obtained.

Recross - Stacey

1 A.       That's correct.

2 Q.       And you knew that -- you were armed with that

3 warrant physically when you went to the door; correct?

4 A.       Yes.

5 Q.       In fact, as the -- what would you, yourself, the

6 team leader --

7 A.       Tactical supervisor.

8 Q.       The supervisor -- as the supervisor on the scene,

9 you were literally in possession of the warrant itself?

10 A.      I did not have possession of it.  I saw the

11 warrant -- physically saw the warrant.  It's our

12 protocol to see the warrant, and I handed it back to the

13 case agent, and the case agent presents the warrant to

14 the occupants.

15 Q.      As the supervisor of the entry team, it's

16 literally your responsibility to be educated about the

17 warrant, and you mentioned that you've actually grabbed

18 it and reviewed it; correct?

19 A.      Correct.  And I saw that it was signed.

20 Q.      There weren't -- there wasn't any special

21 permission from the judge on that particular warrant,

22 exigent circumstances; correct?

23 A.      Not that I can remember, no.

24 Q.      In other words, you knew that this was a warrant

25 that you were going to execute under the normal

Recross - Stacey

1 circumstance s of knock and announce as it applied to
2 those circumstance s.

3 A.       That 's correct .

4 Q.       All right . I believe that you testifi ed that you
5 were essentially the first in the door; is that correct ?

6 A.       I was either the first or the second . I think --
7 I can't recall if Agent Muldown precede d me, since we
8 were both in on the land ing .

9 Q.       You were the one who encounter ed Ms. Dobie , if I
10 recall , from your testimony ; correct ?

11 A.       That 's correct .

12 Q.       And by the way . Were you wear ing your hair or
13 head in the same manner on that date ? Were you clean
14 shaven on that date ?

15 A.       No . I had a balaclava on over my head .

16 Q.       Can you describe what that is?

17 A.       It's a black hood that 's worn over the head ,
18 goggle s, and a black battle dress uniform .

19 Q.       All the member s of the team are wear ing that ?

20 A.       Correct .

21 Q.       Was there an ICE agent who had blond hair who
22 show ed up later that wasn't wear ing that entry garb ?

23 A.       That had blond hair ? Not that I can recall .

24 Q.       Do you recall -- happen to recall any M.P.D. or
25 Montgomery County detective s, a male with blond hair ?

Recross - Stacey

1  A.       Not that I can recall.  There were -- again, we

2  did five warrants that day, and I don't recall, you

3  know, everyone at every scene, every location.

4  Q.       I think you've already testified you specifically

5  do not recall a woman among any of the officers, right,

6  or agents?

7  A.       That's correct.

8  Q.       And does that include that you do not recall an

9  African-American officer from the M.P.D.?

10  A.       I don't recall an African-American officer from

11  M.P.D.

12  Q.       An African-American woman officer, I'm sorry.

13  A.       No, I don't recall an African-American woman

14  officer at the Dobie location at all.

15  Q.       All right.  But you did testify that you were the

16  person who essentially first encountered or apprehended

17  Ms. Dobie; right?

18  A.       That's correct.

19  Q.       She was coming out of the bedroom?

20  A.       She was standing at the top of the landing, the

21  top of the stairs adjacent to the bedrooms.

22  Q.       Was she naked?

23  A.       No.  She had a white T-shirt on, sleeveless

24  T-shirt that extended perhaps to the top of her thigh.

25  Q.       Do you know if she was otherwise naked?

Recross - Stacey

1  A.      No.   Other  than  the  T-shirt  --  I  mean  not  --  you

2  mean  not  clothed  below  her  T-shirt,  is  that's  what

3  you're  asking?

4  Q.      Correct.

5  A.      I  would  say  probably  she  was  not  clothed.

6  Q.      I  take  it  it  appeared  to  you  she  was  literally

7  rising  out  of  the  bed  when  you  encountered  her?

8  A.      That's  what  it  appeared  to  me.

9  Q.      Can  you  describe  for  us  a  bit  more  fully

10  apprehension  to  request  to  use  the  restroom  to  using  the

11  rest  room?

12  A.      Sure.   As  I  went  to  the  top  of  the  stairs,  I  gave

13  Ms.  Dobie  several  commands  to  raise  her  hands.   I  also

14  wanted  her  to  get  out  of  the  way  of  the  middle  of  the

15  hallway  to  allow  the  rest  of  the  team  to  pass  and  start

16  securing  hot  areas.   She  asked  me  what  was  the  nature  of

17  what  we  were  doing.   She  said,  officer,  what  are  you

18  doing?   I  said,  we're  executing  a  search  warrant.   And

19  she  goes,  what's  this  about?   I  told  her  someone  would

20  explain  to  her  what  it  was  about  after  we  secured  the

21  residence.   She  then  indicated  to  me  that  she  had  to  use

22  the  restroom.

23  Q.      Was  she  on  the  ground  for  that  discourse?

24  A.      She  was  standing  at  that  point,  and  I  had  her

25  against  the  wall  to  allow  the  rest  of  the  team  to  come

Recross - Stacey

1 through .

2 Q.      Her hands were raised?

3 A.      Her hands were raised.

4 Q.      You've -- I don't remember  if you did testify

5 actually, but you -- were each of these devices used  to

6 make entry, the sledgehammer, the  battering  ram and the

7 hooligan tool?

8 A.      Just the sledge- -- just the battering  ram,

9 excuse me.

10 Q.      How many times did you hit the  door with the

11 battering ram?

12 A.      Once, possibly twice.

13 Q.      I take it it makes a loud boom.

14 A.      Yes.

15 Q.      And it did on that occasion?

16 A.      It did.

17 Q.      And then when you made entry, were you yelling

18 commands upon entry?

19 A.      Yes.  Police officer .  Police officer  with a

20 search warrant over and over again.

21 Q.      I take it that's standard protocol.

22 A.      That is standard protocol.

23 Q.      That probably was literally at the top of your

24 lungs.

25 A.      Yes.

Recross - Stacey

1  Q.      So as you saw her as you went in, she is reacting

2  to this noise and suddenness, is that fair to say?

3  A.      Yes.

4  Q.      Startled?  IS that --

5  A.      Yes.

6  Q.      That was a yes?

7  A.      That's correct, yes.

8  Q.      Was there a point when you -- after you

9  encountered her, where you had her get to the ground or

10 not?

11 A.      I'm trying to recall.  I had her get to the

12 ground because I know she was being very vocal about

13 having to use the bathroom, and I was concerned that

14 there was an open door that hadn't been searched.

15 Again, that's in our hierarchy of threats.  Stairs and

16 open doors are our primary concern, and I remember just

17 looking into the bedroom and seeing Mr. Dobie and

18 starting to give him commands.  So, I don't think  I had

19 her on the ground, because simultaneously I was giving

20 commands to Mr. Dobie to get out of the bed and come to

21 me.

22 Q.      Was this request to use the restroom in the

23 context of being startled at the rush of officers into

24 the house?  Is that your perception?

25 A.      I can't answer that, but I know she was very

Recross - Stacey

1  vocal about having to use the bathroom because I was

2  going to turn around and put the handcuffs on her when

3  she kept saying I really need to use the bathroom, and I

4  allowed her to use the bathroom.

5  Q.     There are two bathrooms in that hallway; is that

6  correct?

7  A.     The only one I can recall is the one directly

8  across from the bedroom.  There might have been another

9  one in the master bedroom and I don't recall.

10 Q.     Your understanding is that she emerged from the

11 master bedroom; correct?

12 A.     Yes.

13 Q.     There was a bathroom in the master bedroom?

14 A.     I believe so.

15 Q.     And then a bathroom in the hallway near where you

16 encountered her?

17 A.     Correct.

18 Q.     How many seconds before entry would you say and

19 her request to use the bathroom?

20 A.     Hard to say.  I would say perhaps ten seconds.

21 Q.     And how many times after her request until you

22 let her -- until you complied with her request?

23 A.     Another ten seconds, because I had -- again, I

24 had an unsecured room, and that's when I saw Mr. Dobie.

25 So, I was dealing with two things at the same time,

Recross - Stacey

1 dealing with Mrs. Dobie and dealing with giving commands

2 to Mr. Dobie to get out of the bed.

3 Q.     Do I understand from your testimony that you

4 allowed her to go use the restroom while you were still

5 securing the house?

6 A.     Correct.

7 Q.     And that didn't appear to be a threat to you.

8 A.     Well, it was -- it's sort of outside of our power

9 to control, but I was afraid that Ms. Dobie was going

10 to have an accident if I didn't allow her to use the

11 restroom.

12 Q.     The bathroom had not been secure though; correct?

13 A.     I took a quick look inside the bathroom to make

14 sure there were no weapons, and Mrs. Dobie actually

15 offered to keep the bathroom door open while she used

16 the bathroom.

17 Q.     All of this discourse happened in the first 20

18 seconds as you made entry?

19 A.     I would say the first request to use the restroom

20 was within ten seconds after entry.  And then by the

21 time she actually used the restroom, another 15, 20

22 seconds.  I don't know.

23 Q.     Between the start of the surveillance as you

24 understood it at approximately midnight and your

25 assembly on the porch, you didn't have any information

Recross - Stacey

1  that people were coming and going from the back of the

2  house , for instance ?

3  A.      We had no intelligence  that there was any

4  activity whether people leaving or entering the house or

5  that light s had come on.

6  Q.      Nothing -- there were no factor s between the

7  beginning of that surveillance  that were related to you

8  prior to entry about any additional  circumstance s that

9  you were worri ed about ; correct ?

10 A.      Correct .

11 Q.      No additional  circumstance s that would present

12 harm to your officer s other than what you already knew ;

13 correct ?

14 A.      That 's correct .

15 Q.      From the time that you knock ed, the first knock ,

16 until you made entry , I belie ve your testimony  was that

17 you didn't hear anything .

18 A.      That 's correct .

19 Q.      You didn't hear anyone say anything ; correct ?

20 A.      That 's correct .

21 Q.      You didn't hear -- you didn't hear anybody moving

22 around at all .

23 A.      I heard nothing .

24 Q.      You didn't -- there wasn't anything that you

25 recall that obscure d your ability to hear , correct , like

Recross -   Stacey

1  air conditioning   and the like ?

2  A.       No.

3  Q.       Court 's indulgence .

4        Agent , you mention ed that there were -- that you

5  had seen roster s of who was going to be among the entry

6  team and then the search and arrest team for each

7  location ; correct ?

8  A.       That 's correct .

9  Q.       Do you happen to know where those roster s are

10  maintain ed today ?

11  A.       I would assume the case agent would have those .

12  Q.       It's standard with your work for those roster s to

13  be maintain ed typically by the case agent ?

14  A.       Correct .   It's part -- it's usually an attach ment

15  to an operation s plan .

16  Q.       Agent , you've testifi ed fair ly clear ly and

17  extensively , I think , about the knock and announce and

18  your entry .   I just want ed to be sure that there weren't

19  any other factor s other than what you had been debrief ed

20  about , your information about the residence , the target s

21  of the search , their backgrounds , nothing happened after

22  the knock and your entry that changed any of your

23  calculus ; correct ?

24  A.       That 's correct .

25  Q.       And you testifi ed that you believe d it was

Recross - Stacey

1  between  15  and  25  seconds .

2  A.        Minimum  15 , correct .

3  Q.        And  I got  the  impression   from  the  question  by

4  counsel  to  you  that  you  had  done  your  own  reenactment --

5  A.        Several  time s.

6  Q.        -- in preparation   for  this  hear ing .

7  A.        But  also  in  most  of  the  warrant s  that  we  do  in

8  Washington,   D. C. there 's  a  very  strict  requirement   to

9  be  at  least  to  10  seconds  of  knock  and  announce  prior  to

10  entry .

11  Q.        In other  words , from  the  first  bang ?

12  A.        From  the  first  bang -bang  to  you  mak ing  entry , it

13  should  be  a  minimum  of  ten  seconds .

14  Q.        That 's  something  different  from  D. C. than

15  elsewhere ?

16  A.        I  think  most  place s  it's  open  to  interpretation ,

17  but  D. C. they  require  --  at  least   this  is  what  I've

18  been  told  --  they  require  ten  seconds  from  the  first

19  knock  to  the  point  of  entry .

20  Q.        So of  the  100  to  120  warrant s  you've  executed ,

21  they  --  there  are  --  they're  sometimes  less  than  ten

22  seconds .

23  A.        Right.   Most  of  those  warrant s  I  was  on  a  team  in

24  Miami  for  seven  year s, and  most  of  those  warrant s  didn't

25  have  that  same  requirement .

Recross - Stacey

1  Q.      So my question was:  So there are warrants that

2  you have participated in?

3  A.      That were less than ten seconds.

4  Q.      Less than ten seconds from knock to entry?

5  A.      Right.

6  Q.      Do I understand your response to be that it's a

7  bit more cumbersome for somebody in your position in D.

8  C. because you have to wait extra amount of time?

9  A.      I wouldn't say it was cumbersome.  We're just a

10 little more methodical about our knock and announce.

11 Q.      You reenacted the bang, bang, bang, the

12 announcement, and the entry in preparation for this

13 hearing.

14 A.      Yes.  I discussed it with counsel, yes.

15 Q.      You didn't reenact it.

16 A.      Reenact in the sense of?

17 Q.      Literally, bang, bang, bang.  Command.  Bang,

18 bang, bang.  Command.  And entry.  You didn't literally

19 reenact it and time it.

20 A.      No.  We discussed how long it would take to knock

21 and announce the whole process.

22 Q.      So it was a discussion between you and counsel.

23 I'm not asking you for the consents of your discussion,

24 but it was just a discussion between you and counsel.

25 A.      Correct.

Recross - Stacey

1 Q.      You did not literally reenact it:  Bang, bang,

2 bang?

3 A.      No.  I think we actually walked through it and

4 how long -- I described exactly what I did.  Knocked.

5 Waited.  Knocked.  Waited.  Made entry.

6 Q.      Okay.  I'm sorry to sound so -- to belabor this

7 point, but you didn't reenact it.  You simply discussed

8 the factors of what was undertaken and then estimated, I

9 think it was at least 15 seconds; correct?

10 A.      Yeah.  I'm not sure if I understand the question,

11 counselor, because I think we actually went and knocked

12 on a table.  I described exactly what I did to counsel.

13 So if that's a reenactment then, yes, we reenacted it,

14 but I didn't physically go through the whole process of

15 showing how the door was breached and the whole process

16 of making entry and did I knock and

17 describe what I did.

18 Q.      Yes, more of a description and reenactment.

19 A.      Yes.

20 Q.      There wasn't any shouting in counsel's office; is

21 that correct?

22 A.      Not at all.

23      MR. PIERCE:  Your Honor, I believe I'm prepared

24 to pass the witness.

25      THE COURT:  Okay.  Thank you.  Ms. Greenberg.

Redirect - Stacey

1          MS. GREENBERG:   Briefly, Your Honor.

2                    **REDIRECT EXAMINATION**

3          BY MS. GREENBERG:

4  Q.      Counsel asked you about the other agents that

5  were present in and around the location that we're

6  talking about here, Ms. Dobie's residence.

7  A.      Yes.

8  Q.      Could you explain to the court, were people sort

9  of out and about lounging on the street, or was it more

10 secretive, more covert?  Could you explain that to the

11 judge?

12 A.      Obviously, it's more covert.  Our entry is

13 stealth.  Like, we try to draw as little attention as

14 possible prior to making entry.  I have no control over

15 what we call the break out team.  That's the team that

16 contains the outer perimeter of the residence.  So, I

17 can't really testify what they did or where they were.

18 All I can testify is what we were going up to and into

19 the entry of the house.

20 Q.      And when you were attempting to -- when you

21 approached the residence and made a knock and announce

22 at the front door, did you look around and see officers

23 standing around or was it -- appear to be a much --

24 A.      No.  My focus is on the threat.  And to me, the

25 door and the window are the two primary threats to

Redirect - Stacey

1  myself and my team.  So the last thing I'd be looking at

2  is who was out on the street.  I just insure that my

3  team is on the stack what we call the stack

4  configuration  to go through the front door and that we

5  were all prepared to make entry.  I don't really look at

6  the street.

7  Q.      Was there any radio or visual alert that you were

8  aware of that somebody from the house could see, based

9  on law enforcement , coming out?

10 A.      I saw no visual -- no indication across the radio

11 that there was that sort of alert, and I was monitoring

12 all the traffic on the radio on a headset.

13 Q.      So it wasn't one of those radios  that we see the

14 police officers  use that's on their collar where

15 somebody standing, you know, next to them or down the

16 street could hear what's squawking over the radio?

17 A.      No.  It's an ear piece sort of like what you see

18 Secret Service agents wearing.  It's an ear pace and

19 small microphone mounted to the top of the vest.

20 Q.      Just to be clear.  When you're at the front porch

21 of the house, you want control over that whole

22 situation.  You don't want anybody sort of out in the

23 street alerting people inside to anything.

24 A.      That's correct.

25 Q.      And you also talked about control  in response to

Redirect - Stacey

1 defense counsel's question s about the fact that the

2 warrant is done so early in the morning when occupant s

3 are usually asleep. Could you tell the judge, does that

4 affect your decision, the time of the warrant and the

5 fact that individuals might be in bed in term s of safety

6 upon entry?

7 A.      Absolute ly.  And that's our primary consideration

8 is the safety of the team and for the occupant s.  We

9 find that if we do it as early as possible, and 6

10 o'clock being the normal time that we do these high risk

11 warrant s and that the occupant is groggy or not quite as

12 alert, and therefore they're not capable to reach a

13 weapon or provide resistance.  So if we quick ly enter

14 the house and secure the area, it's the safest point of

15 time for both the occupant s and the team.

16 Q.      And that's based on your train ing and experience?

17 A.      Correct.

18 Q.      And was that -- was that shown to be true by this

19 particular search warrant?

20 A.      Absolute ly.  This warrant and other s similar to

21 it, that if you get the occupant s early in the morning

22 that it's less like ly that anyone is going to be hurt.

23 Q.      Was there item s locate d within the house by your

24 team that could have been use d against your officer s?

25      MR. PIERCE:  Objection, Your Honor.

Redirect - Stacey

1         THE COURT:   What's the basis of the objection ?
2  What's the basis ?
3         MR. PIERCE:   Oh, the basis is, Your Honor , it's
4  irrelevant .   This is an examination  about  the factor s
5  that went into the knock and announce  and the entry , and
6  whatever  was found  inside  at some  later  time during a
7  search  was really  irrelevant  to the analysis .
8         THE COURT:   Ms. Greenberg .
9         MS. GREENBERG:    Your Honor , I'm just -- counsel
10  was question ing the  agent  on his  judgment  call and
11  allow ing Ms. Dobie  to go to the bathroom  and how they
12  enter ed the  residence .   I was  just factor ing  in --
13         THE COURT:   I'll over rule the  objection .
14         THE WITNESS:   Yes .   The search  team  discovered
15  two handgun s in  the master  bedroom  after we made  entry .
16         BY MS. GREENBERG:
17  Q.      That was one of your hot spot s?
18  A.      That's correct .
19  Q.      And is that because  the door was open and there
20  was a person  in it?
21  A.      That's correct .
22  Q.      Now, counsel  also  question ed you about  the size
23  of the house .   Obvious ly, you were there and we weren't .
24  But could  you tell Judge Titus , based  on the size  of the
25  house  and the location  of the bedroom  to the front  door ,

Recross - Stacey

1  was there sufficient time for somebody to wake up, get

2  out of bed and go to the front door, based on your knock

3  and announce?

4  A.     I would say yes. Absolutely. From the time --

5  from the first knock to the point that we made entry, I

6  would say there was sufficient time to reach the door.

7  Q.     And at the very least to call from the top of the

8  stairs, I'm coming.

9  A.     Absolute.

10     MS. GREENBERG: Court's indulgence.

11     No further questions.

12     THE COURT: Any recross?

13     MR. PIERCE: Very briefly, Your Honor.

14                   **RECROSS  EXAMINATION**

15     BY MR. PIERCE:

16  Q.     Agent, I'm not sure I heard your testimony

17  correctly. Did you say you had an earpiece in at the

18  time of the knock and announce?

19  A.     That's correct.

20  Q.     Just one or two?

21  A.     No, I had one.

22  Q.     Was this connected to a radio? Was it?

23  A.     It was.

24  Q.     Were there any commands or information being

25  relayed to you as you approached the house?

Recross - Stacey

1  A.      No.  No commands at all.

2  Q.      So that from the time that you approached until

3  you actually made entry, no communication  to the ear

4  piece?

5  A.      None.  The only -- there might be inter-team

6  communication.

7  Q.      I'm sorry?

8  A.      Inter-team, the entry team's communication  that

9  they were in position -- that my team was in position.

10 Q.      Your seven members?

11 A.      Correct.  But not from outside the team.

12 Q.      How about after the knock until entry?  Any

13 communications through the ear piece?

14 A.      None.  None from outside the team members.

15 Q.      Is there a sort of a hum or a hiss or a, you

16 know, kind of a white noise that comes through the ear

17 piece?

18 A.      No.  It's kept very low.  We have one ear that's

19 free and the other ear that has the ear piece, and it's

20 kept on a very low volume.

21 Q.      In other words, it didn't distract you from the

22 time you knocked until you made entry?

23 A.      No.

24 Q.      You had mentioned that it was totally silent.

25 A.      Correct.

1  Q.      You didn't hear anything inside the house.

2  A.      Nothing at all.

3  Q.      No toilets flushing?  Nothing?

4  A.      Nothing.

5          MR. PIERCE:  Okay.  That's all I have of the

6  witness, Your Honor.

7          THE COURT:  Anything further?

8          Thank you.  You may step down.

9              (Witness excused at 11:23 a.m.)

10         THE COURT:  Any further witnesses?

11         MS. GREENBERG:  No I want today remind the court

12  it's been some time that we actually litigate it had

13  actual search the court found there was probable cause

14  for the search and for the items seized this is a simply

15  the knock and announce we continue don't have any

16  further witnesses for this location.

17         THE COURT:  All right.

18         MR. PIERCE:  Your Honor, this was, you know,

19  absolutely a critical witness for this hearing.

20  However, we understand that there were percipient

21  witnesses among law enforcement, presumably from --

22  other than the ICE team, but perhaps just the ICE entry

23  team.  We've been endeavoring to determine the identity

24  of those potential witnesses.  We've been operating

25  under the descriptions of a blond customs agent and a

1 female  African-American    M.P.D. officer.

2        The defense  has  been  working  with  the  government

3 in efforts  to  informally  identify  those  people , and

4 those  have  been  unsuccessful.   We  have  issued -- not

5 knowing  about  or  focussing  on  Montgomery   County

6 detectives.   We  issued  a  subpoena  for  the  custodian   of

7 records  of  M.P.D. to  try  and  identify  who  it  was  that

8 was  from  M.P.D. who  was  on  the  site  who  may  have  been  a

9 percipient  witness .   We've  not  gotten  a  return  of  that

10 subpoena  yet.

11        I  would  inform  the  court  that  when  I  spoke  with

12 general  counsel  for  the  M.P.D. this  morning , I  told  him

13 do  not  worry  about  rushing  out  a  custodian  of  records .

14 What  we're  really  interested  in  is  the  records , and  your

15 chambers  were  actually  kind  enough  to  provide  the  fax

16 number  in  the  event  that  M.P.D. is  able  to  locate

17 relevant  records  to  fax  to  chambers  either  this  morning

18 or  to  my  office  later.

19        In  either  event,   once  I've  determined  the

20 identity  of  the  percipient  witness , we  would  probably

21 need  to  ask  the  court  to  indulgence  us  to  present

22 additional  evidence -- not  today , but  at  some  point --

23 to  just  close  the  loop .  If  there  were  any  percipient

24 witnesses  to  this  entry  from  our  investigation , they

25 would  be  among  law enforcement   and  from  our

1 investigation  they would either  be a blond  Customs agent

2 or a female M.P.D. officer , and we're  just not  able  to

3 tell  the  court  those  identiti es  yet .

4          THE COURT:    What  is  it  you believe  those  other

5 officer s would  testify  to  that  would  be  other  than  what

6 I've heard  today ?

7          MS. GREENBERG:    Your Honor , just  to  shortcut

8 this .  Believe  it  or not , this  is the  blond  agent .   He

9 had  hair  then . (Indicating  Agent  Stacey.)

10         THE COURT:   Oh.

11         MS. GREENBERG:   We've  mention ed  to  defense

12 counsel  we've  talk ed  to  him and he's  in  charge  of  the

13 team .  As far as  I know , you  are  the  only  one  that  would

14 have  been  the  blond  officer  on  the  entry  team .

15         AGENT STACEY :  That 's the  only  one  I could  think

16 of .

17         MS. GREENBERG:   Your Honor , Dave  Papalia, who was

18 the  team  leader  for  the  search , has  blond  hair , and  he

19 was  part  of  the  entry  team .   We have  not  been  able  to

20 locate  without  any  name  or  anything  else  an  M.P.D.

21 officer  that  might  have  swung  by  the  location , and  I

22 just  want  to  let  the  court  know  the  status  of  our

23 investigation , but  this  gentleman  is  the   only  blond

24 person  that  could  have  been  on  the  entry  team .

25         MR. PIERCE:   It  wasn 't , from  my  understand ing ,

1  and our investigative effort s to date , it would not have

2  been a member of the entry team . But instead , probably

3  a member of the search and arrest team .

4       THE COURT:   What would that person be able to

5  offer that would assist in resolving the legal issue of

6  the validity of the entry as opposed to the search ? The

7  search is an issue I've already address ed.

8       MR. PIERCE:   Exact ly , Your Honor .  I think the

9  only potential testimony would be that it was not a --

10  it was not even 15 seconds between knock and entry but

11  was a more simultaneous knock and entry .  That 's what

12  the percipient witness , we would testify to that , we

13  would have to identify them .  Obvious ly , if we were

14  allow ed access to the witness and determine in advance

15  that that 's not the potential testimony , then we

16  would n't have any additional evidence to present .

17       THE COURT:   Are you proposing that I continue the

18  hear ing ?

19       MR. PIERCE:   Your Honor , we would like the court

20  to take the matter under submission and allow us to

21  complete try ing to identify who the percipient witness es

22  would be . If there aren't any , we can inform the court

23  and counsel that we will have no additional evidence .  I

24  don't know if the court wants to hear argument now or if

25  the court would just be willing to reconvene the hear ing

1  simply for any additional brief testimony and argument.

2       THE COURT:  Well, this hearing has been scheduled

3  for a number of months with a fairly substantial period

4  of time to investigate these matters.  Why hasn't it

5  been resolved before now?

6       MR. PIERCE:  We've been working with the

7  government.  I think we probably -- I can't remember

8  when it was that we sent a letter over to the government

9  to try to help with the identification and what we just

10  got back.  I think it was the end of the week before

11  last was.  This is the only blond Customs agent we've

12  been able to identify.  We're not able to identify any

13  M.P.D. officers and certainly no females, so that

14  required us to go the subpoena route which we were

15  trying to avoid.  I apologize, Your Honor, but those

16  were the efforts that we undertook to try and make sure

17  that every witness was available for today's date.

18       THE COURT:  All right.  Ms. Greenberg.

19       MS. GREENBERG:  Your Honor, first of all, this

20  would be unbelievable.  If a witness who was out on the

21  street would somehow know what Agent Stacey and his team

22  was doing on the porch, because they were being

23  surreptitious, they were close to the door, and his

24  testimony stands on its own and is sufficient for the

25  court to rule on this matter.

1        Secondly, while I had told counsel I believed I
2    was under no duty to locate witnesses for him without
3    specific names, we endeavored through talking to Special
4    Agent Stacey, talking with the case agents to try and
5    help them in this regard. We have not been able to
6    locate this witness that they allege was there. There
7    is no list of people from M.P.D. who were present that
8    the government has.
9        We're not trying to hide access to anyone. We
10   have tried our best to help counsel. We can show
11   counsel the list that was prepared by the investigating
12   agents; there is no M.P.D. officer on there. It has
13   Special Agent Snider's notes on it, so I can't give it
14   to him at this time but we've been saying for months
15   that we have no idea who Ms. Dobie is talking about.
16       And the fact that, you know, the defense wants to
17   continue the hearing to prove that Agent Stacey
18   committed perjury in his testimony before the court just
19   doesn't make any sense. If they have some evidence like
20   that, they can call us and we can talk about it. But at
21   that this point, I think we just need to put this matter
22   to rest. We've been telling them for quite some time
23   that we have no idea who they're talking about.
24       THE COURT:  Well, you know, as I said, this
25   matter has been scheduled for quite some time. I have

1 listened carefully to the testimony, I've reviewed the

2 submissions by the parties and the law; I'm prepared to

3 make a ruling.  That's not to say that somewhere along

4 the line, if defense counsel could come up with a

5 smoking gun witness who is going to say no, they didn't

6 wait at all, they just came to the front door and

7 battered it down -- if you've got a witness like that,

8 bring it forward and ask to reconsider the ruling.  But

9 I think we've got to rule on this motion based upon what

10 we have now, and if there's -- if indeed something like

11 that pops up, fine, but I -- I don't see a basis for

12 deferring making a ruling.

13        I think we ought to get the pretrial rulings in

14 this case out of the way so this case is ready to go to

15 trial, and if somehow a phantom witness comes out of the

16 woodwork that would in fact contradict the testimony

17 I've heard, then I could certainly be asked to

18 reconsider the ruling.  Nothing is final until we're in

19 trial.

20        So, I'll be glad to hear argument now on why,

21 based upon the testimony I've heard today, I should rule

22 that the search was not properly conducted in terms of

23 the knock and announce.

24        MS. GREENBERG:   Your Honor, I would submit on the

25 motions given to the court.  Obviously, the cases looked

1  at all the evidence present ed to the investigati ng

2  officer in this case . We had two individuals with

3  criminal histori es , we had what was deem ed a high risk

4  entry by the investigating  agent s on a very strong

5  wiretap case , and agent s should be given a reasonable

6  time to consider that they're not being given entry .

7          The case s have general ly talk ed about a

8  reasonable time being anywhere from five to ten seconds

9  to 11 to 12 seconds , and the Fourth Circuit case that 's

10  unpublish ed , but that is on point in this case , is the

11  Hargis case , and it talk ed about 12 to 14 seconds .

12  Certain ly under the circumstance s present ed here , Agent

13  Stacey's decision as to the amount of time reasonable to

14  wait in light of the circumstance s present ed to him was

15  reasonable . I have nothing further to add beyond the

16  testimony which the court has just heard in the motion s.

17          THE COURT: All right . Mr. Pierce .

18          MR. PIERCE: Your Honor , I think the most

19  important fact s and factor s for this search or this

20  entry is that as the agent was able to testify and as

21  I'm sure the court has heard from other testimony

22  throughout this pend ing litigation , this was a long

23  investigation . This was an extensive  investigation .

24  This investigation   included Title 3 intercept s, which is

25  a rarity in law enforcement  , and provided them --

1 provided these investigative agents with much more

2 intelligence and information than they would normally

3 have.

4        They knew everything about the background of the

5 targets of the search and arrest.  They knew everything

6 about the evidence that they would one day present in a

7 courtroom about the guilt and the weight of the evidence

8 for the charged crimes.  They knew an extraordinary

9 amount of information.  And they knew that information

10 at the time of the two debriefings in May when the agent

11 who was in charge of making the decision about entry was

12 educated about all of those facts and circumstances.

13        The warrant in this -- at this location was

14 applied for on, according to counsel, the 27th.  I

15 believe I misspoke when I said the 24th.  That means

16 that four days before the execution of the warrant, the

17 agents went to a judge and swore out the facts that

18 supported the entry, and they had all of the information

19 that they needed to educate that judge to say, judge,

20 this is going to be an exigent entry.

21        We're afraid of the circumstances, we're afraid

22 of the danger, we're afraid of all of the facts that we

23 have learned throughout the investigation.  We're afraid

24 about the fact that this is a drug investigation.  We're

25 afraid about the fact of a prior record on behalf of the

1  people living there. They had all of that information .
2  They had all of it to present to the judge , and if the
3  factor s warrant ed what amount ed to an exigent entry , the
4  judge could have authorize d that .
5       THE COURT:  You're not suggesting that there 's a
6  requirement that they secure authority to enter without
7  knock ing from a judge in advance are you ?
8       MR. PIERCE:  No, I'm not .
9       THE COURT:  That 's not the law as I understand
10  it.  You may be able to go to a magistrate and ask for
11  that but you don't have to.
12       MR. PIERCE:  What I'm -- the only thing that I
13  want to point out to the court is that if this -- if the
14  factor s were such that it allow ed the agent to quick en
15  his entry , to essential ly do a simultaneous knock and
16  entry , then those fact s and circumstance s were known and
17  could have been present ed to a magistrate, who could
18  have said no need to do the knock and announce .
19       It's important , I think , that the record reflect
20  and that the court measure upon :  All of the fact s that
21  were known upon entry were known at the time of the
22  warrant .  This officer testifi ed that he went to the
23  location for the entry , that it had been secured and
24  surveil led for -- since midnight the night before , and
25  there were no factor s or circumstance s that arose

1  over night  that  made  the  entry  anymore  problematic ,

2  anymore  dangerous ,  anymore  anything  than  at  the  time  the

3  warrant  was  obtain ed  and  at  the  time  that  the

4  debrief ings  were  conduct ed.

5          He  even  testifi ed  that  as  he  went  to  the  door  in

6  the  summertime ,  there  were  --  there  was  no  noise .   There

7  was  no  noise  that  obscure d  his  ability  to  hear  anything ;

8  no  air  conditioner .   It  was  still .   It  was  silent  out .

9  They  did  their  knock  and  announce .   And ,  by  the  way ,

10  presumably ,  that  would  have  been  --  if  it  was  going  to

11  be  loud  enough  to  rouse  somebody  from  inside ,  it  should

12  have  been  plenty  loud  enough  to  any  of  the  officer s

13  line d  up  on  the  street s  30  feet  away ,  50  feet  away ,  100

14  feet  away ;  it  should n't  matter  inside  a  car  or  outside  a

15  car ,  close d  windows  or  not .

16          If  this  was  a  proper  knock  and  announce  --  as  the

17  agent  testifi ed  to ,  they  bang ed ,  made  it  apparent  that

18  they  were  there  to  execute  a  search  warrant  and  yell ed ,

19  law  enforcement  with  a  warrant  open  up .   If  it  was  done

20  properly  --  and  I  have  no  doubt  that  the  agent  testifi ed

21  that  they  --  they  did  it  at  the  top  of  their  lung s ,  that

22  should  have  been  heard  up  and  down  the  street s  and

23  certain ly  inside .

24          He  testifi ed  to  still ness  and  silence  afterwards .

25  There  was  nothing  obscuring  anything  --  any  of  his

1   ability to hear.  If somebody was -- had enough time to
2   come to the door, he could have heard it.  He didn't
3   hear any flushing of toilets; there was no evidence
4   being destroyed.  There were no factors that arose from
5   the time of the knock, the entry that would have
6   indicated to this agent that anything else had arisen
7   other than what was known when they went for the warrant
8   itself.  In the face of the silence, he testified that
9   he waited what he believed was 15 seconds.  He thinks it
10  could have been as long as 25, but his better estimate,
11  the 15 he did on a reenactment.
12          The reason I focused on that, Your Honor, is that
13  in the natural circumstances of an agent about to make
14  entry into a house that potentially every time they do
15  that, it could be dangerous.  So the adrenaline is
16  running as it should be, and I submit to the court that
17  15 seconds reenacting it by demonstration  and talking it
18  through with counsel is probably closer to ten is
19  probably closer to five in the circumstances of the
20  adrenaline of an agent knocking, listening, knocking.
21          Your Honor, I think that the -- what the record
22  reflects is that it certainly did not sound like it
23  would be more than the 15 seconds that he testified to
24  and had it been those 15 seconds, had they knocked
25  loudly enough, he testified that he encountered Ms.

1 Dobie at the top of the stairs.

2        If there is a knock that gets somebody up out of
3 bed -- and again, he testified we expected them to be in
4 bed and we expected them to be asleep, there needs to be
5 enough time to allow the person to get up and answer the
6 door. That's what the statute is designed for. We
7 don't want officers breaking down doors if it can be
8 avoided. There were no factors in -- on this record
9 that suggested any danger to these agents that suggested
10 any circumstances of silence where they could not wait
11 for the door to be answered. Ms. Dobie was at the top
12 of the stairs. She didn't have enough -- he testified
13 that it appeared to him clearly that she was just rising
14 from bed.

15        She had on a T-shirt just past her waist. She
16 was clearly in her sleepwear, and she got only as far as
17 from the bed to just outside the bedroom door when the
18 door came crashing in. Your Honor, that's not enough
19 time. It's 15 seconds. If there are circumstances that
20 warrant danger to the officers, fear that evidence is
21 being destructed, and there are no factors here such as
22 that. There is no reason why these agents couldn't have
23 waited 25, 35, 45 seconds, whatever it would have taken
24 for Ms. Dobie to get to the door and answer the door and
25 let them in without breaking the door down. That's what

1 the statute require s, that 's what the case law require s

2 under the fact s of this case where there was a knock ,

3 dead silence , no circumstance s arising that would

4 prevent them from waiting for her to get to the bottom

5 of the stair s and answer the door .

6          So , we believe that the evidence ought to be

7 suppress ed for violation of the knock and announce , as

8 the record demonstrate s today from the witness stand .

9 And we agree with the court if there are additional

10 fact s we learn through other witness es , we will

11 certain ly file something and request a reconsideration .

12 But even on the fact s , even on the record today , this

13 was not a sufficient knock and announce , and the

14 appropriate sanction ought to be suppression of the

15 evidence recovered from within .

16          THE COURT:   All right .   Ms. Greenberg , anything

17 further ?

18          MS. GREENBERG:   Your Honor , brief ly.   The witness

19 before the court was a very experience d agent . This is

20 his job , being on this high risk entry team , and he gave

21 a conservative estimate saying , you know , at the very ,

22 very least it was 15 seconds and he explained how he

23 work ed through that .   And in response to defense

24 counsel 's question by going through the -- without

25 scream ing in the U. S. Attorney 's office with going

1  through  the  circumstance s, and  I don't think   counsel  can

2  say , you  know , we  should  knock  that  down  to  ten  or  five

3  seconds  because  of  the  adrenaline  and  the  different

4  circumstance s.

5        This  is  somebody  who's  testify ing  under  oath , and

6  this  is  part  of  their  job .  So  I think  at  the  very  least

7  we  have  to  say  15  seconds , as  the  witness  said  when  he

8  was  being  very  conservative , and  that  would  be  the

9  absolute  short est  period  of  time , and  it  was  somewhere

10  between  15  and  25  seconds .   In  light  of  what  his

11  testimony  was  about  the  circumstance s of  this  case , I

12  think  that  that  was  reasonable   under  the  circumstance s.

13  Thank  you .

14        THE  COURT:   All right .   The  motion  before  the

15  court  challenge s the  validity  of  the  search  of  Ms.

16  Dobie 's  residence  on  the  basis  of  a violation  of  what's

17  known  as  the  knock  and  announce  rule , which  finds  its

18  origin s in  common  law .   It's  also  part  of  the

19  constitutional   mix  of  reasonableness , and  it's  also

20  codifi ed in  18  U.S.C., Section  3109, which  provides  that

21  an officer  may   break  open  any  outer  or  inner  door  or

22  window of  a house  or  any  part  of  a house     or  anything

23  therein to   execute  a search  warrant  if  after  notice  of

24  his  authority  and  purpose  he  is  refused  admittance  or

25  when  necessary  to  liberate  himself  or  a person  aiding

1  him  in  execution   of  the  warrant .

2        Recent ly  there  were  confirmation   hear ings  in  the

3  U. S.  Senate  for  the  new  Chief  Justice , and  one  of  the

4  matter s  that  he  said  he  would  like  to  do  is  to  try  to

5  have  less  divide d  upon  opinion s  of  the  court  and  great er

6  unanimity,  especially  since  he  as  a  D. C.  circuit  judge

7  had  the  obligation  of  sometimes   interpret ing  these

8  decision s  that  are  broken   into  17  part s .  It  is

9  therefore  a  pleasure  when  I  find  a  unanimous   decision   of

10  the  supreme   court  that  give s  me  pretty  clear  guidance  on

11  what  to  do  with  this .

12        I'm  referring   to  United  States  versus  Banks , a

13  2003  decision   of  the  supreme   court  in  540  U.S.  31,

14  author ed  for  a  unanimous   court  by  Justice   Suitor .   In

15  that  case  he  examine d  in  the  context  of  a  search  having

16  many  character istic s  in  common  with  this  one  the  facts

17  that  should  be  applied  by  a  court  in  determini ng  whether

18  the  interval  between  the  original  knock ing  and  the

19  forcible  entry  satisfi es  the  Fourth  Amendment  or  Section

20  3109 .

21        He  point ed  out , as  I  would  point  out  here , that

22  the  officer s  were  obligate d  to  knock  and  announce , and

23  they  claim , and  I've  heard  credible  testimony  to  the

24  effect , that  they  did  just  that .  So  there 's  no  question

25  here  about  whether  there  was  a  knock ing  and  announci ng .

1    That was done.  It was required to be done, and I'm

2    satisfied that that is not an issue.

3        The supreme court has indicated that it treats

4    reasonableness in terms of an analysis for this case as

5    a function of the facts and that the facts of cases are

6    so various that, no template is likely to produce sound

7    or results then examining the totality of the

8    circumstances in a given case.

9        The supreme court pointed to an earlier decision

10   of that court in Wilson versus Arkansas, which held that

11   the common law knock and announce principle is one focus

12   of the reasonableness inquiry and pointed out that

13   subsequently it had been decided that although the

14   standard generally requires the police to announce their

15   intent to search before entering closed premises.

16       The obligation gives way when officers have a

17   reasonable suspicion that knocking and announcing their

18   presence under the particular circumstances would be

19   dangerous or futile or would inhibit the effective

20   investigation of the crime by, for example, allowing the

21   destruction of evidence.  And the court pointed out that

22   even when a warrant is silent about the authority to

23   enter without knocking or announcing, if circumstances

24   suspect a reasonable suspicion of exigency when the

25   officers arrive at the door, they may go straight in.

1          The issue in this case comes down to whether it

2   was reasonable to suspect eminent loss of evidence after

3   what took place in that case, the 15 to 20 seconds that

4   the officers waited prior to forcing their way in.  The

5   bottom line of Justice Suitor's opinion was that while

6   he considered it a close case and they were reversing

7   the Ninth Circuit, which had gone the other way, the

8   court concluded that after 15 or 20 seconds without a

9   response, police could fairly suspect that cocaine would

10  be gone if they were to be reticent any longer.

11         Justice Suitor went on to points out that the

12  facts that are known to the police are what count in

13  judging a reasonable time.  Here the officer gave

14  detailed and cogent testimony indicating that in this

15  case of the number of warrants being executed that day

16  this was one of five out of 25 they were considered to

17  be high risk.  He gave specific reasons as to why this

18  was considered to be high risk, including the criminal

19  history of the defendant and her husband and the

20  extensive Title 3 wiretap information which had been

21  developed concerning the nature of the criminal activity

22  that served as the basis for the issuance of the search

23  warrant.

24         He had information that both Mr. and Mrs. Dobie

25  had a history of criminal offenses, that Mrs. Dobie had

1  indicated  she  had  committed   so  many  crime s  she  could n't

2  remember  how  many ; Mr.  Dobie  had  been  jail ed  for  a  drug

3  offense  and  had  just  been  re lease d  from  that , and  under

4  these  circumstance s  the  officer  testifi ed  that  they  went

5  to  the  door , did  not  hear  any  noise s  from  inside , and

6  the  officer  in  charge  of  maki ng  the  knock  and  announce

7  announced  in  a  loud  voice , police  officers   with  search

8  warrant :  Open  up.

9          The  door  was  pounded  upon  -- pounded  on  with  his

10  fist s.  They  wait ed, heard  nothing .  Repeat ed  that .  And

11  only  after  receiving  no  response  and  wait ing  a  total

12  period  of  time  from  the  first  knock  -- not  the  second

13  one  but  the  first  one  of  at  least  15  seconds  and  as  much

14  as  25  seconds  did  they  finally  enter  the  premises

15  without  await ing  a  further  response  from  inside .

16          What  Justice  Suitor  said  in  examining  this  type

17  of  circumstance  is  especially  appropriate  here .  The

18  court  said , the  crucial  fact  in  examining  their  action s

19  is  not  the  time  to  reach  the  door  but  the  particular

20  exigency  claim ed.  On  the  record  here  what  matter s  is

21  the  opportunity  to  get  rid  of  cocaine , which  a  prudent

22  deal er  would  keep  near  a  commode  or  kitchen  sink.

23  Significant  c ircumstance s  include  the  sufficiency  of  --

24  the  arrival  of  the  police  during  the  day  when  anyone

25  inside  would  probably  have  been  up  and  around , which  was

1   not the case here, and the sufficiency of 15 to 20

2   seconds for getting to the bathroom or kitchen to   start

3   flushing cocaine down the drain.  It is eminent

4   disposal, not travel time to the entrance, that governs

5   when police may reasonably enter.

6          Here you have the circumstance not only of

7   eminent disposal but a potentially violent response from

8   persons with an extensive criminal background, something

9   borne out, although this is not pertinent to the

10  analysis by the fact that firearms were found inside the

11  premises.  The exigencies relied upon for entering after

12  15 to 25 seconds are more than sufficient under the

13  circumstances of this case in terms of the potential for

14  disposal of the drugs as well as the safety of the

15  officers.  I therefore conclude that the search was

16  reasonable, and I will deny the motion to suppress.

17         As I said, if in fact it turns out that there is

18  some officer who will testify that there -- the

19  testimony I've heard today was not correct, certainly I

20  can be asked to reconsider the ruling.  But based upon

21  what I've heard, I do not see a basis for granting the

22  motion.

23         MR. WARD:  Your Honor, before we adjourn, may I

24  make a comment for the record?  Peter Ward.  As the

25  court knows, I am now appointed to handle this case for

1   Ms. Dobie, and Mr. Pierce is withdrawing his appearance.

2   I first want to thank him for following through on this

3   motion since he actually filed it, but I will be

4   handling matters from this point on.

5            While I appreciate the government's efforts in an

6   attempt to identify the person who we've talked about, I

7   think it would be helpful if the government would

8   produce the rosters that were referred to.

9            MS. GREENBERG:   Here you go.

10           MR. WARD:   With respect to this -- thank you.

11           MS. GREENBERG:   It's already been produced.

12           MR. WARD:   It doesn't tell me where they're from.

13  I don't know.  I need --

14           THE COURT:   Well, you can confer with Ms.

15  Greenberg.

16           MR. WARD:   We'll do that and I think once we get

17  the roster, then I can contact the persons who are

18  likely to be the witnesses we're talking about.

19           MS. GREENBERG:   Your Honor, there is no

20  Metropolitan Police Department person on that list.

21           MR. WARD:   Well, maybe there's a -- maybe the

22  person was actually a Montgomery County officer.

23  Clearly there would have to be a woman present where a

24  woman is being arrested and transported and clothed and

25  so forth and so on.  So we'll discuss that Your Honor,

1  and if we think it appropriate  we will  file  a

2  supplemental  matter  -- motion .

3          THE  COURT:   Very  well .

4          MR.  WARD:   Thank  you , sir .

5          THE  COURT:   Thank  you , counsel .

6                    (Off  the record  at 11:52 a.m. )

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **CERTIFICATE**

2

3          I, Tracy Rae Dunlap, RPR, CRR, an Official Court

4  Reporter for the United States District Court of

5  Maryland, do hereby certify that I reported, by machine

6  shorthand,  in my official capa  city, the proceedings had

7  and testimony adduced upon the     Motions   Hearing

8  Proceedings in the case of UNITED STATES OF AMERICA

9  versus  LAVON  DOBIE , et al, Criminal Action Number

10 RWT-04-0235 on   January 23 , 2006.

11

12         I further certify that the foregoing    89 pages

13 constitute the official transcript of said proceedings,

14 as taken from my machine shorthand notes, of said

15 proceedings.

16

17         In witness whereof, I have hereto subscribed my

18 name, this 2nd day of   January 2009 .

19

20

21                         _____

                           TRACY RAE DUNLAP, RPR, CRR
22                         OFFICIAL COURT REPORTER

23

24

25