1             UNITED STATES DISTRICT COURT OF MARYLAND
                        SOUTHERN DIVISION
2
   ---------------------------x
3  UNITED STATES OF AMERICA   :
              Plaintiff       :
4                             :
                              :
5  vs                         :Criminal Action:RWT-04-0235
                              :
6                             :
   PAULETTE MARTIN, et al     :
7             Defendants.     :
   ---------------------------x
8

9                           Tuesday, July 18, 2006
                            Greenbelt, Maryland
10
        The above-entitled action came on for a Jury Trial
11 before the HONORABLE ROGER W. TITUS, United States
   District Judge, in courtroom 4C, commencing at 9:28 a.m.
12
        THIS TRANSCRIPT REPRESENTS THE PRODUCT
13      OF AN OFFICIAL REPORTER, ENGAGED BY
        THE COURT, WHO HAS PERSONALLY CERTIFIED
14      THAT IT REPRESENTS THE PROCEEDINGS AS
        RECORDED AND REQUESTED.
15
        APPEARANCES:
16
        On behalf of the Plaintiff:
17
        DEBORAH JOHNSTON, Esquire
18      BONNIE GREENBERG, Esquire

19      On behalf of the Defendants:

20      MICHAEL MONTEMARANO, Esquire
        ANTHONY MARTIN, Esquire
21      MARC HALL, Esquire
        TIMOTHY MITCHELL, Esquire
22      PETER WARD, Esquire
        EDWARD SUSSMAN, Esquire
23      HARRY MCKNETT, Esquire

24 Tracy Rae Dunlap, RPR, CRR          (301) 344-3912
   Official Court Reporter
25

1                          I N D E X

2                     DIR  CROSS    REDIR    RECROSS

3  Clyde Shelley        15   29       31

4  Fannie Featherstone  35   55       58

5  David Papalia        62   104     196      232

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                        Page

24 Reporter's Certificate                    246

25

1          THE COURT:  What's the estimate of the defense's

2     -- how long does it think its combined case is going to

3     take?

4          MR. WARD:  It depends on cross-examination, Your

5     Honor.

6          THE COURT:  Now, now.

7          MR. MONTEMARANO:  I suggest the defense will take

8     in total a week, perhaps another day beyond that all in

9     all.

10         THE COURT:  For all the defense?

11         MR. MONTEMARANO:  Those I have spoken to, and the

12    number of witnesses they're planning, etcetera.  Again,

13    that's all -- a lot of that depends on things like cross.

14         THE COURT:  The reason I'm asking is, I have to

15    make some decisions about further days in this case as to

16    whether we need to go longer or whether I need to add

17    days and cancel civil hearings on Mondays where I need to

18    go late in the day and things like that.  If we end up

19    being longer than anticipated, we run into a real

20    problem.  Plus, I've bifurcated this case, and we will

21    need to instruct the jury and have further argument and

22    go back on the issue of forfeiture.

23         MS. JOHNSTON:  Your Honor, we will have to have

24    additional evidence, too, at the forfeiture proceeding.

25         THE COURT:  I had a recent case in which there was

1  a stipulation on the forfeiture and it avoided having to

2  have a jury go back and deliberate again, but there needs

3  to be enough time if there's not a stipulation that the

4  jury would have to deliberate the issue of forfeiture and

5  any additional witnesses.

6          MR. MONTEMARANO:  The defense can discuss the

7  issue of stipulations at lunch today.

8          THE COURT:  I'll leave it up to you all.  You make

9  your tactical decisions, but I can't begin to tell you

10 how much enthusiasm the jury is going to have when I tell

11 them they have to go back and hear more evidence and

12 another verdict.

13         MS. JOHNSTON:  Your Honor, if I might, before we

14 move on.  In another case I had, the defendants agreed to

15 have the court make a ruling in terms of forfeiture, and

16 so the court did that at a later time.  So that's another

17 option if --

18         THE COURT:  Talk about it amongst yourselves.  All

19 I'm saying is if there's a way to resolve this without

20 having to have the jury get that issue, fine, but you

21 have the right to it, and I'm here to give it to you if

22 you want.

23         Now, I've got to make a difficult decision, and I

24 haven't decided what to do.  I'm not going to decide it

25 right now, but there was a major communications failure

1   with the bench on the timing of this luncheon with

2   members of congress on Thursday.  I was told that it

3   began at one, and I assumed I could cheerily go until

4   noon and hop on the Metro and cheerfully go down there

5   and meet with my fellow members of congress.  Now I'm

6   told that oh, we didn't tell you the right information;

7   the lunch actually begins at 12:15

8   and they need you down there three-quarters of an hour

9   ahead because you -- it takes a long time to get through

10  security, and you have to leave by 10:30.

11        Well, I have to either not go, arrive late, or

12  have an even shorter day of trial.  That's why I was

13  asking you where you stood on the length of the trial.

14  One option that my law clerk suggested to me that you

15  might consider, but I don't know if you're ready for it

16  or not yet, is to not have the jury come in at all and

17  have a charge conference from 8:00 to 10:30 on Thursday.

18        Let me tell you where I am on instructions.  I

19  have taken the government's proposed instructions and

20  have been busily making hen scratching on them, adding

21  and deleting -- adding in some instructions the defense

22  asked -- not adding in some instructions the defense

23  asked for, but I could distribute to you hen scratching

24  and all so you can see where I am and discuss

25  instructions with you on Thursday and leave at 10:30.

1    That's one option.  I don't know if you're ready for it

2    or not, though.

3            I recognize if you're not, then we shouldn't do

4    that option.  As we stand right now, I'm inclined to

5    either not go to this luncheon, or just be the last to

6    arrive.  If you all believe that we could have a

7    productive two and a half hours and grind our way through

8    the instructions so that the amount of effort required to

9    put them in final form would be very little based upon,

10   you know, how we are at the end of the trial, subject to

11   any special instructions that might be needed, then we

12   could do that.  So, what is -- do you all have any

13   reaction to that?

14           MR. MONTEMARANO:  A couple of things, Your Honor.

15           THE COURT:  Let the record reflect that you are

16   hobbling because -- what did you do?

17           MR. MONTEMARANO:  I'm going to get into that in a

18   moment.

19           MR. WARD:  That takes care of the hobbling excuse,

20   Your Honor.

21           THE COURT:  Are you taking Rush Limbaugh

22   medication today or something?

23           MR. MONTEMARANO:  Which one?

24           THE COURT:  The former, not the latter.

25           MR. MONTEMARANO:  Being Italian, I have no need

1  for the latter.

2       May it please the court.  I had suggested to Mr.

3  Krinsky the possibility of the charging conference on

4  Thursday and not bringing the jury in for three hours; I

5  had indicated to Mr. Krinsky I would be ready for the

6  charging instructions.

7       THE COURT:  You're not going to be ready to

8  address what I've got to address until I give it to you.

9       MR. MONTEMARANO:  We've got an amended version

10  from the government which I thought incorporated some.

11       THE COURT:  When did you -- is it other than the

12  one I have?

13       MR. HALL:  No.

14       THE COURT:  No.  I think you got an amended

15  version with a letter -- what I've been working off of.

16  God, I hope I'm working off the right one.

17       MR. MONTEMARANO:  I hadn't really given it much

18  thought, but I had assumed they were some of the court's

19  changes that were in there, and I wanted to be clear on

20  that as well.

21       THE COURT:  My law clerk tells me I'm working off

22  the right version.  I have a version that I have  heavily

23  edited; and the only thing that I had not done was to

24  make a decision about, and I'm going to need to hear

25  somebody convince me and tell me how to do it and where

1  to do it.  You had requested a lesser included offense

2  instruction, and I -- I'm not saying no to that, but it

3  -- I need to hear some argument about that, and that's

4  something that perhaps doesn't need to be resolved

5  because we've got a hundred and some pages -- 109 pages

6  in the present draft with some additions to it that could

7  certainly be waded through completely.

8       If the only thing left to argue about is lesser

9  included offense, then we can deal with that later in the

10  trial.  But if I give you this, you know, with all my hen

11  scratching, the government's last version of instructions

12  with my edits which incorporates a number of things the

13  defense suggested, is the defense collectively going to

14  have enough time, as well as the prosecution, to review

15  this and have a meaningful conference on Thursday?

16       MR. MONTEMARANO:  I believe so.

17       MR. MCKNETT:  When would we get them, Your Honor?

18       THE COURT:  Today.  Today.

19       MR. MCKNETT:  I think that would give me enough

20  time.

21       THE COURT:  If you give me the green light, I will

22  hand this to my law clerk and say, make a thousand copies

23  for the prosecution and defense and start working on it.

24       MS. JOHNSTON:  Your Honor, I believe that's a

25  waste of the court's time on Thursday.  The defense has

1  said they're going to have five days or a whole week of

2  testimony.  That may have an effect in terms of what

3  instructions the court chooses to give or doesn't give.

4       In addition to that, we will not finish this case

5  in a timely manner.  I know the court has travel plans

6  starting August 12.  If we lose another trial day -- and

7  the government believes that by doing the charge

8  conference instead of having trial in front of the jury,

9  it will significantly impact -- we're throwing away a

10 trial day, in essence.  I would suggest that a charge

11 conference could be held at 8 o'clock one morning while

12 we're in trial when get closer to the end of the time.

13      THE COURT:  I may do it on a Monday, too.

14      MS. JOHNSTON:  If the court decides -- I will tell

15 the court this Monday I will be out of town.  I have made

16 arrangements to attend a wedding.

17      THE COURT:  This Monday I'm going to be popping

18 pills.  I'm dragging myself in here for something at 12

19 o'clock that day.  I'm not volunteering for next Monday.

20      MS. JOHNSTON:  I just think we should do the

21 charge conference at a time when the jury is not

22 available to us, such as 8 o'clock one morning.

23      THE COURT:  Let me do this, then.  I am going to

24 distribute to you today my current version of the

25 instructions so you can start looking at them.  I'm

1  inclined to agree with Ms. Johnston that I need to get

2  testimony done in this case.  Let me think and talk to my

3  colleagues.  I'm going to make a decision about Thursday

4  this morning or by lunch hour so I can communicate it to

5  the jury.  I'm not going to tell them now that there's a

6  chance that that might change.  As I said, it's either we

7  work the schedule I already told them or I let them loose

8  earlier, which I'm not enthused about because, you know,

9  two and a half hours of testimony is not a lot of time to

10 bring them all in here.

11     MR. MONTEMARANO:  I would point out to the court

12 that beginning next Tuesday we still have three full

13 trial weeks remaining.

14     THE COURT:  Oh, I know, but O'Brien's Corollary to

15 Mercury's Rule that said Mercury was an optimist.  I'm

16 not sure how O'Brien's Corollary will tear up the case.

17     MR. MONTEMARANO:  Can I put something else on the

18 record?

19     THE COURT:  Yes.

20     MR. MONTEMARANO:  I sustained severe damage to my

21 left ankle on Saturday morning.  I spent five hours in

22 the ER.  The official diagnosis is a severe sprain,

23 without reference to an orthopod and an MRI.  I will

24 submit to the court as an officer of the court that I

25 have more than a passing familiarity with

1    athletically-induced injures in that my ankle is very

2    nearly 50 years old, and having heard the pop when I went

3    down, I think O'Brien may have been the optimist.  That

4    being said, it is my intention not to make an appointment

5    before Thursday.  But if the only appointment, or the

6    quickest appointment I can get is Thursday morning or

7    Thursday afternoon, it is my intention to make such an

8    appointment.

9           THE COURT:  Make it Thursday afternoon for sure,

10   and we may have to --

11          MR. MONTEMARANO:  I reference both parts of that

12   day, because I have a meeting set up with regard to my

13   client in the MS-13 case as well.

14          THE COURT:  I can provide you with changes of

15   clothes; I can't give you an MRI.

16          MR. MONTEMARANO:  I understand that.  With all due

17   respect to Your Honor's intelligence and diligence, I

18   don't think you're qualified as an orthopedic surgeon

19   yet.

20          THE COURT:  Not yet.

21          MR. MONTEMARANO:  You may be like me:  Getting

22   there.

23          THE COURT:  Maybe next life.

24          Counsel, what I'm going to do is I want to

25   distribute to you -- I don't want you to think I forgot

1    about the request to put an instruction 9-10 on lesser

2    included offenses.  I'm just not convinced that that's

3    appropriate or how it would be appropriate, and I'm not

4    going to argue that issue now but I know that that was a

5    requested instruction by the defense.

6         I will ask my law clerk now to make a copy of this

7    hen scratching at all to distribute to you.  I will

8    continue to ponder what to do about Thursday, but as of

9    right now I'm not going to tell the jury anything.  I

10   will probably make a decision by lunchtime today about

11   what to do about Thursday, but as of now I'm going to

12   defer to Ms. Johnston on that.

13        What I will do for a charge conference is to look

14   at some opportunities that might exist, and I'm going to

15   examine my motions schedule for the next couple of

16   Mondays and see what it looks like.  I've got to see

17   whether these cases are for real or not that are on my

18   calendar now.  We'll see.  I may just set up an 8 o'clock

19   in the morning charge conference.  It may be easier.  I

20   don't want to lose any trial time.

21        Are we ready for the jury?

22        THE CLERK:  Yes.

23        THE COURT:  Mr. Montemarano, do you want me to

24   tell them that you hurt yourself?  They'll probably see

25   that.

1         MR. MONTEMARANO:  I would appreciate if Your Honor

2  would also indicate that if I don't rise, it's not out of

3  a lack of respect; I'm on absolute non- weight bearing.

4  I can't do anything without the crutches.

5         THE COURT:  All right.  You have my permission to

6  examine people seated, so don't worry about that.

7         MR. MONTEMARANO:  Thank you.

8         THE COURT:  We'll make copies of these for you

9  now.

10              (Jury returns at 10:05 a.m.)

11         THE COURT:  Good morning, ladies and gentlemen.  I

12  hope you had a nice weekend.  I want to remind you this

13  is the week that I have an appointment with a surgeon in

14  a hospital on Friday, so I will not be with you on

15  Friday.

16         I want you to also know that perhaps because we're

17  trying to spread misery around, Mr. Montemarano managed

18  to hurt his left ankle and he's in some kind of device

19  and is in pain, and he will not be standing up as often

20  as he might have otherwise been standing up, with my

21  permission, because he's hurt himself, but he's here.

22         MR. MONTEMARANO:  Thank you, Your Honor.

23         THE COURT:  We're ready to proceed.  Government,

24  you may call your next witness.

25         MS. GREENBERG:  Your Honor, the court would be

1    happy to know, and the jury, I'm sure, that we not only

2    starting almost exactly on time but we've stipulated to

3    the testimony of the first witness, so I will just read

4    in the stipulation and then go to the second witness of

5    the day.

6         THE COURT:  Okay.

7         MS. GREENBERG:  Stipulation No. 6.  And the

8    parties have stipulated as to the following.

9         THE COURT:  As I told you before, a stipulation

10   you should accept as factually true.

11        MS. GREENBERG:  Your Honor, the parties agree that

12   Reece Coleman Whiting was arrested in -- on November 29,

13   1984 in Mexico City, Mexico.  He was convicted of

14   possession of cocaine -- specifically, 7 kilograms, 743

15   grams of cocaine -- on August 29, 1986, and he was

16   sentenced to eight years and three months in  custody and

17   a fine of 400,000 pesos.  Whiting was given credit for

18   time served since his conviction.

19        Specifically, the Mexican police testified that

20   they had responded to the Hotel Century in Mexico City in

21   response to an anonymous complaint about Whiting.  They

22   found Whiting alone in Room 112 of the hotel and in

23   possession of a cardboard box marked Rolling Containers,

24   Inc., Minneapolis, Minnesota which contained the cocaine

25   and an O'hock scale.

Direct - Shelley

1          Whiting voluntarily gave the officers the box of

2   cocaine.  Whiting also told them that Jorge Gonzalez had

3   sold him the cocaine and that Whiting planned to

4   transport the cocaine back to North America.  Whiting

5   further explained he met Gonzalez in a United States

6   prison.  The Mexican officers confirmed that Whiting had

7   previously been incarcerated in a United States jail.

8          Your Honor, this will be provided to the clerk for

9   the jury's review during deliberations.

10          THE COURT:  All right.

11          MS. GREENBERG:  As the court is aware, a limiting

12   instruction is appropriate, but the next witness also

13   would be required for the same limiting instruction.  So,

14   would the court like me to call him next?

15          THE COURT:  You may.

16          MS. GREENBERG:  Your Honor, the government calls

17   Clyde Shirley.

18   Thereupon,

19                    **CLYDE SHELLEY, Jr.**,

20   having been called as a witness on behalf of the

21   Plaintiff, and having been first duly sworn by the

22   Courtroom Deputy, was examined and testified as follows:

23                    <u>**DIRECT EXAMINATION**</u>

24          BY MS. GREENBERG:

25   Q.    Sir, would you state your name and spell your last

Direct - Shelley

1  name for the jury please?

2  A.      Clyde Earl Shelley, Jr.

3  Q.      Where are you employed?

4  A.      The Drug Enforcement Administration.

5  Q.      What is your position with the Drug Enforcement

6  Administration?

7  A.      I am a special agent.

8  Q.      How long have you been a special agent with the

9  Drug Enforcement Administration?

10 A.      For about 17 years.

11 Q.      As such, what is your background, training and

12 experience for that position, sir?

13 A.      Enforcement of Title 21 drug laws.

14 Q.      What is your background and training?  What have

15 you done?

16 A.      Oh, training.  I was a state police officer with

17 the Mississippi State Narcotics -- Bureau of Narcotics.

18 I went to the academy there for, I think, six months.

19 From there I went to DEA and to Quantico for a period of

20 approximately six months, I think, and various narcotics

21 classes.

22 Q.      And you've been a special agent for how long?

23 A.      Approximately 17 years.

24 Q.      In what area of law enforcement with the DEA?

25 A.      Drug enforcement.  Street enforcement.

Direct - Shelley

1  Q.      Have you worked with confidential informants?

2  A.      Yes.

3  Q.      Have you arranged for purchases of drugs?

4  A.      Yes.

5  Q.      Have your investigations resulted in federal

6  prosecutions?

7  A.      Yes.

8  Q.      Sir, were you involved in a case involving Reece

9  Coleman Whiting, Jr. involving importation of heroin

10 indictment in the Eastern District of Virginia?

11 A.      Yes.

12         MS. GREENBERG:  Your Honor, if I may approach the

13 witness.

14         THE COURT:  You may.

15         BY MS. GREENBERG:

16 Q.      I'd like to show you what's been marked as

17 Miscellaneous 31.  That's a judgment of conviction

18 relating to Reece Coleman Whiting and Miscellaneous 32-A,

19 a Statement of Facts relating to Reece Coleman Whiting.

20 Do you recognize those two documents?

21 A.      Yes.

22 Q.      Are they from the investigation of your case?

23 A.      Yes.

24 Q.      Did Mr. Whiting plead guilty in connection with

25 the charges resulting from your investigation?

Direct - Shelley

1  A.      Yes.

2  Q.      Were you present at the time that he pled guilty?

3  A.      Yes.

4  Q.      Did you hear a statement of facts read into the

5  record?

6  A.      Yes.

7  Q.      Did Mr. Whiting, in court, before Judge Ellis, the

8  district judge in the Eastern District of Virginia, admit

9  those facts were true?

10 A.      Yes.

11 Q.      Are those facts contained in miscellaneous 32?

12 A.      Yes.

13 Q.      Do they summarize at least in part your

14 investigation in this case?

15 A.      Yes.

16         MS. GREENBERG:  Your Honor, at this time I'd like

17 to admit Miscellaneous 32 and read it into the record for

18 the jury.

19         THE COURT:  You may.

20         MR. HALL:  No objection, Your Honor.

21         MS. GREENBERG:  And again, the jury will have this

22 back in the -- as evidence, so you don't have to take

23 exact notes.

24         United States of America versus Reece Coleman

25 Whiting, criminal number 94-108A, in the United States

Direct - Shelley

1  District Court for the Eastern District of Virginia,

2  Alexandria Division.  Statement of facts.  Were this

3  matter to proceed to trial, the United States would prove

4  beyond a reasonable doubt, with competent evidence, the

5  following: 1.  From in or about August 1990 and

6  continuing up to and through March 1994, in Arlington,

7  Virginia, within the Eastern District of Virginia and

8  elsewhere, Reece Coleman Whiting, Jr. unlawfully

9  conspired with Phillip Rodney Phillips and other persons

10  to import into the United States more than 1 kilogram of

11  a mixture of substance containing a detectable amount of

12  heroin, a Schedule I narcotic controlled substance.

13          And just for the record Your Honor, the court is

14  sending this back to the jury; correct?

15          THE COURT:  Yes.

16          MS. GREENBERG:  Thank you.

17          In or about August 1990, Reece Coleman Whiting,

18  Jr. and Phillip Rodney Phillips agreed that Reece Coleman

19  Whiting, Jr. would purchase heroin smuggled into the

20  United States from Thailand by other persons.  Phillip

21  Rodney Phillips agreed to obtain the heroin from these

22  other persons and to arrange for its delivery to Reece

23  Coleman Whiting, Jr. in the Washington, D. C. area where

24  it would be sold by Whiting.

25          In or about August 1991, in Silver Spring,

Direct - Shelley

1   Maryland Reece Coleman Whiting, Jr. offered an individual

2   $20,000 in exchange for that person's agreement to travel

3   to Japan, obtain a package containing illegal drugs, and

4   to smuggle the package into the United States.  During

5   that same month, Reece Coleman Whiting, Jr. transported

6   the individual from Washington, D. C. to Richmond,

7   Virginia to pick up identification required to obtain a

8   passport for the planned trip to Japan.  Reece Coleman

9   Whiting, Jr. also assisted the individual in making

10  travel arrangements for the planned trip to Japan.  The

11  person eventually elected to not take the proposed trip.

12         In or about September 1991, Reece Coleman Whiting,

13  Jr. met with another individual, Bonita Freeman, in

14  Washington, D. C. and offered to pay her a sum of money

15  in exchange for her making an agreement to take an

16  international trip on his behalf.  Later that month,

17  Reece Coleman Whiting, Jr. telephoned Freeman and stated

18  that he was make arrangements for Freeman to travel to

19  Japan and pick up a bag on her way back from Tokyo to San

20  Francisco.

21         In or about early October 1991, in Washington, D.

22  C., Reece Coleman Whiting, Jr. provided Bonita Freeman

23  with airline tickets for travel from Washington, D. C. to

24  Tokyo.  That month, at the direction of Reece Coleman

25  Whiting, Jr., Bonita Freeman traveled by airplane from

Direct - Shelley

1  the Washington, D. C. area to Tokyo.

2       On or about October 8, 1991 at the direction of

3  Reece Coleman Whiting, Jr., Bonita Freeman traveled from

4  Tokyo to San Francisco, and from San Francisco to the

5  Washington, D. C. area.  Due to problems encountered by

6  the persons who were to supply the bag to Freeman before

7  she entered the United States, she returned to this

8  country without it and then traveled from San Francisco

9  back to Washington, D. C.

10       In late October 1991, in Washington, D. C., Reece

11  Coleman Whiting, Jr. solicited Bonita Freeman to make

12  another trip to Japan via San Francisco.  On or about

13  November 1st 1991, Reece Coleman Whiting, Jr. placed a

14  telephone call to Bonita Freeman and stated that

15  arrangements had been made for Bonita Freeman to leave

16  for Tokyo on November 7, 1991.

17       On or about November 4, 1991, in Baltimore

18  Maryland, Bonita Freeman received a telephone call from

19  Phillip Rodney Phillips, who identified himself only as

20  Tim.  Phillips told Freeman that he would contact her

21  after she arrived at the Tokyo Hilton on November 10,

22  1991.

23       In early November 1991, at the direction of

24  Whiting and Phillips, Freeman traveled from the

25  Washington, D. C. area to Tokyo.  On or about November

Direct - Shelley

10, 1991, Phillips telephoned Freeman at the Tokyo Hilton
and told her that arrangements had been made for her to
pick up a bag upon her arrival back in San Francisco.

On or about November 11, 1991, in Tokyo, Japan,
Bonita Freeman boarded a Japan Airways flight number 002
and traveled to San Francisco International Airport  in
San Francisco, California.  On November 11, 1991, after
Japan Airs flight number 002 arrived in San Francisco, an
Asian man handed Bonita Freeman a baggage claim ticket.
Bonita Freeman picked up the bag which was the subject of
the baggage claim ticket she received on Japan air flight
002 and entered the customs territory of the United
States.  The bag she carried with her into the United
States contained approximately 8.373 kilograms of heroin,
a Schedule I narcotic controlled substance.

U. S. Customs agents arrested Freeman, and she
agreed to cooperate in the government's investigation of
persons involved in heroin trafficking.  On November 11,
1981 note -- I'm sorry.  On November 11, 1991, Phillips,
again identifying himself as "Tim," telephoned Bonita
Freeman at the Crown Plaza Holiday Inn in San Francisco,
California and asked why she was so late getting through
customs and what she had told U. S. customs inspectors.
Phillips telephoned Freeman a second time at the hotel
and directed her to purchase a black duffel bag and to

Direct - Shelley

1  transport the heroin in the bag.

2       During a third telephone call to Freeman at the
3  Crown Plaza Holiday Inn, Phillips instructed her to
4  travel by U. S. Air from San Francisco to Washington
5  National Airport in Arlington, Virginia via Pittsburgh.
6  On or about November 12, 1991, in Arlington, Virginia,
7  within the Eastern District of Virginia, Reece Coleman
8  Whiting, Jr. arrived at Washington National Airport and
9  parked his burgundy-colored Jaguar in the vicinity of the
10 U. S. Air terminal.

11      At Whiting's direction, a woman entered the
12 terminal and approached a U. S. Air representative,
13 identified herself as Bonita Freeman's sister, and asked
14 that the representative give Freeman a message
15 instructing Freeman to go to the Capitol Hilton in
16 Washington, D. C.  When Bonita Freeman arrived at
17 Washington National Airport accompanied by undercover DEA
18 and customs agents, Rodney Phillips -- I'm sorry, Phillip
19 Rodney Phillips observed her arrival from the U. S. Air
20 terminal.  Phillips telephoned Whiting from the terminal
21 and the two men discussed whether and how they could
22 still obtain the bag that they believed to be in
23 Freeman's possession.

24      Reece Coleman Whiting, Jr. conspired with other
25 persons, including Phillip Rodney Phillips to import into

Direct - Shelley

1  the United States at least 3 kilograms, but less than 10

2  kilograms of heroin, a Schedule I narcotic substance.

3         That was part of your case; is that correct,

4  agent?

5  A.    Yes, ma'am.

6  Q.    Now, after the situation where Ms. Freeman was

7  arrested in San Francisco with approximately 8  kilograms

8  of heroin, did you continue your investigation involving

9  Mr. Whiting?

10 A.    Yes, ma'am, we did.

11 Q.    If I could direct your attention -- I'll put it up

12 on the screen.  Is this part of the indictment?  And just

13 to be clear, this is all one case; correct?

14 A.    Yes, ma'am.

15 Q.    This indictment here where I'm reading, Paragraphs

16 29 and 30, is the same statement of facts that I just

17 read?

18 A.    Yes, ma'am, it's part of the same case.

19 Q.    We're talking about one case, one plea, one

20 indictment, and one judgment of conviction?

21 A.    Yes, ma'am.

22 Q.    Art as part of that, in Paragraph 29 there's a

23 reference to an incident on December 17, 1993 in

24 Washington, D. C. where Reece Coleman Whiting, Jr.

25 distributed approximately 1.5 ounces of heroin to Jane

Direct - Shelley

1  Doe No. 1  in exchange for $10,000 in official authorized

2  funds.  Are you familiar with that transaction?

3  A.    Yes, ma'am, I am.

4  Q.    How are you familiar with that transaction?

5  A.    Basically, myself and my group inducted that

6  transaction or oversaw that transaction.

7  Q.    Just so the jury understands.  Jane Doe No.  1,

8  what does that refer to?

9  A.    It refers to an informant that was working with us

10  in order to complete the transaction.

11  Q.    Was this your informant?

12  A.    Yes.

13  Q.    Could you tell the jury when you have an

14  informant, specifically with this case December 17, 1993,

15  what does law enforcement do with respect to sending that

16  informant in to buy drugs with $10,000 worth of funds?

17  How do you prepare that?

18  A.    Actually, in this case, the informant was in a

19  townhouse.  And we first we go in and we clear the

20  townhouse and we make sure there's no contraband or drugs

21  there, and we also make sure there's no contraband or

22  drugs on the informant.

23  Q.    If I can back you up.  When you say "clear the

24  townhouse," do you mean clean it out?

25  A.    No, I mean search it to make sure these things

Direct - Shelley

1  don't exist before the person arrived.

2  Q.      What things?

3  A.      Drugs or contraband for drugs.

4  Q.      Was that done in this case?

5  A.      Yes.

6  Q.      What do you do with respect to the informant?

7  A.      We do the same thing to the informant.  We make

8  sure that the informant has none of these things on them

9  in case she -- on her.

10 Q.      Do you do that personally?  Or in this case did

11 your partner do it because of the male/female?

12 A.      Yes, I do it.  But she was a female, so most

13 likely my partner would have been the one to actually do

14 the search of her person.

15 Q.      Who was your partner at that time?

16 A.      Special Agent Lisa Summers.

17 Q.      Where is she currently?

18 A.      The last I heard she was stationed in Mexico with

19 DEA.

20 Q.      But she was with you on this case back in 1993?

21 A.      Yes.

22 Q.      What occurred on that date, 12/17/1993, with

23 respect to Mr. Whiting and your investigation?

24 A.      Basically, we did what I mentioned before.  We

25 made sure there was no drugs or contraband in the house

Direct - Shelley

1  or on her person.  We provided her with $10,000 in

2  authorized government funds, and we basically waited for

3  Mr. Whiting to arrive.  Mr. Whiting arrived, she met with

4  the informant inside the residence.  After a period, Mr.

5  Whiting left, and the informant turned over 1.5 ounces of

6  heroin to us.

7  Q.     And Your Honor, as to that, the parties have

8  stipulated that the 74.36 grams of heroin were recovered

9  from Reece Whiting on or about December 17, 1993.  The

10  parties have agreed that the item that the agent is

11  talking about was heroin.

12        Could you tell the jury what occurred on February

13  10, 1994?  There's a reference in this indictment that

14  Mr. Whiting distributed approximately one-half ounce of

15  heroin to Jane Doe No. 1 in exchange for $3,500 in

16  officially authorized funds.

17  A.     Basically, the same thing; to my knowledge the

18  same location.  We entered the location with the

19  informant, made sure that there was no contraband or

20  drugs there previous to Mr. Whiting's arrival.  We

21  provided her with $3,500 in official funds, and a Mr.

22  Whiting arrived, stayed for a period of time.  And after

23  leaving, the informant turned over a half ounce of heroin

24  to us.

25  Q.     Did you have that analyzed?

Direct - Shelley

1  A.      Yes, we did.

2  Q.      Your Honor, the parties agree, and this is under

3  Stipulation No. 5, that the gross weight of that package

4  was 42.9 grams and it was determined to be heroin, the

5  amount purchased from Reece Whiting on or about February

6  10, 1994.

7          And that was all part of this importation

8  conviction which is part of Government's Exhibit

9  Miscellaneous 31; is that correct, sir?

10 A.      Yes, ma'am.

11 Q.      Just briefly.  On the stipulation there's a

12 reference to 74.36 grams of heroin and 42.9 grams of

13 heroin.  Do you have your chemical analyses from this

14 case in front of you?

15 A.      Yes, I do.

16 Q.      That refers to the gross weight of the packaging;

17 is that correct, sir?

18 A.      Yes.  The gross weight was 74.36.  Yes.

19 Q.      And the 42.9?

20 A.      Yes.

21 Q.      So the net weight without the packaging would have

22 been consistent with what you were seeking to purchase?

23 A.      Yes.  That is the weight with the packaging.  Yes.

24 Q.      And that's based on the chemist report they

25

Cross - Shelley

1  weighed it with the packaging and, that's what those

2  numbers refer to?

3  A.     Yes.

4  Q.     Could you read in the record for the purchase that

5  you made through your informant for Mr. Whiting the

6  actual net weight as determined by the chemist?

7  A.     The net weight for the 1.5 ounce was 40.- -- yes,

8  40.89 grams?

9  Q.     And the net weight for the 42.9 grams of heroin,

10 again, as weighed by the chemist not by you.

11 A.     12.41 grams.

12 Q.     Is that consistent with what your informant

13 believed she was purchasing?

14 A.     Yes.

15        MS. GREENBERG:  No further questions, Your Honor.

16                    **CROSS-EXAMINATION**

17        BY MR. HALL:

18 Q.     I just have a couple of questions Your Honor.

19        Sir, I take it you were the case agent in this

20 case.

21 A.     Yes, sir.

22 Q.     And the first events that you testified to, those

23 were approximately 15 years ago, is that correct, the

24 seizure in San Francisco?

25 A.     Approximately 12 to 15.

Cross - Shelley

1  Q.      And the two subsequent purchases that you just

2  testified to were a couple of years later; is that right?

3  A.      After --

4  Q.      After that initial seizure.

5  A.      Yes.

6  Q.      Okay.  And now, the initial seizure involved this

7  Mrs. Freeman, is that correct, in San Francisco?

8  A.      Yes.

9  Q.      The two subsequent ones both involved an

10  informant; is that right?

11  A.      Yes, a separate informant.

12  Q.      All right.  And do I understand correctly that all

13  three of those events, the seizure in San Francisco, and

14  the two purchases involving the informant, all resulted

15  in one conviction; is that right?

16  A.      Yes.

17  Q.      On July 22 --

18  A.      What do you mean, resulted in one conviction?  In

19  all the ones together?

20  Q.      Yes.

21  A.      He pleaded guilty to importation of heroin into

22  the United States.

23  Q.      Okay.  And that occurred on July 22, 1994; is that

24  correct?

25  A.      What was that, the plea?

Cross - Shelley

1 Q.      Yes.

2 A.      Right.  Yes.  1994, around that time, yes.

3 Q.      Okay.  And you were present at the guilty plea, I

4 take it.

5 A.      Yes.

6 Q.      Okay.  And this importation case that you were

7 just talking about, this involved Mr. Whiting, Ms.

8 Freeman, and also a gentleman by the name of Phillip; is

9 that correct?

10 A.      Yes.

11 Q.      Okay.  And none of the people who are currently on

12 trial in this case, other than Mr. Whiting, were involved

13 in this case back in the early '90s; is that right?

14 A.      To my knowledge.

15 Q.      Okay.

16 A.      Yes.

17 Q.      All right.  Thank you very much.

18         THE COURT:  Any redirect?

19                   **REDIRECT EXAMINATION**

20         BY MS. GREENBERG:

21 Q.      Just briefly.  What connection did Mr. Whiting

22 have with Ms. Freeman's importation?

23 A.      He orchestrated her importation.  Is that what

24 you're --

25         MR. HALL:  Your Honor, I'm going to object.  I

1    think this has already been established, so I think it's

2    asked and answered.

3            THE COURT:  Sustained.

4            BY MS. GREENBERG:

5    Q.     But counsel are saying there are other people that

6    possessed the drugs.  Did your information lead you to

7    believe that Mr. Whiting was also involved in this?

8            MR. HALL:  No, Your Honor, that's not what I was

9    suggesting.  If counsel thought that, she misunderstood

10   my questions.

11           MS. GREENBERG:  Your Honor, I want to make sure

12   it's clear that Mr. Whiting was involved in their drug

13   activity.

14           THE COURT:  Any question about that?

15           MR. HALL:  No, sir, there's no question about

16   that.  In fact, we stipulated to the drug results and the

17   -- we weren't challenging that set of facts.

18           BY MS. GREENBERG:

19   Q.     Is that correct, sir?

20   A.     Yes.

21           MS. GREENBERG:  No further questions.

22           THE COURT:  All right.  Counsel, approach the

23   bench

24                  (At the bar of the Court.)

25           THE COURT:  In terms of a limiting instruction on

1  this, does that apply to everything they've heard today?

2       MS. GREENBERG:  Both the Mexico and this.

3       THE COURT:  Okay.

4       MR. HALL:  I was going to ask when the agent

5  stepped down, I think it would be an appropriate time the

6  give that instruction.

7       THE COURT:  I'm going to do it now.  I wanted to

8  make sure I was covering everything today in terms of the

9  stipulation and the testimony in this case and the

10  exhibit also be admitted.

11      MS. GREENBERG:  The next witness is also 404(b)

12  but as to a different defendant.

13      THE COURT:  Different defendant?  Okay.  I'm going

14  to give it now.

15      MR. HALL:  Thank you, Your Honor.

16                  (Back in open court.)

17      MS. GREENBERG:  Your Honor, may the witness be

18  excused?

19      THE COURT:  Yes, you may step down.

20                  (Witness excused at 10:30 a.m.)

21      THE COURT:  Ladies and gentlemen, before the next

22  witness is called, I wanted to give you a cautionary

23  instruction as to the information that you have just had

24  placed before you both by stipulation and by the

25  testimony of this witness.  This stipulated information,

1   as well as the testimony of this witness, has been

2   admitted by me for your consideration but for a limited

3   purpose similar to what I explained to you last week on

4   some other matters.  Our evidence rules state, and I

5   quote:  "Evidence of other crimes, wrongs or acts is not

6   admissible to prove the character of a person in order to

7   show action in conformity therewith."

8        Simply put, this language of the rule means that

9   evidence of other crimes, wrotes or acts may not be used

10  to demonstrate that a person has a certain character, and

11  that because of that character such person is likely to

12  have committed the offense charged in this case.  The

13  evidence rules provide, however, that such evidence, and

14  I quote, "may be admissible for other purposes, such as

15  proof of motive, opportunity, intent, preparation, plan,

16  knowledge, identity or absence of mistake or accident."

17  I have ruled that the stipulated information, as well as

18  the testimony of the Drug Enforcement Administration

19  special agent that you've just heard, is admissible but

20  only for these other limited purposes.  Accordingly, I

21  instruct that you -- instruct you that you may consider

22  this evidence this evidence, but only for the limited

23  purposes that I have just described.

24        All right, you may call your next witness.

25        MS. JOHNSTON:  Your Honor, our next witness would

Direct - Featherstone

1 be Ms. Fannie Buchanan.

2 Thereupon,

3               **FANNIE MAE BUCHANAN FEATHERSTONE**,

4 having been called as a witness on behalf of the

5 Plaintiff, and having been first duly sworn by the

6 Courtroom Deputy, was examined and testified as follows:

7                 **DIRECT EXAMINATION**

8       BY MS. JOHNSTON:

9 Q.      Please state your full name.

10 A.      Fannie Mae Buchanan Featherstone.

11 Q.      Ms. Featherstone, are you currently employed?

12 A.      Yes.

13 Q.      What do you do presently?

14 A.      Presently, I am a part time teacher for Prince

15 George's County Public Schools.

16 Q.      Is that your only employment or work at this time?

17 A.      No.  I'm also the dean of a bible institute.

18 Q.      Where is that located?

19 A.      Refreshing Spring Church of God and Christ on

20 Riverdale Road in Riverdale, Maryland.

21 Q.      Prior to your work as a minister and as a part-

22 time schoolteacher, did you have other employment?

23 A.      Yes.

24 Q.      Where were you employed?

25 A.      D. C.  Metropolitan Police Department.

Direct - Featherstone

1  Q.     How long were you employed at the Metropolitan

2  Police Department?

3  A.     Sixteen years.

4  Q.     Can you give us an idea of when you started and

5  when you retired?

6  A.     I started, like, September of '73 through November

7  of '89.

8  Q.     During the late 1980s, did you go by a different

9  name than your current name?

10 A.     Yes.

11 Q.     What was your name back then?

12 A.     Fannie Johnson.

13 Q.     What different positions did you hold with the

14 Metropolitan Police Department before your retirement?

15 A.     I was a police officer, and I worked undercover in

16 several areas of the police department.  And when I

17 retired, I'd become a detective -- narcotic detective.

18 Q.     Could you give us an idea of how many years'

19 experience you have in investigating narcotics?

20 A.     I had 14 at the time of retirement.

21 Q.     During that time period, were you ever federally

22 deputized?

23 A.     Yes.

24 Q.     With what agency?

25 A.     With the federal Drug Enforcement Administration.

Direct - Featherstone

1  Q.      Calling your attention back to 1987, were you

2  working in narcotics at that time?

3  A.      Yes, I was detailed to DEA.

4  Q.      What do you mean by detailed to the DEA?

5  A.      Well, there was a special task force of

6  Metropolitan police officers that were detailed to the

7  Drug Enforcement Administration to work on special cases.

8  Q.      Now, you mentioned that you've done work in an

9  undercover capacity; is that correct?

10 A.      Yes.

11 Q.      Could you give us an idea of how frequently you

12 worked undercover in your investigation of narcotics

13 cases?

14 A.      Most of my cases I would do my own undercover

15 work.

16 Q.      What do you mean by do your own undercover work?

17 A.      If they're -- I would work along with other

18 detectives as far as the investigation's concerned.  But

19 when it was time to purchase drugs from the suspect, then

20 I would do my own purchases.

21 Q.      Did you conduct such an investigation in the

22 spring of 1987?

23 A.      Yes.

24 Q.      Who was the target of that investigation?

25 A.      Learley Goodwin.

Direct - Featherstone

1  Q.     Approximately when did you your investigation

2  commence into Mr. Goodwin?

3  A.     It started about the latter part of April.

4  Q.     Could you describe what you did in the course of

5  your investigation, beginning in the latter part of

6  April?

7  A.     The latter part of April a confidential informant

8  came to DEA and met with some other detectives initially,

9  and then I was brought into the case and gave information

10 that Mr. Goodwin had an operation -- narcotic operation

11 -- illegal narcotic operation in the Washington, D. C. -

12 Metropolitan area, including New Jersey, New York,

13 Maryland, Virginia.  And the CI gave information in

14 reference to persons -- other persons who were involved,

15 gave us addresses, locations, and just shared personal

16 information about Learley Goodwin.

17 Q.     What happened after you got that information from

18 the confidential source?

19 A.     After I got that information, the source made a

20 phone call to Mr. Goodwin and we both spoke with him via

21 phone to make arrangements for me to make a purchase from

22 him.

23 Q.     Okay.  And what arrangements did you make with him

24 over the phone?

25 A.     Made arrangements to meet him on May 4, 1987 at

Direct - Featherstone

1   his home.

2   Q.      Where was his home located?

3   A.      1302 Chillum Road, Chillum, Maryland.

4   Q.      Could you describe what happened on the May 4th of

5   1987?

6   A.      I drove the -- the CI and I went to the location.

7   I drove a government vehicle.  We parked on the street.

8   We went to the side door; I believe it's, like, to the

9   left of the house if you're facing the front.  We opened

10  the door.  Constance Goodwin answered the door, which is

11  Mr. Goodwin's wife, and I introduced myself.  The CI

12  greeted her.  Apparently she knew her, so the CI greeted

13  her and we were directed to go to the den area and wait.

14          Mr. Goodwin was on the phone talking, and he

15  continued to talk for a bit, and he finally got up from

16  his area and went upstairs.  The staircase was in the

17  kitchen.  It was like a spiral staircase in the kitchen.

18  And he returned with a bag of white powder, placed it on

19  the scale.  He weighed it out for me because the

20  conversation previously had been that I would purchase a

21  half ounce for $1,000 of cocaine.

22  Q.      That was during your conversation with him on the

23  phone?

24  A.      Yes. So everything had been pre-arranged prior to

25  going to the house.  So he went upstairs, he got the

Direct - Featherstone

1  powder, he came back downstairs and he put it on the

2  scale and weighed it in front of me to show me that he

3  was giving me a half an ounce, and I gave him $1,000 of

4  official government funds in exchange for the white

5  powder.

6  Q.    Did you have further discussion with him about any

7  additional contact you might have with him?

8  A.    Yes.  I told him, you know, that I wanted more at

9  a later date.

10 Q.    In fact, did there come a later time when you had

11 a further conversation with him?

12 A.    Yes.

13 Q.    Approximately when was that?

14 A.    I think it was around the 11th.

15 Q.    Do you have some of the notes from your

16 investigation, as well as an affidavit that you prepared

17 for a search warrant of his residence as a result of your

18 investigation?

19 A.    A search warrant of his residence?

20 Q.    Do you have a copy of the affidavit you prepared?

21 A.    Yes.

22 Q.    Does reviewing those materials, would that refresh

23 your recollection concerning the date and the

24 conversations you had with him?

25 A.    Yes.

Direct - Featherstone

1  Q.     If I could have the next miscellaneous number,

2  we'll mark her notes as Miscellaneous -- I believe it's

3  going to be 34.  Approximately how soon after your --

4  this is for identification only, Your Honor.

5         After your first transaction with Mr. Goodwin, did

6  you have further contact with him?

7  A.     I spoke with him again on May 10.  I had a phone

8  conversation with him and I again wanted to purchase a

9  half ounce of cocaine for $1,000 in official government

10 funds, and at that time he was unable to meet with me and

11 he sent his stepson.

12 Q.     Okay.  What did he tell you in relation to who

13 would be coming to meet you and where the transaction

14 would take place?

15 A.     He told me he could send his stepson, Larry Lane.

16 Q.     And did he explain to you why he was unable to

17 meet you at that time?

18 A.     I don't recall.

19 Q.     Do you have a copy of your search warrant

20 affidavit in front of you?

21 A.     I do.

22 Q.     Calling your attention to the paragraph beginning

23 during the week of May 10, which would be on Page 2 of

24 your affidavit.  Does that refresh your recollection

25 concerning why Mr. Goodwin -- what Mr.  Goodwin advised

Direct - Featherstone

1  you in terms of whether he could meet with you?

2  A.    Yes.  Mr. Goodwin stated that he had to go to

3  Fredericksburg, Virginia to his home there.  His father

4  lived in the home, but he said that he had to go there to

5  take some things.

6  Q.    Had you met his son, Larry, before this

7  conversation with Mr. Goodwin, if you can recall?

8  A.    No, I don't think I did.

9  Q.    What arrangements were made through Mr. Goodwin to

10 have you pick up the drugs from his son, Larry Lane?

11 A.    One moment, please.  Arrangements were made for me

12 to meet Larry Lane at Bob's Big Boy at this time, which

13 was in Landover, Maryland.

14 Q.    What occurred at the Bob's Big Boy?

15 A.    I met with Larry Lane, and I did make a purchase.

16 Q.    What did you purchase from Mr. Lane?

17 A.    A half ounce of coke -- well, white powder that

18 was later identified -- preliminarily field tested for

19 cocaine, in exchange for $1,000 in official government

20 funds.

21 Q.    Had you had any contact with Larry Lane before Mr.

22 Goodwin sold you the first half ounce of cocaine?

23 A.    No.

24 Q.    Had you had any independent contact with him,

25 apart from the transaction that Mr. Goodwin set up as of

Direct - Featherstone

1  May 10 of 1987?

2  A.      No.

3  Q.      Now, after these two transactions, what happened

4  to Mr. Goodwin?

5  A.      Mr. Goodwin was placed under arrest for an

6  outstanding fugitive warrant.

7  Q.      So it was unrelated to your investigation?

8  A.      Yes, it was.

9  Q.      Sort of interfered with your investigation?

10 A.      Yes, it did.

11 Q.      Did he then remain in federal custody while you

12 conducted your investigation?

13 A.      Yes, he did.

14 Q.      On or about May 28 of 1987, did you have further

15 contact with Larry Lane?

16 A.      Yes, I did.

17 Q.      For what purpose did you have contact with him?

18 A.      Arrangements had been made to make a purchase of

19 cocaine from him.

20 Q.      This is while his stepfather, Mr. Goodwin, was

21 incarcerated; is that correct?

22 A.      Yes.

23 Q.      At that point in time, when he -- did you conduct

24 that transaction again at the Big Boy restaurant?

25 A.      Yes, I did.

Direct - Featherstone

1  Q.    When Mr. Larry Lane arrived, do you recall what

2  kind of vehicle he was driving?

3  A.    No, I don't.

4  Q.    Calling your attention again to your search

5  warrant affidavit on the next page.  If you would look at

6  that and tell me whether or not that refreshes your

7  recollection.

8  A.    He was driving a green BMW with D. C. dealer tags.

9  Q.    Did you determine whether or not during this time

10 period whether Mr. Goodwin, Learley Goodwin, had owned a

11 car lot in the District of Columbia?

12 A.    Yes.

13 Q.    Do you recall the address of that car lot?

14 A.    No.  I remember it was on Georgia Avenue,

15 Northwest.

16 Q.    Now, in addition to making that transaction from

17 Mr. Lane, did you continue your investigation and have

18 any further contact with Mrs. Goodwin?

19 A.    Yes.

20 Q.    On approximately what date was that contact?

21 A.    July 14.

22 Q.    And where did you have that contact?

23 A.    At her home at 1302 Chillum Road.

24 Q.    What discussion did you have with Ms. Goodwin?

25 A.    Well, I went to the residence to attempt to

Direct - Featherstone

1  purchase drugs from her, I asked her did she have an

2  eighth -- could I get an eighth of an ounce of cocaine.

3  And she said basically she only had fifties and that she

4  preferred right now to only deal with regular customers,

5  but I could come back later if I wanted to.

6          She went on tell me that Mr. Goodwin's, I guess,

7  nickname was Goody and that Goody was in jail, still in

8  jail but that he was still running everything.  And she

9  told me that he was at Lewisburg Federal Correctional

10 Center in Pennsylvania and that she had to go there

11 later.

12 Q.     Did she explain in that conversation what her role

13 was and what Larry Lane's role was in relation to the

14 business while Mr. Goodwin was incarcerated?

15 A.     She stated that everything is on Larry, referring

16 to Larry Lane, her son, while Goody's in jail, and that

17 he was handling the cocaine but she was handling the

18 money.

19 Q.     Did you have occasion subsequent to that

20 conversation to execute a search warrant at the Chillum

21 Road address?

22 A.     Yes.

23 Q.     What date was that executed?

24 A.     It was August 13.  One moment, please.  August 13.

25 Q.     Could you describe for us what you recovered from

Direct - Featherstone

1  that Chillum Road address?

2  A.      There were quantities of white powder which later

3  field tested positive or later was tested positive by the

4  DEA lab for cocaine.

5  Q.      Did you execute warrants at more than one

6  location?

7  A.      Yes.

8  Q.      Ms. Featherstone?

9  A.      Yes.

10 Q.      Calling your attention to the 1302 Chillum Road

11 address.  Do you have a copy of that return?

12 A.      I don't have a copy of the entire list.

13 Q.      Let me --

14 A.      I have individual copies of each item.

15 Q.      Calling your attention to Miscellaneous 34.  Do

16 you see a copy of the return in that package of

17 materials?

18 A.      Yes.

19 Q.      Does that -- what is that search warrant return,

20 if you could just explain it for the jury?

21 A.      Did you ask me, what is it?

22 Q.      What is the search warrant return?  If you could

23 tell the jury what that is.

24 A.      Okay.  It's a listing of the items that were

25 recovered from the property during the search warrant.

Direct - Featherstone

1  Q.     Okay.  And completed during the time of the search

2  warrant?

3  A.     Yes.

4  Q.     What do you have to do with it after you completed

5  it?

6  A.     Well, I have to sign it and then it goes back to

7  the judge and they return.

8  Q.     Return it back?

9  A.     Return it back to the judge.

10 Q.     Did you also leave a copy at the location where

11 you executed the search warrant?

12 A.     Yes.

13 Q.     Now, looking at that return, does that refresh

14 your recollection as to what was recovered at the 1302

15 Chillum Road address?

16 A.     Yes, it does.

17 Q.     What did you recover at that location?

18 A.     .30 caliber Winchester rifle, 12-gauge, short

19 barrel shotgun, a revolver -- .38 revolver, a Smith and

20 Wesson .357 revolver that was loaded, a .22 caliber

21 handgun, an electric scale, small bags of personal

22 papers, narcotic paraphernalia.

23 Q.     What do you mean by narcotic paraphernalia?

24 A.     The glassine bags that were used to package the

25 cocaine.

Direct - Featherstone

1  Q.      And what else?

2  A.      There was a safe.

3  Q.      And ultimately did you get the safe opened?

4  A.      Yes.

5  Q.      What was recovered from the safe?

6  A.      $16,510.

7  Q.      And of course this search warrant was executed

8  while Mr. Goodwin was still incarcerated; is that

9  correct?

10 A.      Yes.

11 Q.      Did you also at that time execute a search warrant

12 at Mr.  Lane's residence?

13 A.      Yes.

14 Q.      What was recovered from that location generally?

15 A.      I don't see a listing.

16 Q.      Do you have copies of the drug reports related to

17 the execution of that search warrant?

18 A.      Yes.

19 Q.      In looking at those drug reports, does that

20 refresh your recollection in terms of what was recovered

21 at that location?

22 A.      Yes.

23 Q.      Could you tell us generally what was recovered at

24 that location?

25 A.      Four bags of plastic bags containing white powder.

Direct - Featherstone

1   Q.     Was this -- as a result of your investigation, was

2   Learley Goodwin ultimately charged with a federal crime?

3   A.     Yes.

4   Q.     Calling your -- let me show you what's been marked

5   as Miscellaneous 33 and Miscellaneous 33A.  Showing you

6   Miscellaneous 33, does that appear to be a judgment in

7   the criminal case associated with your investigation?

8   A.     Yes.

9   Q.     Attached to that Miscellaneous 33A, if you could

10  tell us what that appears to be.  Is that related to this

11  Miscellaneous 33?

12  A.     Yes, it is.

13  Q.     Does that appear to be a transcript of a

14  proceeding?

15  A.     Yes.

16  Q.     What was the date of that proceeding?

17  A.     The date of this proceeding is February 8, 1988.

18  Q.     Were you in fact in court on February 8, 1988 when

19  Learley Reed Goodwin pled guilty to conspiracy to

20  distribute and possess with intent to distribute cocaine?

21  A.     Yes.

22  Q.     Your Honor, if I could read the Statement of Facts

23  that Mr. Goodwin pled guilty to to the jury.

24         THE COURT:  Yes, you may.

25         MS. JOHNSTON:  The government would prove in

Direct - Featherstone

1    substance, Your Honor, that back around the end of April,

2    the first part of May of last year, an individual named

3    Sheila Hall came into the Drug Enforcement Administration

4    office in Washington.  Ms. Hall met with Detective Fannie

5    Johnson, who is here seated at counsel table, and during

6    that meeting advised Detective Johnson that she knew of

7    several individuals in Maryland, the Washington, D. C.

8    suburbs of Maryland that were engaged in trafficking in

9    cocaine.

10        Ms. Hall gave the names of those individuals,

11   including the defendant Learley Goodwin, Larry Lane, and

12   Mr. Goodwin's wife Constance Goodwin.  Based on the

13   information provided to Detective Johnson at that time,

14   she initiated an investigation into the activities of

15   Learley Goodwin and others.

16        On May 4, Detective Johnson had Sheila Hall place

17   a call to the residence of the -- court then interjects:

18   Who is Sheila Hall again?  The prosecutor responds, she

19   is an informant, Your Honor.  She came into the Drug

20   Enforcement Administration office.  The court then says,

21   very well.

22        Mr. Purcell continues, the prosecutor:  On May 4,

23   Detective Johnson had Sheila Hall place a call to the

24   residence of Learley Goodwin at 1302 Chillum Road.  The

25   purpose for that call was to set up the purchase of a

Direct - Featherstone

1   half ounce of cocaine.  Ms. Johnston was on the line when
2   Sheila Hall made that call and listened to the
3   conversation between Sheila Hall and Learley Goodwin.
4   During that conversation, Learley Goodwin stated that he
5   in fact would be willing to sell to a friend of Sheila
6   Hall a half ounce of cocaine for a purchase price of
7   $1,000.
8        An agreement to the time and place for the buy was
9   set.  After that, Detective Johnson arranged for
10  surveillance on the 1302 Chillum Road residence, the
11  residence of Learley Goodwin.  She then, in the company
12  of Sheila Hall, went to that -- the Chillum Road
13  residence and she was introduced to Constance Goodwin.
14  She was introduced to her as "Wendy", her undercover
15  name, as a person who wanted to buy the cocaine.  They
16  went inside.  The individual, Learley Goodwin, was on the
17  phone.  He paused during one conversation on the phone
18  and addressed Detective Johnson and said,
19  "I am trying to keep my workers straight."
20        Constance Goodwin then took Sheila Hall and
21  Detective Johnson on a brief tour of the residence, and
22  after a short time came back to the kitchen area.  At
23  that time this defendant had a digital scale.  He placed
24  on the scale a quantity a white powder substance which
25  weighed in excess of 14 grams, approximately half an

Direct - Featherstone

1  ounce.  He then gave that half ounce of cocaine to

2  Detective Johnson.  Detective Johnson gave him $1,000.

3  They left the residence a short time after that.

4       I might point out during the course of that brief

5  tour of the residence there were numerous items,

6  including a number or of silk dresses, in the residence

7  that had price tags on them.  A lot of merchandise

8  televisions, stereos, that type of thing.  Sheila Hall

9  had told Detective Johnson that it is very common for the

10 Goodwins to accept merchandise in trade for cocaine,

11 rather than money when somebody comes to the residence to

12 buy cocaine.

13      After that May 4 purchase, a week later, on May

14 11, Detective Johnson, through Sheila Hall, again

15 arranged for the purchase of another half ounce of

16 cocaine with Learley Goodwin.  They were at this time to

17 meet at a Big Boy restaurant, which is at Capitol Plaza

18 on Route 450 in Hyattsville near the BWI Parkway.  Again,

19 Detective Johnson set up surveillance on that location

20 and went with Sheila Hall to the Big Boy restaurant.

21 After they arrived, they went inside the restaurant.

22 Sheila Hall, at the direction of Detective Johnson, and

23 while she was standing there, placed several calls to the

24 beeper of Learley Goodwin.

25      After having received no response to the calls to

Direct - Featherstone

1  the beeper, Sheila Hall, at Detective Johnson's

2  direction, placed a call to the residence.  Learley

3  Goodwin was at the residence at that time and said that

4  he wasn't going to be coming to the Big Boy; Larry Lane

5  in fact would arrive at the Big Boy and have the half

6  ounce of cocaine for Detective Johnson to purchase.  He

7  indicated that he would be driving a blue Toyota vehicle

8  and described him.  That description was given to

9  Detective Johnson who in turn gave it to the surveillance

10  agents.

11       Shortly after that, Larry Lane did show up in a

12  blue Toyota vehicle and, after some conversations and

13  introductions, sold to Detective Johnson a half ounce of

14  cocaine, again, for a -- court's indulgence.  I seem to

15  be missing a page.  Your Honor, it looks like the

16  transcript skips a page that we were provided by the

17  court but continues as follows.  Did you hear that

18  recitation by Mr. Purcell, the court asking Mr. Goodwin?

19  Mr. Goodwin says, yes, sir.  The court repeats, you heard

20  it?  (A.)  Yes, sir.  Then the court asks him, do you

21  agree that in the event the case would go to trial this

22  would be the government's proof.  You agree that you did

23  what the government has indicated Mr. Purcell stated he

24  would prove.  Did you do these things?  Mr. Goodwin says,

25  I can't prove I didn't.

Direct - Featherstone

1        Then the court continues with a colloquy with Mr.
2   Goodwin, and the court says, again on Page 45, did you do
3   things that Mr. Purcell indicated he would prove that you
4   did?  Did you do them?  And Mr. Goodwin responds, yes,
5   sir.  The court again says he wants to be absolutely
6   clear:  Did you do the things that Mr.  Purcell indicated
7   he would prove you did not whether or not this would be
8   the government's proof whether you agree that you did
9   these things.  And Mr. Goodwin responds, I agree, sir.
10       Was that the end of your contact then with Mr.
11  Goodwin once he was arrested and taken into federal
12  custody?
13  A.      Yes.
14  Q.      That would have happened in May of 1987; is that
15  correct?
16  A.      Yes.
17  Q.      And you saw him and heard him plead guilty to the
18  charge in federal court in February 1988; is that
19  correct?
20  A.      Yes.
21  Q.      Now, I know it's been a long time.  Are you able
22  to recognize Mr. Goodwin here in court?
23  A.      Yes.
24  Q.      Would you identify him for the record?
25  A.      In terms of where I'm standing?

Cross - Featherstone

1   Q.      In terms of where I'm standing.   Perhaps we can

2   count over?

3   A.      He's the fourth man.

4   Q.      What is he wearing, for the record?

5   A.      It's an olive green or light olive green suit,

6   open shirt, gold-rimmed glasses.

7   Q.      We would ask the record to reflect that the

8   witness has identified the defendant, Learley Goodwin.

9          MR. MARTIN:   No objection.

10         THE COURT:   Cross-examination.

11                      **CROSS-EXAMINATION**

12         BY MR. MARTIN:

13  Q.      Good morning.   My name is Anthony Martin.   As

14  you've probably guessed, I represent Mr. Goodwin.   There

15  were four contacts, if I heard your testimony correctly.

16  The first contact was when you went to the house with

17  Sheila Hall and you were introduced to Constance Goodwin

18  at the door; is that correct?

19  A.      Yes, she did answer the door.

20  Q.      And then there was a second contact on or about

21  May 10, because I heard you say May 10 at one point.   And

22  I heard a question where it might have been May 11.   And

23  in that particular meeting, you met with a  Larry Lane;

24  is that correct?

25  A.      Yes.

Cross - Featherstone

1 Q.    And Larry Lane, you came to understand, was Mr.
2 Goodwin's stepson?
3 A.    Yes.
4 Q.    And then there was a subsequent contact on May 28,
5 1987, and again you met with Larry Lane; correct?
6 A.    Yes.
7 Q.    At this time Mr. Goodwin was in jail; right?
8 A.    Yes.
9 Q.    And he was in jail -- well, he wasn't in jail, but
10 you didn't meet with him on May 10 or 11; again, Larry
11 Lane stood in for him as -- according to your testimony;
12 right?
13 A.    Yes.
14 Q.    Then you attempted to make a fourth contact, and
15 again you went to the house and you didn't meet with Mr.
16 Goodwin.  You met, again, with Constance Goodwin;
17 correct?
18 A.    Yes.
19 Q.    During the time that you met with Larry Lane, you
20 also then became interested or focused on Larry Lane's
21 activities; is that correct?
22 A.    Yes, he was part of the group.
23 Q.    And so you had his apartment searched; right?
24 A.    Yes.
25 Q.    And I believe you said you found some controlled

Cross - Featherstone

1  substances in his house as well; right?

2  A.     Yes.

3  Q.     You also testified that at Chillum Road you found

4  some weapons; is that correct?

5  A.     That's correct.

6  Q.     And with respect to those weapons, do you recall

7  whether or not there were fingerprints taken on any of

8  those?

9  A.     No, I don't recall.

10  Q.     Do you recall whether or not at Larry Lane's

11  apartment whether you found any weapons?

12  A.     No, I don't.

13  Q.     You also testified that Ms. Goodwin, that's

14  Constance Goodwin, told you that Mr. Goodwin was still

15  running things from jail.  Do you remember saying that

16  now?

17  A.     Yes.

18  Q.     You didn't check in Lewisburg to see if there were

19  any phone calls coming from Mr. Goodwin that might have

20  indicated that he was still involved in drug activity,

21  did you?

22  A.     No.

23         MR. MARTIN:  I have no further questions, Your

24  Honor.

25         THE COURT:  All right.  Any redirect?

Redirect - Featherstone

## **REDIRECT EXAMINATION**

BY MS. JOHNSTON:

Q.     Just one question.  Who told you that Larry Lane was his stepson?

A.     Mr. Goodwin.

Q.     And who arranged for you to meet with Larry Lane?

A.     Mr. Goodwin.

Q.     I have nothing further.

THE COURT:  You may step down.  Thank you very much.

MS. JOHNSTON:  Your Honor, our next witness would be Dave Papalia.

THE COURT:  Is this the same one?

MS. JOHNSTON:  No, it is a search warrant location as a result of --

MR. WARD:  May we approach the bench?

(At the bar of the court.)

MR. WARD:  Your Honor, this witness has testified under oath at three occasions before this.  At each occasion he has been want to testify in hearsay fashion, and then when a question was asked at least in the two proceedings where he was challenged before the grand jury, indeed he didn't see what he saw.  I would simply ask the court or the prosecution direct the witness to answer based on his personal knowledge.

1              For example, this is what I'm concerned about.  He

2    was not -- he did not go in the house with the initial

3    entry team.  He stayed outside as he said protecting the

4    perimeter.  When he went into the house, everybody was in

5    the living room.  They had been placed in the living

6    room.  So he doesn't know where they were, although on a

7    couple of occasions he testified where they were, it

8    later turned out he didn't know, and that was based on

9    what he was told.  So I'm simply -- I don't want that to

10   come out.  I mean, I have to try to unring that bell once

11   it's rung.

12             MS. JOHNSTON:  Your Honor, we haven't gone over

13   his testimony.  I haven't asked him any questions during

14   the preparation that would lead me to be concerned that

15   he's going to be testifying to hearsay evidence.

16             THE COURT:  Well.

17             MS. JOHNSTON:  I don't think it's necessary.

18             THE COURT:  Give him an -- do you want an

19   instruction from the court?

20             MR. WARD:  No.  From the government, based on your

21   personal knowledge.

22             THE COURT:  My suggestion is have Ms. Johnston

23   have him not give hearsay.

24             MS. JOHNSTON:  Your Honor, I don't think it's

25   appropriate in front of the jury.

1          THE COURT:  Not in front of the jury.  You can

2    talk to him with the husher on.

3          MS. JOHNSTON:  It makes it look like there's

4    nothing special.  It looks like the government reminding

5    him of something he's going to testify to.  It's not

6    necessary -- the government counsel has been practicing

7    law a long time.  We advise our witnesses in  terms of

8    what they can say and can't say.  I don't know why there

9    should be any reason to have to treat him differently

10   than we've treated any other witness.

11         THE COURT:  Tell him to please make sure you

12   confine your answers to personal knowledge.

13         MR. WARD:  The government would prefer I stand up

14   and object, which would possibly help him.

15         THE COURT:  First of all, before you go, I intend

16   to give a 404(b) instruction on the last witness now.

17   Why don't you just make sure that without making any big

18   deal that you say, please, detective, confine yourself to

19   what you personally saw.

20         MS. JOHNSTON:  I just don't think it's appropriate

21   to do this with this witness.  We haven't done it with

22   any other search witness.

23         THE COURT:  I understand.  But just slip it in and

24   it won't even be noticed.

25              (Back in open court.)

1          THE COURT:  Ladies and gentlemen, with respect to

2    the testimony that you just heard of the former

3    Metropolitan Police Department police officer who

4    testified concerning transactions with Mr. Goodwin in

5    1987, I want to advise you that this testimony as well

6    has been limited -- has been admitted by me, but for a

7    limited purpose.  As I explained to you before about our

8    evidence rules, evidence of other crime, wrongs or acts

9    is not admissible to prove the character of a person in

10   order to show actions in conformity therewith.

11         Simply put, this language of the rule means that

12   evidence of other crimes, wrongs or acts may not be used

13   to demonstrate that a person has a certain character and

14   that because of that character such person is likely to

15   have committed the offense charged in this case.  The

16   evidence rules provide, however that, such evidence, and

17   I quote, "may be admissible for other purposes, such as

18   proof of motive, opportunity, intent, preparation, plan,

19   knowledge, identity, or absence of mistake or accident."

20         I have ruled that the testimony of the

21   Metropolitan Police Department officer that you just

22   heard is admissible, but only for these other limited

23   purposes.  Accordingly, I instruct that you may consider

24   such evidence, but only for the limited purposes that I

25   have just described.

Direct - Papalia

1      You may proceed, Ms. Johnston.

2 Thereupon,

3                           **DAVID PAPALIA**,

4 having been called as a witness on behalf of the

5 Plaintiff, and having been first duly sworn by the

6 Courtroom Deputy, was examined and testified as follows:

7      THE CLERK:  If you would just state your name for

8 the record.

9      THE WITNESS:  Detective David Papalia.  Last name

10 is P A P A L I A.

11                    **DIRECT EXAMINATION**

12      BY MS. JOHNSTON:

13 Q.    Detective Papalia, where are you employed?

14 A.    With the Montgomery County, Maryland Police

15 Department.

16 Q.    How long have you been employed there?

17 A.    I entered the Police Academy in February of 1995.

18 Q.    What positions have you held since your employment

19 there?

20 A.    For a brief period I was in the Patrol Division,

21 then I moved into a station level anti-crime unit in the

22 Silver Spring district.  Subsequent to that, in September

23 of 2000, I entered the narcotics section.

24 Q.    Since September of 2000, have you been working on

25 almost exclusively narcotics cases?

Direct - Papalia

1  A.      Yes, ma'am.

2  Q.      Could you describe the different kind of cases

3  that you've worked on since your assignment to narcotics?

4  A.      I've worked in an undercover capacity numerous

5  times on street level dealers as well as mid-level to

6  high level narcotics traffickers.  I've also worked on --

7  was the case agent on two Title III wiretap

8  investigations.

9  Q.      Meaning intercepted telephone communications?

10 A.      That's correct.

11 Q.      Have you been federally deputized in any cases?

12 A.      Yes, I have.

13 Q.      With what agencies?

14 A.      With the Drug Enforcement Administration, as well

15 as ICE.

16 Q.      All right.  Now, calling your attention back to

17 June of 2004.  Were you working in a narcotics unit at

18 that time?

19 A.      Yes, I was.

20 Q.      Did you have occasion to participate in the

21 execution of a search warrant?

22 A.      Yes, I did.

23 Q.      What was your role in the execution of that search

24 warrant?

25 A.      I was the -- I was in charge of the scene of that

Direct - Papalia

1  particular search warrant.

2  Q.    What were your duties as being in charge of the

3  scene?

4  A.    Just to oversee the search of the residence,

5  collection of any evidence that might be removed from the

6  residence, informing the other detectives and agents what

7  the nature of the investigation was prior to the

8  execution of the warrant.

9  Q.    As a result of that, do you have personal

10 knowledge concerning the evidence that was seized from

11 that scene and who was present in the residence?

12 A.    Yes.

13 Q.    I'll ask you to limit your testimony to that

14 which you have personal knowledge of; is that

15 understandable?

16 A.    Yes.

17 Q.    Is that what you ordinarily do in the course of

18 your testifying concerning --

19        MR. MCKNETT:  Objection.

20        THE COURT:  Overruled.

21        BY MS. JOHNSTON:

22 Q.    -- execution of search warrants?

23 A.    Yes.

24 Q.    Calling your attention back to June 1 of 2004.

25 What was the location that you were responsible for

Direct - Papalia

1  executing the search warrant?

2  A.      7427 Ninth Street, Northwest.

3  Q.      Washington, D. C.?

4  A.      Yes, it was.

5  Q.      Do you prepare an evidence inventory form to keep

6  track of the evidence that is seized when you execute a

7  search warrant?

8  A.      Yes.

9  Q.      Could you describe what information you put on

10 that evidence inventory form?

11 A.      Generally there are three sections on the

12 Montgomery County form:  Primary location, specific

13 location, and description of the items seized, along with

14 the item number that we assign to it and the -- there's

15 also an exhibit number.  But more often than not, we

16 don't use that.

17 Q.      Is that evidence inventory form used in

18 conjunction with the return that you have to file with

19 the court when you execute a search warrant?

20 A.      Yes, ma'am.

21 Q.      Do you -- in terms of executing a search warrant,

22 do you do it by yourself?

23 A.      No.

24 Q.      Would you describe in particular in relation to

25 the search warrant at 7427 Ninth Street, Northwest who

Direct - Papalia

1 was involved in executing the warrant in addition to

2 yourself?

3 A.     The entry was made by ICE agents, Immigration

4 Customs Enforcement agents, and the search team was

5 comprised by customs enforcement agents as well as

6 Montgomery County Police Department detectives.

7 Q.     You mentioned the entry team.  Were you part of

8 the entry team?

9 A.     No, I wasn't.

10 Q.     What was your responsibility at the team?

11 A.     I was located at the rear of the residence.

12 Q.     What does an entry team do at the execution of a

13 search warrant?

14 A.     Well, in this particular case, they're the ones

15 that enter the residence through whatever entry point

16 they determine that they should.

17 Q.     What does the entry team do once they enter?

18 A.     They will attempt to locate any individuals that

19 are inside the residence, secure them, and make the scene

20 safe, so to speak, so the investigators or search team

21 can enter.

22 Q.     Where are you and the rest of the search team when

23 the entry team makes entry?

24 A.     Outside.

25 Q.     Was that procedure followed in the execution of

Direct - Papalia

1   the warrant at 7427 Ninth Street?

2   A.      Yes, it was.

3   Q.      Do you know approximately how soon after the entry

4   team made entry that you entered the premises?

5   A.      Not specifically, no.

6   Q.      Can you give us an idea?  Is it minutes?  Hours?

7   A.      Within 15 to 20 minutes.

8   Q.      Now, did anyone -- where were you positioned while

9   the entry team was making entry?

10  A.      I was to the rear of the residence.

11  Q.      Did you observe anyone exiting the residence prior

12  to your entering, once the entry team made entry?

13  A.      Not that I'm aware of.

14  Q.      When you entered the premises, approximately how

15  many people were on the search team?

16  A.      Approximately five to six people, I believe.

17  Q.      Describe for us what you observed when you

18  initially entered the premises.

19  A.      The layout of the location or --

20  Q.      No.  Just describe -- were there any people in the

21  residence when you entered?

22  A.      Yes, there were.

23  Q.      Do you recall how many people were in there?

24  A.      There were five.

25  Q.      Okay.  Do you recall -- do you see any of them

Direct - Papalia

1 here in the courtroom?

2 A.     Yes, I do.

3 Q.     Who do you see here in the courtroom?

4 A.     LaVon Dobie.

5 Q.     Could you identify her for the record?

6 A.     She's seated at defense table wearing a tan jacket

7 and black shirt.

8 Q.     We would ask the record reflect that the witness

9 has identified the defendant, LaVon Dobie.

10        THE COURT:  The record will so indicate.

11        BY MS. JOHNSTON:

12 Q.     Where was she when you observed her in the

13 residence?

14 A.     She was in the living room area.

15 Q.     You indicated you went in there with your search

16 team.  What was the first thing that you did in terms of

17 your search?

18 A.     We took overall photographs.

19 Q.     For what purpose do you take overall photographs?

20 A.     Just so we have -- just to capture what the

21 residence looked like.

22 Q.     If I could, Your Honor, ask the witness to step

23 down.  We have some photos on the boards.

24        THE COURT:  Yes, you may.

25        MS. JOHNSTON:  Can we proceed in that manner?

Direct - Papalia

1          MR. WARD:  May I join the proceedings?

2          MS. JOHNSTON:  I don't know where Mr. Ward is

3    going to stand.

4          MR. WARD:  I will stand right here Your Honor, if

5    this's all right.

6          MS. JOHNSTON:  You may be blocking the jurors, Mr.

7    Ward.

8          BY MS. JOHNSTON:

9    Q.    I'm going to give you this laser pointer.  And

10   beginning with the first photograph, P-44.  If you could

11   stand to the side after you look at it and explain to the

12   jury what we're looking at in P-44.

13   A.    P-44 is a front view of the residence.

14   Q.    And P-45.

15   A.    P-45 is the front door of the residence.

16   Q.    P-46.

17   A.    P-46 is a view from the main floor living room

18   area looking up to the second floor of the residence.

19   Q.    If you could, describe for us generally the layout

20   of this house as you open that front door.

21   A.    As you open the front door you find yourself in

22   the living area, the main floor so to speak, and you have

23   two options.  You can either turn to the left, which is a

24   living room-type of area with chairs and so forth.  You

25   can either go upstairs to the bedroom section of the

Direct - Papalia

1  residence or to the right.  Here you can actually walk

2  downstairs into what is -- you walk into almost another

3  living room area.

4  Q.    You referred to P-46 when you said "right here;"

5  is that correct?

6  A.    That's correct.

7  Q.    If we look at P-47, what do we see in that

8  photograph?

9  A.    P-47 is actually walking up the steps and just

10  taking another photograph in the actual hallway.  So I'm

11  up here in -- I'm upstairs in P-46, and P-47 is in that

12  hallway now.

13  Q.    What is P-64?  How does that relate to P-46?

14  A.    P-64, you can see the railing right here.  This is

15  the right side of that railing looking downstairs  into

16  the second living area of the residence.

17  Q.    That's a second living area you described for the

18  jury; is that correct?

19  A.    That's correct.

20  Q.    Is there a way to access the basement from that

21  location?

22  A.    Yes, there is.

23  Q.    If you could, using the laser and, again, standing

24  back so that the jurors on this side can see.

25  A.    You can walk down the steps here.  And as I recall

Direct - Papalia

1  getting down to -- upon getting down to this living area,

2  you can make a real tight left-hand turn and you can go

3  downstairs into the basement.

4  Q.      In P-47 -- if you could use P-47 and describe for

5  us the layout of the upstairs.

6  A.      Sure.  As you go down the hallway in P-47, over

7  here is one bedroom which we noted as Bedroom No. 1.

8  Q.      Referring to P-46, on the left-hand side of that

9  photograph.

10 A.      That's right.  And again, referring to P-46.  If

11 you continue down the hallway, there's a second bedroom

12 on the left-hand side.  And then if you continue down

13 referring to P-46, straight ahead there's a third

14 bedroom.  And to backtrack for a minute.  Right over here

15 in this area, there's a bathroom on the right-hand side,

16 referring to P-46.

17 Q.      Was there just one bathroom that you recall in

18 that level?

19 A.      As I recall, there was just one.

20 Q.      How did you designate the three bedrooms on the

21 second floor in terms of your search?

22 A.      We designated what we -- what typically do in a

23 search warrant is where items are found, we will

24 designate them with a particular room number.  If we

25 don't find anything in a particular room, we will not

Direct - Papalia

1   give it a number.   In this instance we found items of

2   importance to us in two of the bedrooms.   And as a result

3   of that, the first bedroom here that I discussed in P-46

4   on the left was Bedroom No. 1, and then Bedroom No. 2 in

5   P-46 was the second one further down on my left.

6   Q.     Can we see either of those bedrooms in P-47?

7   A.     Yes.   In P-47 you can see the doorjamb of Bedroom

8   No. 1.   And in P-47 as well, you can see the outline of

9   Bedroom No. 2 as well.

10  Q.     Okay.   Let me put this board down for a moment.

11  Now, calling your attention to P-48.   If you could, tell

12  us what we're looking at in P-48 and P-49 and P-50,

13  please.

14  Q.     P-48 is a photograph of the master bedroom, or in

15  this case Bedroom No. 2.   We designated it as the master

16  bedroom.   P-49 is another view of Bedroom No. 2.   And

17  P-50 is a close-up of a bureau area inside of Bedroom No.

18  2.

19  Q.     Why did you take the close-up of the dresser in

20  P-50?

21  A.     The reason I took the close-up photograph is just

22  to demonstrate -- to try and capture these photographs

23  right here and just to get a better position because it's

24  not as clear from far away.

25  Q.     Now if we go to the next photograph, P-51.   Can

Direct - Papalia

1  you tell us what we're looking at in P-51?

2  A.     P-51 is a photograph of two cellular phones.

3  Q.     And there's a hand there holding a number.  If you

4  could explain to the jury what that is.

5  A.     Referring to P-51, you see right here there's a

6  white index card, standard size, the number 8, and in the

7  bottom right-hand corner the initials "D.J.P."

8  Q.     Let me show you what's been marked as Dobie 1 and

9  ask you if you recognize this telephone.

10 A.     Yes, I do.

11 Q.     What is that?

12 A.     It's one of the phones that was located in P-51.

13 Photograph P-51, Exhibit 8.

14 Q.     Calling your attention to P-52.  If you could tell

15 us what we're looking at in P-52.

16 A.     P-52 is the number 20 and the initials "B.B." And

17 you're looking at two rounds of what appear to be .22

18 caliber ammunition.

19 Q.     Let me show you what's been marked as Dobie 2 and

20 ask you if you recognize that exhibit.

21 A.     Yes, I do.

22 Q.     What is that?

23 A.     Dobie 2 are the two rounds of ammunition that were

24 found as part of Number 20 on the search warrant.

25 Q.     Now, there are initials on the cards.  What do the

Direct - Papalia

1  initials stand for?

2  A.     The initials stand for the detective or agent that

3  actually located those items.

4  Q.     What happened -- what was the procedure that you

5  followed when an agent would, or an officer would locate

6  an item of evidence?  If you could face the jury when

7  you're speaking, and keep your voice up.

8  A.     What we would normally do if someone found an item

9  or evidence in a location, once they found it they would

10  make a note of where it was.  And we went around  the

11  residence at the conclusion of the search warrant, they

12  would point out where it was and what it was.

13  Q.     What would you do at that point?

14  A.     My procedure is we would give it a number,

15  depending on what the order was.  In this case it was

16  20, and the initials down here, note the agent or

17  detective or officer who found it is.

18  Q.     Is that when the photograph is taken as well?

19  A.     I'm sorry?

20  Q.     Is that when the photograph is taken?

21  A.     Yes, ma'am.

22  Q.     Do the photographs accurately depict the locations

23  as you observed them as you were there?

24  A.     Yes.

25  Q.     Now, calling your attention to P-53.  If you could

Direct - Papalia

1  tell us what we're observing in P-53.

2  A.      P-53 is a metal container containing rounds of .22

3  caliber ammunition.

4  Q.      Let me show you what's been marked as Dobie 19 and

5  ask you if you recognize that exhibit.

6  A.      Yes, I do.

7  Q.      What is that?

8  A.      Rounds of .22 caliber ammunition.  Nine rounds of

9  .22 caliber ammunition.

10  Q.      Did you take the container the ammunition was in?

11  A.      No.

12  Q.      Just the ammunition itself?

13  A.      That's correct.

14  Q.      Where was that found, in the master bedroom or

15  Bedroom 2 as you designated it?

16  A.      As you face the bed from the bottom of it, it

17  would be on the left-hand side on the bureau on a night

18  stand, which would have been this one right here.

19  Q.      Again, if you could back up so that the jury can

20  see what you're referring to.  And what photograph is it

21  that you can see the night stand?

22  A.      I'm referring to photograph P-48.

23  Q.      And the night stand on the left side of the bed;

24  is that correct?

25  A.      Yes, ma'am.

Direct - Papalia

1  Q.     Were there night stands on both sides of the bed?

2  A.     Yes, there were.

3  Q.     Okay.  Is that the same caliber as Dobie 2?

4  A.     Yes, it appears to be.

5  Q.     Your Honor, we would publish these exhibits to the

6  jury at this time, Dobie 2 and Dobie 19.

7         THE COURT:  Yes, you may.

8         BY MS. JOHNSTON:

9  Q.     Thank you, Your Honor.

10         Now, staying in the second bedroom and calling

11 your attention to the next several photographs, P-56 and

12 57.  Starting with 56.  If you could tell us what we're

13 looking at in P-56.

14 A.     P-56 is a plastic bag containing unused glassine

15 baggies.

16 Q.     And P-57?

17 A.     P-57 is a digital scale box.

18 Q.     Before we get to those items, let me show you --

19 I'm going to put this up on the monitor so everyone can

20 see it.  P-54, do you recognize that photograph?

21 A.     Yes, I do.

22 Q.     What is that a photograph of?

23 A.     It's a photograph of documents.

24 Q.     Where were those documents seized from?

25 A.     On top of the left-hand night stand.

Direct - Papalia

1  Q.      Referring to what photograph on the board?

2  A.      Referring to photograph P-48.

3  Q.      Did you have occasion to go through those

4  documents after you bundled them up and reviewed those

5  documents in conjunction with preparation of your

6  testimony with Agent Eveler and myself?

7  A.      Yes.

8  Q.      I want to show you some exhibits.  Calling your

9  attention first to Dobie 3 and ask if you recognize that

10 exhibit.

11 A.      Yes, I do.

12 Q.      Where was that recovered from?

13 A.      This was recovered from the left-handed night

14 stand, item number 17.

15 Q.      Let me show you -- what is Dobie 3 for the record?

16 A.      I'm sorry?

17 Q.      What is that exhibit?

18 A.      It's a day planner.

19 Q.      Why would you seize a day minder or day planner?

20 A.      As part of any conspiracy investigation, we're

21 going to take documents for review later on.

22 Q.      Let me show you also Government's Exhibit Dobie 4

23 and ask you if you can identify that exhibit.

24 A.      Yes.  It's a business card.

25 Q.      Coming from the same item, 17, as depicted in

Direct - Papalia

1  photograph P-54?

2  A.      That's correct.

3  Q.      Let me show you the next exhibit, Dobie 5 and ask

4  you if you recognize that exhibit.

5  A.      Yes, I do.

6  Q.      Okay.  And in reference to Dobie 5, let me show

7  you another photograph, P-55.

8  Q.      Court's indulgence one moment.

9          Showing you what's been marked as P-55.  Again,

10 putting it up on the projector here.  Do you see that

11 exhibit?

12 A.      Yes, I do.

13 Q.      What is that?

14 A.      That's a plastic container which contained

15 documents.

16 Q.      Where was that recovered from?

17 A.      Underneath the bedroom inside the Bedroom No. 2.

18 Q.      So it would have been recovered underneath the bed

19 that's depicted in Government's Exhibit P-48; is that

20 correct?

21 A.      That's correct.  This bed right here.  It was

22 located under there.

23 Q.      Calling your attention now back to Government's

24 Exhibit Dobie 5.  What is that item?

25 A.      These are Verizon phone records.

Direct - Papalia

1   Q.      And they were recovered from where?

2   A.      From item 16.

3   Q.      The plastic?

4   A.      Under the bed.

5   Q.      Are you able to tell the telephone number on those

6   bills?

7   A.      Yes.

8   Q.      What is the telephone number?

9   A.      The number is 202-832-6216.

10  Q.      Let me show you the next exhibit, Dobie 6, and ask

11  you again if you recognize that item.

12  A.      Yes, I do.

13  Q.      Where was that recovered from?

14  A.      It was inside of item number 16, the plastic bin

15  that was located under the bed.

16  Q.      Is there a telephone number -- what is that item?

17  A.      It is a Sprint PCS telephone bill.

18  Q.      Is the number for that telephone reflected on the

19  bill?

20  A.      Yes, it is.

21  Q.      What is that telephone number?

22  A.      It's 240-351-3388.

23  Q.      Let me also show you what's been marked as Dobie

24  7 and ask you if you recognize that exhibit.

25  A.      Yes, I do.

Direct - Papalia

1  Q.      What is that?

2  A.      This is a Verizon phone bill.

3  Q.      Okay.  Where was that recovered from?

4  A.      It was located in item number 16 as well.

5  Q.      Are you able to tell what the telephone number was

6  for that relating to that Verizon phone bill?

7  A.      Yes, I am.

8  Q.      What is that number?

9  A.      The telephone number is 202-882-3738.

10 Q.      Now, going back to P-56.  Were items seized from

11 that drawer?

12 A.      Yes.  This item was seized from that drawer.

13 Q.      Where is that drawer in relation to our picture,

14 P-48?

15 A.      Item Number 21 was located, referring to

16 photograph P-48, in this left-handed -- left side night

17 stand in the top drawer.

18 Q.      Let me show you what's been marked as Dobie 8.  Do

19 you recognize that item?

20 A.      It appears to be these baggies in particular in

21 this picture, P-56.

22 Q.      If you could open them up so everyone could see

23 what you're referring to.

24 A.      (Witness indicating.)  Glassine baggies.  Unused

25 glassine baggies.

Direct - Papalia

1  Q.     Did you seize other items out of that drawer as

2  well?

3  A.     Yes.

4  Q.     If we could publish Government's Exhibit Dobie 8

5  to the jury at this time.

6         THE COURT:  Yes, you may.

7         BY MS. JOHNSTON:

8  Q.     Thank you, Your Honor.

9         Calling your attention to P-57.  What are we

10 looking at there?

11 A.     Photograph P-57 is marked as item nine with the

12 initials "D.J.P." on it, which are my initials, and that

13 is a box containing a digital scale.

14 Q.     What drawer is that?

15 A.     This is the top drawer on the right side of the

16 night stand, referring to photograph P-48 on that side.

17 Q.     Just so we're clear then.  In terms of P-56, what

18 drawer was that?  On which side of the night stand was

19 that, or bed was that?

20 A.     P-56 was on the left side referring to photograph

21 P-48.  Item Number nine in photograph P-57 was on the

22 right side of this bed, again, referring back to

23 photograph P-48.

24 Q.     Showing you what's already been received into

25 evidence as Dobie 15.  If you could look at that exhibit

Direct - Papalia

1  for us and tell us whether you recognize that.

2  A.      Yes, I do.

3  Q.      What is that?

4  A.      This is the box, along with the digital scale,

5  that you see in photograph P-57.

6  Q.      Now, there appears to be some black powder on

7  that; is that correct?

8  A.      Yes.

9  Q.      What does that represent to you?

10 A.      It means to me that it was probably analyzed for

11 fingerprints.

12 Q.      Okay.  Do you have any knowledge of there being

13 any prints of value recovered from that?

14 A.      No, I don't.

15 Q.      If we could publish Government's Exhibit Dobie 15

16 to the jury.  If you would hand it to the foreman,

17 please.

18         THE COURT:  Yes, you may.

19         MS. JOHNSTON:  I don't know if the court wants to

20 take a recess now.  I'm ready to switch boards, so we can

21 if the court would like.

22         THE COURT:  We will take a recess until ten

23 minutes of 12.

24                  (Off the record at 11:32 a.m.)

25                  (On the record at 11:54 a.m.)

Direct - Papalia

1          MS. JOHNSTON:  Your Honor, I expect the government

2    will finish tomorrow.

3          THE COURT:  Okay.

4          (Witness resumes the stand at 11:56 a.m.)

5               (Jury returns at 11:56 a.m.)

6          BY MS. JOHNSTON:

7    Q.    Detective Papalia, in addition to that plastic box

8    with other documents in it, did you recover other items

9    from underneath the bed in Bedroom 2 of the master

10   bedroom, as you referred to it?

11   A.    Yes, we did.

12         MR. WARD:  Your Honor, may I --

13         THE COURT:  Yes.

14         MR. WARD:  I'll make sure I don't block anybody's

15   view.

16         BY MS. JOHNSTON:

17   Q.    Again, so the record is clear, we're talking about

18   the bedroom depicted in P-48; is that correct?

19   A.    Yes, we are in this photograph right here, P-48.

20   Q.    If I could ask for your assistance, detective.

21         THE CLERK:  Ms. Johnston, if this would help him,

22   a laser.

23         MS. JOHNSTON:  He has a laser.  Thank you.

24         THE CLERK:  Okay, great.

25         BY MS. JOHNSTON:

Direct - Papalia

1  Q.      Showing you what's been marked as Government's

2  Exhibit P-58.  Can you tell us what we're looking at in

3  Government's Exhibit P-58?

4  A.      In P-58 you're looking at the right side of the

5  bed in the master bedroom, Bedroom No. 2.

6  Q.      Is that -- where are the mattresses?

7  A.      They've been flipped up, lifted up from the back

8  up to the top.  You can see the bottom of it right here,

9  P-58.

10  Q.      The bottom like a boxed spring?

11  A.      Yes.

12  Q.      And this round wooden thing along the right side

13  of the photo, what is that?

14  A.      P-58, that's support for the boxed spring.

15  Q.      And what are we observing here in the center of

16  P-58?

17  A.      Specifically, this box, this cracker box right

18  here.

19  Q.      Can you describe for us what's depicted in the

20  next photograph P-59?

21  A.      Photograph P-59 is box depicted in P-58 actually

22  lifted up on its side, and the ends are pinched so you

23  can see the contents of the box.

24  Q.      What were the contents of the box?

25  A.      Two handguns.

Direct - Papalia

1  Q.      Then going to the next picture, P-60.  What do we

2  observe in P-60?

3  A.      P-60 are the two guns that were contained that you

4  see in photograph P-59.

5  Q.      And then P-61.

6  A.      P-61 is the bottom with the firearm.

7  Q.      What is the significance of those photographs?

8  A.      Just to show how the magazine was placed inside of

9  the gun.

10 Q.      How was it placed inside of the gun?

11 A.      It was taped inside there.

12 Q.      Let me show you now the actual exhibits, beginning

13 with Dobie 22.  Can you tell us what you say we're

14 looking at in Dobie 22?

15 A.      It's the actual box that you see in photographs

16 P-60, P-58 and P-59.

17 Q.      Is there anything different about its appearance

18 than when you found it under the bed?

19 A.      Yes, it is.

20 Q.      What's the difference?

21 A.      It appears to have some powder residue on it.

22 Q.      Is that why you're wearing the gloves?

23 A.      Yes.

24 Q.      If you could -- rather than publish to the jury,

25 if you could just walk it in front of them so that they

Direct - Papalia

1  could see it.

2  A.      (Witness indicating.)

3  Q.      What was recovered from inside of that?

4  A.      Inside this box were two handguns.

5  Q.      Let me show you what's been marked as Dobie 16 and

6  16A and ask you if you recognize those two exhibits.

7  A.      Yes, I do.

8  Q.      What is 16 and 16A?

9  A.      16 and 16A, this is a Lama .40-caliber handgun

10  that we recovered.

11          MR. WARD:  I'm sorry, which exhibit is this?

12  Which number is this one?

13          MS. JOHNSTON:  Dobie 16 and 16A.

14          MR. WARD:  Oh, it's both the same.

15          MS. JOHNSTON:  Dobie 16 is the gun, and Dobie 16A

16  is the magazine and bullets that were inside.

17          MR. WARD:  Thank you.  Thank you.

18          BY MS. JOHNSTON:

19  Q.      Have they been separated for safety purposes?

20  A.      Yes, they have.

21  Q.      If you could just show that to the jury, please.

22  A.      (Witness indicating.)

23          MR. WARD:  That's the Lama?

24          THE WITNESS:  Yes, it is.

25          MR. WARD:  Thank you.

Direct - Papalia

1    BY MS. JOHNSTON:

2    Q.     What caliber handgun is that?

3    A.     This is a .40 Caliber handgun.

4    Q.     Was it loaded when it was recovered?

5    A.     Yes, it was.

6    Q.     Your Honor, I believe that the bullets and

7    magazine are sealed.  If we could publish that to the

8    jury, but not the weapon at this time.

9          THE COURT:  Yes, you may.

10         BY MS. JOHNSTON:

11   Q.     Thank you, Your Honor.

12         You may give them the bullets.

13   A.     (Witness indicating.)

14   Q.     In addition to the .40-caliber, was there also

15   another weapon that was recovered?

16   A.     Yes, there was.

17   Q.     Let me show you what's marked as Dobie 17 and 17A

18   and ask you if you recognize those two photographs.  Or

19   not those two -- those two items.

20   A.     Yes, I do.

21   Q.     If you could tell the ladies and gentlemen of the

22   jury what those two items are.

23   A.     Dobie 17 is the Taurus 9 millimeter handgun.  It's

24   in the box that I'm showing you.  And Dobie 17A are what

25   appear to be 9 millimeter rounds of ammunition and a

Direct - Papalia

1  magazine for that gun as well.

2  Q.     Your Honor, if we could publish Dobie 17A, the

3  magazine and bullets.

4       THE COURT:  You may.

5       BY MS. JOHNSTON:

6  Q.     And just display the gun to the jury.

7  A.     (Witness indicating.)

8  Q.     If I could also show you what's been marked as

9  Dobie 20, and that will show up on the screen.  Do you

10 see that exhibit?

11 A.     Yes, I do.

12 Q.     Are you familiar with photograph, Dobie 20?

13 A.     The one that's on the screen?  Yes, I am.

14 Q.     Can you tell the ladies and gentlemen of the jury

15 what's that's a photograph of?

16 A.     This photograph depicts additional boxes of this

17 brand of table water crackers that I found in the

18 residence.

19 Q.     Do you recall where it was that you made the

20 observations that are depicted in Dobie 20?

21 A.     Yes, I do.

22 Q.     Where was that?

23 A.     As you walk down the stairs of the residence, as I

24 stated earlier you can either go upstairs or you can go

25 downstairs into the lower basement or another living

Direct - Papalia

1   area.   Before you go into the basement you continue

2   through that living area; on the left-hand side was what

3   appeared to be a formal dining area, and there was a

4   table and China cabinet.

5   Q.     Showing you Dobie 21.  Is that picture also from

6   the residence?

7   A.     Yes.

8   Q.     What are we looking at in this picture?

9   A.     Again, we're looking at Carr's table water

10  crackers.

11  Q.     Also while we're discussing that, showing you

12  another exhibit that has previously been admitted as P-

13  195.  Calling your attention to P-195, which is the

14  center picture on the front row.  Do you observe anything

15  in that photograph?

16  A.     Yes, I do.

17  Q.     What do you observe?

18  A.     A stack of boxes along the wall on the right side

19  of the picture.

20  Q.     Can you tell us whether or not those stack of

21  crackers along the wall are similar to the box of

22  crackers from which you --

23       MR. MONTEMARANO:  Objection, Your Honor.  Basis

24  for knowledge.

25       THE COURT:  Rephrase the question.

Direct - Papalia

1          BY MS. JOHNSTON:

2    Q.     Okay.  Well, describe what's depicted in the

3    picture, P-195.

4    A.     Yes.  On the right-hand side of the picture

5    there's a wall, and then there are four -- five different

6    levels of items that are stacked against that wall.

7    Q.     Can you describe the color of those items?

8    A.     Yes.  The one from the very bottom I can't make

9    out the first two levels.  Levels three and four appear

10   to have a resemblance to the Carr's cracker box in my

11   hand.

12   Q.     And the date of the photograph, does it say Carr's

13   on them?

14   A.     It appears to say that, yes.

15   Q.     You weren't at Paula's School of Performing Arts

16   when that search warrant were was executed, were you?

17   A.     No.

18   Q.     You were over at Ninth Street; is that correct?

19   A.     Ninth Street, Northwest, D. C.

20   Q.     Again, you didn't move any of the boxes from Ninth

21   Street over to Paula's School of Performing Arts, did

22   you?

23   A.     Excuse me?

24   Q.     You didn't move any of the boxes from Ninth Street

25   over to Paula's School of Performing Arts, did you?

Direct - Papalia

1   A.      No.

2   Q.      Now, in addition to recovering the documents and

3   the two firearms under the bed, did you also recover

4   other items from underneath the bed?

5   A.      Yes, I did.

6   Q.      Showing you what's been marked as P-62 which

7   should be on this diagram -- on this board.  P-62.  Do

8   you recognize that photograph?

9   A.      Yes, I do.

10  Q.      What is P-62 a photograph of?

11  A.      It's a box containing narcotics paraphernalia

12  right here.

13  Q.      This has already been introduced as Dobie 9.  And

14  ask you if you recognize that item.

15  A.      Yes, I do.

16  Q.      What is that?

17  A.      This box is that box which contained all these.

18  Q.      Again, there's black powder on that.  Was that on

19  it when you recovered it?

20  A.      No.

21  Q.      What is that?

22  A.      It appears to be fingerprints.

23  Q.      And you wear gloves, because what happens if you

24  touch it without gloves?

25  A.      It will transfer to my hands.

Direct - Papalia

1   Q.      You can just display it to the jury.

2   A.      (Witness indicating.)

3   Q.      Now, in regards to Dobie 9, did you recover items

4   that were inside of that box?

5   A.      Yes, I did.

6   Q.      Let me show you first what's been marked as --

7   previously introduced as Dobie 10 and ask you if you

8   recognize Dobie 10.

9   A.      Yes, I do.

10  Q.      What is Dobie 10?

11  A.      Dobie 10 is the scale which you see in this

12  photograph right here that was in photograph P-62.

13  Q.      You made your observations in terms of the

14  condition of the scale when you recovered it?

15  A.      No.

16  Q.      Where was this box found in relation to the Carr's

17  box that contained the two guns?

18  A.      It was located under the bed.  Again, as you face

19  the bed more to the left side which is the firearm.

20  Q.      The box with the documents, where was that in

21  relation to those items?

22  A.      Under the bed, again, to the left of the firearm.

23  Q.      Closer to this box, Dobie 9, that contained this?

24  A.      Yes.

25  Q.      Next, let me show you Dobie 11 -- introduce Dobie

Direct - Papalia

1   11 and ask if you can identify that item.

2   A.     Yes, I can.

3   Q.     What is that?

4   A.     This is a metal box that was located in item

5   number 15 on photograph P-62.

6   Q.     Are we able to see that?

7   A.     You can see the outline of it right towards  the

8   middle of the box in photograph P-62.

9   Q.     If we could publish these items to the jury, Your

10  Honor, Dobie 10 and Dobie 11.

11         THE COURT:  You may.

12         BY MS. JOHNSTON:

13  Q.     Thank you, Your Honor.

14         Showing you next what's been marked as Dobie 12.

15  Do you recognize that exhibit?

16  A.     Yes, I do.

17  Q.     What is that?

18  A.     This is a bottle of Anesetal that was located in

19  the search warrant items.  As you see in photograph P-62,

20  it's right here.

21  Q.     Why did you seize that bottle?

22  A.     I'm sorry?

23  Q.     Why would you have seized that item?

24  A.     It's known as a cutting agent for narcotics.

25  Q.     What's it called again?

Direct - Papalia

1    A.      Anesetal.

2    Q.      It's used as a cutting agent for what drugs?

3    A.      Cocaine; you can use it for heroin.

4    Q.      If we could publish item Dobie 12 to the jury,

5    Your Honor.

6            THE COURT:  Yes, you may.

7            BY MS. JOHNSTON:

8    Q.      Let me show you what has been marked as Dobie 13.

9    And if you can describe what's in Dobie 13, please.

10   A.      Sure.  Dobie 13 has lottery tickets, some spoons,

11   playing cards, things of that nature.

12   Q.      Why did you seize those items?

13   A.      Spoons are used in narcotics trafficking.

14   Q.      Again, are you able to observe some of those items

15   anywhere in the photograph that's been marked as Dobie--

16   as P-62?

17   A.      Yes, I am.

18   Q.      If you could show those to the ladies and

19   gentlemen of the jury, using the laser and standing back

20   so everyone can see.

21   A.      In photograph P-62 you can see this orange card

22   right here.  That's right there.  And you can see a blue

23   playing card right over here in this corner, pop-up

24   corner, photograph P-62.

25   Q.      Again, were those items also taken to the lab for

Direct - Papalia

1  analysis?

2  A.      Yes.

3  Q.      That would have been handled by the analyst,

4  Richard Gervisoni and his staff at the lab; correct?

5  A.      They would have handled -- analyzed it, yes.

6  Q.      You weren't present here in court when Mr.

7  Gervisoni testified in reference to those items, were

8  you?

9  A.      No, I wasn't.

10  Q.      Let me next show you what's been marked as 13A and

11  13B.  Your Honor, if we could publish the next item.

12          THE COURT:  You may.

13          BY MS. JOHNSTON:

14  Q.      Showing you Dobie 13A for the record.  What is

15  13A?

16  A.      13A are numerous unused glassine baggies which

17  were seized from this box right here which you can see in

18  the photograph.

19  Q.      Can you describe the sizes of those baggies?

20  A.      I'd have to take them out, but they're

21  approximately various sizes, a half inch to an inch by an

22  inch square from what I can see.

23  Q.      What are those typically used for?

24  A.      These are typically used to package various

25  quantities of narcotics for sale.

Direct - Papalia

1  Q.      Do you know how many are in there?

2  A.      No, I don't.

3  Q.      If we could publish 13A to the jury.

4          THE COURT:  You may.

5          BY MS. JOHNSTON:

6  Q.      Let me also show you Dobie 13B and ask you if you

7  recognize that exhibit as well.

8  A.      13B, again referring to photograph P-62, is in the

9  top right-hand corner of search warrant exhibit number

10 15, sandwich baggies.

11 Q.      Those sandwich bags, if I understand correctly,

12 were recovered from this box under the bed?

13 A.      Yes, ma'am.

14 Q.      Find any other kitchen -- other than the spoons

15 you've referenced, any other items that you would

16 typically find in the kitchen, under the bed?

17 A.      Not that I recall at this time, no.

18 Q.      You could publish Dobie 13 B with the court's

19 permission.

20 A.      (Witness indicating.)

21 Q.      Why would you seize that green box of sandwich

22 bags?

23 A.      Again, in this setting, the sandwich baggies would

24 be used to package large quantities of narcotics for

25 sale.

Direct - Papalia

1  Q.      Calling your attention to the last photograph on

2  that chart, P-63.  Can you tell us what we're looking at

3  there?

4  A.      P-63 is a cardboard box.

5  Q.      Where was that located?

6  A.      That was under the bed as well.

7  Q.      Can you describe where that was in relation to the

8  car's box that contained the two guns?

9  A.      This was located to the left of the box that

10 contained the two guns.

11 Q.      What did you do -- strike that.  Let me show you

12 what's been marked as Government's Exhibit Drugs 30 and

13 ask you if you recognize that item.

14 A.      Yes, I do.

15 Q.      What is that?

16 A.      This is the box that you see pictured in

17 photograph P-63.

18 Q.      Were there items seized from inside of that box?

19 A.      Yes, there were.

20 Q.      Let me show you first what's been marked as Drugs

21 29A and 29B and ask you if you recognize the exhibits

22 that have previously been introduced as Drugs 29A and

23 29B.

24 A.      Yes, I do.

25 Q.      What are they?

Direct - Papalia

1  A.    One is a large sandwich-size bag containing a

2  tannish powder, and the other is a plastic bag containing

3  numerous glassine baggies that appear to have a tannish

4  powder in them.

5      MR. WARD:  Can we say which is which?  I'm sorry.

6  Or do we know which is which?

7      MS. JOHNSTON:  Counsel, that was previously

8  introduced through Mr. Gervisoni, the chemist.

9      MR. WARD:  Yes, but I don't have a memory going

10 back that far.

11     BY MS. JOHNSTON:

12 Q.    Are you able to differentiate which one is 29A and

13 which one is 29B?

14 A.    Yes.  According to this, this has an A, I believe

15 on it, the larger sandwich-size bag.

16     MR. WARD:  Okay.

17     THE WITNESS:  And this has a B on it.

18     BY MS. JOHNSTON:

19 Q.    The larger sandwich bag was found to contain 11.65

20 grams of heroin by the lab.  Does that appear to be

21 heroin to you?

22 A.    It appears to be.

23     MR. WARD:  Objection, Your Honor.

24     BY MS. JOHNSTON:

25 Q.    Now, 29B, what is that exhibit?

Direct - Papalia

1  A.     29B are numerous glassine baggies which appear to

2  have a residue on them.

3  Q.     Was that also recovered from the same cardboard

4  box underneath the bed?

5  A.     Yes.

6  Q.     And likewise submitted to the lab; is that

7  correct?

8  A.     Yes, it is.

9  Q.     Those exhibits indicate they have already been

10 admitted here in court; is that correct?

11 A.     Yes, ma'am.

12 Q.     Your Honor if we could publish Drugs 29A and 29B

13 to the jury, please.

14        THE COURT:  You may.

15        THE WITNESS:  (Witness indicating.)

16        BY MS. JOHNSTON:

17 Q.     If we could go back just for a moment to Drugs 30.

18 When you recovered this, were there -- was there some

19 residue contained in the box itself?

20 A.     Yes, there was.

21 Q.     Are you able to observe that in fact in the

22 picture that's been marked as P-63?

23 A.     Yes, I am.

24 Q.     Is it in fact attached to the box, the residue?

25 A.     Yes, it is.

Direct - Papalia

1  Q.      Was that likewise submitted to the lab?

2  A.      I believe it was, yes.

3  Q.      Is that another exhibit that's previously been

4  admitted here in court?

5  A.      Yes, it has been.

6  Q.      Again, is there some indication on that item that

7  it's been examined for fingerprints?

8  A.      On the box -- there is a black residue on the box.

9  Q.      A black residue?

10 A.      Yes.

11 Q.      Next, let me show you what's been marked as Dobie

12 14 and ask you if you recognize this item.

13 A.      Yes, I do.

14 Q.      And what is contained in Dobie 14?

15 A.      Some documents, some type of stone, a small spoon,

16 a playing card.

17 Q.      And where were they recovered from?

18 A.      Again, referring to photograph P-63, they were

19 located inside the box.

20 Q.      Why would you have seized those items?

21 A.      Due to the fact-type of investigation we were

22 involved in, we suspected residue as well as possible

23 intoxicant.

24 Q.      Excuse me?

25 A.      Due to the fact that we found suspected narcotics

Direct - Papalia

1  in here, we took everything that was in that box for

2  possible analysis.

3  Q.     Is that another exhibit that's already been

4  introduced before this jury prior to your testimony?

5  A.     Yes.

6  Q.     Your Honor, if we could publish Dobie 14 as well

7  to the jury.

8       THE COURT:  You may.

9       BY MS. JOHNSTON:

10  Q.     Thank you, Your Honor.

11       Now, going back to P-64.  If you could, tell us

12  what we're observing there.

13  A.     Photograph P-64 is a view of the steps leading

14  down to the lower living area of the residence.

15  Q.     Are you able to see -- using that, could you show

16  us where the steps would lead to the basement?

17  A.     As I recall, you walk down these steps, you make a

18  left -- a quick hook left turn, and there should be

19  another set of steps going down.

20  Q.     Calling your attention to the next picture, P-65

21  and P-66.  If you could describe what we're observing in

22  those two photographs.

23  A.     Photograph P-65 are a set of shelves in that

24  basement area that I just discussed, and photograph P-66

25  shows a crawl space underneath the steps that -- you

Direct - Papalia

1  don't see the steps, but the steps leading down in

2  photograph P-64.

3  Q.     Now let me show you photograph P-67.  And this is

4  not going to be on the chart, but it's going to be on the

5  screen.  Do you recognize that photograph?

6  A.     Yes, I do.

7  Q.     What is that?

8  A.     It's a triple beam scale.

9  Q.     Where was that recovered from?

10  A.     That was recovered in the basement.

11  Q.     Where in the basement, if you recall?

12  A.     On these set of shelves, the third shelf from the

13  top.

14  Q.     Is it depicted in the photograph?

15  A.     Yes, ma'am.  It's depicted in photograph P-65.

16  Q.     The area where it was recovered?

17  A.     That's correct.

18  Q.     Is the scale itself depicted in that photograph?

19  A.     No, it's not.

20  Q.     Calling your attention to P-67.  Can you tell us

21  whether that photograph accurately depicts the way the

22  scale appeared or where it was when it was located in

23  terms of being in a plastic bag?

24  A.     Yes, it does.

25  Q.     Let me show you what's been marked as Dobie 18 and

Direct - Papalia

1  ask you if you recognize that item.

2  A.      Yes, I do.

3  Q.      What is that?

4  A.      It's the scale that you see on the TV screen.

5          MR. WARD:  I'm sorry, what's the number?

6          BY MS. JOHNSTON:

7  Q.      Showing you -- does this appear to be the plastic

8  bag that it was originally contained in?

9  A.      Yes, it does.

10 Q.      And this would be the card that went with it; is

11 that correct?

12 A.      That's correct.

13 Q.      Now, again, in terms of that scale, is there a

14 black powder all over it?

15 A.      Yes, there is.

16 Q.      And what is that?

17 A.      It appears to have powder.

18 Q.      If we could publish that Your Honor by having him

19 walk up in front of the jury, because it has fingerprint

20 powder on it.

21         THE COURT:  You may.

22         BY MS. JOHNSTON:

23 Q.      What is that scale used for, based on your

24 experience?

25 A.      Based on my experience, it's used to measure out

Cross - Papalia

1    quantities of narcotics.

2    Q.    Court's indulgence for one moment.  Your Honor, I

3    have no further questions of this witness.

4         THE COURT:  Cross-examination.

5         MR. WARD:  I have a couple of questions, Your

6    Honor.

7         MS. JOHNSTON:  Mr. Ward, would you like the

8    witness back in the witness box?

9         MR. WARD:  I think so.

10        THE COURT:  Mr. Ward, do you want to examine him

11   here?

12        MR. WARD:  I think he would be more comfortable in

13   the witness box.  I think Mr. Montemarano is claiming

14   seniority.

15                    **CROSS-EXAMINATION**

16        BY MR. MONTEMARANO:

17   Q.    Good afternoon, Detective Papalia.  I invite  your

18   attention to P-65.  Ms. Johnston asked you some

19   questions, do you recall that?

20   A.    Can I see step down and see which photograph

21   you're referring to?

22   Q.    Sure.  P-65 is 195, isn't it?

23   A.    Yes, it is.

24   Q.    Okay.  You were providing us some information

25   about this stack of boxes up against the wall next to the

Cross - Papalia

1  doorway?

2  A.      Yes.

3  Q.      Why don't you have a seat?  I just want to make

4  sure we're on the same page.  Thank you.

5          Correct me if I'm wrong, but you've never been to

6  Paula's School of Performing Art; is that correct?

7  A.      No, sir.

8  Q.      As a matter of background, you've been a peace

9  officer since 1995.  That would mean this is your 12th

10 year; correct, sir?

11 A.      Yes.

12 Q.      You've been a narcotics officer since '97, and

13 that would make this your seventh year; is that correct,

14 sir?

15 A.      Not quite.

16 Q.      All right, six years.  Since then you've been

17 involved in a whole bunch of different investigations

18 like Ms. Johnston asked you about; is that correct?

19 A.      Yes.

20 Q.      You've never been to Paula's School of Performing

21 Arts; is that correct?

22 A.      That's correct.

23 Q.      You, therefore, have never examined those boxes

24 that are in the disclosure; is that correct, sir?

25 A.      That's correct.

Cross - Papalia

1   Q.    You've never examined any lot numbers or

2   expiration dates on those numbers; correct, sir?

3   A.    No.  That's correct.

4   Q.    Can you tell us the lot number or expiration date

5   on the boxes you seized?

6   A.    No.

7   Q.    You don't know if those boxes in the photograph

8   are the same kind of product as the Carr's box you

9   seized; correct, sir?

10  A.    That's correct.

11  Q.    You don't know how many different kinds of

12  products Carr's makes, do you sir?

13  A.    No, I don't.

14  Q.    You don't know if they're sold in Giant, do you?

15  A.    No.

16  Q.    You don't know if they're sold at Safeway, do you?

17  A.    No.

18  Q.    You don't know if they're sold at Marr's?

19  A.    Excuse me?

20  Q.    You don't know if they're told sold at Marr's

21  supermarkets?  They don't have those down here?  Maybe

22  that's a Baltimore company.  How about Sam's Club?

23  A.    Not that I'm  aware of.

24  Q.    BJ's?

25  A.    Not that I'm aware of.

Cross - Papalia

1  Q.     Food Lion?  Super Fresh?

2  A.     No.

3  Q.     Would it be fair to say you don't know where you

4  can get those?  Is that a fair statement, sir?

5  A.     I think that's fair, yes.

6  Q.     Okay.  You don't know how many boxes of these --

7  what's the exhibit number?  Assuming it's 22 for the sake

8  of discussion, the black Carr's box we're talking about,

9  you don't know how many of these were sold in the

10 Washington metropolitan area in, let's say, 2004, the

11 first half of 2004.

12 A.     No.

13 Q.     I have no further questions.  Thank you.

14        MR. MARTIN:  Mr. Goodwin has no questions, Your

15 Honor.

16        MR. HALL:  I have no questions, Your Honor.

17                   **CROSS-EXAMINATION**

18        BY MR. WARD:

19 Q.     Good afternoon, Detective Papalia.

20 A.     Good afternoon.

21 Q.     Detective Papalia, you entered the house about, I

22 think you said ten -- 15 to 20 minutes after the entry

23 team had gone in; is that correct, sir?

24 A.     That's approximately how long.

25 Q.     And when you went into the house, the occupants of

Cross - Papalia

1  the house were all seated in the living room; is that

2  correct, sir?

3  A.     I don't recall if they were seated or not.

4  Q.     Well, they were in the living room.

5  A.     To the best of my recollection, I believe they

6  were.

7  Q.     That's standard operating procedure.  The entry

8  team goes to the house, and everybody who is found in the

9  house is put in one location where they can be watched

10 and keep out of the way; is that correct?

11 A.     I guess that's safe to say.  That is a common

12 practice, yes.

13 Q.     Is it safe to say it's a common practice.  Do you

14 go on raids where you're the agent in charge where you

15 permit people to wander around the house at will while

16 you're searching it?

17 A.     No.

18 Q.     No, of course not.  All right, sir.  Now, you are

19 familiar with the people who were in the house at the

20 time of the raid.  That is, you know who they are now

21 even if you didn't know then.

22 A.     Yes.

23 Q.     All right, sir.  And my client, Ms. Dobie, was  in

24 the house; is that correct, sir?

25 A.     Yes.

Cross - Papalia

1  Q.     When you saw her in the living room, sir, how was

2  she dressed, if you can recall.

3  A.     I don't specifically recall what she was wearing.

4  Q.     Well, if you don't specifically recall what she

5  was wearing -- I'm not looking for colors or styles or

6  anything else.  Did she have on regular clothes, or did

7  she have on a nightgown or pajamas?

8  A.     I know when -- at one point she had some bedroom

9  clothes on, but I don't remember when those were changed.

10 Q.     All right, sir.  In addition to LaVon Dobie, there

11 was Goldie Dobie, her husband; is that correct, sir?

12 A.     Goldie Dobie was in the residence.  That's

13 correct, sir.

14 Q.     He was in the living room.  And do you recall how

15 he was dressed when you first saw him?

16 A.     No.

17 Q.     You recall not specifically what he had on,

18 whether he had on some night clothes or maybe just his

19 boxer shorts, or whether he had regular, you know,

20 clothes on, slacks, shirt, things like that?

21 A.     I know eventually he was dressed, but I can't tell

22 you when I first saw him what he was wearing.

23 Q.     All right, sir.  Now, in addition to LaVon  Dobie

24 and Goldie Dobie, her husband, there was Ta'Vaughn Dobie

25 in the house; is that right, sir?

Cross - Papalia

1  A.     Yes, sir.

2  Q.     And he was a 17 year-old; is that right?

3  A.     I believe --

4         MS. JOHNSTON:  Objection.  Basis of knowledge.

5         MR. WARD:  Hmm?

6         MS. JOHNSTON:  Basis of knowledge.

7         THE COURT:  Rephrase the question.

8         MR. WARD:  Do you know how old he was now?  I

9  mean, you processed the case didn't you?

10        MS. JOHNSTON:  Objection, Your Honor.  May we

11 approach the bench?

12        BY MR. WARD:

13 Q.     Don't get upset.

14        Did you follow the case through after you made the

15 search?  In other words, clocking in what was discovered,

16 who discovered it and so forth?

17 A.     Clocking in?  Do you mean logging in evidence?

18 Q.     Filing reports and filing evidence.

19 A.     No.

20 Q.     You didn't do that?

21 A.     I didn't log the evidence in, no.

22 Q.     But you do recall that Ta'Vaughn Dobie was there;

23 is that right?

24 A.     I do recall a subject identified as Ta'Vaughn

25 Dobie was there, yes.

Cross - Papalia

1  Q.      He was -- let's put it this way.  He was younger?

2  A.      He was a teenager, yes.

3  Q.      He was identified by you as the son of LaVon

4  Dobie; is that correct?

5  A.      That's who we believed he was.

6  Q.      Also in the house was a James Walter Parker, P A R

7  K E R; is that correct, sir?

8  A.      I know there was a James Parker.  I didn't know

9  have knowledge of what his middle name is.

10 Q.      Do you know him to be 40 years of age?  Do you

11 know that?

12 A.      No.

13 Q.      He was a, I guess you have to say, older.  He was

14 not a -- did he appear to be in his 40s?  Let's put it

15 that way.

16 A.      I wouldn't say that he appeared to be in his 40s.

17 He wasn't a teenager, I can tell you that.

18 Q.      He was an adult?

19 A.      Yes, sir.

20 Q.      And also in the house, and in the living room when

21 you went in, was Anthony LaVon Carter, C A R T E R; is

22 that correct, sir?

23 A.      There was an Anthony Carter that I'm aware of.

24 Q.      Did he appear to be an adult?

25 A.      Both Mr. Parker and Mr. Carter appeared to be

Cross - Papalia

1  adults.

2  Q.     All right, sir.  Now, let's go back to Ta'Vaughn

3  Dobie for a minute, the youngster.  Do you recall how he

4  was dressed when you first saw him?

5  A.     No.

6  Q.     What about James Parker?  Have any idea how he was

7  dressed when you first saw him?

8  A.     No.

9  Q.     And what about Anthony Carter?  Do you have any

10 idea how he was dressed when you first saw him?

11 A.     No.

12 Q.     All right, sir.  You showed us some overall

13 pictures that you took, and you said that you as part of

14 your normal practice would take pre-search photographs,

15 and I think we're looking at them on the board over

16 there; is that right, sir?

17 A.     Yes.

18 Q.     At least some of them.  Are those some of the

19 pre-search photographs you just identified for the jury?

20 A.     Yes, sir.

21 Q.     And you described the various bedrooms that you

22 found, and I think there were three bedrooms up on the

23 second floor; is that correct, sir?

24 A.     Yes.

25 Q.     And you designated those bedrooms as 1, 2 and 3;

Cross - Papalia

1  is that correct, sir?

2  A.     No.

3  Q.     All right.  Well, tell us how you designated them.

4  That's what you said.

5  A.     We designated two bedrooms, Bedroom No. 1 and

6  Bedroom No. 2.  There was a third bedroom but we didn't

7  give it a number.

8  Q.     Perhaps I misunderstood you, but you designated

9  one as Bedroom No. 1, and that was the first one on the

10  left as you started down the hall.  Is that right, sir?

11  A.     Yes, sir.

12  Q.     And was there a bed in that bedroom?

13  A.     Yes.

14  Q.     And normal sort of bedroom furniture, you know,

15  that goes in the bedroom?  Night tables?  Dresser?  That

16  sort of thing?

17  A.     There was a night table in there.

18  Q.     All right, sir.  And did that bed appear to have

19  been occupied?

20  A.     I don't know if it was occupied or not.

21  Q.     I mean, were the sheets pulled back and rumpled

22  and so forth?

23  A.     I don't remember if they were.

24  Q.     Would you remember if the bed was neatly made up?

25  A.     Not necessarily, no.

Cross - Papalia

1  Q.      Okay.  Did you find anything in Bedroom No.   1?

2  A.      Me, personally?

3  Q.      Well, you were the collecting agent, let's put it

4  that way.  Did anybody in the search team point out

5  anything to you that was in that bedroom?

6  A.      Yes.

7  Q.      Have we seen that today, whatever you found there?

8  A.      I don't believe so, no.

9  Q.      Well, tell us what it was that you found in that

10 bedroom -- that you seized in that bedroom.

11 A.      We seized a plastic bag of white powder, as well

12 as some documents, as well as some glassine  baggies.

13 Q.      Being the good detective that you are and having

14 the experience that you have, you immediately assumed

15 that the bag of white powder was some kind of controlled,

16 dangerous substance; is that correct, sir?

17 A.      I suspected that it might be, yes.

18 Q.      Did you field test it at the scene?

19 A.      I don't recall if I field tested that at the scene

20 or not.

21 Q.      Did you submit it to the laboratory for chemical

22 examination -- chemical testing?

23 A.      I didn't submit it myself, no.

24 Q.      Do you know that it was submitted?

25 A.      That's my understanding, yes.

Cross - Papalia

1  Q.      Do you know that it turned out in fact to be a

2  controlled, dangerous substance in that bag?

3  A.      I'd have to refer back to the lab reports.

4  Q.      Do you have the lab reports with you?

5  A.      I don't believe so.

6  Q.      Perhaps I can share mine with you.

7          MS. JOHNSTON:  Counsel, may I see what it is

8  you're showing the witness, please?

9          MR. WARD:  It's what you gave me.

10         MS. JOHNSTON:  I appreciate that, counsel.  We've

11 given you many, many pieces of paper.

12         BY MR. WARD:

13 Q.      Do you recognize this, sir, as being the crime

14 laboratory report on the various items that were

15 submitted -- let's say seized by you since you were the

16 seizing agent, and submitted by somebody, I suppose

17 somebody on your team?

18 A.      I recognize it, yeah.

19 Q.      You do, sir.  And what did it turn out to be?

20 A.      I don't know which one -- which bag is the actual

21 one we seized from that and the bedroom that you're

22 speaking of from looking at this.

23 Q.      Well, how would you go about determining which

24 item on the paper that you have in front of you is the

25 item that was in fact seized from the bedroom?

Cross - Papalia

1  A.      In reviewing Page 1 of the document you just

2  handed me, it appears to be, marked as Exhibit No. 1 on

3  Page 1 of the document you handed me.

4  Q.      Is that the 8.62 grams of cocaine?

5  A.      Yes, sir.

6  Q.      All right, sir.  That was not one of the items

7  that you identified here this morning; am I correct --

8  A.      That's right.

9  Q.      -- that you were shown?  All right, sir.  And was

10 that submitted for fingerprint analysis, too, if you

11 know?

12 A.      I don't know.

13 Q.      All right, sir.  And you said you found numerous

14 glassine bags with or in relationship to the item you

15 just talked about being in Bedroom 1, CDS.

16 A.      If I could refer to my inventory.  There were

17 unused glassine baggies located in that room, yes, sir.

18 Q.      Do you recall how many?

19 A.      I did not open the bag that they were in, but they

20 were numerous unused glassine baggies inside another bag.

21 Q.      Has the jury seen those this morning?  Have you

22 been shown those by the government?

23 A.      No, sir.

24 Q.      I see.  But you seized them because you recognized

25 them as being the kind of glassine bags that, in your

Cross - Papalia

1  experience, are typically used to package drugs for

2  distribution; is that correct, sir?

3  A.     That's correct.

4  Q.     All right.  Is there some particular reason why

5  you didn't tell the jury that you found those items in

6  Bedroom 1?

7  A.     I wasn't asked.

8  Q.     Well, that's the point.  Yes, thank you.

9         What about bedroom -- first of all, let's stay

10  with Bedroom 1.  Did you check the closets?

11  A.     I didn't check the closets.

12  Q.     Did you see the closet closets?

13  A.     I recall seeing one closet.

14  Q.     Do you recall whether there was clothing in the

15  closet in Bedroom 1?

16  A.     No.

17  Q.     So you can't say whether it had women's clothing,

18  men's clothing, or no clothing.

19  A.     No, I can't.

20  Q.     All right, sir.  How about the dresser?  That was

21  certainly checked, wasn't it, to see if there was any

22  controlled, dangerous substance or paraphernalia in the

23  dresser?

24  A.     I'm sure it was.

25  Q.     You don't recall whether there were any items of

Cross - Papalia

1  clothing, let's say women's underwear or men's underwear,

2  T-shirts, socks, things like that?

3  A.     I didn't look in those drawers, sir.

4  Q.     I see.  What about the night table?  Did you check

5  that, or did you see that?

6  A.     I saw the night table at some point, yes.

7  Q.     Did you open the door and take a peek in?

8  A.     No.

9  Q.     Is there some reason why you didn't peek in there,

10 having already found drugs and paraphernalia in the room

11 and you only -- you didn't check the night table?

12 A.     That room was not my responsibility to be

13 searched.  It was other detectives'.

14 Q.     Pardon me?  Weren't you the agent in charge?

15 A.     Yes, I was.

16 Q.     And that was not your responsibility, to use your

17 words?

18 A.     Well, when you're in charge of a scene or

19 anything, sometimes you will delegate responsibilities.

20 And in this instance, we delegated responsibilities to

21 other detectives and agents to search certain areas of

22 whatever location.  In this particular instance it was a

23 residence.

24 Q.     Well, did any of the people that you delegated

25 responsibility to tell you that they had checked the

Cross - Papalia

1  closet, that they had checked the dresser, that they had

2  checked the bedside table?

3  A.     They didn't specifically tell me that, no.

4  Q.     All right.  Where was the bag of dope -- the

5  glassine bags, where were they found in Bedroom 1?

6  A.     The glassine baggies?

7  Q.     The dope.

8  A.     The cocaine?

9  Q.     Yeah.

10 A.     The cocaine was initially found on the floor

11 inside of pair of shorts -- jean shorts, I believe.

12 Q.     Inside a pair of jeans shorts?

13 A.     Or shorts, yes, sir.

14 Q.     Were these men's shorts or lady's shorts, or could

15 you tell?

16 A.     I don't remember if they were men's or women's.

17 Q.     And you didn't seize the shorts, I suppose.

18 A.     No, sir.

19 Q.     Did you think at all that the shorts might help

20 you to identify, from size and so forth, as to who the

21 shorts belong to, hence who the drugs found in the shorts

22 belong to?

23 A.     It may have been helpful if we were -- if we

24 wanted to do that, yes.

25 Q.     I would think so.  But you didn't think about that

Cross - Papalia

1   at the time?

2   A.      I don't recall if we thought about it or not, sir.

3   Q.      The fact is, you didn't seize them.

4   A.      That's correct.

5   Q.      Okay.  Now, let's go to the -- let's call it the

6   unnumbered bedroom, since you didn't number it.  That was

7   the -- do I understand that was the second bedroom on the

8   left?  Or was it the bedroom all the way at the end of

9   the hall?

10  A.      It was the bedroom all the way at the end of the

11  hall.

12  Q.      All right, sir.  Let's take that room.  That had

13  windows to the outside and so forth, is that right, I

14  assume?

15  A.      I believe it did have a window in it, yes, sir.

16  Q.      That room was searched; is that correct?

17  A.      Yes, it was.

18  Q.      You designated somebody specifically to search

19  that room?

20  A.      Somebody was designated, yes.

21  Q.      All right, sir.  And did you yourself go into that

22  room at any time?

23  A.      I don't specifically remember going into that

24  room, but I believe they took photographs of it.

25  Q.      You took photographs of it?

Cross - Papalia

1   A.      Yes.

2   Q.      Are they photographs that we've seen today?

3   A.      I'd have to review them all again.  Of the

4   interior of that room you're referring to?

5   Q.      Yes.

6   A.      I don't believe we've seen them, no.

7   Q.      Is there some reason you didn't produce those

8   photographs today?

9   A.      I wasn't asked to.

10  Q.      Oh, I see.  All right, sir.  Well, you took

11  photographs of the bedroom.  Tell us what was in it.

12  A.      The only thing that I can recall from that bedroom

13  is seeing a bed.

14  Q.      Is a what?

15  A.      Was seeing a bed.

16  Q.      You saw a bed?

17  A.      In the bedroom you're referring to.

18  Q.      You don't recall if there was a night table or

19  night tables?

20  A.      If I refer back to the photos, it may help me

21  remember it better, if that's what you'd like me to do.

22  Q.      You don't have those with you, right?

23  A.      I have photographs with me, but --

24  Q.      You have them?

25  A.      I have photographs.  I don't know if that's one of

Cross - Papalia

1  them.

2  Q.     Let's take a look at them, please.  Can you

3  produce the photographs of Bedroom 2 that we can look at

4  and share with the jury?

5  A.     Bedroom 2?  You said or Bedroom 3.

6  Q.     I'm sorry.  I'm sorry.  The unnumbered bedroom.

7  Is that what we called it, the unnumbered bedroom?  The

8  one all the way at the end of the hall.  While you're at

9  it, sir, do you have photographs of Bedroom 1?

10 A.     Yes.

11 Q.     Why don't you dig those out for us too while

12 you're at it.

13        MS. JOHNSTON:  Objection, Your Honor.  Counsel has

14 photographs of all -- copies of all the photographs from

15 the search scene.  If there's photographs he wants to

16 see, he can pull them out.

17        MR. WARD:  Frankly, Your Honor, I have Xeroxed

18 photographs that frankly aren't worth a damn.  I'd like

19 the originals so we can see something on them.

20        BY MR. WARD:

21 Q.     All right, sir.  Why don't you show me the

22 photographs of the unnumbered bedroom.

23 A.     (Witness indicating.)

24 Q.     That's it?

25 A.     That's it.

Cross - Papalia

1  Q.      Just one?

2  A.      As far as I know.

3  Q.      What about the one in your left hand there?

4  A.      This is Bedroom 1.

5  Q.      And this is the unnumbered bedroom?

6  A.      That's correct.

7  Q.      Well, let's do this.  Let's stick a Dobie tag on

8  the photograph -- this is the photograph of Bedroom 1?

9  A.      Yeah.

10  Q.     I mean the unnumbered bedroom, I'm sorry.

11  A.     Right.

12  Q.     Let's stick a tag on there.  I think we already

13  have a motions exhibit.  We don't have any actual

14  exhibits; is that right?

15         THE CLERK:  That's correct.

16         BY MR. WARD:

17  Q.     This will be Dobie Trial Exhibit 1.  And you would

18  agree that shows what appears to be a double bed?

19  A.     I don't know what the size of it is.

20  Q.     It ain't a single bed, is it?

21  A.     I don't know.

22  Q.     That's not your field of expertise, I guess.

23         This is a bedside table on the right; is that

24  right.

25         MS. JOHNSTON:  Objection to counsel's comments to

Cross - Papalia

1  the witness.

2          MR. WARD:  I was simply asking if bedrooms were

3  his field of expertise, and apparently they're not Your

4  Honor.

5          THE COURT:  Overruled.

6          BY MR. WARD:

7  Q.     On the right side we have a night table; is that

8  correct, sir?

9  A.     Yes.

10 Q.     And on that is a blue glass sort of a, I guess

11 phony Tiffany-style lamp; is that right, sir?

12 A.     It's a lamp.

13 Q.     A lamp.  Is this dark object on the right here a

14 large dresser?

15 A.     I don't know.

16 Q.     You don't know?  All right.  Well, may I publish

17 this to the jury, Your Honor, the photograph of the

18 unknown bedroom?

19         THE COURT:  Has that been marked?

20         MR. WARD:  I marked it as Dobie Exhibit 1.

21         THE COURT:  All right, you may.

22         MS. JOHNSTON:  That's fine.

23         BY MR. WARD:

24 Q.     Thank you.  And the bed?  Dobie Exhibit 1 appears

25 to be unmade and certainly slept in, doesn't it, sir?

Cross - Papalia

1   A.      It appears to be unmade.

2   Q.      Unmade.  All right, sir.  Well, let me see the

3   photograph now of the bedroom you identified as Number 1.

4   This is the photograph; is that correct, sir?   That is

5   No. 1?

6   A.      That's correct.

7   Q.      All right.  Let me put a Dobie Exhibit No. 2 on

8   that and I'll tell you.  Let me take it off here and put

9   it in the upper corner so it doesn't block anything.

10  Now, this shows, does it not, a double bed?

11  A.      It's a bed, yes, sir.

12  Q.      But you're not able to say if that's a double bed?

13  A.      No.

14  Q.      All right, sir.  It shows a night table on the

15  left of the bed; is that correct, sir?

16  A.      Yes.

17  Q.      And it shows what appears to be a dresser over

18  here on the left.

19  A.      Yes.

20  Q.      As you -- I guess this is taken as you're looking

21  into the room?

22  A.      Yes.

23  Q.      And as far as you know, none of these -- the

24  dressers in Bedroom 1, and the night stand, as far as you

25  know, they were not checked?

Cross - Papalia

1  A.     As far as I know they were checked at some point.

2  Q.     As far as you know, nothing was found in them; is

3  that right, sir?

4  A.     As far as I know, I believe there wasn't anything

5  found inside them.

6  Q.     The only thing found in Bedroom 1 was the bag of

7  dope and the numerous glassine bags which we, of course,

8  haven't seen today; is that right, sir?

9  A.     And some documents.

10 Q.     And some documents.  Oh, documents.  What were the

11 documents, sir?  Do you recall?

12 A.     I'd have to refer back to the inventory.

13 Q.     Do you have the inventory?  I'll tell you what.

14 I've got the inventory.  We'll go through it in a minute,

15 but I just want to see if you recalled them.  Well, we'll

16 get to that in a minute.  And is it fair to say, sir,

17 that this bed, let's say, appears to be unmade.

18 A.     Yes.

19 Q.     There's a fitted sheet on it.  It looks like the

20 rest of the bed clothes and the pillow are on the floor;

21 is that right, sir?

22 A.     There's a white object that's on the floor.

23 Q.     Okay.  May I publish this for the benefit of the

24 jury, Your Honor?

25         THE COURT:  You may.

Cross - Papalia

1        BY MR. WARD:

2    Q.    Do you have any other photographs taken in the

3    house today that the jury hasn't seen of the house that

4    the jury has not seen today, either taken before the

5    search or during the search?

6    A.    Yes.

7    Q.    May I take a look at those?

8    A.    I don't know which ones.

9    Q.    Let's look at that one in your left hand, because

10   I don't think we've seen that.  Can you tell us what that

11   is a photograph of, sir?

12   A.    Yes, I can.

13   Q.    Would you do that?

14   A.    It's a clear plastic bag containing a white

15   substance.

16   Q.    I see.  And do you know where that was recovered?

17   A.    Yes.

18   Q.    Where?

19   A.    It was on the floor of Bedroom 1.

20   Q.    Oh, this is -- the blue jeans shown there, was

21   that the set of blue jeans shorts that you described?

22   A.    Yes.

23   Q.    With the heavy thick leather belt?

24   A.    Yes.

25   Q.    Since we've talked about that, let me make that

Cross - Papalia

1  Dobie Exhibit 3, and we'll show that to the jury.  Just

2  to move things along a bit, I'll save that for a minute

3  and show them to them all at once.  What is that

4  photograph you're looking at now, sir?

5  A.     It's Exhibit 2.

6  Q.     Exhibit 2 in evidence?

7  A.     No, sir, Exhibit 2 from the search warrant

8  inventory.

9  Q.     Okay.  What is it?

10  A.     It's a document.

11  Q.     May I see it, please?  Do you know which room this

12  was found in, sir?

13  A.     Yes, sir.

14  Q.     Which one?

15  A.     Bedroom 1.

16  Q.     Bedroom 1?  The same one where you found the blue

17  jean shorts?

18  A.     That's correct.

19  Q.     All right, sir.  Do you know what the document is,

20  sir?  It's Geico-something.  But other than that, do you

21  know what it is?

22  A.     No.

23  Q.     Hmm?

24  A.     No.

25  Q.     That's not a document we've seen today?

Cross - Papalia

1   A.      No, sir.

2   Q.      Was it seized?

3   A.      Yes, sir.

4   Q.      Why was it seized?

5   A.      Because we -- as a result of doing this search

6   warrant, we seized that document.  We thought it would be

7   pertinent to the investigation.

8   Q.      I see.  But we have not seen it today.

9   A.      That's correct.

10  Q.      Let's make that Dobie Exhibit 4.  That was also,

11  you say, in Bedroom 1 where the blue jean shorts were

12  found.

13  A.      That's correct.

14  Q.      There's something in front of you that I don't

15  think we've seen before.  Can you tell us what that is,

16  sir?

17  A.      Yes.

18  Q.      Tell us what it is, please.

19  A.      It's an ID card, as well as a document.

20  Q.      May I see it please?  And can you tell us where

21  this ID card and document were seized?

22  A.      Yes, I can.

23  Q.      Where, sir?

24  A.      On the dresser inside of Bedroom 1.

25  Q.      The same place where the blue jean shorts were

Cross - Papalia

1  found; is that right, sir?

2  A.     That's correct.

3  Q.     All right, sir.  Well, let's make that Dobie 5.  I

4  take it that document was seized also?

5  A.     That's correct.

6  Q.     But that it has not been produced to this jury

7  today; is that right, sir?

8  A.     No.

9  Q.     And you seized it because you believed it had some

10 evidentiary value in connection with your investigation?

11 A.     At the time, yes.

12 Q.     All right, sir.  The next photograph that you have

13 in front of you, sir, is of what?

14 A.     It's a photograph of two plastic packages of

15 glassine baggies.

16 Q.     Are those the same glassine bags that you talked

17 about as having been found with the dope in Bedroom 1?

18 A.     Can you repeat that, please?

19 Q.     Are those the same glassine bags that you said

20 previously were found -- where the dope was found in

21 Bedroom 1?

22 A.     These were found in Bedroom 1.

23 Q.     In Bedroom 1?

24 A.     That's correct.

25 Q.     Let's make that Dobie 6.  All right, sir.  The

Cross - Papalia

1  next one, is that from Bedroom 1?

2  A.     Yes.

3  Q.     All right, sir.  Tell us what that shows, please.

4  A.     It shows documents.

5  Q.     And did you seize those documents?

6  A.     Yes.

7  Q.     And that was because you believed that they had

8  evidentiary value; is that correct, sir?

9  A.     That's correct.

10 Q.     May I see the photograph, please?  It's kind of

11 hard to tell, at least for me with my eyes.  Do you know

12 what the documents were?

13 A.     No.  It's unclear to me as well, sir.

14 Q.     But you did seize them because you believed they

15 had evidentiary value?

16 A.     That's correct.

17 Q.     All right, sir.  And this was from Bedroom 1,

18 also?

19 A.     Yes.

20 Q.     All right.  Let's make this Dobie Number 7.  The

21 next photograph you have, sir, could you tell us what

22 that is, please?

23 A.     Yes.

24 Q.     And?

25 A.     It's a bag containing jewelry.

Cross - Papalia

1  Q.    A bag containing jewelry?

2  A.    That's correct.

3  Q.    Where was that bag found, sir?

4  A.    Bedroom 2.

5  Q.    Bedroom 2.  That's the one that you testified

6  about today; is that right, sir?

7  A.    That's correct.

8  Q.    Do you recall how many -- there being something on

9  the order of 178 pieces of jewelry in that bag, sir?

10  A.    No, I don't.

11  Q.    Do you recall the jewelry, however many pieces

12  there were, being -- each piece of jewelry being in a

13  small plastic-type bag of the type that you've told this

14  jury is used to hold narcotics for sale?

15  A.    I don't remember.

16  Q.    You don't remember whether they were in bags like

17  that?

18  A.    I can see these plastic bags but I can't tell the

19  size from this picture.

20  Q.    All right, sir.  Are they -- do they appear to be

21  the size of ones that you've identified to this jury as

22  being bags of controlled, dangerous substances for sale?

23  A.    Do these bags appear to be?

24  Q.    Yeah.

25  A.    I can't tell from this picture.

Cross - Papalia

1  Q.      Let me ask you this.  You did seize this jewelry;

2  is that correct?

3  A.      Yes.

4  Q.      You seized it, I assume, because you thought it

5  had evidentiary value.

6  A.      Yes.

7  Q.      All right, sir.  And what did you do with the

8  jewelry?  Did you submit it for some kind of an

9  examination?

10  A.      I transported it back to our division headquarters

11  and turned it over to the ICE agents.

12  Q.      You have no idea what happened to it after that?

13  A.      No, sir.

14  Q.      All right, sir.  Did you -- I mean, if you can't

15  recall how many bags of -- do you recall taking some of

16  the jewelry out of the bag and just looking at the

17  packages of it?

18  A.      I recall briefly looking in there at the jewelry

19  that was there, yes.

20  Q.      There was a lot of jewelery there; is that right?

21  A.      As I remember, yes.

22  Q.      All right, sir.  We haven't heard of that jewelry

23  before now.  Where is the bag of jewelry, sir?

24  A.      I don't know.

25  Q.      Is there some reason you didn't bring it to court

Cross - Papalia

1  with you today?

2  A.     I didn't handle the evidence that was brought to

3  court, sir.

4  Q.     And you weren't asked to bring it to court today;

5  is that right, sir?

6  A.     No.

7  Q.     All right, sir.  Let me first show the jury, if I

8  may Your Honor, Dobie exhibits 3 through 7, which came

9  from Bedroom No. 1.

10        THE COURT:  You may.

11        BY MR. WARD:

12 Q.     What's the photograph you have in front of you

13 now, sir?

14 A.     It's a photograph of documents.

15 Q.     And is that from what bedroom?

16 A.     Bedroom No. 2.

17 Q.     Okay.  But we've already discussed Bedroom No. 2.

18 Let's flip to the next one.  That's Bedroom No. 2 also, I

19 believe?

20 A.     Yes, sir.

21 Q.     The next ones are the rest of Bedroom 2, or do you

22 have any -- anymore of the unnumbered bedroom or Bedroom

23 1?

24 A.     If you give me a minute to look through it.

25 Q.     Yeah, sure.  Of course.  In the meantime, may I

Cross - Papalia

1  publish -- and I forget where I am now.  Am I at 8?

2       THE COURT:  Yes you may.

3       THE CLERK:  Your next number is 9.

4       BY MR. WARD:

5  Q.      Nine.  Okay.  Maybe I didn't mark this one.  I

6  think I didn't mark this one as 8, but let me see.  May I

7  inquire what we're up to?  I think I meant to mark this

8  as 8 and didn't.  This is the jewels.  That's going to be

9  Exhibit No. 8.  That's not another one of the jewelry, is

10 it sir, the one you just turned over?

11 A.      It should be the same one.

12 Q.      The same one I've already seen.  Oh.

13 A.      No.

14 Q.      That's it?

15 A.      Yes.

16 Q.      All right, sir.  Is it fair to say, sir, that you

17 have no personal knowledge -- based on your personal

18 observations, you have no personal knowledge as to which

19 occupants of the house occupied which bedroom?

20 A.      I have no personal knowledge, that's fair to say.

21 Q.      Is it fair to say, sir, that just about all of the

22 items that you seized or we saw that had black powder on

23 them were actually dusted for fingerprints?  That's what

24 the black powder is you testified; is that right, sir?

25 A.      That's what I believe it was, yes.

Cross - Papalia

1  Q.     And you have no knowledge of any positive results

2  of any fingerprints being found identifying my client,

3  LaVon; is that right, sir?

4  A.     No, I don't.

5  Q.     All right, sir.  Now, you found some .22- caliber

6  rounds, but there was no firearm matching those

7  .22-caliber rounds found in the house.

8  A.     That correct.

9  Q.     Dobie Exhibit 3, I believe, was a day planner; is

10 that correct, sir?

11 A.     Yes, sir.

12 Q.     I think that's which Dobie -- do we have Dobie

13 Exhibit 3, by the way?  I assume that you've looked

14 through this item; is that correct, sir?

15 A.     I'm sorry?

16 Q.     Did you look through this item?

17 A.     At some point I did, yes.

18 Q.     You seized it because you thought it might have

19 evidentiary value, is that right, sir, in connection with

20 this case?

21 A.     We seized a lot of items as a result of that.

22 Q.     I understand you seized a lot of things, and you

23 did seize a lot of things.  My question is, the reason

24 you seized them is because you think they might contain

25 evidence of criminality; is that right, sir?

Cross - Papalia

1  A.      That's correct, sir.

2  Q.      All right, sir.  Now, from examining it not just

3  the couple of minutes you did now.  But from examining

4  this previously -- and I recognize you're probably not a

5  handwriting expert; is that correct?

6  A.      That's correct.

7  Q.      Did it appear to you that there were different

8  handwritings in that book?

9  A.      I don't feel that I'm qualified to answer that.

10 Q.      You don't?  All right, sir.  Well, let me ask you

11 this, sir.  To your knowledge, did you or anyone working

12 with you on this investigation obtain handwriting

13 exemplars to compare them to this handwriting in this day

14 planner or day minder or whatever it's called?

15 A.      I don't have any knowledge of that, sir.

16 Q.      You have no knowledge of that?

17        THE COURT:  Mr. Ward, how much more do you think

18 you have for this witness?

19        MR. WARD:  Oh, I have probably another 20 minutes.

20        THE COURT:  Why don't we take a recess until

21 2:20.

22            (Off the record at 1:05 p.m.)

23            (On the record at 2:23 p.m.)

24        MR. MONTEMARANO:  Your Honor, I have something to

25 submit to the court.  I managed to make an appointment

Cross - Papalia

1    with my "orthopod" for 9:30 on Thursday.  They offered me

2    tomorrow morning at 9:45, and I said no, thank you,

3    because I'm in trial.

4         MS. JOHNSTON:  I don't know what's wrong with

5    Friday, Your Honor.  Another day isn't going to hurt him.

6         THE COURT:  Couldn't do Friday?

7         MS. JOHNSTON:  I hate to sound like the Wicked

8    Witch of the West, but the truth of the matter is, he

9    injured it yesterday.

10         MR. MONTEMARANO:  I injured it Saturday, Ms.

11    Johnston.  I probably should be seeing somebody today,

12    but I didn't think it was appropriate.  I figured a

13    couple of days I could do with.

14         MS. JOHNSTON:  I don't know why he didn't see

15    someone Monday if it was that serious.  And we weren't

16    sitting yesterday.

17         MR. MONTEMARANO:  I did, Ms. Johnston.  Like the

18    E-mail to you said, I spent five hours in the ER:  That

19    means "Emergency Room."  I don't have one of those in my

20    home.

21         THE COURT:  All right, folks, let's settle down.

22         Where is the appointment?

23         MR. MONTEMARANO:  Ellicott City.

24         THE COURT:  Where?

25         MR. MONTEMARANO:  Ellicott City.  Near my home.

Cross - Papalia

1          THE COURT:  Ellicott City?  Well, let me tell you

2    all this.  I looked at my calendar, and I am informed,

3    reliably, that a hearing that looked like it was an all

4    afternoon hearing on July 31 is going away, and that's

5    Monday -- a week from this Monday.

6          MR. MARTIN:  Your Honor?

7          THE COURT:  Yes.

8          MR. MARTIN:  Because I knew we weren't sitting on

9    Mondays, I had advised other judges of that.  And on

10   Monday, the 31st, I have a sentencing before Judge Walton

11   in D. C. -- United States District Court for the District

12   of Columbia.

13         THE COURT:  What time?

14         MR. MARTIN:  I'm looking for that right now.

15         MS. JOHNSTON:  Your Honor, while he's checking

16   that.  Has the court given any consideration to going

17   until 5 o'clock?

18         THE COURT:  I'm going to do that.

19         MR. MARTIN:  That's at 10 o'clock, Your Honor, in

20   the case of United States versus Edward Burke, in front

21   of Judge --

22         THE COURT:  Good.  I was thinking about 2 o'clock.

23   The green line is right there and goes right straight to

24   Superior Court -- to U. S. District Court.  It will send

25   you back out here.  Why don't you all pencil in your

Cross - Papalia

1  calendar a charge conference or, if we're running late,

2  jury time on Monday afternoon, July 31.

3          MR. WARD:  31st or 21st?

4          THE COURT:  No, July 31st.  The 24th I'm going to

5  be popping Percocet or something and so forth.

6          MR. SUSSMAN:  I can throw a monkey wrench in this

7  one.  I have a motions hearing in a death penalty case in

8  D. C.

9          THE COURT:  Is it all day?

10         MR. SUSSMAN:  At 2 o'clock.

11         THE COURT:  What time?

12         MR. SUSSMAN:  2 o'clock.  Scheduled at 2 o'clock.

13         THE COURT:  Oh, brother.

14         MS. JOHNSTON:  How about 8 o'clock that morning,

15  Your Honor?

16         THE COURT:  On the 31st?

17         MS. JOHNSTON:  Any day.

18         MR. MARTIN:  The problem with 8 o'clock for me is

19  that then I -- you know, I'm doing a fire drill to get

20  from here down there for 10 o'clock.

21         MS. JOHNSTON:  Your Honor, can we maybe get on

22  with the witnesses in front of the jury?

23         THE COURT:  We're going to get on with that.

24         MR. WARD:  Yes, I'd like to get on with my

25  cross-examination.

Cross - Papalia

1          THE COURT:  We're going to do that, trust me.

2   Well, I'm going to go to 5 o'clock today, at least, and

3   I'm going to tell the jury when they come in that we're

4   going to go to 5 or 6 o'clock on Wednesday, more if

5   necessary.  And then we won't sit Thursday, all right?

6   Mr. Sussman, is there anybody who can cover for you in

7   something like this, a charge conference?  Do you need to

8   be here for that?

9          MR. SUSSMAN:  For a charge conference?

10          THE COURT:  Do you think those motions are going

11   to last all day long?

12          MR. SUSSMAN:  Well, just what do you think about

13   in time?  Maybe I can work around it.

14          THE COURT:  I was thinking 2 o'clock.  Two or 3

15   o'clock, and hopefully we can spend a couple of hours and

16   get them all done.

17          MR. SUSSMAN:  I think I could probably get my

18   suggestions and requests to somebody.

19          THE COURT:  I've got, in front of all of you,

20   present musings on those instructions which I will docket

21   as the court's proposed jury instructions, as ugly as

22   they may be, because I haven't done the retyping.  Play

23   it by ear and let's talk about it next, you know, the

24   next few days and see where you stand on that.

25          MR. SUSSMAN:  Well, what I will do is I will

Cross - Papalia

1  submit something in writing that will keep me from having

2  to make representations for the most part, and then I can

3  probably deputize someone and be available by phone and

4  take care of it.

5       THE COURT:  All right.  Well, what I'm going to

6  tell the jury is because of some matters on my schedule

7  and medical needs of one attorney that we're going to not

8  sit Thursday, but we're going to go longer today and

9  longer tomorrow and that way they will have two days off.

10  Okay?  All right.  I'm not happy, but what can you do?

11  You know you had your problem; I had a wasp that I

12  killed, and the wasp is dead and so is my shoulder, so --

13  all right, bring them in.

14       MS. JOHNSTON:  Are we still starting at 10:00 in

15  the morning?

16       THE COURT:  Yes.  I have a doctor's appointment.

17       MS. JOHNSTON:  Your Honor, I don't think we're

18  going to finish tomorrow, given the pace we're going on

19  cross-examination.

20       THE COURT:  I'm going to go until 6:00 tomorrow

21  and see if you can get it done.

22       (Witness resumes the stand at 2:30 p.m.)

23            (Jury returns at 2:31 p.m.)

24       THE COURT:  Mr. Ward, you may resume.

25       BY MR. WARD:

Cross - Papalia

1   Q.      Detective Papalia, we talked about the number of

2   people that were in the house, and we talked about the

3   three Dobies, my client, her husband and son.  We also

4   talked about James Parker and Anthony Carter.

5   A.      Yes.

6   Q.      You have no personal knowledge as to whether James

7   Parker and Anthony Carter actually lived at that house,

8   do you?

9   A.      No.

10  Q.      All right, sir.  Now I'd like to discuss the

11  report and return that was filed in this case.  You

12  explained that the return is a document that's filed or

13  returned to the judge who issued the warrant telling it

14  what was found; is that correct, sir?

15  A.      That's correct.

16  Q.      All right, sir.  Now, we've established that you

17  were the supervising agent in this matter; is that

18  correct?

19  A.      For that residence, yes.

20          MS. JOHNSTON:  Objection.  Relevance.

21          THE COURT:  Overruled.

22          BY MR. WARD:

23  Q.      Did you fill out the affidavit?  I mean the return

24  document.

25  A.      No.

Cross - Papalia

1  Q.      You do have a copy in front of you?

2  A.      Yes.

3  Q.      I think you might want to refer to that, because I

4  may ask some questions.  Okay.  It looks like this was

5  filled out on -- is that 6/1 or 6/2?

6  A.      It looks like there's a two, and then it's

7  overwritten with a one.

8  Q.      Or is the one overwritten with a two?  It doesn't

9  matter anyway; we know it was the first.  And this

10 inventory was prepared by Officer Grapes; is that

11 correct?

12 A.      That's correct.

13 Q.      So he wrote the whole thing out?

14 A.      Yes, sir.

15 Q.      Did you tell him what to put down?

16 A.      I told him -- yeah, the items and the locations I

17 told him to put down, yes.

18 Q.      What was -- Grapes was like the assistant

19 supervising agent or something?

20 A.      No.  At least in Montgomery County, when we do a

21 search warrant we have three people that are assigned to

22 the collection aspect of it.  One person will record the

23 items, which is what you see on this report that you have

24 on the screen.  Another person's responsibility will be

25 to photograph that item or items.  And then a third

Cross - Papalia

1  person's responsibility, which was mine, would be to

2  actually collect them up.

3  Q.     Incidentally, the bedroom that you testified

4  about.  When Ms. Johnston was asking you a lot of

5  questions on direct, the bedroom you called Number 2, you

6  referred to it as the master bedroom?

7  A.     Yes.

8  Q.     I mean, it wasn't -- it didn't have a label on it

9  that said "master bedroom," that's what you term it as?

10  A.     That's what I termed it as.

11  Q.     Now, let's -- Bedroom 1, in shoes on floor.  Can

12  you see?  Oh, I'm sorry.  Bedroom 1, in shoes on floor.

13  Suspected cocaine unknown.  Is this the bag of drugs that

14  was shown in the photograph that we showed to the jury?

15  A.     Right.  But it doesn't say in "shoes."

16  Q.     What does it say?

17  A.     "In shorts on floor."

18  Q.     Oh, okay.  Well, I'm sorry.  I thought that said

19  "shoes," which I was going to say maybe we're talking

20  about another one.  It does say shorts.  My eyes are not

21  what they should be.  Okay.  That's the bag that we

22  showed -- in the photograph that we showed the jury,

23  right, on cross?  And then in the closet floor there were

24  numerous documents in Bedroom 1 on the top of the dresser

25  with some court papers in the name of James Thomas and an

Cross - Papalia

1  ID of LaTasha Smith.  Any idea who those folks were?

2  A.    No, sir.

3  Q.    Do you know if they lived at the house?

4  A.    No, I don't.

5  Q.    Never heard of them before you saw this?

6  A.    No, sir.

7  Q.    These documents?  Okay, sir.  And then in Bedroom

8  1, on the top of the dresser was where the unused

9  glassine bags were found, and those are the ones I asked

10 you about and we showed the jury a picture of; is that

11 right?

12 A.    That's correct.

13 Q.    The same type of bags that were found in the other

14 rooms?

15 A.    They appeared similar.  I can't say if they were

16 the same ones.

17 Q.    All right, sir.  Now, in Bedroom 2, you termed it

18 "master bedroom."  This is item six.  We've got blue bag

19 containing numerous pieces of jewelry, and that's the

20 duffel bag-type thing that we got a photo of and showed

21 it to the jury; is that right?

22 A.    Yes.

23 Q.    Okay.  That's the jewelry.  We don't know what

24 happened to it.

25 A.    That's correct.

Cross - Papalia

1    Q.    Okay.  And on the top of the night stand there

2    were certain documents, Goldie Dobie -- Goldie and LaVon

3    Dobie photographs, day planner.  And then on top of the

4    night stand there was two Samsung cellular phones with

5    chargers.  We've seen those.  On one of the night stands

6    there was a digital scale in a box.

7         MS. JOHNSTON:  Objection, Your Honor, to counsel

8    just standing up here reading the report aloud.  If he

9    has a question, I would like him to ask it.

10        THE COURT:  Overruled.  But don't go too much

11   farther.

12        MR. WARD:  I'm just trying to hurry things along,

13   Your Honor.

14        THE COURT:  That's fine.

15        BY MR. WARD:

16   Q.    But I will ask the question.  All right, sir.

17   Now, item 10.  Does that say Bedroom 2, night stand, top

18   drawer?

19   A.    Does it say that?

20   Q.    Yeah.  I'm asking you a question.

21   A.    Yes.  Yes.

22   Q.    And it says that there were some documents in the

23   name of LaVon Dobie; is that correct, sir?

24   A.    Item 10 says, document in the name of LaVon Dobie.

25   Q.    All right, sir.  And item 11, that's Bedroom 2,

Cross - Papalia

1  the night stand bottom drawer was a red bag from

2  Continental Jeweler.

3  A.      That's correct.

4  Q.      Is that right, sir?

5  A.      That's what it says, yes, sir.

6  Q.      Now, we haven't seen that today.  Do you have a

7  photograph of that red bag from Continental Jewelers?

8  A.      No, I don't.

9  Q.      Did it have jewelry in it?

10  A.      Not according to the return it didn't.

11  Q.      You have no independent recollection of that.

12  A.      No, sir, I don't.

13  Q.      Okay.  Just a jeweler's bag.  All right.  And then

14  on the night stand, bottom drawer, was a photocopy --

15  photographs and insurance information; is that right?

16  A.      Yes, sir.

17  Q.      So far the only dope we've come across is the

18  stuff that was found in the shorts; right?

19  A.      From the point you started reading, you mean?

20  Q.      Yeah.

21  A.      That's correct.

22  Q.      When we started going through this inventory?

23  A.      Since you started going through it, that's

24  correct.

25  Q.      The only dope we've discussed so far is the dope

Cross - Papalia

1  that was found in the shorts in Bedroom 1?

2  A.      Since you've started, yes.

3  Q.      Bedroom 2, under the right side of the bed, this

4  is the two guns; right?

5  A.      Yes, sir.

6  Q.      And they were contained in each -- in a box?

7  A.      In the same box.

8  Q.      In the same box.  The box was closed?

9  A.      It was closed in the respect where the flaps were

10 pushed in.

11 Q.      Yeah?

12 A.      But they weren't closed like that.

13 Q.      Okay.  But that was under the right side of the

14 bed.

15 A.      Yes, sir.

16 Q.      Was there anything else in that box or any

17 identification, documents or anything else?

18 A.      No.

19 Q.      But right next to that box that contained the

20 guns, there was another box that you testified about; is

21 that correct, sir?

22 A.      Which item are you referring to?

23 Q.      Well, item 14.

24 A.      That's correct, yes.

25 Q.      Let me just try to adjust this thing so we can

Cross - Papalia

1  read it.  Item 14, under the middle of bed, box

2  containing unknown white powder; is that right?

3  A.     That's correct.

4  Q.     All right, sir.  And that was next to the box with

5  the guns in it; right?

6  A.     Yes, sir.

7  Q.     And that box, Number 14, also contained an

8  envelope addressed to Julian Dobie; is that correct, sir?

9  A.     I believe that is correct.

10  Q.     And you know Julian Dobie to be the middle name of

11  Goldie Dobie?

12  A.     I believe that it is.

13  Q.     So that was found with that white powder.

14  A.     Yes, sir.

15  Q.     That was just traces; right?

16  A.     Traces on which part of the box?

17  Q.     Oh, I don't know.  Well, you tell me.  What -- how

18  much powder was in 14.  And how was it contained, if at

19  all?

20  A.     If I can refer back to lab reports I can tell you.

21  In the sandwich baggy there was approximately, according

22  to the lab, 11.65 grams of heroin.

23  Q.     11.65 grams of heroin.  And that was found in the

24  same bag with documents addressed to Julian Dobie, who

25  you believe is also Goldie Dobie -- Goldie Julian Dobie?

Cross - Papalia

1 A.     The same bag?

2 Q.     The same box.

3 A.     Yes.

4 Q.     All right, sir.  Now, 11.65 grams.  You're an

5 experienced narcotics officer.  You've spent a lot of

6 time on the street.  You've done a lot of undercover

7 work; is that correct, sir?

8 A.     Yes, sir.

9 Q.     There's been a lot of talk in this case about

10 eighths, eight balls.  In terms of an eight ball, do you

11 know how many grams is an eight ball?

12 A.     You mean an eighth of an ounce?

13 Q.     Yes.

14 A.     It's 3.54 grams, approximately.

15 Q.     And is an eight ball -- is that consistent with,

16 like, a user?

17 A.     It depends on the context of --

18 Q.     If somebody has a heavy habit, they're going to be

19 able to take care of an eight ball with no problem;

20 right?

21 A.     I can't make a blanket statement like that.  It

22 depends.  What a heavy habit is to you might not be a

23 heavy habit to me.  I don't know if I can really properly

24 answer that question.

25 Q.     All right.  Well, let me ask you this, then.

Cross - Papalia

1  11.65 grams is more than three times an eight ball; is

2  that right?  Or approximately.

3  A.      Approximately, yes.

4  Q.      And that's a lot of dope, right?  I mean, it's not

5  -- let me put it this way.  Let me withdraw that.  Would

6  you say that that was consistent with personal use?

7  A.      By itself?

8  Q.      Yeah.

9  A.      Strictly just having that bag?  If you just found

10 that bag, possibly.  But everything else was -- that was

11 -- we found in addition to that leads me to believe that

12 there was more than just personal use.

13 Q.      Yeah, okay.  Well you're putting it in context,

14 and that's what you mean; right?  Putting it in context

15 with everything else, it's more than personal use.  But

16 that -- would you say that was found in the box with the

17 documentation addressed to Goldie Dobie or Goldie Julian

18 Dobie; right?

19 A.      Yes.

20 Q.      All right, sir.  Now let's talk about item 15.  I

21 don't know if the jury can see this.  I seem to be

22 getting in the way of the lights here.  Bedroom 2.  See

23 that down at the bottom there?

24 A.      Yes, sir.

25 Q.      And it says, under middle of bed; right?

Cross - Papalia

1  A.      That's correct.

2  Q.      Box with scales.  Numerous unused glassine bags.

3  Mirror.  Is that right, sir?

4  A.      That's correct.

5  Q.      Now that was -- when you say, under the middle of

6  the bed, that was right where the -- next to the box that

7  had the 11.-something grams and Goldie Dobie's letter; is

8  that right?

9  A.      They were close to each other, yes.

10  Q.      Close to each other?

11  A.      Yes.

12  Q.      And a mirror is something that is used in

13  connection with drug trafficking.  I mean -- let me put

14  it this way.  Obviously, mirrors are used to look in and

15  adjust your tie and that sort of thing.  But in the

16  context of drug trafficking, it's not unusual to find

17  mirrors, is it?

18  A.      I mean, we find them.  We find them.

19  Q.      Yes.  And people work with the dope on the mirror

20  and then use a razor blade and mix it up and cut it into

21  sections, that sort of thing; isn't that right, sir?

22  A.      That's one use for it.

23  Q.      Yes, that's one use for it.  And the next item,

24  16, we have in Bedroom 2 under the bed.  I assume this

25  was in the vicinity of the other boxes we've just talked

Cross - Papalia

1  about; right?

2  A.      Yes, sir.

3  Q.      Numerous documents.  Do you recall what any of

4  those documents were, sir?

5  A.      They were phone records, things of that nature.

6  Q.      Okay.  And then item 17, Bedroom 2, night stand,

7  top left -- I'm not sure I can -- can you read this

8  writing a description of what was found there?

9  A.      Yes.

10  Q.      Would you please?  Because I can't.

11  A.      That says, security -- security card Tina

12  Ricksberg, SS card Bernadette, and I cannot read that

13  name from this copy.  Birth certificate Bernadette, and

14  it looks like Essler, two day planners, and mail

15  addressed to Goldie Dobie.

16  Q.      To Goldie Dobie.  That was all in the same drawer;

17  is that right?

18  A.      It wasn't in the drawer.

19  Q.      It was on top of the left bed stand -- night

20  stand.

21  A.      Right.

22  Q.      Okay, sir.  And this is a different -- these are

23  different day planners than the ones that we showed you

24  earlier; is that right?

25  A.      I'd have to refer back, but there are two day

Cross - Papalia

1  planners in item 17.

2  Q.      Okay.  Now, item 18, in Bedroom 2.  Is the top of

3  the left night stand the same night stand where you found

4  mail addressed to Goldie Dobie with nine rounds of

5  .22-caliber ammunition in a metal basket?  Is that right,

6  sir?

7  A.      Yes, sir.

8  Q.      And we already established that there was no .22

9  rounds around?

10 A.      Not that I saw, no.

11 Q.      But it was found on the same dresser top with mail

12 addressed to Goldie Dobie.

13 A.      That's correct.

14 Q.      All right, sir.  Now, number 19.  Again, we're

15 still in Bedroom 2.  Night stand, top.  Now, is this the

16 left night stand or the right night stand, or are we

17 talking about the dresser here?

18 A.      The left night stand.

19 Q.      How do you know it's the left night stand?

20 A.      Because we got that document from the same place

21 where the item, the ammunition from item 18 were found.

22 Q.      Okay.  So it's a D. C. driver's license?

23 A.      Right.  That's correct.

24 Q.      What does the next thing say?

25 A.      D. C. driver's license.  Appears it says Naomi S.

Cross - Papalia

1  Robb.

2  Q.      In the middle basket?

3  A.      That's correct.

4  Q.      It was the same basket where the other ones were

5  found?

6  A.      That's correct.

7  Q.      Sitting on the same table top or night stand top

8  as the letter addressed to Goldie Dobie.

9  A.      That's correct.

10  Q.      All right, sir.  And item 20.  Again, we're still

11  in Bedroom 2, and we've got night stand, top drawer left.

12  This is -- we're still talking about the same left-hand

13  night stand?

14  A.      Right.

15  Q.      As you look from the bottom of the bed towards the

16  top, it's on the left.

17  A.      That's right.

18  Q.      And here we have two rounds of .22 ammunition; is

19  that right, sir?

20  A.      Yes, sir.

21  Q.      Again, the same night stand where you found the

22  correspondence to Goldie Dobie; is that right, sir?

23  A.      Same night stand.

24  Q.      Yeah.  And item 21, Bedroom 2, night stand top

25  drawer left.  Again, the same night stand where you found

Cross - Papalia

1  the correspondence to Goldie Dobie is a bag with numerous

2  glassine baggies.  Right, sir?

3  A.     That's correct.

4  Q.     These were empty baggies or unused baggies?

5  A.     Unused baggy.

6  Q.     Unused baggies.  And you've already said these are

7  the types of things that drugs are put in to distribute.

8  A.     That's correct.

9  Q.     Again, was with the same location -- same night

10  stand as the letter addressed to Goldie Dobie?

11  A.     Yes.

12  Q.     All right, sir.  Bedroom 2 -- item 22, we're still

13  on Bedroom 2.  It looks like the top drawer of the left

14  night stand; is that right?

15  A.     Yes, sir.

16  Q.     And it just says, mail.

17  A.     Right.

18  Q.     Could you be more specific as to what kind of

19  mail, and how much, and who it was addressed to, anything

20  like that?

21  A.     I don't recall who it was addressed to, but I

22  believe it was two envelopes from what I can remember.

23  Q.     Two envelopes?

24  A.     Yes.

25  Q.     You didn't note on here you have no recollection

Cross - Papalia

1   as to who it was addressed to?

2   A.      Not off the top of my head, no, sir.

3   Q.      Okay.  Well, I -- you say not -- did you say not

4   off the top of my head?

5   A.      I don't remember who it was addressed to at this

6   time.

7   Q.      Do you have it in your papers there?  I mean, I'm

8   not trying to trick you.  I'm trying to establish who the

9   letters were addressed to.

10  A.      Can you give me one minute?

11  Q.      Sure.

12  A.      I have a photograph of item 22 but it's difficult

13  for me to say who they're entirely addressed to just from

14  looking at the photograph.

15  Q.      Well, sir, considering that you found those two

16  letters in connection with .22-caliber ammunition and

17  glassine -- unused glassine bags, the type used to

18  distribute dope, you didn't think it was important to

19  note who the mail was addressed to?

20  A.      On the return?

21  Q.      Anywhere.  I'm not asking you whether it was on

22  the return.  Look anywhere in your file.

23  A.      On the paperwork that we completed at the scene,

24  this, in my opinion, was adequate for the on scene

25  investigators.

Cross - Papalia

1  Q.      How about any paperwork you completed anywhere

2  else after it got back to the headquarters or wherever

3  you went and you had a chance to sit sown and think about

4  things?  Did you write down who those two letters were

5  addressed to?

6  A.      I did not.  No.

7  Q.      Did anyone else, to your knowledge?

8  A.      Not to my knowledge.

9  Q.      Did you think it was important, looking back in

10 retrospect, to have put down who those letters were

11 addressed to in order to identify them with the

12 contraband you found?

13 A.      At the scene of the search warrant you're

14 referring to?

15 Q.      Anywhere.

16 A.      My responsibility was the search warrant.

17 Whatever decisions were made after the evidence is

18 dropped off is not mine.

19 Q.      You were the agent in charge of the crime scene.

20 Wasn't it your responsibility to see that everything that

21 was seized was properly accounted for and identified?

22 A.      It was my job to seize this evidence, transport it

23 back to our division headquarters, turn it over to

24 customs enforcement, and that was it.  Any decisions with

25 regard to anything else was not up to me after that

Cross - Papalia

1  point.

2  Q.    Okay.  Let's go to item 25 in Bedroom 2, top left

3  drawer, chest of drawers.  And this is not the night

4  stand table.  This is the chest of drawers; right?

5  A.    That's correct, sir.

6  Q.    The one you showed us the photograph of with the

7  pictures all over it?

8  A.    No, that's not this.

9  Q.    Okay.  Well, a chest of drawers, assorted ID

10  cards, money order documentation.  Tell us please whether

11  any names of people were identified with that

12  documentation or ID cards or money orders.

13  A.    I'm sorry, I didn't hear that.  Could you say that

14  again?

15  Q.    Any names?  Was LaVon Dobie's name on there, let

16  me ask you that.

17  A.    I'd have to look at that exhibit to tell you.  I

18  don't recall.

19  Q.    Do you have the exhibit?

20  A.    The actual exhibit?  No, sir, I don't.

21  Q.    Can we get it?

22      MS. JOHNSTON:  Your Honor, counsel has a copy of

23  all of those documents.  I didn't know he was requesting

24  it, so I don't know whether I have it available or not.

25  We would need a recess to check.

Cross - Papalia

1        THE COURT:  Do you have your copy, Mr. Ward?

2        MS. JOHNSTON:  He has copies of each piece of

3   paper.

4        MR. WARD:  Let me say this, Your Honor.  I have

5   Xeroxed copies, many of which are very poor.  I wish to

6   invoke the best evidence rule and show the detective

7   these documents themselves.

8        MS. JOHNSTON:  Your Honor, had I known counsel

9   wanted the had original exhibit, over the break we would

10  have looked for it and made it available to him.  I don't

11  know whether it is available at this time or not.

12       THE COURT:  Mr. Ward, why don't you do the best

13  you can with a copy right now, and at a later time --

14       BY MR. WARD:

15  Q.    I'm doing the best I can, Your Honor, and I'm

16  asking the detective to do the best he can.

17       Detective, you didn't note here or on any other

18  report that you filed who those other documents were

19  identified with; isn't that a fact?

20  A.    I didn't write down the specific names on any

21  document.

22  Q.    All right, sir.  Now, in Bedroom 2, top drawer of

23  right night stand, item 26 Fendi, F E N D I, bag; is that

24  right?

25  A.    That's correct, sir.

Cross - Papalia

1  Q.      Containing three watches and ring; is that right,

2  sir?

3  A.      Yes, sir.

4  Q.      Now, what's -- the uninitiated, or at least for

5  me, what's a Fendi bag?  Is it a jeweler's bag?

6  A.      I don't know.  It's just the name that was on it,

7  sir.

8  Q.      Oh.  Big bag?  Little bag?  Is it made of cloth?

9  Was it made of plastic?  What was it?

10  A.      It's a cloth bag, I believe.

11  Q.      Huh?

12  A.      Cloth bag.

13  Q.      A cloth bag?  And the watch, the three watches

14  that were inside there were men's watches; is that right,

15  sir?

16  A.      I don't remember what types of watches they were,

17  sir.

18  Q.      You didn't make a note of it?

19  A.      Just that we had three watches and a ring, that

20  was it.

21  Q.      Did you check the watches to see if they had any

22  initials on them?

23  A.      No, I didn't.

24  Q.      And they didn't seem important to you at the time

25  to identify them as either men's watches or women's

Cross - Papalia

1  watches?

2  A.      No, sir.

3  Q.      Does it seem important now?

4  A.      No.

5  Q.      How about the ring?  Was that a woman's ring or a

6  man's ring, or do you know?

7  A.      I don't know.

8  Q.      And it didn't seem important to you at the time to

9  make a note of that or make some, at least mental note?

10  A.      I may have at the time known what it was.  But as

11  I speak to you today, I have no recollection as to what

12  they were.

13  Q.      I think in the top drawer on the left side of the

14  dresser on item 27 we had some keys.  Now, item 28, sir,

15  in the basement on the shelves third from the top, which

16  is -- that's what it says here.  And that's what you

17  testify to there was a triple beam balance scale and

18  several glassine bags; is that right, sir?

19  A.      Yes, sir.

20  Q.      And they were all contained in a black plastic

21  trash-type bag; is that correct, sir?

22  A.      Yes, sir.

23  Q.      They weren't just sitting on the shelf open.

24  A.      No.

25  Q.      Was there anything in that bag, sir, with those

Cross - Papalia

1  items to identify them with any particular person or

2  party?

3  A.     Not to my knowledge, no.

4  Q.     Okay.  Was there anything on the shelves where

5  that -- those items were -- where that bag was located

6  that you could identify with any party?

7  A.     Not that I can recall at this time, no.

8  Q.     You don't recall, let's say, a sewing kit being on

9  the shelf down there or a lady's hair dryer or anything

10 at all?

11 A.     On that shelf?  Things of that nature.

12 Q.     In the closet, on the shelf where that stuff was

13 located?

14 A.     I don't remember seeing a hair dryer or anything

15 like that on the shelf.

16        MS. JOHNSTON:  Your Honor, if I could interrupt

17 for a second.  Mr. Ward, here is item 26.  We're looking

18 for item 25 in the event that we have it here.

19        BY MR. WARD:

20 Q.     Oh.  This is the Fendi bag; is that corrector,

21 sir?  Let me show it to you.  Item 26.  This is the Fendi

22 cloth bag that you were talking about, sir?

23 A.     Yes, sir.

24 Q.     And I don't know, that's 8 1/2" x 11" size,

25 approximately?  Does that appear to be about right?

Cross - Papalia

1  A.     Apparently.  That appears to be right.  Yes, sir.

2  Q.     Let's see what's inside here, shall we?  Watch

3  number one looks like a kid's watch.  A blue watch with

4  some kind of blobs of color on the dial; is that correct?

5  A.     Yes.

6  Q.     Item number two looks like a woman's watch; is

7  that correct?

8  A.     Could be.

9  Q.     Could be?  Could be a man's watch?

10  A.     Could be.

11  Q.     Item number three, wouldn't you say that this was

12  a man's watch?

13  A.     Possibly could be, yes.

14  Q.     You ever see a lady wearing a watch like that?

15  Yes or no?

16  A.     I've never seen a lady wear a watch like that.

17  Q.     Okay.  And the ring is in a box.  I think that

18  looks -- I'm not sure what it is.  It's a stone.  I guess

19  that's a woman's ring?

20  A.     Appears to be, yes.

21  Q.     But that's the bag, and these were the items;

22  right?  Your Honor, since we've referred to these,

23  perhaps we ought to mark them in some way.  What's my

24  next number?

25         THE CLERK:  Number 9.

Cross - Papalia

1          MR. WARD:   Number 9.  May I show these to the

2   jury?  I'm sure they're curious about them.

3          THE COURT:  Yes, you may.

4          MR. WARD:  Thank you.

5          MS. JOHNSTON:  For the record counsel, we now have

6   item 25 if you'd like to see that.

7          BY MR. WARD:

8   Q.     Oh, good.  Good.  Well, while the jury is looking

9   at that, let's go to item 25.  This was the stuff found,

10  according to the inventory, top left-hand drawer of the

11  chest of drawers; is that correct, sir?

12  A.     Yes, sir.

13  Q.     Let's take a look at some of these items, shall we

14  sir?  Take a look at this one first and tell me if you

15  can identify that.  Tell us what it is.

16  A.     It's a Western Union money transfer.

17  Q.     All right, sir.  Does it indicate who was sending

18  money and where it was being sent to?

19  A.     Yes, it does.

20  Q.     And tell us what it says, sir.

21  A.     It says the sender is Goldie Dobie.

22  Q.     Goldie Dobie ?  All right, sir.  Sent to where and

23  to whom?

24  A.     It says, Receiver, Triad Financial, Florida.

25  Q.     And how much is it for?

Cross - Papalia

1   A.      $360.55.

2   Q.      What's the date it was sent?

3   A.      There's a date on it.  I don't know if that was

4   the date it was sent.

5   Q.      Well, let's take a look.  In the upper right-hand

6   corner it says 3/12/03; is that correct, sir?

7   A.      Yes, it is.

8   Q.      And on the attachment, which is some kind of a

9   receipt document, it also says 3/12/03; is that correct?

10  Same amount, same sender, and same receiver.

11  A.      That's correct.

12  Q.      All right, sir.  This is another Western Union

13  receipt which has a date in the upper right-hand corner

14  of April 8, '04; is that correct, sir?  Just a couple of

15  months before the bust in this case?

16  A.      That's correct.

17  Q.      Who was the sender in that case, sir?

18  A.      Goldie Dobie.

19  Q.      Who was it sent to?

20  A.      Triad Financial, Florida.

21  Q.      Does this name, Triad, ring a bell with you, sir,

22  in your investigation?

23  A.      From the investigation?

24  Q.      Yes.

25  A.      No.

Cross - Papalia

1  Q.      And how much was it for?

2  A.      The amount that he sent was $1,440.

3  Q.      $1,440.  All right, sir.  Thank you.  Let's --

4  this document that I have in my left hand appears to go

5  with the $1,440 transfer; is that correct, sir?

6  A.      Can I see the other one?  The total on here is

7  different.  Down here it's different.

8  Q.      Hmm?

9  A.      The total down here is different.

10  Q.      That's a service charge.

11  A.      I don't know if it's the same one.

12  Q.      Maybe it's not.  But in any event, this is some

13  kind of a Western Union receipt; is that right, sir?

14  A.      Yes, sir, it is.

15  Q.      To Triad Financial in Florida.

16  A.      Looks like.

17  Q.      Or whatever.

18  A.      Looks like Triad Finance-something.

19  Q.      That's signed by Goldie Dobie; is that correct?

20  A.      Well, his name is crossed out, and there's a --

21  Q.      No, I'm talking about here.

22  A.      Down here?  Yes, sir.

23  Q.      All right, sir.  And is there a date on there that

24  you can see?

25  A.      I don't see one on here.

Cross - Papalia

1  Q.      Okay.  But that's in the amount of $1,456 and

2  change; is that right, sir?

3  A.      Total, yes.

4  Q.      All right.  Thank you.  The next item just looks

5  like a flier for Montgomery County Contractors, Inc.; is

6  that right?

7  A.      Yes, that's what it says.

8  Q.      It has some handwriting on the back?

9  A.      Yes, it does.

10 Q.      Anything about the handwriting that rings a bell

11 with you or strikes a cord or whatever?

12 A.      No, sir.

13 Q.      All right, sir.  The other document here, this

14 yellow document, is a -- sorry, Global Express money

15 order purchases claim receipt; is that right, sir?

16 A.      Yes, sir.

17 Q.      Is there a name on that?  Pay to the order of or

18 whatever?

19 A.      Pay to the order of Geico Insurance Company.

20 Q.      Oh.  $150.

21 A.      That's what it looks like.

22 Q.      Yeah.  It has the name, does it not, on the second

23 line, the purchaser's signature says Goldie Dobie and it

24 says "policy" -- below that, "policy payment for", and it

25 has a number.  And then it says Goldie and LaVon Dobie;

Cross - Papalia

1  is that right, sir?  It looks like -- does it look like

2  payment for an insurance -- automobile insurance or

3  something?

4  A.     I'm not sure what type of insurance it is.

5  Q.     Some kind of insurance?

6  A.     I can't read the signature, but the handwriting

7  says Goldie and LaVon Dobie.

8  Q.     But up here it says the purchaser's name?

9  A.     I can't say for sure what that signature is.

10 Q.     Well, the jury can look at that and they can make

11 their own determination.  We have a number of other items

12 here.  We have a Shawmut, S H A W M U T, some kind of

13 bank card in the name of Cindy Wilson; is that right?

14 A.     Yes, sir.

15 Q.     We have a Great West Neurology Center card in the

16 name of Yasmin Majeed; is that right, sir?

17 A.     Yes, sir.

18 Q.     We have a Social Security number -- I mean, I'm

19 sorry, a Social Security card in the name of Amy Marie

20 Lyon.

21 A.     That's right sir, yes.

22 Q.     We have a Continental Airlines One pass in the

23 name of Mr. David Ulrich.

24 A.     Yes.

25 Q.     We have a Blue Ball Visa check card in the name of

Cross - Papalia

1  David Ulrich; correct?

2  A.      Yes.

3  Q.      We have a Gold Capital One Visa card in the name

4  of Cindy Wilson; is that right, sir?

5  A.      Yes, sir.

6  Q.      We have a Blue Ball National Bank statement

7  Savings something card in the name of Siobhan, S I O B H

8  A N, Ulrich and David Ulrich; is that right, sir?

9  A.      Yes, sir.

10 Q.      A CitiBank card in the name of Cindy Ann Wilson.

11 A.      Yes.

12 Q.      A Costco Wholesale Gold Star member card in the

13 name of David Ulrich; correct?

14 A.      Yes, sir.

15 Q.      A Maine driver's license in the name of Cindy

16 Wilson, with the photograph of a young lady on there;

17 correct?

18 A.      Yes, sir.

19 Q.      A Virginia driver's license in the name of Torvez

20 Portillo Nilton de Jesus, Alexandria, Virginia.  Is that

21 right, sir?  With a photograph?

22 A.      Yes, sir.

23 Q.      A first state license, Delaware driver's license,

24 in the name of Harrell, JoAnn, a lady whose picture is

25 there -- on there, I presume.  Is that right, sir?

Cross - Papalia

1  A.      Yes, sir.

2  Q.      A Filene's Basement -- I'm sorry, a Filene's

3  store card in the name of Cindy Wilson; right?

4  A.      Yes, sir.

5  Q.      A corporate -- American Express Corporate card in

6  the name of David Ulrich.

7  A.      Yes, sir.

8  Q.      A TGI Friday's card, holographic sort of thing

9  card here with -- I don't know if that's the name David

10 Ulrich on the back or not.  Maybe you can tell.

11 A.      I can't tell.

12 Q.      Okay.  A United States of America Smart Pay Visa

13 card in the name of Kay Johnson.  Is that right, sir?

14 A.      Yes, sir.

15 Q.      A Bittersweet Antiques business card with the name

16 David Seavers and Ann Stone; correct?

17 A.      Yes, sir.

18 Q.      A Sanford Institute for Saving ATM card in the

19 name of Cindy Wilson.

20 A.      Yes.

21 Q.      And finally, a prescription drug identification

22 card in the name of Jasmine Majeed; is that right, sir?

23 A.      Yasmin.

24 Q.      Yasmin, or whatever.

25 A.      Yes, sir.

Cross - Papalia

1   Q.     Now, all of these items were found at the same

2   location as the various American Express money transfers

3   by Goldie Dobie; is that correct, sir?

4   A.     They were found with documents with his name on

5   it.

6   Q.     Okay.  And none of these documents has the name of

7   my client, LaVon Dobie, except that the one insurance

8   payment was made for apparently a policy in the name of

9   Goldie and LaVon Dobie; is that right, sir?

10  A.     That's correct.

11  Q.     Madam Clerk, I'm sorry, what was my next number?

12         THE COURT:  Bea.

13         THE CLERK:  11.  I'm sorry, did you mark the

14  documents that you -- the documents in the bureau drawer?

15         MR. WARD:  They're all lumped in there together.

16         THE CLERK:  That's 10, I'm sorry.

17         MR. WARD:  May I, Your Honor?

18         THE COURT:  Yes, you may.

19         MS. JOHNSTON:  Your Honor, may the government

20  maintain custody of that exhibit with the remaining

21  exhibits from that search location?

22         THE COURT:  They will be retained by the

23  government, yes.

24         MS. JOHNSTON:  Thank you, Your Honor.

25         BY MR. WARD:

Cross - Papalia

1  Q.      Detective, we produced the bag with the watches

2  and so forth, you produced this item, but you don't know

3  where the jewelry bag is.

4  A.      No, we don't.

5  Q.      We'll go to the basement.  There's a gray shoe box

6  with assorted documents.  There's nothing that stands out

7  about those documents in your mind?

8  A.      Not that I remember, no.

9  Q.      In the crawl space, item 31 in the basement, there

10 were assorted documents, credit cards, Social Security

11 cards.  Do you have any recollection today, or do you

12 make any note anywhere in your records as to who those

13 documents were identified with?

14 A.      No, I don't.

15 Q.      All right, sir.  Now, it is fair to say, is it

16 not, sir -- I would not be misstating the fact if I said

17 that you did indeed find controlled, dangerous

18 substances, or drugs, in the premises at 7427 Ninth

19 Street on the morning of June 1.

20 A.      That's correct.

21 Q.      Now, the young man that we've talked about,

22 Ta'Vaughn Dobie, the teenager.  Right, sir?

23 A.      Yes.

24 Q.      Do you remember having a conversation with him

25 about those guns?

Cross - Papalia

1          MS. JOHNSTON:  Objection, Your Honor.  May we

2     approach?

3          THE COURT:  Yes.

4               (At the bar of the Court.)

5          MS. JOHNSTON:  He's seeking to elicit hearsay

6     testimony in this case at this time, and it's improper.

7     I'm sure Mr. Ward recognizes that's improper, and let

8     alone he asked the question in front of the jury.

9          THE COURT:  Maybe he's asking to make especially

10    sure, since you asked him not to say hearsay.

11         MR. WARD:  I'm sorry?

12         THE COURT:  Especially since you asked me to

13    admonish them not to say hearsay.

14         MR. WARD:  No, Your Honor.  Let me say why I think

15    this is not hearsay.  Because he testified in a previous

16    hearing on June 16 of '04, just 15 days after this

17    search, that Ta'Vaughn described both firearms to him in

18    great detail, along with the box they were in and

19    proffered that they belonged to somebody else who lived

20    in the house.  And I suggest that that is a statement

21    against one's interest and therefore comes within the

22    exception under the hearsay rule.

23         MS. JOHNSTON:  Your Honor, he may have testified

24    at a hearing on a revocation of probation hearing for Mr.

25    Dobie in which hearsay was admissible.  That statement is

Cross - Papalia

not admissible here, not a statement against interest.
Particularly the -- he's saying they belong to somebody
who didn't live in the house.  In addition to that, he
may very well have given that information because his
mother was being arrested on that date and time at the
place in question.  So it is not a statement against
interest that would have any indicia of reliability, much
like a codefendant saying that I didn't know anything
someone that was taking the blame for the guns so that
his defendant doesn't get convicted.  It's clearly not
admissible in this proceeding.  If he wants to call
Ta'Vaughn Green, then he can go ahead and call Mr. Green.

MR. WARD:  Thank you.  Your Honor, may I say that
the question of whether or not his motive, rather, for
making the statement is, I suggest, a matter of weight,
and it's a matter for redirect examination by the
prosecutor.  The fact is, he didn't just say there were
two guns.  He described them in -- using the detective's
words, he described both firearms in great detail.
Enough detail, I suggest, that it lends credence to his
testimony that he not only knew there were two guns, he
knew a great deal about the two guns and who they
belonged to and so forth.

MS. JOHNSTON:  I would further argue that this is
way beyond the scope of our direct examination.  He

Cross - Papalia

1  wasn't asked about any interviews with any individuals,

2  and I would also move in limine to prevent Mr. Ward from

3  asking him about any conversations he may have had or

4  statements made to him by other individuals in the house,

5  including his client.

6       MR. WARD:  Your Honor, how can it possibly be

7  beyond the scope of cross-examination when they put two

8  guns in.  And clearly the reason they put them in was to

9  tie them to my client.  I don't know how much more

10  relevant it can be than that.

11       THE COURT:  They may arguably be within the scope

12  of direct.  I don't think they're admissible.  I sustain

13  the objection.  It's hearsay.

14       MS. JOHNSTON:  I would also ask the court to --

15  I'm also moving in limine to prevent Mr. Ward from

16  asking, in front of this jury, any questions relating to

17  any statements other people may have made to the

18  detective on this similar basis.  As Mr. Ward said, once

19  the question's asked, although I can't quote him

20  correctly --

21       MR. WARD:  Your Honor, you can be sure I'm not

22  going to ask anything about any other statements of any

23  other people made.  The only other person who made a

24  statement is LaVon Dobie, and I ain't going to ask that.

25       THE COURT:  All right.

Cross - Papalia

1          MR. WARD:  I may be dense, but I'm not that dense.

2                    (Back in open court.)

3          BY MR. WARD:

4     Q.    Detective, you do recall appearing before a

5     federal grand jury in connection with this case on July 1

6     of 2004; is that correct, sir?

7     A.    I recall being in front of a grand jury, yes.

8          MS. JOHNSTON:  Objection, Your Honor.  May we

9     approach the bench?

10                    (At the bar of the Court.)

11         MS. JOHNSTON:  I don't know if he's attempting to

12    impeach him with something he said in that grand jury or

13    if he's trying just to bring out the fact that he -- this

14    witness testified in the grand jury in the District of

15    Columbia, because Mr. Dobie was also charged with

16    possession of those guns because they were found in the

17    bedroom he shared with his wife.  I don't think that fact

18    that he testified in the grand jury in a preliminary

19    hearing relating to charges with Mr. Dobie is relevant or

20    admissible in this case and that there's something

21    inconsistent in what he said in that transcript.  He very

22    well may be subject to cross-examination, but I think

23    counsel is attempting just to get out the fact that Mr.

24    Goldie Dobie was charged with possession of those guns in

25    the District of Columbia.  That fact is inadmissible in

Cross - Papalia

1   this matter, and so we're moving to exclude any testimony

2   unless it is to impeach him about something in particular

3   he said.

4          THE COURT:  Is there something he has said in this

5   court today that the grand jury transcript could impeach?

6          MR. WARD:  Absolutely.

7          THE COURT:  What?

8          MR. WARD:  Well, with respect to what was found in

9   the house.

10         THE COURT:  He's going to say --

11         MR. WARD:  Your Honor, this is a paranoia --

12         THE COURT:  No, no, no.

13         MR. WARD:  Objection.  It really is.  I'm not

14  going to get into the fact about Goldie Dobie or anything

15  else.  I'm going to impeach him on something that he said

16  in this case and what he said in the grand jury, and it

17  has nothing to do with Goldie Dobie or somebody else

18  being charged.

19         THE COURT:  We understand each other.

20  Anticipating any question you ask, it will be to develop

21  an inconsistency in the grand jury testimony that you're

22  asking him now and what he said in this court.

23         MR. WARD:  Your Honor, I well understand the

24  purpose of using a grand jury testimony.

25         THE COURT:  I assume you do.

Cross - Papalia

1        MR. WARD:  I don't play that kind of game, believe

2   me.

3        THE COURT:  All right.  Well, I think you know the

4   limits; don't cross them.

5        MR. WARD:  I do.

6        THE COURT:  Thank you.

7                    (Back in open court.)

8        BY MR. WARD:

9   Q.     Before we get into the question I was going to

10  ask, let me just digress for a moment and go back.  You

11  have testified with respect to a number of items,

12  physical items that were introduced when you were being

13  examined by Ms. Johnston that they had residue on them,

14  the scales; is that right, sir?

15  A.     The scales -- what type of residue?

16  Q.     Huh?

17  A.     You mean narcotics residue or fingerprint residue?

18  Q.     White powder, presumably narcotics residue.

19  A.     On the scales I said that I saw that?

20  Q.     Well, let me ask you this.  Let me put it this way

21  and you can answer.  Was there anything that you found in

22  that house that was introduced this morning on direct

23  examination through you that had residue on it when you

24  seized it?

25  A.     That was suspected to have residue on it?  Yes.

Cross - Papalia

1  Q.    Did you make a note anywhere on the inventory, or

2  since you didn't fill it out with the supervising agent

3  did you instruct the person who wrote out the inventory

4  to put on there a notation that there was residue on

5  whatever the particular item was found?

6  A.    I don't remember if I did or I didn't.

7  Q.    Well, do you want to look at the inventory, sir,

8  and tell me if anywhere it states that there was residue

9  found on any of the items?

10  A.    Item 14.

11  Q.    Hum?

12  A.    Item Number 14.

13  Q.    Item Number 14?

14  A.    Yes.

15  Q.    That was the residue that was in the box, or was

16  it?  Let me find item Number 14.  Item 14 was the box

17  containing unknown white powder and envelope addressed to

18  Julian Dobie, who we know to be Goldie Dobie; is that

19  correct, sir?

20  A.    Yes.

21  Q.    You made no notations as to any other items that

22  were turned in, or you caused no other notations to be

23  made as to any other items that are on this inventory

24  that they had residue on them; is that correct, sir?

25  A.    If you just give me one minute.  Not that I see,

Cross - Papalia

1  no.

2  Q.     Well, if it was on there, you certainly would have

3  seen it wouldn't you?

4  A.     I'm sorry?

5  Q.     If it was on there, you would have seen it.

6  A.     I'd hope so, yes.

7  Q.     I want you to be careful and be clear.  I don't

8  want you to feel I'm rushing you.  If you need more time

9  to give us a definitive answer yes or no, take the time.

10 A.     See two items, item one, suspected white powder,

11 suspected cocaine and Item 14 there is white powder as

12 well.

13 Q.     No indication they're present?

14 A.     He didn't write that down.

15 Q.     And you didn't write it down.  If it was in fact

16 residue.

17 A.     I don't know whether I did or I didn't, but it's

18 not written down on the document.  That's all I have to

19 go on.

20 Q.     I guess, since it wasn't your job so to check on

21 what he wrote down, you didn't; is that right?

22 A.     I didn't feel it necessary, no.

23 Q.     All right, sir.  I asked you a little while ago

24 whether in fact it was fair to say that you had found

25 drugs in the house on Ninth Street; is that correct, sir?

Cross - Papalia

1   A.      Whether we found?

2   Q.      Controlled dangerous substances.

3   A.      That we suspected to be, yes.

4   Q.      Suspected.  And you said it was; is that correct,

5   sir?

6   A.      That it was my job to.

7   Q.      You said there was drugs found?

8   A.      Suspected.

9   Q.      Suspected?

10  A.      Suspected, yes.

11  Q.      We've already heard other evidence with respect to

12  what it turned out to be, and I asked you about the item

13  that said 11.-something grams.  Do you remember that,

14  sir?

15  A.      Yes.

16  Q.      I think that turned out to be whatever -- it

17  turned out to be a controlled substance anyway, and you

18  said that that was about three times an eight ball; is

19  that right, sir?

20  A.      It's approximately correct, yes.

21  Q.      And that an eight ball could be consistent with

22  personal use.

23  A.      Yes.

24  Q.      Well, I mean, drawing on your experience and

25  training, your long experience and training, but that I'm

Cross - Papalia

1  not trying to recite your exact words.  But what I

2  understood from your answer was that 11.-something grams,

3  which is three times an eight ball, was more than -- more

4  indicative of trafficking; is that correct, sir?  Rather

5  than personal use.

6  A.    When you -- from the totality of everything we've

7  found there, it's an indication that any amount of drugs

8  found in this situation that we found on Ninth Street is

9  an indication that there is trafficking going on, yes.

10 Q.    All right, sir.  And this is July 18 of 2006.

11 Would you say that your recollection is better today as

12 to what took place on June 1st of '04, or was it better

13 on July 1 of '04, one month after the actual events?

14 A.    It depends on which events you're talking about.

15 Q.    The actual search and seizure and what you found

16 in the house on Ninth Street.

17 A.    The things that we found, the actual items that

18 were found, I had a pretty good recollection back then as

19 I do now.

20 Q.    Okay.  When you went before the grand jury, do you

21 recall one of the grand jurors asking you, "And you found

22 narcotics there?"  Do you recall being asked that?

23 A.    I can look at what you're referring to?

24 Q.    Sure.  Sure.  I don't want to hide it from you.

25      MS. JOHNSTON:  Counsel, may I see what you're

Cross - Papalia

1  showing the witness, please?

2        BY MR. WARD:

3  Q.    I'm sorry.  This is Page 6, Lines 10 through 13.

4  Perhaps you could read the question for us, sir.  It

5  says, grand juror.  Could you read the question so we can

6  all hear?

7  A.    It says, Grand Juror:  And you found narcotics

8  there?  Witness --

9  Q.    Wait.  The witness is you?

10 A.    That's correct.

11 Q.    Under oath?

12 A.    That's correct.

13 Q.    One month after the event; is that right?

14 A.    I have to look at the date.

15 Q.    July 1.

16 A.    July 1, 2004.

17 Q.    Read your answer.

18 A.    We found some stuff that was indicative of

19 narcotics trafficking, but no narcotics were found.

20 Q.    That was your answer?

21 A.    That's correct.

22 Q.    Thank you.  Your Honor, I don't think I have any

23 other questions with this witness, but let me just check.

24 Nothing else, Your Honor.

25        MR. MCKNETT:  Your Honor, I believe Mr. Ward has

Cross - Papalia

1    completed his cross.

2         THE COURT:  You have some cross?

3         MR. MCKNETT:  Yes.

4         THE COURT:  All right.

5                   **CROSS-EXAMINATION**

6         BY MR. MCKNETT:

7    Q.    Good afternoon, Detective Papalia.

8    A.    Good afternoon.

9    Q.    Detective, I want to ask you just a couple of

10   questions, if I may, about the actual process, the search

11   process at 7427 Ninth Street.  You were part of a team;

12   correct?

13   A.    Yes.

14   Q.    There were actually two teams.  There was an entry

15   team, and then a search team; is that correct

16   terminology?

17   A.    That's correct.

18   Q.    And you were part of the search team, not the

19   entry team; correct?

20   A.    That's correct.

21   Q.    Who else was on the search team with you?

22   A.    It was myself, Detective Richard Grapes from

23   Montgomery County police, Detective Thomas Stack from

24   Montgomery County police, Special Agent Shawn Curry from

25   ICE, Special Agent Byron Braggs from ICE, and there was a

Cross - Papalia

1  D. C. Metropolitan police officer, female officer, whose

2  name I don't know.

3  Q.     When you say ICE, you're talking about Immigration

4  and Customs Enforcement --

5  A.     That's correct.

6  Q.     -- synonym for that agency?

7  A.     That's correct.  And the female was not part of

8  the search.  She was just there at the residence.

9  Q.     Do you recall what time it was when you arrived at

10  7429 Ninth Street on June 1st of 2004?

11  A.     Sometime after six.  I'm not sure what the exact

12  time was.

13  Q.     Six o'clock is the magic time.  That's when you

14  start enforcing search warrants, unless the court has

15  given you permission to search them prior to six a.m;

16  correct?

17  A.     That's my understanding, yes.

18  Q.     So did you gather somewhere else before six

19  o'clock or about six and then proceed as a unit to the

20  premises?

21  A.     Yes, sir.

22  Q.     I want to narrow it down, if I can.  As best as

23  you recall, was it like 6:15?  6:30?

24  A.     That we made entry?

25  Q.     That you arrived at the premises.

Cross - Papalia

1   A.      Sometime -- entry was made at approximately 6:30

2   in the morning.  So, sometime immediately prior to that

3   would have been several minutes at the most.

4   Q.      Okay.

5   A.      We wouldn't stand around.

6   Q.      Were you on the scene when the entry team entered

7   the premises?

8   A.      Yes.

9   Q.      Do you recall what time it was that the entry team

10  went in?

11  A.      Approximately 0630.  6:30 in the morning.

12  Q.      How long was the entry team in the premises before

13  the search team went in?

14  A.      Like I testified before, approximately 15 to 20

15  minutes.

16  Q.      After you entered the premises, did you stay in

17  the premises during the entire period of the search?

18  A.      During the active search warrant part, yes.

19  Q.      How long did that take?

20  A.      Several hours.

21  Q.      Detective, that was not the only search you took

22  part in on June 1st 2004, was it?

23  A.      Yes, it was.

24  Q.      It was the only one?

25  A.      As far as I know, yes.

Cross - Papalia

1   Q.     Did you have any role in this search at 620

2   Sheridan Street?

3   A.     No.

4   Q.     Excuse me, Your Honor.  Consulting with the

5   government.

6          THE COURT:  All right.

7          BY MR. MCKNETT:

8   Q.     Let me focus a little bit differently.  Did you

9   have anything to do with submitting paperwork concerning

10  the searches on Sheridan Street?

11  A.     Actually, the actual submission of the --

12  Q.     Let me show you what I'm talking about, and it

13  might be a lot easier.  May I approach, Your Honor?

14         THE COURT:  Yes, you may.

15         BY MR. MCKNETT:

16  Q.     Detective, I'm showing you what I've marked as

17  Defendant Ali Exhibit 1.  Do you recognize that?

18  A.     No.  I recognize the paperwork but not the writing

19  on it.

20  Q.     Do you -- well, let me -- is that your name on

21  there?

22  A.     Yes.

23  Q.     Did you fill that out?

24  A.     No, sir.

25  Q.     Do you know who would have filled that out?

Cross - Papalia

1  A.      No.

2  Q.      You know when it would have been filled out?

3  A.      Not from looking at that, no.  I don't know.

4  Q.      Do you know why someone would have -- this is the

5  form, and up here it has your name; correct?

6  A.      That's correct.

7  Q.      And then your ID number?

8  A.      That's correct.

9  Q.      And then a lab number.

10 A.      Yes, sir.

11 Q.      And it has your agency assignment, that's MCP for

12 Montgomery County Police, and then a slash, and then I'm

13 not sure a what that is, SID?

14 A.      Yes.

15 Q.      What's that stand for?

16 A.      Special Investigation Division.

17 Q.      Then there's a C.R. number.  What does C.R. stand

18 for?

19 A.      Case report number.

20 Q.      And then down here, there's a phone number.  Is

21 that your phone number?

22 A.      That's the office phone number.

23 Q.      Then in this block here, this box -- you're

24 familiar with this form; correct?  You've seen this form,

25 maybe not this particular form but this format before.

Cross - Papalia

1  A.      Yes, I have.

2  Q.      In this box it shows that something was seized;

3  correct?

4  A.      Yes.

5  Q.      And it was seized at this address, correct, at 620

6  Sheridan Street, Apartment -- looks like -- is that --

7  it's either a 9 or 415 or 915.  I can't quite make it

8  out.

9  A.      I'm not sure, sir.

10  Q.     And then Hyattsville, Maryland.  And the date is

11  06/01/04; correct?

12  A.     That's what it appears to be.

13  Q.     And then whoever filled this out put in today's

14  date, which would be the date it was filled out, correct,

15  which is also 06/01/04; correct?

16  A.     I don't know what they -- how they filled it out

17  as far as --

18  Q.     You weren't there, but it appears that it was

19  filled out on -- well, it doesn't -- you can't even say

20  that, can you?

21  A.     I can't say that.

22  Q.     Just whoever filled this out put those dates on

23  there.

24  A.     Yes, sir.

25  Q.     And then down here, whoever filled out the first

Cross - Papalia

1  two blocks entered these items apparently.  You don't

2  have any firsthand knowledge.

3  A.      Somebody did, that's correct.

4  Q.      That would be the standard practice, wouldn't it,

5  for the person who fills out the heading to also fill out

6  this part; correct?  Then the whole form gets sent to the

7  lab.

8  A.      With other forms, yes.

9  Q.      With other forms and with whatever is listed in

10  here.

11  A.      That's correct.

12  Q.      But you don't know who filled this out.

13  A.      No.

14  Q.      Is that standard practice that other people would

15  fill out evidence forms -- evidence transmittal forms and

16  use your name and not tell you?

17  A.      No.  I knew it was being done.  There was a reason

18  for it.

19  Q.      But you don't know who did it.

20  A.      No.

21  Q.      Would it have been someone who carried out the

22  search at Sheridan?

23  A.      All I know is why my name is up there.  I don't

24  know who did it.

25  Q.      Why is your name up there?

Cross - Papalia

1  A.      Because when these things were analyzed at our

2  crime lab, I would be the person that all of these forms

3  would be referred back to in our division, so I was the

4  common link to this case.  I had assisted with it, so we

5  had agreed prior to logging all this stuff in.  And I

6  can't tell you who logged it in, but when these forms

7  were filled out by whoever filled them out, they would

8  put either my name on there or Sergeant Sakala's so they

9  would know how to -- they would be routed back to me or

10 Detective Sakala.

11 Q.      I'm sorry?

12 A.      They would come back to me or Detective Sakala.

13 Q.      But you don't know who filled that out, and you

14 don't know when it was filled out.

15         MS. JOHNSTON:  Objection.  Asked and answered

16 three times.

17         THE COURT:  Sustained.

18         BY MR. MCKNETT:

19 Q.      Does the person who fills this form out send you a

20 copy of it so you know that it's been submitted?

21         MS. JOHNSTON:  Objection, relevance.

22         THE COURT:  What's the relevance in that?

23         MR. MCKNETT:  I'll --

24         THE COURT:  Sustained.

25         MR. MCKNETT:  I'll withdraw the question, Your

Cross - Papalia

1    Honor.  I have nothing further, Your Honor.  Thank you.

2         THE COURT:  All right.

3         MS. JOHNSTON:  Your Honor, for the record, can we

4    have an exhibit number for that?

5         MR. MCKNETT:  I said it was marked as Ali Exhibit

6    No. 1.

7         MS. JOHNSTON:  Thank you.

8         THE COURT:  All right.  Counsel, we'll take a

9    recess now until five minutes of four, and I would ask

10   the jury to consult among themselves and let me know how

11   late you can go today and tomorrow so we can make up some

12   of the time we're going to miss Thursday.

13              (Off the record at 3:41 p.m.)

14              (On the record at 4:01 p.m.)

15        THE COURT:  Ladies and gentlemen, Ms. Merez has

16   conferred with the jury, and a couple of them have issues

17   with child care arrangements and so forth, so we can go

18   until 5:00 today and tomorrow.  They have asked me to

19   inquire -- I'm not going to do it now, because I want to

20   get moving -- about the possibility of coming in earlier.

21   They're much happier about coming in earlier than staying

22   late, so I'm going to look at my schedule and scrub

23   around with it.  My problem is -- one of my problems next

24   week, on Tuesday I have a physical followup visit with my

25   surgeon.  So it's kind of hard to tell him to forget

Cross - Papalia

1  that, but I do have some guilty pleas and sentencings

2  which I may move to the end of the day and get the jury

3  in here earlier.

4       So, I'm going to try to have us go until five --

5  we'll go to five today and five tomorrow, and I'll give

6  you an update tomorrow.  Tomorrow we should be here at

7  9:45 so any things I need to put out.  I have a doctor's

8  appointment on another day.  I sound like I'm a

9  hypochondriac.  This is a routine, once-a-year-go-see-

10 your-dermatologist visit.  It happens to be tomorrow, but

11 I will be ready to go tomorrow at 9:45 -- to meet with

12 you and then go with them at 10:00.  All right.

13                  (Witness resumes the stand.)

14                  (Jury returns at 4:04 p.m.)

15       THE COURT:  Ladies and gentlemen, while you're

16 getting seated.  I have advised the parties that what we

17 will do is plan on going until five today and tomorrow.

18 I don't want to interfere with other arrangements, and

19 it's also not excited to go home at certain times of day

20 around here.  I'm going to explore some options for

21 starting earlier on some other days if that would be a

22 better alternative for you.  I'm going to have to move

23 some things, but I can move some things if I have to, but

24 I'm going try to get us back on track with a couple of

25 extra hours slipped in here and there.  We're going to go

Redirect - Papalia

1    until five today and tomorrow.  Tomorrow we will be

2    starting at ten sharp and go until five.

3          You may proceed, Ms. Johnston.

4                    **REDIRECT EXAMINATION**

5          BY MS. JOHNSTON:

6    Q.     Thank you, Your Honor.

7          Detective Papalia, when you testified before at

8    the grand jury on July 1st of 2004, had you received back

9    the chemist's report concerning the analysis of the many

10   items that were submitted from this location?

11   A.     No.

12   Q.     Subsequent to that hearing, did you obtain the

13   analysis?

14   A.     Yes, I did.

15   Q.     In regards to that heroin and heroin-cocaine mix

16   which we talked about this morning, marked as

17   Government's Exhibits 29A and 29B, those two exhibits

18   were part of your search warrant item 14; is that

19   correct?

20   A.     Yes.

21   Q.     That item was described as how on your evidence

22   inventory form?

23   A.     It's described as what?

24   Q.     How is it described on the evidence inventory

25   form?

Redirect - Papalia

1  A.      If I can refer to it.

2  Q.      Do I have it up here on the board -- on the

3  screen?

4  A.      It's hard to see.

5  A.      It's referred to as a box containing unknown white

6  powder and an envelope addressed to Julian Dobie.

7  Q.      The inventory form didn't list everything that

8  came out of that box did it?

9  A.      It does not say everything, no.

10 Q.      And after you got the chemist's report back after

11 that hearing on July 1st of 2004, did you testify at

12 other proceedings relating to the search warrant at that

13 location?

14 A.      Yes.

15 Q.      On those subsequent occasions, did you advise --

16 did you testify consistent with what was in the drug

17 report?

18 A.      Yes.

19 Q.      Counsel also asked you about some pictures.  Were

20 there additional pictures that we didn't bother to bring

21 in to the jury?

22 A.      That's correct.

23 Q.      Let me show you Dobie 23.  If you can, tell us

24 what that is.

25 A.      Dobie 23 is the lower living room area.

Redirect - Papalia

1  Q.     Does that accurately depict the way it looked that

2  day?

3  A.     Yes.

4  Q.     How about Dobie 24?

5  A.     That's a small kitchen located in the lower level

6  of the residence.

7  Q.     Dobie 25.

8         MR. WARD:   I think this is somewhat outside the

9  scope of cross.

10        THE COURT:   Overruled.

11        BY MS. JOHNSTON:

12 Q.     Dobie 25.

13 A.     It's the dining room in the lower level of the

14 residence.

15 Q.     Dobie 26.

16 A.     That's a bathroom located in the residence.

17 Q.     And Dobie 27.

18 A.     It appears to be part of the bathroom as well.

19 It's hard to see.

20 Q.     It appears to be the bathroom as well?

21 A.     It's possibly a shower, yes.

22 Q.     Showing you Dobie 28.  What are we looking at

23 here?

24 A.     We're looking at the stairway entrance to the

25 basement area of the residence.

Redirect - Papalia

1   Q.      Is that looking down into the basement?

2   A.      Yes, it is.

3   Q.      Dobie 29.

4   A.      That's a photograph of the basement area of the

5   residence.

6   Q.      Dobie 30.

7           MR. WARD:  Your Honor, I'll object again.  This is

8   outside the scope of direct.

9           THE COURT:  Overruled.

10          MR. WARD:  And what relevance is it?

11          THE COURT:  Overruled.

12          BY MS. JOHNSTON:

13  Q.      Dobie 30?

14  A.      Dobie 30 is item six on the search warrant

15  inventory depicting the bag containing jewelry.

16  Q.      Now, Dobie 31, if you could tell us what this is.

17  A.      What it says or --

18  Q.      What is depicted in that photograph?

19  A.      Documents.

20  Q.      Where were they -- there's a card with a 7 on it

21  and your initials; is that correct?

22  A.      Yes, ma'am.

23  Q.      What does that refer to?

24  A.      It refers to item 7 in the search warrant

25  inventory, and the initials on the bottom right are my

Redirect - Papalia

1    initials, "D.J.P."

2    Q.    When you -- after you took that photograph of

3    those items in that location, what did you do with all of

4    those things?

5    A.    Packaged them to remove them from the residence.

6    Q.    Put them in a plastic bag or box and marked them

7    accordingly?

8    A.    Yes.

9         MR. WARD:  Objection to the leading, Your Honor.

10        THE COURT:  Overruled.

11        BY MS. JOHNSTON

12   Q.    Let me show you what's been marked as -- we'll

13   mark it as the next Dobie exhibit.  And while I'm doing

14   that, can you tell me where it was recovered from?

15   A.    From the right side of the night stand.

16   Q.    Which room?

17   A.    Of Bedroom 2.

18   Q.    Showing you Dobie 44.  Are those the documents you

19   recovered from the right side of the bed night stand on

20   or about June 1st of 2004 in Bedroom 2 of the master

21   bedroom, or the master bedroom as you referred to it?

22        MR. WARD:  I'm sorry, what item is this?

23        MS. JOHNSTON:  Excuse me.  Mr. Ward, what do you

24   need to know?

25        MR. WARD:  My question was, what item on the

Redirect - Papalia

1  return?

2      MS. JOHNSTON:   Item 7.

3      MR. WARD:   Thank you.

4      BY MS. JOHNSTON:

5  Q.   So the record is clear, the witness said he was

6  looking for a particular document.

7  A.   I don't see it in here.   Some of the documents

8  appear to be from item 7, yes, but I don't recall all

9  these documents.

10     MR. WARD:   Sorry, I couldn't hear.   What?

11     THE WITNESS:   Some of the documents from my

12 recollection appear to be from item 7, but I don't recall

13 all of them because there's so many in here.

14     BY MS. JOHNSTON:

15 Q.   When you bundled them up, did you bundle all of

16 the documents that were found in that location in one

17 bag?

18 A.   From item 7, yes, but they weren't all put

19 together.   We didn't put all the documents -- item 7 had

20 its own group, its own bag.

21 Q.   Those were the only documents that went in the bag

22 with the card that said item 7 on it; is that correct?

23 A.   That's what I did, yes.

24 Q.   Your inventory refers that there's a day planner

25 recovered.

Redirect - Papalia

1   Q.      Is that correct?

2   A.      Yes.

3   Q.      Is that in the bag?

4   A.      Yes.

5   Q.      In addition to that, does it also reflect there

6   were some photographs that were recovered as well?

7   A.      Yes.

8   Q.      Are there photographs in there?

9   A.      Yes, there are.

10  Q.      In addition to that, what else does your inventory

11  indicate was recovered in that bag?

12  A.      Documents in the name of LaVon Dobie and Goldie,

13  photographs, and day planner.

14  Q.      Okay.

15  A.      Is.

16  Q.      Is there mail in that in the name of the Dobies?

17  A.      Yes, there is.

18  Q.      As well as some cards?

19          MR. WARD:  Could you leave that out for me,

20  please?

21          MS. JOHNSTON:  Mr. Ward, I don't want to confuse

22  it with other exhibits.  It will be available for you.

23          BY MS. JOHNSTON:

24  Q.      Calling your attention to one piece of mail.  Do

25  you see that?

Redirect - Papalia

1   A.      Yes.

2   Q.      Let me put it up on the board so everyone can see

3   it.  Can tell who that piece of mail is addressed to?

4   A.      Mrs. Goldie Dobie.

5   Q.      Who is it from?

6   A.      Paulette Martin.

7   Q.      At what address?

8   A.      810 Hayward Avenue, Takoma Park, Maryland.

9   Q.      Now, going to the next photograph, Dobie 32.  Do

10  you see that photograph?

11  A.      Yes.

12  Q.      Let me zoom out so you can see the whole thing.

13  What are we seeing in Dobie 32?

14  A.      It's a document in the name of LaVon Dobie.

15  Q.      And where was that recovered from?

16  A.      Right side of the night stand in the top shelf --

17  the top drawer.

18          MR. WARD:  Excuse me.  Can I see that?

19          BY MS. JOHNSTON:

20  Q.      Showing you what's been marked as Dobie Exhibit

21  No. 43.  Do you recognize Government's Exhibit Dobie 43?

22  A.      Yes, I do.

23  Q.      What is -- let me put it up on the -- what's the

24  date on that document?

25  A.      The invoice date appears to be 01/19/2002.

Redirect - Papalia

1          MR. WARD:  33?  Huh?

2          BY MS. JOHNSTON:

3   Q.     Putting it up on the screen.  Can you tell us in

4   whose name that invoice is written?

5   A.     I'm sorry, can you repeat that?

6   Q.     Can you tell us whose name is on the invoice?

7   A.     Yes, I can.

8   Q.     Whose name is on the invoice?

9   A.     LaVon Dobie.

10  Q.     What bedroom was this recovered from?

11  A.     Bedroom No. 2.

12         MR. WARD:  What was the date on that?

13         MS. JOHNSTON:  Counsel, the witness testified that

14  the date on it was January 19th of 2002.

15         MR. WARD:  Your Honor, I am going to object and

16  move to exclude this item as not being relevant.  2002 is

17  two years before the incident.

18         THE COURT:  Overruled.

19         MR. WARD:  Two and a half years before the

20  incident.

21         BY MS. JOHNSTON:

22  Q.     Let me show you the next photograph, Dobie 33.  Do

23  you recognize that item?

24  A.     Yes.

25  Q.     What is depicted there?

Redirect - Papalia

1   A.      Photographs and insurance information.

2   Q.      And where is that in the master bedroom, or

3   Bedroom 2 as you referred to it?

4           MR. WARD:  Objection, Your Honor, to the leading

5   nature of the questions.

6           THE COURT:  Overruled.

7           THE WITNESS:  It's located in the bottom drawer of

8   the right side of the night stand in Bedroom 2.

9           BY MS. JOHNSTON:

10  Q.      These documents were seized by you?

11  A.      Yes, they were.

12  Q.      Have they been turned over to the case agent since

13  June 1st of 2004?  Is that correct?

14  A.      Yes, ma'am.

15  Q.      And available to whomever wanted to look at them

16  since that date; isn't that correct?

17  A.      As far as I know.

18  Q.      Let me next show you Dobie 34.  Do you recognize

19  -- let me white it out so you can see.  Do you recognize

20  Dobie 34?

21  A.      Yes, I do.

22  Q.      What is that?

23  A.      If I could -- it's Washington, D. C., either

24  identification card or driver's license.  I have to

25  actually look at it.

Redirect - Papalia

1  Q.     Let me show you what we'll mark as the next Dobie

2  exhibit, which would be --

3         MR. WARD:  I'm sorry?

4         MS. JOHNSTON:  -- Dobie 45.

5         MR. WARD:  Your Honor, I'm objecting.  He hadn't

6  finished his answer with respect to this one, because he

7  wanted to look at it.

8         THE COURT:  All right.  Let him look at it.

9         BY MS. JOHNSTON:

10 Q.     Let me show you -- so the record is clear, Dobie

11 34 is all I had shown him at that point in time.

12 A.     Okay.

13 Q.     Then let me now show you --

14        MR. WARD:  I don't think he's finished his

15 question, whether it was an ID or license or what it was.

16        THE COURT:  She's showing him two documents.  Let

17 her finish the question.

18        BY MS. JOHNSTON:

19 Q.     Let me next show you Dobie 45.  Can you tell us

20 what Dobie 45 is in relation to the picture that is

21 identified as Dobie 34?

22 A.     Yes, I can.

23 Q.     What is Dobie 45 in relation to the photograph?

24 A.     Dobie 45, in relation to the photograph, is the

25 actual Washington, D. C. driver's license card that we

Redirect - Papalia

1  seized at the residence.

2       MR. WARD:  I'm sorry, I didn't hear the last part.

3       BY MS. JOHNSTON:

4  Q.    Repeat your answer, please, for Mr.  Ward.  And

5  keep your voice loud and clear so he can hear you.

6  A.    Dobie 45 is the actual Washington, D. C. driver's

7  license that's depicted in the photograph in Dobie 34.

8  Q.    Dobie 34, was that taken at the time you recovered

9  Dobie 45?

10 A.    Yes.

11 Q.    Let me put Dobie 45 up on the screen.  Can you

12 tell us what was the expiration date on this driver's

13 license?

14 A.    Yes, I can.

15 Q.    What was the date?

16 A.    July 16, 2004.

17 Q.    The name of that driver's license?

18 A.    Naomi S. Robb.

19 Q.    Was there any Naomi S. Robb present in the

20 residence when you executed the search warrant?

21 A.    No, there wasn't.

22 Q.    In fact, during cross-examination, Mr. Ward asked

23 you questions about numerous identifications, including

24 some in the name of a Cindy Wilson and some other names.

25 Do you recall that testimony?

Redirect - Papalia

1  A.      Yes.

2  Q.      Were any of those people in the residence?

3  A.      No.

4  Q.      Those items that he asked you about, did they

5  contain addresses outside of the state of Maryland and

6  the District of Columbia?  Some of those items.

7          MR. WARD:  Objection to the leading nature of the

8  question.

9          THE COURT:  Sustained.  Ask him where they were

10 from.

11         MS. JOHNSTON:  Can I have that exhibit, please?

12         A JUROR:  I've got it.

13         BY MS. JOHNSTON:

14 Q.      Okay, well you take your time.  We'll get to it in

15 a moment then.  Just pass it back down.  I apologize.

16         Do you, by chance, recognize the woman whose

17 picture is on Dobie 45?

18 A.      I see a resemblance, yes.

19 Q.      Between whom?

20 A.      Between that photo and LaVon Dobie.

21         MR. WARD:  You see a what?

22         THE WITNESS:  A resemblance.

23         MR. WARD:  I move to strike what he sees as a

24 resemblance, Your Honor.  The jury can draw their own

25 conclusions.

Redirect - Papalia

1          THE COURT:  I will grant the motion to strike.

2   Let the jury conclude for itself what it believes by

3   looking at it.

4          MR. WARD:  Ms. Dobie, could you stand so the jury

5   can see your face, please?

6          DEFENDANT DOBIE:  (Stands and faces jury.)

7          MR. WARD:  Thank you, Ms. Dobie.

8          DEFENDANT DOBIE:  (Takes her seat.)

9          BY MS. JOHNSTON:

10  Q.     Let me go to the next photograph, Dobie 35.

11  Again, is this another photograph that you took during

12  the execution of the search warrant?

13  A.     Yes, it is.

14  Q.     Your Honor, if we could publish Dobie 45 to the

15  jury please.

16         THE COURT:  You may.

17         MS. JOHNSTON:  As well as Dobie 43.

18         BY MS. JOHNSTON:

19  Q.     In looking at Dobie 22 -- let me show you next

20  what's marked as the next Dobie exhibit, Dobie 46.  Do

21  you recognize the contents of Dobie 46?

22  A.     Yes, I do.

23  Q.     Okay.  What are the contents of Dobie 46?

24  A.     Do you want me to read them?

25  Q.     Just tell us generally what they are.

Redirect - Papalia

1  A.     It's a couple of citations.  Looks like either

2  parking or traffic citations, two envelopes, and a

3  Western Union document.

4  Q.     Who is the Western Union document addressed to?

5  A.     It says forwarding service requested, LaVon and

6  Goldie Dobie.

7  Q.     Where was item 22 recovered?

8  A.     In Bedroom 2, in the left side of the night stand,

9  in the top drawer.

10  Q.     This is the same bedroom where all of the items

11  that we discussed when you testified this morning were

12  recovered; is that correct?

13  A.     That's correct.

14  Q.     Including the two guns under the bed?

15  A.     That's correct.

16  Q.     And the drugs and the paraphernalia under the bed

17  as well?

18  A.     That's correct.

19  Q.     While I have that there, let me just put up again

20  this envelope here.  Do you recognize this envelope?

21  A.     Yes, I do.

22  Q.     Who is it from?

23  A.     Paulette Martin, 810 Hayward Avenue, Takoma Park,

24  Maryland.

25  Q.     Who is it addressed to?

Redirect - Papalia

1  A.      Mr. and Mrs. Goldie Dobie.

2  Q.      If we could publish Government's Exhibit Dobie 46

3  to the jury.

4          THE COURT:  You may.

5          BY MS. JOHNSTON:

6  Q.      Dobie 46.  What is this a photograph of?

7  A.      Four cameras.

8  Q.      Disposable cameras?

9  A.      Yes, ma'am.

10 Q.      Where are they located?

11 A.      They were located on the right side of a bureau

12 inside of Bedroom 2.

13 Q.      Was that the dresser that we saw in the pictures

14 this morning or a separate piece of furniture?

15 A.      No.  This is the same piece of furniture where the

16 pictures were that we saw this morning.

17 Q.      Let me show you next what's been marked as Dobie

18 37.  Do you recognize that photograph?

19 A.      Yes.

20 Q.      What is that a photograph of?

21 A.      Of some credit cards and state ID.  Looks like

22 Virginia ID card that was located in Bedroom 2, in a top

23 -- the top left drawer or shelf of a bureau in Bedroom 2.

24 Q.      Again in Bedroom 2?

25 A.      Yes.

Redirect - Papalia

1   Q.     Now, are you able to see any of the names on those

2   documents, or those ID cards?

3   A.     Not from the picture on the TV, no.

4   Q.     Do you recall, based upon your recollection of the

5   items that were recovered, approximately how many -- give

6   us an estimate of how many different identification cards

7   you recovered in Bedroom 2 and in the basement of that

8   residence.

9          MR. WARD:  Objection.

10         THE COURT:  Overruled.

11         THE WITNESS:  I can't say.  At least three forms

12  of identification in Bedroom 2.  And then what we found

13  in the basement.  I just don't remember.

14         BY MS. JOHNSTON:

15  Q.     Let me bring this up to you closer.  Strike that.

16  The exhibit from this -- it's still -- okay.  It's still

17  circulating.  We'll get back to that one.  Let me bring

18  this up to you, Dobie 37, and see if you're able to read

19  any of those exhibits that you seized as Exhibit 25 on

20  that item.

21  A.     I can read -- there's a document, Continental

22  Airlines One pass, Mr. David Ulrich.

23         MR. WARD:  Excuse me.  I believe this is what I

24  showed him one by one earlier, aren't they?

25         THE WITNESS:  One of the other documents is a

Redirect - Papalia

1  health plan, PCS, with the last name Majeed, but I can't

2  see --

3          BY MS. JOHNSTON:

4  Q.     Those are the names you can see just based on the

5  photograph; is that correct?

6  A.     Yes, ma'am.

7  Q.     Another photograph, Government's Exhibit Dobie 38,

8  was this also a photograph that you took that date?

9  A.     Yes.

10 Q.     Where is that picture taken?

11 A.     Bedroom 2.

12 Q.     And what are we -- where in the bedroom in

13 particular?

14 A.     Bedroom 2, it was in the top night stand drawer on

15 the right side of the night stand.

16 Q.     And you seized that Fendi bag from there; is that

17 correct?

18 A.     Yes, ma'am.

19 Q.     Let me show you next Dobie 39.  Do you recognize

20 that photograph?

21 A.     Yes, I do.

22 Q.     What is that a photograph of?

23 A.     It's a photograph of numerous keys.

24 Q.     Recovered from where?

25 A.     It was located in the same drawer or shelf where

Redirect - Papalia

1  we found the ID cards that we were just discussing.

2  Bedroom 2, the top left shelf of a dresser drawer set --

3  bureau set.

4  Q.    Let me show you what's been marked as Dobie 40.

5  What are we looking at here in Dobie 40?

6  A.    You can zoom it out a bit.

7  Q.    Oh, I'm sorry.  There you go.

8  A.    We're looking -- this was located in the basement.

9  It was located on a shelf in the basement, and there was

10 a shoe box containing numerous documents.

11 Q.    What we're seeing in the back, is that the top of

12 the shoe box?

13 A.    Yes.

14 Q.    And again, those items have all been available

15 since you seized them; is that correct?

16 A.    As far as I know, yes.

17 Q.    Let me show you Dobie 41 and ask if you recognize

18 that photograph.

19 A.    Yes, I do.

20 Q.    What is that a photograph of?

21 A.    It looks like a computer disk, as well as several

22 envelopes.

23        MR. WARD:  Objection to what it looks like, Your

24 Honor.

25        BY MS. JOHNSTON:

Redirect - Papalia

1  Q.      Can you tell us what is depicted in that

2  photograph?  First, what room were we in?

3  A.      Bedroom No. 2.

4  Q.      Again, that would be the master bedroom, the same

5  bedroom you testified about earlier; is that correct?

6  A.      Yes.

7  Q.      The items that we are looking at, are those

8  referenced as item 30 on your list?

9  A.      Yes, they are.

10 Q.      Let me show you what has been marked as the next

11 Dobie exhibit, which would be Dobie 47.  Do you recognize

12 those items?

13 A.      Yes, I do.

14 Q.      Are those items the items we see depicted in the

15 photograph that's up on the screen?

16 A.      Yes, they are.

17 Q.      And they were recovered from where?

18 A.      It doesn't say on the inventory list, but they

19 were recovered from Bedroom 2, the master bedroom.

20 Q.      From the piece of furniture that's depicted there?

21 A.      Yes, ma'am.

22 Q.      If I could have Dobie 47, please.  Thank you.  If

23 we could look at some of those exhibits, beginning with

24 the yellow sheet that's in there.  Whose name is this

25 document in?

Redirect - Papalia

1  A.      LaVon Dobie.

2  Q.      And are you able to see a date on this document?

3  A.      It says, ticket date 6/24 of 2003.

4  Q.      And what kind of ticket is that?

5  A.      Pawn ticket.

6  Q.      And also in that same item, is there another --

7  let me zoom it out -- piece of paper.  And who is that

8  from?

9  A.      It's from LDS Collection Systems.

10 Q.      And does it return -- does it include a statement

11 to return payment at the bottom?

12 A.      Yes.

13 Q.      And who is the addressee listed on that?

14 A.      LaVon P. Dobie.

15 Q.      At what address?

16 A.      7427 Ninth Street, Northwest.

17 Q.      Finally, also in that exhibit, and for clarity's

18 sake we'll mark this as 47  -- Dobie 47A and B, if I

19 could get a sticker.  Now, it wasn't in this plastic

20 case.

21        MR. WARD:  I'm sorry, which is A and which is B?

22        MS. JOHNSTON:  A will be the Virginia driver's

23 license in the name of Joan M. Chavez, and B -- we'll

24 make B the Visa Platinum Capital One card.

25        MR. WARD:  Thank you.

Redirect - Papalia

1      BY MS. JOHNSTON:

2  Q.      They weren't in this plastic case when you

3  recovered them, were they?

4  A.      No.

5  Q.      Showing you first the Virginia driver's license.

6  What is the expiration date on this Virginia driver's

7  license?

8  A.      September 30 of 2005.

9  Q.      And is there an issuing date on there?

10  A.      I'm sorry, is there a what?

11  Q.      The date it was issued?

12  A.      April 19, 2001.

13  Q.      And what name is that?

14  A.      If you can zoom it out.

15  Q.      I'm sorry.

16  A.      Joan M. Chavez.

17  Q.      Do you recognize the picture?

18  A.      It has a similarity, yes.

19          MR. WARD:   Objection to any similarities.

20          BY MS. JOHNSTON:

21  Q.      Have you seen that photograph on other exhibits

22  that I've shown you here today?

23  A.      I did see one that looked very much like this one,

24  yes.

25  Q.      And the other item, which is 47B, what name is on

Redirect - Papalia

1   that credit card?

2   A.      Looks like J. R. Chavez.

3   Q.      What is the expiration date on that credit card,

4   if you're able to read it.   Or I can read bring it up to

5   you.

6   A.      March 31, 2004.

7   Q.      Well after the date the driver's license was

8   issued in 2001; is that correct?

9   A.      Say that again please.

10  Q.      That would have been a few years after the

11  issuance date on the driver's license; is that correct?

12  A.      Yes.

13  Q.      You didn't find any Joan M. Chavez at the

14  residence, did you?

15  A.      No.

16  Q.      Then if we could publish those after we mark them,

17  please.   Let me show you next what's been marked as Dobie

18  42.   Do you see that photograph?

19  A.      Yes.

20  Q.      What is that a photograph of?

21  A.      Of documents, credit cards, Social Security cards.

22  Q.      Where was that recovered from?

23  A.      It was in a crawl space in the lower level of the

24  house.

25  Q.      We'll mark that Dobie 48.   Showing you what's been

Redirect - Papalia

1  marked as Dobie 48.  Do you recognize this bag of items?

2  A.     Yes, I do.

3  Q.     What is contained in Dobie 48, is that in relation

4  to the picture that's up on the screen?

5  A.     It contains ID cards, credit cards, checkbooks.

6  Q.     We'll mark one set of these as Government's

7  Exhibit Dobie 45A.  Just looking at Dobie 45A.  If you

8  can, go through these photographs and read off the names

9  that appear on those -- that one's a packet of

10  identification cards.

11  A.     Nancy Morgan, Kay Johnson, Tanya Renee Mason, Lila

12  McDonald, Mary Clements, Joan Zimmerman.

13  Q.     Okay, you can stop there.  And how about the

14  checkbooks?  Whose names are on the checkbooks?

15  A.     Charise White.

16  Q.     Are there more cards wrapped up, banded together

17  with those?

18  A.     Yes.

19  Q.     They're not in Ms. Dobie's name are they?

20  A.     No.

21  Q.     You can band those back together.  Now, taking

22  just the subset that we marked as Government's Exhibit

23  Dobie 48A.  You mentioned Nancy P. Morgan; is that

24  correct?

25  A.     Yes.

Redirect - Papalia

1  Q.    How about Tanya Renee Mason?  Is she another one

2  that you mentioned?

3  A.    Yes.

4  Q.    Are those -- how about Lila McDonald?  Was that

5  another card you recovered?

6  A.    Yes.

7  Q.    And how about Mary M. Clements?

8  A.    Yes.

9  Q.    Okay.  And in looking at those pictures, are you

10 able to tell us what color shirt the woman is wearing in

11 all of those pictures?

12 A.    Yellow.

13 Q.    And is that the same photograph on each one of

14 those identifications?

15 A.    It appears to be.

16 Q.    How about -- we'll show another one -- Joan

17 Zimmerman.  Is that the same?

18 A.    Yes.

19 Q.    And how about Betty Mizoni?

20 A.    Yes.

21 Q.    And how about Cynthia J. Maresso?

22 A.    Yes.

23 Q.    Now, in addition to that, there was another D. C.

24 driver's license; is that correct?

25 A.    Yes, ma'am.

Redirect - Papalia

1  Q.     And the name on that, including the middle name,
2  was what?
3  A.     Kay, with a middle initial of C, and last name of
4  Johnson.
5         MR. WARD:  I'm sorry, what was the last name?
6         THE WITNESS:  Johnson.
7         BY MS. JOHNSTON:
8  Q.     I think there was one here that we talked about,
9  Nancy P. Morgan; is that correct?
10 A.     Yes.
11 Q.     The Virginia driver's license.  Let me show you
12 another card out of that packet.  Let me zoom out.  Do
13 you see the second driver's license there?
14 A.     Part of it, yes.
15 Q.     Are you able to see it now?
16 A.     Yes.
17 Q.     What's the name on that second driver's license?
18 A.     Nancy Pearce Morgan.
19 Q.     At what address?
20 A.     500 South Pitt Street.
21 Q.     What was the issuance date on that license?
22 A.     I can't see it from here.
23 Q.     Let me bring it up to you so you can see it.
24 A.     Issuance date was July 1st of 1998.
25 Q.     And on the first Nancy P. Morgan license I showed

Redirect - Papalia

1  you, what was the issuance date on that?

2  A.      July 12, 1998.

3  Q.      Are the driver's license numbers the same on both

4  of those?

5  A.      Yes, they are.

6  Q.      Do you notice any similarity in the photograph on

7  the latter -- the later of the two with the chartreuse or

8  yellow top?  Is that the same photograph we've seen on

9  other identifications here?

10 A.      Yes.

11 Q.      Does this Virginia license, the latter of the two,

12 with the expiration date of 6/30/03, does that have the

13 background photograph on it as did the other Nancy Pearce

14 Morgan driver's license?

15 A.      No.

16 Q.      And these all came out of that bag in the

17 basement; is that correct?

18 A.      Yes, ma'am.

19 Q.      Your Honor, if we could publish these exhibits

20 marking the bag as a -- that's marked as Dobie 48.  The

21 identifications that I've referenced are marked as Dobie

22 48A.

23        THE COURT:  You may.

24        MR. WARD:  Your Honor, I object.  I objected

25 before, and again I object on the basis of relevance.

Redirect - Papalia

1          THE COURT:  Overruled.

2          BY MS. JOHNSTON:

3   Q.     Now, this morning we introduced some items that

4   came out of your Exhibit 17; is that correct?

5   A.     Yes.

6   Q.     I want to show you -- we'll mark this as the next

7   Dobie exhibit, Dobie 49.  First of all, where was Dobie

8   17 recovered?

9   A.     On top of the left side of the night stand.

10  Q.     And that included the exhibits that we introduced

11  this morning -- court's indulgence one moment.  Let me

12  show you what's marked as Dobie 49 and ask you if you can

13  identify this exhibit.

14  A.     Yes, I can.

15  Q.     What is that?

16  A.     It's documents, along with a day planner, that we

17  located on the top left night stand in Bedroom 2.

18  Q.     Does this, likewise, contain identifications in

19  other people's names other than the Dobies?

20  A.     Yes.

21  Q.     Showing you two of those items.  Is that correct?

22  A.     Yes, ma'am.

23  Q.     Now, let me show you what's been marked as -- if I

24  could call your attention to P-50 on the photographs.  Do

25  you see P-50 here?

Redirect - Papalia

1  A.      The top right photograph?

2  Q.      Yes.

3  A.      Yes, ma'am.

4  Q.      Did you recover some items from the top of that

5  dresser area on P-50?

6  A.      Yes.

7  Q.      We'll mark the next item as -- I need a plastic

8  container, please -- as Dobie 50.  Do recognize what

9  we've marked as Dobie 50?

10 A.      Yes, I do.

11 Q.      What is Dobie 50?

12 A.      Dobie 50 are four photographs.

13 Q.      Where were they recovered from?

14 A.      In Bedroom 2 on top of the bureau, the master

15 bedroom.

16 Q.      That would be the dresser that we have depicted

17 here in Government's Exhibit P-50 and P-49?

18 A.      That's correct.

19 Q.      Did you recognize any of the women depicted in

20 these photographs?

21 A.      Yes, I did.

22 Q.      Who did you recognize?

23 A.      Ms. Dobie.

24 Q.      And she's in all four of the photographs; is that

25 correct?

Redirect - Papalia

1  A.      I believe she is, yes.

2  Q.      Is that why you seized the photographs?

3  A.      Yes, ma'am.

4  Q.      Did you recognize the man who appeared with her in

5  some of the pictures?

6  A.      Yes.

7  Q.      Who was that?

8  A.      Goldie Dobie.

9  Q.      If we could publish Dobie 50 to the jury.  Now, in

10 reference to Bedroom 1, we didn't introduce any of those

11 exhibits this morning; is that correct?

12 A.      Yes.

13 Q.      Was that a decision you made or that the trial

14 team made?

15 A.      Trial team.

16         MR. WARD:  Objection, Your Honor.

17         THE COURT:  Overruled.

18         THE WITNESS:  The trial team made that decision.

19         BY MS. JOHNSTON:

20 Q.      Let me mark this next exhibit as Dobie 51.  Do you

21 recognize Dobie 51?

22 A.      Yes.

23 Q.      What is that?

24         MR. WARD:  Your Honor, I am objecting again.  It's

25 way outside the scope of direct.  They had a chance to

Redirect - Papalia

1  put this in this morning if they wanted to and they chose

2  not to.

3       THE COURT:  This is well within the scope of the

4  cross-examination.  Overruled.

5       THE WITNESS:  It's a plastic bag containing a

6  white powder that was located in a pair of jean shorts on

7  the floor of Bedroom 1.

8       BY MS. JOHNSTON:

9  Q.    In fact, was that analyzed and determined to be

10 cocaine?

11 A.    It was.

12 Q.    That's based on your review of the drug report?

13 A.    That's correct.

14 Q.    In reviewing that drug report for Mr. Ward this

15 morning, did you also notice whether or not those items

16 we introduced this morning from under the bed were also

17 analyzed and found to contain various controlled

18 substances, cocaine or heroin?

19 A.    Yes.

20 Q.    Including residue on the scale; is that correct?

21 A.    Yes.

22 Q.    I want to show you what's been marked for ID only

23 as Dobie 52, 53 and 54 and ask you if you recognize those

24 items, beginning with Dobie 52.

25 A.    Yes, I recognize this.

Redirect - Papalia

1  Q.      What is Dobie 52?

2  A.      Dobie 52 is some documents.   Looks like a phone

3  bill, Maryland Department of Human Resources child care

4  medical report, Metropolitan Police Department criminal

5  history request.

6         MR. WARD:   Your Honor, to be consistent, I'm also

7  objecting to these items for the same reasons previously

8  stated.

9         THE COURT:   All right.   Overruled.

10         BY MS. JOHNSTON:

11  Q.      And those items, where are they on your search

12  list?

13  A.      Item five.

14  Q.      That would be Dobie 52, which we've marked for

15  identification; is that correct?

16  A.      That's correct.

17  Q.      Going through those items, did you find anything

18  that related to LaVon Dobie?

19  A.      I don't see anything that relates to LaVon Dobie.

20  Q.      Going to the next exhibit, Dobie 53 as well.   Do

21  you recognize that exhibit?

22  A.      Yes.

23  Q.      And where was that located?

24  A.      It was on top of the dresser in Bedroom 1.

25  Q.      And what does Dobie 53 consist of?

Redirect - Papalia

A.      Court services and Offender Services --

Q.      And is that in Ms. Dobie's name?

        MR. WARD:  Objection, Your Honor.

        THE COURT:  Overruled.

        MR. WARD:  Your Honor, I have an additional reason
and I'd like to state it at the bench.

                    (At the bar of the Court.)

        MR. WARD:  Judge, maybe I'm missing something but
the government had ample opportunity to put this -- this
is way outside of what I had on my cross-examination.  It
doesn't even come close.  Secondly, this is a 404(b) item
because it relates to prior criminal conduct for which I
think I'm entitled to have a hearing and a ruling on.

        MS. JOHNSTON:  Your Honor, we didn't open this
door.  We didn't go into Bedroom 1 at all because we
didn't believe there was material in there related to Mr.
Ward's client.  He asked extensive questions about what
was in Bedroom 1:  Who stayed there?  What did they find
there?  And so I think I'm allowed to show this to this
jury.  We're not hiding anything in terms of 404(b).  The
name on that document is not Ms. Dobie, so it's not a
question of 404(b).  It has someone else's name on it.
We're not introducing it.  We marked it for
identification purposes only, and I'm going to ask him a
question that will tie in the fact that there wasn't

Redirect - Papalia

1  anything in there that had to do with her and that's the

2  reason why those items weren't gone into on direct, and I

3  think we're entitled to do that.

4       MR. WARD:  If that's what it is and she's not on

5  there, that's fine.

6       THE COURT:  As I said, I believe this has been

7  opened by your cross-examination.  She's entitled to do

8  this on redirect.  Your objection is overruled.

9       MR. WARD:  Thank you.

10                 (Back in open court.)

11       BY MS. JOHNSTON:

12  Q.    Going back to the last exhibit I gave you, Dobie

13  Exhibit 53.  Do you recognize that exhibit?

14  A.    Yes, I do.

15  Q.    On that document you're referring to, whose name

16  is on that?

17  A.    It says, offender name:  James Thomas.

18  Q.    Is there also another item in that exhibit?

19  A.    Yes, there is.

20  Q.    If you could tell us what that is.

21  A.    It's a criminal investigator ID card.

22  Q.    In what name is that?

23  A.    The name on it is LaTasha Smith.

24  Q.    Is that a photo ID?

25  A.    Yes, it is.

Redirect - Papalia

1  Q.     Finally, let me show you, for identification

2  purposes only, Dobie 54.  Do you recognize that exhibit?

3  A.     Yes, I do.

4  Q.     Okay.  Is this the way you recovered it?

5  A.     Yes, it is.  Are those the documents that were in

6  there when you recovered it?

7  A.     Yes, they are.

8  Q.     Now, is there anything in there that would assist

9  us in determining who was residing in Bedroom 2 as

10  opposed to Bedroom 1 in reference to these three

11  exhibits?

12  A.     Not that I'm aware of, no.

13  Q.     And the paraphernalia, the heroin and cocaine that

14  you recovered was in Bedroom 2; is that correct?

15  A.     That's correct.

16  Q.     In addition to these documents, are there other

17  documents that were also recovered at this location?

18  A.     Yes.

19  Q.     And all of those have been available since June

20  1st 2004; is that correct?

21         MR. MONTEMARANO:  Objection.  Basis for knowledge.

22         MR. WARD:  Number one.  Number two, I wasn't even

23  anywhere near the case on --

24         THE COURT:  Sustained.

25         BY MS. JOHNSTON:

Redirect - Papalia

1  Q.     You turned all of those documents over to the case

2  agent, Sergeant Sakala, Special Agent Steve Snyder and

3  Task Force Officer Thomas Eveler; is that correct?

4  A.     Yes, ma'am.

5  Q.     Court's indulgence.  You were asked some questions

6  about eight balls.  Do you recall those questions?

7  A.     Yes.

8  Q.     And the 11 or so grams of heroin.  Do you recall

9  those questions?

10 A.     Yes.

11 Q.     Now, is an eight ball consistent with distribution

12 as well as -- can it be consistent with distribution as

13 well as using?

14        MR. MARTIN:  Objection.  Leading.

15        THE COURT:  Sustained.

16        MS. JOHNSTON:  What is -- based on your training

17 and experience, can you tell us what various uses

18 individuals --

19        MR. MARTIN:  Objection. 701.

20        BY MS. JOHNSTON:

21 Q.     I'll rephrase the question.  In response to Mr.

22 Ward's question, you advised him that it would depend

23 upon the circumstances in terms of the eight ball and the

24 11.-whatever grams of heroin.  Do you recall that

25 testimony?

Redirect - Papalia

1  A.      Yes.

2  Q.      What circumstances is your opinion dependent upon

3  in terms of whether drugs are for use or for

4  distribution?

5  A.      It could be determined by what you find in

6  addition to that -- that quantity of narcotics if you

7  find a small quantity but you find large quantities of

8  brand new and unused packaging materials, scales to go

9  along with that, it would be an indication that that is

10 used for packaging -- sale, as opposed to finding that

11 small quantity and just finding crack pipes or the needle

12 needles.

13 Q.      Were some of those items what you found in this

14 residence?

15 A.      Yes.

16 Q.      In Bedroom 2?

17 A.      Yes.

18 Q.      I have nothing further.

19         THE COURT:  All right.  Any recross?

20         MR. WARD:  I think Mr. Montemarano has some.

21                **RECROSS EXAMINATION**

22         BY MR. MONTEMARANO:

23 Q.      Just a moment, Detective Papalia, if you don't

24 mind.  This is Dobie 44.  I'd like to show you something

25 that Ms. Johnston showed you during your redirect

Recross - Papalia

1  examination.  Does this look familiar?

2  A.     Yes.

3  Q.     It's from Paulette Martin to Goldie Dobie at the

4  address you searched; correct?

5  A.     To Mrs. Goldie Dobie, yes.

6  Q.     Mrs. Goldie Dobie.  Why don't you flip it over.

7  Can you tell the ladies and gentlemen of the jury what it

8  says on the back of that envelope?

9  A.     Hallmark.

10  Q.     Want to say that a little louder please?

11  A.     Hallmark.

12  Q.     You mean like the card company?

13  A.     I believe so, yes.

14  Q.     In fact, it looks -- you've bought a Hallmark card

15  at some point in your 35 or so years, haven't you?

16  A.     Yes, I have.

17  Q.     It looks like one of those, doesn't it?

18  A.     Yes.

19  Q.     You've been a police officer, as we've already

20  established through exhaustive questions, since 1995, and

21  a narcotics detective since 2000; correct?

22  A.     Yes.

23  Q.     Would it be fair to say that they didn't teach you

24  anything at the academy, or you've not learned anything

25  during your experience as a narcotics officer that

Recross - Papalia

1  suggests it's common for drug dealers to send their

2  clients Christmas cards or birthday cards or Easter cards

3  or Valentine's cards; is that a fair statement?

4  A.    That's not -- I've never seen it before, but it

5  doesn't mean it --

6  Q.    No further questions, Your Honor.  Thank you.

7        THE COURT:  Any further recross?

8                    **RECROSS EXAMINATION**

9        BY MR. WARD:

10 Q.    Oh, yes.  Detective Papalia, it sounds to me with

11 all of these different identifications and other

12 documents that you were shown, and multiple licenses with

13 what appear to be the same photograph, by chance it

14 didn't appear to be my defendant.

15       MS. JOHNSTON:  Objection to counsel's comments.

16 That's for the jury to decide.

17       MR. WARD:  It's a question.

18       THE COURT:  Let him finish the question.

19       BY MR. WARD:

20 Q.    It appears to me what you came across was evidence

21 of some kind of scam or fraud operation; would that be

22 correct, sir?

23 A.    I think we came across drug trafficking and fraud,

24 yes.

25 Q.    Well, I'm putting across the drug trafficking for

Recross - Papalia

1  a minute now.  I'm talking about the credit cards and the

2  driver's licenses and the multiple photographs.  Isn't

3  that in your experience -- and you've been a police

4  officer how many years?

5  A.     Over 11.

6  Q.     How many?

7  A.     Over 11.

8  Q.     Over 11.  Isn't that indicative of some kind of a

9  scam or fraud operation?

10 A.     That would be, yes.

11 Q.     Huh?

12 A.     Yes, it would.

13 Q.     Yes.  All right, sir.  Now, you were shown Dobie

14 51, the white powder that the government didn't put in

15 this morning but chose to put in this afternoon after I

16 had raised it.  That was found in the pair of jean

17 shorts.  That's the same pair of jean shorts you didn't

18 seize.

19 A.     That's correct.

20 Q.     Which conceivably would have told you whether the

21 shorts belonged to a male or female; right?

22 A.     Yes.

23 Q.     You were shown numerous documents relating to Ms.

24 Dobie.  One, as I recall, was on June 24, '03, a yellow

25 document.  Maybe the government has that.  Do you have

Recross - Papalia

1  that yellow document?  LCD Collections.  I think it was

2  part of 47. Here it is.  This is the pawn ticket that

3  comes out of Dobie Exhibit 47.  Let's see if we can get

4  this up on the screen.  This is Famous Pawn, Inc., right?

5  A.     That's what it says, sir.

6  Q.     And they have advanced the sum of $300; is that

7  right?

8  A.     Yes.

9  Q.     And it says it is to certify that I, LaVon Dobie,

10 -- well, some of it I can't read.  But in any event,

11 there's a date at the bottom of July 16, 2003; is that

12 correct?

13 A.     Yes, sir.

14 Q.     So the item pawned was a rope necklace, 14 karat

15 yellow gold; is that right, sir?

16 A.     I see rope necklace, 14K.

17 Q.     So my client was pawning a gold necklace in July

18 of '03?

19 A.     That's what the document says.

20 Q.     Does that sound like a big time dope dealer to

21 you?

22 A.     Not all drug dealers are big time.

23 Q.     And the LCD thing, let's see if we can find it.

24 LCD Collections.  This is dated -- oh, this has to do

25 with the traffic ticket, an unpaid traffic ticket; is

Recross - Papalia

1  that right, sir?

2  Q.     Do you want to see it?

3  A.     Yes, if I could.

4         THE COURT:  What's the number, Mr. Ward?

5         MR. WARD:  I'm sorry.  It's part of --

6         THE COURT:  Part of number 47.

7         BY MR. WARD:

8  Q.     Part of 47.  I don't think it has a separate

9  number.  I will put it up on the board so everybody can

10 see.

11 A.     Yes, sir.

12 Q.     Oh, there's a date up here of 5/20/04.  Do you see

13 that in the upper left-hand corner?

14 A.     Yes, sir.

15 Q.     So that's probably about ten days before the raid;

16 is that right?

17 A.     Approximately, yes.

18 Q.     And she's been dunned by the Department of Motor

19 Vehicles for a $100 ticket that she hasn't paid; is that

20 right, sir?

21 A.     Apparently, she has an outstanding ticket

22 according to that document.

23 Q.     Huh?

24 A.     I said, apparently she has an outstanding ticket.

25 Q.     Yeah.  And she's being dunned for payment of $100;

Recross - Papalia

1   is that right, sir?

2   A.      Done?

3   Q.      Dunned, D U N N E D.  They're saying pay up or

4   else.

5   A.      I guess they're asking for their payment of the

6   ticket.

7   Q.      Yeah.  All right.  Now, sir, I asked you this

8   morning about what you told the grand jury about the

9   quantity of narcotics found at the residence.  Do you

10  remember that, sir?

11  A.      Yes.

12  Q.      And you went before the grand jury almost exactly

13  one month after the raid; is that right, sir?

14  A.      Yes, sir.

15  Q.      And a grand juror asked you, "And you found

16  narcotics there?"  Is that right, sir?

17  A.      I believe that's what they said, yes.

18  Q.      And as you just explained on redirect by Ms.

19  Johnston, you hadn't received back the chemist's report

20  at that point; is that right, sir?

21  A.      That's correct.

22  Q.      But the reason you seized it was because, based on

23  your long experience and training, you suspected --

24  strongly suspected that it was controlled, dangerous

25  substance, did you not, sir?

Recross - Papalia

A.      Yes.

Q.      Now, you said, We found some stuff that was
indicative of narcotics trafficking, but no narcotics
were found.

A.      Right.

Q.      You didn't say, we found some powder but we didn't
think it was narcotics; or we found some powder and we
thought maybe it was narcotics but we don't really know.
You didn't say that, did you?

A.      I said that no narcotics was found, and that's
what the grand jury testimony said yes.

Q.      You didn't say we found suspected -- what we
suspected, based on our experience and training, was
narcotics, did you?

A.      Well, I normally say something --

Q.      You can answer that.

        THE COURT:  Mr. Ward.  Mr. Ward, let him finish
what he's saying, please.

        MR. WARD:  Well, I'd like him to answer first Your
Honor.

        THE COURT:  He's trying to answer your question.
Let him answer.

        THE WITNESS:  I would have said "suspected."
However, with regard to the stuff that I tested in that
residence, I used field test kits and nothing tested

Recross - Papalia

1  positive in the field for narcotics.  So while it might

2  have appeared to be my field test didn't bring it up as a

3  narcotic.

4      BY MR. WARD:

5  Q.    That's something we've not heard about before.  So

6  when you were at the residence, you had reagent kits with

7  you?

8  A.    Yes.

9  Q.    And that's the standard police method for field

10 testing narcotic or substances to see if they are

11 narcotics; is that correct, sir?

12 A.    Yes.

13 Q.    And does that consist of a little glass tube with

14 a liquid in it?

15 A.    Some of them do.

16 Q.    Some of them do?  And you take a little bit of the

17 powder and you drop it into the liquid.  And if it turns

18 a certain color, it's a narcotic substance.

19 A.    It could be.

20 Q.    Could be.  How many times did you field test items

21 that you found in that residence?

22 A.    I don't remember.

23 Q.    You didn't make any record of that?

24 A.    No.

25 Q.    Anywhere?

Recross - Papalia

1  A.      No.

2  Q.      What about the bag with the 11.-something grams in

3  it that was in the pair of blue jeans?  Did you do a

4  reagent test on that stuff even?

5          MS. JOHNSTON:  Objection.  The question misstates

6  the evidence that's before the jury.

7          THE COURT:  Restate the question.  Sustained.

8          BY MR. WARD:

9  Q.      You found a pair of blue jean shorts, or somebody

10 found a pair of blue jean shorts in Bedroom 1; is that

11 correct, sir?

12 A.      Yes.

13 Q.      Out of the pocket in those shorts was taken a bag

14 of powder; is that correct, sir?

15 A.      Yes.

16 Q.      And that's been marked in this case as an exhibit,

17 and it consisted of 11.-something grams; is that correct?

18         MS. JOHNSTON:  Objection.  Misstates the evidence

19 that's before the jury.

20         MR. WARD:  Maybe he can enlighten me.

21         THE COURT:  How does it misstate it?

22         MS. JOHNSTON:  Your Honor, the 11.-something grams

23 was the heroin that was found in the box from under the

24 box in Bedroom 2.  The exhibit from the jean pocket was

25 small quantity of cocaine powder.  Using two different

Recross - Papalia

1  exhibits and two different --

2        THE COURT:  Sustained.

3        BY MR. WARD:

4  Q.    Let me put it this way.  The bag that you found or

5  was found was in the blue jeans.  Did you test that with

6  the reagent kit?

7  A.    I don't believe I did, no.

8  Q.    You don't believe you did.  All right, sir.  Now,

9  what about the bag that was found in the box under the

10 bed that had the 11.-something grams in it?  I think that

11 was found in a box with an envelope with Goldie -- Goldie

12 Julian Dobie's name on it.  Did you test that?

13 A.    Yes, sir.

14 Q.    What did that show?

15 A.    It came back -- it didn't test up, as they say.  I

16 didn't get a reaction.

17 Q.    It didn't test up?  It didn't indicate any

18 narcotic at all?

19 A.    Not on my field test at all.

20 Q.    Is that why you told the grand jury you didn't

21 have any narcotics?

22 A.    I didn't have any field tests or anything to

23 testify to, so that why I said we didn't find anything at

24 that time because I had no knowledge of it.

25 Q.    I thought you said you did -- did you say you did

Recross - Papalia

1  do a field test on that bag with 11.-something grams?

2  A.      Yes, I did.

3  Q.      You did?

4  A.      Yes.

5  Q.      And it came back not showing positive for

6  controlled substances; right?

7  A.      That's correct.

8  Q.      My question is, since it showed no controlled

9  substances, is that why you told the grand jury that you

10 found no -- a month later that found no controlled

11 substances or no narcotics?

12 A.      That's right.

13 Q.      I see.  All right.  But you didn't tell them you

14 found it, what, was suspected narcotics?

15 A.      I didn't put it that way, no, sir.

16 Q.      You don't know how many field tests that you and

17 your people under your supervision conducted at the Ninth

18 Street residence during the course of the raid; is that

19 correct, sir?

20 A.      That's correct.

21 Q.      All right, sir.  I don't have any other questions.

22 Thank you.

23        MR. MCKNETT:  Your Honor, I realize the time

24 constraints.

25        THE COURT:  I do too.

Recross - Papalia

1       MR. MCKNETT:  I'll be very, very quick.

2       THE COURT:  Quick.

3       BY MR. MCKNETT:

4   Q.    I won't even walk over there.  I just want to

5   clarify one thing.  You said, I believe, an eight ball by

6   itself could be a personal use quantity of drugs;

7   correct?

8   A.    Yes, it could.

9   Q.    Can you speak up a little bit?

10  A.    I'm sorry.  Yes, it could.

11  Q.    An eight ball by itself could also be a quantity

12  of drugs for resale; correct?

13  A.    Yes, sir.

14  Q.    And context is important in terms of determining

15  what that eight ball might be for; correct?

16  A.    It helps out.

17  Q.    If you found an eight ball along with packaging

18  materials and scales or cutting materials, Manitol,

19  things of that sort, that might indicate to you that the

20  eight ball was being possessed for resale; correct?

21  A.    It could, yes.

22  Q.    But if you found an eight ball along with a crack

23  pipe or straws -- little straws or perhaps needles, that

24  would indicate the eight ball was possessed for personal

25  use wouldn't it?

Recross - Papalia

1  A.      It could indicate that, yes.

2  Q.      Thank you.  Nothing further, Your Honor.

3          MS. JOHNSTON:  Nothing further, Your Honor.

4          THE COURT:  You may step down.  Thank you very

5  much.  Ladies and gentlemen, I apologize for running  a

6  little late.  We will see you tomorrow morning.  I am

7  hopeful that we will get through this trial without

8  looking like war veterans, because the next time after

9  tomorrow you see me and Mr. Montemarano we'll probably

10  all be bandaged up from top to bottom.  But we'll get

11  there.  Thank you.

12                      (Jury excused at 5:07 p.m.)

13                      (Off the record at 5:07 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

26

1                          **<u>CERTIFICATE</u>**

2

3        I, Tracy Rae Dunlap, RPR, CRR, an Official Court

4   Reporter for the United States District Court of

5   Maryland, do hereby certify that I reported, by machine

6   shorthand, in my official capacity, the proceedings had

7   and testimony adduced upon the Jury Trial Proceedings in

8   the case of UNITED STATES OF AMERICA versus PAULETTE

9   MARTIN, et al, Criminal Action Number RWT-04-0235 on July

10  18, 2006.

11

12       I further certify that the foregoing 245 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17       In witness whereof, I have hereto subscribed my

18  name, this 2nd day of January 2009.

19

20

21                    _____
                      TRACY RAE DUNLAP, RPR, CRR
22                    OFFICIAL COURT REPORTER

23

24

25