```
 1              UNITED STATES DISTRICT COURT OF MARYLAND
                          SOUTHERN DIVISION
 2
    ---------------------------x
 3  UNITED STATES OF AMERICA    :
              Plaintiff         :
 4                              :
                                :
 5  vs                          :Criminal Action:RWT-04-0235
                                :
 6                              :
    PAULETTE MARTIN, et al      :
 7              Defendants.     :
    ---------------------------x

 8

 9                              Wednesday, August 9, 2006
                                Greenbelt, Maryland
10
         The above-entitled action came on for a Jury Trial
11  Proceeding before the HONORABLE ROGER W. TITUS, United
    States District Judge, in courtroom 4C, commencing at
12  8:15 a.m.

13       THIS TRANSCRIPT REPRESENTS THE PRODUCT
         OF AN OFFICIAL REPORTER, ENGAGED BY
14       THE COURT, WHO HAS PERSONALLY CERTIFIED
         THAT IT REPRESENTS THE PROCEEDINGS AS RECORDED AND
15       REQUESTED.

16       APPEARANCES:

17       On behalf of the Plaintiff:

18       DEBORAH JOHNSTON, Esquire
         BONNIE GREENBERG, Esquire
19
         On behalf of the Defendants:
20
         MICHAEL MONTEMARANO, Esquire
21       ANTHONY MARTIN, Esquire
         MARC HALL, Esquire
22       TIMOTHY MITCHELL, Esquire
         PETER WARD, Esquire
23       EDWARD SUSSMAN, Esquire
         HARRY MCKNETT, Esquire
24
    Tracy Rae Dunlap, RPR, CRR              (301) 344-3912
25  Official Court Reporter
```

1                              I N D E X

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                                        <u>Page</u>

23 Reporter's Certificate                                 340

24 Concordance                                            341

25

1          THE COURT:  All right.  We have all counsel and
2 all parties present now.  Counsel, I have asked my law
3 clerk to distribute to you the verdict form with
4 revisions that I made last night after we met, as well as
5 this verdict form index which simply addresses the
6 verdict by defendant so that they can see what are the
7 counts and what are the questions pertaining to the
8 various defendants.  I intend to distribute that to them
9 this morning during my instructions so that they can
10 follow me along and better follow you along when they go
11 through the closing arguments from you.
12          Before we go to any preliminary matters people
13 have to raise, let me go down the list of items I have to
14 address.  Does anybody have any objections or concerns
15 about the verdict form index that I've prepared?
16          MR. WARD:  Yes, Your Honor, I do.  Your Honor, I
17 brought out the issue yesterday of the amounts in the
18 lesser included offense.
19          THE COURT:  Mr. Ward, I'm asking you, do you have
20 any concerns about the verdict form index that I just
21 handed out?
22          MR. WARD:  Oh, the index.  I'm sorry.
23          THE COURT:  I want to go down my agenda first and
24 then we'll get to your items.
25          MR. WARD:  No, I don't.

1        THE COURT:  I believe this will facilitate
2  understanding the case by the jurors if they see it
3  defendant by defendant and they see what the questions
4  are they have to answer for each defendant.  Then when
5  they hear your arguments, they will be able to follow
6  along better.  I think this will be an aid to their
7  understanding.  So if there is no questions about that,
8  then I will put that aside for distribution when they
9  come out.
10        MS. JOHNSTON:  Your Honor, that may be affected by
11  the court's ruling on some of the issues.
12        THE COURT:  No, I understand.  I understand.
13        The next matter I wanted to discuss was the
14  verdict form.  Now, I have just received and skimmed over
15  -- I mean, I didn't see it before I came on the bench, a
16  letter from Mr. Ward.  Has the government had a chance to
17  look at this and digest this?
18        MS. JOHNSTON:  We've had a chance to look at it,
19  Your Honor.  Quite frankly, if you look at the last
20  paragraph where defense counsel is now objecting to the
21  proposed revised verdict form and the language having to
22  do with the telephone count, that language has been the
23  same since we submitted this verdict form back in May.  I
24  don't think there's any reason to change the language as
25  the court has it.  I don't think there's any prejudicial

1 effect to the defendant to leave it as it is in terms of

2 including the lesser included offense and the conspiracy

3 count but also including the drug quantity.  I think to

4 take it out would be more confusing to the jury than to

5 leave it as it is.

6          THE COURT:  All right.  Mr. Ward.

7          MR. WARD:  Well.

8          THE COURT:  You need to make your argument slowly,

9 because I'm looking at your letter for the first time as

10 you make it.

11          MR. WARD:  I'm sorry, Your Honor.  I worked on it

12 last night when I got home.  I think I raised the issue

13 yesterday about the amounts, but I didn't get the

14 opportunity to work on it until last night.

15          With respect to Dobie -- Ms. Dobie, paragraphs 29,

16 30 and 31 all relate to the lesser included offense of

17 conspiracy to possess.  What I'm saying is that there is

18 no -- that charge does not require a finding of an amount

19 of heroin or cocaine.  I'd point out that  21844(A)

20 there's no requisite amount specified with respect to

21 heroin and cocaine and there are no amount- based

22 enhancements under the sentencing guidelines for

23 possession of heroin or cocaine.  You know, I don't know

24 where this language of 1 kilogram or more, or 100

25 kilograms and less than 1 kilogram or 100 grams comes

1  from, but it doesn't come from the statute and it doesn't

2  come from the sentencing guidelines.

3        Now, with respect to cocaine base.  Under the

4  conspiracy to possess, there is an enhancement provision,

5  but that kicks in only if the mixture or substance

6  containing cocaine base exceeds 5 grams.  And

7  furthermore, the guidelines provide for an enhancement

8  when a defendant is convicted of possessing more than 5

9  grams of a mixture of a substance containing cocaine

10  base.

11        So, I think to conform with the statute and the

12  sentencing guidelines, we need to have a finding as to 29

13  which deals with heroin, and 30 which deals with cocaine,

14  and I think those could very well be joined together

15  since as to neither.  There isn't any amount requirement.

16  And then as to 31 -- maybe leave 29 and 30 the way they

17  are, but we don't need a -- we don't need a -- I guess

18  you wouldn't leave it the way they are.  We have to take

19  them out.  I suggest 29 and 30 would have to come out.

20  31 would stay as we'd have the 5 grams requirement --

21  exceeding 5 grams requirement, both under the statute and

22  under the sentencing guidelines.

23        THE COURT:  All right.  Ms. Johnston.

24        MS. JOHNSTON:  Your Honor, the drug quantities

25  have to stay in there because if the jury finds her

1 guilty of engaging in the conspiracy as charged, then the

2 jury has to decide which drugs and what quantity as to

3 each drug.  The court has included possession and has

4 asked the jury to make those findings regardless of

5 whether it's a conspiracy to possess with intent to

6 distribute or conspiracy to possess -- simple possession.

7 If the jury finds her guilty of the lesser included

8 offense, they're going on and finding what drug it was

9 and what quantity has no legal affect either for Ms.

10 Dobie or against Ms. Dobie.  So I ask the court to leave

11 it as it is.  If the court tries to differentiate between

12 the conspiracy to possess with intent to distribute or

13 the conspiracy to possess, it's only going to confuse the

14 jury all the more.  So I would suggest to the court to

15 leave it as it is.

16          THE COURT:  I concur.  Mr. Ward, I decline to make

17 the changes that you requested.

18          Now, with regard to the verdict form, the

19 government had raised an objection to having a lesser

20 included offense alternative in the instructions and a

21 lesser included offense option in the verdict form.  I

22 have considered that question, and this is with respect

23 to Ms. Ali.  I think specifically the government was

24 objecting to the lesser included offense alternative

25 that's in Question 130.  I believe that's where you were

1 objecting.

2          MS. JOHNSTON:  Yes, Your Honor.  The government's

3 only objection was to the lesser included instruction on

4 possession as to Count 56.

5          THE COURT:  Ms. Johnston, I have considered that.

6 And while it is a closer call than it is with respect to

7 the other count, giving a reasonably generous reading of

8 the evidence that's been placed before the court, I

9 believe that it would be appropriate to give the lesser

10 included offense instruction on Count 56, and I'm going

11 to do that.

12          MS. JOHNSTON:  Your Honor, can I make the record

13 then?

14          THE COURT:  You certainly made.

15          MS. JOHNSTON:  Your Honor, in terms of Count 56,

16 the court heard Ms. Ali's testimony, both on direct and

17 cross-examination yesterday, that she repeatedly said

18 that she had no knowledge of what was in the bags that

19 she moved on May 16 and that as far as she was concerned

20 she did not know whether there were any drugs in that --

21 in those bags, and therefore she did not possess any

22 drugs on May 16 which is the date charged in Count 56.

23

24          Under the Fourth Circuit case law in United States

25 versus Wright, the Fourth Circuit states that to be

1 entitled to an instruction on a lesser included offense

2 there must be -- the proof of the plaintiff element that

3 differentiates the two must be that of  guilty of the

4 lesser offense but not guilty of the greater offense, and

5 there must be one of two conditions satisfied.  Either

6 there must be sharply conflicting testimony or the

7 conclusion as to the lesser element must be fairly

8 inferable from the evidence presented.

9        In this case, Ms. Ali has not said on May 16, I

10 obtained a small quantity of cocaine for my personal use

11 from Ms. Martin but I didn't know anything about the

12 drugs being moved.  Instead, she has unequivocally

13 testified that she did not know anything about any drugs

14 being moved to the school.  Therefore, there is no

15 evidence before this jury upon which they could conclude

16 that she merely possessed drugs.

17        The drugs recovered in those bags were packaged

18 for distribution and included scales and other

19 paraphernalia and included drugs that Ms. Ali offered no

20 testimony about, particularly heroin and cocaine base.

21 She advised she never got anything but powder cocaine

22 from --- cocaine from Ms. Martin.  So, it is the

23 government's position that there is absolutely no

24 evidence before this jury from which they could infer

25 that Ms. Ali simply possessed cocaine on May 16 of 2006,

1 and we would ask the court to strike the lesser included

2 count as it applies to Count 56.

3          THE COURT:  Mr. McKnett.

4          MR. MCKNETT:  Your Honor, I would just abide by

5 the court's ruling.

6          THE COURT:  I'm going to stay with it.  I believe

7 that there is compliance with the Fourth Circuit decision

8 that Ms. Johnston just reviewed and which I have read,

9 and I believe that the issue is fairly joined and that an

10 instruction on the lesser included offense would be

11 appropriate, so I will give that.

12          I also have an issue with respect to the

13 instruction on the telephone counts, and I want to tell

14 you what I have concluded with respect to that.  I

15 reviewed a number of the cases on this question and I

16 thought that the comment of the court that was perhaps

17 most helpful in sorting out this whole question of

18 whether this -- wait a minute.  I'm sorry, strike that.

19 I'm talking about the wrong thing.

20          The issue was raised about the -- I'm dealing with

21 one hand here and it's hard to sort things out.  Okay.

22 On the issue regarding instruction -- the instructions on

23 the counts -- count against Mr. Bynum for possession of a

24 firearm having been convicted of a crime punishable by a

25 term exceeding one year, and the instruction pertaining

1  to that, 60, 61 and the following ones, the issue that
2  was raised was whether or not under the circumstances of
3  this case there is a second element that must be proved.
4  Namely, that the defendant's civil rights had not been
5  restored by the state of Maryland at the time of the
6  charged offense.        In that regard, I have reviewed the
7  cases last evening.  I found that the analysis that was
8  perhaps most helpful in explaining why I don't believe
9  that the second element is pertinent to this case is
10 explained, ironically, in a footnote in the opinion in
11 the Osborne  case.  In the footnote that appears on Page
12 2 of that decision, the court explained in reference to
13 the Thomas case -- it said in Thomas, we held that Essex
14 applies only in circumstances where the underlying felony
15 was a North Carolina conviction that occurred more than
16 five years prior to the defendant's firearm possession.
17       The Thomas court additionally found that the
18 Essex, burden of proof specifically did not apply when
19 the underlying North Carolina felony conviction was less
20 than five years old.  That is because in that state the
21 restoration of civil rights automatically occurs after
22 five years.  Under the circumstances, I conclude that
23 there is no second element that under the facts of this
24 case would apply, because the underlying conviction is a
25 Maryland conviction as to which there is no automatic

1 restoration of civil rights and I therefore decline to

2 include in the instructions the second element that was

3 in the draft instructions.

4        Now let me review with you what the effect of that

5 is on the instructions that I'm going to actually give.

6 Bear with me for just a moment here.

7        MR. MITCHELL:  May I be heard briefly while you're

8 looking at that?

9        THE COURT:  Wait one second, because I'm going to

10 lose myself here.

11        All right.  Let me review with you the places

12 where that would affect my instructions on Mr. Bynum.  On

13 Page 83 of the draft instructions that I previously

14 distributed to you, I would eliminate the second element

15 and renumber the third and fourth elements as the second

16 and third.  I would eliminate in its entirety instruction

17 Number 64 on Page 84.  On Page 85, the first line of the

18 page would say the second element rather than the third

19 element.  On Page 87, the first line of instruction 66

20 would be changed from the fourth element to the third

21 element.  Those are the changes I would make to implement

22 the decision that I've just made.

23        Now, Mr. Mitchell, you had something further?

24        MR. MITCHELL:  Your Honor, I just want to make it

25 clear on the record that our position is that the Osborne

1 case never at any time referred to jury instructions.

2          THE COURT:  I understand.  I do think that --

3          MR. MITCHELL:  There was only an issue as to

4 whether it should be in the indictment.  Reedy, on the

5 other hand, says that restoration of a civil right is an

6 element the government must prove.  So, whether it's in

7 the indictment --

8          THE COURT:  Mr. Mitchell, I have read those cases.

9 I simply come to a different conclusion.

10          MR. MITCHELL:  I'm throwing it on the record.

11          THE COURT:  It's on the record.

12          MR. MITCHELL:  Something more to transcribe,

13 that's all.

14          THE COURT:  Now I just want to confirm -- I

15 believe you've already stated this on the record -- that

16 the parties have all waived the right to trial by jury on

17 the forfeiture allegations and that will be determined at

18 a later time by the court.  Is that correct?

19          MR. MARTIN:  That's correct, Your Honor.

20          MR. WARD:  Correct.

21          MR. SUSSMAN:  That's right.  I think as a

22 practical matter I'm out of forfeiture.  That was my

23 information from Ms. Johnston.  But in any event, we will

24 waive.

25          THE COURT:  Now, I know that when I was going back

1  to my chambers to do my homework and get ready for today,

2  you all were going off to meet with each other.  Have you

3  worked out a timetable that is mutually agreeable to the

4  defense to take up the allocated times?

5          MR. MONTEMARANO:  Yes, Your Honor.  We would

6  anticipate Ms. Johnson would be done about 10:00 or

7  10:30, that neck of the woods.  We would anticipate that

8  -- Mr. Sussman served as recording secretary.

9          THE COURT:  Don't.  You give me what your schedule

10 is.

11         MR. MONTEMARANO:  We would prepare on myself, Mr.

12 Martin and Mr. Hall all being done by 1 o'clock.  And

13 then after lunch, we would anticipate that the -- between

14 2:30, with the other break, and 5:30 with the other with

15 breaks the other attorney would be roughly done and

16 leaving the government to rebut.

17         THE COURT:  The Gettysburg Address is really short

18 and is good.  They've been here a long time.  I want you

19 to take as much time as is reasonably required for your

20 cases, but a really wonderful short speech is frequently

21 --

22         MS. JOHNSTON:  I just wanted to advise the court

23 that I perhaps was more optimistic in terms of the hour

24 for opening and closing.  An hour, that's not even ten

25 minute per defendant.

1          THE COURT:  I will shorten the lunch hour.  I will

2  do everything I can, but I do have jurors turning into

3  pumpkins at six.  So, I really need to make sure we get

4  it done, and I won't punish anybody who goes under.  I

5  will start getting itchy when you go over.

6          MR. MONTEMARANO:  I hate to make promises I cannot

7  keep, but I think I will be much shorter than I had

8  proposed to my brother counsel last evening.

9          THE COURT:  Good bless you.  Mr. McKnett.

10          MR. MCKNETT:  Your Honor, I wanted -- before the

11  court brings the jury in, I wanted to talk about

12  instruction 55-C one more time.

13          THE COURT:  What page is that on?

14          MR. MCKNETT:  That's on Page 73.

15          MR. MITCHELL:  Your Honor, could I by held

16  harmless for, like, two minutes while he is making this

17  argument?

18          THE COURT:  Yes, you may.

19          MS. GREENBERG:  Your Honor, we have talked about

20  this telephone count for the last week and they've had it

21  since the middle of July.

22          THE COURT:  Let me tell you what I have made my

23  decision with respect to this telephone count.  I am

24  going to, at a number of points here, clarify what it is

25  that is the underlying offense that they must be

1 facilitating and we have debated this and debated this,

2 and I have concluded what I'm going to do on it.

3      I can tell you very quickly what it is as I look

4 at my notes on this count.  On Page 73, in the second

5 line, I'm going to put the word "conspiracy" in front of

6 the word "offense."  Last line of the page, I'm doing the

7 same thing.  Page 74, first full paragraph, fifth line,

8 it's going to change to say, conspiracy offense charged

9 in Count One. Two lines farther down instead of saying,

10 facilitate the distribution of drugs, it will say to

11 facilitate and possess with intent to distribute drugs.

12 Two more lines down, instead of the distribution of

13 drugs, it will simply say, facilitate the conspiracy.

14 Two more lines down, the word "distribution" will be

15 changed to "conspiracy."  And that's the way I'm going to

16 do it.

17      MR. MCKNETT:  Your Honor, I just wanted to make

18 one suggestion, simply because I find -- the court's

19 modifications, I think, clarify this significantly, but I

20 think it still might be a bit confusing and I would ask

21 the court to add the words "knowingly and intentionally."

22      THE COURT:  Where?

23      MR. MCKNETT:  In a few places.

24      MS. JOHNSTON:  Your Honor, if the court is going

25 to add that, we're going to add a willful blindness in

1  there.

2       THE COURT:  First of all, I gave them yesterday a

3  careful instruction on knowingly and willingly, including

4  willful blindness.  I don't want to give it again.  I

5  think that I've covered that already, and you're free

6  during your closing argument to say, remember what that

7  judge said about X, Y and Z.

8       MR. MCKNETT:  That's fine.  If I could just put on

9  the record what my suggestion would be.  I would ask that

10  the court, on Page 74, the instruction 55-C at the end of

11  the first full -- the full line of the commission of a

12  crime as to use a telephone knowingly and intentionally

13  in a way which aids and assists.  In the third line, I

14  would ask that the phrase "knowingly and intentionally"

15  be added after the word "telephone." In the next

16  sentence, I would ask that the sentence read, the

17  government is not required to prove the defendant

18  committed the offense, only that he or she knowingly and

19  intentionally facilitated its commission.  To continue, a

20  person -- skip the next sentence.  Then the last sentence

21  I would ask it to read, for example, a person who

22  knowingly and intentionally uses a telephone to

23  facilitate.

24       MS. JOHNSTON:  Your Honor, the court covers that.

25       THE COURT:  I've considered that, and I decline to

1  make those changes.

2          All right.  Counsel, let me review with you what I

3  would like to do when the jury comes in.  If you put in

4  front of you this chart that they gave us of their

5  problem dates and so forth that I previously distributed

6  to you, what I would propose to do today is to do the

7  following.  Now, juror 9 is the one that is the young

8  student who has a nonrefundable ticket to go to Spain on

9  Friday.  I intend to not have him be a deliberating

10  juror.  Let me go back to what I will do with him but not

11  be a deliberating juror.

12          What was the juror number that's leaving?

13          MR. SUSSMAN:  Six.

14          THE COURT:  Number six is the one that is leaving

15  tomorrow.  To remove him.  And number 16 is the one --

16  that's the last alternate who volunteered to serve and

17  asked to serve.  I think I'll leave him as an alternate,

18  and that leaves us with 12 jurors.  Now, what I would

19  like to do --

20          MS. JOHNSTON:  And still one alternate.

21          THE COURT:  No.  If I'm counting correctly, the

22  jurors who were remaining remember -- we excused one at

23  the beginning of the trial.  That's why they have -- the

24  chart that they gave me has 16 jurors on it, but we only

25  have 15 because we already excused one, that was Number

1  eight, who was excused, I think, the first day of the

2  case or second day of the case.

3          MS. GREENBERG:  That's not on the chart, Your

4  Honor.

5          MS. JOHNSTON:  We have 15 jurors left, Your Honor.

6          THE COURT:  We have 15, right.  We have 15.  If I

7  eliminate three, we have 12.

8          MS. JOHNSTON:  I thought the court was only

9  eliminating two.

10          THE COURT:  No.  I'm talking about three.  Well,

11  let me just tell you.  These will be the juror numbers

12  who will deliberate.  We'll talk in a minute about what I

13  do with the other ones.  All right.  They are one --

14  you've got your chart in front of you the jury gave me.

15  1,  2,  3,  4,  5,  7, 10, 11, 13, 14, 15.  Those are

16  your deliberating jurors.  I will tell them that this

17  morning before I resume my instructions.  What I will

18  tell them, however, is the remaining three, I want them

19  to listen to the entirety of the arguments; they will be

20  released from any further duty to deliberate but they

21  will remain available to be called back if necessary in

22  the highly unlikely event that which one reason or

23  another we are not able to continue with deliberations

24  because of death or illness of another jury who's

25  deliberating.

1          I think the first one in line to do that happened

2   without any controversy at all would be number 16 because

3   she is the next alternate.   But in the highly unlikely

4   event we have earthquakes and conflagrations and 9/11s

5   and everything, I don't want to tell 6 and 9 to go home

6   and start talking about this case and so forth.   I want

7   to make sure they remain under the vow of not discussing

8   this with anybody so that in the highly unlikely event of

9   a conflagration  they could come back.   But I want to

10  announce that to them this morning.

11          MR. SUSSMAN:   With respect to 9, that probably

12  doesn't make any sense.   The kid's going to Spain.   How

13  are we ever going to find him?

14          MR. MONTEMARANO:   He still shouldn't be talking.

15          THE COURT:   Well, he still shouldn't talk.   He's

16  going to be gone for a couple of weeks.   Let me give you

17  other observations I have that I want to cover with them.

18  This chart also tells me that this jury, if it does not

19  return a verdict this week, will not be able to return to

20  deliberate until next Wednesday.   We've already given

21  Judge Chasanow this courtroom on Monday for an MS-13 huge

22  hearing, so there's no way they can be here anyway.   I'm

23  going to tell them that they can deliberate as long as

24  they want.   There is no pressure.

25          But here is what I believe would be the

1 appropriate argument schedule.  Remember one of them has

2 a doctor's appointment tomorrow and has to leave at 2:30,

3 so I was going to suggest to them the following argument,

4 a schedule, and I will tell them to discuss it amongst

5 themselves during a break and to let me know through the

6 courtroom deputy.  If there are any issues with this

7 schedule, I would tell them tomorrow 8:30 to 2:30, Friday

8 8:30 to 5:00.  Next Wednesday, 8:30 to 5:00.  Next

9 Thursday, 8:30 to 5:00.  Next Friday, 8:30 to 5:00.  And

10 then a one week break because there's all kinds of

11 problems on this chart.  The following week, I mean huge

12 problems.  So if they still haven't got a verdict, they

13 would return on Monday, August 28 at 8:30 to 5:00, and I

14 won't go beyond that date.  Let's hope they've got it

15 done by then.  But that's what I'm going to tell them.

16 They should let me know, based upon my review of the

17 chart, I think that's a schedule that would work for the

18 12 deliberating jurors.

19        MR. MONTEMARANO:  The 28th is when Your Honor

20 returns, as well?

21        THE COURT:  Excuse me?  Well, I'm going to be in

22 Vermont all next week.  I will return on Sunday the 20th.

23 I had planned to disappear, but I will probably sneak

24 into the courthouse on Monday of that week.  So I might

25 or might not be available to take a verdict or any

1 questions in the meantime.  What I intend to do with the

2 jury when they come in now, and I want to get them in

3 here quickly now, is to review this schedule with them,

4 tell them who the jurors are that are going to

5 deliberate, hand out to them the verdict form and the

6 chart of the counts, explain it to them, and then proceed

7 with the balance of my instructions.

8          MR. MONTEMARANO:  In reviewing the verdict form

9 and the verdict form index further last night, I've

10 discerned two errors in the verdict form and one in the

11 verdict form index.

12          THE COURT:  Where are they?

13          MR. MONTEMARANO:  In the verdict form index on --

14          THE COURT:  I mean, I asked you this at the

15 beginning, Mr. Montemarano.  This is kind of maddening --

16 I'm trying to get this thing underway.

17          MR. MONTEMARANO:  Your Honor had other things you

18 wanted to address.

19          THE COURT:  Where is it?

20          MR. MONTEMARANO:  Page 5.

21          THE COURT:  Page 5.

22          MR. MONTEMARANO:  The description of Count 56

23 lacks a date.

24          THE COURT:  Where?

25          MR. MONTEMARANO:  Top.

1          THE COURT:  What paragraph number?

2          MR. MONTEMARANO:  Page 5 of the verdict form

3 index.

4          THE COURT:  Oh, the verdict form index.

5          MR. MONTEMARANO:  Count 56 lacks a date.  I missed

6 that yesterday.  I only caught it last night.

7          MR. MONTEMARANO:  It should be May 16.

8          THE COURT:  Page 5?

9          MR. MONTEMARANO:  Page 5 at the very top of the

10 verdict form index.

11          THE COURT:  Well, it's on the verdict form.

12          MR. MONTEMARANO:  Well, it's not.  Count -- Page

13 22 of the verdict form there is no date, and Page 25 of

14 the verdict form there is no date for Count 62.

15          THE COURT:  Is this the only change you have?

16 Because I can just tell them these changes and give them

17 clean copies later.

18          MR. MONTEMARANO:  That, or they can handwrite it

19 in for all it matters.

20          THE COURT:  Tell me where they are.

21          MR. MONTEMARANO:  Page 22.

22          THE COURT:  Of what?

23          MR. MONTEMARANO:  Of the verdict form.

24          THE COURT:  Page 22.

25          MR. MONTEMARANO:  Question 126.

1          THE COURT:  Well, number 126.  Okay.

2          MR. MONTEMARANO:  It requires a date.  Count 56.

3          THE COURT:  Where?  In the parentheses?

4          MR. MONTEMARANO:  Yeah, within the parentheses.

5          MR. MONTEMARANO:  On May 16.

6          THE COURT:  On May 16.

7          MR. MONTEMARANO:  2004.

8          THE COURT:  2004.

9          MR. MONTEMARANO:  And similarly, on Page 25,

10 Question 140.

11          THE COURT:  Page 25, Question 140.

12          MR. MONTEMARANO:  It should be on June 1, 2004.

13          THE COURT:  On June 1, 2004.  Correct.

14          MR. MONTEMARANO:  Yes.  And then on Page 5 of the

15 index.

16          THE COURT:  Page 5 of the index.

17          MR. MONTEMARANO:  With regard to question -- Count

18 56.

19          THE COURT:  Page 5?

20          MR. MONTEMARANO:  Page 5.

21          THE COURT:  Okay.  Right.

22          MR. MONTEMARANO:  Number 56, Count 56, at the top.

23 Again, May 16, 2004 in the parentheses.

24          THE COURT:  On May 16, 2004.  What else?

25          MR. MONTEMARANO:  That's it.

1          THE COURT:  I'm going to tell them orally to them.

2          MS. JOHNSTON:  Your Honor, the same errors are

3 made in Ms. Ali's charge.  Question 129 should have the

4 date as well.

5          THE COURT:  On the verdict form?

6          MS. JOHNSTON:  On the verdict form question 129

7 on Page 23.

8          THE COURT:  Wait a minute.  Let me get this.  I'm

9 going to make the change.  Okay.  123.  Which question

10 number?

11          MS. JOHNSTON:  Number 129 should say in the

12 parens, possession with intent to distribute on or about

13 May 16 of 2004.

14          THE COURT:  May 16, 2004.  Any other changes?

15          MS. JOHNSTON:  I think that also has to be changed

16 on your list, your cheat sheet on Page 8.

17          THE COURT:  Page 8?  Don't call it a "cheat

18 sheet."

19          MR. MONTEMARANO:  I thought Your Honor did.

20          THE COURT:  That's not what we should call that.

21          MS. JOHNSTON:  I was quoting Your Honor.

22          THE COURT:  Where?

23          MS. JOHNSTON:  Page 8, the very last Count 56

24 should in parens say, on or about May 16, 2004.

25          THE COURT:  Any other changes, counsel?  All

1 right.  I will review these changes with them.  I will
2 tell them they will get clean copies later, but I want to
3 be able to get them started, and that is what I intend to
4 do.

5       MR. MONTEMARANO:  I apologize to the court and Mr.
6 Krinsky for not notifying you of these.

7       THE COURT:  You have had your wrists appropriately
8 slapped.  Bring them in.

9       MS. GREENBERG:  Your Honor, I just noticed
10 something.  I apologize.  Count 41 "intentionally
11 omitted," but there's another number that's skipped.

12      THE COURT:  Which one?

13      MS. GREENBERG:  On the verdict form, the court
14 added Count 41 intentionally omitted, but there's also
15 another count that was intentionally omitted that was
16 against Mr. Walker.  Oh, it's there.  Never mind.  I
17 stand corrected.  Thank you.

18      THE COURT:  You saw my arm coming down to slap
19 your wrists and you stopped me in mid-slap.  All right.
20 Bring them in.

21                  (Jury returns at 8:49 a.m.)

22      THE COURT:  Good morning, ladies and gentlemen.
23 Before I continue with the balance of my instructions, I
24 wanted to review a number of housekeeping matters with
25 you.  First of all, with regard to the question of which

1  jurors will be the 12 that deliberate and hopefully reach

2  verdicts in this case.  I have reviewed the chart that

3  you gave me, I forget when it was, but it was a week or

4  two ago and have reviewed that with counsel.  Here are

5  the decisions that I'm going to make with regard to this.

6          First of all, I note that the week of August 21st

7  to 25th is a disaster, so that simply can't be fixed by

8  any combination of any 12 of you.  What appears to me to

9  be a workable schedule -- so listen to this schedule

10  carefully with me and discuss it when you take a break

11  and let your foreman know, who can let the courtroom

12  deputy know whether there's any issue with this.  But it

13  would appear that this would be a workable schedule of

14  days of deliberations.  Before I give you this, I want to

15  remind you again at this time that you require to

16  deliberate in this case is entirely up to you.

17          I don't want you to feel any time pressure

18  whatsoever.  I want you to take as much time as you

19  believe is reasonably necessary to arrive at fair and

20  just verdicts, because you have a number of verdicts to

21  reach.  And I want to make certain that you don't feel

22  rushed, but this is what I think, based upon this chart

23  you gave me, is a workable schedule.  One of you has an

24  appointment tomorrow that requires deliberations to  end

25  at 2:30 I believe.  If that changes, of course, this

1 would change what I'm telling you but I believe that a
2 reasonable schedule for you to deliberate because I don't
3 want you to deliberate today.

4        You're going to be exhausted at the end of the
5 day, having heard arguments, and we're going to go close
6 to six today and I want to make certain that when we're
7 finished you go home, you sleep on it and come back and
8 you're ready to go.  But I believe this would be a
9 reasonable schedule.  Tomorrow 8:30 to 2:30; Friday 8:30
10 to 5:00, and now we bump all way the forward to next
11 Wednesday, because Monday and Tuesday were minefields on
12 your schedules.  Wednesday, Thursday and Friday the same
13 thing, 8:30 to 5:00.  And then if you still haven't
14 reached a verdict, then we would kick over to the
15 following Monday.  You don't have to avoid Mondays.  As a
16 deliberating jury, you can be here Monday through Friday
17 and you would just continue until you reach your verdict.
18 Of course, you might reach your verdict this week.
19 That's fine.  But as I said, I want to give you plenty of
20 time for you to take the time you need to deliberate and
21 reach fair and just verdicts.

22        Now, with regard to who will be the 12 jurors who
23 deliberate.  Based on the chart that you've given me, the
24 jurors who will deliberate, and I will tell you what
25 happens to the other others, but right now we have a jury

1  panel of 15 people.  You recall we started with four

2  extras and we lost one along the way.  But the jurors who

3  would actually deliberate would be 1,  2,  3,  4,  5, 7,

4  10, 11, 12, 13, 14, 15.  The jurors who will not

5  deliberate but about whom I will speak more in a moment

6  would be 6 and 9 and 16.  Now, it is always possible that

7  the 12 that I have designated to deliberate will begin

8  the deliberations and then something happens.  Somebody

9  has a serious illness, whatever but it makes it

10 impossible for that person to continue to participate as

11 a juror.  If that happens, I need to be in a position to

12 plug in one of these other persons, and that's why I want

13 all of you to hear all of the closing arguments so that

14 you're all fully qualified and prepared to step in should

15 there be a need to do so.

16        Therefore, when arguments are concluded today, the

17 remaining three jurors, namely 6, 9, and 16 do not need

18 to come back, but I want to continue you under the

19 admonition that you should not discuss this case with

20 anybody, nor permit anybody else to discuss it with you

21 until a verdict has been reached.  The reason is that, as

22 I said, if one of you became unable to continue to

23 deliberate, I could replace you with one of the remaining

24 three.

25        And if that were to happen, you would have to, by

1 law, restart your deliberations from scratch but that

2 person could come in, take over and then be able to reach

3 verdicts that I'm sure all the parties would like to have

4 you reach at some point.  So that is the decision that I

5 have made after consulting with the parties.  I want

6 jurors 6, 9, and 16 to pay close attention today, but you

7 can understand that at the end of the day you are free at

8 least not to deliberate, but I want you to understand you

9 should be on standby to come back.

10      If you are curious as to whether a verdict has

11 been reached, you can call my chambers of the court and

12 find out if a verdict has been reached.  Once it has been

13 reached, then you're free to talk about this as much or

14 as little as you want with anybody you want once the jury

15 verdict has been returned.

16      Now, I have -- I have had handed out to you two

17 documents, and I want to explain those two documents to

18 you.  I also want to point out there's a couple of errors

19 and we will give you corrected copies, but I will tell

20 you what the errors are.  We were reviewing that with the

21 parties before you came in.  The first one is the verdict

22 form.  As you can see, this is a lengthy document that

23 asks you to answer 141 questions, and it is arranged in

24 the order in which the counts of the indictment appear.

25 And in general, the counts of the indictment are in

1 chronological order.  The first count is the conspiracy
2 count, and it covers a range of dates.  Whereas, the
3 other counts, if I recall correctly, are specific dates
4 that certain things are alleged to have occurred.
5        You will see that some counts name more than one
6 defendant so that you have to make verdicts as to
7 individual defendants on each count.  And let me point
8 out to you there's a couple of typographical errors that
9 we're going to fix.  We'll give you a new copy of this,
10 but you probably should have this with you even  with a
11 couple of typos.  We'll give a clean one to you, and when
12 the case finally goes to you we will give to the foreman
13 a pristine original one that is the one to be used for
14 your verdict.  Don't mark on that one.  Put that one
15 aside as the one you're going to use for your verdicts.
16 The other ones you make notes on and scribble on it and
17 do anything you want.
18        But let me point out that there's a couple of
19 typos that need to be fixed in the verdict form.  First
20 of all, let me direct your attention to Page 22 in
21 question 126.  In the parenthetical there, it should say,
22 on or about May 16, 2004.  In other words, the date is
23 missing in this question.  Same thing applies to question
24 129.  It should say, on or about May 16, 2004.  And on
25 Page 25, the last page of the verdict form in Question

1 140, it should say, on or about June first 2004.  Those

2 changes will be made and they will be in the final

3 verdict form that would be provided to your foreman.

4        The second thing that I have prepared for you is

5 not a verdict form, but I've labeled it a verdict form

6 index.  The reason I prepared this for you is that you're

7 going to be hearing arguments presented to you by the

8 government and then by each individual defense attorney

9 and they will be addressing the question of the guilt or

10 innocence of the defendant by defendant.  That's not the

11 way the indictment reads.  And in order to make it easy

12 for you to understand the arguments as to each individual

13 defendant, this verdict form index indicates what are the

14 counts that apply to what defendant so you can look at it

15 defendant by defendant by defendant.

16        This form also has a couple of typos that are

17 again with regard to dates.  If you look at Page 5 at the

18 top of the page where it says Count 56, that should add

19 into it on or about May 16, 2004, and we'll give you

20 clean copies of this for your use as well.  And on Page

21 8, Count 56 should say, on or about May 16, 2004 at the

22 bottom of the page.  But as I said, this is designed to

23 assist you in following the arguments defendant by

24 defendant, rather than by count order.  Ultimately

25 though, you need to translate your thought processes to

1  the verdict form and answer the questions that are

2  contained in the verdict form.

3        A couple of other things.  I think I was asked

4  what do we do if you have questions.  I will be giving

5  you formal instructions on that near the end of the

6  instructions I'm about to resume and conclude.  But if

7  you have a question, first of all, as I said, because my

8  brother always laughed at me:  Read the instructions.

9  You will have them in writing.  They will be provided to

10  you by tomorrow morning because I have to do some cutting

11  and pasting putting the document together.  But you will

12  have the instructions to look at, and you will all have a

13  copy of the instructions so you can read them.

14        So if you have questions, first, go back and take

15  a look and see if it's answered by the instructions.  If

16  you do have a question, then you should put it in

17  writing, have your foreman give it to the court security

18  officer who will be attending to you while you're

19  deliberating.  That will then be provided to me.  I'll

20  review it with the attorneys and we will give you an

21  answer.  That will be the process with any substantive

22  question.  Of course, if your question is, when do we get

23  lunch?, I don't have to call the attorneys together to

24  answer that question.  But anything substantive that you

25  have questions about, you can communicate that way.

1          When you do reach a verdict, don't send the
2   verdict form in an envelope to me.  Send a note that
3   says, we have a verdict.  The verdict form itself is
4   actually presented in open court, and the verdicts are
5   read one by one.  So it takes a while to receive the
6   verdict in a case like this one.
7          With that, I would like to now resume and conclude
8   the instructions that I began yesterday.  I think you
9   will see why I broke when I did, because now I begin to
10  discuss the specific crimes that a are alleged, and I
11  thought it would be helpful to do that before beginning
12  the closing arguments by attorneys.  And as I think I've
13  reminded you before, the closing arguments are not
14  evidence but they are the lawyer's art at the highest
15  level, and that it is their time to remind you that you
16  have heard all the matters that are of evidentiary
17  significance.  What you will hear from now on is my
18  instructions, and then arguments.
19         Let's go through the balance of the instructions
20  that address the specific crimes that are charged.  Count
21  One of the indictment charges all of the defendants with
22  a conspiracy to violate the laws of the United States
23  governing controlled substances.  Count One charges that
24  from at least January 1997 continuing through in or about
25  June 2004, in the district of Maryland, the District of

1 Columbia, California, Florida, New York, Texas, Wyoming

2 and elsewhere, Paulette Martin, also known as Paulette

3 Murphy, also known as Paulette Okufu, also known as Paula

4 Murphy, also known as Auntie; Learley Reed Goodwin, also

5 known as Goody, also known as Lonnie Ross; Reece Coleman

6 Whiting, also known as Guy Counts, also known as Cups,

7 also known as Dino Whiting; Derrick Lewis Bynum, also

8 known as Bo, also known as Bolo; Ruby Bartine Harden;

9 LaVon Dobie, also known as Becky Park, also known as

10 Teresa Waller, also known as Dobie Parker; and LaNora N.

11 Ali, also known as LaNora Ali Gardner, the defendants

12 herein, did knowingly, willfully and unlawfully conspire,

13 confederate and agree with each other and with others,

14 both known and unknown to the grand jury, to distribute

15 and possess with intent to distribute controlled

16 substances, to-wit:  5 kilograms or more of a mixture or

17 substance containing a detectable amount of cocaine, a

18 Schedule II controlled substance, 1 kilogram or more of

19 heroin, a Schedule I controlled substance, and 50 grams

20 or more of cocaine base, a Schedule II controlled

21 substance, in violation of 21 U.S.C. Section 1841.

22       I will first explain the statute, then I will

23 explain the law of conspiracy which applies to this

24 count.  In this case, the defendants are accused of

25 having been a member of a conspiracy to violate certain

1 federal laws.  A conspiracy is a kind of criminal
2 partnership, combination or agreement of two or more
3 persons to join together to accomplish some unlawful
4 purpose.

5      The crime of conspiracy to violate a federal law
6 is an independent offense.  It is separate and distinct
7 from the actual violation of any specific federal laws
8 which the law refers to as substantive crimes.  Indeed,
9 you may find the defendants guilty of the crime of
10 conspiracy to commit an offense against the United States
11 even though the substantive crimes which were the object
12 of the conspiracy were not actually committed.  More
13 over, you may find the defendants guilty of conspiracy
14 despite the fact that they were incapable of committing
15 the substantive crime.

16      Congress has deemed it appropriate to make
17 conspiracy standing alone a separate crime even if the
18 conspiracy is not successful.  This is because collective
19 criminal activity poses a greater threat to the public's
20 safety and welfare than individual conduct and increases
21 the likelihood of success of a particular criminal
22 venture.

23      In order to satisfy its burden of proof as to the
24 conspiracy charged in Count One, the government must
25 establish each of the following two essential elements

1 beyond a reasonable doubt.  First, that at least two or

2 more persons entered the unlawful agreement charged in

3 Count One of the indictment.  That is an agreement to,

4 one, distribute or possess with intent to distribute

5 cocaine; two, distribute or possess with intent to

6 distribute heroin; or three, distribute or possess with

7 intent to distribute cocaine base.

8         Second, that the defendants knowingly and

9 willfully became members of the conspiracy.  The first

10 element which the government must prove beyond a

11 reasonable doubt to establish the offense of conspiracy

12 is that two or persons entered the unlawful agreement

13 charged, which is to distribute and possess with intent

14 to distribute cocaine, heroin and cocaine base.

15         In order for the government to satisfy this

16 element, you need not find that the alleged members of

17 the conspiracy met together and entered into any express

18 or formal agreement.  You need not find that the alleged

19 conspirators stated in words or writing what the scheme

20 was, its object or purpose, or every precise detail of

21 the scheme or the means by which its object or purpose

22 was to be accomplished.  What the government must prove

23 is that there was a mutual understanding, either spoken

24 or unspoken between two or more people to cooperate with

25 each other to accomplish an unlawful act.

1        You may of course find that the existence of an

2   agreement to disobey or disregard the law has been

3   established by direct proof.  However, since conspiracy

4   is by its very nature is characterized by secrecy, you

5   may also infer its existence from the circumstances of

6   this case and the conduct of the parties involved.  In

7   the very real sense then, in the context of conspiracy

8   cases, actions often speak louder than words.  In this

9   regard you may, in determining whether an agreement

10  existed here, consider the actions and statements of all

11  those you find to be participants as proof that a common

12  design existed on the part of the persons charged to act

13  together for the accomplishment of an unlawful purpose.

14       The second element which the government must prove

15  beyond a reasonable doubt to establish the offense of

16  conspiracy is that the defendants knowingly, willfully

17  and voluntarily became members of the conspiracy.  If you

18  are satisfied that the conspiracy  charged existed, you

19  must ask yourself who is the members of each of the

20  conspiracy were.  In deciding if the defendants were in

21  fact members of a conspiracy, you should consider whether

22  the defendants knowingly and willfully joined the

23  conspiracy.  Did they participate in it with knowledge of

24  its unlawful purpose and with a specific intention of

25  furthering its business or objective as an associate or

1  worker.   In that regard, it has been said that in order

2  for the defendants to be deemed participants in the

3  conspiracy, they must have had a stake in the venture or

4  its outcome.

5       You are instructed that while proof of a financial

6  interest in the outcome of the scheme is not essential if

7  you find that the defendants had such an interest that is

8  a factor which you may properly consider in determining

9  whether or not the defendants were members of the

10  conspiracy charged in the indictment.

11       As I mentioned a new moments ago, before the

12  defendants can be found to have been conspirators, you

13  must first find that they knowingly joined in the

14  unlawful agreement or plan.   The key question, therefore,

15  is whether the defendants joined the conspiracy with an

16  awareness of at least some of the basic aims and purposes

17  of the unlawful agreement.   It is important for you to

18  note that the defendant's participation in the conspiracy

19  must be established by independent evidence of their own

20  acts or statements and the reasonable inferences which

21  may be drawn from them.

22       The defendants's knowledge is a matter of

23  inference from the facts proved.   In that connection, I

24  instruct you that to become a member of the conspiracy,

25  the defendants need not have known the identity of each

1  and every member, nor need he or she have been apprised
2  of all of their activities.  More over, the defendants
3  need not have been fully informed as to all of the
4  details or the scope of the conspiracy in order to
5  justify an inference of knowledge on their part.
6          Furthermore, the defendants need not have joined
7  in all of the conspiracies unlawful objectives.  The
8  extent of the defendant's participation has no bearing on
9  the issue of the defendant's guilt.  A conspirator's
10 liability is not measured by the extent or duration of
11 its participation.  Indeed, each member may perform
12 separate and distinct acts and may perform them at
13 different times.  Some conspirators played major roles,
14 while others played minor parts in the scheme.  An equal
15 role is not what the law requires.  In fact, even a
16 single act may be sufficient to draw the defendants
17 within the gamut of the conspiracy, and only a slight
18 knowing and willful connection need be shown linking a
19 particular defendant to the conspiracy to support a
20 finding that the defendant was a member of a conspiracy,
21 though the government must prove the connection, however
22 slight, beyond a reasonable doubt.
23         Thus, the defendants may be convicted of
24 conspiracy without full knowledge of all of the
25 conspiracy's details if they join the conspiracy with an

1 understanding of the unlawful nature thereof and

2 willfully join in the plan on at least one occasion, even

3 though they may not have participated before, might not

4 participate again, and played only a minor role.

5        One may become a member of a conspiracy without

6 full knowledge of all the details, a person who has no

7 knowledge of or intent to join the conspiracy, just

8 happens to act in a way that is of benefit to the

9 conspiracy or to a conspirator in and out.  Therefore,

10 thereby becomes a conspirator.  Evidence of friendship or

11 association or even a familial relationship with alleged

12 conspirators without evidence of knowing participation

13 does not permit an inference of guilt.

14        Furthermore, a simple buyer/seller relationship

15 alone does not make a conspiracy.  A buyer/seller

16 relationship, however, may be sufficient if it is coupled

17 with other evidence indicating a common purpose such as

18 an ongoing or continuing buyer/seller relationship,

19 multiple sales, sales on credit, or fronting, an

20 awareness that the drugs purchased by the buyer are to be

21 resold, or knowledge of a broader illegal venture.

22        Additionally, where the quantity involved is

23 sufficiently large, an inference be drawn that an

24 implicit agreement exists for one defendant to supply

25 another defendant with narcotics for resell on an ongoing

1 basis.  In addition to selling narcotics, participation

2 in the conspiracy may assume a myriad of other forms,

3 assuming the other elements of the conspiracy are proven.

4          I want to caution you, however, that a defendant's

5 mere presence at the scene of an alleged crime does not

6 by itself make him or her a member of the conspiracy.  I

7 also want to caution you that mere knowledge or

8 acquiescence without participation in the unlawful plan

9 is not sufficient.  More over, the fact that the acts of

10 the defendant without knowledge merely happened to

11 further the purposes or objectives of the conspiracy does

12 not make the defendant a member.  More is required under

13 the law.  What is necessary is that the defendants must

14 have participated with knowledge of at least some of the

15 purposes or objectives of the conspiracy and with the

16 intention of aiding in the accomplishment of those

17 unlawful ends.

18          In sum, before you may find the defendants guilty

19 of conspiracy, the government must have proved beyond a

20 reasonable doubt that the defendants, with an

21 understanding of the unlawful character of the

22 conspiracy, must have intentionally engaged, advised or

23 assisted in it for the purpose of furthering the illegal

24 undertaking, thereby knowing and willing participants in

25 the unlawful agreement.  That is to say, conspirators.

1        Count One of the indictment charges that the
2  defendants committed the crime of conspiracy in one of
3  three ways.  The first is that they conspired to
4  distribute or possess with intent to distribute cocaine.
5  The second is that they conspired to distribute or
6  possess with intent to distribute heroin.  The third is
7  that they conspired to distribute or possess with intent
8  to distribute cocaine base, also known as crack.
9        If the government fails to prove that at least one
10 of the three objectives was an objective of the
11 conspiracy in which the defendants participated, then
12 you must find the defendants not only guilty on the
13 conspiracy count.  On the other hand, the government need
14 not prove all of the objectives of the conspiracy for you
15 to find a defendant guilty of the conspiracy count.  It
16 is sufficient if you find beyond a reasonable doubt that
17 a defendant conspired to commit at least one objective in
18 order to convict that defendant on the conspiracy count.
19       However, in order to convict a defendant on this
20 count, all 12 of you must agree on the specific object
21 the defendant you are considering agreed to try to
22 accomplish.  All of you must agree that the defendant you
23 are considering conspired to distribute and possess with
24 intent to distribute cocaine, or all of you must agree
25 that the defendant you are considering conspired to

1 distribute and possess with intent to distribute heroin;

2 or finally, all of you must agree that the defendant you

3 are considering conspired to distribute and possess with

4 intent to distribute cocaine base.

5        In some cases the law a defendant is charged with

6 breaking actually covers two separate crimes.  One is

7 more serious than the second, and the second is generally

8 called a lesser included offense.  As I have previously

9 advised you, Count One of the indictment charges the

10 defendants LaVon Dobie and LaNora Ali with conspiracy to

11 distribute and possess with intent to distribute

12 controlled substances, and I have explained to you the

13 elements which the government must prove beyond a

14 reasonable doubt before you may convict either of them of

15 that crime.

16        If you find that the government has not satisfied

17 its burden of proof on any of those elements, as to the

18 defendants LaVon Dobie and LaNora Ali, then you should

19 render a verdict of not guilty.  However, you must then

20 proceed to determine whether Ms. Dobie or Ms. Ali has

21 committed the lesser crime of conspiring to possess a

22 controlled substance.

23        In order for Ms. Dobie or Ms. Ali to be found

24 guilty of the lesser charge of conspiring to possess a

25 controlled substance, the government must still prove

1 beyond a reasonable doubt that in accordance with my

2 earlier instructions to you defining conspiracy and a

3 possession that she, one, knowingly and willfully

4 conspired with one or more persons to possess a

5 controlled substance; and two, that she in fact possessed

6 a controlled substance.

7        Counts two, four, eight, ten, 14, 16, 25, 29, 31,

8 33, 36, 38, 40, 43, 45, 55, 56 and 62 of the indictment

9 charges the defendants Paulette Martin, Learley Reed

10 Goodwin, Derrick Lewis Bynum, Ruby Bertine Harden, and

11 LaNora Ali with possession of certain controlled

12 substances, heroin, cocaine, or cocaine base, with intent

13 to distribute.  Certain of the counts charge a possession

14 with an intent to distribute more than one controlled

15 substance.  These charges against one or more of these

16 defendants are charged in counts two, four, eight, ten,

17 16, 25, 29, 31, 33, 36, 38, 40, 43, 45, 55, 56, 62 of the

18 indictment.  You also need to understand the elements of

19 these offenses in evaluating Count One of the indictment

20 charging conspiracy to distribute and possess with intent

21 to distribute cocaine, heroin and cocaine base.

22        I will now explain the crime charged in counts

23 two, four, eight, ten, 14, 16, 25, 29, 31, 33, 36, 38,

24 40, four, 45, 55, 56 and 62 of the indictment.   In order

25 to prove a charge of possession with intent to distribute

1  against a defendant you are considering, the government

2  must establish beyond a reasonable doubt each of the

3  following three elements of the crime.  One, that the

4  defendant possessed a controlled substance.  Two, that

5  the defendant knew that he or she possessed a controlled

6  substance.  And three, that the defendant intended to

7  distribute the controlled substance.  Cocaine, heroin and

8  cocaine base are controlled substances.

9       The first thing you must determine is whether the

10 defendant you are consider considering possessed the drug

11 charged in each particular count.  That is, the

12 government must prove that the material that a defendant

13 is charged with possessing is in fact the drug charged in

14 that count.  The government may prove this either through

15 direct or circumstantial evidence.  An example of direct

16 evidence is the testimony of a chemist who has done a

17 chemical analysis of the material.

18      Circumstantial evidence would be evidence from

19 which you could infer that the material was a particular

20 drug, such as testimony concerning the names used by

21 buyers or sellers to refer to the material or testimony

22 about the material's appearance.  Whether the government

23 relies on direct or circumstantial evidence to prove the

24 material was the charged drug, it must prove so beyond a

25 reasonable doubt.

1          As I've instructed you, to convict someone of

2    possession with intent to distribute drugs you must find

3    that the defendant possessed the drugs.  The legal

4    concept of possession differs in some elements from the

5    everyday usage of the term, so I will explain it in some

6    detail.

7          Actual possession is what most of us think of as

8    possession that is having physical custody or control of

9    an object.  For example, if you find that a defendant had

10   the drugs on his or her person, you may find that he or

11   she had possession of the drugs.  However, a person need

12   not have actual physical custody of an object in order to

13   be in legal possession of it.

14         If an individual has the ability to exercise

15   substantial control over an object that he or she does

16   not have in his or her physical custody, then he or she

17   may be in possession of that item.  In addition, you must

18   -- you also must find that the defendant knew of the

19   existence of the drugs of which he or she otherwise had

20   custody or control.

21         You cannot find that the defendant possessed the

22   drugs unless you find that he or she exercised

23   substantial control over them either on his own or acting

24   with others.  An example of this from everyday experience

25   would be a person's possession of items he keeps in the

1 safe deposit box of his or her bank.  Although the person
2 does not have physical custody of those items he or she
3 knows of the contents and exercises substantial control
4 over them and so has what is known as constructive
5 possession of them.  Possession of the drugs cannot be
6 found solely on the ground that the defendant was near or
7 close to the drugs, nor can it be found simply as the
8 defendant was present at a scene where drugs were
9 involved or solely because the defendant associated with
10 a person who does control the drugs or the property where
11 they are found.
12 However, these factors may be considered by you in
13 connection with all the other evidence in making your
14 decision whether each defendant possessed drugs.
15       More than one person can have control over the
16 same drugs.  If this is so, then these people have what
17 is called joint possession.  For purposes of determining
18 a defendant's guilt, joint possession is no different
19 from sole possession.  However, a defendant does not have
20 joint possession of drugs simply because he or she is
21 associated with a person who does have possession and
22 control over the drugs.
23       If you find that a defendant possessed drugs, you
24 must then determine whether the defendant knew that he or
25 she possessed illegal drugs.  The government must prove

1 beyond a reasonable doubt that the defendant knew that he

2 or she possessed illegal drugs and that his or her

3 possession was not due to carelessness, negligence, or

4 mistake.  If you find that the defendant did not know

5 what he or she possessed drugs, then you must find that

6 defendant not guilty.

7        Although the government must prove that the

8 defendant knew that he or she possessed illegal drugs,

9 the government does not have to prove that the defendant

10 knew the exact nature of the drugs in his or her

11 possession.  It is enough that the government proves that

12 the defendant knew that he or she possessed  some kind of

13 illegal drug.

14        Your decision whether a defendant knew the

15 materials he or she possessed were illegal drugs involve

16 a decision about the defendant's state of mind.  It is

17 obviously impossible to prove directly the operation of a

18 defendant's mind, but a wise and intelligence

19 consideration of all the facts and circumstances shown by

20 the evidence and the exhibits in the case may enable you

21 to infer what a defendant's state of mind was.

22        In our every day affairs we are continuously

23 called upon to decide from the actions of others what

24 their state of mind is.  Experience has taught us that

25 frequently actions speak louder and more clearly than

1 spoken or written words.  Therefore, you may rely in part

2 on circumstantial evidence in determining a defendant's

3 state of mind.  For example, if a defendant was the sole

4 occupant of a residence or a vehicle, it is reasonable to

5 conclude that the defendant knew about items in the

6 residence or vehicle.  A defendant's behavior may also

7 indicate knowledge.  Nervousness in the presence of the

8 drugs or flight from the sight at which authorities have

9 identified drugs may indicate that a defendant knew that

10 the materials in question were narcotics.

11      Also, the possession of a large quantity of drugs

12 may indicate that a defendant knew what he or she had in

13 his possession.  These examples are neither exhaustive

14 nor conslusive.  It is up to you, based on all the

15 evidence, to determine whether a defendant knew that he

16 or she possessed narcotics.

17      Finally, you may infer knowledge from proof that a

18 defendant deliberately closed his or her eyes to what

19 would otherwise have been obvious to him or her.  Stated

20 another way, a defendant's knowledge of a fact may be

21 inferred from willful blindness to the existence of that

22 fact.

23      Willful blindness exists when a defendant whose

24 suspicion has been aroused deliberately fails to make

25 further inquiries.  If you find that a defendant had a

1 strong suspicion that someone withheld important facts

2 yet shut his or her eyes for fear of what he would learn,

3 you may conclude that he or she acted knowingly.

4 Actual knowledge and deliberate or conscious avoidance of

5 knowledge are the same thing.

6        If you find that a defendant knowingly possessed

7 drugs, then you must decide whether that defendant

8 intended to distribute them.  To prove this third

9 element, the government must prove beyond a reasonable

10 doubt that the defendant had control over the drugs with

11 a state of mind or purpose to transfer them to another

12 person.

13       Since you cannot read the defendants' minds, you

14 may make inferences from his or her behavior.  However,

15 you may not convict the defendant unless these inferences

16 convince you beyond a reasonable doubt that that

17 defendant intended to distribute the drugs.  The same

18 considerations that apply to your determination whether a

19 defendant knew he or she possessed drugs apply to your

20 decision concerning that defendants' intention to

21 distribute them.

22       When I say that you must find that a defendant

23 intended to distribute the drugs, this does not mean that

24 you must find that that defendant intended personally to

25 distribute or deliver the drugs.  It is sufficient if you

1  find that the defendant intended to cause or assist in

2  the distribution of the drugs.  The word "distribute"

3  means to deliver a controlled substance.  "Deliver" is to

4  defined as the actual constructive or attempted transfer

5  of a controlled substance.  Simply stated, the words

6  "distribute" and "deliver" mean to pass on or to hand

7  over to another or to cause to be passed on or handed

8  over to another or to try to pass on or hand over to

9  another narcotics.

10        For example, if A tells or orders B to hand over

11  the drugs to C, then A has caused the drugs to be handed

12  over and therefore has distributed them.

13  Distribution was does not require a sale.  Activities in

14  furtherance of the ultimate sale, such as vouching for

15  the quality of the drugs, negotiating for or receiving

16  the price, and supplying or delivering the drugs may

17  constitute distribution.  In short distribution, requires

18  a concrete involvement in the transfer of drugs.

19        Basically what you are determining is whether the

20  drugs that were in a defendant's possession were for his

21  or her personal use or for the purpose of distribution.

22  Often it is possible to make this determination from the

23  quantity of drugs found in a defendant's possession.  The

24  possession of a large quantity of drugs does not

25  necessarily mean that a defendant intended to distribute

1  them.   On the other hand, a defendant may have intended

2  to distribute the drugs even if he or she did not possess

3  large quantities of them.

4         Other physical evidence, such as paraphernalia

5  from packaging or processing of drugs may show an intent.

6  There might also be evidence of a plan to distribute.

7  You should make your decision whether a defendant

8  intended to distribute the drugs in his or her possession

9  from all the evidence presented.

10        Counts three, five, seven, nine, 11, 12, 13, 15,

11 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 30, 32, 34,

12 35, 37, 39, 42, 44, 46, 47, 48, 49, 50, 51, 52, 53, 54,

13 57 and 58 of the indictment charges all of the defendants

14 with unlawful use of a communication facility to

15 facilitate a violation of the narcotics laws on various

16 dates.

17        Well, before I go into that, I have one additional

18 instruction with regard to the possession with intent to

19 distribute.   As I mentioned earlier, in some cases, the

20 law a defendant is charged with breaking actually covers

21 two separate crimes.   One is more serious than the

22 second, and the second is generally called a "lesser

23 included offense."   Count 56 of the indictment charges

24 the defendant LaNora Ali with possessing with intent to

25 distribute controlled substances, and I have explained to

1  you the elements which the government must prove beyond a

2  reasonable doubt before you may convict her of that

3  crime.  If you find that the government has not satisfied

4  its burden of proof on any of those elements, then before

5  you -- excuse me, let me start that sentence again.

6          If you find that the government has not satisfied

7  its burden of proof on any of these elements, then you

8  should render a verdict of not guilty.  However, you must

9  then proceed to determine whether Ms. Ali committed the

10 lesser crime of possessing a controlled substance.  In

11 order for Ms. Ali to be found guilty of the lesser crime

12 of possessing a controlled substance, the government must

13 still prove beyond a reasonable doubt that in accordance

14 with my earlier instructions to you defining possession

15 that she one possessed a controlled substance, and that

16 she knew that she possessed a controlled substance.

17         Now let me resume with the instruction that I was

18 beginning concerning the unlawful use of a communications

19 facility to violate narcotics laws on various dates.  The

20 relevant statute on this subject is Title 21 of the

21 United States Code Section 843(b).  That statute provides

22 as follows.  It shall be unlawful for any person

23 knowingly or intentionally to use any communication

24 facility in committing or in causing or facilitating the

25 commission of any act or acts constituting a felony under

1 the narcotics laws.  In order to prove this charge

2 against a defendant, the government must establish beyond

3 a reasonable doubt each of the following elements of the

4 offense.

5        First, that the defendant used a communication

6 facility, in this case a telephone, as charged in the

7 indictment; second, that the defendant used the telephone

8 in the process of committing to facilitate the commission

9 of the conspiracy offense charged in Count One of the

10 indictment; and third, that the defendant did so

11 knowingly and intentionally.

12        The first element that the government must prove

13 beyond a reasonable doubt is that the defendant used the

14 telephone as charged in the indictment.  Use occurs when

15 a defendant either personally uses the telephone or

16 instructs someone else to use one.  In addition, for

17 purposes of this element both the caller and the

18 recipient of the call used the telephone.

19        The second element the government must prove

20 beyond a reasonable doubt is that a defendant used the

21 telephone in the process of committing or to facilitate

22 the commission of the conspiracy offense charged in Count

23 One of the indictment, that is conspiracy to distribute

24 and possess with intent to distribute controlled

25 substances.

1          To facilitate the commission of a crime means to
2  use a telephone in a way which aids, assists or makes
3  easier the commission of that crime.  This element is
4  satisfied if you find that a defendant's use of the
5  telephone facilitated either his or her own or another
6  person's commission of the conspiracy offense charged in
7  Count One.

8          The government is not required to prove that a
9  defendant committed the offense, only that he or she
10 facilitated its commission.  A person may facilitate the
11 conspiracy to distribute and possess with intent to
12 distribute drugs without regard to what the person does
13 or intends to do with the drugs after they are purchased.
14 For example, a person who uses a telephone to facilitate
15 the conspiracy and then consumes the drugs is as culpable
16 as the one who uses the telephone to facilitate the
17 conspiracy and then sells the drugs to another to
18 consume.

19         The final element the government must establish
20 beyond a reasonable doubt is that a defendant used the
21 telephone knowingly and intentionally.  That is the
22 government must prove that a defendant knew that he or
23 she was using the telephone to further the commission of
24 the crime and intended to further the crime by use of the
25 telephone.

1          Counts 59 and 61 of the indictment charge two

2 defendants, Derrick Lewis Bynum and LaVon Dobie, with two

3 separate offenses occurring on or about June 1st 2004 in

4 the district of Maryland, the District of Columbia and

5 elsewhere.  Specifically, that the defendants did

6 knowingly and intentionally possess a firearm in

7 furtherance of a drug trafficking crime.

8          That is conspiracy to distribute controlled

9 substances is more fully set forth in Count One of the

10 indictment.  Title 18 of the United States Code, Section

11 924(c) provides that any person "in furtherance of any

12 drug trafficking crime for which the person may be

13 prosecuted in a court of the United States possesses a

14 firearm shall be guilty of an offense."

15          The government must prove each of the following

16 elements beyond a reasonable doubt to sustain the burden

17 of proving each of these defendants guilty of these

18 counts, Counts 59 and 61.  Please consider the defendants

19 separately as to each of these counts.

20          First, that the defendant committed  the drug

21 trafficking crime charged in Count One which is a crime

22 for which he might be prosecuted in a court of the United

23 States.  Second, that the defendant knowingly possessed a

24 firearm in furtherance of the drug trafficking crime

25 charged in Count One.

1        You are instructed that a firearm is any weapon
2  which will or is designed to or may be readily converted
3  to expel a projectile by the action of an explosive.
4        The first element the government must prove beyond
5  a reasonable doubt is that a defendant committed a drug
6  trafficking crime for which he or she might be prosecuted
7  in a court of the United States.
8        The defendants are charged in Count One with
9  conspiracy to distribute and possess with intent to
10 distribute heroin, cocaine and crack cocaine.  I instruct
11 you that this crime is a drug trafficking crime.
12       If during your deliberations you determine that
13 the government has failed to prove beyond a reasonable
14 doubt that Derrick Lewis Bynum or LaVon Dobie is guilty
15 as to the crime charged in Count One under my previous
16 instructions, then you will proceed no further as to that
17 defendant.  You are only to consider counts 59 and 61 if
18 you find that the defendant charged in that count is
19 guilty as to Count One.
20       It is for you to determine whether the government
21 has proven that the defendant committed  the crime
22 charged in Count One of the indictment.  In reaching your
23 verdict on counts 59 and 61, you are to consider evidence
24 of Count One only for the purpose of determining whether
25 the first element of counts 59 and 61 has been satisfied.

1         The second element that the government must prove

2    beyond a reasonable doubt is that the respective

3    defendant knowingly possessed a firearm in furtherance of

4    the commission of a drug trafficking crime.  That is the

5    crime charged in Count One.  I have already defined

6    knowing possession for you.

7         To possess a firearm in furtherance of the drug

8    trafficking offense simply means that the presence of a

9    firearm played some part in forwarding, promoting,

10   facilitate organize advancing the commission of the drug

11   trafficking crime.  That is that the presence of the

12   firearm was not really coincidental to the drug

13   trafficking crime.

14        Possessing a gun in furtherance of a drug

15   trafficking offense includes but is not limited to having

16   a firearm available to assist or embolden or aid or

17   protect the defendant in committing the drug trafficking

18   crime.

19        In determining whether the defendant possessed a

20   firearm in furtherance of the drug trafficking offense,

21   you may consider all of the evidence received in the

22   case, including but not limited to, the nature of the

23   underlying drug trafficking alleged, the proximity of the

24   defendants to the firearm in question, the proximity of

25   drugs or drug proceeds to the firearm in question, the

1 usefulness of the firearm in furthering the crime

2 alleged, the types and number of firearms found, whether

3 the firearm was stolen or altered, whether the gun was

4 legitimate by owned or registered to the defendant,

5 whether the gun was loaded, whether the gun was

6 sufficiently accessible to so that it could be easily

7 used to defend against anyone who may attempt to rob the

8 defendant or his or her drugs or drug profits, and any

9 other and all circumstances and reasonable inferences

10 surrounding the presence of a firearm.

11        The government is not required to show the

12 defendant actually displayed or fired any weapon.  The

13 government is required, however, to prove that a firearm

14 was in the defendant's possession or in the defendant's

15 control at the time that the drug trafficking crime was

16 committed and that the possession of the gun was not

17 merely incidental to the drug trafficking crime.

18        Count 60 of the indictment charges Derrick Lewis

19 Bynum, aka Bo, aka Bolo, with being a person convicted of

20 a crime who also possessed a weapon on, upon, in and

21 affecting commerce and reads as follows.  The grand jury

22 for the District of Maryland charges that on or about

23 June 1, 2004, in the District of Maryland and elsewhere,

24 Derrick Lewis Bynum, the defendant, having been convicted

25 of a crime punishable by a term of imprisonment for a

1 term exceeding one year, did knowingly and unlawfully

2 possess a firearm, to wit: One Glock Model 26 serial,

3 number CAZ959US, in and affecting interstate and foreign

4 commerce.

5        The relevant statute on this subject is Title 18

6 of the United States Code, Section 922(g), which makes it

7 unlawful for any individual who has been convicted in any

8 court of a crime punishable by a term exceeding one year

9 to possess any firearm or ammunition in or affecting

10 commerce.

11        Congress was of the view that the ease with which

12 persons, including criminals, were able to acquire

13 firearms was a significant factor in the prevalence of

14 violent crime in the United States and that federal

15 control over gun dealers and restriction of the

16 distribution of firearms would be helpful to state and

17 local authorities in meeting this problem.

18        Accordingly, it passed a series of laws aimed at

19 giving support to federal, state and local law

20 enforcement officials in combatting crime and violence.

21 We are not concerned with the wisdom or policy of those

22 laws.  If in fact a violation occurred, the law should be

23 enforced.  In general, these laws include provisions

24 which prohibit certain categories of people from

25 possessing or receiving firearms were shipped in

1 interstate commerce and require any person in the
2 business of dealing in firearms to be licensed.
3        The government contends that the defendant Bynum
4 was within the class of people prohibited from possessing
5 firearms shipped in interstate commerce because he had
6 been convicted of a crime punishable by more than one
7 year in jail.  The government must prove each of the
8 following elements beyond a reasonable doubt before you
9 may find the defendant guilty.
10       First, that the defendant was convicted in any
11 court of a crime punishable by imprisonment for more than
12 one year.  Second, that the defendant knowingly possessed
13 a firearm or ammunition as charged in count 60.  And
14 third, that the defendant charge was -- that the
15 possession charge was in or affecting interstate or
16 foreign commerce.
17       The first element you must find beyond a
18 reasonable doubt is the defendant was convicted of a
19 crime punishable by imprisonment for more than one year
20 prior to the date on which he is charged with possessing
21 the weapon and/or ammunition charged in the indictment in
22 this case.  The government need not prove that the
23 defendant knew that his prior conviction was a felony.
24       The second element that the government must prove
25 beyond a reasonable doubt is that on or about the date

1 set forth in the indictment the defendant possessed the

2 firearm or ammunition chared in Count 60.  A firearm is

3 any weapon which will or is designed to, or may be

4 readily converted to expel a projectile by the action of

5 an explosive.

6         To possess means to have something within a

7 person's control.  This does not necessarily mean that a

8 defendant must hold it physically, that is have actual

9 possession of it.  As long as the firearm is within the

10 defendant's control, he possesses that item.

11         If you find that the defendant Bynum either had

12 actual possession of the firearm or that he had the power

13 and intention to exercise control over the item even

14 though it was not in his physical possession, you may

15 find that the government has proven possession.

16 Dominion and control by the defendant over a residence in

17 which a firearm is found is a sufficient basis for

18 inferring possession of the firearm.  The law also

19 recognizes that possession may be sole or joint.

20         If one person alone possesses it, that is sole

21 possession.  However, it is possible that more than one

22 person may have the power and intention to exercise

23 control over the firearm, this is called joint

24 possession.  If you find that the defendant had such

25 power and intention, then he possessed the firearm under

1 this element even if he possessed it jointly with

2 another.  Proof of ownership of the firearm is not

3 required.  To satisfy this element, you must also find

4 that the defendant Bynum knowingly possessed the firearm.

5 This means that he possessed the firearm purposely and

6 voluntarily and not by accident or mistake.  It also

7 means that he knew that the weapon was a firearm as we

8 commonly use that word.  However, the government is not

9 required to prove that the defendant knew that he was

10 breaking the law.

11         The third element the government must prove beyond

12 a reasonable doubt is that the defendant possessed the

13 firearm and/or the ammunition charged in Count One in or

14 affecting interstate commerce.  This means that the

15 government must prove that at some time before the

16 defendant Bynum's possession the firearm or ammunition

17 traveled in interstate commerce.

18         It is sufficient for the government to satisfy

19 this element by proving that at any time before the date

20 charged in the indictment the firearm and/or the

21 ammunition crossed a state line.

22         As to Counts 1, 2, 4, 8, 10, 14, 16, 25, 29, 31,

23 36, 38, 40, 43, 45, 55, 56, and 62, the government has

24 also alleged the defendants committed the charged

25 offenses under the aiding and abetting statute.  This

1  statute provides an alternative basis for criminal

2  responsibility in those instances in which the person

3  charged did not personally commit the crime.

4        Under the aiding and abetting statute, it is not

5  necessary for the government to show that a defendant

6  himself physically committed the crime with which he is

7  charged in order for you to find the defendant guilty.  A

8  person who counsels, commands, induces, procures, aids or

9  abets, or willfully causes another to commit an offense

10 is just as guilty of that offense as if he or she

11 personally committed it.

12       Accordingly, you may find a defendant guilty of

13 the offense charged if you find beyond a reasonable doubt

14 that the government has proved that another person

15 actually committed the offense with which the defendant

16 is charged and that the defendant counseled, commanded,

17 induced, procured, aided, abetted or willfully caused the

18 commission of the offense.

19       As you can see, the first requirement is you find

20 that another person has committed the crime charged.

21 Obviously, no one can be convicted of aiding or abetting

22 the criminal acts of another if no crime was committed by

23 another in the first place.  But if you do find that a

24 crime was committed but a defendant did not personally

25 commit it, then you must consider whether each defendant

1 aided or abetted the commission of the crime.

2        In order to aid or abet another to commit a crime,

3 it is necessary that the -- it is necessary that the

4 defendant willfully and knowingly associate himself in

5 some way of the crime and that he or she willfully and

6 knowingly seek by some act to help make the crime

7 succeed.  I have already defined the "knowing" and

8 "willful" but will do so again.  Participation in a crime

9 is willful if action is taken voluntarily or

10 intentionally or in the case of a failure to act with a

11 specific accident, intent to fail to do something the law

12 requires to be done.  That is to say with a bad purpose

13 either to disobey or disregard the law.

14        You may also conclude a defendant acted knowingly

15 if you find that a defendant had a strong suspicion that

16 someone withheld important facts yet shut his or her eyes

17 for fear of what he or she would learn, you may conclude

18 he or she acted knowingly.  The mere presence of a

19 defendant where a crime is being committed, even coupled

20 with knowledge by that defendant that a crime is being

21 committed or the mere acquiescence by the defendant in

22 the criminal conduct of others even with guilty knowledge

23 is not sufficient to establish aiding and abetting.

24        An aider and abetter must have some interest in

25 the criminal venture.  To determine whether a defendant

1 aided or abetted the commission of the crime with which
2 he or she is charged, ask yourselves these questions.
3 Did he or she participate in the crime charged because
4 the crime charged was something he or she wished to bring
5 about?  Did he or she associate himself or herself with a
6 criminal venture knowingly or willfully?  If he or she
7 did, then that defendant is an aider and abetter and
8 therefore guilty of the offense.  If, on the other hand,
9 your answer to this series of questions are no, then that
10 defendant is not an aider and abetter and you must find
11 him or her not guilty as an aider and abetter.
12        There is another method which you may determine
13 the possible guilt of each defendant for the substantive
14 charges in teh indictment even if you do not find the
15 government has satisfied its burden of proof with respect
16 to each element of the substantive crime.
17        A conspirator is a person who knowingly or with
18 willful blindness intentionally agrees with one or more
19 persons to accomplish an unlawful purpose.  A conspirator
20 is responsible for offenses committed by his or her
21 fellow conspirators if he or she was a member of the
22 conspiracy when the offense was committed and if the
23 offense was committed in furtherance of and as a
24 foreseeable consequence of the conspiracy.
25        Accordingly, if in light of my instructions you

1 find beyond a reasonable doubt that a defendant was a
2 member of the conspiracy charged in Count One of the
3 indictment and thus guilty of the conspiracy count, then
4 you may also but are not required to find him or her
5 guilty of the substantive crimes charged against him or
6 her in counts two, four, eight, ten, 14, 16, 25, 29, 31,
7 33, 36, 38, 40, 43, 45, 55, 56 and 62, provided you find
8 beyond a reasonable doubt each of the following elements.
9        First, that the crime charged in the substantive
10 count was committed.  Second, that the person or persons
11 you find actually committed the crime, members of the
12 conspiracy you found to have existed.  Third, that the
13 substantive crime was committed pursuant to the common
14 plan and understanding you found to exist among the
15 conspirators.  Fourth, that the defendant was a member of
16 that conspiracy at the time the substantive crime was
17 committed.  Fifth, that the defendant could have
18 reasonably foreseen that a substantive crime might be
19 committed by his or her coconspirators.
20        If you find all of five of these elements to exist
21 beyond a reasonable doubt, then you may find a defendant
22 guilty of the substantive crime charged against him or
23 her even though he or she did not personally participate
24 in the acts constituting a crime or did not have actual
25 knowledge of it.

1        The reason for this rule is simply that a

2   coconspirator who commits a substantive crime pursuant to

3   a conspirac is deemed to be the agent of the other

4   conspirators.  Therefore, all of the coconspirators must

5   bear criminal responsibility for the commission of the

6   substantive crime.  If, however, you are not satisfied as

7   to the existence of any of these five elements, then you

8   may not find a defendant guilty of the substantive crime

9   unless the government proves beyond a reasonable doubt

10  that the defendant personally committed or aided and

11  abetted the commission of the substantive crime charged.

12       When I read some of the counts of the indictment

13  there was a reference to quantity of drugs.  For example,

14  Count One charges that each of the defendants did, one,

15  distribute or possess with intent to distribute 5

16  kilograms or more of a mixture or substance containing a

17  detectable amount of cocaine; two, distribute or possess

18  with intent to distribute 1 kilogram or more of a mixture

19  or substance containing a detectable amount of heroin; or

20  three, distribute or possess with intent to distribute 50

21  grams or more of a substance containing a detectable

22  amount of cocaine base.

23       For each count that alleges a quantity of drugs,

24  if you find the charged defendant or defendants guilty,

25  you must also determine the quantity of drugs involved in

1 the particular count, and you will see that on the

2 verdict form which I handed out to you.

3        With regard to Count One, if you find that the

4 defendant has -- that the government has proven a

5 defendant guilty of cocaine, heroin, and or cocaine base,

6 and if you find that cocaine was one of the objectives of

7 the conspiracy, then you must determine beyond a

8 reasonable doubt the quantity of cocaine that is

9 attributable to each defendant.

10        Likewise, if you deterine that herion was one of

11 the objectives then you must also determine, beyond a

12 reasonable doubt, the quantity of heroin that is

13 ttributable to each defendant.  You must also determine

14 the quantity of cocaine base, commonly known as crack,

15 attributable to each defendant.  In determining what

16 quantity of cocaine, heroin or cocaine base is

17 attributable to each defendant, you should consider the

18 following factors.

19        First, a defendant is accountable for any quantity

20 of drugs which he or she personally distributed or

21 possessed with intent to distribute.

22        Second, a defendant is also accountable for any

23 type and quantity of drugs which he or she attempted to

24 or planned to distribute or possess with intent to

25 distribute.  Specifically, a defendant is accountable for

1 those drugs even if those drugs were never actually
2 obtained or distributed, so long as an objective of the
3 conspiracy was for the defendant to distribute or possess
4 with intent to distribute such quantity of drugs.

5        Third, a defendant is also accountable for any
6 quantity of drugs which another member of the conspiracy
7 distributed or possessed with intent to distribute as
8 part of the conspiracy so long as it was reasonably
9 foreseeable to the defendant that such quantity of drugs
10 would be involved in the conspiracy with he or she
11 joined.

12        Fourth, a defendant is also accountable for any
13 quantity of drugs which another member to have conspiracy
14 attempted to or planned to distribute or possess with
15 intent to distribute so long as it was reasonably
16 foreseeable to the defendant that such quantity of drugs
17 would be involved in the conspiracy which he joined.

18        A defendant is at accountable for those drugs even
19 if those drugs were never actually obtained or
20 distributed by other members of the conspiracy so long as
21 an objective of the conspiracy was for the other members
22 of the conspiracy to distribute or possess with intent to
23 distribute such quantity of drugs.

24        These last rules apply even if a defendant did not
25 personally participate in the acts or plans of his or her

1 coconspirators or even if a defendant did not have actual

2 knowledge of those acts or plans so long as those acts or

3 plans were reasonably foreseeable to that defendant.  As

4 I discussed above, the reason for this is that a

5 coconspirator is deemed to be the agent of all other

6 members of a conspiracy.  Therefore, all of the

7 coconspirators bear criminal responsibility for acts or

8 plants that are undertaken to further the goals of the

9 conspiracy.

10       In Counts 4, 8, 10, 16, 55, 56 and 62, various

11 defendants are charged with possession of controlled

12 substances.

13       If you find the charged defendant guilty you must

14 then determine beyond a reasonable doubt the amount of

15 heroin, cocaine or cocaine base that was possessed.  Your

16 findings about the quantities of controlled substances

17 attributable to each defendant are noted on the verdict

18 form which I distributed to you.

19       The question of possible punishment of the

20 defendants is of no concern to the jury and should not in

21 any sense enter into or influence your deliberations.

22 The duty of imposing sentence rests exclusively upon me.

23 Your function is to weigh the evidence in the case and to

24 determine whether or not the defendant is guilty beyond a

25 reasonable doubt solely upon the basis of such evidence.

1 Under your oath as jurors, you cannot allow consideration

2 of the punishment which may be imposed upon a defendant

3 if he or she is convicted to influence your verdict in

4 any way or in any sense enter into your deliberations.

5        To prevail, the government must prove the

6 essential elements by the required degree of proof as

7 already explained to you.  If it succeeds, your verdict

8 should be guilty.  If it fails, it should be not guilty.

9        To report a verdict, it must be unanimous.  Your

10 function is to weigh the evidence in the case and

11 determine whether or not the defendants are guilty solely

12 upon the basis of such evidence.  Each juror is entitled

13 to his or her opinion.  Each should, however, exchange

14 views with his or her fellow jurors.  That is the very

15 purpose of jury deliberation, to discuss and consider the

16 evidence, to listen to the arguments of fellow jurors, to

17 present your individual views, to consult with one

18 another, and to reach an agreement  based solely and

19 wholly on the evidence, if you can do so without violence

20 to your own individual judgment.

21        Each of you must decide the case for yourself

22 after consideration with your fellow jurors of the

23 evidence in the case, but you should not hesitate to

24 change an opinion which after discussion with your fellow

25 jurors appears erroneous.  However, if after carefully

1 considering all the evidence and the arguments of your

2 fellow jurors you entertain a conscientious view that

3 differs from the others, you are not to yield your

4 conviction simply because you are outnumbered.

5        Your final vote must reflect your conscientious

6 conviction as to how the issues should be decided.  Your

7 verdict, whether guilty or not guilty, must be unanimous.

8        As I mentioned, a verdict form has been prepared

9 and distributed to you for your convenience.  You will

10 take this form to the jury room, and when you have

11 reached a unanimous agreement as to a verdict you should

12 have your foreman fill it out, date and sign  the form.

13 And your foreman, as I indicated, is juror 1.

14        As I noted earlier, in addition to rendering a

15 verdict on whether each defendant has or has not been

16 proven guilty of each count, I am asking you to provide

17 answers to a series of questions about the types and

18 amounts of controlled substances involved in each charge.

19 Your answers to these questions must be unanimous.

20 Please answer the questions on the verdict form.

21        After all of you agree on the answer to the

22 questions on the verdict form the foreperson should write

23 the answer and sign and date the form.  After you have

24 completed the verdict form, please advise me by sending a

25 note through the marshal that you have reached a verdict.

1 Send me a note, not the verdict.  When I receive that
2 note I will have you return to the courtroom where you
3 will actually deliver your verdict.

4        If it becomes necessary during deliberations to
5 communicate with me, you may send a note by a marshal
6 signed by your foreperson or by one or more members of
7 the jury.  No member of the jury should communicate with
8 me by any means other than a signed writing, and I will
9 not communicate with any members of the jury on any
10 subject touching on the merits of the case otherwise than
11 in writing or orally here in open court.

12        As I said, you can ask about sandwiches and things
13 like that.  But anything on the merits is in writing and
14 we do it in open court.  You will note from the oath that
15 will be given when we finish the closing arguments that
16 the marshal is charged with the responsibility to not
17 permit any person to communicate in any manner with any
18 member of the jury on any subject touching the merits of
19 the case.

20        Bear in mind that you may not reveal to any
21 person, not even to me, how the jury stands numerically
22 or otherwise on the question of the guilt or innocence of
23 the accused until after you have reached a unanimous
24 verdict.

25        Now, ladies and gentlemen, that concludes the

1 formal instructions that I'm going to give you.  Let me

2 confer with the attorneys for a moment, and we will then

3 take a recess and begin the closing arguments.

4          Please approach the bench, counsel.

5                    (At the bar of the Court.)

6          MS. GREENBERG:  Can you believe after all that

7 there's a typo?

8          THE COURT:  Where is there a typo?

9          MS. GREENBERG:  This says Count One, and the

10 instruction says --

11          THE COURT:  What page are you on?

12          MS. GREENBERG:  87.

13          THE COURT:  Where is the typo?  What's the count

14 number?

15          MS. GREENBERG:  60.

16          THE COURT:  60.  All right.

17          MS. GREENBERG:  I knew there would be one in there

18 somewhere.

19          THE COURT:  Any other concerns with the

20 instructions as given?

21          MR. MONTEMARANO:  Just for the record, the defense

22 would reassert the objections it's had to the various

23 instructions and the form of the instructions, etcetera,

24 just to --

25          THE COURT:  Right.

1          MR. MONTEMARANO:  Reassert.

2          THE COURT:  All of your objections that we gave

3 before the instructions are deemed asserted now and

4 overruled by me now.  I'm going to do two things.  I'm

5 going to tell them there was one error, and I also

6 neglected to tell them there's 60 counts not 16.  I will

7 make those two clarifications, and we will then take a

8 brief recess.

9          How much time do you need to get ready?

10          MS. GREENBERG:  Run to the restroom and get some

11 charts out.  Counsel will want to see the charts.

12          THE COURT:  Five after ten?  All right.

13                    (Back in open court.)

14          THE COURT:  Ladies and gentlemen, two things.  As

15 I concluded yesterday, I mentioned there were 61 counts.

16 And if you were listening carefully, which I can't

17 believe you were listening this carefully, there's only

18 60.  So I'm sure we're sparing you a count.  You should

19 not concern yourself with how we got to this precise

20 number of counts, but there is 60 counts that you are

21 considering.

22          Secondly, I had one typographical error I wanted

23 to correct with you.  This was the charge of -- to the

24 charge against Mr. Bynum concerning possession of a

25 firearm after having been convicted of a crime punishable

1 by more than one year.  I referenced that as being in

2 Count One.  That charge is actually in count 60.

3      Please consider my instructions corrected to that

4 extent.  These will all be in the written instruction

5 that you will get by the time you come here tomorrow

6 morning, so you can review these again.

7      All right.  We're going to take a recess until

8 five minutes after ten so that the government may set up

9 and proceed to deliver its closing arguments at that

10 time.  Thank you.

11                     (Off the record at 9:58 a.m.)

12                     (On the record at 10:10 a.m.)

13      MS. GREENBERG:  Your Honor, I've gone over my

14 closing charts with all counsel, so they've reviewed

15 them, the ones that are new.

16      THE COURT:  All right.  Counsel, the jury says

17 they cannot go beyond 4 o'clock on Friday, which is not a

18 problem with me.

19      MS. JOHNSTON:  Your Honor, I would suggest, with

20 the defense counsel, that we stay with the courtroom

21 deputy and give her all the exhibits so they -- and give

22 them all to her so they will be locked in here so they

23 with start tomorrow morning.

24      THE COURT:  Right.  You should meet with her and

25 make sure all the exhibits are in.

1                 (Jury returns at 10:14 a.m.)

2        THE COURT:  All right.  You may proceed, Ms.

3 Greenberg.

4        MS. GREENBERG:  Thank you, Judge Titus.  Ladies

5 and gentlemen, good morning.  First, I'd like to say

6 "thank you", but those two words really don't convey what

7 I mean by those two words.  This is week ten of your

8 summer.  It's been a long, hot summer outside, but

9 hasn't been so hot in here.  It's been interesting, I

10 hope, for you.  I know it's not the way that most of you

11 planned or wanted to spend your summer.  We all have work

12 obligations, or school obligations, family obligations,

13 your life obligations, and you've taken out the time to

14 sit with us through this trial.

15        I've looked over occasionally during the testimony

16 and you've all paid attention.  I've been amazed at the

17 interest and enthusiasm that you brought to your work,

18 your work as a citizen.  The judge has told you often

19 about the duties of citizenship and this is one, that is

20 true.  It's so important to our system  of justice to

21 have people willing to serve like you have all served

22 this summer and, on behalf of myself and the government

23 team over here, I wanted to thank you.  Again, those two

24 words don't even begin to say how much we appreciate the

25 time and attention that you've brought this case.

1        Now, for the bad news:  You're going to have a day
2  of listening to lawyers; a day of closing arguments.
3  What closing arguments are -- you've seen it on TV, and
4  it's probably done on TV in five minutes, like everything
5  on TV is done in much quicker time than you've seen
6  during the course of this trial; and like I said, this is
7  the real world.  This isn't TV.  You will have a full day
8  of listening to lawyers.  What closing is, is basically
9  the parties want to give you an idea of what they think
10 the evidence showed.  You will have all the evidence --
11 all the evidence except for the drugs and the guns.  If
12 you need to see that, you will have an opportunity to do
13 that.  After I get done with my closing, all the
14 attorneys on the defense side will get a chance to do
15 their closing, and then Ms. Johnston will come up and
16 speak to you in what's called "rebuttal."  Now, it's not
17 just because Ms. Johnston likes to get the last word in,
18 she does, as we all would, but it's because the
19 government has the burden of proof, and it's a burden of
20 proof we take on willingly.
21       If you think we went into too much detail or  put
22 on too much evidence, it's because we have the burden of
23 proof and we have to prove each and every charge in this
24 indictment.  Sixty counts are presented to you, and we
25 welcome that, and that's why we get the last word so to

1 speak.  It's going to be awful late tonight, so take a
2 deep breath and we will roll into closing arguments.
3 Perhaps not the best way to do things.  It would be nice
4 to sit back in a room with all of you and all the
5 attorneys, and perhaps the judge, and you could ask
6 questions and we could give answers, but that's not how
7 our system of justice is designed, so this is how we have
8 to do it.  But there's a good part about -- a really good
9 part about the jury service, and this jury in particular
10 is, I think that collectively I've watched you and I've
11 watched you watch the evidence; I've watched a number of
12 you take notes.  Collectively, you will all remember
13 what's happened in the last ten weeks.  It might take a
14 while to think back to Nathan King and Horace Smith.  It
15 might take you a while, but you will remember what people
16 testified about nd you will take back with you the most
17 important thing that you have besides the evidence,
18 besides the witness testimony, besides the transcripts,
19 besides the CDs.  What you have, ladies and gentlemen, is
20 something that we can't give you and that's common sense.
21 Your common sense and your life experiences.

22        As the judge told you during your instructions,
23 you should use that in evaluating all the evidence in
24 this case.  You don't have to believe something just
25 because somebody said it.  Evaluate it using your common

1 sense and your life experience.  Don't believe what is

2 ridiculous to you.  Think about how the witness testimony

3 shapes up in terms of all the evidence, and use your

4 common sense in evaluating the evidence.  Nothing is as

5 good as your common sense.  You, individually, each have

6 common sense and collectively, when you talk about

7 things, you can evaluate things and think of what makes

8 sense.

9       As Ms. Johnston told you at the beginning of this

10 case, almost ten weeks ago, we are asking you to hold

11 these seven defendants accountable for being involved in

12 this conspiracy and the very substance of acts that rise

13 from that, and this is like an *Avon* distributorship.  I

14 think you, if you remember back, that's what she told

15 you.  Some people have major roles and some people have

16 minor roles.

17       If we look at this charge which you've seen

18 repeatedly throughout the trial, it helps you put things

19 in order.  As she told you, Mr. Goodwin and Ms. Martin

20 are the center part of this case.  They're partners.

21 Their roles are clear cut.  They obtain drugs and

22 distribute drugs to others.  As she told you, most of the

23 evidence, because it was focused on this, comes out about

24 them.  But you also hear about other people and their

25 involvement in the drug conspiracy:  Reece Whiting, for

1  example.  Early on, Mr. Whiting, who's right here --
2  early on, he was a distributor.  Do you remember Mr.
3  Echarte's testimony?  He would come and he would get
4  drugs from Paulette Martin; he would use drugs in her
5  house, and he would go out and distribute to other people
6  in order to buy more drugs.  He also became an advisor to
7  Ms. Martin.  She would call him when people were
8  arrested.  What do we do?
9  He had a vast amount of experience in the drug world and
10  he was an attorney.  He attempted to assist her with the
11  various people that were arrested and connected with the
12  drug conspiracy and then later on the conspiracy, as you
13  heard through the wiretap tapes, he was trying to help
14  her get another source of supply when Ms. Levi was
15  arrested, the heroin supplier.
16         Derrick Bynum.  Again, he was discovered as
17  another person involved in the conspiracy:  Large
18  quantities of cocaine and cocaine base.  Ladies and
19  gentlemen, if you recall in the transcripts, he was cut
20  off when he returned bad drugs to Ms. Martin.  She had to
21  get Claude Arnold to distribute them, and he owed her
22  money.  But during the first part of the wiretap book,
23  you will hear -- we'll go through various conversations
24  where Mr. Bynum is buying large quantities of cocaine and
25  cocaine base from her.

1        LaVon Dobie.  Ms. Dobie is right here.  Becky

2   Dobie.  She distributed all kinds of drugs -- all three:

3   Cocaine, crack cocaine and heroin to her family, friends

4   and others, and she also attempted to assist Ms. Martin

5   in getting another supplier.

6        Ruby Harden.  Here.  She would purchase eight ball

7   quantities from Ms. Martin, and she also consulted from

8   2000 to 2004 -- and there's a chart which I'll show you

9   later with respect to her role where she lists checks

10  that she paid to Ms. Martin, and there's a long- term

11  relationship between Ms. Martin and Ms. Harden with

12  purchasing quantities of cocaine.

13       LaNora Ali.  Not only did she purchase cocaine

14  from Ms. Martin for her personal use, she assisted Ms.

15  Martin in the conspiracy by storing money, moving the

16  drug business to the school, and Ms. Martin consulted

17  with her regarding the arrests.

18       As you can see, all of these people have different

19  roles.  Ms. Martin and Mr. Goodwin, as we said, are the

20  center part of the conspiracy.  Mr. Bynum, Ms. Dobie, Ms.

21  Harden, Mr. Whiting and Ms.- -- I apologize -- Ms. Ali

22  all have different roles in the conspiracy, but they all

23  are involved in the conspiracy, ladies and gentlemen.

24       Conspiracy.  The judge gave you a fairly long

25  instruction about conspiracy.  It's a legal term, but

1 it's a fairly broad legal term.  The instruction the
2 judge gave you:  At least two or more persons entered the
3 unlawful agreement charged in Count One of the
4 conspiracy.  There's three different objectives:
5 Distribute or possess with intent to distribute cocaine;
6 distribute or possess with intent to distribute heroin;
7 or distribute or possess with intent to distribute
8 cocaine base.
9        You don't have to find that all seven defendants
10 agreed to distribute cocaine or that all seven defendants
11 agReed to distribute heroin.  What you have to find is
12 that two or more persons agReed to distribute or possess
13 with intent to distribute cocaine, and then those two
14 defendants are part of that cocaine conspiracy.  Two
15 defendants, again, for heroin, and two defendants for
16 cocaine base, also known as "crack."  So, it's not like
17 you have to find all seven defendants per one of these
18 objects.  Any one of them will do.
19        Second, that the defendant knowingly and willfully
20 became a member of the conspiracy.  Keep in mind, ladies
21 and gentlemen, as the judge instructed you, this doesn't
22 have to be a written contract or spoken agreement.
23 Actions speak louder than words.  Once two or more people
24 get together under the law to accomplish one of these
25 purposes, that's what a conspiracy is.  The second part

1  of that is the defendant knowingly and willfully became a

2  member of the conspiracy and, again, you can tell that by

3  their actions.  They don't have to speak anything.  On

4  many of these times, these things are unspoken.

5         Ladies and gentlemen, there's no question that

6  this all happened in Maryland ,so we have this happening

7  in the district of Maryland.  When you consider whether

8  or not the defendant knowingly and willfully became a

9  member of the conspiracy, remember that the knowledge

10 element is not only made up by actions, instead of

11 sitting down and agreeing to it.  The actions speak about

12 whether or not the person knowingly and willfully became

13 a member of the conspiracy.

14        Use your common sense and remember the judge's

15 instruction on willful blindness.  You don't get to say,

16 I didn't know; I didn't care; I didn't ask.  That's

17 willful blindness, ladies and gentlemen, and that's just

18 as good as knowing.

19        I could give you examples of conspiracy and tell

20 you different facts that would prove a conspiracy, but I

21 think one of the best examples that I could possibly give

22 you was a conversation between Paulette Martin and LaNora

23 Ali in Call B-4430.  In that particular call, Ms. Martin

24 and Ms. Ali are talking about the "Julio thing."  What

25 they're concerned about here is Gwen Levi's arrest.  Can

1  everybody see the chart?  There is ever a perfect place.
2  What Ms. Ali and Ms. Martin are concerned about is the
3  "Julio thing."  Julio is Mr. Echarte's nickname.  I think
4  we all remember Mr. Echarte.  He's the gentleman who
5  talked about Viagra and gave us all a good laugh at the
6  end of the day, but he was also one of the earlier
7  suppliers to the group.

8         What they're concerned about is that Ms. Levi is
9  arrested, and in this call they think Julio told on Gwen.
10  Ms. Ali said that she thought Gwen was an up front
11  person.  Gwen introduced Julio to the people is another
12  part of that call, and the people wanted the recipe for
13  sweet to potato pie.  What they're talking about here is
14  they thought Gwen got arrested for being involved in Mr.
15  Echarte's PCP operation.

16         If you recall, Mr. Echarte said he was arrested
17  for PCP and giving the recipe for the sweet potato pie.
18  In other words, giving the recipe for how to make PCP.
19  That's all it takes to be part of a conspiracy.  Paulette
20  Martin knew that she was talking to Ms. Ali about it, and
21  that's all it takes to be part of a conspiracy.  You
22  don't have to be one of the major players.  You can be
23  one of the minor players.  As long as you are involved
24  with one or more persons in an agreement, unspoken is
25  perfectly fine.  An agreement to possess with intent to

1 distribute drugs -- in this case:  Cocaine, heroin or

2 cocaine base; and in Mr. Echarte's case it was PCP -- and

3 knowingly and fully becoming a member of the conspiracy

4 can be as simple as giving somebody a recipe for sweet

5 potato pie.  That's what they're talking about here.

6

7     Ms. Martin said that's like conspiracy, and that's

8 she's right.  That's all it takes to be guilty of a

9 conspiracy and not anything more, ladies and gentlemen.

10 The goal is very, very simple, and the law prohibits

11 people from trying to accomplish this goal.  The goal is

12 to distribute drugs, and that's what this group is.

13 Everybody had a role and everybody had a part in it,

14 whether large or small.

15     Ladies and gentlemen, I don't want you to think,

16 as the judge said, about punishment.  The judge is the

17 one that considers whether somebody had a larger role or

18 a smaller role, whether they were a worst player or not

19 the worst player, and considering the punishment is not

20 for you to decide.  The simple questions asked of you in

21 the verdict sheet is whether or not they were guilty of

22 this crime and what the foreseeable drug quantity is.

23     I'm going to talk to you for about an hour,

24 because the judge has us on a very strict time schedule,

25 and I'm going to go over the evidence of conspiracy and

1 each person's involvement in the conspiracy and go over

2 the verdict sheet with you.  I'm not going to go over

3 each and every witness that we had over the ten weeks,

4 because that would be about five minutes per week, and

5 it's clearly not possible to do that; but I trust you

6 collectively to remember the witness testimony.  If I

7 forget something that's relevant to a count, then you

8 will share it with each other.

9        In considering the evidence, we talked about the

10 wiretaps, and they're key evidence in this case.  Think

11 about the calls and how the individuals involved in the

12 conspiracy talked.  Think about Sergeant Sakala's

13 interpretation and how that fits in with the evidence

14 that you've seen, not only through the witness testimony,

15 the cooperating witnesses, but also the evidence seized

16 from the various search warrants.

17        Think about especially, ladies and gentlemen, when

18 you heard the defense calls when they talked about

19 clothes from Martha Jean West.  Think about the detail in

20 which they talked about that, and then think about the

21 detail in which they ordered tickets or, "get me one" or

22 "I need to stop by."  The coconspirators knew what they

23 were talking about.  When they're talking about drugs,

24 they engage in shorthand -- many, many witnesses talked

25 about that -- and they use code words.

1      I think in this case you heard words like tickets;
2 they talked about food; sweet potato pie; oranges; and
3 clothes:  I need a dress, or I need something like that.
4 That makes sense, ladies and gentlemen.  When you think
5 about it, Paulette Martin and her coconspirators aren't
6 going to use words like, I need to get a cow, or I need
7 to buy a race car.  No, that doesn't fit in with their
8 everyday business.  They use code words that fit in with
9 their everyday business.  Ladies and gentlemen, I submit
10 to you that when you listen to the calls and review the
11 transcript books, you're going to see the difference, and
12 it's going to make sense to you.  As Sergeant Sakala
13 said, they were talking about drugs.  It's quite clear
14 from the wiretap calls.

15      Search warrants.  They're common items that were
16 recovered versus drug items, and the evidence showing a
17 connection between the various people, the phone numbers
18 -- you will have many, many phone books back there and
19 you will see the connection between all of these parties.
20 Various witnesses have talked about all of these parties.
21 There's scales, there's drugs.  If you remember the
22 toolboxes from Oglethorpe Avenue, which was Mr. Goodwin's
23 son; the kilo of cocaine from his Farragut Place address;
24 the items from Ms. Dobie's residence that tested positive
25 for cocaine and heroin; the various scales that are used

1   to weigh drugs.  Think about how the search warrants

2   corroborate what you hear on the wiretap.

3         Witness testimony.  Think about their role and

4   their involvement in this case, and evaluate their

5   credibility by how they're corroborated by the other

6   evidence in the case.

7         The pictures and the surveillance.  Various

8   surveillance agents were sent out to watch different

9   things, and you saw the videotapes.  Mr. Whiting

10  arriving, for example, after a particular call at Ms.

11  Martin's house, which I'll get into in a little bit;

12  pictures of Ms. Ali at Paulette's School of Performing

13  Arts to corroborate her going with Ms. Martin over to

14  that school.  Again, use the pictures and the

15  surveillance to corroborate what you heard on the wiretap

16  and to corroborate what the agents are telling you is

17  happening.

18        Somebody's involvement, ladies and gentlemen, as

19  the judge told you, in this conspiracy  could be one day,

20  one year, ten years.  You're part of the conspiracy

21  whether you're involved for one day or more, and I submit

22  to you that even this conspiracy is alleged to go back to

23  1997 and that all these defendants were involved in this

24  conspiracy at one point or the other.

25        If you recall, a while ago -- it does go back to

1  1997.  The agents in this case, Detective Eveler and

2  Sergeant Sakala, they didn't start their investigation

3  until October of 2002, but the evidence in this case that

4  was developed showed that they were involved back in

5  1997.

6       Mr. Encarnacion was an early witness, if you take

7  your minds back that far, and he talked about delivering

8  seven to nine kilograms of cocaine to Paulette Martin in

9  the early part of this conspiracy, in about 1998 to 1999.

10      Jack Cowan, a law enforcement officer, talked

11  about a search of Bexhill in which he recovered evidence

12  related to drugs in his investigation against

13  Ms. Beverly White.

14      In 1999 -- you remember Captain Hubbard.  He

15  talked about a seizure at Derrick Bynum's house, his

16  Takoma Park apartment.  When he arrived, Mr. Bynum was

17  there, and he went through and he found the drugs in  the

18  shoe box.  Then he found the gun, and he also found a

19  significant amount of money.  Then they got a search

20  warrant for the car and they found even more drugs.

21  There was well over 50 grams of crack cocaine.  Again,

22  this is at the early part of this conspiracy.  That's

23  tied to Paulette Martin because there were documents in

24  Mr. Bynum's apartment relating to Ms. Martin.

25      Then, if you recall, there was a seizure on July

1  4, 2002 by Takoma Park police involving John Martin.  He
2  possessed 25 kilo wrappers -- empty kilo wrappers with
3  residue on it for cocaine.  He possessed a scale, a
4  four-pound box of baking soda which, you know from the
5  various witness testimony, he used to make crack cocaine.
6  Also in John Martin's possession was Learley Goodwin's
7  telephone, Mr. Mangual's telephone number, and Reece
8  Whiting's business card.  So, again, these are the early
9  days of this conspiracy:  1997 to 2002.
10        Mr. Echarte also talked about his involvement in
11  the early days of this conspiracy.  He testified he
12  brought cocaine to Paulette Martin through the Spanish
13  bus service and that Reece Whiting was there helping him
14  get cocaine to Paulette Martin.  Mr. Echarte testified
15  that Mr. Whiting was selling the cocaine he got from Ms.
16  Martin during this time period.  Again, if I take you
17  back to Nathan King, he was an individual whose father
18  was Steven Brim, who was killed out in California.
19  Nathan King talked about picking up deliveries for his
20  dad to come out to Maryland, and that he would take
21  approximately nine kilograms of cocaine each time.  Mr.
22  Echarte corroborates that testimony, because Mr. Echarte
23  talks about taking half a million dollar amounts of money
24  wrapped -- the money wrappers to somebody named Steve in
25  a truck.  Well, that's Mr. King's father, Steven Brim.

1          All the testimony fits together, not only with the

2 witnesses and each other but also the evidence seized

3 from the  various residences:  For example, Haywood

4 Avenue.  You saw those oxes full of money wrappers, with

5 all the different amounts.  That fits in with Mr.

6 Echarte's testimony that he took these amounts of money

7 to Nathan King's father.  Also, ladies and gentlemen, the

8 jail calls where Nathan King -- you have the transcript

9 books, and you will have the calls back with you where

10 Nathan King gets stopped with 17 kilograms of cocaine,

11 and he has calls with Ms. Martin while he's in jail.

12         Think about what -- we say these numbers, but when

13 you think about what a kilogram of cocaine costs, ladies

14 and gentlemen, just this one stop -- if you might recall,

15 it's the two duffel bags that were hidden in the tractor

16 trailer.  Those 17 kilograms of cocaine, a good price

17 heard from the various witness testimony was $18,000.

18 That's over $250,000 wholesale before it's cut.  We're

19 talking about a quarter of a million dollars.  That's one

20 load of cocaine to Paulette Martin.

21         Horace Smith.  You might recall his testimony.  He

22 was getting cocaine and crack cocaine from Learley

23 Goodwin.  He met him through Chico.  Tiffany Vessels --

24 he was related to Tiffany Vessels, and he met Learley

25 Goodwin through Chico.  He was getting an eighth of a

1  kilo of crack cocaine every three to four days and his

2  cousin, Raynard Dorsey, who we heard something about,

3  bought an eighth of a kilo of crack cocaine also, along

4  with Mr. Smith, and he talked about what good quality it

5  was and how when he took it out to the street, people ran

6  up to get it.  He talked to Mr. Goody about that, and Mr.

7  Goody said, that's because I cook it with Odessa vodka

8  and that that was a special recipe of his.  That's Mr.

9  Smith's testimony about the crack cocaine that he got

10  from Mr. Goodwin.

11       Michael Thurman traveled to Texas numerous times.

12  You might recall the conversations about Mr.  Thurman

13  where Mr. Goodwin referred to him and his associate as

14  "Dumb and Dumber."  They had more problems going back and

15  forth to Texas.  They had the car stolen; they had an

16  accident; they got arrested with some of the bad cocaine

17  they were taking back to Texas.  But when you think about

18  Mr. Thurman's testimony, ladies and gentlemen, and his

19  phone calls back and forth to Learley Goodwin, Paulette

20  Martin corroborates his testimony and the receipts, the

21  Western Union records.  There's so much evidence in there

22  that corroborates what he's saying about these trips for

23  Learley Goodwin, and he's another member of the

24  conspiracy that puts cocaine and crack cocaine in this

25  group.

1         The search at Lobo's car dealership and Anacostia
2    Road corroborate his testimony, because those places are
3    associated with Mr. Goodwin and there were drugs and drug
4    paraphernalia, empty false bottom cans, and drugs seized
5    from those cases.  There was not a long time here that we
6    see for that period of time through the witness testimony
7    of a pattern of large drug shipments to Paulette Martin
8    and Learley Goodwin, the partners in this conspiracy.
9         Use your common sense, good judgment, and
10   experience to evaluate the witness testimony and decide
11   whether or not it fits in with the other evidence in the
12   wiretap, and decide whether or not those persons are
13   believable.  I submit to you, ladies and gentlemen, does
14   it make sense that Learley Goodwin is a marijuana dealer,
15   in light of all this evidence?  Does that make sense?
16   All of these witnesses explained that they were involved
17   in cocaine and crack cocaine trafficking with him.  Mr.
18   Thurman connected him up with a supplier out in Texas.
19   Mr. Smith bought crack cocaine from him and distributed
20   it in the streets of Maryland.  Search warrants at
21   Oglethorpe, toolboxes full of these items, drugs and drug
22   paraphernalia, and Learley Goodwin's false ID in one of
23   the toolboxes:  His picture, somebody else's name.
24        Cocaine in a file cabinet at Farragut Place, where
25   Learley Goodwin kept his important papers; crack at

1  Lobo's; and, as we'll get into in Count Two, Mr. Goodwin

2  arrested with crack cocaine in the bottom of a fake Pepsi

3  bottle.  There was a lot of argument over whether that

4  was Mr. Goodwin's Pepsi bottle or whether he was set up

5  by Mr. Dorsey, but if you remember the testimony of

6  Detective Martini, Mr. Goodwin's daughter told law

7  enforcement where they could find the crack cocaine

8  because they didn't think to look in what looks like a

9  Pepsi bottle for crack cocaine.

10         Does it make sense, ladies and gentlemen, in light

11  of the search warrant evidence and the wiretap evidence

12  that Ms. Dobie is buying Percocet and marijuana?  There's

13  scales at her house, and on those scales Mr. Gervisoni,

14  the head of the Montgomery County lab, found cocaine and

15  heroin residue on two of them.  There's 11 grams of

16  heroin at her house shortly after she tells Paulette

17  Martin, when they're talking about Gwen Levi, that she

18  has ten to 15 left, which fits in with 11 grams of

19  heroin.  Oh, no Percocets found at her house, but yet

20  there are scales with cocaine and heroin and 11 grams of

21  heroin.  Consider, in light of the inconsistency of their

22  testimony the evidence in the case whether you believe

23  that person or whether the facts, the search warrant, the

24  wiretap evidence tell you something different.

25         Now, moving along the wiretap evidence, along with

1 the surveillances and the search warrants.  That covers a

2 period of time of March 9, 2004 to June 2, 2004.  There's

3 a lot that's been said, ladies and gentlemen, at various

4 times during the trial of why Detective Eveler and

5 Sergeant Sakala didn't go down here and find people to

6 whom these people on the bottom part of the chart, the

7 distributors and facilitators told you, and it makes

8 sense doesn't it, ladies and gentlemen, that the

9 investigation would focus up instead of focus down.  You

10 know from the wiretap calls and you know from their own

11 words that they were involved in distributing drugs.

12 They don't need to go find those people to whom they

13 distributed drugs.  The calls establish the sales and in

14 some cases the quantity.  At some point you have to stop,

15 and it doesn't make sense when you have the wiretap calls

16 about those people talking about distributing to go find

17 the people who distributed.

18          Speaking about distributable quantity.  There's

19 also been a lot of talk in this case about eight balls,

20 and I think we all know what an eight ball is at this

21 point:  It's $125.  It's 3.2 grams of product, whether

22 it's cocaine or crack cocaine.  Michael Thurman talked to

23 you about how he distributed an eight ball and how he

24 would -- when he was using drugs, he would use some and

25 he would sell them.  Sergeant Sakala talked to you about

1 that and how he would use some and sell some, but if that

2 wasn't enough.

3        Ladies and gentlemen, I'd like to thank Mr.

4 Martin, because you a also heard from Margaret Battle.

5 That was a couple of weeks ago.  She was one of the first

6 defense witnesses.  She was using drugs and selling drugs

7 to support her habit.  You may recall when Ms. Johnston

8 talked to her about how she supported her drug habit and

9 they talked about a "working 50", and Ms. Battle was very

10 up front.  She said, you hold out your hand, you break it

11 up, and you sell it.  Yes, I buy $50 amounts; I buy $125

12 amounts.  I use some and sell some so I can go buy more

13 drugs.  I don't need a scale.  I don't need a baggy.  I

14 just go out and sell this so I can go back and get more

15 drugs.  In fact, you might recall at some point Ms.

16 Johnston asked her to explain this, and it was the same

17 thing that Sergeant Sakala and Mr. Thurman and other

18 witnesses have talked about, how they distribute drugs in

19 order to buy more drugs.

20        When Ms. Johnston was talking to her, Ms. Battle

21 said, what's your point?  Because it's so obvious in the

22 drug world, ladies and gentlemen, so obvious, Ms. Battle

23 had to say, what's your point?  Of course if I'm buying

24 $50 worth, it's a working 50.  I buy some and I sell

25 some.  I don't use all that.  I buy some and sell some,

1  and the same with an eight ball.  You buy some and sell

2  them some.

3       If I could ask you to pull out your verdict sheet,

4  the one the judge distributed to you this morning.  Does

5  everybody have it?  The first person on this verdict

6  sheet -- I'm going to kind of walk through it with you,

7  because the government is not asking that you find all

8  the drugs on each person, and I hope that by going

9  through what the evidence is as to each person, the drugs

10 and the drug quantities, it will make your deliberations

11 a little bit easier.

12      Paulette Martin, in Question 1, the Government

13 submits is guilty, and guilty of all three types of

14 drugs:  Heroin, cocaine and cocaine base.  You may recall

15 there were various seizures.  There were seizures in

16 Texas and seizures in Wyoming of cocaine.  They weren't

17 by us; they were by other people.  They just sort of

18 happened during the course of the conspiracy.

19      Mr. Thurman was arrested; Mr. King was arrested;

20 Mr. Philpot was arrested, and those are large quantities

21 of drugs, in addition to the witness testimony about the

22 amounts of cocaine that she was bringing in throughout

23 the conspiracy.  It is clear that there was over -- if

24 you get to Question 4, it's clear that there were five

25 kilograms or more of cocaine involved with Ms. Martin.

1 Then you get to the Maryland  deliveries, and that's what
2 Mr. Mangual -- we'll go over that in a little bit.  He
3 was also, according to Sergeant Sakala's testimony,
4 distributing kilogram quantities to Ms. Martin.
5        As to Question 3, with heroin.  You heard
6 testimony about Gwen Levi.  She was arrested with 2.3
7 kilograms of heroin.  She was distributing heroin to
8 Larry Nunn 100 grams at a time.  There's a Call b-750 on
9 Page 87 of your transcript books where she's distributing
10 100 grams to Larry Nunn.  50 tickets to Larry Nunn,
11 that's on B-2461.  She's getting heroin from Gwen Levi.
12        If you may recall, NY-1 is the notebook from Mr.
13 Uriarte, the heroin supplier up in New York, about how
14 much he distributed to Gwen Levi, and there's at least 20
15 kilograms of heroin that Mr. Uriarte brought down to
16 Maryland that went to Gwen Levi, where she processed it
17 in the Digger's Lane house.  As you might recall, the
18 witness testimony from Detective Kucsan was that was like
19 a heroin processing plant.  There were packages and
20 packages and packages of Mannitol, and that place was
21 searched immediately after Gwen Levi was arrested.
22        Well, a large percentage of that heroin went to
23 Ms. Martin.  You have a number of calls where Ms. Martin
24 is talking about distributing drugs.  Not only did she
25 distribute over one kilo, it's reasonably foreseeable

1  that when she was getting drugs from Gwen Levi that Gwen

2  Levi would get this one kilogram of heroin.  So, I submit

3  to you Question 3 is one kilogram or more for heroin,

4  based on the Gwen Levi trips, which is corroborated by

5  Mr. Uriarte and his ledger, as well as the phone calls

6  involving Larry Nunn and others who are getting heroin

7  from Ms. Martin and the cocaine through the various

8  witness testimony that I've already just talked about, as

9  well as the seizures, as well as Mr. Mangual's phone

10 calls during the course of the conspiracy.

11         As for crack cocaine, which is Question 5,

12 there's clearly 50 grams or more.  There is more than 50

13 grams of crack cocaine that were seized from Paulette's

14 School of Performing Arts.  Ladies and gentlemen, to make

15 your life a little bit easier when you're looking through

16 this pile of evidence that you're going to take back to

17 the jury room with you, Chart 14 lists -- gives you a

18 little cheat sheet, so to speak, of the various drug

19 exhibits that were introduced and the amounts, and

20 there's over 50 grams of crack cocaine from Paula's

21 School of Performing Arts, as well as numerous

22 conversations.

23         There was 270 grams of crack cocaine at Paula's

24 School of Performing Arts, as well as numerous

25 conversations where Ms. Martin talking about "hard rock,"

1  "cooked," "finished," and that, according to Sergeant

2  Sakala and the evidence seized in this case,  means crack

3  cocaine.

4        Next we get to Learley Goodwin.  I submit to you,

5  ladies and gentlemen, that the evidence established that

6  he was partners with Paulette Martin.  There was numerous

7  calls where they would talk about how they would divide

8  up the drugs.  Mr. Echarte talked about how they were

9  partners and whenever she would  get drugs delivered to

10 her by Steve Brim, that she would split it with Mr.

11 Goodwin.

12        Mr. Philpot.  They talked about Mr. Philpot and

13 his arrest.  Nathan King talked about being involved with

14 him, and also there's another supplier that Mr. Goodwin

15 used, Cuba, and there was discussion between him and Ms.

16 Martin about using Cuba and having to have the kilogram

17 wrappers originally wrapped in order to get -- in order

18 to get the correct kind of drugs.

19        Further, Mr. Thurman and Horace Smith talked about

20 various quantities involved in -- with respect to Mr.

21 Goodwin.  At Lobo's, the car dealership, there was more

22 than 56 grams of crack.  In Oglethorpe, as you will see

23 on the drug exhibit, there was a large amount of crack --

24 a large amount of drugs -- as you recall, that was Larry

25 Lane, Mr. Goodwin's son's residence -- in the toolboxes.

1 As I said earlier, a kilogram of cocaine in Farragut, and
2 that was in the bottom of the file drawer.  That's where
3 Mr. Goodwin was arrested  in the early morning hours, and
4 that's where he kept his papers.  Lastly, Detective
5 Martini's arrest with the crack cocaine that was in the
6 bottom of the Pepsi bottle.

7        I submit to you, as to Mr. Goodwin, in Question 7,
8 that he is involved in cocaine and cocaine base, not
9 heroin.  There is no evidence that he was involved in the
10 heroin part of this and that he was involved in  five
11 kilograms or more of cocaine under subsection -- Question
12 9, 50 grams.  Clearly, 50 grams or more of crack cocaine
13 involved -- in his involvement in the case.

14        Now we turn to Reece Whiting, and that's your
15 Question Number 11.  Mr. Whiting was a long-time drug
16 dealer going back to the late '60s, when he was a high
17 level drug dealer.  His testimony was that his last
18 arrest in Virginia was when he was paying couriers
19 $10,000 to $20,000 to go to Thailand and Japan and bring
20 back kilograms of heroin for a drug organization.  He had
21 numerous drug suppliers.

22        The testimony established that he met Paulette
23 Martin and he knew her when he was released from jail in
24 1999.  He knew her before that and he knew her after
25 that.  Mr. Echarte testified that he saw Mr. Whiting at

1  Paulette Martin's house when he lived there in about
2  2001, when Mr. Echarte had recently gotten out of jail.
3  Mr. Echarte knew other associates of Paulette Martin, and
4  he knew various people had just gotten out of jail like
5  himself:  Mr. Byrd.  That's another person that just got
6  out of jail.  Mr. Echarte -- Mr. Whiting got out of jail
7  in 1999, just a couple of years before.

8          All of these people that had just gotten out of
9  jail are associating with Paulette Martin.  If you think
10 of a halfway house, ladies and gentlemen, think of a
11 halfway house as some -- a place that helps people when
12 they're coming out of jail and transitioning back to
13 society.  You might have heard of it.  It's just a place
14 where they can leave jail and acclimate, get jobs, and
15 get back in society.

16         Well, Paulette Martin is like a halfway house for
17 drug dealers.  These drug dealers get out of jail, like
18 Mr. Echarte and Mr. Whiting, and they go to Paulette
19 Martin, and she gets them back involved in the drug
20 business.  She helped Mr. Echarte with that, and she help
21 Mr. Whiting with that.  Take into account Mr. Whiting's
22 significant drug experience in considering whether he had
23 the knowledge and intent to become involved in the drug
24 conspiracy.  He's getting bits of cocaine, according to
25 Mr. Echarte.  Like Ms. Battle, he'd show up at her house,

1 he'd use the cocaine, he'd run out, sell it, come back

2 and get more.  He can't pay it off.  Ms. Martin vouches

3 for him with Mr. Echarte; he gives him 100 grams of

4 heroin, and Mr. Whiting, he's been out of the game so

5 long that he can't pay it off.  So what does he do?  Mr.

6 Echarte said it's a matter of principle, ladies and

7 gentlemen.  It's a matter of principle.  I don't need

8 that money.  To him it's just 100 grams to of heroin.

9        Mr. Echarte says to Mr. Whiting, drive with me to

10 the Spanish bus service in Virginia to pay off your debt.

11 I'm picking up heroin for me; I'm picking up cocaine for

12 Ms. Martin.  He knew that Mr. Echarte said, don't get

13 high when we're driving down there because I don't want

14 to attract police attention.  They get back to Ms.

15 Martin's house with the cocaine for Ms. Martin that Mr.

16 Echarte supplied to her.  Mr. Whiting knew that there

17 were drugs in those containers, because that was part of

18 his reward for driving down with Mr. Echarte:  He got to

19 have some drugs.

20        Considering Mr. Echarte's credibility.  He

21 testified before you, he testified that he was involved

22 in drugs.  He testified that he was a major player in the

23 drug world and, considering whether he was going to tell

24 you a falsehood about Mr. Whiting, wouldn't it he have

25 made up a better story?  Wouldn't it have made Mr.

1 Whiting the big drug dealer like he was before his

2 involvement in this case before he went to jail and got

3 out in 1999?  No.  He told you what he knew and saw from

4 living at Paulette Martin's house.  I submit to you,

5 ladies and gentlemen, the evidence establishes that.  Not

6 only that, but the wiretap evidence establishes that Mr.

7 Whiting knew him.  Mr. Whiting had three conversations

8 with Ms. Martin about Julio in which there's no question,

9 ladies and gentlemen, that that is about Mr. Echarte.

10        Over two years after he left Ms. Martin's house,

11 Mr. Whiting is still talking about him.  What they're

12 trying to do, ladies and gentlemen, is they're trying to

13 verify whether or not he's cooperating.  I'll give you

14 the call numbers, but I'd like to show one, and  I'll ask

15 Ms. Holmes to be sort of my "Vanna White", and that way

16 you don't have to pull out your transcript books and you

17 can see them on the screens.

18        There's three -- I'm sorry.  There's three

19 conversations where they're talking about Julio, and

20 that's at B-703 on Page 84, and B-1026 on Page 137.  I'd

21 like to show you what's on Page 213, and that's B- 1781.

22 Do you see that up on your screen there?  That's a call

23 on March 26, 2004 between Mr. Whiting and Ms. Martin.  At

24 the bottom of that first page, on 213, Mr.- -- if you go

25 all the way down to the bottom, Whiting asks, you have

1 anymore from Julio?  And then if you go to the next page,
2 they're talking about his court, and Mr. Whiting is
3 offering advice about what he would get and what the
4 federal people would do and they're talking about his
5 sister may not know.

6        Ladies and gentlemen, what they're doing in these
7 series of calls is they're trying to figure out what's
8 going on with Mr. Echarte and whether or not he's
9 talking, what his sentence is going to be, and what he's
10 going to do.  Because, ladies and gentlemen, if he's
11 going to cooperate, that's a huge issue for the drug
12 organization, because he knows too much, and that was
13 their concern.  That's why they had to talk about what
14 was going on with Julio and what was going on with Mr.
15 Echarte.

16        You also can't ignore, ladies and gentlemen, the
17 evidence in this case in Wood 28.  Mr. Whiting owes Ms.
18 Martin money.  He borrowed $10,000 from her, and as of
19 April '02 he still owed her $11,500, "RCW."  He owed her
20 money.  That's why, ladies and gentlemen, when you hear
21 the various calls where Mr. Whiting's asking Ms. Martin
22 for tickets, she doesn't want to give him any drugs
23 because he owes her money.  There's lots of calls where
24 he's calling to ask for tickets.  In Call B-82 she tells
25 him the tickets aren't printed.  In B-1026, he calls and

1  asks her about the ticket thing.  In Call B-2354 she said
2  as soon as she hears something; it's rough.  They're not
3  talking about concert tickets, ladies and gentlemen.  You
4  hear the calls when people are talking about clothes; you
5  hear the calls when people are talking about other
6  things.  They don't mention the date of the concert.
7  They don't remember the -- they don't mention the venue
8  of the concert.  They don't mention what kind of show it
9  is and if it's Mary K. Blige or some other person.  All
10 they say are "tickets."
11         You can see the difference between the defense
12 book and when they're talking about clothes or other
13 things and when they're talking about drugs.  He keeps
14 calling her to talk about tickets.  He's trying to get
15 drugs, and she's not giving him any drugs because he owes
16 her money, and whether it's for a car or something else
17 is irrelevant.  The question is, is she going to get him
18 drugs when he owes her money?  He keeps calling her for
19 tickets, and she won't give him any.
20         There's another -- there's two conversations where
21 she needs help from Mr. Whiting.  Mr. Whiting, who's a
22 long-term friend and who knows about the drug world and
23 who knows about the law, and he's helping her with Mr.
24 Philpot who got arrested with five kilograms of cocaine;
25 and he's helping with Ms. Levi who got arrested with 2.3

1 kilograms of heroin.  There's a call where they're

2 talking about Philpot and she keeps saying, they'll be

3 back here tonight anytime now.  These are calls, court's

4 indulgence, in mid- to late March.  Page 72, which is

5 Call B-572 and Page 213, which is Call B-1781.  It's

6 clear from those series of calls that Mr. Whiting is

7 talking to Ms. Martin about where are the people that are

8 supposed to bring your drugs back?  Where is Mr. Philpot?

9        Finally, on Page 213, Mr.- -- on March 26, Ms.

10 Martin tells Mr. Whiting that Philpot was down because

11 Trooper David Chatfield arrested him.  She doesn't say

12 that, but you know that's what happened on March 11

13 because Trooper Chatfield testified before you.  That

14 information is crucial to Mr. Whiting.  It's crucial to

15 Ms. Martin, because they have to see what happened with

16 the drug supply; they have to see what happened with Mr.

17 Philpot.

18        More importantly, after Gwen Levi was arrested,

19 there was a situation where they couldn't get drugs.

20 They were out of heroin.  There were no more tickets for

21 heroin, because Ms. Levi was the heroin supplier.  If you

22 remember Call B-4426, and if we could put that on the

23 screen, that's on Page 386, Book II.  It was a call on

24 April 25, 2004 between Ms. Martin and Mr. Whiting where

25 she tells him, I don't have any tickets now.  I don't

1 have no tickets now.  And he says to her, I know that,

2 Baby.  I wanted to talk to you about something -- and he

3 stammers -- that's going to resolve that problem.  Listen

4 to that tape because she says, oh, okay, that's no

5 problem.  That's the -- I was waiting to hear.  Okay.  So

6 I see you here.  And he says, all right.  Ladies and

7 gentlemen, that's what they're talking about here.

8 They're talking about getting more drugs.  She wants to

9 hear what he has to say.  Her heroin supplier has been

10 arrested, and he went to her house.

11        You know that, ladies and gentlemen, because

12 during Mr. Whiting's cross-examination we played Video

13 23, and what appeared to be a Jaguar showed up at the

14 house and it was about 7:30.  He went in -- you will have

15 that video back with you in the jury room -- and at 8:11,

16 when Mr. Whiting -- when the individual came out -- it's

17 a pole camera, so you can't see it well, but at 8:11,

18 when the tape ends, Video 23, there's another call, and

19 that's at B-4438, and that's at Page 389 and it coincides

20 exactly where with the end of that tape.

21        If we could put that up on the screen, it's John

22 Martin, Ms. Martin's boyfriend, talking to her, and she

23 said, uh-huh, I'm glad you did, too; glad you brought

24 your hind parts back in here and took care of business.

25 I've been on the phone off and on on a conference call.

1  Reece just left.  You know, ladies and gentlemen, that

2  was Reece Whiting.  From these two calls, you know that

3  he came in there for a half hour to talk to Ms. Martin

4  about a source of supply.

5       I submit to you on Question 11 that Mr. Whiting is

6  guilty, and he's guilty of being involved in heroin

7  through his role with Gwen Levi and cocaine through his

8  travels with Mr. Echarte for his purchase and sale of

9  drugs from Ms. Martin.  Due to the fact that he's trying

10 to help her get new suppliers and he aided and abetted

11 the situation with Mr. Philpot for Questions 13 and 14,

12 one kilogram or more of heroin and five kilograms or more

13 of cocaine.  There's no evidence showing that he cooked

14 or distributed crack cocaine, ladies and gentlemen, so

15 for crack cocaine there is -- we're not asking you to

16 check Question 15 or check crack cocaine in connection

17 with Question 12.

18      Mr. Bynum.  Again, this was a while ago.  I talked

19 about it earlier in my closing.  Captain Hubbard  talked

20 about going into his house and finding crack cocaine in a

21 shoe box.  You might recall -- and you will have the

22 pictures -- there was 57 grams of crack cocaine up --

23 there was more than 50 grams in a shoe box, and they went

24 in that shoe box that said "Bynum Family Photos" and they

25 also found crack cocaine in the car in the bottom of a

1 false *Gunk* can; approximately $10,000 in the apartment,

2 and two guns.  Mr. Bynum admitted that that was his crack

3 cocaine and that those were his guns and he was convicted

4 of that, and you have the conviction before you.

5      It also is the subject of -- it's also the reason

6 why he wasn't allowed to possess a gun when it was

7 recovered from his house on June 1, and that count  we'll

8 get to later.  He's continuing from back then in 1999

9 until 2002 in buying crack cocaine from Paulette Martin.

10 Sergeant Sakala told you about the various calls, and

11 I'll just review a couple of them here.

12      You have an index in the front of your book, in

13 front of Book I, where you can see the calls relating to

14 Mr. Bynum.  If we could put Call B-341, Page 41 up on the

15 screen, and that's a call on March 11, 2004 between Ms.

16 Martin and Mr. Bynum.  If we could go down to the middle

17 of the page, and Mr. Bynum -- Ms. Martin says to -- Mr.

18 Bynum says to Ms. Martin, when I, when will I be getting

19 it?  And she said, the $62 I usually loan you?  And

20 that's referring to an amount that is typical in the drug

21 industry, a sixteenth of a quantity of crack cocaine -- a

22 sixteenth of a kilo of crack cocaine, and that's what

23 he's getting from her.

24      In the other calls that related to him he talks

25 about tickets with Ms. Martin on B-838, at Page 123; at

1 A-406 on Page 160 talks about other tickets.  If we could
2 also turn, and I want show you all of these calls, but to
3 give you another example on Page 187, B- 1511.  Again,
4 that's another call between Ms. Martin and Mr. Bynum.
5 It's a call on March 24, 2004.  If you look at the middle
6 of the page, Ms. Martin says to him, yeah, uh, what do
7 you want?  The sweet potato pie like you asked me for?
8 And he said, yeah, that and mine.  Sergeant Sakala
9 testified that's code language for quantity.  It's a
10 kilogram plus 62 grams.  Sixty-two grams is usually what
11 he gets, and plus a kilogram.  He is involved in
12 distributing crack cocaine.

13        Now, at his house on Ray Road, when they searched
14 it, if you recall there were book safes similar to that
15 of Paulette Martin, a PTK -- her business pay stub, a
16 scale with residue, a Glock handgun with ammunition, and
17 $14,000.  Ladies and gentlemen, he wouldn't need to
18 borrow $62 if he had $14,000 in his house.  That doesn't
19 make any sense.  What he's talking about there is getting
20 crack cocaine from Ms. Martin.

21        And why the calls stopped, ladies and gentlemen,
22 where he was getting crack cocaine -- as you might
23 recall, there's a series of calls where Mr. Bynum
24 returned bad drugs, and Ms. Martin got Mr. Arnold to
25 distribute the bad drugs that he returned.  It wasn't

1  profitable for her to deal with him anymore.  He wasn't

2  going to sell the drugs.  He returned bad drugs, so she

3  stopped dealing with him.  There are money problems.

4  There's calls back and forth between her and Mr. Bynum.

5  Again, you will see the outline of the calls in the front

6  of your book, but to give you some numbers:  B-1529,

7  B-1709 and B-2179, where she's complaining about the

8  money that he's giving her and whether she's playing or

9  not.  It's clear that she doesn't want to deal with him

10 anymore, because it's not profitable to deal with him.

11        Consider these calls also in light of Mr. Bynum's

12 prior arrest in 1996.  If you might remember, Ms. Horn

13 from the D. C. -- a D. C. police officer, arrested Mr.

14 Bynum because she thought she saw drug activity.  She

15 approached the car, and when she went up she saw Mr.

16 Bynum reach for the center console, she found more than

17 five grams of crack cocaine.  That was in late 1996,

18 right before this conspiracy started.  So, you can

19 consider that in terms of his knowledge and intent to

20 distribute drugs.

21        As to the question, Question 16, as to Mr. Bynum,

22 we ask that you find him guilty.  Again, there's no

23 evidence of Mr. Bynum being involved in heroin, but he is

24 involved in cocaine and cocaine base, and he was getting

25 large, large quantities over a significant period of

1 time.

2        Question 19.  You can find five kilograms or more.

3 Clearly, on Question 20, there is more than 50 grams at

4 his house, in 1999, of crack cocaine, and there is

5 references in the calls to crack cocaine and that he is

6 dealing crack cocaine.  So, Question 20 is 50 grams or

7 more.

8        As to Ms. Harden.  I'm sorry.  It's as to -- as to

9 Ms. Harden.  She bought drugs from Paulette Martin on an

10 ongoing basis.  One of the summary charts that you will

11 have back with you, so I won't go into it with too much

12 detail, are these check payments from Harden to Martin:

13 125.  125.  125.  125.  125.  125.  125.  "Tickets."

14 "Cabaret tickets."  "Truck lettering."  Ms. Martin had

15 nothing to do with truck lettering.  "Truck detailing."

16 She had nothing to do with truck detailing.  Ladies and

17 gentlemen, this is a long-term buyer of drugs from Ms.

18 Martin.  She's bought from her since at least May 26,

19 2000.  The calls B-1255, Ms. Martin and Ms. Harden are

20 talking, and Ms. Martin asks, what show?  And Ms. Harden

21 said, the early one; the short one.  Then she changed her

22 mind to the other one

23 on B-1256 at Page 150, meaning she needed an eight ball,

24 and it's reflected on the chart.

25        If you turn to Page 150, and if we can put that up

1  on the screen, that's a call on March 21, 2004 between

2  Ms. Harden and Ms. Martin.  If you look down here at the

3  date of check, March 21, 2004 for $125, and if you look

4  at the bottom of that page -- if we can go to the bottom

5  of that page on the screen -- she says, you know, I mean,

6  you know, about the other one.  So she changed her mind

7  from the "early show; the short one" to the other one:

8  $125, an eight ball, a distributable quantity cocaine.

9         On B-2132 -- I apologize.  I thought I had all the

10  page numbers down here.  On B-1332, which is on Page 232,

11  and we could put that up on the screen, Ms. Harden leaves

12  a message for Paula that she needs to get the same

13  tickets that she got.  She's got a couple more people

14  interested, so bring me the same tickets, okay?  She's

15  talking about getting an eight ball because she's gotten

16  people that are interested in buying it, and this call is

17  on March 29, 2004.

18         If there's any question, ladies and gentlemen, and

19  if you turn to Page 235 -- if I can put that up on the

20  screen, and if could turn the Page 235 and put that up on

21  the screen, that's a call on March 29, 2004.  Paulette

22  Martin says -- remember, there's just been a call about

23  tickets.  What size suit did you want for your little

24  boy?  So March 29, eight ball distributed to Ms. Harden

25  because she has a couple other people interested.  We

1 switch the code word from "tickets" to "suit" which is
2 what Sergeant Sakala said happens when they're talking
3 about drugs.
4         You might also recall the surveillance in this
5 case where Officer Musselman went to the shopping center
6 and he saw a piece of paper being passed.  Sergeant
7 Sakala explained that wasn't at all unusual  with this
8 drug group.  They had these things in  envelopes, little
9 envelopes, and Ms. Johnston showed Ms. Ali that little
10 envelope in connection with her drug seizure from her
11 house.
12         The little white envelope.  There was one in the
13 picture from Haywood  from the piano bench that John
14 Martin and Paulette Martin kept their drugs in.  That
15 piece of paper that Detective Musselman saw is the
16 envelope in which they put drugs, and that's what Ms.
17 Martin passed to Ms. Harden.  Then in the further
18 conversation with Ms. Harden and Ms. Martin, on Page 481,
19 she talks about whether the tickets came in.  So, Ms.
20 Harden not only had customers but she knew that Ms.
21 Martin would get tickets in, and she said she just needed
22 one.
23         Ms. Martin talks to her in B-3953 that she's
24 working on the tickets with Goody.  Ms. Harden is advised
25 that Ms. Martin and Mr. Goody have a drug organization

1 and she says the people that got them, they're sky high,

2 so that's why we're not getting any tickets.  Ms. Harden

3 knows about the conspiracy.  She has a stake in it.  She

4 tells Paulette Martin she has customers interested in it,

5 and Ms. Martin tells her about the sky high tickets, and

6 she also tells her -- in B-6948, on Page 540, she

7 explained to Ms. Harden why she had to move the operation

8 to the school.

9        So, there's no question, based on the long-time

10 drug dealing with Ms. Harden and Ms. Martin, that she's

11 involved in the drug conspiracy, and so I ask you on the

12 verdict sheet, with respect to Ms. Harden, Question 22,

13 she's guilty as to cocaine, not as to heroin or cocaine

14 base; and, due to the quantities involved here and the

15 knowledge that Mr. Goody and Ms. Martin have a larger

16 drug conspiracy, that for Question 24 she knows about the

17 -- it's reasonably foreseeable to her that it's five

18 kilograms or more of cocaine.  She's involved in just the

19 cocaine part of it.

20        Ms. Dobie.  I submit to you that Ms. Dobie is a

21 con-woman, ladies and gentlemen.  She's an admitted liar,

22 an admitted thief, an admitted drug user, an admitted

23 robber.  She lies to get money; she lies to get jobs; she

24 lies to get out of trouble with the police.  She has

25 false IDs in her name.  She stole money.  She's

1 representing herself be someone else.  She's used these
2 credit cards to get goods.  She said time and time again
3 to you -- and I have lost count of how many times -- that
4 she was a liar her whole life, but she wasn't lying to
5 you.  She's a good liar, ladies and gentlemen, and that's
6 how she made her living was by lying, cheating and
7 stealing.  I submit that she's a con artist, but don't
8 let her con you.  Do not let that happen.
9        Look at the evidence with respect to Ms. Dobie.
10 Look at the wiretap evidence.  Look at the transcripts.
11 Listen to the calls.  Listen to how they speak on the
12 calls.  Use your common sense in determining whether or
13 not she's part of this drug conspiracy.  Think about how
14 consistent her testimony was, both internally and with
15 the other evidence.  For example, on direct examination,
16 she said she got an eight ball from Paulette Martin for
17 her birthday, and then she denied that on
18 cross-examination.  She said it wasn't an eight ball, it
19 was a sixteenth.  At least we figured out what "hustler"
20 means.  It does mean a magazine, but the magazine has
21 nothing to do with this case, and it's used for jewelry
22 thief, drug dealer; it's used for a lot of different
23 things.  The items seized from Ms. Dobie's house
24 corroborate specifically to a T the discussions of drug
25 activity on the wiretap.

1          Tons of baggies with these apples on them which
2  she says were for jewelry.  This is what we're seeing in
3  the various houses with small amounts of drugs.  This was
4  seized from Ms. Dobie's house.  More bags with apples on
5  them.
6          Cut?  A drug user doesn't use cut.  Detective
7  Eveler testified about that yesterday.
8          Scales?  Not with Percocet or marijuana on them,
9  but with cocaine and heroin.  Scales to weigh drugs,
10 scales to sell drugs, baggies to package drugs, all in
11 her bedroom under her bed.
12         Two handguns fully loaded, with a round in the
13 chamber, in a cracker box similar to the ones that were
14 piled up in Paula's School of Performing Arts.
15         As I mentioned before, the phone calls.  If we
16 look at Page 483, and if we could put that up on the
17 screen, Call B-6229, Page 483, where she's talking --
18 Gwen Levi is talking to Paulette Martin -- they're
19 talking about Gwen Levi, and that's LaVon Dobie and
20 Paulette Martin, and that's on May 11, 2004.  Paulette
21 Martin says, in the middle of that, um-hum.  Somebody
22 called me; they looking for them tickets Gwen had.  I
23 told them I don't know nobody with those kind, you know,
24 they have a show like, I don't know.  And LaVon Dobie
25 says -- Becky Dobie:  Find out what they want.  I just

1 got fifty of them, but I'm down to about ten or 15 of

2 them my damn self.  Now they're talk about Gwen and

3 they're talking about heroin.

4          LaVon Dobie says she got 50 grams of heroin and

5 she's down to ten or 15.  That is what that conversation

6 is about, and that is corroborated by the evidence in

7 this case:  There were 11 grams of heroin under her bed

8 next to the scales and next to the guns.  She says during

9 this call -- during her cross-examination, she said she

10 was lying to Paulette Martin.  Do you know why, ladies

11 and gentlemen?  Because this call is so good, she can't

12 make up a story for it.  This is clear that what she's

13 talking about is ten or 15 grams of heroin that she has

14 back now, and she is talking to Paulette Martin about

15 tickets that Gwen had.  It's as clear as a bell it's

16 talking about 15 grams of heroin.  It's corroborated by

17 the evidence in her house.

18          Think about what makes sense, especially with Ms.

19 Dobie.  Does it make sense that she took guns from  her

20 teenage son, and that while she's in the room she

21 reloaded them with two children in there?  Does it make

22 sense that she put them next to drug paraphernalia to

23 hide them under her bed?  That's where they were, ladies

24 and gentlemen, they were next to the drug paraphernalia.

25 They were next to the drugs and the scales and the

1 packaging, because they were connected to the drug

2 operation.  They weren't her son's guns.

3        Cut.  Scales.  What user would cut their own

4 drugs?  What user would weigh their own drugs?  Persons

5 using as long as LaVon Dobie don't need to weigh their

6 drugs if they're going to use them.  They know from

7 eyeballing it, as Ms. Battle told you.

8        There's also many, many phone calls relating to

9 Ms. Dobie's involvement in other activity.  Call B-5336,

10 if we could put that up on the screen, and it's at Page

11 444 of the transcript book.  That's a call on May 3, 2004

12 between Ms. Martin and Ms. Dobie.  In the middle of the

13 page she said, did you get the ticket?  And Paulette

14 Martin said, I ain't got rid of all the ones I had yet.

15 And she said, do you have tickets for Half Street, some

16 quantity of crack cocaine, because down later she said,

17 is that the one by Hard Rock Cafe?  At the bottom of the

18 page Paulette Martin said, I got  one left; and then at

19 the top of the next page is where Ms. Dobie is talking

20 about distributing drugs.  Okay, I got to get your nephew

21 a ticket if he wants to go to the Hard Rock Cafe.  She's

22 talking about distributing drugs to Ms. Martin's nephew.

23 The nephew is her husband, Goldie Dobie.  Her husband

24 wants crack cocaine, and she's getting the crack cocaine

25 from Paulette Martin to distribute it.

There's other calls where she talks about distributing, and I won't show you all these transcripts now because my time is going to run out, but B-7104 and B-7167 on Pages 555 and 558, respectively.

On Page 247 of the transcript book -- you might recall that call where Ms. Dobie frankly admits she needs to sell a couple of tickets to pay a lawyer. She needs $3,000 to beat the charges and, Abracadabra, they're all gone. All of these calls establish that Ms. Dobie sold drugs, and the scales and the cut in her house corroborate that. She's also talking during the spring of 2004 about finding a new supplier for Paulette Martin. If we could turn to Page 199, it's in Transcript Book I, and put it up on the screen, that's Call B-1638. That's a call on March 25, 2004, and if we go to the bottom of that page, Paulette Martin is asking Ms. Dobie: You ain't heard nothing out of the tickets for the show you were talking about the other day.

If you turn to the top of the next page, she's saying, your nephew said she call them as soon as I get off the phone. So, she is trying to find more drugs for Ms. Martin. There are a number of calls regarding that. On Call B-4183 on Page 361, Ms. Martin tells Ms. Dobie, thought we'd be at one of your shows by now. At Page 501, Call B-6369, Ms. Martin and her are talking and she

1  said "about the other tickets, nephew said any day now."

2  They're looking for new suppliers of drugs.

3        Perhaps the most interesting call is at Page 503.

4  Page 503, Call B-6435.  Ms. Dobie is talking about the up

5  front ticket and there's ten left.  As you might recall

6  Sergeant Sakala's testimony was that Ms. Martin was

7  talking about kilograms and Ms. Dobie was talking about

8  grams and they're confused, but they finally clear it up

9  at Page 505 when they say, we're talking about the big

10  tickets.

11        Lastly, ladies and gentlemen, I've told you time

12  and time again to use your common sense.  This book,

13  Haywood 7, has a lot of information in there about the

14  moneys owed to Ms. Martin and the distribution of drugs

15  to various people charged in the conspiracy.  If I could

16  put up on the screen, I submit to you that the "B.D."

17  here is Becky Dobie, and this lists out 125, 125, 125,

18  125, 125, 125, and you see it consistently throughout

19  here.  It's the drug amounts that were purchased from

20  Becky Dobie to Paulette Martin.  This is the drug ledger

21  for Becky Dobie.  At the end of the day, at least as of

22  May 21, she owes Ms. Martin $2,640.  This is her drug

23  ledger.  "B.D." is Becky Dobie.

24        If you look at that, there isn't a $1,000

25  reference on that.  I submit to you, as to the next

1 series of questions as to Ms. Dobie, do you find her

2 guilty of possession with intent to distribute heroin,

3 cocaine or cocaine base, there is -- there is plenty of

4 evidence to show that she distributed and possessed with

5 intent to distribute quantities consistent with that, as

6 well as the evidence seized from her house, and that she

7 is involved in the heroin; she's involved in the cocaine;

8 and she's involved in the cocaine base.

9 She was trying to assist Ms. Martin in trying to find a

10 bigger supplier to replace Gwen, so it was reasonably

11 foreseeable that she was involved in a kilogram of heroin

12 or more.

13         As for Question 30, she was involved in smaller

14 quantities of cocaine, getting that and talking to Ms.

15 Martin about that, and that was -- that should be 500

16 grams.  As to crack cocaine, it clearly was more than 50

17 grams, based on the references to "hard rock" and  eight

18 balls and candy and things like that.

19         Now, as to LaNora Ali.  Ladies and gentlemen, we

20 spent a lot of time discussing what the police did at her

21 house and a lot of time with what happened at Sheridan

22 Street.  When you get through all the smoke and all the

23 mirrors that went with that and the Pretrial Services

24 officers coming in about what time she came here and we

25 get to the bottom line, the drugs in her house were hers.

1        The evidence that was admitted from the seizure of
2   Sheridan Street found in the suitcase, the scales, and
3   the money she admitted were in her house, and the drugs
4   that were in her house she said were hers.  So, just put
5   that all to the side.  It's just smoke and mirrors.
6   There's no question that what the officers seized were
7   seized from that house.  Nothing was planted, and there
8   is no evidence to suggest anything was planted.
9        The cocaine in the house was hers.  It's clear
10  from Haywood 7, that book I just showed you, that she's
11  getting eight balls.  There is many, many more references
12  to $125 amounts than $50 amounts.  It's clear that she's
13  getting drugs.  There was a phone call that we talked
14  about yesterday where she insisted she was getting $50
15  worth of drugs and whether she was getting $125 worth of
16  drugs, and those are calls A-1224 and A-1226.  You can
17  see right on Ms. Martin's ledger she put "125."  Ms. Ali
18  got an eight ball that day, and she had a to check with
19  somebody.
20       If we can turn to Page -- Call A-1224 and A-1226,
21  and that is on Page 348.  If we could put 348  on the
22  screen where Ms. Martin asks Ms. Ali -- this is April 21,
23  2004, and if we could go the middle of that call.  Ms.
24  Martin asks, do you want one ticket?  And then she has to
25  make a phone call, and then Ms. Martin said, okay, let me

1  know.  She has to find out if she has a customer for that
2  particular ticket.

3          It's clear from Haywood 7 that on that date -- let
4  me just show you April 21, 2004, what we're talking about
5  here in the middle of the book is there is a reference to
6  4 is 125, and then the next someone 4-29.  That is the
7  reference to this call right here, the 125,  and that's
8  what you can tell by the dates throughout this book.
9  She's trying to find out if she can get an eight ball.
10 She can try to find out if she can distribute it.  She
11 doesn't need to call the bank, ladies and gentlemen.
12 That makes absolutely no sense, because she has a running
13 tab with Ms. Martin.  So, that makes no sense.

14         The magazine.  There was a lot of discussion about
15 that yesterday.  There is no information about whether
16 she wants a *Jet* magazine or a magazine representing
17 plastic surgery, or *People* magazine.  All they say is
18 "magazine."  The coconspirators know what she's talking
19 about.  Paulette Martin is a dear friend, according to
20 Ms. Ali, and Ms. Ali talked about when coconspirators
21 would get arrested Paulette Martin would tell her, but
22 she didn't care.  She didn't listen.  She just heard that
23 they got arrested, and she didn't ask any questions.

24         Ladies and gentlemen, I submit to you, what makes
25 sense?  If somebody met through a friend gets arrested --

1 Philpot got arrested -- what's the next question you ask?
2 Why?  Why did that person get arrested?  Unless you know.
3 Unless you already know that he was involved in the drug
4 conspiracy.  Her testimony about cooking tiny amounts of
5 cocaine into crack.  Again, ladies and gentlemen, use
6 your common sense.  If your best friend or one of your
7 dearest friends was the president of Goodyear tires and
8 you wanted a tire, would you go buy rubber from your
9 friend at Goodyear tires and make it into a tire?  No.
10 Paulette Martin was a crack dealer.  Paulette Martin was
11 a cocaine dealer.  Paulette Martin was a heroin dealer.
12 LaNora Ali did not have to cook her cocaine into crack;
13 she did not have to learn how to do that, because she
14 could have bought it from Paulette Martin.  That makes no
15 sense.
16      Ladies and gentlemen, you've seen through this
17 case when there's a problem and when somebody gets
18 arrested, when supplies get lost, that generates
19 conversation.  During this period of time, perhaps the
20 thing that generated the most conversation was when Greg
21 Shrier, one of the surveillance agents, got burned.  You
22 might remember that testimony.  He was sitting outside
23 Haywood Avenue and Paulette Martin came out and saw his
24 car, and it looked like she was writing down his tag
25 number.  Then she was talking to a neighbor, and he left,

1  and he was told by the case agents never to go back with

2  that car again to that house.

3       It was sometime ago, but you might remember he got

4  what's called "burnt" and then the police were coming

5  into the neighborhood and Ms. Martin was concerned and

6  she had to move the stuff to the school.  We looked at

7  the phone call yesterday, and I won't bother to show it

8  to you now, but Ms. Martin calls her friend, LaNora Ali,

9  and said, leave your husband at home.  Tell Jackie a lie.

10 We've got to do something important.  I got to go to the

11 school and I got to run something by your house.  They

12 move the bag and they move the operation.

13      The next call that Ms. Martin makes, about ten

14 minutes later, is to John Martin, and they're talking

15 about it and they said, you know, she said, do you

16 anymore papers that you need to have moved?  That's Call

17 A-1674 on Page 528, and she said, I'm moving them all to

18 the school.  John Martin said, yeah, we'll be as clean as

19 the rain, and that's what Ms. Martin and Ms. Ali were

20 doing.  They were trying to make the house as clean as

21 the rain.

22      That trip alone makes Ms. Ali part of the

23 conspiracy.  Even if you find she did nothing else, even

24 if you find that she didn't distribute drugs, even though

25 the calls establish it, that alone makes her part of the

1  conspiracy, because she helped move the drug operation.

2        Roger St. Louis saw her at the school -- saw Ms.

3  Martin at the school.  If you look at Call A-1675 --

4  again, that's A-1675 on Page 531 -- Ms. Martin talked to

5  John Martin when she was with LaNora Ali, and she said,

6  LaNora's here, and that most of the house is ready.  You

7  hear the buzz for the elevator, because John Martin

8  mentions it on a call, and that's when they're moving the

9  money in the blue suitcase with the scales to Ms. Ali's

10 house.  She's helping her move the drug stash.  Whether

11 they moved the money that day or not, she's storing the

12 drug proceeds.  The large quantity of cash in the blue

13 suitcase is Ms. Martin's drug proceeds, and that's why

14 it's not at her house and it's not at the school; it's at

15 Ms. Ali's house.

16       If there's any question, ladies and gentlemen,

17 that Ms. Ali didn't know what was going on at the school,

18 there's one of the last calls played yesterday on Page

19 612, B-8110.  She's asking Ms. Martin for a dress, and

20 Paulette Martin quickly jumps in and says, I already been

21 down to the school today.  I don't want to go down; I've

22 already been down there.

23       Ms. Ali knows that everything's at the school, and

24 she knows that  because she helped her move it there.

25 There didn't have to be a call relating to that because

1 she knows.  If she didn't know, ladies and gentlemen, the

2 judge instructed you on willful blindness.  You can't

3 walk around with blinders on.  You can't say, I'm going

4 to help my drug supplier move drugs and I'm going move

5 these bags and I'm not going to ask her what's in them;

6 I'm not going to ask what's in them, and I'm going to

7 store the suitcase.  I know she's a drug supplier because

8 she's been supplying me forever, but I'm not going to ask

9 any questions and I'm not going to look.  She stored them

10 and she knew what was in them.  Even if she didn't know,

11 she was willfully blind.

12       She told you -- Ms. Ali specifically told you it's

13 not Ms. Martin's business, it's not -- I'm sorry.  It's

14 not Ms. Ali's business.  If LaNora Ali doesn't want to

15 ask, she just shuts her eyes to what's going on.

16       I'm just going take -- there's a lot of ore other

17 counts.  Most of these counts -- may I have five minutes,

18 Judge?

19       THE COURT:  You may.

20       MS. GREENBERG:  Most of these counts relate to the

21 calls you already heard.  I'm just going to go through

22 them quickly.  And for Ms. Ali, I apologize, I forgot to

23 go down the verdict sheet.  We submit that you find her

24 guilty on Question 32.  She's involved in this conspiracy

25 to distribute and possess with intent to distribute

1  heroin, cocaine and cocaine base, if you find that she

2  helped move the bag and that assisted the conspiracy

3  which, I submit, there is powerful evidence that she was

4  involved in that, and all three drugs were contained at

5  Paula's School of Performing Arts, and that's on Chart 14

6  what drugs were there.  They were using those drugs at

7  Paula's School of Performing Arts, what was moved.

8        Question 35, there's less than 100 grams of

9  heroin, there's less than 500 grams of cocaine, and

10 there's 50 grams or more of crack cocaine.  So that would

11 be for questions 35, 36, 37.

12       All the defendants are charged in Count One.

13       Mr. Goodwin -- this is Detective Martini's

14 testimony when he went over with Raynard Dorsey to the

15 shopping center and they found the drugs in the -- the

16 crack cocaine in the false Pepsi bottle and Mr. Goodwin's

17 daughter told them where to find it, that's Count Two.

18       Use of a telephone.  The judge gave you

19 instructions on that, but that's basically using a

20 telephone to further a conspiracy.  You don't have to

21 find somebody's guilty of the conspiracy, but if they use

22 a telephone in furtherance of the conspiracy -- if they

23 call up to get drugs knowing there's a conspiracy and

24 intending to further the distribution of those drugs,

25 that's what the conspiracy is.

1          Possession with intent to distribute.  I just want
2  to give you -- a lot of these are the same.  In terms of
3  possession with intent to distribute, I want to give you
4  an example as to Mr. Mangual.  This relates to a
5  particular incident that you will see in the transcript
6  book where Martin -- Paulette Martin talks about getting
7  envelopes from Mr. Mangual.  That's another time where
8  she calls and receives books from Mr. Mangual.  There's
9  another time she calls and receives autobiographies from
10 Mr. Mangual.  There's another time she receives a case of
11 sweet potatoes from Mr. Mangual.  Each time Mr. Mangual
12 shows up there, you will see from the calls and the
13 testimony, that's possession with intent to distribute,
14 because he's showing up with quantities of drugs for the
15 drug conspiracy.  The people involved in this case is
16 Martin and Mangual, and these two calls and the
17 surveillance add to that.
18         Count Five is use of a telephone, and you can see
19 from the date on the indictment, March 11, 2004, you will
20 see calls relating to that, B-279 and B-341,  and that's
21 related to a call where Mr. Bynum -- again, this is
22 involving a delivery of drugs, whether it's by Mr.
23 Mangual or others, and this is involving using a
24 telephone to further the conspiracy.
25         Again, there's claims relating to each date I just

1  put down here.  You won't have that back with you, but
2  just to give you an idea, when you look at March 12 you
3  will see these calls, and that relates to possession of
4  drugs with intent to distribute.  Mr. Bynum is coming
5  over to get drugs from Ms. Martin, and what type of drugs
6  depends on the officer's testimony as charged in the
7  indictment.  So, that's how you go through the counts.
8  Most of the counts are involving use of a telephone and
9  possession with intent to distribute, until you get to
10 the very end and there are some counts relating to
11 firearms.
12         Mr. Bynum was at the house when the police
13 executed the search warrants, had a Glock, had a scale
14 with narcotics residue, and had $14,000 in drugs.  Guns
15 are used to protect not only drugs but also drug
16 proceeds, and because Mr. Bynum possessed the firearm in
17 connection with the scale with residue and the money,
18 that is why Count 59 relates to the possession of gun in
19 connection with the drugs.  Mr. Bynum has a prior felony
20 conviction -- you will have that back before you -- and
21 then he possessed a firearm  You might remember the
22 officer coming in to testify that it was a working
23 firearm, and he's a felon in possession of a firearm.
24         Ms. Dobie possessed the two guns in connection
25 with the drug trafficking offense because she had the

1  guns and the drugs and the paraphernalia right next to

2  each other underneath her bed.

3          Ladies and gentlemen, my time is up.  I trust that

4  when you go through the indictment, you will have the

5  transcript books and you can follow along with the dates

6  and the telephone counts and the charges that I have just

7  explained to you.

8          I can't thank you enough for your time and

9  attention in this case.  I appreciate it, and I submit

10 that when you consider all the evidence when you look

11 carefully with your common sense at the evidence, you

12 will find all these defendants guilty of the counts

13 charged in the indictment.  Thank you.

14         THE COURT:  All right.  Mr. Montemarano, how much

15 time do you need to get set up?

16         MR. MONTEMARANO:  Five minutes should be plenty,

17 if the jury needs to take a break.

18         THE COURT:  Let's take a five minute recess and we

19 will hear from the defense.

20                 (Off the record at 11:38 a.m.)

21                 (On the record at 11:47 a.m.)

22         THE COURT:  Bring them in.

23                 (Jury returns at 11:49 a.m.)

24         THE COURT:  You may proceed, Mr. Montemarano.

25         MR. MONTEMARANO:  Thank you, Your Honor.  Good

1  morning, ladies and gentlemen.  Voting and jury duty, the
2  two highest forms of service of any citizen.  We all
3  thank you as well, because without you the system does
4  not work.  But your job is not over yet.  You're going to
5  have to listen to me, you're going to have to listen to
6  these folks, you're going to have to listen to Ms.
7  Johnston when we're all done.  I suggest that the common
8  sense Ms. Greenberg recommended to you will be very
9  useful to you while you're listening and when you start
10 deliberating.
11        Now, let's face it.  This is all about my client.
12 There are 60 counts in the indictment, and 55 of them
13 name my client.  Thirty-seven of them were phone counts:
14 Section 843, the use of a telephone or communications
15 facility.  Seventeen of them are possession with intent
16 to distribute one or two or three of the named drugs,
17 cocaine, crack cocaine or heroin.  And then of course
18 there is the conspiracy, Count One.  If I tried to go
19 through all of them, I'd still be here at 5 o'clock.  I'm
20 not going to do that, and I say that for two reasons.
21 Not because I don't want to bore you, because I don't,
22 but you can look at the counts and you can look at the
23 charge and you can look at the evidence in this case in
24 certain finite lumps.
25        Sort of like if you vote for the All-Star team,

1  and you look at all the shortstops, and you don't take

2  your favorite players you just take all the shortstops.

3  You say, who is the best shortstop?  Who is the best

4  first baseman?  I think you can look at the evidence in

5  this case, and if an area has a problem, if there's

6  something you don't find palatable, acceptable,

7  believable, then I suggest you have a reasonable doubt.

8  And that's what this is all about.  Because if the

9  government does not prove its case beyond a reasonable

10  doubt, these people leave the courtroom as they entered:

11  not guilty.

12         It is the government's burden to prove the

13  charges, and I suggest to you they have not done it.

14  Perhaps you remember my opening statement two months ago.

15  I told you Paulette Martin sold drugs.  Has anything

16  changed?  But I told you she was not a drug dealer, at

17  least not in the way the government says.  She sold small

18  amounts to friends -- long-standing friends so they

19  didn't have to go out on the street and buy, an

20  occupation which you've heard from the government's case

21  is dangerous.

22         What I told you was entirely consistent with the

23  evidence the government presented.  She did not "deal

24  drugs" anymore than any of you gambled when you put down

25  $5 on the Super Bowl.  I suggest to you the government

1 had tunnel vision regarding this case.  I said in the
2 limited nature of this case the government will do
3 nothing to dispel what I'm telling you, and they haven't.
4 They really haven't.  They've brought in suggestion.
5 They've brought in association.  They've brought in
6 innuendo.  What they lack is hard evidence.
7          I'll give you one example.  Looking at the 17
8 charges of possession with intent to distribute.  You
9 will go through them when you look at the indictment.
10 How many of them refer to actual seizures of drugs?
11 Think about the evidence, ladies and gentlemen.  You
12 don't have it all in front of you, but search your
13 memories.  Count Four:  March 10.  Were there any drugs
14 on March 10?  Did we see any drugs?  Was there a chemical
15 test?
16          Count Eight:  March 12.  Any drugs on March 12?
17 Any chemical tests?  Any seizures?  I'll go on and on and
18 on all the way down through Count Sixty-Two, when we
19 finally have drugs, and that's June 1 charging crack
20 cocaine.  And there was crack cocaine seized from my
21 client's place of business, Paula's School of Performing
22 Arts.  So for the first 16 of those 17 possession with
23 intent to distributes, the government has given you no
24 evidence.  They have given you guesswork.  They've given
25 you "we think."  They've given you a lot of "I don't

1 know," words not ours.  But they have not given you

2 evidence.

3        Likewise, if you look at the 37 phone counts, is

4 the word "heroin," "cocaine" or "crack," or anything

5 close to that found anywhere?  There is all this coded

6 language.  And Detective -- Sergeant Sakala, while on the

7 stand, assembled a three-page list which is in evidence.

8 And then while he was back on the stand, he and I

9 assembled this list.  I didn't ask him to adopt it --

10 they don't like to cooperate with the defense -- but

11 these are words he agReed were in the transcripts we put

12 up.

13        And how many -- these are words that come from

14 their list and that clearly don't mean what Sergeant

15 Sakala said they do mean.  These are the folks in blue.

16 I suggest to you that in single-minded pursuit of

17 Paulette Martin, the government has chosen to ignore

18 plain evidence, misconstrue evidence, and in some cases

19 come very close to misrepresenting evidence.  They've

20 ignored what they encountered during the investigation.

21        You may recall questions I asked, not that I

22 quarrelled with their conclusions, of the two chemists.

23 We had Mr. Gervisoni and Ms. Kubicz, from Wyoming, the

24 blonde lady.  I asked them both.  The scientific method,

25 that involves assembling evidence and then from this

1 assemblage of evidence, creating a hypothesis.  And they
2 agReed.  I said, it doesn't involve having a hypothesis
3 and jamming your evidence to fit the hypothesis.  That's
4 what they did.  It's not scientific.  It's not accurate.
5 It's not believable.

6        Unfortunately, the government's view isn't quite
7 like that.  What did the government tell you?  The
8 government tells you that they're sure about their
9 evidence to a moral certainty.  Nobody put those words in
10 Sergeant Sakala's mouth.  That's his view of what he's
11 done.  Sergeant Sakala's never wrong, just ask him.  I'm
12 not sure of that many things to a moral certainty, ladies
13 and gentlemen.  I suggest that doubt and inquisitiveness
14 is the hallmark of an open mind.  Because when you begin
15 an investigation, you can't even begin to think you know
16 the answer.  Because if you know the answer, well, then
17 you don't need to investigate, do you?  And how does that
18 do anything but describe what the government did in this
19 case?  Paulette Martin's a drug dealer.  Let's see if we
20 can assemble evidence to support that.  And if it doesn't
21 fit our hypothesis, out it goes.

22        Now, the government's excuse would be, well, we
23 weren't authorized by the search to seize evidence that
24 wasn't inculpatory of Ms. Martin.  Well that's a great
25 excuse, because they could have put in Schedule A or

1  schedule B, whatever you want to call it, attach it to

2  the search and seizure warrant.  And we'd also like to

3  seize things which suggest that Ms. Martin's not in drug

4  dealing.  It could be done; they didn't choose to.  It

5  doesn't fit their hypothesis.  It doesn't go within their

6  frame.  And that's all they're interested in, what's

7  here, and nothing else.

8          So, tell me.  What kind of moral certainty is it

9  that makes you comfortable?  Let's cut right to the

10  chase.  Is it the same kind of moral certainty that

11  commits America's wealth and treasure and military to

12  Iraq?

13          MS. JOHNSTON:  Objection, Your Honor.

14          MR. MONTEMARANO:  This is argument, Your Honor.

15          THE COURT:  Overruled.

16          MR. MONTEMARANO:  Before you think I'm taking

17  cheap shots at a Republican administration.  Is this the

18  same kind of moral certainty that uses tanks to start

19  fires and kill over 50 people in Waco, Texas?  That was a

20  Democratic administration, ladies and gentlemen.  This is

21  not a political question.

22          MS. JOHNSTON:  Objection.

23          MR. MONTEMARANO:  This is your government --

24          MS. JOHNSTON:  Objection.

25          MR. MONTEMARANO:  -- of, by, and for the people.

1 If you don't police the government, who will?

2         MS. JOHNSTON:  Objection, Your Honor.

3         THE COURT:  Mr. Montemarano, approach the bench.

4                (At the bar of the Court.)

5         MS. JOHNSTON:  That was an outrageous argument to

6 be arguing that this jury's job is to police the

7 government.

8         THE COURT:  Mr. Montemarano, that is not a proper

9 argument, and I think you're skating over the line of

10 reasonable doubt.

11         MS. JOHNSTON:  That was going to be my other

12 point.

13         MR. MONTEMARANO:  I'll stop.

14         THE COURT:  I don't like to interrupt closing

15 argument, I really don't, because I like to consider it

16 as argument and not evidence, but you are over the line

17 on going into the moral certainty question.  That's not

18 what I've instructed the jury.  It's beyond a reasonable

19 doubt, which does not equate to all certainty, as you

20 well know.

21         MR. MONTEMARANO:  I didn't equate the two.

22         THE COURT:  I don't think the function of the jury

23 is to police the government.  It's to police the evidence

24 and see what it comes up to, yes or no, guilt or

25 innocence.  I don't want to interrupt you again, so just

1  --

2          MR. MONTEMARANO:  I'll stop.

3          THE COURT:  Stay within the four corners.

4          MR. MONTEMARANO:  Fair enough.

5          MS. JOHNSTON:  I would tell the court to disregard

6  his argument concerning policing the government.

7          MR. MARTIN:  Wait a minute, Your Honor.  I have a

8  comment with respect to that.  I think in the beginning

9  you gave us a history lesson about the role of the jury

10 and that it is the function of the citizens to stand

11 between the government --

12         THE COURT:  They know what the proper role of a

13 jury is.  They are not policemen of the government.

14         MR. MARTIN:  Maybe not.  But I had intended to

15 argue they --

16         THE COURT:  You can paraphrase what I said when I

17 described the role of the jury.  I don't think their

18 role is to police the government.

19         MR. MARTIN:  I wasn't going to say "police."

20         MR. MONTEMARANO:  That's a verb, Your Honor.

21 That's another way of using it.  Not "police" as in

22 Capitol Police or Prince George's County Police.  That is

23 entirely appropriate.

24         THE COURT:  I've made my ruling.  I am not going

25 to give a cautionary instruction.

1          MS. JOHNSTON:  But their --

2          THE COURT:  I have sustained the objection.

3          MR. MONTEMARANO:  Fair enough.  Thank you, Your

4  Honor.

5                    (Back in open court.)

6          MR. MONTEMARANO:  It's our government, ladies and

7  gentlemen.  We have an investigation that lasted for

8  years.  We have literally tons of evidence seized from

9  all of these different locations.  Twenty-some searches.

10 We have two dozen boxes of paper evidence provided to

11 the search.  We have 35 CDs of calls, the 10,000 calls

12 from the five phone lines.  10,000 activations on the A

13 and B lines alone.  Thousands of conversations.  Ten

14 weeks of trial.  For all this?  Where is the kilograms

15 and kilograms and kilograms of cocaine?  We've heard talk

16 about it.  But unfortunately, like we would get maybe at

17 the end of -- well, remember Miami Vice, the old TV show

18 they've now made into a movie?  Buckets of cocaine at the

19 end of the show, right in time for the credits.  We have

20 a seizure at Ms. Martin's place of business, and that's

21 pretty much it, isn't it.

22         Let's talk about the evidence you didn't see.  Not

23 a single drug transaction.  No money exchanging hands.

24 No hand-to-hand drug purchases.  Hand-to-hand in whatever

25 amount, be it a gram, a quarter kilogram, whatever, or a

1   kilogram.  We've heard lots of testimony about it from
2   Sergeant Sakala, but is there any evidence of it?  How
3   about all the suspected drug dealers?  Where are they?
4        Here's the government's chart.  I wouldn't want to
5   write on an exhibit, so I brought my handy dandy deck of
6   post-its.  Unfortunately, this foam board is light enough
7   I can do this with one hand.  We didn't hear from Cuba or
8   Kelly -- I'm going the lay it down here -- or Steve
9   Campbell or Tiffany Vessels, or Alton McKenzie, or John
10  Irby, or Xavier Moore.
11       We heard from Michael Thurman, and we'll talk
12  about him in a moment.  Steve Brim's dead, so we'll leave
13  him out.  Personnel Philpot.  Luis Mangual.  Gwen Levi.
14  Dog Turner.  Moises Uriarte had nothing to say about
15  anybody here, so we'll leave him out.  Eugene Byrd.
16  Claude Arnold.  George Harris.  Milburn Walker.  Larry
17  Lane.  Larry Nunn.  There's another Nunn, Lionel, but
18  he's in prison; right?  John Martin.  Reasonable doubt?
19  Would you like to know what any of them have to say about
20  the government's evidence?  Take a look, folks.  This is
21  their chart.  I've seen Swiss cheese with fewer holes.
22       MS. JOHNSTON:  Objection.
23       MR. MONTEMARANO:  And there are other people:
24  Raynard Dorsey.  Anthony Hall.  There was the other Steve
25  from Houston.  Couldn't the government set up one single

1   hand-to-hand purchase?  A single traffic stop?  Some way
2   to inculpate some of these people?  Some way to tell you
3   that what Sergeant Sakala says can be tested to a moral
4   certainty?  You heard Sergeant Sakala's testimony.  Well,
5   that's a sale, and it's quarter ounce, or it's a quarter
6   kilo.  We went through this on cross.  But as Mr. Hall
7   likes to point out to me, I like to do math too much.
8          A quarter kilogram is 125 grams, and a quarter
9   ounce is about three grams or a little over.  That's a
10  difference of 40 forty times.  Who here would like to
11  have their paycheck cut by a factor of 40?  Who here
12  would like to have it increased by a factor of 40?  Does
13  that number not mean anything to anybody but me?  Because
14  that's what he told us.  I'm not sure.  It's one or the
15  other.  Or something else?  Larger?  Smaller?  And that's
16  if it's drugs.  Any of these times were there actual
17  deliveries?  Did we see that?
18         Luis Mangual comes over.  Did we ever find out
19  what was in any of those bags?  Do we know?  No, we do
20  No.  Once again, of these 17 possession with intent to
21  distribute charges, some of which charge in addition to
22  Ms. Martin, other of the defendants, many of which just
23  charge her; one of them has drugs.  One.  Based upon
24  that, they're asking you to convict.  I asked you,
25  couldn't they have set up a traffic stop or a hand-to-

1 hand buy?

2        We were weren't in the position.  We had nobody to

3 do it.  If they wanted to, they could have, ladies and

4 gentlemen.  We know that, because this is the evidence in

5 the case.  They did a traffic stop and seized drugs from

6 Gwen Levi and Donna Johnson.  They did a traffic stop and

7 seized drug wrapping from John Martin.  They stopped

8 Michael Thurman with drugs twice.  They stopped Nathan

9 King with drugs twice again.  So when they can, they can;

10 and when they can't, well, we can't.  Or when they don't

11 want to, they can't.  Oh, yeah.  And they stopped Pernell

12 Philpot too, didn't they?

13        By contrast, the evidence we didn't see -- rather,

14 in addition to the evidence we didn't see, we also didn't

15 see an investigation of Martha Jean W, Gilbert Williams,

16 Ron Hayes, Ron Hood, Burt Parnell, Spencer Boyer, Harvey

17 Star Washington, Kevin Scott, not one of the people with

18 whom Paulette Martin was engaged in business and, I

19 submit to you, legitimate business.

20        Sergeant Sakala wants to call it illegitimate.

21 And if there's nothing but drug money involved, I guess I

22 can understand his point of view.  But we haven't had

23 that shown to us that this is obviously drug money.  This

24 is clearly drug money.  This is uncontrovertibly drug

25 money, making the business illegitimate.  But we do have

1 testimony and evidence concerning investments.  We do

2 have evidence and testimony concerning the $130,000 that

3 went to Gil Williams that the government tried to get

4 back.  Did they bother looking at that?  Maybe they were

5 afraid what they'll find out will contrast with their

6 view of the evidence.  And God forbid it should do that.

7 The only financial info that you received in this case

8 was from the defense.

9         MS. JOHNSTON:  Objection.

10        MR. MONTEMARANO:  The only financial info -- you

11 heard Mr. Shannon, a member of the D. C. bar for 30

12 years.  You saw the cancelled checks; they're in

13 evidence.  You can take them and take a look at them.

14 Over $100,000 right there from Mary Payne's estate.

15 Plus, his description of the vast amounts of furs and

16 clothing.  Does that mean money, ladies and gentlemen?

17 You heard testimony from numerous people, even the

18 government's witness, Mr. Washington, about clothing in

19 the home.  Furs.  Children's clothing.  But you don't

20 hear it from the government, because it doesn't fit with

21 their theory.

22        There's no fingerprints anywhere.  All of this

23 plastic material, all of this smooth, clear, clean

24 plastic and there's not a single fingerprint.  What's

25 that all about?  They run DNA, Nada.  Except for the hit

1  on Ms. Dobie on something from her home, but nothing else

2  in this entire case.

3         There is no phone records on the other line at 810

4  Haywood.  You've heard there was a phone upstairs, Jackie

5  Terrell's.  There's no tap on it.  There's no pin

6  register records on it.  We don't know who was being

7  called or calling in on that number, do we?  There was no

8  records in the same way a pin register, dial number

9  recorder, same difference or tap on the phone at South

10 Dakota at Paula's School of Performing Arts.

11        Now, are calls are being made there and out?

12 What's going on there?  Might that not give us some

13 clarity?  Some illumination?

14        The school.  The school which the government

15 ridicules incessantly through every witness.  There was

16 no school here.  Ms. Martin doesn't have any sort of

17 business there.  I'd like to show you Page 289 from the

18 defense book.  Right there in the middle of the page, Ms.

19 Ali and Ms. Martin are talking.  Ms. Martin said she was

20 at the school.  Why was she at the school?  Is the piano

21 person there?  Now I'm no expert, ladies and gentlemen,

22 I've only been doing this for about 20 years, but I've

23 never heard of anybody using a piano to make crack

24 cocaine.  I've never heard of anybody using a piano to

25 abet their sales of cocaine or heroin.  So, just maybe

1   there's somebody there fixing up a piano.  But it doesn't

2   fit with the government's theory, so they ignore it.

3          The government's case is much like the person who

4   does a jigsaw puzzle and then comes to you and says, it's

5   done.  Of course the picture doesn't really look like

6   what it's supposed to on the box, and I got all these

7   extra pieces left over and I don't know what to do with

8   them; and I suggest those extra pieces create reasonable

9   doubt.

10          You heard Sergeant Sakala talk about eighths, $125

11   amounts.  And then you heard Mr. Sussman get up and ask

12   the sergeant what I thought was an outstanding

13   cross-examination, not very many questions, and focused

14   him in on his conclusions.  And Sergeant Sakala said

15   nothing other than what he testified to affected his

16   conclusions.  He just said it.  I'm right.  I know I'm

17   right, and I don't have to think about anything else.

18          I wish I'd asked those questions.  Not all the

19   clothing at Haywood was with tags in different sizes.

20   Not the assemblage of single shoes, and they're ladies

21   shoes, ladies and gentlemen, so they're obviously not

22   mine; right?  Single shoes, like they're on display at a

23   shoe store?  Maybe.

24          Not the absence of any accounting  in any way,

25   shape or form with these mythical huge sums of money.

1 You hear these numbers that boggle the mind.  My
2 favorite, of course, is Emilio Echarte, who talks about
3 40 kilograms of cocaine in Ms. Martin's kitchen.  We'll
4 get to that in a minute.  What kind of money does that
5 involve?  And where is the drug ledger for all these
6 other souls?

7          Haywood 7 has lived on that ELMO machine.  You've
8 seen it over and over again.  It was referred to again
9 during Ms. Greenberg's close, and you see a few people in
10 there.  There's Ms. Dobie, if you believe the government,
11 B.D.; there's Ms. Ali, there's a few other people.  Where
12 is Luis?  Where is all the other purchasers?  You see
13 lists of $125 amounts which, in the government's view, is
14 an eight ball.  It may not be.  We have other testimony
15 that says it's a sixteenth.

16          But assuming it's an eighth ball, where is the
17 quarter kilogram purchases?  Because if you got 40
18 kilograms in your kitchen, do you care about selling an
19 eighth of a key, 125 grams?  Again, Mike does math again.
20 You've got 40 kilograms; right?  That's 320 eighths;
21 right?  I'd like you to look at the phone counts when you
22 go back.  I looked at them.  There's 37 of them naming my
23 client.

24          The people who are allegedly the eighth kilogram
25 buyers may be -- again, Sergeant Sakalla doesn't know.

1  He wasn't there.  He said there were no seizures.  But he
2  said this might be; this could be an eighth kilogram.
3  There is Milburn Walker.  There's George Harris.  Let's
4  use those two.  There are eight calls with Mr. Walker and
5  Mr. Harris over the course of the three months the wire
6  is up.  Again, let's try that math.
7          Let's assume that they're just -- just them the
8  kilogram -- eighth kilogram buyers, and every purchase by
9  them is an eighth of a kilogram.  So these eight calls in
10  three months, well, that would be 32 calls and 32
11  purchases in a year.  Which is what?  About eight
12  kilograms?  32 eighths?  No.  It's 4 kilograms.  Well, if
13  it's four kilograms in one year, then this 40 kilograms
14  will take Paulette Martin ten years to get rid of.
15  And if I'm off?  How about if I'm off by a factor of two?
16  Well, then it will take her five years to get rid of it.
17          Now this was in mid-'01.  So she'd still be
18  selling Echarte's cocaine that he testified to today, if
19  you accept the government's theory.  But according to the
20  government, Ms. Martin's constantly buying it from Mr.
21  Mangual, I believe.  Where's the beef?  You can't ever be
22  sure -- you can't ever be that sure about something you
23  don't know.  The one exception to that, of course, is
24  issues of faith, but this isn't about faith, ladies and
25  gentlemen.  This is about proof.  And you've heard

1  Sergeant Sakala, this stuff is not that difficult.  It's

2  not "rocket science," his words.  It's when the calls

3  "don't make sense" to him.

4       Well I'm very happy that Sergeant Sakala doesn't

5  understand.  I'm involved in many things that have

6  nothing to do with the law that don't ever cross the door

7  to my office in my personal life that Sergeant Sakala

8  wouldn't begin to understand if he heard myself and my

9  friends talk about, and I'm sure every one of us is like

10 that.  Jargon?  Dialect?  Technical terms within a hobby

11 or a sport or an occupation?  But if it doesn't make

12 sense to Chris Sakala, well, it must be drugs, because it

13 certainly doesn't fit in what he knows, once again, his

14 hypothesis.  And we're going to jam the evidence into it.

15 And if we don't jam the evidence in, it goes into the

16 discard pile.  All those extra pieces from the jigsaw

17 puzzle.

18      Let's talk about one of those 17 possession with

19 intent to distribute charges.  May 16.  That's the

20 claimed delivery of drugs or transfer of drugs from Ms.

21 Martin's home to the school.  What do we know about it?

22 At best, the bags carried by Ms. Martin and Ms. Ali are

23 similar to the ones that drugs were found in at the

24 school.  We do not know; there is not enough detail.

25 They look the same.  Who doesn't have more than one bag

1 of similar kinds?  If you go to the same store, you have

2 a lot of bags from that store.  Does that stand to

3 reason?  So, that doesn't tell us anything.

4        There's no  fingerprints on the bags.  The bags

5 are certainly not unique.  We find the drugs 16 days

6 later.  During that 16 days, there's surveillance at the

7 school, and no tap on the phone, and we don't know what's

8 going on there.  And during that time, who is living at

9 Haywood, Ms. Martin's home?  Who is the person she talks

10 to about on the 16th about the school?  John Martin.

11 John Martin, we know, was a drug dealer.  Indeed, who was

12 seized with the most drugs in this case?  John Martin.

13 It's not Nathan King and his 17 or 15 keys, depending on

14 which bust.  It's not Pernell Philpot and his ten.  The

15 biggest amount is the 25 wrappers which nobody

16 controverts that could be nothing but the wrapping to 25

17 bricks of cocaine. 55 pounds, actual drugs in his car in

18 2001.  And during this time, he has access to it.

19        One other thing you didn't hear.  The government

20 had agents at the school waiting to go in, and they were

21 waiting for the key.  Where did the key come from?  Did

22 you hear anybody testify the key was taken from Ms.

23 Martin?  Or, Mr. Martin?  Ask yourselves, ladies and

24 gentlemen, who's the drug dealer here?

25        The evidence concerning "drugs" on the 16th of

1  May, the government will say it's that phone call.  Ms.

2  Greenberg went into it again.  There's a small problem

3  with that, ladies and gentlemen.  If you look at the

4  indictment, that possession with intent to distribute

5  charge is Count 56.  It's the 16 of the 17.  The

6  indictment is, roughly speaking, in chronological order,

7  so let's look at counts 55 and 57 right in front of --

8  right behind possession with intent to distribute drugs

9  on the 16th.

10        Count 55 is another possession with intent to

11  distribute charging Ms. Martin and Mr. Goodwin on the

12  15th of May.  Count 57 is another phone count, use of a

13  telephone communications facility on the 18th charging

14  Ms. Martin and Ms. Dobie.  The government doesn't even

15  think it's a drug call, because they didn't charge it as

16  a drug call.  So they're saying the evidence of drugs is

17  a call -- we don't think it's a drug call -- and that's

18  the only evidence of drugs on the 16th of May.  It's

19  their indictment, ladies and gentlemen.  Let them explain

20  it to you.  But I look at that and I say, this is not a

21  drug call, because they don't even think it is.  You're

22  not being asked to find it's a drug call, not even that.

23  Not that it would be a drug call if they said so, but

24  they don't even say so.

25        There's no possible way to cram it within their

1 hypothesis of drugs.  It gets discarded.  It gets
2 ignored, or maybe they're not drug transactions.  Look at
3 all our the evidence in our friend Haywood 7 of clothing.
4 My favorite is Mr. McKnett's observation in his, I think,
5 redirect of Ms. Ali, that on the day she's allegedly
6 moving drugs to absolve her drug debt to Ms. Martin, she
7 owes Ms. Martin about $1,300 for clothing and, like, $100
8 for cocaine.  What makes more sense to you?  They ignore
9 the $1,300 and focus on the $100.  Okay.  I suggest,
10 ladies and gentlemen, it is not for you to ignore it.
11 It's not for you to ignore that or anything else.
12        Let's talk about the nature of the evidence they
13 did bring in, not what's missing.  Now let's talk about
14 what's here.  Let's talk about the cooperators.  Juan
15 Encarnacion.  He gets arrested.  He gets busted.  He gets
16 prosecuted.  And all of a sudden his memory improves.
17 I'm not sure.  Was it his arrest that improved his
18 memory, or was it his sentence reduction?  I mean, it was
19 one or the other, ladies and gentlemen, I'm just not sure
20 which one.
21        Then we go to the poster child for drug-criminals-
22 are-us, Nathan King.  And I think Ms.- -- your
23 recollection will serve, and you've got all the documents
24 and all that.  But Ms. Greenberg told you he was arrested
25 with 17 kilograms in Indianapolis.  I think she got that

1   wrong.  I think the 17 kilograms was Mississippi.  I
2   think that Indianapolis was only 15 grams.  And you know,
3   what's five pounds of cocaine among friends?  32?  37?
4   Who cares?  And of course, Nathan King is the guy who was
5   walking down the street in northeast D. C. carrying his
6   duffel bag with $200,000 in cash.  Right.  Him and what
7   army?  I mean, are cabs in D. C. that expensive?  He's
8   got $200 grand in scratch and you're not going to call a
9   cab?  Okay, I believe it.  And of course, Mr. King's
10  going to turn down a reduction of his sentence; right?  I
11  don't come here for sentence reduction.  So I only asked
12  him, so you will turn it down?  He couldn't answer that
13  question.
14        Then there's -- talk about people who can't answer
15  questions.  Our friend "Stretch," Michael Thurman.  Mr.
16  Thurman sat here for the better part of two days.  And
17  every time we would have a break from his testimony, and
18  for the next couple of days, I kept walking over here and
19  looking at the side of the -- what do we call this?
20  Where the courtroom deputy sits.  This wooden wall --
21  because that's where he kept staring.  He wouldn't look
22  me in the eye.  He wouldn't look Ms. Johnston in the eye.
23  What's that tell you?  Maybe he's growing a conscience at
24  a late age?  I don't know.
25        Emilio Echarte.  "Mr. 40 kilograms."  Well, here's

1   my first problem.  Who here has ever had a party or had a

2   family gathering at any time?  Birthday party, holiday,

3   Thanksgiving, labor Day cookout, Christmas, or been to a

4   party at someone's home?  What room in the house has the

5   most people in it, invariably?  Even if it's a catered

6   party, you don't turn on the oven.  You don't turn on the

7   stove.  Where do people spend their time always?  Who

8   wants to vote "in the kitchen?"

9         But that's where Ms. Martin keeps 40 kilograms of

10  cocaine.  40 kilograms of cocaine is like half the size

11  of this lectern just kind of sitting there, oh, by the

12  way.  She wouldn't put it in a closet or anything.  She

13  will keep it in the kitchen.  And this is part of the

14  delivery.  Remember Mr. Echarte told us about the

15  delivery he made?  Remember he took Ms. Martin and he

16  carried it for her because he's such a gentleman, and

17  he's such a wonderful, kind guy?  Remember he said he

18  drove Ms. Martin's car; he had just had surgery.

19  Remember I asked him what kind of car did he drive?  It

20  was an Oldsmobile.  Believe Mr. Echarte that Ms. Martin

21  was driving an Oldsmobile in 2001.  For my money, I'm

22  going to believe Matthew Shannon, who sold her a Mercury.

23  You can believe what you like.  I'm going to take a 31-

24  year veteran of the D. C. bar before I take Emilio

25  Echarte.  Mr. Echarte wants what he wants, there's no

1 doubt about it, and he will do what he has to do to get

2 it.  And who cares what happens?  The check for that car

3 is in evidence.  Take a look at it.

4        Let's be real, folks.  If you've got 88 pounds of

5 cocaine, 40 kilograms in your kitchen, you're selling

6 weight.  Do you care about selling eight balls?  Do you

7 care about selling ounces?  You'd be there for the rest

8 of your life.  You don't buy that much and sale it out

9 piece by piece.  You buy large amounts, you sell large

10 amounts, and there is no suggestion by the government of

11 a sale of a large amount because it never existed.

12        In the single-minded pursuit of Ms. Martin, the

13 government doesn't care who gets in the way.  They have

14 their hypothesis, and everything is going to fit it.

15 I'll give you an example.  Before the grand jury, the

16 government's evidence said it was a package -- a package,

17 and Mr. Sussman asked the question, given to Ms. Harden

18 by Ms. Martin on March 29.  Now, you've seen the

19 photograph.  It's not a package.  It's a piece of paper

20 half the size of this.  It's not even folded over.

21 That's not a package.  And the difference is clear.  That

22 doesn't hold drugs, but a package could.

23        In their single-minded pursuit of Ms. Martin,

24 anything that doesn't fit the government's frame, it

25 doesn't get thrown away, it gets twisted and compressed

1  to fit in the frame.  So, just because you might be

2  downstairs being interviewed by Lisa Spinicio of U. S.

3  Pretrial Services at 7:45, 7:30, 7 o'clock in the morning

4  doesn't keep you from being in your apartment at 9:45 or

5  so in the morning with your husband cleaning up your

6  apartment.  Welcome to LaNora Ali's world.  Beam me up,

7  Scotty, right from the lockup back to my apartment.  Not

8  our testimony.  That's what they said.

9          Of course, their detailed, thorough investigation

10 didn't suggest to them they should maybe check the

11 directory on the front door at Sheridan for who lives in

12 what apartment.  You heard Ms. Ali's testimony.  They

13 moved out of -- excuse me, it was Mr. Garner's testimony.

14 They moved out of 301 to the bigger apartment up in 415

15 in, like, 2000 or 2001, a good three years before the

16 search.  I guess the government will catch up in about

17 three years.

18          Don't they read their own reports?  Can't they

19 finish the investigation?  Have they no shame?  Nothing

20 is ever the fault of the police.  The police know

21 everything.  They tell you that to a moral certainty.

22 After all, if there had been an excuse for going to the

23 wrong apartment, like the MVA records were wrong or

24 something, we would have had an MVA witness sitting here

25 saying, we didn't correct the records because we have to

1 lay the blame off on somebody.  The government spent huge

2 amounts of time that shouldn't have taken that much time,

3 like the gentleman from Southwest Airlines.  They could

4 have found somebody from the MVA that says nothing more

5 than they went to the wrong apartment, because they

6 didn't bother looking.

7        Look, they don't have a legal obligation.  And the

8 judge has instructed you to perform every possible

9 investigative item.  No doubt about it.  They don't have

10 to do everything.  They don't have to do it.  They don't

11 have a legal obligation.  But how about their moral

12 obligation, ladies and gentlemen?  How about their

13 obligation to the rest of us?  Not just these defendants

14 but all of the rest of us on the street?  Who hasn't

15 heard stories of governmental oppression?

16        MS. JOHNSTON:  Objection.

17        THE COURT:  Sustained.

18        MR. MONTEMARANO:  Well, what you're being asked to

19 do, no more and no less, ladies and gentlemen, is to

20 convict people based upon innuendo, association, based

21 upon wealth.  The government's agents are simply too lazy

22 to figure it out and run it down.  That's the bottom

23 line.  To run down all the way to N Street to Matthew

24 Shannon's office to find out about Mary Payne.

25        Let's look at Paulette Martin.  She can't have

1  that money.  She can't have that kind of money, because

2  we say so, and we're the government.  That's what they

3  said to you in June, and it's the same today, ladies and

4  gentlemen.  Anybody who gets in their way is going to get

5  run over and spit out if you question that.

6          Remember the cross-examination of Raquelle

7  Whiting, Mr. Whiting's daughter?  Does an attorney

8  deserve that?  Is there anything she said that wasn't

9  true?  Even close to fudging the truth?  Sure, she loves

10 her father.  She sat here and told the truth and got

11 kicked for it.  The only non-professional witnesses -- by

12 "professional," I mean people testifying in a

13 professional capacity -- other than Mr. Washington came

14 from the defense.  They brought in police, they brought

15 in custodian of records, and they brought in cooperators.

16 That's their job to testify.  The civilians -- our

17 witnesses -- the people without an interest: our

18 witnesses.  And I suggest, ladies and gentlemen, the

19 people telling the truth were our witnesses.

20         These are the kinds of questions I submit, ladies

21 and gentlemen, that should be important to you in your

22 deliberations.  The questions, however, that you think

23 are important are those which you think are important.

24 It is up to you.  You are the final arbiters of what is

25 true, what evidence to believe, what arguments to accept,

1 because arguments are merely that.  But I suggest, when
2 you apply a critical eye to the government's case, there
3 are so many holes that reasonable doubt is only the
4 beginning of what you'll find.

5        This is my only chance to speak to you.  I'm going
6 to be followed by all these other attorneys.  And then
7 when we're done, Ms. Johnston will have a crack at you
8 and a crack at us.  We don't get to speak to you again.
9 So I ask you, please, if there are questions that arise
10 from what she says to you, ask them to yourself.  Try to
11 substitute yourselves for us, because we cannot speak to
12 you again.

13        In about 30 seconds, I'm done.  Your job as the
14 jury, and your duty, I suggest, is to remain skeptical.
15 It is that kind of skepticism which makes this system
16 work.  You cannot accept unthinkingly or uncritically
17 what you're told by either side, but the simple fact is
18 we have no obligation, we have no duty, we have no
19 burden.  If these people had sat here like bumps on the
20 log -- and I don't mean the seven defendants, I mean the
21 seven attorneys, I know that's Fantasy Island.  Attorneys
22 being quiet never happens.  But if we had said nothing
23 and done nothing during the trial, no opening, no
24 closing, no cross-examination, and you didn't buy their
25 witnesses and their evidence and you had questions, or

1 you came up with some of the questions I've raised to you

2 on your own, you could acquit.

3          We have nothing to do here.  We don't have to do

4 anything.  They have to do it.  They've got to carry it

5 by themselves.  We're not here to help.  We're not here

6 to impede.  We're here to ask questions.  The ultimate

7 checks and balances in this system, ladies and gentlemen,

8 is you.  I ask your help, Ms. Martin asks your help, and

9 we thank you for your time.

10                    (At the bar of the court.)

11          THE COURT:  How far along are you?

12          MR. MONTEMARANO:  We're a little behind.  We were

13 hoping to get Mr. Martin and Mr. Hall in.  It looks like

14 we won't get Mr. Martin in, or Mr.  Hall in.

15          THE COURT:  There is no judges meeting now.

16          MR. MARTIN:  I would like to go now.

17          THE COURT:  Do you need a break?

18          MR. MARTIN:  No.  I'm not setting up anything like

19 that.  Let's just do it.  Let's keep going.

20          THE COURT:  We'll hear your closing argument, and

21 then we will break.  I can break for a short -- I don't

22 have to go a full hour -- 45 minutes.

23          MR. MARTIN:  I'm not going to speak for an hour.

24 I know you've heard that from others.

25          THE COURT:  I didn't suggest that.  I'm just

1 trying to be considerate of you getting your arguments

2 in.  I don't want to -- I'll revisit it when we you're

3 done.  Forty-five minutes for would be fine with me.

4        MR. MONTEMARANO:  The record will reflect 46, 47

5 minutes.

6        THE COURT:  I wasn't sitting up here with an

7 hourglass.  You may proceed.

8                (Back in open court.

9        THE COURT:  Ladies and gentlemen, I was addressing

10 the all-important question of lunch.  We're going to have

11 one more closing and then have lunch.  And unless there

12 is a big problem, I'm going to have it be a 45 minute

13 lunch so we don't have big train wreck at 6 o'clock.

14        You may proceed, Mr. Martin.

15        MR. MARTIN:  May it please the court.  Counsel.

16 Ladies and gentlemen of the jury, good afternoon.  Let me

17 thank you for your attention.  Let me thank you also for

18 your patience and the tremendous sacrifice that you've

19 made over the last several weeks.  And I want you to know

20 that all of us appreciate it on both sides of the room.

21 This is the last time that I get to speak to you.  My

22 name is Anthony Martin and I represent Learley Agreed

23 Goodwin.  Mr. Goodwin, again stand up please, sir.

24                (Defendant Goodwin stands.)

25        MR. MARTIN:  That's Mr. Goodwin there.  As I told

1 you in my opening statement, Mr. Goodwin is charged in

2 several counts, Count One, Count Two; there are the

3 telephone counts which are 18, 26, 48, 51, 54.  You don't

4 have to write that down because the judge has been kind

5 enough to give you a little index, a worksheet.  There is

6 also Count 55 which you heard something about.  I'm going

7 to talk about each one of these counts before I move into

8 discussing with you some of the evidence that you've

9 heard during this case.

10       Let me start with Count One, which is the

11 conspiracy charge.  I'm going to try not to repeat myself

12 or repeat other lawyers that you've already heard from.

13 With respect to the conspiracy charge, that is, as you

14 know now, an illegal agreement.  I submit to you that

15 there was no agreement on the part of Mr. Goodwin to sell

16 drugs with anybody.  His mere association and long time

17 friendship with Ms. Martin is not enough to establish him

18 as a coconspirator or a partner with her, as the

19 government has suggested.  There is no intent on his part

20 to become part of a larger group, and I'm going to talk

21 to you about the evidence and why I make that argument to

22 you.

23       There is no testimony regarding heroin and Learley

24 Agreed Goodwin.  There's questionable testimony regarding

25 Learly Agreed Goodwin and cocaine, and particularly crack

1 cocaine, and I'm going to discuss that in further detail

2 later on too.  With respect to Count Two.  Let me move

3 straight to that, because that's the count that I talked

4 to you about in opening statement where drugs were found

5 in Raynard Dorsey's car.  Remember back on 25 November,

6 2003?  Raynard Dorsey had access to this car prior to

7 setting up Mr. Goodwin.  Raynard Dorsey set up the

8 meeting with Mr. Goodwin at the mall.  Raynard Dorsey

9 directed the police to the plant when they couldn't find

10 it.  Raynard Dorsey was in custody at the time.

11        There are no recordings of any phone calls between

12 Mr. Dorsey the day before the meeting took place, the day

13 the meeting took place, or any time during the arrest.

14 There was no search of the vehicle prior to Mr. Goodwin's

15 arrest on November 25, 2003.  As I said to you before,

16 this vehicle was not registered to Mr. Goodwin, it was

17 registered in the name of one of Mr. Dorsey's relatives.

18 They didn't search Mr. Goodwin that day.  They didn't

19 have a surveillance on Mr. Goodwin.  There is absolutely

20 nothing to establish beyond a reasonable doubt that

21 Learly Agreed Goodwin knew about any of the contents in

22 that car, let alone this false Pepsi can that allegedly

23 contained crack cocaine.

24        Why do I say "allegedly?" Because I know you're

25 looking at me and you're saying, well, Mr. Martin, even

1  if it wasn't Mr. Goodwin's car, and even if he didn't
2  know that there were drugs in that Pepsi can, certainly
3  that was crack cocaine.  I submit to you that there
4  wasn't a single chemist who came in here and testified
5  that any of the cocaine found contained sodium
6  bicarbonate in it or was smokable.  Not one.
7          And to a person, including the government's
8  witnesses, whenever you heard testimony about how crack
9  is made, how it's concocted, or how it's produced, one of
10 the things you always hear is baking soda.  Well, in the
11 absence of baking soda, and in response to my questions
12 to Gervisone and the other chemist, I asked them, aren't
13 there various types of cocaine base?  Gervisone
14 understood immediately where I was going and he didn't
15 quibble with me.  Mr. Dang did quibble with me, but after
16 a while he too had to admit that, yes, there are various
17 types of cocaine base, including the coca leaf itself and
18 the cocaine that's present there, the paste that's
19 produced from that coca leaf, the freebasing that I had
20 talked about.  And some of you may remember the comedian
21 Richard Pryor who burned himself while using.  Then they
22 are trying to separate out some of the substances.  And
23 then there is what is commonly known as crack.
24          But not one of the chemists who came in here
25 testified that any of the substances that were tested

1  contained sodium bicarbonate.  So, even if you find that

2  there was cocaine in that Pepsi can that day, you cannot

3  find that that substance was crack.

4          Now, with respect to the telephone counts.  If you

5  look at those telephone numbers, not one of them are

6  registered to Learly Agreed Goodwin, and I mentioned that

7  to you in opening statement.  Not a one.  And with

8  respect to those phone calls, I believe that only one of

9  those is initiated by Learly Agreed Goodwin.

10         Now, again, we are not denying that he and

11 Paulette Martin have a long-term relationship, and

12 they're very close.  They regard each other as siblings.

13 Just as some of you may have very close friends of your

14 family that you call auntie or uncle.  They're not really

15 related to you by blood, but you refer to them as you

16 might refer to a relative.  There are no wiretaps on

17 Learly Agreed Goodwin's phone.  And I asked you again to

18 pay attention to who's initiating the calls.  And on

19 these calls, there is no mention specifically of illegal

20 drugs.

21         Now, you would have to take Sergeant Sakala at his

22 word that this involves drugs.  And I'm not going to tell

23 you that Detective Sakala took that stand under oath and

24 lied under oath, because I don't believe that that's what

25 he did.  I do believe that Sergeant Sakala believes that

1  in those conversations there was coded language and that
2  at times people were talking about drugs.  You're not
3  going to convince him otherwise, and he is not going to
4  budge from that, and that's his privilege to do so.  But
5  your job is a little different, because your job is to
6  stand between the government and someone who's accused.
7          It is your job, as members of the community, to
8  decide whether somebody has in fact committed the offense
9  for which they've been charged with.  And I know you take
10 that responsibility seriously, and the judge, you may
11 recall, give us a little history lesson on why that's so.
12 So, that's another reason to thank you, because it's a
13 very important function that you're playing today.
14         So when you listen to the testimony of someone
15 like LaNora Ali, who very bravely took the stand and
16 explained to you why it is that the good sergeant was
17 wrong with respect to conversations, you have to ask
18 yourself, well, if he was wrong with respect to LaNora
19 Ali, who else might he have been wrong with respect to?
20 It doesn't mean -- it doesn't mean that he was lying.  It
21 just means that even if he's convinced, as he said to a
22 certainty, and I've never heard the term "moral
23 certainty," but that's the term he used.  Even if he's
24 convinced to that degree, it doesn't mean that he's
25 right. For a long time people believed that the earth was

1 flat.  That wasn't right either.

2        Count 55.  May 15, 2004, possession with intent to

3 distribute 500 grams of cocaine hydrochloride.  This is

4 the powder.  My recollection -- and yours -- of course,

5 your collective recollection is controlling -- is that

6 there were no drugs seized on that day.  In fact, I think

7 one of the questions I asked the good sergeant was

8 whether or not the pole cam was working on that day.  And

9 I can't remember if it was Sergeant Sakala or whether or

10 not it was Eveler.  I can't remember which one it was

11 that I asked, but I asked whether or not there was ever

12 any video of Learly Agreed Goodwin at any time going to

13 Haywood.  In fact, the way I put it to them was, isn't it

14 a fact that there is no video?  And it turned out I was

15 wrong.  There was in fact one.  And I believe that that

16 occurred sometime later, but it wasn't on that date.

17        So, please don't get confused when you say, well,

18 oh, I remember the Benny Hill video where they showed the

19 guy running back and forth and I think it was Sergeant

20 Sakala who said, yeah, that's Learly Agreed Goodwin.

21 Well, I've been sitting next to Mr. Goodwin for the

22 better part now of two months, and I put on my glasses

23 and I still couldn't tell.  By now you probably realize I

24 have bad eyes.  I took a really good look at that, and I

25 couldn't tell who that was.  In fact, I had a hard time

1 determining if it was even a man.  But that's the video
2 that they showed.

3        It wasn't May 15, 2004.  And unless I'm wrong, I
4 don't recall any drugs that were seized on that day and
5 that are now presented to you to prove that Mr. Goodwin
6 or anybody else was in possession of 500 grams or more of
7 cocaine powder on that particular day.

8        So, these are the questions that I asked.  You did
9 not testify as to what Learly Agreed Goodwin drove during
10 May 2004.  You did not testify as to what car he was
11 driving on May 15, 2004.  The pole camera was on May 15,
12 2004.  It was on 24/7, wasn't it?  And the tape showed a
13 fast forward of a blurred figure.  And you didn't follow
14 Learly Agreed Goodwin to her house, did you?  And you
15 didn't stop Learley Agreed Goodwin after the figure left
16 her house?  And you assumed that that figure was Learly
17 Agreed Goodwin.  Those were the questions that I asked.
18 Again, if I didn't, I certainly intended to.  But your
19 recollection controls.  That's what's in my notes.
20 That's when I leaned over to look and see what questions
21 do I need to ask this particular witness.  And I submit
22 to you when you look at your notes, that's what you're
23 going to find.  You can ask for the videotape that was
24 played.  It wasn't for 15 May 2004.  I think if you look
25 at that tape, you're going to see why I call it the Benny

1 Hill tape.

2          The evidence presented by the government included
3 audio tapes, videotapes, and the transcripts, as you
4 already know, are not actually evidence.  Now, we had
5 some witnesses also for the government.  They like to
6 call them "cooperating witnesses."  Again, when you
7 walked in through that door outside, nobody said you had
8 to leave your common sense outside when you came in here.

9          The government can call them cooperating
10 witnesses, but the truth of the matter is they're
11 coerced.  They're coerced cooperators.  And how are they
12 coerced?  They're coerced, ladies and gentlemen, because
13 the thing that we cherish most in this life is our
14 freedom, is our liberty, and that's what everybody wants.
15 They want their freedom.  If you're locked up, you're
16 always trying to think of what you're going to do when
17 you get out and how you can get out.  And if you've ever
18 seen a fish out of water, the first thing it's doing is
19 flopping around.  Because what's it want to do?  It wants
20 to get back in the water.  It's no different in this
21 particular instance.  So when they're talking about
22 cooperating witnesses, I submit to you what they're
23 really talking about are people who are under duress.

24          They also presented unindicted coconspirators.
25 They presented professional witnesses.  That's right,

1  people who are trained how to testify.  People who are

2  trained and practice getting in front of people just like

3  you, pointing to charts, looking at the jury instead of

4  looking at the person who is questioning them, which is

5  what people ordinarily would do.  And being convincing.

6  And that's what the government put on, professional

7  witnesses.

8         They also put on government employees, and these

9  employees were prepped in their testimony.

10 They knew exactly what was expected of them because they

11 already heard the questions, I submit to you.  They knew

12 what was going to be asked.  And as a result of knowing

13 what was going to be asked, they knew what responses to

14 give.  If you doubt that for one minute, consider how

15 those same witnesses behaved and how their memories

16 suddenly became empty when they were put under cross-

17 examination.  Either they didn't want to cooperate with

18 the cross-examination, or they couldn't recall.  But as

19 soon as redirect came up, suddenly their memory came back

20 to them.  They are professional, and they're biased, and

21 consider that as well.

22         Now, let me move to some of these, one in

23 particular.  Michael Thurman.  Michael Thurman gave

24 evidence against Mr. Goodwin.  Michael Thurman, you will

25 recall, is a very tall fellow, sometimes referred to as

1  "Cadillac Mike."  He was a drug dealer from some time
2  back.  He had drug contacts and family in Texas.  He
3  leased cars for transportation.  He had a motive to lie.
4  As I told you before, he wanted a sentence reduction.
5  And I noticed the same thing that Mr. Montemarano
6  mentioned to you.

7        The entire time, for the first, I guess it was a
8  day or half day, that that gentleman was up there on the
9  stand, his head -- the back of his head was turned so
10 that the people at the latter half of the table couldn't
11 see him.  He would not look at the defendants.  I submit
12 to you there's a reason for that.  Why couldn't he look
13 the defendants in the face?  Now, I don't know why the
14 following day he was able to sit and look straight.  I
15 don't know if it was suggested to him that it might be
16 more convincing and more credible for him to assume that
17 posture, but it was corrected the following day.

18       Now, he says that this drug organization has, at
19 its center, at its nucleus, Mr. Learly Agreed Goodwin and
20 Paulette Martin.  Yet, it is Mr. Thurman who, as I said
21 before, has the connections in Texas.  He has the
22 suppliers.  He has the helpers.  He has the UPS
23 connection.  He has access to cars and car rentals.  He
24 has various addresses to use the Budget rental car, as I
25 mentioned, and he has the false corporation for a

1  telephone account.

2        Seems to me -- and again, it's really not

3  important what I think.  What's important is what you

4  think.  I submit to you that if you look at this and you

5  apply your common sense, it seems that this isn't a

6  fellow who needed an organization run by these people

7  here, because he already had his own organization and

8  that organization was national in scope.

9        The other thing you may recall about Mr. Thurman

10 is he does not recall anything regarding any questions

11 that I asked him about events that occurred in 2003 and

12 2004.  However, the same witness can recall with

13 specificity and detail just about every event the

14 government has asked him about, and I submit to you that

15 also goes to his credibility.  He knows that he can't get

16 a sentence reduction by pleasing Mr. Goodwin.  He can't

17 even get a sentence reduction by pleasing His Honor.

18 There's only one way he's going to get a sentence

19 reduction, and that is if these good people who are

20 sitting over here make a motion or do something, or agree

21 to work out a deal and help him get his sentence reduced.

22 These are the people, with all due respect, that he wants

23 to please.  Again, he wants to get out.  I want you to

24 consider that.

25        Before I move on from Mr. Thurman, let me check my

1 notes very quickly, because there was so much that I

2 wanted to say to you about him.  Oh, yes, the stash cans.

3 Remember him talk about the apartment at Anacostia and

4 how the cans were there?  You may also recall that Mr.

5 Thurman testified that he purchased these stash cans at a

6 store called Starship.  Yet, the government would have

7 you believe, through Mr. Thurman and others, that he was

8 supplied with these stash cans by Learly Agreed Goodwin.

9 He told you out of his own mouth that he bought these

10 through a company called Starship.  Also, his cousin is

11 not to be charged, and neither is his girlfriend.  And

12 again, I leave that to your own common experience and

13 good sense as to why that might be.

14       Horace Smith, another drug dealer that was brought

15 in here by the government who walked through that door,

16 and when he finished testifying walked out that door.

17 Horace Smith is a drug dealer from way back.  He is

18 Raynard Dorsey's cousin.  I submit to you that that blood

19 also made him very willing to come in here as Raynard

20 Dorsey's surrogate.  Mr. Smith came in here and he gave

21 some very damaging testimony against Mr. Goodwin, but

22 there is absolutely nothing -- nothing to corroborate or

23 support his testimony.  This is a gentleman who was

24 arrested in August of 2003.  August of 2003, Mr. Goodwin

25 was still on the street.  And I submit to you, if he was

1 arrested in August of 2003, it is possible that he was

2 cooperating with the government shortly thereafter,

3 Because he's not locked up.

4        Why wasn't there a controlled buy with Horace

5 Smith, since he's buying drugs from Learly Agreed

6 Goodwin?  That's what he told you, he's buying drugs from

7 Learly Agreed Goodwin.  So where is the controlled buy?

8 If they really think that this man is so important that

9 they're going to put him in the middle of this

10 organization, don't you think they'd have a setup?  Not

11 the kind of nonsense that took place on November 25,

12 2003, because they knew that was weak.  Don't you think

13 that they would have had Horace Smith buy drugs from Mr.

14 Goodwin because he says he's doing that anyway?  He's got

15 Mr. Goodwin's confidence, doesn't he?  If you believe

16 him.  That didn't happen.

17        They don't have any pin registers to show

18 telephone calls between Horace Smith and Learly Agreed

19 Goodwin to corroborate Horace Smith's testimony that he

20 would contact Mr. Goodwin.  There's absolutely no

21 corroboration for that.  None.  And he admits that,

22 Horace Smith, that he only knows Mr. Goodwin through

23 Raynard Dorsey.  And he admits that he saw the Pepsi

24 bottles at Aries Place, where Raynard Dorsey lived.  And

25 he also admits that Raynard Dorsey had a white Cadillac.

1  I don't think there's any dispute about that.  That was

2  Raynard Dorsey's Cadillac.

3       The other reason I want to thank you is because

4  it's been very cold in here, and you've had to suffer

5  through that like I have.

6       Emilio Echarte.  He was entertaining, to say the

7  least, but I'm going to cut to the chase with respect to

8  him.  He lied to Ms. Greenberg during the initial proffer

9  session.  He lied to the grand jury, 23 people just like

10 you from the community.  He lied about his citizenship

11 status.  He lied about his name and admitted that he used

12 different names in the past.  He told you that he was a

13 40-year heroin addict, that he has a career anyway

14 involving heroin for 40 years.  In short, he lies about

15 the significant things in life.  And there is nothing

16 more significant, I suggest to you, than your liberty.

17 The only thing that comes before your liberty is your

18 life.

19       What did he tell you?  Yes, I'm hoping to get out

20 of jail at some point.  And he didn't deny that he, you

21 know, he would walk away from a sentence reduction.  In

22 fact, he hopes to live a long time.  So even if he had to

23 do a lot of time, he hopes and expects that he will get

24 out at some point, if these good ladies here would help

25 him in that regard, because he's helped them now.

1        Let's move on to Detective Martini.  Do you
2   remember him?  He's the detective who said he was told by
3   Detective Grant that a Aiesha Goodwin told him that the
4   drugs were in the car back on November 25, 2003.  I know
5   you're saying, well, my God, that's hearsay.  That's
6   hearsay on hearsay.  How does that even come in?  It's
7   double hearsay.  It did come in.  Eventually, the
8   government called Detective Grant.

9        Again, that was hearsay, because Detective Grant
10  said that Aiesha Goodwin told him that the drugs were in
11  the car.  The interesting thing about that particular
12  testimony -- both of those -- was such an important fact
13  was never recorded in any report by Detective Grant or
14  Detective Martini.  Now, again, your recollection
15  controls.  But my recollection is that I asked Detective
16  Grant about that.  I asked him whether or not he had
17  actually recorded that, and he said no.  I asked him, I
18  said, well how long have you been a police officer up to
19  that point anyway?  He said eight and a half years, and
20  he had been involved in hundreds of arrests and
21  investigations.

22       Having been involved in hundreds of arrests and
23  investigations, but not having memorialized that day, he
24  remembers it with such clarity when he's called in by the
25  government to testify about it.  And I ask you to apply

1   your common sense.  Does that make sense to you?
2   Hundreds of arrests, routine drug busts, you know, small
3   quantity of drugs in a car, and you're going to remember
4   that?  He says he does.  And he also denied being prepped
5   by the government regarding his testimony.  I submit to
6   you, he's incredible.  And I'll tell you why he's
7   incredible.  Because later on, Roger St. Louis, who is a
8   police officer not in Prince George's County but in
9   Montgomery County, testified.  That was on June 21, 2006,
10  a Wednesday, and I don't know if you've dated your notes.
11          And even though Roger St. Louis didn't testify in
12  any way against Mr. Goodwin, I took that opportunity to
13  ask him, how long have you been a narcotics officer?  And
14  he said he's been a narcotics -- in the narcotics section
15  for nine years.  That's about the same amount of time as
16  Detective Grant.  And I asked him, I said, would good
17  police work involve taking down detailed notes?  And
18  memorializing events like someone informing or advising
19  you where they could find drugs?  And his testimony was,
20  yes, of course, that would be good police work and he
21  would do that.
22          So you have one officer telling you it wasn't that
23  important; I didn't do it, but I remember it.  And you
24  have another police officer telling you, yeah, you want
25  to memorialize something like that.  The second officer

1  had absolutely no reason to be evasive because he didn't

2  know why I was asking him those questions because it had

3  nothing to do with the reason he was here, but it had

4  everything to do, as far as I was concerned for Mr.

5  Goodwin, because I wanted to show that Officer Grant and

6  Officer Martini were not credible in that regard.

7         Remember Greg Shearer, the young police officer

8  from the -- he's the detective from -- the Prince

9  George's County police officer.  Very young.  I was

10 surprised that he was a detective for as long as he was,

11 to be frank.  And I asked him, I said, detective, do all

12 of the detectives in the narcotics section have Nextel

13 connect telephones?  And he said, yes, we do.  And I

14 asked him, would that include Detective Grant?  He said,

15 yeah, probably so.  Why did I ask that question?  I'll

16 draw the line and connect the dots now.  The reason for

17 that was -- if you're familiar with Nextel, you know that

18 when somebody clicks you, you can oftentimes hear the

19 person calling.  You can hear the voices.

20        I submit to you, ladies and gentlemen, that it

21 would not be beyond possibility or the more likely

22 occurrence that it wasn't Aiesha Goodwin who was being

23 detained and who said, my father keeps the drugs in the

24 Pepsi bottle, that instead it was the person who set up

25 the deal and after they took a very long time to find the

1 drugs who said, "click, click," look in the Pepsi bottle.

2 You heard testimony that there were several people who

3 had access to that car, not only Mr. Goodwin.  So, that

4 count -- there's plenty of doubt on that count.  There is

5 no way that Mr. Goodwin should be found guilty on that

6 count.

7         Now, there were witnesses called by Mr. Goodwin,

8 and they are not the -- they're not pillars of our

9 community, all right?  They're not the cream of the crop,

10 so to speak.  But they came in here and they testified

11 under oath, without any threat, coercion, promise of any

12 benefit of any sort.  They were not professional

13 witnesses.  They weren't threatened with incarceration as

14 far as I know.  They didn't have to worry about sentence

15 reduction.  They came, they took the stand under oath,

16 and for some of them it was painful.

17         Mario Bracket, he was the first to be called.  And

18 he offered an opinion regarding Horace Smith and his

19 credibility.  And he told you that as far as he was

20 concerned, his opinion of Horace Smith's credibility was

21 he had none, and you never heard why, and there was a

22 reason for that that you didn't hear it.

23         Cynthia Winestock offered an opinion regarding

24 Horace Smith as well, and her opinion regarding his

25 honesty was he too was incredible.  And she told you that

1 Horace Smith and Raynard Dorsey were related.

2          You heard Maurice Bowman.  He testified, and he
3 testified regarding Michael Thurman, and he told you
4 about Michael Thurman's drug dealing at Lobo's.  Now,
5 Maurice Bowman -- you may recall I said Mr. Bowman, did
6 you see Mr. Goodwin prior to testifying?  And he told you
7 he did.  The reason I asked him that was because the only
8 way that I am going to have any influence on a jury
9 panel, be it this one or any other, is to be completely
10 honest with you.  I wanted that to come out because I
11 knew that Mr. Bowman had seen Mr. Goodwin.  Cynthia
12 Winestock also had spoken with him.  As you know, she had
13 handled some of his business dealings for him after he
14 was arrested.  Mario Bracket, I asked him the same thing.
15 He didn't know Mr. Goodwin.  You may recall that.

16          Now, there was a lot of evidence that you didn't
17 see and hear.  With the exception of Paulette Martin, you
18 didn't hear that Mr. Goodwin was making phone calls to
19 any of these other people here on this chart.  You didn't
20 hear about Mr. Goodwin carrying money for any other
21 codefendants.  Mr. Goodwin wasn't arrested with any other
22 codefendants.  There were no ledgers for Mr. Goodwin's
23 customers, as the government might allege.  If he's this
24 drug dealer who's selling to people, where are his
25 ledgers?  How does he keep track of these large

1   quantities of cocaine and money that might be owed to him

2   by people he's distributing to?

3           There are no fingerprints on any of the weapons

4   referred to that were found at Oglethorpe.  There were no

5   fingerprints on any of the baggies.  There is no DNA

6   linking Mr. Goodwin to any the drugs, guns, or any of the

7   paraphernalia.  You received an instruction that says the

8   government doesn't have to do these things, but the fact

9   the government doesn't produce it doesn't mean that they

10  didn't try.  In fact, we saw with respect to the

11  toolboxes that came out of Oglethorpe that they had in

12  fact been dusted.  And we know that the government has

13  used DNA on this case and during this investigation,

14  because Ms. Dobie's DNA has been introduced, or the

15  results of the DNA test.  And again, your recollection

16  controls.  That's what my recollection is.  And if I'm

17  wrong, I'm sure Ms. Johnston will get up and she'll tell

18  you that later on.  But, check your notes.  Don't take

19  her word for it.  See what your notes say.

20          I already mentioned to you that the cocaine seized

21  and allegedly linked to Learly Agreed Goodwin, that there

22  was no evidence that any of that is crack.  I'm not going

23  to repeat myself with respect to that or with respect to

24  the ledgers.  Let me get to the audio tapes though.

25  10,000 -- 10,000 contacts.  850 of those contacts -- a

1  little more than 850, I think it was, were directly

2  linked to Learly Agreed Goodwin over several different

3  phone numbers.  More than 850.

4          We now know that a contact could be a recording,

5  or a phone line that rings and isn't necessarily

6  answered.  That's a contact.  I suggest to you that

7  that's an inflation designed to make it look like there

8  is a lot of conversations and activities taking place

9  here.  I want you to consider that kind of inflation when

10 you're thinking about, why is it that the government has

11 decided to do that?  Why couldn't they have just said,

12 well, we've got these five, six or seven phone calls, and

13 this makes our case?  The government's argued to you that

14 they've done that because they've got the burden of

15 proof, this high burden that they have to meet, and

16 that's why they're doing that.  I suggest to you that

17 there's another motive, and it may be much more sinister.

18          If you want to paint a person in a bad light, you

19 do that by making it look like there are a lot of phone

20 calls involving drug activity, and that was not the case.

21 And we heard repeatedly even from Sergeant Sakala that

22 there were legitimate phone conversations -- well, phone

23 conversations not involving drugs.  I don't think

24 Sergeant Sakala would ever agree that anything discussed

25 by Mr. Goodwin and Ms. Martin were legitimate; I don't

1  think he would concede that point.  But again, I leave it

2  to your common sense whether or not that was inflated and

3  whether or not there were legitimate phone conversations.

4          With respect to those audio tapes, I think the

5  good sergeant said right up until the time this trial, he

6  was still listening to transcripts, and he was still

7  making corrections.  What does that tell you?  That when

8  he first looked at the transcripts and made corrections,

9  that he was certain then that that was correct, and then

10  later on he went back and looked again and made

11  corrections and -- how many times does he have to go

12  through it until he reaches that certainty where we can

13  be certain that he's correct?  More importantly, that you

14  can be certain.

15          I already mentioned the videotape.  I think the

16  videotape was 29 April 2004.  I think the exhibit number

17  is Video 27.  Again, I'm not certain of that, but that's

18  the video that I think you should ask for.  And if it

19  turns out that that's not it, then you can ask the court

20  to produce that and look at it.  And that's the one where

21  the figure is running from a vehicle to Haywood and back

22  out of the vehicle, a vehicle, I might add, which was

23  never identified or linked as being Learly Agreed

24  Goodwin's.

25          I already talked to you about the lab reports.

1        I already mentioned to you that whatever was

2  seized or taken -- well, there was nothing taken in May,

3  as far as I know, 2004.

4        I made general arguments to you regarding the

5  calls and the intercepts, and you've already heard from

6  Ms. Ali about different things that were thought to

7  involve or regard one thing, and in fact it had a very

8  innocent meaning.

9        Quantities.  I don't know how anyone can divine

10 the quantities.  Even if you accept the argument that

11 this business about tickets may, from time to time, refer

12 to some controlled substance, be it cocaine, cocaine

13 base, be it marijuana, whatever it might be, how the

14 government expects you to know what the quantity is --

15 ladies and gentlemen, I don't know.  I don't know how

16 you're going to do that.  I suggest to you that there's

17 too much doubt with respect to the quantities.  You're

18 not going to be able to do that on the evidence that you

19 have before you.

20       Moreover, the government would actually try to

21 bolster its case and corroborate the conclusions come to

22 by Sergeant Sakala by quoting Paulette Martin, and I

23 submit to you that many times in those conversations with

24 other people where Paulette Martin was referring to her

25 brother, who may or may not have been Learly Goodwin in

1 some of those conversations, she wasn't always telling

2 the truth.

3          In fact, I think sometimes -- again, what I think

4 is irrelevant, but I submit to you, look at those

5 conversations.  And I submit to you that what she was

6 doing was trying to get rid of the other person on the

7 line.  And the conversation that I have in mind

8 specifically is one where someone is allegedly, if you

9 believe Sergeant Sakala, complaining about the quality of

10 a particular drug purchase from Ms. Martin, and she

11 mentioned her brother had no problem with it.

12          I submit there are two problems with that.  We

13 don't know who her brother was in that instance, because

14 we know that at least one other person in this room has

15 been referred to by her as her brother.  And we also know

16 that she sometimes tells people that she's going to go

17 places, and then she doesn't go.  So, who knows?

18          Different properties were discussed with respect

19 to Mr. Goodwin.  There was the property at Anacostia;

20 again, there were items found there.  Mr. Goodwin doesn't

21 deny that he owns property at Anacostia, and it was at

22 one point searched.  I think you heard about Richard

23 Johnson living there and things that were taken out of

24 that particular apartment.  Again, there's nothing

25 linking Mr. Goodwin to any of the contraband that was

1  seized at Anacostia, nothing.  No objective tests to

2  suggest that Mr. Goodwin owned any of that.  What you

3  have is the testimony of Michael Thurman, who had access

4  to that apartment, as did Tiffany Vessels.

5        Constitution Avenue.  Very little was mentioned

6  about that.

7        Farragut.  We did hear that Mr. Goodwin owned

8  Farragut.  We know that there were several bedrooms in

9  Farragut.  And I think the most important thing the

10 government would say to you about Farragut is a kilo of

11 bad cocaine was found downstairs in a file cabinet, and

12 you may recall the picture of that file cabinet.  We also

13 know because the evidence has suggested that there was

14 more than one bedroom and more than one person or persons

15 living at Farragut, and that the basement was a common

16 area.

17       We also know, or the evidence has suggested that

18 that file cabinet came from Lobo's.  We also know, and

19 the evidence has suggested, that Michael Thurman worked

20 at Lobo's, as well as Michael Jackson.  So, now the

21 government would have you leap from that being there to

22 it being possessed knowingly by Learly Agreed Goodwin,

23 and they would have you believe that he goes in that file

24 cabinet often enough to know what was in it when it was

25 moved from Lobo's to wherever, to the basement.  I

1  suggest to you there's doubt with respect to that as

2  well.

3       Florida Avenue.  Lobo's.  It was searched on

4  October 17, 2002.  According to my notes, it may be 2003.

5  I think it was 2002.  Again, Mr. Goodwin wasn't on the

6  scene.  No fingerprints.  The labelling of all of those

7  items and all of those drugs that say Goodwin, that isn't

8  because Mr. Goodwin says they're his, that's because the

9  government says they're his.  And please keep that in

10 mind with respect to anything that's labeled Goodwin

11 Exhibit A through Z, or 1 through 1,000.  Mr. Goodwin has

12 admitted to nothing.  None of those drugs are his.

13      You are the only ones who can assure that Mr.

14 Goodwin has a fair hearing.  You're not on a timetable,

15 irrespective of how many times you've heard we're going

16 to be out of here by August 11.  Please, ladies and

17 gentlemen, don't do that to any of these people here.

18 Please consider each and every one of them separately.

19 Consider the evidence that's there or not there with

20 respect to each and every one of them separately.  Go

21 through your worksheet very carefully.  Consider the

22 arguments of each and every person, because you're not

23 going to agree on everything.  That's just not going to

24 happen.  Unless I'm fooled, I think everybody here takes

25 this very seriously.  Give consideration to the arguments

1 of your fellow jurors and respect one another.

2          Now, you didn't get an instruction on reasonable

3 doubt, I don't wear a black robe, but I would suggest to

4 you that --

5          MS. JOHNSTON:  Objection.

6          THE COURT:  Sustained.

7          MR. MARTIN:  It's argument, Your Honor.

8          THE COURT:  Sustained.

9          MR. MARTIN:  The government has to prove its case

10 beyond a reasonable doubt, and that's the highest

11 standard of proof that we have in our system of justice.

12 Keep that in mind.

13          The last thing that I'd say to you is this.  I

14 said it to you in the beginning, and I say it now:  Mr.

15 Goodwin was presumed innocent on the day of his arrest

16 back on June 1st 2004.  Mr. Goodwin is presumed innocent

17 as he sits there, and he's presumed innocent as you go

18 into that room into closed session and deliberate.  He's

19 presumed innocent.  And after you've looked at these

20 various charges and considered everything that he faces,

21 Mr. Goodwin is confident that you're going to come back

22 and acquit him.  Thank you for your attention.

23          THE COURT:  All right, ladies and gentlemen.

24 Unless there's a problem with this, I'm going to have an

25 abbreviated lunch so we can get everything done today.

1 So, let's resume at 2:00 p.m.

2                    (Off the record at 1:18 p.m.)

3                    (On the record at 2:04 p.m.)

4        THE COURT:  Are you ready to go?

5                    (Jury returns at 2:11 p.m.)

6        THE COURT:  Mr. Hall, you may proceed.

7        MR. HALL:  Thank you, Your Honor.  May it please

8 the court.  Counsel.  Good afternoon, ladies and

9 gentlemen.  The first thing I'd like to do is thank you

10 for the time you've put into this case.  And I realize

11 having nine lawyers come up here and thank you over the

12 whole course of the day is maybe gilding the lily a

13 little bit, but I also want to tell you that my client,

14 Reece Whiting, thanks you.  Because it is you, the jury,

15 that passes between him and the government in this case

16 in a very critical juncture of his life, and both I and

17 he appreciate the amount of time you have put into this

18 case, and we appreciate the amount of thought you're

19 going to put into his case when you go back into the jury

20 room.

21        Every time I come into this courthouse to try a

22 case, I consider it a real privilege, and I always

23 consider it a real honor to try cases with such qualified

24 counsel as you have seen in this trial.  When I say that,

25 I mean both the defense attorneys, and I also mean the

1 prosecution.  But having said that, I will tell you that
2 as much as I may admire the prosecutors individually, I
3 will spend the remainder of my closing argument attacking
4 their case.

5        Now, there's a couple of things that I think we
6 need to establish, sort of as ground rules, before we
7 talk about the evidence.  And let me go through a couple
8 of things with you.  First of all, you have been told by
9 the court, and I believe by my co-counsel when they
10 talked to you, that each and every defendant is presumed
11 to be innocent when they come into this court, and that
12 presumption remains with them throughout this case.
13 It doesn't change or turn on a particular piece of
14 evidence coming in during the course of the trial or any
15 particular moment in the trial.  That presumption stays
16 with them until you go back in the jury room.  And it
17 continues with them up until, and only if, you reach a
18 contrary conclusion.

19        Coupled with that, and I know it's been stated by
20 the court, but it bears repeating, it is the government's
21 burden to prove this case.  They must prove this case to
22 you beyond a reasonable doubt.  When you are told that
23 they have to prove this beyond a reasonable doubt,
24 remember they must prove to you each and every element of
25 each crime that each defendant is charged with, beyond a

1 reasonable doubt.  If you have a doubt -- a reasonable

2 doubt as to one element of an offense, then it's your

3 duty to acquit the defendant on that particular crime.

4          Now, the crime that we're going to be talking

5 about through most of this is conspiracy.  The court has

6 told you that there are several elements to a conspiracy.

7 One is, you must have an agreement.  And two, it has to

8 be either with the intent to distribute or to possess

9 with intent to distribute a controlled, dangerous

10 substance.

11          You cannot have a conspiracy if you don't have an

12 agreement.  To put it specifically in the context of Mr.

13 Whiting's case, unless -- remember the only person he

14 dealt with during these wiretaps and during anything that

15 you heard in this case, unless you find an agreement

16 existed between Mr. Whiting and Mrs. Martin, you can't

17 have a conspiracy.  What I suggest to you, ladies and

18 gentlemen, is that the phone calls that you heard in this

19 case, which comprises a large part of the government's

20 evidence, do not show you an agreement.  That agreement

21 is lacking.  That agreement is not there, and I'm going

22 to take a few minutes to demonstrate that with you.

23          I'm not going to go through each and every phone

24 call with you.  You have heard them sometimes more than

25 once, and you will have an opportunity to hear them in

1 the jury room.  But what I do want to do is highlight a

2 few to you, and I want to give you sort of a way of

3 looking at the calls.  You have a series of phone calls

4 between Ms. Martin and Mr. Whiting in which the

5 government alleges that Mr. Whiting is trying to get

6 drugs from Mrs. Martin, and that that is their theory, or

7 part of their theory of the conspiracy.

8        I'll just very briefly write here on the board

9 which calls we're talking about and which dates, and

10 these are the calls which the government expert witness,

11 Officer Sakala, talked about tickets and the meaning of

12 tickets.  We have call B-82 on 3/9.  These are all in

13 2004, so I'm going to drop the fours.  B-384 on 3/12,

14 B-572 on 3/14, B-1781 on 3/26, B-2354 on 3/31, B-4426 on

15 4/25, and B-8064 on 5/28.  Now, there are some calls that

16 there may -- an argument could be made that maybe there

17 is some overlap between the ticket phone calls and other

18 subjects, but these are the vast bulk of the ones which

19 involve the word tickets.

20        And the point that I want you to remember about

21 each one of these phone calls is that -- I want you to go

22 back and look at them again, or listen to the tapes again

23 back in the jury room.  But as to these phone calls,

24 there is not one phone call in which Reece Whiting says

25 anything to Ms. Martin about getting tickets and Ms.

1 Martin says, come on over; or, I got something for you;

2 or, meet me at a certain location.  It never happens.

3 There is never an agreement between Reece Whiting and Ms.

4 Martin with regard to any tickets being provided or to

5 believe what Detective Sakala says any drugs were being

6 provided.  If you don't have an agreement, you don't have

7 conspiracy.

8        And another very interesting point about that, and

9 I ask you, and I didn't bother listing these phone calls,

10 and I won't.  But, go back and look at the phone calls

11 that happened on either side of these other phone calls.

12 The phone call just before B-82, or the phone call just

13 after B-572.  Mrs. Martin has drugs for everybody else,

14 but she never has drugs for Mr. Whiting.  Now, why is

15 that?  Well, we don't know what's in Ms. Martin's mind,

16 but there's a couple of things that you should take into

17 consideration.

18        You heard Mr. Whiting's testimony.  And with all

19 due respect to Mr. Whiting, and I'm sure he won't take

20 any insult from what I'm about to say, but you could

21 characterize what Mr. Whiting is doing or what his

22 purpose was, is that he was kind of a mooch.  He told you

23 that he liked to get a little bit of free drugs.  He'd

24 like to go to a show.  And quite frankly, if Ms. Martin

25 would -- had been so inclined, he would like to have had

1   a romantic relationship with her.  That may have been a

2   reason for her to avoid him, I don't know.

3        But another reason she may have avoided him is the

4   fact that, as you heard during the course of this case,

5   he had a substantial record.  The last time he was in

6   prison, he had gotten a sentence reduction, and maybe she

7   feared that he would talk.  Maybe she feared that if she

8   had provided him with drugs or that she engaged in any

9   sort of dealings with him, it might come back to haunt

10  her.  I don't know what was in her mind, but the point is

11  that Ms. Martin turned him down every time he tried to

12  contact her in reference to what the government's witness

13  says is drugs.

14       Now, another theory that the government has is

15  that Mr. Whiting was giving Ms. Martin advice, and that

16  by giving advice -- and I guess the argument is, well, he

17  was an experienced drug dealer, he gave her the benefit

18  of his experience, and because of that he's facilitating

19  the conspiracy.  And I take it that that's what the

20  government's theory is.  So, let's talk about those calls

21  for a minute.  There are several of them.  And again, as

22  I indicated to you, some of them -- there is some

23  overlap.  But, call B-703, and that was on March 16, B-

24  1026 on 3/19, B-4442 on 4/25, B-4506 on 4/26, B-5124 on

25  5/1, and B-6931 on 5/17.  I apologize, that one is barely

1  legible.  That's a 5/1.

2        Now, as I said, the government's theory is that

3  Ms. Martin reached out to him and that he gave her

4  advice.  Well, again, I invite you to listen to those

5  recordings again, and I suggest to you that you will find

6  there is no real advice there.  She calls and asks him to

7  look at a charging document.  A charging document, as you

8  heard during this case, is a public document.  Anybody

9  can look at it.  But the most important thing is that

10 after calling and asking him to do that, you hear that

11 there's a call back, that he actually never looked at the

12 document.  Or, she delivered the document to him, or that

13 there was any further discussion.  Like, for example, if

14 there had been a call where Mr. Whiting had said, oh

15 yeah, I did look at the document of Gwen Levi's and it

16 sounds to me like, you know, this or that, and he gave

17 some legal opinion.

18       I suggest to you what a lot of it is is Ms. Martin

19 sort of talking off the top of her head.  And the

20 government has cited a number of these calls talking

21 about Mr. Echarte or talking about Gwen Levi, charging

22 documents, whatever, to indicate that Mr. Whiting gave

23 advice.  Well, I suggest to you the advice simply isn't

24 there.

25       I'll give you an example.  Call B-4442, which is

1  in your book, which happened on 4/25, and that's Page 390

2  of the -- I'll tell you which book it is -- book two.

3  But let's talk about this interaction here.  They're

4  talking about whether or not an attorney can go to the

5  jail to visit Ms. Levi, and Ms. Martin says, I thought an

6  attorney could visit.  And she's interrupted by Mr.

7  Whiting and he says, he can visit there any time.  That's

8  bullshit.  Ms. Martin says, well, that's what the

9  attorney told Kevin today.  He went -- and Mr. Whiting

10  interrupts again, that's bullshit, man.  That's bullshit.

11  Ms. Martin says, uh-huh.  And Mr. Whiting says, that's

12  bullshit.  That's bullshit.  Pure, unadulterated

13  bullshit.

14        Well, I don't know how many of you ever went to an

15  attorney, but that's not what I would call legal advice.

16  That's simply an expression that Mr. Whiting used because

17  he thought that somebody could go to the jail -- an

18  attorney could go to the jail any time.  And as you may

19  have learned from a question that was asked of Officer

20  Sakala during that period -- during his testimony, in

21  fact, that Mr. Whiting just did not know what the

22  visiting hours were at that particular jail.  It was not

23  what he thought.  But that's not giving advice.  That's

24  not doing something that facilitates the successful

25  operation of a conspiracy.

1          That may be an extreme example, but look at all of
2   the phone calls that I've listed here in which the
3   government is claiming that Mr. Whiting is facilitating
4   the conspiracy by giving this advice, and you'll see it's
5   just not there.  Half of the time during these phone
6   calls, Ms. Martin is talking and Mr. Whiting is going
7   "uh-huh."

8          Now, I want to also focus in on one of these phone
9   calls.  Again, in particular, that's the one that happens
10  -- it's call 6931, and it happens on 5/17.  Here's what I
11  want you to remember about that call.  Now, 5/16 was a
12  critical date in -- according to the government -- in the
13  history of this conspiracy, because it was on that date
14  that the government alleges that Ms. Martin moved the
15  operation that she had from the house on Haywood to
16  Paula's School for Performing Arts.  And it is so
17  significant that if you look at the phone calls that
18  occurred right before 6931, and you see what happens is
19  that as soon as the drugs were moved to Paula's School
20  for Performing Arts, every time Ms. Martin talks to
21  somebody who allegedly is part of this conspiracy, she
22  tells them, you know, don't come the house anymore.

23         There was -- I'm paraphrasing, obviously.  There
24  was this -- Takoma Park police had a meeting with the
25  neighbors, and she's expressing concern.  And the

1  interesting point is that Mr. Whiting calls the very next
2  day.  Somebody that she's allegedly conspiring with to
3  supply drugs to for resell or whatever, and she doesn't
4  tell Mr. Whiting that she moved the operation?  Isn't
5  that something you would expect that a coconspirator
6  would tell another coconspirator, if they were involved
7  in the conspiracy?  But it doesn't happen.  Look at the
8  other transcripts that goes with this that.  She tells
9  Milburn Walker.  She tells a variety of other people that
10 everything's moved.  Got to go to the school now.  But
11 she doesn't tell Reece Whiting.  And I suggest to you,
12 ladies and gentlemen, that that shows you, again, that
13 Mr. Whiting was not a conspirator.
14        Now, another thing that I suggest that you look at
15 in -- we had some testimony about this, and I believe it
16 was from Detective Eveler, but it may have been Detective
17 Sakala.  But look at the number and frequency of phone
18 calls involving Mr. Whiting.  You will recall that
19 there's a chart that the government has.  It has little
20 lines coming off and has a list of phone numbers next to
21 each person and how many times they contacted Mr. Whiting
22 and other individuals contacted Ms. Martin.
23        The interesting thing about that is that out of
24 all of these phone calls, and there are a number of phone
25 calls involving Mr. Whiting.  But out of all these phone

1  calls, when you look at the time period that that
2  covered, because remember he's been in contact with her
3  over a long period of time.  When you look at the time
4  period covered on the government's chart and you divide
5  it by the number of months involved, you will see it only
6  comes to about ten calls a month.
7       It's not extraordinary for two people who have a
8  friendly, cordial relationship to talk to each other ten
9  times a month.  And remember, these are only, I believe
10  the correct word was "activations," so it could include
11  leaving a message.  It could include, as you heard, I
12  believe Detective Sakala describe it as a data stream; or
13  it could involve simply calling and letting it ring for a
14  few minutes and then not wanting to leave a message and
15  then hanging up, which is something we all do sometimes
16  when we want to avoid somebody's answering machine.
17       One last word about the phone calls.  The one
18  thing they suggest to you the phone calls involving Mr.
19  Whiting shows you is that, first of all, Ms. Martin
20  talked a lot, and she very often spoke without the
21  intention of following up on what she was speaking about.
22  She'll throw something out and then you never hear
23  anything more about it, like these instances where Mr.
24  Whiting was going to look at some papers or something.
25  Nothing ever comes of it.  And I suggest to you that

1 simply listening and responding to someone on the phone
2 doesn't make you a coconspirator.  You need the
3 agreement.  You need there to be an agreement between the
4 parties.
5        One other thing I want to mention about the phone
6 calls also is on the phone call on 4/25.  As you will
7 recall, the government played a videotape in which they
8 allege Mr. Whiting drove up after a phone call to show
9 that he went to the house.  And Mr. Whiting told you on
10 his cross-examination that he did not, and that was not
11 him.  I suggest to you, when you go back in the jury
12 room, you look at that videotape again.  You look at it
13 very closely.  Remember, Mr. Whiting's Jaguar is ten
14 years old at that point when that video was taken.  And
15 you look at the one -- you look at the vehicle.  If you
16 can even tell it's a Jaguar, you look at the vehicle.
17 Also, you heard testimony Mr. Whiting has always had his
18 head shaved like that.  And you look at the individual,
19 and I suggest to you that that's not the same person.
20        Now, another thing I want to talk to you about is
21 ledgers.  You have heard, through a number of witnesses
22 involving a number of different defendants, drug ledgers
23 that were kept by Ms. Martin indicating what people had
24 bought and sold, and you will sometimes see repetitive
25 amounts.  I invite you to look at -- I believe it's

1  Haywood 28, and there is a page which has the initials

2  "RCW" on it and has a number of figures.  The government

3  has suggested to you that those are indicative of drug

4  purchases and subsequent payments or increases in that

5  debt.

6          Mr. Whiting has told you, on the other hand, that

7  he borrowed $10,000 to purchase that Jaguar.  And I ask

8  you to look at this and look at some of the additions to

9  that debt, as well as the subtractions to it.  And what I

10 suggest to you is that the numbers that you see -- for

11 example, this one indicated on January 1 $1,435.  Now, I

12 suggest to you that throughout this trial you have not

13 heard of a drug figure that is often used in buying and

14 selling drugs of $1,435.  It just doesn't make sense.

15         Mr. Whiting told you that he borrowed the money

16 for a car.  And then when he had problems with the car,

17 which is to be expected of a Jaguar, that he borrowed

18 money again.  And I suggest to you an amount like $1,435

19 sounds much more consistent with a repair bill than it

20 does with a drug purchase.

21         The other thing that the government rests their

22 case on is the testimony of Mr. Echarte.  I certainly

23 have to admit Mr. Echarte is a very colorful individual.

24 However, Mr. Echarte, I suggest to you it's been shown,

25 is an out and out liar.  First of all, he has spent his

1  entire life dealing drugs.  He told you that.  He is
2  currently serving a 14 year sentence from Florida for
3  PCP.  He told you that he does expect some consideration
4  on his sentence for what he did, which was to testify.
5  He told you that despite that, he expects he will live to
6  be 99 years old.  So, he's going to get out anyway.
7        He told you the most fantastic story in the world
8  about there being 60 or 40, or whatever it was, kilos in
9  Mrs. Martin's kitchen, and I believe that some of my
10  co-counsel have touched on that substantially.  He also
11  testified before the grand jury and having an opportunity
12  and the government having an opportunity to ask whatever
13  they wanted.  Never was the story told that Mr. Whiting
14  had ever been involved in driving this individual out to
15  some place in Virginia to pick up quantities of heroin or
16  cocaine or whatever coming from Miami, Florida.
17        He told you that he had seen Mr. Whiting there on
18  a number of occasions and that he bought small amounts of
19  drugs; that he used the drugs while he was there, or
20  would buy small amounts and then presumably resell them,
21  although there's absolutely no proof or evidence of that,
22  other than what Mr. Echarte said, which I am suggesting
23  to you is not to be believed.
24        So you have Mr. Echarte having either lied to you
25  or lied to the grand jury.  You have him making claims

1 that I suggest to you simply are beyond belief.  You have
2 him, a person who's been impeached by his record, and I
3 know the government's going to get up here and say, well,
4 Mr. Whiting testified and he was impeached by his record.
5 What I suggest to you though is this, ladies and
6 gentlemen.  If both of these gentlemen, if their records
7 impeach them in their eyes, then that means they are
8 here.  Even.  It's the government's burden.  It's not
9 ours.  They had to prove this case to you beyond a
10 reasonable doubt.  And if Mr. Echarte and Mr. Whiting's
11 testimony each are impeached, then they're inequitable
12 between each other.

13       Don't think for a minute Mr. Echarte does not
14 expect to get something for what he did.  It is obvious
15 from everything that you've heard about him that there is
16 one thing that Mr. Echarte is about and that is about
17 himself.  And while we all got a little bit of a laugh
18 out of the Viagra story, the fact remains that would you
19 really trust the judgment and the believability of
20 somebody who would overdose on Viagra?

21       Would you really -- is that the person that you,
22 in making an important decision in Mr. Whiting's life, is
23 that the person with the quality of the evidence and
24 alleged facts, is that the person who you would put your
25 belief in order to make a decision?  I suggest to you

1  it's not.  It kind of goes down to that old saying, would

2  you buy a used car from this man?  And I suggest to you

3  that as intelligent ladies and gentlemen of the jury, you

4  wouldn't.

5          Now, the third prong of the government's evidence

6  is what they've introduced, as this court told you, as

7  404(b) evidence.  What I want to say about the 404(b)

8  evidence is this.  Yes, Mr. Whiting has a very poor

9  criminal record.  But the court has told you that there

10 is a very, very limited purpose for which you are to

11 consider that evidence.  You are not to consider it --

12 the government is not allowed to say, well, he's a person

13 of bad character, or he has a criminal propensity.  It's

14 only there so that when it comes to a decision of -- and

15 one of the examples is intent.  You can then employ that

16 evidence.  And if you had Mr. Whiting having been

17 arrested with some quantity of drugs, and you had to make

18 a decision, was that possession or possession with

19 intent, maybe that 404(b) evidence would be irrelevant.

20         But I suggest to you that Mr. Whiting didn't get

21 arrested with any drugs.  He was not found with one

22 single grain of cocaine, one tiny bit of heroin, and

23 therefore you have to ask yourselves, do I really need to

24 look at the 404(b) evidence to figure out his intent,

25 because I don't have any place to put that part of the

1  equation.  And I suggest to you that what you should do
2  then is to leave that 404(b) evidence in its box on the
3  shelf, because it simply serves no purpose if you do not
4  have to make a decision on Mr. Whiting's intent.
5       You may recall that when I gave my opening
6  statement some time in the last few months that I told a
7  story about growing up as a child in Calvert County and
8  fishing.  And I told you that sometimes when you fish,
9  you get something on your hook and you think it's a big
10 fish, and sometimes you get something on your hook and it
11 turns out to be a very small fish, a minnow, something
12 you have to throw back.  Sometimes you even pull up an
13 old piece of netting or rubber tire or whatever.
14      In trying to do their job, what I suggest to you
15 is that the prosecution and the investigators in this
16 case, in trying to bring in everybody that be associated
17 with this brought in Mr. Whiting, and they shouldn't
18 have.  Now, when his name came up in the wiretap, I'm
19 sure they saw his record and thought, well, this guy must
20 be one of the big fishes.  But as you can see in this
21 trial, the evidence simply hasn't borne that out.
22      What you have here is a 64 year-old man who
23 basically is here based upon officer -- excuse me,
24 Sergeant Sakala's opinion.  And I believe the evidence
25 does not bear his opinion out in this case.  In trying to

1 make their case, they went and unearthed under a rock:

2 Mr. Echarte.  But when you look at the government's case,

3 you have to keep in mind what's not there.  There is not

4 a single distribution anyone can testify to involving Mr.

5 Whiting.  There is no seizure of drugs of any type from

6 Mr. Whiting.  He's not seen on surveillance doing

7 anything.

8        Even if you believe that that's him in that one

9 surveillance, he's not doing anything other than going in

10 somebody's house.  Just to show you how the government's

11 case proves how this simply did not play out the way the

12 government thought, remember this.  June 1st 2004, the

13 day in which most of these individuals were placed under

14 arrest.  The police did not even bother or try to get a

15 search warrant for Mr. Whiting's home.  Clearly, they

16 didn't expect there to be anything there, and I ask you

17 consider that fact when you go back in the jury room.

18        You also know that Mr. Whiting was not living a

19 very lavish lifestyle for somebody who was involved in

20 the sale of drugs.  As you've heard, he was renting a

21 room from his ex-wife.  So, he was driving a ten year-old

22 car that he bought secondhand.  He was working two to

23 three different jobs, one of which was helping people

24 with their bags at the grocery store, taking them to the

25 car.  Not exactly what you would expect from somebody who

1  was a drug dealer.

2        And whatever Mr. Whiting may have been in the
3  past, it is clear from the government's own evidence that
4  he's not that today.  He was not that on June 1st 2004,
5  and he wasn't that during any time prior to June 1st of
6  2004 that we've heard about in this case.  Mr. Whiting,
7  for whatever reason, had almost a fatal attraction with
8  Ms. Martin.  He obviously wanted to see her.  He
9  obviously had a problem with drugs and hoped to get some
10 for his own use from her.  He also made it clear that he
11 had a romantic attachment to her, and that's what kept
12 him coming around.

13       You heard the testimony in this case of Whiting's
14 daughter, Raquelle Whiting, a marvellous woman.  And
15 despite the fact that I am certain he made a hard life
16 for her by the choices that he made, she turned out to be
17 a good, solid citizen.  She went to law school and made
18 something of herself.  She told you that despite whatever
19 her father has done in his life and whatever he had done,
20 he was always honest about the mistakes he made.  Mr.
21 Whiting told you that he was not involved in buying drugs
22 from Ms. Martin; he was not involved in selling drugs for
23 Mrs. Martin; that he was not a conspirator.

24       I suggest to you, ladies and gentlemen, that what
25 he told you in this case is the truth, and the

1  government's own evidence bears that out.  He didn't have

2  any drugs; no one saw him sale any drugs.  His

3  conversations with Ms. Martin he's explained to you, but

4  they never went anywhere.  There was no conspiracy

5  between Ms. Martin and Mr. Whiting.  Therefore, I suggest

6  to you, ladies and gentlemen, that you should find him

7  not guilty.  Thank you.

8        THE COURT:  Counsel, approach the bench.

9             (At the bar of the Court.)

10       THE COURT:  Counsel, I want to remind everybody

11 that I'm assuming you're going to be all finished so that

12 at five, plus or minus, Ms. Johnston is standing up and

13 going.  So, you've got to move things along.

14       MR. MITCHELL:  I don't think I'll have as much.

15       THE COURT:  I just want to warn you that the jury

16 can't come back tomorrow to hear more arguments, not the

17 way I've got it set up.

18       MR. HALL:  Mine was only about 35 minutes.

19       THE COURT:  Maybe a little longer than that.  I'm

20 getting nervous, so move it along.  Are you ready to go?

21       MR. MITCHELL:  Give me about five minutes.

22       THE COURT:  Do you need five minutes?

23       MR. MITCHELL:  Just to use the restroom and get

24 set up.  Just five minutes.

25       MR. MCKNETT:  Your Honor, I also am concerned

1 about this, because I am the last guy.  I need a

2 reasonable amount of time.

3        THE COURT:  I know you need a reasonable amount of

4 time.  That's why I'm saying, move it along fellas.

5        MR. MCKNETT:  I don't want to be the guy that gets

6 chopped off at the end.

7        THE COURT:  I don't either.  I want to make sure

8 the government has a chance to respond.  We're wasting

9 time folks.  All right?

10                    (Back in open court.)

11        THE COURT:  Ladies and gentlemen, we'll take a

12 three minute recess and then you will hear from Mr.

13 Mitchell.

14                    (Off the record at 2:48 p.m.)

15                    (On the record at 2:52 p.m.)

16        MR. MONTEMARANO:  For the record Your Honor, Mr.

17 Sussman is getting a cup of coffee, and Mr. Mitchell can

18 begin without him.  And Ms. Harden has no problem with

19 that.

20                    (Mr. Sussman is present.)

21                    (Jury returns at 2:54 p.m.)

22        THE COURT:  All right.  You may proceed, Mr.

23 Mitchell.

24        MR. MITCHELL:  May it please the court.  Counsel.

25 Ladies and gentlemen.  My name is Timothy Mitchell.  I

1 represent Derrick Bynum.  Here, let me move this over.

2 We've got all these charts.  Ladies and gentlemen, the

3 case against Mr. Bynum is a case of a trace.  After using

4 the vast resources that the government had, all the

5 techniques they had at their disposal on June 1st 2004,

6 they're left with a trace of cocaine.

7          The government alleges Mr. Bynum is a drug dealer

8 dealing in large -- not just large, but large, large

9 amounts of cocaine.  On June 1st 2004, they had a trace

10 of cocaine after all of that.  Let me start by saying

11 that this -- the government's shown you a lot of

12 exhibits.  One that you've seen more probably often than

13 all of the others is this chart.  This chart appears to

14 have everybody here involved in this large conspiracy,

15 but I want to take a minute to go over this chart

16 regarding Mr. Bynum and what evidence that you've heard

17 that links Mr. Bynum to any of these people.

18          First of all, Kelly.  Nothing about Kelly.  There

19 has been no testimony about Mr. Bynum having anything

20 relationship whatsoever with Mr. Kelly in El Paso, or

21 having any drug dealing with him.  Mr. Campbell, no

22 testimony.  Mr. Thurman.  No testimony that Mr. Bynum had

23 anything to do with Mr. Thurman.  Ms. Vessels.  No

24 testimony about her.  Xavier Moore.  Nothing about him.

25 Mr. Irby.  Nothing about him.  Alton McKenzie.  No

1  testimony about him having any relation to Mr. Bynum.

2       Now, let's go up here to the top.  Cuba.  No

3  testimony that Mr. Bynum had anything to do with Mr.

4  Cuba.  Mr. Encarnacion.  Nothing about him.  Nothing

5  about Mr. Mangual.  Nothing about Mr. Philpot.  Mr. Brim.

6  Moises Uriarte.  Ms. Levi.  Mr. William Turner known as

7  Dog.  Nathan King.  Yet, on this big chart, Mr. Bynum is

8  associated with all of these people.  There is not one

9  bit of testimony that he had anything to do with these

10 people.

11      Now, Ms. Ali.  There isn't testimony that he was

12 in any way associated with Ms. Ali to buy or sell drugs.

13 No.  What about Mr. Arnold?  Same answer:  No.  What

14 about Mr. Kirk?  No.  What about Ms. Dobie?  No.  Ruby

15 Harden?  No.  George Harris?  No.  Larry Lane?  No.  John

16 Martin?  No.  Larry Nunn?  No.  Milburn Walker?  No.

17 Reece Whiting?  No.  Yet, if Mr. Bynum is on this big

18 chart, it certainly makes him look far more a part of

19 this entire organization and makes him look, perhaps, a

20 little more responsible as they, perhaps, would like you

21 to believe.

22      Now, is there any testimony that you have heard

23 from any witness that Mr. Bynum ever bought or sold drugs

24 with Mr. Goodwin?  Again, no.  I ask you, ladies and

25 gentlemen, why if they have this big chart is there no

1  evidence whatsoever of Mr. Bynum associating with any of

2  these other people to either buy or sell drugs?

3          In fact, the only testimony that you heard about

4  any allegations about him buying or selling drugs is with

5  Ms. Martin, and that comes from Detective Sakala's

6  opinions.  Now, that's very important here.  Did you hear

7  any informant or any other witness come in and identify

8  him as a buyer or seller of cocaine?  In fact, the only

9  government witness that mentioned anything about him

10  buying or selling cocaine was Mr. Julio Echarte.  I'm

11  sure you remember Mr. Echarte.  We will probably all

12  remember Mr. Echarte.  He said, when asked about Mr.

13  Bynum, if he knew him, he said he did.  And then he was

14  asked did he know anything about him buying or selling

15  drugs.  What was his answer?  His answer was, he's not

16  involved in that.  He's just a working man.

17          Now, you remember Mr. Echarte.  He lied about

18  Kimberly Rice.  Kimberly Rice -- to remind you, Kimberly

19  Rice and Mr. Bynum have a child together.  Kimberly Rice

20  is Ms. Martin's daughter.  He lied about her.  He lied

21  about her involvement.  He said he wanted to protect her.

22  He was asked, then is he trying to protect Mr. Bynum

23  because Mr. Bynum is the father?  Mr. Echarte said no, he

24  wouldn't do that, he's not the mother.

25          I suggest to you the reason why Mr. Bynum is here,

1   after the government knew before they put him on this
2   chart, the only thing they ended up with was a little
3   trace of cocaine because they need him on this chart in
4   order to prove all the rest because someone has to be
5   buying these massive amounts of quantities of drugs that
6   they're alleging Ms. Martin was receiving.  Why is that
7   important?  Because if she's receiving large amounts of
8   quantities of cocaine and there's no one buying it, their
9   theory goes out the window.  So they need Mr. Bynum.
10  They need everyone down there.

11         Now let me talk a little bit about the evidence
12  that they did get from Mr. Bynum.  Well, actually, let me
13  go to what the government failed to do in this case, and
14  then we'll come back to actually what they found.  As you
15  recall, you've been here quite some time.  This
16  investigation lasted almost as long as this trial.  It
17  seems like it, I'm sure, to many of us.  Seven years is
18  what they allege this conspiracy lasted.  A little over
19  two years was the government's investigation.  In those
20  two years, did they find -- did they do any surveillance
21  of Bynum selling drugs?  Did they have any pictures of
22  him selling drugs?  Any videos of Mr. Bynum selling
23  drugs?  Did they have any informants that bought or sold
24  drugs from Mr. Bynum?  Do they have any evidence of Mr.
25  Bynum spending money or people that do things for him or

1 doing favors for him or being couriers for him?  Do they

2 have any controlled buys?  Do they find any kilo wrappers

3 in his apartment?  Did they do any trash runs?

4        Now, certainly you heard them say, well, that

5 wasn't feasible.  But you never heard them say that

6 wasn't impossible.  Are there any recorded phone calls of

7 him selling drugs to anybody?  Were the tests done, any

8 tests done, fingerprints or otherwise, of all these book

9 safes they found in his apartment?  And this is

10 important:  Did they find any ledgers in his apartment?

11 Did they find any phone numbers of any buyers in his

12 apartment?  Why is that important?  Because the

13 government, in their closing argument and in their

14 opening, said that my client is a drug dealer dealing in

15 large, large amounts of cocaine.

16        If he's dealing in large, large amounts of

17 cocaine, he's got to know where the money's going, who's

18 getting what; he's got to have numbers, contact

19 information.  And none of that -- there is no Haywood 7

20 for Mr. Bynum.  They didn't conduct any traffic stops

21 with him, hand-to-hand buys with him.  And as you've

22 heard over and over again, his fingerprints were not

23 found on any one piece of evidence.

24        Here is a drug dealer dealing in large, large

25 quantities of cocaine, yet there's no cut material in his

1  apartment?  I could go on with the things that they could

2  have utilized, the techniques they could have utilized in

3  order to support this theory that Mr. Bynum is a dealer

4  of drugs, really dealing in large, large quantities, but

5  I think you get the point.  They had a tremendous amount

6  of resources.  There's no reason why they couldn't have

7  used a small bit of that resource to support this theory

8  that Mr. Bynum was a dealer in large, large quantities of

9  cocaine.

10        What did they find in his apartment?  They found a

11  scale and a trace of cocaine.  They also found a gun, and

12  I'm going to address that in a little bit.  That's what

13  they ended up with.  So, here they have some someone with

14  a trace of cocaine in his apartment, no other

15  information, no other evidence in -- seized that would

16  support this theory.  So, what do they do?  Let's put him

17  on a big chart, the Goodwin-Martin organizational chart.

18  Let's call him a drug dealer dealing in large, large

19  quantities, because we already know we started out with

20  some powder you could put on my finger and you wouldn't

21  even see it.

22        So if you start with that, you've got to portray

23  him as something worse, and that's exactly what they've

24  done in this case.  You heard Agent Eveler say that,

25  well, there are all these different techniques that could

1  have been utilized.  Yes, we could have done all these

2  things but we just didn't have the resources.  We

3  couldn't have taken officers.  We had enough officers

4  doing all these things.  And besides, he said, it was

5  more important for us to focus on Ms. Martin and Mr.

6  Goodwin.

7          There were 1,200 police officers at their

8  disposal, and perhaps even more federal agents across the

9  country, and they couldn't even afford to take one off

10 maybe a couple of hours in a day and go look at Mr. Bynum

11 and support this theory.  Let me tell you why.  Because I

12 think they were afraid they were going to find out that

13 their theory was wrong and that theory, as Mr.

14 Montemarano referred to it, is their single-minded

15 pursuit.  They had it in mind.  This is what they

16 decided.  This is what they concluded about this case,

17 and they were going to do everything possible to get that

18 final conclusion to support their theory.  They went out

19 and started looking at Mr. Bynum, and perhaps they might

20 realize they were mistaken.

21         The bottom line is, on the allegations of the

22 Count One, him belonging to this conspiracy, is that

23 there's no physical evidence or testimonial evidence

24 other than Sergeant Sakala's opinion linking Mr. Bynum to

25 being a seller of drugs.  Now, even -- and if you find --

1 -- if you do find that Mr. Bynum in fact was part of the

2 conspiracy, one of the things you do need to determine is

3 the amount of drugs, and there's certain quantities that

4 you have to determine.  All you have in his possession is

5 a trace of cocaine.  So, even if you go to that point and

6 look at the amounts, you have the trace of cocaine in his

7 house.  A trace of cocaine is a little hard to

8 distribute, at least in my opinion.

9        You also heard evidence about Mr. Bynum's arrest

10 in 1999 and him going to court and admitting that he in

11 fact was guilty of the charges against him in 1999.

12 There were drugs that were admitted.  I'm sorry, there

13 were drug analyses that were admitted; you won't see in

14 the evidence any physical drugs.  Those were testified as

15 being destroyed.  But in 1999 Mr. Bynum has already

16 accepted his responsibility, admitted his guilt, and he

17 did time for that.  Now they're asking you to do it all

18 over again by bringing that conviction into this

19 conspiracy.  And now, after he's already admitted his

20 guilt, after already doing his time, they're asking you

21 to make him do it all over again.  I ask you, why is that

22 fair to Mr. Bynum?

23        Now, you heard number of phone calls.  There were

24 about 38 that involved Mr. Bynum talking with Ms. Martin.

25 As I said before, you're not going to find him on any of

1 these phone calls talking to anyone else on this chart.

2 It was just Ms. Martin.  The opinion of Sergeant Sakala

3 was that all these phone calls related to discussions

4 about drugs.  As you heard Mr. Montemarano say, and

5 others that will probably repeat what I said, Sergeant

6 Sakala said in response to our challenging his opinions

7 that his interpretation of these phone calls was an

8 ongoing process and that he was still involved in

9 interpreting and reinterpreting and correcting.

10      In fact, in the one phone call that I challenged

11 him on, B-2429, all of a sudden that opinion that he had

12 to a moral certainty changed.  That opinion that my

13 client was trying to find another supplier of drugs for

14 Ms. Martin all of a sudden was changed.  He didn't offer

15 that to me.  He didn't offer that to Mr. Bynum.  He

16 didn't come up and say, wait a second, I was wrong.  I;

17 need to correct the record.  It was only after I

18 challenged him did he say that perhaps -- perhaps it

19 could be viewed as "chickets," and therefore his opinion

20 wasn't necessarily going to be the same.  But he never

21 backed down from the his opinions.  He can't.  The reason

22 is because they have the single-minded pursuit.  If they

23 back down, if he admits perhaps I was wrong, then he's

24 afraid that he's going to lose his theory, his theory

25 that all of these calls are involving drugs and nothing

1  else.

2         Ladies and gentlemen, if someone makes a sweeping

3  opinion so strong as to a moral certainty in order to

4  portray Mr. Bynum as someone higher and more involved

5  than he is, when he said that he was really trying to

6  find a supplier of cocaine for Ms. Martin, I think you

7  should get it right the first time instead of coming to

8  you and trying to convince you of something that later on

9  he finds out after a little more careful consideration is

10 wrong, and I don't think that is in the interest of

11 justice.

12        Now, another phone call that was played was B.  As

13 you will recall, the government played this phone call.

14 We did not introduce this phone call.  When the

15 government introduced the phone call, he could remember

16 everything about the call, and he was very forthcoming

17 about it.  However, when I pointed out that his

18 interpretation of the words in this call was different

19 than the log that he himself created back in March of

20 2002 -- 2004, all of a sudden he wasn't so forthcoming

21 and couldn't remember as much.

22        Let me remind you, he was asked by me whether or

23 not the log indicated that he couldn't make out the word

24 and put actually "U/I" instead of the word that he ended

25 up testifying about, which was tickets.  He couldn't

1 remember only a couple of years ago what U/I stands for.

2 He couldn't remember and wasn't sure.  Well, U/I, as I

3 use it, and I think most people, is "unintelligible."  So

4 the word that he found to be unintelligible in 2004

5 wasn't so unintelligible today in court.  Then all of a

6 sudden it was "ticket."  And the reason why it's ticket?

7 Because it supports his theory to make sure that this

8 chart works.

9         There were other phone calls where Paulette Martin

10 was asking Mr. Bynum if he wanted a loan of $62.

11 Sergeant Sakala interpreted this as 62 grams of cocaine.

12 Now, in March -- March 11 of 2004, after this phone call,

13 they do see Mr. Bynum walking to Ms. Martin's house.

14 They do a surveillance.  But what is important is this.

15 Sergeant Sakala told you that it's his opinion, based on

16 things that he's experienced in his career, that $62 was

17 a code for 62 grams.  However, what don't you have?  You

18 don't have anybody who was inside this organization who

19 knew these two people who would verify that his opinion

20 was correct.  So, all you have is Sergeant Sakala's mere

21 opinion that, based on something else in his career, the

22 $62 means 62 grams of cocaine.  They have no one to

23 corroborate that opinion.  It's simply nothing but his

24 opinion.

25         Now, on March 12, again the word $62 is raised.

1 Again, this is Sergeant Sakala's opinion.  But more than
2 that, if Mr. Bynum is this large dealer of large
3 quantities of drugs, such as 62 grams of cocaine, where
4 is the evidence that they brought in to support that?
5 Where is the evidence from his apartment that would
6 support that theory?  Again, they don't have it.
7        On March 17, 2004, the government brought in
8 evidence to show that Mr. Bynum was using the telephone
9 in furtherance of a drug conspiracy.  In calls B-811 and
10 B-816, Sergeant Sakala opined that Mr. Bynum went to Ms.
11 Martin's house to purchase drugs.  Where did he get this
12 opinion?  From the words "I'm on my way."  How many
13 times, ladies and gentlemen, have you used those words
14 when you have made promises to meet someone or you want
15 to just give someone the courtesy that you're going to
16 their house?  What do you tell them?  I'm on my way.  And
17 that "I'm on my way" was enough for Sergeant Sakala to
18 opine that he was on his way there to buy drugs.  There's
19 no code words in that call.  In fact, Sergeant Sakala
20 didn't testify there were any code words in that call.
21        If they were certainly talking about drugs, as he
22 made an opinion in every other phone call, where are the
23 words "tickets" or "sweet potato pie" or all these other
24 words that he used?  His opinion here is now inconsistent
25 with everything else that he said.  Again, he wasn't

1 there; they have no one to corroborate that opinion.

2        In Count 40 there is an allegation that Mr. Bynum
3 was involved in obtaining an amount of drugs that was a
4 sufficient quantity in order to distribute the drugs
5 during this time between April 1st and April 7 2004 is
6 that phone call B-2429.  Why do I bring this up again?
7 Why is it important?  It's important, because during this
8 period of time of April 1st to April 7, 2004, the
9 government needs to prove that Mr. Bynum received a
10 quantity of drugs in order to distribute those drugs.  In
11 his opinion on that phone call, Mr. Bynum was seeking to
12 provide Ms. Martin with an additional supplier of
13 cocaine.  That was his opinion.  He was wrong and he
14 couldn't admit it to you.

15        Now, there are two charges that allege that my
16 client was in possession of a firearm, possession of a
17 firearm in connection with trafficking drugs.  The second
18 count is possession of a firearm by a felon.  Now,
19 starting with Count 59, let me address that first,
20 possession of a firearm by a felon on June 1st 2004.
21 Here, the government must prove that that gun found in
22 his apartment was used in connection with or in
23 furtherance of the allegations contained in Count One,
24 which is the drug conspiracy.

25        First off, our position is they haven't proven

1 Count One.  There is nothing in his apartment to indicate
2 that they were right in all their theories.  But second,
3 I think there are even more reasons why they have failed
4 to prove this charge.  Let me talk about the gun found
5 inside of his apartment.  There is no evidence that
6 they've introduced to indicate that Mr. Bynum knowingly
7 possessed a gun in his apartment.  What have they proven?
8 That someone knowingly possessed that gun.  It wasn't Mr.
9 Bynum.

10        As you recall, they found DNA on this gun.  It was
11 confirmed.  They had it, they tested it, and they found
12 DNA matched somebody.  It didn't match -- actually, it
13 matched two samples of two different people, but not Mr.
14 Bynum.  If that gun got into his apartment, it wasn't by
15 him.  If the gun was moved or touched at any time, or put
16 in the place where it was found, it wasn't by Mr. Bynum.
17 You heard the expert that did the DNA test.  It's a 100
18 percent chance that his DNA was not on that gun.  There
19 was no testimony of anyone that Mr. Bynum was near the
20 gun, saw the gun or saw him use his gun at any time in
21 the course of this conspiracy to further Count One, the
22 drug conspiracy of drug trafficking.

23        You also heard, on the contrary, that there was
24 another person in his apartment.  The government did not
25 do any DNA testing on that person, so we don't really

1 know who, in fact, touched or possessed this gun.

2 Moreover, there's no proof that this gun was ever traced

3 to be taken in interstate commerce.

4        One of the elements the government must prove is

5 under Count 60, which is a person having possession of a

6 firearm, after having been convicted of a felony, they

7 must show that this gun is involved in interstate

8 commerce.  As you heard, the investigator who did the

9 investigation about this firearm, it was actually owned

10 by an individual living in Silver Spring, Maryland.  No

11 evidence that my client ever touched this gun.  And

12 perhaps -- perhaps if they had taken a little bit of

13 those resources, of the vast resources that they had

14 available to them and perhaps looked for this individual

15 and brought him in, perhaps that might have solved a

16 question as to really where this gun came from.  But they

17 didn't do that.

18        Now, the bottom line, ladies and gentlemen, and

19 I'll give you the opportunity to review the evidence and

20 come to your own conclusions.  But the bottom line is

21 that after all of the resources they used in this case,

22 after all the witnesses that came up here, after two and

23 a half months of you sitting here, all they have left to

24 show you against Mr. Bynum is a trace.  The case is a

25 case about a trace, and that's all there is of Mr. Bynum.

1           Now, one final thing.  The government has said
2   that Mr. Bynum had something to do with this Goodwin-
3   Martin organization.  Well, as you've already heard, he
4   had nothing do with Mr. Goodwin.  He's not a part of this
5   conspiracy.
6           Now, as everyone has said to you before, and I
7   want to reiterate the same thing, I appreciate all the
8   time that you've taken.  It's been an extraordinary
9   sacrifice, and I know that you've all paid close
10  attention to all the witnesses, and I appreciate it, Mr.
11  Bynum appreciates it, everyone appreciates the time that
12  you've taken.
13          I urge you to listen to all the evidence, not just
14  from the government but also from the defense, and think
15  of it in a light that you've already been suggested to
16  take it in.  Be curious.  Be critical.  Don't accept
17  anything on face value, even what I've said.  But do
18  think, why is it if all they had were this large -- this
19  drug dealer dealing in large amounts of cocaine is a
20  trace of cocaine and put him on a chart such as this, to
21  be associated with numbers of other people that he had
22  never encountered, met, or dealt with.  Again, it
23  supports their theory.
24          Ladies and gentlemen, I won't take anymore of your
25  time.  I appreciate everything you've done.  Thank you.

1 Mr. Bynum thanks you.

2          THE COURT:  Mr. Ward.

3          Mr. WARD:  Thank you, Your Honor.

4          Counsel for the government, and my co-counsel, and

5 Judge Titus, and good afternoon, ladies and gentlemen.

6 It's been a tough ten weeks, hasn't it?  And this is

7 probably the toughest part of it today.  I feel like the

8 dentist, you know, who comes up with his hand behind his

9 back and says, "This is going to be painless."  Well, I

10 wouldn't kid you and say that this is going to be

11 painless listening to another -- I think I'm the sixth

12 lawyer today, but I'll and do my best to make it as short

13 and as pain-free as possible.

14          I certainly would be remiss if I didn't join other

15 counsel in thanking you for your service.  What is it, 40

16 bucks a day now, or 45 bucks a day?  Once you've paid

17 your car fare and your lunch, there is not much left, and

18 I realize that you're all missing your normal and

19 everyday activities.

20          I also want to thank Judge Titus.  I know I do,

21 and maybe it's obvious sometimes when you're representing

22 a client, get a little, shall we say, "pushy?"  That's my

23 job.  Nevertheless, I do want to thank Judge Titus, and

24 I'm sure that all counsel join me for the very gracious

25 but firm manner in which he has kept this case on track.

1          Now, I said when I addressed you in my opening

2  remarks that the government had cast a very wide net in

3  this case and, indeed, that view still stands as far as

4  I'm concerned.  We've heard a lot about some very big

5  fish, about kilos and kilos and kilos and hundreds of

6  thousands of dollars in cash, but then we've heard about

7  a lot of little fish, I suggest, who have been caught up

8  in this wide net that the government cast.

9          In my client's case, I suggest that because she is

10  a long-time drug addict and has been cursed with that

11  problem for many, many years, and she wanted, indeed,

12  with a habit needed to cop for her personal use and did

13  and got caught up in this case.

14          Now, let me just say something briefly.  I know

15  we've discussed the charges and the judge has discussed

16  them, but just let me tell you --- and I think you have

17  your guide or whatever it is to the verdict sheet, but

18  Ms. Dobie is charged in the first count of the

19  conspiracy.  There are five felony counts, and I'm not

20  going to relate what they are because you have them, and

21  then finally the possession of a firearm in furtherance

22  of a drug trafficking crime.

23          Let me just say this.  With respect to the

24  conspiracy, you understand certainly what the conspiracy

25  is and the judge has explained it to you.  I think you've

1  got copies of the instructions, and you can certainly

2  read it again to refresh your recollection, but it is a

3  conspiracy to distribute certain controlled dangerous

4  substances.

5         As the judge has explained to you, within that

6  count, there is a lesser included offense that you may

7  consider, and that I'm certainly going to ask you to

8  consider, and that is a conspiracy to possess.  It's

9  what we refer to as a "simple possession", as opposed to

10 a possession with the intent to distribute to other

11 people.  I suggest that my client in buying for herself,

12 for her addiction, and to satisfy her addiction,

13 certainly did conspire with at least one other person to

14 possess drugs, and she said that on the stand quite

15 candidly.  You know, if that's the verdict you come back

16 with, I suggest, at least in my view, that's the right

17 verdict.

18        In any event, the telephone counts -- and there

19 are five of them -- are all the knowing and intentional

20 use of a communication facility.  Well, we're talking

21 about a telephone.  There's no question that my client

22 knowingly and intentionally used a telephone, whether she

23 was on the telephoning end or the outgoing end or the

24 incoming end, but the knowing and intentional use has to

25 be in committing causing and facilitating the commission

1  of the felony, To-wit:  The narcotics offense described

2  in Count One, which is the conspiracy to distribute.

3        The last count against my client, Count 61, is the

4  knowing and intentional possession of a firearm in

5  furtherance of a drug trafficking crime.  That is the

6  conspiracy to distribute controlled substances set forth

7  in Count One.  Those are the charges.

8        What charges do we not have to be concerned with

9  in this case as far as Ms. Dobie is concerned?  Well, she

10 has not been charged in any count with possession with

11 intent to distribute.  There is not one count against her

12 and not one charge against her placed by the government,

13 and that's the way the government chose to proceed,

14 charging her with possession with intent to distribute.

15 Nor is there a single charge in the indictment that she

16 actually distributed controlled dangerous substances.

17        I think there was some suggestion in closing

18 argument by counsel for the government that my client was

19 buying and, according to the government, selling crack.

20 I don't think, ladies and gentlemen -- and certainly your

21 collective recollections are a lot better than my single

22 recollection, but I don't think you will find anywhere in

23 the evidence any suggestion that she actually purchased

24 crack.  She purchased coke, which she snorted, and

25 heroin, which she also snorted to keep her awake from

1 what they call "nodding out" which happens when you take

2 those sorts of drugs.

3        There's no question whatsoever -- no question

4 whatsoever that she did in fact buy heroin and cocaine.

5 I might say bought it -- this is important, and I'll come

6 back to this later.  At least I think it's important.

7 She didn't get any deal, despite the fact that she was

8 supposed to be a charter member of this great

9 organization.  She bought it at the retail price, the

10 price that it was selling for on the street:  An eighth

11 of an eight ball for $125.  Everybody's testified about

12 it, and even the government witnesses have testified that

13 that's the going rate.

14        You recall Detective Eveler yesterday saying it

15 was $125 to $150, you know, depending on who you bought

16 from.  Well, she was buying it at the low end of the

17 going rate but, nevertheless, at the going street rate

18 that I guess any junkie could have bought it for.

19        As for use.  She certainly testified on the stand,

20 candidly and fully, that she had been an addict for many,

21 many years, since her, I think, teenage years, and that

22 she was strung out, as a matter of fact, ta the time she

23 was arrested on June 1, and that this was an ongoing

24 problem.  The government certainly hasn't presented any

25 evidence to the contrary of that.  In fact, my client

1 also said that when she went into the Montgomery County

2 Detention Center on June 1, she went into a detox program

3 because she was having illness related to her addiction.

4         As far as selling or distributing these drugs.

5 She has testified on the stand, under oath, that she

6 never, never sold any of the drugs that she got from Ms.

7 Martin.   There isn't one single surveillance of her going

8 into Ms. Martin's house.   Now, I don't mean to suggest

9 that she didn't because, obviously, she had to get the

10 drugs, but there is also no video of her engaging in any

11 drug trafficking activity.   There are no photographs of

12 her dealing -- giving drugs to somebody in a parking lot

13 or on the street.   There was no surveillance of any of

14 that kind of activity.   There was no testimony from the

15 government that any undercover buys were made from her,

16 either using these cooperators that -- where they pat

17 them down and give them money and tell them to go around

18 the corner and buy the drugs, and then when they come

19 back they get the drugs off them -- or by undercover

20 police officers acting as buyers on the street.   Nothing.

21 Nothing at all.   There is simply no and showing no

22 evidence produced by the government suggested to show

23 that she sold and dealt and trafficked in controlled

24 dangerous substances.

25         Let me say a word about the tapes and about

1 Sergeant Sakala.  This may not be necessarily in
2 sequential order, but it's the way I have my notes.
3 Sergeant Sakala reminds me of the a fellow I once heard
4 say, you know, once I thought I was wrong, but I was
5 mistaken.  The selling aspect or the trafficking aspect
6 of this case that the government is pushing on you is
7 based on the interpretation of the tapes by Sergeant
8 Sakala who, as everybody else has pointed out, and I
9 might as well, is "morally certain" -- his words from the
10 stand -- "morally certain" that what he has produced on
11 the transcripts is what was on the tapes.
12        Keep in mind, ladies and gentlemen of the jury, as
13 the judge has said to you at the time and, I think, also
14 said to you in his closing:  The transcripts are not the
15 evidence.  They're simply a guide for you to use.  The
16 evidence is the actual tape itself.  Tim Mitchell gave
17 you a very good example of that when he talked about the
18 Peruvian chicken.  I've been to Peru, but I've never had
19 Peruvian chicken, by the way, but you understood that the
20 whole question was whether it was "Peruvian chicken" or
21 "Peruvian tickets."  After all this time, Sergeant Sakala
22 wasn't quite able to bring himself to say he was wrong.
23 The best he could say was, it's unintelligible, so I
24 really can't say one way or the other.
25        Now, let me tell you that I've been practicing law

1  for over 40 years, a long time, and whenever I hear

2  somebody say that "I'm right" and "I'm never wrong",  my

3  guard goes up, and I think everybody's does.  I think

4  that's a common experience, because I have never met

5  anybody yet in my life who was infallible, and I

6  Suggest that Sergeant Sakala is not infallible.

7         There's one particular call that I want to direct

8  your attention to, and that was the telephone call having

9  to do with the hammer on that trigger.  I don't recall

10  the number of the telephone call -- let me see.  I do

11  recall it.  It was B-289, on Page 032, and I guess that's

12  in the first book.  That was the call in which Ms. Martin

13  was talking to an unknown male and tells the male that

14  she told Tony, whoever Tony is, and  I'm really not sure

15  I've got this right yet.

16         Anyway, she told Tony that the reason LaVon Dobie

17  was shaking was because that was -- something about stop

18  her from pulling the hammer on that trigger -- trigger on

19  that hammer she had with her.  Sergeant Sakala opined

20  that of course that meant that she had a gun with her.

21  The government produced the tape and the transcript, but

22  what they didn't produce, ladies and gentlemen, was a

23  transcript of another call that I questioned Sergeant

24  Sakala about.  He certainly didn't volunteer any evidence

25  about this in which -- and I asked him about it.  They

1 didn't transcribe it.  They didn't play it.  There's a
2 reason why, and I'll tell you in a minute, in which
3 Paulette Martin had a conversation with LaVon Dobie in
4 which she jokes about telling somebody that LaVon Dobie
5 was talking about pulling the hammer or the trigger on
6 the hammer.  That it was indeed a joke.

7        Now, it seems to me that in the interest of candor
8 and in the interest of putting all the facts before the
9 trier of fact, your good selves, you would bring both of
10 those out.  You would bring out the first call in which
11 she made the comment about the trigger and the hammer,
12 and you would bring out the second call in which she
13 acknowledges that she was joking and let the finders of
14 fact decide, but the government didn't do that, ladies
15 and gentlemen, because I suggest it didn't fit into the
16 place where they wanted to put LaVon Dobie as a major
17 drug dealer.

18        You recall -- this, to me, was the most astounding
19 part of Sergeant Sakala's testimony, when I said to him
20 -- I think I put it in the form of a hypothetical:
21 Sergeant -- something to this effect -- keeping in mind
22 that, first of all, you know, it was the first call, you
23 know, which you transcribed and played for the jury.  If
24 you had learned or if someone had said that Paulette
25 Martin had been joking when she made that comment, would

1 that affect your opinion?  He said, no.  No, it doesn't

2 affect my opinion one bit.  I'm still right whether you

3 like it or not.  To me, ladies and gentlemen, that

4 suggests a sort of rigidity of thinking that -- well, it

5 certainly causes me great concern, and I hope it causes

6 you great concern when you consider that officer's

7 opinions.

8         LaVon Dobie is supposed to be a drug dealer,

9 according to the government, and a part of this

10 organization, this conspiracy.  We've already -- I've

11 already talked about the lack of surveillance or videos

12 or photographs or undercover buys or anything like that.

13 Let me ask you to consider what indicia of drug dealing

14 the police officers found or, to be more precise, didn't

15 find.

16         You've heard a lot of talk about bundles of cash

17 and bundles of bills rolled -- folded over in a certain

18 way and put in with a rubber band so you didn't have to

19 count it all the time; you could stick, you know, several

20 bundles in your pocket and you knew you had $3,000,

21 $4,000, $5,000, whatever it was.  Did you hear one iota

22 of testimony in this case about LaVon Dobie having any

23 bundles of cash?  You've seen bank records produced and

24 gone through line by line by line by line by the

25 government.  Have you seen any bank records produced to

1 show or even suggest that LaVon Dobie is making bundles
2 of money as a big-time dope dealer?

3        You saw a picture of her home.  It's a very --
4 it's a nice home, but let's face it:  It's a modest home.
5 You know, it ain't no palace  Have you seen any property
6 records produced by the government to show that LaVon
7 Dobie was investing in, you know, other fancier
8 properties anywhere with all of this money she was making
9 as a conspirator in a big-time dope organization?  Have
10 you heard any testimony about her driving a flashy car?
11 I think the only testimony you've heard about cars is a
12 conversation she had with John Martin about buying a -- I
13 think it was called a "hoopdee", like an old junker,
14 which she testified on this stand she had bought more
15 than one of them at auctions.  Some big-time dope dealer.

16        Did you find or did you hear any evidence of -- I
17 think this has been testified to in this case -- owe
18 sheets, O W E, a sheet or a tally of what people owe you
19 for the drugs that they get from you with respect to Ms.
20 Dobie, except the one that the government says is hers
21 for the dope that she bought from Ms. Martin?  Which
22 brings up another point.  If she's so flush and such a
23 big-time dope dealer, why is she buying on credit at $125
24 a shot?  Have you heard any testimony at all from the
25 government, or any evidence from the government about any

1 other investments that my client might be making of
2 substantial amounts of cash in, you know, I don't know,
3 anything?  Broadway shows?  Well, you know, let your
4 imagination run wild.  There has been no evidence at all
5 of any expenditures or investments of large amounts of
6 cash like that.
7        If my client was what the government says she is,
8 a conspirator in this major organization, and a dope
9 dealer, where's the evidence of it?  I mean, where is it?
10 You heard Mr. Thurman -- of course we've heard from the
11 government's experts, the police officers, but you heard
12 from Mr. Thurman, who testified on the stand that he
13 himself had been a long-time drug dealer, a drug dealer
14 and drug user, and I asked him -- I think my question was
15 something to the effect:  Is an eight ball inconsistent
16 with personal use, particularly from someone who has a
17 long-time habit?  He said no.  Certainly you can take an
18 eight ball -- and he testified he did this himself when
19 he was hard up -- and break it down into smaller lots and
20 sell them, but he said that an eight ball -- buying an
21 eight ball and using an eight ball was certainly not
22 inconsistent with personal use.
23        What evidence have you heard of any money -- I
24 hesitate to use the word "wealth" on behalf of my client
25 which has come from her stealing and peddling stolen

1  goods such as jewelry and furs.  As she said on the

2  stand, "I've done some pretty terrible things in my

3  life."  I can't disagree with that.  I can't represent to

4  you otherwise.  She has.  She's not on trial for that,

5  ladies and gentlemen, for being a thief or dealing in

6  stolen goods.  But we don't just have her word for that.

7  We have, well, Mr. Echarte or however it's pronounced.

8         You recall on the stand I asked him if he knew

9  LaVon Dobie, and he professed as to how he didn't.  Then

10 I asked him about meeting somebody at a bar in D. C. -- I

11 forget the name of the bar and I forget where it was in

12 D. C., but the meeting was set up by somebody who was a

13 friend in common -- for the purpose of looking at stolen

14 property.  I think it was diamonds -- loose diamonds or

15 watches.  Whatever it was, it was jewelry.

16        Then he remembered and he said, yes, I do remember

17 that.  I asked Ms. Dobie to stand up, and he said, yes,

18 that's the young lady I met.  She's the one who was

19 selling stolen stuff.  I think just yesterday Ms. Ali

20 testified that over at Paulette Martin's -- I don't

21 recall when or what occasion it was, but she had bought

22 -- was it a pair of earrings from my client?  That's how

23 she made her living, ladies and gentlemen.  If she had

24 any money, that's where it came from.

25        Let's talk about some of the other supposed

1  coconspirators who have testified in this case.  The

2  first one was Juan Encarnacion.  He was a gentleman who

3  was from the Dominican Republic who expects to have his

4  sentence reduced and then be shipped back home in the

5  Dominican Republic.  In any event, I asked him if he knew

6  LaVon Dobie, and he had never seen her and never heard of

7  her.

8          We then had Mr. Nathan King.  I'm sorry -- yeah,

9  Nathan King was the next one.  This was almost comical,

10 because I think the government asked him to look on this

11 chart and say, do you see anybody on here you recognize?

12 And he wrote next to my client's name "Bridgett Brim",

13 his own stepmother.  I then asked my client to stand so

14 that he could look at her in person, and he had no idea

15 who she was.  He had never seen her.

16         Horace Smith, another self-confessed, according to

17 him, "conspirator", a cousin of Raynard Dorsey, who got

18 him into dealing in the first place.  Horace Smith,

19 likewise, said that he had not ever heard of or seen

20 LaVon Dobie.

21         Mr. Thurman, who I talked about, Michael Thurman.

22 He was released in June of '01 from an armed robbery

23 sentence and immediately went back to using and selling

24 and supposedly, according to the government, was a major

25 player in this alleged organization.  Mr.  Thurman, when

1   I asked him, do you know LaVon Dobie?  He, first of all,

2   said, no, I've never heard of her.  Then when I asked her

3   to stand and take a look -- have him take a look at her,

4   he said, I've never seen her either.  I don't know who

5   she is.

6        If my client is a conspirator, as the government

7   says, whatever role she played in this organization, one

8   would think and -- one would think that the government

9   would have been able to produce one of the people that

10  bought -- and when I say "bought" I don't mean "bought"

11  in terms of money, but "bought" with something a lot more

12  precious than money, and that's  either no prosecution or

13  time off for the time you've already got.  You would

14  think the government would have been able to bring

15  somebody in here and say, yes, I know LaVon Dobie and

16  she's everything you say she is, but it never happened.

17       I want to say a few words about the search and

18  seizure at Ninth Street which took place on June 1.

19  Detective Papalia, the fellow with the sort of macho

20  little ponytail -- I guess he's an undercover officer --

21  came in and testified and was supposedly the officer in

22  charge, although he didn't seem to know a great deal

23  about what was going on there.  In any event, what he did

24  say -- what he didn't say, I suggest, is as important as

25  what he did say.

1       The government never asked him on direct
2  examination about the pair of blue jean shorts in bedroom
3  one -- another bedroom, not the bedroom where my client
4  was with her husband -- and the bag of dope that was
5  found in those shorts, and a bunch of small envelopes of,
6  according to the testimony, the type that is used to
7  package drugs for street sale, which were sitting on the
8  bedside table, I believe, in that same room.
9       It wasn't until I asked on cross-examination about
10 that pair of shorts and about the dope that was in the
11 pair of shorts that Detective Papalia finally -- not
12 finally, but he certainly admitted that indeed there was
13 dope in those shorts.  I don't think he ever even seized
14 the shorts.  I certainly asked myself, and I hope you ask
15 yourself, why the government chose to hide that
16 information.  Was it because it somehow didn't fit into
17 their mold into which they wanted to put LaVon Dobie?  I
18 may certainly stand corrected on this, but I don't think
19 that Detective Papalia testified on cross-examination --
20 I don't think he was even asked on cross-examination
21 about the two other males -- adult males who were in the
22 apartment, James Parker, age 42, and Anthony Carter, age
23 32.  I asked him about that on cross.  He admitted that
24 yes, indeed, there were two other males there, but they
25 were let go.  They, apparently, just were let -- able to

1 walk out.  Again, I've asked myself:  Why would the

2 government want to, let's say, not bring that information

3 out?  I hope you ask yourselves, ladies and gentlemen,

4 the same question.  Again, is it because for some reason

5 it might impact upon the government's view of what LaVon

6 Dobie's role was, at least in their mind in this

7 organization?

8         Then we come to the jewelry.  This is interesting,

9 because I remember specifically, and I'm sure you do too,

10 the agent was never -- Papalia was never asked by the

11 government about the jewelry.  I knew there was a bag in

12 there with a lot of jewelry -- I think it was 172 pieces

13 -- and on cross-examination, you may recall I looked and

14 he had a bunch of photographs there, and I said, may I

15 see those photographs?  Then we started going through

16 them, and low and behold there was a picture of the black

17 -- what do you call it?  Duffel bag.  You couldn't see

18 very well, but you could see that it had items in it, and

19 the officer finally admitted on cross that yes, indeed,

20 it did have items of jewelry, and there were a lot -- I

21 don't recall specifically how many, but there certainly

22 were a lot of them.

23         I asked him, isn't it a fact that the items were

24 each placed -- you remember my client's testimony on this

25 on the stand, that these are those small -- the pieces of

1  jewelry that was placed in a small bag, some with apples
2  and some with oranges of the type that you say were found
3  in the house that were used strictly for packaging drugs
4  for sale?  Well, apparently he couldn't remember that.  I
5  remember there was jewelry there.  I know there was a
6  lot; I don't know how much, and I don't recollect if it
7  was in small plastic bags like that.

8        Again, ladies and gentlemen, I've asked myself,
9  and I hope you ask yourself, why the government didn't
10 bring it out.  Is it because they didn't want to lend
11 credence to her testimony, which they had to know was
12 coming that, I'm a jewel thief and that's how get by and
13 that's how I buy my drugs.  That's how I make a living.
14 Because if she's a jewel thief, then that is sort of
15 contrary to their view that she's really a drug dealer
16 and not anything else.  Again, ask yourselves why the
17 government hid that information from you; after all,
18 you're the finders of fact.  It seems to me you need all
19 the facts before you -- all of them in order to make a
20 rational and reasoned judgment.

21        The guns.  You heard the story told by my client
22 on the stand how she went into her 17 year-old son's room
23 and he was there with another young fellow about the same
24 age, and they had these two guns:  One on the bed and one
25 in the hand of -- in one of them's hand, and I forget

1  which one.  She took the guns away and put them in a box.

2  You remember her saying, I went around and I closed my

3  bedroom door and I slammed the doors -- the closet doors

4  so they'd think -- you know, they'd think I was putting

5  it there, and I actually put them in a cracker box --

6  inside a box under the bed.

7           You know, I guess to many of us -- I'm not sure to

8  me, because I've been doing this a long time, but that

9  might sound -- 17 year-old kids that would have a couple

10 of guns like that sounds pretty wild and pretty

11 fantastic, but it happens.  It happens.  She took the

12 guns away.  She said it was certainly within 48 hours of

13 when the place was busted, and she hadn't even gone out

14 of the house in that period of time.  I don't think she

15 had made up her mind what she was going to do with the

16 guns.  Maybe the thing that you or I would say was, well,

17 why didn't she call the police?  You know, first of all,

18 she's not always been on the best terms with law

19 enforcement herself, and to call the police on your 17

20 year-old son for possessing a couple of handguns is, I

21 think, something that any of us might think twice about.

22 Whether it's the right thing to do or the wrong thing to

23 do, I don't know.

24           In any event, keep in mind that it is incumbent on

25 the government to prove that she possessed those guns --

1 let me get the language -- in furtherance of a drug

2 trafficking crime for which she could be prosecuted in a

3 court of the United States, that is the conspiracy to

4 distribute controlled substances as set forth in Count

5 One.  I suggest to you she didn't possess the guns for

6 that purpose, so then the government's case falls.

7        I don't know why the government didn't choose to

8 charge her with being a convicted felon in possession of

9 a firearm.  You know from her own mouth that she's a

10 convicted felon, and you know from her own mouth that she

11 possessed those two guns.  Putting aside the

12 circumstances, she still possessed them.  That's not what

13 the government charged and that's not something you have

14 to be concerned about.  What you have to be concerned

15 about is, did she possess them for reasons stated in

16 Count 61.

17        Finally, with respect to at least to the search

18 and seizure.  There was a box seized under the bed, and

19 in it was a letter addressed to my client's husband,

20 Julian Dobie, who, by the way, she testified, is also a

21 drug addict.  Within that box, with the letter, was found

22 the package which Papalia testified that he field-tested

23 and which turned out to be negative; the same package

24 about which he went to the grand jury shortly after the

25 search and seizure -- and you remember my questioning

1  about his prior statements -- told the grand jury that we
2  found some stuff that was indicative of narcotics
3  trafficking, but no quantities of narcotics were found,
4  and yet we then have a chemist coming in and saying, yes,
5  I was given this package and I tested it and it's 11.65
6  grams of heroin.  Keep in mind, please, what the Court
7  said about when defining possession, that if one is a
8  sole occupant of an apartment or a building or a living
9  space or a bedroom, for example, that puts one light on
10 things.  If this is an apartment, a bedroom, a living
11 space or whatever that one shares with another or others,
12 then that is another thing.

13        Before I leave the question of the search and the
14 house on Ninth Street, I'm sure you will recall that no
15 packaged drugs were found in that house, no drugs
16 packaged for street sell.  Where's -- if my client's a
17 dope dealer, where is her stock in trade?  You know, if
18 you're a dope dealer, it's like a grocer having cans on
19 the shelf.  If you don't have the cans on the shelf, you
20 don't have a business.  If you don't have dope packaged
21 for street sell, you don't have any stock in trade.

22        All right.  Let me say this, and I'll try to wind
23 up, because I promised you I'd keep it short, and I've
24 gone on longer than I had hoped I would.  As far as LaVon
25 Dobie is concerned, ladies and gentlemen, what can I say?

1  She is what she is.  She's a woman who's lived by her
2  wits and her guile ever since she was a youngster.  She
3  admits she's an addict.  She admits that she has a number
4  of convictions for fraud-type crimes, larceny, bum
5  checks, whatever.  She said that, you know, when I was
6  guilty, I pled guilty, but she doesn't have one
7  conviction -- not one conviction for any type of drug
8  trafficking activity.  I think, and I hope you think,
9  that that's significant.
10        If the government had charged her with simple
11  possession, ladies and gentlemen, I wouldn't be standing
12  here making these closing remarks today, because this
13  case would have pled out a long time ago, I guarantee
14  you, and my client would have been happy to resolve the
15  matter that way, but the government has invested, as
16  you've heard others say, a tremendous amount of manpower
17  and woman-power and resources on this case, and I guess,
18  given her background, her addiction, her criminal record,
19  they thought that she'd be an easy target to go after.
20        Well, she's proven to be a little tougher than
21  they thought.  She didn't roll over and she didn't cave
22  in.  She didn't cop a plea just to get a deal.  She said
23  when she stood before this Court on arraignment, I am not
24  guilty of these charges and I demand -- she didn't say "I
25  demand" but she did say, I am not guilty.  She demanded

1  to be tried by a jury and to put the Government to the

2  test which it must meet of proving her guilty beyond a

3  reasonable doubt.

4         When you weigh all the evidence, you might wonder

5  if she's guilty.  You might be suspicious as to whether

6  or not she did what the Government charges.  You might

7  even think it's likely that she might have done what the

8  Government charged.  That, ladies and gentlemen, is not

9  the burden of proof that the Government must meet.  It's

10 not the Government but the burden of proof that the law

11 demands.  It's certainly not the quantum of proof that I

12 or any of you would want to be convicted on if we happen

13 to find ourselves in an unfortunate situation like this.

14 You must, as the Court has said, and as you well know,

15 make findings beyond a reasonable doubt as to each count

16 against my client and nothing short of that.

17        Now, I talked a little bit in my closing -- my

18 opening, and I'm not going to regale you with it again,

19 about your historic role as jurors.  It is, as other

20 counsel have said, a very crucial -- and I think the

21 judge termed it in a bedrock aspect of the criminal

22 justice system.  Without people such as yourselves -- I

23 know you didn't come in voluntarily and you were

24 summonsed in, but you've paid attention, you've been

25 attentive, you've handled things with good grace and

1  patience.  Without you, the system would not function.

2          Now, very shortly -- I don't know how shortly it

3  will be, considering the amount of evidence you have to

4  go through, but this case will be over and you will go

5  back to your "normal" lives, your jobs, your family, your

6  children, your grandchildren, and I'll go back to trying

7  to pick up the pieces of my practice that I haven't

8  really looked at much for about ten weeks, and of course

9  other counsel will do the same thing.  Certainly, Judge

10 Titus has plenty to keep him busy as a judge.  As for

11 LaVon Dobie, ladies and gentlemen, she will have the rest

12 of her life to live with your decision.  I know you

13 appreciate the solemnity of what you are undertaking and,

14 again, on behalf of myself, my client and I'm sure all

15 other counsel in the courtroom, I thank you for your

16 attention.

17         THE COURT:  Ladies and gentlemen, you have sent me

18 a missive through the courtroom deputy that you would

19 like a 15 minute break.  I'm going to have to compromise

20 with you and make it a ten minute break, if we're going

21 to have any chance of being finished at or around six.

22 So we will resume at 4:25.  Thank you.

23              (Off the record at 4:17 p.m.)

24              (On the record at 4:26 p.m.)

25         THE COURT:  Counsel, I really want you to put the

1 pedal to the metal.  Do not assume we're going to have

2 anymore breaks today.  Number two, I want to make sure

3 the government has its opportunity to rebut, and I'm

4 going to make sure that it has.  So, don't be redundant.

5 Don't say the same things that have been said by other

6 counsel.  Let's move it along, consistent with giving you

7 a chance to do what you need to do, but I want to make

8 sure we get this done.

9       MS. JOHNSTON:  Your Honor, I don't need but five

10 minutes per defendant for rebuttal.

11       THE COURT:  I think if we stop talking to each

12 other, we can get this done.  Let's get the jury.  I

13 think the most efficient thing to do with the things to

14 do with the exhibits is, I think you need to do that

15 tomorrow morning with Bea.  I really don't think that --

16 I think the chance of you committing errors yourself

17 after a long day like this are much higher.  So, be here

18 tomorrow morning to go over it with Ms. Merez.

19       In the meantime, I'm also going to have the final

20 verdict form, with the final changes made, if you want to

21 look at that, and the hard copy of the final

22 instructions, if you want to look at that.  But

23 otherwise, we're just going to give that to the jury and

24 have them start.

25       MS. JOHNSTON:  Your Honor, would you order counsel

1  to be here at 7:45 tomorrow so we can have the exhibits

2  ready for the jury when they start deliberating at 8:30,

3  since it will be a short day tomorrow?

4       MR. MONTEMARANO:  Your Honor, I'm not sure they

5  will get to exhibits within the half hour or so.

6       THE COURT:  I'm sure they will get to it, whether

7  it's 7:45 or 8:00.  I don't care.  Just make certain when

8  the jury anticipates receiving exhibits that we're ready

9  to give it to them.  All right, let's bring them in.

10       Mr. McKnett, be ready as soon as Mr. Sussman

11  finishes.

12       MR. MCKNETT:  I'm ready right now.

13       THE COURT:  I'm not breaking.

14            (Jury returns at 4:31 p.m.)

15       THE COURT:  All right.  You may proceed, Mr.

16  Sussman.

17       MR. SUSSMAN:  Thank you, your Honor.  Good

18  afternoon.  I want to join my co-counsel in thanking you.

19  I know you've been drafted for this job.  I, myself, was

20  drafted once, and I know what that feeling is.  I'm going

21  to -- I know it's a tough day, you know, with a parade of

22  lawyers talking at you, but I'm just going to ask you to

23  hang in there a little while longer.

24       I think you know the finish line is in sight, and

25  it's important to Ms. Harden, and I'm going to ask you to

1 try to pay as much attention as you can.  You know, when
2 I listen to the government's closing argument, I was
3 struck with the fact that I think Ms. Greenberg
4 trivialized what it is to join a conspiracy.  She made it
5 sound almost as if it's like pulling your car into a
6 parking lot spot, you know, that you're in a conspiracy.
7 It struck me, if it was that simple and that easy, why
8 would we need that?  Why would we have spent ten weeks
9 here?  And why would it take so long to explain
10 everything that went on?  It's just not quite as simple
11 as the government wants to make it.

12        You know, we've all had teachers that occasionally
13 would tell us, you know, if you know and remember nothing
14 else in this course, remember these things, you know,
15 sort of spoon feed you a little bit.  And I think it's
16 important that if you remember nothing else about what I
17 say in the next 20 or 25 minutes, that there are some
18 things that are very important for you to remember.

19        The government has based its entire case on the
20 fact that Ruby Harden sold drugs.  Based on that
21 conception, they have argued to you that she joined a
22 conspiracy, that's the first count; and that she
23 knowingly joined a conspiracy with the intent to further
24 the interests of that conspiracy, and that was the
25 organization chart you saw.  And I ask you to remember

1  that chart is the government's creation.  That is not --
2  it's for you to judge what the conspiracy might have been
3  and what the shape of a conspiracy is.

4       The fact that Tom Eveler or Sakala or one of the
5  prosecutors put a chart together doesn't make that the
6  conspiracy.  It's for you to judge what the conspiracy is
7  and who is in the conspiracy.  Based on her drug selling,
8  the government has asked you to conclude that on March 21
9  and on March 29 that she intentionally used the
10 telephone, with the specific intent to further the
11 interests of the conspiracy, and that it was her goal to
12 help the conspiracy along.

13      Finally, in the fourth count which she's charged,
14 the March 29, 2004 count, the government has claimed that
15 in that parking lot up on New Hampshire Avenue in silver
16 Spring that Ms. Harden obtained cocaine, and she obtained
17 it for the purposes of selling it to someone.  That's the
18 count, possession of cocaine with the intent to
19 distribute it.

20      It's our position here today that they haven't
21 even come close, not even close to proving any of those
22 allegations.  And starting from the bottom.  If you
23 really think it through, the only evidence that you've
24 seen in this case against Ms. Harden comes from experts.
25 There is not one fact witness who comes into this court

1  throughout the ten weeks of this trial who testified that

2  he or she saw Ms. Harden with drugs, saw Ms. Harden sale

3  drugs, found drugs in Ms. Harden's possession, saw Ms.

4  Harden distribute drugs, found a ledger that had Ms.

5  Harden's name in it, found paraphernalia associated with

6  drugs.  Even the notion that it's cocaine is Sakala's

7  opinion.  It's an opinion.  There's absolutely no hard

8  evidence pointing to any particular drug or possession of

9  any particular drug.

10        Go back in that room when your deliberations

11  begin, and the 12 of you think, what evidence was there

12  other than Chris Sakala?  And because of the lack of

13  evidence, I'll say it right up front, it's your duty to

14  find Ms. Harden not guilty with regard to every one of

15  those counts.  And let me make this crystal clear.  We're

16  not asking for any compromises.  We're not asking for --

17  we're asking for the whole, the Full Monty, an acquittal

18  across the board, because we think that's what the

19  evidence requires.

20        Now, in terms of explaining what you saw and heard

21  with regard to Ms. Harden during the trial.  I didn't do

22  that much, and there's a good reason why I didn't do that

23  much.  My efforts have to be in proportion to what the

24  government brings you, and the government didn't bring a

25  lot against Ms. Harden.  But let me tell you about some

1 of the things I did and how I went about my business that

2 may help you in your deliberations and help you

3 understand exactly what our position is.

4          You know, as a general rule, if a witness gets up

5 there and doesn't mention your client, you leave them

6 alone.  You don't ask questions because there's really no

7 point.  They don't hurt you.  Why bother with them?  I

8 mean, it makes a lot of sense.  And pretty much, that's

9 the rule I followed.  There are some exceptions, and I

10 want you to understand those exceptions and why I did

11 some of the things I did.

12          At times, there's a witness who has information

13 for you, important information that you have to hear.

14 And if that witness has no particular connection with my

15 client, no real axe to grind, that is the witness who

16 will give you the most truth.  That is the witness who is

17 not trying to figure out your agenda.  He's not asking,

18 like Agent Sakala did, where are you going with that

19 question?  He doesn't care where you're going.  He's just

20 -- those witnesses are just answering your questions.

21          One of those witnesses was the FBI agent you might

22 recall, Kevin Ashby.  He did a search.  He wasn't

23 involved in the case.  I can't even remember what or who

24 the search related to, but it was important in my mind

25 for you to hear the kinds of things that the police look

1 for when they do a narcotics search, and we went through

2 a long laundry list of maybe 20, 25 things, the kinds of

3 items that an experienced narcotics officer -- narcotics

4 guy would pull right away as suspicious or as indicative

5 of drug dealing.  And there were a lot of things, and

6 we'll talk about some of those things later on.

7          And what did he tell you?  He told you what those

8 things were, and he told you that he'd done a lot of

9 searches, and it was pretty rare that you're going to

10 find all those things in one place.  But he also told you

11 it's pretty rare that you don't find any of those things,

12 and that was an important thing for you to know because

13 later on you were going to hear from us, or through Agent

14 Eveler, about the search of Ms. Harden's apartment and

15 the astounding evidence that they found:  Absolutely

16 nothing.  Absolutely nothing that was indicative of drug

17 dealing when they entered her apartment at 6 o'clock in

18 the morning on June 1st 2004.  Sometimes you ask a

19 question there's something you have to know.

20          Now, to give you an example about that -- and I

21 don't remember the guy's name.  It was the state trooper

22 out in Wyoming who stopped, I think, Philpot.  I didn't

23 care about Philpot's stop.  We don't have anything to do

24 with that.  My client doesn't know who Philpot is and

25 doesn't care about Philpot, nor do I, but it's important

1 for you to know that when a cop gets on the stand and he

2 testifies that I stopped these guys going two miles over

3 the limit, I noticed they had a California plate, and oh

4 my God, after I stopped them I saw that they were black.

5 You know, I was too busy looking at their license plate.

6          It's important for you to know you can't take

7 everything these guys say at face value, because if you

8 give some of these folks -- I'm not saying all of them,

9 if you give them a chance, they'll take a liberty.  It's

10 just like the officer I talked to where I questioned

11 about him saying what somebody else told him what

12 somebody else told him.  He's an experienced cop.  He

13 knows what the rules are, and you don't go telling what

14 other people have told you.  But if they can slip

15 something like that through, they'll do it, and you've

16 got to call them on that.  You've got to call them on

17 that, and you've got to have -- I want you folks to know

18 that there are witnesses that are cops who are trying to

19 do that, and that's something that you have to look out

20 for and you have to be very mindful of in your

21 deliberations.

22          I talked to Agent Eveler, I believe, about that

23 chart and about where that chart could have gone in terms

24 of additional people.  And it was important, because

25 there was no limit to how many people the government

1 could have put on that chart.  They arbitrarily decided

2 where that chart ends.  And it was significant, because I

3 knew, and you know now, that my client doesn't know any

4 of those people, and none of those people know her.  That

5 in all of the ledgers, and all the articles they seized

6 in all of the phone records, there is absolutely not one

7 iota of contact between Ruby Harden and anybody but

8 Paulette Martin.

9        Now, you don't have to know everybody in a

10 conspiracy, but you've got to know somebody.  You know,

11 let me give you an analogy.  You go to work for a large

12 corporation, General Motors -- they're still around,

13 although I haven't read the papers in a couple of days.

14 You don't know everybody who works for General Motors.

15 You don't.  You don't even know half the people, what

16 they're doing, but there's certain things you do know.

17 You do know that you're in the business of manufacturing

18 cars and trying to make money, and you also know you're

19 working for General Motors.  It's not an accident.  You

20 know who you're working for.  It's an identity, and

21 you're signing on with the goal of trying to make General

22 Motors lose less money or make more money or what have

23 you.

24        That's part of being an employee, being

25 associated, and that's exactly what the government has

failed to prove is that Ms. Harden cared in any way or
had any interest or stake in the outcome of this
purported conspiracy.  What interest did she have?  What
money?  What did she gain from this conspiracy?  What did
she know about these people and what they were doing?
That kind of lack of information, lack of understanding
from an evidentiary standpoint is wholly incompatible
with being a member of a conspiracy.  You don't have to
know everybody, but you've got to know some of the
people.

Now, in the same vein, the government says, Ms.
Harden sells drugs.  Well, you know, I talked a little
bit about a total lack of evidence.  There's no
customers.  There is no ledgers.  There is no purported
transactions.  There is no paraphernalia.  There's no
scales.  And the government can be pretty cute on that.
Well, if you've got a scale, it's indicative of drug
dealing.  If you don't have a scale, that's indicative of
drug dealing.  If you've got packaging, it's indicative
of drug dealing.  If you don't have packaging, it's
indicative of drug dealing.  You can't have it both ways.
You've got to pick your side here.  If you don't have it,
it's indicative that you're not involved in drug
trafficking.  You know, it's another example of where the
experts try to make a case but they haven't come close.

1 They really haven't come close.

2        Now, you've heard it a million times, and I guess
3 you can't hear it too much.  The government's obligation
4 is to prove guilt beyond a reasonable doubt.  High
5 standard, right?  And that's a standard that not only
6 protects Ms. Harden, it protects everybody in this
7 process.  Because it means that before you as jurors
8 convict anybody or -- and have to live with maybe second
9 guessing or -- you don't, because the evidence is certain
10 and so secure in your minds, and you're so positive of
11 what you're doing that there are no recriminations.  It's
12 an easy decision for you at that point.  When the
13 government meets its burden, it's an easy  decision.
14 Similarly, when the government doesn't meet its burden,
15 it's just as easy a decision.  It's not guilty when the
16 government doesn't meet its burden.

17        Now, you know, during the course of this trial,
18 we've seen criminality as a matter of opinion.  Being a
19 criminal is not a matter of opinion, it's a matter of
20 evidence.  And criminal conduct is something, I submit to
21 you, you can taste, you can smell, you can feel.  You
22 know it.  Chris Sakala doesn't have to tell you who's a
23 criminal.  Tom Eveler doesn't have to tell you who's a
24 criminal.  You know criminal behavior when you see it.
25 It's like spoiled milk.  You open it up, you know it's

1 spoiled.  You don't need any expert or, you know, honey,
2 why don't you try this and see if it stinks.  You know
3 it.  And I submit to you that in this case you don't know
4 it with regard to Ms. Harden.

5      Let me turn a little bit and talk about experts
6 generally.  Because as I said, the experts are the only
7 ones who provided any testimony against Ms. Harden, and
8 let me suggest this.  As our lives become more and more
9 complicated, increasingly, we as a society, turn to
10 experts.  There are just so many things we don't
11 understand, and we turn to experts.  In some cases,
12 experts become the false gods of our time.  You know,
13 experts are the ones who say, if you knew what I knew you
14 know, you'd be agreeing with me too.  And too many times,
15 experts, they're not independent.  They're advocates.
16 They're shills.

17      We pick our experts to advocate our position.  The
18 government does that.  The administration does that.
19 That's how we pick our experts, and that's how lawyers do
20 it.  Look.  If I'm trying a case and I need an expert, I
21 go out and find an expert who is going to further my
22 position.  I mean, sometimes I find one right away, and
23 sometimes I've got to go through a whole bunch of them,
24 but you bet I'll find one.  I will find an expert who
25 will agree with my position and further my position.

1          Now, it's a little bit more problematic, I think,
2 when your expert is part of the team.  Here, you have
3 experts part of the team.  If I go out and hire an
4 expert, he's not pushing the evidence cart.  He's not
5 working for two years on a case.  He's not sitting in the
6 court for ten weeks.  He or she is going to testify, take
7 my check, and go to the bank to make sure it clears.
8 That's their stake in the case.  This is a little bit
9 different.  Here, the experts are part of the team.  Let
10 me explain "part of the team."  There's no doubt about
11 it, this is a competitive enterprise.  I'm here to win.
12 They're here to win.  And if anybody doesn't think
13 they're here to win, you've been comatose for the last
14 ten weeks.  They're here to win.  And it's just a
15 question, when it's a competitive event, what will you do
16 win?
17          How far will you go?  Is it -- you've got to do
18 what you've got to do?  You know, you've got to do --
19 we've got to do what makes us win.  You know, that's the
20 prevailing view you hear out in society.  And don't think
21 that that courtroom -- those doors on that courtroom stop
22 that.  You're part of a team.  And what does a good
23 teammate do?  Helps the team.  And I would submit to you
24 that during the course of testimony examination, that's
25 exactly what you saw.

1          Other people have talked about it, but I want to
2  talk about experts in terms of Agent Sakala, in terms of
3  the way he dealt with my issues, and particularly with
4  the evidence with regard to Ruby Harden.  I started off
5  with cocaine.  Cocaine.  That's Chris Sakala's creation.
6  Go back there and search your recollections.  Search the
7  evidence.  Search everything and find out, how does he
8  say with requisite certainty that there's cocaine.  Why
9  isn't it crack?  Why isn't it heroin?  It's the
10  government's burden to prove what substance my client is
11  supposed to be selling.  How do they do that?  Because he
12  says so?  He says that $125 is indicative of a sale.  You
13  buy $125, it's indicative of you've got to be in the
14  position of selling.  That means that you're cutting it
15  up into $10 and $20 and running up and down the street
16  selling drugs like Thurman did, you know, and that's how
17  you make money with $125 worth of cocaine.
18          Don't you think there would be some evidence of
19  selling on Ms. Harden's part if that was the case?  Don't
20  you think there would be something to indicate she was
21  selling drugs?  There is no past history of drug selling.
22  There is no arrest.  There's no paraphernalia.  There's
23  nothing, but there's Sakala, and he'll tell you.  And he
24  also tells you that 125 bucks is 3.5 grams, an eight ball
25  .  Well, it got a little lower during the opening

1 argument -- closing argument, it was 3.2.  But people
2 tell you LaVon Dobie, whatever she bought, you know, she
3 bought for a $100 she said was 1.75.  LaNora Ali told you
4 she got three 50s which she thought was about a gram and
5 a half.  You know, there's retail and there's wholesale,
6 And don't think that every person who buys drugs knows
7 exactly weights and measures.

8          I'll give you an example, and maybe it'll make
9 some sense to you.  I admit that I am a recreational
10 abuser of ice cream.  I have been one all my life.  I
11 have transported ice cream across state lines.  I have
12 never smuggled it across the border.  I have purchased
13 ice cream on a thousand occasions, cones, single scoop,
14 double scoop.  I do not know the weight of the ice cream.
15 I do not know the volume of the ice cream I've purchased.
16 I know it's one scoop or two; it's a sugar cone, or it's
17 a cake cone.  That's all I know.  I don't have any stake
18 in Ben and Jerry's.  I don't know who Ben and Jerry are.
19 I don't know who Hagen-Das is, if there is a person named
20 Hagen-Das.  All I know is I go in and I buy the ice
21 cream.  They give me what they give me, and I generally
22 wish it were more.

23          I do not have to be an authority on the volume or
24 the weight or the grammage, if there is such a word, of
25 the ice cream I get.  It's not my issue.  And when it

1 comes to price and buying, you know, there are a lot of

2 ways to buy things.  You know, you can go buy your

3 groceries at the 7-Eleven and you will pay a hell of a

4 lot more than you will than if you go to Costco's.  It's

5 just a question of your purse, your convenience, what you

6 want to do, and what you want to do in a particular time.

7          Now, this was something that I found virtually

8 incredible.  Agent Sakala testified -- you know, I asked

9 him specifically, what about all those people who use

10 drugs who are, you know, accountants.  I want to stay

11 away from lawyers.  You know, accountants, musicians, you

12 know, waiters, chefs, you know, rock stars.  I mean,

13 don't they buy from, you know, somebody they connect up

14 with, a friend or something like that and buy, you know,

15 100, 200, whatever their habits are?  He goes, oh, no,

16 no, no, no, no.  It's my experience they're all running

17 down to the local drug strip, you know, and buying $10 at

18 a time.  So, they can run down to the strip every other

19 day.

20          Well, I'll tell you something.  And use a little

21 bit of your common sense as you've been asked to do

22 before and think about someone like me going down to the

23 housing projects in southeast to negotiate with some 18

24 year-old guy in a crew and his buddies down there.  You

25 know, it would be like a new game of Survivor, you know,

1 for me, and it probably wouldn't last that long.  It's

2 just another example of whatever it takes.  You know,

3 it's whatever it takes to make the case.

4        Ms. Greenberg talked about smoke and mirrors.  You

5 know, I've got nothing up my sleeve.  Can they say the

6 same thing?  And the worst of it all was the testimony

7 about the events of March 29.  You know, I don't know how

8 well you recall that, but I'm going to remind you.  March

9 29, my client talks with Paulette Martin, and she meets

10 her at a shopping center up on New Hampshire Avenue in

11 Silver Spring, and she drives her truck -- you all know

12 that she drives a tractor trailer.  And she drives up

13 there, and she parks it and goes in, and she's supposed

14 to meet Ms. Martin.

15       And the police hear the wiretap, so they send up a

16 surveillance team.  One of the guys is Detective

17 Musselman, an experienced, either P.G. or Montgomery

18 County cop, and he has another guy taking pictures, I

19 think, in another vehicle.  And they see Ms. Martin pull

20 up right to the front of the shopping strip, you know,

21 right where the sidewalk -- where all the people are

22 walking by.  She doesn't park way in the back, you know,

23 away from everybody.  And Ms. Harden comes out and they

24 talk.

25       And he's 15' away, Musselman.  He's 15 to 20'

1 away, the distance, I guess, to the clerk, something of
2 that order, and he can see everything perfectly.  He's
3 really in the catbird seat.  And he says that -- watches,
4 and he sees a piece of paper get passed over to Ms.
5 Harden, and they take a picture.  You know, it's a
6 picture.  You look at it.  I think it's P-234 or
7 something like that -- close to that number, at least.
8 And they look at the picture, and she's holding up a
9 piece of paper and talking on a cell phone, and that's
10 what you see.

11        Well, you know, I assume Musselman is not an
12 idiot, that he can accurately report things he's seen.
13 And somehow when it's retold, it's Agent Sakala, with Ms.
14 Johnston, and he's got a piece of paper, you know, and
15 he's showing that the cone is, you know, and there's
16 drugs down in the bottom of the cone.  Well, I would
17 submit to you that maybe it would have been a better
18 question to ask Detective Musselman, is that what you
19 saw.  He didn't testify to that.  He was the guy who was
20 there.  I always thought the guy who was there was the
21 best one to ask.  What do I know?

22        But ultimately, the worst thing that happens, and
23 it shows a cynicism for the system, is Agent Sakala goes
24 into the grand jury on October 27, 2004, the grand jury
25 that's considering the count of possession with intent to

1  distribute, and he tells the grand jury that Ms. Harden
2  received a package in the parking lot.  A package.  And
3  when I questioned him about that, I said, that's a pretty
4  bad mistake wasn't he it?  He said, no, that wasn't a
5  mistake.  I said, the grand jury is a pretty important
6  place.  And he goes, no, no, the grand jury isn't that
7  important.  Well, maybe it wasn't important to him, but
8  it sure as hell was important to Ms. Harden because
9  that's the grand jury that indicted her for possession
10 with intent to distribute cocaine on March 29, and that's
11 the count you're being asked to consider.
12        You know, there's more.  And I think it's worth
13 talking about.  It's a way of answering questions.  You
14 remember there was a photograph taken of the basement, I
15 think it was on Haden -- 810 Harden --
16        MR. MONTEMARANO:  Haywood.
17        MR. SUSSMAN:  My client's Harden.
18        MR. MONTEMARANO:  Haywood.
19        MR. SUSSMAN:  I'm sorry.  You need all the help
20 you can get in this business.  There was a rack of
21 clothing with plastic bags on it and a bunch of shoes.
22 At first I asked Agent Sakala, that's clothing; that's
23 the way they display clothing.  I don't really care
24 whether it's legitimate or it's hot clothing or whatever,
25 but it's clear Ms. Martin is selling clothing.  And he

1 goes, no, no.  I don't know, maybe that's just the way

2 she keeps her clothes.  Okay.  Don't want to give it to

3 me?  Thinks he may help me, you know.

4          At that point, that seems like a big deal that he

5 thinks it might help me.  Well, he won't give it to me.

6 So I say, well, how about all these single shoes, you

7 know, lined up on the bottom.  You know, it's like that's

8 consistent with a retail sale.  I don't know why they do

9 that, to keep people from stealing them or keep more

10 space or whatever.  And I said, that's consistent with

11 display or sale.  Well, I couldn't say that, you know.

12 And then I give him some smart remark about, like, people

13 hopping around, you know, one-legged people.

14          And, you know, and when you saw the surveillance

15 people, a lot of these people did look like they were

16 hopping when it was all speeded up.  But at the time, it

17 seemed important to him, and it seemed important to the

18 case, and he wasn't going to give it to me because it's

19 about winning and it's not about truth.  It's about

20 winning.  Not going to hurt the team.

21          Notice that the team has seemed to have disbanded

22 at the last moment, but -- and I was looking for Agent

23 Eveler because I didn't want to talk behind his back but,

24 he seems to have left, so I'll do it anyhow.  Agent

25 Eveler was the guy who was in charge of all the searches

1 and seizures.  He was the point man on all that.  And
2 supposedly -- he was pretty good.  He knew about phone
3 numbers.  He had a pretty good recollection, pretty good
4 grasp of what was going on.

5        Unfortunately though, when I asked him questions,
6 his memory seemed a little bit different.  You know, it
7 was pretty clear that he searched Ms. Harden's home, and
8 you heard about searches and, you know, I asked one of
9 the officers, when you search a house, you search this
10 house so they're not going to find anything.  Nothing is
11 going to get left unfound, if that's English.  And it was
12 pretty clear that they toss your house pretty good, and
13 it's not willful or -- I wasn't trying to imply it was,
14 you know, malicious.  If something's there, they want to
15 find it; they're going to find it.

16        And after all that, they didn't find anything in
17 Ms. Harden's house, and they even put on a -- they didn't
18 put on a witness to testify about the search.  So, to get
19 it out of Eveler and his answers, I said, well they
20 didn't find any drugs.  They didn't find any residue.  He
21 gave me one of these, you know, that pained look.  You
22 know, a little pause, a little hesitation, and a "not
23 that I recall."  Gee, I was having flashbacks of Richard
24 Nixon, you know?  I mean, "not that I recall?"  And he
25 gave me that answer about 30 times.  You know, he gave me

1 one, well you know, I don't have all my notes today.
2 You know, it's kind of a sly way of implying, if I had
3 better recall, if I had all my notes, maybe I'd find
4 something, you know?
5        Let me give you an analogy, and hopefully this
6 will drive that home.  You get a call from school about
7 your kid and, you know, the assistant principal tells
8 you, you know, your kid hasn't been at the eighth period
9 for the last three weeks.  You know, why don't you talk
10 to him about that.  You call him in and, you know, you
11 say, hey I got a call and, you know, you're trying to
12 keep it together because you've read all the books, you
13 know, and you're trying to be a sensitive parent and you
14 say, they say you haven't been there.  And the kid looks
15 at you and says, what's the story?  And he gives you that
16 pained look and he says, not that I -- I don't really
17 recall, you know?  I mean, you'd hit the kid with a
18 toaster oven at about that point because, you know, it's
19 just garbage.  It's just garbage.  The answer is either
20 yes or no.  But being that candid doesn't help the team.
21 It doesn't help the team achieve the team's goals.
22        You know, so what's the upshot of all this?  You
23 know, the investigation started, I don't know, '97, 2001,
24 2002.  It's been going on and going on as this case
25 progressed, and going on since the arrests because it's

1   an ongoing thing.  They haven't uncovered one bit of

2   evidence that suggests that Ruby Harden ever sold drugs

3   to anyone.  All they can tell you is they didn't find

4   anything at her house.  She doesn't talk to any of the

5   people in the conspiracy.  They don't give her the news

6   of the conspiracy.

7           When she talks to Paulette Martin, Paulette Martin

8   could be a lot of things to a lot of people, and she

9   talks to people in different ways.  There's some people

10  she talks to and she's pretty direct, she's pretty

11  coarse.  And then when she talks to Ms. Harden, she's

12  talking about -- she's talking about clothing.  She's

13  talking about shows she's producing.  She's talking about

14  working for Dankers, and you will see that.  She's

15  talking about, you know, trying to crack the big time on,

16  you know, in the entertainment field.

17          She's portraying herself exactly the way she

18  portrayed herself in that March 2003 thing that Harvey

19  Star Washington put on.  You saw that picture.  This is a

20  woman who knows how to present herself, and she wasn't

21  presenting herself to Ruby Harden as a woman who had 40

22  kilograms of coke in the cupboard.  She was presenting

23  herself as a woman on the make, a woman trying to be an

24  entrepreneur trying to do a lot of things.

25          Why should Ruby Harden, who doesn't go to her

house, doesn't eat her turkey wings, doesn't eat her
sweet potato pies or whatever else, know what's going on
out there in world?  Nobody's telling her.  Nobody's
telling her Gwen Levi's arrested.  Nobody's giving her
the front page news.  And the reason they're not giving
it to her is because it's none of her affair, because
she's not part of this.  You don't give that information
to people who aren't part of your world.

        The evidence is, and the government opened with
it, and Ms. Harden drove a tractor trailer.  Tough job.
When you see people -- and, you know, they went in her
house and they didn't find any signs of wealth.  No
plasma TVs.  No jewelry.  You didn't hear anything about
that.  When you see somebody who's working a hard job,
probably long hours, you generally think "honest."
Because in my experience, and maybe it's not criminal to
like short hours and big money, that's why you become a
criminal.  There's absolutely nothing in the government's
evidence that indicates that Ruby Harden ever sold drugs
or ever was in the drug business or ever tried to
facilitate or make that conspiracy succeed, that she had
any stake in its outcome or cared or knew of its
existence.

        The government's showing you $2,300 worth of
checks.  Now, there are checks for $125, there are checks

1  for $123, there are checks for $130, there are checks for

2  $25, $30, $50.  These are a whole range of checks.  Four

3  years, $2,300.  Fifty bucks a month.  I spend more on gum

4  and cigarettes than that.  It's a tank of gas.  Is that

5  drug dealing?  Is that drug dealing on a professional

6  level?  And do professional drug dealers pay in check?

7  It's a cash and carry business.  You get cash, you roll

8  it over.  I mean, you heard about $200,000, a quarter of

9  a million dollars.  Nobody's taking a check in that

10  business for serious drug dealing.

11         Years of investigation, ten weeks of trial, and

12  the government has produced painfully little.  Painfully

13  little.  My time is up.  I'd ask you to use your time

14  wisely and acquit Ms. Harden of all charges.  Thank you

15  very much.

16         THE COURT:  Thank you, Mr. Sussman.

17         Mr. McKnett.  MR. MCKNETT:  Thank you, Your

18  Honor.

19         In the overwhelming of conversations, I know

20  exactly what the people are talking about to a moral

21  certainty.  Sergeant Sakala said that on June 20.  When

22  he said that, it reminded me of another quote from a

23  classic piece of English literature.  When I use a word,

24  Humpty Dumpty said in his rather scornful tone, it means

25  just what I choose it to mean, nothing more or less.

 1          Thomas Jefferson once said words to the effect
 2 that when you're in a debate, if you allow your opponent
 3 to define the terms of the debate, you will always lose.
 4 When you go back in that room, you're going to be in a
 5 debate.  You're going to be debating with each other.
 6 You're going to be debating with the government, you're
 7 going to be debating with Sergeant Sakala and Corporal
 8 Eveler.  Don't let them define the terms of the debate.
 9 Define the terms for yourself.
10          2000 years ago Alexandria, Egypt was an
11 intellectual center of the world.  At least, the people
12 who lived there thought it was.  And Ptolemy was the
13 intellectual leader of Alexandria.  He was a very smart
14 man.  He was a scientist.  He was a mathematician.  He
15 measured and studied how light traveled through
16 atmosphere.  He measured how the moon revolved around the
17 earth.  And one day he noticed that the sun seemed to
18 move across the sky just like the moon did, and he
19 decided that the sun must go around the earth just like
20 the moon.  Well, obviously, he made a great mistake.
21          Anybody with any background or knowledge of
22 scientific investigation knows he made a tremendous
23 mistake.  Nevertheless, he set out to prove his theory.
24 He made observations he interpreted to support his
25 theory.  He measured and observed the sun's movement

1  across the sky.  He interpreted his measurements and his

2  observation to produce precise calculations to prove his

3  theory correct beyond a doubt.

4        Those observations which didn't fit the theory, he

5  ignored, or he explained them away.  When later

6  observations contradicted those conclusions that he had

7  drawn, his solution was simple to reinterpret the earlier

8  observations to fit.  He was the expert.  Everybody

9  believed him.  Everybody accepted his theory because he

10  was expert.  And for 1,400 years, all the western

11  civilization believed that the revolved around the earth.

12        Nicolaus Copernicus, I think that's the Latin form

13  of his name, he was born in Poland in 1473.  He was not

14  an expert.  Never claimed to be one.  Never wanted to be

15  one.  He was a student.  He was a very quiet man.  He

16  lived a life of almost solitude in a, I want to say

17  monastery.  That's not exactly right, but it was a

18  religious residence.  He studied religion.  He studied

19  mathematics.  He studied optics.  And eventually, he

20  began to study astronomy, and he studied Ptolemy because

21  Ptolemy was the expert.  But Copernicus had problems with

22  Ptolemy's theories.

23        Astronomers after Ptolemy, for 1,400 years, had

24  produced a profusion of charts, graphs, diagrams,

25  formulas, all proving that Ptolemy was right.  When

1  Copernicus began to make his own observations, he came up

2  with a simpler theory that didn't require charts,

3  diagrams, it didn't require any of that.  His theory?

4  The earth revolved around the sun.  Nowadays, Alexandria,

5  Egypt is not considered one of the intellectual centers

6  around the world, and no one believes that the sun

7  revolves around the earth.  Ms. Ali needs you to be

8  Copernicus to the government's Ptolemy.

9        Let's talk about powder versus crack.  There is no

10  evidence at all that Ms. Ali ever bought anything other

11  than powder cocaine, except for Sergeant Sakala's and

12  Corporal Eveler's so-called expert opinions.  Keep in

13  mind their opinions are based in large part on their

14  interpretations of what they deemed in their expert

15  opinions to be drug-related conversations.  How did they

16  know the conversations were drug related?  Because Ms.

17  Ali and Ms. Martin talked in code.  How did Sakala and

18  Eveler know they were talking in code?  They're the

19  experts.  How did they understand -- Sakala and Eveler

20  understand the codes?  They're the experts.

21        Corporal Eveler also testified he didn't believe

22  Ms. Ali when she described how she cooked powder into

23  crack.  He said it would be too wasteful to cook powder

24  the way she described that, and the end result would be

25  too difficult to use because the crack would have to be

1 scraped out of the container that it was cooked in.  His

2 opinion is flawed in at least two ways.

3         First, Ms. Ali herself described how she had

4 difficulty cooking the crack in those small quantities.

5 She described how, when she tried to cook it in the

6 microwave, it stuck to the container and she had to

7 scrape it out.  The corporal didn't contradict what Ms.

8 Ali said; he just didn't want to accept what she said,

9 because he's the expert.  He knows better.

10        Second, he based his opinion, or his assumption,

11 that Ms. Ali mixed a half a gram of powder cocaine to the

12 half a gram of baking soda, a mixture he said would

13 result in a loss of too much cocaine.  He might be right,

14 but that's not what Ms. Ali said.  She never said she

15 mixed equal amounts of powder to cocaine with baking

16 soda.  She said she mixed her powder cocaine with a small

17 amount of baking soda.  The assumptions underlying the

18 corporal's opinion are false, and his opinion is fatally

19 flawed.

20        Excuse me while I get some water.

21        I want to talk about drug quantities.  Again,

22 Sergeant Sakala and Corporal Eveler said that $125 equals

23 an eight ball.  And how do they know that?  Because

24 they're the experts.  It's based on their many years of

25 experience, their training.  They know that when someone

1  talks about a 125, he or she is talking about an eight

2  ball.  They also know, based on their training and

3  experience, that an eight ball equals 3.5 grams.  They

4  also know, based on their training and experience, that

5  when someone talks about a 50, he or she is talking about

6  a gram.  How do they know that?  They're the experts.

7          However, the government's own evidence in this

8  case contradicts those so-called expert opinions.  Look

9  at the drug evidence seized at Ms. Ali's apartment on

10 June 1st and look at Drug Exhibit 32 and Defendant Ali's

11 Exhibit 1.  Ali's Exhibit 1 is this lab report.  And if

12 you look down here, you will see Exhibit 1, one white

13 envelope with plastic bag with white rock-like substance.

14 Suspected cocaine.

15         You look down here, there it is, Exhibit 1, .6

16 cocaine hydrochloride, which is cocaine powder.  Exhibit

17 32 is that little square baggy that we was seized in Ms.

18 Ali's house.  That baggy contains .6 grams,

19 Three of those, and that cost $50.  Three of those is 1.8

20 grams.  You get three for $125.  That's half an eight

21 ball.  That's the government's own evidence.  But their

22 opinions are so firm and so rigid, they allow their

23 opinions to override the facts.

24         Besides that, Ms. Ali and Ms. Martin never talked

25 about drug quantities in the sense of weight.  They

1  talked about a one.  Do you want one?  I want one.  A

2  dollar 25.  125.  50.  They don't talk about, I want a

3  gram.  They don't talk about, I want an eight ball.  Ms.

4  Ali is buying drugs, but she's not buying a specific

5  quantity.  She's buying a dollar amount of drugs.  There

6  was a relationship between the two of them.  They knew

7  what they were talking about.

8         When Ms. Ali said, I want one.  Ms. Martin knew

9  she wanted one of those little .6 gram packages.  And

10 keep in mind that .6 grams included the weight of the

11 package.  Ms. Ali was buying dollar amounts of cocaine,

12 not a specific amount by weight.  Just like when you go

13 to the gas station and you buy $20 worth.  How many

14 gallons?  Real quick, how many gallons are in $20?  You

15 don't know; the price changes daily, hourly sometimes

16 these days, but you pay $20 for whatever you get.

17        Remember the testimony of Detective John Shea.  He

18 testified about the search of Paula's School of

19 Performing Arts on June 1st of '04.  He testified that

20 among other things that were seized were 23 small ziplock

21 baggies and that each baggy contained cocaine and each

22 baggy weighed an average of 3.3 grams, including both the

23 weight of the baggy and its contents.  We're not talking

24 about specific measurements.  In this business, at the

25 level that Ms. Ali was buying drugs, she was buying

1 dollar amounts.  Nevertheless, the government, through
2 its so-called experts, insist that Ms. Ali was buying
3 eight balls for $125, that each eight ball consisted of
4 3.5 grams of cocaine exclusive of the weight of the
5 baggy.  There no evidence at all to support that, except
6 Sergeant Sakala and Corporal Eveler's expert opinions
7 based on things that happened outside of this case.
8        Let me talk about drug volumes in the sense of
9 what Ms. Ali was buying.  Haywood 7, this is a photocopy
10 of it.  The actual exhibit is there somewhere.  Haywood 7
11 tells you what Ms. Ali was buying, how often she bought
12 it from Ms. Martin; it also shows you when Ms. Ali
13 started buying 125s instead of 50s.  This is the first
14 page of the ledger.  This is the column with the
15 clothing.  This is the column with the drugs.  It starts
16 out August 22.  As it turns out, that's '03.  Starts out
17 $50.  Another $50 purchase.  A hundred.  August 23, $50.
18 August 29, $50, for a total of $200.  And then on August
19 29, Ms. Ali paid $100.
20        Then, over here, carry this up $100. $50 purchase.
21 $50 purchase. $50 purchase.  $90 payment for $160.  And
22 then it carries down to here and there.  October 22, a
23 125.  And from there on down from October 22 through May
24 28, there are quantities of -- it is 125, 125, a 50, a
25 50, and then payments:  A 50, a 125, and so forth.

1 That's when the change took place.  This tells you.  You

2 don't need an expert opinion.

3         Heroin.  The government's accused Ms. Ali of

4 participating in a conspiracy to possess with intent to

5 distribute it -- possess with intent to distribute

6 heroin.  You have not heard a single word relating heroin

7 to Ms. Ali.  Not a single syllable relating Ms. Ali to

8 heroin.  What you have heard is speculation and

9 supposition in the form of so-called expert opinion.  The

10 government says that she is guilty of a heroin conspiracy

11 because, on the 16th of May, when Ms. Ali helped Ms.

12 Martin carry bags to the school, that there was heroin in

13 those bags.  Well, there's several problems with that.

14         First of all, there's no evidence that Ms. Ali had

15 any idea that Ms. Martin had ever had anything to do with

16 heroin.  You can't find a single conversation, you can't

17 find a single piece of evidence that shows to any degree

18 that Ms. Ali had any idea, any reason to suspect or even

19 be suspicious that Ms. Martin was involved with heroin.

20 There is no evidence, other than the expert opinions that

21 you've heard, that there were drugs in the bags on May

22 16.

23         The evidence that drugs were seized from the

24 school on June 1st is not evidence that Ms. Ali helped

25 carry drugs into the school on May 16.  Any attempt to

1 connect those two events, the seizure of drugs in the
2 school on June 1st and the carrying of the bags into the
3 school on May 16, is nothing more than speculation in the
4 guise of expert opinion.  There's no evidence that Ms.
5 Ali knew or had reason to know or suspect that there
6 might have been any drugs at all in those bags on May 16
7 when she carried them into the school.  Keep in mind that
8 Ms. Martin said she wanted to take something to the
9 school in that conversation with Miss Ali.  Ms. Martin's
10 word was "something."

11        Ms. Ali testified that Ms. Martin explained that
12 she was concerned about the police coming into her house
13 and damaging or taking or tearing up the clothing she was
14 selling because of her neighbors' mistaken belief that
15 she was selling stolen clothes.  And you've seen and
16 heard what police do when they come in and search a
17 house.  And as Mr. Sussman said, I'm not accusing the
18 police of being malicious or intentionally destructive,
19 but they take things apart.  They disassemble your house
20 looking for the things in the search warrant.

21        Ms. Martin told Ms. Ali that she was concerned
22 about that and she wanted to take things to the school
23 and asked Ms. Ali to help her.  Because if you recall,
24 John Martin, Ms. Martin's boyfriend at the time, was
25 using Ms. Martin's car.  But for the fact that Ms. Martin

1  loaned her car to John Martin, Ms. Ali wouldn't have been
2  involved in this May 16 incident at all.  She was simply
3  helping out a friend.
4           Keep in mind that when you look at the transcripts
5  and listen to the tapes -- the recordings, and I hope you
6  will, you will hear Ms. Ali telling other people that
7  she's taking the business to the school.  She's taking
8  the tickets to the school.  She's telling Mr. Martin
9  she'll take his money to the school.  She's telling all
10 the people who were involved in the business, the drug
11 business, that she's taking that business to the school.
12 If they want things from then on, they'll have to see her
13 at the school.  She never told Ms. Ali that.  That's not
14 in any of the transcripts.  You haven't heard any
15 testimony that Ms. Martin ever told Ms. Ali that she was
16 taking drugs anywhere.  And remember, these bags had
17 already been packed by the time Ms. Ali got to Ms.
18 Martin's house.
19          The pole camera.  I want you to look at that pole
20 camera.  It's only a two or three minute segment on there
21 for 16.  You will see that Ms. Ali walks in the house and
22 walks back out to the car with bags in her hands in less
23 than three minutes.  She didn't pack anything in those
24 bags.  She didn't put anything in those bags.  Those bags
25 were packed by Ms. Martin.  And look at that pole cam

1 again, because you won't see anybody carrying a suitcase

2 out of Ms. Martin's house.

3        The government talks about willful blindness.

4 Well, there's an instruction on that.  It's a rather

5 precise instruction.  I won't read the whole thing, just

6 parts of it, but willful blindness exists when a

7 defendant whose suspicion has been aroused deliberately

8 fails to make further inquiries.  If you find that a

9 defendant had a strong suspicion that someone withheld

10 important facts, yet shut his or her eyes for fear of

11 what he or she would learn, you may conclude that he or

12 she acted accordingly -- acted knowingly.

13        Well, where are the facts?  Where is the

14 testimony?  Where is the evidence that shows that Ms. Ali

15 should have been suspicious of anything?  Where is the

16 evidence?  Where are the facts that show that Ms. Ali

17 deliberately failed to inquire after her suspicion was

18 aroused?  There isn't any.  Where is the evidence?  Where

19 are the facts to show that Ms. Ali should have had a

20 strong suspicion that Ms. Martin was withholding

21 important facts?  There isn't any.  There is no willful

22 blindness going on here.  Ms. Ali trusted Ms. Martin,

23 whom she considered to be a friend and did a friend a

24 favor.

25        The transcripts.  The government interprets those

1 transcripts in a way to show guilt.  It's not the
2 government's job, it is not Sergeant Sakala's or Corporal
3 Eveler's function to prove anybody innocent.  It is their
4 job, it is their goal to prove people guilty.  That's the
5 flaw that Ptolemy made.  He started from an assumption
6 and set out to prove it.
7        Sergeant Sakala, Corporal Eveler, by the time Ms.
8 Ali came upon the scene were convinced that virtually
9 everybody who associated with Ms. Martin had to be
10 involved in drug trafficking, so they set out to prove
11 that assumption.  So, every interpretation of every
12 conversation is based on the assumption that the people
13 involved are involved in drug dealing.
14        It's a fundamental flaw in any investigation,
15 criminal, scientific or any investigation:  You can't
16 start out assuming you know the truth, but that's what
17 they've done.  The theory is that Ms. Ali is guilty.  The
18 experts already believe that she is guilty, so the
19 experts will interpret the evidence to support the theory
20 that she's guilty.  They will interpret the evidence
21 through the filter of their own presumptions of guilt.
22        What is wrong with the government's version of all
23 the transcripts and of all the evidence that they've
24 testified about is, first, that it does not allow for any
25 other innocent interpretation.  A good example, there is

1 one of the very last transcripts, I forget the number.

2 But one of the very last calls has to do with Ms. Ali

3 asking Ms. Martin, did you get; Ms. Martin interrupting

4 and saying, yeah, I got.  I got it.  Detective Sakala --

5 Sergeant Sakala was firm, unshakable in his position that

6 Ms. Ali was asking Ms. Martin if she had gotten more

7 drugs, and Ms. Martin was saying yes.

8         Well, I played him the transcript of the

9 conversation; I played him the tape and showed him the

10 transcript of the conversation they had the evening

11 before when Ms. Ali was asking Ms. Martin to go to the

12 post office and pick up a certified letter from the IRS

13 for her husband.  That's what they were talking about.

14 It wasn't drugs.  But when I asked the sergeant if that

15 affected his opinion in any way, absolutely not.  It's so

16 clear that that's what they were talking about, but his

17 opinion is unshakable because he knows the truth.  He

18 knows they're guilty.  That's the second flaw of these

19 opinions.  It ignores facts that don't fit the theory.

20 Those calls, by the way, are B-7735 and B-7815.

21         You can't view the evidence the way the government

22 does that is with a presumption of guilt.  If you do

23 that, you will not be doing your job.  You will be

24 violating the instructions Judge Titus has given you, and

25 you will be failing your obligations to Ms. Ali and the

1 other defendants.  You must view the evidence as you have

2 been instructed: with the presumption of innocence.

3        I want to comment a bit about Ms. Greenberg's

4 statements earlier today.  And I did find it -- I've lost

5 my water.  Here it is.  I find it interesting that Ms.

6 Greenberg started out by talking about Ms. Ali, even

7 though Ms. Ali is the last person on the indictment.  Is

8 it possible that's an indication the government's

9 concerned about the weakness of their case against Ms.

10 Ali?

11        The call chart.  Let me just use the real chart.

12 Where is that?

13        MS. GREENBERG:  Which one?

14        MS. JOHNSTON:  I don't know which chart you're

15 referring to.

16        MR. MCKNETT:  Martin Mangual wiretap.

17        MS. JOHNSTON:  Your Honor, while Ms. Greenberg is

18 getting that, may we approach the bench?

19        THE COURT:  Yes.

20               (At the bar of the Court.)

21        MS. JOHNSTON:  Your Honor, the government has very

22 serious concerns.

23        THE COURT:  How much longer?

24        MR. MCKNETT:  I think about ten minutes.

25        THE COURT:  I've talked to the jurors; I think we

1 can go until about 6:15.

2          MS. JOHNSTON:  Thank you.

3                    (Back in open court.)

4          MR. MCKNETT:  It's Martin-Mangual cocaine

5 distribution chart.  Let me just hold this up here.

6 Thank you, Ms. Greenberg.  This is a chart that Ms.

7 Greenberg referred to to show, I think, the government's

8 theory of connections between various people involved in

9 this conspiracy and how it related these Martin-Mangual

10 so-called cocaine distributions.

11          Well, it refers to Ms. Ali right here.  Now, it

12 says "Ali Calls."  Now, look at the calls and listen to

13 them, because this could be somewhat deceptive.  You can

14 read it that these are calls related to Ms. Ali, or Ms.

15 Ali's making the calls.  She's not.  She's making some of

16 the calls.  And look at what they're talking about on the

17 calls.  They're not talking about Mr. Mangual.  They're

18 not talking about shipments of drugs.  I think in one of

19 them they might be actually talking about drugs, but

20 there's no reference about, did you get anything from

21 Luis?  It's just one of those routine calls.

22          There's others down here.  Here.  Calls A-367,

23 B-1233.  And then another one.  B-1233.  It says here

24 they were both, call A-367 and B-1233 were made on March

25 20, '04, which would make it look like, if Ali made the

1 calls, that she was anxious about something.  She called

2 once, and called back.  That's not what happened.  The

3 second call, B-1233, happened the next day.  So, this

4 chart is wrong.

5        Ms. Greenberg thought it was incriminating that in

6 call B-8110 which, I think, is the very last call when

7 Ms. Martin interrupted and said that she had already been

8 to the school, after Ms. Ali said she wanted another

9 dress with the ties.  Maybe you might recall that one

10 starts out where Ms. Ali says, I want another dress.  Ms.

11 Martin interrupts.  Ms. Ali says, with the ties?  Ms.

12 Martin interrupts again and says that she had already

13 been to the school.  Well, Ms. Greenberg thought that was

14 suspicious and indicative of Ms. Ali placing an order for

15 drugs.

16        Now, Ms. Ali testified that she was talking about

17 getting the dress like the one she had gotten before for

18 her birthday and the dress, the sun dresses.  The

19 government rejected that interpretation.  Can't be,

20 because they know the truth.  I suggest if you take the

21 time to review the recorded conversations and the

22 transcripts, and I ask you to do that.  I know you've

23 been here a long time, and I know you would like to bring

24 this case to a conclusion, but this is not the time to

25 rush to judgment.

1          If you listen to the calls, you will see that Ms.
2   Martin interrupts people all the time.  She's constantly
3   interrupting people.  That's the way she talks.  She
4   wants to talk about what's on her mind at the time, and
5   she's not particularly interested in talking about what's
6   on the mind of the other person in the conversation.
7   Listen to the calls.

8          Ms. Greenberg and the government made a big deal
9   out of the fact that Ms. Ali had a conversation with Ms.
10  Martin about Gwen Levi being arrested.  Well, listen to
11  that call.  Look to see who's doing all the talking.
12  It's Ms. Martin.  Ms. Martin wants to talk about what she
13  wants to talk about, and she interrupts people to do it
14  all the time.  There's nothing suspicious about that.
15  She got the information that she needed that Ms. Ali
16  wanted another dress with the ties, and she changed the
17  subject to talk about what she wanted to talk about.

18         Ms. Greenberg talked about my comments about the
19  arrest of my client on June 1st 2004 and said that my
20  presentation with regard to that was smoke and mirrors.
21  Was it smoke and mirrors that police officers were in my
22  client's bedroom and the office room with the doors
23  closed, and in the bathroom out of Mr. Garner's sight
24  well before they had a valid search warrant?  Is that
25  smoke and mirrors?

1          Who knows what they were doing?  Were they
2   artfully rearranging the drugs they found, as would
3   appear to be the case from Ms. Ali's testimony and Mr.
4   Garner's testimony in those nice clean photographs you
5   saw of a jewelry box drawer next to Ms. Ali's bed, with
6   nothing in it but drug paraphernalia?  A little baggy
7   nicely put down, a straw nicely put down, a napkin nicely
8   placed in the corner, and a jewelry box with the top off.
9   Does that look like -- I know it doesn't resemble any
10  drawers that my wife keeps things in.  It doesn't look
11  like any drawer that I keep things in by the side of my
12  bed.

13         It was not smoke and mirrors that Ms. Ali was
14  downstairs in this very building in custody at the very
15  time Officer Muldoon told you that he was in her
16  apartment having a conversation with her.  He said he
17  went in that apartment, and Officer Muldoon was not real
18  clear on much.  He was the leader of that search team.
19  He couldn't really remember who was on the team very
20  well.  He couldn't remember who was in the bedrooms.  He
21  couldn't remember who was in the kitchen.  He couldn't
22  remember who recovered the items.

23         He couldn't remember who arrested Ms. Ali.  Of
24  course, that part makes sense.  Because at that time of
25  the day, nobody was arresting Ms. Ali.  She had been

1 arrested three hours earlier and was downstairs.  And you

2 heard Ms. Snook and Ms. Spinicio tell you that.  They

3 have no reason to lie.  They work for the government.

4 They're the ones who interviewed her after she got

5 arrested at 7 o'clock in the morning.

6          There was something seriously wrong with that

7 search of Ms. Ali's apartment, but Ms. Ali never denied

8 that the drugs in the apartment were hers.  She told you

9 they were.  She uses drugs -- she used drugs.  She

10 doesn't use drugs now.  She used drugs.  She wasn't proud

11 of it.  It embarrassed her, but she did.

12         Ms. Greenberg said my client assisted the

13 conspiracy by storing money, and that was a reference to

14 the suitcase.  And you heard about that suitcase.  You've

15 seen that suitcase many times.  And you heard from Ms.

16 Ali and her husband how the suitcase got into the

17 apartment.  When it got into the apartment, they took it

18 into the apartment at Ms. Martin's request back in 2002

19 when Ms. Martin was leaving her house on Bexhill and

20 moving to a rented room on Riggs Road, I believe, and

21 asked a friend to hold on to some property for her until

22 she got her new house.  Is that a criminal act?  Is that

23 suspicious?

24         Sergeant Sakala told you that Ms. Ali and Ms.

25 Martin took that suitcase to Ms. Ali's apartment on the

1   16th of May 2004, and there was absolutely no evidence to

2   support that opinion, except he's the expert.  Look at

3   the pole cam.  It's in the there.  Look.  There are

4   surveillance photographs that were taken, and there is no

5   suitcase.  There was no surveillance done.  They knew --

6   the government knew this transaction was going on, but

7   they didn't put a surveillance team on it.  They sent one

8   officer to the school.  By the time he got there, Ms. Ali

9   and Ms. Martin were coming out of the school.

10         And for whatever reason, they didn't have anybody

11  else to follow them back to wherever they went to see

12  what they did, because Ms.- -- it would have made sense,

13  because Ms. Martin said she wanted to come by Ms. Ali's

14  apartment and take something.  The sergeant interpreted

15  hat to mean she wanted to take the suitcase to the

16  apartment.  It doesn't say that.  It says, I want to come

17  by your apartment -- come by your place, I forget the

18  exact words, and take something.  It doesn't say take

19  something into the apartment.  It doesn't say take

20  anything out of the apartment.  But Ms. Ali told you that

21  when Ms. Martin went to the apartment, she went into the

22  suitcase and apparently took something and left.

23         THE COURT:  Mr. McKnett, you need to wrap it now.

24         MR. MCKNETT:  I'm almost there Your Honor.

25         THE COURT:  Okay.

1          MR. MCKNETT:  Ms. Greenberg said that my client
2 assisted the conspiracy by consulting with Ms. Martin
3 about other people being arrested and said that that's
4 all it takes for Ms. Ali to be part of the conspiracy.
5 Well, that's simply not true.  Read the instructions on
6 what it takes to become a member of the conspiracy.
7 Simply talking about it doesn't make you a member.  Even
8 knowing what's going on doesn't make you member.
9 Associating with people in the conspiracy doesn't make
10 you a member.  You have to take an active, knowing,
11 intentional part in the conspiracy before you're a member
12 of it.
13          Ms. Greenberg suggested Ms. Ali bought eight balls
14 for resell.  Well, that's -- not just Ms. Greenberg, the
15 sergeant and the corporal.  But this's ridiculous.  Ms.
16 Ali and her husband made $130,000 a year.  Why would Ms.
17 Ali be buying eight balls and breaking them down to sell
18 them on the street or wherever to make 15 or 20 bucks or
19 whatever it was that you made by doing that?  Does that
20 make any sense at all?  And there's no evidence.  No
21 surveillances, no customers, no seizures, no prior
22 arrests, no ledgers, no paraphernalia, no cut.  Nothing,
23 except the expert opinion.
24          And two people we know who were in the business,
25 Juan Encarnacion and Mr. Echarte, both said they met Ms.

1 Ali at Ms. Martin's house and she had nothing to do with
2 drugs.  Echarte said he was there for -- lived there for
3 a year and saw my client there numerous times, was aware
4 of 95 percent of what went on in that house.  You have to
5 assume he was listening to what they were saying.  There
6 was absolutely nothing involving my client with drugs at
7 Ms. Martin's house for that entire year.
8        Ms. Ali is 53 years old.  She has no prior
9 arrests, and there were no observations, no buyers, no
10 ledgers, no cut, no paraphernalia, nothing to support the
11 expert opinion that she was selling.  I asked you at the
12 beginning -- I talked to you at the beginning, I asked
13 you to remember five things.  One is, associating with a
14 criminal doesn't make you a criminal by itself.  The
15 second is, merely being present when a crime takes place
16 doesn't make you a criminal.  Third, the fact that a
17 person does something that furthers the purpose or
18 objectives of the conspiracy does not make that person a
19 member of the conspiracy, unless that person acts with
20 knowledge and with the intention to further the purposes
21 of the conspiracy.
22        It's not enough that you act negligently,
23 carelessly, mistakenly, ignorantly, or even  foolishly.
24 You've got to act knowingly, intentionally, voluntarily
25 to further the purposes.  And fifth, simply buying drugs

1 by itself does not make you a conspirator, because you're

2 not conspiring to sell drugs.  You're buying them for

3 your own use.  The conspiracy requires an intent to sell.

4 You keep those five points in mind and you will find Ms.

5 Ali not guilty.  Humpty Dumpty has fallen off the wall,

6 and Ms. Johnston can't put him back together.

7        THE COURT:  All right.  Thank you very much.  Ms.

8 Johnston.

9        Ms. JOHNSTON:  Thank you, Your Honor.

10        I hope it won't be too distracting, but I will ask

11 my agent to move some things forward while I try to talk

12 very quickly, since we are now at the Eleventh Hour and I

13 understand some jurors must get out of here.   I

14 apologize to you, but I don't have control over the

15 Court's schedule, as you well know, and as much as I like

16 to have the last word, I am happy to say that I do not

17 have the last word, but you will have the last say in

18 this case.  It will be you who decide.  You will render

19 justice in this case, because you have heard all of the

20 evidence.  You have listened very attentively.  You will

21 take those recordings back with you, and you will listen

22 to them and consider all of the evidence, and when you

23 return to this courtroom you will render a just and fair

24 verdict as to the involvement of each one of these

25 individuals in this drug organization and this drug

1 conspiracy.

2         That's fine, Ms. Greenberg.  Just stop with
3 whatever we have, please.  No.  No, I just want you to
4 stop, please.

5         You know, we started this trial back -- way back
6 in June -- on June 6 we actually started with jury
7 selection.  Some of you were here for a day or two,
8 depending on how many days you had to come in and wait to
9 be voir dired by the Court, and then I think on June 10
10 or June 12 we started with opening statements.  In my
11 opening statement, I told you what the Government
12 intended to do in this case, and that was to ask each and
13 every one of you to hold each one of these defendants
14 accountable for their involvement in this drug
15 organization.  I told you that they each had different
16 roles in this business, so to speak, and those roles
17 varied and their objectives varied.

18         Some of them wanted drugs or to use those drugs,
19 as the *Avon* lady who just distributes to her family
20 members because she can get it at a cheaper price.  Some
21 of those people assisted by helping with advertising and
22 promotion and giving advice, and that's where we're at
23 here today, and that is to ask you to hold them
24 accountable for their individual involvement in this
25 organization because the evidence you have heard

1  establishes that each one of these people were involved

2  in this case.

3        We're not here -- you know, I wonder why -- I

4  wonder why people like Sergeant Sakala and Detective

5  Eveler spend thousands and thousands of hours and years

6  working at their job to be accused and be called Humpty

7  Dumpty and be accused of having sinister motives of

8  trying to, you know, fabricate evidence for you all here,

9  when what they've done is they've done their job, and

10  they've done their job admirably, because they had a

11  difficult job to do in this case.

12        In 2002, Thomas Eveler who, unfortunately, so he

13  didn't have a ten year-old standing alone on a soccer

14  field somewhere, had to go to either soccer or lacrosse

15  practice, because his wife is not available, so he went

16  to pick up his son.  He isn't here, but he got enough

17  information from Juan Encarnacion who was part of a huge

18  drug organization.  He was down at the bottom of that

19  getting kilograms from people, importing it from Mexico,

20  and he said that Paulette Martin is involved in drugs.

21  Detective Eveler took that little bit of information and

22  started trying to verify it and, sure enough, you've

23  heard -- and while it's not before you in terms of her

24  involvement in this conspiracy ,it shows her knowledge

25  and intent that back in 1986 she's arrested selling drugs

1  -- selling eight ball quantities of drugs back then,

2  cocaine or cocaine base, and doing the same thing,

3  showing her knowledge and her experience in the drug

4  business.  Then, in 1994, you heard that her school had

5  been searched, and I believe heroin was recovered then.

6  Important, because it goes to her knowledge and her

7  intent to be involved in what happened here.

8       The Government stands before you not ashamed of

9  the case here but very proud of the work that these

10 detectives and these agents did over the course of this

11 investigation, because what they did -- as you heard,

12 thirty-some people have been charged and have come to

13 justice in this case because of their hard work and

14 effort, and you have seven of those before you.  So, the

15 Government makes no apologies for the actions or

16 testimonies of any of the witnesses that it called here,

17 because they did what they could and they did the best

18 that they could in terms of their work.

19      Let me talk to you for just a few moments about

20 the instructions that you heard, because I think some

21 things have gotten very confusing with the arguments.

22 First of all, we've heard lots of things:  Well, where

23 are the drugs?  You didn't find any drugs in Mr. Bynum's

24 house.  Well, we did in 1999.  They got over 54 grams of

25 crack cocaine and paperwork indicating his relationship

1  with Ms. Martin, a loaded gun back then, and he pled
2  guilty to those offenses of possessing that gun in
3  furtherance of that drug possession; all of that is
4  evidence you can consider in this case showing his
5  involvement in the conspiracy, because he possessed it
6  during the time of the conspiracy.
7          Counsel says, where are the drugs?  Look at the
8  instructions.  As the Court told you, in terms of
9  conspiracy, you need nothing.  You need no drugs -- you
10 need no drugs at all.  You don't need a single
11 distribution or a single possession of drugs to prove the
12 conspiracy.  It is the agreement itself that is wrong.
13         In terms of the agreement.  There must be an
14 agreement between two or more persons, and in this case
15 the agreement is very clear that Mr. Goodwin and Ms.
16 Martin were involved in a long-term agreement to
17 distribute drugs going back from November 2003 and even
18 further back than that.
19         You heard Mr. Thurman testify about how they
20 pooled their money for his trips to Texas.  Going back
21 further than that was Mr. Mangual and Mr. Encarnacion
22 establishing her involvement in a drug conspiracy to
23 distribute drugs, heroin, crack cocaine and cocaine base.
24 There is no doubt that she was involved in the business
25 and had an agreement with at least multiple people to

1  distribute drugs.  The question then before you is who
2  became a member -- who facilitated or assisted --
3  knowingly facilitated or assisted her in carrying out
4  that conspiracy and to be a member of the conspiracy, and
5  I call your attention to the Court's instructions
6  beginning at Page 53:  To be a member of the conspiracy,
7  all you have to do is knowingly and willfully join the
8  conspiracy.  What that means is that you don't have to
9  know the identity of everyone else, nor do you need to
10 know all of the activities of the conspiracy, nor do you
11 have to be fully informed of all of the details; you need
12 not have joined in all of the objectives.

13      Ms. Greenberg told you what drugs we believe have
14 been shown as to each of the individual defendants, but a
15 -- and the Court -- the instruction goes on:  The
16 defendants need not have joined in all of the
17 conspiracy's unlawful objectives.  A conspiratory's
18 liability is not measured by the extent or duration of
19 his participation.  In fact, even a single act may be
20 sufficient to draw the defendants within the gamut of the
21 conspiracy.

22      Similarly, someone raised the issue about the
23 drugs and the Government not having drugs here for those
24 possession with intent to distribute counts.  The ones
25 associated with Mr. Mangual's calls where we had books

1 and we had a "Reader's Digests" and we had "Versace

2 sunglasses".

3        Then the calls with Mr. Bynum.  The possession

4 instruction, likewise, tells you circumstantial evidence

5 is sufficient to establish that the drugs were -- that

6 whatever was delivered was in fact drugs, and you have

7 abundant circumstantial evidence in that regard.

8        Let me begin by speaking about Ms. Ali, since she

9 was the last one here.  Sergeant Sakala sits here in

10 front of you.  He doesn't look like Humpty Dumpty to me.

11 He's not falling apart and in a bunch of pieces.  In

12 fact, we spent many hours with him on the stand.

13 Remember the original cross-examination of him.  Well,

14 you don't know that tickets are tickets.  Isn't it right

15 she was involved in shows and they could have been

16 concert tickets?  Agent Sakala told them then that you

17 can tell the difference between when somebody's talking

18 about a ticket for a trip to Las Vegas or discussing a

19 ticket for a cruise than the tickets that involve drugs.

20        Then we hear him again, then, on cross-examination

21 when they call him back in here.

22 He told you originally in response to my questions back

23 in June that there were some calls that were actually

24 about clothing.  Kevin Scott sold clothes -- brought

25 clothes to Ms. Martin to sell.  He never changed that bit

1  of his testimony.   Not one single time did he change

2  that.

3          He also said that she was getting some clothes

4  from Martha Jean West in Florida.   Well, Martha West was

5  in Florida and, for whatever reason, they felt it

6  necessary to put him back on the stand and play those

7  calls and write these words down on this chart here:   16

8  pieces, Sand 8, size 4, Sizes 6 and 10, all of these

9  words here.   Agent Sakala told you that in none of those

10  calls did those words mean anything to do with drugs,

11  because they were with Martha Jean West, and the part of

12  the call they didn't play for you is the part where she

13  told Martha Jean West she was worried about John Martin

14  taking her fancy red Mercedes down into the city with

15  those tickets in it, and he told you that referenced to

16  "tickets" there was the drug business, because certainly,

17  if he were taking concert tickets anywhere, there would

18  be no reason to be concerned about that.

19          We spent all of that time going through all of

20  those calls.   For what?   For what reason?   Agent Sakala

21  always said Martha Jean West was involved in clothes.

22  Now, he told you it wasn't a legitimate business and that

23  was demonstrated by the very call where she says her

24  coworker was too busy taking some woman from Mexico

25  around to do "legitimate" shopping.   Indeed, even Ms. Ali

1  had to admit on cross-examination that she was suspicious
2  that she wasn't sure where those clothes came from, but
3  it wasn't her concern.  Not her concern.  She suspected
4  they might be stolen, but she wasn't going to ask any
5  questions, which belies Ms. Ali's actions throughout the
6  course of this conspiracy.
7         Ms. Ali -- let me just speak to her for a little
8  bit.  We heard all of this testimony about the search at
9  her house, and all of this is a diversion to take your
10 attention away from the evidence that's here.  I'm
11 wondering -- we're hearing all this about, well, the
12 officer said this and she was there -- and you remember
13 this is where they had the wrong apartment number on the
14 search warrant, so they had to wait for a warrant, and he
15 said he thought she was still there and what time she
16 left, and I'm thinking, well, maybe they're going to say
17 that the police officers planted the drugs; right?  But
18 do we hear that?  No.  After all of those questions about
19 all of that with the officer and then with bringing in
20 Pretrial Services, Ms. Ali's husband gets on the stand
21 and doesn't say anything in terms of those drugs, that it
22 wasn't mixed up.  His wife gets on the stand and admits
23 that those are her drugs and that she's been getting
24 drugs from Paulette Martin since 1998. 1998.  That ledger
25 we have there only gives you a snapshot view, just like

1 the wiretap is nothing more than a snapshot view of what
2 was going on.  So, why?  Why?  To divert your attention
3 from what is the evidence in this case.

4          Let's talk all about those police officers.  He
5 did it again here in closing argument.  It doesn't change
6 anything.  Sure, they moved the things out of the drawer,
7 because you were never going to see that glycine baggy in
8 the bottom of that jewelry box without moving the books
9 and stuff that was on top of it.  Does that change
10 anything?  Does that change anything?  Not at all.  Even
11 Ms. Ali had to admit it didn't change anything.

12          Ms. Ali's involvement in the drug conspiracy is --
13 we've heard this term "sell."  We're not here about
14 selling drugs.  This conspiracy was to distribute drugs -
15 cocaine, cocaine base and heroin -- and it was to possess
16 with intent to distribute drugs.  Ms. Ali knew since 1998
17 that Ms. Martin was involved in the distribution of drugs
18 and clearly, anyone would know that she's not making
19 those drugs herself so she had a business of getting
20 those drugs from somewhere.  So, she was aware that Ms.
21 Martin was involved in obtaining drugs and distributing
22 those drugs from at least 1998.  She had that knowledge.

23          The next question is, did she do anything to aid
24 or assist Ms. Martin in carrying out Ms. Martin's
25 involvement in the conspiracy?  Did she do something in

1 order to assist her?  Well, she certainly assisted Ms.
2 Martin by her communications with Ms. Martin but most
3 importantly by what she did on May 16 and by what she did
4 in her apartment with that $129,000 of U. S. currency
5 stored in book safes, as well as the 15 scales.  She
6 says, well, I didn't know what was in there.  She knew
7 Ms. Martin was dealing cocaine.  She knew she was
8 involved in cocaine powder and it was imperative to Ms.
9 Ali to make sure that her source for her habit remained
10 available to her, and the way to do that was to make sure
11 Ms. Martin stayed in business.  So, you're going to do
12 anything you can to aid and assist Ms. Martin.
13        "I didn't know."  Why didn't she know?  Because
14 she didn't want to know.  She didn't want to know the
15 scope of what Ms. Martin was doing, so she deliberately
16 closed her eyes to what was going on with Ms. Martin.
17 Read that "willful blindness" instruction.  Mr. McKnett
18 read a part of it.  She knew Ms. Martin was involved in
19 selling drugs, not only to her, as she admitted, but to
20 Mr. Walker.  She knew she was bringing her something to
21 keep in her apartment, and she closed her eyes to it
22 because she didn't want to lose her source for cocaine.
23 That was her motivation.
24        Indeed, look at May 16.  Look at the calls.
25 Please listen to the calls, because they even sound

better than when you read them, because you get the
intonation.  Listen to those calls and you will hear how
she indeed was told, "Don't bring your husband.  I got to
take something to the school, and when you get here, just
say something about how we're going to go show clothes to
someone."  There weren't any clothes found in that
school.

Counsel says, oh, you don't know the drugs were
there.  Bags went out, and those shopping bags are here
in court, which I don't really have time to pull out, but
they were recovered there.  Inside those bags were 23
little baggies of eight balls.  As Counsel mentioned, 23
little bags of eight balls, just like the ones that were
discussed by John Shea.  Not only that, but there was
heroin recovered and crack cocaine recovered.

Ms. Ali is guilty of possession with intent to
distribute on May 16 for those drugs found at the school.
Why?  Because she aided and assisted Ms. Martin in her
possessing with intent to distribute.  Ms. Martin could
not have gotten those drugs out of the house and to the
school without the assistance of Ms. Ali.  Ms. Ali can
claim she didn't know what was in there, but certainly
she had every reason to be suspicious, and she closed her
eyes because she didn't  want to know.  This is after,
mind you, her call with Ms. Martin about Gwendolyn Levi

1   getting arrested over the sweet potato pie recipe of
2   which she asked no questions, because Ms. Ali, as she
3   told you, it was no -- of no concern of hers.  It was no
4   concern of hers to know what was in those bags, because
5   she wanted to protect herself, and the law says you
6   cannot do that.  When you're suspicion is aroused, and
7   when you've gotten drugs from somebody for five, six
8   years and then you close your eyes to what should be
9   obvious to anyone, you are guilty of assisting that
10  person, and it is upon that basis -- not that she
11  possessed the drugs with intent to distribute, but that
12  she aided and assisted Ms. Martin by helping her
13  transport those drugs, the heroin, the cocaine base and
14  the cocaine to the jail.
15          Similarly, she is likewise guilty of the telephone
16  counts because the telephone counts make her guilty for
17  facilitating Ms. Martin's distribution of drugs for
18  facilitating Ms. Martin's conspiracy to distribute and
19  possess with intent to distribute, because in those calls
20  she asks -- they discuss tickets in some of those calls.
21  You have all of this discussion that tickets isn't
22  tickets, and then we find out Ms. Martin has never had a
23  concert and her last selling of tickets in a fashion show
24  was in November of 2003.  "Tickets" mean drugs.
25          Finally, the defendants had to start admitting

1 that although Mr. Goodwin said it meant marijuana, so she

2 orders tickets.  Those calls are what is referred to in

3 Count 44 and Count 45, A-1224 and 1226.  She said she

4 just wanted one ticket, and then Ms. Ali wants to make

5 sure the price is right in the book because the price for

6 one ticket is 125, and she wanted to make sure that Ms.

7 Martin didn't put 50 down there, clearly showing that

8 around April 21st she ordered drugs, a ticket, and that

9 she got drugs a 125.

10        I'm going to jump around a little bit, because I

11 don't have much time.  Let me talk about Ruby Harden. You

12 know, Mr. Sussman stood up here and told you some jokes

13 and made some analogies about ice cream and ice cream

14 cones and that the government had something up its

15 sleeves.  Well, I have my arms up my sleeves, a bracelet,

16 and a watch.  That's what I have up my sleeves.  I don't

17 know that Sergeant Sakala has anything up his sleeves.

18 We don't ask you to make your decisions based solely on

19 Agent Sakala's testimony, because it's not his testimony

20 that makes Ms. Harden guilty of participating in this

21 conspiracy and guilty of facilitating Ms. Martin's

22 participation, but it is her own words in the calls.

23        He says to you -- he stood up here and said to

24 you, Ms. Martin didn't give her news of the conspiracy.

25 That's wrong.  That is absolutely wrong, and he said it

1  repeatedly.  Let me tell you all we got to do is look at
2  Page -- Call B-3953 on Page 345.  Martin is talking to
3  Harden on April 19, and this is before she moved the
4  stuff to the drugs.  Martin told Harden she didn't have
5  any tickets; they are hard to get.  Goody is having a
6  problem with that.  The people who have them are sky
7  high, so we're working on it right now, working on that
8  ticket thing.
9         As of April 19, it was very clear to Ms. Harden
10 that Ms. Martin and Mr. Goody were in the business of
11 getting drugs.  It was very clear then.  Ms. Harden and
12 Ms. Martin reported to her the news of the conspiracy.
13 Mr. Sussman stood before you and said that didn't occur.
14 Furthermore, she goes on and tells her the other news of
15 the conspiracy in call B-6948, Page 540, where she
16 explains that she had to close the shop down, that there
17 was a meeting and that there was too much traffic at the
18 house.  She explains to Ruby Harden that that traffic was
19 about the clothes which are legit,  Mr. Scott's clothes,
20 but not the ticket business.  So, she moved the ticket
21 business down to the school.  Clearly, Ms. Harden knew
22 what was going on.
23        If we go back to those two drug transactions.
24 March 29 is ever so clear, and this was a very clear
25 example of the fact that "tickets" meant drugs very early

1  on, on March 29, because in that series of calls Ms.

2  Harden -- on B-2132, on Page, 232 Ms. Harden leaves a

3  voice message, "I need to get those same tickets that I

4  got," meaning that she got before and multiple tickets.

5  "I got a couple of more people interested, so just bring

6  me the same tickets, okay?"  That is Ms. Harden's own

7  words.  That establishes she was involved in the

8  distribution of drugs she was getting from Ms.

9  Martin.

10       How do we know it's cocaine?  Well because that's

11  what she got with Mr. Goody, and when she tells -- when

12  Ms. Harden tells Ms. Martin that Goody and she are having

13  problems getting tickets, the tickets involving Mr.

14  Goodwin was cocaine, either the bad cocaine from Cuba or

15  the cocaine from Texas with Mr.  Thurman.  So, it is

16  clear that Ms. Harden was involved in distributing the

17  tickets, the cocaine she was getting from Ms. Martin

18  based upon that call as well as some of the other calls,

19  but that call makes it very clear.  When you couple that

20  call with B-2139, where she gets the call back from Ms.

21  Martin and Ms. Martin wants to know what size suit or

22  outfit do you want for your son, changing the code word

23  and demonstrating again that it was indeed cocaine that

24  they were talking about.

25       Furthermore, even if you were to assume that, or

1 presume that Ms. Harden wasn't involved directly in the
2 conspiracy, she knew about Ms. Martin's business and Ms.
3 Martin's conspiracy, and her calls ordering drugs
4 facilitated Ms. Martin's continuing conspiracy and her
5 continuing business to sell drugs.
6          Let me talk about LaVon Dobie.  This is another
7 instance of diversion or smoke.  Let's blow it out here.
8 Let's get a big old fan and blow it all out of here,
9 because first we have, you know, all of these arguments
10 about whether tickets is drugs or tickets is concerts.
11 Then we have Mr. McKnett talking for hours about the
12 search and how it was conducted, when His Honor told you
13 that the search was a lawful search.  Then his own client
14 admits that it's her own stuff in the house.  So, what
15 was the point of that?  To divert your attention from the
16 real evidence.
17          Then we have Ms. Dobie and Mr. Ward.  Mr. Ward is
18 upset and accusing the Government, well, why didn't  the
19 Government introduce drugs that were in the man's jean
20 pocket in the other room?  Well, because we didn't have
21 any evidence or any way to associate what was in that
22 room with LaVon Dobie.  If he wants to bring it out, go
23 right ahead.  The stolen jewelry would have been improper
24 for the Government to have raised with you, because it
25 would have reflected negatively on Ms. Dobie's character,

1  so the Government didn't do that.

2         They spent all of these hours questioning Officer

3  Papalia about what room the stuff came from, and who was

4  sleeping in that room, and how did you know it was Ms.

5  Dobie's room, and so we had to call the other officer who

6  said he saw her standing at the top of the stairs with

7  the bathroom door open and her bedroom door open.  What

8  was the point of all of that?  To divert your attention,

9  because then what happens is even Ms. Dobie, who is the

10 ultimate con person -- the ultimate con person -- gets on

11 the stand and says, well, wait a second.  I got to try to

12 cut my losses here, and how can I do it?  How can I do

13 that?  So, she gets on the stand and she tells you she's

14 just a drug user and she's a drug addict and that's why

15 she had the drugs.

16        Then Mr. Ward stands up before you here about an

17 hour or two ago and says Ms. Dobie, when she's guilty,

18 she pleads guilty.  Well, that's not true.  We got that

19 "Abracadabra" call in here, if you recall -- I don't know

20 the number of it, but if you look at the index in the

21 front, it will help you.  It shows the dates of all of

22 the calls so you can match those days with the counts.

23        At any rate, in the "Abracadabra" call, she's

24 talking about how she needs to sell some tickets to get

25 some money to pay her lawyer, I think, $6,000 or $3,000

1  and then she can beat the charge.  Ms. Dobie is not
2  interested in pleading guilty because she is guilty.  Ms.
3  Dobie is interested in whatever is best for her.  How can
4  she minimize her punishment?  How can she minimize it?
5  So there in that call she could do "abracadabra" and beat
6  a charge she's happy to do that.  In this case she wants
7  to tell you she just possessed drugs because that's the
8  best option for her.
9          And then the guns under the bed.  Oh, please.  "I
10 had to take those guns from my son?"  This is a son for
11 whom she got drugs -- Ta'Vaughn.  She got drugs from Ms.
12 Martin for him, and she tells you, oh, I had to take the
13 gun from him, so before I left the room with him I had to
14 slam that loaded magazine in.  She didn't even bother
15 unloading the guns?  No.  She had those guns under her
16 bed with the drug paraphernalia,  with all of those
17 baggies.  Those baggies weren't in the bag with the
18 jewelry.  Those thousands of baggies -- if we counted
19 them, probably thousands of baggies were with the 11
20 grams of heroin, as well as the -- some scales with
21 cocaine and heroin residue and other paraphernalia.
22         But let me -- I told you that in all the time Mr.
23 Ward was up here, the only call he talked to you about
24 was that "hammer" call.  If you remember, Sergeant Sakala
25 -- the only thing he said about that call was that

1 "hammer" is a term -- a slang term that refers to a gun.
2 He didn't say whether it was a real story or a false
3 story.  In fact, he said he didn't know what the --
4 whether the story was true or false.  All he told you was
5 that hammer means gun, nothing more than that, but we had
6 to make a big to-do out of that call, because Mr. Ward
7 doesn't want you to look at the rest of her calls.  He
8 doesn't want you to look at those.  He didn't even
9 mention one other call.
10       Let's just start on Page 12, Call B-158 on March
11 9, I think the very first day we started intercepting
12 calls, and there is a call between LaVon Dobie and
13 Paulette Martin.  I'm paraphrasing -- I may be quoting it
14 a little bit, but you look at it and you listen to the
15 call.  Ms. Martin says to Ms. Dobie, you know that ticket
16 I got for your son to go to the show?  I would never sell
17 him no tickets to go to no show myself.      And then she
18 continues telling Ms. Dobie she wouldn't let Ms. Dobie's
19 son come to her like that.  Ms. Dobie got a ticket -- got
20 drugs from Ms. Martin for her son.
21       Then there's a later call where she's late getting
22 over there to pick up the tickets and Ms. Dobie says her
23 son was upset and wanted to make sure she got up to do
24 this thing, to make sure that she got that ticket.  The
25 ticket calls with Ms. Martin and Ms. Dobie go on and on

1 and on.

2         Call B-929, on Page 132, Ms. Martin admonishes Ms.
3 Dobie because she was late coming to pick up the tickets,
4 so she sold it to someone else.  Ms. Dobie is clearly
5 involved in the drug conspiracy, because she calls her,
6 and B-6229 on Page 483, a May 11 call, Ms.
7 Dobie tells Ms. Martin that Ms. Martin -- strike that.
8 Ms. Martin tells Dobie that she's looking for tickets
9 like Gwen had, and Ms. Dobie tells her, "I have 50 of
10 them.  I got rid of most of them for a hundred," but she
11 still had a few left.  Then they talk more about those
12 tickets.  Then you have the later call where Ms. Dobie
13 thinks Ms. Martin's talking about Gwen's tickets, and
14 then she explains she's looking for the "big tickets",
15 meaning the kilos of cocaine and not Gwen's heroin
16 tickets.

17         Ms. Dobie was up to this conspiracy up to her
18 ears, and there is no doubt about it.  When you look at
19 her calls and the stuff that was found in her house,
20 including the firearms located in close proximity to the
21 drugs, establishing that she possessed guns to protect
22 her drug stash -- indeed, I don't believe you should give
23 credence to much of anything that Ms.
24 Dobie would say because, as she has said, she would --
25 she'd sell tickets to pay her lawyer to beat her charges;

1 she'd do anything to keep her -- commit any crime to keep

2 her parents out of a nursing home.  She is a criminal,

3 she's always been a criminal, and her involvement here in

4 the drugs is established -- in the drug conspiracy is

5 established through those calls and what was recovered

6 from her house.

7       Let me talk for a very few minutes about Mr.

8 Whiting, because I think it's important that I address

9 some of the arguments that were made by Mr. Hall.  He

10 says that there is no agreement and to look at this

11 discussion on the conspiracy charge.  As I told you

12 before, the instruction tells you that you don't need to

13 actually possess the drugs.  You don't need a single

14 distribution of drugs to be guilty of the conspiracy.

15 You are guilty of the conspiracy if you know about the

16 agreement and somehow you assist or want to assist or

17 take steps to make it a success.

18       Ms. Martin was engaged in the drug conspiracy with

19 Mr. Goodwin and other people.  Mr. Whiting knew about

20 that.  He knew it when he called her looking for tickets

21 on March 9 of 2004, and when she told him she didn't have

22 any printed, it was very clear that he wasn't talking

23 about some concert that he couldn't tell you the name of,

24 that he just hoped she might have tickets for.  Those

25 calls establish that.

1          What else did he do?  Well, you heard Mr.
2  Echarte's testimony.  It's funny.  We had one defense
3  attorney tell you to believe Mr. Echarte because Mr.
4  Echarte said Ms. Dobie tried to sell him stolen jewelry
5  at one time, so he was truthful about that; and Mr.
6  Bynum said, believe Mr. Echarte, because Mr. Echarte said
7  he didn't know Mr. Bynum.  Then they say, oh, but don't
8  believe him when he says that, yes ,he saw Reece Whiting
9  at the house and Reece Whiting was getting small
10 quantities of cocaine.
11         If Mr. Echarte was worried about getting some
12 credit for what he said here, he would be puffing up
13 that.  He wouldn't say Mr. Whiting is getting small
14 quantities, eight balls or little quantities from Ms.
15 Martin and smoking part and taking it out and selling it.
16 He just said he was getting kilos from her, but he didn't
17 tell you that he told you what he recalled and testified
18 as to what he remembered his involvement was.  Then he
19 told you about giving Mr. Whiting, at Ms. Martin's
20 direction, 100 grams of heroin that Mr. Whiting had a
21 tough time getting rid of and how Mr.  Whiting helped him
22 transport his kilos of heroin back to Ms. Martin, where
23 he gave the cocaine to Ms. Martin.
24         Recall, also, Mr. Echarte was upset with Ms.
25 Martin.  He gave her advice.  He told her to stop dealing

1  those eight ball quantities, the small quantities, in
2  your house because that's the way you get in trouble.   If
3  you're going to be a drug dealer, deal big quantities.
4  Don't deal those little quantities, because you're moving
5  too much stuff with too many people.
6         Mr. Whiting also performed another very important
7  service in trying to assist Ms. Martin in making sure her
8  conspiracy continued and that she didn't have any
9  problems with her drug business, and that was discussing
10 with her Julio's situation.  Was he snitching on Gwen?
11 Okay.  Was that why Ms. Levi got arrested?  Was Ms. Levi
12 going to cooperate because she was facing 25 to life?
13 Those calls you can find at B-703, B-1781, and B-5124.
14        What is of note at B-5124 is Mr. Whiting did the
15 same thing for Ms. Martin when John Martin, her
16 boyfriend, was arrested in 2002.  During that time frame
17 where she was getting 20 kilos -- 15, 20 kilos from Mr.
18 Brim or his son, Nathan King, she -- Mr.  Whiting says,
19 remember he went up to see John Martin when he was at
20 Seven Locks, when he was in jail back then.  He was
21 always trying to assist her to make sure that nobody was
22 snitching, nobody was cooperating with the Government
23 ,because that would be devastating to her conspiracy
24 business.
25        Most importantly, one call that I think counsel

1  for Mr. Whiting skipped was call B-4426, and this is

2  Count 49, when Ms. Martin tells him -- Mr. Whiting, for

3  whatever her motive -- and the Government never, never --

4  not one witness ever said that that ledger that Mr.  Hall

5  put up there was a drug debt.  Rather, it was a debt for

6  something, and that would be a reason why she wouldn't

7  want to give him tickets in 2004 on -- over the phone,

8  because he owed her so much money for such a long period

9  of time.

10       We're talking about Mr. Whiting's involvement, his

11  efforts to facilitate or further the conspiracy.  He does

12  it not only by giving her advice and helping her figure

13  out if any of these people -- Julio, Gwen Levi, Philpot

14  and, in the past, John Martin, are cooperating with

15  authorities, but in Call B-4426 she tells him, "I still

16  don't have any tickets."  Mr. Whiting says, "I think I

17  have a solution to your ticket problem."

18       He got on the stand and tells you he had a friend

19  he thought might be able to get tickets to some concerts,

20  but everyone else has since admitted that tickets are

21  drugs.  He says, "I'll come become by and tell you " and

22  that's when we had the surveillance.  You can't see his

23  face on that video, but he dared us to bring out the pole

24  camera.  You have the pole camera.  What is amazing is

25  that that pole camera and him leaving matches up to a T

1 with Call B-4438, when  Ms. Martin says, "Reece just

2 left."  So it is all of those circumstances that you look

3 at in determining whether or not someone is involved.

4        Let me, if I could -- if you could bear with me

5 just two or three more minutes so I can talk briefly

6 about Mr. Bynum, because I think, quite frankly, Mr.

7 Bynum's calls are very clear.  He wants the $62 Martin

8 usually loans him; that was on March 11.  He had almost

9 $15,000 -- $14,906 in cash in his house on June 1st of

10 2004.  Who in their right mind calls somebody and asks to

11 borrow $62?  That, indeed, is a quantity of drugs.  Look

12 at his calls in conjunction with the Luis Mangual calls

13 and you will see how they line up almost perfectly.

14        She calls him, then she tells him Mr. Mangual's

15 still in Baltimore and he's on his way down, and she will

16 call Mr. Mangual back and say that Mr. Bynum liked the

17 book.  She won't use his name "Bynum" but says, "somebody

18 liked the book."

19        Tickets.  There are ticket calls with Mr. Bynum as

20 well, and I'm not talking about the Peruvian chicken

21 call.  You listen to the other calls.  You have several

22 of them, including one or two that I added during the --

23 I don't know if it was the second or third recross

24 examination of Sergeant Sakala and it was, well, we

25 couldn't get him the first time so let's try again and

1 play all of these calls that he has said doesn't have

2 anything to do with drugs see what we can do here.  What

3 that made come up was that he made a -- that he wasn't

4 sure that Peruvian-style chicken was "ticket" instead of

5 "chicken," and he acknowledged that.  It doesn't change

6 anything in terms of the other calls or the charges

7 before you.

8        Look at call B-838 on Page 123, where Martin told

9 Bynum she had the ticket he wanted.  A-406, on Page 160:

10 Bynum told Martin he needs one of those tickets.

11 Clearly, he understood what those tickets were.  Then

12 Bynum wants a sweet potato pie.  I don't think it's the

13 same recipe that Ms. Levi was involved in that Ms. Martin

14 told Ms. Ali about but, nevertheless -- and then there's

15 a discussion about the artificial drugs.

16        Call B-2633, Page 281, Bynum told Martin it was

17 one step away from artificial.  She told him to bring it

18 back.  They argued back and forth about it.  Ms. Martin

19 was very upset, and she told Mr. Bynum that Goodwin --

20 not her brother, Goodwin had gotten five of them and had

21 had no complaints.  Well, it might have been -- my notes

22 say "Goodwin" but I'm not sure, but that he had five of

23 them -- five kilograms of cocaine, and he didn't have any

24 problem.  We know that there was bad drugs there, right,

25 because here is that kilo of cocaine found in the bottom

1 of Mr. Goodwin's file cabinet.

2          After that point in time, Mr. Bynum talks to Ms.

3 Martin periodically between -- that's the possession with

4 intent to distribute charge between April 1 and April 7.

5 If she hadn't given him something that was close to

6 artificial, he would not have had to bring it back, and

7 so those conversations clearly establish that she had

8 given him a kilogram of cocaine and established that

9 beyond a reasonable doubt.

10          Mr. Bynum's attorney also mentioned the gun.  Let

11 me see if I have that gun.  I do have it here.  Probably

12 all taped shut because people around here don't trust you

13 with guns, but remember the detective -- I had the

14 firearms guy who testified about -- testifying look at

15 this gun, and he told you it was made in Austria, I

16 believe, or Germany, but I think it was Austria.  It

17 traveled in interstate commerce before June 1, 2004,

18 because it wasn't manufactured in this country.  It was

19 assembled in Georgia according to that detective.  Again,

20 some more information just to divert you.

21          Now, in terms of Ms. Martin and Mr. Goodwin.  I

22 don't know that there really is anything that I need to

23 say.  I think that the evidence is incredible in terms of

24 them, and perhaps what sums up the evidence against them

25 best of all is you remember the call between Mr. Goodwin

1  and Ms. Martin where they talked about Mr. Philpot

2  getting arrested and they had two cars -- his

3  transportation had two of them that he had equipped with

4  compartments, and of course he got stopped in one car in

5  Wyoming, and I think we probably have Wyoming drugs here:

6  One, two, three, four -- here's some more.  What did Mr.

7  Goodwin and Ms. Martin say about these drugs?  Oh, Mr.

8  Philpot got stopped with ten of those outfits for the

9  Aretha Franklin show.

10        Ladies and gentlemen of the jury, that sums up Mr.

11  Goodwin and Ms. Martin.  They weren't involved in the

12  concert business.  They never did a concert in their

13  lives.  They wanted to, because they had hundreds of

14  thousands of dollars that they needed to do something

15  with to make more money and to make it look legit.

16  That's where they got their money from those transactions

17  that we weren't fortunate enough to have police officers

18  like the officer in Wyoming alert enough to stop that

19  vehicle and recover those drugs.  That's why Nathan King

20  got stopped with 17 kilograms, all independent of this

21  investigation.

22        These officers didn't know about Horace Smith or

23  Michael Thurman or Mr. Echarte or about the drug seizure

24  from Goody's place of business in Anacostia or his

25  business until after this wiretap was underway.  That's

1  how they started to learn about these other people.
2  That's how they put the pieces together of this puzzle,
3  and you will never have all of the pieces to the puzzle
4  before you, because if we don't live in a world where
5  everything is perfect, we don't live in the CSI world.
6  As you heard the detectives say, they dusted many, many
7  things for prints -- for latent prints and they got one
8  print off of a box up in New York that had the heroin in
9  it.  But what you do have here is when you put these
10 pieces together, these pieces do put together a puzzle so
11 that you can see the picture very clearly of that puzzle,
12 and that puzzle is this organizational chart that
13 establishes their role, their business, their drug
14 conspiracy and shows how each of the other individuals
15 who sit before you are involved in that conspiracy as
16 aiding and abetting Ms. Martin to make sure, for whatever
17 their motives, that her business and her conspiracy
18 continued to function.
19         In closing, what the government asks you is what I
20 asked you -- what I told you in opening statement, and
21 that is to hold each one of these individuals
22 accountable.  Not for what Ms. Martin did, but for their
23 individual roles in furthering her conspiracy and in
24 assisting her and in making sure she was successful as a
25 drug dealer.  To do that, what we ask you to do is

1 justice.

2      We've quoted from Humpty Dumpty and everybody
3 else, but I'd like to leave you with this quote, and it's
4 a quote from, I think, St. Augustine, and it is this:
5 "Justice is the virtue which assigns every man his due."
6 What we ask you to do in this case is justice and to hold
7 each one of these defendants accountable for their role
8 in making sure Ms. Martin and/or Mr. Goodwin were
9 successful as drug dealers.  Thank you.

10     THE COURT:  Thank you.  Ladies and gentlemen, I
11 apologize for being a little overtime.  I think it was
12 important to get all of this in today so you can have a
13 clean slate.  This now brings to a conclusion the service
14 of Jurors 6, 9 and 16.  You are, as I indicated earlier,
15 conditionally discharged from further responsibility in
16 this case.  Please remember, however, that the condition
17 is that you don't do anything and don't talk to anybody
18 and be in shape to rejoin this jury should one of the 12
19 deliberating jurors be unable to continue, and we'll be
20 glad to let you know what the verdict is when it happens.
21 I know one of you is getting ready to go to Spain, so
22 good luck.

23     Other matters that you all need to attend to:  At
24 this time, rather than to wait for the alternates to
25 exit, we need to administer another oath.  You remember

1  we began this trial with an oath being administered to

2  answer my questions truthfully, then an oath to be good

3  jurors and to be true and good jurors, and then you heard

4  oaths administered to witnesses, and there is one more

5  oath you're going to hear and that's the oath

6  administered to this gentleman as the court security

7  officer to watch over you, and you will listen to the

8  oath as he takes it now.

9          (Court Security Officer sworn at 6:29 p.m.)

10         THE CLERK:  Please state your name for the record.

11         COURT SECURITY OFFICER:  Matthew Robert Lutomski.

12         THE COURT:  All right.  You are now in his care,

13 custody and control; however, it's late, you need to go

14 places, and you may leave.  Please return tomorrow

15 morning at 8:30.  I've got you scheduled for

16 deliberations from 8:30 to 2:30.  Ms. Merez will be back

17 tomorrow morning and she can assist you in lunch orders.

18         Let me just tell you a couple of final things

19 before you go.  I will distributing to you tomorrow

20 morning, for your foreman, the corrected verdict form

21 that has those dates that were missing from it so that

22 that should be kept on the side and in pristine condition

23 to be filled out as you reach your verdicts.

24         I want to remind you of one other thing.  Although

25 this is -- we have great technology and so forth, and we

1  do not have the ability to spew out transcripts for you.

2  That is something that is not really feasible.  It's not

3  really good if you were to ask to see the testimony of a

4  particular witness to have you focus on one witness, to

5  the exclusion of all others.  So, it would be very

6  difficult to produce transcripts for you if we don't have

7  them.

8        Tomorrow the attorneys will be meeting with Ms.

9  Merez to review the evidence for final submission to you.

10 So, as you deliberate, the evidence will be made

11 available to you, minus drugs and guns -- you won't be

12 getting those back in the jury room.  If you want to see

13 them, you can come back into the courtroom and we will

14 let you see them in the courtroom.

15       If you need to play anything -- if there is

16 anything that you want to hear a recording or see a pole

17 camera, let us know and we'll make arrangements for that

18 to be played.

19       MS. JOHNSTON:  Your Honor, we have a computer that

20 is a clean computer that we send back with a disk.

21       THE COURT:  We will make sure that's available to

22 you.  As I said, if you have any questions for me at any

23 time during deliberations, submit a note to this

24 gentleman or his successors through the foreman.  I will

25 be here to the end of this week, and if you your

1 deliberations do not end by the end of this week and you
2 resume on Wednesday, Thursday and Friday of next week,
3 and if there are any questions or you reach a verdict at
4 that time, my colleague, Judge Deborah Chasanow, will be
5 here to assist in bringing this case across the finish
6 line.  And if you don't get it done by then, well, now
7 you may have me back again.

8        Since I may or may not be with you when you reach
9 your verdict, I personally want to thank each and every
10 one of you, including the three that are being discharged
11 conditionally, now for your long, faithful service in
12 this very long and complicated case.  It's been obvious
13 to me and to all the attorneys as well that you have
14 discharged your duties fully and well, and I express
15 appreciation on behalf of the whole court system for you
16 taking an enormous debt of citizenship in undertaking
17 this responsibility.

18        Thank you very much, and you are discharged until
19 8:30 tomorrow morning.  I would be glad to meet and
20 personally thank the discharged jurors in a few moments.

21        MS. GREENBERG:  Judge, they're asking if you want
22 them to take the transcripts, also.

23        THE COURT:  Yes, you can take that back to the
24 jury room also.  They are not evidence, but they are to
25 assist you in reviewing the recordings.

1        THE FOREMAN:  The instructions you will give us

2   tomorrow morning?

3        THE COURT:  You will get those tomorrow morning.

4        THE FOREMAN:  Will you give a copy for each juror?

5        THE COURT:  You already have the verdict form

6   with the minor typos.  You will, Mr. Foreman, get the

7   verdict form; you will also tomorrow morning get the

8   clean instructions as delivered to you.

9                    (Jury excused at 6:33 p.m.)

10       THE COURT:  Counsel, my law clerk is going to

11  distribute to you the corrected verdict form, the

12  original of which will be provided to the jury foreman

13  tomorrow morning.

14       Counsel, before you disappear, first of all, make

15  sure you let Rita or Ms. Merez know exactly where you are

16  and how to get hold of you.  I wanted to tell you, now

17  that this long trial has come to an end, how much I

18  appreciate the extraordinarily good lawyering that I've

19  seen in front of me by each and every attorney in this

20  case.  It is so much more of a pleasure to have good

21  lawyering than the other type, and every single party in

22  this case has been extremely well represented in the best

23  traditions of the legal profession, and I thank you very

24  much.

25       MS. JOHNSTON:  Your Honor, I may.  If it's all

1 right with the court, Ms. Greenberg has agreed to fill in

2 for me once the evidence gets sorted for the jury so I

3 might rejoin the rest of my vacation.

4        THE COURT:  That's fine.  If you would, register

5 how we can find you.  I will be here tomorrow morning.  I

6 won't be conducting proceedings in the case tomorrow

7 morning unless it's necessary, but please get here

8 tomorrow morning so you can review with Ms. Merez the

9 exact exhibits that go back, and make sure that they're

10 appropriate to go to the jury.

11        MR. MONTEMARANO:  What time will Bea be in?

12        THE COURT:  She usually gets here around 7:30, so

13 she will be here early.  I didn't direct her to come to

14 the courtroom at 8:30 tomorrow.  I will try to -- I'll

15 leave a message on her voicemail that counsel would like

16 to meet with her -- what time is best for all counsel?

17        MS. JOHNSTON:  How about 8 o'clock, Your Honor?

18 It's going to take us about on hour.

19        MR. MONTEMARANO:  8 o'clock?

20        THE COURT:  I won't bring the jury into the

21 courtroom again.  As I said, we'll provide them with the

22 clean instructions that I'll review tonight, and the

23 verdict form.

24        MS. GREENBERG:  Judge, one other thing.  I think

25 that all the evidence should go back at the same time.

1 We've been back and forth with a number of different

2 versions of the defense disk and the defense calls.  If

3 they could resolve it tonight so the disk reflects the

4 calls that are in evidence --

5       MR. MITCHELL:  It's been resolved.

6       THE COURT:  All right.  Mr. Mitchell says it's

7 been resolved.

8       MS. GREENBERG:  Okay.  If he could let us review

9 it.

10      MR. MITCHELL:  Everything's taken care of.

11      MR. MCKNETT:  Your Honor, what's the Court's

12 desires as far as Ms. Ali and Ms. Harden are concerned

13 for tomorrow?

14      MR. MONTEMARANO:  Half an hour call like us?

15      THE COURT:  I think they should be in the same

16 status as counsel:  Able to get here in a hurry.

17      MR. MARTIN:  What is our status?  15 minutes?

18 Half hour?  What is it?

19      THE COURT:  Frankly, it would be very -- I would

20 be very surprised if I start getting notes tomorrow

21 morning.  I would think an hour away -- no more than an

22 hour away.  But if we start getting a lot of notes, it's

23 going to feel like a yo-yo, so I may shorten that time if

24 we start getting notes.

25      MS. JOHNSTON:  That's after they are here at 8

1 o'clock to start going through the evidence?

2          THE COURT:  Yes, after 8 o'clock.  I want to make

3 sure all parties are here and counsel are here tomorrow

4 morning.  I won't go on the bench, though, unless it's

5 necessary.  I have a status conference call at 8:30, but

6 if there's anything I need to sort out, I will be glad to

7 come on the bench and do so tomorrow morning.  The

8 defendants don't need to be in the courtroom when I know

9 you're doing this review of this, unless you want to be

10 here.

11          MR. MONTEMARANO:  No.  We're okay.

12          THE COURT:  They're going to be in the courthouse,

13 they in custody defendants.

14          MR. MONTEMARANO:  It will go more quickly if we

15 don't fight with the marshals for floor space and  all

16 that.

17          MR. WARD:  I've given your law clerk my card with

18 my cell phone.  I'm going to hang out at Michael

19 Montemarano's office.  He's closer.

20          THE COURT:  All right.  Counsel, anything further?

21 Thank you very much.

22                    (Off the record at 6:37 p.m.)

23

24

25

1                           **CERTIFICATE**

2

3          I, Tracy Rae Dunlap, RPR, CRR, an Official Court

4   Reporter for the United States District Court of

5   Maryland, do hereby certify that I reported, by machine

6   shorthand, in my official capacity, the proceedings had

7   and testimony adduced upon the Jury Trial Proceedings in

8   the case of UNITED STATES OF AMERICA versus PAULETTE

9   MARTIN, et al, Criminal Action Number RWT-04-0235 on

10  August 9, 2006.

11

12         I further certify that the foregoing 339 pages

13  constitute the official transcript of said proceedings,

14  as taken from my machine shorthand notes, of said

15  proceedings.

16

17         In witness whereof, I have hereto subscribed my

18  name, this 2nd day of June 2008.

19

20

21                      _____
                        TRACY RAE DUNLAP, RPR, CRR
22                      OFFICIAL COURT REPORTER

23

24

25