1               UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND
2                    SOUTHERN DIVISION

3

4    UNITED STATES OF AMERICA      .

5          vs.                     .  DOCKET RWT-04-0235

6    PAULETTE MARTIN, ET AL     .  GREENBELT, MARYLAND

7                                .  NOVEMBER 21, 2006

8

9            TRANSCRIPT OF FORFEITURE HEARING
          BEFORE THE HONORABLE ROGER W. TITUS,
10              UNITED STATES DISTRICT JUDGE

11

12   A P P E A R A N C E S

13   FOR THE GOVERNMENT:        DEBORAH A. JOHNSTON, ESQ.
                               BONNIE GOLDBERG, ESQ.
14                             ASSISTANT U.S. ATTORNEYS

15

16   FOR THE DEFENDANT MARTIN:   MICHAEL D. MONTEMARANO, ESQ.
     FOR THE DEFENDANT WHITING:  MARC HALL, ESQ.
17   FOR THE DEFENDANT GOODWIN:  ANTHONY MARTIN, ESQ.
     FOT THE DEFENDANT DOBIE:    PETER WARD, ESQ.
18   FOR THE DEFENDANT BYNUM:    TIMOTHY MITCHELL, ESQ.
     FOR THE DEFENDANT ALI:      HARRY McKNETT, ESQ.
19
     Court Reporter:            Sharon O'Neill, RMR
20                              Official Court Reporter
                               United States District Court
21                              6500 Cherrywood Lane
                               Greenbelt, Maryland 20770
22                              301-344-3227

23

24

25

INDEX

| GOVERNMENT WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Det. Thomas Eveler | 66 | 90 102 105 109 | 124 | |
| Kenneth Oland | 128 | 133 137 139 | | |

1          THE COURT:  Good morning.  Please be seated.

2          VOICES:  Good morning.

3          MS. JOHNSTON:  Good morning, Your Honor.  We are here

4     in the matter of United States vs. Paulette Martin, et al.,

5     case number RWT 04-0235.  I'm Deborah Johnston representing the

6     Government.  I will be joined at counsel table by Ms.

7     Greenberg, who had a matter in Baltimore, so she'll be arriving

8     late.  Seated with me at counsel table are Case Agents Thomas

9     Eveler, Chris Sakala, and Genevieve Holmes, our paralegal Ms.

10    Noel.

11         THE COURT:  All right.

12         MR. MONTEMARANO:  Good morning, Your Honor.  Michael

13    Montemarano on behalf of the defendant Paulette Martin, who is

14    seated behind me.

15         MR. MARTIN:  Good morning, Your Honor.  Anthony

16    Martin on behalf of Learley Goodwin, who is present.

17         THE COURT:  Good morning.

18         MR. HALL:  Good morning, Your Honor.  Marc Hall

19    representing Reece Whiting.

20         MR. MITCHELL:  Good morning, Your Honor.  Timothy

21    Mitchell representing Mr. Derrek Bynum.

22         MR. WARD:  Good morning, Your Honor.  Peter Ward

23    representing Lavon Dobie.

24         THE COURT:  Good morning.

25         MR. McKNETT:  Good morning, Your Honor.  Harry

1    McKnett, representing Lanora Ali.

2              THE COURT:  All right.  Counsel, we are here today, I

3    believe, for two matters.  One is the all pending post-trial

4    motions, and the second is the Court's non-jury determination

5    of the forfeiture allegations.  Am I missing anything, or is

6    that what we're all here for.

7              MS. JOHNSTON:  I believe that's what we're all here

8    for.  I don't know that there are motions for new trial as to

9    all defendants.

10             THE COURT:  What I'm going to do now is review what I

11   think are all outstanding motions.  And I looked on CM\ECF to

12   see what the list was, and let me tell you what my notes show

13   are still outstanding and to be disposed of.

14             Ms. Martin has filed pro se some matters that I

15   believe have been forwarded to Mr. Montemarano, so he is aware

16   of them.  Correct, Mr. Montemarano?

17             MR. MONTEMARANO:  Yes, sir.

18             THE COURT:  Your client's pro se filings.  All right.

19   And you may not have it reflected in your notes, but I'll tell

20   you what I have on the docket, 776, is Ms. Martin's motion,

21   filed in March of this year, to dismiss on speedy trial

22   grounds, and 930 and 934 are additional filings relating to the

23   same subject matter of speedy trial.

24             And then I have the document filed by Mr. Montemarano

25   on behalf of Ms. Martin, which is the consolidated post trial

1    motions.  That's docket entry 953.  Then there was a supplement

2    to that which fleshed out in greater detail the grounds for

3    that motion.  That's 995.  That was filed on November 1st.

4    That's what I have for Ms. Martin.  Are there any other

5    matters, Mr. Montemarano, that you're aware of

6              MR. MONTEMARANO:  No, sir, not with regard to defense

7    motions or with regard to forfeiture.

8              THE COURT:  All right.  Let me then go down, I'll go

9    down defendant by defendant, tell you what I have and anybody

10   correct me if I'm missing anything.

11             The defendant Learley Goodwin, I have a Motion for

12   Return of Property, which is filed on September 27th.  That's

13   number 963.  I have no other pending motions for Lerley Godwin.

14             MR. MARTIN:  That's correct, Your Honor.

15             THE COURT:  Then I have, for the Defendant Reece

16   Whiteing, I have no post trial motions.

17             I do have a pro se motion for downward departure,

18   960, which I will not hear today.  I will hear that at the time

19   of sentencing.

20             MR. HALL:  That's what I anticipated, Your Honor.  My

21   client did file that pro se.  As far as today's proceeding,

22   I've filed no additional motions.

23             THE COURT:  Okay.  On the defendant Derrek Bynum, I

24   have no motions.

25             MR. MITCHELL:  That's correct, Your Honor.

1          THE COURT:  That's correct.  All right.  On the

2     defendant Lavon Dobie, I have a motion to adopt the motions of

3     the other defendants, filed on September 14th, is that correct?

4          MR. WARD:  That's right, Your Honor.

5          THE COURT:  And on Lanora Ali, I have no motions

6     other than number 952, which is the motion to adopt the motions

7     of other defendants, but I have a supplement to that that was

8     filed last week.

9          MR. McKNETT:  That's correct, Your Honor.

10          THE COURT:  Is that everything for all defendants?

11     Anything else?  All right.  Well, then let's take them from the

12     top.  Start with Ms. Martin's motions.  Ms. Johnston, you had

13     --

14          MS. JOHNSTON:  Your Honor, I had prepared, and I'm

15     prepared to handle Ms. Martin's motions for new trial.  In

16     terms of her pro se motions, I think Ms. Greenberg had filed

17     something with the Court.  I didn't know the Court was planning

18     to address those today.

19          THE COURT:  Mr. Montemarano, do you wish to be heard

20     on her pro say motions on speedy trial?

21          MR. MONTEMARANO:  No, Your Honor.  While in no way

22     shape or form would I like the Court to understand that I don't

23     agree with them or believe that they are meritorious, the issue

24     of speedy trial was addressed at the motions hearing in the

25     spring of 2005.

1          THE COURT:  Correct.

2          MR. MONTEMARANO:  I filed specifically a speedy trial

3   motion at that point, because of the delay even until motions

4   with trial not yet set at that point.

5          THE COURT:  Right.

6          MR. MONTEMARANO:  But I believe the motion is

7   adequately preserved for appellate review and I don't think

8   it's necessary to waste the Court and counsel's time to go yet

9   further.

10         THE COURT:  All right.  Then with regard to the

11  defendant Paulette Martin's pro se motions, and I'll address

12  each one of them, the number 776, filed on March 31, 2006, and

13  then she filed -- let me put them in front of me here -- on

14  August 30 she filed a document that had two captions to it, so

15  it was filed two different ways.

16         One is a Motion In Request Of Transcript of the

17  Court's denial of my Motion to Dismiss based on lack of a

18  speedy trial.  Second caption was Motion For Dismissal based on

19  improper jury recess for an extended period.  And those are the

20  matters that I have in front of me that I believe Ms. Greenberg

21  has filed a responsive memorandum by the Government.

22         I will deny that motion.  The Government has filed a

23  memorandum that I think adequately sets forth the standards on

24  this question, two questions.  One is the speedy trial and the

25  second is the question of the jury recess.  And the, first I

1   have already addressed, the question of the alleged denial of

2   rights under the speedy trial act and under the Sixth Amendment

3   in a previous hearing in this matter.  Nothing has changed.  I

4   believe that the delay in this case is fully justifiable under

5   the factors set forth in the Speedy Trial Act, and that there

6   has not been the denial of the right to a speedy trial, taking

7   into account the factors under Barker vs. Wingo and looking at

8   the Fourth Circuit cases that address the question, the length

9   of the delay in this case has not been sufficient to trigger a

10  denial of rights under the statute or under the Constitution.

11      With regard to the recess of the case, this was a

12  relatively brief recess in deliberations of a very long trial.

13  The case went longer than it should have gone.  It is very

14  difficult to impanel this jury with summer vacation plans and

15  the break that the jury took in its deliberations was essential

16  for being able to have these jurors serve.

17      They served substantially longer than they were

18  anticipating.  The case should have been concluded before this

19  break, and I consider that the break was proper.  In addition,

20  no objection was made at the time that the decision was made to

21  allow the jury to have a break in its deliberations.

22      The request for documents and productions, I don't

23  see any need for doing that.  All these matters will be fully

24  preserved for appellate review and are available for review by

25  the Fourth Circuit should Ms. Martin pursue an appeal from the

1    ultimate disposition in this case, so those motions will be

2    denied.

3              Now, I'll hear, Mr. Montemarano, on your motion as

4    you supplemented as well.

5              MR. MONTEMARANO:  Thank you, Your Honor.

6              THE COURT:  Let me say one other thing before I go

7    further.  One of the counsel in this case has a situation which

8    may require departing earlier, so I wanted to clear up one

9    scheduling matter.  On December 19th, I have got the sentencing

10   in this case scheduled.

11             If I remember correctly, Mr. Martin, your client was

12   scheduled late in the day because you had some problem early in

13   the day.

14             MR. MARTINA:  That's correct, Your Honor.

15             THE COURT:  Okay.  Is that still a problem?

16             MR. MARTIN:  If the Court would give me about two

17   minutes once Mr. Montemarano finishes, I could tell you,

18   because I have to look at my calendar.

19             THE COURT:  Okay.  Well, let me tell you what I want

20   you to look for.  I received a letter dated November 17th from

21   Ms. Johnston, indicating that she would like to call or may

22   call Case Agents Eveler and Sakala to testify about the scope

23   of the conspiracy, the role of each defendant, drug quantity

24   and so forth.  I received that letter.  I assume all counsel

25   have received that letter.

1          If we're going to have six sentencings in one day and

2     in each and every one of them we're going to hear from these

3     officers, it's going to be a very long day, and we did discuss

4     the length of the time for the sentencings at the time of the

5     verdicts.

6          I asked whether one hour for each sentencing would be

7     sufficient.  I was told yes.  What I am going to suggest, if

8     the Government really does want to call these persons to the

9     stand, is that that be done first thing in the day and that all

10    counsel have an opportunity to cross-examine them on any and

11    everything they may say, and then I will then proceed into the

12    separate sentencings and disposition of each case.  That's why

13    I want you to check your calendar, Mr. Martihn.

14         MR. MARTIN:  And I just did, Your Honor, and it

15    appears that the conflict is a trial that I have before Judge

16    Williams, and I think that's why you put it off to the end of

17    the day, because we knew that I would be in trial all day.

18         However, yesterday a most generous offer was made by

19    the Government, and my client is in the hospital in Laurel.  I

20    haven't had a chance to communicate that to him.

21         THE COURT:  All right.

22         MR. MARTIN:  So I have to run to Laurel to

23    communicate to him the new offer that has been made by the

24    Government and if he accepts that, then I would be able to be

25    here earlier.

1          THE COURT:  Well, let me tell you this.  What I

2     intend to do then is, if it turns out that you're not available

3     until late in the day, I will hear anything and everything

4     these agents have to say about all of the defendants other than

5     your client in the morning.  Then when you come in we'll put

6     them back on the stand and anything they want to say about your

7     client will be heard.

8          MS. JOHNSTON:  Your Honor, just so the Court

9     understands that we had a deadline of November 20th to notify

10    the court of our intent and our filing that notice was based on

11    what we saw were some of the objections that are being raised

12    and what we anticipate may be raised in sentencing.

13          It may be that, especially in terms of Mr. Goodwin,

14    we rely on the testimony that the Court has already heard and

15    don't have a need to call one of the agents --

16          THE COURT:  Well, that's a judgment call you have to

17    make.

18          MS. JOHNSTON:  Right.

19          THE COURT:  But if, in your judgment, you need a

20    witness with regard to Learley Goodwin and Mr. Martin is not

21    available until 4:30, you put him on at 4:30.

22          MS. JOHNSTON:  Thank you, Your Hojor.  I just wanted

23    to let the Court know it may not be necessary.

24          THE COURT:  Mr. Ward.

25          MR. WARD:  Your Honor, I just wanted to comment, I

1    just got that letter, I think it was yesterday and I have not

2    had the opportunity to respond, but I'm certainly going to.  I

3    frankly don't see why the same witnesses who testified at trial

4    have got to be called again in a sentencing hearing.  Your

5    Honor has already heard what they had to say.

6            THE COURT:  I don't know.  I mean, it's the

7    prosecutor's decision if they want to call someone, and I have

8    not studied the presentence reports as some of you may have

9    already done, so I don't know what issues there may be that are

10   not fully encompassed within the trial testimony.  So I agree

11   there may be no need for one or both of these witnesses to

12   testify, but I'm not going to preempt the Government from

13   making that decision.  That's their decision to make.

14           They notified me in accordance with my order of their

15   intent to call these witnesses.  All I'm saying is if they're

16   going to call them, assuming Mr. Martin is available the first

17   thing in the day, I want to hear all the testimony from them

18   and all the cross of these witnesses first off at 9:00 on

19   December 19th.

20           MR. WARD:  I appreciate what the Court is saying.

21           THE COURT:  But I share your concern that we may not

22   need to hear from anybody, because this was a long trial and I

23   heard a lot of testimony from both of these officers and there

24   may not be a need, but we'll see.

25           MR. WARD:  Thank you, Your Honor.

1          MR. MONTEMARANO:  Your Honor, I would join Mr. Ward's

2     objection for the reasons he noted.  I was here for ten weeks

3     or so.  I seem to recall Your Honor being up there for most of

4     the time and paying attention.

5          So I would assume that Your Honor heard what I heard.

6     That's number one.  Number two, in all candor, I'm not sure

7     what these witnesses are going to contribute in the sense they

8     are not going to be testifying based upon personal knowledge.

9          THE COURT:  I understand.  All of your objections you

10     can make at the time they call them, but they perfectly have

11     the right to call them, but they perfectly have the right to

12     call them.  They have notified me.  All I'm telling you is if

13     their testimony is germane, and if they decide to call them, we

14     are going to hear all of their testimony all at once with all

15     counsel present to cross-examine, and then they can be excused

16     and then we deal with sentencing issues individual to each

17     defendant, rather than to have them called potentially six

18     times, which I don't want to do that.

19          MR. MONTEMARANO:  We're going to begin at 0900?

20          THE COURT:  Yeah.  What did I say?

21          MR. MONTEMARANO:  That's what you said.

22          THE COURT:  Let me make sure I'm not telling you

23     somethings that's wrong.  Nine-thirty.

24          MR. MONTEMARANO:  Okay.  Just wanted to be clear.

25     Whatever the Court's pleasure.

1          THE COURT:  I mean, at the present time, just for

2    your information, Paulette Martin is set for 9:30; Reece

3    Whiting 10:30; Derrek Bynum, 11:30; Lavon Dobie, 1:00; Lanora

4    Ali, 2:00 o'clock, and Learley Goodwin, 4:30.

5          What I'm telling you is everybody is going to be in

6    the courtroom at 9:30 and we will do them seriatim, so that to

7    the extent that you need to be notified of a schedule change,

8    consider yourself notified.

9          MR. MONTEMARANO:  To the extent that it saves time

10   with regard to the proceedings on that day, I will be filing a

11   sentencing memorandum addressing issues in the PSR and I'll

12   probably do that no later than the first of the month, which

13   will give the Government more than enough time to respond and

14   for Chambers to have considered the issues which will be raised

15   in advance of the hearing.

16         THE COURT:  All right.  Well, all of  you should be

17   doing that.  I mean, I want to be able to be prepared and not

18   get a memorandum handed to me the day before on any of these

19   issues.  I do read these things and I do want to be able to

20   pass a quiz on what they said.

21         MS. JOHNSTON:  I'm sure that the Court will wait

22   until it hears all of the testimony then.  As the Court well

23   knows, hearsay is admissible at sentencing.  We operate under

24   different standards than trial, so there is plenty of evidence

25   which this court has not heard in the course of the trial that

1    may be relevant to a particular defendant's sentencing issues.

2              THE COURT:  Okay.  We're all on the same page then as

3    to how I'm going to proceed on December 19 and -- Okay.  You

4    may proceed, Mr. Montemarano.

5              MR. MONTEMARANO:  Thank you, Your Honor.  I'm going

6    to try to avoid repeating what I have already put in writing

7    for the Court to consider, in particular, the citations to

8    authorities in support of the propositions that I advanced for

9    the Court's consideration.  That being said, I think I need to,

10   before we begin, to give the Court a global perspective.

11             Our contention is that the verdicts are unsupported

12   by adequate evidence to rise to the level of beyond a

13   reasonable doubt, number one, or in some instances are

14   specifically against the weight of the evidence regarding

15   participation by my client in possession with intent to

16   distribute.

17             What I am not addressing because, and I am submitting

18   on behalf of Ms. Martin, is the count one charge, the

19   overarcing conspiracy, and the count 62, possession with intent

20   to distribute, which charges conduct on June 1 which as the

21   Court -- June 1, 2004, which as the Court will recall was raid

22   day, at which time there was approximately three hundred grams

23   each of cocaine and crack cocaine seized from what we will

24   term, "the school," Paulette's School of Performing Arts.

25             And being aware of that evidence, I understand the

1    posture in which the defense stands today and I think arguing

2    over those two counts would be substantially a waste of time.

3    I am not submitting in the sense of conceding, but I am

4    submitting in the sense of argument.

5         I do, however, invite the Court's attention to the

6    possession with intent to distribute charges in the indictment

7    lodged again Ms. Martin.  For the record, they are counts four,

8    eight, ten, 14, 16, 25, 29, 31, 33, 36, 38, 40, 43, 45, 55 and

9    56.  These are the other 15 possessions with intent.

10        These, I submit, merit the closest of scrutiny by

11   this Court with regard to defenses' motions post trial.  These

12   charges involve a serious felony, possession with intent to

13   distribute of a drug, heroin, cocaine, crack cocaine.

14        In half of the charges they refer to specific amounts

15   of drugs, 500-grams of cocaine, fifty of crack.  Whatever.

16   There is not a scintilla of evidence regarding type of drug or

17   amount of drug with regard to any of these counts.  There is,

18   and the matter has been litigated and I'm not going to go back

19   into it, but I do have to present a full argument to the Court,

20   to invite the Court's attention once again to the affray we had

21   in this courtroom over the question of expert testimony,

22   specifically that from Sergeant Secalla.

23        In all candor, that from Sergeant Eveler was icing on

24   the cake.  I think the Government's case, or our argument

25   relative to the Government's case, is focused upon and relevant

1    to Sergeants Secalla testimony.

2           There are telephone calls.  They involve what is

3    ostensibly coded language, so the Sergeant has testified.

4    Fine.  For the sake of discussion, they can be considered to

5    revolveing around drug dealing.  The fact that they are dealing

6    around, hauling around drug dealing, that there is some sort of

7    questionable conduct that this language is indeed code for

8    something other than what it purports to be, shirts, tickets

9    books, whatever, does not permit a finder of fact to proceed

10   from that, across the great divide, keeping it from reaching

11   the goal, in the Government's view, of proof beyond a

12   reasonable doubt.

13          It is the most egregious of assumptions to be able to

14   "determine", and I put quotes around that word, that a

15   particular count involves a particular kind of drug, absent

16   more.  It is likewise simply beyond comprehension, in my view,

17   that the jury could find with regard to a specific count, an

18   amount of drug when there is no obligation and there is no

19   seizure regarding any of these counts.

20          And most importantly, and this is something that was

21   absolutely hammered home by all the defense attorneys, during

22   cross and during argument, that Sergeant Sakala really admitted

23   repeatedly "I don't know," regarding the amounts of certain

24   transactions.

25          The most classic example of that is the famous size

1   8, where Sergeant Sakala could not testify with regard to

2   specifics if they were eighths of killograms, 125 grams, four

3   ounces and change, an amount indicating under all circumstances

4   an intent to distribute, and an eighth of an ounce.  Three to

5   three and a half grams, an amount possibly distributable, but

6   if you are profoundly addicted, as many of these purchasers

7   were, including co-defendants here in the courtroom, not enough

8   to indicate an intent to distribute.

9        For lack of a better term, Your Honor, even Dom

10  Delouise, driving a Dunkin Donuts truck, can be understood to

11  be attemping to distribute those donuts, because he couldn't

12  eat the whole truck; with a dozen under his arm, we don't know

13  if that's for coffee, breakfast at the office, or if that's

14  just a morning snack, and there is no way to determine that to

15  that standard which the jury was obligated to reach beyond a

16  reasonable doubt.  Beyond a Reasonable Doubt.  That this

17  conduct subsumed some form of drug dealing based upon other

18  conduct, seizures, et cetera, the people with whom Ms. Martin

19  was dealing, I can understand the jury believing that, but

20  we're not at the point of belief by preponderance of the

21  evidence.  We are not at the point of a firm conviction by

22  clear and convincing evidence.  We are at the point of beyond a

23  reasonable doubt?

24        THE COURT:  Look, Mr. Montemarano, let me ask you

25  this.

1          MR. MONTEMARANO:  Yes, sir.

2          THE COURT:  You would agree with me, would you not,

3    that --

4          MR. MONTEMARANO:  I'm always scared when a judge says

5    that.

6          THE COURT:  I hope you would agree.  I'm trying to

7    bring you something that's bullet proof.  But would you agree

8    with me that I should sustain their convictions if any rational

9    trier of fact, given the evidence in the light most favorable

10   to the Government, could find the essential elements of the

11   crime beyond a reasonable doubt.  That's the standard, is it

12   not?

13         MR. MONTEMARANO:  Yes, sir.

14         THE COURT:  All right.  Now, your focus right now is

15   on the counts other than the conspiracy count, correct?

16         MR. MONTEMARANO:  Yes.  Those, those enumerated

17   possessions with intent that I set out, absent counts one and

18   62.

19         THE COURT:  Right.  So, insofar as the argument

20   you're making is concerned, you're dealing with specific counts

21   the dealt with possession with intent to distribute on date X,

22   Y and Z.

23         MR. MONTEMARANO:  And often in amounts A, B or C.

24         THE COURT:  Correct.  Now, in determining whether a

25   rational trier of fact could have reached the conclusions

1    reflected in these verdicts, does not the jury have the right

2    to take into account the totality of all the evidence before

3    them, not just evidence on a specific day, so that what we're

4    dealing with here is on these various dates that are pertinent

5    to the counts that you have enumerated in your argument, we do

6    know that large amounts of heroin were intercepted coming from

7    New York.  We do know repeated sales of large quantities of

8    cocaine from Mr. Mangual, Jr.  Correct?

9               MR. MONTEMARANO:  No, we do not.  Mr. Mangual didn't

10   testify.

11              THE COURT:  Didn't have to testify.

12              MR. MONTEMARANO:  He was not seized with large

13   amounts of cocaine.

14              THE COURT:  Well, were there not purchases made by

15   your client from Luis Mangual, Jr.?

16              MR. MONTEMARANO:  Were there?  So he says.  As I

17   pointed out, Your Honor, there are no seizures, there is no

18   cooperator testimony who participated.

19              THE COURT:  Why is all of that necessary in the face

20   of the amount of other evidence in this case that is already

21   before the jury?

22              MR. MONTEMARANO:  Because, Judge, we are not talking

23   about a conspiracy where -- this is not the standard but

24   perhaps framing it this way will --

25              THE COURT:  Well, doesn't the conspiracy, doesn't the

1    existence of the conspiracy that has been proven beyond a

2    reasonable doubt to the jury, help in detremining the question

3    of whether the possession was with intent to distribute or

4    whether it was just a bunch of doughnuts that I'm going to go

5    back and eat at my office.

6           MR. MONTEMARANO:  Only insofar as we know that there

7    are doughnuts actually possessed, and on these dates what we

8    have is questionable conversations which may underlie the

9    findings on the phone counts at best.  We can do not know what

10   was discussed.  We did not know which drugs, and we certainly

11   do not know amounts.

12          I don't want to -- Your Honor, it is not fitting for

13   counsel to play gottcha with the Court, but what Your Honor has

14   said is what I anticipated the Government's argument to be, and

15   I submit it is an argument that is effective on count one

16   because, in a manner of speaking, the Rules of Evidence are

17   different on a conspiracy.

18          They are more relaxed, because in 801(d)(2)(e)

19   evidence we bring in implication.  We bring in something

20   extending over time, and roping all that together is a much

21   easier job for the Government than it is proving a specific

22   conduct on a specific date.  I mean, it's no different than

23   saying John Smith is a serial killer.

24          THE COURT:  But do I take all these dates in a

25   vaccuum?  Was the jury required to take these dates in a

1    vaccuum and ignore all the other evidence they had in front of

2    them?

3                MR. MONTEMARANO:  With respect, Your Honor, I reject

4    the notion that considering the evidence arrayed against a

5    defendant on a date with regard to specific conduct and a

6    specific drug in a specific amount is in a vacuum, because what

7    we have then is guilt by association, guilt by implication.

8    "Oh, well, gee, she's dealt before, she must be dealing now."

9                THE COURT:  That's -- we're not just dealing with

10   prior bad acts.  We're dealing with evidence presented in this

11   court room.

12               MR. MONTEMARANO:  That's all they're left with,

13   because what Your Honor is then suggesting is, let us take, for

14   example, the first of the enumerated counts, count four.  What

15   Your Honor is suggesting is "Well, we have all this other

16   conspiracy conduct and, gee, all these other counts, count

17   eight, ten, 14, 16, ad nauseam, well, then because she has done

18   all this similar stuff on other times, this must be the same

19   stuff."  You know, the proverbial same stuff, different day.

20               I respectfully submit that's not beyond a reasonable

21   doubt.  I respectfully submit that is not a way for any finder

22   of fact to reach a question of guilt on a certain date.  That

23   is what due process is all about.  Even if you concede that a

24   person is a terrible person, a serial killer, for example,

25   you're still obligated to prove that a particular victim was

1    killed by that serial killer, and that person is actually dead,

2    that this person had the ability, was present or in the same

3    area, the same zip code, the same time zone, etc., having the

4    ability to do so.

5            The Government cannot do that by supposition and

6    guess work, and that is exactly what Sergeant Sakala presented

7    to this court, and that's the reason we so ardently opposed it

8    from the very outset.

9            Let us look at Count four.  It charges 500-grams of

10   cocaine.  Now, last time I looked that's about 18 ounces, give

11   or take a little.  We're not talking about an insignificant

12   amount.  It does not fit in your pocket.  It is thousands of

13   dollars of product, even at the wholesale level.  A half

14   kilogram.  On the 10th of March, 2004, if you look at the

15   Government's own evidence, because evidence is what this

16   analysis is suppose to be about.

17           I invite the Court's attention to our transcript

18   book.  Book 1, call relative to March 10, begin on page 0015,

19   that would be 15, call A1-11.  They extend through and

20   including call B248, which is on page 26.  My math suggests

21   there are ten calls covering 12 pages.  That was the evidence

22   regarding March 10th.  Correct, Your Honor?

23           There was no cooperator concerning March 10th.  There

24   was no controlled buy concerning March 10th.  There was no

25   seizure concerning March 10th.  March 10th was this, that's all

1    the Government adduced into evidence.  On top of that they a

2    adduced Sergeant Sakala's testimony, based upon his analysis of

3    all these calls.  Fine.

4         Based upon other calls on March 10th, fine.  No

5    seizures, no personal knowledge.  And, quite honestly, it is

6    because of this that we screamed, ranted and raved months ago

7    about Daubert relating to Sergeant Sakala, because his

8    supposition cannot be tested.  You could test his supposition

9    if based upon these calls at 11:59 p.m., or 2359 hours, the

10   Government had executed a search warrant on Hayward.

11        THE COURT:  Well, you're essentially saying that the

12   Government's required to present testimony from a participant

13   in a transaction or introduce the actual drugs, right?

14        MR. MONTEMARANO:  By and large I couldn't imagine

15   what other evidence there would be.

16        THE COURT:  Well, hasn't the Fourth Circuit in *U.S.*

17   *vs. Campbell* pretty soundly rejected that contention?

18        MR. MONTEMARANO:  I respectfully submit that in light

19   of the need for an element of the offense to be proved beyond a

20   reasonable doubt, as the Supreme Court guides us in *Booker*, I

21   respectfully submit that is simply not enough.

22        I mean, if we again look at the evidence on page 17

23   of the book, we have a discussion of, I believe by John Martin,

24   "needing one starched and one Downy T-shirt."  Sergeant Sakala,

25   "Pretty clearly, drug conversation.  Starch and Downy are, you

1    know, soft and hard.  Cocaine.  Crack Cocaine."  We know they're

2    soft and hard.  That's one possible meaning.  Fine.  On page

3    21 --

4              THE COURT:  Isn't that all that's necessary to

5    support the jury's verdict?

6              MR. MONTEMARANO:  It's all that's necessary --

7              THE COURT:  Under the applicable standard?

8              MR. MONTEMARANO:  I would respectfully submit the

9    standard then permits mere supposition, because that's all it

10   is.  There is not even consistent testimony or consistent

11   evidence, if you want to call that evidence, which I quail at

12   dignifying this way.  But if you call that evidence, then how

13   is it if a T-shirt on page 17, and three or four calls later on

14   page 21, and for the record the call on page 17 would be B 197

15   and the call on page 21, B 243, and these are both on March 10

16   again, there is a discussion about a ticket.

17             Based upon exactly what, it's a T-shirt here, it's a

18   ticket there.  I'm guessing.  Judge, this isn't odds making.

19   This isn't somebody on ESPN talking about who's going to win

20   the game on Saturday or on Sunday and how many points you

21   should be giving.

22             Your Honor, this is something a bit more serious and,

23   quite honestly, unlike odds making or whatever, this is

24   something you have to be reducing to cold, hard facts to reach

25   the standard of beyond a reasonable doubt.  It is for that

1    reason that we sought, at the beginning of trial, I don't wish

2    to steal the thunder of co-counsel, I forgot who filed the

3    motion in all honesty, we sought to have the jury instructed on

4    the reasonable doubt standard, and it is for this reason that

5    the Fourth Circuit instruction denies these defendants due

6    process.  I harken the Court --

7              THE COURT:  What Fourth Circuit instruction?

8              MR. MONTEMARANO:  Excuse me.  The Fourth Circuit

9    prohibition of the instruction.

10             THE COURT:  Oh.  Oh.  Okay.

11             MR. MONTEMARANO:  The Fourth Circuit standard on the

12   instruction is what I should have said, which is to say none.

13             THE COURT:  Well --

14             MR. MONTEMARANO:  Your Honor, I'm make a record here.

15   Your Honor may agree or disagree.

16             THE COURT:  All right.  I understand.

17             THE COURT:  Okay.  But if there is --

18             THE COURT:  This may be the case that causes them to

19   revisit the question of whether they should give an instruction

20   on reasonable doubt when requested by defense.  But as of right

21   now, I am told I should not give a definition of reasonable

22   doubt unless and until the jury asks me for one.

23             MR. MONTEMARANO:  And I submit that given that

24   instruction by the Fourth Circuit this Court is obligated,

25   perhaps not a felicitous word for counsel to address to an

1    Article 3 Judge, but I submit that in the interest of due

2    process this Court is obligated to consider the Fourth

3    Circuit's admonition, to consider the facts of the case, to

4    consider the nature, the evanescent nature, the tenuous nature

5    of the evidence.  I'll put quotes around that again, when

6    considering why the reasonable doubt instruction was required,

7    why it would have been felicitous to give it.

8              I harken the Court to the Maryland standard.  I know

9    Your Honor in private practice did not handle very many

10   criminal cases.

11             THE COURT:  I had my fair share.

12             MR. MONTEMARANO:  Okay.  In Maryland the standard is

13   proof of a certainty to permit you to make an important --

14             THE COURT:  Decision in life. I'm --

15             MR. MONTEMARANO:  -- decision in your life --

16             THE COURT:  -- very familiar.

17             MR. MONTEMARANO:  -- without reservation.  And a

18   failure to add those two words is an automatic fast bus back

19   from Annapolis, Your Honor.  I can speak from personal

20   experience, without reservation.  You don't have reservation

21   based upon the guesswork provided by Sergeant Sakala, you're

22   not doing your job as a juror, and these jurors, God bless them

23   for sitting here as patiently as they did and putting up with

24   all the ranting and raving and listening to me, not to mention

25   poor Mr. McKnett at the tail end of the caboose, let alone Ms.

1    Johnston, who was after all of us.

2                (Audio problem)

3                THE COURT:  That was a very good argument that you

4    just made.

5                MR. MONTEMARANO:  Not quite like the entrails of the

6    lamb, but it will do.  (Laughter.)

7                I submit that this is simply not enough.  And before

8    the Court or Ms. Johnston, the fact that there is one of these

9    or that there's -- somebody lend me hand -- 15 of them, is

10   absolutely immaterial, because one guess, 15 guesses, it's

11   still that.  It's still supposition.

12               It's no more than.  I am not hooked by the argument

13   relative to the conspiracy incident.  I do not hook the

14   argument relative to the seizure at a school which my client

15   had dominion and control, even if not sole dominion and

16   control, on June 1.

17               With the rest of these, it is the most egregious form

18   of nonsense to suggest that based upon these calls, a starched

19   shirt, a Downy T-shirt and a ticket, that language, they found

20   not only that it was cocaine but that it was 500 grams.  Where

21   did this number come from?  Your Honor, I'm a pretty practical

22   guy.  I understand my limitations.  It sort of is what it is.

23               If I had any question about my limitations, I'll

24   observe to the Court that that sprained ankle that I troubled

25   the Court with for part of trial was no more serious than one I

1    did playing football in the years in Chicago in 1974.  There's

2    a little difference, of course, and that's 32 years.  And I

3    understand that being 50 ain't all it's cracked up to be or 49

4    when I did it, compared to being 18.  Maybe I'm not --

5              THE COURT:  Wait until I get to the Beatles level of

6    "When I'm 64", which is where I am now.  You got a long way to

7    go, baby.

8              MR. MONTEMARANO:  I'm going to submit to the Court --

9              THE COURT:  You will be suffering far more then than

10   you do now.

11             MR. MONTEMARANO:  Perhaps, Your Honor.  But it will

12   all be my fault.  What I would like to observe for the Court

13   is, just regarding count four, Your Honor, I've been on the

14   panel a long time and I've been told by more than one judge and

15   more than one prosecutor, I don't do a bad job.

16             Maybe I'm just not smart enough to do this because I

17   can't abstract 500 grams from this evidence, not even close.

18   Even if Your Honor's point is well taken, which it is not for

19   this defense attorney, but even if Your Honor's point is well

20   taken, "Well, you know, they're dealing drugs.  That's what the

21   conversation's about."  Where do you get what kinds of drugs?

22   Where do you get, and I'll do the math, we are not talking

23   where they're talking about 15, 16, 17 -- excuse -- where we're

24   talking eight or ten or 12, and that could have been testified

25   to by our expert sitting at the end of the table, that that's

1    the kind of price you pay in thousand of the a half key of

2    coke.

3          You know, we can abstract amounts from prices, or the

4    size of a container.  I remember some testimony during the

5    trial where, you know, "We seized wrappers and these are all

6    about the same size of what a kilogram wrapper is.  You know,

7    what would go inside of this would be about a key of cocaine.

8    And therefore we know that these 25 wrappers in John Martin's

9    back seat are 25 kilogram wrappers."

10         Okay.  Fine.  "There is no seizure amounts, Mr.

11   Montemarano."  I understand that.  I'm no fool.  The wrappers

12   test positive.  They they wrapped around cocaine.  From the

13   size of the wrapper you can figure out what the contents were,

14   the volume.  I mean that's like what, physics, or maybe math

15   from eighth grade or something.  I remember that.  It's been a

16   long time, but I do remember it.

17         But where on Count four can you give me 500 grams?

18   I'm clueless and I'm not going to belabor this because I'm sure

19   while my brother counsel have been very patient with my ranting

20   and raving through the ten weeks of trial would love to hear me

21   go on and on and on, you could apply this analysis to every one

22   of the enumerated specified counts.

23         In count eight, there is no language that's coded,

24   yet they find 50 grams of crack.  Count 14, we talk about a

25   hundred tickets, a 106 envelopes, 75, not a hundred, 75 plus

1    six between pages 81 and 87.  Based upon that, there is an

2    amount of heroin.  How do we know it's heroin?  I don't know.

3         Okay.  Ms. Levi dealt heroin most of the time, but

4    there was not just heroin seized from her home.  Once again,

5    beyond a reasonable doubt?  And it goes on and on.  Many of

6    these calls there is no coded language relative thereto.  I

7    mean, they deliberated, as I recall, about nine days or parts

8    of nine days.  What were they talking about?

9         I mean, did they spend eight and a half days talking

10   about Ms. Martin?  I guess, because they obviously gave no

11   consideration to the actual evidence adduced.  And I submit

12   that under the, in the cold light of a post-trial motion, what

13   the jury did and didn't do in meeting its obligations, for this

14   Court to determine, and I respectfully submit that in analyzing

15   that, the whole question of if they understood what a

16   reasonable doubt was, which I don't think they did because they

17   weren't instructed, notwithstanding our request.

18        But even if they understood it, they sure didn't

19   apply it.  And I submit for that reason, if it's going to

20   happen, Judge, this is as good a case as any.  I submit that

21   these defendants, mine in particular, were denied a fair trial

22   in a finding beyond a reasonable doubt, that a certain amount

23   of drug was possessed with the intent to distribute on a

24   certain day, in a certain amount, on half the charges.  And if

25   the Court would like, I will address each one of these one by

1    one.  But I don't think the Court wants to hear all that.  The

2    Court was here during the evidence.

3         If you look at, on count 29 -- Court's indulgence --

4    no cocaine.  It is a charge on the 26th of March.  There is no

5    amount of cocaine found.  It's a substance with a detectable

6    amount of cocaine, possession with intent.  But it's what I, in

7    my notes, it was a zero amount.  It was less than the 500 grams

8    under B 1(b) or the five kilograms -- one kilogram under B 1(b)

9    versus five kilograms under B 1(a), so it's less than a

10   kilogram.

11        We have at one point, on page 215, in the recalls on

12   that date, covering four pages, on page 215 there's a reference

13   to some size 8s.  How do we abstract an amount?  How do we

14   abstract -- remember size 8s, Sergeant Sakala has already said

15   he doesn't know whether it's an eighth, an eighth of what?  How

16   do we abstract that in three calls?  That's all you got on the

17   26th.

18        In some cases we have many, many calls.  Count 16,

19   March 17th, St. Patrick's Day, it's 500 grams of cocaine.

20   There are twelve calls covering 21 pages.  And if like, I can

21   get the language.  Page 116, there's a reference to $62.  By

22   the testimony of Sergeant Sakala, "Sixty-two, a curious number.

23   Could be referring to a 16th of a key, half of 125."  Okay.  So

24   it's a 16th of a key.

25        Well, on that date we have a conviction for a half

1    key.  Exactly how?  I don't understand.  And it goes on and on.

2            Count 45, there are three calls covering a total of

3    five pages.  I mean, there is just not enough evidence with

4    regard to specific charged incidents, because there would be as

5    much evidence of these as there is evidence of all the other

6    dates which were not charged.  And had the Government charged

7    each and every day of the conspiracy, arguably because of

8    overarcing conspiracy, the jury could have found certain

9    conduct, certain dates involved.

10            It reduces the overt acts of the conspiracy to a

11   nullity.  The Government is obligated to prove actual overt

12   acts in support of convictions on those specific overt acts.

13            As to the balance of my argument, Your Honor, I think

14   I've laid it out.  I think the Government has agreed that there

15   is a need to merge certain of the phone counts where there's a

16   phone count as charged regarding Ms. Martin on a certain date,

17   and another phone count that's charged on a certain date.

18            The jury instruction is not clear as to what specific

19   conduct.  There are numerous phone calls on a date.  I don't

20   believe under the language of the statute and the instruction,

21   that it is possible to convict a person of that offense more

22   than one time on a specific date in the way the indictment came

23   to the --

24            THE COURT:  Yeah.  It appears the Government agrees

25   with you that they should be merged for sentencing purposes, so

1    I will proceed on that basis of agreement between the parties.

2              MR. MONTEMARANO:  And as to the balance of my

3    argument, Your Honor, I think I've laid it out adequately in

4    writing.  If the Court has any questions, I'll be glad to

5    answer them.

6              THE COURT:  All right.

7              MR. MONTEMARANO:  But I think that I've said all I

8    need to say.

9              THE COURT:  Okay.

10             MR. MONTEMARANO:  Thank you, Your Honor.

11             THE COURT:  All right.  Any other counsel wish to be

12   heard?

13             MR. MARTIN:  Just briefly.  With respect to --

14             MS. JOHNSTON:  Your Honor, I'm going to object to Mr.

15   Goodwin being heard on this motion for new trial.  He did not

16   file a motion for new trial, so there's nothing pending as to

17   his client and the Court has nothing to decide.  There are very

18   strict rules when it comes to motion for new trial.  He hasn't

19   filed one so I don't think --

20             THE COURT:  Well, let me hear very briefly from him.

21   Mr. Martin.

22             MR. MARTIN:  Just want to say that with respect to

23   the argument regarding failure to give the instruction on

24   reasonable doubt at the conclusion of trial, or when we were

25   discussing the jury instructions, Mr. Goodwin did request an

1   instruction on reasonable doubt.  Your Honor declined and we

2   renew again our objection to the Court not having given that.

3           THE COURT:  Okay.

4           MR. MARTIN:  That's all.

5           THE COURT:  All right.

6           MR. HALL:  Other than to join in what Mr. Martin just

7   said concerning the reasonable doubt instruction, I have

8   nothing else.

9           THE COURT:  Okay.  Thank you. Mr. Mitchell.

10          MR. MITCHELL:  Same, Your Honor.  I have nothing

11  else.

12          THE COURT:  Mr. Ward.

13          MR. WARD:  Nothing to add, Your Honor.

14          THE COURT:  Mr. McKnett.

15          MR. McKnett:  Your Honor, I have in writing adopted

16  Mr. Montemarano's and I'll just renew that and adopt the

17  arguments he made.

18          THE COURT:  You also filed some additional --

19          MR. McKNETT:  I did, Your Honor.

20          THE COURT:  Do you want to be heard on that now?  I

21  think it would be most efficient just to have Ms. Johnston

22  respond to all of them, all the arguments, so you may proceed

23  with your argument.

24          MR. McKNETT:  Thank you, Your Honor.  Your Honor,

25  I'll be very brief.  I think I have in my written submission

1    laid out the basis for my argument concerning counts one, 44

2    and 56.  Again, I will adopt Mr. Montemarano's arguments,

3    especially but not limited to count 56.  I would like to make

4    one change in terminology in the written memorandum I

5    submitted.  Page six, at the last sentence in the first full

6    paragraph.

7                 THE COURT:  Wait a minute.  Wait a minute.  Let me

8    get it in front of me.  This is the latest filing?

9                 MR. McKNETT:  Yes, Your Honor?

10                THE COURT:  What page?

11                MR. McKNETT:  Page six, first full paragraph.

12                THE COURT:  Right.

13                MR. McKNETT:  The last sentence beginning "She was

14   seen going to the school."  I used the word "person."  "She was

15   seen going to the school from time to time, was the only person

16   who had access to the premises," and I'll give Mr. Montemarano

17   credit for this.  He pointed out that she was not the only

18   person who had access to the school, because John Martin also

19   had access.  So, I would like to change the word "person" to

20   "defendant".  She was the only defendant in this case who had

21   access to the premises.

22                THE COURT:  Defendant on trial or defendant --

23                MR. McKNETT:  Defendant on trial would be better

24   terminology.

25                THE COURT:  I think he is a defendant.

1          MR. McKNETT:  He had been at one point.  He was a

2     defendant that didn't go to trial.

3          THE COURT:  All right.  Okay.

4          MR. McKNETT:  With regard to count one and count 56,

5     specifically with reference to quantities, I did address that

6     in my written submission, but Mr. Montemarano used a phrase

7     that I wish I had thought of, that the jury's verdict with

8     regard to quantities, particularly with count 56, which I

9     believe is a finding which underlies the quantities they found

10    with regard to count one, was superstition -- not superstition,

11    supposition and guesswork because the jury had to suppose that

12    the drugs found in the school on June 1st were taken there on

13    May 16th.

14         It's a more than two week timeframe.  There were no

15    surveillances at the school during that timeframe.  There were

16    surveillances of Ms. Martin, I believe, but no surveillance at

17    the school.  There was no search of the school before May 16th

18    to see whether or not in fact there were already drugs in the

19    school.

20         The jury's verdict, particularly with regard to

21    quantities, is based on supposition stacked on top of

22    supposition.

23         THE COURT:  Well, didn't the jury have before it and,

24    my memory will probably fade quicker than most on this, but

25    didn't the jury have before it information that at the

1    particular time in question there had been concerns raised by

2    neighbors in Tacoma Park, things were getting hot, police

3    activity, and testimony was before me indicating that Ms.

4    Martin needed to move things to the school, get them away from

5    there and get them to the school.

6           And there's a pretty significant record developed of

7    the nature and scope of the drug transactions taking place up

8    until the time the relocation of the business and its inventory

9    to Paulette's School.  Isn't that all before this jury?

10          MR. McKNETT:  It is before the jury, Your Honor, and

11   I addressed that in my written submission.  I think it's

12   important for the Court to take note that when Ms. Martin was

13   telling people that she was moving her business to the school,

14   she did not tell Ms. Ali that.  She told, as I pointed out in

15   my written submission --

16          THE COURT:  Well, why does she need to tell Ms. Ali

17   that?

18          MR. McKNETT:  Well, it goes to the basis of what Ms.

19   Ali knew that she was doing on May 16th.  If Ms. Ali did not

20   know on May 16th that Ms. Martin was recruiting her to help

21   move drugs to the school, then there is no basis to find her

22   guilty.  As the Court instructed the jury, even if you do

23   something that furthers the conspiracy, if you don't know what

24   is an otherwise legal act is in fact furthering the conspiracy,

25   then you can't be found guilty of it because you have no

1  knowledge, you have no guilty knowledge.  And that's my

2  argument with regard to count one and count 56, which I

3  believe -- more accurately count 56, which is the count that

4  focuses specifically on May 16th.

5        On May 16th Ms. Martin, in the conversations that

6  I've outlined in my memorandum, told, for instance, John Martin

7  she was going to move those tickets and everything to the

8  school.  Tickets, as we heard from the Government's witnesses,

9  was a code word for drugs, not necessarily a specific drug but

10  a code word for drugs generally.

11        She told Ms. Harden that she closed the shop down

12  because of the neighbor meeting and the neighbor concern about

13  traffic in and out of the house, and the traffic had nothing to

14  do with the tickets, she would be having her shows at the

15  school.  She told Ms. Dobie "What little tickets I did have, I

16  took them to my business," meaning the school.

17        She told George Harris "I stopped everybody from

18  coming here, so people just have to catch me at the school."

19  Clearly, if the jury accepts the Government's versions of what

20  those words mean, the business, the tickets, the shows, as drug

21  references then it's extremely important to look at what Ms.

22  Martin told Ms. Ali on May 16th.  She said that she wanted Ms.

23  Ali to help her take something to the school.  Something is not

24  any word that would raise a suspicion that it is drugs.

25        Something could be boxes of clothing.  Something

1   could be bags of anything.  When Ms. Ali arrived at Ms.

2   Martin's house, the Court will recall, she was in and out of

3   Ms. Martin's house within minutes, because the bags were

4   already packaged up.  Whatever was in them was in the bags.

5        Ms. Ali did not help load the bags.  All she did was

6   carry them to her vehicle, drive Ms. Martin and the bags to the

7   school and help her carry them in.  And even carry them in is

8   an assumption, because there was no surveillance at the school

9   at that point.

10       But that, even assuming that Ms. Ali knew there were

11  drugs in the bags, and there is no evidence to support that

12  supposition, there is no evidence to support a finding of

13  quantities of drugs at all.  Ms. Martin herself, in those

14  conversations, talks about "What little tickets I did have."

15  In the school, significant quantities of drugs were found:

16  Heroin, powder cocaine, crack cocaine.

17       There was no evidence refuting a reasonable argument

18  that Ms. Martin, John Martin, someone else could have taken

19  quantities of drugs into the school after May 16th.  There is

20  no evidence that would refute the reasonable assumption that

21  there were drugs in the school before May 16th.

22       The only connection the Government made was a

23  shopping bag, a department store shopping bag that was found in

24  the school on June 1st that resembled a shopping bag that was

25  taken out of Ms. Martin's house on May 16th.  The mere presence

1    of a department store shopping bag, which I think it's fair to

2    state, are probably produced in the hundreds of thousands is

3    simply insufficient, not just to find somebody guilty beyond a

4    reasonable doubt of participating in the movement of drugs from

5    one location to another, it is certainly not a sufficient basis

6    for a finding of a specific quantity of drugs, and that's what

7    the jury did.

8           The jury said that because specific quantities were

9    found on May 16th, that beyond a reasonable doubt, they were

10   taken thereby Ms. Ali on May 16th, and there is simply no basis

11   for the jury to make that finding beyond a reasonable doubt.

12   At worst the jury could, and I don't think beyond a reasonable

13   doubt, but at worst the jury could make a finding that Ms. Ali

14   helped take Ms -- helped Ms. Martin take some quantity of drugs

15   to the school, and even that's a stretch, because there's no

16   evidence from which the jury could find beyond a reasonable

17   doubt that Ms. Ali knew that, first of all that Ms. Ali had any

18   reason to suspect that there were drugs in those bags, let

19   alone know it.

20          Because of that the jury's findings about quantities

21   must be set aside at minimum, and I would argue that because of

22   the speculative and -- the speculative nature, the supposition

23   and guesswork involved in reaching the conclusions the jury

24   did, the verdicts themselves cannot stand.

25          THE COURT:  All right.  Ms. Johnston.

1          MS. JOHNSTON:  Your Honor, I don't -- I know that the

2     Court noted that Mr. Ward had filed a motion to adopt the

3     motion for new trial filed by Mr. Martin that I believe the

4     Court referenced was filed on September 14th.

5          The Government would argue that that motion is out of

6     time.  Under Rule 33 a motion for new trial must be filed

7     within seven days of the verdict, setting forth the grounds.

8     That motion was not filed within that time period, so I would

9     ask the Court to deny that motion on that basis, in addition to

10    the fact that, if the Court wants to reach the substance,

11    certainly there was sufficient evidence to support Ms. Dobie's

12    conviction on the counts on which she was convicted.

13         But Rule 33 is a strict time limit requirement.

14    Counsel did not seek grounds to get the time extended within

15    the seven days, so I would ask the Court to dismiss Ms. Dobie's

16    motion to adopt the motion for new trial as it not being timely

17    filed, having been filed on September 14th.

18         In terms of Ms. Ali, again, people like to use the

19    word "supposition".  There was more than abundant evidence in

20    this case to establish Ms. Ali's involvement in the drug

21    conspiracy.  Ms. Ali admitted her involvement with Ms. Martin

22    over a period of years of buying drugs from her, of being a

23    frequent visitor at her house, of meeting other individuals.

24         In reference to the two counts surrounding May 16th,

25    or the count surrounding May 16th, counsel doesn't mention the

1   call to Ms. Ali "Saying leave your husband at home."  Don't

2   mention the fact that "If Jackie asks you what you're doing

3   here, to give her a story about why you're here."

4         The surveillance observed and, in fact, there is a

5   videotape that was introduced showing her assisting Ms. Martin

6   locate -- putting those bags in the vehicle, and then a

7   photograph of them leaving the store, taken by the surveillance

8   agent who arrived after they had already entered the store.

9         In addition to that, there was evidence before the

10  jury that Ms. Martin stopped getting heroin, couldn't get any

11  more heroin once Ms. Levi was arrested the end of April, that

12  Mr. Mangual didn't have any drugs, any cocaine, that there was

13  difficulty getting cocaine during May of 2004.

14        So, if anything, the drugs recovered at the school on

15  June 1st were less than what was taken there, so it was fair

16  for the jury, given the similarity and description of the

17  packages, given the nature of those calls and the drugs

18  recovered, to reach the drug quantity conclusions that they

19  did, and certainly to support their finding of involvement by

20  Ms. Ali.

21        There was one comment.  Counsel made a big to-do to

22  change his motion to say that John Martin, Jr. had access to

23  the school.  There was absolutely no evidence before this jury

24  that John Martin, Jr. had access to the school without going

25  through Ms. Martin.  I think it's immaterial, but I'd just like

1    to note that for the record.

2           In term of Ms. Martin's motion, Your Honor, one

3    doesn't look at evidence of a particular count in isolation of

4    the other evidence.  Certainly, you consider the counts

5    individually and this jury did just that.  If the Court will

6    recall, with certain counts in fact, Ms. Martin they found not

7    guilty of a count of telephone use, so this jury very much

8    distinguished defendants.

9           They found varying drug quantities involved in the

10   conspiracy for different defendants based on their

11   consideration of the evidence.  And they found the defendant

12   Ms. Martin guilty of possession with intent to distribute for

13   her distribution to Ruby Harden but were hung in terms of being

14   able to reach a verdict as to Ms. Harden.  That verdict of

15   guilty based upon the telephone calls, the ledger, the checks

16   that showed checks being paid in the amount of $125, which

17   Agent Sakala testified as well as I think other agents, that

18   125 was a typical price paid for an eigh ball, and the

19   observations of the actual distribution sufficient to support

20   her conviction for possession with intent to distribute that

21   quantity.

22           Counsel mentions the quantity of 500 grams or more.

23   That was based on Agent Sakala's testimony that Ms. Martin was

24   getting a kilo from Mr. Mangual.  The one box of envelopes,

25   certainly if you looked at that in isolation, maybe she just

1    was asking him for a box of envelopes because she ran out of

2    envelopes but when you look at that call in conjunction with

3    all of the other calls, it is very clear that she wasn't

4    getting envelopes, she wasn't getting boxes of oranges, she

5    wasn't getting autobiographies.  She wasn't getting Verace

6    sunglasses.  She was getting cocaine and the officers testified

7    to that fact.

8            And, indeed, Ms. Ali admitted, you know, she was

9    getting cocaine so there's no doubt Ms. Martin was dealing

10   cocaine during those time periods.

11           I don't belabor the point.  It is clear that this

12   jury understood the evidence.  It is circumstantial evidence.

13   Counsel uses the example of a serial killer.  Well, you don't

14   have to have the body or even the cause of death to convict

15   someone of homicide and that is what this case, in terms of

16   each one of those counts there was evidence, actual

17   conversations, the surveillance, the drugs that were recovered,

18   all sufficient for this jury to conclude that Ms. Martin was

19   guilty of each one of one those substantive counts in the

20   quantity, in a quantity above the quantity charged in the

21   indictment as they found.  We would ask the Court to deny the

22   motion for new trial.

23           THE COURT:  Any reply?

24           MR. MONTEMARANO:  Very briefly, Your Honor.

25           MR. MONTEMARANO:  Ms. Johnston, Ms. Greenberg and

1  their team of investigators did what I believe is an admirable

2  job of assembling evidence and presenting it to the jury.  Is

3  is sad, therefore, at this late date that the Government's

4  arguments reduce themselves to the parcel.

5       Ms. Johnston argues that "We had this conversation

6  about a box of envelopes."  Gee, maybe she was dealing with Mr.

7  Mangual and wanting a box from him.  I'm not aware there is any

8  evidence or any suggestion by the defense that Mr. Mangual

9  owned a Barnes and Nobel or Staples franchise, and there has

10  been no suggestion by me that that specific call, or that kind

11  of call was not drug related.  We have not presented evidence

12  to the contrary.

13       There is doubt about that, but because of the massive

14  number of calls of similar nature over time, the jury made a

15  decision concerning the conspiracy.  That's their decision.

16  Whether or not I agree with it, I can understand it and I have

17  not made an argument concerning the conspiracy.

18       But the fact that a particular call on a particular

19  date raises Chris Sakala's hackles does not permit him to say

20  "That's a drug deal of this kind of drug in this amount."

21  That's nonsense, and I would like to turn the argument around,

22  if I might.

23       What the Government's argument is, in essence is

24  because we know Ms. Martin is involved in a drug conspiracy

25  over time based upon this huge arc of calls, we therefore can

1    say that a specific call is drug related.  That is as

2    ridiculous, I submit, as the course of conduct for between ten

3    and 50 years, where there were allegations made by young man

4    after young man after young man that he was being sexually

5    abused as a minor by a priest and nobody wanted to believe it

6    was possibly true until we found out it was so true that it

7    shocks the conscience and not only is it true for numerous

8    individual priests but numerous dioceses ––

9           MS. JOHNSTON:  Your Honor, I must object to this

10   argument.

11          MR. MONTEMARANO:  –– across this country were

12   involved in covering it up.

13          THE COURT:  Well ––

14          MR. MONTEMARANO:  Nobody wanted to believe it because

15   ––

16          THE COURT:  Go back to talking about this case.

17          MR. MONTEMARANO:  Well, Your Honor, the point is

18   nobody wanted to believe it because of the nature of the person

19   being accused.  And this is the exact opposite.  We have

20   someone we are very sure is involved in a conspiracy, therefore

21   we can address from that, we can abstract from that, excuse me,

22   we can abstract from that that she is guilty of specific

23   conduct on a specific date.

24          It does not work.  It does not work any more than

25   because of the person charged we can't believe that plain

1    evidence which is before us in huge amounts.  I submit that you

2    cannot convict Paulette Martin of specific conduct because of

3    what you believe she has been doing over a period of time, that

4    there must be specific seizures, which we have in Count 62, or

5    specific conduct supported by specific facts.

6         If there were repeated calls using only a certain

7    kind of language, talking about only certain amounts, we could

8    therefore abstract what kind of drug.  You know, the classic

9    example in Baltimore, the Court may or may not be aware, is

10   "boy" and "girl" for heroin and cocaine.  Routinely that's the

11   language used.  And if boy and girl was used and a police

12   officer comes in and testifies "Guy's out there yelling 'Boy,

13   Boy,'" well I know what he's talking about.

14        That's a different kind of story.  Likewise, if

15   they're discussing certain amounts, and they're within the

16   realm of numerical probability that this is what you pay for

17   this kind of drug and, of course, there are some fluctuation

18   in, you know, the free market, but if we're talking, case in

19   point, Your Honor, I had a client in another case in this court

20   who took a plea not long before this case began, and he was on

21   the phone with another participant in the conspiracy and he

22   said "Well I'm like on 47th street," and the person responded

23   "And I'm on 44th Street," and the person responds "No, you're

24   on 47th Street," and then a stunning bit of evidence, in my

25   view, the response is "No.  You're on 45th and a half Street."

1          You know, Judge, I don't know of any 45th and a half

2     Street anywhere.  That was negotiating about 2-kilograms of

3     cocaine and for a price of between $44 and $47,000 and for a

4     final agreement of 45 and a half thousand dollars.

5          With that and an experienced police officer coming

6     and testifying about it, I could understand where the jury is

7     coming from, but words like "supposition" and "guesswork" just

8     scratch the surface here.  What kind of drug, what kind of

9     amount on a specific date is just not before us and for that

10    reason I submit all 15 of those counts fall of their own

11    weight.  Thank you, Your Honor.

12         THE COURT:  All right.

13         MR. WARD:  Simply wanted to respond to Ms. Johnston's

14    comment about the supposed late filing.  It has been my

15    understanding, and was my understanding throughout this trial

16    and I think it was discussed on the record many times that a

17    motion filed by one is deemed to be filed a motion by all

18    unless the others opt out.

19         So, the letter I sent on September 13 is simply an

20    embodiment of what I understood to be the, if you will, Rule in

21    this case with regard to filing of motions.

22         THE COURT:  All right.  Mr. McKnett.

23         MR. McKNETT:  Your Honor, Ms. Johnston said that I

24    didn't mention the call in which Ms. Martin told Ms. Ali to

25    leave your husband at home and told her further to give a cover

1   story to Jackie.  Well, I did mention that call.  That the call

2   in which Ms. Martin told Ms. Ali that she wanted help moving

3   something to the school.  And I think it's important to note

4   not only did she use the word "something" instead of tickets,

5   business, other stuff, other words that she used with regard to

6   other members in the conspiracy.

7       The only reason she called Ms. Ali at all that day is

8   she didn't have a car.  John Martin had her vehicle and the

9   transcripts and the records shows that.

10      THE COURT:  But wasn't the jury entitled to infer

11  something was up in the sense that she says don't tell your

12  husband and let's do a nice cover store for Jackie.  "I need to

13  move something," and that something she was going to move, if

14  it is an innocent thing to move, why wouldn't she tell her

15  husband or why wouldn't she come clean and tell Jackie what's

16  going, if she needed help to move some clothing.

17      MR. McKNETT:  It might have been a reasonable

18  assumption for the jury to make with regard to what Ms. Martin

19  was saying, that Ms. Martin may have been trying to hide

20  something, but Your Honor --

21      THE COURT:  The conversations, I mean the statements

22  made by Ms. Martin to Ms. Ali obviously were her statements,

23  not your client's, but it does indicate that there was

24  specifically communicated to your client the notion that what

25  Ms. Martin wanted her to help her was something she was doing

1    surreptitiously, right?

2              MR. McKNETT:  Not necessarily, Your Honor.

3              THE COURT:  Well --

4              MR. McKNETT:  I'm married, and I have been told by my

5    wife more than once that a friend of her is coming over and I'm

6    staying home.  There is nothing suspicious in one friend

7    telling another friend "I want you to do something with me and

8    don't bring your husband."  There is nothing suspicious in that

9    at all.  And as for as telling -- tell Jackie some story, well,

10   the evidene was clear that Jackie was nosey.  Jackie was always

11   trying to find out was going on.

12             And there was evidence in the transcripts that Ms.

13   Martin and Ms. Ali talked about that and complained about

14   Jackie trying to find out what was going on, just sticking her

15   nose into other people's business.

16             That doesn't -- those two statements standing alone

17   as they do, combined with the phrase "Help me take something to

18   the school," and in the background of Ms. Martin not having her

19   own car and needing somebody to drive, does not and cannot

20   under any circumstances allow a jury to find beyond a

21   reasonable doubt that Ms. Ali knew she was being recruited to

22   move drugs.

23             Those statements and those circumstances simply

24   didn't allow that.  A jury might be suspicious.  The jury might

25   think that something was up, but there is no basis for the jury

1    to find beyond a reasonable doubt that Ms. Ali knew or should

2    have known that Ms. Martin was up to something involving drugs.

3           And the fact that this took place, this event on

4    May 16th took place against a background of other drug dealings

5    between Ms. Ali, drug purchases by Ms. Ali from Ms. Martin,

6    doesn't lend any weight at all to that supposition, the

7    suspicion.  This is simply, as Mr., the phrase that Mr.

8    Montemarano used, she did it before, she must be doing it now.

9    The jury is not allowed to make that kind of a broad

10   assumption.

11          There must be a factual basis beyond a reasonable

12   doubt for every guilty verdict and there simply isn't any.

13   Even if the Court, even if I were to assume, and I'm not

14   admitting this, even if I were to agree that Ms. Ali knew or

15   should have suspected that Ms. Martin was doing something

16   illegal, there is absolutely no facts, no evidence in the

17   record to support a finding with regard to specific drugs such

18   as heroin, powder and crack and certainly no evidence, no facts

19   in the record to support a finding that on May 16th specific

20   quantities of drugs were being moved.  It's simply not there.

21          At worst, and I don't admit this, but at worst the

22   jury could make a finding that Ms. Ali should have asked more

23   questions and therefore was involved in moving drugs, but not

24   as to specific drugs, not as to specific quantities.

25          Ms. Johnston says "Well, there must have been more

1    drugs than were found on May 16th," as if she's giving Ms. Ali

2    some sort of a break.  There isn't any evidence of specific

3    quantities in those bags on that day.  Ms. Johnston points out

4    that because the Government didn't find any other sources,

5    there couldn't have been any other sources, that Ms. Martin was

6    complaining about the sources drying up.

7         Well that's –– Ms. Martin –– Ms. Johnston is saying

8    that Ms. Martin is telling the truth in those conversations and

9    therefore the Government can rely on the truth of what Ms.

10   Martin was telling other people.  And that –– and by the

11   Government relying on the truth of what Ms. Martin was saying,

12   Ms. Ali is guilty.  It doesn't work that way, Your Honor,

13   because the record shows that Ms. Martin repeatedly told people

14   things that were not true and the Government's witnesses

15   testified to that.

16        Ms. Martin talked, from the transcripts, about going

17   to Philadelphia.  Never happened.  She talked about several

18   things as if they were facts, and they didn't happen.  She said

19   that major R and B performers were stopping by her house.

20   There is no evidence to support that.  But the Government wants

21   to pick one conversation and vouch for that one conversation

22   and make that the basis for the conviction of Ms. Ali.

23        The Government did not address my argument that there

24   could have been drugs in the school before May 16th.  There is

25   no way to establish what was in that school before or what was

1    taken into that school after May 16th.  There is no evidence

2    upon which any reasonable jury, any rational jury could find

3    beyond a reasonable doubt that Ms. Ali on May 16th moved

4    specific drugs in specific quantities to the school.

5                THE COURT:  All right.

6                MR. HALL:  Your Honor, if I may interrupt for a

7    moment.  My client needs an opportunity to use the bathroom.

8    This particular argument does not involve him.  He will waive

9    his presence, if it is possible to have him taken back.

10   Apologize, Your Honor but --

11               THE COURT:  All right.  Mr. Whiting, you understand

12   you have a right to remain present in the courtroom?

13               MR. WHITING:  Yes, sir, I do.

14               THE COURT:  You desire to absent yourself?

15               MR. WHITING:  Yes, sir.

16               THE COURT:  And you're waiving your right to be

17   present?

18               MR. WHITING:  Yes, sir.

19               THE COURT:  All right.  You can take him out,

20   Marshal.

21               (Mr. Whiting left the courtroom.)

22               THE COURT:  The verdict in this case was received by

23   the Court on September 5th and under the Federal Rules of

24   Criminal Procedure, post-trial motions of the nature in this

25   case were required to be filed in seven days and the Government

1  argues that the post-trial motions filed oh behalf of Lavone

2  Dobie was filed outside the seven day period.

3           MS. JOHNSTON:  Your Honor, if I might correct the

4  Court, the verdict was returned by the jury on August 31st,

5  2006.

6           THE COURT:  I'm sorry.  August 31st.  Excuse me.

7           MS. JOHNSTON:  Entered on to the docket --

8           THE COURT:  I'm not looking at the right date.

9  Excuse me.  The date was what?

10          MS. JOHNSTON:  August 31st.

11          THE COURT:  August 31st.  Excuse me.  You're right.

12          MR. MONTEMARANO:  We would agreed with that, Your

13  Honor.

14          THE COURT:  Now, your argument was that it should

15  have been filed by what date.

16          MS. JOHNSTON:  Within seven business days of that

17  date, which would have went I think September 12th, if my math

18  is correct.  Of course, Mr. Montemarano, who is the math genius

19  here, can correct me if I counted seven incorrectly.

20          THE COURT:  Seven, well, let me put my calendar in

21  front of me.

22          MR. MONTEMARANO:  The Government keeps holding me to

23  such a high standard that I cannot meet, Your Honor.

24          THE COURT:  I have a calendar, so --

25          MR. MONTEMARANO:  I would have seven as being the

1   12th as well, the Court being closed on Monday, the 4th.  That

2   would be Friday the 1st, Tuesday through Friday, the 5th

3   through 8th, that would be five days.  Day 6 would be Monday,

4   the 11th.  Day 7 would be Tuesday, the 12th.  Ms. Johnston is

5   correct, Your Honor.

6           THE COURT:  Yes.  Okay.  I misspoke when I said the

7   15th.  I meant August 31 was the verdict day, so seven business

8   days, counting the method used when the limitation is that

9   short a duration would require that the motion on behalf of Ms.

10  Dobie be filed by September 12th.  And the motion filed by

11  counsel for Ms. Dobie was filed on September 14th, which makes

12  it out of turn.

13          I have heard Mr. Ward's argument that he believed we

14  were proceeding under the rule that I adopted at the beginning

15  of trial that a motion by one is a motion by all and an

16  objection by one is an objection by all.  I believe that my

17  ruling in that regard was relating to the filing of or making

18  of motions during the course of trial and not with respect to a

19  motion of this nature, and I don't believe there was really any

20  ambiguity in that regard, so I will with respect to Ms. Dobie's

21  motion, conclude that it is out of turn.

22          I will not, however, rest my decision with respect to

23  Ms. Dobie on that ground alone, because I will address the

24  merits alternatively with respect to Ms. Dobie, and let me do

25  that now with respect to all of the defendants who have raised

1    motions, post-trial motions.

2              The -- two defendants have been the principal or

3    three, three defendants have specifically addressed arguments

4    to me or have joined that is in the post-trial motions, Ms.

5    Martin, Ms. Ali, and I just mentioned Ms. Dobie.

6              There are no other defendants who joined in the

7    post-trial motions filed by Mr. Montemarano.  I have had

8    specific arguments made to me with regard to the factual

9    circumstances by Ms. Martin, and by Ms. Ali.  There were not

10   specific circumstances brought to my attention by counsel for

11   Ms. Dobie, but I will assume that essentially the same

12   arguments have been made, which go to the sufficiency of the

13   evidence.

14             Under the applicable standard a verdict or series in

15   this case of verdicts reached by the jury in this case should

16   be sustained if any rational trier of fact viewing the evidence

17   in the light most favorable to the Government could find the

18   essential elements of the crime beyond a reasonable doubt.

19             I occupied this courtroom for almost the entire

20   summer and listened to extensive testimony presented by the

21   Government, as well as the evidence presented by the defense.

22   The jury in this case took a fairly substantial amount of time

23   to go through a very extensive verdict sheet and did not simply

24   come in with across the board guilty verdicts.

25             There were some not guilty verdicts.  There was

1    inability to reach a verdict on one defendant.  There were very

2    specific verdicts on the various charges against the various

3    defendants, and the jury obviously proceeded in a thoughtful,

4    careful and thorough basis, sifting through the massive amount

5    of evidence that was before it.

6         I conclude on the basis of the evidence that was

7    presented to this jury that it has more than an adequate amount

8    of evidence on the basis of which, as a finder of fact, it

9    could rationally reach the verdicts that it did.  I do so

10   viewing the evidence as I must in the light most favorable to

11   the Government.

12        Yet it appears to me that the argument of the defense

13   is that I should view evidence with regard to specific dates in

14   isolation, and I decline to do so.  This jury had before it a

15   very substantial amount of evidence, some of it circumstantial,

16   some of it direct, but evidence from which they rationally

17   could and did conclude based upon the evidence that the

18   verdicts of guilty that they returned were appropriate.

19        And I do not believe that the arguments raised by the

20   defense is sufficient to overcome or meet, that is, the

21   standard that I am required to follow in examining and deciding

22   a post-trial motion of this nature.

23        Ms. Ali, for example, contends that the evidence was

24   insufficient to support her conviction under Count 56, and yet

25   the fact is that the testimony and evidence before this Court

1    indicated that the surreptitious and clandestine nature of the

2    activity of that date was communicated to her specifically by

3    Ms. Martin, including making certain that her husband was not

4    home and deceiving Jackie Terrell, the other occupant of Ms.

5    Martin's house.  And I conclude that this is more than

6    sufficient evidence from which a jury could infer the nature of

7    the activity was being engaged in and that there were

8    significant quantities of drugs being moved from Maryland to

9    the District of Columbia.

10            I have already indicated, but I will repeat it, that

11   Ms. Martin's arguments with respect to the merger of counts for

12   sentencing is one that the Government agrees with, and

13   accordingly I will merge the counts at issue for purposes of

14   sentencing, and I believe that would mean that the counts that

15   are merged for sentencing purposes are counts five and seven,

16   11 and 12, 13 and 15, 17 and 18, 20 and 21, 27 and 28, 30 and

17   32 and 46 and 47.  If I've missed something, please let me

18   know, but I will enter an order that says that for sentencing

19   purposes those counts should be considered merged.

20            By the way, I don't think I mentioned this when I

21   reviewed the counts at the beginning, but Mr. Goodwin, I think

22   I did, filed a motion for return of property and I consider

23   that motion to be premature and I will deny it without

24   prejudice.  I mean, to the extent that it is addressing the

25   forefeiture matter that we'll address shortly, I'll consider it

1    in connection with that.

2         So for those reasons I'll deny the motion of Ms.

3    Martin which is, or are docketed at 953 and 995, that's the

4    original motion, and then the supplemental motion.

5         With regard to Reece Whiting, I already indicated I'm

6    going to hold on to the Motion For Downward Departure and

7    decide that at the time of sentencing.

8         Mr. Bynum has filed no post-trial motions.

9         Ms. Dobie has filed, at 955 the motion to adopt

10   motions of other defendants.  I'm going to deny that for the

11   two reasons that it's out of turn and, secondly, that the, to

12   the extent that it is timely, that the motion is without merit

13   for the same reasons I just indicated with respect to Ms.

14   Martin.

15        With respect to Lanora Ali, I will deny her motion at

16   tab number 952 for reasons that I have just indicated.

17        I believe that disposes of all post trial motions.

18   Have I missed any?

19        MS. JOHNSTON:  No, sir.

20        THE COURT:  All right.  Counsel, let me ask you this;

21   what amount of time does the Government anticipate will be

22   required to deal with the forefeiture allegations?

23        MS. JOHNSTON:  Your Honor, the Government intends to

24   call Task For Officer Thomas Eveler to testify concerning the

25   value of the drugs that were testified to by various witnesses

1    during the course of this trial, and also to call IRS Agent Ken

2    Oland to testify as to the matters that the Court didn't allow

3    us to introduce in rebuttal, which is summary charts of the

4    bank records showing the amount of cash that went into Ms.

5    Martin's various accounts.  So direct examination of Mr. Oland

6    maybe will take 30 minutes, Mr. Eveler may take 45.

7              THE COURT:  All right.  First of all, do counsel and

8    the defense intend to call witnesses on this issue?

9              MR. MONTEMARANO:  No, Your Honor, on behalf of Ms.

10   Martin.  But I have two preliminary matters, actually three

11   preliminary matters.

12             THE COURT:  Let me just get the scheduling question

13   out of way.  No defendant intends to call a witness on the

14   forefeiture allegations of the Government, is that correct?

15             MR. MARTIN:  Mr. Goodwin does not.

16             MR. HALL:  No, Your Honor.

17             MR. MITCHELL:  No, Your Honor.

18             MR. WARD:  That's correct, Your Honor.

19             MR. McKNETT:  No, Your Honor.

20             THE COURT:  All right.  I anticipate there will be

21   spirited cross-examination, so you can take that into account.

22   Now, what were your three preliminary matters?

23             MR. MONTEMARANO:  Well, Your Honor, the spirit of

24   cross-examination pre-supposes that the Court will permit the

25   other agent, Mr. Oland, to testify.  There has been no notice

1   to the defense in any way, shape or form in the time since the

2   verdict was returned that the Government intended to aduce

3   evidence regarding this, nor has there be any filing by the

4   Government establishing to the Court or to the defense what its

5   theory for the seizure of these assets is, so we are at this

6   time clueless.

7          I mean, is this a suggestion that these are proceeds

8   of narcotics activity?  Certainly Mr. Eveler, excuse me,

9   Sergeant Eveler could testify regarding that.  Is this, are

10  these assets that were used to facilitate?  Once again, perhaps

11  Sergeant Eveler could testify to that, and he has testified

12  about related matters already in this trial.

13         Or is the Government now proceeding at this eleventh

14  hour 59 minutes on the theory of substitute assets?  We have

15  not had any of that established to us.  I was anticipating at

16  some point in advance of this hearing today that the Government

17  would make some sort of case relating to this and establish or

18  identify, I should say, witnesses to support this.

19         THE COURT:  Well, isn't their time to do that now?  I

20  mean, we went to trial and at the beginning of the trial, which

21  was set to hear everything, by agreement of all parties we

22  bifurcated it into two parts and the defendants waived a jury

23  and we're here today to now do the second half of trial,

24  correct?

25         MR. MONTEMARANO:  Correct.

1          THE COURT:  All right.  Have you not previously been

2     provided with whatever information you believe you're entitled

3     to with respect to the forfeiture when we began this trial?

4          MR. MONTEMARANO:  I don't believe so in terms of

5     identifying the nature of the assets, not the nature of the

6     assets, not the specific assets.  We received a vast amount of

7     bank information and deposit information.

8          THE COURT:  All right.  Any other --

9          MR. MONTEMARANO:  A theory under which the Government

10    chooses to proceed, it has not identified in the indictment, I

11    submit.

12         THE COURT:  Any other preliminary matters?

13         MR. MONTEMARANO:  No, Your Honor.

14         THE COURT:  Ms. Johnston, any response?

15         MS. JOHNSTON:  Only that the forfeiture allegation in

16    the indictment specifically says that we want to forfeit the

17    property obtained directly or indirectly, any property used or

18    intended to be used in any manner or part, to commit or

19    facilitate the commission of the conspiracy.  And then we have

20    asked for $10,200,000 in U.S. currency and then specific

21    personal real property, listing each one of the accounts.  And

22    finally indicate that we wish to seize things as substitute

23    assets as well.

24         I don't know that substitute assets is something for

25    this Court to decide at this time.  The Court is to determine

1    what is the amount to be forfeited in terms of the amount of

2    currency we've asked to be forfeited, $10 million --

3            THE COURT:  Right.

4            MS. JOHNSTON:  -- and then as to the specific items,

5    as to whether or not they can be forfeited criminally.  In the

6    event that they were, they contain any part of proceeds that

7    were used in any manner to facilitate this offense, then they

8    would be subject to criminal forfeiture.

9            Alternatively, once the Court enters the judgment for

10   the currency amount representing the $10 million, then if we're

11   unable to satisfy it, we may ask the Court to forefeit items as

12   substitute assets, but right now we've asked for the items

13   listed here to be forfeited under the crimial forfeiture

14   statute as set forth in the indictment.

15           The charts that I'm going to use with Mr. Olin are

16   our summary charts from bank records.  We have provided those

17   to defense counsel.  The two primary ones are CH 16 and 16A and

18   CH 17.  We remarked them as forfeiture exhibits for purposes of

19   this hearing.  And we have some other calls that we may be

20   playing.  All matters that were disclosed during discovery and

21   didn't know that there was -- there was no request made of the

22   Government for any specifics prior to this hearing.

23           THE COURT:  Okay.

24           MR. MONTEMARANO:  Actually, Your Honor ruled a long,

25   long time ago, I think back in the spring, June 5th give or

1    take, witnesses will be identified at least 24 hours before

2    their appearance.  I didn't get anything yesterday.  I didn't

3    get anything Friday.

4            THE COURT:  Well, that's --

5            MR. MONTEMARANO:  With all due respect, Your Honor,

6    if they're goingn to call witnesses, I think it's incumbent

7    upon them to identify them to us so that we can prepare.  I

8    brought those specific banking records because I'm not an

9    idiot, but as observed by some of the other defense counsel

10   here, none of us brought our entire file.  If I had brought

11   just those banking records, I'd have doubled what I was

12   carrying, all the paperwork on all the various --

13           THE COURT:  Any specific thing that you feel you're

14   concerned about when a witness gets called, let me know and

15   we'll address it.

16           All right.  Counsel, let me tell you what I'm going

17   to need to do.  I have a very important meeting at 3:00 that I

18   cannot avoid going to.  What I'm going to do is take a break

19   for lunch now.  We'll return, we will grind along until just

20   before 3:00.  If we are not finished at 3:00 I'm going to have

21   to either carry over to another day, hopefully I won't have to,

22   or we will resume after my meeting finishes, but I have, as you

23   recall from this summer's surgery, I have a physical therapy

24   appointment at 5:30, which means I have to be out of here by,

25   like 4:30.

1           So, we will have to deal with it.  We did get off to

2     a slow start today for long and complicated reasons that I

3     won't go into but, so we're running a little bit behind where

4     I'd like to be to get this done.

5           So, I would like to take a shorter than normal recess

6     for lunch so hopefully we can get this thing done by 3:00, so

7     it's five minutes after 12:00 from the clock that I'm looking

8     at in the back of the courtroom, so synchronize your watches on

9     that one.  Can we tolerate a half hour lunch, since we got off

10    to a late start?

11          VOICES:  Sure.

12          THE COURT:  Be back at 12:35.

13          (The luncheon recess was taken.)

14          MS. JOHNSTON:  The Government would call Case Agent

15    Thomas Eveler to the witness stand.

16          (The oath was administered.)

17          THE CLERK:  State your name for the record.

18          THE WITNESS:  Thomas Eveler, E V E L E R.

19    BY MS. JOHNSTON:

20                          DIRECT EXAMINATION

21    Q.   Detective Evler, are you one of the case agents in this

22    case?

23    A.   Yes, ma'am.

24    Q.   And were you present throughout the jury trial of this

25    matter for the testimony of all of the witnesses?

1    A.    Yes.

2    Q.    And based upon that testimony as well as the documents and

3    evidence that was introduced during that trial, did you

4    summarize the number of kilograms of cocaine that were part of

5    the dug conspiracy as based on that testimony?

6    A.    Yes.

7    Q.    If we could, I'm going to ask you to bring that easel

8    over.  And do you have a marker up there?

9               Beginning with Pernell Philpot, were there telephone

10   calls that were introduced between Mr. Goodwin within and Ms.

11   Martin and perhaps otherS discussing Mr. Philpot?

12   A.    Yes, there were.

13   Q.    And who else was intercepted discussing Philpot in

14   addition to Mr. Goodwin and Ms. Martin?

15   A.    Mr. Whiting, Mr. Mangual.

16   Q.    In terms of the defendants here, it would be Mr. Whiting?

17   A.    Yes.

18   Q.    And Mr. Goodwin and Ms. Martin, is that correct?

19   A.    Yes.

20   Q.    Okay.  And was there also testimony from the Wyoming

21   officers concerning the seizure?

22   A.    Yes, ma'am.

23   Q.    Okay.  And based on that, how many kilograms of cocaine

24   did you associate with this conspiracy from Mr. Philpot?

25   A.    Ten kilograms.

1   Q.   Okay.  If would you write "Philpot" and "10 kilograms"

2   next to that.  Was there also testimony concerning John Martin

3   and a number of kilograms?

4   A.   Yes, ma'am.

5   Q.   Okay.  And what was -- what were the number of kilograms

6   there?

7   A.   Twenty-five.

8   Q.   And that is based upon what?

9   A.   The kilo wrappers recovered from his vehicles on July 4,

10  2002.

11  Q.   If you would write 25, John Martin and 25 kilograms.  Now

12  we also heard testimony from Juan Encarnacion.  Do you recall

13  how many kilograms of cocaine he acknowledged distributing to

14  Ms. Martin?

15  A.   Yes.

16  Q.   Again, how many kilograms was that?

17  A.   Nine.

18  Q.   If you could write Mr. Encarnacion.

19  A.   (Witness complying.)

20  Q.   Now, you heard testimony, there was also testimony

21  concerning Nathan King and his father, Steve Grimm?

22  A.   Yes.

23  Q.   Did you determine how many kilograms there was testimony

24  about them distributing to Ms. Martin and Mr. Goodwin?

25  A.   Yes.

1    Q.   Approximately how many?

2    A.   Approximately 100 kilos.

3    Q.   Okay.  And how did you reach that conclusion?

4    A.   Based on the number of trips, the range of trips that he

5    estimated and the range of kilos that he estimated they

6    transported per trip.

7    Q.   And do you recall what those were?

8    A.   If I could refer to my notes.

9    Q.   Certainly.  Go ahead.

10   A.   Yes.  This refreshes my recollection.

11   Q.   Okay.  What was the range of trips, and how did it reach a

12   hundred kilograms?

13   A.   He estimated that he transported 15 to 25 kilos per trip.

14   He made several trips himself and he also, his father had also

15   made trips, based on his testimony and the testimony of Mr.

16   Echarte.

17   Q.   Based upon the testimony of Nathan King and Mr. Echarte,

18   what is the number of kilograms that you attribute -- what was

19   the, you said the range was 15 to how many?

20   A.   Fifteen to 25 per trip.

21   Q.   How many trips did Mr. King, as you can recall, testify

22   that he had made?

23   A.   I believe it was at least four.

24   Q.   And his father, Mr. Echarte testified about trips made by

25   Steven Brimm, in addition to Mr. King's testimony, is that

1    correct?

2    A.    That's correct.

3    Q.    Okay.  If you could Brimm/King and a hundred kilograms

4    next to that.

5    A.    (Witness complying.)

6    Q.    Now, you mentioned that Mr. Echarte testified concerning

7    the delivering of drugs from Mr. Brimm that were shared between

8    Mr. Goodwin and Ms. Martin.  How many kilograms did Mr. Echarte

9    testify having delivered to Ms. Martin?

10   A.    My recollection was three to four.

11   Q.    If you could write that up there as well.

12   A.    (Witness complying.)

13   Q.    Pick three kilograms, just so we're on the lower range.

14   And was there also testimony concerning, and evidence

15   concerning Tiffiny Vessels obtaining cocaine and transporting

16   it for Mr. Goodwin?

17   A.    Yes, there was.

18   Q.    And what was the source of that information?

19   A.    Telephone intercepts, the testimony of Mr. Thermon and the

20   documentary evidence seized during the search warrants.

21   Q.    The telephone intercepts were between whom, if you recall?

22   A.    Paulette Martin and an unknown male.  Paulette Martin and

23   Learley Goodwin and Mr. Goodwin and Mr. Thurman.  Mr. Thurman

24   was returning the bad cocaine.

25   Q.    And how many kilograms was that that Ms. Vessels had

1   delivered?

2   A.    Approximately 15.

3   Q.    If you would write Vessels and 15 up there.

4   A.    (Witness complying.)

5   Q.    Now, in reference to Mr. Thurman, did you calculate the

6   number of kilograms that he testified about?

7   A.    Yes.  That was based on a range and a range of trips and a

8   range of kilos.

9   Q.    And what was the range of trips and the range of kilos

10  that you used that he testified about?

11  A.    If I could refer to my notes.

12  Q.    Certainly.

13  A.    Okay.

14  Q.    Okay.  What was the range that he gave in terms of trips

15  and quantities?

16  A.    Five to ten trips at eight to 10 kilos is a low end

17  estimate.

18  Q.    What was the low end estimate?

19  A.    That would be 40 kilos.

20  Q.    If you could write Thurmon and 40 kilos up there.

21  A.    (Witness complying.)

22  Q.    And Luis Mangual, did you make a calculation based upon

23  the interceptd calls that were introduced, and the other

24  evidence, in terms of the number of kilograms that Ms. Martin

25  was receiving from Mr. Mangual during the conspiracy?

1    A.    Yes.

2    Q.    Okay.  And could you describe for the Court what figure

3    you calculated and how you reached it?

4    A.    During the course of the wiretap we estimated that Mr.

5    Mangual, or during the course of 2004, Mr. Mangual supplied Ms.

6    Martin with approximately seven kilograms of cocaine.

7          He had been in touch with her for a number of years

8    prior to that, so we gave an estimate of 21 kilograms of

9    cocaine supplied by Mr. Mangual to Ms. Martin.

10   Q.    When did their -- do you recall when their contact

11   started?

12   A.    March of 2002.

13   Q.    So you added another 14 kilograms for that period of time,

14   is that correct?

15   A.    Yes, ma'am.

16   Q.    And during that time period was a pen register contact, or

17   the air time records contact consistent with the kind of

18   contact you saw during the wiretap?

19   A.    Yes, ma'am.

20   Q.    Did you find any evidence of any other relationship

21   between Ms. Martin and Mr. Mangual?

22   A.    She had contact with him regarding a crib.

23   Q.    A baby crib?

24   A.    Yes.

25   Q.    Any other business relations, other than the calls --

1  A.   No, ma'am.

2  Q.   -- that have been testified to as being drug related?

3  A.   No, ma'am.

4  Q.   If you could add Mr. Mangual and 21 kilograms.

5  A.   (Witness coomplying.)

6  Q.   Now, finally, there was an individual name Cuba.  Who were

7  the conversations about Cuba between?

8  A.   Ms. Martin and Mr. Goodwin.

9  Q.   And based upon those conversations, how many kilos of

10  cocaine did they received from Cuba?

11  A.   Five kilograms because during the telephone contacts there

12  was evidence of prior distributions from Cuba to Ms. Martin

13  through Mr. Goodwin.

14  Q.   If you could write Cuba and five kilos.

15  A.   (Witness complying.)

16  Q.   And then I'm going to ask you to total up the total number

17  of kilograms that are listed there.  If you have a calculator

18  you can use that, if you think that will be quicker.

19  A.   That would be faster.

20  Q.   And what's the total number of kilograms?

21  A.   Two hundred twenty-eight.

22  Q.   Excuse me?

23  A.   Two hundred twenty-eight.

24  Q.   If you would write, total them up there, draw a line for

25  the total.

1   A.   (Witness complying.)

2   Q.   Now, in terms of amount of money paid by Ms. Martin and/or

3   Mr. Goodwin when they were purchasing these kilos, did you have

4   a range of prices?

5   A.   Yes, ma'am.

6   Q.   Okay.  And do you recall what the price was that was being

7   paid to Mr. Mangual?

8   A.   Mr. Mangual was receiving the cocaine for approximately

9   $23,000 a kilo, and we know he was selling it for approximately

10  $24,500 a kilo.

11  Q.   And do you know what Mr. Thermon, or what Mr. Goodwin was

12  paying through Mr. Thermon, what price he was paying for a kilo

13  in Texas?

14  A.   Somewhere around $15,500 per kilo.

15  Q.   How much?

16  A.   Fifteen thousand five hundred.

17  Q.   And that would be the price that was paid, is that

18  correct?

19  A.   Yes.

20  Q.   And then it would be sold from there?

21  A.   Yes.

22  Q.   And did you use that as an average price to make

23  calculations of the amount of money that was involved in the

24  cocaine aspect of this case?

25  A.   Yes.

1  Q.   And what figure did you use?

2  A.   Twenty thousand.

3  Q.   And why did you select $20,000?

4  A.   That is a common average, but low conservative average for

5  this area for the price of a kilo of cocaine.

6  Q.   For the wholesale price of --

7  A.   Yes.  It's a very low average.  Average would be closer to

8  $23,000.

9  Q.   In terms of what one would pay to buy a kilo, is that

10  correct?

11  A.   That's correct.

12  Q.   Not the profits one would make, is that correct?

13  A.   That's correct.

14  Q.   Could you multiply 228 by $20,000 per kilo.

15  A.   (Witness complying.)

16  Q.   And what is that figure?

17  A.   Four hundred fifty-six.

18  Q.   Two hundred twenty-eight by $20,000?

19       MR. MONTEMARANO:  We will stipulate it's

20  $4.56 million, Your Honor.

21       THE COURT:  My calculator agrees with you.

22  Q.   Now, in terms of Mr. -- Strike that.  That would be for

23  powder cocaine, is that correct?

24  A.   That's correct.

25  Q.   And you didn't include in there the calculations for the

1  crack cocaine that was seized throughout this case?

2  A.   That's correct.

3  Q.   Or include the crack transactions that were testified to

4  involving Ms. Martin, Mr. Bynum and other people involved in

5  the conspiracy?

6  A.   That's correct.

7  Q.   Now, did you also do calculations for the heroin?

8  A.   Yes, ma'am.

9  Q.   Okay.

10       Why don't you mark "Cocaine" at the top of that, and

11  we'll have that charge marked as Forfeiture 9 for purposes of

12  this hearing.

13       MR. MONTEMARANO:  Subject to cross, Your Honor.

14       THE COURT:  What?

15       MR. MONTEMARANO:  Ms. Johnston moved the admission of

16  this by having it marked.

17       THE COURT:  Oh.  Okay.  All right.  Yes.

18       MS. JOHNSTON:  Write "Heroin" on the top of chart.

19  Q.   Okay.  And did you, based upon the evidence that was heard

20  before this jury in this case back over the course of the

21  summer, determine an amount of heroin that was reasonably

22  foreseeable within the scope of the agreement as it involved

23  Ms. Martin?

24  A.   Yes.

25  Q.   And what was that quantity?

1    A.    Between 60 and 80 kilograms of heroin.

2    Q.    And what was the price of that?

3    A.    Ms. Levi was paying $60 per gram to Mr. Echarte for the

4    heroin.

5    Q.    Then what was Ms. Martin paying for it?

6    A.    Something more than $60 per gram.

7    Q.    Do you recall what she was selling it to Mr. Mangual for?

8    A.    No, I do not.

9    Q.    And if you could just make the calculation using the

10   amount that was paid by her co-conspirator Ms. Levi for the

11   heroin, and do the calculations using the low figure of

12   60 kilograms --

13          MR. WARD:  Excuse me, Your Honor.  Allow me to

14   interrupt.  We can't see the board.  You could step on the

15   other side of the board, Agent, please.  Thank you.

16          MS. JOHNSTON:  I don't know that the Court can see

17   it.

18          THE COURT:  I'm writing it down.

19   Q.    If you could give us the total amount of money used to

20   purchase that heroin.

21   A.    (Witness complying.)

22   Q.    Now, in regards to the heroin, did Ms. Martin receive all

23   of those 60 kilograms of heroin?

24   A.    No.

25   Q.    Okay.  And did she assist Ms. Levi, in addition to taking

1  these drugs and distributing heroin for Ms. Levi?

2  A.   Yes.

3  Q.   If you could sit down for a moment.  We'll get back at the

4  chart in a second.

5        If you could describe to the Court how else Ms.

6  Martin assisted Ms. Levi?

7  A.   Ms. Martin also assisted Ms. Levi by converting cash,

8  lower denomination bills to larger denomination bills, and also

9  writing checks for Ms. Levi in order for her to purchase real

10  property.

11  Q.   Ms. Levi, did she have any legitimate means of income?

12  A.   No, she did not.

13  Q.   And the checks that were written, were they written on Ms.

14  Martin's accounts?

15  A.   Yes, ma'am.

16  Q.   And they are used for what purpose?

17  A.   Ms. Levi was purchasing property through her sister.  Ms.

18  Levi was a fugitive at the time and could not convert -- could

19  not have a bank account, and also had no legal income so she

20  could not purchase, easily purchase property.

21  Q.   She didn't have a bank account in her real name to

22  purchase the property with?

23  A.   No, she did not.

24  Q.   Now, in addition to the calls that the Court heard, were

25  there a few other calls that relate specifically to the

1   laundering as to Ms. Levi's purchase by Ms. Martin?

2   A.   Yes.

3           MS. JOHNSTON:  And, Your Honor, we'd like to admit as

4   Forfeiture 8 the transcript of those calls.  We have a CD so we

5   can mark that as --

6           THE COURT:  Yes, ma'am.

7   Q.   Who are the parties in this conversation?

8   A.   In E108, it is Gwendolyn Levi and her sister, Margaretta

9   Terry, or Margarette Jean is her other name.

10          MS. JOHNSTON:  Your Honor, I don't know if you had

11  the original.

12          THE COURT:  If you could hand me up the exhibit, if

13  you would.

14          MS. JOHNSTON:  If we could play E108 please.

15          (Tape being played.)

16  Q.   What time did that call take place on April 8, 2004?

17  A.   At 10:05 a.m.

18  Q.   Will you go to the next call, E124\c30044.  What time did

19  this call take place?

20  A.   At 10:51 a.m.

21  Q.   Who are the parties?

22  A.   Gwendolyn Levi and Paulette Martin.

23  Q.   Play that call, please.

24          (Tape being played.)

25  Q.   And was there a follow-up call to that call on April 8th?

1    A.    Yes.

2    Q.    What time was this call?

3    A.    11:45 a.m

4    Q.    That would be B3046 and E134?

5    A.    Yes.

6    Q.    And who were the parties to that call?

7    A.    Again, Gwendolyn Levi and Paulette Martin.

8    Q.    If you would play that call, please.

9          (Tape being played.)

10   Q.    And do you know what, based upon that call did you also

11   review bank records?

12   A.    Yes, ma'am.

13   Q.    Okay.  And when Ms. Martin in that call refers to writing

14   one for 905 and one for 1405, what is she referring to?

15   A.    The amounts of the checks that she wrote on that day.

16   Q.    I'll show you Government's exhibit Forfeiture 6 and seven.

17   Do you recognize those two items?

18   A.    Yes, ma'am.

19   Q.    What are those?

20   A.    These are copies of the checks written on Ms. Martin's

21   account, Bank of American account.

22   Q.    On that same day, April 8th?

23   A.    On that same date to Stephane Jean and Margaretta Jean.

24   Q.    And on what account were those checks written?

25   A.    Bank of America account 9517233.

1    Q.   And the other one?

2    A.   91274292.

3    Q.   And what it the name on the account?

4    A.   On the one ending 7233, it is in the name of Paulette

5    Martin, 9002 Bexhill Court.

6    Q.   Okay.  And is that the account that is listed on our

7    indictment as the forfeiture allegation under Roman numeral

8    ten?

9    A.   Yes.

10   Q.   And the preceding check, forfeiture number 7, written to

11   Margaretta Jean, is that from an account that is also listed on

12   our forfeiture allegation, this time as Roman numeral eight?

13   A.   Yes.

14   Q.   And were those accounts listed as Ms. Martin being the

15   owner of the accounts with beneficiaries in different peoples'

16   names?

17   A.   One was in -- one was -- they both were actually, yes.

18   Q.   Okay.  And who were the beneficiaries on the, listed on

19   these accounts?

20   A.   On the one ending in 4292 it was Theresa and Burgess

21   Arnold, Courice Martin and Kimberly Rice, and the one ending

22   7233 is Theresa and Burgess Arnold, Courice Martin and Kimberly

23   Rice.

24   Q.   Now, if we could turn to the allegations that are set

25   forth in the forfeiture allegations of the indictment, do you

1   have a copy of that in front of you?

2   A.    Yes, ma'am, I do.

3   Q.    In regard to the first item listed under personal and real

4   property, Item I, who was the owner of that account?

5   A.    That is Paulette Martin.

6   Q.    During the course of your investigation, did you find --

7   did you identify any legitimate source of income for Ms.

8   Martin?

9   A.    No.

10   Q.    And Roman numeral two, in whose name, does the indictment

11   accurately reflect the account numbers and the amount of moneys

12   that was seized?

13   A.    Yes.

14   Q.    And, again, in terms of item number two, in whose name was

15   that money or that account owned?

16   A.    Paulette Martin.

17   Q.    Did you find any source of legitimate income that would

18   support that advisor investment account?

19   A.    No, ma'am.

20   Q.    If we could go to Roman number three, what was that

21   account number?

22   A.    It's a Chevy Chase back account, 0942000609.

23   Q.    And, again, who was listed as the owner of that account?

24   A.    Paulette Martin with, looks like it's in trust for Courice

25   Martin and Burgess Arnold.

1    Q.    And who are -- do you know who Courice Martin and Burgass

2    Arnold are?

3    A.    Those are her sons.

4    Q.    And was that the amount of money seized from that account?

5    A.    Yes, ma'am.

6    Q.    Did you determine whether or not any checks were deposited

7    in that account from either Ms. Ali or Ms. Harden?

8    A.    Yes.  There are checks from Ms. Ali and Ms. Harden both to

9    that account.

10   Q.    Show you what's been marked as Government's Exhibit

11   Forfeiture 3 and Forfeiture 4 and 5 at this time.  Do those

12   checks reflect checks that were deposited from Ms. Harden, Ms.

13   Ali and Mr. George Harris?

14   A.    Yes, they do.

15   Q.    And are some of those checks the checks that were

16   testified about during the course of the trial?

17   A.    Some of them, yes.

18   Q.    Now, and Mr. Harris, for the record, based upon the

19   testimony and the calls that were played, who was Mr. Harris in

20   relation to Ms. Martin?

21   A.    He is a drug customer of Ms. Martin's.

22   Q.    If we could then go to the next item on the list, which

23   would be item 4.  Does item 4 reflect the amount of money that

24   was seized from the Chevy Chase account listed there?

25   A.    It does.

1    Q.    And in what name was that account?

2    A.    It's in PTK Associates.

3    Q.    And did you find any legitimate source of income for that

4    business?

5    A.    No, ma'am.

6    Q.    If we could go to the next item number five, again, does

7    that accurately reflect the amount of money recovered from that

8    Chevy Chase Bank account?

9    A.    Yes, it does.

10   Q.    The amount is $15,479, is that correct?

11   A.    That's correct.

12   Q.    And that account was held in the name as reflected there?

13   A.    I'm sorry?

14   Q.    Does the forfeiture allegation contain the correct name on

15   the account?

16   A.    Yes, it does.

17   Q.    That was arguably the Paulas School of Performing Arts

18   business account, is that correct?

19   A.    Yes.

20   Q.    Did you find any evidence that there was actually ongoing

21   activity at the school, ongoing legitimate activity at the

22   school during the course of the conspiracy?

23   A.    No, ma'am.

24   Q.    Now, if we could go to the next item B6, B6, VI, that

25   account was in the name of what individuals?

1    A.    Learley Goodwin and Paulette Martin Akuffo.

2    Q.    And what was the amount of money?

3    A.    Ten thousand nine hundred fifty-one dollars.

4    Q.    And with regards to that account, were Mr. Goodwin and Ms.

5    Martin, based on your review and your investigation, ever

6    involved in a legitimate business together?

7    A.    No, ma'am.

8    Q.    And where do you say no?  We heard testimony concerning

9    concert business.  Why do you say that was not legitimate?

10   A.    Because their investment in the concert business stemed

11   from their involvement in the drug trafficking business.  That

12   money was drug proceeds which was being invested in the concert

13   business.

14   Q.    If you could go to the next item, VII, again, does that

15   accurately reflect the forfeiture allegations set forth in the

16   indictment actually reflect the amount of money seized and the

17   individual in whose name the account was held?

18   A.    Yes, ma'am.

19   Q.    Now, in regards to the Sun Trust Bank account listed under

20   VII, were funds or checks received from Ms. Ali and Ms. Harden

21   deposited into those accounts?

22   A.    Yes.

23   Q.    Now, if we could go to the next item, which I think we

24   covered, VIII, again does that accurately reflect the name on

25   the account and the amount of money seized?

1   A.   Yes, ma'am, it does.

2   Q.   Okay.  And is this one of the accounts you mentioned that

3   Ms. Martin wrote a check for Ms. Levi from?

4   A.   Yes.

5   Q.   We go to the next number, IX, and that account is in the

6   name of Paulette Martin and Mary Alice Payne, is that correct?

7   A.   That's correct.

8   Q.   Ms. Payne wasn't alive at the time this account was

9   seized, is that correct?

10   A.   No, ma'am, she was not.

11   Q.   And, indeed, was she alive when the -- Strike that.  Were

12   any checks deposited in that account Ms. Martin's drug

13   customers?

14   A.   Yes, ma'am, they were.

15   Q.   From what customers?

16   A.   Lenora Ali and Ruby Harden.

17   Q.   And at the time those checks were deposited was Ms. Panye

18   alive?

19   A.   No, ma'am, she was not.

20   Q.   And if we could go to the next account number, X on the

21   asset forefeiture list, does that accurately reflect the

22   account number and the amount of money seized from that

23   account, as well as the owner and the beneficiaries?

24   A.   Yes, it does.

25   Q.   In relation to that account, were any moneys or checks

1  from drug customers deposited in that account?

2  A.    Yes.  There were checks received from Ms. Ali, Ms. Harden

3  and Mr. Harris.

4  Q.    Now, if we could go to XI, and if you could explain to the

5  Court that the $126,000 in the escrow account for Norbeck Road

6  LC?

7  A.    This was money placed in an escrow account for the

8  purchase of land and the construction of a home for Ms. Martin.

9  This money came from Bank of America 9517233, which is listed

10  as X, just prior to this, and there were checks from Ms.

11  Martin's drug customers, Ali, Harden and Harris, that were

12  deposited into that account.

13  Q.    If we could go to the next one, XII, is that the accurate

14  count of the currency that was seized from Paulette's School of

15  Performing Arts on June 1, 2004?

16  A.    Yes, ma'am.

17  Q.    And, again, was there any evidence of an ongoing

18  performing arts school at the time that money was seized?

19  A.    No, it was not.

20  Q.    And, indeed, do you recall the testimony of Ms. Ali's

21  husband concerning his efforts to try to get Ms. Martin started

22  in a performing arts school?

23  A.    Yes.

24  Q.    Now, if we could go to the next number, XIII, does that

25  list a Mercedes SLK, is that correct?

1    A.    That's correct.

2    Q.    And is that the Mercedes SLK that we observed on the

3    various videotapes during the course of the trial?

4    A.    Yes, ma'am, it is.

5    Q.    And based on that testimony, do you recall whether or not

6    Ms. Martin used that car to drive to the school when she was

7    meeting different drug customers there?

8    A.    She used it to deliver to customers.  She used it to meet

9    Ms. Harden at the Shoppers Food Warehouse parking lot.  She

10   used it to delivered money to Mr. Lane for Mr. Goodwin to

11   purchase cocaine.

12   Q.    If we could go to the next number, XIV, does that

13   allegation accurately reflect the amount of currency recovered

14   from Ms. Martin's residence at Haywood Drive on June 1st?

15   A.    It does.

16         MS. JOHNSTON:  And, Your Honor, we're going to skip

17   number XV for purposes of this hearing, because Guilty

18   Productions moved that money out of the account, so we don't

19   have the derivative proceeds that resulted from Ms. Martin

20   sending a $150,000 check to that account.

21         THE COURT:  So --

22         MS. JOHNSTON:  Well, there's nothing -- we were

23   unable to seize it from Guilty Productions --

24         THE COURT:  Right.

25         MS. JOHNSTON:  They transferred it I think the day

1    before we got there with the seizure warrant.

2              THE COURT:  Right.

3    Q.   So we'll go to XVI, and what is reflected in the

4    allegation of XVI?

5    A.   The $129,700 in currency seized from Ms. Ali's apartment.

6    Q.   And number XVII?

7    A.   $14,905 in currency seized from the apartment of Derrek

8    Bynum.

9    Q.   Let's talk for a moment about Mr. Bynum.  Did you perform

10   a calculation concerning the number of kilograms of cocaine

11   that Mr. Bynum was involved in, based upon the calls that were

12   played here in the courtroom and his relationship with Ms.

13   Martin?

14   A.   No, I did not.  I based it on what the jury found.

15   Q.   And the jury in this case found five kilograms or more of

16   cocaine, is that correct?

17   A.   That's correct.

18   Q.   And did you do a calculation based on their attributing a

19   minimum of five kilos to Mr. Bynum?

20   A.   Yes.

21   Q.   Okay.  And what was -- what price did you use for the

22   kilograms of cocaine?

23   A.   I used the price that Ms. Martin would have paid

24   Mr. Mangual, which was $24,500, which would give you a total of

25   $122,500.

1   Q.   If you could write that up on the board under Bynum.   You

2   can put it right under the heroin.

3   A.   (Witness complying.)

4   Q.   That's fine.   And why did you use the $24,500 that

5   Mr. Mangual was selling the cocaine to Ms. Martin for, rather

6   than the $20,000 that you used for the overall cocaine total?

7   A.   Because Mr. Bynum wasn't getting the reduced price that

8   Ms. Martin would have received, and the other prices were based

9   on cocaine over a period of time over a number of years, with

10  the prices varying.

11  Q.   And this five kilograms was based on what period of time?

12  A.   March through June of 2004.

13             MS. JOHNSTON:   I have no other questions, Your Honor.

14             THE COURT:   Cross.

15             MR. MONTEMARANO:   Thank you.

16                        CROSS EXAMINATION

17  BY MR. MONTENARANO:

18  Q.   Good afternoon, Sergeant Eveler.   How have you been?

19  A.   I'm fine.   I'm a corporal, but thanks for the promotion.

20  I'd be happy to have the pay.

21             MR. MONTEMARANO:   Thank you.   You know, Your Honor,

22  after ten weeks, you think I would be able to get it straight.

23  Q.   My apologies, Corporal Eveler.

24  A.   Detective Evler.

25  Q.   Let's start with the board right behind you.   You put down

1   68 to 80 kilograms of heroin, correct?

2   A.   Yes, sir.

3   Q.   And that's what your testimony would be, you believe Ms.

4   Levi transferred to Ms. Martin?

5   A.   No.  That's what she received from her source of supply,

6   Mr. Escarte, who testified in the summer.

7   Q.   And if I understand correctly, what was seized from Ms.

8   Levi was approximately 2.3 kilograms, correct?

9   A.   That's correct.

10  Q.   So less than five percent of the amount up there, is that

11  a fair statement?

12  A.   Yes.

13  Q.   Any other seizures, other then that seizure from Ms. Levi,

14  any other seizures from Mr. Echarte?

15  A.   Yes.

16  Q.   How much?

17  A.   A kilogram of heroin from his store in New York.

18  Q.   Okay.  So now we're up to about three, three and a half

19  kilograms, give or take?

20  A.   Yes.

21  Q.   Maybe we're just over five percent of that amount behind

22  you?

23  A.   Yes.

24  Q.   Any other seizures from Ms. Levi?

25  A.   There was a seizure of heroin from her residence.

1  Q.   How much was that?

2  A.   Can't recall.

3  Q.   So we're still in the three and a half kilogram range?

4  A.   We're less than four.

5  Q.   Okay.  Less than four.  And no other seizures other than

6  that one kilogram in New York from Mr. Echarte, correct?

7  A.   That's correct.

8  Q.   So, the other 95 percent of the amount on the board behind

9  you would be based upon Mr. Escharte's claims, correct?

10  A.   And his ledgers, which we had.

11  Q.   And those were transfers to whom?

12  A.   To William Turner and Ms. Levi, who were partners.

13  Q.   And those ledgers demonstrated a transfer from Mr. Turner

14  to Ms. Martin?

15  A.   No.  They showed -- they did not

16  Q.   That's an easy question.  Yes or no.  They did or did not

17  demonstrate a transfer from Mr. Turner to Ms. Martin?

18  A.   That was solely based on his relationship with Ms. Levi

19  and Mr. Turner and no transactions beyond that.

20  Q.   Okay.  So, your ledger demonstrates a transfer to Ms. Levi

21  and this ledger demonstrates a transfer to Mr. Tuner, but this

22  ledger does not demonstrate a transfer to Ms. Martin, is that a

23  fair statement?

24  A.   That's correct.

25

1    Q.   If I could invite your attention to this board, and this

2    is the list you prepared based upon Ms. Johnston's questions

3    regarding the amount of drugs testified to during the trial,?

4    A.   Yes.

5    Q.   Now, I would like to clarify a few things.

6    Twenty-one kilos regarding Mr. Mangual.  That was based upon

7    your estimate, your estimate from what you believe was

8    transfered during the term -- the period of the wiretap and

9    then extending that through the time you believe Mr. Mangual

10   and Ms. Martin did business together?

11   A.   Yes.

12   Q.   Okay.  So it would be fair to say that the only amounts

13   within that 21 that you have actual evidence of would be the

14   seven kilograms that you believe was transferred between Mr.

15   Mangual and Ms. Martin, is that a fair statement?

16   A.   I would disagree with that.

17   Q.   Well, during the trial we heard testimony from the wire

18   taps, and it's based upon that that you extrapolated seven

19   kilograms, correct?

20   A.   That and the DNR contacts and the surveillance prior to

21   the wiretap, I think show more than that.

22   Q.   Show contacts, correct?  The DNRs, the surveillances, that

23   shows contact between Ms. Martin and Mr. Mangual, correct, sir?

24   A.   Yes, and I believe that's evidence.

25   Q.   Okay.  And there were seizures related to those DNRs?

1    A.    No.

2    Q.    There was seizures related to those surveillances?

3    A.    No.

4    Q.    And you were here when Sergeant Sakala testified that with

5    regard to certain phone calls, he could not tell us what the

6    amounts were.  Do you remember that testimony?

7    A.    Not with regard to Mr. Mangual.  With regard to some other

8    individuals, yes.

9    Q.    Some other individuals.  No way of knowing when Mr.

10   Mangual came over with the bag in his hand, if that was a

11   delivery of an ounce, a kilogram, five kilograms, correct?

12   A.    There is no way of knowing?

13   Q.    Based upon the evidence at this trial.

14   A.    I believe it's a kilogram, yes.

15   Q.    You believe it's a kilogram.  My question was, there is no

16   way of knowing.  You don't seize a kilogram --

17         MS. JOHNSTON:  Objection.  The question was asked and

18   answered.

19         THE COURT:  Overruled.

20         MR. MONTEMARANO:  Thank you, Your Honor.

21         THE WITNESS:  I'm sorry.  Can you repeat that.

22   Q.    I'll try.  There were no seizures of that particular

23   kilogram with regard to a certain visit by Mr. Mangual,

24   correct?  You could be wrong, correct?

25   A.    It's possible.

1    Q.    Possible.  Twenty-five kilograms, that 25 kilogram

2    wrappers in Mr. Martin's vehicle, correct, sir?

3    A.    That's correct.

4    Q.    And that was seized in 2004?

5    A.    2002.

6    Q.    2002, I'm sorry.  And those wrappers had been in

7    Mr. Martin's vehicle for how long?  Fair to say you don't know?

8    A.    Don't know.

9    Q.    And you don't know if, there is no surveillance or DNR or

10   wiretap ongoing during the time of that seizure for Mr. Martin

11   in 2002, correct, sir?

12   A.    Not that I'm aware of.

13   Q.    So, therefore, you don't know if Ms. Martin, that is

14   Paulette Martin, had any knowledge of John Martin's trafficking

15   in cocaine at that point in time, based on the evidence of our

16   trial, correct, sir?  Take your time.

17   A.    Would you repeat the question.

18   Q.    Based upon the evidence at our trial, which did not

19   involve DNR, surveillance, wiretap or anything like that during

20   that period of time, 2002, July of 2002, July 4th week-end as I

21   recall?

22   A.    Correct.

23   Q.    You have no way of knowing if John Martin and\or Paulette

24   Martin were involved together in cocaine trafficking at the

25   time he's seized with these wrappers, correct?

1   A.   I believe Mr. Echarte testified that they were in contact

2   during that time.

3   Q.   We'll get to Mr. Echarte.  Other than Mr. Echarte, there

4   would be no evidence, is that a fair statement?

5   A.   And the contacts linking Mr. Martin to other conspirators

6   with Ms. Martin, such as having Mr. Goodwin's telephone number

7   on him, Mr. Whiting's telephone number on him and Mr.

8   Encarnacion's telephone number on him and Mr. Mangual's

9   telephone number on him at the time of his arrest.

10  Q.   2002?

11  A.   Correct.

12  Q.   Mr. Encarnacion, were there any seizures from

13  Mr. Encarnacion?

14  A.   No.

15  Q.   So, if he said nine kilograms, it could be that, it could

16  be .9, it could be 19, couldn't it?  You don't know, you do?

17  A.   Could be more, yes.

18  Q.   Could be less?

19  A.   I don't believe so.

20  Q.   Do you trust Mr. Encarnacion?

21  A.   Yes, I do.

22  Q.   We're not going to go into Mr. Encarnacion's record, but

23  it would be fair to say he's not the kind of person you would

24  necessarily want to trust, would you?

25  A.   I have corroboration from Mr. Encarnacion.

1    Q.    Mr. King, You have a hundred kilos.  How many kilograms of

2    cocaine were seized from Mr. King, if you recall, based on the

3    evidence at trial?

4    A.    Twenty-one, I believe.

5    Q.    That was in Indianapolis, correct?

6    A.    Correct.

7    Q.    Let's be honest.  There was also a seizure in Mississippi,

8    right?

9    A.    Right.

10   Q.    And that 16 or 17 or something like that, for the sake of

11   a rough number --

12   A.    That's close.

13   Q.    Let's say 40.  Will you agree with that, no more than 40

14   between the two?

15   A.    A little less but close.

16   Q.    I wouldn't want you to bend too far.  Forty, you can live

17   with that, right?

18   A.    I can live with that.

19   Q.    Okay.  Fifteen kilograms, Tiffany Vessels testified to.

20   A.    Yes.

21   Q.    Any seizure related to this 15 kilograms?

22   A.    Yes.  And a small portion of the cocaine that Mr. Thurman

23   returned to El Paso was seized in Louisiana --

24   Q.    So --

25   A.    -- that was the rebate on the bad cocaine.

1    Q.   So, is this 15 separate and apart from the 40 for Thurman?

2    A.   Yes.

3    Q.   So, my question is, let's leave Mr. Thurman out --

4    A.   I can't separate the two on that incident because 15 kilos

5    came from Kelly LNUK in El Paso, Texas and Mr. Thurman returned

6    the bad cocaine, a portion of the bad cocaine to El Paso for

7    Mr. Goodwin.

8    Q.   Now, LNUK, that's law enforcement shorthand for last name

9    unknown, right?

10   A.   Correct.

11   Q.   Because we don't know who Kelly is, or do you, right?

12   A.   We're trying very hard to find that out.

13   Q.   You're trying very hard to find that out.  Unless I'm

14   wrong, my math isn't as good as as Ms. Johnston would like to

15   suggest, we're 27 months now since raid day, right?

16   A.   Yes.

17   Q.   Give or take?

18   A.   Yes.

19   Q.   So we're 30 some months more since all these events took

20   place, 40 some months.  Fair to say you're not going to find

21   him any time soon?  You haven't yet, correct?

22   A.   Not yet.  I've been busy.

23   Q.   Haven't we all.  Speaking of LNUKs, Cuba is not related to

24   Kelly, is he?

25   A.   No.

1    Q.   But he's another LNUK, right?

2    A.   That's correct.

3    Q.   They're like sort of ubiquitous in this business, right?

4    A.   Yes.

5    Q.   So we don't know who Cuba is?

6    A.   I have his voice on tape.

7    Q.   You have his voice on tape.  For all you know, it's

8    someone claiming to be him.  You've heard of voice

9    impersonators and things like that, right, so you don't know

10   who Cuba is, right?

11   A.   Not yet.

12   Q.   You've never located him?

13   A.   Correct.

14   Q.   Well, we don't know who Cuba is, correct?  In your

15   testimony the evidence shows 7 kilograms.  Let's talk about

16   Mr. Thurman.  Where is all this -- where do all these drugs

17   come from, 15 seized in Louisiana, correct?

18   A.   Steven Campbell in Houston, Texas.

19   Q.   And those were seized?

20   A.   No.

21   Q.   You've never seen them, correct?  Let's face it, the

22   evidence you've got is like Mr. Goodwin paying for a tire in

23   Arizona, correct?  A trip to Houston, correct?  No cocaine

24   right?

25   A.   That's correct.

1    Q.    And Ms. Vessels, that was the 15, that's the same as the

2    15 seized in Louisiana?

3    A.    Few ounces seized in Louisiana.

4    Q.    Nine ounces, right?

5    A.    I think.

6    Q.    Let's just for the sake of discussion.  And then

7    Mr. Echarte, the 3 kilograms, never seized those?

8    A.    No.

9    Q.    Actually, if you were to be accurate, Mr. Echarte talked

10   about dozens and dozens of kilograms sitting on the counter in

11   Ms. Martin's kitchen, right, and that's not here.  That's more

12   than three kilograms, right, big piles?

13   A.    That's included in the 100 kilograms from Brimm\King.

14   Q.    That's what the hundred kilograms is.  Okay.  We agree we

15   seized 40, if that?

16         MS. JOHNSTON:  Your Honor, I'm going to object to

17   counsel marking that.  We marked that as an exhibit.  He

18   shouldn't be writing on it.

19         MR. MONTEMARANO:  We don't have a jury here.  I'm

20   going to ask that it be marked with blue ink and marked as a

21   defense exhibit when I'm done.

22         THE COURT:  You can mark it.  Just don't cross over

23   anything --

24         MR. MONTEMARANO:  I'm going to use a different color,

25   so the Court has --

1          THE COURT:  Don't cross out anything the Government

2    put on there.

3          MR. MONTEMARANO:  Thank you.

4    Q.   Mr. Encarnacion, we never seized that?

5    A.   That's correct.

6    Q.   And the John Martin, we don't know where that comes from.

7    And the Philpot, the ten kilograms, that's the Wyoming seized

8    during the pendency of the wire tap?

9    A.   That's correct.

10   Q.   Now, let's see how good my math is.  You came up with the

11   228, correct, sir?

12   A.   That's correct.

13   Q.   So we take up all of this guesswork, 228 minus 166 comes

14   to 62, correct?

15   A.   I don't know what you're adding with the cross-outs and

16   the others.  I don't know what the total would be.

17   Q.   The amounts in blue either that are not altered, or the

18   blue amounts, ten, 40 would be 50, three, four, 61.  Oh, 61.

19   Not 228, right, sir?  That's what we've got evidence of, 61, is

20   that a fair statement?

21   A.   No.

22   Q.   Just went through the math.  That's what you actually

23   seized in this this case.

24   A.   You said that's what we have evidence to.  I disagree with

25   your characterization.

1  Q.   That's what we have seizures of?

2  A.   No.  That's not true.  We don't have three kilograms

3  seized from Mr. Echarte.

4  Q.   What was that seized from Mr. Echarte?

5  A.   It wasn't.  I believe you totaled that in with the other

6  numbers.

7  Q.   Oh, that should be even less, 58?

8  A.   Your numbers, not mine.

9  Q.   But if -- you wouldn't disagree, even if you don't like

10 the numbers I've createed, you're not going to argue with my

11 math, right?

12 A.   That is the number you totaled, yes, that's correct.

13 Q.   Just so we're clear again, this was less than 4 kilograms,

14 we agree, right?

15 A.   Your number, yes.

16 Q.   You helped me with the math, right?

17 A.   That was your number.  Yes.

18            MR. MONTEMARANO:  Thank you, Your Honor.

19            MR. MARTIN:  Thank you.

20                     CROSS EXAMINATION

21 BY MR. MARTIN:

22 Q.   Corporal Eveler, you are a Special Agent of the task

23 force, right?

24 A.   I'm a task force officer.

25 Q.   So it won't be inaccurate to refer to you as Agent Eveler,

Case 8:04-cr-00235-DKC   Document 1379   Filed 06/03/10   Page 103 of 153

1   would it?

2   A.   I answer to many titles.

3   Q.   I'm just trying to --

4   A.   I'm flexible.

5   Q.   I'm just trying to make it easy on everybody else.

6   A.   That's fine.

7   Q.   With respect to Mr. Goodwin and the indictment, I guess

8   it's the fifth superseding indictment, that's the one I've been

9   looking at anyway, on page 65, I believe it's VI, if you have

10  it in front of you.  There's a number there, it's like $30,951.

11  Do you see that?

12  A.   Yes.

13  Q.   Now, during the trial you heard testimony that Mr. Goodwin

14  had rental property, right?

15  A.   That's correct.

16  Q.   And you also heard testimony that he had an auto

17  dealership called Lobo's?

18  A.   Yes.

19  Q.   You were not involved in the search of Lobo's in the

20  District of Columbia, were you?

21  A.   No, I was not.

22  Q.   And you didn't audit Lobo's books, did you?

23  A.   No.

24  Q.   And you didn't go through the bank records for Lobo's

25  Discount Autos, did you?

1  A.    I did not, no.

2  Q.    And so with respect to the activity statements, you

3  couldn't say where any of the income from Lobo's came from,

4  could you?

5  A.    From Lobo's?

6  Q.    That's right.

7  A.    Are we speaking -- I'm sorry.  I don't understand your

8  question.  Are we speaking to this account or something else?

9  Q.    We're speaking to the account for Lobo's.  Not that

10  account.  We're talking about Lobo's Discount Auto.  You did

11  not look at any of the bank activity statements for Lobo's, did

12  you?

13  A.    I did not, no.

14  Q.    So you couldn't say to His Honor today whether any of the

15  moneys from Lobo's bank accounts was transferred into the

16  account referenced on page 65, item VI of the indictment, is

17  that correct?

18  A.    That's correct.

19  Q.    Now, let's move to the rental property on Anacostia Road.

20  With respect to that property, you didn't do an inventory or a

21  search of that apartment, did you?

22  A.    No.  That was conducted by the FBI.

23  Q.    Okay.  And at the time that the FBI finished doing their

24  inventory and search, did they give you any papers from

25  Anacostia Road?

1    A.   That was done, that was a separate investigation that they

2    did.  I received them later, but I was not part of that

3    investigation.

4    Q.   All right.  Well, when you received the papers later did

5    you go through any of the bank statements that might have been

6    seized from Anacostia Road?

7    A.   I don't recall.

8    Q.   Did you go through any of Mr. Lurley Goodwin's bank

9    accounts, and I'm not talking about bank accounts with Paulette

10   Martin.  Did you go through any of his bank accounts during the

11   course of this investigation?

12   A.   I personally did not.

13   Q.   Okay.  So you can't say to His Honor today whether any

14   moneys that came from Anacostia in the way of rental property

15   was deposited into the account that's listed on page 65, item

16   VI of the indictment, you can?

17   A.   I cannot, no.

18       MR. MARTIN:  I have no further questions, Your Honor.

19   Thank you, sir.

20       MR. MONTEMARANO:  Your Honor, before Mr. Hall begins,

21   I move this, which I failed to do, as a defense exhibit as

22   well, with the turquoise amendments.

23       THE COURT:  Hearing no objection, it will be

24   received.

25                       CROSS EXAMINATION

1    BY MR. HALL:

2    Q.   Detective Eveler, let me ask you just a couple questions

3    about the forfeiture.  First of all, in reference to the list

4    of accounts that were seized in this case, you went over them

5    earlier with Ms. Johnston, correct?

6    A.   That's correct.

7    Q.   Okay.  And would you agree with me that none of these

8    accounts has the name of Reece Whiting on them?

9    A.   I agree with you.

10   Q.   Okay.  And during the course of your investigation, you

11   didn't seize or find any accounts with the name of Reece

12   Whiting, did you?

13   A.   I did not seize any.

14   Q.   Okay.  Did you find one?

15   A.   I don't recall.

16   Q.   You don't recall.  Okay.  And as part of your

17   investigation, you are not aware of any large amounts of real

18   estate or anything that were owned by Mr. Whiting, are you?

19   A.   I'm not aware of any.

20   Q.   Okay.  In fact, do we have the same understanding at the

21   time that Mr. Whiting was arrested, he was renting a room from

22   his ex-wife.  Do you recall that?

23   A.   I don't know what the financial arrangement was, but he

24   was residing with his ex-wife.

25   Q.   All right.  You do recall that part of the testimony that

1    he was residing with his ex-wife, right?

2    A.    Correct.

3    Q.    Okay.  And did you ever seize the vehicle he was driving

4    at the time, the 1980 something Jaguar?

5    A.    No.

6    Q.    Let me ask you a couple questions about the chart.  I'm

7    not sure what number the Government has marked it as, but the

8    exhibit that's present here in front of the jury at the top of

9    list.  You have Philpot and ten kilos, referring to cocaine, is

10   that correct?

11   A.    That's correct.

12   Q.    Okay.  And I think Mr. Montemarano asked you, that's in

13   reference to the cocaine that was seized from Mr. Philpot was

14   stopped in Wyoming, is that right?

15   A.    Yes.  Half were seized and half made it through with the

16   previous driver.

17   Q.    So, five, just to be clear, approximately five kilograms

18   was actually seized, is that correct?

19   A.    That's correct.

20   Q.    Okay.  And it was your belief that 5 kilograms had made it

21   through to their destination, is that correct?

22   A.    That's correct.

23   Q.    And in your direct testimony a few minutes ago, you

24   referred to conversations amongst parties in this case in

25   reference to Mr. Philpot and that seizure, is that correct?

1   A.   Correct.

2   Q.   And I believe the individuals that you said were involved

3   in those conversations was my client, Mr. Whiteing, correct?

4   A.   Correct.

5   Q.   Ms. Martin, correct?

6   A.   Correct.

7   Q.   And Mr. Goodwin?

8   A.   Correct.

9   Q.   Okay.  And when you referred to a conversation involving

10  my client, you referred -- can you tell me specifically what

11  conversation you're referring to?

12  A.   I don't recall the call number, but Ms. Martin told

13  Mr. Whiteing "Philpot is down," or "Philpot is in," and

14  Mr. Whiteing said "Oh, no," or expressed dismay.

15  Q.   So, it would be fair to say the conversation you're

16  referring to, whatever the date was, whatever the time was, is

17  one that was heard in front of the jury, correct?

18  A.   Yes.

19  Q.   Okay. and that was a conversation in which Ms. Martin

20  provided information to Mr. Whiteing, in other words, "Philpot

21  is down," I think you can probably agree that that's the quote?

22  A.   Words to that effect.

23  Q.   Words to that effect.  And Mr. Whiteing made some kind of

24  exclamation response to it?

25  A.   I believe that's an accurate characterization.

1          MR. HALL:  That's all the questions I have.

2                        CROSS EXAMINATION

3    BY MR. MITCHELL:

4    Q.   I can also call you Sergeant Eveler, if you want, if you

5    like that title.

6    A.   Colonel would be fine also.

7    Q.   Corporal, correct?

8    A.   Correct.

9    Q.   Corporal.  On June 1, 2004, when the search warrant was

10   served on Mr. Bynum at his residence on Ray Road, what was the

11   amount, the quantity of drugs that were found in his apartment,

12   do you recall?

13   A.   I believe there was residue on a strainer, and possibly on

14   the scale.

15   Q.   And what would be the value of that amount of drugs found

16   on that scale, the residue, street value?

17   A.   Negligible.

18   Q.   Is it of any value, really?

19   A.   I'm sure some people would find it of value.

20   Q.   For Mr. Bynum, the total amount of drugs seized from the

21   him during the amount of the conspiracy was how much?

22   A.   I can't remember the quantity seized in 1999, but that was

23   within the conspiracy, so that was ounces of crack.

24   Q.   A couple ounces, correct?

25   A.   I can't remember the exact number.

1   Q.   Would you have any, could you estimate what the value of

2   that amount was?

3   A.   Not without some specifics.

4   Q.   Okay.  If you could turn, I'm not sure what the chart

5   number is?

6   A.   This one?

7   Q.   It's kind of a dual chart, one for heroin, one for

8   Mr. Bynum, and you quantify the amount of money that is

9   attributable to Mr. Bynum as $122,500, correct?

10  A.   That's correct.

11  Q.   If we are to attribute the amount that was actually seized

12  on him, trace on 6\1\04 and in 1999, two ounces, three ounces,

13  there about?

14  A.   A more substantial quantity, yes.  I don't remember the

15  amount.

16  Q.   And the value approximately, if it were a couple ounces of

17  crack cocaine?

18  A.   Wholesale or street value?

19  Q.   Well, let's use this value here you used.

20  A.   If it's two ounces at the time it would be somewhere

21  around $2,500, $2,400.

22  Q.   All right.  Use $2,500.  Would you agree that's the amount

23  that was actually seized from him, $2,500?

24  A.   Not the street value.  That's how much he would have paid

25  for it at the time, give or take.

1    Q.    Now, would you agree or disagree that Mr. Bynum was

2    selling these drugs during the time of this conspiracy?

3    A.    I believe he was selling the drugs during the time of this

4    conspiracy.

5    Q.    Do you know the quantity of drugs that he sold during the

6    time of this conspiracy?

7    A.    It's my belief he sold all the drugs he purchased.

8    Q.    That's not my question, though.  Do you know how many, in

9    quantity, how much drugs, in quantity, Mr. Bynum sold during

10   the time of this conspiracy?

11   A.    Several kilos.

12   Q.    And you know that, from what observations did you make of

13   Mr. Bynum selling any quantities of drugs?

14   A.    When he would purchase the cocaine from Ms. Martin and

15   then resell it.

16   Q.    And that's my question --

17   A.    That's based on the scale, the strainer and the other

18   evidence.

19   Q.    But I don't think you understand my question.  What -- Do

20   you have any surveillance of any kind that Mr. Bynum was

21   selling drugs to any person either involved in the conspiracy

22   or otherwise?

23   A.    No.

24   Q.    Any photographs of him selling drugs to anybody?

25   A.    No.

1    Q.   Do you have any electronic means, any electronic

2    surveillance means, indicating that Mr. Bynum was selling drugs

3    to my person involved in this conspiracy or otherwise?

4    A.   No.

5    Q.   So, simply, would you agree with me then, you're basing

6    your amount, you're basing your assumption simply on guesswork?

7    A.   No.  No.  Actually he did distribute a quantity of drugs

8    we know about when he returned the sub-standard cocaine to Ms.

9    Martin, which she then gave to Claude Arnold for resale.

10   Q.   He sold those drugs to someone else?

11   A.   No, it was a distribution.  It wasn't a sale.

12   Q.   Do you know how much money he received or bought these

13   drugs for?

14   A.   That was a return.  He was unhappy with the product.

15   Q.   Do you know what types of drugs Mr. Bynum was selling to

16   any person involved in this conspiracy or otherwise?

17   A.   He was involved in the sale of cocaine.

18   Q.   That's not my question.  I'm asking you specifically, not

19   to guess, want to you base your answers on specific information

20   that you have in your possession, or the Government's

21   possession, which would indicate that Mr. Bynum was in fact

22   selling drugs to persons involved in this conspiracy or

23   otherwise?

24   A.   It's not a guess.  It is a reasonable inference based on

25   the strainer in the house, the scale and the intercepts, that

1   there was distribution.  As I testified earlier, no, I did not

2   see him distribute to somebody.  No, I did not take a

3   photograph of him distributing to others, but that is a

4   reasonable inference based on the evidence seized both in 1999

5   and in 2004.

6   Q.   Okay.  Fine.  And that's what Judge Titus can draw.  I'm

7   asking you what specific evidence do you have, specific,

8   meaning actual, concrete evidence, whether it's surveillance,

9   whether it's other cooperators, something that you can direct

10  us to which would indicate that you know Mr. Bynum was in fact

11  selling drugs?

12          MS. JOHNSTON:  Objection.  Asked and answered.  He

13  just answered it.

14          THE COURT:  Sustained.

15  Q.   Are you aware of any other means that Mr. Bynum used to

16  get the money seized on June 1, the $14,500 that was seized

17  from him?

18  A.   Am I aware of any other sources of income?

19  Q.   Correct.

20  A.   I know he was conspiring to engage in insurance fraud, but

21  I don't know if he received any payment as far as the fraud

22  goes.

23          MR. MITCHELL:  Your Honor, I thought we were not

24  going to be discussing insurance frauds --

25          THE COURT:  You asked the question.

1          MR. MITCHELL:  -- and I don't think that's part of

2    the question.

3    Q.   What means did you use to indicate whether or not he had

4    any other means to obtain this money?

5    A.   The review of evidence from his, from the search warrant,

6    did not reveal any that I am aware of.

7    Q.   What means did you take upon yourself investigating to

8    determine whether or not Mr. Bynum was receiving income from

9    any other sources?

10   A.   Used many means.  We used interviews of co-defendants.  We

11   used review of documents from the search warrant.  We used

12   subpoenas.  We used so many different methods of investigation

13   in this case, I can't go through them all.

14   Q.   Okay.  Great.

15   A.   That's the best I can do.

16   Q.   I'm sure that those are means that you used in the purpose

17   of your investigation, but I'm speaking with regard to

18   specifically Derrek Bynum, what means did you use specifically

19   for him to determine whether or not there were other means of

20   income that he was receiving which would give him legitimate

21   income?

22   A.   Interviews of co-defendants who were familiar with Mr.

23   Bynum.  Searches, the search of his residence, and a review of

24   the documentary evidence seized from his property.  Those are

25   two that I know of specifically.

1    Q.    And what specific witnesses or cooperators did you

2    interview to determine whether or not Mr. Bynum was receiving

3    legitimate income?

4    A.    Did you want me to name every person that I interviewed?

5    Q.    No.  Every person you interviewed --

6    A.    Every person I interviewed --

7    Q.    -- that you asked about Mr. Bynum?

8    A.    Every person I interviewed, I asked about Mr. Bynum.

9    Every person in this case that was interviewed was asked about

10   every codefendant in the case.

11   Q.    Did you do any search of the Social Security records of

12   the United States Government?

13   A.    I cannot recall.

14   Q.    Did you do any credit checks to determine whether or not

15   he had employment, or had employment at or before the time of

16   this conspiracy?

17   A.    I believe we did a wage and record check.  I cannot recall

18   the results of the wage and record check.

19   Q.    Do you have it with you today?

20   A.    Not in front of me, no.

21   Q.    Certainly, if it were helpful, that evidence was helpful

22   to Government, you would have brought that here to make sure

23   that Judge Titus was aware that he had no other legitimate

24   source of income, wouldn't you?

25   A.    Probably is helpful to the Government and I probably

1    overlooked it.

2    Q.   If you could turn the chart back, the first, turn the page

3    back to the first chart, if you could.  Just looking at that

4    list, would you agree that Mr. Bynum had no direct

5    participation with any of these transfers of those drugs listed

6    on that chart?

7    A.   He had no --

8    Q.   He had no direct participation party in any of the

9    transfers of any of those drugs listed on that chart?

10   A.   Between whom?

11   Q.   Transfers between anybody.

12   A.   There were transfers --

13   Q.   Did Mr. Bynum have any direct participation -- I'll go

14   through it -- Mr. Philpot, did he have any direct participation

15   in Mr. Philpot's transfer of 10 kilos of cocaine to whomever?

16   A.   No, not that I'm aware of.

17   Q.   What about Mr. Martin, the 25 kilos?

18   A.   I don't know.

19   Q.   Okay.  Now, do you understand my question, going down the

20   list, was there anyone on that list where he had any direct

21   participation in any transfer or any kilograms of cocaine to

22   any other person?

23   A.   Yes.

24   Q.   Who?

25   A.   Mr. Mangual.

1    Q.   He directly dealt with Mr. Mangual?

2    A.   No.  He directlyly dealt with Ms. Martin immediately after

3    she dealt with Mr. Mangual.

4    Q.   That's not my question.

5         MS. JOHNSTON:  Objection to counsel arguing with the

6    witness over whether it's the question or not.

7         THE COURT:  Overruled.

8    Q.   I'm not arguing with anyone.  I'm just clarifying.  Did

9    Mr. Bynum deal with Mr. Mangual directly?

10   A.   No.  He went through Ms. Martin.

11   Q.   So, again, I'll ask the question.  Did he have any direct

12   participation in Mr. Mangual's transfer of seven or

13   21 kilograms, depending on which side you believe, did he have

14   any direct participation in the transfer of those kilograms to

15   any other person?

16   A.   He contacted Ms. Martin and ordered the drugs and then she

17   would call Mr. Mangual and order more, so I consider that

18   direct participation.  If she is -- if he is causing her to

19   take an action to transfer cocaine, that is direct

20   participation.

21   Q.   All right.  So if I take this water right here and I give

22   it to lead counsel here, did anyone else here have any direct

23   participation in what I just did?

24   A.   If Mr. Montemarano asked Mr. Martin for some water and he

25   asked you to get some water, I would consider that direct

1    participation.  He's causing someone else to take an action

2    based on his request.

3    Q.    Direct participation --

4    A.    May not be a very good analogy.

5    Q.    I haven't finish my question.  What communication did I

6    give to Mr. Martin?

7    A.    I probably used a poor analogy, but that was the best I

8    could come up with on a moment's notice.  You handing the water

9    to Mr. Martin, there was no direct participation by any one

10   else at the table when you handed him that water.

11   Q.    Now, using that same analogy, did Mr. Bynum, having -- did

12   Mr. Bynum, standing here --

13         MS. JOHNSTON:  Your Honor, we'll stipulate that

14   Mr. Bynum didn't deal directly with Mr. Mangual, that he acted

15   through Ms. Martin.  I think that's been crystal clear

16   throughout the trial.

17         MR. MARTIN:  I thought it was too, but for some

18   reason Corporal Eveler is not.

19         THE COURT:  Move on to the next subject.

20   Q.    Similarly, on the next chart, if you could turn that over,

21   please.  Looking at the top part of that, in the amount of

22   heroin, what direct participation did Mr. Bynum have in the

23   purchase or sale of heroin from Ms. Levi?

24   A.    He has no participation that I know of.

25   Q.    Now, you used the amount, as you stated in your earlier

1    testimony, you used the amount of five kilograms to come up

2    with an amount attributable to Mr. Bynum for forfeiture.  Why

3    did you use the amount of kilograms that the jury found?

4    A.   That's what we chose based -- that's what I chose based

5    on -- I based it on what the jury found rather than

6    extrapolating back a number of years and including a much

7    higher number, this was a conservative estimate to use what the

8    jury found.

9    Q.   Is that because it was just simpler to do?

10   A.   No.  It's a more conservative and I stuck with what the

11   jury found rather than --

12   Q.   So you could have used a number --

13   A.   -- the number would have been much higher had I used the

14   cocaine that he actually received.

15   Q.   So do you consider that 5 kilograms an inaccurate amount?

16   A.   No.  I consider it a low ball estimate.

17   Q.   Is it an accurate or is it an inaccurate amount?

18           MS. JOHNSTON:  Objection.  He just asked that

19   question.  He said he considered it a low ball number.

20           THE COURT:  Sustained.

21           MR. MITCHELL:  I simply want to -- he hasn't answered

22   the question.

23           THE COURT:  He answered you that it was a low ball

24   estimate.

25   Q.   Do you have any specific instances when these 5 kilograms,

1   the five kilograms that you're referring to in this chart, were

2   actually transferred or purchased from Ms. Martin to Mr. Bynum?

3   A.    Yes.  A number of them were transferred between March and

4   June of 2004.  I can give you specific dates and times, if I

5   could refer to the transcript book or our surveillance notes,

6   which we had surveillance of him going to Ms. Martin's to

7   receive cocaine.

8   Q.    And you could go back in your notes and find the exact

9   amount of five kilograms that were transferred?

10  A.    Not on one –– it wasn't transferred at one time.  It was

11  transferred over a period of either in 62s or kilogram

12  quantities he received the cocaine.

13  Q.    And you could go back and find a exact quantity of five

14  kilograms?

15          MS. JOHNSTON:  Objection.  Asked and answered.  Same

16  question again?

17          THE COURT:  Sustained.

18  Q.    Do you have any –– the $14,500, do you have any idea where

19  Mr. Bynum received that money from?

20  A.    Sales of narcotics.

21  Q.    Do you know that?

22  A.    Allegedly Mr. Bynum was involved in photography.  There

23  were no cameras or any photography equipment located at the

24  residence.  That was what he was purported to be involved in as

25  his legitimate income.  Based on that and other evidence

1   recovered from the house, we had no evidence of legitimate

2   income for Mr. Bynum.

3   Q.   And did you look at any evidence in his apartment to

4   indicate that he had in his apartment at any one time

5   five kilograms of cocaine?

6   A.   Yes, the scale and the strainer.

7   Q.   And there was something you could extract, extrapolate

8   from a strainer and a scale to indicate that he had at one

9   point five kilograms of cocaine in his apartment?

10  A.   That was based on the totality of the evidence we received

11  that we came up with this number.

12  Q.   And would that be -- would it be safe to say that's simply

13  a guess of your?

14  A.   No, I don't believe that's accurate, the word guess.  I

15  believe it would be inaccurate.

16  Q.   All right.  Well, let me ask you this question.  Can I

17  stand here?  Can you tell me how much I weigh?

18          MS. JOHNSTON:  Objection, Your Honor.  Relevance.

19          THE COURT:  Where are we going with this?  I mean --

20          MR. MITCHELL:  I think it's a reasonable question --

21          THE COURT:  That's always a dangerous question to ask

22  somebody "How much I do weigh?"

23          MR. MONTEMARANO:  Your Honor, the dangerous question

24  is "Does this make me look fat?"

25          MS. JOHNSTON:  Your Honor, can we move on here?

1          MR. MITCHELL:  I will, as soon as he answers the

2    question.

3    A.    Would I estimate it?

4    Q.    Yes.  The question is, do you have any idea how much I

5    weigh?

6          MS. JOHNSTON:  And I'm objecting.  It's not relevant.

7    What, is counsel going to take the stand and testify?

8          THE COURT:  Sustained.

9    Q.    Would you be afraid to guess how much I weigh?

10         MS. JOHNSTON:  Objection.

11         THE COURT:  Sustained.

12         MR. MITCHELL:  There's a reason why I'm asking these

13   questions, Your Honor.  The reason is --

14         MS. JOHNSTON:  Objection.

15         THE COURT:  I understand your reasons and I sustain

16   the objection.

17   Q.    For the same reason that you would hesitate guessing how

18   much I weigh, isn't it -- isn't it possible --

19         THE COURT:  He didn't say he would hesitate to guess

20   how much you weigh.  I sustained the objection.  He's never

21   said whether he could estimate how much you weigh.

22         MR. MITCHELL:  Well, he didn't answer my question

23   initially and then eventually there was a --

24   Q.    It's fair to say that you're simply guessing about all the

25   amounts that are attributable to Mr. Bynum and nothing more?

1   A.   The jury made a determination.  I'm following that

2   determination.  If the jury had made a determination as to your

3   weight, I'd probably just go with their determination as to

4   your weight.

5   Q.   And if they were wrong?

6   A.   I believe they were presented with certain facts that

7   would support an estimate of your weight and they reached that

8   conclusion based on those facts and that evidence, that I

9   believe that would be a fair determination.

10          MR. MITCHELL:  Now may I ask him questions about my

11   weight, Your Honor, now that he made --

12          THE COURT:  No, you may not.

13          MR. MITCHELL:  No further questions.

14          MR. WARD:  I don't have any questions, Your Honor.

15          THE COURT:  Mr. McKnett?

16          MR. McKNETT:  I have no questions.

17          THE COURT:  All right.  Before we do redirect, I will

18   do a five minute recess.  Count them, five, because I want to

19   see if I can keep it close to that.

20          (A brief recess was taken.)

21          THE COURT:  All right.  Counsel, ready to proceed.

22   If you're waiting for a document, let me just ask counsel, you

23   may have forgotten.  If we're not able to get this finished by

24   five of 3:00, I am going to break at five minutes of 3:00.  I

25   don't know how long the meeting I'm going to go to is, perhaps

1    an hour, and then I have to be out of here by 4:30.

2            If we don't finish today, can we carry over to

3    tomorrow morning?  Do you have any problem with that?

4            MR. HALL:  I have another court commitment tomorrow

5    morning.

6            THE COURT:  Well, the other option, knowing that I

7    own December 19th on your calendars, is to finish this up, if I

8    don't finish it up earlier in the morning, on December 19th,

9    which I may have to do.

10           MR. MONTEMARANO:  Fine.

11           THE COURT:  At least we'll be able to wrap up all the

12   testimony today, it seems to me, unless we really get stuck

13   with endless cross-examination.  But are you ready with the

14   exhibit now, Ms. Johnston?

15           MS. JOHNSTON:  I think I am, Your Honor.  If I could

16   have the Court's indulgence for a moment.

17           THE COURT:  You may.

18                      REDIRECT EXAMINATION

19   BY MS. JOHNSTON:

20   Q.   Detective Eveler, in regards to Mr. Goodwin, was there

21   evidence that Lobo's used to distribute drug?

22   A.   Yes, ma'am.

23   Q.   And was that introduced in this trial before this jury?

24   A.   Yes, it was.

25   Q.   And in addition to that was Ms. Martin ever a business

1    partner in the Lobo's Automobile rehab garage, whatever it was,

2    at Lobo's, that was arguably a legitimate business?

3    A.   No.

4    Q.   And the accounts that are listed in our asset forfeiture

5    allegations, was that an account in both Mr. Goodwin and Ms.

6    Martin's name?

7    A.   Yes.

8    Q.   Now, in regards to Mr. Bynum, well, who -- what was the

9    information that you had had that Mr. Bynum was allegedly a

10   photographer?

11   A.   I believe there was a business card that I saw somewhere,

12   or I believe even a witness who was interviewed said that Mr.

13   Bynum said he was a photographer.

14   Q.   Okay.  Now, when the search warrant was executed was any

15   evidence, the search warrant on June 1, 2004, was there any

16   evidence of a photography business recovered from his resident?

17   A.   No.

18   Q.   And similarly back when Takoma Park executed their search

19   warrants, was there any evidence recovered then of Mr. Bynum

20   being involved in the photography business?

21   A.   No.

22   Q.   Now, counsel also asked you about, Mr. Bynum's counsel,

23   about the amount of cocaine, crack cocaine that was recovered

24   by the Takoma Park police officers during the course of this

25   conspiracy --

1          THE COURT REPORTER:  I'm sorry?

2    Q.   -- specifically November 12th of 1999.  Reviewing these

3    lab reports, does that refresh your recollection concerning the

4    actual amount of crack cocaine that was seized from his house

5    and from his vehicle?

6    A.   Yes.

7    Q.   And what was the total amount of crack cocaine that was

8    seized from his residence?

9    A.   Approximately -- I'm sorry, from his residence 147.12

10   grams.

11   Q.   And from the vehicle?

12   A.   Fifty-seven point 88 grams.

13   Q.   So the total was approximately?

14   A.   Two hundred and four and change.

15   Q.   Now, Mr. Montemarano asked you about the amount and he got

16   down to, is it 61 kilograms and then you corrected him, and

17   said it was it was actually 60 kilogams, and it should be in

18   the aquamarine?

19          MR. MONTEMARANO:  Fifty-eight.

20          MS. JOHNSTON:  Okay.  Fifty-eight.

21   Q.   Fifty-eight times the $20,000, which was your low ball

22   price that you obtained for a kilogram comes out to what?

23          MR. MONTEMARANO:  Stipulate $1.16 million.

24   A.   Correct.

25   Q.   1.16 million.

1    A.   Yes.

2    Q.   Was there evidence at the trial that she was selling that

3    cocaine as eight balls?

4    A.   Yes.

5    Q.   And what was the price she was changing for an eight ball?

6    A.   Somewhere between $125 and $135.

7    Q.   Using that $125, how many eight balls in a kilogram?

8    A.   Over 285, 285.7. plus.

9    Q.   Well, take that 285 eight balls per kilogram, multiplying

10   his 58 by 285, tell us how many eight balls were in his, in Ms.

11   Martin's 58 kilograms that counsel concedes she was involved

12   with?

13   A.   Sixteen thousand five hundred thirty.

14   Q.   And what, using the low ball price of how much money would

15   be the proceeds of those 58 kilograms, selling as eight balls?

16   A.   The gross would be $2,066,250.00.

17   Q.   And that would be without cutting the cocaine once she

18   purchased it?

19   A.   That's correct.

20   Q.   Okay.  Could you write that figure up there for us, and

21   why don't you write it in turquoise.  Just write it in black.

22   That's fine.

23   A.   (Witness complying.)

24        MS. JOHNSTON:  That's all the questions I have of

25   this witness, Your Honor.

1          THE COURT:  All right.  After he writes the number

2     down he can step down.  Next witness.

3          MS. JOHNSTON:  Our next witness would be IRS Special

4     Agent Ken Oland.

5          THE CLERK:  Please be seated.

6          (The oath was administered.)

7          THE CLERK:  State your name for the record.

8          THE WITNESS:  Kenneth W. Oland, Jr., last name is

9     spelled O L A N D.

10          THE COURT:  I coulldn't hear you, sir.

11          THE WITNESS:  Last name is spelled O L A N D.

12                        DIRECT EXAMINATION

13     BY MS. JOHNSTON:

14     Q.    Where are you employed?

15     A.    Internal Revenue Service.

16     Q.    And what do you do there?

17     A.    I'm a special agent with the criminal investigation

18     division.

19     Q.    And how long have you been employed with the Internal

20     Revenue Service?

21     A.    Since January of 1995.

22     Q.    Could you describe for the Court the various duties that

23     you have there?

24     A.    I was a revenue officer for a short time, which is

25     basically the person that goes into the field and does

1    collection work.  I was a revenue agent for a few years, which

2    does examinations, and then I was a special agent, which is the

3    position that I currently hold.

4    Q.   And you can desscribe your educational background?

5    A.   I attended Salisbury State University and received a

6    Bachelor of Science in accounting.

7    Q.   Do you use your accounting experience in your -- did you

8    in your various positions with the IRS?

9    A.   Yes, I did.  I'm also a CPA.

10   Q.   And calling your attention to this investigation, were you

11   asked to assist the Immigrations and Customs Enforcement Agency

12   with analyzing Ms. Martin's bank records?

13   A.   Yes, I was.

14   Q.   And did you prepare summary charts of her bank accounts?

15   A.   Yes, I did.

16   Q.   Let me show you what's been marked as Forfeiture 1 and

17   Forfeiture 2.  Do you recognize theses charts?

18   A.   Yes, I do.

19   Q.   What are those charts?

20   A.   Those are an extract of the cash deposits to the

21   miscellaneous accounts belonging to Paulette Martin or her

22   businesses.

23   Q.   And there are two, one is Forfeiture 1 and Forfeiture 2.

24   Do they contain the same data?

25   A.   They contain the same data, it's just in the way that they

1    are organized that changed.

2    Q.   Do they accurately summarize the information that you

3    reviewed in her bank account records?

4    A.   Yes, they do.

5             MR. MONTEMARANO:  Subject to cross, Your Honor.

6             THE COURT:  Subject to cross, they will be received.

7    Q.   If we could begin with Forfeiture 1, and if you could

8    explain to the Court what's on the very first page of

9    Forfeiture 1.

10   A.   That is essentially the nine bank accounts that I analyzed

11   associated with Paulette Martin, and a summary of the cash

12   deposits that were made to those accounts.

13   Q.   Did you include in these exhibits, Forfeiture 1 and

14   Forfeiture 2, any of the checks or wire transfers that were

15   deposited in these accounts?

16   A.   No.  These reference cash deposits only.

17   Q.   And if you could, what time period is covered by these

18   records?

19   A.   From January of 1999 to May of 2004.

20   Q.   And when we look at these, does page 1 accurately reflect

21   the bank name, the account number and the account holder?

22   A.   Yes, it does.

23   Q.   And the amount at the end, is that the total amount of

24   cash in each account during the time period January 1999 to May

25   of 2004?

1    A.    That's correct.

2    Q.    Okay.  And what was the total amount of cash only

3    deposited in these accounts of Paulette Martin?

4    A.    $1,122,319.50.

5    Q.    And, again, there was some testimony at trial concerning

6    Ms. Martin inheriting some money from an estate.  Are you

7    familiar with those estate checks?

8    A.    Yes.

9    Q.    Were those included in any way in this $1.1 million.

10   A.    No.  This is cash only.

11   Q.    Now, the pages behind the summary sheet, if you could tell

12   the Court how they are organized?

13   A.    They are organized by account, and then by date.

14   Q.    And were all of these amounts kept under $10,000?

15   A.    I believe so.

16   Q.    And what is the significance of that?

17   A.    If a deposit was made over ten thousand, a currency

18   transaction report would be filed.

19   Q.    And, now, when we go through these pages, for example, on

20   page 4 of 24, have you broken down and given the dates of each

21   deposit for each account and then totaled up the individual

22   accounts on the pages as you've gone through the deposits?

23   A.    That's correct.  And then the total you will see carried

24   forward to the first page.

25   Q.    Now, looking at Government's Exhibit Forfeiture 2, if you

1    could tell the Court again, is this the same data that's

2    contained in Forfeiture 1?

3    A.   This is the same data.  It's just organized by the year of

4    deposit, with no differentiation, depending on the account.

5    Q.   So if we were to look at January of 2002 to December of

6    2002, the amount $524,593.04 would be the total cash only

7    deposited in her accounts during that year, is that correct?

8    A.   That's correct.

9    Q.   Now, in terms of reviewing Ms. Martin's bank account

10   records, did you find any source of legitimate income, with the

11   exception of the checks from the estate?

12            MR. MONTEMARANO:  Objection.

13            THE COURT:  Overruled.

14   A.   No, I did not.

15            MR. MONTEMARANO:  Objection, Your Honor.  Basis for

16   knowledge.  How could he possibly know where this cash came

17   from?  She, the question posed by Government counsel was with

18   regard to legitimate sources of income.

19            THE COURT:  You may inquire on cross-examination.

20   Q.   Putting aside the cash, did you find any evidence that Ms.

21   Martin was engaged in any legitimate business?

22   A.   No.

23   Q.   In regards to the cash, did you find any evidence in

24   reviewing those documents to indicate that she was involved in

25   a business that would have generated this kind of cash deposit,

1   a legitimate business?

2   A.   No.

3        MS. JOHNSTON:  Government's going to move Forfeiture

4   1 and 2 into evidence.

5        THE COURT:  All right.  They will be received.

6        MS. JOHNSTON:  I have no other questions of this

7   witness.

8        THE COURT:  Cross.

9                     CROSS EXAMINATION

10  BY MR. MONTEMARANO

11  Q.   Special Agent Oland, good afternoon.  How are you?

12  A.   I'm fine.  Thank you.

13  Q.   Ms. Johnston was just asking you about legitimate

14  businesses, correct?

15  A.   Correct.

16  Q.   Would I be correct in understanding your testimony that

17  you would believe a business involving legal merchandise that

18  was not reporting its income and paying taxes to the IRS to be

19  illegitimate in your view?

20  A.   The business itself would not be illegitimate, but

21  certainly a crime would be committed if that was the purpose.

22  Q.   Okay.  So, Ms. Johnston asked you if you had managed to

23  locate any evidence concerning legitimate businesses, correct?

24  A.   That's correct.

25  Q.   And if I understand your testimony correctly, if Ms.

1   Martin were involved in selling cantaloupes, correct.

2   Cantaloupes are legal, as far as you understand, correct, sir?

3   A.   As far as I know, yes.

4   Q.   If she is not reporting her income to the IRS, she does

5   not keep any records, she is paying for her cantaloupes with

6   cash and she's putting the money from the cantaloupe sales into

7   her bank account, your testimony would be the very same, would

8   it not?  You have no evidence of her being involved in a

9   legitimate business.  Is that a fair statement?

10  A.   I'm assuming that if there would be a line of people for

11  cantaloupes, if she's selling 1.1 million dollars worth.

12  Q.   But you would have no evidence of her being involved in a

13  legitimate business, correct?

14  A.   It would be apparent, if someone was conducting a business

15  of $1.1 million in gross receipts that a business was being

16  conducted.

17  Q.   Let me ask the question now again for the third time.

18  Your testimony would not be any different than it was just in

19  response to counsel, the question posed by Government counsel.

20  You located no evidence of Ms. Martin being involved in a

21  legitimate business.  Your answer to that question was no, you

22  don't?

23  A.   No, I did not.  That's correct.

24  Q.   But if she had been involved in what you agree is a

25  legitimate business, selling cantaloupes, and had not been

1    maintaining records or paying taxes or anything else, you still

2    would have located no evidence of her being involved in a

3    legitimate business, correct, sir?

4    A.    No.  I think I would see a lot of purchases of cantaloupes

5    for one.  You would see a line outside of the door selling

6    cantaloupes.

7    Q.    Were you involved in this investigation?  Were you

8    involved in a surveillance at all?

9    A.    No, I was not.

10   Q.    So you have no knowledge that she was selling cantaloupes

11   out of her house, right?

12   A.    There is no checks to anyone indicating the purchase of

13   cantaloupes.  Those things would be apparent from the bank

14   records that I looked at.

15   Q.    Except that I posed the question to you earlier, if she

16   were paying cash for the cantaloupes there would be no record,

17   would there?  Pure cash business, not reported to the IRS

18   involving quantity would be a legitimate business involved in

19   tax fraud, correct?

20   A.    That's correct.

21   Q.    But that would not make the business itself illegitimate

22   or illegal, correct?

23   A.    No.  Assuming that she paid every expense of the business

24   in cash and received all of her items in cash, there would not

25   be a record on the bank records.

1    Q.    And if for the sake of discussion the items she is

2    selling, she inherited as opposed to having to buy them from

3    her cantaloupe supplier, likewise there would be no record of

4    her having paid for those items, correct, sir?  And when she

5    sold them for cash, there would be no record of them, correct,

6    sir?

7    A.    There would be a record of any inheritance of this size,

8    yes.

9    Q.    Where would that record be?

10   A.    It would be an estate filing.  There would be a trustee

11   that would be paying out money.

12   Q.    As a part of --

13   A.    There would be reports associated with a one million

14   dollar estate.

15   Q.    As part of your investigation did you interview or have

16   contact with an attorney in Washington, D.C. by the name of

17   Matthew Shannon?

18   A.    No, I did not.  I did see the checks for him.

19   Q.    So, you are aware of his existence, but you did not talk

20   to him?

21   A.    I did not talk to him.

22   Q.    So you wouldn't know anything about dozens and dozen of

23   furs and other items inherited by Ms. Martin from her

24   godmother, Mary Alice Payne, about which Mr. Shannon testified

25   at this trial, right, sir?

1    A.   No, I do not.

2    Q.   And that wasn't shared with you by Government counsel, was

3    it?

4    A.   No, I did not know about furs being inherited.

5         MR. MONTEMARANO:   Thank you, very much, Special Agent

6    Oland.   Appreciate your testimony.

7                        CROSS EXAMINATION

8    BY MR. MARTIN:

9    Q.   Special Agent Oland, good afternoon.   My name is Anthony

10   Martin.   I represent Mr. Goodwin.   Let me ask you a few

11   questions about your role as an accountant.   You do audits,

12   right?

13   A.   No, I do not.   I did when I was a revenue agent.   That is

14   their role.

15   Q.   But you are familiar with the auditing process?

16   A.   Yes, I am.

17   Q.   And I guess one of your jobs with the FBI is to look at

18   businesses to determine whether or not the proceeds are from

19   legitimate sources, is that correct?

20   A.   I'm with IRS but, yes, that would be part of my job if I

21   was working on a tax case, or depending on the type of case,

22   whether or not a judge would issue an order allowing me to look

23   at those tax records.

24   Q.   The question is have you actually done that before?

25   A.   Yes, I have.

1   Q.   Okay.  And when you're doing that, would it be fair to say

2   that what you do is you look at bank activity statements?

3   A.   Yes.

4   Q.   And you would also look at checks that correspond with

5   that bank activity statement?

6   A.   During the course of the investigation, yes.  Um hum.

7   Q.   Okay.  And you do that to determine whether or not the

8   money is coming from legitimate as opposed to illegitimate

9   sources, right?

10  A.   That's one of ways, yes.

11  Q.   And you were not asked to do that with respect to

12  Mr. Learley Reed Goodwin, were you?

13  A.   No, I did not look at records of Mr. Goodwin.

14  Q.   So you're not familiar with a business knows as Lobo's

15  Auto Discount, are you?

16  A.   No.

17  Q.   And you're not familiar with any rental properties with

18  addresses on Anacostia Road in southeast Washington, D.C., are

19  you?

20  A.   No, I am not.

21  Q.   But in order to determine whether or not --

22       MR. MARTIN:  Well, strike that.  Court's indulgence.

23  Q.   Sir, without those records, if someone were to ask you to

24  give an opinion as to whether or not -- Now, remember, you

25  don't have the bank records, you don't have any checks, and

1    they asked you to give an opinion as to whether or not the

2    funds were legitimate that were coming from either rental

3    property or a discount store, you wouldn't be able to tell

4    them, would you?

5    A.   No.

6            MR. MARTIN:  Nothing further.

7            MR. HALL:  No questions, Your Honor.

8            MR. MITCHELL:  Just a couple, Your Honor.

9                        CROSS EXAMINATION

10   BY MR. MITCHELL:

11   Q.   Looking at Forfeiture 1 and Forfeiture 2, these are a

12   number of cash deposits, and also I do understand there is also

13   a listing of -- these are all cash deposits, correct.

14   A.   That's correct.

15   Q.   Do you have any idea if any of these cash deposits came

16   from any one of the people sitting behind me --

17   A.   No, I don't.

18   Q.   -- according to these two charts?

19   A.   I don't know that, no.

20           MR. MITCHELL:  No further questions.

21           THE COURT:  Mr. Ward.

22           MR. WARD:  I've no questions, Your Honor.  Thank you.

23           THE COURT:  Mr. McKnett.

24           MR. McKNETT:  I have no questions.

25           THE COURT:  Redirect?

1          MS. JOHNSTON:  No, sir.

2          THE COURT:  You may step down.

3          MS. JOHNSTON:  Your Honor, that's the Government's

4    evidence as it applies to forfeiture.

5          THE COURT:  All right.  I'll be glad to hear

6    argument.

7          MS. JOHNSTON:  Your Honor, as we indicated, as we've

8    alleged in the asset forefeiture allegations in the indictment,

9    we are requesting the Court to -- I don't know what the problem

10   is with the --

11         (Pause.)

12         MS. JOHNSTON:  The Government is asking the Court to

13   order assets forfeited in the amount of currency, as to the

14   cocaine conspiracy, in the amount of $4,550,000 in terms of the

15   foreseeable amount of money expended for and therefore also

16   constituting proceeds of drug trafficking activities.

17         We are asking the Court to award that amount of money

18   as to Mr. Goodwin and Ms. Martin because those two individuals,

19   there was evidence throughout the trial, were partners in this

20   drug conspiracy, that they were partners in investing their

21   drug proceeds, they were partners in sharing sources for

22   cocaine.  They discussed multiple sources amongst each other.

23         Mr. Thurman testified as to how Ms. Martin got drugs

24   from the shipments he was bringing back for Mr. Goodwin.

25         Mr. Echarte testified as to the fact that Mr. Goodwin

1    was getting portions of the drugs that Ms. Martin received,

2    including the huge quantity of drugs that came from Mr. Brimm

3    and Mr. King.

4            So, for that reason we ask the Court to assess the

5    amount of $4,550,000.  I believe that that's been established

6    from the evidence at trial and as presented here in this Court

7    by a preponderance of the evidence, which is the standard that

8    the Court applies at this juncture.

9            In regards to the heroin amount, we are asking the

10   Court to hold Ms. Martin accountable for $3.6 million, based on

11   her relationship with Ms. Levi.  We certainly do not allege

12   that she received 60 kilograms, which is what that is based

13   upon, but rather that that is reasonably foreseeable to her and

14   within the scope of the agreement, given her various roles with

15   Ms. Levi.  In that she not only took drugs from Ms. Levi and

16   distributed them to people such as Bynum, and I believe Mr.

17   Martin, Mr. John Martin.

18           She also took her large amounts of small demonination

19   bills, converted them to larger amounts, making it easier for

20   Ms. Levi to handle the money and transport sums such as the

21   $250,000 she took up to New York, when she was stopped with

22   those 2.3 kilograms on her return trip.

23           But also Ms. Martin's involvement in the laundering

24   of Ms. Levi's proceeds in assisting her with transferring money

25   to her sister and brother-in-law in Massachusetts, or

1    Connecticut, to purchase property on her behalf.

2              So for that reason, we'd ask the Court to assess that

3    amount of money against Ms. Levi for her involvement and Ms.

4    Martin for her involvement in the heroin conspiracy.

5              As the, and I'm just going to go down the row here.

6    As to Mr. Goodwin, we'd ask the Court, and the jury found that

7    that he was involved in more than 10 kilograms, five or more

8    kilograms of cocaine, and we'd ask the Court to attribute to

9    him the 10 kilograms involving Mr. Philpot.

10             He discussed Mr. Philpot with Ms. Martin, showing

11   this his, Mr. Philpot's involvement was foreseeable and within

12   the scope of Mr. Whiting's agreement, as well as the three

13   kilograms going go Mr. Echarte.

14             There was specific testimony from Mr. Echarte that

15   Mr. Whiting helped him transport cocaine and heroin from his

16   courier in Virginia back to Maryland on several occasions.  So

17   the 3 kilograms is actually a small quantity and that's an

18   underestimate there, and take that 13 kilograms and multiply it

19   by again that low figure of $20,000, to give the Court the

20   amount of proceeds and money used to purchase cocaine that

21   could be reasonably foreseeable and attributable to

22   Mr. Whiting.  I apologize.  I didn't do the calculation, but

23   13 kilos times $20,000 is what we're also asking the Court --

24             THE COURT:  You're going a little fast.  It's $22,000

25   times the 13 is what you're asking?

1    MS. JOHNSTON:  $20,000, Your Honor, was the figure

2    that Agent Eveler used in terms of all of these --

3    THE COURT:  $20,000 times 13.

4    MS. JOHNSTON:  -- kilograms in terms of Mr. Whiting.

5    THE COURT:  That would be $260,000.

6    MS. JOHNSTON:  That would be it, Your Honor.

7    THE COURT:  That's what your seeking as to Mr.

8    Whiting?

9    MS. JOHNSTON:  Right.  And as to the heroin, Your

10   Honor, I believe Mr. Whiting was found guilty.  The jury found

11   beyond a reasonable doubt that he was involved in, let me check

12   to make sure what that finding was.

13   Court's indulgence.  I don't want to misspeak.  Found

14   him guilty beyond a reasonable doubt that one kilogram or more

15   was reasonably foreseeable and within the scope of Mr.

16   Whiting's participation in the heroin aspect of the conspiracy.

17   So the Government is asking the Court to order the forfeiture

18   in the amount of one kilogram times $60 a gram, which is

19   $60,000, Your Honor.

20   THE COURT:  As to Mr. --

21   MS. JOHNSTON:  That's as to Mr. Whiting, in addition

22   to the cocaine.

23   Now, as to Derrek Bynum, Your Honor, the jury found

24   both cocaine and cocaine base and the jury found 5 kilograms or

25   more of cocaine and 50 grams or more of cocaine base, and they

1      made those findings beyond a reasonable doubt, and the

2      Government could, indeed, argue and could present evidence to

3      establish more than five kilograms, but rather than do that

4      we're asking the Court again to use only the jury's findings

5      for purposes of asset forfeiture and order that proceeds and

6      currency in the amount of $122,500 be forfeited by Mr. Bynum.

7      And in particular that the proceeds recovered in his residence,

8      which are identified in the indictment as XVII, $14,905, be

9      ordered forfeited as proceeds of drug trafficking or in the

10     alternative as substitute assets for a portion of that $122,500

11     that we're asking the Court to order forfeited by Mr. Bynum.

12              THE COURT:  Okay.

13              MS. JOHNSTON:  Your Honor, and in terms of Ms. Dobey,

14     we have not requested any specific amount of assets be

15     forfeited as to her and, quite frankly, we have not located any

16     assets that can be forfeited, so I think to request a judgment

17     at this time would be in essence nothing that would be

18     enforceable, so we're not asking the Court to make a specific

19     finding as to Ms. Dobey.

20              As to Ms. Ali, the Government is seeking the

21     forfeiture as set forth in XVI, about $129,700, based upon the

22     evidence in court and in particular Ms. Ali's testimony that

23     she did not own that money, that it was Ms. Martin's money,

24     that the Court forfeit that money as drug proceeds of Ms.

25     Martin, or in the alternative as a substitute asset for that

 1    larger --

 2              THE COURT:  You said $129,500 in damages?

 3              MS. JOHNSTON:  Seven hundred.

 4              THE COURT:  One twenty-nine seven.

 5              MS. JOHNSTON:  I misspoke, $129,700.

 6              THE COURT:  All right.

 7         MS. JOHNSTON:  So, we're not asking for an additional

 8    amount in terms of Ms. Ali, only that specific fund that was

 9    recovered from her residence.

10              I think that clarifies what the Government is

11    requesting in this case.

12              In terms of the specific assets that are listed here,

13    as Agent Eveler testified, with regards to III and V and VII,

14    VIII, IX, X and XI, all of those accounts, moneys were either

15    deposited from, received from Ms. Ali or Ms. Harden or Mr.

16    Harris, or checks were drawn out from Ms. Levi's property, so

17    we believe that all those accounts were utilized to further the

18    drug conspiracy and to process direct drug purchases.

19              In addition to that, the other items we would ask the

20    court to forfeit on the basis that --

21              THE COURT:  Give me the paragraph numbers again.

22              MS. JOHNSTON:  The paragraph numbers that were

23    directly used to process payment received from Ms. Ali, Ms.

24    Harden or Mr. Harris and\or to write the checks for Ms. Levi's

25    property are III, V, VI, VII, VIII, IX, X, XI, and those are

1    the ones where we have checks that were actually deposited or

2    withdrawn, so we would ask the Court to forfeit those accounts

3    on that basis.

4         In addition, we would ask the Court to forfeit all of

5    the accounts on the basis that they constitute, some portion of

6    them constitutes drug proceeds, as there has been no evidence

7    that either Ms. Martin or Mr. Goodwin had any, in reference to

8    the one account, had any legitimate source of the moneys in

9    those accounts, given the large number of cash deposits and the

10   testimony that the Court heard during the trial.

11        Alternatively, we ask the Court to order all of those

12   accounts, including the currency that was seized at the various

13   locations, that it be forfeited as substitute assets, as these

14   are the only assets that agents have been able to identify as

15   being associated with Ms. Martin.

16        The, and, again, this goes to the cash currency and

17   the Mercedes which is listed as number 13, there certainly was

18   abundant evidence that it was used throughout the conspiracy to

19   further the conspiracy.

20        I think that I've addressed all the particular items

21   listed, as well as the overall amount, which is a little bit

22   less than set forth in the indictment but is what we're

23   seeking.

24        THE COURT:  All right.  Well, I'll tell you what I'm

25   going to do.  Because we had a very late start this morning,

1      I'm not going to be able to hear anything further today.

2              What I'm going to do is to request that the

3      Government submit to me to me a proposed order that contains

4      the findings and the orders on forfeiture that you would

5      request that I have entered.

6              MS. JOHNSTON:  Certainly, Your Honor.

7              THE COURT:  That you provide a copy to opposing

8      counsel, and how long will it take you to do that?

9              MS. JOHNSTON:  When does the Court want us to have it

10     done?

11             THE COURT:  Well, not by Thursday afternoon.

12             MS. JOHNSTON:  As the Court knows, we are preparing

13     for the trial that starts next Tuesday.

14             THE COURT:  Yes, I know.

15             MS. JOHNSTON:  And then the other trial I have

16     January 3rd, but I would think by the end of the week after

17     this, so I think December 2nd, is that --

18             MR. MONTEMARANO:  December 1st.

19             MS. JOHNSTON:  December 1st, by December 1st.

20             MR. MONTEMARANO:  That's fine with the defense, Your

21     Honor.  I would just observe that with regard to the proposed

22     order because -- will it be one order with regard to all

23     defendants or separate orders with regard to each?

24             THE COURT:  That's up to the Government.  Give me

25     what the Government wants.  That's what I would like to so.

1          MR. MONTEMARANO:  I asked for a reason, because I

2    would like to see copies of the orders relating to the other

3    defendants, as well as that relating to my defendant.  If it's

4    a joint order --

5          THE COURT:  Any and all orders that Ms. Johnston

6    prepares should be served on any and all counsel --

7          MR. MONTEMARANO:  Thank you.  That's all I wanted --

8          THE COURT:  -- and be done by the close of business

9    on December 1.  That's a Friday.  How much time do you think,

10   do the defense wish to have to tell me what they think's wrong

11   with what she gave me.

12         MR. MONTEMARANO:  I could probably get something to

13   the Court by a week from the following Monday, the 11th.

14         MR. MITCHELL:  Your Honor, since those of us on the

15   defense side didn't really get to argue --

16         THE COURT:  What are you going to argue?

17         MR. MITCHELL:  I was going to say, if you want it in

18   writing, I have no problem including it in, or at least from my

19   point of view, in my response to what Ms. Johnston submits.

20         THE COURT:  All right.  Well, I want to have, in

21   writing, a memorandum, whatever you want to communicate to me.

22   A letter or memorandum would be fine and we can docket it, of

23   your objections to her proposed order, which can include your

24   argument as to why the order is all wet.  All right.

25         MR. MITCHELL:  That's fine.

1          THE COURT:  All right.  And if I get you to do that

2   by Monday, the 11th, is that enough time for everything.  And

3   then I would like to have the Government give me any reply by

4   Friday, the 15th.  Will that work?

5          MS. JOHNSTON:  I don't know that that will work, Your

6   Honor, because we're going to be in court.  If they're filing

7   it on Monday, December 11th, we're going to be in court

8   Tuesday, Wednesday, Thursday and Friday, which is --

9          THE COURT:  We'll be finished early.  You're going to

10  go very fast with that case.

11         MR. MONTEMARANO:  Your Honor, understanding that Ms.

12  Johnston has other obligations before she can file, I'll do by

13  very best, everything in my power --

14         THE COURT:  Can you all do better than December 11th?

15         MS. JOHNSTON:  It would be nice if we could just do

16  it the Friday before.

17         THE COURT:  All right.  Make it Friday, the 8th.  All

18  right.  Friday, the 8th, submit your opposition memorandum why

19  you don't like her findings and that way she'll have the

20  weekend to look it over.  You'll have a jury deliberating.

21         MS. JOHNSTON:  I believe I have a trial starting

22  January 3rd involving four homicides.

23         THE COURT:  I remember that too.  Can you give me

24  something by the 14th, that's a Thursday?

25         MS. JOHNSTON:  Sure.

1          THE COURT:  All right.

2          MS. JOHNSTON:  The weekend will help.

3          THE COURT:  Now, the next thing is on the 19th, which

4     is the day we have set for sentencing.

5          I'm going to move a couple things around and I'll

6     start at 8:30, and at 8:30 I will hear the defense response to

7     Ms. Johnston's closing argument, anything else you want to add

8     based upon your memoranda, your reply from Ms. Johnston, and I

9     will decide right then and there the forfeiture questions.

10         Then we'll go into the first witness that's going to

11    be called by the Government which will be applicable to such

12    defendants as you call that witness for, with everybody

13    entitled to cross, and then I will go to the sentencings one at

14    a time, in the order in which I originally scheduled them.  It

15    will not be as to time, but it will simply be seriatim.

16         MS. JOHNSTON:  Your Honor, I would propose asking the

17    Court to consider the testimony that the Court has heard today

18    as part of the sentencing presentation, so that we don't have

19    to reproduce that.

20         THE COURT:  You don't need to repeat the testimony we

21    heard today all over again.  We've all been here, we've all

22    been subject to cross-examination, so all the testimony heard

23    at trial, all the testimony heard today, if that means you

24    don't have to add anything additional, that's not a problem

25    with me.  We'll see.

1          MS. JOHNSTON:  We may, because we didn't go above the

2     quantities for some of the defendants.

3          THE COURT:  All right.  So let me just recap for

4     everybody's pleasure.  I'm going to have have the Government

5     submit to me its proposed findings and order on or before

6     December 1 close of business, with copies to opposing counsel,

7     defense objections and memorandum on the whole question of

8     forfeiture on December 8th,; the Government reply

9     December 14th.

10          I will hear the remaining argument on forfeiture and

11     resolve it beginning at 8:30 on the 19th, followed by the

12     witnesses for the, witness or witnesses for the Government on

13     the sentencing issues, followed by the sentencing in the order

14     originally scheduled.  Mr. Montemarano.

15          MR. MONTEMARANO:  Because of the time frame involved

16     I assume we'll be faxing these to each other to make sure

17     they're received on the dates.

18          THE COURT:  Whatever way it works.  Don't put them in

19     the U.S. mail.

20          MR. MONTEMARANO:  Right.

21          THE COURT:  Either by hand, fax or email.  And as far

22     as my chambers is concerned, you know, get it to us the fastest

23     way you can.

24          MR. MONTEMARANO:  Absolutely.  Just want to be clear

25     on that, Your Honor.

1          THE COURT:  No.  I want to be able to, as does my law

2    clerk, start looking at the information as soon as it comes in.

3    Yes, sir.

4          MR. MITCHELL:  Your Honor, I just wanted to ask, I

5    was going to be filing a sentencing memorandum.  I don't have

6    your sentencing order in front of me.  Did you establish a date

7    that you wanted that filed?

8          THE COURT:  I don't have the sentencing order here,

9    but sentencing memoranda should be submitted promptly.

10         MR. MITCHELL:  Well, I'll do it but I just wanted to

11   know if there was a date certain.

12         THE COURT:  I don't have the date certain to give.

13         MR. MITCHELL:  Okay.

14         THE COURT:  Because I don't have it with me.

15         MR. MONTEMARANO:  Mr. Hall and I were discussing

16   having ours in chambers by the 1st.  We propose to have it in

17   chambers by the 1st, a week from this coming Friday.

18         THE COURT:  Well, I'd would like to have them as soon

19   as I can, so I can go through them.

20         MR. MONTEMARANO:  Certainly.

21         THE COURT:  All right.  Anything further, counsel?

22   No?  See you then.

23

24

25

COURT REPORTER'S CERTIFICATE

-oOo-

         I certify that the foregoing is a correct transcript

from the record of proceedings in the above matter.


Date:

                              /s/
                              _____

                              Sharon O'Neill